DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-[    ](RDD)** |
| **Debtors.** [1] | **(Joint Administration Pending)** |

**DECLARATION OF JON LOWNE IN SUPPORT OF THE DEBTORS' CHAPTER 11**
**PETITIONS AND FIRST DAY PLEADINGS**

I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of

my knowledge, information and belief:

1.      I am a Senior Vice President and the Chief Financial Officer of Purdue Pharma

L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**,"

the "**Company**" or "**Purdue**").  I was first employed by Purdue as Senior Internal Auditor in

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable
jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal
Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034),
Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven
Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140),
Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc.
(7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584),
Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and
SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser
Boulevard, Stamford, CT 06901.

1995 and gained increasing responsibility in the Company's finance team over time, including as Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017 to February 2018.  Since March 2018, I have been the Chief Financial Officer of PPLP.  I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      I submit this declaration (this "**Declaration**") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "**First Day Motions**").  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## Commencement of Bankruptcy Proceedings

4.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.

5.      Part I of this Declaration sets forth the relevant facts in support of the First Day Motions and Part II provides additional information about the Debtors.

# I.
# First Day Motions

6.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions.  In my opinion, the granting of each First Day Motion constitutes a critical element in achieving a successful and smooth transition to chapter 11.

7.     For a more detailed description of the First Day Motions than set forth below, I respectfully refer the Court to the respective First Day Motions.  To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.  Capitalized terms that are used in this Part I but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motions (including the term, "Motion"), and all terms of reference such as "herein" or "hereto" shall refer to the applicable First Day Motion.

### A.     Administrative Motions

   i.     *Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")*

8.     The Debtors seek entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case—that of Purdue Pharma L.P.—and further, that an entry be made on the docket of each of the chapter 11 cases of the Debtors to indicate the joint administration of the estates.

9.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders,

thereby saving Purdue considerable time, expense and resources. The financial affairs and business operations of the Debtors are closely related with another. Many of the motions, hearings and orders in these chapter 11 cases will affect each Debtor and their respective estates. The rights of creditors will not be adversely affected by joint administration, as the Joint Administration Motion requests only administrative, and not substantive, consolidation of the estates. Moreover, each creditor can still file its claim against a particular estate. In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these chapter 11 cases. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the Southern District of New York will be simplified.

10.     In my opinion, the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical step toward achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

> ii.     *Motion of Debtors for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the* **"Case Management Motion"***)*

11.     The Debtors seek entry of an order approving and implementing proposed notice, case management and administrative procedures. The proposed Case Management Procedures, among other things: (a) establish requirements for the filing and service of notices, motions, applications, documents filed in support thereof and objections and responses thereto, (b) delineate standards for notices of hearing and hearing agendas, (c) articulate mandatory

guidelines for the scheduling of hearings and objection deadlines, (d) limit matters that are required to be heard by the Court and (e) authorize the Debtors to (i) schedule, in cooperation with the Court, periodic omnibus hearing dates and (ii) serve documents by email on certain parties in interest.  The proposed Case Management Procedures include four proposed omnibus hearing dates, with the Debtors subsequently proposing additional omnibus hearing dates (which omnibus hearings may occur monthly or as otherwise proposed by the Debtors).

12.    Implementing the Case Management Procedures will maximize efficiency and orderliness, and reduce costs associated with the administration of these chapter 11 cases. Granting the relief requested will also limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents.  In addition, the Case Management Procedures will assist the Debtors and their personnel and professionals in organizing and prioritizing the numerous tasks attendant to these cases.  The Debtors estimate that implementing the Case Management Procedures will yield significant savings to these estates and will also avoid unnecessary cost and delay.  In particular, the proposed Case Management Procedures will benefit the Debtors, the Court and all parties in interest by, among other things:

    a.    providing for omnibus hearings for the Court to consider motions, pleadings, applications, objections and responses thereto;

    b.    ensuring prompt and appropriate notice of matters affecting parties' interests;

    c.    allowing for electronic notice pursuant to the Court's electronic filing system;

    d.    providing ample opportunity to parties in interest to prepare for and respond to matters before the Court;

    e.     reducing the substantial administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these chapter 11 cases; and

    f.     reducing the administrative burdens on the Court and the clerk of the Court.

13.    In my opinion, the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be granted.

    *iii.*    *Debtors' Motion for an Order: (I) Waiving Requirement to File List of Creditors, (II) Authorizing the Debtors and the Claims and Noticing Agent to Suppress Personally Identifiable Information for Individuals, (III) Authorizing the Debtors' Claims and Noticing Agent to Withhold Publication of Claims Filed by Individuals Until Further Order of the Court and  (IV)Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases (the "**Creditors List Motion**")*

14.    The Debtors seek entry of an order (i) waiving the requirement to file a list of creditors on the Petition Date (the "**List of Creditors**"); (ii) authorizing the Debtors and Prime Clerk LLC, the proposed claims and noticing agent (the "**Claims and Noticing Agent**"), to suppress personally identifiable information for any individual listed on or appearing on any document filed with the court and/or otherwise made publicly available by the Debtors and the Claims and Noticing Agent, including the List of Creditors, the claims register for each Debtor (collectively, the "**Claims Registers**"), and Schedules (as defined herein), (iii) authorizing the Claims and Noticing Agent to withhold publication of claims filed by individuals until entry of an order establishing deadlines for filing proofs of claim and granting related relief (the "**Bar Date Order**") or such other order of the Court as may be appropriate, and (iv) authorizing the

Debtors to implement certain procedures (the "**Procedures**") for the mailing and publication of the notice to creditors and other parties in interest announcing the commencement of these chapter 11 cases (the "**Notice of Commencement**").

15.     Permitting the Debtors to waive the requirement to provide notice to creditors is warranted under the circumstances of these chapter 11 cases.  Specifically, this relief will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.

16.     The Debtors have filed a motion for authority to retain and employ Prime Clerk LLC as their Claims and Noticing Agent.  Under the proposed Procedures set forth in the Motion, as soon as practicable after the Petition Date, the Debtors will distribute their consolidated List of Creditors to the Claims and Noticing Agent so that the Claims and Noticing Agent may mail the Notice of Commencement to creditors identified on the Debtors' List of Creditors.  Given that the Claims and Noticing Agent will receive the List of Creditors and will use the list to furnish the Notice of Commencement to creditors, I believe that filing the List of Creditors would serve no useful purpose.  In addition, the List of Creditors may contain personally identifiable information that may be protected by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**").

17.     Given the nature of these cases in particular, the Debtors and the Claims and Noticing Agent are sensitive to the privacy concerns of individuals who may file claims containing medical or other sensitive information without realizing that the Debtors and Claims and Noticing Agent are obligated to publish such information in whole no matter the content, including any personally identifiable information protected by HIPAA.

7

18.     Notwithstanding the obligation of the Debtors and the Claims and Noticing Agent to publish all information filed by claimants, the Debtors believe that disclosing the names and residential addresses of individuals affected by these chapter 11 cases would pose an undue risk to such individuals' privacy and personal safety.   Suppressing the names and addresses of individuals will prevent the inadvertent disclosure of protected health information ("**PHI**") because the Claims and Noticing Agent will not need to parse names and email addresses and make any determinations as to what constitutes PHI.

19.     In my opinion, the release of names and addresses of employees and other individuals would create an undue risk of identity theft.

20.     Moreover, I believe that there is good reason to redact or replace certain identity information as the release of such information would create an undue risk of identity theft.   The Debtors are sensitive to the privacy and safety concerns of their employees and other individuals. These concerns are paramount in this instance due to the extensive media coverage and attention that the Debtors continue to receive.   In addition, as is the case for any large employer, there may be certain employees whose personal circumstances unrelated to their employment would be negatively impacted by the disclosure of residential addresses.   I also believe that attracting and retaining employees, and maintaining the morale of employees, is critical to the Debtors' business operations.   Disclosure of personal addresses would likely hinder the Debtors' efforts to attract and retain the employees necessary to preserve the value of the Debtors' estates for the benefit of creditors and other parties in interest.   In view of the foregoing, and given that there is minimal, if any, benefit to the public of publishing the names and home addresses of the Debtors' employees and other individuals in these chapter 11 cases, I believe that the relief requested is appropriate.

21.     I understand that the Debtors will instruct the Claims and Noticing Agent to serve such individuals at their personal home addresses, ensuring that each individual will receive the same notices in these chapter 11 cases as all other creditors without the unnecessary public disclosure of the names and home address of such individuals.

22.     I believe that that the compilation of separate top 20 creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources. Further, I believe a single, consolidated list of the Debtors' 50 largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors. Accordingly, I believe that filing a single consolidated list of the 50 largest unsecured creditors in these chapter 11 cases is appropriate.

23.     In this case, there is a likelihood that claimants will not be aware that they are obligated to redact personally identifiable information and PHI and, absent their action, the Debtors and Claims and Noticing Agent, absent order of this Court, are obligated to publish such claims without redaction.  I believe there is a risk that proofs of claim filed by individual creditors may contain information regarding medical conditions and related issues.  I understand that the Debtors intend to seek a Bar Date Order that would, among other things, approve a tailored individual claim form and procedures designed to prevent the disclosure of sensitive information of this nature.

24.     In my opinion, the relief requested in the Creditors List Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditors List Motion should be granted.

iv. *Debtors' Motion for an Order Extending the Time to File Schedules of
Assets and Liabilities, Schedules of Current Income and Expenditures,
Schedules of Executory Contracts and Unexpired Leases and Statements
of Financial Affairs (the "***Schedules Motion***")*

25.     The Debtors seek entry of an order granting additional time to file their
(a) schedules of assets and liabilities, (b) schedules of current income and expenditures,
(c) schedules of executory contracts and unexpired leases and (d) statements of financial affairs
(collectively, the "**Schedules**").

26.     Due to the complexity of their operations, the overwhelming number of contracts
to which the Debtors are party and the numerous other matters that the Debtors must attend to in
connection with filing these cases, the Debtors anticipate that they will be unable to complete the
Schedules for the 24 Debtor entities in the 14 days provided for under the Bankruptcy Rules.

27.     To prepare their Schedules, the Debtors must compile information from books,
records and documents relating to potentially tens of thousands of claims, assets and contracts.
This information is voluminous and is located in numerous places throughout the Debtors'
organization.  Collection of the necessary information requires an enormous expenditure of time
and effort on the part of the Debtors and their employees.  Additionally, because all invoices
related to prepetition goods and services have not yet been received and/or entered into the
Debtors' accounting system, it may be some time before the Debtors have access to all of the
required information to prepare the Schedules.

28.     Unavoidably, the Debtors' primary focus in recent months has been on preparing
these complex cases for filing and reacting to the events surrounding the filing.  While the
Debtors, with the help of their professional advisors, are mobilizing their employees to work
diligently and expeditiously on the preparation of the Schedules, resources are strained.  Not only

have the same employees with the expertise to complete the Schedules been diligently preparing for the chapter 11 filing, they have also been occupied by numerous other restructuring-related work streams.

29.     In light of the amount of work entailed in completing the Schedules and the competing demands upon the Debtors' employees and professionals to assist in efforts to transition into the initial post-petition period under extraordinary circumstances, the Debtors will not be able to properly and accurately complete the Schedules within the required 14-day time period.

30.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases, I believe that with the 30-day extension requested, the Debtors will be able to focus their attention on business operations to maximize the value of the Debtors' estates during the first critical post-petition months.  I believe this will help the Debtors make a smooth transition into chapter 11 and, therefore, maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

31.     In my opinion, the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Motion should be granted.

B.      **Operational Motions Requesting Immediate Relief**

    i.      *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "Cash Management Motion")*

32.     The Debtors request entry of an Interim Order and a Final Order authorizing, but not directing, the Debtors, in their sole discretion, to (a) continue to operate the Cash Management System, (b) fund the operations of PPLP and its subsidiaries, (c) maintain the Debtors' existing bank accounts (as well as authorizing the Debtors to open and close bank accounts) (the Debtors' existing bank accounts together with any accounts opened after the Petition Date, the "**Bank Accounts**") located at various banks and financial institutions (the "**Banks**") and (d) maintain the Debtors' existing Business Forms (as defined below), in each case consistent with the Debtors' prepetition practice.  Without the requested relief, I believe the Debtors would be unable to maintain their operations, which would cause grievous harm to the Debtors and their estates.

33.     Prior to the commencement of these chapter 11 cases, the Debtors maintained a cash management system which the Debtors use to collect, transfer, invest and disburse funds generated by the operations of the Debtors (the "**Cash Management System**").

34.     The Cash Management System also enables the Debtors to perform cash reporting, monitor the collection and disbursement of funds and maintain control over intercompany obligations and the administration of the Bank Accounts.  The Cash Management System is not entirely automated: certain activities such as monitoring the system, managing the proper collection and disbursement of funds, depositing checks and transferring monies to and from investment accounts, are performed manually by employees of the Debtors.

35.     The Cash Management System has four main components: (a) cash collection, (b) cash concentration, (c) cash disbursement and (d) investments.

### a) Cash Collection and Concentration

36.     The Debtors generate and receive funds from the sales of their products. Customer payments are made by check, wire or electronic transfer.

37.     The majority of the Debtors' receipts are deposited directly into the Debtors' concentration accounts (the "**Concentration Accounts**") with JPMorgan Chase Bank, N.A. ("**JPMorgan**").    Additionally, the Debtors maintain thirteen (13) working accounts with JPMorgan (the "**Working Accounts**") in which miscellaneous receipts are deposited from time to time.  Funds in the Working Accounts are either automatically swept into the Concentration Accounts or manually transferred as needed, depending on whether the Working Account is designated "zero balance" or "non-zero balance."  Funds in Working Accounts that are non-zero balance are moved by automatic clearinghouse transfers ("**ACH Transfers**") or by book transfer when needed or as directed.  These transfers are performed manually.  Funds in Working Accounts that are zero balance are swept each night into the Concentration Accounts.

38.     The Debtors also maintain the restricted cash accounts listed on **Exhibit C** to the Cash Management Motion, which either hold security deposits or provide collateral to various counterparties.

39.     The Debtors are currently in the process of migrating their Cash Management System from JPMorgan to East West Bank.  East West Bank is one of the 25 largest publicly traded banks in the country, with over $40 billion in assets and over 130 branches.  Since 2010, they have been recognized by *Forbes* as one of the top 15 best banks in America.  While the Cash Management System currently uses accounts at JPMorgan, the Debtors are in the midst of

substituting accounts with East West Bank (which have already been opened) for the JPMorgan accounts. The Debtors do not expect the migration of accounts from JPMorgan to East West Bank to impact the structure of or flow of funds through the Cash Management System.

40.    As of September 13, 2019, the balance of cash in the Debtors' accounts is approximately $1.36 billion.

41.    Funds received in the form of foreign currencies are sent to currency-specific JPMorgan Nostro accounts, where an analyst confirms and converts at spot rate the foreign currencies into United States dollars.

### b) Cash Disbursements

42.    The Debtors use receipts concentrated in the Concentration Accounts to satisfy their financial obligations on account of operating expenses, interest, taxes and regulatory fees, utilities and payments due to other vendors. Disbursements are paid by wire, check or ACH Transfer or auto-debited out of the Concentration Accounts, the Working Accounts, and the Controlled Disbursement Accounts. In addition, if a Debtor's Working Account is at a deficit or additional funding is otherwise required, the Concentration Accounts will fund the Working Account in an amount appropriate to remove the deficit. The Debtors fund payroll obligations through disbursements out of the Working Accounts. The Debtors fund flexible spending accounts and other benefits payments through disbursements out of the Concentration Accounts.

43.    The Debtors process payroll and related taxes through Ceridian Dayforce, a third-party provider of human resources management services. Once the payroll amounts have been confirmed by the Debtors for a certain period, Ceridian Dayforce debits the appropriate amounts from the Working Accounts one business day before each payroll date. Ceridian Dayforce then proceeds to make the payments as scheduled out of its own bank account.

44.    The Debtors maintain flexible spending accounts for their employees.  Employee contributions are deducted from their payroll amounts and deposited into the Debtors' flexible spending account from the Debtors' Concentration Account.  Periodically, the Debtors reimburse WageWorks, a third-party administrator of consumer-directed benefits, for medical and dependent-care expenses incurred by employees.  These WageWorks reimbursements are made from the Debtors' Concentration Account (which is reimbursed in turn by the Debtors' employee flexible spending account).

*c) Investments*

45.    Funds to be invested are transferred from the Concentration Accounts to certain accounts (the "**Investment Accounts**") that hold Treasuries or interests in money market funds that primarily invest in Treasuries, or interest-bearing bank accounts.

*d) Existing Business Forms and Checks*

46.    In the ordinary course of business, the Debtors use sequentially numbered check stock with the Debtors' logo printed thereon.  In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, purchase orders, invoices, sales order acknowledgments and other business forms (collectively, along with the Debtors' checks, the "**Business Forms**").

*e) The Cash Management Motion Should be Granted*

47.    Given the Debtors' operations, the goal of preserving and enhancing the value of the Debtors' estates simply cannot be accomplished if there is substantial disruption to the Cash Management System, including the intercompany transfers between Debtors made thereunder.  I believe that it is essential that the Debtors be permitted to continue to consolidate the management of their cash and transfer monies from entity to entity as necessary and appropriate

15

to continue the operation of their businesses.  If the Debtors were required to dismantle the Cash

Management System, it would wreak havoc in their day-to-day operations and their accounting

practices and impair the Debtors' ability to generate timely reports of transactions and balances.

48.     The widespread use of similar cash management systems is attributable to the

numerous benefits they provide, including the ability to collect and apply receivables, pay

operating expenses and other vendors, tightly control corporate funds, ensure cash availability

and reduce administrative expenses by facilitating the expeditious movement of funds and the

development of timely and accurate account balance and presentment information.

49.     In addition, I believe that it would be very time consuming, difficult, and costly

for the Debtors to establish an entirely new system of accounts and new cash management

system, and doing so would disrupt the Debtors' relationships with their key customers.  The

attendant delays from opening new accounts, revising cash management procedures and

instructing customers to redirect payments would harm the Debtors' ability to operate their

businesses.  Under the circumstances, maintenance of the Cash Management System is essential

and in the best interests of the Debtors' estates.

50.     The Debtors will maintain records of all transfers within the Cash Management

System to the same extent they were recorded by the Debtors before the commencement of these

chapter 11 cases.  As a result, the Debtors will be able to document and record the transactions

occurring within the Cash Management System for the benefit of all parties in interest.  As a part

thereof, each Debtor will record in its books and records any transfer made by such Debtor to or

for the benefit of any other Debtor that occurs on or after the Petition Date (a "**Post-**

**Petition Transfer**").

51.     I also believe that Debtors should be permitted to maintain their Investment

Accounts.    First, the Investment Accounts are maintained at reputable, financially sound

institutions that are subject to supervision by national banking regulators, and the funds in the

Investment Accounts are invested solely in highly liquid Treasuries or interests in money market

funds that invest primarily in Treasuries, which the Debtors regard as cash equivalents.    I

therefore believe that the Investment Accounts are safe and secure and pose no substantial risk to

the Debtors' estates.    Second, I understand that the process of satisfying the requirements of

section 345(b) of the Bankruptcy Code would lead to needless inconvenience and inefficiencies

in the management of the Debtors' businesses.    Third, a bond secured by the undertaking of an

adequate corporate surety would be prohibitively expensive for the Debtors (if such a bond could

be obtained at all).

52.     I further believe that to avoid delays in payments, to ensure as smooth a transition

into chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to

reorganize, it is critical that the Debtors be permitted to maintain the Bank Accounts with the

same account numbers following the commencement of these cases, subject to a prohibition

against honoring checks issued or dated before the Petition Date absent a prior order of the Court.

53.     I believe that by preserving business continuity and avoiding the disruption and

delay to the Debtors' disbursement obligations that would necessarily result from closing the

Bank Accounts and opening new accounts, Debtors' estates, employees, vendors, and customers

will be best served.    The confusion and operational harm that would result absent the relief

requested herein would ill serve the Debtors' rehabilitative efforts.

54.     I believe that if the Debtors are not permitted to maintain and use their Bank

Accounts and continue to use their existing Business Forms as set forth herein, the resulting

prejudice will include (a) disruption of the ordinary financial affairs and business operations of

the Debtors, (b) delay in the administration of the Debtors' estates, (c) compromise of the

Debtors' internal controls and accounting system and (d) cost to the estates to set up new systems

and open new accounts and print new business forms.  As a result, I believe the relief requested

in the Cash Management Motion is necessary to avoid immediate and irreparable harm to the

Debtors.

55.     In my opinion, the relief requested in the Cash Management Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

ii.     *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Wages and Benefits Motion**")*

56.     The Debtors seek entry of an Interim Order and Final Order: (a) authorizing, but

not requiring, them to pay, in their sole discretion, amounts owing (and associated costs) under

or related to Wages, Sign-On Bonuses, Withholding Obligations, Reimbursement Obligations,

Relocation Obligations, Health and Welfare Plan Obligations, Vacation and Sick Leave

Obligations, Leave of Absence Obligations, Savings Plans Obligations, Severance Obligations,

Workers' Compensation Obligations, Contingent Workers Obligations, Incentive Plan

Obligations (solely to non-insiders), Retention Payments (solely to non-insiders), Advancement

of Expenses, Automobile Cash Benefits and Other Employee Programs (each as individually

defined below and, collectively, the "**Prepetition Employee Obligations**"), (b) unless otherwise

18

set forth herein, authorizing, but not requiring, them to continue, in their sole discretion, their plans, practices, programs and policies for their Employees and Retirees (each as defined below) in effect as of the Petition Date and as may be modified, terminated, amended or supplemented from time to time, in their sole discretion, and to make payments pursuant to such plans, practices, programs and policies in the ordinary course of business, as well as to pay related administrative obligations, (c) permitting Employees and Retirees holding claims under the Workers' Compensation Programs to proceed with such claims in the appropriate judicial or administrative fora and permitting insurers to continue to access collateral and security provided by the Debtors pursuant to the Workers' Compensation Programs and (d) authorizing applicable banks and other financial institutions (the "**Banks**") to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.  No member of the Sackler family is an Employee and no payments will be made to or for the benefit of any Sackler family member pursuant to the relief requested in this Motion.

### a) Wages, Salaries, and Other Compensation

57.    The Debtors currently employ approximately 700 people in an active status,[2] working in both full and part-time positions,[3] including executives, business and operational managers, sales and marketing personnel, medical affairs personnel, research and development

---

[2] In addition, approximately 37 of the Debtors' Employees are on short-term disability, long-term disability or severance (four of such Employees are employees of the Rhodes Debtors).  While such Employees are not receiving wages, some may be receiving other benefits, including, but not limited to, severance payments, disability payments from health and welfare benefit plans or programs, workers' compensation benefits from state-mandated programs, severance benefits, continuation of medical, dental and vision benefits and/or certain life insurance benefits, depending on the type of leave and/or years of service.

