DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-[    ](RDD) |
| Debtors. [1] | (Joint Administration Pending) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PRE-PETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS <u>RELATED CHECKS AND TRANSFERS</u>**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession

in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") hereby move

(this "**Motion**") this Court for entry of interim and final orders, substantially in the forms

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

attached hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and the "**Final Order**," respectively), granting the relief described below.  In support thereof, the Debtors refer to the contemporaneously filed *Declaration of Jon Lowne in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Lowne Declaration**") and further represent as follows:

**Jurisdiction and Venue**

1.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

2.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a statutory committee of creditors in these chapter 11 cases, nor has the Court appointed a trustee or examiner therein.

3.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

4.      PPLP and its direct and indirect subsidiaries other than the Rhodes Debtors (defined below) (the "**Purdue Debtors**") primarily operate a branded pharmaceuticals business, while Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries (the "**Rhodes Debtors**") primarily develop and distribute generic pharmaceutical products and manufacture a range of active pharmaceutical ingredients.

5.      Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed contemporaneously herewith.

**Relief Requested**

6.      By this Motion, and pursuant to sections 105(a), 362(d) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Debtors seek entry of an Interim Order and Final Order: (a) authorizing, but not requiring, them to pay, in their sole discretion, amounts owing (and associated costs) under or related to Wages, Sign-On Bonuses, Withholding Obligations, Reimbursement Obligations, Relocation Obligations, Health and Welfare Plan Obligations, Vacation and Sick Leave Obligations, Leave of Absence Obligations, Savings Plans Obligations, Severance Obligations, Workers' Compensation Obligations, Contingent Workers Obligations, Incentive Plan Obligations (solely to non-insiders), Retention Payments (solely to non-insiders), Advancement of Expenses, Automobile Cash Benefits and Other Employee Programs (each as individually defined below and, collectively, the "**Pre-petition Employee Obligations**"), (b) unless otherwise set forth herein, authorizing, but not requiring, them to continue, in their sole discretion, their plans, practices, programs and policies for their Employees and Retirees (each as defined below) in effect as of the Petition

3

Date and as may be modified, terminated, amended or supplemented from time to time, in their

sole discretion, and to make payments pursuant to such plans, practices, programs and policies

in the ordinary course of business, as well as to pay related administrative obligations,

(c) permitting Employees and Retirees holding claims under the Workers' Compensation

Programs to proceed with such claims in the appropriate judicial or administrative fora and

permitting insurers to continue to access collateral and security provided by the Debtors

pursuant to the Workers' Compensation Programs and (d) authorizing applicable banks and

other financial institutions (the "**Banks**") to receive, process and pay any and all checks drawn

on the Debtors' payroll and general disbursement accounts and automatic payroll and other

transfers to the extent that those checks or transfers relate to any of the foregoing.

7.      The Debtors intend to pay all Employees and, where applicable, former

Employees, with respect to validly earned Pre-petition Employee Obligations that the Debtors

would be required to pay in the ordinary course of business, other than severance or retention

payments to insiders in excess of the amounts permitted under section 503(c) of the Bankruptcy

Code. For the avoidance of doubt, no member of the Sackler family is an Employee and no

payments will be made to or for the benefit of any Sackler family member pursuant to the relief

requested in this Motion.

### Pre-petition Employee Obligations

**A.      Wages, Salaries and Other Compensation**

8.      The Debtors currently employ approximately 700 people in an active status,[2]

working in both full and part-time positions,[3] including executives, business and operational

---

[2] In addition, approximately 40 of the Debtors' Employees are on short-term disability, long-term disability or severance (four of such Employees are employees of the Rhodes Debtors). While such Employees are not receiving wages, some may be receiving other benefits, including, but not limited to, severance payments, disability payments from health and welfare benefit plans or programs, workers' compensation benefits from state-mandated programs,

managers, sales and marketing personnel, medical affairs personnel, research and development personnel, technology operations personnel, human resource professionals, information technology specialists, administrative support staff and other personnel (together with current members of the Debtors' boards of directors, the "**Employees**"). Approximately 490 of the Employees work for the Purdue Debtors and 210 of the Employees work for the Rhodes Debtors. The business of the Rhodes Debtors is divided into legal entities that each have their own employees —Rhodes Pharmaceuticals L.P. and Rhodes Technologies.

9.      The Debtors' Employees are paid bi-weekly, on Fridays.[4]  Payroll is funded by the Debtors to Ceridian, the Debtors' payroll administrator, on the Thursday immediately prior to when Employees are paid. The Debtors' average bi-weekly gross payroll is approximately $4,700,000 (the "**Wages**"). The Debtors estimate that as of the Petition Date they owe approximately $2,350,000 in wages and salaries to Employees. The Debtors do not believe that any individual is owed pre-petition Wages that would exceed the $13,650 priority claim cap, and, prior to entry of the Final Order, the Debtors will not pay any individual pre-petition Wages that would exceed such cap.

**B.      Withholding Obligations**

10.      The Debtors routinely withhold from Employees' wages certain amounts that the Debtors are required to transmit to third parties for such purposes as Social Security, Medicare, federal, state, local and disability taxes, Health and Welfare Plan (as defined below)

---

(continued…)

severance benefits, continuation of medical, dental and vision benefits and/or certain life insurance benefits, depending on the type of leave and/or years of service.

[3] The Debtors have approximately three part-time Employees (two are employees of the Purdue Debtors, and one is an employee of Rhodes Technologies Inc.).

[4] Regular, full-time employee wages are paid through the applicable pay date, while overtime and part-time employee wages are paid one week in arrears.

contributions, 401(k) Plan (as defined below) contributions, Supplemental Savings Plan (as defined below) contributions and payroll deduction payment programs for various optional insurance programs, cafeteria expenses, qualified transportation, charitable deductions, 401k loan re-payments, child support and other similar orders (collectively, the "**Withholding Obligations**"). The Debtors believe that such withheld funds, to the extent that they were in the Debtors' possession as of the Petition Date and/or remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates.

## C. Business Expense Reimbursement

11. The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their business duties on behalf of the Debtors.[5] These reimbursement obligations include lodging, transportation, meals, office supplies, membership dues for professional organizations and other miscellaneous business expenses (collectively, the "**Reimbursement Obligations**").

12. Employees submit expense reports through Databasics or SAP Ariba, expense tracking software programs. Employees are reimbursed in connection with each bi-weekly pay cycle by the Debtors for approved expense reports submitted through the Databasics system or through separate electronic transfer or check for expenses submitted through the SAP Ariba system. It is difficult for the Debtors to determine the exact amount of Reimbursement Obligations outstanding at any particular time because of the generally unpredictable and irregular nature of the Reimbursement Obligations and the timing of submission of expense

---

[5] With respect to certain employee expenses, including certain legal, medical and other professional licensing fees associated with the roles of applicable employees, the Company instead pays such expenses directly to the relevant organization in the ordinary course of business.

reports. However, as of the Petition Date, the Debtors estimate that the outstanding Reimbursement Obligations are *de minimis*.

**D.      Relocation Benefits**

13.      The Debtors also offer relocation benefits to Employees who relocate at the request of the Debtors in furtherance of the Debtors' business needs (the "**Relocation Obligations**"). The Relocation Obligations generally include amounts incurred for property rental assistance, temporary lodging and housing, moving expenses, travel expenses for housing services and visits, storage, home purchase option, lease termination and sales and marketing assistance. The Relocation Obligations also include making annual tax payments directly to certain taxing authorities on behalf of the relevant Employees to account for the tax implications of their receipt of such relocation benefits. As of the Petition Date, the Debtors estimate that Relocation Obligations with respect to Employees who are currently entitled to receive relocation benefits will total $1,242,000.

