DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-[    ](RDD)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING (I) PAYMENT OF CERTAIN PRE-PETITION CLAIMS OF
CRITICAL VENDORS AND (II) FINANCIAL INSTITUTIONS TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession

in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") hereby move

(this "**Motion**") this Court for entry of interim and final orders, substantially in the forms attached

hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and the "**Final Order**," respectively),

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

granting the relief described below.  In support thereof, the Debtors refer to the contemporaneously filed *Declaration of Jon Lowne in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Lowne Declaration**") and further represent as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

2.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a statutory committee of creditors in these chapter 11 cases, nor has the Court appointed a trustee or examiner therein.

3.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

4.      PPLP and its direct and indirect subsidiaries other than the Rhodes Debtors (defined below) (the "**Purdue Debtors**") primarily operate a branded pharmaceuticals business, while

Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries (the "**Rhodes Debtors**") primarily develop and distribute generic pharmaceutical products and manufacture a range of active pharmaceutical ingredients.

5.     Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed contemporaneously herewith.

## **Relief Requested**

6.     By this Motion, and pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors seek entry of an Interim Order and a Final Order (a) granting them the authority in their sole discretion, but not requiring them, to pay all or a portion of their pre-petition obligations owed to certain Critical Vendors (as defined below)[2] up to the Critical Vendors Claims Cap (as defined below), (b) granting them the authority, but not requiring them, in their sole discretion, to pay claims of Critical Vendors (as defined below) secured by trade liens or for the value of goods received by the Debtors in the ordinary course of their businesses during the twenty (20) day period prior to the Petition Date, which likely are entitled to administrative expense priority under Bankruptcy Code section 503(b)(9) or constitute secured claims, respectively, (c) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing and (d) granting related relief.  The Debtors are not seeking authority to pay or satisfy any obligations to any shareholder of the Debtors or any non-Debtor affiliate of any shareholder of the Debtors.

---

[2] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors.  To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Motion shall not apply to such prepetition claim.

7.      If the requested relief is not granted and essential Critical Vendors (as defined below) refuse to continue to supply goods and services to the Debtors post-petition, the Debtors may be unable to continue portions of their operations, thereby preventing the Debtors from maximizing the value of their estates and substantially harming all creditors.

### The Debtors' Critical Vendors

8.      The Debtors purchase goods and services from certain vendors and independent contractors that are unaffiliated with the Debtors or any shareholder of the Debtors and, in many instances, the Debtors could not operate without access to the goods and services provided by these parties (collectively, the "**Critical Vendors**").[3]  As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular goods or services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.

9.      The Debtors estimate that the maximum amount needed to pay the pre-petition claims of Critical Vendors (excluding those pre-petition claims secured by trade liens, where the vendor is entitled to assert possessory liens securing their claims under applicable state law, or entitled to an administrative expense claim under Bankruptcy Code section 503(b)(9)) (the "**Vendor Claims**") is approximately $7,700,000 (the "**Critical Vendor Claims Cap**").[4]  The Debtors' most material categories of critical vendors are described below.

---

[3] To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors in the ordinary course of their businesses.  Identifying the Critical Vendors now would likely cause all such vendors to demand payment in full.  However, as noted in this Motion, in determining the Critical Vendor Claims Cap (as defined below), the Debtors were careful to include only such payments that the Debtors, in their best estimate, determined would be required to continue the supply of critical goods and services as a condition of continued operations.

[4] In determining the amount of the Critical Vendor Claims Cap, the Debtors and their advisors have carefully reviewed their suppliers to determine, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers would present an unacceptable risk to the Debtors' operations should they cease the provision of truly essential services or supplies, (d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors or an administrative expense claim pursuant to section 503(b)(9) of

A.      **Debtors' Supply Chain**

10.     To conduct their businesses, the Debtors rely on third-party suppliers (the

"**Operations and Supply Chain Vendors**") to provide ingredients and equipment components,

storage and distribution services, equipment servicing, batch release testing, monitoring, and

manufacturing and packaging services for pharmaceutical products.  Problems with any of the

suppliers could result in the inability to produce adequate supplies of the Debtors' pharmaceutical

products and/or interruptions in the Debtors' ability to timely, efficiently and safely package and

distribute the products.  This could delay or reduce commercial sales and materially harm the

Debtors' businesses as well as negatively impact patients relying on the Debtors' pharmaceutical

products.

11.     In order to ensure the quality of the Debtors' products, the United States Food and

Drug Administration ("**FDA**") carefully monitors the Debtors' compliance with the FDA's current

Good Manufacturing Practice ("**cGMP**") regulations.  The Debtors rely on third parties to

manufacture and package many of the finished products that they sell.  These manufacturers have

each passed the rigorous cGMP audit and certification process.  To replace any of these vendors

would require the Debtors to undertake an exhaustive review process to ensure that processes of

the new prospective vendor were also in compliance with the cGMP regulations.  Such process

could take anywhere from twelve to twenty-four months each to complete.

