DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-[    ](RDD)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING (I) DEBTORS TO HONOR PREPETITION OBLIGATIONS TO
CUSTOMERS AND RELATED THIRD PARTIES AND TO OTHERWISE CONTINUE
CUSTOMER PROGRAMS (II) RELIEF FROM STAY TO PERMIT SETOFF IN
CONNECTION WITH THE CUSTOMER PROGRAMS AND (III) FINANCIAL
INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession

in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") hereby move

(this "**Motion**") this Court for entry of interim and final orders, substantially in the forms attached

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and the "**Final Order**," respectively), granting the relief described below.  In support thereof, the Debtors refer to the contemporaneously filed *Declaration of Jon Lowne in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Lowne Declaration**") and further represent as follows:

**Jurisdiction and Venue**

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

2.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a statutory committee of creditors in these chapter 11 cases, nor has the Court appointed a trustee or examiner therein.

3.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

4.      PPLP and its direct and indirect subsidiaries other than the Rhodes Debtors (defined below) (the "**Purdue Debtors**") primarily operate a branded pharmaceuticals business, while Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries (the "**Rhodes Debtors**") primarily develop and distribute generic pharmaceutical products and manufacture a range of active pharmaceutical ingredients.

5.      Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed contemporaneously herewith.

**<u>Relief Requested</u>**

6.      By this Motion, pursuant to Bankruptcy Code sections 105(a) and 363(b), Bankruptcy Rules 6003 and 6004, and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Debtors seek entry of an Interim Order and a Final Order authorizing, but not directing, the Debtors, in their sole discretion, to honor certain prepetition obligations owed to customers under existing customer programs and practices and to otherwise continue, renew, replace, implement or terminate customer programs and practices (as described in greater detail below, the "**Customer Programs**") in the ordinary course of business.

7.      The Debtors also respectfully request that the Interim Order and the Final Order (a) grant relief from the automatic stay to permit setoffs in connection with the Customer Programs; (b) authorize the Debtors to satisfy any outstanding obligations under certain agreements described herein (the "**Third-Party Services Agreements**") with Emerson, Deloitte, iContracts, Apexus, Inmar, Cumberland, Model N and certain coupon adjudicators (collectively, the "**Third-Party Service Providers**"); (c) authorize and direct all applicable banks and other financial institutions (collectively, the "**Banks**") to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Customer

3

Programs, whether such checks or other requests were submitted before, on or after the Petition

Date; (d) authorize the Banks to rely on the representations of the Debtors as to which checks and

fund transfers are subject to this Motion, *provided* that no Bank shall have any liability to any party

for relying on such representations; (e) prohibit the Banks from placing any holds on, or attempting

to reverse, any automatic transfers to any account of the Customer Programs; and (f) authorize the

Debtors to issue new post-petition checks or effect new post-petition fund transfers to replace any

checks, drafts and other forms of payment that are dishonored or rejected, and to reimburse any

expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or

other form of payment.  The Debtors are not seeking authority to pay or satisfy any obligations to

any shareholder of the Debtors or any non-Debtor affiliate of any shareholder of the Debtors.

### The Debtors' Customer Programs

8.      In the ordinary course of business, the Debtors participate in various Customer

Programs integral to the sale of their products and to ensure continuity of product supply to

patients.  The Debtors seek authority to honor and continue, in the Debtors' sole discretion, the

Customer Programs that they deem to be beneficial and cost-effective to their businesses.  A

diagram outlining the flow of the Debtors' products and related Customer Programs is attached

hereto as **Exhibit C**, which diagram separately illustrates (1) Rhodes Pharmaceuticals L.P.

prescription products, (2) Purdue Pharma L.P. prescription products and (3) Avrio Health L.P.

consumer health products.

**A.      Discounts, Fees and Other Benefits Provided to Wholesalers**

9.      The Debtors' primary sales channel for prescription products is through

wholesalers (collectively, the "**Wholesalers**"), who sell these products to retail drugstores, mass

merchandisers, pharmacies, hospitals, long-term care and other mail, retail and non-retail

institutions in the United States.  These buyers, in turn, dispense these products to patients.  The

Debtors sell their products to the Wholesalers at the wholesale acquisition cost (the "**WAC**"), a base price set by the Debtors in their sole discretion and adjusted from time to time.  If the Wholesalers refuse to do business with the Debtors, the Debtors would lose access to their primary sales channel for prescription products, which would have a devastating impact on the Debtors' operations and revenues.  The Wholesalers will only continue to do business with the Debtors if they are able to continue to provide the Wholesalers with industry standard terms, including Prompt Pay Discounts, Fee for Service payments, and honoring the Sales Return Programs (each as defined below).  Accordingly, allowing the Debtor to continue such programs is critical to their ability to operate their business post-petition.    Wholesalers McKesson Corporation, AmerisourceBergen Drug Corporation and Cardinal Health Inc. accounted for over 90% of the Debtors' gross sales as of August 31, 2019.

