| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date: October 10, 2019<br>Hearing Time: 10:00 am |

-------------------------------------------------- x
:
In re : Chapter 11
:
PURDUE PHARMA L.P., *et al.*, : Case No. 19-23649 (RDD)
:
                                  Debtors. : Jointly Administered
:
-------------------------------------------------- x

**OBJECTION OF THE UNITED STATES TRUSTEE
TO MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING (I) DEBTORS
TO (A) PAY PRE-PETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND
OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFIT PROGRAMS
AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND
RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION
CLAIMS AND (III) FINANCIAL INSITUTITONS TO HONOR AND PROCESS
<u>RELATED CHECKS AND TRANSFERS</u>**

TO: **THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:**

       William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this objection to the Debtors' Motion for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers (the "Wage Motion"). ECF Doc. No. 6. In support thereof, the United States Trustee respectfully states:

**PRELIMINARY STATEMENT**

       Debtors appear to seek approval of no less than $38,000,000 in bonus and severance payments for various unidentified employees, although it is difficult to discern the precise relief

Debtors seek due to the lack of information in their very atypical Wage Motion. Inexplicably, the Debtors seek approval of these payments and the continuation of their various incentive, bonus, and severance plans in their first-day priority Wage Motion—the type of motion the Court typically adjudicates under the doctrine of necessity to accommodate debtors and their employees with relief *limited* to that *necessary* to continue operations while a business stabilizes immediately after the filing of a Chapter 11 case. But Debtors' Wage Motion, by seeking authorization for their multi-million dollar incentive, bonus, and severance plans, pushes the boundaries far beyond the typical, narrowly tailored relief appropriate so early in a case.

Debtors compound their timing problem with an information problem: Debtors have provided virtually no information, much less sufficient information, to allow the Court, the United States Trustee, and parties in interest to evaluate these plans and their participants. Nor have they referenced, much less satisfied, the applicable law, Bankruptcy Code Section 503(c), and its governing standards. But based on the little information disclosed, some of the retention and severance plans cover persons that the Debtors admit are insiders without those plans satisfying Sections 503(c)(1) and (c)(2), respectively.

Even if some of the payments and plans are not governed by Sections 503(c)(1) and (c)(2) and are, instead, governed by Section 503(c)(3)—again the wholesale lack of information makes it impossible to determine—the payments are impermissible because they are not "justified by the facts and circumstances" of the case. Debtors filed these cases to address their multi-billion dollar liabilities for their role in precipitating a national opioid crisis, and as the Debtors acknowledge in their Informational Brief, its employees engaged in misconduct in marketing OxyContin, one affiliate pleaded guilty to misbranding OxyContin,

and three senior executives pleaded guilty to strict liability criminal misdemeanor violations of the FDCA. Moreover, the Debtors face more than 2600 lawsuits alleging that the Debtors acted improperly in the marketing and sale of prescription opioid medications that have caused the national opioid crisis. Against this eye-opening backdrop, the Wage Motion provides only the vaguest descriptions of the Debtors' bonus and severance plans. In fact, there is little or no information about the potential plan participants, the type of work that each participant does—or did—for the Debtors, and whether any potential plan participant has—or had—any connection to the misconduct outlined by the Debtors in their Informational Brief. As in another recent case with extensive public and government interests affected by corporate misconduct, PG&E, the facts and circumstances compel disallowance of insider bonuses.

Accordingly, the United States Trustee objects to those portions of the Wage Motion relating to the Severance Program, Incentive Plans, and Sign-On bonuses (as defined below). Debtors seek expedited relief in an unorthodox Wage Motion yet withhold critical details about the relief they seek. Unless and until the Debtors meet their burden of proof under Sections 503(b) and (c) of the Bankruptcy Code, the portions of the Wage Motion addressed herein should not be granted.

## BACKGROUND

### General Background

1.  The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 15, 2019 (the "Petition Date").

2.	The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.	The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. ECF Doc. No. 59.

