DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.¹ | (Jointly Administered) |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PRE-PETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS <u>AND TRANSFERS</u>**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") respectfully

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

submit this omnibus reply (the "**Reply**") in support of *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**")[2] and in response to the objections (the "**Objections**"),[3] and respectfully represent as follows:

### Preliminary Statement

1.  In the early weeks of these chapter 11 cases, the Debtors, the Unsecured Creditors' Committee (the "**Committee**"), the Ad Hoc Committee[4] and their respective advisors have worked collaboratively and tirelessly to get the Committee and Ad Hoc Committee teams up to speed on the Debtors' complex business. In working through all of the Debtors' requested first day relief, the Debtors, the Committee, and the Ad Hoc Committee have worked hard to find common ground wherever possible and to avoid wasting valuable estate resources on needless litigation. As a result of these efforts, the Committee and the Ad Hoc Committee have

---

[2] Except where otherwise indicated, capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Wages Motion or the *Supplemental Declaration of Jon Lowne in Support of the Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor And Process Related Checks And Transfers* ("**Lowne Supp. Decl.**" or "**Supplemental Lowne Declaration**") filed contemporaneously herewith.

[3] Objections were filed by the following parties: The United States Trustee for Region 2 (the "**U.S. Trustee**") [Docket No. 134] (the "**UST Objection**"); Nevada Counties and Municipalities [Docket No. 190]; the Commonwealth of Pennsylvania [Docket No. 196]; the Ad Hoc Group of Non-Consenting States [Docket No. 197]; and the State of Arizona [Docket No. 201]. The New York State Department of Financial Services also submitted an informal objection [Docket No. 99].

[4] The "**Ad Hoc Committee**" refers to the ad hoc committee of governmental and other contingent litigation claimants represented by Kramer Levin Naftalis & Frankel LLP, Brown Rudnick LLP, Gilbert LLP and Otterbourg P.C. (notice of appearance filed at Docket No. 147).

agreed to support approval on a final basis of a modified version of the relief requested in the Wages Motion, and the Debtors have agreed that certain of the relief requested in the Wages Motion will be deferred to a later date so that the Committee and the Ad Hoc Committee can complete their diligence process under less time pressure, with the understanding that such parties have not yet made a final decision regarding such relief. Accordingly, at this time the Debtors ask that the Court grant final approval of the Wages Motion, but with the following adjustments: approval of the Debtors' AIPs and the Debtors' LTRPs, along with Sign-On Bonus payments beyond those already authorized in the Interim Order, will be deferred until a hearing date to be scheduled in November, and while the Non-Executive Retention Plan and Advancement of Expenses will continue to be authorized on an interim basis, final approval of those programs will also be deferred. New authority that is sought beyond the matters already approved in the Interim Order is limited to certain modest programs that have payments coming due in the immediate future or concern near-term events: (i) the Market Access ICP, an ordinary course incentive plan for six non-insider Employees that contemplates near-term payments and (ii) the Treyburn Retention Plan, which is critical to the Debtors' efforts to complete a near-term orderly consolidation of their manufacturing operations.

2.     At this time, the U.S. Trustee has unfortunately not confirmed the withdrawal of its objection to certain of these limited programs. As such, this Reply is submitted out of an abundance of caution and is narrowly focused on the few programs now before the Court that may be contested. The Debtors remain hopeful that the U.S. Trustee will withdraw its objection in advance of the hearing and render approval of these programs nearly or fully consensual.[5]

---

[5] Joinders to the UST Objection were also broad and unclear, so the Debtors also submit this Reply to the extent any other party still wishes to press an objection to the limited relief currently being sought.

3. None of the programs the U.S. Trustee may take issue with are new—all predate this bankruptcy and all are programs on which the Debtors' Employees already rely. Failure to continue these programs would therefore not deny Employees an increase in pay, but rather force a cut. The challenging work environment faced by Purdue Employees and the resulting retention challenges faced by the business are well established in these chapter 11 cases. Needless to say, a failure by the Debtors to honor longstanding commitments to the workforce would have a severe negative impact on morale, and would likely create harm to the business vastly outweighing any meager savings.

## Reply

**I.    The Treyburn Retention Plan Satisfies the Bankruptcy Code and Is a Sound Exercise of the Debtors' Business Judgment**

4. In order to save costs and streamline their business, the Debtors made the difficult decision to consolidate their manufacturing operations and sell their manufacturing facility in Treyburn, North Carolina. Lowne Supp. Decl. ¶ 17. The sale of the Treyburn facility closed in August 2019, and the Debtors are leasing back the facility through the end of November. *Id*. The Debtors have developed a highly detailed transition plan that is necessary to maintain the safety and quality of the Debtors' manufacturing process, and the rank-and-file Employees currently working at the Treyburn facility are crucial to this plan. *Id*. ¶¶ 17, 19. Key transition activities underway include: (i) the preparation for removal and reinstallation of selected equipment at other manufacturing locations; (ii) identification and acquisition of leased office, laboratory and warehousing space; (iii) preparation for required decommissioning activities; (iv) preparation for cleaning and decontamination of the site once manufacturing activities cease; and (v) providing all required notifications to regulatory agencies, including the DEA and FDA. *Id*. ¶ 19. The Debtors therefore believe, in their sound business judgment, that it was necessary to

establish the Treyburn Retention Plan to incentivize 52 non-insider Employees to remain employed at the Treyburn facility through the critical transition periods through December 2019 and June 2020. *Id.* ¶ 17.

