DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**SUPPLEMENTAL DECLARATION OF JON LOWNE IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS <u>RELATED CHECKS AND TRANSFERS</u>**

I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1.      I am a Senior Vice President and the Chief Financial Officer of Purdue Pharma

L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**,"

the "**Company**" or "**Purdue**"). I was first employed by Purdue as Senior Internal Auditor in

1995 and gained increasing responsibility in the Company's finance team over time, including as

Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017

to February 2018. Since March 2018, I have been the Chief Financial Officer of PPLP. I am

familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      I submit this declaration (this "**Declaration**") in further support of the *Motion of*

*Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries,*

*Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and*

*Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with*

*Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and*

*Process Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**").[2]  I am authorized

to submit this Declaration on behalf of the Debtors.

3.      On September 15, 2019 (the "**Petition Date**"), the Debtors each commenced with

this Court a voluntary case under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**"). On September 18, 2019, the Court entered the *Interim Order Authorizing*

*(I) Debtors to (A) Pay Prepetition Employee Benefits and Other Compensation and (B) Maintain*

*Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and*

*Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial*

*Institutions to Honor and Process Related Checks and Transfers* [Docket No. 62].

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

---

[2] Capitalized term used but not otherwise defined herein shall have the meanings ascribed to such terms in
the Wages Motion.

my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      For the avoidance of doubt, under the Wages Motion, the Debtors are not requesting the authority to make any payments to any member of the Sackler family—the Debtors seek authority only to continue certain pre-existing compensation programs, which I believe are necessary to maintain employee morale, ensure retention of critical Employees, and protect the value of Purdue's business.

## Purdue's Work Environment

6.      Purdue has become a difficult place to work, and in recent years has experienced significant challenges retaining and motivating its workforce.   In 2017 and 2018 overall Company headcount, exclusive of the Rhodes Debtors, was reduced by over 1,000 employees—a 67% reduction, with 842 of those reductions occurring in 2018.   From 2018 to date the Company has experienced an attrition rate of over 19% among the top tier of employees (which includes Employees at the Associate Director level and above).   The ongoing litigation faced by the Debtors has consumed a significant amount of employee time and energy, and put a tremendous strain on employee morale.   The Debtors fear that the failure to obtain the relief requested in the Wages Motion on a final basis would significantly accelerate the already damaging attrition faced by the Debtors.

7.      The Debtors have also faced unprecedented negative publicity.   The vocal group of attorneys general actively campaigning to drive the Debtors out of existence, coupled with regular demonstrations outside the Debtors' corporate headquarters, the constant negative media barrage, and banks, insurance companies and vendors not wanting to do business with the

Debtors, employees having to be deposed or answer constant litigation data requests, puts an additional strain on Employees well beyond the normal challenges of working for a debtor in bankruptcy. While employees of any chapter 11 debtor fear that the reorganization may not succeed, or even if it succeeds fear that their job may be eliminated, Purdue's Employees are faced with the additional uncertainty that comes from various people and entities targeting the company for non-economic reasons. This has contributed to an escalating climate of unease among Employees at all levels of the Company and has made retaining and motivating Employees extraordinarily challenging. It has been and will continue to be extremely difficult to attract new talent were the company to lose current Employees, and the costs of replacing Employees that leave often substantially exceed the costs of retaining current Employees.

8.      Purdue has a highly skilled, highly educated workforce, and the collective knowledge, experience and expertise of Purdue's Employees is essential to the Debtors' reorganization efforts and maximizing value for all stakeholders. The value of the Purdue enterprise resides, in large part, in its Employees. To maintain and drive Employee productivity, morale and achievement in these difficult times, it is imperative that the Company continue to honor its commitments to its Employees under the Treyburn Retention Plan, Market Access ICP, and Severance Plan set forth in the Wages Motion and discussed in more detail in this Declaration.

### **Insider Definition**

9.      This Declaration discusses how various Company programs apply to insiders as compared to non-insiders. For purposes of these distinctions, the Company, after consultation with counsel, categorized an Employee as an insider if the Employee met <u>any</u> <u>one</u> of the following five criteria. The Employee:

    a)   is an officer appointed by the Board;

4

b) holds the title of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or Senior Vice President;

c) reports directly to the Board;

d) has authority to make Company-wide or strategic decisions, including critical financial decisions; or

e) is in a position to determine his or her own compensation.[3]

In my role as Chief Financial Officer, I am necessarily very familiar with, and I work frequently with, every one of the 10 Employees who fall into any of the categories above.[4]

### Severance Plan

10.    The Debtors maintain a company-wide Severance Plan for eligible Employees. The Severance Plan has been in place substantially in its current form since June 2014 and was not altered or amended in any way in conjunction with or in anticipation of these chapter 11 cases.  As described in more detail in the *Declaration of Jon Lowne in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 3] (the "**Initial Lowne Declaration**"), under the Severance Plan, Vice Presidents and above (to the extent they do not have employment contracts) with less than five years of employment with the Debtors receive six months of severance pay, and Vice Presidents and above (to the extent they do not have employment contracts) with greater than five years of service receive one year of severance pay. Employees below Vice President receive either two or three weeks of severance pay for each year they have worked for the Debtors depending on grade level (with a minimum of eight weeks and a

---

[3] I note that not even any of the insiders of the Debtors is in a position to determine his or her own compensation.

