DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.***,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### NOTICE OF FILING OF TERM SHEET WITH AD HOC COMMITTEE

**PLEASE TAKE NOTICE** that on September 15, 2019 (the "**Petition Date**"), Purdue Pharma L.P. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the settlement term sheet, attached hereto as **Exhibit A** (the "**Term Sheet**"),[2] by and among the Debtors, the Ad Hoc Committee and the Shareholder Parties.

**PLEASE TAKE FURTHER NOTICE** that copies of the Term Sheet may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  October 8, 2019
        New York, New York

                                        DAVIS POLK & WARDWELL LLP

                                        By:  */s/ Timothy Graulich*

                                        450 Lexington Avenue
                                        New York, New York 10017
                                        Telephone: (212) 450-4000
                                        Facsimile:  (212) 701-5800
                                        Marshall S. Huebner
                                        Benjamin S. Kaminetzky
                                        Timothy Graulich
                                        Eli J. Vonnegut

                                        *Proposed Counsel to the Debtors
                                        and Debtors in Possession*

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Term Sheet.

**Exhibit A**

**Term Sheet**

## *S*UMMARY *T*ERM *S*HEET

This Summary Term Sheet summarizes the salient terms of a proposed comprehensive settlement of the claims relating to the opioid business of Purdue Pharma L.P. and its subsidiaries (collectively, "**Purdue**" or the "**Debtors**").  The ad hoc committee of consenting claimants (the "**Ad Hoc Committee**") consists of certain members, including the MDL Plaintiffs' Executive Committee, representative States, Municipalities and others.  The Debtors and the Ad Hoc Committee recognize that there may be other important stakeholders that will have a meaningful participation in the chapter 11 cases, and the Debtors and the Ad Hoc Committee will work together and with such other stakeholders, as applicable, in good faith to negotiate, draft and finalize definitive documents in furtherance of the proposed settlement set forth herein (the "**Settlement**").

1. No later than 14 days following the finalization of this Summary Term Sheet (or such earlier date as required to have the motion heard at the earlier of the hearing scheduled for November 19, 2019 or any earlier hearing scheduled), the Debtors shall file and thereafter pursue a motion in a form reasonably acceptable to the Ad Hoc Committee with the Bankruptcy Court to (i) assume the pre-petition reimbursement agreement with the Ad Hoc Committee and (ii) pay, on a monthly basis, the reasonable and documented expenses (e.g., hotels, meals, travel costs, etc., but excluding the fees and expenses of any professional, including internal counsel, retained or employed by any Ad Hoc Committee member) incurred by the Ad Hoc Committee members in furtherance of their service on the Ad Hoc Committee.

2. Pursuant to the chapter 11 plan, 100% of the assets or equity of Purdue – which together with its subsidiaries constitutes 100% of Purdue's U.S. pharmaceutical business – will be placed under a trust or a similar post-emergence structure, for the benefit of claimants and the U.S. public (the "**Trust**").[1]  The company ("**NewCo**") and the Trust will be run by independent directors or trustees disclosed to the Bankruptcy Court and selected by creditors or their representatives (subject to reasonable approval by the Ad Hoc Committee) pursuant to a process reasonably acceptable to the Ad Hoc Committee and the Debtors.  The Trust will own NewCo.

3. The corporate charter of NewCo will (i) require it to deploy its assets to address the opioid crisis through the provision of cash payments, the contribution of doses of overdose reversal medications or through other means chosen by the directors and trustees, (ii) obligate it to periodically evaluate the optimum methods of fulfilling its obligations, including a strategic winddown or liquidation, and (iii) be approved by the Ad Hoc Committee and the Debtors, approval of which shall not be unreasonably withheld, *provided* that Purdue and Shareholder Parties will have no role, control or consent/approval rights in NewCo from and after the Effective Date (as defined below). Both the charter of NewCo and the Trust governance documents will require the directors and trustees to periodically consider, *inter alia*, a strategic winddown of the entirety of NewCo or the monetization of its various asset classes.

