**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** ***et al.*****,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**AFFIDAVIT OF PUBLICATION**

I, Shunte Jones, depose and say that I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

This Affidavit of Publication includes sworn statements verifying that the *Notice of Chapter 11 Bankruptcy Case*, as conformed for publication, was published on October 4, 2019 in (1) The New York Times, National Edition, as described on **Exhibit A** attached hereto and (2) The Wall Street Journal, National Edition, as described on **Exhibit B** attached hereto; and on October 7, 2019 in USA Today, National Edition, as described on **Exhibit C** attached hereto.

Dated: October 10, 2019

[signature]
Shunte Jones

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on October 10, 2019, by Shunte Jones, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: [signature]

JAMES A. MAPPLETHORPE
Notary Public, State of New York
No. 01MA6370846
Qualified in New York County
Commission Expires February 12. 2022

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Exhibit A**



NYT The New York Times
620 8TH AVENUE • NEW YORK, NY 10018

# PROOF OF PUBLICATION

Oct 7 2019

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

OCT 04 2019 B6 NATIONAL

Alice Weber

Sworn before me the 7th day of Oct, 2019

Michelle M. Sc[illegible]

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

**Information to identify the case:**
**Debtor: Purdue Pharma L.P. EIN: 06-1307484**
**United States Bankruptcy Court Southern District of New York**
**Case Number: 19-23649 (RDD)**
**Date case filed for chapter 11: September 15, 2019**
Official Form 309F (For Corporations or Partnerships)
**Notice of Chapter 11 Bankruptcy Case 12/17**

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice. Do not file this notice with any proof of claim or other filing in the case.**

1. **Debtors' full name: See Chart Below**
2. **All other names used in the last 8 years: See Chart Below (If applicable)**
3. **Address: See Chart Below**

**Jointly Administered Cases**

**Debtor, (*Other Name's Used In Last 8 Years*), Case No., EIN:**

The address for the following Debtors is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901: Purdue Pharma L.P., 19-23649, 06-1307484; Purdue Pharma Inc., 19-23648, 06-1307486; Purdue Transdermal Technologies L.P., 19-23650, 20-3931868; Purdue Pharma Manufacturing L.P., 19-23651, 80-0913821; Purdue Pharmaceuticals L.P., 19-23652, 13-4030034; Imbrium Therapeutics L.P., 19-23653, 83-1928810; Adlon Therapeutics L.P., 19-23654, 83-2446745; Greenfield BioVentures L.P., 19-23655, 83-1936150; Seven Seas Hill Corp., 19-23656, N/A; Ophir Green Corp., 19-23657, N/A; Purdue Pharma of Puerto Rico, 19-23658, 52-2333925; Avrio Health L.P., *(Purdue Products L.P.)*, 19-23659, 55-0804140; Purdue Pharmaceutical Products L.P., 19-23660, 05-0553902; Purdue Neuroscience Company, 19-23661, 06-1574712; Nayatt Cove Lifescience Inc., 19-23662, 82-3487805.

The address for the following Debtors is 498 Washington Street, Coventry RI 02816: Button Land L.P., 19-23663, 26-3547502; Paul Land Inc., 19-23664, 26-3547425; Quidnick Land L.P., 19-23665, 26-3547584; Rhodes Associates L.P., 19-23666, N/A; Rhodes Pharmaceuticals L.P., 19-23667, 26-1916166; Rhodes Technologies, 19-23668, 22-3527143; UDF LP, 19-23669, 42-1570495; SVC Pharma LP, 19-23670, 41-2125717; SVC Pharma Inc., 19-23671, 59-3784014.

4. **Debtors' attorney and claims agent: DAVIS POLK & WARDWELL LLP, 450 Lexington Avenue, New York, New York 10017, Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut.**

**Debtors' Claims and Noticing Agent: If you have questions about this notice, please contact Prime Clerk LLC: Contact phone: 844-217-0912 (toll-free), 347-859-8093 (international), Email: purduepharmainfo@primeclerk.com. Website: https://restructuring.primeclerk.com/purduepharma.**

5. **Bankruptcy clerk's office:** United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601, Hours open: Monday – Friday 8:30 AM – 5:00 PM, Contact phone: 914-467-7250. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at www.pacer.gov.
6. **Meeting of creditors:** November 5, 2019 at 2:30 p.m. Location: U.S. Bankruptcy Court, Southern District of New York, One Bowling Green (Room 511), New York, NY 10004-1408. The debtor's representative must attend the meeting to be questioned under oath. Creditors may attend but are not required to do so. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket.
7. **Proof of claim deadline: Deadline for filing proof of claim: Not yet set. If a deadline is set, the court will send you another notice.** A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as *disputed, contingent*, or *unliquidated*; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as *disputed, contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.
8. **Exception to discharge deadline:** If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below. The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. **Deadline for filing the complaint: To be determined**
9. **Creditors with a foreign address:** If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.
10. **Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.
11. **Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.

**MEDIA | FINANCE**

# Layoffs Follow Transfer of Sports Illustrated's Control

By MARC TRACY

Sports Illustrated, which set a standard for sportswriting and photography during its 20th-century heyday, was transferred to a new company Thursday. Along with the change, there were layoffs, according to three people with knowledge of the moves.

The number of those who lost their jobs under the magazine's new steward, Maven, a digital platform company in Seattle, was not immediately clear. Before the layoffs, there were 31 full-time employees at the magazine who belonged to the NewsGuild union and nearly 80 who worked at the Sports Illustrated website.

Journalists at the 65-year-old publication arrived at the office in

*A digital company says a publication will relaunch in January.*

Lower Manhattan on Thursday not knowing whether or not they would have jobs by the end of the day. By evening, after cardboard boxes appeared, some of them had been laid off, the people said.

In a statement, Maven said it planned to "refocus" Sports Illustrated for a January relaunch, adding that it would "strengthen mobile platform delivery and increase the development of complementary video content."

Maven also said much of the coverage would shift to a network of bloggers, known as Sports Illustrated Mavens, who would cover up to 200 college and professional teams.

Sports Illustrated has changed hands more than once in recent years.

In 2018, it became the property of Meredith, the venerable Des Moines publisher of Family Circle and of Better Homes and Gardens, after that company bought Time Inc. in a deal valued at roughly $2.8 billion.

Meredith quickly sought buyers for Sports Illustrated, which was not a fit for its stable of women's and lifestyle publications. It found a taker in a New York brand management company, Authentic Brands Group, which owns the commercial rights to celebrities including Marilyn Monroe and Elvis Presley, as well as retailers like Juicy Couture.

The $110 million deal went through in May, giving Authentic Brands Group the magazine's archive of photographs and covers, as well as its Sportsperson of the Year and swimsuit issue franchises. Under the arrangement, Meredith was to continue operating the website and biweekly print magazine. Then Authentic Brands Group sold that license to Maven.

On Thursday, the transfer was completed, Meredith said in a statement.

