AKIN GUMP STRAUSS HAUER & FELD LLP
Ira Dizengoff
Arik Preis
Mitchell Hurley
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com

*Proposed Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**PURDUE PHARMA L.P.**, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |
| **PURDUE PHARMA L.P.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**COMMONWEALTH OF MASSACHUSETTS**, *et al.*,<br><br>Defendants. | Adv. Pro. No. 19-08289 (RDD) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' STATEMENT IN SUPPORT OF DEBTORS' MOTION FOR A PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. § 105(A) AND STATEMENT IN SUPPORT OF COMPLAINT FOR INJUNCTIVE RELIEF**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

The Official Committee of Unsecured Creditors (the "Committee") by and through its undersigned proposed counsel, hereby submits this statement in support of the Debtors' Motion for a Preliminary Injunction Pursuant to 11 U.S.C. § 105(a), Sept. 18, 2019 [ECF No. 2] (the "Motion") and Debtors' Memorandum of Law in Support of Motion for a Preliminary Injunction, Sept. 18, 2019 [ECF No. 3] (the "Debtors' Brief") and statement in support of the Debtors' Complaint for Injunctive Relief, Sept. 18, 2019 [ECF No. 1] (the "Complaint") pursuant to which Debtors seek to enjoin certain actions pending against the Debtors and Related Parties outside of these Bankruptcy Cases (the "Active Matters").[2]

## DISCUSSION

1.    The Committee supports entry of a limited, six month injunction of the Active Matters, as further described below, and in the Case Stipulation Among the Debtors, the Committee and Certain Related Parties also filed today (the "Stipulation").[3]

2.    Critically, the injunction supported by the Committee is *temporary*. The Committee fully expects that the Debtors and the Related Parties will use the provisional "breathing spell" they seek to work diligently and cooperatively with the Committee and other parties in interest towards a just chapter 11 plan in these cases. Among other things, any hint that the Related Parties are using the injunction to evade disclosures they would likely be required to

---

[2] The Debtors seek to enjoin (i) more than 2,200 lawsuits brought by governmental entities that are identified in the Complaint, as well as (ii) lawsuits against "Related Parties," defined by the Debtors to include certain former or current (a) owners (including any trusts and their respective trustees and beneficiaries), (b) directors, (c) officers, (d) employees, and (e) associated entities of the Debtors that were or could have been commenced before the commencement of the case. The Related Parties include members of the Sackler family ("Sacklers") who directly or indirectly own all of the equity of, and who at least until recently controlled, the Debtors. While the Committee is not in a position at this early stage of these cases to agree (or disagree) with all of the factual contentions and characterizations contained in the Debtors' brief, the Committee concurs that an injunction is warranted.

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Debtors' Brief and the Stipulation.

1

make outside of these cases (or are now required to make pursuant to the Stipulation) will be considered by the Committee as evidence of bad faith.

3.      Moreover, and of equal importance, the Committee's support for the temporary injunction should not be confused with support for the settlement term sheet ("Summary Term Sheet") filed by the Debtors on October 8, 2019.  For one thing, the Committee has had access to the Summary Term Sheet for less than 72 hours—a period which included Yom Kippur—and the Summary Term Sheet, as its title suggests, does not include a comprehensive description of the contemplated compromise.  More fundamentally, it is far too early in these cases for the Committee (and presumably other parties in interest) to make an informed judgment about the right plan for these cases, particular in light of the very limited information to which they currently have access.

4.      In fact, the Committee supports the injunction in significant part so that the Debtors and Related Parties will not be distracted from what should be their primary focus: producing detailed and voluminous information to the Committee and others in *these cases* so all parties in interest can participate meaningfully in reorganization efforts.  With that objective in mind, the Stipulation calls for the Debtors and Certain Related Parties (as referenced in the Stipulation) to begin their productions without delay.  *See id.* ¶¶ 7, 17.  The Debtors have agreed to provide information the Committee reasonably requests relating to these cases, including, without limitation, certain categories of documents identified in the Stipulation.  *See id.* ¶ 7.  We expect the Debtors will make these and other requested materials available to the Committee promptly and on a rolling basis.

