Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 19-23649-rdd

4   - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P., ET AL.

8

9            Debtors.

10  - - - - - - - - - - - - - - - x

11

12

13                 U.S. Bankruptcy Court

14                 300 Quarropas Street

15                 White Plains, New York 10601

16

17                 September 17, 2019

18                 10:03 AM

19

20

21

22  B E F O R E :

23  HON ROBERT D. DRAIN

24  U.S. BANKRUPTCY JUDGE

25  ECRO:  A. VARGAS

Page 2

 1    Notice of Hearing Notice of Commencement of Chapter 11 Cases

 2    and Hearing on First Day Motions

 3

 4    Notice of Agenda for First Day Hearing

 5

 6    Motion for Joint Administration (document #2)

 7

 8    Chapter 11 Voluntary Petition

 9

10    First Day Declaration

11

12    Debtors' Informational Brief

13

14    Case Management Motion

15

16    Cash Management Motion

17

18    Creditor List and Personal Information Motion

19

20    Noticing Agent 156(c) Application

21

22    Taxes and Fees Motion

23

24    Insurance Motion

25

1    Schedules Motion

2

3    Surety Bonds Motion

4

5    Unities Motion

6

7    Customer Programs Motion

8

9    Wages Motion

10

11    Critical Vendor Motion

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sherri L. Breach & Sheila Orms

```
 1   A P P E A R A N C E S :

 2   DAVIS POLK & WARDWELL, LLP

 3        Attorneys for Debtor

 4        450 Lexington Avenue

 5        New York, New York 10017

 6

 7   BY:  MARSHALL S. HUEBNER, ESQ.

 8        CHRISTOPHER ROBERTSON, ESQ.

 9        DYLAN A. CONSLA, ESQ.

10        ELI J. VONNEGUT, ESQ.

11        TIMOTHY GRAULICH, ESQ.

12        BENJAMIN S. KAMINETZKY, ESQ.

13

14   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

15        Attorneys for Ad Hoc Committee

16        1177 Avenue of the Americas

17        New York, New York 10036

18

19   BY:  KENNETH H. ECKSTEIN, ESQ.

20

21

22

23

24

25
```

```
 1   BROWN RUDNICK

 2        Attorneys for Plaintiff's Executive Committee

 3        7 Times Square

 4        New York, New York 10036

 5

 6   BY:  DAVID MOLTON, ESQ.

 7

 8   MILBANK, LLP.

 9        Attorneys for Raymond Sackler Family

10        55 Hudson Yards

11        New York, New York 10001

12

13   BY:  ERIC K. STODOLA, ESQ.

14        GERARD UZZI, ESQ.

15

16   CAPLIN & DRYSDALE

17        Attorneys for Multi-State Governmental Entities Group

18        One Thomas Circle, NW

19        Suite 1100

20        Washington, DC 20005

21

22   BY:  KEVIN C. MACLAY, ESQ.

23        TODD PHILLIPS, ESQ.

24        JAMES P. WEHNER, ESQ.

25
```

Page 6

1    OTTERBOURG

2        Attorneys for Ad Hoc Committee

3        230 Park Avenue

4        New York, New York 10169

5

6    BY:  MELANIE L. CYGANOWSKI, ESQ.

7

8    PILLSBURY WINTHROP SHAW PITTMAN, LLP

9        Attorneys for Attorney General for the State of NY & ad

10       hoc committee in formation of other states

11       31 West 52nd Street

12       New York, New York 10019

13

14   BY:  ANDREW M. TROOP, ESQ.

15

16   GODFREY KAHN

17       Attorneys for Tennessee & Arkansas Plaintiffs

18       One East Main Street

19       Suite 500

20       Madison, Wisconsin 53701

21

22   BY:  KATHERINE STADLER, ESQ.

23

24

25

Page 7

1    STATE OF NEW YORK - OFFICE OF THE ATTORNEY GENERAL

2         Attorneys for Opioids & Impact Litigation

3         28 Liberty Street

4         New York, New York 10005

5

6    BY:  DAVID E. NACHMAN, ESQ.

7

8    AGENTIS

9         Attorneys for Unspecified

10        55 Alhambra Plaza

11        Suite 800

12        Coral Gables, Florida 33134

13

14   BY:  ROBERT P. CHARBONNEAU, ESQ.

15

16   MCELROY DEUTSCH MULVANEY & CARPENTER

17        Attorneys for Westchester Fire Insurance Company

18        225 Liberty Street

19        36th Floor

20        New York, New York 10281

21

22   BY:  NICOLE LEONARD, ESQ.

23

24

25

Page 8

```
 1   BUCHALTER LAW FIRM
 2        Attorneys for McKesson
 3        18400 Von Karman Avenue
 4        Suite 800
 5        Irvine, California 92612
 6
 7   BY:  JEFFREY GARFINKLE, ESQ. (telephonic)
 8
 9   OFFICE OF THE UNITED STATES TRUSTEE
10        Attorneys for U.S. Trustee
11        201 Varick Street, Suite 1006
12        New York, New York 10014
13
14   BY:  PAUL K. SCHWARTZBERG, ESQ.
15        BRIAN MASUMOTO, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Page 9

1                        P R O C E E D I N G S

2                THE COURT:  Please be seated.

3                Okay.  Good morning.  In re: Purdue Pharma L.P.,

4      et al.

5                MR. HUEBNER:  Good morning, Your Honor.  I am

6      ready to proceed.  I wonder if the Court would like to take

7      appearances first or if they have otherwise been taken and

8      we're just ready to go.

9                THE COURT:  Well, normally I appreciate that, but

10     given the size of the group here, it probably would be

11     better for people just to state their appearance, who

12     they're appearing for, if and when they speak.

13               MR. HUEBNER:  Okay.

14               THE COURT:  Otherwise we'll just proceed.

15               MR. HUEBNER:  Terrific.  Your Honor, may I

16     proceed?

17               THE COURT:  Sure.

18               MR. HUEBNER:  Good morning, Your Honor.  May it

19     please the Court for the record I am Marshall Huebner of

20     Davis Polk & Wardwell, LLP on behalf of Purdue Pharma L.P.

21     its 22 subsidiaries, and Purdue Pharma Inc., its general

22     partner.  These collectively are the 24 debtors in these

23     Chapter 11 cases that I will be referring to as Purdue.

24               Please allow me to begin with a heartfelt thanks

25     to Your Honor.  First day hearings in large cases invariably

Page 10

1   involve dumping large amounts of paper on an already very

2   busy court and chambers on very short notice.  We are

3   grateful that you agreed to hear us this morning.

4            I would also like to add a few other thank you's

5   at the present.  To Vito Genna, the Clerk of the Court, and

6   Eddie Antino (ph), the Deputy Clerk, for taking the time to

7   speak with us last week and immediately reviewing the

8   pleading relevant to their office, and helped all of us

9   administratively in advance of this hearing.

10           And, of course, my thanks to Linda Rifkin, Paul

11  Schwartzberg and Brian Masumoto of the U.S. Trustee's

12  Office.  We spoke to them many times over the last few days

13  regarding the first day filings and, of course, dumped

14  waives of paper on them as well.  More on the outcome of

15  those discussions when we get to the motions.

16           Finally, we would like to thank the U.S. Marshals,

17  court security officials, building personnel and others

18  involved in keeping all of us safe and the lights on.

19           We are appreciative of everyone's time and

20  attention and are honored to be here today in White Plains.

21           Your Honor, I would like to say a word about

22  notice, which I think is also an important place to start.

23  Our press release that was issued immediately upon the

24  filing of the first petition contained in it information and

25  a hyperlink to the Prime Clerk website.  And as far as we

Page 11

1    could load things onto the system officially with the Court,

2    Prime Clerk put them onto their system.  It also contained

3    toll free numbers to provide additional information.

4           Notice of the commencement and of the first day

5    hearing was also served on the U.S. Trustee, the debtors'

6    top 50 unsecured creditors.  We actually thought about 30,

7    40, 50 and just decided to go with the, what's pretty much

8    the largest number I think any case uses, although the

9    numbers are not very big by the time you get down into the

10   lower tens.  The debtors' top three secured creditors, the

11   IRS, the Department of Justice, the U.S. Attorney's Office

12   for the Southern District, the Attorney General for all 50

13   states and the District of Columbia, the debtors' banks, and

14   all parties that have requested notice pursuant to Rule

15   2002, that, of course, being a very small number given that

16   the case was just getting going.

17          And, obviously, you know, once the 341 meeting is

18   scheduled we will (indiscernible) for 309(f) as appropriate.

19          THE COURT:  Okay.

20          MR. HUEBNER:  One last thing, Your Honor, I

21   thought I might do before beginning my overview is to

22   introduce a few people that you are likely to see during the

23   case.  Davis Polk was retained by Purdue in March 2018 and

24   has been working in multiple areas of practice since then.

25          With me in court today are Ben Kaminetzky, Tim

1    Graulich, Jim McClammy, Eli Vonnegut, Marc Tobak and Chris

2    Robertson, some of whom you will be hearing from soon.  Let

3    me be very clear.  At future hearings we expect that you

4    will be seeing a tiny fraction, hopefully, or at least a

5    small fraction of the Davis Polk folks here today.  But

6    first day hearings of necessity are very broad and very

7    deep, and obviously this one came upon us with some speed.

8              PJT Partners, the company's investment banker,

9    began with Purdue in November 2017.  Here in court today are

10   Jamie O'Connell and Rafael Schnitzler (ph), and Tim Coleman

11   along with Jamie is leading the engagement.

12             AlixPartners, LLP, the company's primary financial

13   advisor was hired by Purdue in March 2019.  In court today

14   are Jessie De La Conte (ph) and Barry False (ph).

15             Also here are Mark Kesselman who joined as

16   Purdue's general counsel in July 2018, and Roxana Aleali,

17   the equally indefatigable associate general counsel.

18             And, of course, Jon Lowne, our CFO and first day

19   declarant.

20             Given its complex situation, the company has other

21   law firms and professionals hard at work.  The three primary

22   ones are Dechert, LLP, the company's primary civil

23   litigation counsel; Skadden Arps, which is primarily

24   handling the DOJ matters; and Wilmer Hale which has been

25   handling congressional matters.

Page 13

1           Many Chapter 11 cases, both large and small, have

2     a great deal at issue.  This one most assuredly is no

3     exception, and has lives as well as dollars at stake.

4           Moreover, because there is no secured or unsecured

5     debt, no material trade claims, no judgments, and because

6     more than 85 percent of the CUD claimants are governmental,

7     it is in essence America, itself, that stands to benefit or

8     lose from the success or failure of these reorganization

9     proceedings.

10           As the Court is no doubt aware, the debtors, the

11    debtors' ultimate owners, and a critical mass of

12    constituencies have reached an agreement in principal on a

13    settlement framework for resolving the over 2,625 lawsuits

14    now pending around the country, lawsuits that are draining

15    and destroying millions of dollars of estate value every

16    single week.  Literally millions a week.

17           The agreed upon settlement framework involves

18    three primary components to resolve the litigations.  First,

19    despite the absence of even a single judgment against any of

20    the debtors, the entirety of the debtors, every company,

21    every right, every dollar, every contract, every asset will

22    be transferred to a trust or other suitable post-emergent

23    structure to be administered by independent trustees and

24    directors chosen by and acting for the benefit of claimants

25    and, thus, the American public.

Page 14

1           Lest there be any conclusion -- any confusion, let

2      me be clear and emphatic.  The entirety of Purdue means

3      exactly that.  Purdue's cash position of more than $1

4      billion, all of its products, its material future revenues,

5      contract rights, intellectual property, insurance proceeds

6      as well as it's unique accumulated expertise, knowledge and

7      manufacturing capacity. The expectation is that this

8      transfer will be free and clear of Purdue's liabilities to

9      the fullest extent of the law.

10          Prong two is that Purdue's ultimately indirect

11     owners, the Sackler families, will contribute a minimum of

12     $3 billion in additional funds on top of relinquishing their

13     ownership of 100 percent of Purdue over a seven-year period.

14          Finally, the Sacklers have agreed to engage in a

15     sales process for their XUS pharmaceutical companies that

16     will fund hopefully very material further cash payments out

17     of net proceeds on top of this incremental $3 billion of

18     cash and the debtors' themselves.

19          The key group of plaintiffs in the pending actions

20     that have agreed to support the settlement framework include

21     24 State Attorney Generals and analogous officials of all

22     five permanently inhabited U.S. territories or

23     commonwealths, including Puerto Rico, which I believe is

24     bigger than 21 or so U.S. States.

25          In case anybody is curious, a thing I learned is

Page 15

1    that the U.S. actually has 14 territories, but only five of

2    them have people on them.

3              As Your Honor -- technically, only five of them

4    are permanently inhabited.  I guess maybe they have seasonal

5    people.  I'm not -- I don't mean to diss (sic) the other

6    nine, but that's what --

7         (Laughter)

8              MR. HUEBNER:  -- that's what they told us.

9              THE COURT:  I think we should end the hearing

10   right now.

11             MR. HUEBNER:  As Your Honor may have read, Purdue

12   had previously settled with Oklahoma and Kentucky, leaving

13   24 states and the District of Columbia not in the supporting

14   group.

15             While we know that some of these states are firmly

16   and in some cases passionately presently opposed, we are

17   hopeful that some are still forming and all are willing to

18   re-evaluate their views which we hope to inform during these

19   cases with facts and figures that may prove important to

20   them.

21             But even if one assumed arguendo that all of the

22   states not yet in the deal were and remain opposed, the

23   proverbial preliminary vote tally would not be 29 in favor

24   and 25 opposed because state or territory level actors are

25   merely one piece of this complex puzzle.

1          The settlement structure also has the unanimous

2    endorsement of the plaintiffs' executive committee, known as

3    the PEC, appointed by Judge Dan Polster in the Ohio MDL, and

4    also has the support of the three Kobe plaintiffs' firms in

5    the MDL.

6          As Your Honor may know, the PEC is the court-

7    appointed claimants' leadership team in the MDL.  It is

8    comprised of attorneys at 19 law firms that collectively

9    represent over 1,000 counties and municipalities, including

10   cities, towns and villages, Native American tribes,

11   individual and third party payors, and is charged with

12   coordinating and organizing the approximately 2,000 MDL

13   plaintiffs and litigation tracks.

14         Thus, the clients of the PEC firms and the MDL co-

15   lead counsel may bring as many to -- may bring as many as

16   2,000 additional entities, most governmental, into the

17   supporter camp.

18         In another recent step towards progressing the

19   settlement structure, the supporting entities recently

20   formed a representative ad hoc committee and retained

21   professionals.  The committee presently has the following

22   members:  The States of Florida, Louisiana, Michigan,

23   Mississippi, New Mexico, Ohio, Tennessee, Texas and Utah.

24   The other members are the MDL PEC itself, the City of

25   Philadelphia, and Santa Clara County.

1          We have already begun engagement productively with

2     our professionals on multiple topics, including the first

3     day relief being requested today.  And this committee is

4     especially important in this case because the firm in

5     movable position of the United States Trustee is that

6     governmental entities, which virtually all of our contingent

7     creditors are, are not eligible to serve on official

8     committees appointed by the U.S. Trustee.

9          We had no interest in litigating with the U.S.

10    Trustee on this issue.  So to solve the problem of needing a

11    group smaller than 2,029 or so supporting counterparties to

12    negotiate and document a very complex deal with, and given

13    our UCC membership constraints, we instead encouraged and

14    will support an ad hoc committee of supporting claimants.

15         The settlement framework was arrived at after

16    months of intense, arduous, careful and complex negotiations

17    with dozens and dozens of relevant stakeholders as the deal

18    and its components evolved and evolved and evolved in an

19    attempt to build as big a tent as we possibly could, with

20    counterparties whose goals were by no means aligned in all

21    respects.  The debtors have entered Chapter 11 to continue

22    to listen hard and to work to expand the number of parties

23    supporting the settlement framework and ultimately to

24    construct, confirm and effectuate a plan that resolves the

25    litigation through that framework.

Page 18

1           Because so very much is at stake here, dare I say

2     for our country and its states, counties, cities, and towns,

3     billions of dollars of value, millions of doses of opioid

4     overdose rescue drugs, at no or low costs and, thus,

5     thousands of American lives to be improved and possibly even

6     saved.

7           Your Honor, I have practiced in our field for more

8     than 25 years and have always held two principles to be at

9     the core of the United States Bankruptcy system.  The first

10    is the maximization of value.  The second is the

11    distribution of that value to legitimate creditors in

12    accordance with the priorities established by federal law

13    with equality of treatment within those categories.

14          Although this case, probably the first

15    governmental mass tort mega Chapter 11 in U.S. history, will

16    almost certainly take many of us down new paths and into

17    some unchartered waters together, it is still actually those

18    two principles, maximization of value, which in this unusual

19    case is for the common good, not for bank lenders or bond

20    holders, hedge funds or private equity firms, and equality

21    of distribution to validate its stakeholders, which in most

22    cases are the American people themselves, that I believe

23    need to remain our unmoving guiding stars.

24          We recognize, Your Honor, that achieving these

25    objectives will not be easy.  These Chapter 11 proceedings

Page 19

1    will present no shortage of complex legal issues and

2    strongly held views on all sides.

3            Well, let me provide a spoiler alert right at or

4    at least near the outset of today's hearing.  Today's goal

5    is a hearing that is quotidian and uninteresting.  As the

6    Court has no doubt seen, we are not asking for any typical

7    relief at today's hearing and none at all concerning

8    injunctive or litigation related issues or relating in any

9    way to the settlement framework.

10           There will unfortunately likely be plenty of

11   opportunity over the next many months to discuss and join

12   issues on various difficult subjects:  The shape and

13   contours of the global resolution; the debtors' past and

14   future conduct; the police power exception to the automatic

15   stay and 105 injunctions; standing; causation; channeling

16   injunctions; the apparent desire of some to just kill Purdue

17   regardless of the costs to a wide array of stakeholders and

18   other claimants.  But today is not that day.

19           Rather, today is the day hopefully to help

20   facilitate the smooth transition of a complex corporate

21   enterprise into Chapter 11, and to minimized value loss and

22   operational disruption that might have otherwise resulted

23   from the Chapter 11 filing.

24           And this is so very important here because we

25   cannot forget that Purdue is a heavily regulated

Page 20

1    pharmaceutical company, the manufacturers, among other

2    things, multiple FDA approved Schedule II opioid medications

3    prescribed to hundreds of thousands of Americans.  The

4    safety, security and stability of Purdue's operations and of

5    its controlled substance inventory and work in progress is

6    of grave importance.

7            Like many who have appeared before you, Your

8    Honor, I am well aware that the Court has read every page of

9    the many pleadings that we have submitted and no doubt has a

10   tabbed binder that identifies some things we got wrong or

11   typos that we missed in the intense march to filing.

12   Apologies in advance for these unintended peccadilloes.

13           A fair amount of the litigation history and

14   background of our business was laid out in the informational

15   brief that we have filed, and there will be hearings more

16   relevant to these topics coming up swiftly.  Thus, I will

17   not be giving any overview of the debtors' operation or

18   structure, of its products, or of the contingent,

19   unliquidated, and disputed liabilities that have been

20   asserted against the debtors this morning.

21           We are not here today to litigation or really even

22   to discuss these issues or the claims.  There are, in fact,

23   only three items that I would like to address before we turn

24   to those first day motions themselves.

25           The first is Purdue's current governance conduct

Page 21

1    and practices.  It is my intention to speak only to the

2    present with no comments made or implied about the past.  I

3    would like to start by discussing Purdue's board of

4    directors briefly, which will be instrumental to the success

5    of these proceedings.

6           No member of the Sackler family is currently on

7    the board or employed by the company.  The resignation of

8    the last member came over eight months ago, and others

9    occurred during or prior to 2018.

10          Davis Polk does not, has not, and will not

11   represent the Sackler families.  We have represented only

12   Purdue from the opening moments of our engagement.

13          The current board has seven directors, at least

14   three of whom may well be known to some or many in the

15   courtroom today.  Robert S., known as Steve, Miller, who

16   chairs the board has (indiscernible) a nearly 50-year career

17   at the upper echelons of corporate restructuring, including

18   the successful restructurings of Chrysler, which none of the

19   associates (indiscernible) ever heard of, during which he

20   served as the CFO; Delphi, where he was chairman and CEO;

21   and AIG where he was non-executive chairman.  Mr. Miller

22   joined the board in July 2018.

23          Kenneth Buckfire is among the most senior

24   financial professionals in our industry.  He has been

25   involved in dozens of mega-cases throughout his career,

Page 22

1    including serving as the primary advisor to the City of

2    Detroit in its bankruptcy.  Mr. Buckfire joined the board in

3    May 2019.

4              John Dubel is also deeply credentialed with over

5    37 years of experience, specifically in connection with the

6    leadership of complex, global class-action related Chapter

7    11 proceedings.  He was, among many other things, the CEO of

8    FGIC, the country -- one of the country's three largest

9    monoline insurers in its rehabilitation and served as the

10   CRO and then CEO of SunEdison, which I believe was the

11   largest natural energy failure in U.S. history.

12             Mike Cola joined the board about 14 months ago and

13   has decades of experience and wisdom accumulated in senior

14   positions at AstraZeneca and AstraMerck as well as serving

15   as the president of Shire, PLC.

16             John Dubel chairs and Mister's Miller, Buckfire

17   and Cola serve on the special committee that has exclusive,

18   delegated authority for all transactions with and all

19   potential and litigation and claims against the owners and

20   all related parties.

21             Thus, four of Purdue's seven directors who

22   constitute a majority of the board and the totality of the

23   special committee are beyond blue chip recent arrivals

24   without any prior connections to the company or to the

25   family.

1            And having myself been endlessly run ragged by

2    them month after month, I would happily testify under oath

3    in any forum that they are strong, independent, demanding

4    and fully engaged.

5            Purdue's remaining three directors, Cecil Pickett,

6    Peter Bore (ph), and Turnaron Colley (ph), bring decades of

7    experience and knowledge about Purdue's business and the

8    pharmaceutical industry.  One has a PhD in cell biology, one

9    has a PhD in physics and one merely is an experienced

10   lawyer.

11           That brings me, Your Honor, to Purdue's current

12   business practices and its conduct as a pharmaceutical

13   company moving forward.  Certain past practices throughout

14   the core of the voluminous litigation against the company

15   will undoubtedly be the subject of future proceedings.

16   These include allegations with respect to detailing or

17   promoting to prescribers Oxycontin and other opioid

18   medications.

19           Again, I will not be discussing any of this today

20   because it is not within the scope of today's hearing or any

21   of the first day motions.  And because it is in the past.

22           All promoting of Oxycontin and all other opioid

23   medications to prescribers by Purdue ceased no later than 20

24   months ago in February 2018.  At that time Purdue began the

25   process of entirely eliminating its opioid sales force.

Page 24

1   Today, Purdue no longer has any sales representatives, not

2   one, promoting any opioid products to any prescribers.

3           As was referenced in the first day papers, Purdue

4   intends to take the novel approach of seeking from this

5   Court an injunction against itself that prohibits it from

6   engaging in various categories of conduct, conduct like the

7   promotion of opioids or opioid products through sales

8   representatives, speakers or key opinion leaders, or medical

9   educational programs, conduct that is at the core of the

10  plaintiffs' claims against the debtors, but has already

11  ceased almost two years ago.

12          I know of no precedent for such a request.  So to

13  be clear, the debtors will soon as you to -- will soon

14  voluntarily ask you to subject us to the coercive power of

15  this Court and potential contempt sanctions.  We will be

16  doing this to give the Court and all parties in interest

17  absolute comfort that Purdue in no way, shape or form is

18  using Chapter 11 as an improper refuge for any of the types

19  of past conduct that have been challenged and are the

20  subject of litigation.

21          Which is an appropriate segway to the second of

22  the two items that I would like to briefly highlight today.

23  Over the past hours, days, weeks and months, some of the

24  litigants pursuing their claims against Purdue have

25  repeatedly pounded certain themes into the media again and

1   again.   Themes like we will never let Purdue escape justice

2   in Chapter 11.   We will still get our day in court no matter

3   where Purdue runs, even in Chapter 11.   Candidly, I have

4   always been rather perplexed by these and similar

5   statements.

6           In reality, Your Honor, why is Purdue in Chapter

7   11?   First and foremost, Purdue, despite having no judgments

8   against it, is in Chapter 11 to implement a global

9   resolution that maximizes its value and does not see that

10  value continuing to be relentlessly and needlessly

11  diminished.

12          Purdue is also here to build further support for

13  the settlement framework that would transfer 100 percent of

14  the debtors to its contingent claimants.

15          Your Honor, Purdue is not shielding itself from

16  these claimants.   It's giving itself to these claimants

17  without them even needing to prevail in their litigations

18  as part of the global resolution of this unsustainable

19  runaway litigation.

20          Purdue is in Chapter 11 precisely to address the

21  litigation morass that it faces, not to evade it.   There

22  were five cases filed between 2014 and 2016, five.   Then

23  there were 300 in 2017.   Then there were 1,500 in 2018.   And

24  the 2019 count is 800 and climbing very quickly.   Today,

25  Purdue faces over 2,625 separate lawsuits, with the number

Page 26

1    of copycat lawsuits climbing literally daily.

2            These lawsuits allege that Purdue is responsible

3    for creating the national opioid crisis and is potentially

4    liable for hundreds of billions of dollars of damages.  As a

5    result, Purdue is now mired in proceedings in almost every

6    conceivable forum in the United States, including

7    administrative proceedings, state trial courts, state

8    appellate courts, state supreme courts, federal district

9    courts, federal appellate courts, and even the United States

10   Supreme Court.  There are approximately 120 tribal lawsuits

11   already in or pending for transfer to the Ohio MDL as well

12   as tribal lawsuits in state courts.

13           Over the course of the last year there has been an

14   almost unprecedented scramble of hospitals and cities,

15   states and counties, Indian tribes and others deploying

16   varied and unusual techniques seeking to get to the front of

17   the litigation line to secure early or outsized recoveries.

18           How can anyone genuinely believe that this chaotic

19   nostrum with governments even suing each other about which

20   one of them has the right to sue Purdue should continue, let

21   alone claim that this is the path to fairness and justice.

22           And it, of course, should come as no surprise that

23   the soft and hard litigation costs and burdens associated

24   with this litigation are staggering.  Legal expenses are by

25   far Purdue's largest category of operating expense.

Page 27

1    Professional bills are now topping $250 million a year, and

2    that is just one element of the hard costs.

3            The path outside of Chapter 11 had an unavoidable

4    conclusion.  Lawyers would have made hundreds of millions of

5    dollars or more as the ever increasingly battered company

6    continued to direct its dwindling cash balance to defending

7    these still multiplying litigations, the balance that was

8    diminishing because of these litigations.

9            And even if arguendo Purdue chose and had the

10   resources to fight every single lawsuit to conclusion and

11   ultimately would have been vindicated at either the trial or

12   an appellate level, it is all but certain that Purdue would

13   have had to end up in Chapter 11 in any event because even

14   at the trial level losing a mere one percent of the lawsuits

15   is still losing 26 big lawsuits.

16           Had Purdue chosen to battle on, it would likely

17   have ended up here in any event, but with only a small

18   fraction of the billions of dollars of lifesaving value that

19   it has available at present.

20           And, Your Honor, to switch the lens for a minute

21   because this really should not be forgotten, we shouldn't

22   lose sight of the fact that the settlement framework

23   radically declaration-risks the situation for the

24   plaintiffs.  They collectively no longer have to race each

25   other to dozens of courthouses, prevail at hundreds of

Page 28

1   trials or appeals, and then go actually recover on their

2   judgments, potentially in lots of places against the people

3   they believe are liable.  The full company and billions more

4   in cash are on offer as soon as we can close.

5           Simply put, Your Honor, continuing to litigate the

6   crushing multitude of cases outside of Chapter 11 would

7   benefit no one except lawyers and other professionals.

8   Given that 100 percent of Purdue is being tendered to settle

9   the kaleidoscope of litigations, despite not having yet lost

10  a case, it can scarcely be said that Purdue has come here to

11  escape justice.

12          Rather, Purdue is here to pause and then resolve

13  the tragedy of the commons that will certainly not lead to

14  justice or to better, fairer or faster recoveries for

15  stakeholders.

16          Which brings me to my third and last item.  We

17  will understand that many parties have raised questions or

18  made serious allegations about a variety of things

19  including, for example, past transfers by Purdue and

20  transactions with members of the Sackler families and

21  related entities.

22          And, of course, the company and its advisors well

23  understand that as part of ultimately approving the

24  settlement, some of these issues must be ultimately

25  understood, be understood better by the Court and by key

1   stakeholders under appropriate, protective orders and

2   confidentiality agreements.

3           Moreover, perhaps I am being unduly optimistic,

4   but I actually remain hopeful that parties may be more

5   willing to settle and come on board with the framework as

6   they learn more about certain facts and numbers that they

7   don't currently know.

8           This special committee which has full and

9   exclusive delegated authority with respect to all Sackler

10  facing issues has taken and will continue to take very

11  seriously the allegations raised in various lawsuits around

12  the country regarding the management of Purdue by its

13  owners, especially with respect to causes of action that

14  automatically and immediately vested in the estates upon a

15  Chapter 11 filing.

16          Work on these issues began months ago and is

17  ongoing.  Dedicated professionals at Davis Polk,

18  AlixPartners and Bates White have spent more than 12,500

19  hours on these projects to date at the direction and under

20  the supervision of the special committee, which has been

21  meeting multiple times a month on these issues.

22          Let me give one example so that it's more

23  concrete.  A forensic investigation team at AlixPartners has

24  been working for months with counsel at Davis Polk and

25  valuation experts at Bates White analyzing all transfers and

Page 30

1    transactions with the shareholders and their affiliates from

2    and after January 1, 2008.  This work, covering a period

3    stretching back more than a decade, is not yet completed,

4    but the draft reports already exceed 700 pages in length and

5    counting.

6            Under appropriate protective orders and at the

7    right time, the debtors are fully prepared to talk and

8    indeed welcome discussions with relevant parties about this

9    and other material investigations.

10           And this is quite consistent with several

11   transparency initiatives in which Purdue, and

12   parenthetically I personally, have been involved for quite a

13   while.  Starting on or about October 3rd, 2018, a detailed

14   presentation with written materials was made to various

15   groups of plaintiffs, including both multiple MDL parties

16   and states with detailed corporate and financial information

17   about Purdue.

18           It also included all cash dividends paid out by

19   Purdue since January 1, 2015.  But they asked for more.  So

20   starting a few weeks later after we could pull it together,

21   on or about October 19th, 2018, in response to these

22   requests, a dense 15-page deck was presented and provided at

23   several meetings to multiple parties which included, among

24   many other things, a recounting of all transfers made by

25   Purdue up to its parent company for a 24-year period from

Page 31

1    January 1, 1995 to September 30th, 2018.

2         This detailed information, which has since been

3    checked and refined by AlixPartners, was presented and

4    voluntarily given over to the plaintiffs who got it and have

5    had it for almost a year.

6         One other noteworthy example as I move towards

7    conclusion.  Over the last 18 months intense work has been

8    underway to ensure that all contracts and relationships of

9    any kind between Purdue and any non-Purdue Sackler entity

10   are and remain in Purdue's best interest.

11        In one recent push, approximately 140 of such

12   contracts were reviewed.  Of these 140, the special

13   committee decided to terminate 49, amend 2, and leave 88 in

14   place as still being in Purdue's best interest.

15        But, again, these are issues for another day.  I

16   mention them to give the Court and others insight into the

17   seriousness with which the special committee and Purdue's

18   independent professionals have been and continue to take

19   their weighty responsibilities.  The company and its

20   advisors well understand that they are fiduciaries for all.

21        One very last thing, Your Honor, before turning to

22   the first day motions, and you might remember I may have

23   concluded either (indiscernible) with this request.  Davis

24   Polk is by no means afraid to litigation issues when it is

25   unavoidable.  But we strongly prefer consensual resolutions

Page 32

1   whenever possible.

2           We would like to make it clear to all parties,

3   whether in Court or on the phone, that our way is always the

4   way of attempted consensual resolution.  The omnibus

5   hearings of which we are most proud, which has been -- it's

6   been historically true in our cases are the ones that are

7   canceled because every single thing has been resolved.

8           So, please, pick up the phone and call us.  Use

9   your device and e-mail us, and just discuss things before

10  filing papers.  We stand ready just about 24 hours a day to

11  intake and try to address issues or problems with anyone who

12  has a problem or thinks they have a problem.

13          Your Honor, I'm happy to answer any questions or,

14  if it pleases the Court, we would propose to turn at this

15  point to the first day relief we're seeking.

16          THE COURT:  Okay.  Why don't we proceed with the

17  agenda?

18          MR. HUEBNER:  Sure.

19          Just to make sure someone does it, I guess, let me

20  first before turning over the podium, move the admission of

21  the Jon Lowne declaration which is the evidentiary support

22  of our 14 motions and two evidence.

23          THE COURT:  Okay.  I reviewed that declaration.

24  If anyone wants to cross-examine Mr. Lowne on any particular

25  motion that comes up, you should let me know.  As far as the

Page 33

1    declaration as a whole is concerned, I don't have any

2    questions on it.  I may have questions when we get to

3    individual motions.

4           But with that said I don't know if anyone objects

5    to the -- anything in it as far as its admission, having

6    reserved their right to cross-examine Mr. Lowne if they want

7    to in connection with any particular motion.

8           MR. HUEBNER:  Your Honor, at this point I believe

9    I'm turning the podium over to --

10          THE COURT:  Okay.  So I --

11          MR. HUEBNER:  -- Mr. --

12          THE COURT:  -- I will admit it as Exhibit 1.

13          MR. HUEBNER:  Great.  Thank you, Your Honor.

14          Chris Robertson, Your Honor, of our firm.

15          THE COURT:  Okay.

16      (Pause)

17          MR. ROBERTSON:  Good morning, Your Honor.

18   Christopher Robertson, Davis Polk & Wardwell on behalf of

19   the debtors.

20          Your Honor, the first motion on the agenda is the

21   debtor's joint administration motion at -- that's at Docket

22   Number 2, Agenda Number 4.

23          Your Honor, there are 24 debtor affiliates in

24   these Chapter 11 cases.  For administrative convenience the

25   debtors have requested that all cases be jointly

Page 34

1   administered for procedural purposes only under the case of

2   the debtors' main operating entity, Purdue Pharma L.P., Case

3   Number 19-23649.

4           We have received no comments to this motion or

5   proposed order.  Unless Your Honor has any questions

6   regarding the relief requested in this motion, the debtors'

7   respectfully request that the relief requested be granted.

8           THE COURT:  Okay.  Does anyone have anything to

9   say on this motion?

10          All right.  I will grant the motion.  I've

11  reviewed it.  Clearly, with this multi-debtor case and based

12  on the pleadings before me, joint administration is

13  warranted.  I've also reviewed the order and the proposed

14  caption, both of which are fine with me.  So you can e-mail

15  that to chambers --

16          MR. ROBERTSON:  Thank you, Your Honor.

17          THE COURT:  -- for entry.

18          MR. ROBERTSON:  Moving on to the next agenda item,

19  Item Number 5, this is the case management motion.  That's

20  at Docket Number 16.

21          Your Honor, this motion -- these procedures are in

22  line with the procedures Your Honor has entered in other

23  cases.  We circulated a draft to the U.S. Trustee and

24  incorporated informal comments received from Mr.

25  Schwartzberg's office.

1            Your Honor, I would also like to clarify two

2     points in the procedures.  One, in paragraph 11 of the

3     procedures we would like to include the ad hoc committee as

4     a party on the service list and, of course, any other party

5     that requests service under Rule 2002 will also be included

6     on that list.

7            We would also like to delete the last sentence of

8     paragraph 25 of the procedures.  And, Your Honor, that

9     paragraph -- would you like me to turn you to it?  Sorry.

10    Bear with me.  That paragraph is on page 13 of the

11    procedures.  It provided, notwithstanding any

12    (indiscernible) contrary herein, the debtors and the

13    official committee and the U.S. Trustee, but no other party,

14    are authorized to file statements in support of request for

15    relief by the reply deadline defined below.  We propose to

16    delete that from the form of procedures.

17            THE COURT:  Okay.

18            MR. ROBERTSON:  We have not received any other

19    comments on the form of order of the procedures.  Unless

20    Your Honor has any questions, we would ask that it be

21    granted.

22            THE COURT:  Okay.  Does anyone have anything to

23    say on the case management motion?

24            All right.  I've reviewed it and I appreciate that

25    you've largely followed similar orders that I've entered in

Page 36

1    similar cases.

2            But there are always improvement and I'm going to

3    give you a markup that has a few improvements in them --

4            MR. ROBERTSON:  Certainly.

5            THE COURT:  -- which I think are going to be self-

6    explanatory.  Some of them just track the chambers website.

7    For example, on submission of orders, if there's been no

8    objection or after notice of presentment, one reflects a

9    similar one I had in dealing with issues about e-mail

10   service that I wrote an opinion on last month, which says

11   that -- which reflects that people are sometimes wary to

12   open attachments.

13           So the e-mail subject line or the body of the

14   email service should now say, in addition to what you have

15   here, which is appropriate, that the attachments are also

16   available on the docket.  So if people are afraid to -- or

17   told by their IT people not to open attachments, they know

18   they can go to the docket.

19           MR. ROBERTSON:  Certainly.

20           THE COURT:  I think the rest will be self-

21   explanatory.

22           I left in the language for seeking shortened

23   notice by order to show cause.  But I want everyone to know

24   that 99 percent of the time I don't like to enter an order

25   to show cause shortening notice.  If I think there is at

Page 37

1    least a colorable basis to have shortened notice, I instead

2    instruct the movant to file not only their motion for

3    underlying relief, but also their request for a hearing on

4    shortened notice, and to notice them both for the hearing

5    date.  So that at least gives someone that much time to come

6    up with an explanation as to why I shouldn't be hearing it

7    on shortened notice rather than just predetermining that

8    issue in an order to show cause.

9            So most of the time that's what will be the

10   resolution.  But I haven't thought of a way for people to

11   ask me to schedule the hearing other than the show cause

12   language.  So I've left it in.

13           But with those changes, which you can take, I'll

14   grant the motion.

15           MR. ROBERTSON:  May I approach?

16           THE COURT:  Yes.  And obviously this is a first

17   day motion.  I'm not going to require it to be dealt with as

18   an interim order.  But once a committee is formed, and

19   perhaps an ad hoc committee, in addition, they can always

20   speak to their view about changes that they would like.  And

21   if they make sense, you can submit them.

22           MR. ROBERTSON:  Of course.  Thank you, Your Honor.

23           THE COURT:  Okay.

24           MR. ROBERTSON:  Moving onto the next agenda item

25   is Item Number 6, the motion at Docket Number 5.  This is

Page 38

1    the cash management order.  Pursuant to this motion the

2    debtors seek authority to continue to use their existing

3    cash management system from the operations of PPLP and its

4    subsidiaries, maintain their existing bank accounts, open

5    and close bank accounts, and maintain their existing

6    business forms.

7              The debtors integrated cash management system is

8    discussed in detail in the motion.  Attached the motion as

9    Exhibit D is a diagram that shows, you know, the inflows and

10   out flows through the system.

11             The United States Trustee has provided I believe

12   three informal comments in the -- to the form of orders.  If

13   Your Honor would like me to walk you through those.

14             THE COURT:  Sure.

15             MR. ROBERTSON:  So, first, in paragraph 13 of the

16   interim order, the debtors agree that any new accounts

17   opened at FDIC insured banks that are not authorized

18   depositories shall not hold average monthly balances in

19   excess of the FDIC insurance limit.

20             Second, to the extent reasonably practical --

21             THE COURT:  Did the debtors --

22             MR. ROBERTSON:  Oh, sorry.

23             THE COURT:  -- believe they could comply with

24   that?

25             MR. ROBERTSON:  I believe that we can.  It only

Page 39

1   applies to banks that are FDIC insured but not authorized

2   depositories.

3            THE COURT:  Right.  There --

4            MR. ROBERTSON:  And --

5            THE COURT:  -- are fewer and fewer authorized

6   depositories these days, but --

7       (Laughter)

8            MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

9   for the U.S. Trustee's Office.  The bulk of their accounts,

10  and their new accounts that are coming in are authorized

11  depositories.

12           THE COURT:  Okay.

13           MR. ROBERTSON:  That's right.  Pecos Bank is the

14  most, Your Honor.

15           THE COURT:  Okay.

16           MR. ROBERTSON:  Second, to the extent reasonably

17  practicable the debtor shall mark debtor-in-possession on

18  business forms and checks that are electronically generated.

19           And then third, this with respect to paragraph 19

20  in the order.  I would like to read an agreement into the

21  record.  With respect to the investment accounts, paragraph

22  19, interim order, will be revised to provide that the

23  continuation of the investment accounts is approved on an

24  interim basis, and within 45 days we will work to get the

25  U.S. Trustee comfortable with the terms of the investment

Page 40

1    accounts and either (a) get in full compliance with Section

2    345 or (b) obtain this Court's approval for any deviation

3    from 345 under the final order.

4           Other than those comments -- and I would pause if

5    Mr. Schwartzberg wants to add anything.

6           MR. SCHWARTZBERG:  Yes, Your Honor.  The counsel

7    accurately reflected our agreement.  We had concerns that

8    the debtor references three accounts that are not authorized

9    depositories and that do not appear as of now to be in

10   compliance with 345.  We are not aware of what's in the

11   account.  We are not aware of how much is in the account.

12   So we need more information.  And we hope to work for the

13   debtors -- with the debtors in the next few days or weeks on

14   this issue.  But we may be back before Your Honor on this if

15   they don't come into compliance.

16          THE COURT:  Okay.  That's fine.

17          Have you gotten a date for a final hearing on

18   these first day motions from Ms. Lee?

19          MR. ROBERTSON:  We have not, Your Honor.

20          THE COURT:  All right.  Well, I'm sure she'll give

21   you one.  But it obviously needs to be more than 15 days

22   from the -- from today.  So we're talking sometime in

23   October.

24          MR. ROBERTSON:  Yeah.  Certainly, Your Honor.

25          THE COURT:  Okay.  Does anyone have anything

Page 41

1    further to say on this motion?

2          All right.  I have reviewed it and with the

3    changes agreed with the U.S. Trustee I'll grant the motion

4    on an interim basis.  It's appropriate for the moving state

5    of the motion to grant this relief.

6          MR. ROBERTSON:  Thank you, Your Honor.

7          Moving onto the next motion on the agenda is what

8    we call the creditor list and personal information motion.

9    This is Item 7 on the agenda.  It can be found at Docket

10   Number 13.

11         Your Honor, in this motion we're seeking authority

12   to file a consolidated list of the top 50 creditors instead

13   of filing separate lists for each debtor, authority to

14   redact certain personal information for individuals, and

15   approval of procedures for service of notice and

16   commencement.

17         The motion also seeks to authorize the debtors'

18   notice and claims agent to withhold publication of claims

19   filed by individuals until entry of the bar date order or

20   other order of the Court.

21         The debtors and their notice of claims agent are

22   sensitive to privacy concerns of individuals who may file

23   claims containing medical or other sensitive information,

24   given the nature of these cases.  Absent the relief sought

25   herein, the debtors and the notice and claims agent would be

Page 42

1   obligated to publish such information and hold, even if the

2   information was personally identifiable information

3   protected by HIPPA, for instance.

4           The debtors intend to address these concerns more

5   fulsomely in the context of the bar date order.  But until

6   then, we would request authority to suppress any individual

7   proof of claim that may be filed and to withhold the names

8   and addresses of any filers.

9           So I'll pause there if Your Honor has any

10  questions.

11          THE COURT:  I guess the -- this -- this is

12  obviously, to me at least, a worthwhile and important

13  direction to the claims and noticing agent.  Right now the

14  order says authorized to suppress, and my only -- I don't

15  want there to be an implication that they're not directed to

16  where there is a legal obligation to do so.

17          MR. SCHWARTZBERG:  Your Honor, I don't know if I

18  can speak now or if you --

19          THE COURT:  Sure.  No.  Go ahead.

20          MR. SCHWARTZBERG:  Yeah.

21          THE COURT:  If it's on this point.

22          MR. SCHWARTZBERG:  Yeah.  Yes.  It is exactly on

23  this point.

24          THE COURT:  Okay.

25          MR. SCHWARTZBERG:  Your Honor, the redaction

Page 43

1   requests or the sealing requests is broken into two,

2   employees and creditors.  As to the creditors, the U.S.

3   Trustee has objections.

4            First, the application indicates the names and all

5   the information of creditors on every document, including

6   the creditor matrix which is being filed today.  The

7   creditor matrix isn't going to contain HIPPA or personal

8   information.  It's just going to contain their names,

9   perhaps their addresses and the amount of claim or the

10  number -- the type of claim.

11           But nobody's putting forth today information

12  that's going to be personally identifiable information as

13  defined under the code.  Names and the addresses of the

14  creditors should be out there.  And that will allow the

15  creditors to coordinate, perhaps contact each other, and go

16  forward as a committee if they want, as an ad hoc committee.

17  But to suppress that right now --

18           THE COURT:  Well, I was just focusing on the

19  portion that focuses on personally identifiable information

20  first.

21           MR. SCHWARTZBERG:  If we leave it to that right

22  now, Your Honor, the debtors are not filing any personally

23  identifiable information of these individuals.  They're

24  seeking to, I think, basically not put their names or

25  addresses on the creditor matrix, on the schedule --

1          THE COURT:  Well, no.  But -- I'm not being clear.

2     There are two aspects of the relief sought.  One pertains to

3     personally identifiable information as defined, I think, in

4     the Bankruptcy Code and rules.  The other goes to names and

5     addresses and things like that.  I was focusing on the first

6     part.

7          MR. SCHWARTZBERG:  Right now, Your Honor, it's

8     just the debtors.  If we're talking about the claims agent,

9     the claims agent can be directed to just put down, say, tort

10    claim, not the whole list of --

11         THE COURT:  Right.

12         MR. SCHWARTZBERG:  -- other names and --

13         THE COURT:  So does anyone have -- okay.  So we're

14    on the same page on that point.

15         Does anyone have an issue with adding language to

16    say that nothing herein relieves any part of an obligation

17    or under applicable law to suppress personally identifiable

18    information?  I'm not deciding what that obligation is

19    today, but I don't want there to be any implication here

20    that somehow this order supersedes such an obligation.

21         MR. SCHWARTZBERG:  As long as the creditor matrix

22    has the names and --

23         THE COURT:  It's a separate issue.

24         MR. SCHWARTZBERG:  So as long as --

25         THE COURT:  I just -- I'm just focusing on PII

1    right now.

2              MR. SCHWARTZBERG:  In the claims --

3              THE COURT:  Anywhere.  If it's personally

4    identifiable information.

5              MR. SCHWARTZBERG:  Clearly, no party is allowed to

6    --

7              THE COURT:  Right.

8              MR. SCHWARTZBERG:  -- put that forth in the public

9    realm.  But I --

10             THE COURT:  Right.

11             MR. SCHWARTZBERG:  -- think even under the debtors

12   -- the individual --

13             THE COURT:  We're going to get to that in a

14   second.  Okay.

15             MR. WISEMAN:  Your Honor, Shye (ph) Wiseman from

16   Prime Clerk.

17             THE COURT:  Good morning.

18             MR. WISEMAN:  Your Honor, the local rules make

19   very clear that the claims agent has no authority absent an

20   order of the Court to suppress anything no matter --

21             THE COURT:  I understand.

22             MR. WISEMAN:  -- what information is contained.

23   And I just don't want an implication that there is some

24   obligation because, in fact, the direction is to --

25             THE COURT:  No.  I agree with that.  But I don't

Page 46

1    want there to be implication that there isn't an obligation

2    to someone either.  So I just want it to be neutral on that

3    point.

4                  MR. WISEMAN:  Okay.

5                  THE COURT:  Okay.  All right.

6                  So the second point, we'll now get to it.

7                  MR. ROBERTSON:  Right.  So turning back to the

8    names on the creditor matrix --

9                  THE COURT:  Right.

10                 MR. ROBERTSON:  -- and I think in many cases it's

11   become standard to not include, for instance, current

12   employees' addresses, home addresses on the schedules

13   instead of use a business address.

14                 In this case, you know, those concerns are

15   anything heightened just giving the -- you know, the

16   extraordinary circumstances of these cases and everything

17   surrounding them.  And so, you know, we are, you know, just

18   as we were being very sensitive in the context of individual

19   claimants, you know, we are very sensitive to the company's

20   current employees and others whose, you know, personal home

21   addresses would appear on these schedules.

22                 THE COURT:  Well, who would be the others besides

23   the employees?

24                 MR. ROBERTSON:  I don't -- I believe this relief

25   is primarily targeted towards the current employees, Your

Page 47

1    Honor.

2              THE COURT:  Okay.

3              MR. SCHWARTZBERG:  Your Honor, as to the employees

4    on an interim basis we do not have an objection because

5    obviously once that information is out there, it's out

6    there.  But we believe if they're going to come back on a

7    final basis, they should come back on a final basis and

8    provide a more fulsome reason why this needs to be redacted

9    from the public record for -- on a permanent basis.  I don't

10   think they've put forth sufficient evidence indicating that

11   this needs to be suppressed forever.

12             THE COURT:  Okay.  Well, you can certainly give a

13   business address, for example.

14             UNIDENTIFIED SPEAKER:  That's what we're doing.

15             MR. ROBERTSON:  Yeah.  That's what --

16             MR. SCHWARTZBERG:  That's what they said.  They

17   put the business addresses for the --

18             THE COURT:  Right, which, I mean, if you --

19             MR. ROBERTSON:  And --

20             THE COURT:  This has come up in a couple of my

21   cases already, and I forget which of you two argued this

22   point and I generally agree with you.  But it seems to me

23   the issue is enabling people to communicate with each other.

24   But my experience is that employees generally find ways to

25   communicate with each other.  And if someone else wants to

Page 48

1    communicate with them for legitimate purpose, they can go

2    through the business address because that's where people get

3    their information.

4             MR. SCHWARTZBERG:  As I said, on the interim

5    basis, Your Honor, for the --

6             THE COURT:  Okay.

7             MR. SCHWARTZBERG:  -- business employees we --

8             MR. HUEBNER:  Your Honor, I hope Mr. Robertson

9    will forgive me.  I'm going to jump in and help for just a

10   minute.

11            We've litigated this issue in several recent cases

12   as well and resolved it where we can.  We think that

13   business addresses, frankly, in all cases.  In the typical

14   case the concern, which is very real, is relating to

15   poaching and things like that.

16            This case is very different and we've already been

17   very clear as to why and, frankly, we would prefer not to

18   have to put in a lot of evidence about this at the final

19   hearing because we think the issue is so obvious.

20            THE COURT:  Well --

21            MR. HUEBNER:  There have been death threats to

22   multiple people involved with this company.  There have been

23   demonstrations at people's homes.

24            THE COURT:  Well, I --

25            MR. HUEBNER:  There have been protests --

1    THE COURT:  We're not putting their home addresses

2    on it.

3    MR. HUEBNER:  No.  But that's my point.  Mr.

4    Schwartzberg is saying it can't go in the final unless we

5    put on a written record.

6    THE COURT:  Well, we'll --

7    MR. HUEBNER:  And --

8    THE COURT:  -- we'll deal with that then.

9    MR. HUEBNER:  -- I just wanted to -- we've already

10   made clear about the reason for this.

11   THE COURT:  Okay.

12   MR. HUEBNER:  And we would like to find a more

13   subtle way to address it without having to list a litany of

14   things which only makes our situation more difficult.

15   THE COURT:  Fine.  In any event, for the interim

16   order we're dealing with business addresses --

17   MR. ROBERTSON:  Thank you, Your Honor.

18   THE COURT:  -- for employees and former employees.

19   Okay.

20   MR. ROBERTSON:  I'm sorry, Your Honor.  If I may

21   proceed to Agenda Item Number 8.  It's at Docket --

22   THE COURT:  Well, I --

23   MR. ROBERTSON:  -- Number 4.

24   THE COURT:  So does anyone else have anything

25   further to say on this motion?

1          MR. SCHWARTZBERG:  Just because I'm dense, Your

2    Honor, on the creditor matrix, the names and addresses of

3    the creditors, I'm not exactly 100 percent sure how Your

4    Honor ruled, but I believe that they should be included on

5    the creditor matrix that's going to be filed.

6          THE COURT:  That -- as -- with their business

7    address.

8          MR. SCHWARTZBERG:  We're now talking about

9    creditors, not the employees.

10          THE COURT:  Well, I don't -- you -- I didn't think

11    you had an issue with creditors, just their name and address

12    because that's not --

13          MR. ROBERTSON:  At this time I don't think that

14    there are --

15          THE COURT:  -- personally identifiable

16    information.

17          MR. ROBERTSON:  Right.  I don't think that there

18    are creditors at this time that would fall into this bucket.

19    Now I would reserve, you know, it's kind of part and parcel

20    with the --

21          THE COURT:  If there's an employee creditor that

22    would go on the matrix, it would be the name and business

23    address.

24          MR. ROBERTSON:  That's correct, Your Honor.

25          MR. SCHWARTZBERG:  We're talking beyond employees.

Page 51

1    If there are other creditors out there.

2            THE COURT:  I don't think they had an issue with

3    that because there's no personally identifiable information.

4            MR. ROBERTSON:  Your Honor --

5            THE COURT:  It's just the name and address.

6            MR. ROBERTSON:  -- let me add one point just to

7    make sure.  To the extent a claim is filed that is subject

8    to our claims suppression --

9            THE COURT:  That's a separate --

10           MR. ROBERTSON:  -- procedures.

11           THE COURT:  -- issue.  Yeah.

12           MR. ROBERTSON:  We don't want to then say, well,

13   they filed this claim and they have -- you know, so as long

14   as those two things are not put together --

15           THE COURT:  Proofs of claim, they're -- Prime

16   Clerk, as claims agent, is authorized to suppress PII if

17   someone inadvertently puts in their social security number,

18   for example, or something like that.

19           MR. SCHWARTZBERG:  But their names are not being

20   suppressed.

21           THE COURT:  Correct.

22           MR. SCHWARTZBERG:  Thank you, Your Honor.

23           THE COURT:  Did you have something to say?

24           MR. MARKOWITZ:  I did.  Your Honor, Scott

25   Markowitz.  I was wanting -- we put individual plaintiffs

Page 52

1  into our lawsuit, would it be A, B, C or Mr. X care of the

2  law firm or are we listing the creditor on the matrix?  We

3  named our lawsuit by the individual parties.

4           THE COURT:  I don't know.  I mean, this motion

5  doesn't deal with that issue.

6           MR. ROBERTSON:  It does not.

7           THE COURT:  I mean, that's up to the -- if the

8  debtors -- the debtors are supposed to prepare the matrix,

9  or the claims agent with the debtors will do so.  And I'm

10  assuming they'll do it in a way that --

11           MR. MARKOWITZ:  They're asking to exclude that and

12  that's the way --

13           THE COURT:  No.  No.  I -- it's not -- no.  I

14  don't think so.

15           MR. ROBERTSON:  And, also, the bar date motion

16  will address, you know, these and many other concerns as far

17  --

18           THE COURT:  There's nothing in this motion that

19  excludes --

20           MR. MARKOWITZ:  Okay.

21           THE COURT:  -- the name and address of --

22           MR. MARKOWITZ:  A plaintiff.

23           THE COURT:  -- of a creditor.

24           Okay.  So I will grant the motion.  I actually --

25  I think the only change to it is just the -- I think that

Page 53

1   would say nothing herein relieves any part of any obligation

2   under applicable regulation of law --

3           MR. ROBERTSON:  Thank you, Your Honor.

4           THE COURT:  -- to suppress PII.

5           MR. ROBERTSON:  Thank you, Your Honor.

6           Moving onto the next motion on our agenda.  This

7   is Agenda Item Number 8, Docket Entry Number 4.  This is the

8   Prime Clerk retention application under Section 156(c).

9       We vetted the form of application with the clerk's

10  office.  They had actually raised one question that related

11  to language that would permit Prime Clerk to limit public

12  access to the claims register upon further order of the

13  court.  This is sort of the bone suspenders for Prime Clerk

14  to make sure that the retention application didn't override

15  the relief that Your Honor just approved in the prior

16  motion.  You know, we explained that rationale to the

17  clerk's office and they were understanding of our concerns.

18          I know that the U.S. Trustee had raised some

19  issues with the Prime Clerk retention and I would let Mr.

20  Schwartzberg --

21          MR. SCHWARTZBERG:  Thank you.

22          Your Honor, once again Paul Schwartzberg of the

23  U.S. Trustee's Office.  We just had one concern with the

24  Prime Clerk retention. The underlying engagement letter had

25  a limitation on liability.  In fact, even if Prime Clerk is

Page 54

1    grossly negligent and acts with a willful misconduct, their

2    liability I think is limited to their fees.

3            On the Court's -- there's a protocol that the

4    claim agents have developed with the clerk's office is a

5    published order.  None of them reference or permit a

6    limitation on liability.  So there is talk about

7    indemnification which they have and we do not object to.

8    But we believe the limitation on liability should be

9    stricken from the engagement letter.

10           THE COURT:  Okay.  I agree with that.

11           MR. ROBERTSON:  Okay.  Thank you, Your Honor.

12           THE COURT:  Rather than amending the engagement

13   letter, you can just put that in the (b) paragraph.

14       (Pause)

15           THE COURT:  I thought I had it here.  It will be

16   in the paragraph with the indemnification and the --

17           MR. ROBERTSON:  Paragraph 10.

18           THE COURT:  Paragraph 10.  Fine.

19           But except for the two points that have just been

20   raised, this order tracks the standard order for engagements

21   like this which are, given the number of potential claimants

22   listed on the petition, the required retention of a claims

23   agent to relieve the clerk's office of the burden of dealing

24   with all the claims.  And it's consistent with those orders.

25           So except for the reference to or the cross

Page 55

1    reference to the order that I just a moment ago said I would

2    grant, and the clarification on the -- there being no cap

3    for willful misconduct, gross negligence, the agreement is

4    standard, and with those changes I'll approve it.

5              MR. ROBERTSON:  Thank you, Your Honor.

6              Moving onto Agenda Item Number 10.  This is at

7    Docket Number 8.  This is the debtors' taxes motion.  In the

8    ordinary course of business the debtors collect

9    (indiscernible) incur use taxes, entity taxes and fees, real

10   property taxes, personal property taxes, federal excise

11   taxes, regulatory and business license fees and taxes,

12   Puerto Rico taxes, a branded prescription drug fee, FDA fees

13   and certain other taxes.  A non-exhaustive list of

14   governmental authorities to whom the debtors remit the taxes

15   and fees is annexed to the prepetition taxes motion at

16   Exhibit C.

17             The debtors do not believe that any of the taxes

18   and fees are past due and delinquent.  The relief sought is

19   to pay them as they come due in the ordinary course.  Given

20   the nature of the debtors' business, you know, payment of

21   taxes is, as it is in every business, you know, very

22   important.

23             In response to a question from the U.S. Trustee,

24   the license fees and taxes, the branded prescription drug

25   fees, the FDA fees, these are all billed to the company and

Page 56

1    paid when due.  On the opioid access excise tax, which is

2    discussed in the motion, the company will report to New York

3    State periodically and New York State will calculate the

4    amount of the tax owed and then remit the amount.

5           As disclosed in the motion itself, if you would

6    allow me, we -- we're very clear that these -- we are clear

7    that these -- the debtors are not seeking to -- sorry.  The

8    debtors are not seeking to pay taxes and fees that are past

9    due.  Paragraph 20, dealing with the regulatory and business

10   license fees, the debtors -- as I said, they're not aware of

11   any taxes that have not yet been remitted to the relevant

12   governmental authorities.

13          In paragraph 23, we note that there are no branded

14   prescription drug fees.  Excuse me.  We note that we are

15   seeking authority to pay branded prescription drug fees as

16   they come due on or after the petition date.  Likewise, for

17   the FDA fees in paragraph 24.

18          Mr. Schwartzberg or Brian, I don't know if that --

19          MR. MASUMOTO:  Your Honor, Brian Masumoto for the

20   Office of the United States Trustee.

21          Your Honor, as indicated by counsel, we've had

22   some discussions.  Part of our concern is that with respect

23   to trust fund taxes we don't have any objections to payments

24   of those even if they constitute prepetition taxes.

25          However, non-trust fund taxes that may be

Page 57

1   attributable to the prepetition period should not be

2   elevated to an admin expense in our view.

3           My understanding, the order does provide for a

4   non-acceleration provision, so I'm not sure if any payments

5   will be due between now and the final.  But to the extent

6   non-trust fund taxes are attributable to a prepetition

7   period, at least until we get clarification we have some

8   concerns about allowing those payments to be made as admin

9   -- administrative expenses and elevating their priority.

10          MR. ROBERTSON:  And as I said, Your Honor, there's

11  a schedule on page 5 of the motion, you know, of amounts

12  seeking to be paid in the interim and final -- in the

13  interim period and on a final basis.  You know, certainly,

14  the debtors have every intention to continue to satisfy

15  their tax obligations.

16          THE COURT:  On the record before me it looks as if

17  the amounts, if any, that come due between now and say mid-

18  October that might have a portion in the prepetition period

19  would be minimal and would be a priority claim, not an admin

20  claim.

21          I don't -- to me it's beneficial to pay the least

22  minimal amount to avoid accrual of interest and get into the

23  issue as to whether they're -- they give rise to liens

24  and/or trust fund liability, particularly given the fact

25  that there's no funded debt here.

1              MR. MASUMOTO:  Well, again, we'll defer to Your

2       Honor.  Again, our -- once again, our position is that even

3       priority taxes should not be elevated, certainly not on the

4       interim.

5              MR. HUEBNER:  Your Honor, let me just help for a

6       second.  You know, the thing that also matters to us a lot

7       is the administrative costs of actually fighting and not

8       paying these things.

9              THE COURT:  Well, that --

10             MR. HUEBNER:  It's not just interest.

11             THE COURT:  -- that's what I was trying to get to.

12             MR. HUEBNER:  The amounts are so small and these

13      are all things that were very recently incurred, that to say

14      start incurring the wrath of governmental regulators who,

15      among other things, grant you your license to sell your

16      product and say, ha ha, it's a priority claim and go file

17      it, we're not paying it, that just makes no sense here, Your

18      Honor.  This is an extraordinarily heavily regulated

19      business.  These amounts are extremely modest.  The company

20      worked hard to make sure that we were basically current on

21      them.  And we actually would request authority to pay all of

22      them as set forth in the motion, and we believe fully

23      supported by the declaration.

24             THE COURT:  Okay.

25             MR. TROOP:  Your Honor, if I may.

1              THE COURT:  Okay.

2              MR. TROOP:  Your Honor, Anthony Troop from

3    Pillsbury Winthrop Shaw Pittman.  I'm here today on behalf

4    of the Attorney General for the State of New York, but also

5    for an ad hoc committee in formation of other states --

6              THE COURT:  Okay.

7              MR. TROOP:  -- which would be the states who have

8    not expressed their support for the deal.

9              MR. HUEBNER:  Your Honor, we want to pay their

10   taxes, too.  I want to be clear.

11         (Laughter)

12             MR. HUEBNER:  We're not discriminating based on

13   who supports our deal.  If we owe Massachusetts taxes,

14   please let us pay them.

15         (Laughter)

16             MR. TROOP:  And, Your Honor, I'm not here to make

17   sure -- I'm not here to say don't pay them.

18         (Laughter)

19             MR. TROOP:  What I am saying is that because you

20   haven't paid them, there may be an issue with regard to the

21   applicable look back periods on a variety of potential

22   claims that the estate might have to recover what might have

23   been improper payments as the case law is developing with

24   regard to standing or look back periods or, for example,

25   fraudulent conveyance claims.

1            And so my concern, Your Honor, having not thought

2     about the issue or argued about the issue or really put it

3     in this context till I heard it, is that paying the claim

4     shouldn't deprive the estate of a look back period that

5     might otherwise have been applicable on the filing date

6     because there was an amount outstanding.

7            And so I'm left with the following conundrum, Your

8     Honor, because I -- we got these papers late on Sunday.  We

9     didn't have an opportunity to parse these issues or to

10    parse statute of limitations, is whether inadvertently --

11    and I do emphasize inadvertently because I ascribe no ill

12    will to anyone --

13            THE COURT:  Well, how -- what is -- do we know

14    what New York State's look back period is for --

15            MR. TROOP:  It's --

16            THE COURT:  -- taxes?  Is it ten years?

17            MR. TROOP:  For taxes?  I don't know what it is

18    for taxes, Your Honor.  I have never had to look back for

19    taxes.

20            THE COURT:  Well, I mean, you could solve that by

21    saying you could pay all but a de minimus amount.

22            MR. TROOP:  Thank you, Your Honor.  I just want

23    to make sure we don't inadvertently mess something up.

24            THE COURT:  Okay.  All right.

25            MR. TROOP:  Thank you.

1            THE COURT:  But, again, it appears to me given the

2    record before me that if there is any amount that is either

3    unpaid or would be coming due in the roughly two weeks

4    before our final hearing, the failure to pay that amount

5    would create a greater liability and greater expense to the

6    debtors and, therefore, their creditors than the amount that

7    would be paid, but for the point that was just raised that

8    would argue for granting interim relief here.

9            I think the debtors in -- if there is any such

10   payment that they actually find out that they should be

11   making should simply be mindful of the statute of

12   limitations issue.  And what I'm authorizing here is just

13   that, authorization.  It's not a direction.  So I'm assuming

14   if they're mindful of that issue, they will manage it by not

15   making the payment or making all but a portion of the

16   payment.

17            MR. ROBERTSON:  Thank you, Your Honor.

18            THE COURT:  But there's a net benefit here to the

19   estate, even after taking into account the priority scheme

20   of the Bankruptcy Code.  So I would therefore grant the

21   motion on an interim basis.

22            MR. ROBERTSON:  Thank you, Your Honor.

23            THE COURT:  Can I just say it's been raised.  The

24   idea of having two ad hoc committees, one supporting and one

25   not supporting, is a little odd to me.  I would urge the

Page 62

1    parties to at least consider whether they could actually

2    work together with perhaps subcommittees when they disagree

3    with each other.  I'm assuming attorney generals do talk to

4    each other, even if they're from different parties.  And

5    that might avoid the necessity of having, you know, a more

6    cumbersome structure.

7                MR. ECKSTEIN:  Good morning, Your Honor.  Kenneth

8    Eckstein of Kramer Levin.  I thought this might be an

9    opportune time to rise and present myself to the Court.  And

10   I'm pleased to be here today with my co-counsel Melanie

11   Cyganowski of the Otterbourg firm, David Molton, Brown

12   Rudnick, and Craig Lithland (ph) of the Gilbert's firm.  And

13   we are representing the ad hoc committee that was formed

14   consisting of the entities that Mr. Huebner described.

15               There were nine state's attorney general, the PEC,

16   the plaintiffs' executive committee, and the MDL, and

17   certain municipalities, specifically the County of Santa

18   Anna -- Santa Clara and the City of Philadelphia, all of

19   whom have indicated their support for the conceptual

20   framework for a settlement with the debtors and the Sackler

21   families that was outline by the company in Mr. Huebner's

22   remarks and their papers.

23               The ad hoc committee, Your Honor, is

24   representative of state's attorney's general for 24 states

25   and five territories, and substantial other municipalities

Page 63

1    and tribes who have likewise indicated their support for the

2    conceptual settlement framework.

3             I just outline that, Your Honor, so Your Honor has

4    a perspective of the breadth of the entities.  And I believe

5    that Ms. Cyganowski and Mr. Molton will probably make brief

6    remarks as well just to give Your Honor a little more

7    perspective.

8             Your Honor, I think that a great deal has been

9    accomplished to create a framework today and to organize a

10   group that can interact with the debtor on trying to move

11   this case forward in a constructive fashion.  This case is,

12   at this point, only at a very preliminary stage and there's

13   a great deal of work that will need to be done.  And we will

14   certainly be mindful of Your Honor's suggestion in terms of

15   thinking how we should operate.

16            But I want Your Honor to appreciate the complexity

17   surrounding what it took to get to this point and what it's

18   going to take to get to a resolution.  And I completely

19   subscribe to Your Honor's sentiment that, ultimately, in

20   order to achieve a consensual plan, all parties in this case

21   -- and that is going to be a wide, wide range of

22   governmental entities and other interested parties are going

23   to have to find a way to ultimately achieve a consensus that

24   will allow us to get to a confirmed plan.

25            But in the first instance, we have to find out

Page 64

1   whether or not we can create a workable structure that will

2   be the framework for a plan and we're only at the very early

3   stages.

4            THE COURT:  Okay.

5            MR. ECKSTEIN:  Your Honor, the only other thing

6   I'll say today is we appreciate that today's a first day

7   hearing and we appreciate that relief is limited to what is

8   necessary for operations.  And we have also had only a very

9   brief amount of time to see the papers and to interact with

10  the debtor.  And we appreciate that the U.S. Trustee has

11  made a variety of comments, most of which we subscribe to.

12           I will have a few comments about some of the other

13  motions, but as a general matter, given the fact that the

14  relief is interim and given the fact that the debtor has

15  already agreed to make certain modifications as will be

16  referred to with some subsequent motions, as a general

17  matter we are reserving our rights to do more diligence over

18  the next several weeks.  And we would reserve our rights to

19  come back obviously and take substantive positions on these

20  motions.  But we think as a general matter it makes sense

21  for the debtor to continue to operate in the ordinary course

22  of business based upon the types of relief that are being

23  sought.

24           So with respect to this particular motion, Your

25  Honor, we don't have an objection based upon the fact that

Page 65

1    it's interim.  But I thought this would be a good

2    opportunity to at least introduce ourselves.  And I

3    appreciate the time, Your Honor.

4              THE COURT:  Okay.  Thank you.

5              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

6    for the U.S. Trustee's Office.

7              While we're dealing with the ad hoc committees, I

8    just wanted to go on the record.  Right now I know we're

9    going to meet with the one that exists, but I don't want our

10   silence -- in terms of the payment of these ad hoc

11   committees the U.S. Trustee has a position on it and we're

12   going to talk to the committees with them.  But I don't want

13   our silence saying -- being mistaken for our agreeing to

14   anything that gets agreed to that we believe is beyond what

15   the code permits.

16             THE COURT:  Okay.

17             MR. HUEBNER:  Yeah.  And, Your Honor, just to be

18   very clear so that there's no mistake at all, we reserve the

19   same rights.  In other words, part of the deal that we put

20   forth a while ago was actually our suggestion because we

21   needed a group of experienced, you know, sort of synthesize

22   down counterparties to negotiate with is that when we reach

23   a settlement framework, because we respect the U.S.

24   Trustee's position and didn't want to fight unofficial

25   committees, that the supporting parties would have to

Page 66

1   actually form a smaller group because we have a lot of very

2   complex documents to be done.

3           The fact that there -- the people who are opposing

4   the deal have chosen to organize and speak in a more focused

5   way hopefully will ultimately be helpful.  The debtors

6   certainly have never offered and their clients didn't even

7   know about it until they heard it in open court, I think,

8   today.  And so I don't want anyone to think that we have

9   agreed to pay the fees of the objectors.  We certainly have

10  not.

11          Whether ultimately it makes sense to have a larger

12  synthetic, non-U.S. Trustee appointed governmental

13  plaintiffs' committee we'll leave to another day.  But I

14  just -- people use the word ad hoc, and sometimes that

15  implies that that's already an agreement that's been made

16  with the company.  That is definitely not the case here.

17          We are agreeing sort of conceptually, frankly,

18  like RSA counterparties, you know, when you reach a deal

19  with a critical mass and they are advancing with you, here

20  we have the edit overlay that they just -- the trustee won't

21  let them on the official committee.  So in order for the

22  vast majority of our claimants, which I think 85.8 percent

23  of the filed lawsuits are governmental, we believe it's

24  appropriate to give the real parties of interest a voice.

25          But none of this is for today.  Let me just be

Page 67

1    super clear.  I know it's obvious to the Court, but for

2    everybody.  We will file a motion at the appropriate

3    juncture with appropriate argument and factual support when

4    we are ready to move forward seeking to use estate property,

5    to pay the fees of X, and people should talk before then and

6    they've heard the Court's view that maybe one bigger tent

7    makes sense.  It may make sense.  It's hard to say.  There

8    are a lot of people with very different views.

9              But I didn't want the use of the word -- actually,

10   there are two, Your Honor, to have anybody imply from that

11   that the debtors have agreed to pay for a UCC and a

12   supporting governmental entities' committee and an opposing

13   governmental committee.  That would make it go on in a way

14   that I don't think we're going to sign onto.

15              THE COURT:  Okay.

16              MR. SCHWARTZBERG:  Your Honor, I'm sure -- it's

17   not for today, but I'm sure Your Honor clearly understands

18   the U.S. Trustee's position on the committee.  Persons is a

19   defined word under the code.  And it does not include

20   governmental entities, and that's -- we believe our position

21   is following through in what congress enacted when they

22   enacted the Bankruptcy Code.

23              THE COURT:  Okay.

24              MR. MACLAY:  Your Honor, may I be heard?

25              THE COURT:  Sure.

1              MR. MACLAY:  My name is Kevin Maclay, Your Honor.

2      I'm from Caplin & Drysdale, along with my colleagues, Todd

3      Phillips and Jim Wehner.  I just wanted to announce to the

4      Court that we represent a group of approximately 400

5      governmental entities.  We call it the multi-state group,

6      Your Honor.  And that isn't in the objector can or right now

7      in the support can.  We're in a can of trying to figure out

8      what's going on and hopefully working with the debtors in

9      the current other ad hoc to figure out the best step

10     forward.

11             But I just wanted to make sure that our existence

12     was known, Your Honor, as we move forward hopefully

13     consensually.

14             THE COURT:  Okay.  That's fine.

15             I mean, but my remark just went to one simple

16     point, which is that it is probably a good thing for various

17     groups of parties in interest in these cases to act through

18     common representatives just as official committees may have

19     members that at times disagree with each other.  It's quite

20     possible that, although they generally act through common

21     entities they may have a disagreement.  And maybe those

22     disagreements will be so fundamental that they can't all

23     work together through a common representative.

24             But it would seem to me that there are certain

25     functions that common representatives would perform that

1    would be standard, such as coordinating due diligence,

2    coordinating discovery and the like that might warrant these

3    groups to see if they can organize a common way to deal with

4    those issues even if they decide that they want to have a

5    separate group.

6              But all sorts of -- all other issues, including

7    rights to compensation and the like are clearly not what I'm

8    addressing here.

9              MR. ROBERTSON:  Thank you, Your Honor.  This is,

10   again, Christopher Robertson on behalf of the debtors,

11   turning back to the first day agenda.

12             THE COURT:  Right.

13             MR. ROBERTSON:  Moving on to Agenda Item Number

14   10, that's also Docket Number 10.  This is the debtors'

15   insurance motion.

16             The debtors require various liability, casualty,

17   property and other insurance programs.  If any of these

18   programs or policies lapse without renewal, the debtors

19   could be in violation of state and/or federal law resulting

20   in loss of licenses and then loss of ability to operate

21   their businesses.

22             Certain governmental agencies also require the

23   debtors to maintain certain insurance policies.

24             The debtors believe that all material insurance

25   premiums or amounts due under the insurance policies that

Page 70

1   were due and payable prior to the petition date have been

2   fully paid.

3          We have received no formal or informal objections

4   to this motion.  Unless Your Honor has any questions, we

5   respectfully request that the motion be approved.

6          THE COURT:  Okay.  Does anyone have anything to

7   say on the insurance motion?

8          I will grant the motion on an interim basis.  The

9   legal issue is to the nature of an insurance policy and

10  whether an insurer for non-payment of premium is violating

11  the stay.  And terminating a policy is a nice legal issue.

12  But in the context of these cases and based on the record

13  before me which shows that the debtors believe they're

14  current with all these policies, this does not appear to me

15  to be the place to press that issue.

16         So I will grant the motion on an interim basis.

17         MR. ROBERTSON:  Thank you, Your Honor.

18         Turning to Agenda Item Number 11.  That's at

19  Docket Number 13.  This is the schedules and SOFAs

20  extension.  Pursuant to Rule 1007 and Section 521 of the

21  Bankruptcy Code, the debtors are required to file their

22  schedules and SOFAs within 14 days after the petition date.

23         Given the size and complexity of these cases, we

24  believe that an additional 30-day extension is appropriate.

25  The debtors and their professionals intend to work

Page 71

1    diligently to have the schedules and SOFAs filed before the

2    expiration of what would be a 44-day period should Your

3    Honor grant that relief.

4              This motion is unopposed.  Unless Your Honor has

5    any questions, we would respectfully request it be entered.

6              THE COURT:  Okay.  Does anyone have anything to

7    say on this motion?

8              All right.  Given the size of the debtors and

9    their creditor body, and the other legal work the debtors

10   have been doing leading up to these filings, a 30-day

11   extension is certainly warranted.  So I'll grant that

12   relief.

13             MR. ROBERTSON:  Thank you, Your Honor.

14             I would now like to turn the podium over to my

15   colleague, Dylan Consla to present the surety motion.

16             THE COURT:  Okay.

17             MR. CONSLA:  Good morning, Your Honor.

18             THE COURT:  Good morning.

19             MR. CONSLA:  For your record -- for the record

20   Dylan Consla of Davis Polk & Wardwell on behalf of the

21   debtors.  The next motion on the agenda is the surety bonds

22   motion, which is Agenda Item Number 12 and also Docket Item

23   Number 12.

24             By this motion, the debtors seek authority to

25   maintain, continue and renew their surety bond program in

Page 72

1    accordance with the same practice and procedures as were in

2    effect prior to the petition date.

3            This relief is necessary because various state and

4    local governmental authorities require the debtors to post

5    surety bonds to operate their business in the ordinary

6    course, including to maintain licenses to sell or distribute

7    pharmaceutical products.  So this is necessary to operate

8    the business as they have been doing.  Failure to provide,

9    maintain, replace these surety bonds could jeopardize their

10   ability to continue to operate.

11           There have been no objections or changes to the

12   proposed form of order.  So unless Your Honor has any

13   questions, we would ask that the relief be granted.

14           THE COURT:  Okay.  Does anyone have anything to

15   say on this motion?

16           MS. LEONARD:  Yes, Your Honor.  Nicole Leonard of

17   McElroy Deutsch Mulvaney and Carpenter on behalf of

18   Westchester Fire Insurance Company.

19           THE COURT:  All right.

20           MS. LEONARD: We just want to clarify that

21   Westchester has no obligation to issue any new bonds or

22   modify any existing bonds.  And we would like that added to

23   the order.

24           THE COURT:  Well, I don't know if that's true.  I

25   mean, I don't know what the agreement is between your client

1    and the debtors.

2         MS. LEONARD:  Well, we -- our position is we have no

3    obligation --

4              THE COURT:  Well, I know that's your position.

5    But if you're asking me to enter an order that actually

6    declares that position is correct, I'm not going to do it.

7    I mean, obviously -- there's nothing in the order that

8    forces someone to do anything beyond their contractual

9    obligations as modified by the Bankruptcy Code.

10             MS. LEONARD:  Well, then we would like to reserve

11   all our rights for the final --

12             THE COURT:  That's -- okay.

13             MS. LEONARD:  -- and we --

14             THE COURT:  I mean, I -- as you probably know, I'm

15   not a big fan of people standing up and saying they reserve

16   their rights because basically all rights are reserved

17   unless they're specifically dealt with in an order.  And if

18   I let one person stand up, then everyone thinks they have to

19   stand up to reserve their rights.

20             So I'm just going to say this once.  The order is

21   limited to what it says.

22             MS. LEONARD:  Okay.

23             THE COURT:  And I don't view this as determining

24   any rights under surety bonds.

25             MR. HUEBNER:  Your Honor, for the avoidance of

Page 74

```
 1    doubt, this is an entirely standard order that just

 2    authorizes --

 3              THE COURT:  No.  I know.  I read it.

 4              MR. HUEBNER:  If any party really believes that

 5    somewhere there's magic language that we missed that is an

 6    affirmative injunction that compels them to do things,

 7    they're welcome to call us and point out that we made a

 8    mistake in a very standard order.

 9              THE COURT:  Okay.

10              MR. HUEBNER:  If they --

11              THE COURT:  But, again, the --

12              MR. HUEBNER:  -- didn't, then we're done.

13              THE COURT:  I think I was careful to say people's

14    rights are limited by their contracts --

15              MR. HUEBNER:  Exactly.

16              THE COURT:   -- as modified by the Bankruptcy

17    Code.  The automatic stay applies in the Bankruptcy Code

18    automatically.

19              MR. HUEBNER:  Exactly.  It's a motion to grant --

20    giving us authority, not enjoining other parties to act in

21    any way that they don't have to do.  And of course we

22    understand that.

23              THE COURT:  Right.  But, again, the order doesn't

24    adjoin people, but the automatic stay --

25              MR. HUEBNER:  Correct.
```

Page 75

1                THE COURT:  -- may depending on the issue.

2                So I'm going to grant the relief as sought.

3                MS. LEONARD:  Thank you, Your Honor.

4                MR. ROBERTSON:  And essentially for the same

5      reasons that I granted the relief with respect to the

6      insurance programs.

7                MR. CONSLA:  Thank you, Your Honor.

8                The next item on the agenda is the utilities

9      motion --

10                THE COURT:  Right.

11                MR. CONSLA:  -- which is Agenda Item Number 13 and

12      Docket Entry Number 7.

13                By this motion, the debtors propose to provide the

14      utility providers with an adequate assurance deposit that's

15      estimate to total approximately $350,611.  This is equal to

16      two weeks' worth of utility services calculated on a

17      weighted average over the 12 months ending June 30th, 2019,

18      which is the customary amount and calculation methodology.

19                The debtors seek a determination that the adequate

20      assurance deposit will provide utility companies with

21      adequate assurance of payment under the meaning of 366, and

22      an order prohibiting the utility providers from altering,

23      refusing or discontinuing services on account of prepetition

24      amounts outstanding or the perceived inadequacy of such

25      deposit.

1          The debtors are also seeking approval of customary

2   procedures for resolving requests from insured -- from

3   utility providers for additional amounts or resolving other

4   disputes before having to bring them to Your Honor.

5          We have received no objections.  There are no

6   changes to the proposed form of order here as well.  So we

7   would respectfully ask that this order be granted as well.

8          THE COURT:  Okay.  I think, again, as with the

9   case management order, I appreciate that you have generally

10  tracked what I've entered in the past and that the order is

11  largely consistent with the applicable law, including in

12  this jurisdiction as well laid out in Judge Seibel's A&P

13  opinion.

14         But there are a couple of changes that I believe

15  you should make --

16         MR. CONSLA:  Okay.

17         THE COURT:  -- to better track that opinion

18  dealing with how the money actually goes out, if there's a

19  default and how it comes back, if there's a cure and the

20  like, as well as with disputes.

21         So I'm going to give you that mark up and it

22  references an order that I entered recently that has the

23  paragraphs that I would like you to add.

24         MR. CONSLA:  Should I approach, Your Honor?

25         THE COURT:  Sure.

1          And, again, this is an interim order.  You'll be

2    giving notice to the utilities so they can raise an issue if

3    they want, although for the last several cases they haven't

4    done that.  So I'm assuming they're going to be happy with

5    this, or at least content to live by it.

6          MR. CONSLA:  Thank you, Your Honor.

7          THE COURT:  Okay.

8          MR. CONSLA:  With that I will turn the podium over

9    to my colleague, Eli Vonnegut.

10          THE COURT:  Okay.

11          MR. VONNEGUT:  Good morning, Your Honor.  For the

12   record my name is Eli Vonnegut of Davis Polk & Wardwell, LLP

13   on behalf of the debtors.

14          Your Honor, first I will be presenting our

15   customer programs motion which is Agenda Item Number 14,

16   Docket Number 11.

17          Your Honor, by this motion we are seeking

18   authority to continue performing under the debtors' existing

19   customer programs to honor prepetition obligations owed to

20   customers and to otherwise continue to manage the customer

21   programs and practices in the ordinary course of business.

22          We also seek relief from the automatic stay to

23   permit setoffs in connection with the customer programs,

24   authority to satisfy any outstanding obligations under our

25   agreements with third party vendors that help us manage our

Page 78

1    customer programs.  And we ask that the Court authorize all

2    applicable banks and other financial institutions to process

3    related checks and transfers.

4            Your Honor, I'll cover the programs themselves

5    very briefly because they are described exhaustively in the

6    motion.

7            The vast bulk of the debtors' sales, 90 percent as

8    of August 31 of 2019, are to wholesalers, principally three

9    of them:  McKesson, AmerisourceBergen and Cardinal.  Those

10   sales, however, are really just the first step in the flow

11   of the debtors' products through the market, which in

12   aggregate involves a series of chargebacks, discounts,

13   rebates and other adjustments to those initial prices based

14   on who the ultimate buyers of the product are.  And those

15   together create a dynamic fluctuating set of accounts

16   payable and receivable that together add up to the debtors'

17   real bottom line.

18           Our motion to hopefully aid in explaining how

19   these programs work attached a diagram at Exhibit C that

20   lays out the flow of the debtors' products through the

21   market, separately for the Purdue debtors who sell branded

22   prescription products, the Rhodes' debtors who sell generic

23   prescription products, and the Averio (ph) entities that

24   sell consumer health products.  So that's annexed to the

25   customer programs' motion at Exhibit C.

1              For the debtors to continue operating their

2     businesses, they need to continue honoring these obligations

3     in the ordinary course.  Its failure to do so could erode

4     goodwill, incur fines, penalties and exclusion from

5     important programs and cause irreparable damage to the

6     debtors' relationships with their customers.

7              Stated simply, failure to honor any of our

8     obligations under the customer programs would result in the

9     loss of the revenue associated with the relevant end

10    customer which would harm all stakeholders.

11             Your Honor, as these programs are described

12    exhaustively in the motion, unless you had any questions I

13    wouldn't propose to describe them in detail.

14             THE COURT:  Well, my question on this -- and maybe

15    it's more appropriate for Mr. Lowne, but is -- well, I have

16    two, actually.

17             The first is have these programs changed over the

18    last couple of years as the debtors' business has changed.

19    I mean, are -- and the second question is related to the

20    first, which is are they still working?  The premise behind

21    this and the next few motions is all centered on the fact

22    that the debtor has agreed to -- or the debtors have agreed

23    to turn over the value in the debtors to their creditors

24    pursuant to a process that, as Mr. Eckstein said, will take

25    a fair amount of work to figure out.

Page 80

1              So the premise here is you want to preserve that

2    value.

3              MR. VONNEGUT:  Correct, Your Honor.

4              THE COURT:  Are these programs being still run in

5    a way that preserves that value or have they been effected

6    by the debtors' litigation and business experience over the

7    last at least couple of years in a way that actually may at

8    this point be reducing value?

9              MR. VONNEGUT:  Sure, Your Honor.

10             So the short answer to your question is yes, the

11   customer programs are continuing to work.  The business is

12   still operating actively and has maintained good and

13   productive and profitable relationships with its -- both its

14   wholesaler customers and with end users.

15             I would not, however, tell you that the pending

16   litigation has not impacted the business.

17             THE COURT:  So that's a separate question.  What I

18   --

19             MR. VONNEGUT:  Sure.

20             THE COURT:  -- I'm really getting at, particularly

21   since many of these end users are also regulated and/or

22   governmentally tied, are -- am I authorizing here the

23   debtors to walk into some sort of extra penalty or, you

24   know, not in a legal sense, but tax or some sort of

25   imposition that people shouldn't be imposing on the debtors?

1          MR. VONNEGUT:  No, Your Honor.  I don't think you

2     are.  This is simply authorizing continued operation of the

3     business the way that it has been operated in the ordinary

4     course in the past.  And while there are, of course,

5     adjustments from time to time based on evolving

6     relationships with counterparties, the core function of the

7     business remains unchanged.  And we're not proposing to

8     change it under any of these programs.

9          THE COURT:  Okay.  All right.

10          Does anyone have anything to say on this motion?

11          MR. VONNEGUT:  Oh, I'm sorry, Your Honor.  I

12     should have said we've received no objections.  We're not

13     aware of any questions or concerns.

14          THE COURT:  All right.  Okay.

15          MR. ECKSTEIN:  Your Honor, Kenneth Eckstein of

16     Kramer Levin on behalf of the ad hoc committee.  I just rise

17     to note this is obviously involving very, very material sums

18     of money, $344 million of proposed --

19          THE COURT:  Right.

20          MR. ECKSTEIN:  -- rebates and discounts.

21          THE COURT:  Right.

22          MR. ECKSTEIN:  At this point, we don't object to

23     the relief, but I think it's appropriate at this juncture to

24     note this is an example of a motion that we do intend to

25     review and reserve our rights to come back.  And if there

Page 82

1   are any appropriate modifications and limitations, we'll

2   deal with that at the final hearing.

3            THE COURT:  Right.  I understand.  And other

4   people don't need to -- I mean, everyone will have a chance

5   to review it, obviously.

6            And to be clear, this seeks relief to continue or

7   authority to continue these various programs in the ordinary

8   course.  So --

9            MR. VONNEGUT:  Correct.

10           THE COURT:  -- if some entity starts acting out of

11  the ordinary course, then you can tell them that we don't

12  have authority to pay you on that basis or let you offset on

13  that basis.

14           MR. VONNEGUT:  Thank you, Your Honor.  And just to

15  --

16           THE COURT:  All right.  So --

17           MR. VONNEGUT:  -- address Mr. Eckstein's concerns

18  and any similar concerns that anyone may have, this is, of

19  course, a very complex business.  We stand ready.  We want

20  to help everybody understand it and address any questions

21  that anybody has.  So if there are questions about the

22  customer programs or anything else, please just reach out to

23  us.

24           THE COURT:  Okay.  All right.  So based on the

25  record before me I'll grant this relief on an interim basis.

1    It's clear to me that these programs are significant and

2    complicated.  It's not your normal green stamps at the

3    supermarket.  But it also is clear to me that disrupting

4    them at this juncture in the case would be truly detrimental

5    to the debtors' business.  And that the debtors should have

6    the authority to continue to perform under them pending a

7    final hearing, and the due diligence that I'm sure parties

8    of interest will be taking.

9              MR. VONNEGUT:  Thank you, Your Honor.

10             Oh, and I apologize.  I should have mentioned at

11   the outset.  We do have one small adjustment to the order

12   that was requested by two wholesalers, McKesson and

13   AmerisourceBergen that is simply a recitation that we intend

14   to continue performing under our customer programs with them

15   in the ordinary course of business.

16             And my colleague has the marked order.  If I may

17   approach the bench, Your Honor?

18             THE COURT:  I'm not sure what that means, continue

19   --

20             MR. VONNEGUT:  It's -- frankly, Your Honor, I

21   think it just said what we said we were intending to do.

22   We're happy to add it to accommodate the concerns of these

23   wholesalers --

24             THE COURT:  Well, I'm a little --

25             MR. VONNEGUT:  -- or not, as you prefer.

                                                            Page 84

 1              THE COURT:  I don't know the relationships that

 2    you have with them.

 3              MR. VONNEGUT:  Sure.

 4              THE COURT:  If they are just a supplier -- if they

 5    are just a customer or if they might be a supplier, too.  I

 6    mean, partly I'm motivated by the fact that yesterday I

 7    denied a summary judgment motion by McKesson --

 8        (Laughter)

 9              THE COURT:  -- saying that they should be relieved

10    of all preference claims in the A&P case.  You know, there

11    they were clearly a customer --

12              MR. MOLTON:  Your Honor, David Molton --

13              THE COURT:  -- and supplier, too.

14              MR. MOLTON:  Oh, I'm sorry.

15              THE COURT:  So I just don't know what it means

16    when you say that you'll just continue all relationships in

17    the ordinary course.  I mean, effectively --

18              MR. VONNEGUT:  Would you like me to present the

19    language to Your Honor or read it?

20              THE COURT:  Well, you can hand it up.  But I don't

21    know what the relationships are, so --

22              MR. VONNEGUT:  I understand, Your Honor.  If I may

23    approach?

24              THE COURT:  I mean, it's one thing -- anyway, I

25    think you understand what I'm saying.

1           MR. GARFINKLE:  Your Honor, this is Jeff Garfinkle

2    for McKesson.  May I be heard?

3           THE COURT:  Well, let me just read this language

4    first.

5           MR. GARFINKLE:  Okay.  Thank you.

6        (Pause)

7           THE COURT:  Well, so this is actually set off

8    language, right?

9           MR. VONNEGUT:  Correct.  Correct, Your Honor.

10   That is a component of the customer programs.  The way that

11   a number of these work is that charge back and rebate claims

12   that the wholesalers have are set off against other payments

13   that would be made to the debtors.  It's -- most of these

14   amounts are not paid in cash.

15          THE COURT:  Well, I think the difference is that

16   this order before this language authorized the debtors to

17   set off.

18          MR. VONNEGUT:  Correct.

19          THE COURT:  The new language would authorize the

20   wholesalers to set off.  And I'm just -- I'm not prepared to

21   do that on an interim basis.  I mean, you know, there's no

22   stay motion.  If they have a recoupment right, they can do

23   it.  But a set off right is more complicated.

24          I mean, for -- I mean, I just --

25          MR. VONNEGUT:  Understood, Your Honor.  I believe

Page 86

1    Mr. Garfinkle --

2             THE COURT:  I mean, yesterday we litigated for

3    about -- well, we argued for about 45 minutes whether a

4    503(b)(9) claim is pre or post-petition for purposes of a

5    preference claim for set off purposes.  So it's a

6    complicated area.

7             MR. MOLTON:  Judge, just one point.  David Molton,

8    Brown Rudnick, for the committee.

9             Your Honor, in explaining the context -- and I

10   think Your Honor cautioned with respect to this motion is

11   wise and the committee itself will need to take a very hard

12   look at this.

13            But Your Honor should be advised McKesson and

14   Amerisource are indeed active defendants in the national

15   opioid litigation.  And so many of these issues have serious

16   impact across the board.

17            THE COURT:  All right.

18            MR. MOLTON:  And accordingly what Mr. Eckstein

19   said at the beginning is we're two days into this, the

20   interim relief.  We acknowledge it's interim relief, but

21   we're going to have to take a very deep look at this.

22            THE COURT:  Okay.  Well, I mean, I -- that's -- I

23   mean, you're going to take a look at everything, but I'm

24   reluctant to grant stay relief at the beginning of the case.

25            MR. VONNEGUT:  Your Honor, just one important

1   additional point to mention.  The way these programs is work

2   is the setoffs, which are how these rebates and charge backs

3   are applied, practically speaking, mechanically, they are

4   actually done by the wholesalers rather than done by the

5   debtors.  That's the way the programs operate.

6           THE COURT:  Well, but you tell them it can be

7   done, right?  You're --

8           MR. VONNEGUT:  Yes, sir.

9           THE COURT:  -- authorized to tell them that under

10  this order.

11          MR. VONNEGUT:  Yes.

12          THE COURT:  So I just -- I think there's more that

13  could be subsumed in this agree -- in this language than is

14  -- I'm comfortable with.

15          MR. VONNEGUT:  Okay.  And just to address a

16  concern that was raised.  They are just distributors.

17          THE COURT:  No.  This deals with payables and I

18  understand that.

19          MR. VONNEGUT:  Yeah.

20          THE COURT:  But I don't -- I want to limit it to

21  how it was originally worded.

22          MR. HUEBNER:  Your Honor, with great apologies.

23  Let me just jump in for a second because I do have the CFO

24  talking to me right next to me.

25          THE COURT:  Right.

1            MR. HUEBNER:  I think we're all clear, but the

2    company needs to know with specificity, especially with Mr.

3    Lowne sitting here listening to you.  The way it works kind

4    of every day is that the wholesalers do complex calculations

5    based on rebates that end users are entitled to, and they

6    deduct from what they otherwise would pay us amounts for

7    veterans, Medicare, state programs, and send us that --

8            THE COURT:  Well --

9            MR. HUEBNER:  -- money.

10            THE COURT:  -- the company can -- the company

11    would be authorized on an interim basis to --

12            MR. HUEBNER:  Allow --

13            THE COURT:  -- allow that set off, but I don't

14    want to give additional authority to set off beyond that.

15    And you may say, well, that's all that this sentence says.

16    But then you don't need the sentence.

17            MR. HUEBNER:  Understood.  And, again, I just --

18    because Mr. Lowne was getting not anxious because he

19    actually, in fact, never gets anxious which is kind of

20    amazing to me.

21            THE COURT:  Okay.

22            MR. HUEBNER:  But looking for clarification on

23    this.

24            THE COURT:  All right.

25            MR. HUEBNER:  But the business model, I think

1    we've now described sufficiently --

2              THE COURT:  The prior sentence says the company --

3              MR. HUEBNER:  -- and it does it.

4              THE COURT:  -- is allowed to --

5              MR. HUEBNER:  Exactly.

6              THE COURT:  -- do the set off.

7              MR. HUEBNER:  And he is now -- thank you, Your

8    Honor.  I apologize very much for standing up.

9              MR. VONNEGUT:  So, Your Honor, I do believe we

10   have counsel to one of the wholesalers on the phone.  I

11   don't know if Mr. Garfinkle wanted to be heard.

12             MR. GARFINKLE:  Your Honor, Jeff Garfinkle for

13   McKesson.  And I appreciate yesterday being in front of the

14   Court and explaining work --

15        (Laughter)

16             MR. GARFINKLE: -- from the wholesaler to the end

17   user customer such as was existing in A&P.  What we have

18   here is the top end of the relationship whereby a

19   pharmaceutical company utilizes wholesalers such as

20   McKesson, such as AmerisourceBergen, such as Cardinal

21   Health, to distribute their products.

22             It is our position, McKesson's position, in a

23   number of pharmaceutical bankruptcy cases that have filed

24   around the country over the last 20 years is that this

25   relationship is recoupment in terms of the day to day

Page 90

1    netting that takes place when --

2              THE COURT:  The recoupment -- can I -- let me --

3    I'm sorry to interrupt you.  Recoupment is allowed.

4    Recoupment doesn't violate the stay.  And if it truly is

5    recoupment, then there is no consequences.  But this

6    sentence said set off.  It didn't say recoupment.  And the

7    prior sentence said the debtor is authorized to allow the

8    set off.

9              So I'm just -- I don't want there to be any issues

10   down the road.  I think the way it was worded is clear and

11   this additional sentence, I think, to me unduly complicates

12   the issue.  So there's nothing in this order that prevents

13   recoupment.  Obviously, if someone makes a mistake and it's

14   not recoupment, it's a set off.  That's a problem, although

15   usually and particularly under Taggert there may be a

16   perfectly legitimate way that no one gets sanctioned for it.

17             So let's just leave it at that.

18             MR. GARFINKLE:  Fair enough, Your Honor.

19             THE COURT:  Okay.

20             MR. VONNEGUT:  Thank you, Your Honor.  If there's

21   no further questions on the customer programs motion, we

22   would propose to turn to the next item on the agenda, the

23   wages motion.

24             THE COURT:  All right.  So you can e-mail the

25   interim order as proposed --

1          MR. VONNEGUT:  Thank you, Your Honor.  We'll do

2     that.

3          THE COURT:  -- in the binder to chambers.

4          MR. VONNEGUT:  Of course.  And, Your Honor, the

5     next item on the agenda is Agenda Number 15, Docket Number

6     6, the employee wages motion.

7          Pursuant to this motion, the debtors seek

8     authority to pay prepetition wages, salaries and other

9     amounts owing to their employees and to continue existing

10    employee benefit programs in the ordinary course of

11    business.

12         Your Honor, my partner, Mr. Huebner, outlined at

13    the outset of this hearing the structure of our proposed

14    settlement and what the debtors hope to achieve in these

15    cases.  The cornerstone of the settlement is the

16    contribution of the entirety of the debtors' value to a

17    trust for the benefit of the claimants in these cases who

18    are effectively the American people.

19         In order for the promise of that settlement to be

20    realized, we must preserve the stability and value of the

21    company during these cases.  Purdue will be worth more to

22    its ultimate owners and creditor recoveries will be higher

23    if we are able to protect the value of the enterprise.

24         The debtors employ approximately 700 dedicated and

25    talented individuals working in both full and part-time

Page 92

1    positions.  The employees are the life blood of the

2    organization and are critical to the value proposition that

3    underlies our proposed settlement.

4         The work force includes a dedicated roster of

5    operational managers, sales and marketing personnel, medical

6    affairs personnel, research and development personnel, human

7    resources people, as well as a diverse group of business and

8    administrative professionals.

9         The pharmaceutical industry, as you're no doubt

10   well aware, is highly specialized and highly technical.  The

11   collective knowledge and experience of these employees is

12   critical to the success of the debtors' business.  If we

13   lose employees, we may not be able to replace them, and the

14   resulting harm to the value of the business would hurt all

15   of the stakeholders.

16        Your Honor, it's important to note that Purdue in

17   recent years is a hard place to work.  Starting with some

18   simple statistics.  In 2017 and 2018 overall company

19   headcount, exclusive of the Rhodes' business, was reduced by

20   over 1,000 employees. That's a 67 percent reduction with 856

21   of those reductions occurring in 2018.

22        From 2018 to date the company has experienced over

23   25 percent attrition among the top tier of employees.

24        The ongoing litigation has also consumed a

25   tremendous amount of critical employee time and energy.

Page 93

1    Many employees have had to devote their time to preparing

2    for depositions, to being deposed, to responding to

3    litigation related requests for information, and otherwise

4    generally bearing the weight of the litigation,

5            The litigation has also caused operational

6    challenges.  Multiple financial institutions have refused to

7    do business with the debtors due to concerns about the

8    litigation, and a variety of vendors, suppliers, and other

9    counterparties necessary to the continued operation of the

10   business have attempted or threatened to terminate the

11   relationships with the debtors which requires management to

12   spend substantial time securing replacement services.

13           The overall environment in which the debtors'

14   employees work is extremely challenging.  They have faced an

15   unprecedented wave of negative publicity, including very

16   recently the attorney general of their home state of

17   Connecticut stating his belief that, as he put it, Purdue

18   has to go away and has to be shut down earlier this month.

19           Working for any debtor in bankruptcy is, of

20   course, challenging.  It's always challenging.  But having a

21   large mobilized and vocal group actively campaigning to

22   drive your employer out of existence is quite simply

23   qualitatively different.  And it puts a tremendous strain on

24   Purdue's employees.

25           Throughout recent years, 2018 and 2019, this has

1   led to an escalating climate of uneasiness among Purdue

2   leaders and employees at all levels of the company.  And it

3   makes employee retention extraordinarily challenging.

4           Following the recent headcount reductions which

5   included both planned reductions in force and unplanned

6   attrition, Purdue is a very, very leanly staffed

7   organization.  It's critical to remain key talent including

8   executives as well as middle managers and staff with

9   specific skills and valuable knowledge.

10          Ongoing operation of the business requires

11  preservation of staff with specific skills including, but

12  not limited to, medical and scientific expertise, controlled

13  substance clinical research expertise, epidemiology risk

14  management, central nervous system research, oncology,

15  expertise in working with governmental agencies.  It's a

16  very long list of important types of expertise that this

17  company needs to continue operating.

18          All of this, Your Honor, and apologies for

19  belaboring it, is to emphasize a simple point.  If we are

20  going to preserve the value of the estate, the debtors need

21  to honor their commitments to their employees.  The value of

22  the business relies -- resides in large part in its people

23  and the company's many stakeholders cannot afford to

24  undermine employee morale and thereby destroy that value,

25  particularly in the critical early days of the case.

1          Your Honor, the obligations are fairly simple, and

2     I'll describe them in a moment.  But first I want to make

3     clear a few important things.  First and most importantly,

4     no member of the Sackler family is an employee of the

5     company.  No payments will be made to or for the benefit of

6     a Sackler family member, period, full stop.

7          Number two, we are not seeking authority today to

8     make any payments to insiders beyond their simple wages and

9     benefits.  No bonuses, no retention, no severance for

10    insiders.

11         Third, we are not seeking authority to implement

12    any new compensation plans.  The wages motion exclusively

13    covers preexisting programs.  What we're trying to do in

14    these early stages of the case is simply continue operating

15    the business the way that we always have, including paying

16    people the way we've always paid people.

17         THE COURT:  Other than annual setting of targets,

18    were any preexisting programs brought into existence within

19    the year before the bankruptcy?

20         MR. VONNEGUT:  No, sir.  The programs are long-

21    standing.  Now I should mention that --

22         Excuse me, Your Honor.

23      (Pause)

24         MR. VONNEGUT:  Excuse me, Your Honor.  Some of the

25    retention programs were phased in over the calendar years of

Page 96

1    2018 and 2019.

2              THE COURT:  Okay.

3              MR. VONNEGUT:  So first I want to mention a few

4    agreements that we've reached with the United States

5    Trustee's Office.  And I would like to thank Mr.

6    Schwartzberg, Mr. Masumoto and Mr. Carney (ph) for their

7    help and patience working on this with us.

8              We believe that, frankly, all of the employee

9    programs outlined in the motion are important to the

10   continued driving of the business.  However, based on input

11   from the United States Trustee's Office, we have agreed to

12   defer a number of those items to final hearing on this

13   matter.  So those are not on for today.

14             Those items include the annual incentive plan, or

15   the AIP, the market access ICP, the long-term results plan

16   for both the Purdue debtors and the Rhodes' debtors, the

17   Treyburn retention plan, and payment of severance to former

18   employees.

19             Also, the sign on bonuses, and I think this is

20   just chronologically true, but we're making it clear in the

21   order.  We're not seeking authority to pay any sign on

22   bonuses that fall due after October 31st, so that those will

23   be subject to entry of the final order.

24             And if I may approach, Your Honor, I have a

25   revised form of order with an additional paragraph that

1    we've worked out with the U.S. Trustee's Office.

2              THE COURT:  Okay.  Were any of the payments under

3    the five programs that you mentioned before the sign on

4    bonuses, were any of those -- well, severance I guess could

5    conceivably come in.  But were any of the other four, are

6    their obligations currently owing under them?

7              MR. VONNEGUT:  I'll get to that in a moment, Your

8    Honor.

9              THE COURT:  Okay.

10       (Pause)

11             MR. VONNEGUT:  Okay.  Your Honor, unless you have

12   any questions I would propose to skip the basic benefit

13   programs that are -- that we view as kind of a component to

14   basic wages.  But if you have any questions I'm happy to

15   address them.

16             THE COURT:  Well, I just had that -- I just asked

17   that one question.

18             MR. VONNEGUT:  Oh, no, sorry.  I meant just, you

19   know, withholding obligations, expense reimbursement, that

20   category of thing.

21             THE COURT:  No, I don't have questions on that.

22             MR. VONNEGUT:  Great.  Okay.

23             So first with respect to severance we're asking

24   for very limited relief.  The existing company-wide

25   severance plan provides for six month's severance to vice

Page 98

1    principals -- not vice principals, excuse me, Your Honor,

2    vice presidents with less than five years' service and one

3    year for those with more than five years' service, more

4    junior employees get either two or three weeks' severance

5    per each year of service up to a maximum of 52 weeks.

6             And the only authority that we're asking for is to

7    pay severance to any employees who are terminated post-

8    petition, excluding insiders.

9             THE COURT:  Okay.  Which would be consistent with

10   Strauss DuParkay (ph).

11            MR. VONNEGUT:  Correct, Your Honor, that's --

12   those would be administrative claims, that's the only

13   authority we're asking for.

14            THE COURT:  Okay.

15            MR. VONNEGUT:  Okay.  The annual incentive plan as

16   I noted, that's being deferred.  That leaves the non-

17   executives --

18            THE COURT:  And I'm sorry, that plan -- it wasn't

19   clear to me whether anything was going to come due in any --

20   under that plan over the next two or three weeks.

21            MR. VONNEGUT:  That's correct, it would not, Your

22   Honor, and that's why we're comfortable deferring it.

23            THE COURT:  So your employees should realize that

24   you put off a fight that may never happen.

25            MR. VONNEGUT:  Absolutely, Your Honor, and that's

1      our intention.

2               THE COURT:  Okay.

3               MR. VONNEGUT:  Okay.  So that takes me to the

4      several components, the non-executive retention plan,

5      advancement of legal fees and sign-on bonuses.

6               Now with respect to these, we have had extensive

7      discussions with the U.S. Trustee's Office.  I don't believe

8      that our disagreements are fully resolved.  So if it's

9      acceptable to Your Honor, I'd propose to proffer some

10     additional testimony of our first day declarant who is the

11     senior vice-president and chief financial officer of PPLP

12     Jon Lowne in support of these programs.

13              THE COURT:  I thought you agreed on this sign on

14     bonus language?

15              MR. SCHWARTZBERG:  No, Your Honor, we actually

16     have a --

17              THE COURT:  Beyond what's in the order.  There's

18     an issue beyond what's in the proposed order on the sign on

19     bonuses?

20              MR. MASAMUTO:  There's some sign-on bonuses that

21     they're seeking to --

22              THE COURT:  Right.

23              MR. MASAMUTO:  I believe there are five

24     individuals.

25              THE COURT:  Okay.

Page 100

1              MR. VONNEGUT:  Correct, Your Honor.

2              THE COURT:  Okay.  All right.  So you're going to

3     proffer Mr. Lowne's testimony?

4              MR. VONNEGUT:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MR. VONNEGUT:  So as mentioned earlier, Mr. Lowne

7     is in the courtroom.  If called upon to testify Mr. Lowne

8     would testify as follows.

9              With respect to the non-executive retention plan,

10    Mr. Lowne is familiar with the non-executive employee

11    retention plan.  The purpose of that plan is to provide cash

12    based incentive awards to certain critical employees each

13    quarter in order to retain those employees.

14             This is a difficult time for Purdue and it would

15    be very difficult to attract new talent were the company to

16    lose its current employees.  With all the negative

17    publicity, many employees are concerned about the economic

18    risks that they are taking by staying at Purdue.

19             Further, Mr. Lowne would testify that these

20    employees are highly skilled and would have no trouble

21    finding new role at another company.  These employees have

22    highly coveted skills in the industry and the company is not

23    an easy place to work right now.  It would cause immediate

24    and irreparable harm to the company if these persons were to

25    leave.

1          Mr. Lowne would testify that he was involved in

2     the process of deciding which employees were critical for

3     Purdue so as to make those employees a part of the non-

4     executive retention plan.

5          Mr. Lowne would testify that they then evaluated

6     the nature of the jobs held and the functions of each role

7     in determining both criticality of the relevant persons and

8     their insider status.

9          Mr. Lowne would testify that in evaluating

10    critical -- criticality, the debtors first identified all

11    insiders and excluded them from consideration.

12         Mr. Lowne would testify that he understands that

13    term insider to encompass and we have been -- they evaluated

14    persons for inclusion on the non-employee retention plan on

15    the basis that the term covers those responsible for the

16    strategic decision-making at Purdue, such as for example,

17    financial strategy or development strategy.

18         Mr. Lowne would testify that he is familiar with

19    the person scheduled to receive payments from the non-

20    executive retention plan in the next 45 days, those that

21    would fall due prior to our second day hearing, and that

22    none of those persons are insiders, none set policy at

23    Purdue, none have authority to make strategic decisions for

24    Purdue, none exercise any control over the company, none

25    were elected, or appointed by the Board of Directors, and

Page 102

1   none of those persons report directly to the Board of

2   Directors.

3           With respect to the sign on bonus program, Mr.

4   Lowne would testify that he is familiar with the sign on

5   bonus program, that Purdue is providing sign on bonuses to

6   certain employees in the ordinary course of its business in

7   order to encourage those people to accept an offer to work

8   and continue to work at Purdue.

9           Mr. Lowne would testify that the employees who

10  received sign on bonuses are in general, those that had a

11  vested stock -- a vested interest in stock options or a

12  bonus or other benefits at the company where they previously

13  worked and were leaving to join Purdue.

14          He would testify that these employees are highly

15  skilled individuals who have many options for employment,

16  and would have been unlikely to have chosen to work at

17  Purdue without the sign on bonus or to continue to work at

18  Purdue without the sign on bonus.

19          Mr. Lowne would testify that if these sign on

20  bonuses were to remain unpaid there would be a risk of all

21  of these individuals leaving Purdue.

22          Further, the non-payment of these bonuses would be

23  a strong signal about the nature of Purdue's business in the

24  face of the current bankruptcy filing and would create a

25  tremendous risk that other employees would leave the company

Page 103

1    taking this as a sign of things to come.

2          Mr. Lowne would testify that this would cause

3    immediate and irreparable harm to the company if these

4    persons were to leave.

5          With respect to those participants in this program

6    that are due to receive payments in the next 45 days, Mr.

7    Lowne would testify that there are five such individuals who

8    are scheduled to receive a grand total of less than $100,000

9    prior to our anticipated second day hearing, and that none

10   of those persons are insiders because none set policy at

11   Purdue, none have authority to make strategic decisions for

12   Purdue, none exercise any control over the company, none

13   were elected or appointed by the Board of Directors, and

14   none of those persons report directly to the Board of

15   Directors.

16         With respect to the advancement of legal fees for

17   current and former directors, officers and employees, Mr.

18   Lowne would testify that the ability of Purdue to advance

19   these legal fees to these persons is critical to Purdue.

20   That there would be an immediate and irreparable harm if

21   Purdue were unable to advance these legal fees.

22         Mr. Lowne would testify that Purdue is going

23   through a very difficult period currently as it faces an

24   unprecedented number of legal cases, and having just filed

25   for bankruptcy protection.

Page 104

1               Mr. Lowne would testify that the amount of

2      litigation and the uncertainty that it creates has terrified

3      many current employees, into a feeling like there's a target

4      on their back, like any one of them could be next.

5               He would testify that these employees never

6      previously considered that they would have to hire a lawyer

7      and that that thought is terrifying.

8               In addition, the possibility of having to cover

9      legal fees would be economically devastating to many of

10     those employees, the majority of whom are making only 100 to

11     $200,000 a year.

12              Mr. Lowne would testify that in order to show the

13     company's employees that the company continues to stand

14     behind them and that it will assist them if the next lawsuit

15     names them personally, it is critical that the company

16     continue to cover the legal expenses of its current and

17     former people.

18              The coverage of former employees is important,

19     because all current employees fear that they may be one day

20     former employees.  And in addition, Mr. Lowne would testify

21     that this is a moral issue, as many former employees remain

22     friends with current employees.

23              Mr. Lowne would testify that if Purdue were to

24     cease advancing legal fees, employees would leave.  Any

25     employees that did not leave would likely be scared,

Page 105

1    distracted, and have a difficult time continuing to perform

2    at the highest level, and that all of that would cause

3    economic harm to the enterprise.

4          Mr. Lowne would testify that Purdue is taking

5    extreme precautions to ensure that the advancement of legal

6    fees is proper.  First, any decision to advance legal fees

7    of any kind must be approved by the Special Committee of the

8    Board of Directors.

9          Second, Purdue is requiring each person for whom

10   the company is to advance legal fees to agree to reimburse

11   the company, if that person is ever found to have acted not

12   in good faith, or to have had reason to believe that his or

13   her conduct was unlawful.

14         Third, Purdue is also requiring each indemnity to

15   sign an affirmation that he or she believes that he or she

16   has acted in good faith and lawfully and acknowledging the

17   aforementioned reimbursement requirement.

18         Lastly, Mr. Lowne would testify that Purdue is not

19   advancing legal fees for any member of the family of the

20   Sackler family, and that Purdue ceased doing so on March 1st

21   of 2019.

22         Your Honor, that concludes the proposed proffer of

23   Mr. Lowne's testimony.

24         THE COURT:  Okay.  Does anyone want to cross-

25   examine Mr. Lowne?

Page 106

1              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

2      for the U.S. Trustee's Office, I do have a few questions.  I

3      do apologize, this is information that I'm getting in real

4      time, but I do have some questions.

5              THE COURT:  Okay.

6              MR. SCHWARTZBERG:  Some of the proffer was based -

7      - was this is what the employees are saying, this is what

8      the employees are feeling I think that's all hearsay.

9              THE COURT:  Well, for the truth of the matter, but

10     it certainly can be introduced for what the company

11     understands.  So do you want to cross-examine Mr. Lowne?

12             MR. SCHWARTZBERG:  I have a few questions, Your

13     Honor.

14             THE COURT:  All right.  So, Mr. Lowne, can you

15     take the stand?

16             MR. SCHWARTZBERG:  My one concern is, you know, I

17     received information this morning and there are names on it,

18     and I'm loathe to mention someone's names, understanding the

19     concerns the debtor has.  Can I reference --

20             THE COURT:  You can do it generically I suppose if

21     they know their job title.

22             UNIDENTIFIED:  Can you do it by job title, would

23     that work?

24             MR. SCHWARTZBERG:  That's fine.

25             THE COURT:  Okay.  All right.  Would you raise

Page 107

1    your right hand, please?

2                    JON LOWNE, WITNESS, SWORN

3            THE COURT:  And could you just spell your name for

4    the record?

5            THE WITNESS:  Sure, it's J-O-N, L-O-W-N-E.

6            THE COURT:  Okay.

7                    CROSS-EXAMINATION

8    BY MR. SCHWARTZBERG:

9    Q    Good morning, Mr. --

10           THE COURT:  Before I -- Mr. Lowne, you just heard

11   the proffer of your direct testimony in this matter.

12   Sitting where you are today, you understand that is your

13   direct testimony.

14           THE WITNESS:  I understand.

15           THE COURT:  And is there anything you'd wish to

16   change in it?

17           THE WITNESS:  Nothing I wish to change.

18           THE COURT:  Okay.  You can go ahead, Mr.

19   Schwartzberg.

20           MR. SCHWARTZBERG:  Thank you.

21   BY MR. SCHWARTZBERG:

22   Q    Good morning.  My name is Paul Schwartzberg, I'm an

23   attorney with the U.S. Trustee's Office.

24       Under the retention plan there are numerous individuals

25   that are proposed to receive payment under -- the vice-

Page 108

1   president of regulatory affairs, what is their job role?

2   A    So they report to Paul Medeiros who's an insider.  That

3   person looks after the regulatory affairs, aspects of that

4   company, as well as the research and development activities

5   under the leadership of Paul Medeiros who we have listed as

6   an insider.

7   Q    And what is Mr. Medeiros' title?

8   A    Mr. Medeiros I believe is SVP of Imbrium.  I can't

9   recall his exactly title, it's one of our subsidiaries

10  that's responsible for advancing our pipeline and regulatory

11  matters related to our products.

12  Q    And who does he report to?

13  A    He reports directly to our CEO, Craig Landau.

14  Q    The executive -- oh, I'll skip that.

15       The vice-president of sales and marketing, what is that

16  person's role?

17  A    So that person is responsible for primarily the launch

18  of Adhansia which we launched earlier this year.

19  Q    I'm sorry, I didn't understand that word.

20  A    Adhansia, A-D-H-A-N-S-I-A.  It's the only prescription

21  product that we market.  We have a contract field force of

22  just about over 90 people so he's responsible for that brand

23  under the direction of our CEO, Craig Landau.

24  Q    So he reports directly to the CEO.

25  A    That is correct.

Page 109

1    Q    And this person, do you know their annual salary

2    ballpark?

3    A    Not off the top of my head, I'm sorry.

4    Q    Okay.  The vice-president, chief security officer, who

5    does that person report to?

6    A    I believe that person reports to Mark Kesselman, our

7    general counsel.

8    Q    All right.  And what is his --

9         UNIDENTIFIED:  He reports to Karen?

10        THE WITNESS:  I'm sorry, I've been corrected.

11   Reports to Karen Laurel, who's --

12   Q    I didn't hear you, I apologize.

13   A    Reports to Karen Laurel, who's the head of human

14   resources.

15   Q    Okay.  And then turning over to the roads technology

16   retention, the vice-president of sales and marketing,

17   RPharma (ph).

18   A    Yes.

19   Q    What is that person's job description?

20   A    So that person is responsible for all customer

21   interactions.  They report in to Vince Manicinelli who's

22   head of the generic business which is the entity Rhodes

23   Pharmaceutical LP.

24   Q    And the person they report to, what is his title?

25   A    I don't recall his exact title, I believe it's

Page 110

1   President of Rhodes Pharmaceuticals, LP or something like

2   that.  He's an insider.

3   Q    And on the -- just turning over to the sign-on bonuses

4   --

5   A    Sure.

6   Q    -- I believe there are five people that you propose to

7   pay between now and the final hearing.

8   A    That is correct.

9   Q    Do you know -- can I ask, because I don't want to --

10   the range of salaries of those people?

11   A    The range of salaries I think is -- these are

12   approximate numbers --

13   Q    Yeah.

14   A    -- I don't recall everyone's salary.  I believe they

15   range from something like 140,000 to approximately over

16   300,000.

17   Q    And are any of them officers or directors?

18   A    No.

19   Q    And the amounts you're paying them, is that the

20   entirety of their sign on bonuses or just a sub part --

21   portion of it?

22   A    I don't know the specifics of each individual, but it

23   may well just be one part of their sign on bonus.

24   Q    Do you know what -- the range for the five people,

25   their sign on bonuses were or are?

Page 111

1    A    I don't in totality, no, I know the amounts that are

2    going to be paid within the next several weeks.

3              MR. SCHWARTZBERG:  Thank you.

4              THE WITNESS:  Sure.

5              MR. SCHWARTZBERG:  One moment.

6              Thank you.

7              THE COURT:  Okay.  So, Mr. Lowne, the people that

8    you just discussed in connection with the non-executive

9    retention plan and the sign-on program, do any of those

10   parties or people have control over other people's bonuses?

11             THE WITNESS:  There are certainly people on the

12   list of retention.  The way it works is that they will

13   recommend bonuses.  The final actual bonus payments have to

14   be approved by our head of HR, by our president and by

15   myself, and then ultimately the proposals are taken to the

16   Board.

17             THE COURT:  And other than Board approval, do any

18   of those people have any say over their own non-retention

19   plan bonus or sign on bonus?

20             THE WITNESS:  Individuals have no say on their own

21   individual retention plan, no.

22             THE COURT:  Not just -- I mean, there's review --

23   is there review of their plan or sign-on bonus beyond the

24   Board?  Who reviews it besides the Board?

25             THE WITNESS:  So for sign on bonuses they are

Page 112

1    typically considered non-Board related matters, so sign on

2    bonuses are typically done through the human resources

3    department and the compensation experts.  And really what

4    they're looking at is market data and the data of what their

5    vested --

6            THE COURT:  What they gave up.

7            THE WITNESS:  What they gave up to come to Purdue.

8    So that's outside of any Board process.

9            THE COURT:  And what about the non-executive

10   retention plan?

11           THE WITNESS:  So the retention plan was developed

12   very, very carefully with the head of HR, the president,

13   myself looking through the different organizations, talking

14   to the different organizations, understanding who is

15   critical to the ongoing operations of those different parts

16   of our business, and developing a plan, consulting in a lot

17   of detail with our external advisors, whether that was Alix,

18   PJT or Davis Polk.  Ultimately the plan and the composition

19   of the plan went to the Board compensation committee for

20   approval.

21           THE COURT:  Okay.  All right.  Any questions on

22   that?

23           MR. VONNEGUT:  No, Your Honor, we have no

24   redirect.

25           THE COURT:  Any redirect?

Page 113

1              MR. VONNEGUT:  No, Your Honor.

2              THE COURT:  You can step down.

3              UNIDENTIFIED:  Your Honor, do you want to leave

4    Mr. Lowne on the stand if there are other questions with

5    regard to other parts of the motion or do you want him to --

6              THE COURT:  I'm not going to swear you in again

7    but you can sit down for now.  Okay.

8              MR. VONNEGUT:  Thank you, Your Honor, just one

9    data point that I did get.  Paul Medeiros' correct title is

10   he's the President of Imbrium, the senior vice-president of

11   corporate and business development at Purdue Pharma LP and

12   at PPI.

13             THE COURT:  Okay.

14             MR. VONNEGUT:  Okay.  So, Your Honor, just some

15   factual data points with respect to the non-executive

16   retention plan and what relief we are asking for today.

17             In between now and our contemplated second day

18   hearing there are 103 people who would be entitled to pay

19   outs under the non-executive retention plan.  And that will

20   be their last pay out for the entirety of calendar year

21   2019.  Frankly, this is just unfortunate timing that those

22   payments are falling due in between our first and second day

23   hearing.

24             You heard from Mr. Lowne that the company

25   undertook a rigorous analytical process to get comfortable

Page 114

1   that none of those participants are insiders.  And it's

2   important to note that for the participants in the plan, the

3   non-executive retention plan is a material component of

4   their overall compensation package.

5           THE COURT:  And are the payments all made on the

6   same day?

7           MR. VONNEGUT:  October 4th, Your Honor.

8           THE COURT:  Okay.

9           MR. VONNEGUT:  So this plan, you know, I mentioned

10  at the outset of the hearing that we very intentionally are

11  not seeking approval for anything new.  This is an existing

12  program.  This is not for these participants an extra bonus.

13  This is a part of the compensation that they expect for

14  doing their jobs and around which they plan their lives.

15          We are concerned that were these payments not

16  made, there's a very real risk the covered employees would

17  depart.  And now it looks like Mr. Eckstein has --

18          MR. ECKSTEIN:  Your Honor, I'm sorry, if I could

19  just have a minute to interrupt Mr. Vonnegut.  But I thought

20  maybe as we go on, I was just going to inquire or just try

21  to confirm the amount of these payments --

22          MR. VONNEGUT:  Yes, I was --

23          MR. ECKSTEIN:  -- if Mr. Vonnegut put that on the

24  record, that would be useful.

25          MR. VONNEGUT:  Sure.  So for the record, Your

Page 115

1    Honor, in between now and the second day hearing we're

2    seeking limited authority for the balance of 2019 and all

3    these payments would be made on October 4th.  There's just

4    over $916,000 in payments that are coming due for employees

5    of the Purdue debtors, and just below $870,000 in payments

6    in total coming due for the Rhodes debtors.

7              Any further payments beyond those that fall due

8    after our second day hearing or that otherwise exceed those

9    amounts will be subject to separate order of the Court, and

10   we will seek approval for those in our final order.

11              THE COURT:  Okay.

12              MR. VONNEGUT:  Okay.  Your Honor, with respect to

13   the sign on bonuses, I'll be brief.  I think the core data

14   is in the record and was included in Mr. Lowne's testimony.

15   This is a very, very small group of participants that are

16   relevant between now and the final hearing, it's five

17   people.  They are receiving in total under $100,000 among

18   the five of them.

19              With respect to advancement of legal expenses --

20              THE COURT:  And I'm sorry and that's --

21              MR. VONNEGUT:  Sure.

22              THE COURT:  -- when you say receiving, they'll be

23   receiving that before the --

24              MR. VONNEGUT:  Before the second day hearing.

25              THE COURT:  -- middle of October.  All right.

1          MR. VONNEGUT:  Correct.  Between now and the end

2     of October.

3          THE COURT:  Okay.

4          MR. VONNEGUT:  Okay.  So, Your Honor, with respect

5     to the advancement of legal expenses, Your Honor is very

6     well aware that the debtors are involved in over 2,600

7     pending civil actions.

8          A number of the debtor's current and former

9     officers, directors, and employees have been named in these

10    actions or called as witnesses.  Historically consistent

11    with Purdue Pharma's organizational documents and its

12    longstanding customary policies the debtors have paid the

13    legal costs of these current and former officers, directors,

14    and employees that are either named as defendants, potential

15    defendants or witnesses in the pending actions.

16         It's very important to note, I said this once

17    already, but I want to be very clear and say it again.

18    Since March 1st of this year no debtor has made any

19    indemnification payment or advanced any legal fees to any

20    member of the Sackler family and we do not seek any

21    authority to do so.

22         We've received the question from a number of

23    stakeholders, so I'll address it for Your Honor, why can't

24    insurance cover this.  The debtors do not maintain

25    sufficient insurance that would cover the legal costs of the

Page 117

1    vast majority of the indemnities, there just is not enough

2    coverage there, which is why we're seeking authority from

3    the Court to continue our prepetition practice of paying

4    these amounts.

5             Given the nature of the expenses, it's difficult

6    to predict with certainty exactly what the quantum would be.

7    We tried to be conservative to give everybody as much notice

8    as possible and estimated that at the outset of the cases it

9    would not exceed roughly $1.5 million per month, but I want

10   to emphasize that throughout these cases, and particularly

11   in the early days it is our fervent hope to reduce that cost

12   aggressively as we attempt to --

13             THE COURT:  Well, can I --

14             MR. VONNEGUT:  Sure.

15             THE COURT:  This is -- these are payments of

16   amounts already incurred or amounts to be incurred?

17             MR. VONNEGUT:  Amounts to be incurred.  They --

18   because they are legal fees, of course, they depend on when

19   the relevant attorneys submit their bills, but we are

20   seeking authority to --

21             THE COURT:  But it's for work that was --

22             MR. VONNEGUT:  -- continue going forward.

23             THE COURT:  -- done by counsel pre-bankruptcy?

24             MR. VONNEGUT:  We can't know with certainty, Your

25   Honor, whether there are pending bills pre-bankruptcy that

Page 118

1    had not been paid.

2              THE COURT:  But it would include --

3              MR. VONNEGUT:  Sorry if I'm being imprecise.

4              MR. HUEBNER:  Your Honor, let me help, I'm just

5    getting information from the GC in the background.  We're

6    largely current on the legal invoices.  This is not a big

7    backlog of prepetition bills.  There could be some that

8    straddle, but it's, you know, I think --

9              THE COURT:  Okay.

10             MR. HUEBNER:  -- in no small part for the current

11   and go forward.

12             THE COURT:  All right.  So obviously people could

13   be very creative in asserting litigation claims, but the

14   case law is pretty well established that if someone is being

15   sued, and this would certainly be the case if they're being

16   called as a witness, because of their actions really through

17   or as a proxy for the debtor the stay applies to them.

18             On the other hand if they're being sued for

19   something that is separate and apart and antithetical to the

20   debtor which is basically what you're getting them to swear

21   that they're not being sued for, then the stay wouldn't

22   apply.

23             MR. VONNEGUT:  Correct.

24             THE COURT:  Well laid out in the plus funds

25   DeSouza opinion.

Page 119

1          MR. VONNEGUT:  Yes, Your Honor, I think the unique

2    --

3          THE COURT:  So I'm not -- I don't know why -- I

4    would think that in most cases the stay would apply to these

5    people --

6          MR. VONNEGUT:  Well, Your Honor --

7          THE COURT:  -- incurring any more legal fees.

8          MR. HUEBNER:  We'd love to talk about that in

9    about a month.

10         THE COURT:  Well, I don't think it's even -- you

11   know, it's one thing to -- I've talked about this before,

12   the case law in this area is very misleading when it talks

13   about extending the stay, because half the time that means

14   just declaring that the stay actually does apply to

15   somebody.  But, I mean, the case law is really quite clear

16   on this, so I'm not --

17         MR. VONNEGUT:  Yes, Your Honor.  I can address

18   that if I may.

19         What this case has, the unique complexity is the

20   fact that the overwhelming bulk of the litigations are

21   brought by governmental actors, and it's not an issue for

22   today but there may well be assertions that those particular

23   litigations are not subject to the automatic stay.

24         The reason that we are seeking authority to

25   continue this practice is to address that uncertainty.  We

Page 120

1    would hope that all of the litigation, both against the

2    debtors and against employees, present and former could be

3    stayed but we can't be certain that it will be, which is why

4    in order to be cautious we're seeking the authority to

5    continue this practice in case we are not effective in

6    staying the litigation.

7                THE COURT:  Or there's a determination that the

8    stay doesn't apply.

9                MR. VONNEGUT:  Correct, Your Honor.

10               THE COURT:  Whereas if there's a determination

11   that the stay does apply in this litigation as nevertheless

12   has been pursued, you would get this money back from the

13   governments or whoever is the plaintiff because it would be

14   violating the stay.

15               MR. VONNEGUT:  Correct.  And if we prevail in

16   staying the litigation then this --

17               THE COURT:  Again, the stay is the stay.

18               MR. VONNEGUT:  Yes.

19               THE COURT:  Generally speaking, the person who may

20   be violating the stay should act with caution to seek relief

21   from the stay before doing it, as opposed to shooting and

22   then aiming.

23               MR. VONNEGUT:  Yes, Your Honor.

24               THE COURT:  And that applies to everyone,

25   including governments.  The Supreme Court on down has ruled,

Page 121

1   so this doesn't seem to be to me something that should be a

2   big expense if people act responsibly, which I would expect

3   governments to act responsibly over the next two to three

4   weeks.

5          MR. VONNEGUT:  We couldn't agree more, Your Honor,

6   that is very much our hope.  Again, we're just trying to be

7   conservative and cautious, but we share that view and that

8   hope.

9          THE COURT:  Okay.

10         MR. SCHWARTZBERG:  Your Honor, since most of these

11  or all of these are not yet incurred, it probably should be

12  kicked to the final hearing to at least allow the three or

13  four --

14         THE COURT:  Well, I don't -- I'm not sure about

15  that.  I'm not sure about that.

16         MR. VONNEGUT:  Your Honor, I'll just briefly

17  respond to that.

18         THE COURT:  To me this is like the facts, most of

19  them -- most of it would, in fact, not be incurred, but the

20  consequences of not paying it I think are quite serious.

21         MR. VONNEGUT:  Correct, Your Honor.  Our concern

22  is that this is about employee morale, this is about

23  messaging.  This is, as much or more about telling people

24  that they are protected, then it is about actually paying

25  the bills.  And so a time delay we think would be very

Page 122

1    harmful.

2              THE COURT:  Okay.  Does anyone else have something

3    to say on these particular -- I gather that the U.S. Trustee

4    is opposed to these three categories of payments, correct?

5              MR. SCHWARTZBERG:  Yes, Your Honor.

6              THE COURT:  Okay.  So I'm happy to hear you, Mr.

7    Schwartzberg, but does anyone else have anything to say on

8    any of these three categories?

9              MR. SCHWARTZBERG:  Your Honor, I assume Your Honor

10   has ruled on the legal action, so I'm not going to belabor

11   that point.

12             THE COURT:  No, I haven't.  I was just trying to

13   get the facts and get a reaction from people.

14             MR. SCHWARTZBERG:  These -- were this just a wage

15   motion I would not be standing here, Your Honor.  As Your

16   Honor is aware typically wages -- the wage motion is to pay

17   the prepetition wages of the employees.  It's capped

18   generally as a priority map if -- they're going to get

19   hopefully anyway.

20             This goes way beyond that.  The presentation

21   provided by counsel I felt like I was transported two months

22   into the future and we're arguing on a KEIP or a KERP

23   motion.  That's really what this is when you throw in the

24   four other motions, one is a $26 million bonus payment.

25   Overall that's $2.2 million worth of sign on bonuses that

Page 123

1    they're asking, and millions more.

2              THE COURT:  Well, not for today.

3              MR. SCHWARTZBERG:  Not for today, Your Honor.

4              THE COURT:  Okay.

5              MR. SCHWARTZBERG:  A lot of that can be pushed,

6    but we believe all of it should be separated out and put on

7    a different motion where we're not talking about -- today

8    we're talking about what's an emergency motion to get the

9    wages paid for the employees.  Usually as I said it's capped

10   at the 13,000.

11             The bonuses, the sign on bonuses being paid to

12   people who are pretty highly compensated may be up to

13   $300,000 are in the, you know, not an insignificant amount

14   but all over the cap, ahead of the -- in excess of the

15   priority cap which they'll probably also -- or maybe also be

16   receiving under the wage motion.  So we're talking a double,

17   triple just on the sign on bonuses, and those people make

18   significant salaries, they can wait till the final hearing

19   to have the creditors -- the committee, the ad hoc

20   committees review these -- rather than having these motions,

21   you know, dumped on Monday morning and having a hearing on

22   Tuesday morning.

23             THE COURT:  Well, on the sign on bonuses, the

24   testimony was that no officers are included in those sign on

25   bonuses.

Page 124

1          MR. SCHWARTZBERG:  As I said, Your Honor, when you

2     -- every single sign on bonus except one, as I understand,

3     is almost double.

4          THE COURT:  No, I understand.  But if the concern

5     is that this is somehow violative of 503(c) it wouldn't

6     appear to be.

7          MR. SCHWARTZBERG:  It's also a concern, Your

8     Honor, I think it's -- these are -- as I said there are --

9     it's a first day motion, you need to do what you only --

10    allow the minimum so as to allow the company to continue.

11         THE COURT:  Right.

12         MR. SCHWARTZBERG:  These people are highly

13    compensated they can wait till the last -- of the last

14    hearing date to allow the parties to -- other parties at

15    least to have proper notice of that motion, similar with the

16    non -- the retention plan that they spoke about.  The

17    amounts there are even in excess of what's being on the sign

18    on bonus, in excess of the priority cap.  I assume these

19    people, since I'm looking at the bonuses are pretty

20    substantial, retention payments, they could wait till the

21    final to allow proper notice of these motions to go out.

22         THE COURT:  Okay.  Well, why don't I hear the

23    comments before the company responds.

24         MR. ECKSTEIN:  Your Honor, Kenneth Eckstein with

25    Kramer Levin on behalf of the ad hoc committee.

Page 125

1            A couple of observations.  First, Your Honor, I'm

2    sure you appreciate the members of the ad hoc committee have

3    not had the opportunity to review any of the details

4    surrounding this motion, and therefore, like I mentioned

5    previously, this is a motion where there is going to need to

6    be review and diligence before people can give any sign off.

7            That said, I think there was general willingness

8    not to object to ordinary course ongoing transactions and

9    much of the wages and other typical benefits that are

10   included in the motion are not objectionable.

11           I do commend the U.S. Trustee's office for making

12   the modifications that the debtor has agreed to because

13   those were consistent with our reaction and I think those

14   deferrals are all deferrals that are appropriate.

15           I do want to confirm, and I take Mr. Vonnegut at

16   his word, and Mr. Huebner, that none of the payments that

17   are being referred to here, particularly in connection with

18   the reimbursement of legal expenses, are going to any

19   members of the Sackler family, direct or indirect.  We think

20   that's a very important item to underscore and we're going

21   to rely upon that representation.

22           As to the reimbursement of legal expenses, just

23   because of the uncertainty surrounding exactly who is

24   benefitting, it appears from the motion that it includes

25   former officers and directors, and it's not clear exactly

Page 126

1    what justification there is in terms of -- from the debtor's

2    standpoint for former officers and directors and who they

3    are.  Those would be items that I think ideally would be

4    subject to further diligence before it's authorized.

5              And with respect to the non-executive retention

6    plan I had a similar reaction as Mr. Schwartzberg, it

7    sounded more like a KEIP and KERP than a wage motion, but I

8    think with the limitations that have been put on the record

9    we will abide an interim order and defer our comments to the

10   final order, as long as everything is done on an interim

11   basis.

12             THE COURT:  Okay.  Anyone else?

13             MR. TROOP:  Your Honor, Andrew Troop from

14   Pillsbury for the other ad hoc committee.

15             Your Honor, I'm not going to repeat anything that

16   Mr. Eckstein mentioned or the U.S. Trustee.  I do, however,

17   have a question about the reimbursement of legal fees in

18   this particular case.

19             I under -- as I understand the process and as it's

20   been represented in the papers, the debtors are relying on

21   sort of a two-step process to make sure that funds that go

22   out, go out legitimately.  Leave aside the credit worthiness

23   of the parties that are receiving it because we have no

24   information --

25             THE COURT:  Right.

Page 127

1          MR. TROOP:  -- to be able to judge that.

2          So I'm just going to talk about the two-step.  The

3     first is, is that you're asking the person who wants to get

4     paid, right, their legal fees, to attest to the fact that

5     they've done nothing wrong.  And then --

6          THE COURT:  I doubt that there will be few of

7     those turned back unsigned.

8          MR. TROOP:  I agree, Your Honor, and I think

9     that's what really puts the importance on the second

10    guardrail that the debtors described.  And as I understand

11    Mr. Lowne's proffered testimony to confirm, and that is that

12    the special committee of the Board of Directors will need to

13    approve these payments.

14         The standard under which that approval is going to

15    be made, however, at least based on the papers that were

16    filed, were whether it's in the best interests of the

17    company to make the payment.  It was not whether the company

18    determines independently that the employee would qualify for

19    reimbursement of legal fees, because it hasn't done anything

20    wrong, that employee isn't for lack of a better word, Your

21    Honor, I'm not trying to cast any particular aspersions on

22    any individual, whether or not that employee is tainted by

23    the allegations involved in connection with the opioid

24    crisis, whether that employee acted outside the scope of his

25    employment in connection --

1           THE COURT:  Right, so we should clarify that.

2           MR. TROOP:  So I think that needs to be clarified.

3    I think the Board needs to -- the special committee of the

4    Board needs to make some --

5           THE COURT:  I mean --

6           MR. TROOP:  -- qualitative determination.

7           THE COURT:  -- I guess we should -- by saying that

8    I don't want to give the impression that if there's another

9    legitimate reason to make the advance, because it's the best

10   interests of the company, but it would seem to me that, at

11   least in the first instance and perhaps always, the question

12   to ask is, would -- I look at it in bankruptcy terms.  Would

13   this employee fall on the right side or the left side of the

14   rationale in the plus funds DeSouza case, you know, should

15   they be indemnified or not.

16          And generally speaking I think that would be the

17   inquiry.  Now maybe there are other aspects that the Board

18   would have to -- the special committee would have to take

19   into account, but I think those would be highly unusual.

20          MR. TROOP:  Agreed, Your Honor, and not to belabor

21   the point, I think that's exactly the point I'm trying to

22   make, because the issue with best interests of the company

23   is pretty broad.  A, it's pretty broad, but in light of the

24   allegations that have been sought, it may also be to create

25   an environment in which employees can't testify about what

Page 129

```
 1    the company did wrong --

 2              THE COURT:  Well --

 3              MR. TROOP:  -- and again I'm not --

 4              THE COURT:  No, I don't --

 5              MR. TROOP:  -- ascribing ill will, Your Honor, or

 6    ill intent, I'm just using that as a -- well, if --

 7              THE COURT:  If they're acting as, yeah, I mean,

 8    the -- well, if they're properly indemnified, then they

 9    should get paid their legal fees.

10              MR. TROOP:  Yes, Your Honor.

11              THE COURT:  I don't think there's any intention to

12    silence them, right?

13              MR. VONNEGUT:  No, Your Honor.

14              THE COURT:  Okay.

15              MR. TROOP:  Again, Your Honor, I --

16              THE COURT:  No, I think that's important to get on

17    the record, I understand your point.

18              MR. TROOP:  I gave an outrageous example, Your

19    Honor --

20              THE COURT:  Right.

21              MR. TROOP:  -- to deal with the issue of the best

22    interest, Your Honor.

23              THE COURT:  Okay.  No, that's fair.  All right.

24    Anyone else have anything to say on this issue or this --

25    these three issues?
```

1           (No response)

2           THE COURT:  Okay.

3           MR. VONNEGUT:  Thank you, Your Honor.  I'd just

4      like to briefly address a few of the things that were said.

5      I'll start with the most important, which is what are the

6      guardrails that we have around this process because that's

7      something that this company takes very seriously, and that

8      we at Davis Polk and the other advisors take extremely,

9      extremely seriously.

10          So we very carefully designed the process to

11     ensure that payments are not made to any inappropriate

12     recipient.  First, we have the approval, the body

13     responsible for approval of indemnification payments, which

14     is the special committee of the Board.  I think it would be

15     extremely challenging to find a more respected and well

16     credentialed group of directors in corporate America.  They

17     are the principal -- not the principal, the exclusive body

18     vested with authority to say yes or no to indemnification

19     requests.

20          In considering whether to improve -- to approve an

21     indemnification request Mr. Troop pointed that they will be

22     considering the best interests of the company.  I think we

23     would stipulate that the best interest of the company would

24     not be served by reimbursing or advancing legal fees to

25     anybody that was suspected of wrongdoing.

Page 131

1              THE COURT:  Well, the other point is that you

2     wouldn't refuse to reimburse them if they were properly

3     indemnifiable.

4              MR. VONNEGUT:  Correct, correct, Your Honor.

5              THE COURT:  You wouldn't silence then, in other

6     words.

7              MR. VONNEGUT:  That's right.

8              Now, another point that was kind of left out of

9     the description of our process which we view is very, very

10    important is there's really three legs to the stool.  First,

11    the relevant person needs to attest to the special committee

12    that they satisfy the requirements for indemnification, that

13    they are -- they acted in good faith, in the best interests

14    of the company, they believed their actions were lawful.

15             The special committee needs to believe that, and

16    then the indemnitee commits to a disgorgement obligation, if

17    any of that turns out to be wrong, so there's an enforcement

18    mechanism.

19             THE COURT:  But there's not really a credit

20    analysis here, and you've told that --

21             MR. VONNEGUT:  That's --

22             THE COURT:  -- this is really important to people

23    --

24             MR. VONNEGUT:  That's true, Your Honor.

25             THE COURT:  -- that don't have the money, so

Page 132

1    that's -- I think -- I agree, that the real inquiry for the

2    special committee is indemnification warranted here because

3    they were really acting on behalf of the company --

4            MR. VONNEGUT:  That's correct, Your Honor.  We

5    didn't want the impression --

6            THE COURT:  -- and not separately committing some

7    tort, right.

8            MR. VONNEGUT:  -- it goes out the door and it's

9    forever gone.

10           THE COURT:  No, I understand it too.  There is

11   some internal effect, you can always get de volvo I guess,

12   but you know.

13           MR. VONNEGUT:  Right.  Okay.  Then I'll just

14   briefly address some of the other points raised by Mr.

15   Eckstein and the U.S. Trustee's office.

16           With respect to Mr. Eckstein's concerns, these are

17   very easy.  First, we will swear up and down in any form

18   required that no payments will go to the Sacklers, we want

19   to be very clear about that.

20           With respect to diligence on these programs, again

21   we understand that people are going to want to take time to

22   understand how the company handles this.  We are ready,

23   willing, and able to provide any diligence that folks need,

24   so we're very enthusiastic about that.

25           With respect to the concerns raised by Mr.

Page 133

1    Schwartzberg for the U.S. Trustee's office, I'll just echo

2    Your Honor's comments that the vast bulk of things with

3    which the U.S. Trustee's office takes issue are not for

4    today, they're not on for hearing today, we'll be back

5    before Your Honor before the end of October.  We will

6    discuss those issues then.

7             That brings up my next point which is why are we

8    doing this, and why are we asking for authority to do this

9    now.  And that is directly explained by the standard for

10   approval of this kind of relief early in the case.  Failure

11   to make these payments we are concerned would cause

12   immediate and irreparable harm to the debtors.

13            When you stack up the potential risks to the value

14   of the enterprise that would arise from massive employee

15   attrition against the costs of these payments that are going

16   to go out the door in between now and the end of October, we

17   just really don't see any contest between those two things.

18            Lastly something else that Mr. Schwartzberg

19   mentioned was the 503(c) cap.  We have no intention of

20   paying anything that is not permitted by Section 503(c) of

21   the Bankruptcy Code.  That's in the order.  So I just wanted

22   to state that on the record so it's abundantly clear.

23            THE COURT:  Okay.

24            MR. HUEBNER:  Your Honor, I apologize, I won't --

25   I'll take some lashes from Mr. Vonnegut here, because he

Page 134

1    does not need my help.  But Mr. Kaminetzky asked me to make

2    one point because we ended up having quite amorphous round

3    robin colloquy.  And one thing I think is important to make

4    clear, and Mr. Kaminetzky quite validly pointed out.

5              The special -- we put in multiple layers here

6    precisely because of how seriously we think this and we

7    understand that none of this is simple.  But what I think is

8    important is that we can't put an onus on the special

9    committee to have to determine that every indemnitee acted

10   lawfully before authorizing their lawyer's fees, because

11   that's not the job of three business people who are sitting

12   on a committee --

13             THE COURT:  That's not what Plus One's DeSouza

14   (ph) requires.

15             MR. HUEBNER:  Exactly.  So I just wanted to make

16   clear because people were all different places when they

17   were at the podium and -- which sort of all kind of agree

18   with each other, but we need to be very clear because there

19   are Board members who need to be told what is being imposed

20   on them before they take formal board action.

21             And the idea taking into account the factors in

22   this case, in addition to ensuring that it's in the

23   company's best interest, to the extent if anyone

24   misunderstood the Court, I believe the special committee has

25   to certify this person did not do anything unlawful or else

1     they can't get their fees paid, no one could ask directors

2     to be in that position.  This is a complex ongoing fluid

3     situation.  I mean, I don't think anybody misunderstood --

4               THE COURT:  Look, I don't think --

5               MR. HUEBNER:  -- but I think the Board deserves

6     clarity.

7               THE COURT:  I don't think -- I think everyone

8     understands as good as he was, former Judge Peck didn't

9     certify that the defendants in the DeSouza case were one way

10    or another.  He did his best analysis of it and concluded

11    that they fell outside the indemnification provision.

12              MR. HUEBNER:  And I knew -- I had a pretty good

13    (indiscernible) by most, but this is too serious to be

14    ambiguous about this.  We have Board members who actually

15    have to sign things and do things.

16              THE COURT:  Okay.

17              MR. VONNEGUT:  Your Honor, I just have one further

18    clarification that was helpfully pointed out by Mr.

19    Eckstein.  When we say that no payments will be made to the

20    Sacklers, we mean very broadly to or for the benefit of the

21    Sacklers.  We are not paying them individually, we are not

22    paying their lawyers.  So I just wanted that to be very

23    clear on the record.

24              THE COURT:  Okay.  All right.  This is an interim

25    hearing but the request is for a significant amount of money

1    to be paid on two categories of obligations that are pretty

2    clearly prepetition obligations for the amounts that are at

3    issue here, namely the -- roughly $1,600,000 of payments

4    coming due in the first week of October and the non-

5    executive retention plan and the under $100,000 of payments

6    coming to, in all likelihood, before the final hearing on

7    this motion on the sign on bonus program, far exceed the

8    junior priority cap for unpaid wages of $13,660 in Section

9    507 of the Bankruptcy Code.

10          That is not a really dispositive fact, however.

11   The payment of any prepetition obligation with the exception

12   of an administrative expense under 503(b)(9) varies the

13   priority scheme of the Bankruptcy Code.  So the Court needs

14   to examine whether or not withstanding that priority scheme

15   the payment provides a net material benefit to the estate

16   and creditors, and in an interim hearing like this, in

17   addition the Court needs to determine that the payment is

18   necessary to avoid immediate and irreparable harm to the

19   debtor's estate and creditors.

20          Given the size of the payments, I certainly

21   understand the U.S. Trustee's position, particularly given

22   the fact that its office generally has more notice on these

23   types of first day motions than anyone else, and

24   consequently is looked to to take a reasonably conservative

25   view on the request for relief.

1          On the other hand, it's clear to me from the

2     record in this case that this is a highly unusual case, in

3     that the debtors have determined to turn over their

4     businesses to their claimants through a plan process that

5     lays out a reasonable mechanism for determining who those

6     claimants are and how they would receive the value in the

7     business.

8          So all of the claimants in essence have the same

9     interest in maximizing the value of the business and

10    avoiding immediate and irreparable harm to the business.

11         The two largest groups of those claimants, while

12    expressing their reservations about the entirety of the

13    relief sought in this motion have made it clear to me in

14    this hearing that they do not oppose the request for relief

15    that the U.S. Trustee as opposed, and no one else has spoken

16    up either.

17         I think that says a lot as to the need to preserve

18    the status quo pending further due diligence and is being

19    sought clearly in their capacity as future owners of the

20    business and beneficiaries of all of that value, without any

21    real dispute as to whether existing owners or secured

22    creditors or the like would have a different view.

23         Giving that and given my determination based on

24    Mr. Lowne's testimony that none of the parties who would be

25    the beneficiaries of the interim relief would, in fact, be

Page 138

1    insiders, and therefore, the debtors would run afoul of

2    Section 503(c) of the Bankruptcy Code, I believe that this

3    relief is warranted under the standards that I've already

4    articulated.

5            In other words, not only are these payments

6    necessary to avoid immediate and irreparable harm to the

7    debtor's estate, and necessary and beneficial to the estate

8    after taking into account the Bankruptcy Code's priority

9    scheme but none of the beneficiaries is an insider based on

10   my evaluation of the testimony as opposed to the debtors

11   simply saying they're not an insider.

12           None of them is in a position effectively to

13   determine his or her own award which is Congress' primary

14   concern in Section 503(c) by those who have the ability to

15   feather their own nest in a bankruptcy case shouldn't have

16   that ability.

17           Secondly, they clearly don't make policy generally

18   and report to those who do.

19           As far as the legal fee, I think we've discussed

20   that sufficiently.  I hope this doesn't actually rise to the

21   level where there are significant expenses to be paid, given

22   what I've said about the reach of the automatic stay and the

23   need to aim for astentute (ph) later as opposed to the other

24   way around, namely one should seek relief from the stay if

25   there's any question as to whether it applies or not.  And

Page 139

1   generally speaking, there's clear guidance as to when the

2   stay would apply to a lawsuit against a director, officer,

3   or former employee and when it does not, and that generally

4   coincides with state law indemnification rights, which I

5   believe are largely consistent with what the debtors have

6   laid out in their pleading and clearly consistent with

7   what's been set forth on the record today.

8          Obviously the debtors and their special committee

9   cannot guarantee that someone would fall out of an

10  indemnification, but they can make a reasonable evaluation

11  as to whether they can or cannot, and that's an appropriate

12  check on the payment, as well as the other requirements for

13  receiving the advancement of legal fees.

14         For each of these obviously there will be due

15  diligence going forward, so there should clearly be a record

16  as to the thought process in making each of these payments,

17  which will be shared with the parties who will be conducting

18  due diligence.

19         So you can e-mail the order as revised in

20  paragraph 19, but otherwise I think it stays the same.

21         MR. VONNEGUT:  Thank you very much, Your Honor, we

22  will do that.

23         THE COURT:  Okay.

24         MR. VONNEGUT:  So, Your Honor, that takes us to

25  item number 16 on the agenda which is our critical vendors

Page 140

1      motion.  We're hopefully getting close to the end here.

2              This motion is Docket No. 9, Agenda No. 16.  Under

3      this motion we are seeking authority to pay certain claims

4      owed to critical vendors.  The vendors that we are seeking

5      authority to pay, we want to pay claims that are secured by

6      trade liens are subject to 503(b)(9) priority, as well as

7      other critical vendor claims, but with that third category

8      limited to an amount not to exceed $7.7 million.

9              Again, I'll just make clear things that we are not

10     seeking authority to do.  We're not seeking authority to pay

11     or satisfy any prepetition obligations to any shareholder of

12     the debtors or any non-debtor affiliate of any shareholder

13     of the debtors.

14             As you'll see, Your Honor, we've done our best to

15     ask for very, very limited critical vendor relief here.  In

16     sizing the request, the debtors carefully reviewed all of

17     their key suppliers to determine which ones are sole source

18     or limited source, and which suppliers we could get by

19     without, which suppliers would be prohibitively expensive to

20     replace, which would present an acceptable risk to the

21     operations if we lost access to their services, which might

22     assert trade liens or 503(b)(9) priority claims, who might

23     credibly threaten self-help and the extent to which

24     suppliers may believe themselves not subject to the

25     automatic stay.

Page 141

1           Lastly we considered the debtors relative

2      commercial leverage over each vendor to determine frankly

3      whether their dependence on us would allow us to not pay

4      them and still secure ongoing access to their services and

5      goods.

6           This analysis led us to a conservative estimate of

7      $7.7 million as the top end of the amount that we may need

8      to pay to ensure the continued supply of critical goods and

9      services to keep the business running.

10          On this point, Your Honor, I'll just briefly note

11     that in this highly regulated industry critical really does

12     mean critical.  Nearly every change to a vendor or input in

13     the debtor's supply chain can require regulatory approval,

14     sometimes multiple regulatory approvals.  And so if we need

15     to swap out critical vendors, one or two of those the cost

16     of that can very quickly eclipse the amount of money we're

17     asking to pay the critical vendors.

18          The vendors are broken down into six principal

19     categories which I'll cover very briefly.  These are

20     described exhaustively in the motion.

21          We have operations and supply chain vendors who

22     provide ingredients, equipment, components, storage, freight

23     carriers, clinical trial vendors, security vendors, waste

24     management and foreign vendors.  Both with respect to

25     security vendors and waste management it's just worth noting

Page 142

1    that given the nature of the debtor's enterprise these are

2    critically important.  We need people who are credentialed

3    to deal with hazardous waste and secure controlled

4    substances, so that's a limited population.

5           Foreign vendors is a pretty limited population,

6    but there are a small number of foreign vendors who are

7    critical.

8           One important thing to note again going back to

9    just giving all parties in interest abundant comfort here,

10   the Sacklers do have an ex-U.S. pharmaceutical business

11   under the name of Mundipharma.  None of these entities that

12   are we seeking permission to make payments to are associated

13   with Mundipharma.

14          The large foreign vendors who are included in this

15   population provide goods and services including critical

16   production machinery, clinical study assistance and data

17   analytics related to our industry.

18          The process that we intend to use for evaluating

19   and paying critical vendor payment requests is very

20   standard.  We want to try to use as little of this

21   authorization as we possibly can while still maintaining

22   access to critical goods and services.

23          In order to do that, we're seeking authority to

24   identify critical vendors in our business judgment.

25   Identifying them now, as Your Honor is well aware, would

Page 143

1    likely cause all such critical vendors to immediately demand

2    payment in full, defeating the purpose of this motion which

3    is to limit the amount of money that we have to spend.

4              Conversely allowing the debtors to flexibly

5    identify and pay critical vendors will allow us to negotiate

6    with them zealously to protect estate resources.

7              As a condition to payment, we would propose that

8    each critical vendor that wants to receive a payment of

9    their prepetition claim has to agree to a standard vendor

10   agreement that would require them to continue to supply

11   goods and services on normal and customary trade terms that

12   are most favorable to the debtors in effect between relevant

13   critical vendor and the debtor's prior petition date.

14             THE COURT:  Although as I read it, that's not an

15   absolute condition?

16             MR. VONNEGUT:  Correct, Your Honor, we're --

17             THE COURT:  But you're going to use your best

18   efforts to get them to agree.

19             MR. VONNEGUT:  That's exactly right.

20             THE COURT:  They should have the understanding

21   that if they don't agree they may not stay on the list.

22             MR. VONNEGUT:  Correct, correct.  We're just

23   trying to include a safety valve if we have an emergency

24   situation.

25             Payment of critical vendor claims will include a

Page 144

1    communication specifying that by accepting payment the

2    creditor agrees to those terms, and as a further condition

3    of receiving payment on a vendor claim we propose that

4    critical vendors would have to agree to take whatever action

5    is necessary to remove any existing trade liens at their

6    sole cost and expense.

7            Your Honor, we received very limited comments on

8    this motion, principally from the U.S. Trustee's office, I

9    think that we have accommodated a lot of those concerns,

10   although I'll defer to Mr. Schwartzberg as to whether we've

11   addressed all of them.

12           We do have a modest revision to the order if I may

13   approach Your Honor.

14           THE COURT:  Okay.

15           MR. SCHWARTZBERG:  Could we see it?

16           MR. VONNEGUT:  Oh, yes.  I think you did.  Here.

17           MR. SCHWARTZBERG:  Thanks.

18           THE COURT:  Right, it's a good comment.

19           MR. VONNEGUT:  So this again, Your Honor, this is

20   something that we intended to do.  So it's a comment we were

21   happy to accommodate.  We are going to consult with our main

22   stakeholders on whether any of these payments are a good

23   idea or bad idea as we go forward.

24           THE COURT:  And if there is a large constituency

25   that isn't in this data group that is prepared to keep it

Page 145

1    confidential, then I think, you know, you should be sharing

2    it with them.

3            MR. VONNEGUT:  Absolutely, Your Honor.

4            THE COURT:  I don't think you have to put that in

5    the order, but that's what you should be doing.

6            MR. VONNEGUT:  Yes, and we're happy to do that.

7            THE COURT:  Okay.

8            MR. VONNEGUT:  So unless Your Honor has any

9    questions I'll cede the podium to Mr. Schwartzberg and I'll

10   just reply to whatever.

11           THE COURT:  Well, I -- it wasn't clear to me, are

12   these -- are any of these vendors that are owed significant

13   amounts parties to executory contracts, or are these, you

14   know, more like purchase order regular service --

15           MR. VONNEGUT:  With apologies, Your Honor, I'm

16   just going to briefly consult.

17           (Pause)

18           MR. VONNEGUT:  Your Honor, it's a mix.  Some of

19   the critical vendors do have contracts, some are just under

20   purchase orders.

21           THE COURT:  Because generally speaking, you -- at

22   least as far as I'm concerned, you've laid out the risk of

23   factors to consider --

24           MR. VONNEGUT:  Uh-huh.

25           THE COURT:  -- or the appropriate factors to

Page 146

1    consider.  They're listed in footnote 4, but I would add one

2    other, which is, is the vendor a party to an executory

3    contract --

4              MR. VONNEGUT:  Uh-huh.

5              THE COURT:  -- they cannot stop performing under.

6              MR. VONNEGUT:  Yeah, absolutely, Your Honor, we're

7    happy to add that to the list.

8              THE COURT:  Okay.

9              MR. HUEBNER:  And, Your Honor, for the avoidance

10   of doubt it's not related to this motion, but it is

11   important to us.  So the Court understands, we actually

12   stand ready to deal with anyone who tries to stop doing

13   business with us in ways that we believe are not legal.

14             THE COURT:  Right.

15             MR. HUEBNER:  We have a very nice letter that goes

16   first --

17             THE COURT:  Okay.

18             MR. HUEBNER:  -- and next friendly goes next, and

19   we have papers that that come to this Court if those fail.

20   Believe me, we fully intend to enforce all the executive

21   contracts that --

22             THE COURT:  And that's fine, but I also want to

23   make clear if there's an entity that is critical and they

24   have no meaningful assets in the U.S., and they have an

25   executory contract, if I were the debtors I would authorize

Page 147

1   the payment, but on the conditions that are laid out here.

2   So it's not an absolute requirement, but it would seem to be

3   in most cases parties should understand that to have an

4   executory contract their remedy is limited to asking the

5   Court for an order compelling assumption or rejection, and

6   if they have a lien on something for adequate protection.

7   And that the -- I assume the experienced people who will be

8   making the determinations on an entity-by-entity basis will

9   take that into account.

10          MR. VONNEGUT:  Very much so, Your Honor.  We view

11  payment of the critical vendor claims as a last resort to

12  only be used when necessary.

13          THE COURT:  Okay.

14          MR. SCHWARTZBERG:  Your Honor, just -- Paul

15  Schwartzberg once again for the record.  We had spoke with

16  counsel and they had some language in here that we're not

17  completely sure what it means.

18          THE COURT:  Okay.

19          MR. SCHWARTZBERG:  Our agreement or what we saw

20  today, we're going to provide the parties with a list of the

21  critical vendors, to the extent that they went beyond it,

22  they'll provide us that information ahead of time, I'm not

23  sure that's what's in here -- that's actually articulating

24  what's in here, I'm not sure what reasonable time this

25  information means.  For lack of a better term, we were using

Page 148

1    the word list, so I would like if the counsel can confirm

2    what actually is -- yeah, and then obviously if the Court

3    wants -- I mean, let me hear the answer, but also if the

4    Court wants --

5              MR. VONNEGUT:  Sure.

6              MR. SCHWARTZBERG:  -- that information as well.

7              MR. VONNEGUT:  Your Honor, we're happy to provide

8    a list so long as it's done confidentially to the Trustee

9    and to the Court.

10             THE COURT:  Okay.  So you say including a list?

11             MR. SCHWARTZBERG:  That's fine, Your Honor.

12             THE COURT:  Okay.  All right.

13             MR. VONNEGUT:  Unless Your Honor has any

14   questions.

15             THE COURT:  Well, does anyone have anything to say

16   on this motion?

17             MR. ECKSTEIN:  Your Honor, Kenneth Eckstein again

18   on behalf of the ad hoc committee.  Similar reservation on

19   this issue, this has to be reviewed.  The one question that

20   we had that we had raised yesterday evening was to try to

21   get a sense of what percentage of the prepetition trade debt

22   this relief represented.  I don't know whether the company

23   is in a position yet to respond, but that was an issue that

24   we had raised.

25             MR. VONNEGUT:  Sure.  I don't have exhaustive

Page 149

1    statistics at the ready.  Overall, the company does not have

2    a lot of outstanding trade debt.  I think you'll see in the

3    list of creditors that there are not many material trade

4    creditors.

5            THE COURT:  Okay.

6            MR. VONNEGUT:  Other than those addressed by the

7    customer programs motion.

8            THE COURT:  Well, I mean, again to me the issue is

9    the failure to make these payments cause immediate and

10   irreparable harm to the debtor's estate.  Almost by

11   definition that's the case.  The devil's in the details.  I

12   think with the one point that I raised, you've identified

13   the right details for the inquiry.

14           You know, this sharing of information can start

15   right away.  You don't have to wait till the next hearing.

16   You know, you can sit down with whoever it is that -- your

17   financial advisor and/or Davis Polk and just make sure

18   they're looking at it right, given the experience of the

19   people involved I think they will be.

20           But I've always been of the view that these types

21   of motions necessarily need to leave the discretion with

22   people who both know the business and know the Bankruptcy

23   Code and leave it up to them with appropriate monitoring by

24   the parties in interest.  Because it's some level keeping

25   the list general and not particularized and just dealing

1    with the factors ensures that all the critical vendors will

2    get paid and on the proper credit terms.

3            So I will grant the motion for the reasons stated

4    in the motion as modified by the change for the order.

5            MR. VONNEGUT:  Thank you very much, Your Honor.

6    With that, that brings us to the last item on the agenda,

7    the foreign representative motion and for that I'll cede the

8    podium to my partner, Mr. Graulich.

9            THE COURT:  Okay.

10           MR. GRAULICH:  Good afternoon, Your Honor, Timothy

11   Graulich of Davis Polk & Wardwell.  As Mr. Vonnegut just

12   indicated, we've saved the cross-border element of our

13   presentation to the very end.  But also, Your Honor, just to

14   also borrow a phrase that you have indicated I think twice

15   throughout the proceedings today, this is also a motion

16   designed to help encourage creditors who are outside the

17   United States to aim first.  That is really what this motion

18   is frankly all about.

19           As mentioned earlier, the debtors or some or all

20   of the debtors are subject to some 2,600 lawsuits and

21   counting, 13 of which of these are in Canada.  And they're

22   described in the motion, there's 12 either class actions or

23   purported class actions and claim by a single claimant.

24           And the intention here is to commence an enounced

25   to trial Mono Law (ph) proceeding in Canada under the CCAA.

Page 151

1     As Your Honor is well aware in the United States, there is a

2     presumption under 1516(a) about being able to presume if a

3     foreign court has established a foreign representative that

4     you can make a conclusion and presume, in fact, that that is

5     a foreign representative.

6          The CCAA is different in the sense that under

7     Section 45 and 46 of the statute there really seems to be --

8     it's not just they can presume, but they really ought to be

9     somebody who's appointed in the foreign case who has the

10    role of a trustee effectively.

11         Now, we could make the argument that under 1107

12    the debtor in possession is the trustee for all purposes,

13    but again we just want to make this as clear as possible,

14    and therefore, we'd be asking -- this motion is asking under

15    Section 1505 to designate the lead debtor PPLP as an entity

16    to represent these estates in a foreign proceeding.  The

17    foreign proceeding that we currently are thinking of

18    commencing is the one I just referred to, the one in Canada.

19         Just in case Your Honor is concerned about or is

20    curious about, is this the beginning of many -- maybe many

21    such requests because perhaps there's litigation throughout

22    the world.  As far as I'm aware, Canada is where the non-

23    U.S. litigation is located.  I'm aware of -- to be precise,

24    I'm also aware of a U.K. insurance proceeding which I don't

25    think we're currently considering commencing a Mono Law with

Page 152

1    proceeding to specifically deal with that.

2              But here we are considering and intending to

3    commence a Mono Law proceeding under the CCAA, and request

4    that Your Honor enter an order authorizing PPLP to act as

5    foreign representative.  As far as I know, we have not

6    received any comments to this request.

7              THE COURT:  Okay.  Does anyone have any say on

8    this motion?

9              MR. MASAMUTO:  Good afternoon, Your Honor, Brian

10   Malamute for the Office of the United States Trustee.

11             As Your Honor is probably aware this is not a

12   typical motion and certainly not a first day motion that

13   we've seen routinely.  I was just wondering if counsel could

14   perhaps explain any consequences for not deferring this

15   order till the final hearing.

16             THE COURT:  Well, the litigation is ongoing,

17   right?

18             MR. GRAULICH:  The litigation is ongoing and in

19   one -- first of all the litigations ongoing our counsel is

20   going to court on a fairly regular basis.

21             THE COURT:  I know it's cheaper in Canada, but

22   it's still an ongoing expense.

23             MR. GRAULICH:  Every penny counts, Judge.

24             THE COURT:  And there are issues of -- about issue

25   preclusion and the like, so.

1              MR. GRAULICH:  And also, Your Honor, just as is

2     the dynamic in the United States we are being -- there is a

3     process to join the American debtors to Canadian class

4     actions.  These aren't just against the debtors, there are

5     other joint defendants.  And so, you know, in early October

6     there was a motion to join the debtor to a class action.

7              THE COURT:  Okay.  I understand why you're

8     bringing it now, it's a question worth asking, but it's

9     clear to me that there's, as you said, I think most courts

10    including the Canadian courts would assume that the debtor

11    in possession would qualify, but this makes it crystal clear

12    and depending on the judge in Canada you might need that.

13    So I will grant the relief and designate the named Purdue

14    Pharma LP as the foreign representative under Section 1505

15    of the Bankruptcy Code.

16             And if and when you do file I would urge you all

17    to follow the court-to-court guidelines that have been

18    adopted by general order here, and either have it adopted or

19    in the process of being adopted as a practice guideline in

20    Canada --

21             MR. GRAULICH:  I was going to mention that, Your

22    Honor.  I know obviously you -- we are all aware of the

23    guidelines, we are also aware of Your Honor's role in

24    bringing them to the Southern District, so.

25             THE COURT:  That's not why I raised it.  I mean --

Page 154

1           MR. GRAULICH:  But we'll -- but we will --

2           THE COURT:  -- obviously the prospect of multi

3    defendant litigation warrants some coordination.

4           MR. GRAULICH:  Agreed, Your Honor.

5           THE COURT:  Okay.

6           MR. GRAULICH:  Thank you.

7           THE COURT:  Very well.  Does anyone have anything

8    further to say for today's purposes?

9           UNIDENTIFIED:  (indiscernible)

10          THE COURT:  Okay.

11          MS. CYGANOWSKI:  Very briefly, Your Honor.  Thank

12   you.  I'm Melanie Cyganowski, Otterbourg PC, co-counsel to

13   the ad hoc committee that Mr. Huebner referred to in his

14   opening remarks.

15          This ad hoc committee includes representatives of

16   the bipartisan group of the 29, specifically 24 states and 5

17   territories or the Attorney Generals or their equivalents,

18   together with the MDL PEC and several other governmental

19   parties.

20          These parties have collectively supported the

21   framework by which we hope and seek resolution with the

22   debtors.  We appreciate that it's been a long road to get to

23   this point, we all keenly appreciate that there's a long

24   road to come.

25          One of the reasons I rise is to address one of the

Page 155

1    questions that the Court throughout -- during the course of

2    its colloquy about communication the parties, and I can

3    assure the Court that there is indeed robust communications

4    within and among and between the various Attorney Generals

5    throughout the country.

6            And to make the point that whether they differ on

7    their views regarding this particular case, they stand

8    united in their steadfast belief and commitment that they

9    are undertaking what they each believe is in the best

10   interests of their constituents.

11           Those Attorney Generals who are supportive of this

12   settlement framework believe that it's critical to start the

13   healing by among other things seeking a resolution and

14   quicker and significant money to treatment for their folks,

15   and to stop the litigation costs that we know inevitably

16   follows from conflicts litigation.

17           With that, I would like to just briefly cede the

18   podium to Mr. Molton.

19           THE COURT:  Okay.

20           MR. MOLTON:  Thank you, Ms. Cyganowski.

21           Your Honor, just a second my role here on behalf

22   of the committee is to describe what the plaintiff's

23   executive committee is, just so it's clear.  I know Mr.

24   Huebner talked about it, it's been referenced.

25           And it's the Court appointed plaintiff's executive

Page 156

1    committee with co-lead counsel in the National Prescription

2    Opioid, MDL which is Docketed at 17-ND-02804 in the Northern

3    District of Ohio and presided over by Judge Polster.  We

4    have with us today, Your Honor, the two co-lead counsel in

5    the audience, Joe Rice and Paul Hanling (ph) who have been

6    working extremely hard with the debtors, and with all of the

7    various state, municipal and private claimant constituents

8    and stakeholders in this case.

9              I know that there's been reference to what the MDL

10    contains, and I just want to give you a brief statement what

11    it encompasses without getting into the weeds.  There's

12    2,288 cases, Your Honor, municipalities, cities, towns, and

13    villages all across the United States.  Some representing

14    some of the most popular cities and counties in the United

15    States.

16              Also, Native American tribes, and not just

17    government entities, Your Honor, but also hospitals, third

18    party payors and individuals as well.

19              So within that 2,288 cases how many are referenced

20    against Purdue and/or the Sacklers or debtor affiliates.  I

21    know Mr. Huebner in his papers talks about the fact that at

22    present and it's a changing number, but approximately 2,600

23    cases nationally in the United States civil actions against

24    Purdue or the Sacklers, of those 2,600 cases, Your Honor, my

25    best information is 2,259, that is all but 350 are presently

1    pending and reside in the MDL in front of Judge Polster.

2              And as Your Honor heard from Mr. Huebner and from

3    my co-counsel the MDL executive committee and co-lead

4    counsel have voted to recommend the settlement framework to

5    the MDL plaintiffs.

6              And I should also say that in addition to co-lead

7    counsel there's 16 other executive plaintiffs, executive

8    committee members constituted by some of the most recognized

9    or renown specialists in mass tort litigation in the United

10   States and three liaison counsel.

11             So I just wanted to give a flavor, Your Honor, for

12   the plaintiff's executive committee and co-lead counsel and

13   what they bring to the table.

14             THE COURT:  Okay.  Thank you.

15             MR. TROOP:  Your Honor, I'll note there's only one

16   lawyer here for the other committee.  The -- Your Honor, I

17   don't want to end on a down note on this hearing, and I'm

18   going to cede the podium in a minute to David Nachman who is

19   with the New York Attorney General's office and heads their

20   opioid and impact litigation division to talk about some of

21   the cooperation issues that you talked about.

22             But, Your Honor, and I know this isn't lost on

23   you, we're talking about an opioid crisis that accounts for

24   an average of 130 deaths a day.  Currently 130 deaths a day.

25   The burden, the responsibility for dealing with that falls

Page 158

1    primarily on the states, it doesn't fall on the debtors, it

2    doesn't fall on the other creditors, it falls on the states.

3             The states have unique recognized responsibilities

4    to ensure the health and safety of their citizens and their

5    regulatory framework.  And while this case overlaps a

6    variety of issues with regard to this debtor, and these

7    debtors, it does so in the context of this crisis and its

8    responsibility.

9             We're well aware of the framework of the

10   construct, whatever it's being called with regard to a

11   settlement, but Your Honor, let's just think about a couple

12   of things that were said today.

13            I think it was Mr. Huebner who said there's

14   potentially hundreds of billions of dollars' worth of

15   damages being asserted.  And while I know it's not meant

16   this way, the fact that the parties who are creditors and

17   contingent creditors of this enterprise will end up with the

18   value of this enterprise and not its owners, is not

19   reflective of a gift so to speak.  It's reflective of an

20   economic reality, a bankruptcy driven economic reality.

21            Your Honor, you talked today about in many ways

22   and Mr. Huebner did as well about the need to have the

23   sharing of data, communications and the like.  And we look

24   forward to that opportunity.  We look forward to that

25   opportunity in the context of this case and in others.

Page 159

1           Finally, Your Honor, just like Mr. Huebner, though

2    I think he's done a much better job of laying out for you

3    the likely factual and other issues that will come down the

4    pipe in connection with matters that weren't before you

5    today.

6           Obviously I -- our (indiscernible) decision not to

7    respond to those specifics today.  I know Your Honor

8    understands is not an acceptance of any of those

9    representations towards the obligation of the law, the

10   importance of the balance here, the application of the stay

11   and its exceptions, or the power of the Court, all of those

12   things will be resolved and dealt with separately.  Resolved

13   potentially by you, dealt with separately or if possible

14   resolved by the parties.

15          That said, Your Honor, I -- they don't need to

16   hear it from me at all, but it is always a pleasure to

17   listen to Mr. Huebner and his team present matters to the

18   Court.  They are articulate, their vocabulary is expansive,

19   it is -- and notwithstanding, quotidian, I've got to go look

20   up quotidian and notwithstanding whatever differences any of

21   us in this courtroom might have, I look around and I think

22   we all look around and see faces that we know very well and

23   that we respect highly.  And I expect that that will come

24   through in every hearing that we have before you.  And I

25   look forward to that, thank you, Your Honor.

Page 160

1              THE COURT:  Thank you.

2              MR. TROOP:  If Mr. Nachman could have one minute,

3      Your Honor.

4              THE COURT:  Okay.

5              MR. NACHMAN:  Your Honor, just briefly David

6      Nachman from the Attorney General's office on behalf of

7      Attorney General Leticia James and the people of the State

8      of New York.

9              I just want to address an implicit concern that

10     might have been contained in your earlier observation that

11     Ms. Cyganowski also addressed briefly, which is that the AGs

12     do talk to each other, and they talk to each other quite

13     often and quite well.

14             As this hearing today illustrates there will be

15     issues on which we have a common interest, and maybe even a

16     common proposed resolution.  They include issues like the

17     customer program that Mr. Eckstein already addressed some

18     comments to.  And ultimately they address a very thorny

19     issue, which is not actually even addressed by the debtor's

20     proposed conceptual or settlement framework, which is the

21     eventual allocation as among all of these unsecured

22     creditors at different levels of governmental unit and how

23     that's all going to work, a subject which is presently

24     conspicuously absent from the proceedings and which

25     ultimately if there's going to be any confirmable plan of

1    reorganization it'll have to be addressed.

2              As the hearing also illustrates, there are points

3    on which we disagree, and disagree quite pointedly.  Having

4    again to do primarily with the conceptual framework, I want

5    to assure the Court that the opposing states, the states

6    that are not convinced of the merits of that plan intend and

7    I fully expect will cooperate in the guise of the ad hoc,

8    the other ad hoc committee in pursuing vigorous, vigorous

9    due diligence into the dependence and deliberations of the

10   so-called independent committee, as well as the fraudulent

11   conveyance claims that we've asserted, and that perhaps now

12   belong to the estate, as well as the public benefits that

13   either are attached to or not so attached to the infant and

14   early development stage treatment drugs that have been

15   mentioned as part of a plan here.

16             I think that some of my AG colleagues there in the

17   back row who support this plan obviously do not have the

18   same interest as supporters of the plan to pursue that due

19   diligence aggressively and appropriately.  We certainly --

20             THE COURT:  Maybe they've already done it, I don't

21   know.

22             MR. NACHMAN:  No comment.

23             THE COURT:  Okay.

24             MR. NACHMAN:  No comment.  And as -- we certainly

25   have different views and different experience in terms of

Page 162

1    our aggressive pursuit of some of these issues, including

2    obviously payments to and among members of the Sackler

3    family.  And I just wanted to emphasize to the Court that we

4    will, of course, cooperate on all matters of common interest

5    with members of the other ad hoc committee, some of whom are

6    also in the middle row, and friends of mine, but where we

7    differ we intend to cooperate within our own group of

8    states, some of whom have different opinions and different

9    perspectives, obviously, but we will make a maximum effort

10   to come to Your Honor with a unified voice, counsel voice,

11   and we look forward to a most efficient possible proceeding

12   here.  Thank you.

13            THE COURT:  Okay.  Thank you, I appreciate that.

14            And, you know, to be clear, one of the functions

15   of a bankruptcy case is to enable due diligence into the

16   debtor's estate, so there's nothing wrong with that.

17            MR. MACLAY:  Your Honor, may I be heard?

18            THE COURT:  Sure.

19            MR. MACLAY:  Your Honor, it's Kevin Maclay, Your

20   Honor, from Caplin & Drysdale.  I just wanted to clean up

21   one thing in the record.

22            THE COURT:  The on the fence committee.

23            MR. MACLAY:  I am on the multi-state governmental

24   -- I represent them I should say.

25            THE COURT:  Yes.

Page 163

1           MR. MACLAY:  Your Honor, I just wanted to clarify

2    my colleagues, who are with me here today are both members

3    of this Bar, I myself am not, so I wanted to let Your Honor

4    know I'd be filing a motion --

5           THE COURT:  That's fine.

6           MR. MACLAY:  -- shortly and also to echo the

7    comments made by the other groupings of ad hoc committees

8    that have spoken here today, we look forward to engaging

9    with the debtors and other constituencies on hopefully a

10   joint path forward, and at least taking up the initiation we

11   heard today to expand the tent to try to make this case move

12   more smoothly.  Thank you, Your Honor.

13          THE COURT:  I have a pending case that's a tiny

14   case with enormous damages, and the main parties are

15   Attorney Generals in about 19 states, and we have thus far

16   been able to avoid issues that I don't think the states nor

17   I believe need to be litigated, because the states have

18   worked cooperatively, even though they might have had

19   different views about the end result in terms of information

20   sharing, obtaining, et cetera, and I think that's

21   appropriate.

22          And I also think it is appropriate for all the

23   states to focus on -- and other parties too, of course, to

24   focus on issues surrounding a bar date and ultimate

25   distribution.  I mean, to me that's critical and I would

Page 164

1    hope that anyone with a serious interest in that process

2    will not wait till the last minutes, but will get involved

3    early in working on those issues, which are thorny.

4              MR. HUEBNER:  Your Honor, if I may, let me bring

5    us home, which I hope we'll be brief enough, I'm not even

6    going to step up to the podium.

7              THE COURT:  Okay.

8              MR. HUEBNER:  You know, under the last few moments

9    of remarks as Your Honor of course understood, there are

10   some relatively sharp state versus locality issues, some

11   relatively potentially sharp and sharply expressed state

12   versus state issues.  And obviously there's only one us and

13   there are many of them.  And we are here to serve as

14   fiduciary and to be a clearinghouse.  As I said in the

15   beginning, there are two touchstones.  To maximize the value

16   of this enterprise, and to ensure that it is fairly

17   distributed under the priorities required by federal law, to

18   legitimate claimants with equality of treatment within the

19   class.

20             So those things will have to be worked out to some

21   extent since we are all aware that Purdue is only one

22   defendant and as dollars go, nowhere near the top of the

23   pile of the opioid defendants being sued by many of these

24   folks, our hope is that ultimately they will figure out an

25   allocation method amongst themselves, that they will apply

Page 165

1   to all opioid proceeds and all litigations that I assume

2   they hope will get --

3              THE COURT:  Well, let's just start with this one.

4              MR. HUEBNER:  No, understood, so let me tell you

5   what, so just so you understand, Your Honor, in version 44

6   and 45 of my speech, I actually address the bar date and the

7   fact that we have documents largely drafted and we're ready

8   to interface.  We're actually waiting to have people to have

9   a dialogic relationship with, to actually talk sensibly and

10  show them what we have in mind.  We've canvassed the other

11  cases, we always try, as Your Honor did in several things

12  say, when you said, pretty good, but actually it's gotten

13  even better in the last month and you missed it.  We

14  actually try to do that, and so for things like the bar date

15  and related issues, you can be sure that we're standing

16  ready and we will advance the ball as far as we can.

17             I would like to commend all the parties because I

18  actually am grateful for it.  We worked very hard today not

19  to discuss at all things related to liability and the past

20  and the conduct, and obviously the people on all sides and

21  all benches who have very strong views, whether people all

22  agree, this is not a gift, this is economic reality, is

23  something I think I'm also going to leave, and I'm not just

24  going to address that today.

25             This is a very complicated case.  And we

Page 166

1    understand that in some ways the debtors are in the middle

2    trying to bring together a deal that we hope is in

3    everybody's best interests, do the best we can.  It'll be a

4    bumpy road and hopefully we'll work together constructively.

5    And if we have to litigate things we will, but you know, for

6    starters, let's have people to talk to and go from there, we

7    certainly stand ready to do so.

8             Let me finally end with where I actually, in fact,

9    began which is with a thank you.

10            THE COURT:  Okay.

11            MR. HUEBNER:  We know how much work this meant for

12   people, especially people who don't have flogs of associates

13   and counsel and partners to work with them, who got binders

14   just as thick as people who do, and people moved heaven and

15   earth to think thoughtfully, to raise problems that were

16   good faith questions, and got us to change our path on some

17   issues, and we really are grateful especially for the

18   governmental actors who work on extremely short notice, very

19   often on a weekend, with no overtime pay and no staff

20   including obviously chambers itself.  We hope to accommodate

21   obviously a much more reasonable timing schedule going

22   forward.

23            THE COURT:  Okay.  All right.  So I will look for

24   the orders.  You can e-mail them, and in the meantime, you

25   can act in reliance on my rulings today.

1            MR. SCHWARTZBERG:  Your Honor, I just wanted to

2    announce today, committee formation meeting is the 22nd --

3    26th at the Grand Height at 10 --

4            THE COURT:  Okay.

5            MR. SCHWARTZBERG:  -- at 11 a.m.

6            THE COURT:  Thank you.

7    (Proceedings concluded at 1:27 p.m.)

8                        * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 168
 1                      I N D E X

 2

 3                   W I T N E S S E S

 4    WITNESS                BY                    PAGE

 5    JON LOWNE          MR. SCHWARTZBERG          107

 6

 7

 8

 9                      I N D E X

10

11                      RULINGS

12                                                Page

13    Motion for Joint Administration (document #2)    34

14

15    Case Management Motion                      37

16

17    Cash Management Motion                      41

18

19    Creditor List and Personal Information Motion    52

20

21    Noticing Agent 156(c) Application           55

22

23    Taxes and Fees Motion                       61

24

25    Insurance Motion                            70
```

1    Schedules Motion                                          71

2

3    Surety Bonds Motion                                       75

4

5    Unities Motion                                            77

6

7    Customer Programs Motion                                  82

8

9    Wages Motion                                             135

10

11   Critical Vendor Motion                                   150

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

1                    C E R T I F I C A T I O N

2

3        We, Sherri L. Breach & Sheila Orms, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Sherri L. Breach    Digitally signed by Sherri L. Breach
                         DN: cn=Sherri L. Breach, o, ou,
                         email=digital@veritext.com, c=US
8    _____
                         Date: 2019.09.18 13:51:05 -04'00'

9    Sherri L. Breach, Approved Transcriptionist

10

11

12   Shelia Orms    Digitally signed by Shelia Orms
                    DN: cn=Shelia Orms, o, ou,
                    email=digital@veritedt.com, c=US
13   _____
                    Date: 2019.09.18 13:51:19 -04'00'

14   Sheila Orms, Approved Transcriptionist

15

16

17   Date:   September 18, 2019

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501

[& - 450]                                                                      Page 1

**&**

**&**   3:25 4:2,14
5:16 6:9,17 7:2,16
9:20 33:18 68:2
71:20 77:12
150:11 162:20
170:3

**0**

**02804**   156:2

**1**

**1**   14:3 30:2,19
31:1 33:12
**1,000**   16:9 92:20
**1,500**   25:23
**1,600,000**   136:3
**1.5**   117:9
**10**   54:17,18 55:6
69:14,14 167:3
**100**   14:13 25:13
28:8 50:3 104:10
**100,000**   103:8
115:17 136:5
**10001**   5:11
**10005**   7:4
**10014**   8:12
**10017**   4:5
**10019**   6:12
**10036**   4:17 5:4
**1006**   8:11
**1007**   70:20
**10169**   6:4
**10281**   7:20
**103**   113:18
**105**   19:15
**10601**   1:15
**107**   168:5
**10:03**   1:18
**11**   2:1,8 9:23 13:1
17:21 18:15,25
19:21,23 22:7
24:18 25:2,3,7,8
25:20 27:3,13

28:6 29:15 33:24
35:2 70:18 77:16
167:5
**1100**   5:19
**1107**   151:11
**11501**   170:25
**1177**   4:16
**12**   71:22,23 75:17
150:22
**12,500**   29:18
**120**   26:10
**13**   35:10 38:15
41:10 70:19 75:11
150:21
**13,000**   123:10
**13,660**   136:8
**130**   157:24,24
**135**   169:9
**14**   15:1 22:12
32:22 70:22 77:15
**140**   31:11,12
**140,000**   110:15
**15**   30:22 40:21
91:5
**150**   169:11
**1505**   151:15
153:14
**1516**   151:2
**156**   2:20 53:8
168:21
**16**   34:20 139:25
140:2 157:7
**17**   1:17 156:2
**18**   31:7 170:17
**18400**   8:3
**19**   16:8 39:19,22
139:20 163:15
**19-23649**   1:3 34:3
**1995**   31:1
**19th**   30:21
**1:27**   167:7
**1st**   105:20 116:18

**2**

**2**   2:6 31:13 33:22
168:13
**2,000**   16:12,16
**2,029**   17:11
**2,259**   156:25
**2,288**   156:12,19
**2,600**   116:6
150:20 156:22,24
**2,625**   13:13 25:25
**2.2**   122:25
**20**   23:23 56:9
89:24
**200,000**   104:11
**20005**   5:20
**2002**   11:15 35:5
**2008**   30:2
**201**   8:11
**2014**   25:22
**2015**   30:19
**2016**   25:22
**2017**   12:9 25:23
92:18
**2018**   11:23 12:16
21:9,22 23:24
25:23 30:13,21
31:1 92:18,21,22
93:25 96:1
**2019**   1:17 12:13
22:3 25:24 75:17
78:8 93:25 96:1
105:21 113:21
115:2 170:17
**21**   14:24
**22**   9:21
**225**   7:18
**22nd**   167:2
**23**   56:13
**230**   6:3
**24**   9:22 14:21
15:13 30:25 32:10
33:23 56:17 62:24
154:16

**25**   15:24 18:8 35:8
92:23
**250**   27:1
**26**   27:15 122:24
**26th**   167:3
**28**   7:3
**29**   15:23 154:16

**3**

**3**   14:12,17
**30**   11:6 70:24
71:10
**300**   1:14 25:23
170:24
**300,000**   110:16
123:13
**309**   11:18
**30th**   31:1 75:17
**31**   6:11 78:8
**31st**   96:22
**330**   170:23
**33134**   7:12
**34**   168:13
**341**   11:17
**344**   81:18
**345**   40:2,3,10
**350**   156:25
**350,611**   75:15
**366**   75:21
**36th**   7:19
**37**   22:5 168:15
**3rd**   30:13

**4**

**4**   33:22 49:23 53:7
146:1
**40**   11:7
**400**   68:4
**41**   168:17
**44**   71:2 165:5
**45**   39:24 86:3
101:20 103:6
151:7 165:6
**450**   4:4

| | | | |
|---|---|---|---|
| **46** 151:7 | **9** | **accomplished** | **actors** 15:24 |
| **49** 31:13 | **9** 86:4 136:12 | 63:9 | 119:21 166:18 |
| **4th** 114:7 115:3 | 140:2,6,22 | **account** 40:11,11 | **acts** 54:1 |
| **5** | **90** 78:7 108:22 | 61:19 75:23 | **actual** 111:13 |
| **5** 34:19 37:25 | **916,000** 115:4 | 128:19 134:21 | **ad** 4:15 6:2,9 |
| 57:11 154:16 | **92612** 8:5 | 138:8 147:9 | 16:20 17:14 35:3 |
| **50** 11:6,7,12 21:16 | **99** 36:24 | **accounts** 38:4,5 | 37:19 43:16 59:5 |
| 41:12 | **a** | 38:16 39:9,10,21 | 61:24 62:13,23 |
| **500** 6:19 | **a&p** 76:12 84:10 | 39:23 40:1,8 | 65:7,10 66:14 |
| **503** 86:4 124:5 | 89:17 | 78:15 157:23 | 68:9 81:16 123:19 |
| 133:19,20 136:12 | **a.m.** 167:5 | **accrual** 57:22 | 124:25 125:2 |
| 138:2,14 140:6,22 | **abide** 126:9 | **accumulated** 14:6 | 126:14 148:18 |
| **507** 136:9 | **ability** 69:20 | 22:13 | 154:13,15 161:7,8 |
| **52** 98:5 168:19 | 72:10 103:18 | **accurate** 170:4 | 162:5 163:7 |
| **521** 70:20 | 138:14,16 | **accurately** 40:7 | **add** 10:4 40:5 |
| **52nd** 6:11 | **able** 91:23 92:13 | **achieve** 63:20,23 | 51:6 76:23 78:14 |
| **53701** 6:20 | 127:1 132:23 | 91:14 | 83:22 146:1,7 |
| **55** 5:10 7:10 | 151:2 163:16 | **achieving** 18:24 | **added** 72:22 |
| 168:21 | **absence** 13:19 | **acknowledge** | **adding** 44:15 |
| **6** | **absent** 41:24 | 86:20 | **addition** 36:14 |
| **6** 37:25 91:6 | 45:19 160:24 | **acknowledging** | 37:19 104:8,20 |
| **61** 168:23 | **absolute** 24:17 | 105:16 | 134:22 136:17 |
| **67** 92:20 | 143:15 147:2 | **act** 68:17,20 74:20 | 157:6 |
| **7** | **absolutely** 98:25 | 120:20 121:2,3 | **additional** 11:3 |
| **7** 5:3 41:9 75:12 | 145:3 146:6 | 152:4 166:25 | 14:12 16:16 70:24 |
| **7.7** 140:8 141:7 | **abundant** 142:9 | **acted** 105:11,16 | 76:3 87:1 88:14 |
| **70** 168:25 | **abundantly** | 127:24 131:13 | 90:11 96:25 99:10 |
| **700** 30:4 91:24 | 133:22 | 134:9 | **address** 20:23 |
| **71** 169:1 | **acceleration** 57:4 | **acting** 13:24 | 25:20 32:11 42:4 |
| **75** 169:3 | **accept** 102:7 | 82:10 129:7 132:3 | 46:13 47:13 48:2 |
| **77** 169:5 | **acceptable** 99:9 | **action** 22:6 29:13 | 49:13 50:7,11,23 |
| **8** | 140:20 | 122:10 134:20 | 51:5 52:16,21 |
| **8** 49:21 53:7 55:7 | **acceptance** 159:8 | 144:4 153:6 | 82:17,20 87:15 |
| **800** 7:11 8:4 25:24 | **accepting** 144:1 | **actions** 14:19 | 97:15 116:23 |
| **82** 169:7 | **access** 53:12 56:1 | 116:7,10,15 | 119:17,25 130:4 |
| **85** 13:6 | 96:15 140:21 | 118:16 131:14 | 132:14 154:25 |
| **85.8** 66:22 | 141:4 142:22 | 150:22,23 153:4 | 160:9,18 165:6,24 |
| **856** 92:20 | **accommodate** | 156:23 | **addressed** 144:11 |
| **870,000** 115:5 | 83:22 144:21 | **active** 86:14 | 149:6 160:11,17 |
| **88** 31:13 | 166:20 | **actively** 80:12 | 160:19 161:1 |
| | **accommodated** | 93:21 | **addresses** 42:8 |
| | 144:9 | **activities** 108:4 | 43:9,13,25 44:5 |
| | | | 46:12,12,21 47:17 |

48:13 49:1,16
50:2
**addressing** 69:8
**adequate** 75:14
75:19,21 147:6
**adhansia** 108:18
108:20
**adjoin** 74:24
**adjustment** 83:11
**adjustments**
78:13 81:5
**admin** 57:2,8,19
**administered**
13:23 34:1
**administration**
2:6 33:21 34:12
168:13
**administrative**
26:7 33:24 57:9
58:7 92:8 98:12
136:12
**administratively**
10:9
**admission** 32:20
33:5
**admit** 33:12
**adopted** 153:18
153:18,19
**advance** 10:9
20:12 103:18,21
105:6,10 128:9
165:16
**advanced** 116:19
**advancement**
99:5 103:16 105:5
115:19 116:5
139:13
**advancing** 66:19
104:24 105:19
108:10 130:24
**advised** 86:13
**advisor** 12:13
22:1 149:17

**advisors** 28:22
31:20 112:17
130:8
**affairs** 92:6 108:1
108:3
**affiliate** 140:12
**affiliates** 30:1
33:23 156:20
**affirmation**
105:15
**affirmative** 74:6
**afford** 94:23
**aforementioned**
105:17
**afoul** 138:1
**afraid** 31:24
36:16
**afternoon** 150:10
152:9
**ag** 161:16
**agencies** 69:22
94:15
**agenda** 2:4 32:17
33:20,22 34:18
37:24 41:7,9
49:21 53:6,7 55:6
69:11,13 70:18
71:21,22 75:8,11
77:15 90:22 91:5
91:5 139:25 140:2
150:6
**agent** 2:20 41:18
41:21,25 42:13
44:8,9 45:19
51:16 52:9 54:23
168:21
**agentis** 7:8
**agents** 54:4
**aggregate** 78:12
**aggressive** 162:1
**aggressively**
117:12 161:19

**ago** 21:8 22:12
23:24 24:11 29:16
55:1 65:20
**agree** 38:16 45:25
47:22 54:10 87:13
105:10 121:5
127:8 132:1
134:17 143:9,18
143:21 144:4
165:22
**agreed** 10:3 13:17
14:14,20 41:3
64:15 65:14 66:9
67:11 79:22,22
96:11 99:13
125:12 128:20
154:4
**agreeing** 65:13
66:17
**agreement** 13:12
39:20 40:7 55:3
66:15 72:25
143:10 147:19
**agreements** 29:2
77:25 96:4
**agrees** 144:2
**ags** 160:11
**ahead** 42:19
107:18 123:14
147:22
**aid** 78:18
**aig** 21:21
**aim** 138:23
150:17
**aiming** 120:22
**aip** 96:15
**al** 1:7 9:4
**aleali** 12:16
**alert** 19:3
**alhambra** 7:10
**aligned** 17:20
**alix** 112:17

**alixpartners**
12:12 29:18,23
31:3
**allegations** 23:16
28:18 29:11
127:23 128:24
**allege** 26:2
**allocation** 160:21
164:25
**allow** 9:24 43:14
56:6 63:24 88:12
88:13 90:7 121:12
124:10,10,14,21
141:3 143:5
**allowed** 45:5 89:4
90:3
**allowing** 57:8
143:4
**altering** 75:22
**amazing** 88:20
**ambiguous**
135:14
**amend** 31:13
**amending** 54:12
**america** 13:7
130:16
**american** 13:25
16:10 18:5,22
91:18 153:3
156:16
**americans** 20:3
**americas** 4:16
**amerisource**
86:14
**amerisourceber...**
78:9 83:13 89:20
**amorphous** 134:2
**amount** 20:13
43:9 56:4,4 57:22
60:6,21 61:2,4,6
64:9 75:18 79:25
92:25 104:1
114:21 123:13

[amount - assuming]                                                                                     Page 4

135:25 140:8
141:7,16 143:3
**amounts** 10:1
57:11,17 58:12,19
69:25 75:24 76:3
85:14 88:6 91:9
110:19 111:1
115:9 117:4,16,16
117:17 124:17
136:2 145:13
**analogous** 14:21
**analysis** 131:20
135:10 141:6
**analytical** 113:25
**analytics** 142:17
**analyzing** 29:25
**andrew** 6:14
126:13
**anna** 62:18
**annexed** 55:15
78:24
**announce** 68:3
167:2
**annual** 95:17
96:14 98:15 109:1
**answer** 32:13
80:10 148:3
**anthony** 59:2
**anticipated** 103:9
**antino** 10:6
**antithetical**
118:19
**anxious** 88:18,19
**anybody** 14:25
67:10 82:21
130:25 135:3
**anyway** 84:24
122:19
**apart** 118:19
**apologies** 20:12
87:22 94:18
145:15

**apologize** 83:10
89:8 106:3 109:12
133:24
**apparent** 19:16
**appeals** 28:1
**appear** 40:9 46:21
70:14 124:6
**appearance** 9:11
**appearances** 9:7
**appeared** 20:7
**appearing** 9:12
**appears** 61:1
125:24
**appellate** 26:8,9
27:12
**applicable** 44:17
53:2 59:21 60:5
76:11 78:2
**application** 2:20
43:4 53:8,9,14
159:10 168:21
**applied** 87:3
**applies** 39:1 74:17
118:17 120:24
138:25
**apply** 118:22
119:4,14 120:8,11
139:2 164:25
**appointed** 16:3,7
17:8 66:12 101:25
103:13 151:9
155:25
**appreciate** 9:9
35:24 63:16 64:6
64:7,10 65:3 76:9
89:13 125:2
154:22,23 162:13
**appreciative**
10:19
**approach** 24:4
37:15 76:24 83:17
84:23 96:24
144:13

**appropriate**
11:18 24:21 29:1
30:6 36:15 41:4
66:24 67:2,3
70:24 79:15 81:23
82:1 125:14
139:11 145:25
149:23 163:21,22
**appropriately**
161:19
**approval** 40:2
41:15 76:1 111:17
112:20 114:11
115:10 127:14
130:12,13 133:10
141:13
**approvals** 141:14
**approve** 55:4
127:13 130:20
**approved** 20:2
39:23 53:15 70:5
105:7 111:14
170:9,14
**approving** 28:23
**approximate**
110:12
**approximately**
16:12 26:10 31:11
68:4 75:15 91:24
110:15 156:22
**arduous** 17:16
**area** 86:6 119:12
**areas** 11:24
**argue** 61:8
**argued** 47:21 60:2
86:3
**arguendo** 15:21
27:9
**arguing** 122:22
**argument** 67:3
151:11
**arkansas** 6:17

**arps** 12:23
**array** 19:17
**arrivals** 22:23
**arrived** 17:15
**articulate** 159:18
**articulated** 138:4
**articulating**
147:23
**ascribe** 60:11
**ascribing** 129:5
**aside** 126:22
**asked** 30:19 97:16
134:1
**asking** 19:6 52:11
73:5 97:23 98:6
98:13 113:16
123:1 127:3 133:8
141:17 147:4
151:14,14 153:8
**aspects** 44:2 108:3
128:17
**aspersions** 127:21
**assert** 140:22
**asserted** 20:20
158:15 161:11
**asserting** 118:13
**assertions** 119:22
**asset** 13:21
**assets** 146:24
**assist** 104:14
**assistance** 142:16
**associate** 12:17
**associated** 26:23
79:9 142:12
**associates** 21:19
166:12
**assume** 122:9
124:18 147:7
153:10 165:1
**assumed** 15:21
**assuming** 52:10
61:13 62:3 77:4

**assumption** 147:5
**assurance** 75:14
75:20,21
**assure** 155:3
161:5
**assuredly** 13:2
**astentute** 138:23
**astramerck** 22:14
**astrazeneca** 22:14
**attached** 38:8
78:19 161:13,13
**attachments**
36:12,15,17
**attempt** 17:19
117:12
**attempted** 32:4
93:10
**attention** 10:20
**attest** 127:4
131:11
**attorney** 6:9 7:1
11:12 14:21 59:4
62:3,15 93:16
107:23 154:17
155:4,11 157:19
160:6,7 163:15
**attorney's** 11:11
62:24
**attorneys** 4:3,15
5:2,9,17 6:2,9,17
7:2,9,17 8:2,10
16:8 117:19
**attract** 100:15
**attributable** 57:1
57:6
**attrition** 92:23
94:6 133:15
**audience** 156:5
**august** 78:8
**authorities** 55:14
56:12 72:4
**authority** 22:18
29:9 38:2 41:11

41:13 42:6 45:19
56:15 58:21 71:24
74:20 77:18,24
82:7,12 83:6
88:14 91:8 95:7
95:11 96:21 98:6
98:13 101:23
103:11 115:2
116:21 117:2,20
119:24 120:4
130:18 133:8
140:3,5,10,10
142:23
**authorization**
61:13 142:21
**authorize** 41:17
78:1 85:19 146:25
**authorized** 35:14
38:17 39:1,5,10
40:8 42:14 51:16
85:16 87:9 88:11
90:7 126:4
**authorizes** 74:2
**authorizing** 61:12
80:22 81:2 134:10
152:4
**automatic** 19:14
74:17,24 77:22
119:23 138:22
140:25
**automatically**
29:14 74:18
**available** 27:19
36:16
**avenue** 4:4,16 6:3
8:3
**average** 38:18
75:17 157:24
**averio** 78:23
**avoid** 57:22 62:5
136:18 138:6
163:16

**avoidance** 73:25
146:9
**avoiding** 137:10
**award** 138:13
**awards** 100:12
**aware** 13:10 20:8
40:10,11 56:10
81:13 92:10 116:6
122:16 142:25
151:1,22,23,24
152:11 153:22,23
158:9 164:21

**b**

**b** 1:22 40:2 52:1
54:13 86:4 136:12
140:6,22
**back** 30:3 40:14
46:7 47:6,7 59:21
59:24 60:4,14,18
64:19 69:11 76:19
81:25 85:11 104:4
120:12 127:7
133:4 142:8
161:17
**background**
20:14 118:5
**backlog** 118:7
**backs** 87:2
**bad** 144:23
**balance** 27:6,7
115:2 159:10
**balances** 38:18
**ball** 165:16
**ballpark** 109:2
**bank** 18:19 38:4,5
39:13
**banker** 12:8
**bankruptcy** 1:1
1:13,24 18:9 22:2
44:4 61:20 67:22
70:21 73:9 74:16
74:17 89:23 93:19
95:19 102:24

103:25 117:23,25
128:12 133:21
136:9,13 138:2,8
138:15 149:22
153:15 158:20
162:15
**banks** 11:13 38:17
39:1 78:2
**bar** 41:19 42:5
52:15 163:3,24
165:6,14
**barry** 12:14
**based** 34:11 59:12
64:22,25 70:12
78:13 81:5 82:24
88:5 96:10 100:12
106:6 127:15
137:23 138:9
**basic** 97:12,14
**basically** 43:24
58:20 73:16
118:20
**basis** 37:1 39:24
41:4 47:4,7,7,9
48:5 57:13 61:21
70:8,16 82:12,13
82:25 85:21 88:11
101:15 126:11
147:8 152:20
**bates** 29:18,25
**battered** 27:5
**battle** 27:16
**bear** 35:10
**bearing** 93:4
**began** 12:9 23:24
29:16 166:9
**beginning** 11:21
86:19,24 151:20
164:15
**begun** 17:1
**behalf** 9:20 33:18
59:3 69:10 71:20
72:17 77:13 81:16

[behalf - business]                                                                    Page 6

124:25 132:3
148:18 155:21
160:6
**belabor**  122:10
128:20
**belaboring**  94:19
**belief**  93:17 155:8
**believe**  14:23
18:22 22:10 26:18
28:3 33:8 38:11
38:23,25 46:24
47:6 50:4 54:8
55:17 58:22 63:4
65:14 66:23 67:20
69:24 70:13,24
76:14 85:25 89:9
96:8 99:7,23
105:12 108:8
109:6,25 110:6,14
123:6 131:15
134:24 138:2
139:5 140:24
146:13,20 155:9
155:12 163:17
**believed**  131:14
**believes**  74:4
105:15
**belong**  161:12
**ben**  11:25
**bench**  83:17
**benches**  165:21
**beneficial**  57:21
138:7
**beneficiaries**
137:20,25 138:9
**benefit**  13:7,24
28:7 61:18 91:10
91:17 95:5 97:12
135:20 136:15
**benefits**  95:9
102:12 125:9
161:12

**benefitting**
125:24
**benjamin**  4:12
**best**  31:10,14 68:9
127:16 128:9,22
129:21 130:22,23
131:13 134:23
135:10 140:14
143:17 155:9
156:25 166:3,3
**better**  9:11 28:14
28:25 76:17
127:20 147:25
159:2 165:13
**beyond**  22:23
50:25 65:14 73:8
88:14 95:8 99:17
99:18 111:23
115:7 122:20
147:21
**big**  11:9 17:19
27:15 73:15 118:6
121:2
**bigger**  14:24 67:6
**billed**  55:25
**billion**  14:4,12,17
**billions**  18:3 26:4
27:18 28:3 158:14
**bills**  27:1 117:19
117:25 118:7
121:25
**binder**  20:10 91:3
**binders**  166:13
**biology**  23:8
**bipartisan**  154:16
**blood**  92:1
**blue**  22:23
**board**  21:3,7,13
21:16,22 22:2,12
22:22 29:5 86:16
101:25 102:1
103:13,14 105:8
111:16,17,24,24

112:1,8,19 127:12
128:3,4,17 130:14
134:19,20 135:5
135:14
**body**  36:13 71:9
130:12,17
**bond**  18:19 71:25
**bonds**  3:3 71:21
72:5,9,21,22
73:24 169:3
**bone**  53:13
**bonus**  99:14 102:3
102:5,12,17,18
110:23 111:13,19
111:19,23 114:12
122:24 124:2,18
136:7
**bonuses**  95:9
96:19,22 97:4
99:5,19,20 102:5
102:10,20,22
110:3,20,25
111:10,13,25
112:2 115:13
122:25 123:11,11
123:17,23,25
124:19
**border**  150:12
**bore**  23:6
**borrow**  150:14
**bottom**  78:17
**brand**  108:22
**branded**  55:12,24
56:13,15 78:21
**breach**  3:25 170:3
170:9
**breadth**  63:4
**brian**  8:15 10:11
56:18,19 152:9
**brief**  2:12 20:15
63:5 64:9 115:13
156:10 164:5

**briefly**  21:4 24:22
78:5 121:16 130:4
132:14 141:10,19
145:16 154:11
155:17 160:5,11
**bring**  16:15,15
23:6 76:4 157:13
164:4 166:2
**bringing**  153:8,24
**brings**  23:11
28:16 133:7 150:6
**broad**  12:6 128:23
128:23
**broadly**  135:20
**broken**  43:1
141:18
**brought**  95:18
119:21
**brown**  5:1 62:11
86:8
**buchalter**  8:1
**bucket**  50:18
**buckfire**  21:23
22:2,16
**build**  17:19 25:12
**building**  10:17
**bulk**  39:9 78:7
119:20 133:2
**bumpy**  166:4
**burden**  54:23
157:25
**burdens**  26:23
**business**  20:14
23:7,12 38:6
39:18 46:13 47:13
47:17 48:2,7,13
49:16 50:6,22
55:8,11,20,21
56:9 58:19 64:22
72:5,8 77:21
79:18 80:6,11,16
81:3,7 82:19 83:5
83:15 88:25 91:11

92:7,12,14,19
93:7,10 94:10,22
95:15 96:10 102:6
102:23 109:22
112:16 113:11
134:11 137:7,9,10
137:20 141:9
142:10,24 146:13
149:22
**businesses** 69:21
79:2 137:4
**busy** 10:2
**buyers** 78:14

**c**

**c** 2:20 4:1 5:22 9:1
52:1 53:8 55:16
78:19,25 124:5
133:19,20 138:2
138:14 168:21
170:1,1
**calculate** 56:3
**calculated** 75:16
**calculation** 75:18
**calculations** 88:4
**calendar** 95:25
113:20
**california** 8:5
**call** 32:8 41:8 68:5
74:7
**called** 100:7
116:10 118:16
158:10 161:10
**camp** 16:17
**campaigning**
93:21
**canada** 150:21,25
151:18,22 152:21
153:12,20
**canadian** 153:3
153:10
**canceled** 32:7
**candidly** 25:3

**canvassed** 165:10
**cap** 55:2 123:14
123:15 124:18
133:19 136:8
**capacity** 14:7
137:19
**caplin** 5:16 68:2
162:20
**capped** 122:17
123:9
**caption** 34:14
**cardinal** 78:9
89:20
**care** 52:1
**career** 21:16,25
**careful** 17:16
74:13
**carefully** 112:12
130:10 140:16
**carney** 96:6
**carpenter** 7:16
72:17
**carriers** 141:23
**case** 1:3 2:14 11:8
11:16,23 14:25
17:4 18:14,19
28:10 34:1,2,11
34:19 35:23 46:14
48:14,16 59:23
63:11,11,20 66:16
76:9 83:4 84:10
86:24 94:25 95:14
118:14,15 119:12
119:15,19 120:5
126:18 128:14
133:10 134:22
135:9 137:2,2
138:15 149:11
151:9,19 155:7
156:8 158:5,25
162:15 163:11,13
163:14 165:25
168:15

**cases** 2:1 9:23,25
13:1 15:16,19
18:22 21:25 25:22
28:6 32:6 33:24
33:25 34:23 36:1
41:24 46:10,16
47:21 48:11,13
68:17 70:12,23
77:3 89:23 91:15
91:17,21 103:24
117:8,10 119:4
147:3 156:12,19
156:23,24 165:11
**cash** 2:16 14:3,16
14:18 27:6 28:4
30:18 38:1,3,7
85:14 100:11
168:17
**cast** 127:21
**casualty** 69:16
**categories** 18:13
24:6 122:4,8
136:1 141:19
**category** 26:25
97:20 140:7
**causation** 19:15
**cause** 36:23,25
37:8,11 79:5
100:23 103:2
105:2 133:11
143:1 149:9
**caused** 93:5
**causes** 29:13
**caution** 120:20
**cautioned** 86:10
**cautious** 120:4
121:7
**ccaa** 150:25 151:6
152:3
**cease** 104:24
**ceased** 23:23
24:11 105:20

**cecil** 23:5
**cede** 145:9 150:7
155:17 157:18
**cell** 23:8
**centered** 79:21
**central** 94:14
**ceo** 21:20 22:7,10
108:13,23,24
**certain** 23:13
24:25 27:12 29:6
41:14 55:13 62:17
64:15 68:24 69:22
69:23 100:12
102:6 120:3 140:3
**certainly** 18:16
28:13 36:4,19
40:24 47:12 57:13
58:3 63:14 66:6,9
71:11 106:10
111:11 118:15
136:20 152:12
161:19,24 166:7
**certainty** 117:6,24
**certify** 134:25
135:9 170:3
**cetera** 163:20
**cfo** 12:18 21:20
87:23
**chain** 141:13,21
**chairman** 21:20
21:21
**chairs** 21:16
22:16
**challenged** 24:19
**challenges** 93:6
**challenging** 93:14
93:20,20 94:3
130:15
**chambers** 10:2
34:15 36:6 91:3
166:20
**chance** 82:4

**change** 52:25 81:8 107:16,17 141:12 150:4 166:16
**changed** 79:17,18
**changes** 37:13,20 41:3 55:4 72:11 76:6,14
**changing** 156:22
**channeling** 19:15
**chaotic** 26:18
**chapter** 2:1,8 9:23 13:1 17:21 18:15 18:25 19:21,23 22:6 24:18 25:2,3 25:6,8,20 27:3,13 28:6 29:15 33:24
**charbonneau** 7:14
**charge** 85:11 87:2
**chargebacks** 78:12
**charged** 16:11
**cheaper** 152:21
**check** 139:12
**checked** 31:3
**checks** 39:18 78:3
**chief** 99:11 109:4
**chip** 22:23
**chose** 27:9
**chosen** 13:24 27:16 66:4 102:16
**chris** 12:1 33:14
**christopher** 4:8 33:18 69:10
**chronologically** 96:20
**chrysler** 21:18
**circle** 5:18
**circulated** 34:23
**circumstances** 46:16
**cities** 16:10 18:2 26:14 156:12,14

**citizens** 158:4
**city** 16:24 22:1 62:18
**civil** 12:22 116:7 156:23
**claim** 26:21 42:7 43:9,10 44:10 51:7,13,15 54:4 57:19,20 58:16 60:3 86:4,5 143:9 144:3 150:23
**claimant** 150:23 156:7
**claimants** 13:6,24 16:7 17:14 19:18 25:14,16,16 46:19 54:21 66:22 91:17 137:4,6,8,11 164:18
**claims** 13:5 20:22 22:19 24:10,24 41:18,18,21,23,25 42:13 44:8,9 45:2 45:19 51:8,16 52:9 53:12 54:22 54:24 59:22,25 84:10 85:11 98:12 118:13 140:3,5,7 140:22 143:25 147:11 161:11
**clara** 16:25 62:18
**clarification** 55:2 57:7 88:22 135:18
**clarified** 128:2
**clarify** 35:1 72:20 128:1 163:1
**clarity** 135:6
**class** 22:6 150:22 150:23 153:3,6 164:19
**clean** 162:20
**clear** 12:3 14:2,8 24:13 32:2 44:1

45:19 48:17 49:10 56:6,6 59:10 65:18 67:1 82:6 83:1,3 88:1 90:10 95:3 96:20 98:19 116:17 119:15 125:25 132:19 133:22 134:4,16 134:18 135:23 137:1,13 139:1 140:9 145:11 146:23 151:13 153:9,11 155:23 162:14
**clearinghouse** 164:14
**clearly** 34:11 45:5 67:17 69:7 84:11 136:2 137:19 138:17 139:6,15
**clerk** 10:5,6,25 11:2 45:16 51:16 53:8,11,13,19,24 53:25
**clerk's** 53:9,17 54:4,23
**client** 72:25
**clients** 16:14 66:6
**climate** 94:1
**climbing** 25:24 26:1
**clinical** 94:13 141:23 142:16
**close** 28:4 38:5 140:1
**code** 43:13 44:4 61:20 65:15 67:19 67:22 70:21 73:9 74:17,17 133:21 136:9,13 138:2 149:23 153:15
**code's** 138:8

**coercive** 24:14
**coincides** 139:4
**cola** 22:12,17
**coleman** 12:10
**colleague** 71:15 77:9 83:16
**colleagues** 68:2 161:16 163:2
**collect** 55:8
**collective** 92:11
**collectively** 9:22 16:8 27:24 154:20
**colley** 23:6
**colloquy** 134:3 155:2
**colorable** 37:1
**columbia** 11:13 15:13
**come** 26:22 28:10 29:5 37:5 40:15 47:6,7,20 55:19 56:16 57:17 64:19 81:25 97:5 98:19 103:1 112:7 146:19 154:24 159:3,23 162:10
**comes** 32:25 76:19
**comfort** 24:17 142:9
**comfortable** 39:25 87:14 98:22 113:25
**coming** 20:16 39:10 61:3 115:4 115:6 136:4,6
**commence** 150:24 152:3
**commencement** 2:1 11:4 41:16
**commencing** 151:18,25

**commend** 125:11
165:17
**comment** 144:18
144:20 161:22,24
**comments** 21:2
34:4,24 35:19
38:12 40:4 64:11
64:12 124:23
126:9 133:2 144:7
152:6 160:18
163:7
**commercial** 141:2
**commitment**
155:8
**commitments**
94:21
**commits** 131:16
**committee** 4:15
5:2 6:2,10 16:2,20
16:21 17:3,14
22:17,23 29:8,20
31:13,17 35:3,13
37:18,19 43:16,16
59:5 62:13,16,23
66:13,21 67:12,13
67:18 81:16 86:8
86:11 105:7
112:19 123:19
124:25 125:2
126:14 127:12
128:3,18 130:14
131:11,15 132:2
134:9,12,24 139:8
148:18 154:13,15
155:22,23 156:1
157:3,8,12,16
161:8,10 162:5,22
167:2
**committees** 17:8
61:24 65:7,11,12
65:25 68:18
123:20 163:7

**committing** 132:6
**common** 18:19
68:18,20,23,25
69:3 160:15,16
162:4
**commons** 28:13
**commonwealths**
14:23
**communicate**
47:23,25 48:1
**communication**
144:1 155:2
**communications**
155:3 158:23
**companies** 14:15
75:20
**company** 7:17
12:20 13:20 20:1
21:7 22:24 23:13
23:14 27:5 28:3
28:22 30:25 31:19
48:22 55:25 56:2
58:19 62:21 66:16
72:18 88:2,10,10
89:2,19 91:21
92:18,22 94:2,17
95:5 97:24 100:15
100:21,22,24
101:24 102:12,25
103:3,12 104:13
104:15 105:10,11
106:10 108:4
113:24 124:10,23
127:17,17 128:10
128:22 129:1
130:7,22,23
131:14 132:3,22
148:22 149:1
**company's** 12:8
12:12,22 46:19
94:23 104:13
134:23

**compelling** 147:5
**compels** 74:6
**compensated**
123:12 124:13
**compensation**
69:7 95:12 112:3
112:19 114:4,13
**completed** 30:3
**completely** 63:18
147:17
**complex** 12:20
15:25 17:12,16
19:1,20 22:6 66:2
82:19 88:4 135:2
**complexity** 63:16
70:23 119:19
**compliance** 40:1
40:10,15
**complicated** 83:2
85:23 86:6 165:25
**complicates** 90:11
**comply** 38:23
**component** 85:10
97:13 114:3
**components** 13:18
17:18 99:4 141:22
**composition**
112:18
**comprised** 16:8
**conceivable** 26:6
**conceivably** 97:5
**conceptual** 62:19
63:2 160:20 161:4
**conceptually**
66:17
**concern** 48:14
53:23 56:22 60:1
87:16 106:16
121:21 124:4,7
138:14 160:9
**concerned** 33:1
100:17 114:15
133:11 145:22

151:19
**concerning** 19:7
**concerns** 40:7
41:22 42:4 46:14
52:16 53:17 57:8
81:13 82:17,18
83:22 93:7 106:19
132:16,25 144:9
**concluded** 31:23
135:10 167:7
**concludes** 105:22
**conclusion** 14:1
27:4,10 31:7
151:4
**concrete** 29:23
**condition** 143:7
143:15 144:2
**conditions** 147:1
**conduct** 19:14
20:25 23:12 24:6
24:6,9,19 105:13
165:20
**conducting**
139:17
**confidential** 145:1
**confidentiality**
29:2
**confidentially**
148:8
**confirm** 17:24
114:21 125:15
127:11 148:1
**confirmable**
160:25
**confirmed** 63:24
**conflicts** 155:16
**confusion** 14:1
**congress** 67:21
138:13
**congressional**
12:25
**connecticut** 93:17

**connection** 22:5
33:7 77:23 111:8
125:17 127:23,25
159:4
**connections** 22:24
**consensual** 31:25
32:4 63:20
**consensually**
68:13
**consensus** 63:23
**consequences**
90:5 121:20
152:14
**consequently**
136:24
**conservative**
117:7 121:7
136:24 141:6
**consider** 62:1
145:23 146:1
**consideration**
101:11
**considered** 104:6
112:1 141:1
**considering**
130:20,22 151:25
152:2
**consistent** 30:10
54:24 76:11 98:9
116:10 125:13
139:5,6
**consisting** 62:14
**consla** 4:9 71:15
71:17,19,20 75:7
75:11 76:16,24
77:6,8
**consolidated**
41:12
**conspicuously**
160:24
**constituencies**
13:12 163:9

**constituency**
144:24
**constituents**
155:10 156:7
**constitute** 22:22
56:24
**constituted** 157:8
**constraints** 17:13
**construct** 17:24
158:10
**constructive**
63:11
**constructively**
166:4
**consult** 144:21
145:16
**consulting** 112:16
**consumed** 92:24
**consumer** 78:24
**contact** 43:15
**contain** 43:7,8
**contained** 10:24
11:2 45:22 160:10
**containing** 41:23
**contains** 156:10
**conte** 12:14
**contemplated**
113:17
**contempt** 24:15
**content** 77:5
**contest** 133:17
**context** 42:5
46:18 60:3 70:12
86:9 158:7,25
**contingent** 17:6
20:18 25:14
158:17
**continuation**
39:23
**continue** 17:21
26:20 29:10 31:18
38:2 57:14 64:21
71:25 72:10 77:18

77:20 79:1,2 82:6
82:7 83:6,14,18
84:16 91:9 94:17
95:14 102:8,17
104:16 117:3,22
119:25 120:5
124:10 143:10
**continued** 27:6
81:2 93:9 96:10
141:8
**continues** 104:13
**continuing** 25:10
28:5 80:11 105:1
**contours** 19:13
**contract** 13:21
14:5 108:21 146:3
146:25 147:4
**contracts** 31:8,12
74:14 145:13,19
146:21
**contractual** 73:8
**contrary** 35:12
**contribute** 14:11
**contribution**
91:16
**control** 101:24
103:12 111:10
**controlled** 20:5
94:12 142:3
**conundrum** 60:7
**convenience**
33:24
**conversely** 143:4
**conveyance** 59:25
161:11
**convinced** 161:6
**cooperate** 161:7
162:4,7
**cooperation**
157:21
**cooperatively**
163:18

**coordinate** 43:15
**coordinating**
16:12 69:1,2
**coordination**
154:3
**copycat** 26:1
**coral** 7:12
**core** 18:9 23:14
24:9 81:6 115:13
**cornerstone** 91:15
**corporate** 19:20
21:17 30:16
113:11 130:16
**correct** 50:24
51:21 73:6 74:25
80:3 82:9 85:9,9
85:18 98:11,21
100:1 108:25
110:8 113:9 116:1
118:23 120:9,15
121:21 122:4
131:4,4 132:4
143:16,22,22
**corrected** 109:10
**cost** 117:11
141:15 144:6
**costs** 18:4 19:17
26:23 27:2 58:7
116:13,25 133:15
155:15
**counsel** 12:16,17
12:23 16:15 29:24
40:6 56:21 62:10
89:10 109:7
117:23 122:21
147:16 148:1
152:13,19 154:12
156:1,4 157:3,4,7
157:10,12 162:10
166:13
**count** 25:24
**counterparties**
17:11,20 65:22

66:18 81:6 93:9
**counties**  16:9 18:2
26:15 156:14
**counting**  30:5
150:21
**country**  13:14
18:2 22:8 29:12
89:24 155:5
170:23
**country's**  22:8
**counts**  152:23
**county**  16:25
62:17
**couple**  47:20
76:14 79:18 80:7
125:1 158:11
**course**  10:10,13
11:15 12:18 26:13
26:22 28:22 35:4
37:22 55:8,19
64:21 72:6 74:21
77:21 79:3 81:4,4
82:8,11,19 83:15
84:17 91:4,10
93:20 102:6
117:18 125:8
155:1 162:4
163:23 164:9
**court**  1:1,13 9:2,6
9:9,14,17,19 10:2
10:5,17 11:1,19
11:25 12:9,13
13:10 15:9 16:6
19:6 20:8 24:5,15
24:16 25:2 26:10
28:25 31:16 32:3
32:14,16,23 33:10
33:12,15 34:8,17
35:17,22 36:5,20
37:16,23 38:14,21
38:23 39:3,5,12
39:15 40:16,20,25
41:20 42:11,19,21

42:24 43:18 44:1
44:11,13,23,25
45:3,7,10,13,17
45:20,21,25 46:5
46:9,22 47:2,12
47:18,20 48:6,20
48:24 49:1,6,8,11
49:15,18,22,24
50:6,10,15,21
51:2,5,9,11,15,21
51:23 52:4,7,13
52:18,21,23 53:4
53:13 54:10,12,15
54:18 57:16 58:9
58:11,24 59:1,6
60:13,16,20,24
61:1,18,23 62:9
64:4 65:4,16 66:7
67:1,15,23,25
68:4,14 69:12
70:6 71:6,16,18
72:14,19,24 73:4
73:12,14,23 74:3
74:9,11,13,16,23
75:1,10 76:8,17
76:25 77:7,10
78:1 79:14 80:4
80:17,20 81:9,14
81:19,21 82:3,10
82:16,24 83:18,24
84:1,4,9,13,15,20
84:24 85:3,7,15
85:19 86:2,17,22
87:6,9,12,17,20
87:25 88:8,10,13
88:21,24 89:2,4,6
89:14 90:2,19,24
91:3 95:17 96:2
97:2,9,16,21 98:9
98:14,18,23 99:2
99:13,17,22,25
100:2,5 105:24
106:5,9,14,20,25

107:3,6,10,15,18
111:7,17,22 112:6
112:9,21,25 113:2
113:6,13 114:5,8
115:9,11,20,22,25
116:3 117:3,13,15
117:21,23 118:2,9
118:12,24 119:3,7
119:10 120:7,10
120:17,19,24,25
121:9,14,18 122:2
122:6,12 123:2,4
123:23 124:4,11
124:22 126:12,25
127:6 128:1,5,7
129:2,4,7,11,14
129:16,20,23
130:2 131:1,5,19
131:22,25 132:6
132:10 133:23
134:13,24 135:4,7
135:16,24 136:13
136:17 139:23
143:14,17,20
144:14,18,24
145:4,7,11,21,25
146:5,8,11,14,17
146:19,22 147:5
147:13,18 148:2,4
148:9,10,12,15
149:5,8 150:9
151:3 152:7,16,20
152:21,24 153:7
153:17,17,25
154:2,5,7,10
155:1,3,19,25
157:14 159:11,18
160:1,4 161:5,20
161:23 162:3,13
162:18,22,25
163:5,13 164:7
165:3 166:10,23
167:4,6

**court's**  40:2 54:3
67:6
**courthouses**
27:25
**courtroom**  21:15
100:7 159:21
**courts**  26:7,8,8,9
26:9,12 153:9,10
**cover**  78:4 104:8
104:16 116:24,25
141:19
**coverage**  104:18
117:2
**covered**  114:16
**covering**  30:2
**covers**  95:13
101:15
**coveted**  100:22
**craig**  62:12
108:13,23
**create**  61:5 63:9
64:1 78:15 102:24
128:24
**creates**  104:2
**creating**  26:3
**creative**  118:13
**credentialed**  22:4
130:16 142:2
**credibly**  140:23
**credit**  126:22
131:19 150:2
**creditor**  2:18 41:8
43:6,7,25 44:21
46:8 50:2,5,21
52:2,23 71:9
91:22 144:2
168:19
**creditors**  11:6,10
17:7 18:11 41:12
43:2,2,5,14,15
50:3,9,11,18 51:1
61:6 79:23 123:19
136:16,19 137:22

149:3,4 150:16
158:2,16,17
160:22
**crisis** 26:3 127:24
157:23 158:7
**critical** 3:11 13:11
66:19 92:2,12,25
94:7,25 100:12
101:2,10 103:19
104:15 112:15
139:25 140:4,7,15
141:8,11,12,15,17
142:7,15,19,22,24
143:1,5,8,13,25
144:4 145:19
146:23 147:11,21
150:1 155:12
163:25 169:11
**criticality** 101:7
101:10
**critically** 142:2
**cro** 22:10
**cross** 32:24 33:6
54:25 105:24
106:11 107:7
150:12
**crushing** 28:6
**crystal** 153:11
**cud** 13:6
**cumbersome** 62:6
**cure** 76:19
**curious** 14:25
151:20
**current** 20:25
21:13 23:11 46:11
46:20,25 58:20
68:9 70:14 100:16
102:24 103:17
104:3,16,19,22
116:8,13 118:6,10
**currently** 21:6
29:7 97:6 103:23
151:17,25 157:24

**customary** 75:18
76:1 116:12
143:11
**customer** 3:7
77:15,19,20,23
78:1,25 79:8,10
80:11 82:22 83:14
84:5,11 85:10
89:17 90:21
109:20 149:7
160:17 169:7
**customers** 77:20
79:6 80:14
**cyganowski** 6:6
62:11 63:5 154:11
154:12 155:20
160:11

**d**

**d** 1:23 9:1 38:9
108:20 168:1,9
**daily** 26:1
**damage** 79:5
**damages** 26:4
158:15 163:14
**dan** 16:3
**dare** 18:1
**data** 112:4,4
113:9,15 115:13
142:16 144:25
158:23
**date** 29:19 37:5
40:17 41:19 42:5
52:15 56:16 60:5
70:1,22 72:2
92:22 124:14
143:13 163:24
165:6,14 170:17
**david** 5:6 7:6
62:11 84:12 86:7
157:18 160:5
**davis** 4:2 9:20
11:23 12:5 21:10
29:17,24 31:23

33:18 71:20 77:12
112:18 130:8
149:17 150:11
**day** 2:2,4,10 9:25
10:13 11:4 12:6
12:18 17:3 19:18
19:19 20:24 23:21
24:3 25:2 31:15
31:22 32:10,15
37:17 40:18 64:6
66:13 69:11 70:24
71:2,10 88:4
89:25,25 99:10
101:21 103:9
104:19 113:17,22
114:6 115:1,8,24
124:9 136:23
152:12 157:24,24
**days** 10:12 24:23
39:6,24 40:13,21
70:22 86:19 94:25
101:20 103:6
117:11
**dc** 5:20
**de** 12:14 60:21
132:11
**deadline** 35:15
**deal** 13:2 15:22
17:12,17 49:8
52:5 59:8,13 63:8
63:13 65:19 66:4
66:18 69:3 82:2
129:21 142:3
146:12 152:1
166:2
**dealing** 36:9
49:16 54:23 56:9
65:7 76:18 149:25
157:25
**deals** 87:17
**dealt** 37:17 73:17
159:12,13

**death** 48:21
**deaths** 157:24,24
**debt** 13:5 57:25
148:21 149:2
**debtor** 4:3 33:23
34:11 39:17,17
40:8 41:13 63:10
64:10,14,21 79:22
90:7 93:19 106:19
116:18 118:17,20
125:12 140:12
151:12,15 153:6
153:10 156:20
158:6
**debtor's** 33:21
116:8 126:1
136:19 138:7
141:13 142:1
143:13 149:10
160:19 162:16
**debtors** 1:9 2:12
9:22 11:5,10,13
13:10,11,20,20
14:18 17:21 19:13
20:17,20 24:10,13
25:14 30:7 33:19
33:25 34:2,6
35:12 38:2,7,16
38:21 40:13,13
41:17,21,25 42:4
43:22 44:8 45:11
52:8,8,9 55:7,8,14
55:17,20 56:7,8
56:10 57:14 61:6
61:9 62:20 66:5
67:11 68:8 69:10
69:14,16,18,23,24
70:13,21,25 71:8
71:9,21,24 72:4
73:1 75:13,19
76:1 77:13,18
78:7,11,16,20,21
78:22 79:1,6,18

79:22,23 80:6,23
80:25 83:5,5
85:13,16 87:5
91:7,14,16,24
92:12 93:7,11,13
94:20 96:16,16
101:10 115:5,6
116:6,12,24 120:2
126:20 127:10
133:12 137:3
138:1,10 139:5,8
140:12,13,16
141:1 143:4,12
146:25 150:19,20
153:3,4 154:22
156:6 158:1,7
163:9 166:1
**decade** 30:3
**decades** 22:13
23:6
**dechert** 12:22
**decide** 69:4
**decided** 11:7
31:13
**deciding** 44:18
101:2
**decision** 101:16
105:6 159:6
**decisions** 101:23
103:11
**deck** 30:22
**declarant** 12:19
99:10
**declaration** 2:10
27:23 32:21,23
33:1 58:23
**declares** 73:6
**declaring** 119:14
**dedicated** 29:17
91:24 92:4
**deduct** 88:6
**deep** 12:7 86:21

**deeply** 22:4
**default** 76:19
**defeating** 143:2
**defendant** 154:3
164:22
**defendants** 86:14
116:14,15 135:9
153:5 164:23
**defending** 27:6
**defer** 58:1 96:12
126:9 144:10
**deferrals** 125:14
125:14
**deferred** 98:16
**deferring** 98:22
152:14
**defined** 35:15
43:13 44:3 67:19
**definitely** 66:16
**definition** 149:11
**delay** 121:25
**delegated** 22:18
29:9
**delete** 35:7,16
**deliberations**
161:9
**delinquent** 55:18
**delphi** 21:20
**demand** 143:1
**demanding** 23:3
**demonstrations**
48:23
**denied** 84:7
**dense** 30:22 50:1
**depart** 114:17
**department** 11:11
112:3
**depend** 117:18
**dependence** 141:3
161:9
**depending** 75:1
153:12

**deploying** 26:15
**deposed** 93:2
**deposit** 75:14,20
75:25
**depositions** 93:2
**depositories**
38:18 39:2,6,11
40:9
**deprive** 60:4
**deputy** 10:6
**describe** 79:13
95:2 155:22
**described** 62:14
78:5 79:11 89:1
127:10 141:20
150:22
**description**
109:19 131:9
**deserves** 135:5
**designate** 151:15
153:13
**designed** 130:10
150:16
**desire** 19:16
**desouza** 118:25
128:14 134:13
135:9
**despite** 13:19 25:7
28:9
**destroy** 94:24
**destroying** 13:15
**detail** 38:8 79:13
112:17
**detailed** 30:13,16
31:2
**detailing** 23:16
**details** 125:3
149:11,13
**determination**
75:19 120:7,10
128:6 137:23
**determinations**
147:8

**determine** 134:9
136:17 138:13
140:17 141:2
**determined** 137:3
**determines**
127:18
**determining**
73:23 101:7 137:5
**detrimental** 83:4
**detroit** 22:2
**deutsch** 7:16
72:17
**devastating** 104:9
**developed** 54:4
112:11
**developing** 59:23
112:16
**development** 92:6
101:17 108:4
113:11 161:14
**deviation** 40:2
**device** 32:9
**devil's** 149:11
**devote** 93:1
**diagram** 38:9
78:19
**dialogic** 165:9
**differ** 155:6 162:7
**difference** 85:15
**differences**
159:20
**different** 48:16
62:4 67:8 93:23
112:13,14,15
123:7 134:16
137:22 151:6
160:22 161:25,25
162:8,8 163:19
**difficult** 19:12
49:14 100:14,15
103:23 105:1
117:5

**diligence** 64:17
69:1 83:7 125:6
126:4 132:20,23
137:18 139:15,18
161:9,19 162:15
**diligently** 71:1
**diminished** 25:11
**diminishing** 27:8
**direct** 27:6 107:11
107:13 125:19
**directed** 42:15
44:9
**direction** 29:19
42:13 45:24 61:13
108:23
**directly** 102:1
103:14 108:13,24
133:9
**director** 139:2
**directors** 13:24
21:4,13 22:21
23:5 101:25 102:2
103:13,15,17
105:8 110:17
116:9,13 125:25
126:2 127:12
130:16 135:1
**disagree** 62:2
68:19 161:3,3
**disagreement**
68:21
**disagreements**
68:22 99:8
**disclosed** 56:5
**discontinuing**
75:23
**discounts** 78:12
81:20
**discovery** 69:2
**discretion** 149:21
**discriminating**
59:12

**discuss** 19:11
20:22 32:9 133:6
165:19
**discussed** 38:8
56:2 111:8 138:19
**discussing** 21:3
23:19
**discussions** 10:15
30:8 56:22 99:7
**disgorgement**
131:16
**dispositive** 136:10
**dispute** 137:21
**disputed** 20:19
**disputes** 76:4,20
**disrupting** 83:3
**disruption** 19:22
**diss** 15:5
**distracted** 105:1
**distribute** 72:6
89:21
**distributed**
164:17
**distribution** 18:11
18:21 163:25
**distributors** 87:16
**district** 1:2 11:12
11:13 15:13 26:8
153:24 156:3
**diverse** 92:7
**dividends** 30:18
**division** 157:20
**docket** 33:21
34:20 36:16,18
37:25 41:9 49:21
53:7 55:7 69:14
70:19 71:22 75:12
77:16 91:5 140:2
**docketed** 156:2
**document** 2:6
17:12 43:5 168:13
**documents** 66:2
116:11 165:7

**doesn't** 158:1
**doing** 24:16 47:14
71:10 72:8 105:20
114:14 120:21
133:8 145:5
146:12
**doj** 12:24
**dollar** 13:21
**dollars** 13:3,15
18:3 26:4 27:5,18
158:14 164:22
**don't** 44:19 50:13
88:16
**door** 132:8 133:16
**doses** 18:3
**double** 123:16
124:3
**doubt** 13:10 19:6
20:9 74:1 92:9
127:6 146:10
**dozens** 17:17,17
21:25 27:25
**draft** 30:4 34:23
**drafted** 165:7
**drain** 1:23
**draining** 13:14
**drive** 93:22
**driven** 158:20
**driving** 96:10
**drug** 55:12,24
56:14,15
**drugs** 18:4 161:14
**drysdale** 5:16
68:2 162:20
**dubel** 22:4,16
**due** 55:18,19 56:1
56:9,16 57:5,17
61:3 69:1,25 70:1
83:7 93:7 96:22
98:19 101:21
103:6 113:22
115:4,6,7 136:4
137:18 139:14,18

161:9,18 162:15
**dumped** 10:13
123:21
**dumping** 10:1
**duparkay** 98:10
**dwindling** 27:6
**dylan** 4:9 71:15
71:20
**dynamic** 78:15
153:2

**e**

**e** 1:22,22 4:1,1 7:6
9:1,1 32:9 34:14
36:9,13 90:24
107:5 139:19
166:24 168:1,3,3
168:9 170:1
**earlier** 93:18
100:6 108:18
150:19 160:10
**early** 26:17 64:2
94:25 95:14
117:11 133:10
153:5 161:14
164:3
**earth** 166:15
**east** 6:18
**easy** 18:25 100:23
132:17
**echelons** 21:17
**echo** 133:1 163:6
**eckstein** 4:19 62:7
62:8 64:5 79:24
81:15,15,20,22
86:18 114:17,18
114:23 124:24,24
126:16 132:15
135:19 148:17,17
160:17
**eckstein's** 82:17
132:16
**eclipse** 141:16

**economic** 100:17
105:3 158:20,20
165:22
**economically**
104:9
**ecro** 1:25
**eddie** 10:6
**edit** 66:20
**educational** 24:9
**effect** 72:2 132:11
143:12
**effected** 80:5
**effective** 120:5
**effectively** 84:17
91:18 138:12
151:10
**effectuate** 17:24
**efficient** 162:11
**effort** 162:9
**efforts** 143:18
**eight** 21:8
**either** 27:11 31:23
40:1 46:2 61:2
98:4 116:14
137:16 150:22
153:18 161:13
**elected** 101:25
103:13
**electronically**
39:18
**element** 27:2
150:12
**elevated** 57:2 58:3
**elevating** 57:9
**eli** 4:10 12:1 77:9
77:12
**eligible** 17:7
**eliminating** 23:25
**email** 36:14
**emergency** 123:8
143:23
**emergent** 13:22

**emphasize** 60:11
94:19 117:10
162:3
**emphatic** 14:2
**employ** 91:24
**employed** 21:7
**employee** 50:21
91:6,10 92:25
94:3,24 95:4 96:8
100:10 101:14
121:22 127:18,20
127:22,24 128:13
133:14 139:3
**employees** 43:2
46:12,20,23,25
47:3,24 48:7
49:18,18 50:9,25
91:9 92:1,11,13
92:20,23 93:1,14
93:24 94:2,21
96:18 98:4,7,23
100:12,13,16,17
100:20,21 101:2,3
102:6,9,14,25
103:17 104:3,5,10
104:13,18,19,20
104:21,22,24,25
106:7,8 114:16
115:4 116:9,14
120:2 122:17
123:9 128:25
**employer** 93:22
**employment**
102:15 127:25
**enable** 162:15
**enabling** 47:23
**enacted** 67:21,22
**encompass** 101:13
**encompasses**
156:11
**encourage** 102:7
150:16

**encouraged** 17:13
**ended** 27:17 134:2
**endlessly** 23:1
**endorsement** 16:2
**energy** 22:11
92:25
**enforce** 146:20
**enforcement**
131:17
**engage** 14:14
**engaged** 23:4
**engagement** 12:11
17:1 21:12 53:24
54:9,12
**engagements**
54:20
**engaging** 24:6
163:8
**enjoining** 74:20
**enormous** 163:14
**enounced** 150:24
**ensure** 31:8 105:5
130:11 141:8
158:4 164:16
**ensures** 150:1
**ensuring** 134:22
**enter** 36:24 73:5
152:4
**entered** 17:21
34:22 35:25 71:5
76:10,22
**enterprise** 19:21
91:23 105:3
133:14 142:1
158:17,18 164:16
**enthusiastic**
132:24
**entirely** 23:25
74:1
**entirety** 13:20
14:2 91:16 110:20
113:20 137:12

**entities** 5:17 16:16
16:19 17:6 28:21
62:14 63:4,22
67:12,20 68:5,21
78:23 142:11
156:17
**entitled** 88:5
113:18
**entity** 31:9 34:2
55:9 82:10 109:22
146:23 147:8,8
151:15
**entry** 34:17 41:19
53:7 75:12 96:23
**environment**
93:13 128:25
**epidemiology**
94:13
**equal** 75:15
**equality** 18:13,20
164:18
**equally** 12:17
**equipment** 141:22
**equity** 18:20
**equivalents**
154:17
**eric** 5:13
**erode** 79:3
**escalating** 94:1
**escape** 25:1 28:11
**especially** 17:4
29:13 88:2 166:12
166:17
**esq** 4:7,8,9,10,11
4:12,19 5:6,13,14
5:22,23,24 6:6,14
6:22 7:6,14,22 8:7
8:14,15
**essence** 13:7
137:8
**essentially** 75:4
**established** 18:12
118:14 151:3

**estate** 13:15 59:22
    60:4 61:19 67:4
    94:20 136:15,19
    138:7,7 143:6
    149:10 161:12
    162:16
**estates** 29:14
    151:16
**estimate** 75:15
    141:6
**estimated** 117:8
**et** 1:7 9:4 163:20
**evade** 25:21
**evaluate** 15:18
**evaluated** 101:5
    101:13
**evaluating** 101:9
    142:18
**evaluation** 138:10
    139:10
**evening** 148:20
**event** 27:13,17
    49:15
**eventual** 160:21
**everybody** 67:2
    82:20 117:7
**everybody's**
    166:3
**everyone's** 10:19
    110:14
**evidence** 32:22
    47:10 48:18
**evidentiary** 32:21
**evolved** 17:18,18
    17:18
**evolving** 81:5
**ex** 142:10
**exact** 109:25
**exactly** 14:3 42:22
    50:3 74:15,19
    89:5 108:9 117:6
    125:23,25 128:21
    134:15 143:19

**examination**
    107:7
**examine** 32:24
    33:6 105:25
    106:11 136:14
**example** 28:19
    29:22 31:6 36:7
    47:13 51:18 59:24
    81:24 101:16
    129:18
**exceed** 30:4 115:8
    117:9 136:7 140:8
**exception** 13:3
    19:14 136:11
**exceptions** 159:11
**excess** 38:19
    123:14 124:17,18
**excise** 55:10 56:1
**exclude** 52:11
**excluded** 101:11
**excludes** 52:19
**excluding** 98:8
**exclusion** 79:4
**exclusive** 22:17
    29:9 92:19 130:17
**exclusively** 95:12
**excuse** 56:14
    95:22,24 98:1
**executive** 5:2 16:2
    21:21 62:16 99:4
    100:9,10 101:4,20
    108:14 111:8
    112:9 113:15,19
    114:3 126:5 136:5
    146:20 155:23,25
    157:3,7,7,12
**executives** 94:8
    98:17
**executory** 145:13
    146:2,25 147:4
**exercise** 101:24
    103:12

**exhaustive** 55:13
    148:25
**exhaustively** 78:5
    79:12 141:20
**exhibit** 33:12 38:9
    55:16 78:19,25
**existence** 68:11
    93:22 95:18
**existing** 38:2,4,5
    72:22 77:18 89:17
    91:9 97:24 114:11
    137:21 144:5
**exists** 65:9
**expand** 17:22
    163:11
**expansive** 159:18
**expect** 12:3
    114:13 121:2
    159:23 161:7
**expectation** 14:7
**expense** 26:25
    57:2 61:5 97:19
    121:2 136:12
    144:6 152:22
**expenses** 26:24
    57:9 104:16
    115:19 116:5
    117:5 125:18,22
    138:21
**expensive** 140:19
**experience** 22:5
    22:13 23:7 47:24
    80:6 92:11 149:18
    161:25
**experienced** 23:9
    65:21 92:22 147:7
**expertise** 14:6
    94:12,13,15,16
**experts** 29:25
    112:3
**expiration** 71:2
**explain** 152:14

**explained** 53:16
    133:9
**explaining** 78:18
    86:9 89:14
**explanation** 37:6
**explanatory** 36:6
    36:21
**expressed** 59:8
    164:11
**expressing** 137:12
**extending** 119:13
**extension** 70:20
    70:24 71:11
**extensive** 99:6
**extent** 14:9 38:20
    39:16 51:7 57:7
    134:23 140:23
    147:21 164:21
**external** 112:17
**extra** 80:23
    114:12
**extraordinarily**
    58:18 94:3
**extraordinary**
    46:16
**extreme** 105:5
**extremely** 58:19
    93:14 130:8,9,15
    156:6 166:18

|  f  |
| --- |

**f** 1:22 11:18 170:1
**face** 102:24
**faced** 93:14
**faces** 25:21,25
    103:23 159:22
**facilitate** 19:20
**facing** 29:10
**fact** 20:22 27:22
    45:24 53:25 57:24
    64:13,14,25 66:3
    79:21 84:6 88:19
    119:20 121:19
    127:4 136:10,22

137:25 151:4
156:21 158:16
165:7 166:8
**factors** 134:21
145:23,25 150:1
**facts** 15:19 29:6
121:18 122:13
**factual** 67:3
113:15 159:3
**fail** 146:19
**failure** 13:8 22:11
61:4 72:8 79:3,7
133:10 149:9
**fair** 20:13 79:25
90:18 129:23
**fairer** 28:14
**fairly** 95:1 152:20
164:16
**fairness** 26:21
**faith** 105:12,16
131:13 166:16
**fall** 50:18 96:22
101:21 115:7
128:13 139:9
158:1,2
**falling** 113:22
**falls** 157:25 158:2
**false** 12:14
**familiar** 100:10
101:18 102:4
**families** 14:11
21:11 28:20 62:21
**family** 5:9 21:6
22:25 95:4,6
105:19,20 116:20
125:19 162:3
**fan** 73:15
**far** 10:25 26:25
32:25 33:5 52:16
136:7 138:19
145:22 151:22
152:5 163:15
165:16

**fashion** 63:11
**faster** 28:14
**favor** 15:23
**favorable** 143:12
**fda** 20:2 55:12,25
56:17
**fdic** 38:17,19 39:1
**fear** 104:19
**feather** 138:15
**february** 23:24
**federal** 18:12 26:8
26:9 55:10 69:19
164:17
**fee** 55:12 138:19
**feeling** 104:3
106:8
**fees** 2:22 54:2
55:9,11,12,15,18
55:24,25,25 56:8
56:10,14,15,17
66:9 67:5 99:5
103:16,19,21
104:9,24 105:6,6
105:10,19 116:19
117:18 119:7
126:17 127:4,19
129:9 130:24
134:10 135:1
139:13 168:23
**fell** 135:11
**felt** 122:21
**fence** 162:22
**fervent** 117:11
**fewer** 39:5,5
**fgic** 22:8
**fiduciaries** 31:20
**fiduciary** 164:14
**field** 18:7 108:21
**fight** 27:10 65:24
98:24
**fighting** 58:7
**figure** 68:7,9
79:25 164:24

**figures** 15:19
**file** 35:14 37:2
41:12,22 58:16
67:2 70:21 153:16
**filed** 20:15 25:22
41:19 42:7 43:6
50:5 51:7,13
66:23 71:1 89:23
103:24 127:16
**filers** 42:8
**filing** 10:24 19:23
20:11 29:15 32:10
41:13 43:22 60:5
102:24 163:4
**filings** 10:13
71:10
**final** 40:3,17 47:7
47:7 48:18 49:4
57:5,12,13 61:4
73:11 82:2 83:7
96:12,23 110:7
111:13 115:10,16
121:12 123:18
124:21 126:10
136:6 152:15
**finally** 10:16
14:14 159:1 166:8
**financial** 12:12
21:24 30:16 78:2
93:6 99:11 101:17
149:17
**find** 47:24 49:12
61:10 63:23,25
130:15
**finding** 100:21
**fine** 34:14 40:16
49:15 54:18 68:14
106:24 146:22
148:11 163:5
**fines** 79:4
**fire** 7:17 72:18
**firm** 8:1 17:4
33:14 52:2 62:11

62:12
**firmly** 15:15
**firms** 12:21 16:4,8
16:14 18:20
**first** 2:2,4,10 9:7
9:25 10:13,24
11:4 12:6,18
13:18 17:2 18:9
18:14 20:24,25
23:21 24:3 25:7
31:22 32:15,20
33:20 37:16 38:15
40:18 43:4,20
44:5 63:25 64:6
69:11 77:14 78:10
79:17,20 85:4
95:2,3 96:3 97:23
99:10 101:10
105:6 113:22
124:9 125:1 127:3
128:11 130:12
131:10 132:17
136:4,23 146:16
150:17 152:12,19
**five** 14:22 15:1,3
25:22,22 62:25
97:3 98:2,3 99:23
103:7 110:6,24
115:16,18
**flavor** 157:11
**flexibly** 143:4
**flogs** 166:12
**floor** 7:19
**florida** 7:12 16:22
**flow** 78:10,20
**flows** 38:10
**fluctuating** 78:15
**fluid** 135:2
**focus** 163:23,24
**focused** 66:4
**focuses** 43:19
**focusing** 43:18
44:5,25

**folks** 12:5 132:23
155:14 164:24
**follow** 153:17
**followed** 35:25
**following** 16:21
60:7 67:21 94:4
**follows** 100:8
155:16
**footnote** 146:1
**force** 23:25 92:4
94:5 108:21
**forces** 73:8
**foregoing** 170:4
**foreign** 141:24
142:5,6,14 150:7
151:3,3,5,9,16,17
152:5 153:14
**foremost** 25:7
**forensic** 29:23
**forever** 47:11
132:9
**forget** 19:25 47:21
**forgive** 48:9
**forgotten** 27:21
**form** 24:17 35:16
35:19 38:12 53:9
66:1 72:12 76:6
96:25 132:17
**formal** 70:3
134:20
**formation** 6:10
59:5 167:2
**formed** 16:20
37:18 62:13
**former** 49:18
96:17 103:17
104:17,18,20,21
116:8,13 120:2
125:25 126:2
135:8 139:3
**forming** 15:17
**forms** 38:6 39:18

**forth** 43:11 45:8
47:10 58:22 65:20
139:7
**forum** 23:3 26:6
**forward** 23:13
43:16 63:11 67:4
68:10,12 117:22
118:11 139:15
144:23 158:24,24
159:25 162:11
163:8,10 166:22
**found** 41:9 105:11
**four** 22:21 97:5
121:13 122:24
**fraction** 12:4,5
27:18
**framework** 13:13
13:17 14:20 17:15
17:23,25 19:9
25:13 27:22 29:5
62:20 63:2,9 64:2
65:23 154:21
155:12 157:4
158:5,9 160:20
161:4
**frankel** 4:14
**frankly** 48:13,17
66:17 83:20 96:8
113:21 141:2
150:18
**fraudulent** 59:25
161:10
**free** 11:3 14:8
**freight** 141:22
**friendly** 146:18
**friends** 104:22
162:6
**front** 26:16 89:13
157:1
**full** 28:3 29:8 40:1
91:25 95:6 143:2
**fullest** 14:9

**fully** 23:4 30:7
58:22 70:2 99:8
146:20 161:7
**fulsome** 47:8
**fulsomely** 42:5
**function** 81:6
**functions** 68:25
101:6 162:14
**fund** 14:16 56:23
56:25 57:6,24
**fundamental**
68:22
**funded** 57:25
**funds** 14:12 18:20
118:24 126:21
128:14
**further** 14:16
25:12 41:1 49:25
53:12 90:21
100:19 102:22
115:7 126:4
135:17 137:18
144:2 154:8
**future** 12:3 14:4
19:14 23:15
122:22 137:19

**g**

**g** 9:1
**gables** 7:12
**garfinkle** 8:7 85:1
85:1,5 86:1 89:11
89:12,12,16 90:18
**gather** 122:3
**gc** 118:5
**general** 6:9 7:1
9:21 11:12 12:16
12:17 59:4 62:15
62:24 64:13,16,20
93:16 102:10
109:7 125:7
149:25 153:18
160:7

**general's** 157:19
160:6
**generally** 47:22
47:24 68:20 76:9
93:4 120:19
122:18 128:16
136:22 138:17
139:1,3 145:21
**generals** 14:21
62:3 154:17 155:4
155:11 163:15
**generated** 39:18
**generic** 78:22
109:22
**generically**
106:20
**genna** 10:5
**genuinely** 26:18
**gerard** 5:14
**getting** 11:16
80:20 88:18 106:3
118:5,20 140:1
156:11
**gift** 158:19 165:22
**gilbert's** 62:12
**give** 24:16 29:22
31:16 36:3 40:20
47:12 57:23 63:6
66:24 76:21 88:14
117:7 125:6 128:8
156:10 157:11
**given** 9:10 11:15
12:20 17:12 28:8
31:4 41:24 54:21
55:19 57:24 61:1
64:13,14 70:23
71:8 117:5 136:20
136:21 137:23
138:21 142:1
149:18
**gives** 37:5
**giving** 20:17
25:16 46:15 74:20

[giving - hearing]                                                      Page 19

77:2 137:23 142:9
**global** 19:13 22:6
  25:8,18
**go** 9:8 11:7 28:1
  36:18 42:19 43:15
  48:1 49:4 50:22
  58:16 65:8 67:13
  93:18 107:18
  114:20 118:11
  124:21 126:21,22
  132:18 133:16
  144:23 159:19
  164:22 166:6
**goal** 19:4
**goals** 17:20
**godfrey** 6:16
**goes** 44:4 76:18
  122:20 132:8
  146:15,18
**going** 11:16 36:2
  36:5 37:17 43:7,8
  43:12 45:13 47:6
  48:9 50:5 63:18
  63:21,22 65:9,12
  67:14 68:8 73:6
  73:20 75:2 76:21
  77:4 86:21,23
  94:20 98:19 100:2
  103:22 111:2
  113:6 114:20
  117:22 122:10,18
  125:5,18,20
  126:15 127:2,14
  132:21 133:15
  139:15 142:8
  143:17 144:21
  145:16 147:20
  152:20 153:21
  157:18 160:23,25
  164:6 165:23,24
  166:21
**good** 9:3,5,18
  18:19 33:17 45:17

62:7 65:1 68:16
  71:17,18 77:11
  80:12 105:12,16
  107:9,22 131:13
  135:8,12 144:18
  144:22 150:10
  152:9 165:12
  166:16
**goods** 141:5,8
  142:15,22 143:11
**goodwill** 79:4
**gotten** 40:17
  165:12
**governance** 20:25
**government**
  156:17
**governmental**
  5:17 13:6 16:16
  17:6 18:15 55:14
  56:12 58:14 63:22
  66:12,23 67:12,13
  67:20 68:5 69:22
  72:4 94:15 119:21
  154:18 160:22
  162:23 166:18
**governmentally**
  80:22
**governments**
  26:19 120:13,25
  121:3
**grand** 103:8 167:3
**grant** 34:10 37:14
  41:3,5 52:24 55:2
  58:15 61:20 70:8
  70:16 71:3,11
  74:19 75:2 82:25
  86:24 150:3
  153:13
**granted** 34:7
  35:21 72:13 75:5
  76:7
**granting** 61:8

**grateful** 10:3
  165:18 166:17
**graulich** 4:11 12:1
  150:8,10,11
  152:18,23 153:1
  153:21 154:1,4,6
**grave** 20:6
**great** 13:2 33:13
  63:8,13 87:22
  97:22
**greater** 61:5,5
**green** 83:2
**gross** 55:3
**grossly** 54:1
**group** 5:17 9:10
  14:19 15:14 17:11
  63:10 65:21 66:1
  68:4,5 69:5 92:7
  93:21 115:15
  130:16 144:25
  154:16 162:7
**groupings** 163:7
**groups** 30:15
  68:17 69:3 137:11
**guarantee** 139:9
**guardrail** 127:10
**guardrails** 130:6
**guess** 15:4 32:19
  42:11 97:4 128:7
  132:11
**guidance** 139:1
**guideline** 153:19
**guidelines** 153:17
  153:23
**guiding** 18:23
**guise** 161:7

**h**

**h** 4:19 108:20
**ha** 58:16,16
**hale** 12:24
**half** 119:13
**hand** 84:20 107:1
  118:18 137:1

**handles** 132:22
**handling** 12:24,25
**hanling** 156:5
**happen** 98:24
**happily** 23:2
**happy** 32:13 77:4
  83:22 97:14 122:6
  144:21 145:6
  146:7 148:7
**hard** 12:21 17:22
  26:23 27:2 58:20
  67:7 86:11 92:17
  156:6 165:18
**harm** 79:10 92:14
  100:24 103:3,20
  105:3 133:12
  136:18 137:10
  138:6 149:10
**harmful** 122:1
**hasn't** 127:19
**hazardous** 142:3
**head** 109:3,13,22
  111:14 112:12
**headcount** 92:19
  94:4
**heads** 157:19
**healing** 155:13
**health** 78:24
  89:21 158:4
**hear** 10:3 109:12
  122:6 124:22
  148:3 159:16
**heard** 21:19 60:3
  66:7 67:6,24 85:2
  89:11 107:10
  113:24 157:2
  162:17 163:11
**hearing** 2:1,2,4
  10:9 11:5 12:2
  15:9 19:4,5,7
  23:20 37:3,4,6,11
  40:17 48:19 61:4
  64:7 82:2 83:7

91:13 96:12
101:21 103:9
110:7 113:18,23
114:10 115:1,8,16
115:24 121:12
123:18,21 124:14
133:4 135:25
136:6,16 137:14
149:15 152:15
157:17 159:24
160:14 161:2
**hearings** 9:25
12:3,6 20:15 32:5
**hearsay** 106:8
**heartfelt** 9:24
**heaven** 166:14
**heavily** 19:25
58:18
**hedge** 18:20
**height** 167:3
**heightened** 46:15
**held** 18:8 19:2
101:6
**help** 19:19 48:9
58:5 77:25 82:20
96:7 118:4 134:1
140:23 150:16
**helped** 10:8
**helpful** 66:5
**helpfully** 135:18
**higher** 91:22
**highest** 105:2
**highlight** 24:22
**highly** 92:10,10
100:20,22 102:14
123:12 124:12
128:19 137:2
141:11 159:23
**hippa** 42:3 43:7
**hire** 104:6
**hired** 12:13
**historically** 32:6
116:10

**history** 18:15
20:13 22:11
**hoc** 4:15 6:2,10
16:20 17:14 35:3
37:19 43:16 59:5
61:24 62:13,23
65:7,10 66:14
68:9 81:16 123:19
124:25 125:2
126:14 148:18
154:13,15 161:7,8
162:5 163:7
**hold** 38:18 42:1
**holders** 18:20
**home** 46:12,20
49:1 93:16 164:5
**homes** 48:23
**hon** 1:23
**honor** 9:5,15,18
9:25 10:21 11:20
15:3,11 16:6 18:7
18:24 20:8 23:11
25:6,15 27:20
28:5 31:21 32:13
33:8,13,14,17,20
33:23 34:5,16,21
34:22 35:1,8,20
37:22 38:13 39:8
39:14 40:6,14,19
40:24 41:6,11
42:9,17,25 43:22
44:7 45:15,18
47:1,3 48:5,8
49:17,20 50:2,4
50:24 51:4,22,24
53:3,5,15,22
54:11 55:5 56:19
56:21 57:10 58:2
58:5,18,25 59:2,9
59:16 60:1,8,18
60:22 61:17,22
62:7,23 63:3,3,6,8
63:16 64:5,25

65:3,5,17 67:10
67:16,17,24 68:1
68:6,12 69:9 70:4
70:17 71:3,4,13
71:17 72:12,16
73:25 75:3,7 76:4
76:24 77:6,11,14
77:17,19 78:4
79:7,11 80:3,9
81:1,11,15 82:14
83:9,17,20 84:12
84:19,22 85:1,9
85:25 86:9,10,13
86:25 87:22 89:8
89:9,12 90:18,20
91:1,4,12 92:16
94:18,21 95:1,22
95:24 96:24 97:8
97:11 98:1,11,22
98:25 99:9,15
100:1,4 105:22
106:1,13 112:23
113:1,3,8,14
114:7,18 115:1,12
116:4,5,23 117:25
118:4 119:1,6,17
120:9,23 121:5,10
121:16,21 122:5,9
122:9,15,16 123:3
124:1,8,24 125:1
126:13,15 127:8
127:21 128:20
129:5,10,13,15,19
129:22 130:3
131:4,24 132:4
133:5,24 135:17
139:21,24 140:14
141:10 142:25
143:16 144:7,13
144:19 145:3,8,15
145:18 146:6,9
147:10,14 148:7
148:11,13,17

150:5,10,13 151:1
151:19 152:4,9,11
153:1,22 154:4,11
155:21 156:4,12
156:17,24 157:2
157:11,15,16,22
158:11,21 159:1,7
159:15,25 160:3,5
162:10,17,19,20
163:1,3,12 164:4
164:9 165:5,11
167:1
**honor's** 63:14,19
133:2 153:23
**honored** 10:20
**honoring** 79:2
**hope** 15:18 40:12
48:8 91:14 117:11
120:1 121:6,8
138:20 154:21
164:1,5,24 165:2
166:2,20
**hopeful** 15:17
29:4
**hopefully** 12:4
14:16 19:19 66:5
68:8,12 78:18
122:19 140:1
163:9 166:4
**hospitals** 26:14
156:17
**hours** 24:23 29:19
32:10
**hr** 111:14 112:12
**hudson** 5:10
**huebner** 4:7 9:5
9:13,15,18,19
11:20 15:8,11
32:18 33:8,11,13
48:8,21,25 49:3,7
49:9,12 58:5,10
58:12 59:9,12
62:14 65:17 73:25

74:4,10,12,15,19
74:25 87:22 88:1
88:9,12,17,22,25
89:3,5,7 91:12
118:4,10 119:8
125:16 133:24
134:15 135:5,12
146:9,15,18
154:13 155:24
156:21 157:2
158:13,22 159:1
159:17 164:4,8
165:4 166:11
**huebner's** 62:21
**huh** 145:24 146:4
**human** 92:6
109:13 112:2
**hundreds** 20:3
26:4 27:4,25
158:14
**hurt** 92:14
**hyperlink** 10:25

**i**

**icp** 96:15
**idea** 61:24 134:21
144:23,23
**ideally** 126:3
**identifiable** 42:2
43:12,19,23 44:3
44:17 45:4 50:15
51:3
**identified** 101:10
149:12
**identifies** 20:10
**identify** 142:24
143:5
**identifying**
142:25
**ii** 20:2
**illustrates** 160:14
161:2
**imbrium** 108:8
113:10

**immediate** 100:23
103:3,20 133:12
136:18 137:10
138:6 149:9
**immediately** 10:7
10:23 29:14 143:1
**impact** 7:2 86:16
157:20
**impacted** 80:16
**implement** 25:8
95:11
**implication** 42:15
44:19 45:23 46:1
**implicit** 160:9
**implied** 21:2
**implies** 66:15
**imply** 67:10
**importance** 20:6
127:9 159:10
**important** 10:22
15:19 17:4 19:24
42:12 55:22 79:5
86:25 92:16 94:16
95:3 96:9 104:18
114:2 116:16
125:20 129:16
130:5 131:10,22
134:3,8 142:2,8
146:11
**importantly** 95:3
**imposed** 134:19
**imposing** 80:25
**imposition** 80:25
**imprecise** 118:3
**impression** 128:8
132:5
**improper** 24:18
59:23
**improve** 130:20
**improved** 18:5
**improvement**
36:2

**improvements**
36:3
**inadequacy** 75:24
**inadvertently**
51:17 60:10,11,23
**inappropriate**
130:11
**incentive** 96:14
98:15 100:12
**include** 14:20
23:16 35:3 46:11
67:19 96:14 118:2
143:23,25 160:16
**included** 30:18,23
35:5 50:4 94:5
115:14 123:24
125:10 142:14
**includes** 92:4
125:24 154:15
**including** 14:23
16:9 17:2 21:17
22:1 26:6 28:19
30:15 43:5 69:6
72:6 76:11 93:15
94:7,11 95:15
120:25 142:15
148:10 153:10
162:1 166:20
**inclusion** 101:14
**incorporated**
34:24
**increasingly** 27:5
**incremental** 14:17
**incur** 55:9 79:4
**incurred** 58:13
117:16,16,17
121:11,19
**incurring** 58:14
119:7
**indefatigable**
12:17
**indemnifiable**
131:3

**indemnification**
54:7,16 116:19
130:13,18,21
131:12 132:2
135:11 139:4,10
**indemnified**
128:15 129:8
**indemnitee**
131:16 134:9
**indemnities** 117:1
**indemnity** 105:14
**independent**
13:23 23:3 31:18
161:10
**independently**
127:18
**indian** 26:15
**indicated** 56:21
62:19 63:1 150:12
150:14
**indicates** 43:4
**indicating** 47:10
**indirect** 14:10
125:19
**indiscernible**
11:18 21:16,19
31:23 35:12 55:9
135:13 154:9
159:6
**individual** 16:11
33:3 42:6 45:12
46:18 51:25 52:3
110:22 111:21
127:22
**individually**
135:21
**individuals** 41:14
41:19,22 43:23
91:25 99:24
102:15,21 103:7
107:24 111:20
156:18

industry 21:24
   23:8 92:9 100:22
   141:11 142:17
inevitably 155:15
infant 161:13
inflows 38:9
inform 15:18
informal 34:24
   38:12 70:3
information 2:18
   10:24 11:3 30:16
   31:2 40:12 41:8
   41:14,23 42:1,2,2
   43:5,8,11,12,19
   43:23 44:3,18
   45:4,22 47:5 48:3
   50:16 51:3 93:3
   106:3,17 118:5
   126:24 147:22,25
   148:6 149:14
   156:25 163:19
   168:19
informational
   2:12 20:14
ingredients
   141:22
inhabited 14:22
   15:4
initial 78:13
initiation 163:10
initiatives 30:11
injunction 24:5
   74:6
injunctions 19:15
   19:16
injunctive 19:8
input 96:10
   141:12
inquire 114:20
inquiry 128:17
   132:1 149:13
insider 101:8,13
   108:2,6 110:2

138:9,11
insiders 95:8,10
   98:8 101:11,22
   103:10 114:1
   138:1
insight 31:16
insignificant
   123:13
instance 42:3
   46:11 63:25
   128:11
institutions 78:2
   93:6
instruct 37:2
instrumental 21:4
insurance 2:24
   7:17 14:5 38:19
   69:15,17,23,24,25
   70:7,9 72:18 75:6
   116:24,25 151:24
   168:25
insured 38:17
   39:1 76:2
insurer 70:10
insurers 22:9
intake 32:11
integrated 38:7
intellectual 14:5
intend 42:4 70:25
   81:24 83:13
   142:18 146:20
   161:6 162:7
intended 144:20
intending 83:21
   152:2
intends 24:4
intense 17:16
   20:11 31:7
intent 129:6
intention 21:1
   57:14 99:1 129:11
   133:19 150:24

intentionally
   114:10
interact 63:10
   64:9
interactions
   109:21
interest 17:9
   24:16 31:10,14
   57:22 58:10 66:24
   68:17 83:8 102:11
   129:22 130:23
   134:23 137:9
   142:9 149:24
   160:15 161:18
   162:4 164:1
interested 63:22
interests 127:16
   128:10,22 130:22
   131:13 155:10
   166:3
interface 165:8
interim 37:18
   38:16 39:22,24
   41:4 47:4 48:4
   49:15 57:12,13
   58:4 61:8,21
   64:14 65:1 70:8
   70:16 77:1 82:25
   85:21 86:20,20
   88:11 90:25 126:9
   126:10 135:24
   136:16 137:25
internal 132:11
interrupt 90:3
   114:19
introduce 11:22
   65:2
introduced
   106:10
invariably 9:25
inventory 20:5
investigation
   29:23

investigations
   30:9
investment 12:8
   39:21,23,25
invoices 118:6
involve 10:1
involved 10:18
   21:25 30:12 48:22
   101:1 116:6
   127:23 149:19
   164:2
involves 13:17
   78:12
involving 81:17
irreparable 79:5
   100:24 103:3,20
   133:12 136:18
   137:10 138:6
   149:10
irs 11:11
irvine 8:5
issue 13:2 17:10
   37:8 40:14 44:15
   44:23 47:23 48:11
   48:19 50:11 51:2
   51:11 52:5 57:23
   59:20 60:2,2
   61:12,14 70:9,11
   70:15 72:21 75:1
   77:2 90:12 99:18
   104:21 119:21
   128:22 129:21,24
   133:3 136:3
   148:19,23 149:8
   152:24 160:19
issued 10:23
issues 19:1,8,12
   20:22 28:24 29:10
   29:16,21 31:15,24
   32:11 36:9 53:19
   60:9 69:4,6 86:15
   90:9 129:25 133:6
   152:24 157:21

158:6 159:3
160:15,16 162:1
163:16,24 164:3
164:10,12 165:15
166:17
**it'll** 161:1 166:3
**item** 28:16 34:18
34:19 37:24,25
41:9 49:21 53:7
55:6 69:13 70:18
71:22,22 75:8,11
77:15 90:22 91:5
125:20 139:25
150:6
**items** 20:23 24:22
96:12,14 126:3

**j**

**j** 4:10 107:5
**james** 5:24 160:7
**jamie** 12:10,11
**january** 30:2,19
31:1
**jeff** 85:1 89:12
**jeffrey** 8:7
**jeopardize** 72:9
**jessie** 12:14
**jim** 12:1 68:3
**job** 106:21,22
108:1 109:19
134:11 159:2
**jobs** 101:6 114:14
**joe** 156:5
**john** 22:4,16
**join** 19:11 102:13
153:3,6
**joined** 12:15
21:22 22:2,12
**joint** 2:6 33:21
34:12 153:5
163:10 168:13
**jointly** 33:25
**jon** 12:18 32:21
99:12 107:2 168:5

**judge** 1:24 16:3
76:12 86:7 127:1
135:8 152:23
153:12 156:3
157:1
**judgment** 13:19
84:7 142:24
**judgments** 13:5
25:7 28:2
**july** 12:16 21:22
**jump** 48:9 87:23
**juncture** 67:3
81:23 83:4
**june** 75:17
**junior** 98:4 136:8
**jurisdiction** 76:12
**justice** 11:11 25:1
26:21 28:11,14
**justification**
126:1

**k**

**k** 5:13 8:14
**kahn** 6:16
**kaleidoscope** 28:9
**kaminetzky** 4:12
11:25 134:1,4
**karen** 109:9,11,13
**karman** 8:3
**katherine** 6:22
**keenly** 154:23
**keep** 141:9 144:25
**keeping** 10:18
149:24
**keip** 122:22 126:7
**kenneth** 4:19
21:23 62:7 81:15
124:24 148:17
**kentucky** 15:12
**kerp** 122:22 126:7
**kesselman** 12:15
109:6
**kevin** 5:22 68:1
162:19

**key** 14:19 24:8
28:25 94:7 140:17
**kicked** 121:12
**kill** 19:16
**kind** 31:9 50:19
88:3,19 97:13
105:7 131:8
133:10 134:17
**knew** 135:12
**know** 11:17 15:15
16:6 24:12 29:7
32:25 33:4 36:17
36:23 38:9 42:17
46:14,15,17,17,19
46:20 50:19 51:13
52:4,16 53:16,18
55:20,21 56:18
57:11,13 58:6
60:13,17 62:5
65:8,21 66:7,18
67:1 72:24,25
73:4,14 74:3
80:24 84:1,10,15
84:21 85:21 88:2
89:11 97:19
106:16,21 109:1
110:9,22,24 111:1
114:9 117:24
118:8 119:3,11
123:13,21 128:14
132:12 145:1,14
148:22 149:14,16
149:22,22 152:5
152:21 153:5,22
155:15,23 156:9
156:21 157:22
158:15 159:7,22
161:21 162:14
163:4 164:8 166:5
166:11
**knowledge** 14:6
23:7 92:11 94:9

**known** 16:2 21:14
21:15 68:12
**kobe** 16:4
**kramer** 4:14 62:8
81:16 124:25

**l**

**l** 3:25 6:6 107:5
170:3,9
**l.p.** 1:7 9:3,20
34:2
**la** 12:14
**lack** 127:20
147:25
**laid** 20:14 76:12
118:24 139:6
145:22 147:1
**landau** 108:13,23
**language** 36:22
37:12 44:15 53:11
74:5 84:19 85:3,8
85:16,19 87:13
99:14 147:16
**lapse** 69:18
**large** 9:25 10:1
13:1 93:21 94:22
142:14 144:24
**largely** 35:25
76:11 118:6 139:5
165:7
**larger** 66:11
**largest** 11:8 22:8
22:11 26:25
137:11
**lashes** 133:25
**lastly** 105:18
133:18 141:1
**late** 60:8
**laughter** 15:7
39:7 59:11,15,18
84:8 89:15
**launch** 108:17
**launched** 108:18

laurel  109:11,13
law  8:1 12:21 14:9
  16:8 18:12 44:17
  52:2 53:2 59:23
  69:19 76:11
  118:14 119:12,15
  139:4 150:25
  151:25 152:3
  159:9 164:17
lawful  131:14
lawfully  105:16
  134:10
lawsuit  27:10 52:1
  52:3 104:14 139:2
lawsuits  13:13,14
  25:25 26:1,2,10
  26:12 27:14,15
  29:11 66:23
  150:20
lawyer  23:10
  104:6 157:16
lawyer's  134:10
lawyers  27:4 28:7
  135:22
layers  134:5
laying  159:2
lays  78:20 137:5
lead  16:15 28:13
  151:15 156:1,4
  157:3,6,12
leaders  24:8 94:2
leadership  16:7
  22:6 108:5
leading  12:11
  71:10
leanly  94:6
learn  29:6
learned  14:25
leave  31:13 43:21
  66:13 90:17
  100:25 102:25
  103:4 104:24,25
  113:3 126:22

leaves  98:16
leaving  15:12
  102:13,21
led  94:1 141:6
lee  40:18
left  36:22 37:12
  60:7 128:13 131:8
legal  19:1 26:24
  42:16 70:9,11
  71:9 80:24 99:5
  103:16,19,21,24
  104:9,16,24 105:5
  105:6,10,19
  115:19 116:5,13
  116:19,25 117:18
  118:6 119:7
  122:10 125:18,22
  126:17 127:4,19
  129:9 130:24
  138:19 139:13
  146:13 170:22
legitimate  18:11
  48:1 90:16 128:9
  164:18
legitimately
  126:22
legs  131:10
lenders  18:19
length  30:4
lens  27:20
leonard  7:22
  72:16,16,20 73:2
  73:10,13,22 75:3
lest  14:1
leticia  160:7
letter  53:24 54:9
  54:13 146:15
level  15:24 27:12
  27:14 105:2
  138:21 149:24
levels  94:2 160:22

leverage  141:2
levin  4:14 62:8
  81:16 124:25
lexington  4:4
liabilities  14:8
  20:19
liability  53:25
  54:2,6,8 57:24
  61:5 69:16 165:19
liable  26:4 28:3
liaison  157:10
liberty  7:3,18
license  55:11,24
  56:10 58:15
licenses  69:20
  72:6
lien  147:6
liens  57:23 140:6
  140:22 144:5
life  92:1
lifesaving  27:18
light  128:23
lights  10:18
likelihood  136:6
likewise  56:16
  63:1
limit  38:19 53:11
  87:20 143:3
limitation  53:25
  54:6,8
limitations  60:10
  61:12 82:1 126:8
limited  54:2 64:7
  73:21 74:14 94:12
  97:24 115:2 140:8
  140:15,18 142:4,5
  144:7 147:4
linda  10:10
line  26:17 34:22
  36:13 78:17
list  2:18 35:4,6
  41:8,12 44:10
  49:13 55:13 94:16

111:12 143:21
  146:7 147:20
  148:1,8,10 149:3
  149:25 168:19
listed  54:22 108:5
  146:1
listen  17:22
  159:17
listening  88:3
listing  52:2
lists  41:13
litany  49:13
literally  13:16
  26:1
lithland  62:12
litigants  24:24
litigate  28:5 166:5
litigated  48:11
  86:2 163:17
litigating  17:9
litigation  7:2
  12:23 16:13 17:25
  19:8 20:13,21
  22:19 23:14 24:20
  25:19,21 26:17,23
  26:24 31:24 80:6
  80:16 86:15 92:24
  93:3,4,5,8 104:2
  118:13 120:1,6,11
  120:16 151:21,23
  152:16,18 154:3
  155:15,16 157:9
  157:20
litigations  13:18
  25:17 27:7,8 28:9
  119:20,23 152:19
  165:1
little  61:25 63:6
  83:24 142:20
live  77:5
lives  13:3 18:5
  114:14

**llp**   4:2,14 5:8 6:8
   9:20 12:12,22
   77:12
**load**   11:1
**loathe**   106:18
**local**   45:18 72:4
**locality**   164:10
**located**   151:23
**long**   44:21,24
   51:13 94:16 95:20
   96:15 126:10
   148:8 154:22,23
**longer**   24:1 27:24
**longstanding**
   116:12
**look**   59:21,24
   60:4,14,18 86:12
   86:21,23 128:12
   135:4 158:23,24
   159:19,21,22,25
   162:11 163:8
   166:23
**looked**   136:24
**looking**   88:22
   112:4,13 124:19
   149:18
**looks**   57:16 108:3
   114:17
**lose**   13:8 27:22
   92:13 100:16
**losing**   27:14,15
**loss**   19:21 69:20
   69:20 79:9
**lost**   28:9 140:21
   157:22
**lot**   48:18 58:6
   66:1 67:8 112:16
   123:5 137:17
   144:9 149:2
**lots**   28:2
**louisiana**   16:22
**love**   119:8

**low**   18:4
**lower**   11:10
**lowne**   12:18 32:21
   32:24 33:6 79:15
   88:3,18 99:12
   100:6,7,10,19
   101:1,5,9,12,18
   102:4,9,19 103:2
   103:7,18,22 104:1
   104:12,20,23
   105:4,18,25
   106:11,14 107:2
   107:10 111:7
   113:4,24 168:5
**lowne's**   100:3
   105:23 115:14
   127:11 137:24
**lp**   109:23 110:1
   113:11 153:14

## m

**m**   6:14
**machinery**   142:16
**maclay**   5:22 67:24
   68:1,1 162:17,19
   162:19,23 163:1,6
**madison**   6:20
**magic**   74:5
**mail**   32:9 34:14
   36:9,13 90:24
   139:19 166:24
**main**   6:18 34:2
   144:21 163:14
**maintain**   38:4,5
   69:23 71:25 72:6
   72:9 116:24
**maintained**   80:12
**maintaining**
   142:21
**majority**   22:22
   66:22 104:10
   117:1
**making**   61:11,15
   61:15 96:20

101:16 104:10
   125:11 139:16
   147:8
**malamute**   152:10
**manage**   61:14
   77:20,25
**management**   2:14
   2:16 29:12 34:19
   35:23 38:1,3,7
   76:9 93:11 94:14
   141:24,25 168:15
   168:17
**managers**   92:5
   94:8
**manicinelli**
   109:21
**manufacturers**
   20:1
**manufacturing**
   14:7
**map**   122:18
**marc**   12:1
**march**   11:23
   12:13 20:11
   105:20 116:18
**mark**   12:15 39:17
   76:21 109:6
**marked**   83:16
**market**   78:11,21
   96:15 108:21
   112:4
**marketing**   92:5
   108:15 109:16
**markowitz**   51:24
   51:25 52:11,20,22
**markup**   36:3
**marshall**   4:7 9:19
**marshals**   10:16
**masamuto**   99:20
   99:23 152:9
**mass**   13:11 18:15
   66:19 157:9

**massachusetts**
   59:13
**massive**   133:14
**masumoto**   8:15
   10:11 56:19,19
   58:1 96:6
**material**   13:5
   14:4,16 30:9
   69:24 81:17 114:3
   136:15 149:3
**materials**   30:14
**matrix**   43:6,7,25
   44:21 46:8 50:2,5
   50:22 52:2,8
**matter**   1:5 25:2
   45:20 64:13,17,20
   96:13 106:9
   107:11
**matters**   12:24,25
   58:6 108:11 112:1
   159:4,17 162:4
**maximization**
   18:10,18
**maximize**   164:15
**maximizes**   25:9
**maximizing**   137:9
**maximum**   98:5
   162:9
**mcclammy**   12:1
**mcelroy**   7:16
   72:17
**mckesson**   8:2
   78:9 83:12 84:7
   85:2 86:13 89:13
   89:20
**mckesson's**   89:22
**mdl**   16:3,5,7,12
   16:14,24 26:11
   30:15 62:16
   154:18 156:2,9
   157:1,3,5
**mean**   15:5 47:18
   52:4,7 60:20

68:15 72:25 73:7
73:14 79:19 82:4
84:6,17,24 85:21
85:24,24 86:2,22
86:23 111:22
119:15 128:5
129:7 135:3,20
141:12 148:3
149:8 153:25
163:25
**meaning** 75:21
**meaningful**
146:24
**means** 14:2 17:20
31:24 83:18 84:15
119:13 147:17,25
**meant** 97:18
158:15 166:11
**mechanically**
87:3
**mechanism**
131:18 137:5
**medeiros** 108:2,5
108:7,8 113:9
**media** 24:25
**medical** 24:8
41:23 92:5 94:12
**medicare** 88:7
**medications** 20:2
23:18,23
**meet** 65:9
**meeting** 11:17
29:21 167:2
**meetings** 30:23
**mega** 18:15 21:25
**melanie** 6:6 62:10
154:12
**member** 21:6,8
95:4,6 105:19
116:20
**members** 16:22
16:24 28:20 68:19
125:2,19 134:19

135:14 157:8
162:2,5 163:2
**membership**
17:13
**mention** 31:16
87:1 95:21 96:3
106:18 153:21
**mentioned** 83:10
97:3 100:6 114:9
125:4 126:16
133:19 150:19
161:15
**mere** 27:14
**merely** 15:25 23:9
**merits** 161:6
**mess** 60:23
**messaging** 121:23
**method** 164:25
**methodology**
75:18
**mexico** 16:23
**michigan** 16:22
**mid** 57:17
**middle** 94:8
115:25 162:6
166:1
**mike** 22:12
**milbank** 5:8
**miller** 21:15,21
22:16
**million** 27:1 81:18
117:9 122:24,25
140:8 141:7
**millions** 13:15,16
18:3 27:4 123:1
**mind** 165:10
**mindful** 61:11,14
63:14
**mine** 162:6
**mineola** 170:25
**minimal** 57:19,22
**minimized** 19:21

**minimum** 14:11
124:10
**minimus** 60:21
**minute** 27:20
48:10 114:19
157:18 160:2
**minutes** 86:3
164:2
**mired** 26:5
**misconduct** 54:1
55:3
**misleading** 119:12
**missed** 20:11 74:5
165:13
**mississippi** 16:23
**mistake** 65:18
74:8 90:13
**mistaken** 65:13
**mister's** 22:16
**misunderstood**
134:24 135:3
**mix** 145:18
**mobilized** 93:21
**model** 88:25
**modest** 58:19
144:12
**modifications**
64:15 82:1 125:12
**modified** 73:9
74:16 150:4
**modify** 72:22
**molton** 5:6 62:11
63:5 84:12,12,14
86:7,7,18 155:18
155:20
**moment** 55:1 95:2
97:7 111:5
**moments** 21:12
164:8
**monday** 123:21
**money** 76:18
81:18 88:9 120:12
131:25 135:25

141:16 143:3
155:14
**monitoring**
149:23
**mono** 150:25
151:25 152:3
**monoline** 22:9
**month** 23:2,2
29:21 36:10 93:18
117:9 119:9
165:13
**month's** 97:25
**monthly** 38:18
**months** 17:16
19:11 21:8 22:12
23:24 24:23 29:16
29:24 31:7 75:17
122:21
**moral** 104:21
**morale** 94:24
121:22
**morass** 25:21
**morning** 9:3,5,18
10:3 20:20 33:17
45:17 62:7 71:17
71:18 77:11
106:17 107:9,22
123:21,22
**motion** 2:6,14,16
2:18,22,24 3:1,3,5
3:7,9,11 32:25
33:7,20,21 34:4,6
34:9,10,19,21
35:23 37:2,14,17
37:25 38:1,8,8
41:1,3,5,7,8,11,17
49:25 52:4,15,18
52:24 53:6,16
55:7,15 56:2,5
57:11 58:22 61:21
64:24 67:2 69:15
70:4,5,7,8,16 71:4
71:7,15,21,22,24

[motion - note]                                                                    Page 27

72:15 74:19 75:9
75:13 77:15,17
78:6,18,25 79:12
81:10,24 84:7
85:22 86:10 90:21
90:23 91:6,7
95:12 96:9 113:5
122:15,16,23
123:7,8,16 124:9
124:15 125:4,5,10
125:24 126:7
136:7 137:13
140:1,2,3 141:20
143:2 144:8
146:10 148:16
149:7 150:3,4,7
150:15,17,22
151:14 152:8,12
152:12 153:6
163:4 168:13,15
168:17,19,23,25
169:1,3,5,7,9,11
**motions**  2:2 10:15
20:24 23:21 31:22
32:22 33:3 40:18
64:13,16,20 79:21
122:24 123:20
124:21 136:23
149:21
**motivated**  84:6
**movable**  17:5
**movant**  37:2
**move**  31:6 32:20
63:10 67:4 68:12
163:11
**moved**  166:14
**moving**  23:13
34:18 37:24 41:4
41:7 53:6 55:6
69:13
**multi**  5:17 34:11
68:5 154:2 162:23

**multiple**  11:24
17:2 20:2 29:21
30:15,23 48:22
93:6 134:5 141:14
**multiplying**  27:7
**multitude**  28:6
**mulvaney**  7:16
72:17
**mundipharma**
142:11,13
**municipal**  156:7
**municipalities**
16:9 62:17,25
156:12

**n**

**n**  4:1 9:1 107:5,5
108:20 168:1,3,9
170:1
**nachman**  7:6
157:18 160:2,5,6
161:22,24
**naftalis**  4:14
**name**  50:11,22
51:5 52:21 68:1
77:12 107:3,22
142:11
**named**  52:3 116:9
116:14 153:13
**names**  42:7 43:4,8
43:13,24 44:4,12
44:22 46:8 50:2
51:19 104:15
106:17,18
**national**  26:3
86:14 156:1
**nationally**  156:23
**native**  16:10
156:16
**natural**  22:11
**nature**  41:24
55:20 70:9 101:6
102:23 117:5
142:1

**nd**  156:2
**near**  19:4 164:22
**nearly**  21:16
141:12
**necessarily**
149:21
**necessary**  64:8
72:3,7 93:9
136:18 138:6,7
144:5 147:12
**necessity**  12:6
62:5
**need**  18:23 40:12
63:13 79:2 82:4
86:11 88:16 94:20
124:9 125:5
127:12 132:23
134:1,18,19
137:17 138:23
141:7,14 142:2
149:21 153:12
158:22 159:15
163:17
**needed**  65:21
**needing**  17:10
25:17
**needlessly**  25:10
**needs**  40:21 47:8
47:11 88:2 94:17
128:2,3,4 131:11
131:15 136:13,17
**negative**  93:15
100:16
**negligence**  55:3
**negligent**  54:1
**negotiate**  17:12
65:22 143:5
**negotiations**
17:16
**nervous**  94:14
**nest**  138:15
**net**  14:17 61:18
136:15

**netting**  90:1
**neutral**  46:2
**never**  25:1 60:18
66:6 88:19 98:24
104:5
**nevertheless**
120:11
**new**  1:2,15 4:5,5
4:17,17 5:4,4,11
5:11 6:4,4,12,12
7:1,4,4,20,20 8:12
8:12 16:23 18:16
38:16 39:10 56:2
56:3 59:4 60:14
72:21 85:19 95:12
100:15,21 114:11
157:19 160:8
**nice**  70:11 146:15
**nicole**  7:22 72:16
**nine**  15:6 62:15
**nobody's**  43:11
**non**  21:21 31:9
55:13 56:25 57:4
57:6 66:12 70:10
98:16 99:4 100:9
100:10 101:3,14
101:19 102:22
111:8,18 112:1,9
113:15,19 114:3
124:16 126:5
136:4 140:12
151:22
**normal**  83:2
143:11
**normally**  9:9
**northern**  156:2
**nostrum**  26:19
**note**  56:13,14
81:17,24 92:16
114:2 116:16
141:10 142:8
157:15,17

noted  98:16
noteworthy  31:6
notice  2:1,1,4 10:2
  10:22 11:4,14
  36:8,23,25 37:1,4
  37:4,7 41:15,18
  41:21,25 77:2
  117:7 124:15,21
  136:22 166:18
noticing  2:20
  42:13 168:21
noting  141:25
notwithstanding
  35:11 159:19,20
novel  24:4
november  12:9
number  11:8,15
  17:22 25:25 33:22
  33:22 34:3,19,20
  37:25,25 41:10
  43:10 49:21,23
  51:17 53:7,7
  54:21 55:6,7
  69:13,14 70:18,19
  71:22,23 75:11,12
  77:15,16 85:11
  89:23 91:5,5 95:7
  96:12 103:24
  116:8,22 139:25
  142:6 156:22
numbers  11:3,9
  29:6 110:12
numerous  107:24
nw  5:18
ny  6:9 170:25

o

o  1:22 9:1 107:5,5
  170:1
o'connell  12:10
oath  23:2
object  54:7 81:22
  125:8

objection  36:8
  47:4 64:25
objectionable
  125:10
objections  43:3
  56:23 70:3 72:11
  76:5 81:12
objectives  18:25
objector  68:6
objectors  66:9
objects  33:4
obligated  42:1
obligation  42:16
  44:16,18,20 45:24
  46:1 53:1 72:21
  73:3 131:16
  136:11 159:9
obligations  57:15
  73:9 77:19,24
  79:2,8 95:1 97:6
  97:19 136:1,2
  140:11
observation
  160:10
observations
  125:1
obtain  40:2
obtaining  163:20
obvious  48:19
  67:1
obviously  11:17
  12:7 37:16 40:21
  42:12 47:5 64:19
  73:7 81:17 82:5
  90:13 118:12
  139:8,14 148:2
  153:22 154:2
  159:6 161:17
  162:2,9 164:12
  165:20 166:20,21
occurred  21:9
occurring  92:21

october  30:13,21
  40:23 57:18 96:22
  114:7 115:3,25
  116:2 133:5,16
  136:4 153:5
odd  61:25
offer  28:4 102:7
offered  66:6
office  7:1 8:9 10:8
  10:12 11:11 34:25
  39:9 53:10,17,23
  54:4,23 56:20
  65:6 96:5,11 97:1
  99:7 106:2 107:23
  125:11 132:15
  133:1,3 136:22
  144:8 152:10
  157:19 160:6
officer  99:11
  109:4 139:2
officers  103:17
  110:17 116:9,13
  123:24 125:25
  126:2
official  17:7 35:13
  66:21 68:18
officially  11:1
officials  10:17
  14:21
offset  82:12
oh  38:22 81:11
  83:10 84:14 97:18
  108:14 144:16
ohio  16:3,23
  26:11 156:3
okay  9:3,13 11:19
  32:16,23 33:10,15
  34:8 35:17,22
  37:23 39:12,15
  40:16,25 42:24
  44:13 45:14 46:4
  46:5 47:2,12 48:6
  49:11,19 52:20,24

  54:10,11 58:24
  59:1,6 60:24 64:4
  65:4,16 67:15,23
  68:14 70:6 71:6
  71:16 72:14 73:12
  73:22 74:9 76:8
  76:16 77:7,10
  81:9,14 82:24
  85:5 86:22 87:15
  88:21 90:19 96:2
  97:2,9,11,22 98:9
  98:14,15 99:2,3
  99:25 100:2,5
  105:24 106:5,25
  107:6,18 109:4,15
  111:7 112:21
  113:7,13,14 114:8
  115:11,12 116:3,4
  118:9 121:9 122:2
  122:6 123:4
  124:22 126:12
  129:14,23 130:2
  132:13 133:23
  135:16,24 139:23
  144:14 145:7
  146:8,17 147:13
  147:18 148:10,12
  149:5 150:9 152:7
  153:7 154:5,10
  155:19 157:14
  160:4 161:23
  162:13 164:7
  166:10,23 167:4
oklahoma  15:12
old  170:23
omnibus  32:4
once  11:17 37:18
  47:5 53:22 58:2
  73:20 116:16
  147:15
oncology  94:14
one's  134:13

**ones**  12:22 32:6
  140:17
**ongoing**  29:17
  92:24 94:10
  112:15 125:8
  135:2 141:4
  152:16,18,19,22
**onus**  134:8
**open**  36:12,17
  38:4 66:7
**opened**  38:17
**opening**  21:12
  154:14
**operate**  63:15
  64:21 69:20 72:5
  72:7,10 87:5
**operated**  81:3
**operating**  26:25
  34:2 79:1 80:12
  94:17 95:14
**operation**  20:17
  81:2 93:9 94:10
**operational**  19:22
  92:5 93:5
**operations**  20:4
  38:3 64:8 112:15
  140:21 141:21
**opinion**  24:8
  36:10 76:13,17
  118:25
**opinions**  162:8
**opioid**  18:3 20:2
  23:17,22,25 24:2
  24:7 26:3 56:1
  86:15 127:23
  156:2 157:20,23
  164:23 165:1
**opioids**  7:2 24:7
**opportune**  62:9
**opportunity**
  19:11 60:9 65:2
  125:3 158:24,25

**oppose**  137:14
**opposed**  15:16,22
  15:24 120:21
  122:4 137:15
  138:10,23
**opposing**  66:3
  67:12 161:5
**optimistic**  29:3
**options**  102:11,15
**order**  34:5,13
  35:19 36:23,24
  37:8,18 38:1,16
  39:20,22 40:3
  41:19,20 42:5,14
  44:20 45:20 49:16
  53:12 54:5,20,20
  55:1 57:3 63:20
  66:21 72:12,23
  73:5,7,17,20 74:1
  74:8,23 75:22
  76:6,7,9,10,22
  77:1 83:11,16
  85:16 87:10 90:12
  90:25 91:19 96:21
  96:23,25 99:17,18
  100:13 102:7
  104:12 115:9,10
  120:4 126:9,10
  133:21 139:19
  142:23 144:12
  145:5,14 147:5
  150:4 152:4,15
  153:18
**orders**  29:1 30:6
  35:25 36:7 38:12
  54:24 145:20
  166:24
**ordinary**  55:8,19
  64:21 72:5 77:21
  79:3 81:3 82:7,11
  83:15 84:17 91:10
  102:6 125:8

**organization**  92:2
  94:7
**organizational**
  116:11
**organizations**
  112:13,14
**organize**  63:9
  66:4 69:3
**organizing**  16:12
**originally**  87:21
**orms**  3:25 170:3
  170:14
**otterbourg**  6:1
  62:11 154:12
**ought**  151:8
**outcome**  10:14
**outline**  62:21 63:3
**outlined**  91:12
  96:9
**outrageous**
  129:18
**outs**  113:19
**outset**  19:4 83:11
  91:13 114:10
  117:8
**outside**  27:3 28:6
  112:8 127:24
  135:11 150:16
**outsized**  26:17
**outstanding**  60:6
  75:24 77:24 149:2
**overall**  92:18
  93:13 114:4
  122:25 149:1
**overdose**  18:4
**overlaps**  158:5
**overlay**  66:20
**override**  53:14
**overtime**  166:19
**overview**  11:21
  20:17
**overwhelming**
  119:20

**owe**  59:13
**owed**  56:4 77:19
  140:4 145:12
**owing**  91:9 97:6
**owners**  13:11
  14:11 22:19 29:13
  91:22 137:19,21
  158:18
**ownership**  14:13
**oxycontin**  23:17
  23:22

**p**

**p**  4:1,1 5:24 7:14
  9:1
**p.m.**  167:7
**package**  114:4
**page**  20:8 30:22
  35:10 44:14 57:11
  168:4,12
**pages**  30:4
**paid**  30:18 56:1
  57:12 59:20 61:7
  70:2 85:14 95:16
  111:2 116:12
  118:1 123:9,11
  127:4 129:9 135:1
  136:1 138:21
  150:2
**paper**  10:1,14
**papers**  24:3 32:10
  60:8 62:22 64:9
  126:20 127:15
  146:19 156:21
**paragraph**  35:2,8
  35:9,10 38:15
  39:19,21 54:13,16
  54:17,18 56:9,13
  56:17 96:25
  139:20
**paragraphs**  76:23
**parcel**  50:19
**parent**  30:25

**parenthetically**
30:12
**park** 6:3
**parse** 60:9,10
**part** 25:18 28:23
44:6,16 50:19
53:1 56:22 65:19
91:25 94:22 101:3
110:20,23 114:13
118:10 161:15
**participants**
103:5 114:1,2,12
115:15
**particular** 32:24
33:7 64:24 119:22
122:3 126:18
127:21 155:7
**particularized**
149:25
**particularly**
57:24 80:20 90:15
94:25 117:10
125:17 136:21
**parties** 11:14
17:22 22:20 24:16
28:17 29:4 30:8
30:15,23 32:2
52:3 62:1,4 63:20
63:22 65:25 66:24
68:17 74:20 83:7
111:10 124:14,14
126:23 137:24
139:17 142:9
145:13 147:3,20
149:24 154:19,20
155:2 158:16
159:14 163:14,23
165:17
**partly** 84:6
**partner** 9:22
91:12 150:8
**partners** 12:8
166:13

**parts** 112:15
113:5
**party** 16:11 35:4
35:4,13 45:5 74:4
77:25 146:2
156:18
**passionately**
15:16
**path** 26:21 27:3
163:10 166:16
**paths** 18:16
**patience** 96:7
**paul** 8:14 10:10
39:8 53:22 65:5
106:1 107:22
108:2,5 113:9
147:14 156:5
**pause** 28:12 33:16
40:4 42:9 54:14
85:6 95:23 97:10
145:17
**pay** 55:19 56:8,15
57:21 58:21 59:9
59:14,17 60:21
61:4 66:9 67:5,11
82:12 88:6 91:8
96:21 98:7 110:7
113:18,20 122:16
140:3,5,5,10
141:3,8,17 143:5
166:19
**payable** 70:1
78:16
**payables** 87:17
**paying** 58:8,17
60:3 95:15 110:19
117:3 121:20,24
133:20 135:21,22
142:19
**payment** 55:20
61:10,15,16 65:10
70:10 75:21 96:17
102:22 107:25

116:19 122:24
127:17 136:11,15
136:17 139:12
142:19 143:2,7,8
143:25 144:1,3
147:1,11
**payments** 14:16
56:23 57:4,8
59:23 85:12 95:5
95:8 97:2 101:19
103:6 111:13
113:22 114:5,15
114:21 115:3,4,5
115:7 117:15
122:4 124:20
125:16 127:13
130:11,13 132:18
133:11,15 135:19
136:3,5,20 138:5
139:16 142:12
144:22 149:9
162:2
**payors** 16:11
156:18
**pc** 154:12
**pec** 16:3,6,14,24
62:15 154:18
**peccadilloes**
20:12
**peck** 135:8
**pecos** 39:13
**penalties** 79:4
**penalty** 80:23
**pending** 13:14
14:19 26:11 80:15
83:6 116:7,15
117:25 137:18
157:1 163:13
**penny** 152:23
**people** 9:11 11:22
15:2,5 18:22 28:2
36:11,16,17 37:10
47:23 48:2,22

66:3,14 67:5,8
73:15 74:24 80:25
82:4 91:18 92:7
94:22 95:16,16
102:7 104:17
108:22 110:6,10
110:24 111:7,10
111:11,18 113:18
115:17 118:12
119:5 121:2,23
122:13 123:12,17
124:12,19 125:6
131:22 132:21
134:11,16 142:2
147:7 149:19,22
160:7 165:8,20,21
166:6,12,12,14,14
**people's** 48:23
74:13 111:10
**perceived** 75:24
**percent** 13:6
14:13 25:13 27:14
28:8 36:24 50:3
66:22 78:7 92:20
92:23
**percentage**
148:21
**perfectly** 90:16
**perform** 68:25
83:6 105:1
**performing** 77:18
83:14 146:5
**period** 14:13 30:2
30:25 57:1,7,13
57:18 60:4,14
71:2 95:6 103:23
**periodically** 56:3
**periods** 59:21,24
**permanent** 47:9
**permanently**
14:22 15:4
**permission**
142:12

**permit** 53:11 54:5
77:23
**permits** 65:15
**permitted** 133:20
**perplexed** 25:4
**person** 73:18
101:19 105:9,11
108:3,17 109:1,5
109:6,20,24
120:19 127:3
131:11 134:25
**person's** 108:16
109:19
**personal** 2:18
41:8,14 43:7
46:20 55:10
168:19
**personally** 30:12
42:2 43:12,19,22
44:3,17 45:3
50:15 51:3 104:15
**personnel** 10:17
92:5,6,6
**persons** 67:18
100:24 101:7,14
101:22 102:1
103:4,10,14,19
**perspective** 63:4,7
**perspectives**
162:9
**pertains** 44:2
**peter** 23:6
**petition** 2:8 10:24
54:22 56:16 70:1
70:22 72:2 86:4
98:8 143:13
**ph** 10:6 12:10,14
12:14 23:6,6
45:15 62:12 78:23
96:6 98:10 109:17
134:14 138:23
150:25 156:5

**pharma** 1:7 9:3
9:20,21 34:2
113:11 153:14
**pharma's** 116:11
**pharmaceutical**
14:15 20:1 23:8
23:12 72:7 89:19
89:23 92:9 109:23
142:10
**pharmaceuticals**
110:1
**phased** 95:25
**phd** 23:8,9
**philadelphia**
16:25 62:18
**phillips** 5:23 68:3
**phone** 32:3,8
89:10
**phrase** 150:14
**physics** 23:9
**pick** 32:8
**pickett** 23:5
**piece** 15:25
**pii** 44:25 51:16
53:4
**pile** 164:23
**pillsbury** 6:8 59:3
126:14
**pipe** 159:4
**pipeline** 108:10
**pittman** 6:8 59:3
**pjt** 12:8 112:18
**place** 10:22 31:14
70:15 90:1 92:17
100:23
**places** 28:2
134:16
**plains** 1:15 10:20
**plaintiff** 52:22
120:13
**plaintiff's** 5:2
155:22,25 157:12

**plaintiffs** 6:17
14:19 16:2,4,13
24:10 27:24 30:15
31:4 51:25 62:16
66:13 157:5,7
**plan** 17:24 63:20
63:24 64:2 96:14
96:15,17 97:25
98:15,18,20 99:4
100:9,11,11 101:4
101:14,20 107:24
111:9,19,21,23
112:10,11,16,18
112:19 113:16,19
114:2,3,9,14
124:16 126:6
136:5 137:4
160:25 161:6,15
161:17,18
**planned** 94:5
**plans** 95:12
**plaza** 7:10
**plc** 22:15
**pleading** 10:8
139:6
**pleadings** 20:9
34:12
**please** 9:2,19,24
32:8 59:14 82:22
107:1
**pleased** 62:10
**pleases** 32:14
**pleasure** 159:16
**plenty** 19:10
**plus** 118:24
128:14 134:13
**poaching** 48:15
**podium** 32:20
33:9 71:14 77:8
134:17 145:9
150:8 155:18
157:18 164:6

**point** 32:15 33:8
42:21,23 44:14
46:3,6 47:22 49:3
51:6 61:7 63:12
63:17 68:16 74:7
80:8 81:22 86:7
87:1 94:19 113:9
122:11 128:21,21
129:17 131:1,8
133:7 134:2
141:10 149:12
154:23 155:6
**pointed** 130:21
134:4 135:18
**pointedly** 161:3
**points** 35:2 54:19
113:15 132:14
161:2
**police** 19:14
**policies** 69:18,23
69:25 70:14
116:12
**policy** 70:9,11
101:22 103:10
138:17
**polk** 4:2 9:20
11:23 12:5 21:10
29:17,24 31:24
33:18 71:20 77:12
112:18 130:8
149:17 150:11
**polster** 16:3 156:3
157:1
**popular** 156:14
**population** 142:4
142:5,15
**portion** 43:19
57:18 61:15
110:21
**position** 14:3 17:5
58:2 65:11,24
67:18,20 73:2,4,6
89:22,22 135:2

136:21 138:12 148:23
**positions** 22:14 64:19 92:1
**possession** 39:17 151:12 153:11
**possibility** 104:8
**possible** 32:1 68:20 117:8 151:13 159:13 162:11
**possibly** 17:19 18:5 142:21
**post** 13:22 72:4 86:4 98:7
**potential** 22:19 24:15 54:21 59:21 116:14 133:13
**potentially** 26:3 28:2 158:14 159:13 164:11
**pounded** 24:25
**power** 19:14 24:14 159:11
**ppi** 113:12
**pplp** 38:3 99:11 151:15 152:4
**practicable** 39:17
**practical** 38:20
**practically** 87:3
**practice** 11:24 72:1 117:3 119:25 120:5 153:19
**practiced** 18:7
**practices** 21:1 23:12,13 77:21
**pre** 86:4 117:23 117:25
**precautions** 105:5
**precedent** 24:12
**precise** 151:23
**precisely** 25:20 134:6
**preclusion** 152:25
**predetermining** 37:7
**predict** 117:6
**preexisting** 95:13 95:18
**prefer** 31:25 48:17 83:25
**preference** 84:10 86:5
**preliminary** 15:23 63:12
**premise** 79:20 80:1
**premium** 70:10
**premiums** 69:25
**prepare** 52:8
**prepared** 30:7 85:20 144:25
**preparing** 93:1
**prepetition** 55:15 56:24 57:1,6,18 75:23 77:19 91:8 117:3 118:7 122:17 136:2,11 140:11 143:9 148:21
**prescribed** 20:3
**prescribers** 23:17 23:23 24:2
**prescription** 55:12,24 56:14,15 78:22,23 108:20 156:1
**present** 10:5 19:1 21:2 27:19 62:9 71:15 84:18 120:2 140:20 156:22 159:17
**presentation** 30:14 122:20 150:13
**presented** 30:22 31:3
**presenting** 77:14
**presently** 15:16 16:21 156:25 160:23
**presentment** 36:8
**preservation** 94:11
**preserve** 80:1 91:20 94:20 137:17
**preserves** 80:5
**presided** 156:3
**president** 22:15 99:11 108:1,15 109:4,16 110:1 111:14 112:12 113:10,10
**presidents** 98:2
**press** 10:23 70:15
**presume** 151:2,4 151:8
**presumption** 151:2
**pretty** 11:7 118:14 123:12 124:19 128:23,23 135:12 136:1 142:5 165:12
**prevail** 25:17 27:25 120:15
**prevents** 90:12
**previously** 15:12 102:12 104:6 125:5
**prices** 78:13
**primarily** 12:23 46:25 108:17 158:1 161:4
**primary** 12:12,21 12:22 13:18 22:1 138:13
**prime** 10:25 11:2 45:16 51:15 53:8 53:11,13,19,24,25
**principal** 13:12 130:17,17 141:18
**principally** 78:8 144:8
**principals** 98:1,1
**principles** 18:8,18
**prior** 21:9 22:24 53:15 70:1 72:2 89:2 90:7 101:21 103:9 143:13
**priorities** 18:12 164:17
**priority** 57:9,19 58:3,16 61:19 122:18 123:15 124:18 136:8,13 136:14 138:8 140:6,22
**privacy** 41:22
**private** 18:20 156:7
**probably** 9:10 18:14 63:5 68:16 73:14 121:11 123:15 152:11
**problem** 17:10 32:12,12 90:14
**problems** 32:11 166:15
**procedural** 34:1
**procedures** 34:21 34:22 35:2,3,8,11 35:16,19 41:15 51:10 72:1 76:2
**proceed** 9:6,14,16 32:16 49:21
**proceeding** 150:25 151:16,17 151:24 152:1,3 162:11

| | | | |
|---|---|---|---|
| **proceedings** 13:9 | 78:25 79:5,8,11 | **proposition** 92:2 | **purchase** 145:14 |
| 18:25 21:5 22:7 | 79:17 80:4,11 | **prospect** 154:2 | 145:20 |
| 23:15 26:5,7 | 81:8 82:7,22 83:1 | **protect** 91:23 | **purdue** 1:7 9:3,20 |
| 150:15 160:24 | 83:14 85:10 87:1 | 143:6 | 9:21,23 11:23 |
| 167:7 170:5 | 87:5 88:7 90:21 | **protected** 42:3 | 12:9,13 14:2,13 |
| **proceeds** 14:5,17 | 91:10 95:13,18,20 | 121:24 | 15:11 19:16,25 |
| 165:1 | 95:25 96:9 97:3 | **protection** 103:25 | 21:12 23:23,24 |
| **process** 14:15 | 97:13 99:12 | 147:6 | 24:1,3,17,24 25:1 |
| 23:25 78:2 79:24 | 132:20 149:7 | **protective** 29:1 | 25:3,6,7,12,15,20 |
| 101:2 112:8 | 169:7 | 30:6 | 25:25 26:2,5,20 |
| 113:25 126:19,21 | **progress** 20:5 | **protests** 48:25 | 27:9,12,16 28:8 |
| 130:6,10 131:9 | **progressing** 16:18 | **protocol** 54:3 | 28:10,12,19 29:12 |
| 137:4 139:16 | **prohibiting** 75:22 | **proud** 32:5 | 30:11,17,19,25 |
| 142:18 153:3,19 | **prohibitively** | **prove** 15:19 | 31:9,9 34:2 78:21 |
| 164:1 | 140:19 | **proverbial** 15:23 | 91:21 92:16 93:17 |
| **product** 58:16 | **prohibits** 24:5 | **provide** 11:3 19:3 | 94:1,6 96:16 |
| 78:14 108:21 | **projects** 29:19 | 39:22 47:8 57:3 | 100:14,18 101:3 |
| **production** | **promise** 91:19 | 72:8 75:13,20 | 101:16,23,24 |
| 142:16 | **promoting** 23:17 | 100:11 132:23 | 102:5,8,13,17,18 |
| **productive** 80:13 | 23:22 24:2 | 141:22 142:15 | 102:21 103:11,12 |
| **productively** 17:1 | **promotion** 24:7 | 147:20,22 148:7 | 103:18,19,21,22 |
| **products** 14:4 | **prong** 14:10 | **provided** 30:22 | 104:23 105:4,9,14 |
| 20:18 24:2,7 72:7 | **proof** 42:7 | 35:11 38:11 | 105:18,20 112:7 |
| 78:11,20,22,23,24 | **proofs** 51:15 | 122:21 | 113:11 115:5 |
| 89:21 108:11 | **proper** 105:6 | **providers** 75:14 | 116:11 153:13 |
| **professional** 27:1 | 124:15,21 150:2 | 75:22 76:3 | 156:20,24 164:21 |
| **professionals** | **properly** 129:8 | **provides** 97:25 | **purdue's** 12:16 |
| 12:21 16:21 17:2 | 131:2 | 136:15 | 14:3,8,10 20:4,25 |
| 21:24 28:7 29:17 | **property** 14:5 | **providing** 102:5 | 21:3 22:21 23:5,7 |
| 31:18 70:25 92:8 | 55:10,10 67:4 | **provision** 57:4 | 23:11 26:25 31:10 |
| **proffer** 99:9 100:3 | 69:17 | 135:11 | 31:14,17 93:24 |
| 105:22 106:6 | **proposals** 111:15 | **proxy** 118:17 | 102:23 |
| 107:11 | **propose** 32:14 | **public** 13:25 45:8 | **purported** 150:23 |
| **proffered** 127:11 | 35:15 75:13 79:13 | 47:9 53:11 161:12 | **purpose** 48:1 |
| **profitable** 80:13 | 90:22 97:12 99:9 | **publication** 41:18 | 100:11 143:2 |
| **program** 71:25 | 110:6 143:7 144:3 | **publicity** 93:15 | **purposes** 34:1 |
| 102:3,5 103:5 | **proposed** 34:5,13 | 100:17 | 86:4,5 151:12 |
| 111:9 114:12 | 72:12 76:6 81:18 | **publish** 42:1 | 154:8 |
| 136:7 160:17 | 90:25 91:13 92:3 | **published** 54:5 | **pursuant** 11:14 |
| **programs** 3:7 | 99:18 105:22 | **puerto** 14:23 | 38:1 70:20 79:24 |
| 24:9 69:17,18 | 107:25 160:16,20 | 55:12 | 91:7 |
| 75:6 77:15,19,21 | **proposing** 81:7 | **pull** 30:20 | **pursue** 161:18 |
| 77:23 78:1,4,19 | | | |

pursued 120:12
pursuing 24:24
  161:8
pursuit 162:1
push 31:11
pushed 123:5
put 11:2 28:5
  43:24 44:9 45:8
  47:10,17 48:18
  49:5 51:14,25
  54:13 60:2 65:19
  93:17 98:24
  114:23 123:6
  126:8 134:5,8
  145:4
puts 51:17 93:23
  127:9
putting 43:11
  49:1
puzzle 15:25

**q**

qualify 127:18
  153:11
qualitative 128:6
qualitatively
  93:23
quantum 117:6
quarropas 1:14
quarter 100:13
question 53:10
  55:23 79:14,19
  80:10,17 97:17
  116:22 126:17
  128:11 138:25
  148:19 153:8
questions 28:17
  32:13 33:2,2 34:5
  35:20 42:10 70:4
  71:5 72:13 79:12
  81:13 82:20,21
  90:21 97:12,14,21
  106:2,4,12 112:21
  113:4 145:9

148:14 155:1
  166:16
quicker 155:14
quickly 25:24
  141:16
quite 30:10,12
  68:19 93:22
  119:15 121:20
  134:2,4 160:12,13
  161:3
quo 137:18
quotidian 19:5
  159:19,20

**r**

r 1:22 4:1 9:1
  170:1
race 27:24
radically 27:23
rafael 12:10
ragged 23:1
raise 77:2 106:25
  166:15
raised 28:17
  29:11 53:10,18
  54:20 61:7,23
  87:16 132:14,25
  148:20,24 149:12
  153:25
range 63:21
  110:10,11,15,24
rationale 53:16
  128:14
raymond 5:9
rdd 1:3
reach 65:22 66:18
  82:22 138:22
reached 13:12
  96:4
reaction 122:13
  125:13 126:6
read 15:11 20:8
  39:20 74:3 84:19
  85:3 143:14

ready 9:6,8 32:10
  67:4 82:19 132:22
  146:12 149:1
  165:7,16 166:7
real 48:14 55:9
  66:24 78:17 106:3
  114:16 132:1
  137:21
reality 25:6
  158:20,20 165:22
realize 98:23
realized 91:20
really 20:21 27:21
  60:2 74:4 78:10
  80:20 112:3
  118:16 119:15
  122:23 127:9
  131:10,19,22
  132:3 133:17
  136:10 141:11
  150:17 151:7,8
  166:17
realm 45:9
reason 47:8 49:10
  105:12 119:24
  128:9
reasonable 137:5
  139:10 147:24
  166:21
reasonably 38:20
  39:16 136:24
reasons 75:5
  150:3 154:25
rebate 85:11
rebates 78:13
  81:20 87:2 88:5
recall 108:9
  109:25 110:14
receivable 78:16
receive 101:19
  103:6,8 107:25
  137:6 143:8

received 34:4,24
  35:18 70:3 76:5
  81:12 102:10
  106:17 116:22
  144:7 152:6
receiving 115:17
  115:22,23 123:16
  126:23 139:13
  144:3
recipient 130:12
recitation 83:13
recognize 18:24
recognized 157:8
  158:3
recommend
  111:13 157:4
record 9:19 39:21
  47:9 49:5 57:16
  61:2 65:8 70:12
  71:19,19 77:12
  82:25 107:4
  114:24,25 115:14
  126:8 129:17
  133:22 135:23
  137:2 139:7,15
  147:15 162:21
  170:4
recounting 30:24
recoupment 85:22
  89:25 90:2,3,4,5,6
  90:13,14
recover 28:1
  59:22
recoveries 26:17
  28:14 91:22
redact 41:14
redacted 47:8
redaction 42:25
redirect 112:24
  112:25
reduce 117:11
reduced 92:19

reducing 80:8
reduction 92:20
reductions 92:21
  94:4,5
reference 54:5,25
  55:1 106:19 156:9
referenced 24:3
  155:24 156:19
references 40:8
  76:22
referred 64:16
  125:17 151:18
  154:13
referring 9:23
refined 31:3
reflected 40:7
reflective 158:19
  158:19
reflects 36:8,11
refuge 24:18
refuse 131:2
refused 93:6
refusing 75:23
regard 59:20,24
  113:5 158:6,10
regarding 10:13
  29:12 34:6 155:7
regardless 19:17
register 53:12
regular 145:14
  152:20
regulated 19:25
  58:18 80:21
  141:11
regulation 53:2
regulators 58:14
regulatory 55:11
  56:9 108:1,3,10
  141:13,14 158:5
rehabilitation
  22:9
reimburse 105:10
  131:2

reimbursement
  97:19 105:17
  125:18,22 126:17
  127:19
reimbursing
  130:24
rejection 147:5
related 19:8 22:6
  22:20 28:21 53:10
  78:3 79:19 93:3
  108:11 112:1
  142:17 146:10
  165:15,19
relating 19:8
  48:14
relationship
  89:18,25 165:9
relationships 31:8
  79:6 80:13 81:6
  84:1,16,21 93:11
relative 141:1
relatively 164:10
  164:11
release 10:23
relentlessly 25:10
relevant 10:8
  17:17 20:16 30:8
  56:11 79:9 101:7
  115:16 117:19
  131:11 143:12
reliance 166:25
relief 17:3 19:7
  32:15 34:6,7
  35:15 37:3 41:5
  41:24 44:2 46:24
  53:15 55:18 61:8
  64:7,14,22 71:3
  71:12 72:3,13
  75:2,5 77:22
  81:23 82:6,25
  86:20,20,24 97:24
  113:16 120:20
  133:10 136:25

137:13,14,25
138:3,24 140:15
148:22 153:13
relies 94:22
relieve 54:23
relieved 84:9
relieves 44:16
  53:1
relinquishing
  14:12
reluctant 86:24
rely 125:21
relying 126:20
remain 15:22
  18:23 29:4 31:10
  94:7 102:20
  104:21
remaining 23:5
remains 81:7
remark 68:15
remarks 62:22
  63:6 154:14 164:9
remedy 147:4
remember 31:22
remit 55:14 56:4
remitted 56:11
remove 144:5
renew 71:25
renewal 69:18
renown 157:9
reorganization
  13:8 161:1
repeat 126:15
repeatedly 24:25
replace 72:9
  92:13 140:20
replacement
  93:12
reply 35:15
  145:10
report 56:2 102:1
  103:14 108:2,12
  109:5,21,24

138:18
reports 30:4
  108:13,24 109:6,9
  109:11,13
represent 16:9
  21:11 68:4 151:16
  162:24
representation
  125:21
representations
  159:9
representative
  16:20 62:24 68:23
  150:7 151:3,5
  152:5 153:14
representatives
  24:1,8 68:18,25
  154:15
represented 21:11
  126:20 148:22
representing
  62:13 156:13
request 24:12
  31:23 34:7 35:14
  37:3 42:6 58:21
  70:5 71:5 130:21
  135:25 136:25
  137:14 140:16
  152:3,6
requested 11:14
  17:3 33:25 34:6,7
  83:12
requests 30:22
  35:5 43:1,1 76:2
  93:3 130:19
  142:19 151:21
require 37:17
  69:16,22 72:4
  141:13 143:10
required 54:22
  70:21 132:18
  164:17

**requirement**
105:17 147:2
**requirements**
131:12 139:12
**requires** 93:11
94:10 134:14
**requiring** 105:9
105:14
**rescue** 18:4
**research** 92:6
94:13,14 108:4
**reservation**
148:18
**reservations**
137:12
**reserve** 50:19
64:18 65:18 73:10
73:15,19 81:25
**reserved** 33:6
73:16
**reserving** 64:17
**reside** 157:1
**resides** 94:22
**resignation** 21:7
**resolution** 19:13
25:9,18 32:4
37:10 63:18
154:21 155:13
160:16
**resolutions** 31:25
**resolve** 13:18
28:12
**resolved** 32:7
48:12 99:8 159:12
159:12,14
**resolves** 17:24
**resolving** 13:13
76:2,3
**resort** 147:11
**resources** 27:10
92:7 109:14 112:2
143:6

**respect** 23:16 29:9
29:13 39:19,21
56:22 64:24 65:23
75:5 86:10 97:23
99:6 100:9 102:3
103:5,16 113:15
115:12,19 116:4
126:5 132:16,20
132:25 141:24
159:23
**respected** 130:15
**respectfully** 34:7
70:5 71:5 76:7
**respects** 17:21
**respond** 121:17
148:23 159:7
**responding** 93:2
**responds** 124:23
**response** 30:21
55:23 130:1
**responsibilities**
31:19 158:3
**responsibility**
157:25 158:8
**responsible** 26:2
101:15 108:10,17
108:22 109:20
130:13
**responsibly** 121:2
121:3
**rest** 36:20
**restructuring**
21:17
**restructurings**
21:18
**result** 26:5 79:8
163:19
**resulted** 19:22
**resulting** 69:19
92:14
**results** 96:15
**retain** 100:13

**retained** 11:23
16:20
**retention** 53:8,14
53:19,24 54:22
94:3 95:9,25
96:17 99:4 100:9
100:11 101:4,14
101:20 107:24
109:16 111:9,12
111:18,21 112:10
112:11 113:16,19
114:3 124:16,20
126:5 136:5
**revenue** 79:9
**revenues** 14:4
**review** 81:25 82:5
111:22,23 123:20
125:3,6
**reviewed** 31:12
32:23 34:11,13
35:24 41:2 140:16
148:19
**reviewing** 10:7
**reviews** 111:24
**revised** 39:22
96:25 139:19
**revision** 144:12
**rhodes** 78:22
92:19 96:16
109:22 110:1
115:6
**rice** 156:5
**rico** 14:23 55:12
**rifkin** 10:10
**right** 13:21 15:10
19:3 26:20 30:7
33:6 34:10 35:24
39:3,13 40:20
41:2 42:13 43:17
43:21 44:7,11
45:1,7,10 46:5,7,9
47:18 50:17 60:24
65:8 68:6 69:12

71:8 72:19 74:23
75:10 81:9,14,19
81:21 82:3,16,24
85:8,22,23 86:17
87:7,24,25 88:24
90:24 99:22 100:2
100:23 106:14,25
107:1 109:8
112:21 115:25
118:12 124:11
126:25 127:4
128:1,13 129:12
129:20,23 131:7
132:7,13 135:24
143:19 144:18
146:14 148:12
149:13,15,18
152:17 166:23
**rights** 14:5 64:17
64:18 65:19 69:7
73:11,16,16,19,24
74:14 81:25 139:4
**rigorous** 113:25
**rise** 57:23 62:9
81:16 138:20
154:25
**risk** 94:13 102:20
102:25 114:16
140:20 145:22
**risks** 27:23 100:18
133:13
**road** 90:10 154:22
154:24 166:4
170:23
**roads** 109:15
**robert** 1:23 7:14
21:15
**robertson** 4:8
12:2 33:14,17,18
34:16,18 35:18
36:4,19 37:15,22
37:24 38:15,22,25
39:4,13,16 40:19

40:24 41:6 46:7
46:10,24 47:15,19
48:8 49:17,20,23
50:13,17,24 51:4
51:6,10,12 52:6
52:15 53:3,5
54:11,17 55:5
57:10 61:17,22
69:9,10,13 70:17
71:13 75:4
**robin** 134:3
**robust** 155:3
**role** 100:21 101:6
108:1,16 151:10
153:23 155:21
**roster** 92:4
**roughly** 61:3
117:9 136:3
**round** 134:2
**routinely** 152:13
**row** 161:17 162:6
**roxana** 12:16
**rpharma** 109:17
**rsa** 66:18
**rudnick** 5:1 62:12
86:8
**rule** 11:14 35:5
70:20
**ruled** 50:4 120:25
122:10
**rules** 44:4 45:18
**rulings** 166:25
168:11
**run** 23:1 80:4
138:1
**runaway** 25:19
**running** 141:9
**runs** 25:3

**s**

**s** 4:1,7,12 9:1
21:15 108:20
168:3,3,3

**sackler** 5:9 14:11
21:6,11 28:20
29:9 31:9 62:20
95:4,6 105:20
116:20 125:19
162:2
**sacklers** 14:14
132:18 135:20,21
142:10 156:20,24
**safe** 10:18
**safety** 20:4 143:23
158:4
**salaries** 91:8
110:10,11 123:18
**salary** 109:1
110:14
**sales** 14:15 23:25
24:1,7 78:7,10
92:5 108:15
109:16
**sanctioned** 90:16
**sanctions** 24:15
**santa** 16:25 62:17
62:18
**satisfy** 57:14
77:24 131:12
140:11
**saved** 18:6 150:12
**saw** 147:19
**saying** 49:4 59:19
60:21 65:13 73:15
84:9,25 106:7
128:7 138:11
**says** 36:10 42:14
73:21 88:15 89:2
137:17
**scarcely** 28:10
**scared** 104:25
**schedule** 20:2
37:11 43:25 57:11
166:21
**scheduled** 11:18
101:19 103:8

**schedules** 3:1
46:12,21 70:19,22
71:1 169:1
**scheme** 61:19
136:13,14 138:9
**schnitzler** 12:10
**schwartzberg**
8:14 10:11 39:8,8
40:5,6 42:17,20
42:22,25 43:21
44:7,12,21,24
45:2,5,8,11 47:3
47:16 48:4,7 49:4
50:1,8,25 51:19
51:22 53:20,21,22
56:18 65:5,5
67:16 96:6 99:15
106:1,1,6,12,16
106:24 107:8,19
107:20,21,22
111:3,5 121:10
122:5,7,9,14
123:3,5 124:1,7
124:12 126:6
133:1,18 144:10
144:15,17 145:9
147:14,15,19
148:6,11 167:1,5
168:5
**schwartzberg's**
34:25
**scientific** 94:12
**scope** 23:20
127:24
**scott** 51:24
**scramble** 26:14
**sealing** 43:1
**seasonal** 15:4
**seated** 9:2
**second** 18:10
24:21 38:20 39:16
45:14 46:6 58:6
79:19 87:23

101:21 103:9
105:9 113:17,22
115:1,8,24 127:9
155:21
**secondly** 138:17
**section** 40:1 53:8
70:20 133:20
136:8 138:2,14
151:7,15 153:14
**secure** 26:17
141:4 142:3
**secured** 11:10
13:4 137:21 140:5
**securing** 93:12
**security** 10:17
20:4 51:17 109:4
141:23,25
**see** 11:22 25:9
64:9 69:3 133:17
140:14 144:15
149:2 159:22
**seeing** 12:4
**seek** 38:2 71:24
75:19 77:22 91:7
115:10 116:20
120:20 138:24
154:21
**seeking** 24:4
26:16 32:15 36:22
41:11 43:24 56:7
56:8,15 57:12
67:4 76:1 77:17
95:7,11 96:21
99:21 114:11
115:2 117:2,20
119:24 120:4
140:3,4,10,10
142:12,23 155:13
**seeks** 41:17 82:6
**seen** 19:6 152:13
**segway** 24:21
**seibel's** 76:12

**self** 36:5,20
140:23
**sell** 58:15 72:6
78:21,22,24
**send** 88:7
**senior** 21:23
22:13 99:11
113:10
**sense** 37:21 58:17
64:20 66:11 67:7
67:7 80:24 148:21
151:6
**sensibly** 165:9
**sensitive** 41:22,23
46:18,19
**sentence** 35:7
88:15,16 89:2
90:6,7,11
**sentiment** 63:19
**separate** 25:25
41:13 44:23 51:9
69:5 80:17 115:9
118:19
**separated** 123:6
**separately** 78:21
132:6 159:12,13
**september** 1:17
31:1 170:17
**series** 78:12
**serious** 28:18
86:15 121:20
135:13 164:1
**seriously** 29:11
130:7,9 134:6
**seriousness** 31:17
**serve** 17:7 22:17
164:13
**served** 11:5 21:20
22:9 130:24
**service** 35:4,5
36:10,14 41:15
98:2,3,5 145:14

**services** 75:16,23
93:12 140:21
141:4,9 142:15,22
143:11
**serving** 22:1,14
**set** 58:22 78:15
85:7,12,17,20,23
86:5 88:13,14
89:6 90:6,8,14
101:22 103:10
139:7
**setoffs** 77:23 87:2
**setting** 95:17
**settle** 28:8 29:5
**settled** 15:12
**settlement** 13:13
13:17 14:20 16:1
16:19 17:15,23
19:9 25:13 27:22
28:24 62:20 63:2
65:23 91:14,15,19
92:3 155:12 157:4
158:11 160:20
**seven** 14:13 21:13
22:21
**severance** 95:9
96:17 97:4,23,25
97:25 98:4,7
**shape** 19:12 24:17
**share** 121:7
**shared** 139:17
**shareholder**
140:11,12
**shareholders** 30:1
**sharing** 145:1
149:14 158:23
163:20
**sharp** 164:10,11
**sharply** 164:11
**shaw** 6:8 59:3
**she'll** 40:20
**sheila** 3:25 170:3
170:14

**sherri** 3:25 170:3
170:9
**shielding** 25:15
**shire** 22:15
**shooting** 120:21
**short** 10:2 80:10
166:18
**shortage** 19:1
**shortened** 36:22
37:1,4,7
**shortening** 36:25
**shortly** 163:6
**show** 36:23,25
37:8,11 104:12
165:10
**shows** 38:9 70:13
**shut** 93:18
**shye** 45:15
**sic** 15:5
**side** 128:13,13
**sides** 19:2 165:20
**sight** 27:22
**sign** 67:14 96:19
96:21 97:3 99:5
99:13,18,20 102:3
102:4,5,10,17,18
102:19 103:1
105:15 110:3,20
110:23,25 111:9
111:19,23,25
112:1 115:13
122:25 123:11,17
123:23,24 124:2
124:17 125:6
135:15 136:7
**signal** 102:23
**significant** 83:1
123:18 135:25
138:21 145:12
155:14
**silence** 65:10,13
129:12 131:5

**similar** 25:4 35:25
36:1,9 82:18
124:15 126:6
148:18
**simple** 68:15
92:18 94:19 95:1
95:8 134:7
**simply** 28:5 61:11
79:7 81:2 83:13
93:22 95:14
138:11
**single** 13:16,19
27:10 32:7 124:2
150:23
**sir** 87:8 95:20
**sit** 113:7 149:16
**sitting** 88:3
107:12 134:11
**situation** 12:20
27:23 49:14 135:3
143:24
**six** 97:25 141:18
**size** 9:10 70:23
71:8 136:20
**sizing** 140:16
**skadden** 12:23
**skilled** 100:20
102:15
**skills** 94:9,11
100:22
**skip** 97:12 108:14
**small** 11:15 12:5
13:1 27:17 58:12
83:11 115:15
118:10 142:6
**smaller** 17:11
66:1
**smooth** 19:20
**smoothly** 163:12
**social** 51:17
**sofas** 70:19,22
71:1

soft 26:23
sole 140:17 144:6
solutions 170:22
solve 17:10 60:20
somebody 119:15
151:9
someone's 106:18
soon 12:2 24:13
24:13 28:4
sorry 35:9 38:22
49:20 56:7 81:11
84:14 90:3 97:18
98:18 108:19
109:3,10 114:18
115:20 118:3
sort 53:13 65:21
66:17 80:23,24
126:21 134:17
sorts 69:6
sought 41:24 44:2
55:18 64:23 75:2
128:24 137:13,19
sounded 126:7
source 140:17,18
southern 1:2
11:12 153:24
speak 9:12 10:7
21:1 37:20 42:18
66:4 158:19
speaker 47:14
speakers 24:8
speaking 87:3
120:19 128:16
139:1 145:21
special 22:17,23
29:8,20 31:12,17
105:7 127:12
128:3,18 130:14
131:11,15 132:2
134:5,8,24 139:8
specialists 157:9
specialized 92:10

specific 94:9,11
specifically 22:5
62:17 73:17 152:1
154:16
specificity 88:2
specifics 110:22
159:7
specifying 144:1
speech 165:6
speed 12:7
spell 107:3
spend 93:12 143:3
spent 29:18
spoiler 19:3
spoke 10:12
124:16 147:15
spoken 137:15
163:8
square 5:3
stability 20:4
91:20
stack 133:13
stadler 6:22
staff 94:8,11
166:19
staffed 94:6
stage 63:12
161:14
stages 64:3 95:14
staggering 26:24
stake 13:3 18:1
stakeholders
17:17 18:21 19:17
28:15 29:1 79:10
92:15 94:23
116:23 144:22
156:8
stamps 83:2
stand 32:10 73:18
73:19 82:19
104:13 106:15
113:4 146:12
155:7 166:7

standard 46:11
54:20 55:4 69:1
74:1,8 127:14
133:9 142:20
143:9
standards 138:3
standing 19:15
59:24 73:15 89:8
95:21 122:15
165:15
standpoint 126:2
stands 13:7
stars 18:23
start 10:22 21:3
58:14 130:5
149:14 155:12
165:3
starters 166:6
starting 30:13,20
92:17
starts 82:10
state 5:17 6:9 7:1
9:11 14:21 15:24
26:7,7,8,12 41:4
56:3,3 59:4 68:5
69:19 72:3 88:7
93:16 133:22
139:4 156:7 160:7
162:23 164:10,11
164:12
state's 60:14
62:15,24
stated 79:7 150:3
statement 156:10
statements 25:5
35:14
states 1:1 6:10 8:9
11:13 14:24 15:13
15:15,22 16:22
17:5 18:2,9 26:6,9
26:15 30:16 38:11
56:20 59:5,7
62:24 96:4,11

150:17 151:1
152:10 153:2
154:16 156:13,15
156:23 157:10
158:1,2,3 161:5,5
162:8 163:15,16
163:17,23
stating 93:17
statistics 92:18
149:1
status 101:8
137:18
statute 60:10
61:11 151:7
stay 19:15 70:11
74:17,24 77:22
85:22 86:24 90:4
118:17,21 119:4
119:13,14,23
120:8,11,14,17,17
120:20,21 138:22
138:24 139:2
140:25 143:21
159:10
stayed 120:3
staying 100:18
120:6,16
stays 139:20
steadfast 155:8
step 16:18 68:9
78:10 113:2
126:21 127:2
164:6
steve 21:15
stipulate 130:23
stock 102:11,11
stodola 5:13
stool 131:10
stop 95:6 146:5,12
155:15
storage 141:22
straddle 118:8

strain 93:23
strategic 101:16
  101:23 103:11
strategy 101:17
  101:17
strauss 98:10
street 1:14 6:11
  6:18 7:3,18 8:11
stretching 30:3
stricken 54:9
strong 23:3
  102:23 165:21
strongly 19:2
  31:25
structure 13:23
  16:1,19 20:18
  62:6 64:1 91:13
study 142:16
sub 110:20
subcommittees
  62:2
subject 23:15
  24:14,20 36:13
  51:7 96:23 115:9
  119:23 126:4
  140:6,24 150:20
  160:23
subjects 19:12
submission 36:7
submit 37:21
  117:19
submitted 20:9
subscribe 63:19
  64:11
subsequent 64:16
subsidiaries 9:21
  38:4 108:9
substance 20:5
  94:13
substances 142:4
substantial 62:25
  93:12 124:20

substantive 64:19
subsumed 87:13
subtle 49:13
success 13:8 21:4
  92:12
successful 21:18
sue 26:20
sued 118:15,18,21
  164:23
sufficient 47:10
  116:25
sufficiently 89:1
  138:20
suggestion 63:14
  65:20
suing 26:19
suitable 13:22
suite 5:19 6:19
  7:11 8:4,11
  170:24
summary 84:7
sums 81:17
sunday 60:8
sunedison 22:10
super 67:1
supermarket 83:3
supersedes 44:20
supervision 29:20
supplier 84:4,5,13
suppliers 93:8
  140:17,18,19,24
supply 141:8,13
  141:21 143:10
support 14:20
  16:4 17:14 25:12
  32:21 35:14 59:8
  62:19 63:1 67:3
  68:7 99:12 161:17
supported 58:23
  154:20
supporter 16:17
supporters
  161:18

supporting 15:13
  16:19 17:11,14,23
  61:24,25 65:25
  67:12
supportive 155:11
supports 59:13
suppose 106:20
supposed 52:8
suppress 42:6,14
  43:17 44:17 45:20
  51:16 53:4
suppressed 47:11
  51:20
suppression 51:8
supreme 26:8,10
  120:25
sure 9:17 32:18
  32:19 38:14 40:20
  42:19 50:3 51:7
  53:14 57:4 58:20
  59:17 60:23 67:16
  67:17,25 68:11
  76:25 80:9,19
  83:7,18 84:3
  107:5 110:5 111:4
  114:25 115:21
  117:14 121:14,15
  125:2 126:21
  147:17,23,24
  148:5,25 149:17
  162:18 165:15
surety 3:3 71:15
  71:21,25 72:5,9
  73:24 169:3
surprise 26:22
surrounding
  46:17 63:17 125:4
  125:23 163:24
suspected 130:25
suspenders 53:13
svp 108:8
swap 141:15

swear 113:6
  118:20 132:17
swiftly 20:16
switch 27:20
sworn 107:2
synthesize 65:21
synthetic 66:12
system 11:1,2
  18:9 38:3,7,10
  94:14

t

t 168:3 170:1,1
tabbed 20:10
table 157:13
taggert 90:15
tainted 127:22
take 9:6 18:16
  24:4 29:10 31:18
  37:13 63:18 64:19
  79:24 86:11,21,23
  106:15 125:15
  128:18 130:8
  132:21 133:25
  134:20 136:24
  144:4 147:9
taken 9:7 29:10
  111:15
takes 90:1 99:3
  130:7 133:3
  139:24
talent 94:7 100:15
talented 91:25
talk 30:7 54:6
  62:3 65:12 67:5
  119:8 127:2
  157:20 160:12,12
  165:9 166:6
talked 119:11
  155:24 157:21
  158:21
talking 40:22 44:8
  50:8,25 87:24
  112:13 123:7,8,16

157:23
**talks** 119:12
    156:21
**tally** 15:23
**target** 104:3
**targeted** 46:25
**targets** 95:17
**tax** 56:1,4 57:15
    80:24
**taxes** 2:22 55:7,9
    55:9,10,10,11,11
    55:12,13,14,15,17
    55:21,24 56:8,11
    56:23,24,25 57:6
    58:3 59:10,13
    60:16,17,18,19
    168:23
**team** 16:7 29:23
    159:17
**technical** 92:10
**technically** 15:3
**techniques** 26:16
**technology**
    109:15
**telephonic** 8:7
**tell** 80:15 82:11
    87:6,9 165:4
**telling** 121:23
**ten** 60:16
**tendered** 28:8
**tennessee** 6:17
    16:23
**tens** 11:10
**tent** 17:19 67:6
    163:11
**term** 96:15 101:13
    101:15 147:25
**terminate** 31:13
    93:10
**terminated** 98:7
**terminating** 70:11
**terms** 39:25 63:14
    65:10 89:25 126:1

128:12 143:11
    144:2 150:2
    161:25 163:19
**terrific** 9:15
**terrified** 104:2
**terrifying** 104:7
**territories** 14:22
    15:1 62:25 154:17
**territory** 15:24
**testify** 23:2 100:7
    100:8,19 101:1,5
    101:9,12,18 102:4
    102:9,14,19 103:2
    103:7,18,22 104:1
    104:5,12,20,23
    105:4,18 128:25
**testimony** 99:10
    100:3 105:23
    107:11,13 115:14
    123:24 127:11
    137:24 138:10
**texas** 16:23
**thank** 10:4,16
    33:13 34:16 37:22
    41:6 49:17 51:22
    53:3,5,21 54:11
    55:5 60:22,25
    61:17,22 65:4
    69:9 70:17 71:13
    75:3,7 77:6 82:14
    83:9 85:5 89:7
    90:20 91:1 96:5
    107:20 111:3,6
    113:8 130:3
    139:21 150:5
    154:6,11 155:20
    157:14 159:25
    160:1 162:12,13
    163:12 166:9
    167:6
**thanks** 9:24 10:10
    144:17

**themes** 24:25 25:1
**thick** 166:14
**thing** 11:20 14:25
    31:21 32:7 58:6
    64:5 68:16 84:24
    97:20 119:11
    134:3 142:8
    162:21
**things** 11:1 20:2
    20:10 22:7 28:18
    30:24 32:9 44:5
    48:15 49:14 51:14
    58:8,13,15 74:6
    95:3 103:1 130:4
    133:2,17 135:15
    135:15 140:9
    155:13 158:12
    159:12 164:20
    165:11,14,19
    166:5
**think** 10:22 11:8
    15:9 36:5,20,25
    43:24 44:3 45:11
    46:10 47:10 48:12
    48:19 50:10,13,17
    51:2 52:14,25,25
    54:2 61:9 63:8
    64:20 66:7,8,22
    67:14 74:13 76:8
    81:1,23 83:21
    84:25 85:15 86:10
    87:12 88:1,25
    90:10,11 96:19
    106:8 110:11
    115:13 118:8
    119:1,4,10 121:20
    121:25 124:8
    125:7,13,19 126:3
    126:8 127:8 128:2
    128:3,16,19,21
    129:11,16 130:14
    130:22 132:1
    134:3,6,7 135:3,4

135:5,7,7 137:17
    138:19 139:20
    144:9,16 145:1,4
    149:2,12,19
    150:14 151:25
    153:9 158:11,13
    159:2,21 161:16
    163:16,20,22
    165:23 166:15
**thinking** 63:15
    151:17
**thinks** 32:12
    73:18
**third** 16:11 28:16
    39:19 77:25 95:11
    105:14 140:7
    156:17
**thomas** 5:18
**thorny** 160:18
    164:3
**thought** 11:6,21
    37:10 54:15 60:1
    62:8 65:1 99:13
    104:7 114:19
    139:16
**thoughtfully**
    166:15
**thousands** 18:5
    20:3
**threaten** 140:23
**threatened** 93:10
**threats** 48:21
**three** 11:10 12:21
    13:18 16:4 20:23
    21:14 22:8 23:5
    38:12 40:8 78:8
    98:4,20 121:3,12
    122:4,8 129:25
    131:10 134:11
    157:10
**throw** 122:23
**tied** 80:22

**tier** 92:23
**till** 60:3 123:18
  124:13,20 149:15
  152:15 164:2
**tim** 11:25 12:10
**time** 10:6,19 11:9
  23:24 30:7 36:24
  37:5,9 50:13,18
  62:9 64:9 65:3
  81:5,5 91:25
  92:25 93:1,12
  100:14 105:1
  106:4 119:13
  121:25 132:21
  147:22,24
**times** 5:3 10:12
  29:21 68:19
**timing** 113:21
  166:21
**timothy** 4:11
  150:10
**tiny** 12:4 163:13
**title** 106:21,22
  108:7,9 109:24,25
  113:9
**tobak** 12:1
**today** 10:20 11:25
  12:5,9,13 17:3
  19:18,19 20:21
  21:15 23:19 24:1
  24:22 25:24 40:22
  43:6,11 44:19
  59:3 62:10 63:9
  64:6 66:8,25
  67:17 95:7 96:13
  107:12 113:16
  119:22 123:2,3,7
  133:4,4 139:7
  147:20 150:15
  156:4 158:12,21
  159:5,7 160:14
  163:2,8,11 165:18
  165:24 166:25

**today's** 19:4,4,7
  23:20 64:6 154:8
**todd** 5:23 68:2
**told** 15:8 36:17
  131:20 134:19
**toll** 11:3
**top** 11:6,10 14:12
  14:17 41:12 89:18
  92:23 109:3 141:7
  164:22
**topics** 17:2 20:16
**topping** 27:1
**tort** 18:15 44:9
  132:7 157:9
**total** 75:15 103:8
  115:6,17
**totality** 22:22
  111:1
**touchstones**
  164:15
**towns** 16:10 18:2
  156:12
**track** 36:6 76:17
**tracked** 76:10
**tracks** 16:13
  54:20
**trade** 13:5 140:6
  140:22 143:11
  144:5 148:21
  149:2,3
**tragedy** 28:13
**transactions**
  22:18 28:20 30:1
  125:8
**transcribed** 3:25
**transcript** 170:4
**transcriptionist**
  170:9,14
**transfer** 14:8
  25:13 26:11
**transferred** 13:22

**transfers** 28:19
  29:25 30:24 78:3
**transition** 19:20
**transparency**
  30:11
**transported**
  122:21
**treatment** 18:13
  155:14 161:14
  164:18
**tremendous** 92:25
  93:23 102:25
**treyburn** 96:17
**trial** 26:7 27:11
  27:14 141:23
  150:25
**trials** 28:1
**tribal** 26:10,12
**tribes** 16:10 26:15
  63:1 156:16
**tried** 117:7
**tries** 146:12
**triple** 123:17
**troop** 6:14 58:25
  59:2,2,7,16,19
  60:15,17,22,25
  126:13,13 127:1,8
  128:2,6,20 129:3
  129:5,10,15,18,21
  130:21 157:15
  160:2
**trouble** 100:20
**true** 32:6 72:24
  96:20 131:24
  170:4
**truly** 83:4 90:4
**trust** 13:22 56:23
  56:25 57:6,24
  91:17
**trustee** 8:9,10
  11:5 17:5,8,10
  34:23 35:13 38:11
  39:25 41:3 43:3

**trustee's** 10:11
  39:9 53:23 65:6
  65:24 67:18 96:5
  96:11 97:1 99:7
  106:2 107:23
  125:11 132:15
  133:1,3 136:21
  144:8
**trustees** 13:23
**truth** 106:9
**try** 32:11 114:20
  142:20 148:20
  163:11 165:11,14
**trying** 58:11
  63:10 68:7 95:13
  121:6 122:12
  127:21 128:21
  143:23 166:2
**tuesday** 123:22
**turn** 20:23 32:14
  35:9 71:14 77:8
  79:23 90:22 137:3
**turnaron** 23:6
**turned** 127:7
**turning** 31:21
  32:20 33:9 46:7
  69:11 70:18
  109:15 110:3
**turns** 131:17
**twice** 150:14
**two** 14:10 18:8,18
  24:11,22 32:22
  35:1 43:1 44:2
  47:21 51:14 54:19
  61:3,24 67:10
  75:16 79:16 83:12
  86:19 95:7 98:4

53:18 55:23 56:20
64:10 65:11 66:12
66:20 122:3
126:16 137:15
148:8 151:10,12
152:10

98:20 121:3
122:21 126:21
127:2 133:17
136:1 137:11
141:15 156:4
164:15
**type** 43:10
**types** 24:18 64:22
94:16 136:23
149:20
**typical** 19:6 48:13
125:9 152:12
**typically** 112:1,2
122:16
**typos** 20:11

**u**

**u.k.** 151:24
**u.s.** 1:13,24 8:10
10:11,16 11:5,11
14:22,24 15:1
17:8,9 18:15
22:11 34:23 35:13
39:9,25 41:3 43:2
53:18,23 55:23
64:10 65:6,11,23
66:12 67:18 97:1
99:7 106:2 107:23
122:3 125:11
126:16 132:15
133:1,3 136:21
137:15 142:10
144:8 146:24
151:23
**ucc** 17:13 67:11
**uh** 145:24 146:4
**ultimate** 13:11
78:14 91:22
163:24
**ultimately** 14:10
17:23 27:11 28:23
28:24 63:19,23
66:5,11 111:15
112:18 160:18,25

164:24
**unable** 103:21
**unanimous** 16:1
**unavoidable** 27:3
31:25
**uncertainty** 104:2
119:25 125:23
**unchanged** 81:7
**unchartered**
18:17
**underlies** 92:3
**underlying** 37:3
53:24
**undermine** 94:24
**underscore**
125:20
**understand** 28:17
28:23 31:20 45:21
74:22 82:3,20
84:22,25 87:18
107:12,14 108:19
124:2,4 126:19
127:10 129:17
132:10,21,22
134:7 136:21
147:3 153:7 165:5
166:1
**understanding**
53:17 57:3 106:18
112:14 143:20
**understands**
67:17 101:12
106:11 135:8
146:11 159:8
**understood** 28:25
28:25 85:25 88:17
164:9 165:4
**undertaking**
155:9
**undertook** 113:25
**underway** 31:8
**undoubtedly**
23:15

**unduly** 29:3 90:11
**uneasiness** 94:1
**unfortunate**
113:21
**unfortunately**
19:10
**unidentified**
47:14 106:22
109:9 113:3 154:9
**unified** 162:10
**unintended** 20:12
**uninteresting**
19:5
**unique** 14:6 119:1
119:19 158:3
**unit** 160:22
**united** 1:1 8:9
17:5 18:9 26:6,9
38:11 56:20 96:4
96:11 150:17
151:1 152:10
153:2 155:8
156:13,14,23
157:9
**unities** 3:5 169:5
**unlawful** 105:13
134:25
**unliquidated**
20:19
**unmoving** 18:23
**unofficial** 65:24
**unopposed** 71:4
**unpaid** 61:3
102:20 136:8
**unplanned** 94:5
**unprecedented**
26:14 93:15
103:24
**unsecured** 11:6
13:4 160:21
**unsigned** 127:7
**unspecified** 7:9

**unsustainable**
25:18
**unusual** 18:18
26:16 128:19
137:2
**upper** 21:17
**urge** 61:25 153:16
**use** 32:8 38:2
46:13 55:9 66:14
67:4,9 142:18,20
143:17
**useful** 114:24
**user** 89:17
**users** 80:14,21
88:5
**uses** 11:8
**usually** 90:15
123:9
**utah** 16:23
**utilities** 75:8 77:2
**utility** 75:14,16,20
75:22 76:3
**utilizes** 89:19
**uzzi** 5:14

**v**

**validate** 18:21
**validly** 134:4
**valuable** 94:9
**valuation** 29:25
**value** 13:15 18:3
18:10,11,18 19:21
25:9,10 27:18
79:23 80:2,5,8
91:16,20,23 92:2
92:14 94:20,21,24
133:13 137:6,9,20
158:18 164:15
**valve** 143:23
**vargas** 1:25
**varick** 8:11
**varied** 26:16
**varies** 136:12

**variety** 28:18
  59:21 64:11 93:8
  158:6
**various** 19:12
  24:6 29:11 30:14
  68:16 69:16 72:3
  82:7 155:4 156:7
**vast** 66:22 78:7
  117:1 133:2
**vendor** 3:11 140:7
  140:15 141:2,12
  142:19 143:8,9,13
  143:25 144:3
  146:2 147:11
  169:11
**vendors** 77:25
  93:8 139:25 140:4
  140:4 141:15,17
  141:18,21,23,23
  141:24,25 142:5,6
  142:14,24 143:1,5
  144:4 145:12,19
  147:21 150:1
**veritext** 170:22
**version** 165:5
**versus** 164:10,12
**vested** 29:14
  102:11,11 112:5
  130:18
**veterans** 88:7
**vetted** 53:9
**vice** 97:25 98:1,2
  99:11 107:25
  108:15 109:4,16
  113:10
**view** 37:20 57:2
  67:6 73:23 97:13
  121:7 131:9
  136:25 137:22
  147:10 149:20
**views** 15:18 19:2
  67:8 155:7 161:25
  163:19 165:21

**vigorous** 161:8,8
**villages** 16:10
  156:13
**vince** 109:21
**vindicated** 27:11
**violate** 90:4
**violating** 70:10
  120:14,20
**violation** 69:19
**violative** 124:5
**virtually** 17:6
**vito** 10:5
**vocabulary**
  159:18
**vocal** 93:21
**voice** 66:24
  162:10,10
**voluminous** 23:14
**voluntarily** 24:14
  31:4
**voluntary** 2:8
**volvo** 132:11
**von** 8:3
**vonnegut** 4:10
  12:1 77:9,11,12
  80:3,9,19 81:1,11
  82:9,14,17 83:9
  83:20,25 84:3,18
  84:22 85:9,18,25
  86:25 87:8,11,15
  87:19 89:9 90:20
  91:1,4 95:20,24
  96:3 97:7,11,18
  97:22 98:11,15,21
  98:25 99:3 100:1
  100:4,6 112:23
  113:1,8,14 114:7
  114:9,19,22,23,25
  115:12,21,24
  116:1,4 117:14,17
  117:22,24 118:3
  118:23 119:1,6,17
  120:9,15,18,23

121:5,16,21
  125:15 129:13
  130:3 131:4,7,21
  131:24 132:4,8,13
  133:25 135:17
  139:21,24 143:16
  143:19,22 144:16
  144:19 145:3,6,8
  145:15,18,24
  146:4,6 147:10
  148:5,7,13,25
  149:6 150:5,11
**vote** 15:23
**voted** 157:4

| w |
|---|

**w** 107:5 168:3
**wage** 122:14,16
  123:16 126:7
**wages** 3:9 90:23
  91:6,8 95:8,12
  97:14 122:16,17
  123:9 125:9 136:8
  169:9
**wait** 123:18
  124:13,20 149:15
  164:2
**waiting** 165:8
**waives** 10:14
**walk** 38:13 80:23
**want** 33:6 36:23
  42:15 43:16 44:19
  45:23 46:1,2
  51:12 59:9,10
  60:22 63:16 65:9
  65:12,24 66:8
  67:9 69:4 72:20
  77:3 80:1 82:19
  87:20 88:14 90:9
  95:2 96:3 105:24
  106:11 110:9
  113:3,5 116:17
  117:9 125:15
  128:8 132:5,18,21

140:5 142:20
  146:22 151:13
  156:10 157:17
  160:9 161:4
**wanted** 49:9 65:8
  68:3,11 89:11
  133:21 134:15
  135:22 157:11
  162:3,20 163:1,3
  167:1
**wanting** 51:25
**wants** 32:24 40:5
  47:25 127:3 143:8
  148:3,4
**wardwell** 4:2 9:20
  33:18 71:20 77:12
  150:11
**warrant** 69:2
**warranted** 34:13
  71:11 132:2 138:3
**warrants** 154:3
**wary** 36:11
**washington** 5:20
**waste** 141:23,25
  142:3
**waters** 18:17
**wave** 93:15
**way** 19:9 24:17
  32:3,4 37:10
  49:13 52:10,12
  63:23 66:5 67:13
  69:3 74:21 80:5,7
  81:3 85:10 87:1,5
  88:3 90:10,16
  95:15,16 111:12
  122:20 135:9
  138:24 158:16
**ways** 47:24
  146:13 158:21
  166:1
**we've** 48:11,16
  49:9 56:21 81:12
  89:1 95:16 96:4

97:1 116:22
138:19 140:14
144:10 150:12
152:13 161:11
165:10
**website**   10:25
36:6
**weeds**   156:11
**week**   10:7 13:16
13:16 136:4
**weekend**   166:19
**weeks**   24:23 30:20
40:13 61:3 64:18
75:16 98:4,5,20
111:2 121:4
**wehner**   5:24 68:3
**weight**   93:4
**weighted**   75:17
**weighty**   31:19
**welcome**   30:8
74:7
**went**   68:15 112:19
147:21
**west**   6:11
**westchester**   7:17
72:18,21
**white**   1:15 10:20
29:18,25
**wholesaler**   80:14
89:16
**wholesalers**   78:8
83:12,23 85:12,20
87:4 88:4 89:10
89:19
**wide**   19:17 63:21
63:21 97:24
**willful**   54:1 55:3
**willing**   15:17 29:5
132:23
**willingness**   125:7
**wilmer**   12:24
**winthrop**   6:8 59:3

**wisconsin**   6:20
**wisdom**   22:13
**wise**   86:11
**wiseman**   45:15,15
45:18,22 46:4
**wish**   107:15,17
**withhold**   41:18
42:7
**withholding**
97:19
**withstanding**
136:14
**witness**   107:2,5
107:14,17 109:10
111:4,11,20,25
112:7,11 118:16
168:4
**witnesses**   116:10
116:15
**wonder**   9:6
**wondering**   152:13
**word**   10:21 66:14
67:9,19 108:19
125:16 127:20
148:1
**worded**   87:21
90:10
**words**   65:19
131:6 138:5
**work**   12:21 17:22
20:5 29:16 30:2
31:7 39:24 40:12
62:2 63:13 68:23
70:25 71:9 78:19
79:25 80:11 85:11
87:1 89:14 92:4
92:17 93:14
100:23 102:7,8,16
102:17 106:23
117:21 160:23
166:4,11,13,18
**workable**   64:1

**worked**   58:20
97:1 102:13
163:18 164:20
165:18
**working**   11:24
29:24 68:8 79:20
91:25 93:19 94:15
96:7 156:6 164:3
**works**   88:3
111:12
**world**   151:22
**worth**   75:16 91:21
122:25 141:25
153:8 158:14
**worthiness**
126:22
**worthwhile**   42:12
**wrath**   58:14
**written**   30:14
49:5
**wrong**   20:10
127:5,20 129:1
131:17 162:16
**wrongdoing**
130:25
**wrote**   36:10

|  **x**  |
| --- |

**x**   1:4,10 52:1 67:5
168:1,9
**xus**   14:15

|  **y**  |
| --- |

**yards**   5:10
**yeah**   40:24 42:20
42:22 47:15 51:11
65:17 87:19
110:13 129:7
146:6 148:2
**year**   14:13 21:16
26:13 27:1 30:25
31:5 95:19 98:3,5
104:11 108:18
113:20 116:18

**years**   18:8 22:5
24:11 60:16 79:18
80:7 89:24 92:17
93:25 95:25 98:2
98:3
**yesterday**   84:6
86:2 89:13 148:20
**york**   1:2,15 4:5,5
4:17,17 5:4,4,11
5:11 6:4,4,12,12
7:1,4,4,20,20 8:12
8:12 56:2,3 59:4
60:14 157:19
160:8
**you's**   10:4

|  **z**  |
| --- |

**zealously**   143:6