Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 19-23649-rdd

4   - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P., ET AL.

8

9            Debtors.

10   - - - - - - - - - - - - - - - x

11

12

13                  U.S. Bankruptcy Court

14                  300 Quarropas Street

15                  White Plains, New York 10601

16

17                  October 10, 2019

18                  10:06 AM

19

20

21

22   B E F O R E :

23   HON. ROBERT D. DRAIN

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  NAROTAM RAI

Page 2

1    HEARING Re Notice of Agenda for Second Day Hearing

2

3    HEARING Re Motion of Debtors for Entry of an Order

4    Authorizing (I) Debtors to (A) Pay Prepetition Wages,

5    Salaries, Employee Benefits and Other Compensation and (B)

6    Maintain Employee benefits Programs and Pay Related

7    Administrative Obligations, (II) Employees and Retirees to

8    Proceed with Outstanding Workers' Compensation Claims and

9    (III) Financial Institutions to Honor and Process Related

10   Checks and Transfers (ECF 6)

11

12   HEARING Re Object of UST (ECF 134)

13

14   HEARING Re Nevada Counties and Municipalities' Joinder to

15   the Objection of UST (ECF 190)

16

17   HEARING Re The Commonwealth of Pennsylvania's Joinder to the

18   Objection of the UST (ECF 190)

19

20   HEARING Re Joinder/Objection of the AdHoc Group of Non-

21   consent States (ECF 197)

22

23   HEARING Re Joinder of the State of Arizona to the Objection

24   of the UST (ECF 201)

25

1   HEARING Re Letter of Linda A. Lacewell, Superintendent of

2   New York State Department of Financial Service Re: Request

3   Payments to Purdue Pharma Employees (ECF 99)

4

5   HEARING Re Motion of Debtors for entry of Interim and Final

6   Orders Authorizing (I) Debtors to Pay Certain Prepetiion

7   Taxes, Governmental Assessments and Fees and (II) Financial

8   Institutions to Honor and Process Related Checks and

9   Transfers (ECF 8)

10

11   HEARING Re Motion of Debtors for Entry of Interim and Final

12   Orders Authorizing (I) the Debtors to Continue and Renew

13   Their Liability, Property, Casualty and Other Insurance

14   Policies and Honor all Obligations in Respect Thereof and

15   (II) Financial Institutions to Honor and Process Related

16   checks and Transfers (ECF 10)

17

18   HEARING Re Motion of Debtors for Entry of Interim and Final

19   Orders Authorizing the Debtors to Continue and Renew Surety

20   Bond Program (ECF 12)

21

22   HEARING Re Motion of Debtors for Entry of Interim and Final

23   Orders (I) prohibiting Utilities From Altering, Refusing or

24   Discontinuing Service, (II) Deeming Utilities Adequately

25   Assured of Future Performance and (III) Establishing

Page 4

1     Procedures for Determining Requests for Additional Adequate

2     Assurance (ECF 7)

3

4     HEARING Re Motion of Debtors for Entry of Interim and Final

5     Orders Authorizing (I) Debtors to Honor Prepetition

6     Obligations to Customers and Related Third Parties and to

7     Otherwise Continue Customer Programs (II) Relief from Stay

8     to Permit Setoff in Connection with the Customers and

9     Programs and (III) Financial Institutions to Honor and

10     Process Related Checks and Transfer (ECF 11)

11

12     HEARING Re Motion of Debtors for Entry of Interim and Final

13     Orders Authorizing (I) Payment of Certain Prepetition Claims

14     of Critical Vendors and (II) Financial Institutions to Honor

15     and Process Related Checks and Transfers (ECF 9)

16

17

18

19

20

21

22

23

24     Transcribed by:  Sheila Orms, Tracey Williams and Jamie

25     Gallagher

```
1    A P P E A R A N C E S :

2    DAVIS POLK & WARDWELL, LLP

3         Attorneys for Debtor

4         450 Lexington Avenue

5         New York, New York 10017

6

7    BY:  MARSHALL S. HUEBNER, ESQ.

8         CHRISTOPHER ROBERTSON, ESQ.

9         ELI J. VONNEGUT, ESQ.

10        JAMES I. MCCLAMMY, ESQ.

11

12   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

13        Attorneys for Ad Hoc Committee

14        1177 Avenue of the Americas

15        New York, New York 10036

16

17   BY:  KENNETH H. ECKSTEIN, ESQ.

18        RACHEL RINGER, ESQ.

19

20   MILBANK, LLP.

21        Attorneys for Raymond Sackler Family

22        55 Hudson Yards

23        New York, New York 10001

24

25   BY:  GERARD UZZI, ESQ.
```

Page 6

1    PILLSBURY WINTHROP SHAW PITTMAN, LLP

2         Attorneys for Attorney General for the State of NY & ad

3         hoc committee in formation of other states

4         31 West 52nd Street

5         New York, New York 10019

6

7    BY:  ANDREW M. TROOP, ESQ.

8

9    GODFREY KAHN

10        Attorneys for Tennessee & Arkansas Plaintiffs

11        One East Main Street

12        Suite 500

13        Madison, Wisconsin 53701

14

15   BY:  BRADY C. WILLIAMSON, ESQ.

16

17

18   OFFICE OF THE UNITED STATES TRUSTEE

19        Attorneys for U.S. Trustee

20        201 Varick Street, Suite 1006

21        New York, New York 10014

22

23   BY:  PAUL K. SCHWARTZBERG, ESQ.

24        BRIAN MASUMOTO, ESQ.

25

1   BAYARD LAW

2        Attorneys for Official Unsecured Creditors Committee

3

4   BY:  DANIEL N. BROGAN, ESQ.

5        JUSTIN R. ALBERTO, ESQ.

6

7   PILLSBURY WINTHROP SHAW PITTMAN LLP

8        Attorneys for the Ad Hoc Group of Non-Consenting States

9        31 West 52nd Street

10       New York, NY  10019-6131

11

12  BY:  ANDREW M. TROOP, ESQ.

13

14  AKIN GUMP STRAUSS HAUER & FELD, LLP

15       Attorneys for Unsecured Creditors Committee

16       One Bryant Park

17       New York, NY  10036-6745

18

19  BY:  IRA DIZINGOFF, ESQ.

20       ANK PRIS, ESQ.

21       MITCHELL HURLEY, ESQ.

22       EDAN LISOVICZ, ESQ.

23       SARA L. BRAUNER, ESQ.

24

25

Page 8

1   DEBEVOISE & PLIMPTON LLP

2        Attorneys for the Beacon Company

3

4   BY:  MAURA K. MONOGHAN, ESQ.

5

6   LUSKIN STERN & EISLER, LLP

7        Attorneys for Old Republic Insurance Company

8        Eleven Times Square

9        New York, NY  10036

10

11  BY:  MICHAEL LUSKIN, ESQ.

12

13  COMMONWEALTH OF PENNSYLVANIA

14        Attorneys for the Commonwealth of Pennsylvania

15        Financial Enforcement section

16        Strawberry Square

17        15th Floor

18        Harrisburg, PA  17120

19

20  BY:  MELISSA L. VAN ECK, ESQ.

21

22

23

24

25

Page 9

1    BROWN RUDNICK

2        Attorneys for the Ad Hoc Committee of Consenting

3        Claimants

4

5    BY:  DAVID MOLTON, ESQ.

6

7    VIA TELEPHONICALLY:

8    JEFFREY K. GARFINKLE, BUCHALTER, APC FOR MCKESSON

9    JENNIFER L. VANDERMEUSE, STATE OF WISCONSIN DEPARTMENT OF

10   JUSTICE

11   PETER C. D'APICE AND SANDER L. ESSERMAN, STUTZMAN BROMBERG

12   ESSERMAN & PLIFKA FOR CERTAIN NATIVE AMERICAN TRIBES AND

13   OTHERS

14

15

16

17

18

19

20

21

22

23

24

25

 1                        P R O C E E D I N G S

 2                  THE COURT:  Okay.  Good morning.  In Re Purdue

 3      Pharma L.P., et al.

 4                  MR. HUEBNER:  Good morning, Your Honor, may I

 5      proceed?

 6                  THE COURT:  Sure.

 7                  MR. HUEBNER:  May it please the Court, Your Honor,

 8      I am Marshall Huebner of Davis Polk & Wardwell LLP on behalf

 9      of the 24 Purdue debtors.

10                  Your Honor, as we promised you at the first day

11      hearing we would and will work around the clock whenever

12      possible to settle and progress things with actual and

13      potential objectors and stakeholders in advance of these

14      Chapter 11 cases.

15                  We will do so in service of our other pledge, to

16      do that work and service of Chapter 11's two core

17      objectives, maximization of value and appropriate

18      distribution of that value to stakeholders.

19                  For what it's worth, the last four weeks have been

20      just about the most demanding and unceasing of my career,

21      even taken into account the financial crisis.  Our calls and

22      interactions with various creditor constituencies day after

23      day often started at 7 a.m. and ended at or after 1 a.m.

24                  With that said, I'm happy to report that these

25      efforts of many parties are bearing important fruit.  Three

Page 11

1    days ago after a week of around the clock work, we reached

2    agreement on a summary term sheet with an ad hoc group of

3    supporting creditors which includes the 23 states and

4    territories, including Puerto Rico, the MDL PEC and Coby

5    plaintiffs and the shareholders.

6          The term sheet was agreed to Monday night and

7    filed on the docket Tuesday, and puts substantially more

8    meat on the bones for all to see, in the general framework

9    that I was able to describe at the first day hearing.

10          We are not at this time moving for any formal

11   Court authority with respect to this term sheet, but it is

12   an important milestone that we have tried partied agreement

13   as to its form and content.

14          To be sure there is much more work to do on all

15   sides, including of course, with respect to the newly formed

16   UCC, before we would be ready to proceed through gate three

17   with an RSA.

18          The term sheet itself contains much more detail

19   about the essential elements of the framework that I

20   described to the Court on the first day.  The entirety of

21   the debtors will be transferred to claimants without the

22   need for litigation, about either solvency or liability.

23          The ultimate goals remains the same, for the

24   exceedingly valuable medical, scientific and financial

25   assets of these 24 companies, billions of dollars' worth to

Page 12

1   be turned exclusively towards the public good instead of

2   being relentlessly destroyed by litigation.

3           With respect to shareholders as the world can now

4   see, they are agreeing to exit their opioid businesses, not

5   only in the United States but worldwide.  And to tender to

6   this bankruptcy estate nearly all and possibly even all of

7   the net proceeds from the sale of these worldwide family

8   owned pharmaceutical businesses known as IACs.

9           There's a minimum guaranteed shareholder

10  contribution of $3 billion, even if these businesses sell

11  for nothing.  After 3 billion in net proceeds has been

12  realized there's a 90/10 split in favor of the estate until

13  the estate has received another $1.5 billion.

14          The 10 percent shareholder sliver interest of net

15  proceeds between 3 billion and 4.6 billion was supported by

16  the plaintiffs to incentivize the Sacklers to maximize the

17  estate's recovery.  But to be clear it is not very much.

18          For example, if the net proceeds turned over are 3

19  billion, the shareholders get zero.  If the estate gets 4

20  billion of net proceeds, the shareholders get 100 million or

21  2.4 percent of the total and the estate gets 97.6 percent of

22  the total.  Then once the estate has gotten $4.5 billion

23  there's a 50/50 split of all additional net proceeds in

24  whatever amount.

25          Thus while there's a committed minimum

Page 13

1   contribution of $3 billion, in addition, of course, to the

2   voluntary give up of the Purdue companies, which themselves

3   are worth billions of dollars, the ultimate incremental cash

4   payment to the estate could end up being 3, 4, 5 billion or

5   some other number depending on the overseas sales.

6           Indeed, the lead representative for a major state

7   that is currently opposing the deal represented that the

8   shareholders overseas businesses are worth $9 billion.

9           Assuming the effective tax rate of 25 percent for

10  illustrative purposes, the estate would realize almost $6

11  billion in incremental proceeds at those value levels.   To

12  be clear, I am not sure that valuation is lively shared, but

13  it would be great if it were true.

14          The term sheets contains a great many other

15  things, I will mention a few of the most salient for the

16  benefit of the parties and the Court and on the phone.

17          As to the debtors, that obligates us to move

18  promptly for Court approval to pay the professional fees of

19  the ad hoc group, of course, on a proper motion on notice.

20          We think of this as similar to a restructuring

21  support agreement provision, but it is a fortiori as in this

22  unusual case, the vast majority of our litigation claimants,

23  about 85 or 86 percent of them, in fact, were deemed

24  ineligible by the United States Trustee to serve on the

25  official committee, as we discussed on the first day and we

Page 14

1    decided not to pick a fight on that issue.

2           The term sheet also makes clear that the

3    reorganized entity will be designed in partnership with

4    (indiscernible) representatives, and the current shareholder

5    will have no role, no voice, no vote, no ownership, and no

6    involvement in the post emergent entities, none.

7           The directors and trustees, if that's the

8    structure we end up going with, will be selected exclusively

9    by creditor representatives.  As discussed on the first day,

10   the goal is to maximize the value of these very material

11   companies and make sure that the area is exclusively for the

12   public good, in the hands chosen by creditors and approved

13   by this Court.

14          Moreover, Your Honor, although the gravamen of the

15   lawsuits is the past conduct that has long since ceased and

16   OxyContin remains an FDA approved product that continues to

17   be prescribed to hundreds of thousands of Americans and

18   reimbursed by at least 43 states and the federal government.

19   A small set of stakeholders seems to have expressed inherent

20   concerns about the product itself.  There are elements in

21   the structure that are designed to address that as well.

22          So, Your Honor, while there are many conversations

23   ahead, of this I have no doubt, this is our current best

24   proposal for meeting several critical goals at the same

25   time, including of course maximizing the value of these

Page 15

1   sizeable estates for the claimants and for the American

2   people.

3            I should also note since many people and many news

4   articles are asking and referring to the fact that this not

5   be like the tobacco settlement, where the money apparently

6   did not go to address the crisis at hand.  That our goal, as

7   set forth in the term sheet expressly is that the

8   reorganized entity be required to deploy its assets to

9   address the opioid crisis.

10            And as even the cursory review of the document

11   makes clear, the shareholders will be providing substantial

12   diligence to the ad hoc committee, and presumably the

13   official committee as well.

14            Equally important, Your Honor, since the estate

15   and all parties need and deserve comfort that should the

16   deal not progress, the shareholders will not have used the

17   timing of the Chapter 11 process to be able to secrete

18   assets.  The term sheet has an exhibit exclusively devoted

19   to asset protection provisions, that will be enshrined

20   assuming Your Honor agrees, in an order of this court.  More

21   on that in a few minutes.

22            A second major thing we have been doing, virtually

23   every day since it was formed, is to begin our relationship

24   hopefully both professionally and productively with our nine

25   member official committee of unsecured creditors.  I will,

1    of course, let Mr. Priz describe who the committee is, and

2    how they see their role in this case.

3          I will mention only one thing, the UCC's 2019

4    statement clearly and helpfully states that it views itself

5    as having fiduciary duties to all unsecured creditors in

6    these cases, despite the very unusual fact that almost 90

7    percent of our contingent creditors were deemed ineligible

8    to serve on the creditor's committee.

9          I will tread lightly here, but I think it bears

10   mention that this is a very unusual representation structure

11   and will create unusual dynamics.  And there are incipient

12   result in intercreditor complexity and tensions that are

13   already manifesting.

14         That said, from our perspective in this unusual

15   case, with no secure debt, and where the plan structure

16   contemplates assets going exclusively to unsecured

17   creditors, there's an unusually substantial, although not

18   complete overlap between the fiduciary duties of the

19   debtors, the ultimate stewards of these estates, and the

20   duties of the UCC whose obligations run exclusively to

21   unsecured creditors.

22         As Your Honor knows, likely better than anyone

23   else in this room, there are a great many things that a

24   debtor and a UCC could already be tussling about in a case

25   of this complexity.  To both parties credit, we are pursuing

Page 17

1    a better way.

2         The debtors and the UCC and in a few relevant

3    respects, the shareholders, are very hard at work on a

4    stipulation that provides a constructive blueprint for at a

5    minimum the opening six months of this case.  Multiple

6    drafts have gone back and forth at extreme speed.

7         While there is still wood to chop, I am hopeful

8    that we can reach agreement before tomorrow's hearing, and

9    I've invited the relevant lawyers to meet in person from the

10   very minute this hearing ends until the document hopefully

11   is done.

12        Because these are highly confidential settlement

13   negotiations with multiple parties, as much as I would like

14   to, it would be wholly improper for me, or I believe anyone

15   else, to give the Court an update on the contents of this

16   draft stipulation or the exact status of the negotiations.

17        So for today I will have to leave it at that,

18   except to note that there will clearly be an update tomorrow

19   and hopefully a good one.

20        There is one thing, though that I can and should

21   mention that is in the ad hoc committee term sheet that we

22   had discussed with others as well including of course

23   extensively with the UCC.

24        The debtors are cutting down the requested length

25   of the injunction from 270 days to 180 days, despite the

Page 18

1    fact that there is a non-reducible governmental bar date

2    governing almost all creditors in this case about 86 percent

3    or so, there's 180 days from the petition date.

4            As I briefly mentioned before, there will be Court

5    ordered provisions designed to ensure that the estate is not

6    put at inappropriate risk of assets secretion or removal by

7    shareholders during the injunction period.  That period

8    certainly should not and must not be used by any shareholder

9    party in an attempt to make itself more judgment proof by

10   taking actions to frustrate potential judgments.

11           As I made clear at the first day hearing, the

12   debtors and the special committee of the board are keenly

13   aware that under federal law they now own and are the

14   plaintiff for all potential fraudulent transfer, preference

15   and veil piercing actions against the shareholder parties.

16   And that under Section 550 that potential avoidance

17   liability attaches to many categories of transferees,

18   including initial transferee, the entity for whose benefit

19   any voidable transfers were made, or any intermediate or

20   immediate transferees of the initial transferees.

21           Your Honor, there's one last issue that I think I

22   need to address briefly before turning to the second day

23   agenda itself, that constitutes the primary reason we are

24   here.

25           I am, of course, not unaware that this case and

Page 19

1    these debtors invoke very strong emotions and reactions, as

2    well as seemingly ceaseless media attention.  As an officer

3    of this Court, just like the debtors themselves, very

4    serious duties under federal law it is critical to me and to

5    the debtors that the many parties in interest in this

6    situation have accurate facts and not misinformation in

7    front of them as they consider how to approach the complex

8    situation we all face.

9            So here are four things, Your Honor, that the

10   Court and stakeholders should know, that I probably should

11   have laid out in my first day remarks, but I erred heavily

12   on the side of brevity.

13           One, since at least March 2018 when Davis Polk &

14   Wardlow was retained, Purdue has made no distributions,

15   neither tax nor non-tax to its shareholders.  The only tiny

16   sort of exception to this flat statement is that Rhodes paid

17   approximately $140,000 directly to Maryland State taxing

18   authorities in 2017 and another 70,000 in 2018, almost all

19   of that before we became its counsel.

20           Two, in fact, the primary cash flows between

21   Purdue and its shareholders since January 1, 2017 have been

22   as follows.  In 2017, Purdue's parent company borrowed

23   $312.6 million from Purdue.  During 2018 and '19, every

24   single penny, every penny of those loans was paid back with

25   interest.

1           Thus, in 2018 and 2019 there were only Purdue in

2    flows from and not out flows to the shareholders.  In 2017,

3    there were approximately $187 million in tax distributions

4    and no non-tax distributions, except for the $199,000 that

5    was sent to Sliver Holding Company shareholders in

6    connection with a product transfer from Purdue to Rhodes.

7           Three, moreover, while there is still work to be

8    done, I believe it to be true that if one looks back a full

9    40 years from the petition date, the grand total of all tax

10   and non-tax distributions to the shareholders is less than

11   half of the minimum $3 billion guaranteed contribution under

12   the settlement reached with the ad hoc group.

13          Four, finally Your Honor and others in the

14   courtroom may well have read recent media reports that one

15   of the Purdue depositions recently quote revealed, that over

16   the years more than 12 billion was distributed by Purdue to

17   its shareholders.  Please allow me to remind the Court and

18   all parties here today at my first day presentation I

19   expressly referenced the financial transparency that we have

20   manifested, and more specifically that approximately one

21   year ago detailed presentations were given to a wide variety

22   of plaintiffs and governments about Purdue's financial

23   history.

24          The $12 billion number breathlessly reported in

25   recent days in the press is in fact not new at all.  In

1    fact, the previous diligence covered in detail Purdue's

2    transfers to its parent company during the 25 year period,

3    25 years from 1995 to the end of 2018.

4            As set forth herein, the non-tax distributions

5    during the 25 year period from 1995 to 2018 totaled just

6    under $5.9 billion.  The tax distributions over this 25 year

7    period total $5.75 billion and non-cash distributions total

8    approximately $410 million.  This total is about $12.05

9    billion since 1995 split about 52 percent non-tax and 48

10   percent tax.

11           In the last several months, these numbers have

12   been carefully examined in connection with something else

13   that I referenced at the first day hearing, which is the

14   multi-hundred page forensics report that is moving smartly

15   towards completion and will be shared with multiple parties

16   under appropriate confidentiality agreements.

17           One very last thing, Your Honor, before I turn

18   over the podium to Mr. Vonnegut, I've been seeing various

19   public statements from currently opposing government

20   officials about the conduct of these case that requires a

21   brief response, which I will make as briefly and as

22   controversially as I can.

23           There is much I would dearly like to address, but

24   today is not that day.  In an editorial yesterday, one State

25   Attorney General stated as follows, "Last month Purdue filed

Page 22

1    for bankruptcy, that's fine.  Shutting down Purdue can help

2    to end a painful chapter."  And also "Unfortunately Purdue's

3    actions suggest its less interested in closing the company

4    than in protecting the Sacklers' billions."

5            So please allow me to be very, very clear, so

6    there's no possibility of any mistake or any

7    misunderstanding.  These Chapter 11 proceedings were not

8    connects to shut down Purdue or to close the company.

9            Upon filing, these 24 debtors worth billions of

10   dollars and with critical medical, manufacturing,

11   intellectual property and financial assets became Chapter 11

12   estates under the U.S. Bankruptcy Code and have a federal

13   law duty to maximize their value for all of their

14   stakeholders and to distribute that value as required by the

15   Bankruptcy Code.  And that is what we are going to do.

16           To prepare, preserve create, as valuable a set of

17   assets and entities and proceeds and rescue drugs as we

18   possibly can to do the most to help claimants and America

19   itself with the opioid crisis.

20           Second, the notion that Purdue is "protecting the

21   Sackler billions" is as false as it is offensive.  Unless of

22   course one finishes the sentence as one needs to, with the

23   critical missing clause.  For the benefit of the estate and

24   its claimants where many of those billions are slated to be

25   transferred.  That is the deal we have reached.  To transfer

1    an absolute minimum of $3 billion of additional Sackler cash

2    into the estates and hopefully much more, and to have the

3    shareholders voluntarily but irrevocably relinquish all

4    ownership, control, claims, and rights to the billions of

5    dollars of value at Purdue.

6          It is the estate that is the owner of veil

7    piercing and fraudulent transfer claims against the

8    shareholders.  And we will not allow individual litigants to

9    helter skelter destroy that value, and to needlessly cause

10   hundreds of millions or billions of dollars of legal fees

11   and other costs and damage in the process that could instead

12   go to help ameliorate the opioid crisis.

13         I will understand and have sympathy for the fact

14   that every single one of the thousands of litigants would

15   like to have their own day in their own chosen court on

16   their own terms on their own schedule.  But as I said at the

17   first day hearing that creates a true tragedy of the

18   comments since the impact of allowing that to proceed is

19   unthinkable value destruction for all.

20         And with that, Your Honor, I would like to turn to

21   the second day agenda which is actually largely uncontested

22   and that's --

23         MR. SCHWARTZBERG:  Your Honor?

24         MR. HUEBNER:  I'm sorry.  Maybe other people want

25   to speak before we --

Page 24

1              MR. SCHWARTZBERG:  May I respond to Mr. Huebner's

2      statement?

3              THE COURT:  Briefly, yes.

4              MR. SCHWARTZBERG:  I'll be brief, Your Honor.

5              Your Honor, Paul Schwartzberg for the U.S.

6      Trustee's Office.  I apologize for interrupting but prior to

7      getting into the meat of today's hearing I just wanted to --

8      I didn't want this to fall through the cracks.

9              Mr. Huebner said a lot in his opening statement,

10     including discussions regarding the cash distributions and

11     transfers made by the debtor.  I am completely aware and I'm

12     sure the Court is aware of this, but those are just lawyer

13     statements, those are just Mr. Huebner's statements.  I

14     don't know at this point if those statements have been

15     vetted by the ad hoc committee, the regular committee, the

16     official committee, so I just wanted that to go on the

17     record, Your Honor, that those are Mr. Huebner's statements,

18     the debtor's attorney's statements and not necessarily true

19     or -- they're not facts, Your Honor, there's no evidence,

20     there's no witness regarding that.  I just wanted to state

21     that for the record, Your Honor.

22             MR. HUEBNER:  That's actually very helpful, Your

23     Honor.  Let me be very clear.  Obviously I'm not the

24     financial forensics person.  As I referenced I think both at

25     the last hearing and actually as I was making those remarks,

1    that analysis is being done by a very large financial

2    forensics team that is producing a massive report that will

3    have all those facts and a great many other facts that I

4    think are going to be of interest to the constituencies in

5    this case.  And the Court can be very, very comfortable that

6    the ad hoc committee and the UCC and I'm sure a few others

7    as well will have full access to those reports when they're

8    done.

9              THE COURT:  Okay.

10             MR. DIZENGOFF:  Good morning, Your Honor, Ira

11   Dizengoff, Akin Gump Strauss Hauer and Feld, we are proposed

12   counsel for the official committee of unsecured creditors.

13   I rise for two reasons.

14             One to tell you it's very important we're here and

15   we have a job to do, so that's one.  Two, to introduce you

16   to my partners, Ira Priz who is sitting right next to me

17   now, next to Marshall and Mitch Hurley.  You'll hear from

18   them very often in the case.  Mr. Priz has a comment, just

19   to give you our status on where we are and what we foresee

20   as a -- excuse me, what we foresee happening in the next

21   couple of days.

22             THE COURT:  Okay.

23             MR. PRIZ:  Good morning, Your Honor, Arik Priz

24   from Akin Gump as proposed counsel of the official committee

25   of unsecured creditors.  Given that it's a first time

1    appearing in front of you, Your Honor, I have some prepared

2    remarks that I would like to make.  Is that okay for me to

3    do so?

4              THE COURT:  Okay.  Can I just interrupt you for a

5    second?

6              MR. PRIZ:  Yeah.

7         (Pause)

8              THE COURT:  Go ahead.

9              MR. PRIZ:  Let me start by saying it's an honor

10   and privilege to represent the official committee of

11   unsecured creditors in this case.  This case and the opioid

12   crisis in general is a nationwide problem of epic

13   proportions that needs to be addressed, and in the

14   opportunity to play a role, indeed any role in combatting

15   the crisis and distributing much needed funds to state,

16   municipalities, hospitals, personal injury victims, NAS

17   children, health insurance carriers and others is of

18   monumental importance to the committee, it's advisors and

19   each of us personally.

20             With that, Your Honor, I'd like to address four

21   items, who we are.  Second, how we are approaching this

22   case.  Third, where we see this case going, and fourth, the

23   preliminary injunction motion that is up for hearing

24   tomorrow.

25             And on that, Your Honor, I'm obviously not

Page 27

1    presenting argument, but I do want to address while we have

2    not yet filed an objection or a statement.

3              So first who we are.  As you may heard, we

4    understand there were approximately 70 parties who sought to

5    sit on the official creditor's committee.  Of those, the

6    Office of the United States Trustee chose just nine two

7    weeks ago, although frankly only six working days since

8    then.

9              Since that time, the committee has selected legal

10   counsel.  They've selected efficiency legal counsel, which

11   is Bayard, they've selected a financial forensic advisor,

12   which is Province and an investment banker Jeffries.

13             Last weekend we filed a Rule 2019 statement that

14   listed the membership of the committee.  As stated there,

15   the committee is made up of the following type of claimants,

16   two personal injury claimants Ryan Hampton and Cheryl Azura

17   (ph), two parents, or in one case a grandparent of the

18   children born with NAS, which is neonatal abstinence

19   syndrome, that's Cara Trainer (ph) and Walter Lee Sammons

20   (ph); one health insurance carrier, it's Blue Cross/Blue

21   Shield, one private hospital, West Boca, a pension benefit

22   guarantee corporation and two trade creditors, LTS Loan and

23   Therapy Systems and CBS Caremark.

24             The first six -- well, you've heard Mr. Huebner

25   describe something about our make-up.  I think we need to

Page 28

1    explain a little bit of this.  The first six claimants are

2    examples of what we would refer to in this case as private

3    litigants.  Private litigants include among others personal

4    injury plaintiffs, private hospitals, private health

5    insurance carriers, children born with NAS, both in the firm

6    of personal injury type claims and medical monitoring

7    claims, and a class of individuals who claim that their

8    health insurance premiums increased as a result of the

9    opioid crisis.

10           These private litigants are distinguishable from

11   what we refer to as the public litigants, the DOJ, states,

12   municipalities, cities and towns across the country, and the

13   Native American tribes.

14           Both public and private litigants have asserted or

15   will be asserting claims against Purdue.  And in many

16   instances, such litigants have also asserted or will assert

17   claims against the Sacklers and other defendants.

18           The public and private litigants have, in many

19   instances, different damages theories, different causation

20   theories, different views about the strengths and weaknesses

21   of their claims and the strengths and weaknesses of the

22   claims of others.

23           These different views translate into different

24   views as to how any proceeds received from Purdue or the

25   Sacklers, or indeed any opioid manufacturer or distributor

Page 29

1    or other defendants should be allocated.  Indeed, these

2    intercreditor issues are one of the unspoken about issues

3    that are unfortunate byproduct of the opioid crisis that

4    could get in the way of efforts to compensate, abate, and

5    remediate.

6         We are very aware of these issues and we are going

7    to do everything we can to avoid them, becoming an

8    unnecessary and costly distraction in these cases.

9         To that end and to be clear as we stated in our

10   2019 statement, we have a fiduciary duty, not that we intend

11   to exercise our fiduciary, we do have a fiduciary duty and

12   will be representing the interests of all unsecured

13   creditors, whether they be public litigants, private

14   litigants, trade, or general unsecured creditors.

15        And in that role, we'll be trying to among other

16   things both increase the numerator, and we'll talk about

17   that in a second, and settle the denominator by determining

18   the appropriate allocation among creditors to avoid costly

19   and time consuming litigation.

20        To that end, although a lot has been said about

21   the U.S. Trustee's statutory decision not to place

22   governmental entities on the official committee, the members

23   of the committee are not themselves concerned with anything,

24   other than their fiduciary duties to all unsecured

25   creditors.

Page 30

1           Three final words about the membership of the

2    official committee and then I'll move on to the second

3    point.  First, a few of our committees have been contacted

4    directly by parties in this case, including by lawyers

5    representing parties in this case to discuss with them their

6    views and their roles as committee members.

7           We would kindly ask that all parties refrain from

8    doing so, but instead contact us as counsel of the committee

9    or those committee members individual counsel, names of

10   which we can provide if requested.  As you can imagine, this

11   is the first time that certain committee members that have

12   been part of a committee and as such, they feel a little

13   harassed by these calls.  If that continues, we're going to

14   ask this Court's assistance in enjoining these calls.

15          THE COURT:  I think that's an important point to

16   reiterate.  Serving on a committee like this is difficult

17   enough as it is, and there should be clear lines of

18   communication to facilitate that service.  I expect in due

19   course the committee will propose procedures consistent with

20   the relevant Code section dealing with disclosure and the

21   like, which are particularly important in this type of case,

22   but to approach committee members willy nilly just is not

23   productive and not appropriate.

24          MR. PRIZ:  Thank you, Your Honor, we appreciate

25   that.  Second, certain committee members are active in the

1   victim rights advocacy arena.  And part of their job in that

2   arena involves talking to the press, being active on social

3   media.  As part of their services on the creditor's

4   committee they have been asked by us and have agreed to

5   refrain from talking to the press and being active on social

6   media regarding this case during the pendency of this case.

7           We felt, and they agreed, that this was the

8   appropriate course of action, and that as a committee, we

9   would speak with one voice in a courtroom and through our

10  pleadings.

11          The committee did not want its efforts in this

12  case to be undermined by a perception that members of the

13  committee are in some way trying to influence the Court

14  through the press, or make this case into a spectacle.

15          We point this out only as a point of reference,

16  because other parties in this case enjoy substantial press

17  coverage, and use the press as a tool in their strategic

18  arsenal, which they are of course permitted to do and should

19  do as they see fit.  We're not saying that.

20          The members of the committee, however, who serve

21  all unsecured creditors and not any parochial interest will

22  not be doing so.

23          Finally, Your Honor, a note about some of the

24  individuals on the committee.  I will be remiss if I do not

25  mention that the individuals on the committee sought to

1    serve on the committee because they want to be part of the

2    solution and feel deeply, strongly and personally about what

3    has happened.

4            It bears mentioning because they of all people

5    will be faced with difficult choices in the case, when

6    putting aside their very strong personal feelings to

7    exercise their fiduciary duties, which they've all committed

8    to do so.  We are honored to be representing people of such

9    high integrity.

10           Second, how we are approaching this case.  Your

11   Honor, the way we see it and very broadly there are three

12   main parts of this case.  First, what we call the numerator,

13   second we call the denominator; i.e., allocation to

14   creditors, and third, what we call public health and safety,

15   ensuring that the first two parts are determined and decided

16   in a way that does not compromise but promotes public health

17   and safety given the opioid crisis.

18           With regard to the numerator as relates to at

19   least part of it, as you know, as Mr. Huebner just went

20   through the debtors and ad hoc group of supporting parties,

21   24 state -- 23 states now, and the plaintiff's executive

22   committee, the MDL, although not municipalities themselves

23   and the Sackler family have agreed to a term sheet which was

24   filed on the docket a few days ago outlining the settlement

25   framework.

Page 33

1           We weren't provided with a draft of that term

2   sheet, we asked for it, and we saw it -- at first we saw it,

3   well, two hours before it was put on the docket, although

4   that was already the time of (indiscernible).  The committee

5   currently takes no position on a settlement framework.

6   Because frankly we're just looking at it the same time

7   everyone else is, other than to note the following two

8   points.

9           First, we would hope that any party that wants it

10   to be approved and confirmed should spend time and effort

11   convincing us of that fact.  And if a party wants to reject

12   it and wants to think -- say that it should not be approved,

13   they should time and effort convincing us of that case.

