# Exhibit A

No.        , Original

IN THE

# Supreme Court of the United States

STATE OF ARIZONA,

*Plaintiff,*

*v.*

RICHARD SACKLER, THERESA SACKLER, KATHE SACKLER, JONATHAN SACKLER, MORTIMER D.A. SACKLER, BEVERLY SACKLER, DAVID SACKLER, ILENE SACKLER LEFCOURT, PURDUE PHARMA, INC., PURDUE PHARMA, L.P., THE PURDUE FREDERICK COMPANY, INC., PURDUE HOLDINGS L.P., PLP ASSOCIATES HOLDINGS L.P., BR HOLDINGS ASSOCIATES L.P., ROSEBAY MEDICAL COMPANY L.P., AND BEACON COMPANY,

*Defendants.*

## MOTION FOR LEAVE TO FILE BILL OF COMPLAINT

Mark Brnovich
  *Attorney General*
Rebecca Eggleston
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-5025

William S. Consovoy
  *Counsel of Record*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard,
Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Ashley Keller
Travis Lenkner
KELLER LENKNER LLC
150 North Riverside Plaza
Suite 4270
Chicago, IL 60606
(312) 741-5220

July 31, 2019

*Attorneys for Plaintiff, State of Arizona*

Plaintiff, the State of Arizona,[1] respectfully moves this Court for leave to file the attached Bill of Complaint. The grounds for this Motion are set forth in an accompanying brief.

Respectfully submitted,

Mark Brnovich
  *Attorney General*
Rebecca Eggleston
OFFICE OF THE
ARIZONA ATTORNEY
GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-5025

William S. Consovoy
  *Counsel of Record*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard,
Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Ashley Keller
Travis Lenkner
KELLER LENKNER LLC
150 North Riverside Plaza,
Suite 4270
Chicago, IL 60606
(312) 741-5220

July 31, 2019

*Attorneys for Plaintiff, State of Arizona*

---

[1] Arizona Attorney General Mark Brnovich brings this action on behalf of the State of Arizona pursuant to A.R.S. § 41-193(A)(3).

No.          , Original

IN THE

# Supreme Court of the United States

STATE OF ARIZONA,

*Plaintiff*,

*v.*

RICHARD SACKLER, THERESA SACKLER, KATHE SACKLER, JONATHAN SACKLER, MORTIMER D.A. SACKLER, BEVERLY SACKLER, DAVID SACKLER, ILENE SACKLER LEFCOURT, PURDUE PHARMA, INC., PURDUE PHARMA, L.P., THE PURDUE FREDERICK COMPANY, INC., PURDUE HOLDINGS L.P., PLP ASSOCIATES HOLDINGS L.P., BR HOLDINGS ASSOCIATES L.P., ROSEBAY MEDICAL COMPANY L.P., AND BEACON COMPANY,

*Defendants.*

## BILL OF COMPLAINT

<table>
<tr><td>

Mark Brnovich
  *Attorney General*
Rebecca Eggleston
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-5025

</td><td>

William S. Consovoy
  *Counsel of Record*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard,
Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Ashley Keller
Travis Lenkner
KELLER LENKNER LLC
150 North Riverside Plaza
Suite 4270
Chicago, IL 60606
(312) 741-5220

</td></tr>
</table>

July 31, 2019

*Attorneys for Plaintiff, State of Arizona*

## BILL OF COMPLAINT

Plaintiff, the State of Arizona,[1] brings this action against Defendants Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Purdue Pharma, Inc., Purdue Pharma, L.P., The Purdue Frederick Company, Inc., Purdue Holdings L.P., PLP Associates L.P., Rosebay Medical Company L.P., and Beacon Company (collectively, "Defendants"), and for its causes of action asserts as follows:

### NATURE OF THE ACTION

1.      Defendants Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, and Ilene Sackler Lefcourt ("the Sacklers") for decades owned and controlled The Purdue Frederick Company, Inc., Purdue Pharma Inc. and Purdue Pharma, L.P. (collectively, "Purdue"). The Sacklers and Purdue have made billions of dollars off the promotion and sale of opioids, fueling a crisis with devastating effects in Arizona and the nation. The Sacklers and Purdue reaped profits through misleading marketing tactics that were barred by a 2007 consent judgment that Purdue entered into with the State of Arizona. The State is seeking civil

---

[1] Arizona Attorney General Mark Brnovich brings this action on behalf of the State of Arizona pursuant to A.R.S. § 41-193(A)(3).

2

penalties and other relief for violation of that consent judgment in a pending case before Pima County Superior Court. *See Arizona ex rel. Brnovich v. Purdue Pharma, L.P., et al.*, No. C20072471 (Ariz. Super. Ct.).

2.      The State brings this action because it has evidence that the Sacklers, Purdue, and the other Defendants were parties in recent years to massive cash transfers—totaling billions of dollars—at a time when Purdue faced enormous exposure for its role in fueling the opioids crisis. These transfers threaten the ability of Purdue to satisfy any relief the State may obtain in its pending proceeding against Purdue. The State therefore brings this action to hold the Defendants accountable for their attempts to loot Purdue, and to ensure that the people of Arizona can obtain adequate relief for the devastation that the Sacklers and Purdue have wrought in this state.

## JURISDICTION

3.      This Court has original jurisdiction over this action under Article III, § 2, cl. 2 of the U.S. Constitution because the dispute is a "Case[] … in which a State shall be Party" and under 28 U.S.C. § 1251(b)(3) because it is an "action[] or proceeding[] by a State against the citizens of another State."

## PARTIES

4.      Plaintiff is the State of Arizona.

3

5.     Defendant The Purdue Frederick Company, Inc., is a drug company that manufactured, sold, and distributed pharmaceutical products, including opioids.

6.     Defendant Purdue Pharma Inc. is a drug company that manufactures, sells, and distributes pharmaceutical products, including opioids. It is the general partner of Defendant Purdue Pharma L.P.

7.     Defendant Purdue Pharma L.P. is a limited partnership that includes the commercial group responsible for promoting and selling opioids. It is controlled by Defendant Purdue Pharma Inc.

8.     Defendants Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, and Ilene Sackler Lefcourt were members of the Board of Directors of Purdue Pharma Inc. since the 1990s. Together, they always held the controlling majority of the Board, giving them full control over Purdue Pharma Inc. and Purdue Pharma L.P. From that position, they directed the deceptive sales and marketing of OxyContin. And they paid themselves billions of dollars through transfers to numerous entities that either were controlled by the Sacklers or were created for their benefit.

9.     Defendant Richard Sackler is the former President and CEO of Purdue Pharma Inc. He also was a Board member of Purdue Pharma Inc. until 2018.

4

10.    Defendant Theresa Sackler served as a Board member of Purdue Pharma Inc. until 2018.

11.    Defendant Kathe Sackler previously served as Vice President and was a Board member of Purdue Pharma Inc. until 2018.

12.    Defendant Jonathan Sackler previously served as Vice President and was a Board member of Purdue Pharma Inc. until 2018.

13.    Defendant Mortimer D.A. Sackler previously served as Vice President and was a Board member of Purdue Pharma Inc. until 2019.

14.    Defendant Beverly Sackler served as a Board member of Purdue Pharma Inc. until 2017.

15.    Defendant David Sackler served as a Board member of Purdue Pharma Inc. until 2018.

16.    Defendant Ilene Sackler Lefcourt served as a Board member of Purdue Pharma Inc. until 2018.

17.    Defendant Purdue Holdings, L.P. is a Delaware limited partnership. Purdue Holdings L.P.'s partners are Purdue Pharma Inc., PLP Associates Holdings Inc., and PLP Associates Holdings L.P.

18.    Defendant PLP Associates Holdings L.P. is a Delaware limited partnership and a limited partner of Purdue Holdings L.P. Its partners are PLP Associates Holdings Inc. and BR Holdings Associates L.P.

