AKIN GUMP STRAUSS HAUER & FELD LLP
Ira Dizengoff
Arik Preis
Mitchell Hurley
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com

*Proposed Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*, | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**AMENDED VERIFIED STATEMENT OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF PURDUE
PHARMA L.P., *ET AL*. PURSUANT TO BANKRUPTCY RULE 2019**

Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u>

<u>Rules</u>"), the Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the

chapter 11 cases of Purdue Pharma L.P., *et al.* (collectively, the "<u>Debtors</u>"), hereby submits this

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

amended verified statement (the "Amended Verified Statement")[2] to identify and disclose information regarding the addition of an *ex officio* member to the Committee since the Committee filed its Initial Verified Statement.

1.    As further discussed below, on October 21, 2019, the Committee granted the request of a multi-state group comprising approximately 1,222 entities, including 1,172 cities, counties and other governmental entities, seven Native American tribal nations, six hospital, two districts, 34 medical groups, two funds, and one veterans' class across 36 states, representing the interests of approximately 60,000,000 individuals (the "Multi-State Group") to serve on the Committee in an *ex officio* capacity.  The Multi-State Group has designated Cameron County, Texas to act as an *ex officio* member of the Committee (the "Ex Officio Member").[3]

2.    The Debtors are pharmaceutical companies that manufacture and sell, among other products, opioid pain medications including OxyContin Extended-Release Tablets CII ("OxyContin").  As a result of the Debtors' alleged role in the ongoing opioid crisis in the United States, the Debtors have been named in more than 2,600 lawsuits filed through the state and federal court systems.  While the Debtors have significant trade debt, current and potential public and private litigants represent the overwhelming majority of claims against the Debtors.

3.    The Debtors' public creditors include, among others, states, territories, municipalities, and Native American tribes, including the 1,222 public entities (representing

---

[2] On October 5, 2019, the Committee filed the *Verified Statement of the Official Committee of Unsecured Creditors of Purdue Pharma L.P.,* et al., *Pursuant to Bankruptcy Rule 2019* [ECF No. 218] (the "Initial Verified Statement").

[3] On October 9, 2019, the Committee received a letter from counsel to the Multi-State Group requesting the opportunity to join the Committee in an *ex officio* capacity.  After careful consideration, on October 21, 2019, the Committee determined to grant the Multi-State Group's request, and the Ex Officio Member joined the Committee. On October 30, 3019, the Multi-State Group filed the *Verified Statement of the Multi-State Governmental Entities Group Pursuant of Rule 2019 of the Federal Rules of Bankruptcy Procedure* [ECF No. 409] disclosing the identity of each member of such group.  For the avoidance of doubt, the Ex Officio Member is a non-voting member of the Committee and does not owe fiduciary duties to unsecured creditors as a result of its *ex officio* seat on the Committee.

60,000,000 people) that are part of the Multi-State Group now represented on the Committee.  The Debtors' private litigation creditors include, among others, hospitals, health insurance carriers, personal injury plaintiffs (both adults and children), a class of claimants representing children born with Neonatal Abstinence Syndrome ("NAS") and various birth defects, and a class of health insurance payers that experienced increased health insurance premiums as a result of the opioid crisis.  The public and private litigants all seek relief arising from the national opioid crisis that Purdue and its shareholders are alleged to have helped create.  In many instances, however, the different types of plaintiffs have brought dramatically different causes of action based on divergent theories of liability and damages, a circumstance that helps to explain the several ad hoc groups that have already formed to represent both public and private constituent groups in these cases.[4]

4.    On the afternoon of Thursday, September 26, 2019, the United States Trustee for Region 2 appointed nine creditors to serve on the Committee to act as the fiduciary for *all* such creditors, pursuant to section 1102 of title 11 of the United States Code (the "Bankruptcy Code"). As set forth in the Committee's Initial Verified Statement, the Committee, as originally constituted, comprised the following entities and persons: (1) Blue Cross and Blue Shield Association; (2) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health, L.L.C.; (3) Ryan Hampton; (4) Cheryl Juaire; (5) LTS Lohmann Therapy Systems, Corp.; (6) Pension Benefit Guaranty Corporation; (7)

