**Hearing Date and Time: November 19, 2019 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: November 15, 2019 at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649 (RDD)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**NOTICE OF HEARING ON DEBTORS' APPLICATION**
**TO EMPLOY PJT PARTNERS LP AS INVESTMENT BANKER**
***NUNC PRO TUNC* TO THE PETITION DATE**

   **PLEASE TAKE NOTICE** that Purdue Pharma L.P and certain of its affiliates, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**")

will present the *Debtors' Application to Employ PJT Partners LP as Investment Banker Nunc Pro*

*Tunc to the Petition Date* (the "**Application**"). A hearing on the Application will be held on

**November 19, 2019, at 10:00 a.m. (Prevailing Eastern Time)** (the "**Hearing**") before the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Honorable Judge Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

PLEASE TAKE FURTHER NOTICE that copies of the Application may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing.  The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Application shall be in writing, shall comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399 and the *Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures*,

entered on October 23, 2019 [Docket No. 342], so as to be filed and received no later than

**November 15, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**").

  **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

  **PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Application, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Application, which order may be entered without further notice or opportunity to be heard.

Dated: November 5, 2019
   New York, New York

       DAVIS POLK & WARDWELL LLP

       By: */s/ Eli J. Vonnegut*      

       450 Lexington Avenue
       New York, New York 10017
       Telephone: (212) 450-4000
       Facsimile:  (212) 701-5800
       Marshall S. Huebner
       Benjamin S. Kaminetzky
       Timothy Graulich
       Eli J. Vonnegut

       *Proposed Counsel to the Debtors*
       *and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DEBTORS' APPLICATION TO EMPLOY PJT PARTNERS LP
## AS INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE

The above-captioned debtors and debtors in possession (collectively, the

"**Debtors**" or "**Purdue**") seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "**Proposed Order**"), (i) authorizing the Debtors to employ and retain PJT

Partners LP ("**PJT**") as investment banker for the Debtors, in accordance with the terms and

conditions set forth in that certain engagement letter, including any amendments and schedules

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

thereto, dated as of May 6, 2019 (the "**Engagement Letter**"), effective *nunc pro tunc* to the

Petition Date (as defined below), (ii) modifying the time-keeping requirements under Bankruptcy

Rule 2016(a) and Rule 2016-1(a) of the Local Bankruptcy Rules for the Southern District of

New York (the "**Local Rules**") in connection with PJT's proposed engagement by the Debtors,

and (iii) granting related relief.  In support of this Application, the Debtors submit the declaration

of Timothy Coleman, a Partner at PJT (the "**Coleman Declaration**"), annexed hereto as **Exhibit**

**B**, and the declaration of Tara Flanagan, the Chief Compliance Officer of PJT (the "**Flanagan**

**Declaration**"), annexed hereto as **Exhibit C**.

### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157

and 1334. This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the

Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), the Debtors consent to

entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter a final order or judgment

consistent with Article III of the United States Constitution.

2.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The legal predicates for the relief requested are sections 327(a) and 328(a) of title

11 of the United States Code (the "**Bankruptcy Code**"), Bankruptcy Rules 2014 and 2016, and

Local Rules 2014-1 and 2016-1.

### Background

4.      On September 15, 2019 (the "**Petition Date**"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate

their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code. On September 27, 2019, the United States Trustee for

the Southern District of New York appointed the official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [D.I. 131]. No request has been made for the appointment of a trustee or examiner in these chapter 11 cases.

5.     These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 59] entered by the Court in each of the chapter 11 cases.

6.     Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* [D.I. 17].

## Relief Requested

7.     By this Application, the Debtors seek entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (i) authorizing the Debtors to employ and retain PJT as investment banker for the Debtors, in accordance with the terms and conditions set forth in the Engagement Letter, effective *nunc pro tunc* to the Petition Date, (ii) modifying the time-keeping requirements of Bankruptcy Rule 2016(a) and Local Rule 2016-1(a) in connection with PJT's proposed engagement by the Debtors, and (iii) granting related relief.

