## **Exhibit B**

**Coleman Declaration**

#92327993v19

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF TIMOTHY COLEMAN IN SUPPORT OF
DEBTORS' APPLICATION TO EMPLOY PJT PARTNERS LP
AS INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE**

I, Timothy Coleman, hereby declare:

1. I am a Partner in and the Global Chairman of the Restructuring and Special Situations Group at PJT Partners LP ("**PJT**") and one of the lead restructuring advisors involved in these chapter 11 cases of the above-captioned debtors and debtors in possession (collectively,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

#92327993v19

the "**Debtors**" or "**Purdue**"). PJT is the proposed investment banker to the Debtors. I submit this declaration (this "**Declaration**") on behalf of PJT in support of the *Debtors' Application to Employ PJT Partners LP as Investment Banker Nunc Pro Tunc to the Petition Date* (the "**Application**").[2]

2.      Unless otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' senior management, other members of the PJT team, or other interested parties, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called to testify, I would testify competently to the facts set forth below.

### PJT's Qualifications

3.      PJT's Restructuring and Special Situations Group is one of the industry's leading advisors to companies and creditors in a variety of complex restructurings and bankruptcies. PJT was spun off from The Blackstone Group L.P. ("**Blackstone**") effective October 1, 2015.[3] Upon the consummation of the spinoff, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. The former Blackstone restructuring professionals, in their capacity as PJT employees, have been conducting business and providing their clients with the same high-quality restructuring services

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Application.

[3] On October 7, 2014, the board of directors of Blackstone's general partner approved a plan to spin off its financial and strategic advisory services, restructuring and reorganization advisory services and Park Hill fund placement businesses, and to combine these businesses with an independent financial advisory firm founded by Paul J. Taubman, to form an independent, publicly traded company called PJT Partners Inc. PJT is a wholly-owned subsidiary of PJT Partners Holdings LP, a holding partnership that is controlled by PJT Partners Inc., as general partner. PJT Partners Inc. is led by Paul J. Taubman, as chairman and chief executive officer. This spinoff was effected via a multi-step transaction.

that Blackstone had itself provided since the formation of its restructuring advisory practice 28 years ago. PJT professionals have extensive experience working with financially troubled companies in complex financial restructurings. Since 1991, PJT professionals have advised on more than 600 distressed situations, both in and out of court, involving more than $2.0 trillion of total liabilities.

4. The partners and members of PJT's Restructuring and Special Situations Group have assisted and advised in numerous chapter 11 cases. In particular, they have provided services to debtors, creditors' committees, and other constituencies in numerous chapter 11 cases, including, among others: AbitibiBowater Inc.; Aegean Marine Petroleum Network Inc.; Adelphia Communications Corporation; Allen Systems Group, Inc.; Ambac Financial Group, Inc.; Apex Silver Mines Ltd.; Arch Coal, Inc.; Ascent Resources Marcellus Holdings, LLC; The Bon-Ton Stores, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Chaparral Energy LLC; CHC Group Ltd.; Cumulus Media Inc.; Delta Air Lines, Inc.; Dixie Electric, LLC; Dynegy Inc.; Eastman Kodak Company; Edison Mission Energy; Energy Future Holdings Corporation; Energy XXI Ltd.; Endeavor International Corporation; Energy & Exploration Partners, Inc.; Enron Corporation; Excel Maritime Carriers, Ltd.; EXCO Resources, Inc.; FirstEnergy Solutions Corp.; Flag Telecom Holdings Limited; Flying J. Inc.; FullBeauty Brands Holding Corp.; Fusion Connect, Inc.; Genco Shipping & Trading Limited; General Motors Corporation; Global Crossing Ltd.; Halcón Resources Corporation; Hawker Beechcraft, Inc.; Hercules Offshore, Inc.; Homer City Generation, L.P.; Hostess Brands, Inc.; Houghton Mifflin Harcourt Publishing Company; Lee Enterprises Inc.; Legend Parent Inc.; LightSquared Inc.; Los Angeles Dodgers LLC; LyondellBasell Industries; Magnetation LLC; Magnum Hunter Resources Corporation; Merisant Worldwide, Inc.; Mirant Corp.; New Gulf Resources, LLC;

