ASK LLP
151 West 46th Street, 4th Floor
New York, New York 10036
Tel.:(212) 267-7342
Fax:(212) 918-3427
Edward E. Neiger, Esq.
Jennifer A. Christian, Esq.
eneiger@askllp.com
jchristian@askllp.com

Hearing Date: **November 19, 2019**
Hearing Time: **10:00 a.m. ET**

*Counsel for Ad Hoc Group of Individual Victims
of Purdue Pharma L.P., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649-RDD |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |

------------------------------------------------------x

TO:     **THE HONORABLE ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE:**

**OBJECTION OF AD HOC GROUP OF INDIVIDUAL VICTIMS OF PURDUE PHARMA L.P.,** *ET AL.* **TO DEBTORS' MOTION TO ASSUME THE PREPETITION REIMBURSEMENT AGREEMENT WITH THE AD HOC COMMITTEE, AND TO PAY THE FEES AND EXPENSES OF THE AD HOC COMMITTEE'S PROFESSIONALS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

The Ad Hoc Group of Individual Victims of Purdue Pharma L.P., *et al.* (the "**Ad Hoc Group of Individual Victims**")[2] files this objection (the "**Objection**") to the *Debtors' Motion to Assume the Prepetition Reimbursement Agreement with the Ad Hoc Committee, and to Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [Dkt. 394] (the "**Motion**").[3] In support of the Objection, the Ad Hoc Group of Individual Victims respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Ad Hoc Group of Individual Victims objects to the entry of an order approving the assumption of the Reimbursement Agreement and the payment of the ongoing fees and expenses of the Ad Hoc Committee's professionals during the course of these bankruptcy cases. The Debtors have consistently elided over the individual victims of the opioid epidemic in an attempt to abstract away the enormous human suffering that was a direct result of their products and their deceptive marketing efforts. However, not only do the individual victims comprise the majority by *number* of creditors in these cases, but have arguably suffered the largest *amount* of damage at the hands of the Debtors.[4] Accordingly, this Court should not permit the Debtors to pay the fees and expenses of numerous counsel and other professionals to the Ad Hoc Committee, which fees and expenses could total in the **tens of millions of dollars** until the Debtors make the

---

[2] The Ad Hoc Group of Individual Victims is representative of the more than 1,000 individual victims of Purdue, including over 250 victims with wrongful death claims, who are also represented by ASK LLP and others and who support this Objection.

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[4] According to the Society of Actuaries' report entitled the "Economic Impact of Non-Medical Opioid Use in the United States, Annual Estimates and Projections for 2015 through 2019," dated October 2019, the economic damage resulting from the opioid epidemic was $179 billion in 2018 and $631 billion in the last four years. *See* https://www.soa.org/globalassets/assets/files/resources/research-report/2019/econ-impact-non-medical-opioid-use.pdf. However, the White House's Council of Economic Advisors has produced data which *includes* non-economic damage, including wrongful death, which was suffered only by the individual victims and not municipalities, and that data shows the total damage resulting from the opioid epidemic was $696 billion in 2018 and $2.5 trillion over the last four years. *See* https://www.whitehouse.gov/articles/full-cost-opioid-crisis-2-5-trillion-four-years/.

2

individual victims whole.[5] Notably, the Debtors seek to pay these substantial fees and expenses while little progress has been made on the $200 million fund the Debtors proposed to assist opioid victims during the first six months of the cases. The Centers for Disease Control estimate that on average **130 Americans die every day** from an opioid overdose.[6] The funds proposed to pay the fees and expenses of the Ad Hoc Committee could be used to literally save thousands of lives immediately.[7] Instead of prioritizing actions that could save lives, the Debtors have chosen to prioritize the payment of legal and other fees and expenses of one subset of its unsecured creditors.

2.  The individual victims are the most personally affected by the Debtors' years-long effort to push opioid-based medications that they knew where addictive and harmful. The result of this effort has been millions of lives harmed both directly and indirectly from the scourge of these drugs. According to the Centers for Disease Control, from 1999-2017, almost **400,000 people died**

---

[5] Nowhere in the Motion is there any disclosure regarding (i) the terms of engagement of any of the many professionals of the Ad Hoc Committee that the Debtors are proposing to reimburse, or (ii) the dollar amount of the pre-petition fees and expenses of the professionals of the Ad Hoc Committee (that was not even an Ad Hoc Committee at the time) that the Debtors are proposing to reimburse. Based on the number of entities representing the individual members of the newly-constituted Ad Hoc Committee and the amount of time that likely went into the negotiations of the Settlement Framework and the Settlement Term Sheet, the dollar amount of the fees and expenses incurred both pre-petition and post-petition already is likely quite substantial, and, at a very minimum, should be disclosed to all parties-in-interest and factored into the Court's analysis of the Motion.

