**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Sara L. Brauner
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002

*Proposed Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 19-23649 (RDD) |
| PURDUE PHARMA L.P., *et al.*,[1] | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF PURDUE PHARMA L.P.,** *ET AL.* **TO DEBTORS' MOTION TO ASSUME**
**THE PREPETITION REIMBURSEMENT AGREEMENT WITH THE**
**AD HOC COMMITTEE, AND TO PAY THE FEES AND EXPENSES**
**OF THE AD HOC COMMITTEE'S PROFESSIONAL**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

The Official Committee of Unsecured Creditors (the "**Official Committee**") of Purdue Pharma L.P., *et al.* (collectively, the "**Debtors**") by and through its counsel, hereby submits this objection (the "**Objection**") to the *Debtors' Motion To Assume the Prepetition Reimbursement Agreement with the Ad Hoc Committee and To Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [ECF No. 394] (the "**Motion**"). In support of its Objection, the Official Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1. From the outset of these cases, the Official Committee has made its objectives clear: maximize the estates' value, determine a fair allocation, and promptly seek to address the urgent public health and safety issues arising from the opioid crisis.

2. In that regard, the Official Committee has worked tirelessly with all parties in interest to understand their views and positions on all of the issues of importance to them and these chapter 11 cases, and will continue to do so. At the same time, the Official Committee continues to work with the Debtors—each in their fiduciary capacity—to achieve their shared goals. The Official Committee and all of its members, thus far, have carried out their mandate with alacrity, and will do so for the duration of these cases. The Official Committee also is cognizant of—and indeed appreciates—the role that each of the creditors and ad hoc groups of creditors that have formed to date (and that may form in the future) will play in these cases. The Official Committee submits, however, that the Court should deny the Debtors' request to use estate property to pay, on a current basis, the professional fees of just one such group—the so-called consenting ad hoc committee (the "**CAHC**").

3. As a preliminary matter, the Debtors misstate the standard governing their application. The "business judgment rule" identified by the Debtors is not deferential like the

1

standard of the same name used to assess corporate decision-making under state law.  As this Court has explained, a bankruptcy court does not simply defer to a debtor's business judgment with respect to an act proposed under sections 363 or 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), and objecting parties are not required to show the debtor's request for approval of the act is made in bad faith.  Instead, the bankruptcy court must exercise—and potentially substitute—its own business judgment in passing on a path proposed by a debtor.  The court specifically must determine whether the evidence submitted by the debtor establishes that the proposed action is in the best interests of the estates, and the debtor retains the burden of proof at all times.

4.      With the governing standard clarified, it is plain that the Motion fails.  The Debtors have submitted no evidence in support of their Motion of any kind, and paying fees and expenses of seven (7) different professional firms hired by the non-fiduciary CAHC manifestly is not in the best interests of the estates.  Courts sometimes permit payment of professional fees for non-estate fiduciaries outside of a "substantial contribution" motion under Bankruptcy Code section 503(b).  However, virtually all such cases involve contribution by the non-estate fiduciary of new money to the estate, or a binding restructuring support agreement or pre-packaged plan enjoying broad consensus among major parties in interest that is likely to lead to a rapid exit from bankruptcy.  Here, in contrast, the CAHC has signed nothing—other than their own fee payment letter—and is in no way bound to the so-called "settlement framework" that the Debtors have sketched out in their October 8, 2019 term sheet.  As the Debtors have noted as recently as November 6, the framework is not yet "a real deal," and "no one has yet signed on," and the CAHC and its members can walk away from it at any time.

5.    Counsel for the CAHC candidly has admitted that its members lack sufficient information to assess the merits of the settlement framework, and plan to undertake significant diligence in the coming weeks and months to determine whether it ever could yield a confirmable plan.  The Official Committee encourages the CAHC and other creditors to undertake whatever analysis and activity they deem appropriate based on their own priorities and interests as non-fiduciaries in these cases.  It would not be fair, however, for the estates to pay the uncapped, and potentially massive diligence expenses of the CAHC members so they can decide *whether* to support a deal that the Debtors *might* one day propose relating to the Settlement Framework.  This is particularly so given that, as currently drafted, the Fee Letter (as defined herein) would also require the estates to pay fees of CAHC members in connection with negotiating allocation of estate property *against* other creditors.  Notably, each of the four proposed law firms for the CAHC also represents individual clients in these cases and the opioid litigation, ███████████ ██████████████████████████████████████████████████████████████ ██████████████████████    Absent the consent of all interested parties, there is no precedent for paying non-fiduciary professional fees under these circumstances.

6.    The claimants represented by the CAHC also appear to be far fewer than has sometimes been suggested.  According to the CAHC's verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")[2]—the membership of CAHC consists of 10 states, six governmental sub-units, one tribe, and a plaintiffs executive committee (the "**PEC**") which itself consists of a number of lawyers in the multi-district opioid litigation pending in the Northern District of Ohio (the "**MDL**").[3]  While the PEC has an important

---

[2] *See* Verified Statement Pursuant to Bankruptcy Rule 2019 [ECF No. 279] (the "**CAHC 2019 Statement**").

[3] *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio).

3

role in the MDL, the PEC itself is not a creditor in these cases, and no evidence has been offered

to establish which claimants, if any, the PEC is authorized to bind in these cases.  Collectively, the

other members of the CAHC represent a very tiny percentage of the 2,700 filed claims.  According

to the CAHC 2019 Statement, its members negotiated prepetition on behalf of a larger group of

creditors, but the statement does not specifically identify any of those creditors.  Certainly, none

are themselves members of the CAHC, ███████████████████████████████████

███████████.[4]  In short, there is simply no evidence that the CAHC represents anyone but 17

creditors and the PEC.

7.    Notably, at least seven other groups of creditors have organized informally to work

together in these cases or appeared with consolidated counsel.  All of these other ad hoc committees

or creditor collectives undoubtedly believe that they too will contribute to the success of these

cases, but none has asked the estates to pay their expenses.  Nor should they, at least at this early

stage.  In the meantime, it is black letter law that their interests—like those of all other unsecured

creditors—are represented by the Official Committee as their statutory fiduciary.  Indeed, the

Official Committee has made clear on multiple occasions its commitment to discharging those

duties faithfully and in full.  In addition, *ex officio* members have been added to the Official

Committee that represent more than 1,200 local governments, more than 40 Native American tribes

and the State of Maryland.[5]

8.    Significantly, the CAHC is capable of bearing its own fees, and amply motivated

to do so if the Motion is denied.  The Debtors note that some of the CAHC members are states,

and suggest (again without evidence) that the CAHC therefore will struggle to pay professional

---

[4] In contrast, all 24 "dissenting" states and the District of Columbia are actual members of the non-consenting ad hoc committee (the "**Non-Consenting Ad Hoc Committee**").

[5] The State of Maryland has joined the Official Committee as an *ex officio* member as of November 12, 2019.

