## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### JOINDER OF THE PRIVATE INSURANCE CLASS CLAIMANTS TO OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION TO ASSUME PRE-PETITION REIMBURSEMENT AGREEMENT WITH AD HOC COMMITTEE

Ronald D. Stracener; F. Kirk Hopkins; Jordan Chu; Amel Eiland; Nadja Streiter; Michael Konig; Eli Medina; Barbara Rivers; Marketing Services of Indiana, Inc.; Glenn Golden, Gretta Golden and Michael Christy; Edward Grace; Debra Dawsey; Darcy Sherman; Kimberly Brand; Lou Sardella; Michael Klodzinski; Kevin Wilk; Heather Enders; Jason Reynolds; MSI Corporation; Deborah Green-Kuchta; W. Andrew Fox; Dora Lawrence; Michael Lopez; Zachary R. Schneider; William Taylor; William Stock and Al Marino, Inc. (collectively, "Private Insurance Plaintiffs"), in their individual and representative capacities as set forth below (and with the class members, collectively, the "Private Insurance Class Claimants") in their 28 respective actions in the 28 states identified below (the "Class Actions"), join in the Objection of the Official Committee to the Debtors' Motion to Assume a Pre-Petition Reimbursement

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Agreement with the Ad Hoc Committee [Docket No. 459] (the "Objection"),[2] and respectfully state as follows:

1.        The Private Insurance Plaintiffs[3] hereby join in the Objection and incorporate the Official Committee's arguments made therein.  The Private Insurance Plaintiffs respectfully submit that the Motion should be denied for the reasons stated herein and in the Objection.

***Purdue's Role in the Opioid Crisis Is the Proximate Cause of Private Insurance Plaintiffs' Damages.***

2.        The Private Insurance Class Claimants are among the hardest hit victims of Purdue's conduct and represent a key constituency in the cases to hold Purdue accountable.  At bottom, this case is for the benefit of Purdue's countless tort claimants.

3.        The explosion in opioid prescriptions and use has created a public health crisis in the States (defined in ¶ 22 below).  An oversupply of prescription opioids has provided a source for the illicit use or sale of opioids, while their widespread use has created a population of addicted and dependent patients.  When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.  In addition to the societal impact of deaths, overdoses, and rampant addiction, Purdue's conduct has created higher demand and thus higher prices for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for residents of the States (defined in ¶ 22 below).

4.        Purdue's conduct has fueled skyrocketing opioid addiction and opioid-related deaths and emergency treatments and has generated huge sales of opioids at inflated prices.

---

[2] Capitalized terms not defined herein have the meanings ascribed thereto in the Objection.

[3] Referred to as the Ratepayer Ad Hoc Committee in the Objection.

5.      Purchasers of private health insurance have been damaged as a result of paying prices for premiums, co-pays and deductibles that are higher as a direct result of Purdue's misconduct.  Health insurers possess considerable market power, and are easily able to—and do—pass higher costs onto their insureds.  Premiums in health-insurance markets do not reflect individual differences in costs, meaning that *all* insureds bear higher costs inflicted by the highest-risk insureds.

6.      While insurance companies may refuse to cover ineffective or dangerous treatments, they too were misled by Purdue's pervasive campaign to convince the healthcare industry that opioids were effective and necessary for long-term pain management.  Insurers paid Purdue for the care ordered by patients' doctors, as well as for the resulting costs of addiction: treatment, emergency-room care, and other claims.  Those costs were ultimately passed along by insurers to Private Insurance Plaintiffs and all Class Members.

7.      Superseding causes that are foreseeable or the normal incidents of the risks created by Purdue, such as doctors who prescribed the opioids and patients who became addicted, will not break the chain of causation and relieve Purdue of liability as to these Private Insurance Plaintiffs.  It was entirely foreseeable that Purdue's products would be sold in pharmacies; that a fraudulent marketing scheme would deceive doctors into prescribing medically unnecessary opioids; that patients would trust their doctors and fill their prescriptions; that Purdue's misconduct would result in insurers' initial losses in the form of overpayment for ineffective drugs, and massive healthcare costs associated with opioid addiction; and that insurance companies would pay for and pass these costs on to their customers.  In fact, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Purdue and charged that back to insureds in the form of higher premiums, deductibles,

3

and co-payments. Purdue needed to deceive the entire medical community so that health insurers—and ultimately those who purchase health insurance—would pay for OxyContin and Purdue's other drugs.

