DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### DEBTORS' REPLY TO OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION OF DEBTORS FOR ENTRY OF FINAL ORDER AUTHORIZING (I) DEBTORS TO CONTINUE USING EXISTING CASH MANAGEMENT SYSTEMS AND MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND (II) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") hereby submit

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

this reply (the "**Reply**") to the objection, dated October 3, 2019 [Docket No. 206] (the "**Objection**") filed by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") to the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Continue to Use Existing Cash Management Systems and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 5] (the "**Cash Management Motion**").[2] In response to the Objection and in further support of the Cash Management Motion and the Reply, the Debtors submit the supplemental declaration of Jon Lowne, the Senior Vice President and Chief Financial Officer of PPLP (the "**Supplemental Lowne Declaration**") attached hereto as **Exhibit A**, and respectfully state as follows:

## Preliminary Statement

1. The Debtors commenced these chapter 11 cases with a sizeable cash position of approximately $1,145 million as of October 31, 2019. The Debtors' practice is to concentrate unrestricted cash in treasury money market funds ($800 million as of October 31, 2019) or authorized deposit accounts collateralized by treasuries or guaranteed by surety bonds ($345 million as of October 31, 2019). The Debtors maintain written short-term investment guidelines (the "**Investment Guidelines**") that establish procedures and policies for investing any excess cash. *Only* Treasury Money Market Funds and deposits collateralized by U.S. treasuries or U.S. agencies are considered "Permissible Securities" under the Investment Guidelines.

2. For the unrestricted cash that is not collateralized by treasuries or guaranteed by surety bonds, consistent with the Investment Guidelines, the Debtors' standard practice is to invest their excess cash in two money market treasury accounts (together, the "**Investment Accounts**"):

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Cash Management Motion.

2

the Goldman Sachs Financial Square Treasury Instruments Fund (the "**Treasury Instruments Fund**") and the Goldman Sachs Financial Square Treasury Solutions Fund (the "**Treasury Solutions Fund**" and, together with the Treasury Instruments Fund, the "**Treasury Funds**"). The Treasury Funds invest only in U.S. Treasury Obligations (as defined below) or repurchase agreements issued by the Federal Reserve Bank of New York collateralized by U.S. Treasury Obligations. These well-reputed Treasury Funds carry the highest possible ratings under Standard & Poor's Global Ratings ("**S&P's**") and Moody's Investor Service, Inc. ("**Moody's**"), AAAm and Aaa-mf, respectively. The Debtors' prudent investment practice is designed to preserve principal and minimize credit and interest rate risk, maintain adequate liquidity to meet the Debtors' financial obligations in a timely manner, and maximize investment return subject to the foregoing considerations.

3. The U.S. Trustee argues that the Investment Accounts do not comply with section 345 of the Bankruptcy Code for three reasons, which can be summarized as follows: (i) while the underlying securities held by the Treasury Funds are backed by the full faith and credit of the United States, the Investment Accounts themselves are not, (ii) while the prospectuses of the Treasury Funds limit investments to securities backed by the full faith and credit of the United States, the fund managers might improperly manage the funds, and (iii) even if the funds are managed properly and only hold securities backed by the full faith and credit of the United States, the Debtors must hold such securities directly in order to comply with the strict requirements of section 345 of the Bankruptcy Code. Taking the U.S. Trustee's objection to its logical conclusion, the Debtors could only comply with section 345 of the Bankruptcy Code by purchasing U.S. Treasury Obligations directly from the U.S. government or by depositing all of their excess cash

in deposit accounts with one or more Authorized Depositories collateralized by U.S. treasuries or U.S. agencies or backed by surety bonds.

4. The Debtors believe that their current investment practice is consistent with section 345 of the Bankruptcy Code. Moreover, both alternatives raise significant concerns for the Debtors. It is not practical for the Debtors to purchase U.S. Treasury Obligations directly. Apart from the cost of administering such a program and the negative effect any such program would have on the highly liquid nature of the Debtors' current investments, the direct purchase of U.S. Treasury Obligations would introduce unnecessary and unacceptable control risk into the cash management system. Under a Treasury Direct Account, only one single person is designated to buy and sell U.S. Treasury Obligations, change bank accounts, and make withdrawals under the account. This is counter to the Debtors' internal control requirement to have segregation of duties.

