# **EXHIBIT A**

**Supplemental Lowne Declaration**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**SUPPLEMENTAL DECLARATION OF JON LOWNE IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF FINAL ORDER AUTHORIZING
(I) DEBTORS TO CONTINUE TO USE EXISTING CASH
MANAGEMENT SYSTEMS AND MAINTAIN EXISTING BANK ACCOUNTS AND
BUSINESS FORMS AND (II) FINANCIAL INSTITUTIONS TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS**

I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am a Senior Vice President and the Chief Financial Officer of Purdue Pharma L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**," the "**Company**" or "**Purdue**"). I was first employed by Purdue as Senior Internal Auditor in 1995 and gained increasing responsibility in the Company's finance team over time, including as Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017 to February 2018. Since March 2018, I have been the Chief Financial Officer of PPLP. I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

2.  I submit this declaration (the "***Declaration***") in further support of the Debtors' Motion for Entry of Final Order Authorizing (I) Debtors to Continue to Use Existing Cash Management Systems and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers [Docket No. 5] (the "***Cash Management Motion***").[2]  I am authorized to submit this Declaration on behalf of the Debtors.

3.  On September 15, 2019 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  On September 18, 2019, the Court entered the *Interim Order Authorizing (I) Debtors to Continue to Use Existing Cash Management Systems and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 61].

4.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.  The Debtors' practice is to concentrate unrestricted cash in treasury money market funds ($800 million as of October 31, 2019) or authorized deposit accounts collateralized by treasuries or US agencies or guaranteed by surety bonds ($345 million as of October 31, 2019). The Debtors maintain written short-term investment guidelines (the "**Investment Guidelines**")

---

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Cash Management Motion.

2

that establish procedures and policies for investing any excess cash. *Only* Treasury Money Market Funds and deposits collateralized by US treasuries or US agencies are considered "Permissible Securities" under the Investment Guidelines.

6.      The Debtors invest their excess cash in two money market accounts: the Goldman Sachs Financial Square Treasury Instruments Fund (the "**Treasury Instruments Fund**") and the Goldman Sachs Financial Square Treasury Solutions Fund (the "**Treasury Solutions Fund**" and, together with the Treasury Instruments Fund, the "**Treasury Funds**"). I understand that the applicable prospectus for the Treasury Funds provides that the Treasury Instruments Fund invests only in securities issued or guaranteed by the U.S. Treasury where the payment of principal and interest is backed by the full faith and credit of the U.S. government ("**U.S. Treasury Obligations**"), and the Treasury Solutions Fund invests only in U.S. Treasury Obligations and repurchase obligations with the Federal Reserve Bank of New York collateralized by U.S. Treasury Obligations. The Treasury Funds each carry the highest possible ratings from S&P's and Moody's, AAAm and Aaa-mf, respectively, denoting safety and liquidity. I have reviewed the most recent Weekly Holdings Report for the Treasury Solutions Fund and the Treasury Instruments Fund and understand that all of the Treasury Funds' reported holdings are in U.S. Treasury Obligations only.

7.      As of October 31, 2019, the Debtors had approximately $500 million invested in the Treasury Instruments Fund and $300 million invested in the Treasury Solutions Fund.

8.      The Investment Accounts offer greater liquidity than direct investments in U.S. Treasury Obligations. The Investment Accounts are highly liquid (same-day liquidity up to 3 p.m. on the day of transaction), whereas direct investments in U.S. Treasury Obligations would be less flexible, since direct investments in Treasuries mature weekly on Thursdays. Access to liquidity

3

on short notice is important to the Debtors' business. For example, it is not uncommon for the Debtors to require access to tens of millions of dollars in respect of, for example, rebate payments, royalties, and pharma fees.

9.    The Debtors have well established procedures and controls to purchase and redeem shares of the Treasury Funds, as well as internal systems to record cash movements and general ledger entries. Direct purchases of U.S. Treasury Obligations would require the Debtors to establish a new brokerage and/or custody account to trade the securities and to establish new controls and procedures for trading, cash movement and accounting. The Debtors do not currently have a brokerage or custody account and are unsure whether existing or new banks would be prepared to open such an account for the Debtors. Managing a portfolio of direct purchases including managing trading and maturities required to fund daily cash flow needs and recording the cash movement, accounting, and reconciliation of the portfolio, would be an added administrative burden on the Debtors.

10.    It would be difficult, if not impossible, to find approved banks that would accept deposits in the full amount of the Debtors' excess cash. The Debtors have faced unprecedented negative publicity which has resulted in four institutions terminating banking relationships with the Debtors. Indeed, at one point the Debtors were within weeks of not having operational bank accounts. As a result, the Debtors were forced to spend countless hours navigating various banks' "Know Your Customer" diligence processes, contacting prospective banking partners, implementing new banking arrangements, and integrating Debtors' collection and payment systems with a new bank. During this process of finding a bank that was prepared to work with the Debtors, at least 10 banks advised that they would not do business with the Debtors, the majority of which were on the U.S. Department of Justice list of Authorized Bank Depositories.

It would therefore be an administrative burden to ask the Debtors to approach additional banks, and I believe that the likelihood of the Debtors finding additional willing institutions is low.

11. I believe that moving the funds in the Investment Accounts to collateralized deposit accounts would cost the Debtors approximately $8 million a year in lost interest income.

12. As of October 31, 2019, the Debtors report an aggregate amount of restricted cash of approximately $268 million. Of that amount, approximately $137 million is held in deposit accounts at Metropolitan Commercial Bank and $750,000 is held in a certificate of deposit at American Express National Bank. The remaining funds, approximately $130 million in the aggregate, are deposited in various escrow or trust accounts with Wells Fargo Bank, N.A. ("**Wells Fargo**"), East West Bank and Bank of Oklahoma ("**BOKF**"). The cash in these accounts is collateral for the benefit of the Debtors' insurers, as required under various fronting and captive insurance arrangements. The East West Bank ($15 million) and BOKF ($27 million) accounts were opened in late September as part of insurance policy renewal collateral requirements.

13. The cash held in the various Wells Fargo accounts and the BOKF account are invested in money market treasury funds in accordance with the underlying trust or escrow agreements.[3] The Debtors have a fragile relationship with both Wells Fargo and the insurance companies. Asking either the banks or the insurance companies to make a change in investments could risk the Debtors losing their banking and/or insurance relationships.

*[Continued on Following Page]*

---

[3] The cash held in East West Bank is collateralized.

14. I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   November 15, 2019

By:  */s/ Jon Lowne*
Jon Lowne
Senior Vice President and Chief Financial Officer