DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Marc J. Tobak

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**DEBTORS' OMNIBUS REPLY BRIEF IN FURTHER SUPPORT OF
MOTION TO ASSUME THE PREPETITION REIMBURSEMENT
AGREEMENT WITH THE AD HOC COMMITTEE, AND TO PAY THE
FEES AND EXPENSES OF THE AD HOC COMMITTEE'S PROFESSIONALS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## **Preliminary Statement**

1.      The Debtors' Motion presents a simple question:  will it benefit the Debtors' estates to pay certain fees of the professionals representing the Ad Hoc Committee[2] so that the Ad Hoc Committee and its constituents can continue to fill their essential role in these cases? This question has an equally simple answer:  yes.  The Ad Hoc Committee has a unique role to fill, both as a voice for certain governmental entities that may not serve as voting members of the UCC and as one of the co-architects of the Settlement Framework that is expected to bring billions of dollars of value into these estates.  The Ad Hoc Committee cannot continue to play that important role without experienced professional representation.  The Debtors would face possibly insurmountable obstacles in efforts to construct a confirmable plan and settlement on the basis of the Settlement Framework if they do not have an organized counterparty representing the unique interests of governmental entities, or if they are unable to carry out their promise to pay professional fees of the Ad Hoc Committee as one of the many bargains and counter-bargains under the Settlement Framework.  The Debtors' decision to pay certain professional fees benefits the estates and is therefore a sound exercise of business judgment.

2.      None of the Objectors meaningfully challenge these fundamental facts.  Instead, they lodge objections based on an attempt to side-step the critical facts of these cases by an inapt analogy to run of the mill chapter 11 cases, by attempting to attack the Debtors' decision to pay fees as a sub rosa means to favor one creditor group over others, and by misunderstanding the governing law.

---

[2] Unless otherwise set forth herein, capitalized terms have the meanings ascribed to them in the Debtors' Motion to Assume the Prepetition Reimbursement Agreement with the Ad Hoc Committee, and to Pay the Fees and Expenses of the Ad Hoc Committee's Professionals, dated Oct. 29, 2019 [Docket No. 394] ("**Motion**").

3.      These objections are unavailing.  While in some ordinary commercial cases, one group of financial creditors might not be able to demonstrate sufficient benefit to the estates to justify payment of professional fees in the absence of a binding settlement or restructuring support agreement ("**RSA**"), here, the Ad Hoc Committee has both already conferred significant value to the estates, and is essential to the significant efforts that will be needed going forward to translate the Settlement Framework and Term Sheet into a confirmable plan.  Relatedly, the Debtors' decision to pay certain professional fees of the Ad Hoc Committee in no way prejudges the Debtors' views on allocation of estate recoveries.  Moreover, the Debtors and Ad Hoc Committee have revised the Proposed Order, attached hereto as Exhibit A, to expressly exclude from the scope of reimbursement both objecting to the claims of other creditors and advancing or prosecuting the claims of the individual members of the Ad Hoc Committee.

4.      Attempts to argue that the Motion should be denied because creditors' professional fees may only be paid under 503(b) upon a showing of a substantial contribution also fail.  Courts in this District—and around the country—routinely authorize Debtors to pay the professional fees of unsecured creditors and other parties in interest when payment of such fees would benefit the estate.  For good reason:  because 503(b), on the one hand, and sections 363 and 365, on the other, address entirely distinct scenarios—the former, a retrospective claim granted on motion of a creditor, and the latter, prospective authorization to the debtor to use estate assets for purposes beneficial to the estate as a whole—they have different standards and apply in different circumstances.

5.      The Ad Hoc Committee, the Debtors, and the UCC each have essential roles to play in these complex chapter 11 cases.  The Debtors' sound business judgment that honoring its

agreement to pay certain professional fees of the Ad Hoc Committee to enable or enhance its ability to play that role should be upheld, and the motion granted.

**Argument**

I.   **The Debtors' Reimbursement of Certain Professional Fees of the Ad Hoc Committee Will Benefit the Estates**

   **A. The Ad Hoc Committee Has a Unique Role to Play Alongside the Debtors and the UCC**

6.   The Debtors' Motion demonstrated that the Ad Hoc Committee affords the Debtors a single counterpart with which to efficiently negotiate on behalf of governmental units—and States in particular—whose support the Debtors will need for any viable plan of reorganization or settlement. (Mot. ¶ 20.)   In response, the UCC argues that the Ad Hoc Committee's fees need not be paid to facilitate their participation because the UCC has a fiduciary duty to all creditors, including States (*see* (Obj. of the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. [Docket No. 472] ("**UCC Obj.**") ¶ 6, 31), and because the Ad Hoc Committee, unlike the UCC, is not an estate fiduciary. (*See id.*)

7.   It is, of course, true that the UCC is a fiduciary of all creditors, including States and governmental units that the U.S. Trustee believes cannot be appointed to the UCC. And to be clear, the Debtors in no way intend to diminish the importance of the UCC and its role by agreeing to pay certain professional fees of the Ad Hoc Committee. But it would ignore the reality of these cases to suggest that sovereign states and other governmental units do not play a direct and central role as a third major constituency alongside the Debtors and the UCC.

