DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Marc J. Tobak

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JAMIE O'CONNELL IN SUPPORT OF DEBTORS'
MOTION TO ASSUME THE PREPETITION REIMBURSEMENT
AGREEMENT WITH THE AD HOC COMMITTEE AND TO PAY
THE FEES AND EXPENSES OF THE AD HOC COMMITTEE'S PROFESSIONALS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, John James O'Connell III, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1.      I am a partner in the Restructuring and Special Situations Group (the
"**Restructuring Group**") of PJT Partners LP ("**PJT**"), which serves as the investment banker for
Purdue Pharma L.P. ("**Purdue Pharma**") and certain of its affiliates, as debtors and debtors in
possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**").

2.      PJT is an investment banking firm listed on the New York Stock
Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.  PJT was
spun off from The Blackstone Group L.P. ("**Blackstone**") on October 1, 2015.  Upon the
consummation of the spin-off, the Restructuring Group became a part of PJT, and Blackstone's
restructuring professionals became employees of PJT.  The professionals at PJT have extensive
experience in the reorganization and restructuring of distressed companies, both out of court and
in chapter 11 proceedings.  PJT has over 650 employees located in New York, San Francisco,
Boston, Chicago, London, Sydney, Hong Kong, and Madrid.  PJT is a broker-dealer registered
with the United States Securities and Exchange Commission, is a member of the Securities
Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

3.      Prior to joining PJT, I was a Senior Managing Director at Blackstone,
where I worked in the Restructuring and Reorganization Group from 2004 to 2015.  Before that,
I worked at Dolphin Equity Partners and in the Corporate Recovery Services Group of Arthur
Andersen.

4.      I hold a Bachelor of Business Administration degree *magna cum laude* in
Accountancy from the University of Notre Dame and a Master of Business Administration
degree with honors in Finance and Strategic Management from the Wharton School of the
University of Pennsylvania.

5.    I have over 20 years of corporate restructuring experience and have served as a financial advisor in numerous restructurings, both in court and out of court.  With respect to chapter 11 matters, I have advised debtors, creditors or sponsors in the following cases, among others:  Aegean Marine Petroleum Network, Inc.; Central European Distribution Corporation; Excel Maritime Carriers, Inc.; Genco Shipping & Trading Limited; Mrs. Fields Original Cookies, Inc.; Nautilus Holdings Limited; New World Pasta Company; Overseas Shipholding Group Inc.; Simmons Bedding Company; Solutia Inc.; Stearns Holdings, LLC; TGHI, Inc. (Targus Holdings); Toisa, Inc.; Ultrapetrol Bahamas Limited; and Winn-Dixie Stores, Inc.

6.    More specific to this matter, I have advised companies in situations involving potential mass tort liability.  These companies include The Babcock & Wilcox Company, Dow Corning Corporation, Specialty Products Holding Corp. (parent of Bondex International), and W. R. Grace & Co.

7.    Except as otherwise indicated herein, the facts set forth in this declaration ("**Declaration**") are based upon my personal knowledge and expertise, my discussions with the Debtors' management, their other advisors, and other members of the PJT team involved in this matter, my review of relevant documents and information provided by the Debtors, and my experience and familiarity with the Debtors' business and chapter 11 cases.  If called upon to testify, I can and will testify competently as to the facts set forth herein.

### Background

8.    PJT was initially retained on or around November 13, 2017 as Purdue faced mounting litigation related to its opioid medications.  Several months later, beginning on or around May 1, 2018, PJT started a second engagement with Purdue Pharma.  The third phase of PJT's engagement with Purdue began on or around April 1, 2019 and has included financial

advisory work pre-petition and post-petition. This work has included, among other things, assisting management with financial analyses, supporting counsel in various bankruptcy court matters and settlement negotiations, and managing information requests from advisors representing various parties-in-interest.

9.      As a result of this work, I have personal knowledge of the Debtors' business and these chapter 11 cases.

### Importance of the Settlement Framework

10.      I understand that the Debtors face more than 2,700 civil lawsuits relating to the marketing and sale of opioid medications (the "**Litigation**") with, as of the Petition Date, approximately 85% of these lawsuits brought on behalf of state and local governments. Accordingly, I understand that the vast majority of claims asserted against the Debtors, as of the Petition Date, are unliquidated, contingent and disputed claims brought by state, municipal, and other plaintiffs.

11.      I have been advised by counsel to the Debtors that over 2,000 of the separate suits in the Litigation have been consolidated for pretrial purposes in the multidistrict litigation pending in the United States District Court for the Northern District of Ohio, *In re National Prescription Opiate Litigation*, No. 1:17-md-02804-DAP (the "**MDL**").  I have also been advised that the court presiding over the MDL has appointed a plaintiffs' executive committee (the "**PEC**") that comprises attorneys at law firms that collectively represent a thousand counties, municipalities, Native American and Alaska Native tribes, individuals, and third-party payors, and certain major U.S. cities and counties.

