KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
David E. Blabey Jr.
Rachael Ringer
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl (admitted *pro hac vice*)
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

In re:                                                                    :          Chapter 11
                                                                              :
PURDUE PHARMA L.P., *et al.*,                         :          Case No. 19-23649 (RDD)
                                                                              :
                                   Debtors.                       :          (Jointly Administered)
                                                                              :

------------------------------------------------------------------ X

**AD HOC COMMITTEE'S STATEMENT IN SUPPORT**
**OF DEBTORS' MOTION TO ASSUME PREPETITION**
**REIMBURSEMENT AGREEMENT AND REPLY TO OBJECTIONS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ......................................................................................................6

    A.    The Ad Hoc Committee and the Professionals .......................................6

    B.    The Prepetition Negotiations and the Settlement Structure ....................7

    C.    The Reimbursement Agreement .............................................................9

    D.    The Settlement Term Sheet and the Stay Motion ..................................11

    E.    The Ad Hoc Committee's Cooperation With Other Case Constituents ................13

STATEMENT IN SUPPORT ....................................................................................15

I.    ASSUMPTION OF THE REIMBURSEMENT AGREEMENT IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT IN LIGHT OF THE MANY BENEFITS IT CONFERS ...................................................................................15

II.    THE OBJECTIONS TO THE MOTION SHOULD BE OVERRULED .........................20

    A.    The Unique Circumstances of these Cases Support the Debtors' Decision to Assume the Reimbursement Agreement............................................20

    B.    The Terms and Conditions On Which the Debtors Propose to Reimburse the Professionals Impose Ample Safeguards Against Duplication and Waste....................................................................................................22

    C.    The Professionals' Representation of Other Clients Is Irrelevant .........25

    D.    The PEC's Participation on the Ad Hoc Committee is Appropriate ....................25

    E.    The Reimbursement Agreement is Amenable to Assumption...............26

    F.    A Substantial Contribution Claim Is An Inadequate Substitute for Current Payment of the Professionals' Fees .........................................................28

    G.    The Debtors Appropriately Determined to Limit Reimbursement to the Ad Hoc Committee's Professionals, and Not Those of Other Groups ........................30

    H.    The Scope of the Ad Hoc Committee's Mandate is Appropriate .........................32

CONCLUSION .....................................................................................................33

The ad hoc committee of governmental and other contingent litigation claimants (the "**Ad Hoc Committee**"), which consists of (i) ten States, (ii) the court-appointed Plaintiffs' Executive Committee (the "**PEC**") in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804 (N.D. Ohio) (the "**MDL**"), (iii) six political subdivisions of States, and (iv) one federally recognized American Indian Tribe, hereby submits this statement on behalf of its members in support of the motion (the "**Motion**") [Dkt. No. 394] brought by Purdue Pharma L.P. and its affiliated debtors (collectively, "**Purdue**" or the "**Debtors**") seeking authority to assume the prepetition agreement (the "**Reimbursement Agreement**") by which Purdue agreed to pay the reasonable and documented fees and expenses of the professionals to the Ad Hoc Committee (as identified below, the "**Professionals**").[1]

## PRELIMINARY STATEMENT[2]

1.      The Settlement Structure upon which the Debtors have premised their bankruptcy cases lays the groundwork for a chapter 11 plan that will provide a comprehensive and expeditious resolution of Purdue's role in the national opioid crisis.  This framework was put in place shortly before the Petition Date following months of negotiations with representatives of certain of the states and municipalities with whom the Debtors have been litigating for years.  Because resolution of the claims of these governmental entities is a principal focus of these chapter 11 cases, Purdue recognized that, without the support of its governmental creditors, it could never hope to achieve a global resolution of the litigation that threatened to overwhelm the company and denude it of value that would otherwise flow to its creditors.  Thus, in an effort to preserve and enhance value for all creditors, Purdue negotiated the terms of a deal pursuant to which, among other things,

---

[1] The members of the Ad Hoc Committee are set forth in the statement filed at Dkt. No. 279 (the "**AHC 2019**").

[2] Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed below.

Purdue would deliver one hundred percent of the value of the company to its creditors, and Purdue's owners would contribute a minimum of $3 billion over seven years, with the expectation of further material contributions from sales of the owners' ex-U.S. pharmaceutical businesses. The settlement came to be supported by the attorneys general for 23 states and five United States territories, and the PEC – the entity charged with principal responsibility for negotiating on behalf of the thousands of municipal, tribal, and other plaintiffs involved in the federal MDL. The degree of consensus was critical yet remarkable, particularly in light of the deep divisions and complex issues confronting the states, tribes, and municipalities.

2.    As an integral part of the Settlement Structure, Purdue requested that a subset of the supporting parties form an ad hoc group, whose principal role would be to help shepherd the deal through bankruptcy, including performing necessary diligence and negotiating requisite documents such as a term sheet, a restructuring support agreement, a disclosure statement, and a chapter 11 plan. To accomplish these goals, and to promote the broadest possible additional outreach to other creditors, the parties concluded that it was essential that the contemplated ad hoc group comprise representatives of both the negotiating states *and* non-state governmental claimants (including the PEC) – two blocs that were frequently not aligned and had fundamental disagreements on critical issues such as allocation. The result was the Ad Hoc Committee: a creditor group holding or representing the interests of the majority of claims against the Debtors' estates, measured in both number and dollar amount. The Ad Hoc Committee, as disclosed in its Rule 2019 statement and evidenced by the statements in support filed by various supporting states contemporaneously herewith, speaks not just on behalf of its members, but also on behalf of all of the 23 states supporting the Settlement Framework.

3.      The Debtors and the members of the Ad Hoc Committee recognized that several counsel would be required to anchor such a large and diverse group of entities, coordinate the diverse constituencies on whose behalf the Ad Hoc Committee is acting, interact with the numerous important parties in the case, and navigate the exceedingly complex bankruptcy, mass tort, and deal-related issues that the Ad Hoc Committee would face.  Naturally the members gravitated toward the counsel that had represented them, in some cases over many months, during the prepetition period, and whose involvement had been integral to the achievement of the Settlement Structure.  But in light of the diversity of interests represented on the Ad Hoc Committee, it was also determined that a lead bankruptcy counsel would be required, with which both sides of the aisle – states and municipalities – would be comfortable.  Thus, the current structure emerged, in which the Ad Hoc Committee has selected a lead bankruptcy counsel, coordinating counsel for the states, coordinating counsel for the PEC, tribes, and municipalities, and mass tort, deal and insurance counsel, all with experience in mass torts and some with an extensive history representing these very same parties in opioid litigation.  A financial advisor and investment banker would be required as well, particularly in light of the complicated asset sales (both foreign and domestic) and allocation issues that were part and parcel of the Settlement Structure.

4.      In the context of these events, and as elaborated further below, the Debtors' decision to assume the Reimbursement Agreement is eminently prudent and reasonable.  In addition to enjoying the support of *virtually every state* (including the Non-Consenting States, who have filed a statement in support) and the representatives of thousands of municipalities, tribes, and other contingent litigation claimants, the Reimbursement Agreement, by facilitating the Settlement Structure, has brought stability to a case that had the potential for massive dislocation

and additional expense and delay.  Together with the Settlement Structure, the basic terms of the

Reimbursement Agreement – to pay the reasonable fees and expenses of the Professionals incurred

in connection with a defined scope of work, and subject to a reasonableness review by the Debtors

and various other limitations and safeguards – have served as a foundation and springboard for

many of the major successes in these cases to date.  The Settlement Structure, the Summary Term

Sheet, the negotiated stay of the Pending Actions, the Debtors' negotiation of a case stipulation

with the official committee, the establishment of the due diligence protocols and case milestones,

and the notable absence of the litigiousness and rancor of the prepetition period – all can be traced

to the Debtors' prescient determination that the interests of achieving an expeditious, value-

maximizing, and, potentially, consensual reorganization could best be served if they were able to

organize, and reimburse the costs of, a supportive, effective, and representative coalition of their

key creditor constituencies:  the supporting states, tribes, and municipalities.