[3] The Debtors have approximately three part-time Employees (two are employees of the Purdue Debtors, and one is an employee of the Rhodes Debtors).

personnel, technology operations personnel, human resource professionals, information technology specialists, administrative support staff and other personnel (together with current members of the Debtors' boards of directors, the "Employees"). Approximately 490 of the Employees work for PPLP and its direct and indirect subsidiaries other than the Rhodes Debtors (defined below) (the "**Purdue Debtors**") and 210 of the Employees work for Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries (the "**Rhodes Debtors**"). The business of the Rhodes Debtors is divided into legal entities that each have their own employees —Rhodes Pharmaceuticals L.P. and Rhodes Technologies.

58.      The Debtors' Employees are paid bi-weekly, on Fridays. Payroll is funded by the Debtors to Ceridian, the Debtors' payroll administrator, on the Thursday immediately prior to when Employees are paid. The Debtors' average bi-weekly gross payroll is approximately $4,700,000 (the "**Wages**"). The Debtors estimate that as of the Petition Date they owe approximately $2,350,000 in wages and salaries to Employees. The Debtors do not believe that any individual is owed prepetition Wages that would exceed the $13,650 priority claim cap, and, prior to entry of the Final Order, the Debtors will not pay any individual prepetition Wages that would exceed such cap.

### b) Withholding Obligations

59.      The Debtors routinely withhold from Employees' wages certain amounts that the Debtors are required to transmit to third parties for such purposes as Social Security, Medicare, federal, state, local and disability taxes, Health and Welfare Plan (as defined below) contributions, 401(k) Plan (as defined below) contributions, Supplemental Savings Plan (as defined below) contributions and payroll deduction payment programs for various optional insurance programs, cafeteria expenses, qualified transportation, charitable deductions, 401k

loan re-payments, child support and other similar orders (collectively, the **"Withholding Obligations"**). I understand that the Debtors believe that such withheld funds, to the extent that they were in the Debtors' possession as of the Petition Date and/or remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates.

### c) Business Expense Reimbursement

60.    The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their business duties on behalf of the Debtors.[4] These reimbursement obligations include lodging, transportation, meals, office supplies, membership dues for professional organizations and other miscellaneous business expenses (collectively, the **"Reimbursement Obligations"**).

61.    Employees submit expense reports through Databasics or SAP Ariba, expense tracking software programs. Employees are reimbursed in connection with each bi-weekly pay cycle by the Debtors for approved expense reports submitted through the Databasics system or through separate electronic transfer or check for expenses submitted through the SAP Ariba system. It is difficult for the Debtors to determine the exact amount of Reimbursement Obligations outstanding at any particular time because of the generally unpredictable and irregular nature of the Reimbursement Obligations and the timing of submission of expense reports. However, as of the Petition Date, the Debtors estimate that the outstanding Reimbursement Obligations are *de minimis*.

### d) Relocation Benefits

---

[4] With respect to certain employee expenses, including certain legal, medical and other professional licensing fees associated with the roles of applicable employees, the Company instead pays such expenses directly to the relevant organization in the ordinary course of business.

62.     The Debtors also offer relocation benefits to Employees who relocate at the request of the Debtors in furtherance of the Debtors' business needs (the "**Relocation Obligations**").   The Relocation Obligations generally include amounts incurred for property rental assistance, temporary lodging and housing, moving expenses, travel expenses for housing services and visits, storage, home purchase option, lease termination and sales and marketing assistance.   The Relocation Obligations also include making annual tax payments directly to certain taxing authorities on behalf of the relevant Employees to account for the tax implications of their receipt of such relocation benefits.   As of the Petition Date, the Debtors estimate that Relocation Obligations with respect to Employees who are currently entitled to receive relocation benefits will total $1,242,000.

### e) Health and Welfare Benefits

63.     The Debtors offer several health and welfare benefit plans and programs (each, a "**Health and Welfare Plan**"  and   collectively,   the   "**Health and Welfare Plans**,"  and   the obligations with respect thereto, the "**Health and Welfare Plan Obligations**") for Employees, certain former employees and certain retirees (the "**Retirees**"), including coverage for medical, dental, vision, prescriptions, flexible spending accounts, health savings accounts, retiree reimbursement accounts, basic and voluntary supplemental life, retiree life, personal accident, travel accident, short-term and long-term disability and certain other insurance, employee assistance and benefit programs.

64.     The Purdue Debtors' medical, dental and prescription insurance plans (the "**Purdue Health Plans**") are self-insured.   In connection with the Purdue Health Plans, the Purdue Debtors purchased stop-loss insurance (the "**Stop-Loss Coverage**") that provides additional protection against catastrophic claim accumulation above predetermined individual

thresholds. Cigna administers the Purdue Health Plans and provides the Stop-Loss Coverage. The Debtors pay approximately $481,000 per year to Cigna in premiums for the Stop-Loss Coverage.

65.     Employees of the Rhodes Debtors are eligible to participate in either a medical and prescription insurance plan that is insured by and administered through Blue Cross Blue Shield of Rhode Island (the "**Rhodes Medical Plan**") or the Purdue Debtors' self-insured medical and prescription insurance plans administered by Cigna.

66.     Other Health and Welfare Plans offered by the Debtors are also insured by and/or administered through third-party providers, including: (a) UnitedHealthcare (vision), (b) the Standard (life insurance and dependent life insurance, short-term disability, long-term disability, personal accident insurance), (c) the Hartford (travel accident and accidental death and dismemberment), (d) WageWorks (flexible spending accounts), (e) HSA Bank (health savings accounts) and (f) Aetna medical and prescription health insurance plans (for internationally-located family members of certain Employees).

67.     In 2018, the Debtors incurred expenses of approximately (a) $19.11 million for payments under the Purdue Health Plans and Rhodes Medical Plan, (b) $261,000 for contributions to health savings accounts, (c) $33,000 for administrative costs of flexible spending accounts, (d) $104,000 for payments under the Debtors' vision plan, (e) $1,167,000 for payments under life, personal accident insurance, short-term disability and long-term disability insurance plans, (f) $38,000 for payments under travel and accident and accidental death and dismemberment insurance plans, (g) $1,209,000 in reimbursements to retirees for qualified medical expenses and (h) $166,000 in other wellness and benefit programs.

23

68.     Because of the manner in which such expenses are incurred and claims are processed under the Health and Welfare Plans, it is difficult for the Debtors to determine the extent of their obligations under the Health and Welfare Plans outstanding at any particular time. As of the Petition Date, the Debtors estimate that the outstanding Health and Welfare Plan Obligations are $3,103,000. Based on historical experience, the Debtors estimate that the Health and Welfare Plan Obligations will be approximately $1,383,000 per month going forward.

### f) Vacation Policy and Sick Leave

69.     Pursuant to the Debtors' vacation policies, eligible Employees are paid their regularly scheduled full or part time wage, for each vacation day, up to the maximum number of days accrued ("**Vacation**"). Vacation time accrues based on an Employee's tenure with the Debtors. Non-exempt Employees accrue two work weeks of Vacation per calendar year until their fifth year of continuous employment, three work weeks of Vacation per calendar year beginning in their fifth year of continuous employment, four work weeks of Vacation per calendar year beginning in their tenth year of continuous employment and one additional Vacation day is added per calendar year beginning in their fifteenth year of continuous employment until annual Vacation day accrual equals five work weeks per calendar year. Exempt Employees accrue three work weeks of Vacation per calendar year until their tenth year of continuous employment, four work weeks of Vacation per calendar year beginning in their tenth year of continuous employment, and one additional Vacation day is added per calendar year beginning in their fifteenth year of continuous employment until annual Vacation day accrual equals five work weeks per calendar year.  Accrued Vacation may not be carried from one calendar year to the next, unless specifically authorized by a supervisor and the Human

Resources department.[5]  If authorized, no more than one work week may be carried over and all carry-over vacation must be taken by March 31st of the next calendar year.  Upon (but not prior to) termination of employment, all accrued but unused Vacation days are paid out (the "**Vacation Cash-Out**" and together with the Vacation, the "**Vacation Obligations**").  In 2018, the Debtors paid an aggregate of approximately $2,503,000 on account of the Vacation Cash-Out. The Debtors intend to honor the Vacation Obligations in the ordinary course of business.

70.     The Debtors' Employees have paid time off ("**PTO**") for twelve holidays per year. PTO for full-time non-exempt Employees also includes two personal days, and such Employees receive pay for each unused personal day as of the end of each calendar year during the first quarter of the following year at the rate of pay received as of the end of the previous year (the "**PTO Cash-Out**" and together with the PTO, the "**PTO Obligations**").  In 2018, the Debtors paid an aggregate of approximately $107,000 on account of the PTO Cash-Out.  The Debtors intend to honor the PTO Obligations in the ordinary course of business.

71.     The Debtors also provide sick leave and/or personal time off to their Employees ("**Sick Leave**").  In the first calendar year of employment, full-time non-exempt Employees accrue one day of sick leave per month beginning on the first day of the month after the date of employment, up to a maximum of six days. Thereafter, full-time non-exempt Employees are provided with six sick leave days per calendar year. Unused sick leave days are paid out following the end of each calendar year but are not paid out upon termination of employment (the "**Sick Leave Cash-Out**" and together with Sick Leave, the "**Sick Leave Obligations**"; the

---

[5] Subject to any applicable Federal, state and local laws, including any state laws that may require vacation carry-over.

Sick Leave Obligations together with the Vacation Obligations and the PTO Obligations, the "**Vacation and Sick Leave Obligations**").

72.    The Debtors also provide a variety of both paid and unpaid leave of absence benefits to certain Employees (collectively, the "**Leave of Absence Obligations**"). Under the Debtors' short-term medical leave policy, which the Debtors self-insure, benefits vary based on Employee status for the first 30 days, and for the 31st day of continuous absence through the 180th day, full-time Employees are eligible for disability pay in an amount equal to 70% of annual base salary less any amount the Employee receives from workers' compensation, state disability or any other income sources. For leaves of absence exceeding 180 days, the Debtors' long-term disability benefits are covered through an insurance carrier (included in Health and Welfare Plan Obligations above). The Debtors also offer parental leave and leave for certain family and/or medical reasons under the Family and Medical Leave Act.

### g) Workers' Compensation Program

73.    Under applicable law, the Debtors are required, through self-insurance or third-party insurers, to provide their Employees and Retirees with workers' compensation insurance coverage for claims arising from or related to their employment with the Debtors (the "**Workers' Compensation Programs**"), and to satisfy the Debtors' obligations arising under or related to these programs (the "**Workers' Compensation Obligations**"). The Purdue Debtors maintain a high-deductible workers' compensation insurance policy with Liberty Insurance Corporation ("**Liberty**"). To secure the Debtors' obligation to pay amounts up to the deductible, the Purdue Debtors have posted collateral in favor of Liberty in the amount of $1.66 million[6] and

---

[6] This amount is held in a trust account with Wells Fargo Bank, N.A. and also supports the Debtors' high-deductible automobile liability insurance policy. See *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) the Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Policies and Honor All*

another $110,000 is held in escrow for Liberty. The Purdue Debtors also maintain a workers' compensation insurance policy with the Insurance Company of the State of Pennsylvania for excess liability arising from claims made by Employees who are United States nationals and working abroad. The Rhodes Debtors maintain a separate workers' compensation insurance plan with Liberty.

74.     There are approximately 16 open claims (the "**Workers' Compensation Claims**") under the Workers' Compensation Programs, with an amount totaling approximately $1,670,000. As of the Petition Date, the Debtors estimate that they owe approximately $340,000 on account of the Workers' Compensation Claims. The aggregate average monthly cost of Workers' Compensation Obligations paid by the Debtors is approximately $40,000.

### h) Savings Plans, Pension Plans and Non-Medical Retirement Obligations

75.     The Debtors offer savings and benefit plans, including the 401(k) Plan, Pension Plan and Supplemental Savings Plan (each as defined below) (collectively, the "**Savings Plans**," and the obligations with respect thereto, the "**Savings Plan Obligations**").

76.     The Debtors offer a 401(k) retirement savings plan to all regular, full-time and part-time Employees of the Debtors[7] (the "**401(k) Plan**"). The 401(k) Plan is a qualified defined contribution savings plan. The Debtors generally match an Employee's voluntary contributions at a rate of 50 cents for every dollar contributed up to 6% of the Employee's eligible

---

<span style="float:right">(continued…)</span>

*Obligations in Respect Thereof and (ii) Financial Institutions to Honor and Process Related Checks and Transfers* for additional information.

[7] Employees of certain non-Debtor Affiliates are also participants in the 401(k) plan, but any employer contributions to the 401(k) plan on behalf of employees of the non-debtor affiliates are funded by the applicable non-Debtor affiliate and the Debtors do not do not process or pay any payroll costs with respect to such employees.

compensation, subject to limits under the Internal Revenue Code.  Employees are immediately

vested in the matching contributions made by the Debtors to Employee 401(k) Plan accounts.

77.     Employees employed after January 1, 2013 or who were employed as of

December 31, 2012 but not eligible for continued participation in the Defined Benefit Pension

Plan (defined below) are eligible for retirement contributions by the Debtors to such Employees'

401(k) Plan accounts.  Retirement contributions by the Debtors are calculated as a percentage of

eligible compensation, based on age and service, ranging from two percent until the maximum

contribution of five percent.  Pension Plan participants who were accruing benefits under the

Pension Plan on December 31, 2017 are eligible to receive an additional retirement contribution

in an amount equal to five percent of their eligible compensation. Employees will be fully vested

in retirement contributions contributed on their behalf upon the completion of three years of

credited service. The Debtors estimate their matching contributions and retirement contributions

under the 401(k) Plan to be approximately $1,251,000 per month.

78.     The Debtors maintain a qualified defined benefit pension plan under the Internal

Revenue Code and the Employee Retirement Income Security Act of 1974 ("**ERISA**") for

certain of their Employees, former employees and Retirees, and certain employees, former

employees and retirees of certain non-Debtor affiliates, and beneficiaries of the foregoing (the

"**Pension Plan**"). The Pension Plan covers approximately 3,520 participants. While eligibility

for the Pension Plan was frozen on January 1, 2013 and the accrual of additional benefits by

existing participants in the Pension Plan was frozen on January 1, 2018, pension obligations

continue to exist.

79.     As of late August 2019, the Pension Plan was approximately 80% funded on a

current basis. Under the Internal Revenue Code and ERISA, the Debtors may be required to

28

make minimum funding contributions to the Pension Plan based on actuarial calculations ("**Minimum Funding Obligations**"). As of the Petition Date, the Debtors do not have any outstanding Minimum Funding Obligations and no Minimum Funding Obligations are currently anticipated to be due until 2023. By this Motion, the Debtors are not seeking any authority to pay any Minimum Funding Obligations or make any other contributions. If the Debtors seek in the future to pay any Minimum Funding Obligations or make any other contributions to the Pension Plan, they will seek such authority by separate motion or in connection with a proposed chapter 11 plan.

80.     The Pension Plan is insured by the Pension Benefit Guaranty Corporation ("**PBGC**"), a wholly-owned United States government corporation that administers the pension plan termination insurance program created under ERISA. The Debtors are obligated to make certain statutory insurance premium payments to the PBGC (the "**PBGC Premiums**"). The Debtors' PBGC Premiums are payable annually and the Debtors estimate that the PBGC Premium due in September 2019 will be approximately $1,600,000. The Debtors have historically paid all PBGC Premiums as and when due and, accordingly, do not believe that they owe any prepetition amounts on account of PBGC Premiums.

81.     In addition, the Debtors maintain a supplemental, non-qualified savings plan (the "**Supplemental Savings Plan**") for certain salaried employees. Under the Supplemental Savings Plan, certain Employees are eligible to save the after-tax value of up to 10% of their eligible compensation in investment accounts owned by each Employee, and the Debtors match such employee contributions on a dollar for dollar basis. The Debtors estimate the matching contributions under the Supplemental Savings Plan to be approximately $194,000 per month.

The Debtors request authority to continue the Supplemental Savings Plan in the ordinary course of business.

### i) Severance

82.     The Debtors maintain a company-wide severance plan (the "**Severance Plan**") for eligible Employees. Under the Severance Plan, Vice Presidents with less than five years of employment with the Debtors receive six months of severance pay and those with greater than five years of service receive one year.  Employees below Vice President receive either two or three weeks of severance pay for each year they have worked for the Debtors depending on grade level (with a minimum of eight weeks and a maximum of fifty-two weeks of severance pay). Severance payments are made bi-weekly and are based on the applicable Employee's wages prior to termination. Medical, prescription, dental, vision and life insurance coverage continues through the applicable severance period.  The Debtors believe that having the authority, in their discretion, to maintain the Severance Plan is essential to their businesses in order to retain, motivate and provide security to, their Employees.  For instance, the Debtors recently sold their Treyburn, North Carolina manufacturing facility to Novo Nordisk.  The Debtors intend to lease and continue to use this facility through November 2019, before consolidating manufacturing operations at their Wilson, North Carolina location.  The Debtors must retain staff at the Treyburn plant to meet production requirements during this time, to transfer activities to the Debtors' Wilson, North Carolina site and to ensure an overall smooth transition to Novo Nordisk. In connection with the sale and transition, the Debtors expect that approximately 14 non-insider Employees' roles will be eliminated.  If the Debtors are unable to honor their obligations and the Severance Plan (the "**Severance Obligations**"), Employees at this critical facility may be unwilling to continue through the transition period, and the Debtors may be unable to replace

skilled workers at this state-of-the-art and highly regulated facility. Such a result would significantly disrupt operations and meaningfully harm the Debtors' businesses. As of the Petition Date, the Debtors estimate that their Severance Obligations consist of approximately $660,000 on account of current Employees at the Treyburn location plus approximately $485,000 on account of other Employees.

### j) Contingent Workers

83.    From time to time, the Debtors use the personal services of individuals employed by, and provided through, staffing agencies and of individuals providing personal services directly as temporary employees, independent contractors and consultants (collectively, the "**Contingent Workers**"). The Contingent Workers work in a variety of departments, including, but not limited to: human resources, risk management, marketing, manufacturing, production, compliance, research and development and finance. Payments to the Contingent Workers vary according to the terms of their individual contracts with the Debtors or according to the terms of the Debtors' contract with the relevant staffing agencies. The services provided by the Contingent Workers are necessary to the operation of the Debtors' businesses. Absent authority to continue to honor Contingent Workers Obligations (defined below), the Debtors would risk losing the services of the Contingent Workers, which could cause severe disruptions across critical departments. Such disruptions would be particularly harmful at this time when the Debtors' operations are subject to immense burdens associated with the commencement of these chapter 11 cases. It is difficult for the Debtors to determine the total accrued and unpaid prepetition obligations to the Contingent Workers because of the generally unpredictable and irregular nature of and schedule for incurrence of the obligations. While difficult to estimate, the Debtors believe that their total accrued and unpaid prepetition obligations to staffing agencies

31

that provide Contingent Workers do not exceed $600,000 (the "**Contingent Workers Obligations**").

*k) Annual Incentive Plan*

84.     As a part of their overall Employee compensation plan, the Purdue Debtors maintain a long-standing annual incentive program (the "**Purdue AIP**") for certain of their Employees, which has been in place substantially in its current form for over thirty years.  The Purdue AIP designates payments on an annual basis to eligible Employees based on a combination of Employee performance and the performance of the Company, as compared with the target performance goals set for the Employee and Company, as approved by the Board of Directors of Purdue Pharma Inc. (the "**Board**").   The Rhodes Debtors also maintain long-standing annual incentive programs (the "**Rhodes AIP**" and, together with the Purdue AIP, the "**Debtors' AIPs**") for certain of their Employees. The payments under the Rhodes AIP are similarly based on a combination of individual and Company performance for exempt Employees (while payments to non-exempt Employees are based on individual performance), as approved by the Board.  The Debtors' AIPs are not retention plans.  The Debtors' AIPs have not been altered or amended in any way in connection with these chapter 11 cases, and have been consistently used to drive Employee performance and productivity.   The total targeted payout under the Debtors' AIPs related to calendar year 2019, which is scheduled to be paid in late February or early March 2020 (or December 2019 for non-exempt Employees of the Rhodes Debtors), is $26,490,000 and the actual payout related to calendar year 2018, which was paid in late February or early March 2019 (or December 2018 for non-exempt Employees of the Rhodes Debtors), was $33,290,000.

85.     The Purdue Debtors also maintain a Market Access Incentive Compensation Plan ("**the Market Access ICP**") for six eligible field-based Employees where (i) 50% is paid semi-annually in July of the current year and March of following year based on Employee performance, (ii) 25% is paid quarterly based on the performance of the Company (measured by the Purdue AIP metrics described above) and (iii) 25% is paid quarterly based on the average of the field sales representatives' percentage of target earnings for the component of their incentive plan related to the launch of Adhansia XR.  The total targeted payout under the Market Access ICP related to calendar year 2019 is $334,000 of which $166,000 has already been paid with respect to the first and second quarters of the calendar year.

86.     In addition, the Purdue Debtors maintain a long-term results plan for certain of their Employees (the "**Purdue LTRP**"), which has been in place substantially in its current form for nearly twenty years.  The Purdue LTRP is a long-term cash incentive program that provides an annual grant to each eligible Employee.   For an eligible PPLP Employee, the incentive payment is calculated at the end of the three-year performance period for each annual grant, and is based on the actual performance of Company key metrics (such as financial metrics, achievement of milestones related to progression of research projects or on-time launch of new products) as compared with the target performance of Company key metrics, which were identified at the beginning of the applicable three-year performance period, as approved by the Board.  The Purdue LTRP is generally payable once a year related to the fiscal year three years prior.  The targeted Purdue LTRP payout in March 2020 for fiscal year 2017 is $7,889,000 and the actual payout in March 2019 for fiscal year 2016 was $6,450,419 (alternatively, $8,267,944 if inclusive of insiders).  The Rhodes Debtors also maintain a long-term results plan, which has been in place in its current form for nearly twenty years (the "**Rhodes LTRP**", together with the

33

Debtors' AIPs, Market Access ICP and the Purdue LTRP, the "**Incentive Plans**"), for certain of its Employees. Payments under the Rhodes LTRP are based upon each individual's actual bonus payout percentage for each of the three years within a three-year performance period. The targeted Rhodes LTRP payout in March 2020 for fiscal year 2017 is $1,406,900 and the actual payout in March 2019 for fiscal year 2016 was $1,072,433. Like the Debtors' AIPs, neither the Purdue LTRP nor the Rhodes LTRP have been altered or amended in any way in connection with these chapter 11 cases, and both plans have been used to drive Employee performance and productivity. The Purdue LTRP and the Rhodes LTRP are not retention plans. The Incentive Plans provide for payments to be made annually during the first quarter of each year, so no payments under the Incentive Plans are anticipated to be due prior to entry of an order granting the relief requested herein on a final basis.