**E.      Health and Welfare Benefits**

14.      The Debtors offer several health and welfare benefit plans and programs (each, a "**Health and Welfare Plan**" and collectively, the "**Health and Welfare Plans**," and the obligations with respect thereto, the "**Health and Welfare Plan Obligations**") for Employees, certain former employees and certain retirees (the "**Retirees**"), including coverage for medical, dental, vision, prescriptions, flexible spending accounts, health savings accounts, retiree reimbursement accounts, basic and voluntary supplemental life, retiree life, personal accident, travel accident, short-term and long-term disability and certain other insurance, employee assistance and benefit programs.

15.     The Purdue Debtors' medical, dental and prescription insurance plans (the "**Purdue Health Plans**") are self-insured.  In connection with the Purdue Health Plans, the Purdue Debtors purchased stop-loss insurance (the "**Stop-Loss Coverage**") that provides additional protection against catastrophic claim accumulation above predetermined individual thresholds. Cigna administers the Purdue Health Plans and provides the Stop-Loss Coverage. The Debtors pay approximately $481,000 per year to Cigna in premiums for the Stop-Loss Coverage.

16.     Employees of the Rhodes Debtors are eligible to participate in either a medical and prescription insurance plan that is insured by and administered through Blue Cross Blue Shield of Rhode Island (the "**Rhodes Medical Plan**") or the Purdue Debtors' self-insured medical and prescription insurance plans administered by Cigna.

17.     Other Health and Welfare Plans offered by the Debtors are also insured by and/or administered through third-party providers, including: (a) UnitedHealthcare (vision), (b) the Standard (life insurance and dependent life insurance, short-term disability, long-term disability, personal accident insurance), (c) the Hartford (travel accident and accidental death and dismemberment), (d) WageWorks (flexible spending accounts), (e) HSA Bank (health savings accounts) and (f) Aetna medical and prescription health insurance plans (for internationally-located family members of certain Employees).

18.     In 2018, the Debtors incurred expenses of approximately (a) $19.11 million for payments under the Purdue Health Plans and Rhodes Medical Plan, (b) $261,000 for contributions to health savings accounts, (c) $33,000 for administrative costs of flexible spending accounts, (d) $104,000 for payments under the Debtors' vision plan, (e) $1,167,000 for payments under life, personal accident insurance, short-term disability and long-term

8

disability insurance plans, (f) $38,000 for payments under travel and accident and accidental death and dismemberment insurance plans, (g) $1,209,000 in reimbursements to retirees for qualified medical expenses and (h) $166,000 in other wellness and benefit programs.

19.     Because of the manner in which such expenses are incurred and claims are processed under the Health and Welfare Plans, it is difficult for the Debtors to determine the extent of their obligations under the Health and Welfare Plans outstanding at any particular time. As of the Petition Date, the Debtors estimate that the outstanding Health and Welfare Plan Obligations are $3,103,000. Based on historical experience, the Debtors estimate that the Health and Welfare Plan Obligations will be approximately $1,383,000 per month going forward.

**F.      Vacation Policy and Sick Leave**

20.     Pursuant to the Debtors' vacation policies, eligible Employees are paid their regularly scheduled full or part time wage, for each vacation day, up to the maximum number of days accrued ("**Vacation**"). Vacation time accrues based on an Employee's tenure with the Debtors. Non-exempt Employees accrue two work weeks of Vacation per calendar year until their fifth year of continuous employment, three work weeks of Vacation per calendar year beginning in their fifth year of continuous employment, four work weeks of Vacation per calendar year beginning in their tenth year of continuous employment and one additional Vacation day is added per calendar year beginning in their fifteenth year of continuous employment until annual Vacation day accrual equals five work weeks per calendar year. Exempt Employees accrue three work weeks of Vacation per calendar year until their tenth year of continuous employment, four work weeks of Vacation per calendar year beginning in their tenth year of continuous employment, and one additional Vacation day is added per calendar year beginning in their fifteenth year of continuous employment until annual Vacation day

accrual equals five work weeks per calendar year.  Accrued Vacation may not be carried from one calendar year to the next, unless specifically authorized by a supervisor and the Human Resources department.[6]  If authorized, no more than one work week may be carried over and all carry-over vacation must be taken by March 31st of the next calendar year.  Upon (but not prior to) termination of employment, all accrued but unused Vacation days are paid out (the "**Vacation Cash-Out**" and together with the Vacation, the "**Vacation Obligations**").  In 2018, the Debtors paid an aggregate of approximately $2,503,000 on account of the Vacation Cash-Out.  The Debtors intend to honor Vacation Obligations in the ordinary course of business.

21.     The Debtors' Employees have paid time off ("**PTO**") for twelve holidays per year.  PTO for full-time non-exempt Employees also includes two personal days, and such Employees receive pay for each unused personal day as of the end of each calendar year during the first quarter of the following year at the rate of pay received as of the end of the previous year (the "**PTO Cash-Out**" and together with the PTO, the "**PTO Obligations**").  In 2018, the Debtors paid an aggregate of approximately $107,000 on account of the PTO Cash-Out.  The Debtors intend to honor the PTO Obligations in the ordinary course of business.

22.     The Debtors also provide sick leave and/or personal time off to their Employees ("**Sick Leave**").  In the first calendar year of employment, full-time non-exempt Employees accrue one day of sick leave per month beginning on the first day of the month after the date of employment, up to a maximum of six days. Thereafter, full-time non-exempt Employees are provided with six sick leave days per calendar year. Unused sick leave days are paid out following the end of each calendar year but are not paid out upon termination of employment (the "**Sick Leave Cash-Out**" and together with Sick Leave, the "**Sick Leave Obligations**"; the

---

[6] Subject to any applicable Federal, state and local laws, including any state laws that may require vacation carry-over.

Sick Leave Obligations together with the Vacation Obligations and the PTO Obligations, the "**Vacation and Sick Leave Obligations**").

23.    The Debtors also provide a variety of both paid and unpaid leave of absence benefits to certain Employees (collectively, the "**Leave of Absence Obligations**"). Under the Debtors' short-term medical leave policy, which the Debtors self-insure, benefits vary based on Employee status for the first 30 days, and for the 31st day of continuous absence through the 180th day, full-time Employees are eligible for disability pay in an amount equal to 70% of annual base salary less any amount the Employee receives from workers' compensation, state disability or any other income sources. For leaves of absence exceeding 180 days, the Debtors' long-term disability benefits are covered through an insurance carrier (included in Health and Welfare Plan Obligations above). The Debtors also offer parental leave and leave for certain family and/or medical reasons under the Family and Medical Leave Act.

## G.    Workers' Compensation Program

24.    Under applicable law, the Debtors are required, through self-insurance or third-party insurers, to provide their Employees and Retirees with workers' compensation insurance coverage for claims arising from or related to their employment with the Debtors (the "**Workers' Compensation Programs**"), and to satisfy the Debtors' obligations arising under or related to these programs (the "**Workers' Compensation Obligations**").  The Purdue Debtors maintain a high-deductible workers' compensation insurance policy with Liberty Insurance Corporation ("**Liberty**"). To secure the Debtors' obligation to pay amounts up to the deductible, the Purdue Debtors have posted collateral in favor of Liberty in the amount of $1.66 million[7]

---

[7] This amount is held in a trust account with Wells Fargo Bank, N.A. and also supports the Debtors' high-deductible automobile liability insurance policy. See *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Policies and Honor All*

and another $110,000 is held in escrow for Liberty. The Purdue Debtors also maintain a workers' compensation insurance policy with the Insurance Company of the State of Pennsylvania for excess liability arising from claims made by Employees who are United States nationals working abroad. The Rhodes Debtors maintain a separate workers' compensation insurance plan with Liberty.