---

the Bankruptcy Code, and (e) the extent to which suppliers are beyond the jurisdiction of this Court and can thus,
notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.  The
Debtors then considered the financial condition of each supplier, where that information was known, including the
level of dependence each supplier has on the Debtors' continued businesses.  After compiling this information, the
Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical
goods and services.  The Critical Vendors Claims Cap does not include any prepetition claims that the Debtors seek
to pay pursuant to other orders entered by this Court in these chapter 11 cases.

12.     Due to the highly regulated nature of the Debtors' business, nearly every change to a vendor or input in the Debtors' supply chain requires regulatory approval from one or more jurisdictions, including ensuring that any new vendor facility or processes are also in compliance with cGMP regulations.  Even seemingly mundane changes–such as switching bottle or label manufacturers–can require months to years of regulatory study and the concomitant expenditure of millions of dollars to execute.  More complex changes take even longer and are more expensive.

13.     Shipping and warehousing services are also critical to the Debtors' business.  The Debtors have engaged freight carriers (collectively, the "**Freight Carriers**") to warehouse and/or transport their products (including the active pharmaceutical ingredients for opioid products).  The Debtors also engage a freight clearing company to manage the Freight Carriers.  The Freight Carriers are critical to the warehousing and transport of the Debtors' products.

14.     As a result, the Freight Carriers are regularly in possession of the Debtors' products in the ordinary course of business.  Any disruption in the transport of the Debtors' products would have a serious negative impact on the Debtors' ability to conduct their businesses and to ensure consumers timely delivery of such products.  As of the Petition Date, the Debtors had accrued but not yet paid approximately $300,000 in fees to the Freight Carriers.

15.     The Debtors' business is ill-equipped to switch manufacturers, suppliers or logistics providers on short notice and faces significant risks to its supply chain if pre-petition amounts owed to these Critical Vendors cannot be paid.  Due to the regulated nature of the Debtors' business and the limited number of qualified vendors available, in many cases, the Debtors have limited-to-no options for replacement suppliers.  Replacing suppliers is time-consuming, cost-prohibitive, and in certain circumstances, plainly not feasible.  Moreover, any failure of a supplier to provide the necessary goods for delivery to the Debtors' customers likely would create shortages in the

Debtors' supply chain and adversely affect cash flow, profitability and the ability of the Debtors to restructure their business. As of the Petition Date, the Debtors had accrued but not yet paid approximately $1,800,000 in fees to Operations and Supply Chain Vendors.

**B.    The Debtors' Clinical Studies**

16.    The Debtors are subject to FDA regulations governing labeling, packaging, storage, advertising, promotion, recordkeeping, and submission of safety data and other post-marketing data for their products. Some of these regulations require the Debtors to conduct further clinical trials and research supporting the safety and efficacy of their products, and failure to complete these requirements could result in a withdrawal of the Debtors' marketing authorizations or approval. In connection with the FDA approval of the Debtors' pharmaceutical products, the Debtors conduct post-marketing clinical trials and research to gather safety and efficacy information about the product. The Debtors rely on certain research organizations and various other service providers (the "**Clinical Trial Vendors**") to design and conduct these trials and research or to assist with other aspects of FDA reporting requirements or compliance.

17.    Difficulty enrolling or maintaining patients in sufficient numbers will delay or terminate ongoing trials, negatively impacting the Debtors' business and effectively withdrawing treatment from patients enrolled in trials. Failing to remain compliant with FDA's post-marketing product requirements could result in withdrawal of the Debtors' marketing authorizations or approval. Absent payment of the Clinical Trial Vendor's pre-petition claims, the Clinical Trial Vendors may cease enrollment of new patients or performing other work required to keep the Debtors compliant with FDA requirements. It is imperative, therefore, that the Debtors maintain working relationships with these Clinical Trial Vendors. As of the Petition Date, the Debtors had accrued but not yet paid approximately $3,600,000 in fees to Clinical Trial Vendors.

C.      **Security and Waste Management Services**

18.      To prevent theft of, misuse of or unintended exposure to the Debtors'
pharmaceutical products, the Debtors rely on certain security services for their facilities,
warehouses and transport vehicles (collectively, the "**Security Vendors**").  Each Security Vendors
employee is required to undergo vigorous background screenings to secure employment.   If
successful, the employee then must be trained in typical controlled substance security protocols.
Replacing Security Vendors with compliant alternatives on short notice would be difficult and
would leave the Debtors vulnerable to potential harm.  As of the Petition Date, the Debtors had
accrued but not yet paid approximately $100,000 in fees to the Security Vendors.