### i.     *Prompt Pay Discount*

10.      The contracts with the Wholesalers, along with Purdue's general terms and conditions of sale, provide for industry-standard discounts, such as a "prompt pay" discount (the "**Prompt Pay Discount**"), which affords an approximately two percent (2%) discount to Wholesalers for paying their invoices within the payment terms of the contracts or Purdue's general terms and conditions of sale.  Without the ability to offer industry standard Prompt Pay Discounts, Wholesalers would be unwilling to enter into relationships with the Debtors.  Each month, the Debtors extend approximately $3,840,000 in Prompt Pay Discounts, with approximately $5,717,575 outstanding at the Petition Date.  The Debtors seek authority to continue providing these discounts in the ordinary course of business.

### ii.     *Fee for Service*

11.      In addition to purchasing the Debtors' products, the Wholesalers provide various services to the Debtors, including managing inventory, distributing the Debtors' products and

managing industry-specific data.  The Debtors compensate the Wholesalers for these services by offering a fee for these services (the "**Fee for Service**").  The Fee for Service is generally calculated by multiplying the Debtors' quarterly invoiced sales to the Wholesalers by a fixed percentage rate, or for certain services, a fixed amount per unit sold, negotiated between the Debtors and each individual Wholesaler, which may be adjusted based on performance of the services and whether the Wholesalers met relevant metrics in the contracts.  The Fee for Service is applied a credit against outstanding invoices, quarterly in arrears.  The Debtors' average quarterly liability for the Fee for Service is approximately $16,000,000.  The Debtors seek authority to pay any unpaid Fee for Service that accrued prepetition and to continue paying these fees in the ordinary course of business.

### iii.    *Sales Return Program*

12.    In the ordinary course of business, the Debtors' customers may be unable to sell the products they purchase from the Debtors because the product expires, the product is damaged, there is a drop in demand, or for some other reason.  Under these circumstances, the Debtors permit returns of the product in exchange for credit within a limited time before and after the date of expiration of the product (the "**Sales Return Program**").  The Debtors' products have up to three (3) years of shelf life, depending on the product, and can be returned six (6) months prior to and up to twelve (12) months after expiration for prescription products and up to twenty-four (24) months after expiration for consumer health products.  As of the Petition Date, the Debtors estimate there is approximately $102,535,000 in potential returns of the Debtors' products, which would set off against the Debtors' accounts receivable over a period of up to four (4) years.  Credits processed for returns in the last three (3) months were $12.5 million.  To maintain their customers' and Wholesalers' goodwill and continued business, the Debtors seek authorization to honor any

prepetition return requests and obligations under the Sales Return Program in the ordinary course of business.

**B.    Non-Governmental Discount Programs**

   ***i. GPOs***

13.    The Debtors have negotiated discount programs with certain customers and group purchasing organizations (collectively, "**GPOs**") for members of the GPO to purchase their products from Wholesalers at prices that are lower than WAC.  Members of GPOs include hospitals, long-term care facilities and other healthcare providers.  Members of the GPO purchase the Debtors' products from a Wholesaler at the discounted price negotiated by the GPO, and the Wholesaler then submits a chargeback to the Debtors for the difference between WAC and the discounted price negotiated by the GPO (the "**GPO Wholesaler Chargebacks**").  The Debtors pay fees to certain GPOs in return for their services negotiating on behalf of their members and setting the discounted prices (the "**GPO Fees**").  The Debtors pay on average $943,250 in monthly GPO Fees.  The Debtors' average monthly liability for GPO Wholesaler Chargebacks is approximately $21,065,000, though GPO Wholesaler Chargebacks are netted against accounts receivable and thus generally do not result in a cash payment.

14.    The Debtors seek authority to continue honoring all GPO Wholesaler Chargebacks in the ordinary course of business and to apply any prepetition GPO Wholesaler Chargebacks that may be outstanding against subsequent invoices of the Debtors' products in the ordinary course of business.  If the Debtors stopped paying these GPO Fees, the Debtors would be unable to make use of the GPOs' services.  The immediate effect would be the loss of various vital customers and frustration to the Debtors' distribution channels.  Accordingly, to maintain their customers' goodwill and continued business, the Debtors seek authorization to pay any unpaid GPO Fees that accrued prepetition and to continue to pay such fees in the ordinary course of business.

### *ii. Private Insurers*

15.    The Debtors are party to agreements with certain managed care organizations, private insurance providers and pharmacy benefit managers that contract on behalf of private insurers, managed care organizations, third party administrators and other types of managed healthcare entities (collectively, the "**Private Insurers**") that cover, or whose members cover, the cost of medications for the Private Insurers' beneficiaries.  In order to ensure appropriate formulary coverage and access to Debtors' products, the Debtors are required to provide the Private Insurers with periodic rebates and, in certain cases, administrative fees (the "**Private Insurance Program Rebates**").  As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $64,665,000 in Private Insurance Program Rebates.  The Debtors seek authority to pay these rebates as they come due in the ordinary course of business.