4.	The Debtors are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting opioid pain medications. See Debtors' Information Brief ECF Doc. No. 17 at 1.

**The Benefits Motion**

5.	On the Petition Date, the Debtors filed the Wage Motion.

6.	Pursuant to the Wage Motion the Debtors seek authority to continue to implement, among other things, a (i) a severance program (the "Severance Program"), (ii) five incentive plans (the "Incentive Plans"), and (iii) sign-on bonuses (the "Sign-On Bonuses"). Wage Motion at ¶¶ 33, 35, and 39.

7.	After an interim hearing on September 16, 2019 (the "Interim Hearing"), the Court entered, on an interim basis, an order granting the Wage Motion. ECF No. 62. At the Interim Hearing, the Debtors did not request, and the Interim Order did not authorize, the continuation of the Severance Program, the Incentive Plans, or certain of the Sign-On Bonuses. Id. at ¶ 19.

8.	A final hearing for the Wage Motion is scheduled for October 10, 2019.

*The Severance Program*

9. According to the Wage Motion, the Debtors maintain a company-wide severance program for eligible employees. Wage Motion at ¶ 33.

10. Under the Severance Program, Vice Presidents with fewer than five years of employment with the Debtors receive six months of severance pay and those with greater than five years of service receive one year. Id.

11. The Wage Motion does not indicate if it applies to employees with positions that are higher than Vice President and if so, the amount of severance payments such senior employees would receive.

*Incentive Plans*

12. As discussed below, the Wage Motion describes the various incentive plans that were maintained by the Debtors prior to filing their respective Petitions.

*Purdue Annual Incentive Plan*

13. Purdue Pharma L.P. and its direct and indirect subsidiaries, other than the Rhodes Debtors (defined below) (the "Purdue Debtors"), maintain an annual incentive program that designates payments based on a combination of employee and Debtor performance (the "Purdue Annual Incentive Plan"). Wage Motion at ¶ 35.

*Rhodes Annual Incentive Plan*

14. Rhodes Associates L.P. and its direct and indirect subsidiaries (the "Rhodes Debtors") also maintain an annual incentive plan based upon a similar combination of individual and Debtor performance (the "Rhodes Annual Incentive Plan"). Id.

15. The total targeted payout under the Purdue and Rhodes Annual Incentive Plans is $26,490,000. Id.

*Market Access Incentive Compensation Plan*

16. The Purdue Debtors also maintain a Market Access Incentive Compensation Plan (the "Market Access Incentive Compensation Plan") for six employees wherein (i) 50% is paid semi-annually based upon performance, (ii) 25% is paid quarterly based on the performance of the Debtors, and (iii) 25% is paid quarterly based on the average of the filed sales representative's percentage target earnings for the component of their incentive plan related to the launch of Adhansia XR. Id. at ¶ 36.

17. The total target payout under the Market Access Incentive Compensation Plan is $334,000 of which $166,000 has already been paid. Id.

*Purdue Long Term Results Plan*

18. In addition, the Purdue Debtors maintain a long-term results plan (the "Purdue Long Term Results Plan"). Id. at ¶ 37.

19. The Purdue Long Term Results Plan provides an annual grant to eligible employees. Id. The plan is calculated at the end of the three-year performance period and is based on the actual performance of company key metrics (such as financial metrics, achievements of milestones related to the progression of research projects or on-time launch of new projects). Id.

20. Payments under the Purdue Long Term Results Plan are payable once a year related to the fiscal year three years period. Id. The targeted payout under the Purdue Long Term Results Plan is $7,889,000. Id.

*Rhodes Long Term Results Plan*

21. The Rhodes Debtors also maintain a long term results plan (the "Rhodes Long Term Results Plan"). Id. The targeted payout under the Rhodes Long Term Results Plan is $1,406,900. Id.