5.  The Treyburn Retention Plan does not apply to any insider. *Id.* ¶ 18. The most senior employee offered Treyburn Retention Payments holds the title of Director, Pharmaceutics and Analytical Development. *Id.* This role reports to the Head of Technical Services (also not an insider) and has responsibilities including the developing of product formulations, manufacturing processes and analytical methods with respect to production of the Debtors' products at the Treyburn facility. *Id.* There can be no serious argument that this Employee, or the other Employees that will receive Treyburn Retention Payments, such as Diversion Control Specialists, Manufacturing and Packaging Operators, Pharmaceutical Technicians and Pharmaceutical Process Specialists, are insiders. *See id.*

6.  Non-insider transactions that are outside the ordinary course of the Debtors' business are governed by section 503(c)(3) of the Bankruptcy Code. *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011). Many courts, both in this district and elsewhere, have held that section 503(c)(3) reiterates the traditional business judgment rule that is otherwise applicable to a debtor's decision to use, sell or lease assets outside the ordinary course of business under section 363(b). *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012); *In re Dana Corp.* ("*Dana II*"), 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007); *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010).

7.  The Treyburn Retention Plan is a valid exercise of the Debtors' business judgment, as the facts set forth in the Supplemental Lowne Declaration make clear. Given that

the covered Employees are crucial to the transition process and to the safety and security of the Treyburn facility, it was reasonable and necessary for the Debtors to offer the Treyburn Retention Plan to motivate performance and mitigate the risk of attrition at the facility. If the Debtors were unable to honor their obligations under the plan, Employees may be unwilling to stay through the transition period, and the Debtors may be unable to replace skilled workers at this state-of-the-art and highly regulated facility. Lowne Supp. Decl. ¶ 20. Such a result would significantly disrupt operations, meaningfully harm the Debtors' businesses, and could threaten the safety and security of the Treyburn operations.

8. The cost of the Treyburn Retention Plan is reasonable, especially in comparison to the benefits that it provides to the Debtors' business. Payments under the plan will not exceed a maximum of $23,506 per Employee. *Id*. ¶ 18. In total, the Debtors estimate that they will pay approximately $521,058 in 2019 and $108,972 in 2020 under the plan. *Id*. Given the modest size of the program and the criticality of the Treyburn Employees to the transition, the Treyburn Retention Plan is undoubtedly a valid exercise of the Debtors' business judgment.

II. **Continuation of the Pre-Existing Market Access ICP Satisfies the Bankruptcy Code and is a Sound Exercise of the Debtors' Business Judgment**

9. To maximize its enterprise value going forward (and thus the value of the Debtors' estates for all stakeholders), Purdue has been executing a business plan that diversifies its business beyond opioids and generates new growth. Lowne Supp. Decl. ¶ 12. The recent launch of Adhansia XR, which is a 16-hour methylphenidate indicated for ADHD, illustrates Purdue's diversification strategy into new therapeutic areas. *Id.* New product launches require motivated field-based Employees, and the Market Access ICP, which provides incentive payouts to six non-insider field-based Employees who clearly are not insiders, plays a crucial role in motivating employees in connection with this diversification strategy. *Id.* Further, the Debtors'

field-based market access Employees are critical to ensuring that Purdue's products obtain formulary coverage and are made available for the appropriate patients. *Id*.

10. The Employees eligible for payments under the Market Access ICP are responsible for, among other things, ensuring the optimal distribution of Purdue products throughout the trade channels, negotiating and implementing contracts with selected wholesaler accounts, and securing managed care access to Purdue products and managing the performance of market access customers (including managed care organizations, government plans (Medicaid/Medicare), pharmacy benefit managers, group purchase organizations and employer groups). *Id*. ¶ 13. None of the Employees eligible for payments under the Market Access ICP are engaged in or compensated on the basis of promotion of any opioid products to prescribers. *Id.* None of the Employees eligible for payments under the Market Access ICP have a title higher than Director or otherwise qualify as an insider. *Id.*[6]

11. The Market Access ICP has not been altered or amended in any way in conjunction with or in anticipation of these chapter 11 cases. *Id*. ¶ 15. The amounts paid out under the plan are also de minimis in the context of the Debtors' operations; the total targeted payout related to calendar year 2019 is $334,000, of which $166,000 has already been paid out for the first and second quarters. *Id.* The average remaining 2019 payout for the six non-insider employees is approximately $28,050. *Id.* The maximum remaining 2019 payout is approximately $273,000. *Id*. Given these facts, the Market Access ICP is a customary incentive

---

[6] The Debtors have also engaged in a careful and thorough analysis of which Employees are insiders. Lowne Supp. Decl. ¶ 9. Under this system, an Employee is categorized as an insider if the Employee met any one of the following five criteria. The Employee: (1) is an officer appointed by the Board; (2) holds the title of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or Senior Vice President; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine his or her own compensation. *Id.* ¶ 9. There can be no serious argument that any of the Employees who participate in the Market Access ICP meets any of these factors.

plan well within the ordinary course of the Debtors' business, and continuation of the program is a reasonable exercise of the Debtors' business judgment.