[4] The Debtors' insiders are the senior executives identified on **Schedule 10** to the Initial Lowne Declaration: (i) Craig Landau (President and Chief Executive Officer); (ii) Christian Mazzi (President and Executive Medical Director, Adlon Therapeutics L.P.); (iii) Marc Kesselman (SVP, General Counsel); (iv) David Lundie (Chief Operating Officer, Rhodes Technologies); (v) Jon Lowne (SVP, Chief Financial Officer); (vi) Paul Medeiros (VP, Corporate and Business Development (PPLP) and President, Imbrium Therapeutics); (vii) Philip Strassburger (SVP, IP Strategy & Litigation); (viii) Caroline Chomiak (President, Avrio Health); (ix) Randy Shamblen (President, Rhodes Technologies); and (x) Vincent Mancinelli (President, Rhodes Pharmaceuticals L.P.).

maximum of 52 weeks of severance pay).  There are four insiders and one non-insider whose severance amounts are governed by the applicable Employee's employment contract.[5]  As provided for in the Wages Motion and the proposed Final Order, with respect to insiders, the Debtors will not at any time make any payments to insiders that exceed the caps established under section 503(c) of the Bankruptcy Code.  Should an insider be severed, the Debtors will run the calculation required by 503(c)(2) and only pay the statutorily capped amount. In addition, the Debtors do not seek authority to make any severance payments to any former insiders.

11.    Continuation of the Severance Plan is critical to providing Employees the security they need to stay motivated at Purdue during these difficult times.  In particular, in connection with the Debtors' sale of their Treyburn, North Carolina manufacturing facility, the Debtors expect that approximately 14 non-insider Employees' roles will be eliminated.  If the Debtors are unable to honor their obligations under the Severance Plan, the Employees at this crucial facility may be unwilling to remain with the Company through the transition period, and the Debtors may be unable to replace them.  I believe any disruption to the Severance Plan would therefore disrupt the Debtors' operations and meaningfully harm the Debtors' businesses, causing immediate and irreparable damage.

## Market Access ICP

12.    To maximize its enterprise value going forward (and thus the value of the Debtors' estates for all stakeholders), Purdue has been executing a business plan that diversifies its business beyond opioids and generates new growth.  The recent launch of Adhansia XR, which is a 16-hour methylphenidate indicated for ADHD, illustrates Purdue's diversification strategy into new therapeutic areas. New product launches require motivated field-based

---

[5] With respect to the non-insider, the employment contract provides for six months of severance pay and payment of any earned but unpaid prior-year annual bonus.

Employees, and the Market Access ICP, which provides incentive payouts to six non-insider field-based Employees who clearly are not insiders, plays a critical role in motivating employees in connection with this diversification strategy.  Further, the Debtors' field-based market access Employees are critical to ensuring that Purdue's products obtain formulary coverage and are made available for the appropriate patients.

13.    The Employees eligible for payments under the Market Access ICP are responsible for, among other things, ensuring the optimal distribution of Purdue products throughout the trade channels, negotiating and implementing contracts with selected wholesaler accounts, and securing managed care access to Purdue products and managing the performance of market access customers (including managed care organizations, government plans (Medicaid/Medicare), pharmacy benefit managers, group purchase organizations and employer groups).  None of the Employees eligible for payments under the Market Access ICP are engaged in or compensated on the basis of promotion of any opioid products to prescribers. None of the Employees eligible for payments under the Market Access ICP have a title higher than Director or otherwise qualify as an insider.

14.    Under the Market Access ICP, (i) 50% of the 2019 payout is based on Employee performance, (ii) 50% of the Q1 and Q2 2019 payout and 25% of the Q3 and Q4 2019 payout is based on the performance of the Company[6] and (iii) 25% of Q3 and Q4 2019 payout is based on the average of the field sales representatives' percentage of target earnings for the component of their incentive plan related to the launch of Adhansia XR, a newly developed ADHD medication. The Market Access ICP was not altered or amended in any way in conjunction with or in

---

[6] Each year, corporate objectives are determined based on the Company's strategic priorities. A range of performance measures are established for the corporate objectives, including the weight given to each objective, the expected target performance, and the level of performance necessary to achieve minimum (0%) and maximum (150%) performance levels. The Company's current 2019 corporate objectives are (i) 60% efficiency and process optimization (operating profit), (ii) 30% value creation / pipeline, and (iii) 10% people and culture.

anticipation of these chapter 11 cases.