4. The Shareholder Parties (defined below) will have no role in the appointment of the persons overseeing the Trust, the board members of NewCo, or the operations of either entity, and the Shareholder Parties will release, and will receive no recovery under the

---

[1] For the avoidance of doubt, the contribution of Purdue includes all property, interests and assets of the Debtors and their estates as such terms are understood and defined under the Bankruptcy Code, including, without limitation: (i) all cash on their balance sheets; (ii) insurance policies and proceeds therefrom, and (iii) all other estate assets including causes of action belonging to the Debtors or their estates.

1

        chapter 11 plan on account of, any equity interests in, or claims that have been or may be asserted against, any of the Debtors or any of their successors (including on account of any legacy liabilities, unpaid rent, or outstanding debts otherwise owed to the Shareholder Parties).  There shall be no payments made by the Debtors to or for the benefit of the Shareholder Parties (including the IACs and any affiliates) during the pendency of the chapter 11 cases, other than in the ordinary course of business pursuant to contracts validated by the Special Committee, and, if outside the ordinary course of business, approved by the Special Committee and the Bankruptcy Court.  The Ad Hoc Committee reserves the right to contest any of these transactions or payments. Each of the Shareholder Parties will consent to the jurisdiction of the Bankruptcy Court solely for the enforcement of any parties' rights, if any, under (i) the Stay Order, (ii) this Summary Term Sheet, or (iii) any definitive documents (including any restructuring support agreement or chapter 11 plan), and for no other purpose.

5.      Pursuant to the chapter 11 plan, NewCo and the Trust will have no liability for any claims or causes of action that have been or could have been asserted against the Debtors (including but not limited to claims based on successor liability), and all assets or equity interests will be transferred to NewCo "free and clear."  In addition, the chapter 11 plan will also include releases and exculpations, consistent with applicable law, with respect to Purdue's restructuring and chapter 11 cases, including (i) releases and discharges of the Debtors and their related parties from all claims and causes of action of any nature and (ii) exculpations of the Debtors and their related parties with respect to all acts or omissions arising in connection with the chapter 11 cases.

6.      In exchange for comprehensive releases in the form and manner to be agreed upon by the parties and set forth in, *inter alia*, the chapter 11 plan and related confirmation order, from each of (i) the Debtors and their estates, (ii) NewCo and (iii) all claimants, the existing shareholders, including trusts, beneficiaries, companies, affiliates, family members and any similar related parties (together, the "**Shareholder Parties**") will make or cause to be made the Consenting Shareholder Cash Contribution (defined below), subject to appropriate security interests in and negative pledges relating to the IACs (defined below), tolling agreements, and appropriate protections to preserve the value of the IACs pending sale, to be negotiated with creditor representatives including the Ad Hoc Committee, on the terms set forth on Exhibit A.[2]  Releases provided to any releasee will sunset and become null and void in the event that such releasee defaults in its obligation to make any payments under its allocated portion of the Consenting Shareholder Cash Contribution.[3]  It shall be a condition precedent to agreement on the definitive documents that the Ad Hoc Committee, the Debtors, and Shareholder Parties, each in their discretion, shall have agreed upon the allocation among payors of the Consenting Shareholder Cash Contribution, which shall be based on further diligence reasonably acceptable to the Ad Hoc Committee and tied to assurances of the ability of the Shareholder Parties to satisfy the Guaranteed Contribution in full when due, taking into account the results of diligence regarding the IACs.  A list of identifiable releasees

---

[2] For the avoidance of doubt, the releases in favor of the Shareholder Parties to be set forth in the chapter 11 plan will not include liabilities owed by them to governmental units that are not related to Purdue and/or opioid/litigation liability, such as individual taxes or other unrelated categories of liabilities.