"As the new licenser of Sports Illustrated, Maven made the Sports Illustrated personnel decisions that Meredith communicated to the SI employees today," the statement said. "Going forward, the remaining SI employees will work at the direction and at the pleasure of Maven."

The NewsGuild expressed its concerns in a letter that it made public before the layoffs on Thursday, questioning whether the job cuts would "not only be sudden and devastating to the staff directly impacted, but severely compromise the ability of the remaining staff to put out a quality product, thus imperiling the future of Sports Illustrated."

A group of Sports Illustrated staff members also objected to having Maven at the helm. They said in a statement that the company "wants to replace top journalists in the industry with a network of Maven freelancers and bloggers, while reducing or eliminating departments that have ensured that the stories we publish and produce meet the highest standards."

In June, Maven named Ross Levinsohn the chief executive of Sports Illustrated. Mr. Levinsohn, previously an executive at News Corporation and Yahoo, was formerly the publisher of The Los Angeles Times during a period of unrest in the newsroom.

On Tuesday, in an email obtained by The New York Times, Mr. Levinsohn told the Sports Illustrated staff that Chris Stone, a 27-year veteran of the magazine and its editor in chief, would leave the publication, but was "considering an offer" from Maven. Mr. Stone did not respond to requests for comment.

In Mr. Stone's place, two staff members, Steve Cannella and Ryan Hunt, were elevated to co-editors in chief, the email said.

"We care deeply — as we know all of you do — about the excellent work SI does and the power and prestige it carries for us, our audience and for the people we cover," Mr. Levinsohn wrote.

Through a spokesman, Mr. Levinsohn declined to comment on Thursday.

In an email to the staff on Wednesday, Mr. Cannella and Mr. Hunt said, "Our goal is simple: to double down on the best of what Sports Illustrated has always been known for — unparalleled journalism and powerful storytelling — while creating a new company that's built for success in the 21st century and beyond."

JEENAH MOON FOR THE NEW YORK TIMES

A group of the magazine's staff members said in a statement that Maven, the new steward, "wants to replace top journalists in the industry."

# 'She Said' Talk Ends With Ire For Questions By Woodward

By MARC TRACY

During a career spanning nearly five decades, Bob Woodward has interviewed several presidents, dozens of cabinet officials and, most famously, W. Mark Felt, an associate F.B.I. director who helped him piece together the narrative that led to the resignation of President Richard M. Nixon.

But Mr. Woodward, a longtime Washington Post reporter who is an associate editor at the paper, was heckled on Wednesday night while interviewing the New York Times reporters Jodi Kantor and Megan Twohey. They are the authors of the book "She Said," a chronicle of their investigation into the sexual misconduct allegations against Harvey Weinstein and other powerful men that won them a Pulitzer Prize and was instrumental in jump-starting the global #MeToo movement.

The event, at the Sixth and I building in Washington, started with Mr. Woodward referring to "She Said" as "a masterpiece." At one point, according to an attendee, he said he planned to assign it to his students.

Twenty minutes into the interview, however, the mood changed. Mr. Woodward repeatedly interrupted Ms. Kantor and Ms. Twohey and posed questions that, to many attendees, suggested a lack of understanding of sexual assault and workplace harassment.

Audience members voiced their objections — "Let her finish!" one person shouted during one of Mr. Woodward's interruptions — and registered their complaints on social media, according to several accounts and interviews.

One attendee, Robyn Swirling, the founder of the nonprofit Works in Progress, said Mr. Woodward had done a poor job. "It wasn't just the interrupting," Ms. Swirling said in an interview on Thursday. "It was some really inappropriate questions that were just so clearly lacking in any sort of understanding of the dynamics of sexual violence."

In a statement after the event, Mr. Woodward said: "As a longtime believer in the First Amendment, I am glad people got to express themselves. Jodi and Megan signed a copy of their book for me after the session, which I enjoyed very much, and said, 'Thank you for the fabulous questions.' So there may be a difference of opinion. Welcome to America!"

In a statement, Ms. Kantor and Ms. Twohey said: "We're just starting our book tour, and we're grateful to all the moderators — Bob Woodward, Katie Couric, America Ferrera and many others — who have agreed to join us onstage. We welcome all questions, from them and especially from the audience, because each one is an opportunity to relate the wrenching decisions that many of our sources had to make and grapple with Metoo as an example and test of social change in our time."

Accusing them of "artfully dodging" his questions, Mr. Woodward suggested during the interview that the behavior Mr. Weinstein was accused of had been at least partly to do with sex. The authors emphasized that based on their reporting, the misconduct many women accused Mr. Weinstein of — often occurring at work, or in a work context — was fundamentally about power.

"It's not about sex in the romantic sense," Ms. Kantor said. "I would say that part of the way it's about power is it's about work."

Mr. Woodward also described Mr. Weinstein's behavior as "a weird foreplay," Ms. Swirling said.

In an interview Thursday afternoon, Mr. Woodward reiterated his praise for the book. He said he could not always understand what the audience members were saying, as he had tuned his hearing aids to be able to hear Ms. Kantor and Ms. Twohey on the stage.

He said he had listened to his critics over the previous day, but defended his line of questioning about sex and Mr. Weinstein as a subject worthy of further discussion.

"It's called sexual assault, sexual harassment, not power assault or power harassment. It does involve sex. So I asked the question — you always ask the 'why' in journalism, or I try to."

Ms. Swirling said she felt nauseated after the talk. "Like many other survivors of sexual violence in that audience, I had a pretty visceral response," she said.

Robin Runge, a former victims-rights lawyer, said two audience members had criticized Mr. Woodward directly during the post-interview question-and-answer session.

Toward the end of the event, Mr. Woodward again praised "She Said," calling it "a blueprint" for how investigative journalism should be done, Ms. Runge said.

# After Plea Deal and Financial Loss, Epstein Made $200 Million

FROM FIRST BUSINESS PAGE

Mr. Epstein's business revival is documented in financial statements and other filings obtained by The New York Times. The documents — from Southern Trust and his earlier firm, Financial Trust — offer a glimpse of Mr. Epstein's mysterious finances. They show that Financial Trust peaked at the end of 2004, when it reported $563 million in assets and net income of $108 million. And they demonstrate how Mr. Epstein rebuilt his business in his later years, with Southern Trust reporting $175 million in retained earnings — leftover profits that can be reinvested — in 2017, the last year for which statements were available.

But the documents do not say who was paying vast sums of money to Mr. Epstein's new venture just a few years after his 2008 guilty plea to soliciting a minor for prostitution. Nor do they offer an explanation for why customers would hand over money to a man who had apparently switched from financial services to DNA research.

They do, however, offer a reason for that sudden change in focus. In 2012, Mr. Epstein asked the Virgin Islands Economic Development Authority to note that Financial Trust no longer managed money, so it would not have to register with federal securities regulators as required under the Dodd-Frank Act. Later that year, Financial Trust was replaced by South-

*A financier accused of sex trafficking had received tax breaks in the Virgin Islands.*

ern Trust, which Mr. Epstein told territorial officials would still maintain a "financial arm."