5.      For their part, Certain Related Parties have agreed to provide certain categories of information identified in the Stipulation (the "Related Party Initial Disclosures") on the time

2

table set forth in the Stipulation, and will seek in good faith to complete the Related Party Initial Disclosures within 90 days of the date the injunction is entered. The Committee has the right to seek information from Related Parties in addition to the Related Party Initial Disclosures, but has agreed that it will not serve formal discovery, whether by Rule 2004 of the Federal Rules of Bankruptcy Period or otherwise, for the first 90 days of the stay.

6. The Related Parties have indicated that they need a period of peace to engage fully in these cases, and have represented that they plan to do so in good faith, including with respect to information disclosure. The Stipulation gives the Related Parties a 90 day opportunity to back up their words with actions, and reserves to the Committee the coercive discovery methods available under the bankruptcy code and rules as may be necessary or appropriate. Of course, these provisions would be of little value if the Related Parties could use the stay as an opportunity to move assets outside (or further outside) of the reach of the estates, its creditors, and this Court. Accordingly, the Committee and the Debtors negotiated a detailed section of the stipulation designed to ensure that the Related Parties do not engage in secretion of assets while the stay endures, as well as for a period of 30 days thereafter. *See id.* ¶¶ 13-16.

7. During the October 10, 2019 hearing, the Court suggested that the parties focus in the near term not only on maximizing estate assets, but also on a sensible plan for allocating those assets in a manner that addresses the national opioid crisis more generally, in addition to the specific claims of creditors in these cases. Under the Stipulation the Debtors and the Committee agree to seek consensus among the parties in interest to these cases to create an Emergency Fund of $200 million to provide relief to victims of the Opioid crisis during the first six months of these cases. The Debtors also have agreed to consider in good faith a number of potential uses for those funds proposed by the Committee and identified on Exhibit A to the

Stipulation. *Id. ¶* 11 & Ex. A. The Stipulation also requires the Debtors to promptly commence and thereafter work during the Stay Period with the Committee on issues with respect to claims allowance, categorization and classification, including with respect to methods of allowance, distribution and allocation. *Id*. ¶ 9.[4] The Debtors and the Committee have agreed to work with a broad array of governmental and non-governmental claimants to attempt to resolve disputes regarding intercreditor issues expeditiously and minimize, to the extent possible, litigation and claims disputes. *Id.*

8.  The allocation issue also highlights another key reason for the Committee's support of the temporary injunction: the need to treat all creditors equitably. Like the entities opposing the Motion for an injunction (the "Opposing Entities"), the Committee believes that the Debtors and the Related Parties are among the parties responsible for the devastation wrought by the opioid crisis, legally, financially and morally. Unlike the Opposing Entities, however, the Committee represents and seeks to safeguard the interests of *all* unsecured creditors. That group includes the Opposing Entities, but also includes trade creditors, hospitals, insurance premium payors, individual personal injury plaintiffs, Neonatal Abstinence Syndrome victims, tribes, third party payors and many other persons and entities.[5] Each of these creditors' claims on the Debtors' assets are of equal priority, and none should gain an advantage by pursuing extra-bankruptcy litigation while other creditors are forced to watch from the sidelines.

---

[4] Other significant aspects of the Stipulation include (i) the Debtors' agreement not to file a chapter 11 plan or seek approval of any settlement or restructuring term sheet, and (ii) the Committee's agreement not to move for derivative standing to assert estate causes of action and support for the Debtors' retention of exclusivity, in each case during the six month Initial Stay Period. *Id*. ¶¶ 3-6.

[5] The injunction sought by the Debtors would halt claims brought by many types of plaintiffs whose interests are represented by the Committee, not just those of the Opposing Entities. Indeed, the Debtors' Complaint seeks to enjoin claims brought by Committee members themselves. *E.g.* Complaint, Ex. B, at entries 448, 535, and Ex. C, at entries 2588, 2623.