14   They should not be going out, they should be coming to us.

15           Second, all we can say about it substantively is

16   that it's a starting point.  At this point we're not

17   prejudging anything and we need to do our work.  A lot of

18   work actually.  We'll have to investigate any and all claims

19   both against the Sacklers and others and understand the

20   potential value from the Purdue business and the IACs and

21   any insurance policies, and we hope and expect every party

22   in the case will cooperate with us.

23           With regards to the denominator, perhaps as

24   important as getting value for creditors is determining how

25   that value should be allocated and doing so quickly.  AS pro

Page 34

1    hocs obvious, but we're stating that it would be a

2    tremendous disappointment in this case if we were to achieve

3    a consensual settlement, one that maximizes value and then

4    spend years and years fighting over the allocation of it.

5            We raise this issue now because as noted earlier,

6    there are different types of creditors here, and different

7    types of litigants.  We express in our 2019 statement that

8    certain litigants have gotten most of the press coverage,

9    and some parties in this case have expressed to us that such

10   litigants should get the lion share of any value that comes

11   out of this case.  Indeed, you heard Mr. Huebner say that he

12   thinks 85 percent or 86 percent of the creditors in this

13   case are public entities.  We don't know that.

14           We take no position on this issue at the time --

15   at this time.  Given our role as fiduciaries of all

16   unsecured creditors, and at the same time that we're looking

17   to settlement framework of the numerator, we hope to engage

18   in a process of figuring out who gets what during the six

19   month period if there is a preliminary injunction, so as to

20   avoid a protracted and costly fight at some point in the

21   future.

22           And we hope to do it in the form of consensus

23   where all parties will have to give a little and recognize

24   that the parties' claims have value.

25           The third big issue I said was public health and

Page 35

1   safety.  It goes without saying that the reason we are all

2   here is not just trying to figure out the future of Purdue,

3   but to do so in a way that intends to combat the opioid

4   crisis, that many people believe that Purdue and the

5   Sacklers had a part, had a role.  It is inevitable that we

6   are going to have to address these issues.

7          And so as we think about doing so on key decisions

8   like what to do with Purdue's business now, what to do with

9   Purdue's go forward business, what to do with the IACs,

10  whether an emergency victim fund should be set up, we have

11  to do so while considering public health and safety.  There

12  may actually be no greater or grander important issue

13  considered in this case.

14         Third, where do we see this case going?

15  Preliminarily and noted above, sorry, noted earlier, we

16  talked about the settlement term sheet.  The debtors for

17  their part have facilitated discussions between these

18  parties, but they have unequivocally stated that they're

19  still doing their work, and therefore as we understand it

20  could not possibly be bound to that term sheet.  In fact, I

21  think everyone knows that the term sheet is unsigned.

22         And the committee for its part is going to do its

23  work as noted above and will be looking at everything.  And

24  24 other states, as you know, vehemently object to the

25  settlement.  So what actually do you have?  You have two

1    open minded fiduciaries, half the states on one side, half

2    the states on the other.  We for our part are going to do

3    everything we can to achieve the three goals I noted

4    earlier.

5            And we think it would behoove everybody in this

6    case to take a short period of time to allow the two estate

7    fiduciaries to come to a determination together, as to which

8    way they think this case should go with regard to the

9    settlement framework.

10           This would mean that the estate fiduciaries should

11   not be dealing with Chapter 11 plans, exclusivity

12   objections, standing motions, examiner motions for a short

13   period of time, because at bottom, the two estate

14   fiduciaries should be the only ones in this case without a

15   parochial interest in what happens to the Sacklers or to

16   which creditors get which proceeds, so long as it's done

17   fairly and equitably in a manner that enhances the public

18   health and safety.

19           Finally, Your Honor, the fourth point of our

20   agenda is what is the UCC's position on the preliminary

21   injunction motion and why we haven't done anything or filed

22   anything on the docket yet.

23           As you've no doubt noticed, we have not taken a

24   position yet and we still are not going to take a position

25   as of this morning.  The committee has been in existence for

Page 37

1    six working days.  We've been dealing with a lot of things

2    all at once, including this.  Consistent with what I

3    mentioned earlier, we've been working with the debtors and

4    the Sacklers on a case protocol on terms that would allow

5    some of the items that I mentioned earlier to occur.

6             It is our hope to be in a position as Mr. Huebner

7    said to file this before the hearing tomorrow, and include

8    at that time, the statements in support of the injunction.

9    We don't know if that'll happen, but that's our hope.

10            We've been focused on this because we believe we

11   are the best situated to investigate the cause of action

12   against the various parties including the Sacklers.  And if

13   we do not believe the settlement is sufficient and we are

14   unable to procure more value, we believe we're the best

15   situated to bring those causes of action in a way that will

16   benefit all unsecured creditors.

17            Third, and perhaps most importantly, we are

18   working with the debtors as part of this protocol on

19   potentially jointly seeking this Court's approval to set up

20   an emergency relief fund to start combatting the crisis.

21            This is not designed to be a payment on claims.

22   It's designed for lack of a better word to be -- to do the

23   right thing and to start dealing with the opioid crisis now.

24   We believe there's precedent to do this from PG&E and we

25   expect every party in the case will work cooperatively and

1    collaboratively to get this in place early and not let their

2    parochial interest get in the way.

3              With that, Your Honor, we've no more remarks.

4              THE COURT:  Okay.

5              MR. PRIZ:  Thank you.

6              MR. HUEBNER:  Just two very very tiny things for

7    me --

8              THE COURT:  Okay.

9              MR. HUEBNER:  -- because I'm like 99 percent or so

10   in agreement.  One, when I said 85 to 86 percent, we're not

11   taking obviously any view on ultimately allowable claims.

12   I'm merely telling you in terms of the litigations filed,

13   85.8 I think percent of them were filed by governmental

14   litigants.  Obviously we're a long way from knowing who has

15   what claim and I don't want anybody to draw an inference

16   from Mr. Priz's remarks that the debtors have remotely

17   concluded let alone done the work necessary to figure out

18   ultimately a claim allowance when we're three weeks into the

19   case.

20              Number two, just one tiny point, I hope Mr. Priz

21   will forgive me, when he sort of cast it as half the states

22   on one side, half the states on the other, I think it

23   probably is fair to mention that the supporters also include

24   the MDL PC and the co-lead plaintiffs which together I think

25   represent a massive percentage of the state entities --

1    under the states, municipalities, counties, et cetera, on

2    the -- not taking a view, I just don't want the record to be

3    sort of inaccurate.  I have nothing else to say at this

4    point.  I see Mr. Eckstein wants to rise, as I think the

5    third (indiscernible) will be out by the time we're done, I

6    shouldn't say the third wheel, I'll just sit down.

7               THE COURT:  Okay.

8               MR. ECKSTEIN:  Good morning, Your Honor, Kenneth

9    Eckstein of Kramer Levin representing to the ad hoc

10   committee of consenting states and municipalities.

11              I'm going to try to supplement the remarks made by

12   Mr. Huebner and Mr. Priz briefly, but I think given what has

13   been accomplished to date, it's useful to make a couple of

14   observations to supplement the first day hearing.

15              As we informed Your Honor at the outset of the

16   case, we entered this case representing a group of

17   governmental and other creditors that were supportive of a

18   settlement framework that had not yet been memorialized in

19   writing.

20              Mr. Huebner referenced over the past several weeks

21   there has been an extremely intense effort invested by a

22   variety of constituencies involved in this case to try to

23   achieve more substance to a settlement, and in fact, earlier

24   this week a settlement term sheet was agreed to that was

25   ultimately filed on the docket on Tuesday.

1              The settlement term sheet continues to have the

2       support of substantial governmental and other creditors,

3       including 28 states and territories or 23 states, five

4       territories, Indian tribes, one of which is a member of the

5       ad hoc committee, countless cities, counties and

6       municipalities, six of which are members of the ad hoc

7       committee as well as the plaintiff's executive committee

8       which consists of thousands of cities, counties and tribes,

9       as well as other litigants, including hospitals and third

10      party payors.

11             Collectively, Your Honor, the creditor

12      (indiscernible) in support of the settlement comprises over

13      half of the population of the country and holds and

14      represents the interests of the majority of claims against

15      the debtor's estates.

16             That said, Your Honor, we recognize that there are

17      -- there is still substantial constituencies in the case

18      that do not yet support the settlement, and there is

19      significant work that needs to be done in order to achieve a

20      sufficient broad consensus.

21             Your Honor, the settlement does have several key

22      elements to it that are important.  First of all, the assets

23      will be transferred to a new post reorganization structure

24      controlled by claimants, as Mr. Huebner indicated will have

25      no involvement from the Sackler family.

Page 41

1                    The Sackler family will no longer be in the opioid

2       business.  Billions of dollars will be dedicated to

3       treatment and remediation of the public health crisis caused

4       by the opioid epidemic and this remediation will occur in

5       the near future, not years from now after protracted and

6       costly litigation, one of the significant motivations of

7       entering into a settlement at the outset of the case.

8                    As Your Honor has heard, the settlement

9       contemplates substantial ongoing diligence to be provided by

10      the debtors and the Sacklers.  We need financial clarity as

11      to where the money has gone and the value of the Sacklers'

12      overseas operations, as well as sufficient information and

13      documents to allow all parties in this case to verify the

14      obligations in the agreement.

15                   While negotiations over the settlement have been

16      lengthy and at times contentious, the parties have all

17      worked hard to get to this point.  Reaching the settlement

18      of the term sheet is not a final step in this process, Your

19      Honor.  While a large accomplishment it remains frankly only

20      an initial step.

21                   I want to assure, Your Honor, all of the parties

22      that were involved in this term sheet recognize the

23      importance for a broad group of constituencies to

24      participate in what needs to be done in order to achieve a

25      plan.  Therefore, this term sheet does not contemplate quick

Page 42

1    break neck type of milestones that Your Honor may have seen

2    in other cases.

3            This contemplates a significant diligence process

4    that is going to be undertaken, not only by the ad hoc

5    committee, but undoubtedly by the official creditor's

6    committee.  There is going to be a negotiation of a

7    restructuring support agreement over the next 120 days and

8    leading up to that we expect that there's going to be

9    significant diligence provided by the debtors and the

10   Sacklers.

11           The term sheet expressly provides that there will

12   not be a motion to approve the restructuring support

13   agreement prior to 180 days.  That will allow even more time

14   to elapse and it contemplates that a plan will not be filed

15   until 270 days.  This is an attempt to on the one hand move

16   this case forward expeditiously but not to in any way

17   interfere with the important rights that parties have to

18   test a lot of information that needs to be vetted in this

19   case.

20           The term sheet also specifically contemplates that

21   there are other parties in interest in this case that will

22   need to be consulted and actively involved in the process.

23   I'm hopeful, Your Honor, that the term sheet will not be a

24   source of division, but rather will provide a framework,

25   will provide a foundation for ultimately a successful plan

Page 43

1    of reorganization and will provide adequate opportunity for

2    the official creditor's committee to do its important job,

3    and will provide an opportunity for the states and

4    municipalities who are not yet supportive of this plan to

5    gain the information they need in order to ultimately get

6    comfortable with the plan structure, and have the confidence

7    that this, in fact, does provide an appropriate vehicle to

8    resolve this case and address this problem in an effective

9    and significant manner, which is the intention of the

10   parties who are supporting this process and the members of

11   the ad hoc committee.

12          Your Honor, I want to assure the Court as Your

13   Honor had urged at the outset, we have begun interactions

14   with the other parties in this case while we have been

15   interacting with the debtors and the Sacklers on the term

16   sheet.  We have begun our discussions with the creditor's

17   committee, we also have ongoing discussions with the non-

18   supporting states, and the hope is that with the term sheet

19   now in place, all the parties in this case including the ad

20   hoc committee can turn their attention to building the

21   appropriate consensus, and through an efficient process

22   learning the important information necessary to satisfy

23   ourselves with this plan, in fact, can lead to a confirmable

24   solution that will have the greatest support possible

25   through the constituencies in the case.  Thank you, Your

Page 44

1    Honor.

2          THE COURT:  Okay.  Thank you.

3          MR. TROOP:  They keep pointing at me, Your Honor,

4    so Andrew Troop from Pillsbury Winthrop representing the ad

5    hoc group non-consenting states.

6          Just a few facts.  I represent 53 percent of the

7    United States population on the ad hoc group, counting these

8    municipalities, included (indiscernible) subdivisions.

9    Second, I apologize to Mr. Priz because I kicked the podium

10   while he was speaking and he didn't skip a beat.

11         Third, Your Honor, I would be -- I have no

12   intention of arguing before you today (indiscernible) to

13   argue tomorrow.  But I would ask you to think about reducing

14   the time that the debtor's committee and others in support

15   of the preliminary injunction can talk tomorrow by about the

16   hour that we spent talking today.

17         The -- I know that we'll all vehemently protest

18   that that's not what they're doing, we were just giving you

19   an update on where we are, but the very important issues of

20   how this Court should or should not exercise its power to

21   limit the ability of parties to litigate outside of this

22   forum against not only (indiscernible) for hearing tomorrow

23   and I'll reserve my comments on that until then.  Thank you,

24   Your Honor.

25         THE COURT:  Okay.  I appreciate the remarks by the

1   four parties.  They don't directly pertain to any of the

2   matters that are on today's calendar, and normally I

3   would've cut each of you short because of that, but this is

4   an unusual case and I applaud and encourage the parties, as

5   frankly I think they have in connection with this hearing,

6   to continue to work behind the scenes to minimize litigation

7   issues.

8          It's clear to me that work will be going on as

9   soon as this hearing ends pertaining to tomorrow's issue.

10  And that's a good thing.  I also note that in an unusual

11  case like this, remarks from the bench can sometimes be

12  helpful to help guide that type of process, that consensual

13  process.

14         So not knowing where you are going with your as

15  Mr. Priz said, case protocol and Mr. Huebner said blueprint,

16  I wanted to give you a couple of my preliminary thoughts to

17  make sure that you at least consider them and focusing on

18  those issues, which I think also may be relevant to other

19  parties in interest in the case.

20         The Purdue companies in some way, in some major

21  way, are a focal point for a much larger issue, which is the

22  nationwide opioid crisis.  The degree of their

23  responsibility for that crisis is disputed, although I think

24  at least to some extent acknowledged by the agreements that

25  Purdue has put forward.

1              But there are, to my mind, two courses for this

2       case.  One is to deal specifically with Purdue's exposure

3       and the other is to deal more generally with the general

4       crisis.  And those two courses can be harmonized, but it

5       will be a difficult task and I appreciate very much that as

6       Mr. Eckstein said, parties who are moving ahead in the

7       settlement process recognize that it's a difficult process,

8       that it won't take 30 days, it will not take 180 days to

9       resolve, but that it needs to be addressed.

10             As valuable as these debtors are, and as valuable

11      as the assets of related third parties, including various

12      Sackler family members and entities are, the size of the

13      opioid crisis generally in terms of damages, just monetary

14      damages is estimated to be far greater.  Estimates range

15      from a hundred to $500 billion per year, many orders of

16      magnitude greater than the valuations that people are

17      talking about here.

18             The money here therefore should be put to the best

19      use.  And given that different types of claimants I think it

20      is obvious here that dealing with individual claims is not

21      necessarily the best use.  Although one can't possibly

22      ignore the direct human impact.

23             So it seems to me that while the traditional

24      bankruptcy function of due diligence on assets, including

25      litigation claims that the debtors may have is a major focus

Page 47

1   of this case and should be.  That is a relatively easy

2   matter to grapple with.  Bankruptcy courts deal with that

3   all the time, who should investigate, how should the

4   investigation be shared, and ultimately what decisions

5   should be made as far as litigation or settlement.

6         What is more difficult is coming to grips with how

7   the resources of these companies and any litigation targets

8   should be distributed.  That distribution mechanism I think

9   the major cases, whether that's been a massive dislocation,

10  whether it's Agent Orange, 9-11, the BP settlement, it has

11  been proven that those payment mechanisms work best when

12  thoroughly vetted.  You mustn't ignore that.

13        So I will leave the rest for tomorrow, but I do

14  hope that in coming up with your blueprint in addition to

15  the due diligence that you focus on assets, you focus on a

16  process for dealing with claims, but equally with the future

17  on how these assets are distributed.

18        I am pleased to see that the committee has

19  appointed several individuals to the -- I'm sorry, the U.S.

20  Trustee has appointed several individuals to the creditor's

21  committee.  I understand that each state, whether through

22  its governor or attorney general, represents the people of

23  that state, as does the various municipalities, but no one

24  can ignore the individual people affected by this crisis.

25        So I hope that you all will be able to work

1    together to use the money as wisely as possible, and through

2    a plan which under the Bankruptcy Code and ultimately the

3    Constitution can, in fact, be binding forever, unlike

4    individual settlements in a non-bankruptcy context, where

5    funds dedicated to solving a public health crisis can and

6    have been invaded for other purposes.

7             So why don't we proceed then with today's agenda.

8             UNIDENTIFIED:  Thank you, Your Honor, my

9    colleague, Mr. Robertson will be presenting the uncontested

10   matters first, if that's okay with Your Honor.

11            THE COURT:  Well, actually can I say one more

12   thing?  As part of the blue print you should definitely be

13   focusing on not only a claims process, but on how to

14   structure that in light of potential use of the settlement

15   funds.

16            There are enormous overlapping claim issues here,

17   and one could see various places where the money could go,

18   and there's certainly precedent for that going back to the

19   Agent Orange settlement.  Unlike most bankruptcy cases where

20   you want to get the claims in and decide, I think a fair

21   amount of thought should be given here to allocation issues

22   first.

23            MR. DIZENGOFF:  Your Honor, to give the Court

24   comfort if I may, the proposed blueprint actually contain

25   provisions on exactly those points.  As I think I said at

1    some length on the first day, minimizing professional fees,

2    and time to distribution of monies, and frictional costs

3    which actually could be infinite is really, you know, maybe

4    even the single most pressing reason we're in Chapter 11 at

5    all.  And I think the Court -- I hope will ultimately find

6    that we are actually taking those issues deadly seriously.

7                 THE COURT:  Okay.  Very well.

8                 MR. ROBERTSON:  Thank you, Your Honor, and good

9    morning.

10               Your Honor, as Mr. Vonnegut noted, if it pleases

11   the Court we would like to turn to the second day relief and

12   first proceed with the uncontested items on for today

13   beginning at the item number two.

14               THE COURT:  Okay.

15               MR. ROBERTSON:  Thank you, Your Honor.  Your

16   Honor, for the record, Christopher Robertson, Davis Polk &

17   Wardwell on behalf of the debtors.

18               Your Honor --

19               THE COURT:  And I'm working off the amended

20   agenda, right?

21               MR. ROBERTSON:  That's correct, Your Honor.

22               THE COURT:  Very good.

23               MR. ROBERTSON:  Your Honor, the first uncontested

24   matter going forward is the debtor's taxes motion.  That

25   order -- the order approving the taxes motion on an interim

Page 50

1   basis was entered on September 18th at Docket No. 65.  The

2   debtors filed a proposed form of final order at Docket No.

3   252.  I believe that Your Honor has binders with blacklines

4   of each of the proposed final orders that show changes from

5   the as entered confirmed orders.  I have extra copies if

6   Your Honor would prefer.

7           THE COURT:  No, I have them here.  So you don't

8   have to hand it up.

9           MR. ROBERTSON:  Thank you, Your Honor.

10          Your Honor, as is the case for each of the

11  uncontested matters the final forms -- the taxes -- the

12  final form of taxes order was negotiated with the official

13  creditor's committee, the ad hoc committee and the U.S.

14  Trustee.  I would note up front that these key parties are

15  signed off on each final form of order relating to the

16  uncontested matters before Your Honor today.

17          As Mr. Huebner said at the outset, we work hard to

18  reach consensus, you know, before coming into court and we

19  would like to thank the U.S. Trustee, the UCC and the ad hoc

20  committee for, you know, working with us very long and

21  difficult hours to present a largely uncontested agenda

22  today.

23          The debtors did not receive any objections or

24  comments from any other parties in interest to the final

25  taxes relief.  The changes to this order are conforming

Page 51

1    changes to make the interim order a final order.  Subject to

2    any questions that Your Honor may have, the debtors

3    respectfully request entry of the final order.

4            THE COURT:  Okay.  Does anyone have anything to

5    say on this motion, on a final basis?

6            All right.  I had just one question.  In this

7    revised order as in a couple of other ones, the following

8    paragraph was stricken, I'm not quite sure why.  "Nothing in

9    the motion of this order shall be deemed to authorize the

10   debtors to accelerate any payments not otherwise due."

11           I think it was stricken because it then says prior

12   to entry of a final order.

13           MR. ROBERTSON:  That's correct, Your Honor.

14           THE COURT:  But I don't -- I think the thought in

15   the first clause is a good one, which is, "Nothing herein

16   requires anyone to accelerate anything."  So I would leave

17   that in.

18           MR. ROBERTSON:  That's --

19           THE COURT:  I mean, it's consistent with the

20   motion and the fact that the whole thing came out.

21           MR. ROBERTSON:  That is --

22           THE COURT:  I don't want there to be any

23   implication --

24           MR. ROBERTSON:  -- entirely okay, Your Honor.  I

25   appreciate that.

Page 52

1           THE COURT:  Okay.  All right.  Well, with that one

2   change, I'll grant the motion based on the record of the

3   interim hearing and the lack of any objection to the entry

4   of this order after due notice.

5           MR. ROBERTSON:  Thank you, Your Honor.

6           Your Honor, the next motion on the agenda is item

7   number 3, the debtor's insurance motion.  The order

8   approving the insurance motion on an interim basis was

9   entered at Docket No. 66.  The debtors filed a proposed form

10  of final order at Docket No. 253.  The debtors received

11  informal comments from the U.S. Trustee, the UCC, and the ad

12  hoc committee, and also from two of their insurance

13  providers, which are reflected in the final form of order.

14          I believe that counsel of Old Republic Insurance

15  Company is present here and on the phone, Your Honor.

16          THE COURT:  Okay.  I guess that raises my only

17  question.  You've added a paragraph regarding Old Republic,

18  or ORIC.  Reading between the lines, but I just wanted to

19  have confirmation of this, in essence, you've negotiated an

20  extension and these are the terms, in essence?

21          MR. ROBERTSON:  That's correct, Your Honor.  If I

22  may, so referring to paragraph 5 in the final order --

23          THE COURT:  Right.

24          MR. ROBERTSON:  -- this paragraph 5 relates to

25  insurance policies with Old Republic Insurance Company.  Old

1  Republic agreed to extend by one year its products liability

2  policy, and also agreed to provide primary layer general

3  liability coverage, effective October 1st.

4          THE COURT:  And so part of that extension is to

5  spread the existing collateral to the new policy?

6          MR. ROBERTSON:  That's correct, Your Honor.  So

7  both of these policies are fronting policies.  And

8  importantly, the Old Republic policies require the debtors

9  to provide and maintain collateral to secure any claims paid

10  with respect to the policies.

11          So the language in paragraph 5, it mitigates any

12  risk that Old Republic might advance amounts under these

13  fronting policies about a guarantee of full reimbursement

14  from the debtors.  And just to say it, these protections

15  were required by Old Republic, you know, in the context of

16  the extension.

17          THE COURT:  And you haven't reduced any -- I'm not

18  sure you could -- but you haven't reduced any obligations of

19  ORIC under the old policies?

20          MR. ROBERTSON:  No, Your Honor.  I don't speak for

21  them, but I don't think so, Your Honor.

22          THE COURT:  Okay.  Not that I think you could, but

23  I just wondered --

24          MR. LUSKIN:  Your Honor, Michael Luskin, Luskin,

25  Stern & Eisler for ORIC.  And on the phone is Margaret

1    Anderson of Fox, Swibel, Levin, and Carroll, which is the

2    primary outside counsel for ORIC, and her pro hac is

3    pending.  I don't think the order has yet been signed, but

4    I'm sure there's a pile of them --

5              THE COURT:  About 200, yeah.

6              MR. LUSKIN:  -- back in chambers.  Your Honor is

7    correct.  What ORIC has done is actually at the debtor's

8    request issued a new policy, a replacement policy for

9    another insurer who I gather wouldn't extend on the primary

10   liability and then it extended the product liability claim,

11   the existing collateral is spread over both.

12             There are no known prepetition claims, but the

13   protection is there at the insistence of the insurer.

14             THE COURT:  Okay.  All right.  Does anyone have

15   anything to say on this motion?  All right, I will grant the

16   motion, again, based on the record of the interim hearing

17   and the fact that, except as addressed in the revised final

18   order, there were no objections, informal or formal.

19             Just on the pro hac point for a second, you're

20   right.  We have gotten a lot of pro hac motions.  I just

21   want to make sure everyone understands that unless you --

22   after the time for any objection to the motion has passed,

23   unless you e-mail the proposed order to chambers, it won't

24   get addressed.

25             So if you haven't done that, then the order won't

Page 55

1   get entered, it will just sit on the docket because I won't

2   know about it.

3              MR. ROBERTSON:  Thank you, Your Honor.  Once

4   again, this is Christopher Robertson, Davis Polk & Wardwell

5   on behalf of the debtors.

6              Your Honor, the next motion on the agenda is item

7   number 4, the debtor's surety motion.  The order approving

8   the surety's motion on an interim basis was entered at

9   Docket No. 68.  The debtor has filed a proposed form of

10  order at Docket No. 254.

11             Your Honor, Westchester Fire Insurance Company

12  provided informal comments to the proposed final order.  In

13  order to resolve any potential objection, we agreed to read

14  our reservation of rights into the record.  If Your Honor

15  would indulge me?

16             THE COURT:  Okay.

17             MR. ROBERTSON:  Thank you.  Thank you, Your Honor.

18  Nothing in the final -- nothing in the interim or final

19  orders shall increase the surety's obligations, if any, to

20  issue new bonds or increase the amount of, or renew any

21  current bonds.

22             THE COURT:  Nothing in this order will?

23             MR. ROBERTSON:  Nothing in this order.

24             THE COURT:  Okay.

25             MR. ROBERTSON:  The remaining changes to the form

Page 56

1   of final order relates to consultation rights agreed with

2   the creditor's committee, and the ad hoc committee, and

3   conforming final order changes.  And unless Your Honor has

4   any questions regarding the relief requested in the surety's

5   motion, the debtors respectfully request that a relief be

6   granted on a final basis.

7             THE COURT:  My only point on this one is the same

8   one I've made on the tax motion.  At the top of page 3,

9   bottom of paragraph 4, there was a proviso.  The whole

10  proviso was stricken, I think, because there's a reference

11  to granting the motion on a final basis.  But you should put

12  in again, "Provided that the debtors will not pay any

13  prepetition amounts arising under the surety bond program

14  before the applicable due date."

15            MR. ROBERTSON:  Thank you, Your Honor.  And the

16  forms of order that we submit to chambers after this hearing

17  will reflect that change.

18            THE COURT:  Okay.  So again, given that there's no

19  opposition to this motion and the entry of the order as

20  revised, and based on the record of the interim hearing,

21  I'll grant the motion on a final basis.

22            MR. ROBERTSON:  Thank you, Your Honor.  Your

23  Honor, I now turn to item number 5 on the agenda, the

24  debtor's utilities motion.  That -- the order approving the

25  utilities motion on an interim basis was entered at Docket

Page 57

1   No. 64.  The debtors filed a proposed form of final order at

2   Docket No. 250.

3           Your Honor, no responses were received to this

4   motion other than from the creditor's committee, the ad hoc

5   committee, and the U.S. Trustee.  One point of clarification

6   with respect to paragraph 3, the debtors have deposited the

7   full amount of the adequate assurance deposit.

8           THE COURT:  Okay.  As per the interim order.

9           MR. ROBERTSON:  Correct, Your Honor.

10          THE COURT:  Right.

11          MR. ROBERTSON:  I will pause, Your Honor, in case

12  you have any questions regarding the requested relief.

13  Otherwise, the debtors respectfully request that the relief

14  be granted on a final basis.

15          THE COURT:  Okay.  Does anyone have anything to

16  say on the utilities adequate assurance order?  All right.

17  I will grant the motion, which is unopposed, and based on

18  the record of the interim hearing, this relief is consistent

19  with Section 366 and the applicable case law in this

20  district.

21          The point you just made, though, maybe is -- let

22  me just look at paragraph 3, "To the extent not already

23  deposited."  All right.  That's fine.  There's no confusion

24  there.  That's fine.  So you can e-mail that order to

25  chambers.

1              MR. ROBERTSON:  Thank you, Your Honor.  Your

2      Honor, the debtor's customer programs motion is the next on

3      the agenda at item number 6.

4              THE COURT:  Okay.

5              MR. ROBERTSON:  The order approving the customer

6      programs motion on an interim basis was entered at Docket

7      No. 67.  The debtors filed a proposed form of final order at

8      Docket No. 251.

9              Apart from informal comments from the U.S.

10     Trustee, the UCC, and the ad hoc committee, the debtors did

11     not receive any formal or informal comments to customer

12     programs after entry of the interim order.  The changes to

13     the form of final order reflect the addition of agreed

14     reporting and consultation rights to the creditors committee

15     and the ad hoc committee, other provisions -- agreed with

16     the committees and other conforming interim order to final

17     order changes.

18             Subject to any questions that Your Honor may have,

19     the debtors respectfully request entry of the final order.

20             THE COURT:  Okay.  Does anyone have anything to

21     say on this motion?  All right.  I'll grant the motion on a

22     final basis, again, based on the fact that it's unopposed

23     and the record of the interim hearing.

24             As you noted, this order has consultation

25     obligations in it.  As I noted before, there's at least one

Page 59

1      other large active group.  There may be more than one.

2      While it doesn't have formal consultation rights under these

3      orders, consistent with what the debtors have said all

4      along, I'm sure they will be sharing information as far as

5      appropriate requests are concerned on a regular basis with

6      those parties too.

7               MR. ROBERTSON:  Certainly, Your Honor.

8               Your Honor, the final uncontested matter is the

9      debtor's critical vendor motion, which is at agenda number

10     7.  The order approving the critical vendors motion on an

11     interim basis was entered at Docket No. 63.  The debtors

12     filed a proposed form of final order at Docket No. 255.

13              THE COURT:  Okay.

14              MR. ROBERTSON:  Apart from informal comments from

15     the U.S. Trustee, the UCC, and the ad hoc committee, the

16     debtors received an informal response from one vendor, LTS,

17     Loan Therapy Systems Corp.  Your Honor, the debtors agreed

18     to add paragraph 14 of the proposed final order at the

19     request of LTS Lohmann.  This paragraph provides that goods

20     shipped under prepetition purchase orders that are delivered

21     to and accepted by the debtors after the petition date are

22     granted administrative expense status.

23              The paragraph does not address payment of any

24     outstanding claims that LTS may have on account of goods

25     delivered prepetition.  Again, the remaining changes to the

Page 60

```
1    form of final order reflect the addition of agreed reporting
2    and consultation rights for the creditors committee and the
3    ad hoc committee, and other conforming changes.
4              Subject to any questions that Your Honor may have,
5    the debtors respectfully request entry of the final order.
6              THE COURT:  All right.  I obviously saw the
7    addition of paragraph 14, which dealt with LTS Lohmann.
8    This may be a much smaller -- I'm sure it will be a much
9    smaller issue in this case than it has become in the Sears
10   case, but a lot of potentially ambiguous meaning can be
11   found by at least some parties in the phrase "delivered to
12   and accepted by the debtors on the petition date," i.e.
13   whether it's delivered to an intermediary, et cetera.  I'm
14   not sure whether the parties understand what they've agreed
15   to here or if they're just willing to live with this
16   language and deal with it later.  But I just wanted to note
17   that for the record.
18             MR. ROBERTSON:  Thank you, Your Honor.
19             THE COURT:  Okay.  Is it --
20             MR. HUEBNER:  Let me help with that for a second.
21             THE COURT:  Okay.
22             MR. HUEBNER:  I think given the context of this
23   case and the extremely small --
24             THE COURT:  Yeah.  It's not -- it doesn't have the
25   same meaning, but I -- if these two parties had an
```

Page 61

1    understanding as to what that means, fine.  It may not mean

2    the same thing in -- and this isn't a precedent for any

3    other vendor.

4           MR. HUEBNER:  Yeah.  And as a reminder, Your

5    Honor, of course, we have no secured debt and no DIP loans.

6    There aren't really competing creditors per se on this.

7    It's just a pre versus post issue.  But we're pretty sure we

8    know what it means.

9           THE COURT:  Okay.  Very well.  Does anyone have

10   anything to say on this motion?  All right.  I'll grant the

11   relief on a final basis, again, based on the record of the

12   interim hearing and the fact that the motion, except as the

13   parties have modified the order, received no informal or

14   formal objections.

15          MR. ROBERTSON:  Thank you, Your Honor.  And now

16   I'd like to turn the podium over to my colleague, Eli

17   Vonnegut, to address the wages motion, which is item number

18   1 on the agenda.

19          THE COURT:  Okay.

20          MR. VONNEGUT:  Good morning, Your Honor.  For the

21   record, Eli Vonnegut of Davis Polk & Wardwell on behalf of

22   the debtors.

23          The next item on the agenda is agenda item number

24   1, Docket No. 6, the employee wages motion.  The interim

25   order on this motion is on the docket at item number 62, and

Page 62

1    our proposed form of final order was filed at Docket 256.

2              Your Honor, since our first day hearing, we have

3    been hard at work with the unsecured creditors committee,

4    the ad hoc committee, and the U.S. Trustee, working to help

5    everyone understand at warp speed produce complex business,

6    and working to get everyone comfortable with all of the

7    relief that we've sought from the Court.

8              I want to personally applaud and thank all of the

9    advisors for these two groups for their very, very

10   constructive and tireless efforts.  They jumped in with both

11   feet in a very difficult situation and got to work with

12   truly remarkable speed and skill.

13             As we hope will become a theme in these cases, the

14   principal shared goal of all of this hard work was reaching

15   agreement as much as we possibly can and avoiding wasting

16   estate resources and burdening the Court with unnecessary

17   disputes.

18             With respect to the wages motion and the unsecured

19   creditors committee and the ad hoc committee, we've reached

20   agreements for today on the following approach.  First are

21   basic programs, including wages, benefits, expense

22   reimbursement, vacation and sick leave, worker's

23   compensation, savings plans, contingent workers.  All of

24   those programs are wholly uncontested.  So we would ask the

25   Court to authorize those programs on a final basis to give

Page 63

1    our workforce comfort that they are squared away.

2            There's a second category of programs.  This

3    hearing was scheduled, as Your Honor well knows, unusually

4    early in this case.  And the early days of this case have

5    been extraordinarily busy.  There's been a lot to do.  In

6    light of that, our constituents asked for some more time to

7    complete their diligence on some of the more complex

8    compensation programs that we have.