5

19.    Defendant BR Holdings Associates L.P. is a Delaware limited partnership.

20.    Defendant Rosebay Medical Company L.P. is a Delaware limited partnership ultimately owned by trusts for the benefit of one or more of the Sacklers. Its general partner is Rosebay Medical Company, Inc. The Board of Directors of Rosebay Medical Company, Inc. includes board members Richard S. Sackler and Jonathan D. Sackler.

21.    Defendant Beacon Company is a Delaware general partnership ultimately owned by trusts for the benefit of one or more of the Sacklers.

## FACTUAL ALLEGATIONS

### A.    The Nationwide Opioid Crisis

22.    The opioid crisis is the worst man-made disaster in American history. There have been almost 400,000 opioid-related deaths in the United States in the last two decades. *See Understanding the Epidemic*, U.S. Dep't of Health & Human Services, Centers for Disease Control & Prevention, Dec. 19, 2018, https://bit.ly/2jEOHfs.

23.    And it is only getting worse. In 2017, the number of overdose deaths involving opioids was six times higher than in 1999. *Id.* Staggeringly, more than 130 people in the United States die every day from an opioid overdose. *See Opioid Overdose Crisis*, National Institute on Drug Abuse, Jan. 2019, https://bit.ly/2j6YEE1. These deaths "are up among

6

both men and women, all races, and adults of nearly all ages." *Understanding the Epidemic*, *supra*.

24.     This     epidemic     is     devastating communities   across   the   United   States.   It   has increased crime, homelessness, and healthcare costs; it has torn apart families; and it has damaged the economy. *Id.* In all, prescription opioid misuse costs the U.S. economy at least $78.5 billion annually. *Opioid Overdose Crisis, supra.* The President has rightly declared the opioid crisis to be a public health emergency. *Ending America's Opioid Crisis*, The White House, https://www.whitehouse.gov/opioids/.

25.     Like   its   sister   States,   Arizona   has suffered   these   harms.   Since   2013,   opioid-related deaths in Arizona have risen 76 percent, with 928 deaths   reported   just   in   2017   alone. *See Arizona Opioid Summary*, National Institute on Drug Abuse, Rev., Mar. 2019, https://bit.ly/31Fm0p0. That same year, Arizona providers wrote an astonishing 61.2 opioid prescriptions for every 100 Arizonans. *See id.*

26.     The   Arizona   Department   of   Health Services estimates that between June 2017 and June 2019, more than 3,000 Arizonans died from an opioid overdose. *See Opioid Epidemic*, Arizona Dep't of Health   Services,   2019,   https://bit.ly/2kaC9Ou.   In 2017, Governor Ducey declared the crisis to be a statewide emergency. *See id.*

7

## B.    Purdue's Role in Causing the Opioid Epidemic

27.    Opioids have existed for centuries, but they were not always the scourge they have become. Before the 1990s, doctors rarely prescribed them. The medical community understood that, although opioids could effectively mask pain, they carried serious risks, including addiction, withdrawal, and overdose. As a result, they were typically prescribed only for acute pain, surgery recovery, cancer treatment, or end-of-life palliative care. Opioids were not prescribed for chronic or commonplace pain.

28.    But this was not good enough for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and Purdue Frederick Company, Inc. (collectively, "Purdue"). Over the last two decades, Purdue embarked on an aggressive marketing campaign to disrupt prevailing medical norms in order to pump up sales of its opioid painkillers, including OxyContin.

29.    In particular, Purdue illegally minimized the risks associated with prescription opioids and aggressively encouraged doctors to prescribe them more broadly. Indeed, shortly after Purdue began selling OxyContin, its President, Defendant Richard Sackler, crassly boasted that "the launch of OxyContin tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white."

8

30.    He was right. Doctors were deceived into prescribing more of Purdue's opioids, in higher doses, and for longer periods of time. Purdue's profits soared. By 2000, in fact, the company was realizing more than a billion dollars each year in sales of OxyContin alone. *See* Mike Mariani, *How the American Opiate Epidemic Was Started by One Pharmaceutical Company*, The Week, Mar. 4, 2015, https://bit.ly/2nlwLfu.

31.    And as Purdue's profits rose, so too did opioid addiction, overdoses, and deaths. In just seven years (1999 to 2006), prescription opioid deaths in the United States rose by nearly 400%. *See Understanding the Epidemic*, *supra*.

32.    Federal and state officials took notice. In 2006, the Justice Department began investigating Purdue over its marketing of OxyContin. It discovered that Purdue knew about "significant" abuse of OxyContin as far back as 1996, yet actively concealed that information from the public. Company officials had received reports that the pills were being crushed and snorted, stolen from pharmacies, and that some doctors were being charged with illegally selling prescriptions.

33.    Yet Purdue continued to market OxyContin as less prone to abuse and addiction than other opioids. DOJ also discovered that the Sacklers had received reports detailing the ways in which Purdue's opioids were being abused. *See* Barry Meier, *Origins of an Epidemic: Purdue Pharma*

9

*Knew Its Opioids Were Widely Abused,* N.Y. Times, May 29, 2018, https://nyti.ms/2sfaW1G.

34.    In 2007, Purdue and top executives pleaded guilty to misleading doctors and patients about the addictive properties of OxyContin and misbranding the product as "abuse resistant." *United States v. Purdue Frederick Co., Inc.*, No. 1:07-cr-29 (W.D. Va. May 10, 2007). Federal prosecutors had uncovered a "corporate culture that allowed this product to be misbranded with the intent to defraud and mislead." *Id.*

35.    Purdue paid more than $600 million in fines, among the largest settlements in U.S. history for a pharmaceutical company. *Id.* It also signed a corporate integrity agreement with the federal government, promising that the company would not violate the law in the future. *Id.*

36.    During this time, Purdue also entered into a consent judgment with the State of Arizona ("Consent Judgment") to resolve the State's investigation into the company's misleading marketing of OxyContin. *See Arizona, ex rel. Goddard v. Purdue Pharma Inc., et al.*, No. C20072471 (Ariz. Super. Ct. May 14, 2007).

37.    The Consent Judgment prohibited Purdue from, among other things, promoting and marketing its oxycodone painkillers in deceptive ways, and it required Purdue to pay a $19.5 million fine, which was distributed to Arizona and 25 other

10

States that had entered into similar consent judgments with the company. *Id.*

## C.     Purdue's Continued Misconduct

38.     Despite all of the fines, settlements, judgments, and promises, Purdue—with the knowledge and approval of the Sacklers—continued to market its opioids illegally through a marketing campaign that was designed to aggressively increase sales.

39.     Purdue targeted doctors it knew would be susceptible to its deceptive marketing—*e.g.*, high-volume opioid prescribers, inexperienced providers, and primary-care physicians who knew little about pain management—and encouraged them to prescribe higher and higher doses for longer periods of time.

40.     Purdue then blamed opioid abuse on patients, instead of the addictive nature of the drugs. It pushed opioid prescriptions to elderly patients who had never taken them before, without disclosing the higher risks to this vulnerable population. It claimed that opioids were safer than acetaminophen (*e.g.*, Tylenol) and non-steroidal anti-inflammatory drugs (*e.g.,* ibuprofen) and that the risk of addiction was insignificant. And it falsely assured doctors and patients that its reformulated OxyContin was safe.

41.     This brazen campaign caused opioid prescriptions (and Purdue's profits) to skyrocket. By 2009, Purdue was making more than two billion

11

dollars each year from sales of OxyContin alone; as of 2016, Purdue had earned more than $31 billion from OxyContin.