---

[4] Verified statements pursuant to Bankruptcy Rule 9019 have been filed by: (i) an ad hoc group of states, municipalities and the MDL PEC that support the Debtors' prepetition settlement construct (the "Consenting Governmental Entities Ad Hoc Group") [ECF No. 279]; (ii) an ad hoc group of states that do not support the Debtors' prepetition settlement construct (the "Non-Consenting Governmental Entities Ad Hoc Group") [ECF No. 296]; (iii) an ad hoc group of proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives in actions against the Debtors and other affiliated defendants (the "Class Claimants Ad Hoc Group") [ECF No. 333]; (iv) an ad hoc group of NAS children and their next of kin (the "NAS Children Ad Hoc Group") [ECF No. 341]; and (v) an ad hoc group of individual personal injury plaintiffs [ECF No. 348] (the "PI Plaintiffs Ad Hoc Group" and, together with the Consenting Governmental Entities Ad Hoc Group, the Non-Consenting Governmental Entities Ad Hoc Group, the Class Claimants Ad Hoc Group, and the NAS Children Ad Hoc Group, the "Ad Hoc Groups").

Walter Lee Salmons; (8) Kara Trainor; and (9) West Boca Medical Center (the "Original Committee Members").

5.      The Original Committee Members represent a diverse array of creditor interests. They also share a genuine commitment to these cases and an appreciation for the gravity and significance of their participation on the Committee.  Each Original Committee Member takes his, her, or its role very seriously and is fully committed to the creditor interests the Committee represents.  Moreover, each Original Committee Member understands the Committee's fiduciary obligations to all of Purdue's creditors, including, without limitation, with respect to the segment of its constituency made up of governmental units.[5]  The Committee has and shall continue to discharge those duties enthusiastically and in full.

6.      During the first hearing following the Committee's appointment, counsel for the Committee explained as follows:

> Both public and private litigants have asserted or will be asserting claims against Purdue.  And in many instances, such litigants have also asserted or will assert claims against the Sacklers and other defendants.  The public and private litigants have, in many instances, different damages theories, different causation theories, different views about the strengths and weaknesses of their claims and the strengths and weaknesses of the claims of others.  These different views translate into different views as to how any proceeds received from Purdue or the Sacklers, or indeed any opioid manufacturer or distributor or other defendants should be allocated. Indeed, these intercreditor issues are one of the unspoken about issues that are unfortunate byproduct of the opioid crisis that could get in the way of efforts to compensate, abate, and remediate.  We are very aware of these issues and we are going to do everything we can to avoid them becoming an unnecessary and costly distraction in these cases.  To that end and to be clear as we stated in our 2019 statement . . . *we do have a fiduciary duty and will be representing the interests of all unsecured creditors, whether they be public litigants, private litigants, trade, or general unsecured creditors*.  And in that role, we'll be trying to among other things both increase the numerator . . . and settle the denominator by determining the

---

[5] The Committee understands that the U.S. Trustee's office interprets the Bankruptcy Code, not unreasonably, to exclude governmental units from serving on official committees of unsecured creditors.  *See* 11 U.S.C. § 101(41) (defining "Person"); *see also id.* § 1102(b)(1) (providing that a committee should consist of Persons).

appropriate allocation among creditors to avoid costly and time consuming litigation. To that end, although a lot has been said about the U.S. Trustee's statutory decision not to place governmental entities on the official committee, ***the members of the committee are not themselves concerned with anything, other than their fiduciary duties to all unsecured creditors.***

Transcript of Oct. 10, 2019 Hearing at 28:14-25 (emphasis added).