## PJT's Qualifications

8.     As detailed in the Coleman Declaration, PJT's Restructuring and Special Situations Group is one of the industry's leading advisors to companies and creditors in a variety of complex restructurings and bankruptcies. PJT was spun off from The Blackstone Group L.P. ("**Blackstone**") effective October 1, 2015.[2] Upon the consummation of the spinoff, Blackstone's

---

[2]    On October 7, 2014, the board of directors of Blackstone's general partner approved a plan to spin off its financial and strategic advisory services, restructuring and reorganization advisory services and Park Hill fund placement businesses, and to combine these businesses with an independent financial advisory firm founded by Paul J. Taubman, to form an independent, publicly traded company called PJT Partners Inc. PJT is a wholly-owned subsidiary of PJT Partners Holdings LP, a holding partnership that is controlled by PJT Partners Inc., as

Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. The former Blackstone restructuring professionals, in their capacity as PJT employees, have been conducting business and providing their clients with the same high-quality restructuring services that Blackstone had itself provided since the formation of its restructuring advisory practice 28 years ago. PJT professionals have extensive experience working with financially troubled companies in complex financial restructurings. Since 1991, PJT professionals have advised on more than 600 distressed situations, both in and out of court, involving more than $2.0 trillion of total liabilities.

9.      The partners and members of PJT's Restructuring and Special Situations Group have assisted and advised in numerous chapter 11 cases. In particular, they have provided services to debtors, creditors' committees, and other constituencies in numerous chapter 11 cases, including, among others: AbitibiBowater Inc.; Aegean Marine Petroleum Network Inc.; Adelphia Communications Corporation; Allen Systems Group, Inc.; Ambac Financial Group, Inc.; Apex Silver Mines Ltd.; Arch Coal, Inc.; Ascent Resources Marcellus Holdings, LLC; The Bon-Ton Stores, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Chaparral Energy LLC; CHC Group Ltd.; Cumulus Media Inc.; Delta Air Lines, Inc.; Dixie Electric, LLC; Dynegy Inc.; Eastman Kodak Company; Edison Mission Energy; Energy Future Holdings Corporation; Energy XXI Ltd.; Endeavor International Corporation; Energy & Exploration Partners, Inc.; Enron Corporation; Excel Maritime Carriers, Ltd.; EXCO Resources, Inc.; FirstEnergy Solutions Corp.; Flag Telecom Holdings Limited; Flying J. Inc.; FullBeauty Brands Holding Corp.; Fusion Connect, Inc.; Genco Shipping & Trading Limited; General

---

general partner. PJT Partners Inc. is led by Paul J. Taubman, as chairman and chief executive officer. This spinoff was effected via a multi-step transaction.

#92327993v19

Motors Corporation; Global Crossing Ltd.; Hálcon Resources Corporation; Hawker Beechcraft, Inc.; Hercules Offshore, Inc.; Homer City Generation, L.P.; Hostess Brands, Inc.; Houghton Mifflin Harcourt Publishing Company; Lee Enterprises Inc.; Legend Parent Inc.; LightSquared Inc.; Los Angeles Dodgers LLC; LyondellBasell Industries; Magnetation LLC; Magnum Hunter Resources Corporation; Merisant Worldwide, Inc.; Mirant Corp.; New Gulf Resources, LLC; NewPage Corporation; NTK Holdings, Inc.; Paragon Offshore plc; Patriot Coal Corporation; Penn Virginia Corporation; PES Holdings, LLC; PHI, Inc.; Quicksilver Resources, Inc.; Relativity Media, LLC; Sabine Oil & Gas Corp.; Samson Resources Corporation; SemGroup; Stearns Holdings, LLC; Toisa Ltd.; TerreStar Networks Inc.; Triangle USA Petroleum Corporation; Trident Holding Company, LLC; Tribune Company; Ultra Petroleum Corp.; Venoco Inc.; VER Technologies Holdco LLC; Verso Corporation; Walter Energy, Inc.; Westinghouse Electric Company LLC; W.R. Grace & Co.; Windstream Holdings, Inc.; and Winn-Dixie Stores, Inc. In addition, the restructuring group has provided general restructuring advice to major companies such as Clearwire Corporation, Ford Motor Company, The Goodyear Tire & Rubber Company, and Xerox Corporation.

10.     More specific to this matter, the partners and members of PJT's Restructuring and Special Situations Group have advised companies in situations involving potential mass tort liability. These companies include The Babcock & Wilcox Company, Dow Corning Corporation, Specialty Products Holding Corp. (parent of Bondex International), and W. R. Grace & Co.