3

NewPage Corporation; NTK Holdings, Inc.; Paragon Offshore plc; Patriot Coal Corporation; Penn Virginia Corporation; PES Holdings, LLC; PHI, Inc.; Quicksilver Resources, Inc.; Relativity Media, LLC; Sabine Oil & Gas Corp.; Samson Resources Corporation; SemGroup; Stearns Holdings, LLC; TerreStar Networks Inc.; Toisa Ltd.; Triangle USA Petroleum Corporation; Tribune Company; Trident Holding Company, LLC; Ultra Petroleum Corp.; Venoco Inc.; VER Technologies Holdco LLC; Verso Corporation; Walter Energy, Inc.; Westinghouse Electric Company LLC; W.R. Grace & Co.; Windstream Holdings, Inc.; and Winn-Dixie Stores, Inc. In addition, the restructuring group has provided general restructuring advice to such major companies as Clearwire Corporation, Ford Motor Company, The Goodyear Tire & Rubber Company, and Xerox Corporation.

5.     More specific to this matter, the partners and members of PJT's Restructuring and Special Situations Group have advised companies in situations involving potential mass tort liability. These companies include The Babcock & Wilcox Company, Dow Corning Corporation, Specialty Products Holding Corp. (parent of Bondex International), and W. R. Grace & Co.

6.     PJT was initially retained on or around November 13, 2017 as Purdue faced mounting litigation related to its opioid medications. The scope of PJT's initial work, which lasted approximately three months, focused primarily on assessing Purdue's business plan. In connection with this assessment, Purdue decided to scale back certain functions, including sales initiatives, research and development investment, and pipeline product development.

7.     Several months later, beginning on or around May 1, 2018, PJT started a second engagement with Purdue. The scope of this assignment included the analysis of intercompany

4

#92327993v19

relationships with Rhodes Technologies and Rhodes Pharmaceuticals L.P. ("**Rhodes**"),[4] the evaluation of manufacturing arrangements, the analysis of the financial impact of potential settlement and restructuring options and the assessment of business risks resulting from an ever-increasing number of lawsuits. These risks included, among others, a substantial reduction in the amount of cash on hand as a result of significant legal defense and related indemnification expenses and potential business interruption resulting from suppliers and vendors requiring more onerous trade terms.

8.    The third phase of PJT's engagement began on or around April 1, 2019 and has included the ongoing evaluation of the business plan, the support of Debtors' counsel in negotiations with advisors to various litigants and the preparation of the Debtors' chapter 11 bankruptcy filing.

9.    To date, PJT has engaged in extensive due diligence of the Debtors' businesses, including their operations, assets, corporate structure, and contractual arrangements to build a foundation for a restructuring strategy. Moreover, PJT has performed diligence on the Debtors' cash flows and liquidity. PJT has played a key role in arms' length negotiations among the Debtors and their key stakeholders in furtherance of the Debtors' restructuring efforts. Finally, PJT has participated in Board of Directors meetings throughout its engagement.

10.    As a result of the prepetition work performed by PJT on behalf of the Debtors, PJT has acquired significant knowledge of the Debtors' financial affairs, business operations, corporate structure, assets, key stakeholders and other related material information. Likewise, in providing prepetition services to the Debtors, PJT's professionals have worked closely with the

---

[4] At this time, Rhodes was under a different ownership chain than Purdue (although Rhodes and Purdue, I understand, have always shared the same ultimate owners). In May 2019, Rhodes was contributed to Purdue, becoming a Purdue subsidiary.

5

#92327993v19

Debtors' management, Board of Directors and other advisors. If this Application is approved, several of PJT's professionals, all with substantial expertise in the areas discussed above, will continue to provide services to the Debtors and will work closely with the Debtors' management and other professionals to complete the Debtors' reorganization. Accordingly, as a result of PJT's representation of the Debtors prior to the commencement of these chapter 11 cases and PJT's extensive experience representing chapter 11 debtors, PJT is well qualified to provide these services and represent the Debtors during these chapter 11 cases.