[6] *See* https://www.cdc.gov/drugoverdose/epidemic//.

[7] According to the National Institute on Drug Abuse: "Although the price for opioid treatment may vary based on a number of factors, recent preliminary cost estimates from the U.S. Department of Defense for treatment in a certified opioid treatment program (OTP) provide a reasonable basis for comparison:
- methadone treatment, including medication and integrated psychosocial and medical support services (assumes daily visits): $126.00 per week or $6,552.00 per year
- buprenorphine for a stable patient provided in a certified OTP, including medication and twice-weekly visits: $115.00 per week or $5,980.00 per year
- naltrexone provided in an OTP, including drug, drug administration, and related services: $1,176.50 per month or $14,112.00 per year[.]"

https://www.drugabuse.gov/publications/research-reports/medications-to-treat-opioid-addiction/how-much-does-opioid-treatment-cost (citing U.S. Department of Defense, Office of the Secretary. TRICARE; Mental Health and Substance Use Disorder Treatment. Federal Register. https://www.federalregister.gov/documents/2016/09/02/2016-21125/tricare-mental-health-and-substance-use-disorder-treatment. Published September 2, 2016. Accessed May 11, 2017).

from an overdose involving opioids[8] and millions more have had their lives and families shattered by drugs that the Debtors knew were addictive but nevertheless systematically deceived both regulators and physicians into believing were safe. From 2007–2012, the United States Government required the Debtors to abide by a "Corporate Integrity Agreement." Yet after that agreement expired, the Debtors continued to push their products irrespective of the harms they brought upon those who used them.

3. The results of this protracted campaign have wreaked havoc across the United States, creating one of the most significant public health crises in American history. But the raw numbers belie the essential truth of this case: the many individual Americans whose lives and livelihoods have ended due to these drugs. It is not only those who became addicted to the potent narcotics, nor only those who ended up being so controlled by these substances that they ended up becoming addicted to other substances, nor only those who lost custody of their children, nor only those who lost their livelihoods, nor only those who lost their homes, nor only those who lost their lives. It is the mothers who watched the promising arcs of their sons' lives come crashing down, the children who lost their parents to these addictive chemicals, and the families who were torn apart by a cycle of addiction and abuse. The Debtors, to this day, are unwilling to call themselves to account for their role in causing such large-scale human suffering. Incredibly, in their Informational Brief [Dkt. No. 17], the Debtors have strongly emphasized not only various initiatives and charitable donations they have made over the last twenty years, but also their desire to manage away the consequences of their actions by seeking consensual settlement of these cases, without taking responsibility for their part in the crisis.

---

[8] *See* https://www.cdc.gov/drugoverdose/epidemic/index.html.

4.	In the hearing on the first-day motions, Debtors' counsel intimated that it is "America" itself that stands to gain or lose from the Debtors' Chapter 11 filing. However, it is not America itself, in the abstract, that stands to gain or lose, it is the human victims of the opioid epidemic that stand to either gain some semblance of justice or lose it forever. The Debtors ignore the true gravity of the events that gave rise to the multitude of lawsuits and this bankruptcy filing and seek now instead to favor one group of unsecured creditors for certain efforts made prior to the bankruptcy filing, essentially providing them with a guarantee of payment, with no guarantee of *any* result for the Debtors' chapter 11 estates or the multitude of individual victims.