4

fees.  But the Non-Consenting Ad Hoc Committee is made up of 24 states and the District of Columbia alone, and its membership is paying its own professional fees.  Furthermore, these cases present enormous financial stakes for the lawyers, states and other governmental entities that are members of the CAHC; indeed, the states alone claim to be entitled to recover billions of dollars. The notion that these parties will disband or meaningfully reduce their participation in these cases if the estates do not pay their professional fees is implausible, and wholly unsupported by evidence.

9.      For the avoidance of doubt, the Official Committee welcomes participation by the CAHC and its members in these cases, and hopes and expects that they will do so productively and meaningfully.  However, like all other non-estate fiduciaries, the CAHC should be required to bear its own costs in doing so, at least until these cases have advanced to a stage where payment of professional fees for unsecured creditors might be justified.  The Motion should be denied.

## BACKGROUND

10.     The Debtors are pharmaceutical companies that manufacture and sell, among other products, opioid pain medications.  As a result of the Debtors' alleged role in the ongoing opioid crisis in the United States, the Debtors have been named in more than 2,700 lawsuits filed through the state and federal court systems.  *See* Mot. ¶ 2.

11.     On the September 15, 2019 Petition Date, and continuing thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On the same day, the CAHC, an ad hoc committee of governmental and other contingent litigation claimants was formed.  *See* CAHC 2019 Statement ¶ 1.  The CAHC has 18 members—10 states, six local governments, one Native American tribe, and the PEC appointed by Judge Polster in the MDL. *Id*. Ex. A; *see also* Preis Decl. Ex. B (Bylaws) at Ex. A.

12.     The PEC[6] is a team of 16 plaintiffs' lawyers who have been assigned to "assist and advise" three "lead counsel" in "coordinating and conducting pre-trial proceedings" in the Ohio MDL.[7]  No evidence has been presented that the PEC itself has any claims against the Debtors, or that the PEC or its representatives speak for any persons that have such claims on substantive matters in these cases, as opposed to procedural and administrative matters in the MDL.

13.     Also on September 15, 2019, the CAHC selected four law firms as legal counsel: Brown Rudnick LLP ("**Brown Rudnick**"), Gilbert, LLP ("**Gilbert**"), Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**"), and Otterbourg PC ("**Otterbourg**" and collectively, the "**Four Law Firms**").  *See* CAHC 2019 Statement ¶ 1; Mot. Ex. B at 1.  The CAHC subsequently retained a financial advisor and an economic consultant and have stated their intention to retain an investment banker in the future (collectively with the Four Law Firms, the "**Seven Ad Hoc Firms**").  Mot. Ex. B at 1.

14.     Each of the four proposed CAHC law firms also "represents one or more creditors or parties in interest in the Bankruptcy Cases and adversary proceedings, including [CAHC] Members in such members' independent capacities as creditors or parties-in-interest in the Chapter 11 Cases."  CAHC 2019 Statement  ¶ 1 n.1.[8]  More specifically, the Four Law Firms represent the following creditors:

---

[6] Nothing in this Objection should be construed or understood as an attack on the PEC, its members, or the job they are doing in the MDL.  Indeed, the PEC has an important role in the MDL and the Official Committee appreciates that.

[7] *See* Plaintiffs' Renewed Motion to Approve Co-Leads, Co-Liaisons and Executive Committee, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio) [MDL ECF No. 34] (the "**MDL Amended Leadership Motion**") at 10;  Order *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio) [MDL ECF No. 37] (granting MDL Amended Leadership Motion).

[8] The fact that each of the CAHC counsel simultaneously represent creditors in their individual capacities in these cases and otherwise in the opioid MDL was contained in a footnote in the CAHC 2019 Statement.  See CAHC 2019 Statement ¶ 1 n.1.  The identities of those creditors was not disclosed in the CAHC 2019 Statement, and were revealed only after several requests by the Official Committee.  See Preis Decl. Ex. A at 3-7.



| | |
|---|---|
| **Brown Rudnick**[9] | ■ |
| **Kramer Levin** | ■ |
| **Otterbourg**[10] | ■ |
| **Gilbert**[11] | ■ |

*See* Preis Decl. Ex. A at 8.

15. ████████████████████████████

████████████████████████████████████



---

[9] ████████████████████████████████ *See* Preis Decl. Ex. A at 3.

[10] ████████████████████████ *See* Preis Decl. Ex. A at 6.

[11] ████████████████████████████████ *Id.*

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████  *See id.*

16.    On September 15, 2019, the Debtors signed a letter agreement (the "**Fee Letter**")
pursuant to which the Debtors agreed to move to assume the Fee Letter and to try to cause the
Debtors' estates to pay the professional fees of the Seven Ad Hoc Firms.  Mot. ¶ 10; *id.* Ex. B.[12]

17.    On September 26, 2019, the United States Trustee for the Southern District of New
York appointed nine creditors to serve on the Official Committee to act as the fiduciary for all
unsecured creditors of the Debtors.  The Official Committee selected Akin Gump Strauss Hauer
& Feld LLP ("**Akin Gump**") to act as its proposed lead counsel, and Bayard P.A. as efficiency
counsel to undertake appropriate tasks at materially lower billing rates.  The Official Committee
also selected Province Inc. as its financial advisor, and Jefferies LLC as its investment banker.

18.    The members of the Official Committee, as selected by the U.S. Trustee, include
(1) Blue Cross and Blue Shield Association; (2) CVS Caremark Part D Services L.L.C. and
CaremarkPCS Health, L.L.C.; (3) Ryan Hampton; (4) Cheryl Juaire; (5) LTS Lohmann Therapy
Systems, Corp.; (6) Pension Benefit Guaranty Corporation; (7) Walter Lee Salmons; (8) Kara
Trainor; and (9) West Boca Medical Center and its affiliates.[13]

19.    Certain parties in interest expressed concerns about the absence from the Official
Committee of governmental units, despite the Official Committee's statutory role as fiduciary for
all creditors, both members and non-members alike.  The Official Committee has assured all
interested parties that the Official Committee and its professionals intend to discharge their
fiduciary and other duties to all creditors, including government claimants, enthusiastically and in

---

[12] The Fee Letter also leaves open the possibility of hiring more firms and provides that the CAHC may "select and
engage a FA Firm and an IB Firm in its discretion."  Mot. Ex. B at 3.

[13] *See* Verified Statement of the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al., Pursuant
to Bankruptcy Rule 2019 [ECF No. 218] (the "**Initial Official Committee 2019 Statement**").

full.[14]  In addition, although the criticism of its membership was misguided, the Official Committee

also agreed to place representatives of three separate governmental claimant groups on the Official

Committee on an *ex officio* basis.