***Private Insurance Plaintiffs' Claims.***

8.      The direct and proximate consequence of Purdue's misconduct is that every purchaser of private health insurance in the States[4] paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Purdue and passed all or virtually all of these increased costs through to insureds in the form of higher premiums, deductibles, and co-payments. Thus, it is the Private Insurance Plaintiffs, not the insurers, who ultimately footed and continue to foot the bill.

9.      The Private Insurance Class Claimants consist of all persons (including natural persons and entities) who purchased health insurance policies in the States from 1996 through the present, and all persons who paid for any portion of employer-provided health insurance from 1996 through the present.[5]

***Private Insurance Class Claimants' Damages.***

10.      By order dated December 14, 2017 (as supplemented by orders dated January 11, 2018 and February 16, 2018), U.S. District Judge Dan Aaron Polster imposed a stay in *In re*

---

[4] The States consist of Alabama, Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wisconsin.

[5] The particular actions are specified in the Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Procedure 2019, dated October 21, 2019. [Dkt. No. 333].

4

*National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio) (the "MDL"), against

prosecution of almost all opioid-related litigation (including Private Insurance Plaintiffs' Class

Actions identified above), except for certain bellwether cases for which trial was scheduled to

commence on October 21, 2019 in the MDL.

11.     While Private Insurance Plaintiffs have been precluded from conducting

discovery because of the stay imposed in connection with the MDL, Private Insurance Plaintiffs

preliminarily estimate that Purdue and other parties associated with the opioid crisis, including

manufacturers, distributors and pharmacies, are jointly and severally liable to Private Insurance

Class Members in an amount exceeding $175 billion.

12.     The Centers for Disease Control and Prevention's estimate of total spending for

healthcare costs attributable to the opioid epidemic is $28 billion per year.  Statistics generated

by the Center for Medicare and Medicaid Services indicate that 34% of national healthcare

spending is on private health insurance.  This means that $9.52 billion of the $28 billion per year

is borne by private health insurance.  Private Insurance Plaintiffs believe that insurance carriers

passed through all or virtually all of their increased costs to Private Insurance Class Members.

The aggregate population of the 28 States in which the Private Insurance Class Actions are

pending is approximately 260 million, or 80% of the total U.S. population of 327 million, which

means that approximately $7.61 billion per year has been borne by Private Insurance Class

Members in the 28 States.  The time frame at issue covers 23 years (1996 to 2019), which works

out to $175 billion in damages plus interest, subject to trebling.

13.     Private Insurance Plaintiffs filed a motion seeking class certification in the

Chapter 11 case of opioid manufacturer Insys Therapeutics, Inc. ("Insys").  19-11292-KG (Del.)

[Dkt. No. 76].  Four other sets of putative class action plaintiffs likewise filed motions seeking

class certification in Insys.  All of these motions have been adjourned pending settlement

negotiations.  Private Insurance Plaintiffs, the Insys debtors, the Insys official creditors'

committee, states, tribes, municipalities, other putative classes, and other creditors participated in

a plan mediation before then Delaware Bankruptcy Judge Kevin Carey.

14.    In connection with the Insys mediation, the Insys debtors and the Insys official

creditors' committee carefully analyzed the claims of Private Insurance Plaintiffs and other tort

claimants, and negotiated the treatment thereof.  As a result of the mediation and subsequent

settlement negotiations, on September 16, 2019, Insys filed a liquidating plan supported by

Private Insurance Plaintiffs and other constituencies and an accompnaying disclosure statement.