5. With respect to the deposit agreement alternative, the Debtors' current banking partners have indicated that they could not hold an additional $800 million of deposits (representing the unrestricted cash in treasury money market funds as of October 31, 2019), and the Debtors believe that it would be difficult, if not impossible, to find approved banks that would be willing to hold the excess amounts. The Debtors have faced unprecedented negative publicity which has resulted in four institutions terminating banking relationships with the Debtors. Indeed, at one point the Debtors were within weeks of not having operational bank accounts. As a result, the Debtors were forced to spend countless hours navigating various banks' "Know Your Customer" diligence processes, contacting prospective banking partners, implementing new banking arrangements, and integrating their collection and payment systems with a new bank. During this process of finding a bank that was prepared to work with the Debtors, at least 10 banks advised that they would not do business with the Company, the majority of which were on the U.S.

Department of Justice list of Authorized Bank Depositories. It would therefore be an administrative burden to ask the Debtors to approach additional banks, particularly given the low likelihood of obtaining new deposit accounts.

6. In addition, even assuming that the Debtors could find one or more acceptable banks, the Debtors estimate that the cost of moving the cash held in the Investment Accounts to approved deposit accounts would be roughly $8 million a year of lost interest income.

7. This Court is well within its explicit statutory authority to provide the Debtors with a very limited exemption from the requirements of section 345(b) under these circumstances, to the extent that such a waiver is required at all.

8. The U.S. Trustee also questions why the protections of section 345 do not apply to the approximately $268 million in restricted cash as of October 31, 2019. As explained below, this cash is held in various trust, reserve and escrow accounts for the benefit of the Debtors' insurers, banks and commercial counterparties. To the extent that this cash is invested in money market treasury accounts, the Debtors likewise believe that the arrangement is compliant with section 345 of the Bankruptcy Code and that a limited waiver is appropriate to the extent necessary.

9. The U.S. Trustee's objection is inconsistent with business realities and the clear parameters of section 345(b). The U.S. Trustee's objection should thus be overruled, and the Debtors respectfully submit that this Court should enter the final cash management order.

**General Background**

10. On September 15, 2019 (the "**Petition Date**"), the Debtors filed the Cash Management Motion. Pursuant to the Cash Management Motion, the Debtors requested that they be authorized, but not required, to continue to invest their excess cash in the Investment Accounts.

11. On September 18, 2019, the Court entered an interim order granting the relief sought in the Cash Management Motion [Docket No. 61] (the "**Interim Order**"). Pursuant to

5

paragraph 19 of the Interim Order, continuation of the Investment Accounts was approved on an interim basis, and the Debtors were provided 45 days to either comply with section 345(b) of the Bankruptcy Code or obtain this Court's approval for any deviation from section 345(b) under the order approving the Cash Management Motion on a final basis.

12. On October 3, 2019, the U.S. Trustee filed its Objection.

13. On October 8, 2019, the Debtors adjourned the final hearing on the Cash Management Motion from October 10, 2019 to November 6, 2019. On October 25, 2019, the Debtors further adjourned the final hearing on the Cash Management Motion from November 6, 2019 to November 19, 2019.

### The Money Market Treasury Funds

14. As described in the Cash Management Motion and as discussed above, the Debtors invest their excess cash in the Investment Accounts. As of October 31, 2019, the Debtors had approximately $500 million invested in the Treasury Instruments Fund and $300 million invested in the Treasury Solutions Fund, for a total of $800 million in Treasury Money Market Funds. The Treasury Instruments Fund invests only in securities issued or guaranteed by the U.S. Treasury where the payment of principal and interest is backed by the full faith and credit of the U.S. government ("**U.S. Treasury Obligations**"). The Treasury Solutions Fund invests only in U.S. Treasury Obligations and repurchase obligations with the Federal Reserve Bank of New York collateralized by U.S. Treasury Obligations. The Treasury Funds each carry the highest possible ratings from S&P's and Moody's, AAAm and Aaa-mf, respectively, denoting safety and liquidity.

15. Each Treasury Fund is a diversified, open-end management investment company (as defined in the Investment Company Act of 1940, as amended). As such, the owners of each Treasury Fund are the fund investors. The Treasury Funds are separate legal entities from Goldman, Sachs & Co. ("**Goldman Sachs**") or its affiliates, including Goldman Sachs Asset

6

Management L.P. ("**GSAM**"), which manages the Treasury Funds. The assets of the Treasury Funds are held separate from the assets of Goldman Sachs, are in the safekeeping of independent custodians, and are not subject to the claims of creditors of Goldman Sachs.