8.   The Ad Hoc Committee is comprised of governmental entities, including 10 states (the "**States**"), that support the Settlement Framework.  The Debtors believe that the States, as sovereigns vested with a panoply of police and regulatory powers and representatives of their citizens, will be an essential component of any viable settlement or plan of reorganization.   And

3

it is of great import that the dissenting states also support the relief requested, and will be directly benefiting from the relief requested.

9.      That the UCC has fiduciary duties that also run to the States and municipalities and that the UCC has appointed certain governmental entities—although, notably, only one dissenting state—as "ex officio" members of the UCC (UCC Obj. ¶ 32), in no way obviates the need for the Ad Hoc Committee.  States and other government actors may reasonably chose to pursue public policy goals that diverge from the views of the UCC and its private constituent members.  Although the UCC is the fiduciary of all unsecured creditors, the voting members of the UCC lack the unique police powers of the members of the Ad Hoc Committee.  The UCC is therefore not in a position to credibly leverage the power possessed by governmental entities in negotiations with the Debtors' shareholders ("**Shareholder Parties**").  Indeed, the Ad Hoc Committee has already capitalized on its members' distinct powers, and has successfully negotiated with the Shareholder Parties to secure their financial contribution and agreement to disclose key financial information.  (*See* Decl. of Jamie O'Connell, dated Nov. 15, 2019 ("**O'Connell Decl.**") ¶¶ 18, 19, 22.)  Moreover, given the sovereignty of governmental entities, the members of the Ad Hoc Committee are not willing to rely only upon a fiduciary representative they had no role in selecting.  It is hardly surprising, then, that virtually every State—each of whom is a fiduciary to its citizens in its own right and most of whom are represented by their senior law enforcement personnel—has seen fit to join separate ad hoc groups to represent their interests with representatives of their own choosing. It is the Debtors' sound business judgment that performing the Reimbursement Agreement to ensure the robust functioning of the Ad Hoc Committee will assist the Debtors in maximizing the value of the

estates for the benefit of <u>all</u> creditors, as has already been amply demonstrated in just the first 60 days of these cases.

10.    The Debtors do not seek this relief to favor certain creditors over others, and the Debtors are deeply aware of the personal toll of the opioid crisis on individual victims and families.  To be clear, the Debtors' Motion to assume the Reimbursement Agreement and its request for authority to pay the fees of the Ad Hoc Committee do not reflect any view of the Debtors that certain creditors are entitled to more of the estates' value than others.  The Debtors currently do not have a position as to how the estates' assets should ultimately be allocated as part of a plan of reorganization.  Allocation is and will continue to be a complicated question that requires the attention of all constituents, as the Court has repeatedly recognized. (Prelim. Inj. Hr'g Tr. 149:14-150:8, 175:11-17, 175:24-176:6, 150:23-151:1, 256:6-12 (Oct. 11, 2019).)  But it is undeniable that the States and other governmental entities will need to have a well-represented voice at the table, and one or two organized voices is far better for all than 48.  (*See* Prelim. Inj. Hr. Tr. 57:10-13 (requesting that "each [S]tate reach out to the claimants in its [S]tate, and start discussing this [crisis] to see if there's an equitable way that the claimants within the [S]tate can get comfortable with how it can be addressed"); 57:20-58:1  ("[U]rg[ing] the [S]tate representatives to reach out to those people who have made their presence known in this state [*sic*] who are within the state . . .[including] municipalities, localities, [and] hospitals").

### B.    The Ad Hoc Committee Has Already Provided Significant Benefits to the Estates

11.    Contrary to the UCC's assertion that the Ad Hoc Committee's actions "primarily benefit" only the committee itself (UCC Obj. ¶¶ 45, 54),[3] the Ad Hoc Committee's work has

---

[3] The cases the UCC cites for the principle that professionals services that "primarily benefit the client do not justify" payment by the estate (UCC Obj. ¶¶ 45, 54 (citing *In re Dana*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) and *In re Hooker Investments, Inc.* 188 B.R. 117, 120-121 (S.D.N.Y. 1995)), do not address whether the Debtors'

directly benefited the Debtors and all of the estates' creditors.  In fact, arguably <u>none</u> of its work to date has benefited itself.

12.    First, the formation of Ad Hoc Committee alleviated a significant, time-consuming, and costly administrative burden on the estates.  By forming a single, well-represented counterparty, the Ad Hoc Committee enabled the estates to avoid having to negotiate separately with numerous States and thousands of municipalities and Native American Tribes concerning the terms of injunctive relief and the Settlement Framework.  The Debtors' negotiating experience before the Ad Hoc Committee was formed has demonstrated the efficiency of dealing with one counterparty rather than many.  This alone has conferred a significant financial benefit to the estates.  (O'Connell Decl. ¶ 21.)