12.      In the months and weeks before the Petition Date, the Debtors and their professionals carefully evaluated the options available to the Debtors and the costs and benefits

of a chapter 11 filing.  One of the most important considerations in this analysis was whether the Debtors could garner some level of support among their creditors before filing for chapter 11 protection. In my experience, this is a standard and appropriate strategy. In this situation, the need was elevated because without some level of support, the cases could have devolved into unmanageable litigation, thereby significantly diminishing the effectiveness of a chapter 11 proceeding. To that end, the Debtors and their professionals—myself included—sought to avoid a "free fall" bankruptcy if possible.  It was our view that a "free fall" bankruptcy filing would likely reduce estate value and increase professional costs as compared to a filing in which the Debtors had the support of a material threshold of contingent creditors.

13.     At the outset of these cases, the Debtors sought to enjoin the prosecution of active litigation against the Debtors and certain related parties to preserve the value of the estates and reduce the Debtors' legal costs—which were projected to be approximately $263 million in 2019.  Demonstrating tangible progress toward a comprehensive resolution of the Litigation was an important part of the Debtors' arguments in support of an injunction of the Litigation.

14.     In September 2019, I learned that the Debtors reached an agreement in principle with 24 states, five U.S. territories, including Puerto Rico, and the PEC in the Ohio MDL regarding a comprehensive settlement framework to settle the Litigation (the "**Settlement Framework**").

15.     Representatives of the settling states, the PEC and other litigants who supported the Settlement Framework formed an ad hoc committee (the "**Ad Hoc Committee**") and, as part of the Settlement Framework, the Debtors agreed to pay the fees of the Ad Hoc Committee's professionals, as set forth in a fee reimbursement letter (the

"**Reimbursement Agreement**").

16.    On October 7, 2019, the Debtors and the Ad Hoc Committee progressed the Settlement Framework into a Summary Term Sheet (the "**Settlement Term Sheet**"), which memorialized the key terms of the Settlement Framework.  The Ad Hoc Committee and the Debtors agreed to the Settlement Term Sheet, which was filed on October 8, 2019.  *See In re Purdue Pharm L.P., et al*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Oct. 8, 2019) [ECF Docket No. 257].   The Settlement Term Sheet sets forth the Settlement Framework and includes a provision stating that the Debtors would assume the Reimbursement Agreement.

## An Organized and Well-Advised Ad Hoc Committee Has Benefited and Will Continue to Benefit the Estates

17.    I believe the Debtors' decision to seek court approval of their agreement to pay the Ad Hoc Committee's fees is in the best interests of the Debtors' estates. The Ad Hoc Committee and its professionals have already provided—and, in my opinion, will continue to provide—significant benefit to the Debtors' estates, both in terms of helping to maximize the value to be distributed to creditors and reducing the overall administrative and professional costs of these cases.

18.    To date, the Ad Hoc Committee has generated tangible value for the Debtors' estates in a number of ways.  First, the Ad Hoc Committee's agreement to the Settlement Term Sheet was a significant step toward a consensual resolution of the Litigation and provides a structure for the parties to continue negotiating, perform due diligence, investigate potential claims, and agree on a chapter 11 plan that seeks to maximize the value of the estate and recoveries for its creditors.  I believe that, without a single committee to represent the interests of the supporting governmental entities, it would not have been possible for the

Debtors and the supporting states to reach agreement on a Settlement Term Sheet in the first weeks of these chapter 11 cases. Moreover, a well-represented and informed Ad Hoc Committee will be positioned to play an important role on a prospective basis in making a proposed contribution of a minimum of $3 billion by the Sackler families a binding commitment, and perhaps even enhancing the amount of the proposed contribution.

19.    Second, it is my understanding that since execution of the Settlement Term Sheet, the Ad Hoc Committee has been working to bring other constituents on board with the Settlement Framework and has been crucial to reaching agreement with the Sackler families regarding their willingness to provide financial information for due diligence.

20.    Third, the Ad Hoc Committee conferred significant value on the estates by agreeing to stand down in their litigation against the Debtors pending a decision on the Preliminary Injunction Motion and by supporting the Debtors' request for injunctive relief. These steps were a significant demonstration of good faith by the Ad Hoc Committee and meaningfully aided the Debtors' efforts to preserve estate value by obtaining a preliminary injunction staying the Litigation.