5.    There is much work left to be done in these cases.  The Summary Term Sheet

represents an essential step forward, but the parties must, among other things, engage in substantial

diligence and negotiate a restructuring support agreement, disclosure statement, and chapter 11

plan.  Issues of allocation loom large, as well, including allocation among states, municipalities,

and tribes, and allocation among public and private creditors.  Consistent with the scope of its

mandate, the Ad Hoc Committee expects to be an active and constructive participant in all of these

areas, and to work cooperatively with each of the other case parties.  Importantly, while the Ad

Hoc Committee has no desire to supplant the official statutory committee in these cases, the official

committee is not, by virtue of its voting membership, effectively able to speak for the governmental

creditors in these cases.  In light of that dynamic, and without diminishing the official committee,

the role of the Ad Hoc Committee is that much more essential.

6.      For these and other reasons, the Debtors' decision to assume the Reimbursement Agreement is amply supported by the history of these cases to date, and certainly satisfies the "deferential" business judgment standard.[3]  The Motion and the Debtors' reply, together with evidence to be presented at the hearing on the Motion, provide compelling support for the Debtors' decision to assume the Reimbursement Agreement, and the legal standards and arguments set forth therein will not be repeated here.  The Ad Hoc Committee writes separately, however, to recount the history of its formation and involvement in the cases (both pre- and post-petition), explain its significant contributions to the progress that has been made to date, emphasize the well-defined but critical nature of its role going forward, and address the miscellaneous objections that have been filed.

7.      While each objection will be addressed in full below, it bears noting, at the outset, what the objections do *not* say.  No party contests the valuable role the Ad Hoc Committee has played to date and no party asserts that the Ad Hoc Committee's role should be diminished going forward.  Importantly, the Ad Hoc Group of Non-Consenting States affirmatively supports the grant of the Motion, a development that is reflective of the spirit of cooperation that has emerged in these cases to date.  The Ad Hoc Committee looks forward to continuing to work constructively with all case parties, including the Non-Consenting States, the official committee, and the other ad hoc groups, to bring these cases to a swift and successful conclusion, thus fostering the overarching goal of the states, municipalities, and tribes to direct billions of dollars to deserving parties throughout the United States to address and help remedy the national opioid crisis.  Because that outcome is best served by granting the Motion, the objections should be overruled.

---

[3] *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1658 (2019).

## BACKGROUND

**A.    The Ad Hoc Committee and the Professionals**

8.    The Ad Hoc Committee consists of (i) ten States, (ii) the PEC, (iii) six political subdivisions of States, and (iv) one federally recognized American Indian tribe, as identified in the verified statement filed pursuant to Bankruptcy Rule 2019 at Docket Number 279.  Collectively, the members of the Ad Hoc Committee hold or represent the interests of the majority of claims against the Debtors' estates, measured in both number and dollar amount.

9.    The Ad Hoc Committee is represented in these bankruptcy cases by the following counsel:  (i) Kramer Levin Naftalis & Frankel LLP, as lead bankruptcy counsel; (ii) Brown Rudnick LLP, as coordinating counsel for the non-state members of the Ad Hoc Committee, including the PEC; (iii) Otterbourg P.C., as coordinating counsel for the state members of the Ad Hoc Committee; and (iv) Gilbert LLP, as mass tort, deal and insurance counsel.  In addition, the Ad Hoc Committee has retained FTI Consulting, Inc., as financial advisor, and expects that it will retain an investment banker to assist in evaluating and structuring the complex sale and M&A transactions for the Sackler assets that will be required to effectuate the Settlement Structure.

10.    As discussed further below, the Ad Hoc Committee has offered to make its financial advisor and investment banker available to the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**") and the Multi-State Governmental Entities Group (the "**Multi-State Group**") to help facilitate their own review and analysis of the financial and restructuring issues in these cases.

11.    The Ad Hoc Committee was formed prior to the Debtors' bankruptcy filings to facilitate the negotiation of a settlement structure for a comprehensive resolution of litigation concerning the Debtors' opioid businesses.  The members of the Ad Hoc Committee formally began to coordinate their efforts in August of 2019 (at the Debtors' suggestion), and were officially

constituted as a committee shortly thereafter.  As reflected in the Reimbursement Agreement, the Debtors concluded, as a reasonable exercise of their business judgment, that it would be "in the best interest of, and would be beneficial to, the Company for certain State Attorneys General, the plaintiffs in the pending Multi-District Litigation, and certain additional municipal entities that have reached agreement with the Company on the framework for a proposed comprehensive settlement . . . to form a single Ad Hoc Committee of Restructuring Support Parties . . . to negotiate the final terms and documents associated with such Settlement in the Bankruptcy Case." Reimbursement Agreement at 1.

12.     The members of the Ad Hoc Committee were further motivated to organize and coordinate their efforts in light of their understanding that it is the current policy of the United States Trustee that governmental entities, *which hold the overwhelming majority of the claims in these cases*, are ineligible to serve on official creditors' committees in bankruptcy.  The members of the Ad Hoc Committee determined, much like the Debtors, that the formation of a diverse committee representing a broad cross-section of the Debtors' major governmental creditors – including state, municipal, and tribal members whose interests are not always aligned – would provide Purdue with an efficient conduit for negotiation and implementation of a successful restructuring.

B.     **The Prepetition Negotiations and the Settlement Structure**

13.     While the Ad Hoc Committee was not formed until shortly before the Debtors' bankruptcies, certain members of the Ad Hoc Committee have been actively negotiating with Purdue for well over two years.  These negotiations, while frequent and intense, were initially uncoordinated and diffuse.  The PEC and the states, at that time, were not aligned, and negotiations were characterized by disagreements on all sides, both among the disparate claimant groups and between the claimants and defendants.  The Sacklers, for their part, were reluctant to engage absent

7

assurances that their negotiating counterparties could deliver a deal that would garner a broad consensus, including, most importantly, among the litigating governmental entities.

14.     In the summer of 2019, the negotiations came to be centered in Cleveland (the site of the MDL), and were facilitated by the supervision of the Honorable Dan Polster of the United States District Court for the Northern District of Ohio and the involvement of a court-appointed special master.  The negotiating parties included Purdue, representatives of the Sacklers, the PEC, and a group of state attorneys general.

15.     In August 2019, following months of hard-fought and arms'-length negotiations, the parties emerged from a mediation session in Cleveland with a court-proposed general framework for a comprehensive settlement (which came to be referred to as the "**Settlement Structure**") that would require consent by a "critical mass" of state attorneys general, the PEC, Purdue, and the Sacklers.  The Settlement Structure would be implemented through a chapter 11 filing by Purdue.  The Settlement Structure left significant issues unaddressed for further negotiation that would need to be resolved and implemented in a term sheet.  Further, the parties were not in complete agreement as to certain key aspects of the Cleveland deal, which would require resolution as part of a formal documentation process.