87.    I believe that the longstanding Incentive Plans are critical as tools that will enable the Debtors to maximize the value of their estates by motivating Employees through programs that they have come to rely on as a part of their annual compensation.

### l) Sign-On Bonuses

88.    The Debtors historically have provided cash sign-on bonuses ("**Sign-On Bonuses**") to certain newly-hired Employees in the ordinary course of business, to induce them to accept an offer of employment with the Debtors. Some of these prospective employees would be giving up (or did give up) incentive compensation opportunities or forfeiting equity grants at their current employers by choosing to join the Debtors. The amount and timing of any Sign-On Bonus is determined on a case-by-case basis based on these and other factors for new hires. Approximately 14 Employees are scheduled to receive Sign-On Bonuses, so long as they are in active, full-time employment with the Debtors as of each applicable

payment date. Sign-On Bonus payments are expected to total approximately $2,275,000 in the aggregate.

### *m) Non-Executive Retention Plan*

89.     The Debtors historically have maintained various retention plans for their Employees in the ordinary course of business.   Given the Debtors' current and recent circumstances, the Debtors implemented retention plans for certain executive and non-executive Employees in both 2018 and 2019, which were carefully calibrated to ensure that key Employees are incentivized to remain employed with the Debtors through the end of 2020, which was deemed a critical period for the Debtors.

90.     The current non-executive retention plan (the "**Non-Executive Retention Plan**") includes approximately 120 non-insider Employees.   No participant is an officer appointed by the Board, reports to the Board, has the title of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel, or Senior Vice President or controls the financial or strategic decisions of the Debtors.

91.     The Non-Executive Retention Plan provides for cash-based incentive awards ("**Non-Executive Retention Payments**"), which are paid to individual Employees each quarter through October 1, 2020 provided that the Employee is in active, full-time employment with the Debtors as of each payment date.   Pursuant to this Motion, the Debtors are seeking authority only to make Non-Executive Retention Payments, in their sole discretion, under the existing Non-Executive Retention Program only to non-insider Employees.   The Debtors are not seeking authority to make any Non-Executive Retention Payments to any insider pursuant to this Motion. As of the Petition Date, the Debtors believe that no obligations are currently due under the Non-Executive Retention Plan. The Debtors estimate that they will pay approximately $1.0 million

35

with respect to Employees of the Purdue Debtors and $0.9 million with respect to Employees of the Rhodes Debtors in the remainder of 2019 and approximately $6.7 million with respect to Employees of the Purdue Debtors and $1.7 million with respect to Employees of the Rhodes Debtors in 2020.

92.     I believe that, absent continuation of the Non-Executive Retention Plan, there is a very real risk that many of the approximately 120 Employees covered thereunder would depart for other employment opportunities. This retention risk is primarily driven by the extraordinary circumstances surrounding the Debtors, including a prior downsizing in which the Debtors' headcount was reduced by over 60%, the burdens of operating in the shadow of thousands of pending lawsuits and the related negative publicity, and the demanding workload accompanying the bankruptcy process. From 2018 to date, the Debtors experienced over 25% attrition among the top tier of Employees participating in the Non-Executive Retention Plan (consisting of certain key employees and managers with titles junior to Senior Vice President). I believe that the attrition rate would have been even higher if the Debtors had not established the Non-Executive Retention Plan. Failure to continue the Non-Executive Retention Plan at this point could result in a catastrophic loss of talent.  Moreover, I believe that it would be extremely difficult to attract replacements in the current environment and given the Debtors' ongoing challenges.  In my opinion, therefore, it is essential that the Debtors have the authority, in their discretion, to maintain the Non-Executive Retention Plan and to make Non-Executive Retention Payments to non-insider Employees thereunder.

### n) Treyburn Retention Plan

93.     The Debtors also recently established a retention plan following the sale of their Treyburn, North Carolina manufacturing facility (the "**Treyburn Retention Plan**").    As

discussed above, it is critical that the Debtors retain staff at the Treyburn plant over the coming months.  To incentivize key non-insider Employees to remain employed with the Debtors at the Treyburn facility through the critical transition periods through December 2019 and June 2020, cash incentive awards ("**Treyburn Retention Payments**," and together with the Non-Executive Retention Payments, the "**Retention Payments**") have been offered to approximately 52 non-insider Employees, payable in December 2019, and approximately 15 non-insider Employees, payable in June 2020.  The Employees that were offered Treyburn Retention Payments consist primarily of Manufacturing and Packaging Operators, Pharmaceutical Technicians, Senior Pharmaceutical Technicians, and Pharmaceutical Process Specialists.  The most senior employee offered Treyburn Retention Payments holds the title of Director, Pharmaceutics and Analytical Development. The Treyburn Retention Payments will not exceed $23,056 per Employee. The Debtors estimate that under the Treyburn Retention Plan they will pay approximately $521,058 in 2019, and approximately $108,972 in 2020.

### o) Advancement of Legal Expenses

94.     The Debtors are defendants in over 2,600 civil actions pending in state and federal courts around the country that allege that the Debtors, Related Parties, and other co-defendants engaged in past misconduct in manufacturing, marketing and selling of certain FDA-approved opioid medications (the "**Pending Actions**"). Certain of the Debtors' current and former owners, officers, directors and affiliates have also been named in the Pending Actions (the "**Related Parties**").  New complaints against the Debtors and the Related Parties are being filed almost every day.  In addition to their own legal expenses, prior to the Petition Date, in the ordinary course of their prepetition business, and consistent with PPLP's Fifth Amended and Restated Limited Partnership Agreement, dated as of June 20, 2019 (the "**LPA**") and long-standing and

customary policies, the Debtors paid the legal costs of a number of current and former officers, directors and other employees that are named defendants, potential defendants and/or witnesses in the Pending Actions (any such individuals from time to time, the "**Indemnitees**").  Since March 1, 2019, the Debtors have not made any indemnification payments or advanced any legal fees to any member of the Sackler family.

95.     Although certain current and former directors, officers and "Agents" that are named defendants in Pending Actions may have access to the Debtors' D&O insurance policies, only a small subset of the Indemnitees fall into this category, and the Debtors do not maintain insurance that would cover the legal costs of the vast majority of Indemnitees.  In addition, the nature and scope of the various litigations and the number of potential claimants under the policies creates the risk that insurance may be unavailable or insufficient to cover costs incurred by these individuals.  There are over 270 former employees that are currently or have been witnesses and/or named defendants in Pending Actions and related matters but who were not directors, officers or designated Agents.[8]  The Debtors terminated the entirety of their opioid medication sales force as of June, 2018, and many of the former employee Indemnitees are former sales representatives.

96.     Without the Debtors' continued payment of these legal costs post-petition, the Debtors' insurance cannot adequately address the issue.  Given the number of Indemnitees, the nature of the Pending Actions and prior experience, the Debtors anticipate that aggregate costs will be approximately $1.5 million per month at the outset of these chapter 11 cases.  If legal costs are not paid, the Debtors believe that many of the individuals will be unable to obtain

---

[8] These employees are not designated "Agents" as defined in the LPA and were therefore not entitled to mandatory indemnification.

adequate representation and that their lack of adequate counsel could be severely detrimental to the Debtors and their estates.   I believe that failure to advance expenses would be highly detrimental to morale of the Debtors' current workforce and would adversely affect the Debtors' ability to execute their reorganization plan.   Moreover, participation by Indemnitees without counsel in the litigation of the Pending Actions may be used, or attempted to be used, to judicially prejudice or unfairly and inaccurately prosecute claims against the Debtors.   In addition, claims against these parties could give rise to potential future indemnification claims against the Debtors or otherwise diminish shared insurance coverage.

97.     Accordingly, in order to protect the interests of the estates, the Debtors request that they be authorized, but not directed, in their sole discretion, to advance and pay the legal costs of Indemnitees consistent with the advancement of expenses provisions of the LPA and past practice (the "**Advancement of Expenses**").   Importantly, in order to ensure that such payments are in the best interest of the Debtors and subject to appropriate oversight and controls, the Debtors propose that any decision to advance defense costs of any Indemnitee be subject to approval by the Special Committee of the Board, which consists solely of directors with no affiliation with the Sackler family.   Notably, under the LPA, each Indemnitee also agrees to reimburse the Debtors for any defense costs advanced should it be determined that such Indemnitee did not act in good faith, or, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful, or is otherwise not entitled to be indemnified under the terms of the LPA.   The Debtors further propose that each Indemnitee receiving post-petition payments hereunder sign a written affirmation of the Indemnitee's belief that he or she has conducted himself or herself in good faith and reasonably believes that his or her conduct was in the best interest of the Debtors and acknowledging the standards with respect

to indemnification set forth in the LPA, including the requirement to repay advances as described above.

### p) Cash in Lieu of Automobile Benefit

98.     In the ordinary course of business, the Debtors provide a cash payment in lieu of automobile benefits to certain Employees (the "**Automobile Cash Benefit**").   Approximately 215 Employees receive a bi-weekly cash payment in lieu of an assigned automobile.   The average bi-weekly cash payment is approximately $383 per employee.

### q) Other Employee Programs

99.     In addition to the foregoing, the Debtors have in place miscellaneous practices, programs and policies that provide benefits and protections to various groups of Employees, including, but not limited to, tuition assistance, adoption assistance, recognition and an anniversary gift program (collectively, the "**Other Employee Programs**").   I believe that the Other Employee Programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce.   The monthly cost of such programs for the Debtors is negligible in the context of the Debtors' aggregate compensation and benefit obligations.   The Debtors believe that, as of the Petition Date, they owe approximately $150,000 on account of the Other Employee Programs.   I understand that the Debtors are seeking authority to continue to honor their obligations under the Other Employee Programs after the Petition Date, as such practices, programs and policies may be modified, amended or supplemented from time to time.

### r) The Wages and Benefits Motion Should be Granted

100.     I believe that the requested relief in the Wages and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm.   This is because any delay in paying Prepetition Employee Obligations will

adversely impact the Debtors' relationships with their Employees and could irreparably impair the Employees' morale, dedication, confidence, commitment and cooperation. The Debtors' businesses hinge on their ability to deliver superior products and advance the research and development pipeline of new products. Employees' support for the Debtors' reorganization efforts is critical to the success of those efforts. At this early stage, the Debtors cannot risk the substantial damage to their businesses that would inevitably attend any decline in their Employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

101.   I believe that, absent an order granting the relief requested, many Employees will suffer hardship and, in many instances, serious financial difficulties. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the possibility that otherwise loyal Employees will seek other employment alternatives. I believe that all of the Debtors' creditors will benefit if the requested relief is granted.

102.   I further believe that it is imperative that the Debtors be permitted to continue to pay and/or honor any and all Workers' Compensation Obligations, including all prepetition premiums, claims (including claim settlements), losses and expenses in connection with their Workers' Compensation Obligations, and to pay all costs and expenses associated with the Workers' Compensation Programs, including costs and expenses related to administration, servicing, processing, adjusting, paying and settling claims and losses under these programs. In connection with their Workers' Compensation Obligations, I understand that the Debtors are also seeking authority for the insurers to continue to use collateral and security as provided under the Workers' Compensation Programs, without further order of the Court.

103.    I believe that it is crucial for employee morale and the operations of the Debtors' businesses for the Debtors to continue to pay workers' compensation benefits and honor their obligations under the Workers' Compensation Programs described herein.    The Debtors anticipate that they will have sufficient cash on hand to make these payments, which are in the best interests of the Debtors, their estates and their creditors.

104.    This is also true to the extent any of the Employees or Retirees hold claims pursuant to the Workers' Compensation Programs.    I believe staying such claims could have a detrimental effect on the financial (and medical) well-being and morale of the Debtors' Employees and Retirees and lead to the departure of Employees.    Such departures could cause a severe disruption in the Debtors' businesses, to the detriment of all parties in interest.

105.    In my opinion, the relief requested in the Wages and Benefits Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and constitutes a critical element in achieving a successful and smooth transition to chapter 11.    Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

> iii.    *Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "**Utilities Motion**")*

106.    The Debtors seek entry of the Interim Order and the Final Order, substantially in the forms attached hereto (the "**Proposed Orders**"), (a) prohibiting the Debtors' utility providers (as that term is used in Bankruptcy Code section 366 and as described herein, the "**Utility Providers**") from altering, refusing or discontinuing service on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed

adequate assurance, (b) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code section 366, (c) approving the Debtors' adequate assurance procedures as proposed herein and as set forth in the Proposed Orders (the "**Adequate Assurance Procedures**") and (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion and the Adequate Assurance Procedures.  In connection with the operation of their businesses and management of their properties, the Debtors obtain utility services, including electricity, natural gas, telephone, sewage, telecommunications, waste removal, water and other similar services from dozens of utilities, as that term is used in section 366 of the Bankruptcy Code.  The Debtors seek approval of the procedures to avoid the severe consequences to the Debtors of any interruption in services by the Utility Providers.

### a) The Utility Services

107.   In connection with the operation of their business and management of their properties, the Debtors purchase utility services, including electricity, telecommunications, cable and internet (collectively, "**Utility Services**") from the Utility Providers.   Annexed as **Schedule 1** to each of the Proposed Orders is a list of Utility Providers (as may be supplemented from time to time, the "**Utilities List**")[9] that provide Utility Services to the Debtors as of the Petition Date.  The relief requested herein is for all Utility Providers providing Utility Services to the Debtors, and is not limited to those listed on the Utilities List.  The Debtors have made an extensive and good faith effort to identify all of the Utility Providers that provide Utility Services to them and to include such Utility Providers in the Utilities List.  Nonetheless, I understand that

---

[9] I understand that the listing of an entity on the Utility List is not an admission that such entity is a Utility Provider within the meaning of Bankruptcy Code section 366, and that the Debtors reserve the right to contest any such characterization at any time in the future.

the Debtors reserve the right to supplement the Utilities List by filing a notice at a later date with the Court, if necessary.

108.     During the past twelve (12) months, the Debtors paid an average of approximately $759,658[10] per month on account of Utility Services.   To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

*b) Proposed Adequate Assurance Deposit*

109.     The Debtors intend to pay all post-petition obligations owed to the Utilities in a timely manner.  As of September 13, 2019, the Debtors had approximately $1.36 billion million in cash, cash equivalents and short-term investments.

110.     To provide adequate assurance to the Utility Providers, the Debtors propose to deposit[11] a sum equal to two (2) weeks' worth of Utility Services, calculated as a historical average over the past twelve (12) months (the "**Adequate Assurance Deposit**").   As of the Petition Date, the Debtors estimate the Adequate Assurance Deposit will total approximately $350,611.[12] The portion of the Adequate Assurance Deposit applicable to each Utility Provider will be placed in a dormant account of the Debtors that is not being used for operations (the "**Utility Deposit Account**").   The Debtors will not use the Utility Deposit Account for any purpose other than holding the Adequate Assurance Deposit.  The Adequate Assurance Deposit will be held by the Debtors in the Utility Deposit Account until the earlier of (a) the Debtors'

---

[10] Based on the 12 months ended June 30, 2019.

[11] Section 366(c)(1)(A) of the Bankruptcy Code defines "assurance of payment" to mean, among other things, a cash deposit.

[12] Based on 12 months ended June 30, 2019.

termination of Utility Services from such Utility Provider or (b) the conclusion of these chapter 11 cases, if not applied earlier.

111.     The Debtors will deposit the Adequate Assurance Deposit in the Utility Deposit Account within twenty (20) calendar days of entry of the Interim Order approving the relief requested in this Motion.  The amount allocated for, and payable to, each Utility Provider shall be equal to the amount set forth on the Utilities List as to each Utility Provider or as otherwise agreed.

112.     The portion of the Adequate Assurance Deposit attributable to each Utility shall be returned to the Debtors upon the effective date of a chapter 11 plan for the Debtors. Additionally, if the Debtors terminate any of the Utility Services provided by a Utility, the Debtors request that they immediately be permitted to reduce the Adequate Assurance Deposit to reflect the termination of such Utility Services.

### c) The Utilities Motion Should be Granted

113.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations, and, therefore, maximizing the value of the Debtors' estates.  The Debtors operate businesses that are supported by a corporate office located in Stamford, Connecticut, which depends on reliable delivery of power and other Utility Services.  Should any Utility Provider alter, refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted, resulting in immediate and irreparable harm to the Debtors' business operations and jeopardizing the value of the Debtors' assets.

114.     The relief requested in the Utilities Motion will ensure that the Debtors' operations will not be disrupted.  Furthermore, the relief requested provides the Utility Providers with a fair and orderly procedure for addressing requests for additional or different adequate

assurance.  Without the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner at a critical period in these chapter 11 cases and during a time when the Debtors' efforts could be more productively focused on the continuation of the Debtors' operations for the benefit of all parties in interest.

115.     Additionally, I believe that the Utility Providers have "adequate assurance of payment" even without the proposed Adequate Assurance Deposit.  The Debtors have no secured debt and significant unencumbered cash on hand, which will enable them to pay their operating costs, including any utility costs, as they come due.   The Debtors, thus, anticipate having sufficient resources to pay, and intend to pay, any and all valid post-petition obligations for Utility Services in a timely manner.

116.     In addition, the Debtors' reliance on Utility Services for the operation of their businesses provides them with a powerful incentive to stay current on their utility obligations.

117.     Notwithstanding the foregoing, I believe that the Proposed Adequate Assurance and the Adequate Assurance Procedures are reasonable and are necessary for the Debtors to carry out their reorganization efforts.  If they are not approved, the Debtors could be forced to address payment requests by any Utility Provider in a disorganized manner, which would distract management from focusing on the Debtors' reorganization.  Moreover, on the thirtieth (30th) day following the Petition Date, the Debtors could be surprised by a Utility Provider unilaterally (a) deciding that it is not adequately protected, (b) discontinuing service or (c) making an exorbitant demand for payment to continue service.  Such discontinuation of Utility Service could put the Debtors' reorganization efforts in jeopardy.

118.    In addition, I believe that, if the Court does not approve the proposed Adequate
Assurance Procedures, the Debtors could be forced to address requests from Utility Providers in
a disorganized manner at a critical point in their restructuring efforts.

119.    I further believe that, if the Court does not approve the proposed Adequate
Assurance Procedures, the Debtors could be forced to address requests from Utility Providers in
a disorganized manner at a critical point in their restructuring efforts.  I believe that preserving
Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and the
Debtors' reorganization.  Indeed, any interruption in Utility Services, even for a brief period of
time, would immediately and irreparably harm the Debtors' businesses.  I therefore believe that it
is imperative that the Utility Providers continue to provide their Utility Services without
interruption.

120.    In my opinion, the relief requested in the Utilities Motion is necessary to avoid
immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their
creditors, and all other parties in interest, and constitutes a critical element in achieving a
successful and smooth transition to chapter 11.  Accordingly, on behalf of Debtors, I respectfully
submit that the Utilities Motion should be granted.

      *iv.*     *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I)
Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and
Fees and (II) Financial Institutions to Honor and Process Related Checks
and Transfers (the "***Taxes and Fees Motion***")*

121.    The Debtors request entry of an Interim Order and a Final Order authorizing, but
not directing, the Debtors to pay certain taxes and business license, compliance and regulatory
fees (as further described below, the "**Taxes and Fees**") to various federal, state, county and city
taxing, licensing and regulatory authorities (the "**Governmental Authorities**"), whether asserted

before, on or after the Petition Date, and without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds available under applicable law.

122.    The Debtors also respectfully request that the Interim Order and the Final Order (a) authorize and direct all applicable banks and other financial institutions (collectively, the "**Banks**") to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Taxes and Fees, whether such checks or other requests were submitted before, on or after the Petition Date; (b) authorize the Banks to rely on the representations of the Debtors as to which checks and fund transfers are subject to this Motion, *provided* that no Bank shall have any liability to any party for relying on such representations; (c) prohibit the Banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the Taxes and Fees; and (d) authorize the Debtors to issue new post-petition checks or effect new post-petition fund transfers to replace any checks, drafts and other forms of payment which may be dishonored or rejected and to reimburse any expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or other payment.

### a) The Debtors' Taxes and Fees

123.    In the ordinary course of business, the Debtors collect, withhold and incur various Taxes and Fees, including (a) Use Taxes; (b) Entity Taxes and Fees; (c) Real Property Taxes; (d) Personal Property Taxes; (e) Federal Excise Taxes; (f) Regulatory and Business License Fees and Assessments; (g) Puerto Rico Taxes; (h) Branded Prescription Drug Fees; (i) FDA Fees, (j) Opioid Excise Taxes and (k) Other Taxes (each as defined below).  The Debtors remit the

48

Taxes and Fees to Governmental Authorities, a nonexclusive list of which is attached to the Taxes and Fees Motion as **Exhibit C** (the "**Governmental Authorities List**").[13]

124.    I understand that the Debtors believe that many of the Taxes and Fees they collected prepetition are not property of the Debtors' estates.  Rather, the Debtors hold these Taxes and Fees in trust for the applicable Governmental Authorities.  The Debtors seek to pay certain Taxes and Fees to forestall Governmental Authorities from taking actions that might interfere with maximizing the value of the Debtors' estates.  Such interference could include blocking the receipt or renewal of permits required for the operation of the Debtors' businesses or bringing personal liability actions against directors, officers and other employees.  Any of those actions would distract key personnel, whose full-time attention to the Debtors' chapter 11 efforts is required, and would likely cause business disruptions, eroding the Debtors' customer base and negatively affecting these chapter 11 cases, which could result in immediate and irreparable harm to the Debtors and their estates.  In addition, I understand that nonpayment of the Taxes and Fees may give rise to priority claims under the Bankruptcy Code.  Accordingly, I believe that the proposed relief is in the best interest of the Debtors' estates.

125.    The Debtors believe that, as of the Petition Date, none of the Taxes and Fees are past due or delinquent.  After entry of the Interim Order, the Debtors propose to pay amounts that come due and owing in the ordinary course of business.

126.    A chart outlining the various categories and approximate amounts of the Taxes and Fees that the Debtors are seeking authority to pay pursuant to this Motion is set forth below.

---

[13] I understand that, although the Governmental Authorities List is substantially complete, and the Debtors have exercised their reasonable best efforts, the Debtors request the relief be made applicable to all Governmental Authorities, and not solely to those listed on the Governmental Authorities List.