25.     There are approximately 16 open claims (the "**Workers' Compensation Claims**") under the Workers' Compensation Programs, with an amount totaling approximately $1,670,000. As of the Petition Date, the Debtors estimate that they owe approximately $340,000 on account of the Workers' Compensation Claims. The aggregate average monthly cost of Workers' Compensation Obligations paid by the Debtors is approximately $40,000.

**H.     Savings Plans, Pension Plans and Non-Medical Retirement Obligations**

26.     The Debtors offer savings and benefit plans, including the 401(k) Plan, Pension Plan and Supplemental Savings Plan (each as defined below) (collectively, the "**Savings Plans**," and the obligations with respect thereto, the "**Savings Plan Obligations**").

27.     The Debtors offer a 401(k) retirement savings plan to all regular, full-time and part-time Employees of the Debtors[8] (the "**401(k) Plan**"). The 401(k) Plan is a qualified defined contribution savings plan. The Debtors generally match an Employee's voluntary contributions at a rate of 50 cents for every dollar contributed up to 6% of the Employee's eligible

---

(continued…)
*Obligations in Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers* for additional information.

[8] Employees of certain non-Debtor affiliates are also participants in the 401(k) plan, but any employer contributions to the 401(k) plan on behalf of employees of the non-debtor affiliates are funded by the applicable non-Debtor affiliate and the Debtors do not do not process or pay any payroll costs with respect to such employees.

compensation, subject to limits under the Internal Revenue Code.  Employees are immediately vested in the matching contributions made by the Debtors to Employee 401(k) Plan accounts.

28.    Employees employed after January 1, 2013 or who were employed as of December 31, 2012 but not eligible for continued participation in the Defined Benefit Pension Plan (defined below) are eligible for retirement contributions by the Debtors to such Employees' 401(k) Plan accounts.  Retirement contributions by the Debtors are calculated as a percentage of eligible compensation, based on age and service, ranging from two percent until the maximum contribution of five percent.  Pension Plan participants who were accruing benefits under the Pension Plan on December 31, 2017 are eligible to receive an additional retirement contribution in an amount equal to five percent of their eligible compensation. Employees will be fully vested in retirement contributions contributed on their behalf upon the completion of three years of credited service. The Debtors estimate their matching contributions and retirement contributions under the 401(k) Plan to be approximately $1,251,000 per month.

29.    The Debtors maintain a qualified defined benefit pension plan under the Internal Revenue Code and the Employee Retirement Income Security Act of 1974 ("**ERISA**") for certain of their Employees, former employees and Retirees, and certain employees, former employees and retirees of certain non-Debtor affiliates, and beneficiaries of the foregoing (the "**Pension Plan**"). The Pension Plan covers approximately 3,520 participants. While eligibility for the Pension Plan was frozen on January 1, 2013 and the accrual of additional benefits by existing participants in the Pension Plan was frozen on January 1, 2018, pension obligations continue to exist.

30.    As of late August 2019, the Pension Plan was approximately 80% funded on a current basis. Under the Internal Revenue Code and ERISA, the Debtors may be required to

13

make minimum funding contributions to the Pension Plan based on actuarial calculations ("**Minimum Funding Obligations**"). As of the Petition Date, the Debtors do not have any outstanding Minimum Funding Obligations and no Minimum Funding Obligations are currently anticipated to be due until 2023.  By this Motion, the Debtors are not seeking any authority to pay any Minimum Funding Obligations or make any other contributions. If the Debtors seek in the future to pay any Minimum Funding Obligations or make any other contributions to the Pension Plan, they will seek such authority by separate motion or in connection with a proposed chapter 11 plan.

31.     The Pension Plan is insured by the Pension Benefit Guaranty Corporation ("**PBGC**"), a wholly-owned United States government corporation that administers the pension plan termination insurance program created under ERISA. The Debtors are obligated to make certain statutory insurance premium payments to the PBGC (the "**PBGC Premiums**"). The Debtors' PBGC Premiums are payable annually and the Debtors estimate that the PBGC Premium due in September 2019 will be approximately $1,600,000. The Debtors have historically paid all PBGC Premiums as and when due and, accordingly, do not believe that they owe any pre-petition amounts on account of PBGC Premiums.

32.     In addition, the Debtors maintain a supplemental, non-qualified savings plan (the "**Supplemental Savings Plan**") for certain salaried employees. Under the Supplemental Savings Plan, certain Employees are eligible to save the after-tax value of up to 10% of their eligible compensation in investment accounts owned by each Employee, and the Debtors match such Employee contributions on a dollar for dollar basis. The Debtors estimate the matching contributions under the Supplemental Savings Plan to be approximately $194,000 per month.

The Debtors request authority to continue the Supplemental Savings Plan in the ordinary course of business.

## I.    Severance

33.    The Debtors maintain a company-wide severance plan (the "**Severance Plan**") for eligible Employees. Under the Severance Plan, Vice Presidents with less than five years of employment with the Debtors receive six months of severance pay and those with greater than five years of service receive one year.  Employees below Vice President receive either two or three weeks of severance pay for each year they have worked for the Debtors depending on grade level (with a minimum of eight weeks and a maximum of fifty two weeks of severance pay). Severance payments are made bi-weekly and are based on the applicable Employee's wages prior to termination. Medical, prescription, dental, vision and life insurance coverage continues through the applicable severance period.  The Debtors believe that having the authority, in their discretion, to maintain the Severance Plan is essential to their businesses in order to retain, motivate and provide security to, their Employees.  For instance, the Debtors recently sold their Treyburn, North Carolina manufacturing facility to Novo Nordisk.  The Debtors intend to lease and continue to use this facility through November 2019, before consolidating manufacturing operations at their Wilson, North Carolina location.  The Debtors must retain staff at the Treyburn plant to meet production requirements during this time, to transfer activities to the Debtors' Wilson, North Carolina site and to ensure an overall smooth transition to Novo Nordisk.  In connection with the sale and transition, the Debtors expect that approximately 14 non-insider Employees' roles will be eliminated.  If the Debtors are unable to honor their obligations and the Severance Plan (the "**Severance Obligations**"), Employees at this critical facility may be unwilling to continue through the transition period, and the Debtors

may be unable to replace skilled workers at this state-of-the-art and highly regulated facility. Such a result would significantly disrupt operations and meaningfully harm the Debtors' businesses.   As of the Petition Date, the Debtors estimate that their Severance Obligations consist of approximately $660,000 on account of current Employees at the Treyburn location plus approximately $485,000 on account of other Employees.   Pursuant to this Motion, the Debtors seek authority, in the exercise of their discretion, to continue the Severance Plan post-petition and to pay Severance Obligations in the ordinary course; *provided* that the Debtors will not make any payments to insiders on account of Severance Obligations prior to entry of an order granting the relief requested herein on a final basis, *provided further* that the Debtors will not at any time make any payments not permitted under section 503(c) of the Bankruptcy Code, including the cap on severance payments to insider provided in section 503(c)(2), as the proposed Interim Order and Final Order attached hereto clearly provide.