19.      Various regulations require that the Debtors have appropriate waste management
procedures to safely dispose of waste of controlled substances.  To maintain compliance, the
Debtors rely upon certain hazardous waste management suppliers (collectively, the
"**Waste Management Vendors**").  The Waste Management Vendors ensure secure, witnessed
destruction of DEA controlled substances and proper disposition of hazardous and non-hazardous
finished goods and manufacturing waste.  These dispositions take place in controlled incineration
facilities and are routinely documented and reported to the required federal agencies.  Without the
Waste Management Vendors, the Debtors would risk immediately violating waste management
regulations and face harsh penalties as a result.  As of the Petition Date, the Debtors had accrued
but not yet paid approximately $300,000 in fees to the Waste Management Vendors.

D.      **Foreign Vendors**

20.      Although the Debtors believe that many of their foreign suppliers of goods and
services (collectively, the "**Foreign Vendors**") may continue to do business with the Debtors after
commencement of these chapter 11 cases, certain Foreign Vendors may be reluctant to do so.  The

Debtors believe that there is material risk that the Foreign Vendors holding Vendor Claims against the Debtors may consider themselves beyond the jurisdiction of this Court, disregard the automatic stay and engage in conduct that disrupts the Debtors' operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures. Notably, Foreign Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods and services.

21.   Foreign Vendors also may sue the Debtors in foreign courts to recover pre-petition amounts owed to them. If they are successful in obtaining judgments against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors. Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses could be irreparably harmed by any such action to the detriment of the Debtors' estates and creditors. As of the Petition Date, the Debtors had accrued but not yet paid approximately $1,600,000 in fees to Foreign Vendors.

### Conditions to Payment of Critical Vendor Claims

22.   The Debtors propose, in their sole discretion, to condition payment of the Vendor Claims of each Critical Vendor upon an agreement by the applicable Critical Vendor to continue to supply goods or services to the Debtors on such Critical Vendor's "**Customary Trade Terms**"[5] for a period of time and on other such terms and conditions as are acceptable to the Debtors.

---

[5] As used herein, "Customary Trade Terms" means, with respect to a Critical Vendor, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such Critical Vendor.

23.     The Debtors further propose that if a Critical Vendor accepts payment for a Vendor Claim and later refuses to continue to supply goods or services to the Debtors on Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, then the Debtors may, in their sole discretion, and without further order of the Court: (i) declare that the payment of the creditor's Vendor Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Critical Vendor in cash or in goods, (ii) demand that the creditor immediately return such payments in respect of the applicable Vendor Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or setoffs of any type whatsoever and (iii) upon recovery of any such payment by the Debtors, reinstate such creditor's Vendor Claim in an amount to restore the Debtors and the Critical Vendor to their original positions, as if the agreement had never been entered into and the payment of the Vendor Claim had not been made.  In sum, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

24.     To ensure that Critical Vendors continue to transact with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying any claim of any Critical Vendor: (a) that a letter or contract including provisions substantially in the form of the letter attached hereto as **Exhibit C** (a "**Vendor Agreement**") be delivered to, and executed by, the Critical Vendor along with a copy of the order granting the relief sought herein and (b) that payment of the applicable Vendor Claims include a communication of the following statement:

By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Southern District of New York, dated _____, 2019 in

the chapter 11 cases of [Company], [Cases No. 19_____(RDD) through 19-_____(RDD)], entitled "Interim Order Authorizing (I) Payment of Certain Pre-petition Claims of Critical Vendors and (II) Financial Institutions to Honor and Process Related Checks and Transfers" and submits to the jurisdiction of that Court for enforcement thereof.

25.     As a further condition of receiving payment on a Vendor Claim, the Debtors propose that each Critical Vendor must agree to take whatever action is necessary or appropriate to remove any existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim, *provided*, *however*, that the foregoing shall be determined by the Debtors in their sole discretion.

26.     If an agreement relating to Vendor Claims is deemed an executory contract within the meaning of Bankruptcy Code section 365, the Debtors do not, at this time, seek to assume the same.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute post-petition assumption, reaffirmation or adoption of the programs, policies or agreements as executory contracts pursuant to Bankruptcy Code section 365.  In addition, nothing in this Motion shall be deemed an admission as to any lien or interest, including any possessory lien.

27.     The Debtors therefore seek authority to pay, in their sole discretion and business judgment, some or all of the Vendor Claims up to the Critical Vendors Claims Cap in order to maintain their operations.  As is illustrated above, maintaining ongoing relations with the Critical Vendors is essential to the Debtors' continuing operations.