### *iii. Co-Pay Reduction*

16.    The Debtors provide certain patients with co-pay assistance to offset their out-of-pocket costs (the "**Co-Pay Reduction Program**").  The Co-Pay Reduction Program is offered to commercially insured patients to help offset the co-payments set by health insurers for prescription medication.  Patients eligible for the Co-Pay Reduction Program receive a coupon, either online, from a healthcare provider or at the point of sale.  When a patient purchases one of the Debtors' products at the pharmacy with either a point of sale discount or a discount coupon, the pharmacy submits redemption information to the coupon adjudicator with whom the Debtors have contracted with to provide coupon adjudication services for the Debtors' products.  The adjudicator reimburses the pharmacy for the discount and is in turn reimbursed by the Debtors (the "**Co-Pay Reduction Rebate**").  The Debtors pay the coupon adjudicators a fee for service and costs for the production of the coupons.  The Debtors estimate that as of the Petition Date, approximately $3,540,400 has accrued but has not been invoiced or paid for Co-Pay Reduction Rebates and fees.

The Debtors seek authority to pay Co-Pay Reduction Rebates and fees when they become due and to continue to utilize and pay the coupon adjudicators in the ordinary course of business.

## C.     Discounted Rates Under Government Programs

### i. Medicaid

17.     Medicaid is a health program, jointly funded by state and federal governments and managed by the states, that assists low-income individuals and families in obtaining healthcare. The Medicaid Drug Rebate Program, a federal and state partnership that offsets the costs of certain prescription medications dispensed to Medicaid patients, requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services.  In return, Medicaid covers the Debtors' products.  In addition, the Debtors have agreements with certain states for rebates under other state programs that serve low-income individuals and families not eligible for Federal Medicaid, as well as supplemental rebate agreements for rebates in excess of those required by federal statute.  Under these programs, individual states collect product utilization data for products paid for under the various state and federal programs and invoice the Debtors for rebates (the "**Medicaid Rebates**"), which are calculated based on a statutory formula or, for supplemental rebates, on the contractual formula.  The Debtors pay the Medicaid Rebates to the various states on a quarterly basis.  The Debtors estimate that approximately $89,170,000 has been accrued but has not been invoiced for Medicaid Rebates as of the Petition Date.  While this amount is not yet due and payable, it may become due and payable over the course of the chapter 11 cases.

18.     If the Debtors fail to fulfill their Medicaid obligations, including payment of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs, as well as being subject to penalties and fines.  As such, honoring the Medicaid Rebates is integral to the Debtors' businesses.  The Debtors cannot afford to risk the substantial harm that would arise

from the failure to pay the Medicaid Rebates, including denial of coverage and irreparable damage to the Debtors' relationships with their customers. Accordingly, the Debtors respectfully request authorization to continue making Medicaid Rebate payments in the ordinary course of business during the chapter 11 cases with respect to both prepetition and post-petition sales of their products.

### ii. Medicare Part D

19.     Medicare is a federally administered, national insurance program that primarily serves Americans over the age of sixty-five (65). Medicare Part D provides prescription drug benefits to eligible patients. The Debtors are party to several contracts with private insurance companies, managed care organizations, and pharmacy benefit managers with Medicare Part D business lines ("**Medicare Part D Plans**"), under which the Debtors pay certain rebates and, in certain cases, administrative or other fees related to Medicare Part D ("**Medicare Part D Rebates**"). The Debtors pay these rebates and fees under the Medicare Part D Plans monthly or quarterly, based on individual contract terms. As of the Petition Date, the Debtors estimate that they had accrued but not yet paid approximately $31,225,000 in Medicare Part D Rebates. The Debtors respectfully request authorization to continue making Medicare Part D Rebate payments in the ordinary course of business during the chapter 11 cases with respect to both prepetition and post-petition sales of their products.

20.     The Debtors are also party to a Medicare Part D Coverage Gap Program Discount Agreement with the Centers for Medicare and Medicaid Services ("**CMS**"), required under PPACA, as modified by the ACA, should manufacturers wish to have coverage for their products under Medicare Part D, pursuant to which the Debtors provide rebates to a certain third party provider of services of CMS, Palmetto GBA ("**Palmetto**"). Palmetto, in turn, administers a program whereby the Medicare Part D Plans provide discounted prescription medications to Medicare Part D beneficiaries within a so-called "coverage gap" (the "**Coverage Gap Program**").

Palmetto consolidates claims arising under the Coverage Gap Program and sends an invoice to the Debtors. Palmetto is not required to, and does not, provide updates to the Debtors regarding claims that have not yet been included in invoices. As such, the Debtors do not know the amount of any prepetition liability they owe under the Coverage Gap Program. Based on previous invoices, however, the Debtors estimate that there is approximately $33,415,000 in outstanding prepetition liability under the Coverage Gap Program. By this Motion, the Debtors seek authority to continue the Coverage Gap Program and to pay any amounts that may become due under the Coverage Gap Program in the ordinary course of business.