***Sign-On Bonuses***

22. Finally, the Debtors seek approval of sign-on bonuses to newly-hired employees. Id. at ¶ 39. The Debtors seek to pay fourteen employees approximately $2,275,000 in the aggregate.[1] Id.

## ARGUMENT

The Debtors have moved under sections 105(a), 362(d), and 363(b) for approval of the relief sought in the Wage Motion. Wage Motion at ¶ 6. As a threshold matter, the proper legal standard for the Severance Program, Incentive Plans, and Sign-On Bonuses is Section 503(c), which the Debtors have neither cited nor briefed. Nor does the Wage Motion provide sufficient facts that would permit the Court, the United States Trustee, and other parties-in-interest—even in view of the failure of the Debtors to plead or brief the correct statutory provision—to determine whether the standards set forth in section 503(c) have been met. As such, the Wage Motion must be denied.

---

[1] At the Interim Hearing, the Court authorized the payment of approximately $93,000 to five employees.

A.  **The Statutory Framework**

1.  **Section 503(c) Restricts Retention and Severance Payments to Insiders and Requires that Other Insider Compensation Be Justified by the Facts and Circumstances of a Case.**

Congress added Section 503(c) to the Bankruptcy Code in 2005 to restrict payments of retention bonuses and severance payments to insiders and to require that other compensation outside the ordinary course of business be justified by the facts and circumstances of a case. Section 503(c) of the Bankruptcy Code provides, in relevant part, that:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid –
>
> (1)  a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that
>
>   (A)  the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
>   (B)  the services provided by the person are essential to the survival of the business; and
>
>   (C)  either –
>
>     (i)  the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>
>     (ii)  if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent

8

      of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2)  a severance payment to an insider of the debtor, unless—

  (A)  the payment is part of a program that is generally applicable to all full-time employees; and

  (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3)  other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

  Thus, if the proposed bonus recipient is an insider, the bonus cannot be paid if its purpose is to induce the person to remain with the debtor's business, unless the recipient has a bona fide job offer for the same or more compensation, the insider's services are essential to the survival of the business, and the proposed bonus amount complies with one of two restrictive formulas related to bonus amounts previously paid by the debtor. 11 U.S.C. § 503(c)(1). Section 503(c)(2) imposes similarly onerous requirements on severance payments for insiders, including that the program be generally applicable to all full-time employees and that the bonus satisfies a restrictive mathematical formula. Section 503(c)(3) requires that any compensation outside the ordinary course of business be justified by the facts and circumstances.

### 2. The Bankruptcy Code Defines "Insiders" Expansively.

Code Section 101(31) sets forth a non-exhaustive, yet very broad, list of those who are insiders. 11 U.S.C. § 101(31). Officers and directors are but two types of corporate "insiders." See 11 U.S.C. § 101(31)(B). If a debtor is a partnership, "insiders" include (a) general partners in the debtor, (b) relatives of general partners in, general partner of, or person in control of the debtor, (c) general partner of the debtor, and (d) a person in control of the debtor. 11 U.S.C. § 101(31)(c). Regardless of title, a person with broad responsibilities over significant aspects of a debtor's business is considered an insider, even if he or she is not a member of senior management. In re Foothills Texas, Inc., 408 B.R. 573, 584 (Bankr. D. Del. 2009 (finding vice presidents who were not members of senior management, but who had broad responsibilities over significant aspects of debtor's business, to be insiders).

### 3. Bonuses Must also Satisfy Section 503(b)'s Standard that they be an Actual and Necessary Cost of Preserving the Estate.