12. First, the Market Access ICP is clearly calculated to drive the performance of Employees, and in turn, the performance of the Debtors' business. As the Supplemental Lowne Declaration makes clear, the Market Access ICP is designed to motivate Employees to achieve performance targets. Payouts under the plan are based entirely on performance; (i) 50% of the 2019 payout is based on Employee performance, (ii) 50% of the Q1 and Q2 2019 payout and 25% of the Q3 and Q4 2019 payout is based on the performance of the Company, and (iii) 25% of the Q3 and Q4 2019 payout is based on the average of the field sales representatives' percentage of target earnings for the component of their incentive plan related to the launch of Adhansia XR, a newly developed ADHD medication. *Id.* ¶ 14.

13. Second, the Market Access ICP is reasonable from a cost perspective. As discussed above, the total targeted 2019 payout under the plan is $334,000. *Id.* ¶ 15. The plan is also limited in scope, and is provided only to six field-based Employees who are not insiders. *Id.* ¶ 12. And because payouts under the plan are based on performance, it is entirely fair and reasonable for the Debtors to compensate the employees who perform and contribute to the business.

14. Third, the Market Access ICP is reasonable in scope because it contains metrics tailored to the specific job of the six applicable Employees. It does not discriminate unfairly among employees because many other Employees instead participate in the Debtors' AIP, which is similarly tailored to their respective roles.

15. The Market Access ICP has also "satisfied the independent 'test of time.'" *See In re Glob. Home Prods., LLC*, 369 B.R. at 786. The Market Access ICP is a preexisting, customary

incentive plan that recognizes the contributions that the Debtors' highly skilled and highly educated Employees make to the business, which maximizes value for all stakeholders. The Market Access ICP is necessary to drive Employee productivity, morale and achievement in these difficult times. The Court should decline to interfere with corporate decisions and uphold such reasonable decisions as long as they are in furtherance of any "rational business purpose." *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

### III. Payment of Severance to Employees at the Treyburn Facility is a Sound Exercise of the Debtors' Business Judgment and Fully Complies with Section 503(c)(2)

16. The Debtors' Severance Plan is an important benefit to all Employees during this difficult and uncertain time. Lowne Supp. Decl. ¶ 11. However, continuation of the Debtors' Severance Plan is particularly important to help retain Employees at the Treyburn plant, given the Debtors' clear inability to offer them long-term job security. *Id.* If the Debtors are unable to honor their obligations under the Severance Plan, the Employees at this crucial facility may be unwilling to remain with the Company through the transition period, and the Debtors may be unable to replace them. *Id.* Payment of amounts owed to these Employees under the Severance Plan should be authorized.

17. There also can be no concern that the Debtors seek authority to pay severance to insiders that would violate section 503(c)(2) of the Bankruptcy Code. Beyond the fact that none of the Treyburn Employees are insiders, the proposed Final Order and the Wages Motion are unambiguous—the Debtors only seek, and would only be authorized, to make severance payments to insiders to the extent they do not exceed the caps established under section 503(c) of the Bankruptcy Code. Proposed Final Order ¶¶ 2, 3; Wages Motion ¶ 33.

18.     Lastly, and importantly, severance payments earned upon termination after the Petition Date, as would be the case with respect to the Treyburn Employees under the Severance Plan, are accorded administrative priority in the Second Circuit (subject to the statutory cap in section 503(c)(2) with respect to insiders). *See Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Bhd. of Elec. Workers, A F of L, CIO*, 386 F.2d 649, 651 (2d Cir. 1967) (holding that where "severance pay is compensation for termination of employment and since the employment of these claimants was terminated as an incident of the administration of the bankrupt's estate, severance pay was an expense of administration and is entitled to priority as such an expense"); *see also In re Bethlehem Steel Corp.*, 479 F.3d 167, 175 (2d Cir. 2007) (noting that an obligation under a severance plan may be entitled to administrative priority "if it provides a new benefit at termination that employees would not otherwise receive"). Therefore, to the extent the U.S. Trustee seeks a result that contravenes well-established Second Circuit case law, it should be overruled.

## Conclusion

WHEREFORE, for the foregoing reasons and the reasons stated in the Motion, the Debtors respectfully request that the Court overrule the Objections and promptly grant the relief requested in the proposed Final Order.

Dated: October 8, 2019
New York, New York

        DAVIS POLK & WARDWELL LLP
        By: */s/ Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*