15.    The total targeted payout under the Market Access ICP related to calendar year 2019 is $334,000, of which $166,000 has already been paid with respect to the first and second quarters of the calendar year.  The average remaining 2019 payout for the six non-insider Employees is approximately $28,000.  The maximum possible remaining 2019 payout for the Market Access ICP is approximately $273,000.

16.    Overall, the Market Access ICP is a customary incentive plan offered to employees in the pharmaceutical industry and is a part of the six non-insider participants' regular compensation package.  Without the Market Access ICP, I do not think such employees' compensation would be competitive.  I believe the Market Access ICP is a necessary tool for incentivizing non-insider Employees and aligning their incentives with those of Purdue's ultimate owners, a market-based incentive plan and in the best interest of Debtors and their estates.

**Treyburn Retention Plan**

17.    In order to save costs and streamline their business, the Debtors made the difficult decision to consolidate their manufacturing operations and sell their manufacturing facility in Treyburn, North Carolina. The sale of the Treyburn facility closed to August 2019, and the Debtors are leasing back the facility through the end of November.  In connection with this sale, the Debtors have developed an orderly transition plan to maintain the safety and quality of its manufacturing process—the rank-and-file Employees currently working at the Treyburn facility are crucial to this plan.  The Debtors therefore believe that it was necessary to establish the Treyburn Retention Plan to incentivize 52 key non-insider Employees to remain employed at the Treyburn facility through the critical transition periods through December 2019 and June 2020.

18.    The Treyburn Retention Plan does not apply to any insider. The most senior

8

Employee covered under the plan holds the title of Director, Pharmaceutics and Analytical Development.  This role reports to the Head of Technical Services (also not an insider) and has responsibilities including the developing of product formulations, manufacturing processes and analytical methods with respect to production of the Debtors' products at the Treyburn facility. Other Employees that will receive Treyburn Retention Payments include Diversion Control Specialists, Manufacturing and Packaging Operators, Pharmaceutical Technicians and Pharmaceutical Process Specialists. The Treyburn Retention Payments will not exceed a maximum of $23,056 per Employee. The Debtors estimate that under the Treyburn Retention Plan they will pay approximately $521,058 in 2019, and approximately $108,972 in 2020.

19.    To allow Purdue to continue to meet its manufacturing targets and to ensure an overall smooth transition, Purdue intends to lease and continue to use the Treyburn facility through November 2019, before consolidating manufacturing operations at other manufacturing locations.  The Treyburn facility is manufacturing at an expedited pace in preparation for the site exit in December 2019.  Employees at the Treyburn facility have been working significant overtime hours and will continue to do so as they strive to manufacture all planned 2019 requirements by the end of November 2019.  Transition teams made up of Employees from the Treyburn facility and other manufacturing locations are working through a detailed transition plan, with very tight timelines involving approximately 175 specific activities required to be completed in order to achieve the transition.  Key transition activities underway include: (i) the preparation for removal and reinstallation of selected equipment at other manufacturing locations; (ii) identification and acquisition of leased office, laboratory and warehousing space; (iii) preparation for required decommissioning activities; (iv) preparation for cleaning and decontamination of the site once manufacturing activities cease; and (v) providing all required

notifications to regulatory agencies, including the DEA and FDA.

20.     If the Debtors are unable to honor their obligations under the Treyburn Retention Plan, Employees at Treyburn may be unwilling to stay through the transition period, and the Debtors may be unable to replace skilled workers at this state-of-the-art and highly regulated facility.  Such a result would significantly disrupt operations and meaningfully harm the Debtors' businesses.  Given the demanding and uncertain work environment in this transition period, the Debtors believe that the Treyburn Retention Plan is necessary to retain critical staff.  The Treyburn Retention Plan will maximize value for all stakeholders because it will allow the Debtors to meet production requirements, efficiently transfer their manufacturing operations to other manufacturing locations and ensure an overall smooth transition.  I therefore believe that the Treyburn Retention Plan is necessary under the circumstances and in the best interests of the Debtors and their estates.

## Conclusion

21.     I believe that the Severance Plan, Market Access ICP and the Treyburn Retention Plan are crucial to the Debtors' business operations during the pendency of the chapter 11 cases, as they will maintain employee morale, dedication, confidence and cooperation and maximize the Debtors' ability to reorganize successfully. The failure to honor these programs would irreparably impair the Debtors' relationships with their Employees, adversely impact the Debtors' ability to deliver to their customers superior products and services, and hinder the Debtors' restructuring efforts.

22.     In sum, the relief the Debtors are requesting in the proposed Final Order is necessary to avoid irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and constitutes a critical element in maximizing value for all stakeholders. Accordingly, on behalf of the Debtors, I respectfully submit that the

proposed Final Order be entered.

*[Remainder of Page Intentionally Left Blank]*

23.     I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   October 8, 2019

By:   */s/ Jon Lowne*
_____
Jon Lowne
Senior Vice President and Chief
Financial Officer