[3] Shareholder Parties who are subject to voidable releases will agree to toll all statutes of limitations, repose, or otherwise, until the Consenting Shareholder Cash Contribution of such releasee is paid in full in accordance with the terms set forth on Exhibit A and the definitive documents.

will be provided by the Shareholder Parties to the Debtors and the Ad Hoc Committee and updated as appropriate.

7. Prior to the effective date of a chapter 11 plan (the "**Effective Date**"), the Debtors, with Bankruptcy Court approval and after consultation with the Creditors' Committee and the Ad Hoc Committee, may settle claims and coverage disputes with any of Purdue's insurers. Following the Effective Date, NewCo and/or the Trust, as applicable, will have all rights with respect to the insurance, including, without limitation, the authority to assert, pursue and settle such claims and coverage disputes with Purdue's insurers.

8. All distributable cash (including, without limitation, the Consenting Shareholder Cash Contribution, the company's excess cash, and insurance proceeds) will be distributed through a chapter 11 plan on terms and conditions, and in accordance with a formula consistent with applicable law and acceptable to the Debtors and the Ad Hoc Committee, *provided, however*, that the Shareholder Parties must also be reasonably satisfied that the allocation of consideration under the plan is consistent with the requirements of the Bankruptcy Code and applicable bankruptcy law. Any sales proceeds from any post-bankruptcy sale of NewCo or its assets will be distributed pursuant to this same agreed-to formulation.

9. The Debtors and NewCo will be bound by, and the Shareholder Parties will not oppose and will not take any action to frustrate, injunctive relief reasonably acceptable to the Ad Hoc Committee, including marketing restrictions, both during the chapter 11 cases and thereafter, with respect to the Debtors' opioid business-related activities.

10. As a condition to the Settlement, Purdue, the Shareholder Parties, and their respective related parties shall have resolved with the U.S. Department of Justice on terms satisfactory to them and approved by the Bankruptcy Court on appropriate notice, all potential federal liability arising from or related to opioid-related activities. If the economic terms of any such resolution are materially inconsistent with this Settlement or otherwise materially adverse to the Debtors, the Ad Hoc Committee shall have the right, within 30 days thereof, to terminate the Settlement.

11. Each consenting creditor, including without limitation each member of the Ad Hoc Committee, will (i) affirmatively undertake efforts to adjourn, sever, suspend or otherwise stay any of their own respective actions against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business; and (ii) either affirmatively support, or not oppose, object to, delay, impede, or take any other action to interfere with, efforts to stay all pending litigation against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business, in each case for the Initial Stay Period (as defined below). The Ad Hoc Committee will affirmatively support a request by the Debtors to stay all pending litigation against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business for an initial period of 180 days (the "**Initial Stay Period**") from the date of entry by the Bankruptcy Court (the "**Stay Date**") of an order approving the stay (the "**Stay Order**"), to facilitate the orderly and efficient implementation of the terms of this Summary Term Sheet. The Debtors and the Shareholder Parties will negotiate, complete and, if agreed to, execute a restructuring support agreement with the Ad Hoc Committee within 120 days of the earlier of the Stay Date or, if the Stay Date is later than October 15, 2019, October 15, 2019, and the Debtors will move for approval of the restructuring support agreement at a hearing to be held as promptly as practicable following the expiration of the Initial Stay Period. The

Ad Hoc Committee may move the Bankruptcy Court to terminate the Initial Stay Period if a restructuring support agreement has not been executed by the Debtors, the Ad Hoc Committee, its members, and the Shareholder Parties within 120 days of the Stay Date, it being expressly understood that the Debtors' execution thereof shall be subject to Bankruptcy Court approval that shall not be obtained, absent the consent of the Creditors' Committee, prior to the date that is 180 days from the Stay Date. Among other things, the restructuring support agreement will provide for appropriate termination events, and for an appropriate "fiduciary out" for the Debtors acceptable to the Debtors and the Ad Hoc Committee. An order of the Bankruptcy Court shall provide for the restrictions set forth on Exhibit C, which shall apply during the Initial Stay Period and any extension thereof (the "**Stay Period**").