The single-page unaudited financial statements for both companies — obtained through a public-records lawsuit against the territory's Division of Corporations and Trademarks — are littered with curious line items.

At Financial Trust, a company with fewer than a dozen employees, investment expenses varied widely, from $1.3 million in 2000 to $16 million in 2004 to $42 million in 2005. In 2006 — the year Mr. Epstein was charged in Florida — Financial Trust pushed $117 million into an unnamed subsidiary whose purpose was undisclosed. The subsidiary was apparently transferred to Southern Trust in 2013, and by the end of 2017 the subsidiary accounted for more than half of the company's $391 million in assets. The filings also disclose that Southern Trust received a $30.5 million loan that same year, but don't say who provided it.

One thing the financial statements make clear: Mr. Epstein paid himself handsomely. He pocketed $400 million in dividends and other payments from the companies starting in 1999 — the first full year after he moved his operations to the Virgin Islands from New York.

The opacity of Mr. Epstein's financial dealings has been a perplexing issue since he was arrested in July on federal charges of sex trafficking with underage girls. Although the criminal case against him closed after he committed suicide in federal custody in August, Mr. Epstein's finances remain an important matter for women who are suing his estate claiming they were among his victims.

Two days before he killed himself, Mr. Epstein signed a will that placed his estate — estimated in court records at more than $500 million — into a trust, potentially an attempt to shield it from public scrutiny. The will lists Darren K. Indyke and Richard D. Kahn, two longtime associates, as executors.

The financial statements and accompanying documents reviewed by The Times were signed at various times by Mr. Indyke, a lawyer who incorporated dozens of Mr. Epstein's companies, and Mr. Kahn, a New York accountant. Mr. Indyke served as president of Financial Trust for two years, which included the period that Mr. Epstein was serving a prison sentence in Florida after his 2008 guilty plea.

Neither Mr. Indyke nor Mr. Kahn responded to repeated requests for comments. Lawyers for the men also did not respond to messages.

For many years, Mr. Epstein's businesses in the Virgin Islands operated out of an office suite at a marina complex on St. Thomas. After Mr. Epstein's death, a man at the office told a visitor through an intercom that no one at Southern Trust was available to talk.

Documents obtained from the Virgin Islands Economic Development Authority show how officials rarely pressed Mr. Epstein on his dealings, even as they granted lucrative exemptions that allowed him to pay as little as 10 percent of the effective tax rate in corporate income tax. The tax breaks are granted to companies that agree to minimum hiring requirements and commit to investing at least $100,000 in an industry that advances the territory's "economic well-being." Currently 71 companies, including Southern Trust, receive the incentive.

The development authority did not respond to messages seeking comment.

Government watchdogs and others have long criticized the territory's history of light regulatory oversight. "Rich people have tried to make it their residence and do business there," said Jack Blum, a Washington lawyer who has led corruption investigations for several Senate committees. "The idea was to keep it all out of the hands of the I.R.S."

Mr. Epstein set up shop in the Virgin Islands in 1998, calling himself a "financial doctor" who had decided to settle there after "vacationing up and down the world," according to a transcript of a hearing the next year as he sought tax incentives that were ultimately granted. During his extensive remarks — an official interrupted Mr. Epstein's soliloquy at one point to remind him he had only 15 minutes to make a presentation — he discussed working at Bear Stearns and opined about that "electronic mail" was rendering the fax machine obsolete.

He also boasted about managing money for Leslie H. Wexner, the longtime chief executive of the company that runs Victoria's Secret, who recently said Mr. Epstein had misappropriated large sums of money from him.

The end of their association is evident in the income statements of Financial Trust. The company reported fee income — money charged to clients for services, rather than gains from investments — of $66 million in 2006. In 2007, the year that Mr. Wexner said he had cut ties with Mr. Epstein, Financial Trust's fee income was just shy of $4 million. In 2008, it was $100,000.

Financial Trust reported fee income of $100,000 for the next three years, then none in 2012 — the year Southern Trust was founded.

In 2013, its first full year in existence, Southern Trust reported fee income of $51 million.

## Jeffrey Epstein's Financial Rebound

The financial crisis and the loss of a key client dealt a blow to Mr. Epstein's money-management business, Financial Trust. His next venture, Southern Trust, proved lucrative. By the end of 2017, it had $391 million in assets and annual revenue of $43 million.

**Annual revenue generated by Epstein's businesses**

Source: United States Virgin Islands Division of Corporations and Trademarks

THE NEW YORK TIMES

**Information to identify the case:**
**Debtor: Purdue Pharma L.P. EIN: 06-1307484**
**United States Bankruptcy Court Southern District of New York**
**Case Number: 19-23649 (RDD)**
**Date case filed for chapter 11: September 15, 2019**
Official Form 309F (For Corporations or Partnerships)
**Notice of Chapter 11 Bankruptcy Case 12/17**

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice. Do not file this notice with any proof of claim or other filing in the case.**

**1. Debtors' full name: See Chart Below**

**2. All other names used in the last 8 years: See Chart Below (if applicable)**

**3. Address: See Chart Below**

**Jointly Administered Cases**

**Debtor, (*Other Names Used in Last 8 Years*), Case No., EIN:**

The address for the following Debtors is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901: Purdue Pharma L.P., 19-23649, 06-1307484; Purdue Pharma Inc., 19-23648, 06-1307486; Purdue Transdermal Technologies L.P., 19-23650, 20-3931868; Purdue Pharma Manufacturing L.P., 19-23651, 80-0913821; Purdue Pharmaceuticals L.P., 19-23652, 13-4030034; Imbrium Therapeutics L.P., 19-23653, 83-1928810; Adlon Therapeutics L.P., 19-23654, 83-2446745; Greenfield BioVentures L.P., 19-23655, 83-1936150; Seven Seas Hill Corp., 19-23656, N/A; Ophir Green Corp., 19-23657, N/A; Purdue Pharma of Puerto Rico, 19-23658, 52-2333925; Avrio Health L.P., *(Purdue Products L.P.)*, 19-23659, 55-0804140; Purdue Pharmaceutical Products L.P., 19-23660, 05-0553902; Purdue Neuroscience Company, 19-23661, 06-1574712; Nayatt Cove Lifescience Inc., 19-23662, 82-3487805.

The address for the following Debtors is 498 Washington Street, Coventry RI 02816: Button Land L.P., 19-23663, 26-3547502; Paul Land Inc., 19-23664, 26-3547425; Quidnick Land L.P., 19-23665, 26-3547584; Rhodes Associates L.P., 19-23666, N/A; Rhodes Pharmaceuticals L.P., 19-23667, 26-1916166; Rhodes Technologies, 19-23668, 22-3527143; UDF LP, 19-23669, 42-1570495; SVC Pharma LP, 19-23670, 41-2125717; SVC Pharma Inc., 19-23671, 59-3784014.