9.      Certain Opposing Entities argue that continuing the Active Matters will actually benefit the estates because the Opposing Entities will be able to gather information through discovery in courts and cases outside of this bankruptcy, and may establish liability on the part of the Related Parties after trial.[6]  But this Court can require the same disclosures by the Debtors and the Related Parties, and can do so in a centralized manner, while providing all parties in interest simultaneous access to those materials.

10.     In addition, as the Opposing Entities no doubt realize, continuing the Active Matters might also result in *payments* to the Opposing Entities from the Related Parties based on settlements or judgments with or from the Related Parties.  Notably, none of the Opposing Entities have so far offered to channel any proceeds they may receive in connection with the Active Matters to the estates to be shared among all creditors.  As a result, the Committee believes that if the states were to go forward with the litigation against the Related Parties, they would take all the value received from any such litigation for themselves—or might at best agree to share their proceeds with other states.  But that would violate both the letter and spirit of the bankruptcy code by preferring one category of unsecured creditor over all others.  And significantly, there is no assurance that proceeds received by the states would be used to abate the opioid crisis, or aid its victims.  Such an outcome would be antithetical not only to fundamental bankruptcy principles, but also to the objectives for which the governmental units have advocated since their involvement in the opioid litigation began.

11.     Continuing the Related Party actions would also consume resources that should be distributed equitably among creditors.  The estates' claims against the Related Parties are

---

[6] *See, e.g.*, The States' Coordinated Opposition to Debtors' Motion for Preliminary Injunction of State Enforcement Actions against Purdue, Oct. 4, 2019 [ECF No. 42], at 12.

immense. For instance, the Sacklers' fraudulent conveyance liability alone could be in the billions of dollars—before interest—and breach of fiduciary duty, unjust enrichment and other claims could increase that liability by additional billions. To be just, any plan in these cases will require enormous payments from the Related Parties. Indeed, the associated liability could well exceed even the Sacklers' vast reported wealth. It is therefore imperative that assets currently in the possession of the Related Parties be available for return to the estates (and eventual distribution among all creditors pursuant to the bankruptcy code), not turned over piecemeal to whichever creditors happen to arrive first at the courthouse. *See, e.g.*, *The Lautenberg Found. v. Irving H. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 512 F. App'x 18 (2d Cir. 2013).

12. In *Lautenberg,* the Second Circuit affirmed an order enjoining litigation against Madoff employees and relatives, observing that "every asset (or the vast majority thereof)" subject to the enjoined actions also was "claimed by the [Securities Investor Protection Act ("SIPA")] Trustee as a fraudulent transfer from" the Madoff estate. *Id*. at *20. Hence, if allowed to continue, the actions would have an "immediate adverse economic consequence for the debtor's estate … inasmuch as, if successful, they would draw down assets almost all of which could otherwise be expected to return to the [] estate." *Id*. at *21. Moreover, without the injunction, "there would ensue a chaotic rush to the courthouse—or rather, multiple courthouses—of those seeking assets that the trustee claims are properly part of the [] estate." *Id*. at *20 (*citing Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003)); *see also In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1189 (7th Cir. 2015) (holding that Section 105(a) injunction is authorized where non-debtor defendants are likely source of funds for reorganization; to the extent suits proceed and are successful, "there will be that much less money for the [debtor's] creditors to recover in the bankruptcy proceeding"). The same

considerations militate in favor of a temporary stay of the Active Matters against the Related Parties in these cases.

## CONCLUSION

Accordingly, for the reasons set forth above in this statement, the Committee supports the Debtors' request for an injunction staying the Governmental Actions and Related Party Claims to the extent not covered by the automatic stay, as modified by the Stipulation.

| | |
|---|---|
| New York, New York<br>Dated: October 11, 2019 | AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>*/s/ Arik Preis*<br>Ira Dizengoff<br>Arik Preis<br>Mitchell Hurley<br>One Bryant Park<br>New York, New York 10036<br>Tel: (212) 872-1000<br>Fax: (212) 872-1002<br>Email: idizengoff@akingump.com<br>          apreis@akingump.com<br>          mhurley@akingump.com<br><br>*Proposed Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.* |