9            We want everybody to be comfortable.  We don't

10   want to rush anybody needlessly, so we agreed to defer those

11   programs to a hearing to be held on November 6th at 10:00

12   a.m.  For those programs, the annual incentive plan and the

13   long term results plan will be deferred.  The sign on

14   bonuses above the small cap that Your Honor authorized in

15   the interim order will also be deferred.  So nothing will

16   happen with respect to those programs.

17           The non-executive retention plan and advancement

18   of expenses, those were already authorized on an interim

19   basis.  They will continue to be authorized on an interim

20   basis, but final approval will be deferred to November 6th.

21   So for all of those programs, we are leaving in place the

22   status quo under the interim order.

23           With those deferrals, the relief that we're asking

24   for today that goes beyond what was approved in the interim

25   order already is very, very narrow.  It's two programs that

Page 64

1    we agreed to defer at the first day hearing, for which we

2    now need approval, because they are relevant to business

3    initiatives that the company is undertaking right now,

4    effectively.

5              The first one is the Treyburn (ph) retention plan.

6    That is modest in amount.  It's limited to non-insider

7    employees.  And I'll go through this in more detail in a

8    moment.  It applies to employees that are critical to the

9    successful consolidation of produced manufacturing

10   operations.  That work is being completed now and the

11   payments will fall due soon, so we didn't think that those

12   people should have to wait for comfort that they will be

13   paid.

14             The second program is the market access ICP, which

15   is another small program that only applies to non-insider

16   employees.  And that is scheduled to pay out very soon.  And

17   again, we wanted to give those people comfort that they're

18   going to get paid so they're not left waiting.

19             One point of clarification, this is not new

20   relief, but there's been some confusion on it, so I want to

21   make sure that everybody's clear.  Payment of severance to

22   current employees, current employees now that are terminated

23   post-petition was authorized on an interim basis and we are

24   seeking final approval today.  The only employees that we're

25   aware of for whom this would be relevant are the Treyburn

1    employees, because they're the only people that we know will

2    be let go.

3            The U.S. Trustee, it's not clear to me whether

4    they object to this.  I think they may have some questions.

5    So we'll leave that to later in the agenda.

6            We did get some requests from various constituents

7    for additional information on the programs that we're moving

8    forward with today.  Those requests we have addressed in the

9    supplemental declaration and Mr. Jon Lowne, who's our chief

10   financial officer.  That is on file at Docket No. 236.  Mr.

11   Lowne is present in the courtroom today, if anybody has

12   questions.  If not, I would ask that that declaration be

13   admitted into evidence at this time.

14           THE COURT:  Okay.  Does anyone want to cross-

15   examine Mr. Lowne on his supplemental declaration?

16           MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

17   for the U.S. Trustee's Office.  I do have a few questions

18   for Mr. Lowne.

19           THE COURT:  Okay.  If you could come up to the

20   stand then, sir.  Would you raise your right hand, please?

21                   JON LOWNE, WITNESS, SWORN

22           THE COURT:  And could you just spell your name for

23   the record, please?

24           THE WITNESS:  Yes.  It's J-O-N, L-O-W-N-E.

25           THE COURT:  Okay.

Page 66

1                    CROSS-EXAMINATION

2    BY MR. SCHWARTZBERG:

3    Q    Good morning, Mr. Lowne.  My name is Paul Schwartzberg.

4    I'm an attorney with the U.S. Trustee's Office.  And I was

5    going to ask you a few questions on your supplemental

6    declaration.  Would you need a copy of that?  Because I will

7    refer to it.

8    A    It might be helpful, yes.  Thank you.

9    Q    Counsel is quicker than I am.  Thank you.  First, I'd

10   like to refer to paragraph 13 of that declaration.  The

11   second to the last question -- or last sentence, I

12   apologize.  It says, "None of the eligible -- none of the

13   employees eligible for payment under the market access ICP

14   are engaged or compensated on the basis of promotion of any

15   opioid products to prescribers."

16            MR. VONNEGUT:  Excuse me, Your Honor.  We do have

17   supplementary proffer testimony on this subject.  I don't

18   know if it's better to wait until --

19            THE COURT:  Well, no, let Mr. Schwartzberg ask the

20   question.

21            MR. SCHWARTZBERG:  I apologize.  I didn't --

22   BY MR. SCHWARTZBERG:

23   Q    My first general question is what does the promotion of

24   opioid products to -- well, what is the definition of a

25   prescriber?

Page 67

1   A    A prescriber is someone that writes a prescription for

2   an opioid product.

3   Q    So the employees who are eligible to the market access

4   ICP program, the bonus program that the debtors are seeking

5   approval of today, they are being compensated for the

6   promotion of opioids to people who -- or entities who are

7   not prescribers?

8   A    So they work with our distributors and our managed care

9   organizations, and their compensation is based upon the

10  parts of their compensation program, which is for Q3 and Q4,

11  50 percent their individual objectives, 25 percent Adhansia,

12  which is a non-opioid product, and 25 percent based upon the

13  corporate objectives.

14  Q    So to the extent the debtors are reaping benefits from

15  the sale of opioids for either the 50 percent metric or the

16  25 percent metrics, these people would be rewarded or

17  provided bonuses?

18  A    Well, their individuals objectives are tied to the

19  specifics of working with wholesalers and the specifics of

20  working with managed care organizations, which is primarily

21  working on (indiscernible) access --

22  Q    I'm sorry.  I didn't hear what you said.

23  A    So working with managed care organizations, which is

24  getting all of our products (indiscernible) access to

25  provide products, make products available to the appropriate

Page 68

1    patients.

2    Q    And those products include opioids?

3    A    Those products do include opioids.

4    Q    Okay.  You're aware of the six people who are under

5    this plan, is that correct?

6    A    That's correct.

7    Q    Okay.  Do you know if their compensation is below

8    market value for the average pharmaceutical industry for

9    their particular positions?

10   A    I can talk generally on that.

11   Q    I'm talking about these six people.

12   A    So for the six people, like other people in our

13   organization, compensation is compared to benchmarks for

14   similar positions that our human resource compensation

15   experts look at as part of compensation review of our

16   employees.

17   Q    So are they below market average?

18   A    I don't know for these six individuals whether they're

19   below, but we certainly benchmark our employees.

20   Q    So it's possible they're being currently paid above

21   market average?

22   A    It's possible they could be above or below, I just

23   don't know the answer to that question.

24   Q    All right.  Thank you.  I'm going to reference

25   paragraph 10 of your declaration.  Let me get to it too.

1    Roughly four lines down, a sentence starts, "As described in

2    more detail in the -- your declaration, under the severance

3    plan, vice presidents and above, with less than five years

4    of employment with the debtors received six months of

5    severance pay."  And then, "And vice presidents and above

6    with greater than five years receive one year of severance

7    pay."

8        What I'm focusing on on that sentence is the "and

9    above" portion.  Do you see that?

10   A    I do.

11   Q    Okay.  How many employees do the debtors have that are

12   above vice president?

13   A    I don't know the exact number of people above vice

14   president.

15   Q    Do the people above vice president include more than

16   the ten people referenced in -- I'm sorry, in Footnote 4 of

17   your declaration?  Those ten people, if you want to look,

18   are the people that are, for lack of a better term, admitted

19   insiders?  The ten people referenced in your -- I think to

20   an exhibit to your initial declaration.  Are there more than

21   those ten people?

22   A    Yes, there are.

23   Q    And what are the levels?  How many senior vice

24   presidents are there?

25   A    I don't know of the ten how many are senior vice

Page 70

1    presidents.

2    Q    No, I apologize.  Forgetting about Footnote 4.

3    A    Okay.

4    Q    You had indicated there are people above the vice

5    president level that are not included in Footnote 4.  How

6    many of those people are senior vice presidents?

7    A    How many people --

8    Q    But do you know how many senior vice presidents the

9    company has, other than referenced in Footnote 4?

10   A    There are no other senior vice presidents, other than

11   those referenced in Footnote 4.

12   Q    Okay.  What are the levels -- the general description,

13   their levels of the people who are above vice president that

14   are not listed in Footnote 4?

15   A    So --

16   Q    Broad brush.

17   A    Yeah.  So it's vice presidents.  There's no title that

18   I'm aware of between vice president and senior vice

19   president.  So it would be a vice president title as

20   pertains to the paragraph 10 that you've asked me to look

21   at.  So for example, some titles that I can think of are our

22   head of the -- our commercial organization, which is now a

23   very small part of our business, is a vice president.  I

24   don't recall his exact title.

25   Q    Well, I -- maybe we're talking at cross-purposes here.

Page 71

1    I was asking how many people are above the vice president.

2    I'm focusing on the "and above" in those two phrases.  And I

3    wanted to know how many people are above the vice president

4    level that are not included in Footnote 4.  And you had

5    indicated, if I recall, that you did not know.

6    A    No, no, so I misunderstood your question.

7    Q    Okay.

8    A    I thought I replied that there are no senior vice

9    president and above, with the exception of those people that

10   are listed in paragraph --

11   Q    Okay.  Then maybe I misunderstood you, so --

12   A    Yeah, no, no.

13   Q    So other than the ten people in paragraph 4, there's

14   nobody above vice president?

15   A    That is correct.

16   Q    Okay.  All right.  That's --

17   A    Sorry.

18   Q    And then the next question is how many vice presidents

19   are there?

20   A    I don't know the exact number.

21   Q    Okay.  Could it be more than ten?

22   A    If it's above ten, it would be marginally above ten.  I

23   can't think that there's much more than ten.  It might be

24   slightly less.

25   Q    So I want to focus on the people in Footnote 4.

Page 72

1    A    Okay.

2    Q    Do any of them -- do any of their job descriptions or

3    functions entail the sale of opioids or connected to the

4    sale of opioids?

5              THE COURT:   This company sells opioids.

6              THE WITNESS:   So -- so --

7              THE COURT:   No, the answer is they all do.

8    BY MR. SCHWARTZBERG:

9    Q    All right, thank you.   That's the answer?

10   A    (No audible response).

11   Q    Yes, okay.

12   A    I would expand on the answer to say that we don't have

13   a sales force that calls on prescribers of opioids.   We

14   don't do any promotion of opioids, but obviously much of our

15   sales revenue is from opioids.   So we touch opioids from

16   that perspective.

17   Q    Are any of the ten people that are referenced in

18   Footnote 4, do they have -- let me back up.   Are you aware

19   of the informational brief the debtors filed on the first

20   day?

21   A    I've read a lot of the briefs.   I'm sure I've seen it.

22   Q    In that brief, the debtor acknowledged misconduct, or

23   the debtor discusses the acknowledged misconduct in the

24   marketing of OxyContin from 1996 to 2001; are you aware of

25   that?

1    A     I am aware of that, yes.

2    Q     And in that information brief, it references that

3    Purdue, Frederick Company, and the guilty plea for

4    misbranding OxyContin; are you aware of that?

5    A     Yes, I am.

6    Q     Okay.  Are any of the ten people referenced in Footnote

7    4, are they connected or do they have anything to do with

8    the first thing I discussed, the misconduct between 1996 and

9    2001 in the marketing of OxyContin?

10           MR. VONNEGUT:  Judge, the phrase "connected to," I

11   think is a problematically vague phrasing for this question.

12   BY MR. SCHWARTZBERG:

13   Q     Were any of the ten people employed with the debtor

14   between 1996 and in 2001?

15   A     Certainly, I was employed during that period of time.

16   I'm not sure about all of the others of the ten list.

17   Q     So are you aware of any of the ten people participated

18   in the misconduct that the debtors acknowledged in the

19   informational brief?

20   A     I'm not aware, but I'm -- I don't think any of them

21   were part of the guilty plea, or any of them were convicted

22   of any wrongdoing.  I know that for a fact.

23   Q     You know that for a fact.  Well, we know that they're

24   not convicted of any wrongdoing, but do you know for a fact

25   that they weren't participating in any of the misconduct

Page 74

1   that the debtors acknowledge?

2   A    I'm not aware.

3   Q    Do you know or are you aware if they were involved with

4   the actions that resulted in the guilty plea in 2007?

5            MR. VONNEGUT:  Excuse me, Judge.  We'll proceed

6   however you like, but we do have some very crisp testimony

7   addressing these very issues prepared.  If it would be

8   helpful, we can do that, and maybe then Mr. Schwartzberg can

9   proceed with any unanswered questions.

10           MR. SCHWARTZBERG:  Your Honor, they filed the

11   motion and then they filed the supplement, I'm cross-

12   examining the witness.  If they had other --

13           THE COURT:  You could ask him on redirect.

14           MR. VONNEGUT:  Okay, fair.

15           MR. SCHWARTZBERG:  Thank you, Your Honor.

16   BY MR. SCHWARTZBERG:

17   Q    Do you know if any of the ten in the footnote 4 of your

18   declaration were -- if their employment activities involved

19   the actions that are connected to the guilty plea in 2007

20   regarding the misbranding of OxyContin?

21           MR. MCCLAMMY:  I'm sorry, Your Honor, Jim McClammy

22   from Davis Polk on behalf of the debtors and with Mr.

23   Vonnegut.  I'm just unclear exactly where this is all going

24   with respect to these ten people who are really not part of

25   the relief that's being sought today as who was insiders and

1    not.  I think, given the limited nature, I'm just not sure

2    that this is relevant to the --

3              THE COURT:  You're not looking to apply the

4    severance plan to these ten people?

5              MR. SCHWARTZBERG:  Your Honor, the declaration --

6              THE COURT:  No, let -- I need you to answer that

7    question.

8              MR. VONNEGUT:  No, we are, Your Honor.

9              THE COURT:  You are?

10             MR. VONNEGUT:  Yes.

11             THE COURT:  Okay, all right.

12             MR. SCHWARTZBERG:  Your Honor, because of the --

13             THE COURT:  So it's not irrelevant.

14             MR. SCHWARTZBERG:  -- because of the sparse --

15             THE COURT:  No, it's not irrelevant, you can go

16   ahead.

17             MR. SCHWARTZBERG:  Okay.  Thank you, Your Honor.

18   BY MR. SCHWARTZBERG:

19   Q    Do you know if the ten people that are in your footnote

20   4, admitted insiders, were involved or their jobs caused

21   them to do actions that were connected to the misbranding of

22   OxyContin that Purdue Frederick Company pled guilty to in

23   2007?

24   A    So when I look at the roles of these people, many of

25   these people weren't with the company during this time and

1   the people that were were in jobs that were not remotely

2   touching the sales and marketing organization, and,

3   therefore, it would be my belief that they would have

4   nothing to do with the misbranding of OxyContin.

5   Q    Is that your belief or do you know that for a fact?

6   A    The people that were here were me that was in the

7   finance organization, I could give other examples, but they

8   were in R&D and manufacturing or other parts of the

9   organization.

10  Q    So, to the best of your ability, you do not believe the

11  ten people listed in footnote 10 were connected to or

12  involved in the actions that caused the Purdue Frederick

13  Company to plead guilty in 2007?

14  A    To the best of my knowledge.

15  Q    In terms of the vice presidents that the debtor seeks

16  to pay -- to include in the severance program, do any of the

17  vice presidents participate in board meetings?

18  A    On a very, very rare basis, if there is a particular

19  topic that is highly specialized that may require them to be

20  present.

21  Q    And in those instances do the board listen to what the

22  vice presidents say and influence what the board may do?

23  A    So, ultimately, before they would present to the board,

24  their presentation would be presented to the insider group

25  or limited -- the insider group, which would typically be

Page 77

1    Craig Landau, myself, Mark Kesselman at a minimum, before

2    any presentation would be made to the board.

3    Q    So the vice presidents report directly to the CEO, the

4    CFO, and the COO?

5    A    It varies.  I can't recall every VP, but certainly some

6    of the VPs that I can recall off the top of my head, one

7    does report directly to the CEO.

8    Q    Are you aware if any of the vice presidents were

9    employed by the debtors between 1996 and 2001?

10   A    I don't know the answer to that.

11   Q    Okay.  Are you aware if any of the vice presidents were

12   employed by the debtors in 2005 to 2007?

13   A    I would imagine that in that time period I could think

14   of one I'm pretty sure was employed during that time frame.

15   Q    Do you know if that one that you are thinking about job

16   details would have included activities that were -- that

17   resulted in or connected to the 2007 guilty plea by the

18   Frederick Company in connection with the misbranding of

19   OxyContin?

20   A    My recollection that that was for the period 1996 to

21   2001, I have no knowledge whether that individual had any

22   involvement, but I repeat what I said earlier that I'm not

23   aware of any individual that we have currently employed that

24   has any guilty plea against them.

25   Q    I'm not talking about a guilty plea against them, I'm

Page 78

1    talking about working for or doing their job and that job

2    caused the debtor to plead guilty in -- the Purdue Frederick

3    Company to enter a guilty plea?

4    A    Yeah, I have no knowledge of that.

5    Q    Okay.  I'm going to just now turn the attention to the

6    -- what I -- well, do you understand -- or my understanding

7    is that the debtors currently only have plans regarding 14

8    employees, I'll call them the Treyburn 14, who may receive

9    severance, and there is nobody else that right now is

10   contemplated to be laid off and to receive a severance; is

11   that correct?

12   A    That is correct.

13   Q    Do you know if any of the Treyburn 14, for lack of a

14   better term, are currently also or may receive benefits

15   under the Treyburn retention plan?

16   A    I believe that they are -- so that the Treyburn 14 that

17   are receiving -- is your question are they receiving

18   severance in addition to the Treyburn retention plan?

19   Q    The Treyburn retention plan -- yes, yes.

20   A    Yes, yes, some of them will be.

21   Q    Do you know how many of the 14 will be receiving both?

22   A    I believe it is the majority of them, I don't know the

23   exact number.

24   Q    So more than seven will be receiving both severance and

25   retention payments?

Page 79

1   A    Yes, I'm pretty sure that's the case.

2   Q    Are you aware if any of the 14 have job offers with the

3   purchaser of the Treyburn facility?

4   A    We're not aware of that information and my

5   understanding is that the -- that Novo is posting jobs, our

6   employees may or may not be applying for those jobs, we have

7   no intelligence on whether they've accepted jobs.

8   Q    So all 14 who are going to receive severance on

9   November 29th/December 1st may then show up at the facility

10  on December 2nd and continue with their job but for the

11  purchaser?

12  A    Anything is possible.  They could show up at any

13  employer the following day.

14  Q    Okay.

15         MR. SCHWARTZBERG:  May I have one minute, Your

16  Honor?  I'm sorry.

17      (Pause)

18  BY MR. SCHWARTZBERG:

19  Q    Oh, one last question.  And could you state what is

20  done or produced or manufactured at the Treyburn facility?

21  A    So the Treyburn facility manufactures OxyContin and I

22  believe it manufactures a couple of other opioid generic

23  products for our generic company.

24  Q    Do you know the annual gross revenues of the Treyburn

25  facility that's generated by their production?

Page 80

1    A    Not off the top of my head, no.

2            MR. SCHWARTZBERG:  Your Honor, at this time I

3    don't have any more questions.

4            THE COURT:  Okay.  Redirect?

5            MR. VONNEGUT:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. VONNEGUT:

8    Q    Thank you, Mr. Lowne, just a few follow-up questions.

9            Mr. Schwartzberg asked you a number of questions about

10   the misconduct between December of 1995 and June 2001 that

11   was the subject of the 2007 guilty plea and involvement or

12   connection of any current employees with that misconduct.

13   To your knowledge, were any current employees charged with

14   or convicted of any criminal misconduct?

15   A    No.

16   Q    Thank you.  And currently, Mr. Lowne, am I correct in

17   thinking that the entire opioid salesforce at Purdue has

18   been terminated?

19   A    That is correct.

20   Q    Okay.  And is it correct to say as well that Purdue no

21   longer promotes opioid pain medications to prescribers,

22   whether through sales representatives or via other channels

23   such as medical journals?

24   A    That is correct.

25   Q    Okay.  Now, with respect to the Treyburn retention

Page 81

1    plan, Mr. Schwartzberg asked you some questions about what

2    the Treyburn plant produces, and those products do include

3    opioid pain medications?

4    A    That's correct.

5    Q    Okay.  And am I correct in thinking that some of the

6    people that we are attempting to retain at the Treyburn plan

7    include security personnel and diversion control personnel

8    as well?

9    A    That is correct.

10   Q    Okay.  Thank you, Mr. Lowne.

11            MR. VONNEGUT:  I believe that concludes redirect.

12            THE COURT:  Okay.  Mr. Lowne, I just had a

13   question.  You just testified that the entire opioid

14   salesforce was terminated, but I took from your earlier

15   testimony, maybe I misheard it, that a portion of the work

16   that the six people on the -- covered by the market access

17   ICP is involved in dealing with prescribers for opioid

18   products, but with other parties; is that right?

19            THE WITNESS:  That's right, yes.

20            THE COURT:  So why wouldn't they be included as

21   salesforce?  What's the distinction?

22            THE WITNESS:  The distinction is that typically a

23   branded manufacturer when they have a salesforce, they're

24   calling on doctors to explain -- or prescribers to explain

25   the product in detail --

Page 82

1              THE COURT:  Right.

2              THE WITNESS:  -- and that could certainly be seen

3     as influencing prescribing behavior, and similarly

4     promotion, whether it's a journal publication or other

5     promotional item, could be seen as influencing sales.  The

6     distinction that I think any branded manufacturer would have

7     is that the people that are talking to the wholesalers, as

8     one example -- I'll get to the second in a minute -- is

9     they're working with wholesalers on the contracts that

10    determine how the product is distributed through the

11    channels, they're working with the wholesalers to manage the

12    inventory levels, but they're not doing anything to touch

13    the end prescriber.  They're working on getting products

14    into the market or the trade, as we refer it to, for the

15    appropriate patient.

16             The second category of person in this market

17    access plan is what we refer to as our managed care group

18    and every branded pharmaceutical company has these people.

19    They're the people that work with the managed care

20    organizations and they do that for all of our products,

21    whether it's opioid products or Adhansia products, and

22    that's -- they work with them to get the products on the

23    formulary, which allows the appropriate patient when they

24    walk into the pharmacy to it to be on their benefit plan.

25             THE COURT:  You're using a term that I'm not sure

1    I understand, I'm not sure the court reporter will be able

2    to spell it; formulary, is that what you're referring to?

3            THE WITNESS:  Formulary, yes.  So --

4            THE COURT:  Could you spell it?

5            THE WITNESS:  Yeah, sure.  F-O-R-M-U-L-A-R-Y.

6            THE COURT:  Formulary.

7            THE WITNESS:  Yeah.  So what that means, said a

8    different way, is that when someone that has a benefit plan

9    walks into a pharmacy to pick up their product, it allows

10   them to get the product under their benefit program or

11   insurance plan.

12           THE COURT:  Okay.  So it's already been

13   prescribed?

14           THE WITNESS:  Yes.

15           THE COURT:  Okay, all right.  Any questions on

16   that?

17           All right, you can step down, sir.

18           MR. TROOP:  Actually, Your Honor, you asked a

19   question that was on my mind and you also raised another

20   question, I would just ask (indiscernible) --

21           THE COURT:  All right, that's fine.

22           MR. TROOP:  Maybe four.

23       (Laughter)

24                        RECROSS-EXAMINATION

25   BY MR. TROOP:

Page 84

1    Q    I'm just trying to figure out how to say this most

2    clearly.  Your salesforce, when it goes out to the managed

3    care plans to ensure that OxyContin is on the formulary,

4    what data do you provide to the managed care facilities in

5    order to influence their use of that drug with their

6    patients?

7    A    I'm not sure the exact answer to that question, being a

8    finance person, but we're certainly not giving any

9    promotional materials in any shape or form to managed care

10   to influence their decisions.

11   Q    And getting it on the formulary makes it eligible for

12   Medicare and Medicaid payment; correct?

13   A    That's right.

14   Q    How are your sales affected if the drug is not included

15   on the formulary?

16   A    Like any company, being on formulary would impact sales

17   or not being on formulary would result in a reduction in

18   sales.

19   Q    And you said you provide no promotional materials to

20   the managed care facility, and is that true for the

21   wholesaler as well?

22   A    That's correct.

23   Q    What do you provide them about the drug?

24   A    Any interactions with them in terms of the drug would

25   be medical questions that would be addressed by our medical

Page 85

1   affairs group, which are medical experts.  Our managed care

2   people are not talking about any medical aspects of the

3   product.

4   Q    So does the medical care group provide information --

5   A    On the --

6   Q    -- that goes along with the drug that says use it this

7   way?

8   A    Only on an as-requested basis, as I understand it.

9             MR. TROOP:  No further questions, Your Honor.

10            THE COURT:  Okay.

11            MR. VONNEGUT:  Your Honor, I just have a few

12   clarifying redirect questions, if that's okay.

13                    FURTHER REDIRECT EXAMINATION

14   BY MR. VONNEGUT:

15   Q    Mr. Lowne, so we all seem to be having a hard time

16   with, you know, the line between the things that Purdue does

17   today and the things that Purdue does not do today.  Is a

18   fair to describe that line that the employees we're talking

19   about are responsible for making Purdue medications

20   available in the marketplace, but not responsible for

21   increasing prescription volume or encouraging prescription?

22   A    That is correct.

23   Q    Okay.  Thank you very much.

24            MR. VONNEGUT:  That's the last question that I

25   had.

1              THE COURT:  Okay.  All right, you can step down,

2      sir.

3              MR. VONNEGUT:  Thank you.  Your Honor, as you're

4      well aware, this is an important subject that we intended to

5      and want to address very much head-on today and throughout

6      this case.  The question of whether current employees

7      engaged in misconduct is a very serious one and we think

8      needs to be handled very, very carefully.

9              Before I turn to the programs at issue today and

10     summation of Mr. Lowne's testimony, I would like to

11     reiterate one request to all of our stakeholders:  if you

12     have questions on very serious matters like this, or indeed

13     anything at all, please reach out to us before filing an

14     objection or a pleading of any kind, so that we can try to

15     address them.

16             Purdue today is a very different organization than

17     it has been in the past.  We want to do whatever we can to

18     allay everyone's concerns.  These are very, very difficult

19     times for our workforce and having public speculation about

20     whether they may or may not have engaged in misconduct is

21     very difficult for the morale of people who are working

22     extremely hard under very difficult circumstances to

23     preserve and maximize value for these estates.

24             THE COURT:  Can I ask you, is there -- obviously,

25     this is a highly regulated product --

1          MR. VONNEGUT:  Yes, sir.

2          THE COURT:  -- and industry, are there -- beyond

3    regulatory constraints, are there recognized best practices

4    either coming from the CDC or any other place --

5          MR. VONNEGUT:  Sure.

6          THE COURT:  -- for the current sale of these

7    products?

8          MR. VONNEGUT:  Sure.  So I don't want to purport

9    to be a pharmaceutical regulatory expert, but I'll give you

10   my understanding.

11         Promotion of prescription medications to

12   prescribers is legal; lots of companies do it for a variety

13   of medications.  Purdue, of course, voluntarily stopped

14   doing that entirely with respect to its opioid pain

15   medications.  The activities that the company conducts today

16   related to its opioid pain medications all relate to making

17   sure that those medications are available in the market for

18   patients that need them and are prescribed those medications

19   by their doctor.

20         The other best practice is related to operating a

21   pharmaceutical business that includes opioid medications are

22   all around the safe handling of those businesses, ensuring

23   that diversion of those -- sorry, safe handling of those

24   medications, ensuring that diversions of the medications do

25   not occur.  Frankly, Your Honor, that's one of the reasons

1    that it's so important to retain the staff at the Treyburn

2    plant is to ensure that all of those medications are handled

3    safely and responsibly.

4            THE COURT:  So there are no recognized regulations

5    or best practices as far as distribution of the opioids to

6    either managed care groups or wholesalers?

7            MR. VONNEGUT:  Again, Your Honor, I don't want to

8    purport to be an expert on something that isn't my field,

9    but my understanding is that the company complies with all

10   best practices related to distribution.

11           MR. HUEBNER:  Your Honor, this may or may not be

12   helpful, but to the extent that obviously, as everyone is

13   aware, Purdue has been subject to unprecedented litigation,

14   the injunctive relief that we are requesting to self-impose,

15   which applies to practices that have now been in place at

16   the company for a while, in no small part is actually what

17   the plaintiffs, including many governmental entities who

18   were very involved in these issues, have actually been

19   focused on asking for or demanding, et cetera, for many

20   months now.  It was actually based in part on the Oklahoma

21   settlement where exactly trying to get to what at least the

22   State of Oklahoma perceived of as best practices and most

23   limited practices is exactly what we're gravitating towards

24   for exactly those reasons.

25           I think that the cleavage, you know, even just

1   hearing the people that we're talking about being called the

2   salesforce actually I think is really not the right -- it

3   wasn't your term, it was someone else's, but it's really not

4   the right term.  When pharmaceutical companies talk about

5   having a salesforce, they really talk about trying to talk

6   to prescribers to encourage them in their use of the

7   product.

8           I think as Mr. Lowne was trying to make clear --

9   and, again, I don't think he expected to be cross-examined

10  about the whole organization and so, you know, whether or

11  not he was the right person, I think he hopefully did a fine

12  job -- you know, when we're dealing with formularies and

13  just trying to make sure that it is an available medication

14  on a Blue Cross/Blue Shield plan or a state Medicaid plan --

15          THE COURT:  No, I understand --

16          MR. HUEBNER:  -- that's a very different issue.

17          THE COURT:  -- I understand that.  I just -- I

18  think where the questioning was going ultimately was whether

19  there are practices and procedures in place -- we're talking

20  about six people, so --

21          MR. HUEBNER:  Yes.

22          THE COURT:  -- you know, it's not particularly

23  difficult to brief them and monitor them -- to ensure that

24  they're not through wholesalers or group -- managed group --

25  managed care groups incentivized to, you know, in cahoots

1    with them, get more out than is needed.

2          MR. HUEBNER:   Yeah.   I mean, at the end of the

3    day, Your Honor, it's only prescribers that actually decide

4    how much OxyContin is sold.   No wholesaler, no managed care

5    formulary has any contact with a patient to say take -- my

6    understanding, because I don't want to be testifying, but

7    I'm pretty sure I'm right -- to say you should take this

8    drug, not that drug, or this is a great drug.   That's why

9    the issue of promotion by an actual salesforce to

10   prescribers, which include nurse practitioners, doctors,

11   anesthetists, pharmacists, and the like, is where the

12   industry draws such a bright cleavage.

13         So when you say we have stopped promoting, what

14   that means is all dialogue with potential prescribers has

15   stopped.   As Mr. Lowne did testify -- and this is very

16   important, because this I think is actually as conservative

17   as one could possibly be -- the Medical Affairs Department

18   only responds to incoming inquiries, there's no longer

19   outreach by the company to any end user or prescriber in an

20   attempt to encourage them to choose Oxy over a competing

21   product.

22         I think that's probably the comfort you were

23   looking for.   If I had to take an educated guess -- and it's

24   not much more than that, but I am moderately educated after

25   19 months -- the self-limitations that Purdue is already

1    agreeing to, coupled with, for example, the Oklahoma model,

2    to which we are seeking to impose on ourselves, probably

3    would constitute, if not the most restrictive provisions

4    governing a major pharmaceutical branded manufacturer, are

5    pretty close to it.

6              And I don't want to sort of go under oath and say

7    that, because we weren't quite planning for this today, but

8    I think it's probably a relatively safe assumption that that

9    has a lot of truth to it.

10             THE COURT:  Okay.

11             MR. VONNEGUT:  Yes.  And, Your Honor, the reason

12   we're trying so hard to be so precise about this is the

13   language is very important.  For instance, a distinction

14   that is kind of counterintuitive is some governmental

15   agencies will consider making your products available in the

16   market a form of promotion.  And so, you know, the phrase

17   that we use is salesforce promotion, that is the thing that

18   Purdue does not do, calling on prescribers and affirmatively

19   reaching out to prescribers.

20             Okay.  Your Honor, I would propose now to turn to

21   the details of the two programs that are actually at issue

22   for today.

23             THE COURT:  Okay.

24             MR. VONNEGUT:  So the Treyburn retention plan.

25   The debtors are currently in the process of transitioning

Page 92

1    away from their manufacturing facility in Treyburn, North

2    Carolina, and consolidating their manufacturing operations

3    as a cost-cutting initiative.  The Treyburn plant was sold

4    in August of 2019.  Purdue is currently leasing the facility

5    back from the buyer for a limited transition period, so that

6    they can complete the consolidation of manufacturing

7    operations in their other plant.

8              To maintain the safety, security, and quality of

9    the company's manufacturing operations, the employees at the

10   Treyburn facility, all of whom are non-insiders, needed to

11   be incentivized to stay through completion of the

12   transition.  They are currently undertaking a range of very

13   important transition activities, including preparation for

14   removal and reinstallation of selected equipment at the

15   Treyburn facility that's going to move to another facility;

16   identification and acquisition of leased office, laboratory,

17   and warehousing space; preparation for decommissioning of

18   the Treyburn facility, because it needs to be cleaned up the

19   right way once we leave; preparation for decontamination of

20   the site; providing all required notifications to regulatory

21   agencies, including the DEA and the FDA.  This is, needless

22   to say, a very heavily regulated business and it's extremely

23   important to do this transition and decommissioning the

24   right way.

25              The retention plan covers a total of 52 non-

Page 93

1    insider employees.  Total payments are $521,058 in 2019 and

2    approximately $108,972 in 2020.  These payments will not

3    exceed a maximum of $23,056 per employee.

4          The most senior employee covered under the plan

5    holds the title of Director of Pharmaceutics and Analytical

6    Development.  That person reports to the head of Technical

7    Services, who is themselves also not an insider, and has

8    responsibilities including development of product

9    formulations, manufacturing processes, and analytical

10   methods related to the production of the debtor's products

11   at the Treyburn facility.

12         Other employees covered by the retention plan

13   include diversion control specialists, manufacturing and

14   packaging operators, pharmaceutical technicians, and

15   pharmaceutical process specialists.

16         We're very comfortable, Your Honor, that none of

17   those employees come close to being insiders.

18         With respect to the severance plan, the company-

19   wide severance plan has been in place since 2014, it was not

20   altered in any way or amended in conjunction with this

21   bankruptcy.  Vice presidents and above -- I'll just cover

22   this briefly again, so everybody has it -- vice presidents

23   and above that do not have employment contracts and have

24   less than five years of service get six months of severance,

25   those with five years or more get one year.

Page 94

1              Below vice president, people either get two or

2       three weeks of severance for each year of service, depending

3       on their grade level, with a minimum of eight weeks and a

4       maximum of 52 weeks.

5              We have one non-insider employee with an

6       employment contract that provides for six months' severance,

7       plus any earned but unpaid prior year annual bonus.