42.    That same year, more than 214 million opioid prescriptions were written in the United States—enough for two out of every three Americans to have a prescription. *See U.S. Opioid Prescribing Rate Maps*, U.S Dep't of Health & Human Services, Centers for Disease Control & Prevention, Oct 3, 2018, https://bit.ly/2vzRjoj.

43.    It is unsurprising, then, that Forbes identified the Sacklers as the 19th richest family in the United States, with a fortune that had soared to $13 billion. *See The Sackler Family*, Forbes Magazine, 2016, https://bit.ly/2MUQY9b.

44.    Purdue's misconduct again drew scrutiny. Purdue is presently facing thousands of lawsuits in which plaintiffs, including counties, cities, towns, and nearly every State in the country, are seeking to recover billions of dollars under consumer-protection and tort law. These actions are slowly winding their way through the courts. Recently, Purdue agreed to pay $270 million to settle Oklahoma's lawsuit. *See* Sara Randazzo, *Purdue Pharma Begins Resolution of Opioid Cases With $270 Million Deal*, Wall Street Journal, Mar. 26, 2019, https://on.wsj.com/ 2FCqunj.

45.    Like other States, Arizona is taking action to redress the harm Purdue has inflicted. On September 11, 2018, an Arizona state court ordered

12

Purdue to show cause as to whether it should be found in violation of the Consent Judgment. *See Arizona, ex rel. Brnovich v. Purdue Pharma L.P., et al.*, No. C20072471 (Ariz. Super. Ct. Sept. 11, 2018). The State is seeking civil penalties of up to $25,000 per violation. That case is set for trial in 2021.

## D.    The Sacklers' Looting of Purdue

46.    Purdue is not a public company. It has long been owned and operated by eight individuals from a single family: Defendants Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler. As members of Purdue's Board of Directors, the Sacklers controlled, directed, and oversaw all of the company's actions.

47.    The Sacklers have long been aware that Purdue's marketing of opioids posed a massive liability risk to the company. In fact, through their control of the Board and Richard Sackler's role as President, the Sacklers ordered or oversaw much of Purdue's illegal marketing, in addition to related strategic decisions.

48.    For example, in 2014, Kathe Sackler, a board member, pitched "Project Tango," a secret plan to grow Purdue beyond providing painkillers by also providing a drug, Suboxone, to treat those addicted. According to Ms. Sackler, the plan could be profitable because "[a]ddictive opioids and opioid addiction are 'naturally linked.'"

13

49. After Purdue's settlements and guilty pleas, Richard Sackler wrote a memo exploring options that could protect the family from the "dangerous concentration of risk" they faced. As lawsuits and regulatory scrutiny continued to mount, the Sacklers recognized the dangers Purdue was facing.

50. In 2015, Purdue's chief financial officer, Edward Mahoney, acknowledged that the company faced claims of more than a billion dollars and that the claims, if successful, "would have a crippling effect on Purdue's operations and jeopardize Purdue's long-term viability." The potential liability grew exponentially in the following years.

51. Despite these massive potential liabilities, the Sacklers regularly depleted Purdue of its assets. Between 2008 and 2016, Purdue transferred more than $4 billion to the Sacklers, as the following chart shows:

14



52.    The Sacklers also directed Purdue to transfer billions of dollars to companies the Sacklers controlled, including Defendants PLP Associates Holdings L.P., Rosebay Medical Company L.P., and Beacon Company. Since 2008, the Sacklers voted to distribute nearly $2 billion to PLP Associates Holdings L.P. In 2016 alone, the Sacklers distributed more than $175 million to themselves.

53.    Much of this money has flowed overseas, including to Defendant Rosebay Medical Company L.P. *See* Bruce Einhorn, et al., *OxyContin Billionaires Chase Global Profits to Offset U.S. Woes*, Bloomberg, Mar. 30, 2019, https://bloom.bg/2Gj4Pkb.

54.    These transfers all took place at times when company officials, including the Sacklers, were keenly aware that Purdue was facing massive

15

financial liabilities and that these transfers could prevent it from satisfying eventual judgments.

55.   Not surprisingly, Purdue recently announced that it is contemplating bankruptcy. In March 2019, Purdue CEO Craig Landau told the Washington Post that bankruptcy "is an option. We are considering it, but we've really made no decisions on what course to pursue. A lot depends on what unfolds in the weeks and months ahead."

## E.   Avoiding the Sacklers' Fraudulent Transfers

56.   After the Sacklers' misconduct came to light, States began suing them to avoid the fraudulent transfers. *See, e.g., Connecticut v. Purdue Pharma L.P., et al.*, No. X07 HHD-CV-19-6105325-S (Conn. Super. Ct. Apr. 22, 2019).

57.   More suits are likely to follow. Every State in the country has a fraudulent-conveyance statute and nearly every State faces the prospect of being unable to recover against Purdue due to these improper transfers.

58.   These cases have raised (and will continue to raise) similar if not identical issues and claims. Virtually all States have adopted the Uniform Fraudulent Transfer Act. *See Fraudulent Transfer Act*, Uniform Law Comm'n, https://bit.ly/2YpMg3Y (showing that 43 States and the District of Columbia have adopted UFTA); *Thompson v. Hanson*, 174 P.3d 120, 126 (Wash. Ct.

16

App. 2007) (noting that "an explicit purpose of the UFTA is uniformity among the States").

59.    Under the UFTA, any transfer of funds that is made with intent to hinder, delay, or defraud present or future creditors may be avoided. These transfers also can be avoided if there was constructive fraud, *e.g.*, a transfer of funds without receiving equivalent value in return.

## CAUSES OF ACTION

### COUNT I:
### INTENTIONAL FRAUDULENT CONVEYANCE

60.    Paragraphs 1–59 are incorporated by reference as if fully restated here.

61.    The State's litigation against Purdue constitutes a claim against Purdue rendering the State a creditor of Purdue within the meaning of Ariz. Rev. Stat. §§ 44-1001 and 44-1004.

62.    The State's claim arose no later than 2008 and continued through at least September 2018, when Purdue repeatedly violated the terms of the 2007 Consent Judgment.

63.    All of the transfers of assets from Purdue to the Sacklers described above constituted transfers pursuant to §§ 44-1001 and 44-1004, and were made with actual intent to hinder, delay, or defraud present and/or future creditors of Purdue, including the State of Arizona.

17

64.     Accordingly, the State is entitled to the relief provided by Ariz. Rev. Stat. § 44-1007.

### COUNT II:
### CONSTRUCTIVE FRAUDULENT
### CONVEYANCE

65.     Paragraphs 1–64 are incorporated by reference as if fully restated here.

66.     The State's litigation against Purdue constitutes a claim against Purdue rendering the State a creditor of Purdue within the meaning of Ariz. Rev. Stat. §§ 44-1001 and 44-1004.

67.     The State's claim arose no later than 2008 and continued through at least September 2018, when Purdue repeatedly violated the terms of the 2007 Consent Judgment.

68.     All of the transfers of assets from Purdue to the Sacklers described above constituted transfers pursuant to §§ 44-1001 and 44-1004, and were made without receiving a reasonably equivalent value in exchange for the transfer.

69.     All the transfers of assets from Purdue to the Sacklers described above were made when Purdue was engaged in or about to engage in a business or transaction for which the remaining assets of Purdue were unreasonably small in relation to the business or transaction, or, in the alternative, intended to incur, or believed or reasonably should

18

have believed that Purdue would incur, debts beyond its ability to pay as they became due.

70.   In addition and/or in the alternative, those transfers were made at a time when Purdue was insolvent or became insolvent as a result of the transfer or obligation.