7.      The Original Committee Members' laser focus on their fiduciary duties has been evidenced by every action the Committee has taken during its short existence. Among other things, the Committee already has: (i) convened in person and by phone numerous times each week; (ii) worked tirelessly, along with Committee advisors, to reach consensus with the Debtors and the Sacklers regarding the terms of the *Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 291] (the "Case Stipulation"); and (iii) attended multiple in-person meetings with other parties in interest. Negotiation of the Case Stipulation was particularly significant and required substantial time and attention from the Committee and its professionals. Among other things, the Case Stipulation includes a protocol and timeline for the sharing of information and diligence from the Debtors and their shareholders with the Committee and its advisors. Reaching agreement on the Case Stipulation enabled the Committee to support the Debtors' request for a preliminary injunction, thereby providing the Debtors with the "breathing spell" from extra-bankruptcy litigation that they requested.

8.      Despite these efforts and more, certain parties have suggested that the Committee somehow represents only a small subset of Purdue's creditors because no public litigants were formally seated on the Committee by the U.S. Trustee.[6] To be sure, both public and private

---

[6] During the October 11, 2019 hearing on the Debtors' motion for a preliminary injunction, counsel for Non-Consenting Governmental Entities Ad Hoc Group articulated his concern regarding the composition of the Committee as follows:

There's not a single public entity representative in the creditors' committee. There is no assurance that the evaluation that will take place, that the diligence that will be sought, that the thought or

5

litigants have borne and continue to bear the staggering economic burden from the opioid crisis allegedly perpetuated by the Debtors and their shareholders.  Interestingly, one recent study concludes that over 70% of the economic harm associated with the crisis has been inflicted on private sector businesses and individuals.[7]  At this time, the Committee has not yet formed a view regarding allocation of value among creditors.  In any event, from the beginning, the Committee has demonstrated its commitment to upholding its fiduciary duties to *all* unsecured creditors.

9.        The Committee also believes that in exercising such fiduciary obligations, it is critically important that the Committee and each of its members hears and understands the views of the numerous unsecured creditor constituencies in these chapter 11 cases.[8]  Therefore, as further confirmation of its commitment, and in an effort to allay the concerns of public creditor constituencies regarding their representation, the Committee has granted the request of the Multi-State Group to appoint Cameron County, Texas as the Ex Officio Member to the Committee.  The Ex Officio Member's participation on the Committee should quell the misguided concern that the

---

care that will go into the recommendations that will be made or conclusions that will be drawn will have the voice of [the majority of creditors]—whether you do it by numerosity . . . or you do it in terms of what I think is value, which is what I talk about, in terms of the size of these claims—will have a say, a view, or a look at so much of this information upon which decisions will be made and upon which the states will be asked to make their decisions.

Transcript of Oct. 11, 2019 Hearing at 109:5-19.  Moreover, during the October 10 hearing, counsel for the Debtors stated, "in order for the vast majority of our claimants, which I think 85.8 percent of the filed lawsuits are governmental, we believe it's appropriate to give the *real parties of interest* a voice."  Oct. 10 Hr'g Tr. at 66:21-24 (emphasis added).

[7] Stoddard Davenport, Alexandra Weaver & Matt Caverly, *Economic Impact of Non-Medical Opioid Use in the United States* 4 (Oct. 2019) ("It is important to recognize who bears these economic burdens.  In total, we estimate $186 billion (29%) of the total economic burden of the opioid crisis was borne by federal, state and local governments, while the remainder was borne by the private sector and individuals."  A copy of the executive summary of the report is attached hereto as **Exhibit B**, and the full report may be accessed at: https://www.soa.org/resources/research-reports/2019/econ-impact-non-medical-opioid-use/.

[8] It is worth noting that notwithstanding their direct representation on the Committee, two Ad Hoc Groups have formed to represent the distinct interests of various private constituents (*i.e.*, the NAS Children Ad Hoc Group and the PI Plaintiffs Ad Hoc Group).

6

views and positions of the public litigants will not be taken into account with respect to all of the issues the Committee will confront.