11.     PJT was initially retained on or around November 13, 2017 as Purdue faced mounting litigation related to its opioid medications. The scope of PJT's initial work, which lasted approximately three months, focused primarily on assessing Purdue's business plan. In

connection with this assessment, Purdue decided to scale back certain functions, including sales initiatives, research and development investment, and pipeline product development.

12.     Several months later, beginning on or around May 1, 2018, PJT started a second engagement with Purdue. The scope of this assignment included the analysis of intercompany relationships with Rhodes Technologies and Rhodes Pharmaceuticals L.P. ("**Rhodes**"),[3] the evaluation of manufacturing arrangements, the analysis of the financial impact of potential settlement and restructuring options and the assessment of business risks resulting from an ever-increasing number of lawsuits. These risks included, among others, a substantial reduction in the amount of cash on hand as a result of significant legal defense and related indemnification expenses and potential business interruption resulting from suppliers and vendors requiring more onerous trade terms.

13.     The third phase of PJT's engagement began on or around April 1, 2019 and has included the ongoing evaluation of the business plan, the support of Debtors' counsel in negotiations with advisors to various litigants and the preparation of the Debtors' chapter 11 bankruptcy filing.

14.     To date, PJT has engaged in extensive due diligence of the Debtors' businesses, including their operations, assets, corporate structure, and contractual arrangements to build a foundation for a restructuring strategy. Moreover, PJT has performed diligence on the Debtors' cash flows and liquidity. PJT has played a key role in arms' length negotiations among the Debtors and their key stakeholders in furtherance of the Debtors' restructuring efforts. Finally, PJT has participated in Board of Directors meetings throughout its engagement.

---

[3]    At this time, Rhodes was under a different ownership chain than Purdue (although Rhodes and Purdue, I understand, have always shared the same ultimate owners). In May 2019, Rhodes contributed to Purdue, becoming a Purdue subsidiary.

#92327993v19

15.      As a result of the prepetition work performed by PJT on behalf of the Debtors, PJT has acquired significant knowledge of the Debtors' financial affairs, business operations, corporate structure, assets, key stakeholders and other related material information. Likewise, in providing prepetition services to the Debtors, PJT's professionals have worked closely with the Debtors' management, board of directors, and other advisors. If this Application is approved, several of PJT's professionals, all with substantial expertise in the areas discussed above, will continue to provide services to the Debtors and will work closely with the Debtors' management and other professionals to complete the Debtors' reorganization. Accordingly, as a result of PJT's representation of the Debtors prior to the commencement of these chapter 11 cases and PJT's extensive experience representing chapter 11 debtors, PJT is well qualified to provide these services and represent the Debtors during these chapter 11 cases.

16.      Indeed, if the Debtors were required to retain an investment banker other than PJT in connection with these chapter 11 cases, the Debtors, their estates, and other parties in interest would be unduly prejudiced by the time and expense necessary to familiarize another investment banker with the intricacies of the Debtors and their business operations and the unique complexities involved in these chapter 11 cases.

### Services Provided By PJT

17.      Subject to further order of the Court, and consistent with the terms of the Engagement Letter, PJT's services in these chapter 11 cases, to the extent necessary, appropriate, and feasible, and as may be requested by the Debtors, include the following[4]:

---

[4]    The summary of the Engagement Letter in this Application is qualified in its entirety by reference to the provisions of the Engagement Letter. To the extent there is any discrepancy between the summary contained in this Application and the terms set forth in the Engagement Letter, the terms of the Engagement Letter shall govern. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Engagement Letter.

#92327993v19

a.      assist in the evaluation of the Debtors' businesses and prospects, opportunities and financial condition;

b.      assist in the evaluation of the Debtors' long-term business plan and related financial projections;

c.      assist in the development of presentations to the Debtors' Board of Directors, various creditors and other third parties;

d.      analyze the Debtors' financial liquidity;

e.      analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;[5]

f.      participate in negotiations among the Debtors and their creditors, and other interested parties;

g.      value securities offered by the Debtors in connection with a Restructuring;

h.      assist in arranging financing for the Debtors, as requested;

i.      provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services;

j.      assist the Debtors in preparing marketing materials in conjunction with a possible Transaction;[6]

k.      assist the Debtors in identifying potential buyers or parties in interest to a Transaction and assist in the due diligence process;

l.      assist and advise the Debtors concerning the terms, conditions and impact of any proposed Transaction; and