## Services Provided by PJT

11. Subject to further order of the Court, and consistent with the terms of the Engagement Letter, PJT's services in these chapter 11 cases, to the extent necessary, appropriate, and feasible, and as may be requested by the Debtors, include the following[5]:

　　a.　assist in the evaluation of the Debtors' businesses and prospects, opportunities and financial condition;

　　b.　assist in the evaluation of the Debtors' long-term business plan and related financial projections;

　　c.　assist in the development of presentations to the Debtors' Board of Directors, various creditors and other third parties;

　　d.　analyze the Debtors' financial liquidity;

　　e.　analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;[6]

---

[5] The summary of the Engagement Letter in this declaration is qualified in its entirety by reference to the provisions of the Engagement Letter. To the extent there is any discrepancy between the summary contained in this declaration and the terms set forth in the Engagement Letter, the terms of the Engagement Letter shall govern. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Engagement Letter.

[6] As provided for in the Engagement Letter, a "**Restructuring**" shall mean "collectively, (i) any restructuring, reorganization (whether or not pursuant to chapter 11 of the United States Bankruptcy Code ('**Chapter 11**'), but excluding a liquidation pursuant to chapter 7 of the United States Bankruptcy Code) and/or recapitalization of the [Debtors] affecting any of its existing or potential debt obligations or other claims against the [Debtors],

#92327993v19

  f. participate in negotiations among the Debtors and their creditors, and other interested parties;

  g. value securities offered by the Debtors in connection with a Restructuring;

  h. assist in arranging financing for the Debtors, as requested;

  i. provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services;

  j. assist the Debtors in preparing marketing materials in conjunction with a possible Transaction;[7]

  k. assist the Debtors in identifying potential buyers or parties in interest to a Transaction and assist in the due diligence process;

  l. assist and advise the Debtors concerning the terms, conditions and impact of any proposed Transaction; and

  m. provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a transaction similar to a potential Restructuring and/or Transaction, as requested and mutually agreed.

## Professional Compensation

12. In consideration of the services to be provided by PJT, and as summarized in the Application and as more fully described in the Engagement Letter, subject to the Court's approval, the Debtors and PJT have agreed that PJT shall, in respect of its services, be compensated under the Fee Structure.

13. The Fee Structure is consistent with PJT's typical fee for work of this nature. The fees are set at a level designed to compensate PJT fairly for the work of its professionals and

---

including, without limitation, senior debt, junior debt, trade claims, general unsecured claims, and preferred stock (collectively, the '**Obligations**'), and/or (ii) a sale or other acquisition or disposition of any material assets and/or equity of the [Debtors], and/or (iii) any complete or partial repurchase, refinancing, extension or repayment by the [Debtors] of any of the Obligations."

[7] As provided for in the Engagement Letter, a "Transaction" means "the sale, merger or other disposition of all or a portion of the Company or its assets."

other personnel and to cover fixed and routine overhead expenses. It is PJT's policy to charge its clients for all disbursements and expenses incurred in the rendition of services.

14. The Fee Structure is comparable to those generally charged by investment banking firms of similar stature to PJT and for comparable engagements, both in and out of court, and reflects a balance between a fixed, monthly fee, and a contingency amount that is tied to the consummation of a Restructuring.

15. The Engagement Letter was negotiated at arm's length and in good faith, and I believe that the provisions contained therein are reasonable terms and conditions of PJT's employment by the Debtors.

16. With respect to the Indemnification Agreement, unlike the market for other professionals that a debtor may retain, indemnification is a standard term of the market for investment bankers. The indemnity, moreover, is comparable to those generally obtained by investment banking firms of similar stature to PJT and for comparable engagements, both in and out of court. The Indemnification Agreement was fully negotiated by the Debtors and PJT at arm's length and in good faith, and I respectfully submit that the indemnification, contribution, and reimbursement provisions therein are reasonable.

17. Other than as set forth above, there is no proposed arrangement between the Debtors and PJT for compensation to be paid in these cases. PJT has no agreement with any other entity to share any compensation received, nor will any be made, except as permitted under Bankruptcy Code section 504(b)(1).