5.	The Debtors are asking this Court to permit them to assume a contract for the reimbursement of fees and expenses of the professionals of the Ad Hoc Committee, entered into moments before the bankruptcy filing, which they deem pre-petition and "executory," and to use estate assets to pay the fees and expenses of such professionals on an ongoing basis. The Debtors allege that the business judgment standard applies to their request pursuant to sections 365 and 363 of the Bankruptcy Code. However, neither of these sections of the Bankruptcy Code are applicable to the relief *actually* being sought by the Debtors. Indeed, the Debtors' motion is akin to a Trojan horse — it appears benign on the outside, but when one delves into the details of the Motion, it clearly contains the unexpected and is meant to upend the status quo, where all unsecured creditor groups are on an even footing. The Bankruptcy Code strongly disfavors such inequitable treatment of similarly-situated creditors. With the Debtors agreeing to give themselves up to their creditors, a large part of the work going forward will be negotiations between the various creditor constituencies as to how to divide up the assets of the Debtors' estates. Thus, the Debtors should be agnostic about the distribution of the estates' assets. However, by paying one set of unsecured creditors' fees, the Debtors are essentially funding litigation by one group of unsecured

5

creditors against other groups of similarly situated creditors, thereby providing an advantage to that group of unsecured creditors over the others.

6. The Debtors are essentially providing the Ad Hoc Committee with a superpriority administrative expense claim – without following *any* of the procedures set forth in the Bankruptcy Code for the retention and payment of professionals or the showing of a substantial contribution to the estates. The Motion continues the Debtors' pattern of behavior that led to their key role in the horrors of the opioid epidemic to begin with. The Debtors have spent years trying to skate the system, avoid accountability, and do what they wanted free from the fetters of law and morality. This pattern of behavior must end, and this Court should deny the Motion in its entirety for, among others, the following four reasons:

7. First, the Reimbursement Agreement is not an executory contract amenable to assumption under Section 365 of the Bankruptcy Code. The Reimbursement Agreement is *not* a plan support agreement pursuant to which the Ad Hoc Committee is locked into supporting a proposed bankruptcy plan. Rather, the Reimbursement Agreement is merely an agreement by the Debtors to pay the Ad Hoc Committee's fees that fall within a certain scope of work, with no commitment from the Ad Hoc Committee to take any action, let alone action regarding a specific plan to resolve these cases in their entirety.[9] As no performance remains due and owing from the Ad Hoc Committee, the Reimbursement Agreement cannot be considered executory and subject to assumption by the Debtors.

---

[9] The Reimbursement Agreement is precisely what it says it is and nothing more – it sets forth the Debtors' agreement to pay the fees and expenses of the Ad Hoc Committee's professionals. The Agreement does not contain any obligations on behalf of the Ad Hoc Committee or its professionals. Instead, it outlines a "scope" of work that the Debtors will reimburse for. Importantly, by the Motion, the Debtors are not seeking relief with respect to the Settlement Framework or the Settlement Term Sheet, which was not even filed until three weeks into these cases. Motion at ¶21.

6

8.     Second, the Debtors may not elevate certain unsecured creditors to the level of administrative superpriority claimants by cherry-picking isolated provisions of the Bankruptcy Code because they require the lowest standard of Court review, when there are other, more specific provisions of the Bankruptcy Code that are applicable. Specifically, the Debtors must either seek to retain and pay the Ad Hoc Committee's professionals in accordance with Sections 327 and 328 of the Bankruptcy Code or the Ad Hoc Committee must make an application at the end of the cases for an administrative expense claim under Section 503(b) of the Bankruptcy Code for making a substantial contribution to the cases.

9.     Third, even if the Court determines that the business judgment rule applies to the relief sought in the Motion, the Debtors have not provided any evidence whatsoever to support their decision. The Debtors apparently expect the Court to assume the Reimbursement Agreement provides an actual benefit to the estates. However, there is no guarantee that the Ad Hoc Committee will support a plan that incorporates any ultimate settlement supported by the Debtors, which in all likelihood, will be different from the Settlement Framework once all the creditor constituencies are at the negotiating table. Moreover, any member of the Ad Hoc Committee can withdraw its consent to the Settlement Framework or remove itself from the Ad Hoc Committee at any time, yet (i) the estates will still be authorized to pay the fees and expenses of the Ad Hoc Committee's professionals, and (ii) such withdrawing member will not have to repay the estates its pro-rata share of the professional fees and expenses. Further, the Debtors are not even wedded to the Settlement Framework that is embodied in the Settlement Term Sheet, and there are many conditions in the Settlement Term Sheet that may not be fulfilled.

10.    Finally, there is no basis in the Bankruptcy Code for certain unsecured creditors' fees and expenses to be paid by the estate solely because they are ineligible to sit on a statutory

creditors' committee and it would be inequitable to pay such fees and expenses when similarly situated creditors are not receiving the same treatment.