20.     As a result of these three new *ex officio* members, the Official Committee now

includes representatives of numerous cities, counties and Native American tribes, as well as the

State of Maryland.  Specifically, the Official Committee added to its ranks (i) Cameron County,

Texas, the designee of a multi-state group comprising approximately 1,222 entities, including

1,172 cities, counties and other governmental entities, seven Native American tribal nations, six

hospital districts, 34 medical groups, two funds, and one veterans' class across 36 states (the

"**Multi-State Group**"), (ii) the Cheyenne & Arapaho tribes, designated by an ad hoc group of 38

tribes (the "**Tribal Ad Hoc Group**") that previously had sought recognition from the Court as a

separate statutory committee[15] and (iii) the State of Maryland.[16]

21.     On October 8, 2019, the Debtors filed a notice of a settlement term sheet (the

"**Summary Term Sheet**") between the Debtors, the CAHC, and certain trusts and other entities

associated with the Sackler Family (together, the "**Sackler Parties**").  *See* Notice of Filing of Term

Sheet with Ad Hoc Committee [ECF No. 257]; *see also* Mot. ¶ 11.  The Debtors assert that the

Summary Term Sheet describes a potential framework for settlement (the "**Settlement**

**Framework**"), Mot. ¶ 12, but acknowledge that it is unsigned, that the Debtors have not yet

---

[14] *See, e.g.*, Initial Official Committee 2019 Statement ¶ 5; Amended Verified Statement of the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 2019 [ECF No. 414] (the "**Amended Official Committee 2019 Statement**") ¶ 5; Hr'g Tr. at 29:11-25 (Oct. 10, 2019).

[15] *See* Motion Seeking Appointment of an Official Committee of Native American and Native American Affiliated Creditors [ECF No. 276].  Based on the Official Committee's agreement to provide *ex officio* status on the Official Committee, the tribes have since withdrawn their motion. *See* Notice of Withdrawal of Motion Seeking Appointment of an Official Committee of Native American and Native American Affiliated Creditors [ECF No. 449].

[16] The Official Committee will file a further amended verified statement pursuant to Bankruptcy Rule 2019 reflecting these new members.

concluded that reorganizing based on the Settlement Framework would be in the best interests of the estates, and that the Summary Term Sheet may never mature into a "real deal."    Hr'g Tr. at 72:7-73:14 (Nov. 6, 2019).

22.    A group consisting of 24 states and the District of Columbia, who do not support the Summary Term Sheet, formed the Non-Consenting Ad Hoc Committee.  The Non-Consenting Ad Hoc Committee, represented by a single law firm, filed a verified statement pursuant to Bankruptcy Rule 2019 on October 11, 2019.[17]  The Debtors have not asked to pay any professional fees of the Non-Consenting Ad Hoc Committee.

23.    On October 21, 2019, approximately 30 individuals and entities in their respective individual and putative capacities as proposed representatives of classes of privately insured parties (the "**Ratepayer Ad Hoc Committee**") filed a verified statement pursuant to Bankruptcy Rule 2019.[18]  The Debtors have not asked to pay any professional fees of the Ratepayer Ad Hoc Committee.

24.    On October 22, 2019, an ad hoc committee of neonatal abstinence syndrome ("**NAS**") babies (the "**NAS Ad Hoc Committee**") filed a verified statement pursuant to Bankruptcy Rule 2019.[19]  The NAS Ad Hoc Committee includes members who are individual babies (and/or guardians of such babies) who were born opioid dependent because their mothers either were prescribed opioids during pregnancy or obtained opioids on the diversionary market, and a claim for all babies born in the United States between 2001 and 2019 who were diagnosed

---

[17] *See* Verified Statement of the Ad Hoc Group of Non-Consenting States Pursuant to Bankruptcy Rule 2019 [ECF No. 296] (the "**Non-Consenting Ad Hoc Group 2019 Statement**").

[18] *See* Amended Verified Statement of Stevens & Lee, P.C., Pursuant to Rule 2019 [ECF No. 333].

[19] *See* Verified Statement of the Ad Hoc Committee of NAS Babies Pursuant to Federal Rule of Bankruptcy Procedure 2019 [ECF No. 341].

with NAS syndrome or otherwise born with opioid dependent symptoms.  The Debtors have not

asked to pay any professional fees of the NAS Ad Hoc Committee.

25.    In October 2019, a group of eight individual victims of the Debtors formed an ad

hoc group (the "**PI Plaintiffs Ad Hoc Group**") and filed a verified statement pursuant to

Bankruptcy Rule 2019 on October 25, 2019.[20]  The Debtors have not asked to pay any professional

fees for the PI Plaintiffs Ad Hoc Group.

26.    On October 30, 2019, the Multi-State Group of approximately 1,222 entities with

claims against the Debtors, including cities, counties, and governmental entities, tribal nations,

hospital districts, medical groups, funds, and a veterans' class action filed a verified statement

pursuant to Bankruptcy Rule 2019.[21]  The Debtors have not asked to pay any professional fees of

the Multi-State Group.

27.    On October 29, 2019, the Debtors filed the Motion.

### DISCUSSION

I.    **Payment of the Ad Hoc Committee's Fees Under These**
      **Circumstances Is Contrary to the Bankruptcy Code and Settled Law**

28.    As discussed in Section II, below, the Debtors have not carried their burden of

proving that the relief sought in their Motion is in the best interests of the estates.  Significantly,

moreover, their request to pay the Seven Ad Hoc Firms now is contrary to the fundamental aspects

of the Bankruptcy Code, and would be unprecedented at this point in the proceedings, based on

the unsigned, non-binding Summary Term Sheet.

---

[20] *See* Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P. et al., Pursuant to Bankruptcy Rule 2019 [ECF No. 348] ¶¶ 1, 3.
[21] *See* Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure [ECF No. 409] ¶ 1.

### a. The Ad Hoc Members Are Ordinary Creditors And Must Bear Their Own Costs, Despite Their Lack of Formal Committee Membership

29.    Estate fiduciaries like the Official Committee generally are the only parties in interest entitled to have their professional fees reimbursed under the Bankruptcy Code. *See* 11 U.S.C. §§ 503(b)(2), 1103(a) & 330(a)(1). That is because official committees and their members are fiduciaries for all creditors, while creditors like the members of the CAHC generally owe duties to no one but themselves—███████████████████████████████████████ ███████████████████████[22]    Hence, even creditors with large claims are expected, and usually are sufficiently motivated, to bear their own costs of participating in a bankruptcy. *In re Grasso*, 519 B.R. 137, 140 (Bankr. E.D. Pa. 2014) (citing *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 294 (S.D.N.Y. 2014)). Exceptions exist, such as where a creditor can prove, usually at the end of a case, that it made a "substantial contribution," *see* 11 U.S.C. § 503(b)(3)(D); alternatively, payment of a non-estate fiduciary's fees outside the context of a substantial contribution motion requires facts that simply are not presented here.

30.    Nevertheless, the Debtors argue that their Motion should be granted (at least in part) because the "governmental units" that are members of the CAHC are excluded from formal membership in the Official Committee. Mot. ¶ 4 (arguing that CAHC fees should be paid because, among other reasons, its members "may be ineligible to sit on a statutory committee"). While the Official Committee welcomes the participation in these cases of various ad hoc groups, including the CAHC, and further believes that each ad hoc group has an important role to play in these cases, the fact that governmental units are excluded from actual membership on the Official Committee in no way ***required*** formation of the CAHC, and certainly does not warrant payment of the CAHC's professional fees by the estates.