19-11292-KG (Del.) [Dkt. Nos. 612 & 613].  While the Insys plan was the result of the unique

circumstances of that case and has no precedential effect in this case, it is suggestive of a range

of values for the same types of claims being asserted against Purdue by the same parties.

15.    Under the Insys plan, Private Insurance Plaintiffs will have allowed class claims.

Moreover, Private Insurance Plaintiffs and various insurance companies are included in the same

class under the Insys plan (class 4) and share in a distribution of 68.5% of all Category 2

Distributions, which means "(i) with respect to Distributions of the next $35 million of Estate

Distributable Value following the Distribution of $3 million in Category 1 Distributions to

holders of Allowed Trade and Other Unsecured Claims, fifty-five percent (55%) of the Estate

Distributable Value composing such Distributions and (ii) with respect to Distributions after $38

million of Estate Distributable Value has been distributed on account of Allowed Non-PI

General Unsecured Claims in the aggregate, twenty percent (20%) of the incremental Estate

Distributable Value composing such Distributions."

6

16.    Based on Insys's miniscule share of the overall opioid market from 2012–2016 (and Insys's nonexistence prior thereto), total claims (excluding personal injury claims) are estimated to be only $1,022,000,000, whereas total claims against Purdue are likely to be significantly higher.  Insys class 4 claims are estimated at $258,000,000, and constitute over 25% of total claims (excluding personal injury claims).  As noted above, because insurance carriers passed through all or virtually all of their increased costs to their customers, the Private Insurance Class Members should receive virtually all of the Insys class 4 distributions.

***The Sacklers.***

17.    Purdue and its associated companies are part of a complex web of entities which the Sacklers own and control.  The Sacklers include Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Beverly Sackler, Theresa Sackler, Ilene Sackler Lefcourt, David Sackler, and Raymond Sackler Trust.  All of Purdue's and its associated companies' profits go to Sackler trusts and entities.

18.    The Sacklers have been named as defendants in multiple lawsuits for their misconduct relating to the opioid crisis, as well as for having extracted over $12 billion from an insolvent Purdue in the midst of the opioid crisis.  Various sources have claimed that the Sacklers have a net worth of at least $14 billion and have transferred substantial assets to foreign jurisdictions in order to hinder, delay and defraud creditors such as Private Insurance Plaintiffs.

19.    Before a plan can be formulated, creditors need to conduct a thorough investigation of these and other issues, including without limitation whether the contributions proposed to be made by the Sacklers are substantial under the circumstances of this case.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–43 (2d Cir. 2005) (third-party releases

7

should only be granted under unique circumstances where non-debtor co-liable parties make substantial financial contributions).

***Purdue's Proposed Settlement Structure.***

20.    The Condensed Consolidated Balance Sheet (Unaudited) as of August 31, 2019 annexed as Schedule 4 to the First Day Declaration of Jon Lowne, Senior Vice President and the Chief Financial Officer of Purdue Pharma L.P. [Dkt. No. 3], discloses total assets in the amount of $1.972 billion, total liabilities in the amount of $562 million and total equity in the amount of $1.41 billion.  In fact, virtually all of Purdue's liabilities consist of tort claims arising from more than 2,600 lawsuits filed throughout the state and federal court systems.  *See* Debtors' Informational Brief dated September 15, 2019 [Dkt. No. 17] ("Brief") at pp. 36-40.

21.    In the Brief, Purdue discloses that it has negotiated what it refers to as an "agreed-upon Settlement Structure" that has the support of 24 states, five U.S. territories, the Plaintiffs' Executive Committee (PEC) and Co-Lead Counsel in the Ohio MDL, under which: "(1) Purdue's existing shareholders will relinquish all of their equity interests in the Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-emergence structure for the benefit of claimants and the U.S. public, 'free and clear' of Purdue's liabilities to the fullest extent permitted by law; (2) Purdue's existing shareholders will engage in a sale process for their ex-U.S. pharmaceutical companies; and (3) Purdue's existing shareholders will contribute an additional $3 billion over seven years (in addition to 100% of the value of all 24 Debtors), with the hope of substantial further contemplated contributions from the sales of their ex-U.S. pharmaceutical businesses."  Brief at p. 44.