### The U.S. Trustee's Limited Objection Should Be Overruled

**I.    The Investment Accounts Comply with Section 345 of the Bankruptcy Code.**

16.    As an initial matter, the Debtors' investments in the Treasury Funds already comply with section 345 of the Bankruptcy Code.  While the U.S. Trustee is correct that the Investment Accounts themselves are not backed by the full faith and credit of the United States, any such guarantee would not further protect the Debtors' investment in a meaningful manner.  All of the assets held by the Treasury Funds are (or are backed by) U.S. Treasury Obligations, the Debtors own shares of the Treasury Funds, and the assets of the Treasury Funds are entirely separate from (and not subject to the credit risk of) GSAM or the fund custodian.  Ownership of shares of the Treasury Funds is therefore the functional equivalent of direct ownership of a pool of U.S. Treasury Obligations, an investment "backed by the full faith and credit of the United States." 11 U.S.C. § 345(b).  The U.S. Trustee's attempt to put an additional layer of protection on the Debtors' funds through section 345(b) of the Bankruptcy Code is entirely unnecessary given these facts.

**II.   To the Extent that the Investment Accounts do not Comply with Section 345 of the Bankruptcy Code, Cause Exists to Waive the Requirements of Section 345(b)**

17.    Moreover, to the extent the Debtors' investments in the Treasury Funds do not strictly comply in all respects with the investment guidelines set forth in section 345 of the Bankruptcy Code, cause clearly exists to waive the requirements of section 345(b) as this Court has the authority to order.[3]

---

[3] The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code. The legislative history of the amendment provides: "This section would amend the Code to allow the courts to approve investments other than

7

18. In its Objection, the U.S. Trustee states that "while the prospectuses of the [Treasury Funds] appear to limit investments to securities guaranteed by the full faith and credit of the United States, it is not clear that the [Treasury Funds] are required at all times to be invested in such securities or whether the managers of the Funds have discretion to alter the investment mix based on changing circumstances." Objection at pp. 2, 7. In other words, the Debtors might intend to invest in a fund that owns only Treasuries, but in fact the fund may purchase other securities instead.

19. The U.S. Trustee's concern is entirely unfounded. GSAM advertises the Treasury Funds, through the Treasury Funds' prospectus and otherwise, as investing only in U.S. Treasury Obligations and, in the case of the Treasury Solutions Fund, obligations fully collateralized by U.S. Treasury Obligations. The U.S. Trustee suggests that the fund manager could nevertheless disregard the Treasury Funds' investment objective and invest in some other assets or move the Debtors' investment into some other fund. Securities laws are already in place that would prohibit such acts. *See, e.g.,* Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. In addition, if the Treasury Funds' mandates were modified such that they ceased to invest only in U.S. Treasury Obligations (an exceedingly remote possibility), the Debtors would be alerted to that fact, and both the Investment Guidelines and section 345 of the Bankruptcy Code would require the Debtors to move excess cash into other investments that consist of only Treasuries.

20. Simply put, there is no reason to believe that a multi-billion dollar money market fund managed by a reputable financial institution that advertises itself as investing only in U.S.

---

those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 33 F.3d 294 (3d Cir. 1994)." *In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

8

Treasury Obligations will hold anything other than U.S. Treasury Obligations. Any limited waiver of the requirements of section 345(b) of the Bankruptcy Code, to the extent a waiver is necessary at all, should be viewed in this context. As discussed above, because the U.S. Treasury Obligations are backed by the full faith and credit of the U.S. government, a guarantee of the Investment Accounts themselves by the U.S. government would not add any meaningful incremental protection. If the absence of such a guarantee causes the Investment Accounts to run afoul of section 345, a waiver is warranted. Likewise, the Debtors own shares in the Treasury Funds, which is the functional equivalent of owning a pool of U.S. Treasury Obligations directly. Again, if the absence of direct ownership causes the Investment Accounts to run afoul of section 345, a waiver is warranted.

21. Contrary to the U.S. Trustee's assertions, these arguments are not "available to virtually every debtor." *See* Objection at pp. 6-7. Here, the Debtors are seeking this Court's approval to continue to abide by their written Investment Guidelines, which limit the securities that the Debtors may invest in to only Treasuries, in a manner that is most beneficial to the Debtors' business. This is not a case where the Debtors are seeking to set aside section 345 out of mere convenience in order to maintain investment programs that do not comply with the letter or spirit of section 345.

**III.    Maintaining the Investment Accounts is Beneficial to the Debtors' Business**

22. As discussed above, the U.S. Trustee's Objection suggests two alternative methods of compliance with section 345: the Debtors could keep excess cash in deposit accounts, or they could purchase Treasuries directly from the U.S. government. Both of these options have serious drawbacks.