13.    Second, the Ad Hoc Committee's support of the Debtors' motion for a preliminary injunction conferred another significant benefit on the estates at the outset of these cases.  The Ad Hoc Committee and its members agreed to stand down on their litigation during the pendency of the preliminary injunction motion.  In addition, by voluntarily agreeing to be bound by the terms of the preliminary injunction, the Ad Hoc Committee enabled the Debtors to obtain—within the first 50 or so days of this case—a complete standstill of litigation not only against the Debtors, but also against the Related Parties.  (*See* O'Connell Decl. ¶ 20.)  That support was critical because it enabled the Debtors to avoid incurring hundreds of millions of dollars of professional expenses in "extremely wasteful" litigation that the Court held would "materially and adversely affect the Debtors' Chapter 11 process and estates."  (Prelim. Inj. Hr'g Tr. 261:1-3, 255:17-23 (Oct. 11, 2019).)

---

payment of professional fees is appropriate under Bankruptcy Code Sections 363 or 365 and therefore do not apply the business judgment standard applicable to this Motion.

14.    Third, the Ad Hoc Committee's agreement in principle to the Settlement Framework at the outset of the cases, and its subsequent agreement to the Settlement Term Sheet, were significant first steps forward toward a consensual resolution.  Indeed, the Ad Hoc Committee's agreements provided a structure for the parties in these cases to continue negotiating, perform diligence of key financial information, investigate potential claims, and develop a consensual plan of reorganization that will maximize the value of the estates and recovery for all creditors.  (O'Connell Decl. ¶¶ 18.)  Had the Debtors not been able to reach agreement in principle on a Settlement Framework and, later, the Settlement Term Sheet, the Debtors would have had no choice but to initiate a "free fall" bankruptcy which would have destroyed estate value to the detriment of all creditors.  (O'Connell Decl. ¶¶ 12, 13.)  Indeed, one of the most important factors in the timing of the Debtors' decision to file for bankruptcy was achieving a core level of support for a global resolution.  (*Id.*)

**C.    The Ad Hoc Committee Will Continue to Provide Significant Benefits to the Estates**

15.    The Ad Hoc Committee made these early—and significant—successes possible. It is equally clear that the Ad Hoc Committee, as a result of this experience and its unique position in these cases, will continue to benefit the estates moving forward, for a number of reasons entirely ignored by the Objectors.

16.    Most fundamentally, the Ad Hoc Committee will continue to drive negotiations on the Settlement Framework forward because the committee is comprised of members whose sovereignty and official powers endow them with a distinctive leverage in settlement negotiations. (*See* O'Connell Decl. ¶ 22.)  By virtue of that unique role, the Ad Hoc Committee brings to bear leverage and powers on the Shareholder Parties that other creditor groups with litigation currently filed against the debtors do not possess.  Indeed, the Ad Hoc Committee has

7

already made effective use of that leverage, for example, by negotiating with the Shareholder Parties to assist in securing their commitment to provide in excess of $3 billion in financial contributions to the estates. (*Id.*) The Ad Hoc Committee has also secured diligence materials to assess the Settlement Framework, and in particular commitments from the Shareholder Parties to provide an ever-increasing amount of financial information, thereby increasing the amount of information that will be available for all constituents. (*See* O'Connell Decl. ¶¶ 23-25.)

17.     The importance of these disclosures cannot be overstated. Indeed, the Court has recognized that "information sharing transparency" with the Shareholder Parties is a critical factor "influencing the decision whether to support a settlement" and emphasized that the Shareholder Parties cannot "ge[t] a free ride on disclosure." (Prelim. Inj. Hr'g Tr. 222:18-21, 228:9-13 (Oct. 11, 2019).) The UCC has acknowledged too that "it's going to be impossible for the creditor's committee to fairly evaluate the settlement framework without" information from the Shareholder Parties—information that the Ad Hoc Committee has helped obtain. (Prelim. Inj. Hr'g Tr. 61:14-19 (Nov. 6, 2019).) Moreover, the Ad Hoc Committee and its professionals have played, and will continue to play, a central role in facilitating due diligence, which the Court has stated "is a major focus of this case." (Prelim. Inj. Hr'g Tr. 46:23-47:1 (Oct. 11, 2019).) The Ad Hoc Committee's agreement to share FTI's work product with the governmental entities currently not supporting the Settlement Framework is just one example of how the Ad Hoc Committee will further the due diligence process going forward. (*See* Ex. A, Revised Proposed Order ¶ 7.)

18.     The Ad Hoc Committee will also be an essential player in continued negotiations with other governmental entities. Being comprised entirely of governmental entities, the Ad Hoc Committee understands the concerns and needs of state and local governments, and is therefore

also uniquely situated to facilitate discussions and agreements with States and other governmental entities currently opposing the Settlement Term Sheet, or "on the fence." (*See* O'Connell Decl. ¶ 22.) As these cases progress, the Ad Hoc Committee and its professionals will be crucial in helping the Debtors grow the level of support for the Settlement Framework— or find improvements thereon or variants thereto. (*See, e.g.*, O'Connell Decl. ¶ 24.)