21.    Moreover, the Ad Hoc Committee's continued operation is likely to facilitate the Debtors' efforts to reach a global resolution. First, the continued operation of the Ad Hoc Committee lightens the Debtors' significant administrative burden, time, and cost of communicating separately with the many governmental entities supporting the Settlement Framework. Had the Ad Hoc Committee not formed, the Debtors would have been forced to engage in negotiations by contacting various principals or advisors who each represent separate sovereign states and other governmental entities. Negotiating with an organized and represented

7

committee like the Ad Hoc Committee has the potential to significantly streamline the negotiation process.

22.    In addition, the Ad Hoc Committee's continued operation will enhance the Debtors' prospects for obtaining a global resolution of pending litigation. Because of the sovereignty and official powers of its members, who are states or representatives of municipalities or other localities, the Ad Hoc Committee is in a unique position to assist the Debtors in settlement negotiations in ways other counterparties simply cannot. This is true in part because the members of the Ad Hoc Committee are, by virtue of their position as governmental entities, better positioned to understand the concerns of other state and local governments. Just as the Ad Hoc Committee played an important role in negotiating and reaching agreement on a Settlement Term Sheet in the first weeks of these chapter 11 cases, the Committee is positioned to play an important role in facilitating global agreement on the many issues that the Settlement Term Sheet did not definitively resolve. The Ad Hoc Committee is a key counterparty to help the Debtors facilitate discussions and agreements on these issues, as well as to try to reach agreement with the governmental entities currently opposing the Settlement Term Sheet.

## Payment of the Ad Hoc Committee's Professional Fees Benefits the Estates

23.    There is a substantial amount of work that still needs to be accomplished in these chapter 11 cases. This work includes, among other things, due diligence of financial information, the negotiation of a restructuring support agreement and, ultimately, the drafting and successful solicitation and confirmation of a chapter 11 plan. In addition, the Ad Hoc Committee's work includes facilitating other creditor groups' involvement in each of these stages, with the aim of increasing support for a consensual resolution of these cases.

24.     The Ad Hoc Committee and its retained professionals are important to the continuation and completion of the work necessary for these chapter 11 cases to proceed efficiently and effectively and to maintain and expand support for the Settlement Framework.  It is my opinion that it would likely be more difficult and costly to the estate for this work to be performed without the assistance of the Ad Hoc Committee and its professionals.

25.     Shortly after the chapter 11 filing, PJT began to work with FTI, the Ad Hoc Committee's financial advisor, on numerous matters. These matters included customary activities for a debtor's financial advisor interacting with a creditor's financial advisor, such as providing an overview of the Debtors' business, responding to detailed information requests, granting access to a data site and coordinating due diligence meetings for FTI to speak with management regarding the Debtors' business plan. Moreover, PJT has worked alongside FTI in commencing financial due diligence on the foreign businesses owned by the Sackler families. I also understand that counsel for the Ad Hoc Committee has been helpful in facilitating the production of financial information related to the personal assets of the Sackler families. Going forward, I believe FTI's work and the Ad Hoc Committee's due diligence are essential to advancing the settlement negotiations and will provide constituents with needed information about the Debtors' business, the value of the foreign businesses owned by the Sackler families and the personal assets of the Sackler families.

26.     While these chapter 11 cases involve aspects that are different than others, the Debtors' decision to pay the fees and expenses of the Ad Hoc Committee's professionals is comparable to the other cases in which other debtors have agreed to pay the professional fees of an ad hoc committee supporting a contemplated chapter 11 plan or restructuring framework. Similarly here, it would be more expensive, difficult and time-consuming for the Debtors to

pursue a plan of reorganization and successfully reorganize without the continued participation

and support of the Ad Hoc Committee and its professionals.

27.     In my experience, the form pursuant to which an ad hoc creditor group

agrees to a restructuring framework can range from a non-binding outline of economic terms to a

more formal and comprehensive restructuring support agreement. The fact that the Ad Hoc

Committee has not yet executed a binding agreement in respect of the Settlement Framework

does not mean the Debtors will not continue to benefit from their support and active participation

in helping the Debtors achieve a consensual resolution of these cases. In my experience,

regardless of the form of the support agreement, it is not uncommon for a debtor to pay the fees

of the advisors to an ad hoc creditor group supporting a restructuring framework proposed by a

debtor. Moreover, the Debtors' ability in these cases to unilaterally terminate paying the fees and

expenses of the Ad Hoc Committee's professionals provides the necessary "out" should the

Debtors' and the Ad Hoc Committee's interests diverge.

28.     For the reasons discussed above, I believe it is in the best interests of the

Debtors to assume the prepetition reimbursement agreement with the Ad Hoc Committee and

pay the fees and expenses of the Ad Hoc Committee's professionals.  This arrangement will

enable the Ad Hoc Committee to continue functioning as a productive counterparty, with its

professionals able to perform the work necessary to help achieve a settlement that maximizes

recoveries for all creditors.


*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct.

New York, New York
November 15, 2019

John James O'Connell III
Partner
PJT Partners LP