16.     In the weeks that followed, the original parties to the Cleveland deal, together with additional state, municipal, and tribal entities, worked tirelessly among themselves to attempt to come to agreement on acceptance of the Settlement Structure.  Ultimately, a subset of the attorneys general present in Cleveland and the PEC agreed to the Settlement Structure, along with other states and territories not present at the Cleveland negotiations.  These parties then coordinated their efforts and worked with Purdue and the Sacklers, including through multiple telephonic and in-person meetings, in extensive preparation for an anticipated chapter 11 filing.  Numerous term

sheets were exchanged and negotiated.  While these efforts did not lead to a pre-petition RSA or a pre-petition term sheet, they resolved numerous outstanding issues and laid the groundwork for the agreement to the Settlement Term Sheet post-petition.  Further, the parties to the Settlement Structure formalized the Ad Hoc Committee structure to enable a successful chapter 11 filing.  Ultimately, in addition to the PEC, the attorneys general for 24 states and five United States territories agreed to the Settlement Structure.[4]

17.    Purdue subsequently filed for bankruptcy on September 15, 2019 (the "**Petition Date**"), putting forth the Settlement Structure as the basis upon which the company could expeditiously achieve a global resolution to the benefit of all of its many constituents, including the many victims of the national opioid crisis.  *See, e.g.*, Debtors' Informational Brief [Dkt. No. 17], at 3, 6, 44-45 (stressing importance of the Settlement Structure, and noting, among other things, that the "Settlement Structure would maximize the value of the Debtors' estates and result in an unprecedented transfer of value to the American people," and that implementing the Settlement Structure through the chapter 11 cases was "the only sensible way forward").

### C.    The Reimbursement Agreement

18.    As an essential aspect of the Settlement Structure, Purdue agreed to recognize the Ad Hoc Committee as the negotiating body on behalf of those creditors supporting the Settlement Structure and to reimburse the reasonable and documented fees and expenses of the Ad Hoc Committee's Professionals in order, among other things, to facilitate the implementation of the Settlement Structure through the Debtors' bankruptcy cases.  This understanding was ultimately reflected in the Reimbursement Agreement (attached as Exhibit B to the Motion), executed by Purdue before it filed for bankruptcy.

---

[4] One state, Arizona, later withdrew its support for the Settlement Structure.

19.     The Reimbursement Agreement contains a number of provisions designed to protect the Debtors from the incurrence of unwarranted or excessive fees.  In addition to limiting reimbursement to the "reasonable and documented fees and expenses of the Professionals," the Reimbursement Agreement provides that the Professionals "will allocate the division of responsibilities and their delivery of services to the Ad Hoc Committee so as to limit unnecessary duplication of services," and expressly acknowledges that the Debtors' "review for reasonableness will take into account, among other things, its view of duplication of effort by the Professionals." *See* Reimbursement Agreement.  The proposed order attached to the Motion (as amended, the "**Amended Proposed Order**") requires the Professionals to file monthly fee statements and quarterly fee applications, which the Debtors, the official committee of unsecured creditors (the "**Creditors' Committee**"), and the U.S. Trustee will have an opportunity to review.  Amended Proposed Order ¶ 5.

20.     Reimbursement is also limited to advice and representation rendered in connection with matters within the Ad Hoc Committee's mandate (the "**Scope**"), which is "to negotiate and support the terms and definitive documents associated with the Settlement and to take such other actions as may be necessary or appropriate to facilitate the Settlement, and not to take positions adverse to the Settlement, engage in litigation activities, review or investigate other matters, or engage in matters in which the respective members of the Ad Hoc Committee may be in conflict." *See* Reimbursement Agreement at 3.

21.     Finally, the Reimbursement Agreement contains provisions permitting Purdue to terminate the agreement if it "determines in its sole discretion that this arrangement is no longer in the best interests of the Company," or if certain case milestones are not met, or if "the

membership of the Ad Hoc Committee should change to be less representative without the Company's consent, not to be unreasonably withheld." *Id*.

22.     Based on experience to date, the Ad Hoc Committee estimates that fees incurred by its counsel in connection with matters within the Scope of the Reimbursement Agreement will amount to approximately $1.5 to $2 million per month, and fees incurred by FTI will amount to approximately $1 million per month.  Notably, notwithstanding language in the Reimbursement Agreement, the Ad Hoc Committee has agreed to defer seeking payment of any prepetition fees to the earlier of the execution of a restructuring support agreement or confirmation of a chapter 11 plan – and then only in an amount not to exceed $1.5 million in the aggregate.  *See* Amended Proposed Order ¶ 5.

### D.     The Settlement Term Sheet and the Stay Motion

23.     In the wake of the Debtors' bankruptcy filings, the Ad Hoc Committee continued to work with the Debtors and the Sacklers on refining the terms of the Settlement Structure, engaging in round-the-clock negotiations over the course of several weeks.  These extensive additional negotiations resulted in the parties' agreement to a settlement term sheet (the "**Summary Term Sheet**"), which was publicly filed on October 8, 2019.  [Dkt. No. 257.]

24.     The Summary Term Sheet, among other things:  describes the key terms of a proposed chapter 11 plan for Purdue, including the terms of a cash contribution from the Sacklers; commits the parties to negotiation of a restructuring support agreement within 120 days and negotiation of a chapter 11 plan and disclosure statement within 270 days; and calls for the provision of significant diligence from the Debtors and Sacklers.  *See id.*  In addition, the Summary Term Sheet required the Ad Hoc Committee to "affirmatively support a request by the Debtors to

stay all pending litigation against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business for an initial period of 180 days." *Id.*[5]

25.    This latter requirement – that the Ad Hoc Committee support a stay of actions against both Purdue and the Sacklers – was of critical importance to Purdue.  The Debtors, as the Court is aware, filed these chapter 11 cases in the face of some 2,625 ongoing civil proceedings arising out of their production, marketing, and sale of opioids (the "**Pending Actions**").  Many of the Pending Actions involved claims against non-Debtors, including members of the Sackler families and/or their affiliated entities.  In light of uncertainty over the scope and extent of the automatic stay, the Debtors, on the third day of the case, filed an adversary proceeding and accompanying motion for a preliminary injunction, requesting a stay of the Pending Actions.

26.    In seeking to enjoin the Pending Actions, the Debtors relied, in important part, on the existence of the Settlement Structure (and, once finalized, the Summary Term Sheet), invoking it in support of every element of the four-part test for grant of a preliminary injunction.  *See, e.g.*, Memorandum of Law in Support of Motion for Preliminary Injunction [Adv. Dkt. No. 3], at 19, 24, 28, 29, 33, 36, 38 (invoking Settlement Structure in support of likelihood of success, irreparable harm, balance of harms, and public interest).  With the Ad Hoc Committee's support, the Debtors were ultimately able to obtain a stay of the Pending Actions.  *See, e.g.*, Second Amended Order Granting Motion for a Preliminary Injunction (the "**Stay Order**") [Adv. Dkt. No. 105].

27.    That initial stay has now been extended by mutual agreement of all parties, one of a number of cooperative agreements that have now been, and we believe will continue to be, reached in an environment now focused on constructive and prompt resolution of this proceeding.

---

[5] Consistent with its agreement, the Ad Hoc Committee filed a statement in support of the stay.  [Adv. Dkt. No. 62.]

This has been made possible in no small way by Purdue's ability to file this proceeding on the back of the Settlement Structure negotiated with the Ad Hoc Committee.

### E.    The Ad Hoc Committee's Cooperation With Other Case Constituents

28.    The Ad Hoc Committee's role in these cases has not been limited to negotiations with the Debtors and the Sacklers, but has also included efforts to facilitate coordination and dialogue among other case constituents, including the Creditors' Committee, the Non-Consenting States, and various other groups of creditors.