The amounts of the Taxes and Fees set forth below are good-faith estimates based on the Debtors' books and records and remain subject to potential audits and other adjustments.

| Category of Taxes and Fees | Approximate Amount Seeking Authority to Pay on an Interim Basis | Approximate Amount Seeking Authority to Pay on a Final Basis |
|---|---|---|
| Use Taxes | $463,000 | $2,747,000 |
| Entity Taxes and Fees | $2,000 | $2,000 |
| Real Property Taxes | $639,000 | $1,075,000 |
| Personal Property Taxes | $970,000 | $1,648,000 |
| Federal Excise Taxes | $2,000 | $5,000 |
| Regulatory and Business License Fees and Assessments | $904,000 | $990,000 |
| Puerto Rico Taxes | $95,000 | $121,000 |
| Branded Prescription Drug Fee | $8,000,000 | $8,000,000 |
| FDA Fees | $8,486,000 | $10,918,000 |
| Opioid Excise Taxes | $2,236,000 | $3,885,000 |
| Other Taxes | - | - |
| Total | $21,797,000 | $29,391,000 |

### b) Use Taxes

127.   The Debtors are assessed use taxes on tangible personal property and enumerated taxable services purchased by the Debtors upon the use, storage or consumption of the goods or services during the ordinary course of business (the "**Use Taxes**").  Use Taxes are remitted to the state or local taxing authority where the Debtors have purchased the tangible personal property or enumerated taxable services.   Each state has a different filing frequency requirement, including monthly, quarterly, semi-annually and annually.

128.   In 2018, the Debtors paid Use Taxes in Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Puerto Rico, Rhode Island, Tennessee, Texas, Virginia, Washington and West Virginia of approximately $1,831,000.  The Debtors are not aware of any

outstanding amounts for alleged violations of use tax laws as of the Petition Date.  After entry of the Interim Order, the Debtors intend, in their sole discretion, to pay Use Taxes as they come due.

### c) Entity Taxes and Fees

129.    Nayatt Cove Lifescience Inc. ("**Nayatt**"), a debtor in these chapter 11 cases, is a corporation and files federal and state tax returns related to its income ("**Entity Taxes and Fees**").  Nayatt paid taxes of $0 in 2018 and has estimated tax liabilities of $0 as of the Petition Date.

130.    The earnings and losses of the debtor-partnerships flow through to the federal and state tax returns of Purdue Pharma L.P.'s partner.  As such, the Debtors do not pay or have liabilities for taxes related to their income.  In 2018, the Debtors paid Entity Taxes and Fees in Alabama, Kentucky, and Rhode Island of approximately $1,275.  The Debtors are not aware of any outstanding amounts under state business entity tax laws as of the Petition Date.  After entry of the Interim Order, the Debtors intend, in their sole discretion, to pay Entity Taxes and Fees as they come due.

### d) Real Property Taxes

131.    The Debtors are required to pay taxes on their real property, including land and buildings (the "**Real Property Taxes**").  The Debtors paid Real Property Taxes in North Carolina and Rhode Island of approximately $957,000 and $977,000 in 2018 and 2019, respectively.  The Purdue Debtors made their annual 2019 Real Property Tax payments on January 1, 2019.  The Rhodes Debtors made their semi-annual 2019 Real Property Tax payments on January 1, 2019 and July 1, 2019.  The Debtors are not aware of any outstanding amounts for alleged violations of state real property tax laws as of the Petition Date.  After entry of the

Interim Order, the Debtors intend, in their sole discretion, to pay the Real Property Taxes as they come due.

### e) Personal Property Taxes

132.    The Debtors are required to pay taxes on certain personal property, including machinery, equipment, furniture and fixtures (the "**Personal Property Taxes**").   The Debtors paid Personal Property Taxes in Connecticut, North Carolina and Rhode Island of approximately $1,598,000 and $1,498,000 in 2018 and 2019, respectively.   The Debtors are not aware of any outstanding amounts for alleged violations of state personal property tax laws as of the Petition Date.   After entry of the Interim Order, the Debtors intend, in their sole discretion, to pay Personal Property Taxes as they come due.

### f) Federal Excise Taxes

133.    The Debtors are required to pay excise taxes on certain insurance premiums ("**Federal Excise Taxes**").   In 2018, the Debtors paid Federal Excise Taxes to the Internal Revenue Service of approximately $6,770.   The Debtors are not aware of any outstanding amounts for alleged violations of federal excise tax laws as of the Petition Date. After entry of the Interim Order, the Debtors intend, in their sole discretion, to pay Federal Excise Taxes as they come due.

### g) Regulatory and Business License Fees and Assessments

134.    The Debtors incur various fees, penalties and assessments in connection with certain regulations, business license requirements, environmental policies and participation in state regulatory agencies and boards (the "**Regulatory and Business License Fees and Assessments**").   The Debtors are also subject to certain regulations which carry substantial administrative, civil and criminal penalties for failure to comply.

135.    The Debtors are required to remit these Regulatory and Business License Fees and Assessments to the relevant Governmental Authorities on a periodic basis.  In 2018, the Debtors incurred approximately $659,000 in Regulatory and Business License Fees and Assessments.  As of the Petition Date, the Debtors are unaware of any Regulatory and Business License Fees and Assessments not yet remitted to the relevant Governmental Authorities. Similarly, the Debtors are not aware of any outstanding amounts for alleged violations of regulatory laws as of the Petition Date.  After entry of the Interim Order, the Debtors intend to pay to the appropriate Governmental Authorities such Regulatory and Business License Fees and Assessments as the Debtors, in their sole discretion, deem appropriate pursuant to any applicable law or regulation.

### h) Puerto Rico Taxes

136.    Purdue Pharma Puerto Rico ("**PPPR**"), a debtor in these chapter 11 cases, resides and engages in trade or business in Puerto Rico.  PPPR is required to pay taxes imposed on its net income, which consists of all income (less certain exclusions), reduced by ordinary and necessary business expenses.  A portion of the expenses paid to a related party (*e.g.*, transactions between PPPR and other debtors in these chapter 11 cases) may be subject to disallowance.  In addition, PPPR is required to pay a tax based on the volume of business (defined as gross receipts) the company received or accrued during the year (together, the "**Puerto Rico Taxes**").

137.    The Debtors paid Puerto Rico Taxes of approximately $233,000 in 2018.  The Debtors are not aware of any outstanding amounts owed for alleged violations of Puerto Rico income tax laws as of the Petition Date.  After entry of the Interim Order, the Debtors intend, in their sole discretion, to pay the Puerto Rico Taxes as they come due.

### i) Branded Prescription Drug Fee

138.    The Patient Protection and Affordable Care Act imposed an annual fee on pharmaceutical manufacturers (the "**Branded Prescription Drug Fee**") in an amount determined by branded prescription drug sales, payable annually on October 1st to the IRS. The final invoice is typically received in September of each year and is due on October 1st of each year. The Debtors made a Branded Prescription Drug Fee payment of approximately $18,000,000 in 2018 and expect to pay approximately $8,000,000 in 2019. The Debtors intend, in their sole discretion, to make any Branded Prescription Drug Fee payments that come due on or after the Petition Date.

### j) FDA Fees

139.    The Prescription Drug User Fee Act requires the Debtors to pay certain fees to the United States Food and Drug Administration (the "**FDA Fees**"). The Debtors paid FDA Fees of approximately $8,627,000 on October 1, 2018 for the fiscal year ending September 30, 2019. The Debtors intend, in their sole discretion, to pay any and all FDA Fees that come due and owing on or after the Petition Date.

### k) Opioid Excise Taxes

140.    In early 2019, the State of New York passed a state budget, which included an annual excise tax on prescription opioid manufacturers and distributors. The excise tax is imposed on the first sale of any opioid in the State of New York at a rate of $0.0025 (a quarter of a cent) per morphine milligram equivalent ("**MME**") where the wholesale acquisition cost ("**WAC**") is less than $0.50 (fifty cents) or $0.015 (one and one-half cents) per MME where the WAC is greater than or equal to $0.50 (fifty cents). The excise tax is effective July 1, 2019 and the Debtors are required to file a return and remit payment to the State of New York on a

quarterly basis. The first filing and payment remittance is due on January 20, 2020 covering opioid sales from the effective date of July 1, 2019 through the end of year, December 31, 2019. The Debtors expect to incur approximately $3,885,000 in opioid excise taxes for 2019, which will be paid on or before January 20, 2020. The Debtors intend, in their sole discretion, to pay any and all opioid excise taxes for the State of New York or other states (as applicable) (collectively, "**Opioid Excise Taxes**") that come due and owing on or after the Petition Date.

### l) Other Taxes

141.    The Debtors also collect various other federal, state or local taxes, charges, fines, penalties and fees in the ordinary course of business (including any amounts required to be withheld, incurred or collected under applicable law) (collectively, "**Other Taxes**").    The Debtors are required to remit these Other Taxes to the appropriate Governmental Authorities on a periodic basis.   The Debtors believe that the amount of Other Taxes that have been incurred, withheld or collected by the Debtors before the Petition Date, but have not yet been remitted to the appropriate Governmental Authorities, is *de minimis*.   After entry of the Interim Order, the Debtors intend, in their sole discretion, to pay such Other Taxes to the appropriate Governmental Authorities as they come due.

### m) The Taxes and Fees Motion Should be Granted

142.    I believe that ample cause exists to authorize the payment of the Taxes and Fees, including that (a) certain of the Taxes and Fees may not be property of the Debtors' estates; and (b) the failure to pay the Taxes and Fees may interfere with the Debtors' continued operations.

143.    I believe that any claims or litigation related to the failure to pay the Taxes and Fees would be distracting for the Debtors and their directors, officers and other employees, as well as for this Court, much to the detriment of the Debtors' restructuring efforts.  Payment of

the Taxes and Fees would avoid the loss of focus and harm to director, officer and employee morale that results from the risk of personal liability.  As such, I believe that it is in the best interest of the Debtors' estates to eliminate the possibility of these distractions and enable the Debtors to continue their businesses uninterrupted.

144.    I believe that payment of the Taxes and Fees will also save the Debtors potential interest expense, legal expense and penalties that might otherwise accrue on, or be incurred in connection with, such Taxes and Fees.

145.    I believe that sufficient assets will exist to pay all Taxes and Fees in full under any plan of reorganization that may ultimately be proposed and confirmed by this Court. Accordingly, to the extent the collected taxes are property of the Debtors' estates and give rise to priority claims, the relief requested herein will only affect the timing of the payments of these Taxes and Fees and will not prejudice the rights of general unsecured creditors.

146.    Moreover, I believe that payment of the Taxes and Fees is necessary for the Debtors, as payment of the Taxes and Fees will allow the Debtors to continue their business operations uninterrupted.    Moreover, if the Debtors do not pay the Taxes and Fees, Governmental Authorities could take costly, distracting actions that would interfere with the Debtors' reorganization efforts.

147.    I believe that the Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court.

148.    In my opinion, the relief requested in the Taxes and Fees Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to

operate their businesses.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

> v.   *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Payment of Certain Prepetition Claims of Critical Vendors and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Critical Vendors Motion**")*

149.   The Debtors seek entry of an Interim Order and a Final Order (a) granting them the authority in their sole discretion, but not requiring them, to pay all or a portion of their prepetition obligations owed to certain Critical Vendors (as defined below)[14] up to the Critical Vendors Claims Cap (as defined below), (b) granting them the authority, but not requiring them, in their sole discretion, to pay claims of Critical Vendors (as defined below) secured by trade liens or for the value of goods received by the Debtors in the ordinary course of their businesses during the twenty (20) day period prior to the Petition Date, (c) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing and (d) granting related relief.  The Debtors are not seeking authority to pay or satisfy any obligations to any shareholder of the Debtors or any non-Debtor affiliate of any shareholder of the Debtors.

150.   I believe that if the requested relief is not granted and essential Critical Vendors (as defined below) refuse to continue to supply goods and services to the Debtors post-petition, the Debtors may be unable to continue portions of their operations, thereby preventing the Debtors from maximizing the value of their estates and substantially harming all creditors.

---

[14] I understand that certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors.  To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Motion shall not apply to such prepetition claim.

151.    The Debtors purchase goods and services from certain vendors and independent

contractors that are unaffiliated with the Debtors or any shareholder of the Debtors and, in many

instances, the Debtors could not operate without access to the goods and services provided by

these parties (collectively, the "**Critical Vendors**").[15]  As discussed in further detail below, the

Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular

goods or services, even for a short duration, could significantly disrupt the Debtors' operations

and cause immediate and irreparable harm to the Debtors' businesses, goodwill and market share.

152.    The Debtors estimate that the maximum amount needed to pay the prepetition

claims of Critical Vendors (excluding those prepetition claims secured by trade liens, where I

understand the vender is entitled to assert possessory liens securing their claims under applicable

state law, or entitled to an administrative expense claim under Bankruptcy Code section

503(b)(9)) (the "Vendor Claims") is approximately $7,700,000 (the "**Critical Vendor Claims**

**Cap**").[16]  The Debtors' most material categories of critical vendors are described below.

---

[15] To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors in the ordinary course of their businesses.  Identifying the Critical Vendors now would likely cause all such vendors to demand payment in full.  However, in determining the Critical Vendor Claims Cap (as defined below), I understand the Debtors were careful to include only such payments that the Debtors, in their best estimate, determined would be required to continue the supply of critical goods and services as a condition of continued operations.

[16] In determining the amount of the Critical Vendor Claims Cap, the Debtors and their advisors have carefully reviewed their suppliers to determine, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers would present an unacceptable risk to the Debtors' operations should they cease the provision of truly essential services or supplies, (d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors or an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code, and (e) the extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.  The Debtors then considered the financial condition of each supplier, where that information was known, including the level of dependence each supplier has on the Debtors' continued businesses.  After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.  The Critical Vendors Claims Cap does not include any prepetition claims that the Debtors seek to pay pursuant to other orders entered by this Court in these Chapter 11 Cases.

### a) Debtors' Supply Chain

153.    To conduct their businesses, the Debtors rely on third-party suppliers (the "**Operations and Supply Chain Vendors**") to provide ingredients and equipment components, storage and distribution services, equipment servicing, batch release testing, monitoring, and manufacturing and packaging services for pharmaceutical products.  Problems with any of the suppliers could result in the inability to produce adequate supplies of the Debtors' pharmaceutical products and/or interruptions in the Debtors' ability to timely, efficiently and safely package and distribute the products.  This could delay or reduce commercial sales and materially harm the Debtors' businesses as well as negatively impact patients relying on the Debtors' pharmaceutical products.

154.    In order to ensure the quality of the Debtors' products, the United States Food and Drug Administration ("**FDA**") carefully monitors the Debtors' compliance with the FDA's current Good Manufacturing Practice ("**cGMP**") regulations.  The Debtors rely on third parties to manufacture and package many of the finished products that they sell.  These manufacturers have each passed the rigorous cGMP audit and certification process. To replace any of these vendors would require the Debtors to undertake an exhaustive review process to ensure that processes of the new prospective vendor were also in compliance with the cGMP regulations. Such process could take anywhere from twelve to twenty-four months each to complete.

155.    Due to the highly regulated nature of the Debtors' business, nearly every change to a vendor or input in the Debtors' supply chain requires regulatory approval from one or more jurisdictions, including ensuring that any new vendor facility or processes are also in compliance with cGMP regulations.  Even seemingly mundane changes such as switching bottle or label manufacturers can require months to years of regulatory study and the concomitant expenditure

of millions of dollars to execute. More complex changes take even longer and are more expensive.

156.    Shipping and warehousing services are also critical to the Debtors' business. The Debtors have engaged freight carriers (collectively, the "**Freight Carriers**") to warehouse and/or transport their products (including the active pharmaceutical ingredients for opioid products). The Debtors also engage a freight clearing company to manage the Freight Carriers. The Freight Carriers are critical to the warehousing and transport of the Debtors' products.

157.    As a result, the Freight Carriers are regularly in possession of the Debtors' products in the ordinary course of business. Any disruption in the transport of the Debtors' products would have a serious negative impact on the Debtors' ability to conduct their businesses and to ensure consumers timely delivery of such products. As of the Petition Date, the Debtors had accrued but not yet paid approximately $300,000 in fees to the Freight Carriers.

158.    The Debtors' business is ill-equipped to switch manufacturers, suppliers or logistics providers on short notice and faces significant risks to its supply chain if prepetition amounts owed to these Critical Vendors cannot be paid. Due to the regulated nature of the Debtors' business and the limited number of qualified vendors available, in many cases, the Debtors have limited-to-no options for replacement suppliers. Replacing suppliers is time-consuming, cost-prohibitive, and in certain circumstances, plainly not feasible. Moreover, any failure of a supplier to provide the necessary goods for delivery to the Debtors' customers likely would create shortages in the Debtors' supply chain and adversely affect cash flow, profitability and the ability of the Debtors to restructure their business. As of the Petition Date, the Debtors had accrued but not yet paid approximately $1,800,000 in fees to Operations and Supply Chain Vendors.

### b) The Debtors' Clinical Studies

159.    The Debtors are subject to FDA regulations governing labeling, packaging, storage, advertising, promotion, recordkeeping, and submission of safety data and other post-marketing data for their products.  Some of these regulations require the Debtors to conduct further clinical trials and research supporting the safety and efficacy of their products, and failure to complete these requirements could result in a withdrawal of the Debtors' marketing authorizations or approval.  In connection with the FDA approval of the Debtors' pharmaceutical products, the Debtors conduct post-marketing clinical trials and research to gather safety and efficacy information about the product.  The Debtors rely on certain research organizations and various other service providers (the "**Clinical Trial Vendors**") to design and conduct these trials and research or to assist with other aspects of FDA reporting requirements or compliance.

160.    Difficulty enrolling or maintaining patients in sufficient numbers will delay or terminate ongoing trials, negatively impacting the Debtors' business and effectively withdrawing treatment from patients enrolled in trials.  Failing to remain compliant with FDA's post-marketing product requirements could result in withdrawal of the Debtors' marketing authorizations or approval. Absent payment of the Clinical Trial Vendor's prepetition claims, the Clinical Trial Vendors may cease enrollment of new patients or performing other work required to keep the Debtors compliant with FDA requirements.  It is imperative, therefore, that the Debtors maintain working relationships with these Clinical Trial Vendors.  As of the Petition Date, the Debtors had accrued but not yet paid approximately $3,600,000 in fees to Clinical Trial Vendors.

### c) Security and Waste Management Services

161.   To prevent theft of, misuse of or unintended exposure to the Debtors'
pharmaceutical products, the Debtors rely on certain security services for their facilities,
warehouses and transport vehicles (collectively, the "**Security Vendors**").   Each Security
Vendors employee is required to undergo vigorous background screenings to secure employment.
If successful, the employee then must be trained in typical controlled substance security
protocols.   Replacing Security Vendors with compliant alternatives on short notice would be
difficult and would leave the Debtors vulnerable to potential harm.   As of the Petition Date, the
Debtors had accrued but not yet paid approximately $100,000 in fees to the Security Vendors.

162.   Various regulations require that the Debtors have appropriate waste management
procedures to safely dispose of waste of controlled substances.   To maintain compliance, the
Debtors rely upon certain hazardous waste management suppliers (collectively, the
"**Waste Management Vendors**").   The Waste Management Vendors ensure secure, witnessed
destruction of DEA controlled substances and proper disposition of hazardous and non-
hazardous finished goods and manufacturing waste.   These dispositions take place in controlled
incineration facilities and are routinely documented and reported to the required federal agencies.
Without the Waste Management Vendors, the Debtors would risk immediately violating waste
management regulations and face harsh penalties as a result.   As of the Petition Date, the Debtors
had accrued but not yet paid approximately $300,000 in fees to the Waste Management Vendors.

### d) Foreign Vendors

163.   Although the Debtors believe that many of their foreign suppliers of goods and
services (collectively, the "**Foreign Vendors**") may continue to do business with the Debtors
after commencement of the Chapter 11 Cases, certain Foreign Vendors may be reluctant to do so.

The Debtors believe that there is material risk that the Foreign Vendors holding Vendor Claims against the Debtors may consider themselves beyond the jurisdiction of this Court, may disregard the automatic stay and engage in conduct that disrupts the Debtors' operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.   Notably, Foreign Vendors may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods and services.

164.   Foreign Vendors also may sue the Debtors in foreign courts to recover prepetition amounts owed to them.   If they are successful in obtaining judgments against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors.   Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), I believe that the Debtors' businesses could be irreparably harmed by any such action, to the detriment of the Debtors' estates and creditors.   As of the Petition Date, the Debtors had accrued but not yet paid approximately $1,600,000 in fees to Foreign Vendors.

### e) Conditions to Payment of Critical Vendor Claims

165.   The Debtors propose, in their sole discretion, to condition payment of the Vendor Claims of each Critical Vendor upon an agreement by the applicable Critical Vendor to continue to   supply   goods   or   services   to   the   Debtors   on   such   Critical   Vendor's

"**Customary Trade Terms**"[17] for a period of time and on other such terms and conditions as are acceptable to the Debtors.

166.    The Debtors further propose that if a Critical Vendor accepts payment for a Vendor Claim and later refuses to continue to supply goods or services to the Debtors on Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, then the Debtors may, in their sole discretion, and without further order of the Court: (i) declare that the payment of the creditor's Vendor Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Critical Vendor in cash or in goods, (ii) demand that the creditor immediately return such payments in respect of the applicable Vendor Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or setoffs of any type whatsoever and (iii) upon recovery of any such payment by the Debtors, reinstate such creditor's Vendor Claim in an amount to restore the Debtors and the Critical Vendor to their original positions, as if the agreement had never been entered into and the payment of the Vendor Claim had not been made.  In sum, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

167.    To ensure that Critical Vendors continue to transact with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying any claim of any Critical Vendor: (a) that a

---

[17] As used herein, "Customary Trade Terms" means, with respect to a Critical Vendor, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such Critical Vendor.

letter or contract including provisions substantially in the form of the letter attached to the Critical Vendors Motion as **Exhibit C** (a "**Vendor Agreement**") be delivered to, and executed by, the Critical Vendor along with a copy of the order granting the relief sought herein and (b) that payment of the applicable Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Southern District of New York, dated _____, 2019 in the chapter 11 cases of [Company]. [Cases No. 19_____(RDD) through 19-_____(RDD)], entitled "Interim Order Authorizing (I) Payment of Certain Prepetition Claims of Critical Vendors and (II) Financial Institutions to Honor and Process Related Checks and Transfers" and submits to the jurisdiction of that Court for enforcement thereof.

168.   As a further condition of receiving payment on a Vendor Claim, the Debtors propose that each Critical Vendor must agree to take whatever action is necessary or appropriate to remove any existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim, *provided, however*, that the foregoing shall be determined by the Debtors in their sole discretion.

### f) The Critical Vendors Motion Should Be Granted

169.   I believe that the Critical Vendors are so essential to the Debtors' businesses that loss of access to each of their particular goods and services, even for a short duration, would disrupt the Debtors' operations and cause immediate and irreparable harm to the Debtors' businesses, goodwill and market share.   This irreparable harm to the Debtors and to the recoveries of all creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors.