## J.    Contingent Workers

34.    From time to time, the Debtors use the personal services of individuals employed by, and provided through, staffing agencies and of individuals providing personal services directly as temporary employees, independent contractors and consultants (collectively, the "**Contingent Workers**").  The Contingent Workers work in a variety of departments, including, but not limited to: human resources, risk management, marketing, manufacturing, production, compliance, research and development and finance.  Payments to the Contingent Workers vary according to the terms of their individual contracts with the Debtors or according to the terms of the Debtors' contract with the relevant staffing agencies.   The services provided by the Contingent Workers are necessary to the operation of the Debtors' businesses.  Absent authority to continue to honor Contingent Workers Obligations (defined below), the Debtors would risk

losing the services of the Contingent Workers, which could cause severe disruptions across critical departments. Such disruptions would be particularly harmful at this time when the Debtors' operations are subject to immense burdens associated with the commencement of these chapter 11 cases.  It is difficult for the Debtors to determine the total accrued and unpaid pre-petition obligations to the Contingent Workers because of the generally unpredictable and irregular nature of and schedule for incurrence of the obligations.  While difficult to estimate, the Debtors believe that their total accrued and unpaid pre-petition obligations to staffing agencies that provide Contingent Workers do not exceed $600,000 (the "**Contingent Workers Obligations**").

**K.      Annual Incentive Plan**

35.      As a part of their overall Employee compensation plan, the Purdue Debtors maintain a long-standing annual incentive program (the "**Purdue AIP**") for certain of their Employees, which has been in place substantially in its current form for over thirty years.  The Purdue AIP designates payments on an annual basis to eligible Employees based on a combination of Employee performance and the performance of the Company, as compared with the target performance goals set for the Employee and Company, as approved by the Board of Directors of Purdue Pharma Inc. (the "**Board**").  The Rhodes Debtors also maintain long-standing annual incentive programs (the "**Rhodes AIP**" and, together with the Purdue AIP, the "**Debtors' AIPs**") for certain of their Employees. The payments under the Rhodes AIP are similarly based on a combination of individual and Company performance for exempt Employees (while payments to non-exempt employees are based on individual performance), as approved by the Board.  The Debtors' AIPs are not retention plans.  The Debtors' AIPs have not been altered or amended in any way in connection with these chapter 11 cases, and have been

consistently used to drive Employee performance and productivity. The total targeted payout under the Debtors' AIPs related to calendar year 2019, which is scheduled to be paid in late February or early March 2020 (or December 2019 for non-exempt Employees of the Rhodes Debtors), is $26,490,000 and the actual payout related to calendar year 2018, which was paid in late February or early March 2019 (or December 2018 for non-exempt Employees of the Rhodes Debtors), was $33,290,000.

36.    The Purdue Debtors also maintain a Market Access Incentive Compensation Plan ("**the Market Access ICP**") for six eligible field-based Employees where (i) 50% is paid semi-annually in July of current year and March of following year based on Employee performance, (ii) 25% is paid quarterly based on the performance of the Company (measured by the Purdue AIP metrics described above) and (iii) 25% is paid quarterly based on the average of the field sales representatives' percentage of target earnings for the component of their incentive plan related to the launch of Adhansia XR. The total targeted payout under the Market Access ICP related to calendar year 2019 is $334,000 of which $166,000 has already been paid with respect to the first and second quarters of the calendar year.

37.    In addition, the Purdue Debtors maintain a long-term results plan for certain of their Employees (the "**Purdue LTRP**"), which has been in place substantially in its current form for nearly twenty years. The Purdue LTRP is a long-term cash incentive program that provides an annual grant to each eligible Employee. For an eligible PPLP Employee, the incentive payment is calculated at the end of the three-year performance period for each annual grant, and is based on the actual performance of Company key metrics (such as financial metrics, achievement of milestones related to progression of research projects or on-time launch of new products) as compared with the target performance of Company key metrics, which were

identified at the beginning of the applicable three-year performance period, as approved by the Board. The Purdue LTRP is generally payable once a year related to the fiscal year three years prior. The targeted Purdue LTRP payout in March 2020 for fiscal year 2017 is $7,889,000 and the actual payout in March 2019 for fiscal year 2016 was $6,450,419. The Rhodes Debtors also maintain a long-term results plan, which has been in place in its current form for nearly twenty years (the "**Rhodes LTRP**", together with the Debtors' AIPs, Market Access ICP and the Purdue LTRP, the "**Incentive Plans**"), for certain of its Employees. Payments under the Rhodes LTRP are based upon each individual's actual bonus payout percentage for each of the three years within a three-year performance period. The targeted Rhodes LTRP payout in March 2020 for fiscal year 2017 is $1,406,900 and the actual payout in March 2019 for fiscal year 2016 was $1,072,433. Like the Debtors' AIPs, neither the Purdue LTRP nor the Rhodes LTRP have been altered or amended in any way in connection with these chapter 11 cases, and both plans have been used to drive Employee performance and productivity. The Purdue LTRP and the Rhodes LTRP are not retention plans. The Incentive Plans provide for payments to be made annually during the first quarter of each year, so no payments under the Incentive Plans are anticipated to be due prior to entry of an order granting the relief requested herein on a final basis.

38.    The Debtors believe that the longstanding Incentive Plans are critical as tools that will enable the Debtors to maximize the value of their estates by motivating Employees through programs that they have come to rely on as a part of their annual compensation. The Debtors seek authority to continue to honor their obligations under the Incentive Plans (the "**Incentive Plan Obligations**") in the ordinary course, *provided* that the Debtors are not requesting authority to pay Incentive Plan Obligations to insiders prior to entry of an order

19

granting the relief requested herein on a final basis or to make any payments not permitted under section 503(c) of the Bankruptcy Code.

## L.    Sign-On Bonuses

39.    The Debtors historically have provided cash sign-on bonuses ("**Sign-On Bonuses**") to certain newly-hired Employees in the ordinary course of business, to induce them to accept an offer of employment with the Debtors. Some of these prospective employees would be giving up (or did give up) incentive compensation opportunities or forfeiting equity grants at their current employers by choosing to join the Debtors. The amount and timing of any Sign-On Bonus is determined on a case-by-case basis based on these and other factors for new hires.  Approximately 14 Employees are scheduled to receive Sign-On Bonuses, so long as they are in active, full-time employment with the Debtors as of each applicable payment date. Sign-On Bonus payments are expected to total approximately $2,275,000 in the aggregate.

## M.    Non-Executive Retention Plan

40.    The Debtors historically have maintained various retention plans for their Employees in the ordinary course of business.  Given the Debtors' current and recent circumstances, the Debtors implemented retention plans for certain executive and non-executive Employees in both 2018 and 2019, which were carefully calibrated to ensure that key Employees are incentivized to remain employed with the Debtors through the end of 2020, which was deemed a critical period for the Debtors.

41.    The current non-executive retention plan (the "**Non-Executive Retention Plan**") includes approximately 120 non-insider Employees. No participant is an officer appointed by the Board, reports to the Board, has the title of Chief Executive Officer, Chief Financial Officer,

Chief Operating Officer, General Counsel or Senior Vice President or controls the financial or strategic decisions of the Debtors.

42.     The Non-Executive Retention Plan provides for cash-based incentive awards ("**Non-Executive Retention Payments**"), which are paid to individual Employees each quarter through October 1, 2020 provided that the Employee is in active, full-time employment with the Debtors as of each payment date.  Pursuant to this Motion, the Debtors are seeking authority only to make Non-Executive Retention Payments, in their sole discretion, under the existing Non-Executive Retention Plan only to non-insider Employees.  The Debtors are not seeking authority to make any Non-Executive Retention Payments to any insider pursuant to this Motion.[9]  As of the Petition Date, the Debtors believe that no obligations are currently due under the Non-Executive Retention Plan. The Debtors estimate that they will pay approximately $1.0 million with respect to Employees of the Purdue Debtors and $0.9 million with respect to Employees of the Rhodes Debtors in the remainder of 2019 and approximately $6.7 million with respect to Employees of the Purdue Debtors and $1.7 million with respect to Employees of the Rhodes Debtors in 2020.