## **Basis for Relief**

### A.     **The Bankruptcy Code Authorizes Payment of Critical Vendor Claims**

28.     While the Debtors hope and expect to ensure a continuing post-petition supply of goods and services by consensual negotiation with the Critical Vendors, the Debtors recognize that

their fiduciary duties bind them to consider and plan for vendors that may refuse to provide future goods or services unless their pre-petition claims are paid.  The Critical Vendors are so essential to the Debtors' businesses that loss of access to each of their particular goods and services, even for a short duration, would disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.  This irreparable harm to the Debtors and to the recoveries of all creditors will far outweigh the cost of payment of the pre-petition claims of the Critical Vendors.

29.     The Debtors are mindful of their fiduciary obligations to seek to maximize the value of their estates.  The preservation of key business relationships is among management's primary goals as the Debtors transition into chapter 11.  The Debtors' ability to continue its business operations is key to meeting those goals.

### i. *Payment of Critical Vendor Claims Is Appropriate Under Bankruptcy Code Sections 363(b)(1)*

30.     Bankruptcy Code section 363(b)(1) empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  The debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").

31.     The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this district have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

32.     Payment of Vendor Claims is vital to preserving the Debtors' businesses and maximizing the value of the Debtors' estates. The need for flexibility to pay such claims is particularly acute in the period immediately following the Petition Date. While the Debtors will be focusing on stabilizing their operations and the Debtors' restructuring efforts in chapter 11, the Critical Vendors may attempt to assert their considerable leverage and deny provision of goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment. Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to continue to supply goods or services to the Debtors on Customary Trade Terms. Indeed, in the recent past, certain vendors that became concerned about Debtors' financial condition have demanded that the Debtors pay for their goods on accelerated payment terms, on a

cash in advance or cash on delivery basis or provide collateral to secure outstanding payable balances.  Any further tightening of trade credit by other Critical Vendors would be detrimental to the Debtors, their estates and their creditors.  Accordingly, continuing payment of Vendor Claims to secure access to critical goods and services on Customary Trade Terms is a valid exercise of the Debtors' business judgment and may be authorized by this Court under Bankruptcy Code section 363(b).

ii.    *The Court Also May Grant the Motion Pursuant to Bankruptcy Code Section 105(a) and the Doctrine of Necessity*

33.    Bankruptcy Code section 363(b)(1) empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  The debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").

34.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Under section 105, "the court can permit pre-plan payment of a pre-petition obligation when essential to

the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

35.     In a long line of well-established cases, federal courts have consistently permitted post-petition payment of pre-petition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 312 (1882) (permitting payment of pre-receivership claim prior to reorganization to prevent "stoppage of [crucial] business relations"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (affirming order authorizing payment of pre-petition wages, salaries, expenses and benefits).

36.     This doctrine of "necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical pre-petition claims not explicitly authorized by the Bankruptcy Code. *See In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing existence of judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation). The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of pre-petition claims.

37.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is justified under Bankruptcy Code sections 105(a) and 363(b). The Debtors strongly believe that the uninterrupted supply of goods and services, on Customary Trade Terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors. The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have struggled to obtain over the years, is clearly advantageous to the Debtors. It will

allow the Debtors to maintain and enhance necessary liquidity and focus on their efforts in chapter 11. The Debtors believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit terms with vendors will enable the Debtors to stabilize business operations at this critical time, to maintain their competitiveness and to maximize the value of their businesses for the benefit of all interested parties. Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services, could spell disaster for the Debtors' restructuring efforts. Finally, the relief requested herein also may help to avert the institution of numerous reclamation claims, suits and motions. Avoiding the time and expense of evaluating and litigating such claims will provide another incremental benefit for the Debtors, their estates and their creditors. Any occurrence affecting operations could prolong the Debtors' chapter 11 cases, increase administrative expenses and jeopardize their reorganization.

38. Authority to pay the Critical Vendors in the ordinary course of the Debtors' businesses is in the best interest of the Debtors' estates and creditors. Absent such payment, the operations and value of the Debtors' estates will suffer, possibly precipitously, and the requested relief is necessary to avoid immediate and irreparable harm. This irreparable harm to the Debtors and to the recoveries of all creditors will far outweigh the cost of payment to Critical Vendors.

39. The Critical Vendor Claims Cap reflects the Debtors' best estimate as to how much may be required to be paid to such creditors to secure continued access to critical goods and services. The Debtors hope to pay significantly less than the requested amount. The Debtors' proposed Critical Vendor Claims Cap is within the range of amounts awarded by the courts in other cases. *See, e.g., In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2019) (authorizing the payment of pre-petition claims of critical vendors in an amount not

to exceed $80 million); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2018) (authorizing the payment of up to $90 million in aggregate pre-petition claims of critical vendors); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Feb. 10, 2017) (authorizing the payment of up to $39.5 million in pre-petition claims to critical vendors); *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 3, 2016) (authorizing the payment of up to $4 million in pre-petition claims to critical vendors); *In re The Great Atl. & Pac. Tea Co.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) (court granted debtor authority to pay $28 million of critical vendor claims); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Dec. 23, 2011) (court authorized debtor to pay up to $85 million in critical vendor claims); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2010) (court granted debtor authority to pay $62 million, or approximately 29% of accrued payables); *In re Lyondell Chemical Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 23, 2009) (court granted debtor authority, to the extent consistent with other orders, to pay some or all pre-petition critical vendor claims).