### iii. 340B

21.    Under its agreement with CMS for Medicaid and relevant statutes, the Debtors are required to comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "**340B Program**"). Under this program, the Debtors must sell their products at specified prices that reflect a substantial discount to WAC. Failure to comply with the 340B Program may result in fines and penalties, and exclusion from other federal programs. Certain hospitals, clinics, and other entities, as set forth in relevant statutes, provide a minimum share, set by the 340B Program regulations, of their services to low-income patients and receive federal funds from CMS to help cover the costs of providing care to uninsured patients (such hospitals, clinics and other entities, the "**340B Entities**"). Pursuant to the 340B Program, the 340B Entities are entitled to receive the Debtors' products at a discounted price set by statute, which is calculated on a quarterly basis. 340B Entities purchase the Debtors' products from one of the Debtors' Wholesalers at the discounted price, and the Wholesaler then submits a chargeback to the Debtors for the difference between the WAC price that the Wholesaler paid to the Debtors and the discounted price paid by the 340B Entity to the Wholesaler (the "**340B Wholesaler Chargebacks**").

22.     The Debtors seek authority to continue the 340B Program in the ordinary course of business.   The Debtors' average monthly liability for 340B Wholesaler Chargebacks is approximately $2,830,100, though 340B Wholesaler Chargebacks are netted against accounts receivable and thus generally do not result in a cash payment.   The Debtors seek authority to continue honoring all 340B Wholesaler Chargebacks in the ordinary course of business and to apply any prepetition 340B Wholesaler Chargebacks that may be outstanding against subsequent invoices of the Debtors' products in the ordinary course of business.   The Debtors estimate that approximately $5,660,200 of prepetition 340B Wholesaler Chargebacks is outstanding as of the Petition Date.

### iv. Federal Supply Schedule

23.     Based on its agreement with CMS for Medicaid and relevant statutes, the Debtors must also comply with the Department of Veterans Affairs Federal Supply Schedule (the "**FSS**"), which requires the Debtors to make their products available to federal agencies such as, but not limited to, the Department of Veterans Affairs, Department of Defense, the Coast Guard, Federal Bureau of Prisons and the Public Health Service at deeply discounted prices.   In addition, the Debtors also may offer voluntary additional discounts on the FSS or to the Department of Defense mail order and military treatment facilities (collectively, the "**Federal Supply Schedule Programs**").   For drugs with a New Drug Application ("**NDA**"), there is a statutory maximum amount that certain government entities can be charged for pharmaceuticals based on a specific formula.   For multisource prescription drugs or non-prescription products, the prices and discounts are negotiated with the Department of Veterans Affairs, and often equal the lowest commercial institutional price.   Since the price the Debtors charge under the Federal Supply Schedule is lower than WAC, the Wholesalers charge back the Debtors for the difference (the "**FSS Chargebacks**").   Failure to comply with the Federal Supply Schedule Programs may result in substantial fines and

penalties and exclusion from other federal programs, which would diminish the Debtors' customer base as well as harm the Debtors' relationship with the Wholesalers.

24.     The Debtors seek authority to continue to sell their products under the Federal Supply Schedule Programs in the ordinary course of business.  The Debtors' estimated average monthly liability for FSS Wholesaler Chargebacks is approximately $2,829,000, though FSS Wholesaler Chargebacks are netted against accounts receivable and thus generally do not result in a cash payment.  The Debtors seek authority to continue honoring all FSS Wholesaler Chargebacks in the ordinary course of business and to apply any prepetition FSS Wholesaler Chargebacks that may be outstanding against open invoices of their products in the ordinary course of business.

### v. Industrial Funding Fee

25.     The Debtors also collect for the United States Department of Veterans Affairs an additional 0.5% fee on all FSS purchases (the "**Industrial Funding Fee**").  The Debtors' estimated average quarterly liability for Industrial Funding Fees is $50,000.  Manufacturers collect this fee from purchasers at the time of sale, via the FSS Wholesaler Chargebacks process, and remit payment to the Department of Veterans Affairs on a quarterly basis.  The Debtors seek to continue paying the Industrial Funding Fee over to the Department of Veterans Affairs in the ordinary course of business.

### vi. Tricare

26.     Tricare is a federal program administered by the Defense Health Agency of the Department of Defense, whereby the Defense Health Agency covers prescription products dispensed at retail and mail order pharmacies for military beneficiaries and their dependents.  The Debtors have entered into a contract with the Defense Health Agency for certain rebates, mandated under 10 U.S.C. § 1074g(f) and 32 CFR Part 199, calculated using the FSS statutory maximum pricing, as well as other voluntary rebates (collectively, "**Tricare Rebates**"), in order to ensure

access to Debtor's medications for Tricare beneficiaries.  The Debtors pay these Tricare Rebates
to the Defense Health Agency quarterly.  As of the Petition Date, the Debtors estimate that they
had accrued but not yet paid approximately $8.4 million in Tricare Rebates.  The Debtors
respectfully request authorization to continue making Tricare Rebate payments in the ordinary
course of business during the chapter 11 cases with respect to both prepetition and post-petition
sales of their products.