Not only must bonus plans comply with Section 503(c), but as administrative expenses they must also be "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b); In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr. D. Del. 2001) (administrative expenses may not be allowed unless they are actual and necessary to preserve the estate); In re Regensteiner Printing Co., 122 B.R. 323 (N.D. Ill. 1990) (reversing approval of severance agreements for key employees, because debtors presented no evidence that severance payments were necessary to preserve bankruptcy estate)**.**

B.  **Because the Severance Program, Annual Incentive Plans and Sign-On Bonus Participants Include Insiders, They Are Subject to the Rigorous Requirements of Section 503(c)(1)&(2).**

When a debtor proposes bonuses and severance payments, a court typically must first determine whether the persons who will receive the bonuses are insiders so that the court can determine the appropriate legal standard for approval. But here the Debtors admit in their proposed order that they seek authorization to pay some, and perhaps many, insiders under a final order (although the Wage Motion itself fails to identify any participants): "[N]othing in this Interim Order authorizes the Debtors to make payments on account of Severance Obligations and Incentive Plan Obligations with respect to insiders prior to the entry of an order approving the relief requested in the Motion on final basis." Wage Motion at Exhibit A (Proposed Interim Order). Accordingly, certain of the undisclosed participants are admitted "insiders" within the meaning of Section 101(31) of the Bankruptcy Code. Because all insiders are subject to the strictures of Section 503(c)(1) & (2) and because the Wage Motion on its face offers no information to satisfy either sub-section, all of the requested severance and retention compensation for the insiders must be denied.[2]

Other proposed recipients, beyond the admitted insiders, may also qualify as insiders given the Debtors' failure to provide *any* information—including titles, duties, authority, reporting, or compensation—about the recipients. Unless and until the record is supplemented, no one, including the Court, has the information necessary to determine whether the Debtors

---

[2] Where Section 503(c)(1) applies, the transfer cannot be justified solely on the debtor's business judgment. See In re Borders Group, Inc., 453 B.R. 459, 470-71 (Bankr. S.D.N.Y. 2011). If a proposed transfer falls within Section 503(c)(1), then the business judgment rule does not apply, regardless of whether a sound business purpose may actually exist. In re Dana Corp., 351 B.R. 96, 101 (Bankr. S.D.N.Y. 2006) ("Dana I").

11

have met the appropriate statutory criteria. Accordingly, the continuation of these Incentive Plans, Sign-On Bonuses, and Severance Programs should be denied.

If and when Debtors cure their information deficits, other recipients beyond the admitted insiders may also be insiders given the Code's expansive definition. Regardless of title, a person with broad responsibilities over significant aspects of a debtor's business is considered an insider, even if he or she is not a member of senior management. Foothills Texas, 408 B.R. at 584 (finding vice presidents who were not members of senior management, but who had broad responsibilities over significant aspects of debtor's business, to be insiders); see also In re Borders Group, Inc., 453 B.R. 469 (Bankr. S.D.N.Y. 2011)("[i]nsider status can also be determined on a case by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs"); Office of the United States Trustee v. Fieldstone Mortgage Co., No. CCB-08-755, 2008 WL 4826291, at *5 (D. Md. Nov. 5, 2008) ("[C]ontrol . . . is an independent additional ground for finding a person an insider, not a feature that officers or directors are required to possess in order to be deemed insiders"); In re Krehl, 86 F.3d 737, 741 (7th Cir. 1996) (definition of insider is illustrative rather than exhaustive); compare In re Kunz, 489 F.3d 1072 (10th Cir. 2007) (it is not simply the title "director" or "officer" that renders an individual an insider; rather it is the set of legal rights that a typical corporate director or officer holds). A Debtors' narrow characterization of who is and who is not an insider cannot trump the law's broad definition, and Debtors must provide the requisite information to verify their representations that not all recipients are insiders.