12. The Shareholder Parties will promptly provide the Ad Hoc Committee and the Debtors with a list and description of all IACs. During negotiations of a restructuring support agreement and the definitive documents, the Debtors and/or the Shareholder Parties, as applicable, shall promptly and on a rolling basis provide the Ad Hoc Committee and its professionals with information and documents, including the categories of information and documents set forth on Exhibit B, reasonably requested and necessary to perform due diligence regarding the terms of this Settlement and any chapter 11 plan premised upon this Settlement. All diligence in this paragraph is referred to herein as "**Diligence**". If the Ad Hoc Committee reasonably believes that the Shareholder Parties are not reasonably working in good faith to provide the Diligence promptly and on a rolling basis, subject to written notice and a ten day cure period, the Ad Hoc Committee shall have the right to move the Bankruptcy Court to terminate the Stay Period.

13. The Debtors' agreement to provide any Diligence to the Ad Hoc Committee pursuant to the terms hereof does not extend to information that otherwise could not be obtained in connection with discovery by the Ad Hoc Committee under applicable bankruptcy or federal laws or rules, including Bankruptcy Rule 2004. Nothing herein shall constitute a waiver of the attorney-client privilege by the Debtors. As to matters where there is a basis for information sharing without a waiver of privilege, the Debtors agree to work with the Ad Hoc Committee to explore mechanisms that will ensure that any information or documents shared by the Debtors will remain confidential and privileged.

14. The restructuring support agreement will provide for appropriate consultation and consent rights, including with respect to the definitive documents necessary to effectuate this Settlement, for the Ad Hoc Committee (and any other creditor representative signatory to the restructuring support agreement) to be agreed. All definitive documents relating to the Settlement shall be on terms acceptable to the Ad Hoc Committee, the Debtors and, except as otherwise expressly provided herein, the Shareholder Parties. Among other things, the parties will enter into a mutually agreeable tax protocol, and will seek to maximize tax efficiencies when drafting definitive documentation. The forms of governmental proofs of claim and related documents with respect to the bar date shall be reasonably acceptable to the Ad Hoc Committee.

15. Within 270 days of the earlier of the Stay Date or, if the Stay Date is later than October 15, 2019, October 15, 2019, the parties will negotiate the terms of a chapter 11 plan and disclosure statement and, in the event agreement is reached on all material terms, the Debtors will file a chapter 11 plan and disclosure statement, together with an agreed upon schedule for confirmation.

16. The definitive documents will provide that no State or other governmental entity that is not an initially consenting party with respect to the Settlement will receive a distribution or other benefit under the Debtors' chapter 11 plan that is not provided on an equivalent or pro rata basis to initially consenting parties.

17. Purdue's obligations hereunder shall terminate on written notice to the Ad Hoc Committee if Purdue determines, in its sole discretion (and in keeping with its fiduciary duties, including the duties of the members of its Special Committee), that the Settlement is no longer in its best interests, *provided*, that prior to terminating its obligations hereunder, Purdue shall provide proposed amendments or alternatives to the Settlement to the Ad Hoc Committee and shall provide the Ad Hoc Committee with a reasonable period to determine whether to incorporate such amendments into the Settlement or to proceed consensually with any such alternatives. The Debtors represent that, as of the date of hereof, they believe that reaching agreement on and finalizing this Settlement Term Sheet is consistent with their fiduciary duties.

18. For the avoidance of doubt, all dates set forth herein may be amended with the consent of the Debtors, the Ad Hoc Committee, and the Shareholder Parties.