**4. Debtors' attorney and claims agent: DAVIS POLK & WARDWELL LLP, 450 Lexington Avenue, New York, New York 10017, Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut.**

**Debtors' Claims and Noticing Agent: If you have questions about this notice, please contact Prime Clerk LLC: Contact phone: 844-217-0912 (toll-free), 347-859-8093 (international), Email: purduepharmainfo@primeclerk.com, Website: https://restructuring.primeclerk.com/purduepharma.**

**5. Bankruptcy clerk's office:** United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601, Hours open: Monday – Friday 8:30 AM – 5:00 PM, Contact phone: 914-467-7250. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at www.pacer.gov.

**6. Meeting of creditors:** November 5, 2019 at 2:30 p.m. Location: U.S. Bankruptcy Court, Southern District of New York, One Bowling Green (Room 511), New York, NY 10004-1408. The debtor's representative must attend the meeting to be questioned under oath. Creditors may attend but are not required to do so. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket.

**7. Proof of claim deadline: Deadline for filing proof of claim: Not yet set. If a deadline is set, the court will send you another notice.** A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as *disputed*, *contingent*, or *unliquidated*; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as *disputed*, *contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

**8. Exception to discharge deadline:** If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below. The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. **Deadline for filing the complaint: To be determined**

**9. Creditors with a foreign address:** If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.

**10. Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.

**11. Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.

**Exhibit B**

# AFFIDAVIT

**STATE OF NEW JERSEY )**
**) ss:**
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Andrew Introne, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

1 insertion(s) on the following date(s):

OCT-04-2019;

ADVERTISER: Purdue Pharma L.P.;

and that the foregoing statements are true and correct to the best of my knowledge.

____________________________

Sworn to before me this
4 day of October 2019

____________________________
Notary Public

KEITH OECHSNER NOTARY PUBLIC STATE OF NEW JERSEY

Keith Oechsner
NOTARY PUBLIC
State of New Jersey
ID # 50106528
My Commission Expires
June 10, 2024

STEPHANIE KEITH/REUTERS

Seasonal sales are forecast to rise 3.8% to 4.2% after a disappointing 2018. Crowds in Macy's in New York on Black Friday last year.

# Retailer Group Predicts Robust Holidays, but Sounds Warning

By Sarah Nassauer

Retailers expect a strong holiday shopping season, but warn that global political and economic uncertainty could erode consumer confidence and spending.

The National Retail Federation, which represents retailers including **Walmart** Inc., **Amazon.com** Inc. and **Macy's** Inc., said Thursday it expects holiday sales to rise in a range of 3.8% to 4.2%—to about $730 billion—after sales came in lower than expected last year in the midst of a federal government shutdown.

Retailers and consumers are feeling confident amid low unemployment and rising wages, but the economy is growing at a slower pace than last year and there is "considerable uncertainty around issues including trade, interest rates, global risk factors and political rhetoric," said Matthew Shay, president of the retail federation.

The NRF's figures, which cover sales online and in stores from Nov. 1 to Dec. 31 and exclude auto, gasoline and restaurant sales, are in line with those of retail consulting firms.

AlixPartners predicts holiday sales to rise between 4.4% and 5.3% compared with last year. "While our 2019 forecast is an upswing from last year, tariffs and the trade war are finally beginning to take a hit on consumer confidence, and the buzz of an oncoming recession is getting louder," the firm said in a research report.

U.S. stocks are down in October as signs emerge that a manufacturing slowdown has spread to other parts of the economy. Last week, consumer spending, the driving force in the U.S. economy, showed a slight slowdown in August. Federal data released Thursday showed services activity in the U.S. and eurozone softened in September. Investors and economists are watching Friday's planned employment-data report carefully.

The NRF and retailers have long pointed to the trade war between the U.S. and China as a potential source of economic instability, but so far that mostly hasn't translated to higher prices for consumers, Mr. Shay said Thursday.

The Trump administration has imposed tariffs on the majority of goods imported from China, with some to take effect later in the holiday season on consumer goods including toys and apparel. China also has imposed tariffs on some U.S. goods. Both countries have offered some concessions ahead of high-level negotiations between the countries in October. On Wednesday, the administration said it would impose tariffs on aircraft, food and other goods from the European Union.

"None of these retailers want to pass on cost to consumers if they can avoid it," said the retail federation's Mr. Shay.

But if cost increases because of tariffs spread to more categories of goods in the coming weeks and months, he said, "tariffs certainly could make an impact."

# Hawaiian Airlines' Antitrust Request Is Turned Down

By Doug Cameron

U.S. regulators turned down a request by Hawaiian Airlines and **Japan Airlines** Co. for antitrust immunity to allow them to expand their cooperation, a rare blow that could further dent the patchwork of global alliances between carriers.

The U.S. Department of Transportation on Thursday said the airlines could secure the commercial benefits from increased cooperation without the antitrust immunity they need to coordinate fares and schedules and share revenues and profits.

Airlines in the three big global alliances that dominate most markets rely on antitrust immunity for much of their cooperation, but the benefits have frayed in recent years and led some carriers to pursue alternative pacts.

Critics also argue that the arrangements inflate fares, though airlines with immunity say they expand consumer choice by offering more routes.

The application from Hawaiian Airlines parent **Hawaiian Holdings** Inc. was closely watched as it is the first U.S. carrier not tied to the three alliance groupings—Star, SkyTeam and Oneworld—to seek antitrust immunity. Japan Airlines is part of Oneworld, alongside **American Airlines Group** Inc.

Hawaiian is already under pressure from the launch of flights to and within the islands by **Southwest Airlines** Co., while **All Nippon Airways** Co.—a member of Star alongside **United Airlines Holdings** Inc.—has boosted capacity to and from Hawaii using giant Airbus SE A380 jets.

Hawaii's decision to restrict some Airbnb operations in the state has also hit travel bookings.

Hawaiian Holdings shares fell after the announcement and closed down 2.3% at $25.53.

The Transportation Department did provide tentative approval for Hawaiian and Japan Airlines to expand their existing cooperation, including selling seats on each others' flights and other marketing ties. The two carriers had previously said they needed immunity to proceed with a new deal.

"The evidence in the case indicates that the proposed benefits from this commercial cooperation can be achieved without [antitrust immunity]," the department said.

The airlines have 14 days to respond to the department's tentative findings.

Hawaiian said it was disappointed and planned to press its case. "The tentative decision recognizes the consumer benefits of our joint venture, but it overlooks the importance of antitrust immunity that major global airline alliances already enjoy, harming a small U.S. carrier like Hawaiian by preventing it from being able to compete on equal footing," the airline said.

Japan Airlines didn't respond to requests for comment.

It is the first time an application has been turned down since one from American and Qantas Airways Ltd. was declined three years ago, though the carriers secured approval this year with an updated request.

American's failure to secure antitrust approval from Chilean regulators for an expanded joint venture with Latam Airlines Group SA led the latter to dump its U.S. partner in favor of a deal with Delta Air Lines Inc.

Delta Chief Executive Ed Bastian last week said alliances hadn't fulfilled all of their promises, with more carriers seeking bilateral deals with other airlines outside the framework of the big groupings.