8              One thing I want to be very clear about, since

9       there was some confusion with the U.S. Trustee on the point,

10      if an insider is severed post-petition, we have an automatic

11      cap built into our order.  We will run the calculation

12      required under Section 503(c)(2) of the Bankruptcy Code and

13      cap any payout to that party at that amount.

14             Currently, the only known severance obligations

15      that we have or that we expect to incur are related to the

16      Treyburn employees.  That covers 14 people and totals just

17      under $660,000.  We have no plans to terminate any other

18      current employees, so any other potential severance

19      obligations are hypothetical.

20             THE COURT:  How many people are employed there?

21             MR. VONNEGUT:  Are employed at the Treyburn

22      facility?

23             THE COURT:  Right.

24             MR. VONNEGUT:  I don't know the total number of

25      employees off the top of my head.  I would imagine that it

1      is the 52 participants in this plan, but I'm not sure.

2                UNIDENTIFIED SPEAKER:  Seventy three.

3                MR. VONNEGUT:  Seventy three, Your Honor.

4           (Laughter)

5                THE COURT:  Okay.

6                MR. VONNEGUT:  Okay, so just briefly with respect

7      to the necessity of both of these programs.

8                Orderly completion of our transition and

9      consolidation is very important.  If we do not receive

10     approval of the Treyburn retention plan and payment of the

11     promised severance, we're concerned that the employees that

12     we're trying to retain through the transition may not stay

13     and that we would not be able to replace those highly

14     skilled and very specifically talented workers.  This would

15     be very disruptive to operations, it would harm the value of

16     the business, and it could jeopardize the safety and

17     security of the facility.  So we, therefore, think that

18     those two plans are very necessary under the circumstances.

19               If Your Honor doesn't have any questions about

20     Treyburn, I can turn to the market access ICP plan.

21               THE COURT:  Okay.

22               MR. VONNEGUT:  Okay.  So a key component of

23     Purdue's go-forward business plan is diversification of the

24     business beyond opioids to generate new growth.  One of the

25     key building blocks of that diversification strategy is a

Page 96

1    new medication called Adhansia XR, which is a newly

2    developed medication for ADHD.  To successfully launch new

3    products such as Adhansia, the company needs a motivated

4    group of field-based employees and the market access ICP

5    plan is designed to do just that, to motivate employees in

6    connection with this diversification strategy to get this

7    new product off the ground, up and running.

8         The employees that are eligible for payments under

9    the market access ICP are responsible for ensuring optimal

10   distribution of Purdue medications throughout the market,

11   negotiating contracts with wholesaler accounts, securing

12   managed care access to Purdue products, and managing the

13   performance of market access customers.

14        Very importantly, as you heard from Mr. Lowne and

15   I just want to make this crystal clear, none of the

16   employees that are eligible for payments under this program,

17   indeed none of the employees at the company at all, are

18   engaged in or compensated on the basis of promotion of any

19   opioid products to prescribers, period, full stop.

20        None of the employees that are eligible for

21   payments under the market access ICP have a title higher

22   than director or otherwise qualify as an insider under the

23   rubric that debtors have used and that Mr. Lowne testified

24   to in his supplementary declaration.

25        In the remainder of 2019, the total remaining

1    payout for these six non-insider employees is approximately

2    $168,000, an average of 28,000 per person.  The maximum

3    possible remaining 2019 payout would be $273,000, if results

4    exceed expectations substantially.

5            We believe the market access ICP is a customary

6    program in the pharmaceutical industry, it's necessary to

7    motivate the relevant employees and align their incentives

8    with those of Purdue's future owners, and very much in the

9    best interests of the debtors and their estates.

10           So, unless Your Honor has any questions, we would

11   ask that the modified order be approved, and I can walk Your

12   Honor through the changes in the proposed form of order.

13           THE COURT:  Fifty percent of the plan is based on,

14   quote, "employee performance," which I gather is separate

15   and apart from the sales of the Adhansia.  What are the

16   metrics for determining -- or how is that determined, that

17   50 percent?

18           MR. VONNEGUT:  Sure.  So the metrics under the

19   plan, some relate to company-wide performance, which just go

20   to the --

21           THE COURT:  Well, that's 25 percent.

22           MR. VONNEGUT:  Right.  So the employee-specific

23   performance is based on goals set by each individual's

24   manager that relate to their sales performance, the

25   performance of their individual line of business, and their

Page 98

1    individual performance related to goals set by the company.

2              THE COURT:  Okay.

3         (Pause)

4              THE COURT:  I guess I'm still having a hard -- I

5    mean, if what they're providing is for what's already been

6    prescribed, what is it that they really do other than just

7    sort of --

8              MR. VONNEGUT:  Sure.

9              THE COURT:  -- checking off orders and making sure

10   it's delivered to the pharmacy or to the managed care group.

11             MR. VONNEGUT:  Right, right.  So let me offer an

12   important clarification.

13             That's true with respect to opioid pain

14   medications.  There is promotion of Adhansia XR still going

15   on, so that's one component of their jobs.

16             THE COURT:  But that's the 25 percent.

17             MR. VONNEGUT:  Understood.  So the --

18             THE COURT:  Or are you saying that part of the

19   employee performance may include that too?

20             MR. VONNEGUT:  Yes, sir, I believe it does now.

21   But with respect to what we'll call the making medications

22   available in the market component of their performance, like

23   anything else, that's something that one can do well or

24   badly.  And so, you know, their job is to -- part of their

25   job is to ensure that if a patient is in need of a Purdue

1    medication and their doctor wants to prescribe it to them

2    that they're able to get it.  And in working with

3    wholesalers, with managed care customers, part of these

4    people's job is to ensure that those medications are

5    available for appropriate patients that need them and their

6    performance and how well they do that is part of how their

7    performance is evaluated and part of how these payouts are

8    determined.

9              THE COURT:  Okay.

10             MR. VONNEGUT:  Okay, thank you, Your Honor.  So we

11   have a proposed form of final order, which is on the docket

12   at -- excuse me -- that's on the docket at number 256.  Do

13   you have a copy of the market order?

14             THE COURT:  I do.

15             MR. VONNEGUT:  Great.  Okay.  So the bulk of the

16   changes are relatively straightforward, they're simply

17   converting interim relief to final relief.  We can of course

18   stet the language that you pointed to earlier in paragraph 2

19   regarding the acceleration of payment.

20             The one different category of change is in

21   paragraph 9.  This is language that was requested by

22   American Express, who runs the company's purchasing card

23   program, which employees use for reimbursable expenses.

24   Essentially, they want comfort that they're going to be paid

25   and that's what we've attempted to give them here.

Page 100

1          The one slightly different thing that they've

2     asked for that I would point Your Honor to is towards the

3     end of that paragraph.  They're not asking for this today,

4     but in the proviso at the back of that paragraph they've

5     given us time to seek from the Court approval to waive

6     potential avoidance actions against them.  So we're not

7     asking for that today, but effectively on the basis of us

8     seeking this language for them, they've turned back on the

9     purchasing card program and they're making clear that

10    they're allowed to turn it back off again if by November

11    20th we do not achieve this waiver of avoidance actions.

12          Candidly, Your Honor, we did our best to persuade

13    them they didn't need this and it's duplicative of the other

14    relief that they're getting, we did not succeed.  So we are

15    happy to seek approval of that additional relief however you

16    would like us to do so, whether that's by separate motion or

17    just by asking for it to be included in the amended final

18    order that we're going to seek in November.

19          THE COURT:  To me it just acknowledges the

20    existence of the agreement, so --

21          MR. VONNEGUT:  That's how we feel, Your Honor.

22          THE COURT:  -- it's not -- I guess it's not a

23    problem to put it in there.

24          MR. VONNEGUT:  Okay.

25          THE COURT:  So, Mr. Schwartzberg?

Page 101

1              MR. HUEBNER:  Your Honor, may I see one last

2      thing?  Mr. Lowne actually -- we've been working in the

3      background, because we want all parties, especially the

4      Court, to be comfortable that we're not doing foolish

5      things, even though the amounts at issue here for the ICP

6      plan are not particularly material, Mr. Lowne could actually

7      answer a few more targeted questions, or I could actually

8      proffer a little more testimony that I just adduced from him

9      to answer the question of what is this 50 percent for and

10     are we sure that we're not wasting our money.

11             THE COURT:  Okay, do you want to proffer that?

12             MR. HUEBNER:  Sure.  So I'll watch Mr. Lowne's

13     face to make sure I'm getting it right, because we've been

14     sort of working in the background here.

15             Your Honor, they are doing things that have

16     financial impact to the company, having these employees

17     working with the managed care entities to ensure that the

18     products remain on formulary is critical, because if we are

19     taken off formulary, then our drugs cease to be available to

20     people without an insurance plan.  And so their individual

21     performance includes both having new, large insurance

22     companies add us to formulary and not remove us from

23     formulary, and then they're also involved in negotiating

24     cost issues at the wholesaler and type level to ensure that

25     our fee-for-service for our products remains economically in

Page 102

1      the company's best interest.

2              So they are actually a very, very important

3      function, having them incentivized is important.  But again,

4      as Mr. Vonnegut and Mr. Lowne and then everybody has

5      repeated 50 times, it's not promotion, it's not with

6      prescribers who issue the prescriptions, it's ensuring that

7      the prescriptions are written, there's access to the product

8      and it is done on economically favorable terms to the

9      company, which are critical to our business model.

10             Mr. Lowne, may I ask you if I have successfully

11     summarized what we whispered to one another?

12             MR. LOWNE:  Everything you said is fair, yes.

13             THE COURT:  Okay.

14             MR. HUEBNER:  So hopefully that's helpful, Your

15     Honor.  We're not giving money away for no reason.

16             MR. SCHWARTZBERG:  Can I ask a quick --

17             THE COURT:  Do you want to cross-examine Mr. Lowne

18     on that?

19             MR. SCHWARTZBERG:  Yeah, can I just ask a --

20     should I approach?

21             THE COURT:  Yeah, I want to make sure the

22     microphone is --

23             MR. SCHWARTZBERG:  -- (indiscernible) keeps

24     telling me to sit down, so --

25         (Laughter)

```
 1              THE COURT:  I want to make sure the microphone is

 2     picking you up.  He works for the government.

 3              MR. SCHWARTZBERG:  I'm not sure if that gives me

 4     assurance or not.

 5         (Laughter)

 6              MR. SCHWARTZBERG:  You heard what --

 7              THE COURT:  Oh, let me just say, you're still

 8     under oath for the purpose of answering this question, Mr.

 9     Lowne.

10              MR. SCHWARTZBERG:  You heard what Mr. Huebner

11     said, didn't you?

12              MR. LOWNE:  Yes, I did.

13              MR. SCHWARTZBERG:  Would it be incorrect to say,

14     the more opioids the debtor sells, the more bonus the market

15     access IPC plan pays to these six employees?

16              MR. LOWNE:  They're not an incentive to increase

17     the amount of opioid prescriptions; they're merely trying to

18     keep our product on formulary.  Our product --

19              MR. SCHWARTZBERG:  I don't think that was the

20     question I asked.

21              MR. LOWNE:  I apologize.

22              MR. SCHWARTZBERG:  If -- and I'm making up numbers

23     here --

24              MR. LOWNE:  Yes.

25              MR. SCHWARTZBERG:  -- if the debtors sell 50
```

Page 104

1    million worth of opioids, do they get less bonus than if the

2    debtor sells a hundred million of opioids?

3              MR. LOWNE:  There's no -- nothing in their

4    objectives that tie it to the net sales of opioids.

5              MR. SCHWARTZBERG:  I'm not sure -- it may be my

6    ignorance -- that you answered the question.

7              MR. LOWNE:  Okay.

8              MR. SCHWARTZBERG:  If the debtors sell $100

9    million of opioids, do these people get more bonuses than if

10   they sold 50 million of opioids?

11             MR. HUEBNER:  Your Honor, I'm going to object.

12   This is really asked and answered.  The Court has already

13   acknowledged, everyone has acknowledged, we sell opioid;

14   parts of the bonus plans are based on company-wide

15   performance.

16             THE COURT:  Other than company-wide performance,

17   do they get any more bonus or not?

18             MR. LOWNE:  No, they don't.  No.

19             THE COURT:  Okay, all right.

20             MR. SCHWARTZBERG:  So the amount of opioids

21   doesn't matter, they get --

22             THE COURT:  No, it --

23             MR. HUEBNER:  Okay, now it's badgering

24             THE COURT:  -- now we're asked and answered.

25             MR. SCHWARTZBERG:  All right.  Yes, Your Honor.

Page 105

1              Just so the record is clear, the U.S. Trustee is

2    not objecting to the Treyburn retention plan.

3              THE COURT:  Okay.

4              MR. SCHWARTZBERG:  I wasn't sure that was clear.

5    And then, as Counsel indicated, because of the sensitivity

6    issues regarding the employees, regarding what we were

7    talking about, the past conduct, I will just defer to the

8    Court and the Court can draw its own conclusions from the

9    testimony regarding that.

10             THE COURT:  Well, I'm sorry, I want to make sure I

11   understand the -- what you're not objecting to.  You're not

12   objecting to the Treyburn retention plan --

13             MR. SCHWARTZBERG:  That's referenced in paragraph

14   17 of --

15             THE COURT:  Right.  No, I understand that, but

16   there's severance, which applies generally, except with

17   regard to the ten people in footnote 4, and that includes

18   severance in connection with Treyburn.  Are you objecting to

19   severance?

20             MR. SCHWARTZBERG:  It's the severance, the

21   severance plan, and also as it applies to the Treyburn 14.

22             THE COURT:  Right.

23             MR. SCHWARTZBERG:  And the market access plan.

24             THE COURT:  What is the basis for objecting to the

25   severance?

1          MR. SCHWARTZBERG:  On two bases, Your Honor --

2     well, obviously, I think the testimony elicited these are

3     not insiders, so the question is basically business judgment

4     and things of that nature.

5          Two things that I think they indicated.  One, we

6     don't know if they're going to turn around the day after

7     they get -- I think it's December 1st -- and turn around and

8     still have the same job, so they may not -- the severance --

9          THE COURT:  But can I interrupt you?  If they're

10    not insiders, then the Second Circuit has already spoken on

11    this issue.  I don't understand why it's even an issue under

12    Bethlehem Steel, which acknowledged the validity of Straus-

13    Duparquet.  So, to me, the severance issue is just are they

14    insiders or not.

15         And I guess you could say that, you know, the

16    Treyburn retention plan is doubling up, but at the same time

17    I think everyone knows they're going to be out of a job.  So

18    I'm assuming they've negotiated the retention plan

19    acknowledging that they'll be out of a job and part of that

20    is they need to pay them a little more than just severance

21    to keep them on, because they would get the severance

22    immediately.  So I don't really follow the logic there.

23         MR. SCHWARTZBERG:  Well, our concern was the

24    doubling up as --

25         THE COURT:  But it's not doubling up, because --

Page 107

1    again, if you feel that you need to pay them to stay on, the

2    severance isn't doubling up, they would -- they will leave

3    and so they get their severance.  So it doesn't seem to be

4    doubling up to me.

5              MR. SCHWARTZBERG:  All right, then I'll move on,

6    Your Honor.

7              In terms of the market access plan, as the witness

8    testimony, we don't know if the current compensation is

9    below, at, or above market.  If it's above market, it might

10   not be necessary -- it may or may not, but that's a fact

11   that's important and should be disclosed.

12             Similarly -- well, I'll leave it at that in terms

13   of that issue.  The testimony to me, although at the end it

14   seemed to have changed, it seemed that the more opioids they

15   sold, the more -- the more that --

16             THE COURT:  No, but if we just stop there, I think

17   this is an important point to get over or to address.

18   Opioids are a legal product.  It's not selling thamila (ph)

19   -- it's not like selling an illegal drug or a drug that only

20   has adverse consequences.  It's a product that continues to

21   be prescribed and, as far as I know, unless someone develops

22   a better drug, the alternative is excruciating pain for

23   people.  The problems stem from over prescription or

24   improper prescription.  So just saying that the company

25   shouldn't be -- and its employees shouldn't be rewarded for

Page 108

1    selling it properly is -- it doesn't make sense to me.  I

2    mean, that's basically a decision that regulators should

3    make and doctors should make who influence the regulators.

4              So, to me, the question is whether the -- not

5    whether they are incented to have the company perform better

6    or incented for them to sell more, but rather are they being

7    incented to sell more improperly, and I just -- I don't get

8    the impression that that latter is the case.  It just -- you

9    know, I think their job is to ensure that Purdue's OxyContin

10   isn't rejected in favor of someone else's opioid.  And,

11   obviously, they have to comply with the company's best

12   practices.  I think it would be and I think it probably is

13   warranted to put in the order that they wouldn't be entitled

14   to any bonus if they deviate from -- I mean, among other

15   sanctions, if they deviate from the company's best

16   practices.

17             MR. SCHWARTZBERG:  All right, I'll --

18             THE COURT:  I'm sure -- would the company be

19   amenable to that?  I would think so.

20             MR. VONNEGUT:  Yes, Your Honor.

21             THE COURT:  All right.

22             MR. SCHWARTZBERG:  I'll move on to my last point

23   then, Your Honor.

24             MR. HUEBNER:  And law, Your Honor.  I mean, just

25   to be clear --

Page 109

1              THE COURT:  Well, yeah, but that --

2              MR. HUEBNER:  -- this is an extremely regulated

3      product --

4              THE COURT:  -- but there has been a gap between

5      law and --

6              MR. HUEBNER:  Right.

7              THE COURT:  -- best practices.

8              MR. HUEBNER:  Yeah, we completely agree.  I just

9      want it to be clear that it was clearly both, so that nobody

10     was left with a misimpression.

11             MR. SCHWARTZBERG:  The last point, Your Honor, is

12     that there's a break on the severance plan and the vice

13     presidents are not included as insiders and, therefore,

14     would not be subject to the cap.  The witness indicated that

15     on occasion they do speak to the board and on occasion --

16             THE COURT:  I would hope they do.  Boards are

17     supposed to be informed of the facts when they make

18     decisions.  I don't get any impression that these people are

19     causing the board to make a decision, but they're coming in

20     and reporting, just like any person at a lower level would

21     be expected to do.

22             MR. SCHWARTZBERG:  Well, I think the witness also

23     testified they speak to the CEO, the CFO, the COO, and --

24             THE COURT:  Right, so they don't surprise the

25     people who are actually helping to influence the decision.

```
 1              MR. SCHWARTZBERG:  Well, the thought there being,

 2      Your Honor, that they can influence the decision and

 3      depending --

 4              THE COURT:  Well, I would hope so.  I mean, people

 5      -- boards are not supposed to act with blindfolds on.

 6      They're supposed to act based on information provided to

 7      them.  If you -- it just -- if that were the test, then

 8      boards wouldn't be able to function.

 9              MR. SCHWARTZBERG:  Well, the concern is that the

10      vice presidents may be insiders, or some of them may be,

11      some of them not, and therefore some of them should be

12      subject to the cap and some not.

13              THE COURT:  But that's a concern that doesn't seem

14      to be supported by the evidence.

15              MR. SCHWARTZBERG:  Right.  With that then, Your

16      Honor, I'll sit down.

17              THE COURT:  Okay, all right.  All right, certain

18      parties filed joinders to the U.S. Trustee's objection.  As

19      the case management order makes it clear, a joinder is a

20      very -- in terms of one's rights in court a very weak

21      pleading, including if someone withdraws an objection that

22      you've joined to, you are essentially erased.  So we're

23      early in the case and maybe people don't appreciate that

24      yet, but does anyone else have anything to say with respect

25      to the motion other than the debtors in rebuttal?
```

Page 111

1           MS. VAN ECK:  Good morning, Your Honor, Melissa

2    Van Eck on behalf of the Commonwealth of Pennsylvania.  Our

3    commonwealth was one of the joinders that was filed to the

4    U.S. Trustee motion.  In light of the agreement that was

5    reached between the debtor and the UCC and the ad hoc

6    committee, we are in line with that agreement.  We want to

7    make sure that the Commonwealth is included in the

8    disclosure of the due diligence.

9           THE COURT:  Okay.

10          MS. VAN ECK:  Thank you.

11          THE COURT:  No, I think the agreement is very well

12   taken.  Frankly, if it hadn't been agreed to, I would have

13   pushed you all to do something like it.

14          As I said before, this isn't a normal case in some

15   respects.  It's a very public case where people are tempted

16   to make public statements that they might not have to take

17   if they have more time to look at matters, and I think time

18   is warranted here on the programs that the parties have

19   agreed to defer consideration of.  It may even be too soon

20   to do it on the 6th, we'll see, depending on where you are

21   in the case.

22          Again, public perception here is more important

23   than in most cases, buy-in on a plan that includes some of

24   the points that we were discussing at the beginning of the

25   hearing is important.  And bonus is such a loaded word and

1    can be twisted and turned in ways that, if people are more

2    educated, they might not need to do.

3              So I think it does make sense to defer and include

4    in the discussion people who might feel that they would

5    otherwise have to object because they really don't have the

6    facts.

7              MR. VONNEGUT:  Thank you, Your Honor, very much

8    agreed.  That's the entire purpose of giving extra time is

9    so that we can undertake that discussion and that education

10   process, to make sure that people understand how the company

11   is operating.

12             I'd just like to briefly respond to some of the

13   things that Mr. Schwartzberg said.  First and most

14   importantly, and I don't intend to belabor the point, but

15   this notion that, you know, the more opioids that are sold,

16   the more people get paid.

17             I just want to be very, very clear about the

18   nature of the company's current business and what it does

19   with its opioid medications.  They are made available in the

20   market for prescription by physicians to patients that need

21   them.  Those patients include people who have pain severe

22   enough to require daily, around-the-clock, long-term

23   treatment.  It's important to remember that the initial

24   innovation of OxyContin was an important one.  It's a

25   medicine that for people who need it, it gives them dignity

Page 113

1    and peace, it lets people sleep through the night.  So what

2    we are trying to do with the debtor's opioid medications is

3    make them available to people who need them.

4         With respect to the other points made by Mr.

5    Schwartzberg related to the basis for paying severance,

6    candidly, I think we agree with all the comments that Your

7    Honor made there.  These are people that we need to stick

8    around at the Treyburn plant.  We need to fulfill and honor

9    the promises that were made to these people to get them to

10   continue to work at the plant, given that we can offer them

11   no long-term job certainty of any kind.

12        With respect to the market access plan, I think

13   you heard from Mr. Lowne that the company does undertake

14   market comping.  But from a 50,000-foot level it's important

15   to note that this is a company under extremely difficult

16   circumstances, it's a very hard place to work, it's a very

17   challenging place to work, and Purdue pays its employees

18   what it needs to pay for them to be motivated to do their

19   jobs well, to drive value for this company, and to drive

20   value for the claimants in these cases who are going to be

21   the owners of the company.

22        With respect to categorization of insiders, again,

23   I think this topic has been discussed ad nauseam and,

24   frankly, I think Your Honor has already ruled on it.  The

25   vice presidents were excluded from the insider group for

Page 114

1    very clear reasons.  Although they occasionally speak to the

2    board and they speak to senior executives at the company,

3    they were not appointed by the board and they do not report

4    directly to the board.  So we have a very crisp set of

5    criteria by which we determined who was and was not an

6    insider that we think is very clearly supported by the case

7    law on this topic.

8            So, unless Your Honor has any further questions,

9    that's all that we had on the wages motion.

10           THE COURT:  All right.  I have before me a motion

11   for a final order on the aspects of the so-called employee

12   programs that the debtors have agreed to go forward on

13   today, having adjourned, in agreement with their official

14   creditors' committee and the ad hoc committee of certain

15   states and territories, consideration of the aspect of those

16   employee programs covered in paragraph 17 of the proposed

17   order.

18           Most of the relief that the Court is being asked

19   to consider today on a final basis is unopposed, the only

20   exception is the United States Trustee's objection to two

21   aspects of the employee programs.

22           The first is the continuation of the debtors'

23   severance programs, including at the Treyburn facility,

24   which the debtors will be closing sometime in November, but

25   otherwise company-wide with the exception of ten employees,

Page 115

1    who the debtors acknowledge and identify in footnote 4 to

2    Mr. Lowne's supplemental declaration are insiders.

3    Secondly, the U.S. Trustee objects to the so-called market

4    access ICP, which is an incentive program that would apply

5    to six individuals.

6            As far as the severance Pickering continuation is

7    concerned, this is a very narrow issue.  In Section

8    503(c)(2), Congress prohibited the payment of a severance

9    payment to an insider of the debtor unless, and then sets

10   forth two -- I'm sorry, two tests -- I'm sorry, a joint test

11   that is very difficult to meet, and the debtors have

12   acknowledged that they will cap any severance payment to an

13   insider based on those very difficult to meet tests.

14           Otherwise, severance, if the program is a

15   preexisting program, is subject to other applicable law.

16   Obviously, if the program was adopted on the eve of the

17   filing of the bankruptcy case or otherwise would appear to

18   be questionable, then it would be subject to review, but if

19   it has been long in place, as is the case here, it's subject

20   to the general rules pertaining to the allowance and payment

21   of administrative expenses.

22           There's been no suggestion that the severance

23   program here, which is clearly described in Mr. Lowne's two

24   declarations, is anything other than severance, i.e. a

25   payment earned upon one's termination of employment and

Page 116

1      subject to a lump-sum payment at that time.

2              Under the law of the Second Circuit, namely In re

3      Bethlehem Steel, Corp., 479 F.3d 167 (2d Cir. 2007), which

4      confirmed the applicability of a pre-Bankruptcy Code Second

5      Circuit case, Straus-Duparquet, Inc. v. Local Union No. 3

6      International Brotherhood of Electrical Workers, 386 F.2d

7      649 (2d Cir. 1967), severance payments are entitled to

8      administrative priority, as then-Circuit Judge Sotomayor

9      ruled in dicta, but it was dicta essential to the analysis

10     in that case and In re Bethlehem Steel Corp. at page 169.

11             So the only issue I believe before me is whether

12     the parties to the severance program are insiders for

13     purposes of Section 503(c)(2).  I conclude based on the

14     evidence before me that they are not.  It appears to me that

15     the debtors undertook their own analysis of who would be an

16     insider under applicable law, as summarized in the debtors'

17     pleadings, and most importantly that includes their ability

18     to influence major decisions or make major decisions by the

19     debtors, one or the other.

20             Congress enacted Section 503(c)(3) to prevent the

21     management of debtors in bankruptcy from feathering their

22     own nests.  Almost implicit in that purpose is that if you

23     don't have the ability to do that, you would not be an

24     insider.  The evidence before me makes it clear that the

25     employees who would be covered by this motion do not have

Page 117

1    that ability.  This is not to say that they aren't important

2    to the company, merely that they don't have the ability to

3    feather their own nest or feather each other's nests in the

4    decision-making process of management.  See generally In re

5    Borders Group, Inc., 453 B.R. 459, 469 (Bankr. S.D.N.Y.

6    2011), and in particular that court's focus on the actual

7    responsibilities and decision-making authority that

8    employees would have as opposed to their title.

9            So I will approve that aspect of the motion on a

10   final basis, as well as the unopposed aspects of it.

11           As I said during our oral argument, I don't

12   believe that the fact that certain employees at the Treyburn

13   plant would receive both severance and be parties to the

14   Treyburn retention plan, which no one has objected to,

15   should invalidate the award of severance.  Logically, if one

16   were to believe there was undue compensation being paid

17   under severance and the retention plan, you would modify the

18   retention plan, but I believe that they really do serve

19   different purposes.  Almost by definition, a retention plan

20   is necessary on top of severance, which the employee would

21   be entitled to in any event, it is necessary to incentivize

22   the employee to stay to do the critical functions for the

23   company that are well detailed in Mr. Lowne's declarations.

24           The remaining objection is to the market access

25   ICP incentive program.  It does not appear to me to be

Page 118

1    contested that any of the beneficiaries of this program are

2    insiders, that the record clearly does not suggest that they

3    are insiders.

4           So the analysis then is whether under Section

5    503(c)(1) the incentive program is appropriate under the

6    facts and circumstances of the case, or justified by the

7    facts and circumstances of the case, in this circuit and

8    elsewhere.  That is involved in an analysis of the

9    underlying business justifications for the program as

10   originally laid out by Judge Lifland in In re Dana Corp.,

11   358 B.R. 567, 576-77, (Bankr. S.D.N.Y. 2006), which in

12   evaluating the business judgment underlying the program asks

13   whether there's a reasonable relationship between the plan

14   proposed and the results to be obtained; is the cost of the

15   plan reasonable in the context of the debtor's assets,

16   liabilities, and earning potential; is the scope of the plan

17   fair and reasonable -- does it apply to the right people, in

18   other words -- is the plan or proposal consistent with

19   industry standards; what were the due diligence efforts of

20   the debtor in investigating the need for the plan, including

21   analyzing which key employees needed to be incentivized, and

22   what is generally applicable in the particular industry; and

23   did the debtor receive independent counsel in performing due

24   diligence and in creating and authorizing the incentive

25   compensation.

1                The objection was premised on I believe,

2     ultimately, two points.  And I want to be clear, I don't

3     fault the U.S. Trustee for filing the objection or pursuing

4     it, or anyone else for supporting it, although I believe on

5     the record before me, as brought out by the U.S. Trustee,

6     the grounds for the objection are not warranted here with

7     the one adjustment that I mentioned during oral argument.

8                First, this is a very narrowly tailored incentive

9     program pertaining to only six people and, in the context of

10    the debtors' assets and liabilities, appears to me to be

11    more than manageable by the debtor in terms of its cost.

12               I believe from Mr. Lowne's testimony that the

13    program was designed in a way that the debtors would not be

14    overspending and rather that it is designed to properly

15    incentivize these individuals to do what appears to me to be

16    important work, where an incentive program is an important

17    aspect of their compensation as opposed to a flat salary.

18               The fact that these people are not insiders I

19    think highlights the fact that -- or should highlight the

20    fact that the debtors in proposing the program have no

21    motivation to overpay and rather to design something that

22    will be properly motivating to the employees without

23    overcompensating them.

24               The U.S. Trustee properly points out that Mr.

25    Lowne could not testify that in each instance the aggregate

Page 120

1  compensation here, including the metrics for the bonus plan,

2  are in line with or consistent with the debtors'

3  competitors.  He did states, however, that competitors'

4  programs were taken into account in setting the metrics, in

5  addition to these individuals' salaries, and pointed out

6  that it is -- at least this is what I took away from his

7  testimony -- it is hard to say that there is any true

8  comparator to these debtors given the adverse publicity that

9  these debtors have received and that these six individuals

10  have to contend with in working with managed care groups and

11  wholesalers.

12        So, consistent with the Dana case that I cited, as

13  well as the Borders Group case that I cited, and In re

14  Residential Capital, 491 B.R. 73 (Bankr. S.D.N.Y. 2013), I

15  believe that the debtors have established a sufficient

16  business justification for the incentive program.

17        The other objection was based on a concern and,

18  again, a legitimate concern, which I think is also behind

19  the objections to the adjourned matters with regard to this

20  motion, that all want to be sure that an incentive program

21  does not incentivize people to cause the sale of the

22  debtors' opioid products to occur in a way that's harmful to

23  society and, therefore, to the debtors themselves.  It

24  appears to me, based on the record before me, that that is

25  not the case and that the sales practices that these six

1    people will be assisting in are to be legitimate, subject to

2    applicable law, and, in addition to that, the debtors' own

3    additional best practices.  So that if any of these

4    individuals fail to comply with those things, not only would

5    they face other consequences, but they wouldn't be entitled

6    to these bonuses.

7              As I noted earlier, the debtors' opioid products

8    are legal and, when prescribed properly and with proper

9    controls, beneficial.  And therefore, if the incentives are

10   tied to the proper marketing of those products, that would

11   be beneficial to not only the debtors, but society.

12             The same consideration applies to an argument that

13   actually wasn't made during oral argument and is only

14   implicit in the U.S. Trustee's objection generally, which is

15   a suggestion of the possibility that certain people who

16   would be covered by the severance program under this motion

17   had themselves engaged in improper conduct in the past.

18             The testimony in that regard was to the negative,

19   albeit qualified by Mr. Lowne's statements that he doesn't

20   know for sure.  But it appears to me that not having any

21   evidence along the lines that the U.S. Trustee suggested

22   would warrant rethinking any of these employee programs, it

23   would be a bad exercise of business judgment simply to

24   withhold payments of severance and in fact to insiders it

25   would be, I believe, contrary to applicable law.  As I said

1    earlier, any rights that the debtors have against employees

2    for their improper conduct are clearly preserved,

3    notwithstanding the entry of this order, if that's ever

4    shown.  And that would include, by the way, a setoff of

5    course, but there's really no record that such claims exist

6    as to any particular person.

7         So I will grant the motion as revised and overrule

8    the U.S. Trustee's objection.  Obviously, one of the

9    revisions is to preserve the objection as to the remaining

10   items covered by paragraph 17, but I'll overrule the

11   objection as to the matters I'm approving today.

12        So you can email that order to chambers once it's

13   marked up, as well as the other several orders that I have

14   approved.

15        MR. VONNEGUT:  Thank you very much, Your Honor,

16   we'll do that.

17        THE COURT:  Okay, very well.  Thank you.

18        MR. VONNEGUT:  Thank you.  Well, unless my

19   colleague Mr. Robertson is going to tell me otherwise, I

20   think that concludes the agenda for today.

21        THE COURT:  Okay, very well.  Thank you.

22        MR. VONNEGUT:  Thank you very much, Your Honor.

23        (Proceedings concluded at 12:50 p.m.)