71.   Accordingly, the State is entitled to the relief provided by Ariz. Rev. Stat. § 44-1007.

## PRAYER FOR RELIEF

The State requests that the Court order the following relief:

a)  Declaratory relief that the transfers alleged in this Bill of Complaint are void;

b)  Garnishment against those Defendants who received the transfers alleged in this Bill of Complaint in accordance with the procedure prescribed by law in obtaining such remedy;

c)  Attachment against the assets transferred or other property of the Defendants in accordance with the procedure prescribed by law in obtaining such remedy;

d)  An injunction against further disposition by the Defendants of the assets transferred or of other property; and

e)  Any other relief available at law or equity.

19

Respectfully submitted,

Mark Brnovich
  *Attorney General*
Rebecca Eggleston
OFFICE OF THE
ARIZONA ATTORNEY
GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-5025

William S. Consovoy
  *Counsel of Record*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard,
Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Ashley Keller
Travis Lenkner
KELLER LENKNER LLC
150 North Riverside Plaza,
Suite 4270
Chicago, IL 60606
(312) 741-5220

July 31, 2019

*Attorneys for Plaintiff, State
of Arizona*

No.        , Original

IN THE

# Supreme Court of the United States

STATE OF ARIZONA,

*Plaintiff,*

*v.*

RICHARD SACKLER, THERESA SACKLER, KATHE SACKLER,
JONATHAN SACKLER, MORTIMER D.A. SACKLER, BEVERLY
SACKLER, DAVID SACKLER, ILENE SACKLER LEFCOURT, PURDUE
PHARMA, INC., PURDUE PHARMA, L.P., THE PURDUE FREDERICK
COMPANY, INC., PURDUE HOLDINGS L.P., PLP ASSOCIATES
HOLDINGS L.P., BR HOLDINGS ASSOCIATES L.P., ROSEBAY
MEDICAL COMPANY L.P., AND BEACON COMPANY,

*Defendants.*

## BRIEF IN SUPPORT OF MOTION FOR LEAVE TO FILE
## BILL OF COMPLAINT

Mark Brnovich
 *Attorney General*
Rebecca Eggleston
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-5025

William S. Consovoy
 *Counsel of Record*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard,
Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Ashley Keller
Travis Lenkner
KELLER LENKNER LLC
150 North Riverside Plaza
Suite 4270
Chicago, IL 60606
(312) 741-5220

July 31, 2019

*Attorneys for Plaintiff, State of
Arizona*

i
# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................ ii

INTRODUCTION.......................................................1

STATEMENT OF THE CASE ....................................4

    A. The Nationwide Opioid Crisis..........................4

    B. Purdue's Role in Causing the Opioid
       Epidemic ...........................................................5

    C. Purdue's Continued Misconduct ......................7

    D. The Sacklers' Looting of Purdue......................9

    E. Avoiding the Sacklers' Fraudulent
       Transfers.........................................................11

ARGUMENT .............................................................12

    I. The Constitution Requires the Court to
       Grant Leave to File the Bill of Complaint.....13

    II. The Bill of Complaint Raises an Issue of
        National Importance that Warrants
        Granting Leave to File. ..................................16

CONCLUSION..........................................................21

ii

## TABLE OF CITED AUTHORITIES

**Cases:**

*Ames v. Kansas,*
   111 U.S. 449 (1884).........................................17, 19

*Arizona, ex rel. Brnovich v. Purdue Pharma
   L.P., et al.,*
   No. C20072471 (Ariz. Super. Ct.
   Sept. 11, 2018).......................................................10

*Arizona, ex rel. Goddard v. Purdue Pharma
   Inc., et al.,*
   No. C20072471 (Ariz. Super. Ct.
   May 14, 2007).........................................................8

*Burford v. Sun Oil Co.,*
   319 U.S. 315 (1943)..............................................17

*Colorado River Water Conservation Dist. v.
   United States,*
   424 U.S. 800 (1976)..............................................16

*Connecticut v. Purdue Pharma L.P., et al.,*
   No. X07 HHD-CV-19-6105325-S (Conn.
   Super. Ct. Apr. 22, 2019) ....................................13

*Haywood v. Drown,*
   556 U.S. 729 (2009)..............................................16

*Herb v. Pitcairn,*
   324 U.S. 117 (1945)..............................................22

*Knick v. Township of Scott, Pa.,*
   139 S. Ct. 2162 (2019)....................................18, 19

*Marbury v. Madison,*
   5 U.S. 137 (1803)...................................................18

iii

*Maryland v. Louisiana*,
    451 U.S. 725 (1981)..............................................23

*Merrell Dow Pharm. Inc. v. Thompson*,
    478 U.S. 804 (1986)..............................................17

*Nebraska v. Colorado*,
    136 S. Ct. 1034 (2016)................................2, 17, 18

*Ohio v. Wyandotte Chems. Corp.*,
    401 U.S. 493 (1971)............................15, 16, 18, 23

*South Carolina v. Regan*,
    465 U.S. 367 (1984)..................................17, 22, 23

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013)..............................................16

*Tafflin v. Levitt*,
    493 U.S. 455 (1990)..............................................16

*Thompson v. Hanson*,
    174 P.3d 120 (Wash. Ct. App. 2007)....................13

*United States v. Purdue Frederick Co., Inc.*,
    No. 1:07-cr-29 (W.D. Va. May 10, 2007).............7-8

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..............................................18

*Younger v. Harris*,
    401 U.S. 37 (1971)..............................................17

**Statutes & Other Authorities:**

28 U.S.C. § 1251(b)(3) ..............................................16

37 C.J.S. Fraudulent Conveyances § 3 (2019)..........21

Ariz. Rev. Stat. § 41-193(A)(3) ....................................1

iv

Ariz. Rev. Stat. § 44-1001 .......................................... 14

Ariz. Rev. Stat. § 44-1007(A) ..................................... 21

*Arizona Opioid Summary*, National Institute
on Drug Abuse, Rev. Mar. 2019............................. 5

Barry Meier, *Origins of an Epidemic: Purdue
Pharma Knew Its Opioids Were Widely
Abused,* N.Y. Times, May 29, 2018........................ 7

Bruce Einhorn et al., *OxyContin Billionaires
Chase Global Profits to Offset U.S. Woes*,
Bloomberg, Mar. 30, 2019.................................... 12

David S. Law, *Judicial Comparativism and
Judicial Diplomacy*, 163 U. Pa. L. Rev.
927 (2015) ............................................................. 22

*Ending America's Opioid Crisis*, The White
House ............................................................... 5, 23

*Fraudulent Transfer Act*, Uniform Law
Comm'n ................................................................. 13

Gary B. Born & Peter R. Rutledge,
*International Civil Litigation in United
States Courts* (5th ed. 2011) ............................... 22

Greg Allen, *Cost of U.S. Opioid Epidemic
Since 2001 Is $1 Trillion and Climbing*,
NPR, Feb. 13, 2018 .............................................. 20

Jared S. Hopkins, *OxyContin Made The
Sacklers Rich. Now It's Tearing Them
Apart*, Wall Street Journal, July 13, 2019............ 4

Michael L. Cook, Bankr. Litig. Manual
§ 11.01 (2019) ...................................................... 14

v

Mike Mariani, *How the American Opiate
Epidemic Was Started by One
Pharmaceutical Company*, The Week,
Mar. 4, 2015 ...........................................................7

*Opioid Epidemic*, Arizona Dep't of Health
Services, 2019.........................................................5

*Opioid Overdose Crisis*, National Institute on
Drug Abuse, Rev. Jan. 2019 ...............................4-5

Sara Randazzo, *Purdue Pharma Begins
Resolution of Opioid Cases With \$270
Million Deal*, Wall Street Journal,
Mar. 26, 2019 ......................................................10

Sean D. Murphy, *Negotiation of Convention
on Jurisdiction and Enforcement of
Judgments*, 95 Am. J. Int'l L. 418 (2001).......21-22

The Federalist No. 81 (Jacob E. Cooke ed.
1961) .....................................................................17

*The Sackler Family*, Forbes Magazine, 2016.............9

*U.S. Opioid Prescribing Rate Maps*, U.S
Dep't of Health & Human Services,
Centers for Disease Control &
Prevention, Oct 3, 2018 .........................................9

*Understanding the Epidemic*, U.S. Dep't of
Health & Human Services, Centers for
Disease Control & Prevention,
Dec. 19, 2018 .................................................4, 5, 7

*Voidable Transactions Act Amendments*,
Uniform Law Commission....................................14

1

## INTRODUCTION

The State of Arizona[1] seeks leave to file a bill of complaint against Purdue and the family that owns it. Arizona has sued Purdue for its role in fueling the opioid crisis that is gripping the nation. It would be difficult to overstate the human, social, and economic devastation this epidemic has caused. But what makes the catastrophe especially troubling is that it is man-made. It is now well-documented how Purdue and others in the opioid industry engaged in an array of illegal practices in order to sell more pills so they could reap astronomical profits. Purdue alone made billions of dollars pushing these powerfully addictive drugs on unsuspecting doctors and patients.