## Composition of the Official Committee of Unsecured Creditors

10.    The Committee members include the following broad cross-section of unsecured creditors:

- **Blue Cross and Blue Shield Association** ("BCBS-Association"), a national association of 36 independent community-based Blue Cross Blue Shield companies, provides healthcare coverage to one-third of all Americans. BCBS-Association's and its members' unliquidated claims arise from payments of excessive amounts for prescription medications used by members of the health plans they administer, and for other amounts paid for the treatment of illnesses, injuries, and addiction sustained by members from consumption of the Debtors' drugs, and costs that would not have been incurred but for the actions of the Debtors.

- **CVS Caremark Part D Services L.L.C. and CaremarkPCS Health L.L.C.** (together, "Caremark") are trade creditors that are parties to certain rebate agreements with Purdue Pharma L.P. (together with its affiliates, "Purdue"). Caremark possesses various claims against Purdue, including for unpaid rebates owed by Purdue to Caremark under the rebate agreements for certain drugs manufactured or developed by Purdue and included in Caremark's formulary for eligible beneficiaries of prescription drug plans.

- **Ryan Hampton** was a staffer at the White House in the Clinton administration and became addicted to OxyContin and other prescription opioids. He eventually became homeless and addicted to heroin. After numerous relapses and overdoses, he eventually overcame his addiction. He founded the Voices Project to spread awareness about addiction and provide support to addicts, their friends, and families. Hampton is also an author on addiction and an expert in Public Policy, stemming from his days as a White House aide and political organizer in Washington, D.C. Hampton's claims are not liquidated and, when filed, will include claims based on personal injury, including damages for inducing the unnecessary prescription of opioid medication, resulting in severe personal injury, addiction, overdoses, lost wages, and emotional injury.

- **Cheryl Juaire's** son Corey became addicted to prescription opioids, including those manufactured by the Debtors, after a hernia operation. His dependence worsened over time, and in 2011, Juaire's son died of an overdose at the age of 23, leaving behind a young daughter, for whom Cheryl is guardian *ad litem*. Juaire founded Team Sharing—Massachusetts, a support group for family

members who have lost loved ones due to addiction, which has since become a nationwide support network. Through her work with Team Sharing and contact with her state's attorney general, Juaire learned of the Debtors' conduct years after her son's death. Juaire's unliquidated claims comprise as-yet unfiled litigation claims based on the wrongful death of her son and loss of filial consortium.

- **LTS Lohmann Therapy Systems, Corp.**, with its affiliate LTS Lohmann Therapie-Systeme AG (together, "LTS") are trade creditors and are engaged in the development and manufacture of innovative drug delivery systems such as transdermal patches and oral thin films for the pharmaceutical industry, which treat chronic pain as well as opioid addiction and dependence. For Purdue, LTS manufactures a transdermal patch that delivers around-the-clock treatment of moderate to severe chronic pain. The Debtors market and sell such patches under the Butrans brand and generically. LTS has several contracts with Purdue and is paid for the production of the patches and royalty fees based upon the Debtors' sales of the patches.

- **Pension Benefit Guaranty Corporation** ("PBGC") is a wholly owned United States government corporation and agency created by the Employee Retirement Income Security Act of 1974 ("ERISA"). PBGC's unliquidated claims arise from statutory ERISA claims for unfunded benefit liabilities, unpaid minimum funding contributions, and unpaid Title IV insurance premiums owed with respect to each PBGC-insured pension plan.

- **Walter Lee Salmon's** daughter became addicted after being prescribed opioids, including those manufactured by the Debtors, while recovering from an automobile accident. As a result of her opioid dependency during pregnancy, Salmon's two grandchildren, which he raises along with his daughter, were born with NAS. Salmon, along with his family members, seek to be named as class representatives in a lawsuit seeking to establish a medical monitoring program for children born addicted to opioids and securing compensation for those children. Salmon's unliquidated claims comprise a putative class action filed in the multi-district litigation (the "MDL") currently pending in the Northern District of Ohio seeking medical monitoring and personal injury damages.[9]

- **Kara Trainor's** son was exposed to opioids in utero as a result of her use of opioids prescribed to her. When Trainor's son was born, he exhibited signs of, and was diagnosed with, NAS. As a result, he spent the first months of his life in an intensive care unit being treated for drug addiction withdrawal, and mental and physical issues and ailments, including developmental delays, vision problems, and incontinence. Trainor's son faces a lifetime of latent medical and emotional conditions, including brain damage, muscular-skeletal developmental disorders, speech and language disorders, cognitive