---

[5]    As provided for in the Engagement Letter, a "**Restructuring**" means, "collectively, (i) any restructuring, reorganization (whether or not pursuant to chapter 11 of the United States Bankruptcy Code ("**Chapter 11**")) and/or recapitalization of the Company affecting all or a significant portion of its existing or potential obligations or other claims against the Company, including, without limitation, senior debt, junior debt, trade claims, general unsecured claims, preferred stock, and obligations or claims in respect of litigation (whether or not reduced to judgment) or legal settlement, but excluding any settlement of the current litigation by the State of Oklahoma (collectively, the "**Obligations**"), and/or (ii) a sale or other acquisition or disposition of all or substantially all of the assets and/or equity of the Company, and/or (iii) any repurchase, refinancing, extension or repayment by the Company of all or a significant portion of its Obligations."

[6]    As provided for in the Engagement Letter, a "Transaction" means "the sale, merger or other disposition of all or a portion of the Company or its assets."

#92327993v19

m.    provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a transaction similar to a potential Restructuring and/or Transaction, as requested and mutually agreed.

## Professional Compensation

18.    PJT's decision to advise and assist the Debtors in connection with these chapter 11 cases is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code.

19.    In consideration of the services to be provided by PJT, and as more fully described in the Engagement Letter, subject to the Court's approval, the Debtors and PJT have agreed that PJT shall, in respect of its services, be compensated under the following fee structure (the "**Fee Structure**")[7]:

a.    **Monthly Fee**. The Debtors shall pay PJT a monthly advisory fee (the "**Monthly Fee**") of $225,000 per month. Fifty percent (50%) of all Monthly Fees paid to PJT between the period beginning on April 1, 2019 and ending on March 31, 2021 shall be credited against any Restructuring Fee (as defined below).

b.    **Capital Raising Fee**. The Debtors shall pay PJT a capital raising fee (the "**Capital Raising Fee**") for any financing arranged by PJT, earned and payable upon receipt of a binding commitment letter. The Capital Raising Fee will be calculated as:

- Senior Debt. 1.0% of the total issuance size for senior debt financing;

- Junior Debt. 3.0% of the total issuance size for junior debt financing; and

- Equity Financing. 5.0% of the issuance amount for equity financing.

---

[7]    The summary of the Fee Structure in this Application is qualified in its entirety by reference to the provisions of the Engagement Letter. To the extent there is any discrepancy between the summary contained in this Application and the terms set forth in the Engagement Letter, the terms of the Engagement Letter shall govern.

#92327993v19

c.    **Restructuring Fee**. The Debtors shall pay PJT a restructuring fee equal to $15,000,000 (the "**Restructuring Fee**") upon the consummation of a Restructuring, in accordance with the Engagement Letter.

d.    **Transaction Fee**. Upon consummation of a Transaction, the Debtors shall pay PJT a transaction fee of 2.0% of the Transaction Value[8] (the "**Transaction Fee**"); provided that, the Transaction Fee in respect of a Transaction involving (a) a sale of the products Lemborexant or Adhansia shall, in each case, not be less than $1,500,000 ($3,000,000 for a sale involving both products) or (b) a sale of the Debtors' over-the-counter drug business shall not be less than $3,000,000 (each such fee, a "**Minimum Fee**"). Each Transaction Fee shall be payable in cash at the closing of the applicable Transaction (the "**Closing**"); provided, however, to the extent any amount of Transaction Value in respect of such Transaction is to be paid to the Company after the applicable Closing (each, a "**Post-Closing Payment**"), any portion of the applicable Transaction Fee payable with respect to such Post-Closing Payment shall not be payable at Closing but instead shall be paid to PJT promptly after the Company receives such Post-Closing Payment; provided, further, that each Transaction Fee paid to PJT at the Closing shall not be less than the applicable Minimum Fee. To the extent any Minimum Fee paid to PJT at the Closing of a Transaction exceeds the Transaction Fee that would