18. PJT is willing to be retained by the Debtors as their investment banker and will make appropriate applications to this Court for allowance of compensation and reimbursement of

out-of-pocket expenses, all in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any orders of this Court.

19.     PJT has requested, pursuant to Bankruptcy Code section 328(a), payment of its fees on a fixed-rate and/or fixed-percentage basis. It is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. PJT's restructuring professionals, when formally retained in chapter 11 cases, and when required by local rules, do, and in these cases will, keep time records in half-hour increments describing their daily activities and the identity of persons who performed such tasks. PJT will also supplement this information with a list of the non-restructuring professionals who assist the restructuring department on this matter but who do not, as a matter of general practice, keep records in the same manner. In addition, apart from the time-recording practices described above, PJT's personnel do not maintain their time records on a "project category" basis. As such, the Debtors are requesting modification of the requirements under the Local Rules.

20.     According to the Debtors' books and records, during the 90-day period before the Petition Date, the Debtors paid PJT $780,000 for monthly fees earned and $21,771.63 for expenses incurred. Prior to the Petition Date, PJT had also received an advance payment of $195,000. Given the timing of the filing, PJT may not yet have accounted for all expenses it incurred before the Petition Date. In the event PJT subsequently becomes aware of additional prepetition expenses incurred on behalf of the Debtors, PJT will reduce its advance by such amounts. To the extent that amounts paid by the Debtors to PJT prior to the Petition Date exceed amounts incurred by PJT prepetition, such excess will be credited to amounts incurred postpetition.

### No Duplication of Efforts

21.     The Debtors have worked with PJT and their other advisors to ensure that there will be no duplication of efforts and will continue to do so throughout the course of these chapter 11 cases.

### PJT's Disinterestedness

22.     PJT has performed a conflict search and based on the results, to the best of my knowledge, neither I, PJT, nor any member or employee thereof, insofar as I have been able to ascertain, is an insider of the Debtors, nor has any connection with the Debtors, their creditors, or other parties in interest as reasonably known to us prior to completion of our more detailed conflict search, except as described further in the Flanagan Declaration.

23.     As part of its diverse practice, PJT appears in numerous cases, proceedings, and transactions involving many different professionals, including attorneys, accountants, investment bankers, and financial consultants, some of which may represent claimants and parties in interest in these chapter 11 cases. In addition, PJT has in the past and will likely in the future be working with or against other professionals involved in this case in matters unrelated to this case. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors' estates, and none are in connection with these chapter 11 cases.

24.     Tara Flanagan, the Chief Compliance Officer of PJT (in such capacity, the "**Chief Compliance Officer**"), is responsible for, among other things, overseeing the maintenance of information pertaining to (i) every active matter on which PJT is currently engaged, (ii) the entities represented by PJT in such engagements, (iii) the material parties involved in each current matter (inclusive of adverse and related parties, as identified to us by the prospective client and/or its counsel in the case of a restructuring advisory assignment), and (iv) the

professional at PJT that is knowledgeable about the matter. As part of any conflict review undertaken, this information and information on closed assignments is incorporated into the review. The Chief Compliance Officer and her staff have received a list of parties in interest provided by the Debtors (the "**Parties in Interest**") and have compared this to PJT's information to determine the existence of any possible conflicts (the "**Conflict Check**"). The results of this Conflict Check are disclosed in the Flanagan Declaration.

25. PJT does not believe that any of its involvement with any of the parties included in the Parties in Interest list will adversely affect the Debtors in any way. PJT does not believe that any potential relationship it may have with any of the Parties in Interest would interfere with or impair PJT's representation of the Debtors.

26. Given the large number of parties in interest in these chapter 11 cases, despite the efforts to identify and disclose PJT's relationships with the Parties in Interest, I am unable to state with absolute certainty that every client relationship or other connection has been disclosed in this Declaration. PJT, therefore, has informed the Debtors that PJT will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, PJT will promptly file a supplemental declaration with the Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my information, knowledge and belief.

Dated:  November 5, 2019
        White Plains, New York

                                By:  */s/ Timothy Coleman*
                                     Timothy Coleman
                                     Partner
                                     PJT Partners LP

12