11. While it is appropriate for the Debtors to be given the opportunity to reorganize, that reorganization should not allow significant amounts of money to go out the door to a certain preferred group of unsecured creditors, while at the same time completely ignoring the needs and rights of individual victims and other parties harmed by the Debtors.

## OBJECTION

### I. The Reimbursement Agreement Is Not An Executory Contract And It May Not Be Assumed

12. Courts in the Second Circuit have generally adopted the Countryman Test for determining whether a contract is executory. The Countryman Test provides that an executory contract is "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy*: Part I, 57 MINN. L. REV. 439, 460 (1973); *see also COR Route 5 Co., LLC v. The Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379 (2d Cir. 2008); *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013); *In re Calpine Corp.*, No. 05–60200(BRL), 2008 WL 3154763, at *3, 2008 Bankr. LEXIS 2152, at *13 (Bankr. S.D.N.Y. Aug. 4, 2008). Stated otherwise, a prepetition contract is executory when both sides are still obligated to render substantial performance. *See In re Calpine Corp.*, 2008 WL 3154763, at *3, 2008 Bankr. LEXIS 2152, at *13. Executory contracts exclude those contracts where one party has completed performance and the only performance that remains is the payment of money by the other party. *See In re Ideal Mortgage Bankers, Ltd.*, 539 B.R. 409 (2015); *see also Hawker Beechcraft, Inc.*, 486 B.R. at 276.

13. Other courts in the Second Circuit have applied the more flexible so-called "functional approach test" which finds the existence of an "executory contract" notwithstanding the fact that only one of the parties to the contract has material obligations outstanding. *See In re Bradlees Stores, Inc.*, No. 00–16033, 2001 WL 34809984, at *5, 2001 Bankr. LEXIS 2192, at *16– 17 (Bankr. S.D.N.Y. Mar. 28, 2001); *In re Chateaugay Corp.*, 102 B.R. 335, 345 (Bankr. S.D.N.Y. 1989); *In re Bluman*, 125 B.R. 359, 363 (Bankr. E.D.N.Y. 1991). Under the functional approach test, "even though there may be material obligations outstanding on the part of only one of the parties to the contract, [the contract] may nevertheless be deemed executory…if its assumption [or] rejection would ultimately benefit the estate and its creditors." *In re Gen. Dev. Corp.*, 84 F.3d 1364, 1374 (11th Cir.1996). However, even under the more flexible functional test, a contract is not executory if the "bargained for benefits were received by the debtor prepetition, or if the assumption would saddle the estate with potentially onerous obligations, while rejection would confer benefits." *In re Chateaugay Corp.*, 102 B.R. at 345 n.11.

14. The Reimbursement Agreement is *not* an executory contract under any of the foregoing criteria as the work was already performed by the professionals for the Ad Hoc Committee prior to the bankruptcy filing, the Ad Hoc Committee and its professionals have no obligations under the Reimbursement Agreement, and the Debtors' only obligation is payment. The Debtors clearly acknowledge that the Ad Hoc Committee and its professionals do not have any obligations under the Reimbursement Agreement when they state in the Motion that "[i]f the Debtors do not obtain the authority to pay the fees and expenses of the Professionals in accordance with the Reimbursement Agreement, there is no guarantee that the Ad Hoc Committee will continue to exist." Motion at ¶ 6.

9

15. Moreover, although the Debtors allege that assumption of the Reimbursement Agreement would be in the best interest of the estates because the Agreement is integral to any settlement framework and the successful administration of the chapter 11 cases, the Debtors again ignore the fact that any benefit was received pre-petition. With no further performance obligations required of the Ad Hoc Committee post-petition, there is no benefit to the estates by the Debtors' assumption of the Reimbursement Agreement. First, there is no guarantee there will be an overall settlement reached in these cases or even that the current members of the Ad Hoc Committee will remain a part of the Ad Hoc Committee. In fact, there is no guarantee that the Ad Hoc Committee will continue to exist. Second, assumption of the Reimbursement Agreement would saddle the estates with onerous obligations (specifically, superpriority administrative expense claims not subject to disgorgement). Rejection, on the other hand, would confer a benefit upon the estates because the estates would not be locked into paying a substantial sum of money to one group of unsecured creditors whose further actions are in no way guaranteed to benefit the estates.