---

[22] It is interesting to note that the CAHC and its members did not choose an independent firm to represent them.

12

31.    Critically, the interests of the CAHC's members already are represented in these cases by their statutory fiduciary—the Official Committee.  "It is well settled that statutory unsecured creditors committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case."  *In re Residential Capital, LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012).  Indeed, it is this core obligation to ***all creditors*** that justifies payment of professional fees for official committees in the first place.  As the Debtors acknowledge, "there are hundreds if not thousands of claimants who are not on the Official Committee," including other states and municipalities and private litigants who have organized into their own ad hoc groups, but the Debtors do not seek to pay the expenses of any of those creditors on a current basis.  Mot. ¶ 4 n.3.

32.    Nor should they.  The Official Committee has repeatedly made clear its ability and commitment to discharging its fiduciary duties to all creditors, including the members of the CAHC.[23]  In addition, as noted above, the Official Committee also now includes representatives of more than 1,200 local government and other claimants spread across 34 states, more than 40 Native American Tribes, and the State of Maryland as *ex officio* members.  Collectively, these *ex officio* members represent the interests of more than ***66 million individuals***.  The Official Committee can and will consider all viewpoints in discharging its duties to its creditor constituency, including both private and government litigants.[24]

---

[23] *See, e.g.* Hr'g Tr. at 29:11-25 (Oct. 10, 2019); Initial Official Committee 2019 Statement ¶ 5; Amended Official Committee 2019 Statement.

[24] The Official Committee also has reminded the Non-Consenting Ad Hoc Committee, the CAHC and others that their members and their counsel—like all unsecured creditors—are welcome and encouraged to reach out to the Official Committee's financial advisor, investment banker, and legal counsel concerning these cases.  *See* Preis Decl. Exs. E and F (emails from A. Preis to attorneys general of New York and Massachusetts, to counsel to the Non-Consenting Ad Hoc Committee, and to counsel to the CAHC).

### b. The Debtors' Bid To Pay The Seven Ad Hoc Firms Is Unprecedented

33.    As noted, many courts have authorized payment of professional fees of non-estate fiduciaries under Bankruptcy Code sections 363 and 365.  However, those decisions typically are limited to situations where, unlike here, the proposed payment is pursuant to a binding restructuring support agreement ("**RSA**") and/or in connection with providing new money financing to the debtor.  *See* Appendix A.  Agreement on a true RSA can be a significant milestone in a case, and may result in a dramatically accelerated exit from bankruptcy.  That is because an RSA ordinarily commits key stakeholders in a case to binding provisions that will directly lead to consummation of a plan of reorganization and prompt exit from bankruptcy, thus resulting in huge savings to the estates.[25]

34.    The unsigned Summary Term Sheet at issue here is unlike a binding RSA, and does not warrant the relief sought by the Motion.  During a recent hearing in these cases, the Debtors' counsel again made clear that the Summary Term Sheet does not represent "a real deal," and binds no one:

> As the Court knows well, we have an ***unsigned term sheet*** that we believe is a productive framework. And as I made clear in spades, in technicolor at the prior hearings, ***we're not getting to future gates in this case unless we have a real deal*** that we believe as fiduciaries is the appropriate one. And frankly, that's also to some extent,  and I'm going to potentially dig the hornet's nest just for a second, even that consenting states and objecting states, ***no one has yet signed on any particular final outcome of this case***.

---

[25] Akin Gump acknowledges that his been involved in cases where unsecured creditors and ad hoc groups have received payment of their fees and expenses outside of Section 503(b) motions. In those cases, however, the non-estate fiduciary: (a) had executed an RSA or similar agreement; (b) provided new financing, whether through DIP Financing, Exit Financing, equity financing, or otherwise, and/or (c) included secured creditors. *See, e.g., In re Genco Shipping & Trading Limited*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. May 16, 2014) [ECF No. 187] (unsecured creditor group agreed to backstop portion of rights offering pursuant to binding RSA that formed basis of prepackaged plan); *In re Hercules Offshore, Inc.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [ECF No. 95] (noteholder group subject to binding RSA that formed basis of prepackaged plan); *In re NII Holdings Inc.*, No. 14-12611 (SCC) (Bankr. S.D.N.Y Mar. 24, 2015) [ECF No. 590] (unsecured noteholders provided $350 million bridge loan DIP facility pursuant to plan adopting post-petition RSA). Plainly, and as discussed below, these cases present dramatically different facts than those at issue here.

> With respect to the transaction we have rows and rows and rows to
> hoe *before anybody, certainly the debtors as fiduciary and the UCC
> as fiduciary is actually ready to see to execution documents* …   I
> just don't want anyone to dig in on we're the objectors and we're
> the supporters. *This is a very fluid situation* ….

Hr'g Tr. at 72:7-73:14 (Nov. 6, 2019) (emphasis added).

35.     The Debtors rely on *In re Genco Shipping & Trading Ltd.*, a case that illustrates the

kind of circumstances where reimbursement outside of the context of a 503(b) motion sometimes

is warranted, and that are entirely absent here.  Mot. ¶ 19.  The *Genco* debtors had entered into an

RSA prepetition.  The RSA "form[ed] the basis of the Debtors' prepackaged plan of reorganization

by providing for a global resolution of this bankruptcy."  509 B.R. at 459.  The RSA directly bound

nearly 100% of the holders of secured debt and at least 82% of the unsecured noteholders, and

rendered general unsecured debt unimpaired.  Only a handful of equity holders objected, arguing

that the RSA had to be evaluated under Bankruptcy Code section 363 rather than section 365 and

that the termination fee included in the RSA—payable only if the debtor exercised its "fiduciary

out"—was too large.   Judge Lane disagreed.  *Id*. at 463-64.  As such, the *Genco* RSA represented

a binding commitment by virtually all funded secured and unsecured creditors, provided the

debtors with access to cash collateral and $100 million in new money through a backstopped rights

offering, resolved the claims of more than $1 billion in secured debt, reinstated general unsecured

claims for payment in full, and even provided a small recovery to equity.  *Id*. at 460-61.  In short,

the *Genco* RSA resolved on a consensual basis the claims of all creditors, and obviated the expense

that would accompany a "traditional free fall" bankruptcy.  *Id.* at 468.

36.    In contrast, the Summary Term Sheet is unsigned and imposes only one clear obligation—it requires the Debtors to bring this Motion to pay the Seven Ad Hoc Firms.[26]  For its part, the CAHC has admitted it does not know whether the Settlement Framework is viable or desirable, and plans only now to "learn[] the important information necessary to satisfy ourselves" that the Settlement Framework "can lead to a confirmable solution," but can walk away at any time.  Hr'g Tr. 43:9-25 (Oct. 10, 2019).