22.    Purdue contends that: "Implementing the Settlement Structure through these chapter 11 proceedings is the only sensible way forward because continued litigation of

thousands of Pending Actions to judgment and through appeals outside of bankruptcy benefits no

one. Indeed, continued litigation threatens the success of these chapter 11 proceedings and will

only result in the substantial depletion of the Debtors' assets that would otherwise be available

for distribution to appropriate stakeholders." Brief at p. 45.

23.     Besides the CAHC for whom reimbursement of expenses is being sought, there is

another *ad hoc* committee of states that does not presently support the Settlement Structure, as

well as various municipalities that presently oppose the Settlement Structure. Private litigants

have not publicly taken a position to date.

24.     On October 8, 2019, the Debtors filed a Term Sheet negotiated with the CAHC

and the Sacklers [Dkt. No. 257] ("Term Sheet"). Private Insurance Plaintiffs did not support the

Term Sheet because, *inter alia*, the Official Committee would not play a central role in the plan

negotiating process, there was no articulated role for private litigants, the consideration appears

to be inadequate, a 7-year payout is too long, there are concerns regarding the security for

payment, there would be little or no financial disclosure by the Sacklers, the consenting

shareholder cash contribution is going to be allocated among the shareholder parties but they are

not jointly and severally liable, and there is an absence of the appropriate safeguards and

restrictions in consideration for a six-month standstill such as prohibitions on the Debtors' ability

to file a plan or Rule 9019 motion.

25.     Thereafter, the Official Committee negotiated an Amended and Restated Case

Stipulation [Dkt. No. 431] that assuaged many of the Private Insurance Plaintiffs' concerns.

26.     At the Debtors' request, the Court entered an order granting a preliminary

injunction through April 8, 2020. Certain dissenting states and municipalities agreed to abide by

the terms of such order, subject to certain opt-out rights. Private Insurance Plaintiffs did not

9

oppose the injunctive relief based on the belief that it would provide needed breathing space to

allow Purdue, the Sacklers and the Debtors' various creditor groups, including the Private

Insurance Plaintiffs, an opportunity to explore whether a consensual resolution could be

achieved.

***Private Litigants, Not SMT, Hold a Majority of Claims.***

27.    Based on Purdue's announcements in the Brief, other pleadings and in Court, it

appears that both Purdue and the states, municipalities and tribes asserting claims herein

("SMT") believe that SMT represents the overwhelming majority of claims against Purdue.  That

simply is not the case.  As explained herein, based on Private Insurance Plaintiffs' extensive

experience litigating against multiple opioid manufacturers and distributors throughout the

country over the last couple of years, as well as experience in the Insys chapter 11 case, it is clear

that private litigants, including without limitation Private Insurance Plaintiffs, hospitals, NAS

babies, and personal injury claimants, have significant claims and are entitled to a very

significant percentage of Purdue's assets.  In fact, one recent study estimates that private parties

such as Private Insurance Plaintiffs suffered more than 70% of the total harm inflicted by the

opioid crisis.[6]  This is further exemplified by the disposition of value under the Insys plan.

28.    Besides not constituting the overwhelming majority of claims against Purdue,

SMT claimants will face significant difficulties in trying to establish both causation and

damages.  For instance, unlike SMT, Private Insurance Plaintiffs' claimed damages entail solely

tangible and easily measurable economic loss.  On the other hand, SMT claims include many

speculative components such as lost productivity, which, besides facing serious causation

---

[6] *See* Davenport report cited in Objection at p. 23 & fn. 32.

hurdles, are difficult to measure.  Other components of SMT claims, such as the cost of

additional police and emergency response personnel, are attenuated and not easily attributable to

the use of OxyContin, as opposed to the use of heroin and other illegal drugs, crime, gang

activity, unemployment, homelessness, mental health issues and other societal problems.