23. Direct purchases of U.S. Treasury Obligations would require the Debtors to establish a new brokerage and/or custody account to trade the securities and to establish new

9

controls and procedures for trading, cash movement and accounting. The Debtors do not currently have a brokerage or custody account and, as discussed above, believe that existing or new banks would be unprepared to open such an account for the Debtors. Even if the Debtors could identify a bank, managing a portfolio of direct purchases, including managing trading and maturities required to fund daily cash flow needs and recording the cash movement, accounting, and reconciliation of the portfolio, would be an added administrative burden on the Debtors. More importantly, however, the Debtors have well established procedures and controls to purchase and redeem shares of the Treasury Funds, as well as internal systems to record cash movements and general ledger entries. Moving to a direct-purchasing system would introduce an unacceptable level of control risk since only one single person is designated to buy, sell, change bank accounts, and make withdrawals under the account.

24. Moreover, as a practical matter, the Investment Accounts offer greater liquidity than direct investments in U.S. Treasury Obligations. The Investment Accounts are highly liquid (same-day liquidity up to 3 p.m. on the day of transaction), whereas direct investments in U.S. Treasury Obligations would be less flexible, since direct investments in Treasuries mature weekly on Thursdays. Access to liquidity on short notice is important to the Debtors' business. For example, it is not uncommon for the Debtors to require access to tens of millions of dollars in respect of, for example, rebate payments, royalties, and pharma fees.

25. With respect to deposit accounts, the Debtors' primary bank, East West, has confirmed that it would be able to accommodate some, but not nearly all, of the amount currently invested in the Treasury Money Market Funds. As discussed above, the Debtors may not be able to find other Approved Depositories that will accept deposits for this excess cash on hand. In

addition, moving cash from these Investment Accounts to deposit account would cost the Debtors approximately $8 million a year in lost interest income.

26. Finally, courts routinely authorize debtors in other large and complex chapter 11 cases to invest in investment accounts similar to the Investment Accounts. The Debtors request that the Court do so here.

### IV. The Debtors' Other Investment and Restricted Cash Accounts are Compliant with Section 345 of the Bankruptcy Code

27. As of October 31, 2019, the Debtors report an aggregate amount of restricted cash of approximately $268 million. Of that amount, approximately $137 million is held in deposit accounts at Metropolitan Commercial Bank and $750,000 is held in a certificate of deposit at American Express National Bank. As discussed in the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Policies and Honor All Obligations in Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 10] (the "**Insurance Motion**"), the remaining funds, approximately $130 million in the aggregate, are deposited in various escrow, reserve or trust accounts with Wells Fargo Bank, N.A. ("**Wells Fargo**"), East West Bank and Bank of Oklahoma ("**BOKF**"). The cash in these accounts is collateral for the benefit of the Debtors' insurers, as required under various fronting and captive insurance arrangements. *See* Insurance Motion ¶ 14. Because these Wells Fargo accounts are not the Debtors' accounts, they were included in the list of the Debtors' bank accounts attached as Exhibit C to the Cash Management Motion. The East West Bank ($15 million) and BOKF ($27 million) accounts were opened in late September as part of insurance policy renewal collateral requirements.

11

28.     The cash held in the various Wells Fargo accounts and the BOKF account are invested in money market treasury funds in accordance with the underlying trust or escrow agreements.[4]  The Debtors believe that this investment choice is prudent, as it allows for a reasonable rate of return on the restricted cash while safeguarding the security deposits.  For the same reasons discussed in the context of the Investment Accounts, the Debtors believe that their arrangements with their insurers are compliant with section 345 of the Bankruptcy Code and, to the extent a limited waiver of the requirements of section 345 is necessary, ample grounds exist for such a waiver.[5]  The Debtors have experienced significant challenges in maintaining banking and insurance relationships.  Asking either the banks or the insurance companies to make a change in investments could risk the Debtors losing their banking and/or insurance relationships.

*[Continued on Following Page]*

---

[4] The cash held in East West Bank is collateralized.

**Conclusion**

29. For the reasons set forth herein, in the Supplemental Lowne Declaration and in the Cash Management Motion, the Debtors respectfully request that the Court overrule the Objection on the merits, to the extent not consensually resolved, enter the proposed final order, substantially in the form presented to the Court at the hearing on September 17, 2019, and grant such other and further relief as the Court deems appropriate.

Dated:   New York, New York
         November 15, 2019

By:   /s/ *Eli J. Vonnegut*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Proposed Counsel to the Debtors
and Debtors in Possession*