19.    In short, the Debtors propose to invest estate resources in this counterparty because doing so is in the best interests of the estates. The alternative to doing so—i.e., uncoordinated, individualized negotiations with dozens of supporting sovereigns and thousands of other political subdivisions—would be far more costly for the estates and could derail any hope of reaching consensus on a confirmable plan of reorganization. (*See* O'Connell Decl. ¶ 24.)

20.    As a final attempt to show that payment of the Ad Hoc Committee's professional expenses will not benefit the estates, the UCC argues that the Ad Hoc Committee would not in fact disband or decrease its involvement just because it is required to pay its own professional fees. The UCC is free to speculate about the consequences of the Debtors playing a game of "chicken" with the Ad Hoc Committee. But the business judgment standard certainly does not require—and the Debtors' duties may not even allow—the debtors to risk losing all of the benefits explained above by breaching their promise to pay certain professional fees and hoping that the Ad Hoc Committee would not disband, slacken its efforts, or terminate the Settlement Framework and Term Sheet.

21.    At an even more fundamental level, the Debtors' decision to uphold their prepetition agreement to seek approval to pay the Ad Hoc Committee's fees as part of the Settlement Framework builds among the most essential assets of the Debtors in these cases: trust that the Debtors will keep their word. The Ad Hoc Committee, for its part, has upheld its end of

9

the bargain. The Debtors are now upholding theirs. If the Debtors—having secured the benefits of the Settlement Framework—decided not to honor their word, it is nearly inconceivable that the Debtors could rebuild the trust of the Ad Hoc Committee and other case constituents that will be needed to construct a confirmable plan of reorganization.

### D. The Reimbursement Agreement Ensures that the Debtors Will Bear Only Fees that Benefit the Estate

22.    The UCC's and Ad Hoc Group of Individual Victims of Purdue Pharma L.P., *et al.* ("**Ad Hoc Group of Individual Victims**") object because, in their view, "there is no guarantee that the Ad Hoc Committee will support . . . any ultimate settlement" and that "any member of the Ad Hoc Committee can withdraw its consent to the Settlement Framework or remove itself from the Ad Hoc Committee." (Obj. of Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al. [Docket No. 454] ("**Indiv. Obj.**") ¶¶ 9, 29; UCC Obj. ¶¶ 4, 33).  But this, too, misses the point.

23.    As an initial matter, in the Reimbursement Agreement, the Debtors have a flat and unqualified "fiduciary out" and can terminate the agreement if it "determines in <u>its sole discretion</u> that this arrangement is no longer in the best interests of the Company." (Mot., Ex. B at 3 (emphasis added).)  In addition, the Reimbursement Agreement directly addresses the concern of the Ad Hoc Group of Individual Victims that "Debtors would still be authorized to pay the fees and expenses" of the Ad Hoc Committee even though "members of the Ad Hoc Committee can withdraw from the group," (Indiv. Victims Obj. ¶ 29) because it allows Debtors to terminate the agreement "if the membership of the Ad Hoc Committee should change to be less representative without the Company's consent."  (Mot., Ex. B at 3.)  Additionally, the Reimbursement Agreement provides that the only professional fees covered are those that are in the scope of the agreement, which is limited and excludes activities such as "tak[ing] positions

adverse to the Settlement, engag[ing] in litigation activities, review[ing] or investigat[ing] other matters, or engag[ing] in matters in which the respective members of the Ad Hoc Committee may be in conflict." (*Id.*) The Reimbursement Agreement also automatically terminates if an RSA is not executed by December 13, 2019, unless the Debtors agree to extend that date. (*Id.*)

24. Furthermore, the Debtors "agreement to pay the fees and expenses of the Professionals is subject to its review as to the reasonableness of such fees and expenses" and the Debtors' review for reasonableness "will take into account, among other things, its view of duplication of effort by the Professionals." (*Id.*) Thus, the Debtors are not bound to "pay unlimited fees" to the Ad Hoc Committee under the Reimbursement Agreement, and can limit the amount of fees paid by the estate or even terminate the entire agreement if they believe it is in the estates' best interest. (*See* Obj. of the United States Trustee [Docket No. 463] ("**Trustee Obj.**") at 13.) And it was always contemplated that <u>all</u> parties—not just the Debtors—can and will police these fees through notice and objections. And undoubtedly they will.

### E. The Debtors Have Also Made Substantial Changes to the Proposed Order to Accommodate the Objectors

25. Even though the Reimbursement Agreement itself contains robust protections in the event it ceases to serve the estates' interests, the Debtors nonetheless have made a number of significant amendments to the Proposed Order to alleviate many of the Objectors' concerns. They include the following:

26. First, the Debtors have removed the authorization to amend the Reimbursement Agreement without further Court authorization. (*See* Indiv. Obj. ¶ 33-34.)