29.    The Summary Term Sheet reflects the Ad Hoc Committee's commitment to fostering broad outreach and consensus in these cases.  It contemplates the possibility of improvements to the existing Settlement Structure (which would be shared on an equivalent or pro rata basis), provides the Debtors with a fiduciary out, and contains generous milestones (including 270 days for negotiation of a plan) that were specifically negotiated with a view towards providing the Creditors' Committee and other parties in interest ample opportunity to evaluate and diligence the proposed Settlement Structure.  *See* Summary Term Sheet ¶¶ 15, 16, 17.

30.    The Summary Term Sheet thus worked hand-in-hand with – indeed, served as a springboard for – the Creditors' Committee's own stipulation with the Debtors, pursuant to which the Creditors' Committee was able to negotiate additional protections and concessions, including the Debtors' commitment not to file a plan during the "Initial Stay Period" of 180 days and to provide the Creditors' Committee with significant diligence.  *See* Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties (the "**Case Stipulation**") [Dkt. No. 291], ¶¶ 2-3, 7.  Other ad hoc groups have negotiated similar agreements.

31.    In addition, the Ad Hoc Committee has worked closely with the Creditors' Committee and other case parties to evaluate and improve the terms of certain of the Debtors' requested first-day relief, and to evaluate the Creditors' Committee's proposal for an emergency

fund.[6]  The Ad Hoc Committee has participated in numerous in-person and telephonic meetings with a variety of case parties, including hosting an "all hands" meeting attended by counsel and principals of the Ad Hoc Committee, the Creditors' Committee, and various other ad hoc committees, as well as meetings with the Debtors and the Sacklers.  The states that are members of the Ad Hoc Committee regularly communicate and coordinate with the supporting states, as well as the non-supporting states, in an effort to ultimately garner additional support for the Settlement Structure.

32.    Finally, the Ad Hoc Committee, recognizing that its interests are in many respects aligned with the interests of other ad hoc committees (who have not separately engaged financial professionals), has proposed to enter into an arrangement with the Non-Consenting States and the Multi-State Group, by which the Ad Hoc Committee would share information and work product from FTI and its investment banker with those other two ad hoc committees.  The Ad Hoc Committee anticipates this arrangement will result in significant cost savings for the estates in the long run (including by providing the Debtors with one conduit through which to funnel diligence to the various ad hoc groups) and foster cooperation among the groups.

33.    On November 13, 2019, the Non-Consenting States filed a statement in support of the Debtors' assumption of the Reimbursement Agreement, writing, among other things, that it had concluded that "[h]aving the estate pay the reasonable fees of professionals (particularly financial professionals) to advise the States should enhance public confidence in the fairness and propriety of any outcome."  [Dkt. No. 469.]

---

[6] While the Ad Hoc Committee, at the outset of these cases and before appointment of the official committee, took an active role in evaluating certain of the Debtors' first-day motions, it is anticipated and intended that the Ad Hoc Committee's involvement in day-to-day bankruptcy matters not directly relevant to the Settlement Structure should no longer be necessary.

## STATEMENT IN SUPPORT

34.     The Debtors' assumption of and performance under the Reimbursement Agreement are governed by the business judgment rule – a "deferential" standard (*see Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1658 (2019)) under which a court will generally approve the debtor's choice provided it is satisfied assumption and performance will benefit the estate (*see, e.g., In re The Great Atlantic & Pacific Tea Co.*, 544 B.R. 43, 49 (Bankr. S.D.N.Y. 2016)).   These legal standards are thoroughly articulated in the Debtors' Motion and reply, and will not be repeated here.  *See generally* Motion ¶¶ 15-19, 25-27.

35.     The Ad Hoc Committee submits this Statement in Support primarily to address the objections of the Creditors' Committee (the "**Committee Objection**") [Dkt. No. 459], the Ad Hoc Group of Individual Victims (the "**Individual Victims' Objection**") [Dkt. No. 454], and the United States Trustee (the "**UST Objection**") [Dkt. No. 463], and any joinders thereto.   The objections, in addition to misstating the standards for grant of the Motion, mischaracterize the record, understate the clear benefits of the Reimbursement Agreement, and raise a series of imagined legal and factual deficiencies, all of which have been adequately anticipated or accounted for under the terms of the Reimbursement Agreement, the Amended Proposed Order, and the further assurances and commitments described herein and in the Debtors' pleadings.

## I.     Assumption of the Reimbursement Agreement Is a Sound Exercise of the Debtors' Business Judgment in Light of the Many Benefits It Confers

36.     As an initial matter, there can be no serious doubt that the Reimbursement Agreement has already conferred, and will continue to confer, enormous benefits upon the Debtors' estates – benefits more than sufficient to satisfy the "deferential" standard for assumption of an executory contract as recently articulated by the Supreme Court in *Mission Product Holdings, supra.*

37.    In the summer of 2019, with trial approaching in a number of the Pending Actions, including a bellwether trial in the MDL, the Debtors were faced with the choice of filing a freefall bankruptcy or seeking the support of critical constituents on a framework for a global resolution of their opioid-related liabilities.  The Debtors wisely chose the latter path.  After months of negotiations, many of them under the auspices of Judge Polster in Cleveland, the Debtors reached agreement on the Settlement Structure, supported by, in addition to the Debtors and the Sacklers, the representatives of 23 states, 5 territories, the PEC, and various local government entities.  The Settlement Structure represented a seminal moment in the history of a company that had, to that point, been embroiled in near-constant litigation and controversy for many years (with litigation and related expenses amounting to some $5 million per week, by the Debtors' estimates).[7]  With the Settlement Structure in hand, the Debtors were able to file for bankruptcy with a meaningful prospect of achieving confirmation of a chapter 11 plan calling for distributions of billions of dollars of value to address directly the opioid crisis within a relatively short period of time.

38.    Despite the significance of their achievement, however, the Debtors and the other supporting parties were keenly aware of the obstacles that lay ahead, including the challenges of negotiating and documenting an agreement that would enjoy the support of, and eventually bind, thousands of government entities and other contingent litigation claimants holding often disparate interests.  The history of prepetition negotiations had illustrated the difficulty of this feat, and challenges were only likely to mount as the parties progressed beyond the initial Settlement Structure.  The overlay of bankruptcy would add to the complexity of the situation, particularly in

---

[7] *See Memorandum of Law in Support of Motion for a Preliminary Injunction*, Adv. Pro. 19-08289 (RDD) [Dkt. No. 3] (Bankr. S.D.N.Y. Sept. 18, 2019) ("[T]he Debtors' main operating entity, spends an average of over $2 million per week in legal and professional costs directly related to defending the Pending Actions, on top of another $3 million per week in legal fees and other expenses in large part related to the Pending Actions, government investigations, and the financial pressure resulting therefrom.").

light of the parties' awareness of the United States Trustee's position regarding government entities' eligibility (or lack thereof) to serve on official committees. Without a supporting group with whom the Debtors could negotiate, the parties rightly feared that the Debtors' bankruptcy would be plagued by disputes, delays, and excessive costs as the Debtors attempted to negotiate (or litigate) with some 50 individual state attorneys general and thousands of litigating municipal and tribal legal offices.