170.   I believe that payment of Critical Vendor Claims is vital to preserving the Debtors' businesses and maximizing the value of the Debtors' estates.   The need for flexibility to

pay such claims is particularly acute in the period immediately following the Petition Date. While the Debtors will be focusing on stabilizing their operations and the Debtors' restructuring efforts in chapter 11, the Critical Vendors may attempt to assert their considerable leverage and deny provision of goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment. Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to continue to supply goods or services to the Debtors on Customary Trade Terms. Indeed, in the recent past, certain counterparties that became concerned about Debtors' financial condition have demanded that the Debtors pay for their goods on accelerated payment terms, on a cash in advance or cash on delivery basis, or provide collateral to secure outstanding payable balances. Any further tightening of trade credit by other Critical Vendors would be detrimental to the Debtors, their estates and their creditors.

171.    I believe that the uninterrupted supply of goods and services, on Customary Trade Terms, and the continuing support of the Debtors' customers are imperative to the ongoing operations and viability of the Debtors. The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have struggled to obtain over the years, is clearly advantageous to the Debtors. It will allow the Debtors to maintain and enhance necessary liquidity and focus on their efforts in chapter 11. Preserving working capital through the retention and reinstatement of the Debtors' normally advantageous trade credit terms with vendors will enable the Debtors to stabilize business operations at this critical time, to maintain their competitiveness and to maximize the value of their businesses for the benefit of all interested parties. Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services, could spell disaster for the Debtors' restructuring efforts. Finally, I believe the relief requested in the Critical Vendors Motion also

may help to avert the institution of numerous reclamation claims, suits and motions.  Avoiding the time and expense of evaluating and litigating such claims will provide another incremental benefit for the Debtors, their estates and their creditors.  Any occurrence affecting operations could prolong the Debtors' chapter 11 cases, increase administrative expenses and jeopardize their reorganization.

172.     In my opinion, authority to pay the Critical Vendors in the ordinary course of the Debtors' businesses is in the best interest of the Debtors' estates and creditors.  Absent such payment, the operations and value of the Debtors' estates will suffer, possibly precipitously, and the requested relief is necessary to avoid immediate and irreparable harm.  I believe this irreparable harm to the Debtors and to the recoveries of all creditors will far outweigh the cost of payment to Critical Vendors.

173.     I believe that the Critical Vendor Claims Cap reflects the Debtors' best estimate as to how much may be required to be paid to such creditors to secure continued access to critical goods and services.  The Debtors hope to pay significantly less than the requested amount.

174.     In my opinion, as discussed above, if the Debtors are not permitted to continue paying obligations owed to the Critical Vendors in the ordinary course of the Debtors' business, the Debtors will suffer immediate and irreparable harm.  I believe that maintaining an uninterrupted supply of goods and services, on Customary Trade Terms, and the continuing support of their customers are essential to the Debtors' business operations, and to the Debtors' efforts in chapter 11 more broadly.  Any delay in the relief sought would substantially disrupt the Debtors' operations and damage its going-concern value.

175.     I believe that timely payment of the Twenty-Day/Secured Claims and Secured Vendor Claims will preserve the Debtors' valued relationships with certain Critical Vendors and

reduce the chance that the Debtors will face harmful supply disruptions during the initial and most critical phase of the chapter 11 cases.

176.    In my opinion, the relief requested in the Critical Vendors Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.    Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be granted.

>    vi.    *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue and Renew their Liability, Property, Casualty and Other Insurance Programs and Honor All Obligations in Respect Thereof and (II) Financial Institutions to Honor and process Related Checks and Transfers (the "**Insurance Motion**")*

177.    The Debtors seek entry of Interim and Final Orders, substantially in the forms attached hereto, authorizing (a) the Debtors to maintain, continue, renew or purchase, in their sole discretion, Insurance Policies (defined below) on an uninterrupted basis and in accordance with the practices and procedures in effect before the Petition Date and (b) financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing.    This would include (a) paying all amounts arising under the Insurance Policies including, but not limited to, any Broker's Fees (defined below), whether due and payable before, on or after the Petition Date and (b) renewing or obtaining new insurance policies as needed in the ordinary course of business (including creating, capitalizing, and obtaining insurance from a captive insurance company or a segregated account within a licensed insurer as described herein).

### a) The Debtors' Insurance Policies

178.    The Debtors require various liability, casualty, property and other insurance programs in the ordinary course of their businesses (the "**Insurance Policies**"), which they

maintain through several private insurance carriers, and a segregated account within a Bermuda licensed insurer (collectively, the "**Insurance Carriers**").  A summary of the Debtors' principal Insurance Policies is set forth on **Exhibit C** attached to the Insurance Motion[18]

179.    The Insurance Policies include coverage for, among other things, umbrella liability, workers' compensation, property damage, products liability, operation of automobiles, crime, business interruption, officers or directors liability, employment practice liability, fiduciary liability, transport/cargo and various other property-related and general liabilities.  All of the Insurance Policies are essential to the ongoing operation of the Debtors' businesses.

### b) The Premium Payments

180.    The Insurance Policies renew on various dates throughout the year.  The premiums for most of the Insurance Policies (collectively, the "**Insurance Premiums**") are determined annually and are due either in their entirety at policy inception or up to thirty (30) days after policy inception.  The Debtors make such payments directly to the Insurance Carriers or indirectly to the Insurance Carriers through Marsh USA Inc. and its affiliates (the "**Broker**").

181.    The Debtors employ the Broker to assist them with the procurement and management of the Insurance Policies.  The Broker receives compensation from the Debtors for various services in the form of a commission included in the Insurance Premiums paid by the Debtors or a fee for non-commission insurance policies, as well as fees for claim noticing services (the "**Broker's Fees**").  The employment of the Broker allows the Debtors to obtain and manage the Insurance Policies in an efficient manner and to realize considerable savings in the

---

[18] **Exhibit C** is intended to be a comprehensive schedule of the principal Insurance Policies.  I understand, however, that the Debtors are requesting relief applicable to all Insurance Policies, regardless of whether such Insurance Policy is specifically identified on **Exhibit C**.

procurement of such policies.   Accordingly, I believe that it is in the best interests of the creditors and estates to continue the Debtors' business relationship with the Broker.

182.   The Debtors' aggregate annual Insurance Premiums under the Insurance Policies total approximately $3,200,000, consisting of $2,970,000 with respect to the Purdue Debtors and $230,000 with respect to the Rhodes Debtors.   The Debtors believe that all material Insurance Premiums or amounts due under the Insurance Policies that were due and payable on or prior to the Petition Date have been fully paid but, out of an abundance of caution, I understand that the Debtors are seeking authority to satisfy any such prepetition obligations.

183.   Pursuant to the Insurance Policies, the Debtors may be required to pay various deductibles or self-insurance retention amounts (collectively, the "**Insurance Deductibles**"), depending upon the type of claim and insurance policy involved.   As of the Petition Date, the Debtors do not believe there are any material prepetition obligations relating to Insurance Deductibles but, out of an abundance of caution, I understand that the Debtors are seeking authority to satisfy any such prepetition obligations.

184.   The Debtors believe that certain prepetition amounts under the Insurance Policies remain outstanding.   By the Insurance Motion, the Debtors request the authorization, but not the direction, to pay such amounts.

### c) Collateral

185.   With respect to certain of its Insurance Policies, the Debtors have posted collateral in favor of and as required by relevant Insurance Carriers to secure the Debtors' deductibles or any claims paid with respect to such Insurance Policies.   The Debtors have also posted collateral in connection with and as required by fronting and captive arrangements related to certain of its Insurance Policies, as well as in connection with certain ongoing insurance

obligations.  The Debtors may also need to post letter of credit collateral in connection with upcoming insurance policy renewals and extensions.  The Purdue Debtors have posted $87,349,641 in collateral in the aggregate in various trust accounts at Wells Fargo Bank, N.A. to secure their obligations.

### d) *Product and General Liability Insurance Captive*

186.    The Debtors are required to maintain $10 million in product liability insurance and up to $27 million in general liability insurance under contracts with numerous third party suppliers, wholesalers, distributors, group purchasing organizations and other contract counterparties. A commercial solution to the Debtors' product and general liability coverage requirements has been challenging to obtain with a third party insurer.  The Debtors are therefore in the process of evaluating captive options to insure the Debtors' product and general liability risks, including (i) creating a captive insurance company that will be a wholly owned, non-debtor subsidiary of PPLP or (ii) in the alternative, creating a segregated account within a licensed insurer (any such insurance vehicle, the "**Product and General Liability Captive**").

### e) *The Insurance Motion Should Be Granted*

187.    The nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  I believe that the nonpayment or delayed payment of any premiums, deductibles or related fees under the Insurance Policies could result in one or more of the Insurance Carriers terminating or declining to renew their insurance policies or refusing to enter into new insurance policies with the Debtors in the future.  If any of the Insurance Policies lapse without renewal, the Debtors could be in violation of state and/or federal law, resulting in a loss of licenses, and therefore the loss of the ability to operate their businesses, which would result in immediate and irreparable harm to the

Debtors' and their estates.  Allowing the Insurance Policies to lapse without renewal could also result in exposure to substantial liability for personal, contractual and/or property damages, to the detriment of all parties-in-interest.

188.   As a prerequisite for operations, certain governmental agencies also require the Debtors to maintain certain Insurance Policies.  Moreover, pursuant to contractual obligations with numerous third party suppliers, distributors and contractors, the Debtors are obligated to demonstrate certain levels of insurance coverage and to remain current with respect to certain of their Insurance Policies.  The Debtors must also maintain the Insurance Policies to comply with the U.S. Trustee Guidelines.  Thus, in order for the Debtors to maintain their operations in compliance with various legal and contractual obligations, the Debtors must be able to continue their Insurance Policies without disruption.

189.   I believe that if the Debtors are unable to make any outstanding payments that may be owed on account of the Insurance Policies, the unpaid Insurance Carriers may seek to terminate such Insurance Policies. The Debtors would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates.  If the Debtors were required to obtain replacement insurance, this payment likely would be greater than what the Debtors currently pay.  Even if these Insurance Carriers were not permitted to terminate the agreements, any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

190.   I further believe that the Insurance Carriers and Broker may be reluctant to engage in ordinary course transactions with the Debtors absent an order eliminating any uncertainty as to whether the Debtors have the requisite authority to engage in such transactions.

72

191.    I believe that any interruption in insurance coverage would expose the Debtors to a variety of risks, including the possible (a) incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Policies, (b) incurrence of material costs and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain covered claims, (c) inability to obtain similar types and levels of insurance coverage, (d) incurrence of higher costs for reestablishing lapsed policies or obtaining new insurance coverage and (e) incurrence of direct liability for failing to maintain required insurance coverage.

192.    I further submit that the Motion is justified based on my understanding of the "doctrine of necessity." The Debtors' ability to maintain and honor their Insurance Policies in a timely manner is critical to the ongoing operation of their businesses, as discussed above, and therefore necessary to maximize the value of the Debtors' estates. I believe that any prepetition amounts that the Debtors will pay in respect of Insurance Policies would be small relative to the size of the Debtors' estates and the critical benefits provided by the Insurance Policies. As noted above, interruption of the Debtors' insurance coverage could, among other things, cause the Debtors to violate state and/or federal law and expose the Debtors to direct liability for significant claims that otherwise would be covered by insurance, thus potentially substantially diminishing the value of the Debtors' estates. For the Debtors to pay what would be relatively small prepetition amounts under the Insurance Policies to avoid such an occurrence is, in my opinion, in the best interests of the Debtors, their estates, and all of the Debtors' stakeholders and other parties-in-interest. Thus, payments of amounts to ensure continuation of the Insurance Policies, including the payment of prepetition and post-petition Insurance Premiums, Broker Fees and other amounts necessary to maintain the Debtors' Insurance Policies, falls within the

sound business judgment of the Debtors and will benefit, rather than prejudice, the Debtors' creditors by preserving the property of the Debtors' estates. I further believe that the Insurance Policies are essential to the operation of their business during these chapter 11 cases.

193. I understand that under the terms of the Insurance Policies, the Insurance Carriers may cancel the underlying Insurance Policies for the Debtors' nonpayment. Such cancellation will harm the Debtors not only because some of the Insurance Policies are required by various regulations, laws and contracts that govern the Debtors' commercial activities, but I also understand that Bankruptcy Code section 1112(b)(4)(C) provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). Moreover, I understand that the Operating Guidelines and Reporting Requirements for Debtors In Possession and Trustees, issued by the Office of the United States Trustee for Region 2 (the "**U.S. Trustee Guidelines**") require the Debtors to maintain insurance coverage throughout the pendency of the chapter 11 cases.

194. In my opinion, the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

vii.   *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer Programs (II) Relief from Stay to Permit Setoff in Connection with the Customer Programs and (III) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Customer Programs Motion**")*

195.   The Debtors seek entry of an Interim Order and a Final Order authorizing, but not directing, the Debtors, in their sole discretion, to honor certain prepetition obligations owed to customers under existing customer programs and practices and to otherwise continue, renew, replace, implement or terminate customer programs and practices (as described in greater detail below, the "**Customer Programs**") in the ordinary course of business.

196.   The Debtors also respectfully request that the Interim Order and the Final Order (a) grant relief from the automatic stay to permit setoffs in connection with the Customer Programs; (b) authorize the Debtors to satisfy any outstanding obligations under certain agreements described herein (the "**Third Party Services Agreements**") with Emerson, Deloitte, iContracts, Apexus, Inmar, Cumberland, Model N and certain coupon adjudicators (collectively, the "**Third Party Service Providers**"); (c) authorize and direct all applicable banks and other financial institutions (collectively, the "**Banks**") to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Customer Programs, whether such checks or other requests were submitted before, on or after the Petition Date; (d) authorize the Banks to rely on the representations of the Debtors as to which checks and fund transfers are subject to this Motion, *provided* that no Bank shall have any liability to any party for relying on such representations; (e) prohibit the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of the Customer Programs; and (f) authorize the Debtors to issue new post-petition checks or effect new post-petition fund

transfers to replace any checks, drafts and other forms of payment that are dishonored or rejected, and to reimburse any expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or other form of payment.  The Debtors are not seeking authority to pay or satisfy any obligations to any shareholder of the Debtors or any non-Debtor affiliate of any shareholder of the Debtors.

197.    In the ordinary course of business, the Debtors participate in various Customer Programs integral to the sale of their products and to ensure continuity of product supply to patients.  I understand that the Debtors are seeking authority to honor and continue, in the Debtors' sole discretion, the Customer Programs that they deem to be beneficial and cost-effective to their businesses.  A diagram outlining the flow of the Debtors' products and related Customer Programs is attached to the Customer Programs Motion as **Exhibit C**, which diagram separately illustrates (1) Rhodes Pharmaceuticals L.P. prescription products, (2) Purdue Pharma L.P. prescription products and (3) Avrio Health L.P. consumer health products.

### a)    *Discounts, Fees and Other Benefits Provided to Wholesalers*

198.    The Debtors' primary sales channel for prescription products is through wholesalers (collectively, the "**Wholesalers**"), who sell these products to retail drugstores, mass merchandisers, pharmacies, hospitals, long-term care and other mail, retail and non-retail institutions in the United States.  These buyers, in turn, dispense these products to patients.  The Debtors sell their products to the Wholesalers at the wholesale acquisition cost (the "**WAC**"), a base price set by the Debtors in their sole discretion and adjusted from time to time.  If the Wholesalers refuse to do business with the Debtors, they would lose access to their primary sales channel for prescription products, which would have a devastating impact on the Debtors' operations and revenues.  The Wholesalers will only continue to do business with the Debtors if

they are able to continue to provide the Wholesalers with industry standard terms, including Prompt Pay Discounts, Fee for Service Payments, and honoring the Sales Return Programs (each as defined below). Accordingly, allowing the Debtor to continue such programs is critical to their ability to operate their business post-petition. Wholesalers McKesson Corporation, AmerisourceBergen Drug Corporation and Cardinal Health Inc. accounted for over 90% of the Debtors' gross sales as of August 31, 2019.

- *Prompt Pay Discount*

199.    The contracts with the Wholesalers, along with Purdue's general terms and conditions of sale, provide for industry-standard discounts, such as a "prompt pay" discount (the "**Prompt Pay Discount**"), which affords an approximately two percent (2%) discount to Wholesalers for paying their invoices within the payment terms of the contracts or Purdue's general terms and conditions of sale. Without the ability to offer industry standard Prompt Pay Discounts, Wholesalers would be unwilling to enter into relationships with the Debtors. Each month, the Debtors extend approximately $3,840,000 in Prompt Pay Discounts, with approximately $5,717,575 outstanding at the Petition Date. The Debtors seek authority to continue providing these discounts in the ordinary course of business.

- *Fee for Service*

200.    In addition to purchasing the Debtors' products, the Wholesalers provide various services to the Debtors, including managing inventory, distributing the Debtors' products and managing industry-specific data. The Debtors compensate the Wholesalers for these services by offering a fee for these services (the "**Fee for Service**"). The Fee for Service is generally calculated by multiplying the Debtors' quarterly invoiced sales to the Wholesalers by a fixed percentage rate, or for certain services, a fixed amount per unit sold, negotiated between the

Debtors and each individual Wholesaler, which may be adjusted based on performance of the services and whether the Wholesalers met relevant metrics in the contracts. The Fee for Service is applied a credit against outstanding invoices, quarterly in arrears. The Debtors' average quarterly liability for the Fee for Service is approximately $16,000,000. The Debtors seek authority to pay any unpaid Fee for Service that accrued prepetition and to continue paying these fees in the ordinary course of business.

- ***Sales Return Program***

201. In the ordinary course of business, the Debtors' customers may be unable to sell the products they purchase from the Debtors because the product expires, the product is damaged, there is a drop in demand, or for some other reason. Under these circumstances, the Debtors permit returns of the product in exchange for credit within a limited time before and after the date of expiration of the product (the "**Sales Return Program**"). The Debtors' products have up to three (3) years of shelf life, depending on product, and can be returned six (6) months prior to and up to twelve (12) months after expiration for prescription products and up to twenty-four (24) months after expiration for consumer health products. As of the Petition Date, the Debtors estimate there is approximately $102,535,000 in potential returns of the Debtors' products, which would set off against the Debtors' accounts receivable over a period of up to four (4) years. Credits processed for returns in the last three (3) months were $12.5 million. To maintain their customers' and Wholesalers' goodwill and continued business, the Debtors seek authorization to honor any prepetition return requests and obligations under the Sales Return Program in the ordinary course of business.

*b)*     ***Non-Governmental Discount Programs***

- ***GPOs***

202.    The Debtors have negotiated discount programs with certain customers and group purchasing organizations (collectively, "**GPOs**") for members of the GPO to purchase their products from Wholesalers at prices that are lower than WAC.  Members of GPOs include hospitals, long-term care facilities and other healthcare providers.  Members of the GPO purchase the Debtors' products from a Wholesaler at the discounted price negotiated by the GPO, and the Wholesaler then submits a chargeback to the Debtors for the difference between WAC and the discounted price negotiated by the GPO (the "**GPO Wholesaler Chargebacks**").  The Debtors pay fees to certain GPOs in return for their services negotiating on behalf of their members and setting the discounted prices (the "**GPO Fees**").  The Debtors pay on average $943,250 in monthly GPO Fees.  The Debtors' average monthly liability for GPO Wholesaler Chargebacks is approximately $21,065,000, though GPO Wholesaler Chargebacks are netted against accounts receivable and thus generally do not result in a cash payment.

203.    I understand that the Debtors are seeking authority to continue honoring all GPO Wholesaler Chargebacks in the ordinary course of business and to apply any prepetition GPO Wholesaler Chargebacks that may be outstanding against subsequent invoices of the Debtors' products in the ordinary course of business.  I believe that if the Debtors stopped paying these GPO Fees, the Debtors would be unable to make use of the GPOs' services.  The immediate effect would be the loss of various vital customers and frustration to the Debtors' distribution channels.  Accordingly, to maintain their customers' goodwill and continued business, the Debtors seek authorization to pay any unpaid GPO Fees that accrued prepetition and to continue to pay such fees in the ordinary course of business.

- ***Private Insurers***

204.    The Debtors are party to agreements with certain managed care organizations, private insurance providers, and pharmacy benefit managers that contract on behalf of private insurers, managed care organizations, third party administrators, and other types of managed healthcare entities (collectively, the "**Private Insurers**") that cover, or whose members cover, the cost of medications for the Private Insurers' beneficiaries.  In order to ensure appropriate formulary coverage and access to Debtors' products, the Debtors are required to provide the Private Insurers with periodic rebates and, in certain cases, administrative fees (the "**Private Insurance Program Rebates**").  As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $64,665,000 in Private Insurance Program Rebates. I understand that the Debtors are seeking authority to pay these rebates as they come due in the ordinary course of business.

- ***Co-Pay Reduction***

205.    The Debtors provide certain patients with co-pay assistance to offset their out-of-pocket costs (the "**Co-Pay Reduction Program**").  The Co-Pay Reduction Program is offered to commercially insured patients to help offset the co-payments set by health insurers for prescription medication.  Patients eligible for the Co-Pay Reduction Program receive a coupon, either online, from a healthcare provider or at the point of sale.  When a patient purchases one of the Debtors' products at the pharmacy with either a point of sale discount or a discount coupon, the pharmacy submits redemption information to the coupon adjudicator with whom the Debtors have contracted with to provide coupon adjudication services for the Debtors' products.  The adjudicator reimburses the pharmacy for the discount and is in turn reimbursed by the Debtors (the "**Co-Pay Reduction Rebate**").  The Debtors pay the coupon adjudicators a fee for service

and costs for the production of the coupons.  The Debtors estimate that as of the Petition Date, approximately $3,540,400 has accrued but has not been invoiced or paid for Co-Pay Reduction Rebates and fees.  I understand that the Debtors are seeking authority to pay Co-Pay Reduction Rebates and fees when they become due and to continue to utilize and pay the coupon adjudicators in the ordinary course of business.

### c)     *Discounted Rates Under Government Programs*

- *Medicaid*

206.    Medicaid is a health program, jointly funded by state and federal governments and managed by the states, that assists low-income individuals and families in obtaining healthcare.  The Medicaid Drug Rebate Program, a federal and state partnership that offsets the costs of certain prescription medications dispensed to Medicaid patients, requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services.  In return, Medicaid covers the Debtors' products.  In addition, the Debtors have agreements with certain states for rebates on other state programs that serve low-income individuals and families not eligible for Federal Medicaid, as well as supplemental rebate agreements for rebates in excess of those required by federal statute.  Under these programs, individual states collect product utilization data for products paid for under the various state and federal programs and invoice the Debtors for rebates (the "**Medicaid Rebates**"), which are calculated based on a statutory formula or, for supplemental rebates, on the contractual formula. The Debtors pay the Medicaid Rebates to the various states on a quarterly basis.  The Debtors estimate that approximately $89,170,000 has been accrued but has not been invoiced for Medicaid Rebates as of the Petition Date.  While this amount is not yet due and payable, it may become due and payable over the course of the chapter 11 cases.