43.     The Debtors believe that, absent continuation of the Non-Executive Retention Plan, there is a very real risk that many of the approximately 120 Employees covered thereunder would depart for other employment opportunities. This retention risk is primarily driven by the extraordinary circumstances surrounding the Debtors, including a prior downsizing in which the Debtors headcount was reduced by over 60%, the burdens of operating in the shadow of thousands of pending lawsuits and the related negative publicity, and the demanding workload accompanying the bankruptcy process. From 2018 to date, the company experienced over 25%

---

[9] The Debtors reserve the right to seek, through another motion, approval of retention plans with respect to insiders that are consistent with section 503(c) of the Bankruptcy Code.

attrition among the top tier of Employees participating in the Non-Executive Retention Plan (consisting of certain key employees and managers with titles junior to Senior Vice President). The Debtors believe that the attrition rate would have been even higher if the Debtors had not established the Non-Executive Retention Plan. Failure to continue the Non-Executive Retention Plan at this point could result in a catastrophic loss of talent. Moreover, the Debtors believe that it would be extremely difficult to attract replacements in the current environment and given the Debtors' ongoing challenges. The Debtors therefore believe it is essential to have the authority, in their discretion, to maintain the Non-Executive Retention Plan and to make Non-Executive Retention Payments to non-insider Employees thereunder.

**N.    Treyburn Retention Plan**

44.    The Debtors also recently established a retention plan following the sale of their Treyburn, North Carolina manufacturing facility (the "**Treyburn Retention Plan**"). As discussed above, it is critical that the Debtors retain staff at the Treyburn plant over the coming months. To incentivize key non-insider Employees to remain employed with the Debtors at the Treyburn facility through the critical transition periods through December 2019 and June 2020, cash incentive awards ("**Treyburn Retention Payments**," and together with the Non-Executive Retention Payments, the "**Retention Payments**") have been offered to approximately 52 non-insider Employees, payable in December 2019 and approximately 15 non-insider Employees, payable in June 2020. The Employees that were offered Treyburn Retention Payments consist primarily of Manufacturing and Packaging Operators, Pharmaceutical Technicians, Senior Pharmaceutical Technicians, and Pharmaceutical Process Specialists. The most senior employee offered Treyburn Retention Payments holds the title of Director, Pharmaceutics and Analytical Development. The Treyburn Retention Payments will not exceed $23,056 per

Employee. The Debtors estimate that under the Treyburn Retention Plan they will pay approximately $521,058 in 2019, and approximately $108,972 in 2020.

## O.    Advancement of Legal Expenses

45.    The Debtors are defendants in over 2,600 civil actions pending in state and federal courts around the country that allege that the Debtors, Related Parties, and other co-defendants engaged in past misconduct in manufacturing, marketing and selling certain FDA-approved opioid medications (the "**Pending Actions**"). Certain of the Debtors' current and former owners, officers, directors and affiliates have also been named in the Pending Actions (the "**Related Parties**"). New complaints against the Debtors and the Related Parties are being filed almost every day. In addition to their own legal expenses, prior to the Petition Date, in the ordinary course of their pre-petition business, and consistent with PPLP's Fifth Amended and Restated Limited Partnership Agreement, dated as of June 20, 2019 (the "**LPA**") and long-standing and customary policies, the Debtors paid the legal costs of a number of current and former officers, directors and other employees that are named defendants, potential defendants and/or witnesses in the Pending Actions (any such individuals from time to time, the "**Indemnitees**"). Since March 1, 2019, the Debtors have not made any indemnification payments or advanced any legal fees to any member of the Sackler family.

46.    As discussed in greater detail in the *Debtors' Informational Brief* filed contemporaneously herewith, the present case is unique as it is a bankruptcy in which the vast majority of the plaintiffs are governmental entities. These governmental entities may argue that their actions—over 90% of the Pending Actions—are exempt from the automatic stay by virtue of the section 362(b)(4) police and regulatory power exception. It is therefore possible that

23

many Indemnitees will continue to incur significant legal costs in connection with the Pending Actions.

47.     Although certain current and former directors, officers and "Agents" that are named defendants in Pending Actions may have access to the Debtors' D&O insurance policies, only a small subset of the Indemnitees fall into this category, and the Debtors do not maintain insurance that would cover the legal costs of the vast majority of Indemnitees.  In addition, the nature and scope of the various litigations and the number of potential claimants under the policies creates the risk that insurance may be unavailable or insufficient to cover costs incurred by these individuals.  There are over 270 former employees that are currently or have been witnesses and/or named defendants in Pending Actions and related matters but who were not directors, officers or designated Agents.[10]  The Debtors terminated the entirety of their opioid medication sales force as of June, 2018, and many of the former employee Indemnitees are former sales representatives.

48.     Without the Debtors' continued payment of these legal costs post-petition, the Debtors' insurance cannot address the issue.  Given the number of Indemnitees, the nature of the Pending Actions and prior experience, the Debtors anticipate that aggregate costs will be approximately $1.5 million per month at the outset of these chapter 11 cases.  If legal costs are not paid, the Debtors believe that many of the individuals will be unable to obtain adequate representation and that their lack of adequate counsel could be severely detrimental to the Debtors and their estates.  Failure to advance expenses would also be highly detrimental to morale of the Debtors' current workforce and would adversely affect the Debtors' ability to execute their reorganization plan.  Moreover, participation by Indemnitees without counsel in

---

[10] These employees are not designated "Agents" as defined in the LPA and were therefore not entitled to mandatory indemnification.

the litigation of the Pending Actions may be used, or attempted to be used, to judicially prejudice or unfairly and inaccurately prosecute claims against the Debtors.  In addition, claims against these parties could give rise to potential future indemnification claims against the Debtors or otherwise diminish shared insurance coverage.

49.     Accordingly, in order to protect the interests of the estates, the Debtors request that they be authorized, but not directed, in their sole discretion, to advance and pay the legal costs of Indemnitees consistent with the advancement of expenses provisions of the LPA and past practice (the "**Advancement of Expenses**").  In order to ensure that such payments are in the best interest of the Debtors and subject to appropriate oversight and controls, the Debtors propose that any decision to advance defense costs of any Indemnitee be subject to approval by the Special Committee of the Board, which consists solely of directors with no affiliation with the Sackler family.  Under the LPA, each Indemnitee also agrees to reimburse the Debtors for any defense costs advanced, should it be determined that such Indemnitee did not act in good faith, or, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful, or is otherwise not entitled to be indemnified under the terms of the LPA.  The Debtors further propose that each Indemnitee receiving post-petition payments hereunder sign a written affirmation of the Indemnitee's belief that he or she has conducted himself or herself in good faith and reasonably believes that his or her conduct was lawful and in the best interest of the Debtors and acknowledging the standards with respect to indemnification set forth in the LPA, including the requirement to repay advances as described above.

**P.      Cash in Lieu of Automobile Benefit**

50.      In the ordinary course of business, the Debtors provide a cash payment in lieu of automobile benefits to certain Employees (the "**Automobile Cash Benefit**").   Approximately 215 Employees receive a bi-weekly cash payment in lieu of an assigned automobile.   The average bi-weekly cash payment is approximately $383 per employee.

**Q.      Other Employee Programs**

51.      In addition to the foregoing, the Debtors have in place miscellaneous practices, programs and policies that provide benefits and protections to various groups of Employees, including, but not limited to, tuition assistance, adoption assistance, recognition and an anniversary gift program (collectively, the "**Other Employee Programs**").   The Debtors believe that the Other Employee Programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce.   The monthly cost of such programs for the Debtors is negligible in the context of the Debtors' aggregate compensation and benefit obligations.   The Debtors believe that, as of the Petition Date, they owe approximately $150,000 on account of the Other Employee Programs.   The Debtors seek authority to continue to honor their obligations under the Other Employee Programs after the Petition Date, as such practices, programs and policies may be modified, amended or supplemented from time to time.