**B.    Request for Authority to Pay Certain Claims of Critical Vendors That Are Granted Priority Under Bankruptcy Code Section 503(b)(9) or Secured by Liens**

40.    Under Bankruptcy Code section 503(b)(9), claims asserted by Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the twenty (20) day period prior to the Petition Date are entitled to administrative claim status (the "**Twenty-Day Administrative Claims**").    The Debtors request that payments of Twenty-Day Administrative Claims not count against the Critical Vendor Claims Cap.  As administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors believe that they are authorized to pay the Twenty-Day Administrative Claims of Critical Vendors pursuant to section

363(c)(1) of the Bankruptcy Code; however, the Debtors also believe that they are not required to reconcile or pay the Twenty-Day Administrative Claims prior to the conclusion of these cases.

41.     To the extent that vendor claims are secured by trade liens or vendors are entitled to assert possessory liens securing their claims under applicable state law (the "**Secured Vendor Claims**," and together with the Twenty-Day Administrative Claims, the "**Twenty-Day/Secured Claims**"), they are entitled to receive (a) payment in full of their pre-petition claims pursuant to any confirmed plan or plans in these chapter 11 cases, and (b) the post-petition interest accruing on such claims to the extent such claims are oversecured. Consequently, payment of the Secured Vendor Claims will give the respective claimants no more than that to which they would otherwise be entitled under a plan, will save the Debtors the interest costs that otherwise may accrue on the fully secured claims during these chapter 11 cases, and avoid potentially significant disruptions with paying such claims on a delayed basis of the same nature as those described above.

42.     As timely payment of the Twenty-Day/Secured Claims and Secured Vendor Claims will preserve the Debtors' valued relationships with certain Critical Vendors and reduce the chance that the Debtors will face harmful supply disruptions during the initial and most critical phase of the chapter 11 cases, the Debtors request that the Court enter interim and final orders clarifying that, for the avoidance of doubt, the Debtors are authorized, but not required, to pay in their sole discretion the Twenty-Day/Secured Claims, or any portion thereof, of any Critical Vendor in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem appropriate.

43.     To the extent that vendor claims are fully secured by trade liens, they are entitled to receive (a) payment in full of their pre-petition claims pursuant to any confirmed plan or plans

in these chapter 11 cases, and (b) the post-petition interest accruing on such claims to the extent

such claims are oversecured.  Consequently, payment of the Secured Vendor Claims will give the

respective claimants no more than that to which they otherwise would be entitled under a plan,

will save the Debtors the interest costs that otherwise may accrue on such secured claims during

these chapter 11 cases, and avoid potentially significant disruptions with paying such claims on a

delayed basis of the same nature as those described above.  Accordingly, the Debtors request that

payments of Secured Vendor Claims not count against the Critical Vendor Claims Cap.

**C.      Applicable Financial Institutions Should Be Authorized to Honor and Process Related Checks and Transfers**

44.      The Debtors also request that all applicable banks and other financial institutions

(collectively, the "**Banks**") be authorized to receive, process, honor and pay all checks presented

for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims

that the Debtors request authority to pay in this motion, regardless of whether the checks were

presented or fund transfer requests were submitted before, on or after the Petition Date, *provided*,

*however*, that: (a) funds are available in the Debtors' accounts to cover the checks and fund

transfers and (b) the Banks are authorized to rely on the Debtors' designation of any particular

check as approved by the attached proposed order.

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

45.      Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use,

sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to

pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days

of filing a petition.  Irreparable harm "is a continuing harm which cannot be adequately redressed

by  final  relief  on  the  merits  and  for  which  money  damages  cannot  provide  adequate

compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotations omitted). The "harm must be shown to be actual and imminent, not remote or speculative." *Id.*

46.     As discussed above, if the Debtors are not permitted to continue paying obligations owed to the Critical Vendors in the ordinary course of the Debtors' business, the Debtors will suffer immediate and irreparable harm. Maintaining an uninterrupted supply of goods and services, on Customary Trade Terms, and the continuing support of their customers are essential to the Debtors' business operations, and to the Debtors' efforts in chapter 11 more broadly. Any delay in the relief sought would substantially disrupt the Debtors' operations and damage its going-concern value. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and that Bankruptcy Rule 6003(b) is satisfied.