D.      **Third Party Services Agreements**

27.      Debtor  Avrio  Health  L.P.  ("**Avrio**")  employs  Emerson  Healthcare  LLC
("**Emerson**")  to  take  orders,  issue  invoices,  collect  cash,  issue  credits,  and  distribute
(non-prescription) consumer health products.  Emerson, in turn, sells products to retailers and
wholesalers, who sell the Debtor's products to retail drugstores, mass merchandisers, pharmacies,
hospitals, long-term care and other mail, retail and non-retail institutions in the United States.
These buyers, in turn, sell the Debtors' products to patients.  Avrio pays Emerson a fee for service
as well as its pass-through costs for distributing the products.  On average, the Debtors pay
approximately $160,000 in monthly fees and $80,000 in monthly pass-through costs to Emerson
and estimate that, as of the Petition Date, they owe approximately $155,000 in fees and $80,450
in pass-through costs.  The Debtors seek authority to pay any prepetition unpaid fees and pass-
through costs due and owing to Emerson and to continue to utilize and pay Emerson in the ordinary
course of business.

28.      Given the complexity of calculating and confirming the validity of the various
chargebacks issued by the Wholesalers, including those for government programs, the Purdue
Debtors have engaged Deloitte, as an outsourced third party logistics provider, for assistance
managing the chargeback programs and managing its GPO contracts.  The outsourcing of these
services started in 2010 and the Purdue Debtors no longer have employees to perform these

services.   The average estimated monthly fees for Deloitte are approximately $33,000.   The

Debtors estimate that, as of the Petition Date, $29,000 of these fees remains accrued but unpaid.

29.    Similarly, the Rhodes Debtors have engaged iContracts, a third party service

provider that assists the Rhode Debtors with various facets of their chargeback programs as well

as Medicaid rebate processing.   The average monthly fees paid to iContracts are approximately

$14,000.   The Debtors estimate that, as of the Petition Date, approximately $45,550 of these fees

remains accrued but unpaid.

30.    The Debtors have engaged Inmar RX Solutions Inc. ("**Inmar**") as their authorized

returns processor to ensure accuracy of processing, counterfeit detection, compliance policy and

regulations and to provide electronic transmission of returns data to the Debtors.   The average

monthly fees for Inmar are approximately $13,500.   The Debtors estimate that, as of the Petition

Date, approximately $10,500 of these fees remains accrued but unpaid.

31.    Given the administrative complexity of the Private Insurer, Medicaid and Medicare

Part D rebate processes (including data validation), the Debtors have engaged Cumberland

Consulting Group ("**Cumberland**") as an outsourced service provider to validate, calculate and

pay these rebates.   The outsourcing of these services started in the third quarter of 2018 and the

Debtors no longer have sufficient employees to perform these services itself.   The Debtors, on

average, pay approximately $68,750 in monthly fees to Cumberland and estimate that, as of the

Petition Date, they owe Cumberland approximately $75,000 in accrued but unpaid fees.

32.    Similarly, the Debtors have engaged Model N, a third party cloud application, to

provide software solutions to enable Cumberland to adjudicate and calculate rebates. The average

monthly fee paid to Model N is approximately $30,300, and the Debtors estimate that, as of the

Petition Date, they do not owe Model N any accrued but unpaid fees.

33.     The Debtors have engaged Apexus to assist in repayment to 340B entities of any overpayments from 340B entities, caused by restatements of Medicaid statutory calculations done in the ordinary course of business, as required by statute.   The repayment of 340B entities of overpayment is required by statute within 120 days of determination of an overcharge, subject to civil monetary penalties if a manufacturer is non-compliant.   The repayment process is extraordinarily complex, due to the number of entities and the indirect nature of their original purchases.  The Debtors believe that they do not currently owe any amounts to Apexus, but as the Debtors do not have employees to perform these required services when needed, they request authority to continue to use Apexus to assist with these repayments, including with respect to payment of Apexus' fees and funding amounts needed to repay the 340B entities for any overpayments, if a need for such services arises during these chapter 11 cases.

34.     By this motion, the Debtors seek authority to pay any prepetition unpaid amounts due and owing under the Third-Party Services Agreements and to continue to utilize and pay the Third-Party Service Providers in the ordinary course of business.

## Relief Requested Should Be Granted

35.     The Debtors submit that an order authorizing them to (i) continue the Customer Programs as they determine to be appropriate and (ii) make payments owing on account of prepetition product sales is in the best interest of the Debtors' estates, their creditors and all other parties in interest.  The relief is also appropriate pursuant to Bankruptcy Code sections 105(a) and 363(b).

36.     In 2018, substantially all of the Debtors' products were purchased through the Customer Programs. Preserving the value of the Debtors' businesses is contingent, in large part, upon the Debtors' ability to continue operating in the ordinary course and to maintain ordinary course relationships with all parties in their sales cycle.  If the Debtors' customers do not continue

to receive the benefits of the Customer Programs, the Debtors' business will be severely disrupted, resulting in immediate and irreparable harm to the Debtors and their estates.