**C.    Because the Debtors Have Failed To Establish that the Annual Incentive Plans or Sign-On Bonuses for Insiders Are Genuinely Incentive Payments and not Retention Plans, They Cannot be Approved.**

Although insiders in some circumstances can be paid genuine incentive bonuses under the more permissive terms of Section 503(c)(3), the Debtors must establish by a preponderance of the evidence that the bonuses are primarily incentivizing, rather than primarily retentive.[3] In re Residential Capital, LLC, 478 B.R. 154, 170 (Bankr. S.D.N.Y 2012)("Rescap"); see Hawker Beechcraft, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  That is, in order for the proposed insider bonuses not to run afoul of Section 503(c)(1), the Debtors must demonstrate that the Incentive Plans and Sign-On bonuses are not retention-based, but rather that they present significant hurdles that are difficult to achieve.  Rescap, 478 B.R. at 169; Dana I, 358 B.R. at 583; Hawker Beechcraft, 479 B.R. at 313; In re Velo Holdings Inc., 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); Global Home, 369 B.R. at 784; see also Dana II, 358 B.R. at 583) (benchmarks for the debtors' long-term KEIP "are difficult targets to reach and are clearly not 'lay-ups'").

Congress added Section 503(c) in 2005 to curtail payments of retention incentives to insiders to "'eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process.'"  In re Residential Capital LLC, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012) ("Rescap") (quoting In re Global Home Prods., LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007); accord In re Hawker Beechcraft, Inc., 479 B.R. 308, 312-13 (Bankr. S.D.N.Y. 2012); In re Velo Holdings, Inc., 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012).  In addition, Congress intended to limit the scope of key employee retention plans and other

---

[3] As discussed below, Debtors must also establish that the payments are justified by the facts and circumstances of the case.

13

management retention programs.  Rescap, 478 B.R. at 169. Congress established "a set of challenging standards" for debtors to overcome before retention bonuses could be paid. Global Home, 369 B.R. at 784.

Further, a debtor's label of a plan as incentivizing to avoid the strictures of Section 503(c)(1) must be viewed with skepticism; rather, the circumstances under which the proposal is made and the structure of the compensation package control.  Velo Holdings, 472 B.R. at 209 ("Attempts to characterize what are essentially prohibited retention programs as 'incentive' programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages"); see also Hawker Beechcraft, 479 B.R. at 313 ("The concern ... is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding 'facts and circumstances' standard in ... §503(c)(3)."); Dana I, 351 B.R. at 102 n.3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

The Debtors have provided no evidence to allow the Court to evaluate the terms of the Incentive Plans and Sign-On Bonuses.  For example only, the Debtors do not set forth (i) the current and historical metrics for earning a bonus under any of the plans, (ii) the projections of the metrics set forth in their business plans, (iii) the titles of the covered participants, the number of covered participants, who they report to and the maximum amount each participant may earn if all metrics are met, and (iii) what actions or achievements constitute the "above and beyond" contributions that would warrant bonuses.  Absent any information to establish that the plans are genuine incentive plans, the Debtors have failed to meet their burden of proof, and approval of

the plans for insiders must be denied as impermissible retention payments governed and disallowed by Section 503(c)(1).

**D.      Even If The Severance Program, Annual Incentive Plans and Sign-On Bonuses Are Governed By Sections 503(c)(3) and 363, They Are Still Deficient**

Even if the Court finds that section 503(c)(1) & (2) do not apply, the Court must also determine under section 503(c)(3) whether the proposed payments are "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3); see also Dana II, 358 B.R. at 576.[4] Under section 503(c)(3), the Wage Motion should be denied because the Debtor has failed to proffer any evidence, sufficient or otherwise, that:

  a. any bonus is reasonable in light of the Debtor's economic circumstances, including its assets, liabilities and earning potential;

  b. the bonus accords with industry standards;

  c. there is an adequate relationship between the bonus and the outcome of the case;

  d. the bonus payment does not discriminate unfairly against other employees;

  e. the Debtor exercised "due diligence" in investigating the need for an incentive plan; and

  f. the Debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

---

[4] Although some courts in this district have determined that the standard under Section 503(c)(3) is not different from the business judgment test under Section 363(b), see In re Residential Capital, LLC, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013) (additional citations omitted), these courts and others continue to apply the factors listed by Judge Lifland in Dana II, when determining if the structure of a compensation proposal and the process for its development meet the standard under Section 503(c)(3).