**Exhibit A**

**Consenting Shareholder Cash Contribution**

| **Shareholder Cash Contribution** | The Shareholder Parties will contribute $3 billion (the "**Guaranteed Contribution**") to NewCo or such other designated vehicle over a period no longer than seven years from the Effective Date. |
|---|---|
| | The Shareholder Parties will make the Guaranteed Contribution in the following minimum annual amounts: |
| | 1. Year 1 (to be paid on one or more dates in Year 1 to be agreed by the Debtors, the Shareholder Parties and the Ad Hoc Committee based on timing of initial asset sales): $500 million; |
| | 2. Years 2–6: $300 million per year; and |
| | 3. Year 7: $1 billion[4] |
| | The Shareholder Parties will engage in a sale process for their Ex-U.S. pharmaceutical companies (collectively, the "**IACs**"). A list of all IACs will be promptly provided to the Ad Hoc Committee, and the Shareholder Parties shall represent that the list of IACs is an accurate and complete list of all Ex-U.S. pharmaceutical entities, related businesses, joint ventures, or other holdings directly or indirectly owned or controlled by any Shareholder Party, and that are included in the financial information provided in the investment banker presentation made available to certain of the settling parties' financial experts (the "**IB Presentation**"). It is understood and agreed by the parties that further Diligence and agreement is required with respect to any entities that are controlled, actively managed, or 20% or more owned, by Shareholder Parties consisting both of the descendants of Raymond Sackler and of Mortimer Sackler and engaged in the pharmaceutical business but not included in the IB Presentation, including whether any of such entities shall be included as IACs under the Settlement. The Shareholder Parties will provide representations and enforceable covenants acceptable to the Ad Hoc Committee and the Shareholder Parties to ensure that subsequent to the disposition of the IACs, the Shareholder Parties will no longer be engaged in the opioid business, and if necessary, diligence on specific investments raised by the Ad Hoc Committee, with such enforceable covenants to be set forth in the confirmation order for the chapter 11 plan, such covenants to be specifically enforceable through injunctive relief. |
| | The first use of Net Proceeds (defined below) from one or more equity or asset sales of an IAC (an "**Ex-U.S. Sale**") during this seven-year period, will be to fulfill the Guaranteed Contribution. Any such accelerated contributions will be applied and deemed to satisfy (on a dollar for dollar basis and in whole or part as applicable) the next due installment or installments of the Guaranteed Contribution. The Shareholder Parties (i) will provide the Ad Hoc Committee and the Debtors with financial information (including current audited financial statements for each IAC) as reasonably requested and available for the IACs prior to the execution of the restructuring support agreement, and (ii) will |

---

[4] Amounts payable in years two through seven shall be payable on dates to be agreed.

6

provide access to books and records of the IACs to permit the Ad Hoc Committee and the Debtors to document and monitor the Ex-U.S. Sales and Guaranteed Contribution on terms and conditions to be agreed upon and set forth in the definitive documentation.

In addition to the Guaranteed Contribution, the Shareholder Parties will contribute (i) 90% of any Net Proceeds in excess of $3 billion until the Shareholder Parties have contributed an additional $1.5 billion *plus* (ii) 50% of any Net Proceeds realized from any Ex-U.S. Sale thereafter (such amounts, together with the Guaranteed Contributions, the "**Consenting Shareholder Cash Contribution**").

The Shareholder Parties will provide quarterly reports regarding the progress of any Ex-U.S. Sale to the Debtors and the Ad Hoc Committee during the chapter 11 cases and to the Trust or its successor or designee following the Effective Date. The parties will agree to additional financial disclosures, reporting mechanisms, oversight, and covenants with respect to the IACs in connection with the definitive documentation, with appropriate protections to be agreed to preserve and maximize the value of IACs pending the Ex-U.S. Sale.

The payment of the Consenting Shareholder Cash Contribution will be secured by appropriate security interests in and negative pledges relating to, as well as informational and consultation rights with respect to, the IACs reasonably acceptable to the Ad Hoc Committee.