ADVERTISEMENT

## The Marketplace

To advertise: 800-366-3975 or WSJ.com/classifieds

### BANKRUPTCIES

**Information to identify the case:**
**Debtor: Purdue Pharma L.P. EIN: 06-1307484**
**United States Bankruptcy Court Southern District of New York**
**Case Number: 19-23649 (RDD)**
**Date case filed for chapter 11: September 15, 2019**
Official Form 309F (For Corporations or Partnerships)
**Notice of Chapter 11 Bankruptcy Case 12/17**

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**
**Do not file this notice with any proof of claim or other filing in the case.**

**1. Debtors' full name: See Chart Below**

**2. All other names used in the last 8 years: See Chart Below (if applicable)**

**3. Address: See Chart Below**

**Jointly Administered Cases**

**Debtor, (*Other Names Used in Last 8 Years*), Case No., EIN:**

The address for the following Debtors is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901: Purdue Pharma L.P., 19-23649, 06-1307484; Purdue Pharma Inc., 19-23648, 06-1307486; Purdue Transdermal Technologies L.P., 19-23650, 20-3931868; Purdue Pharma Manufacturing L.P., 19-23651, 80-0913821; Purdue Pharmaceuticals L.P., 19-23652, 13-4030034; Imbrium Therapeutics L.P., 19-23653, 83-1928810; Adlon Therapeutics L.P., 19-23654, 83-2446745; Greenfield BioVentures L.P., 19-23655, 83-1936150; Seven Seas Hill Corp., 19-23656, N/A; Ophir Green Corp., 19-23657, N/A; Purdue Pharma of Puerto Rico, 19-23658, 52-2333925; Avrio Health L.P., *(Purdue Products L.P.)*, 19-23659, 55-0804140; Purdue Pharmaceutical Products L.P., 19-23660, 05-0553902; Purdue Neuroscience Company, 19-23661, 06-1574712; Nayatt Cove Lifescience Inc., 19-23662, 82-3487805.

The address for the following Debtors is 498 Washington Street, Coventry RI 02816: Button Land L.P., 19-23663, 26-3547502; Paul Land Inc., 19-23664, 26-3547425; Quidnick Land L.P., 19-23665, 26-3547584; Rhodes Associates L.P., 19-23666, N/A; Rhodes Pharmaceuticals L.P., 19-23667, 26-1916166; Rhodes Technologies, 19-23668, 22-3527143; UDF LP, 19-23669, 42-1570495; SVC Pharma LP, 19-23670, 41-2125717; SVC Pharma Inc., 19-23671, 59-3784014.

**4. Debtors' attorney and claims agent: DAVIS POLK & WARDWELL LLP, 450 Lexington Avenue, New York, New York 10017, Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut.**

**Debtors' Claims and Noticing Agent: If you have questions about this notice, please contact Prime Clerk LLC: Contact phone: 844-217-0912 (toll-free), 347-859-8093 (international), Email: purduepharmainfo@primeclerk.com, Website: https://restructuring.primeclerk.com/purduepharma.**

**5. Bankruptcy clerk's office:** United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601, Hours open: Monday – Friday 8:30 AM – 5:00 PM, Contact phone: 914-467-7250. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at www.pacer.gov.

**6. Meeting of creditors:** November 5, 2019 at 2:30 p.m. Location: U.S. Bankruptcy Court, Southern District of New York, One Bowling Green (Room 511), New York, NY 10004-1408. The debtor's representative must attend the meeting to be questioned under oath. Creditors may attend but are not required to do so. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket.

**7. Proof of claim deadline: Deadline for filing proof of claim: Not yet set. If a deadline is set, the court will send you another notice.** A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as *disputed*, *contingent*, or *unliquidated*; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as *disputed*, *contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

**8. Exception to discharge deadline:** If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below. The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. **Deadline for filing the complaint: To be determined**

**9. Creditors with a foreign address:** If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.

**10. Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.

**11. Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.

BUSINESS OPPORTUNITIES

BUSINESS FOR SALE
Owner of Fastener Company is approaching retirement. Old line Custom Fastener Manufacturer with a client base of 100+ customers does approximately $ 3,000,000 in Sales. Good opportunity for hand's on owner operator to continue growth of this unique company. *Principals only.*
Send response to:
PO Box 2455
Crystal Lake, IL 60039-2455

SPORTS
One of the fastest growing U.S. companies seeks local entrepreneurs. 47 of 100 territories sold. We have been recognized as a
2019 TOP 50 COMPANY
Significant revenue opportunity. For info call 832-840-6995
50K Min. Investment.

REDUCE INCOME TAXES
Tax Deductions Available Through
Conservation Easements
256-680-3360
1-855-TAX-CUT-0
www.conservationeasements.net
Conservation Easement Advisors, LLC

COMMERCIAL REAL ESTATE

ABSOLUTE AUCTION
56± Ac. of Highly Visible Industrial Land on Rt. 20

90
Rt. 20

190 Washington St.
Auburn, MA
*Selling to the Highest Bidder, Regardless of Price*
Thur., October 10 at 11am
JJ Manning Auctioneers
Info, Full Terms, Broker Reg & More at:
JJManning.com
800.521.0111

TRAVEL

Luxury Barge Cruises
Barge Meanderer is an Exquisite, Top-Rated, Owner-Operated, Luxury Canal Barge.
We offer a Six-Day, **FULLY-Inclusive** cruise on French Canals, with 6 passengers and 6 crew. Transfers to and from the barge, all meals, wines, open bar, shore visits to visit wineries, markets, chateuxs and antiquing. Included are optional guided biking tours and golf.
Highly customized!!
*Please visit our website:*
bargemeanderer.com
*or contact us today to book your adventure!*
info@bargemeanderer.com
602.790.0049

THE WALL STREET JOURNAL.
THE MARKETPLACE
ADVERTISE TODAY
(800) 366-3975
For more information visit:
wsj.com/classifieds
© 2019 Dow Jones & Company, Inc.
All Rights Reserved.

# Longtime Imperial Brands CEO To Leave U.K. Tobacco Company

By Saabira Chaudhuri

LONDON—The chief executive of **Imperial Brands** PLC, Big Tobacco's longest-serving CEO, has unexpectedly resigned, the latest fallout from regulatory headwinds buffeting the industry.

Imperial said Thursday that Alison Cooper, who took the helm in 2010, will leave once a new chief executive is found.

The company, whose brands include Winston, is already searching for a new chairman and last week warned its sales and profit would be lower than expected this year.

Imperial has been under pressure following the Trump administration's plans to ban most vaping products in the U.S. Its shares have fallen about 15% over the past month.

Ms. Cooper and the Imperial board agreed Wednesday that she should resign, a spokesman said, citing the increasingly complex environment. "The board is in agreement that it's time for some fresh thinking," he said.