24                    * * * * *

25

1                            I N D E X

2

3                          R U L I N G S

4       DESCRIPTION                                          PAGE

5       Motion of Debtors for entry of Interim and

6       Final Orders Authorizing (I) Debtors to Pay Certain

7       Prepetiion Taxes, Governmental Assessments and Fees

8       and (II) Financial Institutions to Honor and Process

9       Related Checks and Transfers (ECF 8)                 52

10

11      Motion of Debtors for Entry of Interim and Final Orders

12      Authorizing (I) the Debtors to Continue and Renew Their

13      Liability, Property, Casualty and Other Insurance

14      Policies and Honor all Obligations in Respect

15      Thereof and (II) Financial Institutions to Honor and

16      Process Related checks and Transfers (ECF 10)        54

17

18      Motion of Debtors for Entry of Interim and Final Orders

19      Authorizing the Debtors to Continue and Renew Surety

20      Bond Program (ECF 12)                                56

21

22

23

24

25

1                           I N D E X

2

3                         R U L I N G S

4    DESCRIPTION                                        PAGE

5    Motion of Debtors for Entry of Interim and

6    Final Orders (I) prohibiting Utilities From Altering,

7    Refusing or Discontinuing Service, (II) Deeming

8    Utilities Adequately Assured of Future Performance and

9    (III) Establishing Procedures for Determining

10   Requests for Additional Adequate Assurance (ECF 7)    57

11

12   Motion of Debtors for Entry of Interim and Final Orders

13   Authorizing (I) Debtors to Honor Prepetition

14   Obligations to Customers and Related Third Parties

15   and to Otherwise Continue Customer Programs (II)

16   Relief from Stay to Permit Setoff in Connection with the

17   Customers and Programs and (III) Financial

18   Institutions to Honor and Process Related Checks and

19   Transfer (ECF 11)                                    58

20

21   Motion of Debtors for Entry of Interim and Final Orders

22   Authorizing (I) Payment of Certain Prepetition

23   Claims of Critical Vendors and (II) Financial

24   Institutions to Honor and Process Related Checks and

25   Transfers (ECF 9)                                    61

```
 1                        I N D E X

 2

 3                    R U L I N G S

 4   DESCRIPTION                                    PAGE

 5   Motion of Debtors for Entry of an Order Authorizing (I)

 6   Debtors to (A) Pay Prepetition Wages, Salaries, Employee

 7   Benefits and Other Compensation and (B) Maintain Employee

 8   benefits Programs and Pay Related Administrative

 9   Obligations, (II) Employees and Retirees to Proceed with

10   Outstanding Workers' Compensation Claims and (III) Financial

11   Institutions to Honor and Process Related Checks and

12   Transfers (ECF 6)                              114

13

14                        I N D E X

15

16                    W I T N E S S E S

17   WITNESS                BY                      PAGE

18   JON LOWNE              MR. SCHWARTZBERG        66

19                          MR. VONNEGUT           80

20                          MR. TROOP              83

21                          MR. VONNEGUT           85

22

23                      * * * * *

24

25
```

Page 126

1              C E R T I F I C A T I O N

2

3        We, Sheila Orms, Tracey Williams and Jamie Gallagher,

4     certify that the foregoing transcript is a true and accurate

5     record of the proceedings.

6     Shelia          Digitally signed by Shelia Orms
                      DN: cn=Shelia Orms, o, ou,
7     Orms            email=digital@veritedt.com,
                      c=US
8     _____  Date: 2019.10.14 11:14:40 -04'00'

9     Sheila Orms

10    Tracey Williams   Digitally signed by Tracey Williams
                        DN: cn=Tracey Williams, o, ou,
                        email=Digital@veritext.com, c=US
11    _____  Date: 2019.10.14 11:14:54 -04'00'

12    Tracey Williams

13    Jamie            Digitally signed by Jamie Gallagher
                       DN: cn=Jamie Gallagher, o, ou,
      Gallagher        email=digital@veritext.com, c=US
14    _____  Date: 2019.10.14 11:15:17 -04'00'

15    Jamie Gallagher

16

17

18

19    Date:  October 12, 2019

20

21    Veritext Legal Solutions

22    330 Old Country Road

23    Suite 300

24    Mineola, NY 11501

25

[& - 550]                                                                                                    Page 1

**&**

**&**  5:2,12 6:2,10
7:14 8:1,6 9:12
10:8 19:13 49:16
53:25 55:4 61:21

**1**

**1**  10:23 19:21
61:18,24 118:5
**1.5**  12:13
**10**  1:17 3:16 12:14
68:25 70:20 76:11
123:16
**100**  12:20 104:8
**10001**  5:23
**10014**  6:21
**10017**  5:5
**10019**  6:5
**10019-6131**  7:10
**10036**  5:15 8:9
**10036-6745**  7:17
**1006**  6:20
**10601**  1:15
**108,972**  93:2
**10:06**  1:18
**11**  4:10 10:14
15:17 22:7,11
36:11 49:4 124:19
**11's**  10:16
**114**  125:12
**11501**  126:24
**1177**  5:14
**12**  3:20 20:16,24
123:20 126:19
**12.05**  21:8
**120**  42:7
**12:50**  122:23
**13**  66:10
**134**  2:12
**14**  59:18 60:7 78:7
78:8,13,16,21
79:2,8 94:16
105:21

**140,000**  19:17
**15th**  8:17
**167**  116:3
**168,000**  97:2
**169**  116:10
**17**  105:14 114:16
122:10
**17120**  8:18
**180**  17:25 18:3
42:13 46:8
**187**  20:3
**18th**  50:1
**19**  19:23 90:25
**19-23649**  1:3
**190**  2:15,18
**1967**  116:7
**197**  2:21
**199,000**  20:4
**1995**  21:3,5,9
80:10
**1996**  72:24 73:8
73:14 77:9,20
**1st**  53:3 79:9
106:7

**2**

**2**  94:12 99:18
115:8 116:13
**2.4**  12:21
**200**  54:5
**2001**  72:24 73:9
73:14 77:9,21
80:10
**2005**  77:12
**2006**  118:11
**2007**  74:4,19
75:23 76:13 77:12
77:17 80:11 116:3
**201**  2:24 6:20
**2011**  117:6
**2013**  120:14
**2014**  93:19
**2017**  19:18,21,22
20:2

**2018**  19:13,18,23
20:1 21:3,5
**2019**  1:17 16:3
20:1 27:13 29:10
34:7 92:4 93:1
96:25 97:3 126:19
**2020**  93:2
**20th**  100:11
**23**  11:3 32:21 40:3
**23,056**  93:3
**236**  65:10
**24**  10:9 11:25 22:9
32:21 35:24
**25**  13:9 21:2,3,5,6
67:11,12,16 97:21
98:16
**250**  57:2
**251**  58:8
**252**  50:3
**253**  52:10
**254**  55:10
**255**  59:12
**256**  62:1 99:12
**270**  17:25 42:15
**273,000**  97:3
**28**  40:3
**28,000**  97:2
**29th**  79:9
**2d**  116:3,7
**2nd**  79:10

**3**

**3**  12:10,11,15,18
13:1,4 20:11 23:1
52:7 56:8 57:6,22
116:5,20
**30**  46:8
**300**  1:14 126:23
**31**  6:4 7:9
**312.6**  19:23
**330**  126:22
**358**  118:11
**366**  57:19

**386**  116:6

**4**

**4**  12:19 13:4 55:7
56:9 69:16 70:2,5
70:9,11,14 71:4
71:13,25 72:18
73:7 74:17 75:20
105:17 115:1
**4.5**  12:22
**4.6**  12:15
**40**  20:9
**410**  21:8
**43**  14:18
**450**  5:4
**453**  117:5
**459**  117:5
**469**  117:5
**479**  116:3
**48**  21:9
**491**  120:14

**5**

**5**  13:4 52:22,24
53:11 56:23
**5.75**  21:7
**5.9**  21:6
**50**  67:11,15 97:17
101:9 102:5
103:25 104:10
**50,000**  113:14
**50/50**  12:23
**500**  6:12 46:15
**503**  94:12 115:8
116:13,20 118:5
**52**  21:9 92:25 94:4
95:1 123:9
**521,058**  93:1
**52nd**  6:4 7:9
**53**  44:6
**53701**  6:13
**54**  123:16
**55**  5:22
**550**  18:16

**56**   123:20
**567**   118:11
**57**   124:10
**576-77**   118:11
**58**   124:19

**6**

**6**   2:10 13:10 58:3
   61:24 125:12
**61**   124:25
**62**   61:25
**63**   59:11
**64**   57:1
**649**   116:7
**65**   50:1
**66**   52:9 125:18
**660,000**   94:17
**67**   58:7
**68**   55:9
**6th**   63:11,20
   111:20

**7**

**7**   4:2 10:23 59:10
   124:10
**70**   27:4
**70,000**   19:18
**73**   120:14

**8**

**8**   3:9 123:9
**80**   125:19
**83**   125:20
**85**   13:23 34:12
   38:10 125:21
**85.8**   38:13
**86**   13:23 18:2
   34:12 38:10

**9**

**9**   4:15 13:8 99:21
   124:25
**9-11**   47:10
**90**   16:6
**90/10**   12:12

**97.6**   12:21
**99**   3:3 38:9

**a**

**a.m.**   10:23,23
   63:12
**abate**   29:4
**ability**   44:21
   76:10 116:17,23
   117:1,2
**able**   11:9 15:17
   47:25 83:1 95:13
   99:2 110:8
**absolute**   23:1
**abstinence**   27:18
**accelerate**   51:10
   51:16
**acceleration**
   99:19
**accepted**   59:21
   60:12 79:7
**access**   25:7 64:14
   66:13 67:3,21,24
   81:16 82:17 95:20
   96:4,9,12,13,21
   97:5 102:7 103:15
   105:23 107:7
   113:12 115:4
   117:24
**accomplished**
   39:13
**accomplishment**
   41:19
**account**   10:21
   59:24 120:4
**accounts**   96:11
**accurate**   19:6
   126:4
**achieve**   34:2 36:3
   39:23 40:19 41:24
   100:11
**acknowledge**   74:1
   115:1

**acknowledged**
   45:24 72:22,23
   73:18 104:13,13
   106:12 115:12
**acknowledges**
   100:19
**acknowledging**
   106:19
**acquisition**   92:16
**act**   110:5,6
**action**   31:8 37:11
   37:15
**actions**   18:10,15
   22:3 74:4,19
   75:21 76:12 100:6
   100:11
**active**   30:25 31:2
   31:5 59:1
**actively**   42:22
**activities**   74:18
   77:16 87:15 92:13
**actual**   10:12 90:9
   117:6
**ad**   5:13 6:2 7:8
   9:2 11:2 13:19
   15:12 17:21 20:12
   24:15 25:6 32:20
   39:9 40:5,6 42:4
   43:11,19 44:4,7
   50:13,19 52:11
   56:2 57:4 58:10
   58:15 59:15 60:3
   62:4,19 111:5
   113:23 114:14
**add**   59:18 101:22
**added**   52:17
**addition**   13:1
   47:14 58:13 60:1
   60:7 78:18 120:5
   121:2
**additional**   4:1
   12:23 23:1 65:7
   100:15 121:3

**acknowledged**
   124:10
**address**   14:21
   15:6,9 18:22
   21:23 26:20 27:1
   35:6 43:8 59:23
   61:17 86:5,15
   107:17
**addressed**   26:13
   46:9 54:17,24
   65:8 84:25
**addressing**   74:7
**adduced**   101:8
**adequate**   4:1 43:1
   57:7,16 124:10
**adequately**   3:24
   124:8
**adhansia**   67:11
   82:21 96:1,3
   97:15 98:14
**adhd**   96:2
**adhoc**   2:20
**adjourned**   114:13
   120:19
**adjustment**   119:7
**administrative**
   2:7 59:22 115:21
   116:8 125:8
**admitted**   65:13
   69:18 75:20
**adopted**   115:16
**advance**   10:13
   53:12
**advancement**
   63:17
**adverse**   107:20
   120:8
**advisor**   27:11
**advisors**   26:18
   62:9
**advocacy**   31:1
**affairs**   85:1 90:17
**affirmatively**
   91:18

**agencies**  91:15
92:21
**agenda**  2:1 18:23
23:21 36:20 48:7
49:20 50:21 52:6
55:6 56:23 58:3
59:9 61:18,23,23
65:5 122:20
**agent**  47:10 48:19
**aggregate**  119:25
**ago**  11:1 20:21
27:7 32:24
**agree**  109:8 113:6
**agreed**  11:6 31:4
31:7 32:23 39:24
53:1,2 55:13 56:1
58:13,15 59:17
60:1,14 63:10
64:1 111:12,19
112:8 114:12
**agreeing**  12:4
91:1
**agreement**  11:2
11:12 13:21 17:8
38:10 41:14 42:7
42:13 62:15
100:20 111:4,6,11
114:13
**agreements**  21:16
45:24 62:20
**agrees**  15:20
**ahead**  14:23 26:8
46:6 75:16
**akin**  7:14 25:11
25:24
**al**  1:7 10:3
**albeit**  121:19
**alberto**  7:5
**align**  97:7
**allay**  86:18
**allocated**  29:1
33:25

**allocation**  29:18
32:13 34:4 48:21
**allow**  20:17 22:5
23:8 36:6 37:4
41:13 42:13
**allowable**  38:11
**allowance**  38:18
115:20
**allowed**  100:10
**allowing**  23:18
**allows**  82:23 83:9
**altered**  93:20
**altering**  3:23
124:6
**alternative**
107:22
**ambiguous**  60:10
**ameliorate**  23:12
**amenable**  108:19
**amended**  49:19
93:20 100:17
**america**  22:18
**american**  9:12
15:1 28:13 99:22
**americans**  14:17
**americas**  5:14
**amount**  12:24
48:21 55:20 57:7
64:6 94:13 103:17
104:20
**amounts**  53:12
56:13 101:5
**analysis**  25:1
116:9,15 118:4,8
**analytical**  93:5,9
**analyzing**  118:21
**anderson**  54:1
**andrew**  6:7 7:12
44:4
**anesthetists**  90:11
**ank**  7:20
**annual**  63:12
79:24 94:7

**answer**  68:23 72:7
72:9,12 75:6
77:10 84:7 101:7
101:9
**answered**  104:6
104:12,24
**answering**  103:8
**anybody**  38:15
63:10 65:11
**apart**  58:9 59:14
97:15
**apc**  9:8
**apologize**  24:6
44:9 66:12,21
70:2 103:21
**apparently**  15:5
**appear**  115:17
117:25
**appearing**  26:1
**appears**  116:14
119:10,15 120:24
121:20
**applaud**  45:4 62:8
**applicability**
116:4
**applicable**  56:14
57:19 115:15
116:16 118:22
121:2,25
**applies**  64:8,15
88:15 105:16,21
121:12
**apply**  75:3 115:4
118:17
**applying**  79:6
**appointed**  47:19
47:20 114:3
**appreciate**  30:24
44:25 46:5 51:25
110:23
**approach**  19:7
30:22 62:20
102:20

**approaching**
26:21 32:10
**appropriate**
10:17 21:16 29:18
30:23 31:8 43:7
43:21 59:5 67:25
82:15,23 99:5
118:5
**approval**  13:18
37:19 63:20 64:2
64:24 67:5 95:10
100:5,15
**approve**  42:12
117:9
**approved**  14:12
14:16 33:10,12
63:24 97:11
122:14
**approving**  49:25
52:8 55:7 56:24
58:5 59:10 122:11
**approximately**
19:17 20:3,20
21:8 27:4 93:2
97:1
**area**  14:11
**arena**  31:1,2
**argue**  44:13
**arguing**  44:12
**argument**  27:1
117:11 119:7
121:12,13
**arik**  25:23
**arising**  56:13
**arizona**  2:23
**arkansas**  6:10
**arsenal**  31:18
**articles**  15:4
**aside**  32:6
**asked**  31:4 33:2
63:6 70:20 80:9
81:1 83:18 100:2
103:20 104:12,24

[asked - best]                                                                Page 4

| | | **b** | 117:10 |
|---|---|---|---|

114:18
asking  15:4 63:23
  71:1 88:19 100:3
  100:7,17
asks  118:12
aspect  114:15
  117:9 119:17
aspects  85:2
  114:11,21 117:10
assert  28:16
asserted  28:14,16
asserting  28:15
assessments  3:7
  123:7
asset  15:19
assets  11:25 15:8
  15:18 16:16 18:6
  22:11,17 40:22
  46:11,24 47:15,17
  118:15 119:10
assistance  30:14
assisting  121:1
assuming  13:9
  15:20 106:18
assumption  91:8
assurance  4:2
  57:7,16 103:4
  124:10
assure  41:21
  43:12
assured  3:25
  124:8
attaches  18:17
attempt  18:9
  42:15 90:20
attempted  99:25
attempting  81:6
attention  19:2
  43:20 78:5
attorney  6:2
  21:25 47:22 66:4
attorney's  24:18

attorneys  5:3,13
  5:21 6:2,10,19 7:2
  7:8,15 8:2,7,14
  9:2
audible  72:10
august  92:4
authorities  19:18
authority  11:11
  117:7
authorize  51:9
  62:25
authorized  63:14
  63:18,19 64:23
authorizing  2:4
  3:6,12,19 4:5,13
  118:24 123:6,12
  123:19 124:13,22
  125:5
automatic  94:10
available  67:25
  85:20 87:17 89:13
  91:15 98:22 99:5
  101:19 112:19
  113:3
avenue  5:4,14
average  68:8,17
  68:21 97:2
avoid  29:7,18
  34:20
avoidance  18:16
  100:6,11
avoiding  62:15
award  117:15
aware  18:13
  24:11,12 29:6
  64:25 68:4 70:18
  72:18,24 73:1,4
  73:17,20 74:2,3
  77:8,11,23 79:2,4
  86:4 88:13
azura  27:16

**b**

b  1:22 2:5 125:7
b.r.  117:5 118:11
  120:14
back  17:6 19:24
  20:8 48:18 54:6
  72:18 92:5 100:4
  100:8,10
background
  101:3,14
bad  121:23
badgering  104:23
badly  98:24
banker  27:12
bankr  117:5
  118:11 120:14
bankruptcy  1:1
  1:13,24 12:6 22:1
  22:12,15 46:24
  47:2 48:2,4,19
  93:21 94:12
  115:17 116:4,21
bar  18:1
based  52:2 54:16
  56:20 57:17 58:22
  61:11 67:9,12
  88:20 96:4 97:13
  97:23 104:14
  110:6 115:13
  116:13 120:17,24
bases  106:1
basic  62:21
basically  106:3
  108:2
basis  50:1 51:5
  52:8 55:8 56:6,11
  56:21,25 57:14
  58:6,22 59:5,11
  61:11 62:25 63:19
  63:20 64:23 66:14
  76:18 85:8 96:18
  100:7 105:24
  113:5 114:19

117:10
bayard  7:1 27:11
beacon  8:2
bearing  10:25
bears  16:9 32:4
beat  44:10
becoming  29:7
beginning  49:13
  111:24
begun  43:13,16
behalf  10:8 49:17
  55:5 61:21 74:22
  111:2
behavior  82:3
behoove  36:5
belabor  112:14
belief  76:3,5
believe  17:14 20:8
  35:4 37:10,13,14
  37:24 50:3 52:14
  76:10 78:16,22
  79:22 81:11 97:5
  98:20 116:11
  117:12,16,18
  119:1,4,12 120:15
  121:25
bench  45:11
benchmark  68:19
benchmarks
  68:13
beneficial  121:9
  121:11
beneficiaries
  118:1
benefit  13:16
  18:18 22:23 27:21
  37:16 82:24 83:8
  83:10
benefits  2:5,6
  62:21 67:14 78:14
  125:7,8
best  14:23 37:11
  37:14 46:18,21

**47**:11 76:10,14
87:3,20 88:5,10
88:22 97:9 100:12
102:1 108:11,15
109:7 121:3
**bethlehem** 106:12
116:3,10
**better** 16:22 17:1
37:22 66:18 69:18
78:14 107:22
108:5
**beyond** 63:24
87:2 95:24
**big** 34:25
**billion** 12:10,11
12:13,15,15,19,20
12:22 13:1,4,8,11
20:11,16,24 21:6
21:7,9 23:1 46:15
**billions** 11:25
13:3 22:4,9,21,24
23:4,10 41:2
**binders** 50:3
**binding** 48:3
**bit** 28:1
**blacklines** 50:3
**blindfolds** 110:5
**blocks** 95:25
**blue** 27:20,20
48:12 89:14,14
**blueprint** 17:4
45:15 47:14 48:24
**board** 18:12 76:17
76:21,22,23 77:2
109:15,19 114:2,3
114:4
**boards** 109:16
110:5,8
**boca** 27:21
**bond** 3:20 56:13
123:20
**bonds** 55:20,21

**bones** 11:8
**bonus** 67:4 94:7
103:14 104:1,14
104:17 108:14
111:25 120:1
**bonuses** 63:14
67:17 104:9 121:6
**borders** 117:5
120:13
**born** 27:18 28:5
**borrowed** 19:22
**bottom** 36:13 56:9
**bound** 35:20
**bp** 47:10
**brady** 6:15
**branded** 81:23
82:6,18 91:4
**brauner** 7:23
**break** 42:1 109:12
**breathlessly**
20:24
**brevity** 19:12
**brian** 6:24
**brief** 21:21 24:4
72:19,22 73:2,19
89:23
**briefly** 18:4,22
21:21 24:3 39:12
93:22 95:6 112:12
**briefs** 72:21
**bright** 90:12
**bring** 37:15
**broad** 40:20 41:23
70:16
**broadly** 32:11
**brogan** 7:4
**bromberg** 9:11
**brotherhood**
116:6
**brought** 119:5
**brown** 9:1
**brush** 70:16

**bryant** 7:16
**buchalter** 9:8
**building** 43:20
95:25
**built** 94:11
**bulk** 99:15
**burdening** 62:16
**business** 33:20
35:8,9 41:2 62:5
64:2 70:23 87:21
92:22 95:16,23,24
97:25 102:9 106:3
112:18 118:9,12
120:16 121:23
**businesses** 12:4,8
12:10 13:8 87:22
**busy** 63:5
**buy** 111:23
**buyer** 92:5
**byproduct** 29:3

## c

**c** 5:1 6:15 9:11
10:1 94:12 115:8
116:13,20 118:5
126:1,1
**cahoots** 89:25
**calculation** 94:11
**calendar** 45:2
**call** 32:12,13,14
78:8 98:21
**called** 89:1 96:1
114:11 115:3
**calling** 81:24
91:18
**calls** 10:21 30:13
30:14 72:13
**candidly** 100:12
113:6
**cap** 63:14 94:11
94:13 109:14
110:12 115:12
**capital** 120:14

**cara** 27:19
**card** 99:22 100:9
**care** 67:8,20,23
82:17,19 84:3,4,9
84:20 85:1,4 88:6
89:25 90:4 96:12
98:10 99:3 101:17
120:10
**career** 10:20
**carefully** 21:12
86:8
**caremark** 27:23
**carolina** 92:2
**carrier** 27:20
**carriers** 26:17
28:5
**carroll** 54:1
**case** 1:3 13:22
16:2,15,24 17:5
18:2,25 21:20
25:5,18 26:11,11
26:22,22 27:17
28:2 30:4,5,21
31:6,6,12,14,16
32:5,10,12 33:13
33:22 34:2,9,11
34:13 35:13,14
36:6,8,14 37:4,25
38:19 39:16,16,22
40:17 41:7,13
42:16,19,21 43:8
43:14,19,25 45:4
45:11,15,19 46:2
47:1 50:10 57:11
57:19 60:9,10,23
63:4,4 79:1 86:6
108:8 110:19,23
111:14,15,21
114:6 115:17,19
116:5,10 118:6,7
120:12,13,25
**cases** 10:14 16:6
29:8 42:2 47:9

48:19 62:13
111:23 113:20
**cash** 13:3 19:20
21:7 23:1 24:10
**cast** 38:21
**casualty** 3:13
123:13
**categories** 18:17
**categorization**
113:22
**category** 63:2
82:16 99:20
**causation** 28:19
**cause** 23:9 37:11
120:21
**caused** 41:3 75:20
76:12 78:2
**causes** 37:15
**causing** 109:19
**cbs** 27:23
**cdc** 87:4
**cease** 101:19
**ceased** 14:15
**ceaseless** 19:2
**ceo** 77:3,7 109:23
**certain** 3:6 4:13
9:12 30:11,25
34:8 110:17
114:14 117:12
121:15 123:6
124:22
**certainly** 18:8
48:18 59:7 68:19
73:15 77:5 82:2
84:8
**certainty** 113:11
**certify** 126:4
**cetera** 39:1 60:13
88:19
**cfo** 77:4 109:23
**challenging**
113:17

**chambers** 54:6,23
56:16 57:25
122:12
**change** 52:2 56:17
99:20
**changed** 107:14
**changes** 50:4,25
51:1 55:25 56:3
58:12,17 59:25
60:3 97:12 99:16
**channels** 80:22
82:11
**chapter** 10:14,16
15:17 22:2,7,11
36:11 49:4
**charged** 80:13
**checking** 98:9
**checks** 2:10 3:8
3:16 4:10,15
123:9,16 124:18
124:24 125:11
**cheryl** 27:16
**chief** 65:9
**children** 26:17
27:18 28:5
**choices** 32:5
**choose** 90:20
**chop** 17:7
**chose** 27:6
**chosen** 14:12
23:15
**christopher** 5:8
49:16 55:4
**cir** 116:3,7
**circuit** 106:10
116:2,5,8 118:7
**circumstances**
86:22 95:18
113:16 118:6,7
**cited** 120:12,13
**cities** 28:12 40:5,8
**claim** 28:7 38:15
38:18 48:16 54:10

**claimants** 9:3
11:21 13:22 15:1
22:18,24 27:15,16
28:1 40:24 46:19
113:20
**claims** 2:8 4:13
23:4,7 28:6,7,15
28:17,21,22 33:18
34:24 37:21 38:11
40:14 46:20,25
47:16 48:13,20
53:9 54:12 59:24
122:5 124:23
125:10
**clarification** 57:5
64:19 98:12
**clarifying** 85:12
**clarity** 41:10
**class** 28:7
**clause** 22:23
51:15
**cleaned** 92:18
**clear** 12:17 13:12
14:2 15:11 18:11
22:5 24:23 29:9
30:17 45:8 64:21
65:3 89:8 94:8
96:15 100:9 105:1
105:4 108:25
109:9 110:19
112:17 114:1
116:24 119:2
**clearly** 16:4 17:18
84:2 109:9 114:6
115:23 118:2
122:2
**cleavage** 88:25
90:12
**clock** 10:11 11:1
112:22
**close** 22:8 91:5
93:17

**closing** 22:3
114:24
**coby** 11:4
**code** 22:12,15
30:20 48:2 94:12
116:4
**collaboratively**
38:1
**collateral** 53:5,9
54:11
**colleague** 48:9
61:16 122:19
**collectively** 40:11
**combat** 35:3
**combatting** 26:14
37:20
**come** 36:7 65:19
93:17
**comes** 34:10
**comfort** 15:15
48:24 63:1 64:12
64:17 90:22 99:24
**comfortable** 25:5
43:6 62:6 63:9
93:16 101:4
**coming** 33:14
47:6,14 50:18
87:4 109:19
**comment** 25:18
**comments** 23:18
44:23 50:24 52:11
55:12 58:9,11
59:14 113:6
**commercial** 70:22
**committed** 12:25
32:7
**committee** 5:13
6:3 7:2,15 9:2
13:25 15:12,13,25
16:1,8 17:21
18:12 24:15,15,16
25:6,12,24 26:10
26:18 27:5,9,14

27:15 29:22,23
30:2,6,8,9,11,12
30:16,19,22,25
31:4,8,11,13,20
31:24,25 32:1,22
33:4 35:22 36:25
39:10 40:5,7,7
42:5,6 43:2,11,17
43:20 44:14 47:18
47:21 50:13,13,20
52:12 56:2,2 57:4
57:5 58:10,14,15
59:15 60:2,3 62:3
62:4,19,19 111:6
114:14,14
**committees** 30:3
58:16
**commonwealth**
2:17 8:13,14
111:2,3,7
**communication**
30:18
**companies** 11:25
13:2 14:11 45:20
47:7 87:12 89:4
101:22
**company** 8:2,7
19:22 20:5 21:2
22:3,8 52:15,25
55:11 64:3 70:9
72:5 73:3 75:22
75:25 76:13 77:18
78:3 79:23 82:18
84:16 87:15 88:9
88:16 90:19 93:18
96:3,17 97:19
98:1 101:16 102:9
104:14,16 107:24
108:5,18 112:10
113:13,15,19,21
114:2,25 117:2,23
**company's** 92:9
99:22 102:1

108:11,15 112:18
**comparator** 120:8
**compared** 68:13
**compensate** 29:4
**compensated**
66:14 67:5 96:18
**compensation** 2:5
2:8 62:23 63:8
67:9,10 68:7,13
68:14,15 107:8
117:16 118:25
119:17 120:1
125:7,10
**competing** 61:6
90:20
**competitors** 120:3
120:3
**comping** 113:14
**complete** 16:18
63:7 92:6
**completed** 64:10
**completely** 24:11
109:8
**completion** 21:15
92:11 95:8
**complex** 19:7 62:5
63:7
**complexity** 16:12
16:25
**complies** 88:9
**comply** 108:11
121:4
**component** 95:22
98:15,22
**comprises** 40:12
**compromise**
32:16
**concern** 106:23
110:9,13 120:17
120:18
**concerned** 29:23
59:5 95:11 115:7

**concerns** 14:20
86:18
**conclude** 116:13
**concluded** 38:17
122:23
**concludes** 81:11
122:20
**conclusions** 105:8
**conduct** 14:15
21:20 105:7
121:17 122:2
**conducts** 87:15
**confidence** 43:6
**confidential** 17:12
**confidentiality**
21:16
**confirmable**
43:23
**confirmation**
52:19
**confirmed** 33:10
50:5 116:4
**conforming** 50:25
56:3 58:16 60:3
**confusion** 57:23
64:20 94:9
**congress** 115:8
116:20
**conjunction** 93:20
**connected** 72:3
73:7,10 74:19
75:21 76:11 77:17
**connection** 4:8
20:6 21:12 45:5
77:18 80:12 96:6
105:18 124:16
**connects** 22:8
**consensual** 34:3
45:12
**consensus** 34:22
40:20 43:21 50:18
**consent** 2:21

**consenting** 7:8 9:2
39:10 44:5
**consequences**
107:20 121:5
**conservative**
90:16
**consider** 19:7
45:17 91:15
114:19
**consideration**
111:19 114:15
121:12
**considered** 35:13
**considering** 35:11
**consistent** 30:19
37:2 51:19 57:18
59:3 118:18 120:2
120:12
**consists** 40:8
**consolidating**
92:2
**consolidation**
64:9 92:6 95:9
**constituencies**
10:22 25:4 39:22
40:17 41:23 43:25
**constituents** 63:6
65:6
**constitute** 91:3
**constitutes** 18:23
**constitution** 48:3
**constraints** 87:3
**constructive** 17:4
62:10
**consultation** 56:1
58:14,24 59:2
60:2
**consulted** 42:22
**consuming** 29:19
**contact** 30:8 90:5
**contacted** 30:3
**contain** 48:24

[contains - creditors]                                                                      Page 8

**contains**  11:18
  13:14
**contemplate**
  41:25
**contemplated**
  78:10
**contemplates**
  16:16 41:9 42:3
  42:14,20
**contend**  120:10
**content**  11:13
**contentious**  41:16
**contents**  17:15
**contested**  118:1
**context**  48:4
  53:15 60:22
  118:15 119:9
**contingent**  16:7
  62:23
**continuation**
  114:22 115:6
**continue**  3:12,19
  4:7 45:6 63:19
  79:10 113:10
  123:12,19 124:15
**continues**  14:16
  30:13 40:1 107:20
**contract**  94:6
**contracts**  82:9
  93:23 96:11
**contrary**  121:25
**contribution**
  12:10 13:1 20:11
**control**  23:4 81:7
  93:13
**controlled**  40:24
**controls**  121:9
**controversially**
  21:22
**conversations**
  14:22
**converting**  99:17

**convicted**  73:21
  73:24 80:14
**convincing**  33:11
  33:13
**coo**  77:4 109:23
**cooperate**  33:22
**cooperatively**
  37:25
**copies**  50:5
**copy**  66:6 99:13
**core**  10:16
**corp**  59:17 116:3
  116:10 118:10
**corporate**  67:13
**corporation**  27:22
**correct**  49:21
  51:13 52:21 53:6
  54:7 57:9 68:5,6
  71:15 78:11,12
  80:16,19,20,24
  81:4,5,9 84:12,22
  85:22
**cost**  92:3 101:24
  118:14 119:11
**costly**  29:8,18
  34:20 41:6
**costs**  23:11 49:2
**counsel**  19:19
  25:12,24 27:10,10
  30:8,9 52:14 54:2
  66:9 105:5 118:23
**counterintuitive**
  91:14
**counties**  2:14 39:1
  40:5,8
**counting**  44:7
**countless**  40:5
**country**  28:12
  40:13 126:22
**couple**  25:21
  39:13 45:16 51:7
  79:22

**coupled**  91:1
**course**  11:15 13:1
  13:19 14:25 16:1
  17:22 18:25 22:22
  30:19 31:8,18
  61:5 87:13 99:17
  122:5
**courses**  46:1,4
**court**  1:1,13 10:2
  10:6,7 11:11,20
  13:16,18 14:13
  15:20 17:15 18:4
  19:3,10 20:17
  23:15 24:3,12
  25:5,9,22 26:4,8
  30:15 31:13 38:4
  38:8 39:7 43:12
  44:2,20,25 48:11
  48:23 49:5,7,11
  49:14,19,22 50:7
  50:18 51:4,14,19
  51:22 52:1,16,23
  53:4,17,22 54:5
  54:14 55:16,22,24
  56:7,18 57:8,10
  57:15 58:4,20
  59:13 60:6,19,21
  60:24 61:9,19
  62:7,16,25 65:14
  65:19,22,25 66:19
  72:5,7 74:13 75:3
  75:6,9,11,13,15
  80:4 81:12,20
  82:1,25 83:1,4,6
  83:12,15,21 85:10
  86:1,24 87:2,6
  88:4 89:15,17,22
  91:10,23 94:20,23
  95:5,21 97:13,21
  98:2,4,9,16,18
  99:9,14 100:5,19
  100:22,25 101:4
  101:11 102:13,17

  102:21 103:1,7
  104:12,16,19,22
  104:24 105:3,8,8
  105:10,15,22,24
  106:9,25 107:16
  108:18,21 109:1,4
  109:7,16,24 110:4
  110:13,17,20
  111:9,11 114:10
  114:18 122:17,21
**court's**  30:14
  37:19 117:6
**courtroom**  20:14
  31:9 65:11
**courts**  47:2
**cover**  93:21
**coverage**  31:17
  34:8 53:3
**covered**  21:1
  81:16 93:4,12
  114:16 116:25
  121:16 122:10
**covers**  92:25
  94:16
**cracks**  24:8
**craig**  77:1
**create**  16:11
  22:16
**creates**  23:17
**creating**  118:24
**credit**  16:25
**creditor**  10:22
  14:9 40:11
**creditor's**  16:8
  27:5 31:3 42:5
  43:2,16 47:20
  50:13 56:2 57:4
**creditors**  7:2,15
  11:3 14:12 15:25
  16:5,7,17,21 18:2
  25:12,25 26:11
  27:22 29:13,14,18
  29:25 31:21 32:14