But the Court is not being asked here to determine Purdue's culpability for its illegal practices. In 2007, the company and its top executives pleaded guilty to federal charges and Purdue entered into a consent judgment with Arizona and other States. Whether Purdue violated that consent decree is currently being litigated elsewhere. The issue before this Court is Purdue's capacity to satisfy liquidated and contingent liabilities that are the result of its illegal practices. That is because the Sackler family, which controls

---

[1] Arizona Attorney General Mark Brnovich brings this action on behalf of the State of Arizona pursuant to A.R.S. § 41-193(A)(3).

2

Purdue, has siphoned billions of dollars out of the company in recent years. The law does not permit the Sacklers to reap a windfall while Purdue's creditors absorb a massive loss.

The Uniform Fraudulent Transfer Act that Arizona and forty-two other States have adopted exists for this very fact pattern. There is overwhelming evidence—as the Bill of Complaint demonstrates—that Defendants violated this statute (and the common-law duties it codifies) by engaging in fraudulent transfers that threaten Purdue's ability to satisfy the myriad opioid-related claims that are piling up against it. Exercising jurisdiction and granting Arizona the requested relief would remedy this significant nationwide problem.

Article III of the Constitution grants this Court original jurisdiction over "all Cases … in which a State shall be Party," including "Controversies … between a State and Citizens of another State." This is such a dispute, because the Defendants are not citizens of Arizona. That should resolve the jurisdictional issue. As this Court has many times explained, the existence of jurisdiction includes the duty to exercise it. The grant of original jurisdiction should be no exception. Yet the Court has concluded otherwise, holding that it has discretion to decline original jurisdiction based on "policy considerations." *Nebraska v. Colorado*, 136 S. Ct. 1034, 1035 (2016) (Thomas, J., dissenting from the denial of motion for leave to file complaint). Those decisions should be overruled. The Framers chose this Court as an appropriate forum for Arizona and Defendants to

3

resolve their dispute. That choice should not be displaced for reasons that find no home in the text, structure, or history of the Constitution. No principle of *stare decisis* warrants a different result.

Alternatively, the Court can—and should— avoid this serious constitutional issue by granting leave to file irrespective of whether Article III commands it to do so. In recent history, the Court has been reluctant to accept original jurisdiction over disputes that are grounded in local law and would involve complex factfinding. But this dispute raises neither concern. The Uniform Fraudulent Transfer Act, as its title suggests, is a uniform national legal regime. Furthermore, this case will involve rudimentary and limited factfinding.

Nothing about this action makes it ill-suited to resolution in this forum. To the contrary, exercising original jurisdiction here would fulfill the Court's responsibility to resolve nationally important issues. It is urgent that those responsible for the opioids crisis be held accountable, that their victims be able to recover for the harm that has been inflicted on them, and that the Sacklers' looting of Purdue be remedied. Only this Court can resolve this pressing national issue in a uniform and timely manner.

\*        \*        \*

Purdue has reportedly made more than \$35 billion selling OxyContin. Since 2007, when the company pleaded guilty to federal criminal charges and signed the consent decree with Arizona, Purdue

4

has distributed more than $4 billion to the Sackler family. Yet, now that it is facing civil liability for its central role in the opioids epidemic, Purdue is crying poverty and threatening bankruptcy. *See* Jared S. Hopkins, *OxyContin Made The Sacklers Rich. Now It's Tearing Them Apart*, Wall Street Journal, July 13, 2019, https://on.wsj.com/2xOrgsJ. Only relief under the Uniform Fraudulent Transfer Act can ensure Purdue has the money it needs to meet its liabilities; only a national forum can adequately address this issue without creating potentially unresolvable conflicts; and only this Court has the power under the Constitution to grant the nationwide relief that is badly needed.

For all these reasons, Arizona respectfully requests that the Court grant the motion for leave to file the Bill of Complaint.

## STATEMENT OF THE CASE

### A.    The Nationwide Opioid Crisis

The opioid crisis is the worst man-made disaster in American history. There have been almost 400,000 opioid-related deaths in the United States in the last two decades. *See Understanding the Epidemic*, U.S. Dep't of Health & Human Services, Centers for Disease Control & Prevention, Dec. 19, 2018, https://bit.ly/2jEOHfs. And it is only getting worse. In 2017, the number of overdose deaths involving opioids was six times higher than in 1999. *Id*. Staggeringly, more than 130 people in the United States die every day from an opioid overdose. *See Opioid Overdose Crisis*, National Institute on

5

Drug Abuse, Rev. Jan. 2019, https://bit.ly/2j6YEE1.
These deaths "are up among both men and women,
all races, and adults of nearly all ages."
*Understanding the Epidemic*, *supra.*

This epidemic is devastating communities
across the United States. It has increased crime,
homelessness, and healthcare costs; it has torn apart
families; and it has damaged the economy. *Id.* In all,
prescription opioid misuse costs the U.S. economy at
least $78.5 billion annually. *Opioid Overdose Crisis,
supra.* The President has rightly declared the opioid
crisis to be a public health emergency. *Ending
America's Opioid Crisis*, The White House,
https://www. whitehouse.gov/opioids/.

Like its sister States, Arizona has suffered
these harms. Since 2013, opioid-related deaths in
Arizona have risen 76 percent, with 928 deaths
reported in 2017 alone. *See Arizona Opioid
Summary*, National Institute on Drug Abuse, Rev.
Mar. 2019, https://bit.ly/31Fm0p0. That same year,
Arizona providers wrote an astonishing 61.2 opioid
prescriptions for every 100 Arizonans. *See id.* The
Arizona Department of Health Services estimates
that between June 2017 and June 2019, more than
3,000 Arizonans died from an opioid overdose. *See
Opioid Epidemic*, Arizona Dep't of Health Services,
2019, https://bit.ly/2kaC9Ou. In 2017, Governor
Ducey declared the crisis to be a statewide
emergency. *See id*.

6

**B.    Purdue's Role in Causing the Opioid Epidemic**

Opioids have existed for centuries, but they were not always the scourge they have become. Before the 1990s, doctors rarely prescribed them. The medical community understood that, although opioids could effectively mask pain, they carried serious risks, including addiction, withdrawal, and overdose. As a result, they were typically prescribed only for acute pain, surgery recovery, cancer treatment, or end-of-life palliative care. Opioids were not prescribed for chronic or commonplace pain. Compl. ¶ 27.

But this was not good enough for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and Purdue Frederick Company, Inc. (collectively, "Purdue"). Over the last two decades, Purdue embarked on an aggressive marketing campaign to disrupt prevailing medical norms in order to pump up sales of its opioid painkillers, including OxyContin. In particular, Purdue illegally minimized the risks associated with prescription opioids and aggressively encouraged doctors to prescribe them more broadly. Indeed, shortly after Purdue began selling OxyContin, its President, Defendant Richard Sackler, crassly boasted that "the launch of OxyContin tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white." Compl. ¶¶ 28–29.