---

[9] *Salmons v. Purdue Pharma, et al.*, Case No. 18-op-45268 (N.D. Ohio).

developmental disorders, psychiatric disorders, emotional development disorders, behavioral disorders, and increased risk of addiction. Trainor filed an action against Purdue alleging numerous causes of action: public nuisance; negligence; breach of implied warranty; breach of implied warrant for fitness for a particular purpose; fraudulent misrepresentation; fraudulent concealment; negligent misrepresentation; strict products liability for failure to warn; negligence for failure to warn; products liability; and punitive damages.[10]

- **West Boca Medical Center and its affiliates** ("West Boca") are part of Tenet Healthcare, one of the largest hospital systems in the United States. West Boca filed a complaint[11] in the MDL.[12] The action commenced by West Boca asserts multiple causes of action against the Debtors, including RICO violations, deceptive and unfair trade practices, misleading advertising, breach of implied warranty, negligence, nuisance and unjust enrichment, and was selected as the bellwether for hospital cases in the MDL.

### Ex Officio Member

- **Cameron County, Texas** has been nominated by the Multi-State Group to serve as its representative and sit as an *ex officio* member of the Committee. The Multi-State group comprises 1,222 entities, including 1,172 cities, counties and other governmental entities, seven Native American tribal nations, six hospital, two districts, 34 medical groups, two funds, and one veterans' class across 36 states. The members of the Multi-State Group represent a cumulative population of approximately 60,000,000 individuals impacted by the opioid crisis and have brought numerous and varied claims, including class actions, against the Debtors and their shareholders.

11.     In accordance with Bankruptcy Rule 2019, attached hereto as **Exhibit A** is a list of the names and addresses of, and the nature and amount of all disclosable economic interests held by, each Committee member, including the Ex Officio Member, directly or through entities managed or advised by such Committee member, in relation to the Debtors. The claims and claim amounts set forth in this Amended Verified Statement and on Exhibit A have been provided by the applicable Committee member, and by filing this Amended Verified Statement, the Committee

---

[10] *Trainor as Next Friend v. Purdue Pharma L.P.*, Case No. 2019-L-010077 (Ill. Cir. Ct., Cook County).

[11] *West Boca Medical Ctr., Inc. v. AmerisourceBergen Drug Corp.*, Case No. 18-op-45530 (N.D. Ohio). Other Tenet subsidiaries and West Boca Affiliates are also plaintiffs in other lawsuits.

[12] *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio).

makes no representation with respect to the amount, allowance, validity, secured status, or priority

of such claims and reserves all rights with respect thereto.

12.      Nothing contained in this Amended Verified Statement (or Exhibit A hereto) should

be construed as a limitation upon, or waiver of any Committee member's rights to assert, file,

and/or amend its claim(s) in accordance with applicable law and any orders entered in these cases

establishing procedures for filing proofs of claim.

13.      The Committee reserves the right to amend or supplement this Amended Verified

Statement in accordance with the requirements set forth in Bankruptcy Rule 2019.


New York, New York                    AKIN GUMP STRAUSS HAUER & FELD LLP
Dated: November 1, 2019

                                      */s/ Arik Preis*
                                      Ira Dizengoff
                                      Arik Preis
                                      Mitchell Hurley
                                      One Bryant Park
                                      New York, New York 10036
                                      Tel:  (212) 872-1000
                                      Fax:  (212) 872-1002
                                      Email: idizengoff@akingump.com
                                              apreis@akingump.com
                                              mhurley@akingump.com

                                      *Proposed Counsel to the Official Committee of
                                      Unsecured Creditors of Purdue Pharma L.P.*, et al.