---

[8]    As provided for in the Engagement Letter, "**Transaction Value**" means "the gross value of all cash, securities and other properties and consideration paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Transaction or a transaction related thereto (including, without limitation, amounts paid or to be paid (A) pursuant to covenants not to compete or similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Transaction Value shall also include (i) (I) in the case of the sale, exchange or purchase of the Company's equity securities the principal amount of any indebtedness for borrowed money (net of cash on the Company's balance sheet), preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities as set forth on the most recent consolidated balance sheet of the Company prior to the consummation of such sale, exchange or purchase or (II) in the case of a sale or disposition of assets by the Company the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities indirectly or directly assumed or acquired, and (ii) any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities that are or otherwise repaid or retired, in connection with or in anticipation of the Transaction. Transaction Value shall also include (x) any and all consideration received by the Company for securities of the Company issued in connection with the Transaction as to which PJT Partners is not also receiving a Capital Raising Fee and (y) the aggregate amount of any extraordinary dividend or distribution made by the Company from the date hereof until the closing of the Transaction. Transaction Value shall include all amounts paid into escrow and all contingent payments including, without limitation, contingent or milestone payments and payments to be made in connection with any regulatory filing, product approval, or based on achievement of predetermined sales levels, payable in connection with the Transaction. If the Transaction Value to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Transaction Value is paid."

#92327993v19

otherwise be payable to PJT at such Closing absent any requirement to pay the applicable Minimum Fee, such difference shall be credited against any Transaction Fee payable to PJT with respect to any Post-Closing Payment in respect of such Transaction

Notwithstanding any provision on the Engagement Letter to the contrary, the maximum aggregate amount payable to PJT in respect of all Restructuring Fees, Transaction Fees, and Capital Raising Fees, after giving effect to any crediting of other fees earned under the Engagement Letter, shall be $23,500,000. For the avoidance of doubt, the foregoing cap on fees shall not include or affect any Monthly Fees due under the Engagement Letter, the Company's obligations to pay PJT Partners' out-of-pocket expenses or the Company's obligations under and in respect of the Indemnification Agreement (as defined below).

e.    **Expense Reimbursements**.

- In addition to the fees described above, the Debtors agree to reimburse PJT for all reasonable and documented out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable and documented fees and expenses of PJT's counsel (without the requirement that the retention of such counsel be approved by the Court) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

- Further, in connection with the reimbursement, contribution and indemnification provisions set forth in the Engagement Letter and **Attachment A** to the Engagement Letter (the "**Indemnification Agreement**"), which is incorporated therein by reference, the Debtors agree to reimburse each Indemnified Party (as defined in the Indemnification Agreement) for its reasonable and documented legal and other out of pocket expenses (including the cost of any investigation and preparation) as such expenses are incurred in connection with any claim, suit, action, proceeding, investigation, or inquiry arising out of or in connection with PJT's engagement.

20.    The terms of the Engagement Letter and Indemnification Agreement were negotiated at arm's length and the Debtors respectfully submit that the indemnification, contribution, and reimbursement provisions are reasonable and appropriate under the circumstances.

#92327993v19

21.     Moreover, the Debtors request, and PJT has agreed, that the Court approve the indemnification, contribution, and reimbursement provisions reflected on the Indemnification Agreement, subject to the modifications reflected in the Proposed Order. The Debtors believe that the provisions of the Indemnification Agreement, as modified by the Proposed Order, are appropriate and should be approved.

22.     To the best of the Debtors' knowledge, information, and belief, no promises have been received by PJT as to compensation in connection with these chapter 11 cases other than as outlined in the Engagement Letter, and PJT has no agreement with any other entity to share any compensation received with any person other than the principals and employees of PJT.

23.     PJT intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court, including any order granting this Application (to the extent compliance is not waived).

24.     PJT will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. However, because: (a) it is not the general practice of investment banking firms such as PJT to keep detailed time records similar to those customarily kept by attorneys; (b) PJT does not ordinarily keep time records on a "project category" basis; and (c) PJT's compensation is based on a fixed Monthly Fee, the Restructuring Fee, the Transaction Fee and/or the Capital Raising Fee, the Debtors respectfully request that PJT's professionals only be required to maintain records (in summary format) of the services rendered for the Debtors, including summary descriptions of those services, the approximate time expended in providing those services (in one-half hour

increments), and the identity of the professionals who provided those services. PJT will present such records to the Court in its fee applications. Moreover, the Debtors respectfully request that PJT's professionals not be required to keep time records on a "project category" basis, that its non-investment banking professionals and personnel in administrative departments (including legal) not be required to maintain any time records, and that it not be required to provide or conform to any schedule of hourly rates. To the extent that PJT would otherwise be required to submit more detailed time records for its professionals by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or other applicable procedures and orders of the Court, the Debtors respectfully request that this Court waive or excuse compliance with such requirements or guidelines.