16. Furthermore, in nearly all of the cases cited by the Debtors, most of which were unreported and non-precedential decisions, (i) there was an obligation to support a specific plan, (ii) the creditor whose fees were being paid was secured, and/or (iii) the creditor was advancing new money. These cases are not a pre-packaged bankruptcy and the Motion does not seek relief with respect to a restructuring support agreement. With a restructuring support agreement, the party whose fees are being paid agrees to support a specific plan of reorganization. Thus, obligations remain on both sides of the agreement, which renders the agreement executory and amenable to assumption. Additionally, the Ad Hoc Committee is an **unsecured** creditor group. Here, the Debtors are asking permission to pay the fees of an unsecured creditor who is merely participating in the process of formulating a plan, who has no obligations under the Reimbursement

10

Agreement itself, and who is not obligated to support a specific plan. For these reasons, the Debtors' cases are entirely inapposite.

17. For instance, the Debtors cite to *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 461–62 (Bankr. S.D.N.Y. 2014) in support of the Motion. However, *Genco Shipping* involved a pre-packaged bankruptcy proceeding in which the parties had already negotiated a full plan of reorganization. *Id.* Additionally, the *Genco* case involved the debtor paying the fees of its *secured* lenders. *Id.* at 460. The *Genco* case does not support the contention that a debtor may assume an "executory contract" that seeks to pay the fees of (i) wholly unsecured creditors, (ii) who are not required to support a specific plan.

18. Likewise, the Debtors cite to the *Hercules Offshore* case from the District of Delaware, *In re Hercules Offshore, Inc.*, Case No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [Dkt. No. 95], for the contention that the *Hercules Offshore* court approved the payment of unsecured creditors' fees. This is incorrect. The motion in *Hercules Offshore* involved the question of whether parties providing exit financing to the debtor would be permitted to have their fees paid. *See Id.* [Dkt. No. 53 at ¶ 14].[10] As with *Genco*, the Debtors' citation to *Hercules Offshore* does not advance the contention the Debtors represent it does.

19. The *Dendreon* case is a case where an unsecured bondholder was authorized to have its fees paid—but only in the context where that bondholder agreed to vote in favor of confirmation of the plan. *Dendreon* was a pre-packaged bankruptcy proceeding. *See In re Dendreon Corp.*, Case No. 14-15215 (PJW) (Bankr. D. Del. Dec. 23, 2014) [Dkt. No. 215]. The

---

[10] Equally important is that the *Hercules Offshore* plan proposed to pay all unsecured creditors at 100%—essentially restating their pre-bankruptcy claims and leaving them entirely unimpaired. There is a virtually nil chance of such an outcome here.

11

same is true with *Rural/Metro* (pre-packaged bankruptcy proceeding), *William Lyon Homes* (pre-packaged bankruptcy proceeding), and *NII Holdings, Inc.*[11] (fee payment provision in plan). All of these cases involve the existence of an agreement between a debtor and a creditor group in which the parties have agreed to propose and support a plan of reorganization. None of these cases are relevant here.

20. The *Edison Mission Energy* case cited by the Debtors involved a "Transaction Support Agreement" that was tantamount to a pre-packaged bankruptcy plan and enjoyed the support of the largest creditor class. Further, the debtor's motion in *Edison Mission Energy* was unopposed, meaning that the *Edison Mission Energy* court did not have the full opportunity to test the permissibility of the relief sought in a contested hearing. The result in *Edison Mission Energy* is not consistent with the current law in the Southern District of New York. Moreover, the decision in *Edison Mission Energy* was an order without a supporting opinion, and it does not appear that any court has cited to that order, no less one in the Southern District of New York.

21. This is not a case where (i) a secured creditor is proposing to vote in favor of a plan along certain terms in a plan support agreement or restructuring support agreement, (ii) the fees proposed to be paid will be paid on behalf of a majority of creditors towards work that bears a substantial certainty of resolving this case, or (iii) the creditor whose fees are proposed to be paid is advancing new money. This case is not remotely like any of the cases cited in the Motion. This is a case where a wholly unsecured creditor group wants to have its fees paid for agreeing to participate in the case. Not only do the cases the Debtors cite not support granting such a request, the Debtors ignore the relevant cases that make it clear that such a request is impermissible under

---

[11] The citation to the transcript for *NII Holding, Inc.* was to the confirmation hearing, not a motion under 11 U.S.C. §§ 365 and/or 363. Most importantly, the Debtors take the exchange out of context—Judge Chapman was issuing a hypothetical as to whether a post-petition plan support agreement could provide for the payment of fees.