██████████████████████████████████████████

██████████████████████████████████

Preis Decl. Ex. B (Bylaws) § 1.2.

████████████████████████████████████

*Id.*  The Summary Term Sheet does not provide the binding path forward or tangible contribution to the estates that will sometimes justify paying fees for an RSA party, and the cases cited by the Debtors do not support paying non-fiduciary fees under these circumstances.  *See* Appendix A (summarizing cases).

## II.    Paying The Uncapped Fees Of The Seven Ad Hoc Firms Is Not In The Best Interests Of The Estates, And Thus Is Inconsistent With Business Judgment

37.    As discussed above, using estate resources to pay the fees of the Seven Ad Hoc Firms would be unprecedented based on the facts of these cases.  Additionally, the Debtors have offered no proof, or even plausible allegations, that doing so would be in the best interests of the estates or otherwise consistent with an exercise of sound business judgment.

---

[26] The only document signed by the Ad Hoc Committee members is the Fee Letter.  *Compare* Mot. Ex. B (Fee Letter with signature pages and signatures) *with* Summary Term Sheet [ECF No. 257] (no signature pages).  Furthermore, assumption of the Fee Letter is the very first item in the Summary Term Sheet.  *See* Summary Term Sheet [ECF No. 257].

### a.  The Applicable Business Judgment Rule Is Not Deferential

38.      The Debtors argue that under the "business judgment rule," the Court must grant

their Motion absent proof that the Debtors acted in "bad faith" or engaged in a "gross abuse of

discretion" in seeking to pay the uncapped professional fees of the Seven Ad Hoc Firms.  *See* Mot.

¶ 18 (citing *In re Fed. Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003)).  According to the

Debtors, whether this Motion is considered under Bankruptcy Code sections 363(a) or 365(b), the

Court must defer to the Debtors' judgment so long as the Debtors can articulate a non-arbitrary,

non-capricious basis for that judgment.  *Id*. ¶ 26.  Hence, the Debtors argue, any party objecting to

that judgment bears "the burden of rebutting the presumption of validity."  *Id.* ¶ 17; *see also id.* ¶

26 ("[A] debtor's business decision should be approved unless that decision 'derives from bad

faith, whim or caprice.'") (citations omitted).

39.      The Debtors are mistaken.  As this Court has explained, bankruptcy courts are not

to apply the deferential "state law 'business judgment' standard' [used by courts to] review . . .

corporate decision making" to motions made by debtors under Bankruptcy Code sections 363 and

365.  *See, e.g.*, *In re The Great Atlantic & Pac. Tea Co., Inc.,* 544 B.R. 43, 48-49 (Bankr. S.D.N.Y.

2016) (RDD); *see also COR Route 5 Co., LLC v. Penn Traffic Co.* (*In re Penn*), 524 F.3d 373, 383

(2d Cir. 2008).  Particularly when a motion under Bankruptcy Code section 363 or 365 is objected

to "by parties with a general stake in the decision"—such as an official committee of unsecured

creditors—"the bankruptcy court [must] "plac[e] itself in the position of the . . . debtor-in-

possession and determin[e] whether" the proposed action "would be a good business decision or a

bad one."  *In re The Great Atlantic & Pac. Tea Co., Inc.,* 544 B.R. at 48-49 (citing *Orion Pictures*

*Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).

40.      The *Orion* standard is not deferential to a debtor's opinion, but instead requires the

bankruptcy court to reach its own conclusion about the propriety of the proposed decision.  The

test is "prospective looking and the Court considers the views of the parties in interest to inform its judgment about the desirability of the proposed transaction*." In re The Great Atlantic & Pac. Tea Co., Inc.*, 544 B.R. at 48 (addressing motion to reject contract under Bankruptcy Code section 365). "With an assumption motion . . . [the court does not] merely consider the debtor's business judgment. Instead, [the court] exercise[s]—and possibly substitute[s]—[its] own" business judgment. *In re 611 Sixth Ave. Corp.*, 191 B.R. 295, 301 (Bankr. S.D.N.Y. 1996); *see also* Hr'g Tr. 40:3-9, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Dec. 14, 2018) ("I don't believe that [the applicable standard] is the corporate business law, business judgment standard. . . . Ultimately, the bankruptcy judge has to apply his or her own sense of whether the decision is [a] good exercise of business judgment, informed by all the facts and circumstances as laid out on the record."). Likewise, in considering a motion under Bankruptcy Code section 363(b), "the Court should not simply defer, even when there is no objection, to a … debtor in possession's business judgment … but rather apply its own judgment based on the record before it to the proposed transaction or settlement." Hr'g Tr. 96:19-97:6, *In re Eljamal*, No. 15-22872 (Bankr. S.D.N.Y. Aug. 3, 2018) (RDD).

41.     But even if the Debtors could rely on the comparatively relaxed state-law business judgment rule—and they cannot—their Motion still would fail. Case law requires the debtor to show, based on actual evidence, that a proposed contract assumption or non-ordinary course payment is "in the best interests of [the debtor,] its estate and creditors." *In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006); *see also Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) (assumption of an executory contract "require[s] a judicial finding—up-front—that it was in the best interests of the estate (and the unsecured creditors) for the debtor to assume the [contract], pursuant to 11 U.S.C. § 365(a).") (emphasis

18

added); *In re Minges*, 602 F.2d 38, 44 (2d Cir. 1979) (remanding for further proceedings to determine whether rejection would benefit "general creditors"); *In re Genco*, 509 B.R. at 463 (holding that a "debtor 'must support the [assumption] motion with evidence—usually in the form of a declaration or affidavit—demonstrating that [assumption] of the contract falls within the proper exercise of the [debtors'] business judgment.'") (cited at Mot. ¶ 19).

### b. The Debtors Have Not—And Cannot—Prove That Paying The Seven Ad Hoc Firms Is In The Best Interests Of The Estates

42.     The Debtors' purported justification for paying the Seven Ad Hoc Firms is as follows: (i) the CAHC speaks for a huge swath of governmental claimants in these cases, (ii) unless estate funds are used to pay the Seven Ad Hoc Firms, the CAHC might disband or be unable to retain qualified, unconflicted advisors, which, in turn, (iii) could threaten the Debtors' ability to "progress the Settlement Framework to a confirmable plan of reorganization." Mot. ¶ 3.[27]  None of these allegations are supported by evidence, but even if accepted, they would not justify the relief sought in the Motion.    For one thing, they presuppose that "negotiat[ing] and implement[ing]" a deal as loosely described in the Summary Term Sheet as "desirable." Mot. ¶ 2. That belief is not held by every party in these cases.