29.    While Private Insurance Plaintiffs agree that a consensual resolution of the myriad

complex issues that this case presents is far preferable to protracted and expensive litigation, at

present, Private Insurance Plaintiffs are not in a position to assess what would constitute an

appropriate settlement.  Private Insurance Plaintiffs have advised Purdue and the Official

Committee that they are willing to enter into settlement negotiations and have requested access

to due diligence materials.

## The Motion Should Be Denied

30.    In considering the Motion, the Court should take into account the views of a

constituency as significant as the Private Insurance Plaintiffs.  The Motion does not demonstrate,

or even allege (nor could it), that the Official Committee is not representative of the creditor

class or is incapable of discharging its fiduciary duties to all creditors.

31.    As Debtors' counsel noted at the November 6, 2019 hearing, currently there are at

least nine *ad hoc* creditor groups participating in this case, including the Private Insurance

Plaintiffs.  There is no legitimate basis to give any one group favored treatment over the other *ad

hoc* groups, especially when there is an Official Committee actively performing appropriate

services on behalf of all creditor constituencies.

32.    There are three overarching objectives for creditors in this case: (1) maximizing

the recovery from the Debtors' estates, the Sacklers, other litigation targets, insurance coverage,

and any other sources; (2) abating the opioid crisis; and (3) bargaining over how estate value is

11

allocated among the various creditor groups.  All creditors share the same goal of maximizing value.  However, the Official Committee has been doing a tremendous job performing just those services, so there is no need for the estates to pay anyone else to perform value-maximizing services.  The Official Committee is also best situated to negotiate steps to abate the opioid crisis, and has already begun that process.

33.    On the third objective, all creditor groups are likely to be diametrically opposed, and there is no legitimate reason for the estates to pay for one creditor group to negotiate more favorable treatment for itself at the expense of other creditor groups.  This tension among creditor groups appears to be most pronounced as between private litigants and SMT, and granting the Motion will only further exacerbate these problems.  Instead, the Court should ensure that all creditors remain on a level playing field.  Importantly, as a neutral fiduciary, the Official Committee can play a leading role in spearheading allocation issues among the various creditor constituencies.

34.    In the alternative, if the Court authorizes the Debtors to pay the fees and expenses of any professionals retained by the CAHC, then such approval should be conditioned on the requirement to pay the fees and expenses of the professionals retained by the Private Insurance Plaintiffs.

## CONCLUSION

35.    For all the foregoing reasons, Private Insurance Plaintiffs request that the Court sustain the Objection and deny the Motion.

SL1 1613516v2 113572.00002

Respectfully submitted,

Dated:  November 12, 2019          By: /s/ Nicholas F. Kajon
                                       Attorneys for Private Insurance Plaintiffs

                                   Nicholas F. Kajon
                                   nfk@stevenslee.com
                                   Constantine D. Pourakis
                                   cp@stevenslee.com
                                   STEVENS & LEE, P.C.
                                   485 Madison Avenue, 20th Floor
                                   New York, NY  10022
                                   Tel:  212.319.8500

                                   James Young*
                                   jyoung@ForThePeople.com
                                   MORGAN & MORGAN, P.A.[7]
                                   COMPLEX LITIGATION GROUP
                                   76 S. Laura St., Suite 1100
                                   Jacksonville, FL  32202
                                   Tel:  904.361.0012

                                   Juan R. Martinez*
                                   juanmartinez@ForThePeople.com
                                   MORGAN & MORGAN, P.A.
                                   COMPLEX LITIGATION GROUP
                                   201 N. Franklin Street, 7th Floor
                                   Tampa, Florida  33602
                                   Tel:  813.223.5505

                                   *Admitted Pro Hac Vice

                                   Counsel for Private Insurance Plaintiffs and the
                                   Putative Classes

---

[7]  Morgan & Morgan, P.A. also represent clients in diverse other matters pending against Debtors, as specified in the Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Procedure 2019, dated October 21, 2019.  [Dkt. No. 333].