27. Second, the Proposed Order now requires court approval for both the payment of fees to Compass Lexecon and Coulter & Justus and the authorization to pay fees of an investment banker (unless the Debtors, the UCC, and the U.S. Trustee all give their consent) (Ex.

A, Revised Proposed Order ¶¶ 5, 6), reducing the number of professionals currently seeking fees under the Reimbursement Agreement as part of this Motion (*see* UCC Obj. ¶ 42; Trustee Obj. n. 9; Indiv. Obj. ¶ 1 n. 5).

28.      Third, the Proposed Order now requires the Ad Hoc Committee's professionals to follow the same compensation procedures as professionals of the Debtors and the UCC, including submitting fee statements that comply with U.S. Trustee's guidelines, publicly filing fee statements rather than providing them to only the Debtors, UCC and the U.S. Trustee, submitting applications for court approval of the Ad Hoc Committee's professional fees every four months, and providing for a holdback of 20% of fees until such amounts are approved following each application.  (Ex. A, Revised Proposed Order ¶ 5).

29.      Fourth, the Proposed Order has been revised to expressly provide that grounds for objection to the Ad Hoc Committee's professionals fees include that such fees are (i) duplicative with the work of other Ad Hoc Committee professionals or (ii) outside the Scope as defined in the Reimbursement Agreement.  (*Id*. ¶ 5.)

30.      Fifth, the Proposed Order also now clarifies that neither objecting to the claims of other creditors or advancing or prosecuting the claims of the individual members of the Ad Hoc Committee shall be considered within the Scope.  In addition, the Proposed Order caps the amount of prepetition fees at $1.5 million and provides that the Ad Hoc Committee will not seek reimbursement of such amounts until the earlier of (i) the execution of an RSA among parties including the Debtors and each member of the Ad Hoc Committee and (ii) confirmation of a chapter 11 plan.  (*Id*.)  These changes further address and eliminate the concern that the Ad Hoc Committee will be able to recover "unlimited fees."  (*See, e.g.*, Trustee Obj. 13.)

## II.    The Debtors Should Be Authorized to Perform Under the Reimbursement Agreement

### A. The Reimbursement Agreement May Be Authorized under Section 363(b) and Section 365(a)

31.    The Debtors seek approval to currently perform the Reimbursement Agreement pursuant to sections 363(b) and 365(a) of the Bankruptcy Code.  That the subject matter of the Reimbursement Agreement is the payment of professional fees in no way renders these basic administrative powers inapplicable, or requires shoehorning the Reimbursement Agreement into the strictures of Section 503(b).

32.    As an initial matter, the U.S. Trustee's assertion that Section 503(b) is the "exclusive avenue" to pay the professional fees of an unsecured creditor (Trustee Obj. 2, 7-10), is, respectfully, not the law.  As both the UCC and Ad Hoc Group of Individual Victims concede, courts routinely authorize payment of creditors' professional fees under sections 363 and 365.  (See UCC Obj. ¶ 33 ("[M]any courts have authorized payment of professional fees of non-estate fiduciaries under Bankruptcy Code sections 363 and 365.") & n. 25; Indiv. Obj. ¶ 19 (citing In re Dendreon Corp., No. 14-15215 (PJW) (Bankr. D. Del. Dec. 23, 2014 [Dkt. No. 215] (approving payment of unsecured creditor's professional fees under Section 365(a)); In re Rural/Metro Corp., No. 13011952 (KJC) (Bankr. D. Del. Sept. 5, 2013 [Docket No. 21] (same); In re William Lyon Homes, No. 11-14019 (CSS) (Bankr. D. Del. Sept. 5, 2013) [Docket No. 217] (same),[4] ¶ 23 (citing In re ASARCO, L.L.C., 650 F. 3d 593 (5th Cir. 2011) (affirming district and bankruptcy court approval of payment of bidders' fees under Section 363).)  The UCC and the Ad Hoc Group of Individual Victims essentially admit that if there was an RSA in place, the

---

[4] The Ad Hoc Group of Individual Victims contends the Debtors incorrectly stated the holding of In re Hercules Offshore, Inc. (Indiv. Obj. ¶ 18.)  That is false.  Consistent with the description in Debtors' Motion (Mot. ¶ 19), the Hercules decision granted the debtors' request to assume the fees of a group of senior unsecured noteholders who agreed to an RSA.  In re Hercules Offshore, Inc., No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [Docket No. 95].

Debtors' motion could be approved under Sections 365(a) and 363(b).  Because the combination

of the Settlement Term Sheet with the obligations of the Ad Hoc Committee under the

Reimbursement Agreement essentially creates an RSA enforceable by the Debtors (*see infra* n.

6), this Motion should be granted based on the UCC's and Ad Hoc Group of Individual's views

of what is appropriate under Sections 365(a) and 363(b).