39.     Thus, in connection with their agreement on the Settlement Structure, the parties also agreed that the formation of a negotiating group (that ultimately became the Ad Hoc Committee) would provide the company with an efficient conduit for the negotiation and implementation of the terms of a chapter 11 plan. The composition of the Ad Hoc Committee and the rules that would govern its participation in the bankruptcy were carefully considered. The group would include representatives of the states, municipalities, and tribes, the interests of which may often diverge on critical issues, but each of whose support for a plan would ultimately be necessary; the group's role (the "Scope") would be carefully defined to properly reflect the work necessary to support the deal; and the Debtors would retain the right both to review the group's fees for reasonableness and to terminate the company's obligation to pay under specified circumstances. These terms and others, which came to be memorialized in the Reimbursement Agreement, were ultimately approved by the Purdue Board of Directors on September 15, 2019, prior to the Debtors' bankruptcy filings.

40.     Postpetition events have borne out the wisdom of the Debtors' decision to enter into the Reimbursement Agreement. A short two months into these cases, and with minimal disruption and litigation for a case of this complexity, the Debtors have achieved a series of successes, including the entry of the consensual Stay Order, the finalization of the Summary Term Sheet,

agreement with major case parties on an expansive diligence process, and the establishment of case milestones ample enough to permit a thorough investigation by the Creditors' Committee yet short enough to facilitate timely confirmation of a chapter 11 plan. Each of these successes traces back to the establishment of the Ad Hoc Committee (and the attendant Reimbursement Agreement).

41.    To begin, the existence of the Settlement Structure, and the support of the Ad Hoc Committee, provided the critical lynchpin of and basis for the Debtors' request for a stay of the Pending Actions. With that support, the Debtors were able to represent to the Court that each of the prongs of the four-part test for grant of a preliminary injunction was met, and that a critical block of their creditors – the very same ones against whom they were litigating – supported a stay. Absent the Ad Hoc Committee's existence and support, it is unclear whether the Debtors would have received the initial breathing spell that they deemed so essential to the success of their chapter 11 cases.

42.    The benefits of the Summary Term Sheet trace to the Ad Hoc Committee as well, and such benefits are substantial. Among other things, under the terms of the settlement embodied therein: the Debtors will place 100% of the assets or equity of Purdue into a trust or a similar post-emergence structure for the benefit of their claimants and the U.S. public; the Sacklers will contribute a minimum of $3 billion over the course of seven years and will engage in a sale process for their ex-U.S. pharmaceutical companies (the "**IACs**") that, depending on its outcome, may result in substantial additional contributions for the benefit of the Debtors' estates; and the Sacklers will provide representations and enforceable covenants ensuring that, subsequent to the disposition of the IACs, they will no longer be engaged in the opioid business. Other parties may disagree as to the sufficiency of the settlement consideration, and other terms of the deal, but the monetary

contributions are undoubtedly substantial and represent a valuable framework for negotiation of a plan. Mass tort cases such as this one risk becoming mired in endless litigation and delay, sometimes taking many years to reach resolution.[8] The Summary Term Sheet provides an alternative path forward on a reasonable time frame, while preserving the rights of all parties in interest to take such steps as they deem warranted to attempt to improve the deal, or vote it down.

43.    Indeed, parties in interest, including the Creditors' Committee, have already reaped the benefits of the process negotiated by the Ad Hoc Committee. The Creditors' Committee, in the wake of the entry into the Summary Term Sheet, was able to negotiate its own Case Stipulation, under which the Debtors agreed to provide significant diligence and committed not to take certain actions, including proposing a plan, for a fixed period of time. These concessions built off of the process and milestones put in place by the Ad Hoc Committee, including the Ad Hoc Committee's insistence on a period of time in which to conduct due diligence. The Non-Consenting States are negotiating a similar stipulation, and the Ad Hoc Committee intends to work closely with that group (including through the sharing of FTI) to obtain and evaluate diligence materials.

44.    To be sure, the progress in these cases to date is attributable to the efforts of many parties, including the Debtors and the Creditors' Committee. But each of the key events outlined above – the Stay Order, the Summary Term Sheet, the case timeline and diligence protocols, and the climate of cooperation that has prevailed in these cases – could not have been achieved absent the Ad Hoc Committee's contributions. Those contributions, in turn, were made possible only by the Ad Hoc Committee's ability to work in concert as a group with the assistance of its

---

[8] *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 63-64 (Bankr. D. Del. 2012) (11 years between petition date and confirmation); *In re Congoleum Corp.*, No. 03-51524-KCF (D.N.J. Mar. 12, 2010) [Dkt. No. 8116] (6 years between petition date and confirmation); *In re Diocese of Duluth*, No. 15-50792 (Bankr. D. Minn. Oct. 21, 2019) [Dkt. No. 420] (almost 4 years between petition date and confirmation); *In re Pittsburgh Corning Corp.*, No. 00-22876-TPA (Bankr. W.D. Penn. May 16, 2013) [Dkt. No. 9409] (13 years between petition date and confirmation).

Professionals – an ability that simply would not have existed absent the Debtors' commitments in the Reimbursement Agreement, and which could be irrevocably compromised going forward if those commitments were not honored.  In sum, because the Reimbursement Agreement has proven so critical to the Debtors' achievements to date, and will be critical to negotiation and confirmation of a consensual chapter 11 plan within an acceptable timeframe, the Debtors have amply demonstrated the wisdom of their judgment to assume it.

## II.   The Objections to the Motion Should Be Overruled

### A.   The Unique Circumstances of these Cases Support the Debtors' Decision to Assume the Reimbursement Agreement

45.     The Creditors' Committee acknowledges, as it must, that "many courts have authorized the payment of professional fees of non-estate fiduciaries under Bankruptcy Code sections 363 and 365," but contends that such payment in this case would be premature. Committee Objection ¶ 33.  According to the Creditors' Committee, the cases approving such fees "typically are limited to situations where . . . the proposed payment is pursuant to a binding restructuring support agreement ('RSA') and/or in connection with providing new money financing to the debtor."  *Id*.  Even if the Creditors' Committee were correct (and it is not – see the Debtors' Motion at ¶ 19), the underlying *reasons* supporting courts' willingness to approve fees under RSAs are present here – together with a variety of other reasons that make the payment of fees in this case even more compelling than others.

46.     In particular, as the Creditors' Committee explains, decisions to award fees in other cases are sometimes premised on the view that agreement on an RSA "can be a significant milestone in a case, and may result in a dramatically accelerated exit from bankruptcy," or that an RSA coupled with a fee agreement may "obviate[] the expense that would accompany a 'traditional free fall' bankruptcy."  Committee Objection at ¶¶ 33, 35.  The focus in those cases, however, was

not on the fact of an RSA, but what that agreement accomplished.  Here, the complexity and size of these cases is virtually incomparable in recent memory, involving the resolution of litigation and claims by the legal representatives of over fifty states and territories, thousands of municipalities and tribes, and the federal government, as well as individual personal injury claimants, hospitals, and insurers.  Put in the context of the litigation that preceded them, the Settlement Structure and Summary Term Sheet constitute a "significant milestone."  Together, they are likely to result in an "accelerated exit from bankruptcy," and will likely spare the Debtors from the dislocation and cost of a "traditional free fall" bankruptcy.  In light of these benefits – the very same benefits that the Creditors' Committee recognizes may justify the payment of fees to supporting creditors – the Court should approve the assumption of the Reimbursement Agreement that facilitated them.