207.    If the Debtors fail to fulfill their Medicaid obligations, including payment of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs as well as being subject to penalties and fines.  As such, honoring the Medicaid Rebates is integral to the Debtors' businesses.  I believe that the Debtors cannot afford to risk the substantial harm that would arise from the failure to pay the Medicaid Rebates, including denial of coverage and irreparable damage to the Debtors' relationships with their customers.  Accordingly, the Debtors respectfully request authorization to continue making Medicaid Rebate payments in the ordinary course of business during the chapter 11 cases with respect to both prepetition and post-petition sales of their products.

- ***Medicare Part D***

208.    Medicare is a federally administered, national insurance program that primarily serves Americans over the age of sixty-five (65).  Medicare Part D provides prescription drug benefits to eligible patients.  The Debtors are party to several contracts with private insurance companies, managed care organizations, and pharmacy benefit managers with Medicare Part D business lines ("**Medicare Part D Plans**"), under which the Debtors pay certain rebates and, in certain cases, administrative or other fees related to Medicare Part D ("**Medicare Part D Rebates**").  The Debtors pay these rebates and fees under the Medicare Part D Plans monthly or quarterly, based on individual contract terms.  As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $31,225,000 in Medicare Part D Rebates.

209.    The Debtors are also party to a Medicare Part D Coverage Gap Program Discount Agreement with the Centers for Medicare and Medicaid Services ("**CMS**"), required under PPACA, as modified by the ACA, should manufacturers wish to have coverage for their products

under Medicare Part D, pursuant to which the Debtors provide rebates to a certain third party provider of services of CMS, Palmetto GBA ("**Palmetto**"). Palmetto, in turn, administers a program whereby the Medicare Part D Plans provide discounted prescription medications to Medicare Part D beneficiaries within a so-called "coverage gap" (the "**Coverage Gap Program**"). Palmetto consolidates claims arising under the Coverage Gap Program and sends an invoice to the Debtors. Palmetto is not required to, and does not, provide updates to the Debtors regarding claims that have not yet been included in invoices. As such, the Debtors do not know the amount of any prepetition liability they owe under the Coverage Gap Program. Based on previous invoices, however, the Debtors estimate that there is approximately $33,415,000 in outstanding prepetition liability under the Coverage Gap Program. By this Motion, I understand that the Debtors are seeking authority to continue the Coverage Gap Program and to pay any amounts that may become due under the Coverage Gap Program in the ordinary course of business.

- *340B*

210.    Under its agreement with CMS for Medicaid and relevant statutes, the Debtors are required to comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "**340B Program**"). Under this program, the Debtors must sell their products at specified prices that reflect a substantial discount to WAC. Failure to comply with the 340B Program may result in fines and penalties and exclusion from other federal programs. Certain hospitals, clinics, and other entities, as set forth in relevant statutes, provide a minimum share, set by the 340B Program regulations, of their services to low-income patients and receive federal funds from CMS to help cover the costs of providing care to uninsured patients (such hospitals, clinics and other entities, the "**340B Entities**"). Pursuant to the 340B Program, the

340B Entities are entitled to receive the Debtors' products at a discounted price set by statute, which is calculated on a quarterly basis. 340B Entities purchase the Debtors' products from one of the Debtors' Wholesalers at the discounted price, and the Wholesaler then submits a chargeback to the Debtors for the difference between the WAC price that the Wholesaler paid to the Debtors and the discounted price paid by the 340B Entity to the Wholesaler (the "**340B Wholesaler Chargebacks**").

211.    I understand that the Debtors are seeking authority to continue the 340B Program in the ordinary course of business. The Debtors' average monthly liability for 340B Wholesaler Chargebacks is approximately $2,830,100, though 340B Wholesaler Chargebacks are netted against accounts receivable and thus generally do not result in a cash payment. I further understand that the Debtors are seeking authority to continue honoring all 340B Wholesaler Chargebacks in the ordinary course of business and to apply any prepetition 340B Wholesaler Chargebacks that may be outstanding against subsequent invoices of the Debtors' products in the ordinary course of business.

- *Federal Supply Schedule*

212.    Based on its agreement with CMS for Medicaid and relevant statutes, the Debtors must also comply with the Department of Veterans Affairs Federal Supply Schedule (the "**FSS**"), which requires the Debtors to make their products available to federal agencies such as, but not limited to, the Department of Veterans Affairs, Department of Defense, the Coast Guard, Federal Bureau of Prisons and the Public Health Service at deeply discounted prices. In addition, the Debtors also may offer voluntary additional discounts on the FSS or to the Department of Defense mail order and military treatment facilities (collectively, the "**Federal Supply Schedule Programs**"). For drugs with a New Drug Application ("**NDA**"),

84

there is a statutory maximum amount that certain government entities can be charged for pharmaceuticals based on a specific formula.  For multisource prescription drugs or non-prescription products, the prices and discounts are negotiated with the Department of Veterans Affairs, and often equal the lowest commercial institutional price.  Since the price the Debtors charge under the Federal Supply Schedule is lower than WAC, the Wholesalers charge back the Debtors for the difference (the "**FSS Chargebacks**").  Failure to comply with the Federal Supply Schedule Programs may result in substantial fines and penalties and exclusion from other federal programs, which would diminish the Debtors' customer base as well as harm the Debtors' relationship with the Wholesalers.

213.    I understand that the Debtors are seeking authority to continue to sell their products under the Federal Supply Schedule Programs in the ordinary course of business.  The Debtors' estimated average monthly liability for FSS Wholesaler Chargebacks is approximately $2,829,000, though FSS Wholesaler Chargebacks are netted against accounts receivable and thus generally do not result in a cash payment.  I further understand that the Debtors are seeking authority to continue honoring all FSS Wholesaler Chargebacks in the ordinary course of business and to apply any prepetition FSS Wholesaler Chargebacks that may be outstanding against open invoices of their products in the ordinary course of business.

- ***Industrial Funding Fee***

214.    The Debtors also collect for the United States Department of Veterans Affairs an additional 0.5% fee on all FSS purchases (the "**Industrial Funding Fee**").  The Debtors' estimated average quarterly liability for Industrial Funding Fees is $50,000.  Manufacturers collect this fee from purchasers at the time of sale, via the FSS Wholesaler Chargebacks process, and remit payment to the Department of Veterans Affairs on a quarterly basis.  The Debtors seek

to continue paying the Industrial Funding Fee over to the Department of Veterans Affairs in the ordinary course of business.

- *Tricare*

215. Tricare is a federal program administered by the Defense Health Agency of the Department of Defense, whereby the Defense Health Agency covers prescription products dispensed at retail and mail order pharmacies for military beneficiaries and their dependents. The Debtors have entered into a contract with the Defense Health Agency for certain rebates, mandated under 10 U.S.C. § 1074g(f) and 32 CFR Part 199, calculated using the FSS statutory maximum pricing, as well as other voluntary rebates, (collectively, "**Tricare Rebates**") in order to ensure access to Debtor's medications for Tricare beneficiaries. The Debtors pay these Tricare Rebates to the Defense Health Agency quarterly. As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $8.4 million in Tricare Rebates. The Debtors seek authorization to continue making Tricare Rebate payments in the ordinary course of business during the chapter 11 cases with respect to both prepetition and post-petition sales of their products.

### d) Third Party Services Agreements

216. Debtor Avrio Health L.P. ("**Avrio**") employs Emerson Healthcare LLC ("**Emerson**") to take orders, issue invoices, collect cash, issue credits, and distribute (non-prescription) consumer health products. Emerson, in turn, sells products to retailers and wholesalers, who sell the Debtor's products to retail drugstores, mass merchandisers, pharmacies, hospitals, long-term care and other mail, retail and non-retail institutions in the United States. These buyers, in turn, sell the Debtors' products to patients. Avrio pays Emerson a fee for service as well as its pass-through costs for distributing the products. On average, the Debtors

pay approximately $160,000 in monthly fees and $80,000 in monthly pass-through costs to Emerson and estimate that, as of the Petition Date, they owe approximately $155,000 in fees and $80,450 in pass-through costs.  The Debtors seek authority to pay any prepetition unpaid fees and pass-through costs due and owing to Emerson and to continue to utilize and pay Emerson in the ordinary course of business.

217.    Given the complexity of calculating and confirming the validity of the various chargebacks issued by the Wholesalers, including those for government programs, the Purdue Debtors have engaged Deloitte, as an outsourced third party logistics provider, for assistance managing the chargeback programs and managing its GPO contracts.  The outsourcing of these services started in 2010 and the Purdue Debtors no longer have employees to perform these services.  The average estimated monthly fees for Deloitte are approximately $33,000.  The Debtors estimate that, as of the Petition Date, $29,000 of these fees remains accrued but unpaid.

218.    Similarly, the Rhodes Debtors have engaged iContracts, a third party service provider that assists the Rhode Debtors with various facets of their chargeback programs as well as Medicaid rebate processing.  The average monthly fees paid to iContracts are approximately $14,000. The Debtors estimate that, as of the Petition Date, approximately $45,550 of these fees remains accrued but unpaid.

219.    The Debtors have engaged Inmar RX Solutions Inc. ("**Inmar**") as their authorized returns processor to ensure accuracy of processing, counterfeit detection, compliance policy and regulations and to provide electronic transmission of returns data to the Debtors.  The average monthly fees for Inmar are approximately $13,500.  The Debtors estimate that, as of the Petition Date, approximately $10,500 of these fees remains accrued but unpaid.

220.    Given the administrative complexity of the Private Insurer, Medicaid and Medicare Part D rebate processes (including data validation), the Debtors have engaged Cumberland Consulting Group ("**Cumberland**") as an outsourced service provider to validate, calculate and pay these rebates.  The outsourcing of these services started in the third quarter of 2018 and the Debtors no longer have sufficient employees to perform these services internally. The Debtors, on average, pay approximately $68,750 in monthly fees to Cumberland and estimate that, as of the Petition Date, they owe Cumberland approximately $75,000 in accrued but unpaid fees.

221.    Similarly, the Debtors have engaged Model N, a third party cloud application, to provide software solutions to enable Cumberland to adjudicate and calculate rebates. The average monthly fee paid to Model N is approximately $30,300, and the Debtors estimate that, as of the Petition Date, they do not owe Model N any accrued but unpaid fees.

222.    The Debtors have engaged Apexus to assist in repayment to 340B entities of any overpayments from 340B entities, caused by restatements of Medicaid statutory calculations done in the ordinary course of business, as required by statute.  The repayment of 340B entities of overpayment is required by statute within 120 days of determination of an overcharge, subject to civil monetary penalties if a manufacturer is non-compliant.   The repayment process is extraordinarily complex, due to the number of entities and the indirect nature of their original purchases.  The Debtors believe that they do not currently owe any amounts to Apexus, but as the Debtors do not have employees to perform these required services when needed, they request authority to continue to use Apexus to assist with these repayments, including with respect to payment of Apexus' fees and funding amounts needed to repay the 340B entities for any overpayments, if a need for such services arises during these chapter 11 cases.

### e) The Customer Programs Motion Should Be Granted

223.    I believe that an order authorizing the Debtors to (i) continue the Customer Programs as they determine to be appropriate and (ii) make payments owing on account of prepetition product sales and otherwise owing in connection with the Customer Programs is in the best interest of the Debtors' estates, their creditors and all other parties in interest.

224.    In 2018, substantially all of the Debtors' products were purchased through the Customer Programs.  Preserving the value of the Debtors' businesses is contingent, in large part, upon the Debtors' ability to continue operating in the ordinary course and to maintain ordinary course relationships with all parties in their sales cycle.  If the Debtors' customers do not continue to receive the benefits of the Customer Programs, the Debtors' business will be severely disrupted, resulting in, in my opinion, immediate and irreparable harm to the Debtors and their estates.

225.    Continuing the Customer Programs and payment of amounts due under the Customer Programs and Third Party Service Agreements is vital to preserving the Debtors' businesses and maximizing the value of the Debtors' estates.  Without ongoing fulfillment of these programs, I believe that the Debtors' business would suffer immediate and irreparable harm and that the Debtors' restructuring would be severely jeopardized.

226.    I believe that, if the Debtors are prohibited from honoring the Customer Programs and their obligations under the related Third Party Services Agreements, customers from across the Debtors' supply chain may lose confidence in the Debtors' ability to honor orders and may become reluctant to do business with the Debtors in the future.  Additionally, failure to honor prepetition obligations to customers and related third parties could cause the Debtors' products to be removed from formulary lists, which determine whether a drug is covered by a specific plan

or program.  Ultimately, I believe the damage from disregarding these obligations would far exceed the cost associated with honoring the Customer Programs.  The relief requested in the Customer Programs Motion will protect the Debtors' goodwill and avoid customers and other third parties integral to the sale of the Debtors' products from being driven away during this critical time.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

227.    I believe that the Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court.

228.    In my opinion, the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors.  I believe that continuing the Customer Programs and payment of amounts due under the Third-Party Service Agreements is vital to preserving the Debtors' businesses and maximizing the value of the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be granted.

> viii.    *Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Continue and Renew Surety Bond Program ("**Surety Bonds Motion**")*

229.    The Debtors request entry of interim and final orders, substantially in the forms attached to the Surety Bonds Motion (the "**Proposed Orders**"), authorizing the Debtors to maintain, continue and renew, in their sole discretion, their Surety Bond Program (as defined below) on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date.  This authority would include permitting the Debtors (i) to pay all amounts arising under the Surety Bond Program due and payable after the Petition

Date (the "**Obligations**") and (ii) to renew or obtain new surety bonds as needed in the ordinary course of business, including, but not limited to, as may be required by law or judicial authority. If the requested relief is not granted and the Surety Bond Program is interrupted, lapses or terminates, the Debtors' operations could be immediately and irreparably harmed, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.

230.     In the ordinary course of their businesses, the Debtors are required to provide to third parties surety bonds (the "**Surety Bond Program**") to secure the Debtors' payment or performance of certain obligations required by law, including, among other things, obligations owed to state agencies to maintain licenses to sell and/or distribute pharmaceutical products. Failure to provide, maintain and timely replace these surety bonds could jeopardize the Debtors' ability to conduct their operations.   The obligees of such surety bonds (the "**Obligees**"), their issuers (the "**Issuers**"), their identification numbers and/or the total bond amounts provided are set forth on **Exhibit C** attached to the Surety Bonds Motion.[19]

231.     As of the Petition Date, the Debtors had approximately $896,508.61 in outstanding surety bonds securing the Debtors' payment or performance of obligations owed to state agencies to maintain licenses to sell and/or distribute pharmaceutical products.   The premiums for most of the surety bonds are determined annually and are paid by the Debtors to the Issuers of the surety bonds at inception and annually thereafter.

232.     Because the issuance of a surety bond shifts the risk of the Debtors' non-performance or non-payment from the Debtors' obligee to the surety, sureties cautiously screen

---

[19] I understand that, although the Debtors have made a good faith effort to identify all of their current surety bonds on **Exhibit C**, it is possible that some of the current surety bonds may not be listed on **Exhibit C**.  I believe that the failure of the Debtors to include a particular surety bond on **Exhibit C** should not operate to exclude such surety bond from the coverage of this Motion or any order entered in connection with this Motion.

bond applicants to minimize their risk or loss exposure. Despite this reallocation of financial risk, a surety bond is not the equivalent of an insurance policy. Unlike an insurance policy, if an Issuer incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal. This right to indemnity is typically memorialized in an indemnity agreement between the Issuer and the principal, the execution of which is generally required by the Issuer as a precondition to the issuance of a bond. The Debtors are a party to a number of such indemnity agreements (together, the "**Indemnity Agreements**"). Pursuant to the Indemnity Agreements, the Debtors have agreed to indemnify certain parties from any loss, cost, damage or expense they may incur by reason of their execution of any bonds on behalf of Debtors.

233. Based on the current financial status of the Debtors, it is unlikely that the Debtors will be able to renew or replace surety bonds on an unsecured basis and in some cases capacity may not be available even on a secured basis. In order to be able to give the financial assurances the Debtors will be required to provide in order to continue their business operations during the reorganization process, and in order to avoid what in my opinion would constitute immediate and irreparable harm to their businesses, the Debtors must maintain the existing Surety Bond Program and may need additional bonding capacity not currently provided by the Surety Bond Program.

234. Accordingly, to operate their businesses, which require the Surety Bond Program, the Debtors will have to either renew or replace their existing surety bonds, and will most likely have to maintain collateral arrangements similar to those currently in place.

235. The nonpayment of any Obligations under the Surety Bond Program could result in one or more of the Issuers terminating or declining to renew their surety bonds or refusing to enter into surety bonds with the Debtors in the future. If any surety bonds lapse without renewal,

or the Debtors are unable to obtain new surety bonds, the Debtors could default on various obligations, which could severely disrupt the Debtors' operations to the detriment of all parties in interest.  For example, failure to maintain the required surety bonds could trigger cancellation of the Debtors' licenses to sell or distribute pharmaceutical products in certain states and jeopardize the Debtors' ability to conduct their operations, which I believe would result in immediate and irreparable harm to the Debtors.

236.    I believe that if the Debtors are not permitted to continue to maintain their Surety Bond Program in its current form, it would cause immediate and irreparable harm by endangering the Debtors' ability to maintain sufficient surety bonds, which are necessary for their operations.

237.    In my opinion, the relief requested in the Surety Bonds Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Surety Bonds Motion should be granted.

### C.    Professional Retention Application

i.    *Application for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent for the Debtors (the "**Prime Clerk Application**")*

238.    The Debtors request entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors in these chapter 11 cases, in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  The Debtors selected Prime Clerk to act as the Claims and Noticing Agent after having obtained and reviewed engagement proposals from four court-approved claims and noticing agents to ensure selection through a competitive process.

Moreover, I believe that, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

239.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 25,000 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of a Claims and Noticing Agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

240.    By appointing Prime Clerk as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court (the "**Clerk**") will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

241.    Prime Clerk is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. Prime Clerk's professionals have experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.

242.    Prior to the Petition Date, the Debtors provided Prime Clerk an advance in the amount of $75,000. Prime Clerk seeks to first apply the advance to all pre-petition invoices, and thereafter, to have the advance replenished to the original advance amount, and thereafter, to hold the advance under the Engagement Agreement during the chapter 11 cases as security for the payment of fees and expenses incurred under the Engagement Agreement.

243.    In view of the number of anticipated claimants and the complexity of the Debtors' businesses, on behalf of the Debtors, I respectfully submit that the Prime Clerk Application should be granted.

### D.    Foreign Representative Motion

i.    *Motion of the Debtors for Entry of an Order (I) Authorizing Purdue Pharma L.P. to Act as Foreign Representative and (II) Granting Related Relief (the "**Foreign Representative Motion**")*

244.    The Debtors seek the entry of an order authorizing PPLP to act as Foreign Representative on behalf of the Debtors' estates in any judicial or other proceedings in a foreign country, including the Canadian Proceedings.   The Debtors further request that, as Foreign Representative, PPLP shall be expressly authorized to (i) seek recognition of these chapter 11 cases in Canada, (ii) request that the Canadian Court lend assistance to this Court in protecting the property of the Debtors' estates and (iii) seek any other appropriate relief from the Canadian Court that is just and proper in furtherance of the protection of the Debtors' estates.

245.    PPLP and certain other Debtors are named defendants in the Canadian Proceedings. An order of this Court authorizing PPLP to act as the Foreign Representative with respect to the these chapter 11 cases would, once entered, enable PPLP to seek recognition as the Foreign Representative in the Canadian Proceedings, and apply to have the Debtors' chapter 11 cases recognized by the Canadian Court.  In my opinion, authorizing PPLP to act as the Foreign Representative in the Canadian Proceedings pursuant to section 1505 of the Bankruptcy Code will allow for coordination between these chapter 11 cases and the Canadian Proceedings, and provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates, which would further the purpose of the relevant provisions of the Bankruptcy Code.

246.     In my opinion, the relief requested in the Foreign Representative Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Representative Motion should be granted.

## II.
## Information Required by Local Rule 1007-2

247.     In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

248.     Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

249.     Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' fifty (50) largest unsecured claims on a consolidated basis, excluding claims of insiders.

250.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

251.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

252.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and

classes of shares of stock, debentures and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

253.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

254.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

255.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

256.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

257.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

258.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders and partners) and the estimated amount to be paid to officers, stockholders,

directors, members of any partnerships and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' chapter 11 cases as the Debtors intend to continue to operate their businesses.

259.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the chapter 11 cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue that remain unpaid, other than professional fees.

*[Remainder of Page Intentionally Left Blank]*

## **Conclusion**

260.    This Declaration illustrates the factors that warrant the relief requested in the First

Day Motions. I declare under penalty of perjury that, to the best of my knowledge and after

reasonable inquiry, the foregoing is true and correct.

Executed:    September 15, 2019

By: _____

Jon Lowne
Senior Vice President and Chief
Financial Officer

**Schedule 1**

**Committees**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, an ad hoc committee of governmental and other contingent litigation claimants represented by Brown Rudnick LLP, Gilbert, LLP, Kramer Levin Naftalis & Frankel LLP, and Otterbourg PC has organized, but the Debtors are not aware of any other committee organized prior to the Petition Date.