**Cause Exists to Authorize Payment of
Pre-petition Employee Obligations**

52.      Pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, an individual's claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within 180 days before the Petition Date, are each afforded unsecured priority status of $13,650 per employee. In

addition, severance payments earned upon termination after the Petition Date, as would be the case under the Severance Plan, are accorded administrative priority. *See Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Bhd. of Elec. Workers, A F of L, CIO*, 386 F.2d 649, 651 (2d Cir. 1967) (holding that where "severance pay is compensation for termination of employment and since the employment of these claimants was terminated as an incident of the administration of the bankrupt's estate, severance pay was an expense of administration and is entitled to priority as such an expense"); *see also In re Bethlehem Steel Corp.*, 479 F.3d 167, 175 (2d Cir. 2007) (noting that an obligation under a severance plan may be entitled to administrative priority "if it provides a new benefit at termination that employees would not otherwise receive"). Moreover, the Severance Plan is structured as the type of traditional severance plan to which *Straus-Duparquet* most clearly applies. *See In re Jamesway Corp.*, 199 B.R. 836, 840 (Bankr. S.D.N.Y. 1996) (noting that the type of severance plans contemplated by *Straus-Duparquet* are those where "severance payments are fixed or readily ascertainable amounts which, if anything, increase with the length of service of an employee"). Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code further provides, in relevant part, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

53. The Debtors believe that many of their Pre-petition Employee Obligations constitute priority claims. The Debtors also submit that payment of the Pre-petition Employee Obligations is necessary and appropriate and is authorized under section 105(a) of the Bankruptcy Code pursuant to the "necessity of payment" doctrine, which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition

27

claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

54.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175. Under section 105(a), courts may authorize pre-plan payments of pre-petition obligations when essential to the continued operation of a debtor's businesses. *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); see also *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of pre-petition obligations where such payments are critical to the debtor's organization). Furthermore, Bankruptcy Rule 6003 permits the payment of pre-petition obligations within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."

55.     In a long line of well-established cases, federal courts have consistently permitted post-petition payment of pre-petition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 312 (1882) (permitting payment of pre-receivership claim prior to reorganization to prevent "stoppage of [crucial] business relations"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (affirming order authorizing payment of pre-petition wages, salaries, expenses and benefits).

28

56.     This doctrine of "necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical pre-petition claims not explicitly authorized by the Bankruptcy Code.  *See In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing existence of judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation).  The doctrine is frequently invoked early in a reorganization in connection with the payment of pre-petition claims.  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

57.     Bankruptcy Code section 363(b)(1) empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate" based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented to him or her a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting the standard for determining a section 363(b) motion is "a good business reason").

58.     The business judgment rule is satisfied "when the following elements are present:  (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted).  In fact, "[w]here the debtor articulates a reasonable basis for its

29

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this district have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

59.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under section 363(b), as well as under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 6003. This is because any delay in paying Pre-petition Employee Obligations will adversely impact the Debtors' relationships with their Employees and could irreparably impair the Employees' morale, dedication, confidence, commitment and cooperation. The Debtors' businesses hinge on their ability to deliver superior products and advance the research and development pipeline of new products. Employees' support for the Debtors' reorganization efforts is critical to the success of those efforts. At this early stage, the Debtors cannot risk the substantial damage to their businesses that would inevitably attend any decline in their Employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

60.     Absent an order granting the relief requested, many Employees will suffer hardship and, in many instances, serious financial difficulties. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the possibility that

otherwise loyal Employees will seek other employment alternatives.  All of the Debtors'
creditors will benefit if the requested relief is granted.

61.    In the overwhelming majority of large corporate filings, courts have approved
payment of employee pre-petition claims for compensation, benefits and expense
reimbursements similar to those described herein.  *See, e.g.*, *In re Synergy Pharmaceuticals
Inc.*, Case No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 24, 2019); *In re Cenveo, Inc.,* No. 18-
22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018); *In re 21st Century Oncology Holdings, Inc.,* No.
17-22770 (RDD) (Bankr. S.D.N.Y. June 20, 2017); *In re Answers Holdings, Inc.,* No. 17-10496
(SMB) (Bankr. S.D.N.Y. Apr. 4, 2017); *In re BCBG Max Azria Glob. Holdings, LLC,* No. 17-
10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Sabine Oil & Gas Corporation*, Case No.
15-11835 (SCC) (Bankr. S.D.N.Y. July 16, 2015); *In re Chassix Holdings, Inc.*, Case No. 15-
10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015); *In re NII Holdings, Inc.*, Case No 14-12611
(SCC) (Bankr. S.D.N.Y. Sept. 16, 2014); *In re Genco Shipping & Trading Ltd.*, Case No. 14-
11108 (SHL) (Bankr. S.D.N.Y. May 8, 2014);  *In re Pinnacle Airlines Corp.,* Case No.
12-11343 (REG) (Bankr. S.D.N.Y. Apr. 2, 2012*); In re Eastman Kodak Co.,* Case No.
12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012); *In re Hostess Brands, Inc.,* Case No.
12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2012); *In re AMR Corp.,* Case No. 11-15463 (SHL)
(Bankr. S.D.N.Y. Nov. 29, 2011); *In re Sbarro, Inc.*, Case No. 11-11527 (SCC) (Bankr.
S.D.N.Y. May 4, 2011); *In re Mesa Air Group, Inc.*, Case No. 10-10018 (MG) (Bankr.
S.D.N.Y. Feb. 23, 2010).

62.    Further, courts in this district and others have approved the advancement of legal
expenses to current and former directors, officers and employees, subject to conditions similar
to those provided herein with respect to the Advancement of Expenses.  *See, e.g., In re Hawker*

*Beechcraft, Inc.*, Case No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 31, 2012) (authorizing the debtors to advance legal expenses to current and former directors and officers pursuant to the debtors' bylaws where the directors and officers acted in good faith and in the best interests of the debtors and the directors and officers agreed to reimburse the debtors if it were determined that they were not entitled to be indemnified pursuant to the bylaws or applicable law); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 3, 2008) (authorizing the debtors to advance up to $3 million in legal expenses for former employees involved in governmental investigations and arbitration proceedings where such employees executed (i) a written affirmation that they believed they acted in good and in the best interests of the debtors, (ii) a written undertaking to repay legal costs paid by the debtors if they acted in bad faith and (iii) a written irrevocable assignment of any insurance policy such employees may have had with respect to the applicable legal expenses); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) (authorizing the debtors (a) to advance legal expenses to current and former employees and directors so long as (i) the claims against such employees and directors related to the scope of their employment with the debtors, (ii) the actions at issue were undertaken in good faith and in a manner reasonably believed to be lawful and in the best interests of the debtors and (iii) the employees and directors agreed to reimburse the debtors if it were determined that they were not entitled to be indemnified under applicable law, and (b) to advance up to $5 million of legal expenses that were not otherwise reimbursable by third parties to former employees and directors on a case-by-case basis pursuant to approval by an independent board committee); *In re RNI Wind Down Corporation*, Case No. 06-10110 (CSS) (Bankr. D. Del. July 17, 2006) (authorizing the advancement of up $500,000 in legal expenses for current and former directors, officers and employees, subject to the terms of agreements

with the debtors or the debtors' organizational documents); *In re W.R. Grace & Co.*, Case No. 01-01139 (JKF) (Bankr. D. Del. Dec. 13, 2004) (authorizing the advancement of legal expenses for current or former directors, officers, or employees, subject to the terms of the debtors' organizational documents).