### **Request for Waiver of Stay**

47.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Lowne Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to find the notice requirements of Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent the notice requirement and stay apply.

### **Notice**

48.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) each of the Debtors' fifty largest unsecured creditors on a consolidated basis; (c) each of the Debtors' three largest secured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney's Office for the Southern District of

New York; (g) the attorneys general for all fifty states and the District of Columbia; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

### Reservation of Rights

49.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holders; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### No Previous Request

50.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and grant the Debtors such other and further relief as is just and proper.

Dated:    September 15, 2019
          New York, New York


                                    DAVIS POLK & WARDWELL LLP

                                    By:    /s/ *Eli J. Vonnegut*

                                    450 Lexington Avenue
                                    New York, New York 10017
                                    Telephone: (212) 450-4000
                                    Facsimile:  (212) 701-5800
                                    Marshall S. Huebner
                                    Benjamin S. Kaminetzky
                                    Timothy Graulich
                                    Eli J. Vonnegut

                                    *Proposed Counsel to the Debtors*
                                    *and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-[    ](RDD) |
| Debtors. [1] | (Joint Administration Pending) |

## INTERIM ORDER AUTHORIZING (I) PAYMENT OF
## CERTAIN PRE-PETITION CLAIMS OF CRITICAL VENDORS
## AND (II) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
## RELATED CHECKS AND TRANSFERS

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors

and debtors in possession in these proceedings (collectively, the "**Debtors**"), pursuant to sections

105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, for entry of an interim order (this "**Order**")

and a final order authorizing, but not directing, the Debtors to pay in the ordinary course of

business pre-petition claims of Critical Vendors;[3] and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

[3] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors.  To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Order shall not apply to such prepetition claim.

venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper

notice of the Motion having been provided to the Notice Parties, and it appearing that no other or

further notice need be provided; and the Court having reviewed the Motion and held a hearing to

consider the relief requested in the Motion on a final basis (the "**Hearing**"); and upon the Lowne

Declaration filed contemporaneously with the Motion, and the record of the Hearing; and the Court

having determined that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and the Court having determined that immediate

relief is necessary to avoid irreparable harm to the Debtors and their estates as contemplated by

Bankruptcy Rule 6003(b) and is in the best interests of the Debtors, their estates, creditors and all

parties-in-interest; and upon all of the proceedings had before the Court and after due deliberation

and sufficient cause appearing therefor;

#### IT IS HEREBY ORDERED THAT

1.      The relief requested in the Motion is hereby granted as set forth herein, *provided*,

*however*, that in the first twenty-one (21) days after the Petition Date, the relief requested by the

Debtors is granted only to the extent that it is necessary to avoid irreparable harm.

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are

authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or

all of the pre-petition claims of the Critical Vendors (the "**Vendor Claims**") in an aggregate

amount not to exceed the Critical Vendor Claims Cap; *provided* that, prior to entry of an order

granting the relief requested in the Motion on a final basis, the Debtors will not pay any Vendor

Claim prior to the applicable due date.

3.      The Debtors, in their sole discretion, may condition payment of any Vendor Claims

upon agreement by the Critical Vendor to continue to supply goods or services to the Debtors on

such Critical Vendor's "**Customary Trade Terms**" for a period following the date of the agreement or on other such terms and conditions as are acceptable to the Debtors. As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor, (i) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, and availability, and other applicable terms and programs), that were most favorable to the Company and in effect between such Critical Vendor and the Company prior to the Petition Date or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor.

4.      As a further condition of receiving payment on a Vendor Claim, the Debtors are authorized, in their sole discretion, to require that such Critical Vendor agree to take whatever action is necessary or appropriate to remove any existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim.

5.      After the date hereof, the Debtors shall determine, in the ordinary course of business, which entities are Critical Vendors by considering, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies, (d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors and (e) the extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.

6.      The Debtors, in their sole discretion, may undertake to require Critical Vendors to enter into an agreement (the "**Vendor Agreement**") including provisions substantially in the form

attached to the Motion as **Exhibit C**.  The Debtors may, in their sole discretion, negotiate, amend, or modify the form of Vendor Agreement on a case-by-case basis.

7.       The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in their sole discretion, that it is appropriate to do so in connection with making payments to Critical Vendors.

8.       If the Debtors, in their sole discretion, determine that a Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor as contained in this Order, *provided*, *however*, that the Vendor Agreement may be reinstated (x) if such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor, (y) the underlying default under the Vendor Agreement is fully cured by the Critical Vendor not later than five business days after the date the initial default occurred or (z) the Debtors, in their sole discretion, reach a subsequent agreement with the Critical Vendor.