## A. The Continuation of the Customer Programs and Payment of Amounts Due Under the Third Party Service Agreements is a Sound Exercise of the Debtors' Business Judgment

37.    Bankruptcy Code section 363(b)(1) empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  The debtor's decision to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting the standard for determining a section 363(b) motion is "a good business reason").

38.    The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in this district have consistently and appropriately been loath to

interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

39.     Continuing the Customer Programs and payment of amounts due under the Customer Programs and Third Party Service Agreements is vital to preserving the Debtors' businesses and maximizing the value of the Debtors' estates.  Without ongoing fulfillment of these programs, the Debtors' restructuring would be severely jeopardized.  Accordingly, continuing the Customer Programs and maintaining the Third-Party Service Agreements is a valid exercise of the Debtors' business judgment and may be authorized by this Court under Bankruptcy Code section 363(b).

## B.    The Court Also May Grant the Motion Pursuant to Bankruptcy Code Section 105(a) and the Doctrine of Necessity

36.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  "Under Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

37.     In a long line of well-established cases, federal courts have consistently permitted post-petition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 312 (1882) (permitting payment of pre-receivership claim prior to reorganization to

prevent "stoppage of [crucial] business relations"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (affirming order authorizing payment of prepetition wages, salaries, expenses and benefits).

38.    This doctrine of "necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing existence of judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation).  The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.

39.    The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is justified under Bankruptcy Code sections 105(a) and 363(b).  If the Debtors are prohibited from honoring the Customer Programs and their obligators under the related Third-Party Services Agreements, customers from across the Debtors' supply chain may lose confidence in the Debtors' ability to honor orders and may become reluctant to do business with the Debtors in the future.  Additionally, failure to honor prepetition obligations to customers and related third parties could cause the Debtors' products to be removed from formulary lists, which determine whether a drug is covered by a specific plan or program.  Ultimately, the damage from disregarding these obligations would far exceed the cost associated with honoring the Customer Programs.  The relief requested herein will protect the Debtors' goodwill and avoid customers and other third parties integral to the sale of the Debtors' products being driven away during this critical time.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

40.     The relief requested in this Motion has been granted in comparable chapter 11 cases in this jurisdiction.  *See, e.g.*, *In re Synergy Pharm. Inc.*, No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 23, 2019); *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. Sept. 14, 2018); *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018); *In re 21st Century Oncology Holdings, Inc.*, No. 17-22770 (RDD) (Bankr. S.D.N.Y. June 20, 2017); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Feb. 10, 2017).

**C.      The Proposed Payment-Processing Procedures Are Appropriate**

41.     The Debtors also request that the Court authorize Banks to receive, process, honor and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on or after the Petition Date, *provided* that: (a) funds are available in the Debtors' accounts to cover the checks and fund transfers and (b) the Banks are authorized to rely on the Debtors' designation of any particular check as approved by the Interim Order and the Final Order.  Likewise, the Debtors request that the Wholesalers and other customers be granted relief from the automatic stay to effectuate the Customer Programs.

42.     The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court.  The Debtors therefore submit that the payment-processing procedures described in this Motion are appropriate.

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

43.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use,

sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days of filing a petition.  Irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotations omitted).  The "harm must be shown to be actual and imminent, not remote or speculative." *Id.*

44.     As discussed above, if the Debtors are not permitted to continue paying obligations under the Customer Programs and the Third-Party Services Agreements as they come due, the Debtors will suffer immediate and irreparable harm.  Maintaining these programs and relationships is essential to the Debtors' business operations, and to the Debtors' restructuring efforts more broadly.  Any delay in the relief sought would substantially disrupt sales of the Debtors' products and would dissipate the Debtors' customer base.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and that Bankruptcy Rule 6003(b) is satisfied.

## **Request for Waiver of Stay**

45.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to find the notice requirements of Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent the notice requirement and stay apply.

## Notice

46.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) each of the Debtors' fifty largest unsecured creditors on a consolidated basis; (c) each of the Debtors' three largest secured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney's Office for the Southern District of New York; (g) the attorneys general for all 50 states and the District of Columbia; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

## Reservation of Rights

47.     Nothing contained herein or any actions taken pursuant to such relief is intended or shall be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holders; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## No Previous Request

48.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and grant the Debtors such other and further relief as is just and proper.