15

See id. at 576-77.  Moreover, the Debtors have not explained the metrics for earning a bonus in any of these plans, the number of participants eligible to receive a bonus, or the maximum amount that each eligible participant may earn if all metrics are met.

The somewhat unique facts and circumstances of this case further support disapproving these insider bonus plans.  Debtors acknowledge that its employees engaged in misconduct between 1996 and 2001 with its marketing of OxyContin.  Debtors' Informational Brief at 32, ECF No. 17.  In addition, in 2007 Purdue Frederick Company, Inc., an affiliate of Purdue Pharma, pleaded guilty to misbranding OxyContin, and three senior executives pleaded guilty to strict liability criminal misdemeanor violations of the FDCA.  Id.  Currently, the Debtors face more than 2600 lawsuits alleging that the Debtors acted improperly in the marketing and sale of prescription opioid medications and that have caused the national opioid crisis.  Id. at 36.  To resolve this crush of litigation the Debtors propose to, among other things, transfer their assets to a trust for the benefit of claimants and the U.S. public.  Id. at 3.  The Debtors hope their proposal can be "life savings."  Id. at 4.  With this backdrop, the Wage Motion only provides vague descriptions of the Debtors' bonus and severance plans and fails to disclose their participants.  The Wage Motion, then, fails to establish that the award of bonuses and severance payments is justified by the facts and circumstances of this case.[5]

Another court recently confronted whether bonuses could be justified by the facts and circumstances where debtors' corporate conduct had inflicted harm on broad swaths of public and governmental interests.  See In re PG&E Corp., No. 19-30088 (Bankr. N.D. Cal.

---

[5] Similarly, the Debtors have provided scant information from which a determination can be supported as to whether the proposed bonus and severance payments are "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b).

8/30/2019) (Order Denying Motion to Approve KEIP, Doc. No. 3773).[6] The court in PG&E refused to approve insider bonuses because the facts and circumstances were compelling *against* the award of bonuses when debtors' executives should have been extrinsically motivated to reform corporate conduct given the enormous civil and criminal liability debtors faced from the California wildfires:

> In any case, the facts and circumstances of this case are compelling and justify rejection of the KEIP. Debtors filed these chapter 11 cases to deal with their enormous liability from the Northern California wildfires. Within the context of this case, they face suffocating pressures from their creditor committees, regulatory agencies, various other creditor groups, the general public, and governmental agencies to improve substantially their safety practices and successfully reorganize. Outside of this court, they are met with considerable financial incentive presented by the California legislature to exit bankruptcy by June 30, 2020. Finally, the most vital of these incentives remains the pressure to avoid additional loss of life and property and accompanying civil and criminal liability, which can only be achieved by drastically improving Debtors' safety record. Considering the enormous extrinsic motivation faced by Debtors' officer-Participants, there is simply no justification for diverting additional estate funds to incentivize them to do what they should already be doing. Debtors' executives should be satisfactorily motivated by this laundry list of pressures to reform Debtors' corporate behavior and should not require the promise of more cash to bring Debtors up to the task. For these reasons, the court finds that the KEIP is not justified by the facts and circumstances of this case.

Id. at 7. Like the insiders in PG&E, so, too, should the Purdue insiders "be satisfactorily motivated by this laundry list of pressures to reform Debtors' corporate behavior and should not require the promise of more cash to bring Debtors up to the task." Just as in PG&E, the insider bonus plans should be denied given the compelling facts and circumstances against

---

[6] The PG&E court disallowed the KEIP under Section 503(c)(1), finding it a retention plan without meaningful incentives. But it also analyzed the plan under Section 503(c)(3)'s standards.

17

them.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the approval of the portions of the Wage Motion as set forth herein and grant such other relief as the Court deems fair and just.

Dated: New York, New York
September 27, 2019

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Paul K. Schwartzberg*
Paul K. Schwartzberg
Brian Masumoto
Trial Attorneys
201 Varick Street, Room 1006
New York, New York 10014
Tel. (212) 510-0500