In accordance with to be agreed-upon terms and timing mechanisms, the IACs will not retain excess cash and will, no less than annually and periodically on intervals to be agreed, distribute excess cash only for, and in the following order of priority: (i) *first,* the taxes generated by the income or sale of (including any required presale restructurings of) the IACs and Purdue, and for the legal and other expenses incurred by the shareholders in connection with the restructuring and the Ex-U.S. Sales, (ii) *second,* to repay to the owners any amount of the Consenting Shareholder Cash Contribution advanced from sources other than such distributions and the proceeds from any Ex-U.S. Sale, and (iii) *third***,** (a) the Consenting Shareholder Cash Contribution and (b) any amount to be distributed to the owners alongside the Consenting Shareholder Cash Contribution (i.e., 10% of Net Proceeds after $3 billion and 50% of Net Proceeds after the Shareholder Parties have contributed an additional $1.5 billion). Any distributions and the gross proceeds from any Ex-U.S. Sale minus the amounts described in clause (i) of the immediately preceding sentence shall constitute "**Net Proceeds**".

Determination of what constitutes excess cash of the IACs will, at all times prior to an Ex-U.S. Sale of the IACs, be made in accordance with terms to be agreed with the Ad Hoc Committee, the Debtors, and the Shareholder Parties.

Promptly following the date of finalization of this Summary Term Sheet, the protections requested by and reasonably acceptable to the Debtors, the Ad Hoc Committee, and the Shareholder Parties will be agreed to preserve the value of IACs, including any excess cash of the IACs generated or proceeds of any Ex-U.S. Sale received prior to the Effective Date.

**Exhibit B**

**Initial Diligence**

The following shall be provided initially on a Professionals' Eyes Only ("**PEO**") basis, with further dissemination of diligence to be agreed through the negotiation of a confidentiality agreement among the parties, and subject to court-ordered confidentiality, it being expressly agreed and understood that the parties shall negotiate in good faith as to which Diligence items remain PEO:

1. Any final report(s) prepared for or by the Special Committee of the board of directors regarding transactions between the Debtors and the Shareholder Parties (and/or their respective affiliates).

2. IAC presentation materials, including the IB Presentation, historical financial results, accounting of excess cash for 2019, current projections, business plans and valuations, on an entity level basis where available, and other customary financial, operational, and legal diligence reasonably requested by the Ad Hoc Committee.

3. Updated financials for the Debtors and each of the IACs.

4. Business plan and forecasts for the Debtors as well as detailed historical financial information and/or valuations of the Debtors and other customary financial, operational, and legal diligence reasonably requested by the Ad Hoc Committee.

5. Reasonable access by the professionals to the Ad Hoc Committee to members of the Debtors' and the IAC's management teams to answer questions and elaborate on Diligence items 2-4.

6. Tax information necessary to determine the tax liability set forth in the clause (i) referenced in the definition of Net Proceeds on Exhibit A.

7. Quarterly reports listing the material legal and other fees and expenses incurred by the Shareholder Parties in connection with the chapter 11 cases and the Ex-U.S. Sales.

8. Information necessary to assess the reasonableness of any proposed allocation among payors of the Consenting Shareholder Cash Contribution, and to determine the assurances that are necessary regarding the ability of the Shareholder Parties to satisfy the Guaranteed Contribution in full when due, taking into account the results of diligence regarding the IACs.

9. A list of all contracts validated by the Special Committee providing for any payments by the Debtors to the Shareholder Parties during the chapter 11 cases, and reasonable prior notice regarding any payments approved by the Special Committee to the Shareholder Parties outside the ordinary course of business.

## **Exhibit C**

(a) For purposes of this Order, "Covered Sackler Person" shall mean: Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such).  The Shareholder Parties represent that the Covered Sackler Persons own, directly or indirectly, each of the IACs.

(b) While the injunction hereunder in respect of Related-Party Claims is in effect, no Covered Sackler Person shall take any action with respect to any material amount of his, her, or its property that is located inside or outside the United States with the intent or material effect of frustrating enforcement of any potential judgment of this Court in these cases or any other actions pending against them.

(c) Solely to the extent necessary to enforce the foregoing, each Covered Sackler Person consents to the jurisdiction of this Court in respect of the foregoing.