Ms. Cooper joined Imperial 20 years ago, steadily working her way up the ranks. The 53-year-old chief executive has led Imperial through a time of huge change for its industry, which has pivoted toward so-called next-generation products like e-cigarettes and devices that heat but don't burn tobacco. The shift has come in the face of slumping demand for traditional cigarettes and new regulatory constraints.

Ms. Cooper attempted to stay abreast of the changing environment. But she ignored the heat-not-burn sector. Imperial is far more focused on e-cigarettes than its major rivals, leaving it more exposed to the U.S. crackdown on vaping. Regulators are taking a closer look at such products following a surge in teenage vaping and a slew of pulmonary illnesses.

X-CHAIR
Stylish • Ergonomic • Comfortable
Dynamic Variable Lumbar Support (DVL) feels incredible!
As low as $29 per month!*
Free Shipping & 30 Day Risk Free Trial
Save $100 Now! And, Use code Ergonomic For a Free Footrest
BuyXchair.com
This is Not Your Grandfather's Office Chair!
* $29 / month is based on purchase price of 499.99 for 18 months 0% interest
BuyXchair.com | 844-4-XCHAIR | Corporate Discounts Available

# Costco Posts Strong Sales For Quarter

By Sarah Nassauer And Micah Maidenberg

**Costco Wholesale** Corp. said sales rose in the latest quarter, as the warehouse retailer works to offset the rising costs of tariffs.

Comparable sales, or those from stores open for more than a year as well as online sales, rose 5% in the quarter that ended Sept. 1. Online sales increased 22%.

The company has been aided by strong consumer spending, which helped boost the U.S. economy for much of the year. But consumer spending slowed slightly in August.

"We are still seeing good growth," said Richard Galanti, chief financial officer.

Costco is working to speed shipments of products before tariffs take effect or before duties are set to rise, he said.

Profit during the quarter rose to almost $1.10 billion, or $2.47 a share, from $1.04 billion, or $2.36 a share a year earlier. That includes a $123 million charge related to taxes.

Without the charge, profit would have been $1.19 billion, or $2.69 a share, he said.

Costco said it generated about $47.5 billion in net sales and membership fees in its fiscal fourth quarter, up from $44.41 billion a year earlier.

**Exhibit C**



## VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

---

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Monday, October 7, 2019**, the following legal advertisement – **Purdue Pharma L.P.**– was published in the national edition of **USA TODAY.**

Principal Clerk of USA TODAY
October 7, 2019

This 7th day of October month
2019 year.

Notary Public
Commission expires on 31 October 2019

ROBIN SUE PURCELL
NOTARY PUBLIC
MY COMMISSION NUMBER 7630258
COMMONWEALTH OF VIRGINIA

TRAVEL

# Kangaroo Island is hopping

Katie Jackson
Special to USA TODAY

Had the HMS Beagle landed in Kangaroo Island first, Charles Darwin might never have made it to the Galapagos.

That's because Australia's island that time forgot might be just as fascinating – whether you're studying evolution or simply appreciating it. Australia's third largest island, Kangaroo Island is governed by wildlife. Not surprisingly, it's home to more kangaroos (60,000) than full-time residents (fewer than 5,000). What is surprising, however, is how much it has to offer travelers. For a place not that far off the beaten path, it's relatively undiscovered.

About 10,000 years ago Kangaroo Island broke free from the continent. Today, it's an easy ferry ride from Cape Jervis in South Australia. There are multiple ferries a day, and the scenic crossing takes only 45 minutes. By air, Kangaroo Island is a 35-minute Qantas flight from Adelaide.

Unlike many of the Galapagos islands, you don't need to arrive with a licensed national park guide in tow. Explore much of the 1,700-square-mile island – smaller than Delaware – and its 300 miles of coastline at your leisure. Just remember any animals you encounter have the right of way.

Kangaroo Island is home to everything from a smaller, darker kangaroo species that evolved to survive "island life" to fairy penguins (the world's smallest penguins) and prehistoric echidnas (the only other egg-laying mammal besides the platypus). Like the Galapagos, it also is famous among wildlife biologists for its seals and sea lions. A self-guided tour at Seal Bay is one of the best ways to observe the Australian sea lion up close. More than 800 make up the island's largest colony.

While most of Kangaroo Islands wildlife is endemic – including a tiny insect-eating marsupial unique to the island – there still are invasive species. The most notable, and newsworthy might be the koala. In 1920, 18 koalas were introduced to the island in an effort to boost Australia's koala population. Today, there are more than 25,000 living on Kangaroo Island. Recently, they made headlines when a video of two koalas fighting and "yelling" at each other went viral.

Sure, you can't encounter Darwin's famous finches here. But you can have your photo taken with a koala, (something Prince Harry and Duchess Meghan did on their 2018 royal visit Down Under). You also can cradle a wombat, play with dingoes or even bottle-feed an orphan joey. It's all possible at Kangaroo Island Wildlife Park, where you can find more than 150 native Australian species.

Besides the wildlife park, there are other attractions where unforgettable memories can be made. For starters, Kangaroo Island goes out of its way to cater to adrenaline seekers. Exploring the island's bush by quad won't disturb the peace, in fact, it's welcome. You also can leave a trail of fat bike tracks, play paintball (with biodegradable paint balls) and even sand board or race toboggans in the island's natural dune park known as the "Little Sahara."

Water-based offerings are just as thrilling. There's surfing at Vivonne Bay, and several outfitters offer swimming with wild dolphins and sea lions. It's not unheard of to reel in a whisker shark on a chartered deep-sea fishing excursion. But perhaps the most unique encounters to be had are underwater – snorkeling and diving where scientists recently discovered fossils of a frightening new sea creature. They deemed it the Redlichia rex, which loosely translates into T-Rex of the sea.

So how long does it take to truly get a taste of Kangaroo Island?

For most travelers, a few days is enough. But for a serious foodie, it could take weeks. There aren't hundreds of restaurants to choose from, but this is an island where farm- and sea-to-table is the norm, not a marketing ploy. The first Sunday of the month is sacred. It's when purveyors gather at the Kangaroo Island Farmers Market in Penneshawto sell and trade their organic honey, herb-infused olive oil, free-range eggs, seasonal produce and local wine.

Kangaroo Island is a burgeoning wine destination with several family-owned vineyards, including The Islander Estate Vineyards, started in 2000 by a winemaker from Bordeaux, France. But grape growers aren't the only agricultural entrepreneurs recognizing the island's potential in producing libations worthy of export. There's Kangaroo Island Spirits – South Australia's first boutique distillery – and Kangaroo Island Brewery, where craft beers are poured, locals sing along to live music and the rotating blackboard menu depends on the chef of the day.

With a Mediterranean climate, there's no bad time to visit Kangaroo Island. December, through February are the drier summer months when the average high is around 77. June through August are the wetter and mild winter months when the average low is 41. Of course, accommodation prices are lower during these months than the peak summer months when Australians go on holiday.

While there's no public transportation on the island, there's no shortage of accommodations. Instead of high-rise hotels or hundreds of apartments on Airbnb, expect charming bed and breakfasts, private villas, all-inclusive luxury properties and even lighthouse keepers' cottages to rent. Most rooms are found around the island's largest town, Kingscote.