33:24 34:6,12,16
36:16 37:16 39:17
40:2 58:14 60:2
61:6 62:3,19
114:14
**criminal** 80:14
**crisis** 10:21 15:6,9
22:19 23:12 26:12
26:15 28:9 29:3
32:17 35:4 37:20
37:23 41:3 45:22
45:23 46:4,13
47:24 48:5
**crisp** 74:6 114:4
**criteria** 114:5
**critical** 4:14 14:24
19:4 22:10,23
59:9,10 64:8
101:18 102:9
117:22 124:23
**cross** 27:20 65:14
66:1 70:25 74:11
89:9,14 102:17
**crystal** 96:15
**current** 14:4,23
55:21 64:22,22
80:12,13 86:6
87:6 94:18 107:8
112:18
**currently** 13:7
21:19 33:5 68:20
77:23 78:7,14
80:16 91:25 92:4
92:12 94:14
**cursory** 15:10
**customary** 97:5
**customer** 4:7 58:2
58:5,11 124:15
**customers** 4:6,8
96:13 99:3 124:14
124:17
**cut** 45:3

**cutting** 17:24 92:3

**d**

**d** 1:23 10:1 123:1
124:1 125:1,14
**d'apice** 9:11
**daily** 112:22
**damage** 23:11
**damages** 28:19
46:13,14
**dana** 118:10
120:12
**daniel** 7:4
**data** 84:4
**date** 18:1,3 20:9
39:13 56:14 59:21
60:12 126:19
**david** 9:5
**davis** 5:2 10:8
19:13 49:16 55:4
61:21 74:22
**day** 2:1 10:10,22
10:23 11:9,20
13:25 14:9 15:23
18:11,22 19:11
20:18 21:13,24
23:15,17,21 39:14
49:1,11 62:2 64:1
72:20 79:13 90:3
106:6
**days** 11:1 17:25
17:25 18:3 20:25
25:21 27:7 32:24
37:1 42:7,13,15
46:8,8 63:4
**dea** 92:21
**deadly** 49:6
**deal** 13:7 15:16
22:25 46:2,3 47:2
60:16
**dealing** 30:20
36:11 37:1,23
46:20 47:16 81:17
89:12

**dealt** 60:7
**dearly** 21:23
**debevoise** 8:1
**debt** 16:15 61:5
**debtor** 5:3 16:24
24:11 55:9 72:22
72:23 73:13 76:15
78:2 103:14 104:2
111:5 115:9
118:20,23 119:11
**debtor's** 24:18
40:15 44:14 49:24
52:7 54:7 55:7
56:24 58:2 59:9
93:10 113:2
118:15
**debtors** 1:9 2:3,4
3:5,6,11,12,18,19
3:22 4:4,5,12 10:9
11:21 13:17 16:19
17:2,24 18:12
19:1,3,5 22:9
32:20 35:16 37:3
37:18 38:16 41:10
42:9 43:15 46:10
46:25 49:17 50:2
50:23 51:2,10
52:9,10 53:8,14
55:5 56:5,12 57:1
57:6,13 58:7,10
58:19 59:3,11,16
59:17,21 60:5,12
61:22 67:4,14
69:4,11 72:19
73:18 74:1,22
77:9,12 78:7
91:25 96:23 97:9
103:25 104:8
110:25 114:12,22
114:24 115:1,11
116:15,16,19,21
119:10,13,20
120:2,8,9,15,22

120:23 121:2,7,11
122:1 123:5,6,11
123:12,18,19
124:5,12,13,21
125:5,6
**december** 79:9,10
80:10 106:7
**decide** 48:20 90:3
**decided** 14:1
32:15
**decision** 29:21
108:2 109:19,25
110:2 117:4,7
**decisions** 35:7
47:4 84:10 109:18
116:18,18
**declaration** 65:9
65:12,15 66:6,10
68:25 69:2,17,20
74:18 75:5 96:24
115:2
**declarations**
115:24 117:23
**decommissioning**
92:17,23
**decontamination**
92:19
**dedicated** 41:2
48:5
**deemed** 13:23
16:7 51:9
**deeming** 3:24
124:7
**deeply** 32:2
**defendants** 28:17
29:1
**defer** 63:10 64:1
105:7 111:19
112:3
**deferrals** 63:23
**deferred** 63:13,15
63:20

definitely 48:12
definition 66:24
  117:19
degree 45:22
delivered 59:20
  59:25 60:11,13
  98:10
demanding 10:20
  88:19
denominator
  29:17 32:13 33:23
department 3:2
  9:9 90:17
depending 13:5
  94:2 110:3 111:20
deploy 15:8
deposit 57:7
deposited 57:6,23
depositions 20:15
describe 11:9 16:1
  27:25 85:18
described 11:20
  69:1 115:23
description 70:12
  123:4 124:4 125:4
descriptions 72:2
deserve 15:15
design 119:21
designed 14:3,21
  18:5 37:21,22
  96:5 119:13,14
despite 16:6 17:25
destroy 23:9
destroyed 12:2
destruction 23:19
detail 11:18 21:1
  64:7 69:2 81:25
detailed 20:21
  117:23
details 77:16
  91:21
determination
  36:7

determine 82:10
determined 32:15
  97:16 99:8 114:5
determining 4:1
  29:17 33:24 97:16
  124:9
developed 96:2
development 93:6
  93:8
develops 107:21
deviate 108:14,15
devoted 15:18
dialogue 90:14
dicta 116:9,9
different 28:19,19
  28:20,23,23 34:6
  34:6 46:19 83:8
  86:16 89:16 99:20
  100:1 117:19
difficult 30:16
  32:5 46:5,7 47:6
  50:21 62:11 86:18
  86:21,22 89:23
  113:15 115:11,13
dignity 112:25
diligence 15:12
  21:1 41:9 42:3,9
  46:24 47:15 63:7
  111:8 118:19,24
dip 61:5
direct 46:22
directly 19:17
  30:4 45:1 77:3,7
  114:4
director 93:5
  96:22
directors 14:7
disappointment
  34:2
disclosed 107:11
disclosure 30:20
  111:8

discontinuing
  3:24 124:7
discuss 30:5
discussed 13:25
  14:9 17:22 73:8
  113:23
discusses 72:23
discussing 111:24
discussion 112:4,9
discussions 24:10
  35:17 43:16,17
dislocation 47:9
disputed 45:23
disputes 62:17
disruptive 95:15
distinction 81:21
  81:22 82:6 91:13
distinguishable
  28:10
distraction 29:8
distribute 22:14
distributed 20:16
  47:8,17 82:10
distributing 26:15
distribution 10:18
  47:8 49:2 88:5,10
  96:10
distributions
  19:14 20:3,4,10
  21:4,6,7 24:10
distributor 28:25
distributors 67:8
district 1:2 57:20
diversification
  95:23,25 96:6
diversion 81:7
  87:23 93:13
diversions 87:24
division 42:24
dizengoff 25:10
  25:11 48:23
dizingoff 7:19

docket 11:7 32:24
  33:3 36:22 39:25
  50:1,2 52:9,10
  55:1,9,10 56:25
  57:2 58:6,8 59:11
  59:12 61:24,25
  62:1 65:10 99:11
  99:12
doctor 87:19 99:1
doctors 81:24
  90:10 108:3
document 15:10
  17:10
documents 41:13
doing 15:22 30:8
  31:22 33:25 35:7
  35:19 44:18 78:1
  82:12 87:14 101:4
  101:15
doj 28:11
dollars 11:25 13:3
  22:10 23:5,10
  41:2
doubling 106:16
  106:24,25 107:2,4
doubt 14:23 36:23
draft 17:16 33:1
drafts 17:6
drain 1:23
draw 38:15 105:8
draws 90:12
drive 113:19,19
drug 84:5,14,23
  84:24 85:6 90:8,8
  90:8 107:19,19,22
drugs 22:17
  101:19
due 30:18 46:24
  47:15 51:10 52:4
  56:14 64:11 111:8
  118:19,23
duparquet 106:13
  116:5

**duplicative**
100:13
**duties**  16:5,18,20
19:4 29:24 32:7
**duty**  22:13 29:10
29:11
**dynamics**  16:11

**e**

**e**  1:22,22 5:1,1
10:1,1 54:23
57:24 65:24 123:1
124:1 125:1,14,16
125:16 126:1
**earlier**  34:5 35:15
36:4 37:3,5 39:23
77:22 81:14 99:18
121:7 122:1
**early**  38:1 63:4,4
110:23
**earned**  94:7
115:25
**earning**  118:16
**east**  6:11
**easy**  47:1
**ecf**  2:10,12,15,18
2:21,24 3:3,9,16
3:20 4:2,10,15
123:9,16,20
124:10,19,25
125:12
**eck**  8:20 111:1,2
111:10
**eckstein**  5:17 39:4
39:8,9 46:6
**economically**
101:25 102:8
**ecro**  1:25
**edan**  7:22
**editorial**  21:24
**educated**  90:23,24
112:2
**education**  112:9

**effective**  13:9 43:8
53:3
**effectively**  64:4
100:7
**efficiency**  27:10
**efficient**  43:21
**effort**  33:10,13
39:21
**efforts**  10:25 29:4
31:11 62:10
118:19
**eight**  94:3
**eisler**  8:6 53:25
**either**  11:22 67:15
87:4 88:6 94:1
**elapse**  42:14
**electrical**  116:6
**elements**  11:19
14:20 40:22
**eleven**  8:8
**eli**  5:9 61:16,21
**elicited**  106:2
**eligible**  66:12,13
67:3 84:11 96:8
96:16,20
**else's**  89:3 108:10
**email**  122:12
**emergency**  35:10
37:20
**emergent**  14:6
**emotions**  19:1
**employed**  73:13
73:15 77:9,12,14
77:23 94:20,21
**employee**  2:5,6
61:24 93:3,4 94:5
97:14,22 98:19
114:11,16,21
117:20,22 121:22
125:6,7
**employees**  2:7 3:3
64:7,8,16,22,22
64:24 65:1 66:13

67:3 68:16,19
69:11 78:8 79:6
80:12,13 85:18
86:6 92:9 93:1,12
93:17 94:16,18,25
95:11 96:4,5,8,16
96:17,20 97:1,7
99:23 101:16
103:15 105:6
107:25 113:17
114:25 116:25
117:8,12 118:21
119:22 122:1
125:9
**employer**  79:13
**employment**  69:4
74:18 93:23 94:6
115:25
**enacted**  116:20
**encourage**  45:4
89:6 90:20
**encouraging**
85:21
**ended**  10:23
**ends**  17:10 45:9
**enforcement**  8:15
**engage**  34:17
**engaged**  66:14
86:7,20 96:18
121:17
**enhances**  36:17
**enjoining**  30:14
**enjoy**  31:16
**enormous**  48:16
**enshrined**  15:19
**ensure**  18:5 84:3
88:2 89:23 98:25
99:4 101:17,24
108:9
**ensuring**  32:15
87:22,24 96:9
102:6

**entail**  72:3
**enter**  78:3
**entered**  39:16
50:1,5 52:9 55:1,8
56:25 58:6 59:11
**entering**  41:7
**entire**  80:17 81:13
112:8
**entirely**  51:24
87:14
**entirety**  11:20
**entities**  14:6 22:17
29:22 34:13 38:25
46:12 67:6 88:17
101:17
**entitled**  108:13
116:7 117:21
121:5
**entity**  14:3 15:8
18:18
**entry**  2:3 3:5,11
3:18,22 4:4,12
51:3,12 52:3
56:19 58:12,19
60:5 122:3 123:5
123:11,18 124:5
124:12,21 125:5
**epic**  26:12
**epidemic**  41:4
**equally**  15:14
47:16
**equipment**  92:14
**equitably**  36:17
**erased**  110:22
**erred**  19:11
**especially**  101:3
**esq**  5:7,8,9,10,17
5:18,25 6:7,15,23
6:24 7:4,5,12,19
7:20,21,22,23 8:4
8:11,20 9:5
**essence**  52:19,20

essential  11:19
  116:9
essentially  99:24
  110:22
esserman  9:11,12
established
  120:15
establishing  3:25
  124:9
estate  12:6,12,13
  12:19,21,22 13:4
  13:10 15:14 18:5
  22:23 23:6 36:6
  36:10,13 62:16
estate's  12:17
estates  15:1 16:19
  22:12 23:2 40:15
  86:23 97:9
estimated  46:14
estimates  46:14
et  1:7 10:3 39:1
  60:13 88:19
evaluated  99:7
evaluating  118:12
eve  115:16
event  117:21
everybody  36:5
  63:9 93:22 102:4
everybody's
  64:21
everyone's  86:18
evidence  24:19
  65:13 110:14
  116:14,24 121:21
exact  17:16 69:13
  70:24 71:20 78:23
  84:7
exactly  48:25
  74:23 88:21,23,24
examination  66:1
  80:6 83:24 85:13
examine  65:15
  102:17

examined  21:12
  89:9
examiner  36:12
examining  74:12
example  12:18
  70:21 82:8 91:1
examples  28:2
  76:7
exceed  93:3 97:4
exceedingly  11:24
exception  19:16
  71:9 114:20,25
excluded  113:25
exclusively  12:1
  14:8,11 15:18
  16:16,20
exclusivity  36:11
excruciating
  107:22
excuse  25:20
  66:16 74:5 99:12
executive  32:21
  40:7 63:17
executives  114:2
exercise  29:11
  32:7 44:20 121:23
exhibit  15:18
  69:20
exist  122:5
existence  36:25
  100:20
existing  53:5
  54:11
exit  12:4
expand  72:12
expect  30:18
  33:21 37:25 42:8
  94:15
expectations  97:4
expected  89:9
  109:21
expeditiously
  42:16

expense  59:22
  62:21
expenses  63:18
  99:23 115:21
expert  87:9 88:8
experts  68:15
  85:1
explain  28:1
  81:24,24
exposure  46:2
express  34:7
  99:22
expressed  14:19
  34:9
expressly  15:7
  20:19 42:11
extend  53:1 54:9
extended  54:10
extension  52:20
  53:4,16
extensively  17:23
extent  45:24
  57:22 67:14 88:12
extra  50:5 112:8
extraordinarily
  63:5
extreme  17:6
extremely  39:21
  60:23 86:22 92:22
  109:2 113:15

## f

f  1:22 83:5 126:1
f.2d  116:6
f.3d  116:3
face  19:8 101:13
  121:5
faced  32:5
facilitate  30:18
facilitated  35:17
facilities  84:4
facility  79:3,9,20
  79:21,25 84:20
  92:1,4,10,15,15

92:18 93:11 94:22
  95:17 114:23
fact  13:23 15:4
  16:6 18:1 19:20
  20:25 21:1 23:13
  33:11 35:20 39:23
  43:7,23 48:3
  51:20 54:17 58:22
  61:12 73:22,23,24
  76:5 107:10
  117:12 119:18,19
  119:20 121:24
facts  19:6 24:19
  25:3,3 44:6
  109:17 112:6
  118:6,7
fail  121:4
fair  38:23 48:20
  74:14 85:18
  102:12 118:17
fairly  36:17
fall  24:8 64:11
false  22:21
family  5:21 12:7
  32:23 40:25 41:1
  46:12
far  46:14 47:5
  59:4 88:5 107:21
  115:6
fault  119:3
favor  12:12
  108:10
favorable  102:8
fda  14:16 92:21
feather  117:3,3
feathering  116:21
federal  14:18
  18:13 19:4 22:12
fee  101:25
feel  30:12 32:2
  100:21 107:1
  112:4

feelings 32:6
fees 3:7 13:18
  23:10 49:1 123:7
feet 62:11
feld 7:14 25:11
felt 31:7
fiduciaries 34:15
  36:1,7,10,14
fiduciary 16:5,18
  29:10,11,11,24
  32:7
field 88:8 96:4
fifty 97:13
fight 14:1 34:20
fighting 34:4
figure 35:2 38:17
  84:1
figuring 34:18
file 37:7 65:10
filed 11:7 21:25
  27:2,13 32:24
  36:21 38:12,13
  39:25 42:14 50:2
  52:9 55:9 57:1
  58:7 59:12 62:1
  72:19 74:10,11
  110:18 111:3
filing 22:9 86:13
  115:17 119:3
final 3:5,11,18,22
  4:4,12 30:1 41:18
  50:2,4,11,12,15
  50:24 51:1,3,5,12
  52:10,13,22 54:17
  55:12,18,18 56:1
  56:3,6,11,21 57:1
  57:14 58:7,13,16
  58:19,22 59:8,12
  59:18 60:1,5
  61:11 62:1,25
  63:20 64:24 99:11
  99:17 100:17
  114:11,19 117:10

123:6,11,18 124:6
  124:12,21
finally 20:13
  31:23 36:19
finance 76:7 84:8
financial 2:9 3:2,7
  3:15 4:9,14 8:15
  10:21 11:24 20:19
  20:22 22:11 24:24
  25:1 27:11 41:10
  65:10 101:16
  123:8,15 124:17
  124:23 125:10
find 49:5
fine 22:1 57:23,24
  61:1 83:21 89:11
finishes 22:22
fire 55:11
firm 28:5
first 10:10 11:9,20
  13:25 14:9 18:11
  19:11 20:18 21:13
  23:17 25:25 27:3
  27:24 28:1 30:3
  30:11 32:12,15
  33:2,9 39:14
  40:22 48:10,22
  49:1,12,23 51:15
  62:2,20 64:1,5
  66:9,23 72:19
  73:8 112:13
  114:22 119:8
fit 31:19
five 40:3 69:3,6
  93:24,25
flat 19:16 119:17
floor 8:17
flows 19:20 20:2,2
focal 45:21
focus 46:25 47:15
  47:15 71:25 117:6
focused 37:10
  88:19

focusing 45:17
  48:13 69:8 71:2
follow 80:8
  106:22
following 27:15
  33:7 51:7 62:20
  79:13
follows 19:22
  21:25
foolish 101:4
foot 113:14
footnote 69:16
  70:2,5,9,11,14
  71:4,25 72:18
  73:6 74:17 75:19
  76:11 105:17
  115:1
force 72:13
foregoing 126:4
forensic 27:11
forensics 21:14
  24:24 25:2
foresee 25:19,20
forever 48:3
forgetting 70:2
forgive 38:21
form 11:13 34:22
  50:2,12,15 52:9
  52:13 55:9,25
  57:1 58:7,13
  59:12 60:1 62:1
  84:9 91:16 97:12
  99:11
formal 11:10
  54:18 58:11 59:2
  61:14
formation 6:3
formed 11:15
  15:23
forms 50:11 56:16
formularies 89:12
formulary 82:23
  83:2,3,6 84:3,11

84:15,16,17 90:5
  101:18,19,22,23
  103:18
formulations 93:9
forth 15:7 17:6
  21:4 115:10
fortiori 13:21
forum 44:22
forward 35:9
  42:16 45:25 49:24
  65:8 95:23 114:12
found 60:11
foundation 42:25
four 10:19 19:9
  20:13 26:20 45:1
  69:1 83:22
fourth 26:22
  36:19
fox 54:1
frame 77:14
framework 11:8
  11:19 32:25 33:5
  34:17 36:9 39:18
  42:24
frankel 5:12
frankly 27:7 33:6
  41:19 45:5 87:25
  111:12 113:24
fraudulent 18:14
  23:7
frederick 73:3
  75:22 76:12 77:18
  78:2
frictional 49:2
front 19:7 26:1
  50:14
fronting 53:7,13
fruit 10:25
frustrate 18:10
fulfill 113:8
full 20:8 25:7
  53:13 57:7 96:19

**function**  46:24
102:3 110:8
**functions**  72:3
117:22
**fund**  35:10 37:20
**funds**  26:15 48:5
48:15
**further**  85:9,13
114:8
**future**  3:25 34:21
35:2 41:5 47:16
97:8 124:8

**g**

**g**  10:1 123:3 124:3
125:3
**gain**  43:5
**gallagher**  4:25
126:3,15
**gap**  109:4
**garfinkle**  9:8
**gate**  11:16
**gather**  54:9 97:14
**general**  6:2 11:8
21:25 26:12 29:14
46:3 47:22 53:2
66:23 70:12
115:20
**generally**  46:3,13
68:10 105:16
117:4 118:22
121:14
**generate**  95:24
**generated**  79:25
**generic**  79:22,23
**gerard**  5:25
**getting**  24:7 33:24
67:24 82:13 84:11
100:14 101:13
**give**  13:2 17:15
25:19 34:23 45:16
48:23 62:25 64:17
76:7 87:9 99:25

**given**  20:21 25:25
32:17 34:15 39:12
46:19 48:21 56:18
60:22 75:1 100:5
113:10 120:8
**gives**  103:3
112:25
**giving**  44:18 84:8
102:15 112:8
**go**  15:6 23:12
24:16 26:8 35:9
36:8 48:17 64:7
65:2 75:15 91:6
95:23 97:19
114:12
**goal**  14:10 15:6
62:14
**goals**  11:23 14:24
36:3 97:23 98:1
**godfrey**  6:9
**goes**  35:1 63:24
84:2 85:6
**going**  14:8 16:16
22:15 25:4 26:22
29:6 30:13 33:14
35:6,14,22 36:2
36:24 39:11 42:4
42:6,8 45:8,14
48:18 49:24 64:18
66:5 68:24 74:23
78:5 79:8 89:18
92:15 98:14 99:24
100:18 104:11
106:6,17 113:20
122:19
**good**  10:2,4 12:1
14:12 17:19 25:10
25:23 39:8 45:10
49:8,22 51:15
61:20 66:3 111:1
**goods**  59:19,24
**gotten**  12:22 34:8
54:20

**governing**  18:2
91:4
**government**  14:18
21:19 103:2
**governmental**  3:7
18:1 29:22 38:13
39:17 40:2 88:17
91:14 123:7
**governments**
20:22
**governor**  47:22
**grade**  94:3
**grand**  20:9
**grander**  35:12
**grandparent**
27:17
**grant**  52:2 54:15
56:21 57:17 58:21
61:10 122:7
**granted**  56:6
57:14 59:22
**granting**  56:11
**grapple**  47:2
**gravamen**  14:14
**gravitating**  88:23
**great**  13:13,14
16:23 25:3 90:8
99:15
**greater**  35:12
46:14,16 69:6
**greatest**  43:24
**grips**  47:6
**gross**  79:24
**ground**  96:7
**grounds**  119:6
**group**  2:20 7:8
11:2 13:19 20:12
32:20 39:16 41:23
44:5,7 59:1 76:24
76:25 82:17 85:1
85:4 89:24,24
96:4 98:10 113:25
117:5 120:13

**groups**  62:9 88:6
89:25 120:10
**growth**  95:24
**guarantee**  27:22
53:13
**guaranteed**  12:9
20:11
**guess**  52:16 90:23
98:4 100:22
106:15
**guide**  45:12
**guilty**  73:3,21
74:4,19 75:22
76:13 77:17,24,25
78:2,3 80:11
**gump**  7:14 25:11
25:24

**h**

**h**  5:17
**hac**  54:2,19,20
**half**  20:11 36:1,1
38:21,22 40:13
**hampton**  27:16
**hand**  15:6 42:15
50:8 65:20
**handled**  86:8 88:2
**handling**  87:22,23
**hands**  14:12
**happen**  37:9
63:16
**happened**  32:3
**happening**  25:20
**happens**  36:15
**happy**  10:24
100:15
**harassed**  30:13
**hard**  17:3 41:17
50:17 62:3,14
85:15 86:22 91:12
98:4 113:16 120:7
**harm**  95:15
**harmful**  120:22

**harmonized** 46:4
**harrisburg** 8:18
**hauer** 7:14 25:11
**head** 70:22 77:6
  80:1 86:5 93:6
  94:25
**health** 26:17
  27:20 28:4,8
  32:14,16 34:25
  35:11 36:18 41:3
  48:5
**hear** 25:17 67:22
**heard** 27:3,24
  34:11 41:8 96:14
  103:6,10 113:13
**hearing** 2:1,1,3,12
  2:14,17,20,23 3:1
  3:5,11,18,22 4:4
  4:12 10:11 11:9
  17:8,10 18:11
  21:13 23:17 24:7
  24:25 26:23 37:7
  39:14 44:22 45:5
  45:9 52:3 54:16
  56:16,20 57:18
  58:23 61:12 62:2
  63:3,11 64:1 89:1
  111:25
**heavily** 19:11
  92:22
**held** 63:11
**help** 22:1,18
  23:12 45:12 60:20
  62:4
**helpful** 24:22
  45:12 66:8 74:8
  88:12 102:14
**helpfully** 16:4
**helping** 109:25
**helter** 23:9
**high** 32:9
**higher** 96:21

**highlight** 119:19
**highlights** 119:19
**highly** 17:12
  76:19 86:25 95:13
**history** 20:23
**hoc** 5:13 6:3 7:8
  9:2 11:2 13:19
  15:12 17:21 20:12
  24:15 25:6 32:20
  39:9 40:5,6 42:4
  43:11,20 44:5,7
  50:13,19 52:12
  56:2 57:4 58:10
  58:15 59:15 60:3
  62:4,19 111:5
  114:14
**hocs** 34:1
**holding** 20:5
**holds** 40:13 93:5
**hon** 1:23
**honor** 2:9 3:8,14
  3:15 4:5,9,14 10:4
  10:7,10 14:14,22
  15:14,20 16:22
  18:21 19:9 20:13
  21:17 23:20,23
  24:4,5,17,19,21
  24:23 25:10,23
  26:1,9,20,25
  30:24 31:23 32:11
  36:19 38:3 39:8
  39:15 40:11,16,21
  41:8,19,21 42:1
  42:23 43:12,13
  44:1,3,11,24 48:8
  48:10,23 49:8,10
  49:15,16,18,21,23
  50:3,6,9,10,16
  51:2,13,24 52:5,6
  52:15,21 53:6,20
  53:21,24 54:6
  55:3,6,11,14,17
  56:3,15,22,23

57:3,9,11 58:1,2
58:18 59:7,8,17
60:4,18 61:5,15
61:20 62:2 63:3
63:14 65:16 66:16
74:10,15,21 75:5
75:8,12,17 79:16
80:2,5 83:18 85:9
85:11 86:3 87:25
88:7,11 90:3
91:11,20 93:16
95:3,19 97:10,12
99:10 100:2,12,21
101:1,15 102:15
104:11,25 106:1
107:6 108:20,23
108:24 109:11
110:2,16 111:1
112:7 113:7,8,24
114:8 122:15,22
123:8,14,15
124:13,18,24
125:11
**honored** 32:8
**hope** 33:9,21
  34:17,22 37:6,9
  38:20 43:18 47:14
  47:25 49:5 62:13
  109:16 110:4
**hopeful** 17:7
  42:23
**hopefully** 15:24
  17:10,19 23:2
  89:11 102:14
**hospital** 27:21
**hospitals** 26:16
  28:4 40:9
**hour** 44:16
**hours** 33:3 50:21
**hudson** 5:22
**huebner** 5:7 10:4
  10:7,8 23:24 24:9
  24:22 27:24 32:19

34:11 37:6 38:6,9
39:12,20 40:24
45:15 50:17 60:20
60:22 61:4 88:11
89:16,21 90:2
101:1,12 102:14
103:10 104:11,23
108:24 109:2,6,8
**huebner's** 24:1,13
  24:17
**human** 46:22
  68:14
**hundred** 21:14
  46:15 104:2
**hundreds** 14:17
  23:10
**hurley** 7:21 25:17
**hypothetical**
  94:19

**i**

**i.e.** 32:13 60:12
  115:24
**iacs** 12:8 33:20
  35:9
**icp** 64:14 66:13
  67:4 81:17 95:20
  96:4,9,21 97:5
  101:5 115:4
  117:25
**identification**
  92:16
**identify** 115:1
**ignorance** 104:6
**ignore** 46:22
  47:12,24
**ii** 2:7 3:7,15,24
  4:7,14 123:8,15
  124:7,15,23 125:9
**iii** 2:9 3:25 4:9
  124:9,17 125:10
**illegal** 107:19
**illustrative** 13:10

imagine 30:10
  77:13 94:25
immediate 18:20
immediately
  106:22
impact 23:18
  46:22 84:16
  101:16
implication 51:23
implicit 116:22
  121:14
importance 26:18
  41:23
important 10:25
  11:12 15:14 25:14
  30:15,21 33:24
  35:12 40:22 42:17
  43:2,22 44:19
  86:4 88:1 90:16
  91:13 92:13,23
  95:9 98:12 102:2
  102:3 107:11,17
  111:22,25 112:23
  112:24 113:14
  117:1 119:16,16
importantly
  37:17 53:8 96:14
  112:14 116:17
impose 88:14 91:2
impression 108:8
  109:18
improper 17:14
  107:24 121:17
  122:2
improperly 108:7
inaccurate 39:3
inappropriate
  18:6
incented 108:5,6
  108:7
incentive 63:12
  103:16 115:4
  117:25 118:5,24

119:8,16 120:16
  120:20
incentives 97:7
  121:9
incentivize 12:16
  117:21 119:15
  120:21
incentivized
  89:25 92:11 102:3
  118:21
incipient 16:11
include 28:3 37:7
  38:23 68:2,3
  69:15 76:16 81:2
  81:7 90:10 93:13
  98:19 112:3,21
  122:4
included 44:8
  70:5 71:4 77:16
  81:20 84:14
  100:17 109:13
  111:7
includes 11:3
  87:21 101:21
  105:17 111:23
  116:17
including 11:4,15
  14:25 17:22 18:18
  24:10 30:4 37:2
  37:12 40:3,9
  43:19 46:11,24
  62:21 88:17 92:13
  92:21 93:8 110:21
  114:23 118:20
  120:1
incoming 90:18
incorrect 103:13
increase 29:16
  55:19,20 103:16
increased 28:8
increasing 85:21
incremental 13:3
  13:11

incur 94:15
independent
  118:23
indian 40:4
indicated 40:24
  70:4 71:5 105:5
  106:5 109:14
indiscernible 14:4
  33:4 39:5 40:12
  44:8,12,22 67:21
  67:24 83:20
  102:23
individual 23:8
  30:9 46:20 47:24
  48:4 67:11 77:21
  77:23 97:25 98:1
  101:20
individual's 97:23
individuals 28:7
  31:24,25 47:19,20
  67:18 68:18 115:5
  119:15 120:5,9
  121:4
indulge 55:15
industry 68:8
  87:2 90:12 97:6
  118:19,22
ineligible 13:24
  16:7
inevitable 35:5
inference 38:15
infinite 49:3
influence 31:13
  76:22 84:5,10
  108:3 109:25
  110:2 116:18
influencing 82:3,5
informal 52:11
  54:18 55:12 58:9
  58:11 59:14,16
  61:13
information 41:12
  42:18 43:5,22

59:4 65:7 73:2
  79:4 85:4 110:6
informational
  72:19 73:19
informed 39:15
  109:17
inherent 14:19
initial 18:18,20
  41:20 69:20
  112:23
initiative 92:3
initiatives 64:3
injunction 17:25
  18:7 26:23 34:19
  36:21 37:8 44:15
injunctive 88:14
injury 26:16
  27:16 28:4,6
innovation 112:24
inquiries 90:18
insider 64:6,15
  76:24,25 93:1,7
  94:5,10 96:22
  97:1 113:25 114:6
  115:9,13 116:16
  116:24
insiders 69:19
  74:25 75:20 92:10
  93:17 106:3,10,14
  109:13 110:10
  113:22 115:2
  116:12 118:2,3
  119:18 121:24
insistence 54:13
instance 91:13
  119:25
instances 28:16
  28:19 76:21
institutions 2:9
  3:8,15 4:9,14
  123:8,15 124:18
  124:24 125:11

**insurance** 3:13
8:7 26:17 27:20
28:5,8 33:21 52:7
52:8,12,14,25,25
55:11 83:11
101:20,21 123:13
**insurer** 54:9,13
**integrity** 32:9
**intellectual** 22:11
**intelligence** 79:7
**intend** 29:10
112:14
**intended** 86:4
**intends** 35:3
**intense** 39:21
**intention** 43:9
44:12
**interacting** 43:15
**interactions** 10:22
43:13 84:24
**intercreditor**
16:12 29:2
**interest** 12:14
19:5,25 25:4
31:21 36:15 38:2
42:21 45:19 50:24
102:1
**interested** 22:3
**interests** 29:12
40:14 97:9
**interfere** 42:17
**interim** 3:5,11,18
3:22 4:4,12 49:25
51:1 52:3,8 54:16
55:8,18 56:20,25
57:8,18 58:6,12
58:16,23 59:11
61:12,24 63:15,18
63:19,22,24 64:23
99:17 123:5,11,18
124:5,12,21
**intermediary**
60:13

**intermediate**
18:19
**international**
116:6
**interrupt** 26:4
106:9
**interrupting** 24:6
**introduce** 25:15
**invaded** 48:6
**invalidate** 117:15
**inventory** 82:12
**invested** 39:21
**investigate** 33:18
37:11 47:3
**investigating**
118:20
**investigation** 47:4
**investment** 27:12
**invited** 17:9
**invoke** 19:1
**involved** 39:22
41:22 42:22 74:3
74:18 75:20 76:12
81:17 88:18
101:23 118:8
**involvement** 14:6
40:25 77:22 80:11
**involves** 31:2
**ipc** 103:15
**ira** 7:19 25:10,16
**irrelevant** 75:13
75:15
**irrevocably** 23:3
**issue** 14:1 18:21
34:5,14,25 35:12
45:9,21 55:20
60:9 61:7 86:9
89:16 90:9 91:21
101:5 102:6
106:11,11,13
107:13 115:7
116:11

**issued** 54:8
**issues** 29:2,2,6
35:6 44:19 45:7
45:18 48:16,21
49:6 74:7 88:18
101:24 105:6
**item** 49:13 52:6
55:6 56:23 58:3
61:17,23,23,25
82:5
**items** 26:21 37:5
49:12 122:10

**j**

**j** 5:9 65:24
**james** 5:10
**jamie** 4:24 126:3
126:15
**january** 19:21
**jeffrey** 9:8
**jeffries** 27:12
**jennifer** 9:9
**jeopardize** 95:16
**jim** 74:21
**job** 25:15 31:1
43:2 72:2 77:15
78:1,1 79:2,10
89:12 98:24,25
99:4 106:8,17,19
108:9 113:11
**jobs** 75:20 76:1
79:5,6,7 98:15
113:19
**joinder** 2:14,17
2:20,23 110:19
**joinders** 110:18
111:3
**joined** 110:22
**joint** 115:10
**jointly** 37:19
**jon** 65:9,21
125:18
**journal** 82:4

**journals** 80:23
**judge** 1:24 73:10
74:5 116:8 118:10
**judgment** 18:9
106:3 118:12
121:23
**judgments** 18:10
**jumped** 62:10
**june** 80:10
**justice** 9:10
**justification**
120:16
**justifications**
118:9
**justified** 118:6
**justin** 7:5