He was right. Doctors were deceived into prescribing more of Purdue's opioids, in higher doses,

7

and for longer periods of time. Purdue's profits soared. By 2000, in fact, the company was realizing more than a billion dollars each year in sales of OxyContin alone. *See* Mike Mariani, *How the American Opiate Epidemic Was Started by One Pharmaceutical Company*, The Week, Mar. 4, 2015, https://bit.ly/2nlwLfu. And as Purdue's profits rose, so too did opioid addiction, overdoses, and deaths. In just seven years (1999 to 2006), prescription opioid deaths in the United States rose by nearly 400%. *See Understanding the Epidemic*, *supra*.

Federal and state officials took notice. In 2006, the Justice Department began investigating Purdue over its marketing of OxyContin. It discovered that Purdue knew about "significant" abuse of OxyContin as far back as 1996, yet actively concealed that information from the public. Company officials had received reports that the pills were being crushed and snorted, stolen from pharmacies, and that some doctors were being charged with illegally selling prescriptions. Yet Purdue continued to market OxyContin as less prone to abuse and addiction than other opioids. DOJ also discovered that the Sacklers had received reports detailing the ways in which Purdue's opioids were being abused. *See* Barry Meier, *Origins of an Epidemic: Purdue Pharma Knew Its Opioids Were Widely Abused,* N.Y. Times, May 29, 2018, https://nyti.ms/2sfaW1G.

In 2007, Purdue and top executives pleaded guilty to misleading doctors and patients about the addictive properties of OxyContin and misbranding the product as "abuse resistant." *United States v.*

8

*Purdue Frederick Co., Inc.*, No. 1:07-cr-29 (W.D. Va. May 10, 2007). Federal prosecutors had uncovered a "corporate culture that allowed this product to be misbranded with the intent to defraud and mislead." *Id.* Purdue paid more than $600 million in fines, among the largest settlements in U.S. history for a pharmaceutical company. *Id.* It also signed a corporate integrity agreement with the federal government, promising that the company would not violate the law in the future. *Id.*

During this time, Purdue also entered into a consent judgment with the State of Arizona ("Consent Judgment") to resolve the State's investigation into the company's misleading marketing of OxyContin. *See Arizona, ex rel. Goddard v. Purdue Pharma Inc., et al.*, No. C20072471 (Ariz. Super. Ct. May 14, 2007). The Consent Judgment prohibited Purdue from, among other things, promoting and marketing its oxycodone painkillers in deceptive ways, and it required Purdue to pay a $19.5 million fine, which was distributed to Arizona and 25 other States that had entered into similar consent judgments with the company. *Id.*

**C.    Purdue's Continued Misconduct**

Despite all of the fines, settlements, judgments, and promises, Purdue—with the knowledge and approval of the Sacklers—continued to market its opioids illegally through a marketing campaign that was designed to aggressively increase sales. Purdue targeted doctors it knew would be susceptible to its deceptive marketing—*e.g.*, high-

9

volume opioid prescribers, inexperienced providers, and primary-care physicians who knew little about pain management—and encouraged them to prescribe higher and higher doses for longer periods of time. Purdue then blamed opioid abuse on patients, instead of the addictive nature of the drugs. It pushed opioid prescriptions to elderly patients who had never taken them before, without disclosing the higher risks to this vulnerable population. It claimed that opioids were safer than acetaminophen (*e.g.*, Tylenol) and non-steroidal anti-inflammatory drugs (*e.g.,* ibuprofen) and that the risk of addiction was insignificant. And it falsely assured doctors and patients that its reformulated OxyContin was safe. Compl. ¶¶ 38–40.

This brazen campaign caused opioid prescriptions (and Purdue's profits) to skyrocket. By 2009, Purdue was making more than two billion dollars each year from sales of OxyContin alone; as of 2016, Purdue had earned more than $31 billion from OxyContin. *See* Compl. ¶ 41. That same year, more than 214 million opioid prescriptions were written in the United States—enough for two out of every three Americans to have a prescription. *See U.S. Opioid Prescribing Rate Maps*, U.S Dep't of Health & Human Services, Centers for Disease Control & Prevention, Oct 3, 2018, https://bit.ly/2vzRjoj. It is unsurprising, then, that Forbes identified the Sacklers as the 19th richest family in the United States, with a fortune that had soared to $13 billion. *See The Sackler Family*, Forbes Magazine, 2016, https://bit.ly/2MUQY9b.

10

Purdue's misconduct again drew scrutiny. Purdue is presently facing thousands of lawsuits in which plaintiffs, including counties, cities, towns, and nearly every State in the country, are seeking to recover billions of dollars under consumer-protection and tort law. These actions are slowly winding their way through the courts. Recently, Purdue agreed to pay $270 million to settle Oklahoma's lawsuit. *See* Sara Randazzo, *Purdue Pharma Begins Resolution of Opioid Cases With $270 Million Deal*, Wall Street Journal, Mar. 26, 2019, https://on.wsj.com/ 2FCqunj.

Like other States, Arizona is taking action to redress the harm Purdue has inflicted. On September 11, 2018, an Arizona state court ordered Purdue to show cause as to whether it should be found in violation of the Consent Judgment. *See Arizona, ex rel. Brnovich v. Purdue Pharma L.P., et al.*, No. C20072471 (Ariz. Super. Ct. Sept. 11, 2018). The State is seeking civil penalties of up to $25,000 per violation. That case is set for trial in 2021.

## D.    The Sacklers' Looting of Purdue

Purdue is not a public company. It has long been owned and operated by eight individuals from a single family: Defendants Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler. As members of Purdue's Board of Directors, the Sacklers controlled, directed, and oversaw all of the company's actions.

11

The Sacklers have long been aware that Purdue's marketing of opioids posed a massive liability risk to the company. In fact, through their control of the Board and Richard Sackler's role as President, the Sacklers ordered or oversaw much of Purdue's illegal marketing, in addition to related strategic decisions. For example, in 2014, Kathe Sackler, a board member, pitched "Project Tango," a secret plan to grow Purdue beyond providing painkillers by also providing a drug, Suboxone, to treat those addicted. According to Ms. Sackler, the plan could be profitable because "[a]ddictive opioids and opioid addiction are 'naturally linked.'" Compl. ¶¶ 47–48.

After Purdue's settlements and guilty pleas, Richard Sackler wrote a memo exploring options that could protect the family from the "dangerous concentration of risk" they faced. Compl. ¶ 49. As lawsuits and regulatory scrutiny continued to mount, the Sacklers recognized the dangers Purdue was facing. In 2015, Purdue's chief financial officer, Edward Mahoney, acknowledged that the company faced claims of more than a billion dollars and that the claims, if successful, "would have a crippling effect on Purdue's operations and jeopardize Purdue's long-term viability." Compl. ¶ 50. The potential liability grew exponentially in the following years.

Despite these massive potential liabilities, the Sacklers regularly depleted Purdue of its assets. Between 2008 and 2016, Purdue transferred more

12

than $4 billion to the Sacklers, as the following chart shows:



Compl. ¶ 51.

The Sacklers also directed Purdue to transfer billions of dollars to companies the Sacklers controlled, including Defendants PLP Associates Holdings L.P., Rosebay Medical Company L.P., and Beacon Company. Compl. ¶ 52. Since 2008, the Sacklers voted to distribute nearly $2 billion to PLP Associates Holdings L.P. *Id.* In 2016 alone, the Sacklers distributed more than $175 million to themselves. *Id.* Much of this money has flowed overseas, including to Defendant Rosebay Medical Company L.P. *See* Bruce Einhorn et al., *OxyContin Billionaires Chase Global Profits to Offset U.S. Woes*, Bloomberg, Mar. 30, 2019, https://bloom.bg/2Gj4Pkb. These transfers all took place at times when

13

company officials, including the Sacklers, were keenly aware that Purdue was facing massive financial liabilities and that these transfers could prevent it from satisfying eventual judgments.