**<u>Exhibit A</u>**

| Name | Address | Nature and Amount of Disclosable Economic Interests[1] |
|---|---|---|
| Blue Cross and Blue Shield Association | 1310 G Street NW Washington, DC 20005 | Unliquidated unsecured claim of at least between $68.8 billion and $78.6 billion. |
| CVS Caremark Part D Services L.L.C. and CaremarkPCS Health, L.L.C. | 2211 Sanders Road, NBT-9 Northbrook, IL 60062 | Combined unsecured claims of in excess of $60 million plus unliquidated amounts, subject to further analysis and reconciliation. |
| Ryan Hampton | c/o Anne Andrews Andrews Thornton 4701 Von Karman, Suite 300 Newport Beach, CA 92660 | Unliquidated unsecured claim on the basis of personal injury, including addiction, overdoses, lost wages, and emotional injury. |
| Cheryl Juaire | c/o Anne Andrews Andrews Thornton 4701 Von Karman, Suite 300 Newport Beach, CA 92660 | Unliquidated unsecured claim on the basis of wrongful death. |
| LTS Lohmann Therapy Systems Corp. | 21 Henderson Dr. West Caldwell, NJ 07006 | Unsecured claims totaling an estimated $3,300,000. |
| Pension Benefit Guaranty Corporation | 1200 K Street NW Washington, DC 20005-4026 | Unliquidated unsecured claim of at least $139,000,000. |
| Walter Lee Salmons | c/o Kevin W. Thompson 2030 Kanawha Blvd. E., Charleston, WV 25311 | Unliquidated unsecured class claim on the basis of medical monitoring costs and unliquidated unsecured class claim for direct compensation to each NAS victim. |

---

[1] To the best of counsel's knowledge, the information included herein is accurate as of October 31, 2019.

| Name | Address | Nature and Amount of Disclosable Economic Interests[1] |
|---|---|---|
| Kara Trainor | c/o Celeste Brustowicz<br>Cooper Law Firm, LLC<br>1525 Religious Street<br>New Orleans, LA 70130 | Unliquidated unsecured claim for medical, physical, and addiction monitoring, and unliquidated unsecured claim for personal injuries. |
| West Boca Medical Center | 21644 Florida Highway<br>Boca Raton, FL 33428 | Unliquidated unsecured claim of at least $7 billion. |
| Ex Officio Member | | |
| Cameron County, Texas | c/o Juan A. Gonzalez<br>Cameron County Courthouse<br>Civil Legal Division<br>East Monroe Street<br>Brownsville, Texas 78520 | Unliquidated claims. |

2

**Exhibit B**





 Mortality and Longevity

# Economic Impact of Non-Medical Opioid Use in the United States



October 2019



# Economic Impact of Non-Medical Opioid Use in the United States

## Annual Estimates and Projections for 2015 through 2019

Report prepared by Milliman, Inc.

**AUTHORS**  Stoddard Davenport, MPH
Alexandra Weaver, ASA, MAAA
Matt Caverly

**PEER REVIEWERS**  Steve Melek, FSA, MAAA
Melanie Kuester, PharmD, BCPS
Anne Jackson, FSA, MAAA

**Caveat and Disclaimer**

The opinions expressed and conclusions reached by the authors are their own and do not represent any official position or opinion of the Society of Actuaries or its members. The Society of Actuaries makes no representation or warranty to the accuracy of the information

Copyright © 2019 by the Society of Actuaries. All rights reserved.

# CONTENTS

Executive Summary .................................................................................................................................... 4

Introduction ............................................................................................................................................... 6

Literature review ....................................................................................................................................... 7

Overview of Results .................................................................................................................................. 9

Detailed Results ....................................................................................................................................... 12
    Health Care Costs ............................................................................................................................... 12
        Patients with Diagnosed OUD ....................................................................................................... 12
        Family Members of Individuals with Diagnosed OUD .................................................................. 17
        Neonatal Abstinence Syndrome/Neonatal Opioid Withdrawal Syndrome .................................. 19
    Mortality Costs .................................................................................................................................... 22
    Criminal Justice Costs ......................................................................................................................... 25
    Child and Family Assistance Costs ...................................................................................................... 28
    Education Costs .................................................................................................................................... 31
    Lost Productivity Costs ........................................................................................................................ 32
        Lost Productivity Due to Non-Medical Opioid Use ....................................................................... 32
        Lost Productivity Due to Opioid-Related Incarcerations .............................................................. 33
        Lost Productivity: Costs Borne by Employers ............................................................................... 34