25.    The Debtors believe that the Fee Structure described above and in the Engagement Letter is consistent with, and typical of, compensation arrangements entered into by PJT and other comparable firms in connection with the rendering of similar services under similar circumstances and is reasonable, market-based, and merited by PJT's restructuring expertise. After discussions and arm's-length negotiations, the Debtors believe that the Fee Structure is reasonable, market-based, and designed to compensate PJT fairly for its work and to cover customary expenses.

26.    PJT's strategic and financial expertise, as well as its M&A and capital markets knowledge, financing skills and restructuring capabilities, some or all of which has been and will be required by the Debtors during the term of PJT's engagement, were all important factors to the Debtors in determining the Fee Structure. The Debtors believe that the ultimate benefit of PJT's services hereunder cannot be measured by reference to the number of hours to be expended by PJT's professionals in the performance of such services. The Debtors and PJT have

13

agreed upon the Fee Structure in anticipation that a substantial commitment of professional time and effort will be required of PJT and its professionals in connection with these chapter 11 cases and in light of the fact that: (i) such commitment may foreclose other opportunities for PJT and (ii) the actual time and commitment required of PJT and its professionals to perform its services under the Engagement Letter may vary substantially from week-to-week and month-to-month, creating "peak load" issues for PJT.

### Efforts to Avoid Duplication of Services

27.    PJT's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in these chapter 11 cases. PJT has informed the Debtors that it understands that the Debtors have retained and may retain additional professionals during the term of the engagement and that it will use its reasonable efforts to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

### PJT's Disinterestedness

28.    PJT has reviewed the list of parties in interest provided by the Debtors. To the best of PJT's knowledge, as of the date hereof, and except to the extent disclosed herein, in the Coleman Declaration or in the Flanagan Declaration, PJT: (i) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code; (ii) does not hold or represent an interest adverse to the Debtors' estates; and (iii) has no connection to the Debtors, their creditors, or related parties.

29.    Given the large number of parties in interest in these chapter 11 cases, and despite the efforts to identify and disclose PJT's relationships with parties in interest in these chapter 11 cases, PJT is unable to state with certainty that every client relationship or other connection has been disclosed in the Coleman Declaration and/or the Flanagan Declaration. PJT will make

14

#92327993v19

continued inquiries following the filing of the Application, on a periodic basis, with additional disclosures to the Court if necessary or otherwise appropriate.

30.     According to the Debtors' books and records, during the 90-day period before the Petition Date, the Debtors paid PJT $780,000 for monthly fees earned and $21,771.63 for expenses incurred. Prior to the Petition Date, PJT had also received an advance payment of $195,000. Given the timing of the filing, PJT may not yet have accounted for all expenses it incurred before the Petition Date. In the event PJT subsequently becomes aware of additional prepetition expenses incurred on behalf of the Debtors, PJT will reduce its advance by such amounts. To the extent that amounts paid by the Debtors to PJT prior to the Petition Date exceed amounts incurred by PJT prepetition, such excess will be credited to amounts incurred postpetition.

31.     The Debtors are informed that PJT will not share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than other principals and employees of PJT, to the extent required by section 504 of the Bankruptcy Code.

32.     To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of PJT's retention are discovered or arise, PJT will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## **Basis for Relief Requested**

33.     The Debtors seek authority to employ and retain PJT as their investment banker under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out the [Debtors'] duties

under this title." 11 U.S.C. § 327(a). Section 1107(b) of the Bankruptcy Code elaborates upon

sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy

Code and provides that "a person is not disqualified for employment under section 327 of [the

Bankruptcy Code] by a debtor in possession solely because of such person's employment by or

representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

34.      In addition, the Debtors seek approval of the Fee Structure and the Engagement

Letter (including the Indemnification Agreement) pursuant to section 328(a) of the Bankruptcy

Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ

or authorize the employment of a professional person under section 327 . . . on any reasonable

terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or

percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Accordingly, section 328

of the Bankruptcy Code permits the compensation of professionals, including investment

bankers, on flexible terms that reflect the nature of their services and market conditions. Thus,

section 328 is a significant departure from prior bankruptcy practice relating to the compensation

of professionals. Indeed, as the United States Court of Appeals for the Fifth Circuit recognized in

*Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*:

> Prior to 1978 the most able professionals were often unwilling to work for
> bankruptcy estates where their compensation would be subject to the uncertainties
> of what a judge thought the work was worth after it had been done. That
> uncertainty continues under the present § 330 of the Bankruptcy Code, which
> provides that the court award to professional consultants "reasonable
> compensation" based on relevant factors of time and comparable costs, etc. Under
> present § 328 the professional may avoid that uncertainty by obtaining court
> approval of compensation agreed to with the trustee (or debtor or committee).

123 F.3d 861, 862 (5th Cir. 1997) (internal citations omitted).

35.      Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005 amended section 328(a) of the Bankruptcy Code to read as follows:

#92327993v19

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

11 U.S.C. § 328(a). It is thus clear that debtors may retain a professional on a fixed or percentage fee basis with Court approval, such as the Fee Structure for PJT in the Engagement Letter.

36.     Similar fixed and contingency fee arrangements have been approved and implemented by courts in other large chapter 11 cases. *See, e.g.*, *In re FirstEnergy Solutions Corp.*, Case No-18-50757 (AMK) (Bankr. N.D. Ohio May 8, 2018); *In re VER Technologies Holdco LLC*, Case No. 18-10834 (KG) (Bankr. D. Del. Apr. 5, 2018); *In re Ascent Resources Marcellus Holdings*, LLC, Case No. 18-10265 (LSS) (Bankr. D. Del. Feb. 6, 2018); *In re The Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 4, 2018); *In re PES Holdings*, LLC, Case No. 18-10122 (KG) (Bankr. D. Del Jan. 21, 2018); *In re Castex Energy Partners, L.P.*, Case No. 17-35835 (MI) (Bankr. S.D. Tex. Dec. 4, 2017); *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC) (Bankr. S.D.N.Y. Nov. 29, 2017); *In re GulfMark Offshore, Inc.*, Case No. 17-11125 (KG) (Bankr. D. Del. June 15, 2017); *In re Westinghouse Electric Company LLC*, Case No. 17-10751 (MEW) (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Vanguard Nat. Res., LLC*, Case No. 17-30560 (MI) (Bankr. S.D. Tex. Mar. 20, 2017); *In re Azure Midstream Partners, LP*, Case No. 17-30461 (DRJ) (Bankr. S.D. Tex. Mar. 10, 2017); *In re Am. Gilsonite Co.*, Case No. 16-12316 (CSS) (Bankr. D. Del. Nov. 18, 2016); *In re CJ Holding Co.*, Case No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2016); *In re Midstates Petroleum Co., Inc.*, Case No. 16-32237 (DRJ) (Bankr. S.D. Tex. July 12, 2016); *In re Chaparral Energy, Inc.*, Case No. 16-11144 (LSS) (Bankr. D. Del. June 10, 2016); *In re Ryckman Creek Res., LLC*, Case No. 16-10292 (KJC) (Bankr. D. Del. Feb. 29, 2016); *In re Energy & Exp. Partners, Inc.*, Case No. 15-44931 (RFN) (Bankr. N.D. Tex. Feb. 8, 2016); *In re Parallel Energy LP*, Case No. 15-12263

#92327993v19

(KG) (Bankr. D. Del. Dec. 16, 2015); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015); *In re Altegrity, Inc.*, Case No. 15-10226 (LSS) (Bankr. D. Del. March 16, 2015); *In re Mineral Park, Inc.*, Case No. 14-11996 (KJC) (Bankr. D. Del. Sept. 23, 2014 & Oct. 2, 2014); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 16, 2014); *In re FAH Liquidating Corp. (Fisker Auto.)*, Case No. 13-13087 (KG) (Bankr. D. Del. March 31, 2014); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 23, 2013); *In re Ormet Corp.*, Case No. 13-10334 (MFW) (Bankr. D. Del. Apr. 18, 2013); *In re Otelco Inc.*, Case No. 13-10593 (MFW) (Bankr. D. Del. Apr. 18, 2013); *In re RDA Holding Co.*, Case No. 13-22233 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013); *In re Inspiration Biopharma-ceuticals, Inc.*, Case No. 12-18687 (WCH) (Bankr. D. Mass. Dec. 19, 2012); *In re Broadview Networks Holdings, Inc.*, Case No. 12-13581 (SCC) (Bankr. S.D.N.Y. Sept. 14, 2012); *In re Cir-cus & Eldorado Joint Venture*, Case No. 12-51156 (BTB) (Bankr. D. Nev. July 6, 2012); *In re Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. Jan. 11, 2012); *In re Trico Marine Servs., Inc.*, Case No. 10 12653 (BLS) (Bankr. D. Del. Oct. 6, 2010); *In re CIT Grp. Inc.*, Case No. 09-16565 (ALG) (Bankr. S.D.N.Y. Nov. 24, 2009); *In re Gen. Motors Corp.*, Case No. 09-50026 (MG) (Bankr. S.D.N.Y. Oct. 28, 2009).