12

the Bankruptcy Code, as set forth below.

## II. The Agreement To Pay Fees Is Not Authorized By The Bankruptcy Code

22. The Debtors seek to have an unsecured creditor group gain what is in effect a *de facto* administrative superpriority claim. The Bankruptcy Code contains provisions for the retention and payment of professionals, whether under Section 327 (retention of professionals that do not hold or represent an interest adverse to the estate and are disinterested), 328 (retention of professionals on reasonable terms and conditions), or 503(b) (substantial contribution). The Debtors' Motion ignores all of these provisions. As the Supreme Court has made clear, in interpreting statutes, the specific governs above the general. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, 132 S. Ct. 2065, 2071 (2012). Here, the Debtors seek to ignore the specific rules (those governing the retention and payment of professionals) in favor of the general (the business judgment rule). The Debtors are prohibited from doing this.

23. The Debtors cite to the Fifth Circuit's *ASARCO* case in support of the Motion. *In re ASARCO, L.L.C.*, 650 F.3d 593, 598 (5th Cir. 2011). *ASARCO* involved the question of whether Section 363 applied to the reimbursement of due diligence costs incurred by bidders in the second round of a multi-round auction for a particular asset of the bankruptcy estate—a judgment against a third party. *Id.* The crux of *ASARCO* is that the party who received the fees was being reimbursed for a specific, concrete task—valuing an asset of the bankruptcy estate. Irrespective of whether the bidder was successful or not, its due diligence provided a material, concrete, and specific benefit to the estate. Here, the Debtors allege that 363 is the proper vehicle to support paying a particular group of unsecured creditors under a Reimbursement Agreement (i) that contains no obligations on the part of the Ad Hoc Committee, and (ii) where any material, concrete or specific benefit to the estates will not be known for some time. This is far different from what the Fifth Circuit allowed for in *ASARCO*.

24. Additionally, the Debtors rely on Section 105 of the Bankruptcy Code to support the Motion. However, the Supreme Court has narrowly construed the use of the Bankruptcy Court's equitable powers set forth in Section 105 of the Bankruptcy Code. *Northwest Bank Worthington Inc. v. Ahlers*, 485 U.S. 197, 206, 108 S. Ct. 963, 969 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"). Moreover, Section 105(a) must be exercised in a manner that is consistent with the Bankruptcy Code. *Law v. Siegel*, 571 U.S. 415, 421, 134 S. Ct. 1188, 1194 (2014). Section 105 should be used to supplement other provisions of the Bankruptcy Code, not contravene them. *See In the Matter of Fesco Plastics Corp., Inc.*, 996 F.2d 152, 154-155 (7th Cir. 1993) ("when a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code").

25. The *Lehman Brothers* case is instructive. *In re Lehman Bros.*, 508 B.R. 283 (S.D.N.Y. 2014). In *Lehman Brothers*, the debtor proposed a plan that would have paid the fees of certain individual members of the official creditors' committee as an administrative expense. None of the creditors objected, but the United States Trustee filed an objection. The bankruptcy court confirmed the plan and separately approved the payment of fees. The United States Trustee appealed, and the district court reversed the bankruptcy court, holding in no uncertain terms that there was one way, and one way only, for fees to be paid as administrative expenses—through Section 503(b). *Id.* at 290 (describing 503(b) as "the sole source of administrative expenses."). While the *Lehman Brothers* case involved payments under a plan rather than the assumption of an executory contract, the same principle holds true in this case. What the Debtors propose is to pay the Ad Hoc Committee's fees as an administrative expense. This may be done through Section 503(b) of the Bankruptcy Code, which provides that the fees and expenses may only be paid if

14

19-23649-shl    Doc 454    Filed 11/12/19    Entered 11/12/19 15:49:26    Main Document
Pg 15 of 20

there has been a "substantial contribution" made to the cases. The Debtors seek to put the cart well ahead of the horse by paying these fees prior to any showing of a substantial contribution.