43.     But even the Debtors have admitted they do not, and cannot yet, know whether a plan along the lines of the so-called Settlement Framework is in the best interests of the estates. Hr'g Tr. 223:11-18 (Oct. 11, 2019); *see also* Hr'g Tr. at 72:7-73:14 (Nov. 6, 2019).  Certainly, the Official Committee, and presumably most other creditor groups, are not yet in a position to support the Settlement Framework, and may never be.    Agreeing now to pay potentially material

---

[27] The Official Committee also understands that the Debtors or the CAHC may argue that payment of fees and expenses of the CAHC is, in part, "consideration" for the CAHC's support of the preliminary injunction motion filed by the Debtors.  While this may have been part of its negotiation, there is no requirement that this Court now approve fees paid as part of a prepetition bargain, nor could the parties to that bargain ever require this Court to approve payment of such fees.

professional fees for the CAHC as a means of achieving an outcome that may or may not be desirable—even to the CAHC—certainly is not in the estates' interests.

### i. The Debtors Offer No Evidence, Or Even Speculation, Regarding Past Or Projected Costs Associated With Their Motion

44.    In determining whether a decision is in the best interests of the estates, a bankruptcy court must weigh the claimed benefits of the decision against its burdens, based on actual evidence submitted by the movant. *E.g.*, *In re Orion*, 4 F.3d at 1099. The debtor retains the burden of proof at all times. *See In re Genco*, 509 B.R. at 463 (debtor must demonstrate that contract assumption is a proper exercise of business judgment). Here, the Debtors have offered no evidence (or even allegations) concerning the fee burden that could accompany the relief it requests. The Fee Letter is not helpful as it has no cap and the permitted "Scope" of work is broad, and quite vague. Undoubtedly, though, the CAHC's professional fees would be substantial, since they would include fees of no fewer than seven legal and professional firms. Mot. Ex. B at 1.[28]

45.    ███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ *See* Preis Decl. Ex. A at 3. The Official Committee notes, however, that the CAHC was not "initially formed" until September 15, 2019, *i.e.,* the Petition Date. *See* CAHC 2019 Statement ¶ 1. If the CAHC nevertheless seeks reimbursement for prepetition fees in the future, the Official Committee reserves its right to object, including on the grounds that the CAHC did not exist prepetition, and that any fees incurred before that date by definition were for the benefit of its individual members. *See In re Dana*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (professional services that primarily benefit individual creditors

---

[28] At the Official Committee's request, the CAHC provided some rough estimates suggesting their fees could amount to about $30 million over the first year of these cases, but acknowledged that the actual amount could be very different. *See* Preis Decl. Ex. D.

do not justify payment by the estates even if they also confer an indirect benefit on the estates);

*Trade Creditor Grp. v. L.J. Hooker Corp., Inc.*, (*In re Hooker Investments, Inc.*), 188 B.R. 117,

120-21 (S.D.N.Y. 1995), *aff'd*, 104 F.3d 349 (2d Cir. 1996) (same).

### ii. The Constituency And Mandate Of The CAHC May Be Narrower Than Has Been Suggested

46.     The other side of the "best interests" coin requires the Court to consider and weigh

the potential benefits to the estates associated with the decision under review against its likely

costs.  On this point the Debtors' Motion also fails.  First, the CAHC's constituency and mandate

in these cases have been greatly exaggerated.  The CAHC comprises 10 states, six cities and

counties, one Native American tribe, and the PEC.  Mot. ¶ 10 n.5.  While 13 other states allegedly

support the Settlement Framework, ███████████████████████████████████

██████████████████████    *See* Preis Decl. Ex. B (Bylaws) §§ 1.1, 3.1.

47.     In the CAHC 2019 Statement, the CAHC alleges that their members "negotiated

and support a settlement structure … on behalf of a larger group of supporting governmental and

other contingent claimants," but does not specifically identify any person or entity in the "larger

group."  CAHC 2019 Statement ¶ 1.[29]  For their part, the Debtors submitted no declaration or other

evidence of any kind that would establish the relationship, if any, between the CAHC and the 13

non-member states, or any other "governmental or other contingent litigation claimants."  *Id.* ¶ 1.

████████████████████████████████████████████████████

█████████████████████████████████  ████████████████

---

[29] In contrast, according to the Non-Consenting Ad Hoc Group 2019 Statement, all 24 of those states plus the District of Columbia are actual members of the Non-Consenting Ad Hoc Group, and are represented by a single law firm whose fees they are paying themselves, at least in the first instance.  *See* Non-Consenting Ad Hoc Group 2019 Statement.

████████████████████████████████████████████████████████    *See* Preis Decl.

Ex. B (Bylaws) §§ 3.6, 4.1.

48.    The CAHC 2019 Statement expressly provides that "***the Ad Hoc Committee
Members and the Ad Hoc Committee do not purport to act, represent, or speak on behalf of any
other entities in connection with the Bankruptcy Cases***." CAHC 2019 Statement ¶ 3 (emphasis
added). Notably, a number of cities, counties, tribes, individuals and others caucusing with the
Official Committee are located within the geographic borders of certain members of the CAHC.[30]
Hence, it is clear that the CAHC members do not speak with a single voice even for their own
citizens. The Debtors have not identified any tribes or local governments that support the
Settlement Framework other than the seven that are actually members of the CAHC, and they do
not appear to "represent" anyone but themselves.

49.    Nevertheless, it has repeatedly been suggested that the CAHC somehow represents
the interests of "the vast majority" of claimants in these cases, perhaps as many as "85.8 percent
of the filed lawsuits." Hr'g Tr. 66:13-24 (Sept. 17, 2019) (counsel for Debtors implying that
CAHC "gives the real parties of interest a voice" in these cases). The Debtors do not explain their
math, but the Official Committee presumes these figures are based on the Debtors' claim that the
PEC are "representatives of more than 2,250 . . . governmental and non-governmental claimants."
*E.g.*, Mot. ¶ 2 n.2. Indeed, the Debtors can only be referring to the PEC, since the other 17
members of the CAHC collectively could not comprise materially more than about 0.006% of the
approximately 2,700 "filed lawsuits." Hr'g Tr. 66:23 (Sept. 17, 2019).

50.    The PEC, however, is not a creditor. Nor have the Debtors submitted evidence to
suggest that the PEC "represents," or can bind, any of the thousands of individual MDL plaintiffs

---

[30] *Compare* Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal
Rules of Bankruptcy Procedure [ECF No. 409] Ex. A. at 14-19, 23-31, *with* Mot. Ex. B at Ex. A.

with respect to the MDL, and they likely cannot, given their administrative mandate.[31]  In fact, some of the governmental claimants that now have an *ex officio* designee on the Official Committee are plaintiffs in the MDL, and the PEC certainly does not speak for them.