33.      The U.S. Trustee's argument that "a specific statutory provision governs a general

one" provides no support for the Trustee's position that Section 503(b) is the exclusive means to

pay creditor professional fees because there is no conflict among these statutory provisions.

*Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir. 1996) ("[T]he statute which addresses the

matter at issue in specific terms controls over a statute which addresses the issue in general

terms" only "[w]hen two statutes are in conflict").  Section 503(b) pertains only to the specific

instance where <u>a creditor</u>, with or without the consent of the debtor, files an application for

reimbursement of professional fees, usually in a late stage of a case.  11 U.S.C. § 503(b).  But,

"[t]he authorization of certain types of payments under section 363(b) is not prohibited simply

because there is another section of the Bankruptcy Code related to the same type of payment." *In*

*re Bethlehem Steel*, 2003 WL 21738964, at *11 (S.D.N.Y. July 28, 2003) ("subsections

503(b)(3)(D) and (b)(4) are not rendered meaningless simply because in certain unique

circumstances a bankruptcy court approves a debtor's motion to enter into an agreement to

reimburse a creditor for professional fees.").  Section 503(b) is not applicable here because, as

the U.S. Trustee expressly states, "a substantial contribution claim is retrospective only, not

prospective," (Trustee Obj. at 9) and a <u>retrospective</u> reimbursement would not give any certainty

to the Debtors that they would secure the benefits of the Ad Hoc Committee's contributions to

the case.  The U.S. Trustee's reliance on *In re Lehman Bros. Holdings, Inc.* is thus misplaced.

14

Judge Sullivan's decision in *Lehman* did not limit the scope of section 363(b) or 365(a).  508 B.R. 283, 291 (S.D.N.Y. 2014).  *Lehman* holds only that a <u>plan</u> provision that awarded an administrative expense claim for professional fees to a member of an official committee is inconsistent with section 503(b) because that section does not authorize administrative expense claims on account of "professional fee expenses for official committee members."  *Id.* at 290.  *Lehman* thus has no application here, where the Debtors seek <u>prospective</u> authorization to pay certain professional fees of the Ad Hoc Committee, not to award the Ad Hoc Committee an administrative expense claim under a plan of reorganization.[5]

34.     Moreover, the U.S. Trustee is simply incorrect in asserting that "it is impossible to know now if this ad hoc committee will make a substantial contribution until they take action in the case."  (U.S. Trustee Obj. 2.)  The Ad Hoc Committee has already taken numerous actions that have benefited the Debtors and all of the estates' creditors, including agreeing to support the Debtors' preliminary injunction, placing its members' actions against the Debtors on hold, negotiating and agreeing to the Settlement Term Sheet, and securing the commitment of the Shareholder Parties to produce substantial financial information.  (*See supra* ¶¶ 12-14.)

**B. Performing the Reimbursement Agreement is A Valid Exercise of the Debtors' Business Judgment**

35.     No party disputes that the debtors' decision to assume an executory contract under section 365(a),[6] or its decision to use estate property outside the ordinary course under section

---

[5] In addition, if the U.S. Trustee is correct that Section 503(b) does not allow for payment of financial advisors, as it asserts, (U.S. Trustee Obj. at 10), this case is even more distinct from *Lehman* because the fees the Debtors seek authorization to pay do not completely overlap the type of "administrative expenses" that fall within the ambit of Section 503(b).  The Motion specifically seeks reimbursement of FTI's fees because FTI's work is crucial to advancing the settlement negotiations in this case.  (O'Connell Decl. ¶ 25.)  If the U.S. Trustee were correct, Sections 363 and 365 would be the <u>only</u> available statutory grounds for Debtors' motion.

[6] Contrary to the assertion of the Ad Hoc Group of Individual Victims (Indiv. Obj. ¶¶ 12-15), the Reimbursement Agreement is an executory contract because "both sides are still obligated to render substantial performance."  *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 3154763, at *4 (Bankr. S.D.N.Y. Aug. 4, 2008).  It is true that the Ad Hoc Committee has already rendered *some* performance under the Reimbursement Agreement by agreeing to the

363(b), should be approved if the debtors used "valid business judgment." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Nor does any party dispute that the touchstone of whether a debtor used sound "business judgment" is whether the agreement or transaction contemplated would benefit the estates.  (*See, e.g.*, UCC Obj. ¶ 37-25.)  As explained in Section I, *supra*, paying certain professional fees under the Reimbursement Agreement will plainly benefit the estates.