47.    Considering these milestones and the benefits that will flow from them, it matters not, as the Creditors' Committee contends, that the Summary Term Sheet is not yet an RSA.  Even so, the Reimbursement Agreement itself, together with the Summary Term Sheet, commit the members of the Ad Hoc Committee to negotiating the terms of an RSA, disclosure statement, and plan.  Moreover, whatever may be typical in other cases, the cases before the Court are unique, not least because of the huge scale of the opioid crisis, the enormity and diversity of the claimant pool, and, critically, the fact that the entity typically charged with representing the interests of unsecured creditors does not contain representatives of the main creditor groups in these cases:  the states, municipalities, and tribes.

48.    The Creditors' Committee insists that it *does* represent the interests of the Ad Hoc Committee's members.  But while the Ad Hoc Committee has no doubt that the Creditors' Committee takes its duties seriously, it is simply unrealistic to expect that a committee comprised

*entirely* of private parties can adequately advocate for the interests of the numerous and varying government entities.  Indeed, the Creditors' Committee's objection proves the point:  in taking and advocating the position that "private parties" (i.e., the official committee's membership) suffered "more than 70% of the harm inflicted by the opioid crisis," and that the Ad Hoc Committee's Professionals represent "a group comprising far less than 1% of one category of creditors, a category that may itself include less than one-third of the outstanding claims by value," Committee Objection ¶ 51, the Creditors' Committee has now conceded its intent to advance an allocation agenda that is fundamentally at odds with the facts and directly adverse to the interests of the Ad Hoc Committee and other governmental creditors.[9]

49.    In sum, rather than focus on largely irrelevant distinctions between the reimbursement obligations undertaken by debtors in other cases and those proposed here, the main focus should be on what benefits the proposed assumption will confer on the estates.  In the context of these cases, and the unique and challenging circumstances they present, assumption of the Reimbursement Agreement confers significant benefits, and should be approved.

**B.    The Terms and Conditions On Which the Debtors Propose to Reimburse the Professionals Impose Ample Safeguards Against Duplication and Waste**

50.    One theme in the objections is the risk of waste and duplication posed by the Motion, with the objectors questioning the need for the retention of multiple Professionals.  The Ad Hoc Committee takes this issue very seriously and has endeavored with the Debtors from the outset (as well as on the basis of further discussions with the Creditors' Committee) to implement appropriate safeguards and controls to prevent the incurrence of excessive fees.

---

[9] The inclusion of "ex officio" members – who do not vote – does not meaningfully alter this dynamic.

51.     Before addressing these specific safeguards, it is helpful to understand the unique composition of the Ad Hoc Committee, and how that composition has informed its choice of counsel.  The Ad Hoc Committee, as the Court is aware, is comprised principally of two distinct groups of entities whose interests, particularly on issues of allocation, are not necessarily aligned: the states, on the one hand, and the municipalities and tribes, on the other.  Together, the members of the Ad Hoc Committee represent a singularly large and diverse constituency – both of which factors make the Ad Hoc Committee uniquely positioned to deliver value to the Debtors in the form of a consolidated negotiating counterparty.  But the principal strengths of the Ad Hoc Committee – its size and diversity – also explain the need for multiple Professionals.

52.     During and before the negotiation of the Settlement Structure, the current members of the Ad Hoc Committee were represented by a variety of counsel.  Brown Rudnick and Gilbert represented the PEC, and Otterbourg represented a large state that was helping lead the coordination with other states.  When it became apparent that the creditor parties to the Settlement Structure would benefit from additional organization, Kramer Levin was proposed as counsel by a cross-section of certain states and the PEC.  In light of the particular expertise of each of the firms and the roles they had already played, the members of the Ad Hoc Committee determined that each should be involved going forward.  The ability of the four firms to work together gave this diverse set of clients the confidence they could function as a cohesive group.  Once the firms were selected, they worked to define their respective roles.  Kramer Levin, as lead bankruptcy counsel, takes principal responsibility for day-to-day work on the bankruptcy case; Otterbourg and Brown Rudnick serve, respectively, as coordinating counsel to the states, on the one hand, and the municipalities and tribes on the other; and Gilbert serves as mass tort, insurance, and deal counsel. All four firms work on behalf of the Ad Hoc Committee.

53.    With this background in mind, the choice of four counsel to represent a committee that itself represents over half of the country (and thousands of entities) makes eminent sense. The question of duplication, however, was ever-present in the Ad Hoc Committee's mind, and, as a result, a variety of measures were adopted to limit expenses, including the following:

- Reimbursement is limited to the "reasonable and documented fees and expenses of the Professionals" (Reimbursement Agreement at 1);

- Reimbursement is limited to advice rendered in connection with matters within the Scope of the Ad Hoc Committee's mandate (*id*. at 3);

- The Professionals "will allocate the division of responsibilities and their delivery of services to the Ad Hoc Committee so as to limit unnecessary duplication of services" (*id*. at 3);

- The Debtors' review "will take into account, among other things, its view of duplication of effort by the Professionals" (*id*. at 3);

- The Professionals will file monthly fee statements and quarterly fee applications, which the Debtors, the Creditors' Committee, and the U.S. Trustee will have an opportunity to review (Amended Proposed Order ¶ 5); and

- The Debtors may terminate if they determine in their "sole discretion" that the agreement is "no longer in the best interests of the Company," if certain case milestones are not met, or if the membership of the Ad Hoc Committee changes to be "less representative without the Company's consent, not to be unreasonably withheld" (Reimbursement Agreement at 3).

54.    The Professionals estimate, on the basis of the foregoing and their experience in the case to date, that the monthly expenses for which counsel will seek reimbursement will range from $1.5 million to $2 million. It is respectfully submitted that this range of expense is neither atypical nor inappropriate in a case of this magnitude, particularly in light of the Ad Hoc Committee's important role, which, consistent with the Scope, will include dealing with complex issues of diligence, documentation, and allocation.

### C.    The Professionals' Representation of Other Clients Is Irrelevant

55.    The Creditors' Committee makes much of the fact that the four firms that are counsel to the Ad Hoc Committee also represent individual clients in connection with the cases and/or the opioid litigation, going so far as to include a chart of the Professionals' representations. These other representations are entirely irrelevant to the work of the Ad Hoc Committee, however, as they present no conflict and there is no risk that the estates will be charged for any expenses incurred in connection therewith.  To the extent the Professionals perform any work for these other clients during the course of the bankruptcy cases (and such work, to date, has been de minimis), the Professionals will of course maintain separate time records and will not charge the estates.

### D.    The PEC's Participation on the Ad Hoc Committee is Appropriate

56.    The Creditors' Committee also questions the inclusion of the PEC on the Ad Hoc Committee, contending that no evidence has been presented that "the PEC or its representatives speak for any persons that have [claims] on substantive matters in these cases, as opposed to procedural and administrative matters in the MDL."  Committee Objection ¶ 12; *see also id.* ¶ 50. This is simply incorrect.  As the Order establishing the PEC makes clear, the claimants' leadership team in the MDL is "charged with formulating . . . and presenting positions on *substantive* and procedural issues during the litigation," and "act[ing] for the group . . . ."  Order Granting Plaintiffs' Renewed Motion to Approve Co-Leads, Co-Liaisons, and Executive Committee at 7 *In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804 (N.D. Ohio Jan. 4, 2018), ECF No. 37 (emphasis added).[10]

---

[10] While the Ad Hoc Committee, in reciting its membership, typically refers in shorthand only to the PEC, that term, in the Ad Hoc Committee bylaws, is defined to include the entire claimants' leadership team in the MDL, including three co-lead counsel, the sixteen-member Plaintiffs' Executive Committee, and three co-liaison counsel.