## Schedule 2

### Consolidated List of 50 Largest Unsecured Claims (Excluding Insiders)

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Petition Date, the fifty (50) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

Certain of the Debtors are named as defendants in over 2,600 actions across the country in connection with the marketing and sale of opioid medications ("**Pending Actions**").  Any claims asserted against any Debtor in respect of the Pending Actions (the "**Pending Action Claims**") are contingent, unliquidated in amount and disputed.  All creditors asserting Pending Action Claims will be included in the Debtors' list of creditors.  This Consolidated List of 50 Largest Unsecured Claims (Excluding Insiders) does not include these contingent, unliquidated and disputed claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the Claim | Unsecured Claim |
|---|---|---|---|---|
| 1 | PENSION BENEFIT GUARANTY CORPORATION<br>CYNTHIA WONG<br>1200 K STREET NW<br>WASHINGTON, DC 20005 | PENSION BENEFIT GUARANTY CORPORATION<br>ATTN: CYNTHIA WONG<br>PHONE: 202-229-3033<br>FAX: 202-326-4112<br>EMAIL: WONG.CYNTHIA@PBGC.GOV | PENSION | UNDETERMINED |
| 2 | CVS CAREMARK PART D SERVICES, L.L.C.<br>ANDY ZANIN, TRADE DIRECTOR, MED D<br>1 CVS DRIVE<br>WOONSOCKET, RI 02895 | CVS CAREMARK PART D SERVICES, L.L.C.<br>ATTN: ANDY ZANIN, TRADE DIRECTOR, MED D<br>PHONE: 440-542-4010<br>EMAIL: ANDREW.ZANIN@CVSHEALTH.COM | PAYER REBATES | $19,281,161 |
| 3 | OPTUMRX, INC.<br>KENT ROGERS, SENIOR VP INDUSTRY RELATIONS<br>2300 MAIN ST<br>IRVINE, CA 92614-6223 | OPTUMRX, INC.<br>ATTN: KENT ROGERS, SENIOR VP INDUSTRY RELATIONS<br>PHONE: 949-988-6066<br>EMAIL: KENT.ROGERS@OPTUM.COM | PAYER REBATES | $15,800,513 |
| 4 | DEFENSE HEALTH AGENCY<br>COLONEL DAVID BOBB, CHIEF PHARMACY OPERATIONS DIVISION, DHA<br>16401 E CENTRETECH PKWY<br>AURORA, CO 80011-9066 | DEFENSE HEALTH AGENCY<br>ATTN: COLONEL DAVID BOBB, CHIEF PHARMACY OPERATIONS DIVISION, DHA<br>PHONE: 703-681-2890<br>EMAIL: DAVID.W.BOBB.CIV@MAIL.MIL | PAYER REBATES | $5,952,016 |
| 5 | DEPARTMENT OF HEALTH CARE SERVICES (CA)<br>ROBERT SHUN<br>PO BOX 997413<br>SACRAMENTO, CA 95899-7413 | DEPARTMENT OF HEALTH CARE SERVICES (CA)<br>ATTN: ROBERT SHUN<br>PHONE: 916-552-9609<br>EMAIL: ROBERT.SHUN@DHCS.CA.GOV | PAYER REBATES | $5,162,762 |
| 6 | CAREMARKPCS HEALTH, L.L.C.<br>SAPPAN BHATT, DIRECTOR TRADE RELATIONS<br>1 CVS DRIVE<br>WOONSOCKET, RI 02895 | CAREMARKPCS HEALTH, L.L.C.<br>ATTN: SAPPAN BHATT, DIRECTOR TRADE RELATIONS<br>PHONE: 847-559-3062<br>EMAIL: SAPPAN.BHATT@CVSHEALTH.COM | PAYER REBATES | $5,039,745 |
| 7 | AMERISOURCEBERGEN<br>DAVE VIETRI, VICE PRESIDENT BRANDED AND SPECIALTY CONTRACTS<br>3735 GLEN LAKE DR<br>CHARLOTTE, NC 28208 | AMERISOURCEBERGEN<br>ATTN: DAVE VIETRI, VICE PRESIDENT BRANDED AND SPECIALTY CONTRACTS<br>PHONE: 610-727-7310<br>EMAIL: DVIETRI@AMERISOURCEBERGEN.COM | DISTRIBUTOR FEES | $4,455,373 |
| 8 | NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>JOHN STANCIL<br>2001 MAIL SERVICE CENTER<br>RALEIGH, NC 27699-2000 | NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>ATTN: JOHN STANCIL<br>PHONE: 919-855-4305<br>EMAIL: JOHN.STANCIL@DHHS.NC.GOV | PAYER REBATES | $3,703,227 |
| 9 | MCKESSON CORPORATION<br>CHRIS ALVERSON, SENIOR VICE PRESIDENT OF SUPPLY CHAIN MANAGEMENT<br>ONE POST ST<br>SAN FRANCISCO, CA 94104-5203 | MCKESSON CORPORATION<br>ATTN: CHRIS ALVERSON, SENIOR VICE PRESIDENT OF SUPPLY CHAIN MANAGEMENT<br>PHONE: 972-446-4104<br>EMAIL: CHRIS.ALVERSON@MCKESSON.COM | DISTRIBUTOR FEES | $3,655,581 |
| 10 | CARDINAL HEALTH<br>JEFF CIZL, DIRECTOR STRATEGIC SOURCING NATIONAL BRANDS<br>1330 ENCLAVE PKY<br>HOUSTON, TX 77077-2025 | CARDINAL HEALTH<br>ATTN: JEFF CIZL, DIRECTOR STRATEGIC SOURCING NATIONAL BRANDS<br>PHONE: 614-757-3694<br>EMAIL: JEFF.CIZL@CARDINALHEALTH.COM | DISTRIBUTOR FEES | $3,465,979 |
| 11 | MISSOURI HEALTHNET DIVISION<br>CAROLINA DELAROCHA<br>PO BOX 570<br>JEFFERSON CITY, MO 65102 | MISSOURI HEALTHNET DIVISION<br>ATTN: CAROLINA DELAROCHA<br>PHONE: 573-526-5664<br>EMAIL: CAROLINA.D.DELAROCHA@DSS.MO.GOV | PAYER REBATES | $3,172,515 |
| 12 | ASCENT HEALTH SERVICES LLC<br>EDWARD ADAMCIK, PRESIDENT ASCENT HEALTH SERVICES<br>1209 ORANGE ST<br>WILMINGTON, DE 19801 | ASCENT HEALTH SERVICES LLC<br>ATTN: EDWARD ADAMCIK, PRESIDENT ASCENT HEALTH SERVICES<br>PHONE: 908-240-1537<br>EMAIL: EADAMCIK@ASCENTHEALTHSERVICES.COM | PAYER REBATES | $2,798,697 |
| 13 | WISCONSIN DEPARTMENT OF HEALTH SERVICES<br>KIM WOHLER<br>313 BLETHER RD<br>MADISON, WI 53784 | WISCONSIN DEPARTMENT OF HEALTH SERVICES<br>ATTN: KIM WOHLER<br>PHONE: 608-267-7100<br>EMAIL: KIM.WOHLER@WISCONSIN.GOV | PAYER REBATES | $2,021,937 |
| 14 | STATE OF NEW YORK DEPARTMENT OF HEALTH<br>CHRISTOPHER DESORBO<br>RIVERVIEW CENTER<br>150 BROADWAY SUITE 355<br>ALBANY, NY 12204-2719 | STATE OF NEW YORK DEPARTMENT OF HEALTH<br>ATTN: CHRISTOPHER DESORBO<br>PHONE: 518-402-0836<br>EMAIL: CHRISTOPHER.DESORBO@HEALTH.NY.GOV | PAYER REBATES | $1,963,959 |
| 15 | STATE OF NEW JERSEY DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES<br>DAVID WILLIAMS<br>LOCKBOX 655<br>TRENTON, NJ 08646-0655 | STATE OF NEW JERSEY DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES<br>ATTN: DAVID WILLIAMS<br>PHONE: 609-588-7395<br>EMAIL: DAVID.R.WILLIAMS@DHS.STATE.NJ.US | PAYER REBATES | $1,614,986 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the Claim | Unsecured Claim |
|---|---|---|---|---|
| 16 | PRIME THERAPEUTICS LLC<br>JOSH BAST, SENIOR DIRECTOR<br>PHARMACEUTICAL TRADE RELATIONS<br>PO BOX 64812<br>ST PAUL, MN 08646-0655 | PRIME THERAPEUTICS LLC<br>ATTN: JOSH BAST, SENIOR DIRECTOR PHARMACEUTICAL<br>TRADE RELATIONS<br>PHONE: 612-777-5621<br>EMAIL: JABAST@PRIMETHERAPEUTICS.COM | PAYER REBATES | $1,533,047 |
| 17 | OHIO DEPARTMENT OF MEDICAID<br>TRACEY ARCHIBALD<br>4345 N. LINCOLN BLVD.<br>OKLAHOMA CITY, OK 73105 | OHIO DEPARTMENT OF MEDICAID<br>ATTN: TRACEY ARCHIBALD<br>PHONE: 614-752-3522<br>EMAIL: TRACEY.ARCHIBALD@MEDICAID.OHIO.GOV | PAYER REBATES | $1,478,682 |
| 18 | COMMONWEALTH OF PENNSYLVANIA<br>MEDICAID DRUG REBATE PROGRAM<br>BRITTANY STARR<br>PO BOX 780634<br>PHILADELPHIA, PA 19178 | COMMONWEALTH OF PENNSYLVANIA MEDICAID DRUG<br>REBATE PROGRAM<br>ATTN: BRITTANY STARR<br>PHONE: 717-346-8164<br>EMAIL: C-BSTARR@PA.GOV | PAYER REBATES | $1,442,635 |
| 19 | GEORGIA DEPT OF COMMUNITY  HEALTH<br>REBECCA MORRISON<br>MEDICAID DRUG REBATE PROGRAM<br>ATLANTA, GA 30384-8194 | GEORGIA DEPT OF COMMUNITY  HEALTH<br>ATTN: REBECCA MORRISON<br>PHONE: 404-657-7239<br>EMAIL: REBECCA.MORRISON@DCH.GA.GOV | PAYER REBATES | $1,414,770 |
| 20 | SYNEOS HEALTH fka INVENTIV HEALTH<br>HAIYAN WANG, DIRECTOR BUSINESS<br>DEVELOPMENT, EARLY PHASE<br>1030 SYNC ST<br>MORRISVILLE, NC 27560 | SYNEOS HEALTH fka INVENTIV HEALTH<br>ATTN: HAIYAN WANG, DIRECTOR BUSINESS DEVELOPMENT,<br>EARLY PHASE<br>PHONE: 514-485-7579<br>FAX: 919-876-9360 | TRADE DEBT | $1,073,469 |
| 21 | RHODES TECHNOLOGIES INC<br>EDWARD MAHONY<br>201 TRESSER BOULEVARD<br>STAMFORD, CT 06901 | RHODES TECHNOLOGIES INC<br>ATTN: EDWARD MAHONY<br>PHONE: 203-588-7088<br>EMAIL: EDWARD.MAHONY@TXPSVCS.COM | SERVICES FEES | $1,034,752 |
| 22 | OHIO CLINICAL TRIALS INC<br>GLEN APSELOFF<br>1380 EDGEHILL RD<br>COLUMBUS, OH 43212 | OHIO CLINICAL TRIALS INC<br>ATTN: GLEN APSELOFF<br>PHONE: 614-754-1570<br>EMAIL: GLEN@OHIOCLINICALTRIALS.COM | TRADE DEBT | $600,000 |
| 23 | PPD DEVELOPMENT LP<br>STEPHEN SCALDAFERRI<br>26361 NETWORK PL<br>CHICAGO, IL 60673 | PPD DEVELOPMENT LP<br>ATTN: STEPHEN SCALDAFERRI<br>PHONE: 910-465-7800<br>EMAIL: STEPHEN.SCALDAFERRI@PPDI.COM | TRADE DEBT | $522,334 |
| 24 | OKLAHOMA HEALTH CARE AUTHORITY<br>STACEY HALE<br>PO BOX 18968<br>OKLAHOMA CITY, OK 73154-0299 | OKLAHOMA HEALTH CARE AUTHORITY<br>ATTN: STACEY HALE<br>PHONE: 405-522-7453<br>EMAIL: STACEY.HALE@OKHCA.ORG | PAYER REBATES | $400,586 |
| 25 | PHARMACEUTICAL RESEARCH ASSOC INC<br>JOSEPH DAWN<br>4130 PARKLAKE AVE STE 400<br>RALEIGH, NC 27612 | PHARMACEUTICAL RESEARCH ASSOC INC<br>ATTN: JOSEPH DAWN<br>PHONE: 434-951-3208<br>EMAIL: JOSEPHDAWN@PRAHS.COM | TRADE DEBT | $373,122 |
| 26 | WAVELENGTH ENTERPRISES INC<br>RAYMOND ALSKO<br>1700 RTE 23 N  STE 130 FIRST FL<br>WAYNE, NJ 07470 | WAVELENGTH ENTERPRISES INC<br>ATTN: RAYMOND ALSKO<br>PHONE: 973-832-9260<br>EMAIL: RAYMOND.ALSKO@WAVELENGTHPHARMA.COM | TRADE DEBT | $361,909 |
| 27 | CONTRACT PHARMACAL CORP<br>ANTHONY GARGANO<br>135 ADAMS AVE<br>HAUPPAUGE, NY 11788-3633 | CONTRACT PHARMACAL CORP<br>ATTN: ANTHONY GARGANO<br>PHONE: 631-231-4610<br>EMAIL: ANTHONY.GARGANO@CPC.COM | TRADE DEBT | $327,422 |
| 28 | PL DEVELOPMENT LLC<br>J SINGLETERRY<br>609-2 CANTIAGUE ROCK RD<br>WESTBURY, NY 11590 | PL DEVELOPMENT LLC<br>ATTN: J SINGLETERRY<br>PHONE: 516-986-1700<br>EMAIL: JSINGLETERRY@PLDEVELOPMENTS.COM | TRADE DEBT | $271,195 |
| 29 | HEALTHCORE INC<br>KELSEY GANGEMI<br>123 JUSTISON ST  STE 200<br>WILMINGTON, DE 19801 | HEALTHCORE INC<br>ATTN: KELSEY GANGEMI<br>PHONE: 302-230-2000<br>EMAIL: KGANGEMI@HEALTHCORE.COM | TRADE DEBT | $269,621 |
| 30 | COGNIZANT TECH SOLUTIONS US CORP<br>SURANJAN KAYAL<br>24721 NETWORK PL<br>CHICAGO, IL 60673 | COGNIZANT TECH SOLUTIONS US CORP<br>ATTN: SURANJAN KAYAL<br>PHONE: 201-744-3444<br>EMAIL: SURANJAN.KAYAL@COGNIZANT.COM | TRADE DEBT | $262,216 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the Claim | Unsecured Claim |
|---|---|---|---|---|
| 31 | WALRUS LLC<br>PAULA BUCHMA<br>18 E 17TH ST 4TH FL<br>NEW YORK, NY 10003 | WALRUS LLC<br>ATTN: PAULA BUCHMA<br>PHONE: 646.731.1701<br>EMAIL: PAULA@WALRUSNYC.COM | TRADE DEBT | $236,471 |
| 32 | DENVER HEALTH & HOSPITAL AUTH<br>SCOTT HOYE, GENERAL COUNSEL<br>777 BANNOCK STREET<br>DENVER, CO 80204 | DENVER HEALTH & HOSPITAL AUTH<br>ATTN: SCOTT HOYE, GENERAL COUNSEL<br>PHONE: 303-436-6000<br>FAX: 303-602-4934 | TRADE DEBT | $235,742 |
| 33 | S EMERSON GROUP INC<br>MATT POLI<br>407 EAST LANCASTER AVE<br>WAYNE, PA 19087 | S EMERSON GROUP INC<br>ATTN: MATT POLI<br>PHONE: 610-971-9600<br>EMAIL: MATT.POLI@EMERSONGROUP.COM | TRADE DEBT | $234,029 |
| 34 | INTEGRATED BEHAVIORAL HEALTH INC<br>MARY SWEET<br>3070 BRISTOL ST  STE 350<br>COSTA MESA, CA 92626 | INTEGRATED BEHAVIORAL HEALTH INC<br>ATTN: MARY SWEET<br>PHONE: 617-765-3144<br>EMAIL: MSWEET@INFLEXXION.COM | TRADE DEBT | $228,793 |
| 35 | CHALLENGE PRINTING COMPANY<br>S. YOUNG<br>PO BOX 27775<br>NEWARK, NJ 07101-7775 | CHALLENGE PRINTING COMPANY<br>ATTN: S. YOUNG<br>PHONE: 973-471-4700<br>EMAIL: SYOUNG@CHALLENGEPRINTINGCO.COM | TRADE DEBT | $210,841 |
| 36 | SPECGX LLC<br>GENERAL COUNSEL<br>385 MARSHALL AVE<br>SAINT LOUIS, MO 63119-1831 | SPECGX LLC<br>ATTN: GENERAL COUNSEL<br>PHONE: 314-654-2000<br>FAX: 800-323-5039 | TRADE DEBT | $189,371 |
| 37 | GCI HEALTH<br>MARGARET SHUBNY<br>PO BOX  101890<br>ATLANTA, GA 30392 | GCI HEALTH<br>ATTN: MARGARET SHUBNY<br>PHONE: 312.596.2648<br>EMAIL: MARGARET.SHUBNY@GCIHEALTH.COM | TRADE DEBT | $161,049 |
| 38 | TRIALCARD INC<br>LINDSEY DOBBINS<br>2250 PERIMETER PARK DR  STE 300<br>MORRISVILLE, NC 27560 | TRIALCARD INC<br>ATTN: LINDSEY DOBBINS<br>PHONE: 919-415-5494<br>EMAIL: LINDSEY.DOBBINS@TRIALCARD.COM | TRADE DEBT | $151,286 |
| 39 | PURPLE STRATEGIES LLC<br>SARAH SIMMONS<br>815 SLATERS LN<br>ALEXANDRIA, VA 22314 | PURPLE STRATEGIES LLC<br>ATTN: SARAH SIMMONS<br>PHONE: 703-548-7877<br>EMAIL: SARAH.SIMMONS@PURPLESTRATEGIES.COM | TRADE DEBT | $150,000 |
| 40 | APC WORKFORCE SOLUTIONS LLC<br>CHERISH CHONG<br>PO BOX 534305<br>ATLANTA, GA 30353 | APC WORKFORCE SOLUTIONS LLC<br>ATTN: CHERISH CHONG<br>PHONE: 305.490.6535<br>EMAIL: CCHONG@WORKFORCELOGIQ.COM | TRADE DEBT | $148,537 |
| 41 | DEZENHALL RESOURCES<br>MAYA SHACKLEY<br>1130 CONNECTICUT AVENUE NW<br>WASHINGTON, DC 20036-3904 | DEZENHALL RESOURCES<br>ATTN: MAYA SHACKLEY<br>PHONE: 202-534-3170<br>EMAIL: MSHACKLEY@DEZENHALL.COM | TRADE DEBT | $142,835 |
| 42 | ASHLAND SPECIALTY INGREDIENTS GP<br>BR KINSEY<br>8145 BLAZER DR<br>WILMINGTON, DE 19808 | ASHLAND SPECIALTY INGREDIENTS GP<br>ATTN: BR KINSEY<br>PHONE: 302-594-5000<br>EMAIL: BRKINSEY@ASHLAND.COM | TRADE DEBT | $140,487 |
| 43 | SCIECURE PHARMA INC<br>PURL<br>11 DEER PARK DR STE 120<br>MONMOUTH JUNCTION, NJ 08852 | SCIECURE PHARMA INC<br>ATTN: PURL<br>PHONE: 908-723-1209<br>EMAIL: NOLAN.WANG@SCIECUREPHARMA.COM | TRADE DEBT | $139,364 |
| 44 | FRONTAGE LABORATORIES INC<br>KEVIN LI DONGMEI WANG, SVP/GM, CMC SERVICES<br>700 PENNSYLVANIA DR<br>EXTON, PA 19341-1129 | FRONTAGE LABORATORIES INC<br>ATTN: KEVIN LI DONGMEI WANG, SVP/GM, CMC SERVICES<br>PHONE: 484-362-0395<br>EMAIL: KLI@FRONTAGELAB.COM | TRADE DEBT | $122,902 |
| 45 | COBBS CREEK HEALTHCARE LLC<br>JUN HUANGPU<br>200 MORGAN AVE<br>HAVERTOWN, PA 19083 | COBBS CREEK HEALTHCARE LLC<br>ATTN: JUN HUANGPU<br>PHONE: 610-513-8740<br>EMAIL: JHUANGPU@COBBSCREEKHEALTHCARE.COM | TRADE DEBT | $116,256 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the Claim | Unsecured Claim |
|---|---|---|---|---|
| 46 | BIOECLIPSE LLC<br>PO BOX 512323<br>PHILADELPHIA, PA 19175 | BIOECLIPSE LLC<br>EMAIL: MWEBSTER@THEACCESSGP.COM | TRADE DEBT | $113,381 |
| 47 | GLATT AIR TECHNIQUES INC<br>STEPHEN RADOVANOVICH<br>20 SPEAR RD<br>RAMSEY, NJ 07446-1221 | GLATT AIR TECHNIQUES INC<br>ATTN: STEPHEN RADOVANOVICH<br>PHONE: 201-825-6337<br>EMAIL: STEPHEN.RADOVANOVICH@GLATT.COM | TRADE DEBT | $109,135 |
| 48 | PACKAGING COORDINATORS INC<br>JIM HANEY<br>4545 ASSEMBLY DR<br>ROCKFORD, IL 61109 | PACKAGING COORDINATORS INC<br>ATTN: JIM HANEY<br>PHONE: 815-484-8900<br>EMAIL: JIM.HANEY@PCISERVICES.COM | TRADE DEBT | $108,815 |
| 49 | ALTERGON ITALIA SRL<br>VINCENZO MANNA<br>ZONA INDUSTRIALE ASI<br>MORRA DE SANCTIS, AV 83040<br>ITALY | ALTERGON ITALIA SRL<br>ATTN: VINCENZO MANNA<br>EMAIL: V.MANNA@ALTERGON.IT | TRADE DEBT | $107,512 |
| 50 | THATCHER COMPANY<br>PATRICK SCHWARTZ<br>1905 FORTUNE RD<br>SALT LAKE CITY, UT 84127 | THATCHER COMPANY<br>ATTN: PATRICK SCHWARTZ<br>PHONE: 801-972-4606<br>EMAIL: PATIRCK.SCHWARTZ@TCHEM.COM | TRADE DEBT | $103,393 |

## Schedule 3

### Consolidated List of Holders of Three largest Secured Claims

Pursuant to local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the three (3) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Name of creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1 | AIR LIQUIDE INDUSTRIAL U.S. LP | Air Liquide Industrial U.S. LP<br>180 W. Germantown Pike<br>East Norriton, PA 19401<br>(610) 239-2060 | [Undetermined] | UCC-1 |
| 2 | IKON FINANCIAL SVCS | Ikon Financial Svcs<br>1738 Bass Rd<br>Macon, GA 31210-1043<br>(478) 471-2300 | [Undetermined] | UCC-1 |
| 3 | U.S. BANK EQUIPMENT FINANCE | U.S. Bank Equipment Finance<br>1310 Madrid Street<br>Marshall, MN 56258<br>(507) 532-7000 | [Undetermined] | UCC-1 |

## Schedule 4

**Condensed Consolidated Balance Sheet (Unaudited)
as of August 31, 2019**

Pursuant to Local Rule 1007-2(a)(6), to the best of the Debtors' knowledge, belief, and understanding, the following financial statements provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates

**CONSOLIDATED PURDUE PHARMA L.P. AND PURDUE PHARMA INC.**
**CONSOLIDATED BALANCE SHEET**
AS OF AUGUST 31, 2019

| (In Millions $M) | August 31, 2019 (Unaudited) |
|---|---|
| **ASSETS** | |
| **CURRENT ASSETS** | |
| Cash & Cash Equivalents | $ 1,208 |
| Available For Sale Investments | 1 |
| Accounts Receivable, Net | 90 |
| Due From Associated Companies | 8 |
| Other Receivables | 2 |
| Inventories, Net | 100 |
| Prepaid Expenses & Other Current Assets | 51 |
| Restricted Cash | 1 |
| **TOTAL CURRENT ASSETS** | **1,461** |
| Property and Equipment, Net | 144 |
| Investments at Cost | 26 |
| Restricted Cash - Long-Term | 214 |
| Intangible Assets, Net | 105 |
| Other Assets | 22 |
| **TOTAL ASSETS** | **$ 1,972** |
| | |
| **LIABILITIES AND EQUITY** | |
| **CURRENT LIABILITIES** | |
| Accounts Payable | 28 |
| Accrued Expenses | 426 |
| Due to Associated Companies | 2 |
| **TOTAL CURRENT LIABILITIES** | **455** |
| Other Liabilities | 107 |
| **TOTAL LIABILITIES** | **562** |
| | |
| **EQUITY** | |
| Retained Earnings & Partners' Capital | 1,456 |
| Accumulated Other Comprehensive Loss | (46) |
| **TOTAL EQUITY** | **1,410** |
| **TOTAL LIABILITIES AND EQUITY** | **$ 1,972** |

## Schedule 5

### The Debtors' Securities

Pursuant to Local Rule 1007-2(a)(7), the Debtors do not have any publicly held classes of shares of stock, debentures or other securities.