63.     In *In re Delphi Corp.*, this Court explained that advancing legal expenses for current or former employees is appropriate where "the debtor has determined in exercising its judgment, that there's a net benefit to its estate and creditors in performing the pre-petition indemnity agreement." *See In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y.) Nov. 30, 2006 Hr'g Tr. 47:10-15.   Here, the Debtors have put adequate safeguards in place, including approval by the Special Committee of the PPLP Board of Directors, which consists solely of directors with no affiliation with the Sackler family, to ensure that any advancement of legal expenses is in the best interests of the Debtors and their estates.

### The Automatic Stay Should be Modified as it Applies to Employees' and Retirees' Claims Under the Workers' Compensation Programs

64.     It is imperative that the Debtors be permitted to continue to pay and/or honor any and all Workers' Compensation Obligations, including all pre-petition premiums, claims (including claim settlements), losses and expenses in connection with their Workers' Compensation Obligations, and to pay all costs and expenses associated with the Workers' Compensation Programs, including costs and expenses related to administration, servicing, processing, adjusting, paying and settling claims and losses under these programs.   In connection with their Workers' Compensation Obligations, the Debtors also seek authority for the insurers to continue to use collateral and security as provided under the Workers' Compensation Programs, without further order of the Court.

65.     It is crucial for employee morale and the operations of the Debtors' businesses for the Debtors to continue to pay workers' compensation benefits and honor their obligations under the Workers' Compensation Programs described herein.  The Debtors anticipate that they will have sufficient cash on hand to make these payments, which are in the best interests of the Debtors, their estates and their creditors.

66.     Section 362(a) of the Bankruptcy Code, commonly known as the automatic stay, operates to stay, among other things:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

67.     To the extent any of the Employees or Retirees hold claims pursuant to the Workers' Compensation Programs, the Debtors seek authorization under section 362(d) of the Bankruptcy Code to permit such Employees or Retirees to proceed with such claims in the appropriate judicial or administrative fora in the Debtors' sole discretion.  The Debtors believe cause exists to grant them authority to modify the automatic stay, where the Debtors deem it appropriate to do so, because staying such claims could have a detrimental effect on the financial (and medical) well-being and morale of the Debtors' Employees and Retirees and lead to the departure of Employees.  Such departures could cause a severe disruption in the Debtors' businesses, to the detriment of all parties in interest.  To this end, the Debtors seek an order granting (a) relief from the automatic stay as it relates to Employee and Retiree claims under the Workers' Compensation Programs and the insurers' continued use of collateral and security

provided by the Debtors pursuant to the Workers' Compensation Programs and (b) waiver of the corresponding notice requirements under Bankruptcy Rule 4001(d).

68.     Pursuant to this Motion, the Debtors do not seek a waiver, termination or modification of the automatic stay with respect to any other claims.

### Applicable Banks Should be Authorized to Honor and Pay Checks Issued and Make Other Transfers to Pay the Pre-petition Employee Obligations

69.     The Debtors further request that the Court authorize all of the Debtors' Banks to receive, process, honor and pay all pre-petition and post-petition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtors for the Pre-petition Employee Obligations.  The Debtors also seek authority to issue new post-petition checks, or effect new fund transfers, for Pre-petition Employee Obligations to replace any pre-petition checks or fund transfer requests that may be dishonored or rejected and to reimburse their Employees and Retirees or the applicable payee, as the case may be, for any fees or costs incurred by them in connection with a dishonored or voided check or funds transfer.

70.     As a result of the commencement of the Debtors' chapter 11 cases, in the absence of an order of the Court providing otherwise, the Debtors' checks, wire transfers and direct deposit transfers for Pre-petition Employee Obligations may be dishonored or rejected by the Banks.

71.     The Debtors represent that each of these checks or transfers is or will be drawn on the Debtors' payroll and general disbursement accounts and can be readily identified as relating directly to payment of the Pre-petition Employee Obligations.  Accordingly, the Debtors believe that pre-petition checks and transfers other than those for Pre-petition Employee Obligations will not be honored inadvertently.

72.      Authorization to pay amounts for Pre-petition Employee Obligations shall not be deemed to constitute a post-petition assumption, reaffirmation or adoption of any contract, program, plan or policy pursuant to section 365 of the Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto.  Moreover, authorization to pay Pre-petition Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Pre-petition Employee Obligations, including any payroll taxes that may be due to any taxing authority.

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

73.      Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days of filing a petition.  Irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation."  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotations omitted).  The "harm must be shown to be actual and imminent, not remote or speculative."  *Id.*

74.      If the Debtors are not permitted to continue their ordinary business operations by continuing to pay and provide benefits to employees, and to assure their employees that authority has been granted to honor all such claims, immediate and irreparable harm will result. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and that Bankruptcy Rule 6003(b) is satisfied.

## Request for Waiver of Stay

75.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).   As explained above and in the Lowne Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.   Accordingly, ample cause exists to find the notice requirements of Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent the notice requirement and stay apply.

## Notice

76.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) each of the Debtors' fifty largest unsecured creditors on a consolidated basis; (c) each of the Debtors' three largest secured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney's Office for the Southern District of New York; (g) the attorneys general for all fifty states and the District of Columbia; and (h)  any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

## Reservation of Rights

77.     Nothing contained herein or any action taken pursuant to such relief is intended or shall be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or

37

causes of action which may exist against any creditor or interest holders or any other party; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **No Previous Request**

78.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as may be just and proper.

Dated:    September 15, 2019
New York, New York

DAVIS POLK & WARDWELL LLP

By:    /s/ *Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

## Exhibit A

## Proposed Interim Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-[    ](RDD) |
| Debtors.[1] | (Joint Administration Pending) |

### INTERIM ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PRE-PETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS <u>RELATED CHECKS AND TRANSFERS</u>

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are

debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), pursuant to

sections 105(a), 362(d) and 363(b) of the Bankruptcy Code, for entry of an interim order (this

"**Order**") and a final order authorizing (i) the Debtors to (a) pay certain pre-petition wages,

salaries, and other compensation owing to Employees and Retirees and, (b) maintain the

Employee Programs and pay related administrative obligations, (c) permit Employees and

Retirees with claims under the Workers' Compensation Programs to proceed with such claims

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

and insurers to continue using collateral and security under the Workers' Compensation Programs and (d) authorize applicable banks and other financial institutions to receive, process, honor and process related checks and transfers; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Lowne Declaration filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that immediate relief is necessary to avoid irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003(b) and is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

## IT IS HEREBY ORDERED THAT

1.       The Motion is granted on an interim basis as set forth herein.

2.       The Debtors shall be, and hereby are, authorized, but not required, to pay, in their sole discretion, all amounts required under or related to the Pre-petition Employee Obligations (other than any payments that would contravene section 503(c) of the Bankruptcy Code,

2

including with respect to insiders); *provided* that, (i) prior to entry of an order granting the relief requested herein on a final basis, the Debtors shall not pay any individual an aggregate amount in excess of $13,650 on account of pre-petition Wages; (ii) nothing in this Interim Order authorizes the Debtors to make payments on account of Severance Obligations and Incentive Plan Obligations with respect to insiders prior to entry of an order approving the relief requested in the Motion on a final basis; (iii) prior to entry of an order granting the relief requested herein on a final basis, the Debtors will not pay any amounts on account of Pre-petition Employee Obligations before the applicable due dates; and (iv) nothing in this Interim Order authorizes the Debtors to make payments at any time that would contravene section 503(c) of the Bankruptcy Code.

3.    The Debtors are authorized, but not required, in their sole discretion, to continue to pay and honor their obligations arising under or related to their plans, practices, programs and policies for their Employees, former employees and Retirees as set forth in the Motion, including, without limitation, those giving rise to the Pre-petition Employee Obligations (collectively, the "**Employee Programs**"), as those Employee Programs were in effect as of the Petition Date and as such Employee Programs may be modified, terminated, amended or supplemented from time to time in the ordinary course of the Debtors' businesses (other than any payments that would contravene section 503(c) of the Bankruptcy Code, including with respect to insiders).