9.       If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor that has received payment of a pre-petition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Order, then (a) the Debtors may, in their sole discretion, declare that the payment of the creditor's Vendor Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor, (b) the creditor shall immediately return such payments in respect of a Vendor Claim to the extent that the aggregate amount of such

payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever and (c) the creditor's Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of Vendor Claim had been made.

10.     All Vendor Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors as contained in this Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

11.     The Debtors are authorized, in their sole discretion, and in the exercise of their business judgment, to pay Twenty-Day/Secured Claims in the ordinary course of Debtors' businesses and on such terms as the Debtors deem appropriate.

12.     Payments on account of any Twenty-Day/Secured Claims shall not count against the Critical Vendor Claims Cap.

13.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Order, whether presented prior to or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  Such banks and financial institutions are authorized to rely on representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

14.     Nothing contained in this Order shall be deemed to constitute a rejection, assumption or post-petition reaffirmation of any executory contract or to require the Debtors to make any of the payments or to post any of the deposits authorized herein.

15.     Nothing in this Order or the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of or basis for any claims against the Debtors arising in connection with the Vendor Claims.

16.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

17.     The Final Hearing shall be held on _____, 2019, at _____ (Prevailing Eastern Time).  Any objections or responses to the entry of the Final Order shall be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Paul K. Schwartzberg), (ii) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich and Eli J. Vonnegut) and (iii) counsel to any official committee then appointed in these chapter 11 cases, so as to be received by 4:00 p.m. (Prevailing Eastern Time) seven (7) days before the Final Hearing.  A reply to an objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two (2) business days before the date of the applicable hearing. If no objections or responses are filed and served, this Court may enter the Final Order without further notice or hearing.

18.     If no objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Order, which order shall be submitted and may be entered with no further notice or opportunity to

be heard afforded any party, and the Motion shall be approved *nunc pro tunc* to the date of the commencement of these chapter 11 cases.

19.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

20.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

21.     The requirements of Bankruptcy Rule 6003 are satisfied by the contents of the Motion.

22.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

White Plains, New York
Dated: _____, 2019

                                      _____
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-[    ](RDD) |
| Debtors. [1] | (Joint Administration Pending) |

### FINAL ORDER AUTHORIZING (I) PAYMENT OF
### CERTAIN PRE-PETITION CLAIMS OF CRITICAL VENDORS
### AND (II) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
### RELATED CHECKS AND TRANSFERS

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors

and debtors in possession in these proceedings (collectively, the "**Debtors**"), pursuant to sections

105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, for entry of an interim order and a final

order (this "**Order**") authorizing, but not directing, the Debtors to pay in the ordinary course of

business pre-petition claims of Critical Vendors;[3] and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

[3] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors. To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Order shall not apply to such prepetition claim.

venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion on a final basis (the "**Hearing**"); and upon the Lowne Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that the relief granted herein is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

## IT IS HEREBY ORDERED THAT

1. The relief requested in the Motion is hereby granted on a final basis as set forth herein.

2. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the pre-petition claims of the Critical Vendors (the "**Vendor Claims**") in an aggregate amount not to exceed the Critical Vendor Claims Cap.

3. The Debtors, in their sole discretion, may condition payment of any Vendor Claims upon agreement by the Critical Vendor to continue to supply goods or services to the Debtors on such Critical Vendor's "**Customary Trade Terms**" for a period following the date of the agreement or on other such terms and conditions as are acceptable to the Debtors. As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor, (i) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing,

cash discounts, timing of payments, allowances, rebates, coupon reconciliation, and availability, and other applicable terms and programs), that were most favorable to the Company and in effect between such Critical Vendor and the Company prior to the Petition Date or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor.

4.      As a further condition of receiving payment on a Vendor Claim, the Debtors are authorized, in their sole discretion, to require that such Critical Vendor agree to take whatever action is necessary or appropriate to remove any existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim.

5.      After the date hereof, the Debtors shall determine, in the ordinary course of business, which entities are Critical Vendors by considering, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies, (d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors and (e) the extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.

6.      The Debtors, in their sole discretion, may undertake to require Critical Vendors to enter into an agreement (the "**Vendor Agreement**") including provisions substantially in the form attached to the Motion as **Exhibit C**.  The Debtors may, in their sole discretion, negotiate, amend, or modify the form of Vendor Agreement on a case-by-case basis.

7.      The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in their sole discretion, that it is appropriate to do so in connection with making payments to Critical Vendors.

8.      If the Debtors, in their sole discretion, determine that a Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor as contained in this Order, *provided*, *however*, that the Vendor Agreement may be reinstated (x) if such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor, (y) the underlying default under the Vendor Agreement is fully cured by the Critical Vendor not later than five business days after the date the initial default occurred or (z) the Debtors, in their sole discretion, reach a subsequent agreement with the Critical Vendor.