Dated:    September 15, 2019
          New York, New York

DAVIS POLK & WARDWELL LLP

By:   /s/ *Eli J. Vonnegut*                           

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-[    ](RDD) |
| Debtors. [1] | (Joint Administration Pending) |

### INTERIM ORDER AUTHORIZING (I) DEBTORS TO HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND RELATED THIRD PARTIES AND TO OTHERWISE CONTINUE CUSTOMER PROGRAMS (II) RELIEF FROM STAY TO PERMIT SETOFF IN CONNECTION WITH THE CUSTOMER PROGRAMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an interim order (this "**Order**") and a final order authorizing, but not directing, the Debtors to continue, renew, replace, implement or terminate customer programs and practices (collectively, the "**Customer Programs**") in the ordinary course of business and to pay and otherwise honor prepetition obligations to customers and other third parties relating thereto, all as set forth more fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Lowne Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that immediate relief is necessary to avoid irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003(b) and is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**

1.      The Motion is granted on an interim basis as set forth herein.

2.      The Debtors, in their sole discretion, are authorized (a) to fulfill and honor their obligations under the Customer Programs as they deem appropriate and (b) to continue, renew, replace, implement new and/or terminate any Customer Program, in each case, in the ordinary course of business, without further application to the Court, including making all payments, satisfying all obligations and permitting all setoffs in connection therewith, whether relating to the period prior to, on or subsequent to the Petition Date.

3.     The Debtors, in their sole discretion, are authorized (a) to continue utilizing third parties in connection with administering and maintaining the Customer Programs as described in the Motion and to pay or caused to be paid such claims as and when such obligations are due and (b) to pay prepetition amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Customer Programs, including prepetition amounts owing under any Third-Party Services Agreement.

4.     All Banks are (a) authorized and directed to receive, process, honor and pay any and all checks, drafts, electronic transfers and other forms of payment used by the Debtors on account of the Customer Programs and Third-Party Service Providers, whether presented before, on or after the Petition Date; *provided* that the Debtors have good funds standing to their credit with the applicable Bank; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Customer Programs.  The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

5.     Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Order.

6.     Nothing in the Motion or this Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the final hearing to consider the relief requested in the Motion (the "**Final Hearing**").

7.     Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate

3

party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

8.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

9.      The requirements of Bankruptcy Rule 6003(b) have been satisfied.

10.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

11.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

12.     The Final Hearing shall be held on _____, 2019, at _____ (Prevailing Eastern Time).  Any objections or responses to the entry of the Final Order shall be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Paul K. Schwartzberg), (ii) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich and Eli J. Vonnegut) and (iii) counsel to any official committee then appointed in these chapter 11 cases, so as to be received by 4:00 p.m. (Prevailing Eastern Time) seven (7) days before the Final Hearing.  A reply to an objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two (2) business days before the

date of the applicable hearing. If no objections or responses are filed and served, this Court may

enter the Final Order without further notice or hearing.

13.     The Debtors are authorized to take all action necessary and appropriate to effectuate

the relief granted in this Order.

14.     The Court shall retain jurisdiction to hear and determine all matters arising from or

related to the implementation, interpretation or enforcement of this Order.


White Plains, New York
Dated: _____, 2019

                                                    _____
                                                    THE HONORABLE ROBERT D. DRAIN
                                                    UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

### **Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-[    ](RDD) |
| Debtors. [1] | **(Joint Administration Pending)** |

### FINAL ORDER AUTHORIZING (I) DEBTORS TO HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND RELATED THIRD PARTIES AND TO OTHERWISE CONTINUE CUSTOMER PROGRAMS (II) RELIEF FROM STAY TO PERMIT SETOFF IN CONNECTION WITH THE CUSTOMER PROGRAMS AND (III)  FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), pursuant to sections 105(a), 363(b), 507(a) and 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an interim order and a final order (this "**Order**") authorizing, but not directing, the Debtors to continue, renew, replace, implement or terminate customer programs and practices (collectively, the "**Customer Programs**") in the ordinary course of business and to pay and otherwise honor prepetition obligations to customers and other third parties relating thereto, all as set forth more fully in the Motion; and the Court having jurisdiction to consider the Motion and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing

Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion

and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being

proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion having been provided to the Notice Parties, and it appearing that no other or further notice

need be provided; and the Court having reviewed the Motion and held a hearing to consider the

relief requested in the Motion on a final basis (the "**Hearing**"); and upon the Lowne Declaration,

filed contemporaneously with the Motion, and the record of the Hearing; and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just

cause for the relief granted herein; and the Court having determined that the relief granted herein

is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all

of the proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor;

## IT IS HEREBY ORDERED THAT

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors, in their sole discretion, are authorized (a) to fulfill and honor their

obligations to customers as they deem appropriate and (b) to continue, renew, replace, implement

new and/or terminate any Customer Program, in each case, in the ordinary course of business,

without further application to the Court, including making all payments, satisfying all obligations

and permitting all setoffs in connection therewith, whether relating to the period prior to, on or

subsequent to the Petition Date.

3.      The Debtors, in their sole discretion, are authorized (a) to continue utilizing third

parties in connection with administering and maintaining the Customer Programs as described in

the Motion and to pay or caused to be paid such claims as and when such obligations are due and (b) to pay prepetition amounts owing in the ordinary course of business to third parties in connection with administering and maintaining the Customer Programs, including prepetition amounts owing under any Third-Party Services Agreement.