Of course, there are also plenty of places to camp, too. The only danger of sleeping under the stars on Kangaroo Island is waking up to its diverse wildlife. Should that happen, just channel your inner Darwin.

Kangaroo Island, Australia, is home to more kangaroos (60,000) than full-time residents (fewer than 5,000). SOUTH AUSTRALIA TOURISM COMMISSION

## LEGAL MONDAY

For advertising information: 1.800.872.3433 www.marketplace.usatoday.com

**Information to identify the case:**
**Debtor: Purdue Pharma L.P. EIN: 06-1307484**
**United States Bankruptcy Court Southern District of New York**
**Case Number: 19-23649 (RDD)**
**Date case filed for chapter 11: September 15, 2019**
Official Form 309F (For Corporations or Partnerships)
**Notice of Chapter 11 Bankruptcy Case 12/17**

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read all pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**Do not file this notice with any proof of claim or other filing in the case.**

**1. Debtors' full name: See Chart Below**

**2. All other names used in the last 8 years: See Chart Below (if applicable)**

**3. Address: See Chart Below**

**Jointly Administered Cases**

**Debtor, (*Other Names Used in Last 8 Years*), Case No., EIN:**

The address for the following Debtors is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901: Purdue Pharma L.P., 19-23649, 06-1307484; Purdue Pharma Inc., 19-23648, 06-1307486; Purdue Transdermal Technologies L.P., 19-23650, 20-3931868; Purdue Pharma Manufacturing L.P., 19-23651, 80-0913821; Purdue Pharmaceuticals L.P., 19-23652, 13-4030034; Imbrium Therapeutics L.P., 19-23653, 83-1928810; Adlon Therapeutics L.P., 19-23654, 83-2446745; Greenfield BioVentures L.P., 19-23655, 83-1936150; Seven Seas Hill Corp., 19-23656, N/A; Ophir Green Corp., 19-23657, N/A; Purdue Pharma of Puerto Rico, 19-23658, 52-2333925; Avrio Health L.P., *(Purdue Products L.P.)*, 19-23659, 55-0804140; Purdue Pharmaceutical Products L.P., 19-23660, 05-0553902; Purdue Neuroscience Company, 19-23661, 06-1574712; Nayatt Cove Lifescience Inc., 19-23662, 82-3487805.

The address for the following Debtors is 498 Washington Street, Coventry RI 02816: Button Land L.P., 19-23663, 26-3547502; Paul Land Inc., 19-23664, 26-3547425; Quidnick Land L.P., 19-23665, 26-3547584; Rhodes Associates L.P., 19-23666, N/A; Rhodes Pharmaceuticals L.P., 19-23667, 26-1916166; Rhodes Technologies, 19-23668, 22-3527143; UDF LP, 19-23669, 42-1570495; SVC Pharma LP, 19-23670, 41-2125717; SVC Pharma Inc., 19-23671, 59-3784014.

**4. Debtors' attorney and claims agent: DAVIS POLK & WARDWELL LLP, 450 Lexington Avenue, New York, New York 10017, Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut.**

**Debtors' Claims and Noticing Agent: If you have questions about this notice, please contact Prime Clerk LLC: Contact phone: 844-217-0912 (toll-free), 347-859-8093 (international), Email: purduepharmainfo@primeclerk.com, Website: https://restructuring.primeclerk.com/purduepharma.**

**5. Bankruptcy clerk's office:** United States Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601, Hours open: Monday – Friday 8:30 AM – 5:00 PM, Contact phone: 914-467-7250. Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at www.pacer.gov.

**6. Meeting of creditors:** November 5, 2019 at 2:30 p.m. Location: U.S. Bankruptcy Court, Southern District of New York, One Bowling Green (Room 511), New York, NY 10004-1408. The debtor's representative must attend the meeting to be questioned under oath. Creditors may attend but are not required to do so. The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket.

**7. Proof of claim deadline: Deadline for filing proof of claim: Not yet set. If a deadline is set, the court will send you another notice.** A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. Your claim will be allowed in the amount scheduled unless: • your claim is designated as *disputed*, *contingent*, or *unliquidated*; • you file a proof of claim in a different amount; or • you receive another notice. If your claim is not scheduled or if your claim is designated as *disputed*, *contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov. Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

**8. Exception to discharge deadline:** If § 523(c) applies to your claim and you seek to have it excepted from discharge, you must start a judicial proceeding by filing a complaint by the deadline stated below. The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline.
**Deadline for filing the complaint: To be determined**

**9. Creditors with a foreign address:** If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case.

**10. Filing a Chapter 11 bankruptcy case:** Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business.

**11. Discharge of debts:** Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge and § 523(c) applies to your claim, you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| In re: RAIT FUNDING, LLC, RAIT FINANCIAL TRUST, TABERNA REALTY FINANCE TRUST, RAIT GENERAL INC., RAIT LIMITED INC., RAIT JV TRS, LLC, and RAIT JV TRS SUB, LLC. Debtors. | Chapter 11<br>Case No. 19-11915 (BLS)<br>(Jointly Administered) |
|---|---|

**NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION**
PLEASE TAKE NOTICE THAT:

- Pursuant to the *Order (I) Establishing the Bidding Procedures, Including Approval of a Break-up Fee and Expense Reimbursement, and (II) Granting Related Relief* (the "Bidding Procedures Order") entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on October 2, 2019, certain of the above captioned debtors (the "Debtors"), have entered into an Equity and Asset Purchase Agreement, dated as of August 30, 2019 (the "Stalking Horse Agreement"), with CF RFP Holdings LLC (the "Stalking Horse Bidder") for the sale of substantially all of the Debtors' assets subject to a competitive bidding process as set forth in the Bidding Procedures Order. Capitalized terms used but not otherwise defined in this notice have the meanings ascribed to them in the Bidding Procedures Order or the Stalking Horse Agreement, as applicable.
- Copies of (i) the Stalking Horse Agreement, (ii) the Bidding Procedures, and (iii) the Bidding Procedures Order can be obtained by contacting the Debtors' investment banker at UBS Securities, LLC ("UBS"), Attn: Andrew Kramer, Telephone: (212) 821-6009, Email: andrew.kramer@ubs.com or by download from the Debtors' claims and noticing agent, Epiq, at: https://dm.epiq11.com/case/RTF/info.
- Once filed with the Bankruptcy Court, which will be at least twenty-one (21) days prior to the Sale Hearing, copies of the Sale Order may be obtained by contacting UBS or Epiq as set forth in paragraph 2 above.
- All interested parties are invited to make an offer to purchase the Purchased Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the "Bidding Procedures") by **12:00 p.m.** (prevailing Eastern Time) on **November 27, 2019**. Pursuant to the Bidding Procedures, the Debtor may conduct an auction for the Purchased Assets (the "Auction") beginning at **10:00 a.m.** (prevailing Eastern Time) on **December 3, 2019** at the offices of Debtors' counsel, Drinker Biddle & Reath LLP, 1177 Avenue of the Americas, 41st Floor, New York, New York 10036 or such other location as may be announced prior to the Auction to the Auction Participants. Contact the Debtor's investment banker, UBS, Attn: Andrew Kramer, Telephone: (212) 821-6009, Email: andrew.kramer@ubs.com, for further information regarding the Debtors' assets and/or making a bid.
- Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.
- A hearing to approve the Sale of the Purchased Assets to the highest and best bidder will be held on **December 5, 2019 at 10:00 a.m. (prevailing Eastern Time)** at the Bankruptcy Court. The hearing on the Sale may be adjourned without notice other than an adjournment in open court.
- Objections, if any, to the proposed Sale must be filed and served in accordance with the Bidding Procedures Order, and **actually received** no later than **5:00 p.m.** (prevailing Eastern Time) on **November 18, 2019.**