**k**

**k** 6:23 8:4 9:8
**kahn** 6:9
**keenly** 18:12
**keep** 44:3 103:18
106:21
**keeps** 102:23
**kenneth** 5:17 39:8
**kesselman** 77:1
**key** 35:7 40:21
50:14 95:22,25
118:21
**kicked** 44:9
**kind** 86:14 91:14
113:11
**kindly** 30:7
**know** 19:10 24:14
32:19 34:13 35:24
37:9 44:17 49:3
50:18,20 53:15
55:2 61:8 65:1
66:18 68:7,18,23
69:13,25 70:8
71:3,5,20 73:22
73:23,23,24 74:3
74:17 75:19 76:5
77:10,15 78:13,21

78:22 79:24 85:16
88:25 89:10,12,22
89:25 91:16 94:24
98:24 106:6,15
107:8,21 108:9
112:15 121:20
**knowing** 38:14
45:14
**knowledge** 76:14
77:21 78:4 80:13
**known** 12:8 54:12
94:14
**knows** 16:22
35:21 63:3 106:17
**kramer** 5:12 39:9

**l**

**l** 7:23 8:20 9:9,11
65:24 83:5 123:3
124:3 125:3
**l.p.** 1:7 10:3
**laboratory** 92:16
**lacewell** 3:1
**lack** 37:22 52:3
69:18 78:13
**laid** 19:11 78:10
118:10
**landau** 77:1
**language** 53:11
60:16 91:13 99:18
99:21 100:8
**large** 25:1 41:19
59:1 101:21
**largely** 23:21
50:21
**larger** 45:21
**laughter** 83:23
95:4 102:25 103:5
**launch** 96:2
**law** 7:1 18:13 19:4
22:13 57:19
108:24 109:5
114:7 115:15
116:2,16 121:2,25

**lawsuits** 14:15
**lawyer** 24:12
**lawyers** 17:9 30:4
**layer** 53:2
**lead** 13:6 38:24
43:23
**leading** 42:8
**learning** 43:22
**leased** 92:16
**leasing** 92:4
**leave** 17:17 47:13
51:16 62:22 65:5
92:19 107:2,12
**leaving** 63:21
**lee** 27:19
**left** 64:18 109:10
**legal** 23:10 27:9
27:10 87:12
107:18 121:8
126:21
**legitimate** 120:18
121:1
**length** 17:24 49:1
**lengthy** 41:16
**letter** 3:1
**level** 70:5 71:4
94:3 101:24
109:20 113:14
**levels** 13:11 69:23
70:12,13 82:12
**levin** 5:12 39:9
54:1
**lexington** 5:4
**liabilities** 118:16
119:10
**liability** 3:13
11:22 18:17 53:1
53:3 54:10,10
123:13
**lifland** 118:10
**light** 48:14 63:6
111:4

**lightly** 16:9
**limit** 44:21
**limitations** 90:25
**limited** 64:6 75:1
76:25 88:23 92:5
**linda** 3:1
**line** 85:16,18
97:25 111:6 120:2
**lines** 30:17 52:18
69:1 121:21
**lion** 34:10
**lisovicz** 7:22
**list** 73:16
**listed** 27:14 70:14
71:10 76:11
**listen** 76:21
**litigants** 23:8,14
28:3,3,10,11,14
28:16,18 29:13,14
34:7,8,10 38:14
40:9
**litigate** 44:21
**litigation** 11:22
12:2 13:22 29:19
41:6 45:6 46:25
47:5,7 88:13
**litigations** 38:12
**little** 28:1 30:12
34:23 101:8
106:20
**live** 60:15
**lively** 13:12
**llp** 5:2,12,20 6:1
7:7,14 8:1,6 10:8
**loaded** 111:25
**loan** 27:22 59:17
**loans** 19:24 61:5
**local** 116:5
**logic** 106:22
**logically** 117:15
**lohmann** 59:19
60:7

**long** 14:15 36:16
38:14 50:20 63:13
112:22 113:11
115:19
**longer** 41:1 80:21
90:18
**look** 57:22 68:15
69:17 70:20 75:24
111:17
**looking** 33:6
34:16 35:23 75:3
90:23
**looks** 20:8
**lot** 24:9 29:20
33:17 37:1 42:18
54:20 60:10 63:3
72:21 91:9
**lots** 87:12
**lower** 109:20
**lowne** 65:9,11,15
65:18,21 66:3
80:8,16 81:10,12
85:15 89:8 90:15
96:14,23 101:2,6
102:4,10,12,17
103:9,12,16,21,24
104:3,7,18 113:13
119:25 125:18
**lowne's** 86:10
101:12 115:2,23
117:23 119:12
121:19
**lts** 27:22 59:16,19
59:24 60:7
**lump** 116:1
**luskin** 8:6,11
53:24,24,24 54:6

**m**

**m** 6:7 7:12 83:5
**madison** 6:13
**magnitude** 46:16
**mail** 54:23 57:24

**main** 6:11 32:12
**maintain** 2:6 53:9
  92:8 125:7
**major** 13:6 15:22
  45:20 46:25 47:9
  91:4 116:18,18
**majority** 13:22
  40:14 78:22
**making** 24:25
  85:19 87:16 91:15
  98:9,21 100:9
  103:22 117:4,7
**manage** 82:11
**manageable**
  119:11
**managed** 67:8,20
  67:23 82:17,19
  84:2,4,9,20 85:1
  88:6 89:24,25
  90:4 96:12 98:10
  99:3 101:17
  120:10
**management**
  110:19 116:21
  117:4
**manager** 97:24
**managing** 96:12
**manifested** 20:20
**manifesting** 16:13
**manner** 36:17
  43:9
**manufactured**
  79:20
**manufacturer**
  28:25 81:23 82:6
  91:4
**manufactures**
  79:21,22
**manufacturing**
  22:10 64:9 76:8
  92:1,2,6,9 93:9,13
**march** 19:13

**margaret** 53:25
**marginally** 71:22
**mark** 77:1
**marked** 122:13
**market** 64:14
  66:13 67:3 68:8
  68:17,21 81:16
  82:14,16 87:17
  91:16 95:20 96:4
  96:9,10,13,21
  97:5 98:22 99:13
  103:14 105:23
  107:7,9,9 112:20
  113:12,14 115:3
  117:24
**marketing** 72:24
  73:9 76:2 121:10
**marketplace**
  85:20
**marshall** 5:7 10:8
  25:17
**maryland** 19:17
**massive** 25:2
  38:25 47:9
**masumoto** 6:24
**material** 14:10
  101:6
**materials** 84:9,19
**matter** 1:5 47:2
  49:24 59:8 104:21
**matters** 45:2
  48:10 50:11,16
  86:12 111:17
  120:19 122:11
**maura** 8:4
**maximization**
  10:17
**maximize** 12:16
  14:10 22:13 86:23
**maximizes** 34:3
**maximizing** 14:25
**maximum** 93:3
  94:4 97:2

**mcclammy** 5:10
  74:21,21
**mckesson** 9:8
**mdl** 11:4 32:22
  38:24
**mean** 36:10 51:19
  61:1 90:2 98:5
  108:2,14,24 110:4
**meaning** 60:10,25
**means** 61:1,8 83:7
  90:14
**meat** 11:8 24:7
**mechanism** 47:8
**mechanisms**
  47:11
**media** 19:2 20:14
  31:3,6
**medicaid** 84:12
  89:14
**medical** 11:24
  22:10 28:6 80:23
  84:25,25 85:1,2,4
  90:17
**medicare** 84:12
**medication** 89:13
  96:1,2 99:1
**medications** 80:21
  81:3 85:19 87:11
  87:13,15,16,17,18
  87:21,24,24 88:2
  96:10 98:14,21
  99:4 112:19 113:2
**medicine** 112:25
**meet** 17:9 115:11
  115:13
**meeting** 14:24
**meetings** 76:17
**melissa** 8:20
  111:1
**member** 15:25
  40:4
**members** 29:22
  30:6,9,11,22,25

  31:12,20 40:6
  43:10 46:12
**membership**
  27:14 30:1
**memorialized**
  39:18
**mention** 13:15
  16:3,10 17:21
  31:25 38:23
**mentioned** 18:4
  37:3,5 119:7
**mentioning** 32:4
**merely** 38:12
  103:17 117:2
**methods** 93:10
**metric** 67:15
**metrics** 67:16
  97:16,18 120:1,4
**michael** 8:11
  53:24
**microphone**
  102:22 103:1
**milbank** 5:20
**milestone** 11:12
**milestones** 42:1
**million** 12:20
  19:23 20:3 21:8
  104:1,2,9,10
**millions** 23:10
**mind** 46:1 83:19
**minded** 36:1
**mineola** 126:24
**minimize** 45:6
**minimizing** 49:1
**minimum** 12:9,25
  17:5 20:11 23:1
  77:1 94:3
**minute** 17:10
  79:15 82:8
**minutes** 15:21
**misbranding** 73:4
  74:20 75:21 76:4
  77:18

**misconduct** 72:22
72:23 73:8,18,25
80:10,12,14 86:7
86:20
**misheard** 81:15
**misimpression**
109:10
**misinformation**
19:6
**missing** 22:23
**mistake** 22:6
**misunderstanding**
22:7
**misunderstood**
71:6,11
**mitch** 25:17
**mitchell** 7:21
**mitigates** 53:11
**model** 91:1 102:9
**moderately** 90:24
**modest** 64:6
**modified** 61:13
97:11
**modify** 117:17
**molton** 9:5
**moment** 64:8
**monday** 11:6
**monetary** 46:13
**money** 15:5 41:11
46:18 48:1,17
101:10 102:15
**monies** 49:2
**monitor** 89:23
**monitoring** 28:6
**monoghan** 8:4
**month** 21:25
34:19
**months** 17:5
21:11 69:4 88:20
90:25 93:24 94:6
**monumental**
26:18

**morale** 86:21
**morning** 10:2,4
25:10,23 36:25
39:8 49:9 61:20
66:3 111:1
**motion** 2:3 3:5,11
3:18,22 4:4,12
13:19 26:23 36:21
42:12 49:24,25
51:5,9,20 52:2,6,7
52:8 54:15,16,22
55:6,7,8 56:5,8,11
56:19,21,24,25
57:4,17 58:2,6,21
58:21 59:9,10
61:10,12,17,24,25
62:18 74:11
100:16 110:25
111:4 114:9,10
116:25 117:9
120:20 121:16
122:7 123:5,11,18
124:5,12,21 125:5
**motions** 36:12,12
54:20
**motivate** 96:5
97:7
**motivated** 96:3
113:18
**motivating** 119:22
**motivation** 119:21
**motivations** 41:6
**move** 13:17 30:2
42:15 92:15 107:5
108:22
**moving** 11:10
21:14 46:6 65:7
**multi** 21:14
**multiple** 17:5,13
21:15
**municipalities**
2:14 26:16 28:12
32:22 39:1,10

40:6 43:4 44:8
47:23
**mustn't** 47:12

**n**

**n** 5:1 7:4 10:1
65:24,24 123:1,3
124:1,3 125:1,3
125:14,16 126:1
**naftalis** 5:12
**name** 65:22 66:3
**names** 30:9
**narotam** 1:25
**narrow** 63:25
115:7
**narrowly** 119:8
**nas** 26:16 27:18
28:5
**nationwide** 26:12
45:22
**native** 9:12 28:13
**nature** 75:1 106:4
112:18
**nauseam** 113:23
**near** 41:5
**nearly** 12:6
**necessarily** 24:18
46:21
**necessary** 38:17
43:22 95:18 97:6
107:10 117:20,21
**necessity** 95:7
**neck** 42:1
**need** 11:22 15:15
18:22 27:25 33:17
41:10 42:22 43:5
64:2 66:6 75:6
87:18 98:25 99:5
100:13 106:20
107:1 112:2,20,25
113:3,7,8 118:20
**needed** 26:15 90:1
92:10 118:21

**needless** 92:21
**needlessly** 23:9
63:10
**needs** 22:22 26:13
40:19 41:24 42:18
46:9 86:8 92:18
96:3 113:18
**negative** 121:18
**negotiated** 50:12
52:19 106:18
**negotiating** 96:11
101:23
**negotiation** 42:6
**negotiations**
17:13,16 41:15
**neither** 19:15
**neonatal** 27:18
**nest** 117:3
**nests** 116:22
117:3
**net** 12:7,11,14,18
12:20,23 104:4
**nevada** 2:14
**new** 1:2,15 3:2 5:5
5:5,15,15,23,23
6:5,5,21,21 7:10
7:17 8:9 20:25
40:23 53:5 54:8
55:20 64:19 95:24
96:1,2,7 101:21
**newly** 11:15 96:1
**news** 15:3
**night** 11:6 113:1
**nilly** 30:22
**nine** 15:24 27:6
**non** 2:20 7:8 18:1
19:15 20:4,10
21:4,7,9 43:17
44:5 48:4 63:17
64:6,15 67:12
92:10,25 94:5
97:1

normal 111:14
normally 45:2
north 92:1
note 15:3 17:18
  31:23 33:7 45:10
  50:14 60:16
  113:15
noted 34:5 35:15
  35:15,23 36:3
  49:10 58:24,25
  121:7
notice 2:1 13:19
  52:4
noticed 36:23
notifications
  92:20
notion 22:20
  112:15
notwithstanding
  122:3
november 63:11
  63:20 79:9 100:10
  100:18 114:24
novo 79:5
number 13:5
  20:24 38:20 49:13
  52:7 55:7 56:23
  58:3 59:9 61:17
  61:23,25 69:13
  71:20 78:23 80:9
  94:24 99:12
numbers 21:11
  103:22
numerator 29:16
  32:12,18 34:17
nurse 90:10
ny 6:2 7:10,17 8:9
  126:24

**o**

o 1:22 10:1 65:24
  65:24 83:5 126:1
oath 91:6 103:8

object 2:12 35:24
  65:4 104:11 112:5
objected 117:14
objecting 105:2
  105:11,12,18,24
objection 2:15,18
  2:20,23 27:2 52:3
  54:22 55:13 86:14
  110:18,21 114:20
  117:24 119:1,3,6
  120:17 121:14
  122:8,9,11
objections 36:12
  50:23 54:18 61:14
  120:19
objectives 10:17
  67:11,13,18 104:4
objectors 10:13
objects 115:3
obligates 13:17
obligations 2:7
  3:14 4:6 16:20
  41:14 53:18 55:19
  58:25 94:14,19
  123:14 124:14
  125:9
observations
  39:14
obtained 118:14
obvious 34:1
  46:20
obviously 24:23
  26:25 38:11,14
  60:6 72:14 86:24
  88:12 106:2
  108:11 115:16
  122:8
occasion 109:15
  109:15
occasionally
  114:1
occur 37:5 41:4
  87:25 120:22

october 1:17 53:3
  126:19
offensive 22:21
offer 98:11 113:10
offers 79:2
office 6:18 24:6
  27:6 65:17 66:4
  92:16
officer 19:2 65:10
official 7:2 13:25
  15:13,25 24:16
  25:12,24 26:10
  27:5 29:22 30:2
  42:5 43:2 50:12
  114:13
officials 21:20
oh 79:19 103:7
okay 10:2 25:9,22
  26:2,4 38:4,8 39:7
  44:2,25 48:10
  49:7,14 51:4,24
  52:1,16 53:22
  54:14 55:16,24
  56:18 57:8,15
  58:4,20 59:13
  60:19,21 61:9,19
  65:14,19,25 68:4
  68:7 69:11 70:3
  70:12 71:7,11,16
  71:21 72:1,11
  73:6 74:14 75:11
  75:17 77:11 78:5
  79:14 80:4,20,25
  81:5,10,12 83:12
  83:15 85:10,12,23
  86:1 91:10,20,23
  95:5,6,21,22 98:2
  99:9,10,15 100:24
  101:11 102:13
  104:7,19,23 105:3
  110:17 111:9
  122:17,21

oklahoma 88:20
  88:22 91:1
old 8:7 52:14,17
  52:25,25 53:8,12
  53:15,19 126:22
once 12:22 37:2
  55:3 92:19 122:12
one's 110:20
  115:25
ones 36:14 51:7
ongoing 41:9
  43:17
open 36:1
opening 17:5 24:9
operating 87:20
  112:11
operations 41:12
  64:10 92:2,7,9
  95:15
operators 93:14
opioid 12:4 15:9
  22:19 23:12 26:11
  28:9,25 29:3
  32:17 35:3 37:23
  41:1,4 45:22
  46:13 66:15,24
  67:2,12 79:22
  80:17,21 81:3,13
  81:17 82:21 87:14
  87:16,21 96:19
  98:13 103:17
  104:13 108:10
  112:19 113:2
  120:22 121:7
opioids 67:6,15
  68:2,3 72:3,4,5,13
  72:14,15,15 88:5
  95:24 103:14
  104:1,2,4,9,10,20
  107:14,18 112:15
opportunity
  26:14 43:1,3

[opposed - payment]                                                  Page 22

**opposed** 117:8
  119:17
**opposing** 13:7
  21:19
**opposition** 56:19
**optimal** 96:9
**oral** 117:11 119:7
  121:13
**orange** 47:10
  48:19
**order** 2:3 15:20
  40:19 41:24 43:5
  49:25,25 50:2,12
  50:15,25 51:1,1,3
  51:7,9,12 52:4,7
  52:10,13,22 54:3
  54:18,23,25 55:7
  55:10,12,13,22,23
  56:1,3,16,19,24
  57:1,8,16,24 58:5
  58:7,12,13,16,17
  58:19,24 59:10,12
  59:18 60:1,5
  61:13,25 62:1
  63:15,22,25 84:5
  94:11 97:11,12
  99:11,13 100:18
  108:13 110:19
  114:11,17 122:3
  122:12 125:5
**ordered** 18:5
**orderly** 95:8
**orders** 3:6,12,19
  3:23 4:5,13 46:15
  50:4,5 55:19 59:3
  59:20 98:9 122:13
  123:6,11,18 124:6
  124:12,21
**organization**
  68:13 70:22 76:2
  76:7,9 86:16
  89:10

**organizations**
  67:9,20,23 82:20
**oric** 52:18 53:19
  53:25 54:2,7
**originally** 118:10
**orms** 4:24 126:3,9
**outlining** 32:24
**outreach** 90:19
**outset** 39:15 41:7
  43:13 50:17
**outside** 44:21 54:2
**outstanding** 2:8
  59:24 125:10
**overcompensati...**
  119:23
**overlap** 16:18
**overlapping**
  48:16
**overpay** 119:21
**overrule** 122:7,10
**overseas** 13:5,8
  41:12
**overspending**
  119:14
**owned** 12:8
**owner** 23:6
**owners** 97:8
  113:21
**ownership** 14:5
  23:4
**oxy** 90:20
**oxycontin** 14:16
  72:24 73:4,9
  74:20 75:22 76:4
  77:19 79:21 84:3
  90:4 108:9 112:24

**p**

**p** 5:1,1 10:1
**p.m.** 122:23
**pa** 8:18
**packaging** 93:14
**page** 21:14 56:8
  116:10 123:4

  124:4 125:4,17
**paid** 19:16,24
  53:9 64:13,18
  68:20 99:24
  112:16 117:16
**pain** 80:21 81:3
  87:14,16 98:13
  107:22 112:21
**painful** 22:2
**paragraph** 51:8
  52:17,22,24 53:11
  56:9 57:6,22
  59:18,19,23 60:7
  66:10 68:25 70:20
  71:10,13 99:18,21
  100:3,4 105:13
  114:16 122:10
**parent** 19:22 21:2
**parents** 27:17
**park** 7:16
**parochial** 31:21
  36:15 38:2
**part** 30:12 31:1,3
  32:1,19 35:5,17
  35:22 36:2 37:18
  48:12 53:4 68:15
  70:23 73:21 74:24
  88:16,20 98:18,24
  99:3,6,7 106:19
**participants** 95:1
**participate** 41:24
  76:17
**participated**
  73:17
**participating**
  73:25
**particular** 68:9
  76:18 117:6
  118:22 122:6
**particularly**
  30:21 89:22 101:6
**partied** 11:12

**parties** 4:6 10:25
  13:16 15:15 16:25
  17:13 18:15 19:5
  20:18 21:15 27:4
  30:4,5,7 31:16
  32:20 34:9,23,24
  35:18 37:12 41:13
  41:16,21 42:17,21
  43:10,14,19 44:21
  45:1,4,19 46:6,11
  50:14,24 59:6
  60:11,14,25 61:13
  81:18 101:3
  110:18 111:18
  116:12 117:13
  124:14
**partners** 25:16
**partnership** 14:3
**parts** 32:12,15
  67:10 76:8 104:14
**party** 18:9 33:9
  33:11,21 37:25
  40:10 94:13
**passed** 54:22
**patient** 82:15,23
  90:5 98:25
**patients** 68:1 84:6
  87:18 99:5 112:20
  112:21
**paul** 6:23 24:5
  65:16 66:3
**pause** 26:7 57:11
  79:17 98:3
**pay** 2:4,6 3:6
  13:18 56:12 64:16
  69:5,7 76:16
  106:20 107:1
  113:18 123:6
  125:6,8
**paying** 113:5
**payment** 4:13
  13:4 37:21 47:11
  59:23 64:21 66:13

84:12 95:10 99:19
115:8,9,12,20,25
116:1 124:22
**payments** 3:3
51:10 64:11 78:25
93:1,2 96:8,16,21
116:7 121:24
**payors** 40:10
**payout** 94:13 97:1
97:3
**payouts** 99:7
**pays** 103:15
113:17
**pc** 38:24
**peace** 113:1
**pec** 11:4
**pendency** 31:6
**pending** 54:3
**pennsylvania**
8:13,14 111:2
**pennsylvania's**
2:17
**penny** 19:24,24
**pension** 27:21
**people** 15:2,3
23:24 32:4,8 35:4
46:16 47:22,24
64:12,17 65:1
67:6,16 68:4,11
68:12,12 69:13,15
69:16,17,18,19,21
70:4,6,7,13 71:1,3
71:9,13,25 72:17
73:6,13,17 74:24
75:4,19,24,25
76:1,6,11 81:6,16
82:7,18,19 85:2
86:21 89:1,20
94:1,16,20 101:20
104:9 105:17
107:23 109:18,25
110:4,23 111:15
112:1,4,10,16,21

112:25 113:1,3,7
113:9 118:17
119:9,18 120:21
121:1,15
**people's** 99:4
**perceived** 88:22
**percent** 12:14,21
12:21 13:9,23
16:7 18:2 21:9,10
34:12,12 38:9,10
38:13 44:6 67:11
67:11,12,15,16
97:13,17,21 98:16
101:9
**percentage** 38:25
**perception** 31:12
111:22
**perform** 108:5
**performance** 3:25
96:13 97:14,19,23
97:24,25 98:1,19
98:22 99:6,7
101:21 104:15,16
124:8
**performing**
118:23
**period** 18:7,7 21:2
21:5,7 34:19 36:6
36:13 73:15 77:13
77:20 92:5 96:19
**permit** 4:8 124:16
**permitted** 31:18
**person** 17:9 24:24
82:16 84:8 89:11
93:6 97:2 109:20
122:6
**personal** 26:16
27:16 28:3,6 32:6
**personally** 26:19
32:2 62:8
**personnel** 81:7,7
**perspective** 16:14
72:16

**persuade** 100:12
**pertain** 45:1
**pertaining** 45:9
115:20 119:9
**pertains** 70:20
**peter** 9:11
**petition** 18:3 20:9
59:21 60:12 64:23
94:10
**pg&e** 37:24
**ph** 27:17,19,20
64:5 107:18
**pharma** 1:7 3:3
10:3
**pharmaceutical**
12:8 68:8 82:18
87:9,21 89:4 91:4
93:14,15 97:6
**pharmaceutics**
93:5
**pharmacists**
90:11
**pharmacy** 82:24
83:9 98:10
**phone** 13:16
52:15 53:25
**phrase** 60:11
73:10 91:16
**phrases** 71:2
**phrasing** 73:11
**physicians** 112:20
**pick** 14:1 83:9
**pickering** 115:6
**picking** 103:2
**piercing** 18:15
23:7
**pile** 54:4
**pillsbury** 6:1 7:7
44:4
**pittman** 6:1 7:7
**place** 29:21 38:1
43:19 63:21 87:4
88:15 89:19 93:19

113:16,17 115:19
**places** 48:17
**plains** 1:15
**plaintiff** 18:14
**plaintiff's** 32:21
40:7
**plaintiffs** 6:10
11:5 12:16 20:22
28:4 38:24 88:17
**plan** 16:15 41:25
42:14,25 43:4,6
43:23 48:2 63:12
63:13,17 64:5
68:5 69:3 75:4
78:15,18,19 81:1
81:6 82:17,24
83:8,11 89:14,14
91:24 92:25 93:4
93:12,18,19 95:1
95:10,20,23 96:5
97:13,19 101:6,20
103:15 105:2,12
105:21,23 106:16
106:18 107:7
109:12 111:23
113:12 117:14,17
117:18,19 118:13
118:15,16,18,20
120:1
**planning** 91:7
**plans** 36:11 62:23
78:7 84:3 94:17
95:18 104:14
**plant** 81:2 88:2
92:3,7 113:8,10
117:13
**play** 26:14
**plea** 73:3,21 74:4
74:19 77:17,24,25
78:3 80:11
**plead** 76:13 78:2
**pleading** 86:14
110:21

pleadings 31:10
116:17
please 10:7 20:17
22:5 65:20,23
86:13
pleased 47:18
pleases 49:10
pled 75:22
pledge 10:15
plifka 9:12
plimpton 8:1
plus 94:7
podium 21:18
44:9 61:16
point 24:14 30:3
30:15 31:15,15
33:16,16 34:20
36:19 38:20 39:4
41:17 45:21 54:19
56:7 57:5,21
64:19 94:9 100:2
107:17 108:22
109:11 112:14
pointed 99:18
120:5
pointing 44:3
points 33:8 48:25
111:24 113:4
119:2,24
policies 3:14
33:21 52:25 53:7
53:7,8,10,13,19
123:14
policy 53:2,5 54:8
54:8
polk 5:2 10:8
19:13 49:16 55:4
61:21 74:22
population 40:13
44:7
portion 69:9
81:15

position 33:5
34:14 36:20,24,24
37:6
positions 68:9,14
possibility 22:6
121:15
possible 10:12
43:24 48:1 68:20
68:22 79:12 97:3
possibly 12:6
22:18 35:20 46:21
62:15 90:17
post 14:6 40:23
61:7 64:23 94:10
posting 79:5
potential 10:13
18:10,14,16 33:20
48:14 55:13 90:14
94:18 100:6
118:16
potentially 37:19
60:10
power 44:20
practice 87:20
practices 87:3
88:5,10,15,22,23
89:19 108:12,16
109:7 120:25
121:3
practitioners
90:10
pre 61:7 116:4
precedent 37:24
48:18 61:2
precise 91:12
preexisting
115:15
prefer 50:6
preference 18:14
prejudging 33:17
preliminarily
35:15

preliminary
26:23 34:19 36:20
44:15 45:16
premised 119:1
premiums 28:8
preparation
92:13,17,19
prepare 22:16
prepared 26:1
74:7
prepetiion 3:6
123:7
prepetition 2:4
4:5,13 54:12
56:13 59:20,25
124:13,22 125:6
prescribe 99:1
prescribed 14:17
83:13 87:18 98:6
107:21 121:8
prescriber 66:25
67:1 82:13 90:19
prescribers 66:15
67:7 72:13 80:21
81:17,24 87:12
89:6 90:3,10,14
91:18,19 96:19
102:6
prescribing 82:3
prescription 67:1
85:21,21 87:11
107:23,24 112:20
prescriptions
102:6,7 103:17
present 50:21
52:15 65:11 76:20
76:23
presentation
20:18 76:24 77:2
presentations
20:21
presented 76:24

presenting 27:1
48:9
preserve 22:16
86:23 122:9
preserved 122:2
president 69:12
69:14,15 70:5,13
70:18,19,19,23
71:1,3,9,14 94:1
presidents 69:3,5
69:24 70:1,6,8,10
70:17 71:18 76:15
76:17,22 77:3,8
77:11 93:21,22
109:13 110:10
113:25
press 20:25 31:2,5
31:14,16,17 34:8
pressing 49:4
presumably 15:12
pretty 61:7 77:14
79:1 90:7 91:5
prevent 116:20
previous 21:1
primarily 67:20
primary 18:23
19:20 53:2 54:2,9
principal 62:14
print 48:12
prior 24:6 42:13
51:11 94:7
priority 116:8
pris 7:20
private 27:21 28:2
28:3,4,4,10,14,18
29:13
privilege 26:10
priz 16:1 25:16,18
25:23,23 26:6,9
30:24 38:5,20
39:12 44:9 45:15
priz's 38:16

**pro** 33:25 54:2,19
54:20
**probably** 19:10
38:23 90:22 91:2
91:8 108:12
**problem** 26:12
43:8 100:23
**problematically**
73:11
**problems** 107:23
**procedures** 4:1
30:19 89:19 124:9
**proceed** 2:8 10:5
11:16 23:18 48:7
49:12 74:5,9
125:9
**proceedings** 22:7
122:23 126:5
**proceeds** 12:7,11
12:15,18,20,23
13:11 22:17 28:24
36:16
**process** 2:9 3:8,15
4:10,15 15:17
23:11 34:18 41:18
42:3,22 43:10,21
45:12,13 46:7,7
47:16 48:13 91:25
93:15 112:10
117:4 123:8,16
124:18,24 125:11
**processes** 93:9
**procure** 37:14
**produce** 62:5
**produced** 64:9
79:20
**produces** 81:2
**producing** 25:2
**product** 14:16,20
20:6 54:10 67:2
67:12 81:25 82:10
83:9,10 85:3
86:25 89:7 90:21

93:8 96:7 102:7
103:18,18 107:18
107:20 109:3
**production** 79:25
93:10
**productive** 30:23
**productively**
15:24
**products** 53:1
66:15,24 67:24,25
67:25 68:2,3
79:23 81:2,18
82:13,20,21,21,22
87:7 91:15 93:10
96:3,12,19 101:18
101:25 120:22
121:7,10
**professional**
13:18 49:1
**professionally**
15:24
**proffer** 66:17
101:8,11
**program** 3:20
56:13 64:14,15
67:4,4,10 76:16
83:10 96:16 97:6
99:23 100:9 115:4
115:14,15,16,23
116:12 117:25
118:1,5,9,12
119:9,13,16,20
120:16,20 121:16
123:20
**programs** 2:6 4:7
4:9 58:2,6,12
62:21,24,25 63:2
63:8,11,12,16,21
63:25 65:7 86:9
91:21 95:7 111:18
114:12,16,21,23
120:4 121:22
124:15,17 125:8

**progress** 10:12
15:16
**prohibited** 115:8
**prohibiting** 3:23
124:6
**promised** 10:10
95:11
**promises** 113:9
**promotes** 32:16
80:21
**promoting** 90:13
**promotion** 66:14
66:23 67:6 72:14
82:4 87:11 90:9
91:16,17 96:18
98:14 102:5
**promotional** 82:5
84:9,19
**promptly** 13:18
**proof** 18:9
**proper** 13:19
121:8,10
**properly** 108:1
119:14,22,24
121:8
**property** 3:13
22:11 123:13
**proportions** 26:13
**proposal** 14:24
118:18
**propose** 30:19
91:20
**proposed** 25:11
25:24 48:24 50:2
50:4 52:9 54:23
55:9,12 57:1 58:7
59:12,18 62:1
97:12 99:11
114:16 118:14
**proposing** 119:20
**protecting** 22:4
22:20

**protection** 15:19
54:13
**protections** 53:14
**protest** 44:17
**protocol** 37:4,18
45:15
**protracted** 34:20
41:5
**proven** 47:11
**provide** 30:10
42:24,25 43:1,3,7
53:2,9 67:25 84:4
84:19,23 85:4
**provided** 33:1
41:9 42:9 55:12
56:12 67:17 110:6
**providers** 52:13
**provides** 17:4
42:11 59:19 94:6
**providing** 15:11
92:20 98:5
**province** 27:12
**provision** 13:21
**provisions** 15:19
18:5 48:25 58:15
91:3
**proviso** 56:9,10
100:4
**public** 12:1 14:12
21:19 28:11,14,18
29:13 32:14,16
34:13,25 35:11
36:17 41:3 48:5
86:19 111:15,16
111:22
**publication** 82:4
**publicity** 120:8
**puerto** 11:4
**purchase** 59:20
**purchaser** 79:3,11
**purchasing** 99:22
100:9

**purdue** 1:7 3:3
  10:2,9 13:2 19:14
  19:21,23 20:1,6
  20:15,16 21:25
  22:1,8,20 23:5
  28:15,24 33:20
  35:2,4 45:20,25
  73:3 75:22 76:12
  78:2 80:17,20
  85:16,17,19 86:16
  87:13 88:13 90:25
  91:18 92:4 96:10
  96:12 98:25
  113:17
**purdue's** 19:22
  20:22 21:1 22:2
  35:8,9 46:2 95:23
  97:8 108:9
**purport** 87:8 88:8
**purpose** 103:8
  112:8 116:22
**purposes** 13:10
  48:6 70:25 116:13
  117:19
**pursuing** 16:25
  119:3
**pushed** 111:13
**put** 18:6 33:3
  45:25 46:18 56:11
  100:23 108:13
**puts** 11:7
**putting** 32:6

**q**

**q3** 67:10
**q4** 67:10
**qualified** 121:19
**qualify** 96:22
**quality** 92:8
**quarropas** 1:14
**question** 51:6
  52:17 66:11,20,23
  68:23 71:6,18
  73:11 75:7 78:17

79:19 81:13 83:19
  83:20 84:7 85:24
  86:6 101:9 103:8
  103:20 104:6
  106:3 108:4
**questionable**
  115:18
**questioning** 89:18
**questions** 51:2
  56:4 57:12 58:18
  60:4 65:4,12,17
  66:5 74:9 80:3,8,9
  81:1 83:15 84:25
  85:9,12 86:12
  95:19 97:10 101:7
  114:8
**quick** 41:25
  102:16
**quicker** 66:9
**quickly** 33:25
**quite** 51:8 91:7
**quo** 63:22
**quote** 20:15 97:14

**r**

**r** 1:22 5:1 7:5 10:1
  83:5,5 123:3
  124:3 125:3 126:1
**r&d** 76:8
**rachel** 5:18
**rai** 1:25
**raise** 34:5 65:20
**raised** 83:19
**raises** 52:16
**range** 46:14 92:12
**rare** 76:18
**rate** 13:9
**raymond** 5:21
**rdd** 1:3
**reach** 17:8 50:18
  86:13
**reached** 11:1
  20:12 22:25 62:19
  111:5