Not surprisingly, Purdue recently announced that it is contemplating bankruptcy. In March 2019, Purdue CEO Craig Landau told the Washington Post that bankruptcy "is an option. We are considering it, but we've really made no decisions on what course to pursue. A lot depends on what unfolds in the weeks and months ahead." Compl. ¶ 55.

### E.   Avoiding the Sacklers' Fraudulent Transfers

After the Sacklers' misconduct came to light, States began suing them to avoid the fraudulent transfers. *See, e.g., Connecticut v. Purdue Pharma L.P., et al.*, No. X07 HHD-CV-19-6105325-S (Conn. Super. Ct. Apr. 22, 2019). More suits are likely to follow. Every State in the country has a fraudulent-conveyance statute and nearly every State faces the prospect of being unable to recover against Purdue due to these improper transfers.

These cases have raised (and will continue to raise) similar if not identical issues and claims. Virtually all States have adopted the Uniform Fraudulent Transfer Act. *See Fraudulent Transfer Act*, Uniform Law Comm'n, https://bit.ly/2YpMg3Y (showing that 43 States and the District of Columbia have adopted UFTA); *Thompson v. Hanson*, 174 P.3d 120, 126 (Wash. Ct. App. 2007) (noting that "an

14

explicit purpose of the UFTA is uniformity among the States").[2] Under the UFTA, any transfer of funds that is made with intent to hinder, delay, or defraud present or future creditors may be avoided. These transfers also can be avoided if there was constructive fraud, *e.g.*, a transfer of funds without receiving equivalent value in return.

Arizona seeks leave to file a Bill of Complaint to claw back Defendants' transfers under the UFTA. *See* Ariz. Rev. Stat. § 44-1001, *et seq*. As set forth in the Bill, Arizona alleges that Purdue transferred significant assets to the Sacklers with the intent to hinder, delay, or defraud present and future creditors, including Arizona. *See* Compl. ¶¶ 46–54. Arizona also alleges that, when these transfers were made, Purdue's remaining assets were unreasonably small or, in the alternative, that Purdue would incur debts beyond its ability to pay as they became due. *See id.* ¶ 54. Arizona seeks the declaratory and equitable relief available under the statute, including

---

[2] Twenty states have amended their UFTA law to incorporate the Uniform Voidable Transactions Act. *See Voidable Transactions Act Amendments*, Uniform Law Commission, https://bit.ly/2LLrb1L. These amendments "address a few narrowly-defined issues and are not a comprehensive revision" of UFTA. *Id*; *see* Michael L. Cook, Bankr. Litig. Manual §11.01 (2019) (explaining that "[t]he UVTA is the UFTA with a new name and minor amendments"). Moreover, in the few states that have not adopted either the Uniform Fraudulent Conveyance Act (UFTA's predecessor), the UFTA, or the UVTA, their "common law rules or statutes closely resemble the federal and uniform statutes." Cook, *supra*, §11.01.

garnishment and attachment, and an appropriate injunction. *See id.*, Prayer for Relief.

## ARGUMENT

The Court should grant the motion for leave to file the Bill of Complaint. First, Article III requires the Court to exercise the original jurisdiction the Constitution grants to it. Second, this urgently important nationwide dispute calls for the uniform and timely resolution that only this Court can provide.

## I.    The Constitution Requires the Court to Grant Leave to File the Bill of Complaint.

Article III provides that "the Supreme Court shall have original jurisdiction" over "[c]ontroversies … between a State and Citizens of another State." For nearly 200 years, the Court interpreted the Constitution to mean what it says. In 1971, however, the Court reversed course. *See Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493 (1971). In *Wyandotte*, the Court held that original jurisdiction is discretionary and may be declined if doing so "would not disserve any of the principal policies underlying the Article III jurisdictional grant" and would allow the Court to stay "attuned to its other responsibilities." *Id.* at 499. This more recent conception of the Court's original-jurisdiction docket is incorrect as a matter of first principles and should be abandoned.

A discretionary approach to original jurisdiction flouts the "time-honored maxim of the Anglo-American common-law tradition that a court

16

possessed of jurisdiction generally must exercise it." *Id*. at 496–97. Chief Justice John Marshall, writing for the Court in *Cohens v. Virginia*, embraced this maxim: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." 19 U.S. 264, 404 (1821). Ever since then, this Court "has cautioned" that "[j]urisdiction existing, … a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

That Congress has designated the Court's original jurisdiction over such disputes as "not exclusive," 28 U.S.C. § 1251(b)(3), does not make it discretionary. For instance, Alexander Hamilton explained: "'the inference seems to be conclusive that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union, where it was not expressly prohibited.'" *Tafflin v. Levitt*, 493 U.S. 455, 470 (1990) (Scalia, J., concurring) (quoting The Federalist No. 82 (E. Bourne ed. 1947)); *see also Haywood v. Drown*, 556 U.S. 729, 746 (2009) (Thomas, J., dissenting). Since the dawn of the Republic, in other words, federal courts have not had exclusive jurisdiction over most federal-question cases. Yet no one even thought to argue that a federal court has unbridled discretion to decline a case arising under the laws of the United States merely because a state court could also adjudicate the controversy. *See Colorado River Water Conservation Dist.*, 424 U.S. at 817. So too here. That

17

this original action could be heard in state court does not relieve this Court of its "virtually unflagging" duty to exercise the jurisdiction conferred on it by the Constitution.

This Court has recognized only "narrow exceptions" to "Chief Justice Marshall's famous dictum," and each of those exceptions has "been justified by compelling judicial concerns of comity and federalism." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 829 n.7 (1986) (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)). Yet the discretionary approach to original jurisdiction not only departs from the judicial duty under Article III to exercise jurisdiction that is given, it does so in a manner that cuts against comity and state interests. "In cases in which a State might happen to be a party, it would ill suit its dignity to be turned over to an inferior tribunal." The Federalist No. 81 (Jacob E. Cooke ed. 1961) (A. Hamilton); *see also South Carolina v. Regan*, 465 U.S. 367, 396-97 (1984) (O'Connor, J., concurring); *Ames v. Kansas*, 111 U.S. 449, 464 (1884).

The Court "rooted" its transformation of original jurisdiction from "mandatory" to "discretionary . . . in policy considerations." *Nebraska v. Colorado*, 136 S. Ct. 1034, 1035 (2016) (Thomas, J., dissenting from the denial of motion for leave to file complaint). Because it is "structured to perform as an appellate tribunal," the Court concluded that accepting all original disputes would diminish "the attention [it] could give to those matters of federal

18

law and national import as to which [it is] the primary overseer[]." *Wyandotte Chems. Corp.*, 401 U.S. at 498.

But "policy judgments" are not a basis for overriding the Constitution's text. *Nebraska*, 136 S. Ct. at 1035 (Thomas, J., dissenting); *see also Wyeth v. Levine*, 555 U.S. 555, 604 (2009) (Thomas, J., concurring in the judgment). After all, it is settled that Congress may not alter the Court's original jurisdiction. *See Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("If congress remains at liberty to give this court appellate jurisdiction, where the constitution has declared their jurisdiction shall be original; and original jurisdiction where the constitution has declared it shall be appellate; the distribution of jurisdiction, made in the constitution, is form without substance."). The same goes for the Court. The Constitution did not impliedly grant the Supreme Court the unilateral power to alter the scope of its original jurisdiction. Article III commands this Court to accept Arizona's Bill of Complaint.