Methodology ........................................................................................................................................... 36
    Health Care Costs ............................................................................................................................... 36
        Study Design .................................................................................................................................. 36
        Family Health Care Cost Assumptions .......................................................................................... 37
        National Extrapolations ................................................................................................................. 37
        Medicare Fee-for-Service Part D Adjustment ............................................................................... 38
        Service Categories ......................................................................................................................... 38
        Cost and Prevalence Projections ................................................................................................... 38
    Mortality Costs .................................................................................................................................... 40
        Opioid Overdose Deaths ................................................................................................................ 40
        Average Costs per Death ................................................................................................................ 40
    Criminal Justice Costs ......................................................................................................................... 41
        Opioid Cost Apportionment: Police Protection and Legal and Adjudication Activities ............... 41
        Opioid Cost Apportionment: Correctional Facilities ..................................................................... 44
        Opioid Cost Apportionment: Property Loss .................................................................................. 46
    Child and Family Assistance Costs ...................................................................................................... 46
    Education Costs .................................................................................................................................... 47
    Lost Productivity Costs ........................................................................................................................ 48
        Opioid Cost Apportionment: Lost Productivity Due to Non-Medical Opioid Use ........................ 48
        Opioid Cost Apportionment: Lost Productivity Due to Incarcerations ......................................... 48
        Opioid Cost Apportionment: Costs Borne by Employers .............................................................. 49

Discussion ................................................................................................................................................ 51

Limitations and Caveats .......................................................................................................................... 52
        Limitations ..................................................................................................................................... 52

Acknowledgments ................................................................................................................................... 56

Glossary ................................................................................................................................................... 57

Endnotes .................................................................................................................................................. 59

Appendices ............................................................................................................................................... 64

About The Society of Actuaries ............................................................................................................... 93

Copyright © 2019 Society of Actuaries

## Executive Summary

According to the Centers for Disease Control and Prevention (CDC), nearly 400,000 people in the United States died from drug overdoses involving prescription or illicit opioids from 1999 to 2017.[1] In addition to the substantial human toll of the opioid crisis, many sectors of the economy have been adversely impacted. An understanding of the scale and distribution of these impacts is necessary in order to inform responses and resource allocation decisions as the health care industry works to understand and address what some have termed "the biggest public health epidemic of a generation."[2]

We estimate that the total economic burden of the opioid crisis in the United States from 2015 through 2018 was at least $631 billion. This estimate includes costs associated with additional health care services for those impacted by opioid use disorder (OUD), premature mortality, criminal justice activities, child and family assistance programs, education programs and lost productivity. Importantly, this estimate does not include impacts for which there is a lack of adequate data, yet that are still meaningful and may be significant, as described throughout this report. For example, a few such impacts include reductions in household (non-paid) productivity, reductions in productive output while at work (presenteeism), and reductions in quality of life for those impacted directly or indirectly by OUD.

The estimated costs consist of the following:

- Nearly one-third ($205 billion) of the estimated economic burden of the opioid crisis is attributable to excess health care spending for individuals with OUD, infants born with neonatal abstinence syndrome (NAS) or neonatal opioid withdrawal syndrome (NOWS), and for family members of those with diagnosed OUD.

- Mortality costs accounted for 40% ($253 billion) of the estimated economic impact, predominantly driven by lost lifetime earnings for those who died prematurely due to drug overdoses involving opioids.

- Costs associated with criminal justice activities, including police protection and legal adjudication activities, lost property due to crime, and correctional facility expenditures, totaled $39 billion, roughly 6% of the total cost from 2015 to 2018.

- Costs associated with government-funded child and family assistance programs and education programs contributed another $39 billion over the four-year period.