37.     The Fee Structure set forth in the Engagement Letter sets forth reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The Fee Structure adequately reflects: (i) the nature of the services to be provided by PJT and (ii) fee structures and indemnification provisions typically utilized by PJT and other leading investment banking firms, which do not bill their time on an hourly basis and generally are compensated on a transactional basis. Furthermore, PJT did not vary its rate based on the location of these chapter 11 cases.

#92327993v19

38.     As set forth above, and notwithstanding approval of the Engagement Letter under section 328 of the Bankruptcy Code, PJT intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court, with certain limited modifications.

39.     Specifically, the Debtors request that the requirements of Bankruptcy Rule 2016 and Local Rule 2016-1 be tailored to the nature of PJT's engagement and its compensation structure. PJT has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a fixed-rate and contingency basis and the payment of the fees described in the Engagement Letter, which, as set forth above, is customary in the investment banking industry. Additionally, it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. As discussed above, however, PJT's personnel in these chapter 11 cases will keep summary time records in one-half hour increments describing their daily activities and the identity of persons who performed such tasks. In addition, apart from the time-recording practices described above, PJT's personnel do not maintain their time records on a "project category" basis. As such, the Debtors request modification of the requirements under Local Rule 2016-1.

40.     In addition, the provisions of the Indemnification Agreement are reasonable and have been approved and implemented in other large chapter 11 cases by courts in and outside of this jurisdiction. Accordingly, the relief requested in the Application is in the best interests of the Debtors' estates, creditors, and all parties in interest to these chapter 11 cases.

#92327993v19

41.    Additionally, Bankruptcy Rule 2016 and Local Rule 2016-1 require retained professionals to submit applications for payment of compensation in chapter 11 cases. The guidelines relating to Local Rule 2016-1(a) also require retained professionals to submit detailed time entries, arranged by project category, and to set forth a narrative description of the project performed, an identification of each person providing services on the project, the amount of time spent (in time periods of tenths of an hour), and the amount of compensation requested for each professional on the project. However, the Court has discretion to alter these billing requirements.

42.    The Debtors will regularly monitor the fees and expenses of PJT to ensure that PJT's professionals are assisting the Debtors in the most cost-effective and efficient manner. The Debtors will employ similar procedures for reviewing professional invoices as they have employed since before the commencement of the chapter 11 cases.

43.    Denial of the relief requested herein would deprive the Debtors of the assistance of a uniquely qualified investment banking firm. Moreover, with close to two years of services having been provided by PJT to the Debtors, a denial of PJT's employment would result in an unjust disadvantage to the Debtors and all parties in interest because of PJT's familiarity with the Debtors, their business operations and the unique complexities involved in these chapter 11 cases.

44.    Based on the foregoing, the Debtors submit that they have satisfied the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules to support entry of an order authorizing the Debtors to retain and employ PJT in these chapter 11 cases on the terms described herein and in the Engagement Letter.

## **Notice and No Prior Request**

45.    Notice of this Motion will be provided to: (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at

#92327993v19

https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this motion. The Debtors respectfully submit that no further notice is required.

46. The Debtors have not previously sought the relief requested herein from this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein and granting such other relief as the Court deems just and proper.

Dated: November 5, 2019

**PURDUE PHARMA L.P.**
(for itself and on behalf of its affiliates that are debtors and debtors in possession)

*/s/ Jon Lowne*
Jon Lowne
Senior Vice President and Chief Financial Officer
Purdue Pharma L.P.

22