26. This is not the first time a debtor in a bankruptcy case has tried to have pre-petition professional fees paid through the vehicle of a Section 365 motion. *See In re Financial News Network, Inc.*, 134 B.R. 732, 735 (S.D.N.Y. 1991). In the *Financial News* case, the debtor attempted to pay its own attorneys for pre-petition work through the assumption of a pre-petition contract. The Bankruptcy Court rejected the debtor's attempt to pay fees via the assumption of an executory contract. *Id.* The analysis in *Financial News Network* is directly relevant to the issues here:

> Clearly, the Code's drafters intended that payment of the debtor's professionals would be governed solely by § 327 and its related compensation provisions. *Cf. In re First Federal Corp.*, 43 B.R. 388 (Bankr. W.D. Va. 1984)…Gibson, Dunn seeks to side step these provisions (and their requirements) through the assumption of the FNN Media Agreement…In cases where retention of a professional person holding a claim is approved, courts have consistently declined to authorize payment of prepetition claims. Given the express language of the Code and the case law, Congress could have not intended for retained professionals to look to § 365 as a vehicle for payment of prepetition fees.
>
> Moreover, allowance of attorneys fees through assumption of an employment agreement rather than through the procedures adopted by the Code places unnecessary constraints on the court's ability to evaluate the reasonableness of the fee request. Section 328 gives the court broad discretion to allow or disallow counsel fees notwithstanding the terms and conditions of the employment agreement. In fact, a bankruptcy court may totally disregard an employment agreement where necessary and award compensation more appropriate under the individual circumstances of the case. *In re Port Royal Land & Timber Co.*, 105 B.R. 72 (Bankr. S.D. Ala.1989). Generally, the court does not have the same latitude in the context of an assumption motion. To leave a court solely with the decision to approve or disapprove the assumption of the employment agreement is wholly at odds with the court's duty to evaluate the reasonableness of every fee request. *Cf. In re Chas. A. Stevens & Co.*, 109 B.R. 853, 854 (Bankr. N.D. Ill. 1990); *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D. La.1986) (even if no

>    objections are raised the court has a duty to independently examine the reasonableness of the fees)...."

*Id.* at 734–35.

27.    The Debtors cannot side-step the requirements of the Bankruptcy Code, to the detriment of the other parties in these cases, just because it suits them. The Debtors state in the Motion that they entered into the Reimbursement Agreement on September 15, 2019, the **very day** they filed these cases, meaning that just one day prior to the bankruptcy filing, the Debtors had no legal obligation to pay the professional fees and expenses of the Ad Hoc Committee. If the Ad Hoc Committee or any of its members can assert a legal right to reimbursement of their professional fees under applicable non-bankruptcy law, they may add those fees to their claims pursuant to the Supreme Court's decision in *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007). Alternatively, the Debtors can seek to retain the Ad Hoc Committee's professionals pursuant to Sections 327 or 328 of the Bankruptcy Code. Or, at the conclusion of these cases, the Ad Hoc Committee may file an application with the Court seeking payment of the fees and expenses of its professionals as an administrative expense claim under Section 503(b) of the Bankruptcy Code for making a substantial contribution to these cases.

### III.    **If The Court Determines The Business Judgement Rule Applies, The Debtors Have Not Provided Any Evidence To Support Their Decision**

28.    Even if the Court evaluates the relief requested by the Debtors under the business judgment rule, a party must show that "the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1993), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted). Here, the Debtors only show their business decision, they do not provide anywhere near the quantum of

evidence necessary to show that paying the fees and expenses of the Ad Hoc Committee's professionals is a disinterested decision, made with due care, in good faith, and not an abuse of discretion or waste of corporate assets.

29.    A debtor "must support the motion with evidence – usually in the form of a declaration or affidavit – demonstrating that [assumption] of the contract falls within the proper exercise of the [debtors] business judgment." *In re MF Global Holdings Ltd.*, 466 B.R. 239, 242. Even if the Debtors do submit evidence in the form of an affidavit or declaration in support of the Motion, which, to date, they have not, they cannot show that their decision to pay the fees and expenses of the Ad Hoc Committee will benefit the estates. In fact, the decision to pay such fees and expenses is extremely risky for the estates as (i) there is no guarantee the Ad Hoc Committee will ultimately agree to support any settlement that differs from the framework they negotiated with the Debtors, and (ii) members of the Ad Hoc Committee can withdraw from the group, thus rendering the Ad Hoc Committee less significant in these cases, yet the Debtors would still be authorized to pay the fees and expenses of its professionals.