51.    Finally, even if the CAHC somehow could be said to "represent" a substantial group of governmental claimants, they still may be speaking on behalf only of a minority of those injured by the Debtors' alleged role in creating the opioid crisis.  Governmental units constitute but one class out of many types of litigation creditors in these cases.  One recent study estimates that private parties—individual victims, hospitals, insurance companies, rate payers and others— suffered more than 70% of the total harm inflicted by the opioid crisis.[32]  If accurate, this allocation would further undermine the Debtors' claim that it somehow is essential to use estate resources to pay the Seven Ad Hoc Firms, when those firms represent a group comprising far less than 1%, of one category of creditors, a category that may itself include less than one-third of the outstanding claims by value.[33]

### iii.  The CAHC Members Can Afford To Pay Their Own Professionals

52.    In their Motion the Debtors worry that "payment of the professional fees as set forth" in the Fee Letter is "necessary to ensure that the Ad Hoc Committee is able to retain these advisors so that it can effectively assist the Debtors . . . negotiate, draft and finalize definitive documents in connection with the Settlement Framework."  *See* Mot. ¶ 5.  But the Debtors do not

---

[31] The PEC is made up of 16 leading lawyers tasked in the Ohio MDL with "assist[ing]" three "co-lead counsel" on "pre-trial and discovery issues" in the MDL. *See* Marginal Entry Order, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804 (N.D. Ohio, Jan. 4, 2018) [MDL ECF No. 37] at 1 (granting the renewed motion to approve appointments of co-lead, executive committee, and co-liaison counsel for the described responsibilities).

[32] Stoddard Davenport, Alexandra Weaver & Matt Caverly, *Economic Impact of Non-Medical Opioid Use in the United States* 4 (Oct. 2019) ("It is important to recognize who bears these economic burdens. In total, we estimate $186 billion (29%) of the total economic burden of the opioid crisis was borne by federal, state and local governments, while the remainder was borne by the private sector and individuals."), *available at* https://www.soa.org/resources/research-reports/2019/econ-impact-non-medical-opioid-use/.

[33] The Official Committee has not yet formed a view regarding allocation of value among creditors, but any suggestion that the creditor body is made up mostly of governmental units is not supported on the current record or otherwise.

offer evidence of any financial hardship or other circumstances that would prevent the 18 members of the CAHC from paying the fees of the Seven Ad Hoc Firms themselves.  Notably, the Non-Consenting Ad Hoc Committee is composed mostly of states and is paying the fees of its counsel itself.  Indeed, perhaps that explains the Non-Consenting Ad Hoc Committee's decision not to employ seven different professional firms.  But the CAHC does not include only state and local governments, it also includes the PEC.  There simply is no evidence suggesting that the CAHC is less able to bear its own costs than other creditor groups in these cases.

53.    The members of the CAHC also are highly motivated to retain and pay the fees of their professionals to the extent required.  The creditor-members on the CAHC claim they should recover billions of dollars in these cases, and the financial stakes for other CAHC members also are enormous.  If these members genuinely believe the services of the Seven Ad Hoc Firms are necessary to maximize value for themselves and their putative constituents, there can be no serious doubt that they can and will pay those fees themselves.  That also is the expectation of the Bankruptcy Code, which anticipates that creditors with interests as large as those claimed by the members of the CAHC "are presumably amply motivated to advance the bankruptcy process [and] do not need to be incentivized with payment of their professional fees by the estate."  *In re Lehman Bros.* 508 B.R. at 294.[34]

### iv.   If Granted, The Motion Likely Would Result In Using Estate Resources To Pay For Services Performed For Individual Creditors

54.    The Motion also risks using estate resources to pay for services rendered to individual creditors for their own parochial benefit.  Under black letter law, professional services

---

[34] The Debtors offer no proof that the CAHC would disband if the Motion is denied.  In fact, the Debtors allege that the members of the CAHC have been working on these negotiations for months and their members have been "productive counterparties" for more than a year without having their fees paid.  Mot. ¶ 4 n.3.

that "primarily benefit the client do not justify [payment by the estates] even if they also confer an indirect benefit on the estate." *In re Dana,* 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); *see also In re Hooker Investments, Inc.,* 188 B.R. 117, 120-21 (S.D.N.Y. 1995) (same); *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989 (same).  Here, the Four Law Firms apparently expect the estates to pay them to work on negotiating allocation amongst creditors, even though this activity would benefit only their clients and would be adverse to other creditors.  Paying the professional fees of one group of unsecured creditors to negotiate with other groups of unsecured creditors would violate an animating feature of the Bankruptcy Code by treating creditors of the same class unequally.  *E.g.*, *In re Lakeside Cmty. Hosp., Inc*., 151 B.R. 887, 893 (N.D. Ill. 1993) ("Congress designed the Bankruptcy Code to provide for equal and consistent treatment among similarly situated creditors.").

55.    Moreover, since the Four Law Firms intend to continue representing their separate clients in these cases, it is unclear whether as a practical matter they really can represent the CAHC with undivided loyalty.  CAHC 2019 Statement ¶ 1 n.1 (noting that "each of the [Four Law Firms] represents one or more creditors or parties in interest in the Bankruptcy Cases … including [CAHC] Members in such members' independent capacities as creditors or parties in interest.").[35]



*Id*. § 3.6.   Under these circumstances, agreeing to pay fees for the CAHC on a current basis is particularly dubious.

---

[35]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
*See* Preis Decl. Ex. B (Bylaws) § 2.4 (Quorum).  This portion of the Bylaws was originally redacted (even on a "Professionals' Eyes Only" basis) and revealed only after two requests for an unredacted copy from counsel to the Official Committee.  *See* Preis Decl. Ex. C (providing redacted Bylaws). Exs. G and H (email requests); Ex. B (providing unredacted Bylaws).

## **CONCLUSION**

For the reasons set forth herein, the Committee respectfully submits that the Motion

should be denied.

Dated:  November 12, 2019
New York, NY

AKIN GUMP STRAUSS HAUER & FELD LLP
By:   /s/ *Arik Preis*
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Sara L. Brauner
One Bryant Park
New York, New York 10036
Tel:  (212) 872-1000
Fax: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com

*Proposed Counsel to the Official Committee of*
*Unsecured Creditors of Purdue Pharma L.P.,* et al.