36.     In an unavailing attempt to side-step this conclusion, the UCC argues, first, that the Debtors have attempted to argue for a "state law" business judgment standard, and second, that the Court need not defer to the Debtors' business judgment.  The UCC's argument that the "state law" standard does not apply ( UCC Obj. ¶ 39) is simply irrelevant:  The Debtors have not argued for application of any standard of "business judgment" other than the well-settled standard under the Bankruptcy Code, and certainly have not attempted to apply a "state law standard" in their Motion.  (Mot. ¶¶ 15-18, 25-26.)  And the UCC's attempt to argue that the Court can "apply its own judgment based on the record before it" rather than deferring to the Debtors' business judgment is a distinction without a difference.  (UCC Obj. ¶ 40 (quoting Hr'g Tr. 96:19-97:6, *In re Eljamal*, No. 15-22872 (Bankr. S.D.N.Y. Aug. 3, 2018).)  It is well settled

---

Settlement Framework, halting its members' litigation against the Debtors, supporting the Debtors' preliminary injunction motion, and agreeing to the Settlement Term Sheet. (See *supra* ¶¶ 12-14.)  Nevertheless, it is apparent from the face of the Reimbursement Agreement that the Ad Hoc Committee is obligated to continue its performance, including by "negotiate[ing] and support[ing] the terms and definitive documents associated with the Settlement," and "take[ing] such other actions as may be necessary or appropriate to facilitate the Settlement." (Mot., Ex. B at 3).  In addition, the Ad Hoc Committee's continued obligations are evinced by the Reimbursement Agreement's termination provision, which provides that the Debtors may terminate the agreement on the grounds that the "arrangement is no longer in the best interests of the Company"— e.g. if the Ad Hoc Committee fails to satisfy its obligations to support and advance the Settlement Framework.  (*Id.*)  The Ad Hoc Committee is also obligated under the Reimbursement Agreement to execute an RSA by December 13, 2019 and maintain its membership, or risk termination by the Debtors.  (*Id.*)  Furthermore, as the Ad Hoc Group of Individual Victims admits, the Debtors have a continuing obligation under the Reimbursement Agreement to pay the Ad Hoc Committee's professional fees.  (Indiv. Obj. ¶ 14.)  Therefore, because both parties to the Reimbursement Agreement are still obligated to render substantial performance, the agreement is an executory contract that can be assumed under Section 365(a).

that a Debtors' determination that assuming a certain agreement, or pursuing a certain transaction, is in the best interest of the estate is entitled to deference, even if, as the UCC maintains, a court may in appropriate circumstances apply its own judgment.  *See In re Republic Airways Holdings Inc.*, 547 B.R. 578, 582 (Bankr. S.D.N.Y. 2016) ("Courts will generally not second-guess a debtor's business judgment concerning whether an assumption or rejection benefits the debtor's estate" under Section 365); *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49 (Bankr. S.D.N.Y. 2016) ("[T]he Court may largely defer to the debtor's view that rejection or assumption will benefit the estate, provided that the debtor is not conflicted and has taken sufficient steps to maximize value."); *Lawsky v. Condor Capital Corp.*, 154 F. Supp. 3d 9, 22 (S.D.N.Y. 2015) (Once a Debtor makes the showing that it has a good business reason for a Court to grant an application under Section 363, the Debtor's determination "is owed deference under the business judgment rule."); 3 Collier on Bankruptcy ¶ 363.02 (16th ed. 2019) (In applying Section 363, "[t]he court should not substitute its judgment" for the Debtor's judgment, "but should determine only whether the [Debtor's] judgment was reasonable and whether a sound business justification exists.").  And the Debtors are certainly not conflicted with respect to governmental entities who are among their most bitter detractors and zealous litigation counterparts.

37.    The Debtors exercised "sound business judgment" in deciding to assume the Reimbursement Agreement because the agreement "will benefit the Debtor[s'] estate."  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2014).  As discussed above, and as the Court itself has observed in the proceedings to date,[7] the Ad Hoc Committee has made numerous contributions to the estates, many of which have, or will, save the Debtors

---

[7] Under Federal Rules of Evidence R. 201(b), the Court can take judicial notice of the actions taken by the Ad Hoc Committee, which are generally known to the Court based on these chapter 11 proceedings.

millions, if not tens or hundreds of millions of dollars.  By supporting the Settlement Framework

and agreeing to the Settlement Term Sheet, the Ad Hoc Committee enabled the Debtors to avoid

a value-destructive "free fall" bankruptcy and provided a foundation for all parties to continue

working toward a value-maximizing chapter 11 plan.  (O'Connell Decl. ¶¶ 12-13, 16, 18.)  The

Ad Hoc Committee also itself saved the Debtors significant administrative costs and was

essential to the development of the Settlement Term Sheet, as it provided the Debtors with a

well-represented negotiation counterparty who could speak on behalf of 23 states and counsel for

thousands of other governmental entities.  (*Id*. ¶ 21.)  Moreover, the Ad Hoc Committee's

support of the Debtors' request for injunctive relief assisted the Debtors in staying all litigation

and preserved hundreds of millions of dollars that would have been consumed by legal costs and

further value destruction.  (*Id*. ¶ 20.)  Finally, the Ad Hoc Committee was critical in securing the

in excess of $3 billion contribution from the Shareholder Parties, as part of the Settlement

Framework, and convincing the Shareholder Parties to turn over financial information for due

diligence.  (*Id*. ¶¶ 18,19.)