57.     Moreover, in focusing myopically on the fact that the PEC is not itself a creditor, the Creditors' Committee ignores the crucial – and uniquely valuable – role the PEC will play in ensuring the success of a chapter 11 plan.  Some 2,250 of the Pending Actions against the Debtors are consolidated in the MDL, making the support of these claimants indispensable to a consensual chapter 11 plan.  Historically, including in the negotiations that led to the Settlement Structure, the PEC has served as the negotiating body on whom members of the MDL, and the MDL Court, have come to rely, and the PEC will continue to serve that role in these cases.  The Debtors, in supporting the inclusion of the PEC on the Ad Hoc Committee, recognized that the PEC is an influential member that commands great sway in recommending a deal to MDL plaintiffs.  Finally, lest there be any doubt, it is well settled that entities such as the PEC have standing to speak on substantive matters in a bankruptcy case.  *See, e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 160, 165-66, 170 (2d Cir. 2016) (adopting appellants' "Ignition Switch Plaintiffs" (represented by MDL lead counsel and bankruptcy counsel) arguments in reversing lower court's decision).[11]

### E.     The Reimbursement Agreement is Amenable to Assumption

58.     The Ad Hoc Group of Individual Victims contends that the Reimbursement Agreement is not an executory contract and is therefore not amenable to assumption.  Individual Victims Objection ¶¶ 7, 12-21.  This argument is irrelevant because the Debtors could still seek authority to *perform* under the allegedly non-executory contract even if they could not *assume* it – and the Debtors have done precisely that, seeking both to assume the agreement (pursuant to section 365(a)) and to perform under it (pursuant to section 363(b)).  But in any event, the Reimbursement Agreement is an executory contract, regardless of the standard employed.

---

[11] The Creditors' Committee, as noted, has argued that the PEC is not a "creditor."  Committee Objection ¶ 50.  To the extent relevant, however (and it is not clear why it is, since the PEC is clearly a party in interest), it is well settled that, for purposes of serving on a committee, a representative of a creditor is treated like a creditor.  *See In re Altair Airlines*, 727 F.2d 88, 90 (3d Cir. 1984) (allowing a union to sit on the official creditors' committee).

59.     Under the so-called "Countryman Test," the Reimbursement Agreement is executory because the Ad Hoc Committee has material obligations thereunder (and no party has contested that the Debtors do, as well).  Most centrally, the Ad Hoc Committee has the obligation to perform under the "Scope" section of the agreement, which provides that the "mandate of the Ad Hoc Committee is to negotiate and support the terms and definitive documents associated with the Settlement and to take such other actions as may be necessary or appropriate to facilitate the Settlement, and not to take positions adverse to the Settlement, engage in litigation activities, review or investigate other matters, or engage in matters in which the respective members of the Ad Hoc Committee may be in conflict."  Reimbursement Agreement at 3.  In addition, the Ad Hoc Committee must perform under the "Termination" section, which imposes certain milestones and deadlines for documentation of the deal.  *Id*.  The expectation of continued performance under these provisions constitutes the *raison d'être* of the Reimbursement Agreement, without which the Debtors never would have agreed to pay the Ad Hoc Committee's fees.[12]

60.     The Reimbursement Agreement is an executory contract under the alternative "functional" test that the Individual Victims have cited, since its assumption would ultimately benefit the estate.  *See, e.g.*, *In re Riodizio, Inc.*, 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997) ("Under the functional approach, 'the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate.'") (citation omitted).  As discussed above, the benefits to the estate are numerous and, contrary to the Ad Hoc Committee

---

[12] The Reimbursement Agreement imposes additional obligations on the Ad Hoc Committee, including the obligation to "provide the Company with reasonably detailed monthly statements of fees and documented, out-of-pocket expenses for services rendered to the Ad Hoc Committee," and the obligation to "allocate the division of responsibilities [among the Professionals] and their delivery of services to the Ad Hoc Committee so as to limit unnecessary duplication of services."  Reimbursement Agreement at 2, 3.

of Individual Victims' assertions, such benefits have been, and will be, realized post-, and not merely pre-, petition.

### F.   A Substantial Contribution Claim Is An Inadequate Substitute for Current Payment of the Professionals' Fees

61.     As set forth in the Debtors' Motion, approval of the fees of the Professionals at a later date under section 503(b) of the Bankruptcy Code is an inadequate substitute for the relief sought in the Motion because the governmental units that comprise the bulk of the Ad Hoc Committee's constituency are ill-equipped to bear the costs of the retention of bankruptcy professionals in a large and complex mass tort case, particularly over a long period of time.   Certain of the objectors contest this point, arguing variously that: (i) section 503(b) provides the only available avenue for reimbursement of the Professionals' fees (*see, e.g.*, Individual Victims' Objection ¶ 22; UST Objection at 7-13); and (ii) that the Ad Hoc Committee is likely to maintain an active role in these cases regardless of whether the Motion is approved (*see, e.g.*, Creditors' Committee's Objection ¶ 8; Individual Victims' Objection ¶ 31).   Each of these objections is misplaced.

62.     As an initial matter, there is simply no merit to the suggestion that a debtor's rights under section 363(b) and 365(a) are somehow nullified by the existence of section 503(b).   To the contrary, as set forth in the Debtors' Motion – and as the Creditors' Committee confirms[13] – numerous courts have approved the assumption of and/or performance under fee agreements on the basis of section 363(b) and/or 365(a).   The Ad Hoc Committee of Individual Victims' citation to *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) is inapposite. The "general/specific canon" applied in that case was used to avoid "the superfluity of a specific

---

[13] *See* Creditors' Committee Objection ¶ 33 (noting that "many courts have authorized payment of professional fees of non-estate fiduciaries under Bankruptcy Code sections 363 and 365").

provision that is swallowed by the general one." *Id.* It has no applicability here, where the two key provisions at issue are not in conflict and, in fact, deal with entirely different subject matters: section 365(a) with a *debtor's* decision to assume or reject a contract, and section 503(b) with a *creditor's* request for compensation. Granting a debtor's motion under the former does no violence to the standards applicable to a creditor's request under the latter, and certainly does not render section 503(b) superfluous in any meaningful sense.[14]

63.     The Creditors' Committee's efforts to turn the Motion into a referendum on the Ad Hoc Committee's "financial hardship" or ability to "bear its own costs" should also be disregarded. *See, e.g.*, Committee Objection ¶ 52. The test for grant of the Motion is not whether or not the Ad Hoc Committee can afford to pay its legal counsel; if that were the relevant standard, then supporting creditors in a bankruptcy – often sophisticated financial institutions – could hardly ever hope to be paid. Instead, the question is whether assumption of the Reimbursement Agreement will benefit the estate. And, despite the Creditors' Committee's efforts to minimize the Ad Hoc Committee's importance, the Debtors rightly concluded that there is a real risk that the Ad Hoc Committee will cease to function as a cohesive and organized negotiation counterparty if the fees of its Professionals are not paid. It is of course likely, as the Creditors' Committee suggests, that the individual *members* of the group will continue to participate in the bankruptcy cases regardless of the outcome of the Motion. But there can be no guarantee that the Ad Hoc Committee itself will continue to play the vital role it has played to date (or even exist in its current form) if it is

---

[14] The Individual Victims' reliance on *In re Lehman Bros. Holdings*, 508 B.R. 283 (S.D.N.Y. 2014), is also misplaced, as that case dealt with a perceived conflict between section 503(b) and section 1123(b)(6) – a particularly broad and general Code provision relevant to plan confirmation that is in no way implicated by the Debtors' Motion.

forced to confront difficult issues of fee allocation among multiple groups of creditors – the states, tribes, and the municipalities – whose interests are frequently at odds.[15]

### G. The Debtors Appropriately Determined to Limit Reimbursement to the Ad Hoc Committee's Professionals, and Not Those of Other Groups

64.     Certain of the objectors take issue with the Debtors' decision to reimburse the fees of the Ad Hoc Committee's Professionals and not the professionals retained by other ad hoc groups.  *See* Individual Victims' Objection ¶ 10 (complaining of unequal treatment); Creditors' Committee Objection ¶ 54 (same).  As the Debtors have observed, however, there is nothing in the Bankruptcy Code that requires a debtor to reimburse the fees of every creditor that so requests, particularly creditors that are opposed to the Debtors' objectives.  The relevant question, in every instance, is whether the use of estate resources is a sound exercise of the Debtors' business judgment – and here, for the reasons set forth above, it is.  If the Debtors determine, in the exercise of their business judgment, that reimbursement of some other creditor's fees is warranted, and applicable standards are satisfied, they are free to seek that relief.