## Schedule 6

**Debtors' Property Not in the Debtor's Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor or agent for any such entity.

The following lists the inventory on hand at the Emerson warehouse in Indiana which is operated by Geodis Logistics. There are de minimis amounts of inventory at other locations.

| Product Description | Product ID | Goods Count |
|---|---|---|
| Betadine First Aid Cream 0.53oz | BCFA53 | 118,524 |
| BETADINE FIRST AID CREAM 0.53OZ 2PK | BCFAB2 | - |
| Betadine Solution 1 gallon | BSOLG1 | 6,496 |
| BETADINE SOLUTION 1/2 OZ | BSOL05 | 233,150 |
| Betadine Solution 16 oz. | BSO16P | 46,932 |
| BETADINE SOLUTION 32 OZ | BSOL32 | 7,392 |
| Betadine Solution 4 oz. | BSOL04 | 423,900 |
| Betadine Solution 8 oz. | BSOL8P | 98,832 |
| Betadine Solution 8 oz. OTC | BSOL08 | 117,408 |
| BETADINE SOLUTION SWABSTICK 1s | BSWS1S | 932 |
| BETADINE SOLUTION SWABSTICK 3s | BSWS3S | 4,033 |
| BETADINE SPRAY 3oz OTC | BSPR03 | 123,492 |
| Betadine Surgical Scrub 1 gallon | BSUR1G | 1,860 |
| Betadine Surgical Scrub 16 oz. | BSUR16 | 5,316 |
| Betadine Surgical Scrub 16 oz. w/pump | BSWP16 | 3,972 |
| Betadine Surgical Scrub 32 oz. | BSUR32 | 3,042 |
| Betadine Surgical Scrub 4 oz. | BSUR04 | 79,884 |
| Betadine Veterinary Solution 1 gallon | BVSO1G | 2,816 |
| Betadine Veterinary Solution 16 oz. | BVSO16 | 16,644 |
| Betadine Veterinary Solution 32 oz. | BVSO32 | 8,160 |
| Betadine Veterinary Surgical Scrub 1 gal | BVET1G | 4,108 |
| Betadine Veterinary Surgical Scrub 16 oz | BVET16 | 14,148 |
| Betadine Veterinary Surgical Scrub 32 oz | BVET32 | 5,748 |
| BETASEPT 4% SCRUB 16 OZ | BTA016 | 6,900 |
| BETASEPT 4% SCRUB 32 OZ. | BTA030 | 3,876 |
| BETASEPT 4% SCRUB 4 OZ | BTA004 | 78,624 |
| BETASEPT 4% SCRUB 8 OZ | BTA008 | 23,256 |
| BETASEPT SCRUB 4% 32 OZ W/PUMP | BTA032 | 4,380 |
| COLACE 100 MG CAPSULES 10 CT BLISTER | COL110 | 94,512 |
| COLACE 100 MG CAPSULES 30 CT BOTTLE | COL130 | 592,548 |
| COLACE 100 MG CAPSULES 60 CT BOTTLE | COL601 | 109,572 |
| COLACE 100MG CAPS 250 CT BOTTLE | COL125 | 1,884 |
| COLACE 2-IN-1 TABLETS 10S BLISTER | COL102 | 11,568 |
| COLACE 2-IN-1 TABLETS 30S | COL302 | 340,056 |
| COLACE 2-IN-1 TABLETS 60S | COL602 | 108,888 |
| COLACE CLEAR 50MG SOFT GELS 28S | COL281 | 183,054 |
| Colace/Senokot Shelf Display | COSKDP | 8 |
| Senokot Digestive Support GingerCare | SNKG30 | 21,374 |
| Senokot Digestive Support KiwiBalance | SEKW60 | 127,890 |
| Senokot Extra Strength 36ct | SNKX36 | 42,216 |
| SENOKOT EXTRA STRENGTH TAB 17.2MG 12S | SENK09 | 2,232 |
| SENOKOT EXTRA STRENGTH TAB 17.2MG 12S | SENKV9 | 66,024 |
| Senokot Extra Strength Tab 17.2mg 12sx3 | SNKC36 | 12 |
| Senokot Ginger Care 2pk 30ct Bundle | SNKGB3 | - |
| SENOKOT TABLETS 100's | SNKT1W | 39,420 |
| SENOKOT TABLETS 20'S | SNKT20 | 112,104 |
| SENOKOT TABLETS 50S | SNKT50 | 162,312 |
| Senokot Tabs 100s & 50s Combo Pack | SNKB51 | 312 |
| Senokot Tabs 100s 2PK | SNKB11 | 192 |
| SENOKOT-S TABLETS 10's | SENS10 | 44,352 |
| SENOKOT-S TABLETS 30S | SENS30 | 246,936 |
| SENOKOT-S TABLETS 60S | SENS60 | 67,668 |
| SlowMag Mg Brain Support | SMGM60 | 124,470 |
| Slow-Mag Tablets 120's | SLO120 | 79,488 |
| SLOW-MAG TABLETS 60s | SLOM60 | 266,838 |
| **Total** | | **4,289,755** |

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their business.

### Owned Property

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Purdue Pharmaceuticals LP | 4701 Purdue Drive | Wilson | North Carolina | 27893 | USA |
| Rhodes Technologies | 498-500 Washington Street | Coventry | Rhode Island | 02816 | USA |

### Leased Property

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Avrio Health L.P. | 65 West 36th Street, 8th Floor | New York | NY | 10018 | USA |
| Imbrium Therapeutics LP | 64 Church Street, Unit 2 | Warren | RI | 02885 | USA |
| Purdue Pharma L.P. | One Stamford Forum, 201 Tresser Boulevard | Stamford | CT | 06901 | USA |
| Purdue Pharma L.P. | 120 Towne Street, Unit 318 | Stamford | CT | 06902 | USA |
| Purdue Pharma L.P. | 120 Towne Street, Unit 536 | Stamford | CT | 06902 | USA |
| Purdue Pharma L.P. | 502-538 Canal St. | Stamford | CT | 06902 | USA |
| Purdue Pharma L.P. | 1420 New York Avenue, NW, 2nd Floor | Washington | DC | 20005 | USA |
| Purdue Pharma L.P. | Princeton South Corporate Center Condominium, 100 Princeton South Corporate Center, 2nd Floor Suite 250 | Ewing | NJ | 08628 | USA |
| Purdue Pharma L.P. | 1 Harbor Point Road, Unit 1302 | Stamford | CT | 06902 | USA |
| Purdue Pharma Manufacturing LP | 5235 International Drive | Durham | NC | 27712 | USA |
| Purdue Pharma of Puerto Rico | The Atrium Office Center, 530 Ponce de Leon Ave, Unit 218 | San Juan | PR | 00901 | USA |
| Rhodes Technologies; Rhodes Pharmaceuticals LP | The Upper Mill Building, 498 Washington Street | Coventry | RI | 02816 | USA |

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets, and the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have assets of more than 1.9 billion dollars, as provided in Schedule 4, with substantial assets in Connecticut, Rhode Island, and North Carolina.

### Books and Records

The Debtors' books and records are located at 201 Tresser Blvd, Stamford, CT 06901 and 498 Washington St, Coventry, RI 02816.

### Debtors' Assets Outside the United States

The Debtors do not have any assets outside of the territorial limits of the United States.

## **Schedule 9**

### **Litigation**

Pursuant to Local Rule 1007-2(a)(11), the Debtors do not believe that there are actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent. However, certain of the Debtors are named as a defendants in over 2,600 actions across the country in connection with the marketing and sale of opioid medications ("**Pending Actions**"). Any creditor that asserts a claim against any Debtor in respect of a Pending Action will be included in the Debtors' list of creditors.

**Schedule 10**

**Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

|   | Name | Title | Tenure (Years) | Overview of Experience and Responsibilities |
|---|---|---|---|---|
| 1. | Craig Landau | President and Chief Executive Officer | 14 | Craig Landau, MD became Chief Executive Officer and President at Purdue Pharma L.P. in June 2017. Under his leadership, the Company is taking meaningful actions to address the opioid crisis through partnerships and initiatives by the office of Corporate Social Responsibility and research endeavors to accelerate solutions. Additionally, he has established new wholly-owned operating subsidiaries, which will further advance its emerging portfolio and develop its pipeline in the areas of CNS, non-opioid pain, and select oncology through internal research, strategic collaborations and partnerships.<br><br>Craig joined Purdue Pharma L.P. in October 1999.  Through his tenure with the organization, he assumed roles of increasing responsibilities up to the position of Purdue Pharma L.P.'s Chief Medical Officer and Vice President of Research & Development Innovation, Clinical, and Medical Affairs. In this role, and as part of the Company's Management Team, he and his R&D organization were responsible for several health policy initiatives and product registrations in the U.S. and other regions, including Butrans®, reformulated OxyContin® (a product determined by the U.S. Food and Drug Administration to possess abuse deterrent characteristics), Targiniq® ER and Hysingla® ER. Prior to his role as CEO in the U.S., Craig served as the Chief Executive Officer and President at Purdue Pharma (Canada).<br>Earlier in his career, he held positions of increasing responsibility for analgesic drug development within the Clinical R&D and Medical Affairs arena at Knoll Pharmaceutical Company.<br><br>Craig earned his BS in Physiology and Anatomy from Cornell University and his MD from Mount Sinai School of Medicine. He completed his Residency in Anesthesiology and specialty training in Chronic Pain Management, Obstetric and Peripheral Vascular Anesthesia at Yale |

| | | | | University. |
|---|---|---|---|---|
| | | | | Craig is also a U.S. Army Veteran, with fourteen years of distinguished service. He served as Purdue's Ambassador for the American Cancer Society's Real Men Wear Pink of Fairfield County Class of 2018. |
| 2. | Christian Mazzi | President and Executive Medical Director, Adlon Therapeutics L.P. | 0 | Christian Mazzi, MD, BSBA/BA, MBA will be joining Purdue effective September 9, 2019 as President and Executive Medical Director, Adlon Therapeutics L.P. In addition to general management of Adlon Therapeutics, a wholly-owned subsidiary of Purdue, Christian will have accountability for Medical Affairs, Pharmacovigilance & Drug Safety for Purdue and certain of its subsidiaries.<br><br>Dr. Mazzi brings more than 15 years of pharmaceutical industry experience and accomplishments as his career has advanced through a series of senior roles of increasing accountability and complexity, both in the US and internationally. Dr. Mazzi was a Partner at Bain & Company in Boston, Zurich and London where he was the Healthcare sector head. During his career, he has led assignments in strategy, acquisition, technology & pipeline valuation, and organizational integration and has been directly involved in the development and facilitation of multiple collaborations and partnerships. Most recently, Dr. Mazzi held leadership positions with Mundipharma, an independently associated company of Purdue. Dr. Mazzi is also a physician with training in internal medicine. He has worked across a broad portfolio of therapeutic areas and medical technologies, including: oncology, diabetes, trauma pain, specialty antibiotics, molecular diagnostics, and mental health.<br><br>Dr. Mazzi holds a Masters of Business Administration (MBA) from INSEAD, a Medical Degree from the |

| | | | | University of Sydney, and graduated from Boston University's dual degree program (BUCOP) with a Bachelor of Arts in Biology and a Bachelor of Science in Business Administration (BSBA/BA). |
|---|---|---|---|---|
| 3. | Marc Kesselman | SVP, General Counsel | 1 | Marc Kesselman was appointed General Counsel of Purdue Pharma L.P. in July 2018, with responsibility for Purdue's legal strategy, corporate governance, compliance and government affairs. <br><br> Prior to joining Purdue Pharma L.P., Marc worked for YUM! Brands, Inc. where he served as Chief Legal Officer, Corporate Secretary & Chief Public Policy Officer.  In that role, he oversaw all aspects of legal, compliance, regulatory, government affairs, and sustainability agendas for one of the world's largest restaurant companies, with more than 45,000 restaurants in 135 countries and territories.  Marc joined Yum! from Dean Foods where he held a similar role.  Previously, he was Senior Vice President & General Counsel at PepsiCo America's Foods where he oversaw a wide variety of complex commercial, transactional, litigation, regulatory, and government affairs issues relating to PepsiCo's food businesses in North and South America. <br><br> From 2006 through 2008, Marc served as General Counsel of the U.S. Department of Agriculture (USDA), where he advised the Secretary of Agriculture and directed all legal activity for the USDA. From 2003-2006 he served as Deputy General Counsel in the White House Office of Management and Budget, where he handled a variety of regulatory, budgetary and legal policy matters.  Marc also worked at the U.S. Department of Justice as Senior Counsel in the Office of Legal Policy and as a Trial Attorney in its Civil Division. His work there earned him the John Marshall Award, the Attorney General's highest recognition for trial of litigation. <br><br> Marc is Public Member of the Administrative Conference of the United States, and he currently serves on the Board of the U.S. Chamber of Commerce Litigation Center, and the Penn Law Alumni Board of Managers. He also recently served as a Member of the Leadership Council on Legal Diversity.  He |

| | | | | has previously served on the Board of the Dallas Symphony, on the Campaign Cabinet of the United Way of Metropolitan Dallas, and as Chair of the DC Bar Administrative Law Section. Marc holds a JD from the University of Pennsylvania, and a BS in Government from Cornell University. |
|---|---|---|---|---|
| 4. | David Lundie | Chief Operating Officer, Rhodes Technologies | 11 | David Lundie joined Purdue in 2004 after a successful career with Élan Pharmaceuticals, where he held key management positions in the U.S. and Ireland.<br><br>David is the Chief Operating Officer of Rhodes Technologies, a fine chemical manufacturing company, and Rhodes Pharmaceuticals L.P., a pharmaceutical company that develops and commercializes pharmaceutical products. David is also responsible for achieving supply chain operational synergies, and he is responsible for the overall manufacturing functions for Purdue and Rhodes, including Manufacturing, Supply Chain, Technical Services and Quality, and with strategic manufacturing and supply chain partners.<br><br>David has a Bachelor of Science degree in Molecular Genetics from Trinity College in Dublin, Ireland, and a Diploma in Management from the Irish Management Institute. |
| 5. | Jon Lowne | SVP, Chief Financial Officer | 24 | Jon Lowne joined Purdue in 1995 after 8 years with Price Waterhouse, working in the audit and business advisory group. Jon worked out of the London England, Warsaw Poland, Stamford, CT and Morristown, NJ offices and gained experience in financial accounting, audit, taxation and due diligence reviews of acquisitions and divestitures across the U.S., the U.K., and Eastern Europe.<br><br>Jon began his career at Purdue Pharma L.P. as Senior Internal Auditor. Jon has gained increasing responsibility |

| | | | | and over his tenure at Purdue Pharma Jon served as Controller from 2005 to July 2017, Acting CFO from August 2017 to February 2018 and became SVP, CFO effective March 2018.  He is responsible for Finance, IT, Procurement, Commercial Analytics, Pricing and Market Access.<br><br>Jon earned his BA degree in accounting at Nottingham University, England. He became a Chartered Accountant in 1990. |
|---|---|---|---|---|
| 6. | Paul Medeiros | SVP, Corporate and Business Development (PPLP) and President, Imbrium Therapeutics | 15 | Paul Medeiros is Senior Vice President, Corporate and Business Development of Purdue Pharma L.P. and President and founding executive of its subsidiary Imbrium Therapeutics L.P.  Paul oversees and directs overall business strategy and operations, including R&D, early commercial development and business development and licensing.<br><br>Paul is a proven business leader with a broad track record of success in biopharma strategy and planning, global marketing and commercialization, and corporate development and licensing. Paul co-chaired the corporate transformation program that directed the company's organizational redesign, and establishment of subsidiary Imbrium Therapeutics to advance the Purdue group's future non-opioid Rx product portfolio. Paul also concurrently serves as President of Greenfield BioVentures, a biopharma investment / accelerator firm and Purdue Pharma subsidiary.<br><br>Previously, Paul held the position of Senior Vice President of Corporate and Business Development at Mundipharma International in Cambridge UK, where he held responsibility for corporate development strategy and execution as well as for commercial development, alliance management and corporate communications. Prior to joining Mundipharma, Paul served as Senior Vice President and Chief Business Officer of the publicly traded US biotech AVI BioPharma (now Sarepta Therapeutics), where he co-directed portfolio planning, participated in two equity raises, and where his leadership team sourced the then largest US Department of Defense contracts ever awarded for drug development of biodefense therapeutics. Paul also spent 12 years at Schering-Plough Pharmaceuticals where he held leadership roles of progressing scope and responsibility including head of global marketing for the Claritin allergy franchise, worldwide commercial head for the Merck Schering-Plough respiratory joint venture, and Vice President of global licensing and strategic alliances. Paul began his pharma career as a MBA leadership trainee at Merck & Company. |

| | | | | |
|---|---|---|---|---|
| | | | | Paul currently serves on the Board of Directors of Praxis Precision Medicine, a private CNS-focused biotechnology start-up in Cambridge MA, and he previously served on the boards of Kolltan Pharmaceuticals and Mundipharma EDO GMBH.<br><br>Paul received his AB with Honors from Brown University and his MBA from Columbia University Graduate School of Business. |
| 7. | Philip Strassburger | SVP, IP Strategy & Litigation | 20 | Phil Strassburger joined Purdue Pharma L.P. in 1999 after serving as Senior Patent Counsel at Pfizer Inc, and as an Associate at the New York law firms of Hedman Gibson, and Bryan Cave LLP.  He currently serves as the SVP, IP Strategy & Litigation.<br><br>Before he began his legal career, Phil practiced as a chemical engineer in The Netherlands.  Phil began his career at Purdue as Chief Patent Counsel, and was later named Vice President, Intellectual Property Counsel, and Senior Vice President, General Counsel. At Purdue Pharma, Phil currently has responsibility for intellectual property prosecution and litigation. Phil has negotiated numerous acquisitions, licenses, and patent settlements throughout the world.<br><br>Phil received his BS degree in Chemical Engineering and his BA in Philosophy from Tufts University, and a Juris Doctorate degree from the University of Connecticut. He is admitted to practice in New York and Connecticut as well as the U.S. Patent and Trademark Office. |
| 8. | Caroline Chomiak | President, Avrio Health | 2 | Carrie Chomiak is the President and General Manager for Avrio Health L.P., a wholly owned subsidiary of Purdue Pharma L.P. Carrie joined the organization in April 2017 after serving approximately 20 years at Pfizer Consumer Healthcare (PCH) in various commercial sales, marketing and general management roles across the portfolio of brands. At PCH she also served as a member of the U.S. leadership team and lead the U.S. Digestive Health franchise. During her tenure at PHC held various commercial leadership roles within the Nutrition, Respiratory, Pain, Personal Care and Digestive Health franchises.<br><br>Carrie leads the Consumer Health business for Avrio Health, and is responsible for ensuring the business success of the subsidiary, which includes a complete line of Consumer Health Product — Betadine®, Senokot®, Colace® and Slow Mag®. |

| | | | | Carrie holds a BS in Marketing from Monclair State University. |
|---|---|---|---|---|
| 9. | Randy Shamblen | President, Rhodes Technologies | 22 | Mr. Shamblen joined the company in 1997 as Vice President of Plant Operations in Coventry and as the only company representative on site was responsible for providing operations, engineering, environmental and other guidance during final negotiations leading to the successful acquisition of the Coventry site in February, 1998.  Mr. Shamblen then led efforts to re-staff the site and re-start manufacturing operations (included hiring operations and support staff, obtaining operating permits, effectively dealing with Rhode Island public relations, press, local and state political officials, etc.).  Mr. Shamblen subsequently led a $94 M capital expansion project to install controlled substance Active Pharmaceutical Ingredient manufacturing at the site, including obtaining DEA controlled substance manufacturing, import and export registrations.  Mr. Shamblen was promoted to his current position as President in 2008.  During the past 22 years, Mr. Shamblen has been responsible for all operating aspects of the business, including achieving outstanding long-term manufacturing, safety, health, environmental, FDA, DEA and other regulatory compliance track records.<br><br>From 1978 to 1997, Mr. Shamblen worked in various engineering, operations and leadership roles of increasing responsibility within Celanese, Hoechst Celanese, Celanese Bulk Pharmaceuticals & Intermediates and Ticona Engineering Resins business units.  Locations included Virginia, South Carolina, Rhode Island, North Carolina and a 3 year expatriate leadership role in the People's Republic of China.<br><br>Mr. Shamblen graduated cum laude from West Virginia University with a Bachelor of Science Chemical Engineering in 1978. |

| 10. | Vincent Mancinelli | President, Rhodes Pharmaceuticals L.P. | 8 | Vincent is the President of Rhodes Pharmaceuticals and has over 30 years of leadership experience in the pharmaceutical industry. He began leading Rhodes Pharmaceuticals in November, 2010. From 2009-2010 he was a co-founder and Chief Operating Officer of GenPak Solutions, a specialty pharmaceutical packaging company. Previously, he held various senior executive roles at Mylan from 1986 to 2009 including Head of North American Operations and Executive Vice-President and General Manager of UDL Laboratories, a subsidiary of Mylan. He earned his Bachelor's degree in Biology from West Virginia University. |

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | $9,850,000.00 |
| **Payments to Officers, Stockholders, and Directors*** | $1,550,000.00 |
| **Payments to Financial and Business Consultants** | $0.00 |

*Payments to Officers, Stockholders, and Directors include regular bi-weekly payroll amounts to officers and monthly or quarterly board of director fees.

## Schedule 12

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $111,217 |
| **Cash Disbursements** | $(133,890) |
| **Net Cash Loss** | $(22,673) |
| **Unpaid Obligations** | $112,161 |
| **Uncollected Receivables** | $112,478 |