4.    The Debtors are authorized, but not required, in their sole discretion, to (a) continue utilizing third parties for certain services as described in the Motion and to pay or cause to be paid such claims as and when such obligations are due and (b) pay pre-petition

3

amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Employee Programs.

5.      The Debtors are authorized, but not directed, in their sole discretion, to advance and pay the legal costs of Indemnitees on the terms set forth in the Motion.  Nothing in this Order authorizes the Debtors to advance and pay the legal costs of any member of the Sackler family.

6.      The Debtors are authorized, in their sole discretion, to continue to administer the Supplemental Savings Plan; *provided* that any post-petition amounts contributed to the Supplemental Savings Plan shall be deemed administrative expenses pursuant to section 503 of the Bankruptcy Code; *provided further* that nothing in this Order authorizes the Debtors to make any payments on account of pre-petition contributions to the Supplemental Savings Plan.

7.      The automatic stay is modified solely to the extent necessary to allow Employees and Retirees to proceed with claims under the Workers' Compensation Programs in the appropriate judicial or administrative fora and to permit insurers under the Workers' Compensation Programs to continue to access collateral and security provided by the Debtors pursuant to the Workers' Compensation Programs and the notice requirements under Bankruptcy Rule 4001(d) with respect to the above are waived.

8.      The Debtors' Banks are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Order whether presented prior to or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  The Banks are authorized to rely on the representations of the Debtors

4

as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

9.      Nothing in the Motion or this Order, nor any payments made pursuant to this Order, shall be deemed to be or constitute an admission as to the validity or priority of any claim against the Debtors, or constitute an assumption or post-petition reaffirmation of any agreement, plan, practice, program, policy, executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or a waiver of any rights of the Debtors.

10.     Nothing in the Motion or this Order shall impair the ability of the Debtors to contest the validity or amount of any payment made pursuant to this Order.

11.     Nothing in the Motion or this Order shall be construed as impairing the Debtors' right to contest the validity or amount of any Pre-petition Employee Obligation, including payroll taxes that may be due to any taxing authority.

12.     The requirements of Bankruptcy Rule 6003 are satisfied by the contents of the Motion.

13.     Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

14.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

15.     The Final Hearing shall be held on _____, 2019, at _____ (Prevailing Eastern Time).  Any objections or responses to the entry of the Final Order shall be: (a) filed with the

5

Court and (b) served upon and actually received by (i) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Paul K. Schwartzberg), (ii) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich and Eli J. Vonnegut) and (iii) counsel to any official committee then appointed in these chapter 11 cases, so as to be received by 4:00 p.m. (Prevailing Eastern Time) seven (7) days before the Final Hearing.  A reply to an objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two (2) business days before the date of the applicable hearing. If no objections or responses are filed and served, this Court may enter the Final Order without further notice or hearing.

16.     If no objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Order, which order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved *nunc pro tunc* to the date of the commencement of these chapter 11 cases.

17.     The Debtors are authorized to take all such actions as are necessary or appropriate to implement the relief granted in this Order.

18.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.

White Plains, New York
Dated: _____, 2019

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

6

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-[    ](RDD)** |
| Debtors.[1] | **(Joint Administration Pending)** |

**FINAL ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PRE-PETITION WAGES,
SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND
(B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED
ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO
PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND
(III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS**

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors

and debtors in possession in these proceedings (collectively, the "**Debtors**"), pursuant to sections

105(a), 362(d) and 363(b) of the Bankruptcy Code, for entry of an interim order and a final order

(this "**Order**") authorizing, but not directing (i) the Debtors to (a) pay certain pre-petition wages,

salaries and other compensation owing to Employees and Retirees and, (b) maintain the

Employee Programs and pay related administrative obligations, (c) permit Employees and

Retirees with claims under the Workers' Compensation Programs to proceed with such claims

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

and insurers to continue using collateral and security under the Workers' Compensation Programs and (d) authorize applicable banks and other financial institutions to receive, process, honor and process related checks and transfers; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion on a final basis (the "**Hearing**"); and upon the Lowne Declaration filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that the relief granted herein is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

### IT IS HEREBY ORDERED THAT

1.    The Motion is granted on a final basis as set forth herein.

2.    The Debtors shall be, and hereby are, authorized, but not required, to pay, in their sole discretion, all amounts required under or related to the Pre-petition Employee Obligations (other than any payments that would contravene section 503(c) of the Bankruptcy Code, including with respect to insiders).

2

3.      The Debtors are authorized, but not required, in their sole discretion, to continue to pay and honor their obligations arising under or related to their plans, practices, programs and policies for their Employees, former employees and Retirees as set forth in the Motion, including, without limitation, those giving rise to the Pre-petition Employee Obligations (collectively, the "**Employee Programs**"), as those Employee Programs were in effect as of the Petition Date and as such Employee Programs may be modified, terminated, amended or supplemented from time to time in the ordinary course of the Debtors' businesses (other than any payments that would contravene section 503(c) of the Bankruptcy Code, including with respect to insiders).

4.      The Debtors are authorized, but not required, in their sole discretion, to (a) continue utilizing third parties for certain services as described in the Motion and to pay or cause to be paid such claims as and when such obligations are due and (b) pay pre-petition amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Employee Programs.

5.      The Debtors are authorized, but not directed, in their sole discretion, to advance and pay the legal costs of Indemnitees on the terms set forth in the Motion.  Nothing in this Order authorizes the Debtors to advance and pay the legal costs of any member of the Sackler family.

6.      The Debtors are authorized, in their sole discretion, to continue to administer the Supplemental Savings Plan; *provided* that any post-petition amounts contributed to the Supplemental Savings Plan shall be deemed administrative expenses pursuant to section 503 of

3

the Bankruptcy Code; *provided further* that nothing in this Order authorizes the Debtors to make any payments on account of pre-petition contributions to the Supplemental Savings Plan.

7.      The automatic stay is modified solely to the extent necessary to allow Employees and Retirees to proceed with claims under the Workers' Compensation Programs in the appropriate judicial or administrative fora and to permit insurers under the Workers' Compensation Programs to continue to access collateral and security provided by the Debtors pursuant to the Workers' Compensation Programs and the notice requirements under Bankruptcy Rule 4001(d) with respect to the above are waived.

8.      The Debtors' Banks are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Order whether presented prior to or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  The Banks are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

9.      Nothing in the Motion or this Order, nor any payments made pursuant to this Order, shall be deemed to be or constitute an admission as to the validity or priority of any claim against the Debtors, or constitute an assumption or post-petition reaffirmation of any agreement, plan, practice, program, policy, executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or a waiver of any rights of the Debtors.

10.      Nothing in the Motion or this Order shall impair the ability of the Debtors to contest the validity or amount of any payment made pursuant to this Order.

11.     Nothing in the Motion or this Order shall be construed as impairing the Debtors'

right to contest the validity or amount of any Pre-petition Employee Obligation, including

payroll taxes that may be due to any taxing authority.

12.     Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or

Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the

terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

13.     The contents of the Motion and the notice procedures set forth therein are good

and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the

Southern District of New York, and no other or further notice of the Motion or the entry of this

Order shall be required.

14.     The Debtors are authorized to take all such actions as are necessary or appropriate

to implement the relief granted in this Order.

15.     The Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation and enforcement of this Order.


White Plains, New York
Dated: _____, 2019


                                    _____
                                    THE HONORABLE ROBERT D. DRAIN
                                    UNITED STATES BANKRUPTCY JUDGE