9.      If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor that has received payment of a pre-petition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Order, then (a) the Debtors may, in their sole discretion, declare that the payment of the creditor's Vendor Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor, (b) the creditor shall immediately return such payments in respect of a Vendor Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever and (c) the

4

creditor's Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of Vendor Claim had been made.

10.    All Vendor Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors as contained in this Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

11.    The Debtors, are authorized, in their sole discretion, and in the exercise of their business judgment, to pay Twenty-Day/Secured Claims in the ordinary course of Debtors' businesses and on such terms as the Debtors deem appropriate.

12.    Payments on account of any Twenty-Day/Secured Claims shall not count against the Critical Vendor Claims Cap.

13.    All applicable banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Order, whether presented prior to or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  Such banks and financial institutions are authorized to rely on representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

14.    Nothing contained in this Order shall be deemed to constitute a rejection, assumption or post-petition reaffirmation of any executory contract or to require the Debtors to make any of the payments or to post any of the deposits authorized herein.

15.     Nothing in this Order or the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of or basis for any claims against the Debtors arising in connection with the Vendor Claims.

16.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

17.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

18.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

19.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

White Plains, New York
Dated: _____, 2019

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit C

**Vendor Agreement**

**<u>Purdue Pharma L.P.</u>**

_____, 2019

TO:      [Critical Vendor]
[Name]
[Address]

Dear Valued Supplier:

As you are aware, [Company] and certain of its subsidiaries set forth in Schedule I (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Cases**" and the "**Bankruptcy Court**," respectively) on September 15, 2019 (the "**Petition Date**").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay the pre-petition claims of certain suppliers in recognition of the importance of the Company's relationship with such suppliers and its desire that the Bankruptcy Cases have as little effect on the Company's ongoing business operations as possible.  On [    ], the Bankruptcy Court entered an order (the "**Order**") authorizing the Company, under certain conditions, to pay the pre-petition claims of certain suppliers that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

In order to receive payment on account of pre-petition claims, you must agree to continue to supply goods and services to the Company based on "**Customary Trade Terms**."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Company and in effect between you and the Company prior to the Petition Date, or such other trade terms as you and the Company agree.

For purposes of administration of this trade program as authorized by the Bankruptcy Court, you and the Company both agree that:

1.      The estimated balance of the pre-petition claim (net of any setoffs, credits or discounts) (the "**Vendor Claim**") that you will receive from the Company is $_____.

2.      You will waive any remaining pre-petition general unsecured claim against the Company.

3.      You will provide an open trade balance or credit line to the Company for shipment of post-petition goods consistent with the normal and customary terms that were most favorable to the Debtors and in effect between you and the Debtors prior to the Petition Date.

4       The terms of such open trade balance or credit line are as follows (if more space is required, attach continuation pages):

_____

_____

_____

_____

_____

_____

_____

5.       During the pendency of the Bankruptcy Cases you will continue to extend to the Company all Customary Trade Terms (as defined in the Order).

6.       You will not demand a lump sum payment upon consummation of a plan of reorganization in the Bankruptcy Cases on account of any administrative expense priority claim that you assert, but instead agree that such claims will be paid in the ordinary course of business after consummation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

7.       The undersigned, a duly authorized representative of [Critical Vendor], has reviewed the terms and provisions of the Order and agrees that [Critical Vendor] is bound by such terms;

8.       You will not separately seek payment for reclamation and similar claims outside of the terms of the Order unless your participation in the Critical Vendor payment program authorized by the Order (the "**Critical Vendor Payment Program**") is terminated;

9.       You will not file or otherwise assert against the Company, the estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining pre-petition amounts allegedly owed to you by the Company arising from agreements entered into prior to the Petition Date.  Furthermore, you agree to take (at your own expense) all necessary or appropriate steps to remove any such lien as soon as possible; and

10.       If either the Critical Vendor Payment Program or your participation therein terminates as provided in the Order, or you later refuse to continue to supply goods to the Company on Customary Trade Terms during the pendency of the Bankruptcy Case, any payments you receive on account of your Vendor Claim (including claims arising under section 503(b)(9) of the Bankruptcy Code will be deemed voidable post-petition transfers pursuant to section 549(a) of the Bankruptcy Code).  You will immediately repay to the Company any payments made to you on account of your Vendor Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever.  Your Vendor Claim shall be reinstated in such an amount so as to restore the Company and you to the same positions as would have existed if payment of the Vendor Claim had not been made.

2

11.    Any dispute with respect to this letter agreement, the Order and/or your participation in the Critical Vendor Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement, please do not hesitate to call.

Sincerely,


[Company]

By:    _____
            [Name]
            [Title]


Agreed and Accepted by:
[Critical Vendor]

By:    _____
Its:    _____

Dated:    _____, 20[   ]

3