4.      All Banks are (a) authorized and directed to receive, process, honor and pay any and all checks, drafts, electronic transfers and other forms of payment used by the Debtors on account of the Customer Programs and Third-Party Service Providers, whether presented before, on or after the Petition Date; *provided* that the Debtors have good funds standing to their credit with the applicable Bank; and (b) prohibited from placing any hold on, or attempting to reverse, any automatic transfer on account of the Customer Programs.  The Banks shall rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

4.      Any party receiving payment from the Debtors is authorized and directed to rely on the representations of the Debtors as to which payments are authorized by this Order.

5.      Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

3

6.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

7.      The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

8.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

9.      The Debtors are authorized to take all action necessary and appropriate to effectuate the relief granted in this Order.

10.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation or enforcement of this Order.

White Plains, New York
Dated: _____, 2019

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit C</u>**

**Customer Programs Diagram**

# Purdue Pharma L.P. – Prescription Products



1.  Payment is made net of certain charges including prompt pay discounts, distribution service agreement fees, chargebacks, and returns
2.  Commercial, Medicare Part D, or managed Medicaid plans
3.  Medicaid, Medicare Part D Coverage Gap Program, or TriCare.  The Medicare Part D program can include rebates paid to PBMs or MCOs who have been authorized by the Centers for Medicare and Medicaid Services
    ("CMS") as Part D plans or to Palmetto, who administers the Coverage Gap program
4.  Less any applicable coupon discount for commercial patients, or retail cash price (net of all coupons)
5.  The Company pays fees directly to the VA contracting center (Industrial Funding Fee) for purchases under the Federal Supply Schedule and administrative fees directly to contracted group purchasing organizations
    (hospitals, long-term care facilities, other health care providers)
6.  Less any applicable coupon discount for commercial patients, or cash price only for contracted outpatient pharmacies.  For hospitals, there may not be a co-payment as product dispensed can be part of a capitated payment

# Rhodes Pharmaceuticals L.P. – Prescription Products



1. Payment is made net of certain charges including prompt pay discounts, distribution service agreement fees, chargebacks, and returns
2. Commercial or Medicare Part D
3. Medicaid, Medicare Part D Coverage Gap Program, or TriCare.  The Medicare Part D program can include rebates paid to PBMs or MCOs who have been authorized by the Centers for Medicare and Medicaid Services ("CMS") as Part D plans or to Palmetto, who administers the Coverage Gap program
4. Less any applicable coupon discount for commercial patients, or cash price (net of all coupons)
5. The Company pays fees directly to the VA hospitals (Industrial Funding Fee) and administrative fees directly to contracted group purchasing organizations (hospitals, long-term care facilities, other health care providers)
6. Less any applicable coupon discount for commercial patients, or cash price only for contracted outpatient pharmacies.  For hospitals, there may not be a co-payment as product dispensed can be part of a capitated payment
7. Only applicable to certain branded products sold by Rhodes Pharmaceuticals L.P.  Not relevant to generic products

# Avrio Health L.P. Consumer Health Products



1.   Deduction documentation
2.   Chargeback documentation
3.   The consumer health products business, which includes over-the-counter, dietary, and veterinary products (collectively, "CHP"), is transacted by Avrio Health L.P. which is wholly owned by Purdue Pharma L.P.
4.   Emerson provides warehouse and distribution, freight, and administrative services and, in return, is paid a service fee
5.   Payment is made net of distributor allowance and certain charges including advertising, prompt pay discounts, distribution service agreement fees, chargebacks, returns, and other credits or adjustments
6.   Payment is made net of advertising allowance and certain charges including advertising, prompt pay discounts, distribution service agreement fees, chargebacks, returns, and other credits or adjustments
7.   Drug, food, mass merchants, and specialty (e.g. CVS, Walgreens, Walmart, Kroger)
8.   Certain states only (i.e. certain states cover CHP products written under a prescription)
9.   Payment is made to wholesalers based on contract price of product, net of returns, for institutional and 340B pharmacies and at wholesaler price for retail non-340B pharmacies
10.  Includes hospitals, veterinary hospitals, nursing homes, VA hospitals, Bureau of Prisons facilities, DoD facilities, other government agencies, and public health services 340B outpatient pharmacies.  The Company pays fees directly to the VA contracting center for purchases under the FSS (Industrial Funding Fee) and administrative fees directly to contracted group purchasing organizations (hospitals, long-term care facilities, other health care providers)
11.  Retail price paid unless (a) retailer discount or consumer coupon available or (b) Medicaid patient and dispensed under prescription (certain states cover CHP products written under a prescription)
12.  For inpatient institutional use, billed inpatient cost of care.  For limited outpatient use (340B, own use hospital outpatient pharmacies) where physician has written a prescription for a CHP product, copayment or coinsurance may be applicable
13.  Downstream pharmacies could also sell products subject to Medicaid rebates (in those instances, insurance claim and reimbursement flows would mirror those between Retailers and Medicaid)