This notice is qualified in its entirety by the Bidding Procedures Order.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| In re: Perkins & Marie Callender's, LLC, *et al.*,[1] Debtors. | Chapter 11<br>Case No. 19-11743 (KG)<br>(Jointly Administered) |
|---|---|

**NOTICE OF DEADLINE FOR THE FILING OF PROOFS OF CLAIM, INCLUDING FOR CLAIMS ASSERTED UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**
**(GENERAL BAR DATE IS NOVEMBER 4, 2019, AT 5:00 P.M. (ET))**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On August 5, 2019 (the "**Petition Date**"), the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**"). On October 2, 2019, the Court entered an order [Docket No. 333] (the "**Bar Date Order**") establishing certain deadlines for the filing of proofs of claim in the chapter 11 cases of the following Debtors (the "**Chapter 11 Cases**"): **Debtor, Case No., EID# (Last 4 Digits):** Perkins & Marie Callender's, LLC, 19-11743, 2435; Perkins & Marie Callender's Holding, LLC, 19-11745, 3381; Marie Callender Pie Shops, LLC, 19-11748, 1620; MC Wholesalers, LLC, 19-11750, 2420; PMCI Promotions LLC, 19-11752, 7308; MCID, Inc., 19-11744, 2015; Wilshire Beverage, Inc., 19-11746, 5887; FIV, LLC, 19-11747, 9288; P&MC's Real Estate Holding LLC, 19-11749, 8553; P&MC's Holding Corp., 19-11751, 2225.

Pursuant to the Bar Date Order, each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, and trust) that holds or seeks to assert a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors that arose, or is deemed to have arisen, prior to the Petition Date (including, without limitation, claims entitled to administrative priority status under section 503(b)(9) of the Bankruptcy Code[2]), no matter how remote or contingent such right to payment or equitable remedy may be, **MUST FILE A PROOF OF CLAIM** on or before **5:00 p.m. (ET),** on **November 4, 2019** (the "**General Bar Date**"), by sending an original proof of claim form to Kurtzman Carson Consultants LLC ("**KCC**") at Perkins & Marie Callender's, LLC Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, California 90245 or by completing the online proof of claim form available at http://www.kccllc.net/PMC, so that it is **actually received** on or before the General Bar Date; **provided that**, solely with respect to governmental units (as defined in section 101(27) of the Bankruptcy Code), the deadline for such governmental units to file a proof of claim against the Debtors is February 3, 2020 at 5:00 p.m. (ET) (the "**Governmental Bar Date**"). Proofs of claim must be sent by overnight mail, courier service, hand delivery, regular mail, or in person, or completed electronically through KCC's website. Proofs of claim sent by facsimile, telecopy, or electronic mail will **not** be accepted and will **not** be considered properly or timely filed for any purpose in these Chapter 11 Cases.

ANY PERSON OR ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM IN THESE CHAPTER 11 CASES WITH RESPECT TO A PARTICULAR CLAIM AGAINST THE DEBTORS, BUT THAT FAILS TO DO SO PROPERLY BY THE APPLICABLE BAR DATE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR PURPOSES OF VOTING AND DISTRIBUTION.

A copy of the Bar Date Order and proof of claim form may be obtained by contacting the KCC, in writing, at Perkins & Marie Callender's, LLC Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA, 90245, or online at http://www.kccllc.net/PMC. The Bar Date Order can also be viewed on the Court's website at www.deb.uscourts.gov. If you have questions concerning the filing or processing of claims, you may contact KCC, at (888) 251-3076, or, if calling from outside the United States or Canada, at (310) 751-2617.

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Perkins & Marie Callender's, LLC (2435); Perkins & Marie Callender's Holding, LLC (3381); Marie Callender Pie Shops, LLC (1620); MC Wholesalers, LLC (2420); PMCI Promotions LLC (7308); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); FIV, LLC (9288); P&MC's Real Estate Holding LLC (8553); and P&MC's Holding Corp. (2225). The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, Tennessee 38119-4709.

[2] A claim arising under Bankruptcy Code section 503(b)(9) is a claim arising from the value of any goods received by the Debtors within twenty (20) days before the Petition Date, provided that the goods were sold to the Debtors in the ordinary course of the Debtors' business.

Notice of Disposition of Collateral
Public Auction – UCC Foreclosure Sale
New York, NY

Take notice that Arena Limited SPV, LLC, as administrative agent (in such capacity, the "Agent") for Park Avenue Capital Acquisition, LLC (the "Lender"), will offer for sale at public auction (1) the rights, title, and interests of AOI Funding LLC ("Funding") as lender under 12 separate loan agreements and related documents pursuant to which Funding extended secured loans to the borrowers named therein, which loans have an aggregate outstanding principal balance of $32,856,000.00 (as of September 5, 2019); and (2) all of the personal property of Funding. The public auction will be held on October 28, 2019, at the offices of Troutman Sanders LLP, located at 875 Third Avenue, New York, New York 10022, beginning at 11:00 a.m., prevailing Eastern time; provided, however, that Agent may cancel or adjourn the auction at any time without further notice or publication other than by announcement at or prior to the auction.

This sale is being held to enforce the rights of the Lender in the collateral described in the preceding paragraph (the "Collateral") in order to satisfy the indebtedness of Funding and AOI Advisors LLC to the Lender. The Collateral secures the repayment of indebtedness of Funding and AOI Advisors LLC to the Lender in an amount in excess of $7,872,912.72 (as of September 17, 2019). Agent reserves the right to credit bid for the Collateral on behalf of the Lender. The Collateral is also subject to a senior lien in favor of East West Bank securing indebtedness of the Debtors to East West Bank in an amount in excess of $23,000,000.00 (as of September 5, 2019).

Any inquiry regarding the terms of sale, Debtors, and/or the Collateral may be directed to counsel for the Agent: Andrew Buck, Esq., Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022, Tel: 212-704-6248; Email: andrew.buck@troutman.com.

Visit USA TODAY's web site at www.usatoday.com

For more information on how to place your ad in Legal Monday, call
1-800-872-3433
Toll-free in the U.S. only