**reaching** 41:17
  62:14 91:19
**reactions** 19:1
**read** 20:14 55:13
  72:21
**reading** 52:18
**ready** 11:16
**realize** 13:10
**realized** 12:12
**really** 49:3 61:6
  74:24 89:2,3,5
  98:6 104:12
  106:22 112:5
  117:18 122:5
**reaping** 67:14
**reason** 18:23 35:1
  49:4 91:11 102:15
**reasonable**
  118:13,15,17
**reasons** 25:13
  87:25 88:24 114:1
**rebuttal** 110:25
**recall** 70:24 71:5
  77:5,6
**receive** 50:23
  58:11 69:6 78:8
  78:10,14 79:8
  95:9 117:13
  118:23
**received** 12:13
  28:24 52:10 57:3
  59:16 61:13 69:4
  120:9
**receiving** 78:17
  78:17,21,24
**recognize** 34:23
  40:16 41:22 46:7
**recognized** 87:3
  88:4
**recollection** 77:20
**record** 24:17,21
  39:2 49:16 52:2
  54:16 55:14 56:20

57:18 58:23 60:17
  61:11,21 65:23
  105:1 118:2 119:5
  120:24 122:5
  126:5
**recovery** 12:17
**recross** 83:24
**redirect** 74:13
  80:4,6 81:11
  85:12,13
**reduced** 53:17,18
**reducible** 18:1
**reducing** 44:13
**reduction** 84:17
**refer** 28:2,11 66:7
  66:10 82:14,17
**reference** 31:15
  56:10 68:24
**referenced** 20:19
  21:13 24:24 39:20
  69:16,19 70:9,11
  72:17 73:6 105:13
**references** 73:2
**referring** 15:4
  52:22 83:2
**reflect** 56:17
  58:13 60:1
**reflected** 52:13
**refrain** 30:7 31:5
**refusing** 3:23
  124:7
**regard** 32:18 36:8
  105:17 120:19
  121:18
**regarding** 24:10
  24:20 31:6 52:17
  56:4 57:12 74:20
  78:7 99:19 105:6
  105:6,9
**regards** 33:23
**regular** 24:15
  59:5

**regulated** 86:25 92:22 109:2
**regulations** 88:4
**regulators** 108:2 108:3
**regulatory** 87:3,9 92:20
**reimbursable** 99:23
**reimbursed** 14:18
**reimbursement** 53:13 62:22
**reinstallation** 92:14
**reiterate** 30:16 86:11
**reject** 33:11
**rejected** 108:10
**relate** 87:16 97:19 97:24
**related** 2:6,9 3:8 3:15 4:6,10,15 46:11 87:16,20 88:10 93:10 94:15 98:1 113:5 123:9 123:16 124:14,18 124:24 125:8,11
**relates** 32:18 52:24 56:1
**relating** 50:15
**relationship** 15:23 118:13
**relatively** 47:1 91:8 99:16
**relentlessly** 12:2
**relevant** 17:2,9 30:20 45:18 64:2 64:25 75:2 97:7
**relief** 4:7 37:20 49:11 50:25 56:4 56:5 57:12,13,18 61:11 62:7 63:23 64:20 74:25 88:14

99:17,17 100:14 100:15 114:18 124:16
**relinquish** 23:3
**remain** 101:18
**remainder** 96:25
**remaining** 55:25 59:25 96:25 97:3 117:24 122:9
**remains** 11:23 14:16 41:19 101:25
**remarkable** 62:12
**remarks** 19:11 24:25 26:2 38:3 38:16 39:11 44:25 45:11
**remediate** 29:5
**remediation** 41:3 41:4
**remember** 112:23
**remind** 20:17
**reminder** 61:4
**remiss** 31:24
**remotely** 38:16 76:1
**removal** 18:6 92:14
**remove** 101:22
**renew** 3:12,19 55:20 123:12,19
**reorganization** 40:23 43:1
**reorganized** 14:3 15:8
**repeat** 77:22
**repeated** 102:5
**replace** 95:13
**replacement** 54:8
**replied** 71:8
**report** 10:24 21:14 25:2 77:3,7 114:3

**reported** 20:24
**reporter** 83:1
**reporting** 58:14 60:1 109:20
**reports** 20:14 25:7 93:6
**represent** 26:10 38:25 44:6
**representation** 16:10
**representative** 13:6
**representatives** 14:4,9 80:22
**represented** 13:7
**representing** 29:12 30:5 32:8 39:9,16 44:4
**represents** 40:14 47:22
**republic** 8:7 52:14 52:17,25 53:1,8 53:12,15
**request** 3:2 51:3 54:8 56:5 57:13 58:19 59:19 60:5 86:11
**requested** 17:24 30:10 56:4 57:12 85:8 99:21
**requesting** 88:14
**requests** 4:1 59:5 65:6,8 124:10
**require** 53:8 76:19 112:22
**required** 15:8 22:14 53:15 92:20 94:12
**requires** 21:20 51:16
**rescue** 22:17
**reservation** 55:14

**reserve** 44:23
**residential** 120:14
**resolve** 43:8 46:9 55:13
**resource** 68:14
**resources** 47:7 62:16
**respect** 3:14 11:11 11:15 12:3 53:10 57:6 62:18 63:16 74:24 80:25 87:14 93:18 95:6 98:13 98:21 110:24 113:4,12,22 123:14
**respectfully** 51:3 56:5 57:13 58:19 60:5
**respects** 17:3 111:15
**respond** 24:1 112:12
**responds** 90:18
**response** 21:21 59:16 72:10
**responses** 57:3
**responsibilities** 93:8 117:7
**responsibility** 45:23
**responsible** 85:19 85:20 96:9
**responsibly** 88:3
**rest** 47:13
**restrictive** 91:3
**restructuring** 13:20 42:7,12
**result** 16:12 28:8 84:17
**resulted** 74:4 77:17
**results** 63:13 97:3 118:14

[retain - securing]                                                          Page 28

**retain**  81:6 88:1
  95:12
**retained**  19:14
**retention**  63:17
  64:5 78:15,18,19
  78:25 80:25 91:24
  92:25 93:12 95:10
  105:2,12 106:16
  106:18 117:14,17
  117:18,19
**rethinking**  121:22
**retirees**  2:7 125:9
**revealed**  20:15
**revenue**  72:15
**revenues**  79:24
**review**  15:10
  68:15 115:18
**revised**  51:7 54:17
  56:20 122:7
**revisions**  122:9
**rewarded**  67:16
  107:25
**rhodes**  19:16 20:6
**rico**  11:4
**right**  25:16 37:23
  49:20 51:6 52:1
  52:23 54:14,15,20
  57:10,16,23 58:21
  60:6 61:10 64:3
  65:20 68:24 71:16
  72:9 75:11 78:9
  81:18,19 82:1
  83:15,17,21 84:13
  86:1 89:2,4,11
  90:7 92:19,24
  94:23 97:22 98:11
  98:11 101:13
  104:19,25 105:15
  105:22 107:5
  108:17,21 109:6
  109:24 110:15,17
  110:17 114:10
  118:17

**rights**  23:4 31:1
  42:17 55:14 56:1
  58:14 59:2 60:2
  110:20 122:1
**ringer**  5:18
**rise**  25:13 39:4
**risk**  18:6 53:12
**road**  126:22
**robert**  1:23
**robertson**  5:8
  48:9 49:8,15,16
  49:21,23 50:9
  51:13,18,21,24
  52:5,21,24 53:6
  53:20 55:3,4,17
  55:23,25 56:15,22
  57:9,11 58:1,5
  59:7,14 60:18
  61:15 122:19
**role**  14:5 16:2
  26:14,14 29:15
  34:15 35:5
**roles**  30:6 75:24
**room**  16:23
**roughly**  69:1
**rsa**  11:17
**rubric**  96:23
**rudnick**  9:1
**rule**  27:13
**ruled**  113:24
  116:9
**rules**  115:20
**run**  16:20 94:11
**running**  96:7
**runs**  99:22
**rush**  63:10
**ryan**  27:16

**s**

**s**  5:1,7 10:1 123:3
  124:3 125:3,16,16
  125:16
**s.d.n.y.**  117:5
  118:11 120:14

**sackler**  5:21 22:21
  23:1 32:23 40:25
  41:1 46:12
**sacklers**  12:16
  22:4 28:17,25
  33:19 35:5 36:15
  37:4,12 41:10,11
  42:10 43:15
**safe**  87:22,23 91:8
**safely**  88:3
**safety**  32:14,17
  35:1,11 36:18
  92:8 95:16
**salaries**  2:5 120:5
  125:6
**salary**  119:17
**sale**  12:7 67:15
  72:3,4 87:6
  120:21
**sales**  13:5 72:13
  72:15 76:2 80:22
  82:5 84:14,16,18
  97:15,24 104:4
  120:25
**salesforce**  80:17
  81:14,21,23 84:2
  89:2,5 90:9 91:17
**salient**  13:15
**sammons**  27:19
**sanctions**  108:15
**sander**  9:11
**sara**  7:23
**satisfy**  43:22
**savings**  62:23
**saw**  33:2,2 60:6
**saying**  26:9 31:19
  35:1 98:18 107:24
**says**  51:11 66:12
  85:6
**scenes**  45:6
**schedule**  23:16
**scheduled**  63:3
  64:16

**schwartzberg**
  6:23 23:23 24:1,4
  24:5 65:16,16
  66:2,3,19,21,22
  72:8 73:12 74:8
  74:10,15,16 75:5
  75:12,14,17,18
  79:15,18 80:2,9
  81:1 100:25
  102:16,19,23
  103:3,6,10,13,19
  103:22,25 104:5,8
  104:20,25 105:4
  105:13,20,23
  106:1,23 107:5
  108:17,22 109:11
  109:22 110:1,9,15
  112:13 113:5
  125:18
**scientific**  11:24
**scope**  118:16
**se**  61:6
**sears**  60:9
**second**  2:1 15:22
  18:22 22:20 23:21
  26:5,21 29:17
  30:2,25 32:10,13
  33:15 44:9 49:11
  54:19 60:20 63:2
  64:14 66:11 82:8
  82:16 106:10
  116:2,4
**secondly**  115:3
**secrete**  15:17
**secretion**  18:6
**section**  8:15 18:16
  30:20 57:19 94:12
  115:7 116:13,20
  118:4
**secure**  16:15 53:9
**secured**  61:5
**securing**  96:11

security   81:7 92:8
  95:17
see   11:8 12:4 16:2
  26:22 31:19 32:11
  35:14 39:4 47:18
  48:17 69:9 101:1
  111:20 117:4
seeing   21:18
seek   100:5,15,18
seeking   37:19
  64:24 67:4 91:2
  100:8
seeks   76:15
seemingly   19:2
seen   42:1 72:21
  82:2,5
selected   14:8 27:9
  27:10,11 92:14
self   88:14 90:25
sell   12:10 103:25
  104:8,13 108:6,7
selling   107:18,19
  108:1
sells   72:5 103:14
  104:2
senior   69:23,25
  70:6,8,10,18 71:8
  93:4 114:2
sense   108:1 112:3
sensitivity   105:5
sent   20:5
sentence   22:22
  66:11 69:1,8
separate   97:14
  100:16
september   50:1
serious   19:4 86:7
  86:12
seriously   49:6
serve   13:24 16:8
  31:20 32:1 117:18
service   3:2,24
  10:15,16 30:18

93:24 94:2 101:25
  124:7
services   31:3 93:7
serving   30:16
set   14:19 15:7
  21:4 22:16 35:10
  37:19 97:23 98:1
  114:4
setoff   4:8 122:4
  124:16
sets   115:9
setting   120:4
settle   10:12 29:17
settlement   15:5
  17:12 20:12 32:24
  33:5 34:3,17
  35:16,25 36:9
  37:13 39:18,23,24
  40:1,12,18,21
  41:7,8,15,17 46:7
  47:5,10 48:14,19
  88:21
settlements   48:4
seven   78:24
seventy   95:2,3
severance   64:21
  69:2,5,6 75:4
  76:16 78:9,10,18
  78:24 79:8 93:18
  93:19,24 94:2,6
  94:14,18 95:11
  105:16,18,19,20
  105:21,25 106:8
  106:13,20,21
  107:2,3 109:12
  113:5 114:23
  115:6,8,12,14,22
  115:24 116:7,12
  117:13,15,17,20
  121:16,24
severe   112:21
severed   94:10

shape   84:9
share   34:10
shared   13:12
  21:15 47:4 62:14
shareholder   12:9
  12:14 14:4 18:8
  18:15
shareholders   11:5
  12:3,19,20 13:8
  15:11,16 17:3
  18:7 19:15,21
  20:2,5,10,17 23:3
  23:8
sharing   59:4
shaw   6:1 7:7
sheet   11:2,6,11,18
  14:2 15:7,18
  17:21 32:23 33:2
  35:16,20,21 39:24
  40:1 41:18,22,25
  42:11,20,23 43:16
  43:18
sheets   13:14
sheila   4:24 126:3
  126:9
shield   27:21 89:14
shipped   59:20
short   36:6,12 45:3
show   50:4 79:9,12
shown   122:4
shut   22:8
shutting   22:1
sick   62:22
side   19:12 36:1
  38:22
sides   11:15
sign   63:13
signed   50:15 54:3
significant   40:19
  41:6 42:3,9 43:9
similar   13:20
  68:14

similarly   82:3
  107:12
simply   99:16
  121:23
single   19:24 23:14
  49:4
sir   65:20 83:17
  86:2 87:1 98:20
sit   27:5 39:6 55:1
  102:24 110:16
site   92:20
sitting   25:16
situated   37:11,15
situation   19:6,8
  62:11
six   17:5 27:7,24
  28:1 34:18 37:1
  40:6 68:4,11,12
  68:18 69:4 81:16
  89:20 93:24 94:6
  97:1 103:15 115:5
  119:9 120:9,25
size   46:12
sizeable   15:1
skelter   23:9
skill   62:12
skilled   95:14
skip   44:10
slated   22:24
sleep   113:1
slightly   71:24
  100:1
sliver   12:14 20:5
small   14:19 60:23
  63:14 64:15 70:23
  88:16
smaller   60:8,9
smartly   21:14
social   31:2,5
society   120:23
  121:11
sold   90:4 92:3
  104:10 107:15

112:15
solution 32:2
43:24
solutions 126:21
solvency 11:22
solving 48:5
soon 45:9 64:11
64:16 111:19
sorry 23:24 35:15
47:19 67:22 69:16
71:17 74:21 79:16
87:23 105:10
115:10,10
sort 19:16 38:21
39:3 91:6 98:7
101:14
sotomayor 116:8
sought 27:4 31:25
62:7 74:25
source 42:24
southern 1:2
space 92:17
sparse 75:14
speak 23:25 31:9
53:20 109:15,23
114:1,2
speaker 95:2
speaking 44:10
special 18:12
specialists 93:13
93:15
specialized 76:19
specific 97:22
specifically 20:20
42:20 46:2 95:14
specifics 67:19,19
spectacle 31:14
speculation 86:19
speed 17:6 62:5
62:12
spell 65:22 83:2,4
spend 33:10 34:4

spent 44:16
split 12:12,23
21:9
spoken 106:10
spread 53:5 54:11
square 8:8,16
squared 63:1
staff 88:1
stakeholders
10:13,18 14:19
19:10 22:14 86:11
stand 65:20
standards 118:19
standing 36:12
start 26:9 37:20
37:23
started 10:23
starting 33:16
starts 69:1
state 2:23 3:2 6:2
9:9 13:6 19:17
21:24 24:20 26:15
32:21 38:25 47:21
47:23 79:19 88:22
89:14
stated 21:25 27:14
29:9 35:18
statement 16:4
19:16 24:2,9 27:2
27:13 29:10 34:7
statements 21:19
24:13,13,14,17,18
37:8 111:16
121:19
states 1:1 2:21 6:3
6:18 7:8 11:3 12:5
13:24 14:18 16:4
27:6 28:11 32:21
35:24 36:1,2
38:21,22 39:1,10
40:3,3 43:3,18
44:5,7 114:15,20
120:3

stating 34:1
status 17:16 25:19
59:22 63:22
statutory 29:21
stay 4:7 92:11
95:12 107:1
117:22 124:16
steel 106:12 116:3
116:10
stem 107:23
step 41:18,20
83:17 86:1
stern 8:6 53:25
stet 99:18
stewards 16:19
stick 113:7
stipulation 17:4
17:16
stop 96:19 107:16
stopped 87:13
90:13,15
straightforward
99:16
strategic 31:17
strategy 95:25
96:6
straus 106:12
116:5
strauss 7:14 25:11
strawberry 8:16
street 1:14 6:4,11
6:20 7:9
strengths 28:20
28:21
stricken 51:8,11
56:10
strong 19:1 32:6
strongly 32:2
structure 14:8,21
16:10,15 40:23
43:6 48:14
stutzman 9:11

subdivisions 44:8
subject 51:1 58:18
60:4 66:17 80:11
86:4 88:13 109:14
110:12 115:15,18
115:19 116:1
121:1
submit 56:16
substance 39:23
substantial 15:11
16:17 31:16 40:2
40:17 41:9
substantially 11:7
97:4
substantively
33:15
succeed 100:14
successful 42:25
64:9
successfully 96:2
102:10
sufficient 37:13
40:20 41:12
120:15
suggest 22:3
118:2
suggested 121:21
suggestion 115:22
121:15
suite 6:12,20
126:23
sum 116:1
summarized
102:11 116:16
summary 11:2
summation 86:10
superintendent
3:1
supplement 39:11
39:14 74:11
supplemental
65:9,15 66:5
115:2

**supplementary**
66:17 96:24
**support** 13:21
37:8 40:2,12,18
42:7,12 43:24
44:14
**supported** 12:15
110:14 114:6
**supporters** 38:23
**supporting** 11:3
32:20 43:10,18
119:4
**supportive** 39:17
43:4
**supposed** 109:17
110:5,6
**sure** 10:6 11:14
13:12 14:11 24:12
25:6 45:17 51:8
53:18 54:4,21
59:4 60:8,14 61:7
64:21 72:21 73:16
75:1 77:14 79:1
82:25 83:1,5 84:7
87:5,8,17 89:13
90:7 95:1 97:18
98:8,9 101:10,12
101:13 102:21
103:1,3 104:5
105:4,10 108:18
111:7 112:10
120:20 121:20
**surety** 3:19 55:7
56:13 123:19
**surety's** 55:8,19
56:4
**surprise** 109:24
**swibel** 54:1
**sworn** 65:21
**sympathy** 23:13
**syndrome** 27:19
**systems** 27:23
59:17

**t**

**t** 125:16 126:1,1
**tailored** 119:8
**take** 34:14 36:6
36:24 46:8,8 90:5
90:7,23 111:16
**taken** 10:21 36:23
101:19 111:12
120:4
**takes** 33:5
**talented** 95:14
**talk** 29:16 44:15
68:10 89:4,5,5
**talked** 35:16
**talking** 31:2,5
44:16 46:17 68:11
70:25 77:25 78:1
82:7 85:2,18 89:1
89:19 105:7
**targeted** 101:7
**targets** 47:7
**task** 46:5
**tax** 13:9 19:15,15
20:3,4,9,10 21:4,6
21:9,10 56:8
**taxes** 3:7 49:24,25
50:11,12,25 123:7
**taxing** 19:17
**team** 25:2
**technical** 93:6
**technicians** 93:14
**telephonically** 9:7
**tell** 25:14 122:19
**telling** 38:12
102:24
**tempted** 111:15
**ten** 69:16,17,19,21
69:25 71:13,21,22
71:22,23 72:17
73:6,13,16,17
74:17,24 75:4,19
76:11 105:17
114:25

**tender** 12:5
**tennessee** 6:10
**tensions** 16:12
**term** 11:2,6,11,18
13:14 14:2 15:7
15:18 17:21 32:23
33:1 35:16,20,21
39:24 40:1 41:18
41:22,25 42:11,20
42:23 43:15,18
63:13 69:18 78:14
82:25 89:3,4
112:22 113:11
**terminate** 94:17
**terminated** 64:22
80:18 81:14
**termination**
115:25
**terms** 23:16 37:4
38:12 46:13 52:20
76:15 84:24 102:8
107:7,12 110:20
119:11
**territories** 11:4
40:3,4 114:15
**test** 42:18 110:7
115:10
**testified** 81:13
96:23 109:23
**testify** 90:15
119:25
**testifying** 90:6
**testimony** 66:17
74:6 81:15 86:10
101:8 105:9 106:2
107:8,13 119:12
120:7 121:18
**tests** 115:10,13
**thamila** 107:18
**thank** 30:24 38:5
43:25 44:2,23
48:8 49:8,15 50:9
50:19 52:5 55:3

55:17,17 56:15,22
58:1 60:18 61:15
62:8 66:8,9 68:24
72:9 74:15 75:17
80:8,16 81:10
85:23 86:3 99:10
111:10 112:7
122:15,17,18,21
122:22
**theme** 62:13
**theories** 28:19,20
**therapy** 27:23
59:17
**thereof** 3:14
123:15
**thing** 15:22 16:3
17:20 21:17 37:23
45:10 48:12 51:20
61:2 73:8 91:17
94:8 100:1 101:2
**things** 10:12
13:15 16:23 19:9
29:16 37:1 38:6
85:16,17 101:5,15
106:4,5 112:13
121:4
**think** 13:20 16:9
18:21 24:24 25:4
27:25 30:15 33:12
35:7,21 36:5,8
38:13,22,24 39:4
39:12 44:13 45:5
45:18,23 46:19
47:8 48:20,25
49:5 51:11,14
53:21,22 54:3
56:10 60:22 64:11
65:4 69:19 70:21
71:23 73:11,20
75:1 77:13 82:6
86:7 88:25 89:2,8
89:9,11,18 90:16
90:22 91:8 95:17

103:19 106:2,5,7
106:17 107:16
108:9,12,12,19
109:22 111:11,17
112:3 113:6,12,23
113:24 114:6
119:19 120:18
122:20
**thinking**  77:15
80:17 81:5
**thinks**  34:12
**third**  4:6 26:22
32:14 34:25 35:14
37:17 39:5,6 40:9
44:11 46:11
124:14
**thoroughly**  47:12
**thought**  48:21
51:14 71:8 110:1
**thoughts**  45:16
**thousands**  14:17
23:14 40:8
**three**  10:25 11:16
20:7 30:1 32:11
36:3 38:18 94:2
95:2,3
**tie**  104:4
**tied**  67:18 121:10
**time**  11:10 14:25
25:25 27:9 29:19
30:11 33:4,6,10
33:13 34:14,15,16
36:6,13 37:8 39:5
42:13 44:14 47:3
49:2 54:22 63:6
65:13 73:15 75:25
77:13,14 80:2
85:15 100:5
106:16 111:17,17
112:8 116:1
**times**  8:8 41:16
86:19 102:5

**timing**  15:17
**tiny**  19:15 38:6,20
**tireless**  62:10
**title**  70:17,19,24
93:5 96:21 117:8
**titles**  70:21
**tobacco**  15:5
**today**  17:17 20:18
21:24 44:12,16
49:12 50:16,22
62:20 63:24 64:24
65:8,11 67:5
74:25 85:17,17
86:5,9,16 87:15
91:7,22 100:3,7
114:13,19 122:11
122:20
**today's**  24:7 45:2
48:7
**tomorrow**  17:18
26:24 37:7 44:13
44:15,22 47:13
**tomorrow's**  17:8
45:9
**tool**  31:17
**top**  56:8 77:6 80:1
94:25 117:20
**topic**  76:19
113:23 114:7
**total**  12:21,22
20:9 21:7,7,8
92:25 93:1 94:24
96:25
**totaled**  21:5
**totals**  94:16
**touch**  72:15 82:12
**touching**  76:2
**towns**  28:12
**tracey**  4:24 126:3
126:12
**trade**  27:22 29:14
82:14

**traditional**  46:23
**tragedy**  23:17
**trainer**  27:19
**transcribed**  4:24
**transcript**  126:4
**transfer**  4:10
18:14 20:6 22:25
23:7 124:19
**transferee**  18:18
**transferees**  18:17
18:20,20
**transferred**  11:21
22:25 40:23
**transfers**  2:10 3:9
3:16 4:15 18:19
21:2 24:11 123:9
123:16 124:25
125:12
**transition**  92:5,12
92:13,23 95:8,12
**transitioning**
91:25
**translate**  28:23
**transparency**
20:19
**tread**  16:9
**treatment**  41:3
112:23
**tremendous**  34:2
**treyburn**  64:5,25
78:8,13,15,16,18
78:19 79:3,20,21
79:24 80:25 81:2
81:6 88:1 91:24
92:1,3,10,15,18
93:11 94:16,21
95:10,20 105:2,12
105:18,21 106:16
113:8 114:23
117:12,14
**tribes**  9:12 28:13
40:4,8

**tried**  11:12
**troop**  6:7 7:12
44:3,4 83:18,22
83:25 85:9 125:20
**true**  13:13 20:8
23:17 24:18 84:20
98:13 120:7 126:4
**truly**  62:12
**trustee**  6:18,19
13:24 27:6 47:20
50:14,19 52:11
57:5 58:10 59:15
62:4 65:3 94:9
105:1 111:4 115:3
119:3,5,24 121:21
**trustee's**  24:6
29:21 65:17 66:4
110:18 114:20
121:14 122:8
**trustees**  14:7
**truth**  91:9
**try**  39:11,22 86:14
**trying**  29:15
31:13 35:2 84:1
88:21 89:5,8,13
91:12 95:12
103:17 113:2
**tuesday**  11:7
39:25
**turn**  21:17 23:20
43:20 49:11 56:23
61:16 78:5 86:9
91:20 95:20
100:10 106:6,7
**turned**  12:1,18
100:8 112:1
**turning**  18:22
**tussling**  16:24
**twisted**  112:1
**two**  10:16 19:20
25:13,15 27:6,16
27:17,22 32:15
33:3,7 35:25 36:6

36:13 38:6,20
46:1,4 49:13
52:12 60:25 62:9
63:25 71:2 91:21
94:1 95:18 106:1
106:5 114:20
115:10,10,23
119:2
**type** 27:15 28:6
30:21 42:1 45:12
101:24
**types** 34:6,7 46:19
**typically** 76:25
81:22

### u

**u** 83:5 123:3
124:3 125:3
**u.s.** 1:13,24 6:19
22:12 24:5 29:21
47:19 50:13,19
52:11 57:5 58:9
59:15 62:4 65:3
65:17 66:4 94:9
105:1 110:18
111:4 115:3 119:3
119:5,24 121:14
121:21 122:8
**ucc** 11:16 16:20
16:24 17:2,23
25:6 50:19 52:11
58:10 59:15 111:5
**ucc's** 16:3 36:20
**ultimate** 11:23
13:3 16:19
**ultimately** 38:11
38:18 39:25 42:25
43:5 47:4 48:2
49:5 76:23 89:18
119:2
**unable** 37:14
**unanswered** 74:9
**unaware** 18:25

**unceasing** 10:20
**unclear** 74:23
**uncontested**
23:21 48:9 49:12
49:23 50:11,16,21
59:8 62:24
**underlying** 118:9
118:12
**undermined**
31:12
**understand** 23:13
27:4 33:19 35:19
47:21 60:14 62:5
78:6 83:1 85:8
89:15,17 105:11
105:15 106:11
112:10
**understanding**
61:1 78:6 79:5
87:10 88:9 90:6
**understands**
54:21
**understood** 98:17
**undertake** 112:9
113:13
**undertaken** 42:4
**undertaking** 64:3
92:12
**undertook** 116:15
**undoubtedly** 42:5
**undue** 117:16
**unequivocally**
35:18
**unfortunate** 29:3
**unfortunately**
22:2
**unidentified** 48:8
95:2
**union** 116:5
**united** 1:1 6:18
12:5 13:24 27:6
44:7 114:20

**unnecessary** 29:8
62:16
**unopposed** 57:17
58:22 114:19
117:10
**unpaid** 94:7
**unprecedented**
88:13
**unsecured** 7:2,15
15:25 16:5,16,21
25:12,25 26:11
29:12,14,24 31:21
34:16 37:16 62:3
62:18
**unsigned** 35:21
**unspoken** 29:2
**unthinkable**
23:19
**unusual** 13:22
16:6,10,11,14
45:4,10
**unusually** 16:17
63:3
**update** 17:15,18
44:19
**urged** 43:13
**use** 31:17 46:19
46:21 48:1,14
84:5 85:6 89:6
91:17 99:23
**useful** 39:13
**user** 90:19
**ust** 2:12,15,18,24
**utilities** 3:23,24
56:24,25 57:16
124:6,8
**uzzi** 5:25

### v

**v** 116:5
**vacation** 62:22
**vague** 73:11
**validity** 106:12

**valuable** 11:24
22:16 46:10,10
**valuation** 13:12
**valuations** 46:16
**value** 10:17,18
13:11 14:10,25
22:13,14 23:5,9
23:19 33:20,24,25
34:3,10,24 37:14
41:11 68:8 86:23
95:15 113:19,20
**van** 8:20 111:1,2
111:10
**vandermeuse** 9:9
**varick** 6:20
**varies** 77:5
**variety** 20:21
39:22 87:12
**various** 10:22
21:18 37:12 46:11
47:23 48:17 65:6
**vast** 13:22
**vehemently** 35:24
44:17
**vehicle** 43:7
**veil** 18:15 23:6
**vendor** 59:9,16
61:3
**vendors** 4:14
59:10 124:23
**verify** 41:13
**veritext** 126:21
**versus** 61:7
**vetted** 24:15
42:18 47:12
**vice** 69:3,5,12,13
69:15,23,25 70:4
70:6,8,10,13,17
70:18,18,19,23
71:1,3,8,14,18
76:15,17,22 77:3
77:8,11 93:21,22
94:1 109:12

110:10 113:25
**victim** 31:1 35:10
**victims** 26:16
**view** 38:11 39:2
**views** 16:4 28:20
  28:23,24 30:6
**virtually** 15:22
**voice** 14:5 31:9
**voidable** 18:19
**volume** 85:21
**voluntarily** 23:3
  87:13
**voluntary** 13:2
**vonnegut** 5:9
  21:18 49:10 61:17
  61:20,21 66:16
  73:10 74:5,14,23
  75:8,10 80:5,7
  81:11 85:11,14,24
  86:3 87:1,5,8 88:7
  91:11,24 94:21,24
  95:3,6,22 97:18
  97:22 98:8,11,17
  98:20 99:10,15
  100:21,24 102:4
  108:20 112:7
  122:15,18,22
  125:19,21
**vote** 14:5
**vp** 77:5
**vps** 77:6

**w**

**w** 65:24 125:16
**wages** 2:4 61:17
  61:24 62:18,21
  114:9 125:6
**wait** 64:12 66:18
**waiting** 64:18
**waive** 100:5
**waiver** 100:11
**walk** 82:24 97:11
**walks** 83:9

**walter** 27:19
**want** 23:24 24:8
  27:1 31:11 32:1
  38:15 39:2 41:21
  43:12 48:20 51:22
  54:21 62:8 63:9
  63:10 64:20 65:14
  69:17 71:25 86:5
  86:17 87:8 88:7
  90:6 91:6 94:8
  96:15 99:24 101:3
  101:11 102:17,21
  103:1 105:10
  109:9 111:6
  112:17 119:2
  120:20
**wanted** 24:7,16
  24:20 45:16 52:18
  60:16 64:17 71:3
**wants** 33:9,11,12
  39:4 99:1
**wardlow** 19:14
**wardwell** 5:2 10:8
  49:17 55:4 61:21
**warehousing**
  92:17
**warp** 62:5
**warrant** 121:22
**warranted** 108:13
  111:18 119:6
**wasting** 62:15
  101:10
**watch** 101:12
**way** 17:1 29:4
  31:13 32:11,16
  35:3 36:8 37:15
  38:2,14 42:16
  45:20,21 83:8
  85:7 92:19,24
  93:20 119:13
  120:22 122:4
**ways** 112:1

**we've** 37:1,3,10
  38:3 62:7,19
  99:25 101:2,13
**weak** 110:20
**weaknesses** 28:20
  28:21
**week** 11:1 39:24
**weekend** 27:13
**weeks** 10:19 27:7
  38:18 39:20 94:2
  94:3,4
**went** 32:19
**west** 6:4 7:9 27:21
**westchester** 55:11
**wheel** 39:6
**whispered** 102:11
**white** 1:15
**wholesaler** 84:21
  90:4 96:11 101:24
**wholesalers** 67:19
  82:7,9,11 88:6
  89:24 99:3 120:11
**wholly** 17:14
  62:24
**wide** 20:21 93:19
  97:19 104:14,16
  114:25
**williams** 4:24
  126:3,12
**williamson** 6:15
**willing** 60:15
**willy** 30:22
**winthrop** 6:1 7:7
  44:4
**wisconsin** 6:13
  9:9
**wisely** 48:1
**withdraws** 110:21
**withhold** 121:24
**witness** 24:20
  65:21,24 72:6
  74:12 81:19,22
  82:2 83:3,5,7,14

107:7 109:14,22
  125:17
**wondered** 53:23
**wood** 17:7
**word** 37:22
  111:25
**words** 30:1
  118:18
**work** 10:11,16
  11:1,14 17:3 20:7
  33:17,18 35:19,23
  37:25 38:17 40:19
  45:6,8 47:11,25
  50:17 62:3,11,14
  64:10 67:8 81:15
  82:19,22 113:10
  113:16,17 119:16
**worked** 41:17
**worker's** 62:22
**workers** 2:8 62:23
  95:14 116:6
  125:10
**workforce** 63:1
  86:19
**working** 27:7 37:1
  37:3,18 49:19
  50:20 62:4,6
  67:19,20,21,23
  78:1 82:9,11,13
  86:21 99:2 101:2
  101:14,17 120:10
**works** 103:2
**world** 12:3
**worldwide** 12:5,7
**worth** 10:19 11:25
  13:3,8 22:9 104:1
**would've** 45:3
**writes** 67:1
**writing** 39:19
**written** 102:7
**wrongdoing**
  73:22,24

[x - zero]    Page 35

| x |
|---|
| **x**   1:4,10 123:1 |
| 124:1 125:1,14 |
| **xr**   96:1 98:14 |

| y |
|---|
| **y**   83:5 |
| **yards**   5:22 |
| **yeah**   26:6 54:5 |
| 60:24 61:4 70:17 |
| 71:12 78:4 83:5,7 |
| 90:2 102:19,21 |
| 109:1,8 |
| **year**   20:21 21:2,5 |
| 21:6 46:15 53:1 |
| 69:6 93:25 94:2,7 |
| **years**   20:9,16 21:3 |
| 34:4,4 41:5 69:3,6 |
| 93:24,25 |
| **yesterday**   21:24 |
| **york**   1:2,15 3:2 |
| 5:5,5,15,15,23,23 |
| 6:5,5,21,21 7:10 |
| 7:17 8:9 |

| z |
|---|
| **zero**   12:19 |