*Stare decisis* does not support retaining a misguided approach to original jurisdiction. "The doctrine is at its weakest when [the Court] interpret[s] the Constitution ... because only this Court or a constitutional amendment can alter [such] holdings." *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2177 (2019) (citation and quotations omitted). Treating original jurisdiction as discretionary also has not created "reliance interests." *Id.* at 2179. Last, treating original as discretionary lacks "consistency with other ... decisions," *id.* at 2178 (citation and

quotations omitted), relating to the virtually unflagging duty of federal courts to exercise the jurisdiction granted to them, *supra* 16-17.

In any event, the Court may postpone the question of jurisdiction and set the issue for briefing and argument. *See, e.g.*, Order, No. 18-422, *Rucho v. Common Cause* (Jan. 4, 2019). Given the importance of this issue, the "repeated criticism over the years from Justices of this Court and many respected commentators," *Knick*, 139 S. Ct. at 2178, and that original jurisdiction is grounded in the "dignity of those for whom the provision was made," *Ames*, 111 U.S. at 464, the Court should, at a minimum, follow this prudent course if it sees the issue as decisive in deciding whether to accept the case.

## II.    The Bill of Complaint Raises an Issue of National Importance that Warrants Granting Leave to File.

Even if the Court concludes that it is not required to grant leave to file the Bill, it should nevertheless accept the case. This issue warrants resolution at a national level, and none of the concerns that have previously caused the Court to decline jurisdiction are present here.

The nationwide opioid epidemic is an unprecedented public-health crisis. The human toll is unimaginable. By some estimates, moreover, it has cost more than a *trillion* dollars due to increased spending on health care, social services, and criminal justice, as well as in lost wages, economic

20

productivity, and tax revenue. *See* Greg Allen, *Cost of U.S. Opioid Epidemic Since 2001 Is $1 Trillion and Climbing*, NPR, Feb. 13, 2018, https://n.pr/2o15XyG. Nearly every State (including Arizona), thousands of municipalities, and others who have been harmed have sued Purdue to recover damages caused by the company's illegal marketing practices. Yet because of the Sacklers' campaign to drain Purdue of its assets, these victims now face the prospect of recovering a fraction of what they are owed.

Absent resolution in a single forum, these disputes will be fought over and over in nearly every State in the Nation. This is likely to take years, lead to inconsistent judgments, and create an inequitable distribution of money damages.

Allowing Arizona's original action to proceed will ensure this issue is resolved in a uniform, timely manner. Nearly every State has adopted the Uniform Fraudulent Transfer Act. *See supra* 14. UFTA codifies longstanding common-law rules and is designed "to prevent debtors from prejudicing creditors by improperly moving assets beyond the creditors' reach, invalidat[e] fraudulent transfers, prevent[] debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors, and assist[] creditors in restoring the debtors' assets to their pretransfer status to reach those assets that would have been available to satisfy a judgment but for the

21

fraudulent    transfer."    37    C.J.S.    Fraudulent Conveyances § 3 (2019) (footnotes omitted).

A resolution in this Court thus would be conclusive on all other similar cases. Moreover, the UFTA gives the Court broad power to fashion an equitable remedy. The Court could, among other things, undo the transfers to satisfy creditors' claims; enjoin Purdue and the Sacklers from continuing to transfer assets out of the company; appoint a receiver to take charge of the assets; or impose "any other relief the circumstances may require." Ariz. Rev. Stat. § 44-1007(A).

Hence, the remedies Arizona is seeking— returning to Purdue the money the Sacklers improperly transferred to themselves—will not just help Arizona. All of Purdue's creditors will benefit. That includes the overwhelming majority of States and the thousands of municipalities that have filed claims in courts across the country. This is exactly the sort of national—as opposed to local— controversy that warrants the Court's attention.

Moreover, the Sacklers have taken enormous efforts to transfer money from Purdue to overseas companies controlled by the family. *Supra* 12. Absent this Court's intervention, foreign tribunals will be asked to enforce state-court judgments against Purdue and the Sacklers. But that likely will be a difficult task for judgment creditors, as foreign courts frequently resist enforcing the judgments of American courts. *See, e.g.*, Sean D. Murphy, *Negotiation of Convention on Jurisdiction and*

22

*Enforcement of Judgments*, 95 Am. J. Int'l L. 418, 419 (2001) ("[W]hile U.S. courts are perceived as the most open in the world to the recognition and enforcement of foreign civil judgments in the absence of a treaty obligation to do so, the ability of U.S. judgment holders to enforce their judgments abroad is much more problematic."); *see also* Gary B. Born & Peter R. Rutledge, *International Civil Litigation in United States Courts* 1080 (5th ed. 2011) (same).

This Court is one of the most respected courts in the world. When it speaks, foreign courts listen. *See* David S. Law, *Judicial Comparativism and Judicial Diplomacy*, 163 U. Pa. L. Rev. 927, 1027 (2015) (describing the Supreme Court's "influence[,] recognition and prestige" across the globe). Having a judgment from the Nation's highest court will best serve the dignity and comity interests Arizona is trying to vindicate when it and other jurisdictions seek to enforce a domestic judgment in a foreign tribunal.

In short, a decision from this Court would allow for a uniform resolution of this issue. That is precisely the type of case the Court has deemed to be an appropriate exercise of its original jurisdiction. *See, e.g.*, *Regan*, 465 U.S. at 382. Indeed, because these cases raise only issues of state law, this original petition is likely to be the Court's only chance to address this issue. *See Herb v. Pitcairn*, 324 U.S. 117, 125–26 (1945).

In addition to the clear benefits to the exercise of this Court's jurisdiction, none of the policy reasons

23

for declining original jurisdiction are present here. Enforcing a uniform code is hardly an "issue[] bottomed on local law." *Wyandotte Chems. Corp.*, 401 U.S. at 493. Fraudulent transfer of a company's assets is not an area with a "multiplicity of governmental agencies already involved." *Id.* at 505. Nor does it entail particularly "complex, novel, and technical factual questions." *Id.* at 493; *e.g., id.* at 503–04 (refusing to undertake a "formidable" factfinding process into "factual questions that are essentially ones of first impression" to scientists, such as the "novel" question of whether mercury is a serious water pollutant). The legal regime at issue is uniform and the factfinding here will be straightforward.

Nor is it "highly uncertain" whether Arizona's interest has been adversely affected. *Maryland v. Louisiana*, 451 U.S. 725, 743 (1981). The issue is incredibly important to the State. Purdue and the Sacklers have devastated communities across Arizona, and it is critical that Arizona recover the funds needed to repair the damage. *See supra* 4-10. This factor too weighs in favor of the Court exercising its jurisdiction. *See, e.g., Regan*, 465 U.S. at 382; *id.* at 384 (Blackmun, J., concurring).

Finally, accepting jurisdiction over this case would not "put[] this Court into a quandary" whereby it must "pick and choose arbitrarily among similarly situated litigants." *Wyandotte Chems. Corp.*, 401 U.S. at 504. The opioid crisis has been rightly called "the worst drug crisis in U.S. history." *Ending America's Opioid Crisis*, *supra*. The unique

24

circumstances requiring this Court's attention are unlikely to arise again.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court grant the Motion for Leave to File a Bill of Complaint.

Respectfully submitted,

Mark Brnovich
*Attorney General*
Rebecca Eggleston
OFFICE OF THE
ARIZONA ATTORNEY
GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-5025

William S. Consovoy
*Counsel of Record*
CONSOVOY MCCARTHY
PLLC
1600 Wilson Boulevard,
Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Ashley Keller
Travis Lenkner
KELLER LENKNER LLC
150 North Riverside Plaza,
Suite 4270
Chicago, IL 60606
(312) 741-5220

July 31, 2019

*Attorneys for Plaintiff,*
*State of Arizona*