- Lost productivity costs comprised the remaining 15% of total costs from 2015 through 2018, totaling $96 billion. Lost productivity costs are associated with absenteeism, reduced labor force participation, incarceration for opioid-related crimes, and employer costs for disability and workers' compensation benefits to employees with OUD.

It is important to recognize who bears these economic burdens. In total, we estimate $186 billion (29%) of the total economic burden of the opioid crisis was borne by federal, state and local governments, while the remainder was borne by the private sector and individuals.

Using the latest available data, we also projected costs for 2019 based on three scenarios reflecting how the opioid crisis may develop. Our midpoint cost estimate for 2019 is $188 billion, with our low and high cost estimates ranging from $172 billion to $214 billion. These cost estimates reflect a range of potential outcomes for key assumptions such as the prevalence of OUD and the number of opioid overdose deaths in 2019 and are intended to represent a reasonable range of scenarios, rather than the minimum or maximum of possible outcomes.

Our cost estimates for 2015 through 2018, each projected scenario for 2019 and grand total estimates including the 2019 midpoint scenario are summarized in Figure 1 (all costs in billions of dollars).

Copyright © 2019 Society of Actuaries

**Figure 1**

TOTAL COST ESTIMATES BY CATEGORY, 2015–2019 (BILLIONS)

| COST CATEGORY | 2015 | 2016 | 2017 | 2018 | TOTAL 2015–2018 | 2019 MID EST. (LOW-HIGH) | GRAND TOTAL 2015–2019 MID EST. |
|---|---|---|---|---|---|---|---|
| Health care Costs | $36.7 | $51.7 | $55.8 | $60.4 | $204.6 | $65.1 ($60.4–$76.6) | $269.7 |
| Mortality Costs | $47.3 | $62.2 | $71.2 | $72.6 | $253.3 | $74.1 ($65.6–$83.6) | $327.4 |
| Criminal Justice Costs | $8.9 | $9.2 | $9.8 | $10.9 | $38.8 | $12.2 ($11.2–$12.8) | $50.9 |
| Child and Family Assistance Costs | $9.3 | $8.5 | $7.8 | $7.8 | $33.4 | $7.8 ($7.3–$8.7) | $41.1 |
| Education Costs | $1.4 | $1.3 | $1.2 | $1.2 | $5.2 | $1.3 ($1.2–$1.4) | $6.5 |
| Lost Productivity Costs | $20.7 | $23.5 | $25.0 | $26.5 | $95.7 | $28.0 ($26.0–$31.3) | $123.7 |
| Grand Total | $124.3 | $156.4 | $170.9 | $179.4 | $631.0 | $188.4 ($171.6–$214.4) | $819.3 |

Figure 2 shows how total costs and each component have trended from 2015 through the 2019 midpoint estimate.

**Figure 2**

TRENDS IN TOTAL COSTS BY CATEGORY, 2015–2019 (BILLIONS)



The increases in many of the cost estimates in Figures 1 and 2 are largely driven by increasing numbers of opioid overdose deaths and increasing prevalence of OUD. We see the most significant increases in health care, mortality and lost productivity costs from 2015 to 2016, which coincides with a significant year-over-year increase in both the number of opioid overdose deaths and the prevalence of OUD. Opioid deaths increased significantly in 2016 as the use of fentanyl, which is far more potent than prescription opioids or heroin, became more common. In 2016, illicit opioids (such as heroin and fentanyl) passed prescription opioids as the most common drugs involved in overdose deaths for the first time in the United States. Further, our estimates for the prevalence of OUD increased significantly, from an estimated 2.7 million individuals in 2015 to 3.5 million individuals in 2016 (though some of this increase could be driven by increased identification of individuals already experiencing OUD because the crisis began to generate more awareness within the public and the medical community or by sampling differences in our data sources). Note that, while we estimate that the total economic cost of the opioid crisis increased each year from 2015 to 2018, the rate of increase also slowed each year, though it is too early to tell whether we are approaching a turning point in the crisis.

Copyright © 2019 Society of Actuaries