30.    In addition, as noted in the Settlement Term Sheet, the Debtors have a "fiduciary out," which further demonstrates that the Settlement Framework is a work in progress. Moreover, there are many conditions in the Settlement Term Sheet that may not be fulfilled. *See* Settlement Term Sheet at: ¶ 6 (condition precedent described therein regarding allocation of funds); ¶8 (allocation of funds requires Shareholder approval); ¶ 10 (United States Department of Justice approval of all potential federal liability arising from or related to opioid-related activities and if not accomplished, Ad Hoc Committee can terminate the settlement on 30 days' notice); ¶¶ 11 and 17 (approval of restructuring support agreement required within 120 days of certain dates, which includes a fiduciary out for the Debtors); ¶ 12 (if Shareholders do not provide diligence on IAC's,

17

the Ad Hoc Committee can terminate the stay period, essentially putting an end to the Settlement Framework); and ¶ 15 (negotiation of a plan and disclosure statement required within 270 days of the stay date).

31. Presumably, the members of the Ad Hoc Committee entered into the current Settlement Framework because they believed it to be in their own best interests and they will only support a settlement they deem to be in their best interests. It strains credulity that the members of the Ad Hoc Committee would abandon the current settlement framework if the fees and expenses of their professionals are not paid, especially when the members of the Ad Hoc Committee are states with billions of dollars in tax revenue, which includes years of tax revenue received from the Debtors operating in their states. Conversely, it is equally unlikely that the members of the Ad Hoc Committee would vote in favor of a plan not in their best interests just because their fees and expenses are paid.

**IV.    The Bankruptcy Code Does Not Provide For The Payment Of Fees of Creditors Solely Because They Are Ineligible To Sit On A Statutory Creditors' Committee And It Would Be Inequitable to Allow It**

32. Nowhere in the Code is it contemplated that certain unsecured creditors may be paid by an estate solely because they are ineligible to sit on a statutory creditors' committee. If allowed, the Debtors could receive requests for the payment of professional fees and expenses on a monthly basis throughout the cases from the Ad Hoc Committee of Non-Consenting States, the Multi-State Governmental Entities Group, and the tribes, as well, since their members too are ineligible to be appointed to a statutory creditors' committee according to the United States Trustee. The estates' financial support of certain groups of unsecured creditors over others, and the potential payment of multiple unsecured creditor groups' fees and expenses, could have dramatic ramifications in these cases, including, directly, substantially, and detrimentally impacting the individual victims.

33. Of additional concern to the Ad Hoc Group of Individual Victims is paragraph 4 of the order proposed in connection with the Motion which provides that:

> The Debtors are authorized to enter into amendments to the Reimbursement Agreement, from time to time as necessary, subject to the terms and conditions in the Reimbursement Agreement and without further order of the Court.

Proposed Order at ¶4.

34. Thus, not only is there no Court review of the fees and expenses proposed to be reimbursed by the Debtors, but the Debtors can make any changes they wish to the Reimbursement Agreement, including adding additional professionals (*See* Reimbursement Agreement at p. 2.) or additional expenditures, in general, after this Court rules on the Motion, without any Court review.

## CONCLUSION

35. The Debtors are requesting to make presumably large expenditures from the estates in violation of the clear and specific provisions of the Bankruptcy Code and relevant caselaw. The not insignificant funds should instead be preserved for the benefit of the Debtors' estates, including for the individual victims who have suffered tremendously at the hands of the Debtors. **The millions of dollars proposed to be paid to attorneys and other professionals for the Ad Hoc Committee could be used to save thousands of lives**. If the Debtors truly want to show the world that they intend to right the wrongs they have committed, they should not disadvantage the individual victims they have so egregiously harmed. Like every other unsecured creditor/group, the Ad Hoc Committee will have an opportunity at the end of these cases to show that through their efforts, from beginning to end, they made a substantial contribution to these cases and ask for their fees to be paid at that time. Accordingly, the Court should deny the Motion in its entirety.

WHEREFORE, the Ad Hoc Group of Individual Victims respectfully requests that the Court (i) sustain this Objection; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: November 12, 2019
      New York, New York

ASK LLP

By: /s/ *Edward E. Neiger*
Edward E. Neiger, Esq.
Jennifer A. Christian, Esq.
151 West 46th Street, 4th floor
New York, New York 10036
Tel.: (212) 267-7342
Fax: (212) 918-3427
Email: eneiger@askllp.com
       jchristian@askllp.com

*Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*