**APPENDIX A**

**Summary of Cases Cited in Debtors' Motion To Support Payment of Consenting Ad Hoc Committee Fees**

| Case[1] | Context | Synopsis | UCC Position |
|---|---|---|---|
| *In re Genco Shipping & Trading Limited*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. May 16, 2014) [ECF No. 187] | 11 U.S.C. § 365(a) – Assumption of prepetition RSA in connection with prepackaged plan of reorganization. | Court approved debtors' motion to assume prepetition RSA, which formed the basis of a prepackaged plan of reorganization that eliminated approximately $1.2 billion of debt, left trade unimpaired, provided a recovery to equity, and was supported by the debtors' secured lenders and 82% of the debtors unsecured convertible noteholders, which agreed to backstop 20% of a $100 million rights offering. *Id.; see also Motion for Entry of an Order (A) Authorizing the Assumption of the Restructuring Support Agreement; (B) Approving Payment of the Termination Fee; and (C) Granting Related Relief* [ECF No. 13]. | No UCC was formed. |
| *In re Hercules Offshore, Inc.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [ECF No. 95] | 11 U.S.C. § 365(a) – Assumption of prepetition RSA in connection with prepackaged plan of reorganization. | Court approved debtors' motion to assume prepetition RSA, which formed the basis of prepackaged plan of reorganization that: (i) left all classes of claims other than the unsecured notes unimpaired; (ii) equitized $1.2 billion in principal amount of unsecured notes; and (iii) provided a recovery to equity. *Id.; see also Motion of Hercules Offshore, Inc., et al., for Authorization to (I) Assume Restructuring Support Agreement and (II) Pay and Reimburse Related Fees and Expenses* [ECF No. 12]. | No UCC was formed. |
| *In re Dendreon Corporation*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [ECF No. 215] | 11 U.S.C. § 365(a) – Assumption of prepetition RSA. | Court approved debtors' motion to assume prepetition RSAs with two groups of unsecured noteholders by which noteholders agreed to support competitive sale process and (a) the complete equitization of the notes and cancellation of existing equity in connection with a plan of reorganization or (b) the sale of the company and distribution of the sale proceeds according to priority pursuant to a plan of liquidation.  *Id.; see also Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Assume Plan Support Agreements and (B) Granting Related Relief* [ECF No. 20]. | UCC supported approval of the RSAs after negotiating certain modifications, including limiting reimbursement of noteholder fees and expenses to one lead counsel and one local counsel per group.  *Id.*, Ex. A. |

---

[1] Cases are listed in order of appearance in the Motion.

| Case[1] | Context | Synopsis | UCC Position |
|---------|---------|----------|--------------|
| *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) [ECF No. 217] | 11 U.S.C. § 365(a) – Assumption of prepetition RSA. | Court approved payment of unsecured noteholder group's fees and expenses pursuant to prepetition RSA that provided for: (i) unsecured noteholder group to provide $135 million of new preferred equity through a backstopped rights offering, a portion of the proceeds of which would be used to secure exit financing; (ii) conversion of unsecured notes into 100% of new common stock (subject to dilution); and (iii) secured lenders to provide a $75 million DIP facility and exit financing. *Id.* | UCC did not object to reimbursement of unsecured noteholders' fees and expenses pursuant to RSA. |
| *In re William Lyon Homes*, No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) [ECF No. 105] | 11 U.S.C. § 365(a) – Assumption of prepetition RSA in connection with prepackaged plan of reorganization. | Court approved prepetition RSAs, which formed basis of prepackaged plan of reorganization that provided for: (i) secured lenders' and unsecured noteholders' agreement to provide $75 million in new second lien notes and $85 million in new preferred equity; (ii) equitization of unsecured notes; (iii) secured lenders' agreement to provide $29 million in incremental funding; and (iv) unimpairment of all other creditors. *See Motion of Debtors for an Order Authorizing the Debtors to (I) Assume the Restructuring Support Agreements with Certain Secured Lenders and Noteholders, (II) Pay and Reimburse Related Fees and Expenses, and (III) Indemnify the Parties to the Restructuring Support Agreements* [ECF No. 12]. | No UCC was formed. |
| *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 18, 2013) [ECF No. 317] | 11 U.S.C. § 365(a) – Assumption of counsel payment agreement required by prepetition RSA. | The debtors agreed to pay professional fees of unsecured noteholders that agreed to enter into a prepetition Transaction Support Agreement that contemplated the full equitization of $3.17 billion of unsecured notes, a release of the debtors' equity holder, and the extension by the equity holder of tax sharing agreements that were expected to result in significant payments to the debtors. *See Declaration of Maria Rigatti, Senior Vice Presidence and Chief Financial Officer of Edison Mission Energy, in support of Chapter 11 Petitions and First Day Motions* [ECF No. 6]. | UCC did not object to approval of the motion to pay professional fees. |
| *In re NII Holdings Inc.*, No. 14-12611 (SCC) (Bankr. S.D.N.Y Mar. 24, 2015) [ECF No. 590] | 11 U.S.C. § 365(a) – Assumption of postpetition RSA. | Debtors agreed to pay unsecured noteholders' professional fees and expenses, subject to certain restrictions and caps, pursuant to a postpetition RSA, which eliminated $4.35 billion in debt, settled significant litigation claims, and provided for $350 million bridge loan DIP facility provided by unsecured noteholders. *Id.* | UCC supported assumption of RSA. |

2

| Case[1] | Context | Synopsis | UCC Position |
|---|---|---|---|
| *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) [ECF No. 4652] | 11 U.S.C. § 363(b) – Reimbursement of unsecured creditor group's expenses in connection with potential equity financing. | Court approved debtors' motion to enter into fee letter providing for reimbursement of the fees and expenses incurred by unsecured creditor group's professionals for limited purpose of evaluating financing commitment to support a chapter 11 plan. *See Debtors' Motion for Approval of "Fee Letter" to Pay Certain Work Fees and Expenses of Professionals Employed by the Ad Hoc Group of AMR Corporation Creditors* [ECF No. 4217], Ex. A. | The UCC supported the motion to approve the fee letter, which was not opposed by any party in interest. |
| *In re ASARCO, L.L.C.,* 650 F.3d 593 (5th Cir. 2011) | 11 U.S.C. § 363(b) – Reimbursement of bidders' due diligence expenses in connection with auction. | Debtor sought to reorganize around a more than $1.4 billion judgment against a former affiliate, the debtor's most substantial asset.  Given the difficulty of valuing the asset, the debtor sought to sell it via a two-stage bid solicitation process, and sought to reimburse fees for those bidders that made it to the second stage. *Id.* at 598.  The court granted motion, which was supported by UCC, noting that fee reimbursement was necessary to incentivize bidders to evaluate the "very unique and very valuable but possibly worthless" asset. *Id.* at 602-603. | The UCC supported the debtors' motion, which was not opposed by any party in interest. *See In re ASARCO LLC*, 441 B.R. 813, 822 (S.D. Tex. 2010) (bankruptcy court noted that "the creditors committee and all of those parties that are involved with this . . . including even the U.S. Trustee are not opposed to this proposal."). |
| *U.S. Trustee v. Bethlehem Steel Corp*., No. 02 Civ. 2854 (MBM), 2003 WL 21738964 | 11 U.S.C. § 363(b) – Assumption of USWA fee letters. | The UCC supported debtors' request to reimburse union's professionals to undertake due diligence and analysis necessary to participate in discussions regarding, *inter alia*, possible modifications to the existing labor agreements. *Id.* at *1.  The union represented the "largest constituency of unsecured creditors" and most of Bethlehem's workers, and payment of fees was | The UCC supported the motion, subject to certain limitations on payment of the success fee. *Id.* at *2.  The debtors' |

3

| Case[1] | Context | Synopsis | UCC Position |
|---|---|---|---|
| (S.D.N.Y. July 28, 2003) | | "necessary" for union to participate in modification of labor agreement, which in turn was "vital to a successful reorganization." *Id*. at *7 | prepetition lenders also supported the motion.  The U.S. Trustee was the only party in interest to object. *Id.* |

4