38.     There is a substantial amount of work ahead to reach a consensual resolution of

these cases.  (*Id*. ¶ 23.)  Assuming the Reimbursement Agreement assures the continued zealous

involvement of the Ad Hoc Committee and its professionals, which will facilitate negotiations

with the Shareholder Parties and be a further bridge to other crucial creditor groups (many of

whom are also governmental entities who could not be included on the UCC), assist in the

significant due diligence that lies ahead, and increase the likelihood that the parties achieve a

consensual resolution that maximizes the recovery of all.  Although the Debtors are keenly aware

that every dollar of the estates spent is a dollar that cannot be used to fight the opioid crisis,

assuming the Reimbursement Agreement is "in the best interests of the Debtors and all parties in

interest" because of the unique and critical role of the Ad Hoc Committee, whose work will inure to the benefit of all. *In re Bethlehem Steel Corp.*, No. 02 CIV. 2854 (MBM), 2003 WL 21738964, at *11 (S.D.N.Y. July 28, 2003) (affirming bankruptcy court determination that Debtor made "a good business decision" when it agreed to pay the professional fees of creditor group because doing so "would help develop a reorganization plan.").

39.     The UCC and Ad Hoc Group of Individual Victims argue that the Debtors should not assume the Reimbursement Agreement because the Ad Hoc Committee have not yet signed an RSA. (*See* UCC Obj. ¶¶ 4, 33; Indiv. Obj. ¶¶ 9, 24.)  The Debtors do not deny that they have not yet signed a binding RSA with the Ad Hoc Committee.  Given the complexity, myriad of interests and parties involved, the governmental interests, the nature of the claims, and the billions of dollars at stake, this case is unlike any of the precedents cited in the objections. (Indiv. Obj. ¶¶ 17-21).  The Debtors and Ad Hoc Committee have nevertheless agreed upon a detailed term sheet and both parties have since worked to advance the transactions contemplated by it. Moreover, the Ad Hoc Committee upheld, and continues to uphold, their end of the bargain by supporting the preliminary injunction, and continuing to negotiate regarding due diligence, and negotiating with other constituents about a global resolution.  Indeed, the commitment shown by the Ad Hoc Committee since the filing date far exceeds the actions typically taken by parties who have executed an RSA in chapter 11 cases.  Additionally, even when parties have a signed RSA, most RSAs typically have substantial termination rights and conditions precedent and do not provide the binding guarantee the Objectors argue is missing here.

40.     Indeed, contrary to the UCC's claim that the "circumstances" where reimbursement is "warranted. . . are entirely absent here," the facts in *In re Genco*, where the court approved reimbursement of fees under Bankruptcy Code Section 365, are highly

analogous.  In *Genco*, the court concluded that the fee at issue was "simply one component of a much larger negotiated transaction embodied" in an agreement that "creates tremendous value for the estate."  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).  So too here.  The Settlement Term Sheet was "negotiated in good faith and at arms-length," "resolv[es] the claims of creditor constituencies on a consensual basis," avoids "a free-fall bankruptcy with all those attendant risks" and "provides for a meaningful recovery for all of the Debtors' stakeholders."  *Id*. at 463-69.  If the Reimbursement Agreement "is not assumed, the framework for prompt resolution of this case" may "be removed," which could "irreparably harm other stakeholders in the case" and "jeopardize" the recovery of all unsecured creditors.  *Id*. at 469.  The Ad Hoc Committee's professional fees will not "unduly hamper the Debtors' efforts to maximize value for the estate given" the flat and unqualified "fiduciary out" in the Reimbursement Agreement and are not "unreasonable when compared to the value of the overall transaction contemplated by" the Settlement Term Sheet.  *Id*. at 465.  "Considered in this light," the Debtors' decision to assume the Reimbursement Agreement and pay the fees of the Ad Hoc Committee "clearly satisfies the business judgment test."  *Id*.[8]

## III.        Conclusion

41.     For the above reasons, and those stated in the Motion, the Debtors respectfully request that this Court grant Debtors' motion to assume the prepetition Reimbursement Agreement with the Ad Hoc Committee and to pay the fees and expenses of the Ad Hoc Committee's Professionals.

---

[8] The U.S. Trustee cites *In re Snowcrest Development Group, Inc.*, 200 B.R. 473, 479 n. 5 (Bankr. D. Mass. 1996) and *In re Office Products of America, Inc.*, 136 B.R. 675, 688 (Bankr. W.D. Tex. 1992) in arguing that the Motion cannot be approved under Bankruptcy Code Sections 365 and 363.  These cases are inapposite because, as the Trustee admits, they concern whether Section 365 can "be used to assume pre-petition contracts to retain and pay a <u>debtor's</u> professionals."  (Trustee Obj. 12) (emphasis added).

Dated:  November 15, 2019
        New York, New York

By: /s/ Benjamin S. Kaminetzky

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Marc J. Tobak

*Proposed Counsel to the Debtors
and Debtors in Possession*