65.     In the meantime, however, the objectors have advanced no compelling reason why the Debtors' decision to reimburse the fees of the Professionals representing the *only* parties in interest who *were instrumental in creating and have agreed to support the Settlement Structure*, who have a prepetition reimbursement agreement, and who *represent the interests of a substantial portion of the creditors in these cases* is at all irrational or suspect.  The best the objectors can offer is the inaccurate and disingenuous contention that the Ad Hoc Committee represents but a small minority of the Debtors' constituents.  *See, e.g.*, Committee Objection ¶¶ 49, 51.  This is

---

[15] The Creditors' Committee asserts, without support, that the "Non-Consenting Ad Hoc Committee is composed mostly of states and is paying the fees of its counsel itself."  Creditors' Committee Objection ¶ 52.  The Ad Hoc Committee has no understanding of the fee arrangements of other ad hoc groups – and there is no evidence in the record of those arrangements, including whether they call for current or deferred payment of fees.  In any event, they are irrelevant to the workings of the Ad Hoc Committee itself, which is uniquely diverse.

flatly untrue:  the Ad Hoc Committee, in addition to speaking for the 23 states and various local government and tribal entities that support the Settlement Structure, contains the PEC – the entity that, as both a practical and legal matter, makes recommendations to, and advances the interests of, the thousands of municipalities, tribes, and other plaintiffs comprising the MDL.

66.    The Creditors' Committee appears focused on the fact that not all of the supporting states or municipalities or tribes sit on the Ad Hoc Committee.  But a group that large would be unworkable and unwieldy and, indeed, would defeat the purpose of the Ad Hoc Committee's creation.  Instead, as reflected in the Ad Hoc Committee's 2019 Statement, which the Creditors' Committee misquotes:

> The members of the Ad Hoc Committee negotiated and support a settlement structure with the Debtors and their equity shareholders, on behalf of a larger group of supporting governmental and other contingent litigation claimants.  Collectively, this larger group of creditors comprise over half the population of the country, holding substantial claims against the Debtors' estates.

*See* AHC 2019 ¶ 1 (emphasis added).[16]  Thus, as further evidenced by the statements filed by the supporting states that are not members of the Ad Hoc Committee, the Ad Hoc Committee has been ***delegated*** the authority on behalf of the larger body of supporting creditors to negotiate and implement the Settlement Structure, and has fulfilled that duty in the period leading up to the bankruptcy filing and thereafter.

---

[16] While the Creditors' Committee characterizes paragraph 3 of the AHC 2019 Statement as an "admission" that it does not represent a larger creditor group in the case, the obvious omission in the quoted section renders the argument disingenuous.  The language of paragraph 3 provides "***Other than as discussed herein***, the Ad Hoc Committee Members and the Ad Hoc Committee do not purport to act, represent, or speak on behalf of any other entities in connection with the Bankruptcy Cases."  As noted, "discussed herein" (particularly in paragraph 1) was the role of the Ad Hoc Committee as a voice and representative of the larger body of supporting creditors.  Likewise, given the unique composition of the Ad Hoc Committee it would be highly unusual for any state or municipality or tribe to proclaim it is a ***fiduciary*** for another state or municipality or tribe; this does not mean that the members of the Ad Hoc Committee are not (or cannot be) acting to further the interests of the larger supporting creditor body.

67.     Finally, there is simply no merit to the contention that payment of the Ad Hoc Committee's fees somehow results in unequal treatment.  That argument conflates "treatment" of claims under a plan with the use of estate resources under section 363(b).  As courts have repeatedly held, the requirement that creditors receive equal treatment on account of their claims is simply not implicated by treatment accorded a creditor on account of some other contribution to the case.  *See, e.g.*, *Ad Hoc Committee of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 927 (8th Cir. 2019) (distinguishing between treatment for a claim and treatment in consideration for "valuable new commitments").

### H.     The Scope of the Ad Hoc Committee's Mandate is Appropriate

68.     The Creditors' Committee has also objected to the Scope of the Ad Hoc Committee's mandate, contending it should not work on allocation issues, because such activity "would benefit only their clients and would be adverse to other creditors."  Committee Objection ¶ 54.  To the extent this is a purported "equal treatment" objection, it is meritless, for the reasons addressed above.  To the extent this objection offers something different, it miscomprehends the nature of the allocation dispute in these cases, which will center principally on "big picture" allocation issues such issues as how to allocate among states, municipalities, tribes, and private claimants, on both a national and state-by-state level.  In helping to analyze, negotiate, and resolve those issues, the Ad Hoc Committee will be working in the interests of the estates as a whole, and not on behalf of any individual creditor.  The Ad Hoc Committee takes seriously the Court's suggestion, at the November 6 hearing, that the states, territories, and tribes serve as a "resource," and that "each state reach out to the claimants in its state and start discussing this to see if there's an equitable way that the claimants within the states can get comfortable with how it can be addressed."  Hr'g Tr. at 57:6-58:1 (November 6, 2019).  Of note, the Ad Hoc Committee has agreed that it will *not* object to, or defend, individual claims.

32

69.     Finally, and perhaps most fundamentally, the Creditors' Committee cites no authority for the proposition that the fees of an ad hoc committee, to be eligible for reimbursement, must be expended in service of goals that each and every creditor would support. This standard is as unrealistic as it is unworkable. In bankruptcy, as the Creditors' Committee well knows, there is often no objective that garners universal support, aside from the core objectives of achieving a successful reorganization or liquidation and maximizing value for the estate. If the Debtors, in their business judgment, have sensibly concluded that the active participation of an entity that will advocate for the interests of their main creditor constituents is likely to serve these core objectives of the bankruptcy case (and presumably serve as a counterbalance to the parochial interests of the Creditors' Committee), the Court should defer to that judgment.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons and those set forth in the Debtors' briefs, the Ad Hoc Committee respectfully requests that the Court grant the Motion.

Dated: November 15, 2019

Respectfully submitted,

/s/ *Kenneth H. Eckstein*
Kenneth H. Eckstein
David E. Blabey Jr.
Rachael Ringer
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: keckstein@kramerlevin.com
       dblabey@kramerlevin.com
       rringer@kramerlevin.com

David J. Molton
Steven D. Pohl (admitted *pro hac vice*)
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com

spohl@brownrudnick.com

Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
GILBERT LLP
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200
Email: gilberts@gilberlegal.com
        litherlandc@gilbertlegal.com
        kquinn@gilbertlegal.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: mcyganowski@otterbourg.com
        jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*