Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5

6    PURDUE PHARMA L.P., ET AL.          Case No. 19-23649-rdd

7

8            Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12                    U.S. Bankruptcy Court

13                    300 Quarropas Street

14                    White Plains, New York 10601

15

16                    November 19, 2019

17                    10:31 AM

18

19

20

21

22   B E F O R E :

23   HON ROBERT D. DRAIN

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  NAROTAM RAI

Page 2

1    Notice of Agenda for November 19, 2019 Hearing

2

3    Motion of Debtors for Entry of an Order (I) Authorizing the

4    Rejection of Commercial Lease and (II) Granting Related

5    Relief filed by Eli J. Vonnegut on behalf of Purdue Pharma

6    L.P. (ECF 435)

7

8    Motion of Debtors for Authority to Employ Professionals Used

9    in the Ordinary Course of Business Nunc Pro Tune to the

10   Petition Date filed by Eli J. Vonnegut on behalf of Purdue

11   Pharma L.P. (ECF 128)

12

13   Debtors' Motion Establishing Procedures for Interim

14   Compensation and Reimbursement of Expenses for Retained

15   Professionals filed by Eli J. Vonnegut on behalf of Purdue

16   Pharma L.P. (ECF 434)

17

18   Application of Debtors for Authority to Retain and Employ

19   Dechert LLP as Special Counsel to the Debtors Nunc Pro Tune

20   to the Petition Date filed by Eli J. Vonnegut on behalf of

21   Purdue Pharma L.P. (ECF 424)

22

23

24

25

Page 3

1   Application of Debtors for Authority to Retain and Employ

2   King & Spalding LLP as Special Counsel to the Debtors Nunc

3   Pro Tune to the Petition Date filed by Eli J. Vonnegut on

4   behalf of Purdue Pharma L.P. (ECF 427)

5

6   Debtors' Application for Authority to Retain and Employ

7   AlixPartners, LLP as Financial Advisor Nunc Pro Tune to the

8   Petition Date filed by Eli J. Vonnegut on behalf of Purdue

9   Pharma L.P. (ECF 429)

10

11  Debtors' Application for an Order Authorizing Employment and

12  Retention of Prime Clerk LLC as Administrative Advisor Nunc

13  Pro Tune to the Petition Date filed by Eli J. Vonnegut on

14  behalf of Purdue Pharma L.P. (ECF 439)

15

16  Application of the Official Committee of Unsecured Creditors

17  of Purdue Pharma L.P., et al. to Retain and Employ Akin Gump

18  Strauss Hauer & Feld LLP as Counsel, Nunc Pro Tune to

19  September 26, 2019 filed by Ira S. Dizengoff on behalf of

20  The Official Committee of Unsecured Creditors of Purdue

21  Pharma L.P., et al. (ECF 421)

22

23

24

25

Page 4

1   Application of the Official Committee of Unsecured Creditors

2   for Entry of an Order Authorizing Retention and Employment

3   of Bayard, P.A. as Efficiency Counsel to the Official

4   Committee of Unsecured Creditors, Nunc Pro Tune to September

5   29, 2019 filed by Ira S. Dizengoff on behalf of The Official

6   Committee of Unsecured Creditors of Purdue Pharma L.P., et

7   al. (ECF 422)

8

9   Application of the Official Committee of Unsecured Creditors

10  of Purdue Pharma L.P., et al. to Retain and Employ Province,

11  Inc. as Financial Advisor Nunc Pro Tune to October 1, 2019

12  filed by Ira S. Dizengoff on behalf of The Official

13  Committee of Unsecured Creditors of Purdue Pharma L.P, et

14  al. (ECF 423)

15

16  Application for Order Authorizing Employment and Retention

17  of Jefferies LLC as Investment Banker to the Official

18  Committee of Unsecured Creditors Nunc Pro Tune to October 4,

19  2019 filed by Ira S. Dizengoff on behalf of The Official

20  Committee of Unsecured Creditors of Purdue Pharma L.R, et

21  al. (ECF 425)

22

23

24

25

Page 5

1   Application of the Official Committee of Unsecured Creditors

2   of Purdue Pharma L.P., et al. to Retain and Employ Kurtzman

3   Carson Consultants LLC as Information Agent, Nunc Pro Tune

4   to November 1, 2019 filed by Ira S. Dizengoff on behalf of

5   The Official Committee of Unsecured Creditors of Purdue

6   Pharma L.R, et al. (ECF 426)

7

8   Motion of the Official Committee of Unsecured Creditors of

9   Purdue Pharma L.R, et al. for Entry of an Order Clarifying

10  the Requirement to Provide Access to Confidential or

11  Privileged Information and Approving a Protocol Regarding

12  Creditor Requests for Information filed by Ira S. Dizengoff

13  on behalf of The Official Committee of Unsecured Creditors

14  of Purdue Pharma L.R, et al. (ECF 415)

15

16  Motion of Debtors for Entry of Interim and Final Orders

17  Authorizing (I) Debtors to Continue to Use Existing Cash

18  Management Systems and Maintain Existing Bank Accounts and

19  Business Forms and (II) Financial Institutions to Honor and

20  Process Related Checks and Transfers filed by Eli J.

21  Vonnegut on behalf of Purdue Pharma L.R (ECF 5)

22

23

24

25

Page 6

1    Application of Debtors for Authority to Employ and Retain

2    Davis Polk & Wardwell LLP as Attorneys for the Debtors Nunc

3    Pro Tune to the Petition Date filed by Eli J. Vonnegut on

4    behalf of Purdue Pharma L.R (ECF 419)

5

6    Application of Debtors for Authority to Retain and Employ

7    Skadden, Arps, Slate, Meagher & Flom LLP as Special Counsel

8    to the Debtors Nimc Pro Tune to the Petition Date filed by

9    Eli J. Vonnegut on behalf of Purdue Pharma L.R (ECF 438)

10

11   Application of Debtors for Authority to Retain and Employ

12   Wilmer Cutler Pickering Hale and Dorr LLP as Special Counsel

13   to the Debtors Nunc Pro Tune to the Petition Date filed by

14   Eli J. Vonnegut on behalf of Purdue Pharma L.R (ECF 427)

15

16   Motion to Assume the Prepetition Reimbursement Agreement

17   with Ad Hoc Committee, and to Pay the Fees and Expenses of

18   the Ad Hoc Committee's Professionals filed by Eli J.

19   Vonnegut on behalf of Purdue Pharma L.P. (ECF 394)

20

21

22

23

24

25

1   Motion of Debtors for Entry of an Order Authorizing (I)

2   Debtors to (A) Pay PrePetition Wages, Salaries, Employee

3   Benefits and Other Compensation and (B) Maintain Employee

4   Benefits Programs and Pay Related Administrative

5   Obligations, (II) Employees and Retirees to Proceed with

6   Outstanding Workers' Compensation Claims and (III) Financial

7   Institutions to Honor and Process Related Checks and

8   Transfers filed by Eli J. Vonnegut on behalf of Purdue

9   Pharma L.P. (ECF 6)

10

11   Debtors' Application for Authority to Employ PIT Partners LP

12   as Investment Banker Nunc Pro Tune to the Petition Date

13   filed by Eli J. Vonnegut on behalf of Purdue Pharma L.P.

14   (ECF 430)

15

16   Debtors' Application to Employ Ernst & Young as its Auditor,

17   Nunc Pro Tune to the Petition Date filed by Eli J. Vonnegut

18   on behalf of Purdue Pharma L.P. (ECF 432)

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach & Penny Skaw

Page 8

1    A P P E A R A N C E S :

2    DAVIS POLK & WARDWELL, LLP

3          Attorneys for Debtor

4          450 Lexington Avenue

5          New York, New York 10017

6

7    BY:  MARSHALL S. HUEBNER, ESQ.

8          CHRISTOPHER ROBERTSON, ESQ.

9          DYLAN A. CONSLA, ESQ.

10          BENJAMIN S. KAMINETZKY, ESQ.

11

12    KRAMER LEVIN NAFTALIS & FRANKEL, LLP

13          Attorneys for Ad Hoc Committee

14          1177 Avenue of the Americas

15          New York, New York 10036

16

17    BY:  KENNETH H. ECKSTEIN, ESQ.

18

19    BROWN RUDNICK

20          Attorneys for Consenting Ad Hoc Committee

21          7 Times Square

22          New York, New York 10036

23

24    BY:  DAVID MOLTON, ESQ.

25

Page 9

1    MILBANK, LLP.

2         Attorneys for Raymond Sackler Family

3         55 Hudson Yards

4         New York, New York 10001

5

6    BY:  GERARD UZZI, ESQ.

7

8    CAPLIN & DRYSDALE

9         Attorneys for Multi-State Governmental Entities Group

10        One Thomas Circle, NW

11        Suite 1100

12        Washington, DC 20005

13

14   BY:  KEVIN C. MACLAY, ESQ.

15

16   OTTERBOURG

17        Attorneys for Consenting Ad Hoc Committee

18        230 Park Avenue

19        New York, New York 10169

20

21   BY:  MELANIE L. CYGANOWSKI, ESQ.

22

23

24

25

Page 10

```
 1    PILLSBURY WINTHROP SHAW PITTMAN, LLP

 2         Attorneys for Ad Hoc Group of Non-Consenting States

 3         31 West 52nd Street

 4         New York, New York 10019

 5

 6    BY:  ANDREW M. TROOP, ESQ.

 7

 8    OFFICE OF THE ATTORNEY GENERAL - STATE OF FLORIDA

 9         Attorneys for State of Florida

10

11    BY:  JOHN GUARD, ESQ.

12

13    AKIN, GUMP, STRAUSS, HAUER & FELD

14         Attorneys for Official Creditors' Committee

15

16

17    BY:  KATHERINE PORTER, ESQ.

18         ARIK PREIS, ESQ.

19         SARA BRAUNER, ESQ.

20         MITCHELL HURLEY, ESQ.

21

22    BAYARD, P.A.

23         Attorneys for Official Creditors' Committee

24

25    BY:  JUSTIN ALBERTO, ESQ.
```

Page 11

1    MARTZELL BICKFORD & CENTOLA

2         Attorneys for NAS Ad Hoc Committee

3

4    BY:  SCOTT BICKFORD, ESQ.

5

6    KELLER LENKNER

7         Attorneys for State of Arizona

8

9    BY:  SETH A. MEYER, ESQ.

10

11   PENSION BENEFIT GUARANTY CORPORATION

12        Attorneys for PBGC

13        1200 K Street, NW

14        Suite 320

15        Washington, D.C> 20005

16

17   BY:  MICHAEL I. BAIRD, ESQ.

18

19   ASK LLP

20        Attorneys for Ad Hoc Committee of Individual Victims

21        151 West 46th Street, Fourth Floor

22        New York, New York 10036

23

24   BY:  EDWARD E. NEIGER, ESQ.

25        JENNIFER CHRISTIAN, ESQ.

```
1    GILBERT, LLP

2         Attorneys for Unspecified

3         1100 New York Avenue, NW

4         Suite 700

5         Washington, D.C. 20005

6

7    BY:  SCOTT D. GILBERT, ESQ.

8

9    OFFICE OF THE UNITED STATES TRUSTEE

10        Attorneys for U.S. Trustee

11        201 Varick Street, Suite 1006

12        New York, New York 10014

13

14   BY:  PAUL K. SCHWARTZBERG, ESQ.

15        BRIAN MASUMOTO, ESQ.

16

17

18

19

20

21

22

23

24

25
```

Page 13

1                   P R O C E E D I N G S

2              THE CLERK:  Please be seated,

3              THE COURT:  Good morning.  In re: Purdue Pharma

4    L.P., et al.

5              And before we start, let me apologize for the

6    delay.  They were apparently impaneling a grand jury today,

7    so there was a long line before everyone present added to

8    the line, which delayed the security process.

9              Okay.  So I have the amended agenda.

10             MR. HUEBNER:  I'm going to say that.  Your Honor,

11   Mr. Preis asked to address two things quickly which I, of

12   course, acceded to.

13             THE COURT:  Okay.

14             MR. PREIS:  Okay.  Good morning, Your Honor.  Arik

15   Preis from Akin, Gump, Strauss, Hauer & Feld on behalf of

16   the creditors' committee.  I just wanted to address two

17   things because you will quickly understand why I want to do

18   this before the hearing starts.

19             Late on -- when we submitted our response to the

20   motion to assume the reimbursement agreement, we had

21   indicated that the State of Maryland was added as an ex

22   officio member to our creditors' committee.  That was true

23   at the time.  They had accepted.

24             As of Saturday night, they have decided to

25   withdraw.

1            THE COURT:  Okay.

2            MR. PREIS:  I didn't want to file something on the

3    docket and then have -- then have some sort of colloquy in

4    front of the judge where Maryland had to respond.

5            I actually -- I know that they were outside.  They

6    actually may not be in the room yet.  But I didn't want

7    there to be any confusion today in case it came up --

8            THE COURT:  Okay.

9            MR. PREIS:  But we did not have a chance to file

10   something on the docket taking that off.  Okay.

11           THE COURT:  That's fine.

12           MR. PREIS:  The second thing, just very quickly,

13   Your Honor, one of our creditor committee individual members

14   is here today, Ms. Cheryl Shulayer (ph).  She just wanted to

15   -- we just wanted to introduce her.

16           THE COURT:  Okay.

17           MR. PREIS:  That's all.

18           THE COURT:  Good morning.

19           MR. PREIS:  Thank you.

20           MR. HUEBNER:  Good morning, Your Honor.  May it

21   please the Court, Marshall Huebner, of the law firm of Davis

22   Polk & Wardwell, here on behalf of the debtors.

23           Your Honor, let me begin with a piece of good

24   news, which is actually not apparent on the docket, but an

25   email should be on its way to chambers almost literally as

1    we speak, which is we have actually reached agreement with

2    all parties on the form of injunction order.

3              Your Honor, may remember I described a double exit

4    ramp where on two dates, on December 19th and February 21st,

5    the dissenting states as it were could choose to flip from

6    being voluntarily bound to the terms of the injunction to

7    being involuntarily bound and, thereby, triggering an appeal

8    right.

9              THE COURT:  Right.

10             MR. HUEBNER:  The mechanic that actually, I and I

11   think Ms. Finer (ph) as well described on the docket to you

12   last week ended up working just fine.  It took us a few days

13   to get the language right because, you know, everyone likes

14   their own drafting.  But that is now done done and it is on

15   the way into court.

16             And I don't want to let that actually go too

17   quickly because I think it is worth noting for a moment that

18   the fact that with the exception of the two counties -- Your

19   Honor may remember there was one very specific lawsuit, but

20   I think we were all quite surprised when someone stood up

21   out of the blue having not spoken at all at the earlier

22   hearing and made a big speech.

23             With that one exception, which I think is a very

24   small exception, the fact that essentially now every state

25   in the union that potentially has police powers that they

Page 16

1   alleged might be exempt from the automatic stay has

2   voluntarily consented to an injunction that may go as long

3   as April 8th.  But at a minimum will go at least as long

4   voluntarily until either December 19th or February 21st.

5   It's just a tremendous accomplishment and not a place that I

6   thought that we would be.

7           And so, you know, I know that, you know, we

8   promised you on the opening day of the case, as we feel very

9   passionate about, that we worked day and night and night and

10  day to settle everything that we possibly can.  I am

11  obviously not unaware that we have two smaller contested

12  matters and one large contested matter on for today, but I

13  also don't want that to mask the tremendous underlying

14  progress that (indiscernible) made on issues large and

15  small.  There is a lot going on behind the scenes with many

16  of the parties in this courtroom, even ones with whom we are

17  constrained to litigate against today that we believe are

18  advancing the ball.  It's not appropriate for me to talk

19  about what those things are in terms of documents or

20  stipulations or diligence or meetings because that is work

21  that should be behind the scenes.

22          But, obviously, the injunction which is what we

23  had aspired to really starting to months and months before

24  the case to give us all an initial window to try to progress

25  this in a very unusual and, you know, materially less

Page 17

1    litigious case that I think anybody could possibly have

2    imagined is actually proceeding exactly as we had hoped.

3               THE COURT:  All right.  That's very positive and

4    relevant.  So is that going to be in the form of an amended

5    order?

6               MR. HUEBNER:  Yes.  Yeah.  There's a supplemental

7    order that build -- it -- the way the order that we

8    submitted on November 6th worked, it sort of bridged, you

9    know, there was a footnote that said, the following parties

10   agree to voluntarily comply, essentially until we submit the

11   order which we hope will have the (indiscernible).  There's

12   now an order that does it all.  So there will be one amended

13   order, just like there was after the October 11tgh hearing

14   when, a week later, we got the full list of --

15               THE COURT:  Right.

16               MR. HUEBNER:  -- interim voluntary compliers and

17   we sent in an order.  So this order will do it all and,

18   frankly, you may never need to enter another one because if

19   the voluntary compliance does not terminate by filing a

20   notice of termination on the docket, this order actually

21   runs till April.

22               THE COURT:  All right.

23               MR. HUEBNER:  So it's done, done.

24               THE COURT:  Okay.  And then I guess one other

25   point I wanted to raise with you.  The stipulation with the

Page 18

1    creditors' committee and various shareholders --

2             MR. HUEBNER:  Uh-huh.

3             THE COURT:  -- and companies was noticed for

4    presentment.  I think the objection date has passed.

5             MR. HUEBNER:  Yes.  I believe --

6             THE COURT:  Is --

7             MR. HUEBNER:  -- it was actually yesterday, Your

8    Honor.

9             THE COURT:  So will you be sending that to me

10   also?

11            MR. HUEBNER:  Yes.  The answer is yes.  There's

12   actually one thing that someone asked me to clarify with

13   them and just in the frenzy of preparing for this we weren't

14   able to do that.  I think it works just perfectly and we'll

15   probably send it in some -- someone will -- someone at Davis

16   Polk please remind me to make sure we take care of that when

17   this hearing is over.  And that should, I believe, be ready

18   for entry as well, another milestone and maybe I should have

19   listed as yet another thing I think is atypical and quite

20   important to try and help us all proceed rationally in an

21   almost impossibly difficult and complex situation.

22            THE COURT:  Okay.

23            MR. HUEBNER:  With that, Your Honor, the -- I

24   think it probably makes sense to just knock out the

25   uncontested matters first so that we can get them out of the

Page 19

1    way and ensure that the Court does not have any questions.

2    And I would turn the podium over to my colleague, Dylon

3    Consla, for that.

4              MR. CONSLA:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. CONSLA:  So I'll try and move through the

7    uncontested matters quickly here.

8              THE COURT:  Sure.

9              MR. CONSLA:  So the first item on the agenda is

10   the commercial lease projection, Docket Entry Number 435.

11   There were no objections and we filed a CNO at Docket Number

12   507.  So unless there are any questions we would ask that

13   that relief be granted.

14             THE COURT:  This is the lease in Princeton?

15             MR. CONSLA:  That's correct.

16             THE COURT:  All right.  Where the property was

17   turned over towards the end of September?

18             MR. CONSLA:  That's right, yeah, as of the date

19   that we're seeking to reject as of.  It was vacated.

20             THE COURT:  Okay.  I'll grant that motion which,

21   as you say, is unopposed and supported by good business

22   reasons.  So you can email that order to chambers.

23             MR. CONSLA:  Thank you.

24             The next item on the docket is the ordinary course

25   professionals' motion.  This is Agenda Item Number 2, Docket

Page 20

1    Entry 128.

2         So in this case after extensive discussions with

3    the committee and the ad hoc group, we filed a proposed

4    revised form of order last night with admittedly fairly

5    extensive changes, but the result of that negotiation we

6    think addressed all of the issues.

7         I have a blackline to hand up if you --

8         THE COURT:  Well, I -- this is the same version

9    that was sent to chambers yesterday, I believe.

10        MR. CONSLA:  Correct.

11        THE COURT:  So I have that.

12        MR. CONSLA:  Okay.

13        THE COURT:  So does anyone have anything further

14   to say on this motion?

15        Okay.  I guess the one -- the order talks about

16   disclosure in connection with former representation or

17   current representation of shareholders.

18        MR. CONSLA:  That's right.

19        THE COURT:  I'm not sure the form actually pulls

20   that up, the form that's attached, the disclosure form.

21        MR. CONSLA:  You're looking to Question 9 in the

22   questionnaire?

23        THE COURT:  Well, maybe I just missed it.

24        MR. CONSLA:  Here.  I'm --

25        THE COURT:  It is there?  Okay.

1          MR. CONSLA:  It's at the very, very end.  I think

2     if you flip to literally the last page.

3          THE COURT:  Oh, yeah.  You did.  Oh, so -- okay.

4     I was looking at the old form.  But you added that question.

5          MR. CONSLA:  Yeah.  That's right.  Can I hand up a

6     blackline if you don't have --

7          THE COURT:  No.  No.  I have it.  I just --

8          MR. CONSLA:  Okay.

9          THE COURT:  I just -- I stopped at the order.

10         MR. CONSLA:  Yeah.

11         THE COURT:  Okay.  Thank you.

12         MR. CONSLA:  Yeah.

13         THE COURT:  So I'll grant the motion.

14         MR. CONSLA:  Okay.  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MR. CONSLA:  So I would turn back to the remainder

17     of the agenda.

18              So the next item is the interim compensation

19     motion.  In this case we also -- that's -- sorry.  That's

20     Docket Number 434.  We filed a CNO at Docket Number 510.

21     The CNO attaches a revised order that has literally one

22     change to one number; that is, changing the period after the

23     45 days to submit fee applications to scheduling a hearing

24     from 45 days to a 30 days for people to review at that

25     point, and all the relevant parties agreed to that.

Page 22

1          So we would -- unless Your Honor has any

2     questions, of course, respectfully ask that that motion be

3     granted.

4          THE COURT:  Okay.  Does anyone have anything to

5     say on this motion?

6          All right.  Based on my review of it, it's

7     consistent with similar interim compensation motions that my

8     colleagues have entered over the years consistently in cases

9     of this size.

10         There's no cash collateral order here, so there

11    isn't the same need to monitor cash as per a carve-out or a

12    budget.  But on the other hand, I think it's worthwhile to

13    have key parties in interest reviewing the fees every month

14    to make sure no one's going off the deep end or even the --

15    you know, exceeding what they should be doing as far as

16    expectations.  So I think it's worthwhile to have this

17    procedure here.

18         So I'll grant the motion.

19         MR. CONSLA:  Thank you, Your Honor.

20         So the next items on the agenda are retention

21    applications for both the debtors and then for the committee

22    professionals.  So I would ask to preference.  Should I walk

23    through those individually or would you prefer to consider

24    them as a group?

25         THE COURT:  Well, I have reviewed each of them and

Page 23

1    I can tell you I have -- I appreciate -- and these are the

2    uncontested ones.

3            MR. CONSLA:  The uncontested ones.  Correct.  The

4    contested ones are later in the agenda.

5            THE COURT:  Right.

6            I really only have two -- one question and one

7    issue.

8            MR. CONSLA:  Uh-huh.

9            THE COURT:  Let's put it that way.  On the law

10   firms which include Dechert, King & Spalding for the

11   debtors, and Akin Gump and Bayard for the committee, I only

12   had one question, which is -- which I'll preface by saying I

13   actually welcome the notion that the committee decided to

14   hire Bayard not as a conflicts counsel, but as an efficiency

15   counsel, which is, I think, a nice way of saying a less

16   expensive counsel for matters that are appropriate.

17           But as far as the services that Bayard is

18   rendering, and I appreciate that they acknowledge that

19   they'll be doing the best they can not to duplicate efforts,

20   some are listed as being requested by Akin Gump and the

21   committee, some are listed as assisting Akin Gump and the

22   committee, and some are listed as working in conjunction

23   with Akin Gump and the committee.

24           And I'm just not sure what -- is there any real

25   distinction there?  I mean, how are they getting their

Page 24

1    assignments.  That's really my question.  So that there's

2    some control over avoiding duplication of effort and they

3    know what they're supposed to be doing and they're tasked to

4    do it.

5              MR. ALBERTO:  May I address that?

6              THE COURT:  Sure.

7              MR. ALBERTO:  Justin Alberton from Bayard,

8    proposed co-counsel to the committee or efficiency counsel

9    as Your Honor just mentioned.

10             When we drafted this agenda, we were still -- or

11   excuse me, when we drafted this application we were still

12   working through proposed assignments and division of labor

13   issues with Akin Gump.

14             If Your Honor were to look at the agenda for

15   today, so as an example, there are things like the ordinary

16   course professionals motion, interim comp, and other various

17   retention issues that my firm has handled.  And we have

18   strived over the course of the last 45 days to make sure

19   that things that Akin Gump is handling Bayard is not, and

20   vice versa.

21             THE COURT:  So is there some coordinating person

22   at each firm that basically --

23             MR. ALBERTO:  That's been Mr. Preis and myself,

24   Your Honor.

25             THE COURT:  Okay.  So you just -- when something

Page 25

1    is filed on the docket or the committee wants somebody to

2    look at it, you two speak to each other and --

3              MR. ALBERTO:  That's absolutely right.  And we

4    don't act without speaking to Mr. Preis first.

5              THE COURT:  Okay.  All right.  That's probably the

6    only person in his life that's like that, but --

7         (Laughter)

8              MR. ALBERTO:  It's been a fun 45 days.

9              THE COURT:  So that's fine.  And, again, the

10   assignment is something I welcome.

11             So I'll grant the application as well as the other

12   attorneys' applications.  I think we should amend the order

13   just to reflect what was stated on the record as far as, you

14   know, the division order.

15             MR. ALBERTO:  We can do that, Your Honor.

16             THE COURT:  Okay.

17             MR. ALBERTO:  Thank you.

18             THE COURT:  Thank you.

19             Okay.  And then I -- does anyone -- let me just

20   say, does anyone have anything to say on the uncontested

21   counsels' retentions?  Okay.

22             And then turning to the financial advisors,

23   bankers, et cetera, as well as Prime Clerk, so that would be

24   AlixPartners, Prime Clerk, Province, Inc., Jefferies.  I

25   don't think -- and I'm sorry, Kurtzman Carson.  Three -- I'm

Page 26

1    sorry.  Four of those as is -- well, all of them, as is

2    consistent with, again, the case law in this district, have

3    a limitation on a limited identity.  They're indemnified

4    other than for their gross negligence, willful misconducts

5    -- misconduct, in some cases, and/or breach of fiduciary

6    duty, if any.

7            But four -- Prime Clerk, AlixPartners, KCC and

8    Jefferies -- have caps on those indemnifications limited to

9    their compensation of the case.  And I don't know if this

10   has been the subject of discussion with them.  I know in

11   recent cases involving Prime Clerk and Kurtzman Carson I

12   have stricken that on the basis that the type of liability

13   we're talking about here is really serious, willful

14   misconduct, gross negligence, and it's quite conceivable

15   that it could be more than the fairly limited compensation,

16   at least that those entities would have.

17           So I don't know if this has been discussed or if

18   their representatives are present here, but my inclination

19   would be the lift the limitation on liability for at least

20   willful misconduct and breach of fiduciary duty, if any.  I

21   mean, to me if someone is just looting and pillaging, that

22   it shouldn't be limited to their fees.

23           MR. CONSLA:  So for that matter I think we would

24   defer to the particular professional.

25           THE COURT:  I'm not assuming that they will, of

1    course.  So it's probably an ice in winter, but I just don't

2    like the idea of proving that.

3              MR. CONSLA:  If any --

4              THE COURT:  Okay.  Well --

5              MR. CONSLA:  -- if anyone wanted to --

6              THE COURT:  Well, I will grant each of those

7    applications with that language taken out.  And the U.S.

8    Trustee can show you language from one of my more recent

9    orders dealing with, I forget whether it was KCC or Prime

10   Clerk, but --

11             MR. CONSLA:  Uh-huh.

12             THE COURT:  -- it's a -- it's one more carve out

13   that's in the order.  If I'm missing something here that is

14   of great moment to AlixPartners or Jefferies, who clearly

15   have more fees at stake, so, you know, they can tell me.

16   But that's my ruling on those motions.

17             MR. CONSLA:  All right.  We'll make that change.

18             THE COURT:  Okay.

19             MR. CONSLA:  The last uncontested matter is the

20   creditor committee's information access motion.  And so, you

21   know, obviously if you have any questions I'll defer to

22   them.  If not, we have no objections to that being granted.

23   That's Item -- Agenda Item Number 13.

24             THE COURT:  Okay.

25             MR. CONSLA:  Docket Number 415.

1          THE COURT:  All right.  Does anyone have anything

2     to say on the committee information access motion?

3          Just to be clear, this is not anything more than

4     the access the committee -- as a committee is required to

5     provide under the Bankruptcy Code and the appropriate

6     limitations on it to the public, not access to information

7     that the parties are looking on and the case generally,

8     which would be the subject of either a motion or hopefully a

9     stipulation.

10          So seeing no one has any questions or comments,

11     and noting that it's unopposed, I'll grant the motion.  I

12     think I had the first opinion that actually dealt with the

13     issues raised by the amendment to the code that dealt with

14     the tension between a committee's duty to provide access to

15     the public and its duty not to disclose confidential

16     information, waive attorney/client privilege and the like,

17     and -- in the Refco case, and I think this protocol as well

18     as the use of the information agent is consistent with the

19     case law.

20          So I'll grant the motion.

21          MR. CONSLA:  Thank you, Your Honor.

22          That brings us to the end of the uncontested

23     section of the agenda.  So at this time I'll hand the podium

24     over to Mr. Huebner to address the contested applications.

25          THE COURT:  Okay.

Page 29

1              MR. HUEBNER:  Your Honor, for the record, Marshall

2    Huebner.  I will be very quick on this remaining point.

3              The United States Trustee has no objection to

4    retentions of Davis Polk, Skadden Arps and Wilmer Hale, but

5    has objected to what is contemplated by these applications

6    which is the firms holding their retainers until the end of

7    the case.

8              I'm going to make nine very quick points and

9    otherwise rest on our papers which I think address the issue

10   appropriately.

11             One, this is a very unusual case.  Your Honor

12   actually just mentioned, and I'm glad since it's a perfect

13   segway, most cases have carve outs and they have super

14   priority claims.  And the way the professionals in part are

15   comforted by the risk that they're asked to take by the

16   statutory structure is that they are basically guaranteed to

17   jump even on top of secured creditors for all fees incurred

18   prior to a trigger date and then for an agreed budgeted

19   amount for amounts afterwards.  And those are given both

20   status and lien rights super to anyone else.

21             We have none of that here, and you might say,

22   well, there's no secured debt here.  But what we do have

23   instead, frankly, is a truly unprecedented case with dozens

24   of governmental claimants, many of whom have rights that

25   they have not actually necessarily chosen yet to surface

Page 30

1   with or exercise, but could actually, if things don't go

2   well, take this case in a very complex direction.

3          Number two, the debtors have a very substantial

4   cash balance, over a billion dollars.  And even the trustee

5   has not alleged that we are draining liquidity that is

6   needed by the estate right now to pay its bills.  and so,

7   you know, I think that's a relevant factor as well.  It's

8   relevant in case law and otherwise.  You know, if the

9   debtors had $20 million of cash left in the bank, we would

10  at least be having more complex conversation.  With well

11  over a billion dollars, it really is hard to understand why

12  we're actually here litigating this issue.

13         Three, no party in interest, no economic party in

14  this case has objected to this, neither the professionals,

15  which the U.S. Trustee kind of strangely says is one of the

16  two groups they're here to protect, but they're here

17  representing other professionals who don't have this exact

18  package of rights.  They don't seem fussed by it, nor any

19  other party in interest.  The test is actually, you know, is

20  this a problem for creditors.  And we're not lacking for a

21  surfeit of highly activist focused creditors in this case,

22  and not a single one of them has had any issue with this.

23         Four, the U.S. Trustee is just wrong.

24  Professionals hold retainers all the time, both out of court

25  and in court.  We stopped at 17 examples in the pleading

Page 31

1    because, you know, you have to know when enough is enough.

2    But the notion that there is some doctrine that, you know,

3    this is just not done is just flatly wrong, period, end of

4    story.

5          Five, there is no rule, there is no regulation,

6    there is no statute, there is no guideline, there is just

7    nothing that requires this.  There just isn't.  We're

8    constrained in lots of ways by lots of rules that people

9    impose on us.  This one is just not on the books.  And to

10   try to add this in as sort of a new rule in this district

11   when it's just not, and as much as I respect the U.S.

12   Trustee, it shouldn't be.  It's not appropriate.  The cases

13   they actually cite talk about a kind of facts and

14   circumstances test, and if we're going to be discussing it,

15   we should be discussing it under the little case law that

16   there is which we're happy to do.

17         Because, six, even the cherry picked cases the

18   U.S. Trustee cites, not one of them from this district, some

19   from more than 30 years ago and 3,000 miles away, we easily

20   satisfy.  We went through the standards in our reply.  There

21   are five factors in Insilco and we're five for five.

22         And, by the way, every single case they cited,

23   every one approved the professional holding the retainers.

24   So, in fact, I don't think they found any case ever in the

25   world, no matter how many decades they went back, where a

Page 32

1    court actually said, and they cited to this court, let alone

2    in a binding way that retainers have to be given up at the

3    beginning of a case.

4           Seven, these three firms are actually extending de

5    facto trade terms that are longer than any administrative

6    creditor in this entire case.  The whole case, there is not

7    one creditor, because I asked, that is extending 75 day

8    unsecured trade terms to this estate, not one.

9           Eight, there is no basis and none articulated for

10   asking counsel to take the most risk and extend the most

11   credit of anybody in the constellation of the debtors'

12   dozens or hundreds of counterparties.

13          Nine, and this is the last one, all of Purdue's

14   other administrative creditors have either letters of

15   credit, deposits, COD or trade terms well below 75 days.

16   Only the professionals have to contend with notice periods,

17   objection periods, 20 percent holdbacks, 45 day waiting

18   periods and then another 30 day waiting period for hearings,

19   and, collectively, lend the debtors millions and millions of

20   dollars entirely unsecured and entirely interest free at all

21   times.

22          The trustee's claim that we have a "unfair

23   monetary advantage over other creditors" is unsupported and

24   unsupportable.  We ask that their objection be denied and

25   that the retentions be approved as requested.

1          THE COURT:  Do you -- this has not come up and I'm

2     assuming maybe -- well, I'll just ask you a question.  I

3     don't know the answer.  Are there substantial 503(b)(9)

4     claims here?

5          MR. HUEBNER:  No.

6          THE COURT:  Oh, okay.

7          I don't actually have the three firms' retainer

8     agreements.  And the other two firms' application doesn't

9     really say that they're evergreen retainers.  I don't know

10    where -- what type of retainers are all three of these?

11         MR. HUEBNER:  Yes.  So, Your Honor, I don't want

12    to over speak for the other firms, but let me say it like

13    this.  Certainly, it is understood -- and if it's helpful to

14    the Court we will certainly add language that the retainers

15    will be applied at the end of the case or otherwise as

16    appropriate, and then any overage will, of course, be

17    returned to the debtors.  I don't think anybody is saying

18    that anybody gets to keep what's leftover.  Davis Polk's

19    documents, which obviously I do control, are very clear on

20    that point and they are evergreen retainers and properly

21    structured as such.

22         I am assuming that Skadden and Wilmer are the same

23    way, but I think it's an easy fix in the order to clarify

24    that nobody is remotely suggesting that this money can be

25    kept.  It needs to be applied.  The question is just, you

1    know, like so many other creditors in the case, are we

2    allowed to essentially modulate what in our case is actually

3    extreme trade terms and credit risk.

4            You know, as I said in the pleading, you know, you

5    know X percent of the utilities went and got deposits pre-

6    filing.  No one is saying, hey, utilities, other utilities

7    are sad that they didn't ask, you have to give back your

8    deposits.  This is just an individual contract and we think

9    it's entirely appropriate.

10           THE COURT:  Okay.  And then my last question is

11   these are not couched under 328(a), right, so I think I'm

12   reviewing this under 329 because it was a pre-petition

13   retainer?  So I guess conceivably if facts changed

14   dramatically in the middle of a case, one could revisit

15   whether the retainer should be applied then or not, I

16   suppose.

17           MR. HUEBNER:  I mean, as Your Honor said at prior

18   hearings, people are always welcome to make motions in front

19   of you.  But, yes, there's nothing here that says that the,

20   you know, extraordinary unforeseeable circumstance and --

21   no.  We don't lock this down under 328 at all --

22           THE COURT:  Okay.

23           MR. HUEBNER:  -- to my knowledge.

24           THE COURT:  All right.

25           MR. HUEBNER:  I mean, again, just like I can't

1   imagine a circumstance where somebody would say a utility

2   needs to give back their deposit unless it was a preference

3   or a fraudulent transfer, and in this case, frankly, we

4   would be happy to defend the retainers on those grounds as

5   well, Pillowtex (sic) ironically has made us all very

6   careful and very thoughtful to ensure that we have

7   appropriate mechanics in place well before the filing so

8   that we can stand up and be unquestionably comfortable that

9   we're disinterested which actually is a higher value,

10  frankly, under the code for 327(a) counsel than virtually

11  anything else.

12          And as Your Honor of course knows the U.S. Trustee

13  does a very searching Pillowtex analysis before the filing

14  and obviously was satisfied.  This is the absolutely only

15  issue that is open on the retentions.

16          THE COURT:  Okay.

17          MR. SCHWARTZBERG:  Good morning, Your Honor.  Paul

18  Schwartzberg for the U.S. Trustee's office.  I'll beat Mr.

19  Huebner and just bring up three points, Your Honor.

20      (Laughter)

21          THE COURT:  Okay.

22          MR. SCHWARTZBERG:  Unlike the normal case where

23  there is a carve out, the reason there's not a carve out

24  here is because there's no secured debt or virtually no

25  secured debt.  The debtor, according to their first day

Page 36

1    declaration, has over a billion dollars of cash that is

2    unencumbered.

3             On top of that, they're getting -- the

4    professionals are going to be paid as per Your Honor's prior

5    order today on them monthly where they're going to be

6    getting 80 percent of their fees and a hundred percent of

7    their expenses.

8             Based on that, which is the unencumbered cash is

9    an unusual circumstance, we did not believe that the

10   evergreen retainer was necessary in this case to protect the

11   professionals.

12            THE COURT:  Okay.  I mean, it strikes me given

13   what I think are the undisputed facts here that this dispute

14   really isn't particularly pointed on either side.  You know,

15   it seems to me that the code doesn't have a requirement

16   either way on this point.  And the only case law -- and that

17   -- I mean, I think there are two thoughtful decisions, the

18   Insilco and the Hospital (sic) case, and neither of them

19   really comes up with a bright line as to when it's

20   appropriate and when it's not appropriate to have an

21   evergreen retainer.

22            And, frankly, I think that given the various

23   issues at stake, one could argue that it's more appropriate

24   when there is financial risk.  But on the other hand, if

25   there's no financial risk to either side, maybe it doesn't

1   really matter.  I mean, I just -- I just don't really see

2   this as a particularly important issue for the case.

3          And since congress didn't really address it other

4   than the notion that a prepetition payment needs to have

5   been reasonable under Section 329, this appears to be

6   reasonable to me.  It's not -- you know, it's not -- these

7   retainers are not out of line for the level of work that was

8   being done and anticipated to be done.

9          We've clarified that their true security evergreen

10  retainers, i.e. any surplus comes back.  And I just -- you

11  know, to me I don't think anyone's ox is really being gored

12  here.

13         So I think what's really an issue is whether I

14  should establish some principal that you can never get an

15  evergreen retainer, and I'm just not prepared to do that.  I

16  don't think there is such a legal requirement --

17         MR. SCHWARTZBERG:  I --

18         THE COURT:  -- particularly given the logic of the

19  Insilco case and the American Hospital case, which, you

20  know, as I said, I think they're the -- they're clearly the

21  two decisions that -- I'm sorry -- Pan American Hospital

22  case, 312 B.R. 706 (Bankr. S.D. Fla. 2004) and then Insilco

23  is In re: Insilco Technologies Inc., 291 B.R. 628 (Bankr. D.

24  Del. 2003).

25         I guess ultimately here, and I know you hate to

Page 38

1    hear this and I appreciate that the U.S. Trustee has a major

2    role to flag issues.  And sometimes when you flag issues

3    other parties join in and sometimes they don't.  But no

4    creditor whose ox might be gored here is complaining.  And I

5    think that's a major factor, as well as I don't think

6    there's -- this retainer creates a conflict with anybody

7    ultimately.

8            And since it's not a 328 type of compensation,

9    just 329 reasonableness, if there is some conflict down the

10   road, and it's hard for me to imagine that there would be, I

11   would balance the issue there and probably at that point the

12   firm would -- the firms would apply their retainer anyway.

13           So I'm going to overrule the objection and grant

14   the applications as sought.

15           MR. SCHWARTZBERG:  All right.  Thank you, Your

16   Honor.

17           THE COURT:  Okay.

18           MR. ROBERTSON:  Good morning, Your Honor.  For the

19   record, Christopher Robertson, Davis Polk & Wardwell on

20   behalf of the debtors.  We're going to turn to the second

21   contested matter.  It was actually the first contested

22   matter on the amended agenda at Item Number 14, the debtors'

23   cash management motion.

24           There is one objection to the cash management

25   motions from the United States Trustee.  The U.S. Trustee

Page 39

1    opposed the debtors' request for a waiver of the

2    requirements of Section 345 of the Bankruptcy Code with

3    respect to excess cash invested in two Goldman Sachs

4    treasury funds.

5         We did, of course, work with Mr. Masumoto to try

6    to resolve this matter consensually, but unfortunately we're

7    not able to work out this issue with the U.S. Trustee's

8    Office.

9         Before I move onto the motion, we filed

10   supplemental declaration of John Lown (ph), the debtors'

11   chief financial officer in support of the cash management

12   motion.  As noted on the amended agenda, the declaration is

13   filed as Exhibit A to the debtors' reply at Docket Number

14   480-1.  Mr. Lown is in the courtroom today, if anybody has

15   any questions.  If not, I would ask that the declaration be

16   admitted into evidence at this time.

17        THE COURT:  Okay.  Does anyone want to cross-

18   examine Mr. Lown on his supplemental declaration?

19        All right.  I will admit it as his direct

20   testimony.

21        MR. ROBERTSON:  Thank you, Your Honor.

22        Your Honor, I do not intend to rehash every point

23   we made in our papers.  I would like to briefly explain why

24   we believe that a requested Section 345 waiver is

25   appropriate and why continued access to the Goldman money

1   market treasury accounts is important to the debtors'

2   estates.  Not that Your Honor needs any permission, but

3   please feel free to interrupt me if you have any questions.

4        So why is this waiver appropriate?  At a high

5   level, Section 345(b) of the Bankruptcy Code provides that

6   estate funds may be held in three ways:  In investments or

7   accounts insured or guaranteed by the United States or by a

8   department agency or instrumentality of the United States;

9   in investments or accounts backed by the full faith and

10  credit of the United States; or with entities that have

11  posted a bond or provided acceptable collateral as security

12  for the deposit or investment.

13       The U.S. Trustee's main concern, as I understand

14  it and it's voiced at page 2 of the objection, is that the

15  debtors are asking for a fourth option; that is, the debtors

16  are asking for the Court to set aside the safeguards within

17  Section 345 in the interest of convenience, efficiency and

18  cost.

19       And, Your Honor, the debtors are not asking for a

20  fourth option or special treatment and we are not asking the

21  Court to set aside any statutory safeguards whatsoever.  As

22  discussed in Mr. Lown's supplemental declaration, the

23  debtors adhere to long-standing investment guidelines that

24  only permit the debtors to invest in treasuries or in

25  deposits collateralized by U.S. Treasury or U.S. agencies.

Page 41

1    This is what I'm calling Option 2, Your Honor.  You know,

2    this is an investment backed by the full faith and credit of

3    the United States.

4         The debtors are requesting to continue to invest

5    in treasuries by investing in two treasury funds managed by

6    Goldman Sachs.  In other words, the debtors are seeking to

7    comply with both the letter and the spirit of Section 345.

8         THE COURT:  So I guess this was clarified for me

9    in Mr. Lown's supplemental declaration.  He states that both

10   of those funds only invest in treasuries, U.S. Treasuries

11   and can only invest in U.S. Treasuries.  And obviously

12   they're also rated at the highest level --

13        MR. ROBERTSON:  That's correct.

14        THE COURT:  -- of applicable rating I think

15   probably in light of that.

16        So I guess -- I mean, that -- to me that largely

17   ends the story.  I don't know.  He says that they monitor

18   the cash.  I don't know what that means.  I guess they would

19   pay attention if there's some press story about the funds

20   and someone deciding to violate the securities laws and the

21   funds' governing documents and move the treasuries into, I

22   don't know, wingets (sic) or realles (sic), or something.  I

23   don't --

24        MR. ROBERTSON:  Yeah.  And not to belabor the

25   point, and Mr. Lown can speak to it, but the funds publish

Page 42

1    weekly statements that have, you know, every treasury that

2    they hold.  And so it's very easy to monitor these accounts.

3            THE COURT:  Okay.  All right.  And, I mean, it is

4    true, you are taking the credit risk of the fund as opposed

5    to the underlying treasuries.  But if the only asset in the

6    fund and permitted to be in the fund is the treasuries, then

7    they're essentially coterminous --

8            MR. ROBERTSON:  Right.

9            THE COURT:  -- other than the fact that the

10   government can always print more treasuries and the fund

11   can't get back anything that's let out by fraud.

12           But that same risk applies to a surety as well.

13   You're only getting the credit of the surety, which congress

14   recognized in Section 345 as a proper way to protect the

15   estate, too.

16           MR. ROBERTSON:  I agree, Your Honor.

17           THE COURT:  There's no collateralization of what's

18   in the fund for any of the investors; is that right?

19           MR. ROBERTSON:  No.  That's correct, Your Honor.

20   There's --

21           THE COURT:  Yeah.

22           MR. ROBERTSON:  That's correct.

23           THE COURT:  All right.  Okay.  So I interrupted

24   you, but you can go on.

25           MR. ROBERTSON:  No.  I think that you covered a

Page 43

1    lot of what I was going to say about the nature of the

2    mutual funds and the debtors' investment.

3            You know, the last thing I would say and just to

4    kind of reiterate the point and then I'll cede the podium

5    is, you know, just to return to a theme I kind of touched on

6    at the beginning.  This is not a case where the debtors want

7    to continue an investment program out of, you know,

8    convenience or cost.

9            The alternatives that the trustee suggests, which

10   is holding treasuries directly by purchasing them from the

11   government or moving all of the excess cash into the deposit

12   account, both of these are not viable and Mr. Lown provided

13   testimony as to the difficulties the debtors would have

14   moving cash into a deposit account.  And holding treasuries

15   directly creates a whole host of other operational and

16   control risks that --

17           THE COURT:  Well, that would be a much bigger

18   control risk because --

19           MR. ROBERTSON:  Correct.

20           THE COURT:  -- only one person is authorized to

21   have them.  So unless you have that person under 24-hour

22   surveillance, they're at risk of going somewhere.

23           MR. ROBERTSON:  Correct.

24       (Laughter)

25           MR. ROBERTSON:  And with that, unless Your Honor

Page 44

1    has any further questions for me, I would --

2              THE COURT:  Well, the money that -- the other cash

3    --

4              MR. ROBERTSON:  Uh-huh.

5              THE COURT:  -- I just want to confirm, Mr. Lown

6    says that all of that other cash is in an escrow reserve or

7    a trust account that the party for whose benefit its posting

8    is comfortable with.

9              MR. ROBERTSON:  That's correct.

10             THE COURT:  It's their collateral and -- or

11   required by regulation or agreement to put in that account.

12             MR. ROBERTSON:  Not for the -- for the $130

13   million that's held in trust accounts that are invested in

14   treasury money markets it's essentially -- that's a

15   different institution.  I believe most of those are with

16   Wells Fargo.  But it's exactly the same structure as where

17   the debtors have their cash at Goldman.  So it's the same

18   story.

19             THE COURT:  And is it in any special fund or just

20   at Wells Fargo?

21             MR. ROBERTSON:  It's in -- I would refer to Mr.

22   Lown, but my understanding is that it's in the treasury

23   money market funds that are administered by Wells as posted

24   by Goldman Sachs.

25             THE COURT:  So it's just -- is it limited to the

Page 45

1      treasuries again --

2              MR. ROBERTSON:  Correct.

3              THE COURT:  -- those funds?

4              MR. ROBERTSON:  Correct, Your Honor.

5              THE COURT:  Okay.  He's nodding his head there

6      behind you, nodding it yes.  Okay.

7              All right.  Very well.  Thank you.

8              MR. ROBERTSON:  Thank you, Your Honor.

9              MR. MASUMOTO:  Good morning, Your Honor.  Brian

10     Masumoto for the Office of the United States Trustee.

11             I know Your Honor has addressed the specifics

12     regarding the particular investments, and so essentially I

13     would like to focus in on the area that our office has

14     concerns with, which is we believe that the investment

15     through a fund is not the same as holding the direct

16     treasuries by the debtor and, accordingly, does not fit

17     strictly within the elements under Section 345.

18             We don't have -- the U.S. Trustee does not have

19     the authority to grant a waiver, and although one can argue

20     about the various risks and so forth, it's not the U.S.

21     Trustee's intent or responsibility to determine the

22     soundness or the integrity of particular funds.

23             So from our standpoint an investment through the

24     fund creates a non-compliance with the statute that can only

25     be approved by the Court granting a 345 --

1              THE COURT:  Okay.

2              MR. MASUMOTO:  -- waiver.

3              THE COURT:  All right.  I mean, and that's fair.

4    The statute doesn't -- what gives the trustee discretion is

5    in 345(b)(1)(B), where the money is invested in a bond in

6    favor of the United States secured by the undertaking of a

7    corporate surety.  So it does give you the discretion to

8    evaluate the -- as the debtor says, approved by the United

9    States Trustee.  So it gives the -- your office the

10   discretion to evaluate the credit worthiness of the surety,

11   but not the particular fund where the bonds are held.

12             MR. MASUMOTO:  That's correct, Your Honor.

13             THE COURT:  All right.

14             MR. MASUMOTO:  And one -- although there was --

15   and that's with respect to, I guess particularly the

16   argument applies to the Goldman Sachs funds which have been

17   discussed.

18             One thing that it was not entirely clear is with

19   respect to the restricted funds.  It wasn't clear to me.  In

20   Mr. Lown's declaration there were indications that they were

21   held in I guess government obligations, and that's part of

22   the problem.  The Goldman Sachs fund -- well, it may be --

23   it may pose a problem.  The Goldman Sachs fund where it's

24   supposedly exclusively for a government treasury is at least

25   from our experience relatively unusual because many

1    government fund accounts are not exclusive.  I mean, it's

2    usually a mixed bag of investments which may primarily be in

3    government obligations, but not exclusively.

4         So it's not entirely clear to me whether the

5    restricted funds are, in fact -- although I believe there

6    was some statement that seems to suggest that Goldman

7    managed some of those escrow funds, and if that's the case

8    being exclusive, then the -- your ruling with respect to the

9    Goldman accounts would apply.

10        But to the extent that those other funds, in fact,

11   are not exclusive with respect to government obligations,

12   you've increased the risk of those particular funds.

13        And accordingly, again, once again it would be

14   Your Honor's discretion --

15        THE COURT:  Well, he says the cash held in the

16   various Wells Fargo accounts and the DLKF account are

17   invested in money market treasury funds.

18        MR. MASUMOTO:  Right.  And -- but in many money

19   market treasury funds as such, they're not exclusive.  I

20   mean, in our experience those so-called funds often have a

21   mix.  I mean, they may be primarily holding government

22   treasuries, but not exclusively.

23        And so it's not, at least if that were the case

24   it's not identical to the Goldman Sachs case situation where

25   it's exclusively limited to government securities.

1                THE COURT:  Okay.

2                MR. ROBERTSON:  And, Your Honor, I think just one

3      brief point.  I don't -- I have a printout of every treasury

4      held by the Goldman funds.  I don't have a printout of every

5      treasury held by the other restricted cash accounts.  But I

6      would just add that, you know, this is a very highly

7      regulated industry and, you know, major institutions that

8      administer treasury money market funds, you know, can't use

9      that term, you know, loosely.  There are regulations under

10     the SEC and otherwise that, you know, specify what a

11     treasury money market fund is.

12               So this is not a case where these funds are

13     holding, you know, half their funds in treasuries and half

14     in junk bonds.

15               THE COURT:  And is this -- are these funds also

16     monitored by the company on a weekly basis?

17               MR. LOWN:  Absolutely.

18               THE COURT:  Okay.  Okay.

19               MR. ROBERTSON:  Thank you, Your Honor.

20               THE COURT:  All right.  I have before me the

21     debtors' request for final approval of their motion

22     authorizing the continuation of existing cash management

23     systems and maintaining existing bank accounts and business

24     forms.

25               The motion is objected to by the U.S. Trustee in

Page 49

1    one respect, which is that the debtors' investment of both

2    unrestricted cash and restricted cash, i.e. restricted based

3    on various agreements with third parties where the cash is

4    being held in one form or another for their benefit is not

5    being held consistent with Section 345 of the Bankruptcy

6    Code.   That section provides for specific ways to hold money

7    of bankrupt debtors' estates for which no court ruling is

8    necessary.

9            One aspect of it, which I've already quoted, does

10   subject the United States Trustee to the exercise of some

11   discretion in terms of evaluating a corporate securities --

12   I'm sorry -- corporate sureties' undertaking.

13           But it provides for authorization to invest money

14   of the estates without court review if the money is invested

15   in a deposit or investment that is insured or guaranteed by

16   the United States or backed by the full faith and credit of

17   the United States.   And that obviously is limited for a

18   company of this size given the amount of cash that we're

19   talking about here, which is somewhat over a billion

20   dollars, given the limitations on insurance or guaranties;

21   or, alternatively, invested in the bond in favor of the

22   United States secured by the undertaking of a corporate

23   surety approved by the United States Trustee and conditioned

24   on the proper accounting and faithful performance of duties

25   as the depository.

1            However, there's a safety valve that congress

2    enacted which provides that the Court may order otherwise.

3            I have the benefit of a recent decision by one of

4    my colleagues, Judge Garrity, in In re: Ditech Holding

5    Corp., 605 B.R. 10, (Bankr. SDNY 2019) analyzing the proper

6    application of this cause exception which was enacted in

7    1994.  Judge Garrity also relies on In re: Service

8    Merchandise Company Inc., 240 B.R. 29 (Bankr. Tenn. 1999).

9            I agree with the trustee that technically I don't

10   think these investment accounts necessarily comply with

11   345(b)(1).  However, I actually don't believe that a hearing

12   is necessary on it.  If the parties conduct their due

13   diligence and determine that cause should be warranted, they

14   could submit an order on that basis to chambers, thus

15   obviating the need for a hearing.  I obviously read the

16   underlying motion, so if I disagree with the proposed order

17   and the finding it wanted me to seek, I would ask for a

18   hearing.

19           But here the totality of the circumstances best

20   applied by Judge Garrity and the Tennessee Court in Service

21   Merchandise argues that I should find cause here to approve

22   the investment.  Among other things, the money is held in

23   funds that are weighted at the highest level.  The funds

24   are, as far as I can see, allowed only to invest in U.S.

25   Government treasuries.

Page 51

1          The funds are also reporting on a weekly basis to

2     the debtors and, therefore, the debtors will be able to

3     review whether there is any issue as to the funds'

4     management and the like.

5          Finally, and at least as important, the debtors

6     really don't have reasonable alternatives here.  It's just

7     not a question for them of going down to a approved bank and

8     putting their money in the bank because it's clear from Mr.

9     Lown's declaration that they don't have that flexibility,

10    both given the size of their cash position and the nature of

11    banking in today's world where banks routinely say we don't

12    want your money, which is not only a problem for companies

13    like these, but also for individuals.

14         The only other alternative would be to hold the

15    treasuries actually in the debtors' own possession or in the

16    possession of someone who would be willing to do it and,

17    frankly, I don't believe that that entity would have the

18    type of control or credit support that the funds that are

19    currently holding the treasuries have.

20         So there's clearly substantial harm to the estate

21    of not getting this relief.  Conversely, there's substantial

22    benefit to the estate of getting the relief.  And the

23    calculus is, I think, here quite easy to determine that the

24    motion should be granted.

25         MR. ROBERTSON:  Thank you, Your Honor.  And I

Page 52

1    would turn the podium back over to my colleague, Marshall

2    Huebner.

3              THE COURT:  Okay.

4              MR. HUEBNER:  Good morning, Your Honor.  For the

5    record again I am still Marshall Huebner of Davis Polk &

6    Wardwell on behalf of the debtors.

7              Your Honor, one interim update since I was last at

8    the podium, which is at 10:51 my partner, Tim Graulich, sent

9    in to chambers copying all relevant parties the injunction

10   order, which unless we are sadly mistaken, is ready to be

11   entered and hopefully will give us all the respite

12   aforementioned.

13             THE COURT:  Okay.

14             MR. HUEBNER:  Your Honor, I am obviously quite

15   well aware that this hearing is going to be hotly contested

16   on the one remaining issue on the agenda.  But I also think

17   that there are actually many factual and quasi-factual

18   things that are not disputed.

19             One thing first, which is just in order of

20   operations, and I hope I get this right.  I think that the

21   understanding and agreement with the objectors is that the

22   O'Connell (ph) declaration will be admitted into evidence;

23   that as of now I don't think people want to cross-examine

24   him, and that the deposition that was taken yesterday will

25   be admitted into evidence, may be into -- Mitch, how are you

1    --

2              MR. HURLEY:  Sure.  So Mitch Hurley with Akin Gump

3    on behalf of the official committee.

4              We took the deposition yesterday.  We got the

5    final --

6              THE COURT:  Of who?

7              MR. HURLEY:  Of Mr. O'Connell.

8              THE COURT:  Okay.

9              MR. HURLEY:  The declaration that was submitted on

10   Friday, we agreed to take the deposition yesterday so that

11   we wouldn't have to push off this hearing.  We got the final

12   transcript this morning at 7 a.m.  We want to save at the

13   hearing and get right to the argument rather than doing live

14   testimony.  So we're okay with --

15             THE COURT:  Okay.

16             MR. HURLEY:  -- relying on the deposition.  We

17   unfortunately don't have pages to hand up to Your Honor

18   because we got it so recently.  If after the presentation

19   the Court wants to see any of the excerpts, I'm sure you can

20   work with Davis Polk to provide designations and counter-

21   designations.

22             THE COURT:  Well, okay.  I -- as you know I

23   normally rule from the bench.  So I think you're going to

24   have to at least quote to me what you think is worthwhile

25   quoting from your deposition.

1            And I appreciate that properly so attorneys often

2    designate a lot more in a deposition.  But usually it's one

3    or two quotes that actually make it into the ruling.

4            MR. HURLEY:  Understood, Your Honor.  We'll keep

5    that in mind for the presentation.

6            THE COURT:  Okay.  Can I -- before you go further,

7    Mr. Huebner, I got a revised proposed order --

8            MR. HUEBNER:  Uh-huh.

9            THE COURT:  -- the other day.  Have there been any

10   other changes --

11           MR. HUEBNER:  No.  No.  And, Your Honor, I'll be

12   walking through for the benefit of the Court in the course

13   of my remarks the changes that are reflected in our provided

14   revised order.  There are no changes after that.

15           THE COURT:  Okay.

16           MR. HUEBNER:  So, Your Honor, it -- we take no

17   joy, it goes without saying, in being adverse to the parties

18   who are objecting today, the U.S. Trustee, the official

19   committee of unsecured creditors and then the ad hoc

20   committees representing individual victims, private

21   insurance entities, NAS babies (sic) and Native American

22   tribes.

23           Again, without saying more than I should, I think

24   that, you know, it is probably fair to say we tried awfully

25   hard to try to work something out that would obviate the

1     need for this hearing, but were not able to do so, and here

2     we are.

3            So as I was trying to say, Your Honor, I think

4     there are a variety of things that we're going to be talking

5     about in the course of today that really are as much about

6     judicial notice and common sense as they are about evidence.

7     Judicial notice obviously is a concept that this Court is

8     intimately familiar with,  In Delphi Corporation, for

9     example, 2009 Westlaw 2482146 at *20, Bankr. SDNY July 30,

10    2009 RDD, Your Honor took judicial notice of the docket of

11    the entire Chapter 11 case:

12            "Including without limitation all pleadings and

13    other documents filed, all orders entered and all evidence

14    and arguments made, preferred or adduced, at the hearings

15    held before the Court during the pendency of the Chapter 11

16    cases."

17            This has been done around the country by lots of

18    judge -- by many judges in many contexts, including

19    contested motions.  I give only one example while the

20    exampls are legion.  Judge Gerber did a similar thing in the

21    Adelphia, 291 B.R. 283, page 291 and note 26 (Bankr. SDNY

22    2003) where he took judicial notice of different things on

23    his docket, specifically in connection with a 365 motion to

24    assume or reject the contract.

25            So I'm going to begin, which is where I thought it

1   made sense to begin, by listing some factual things, some

2   quasi-factual things, some things from the docket and some

3   things that are just, frankly I think, common sense as much

4   as testimony and hopefully, frankly, narrow the issues and

5   dispense with some things along the way.

6          One, let there be no mistake.  We all agree that

7   the opioid crisis is just a terrible crisis and tragedy, and

8   no one in this case -- and despite some of the language in

9   some of the objections -- certainly, the debtors in their

10  pleadings have ever minimized that or taken any position to

11  the contrary.  And nothing about today's hearing could

12  possibly be read fairly to suggest to the contrary.

13         Two, as this Court knows because the Court has

14  noted it to parties several times, one-hundred percent of

15  the debtors has been unoffered to the claimants as part of

16  their settlement framework, and now the term sheet since

17  before the case was even filed, the remaining meta-questions

18  in this case involve how to best maximize the debtors' value

19  and assets and how and to whom to distribute them.

20         Three, we agree, every dollar spent during these

21  cases is arguably a dollar that could instead ultimately go

22  to help victims and ameliorate this terrible crisis.  That

23  is exactly why resources need to be spent carefully and

24  thoughtfully, and the same questions or some variance

25  thereof always need to be asked:  Is this an appropriate use

Page 57

1    of money; is it likely to enhance the value of the estate or

2    accelerate these complex proceedings and ultimately increase

3    the distributions to claimants.  Those are the judgments

4    that the debtors actually have to make, in fact, every day.

5            For example, the injunction hearings were very

6    intense and very hard fought and, candidly, also quite

7    expensive which is unfortunate.  But as Your Honor

8    recognized not getting the injunction would likely have

9    diminished the estates by hundreds of millions of dollars or

10   more, multiples and multiples of what the injunction

11   hearings cost.

12           So the debtors expend, or when approval is needed

13   seek authority to expend, resources when they believe that

14   it will ultimately accelerate the case or otherwise

15   ultimately enhance recoveries.

16           Four, the creditors' committee is a fiduciary for

17   all unsecured creditors.  Every single one.  Notwithstanding

18   that as I accurately noted on the first day of the case

19   governmental entities who as of the petition date had filed

20   85 percent of the lawsuits then pending against the debtors

21   cannot be voting members of the UCC per the United States

22   Trustee.

23           This does not of course mean, and I'm not sure why

24   people seem to keep trying to misquote us on this, that

25   governmental entities will be 85 percent of the ultimate

Page 58

1    claimants.  Obviously that number is unknown and unknowable.

2    There will be a bar date and claims will be filed, and we

3    will figure out how to go through them in efficient, unusual

4    and probably unprecedented ways.  The 85 percent number was

5    and is a simple and correct statement of fact as of

6    September 15th, 2019.

7                Five, the creditors' committee has added a few

8    governmental entities as ex officio non-voting members.

9    Camera County, Texas, the designee of the multi-state group;

10   the Cheyenne and Rapaho (ph) Tribes designed by the ad hoc

11   group of 38 tribes as Your Honor knows in lieu of and

12   subsequent to which they withdrew their motion for a

13   separate committee.

14               While the debtors had nothing to do with these

15   decisions and learned of them only afterwards, it seems like

16   a fine idea to build a bigger tent at the UCC level with

17   non-voting members to hear more voices and garner more

18   points of view, including those of governmental entities.

19               But it bears noting, as Mr. Preis began the

20   hearing, that while we were advised a few days ago that the

21   State of Maryland was added as an ex officio non-voting

22   member, we then recently learned either yesterday or the day

23   before that they have since withdrawn their very short

24   tenure.

25               So now there are no states on the UCC, neither as

Page 59

1    voting members nor ex officio members, only two tribes and

2    one county who are, of course, very important, but different

3    in kind than sovereign states and, of course, have no vote.

4         Six, 47 State Attorneys' General, 47 of the 48

5    that are participating in this case, virtually all of whom

6    believe that they have meritorious lawsuits against Purdue

7    and related parties that they believe could or should

8    proceed notwithstanding these Chapter 11 cases because of

9    the police power and regulatory exception to the automatic

10   stay have now all agreed, hopefully until April 8th, but at

11   the very least until December 19th or February 21st to work

12   together to try to move these cases forward productively and

13   avoid what I think all agree would at its worst be a

14   destructive complication of litigation.

15        The 48th state, Arizona, has also agreed, but for

16   their reply brief which they have now filed.  So I think --

17   their Supreme Court reply brief that we discussed at the

18   last hearing.  I think 47 is now -- we're 48 for 48.

19        Seven, states are sovereign governments.  Each is

20   charged with the solemn duty of protecting its citizens.

21   And in the constitutional system of the United States of

22   America, the states play a unique role.  Principals of

23   federalism on which our government is based give the states

24   powers and responsibilities superior to their political

25   subdivisions and distinct also from those with the federal

Page 60

1    government.

2            And as this Court knows very well, the states were

3    zealously using their police and regulatory powers to pursue

4    these debtors and related parties prior to the commencement

5    of these Chapter 11 cases.

6            Eight, these sovereign governments, each

7    represented by its most senior legal officer, are highly

8    unlikely ever to agree at the UCC that they did not select

9    and on which they cannot vote or sit except possibly as

10   observers, and as of now that number is zero, is their

11   primary voice or agent or proxy in these cases.  Even though

12   under federal law the UCC cares about them just as much as

13   it cares about all other unsecured creditors, it's just not

14   going to happen.  The states have been very clear and very

15   consistent about this from the moment these cases were

16   filed.

17           Nine, the probability that this company will be

18   able to emerge from Chapter 11 or optimize its ability to do

19   good for this country post-emergency without the support of

20   a very substantial number of state governments as I stand

21   here today seems to me to be quite remote.

22           This is not to say that we will not also be

23   seeking the support or non-objection of and that we will not

24   be working to build consensus with a great many other

25   claimants, both private and governmental.  But the simple

Page 61

1    reality is that the rights of sovereign states with respect

2    to both the debtors and maybe more importantly the related

3    parties are just different in kind than the rights of

4    others.

5           Ten, we indeed signed a fee letter with the ad hoc

6    committee of supporting states and other governmental

7    entities on the eve of filing.  In fact, I'll go better, on

8    the very eve of filing.  But that's because we had for

9    months been building support for the settlement framework

10   state by state up until the very eve of filing.  And that

11   deal included a fee concept which, as Your Honor knows quite

12   well, is not unusual at all.

13          In fact, we filed for Chapter 11 when we did

14   precisely because we had reached agreement on a settlement

15   framework with this important group, a deal that was and

16   absolutely positively remains critical to these cases and

17   their probability of success.

18          The notion of filing Purdue Pharma for Chapter 11

19   with no deal and no framework and no structure and no

20   supporting entities in hand and at the same time coming

21   before Your Honor with a request to freeze thousands of

22   lawsuits brought by governmental entities, many of whom

23   passionately assert and asserted at the hearing the police

24   and regulatory exemption from the automatic stay was a

25   proposition somewhere between daunting and terrifying.

1          Eleven, the supporting states have done since the

2     petition date what they said they would do.  At no small

3     cost and risk they supported us at the injunction hearing

4     opposite an equal number of passionately opposing states.

5     And this followed many months of work towards the deal that

6     we believe maximizes the value of these estates to which

7     they stepped up when no other party was willing or able to.

8          The ad hoc committee also reached agreement with

9     us on a term sheet to put substantially more meat on the

10    bones of this continuously developing deal.  As Your Honor

11    knows, that was October 7th, filed on the docket I believe

12    three days before the October 11th hearing.  And since then

13    they and their advisors have been working to advance in

14    diligence and yet further flush out the deal, all of which

15    are preconditions for all parties in this case moving to the

16    next phase.

17         The ad hoc committee and the debtors exceeded to

18    the demand of the UCC in the days before the October 11th

19    injunction hearing that we not proceed with an RSA on the

20    schedule originally contemplated with the ad hoc committee.

21    But rather that we slow it down all the way until April, a

22    promise that was in the originally filed UCC stip filed at

23    approximately 9:15 a.m. before the injunction hearing began

24    and that Your Honor referred to earlier today, and those

25    provisions are unchanged in the amended UCC stip.

Page 63

1          Twelve, Sections 327 and 328 of the Bankruptcy

2     Code, as we also actually discussed coincidentally a few

3     minutes ago, apply only to professionals retained by debtors

4     and official committees.  Candidly, I was extremely

5     perplexed to see those sections of the code referenced in

6     certain of the objections as a path that we should have

7     pursued since I believe that they are so obviously utterly

8     inapplicable.

9          Thirteen, as I hope the Court and all parties

10    know, the debtors are working extremely hard and in good

11    faith to do and advance what they believe is in the best

12    interest of these estates and stakeholders.  To that end,

13    after the motion was filed and we began hearing from parties

14    and seeing objections, we went back to the ad hoc committee

15    and suggested and ultimately agreed to a raft of changes to

16    the order that are actually quite important.

17         One, we eliminated the requested authorization to

18    amend the reimbursement agreement without further court

19    authority.  Done.  It's out.  All that's being approved is

20    the letter as it stands.

21         Two, requiring the ad hoc committee's

22    professionals to follow the same compensation procedures as

23    the professionals of the debtors and the UCC, including,

24    one, submitting fee statements that comply with the U.S.

25    Trustee's fees guidelines; two, publicly filing fee

Page 64

1    statements rather than providing them only to the debtors,

2    the UCC and the trustee; three, submitting monthly fee

3    statements and applications; four, providing for interim fee

4    hearings, objection deadlines and the resolutions of

5    objections all as defined in the interim comp order; five,

6    unless I'm miscounting which is possible, providing for a

7    holdback of 20 percent of the fees until such amounts are

8    approved following quarterly applications; six, conditioning

9    the payment of fees to Compass Lexicon and Culture

10   Injustice, two of the three financial advisors upon

11   subsequent court approval pursuant to a request therefore in

12   a monthly application.

13           Let me just explain.  They're not currently at

14   work.  And so we said, well, if they're not at work, rather

15   than having it look like we have three FA's, right now they

16   have one FA.  And so if they end up needing either of these

17   two firms to start again, they can't get paid at all until

18   the next quarterly fee app or they need to come and explain

19   to the Court why they restarted and seek their fees at that

20   time.  So we're not really down to one FA is all that is

21   actually de facto being approved today.

22           I'm going to stop counting because I didn't number

23   these which is a mistake.  Expressly providing that people

24   can object, and it's anybody.  And that's actually pretty

25   important.  All the people who are very angry today are all

1    wearing the uniform of guard and cross-checker and police

2    person, right, because there are multiple grounds on which

3    the ad hoc people acknowledge that their fees can be

4    objected to:  Are they not reasonable and documented, are

5    they duplicative of the work of other ad hoc committee

6    professionals with one another; are they outside the scope.

7              And we'll now have full bright sunlight and

8    whoever is fussed can raise their issues with the Court and

9    the fees will have to be defended.  And I'm also sure that

10   with all that sunlight we'll also probably be seeing things

11   that, you know, hopefully fit comfortably within the rubric

12   that the debtors and others expect.

13             Next number, and this is important, clarifying in

14   the order that neither objecting to the claims of other

15   creditors or advancing or prosecuting the claims of members

16   of the ad hoc committee is considered within the scope.

17   That is outside the scope and we will not pay for that,

18   period.

19             Next, capping the amount of prepetition fees so we

20   have some certainty and in a number not to exceed 1.5

21   million, and further agreeing that they can't actually seek

22   or be paid for that at all right now.  But that actually has

23   to wait for either an RSA or a Chapter 11 plan.

24             Next, clarifying that there will be a new motion

25   and order to pay the fees or have them retained and have the

1    debtors pay for -- they can retain whonever they want.  The

2    question is are we paying for it -- the fees and investment

3    banker unless the UCC, the U.S. Trustee and the debtors all

4    consent.  Otherwise we have to come back to court and people

5    can make their arguments as to why either the need for it or

6    the compensation structure is or is not professional -- is

7    or is not, excuse me, appropriate.

8            And then finally providing that the work product

9    of certain financial professionals, primarily FTI which as

10   of now is the financial professional, will be shared with

11   the ad hoc group of non-consenting states and governmental

12   entities group subject to appropriate protections.  More on

13   this very important change later.

14           Fourteen, without -- now I'm back to the main

15   ones, not the mini-points on the order.

16       (Laughter)

17           MR. HUEBNER:  Those I did number.  There are only

18   16 of them.

19           Fourteen, without in any way minimizing the

20   importance of other parties to the case, neither the UCC nor

21   any of the other private or governmental entities or

22   existing ad hoc committees, the states have a vital role to

23   play.  Your Honor has noted this from the bench multiple

24   times since this case started.

25           During the October 11th preliminary injunction

1   hearing, and nobody needs me to remind the Court and you

2   certainly need me least of all, although no one had actually

3   objected or provided language to the voluntary self-

4   injunction, you told us, go back and work this out with the

5   states and get their -- get them comfortable and then come

6   back.

7        Your Honor also, and I have pin cites for the

8   transcripts if anybody needs them, Your Honor emphasized the

9   need for the debtors to provide the states with more

10  information, implicitly before coming back as we did on

11  November 6th.

12       Your Honor also addressed preliminarily some

13  musings on the allocation process and hoped that:

14       "There would be an understanding between the

15  states and the municipalities and localities throughout the

16  whole process that subject to general guidelines on how the

17  money should be used, specific ways to use it should be left

18  up to the states and the municipalities with guidance from

19  the states primarily," 175-24 to 176-6.

20       Finally, as to the lengthy October 11th hearing,

21  Your Honor expressed hope that once the difficult allocation

22  issues were addressed the actual public health steps taken

23  to correct and address the opioid problem would be "largely

24  left up to the states and municipalities so they can use

25  their unique knowledge about their own citizens and how to

1    address them," 149-22 to 155.

2            Then we came back on November 6th.  And after Your

3    Honor commended the parties on the progress in the case to

4    date, which was very nice of you by the way, the Court

5    emphasized that "Everyone here, including the consenting

6    states...needs to be thinking about...what I believe will be

7    a fairly neutral structure for a plan here."  In fact, the

8    Court's final reflections on these plan issues was to

9    encourage all 50 states and the District of Columbia and the

10   territories and the Native American tribes to be a resource

11   and that "Each state reach out to the claimants in its state

12   and start discussing this crisis" -- crisis we added, you

13   just said this -- "to see if there's an equitable way that

14   the claimants within the state can get comfortable with how

15   it can be addressed," 57-10 to 13.

16           I actually have a few more quotes, but I'll leave

17   it at that.

18           Fifteen, we are most assuredly not agreeing to

19   seek authority to pay these fees as a thank you present for

20   supporting us at the injunction hearing, even though that

21   support likely significantly contributed to us prevailing,

22   an outcome that hopefully is already avoiding value losses

23   and will ultimately avoid value loss and expense many, many

24   multiples of the fees in question.

25           We are not doing it because we like the ad hoc

Page 69

1    group more than we like other creditors or groups.  We're

2    doing it because we think it is in the best interest of the

3    estate.

4            And while I'm discussing the debtors' judgment,

5    which is what lead to this motion, the UCC cited in their

6    brief to several transcripts from Your Honor where Your

7    Honor appears to have articulated a less deferential

8    business judgment standard than that applied by many other

9    courts.

10           Other people cited the Second Circuit case in

11   Orion, which seems to have kind of a slightly different

12   articulation of the Court being an overseer of the wisdom of

13   the debtors.  It actually specifically says that ascension

14   motions should not be mini-trials.  They should actually be

15   sort of summary things that move the case along quickly.

16           And then the ad hoc committee cited a Supreme

17   Court case from six months ago tomorrow where the Supreme

18   Court states that when a debtor seeks to assume or reject an

19   executory contract "the Bankruptcy Court will generally

20   approve the choice under the deferential business judgment

21   rule," Mission Product Holdings Inc., This Is Technology

22   LLC, 139 Supreme Court 1652, 1658 (2019).

23           It is not for me and I will not be doing it, to

24   tell the Court what standard to apply today.  But happily it

25   is of no moment because the debtors believe that under any

Page 70

1    of the standards the Supreme Court's potential deferential

2    business judgment, Orion's overseer of the wisdom or even

3    the transcripts that they found that seem to suggest that

4    you kind of look at it de novo, you know, we are very

5    comfortable with the request relief and the judgment and the

6    complexity that went into it is in the best interest of the

7    estates and should be approved.

8                   Finally, sixteen, as I have told many parties and

9    I believe the Court in some cases more than once, the

10   debtors have long viewed this as a four-gates deal.  Gate

11   One was agreeing to a settlement framework with a critical

12   mass of parties.  Check.

13                  Gate Two was memorializing that agreement in more

14   detail in an actual written term sheet.  Check.

15                  Gate Three is moving to an RSA stapled to a much

16   more flushed out version of that deal and term sheet whose

17   preconditions are massive amounts of diligence, structuring

18   and negotiation.  That work has been progressing intensely

19   in the window created by the initial stay period.

20                  And Gate Four is the confirmation hearing where,

21   if all goes well, that deal is authorized to close and will

22   close.

23                  Therefore, I was in no way surprised or fussed or

24   embarrassed to see my own words from this very podium about

25   where we are at present with much work still to be done and

Page 71

1    uncertainty about ultimate outcome cited back to me at some

2    length in some of the objections.

3            Quite the contrary, we have been completely direct

4    and very forthright with all parties about both exactly

5    where we are and exactly where we are not yet.  The debtors

6    believe that progressing the deal set forth in the term

7    sheet is critical and that it is absolutely in the best

8    interest of the estate to continue with the diligence

9    necessary to move this case towards Gate Three.

10           And that diligence and the work that we need to do

11   in the months ahead is extremely substantial whether or not

12   we pass exactly through the Gate Three whose structure is

13   outlined in the October 8th term sheet or some slightly

14   different one.  It includes questions like, how much are the

15   IACs worth and should they be prepared for sale; how do we

16   establish appropriate security interests and covenants with

17   respect to the Sacklers and the IACs; how do we get the most

18   money into the estate the most quickly; exactly which

19   Sacklers are guaranteeing the $3 billion minimum

20   contribution and how will payments be allocated among them;

21   what covenants and protections do we get from a far flung

22   family for a multi-billion-dollar multi-year deal; how much

23   are the Sacklers worth and where are their assets.

24           As these questions and dozens and dozens of others

25   make clear, there are huge amounts of work to be done on

Page 72

1    this hugely complicated multi-billion dollar, multi-

2    continent, multi-country, multi-year deal or whatever

3    variant of it we end up with that presumably will still

4    include billions of dollars paid in from the shareholder

5    parties.

6            It is in light of all this that it is and remains

7    the debtors' view that three entities each need to be deeply

8    and primarily involved in pushing us all forward, pushing

9    the family, the shareholders, for diligence, disclosure,

10   granularity, covenants, collateral and other protections.

11   These three parties are:

12           One, the debtors, the ultimate fiduciary for all,

13   and the indisputable owner of billions of dollars of

14   potential claims against the related parties;

15           Two, the UCC, an undisputed fiduciary for all

16   unsecured creditors; and

17           Three, the states who along with other

18   governmental entities are participating via one of the ad

19   hoc committees, the UCC itself, or the non-consenting states

20   group and with whom the ad hoc committee has agreed to share

21   substantial financial information analysis produced by their

22   financial professionals.

23           At the end of the day, Your Honor, I think there

24   is one core question for this hearing and it's not actually

25   particularly evidentiary:  Is it acceptable business

Page 73

1      judgment for the debtors to pay the fee for this third

2      party.  It's expensive.  It might be duplicative.  And are

3      they really doing anything that the debtors and the

4      creditors' committee cannot do themselves, and why should

5      the estate spend what might end up being tens of millions of

6      dollars on that.

7            It's a fair question, but the debtors believe that

8      the answer is better than the question.  At base, it is the

9      debtors' informed view and judgment having lived these

10     litigations and other related matters for years that the

11     states have power and negotiating leverage and sovereign

12     rights that they alone can wield against the shareholder

13     parties in addition to the rights and leverage and claims

14     and threats of others.

15           Moreover, unless the supporting states get all the

16     information they need from the related parties to proceed

17     through the next gate, they will neither continue with the

18     deal themselves nor be willing or able to bring any other

19     parties on board or to undertake the various tasks that the

20     Court has suggested to them might be quite critical once we

21     get to the implementation phase.

22           Simply stated, the debtors believe -- and this is

23     really counsel and judicial judgment more than witness

24     testimony -- that this case will be resolved faster and

25     better if today's request is granted.  If the states are to

Page 74

1    play the meaningful role that this Court often sua sponte

2    has raised and suggested, they of course need to be

3    comfortable and fully informed as to facts, options and

4    structure.

5              As everybody knows, Purdue and the Sacklers and

6    the opioid crisis are issues that are very, very public and

7    very material and very controversial in many states.  And

8    those states have been abundantly clear that other entities

9    that they have not chosen and whose boards they cannot vote

10   whether or not they are fiduciaries will not be doing that

11   work for them.

12             Moreover, the irony of this hearing is worth a

13   moment of digression.  The debtors unfairly and wrongly have

14   repeatedly been accused in the press and by certain parties

15   in these cases of trying to protect the Sacklers or trying

16   to inappropriately use the debtors' bankruptcy as a shield

17   for the Sacklers.

18             While all of that is emphatically false and

19   happily is materially dying down as weeks and weeks of fact

20   on the ground give it the lie that it is, what the debtors

21   are here today trying to do is further empower a large

22   number of State Attorneys' General.  And, indeed, all of

23   them, because of the information sharing to which they have

24   agreed, the debtors are seeking to underwrite the very

25   entities who have been their most fierce, their most

Page 75

1   bitterly antagonistic and their most long-standing litigious

2   stakeholders because the debtors believe that that will get

3   us all to consensus better and faster.

4          Moreover, Your Honor, if you want to think about

5   it from a different angle, you could really argue, although

6   it's not actually what animated us today, that this motion

7   is, in fact, a very fair trade for the injunction willing

8   (sic) because the states alone have police powers that are

9   potentially not automatically stayed.

10          But this Court ruled, over the fierce objection of

11   24 of them, that they do not in this unusual case get to

12   continue their extent police and regulatory power litigation

13   in their own preexisting courts of choice because we

14   correctly prevailed in arguing that that would have been

15   insanely value destructive for all.

16          So perhaps another reason the motion should be

17   granted is that as part of being compelled to proceed in a

18   unitary organized fashion in this one court, they get

19   assistance in their efforts to work towards a solution in

20   the common interest.  And if this is part of the bargain

21   that net avoided hundreds of millions of dollars of expense

22   and fees and lost value, it seems pretty sensible.

23          Your Honor, those are the 16.  Let me now switch

24   gears and come at things from two more angles.

25          Number one is the O'Connell deposition.  So like

Page 76

1    others, I, you know, sort of opened my bleary eyes and went

2    through that little mini four on a page transcript.  And I'm

3    going to guess that there are probably a few things that the

4    people who took the deposition are pretty excited about, or

5    maybe a little excited about.  Since I actually lived all

6    this, I actually don't think it's exciting at all.  So since

7    I'm at the podium I'm going to take a few minutes to address

8    some of that.

9           One of the things that came up in the deposition

10   was that Mr. O'Connell did not know and had no answers or I

11   -- if he had them I don't think they were very good -- as to

12   why if the supporting states were supporting us on the

13   injunction that was not laid out in our informational brief

14   and was not even in our initial injunction papers.  Like if

15   they were your big supporters and that was always part of

16   the deal, where is it in the documents.  A totally fair

17   question.  Since Mr. O'Connell is an investment banker, it's

18   not a huge surprise that he didn't know the answer.

19          I'm not an investment banker and I do know the

20   answer, which is the way it was supposed to work was we were

21   supposed to go into Chapter 11, finish a term sheet, know

22   that we had a deal, and then we would proceed with the

23   injunction and they would be supporting us.  Unfortunately,

24   as Your Honor remembers perfectly well because we had some

25   pretty sharp exchanges with some of the states about it,

1     some of the states took the bankruptcy filing as the

2     acceleration gun.

3          And what happened as soon as we filed was that we

4     were getting literally battered, just battered multiple

5     times a day with emergency hearings and sua sponte orders

6     and deposition notices and things like that.  And we simply

7     couldn't survive and wait to proceed with the injunction.

8     So we ended up radically accelerating the injunction papers

9     being filed.  People like didn't go home from the Sunday we

10    filed for Chapter 11 until I think it was the Thursday maybe

11    that we filed the injunction papers.  We didn't have a term

12    sheet yet.  We had to flip the order.

13         And the supporting states said to us, we know we

14    said we would be supporting you, but right now all we have

15    is this three-bullet oral settlement framework.  When we

16    finished the term sheet, that's when you'll see our support.

17    So the second we got the injunction papers filed, we went

18    back into the chamber with them and worked on the term

19    sheet, which was ultimately agreed to on October 7th and

20    filed on October 8th, and about like a minute after that

21    they filed their statement of support for Thursday's

22    injunction hearing.

23         It's actually, frankly, a lot like what we did

24    with the creditors' committee, which actually the minute we

25    finished that one on October 7th we dragged ourselves into

1    the next conference room and the committee said, you know,

2    we're not going to take a position supporting you on the

3    injunction until you reach a stipulation with us.  And that

4    wasn't even done until the Friday morning of the hearing,

5    and then moments later I think they called the Court and

6    said, we're going to be supporting the debtor on the

7    injunction.

8            So there's no Perry Mason moment there.  The

9    reason you didn't see the supporting committee -- the ad hoc

10   committee support is we just weren't done yet and they were

11   saying, finish the term sheet so we know that we actually

12   have something that is, you know, much more flushed out and

13   real, and then we will step up.

14           And just for what it's worth, lawyers shouldn't

15   testify, but this kind of bugged me a little bit.  So one of

16   the other things I did in the middle of the night last night

17   was I actually went back and looked at the earlier drafts

18   that we had been sending them pre-filing starting in August

19   and every one of them of course, because it was the core of

20   the deal, says you will support us at the injunction.  You

21   will fully stand down.

22           So I'm hoping they're not going to say, like we

23   didn't think to ask for that till afterwards and we agreed

24   to pay their fees not having thought about it because that

25   would actually be both actually insulting because they're

Page 79

1    actually making me a moron, and it would also be, in fact,

2    totally false.

3        (Laughter)

4        MR. HUEBNER:  Two, there seemed -- you may hear

5    later, Your Honor, about some kind of blocking position

6    testimony from yesterday.  There appeared to be a brief

7    flurry of what looked to me in a blurry eyed as sort of

8    excitement that, you know, did these guys have a blocking

9    position, like do they own 33.335 percent of the debt.  And

10   the answer is, we have no idea because nobody knows that,

11   like is that a Perry Mason moment?

12       Look, in a totally simplistic case with a known

13   quantum of debt, where you can calculate percentages, people

14   buy 34 percent of the debt have a blocking position and

15   sometimes they get maybe more than they should deserve

16   because of that.

17       But happily for us those of us in the room and

18   especially those of us in a robe are infinitely more

19   sophisticated than that.  There are lots of ways to have

20   leverage in a case.  There are lots of ways to have a

21   blocking position in a case.  We weren't litigating the

22   police power injunction against private entities.  We were

23   litigating against governments.  We weren't here on November

24   6th figuring out a way to get the injunction consented to

25   with private parties because they're automatically stayed.

1              On April 8th when I doubt we will be done with

2     this case and we need an injunction extended, we're not

3     going to be begging the private parties because, candidly,

4     they're automatically stayed and they will file claims and

5     we'll go through them.  Governments are just different.  And

6     when it comes to police power and regulatory -- by the way,

7     at subsequent hearings I may be saying they're very

8     unimportant.  Let me just be very clear about that.  I just

9     want to be up front.

10         (Laughter)

11             MR. HUEBNER:  I know you don't like when people

12    reserve their rights.  I'm reserving my rights to say

13    they're not as important as they think they are when they

14    disagree with us.  Okay.

15         (Laughter)

16             MR. HUEBNER:  Next, another thing they seemed

17    excited about, isn't it true, Mr. O'Connell, this is like

18    from a TV show, isn't it true that RSA parties often provide

19    financing to debtors or consent to the use of cash

20    collateral.  Yeah.  Like it's true.  When that's the nature

21    of what is at issue in the case and when a debtor is running

22    out of money and can't pay its bills and needs financing,

23    that's the trade.  When a creditor has a lock on cash

24    collateral and you can't use a penny of your own cash

25    without their consent, that's the trade.  I just can't find

Page 81

1    a Perry Mason in this one either.

2              Different parties in different cases bring

3    different things to the table, both guns they put away and

4    guns they choose not to use.  And so, yes, in a typical

5    plain vanilla intellectually and analytically uninteresting

6    RSA in a simplistic capital structure, the trade is often

7    for new financing or cash collateral consent.  That's just

8    not the trade that these debtors needed.  We don't need a

9    DIP loan and nobody has cash collateral.  They have lots of

10   other things which Your Honor doesn't obviously need me to

11   elaborate on.

12             The last kind of Perry Mason moment, which wasn't,

13   was when they showed Mr. O'Connell a one-page piece of paper

14   that purported to be a Chapter 11 budget.  Mr. O'Connell,

15   and I think what they were saying was this has a lot of

16   money on here for these ad hoc people, but doesn't even have

17   as much money as they get for the UCC, like, explain.

18             Again, you know, they will describe it and Mr.

19   Kanesty (ph) will help because, you know, I don't -- I'm not

20   like perfectly conversant, but my understanding both at the

21   deposition and then last night was that this is a completely

22   outdated piece of paper from June that probably never -- I

23   don't even know if it should have been put in the data room.

24   And this was one of the many iterations of the budget that

25   was done over the many months.  Obviously, November 19th --

Page 82

1    my sister's birthday -- is actually very far away from June

2    in the life of a Chapter 11 case and there are many things

3    on there that have no relevance at all and are clearly

4    totally outdated and irrelevant.

5              So, you know, again, obviously I will leave it to

6    them to advocate for what they got out of yesterday's

7    deposition.  But, you know, I sort of jumped on it as soon

8    as I could and I didn't really see very much that I thought

9    was too awesome.

10             Okay.  So now I want to do one last thing.  There

11   are three arguments that were made in the papers that I

12   actually want to hit quite directly which I think hopefully

13   will be helpful to the Court.

14             One, there is no signed binding RSA.  It has

15   surface appeal.  Your Honor, look at the term sheet.  It's

16   not even signed.  The only thing these guys and ladies ever

17   put their signature to was their fee letter.  Show me like

18   an actual signature of anybody other than on the fee letter.

19   This is outrageous.

20             Yeah.  It's actually not.  In fact, I actually

21   find it singularly unpersuasive.

22             One, as this Court well knows probably better than

23   anyone in the room, no RSA in fact truly and irrevocably

24   binds its signatories.  In fact, RSAs invariably have

25   multiple outs.  And as Your Honor has seen for decades, they

1   not only have multiple outs, they often have multiple broad

2   and discretionary outs, like the plan and all plan documents

3   and every other document in the history of the universe must

4   be acceptable to us in our sole discretion, or they have

5   milestones like you will file a plan by Thursday.

6           And things like that, every one of them is a

7   discretionary out.  And Your Honor has presided over God

8   knows how many cases where milestones got extended again and

9   again and again, or courts said, I'm not going to approve

10  those milestones.  You know you can't make those and you're

11  just giving them a hidden discretionary out.

12          So I think that the objectors' focus on the

13  absence of a signed RSA is pretty close to a full on red

14  herring because RSAs are very often of gossamer spun.

15          Rather, I would suggest that the ad hoc committee

16  has been and has acted bound to this deal to date as least

17  as much as a distressed bondholder is bound to a deal under

18  a traditional and highly porous RSA.

19          But don't take my word for it, Your Honor, because

20  we actually went back and pulled a whole bunch of RSAs where

21  our colleagues at Akin Gump were getting their fees paid as

22  counsel to ad hoc groups or creditors.  And guess what?

23  Those RSAs consistently have broad and varied termination

24  rights and outs based on documentation consent, milestones

25  and even diligence outs.

Page 84

1          So the notion that wonderful, magical RSAs bind ad

2    hoc committees and that is what justifies their fees being

3    paid, and only these foolish Purdue debtors forgot to bind

4    their ad hoc group is respectably farcical.  Most RSAs have

5    multiple holes large enough to drive a truck through and

6    very often bondholders exit through those holes after

7    getting a whole bunch of fees paid.

8          Two, in this case which does not actually happen

9    very often it is the debtors who have total unmitigated

10   unqualified optionality.  We can terminate paying the ad hoc

11   committee's fees at any time for any reason, period.  If

12   Purdue concludes that it is no longer in the estate's best

13   interest to pay these fees, we send them a one line email:

14   Dear Ad Hoc, it's over, the debtors.

15         Now that's pretty rare and it actually explains

16   we're not actually fool hearty at all.  We signed the fee

17   letter pre-filing knowing that it was about to become a pre-

18   petition, unsecured, unassumed and unenforceable contract,

19   and we would then make the judgment if we got to where we

20   needed to go to file an assumption motion.  We then had the

21   injunction hearing and got the term sheet done and saw the

22   facts on the ground and made the decision to proceed.

23         But today doesn't actually lock us into anything.

24   It authorizes us to pay their fees for only so long as we

25   see fit.

1            In addition --

2            THE COURT:  How can -- can I -- how does that tie

3    into the new provision that says the capped prepetition

4    amount is tied to the earlier of an RSA or a plan?

5            MR. HUEBNER:  Sure.  That's a great question, Your

6    Honor.

7            So I would say it like this.  I'm just a little

8    bit on my feet because it wasn't addressed specifically.

9    But if we terminate before getting to an RSA with them, it

10   never gets paid.

11           THE COURT:  That's clear.  Yeah.

12           MR. HUEBNER:  If we terminate before getting to a

13   plan with them, it's never paid.  I guess your question is

14   what if we terminate and then later we end up doing a deal

15   with them even though they can't get paid for anything in

16   the interim, can they submit a bill for $1.49 million for

17   their prepetition.

18           You know, I don't know, candidly.

19           THE COURT:  I mean, in practical terms you

20   probably would have it in that deal.

21           MR. HUEBNER:  Yeah.  Well, I didn't want to be

22   cheeky, but I was going to say if we end up getting to a

23   global deal later and there is an interregnum, I'm pretty

24   confident there's going to be a larger discussion and a

25   resolution of what happens with the fees, which by the way

Page 86

1    is perfectly consistent with even Akin Gump's own pleading

2    which is like, come back when you have a deal and then we'll

3    be much more favorable.  We acknowledge we get fees paid

4    like this all the time.  The question is just do the facts

5    justify them.

6            So I'm getting -- like -- let me say this.  If our

7    worst problem is figuring out what to do with this 1.49

8    million when we're otherwise all singing Kum Ba Yah, we're

9    in a pretty fabulous place and I'm sure we will figure

10   something out.

11           What I actually thought you were going to ask --

12   and shame on me for guessing wrong -- is if you have a flat

13   unconditional right to terminate, why do you also have a

14   right to terminate if they become less representative or if

15   they don't do an RSA by a date certain.  Like if you have a

16   flat one, why do you have extra ones.

17           The answer is because they are statements of

18   intent that are important to us.  Even in this -- at the

19   time on September 15th totally optional fee letter, this was

20   a let us be totally clear, if you (indiscernible) are not

21   the representatives that we thought you were or you're not

22   moving towards an RSA with us, let there be no mistake.  So

23   those are just additives to a total discretionary at any

24   time termination right.

25           Three, while there is in fact not yet a signed RSA

Page 87

1    and there also isn't a signed term sheet, because candidly,

2    you know, we thought about doing a heads of agreement for

3    the term sheet.  I've been through this rodeo before.

4    They're just kind of foolish because when a term sheet

5    itself -- maybe not much more foolish, ironically, than RSA

6    which has a ton of outs.

7           When a term sheet itself still has lots of TBDs as

8    term sheets always do, you know, you could slap something on

9    that says, you know, we all agree in good faith that we will

10   pursue this term sheet.  And it's worth something.  Filing

11   it on the docket as an agreed term sheet, filing a pleading

12   a few minutes later which they did -- I don't remember if it

13   was a few minutes, but soon thereafter saying we have agreed

14   to the attached term sheet and because of that here is our

15   objection to the injunction, standing up against the other

16   half of the country at the hearing and saying, we stand down

17   and we actually support you being bound, I actually think

18   that those facts on the ground are much stronger evidence of

19   support than a piece of paper on a porous RSA.

20          We're also, though, just to leave no stone

21   unturned, progressing a stipulation with the ad hoc

22   committee that, in fact, will have a variety of covenants

23   and agreements a lot like the UCC stipulation which, again,

24   will be yet another thing that looks a lot like an RSA and

25   will add even more to this sort of package of commitments

Page 88

1    from the ad hoc group.

2            And let's not lose sight of sort of the slightly

3    bizarre twist from today's hearing.  The UCC -- and I

4    understand why they did it because they're not on board with

5    the deal yet and that's totally fine.  They shouldn't be.

6    They were -- had been formed a week earlier -- demanded as

7    part of their October 11th stipulation that we adjourn for

8    four months, the time table we were originally on, to sign

9    an RSA that took us to Gate Three with the ad hocs.

10           Now they're saying, you don't have an RSA.  That's

11   an outrage.  You can't pay their fees.  Well, it kind of

12   seems like a little bit unfair to do both of those things.

13           So, look, nobody knows, nobody, certainly not me,

14   where this case is going to end:  Will it be the exact deal

15   on the term sheet, a variant or improvement of the deal on

16   the terms sheet, or a different deal.  And if I got up and

17   tried to say, the deal on that term sheet, see you at the

18   closing, you would think I was either delusional or a

19   mendicant.

20           But what I do know is that the substantial work

21   that has been done to date and needs to be done many hours a

22   day almost every day for the next few months by each of the

23   UCC, the debtors and the ad hoc committee and other parties

24   as well for sure has been and will continue to be essential

25   to progressing these cases.

1              Your Honor, as a reminder, RSA stands for

2       restructuring support agreement.  Let's just take those for

3       a second.  I'm guessing we can stipulate that we're in a

4       restructuring.

5              I think judicial notice is pretty clear and I

6       don't think it could possibly be disputed that we have

7       gotten substantial support from the ad hoc committee to

8       date, both in terms of the injunction hearing and the term

9       sheet.  And if we don't keep getting the S for support, we

10      will stop paying their fees, period.

11             A is for agreement which, again, when you combine

12      the fee letter, the term sheet, the injunction pleadings,

13      their positions in court and the coming stipulation, we

14      think that that three-dimensional agreement is actually

15      worth at least as much as many of the Swiss cheese two-

16      dimensional agreements that are actually called RSAs.

17             Argument Two, and I'm only addressing three, the

18      ad hoc committee lacks fiduciary responsibilities to the

19      estate.  The UCC and the individual objectors both argue

20      that the payment of the ad hoc committee's fees is

21      inappropriate because they are not a fiduciary to the

22      estate.

23             I just don't get this one.  We all understand and

24      agree that they're not fiduciaries to the estate.  Nobody

25      has ever suggested to the contrary.  That's just not the

1    test moving to approve the fees of a creditor under 363 or

2    365 or 503.  Creditor groups other than UCCs never have

3    fiduciary duties to the estate or all creditors.  Although

4    strangely enough, this may be the first case in history

5    where the ad hoc group actually, may actually have fiduciary

6    duties to almost everybody because they're all 48 of the 50

7    states -- well, 47 because Arizona is sort of solo right now

8    -- and they actually are the representatives --

9               THE COURT:  What are the other two?

10              MR. HUEBNER:  What's that?

11              THE COURT:  What are other two?

12              MR. HUEBNER:  Kentucky and Oklahoma who have --

13              THE COURT:  Oh, they have their own deal.

14              MR. HUEBNER:  Wait.  Did I misspeak?

15              UNIDENTIFIED SPEAKER:  No.  That's right.

16              MR. HUEBNER:  Yeah.  Thank you.

17         (Laughter)

18              MR. HUEBNER:  I would like to thank the peanut

19    gallery for that --

20              THE COURT:  Because they had previously settled.

21              MR. HUEBNER:  Yes.  Exactly.

22              THE COURT:  Okay.

23              MR. HUEBNER:  I don't want to over speak for them.

24    We certainly did a deal with Oklahoma in the months before

25    the filing.  I believe there was a deal with Kentucky, but I

Page 91

1    don't want to ever be viewed as speaking for a state

2    government.

3              THE COURT:  Okay.

4              MR. HUEBNER:  So, you know, these sovereigns

5    actually kind of are fiduciaries for at least 48, 50 or so

6    of the United States.  So they're actually fiduciary-like

7    even if they're not remotely fiduciaries the way that the

8    debtors and the committee are.

9              I'm going to skip some stuff because I'm talking a

10   lot, and let's go to Argument Three.

11             The debtors' request will result in unlawful

12   disparate treatment of similarly situated creditors.  The

13   UCC and individual objectors and other parties have also

14   objected that this is unlawful because of disparate

15   treatment.

16             I'm going to be quite brief on this one.  The

17   debtors' motion plainly has nothing to do with the ultimate

18   treatment of unsecured creditors under a plan.  Rather, the

19   debtors' motion seeks authorization to use estate funds in a

20   way that we believe is helpful for all.

21             The objectors do not, and frankly they couldn't

22   because there is no case law that says that, cite to a

23   single case in support of the notion that paying

24   professional fees to a group of creditors during a case is

25   unlawful disparate treatment.  And Akin Gump is actually

1    pretty lucky that there is no case law that says that.

2           Quite the contrary, they expressly concede that

3    paying such fees is permitted in various circumstances

4    including under 363 and 365.  The only question is, is it

5    justified under the facts.  So it can't be both

6    categorically unlawful as disparate treatment and totally

7    okay as long as it's justified under the facts at the same

8    time.  Right.  You can look at their footnote that has all

9    the RSAs that they honestly cite and say this is done all

10   the time if the circumstances are right.

11          But here's the kicker on this one.  The ad hoc

12   committee is not getting paid on the prepetition claims of

13   each of its ten members.  It's getting paid for the

14   committee's post-petition work in advancing the ball for the

15   large group that they speak for and with their information

16   sharing hopefully advancing the entire case.

17          And let me say just one semi-last thing from a

18   totally different angle.  I want to engage in the following

19   thought experiment because it's actually quite important

20   because it's actually a thought experiment that was urged on

21   us by people.

22          Assume for a moment, Your Honor, that right after

23   we won at the preliminary injunction hearing we turned to

24   the supporting states and we said, thanks so much for all

25   the support at the injunction hearing.  That was really

Page 93

1    terrific of you and we might actually not have prevailed

2    without you.  But now that you did that, we're actually not

3    going to honor our prepetition agreement with you because

4    it's unenforceable because we're in Chapter 11 now, and

5    we're not going to seek approval to pay your fees.  But

6    thanks again.  Now can we sit down and meet about how to

7    progress these cases and get a deal done.

8              We believe that this perfidious breach of trust

9    may well have made any consensual deal not only with that

10   group, but with many other parties as well in this case

11   impossible because this is a uniquely difficult case.  And

12   our credibility and our integrity are among our most

13   valuable assets.  When we give our word, we keep it.  That's

14   also part of business judgment.

15             Moreover, while it is not the governing provision

16   here, the debtors believe that the relief we are seeking, in

17   fact, is quite consonant with the policies underlying 503(b)

18   because the ad hoc committee is working to grow the pie for

19   all; the stand down of their own litigations that preserve

20   estate value for all; the commitment to pursue a value-

21   maximizing structure for a global resolution; assisting to

22   secure at a minimum a $3 billion contribution with upside

23   from the shareholder parties.  All of this work is being

24   done while the ad hoc committee has no idea what the

25   ultimate allocation or percentages or recoveries of their

Page 94

1   own members might be.

2          So, Your Honor, in conclusion, and now this is in

3   conclusion, I think the record more than demonstrates and

4   the debtors firmly believe under any level of deference or

5   lack of deference or standard of review that the

6   reimbursement agreement will benefit the debtors' estates

7   for the many important reasons I have discussed.

8          Six months ago tomorrow in Mission Products

9   Holdings the Supreme Court of the United States stated as

10  follows:

11         "Section 365 enables the debtor or its trustee

12  upon entering bankruptcy to decide whether the contract is a

13  good deal for the estate going forward.  If so, the debtor

14  will want to assume the contract fulfilling its obligations

15  while benefiting from the counterparties' performance.  But

16  if not, the debtor will want to reject the contract

17  repudiating any further performance of its duties.  The

18  Bankruptcy Court will generally approve that choice under

19  the deferential business judgment rule."

20         While we are aware that the fees at issue are not

21  insubstantial, the debtors believe that authorizing us to

22  honor our agreement to pay them, only for so long as we

23  believe that it makes sense to do so, and with all of the

24  bells and whistles and review rights and objection rights

25  and judicial oversight in the proposed order is the right

1    deal at present and is in the best interest of the estates,

2    and we ask that the motion be approved.

3            THE COURT:  Okay.

4            MR. ECKSTEIN:  Your Honor, good afternoon I guess.

5            THE COURT:  Good afternoon.

6            MR. ECKSTEIN:  Kenneth Eckstein of Kramer Levin on

7    behalf of the ad hoc committee of governmental and other

8    contingent litigation claimants.

9            Your Honor, I'm happy to proceed and supplement

10   Mr. Huebner's extensive and I think comprehensive

11   presentation on the motion, but I wanted to ask Your Honor

12   whether you would prefer to hear the objectors first and

13   then have me --

14           THE COURT:  Well --

15           MR. ECKSTEIN:  -- respond to --

16           THE COURT:  -- it was --

17           MR. ECKSTEIN:  -- some questions.

18           THE COURT:  -- extensive and comprehensive.  I'm

19   not sure what, you know, I have -- I have your pleadings.

20   You laid out in that pleading the different roles that the

21   professionals play.  So I'm not sure there's anything really

22   to add other than to respond to points that might be raised

23   in opposition.

24           MR. ECKSTEIN:  That was my sense as well.  The

25   only thing I will say, Your Honor, in addition to the

1    pleading that we submitted last week -- and, Your Honor,

2    there is also submissions by, statements by each of the 23

3    states --

4              THE COURT:  Right.

5              MR. ECKSTEIN:  -- that are -- plus the five

6    territories that are supportive of the motion and are

7    supportive of the settlement framework and that specifically

8    acknowledge in those statements.  And Your Honor may have

9    also noticed that there was a pleading submitted by the ad

10   hoc committee of dissenting states represented by Mr. Troop

11   also supportive of the motion.

12             And I thought it was noteworthy that while the

13   impeachment proceedings are proceeding today and while the

14   election is proceeding we actually found an issue around

15   which all 50, or at least 48 states can agree.

16             Your Honor --

17             THE COURT:  I saw all those pleadings.

18             MR. ECKSTEIN:  -- I'm happy to rise later and

19   respond to specific questions or comments that are made

20   after the objections.

21             THE COURT:  Okay.

22             UNIDENTIFIED SPEAKER:  Your Honor, (indiscernible)

23   as well.

24             THE COURT:  Okay.

25             UNIDENTIFIED SPEAKER:  Thank you.

1          MR. HURLEY:  Good afternoon, Your Honor.  Mitch

2     Hurley with Akin Gump on behalf of the official committee.

3          Your Honor, I want to make clear from the outset

4     what the committee's objection is about and what it's not

5     about.  The committee's objection is not to the

6     participation in these cases of the ad hoc committee of so-

7     called consenting states.  The committee encourages that

8     participation and hopes that the sorts of contributions that

9     the debtors have said they believe the ad hoc committee will

10    make will be made.  And we hope to work alongside them in

11    that regard.

12          Your Honor, this also is not an objection where

13    the official committee is taking the position that there

14    will never come a time in these cases where a non-

15    fiduciary's fees warrant payment out of estate property.  It

16    may be the ad hoc committee's fees.  It may be one of the

17    other seven, eight or nine ad hoc groups that also is

18    formed.

19          The committee's objection is based on our view

20    that under the law and the precedents it is clear that the

21    moment has not yet arrived where a non-fiduciary's fees

22    could be justified to be paid out of estate property.

23          Now we believe that that's true across the board

24    where we are in this case.  We haven't got an RSA yet.

25    Obviously there is no, as Mr. Huebner discussed, new money

1    or secured financing that often accompanies a non-503(b)

2    payment of fees.  I think what you do see across the board

3    in all of those cases though is a relatively broad creditor

4    or party in interest consensus behind a pathway that appears

5    like a promising way to a prompt exit.

6              In this case we don't have that at all.  We have

7    many creditor groups that have looked at the settlement

8    framework and have said, it's interesting.  We want to

9    examine it.  It may be something that makes sense in these

10   cases.

11             Your Honor, that's what the ad hoc committee is

12   saying.  They're not yet signed on to that deal.  They want

13   to diligence it like everybody else.  So we're not at that

14   stage, we submit, for any kind of arrangement.  But this

15   particular arrangement that's being proposed, Your Honor,

16   the official committee submits is especially extraordinary.

17             The proposal is that for this one non-fiduciary

18   group estate property will be used to pay four separate law

19   firms for a single client, FTI plus two other financial

20   experts.  And I'll get in a minute to the change that they

21   made to how Compass and Culture are going to be paid.  But

22   to us it appears to be a distinction without a difference.

23   So you're really talking about seven professionals.  And it

24   looks like they're going to try and hire an investment

25   banker to make it eight at some point in the future,

Page 99

1    although they're going to come back with a different motion

2    for that.

3           So they are before Your Honor not just asking to

4    pay a non-fiduciary's fees in very unusual circumstances,

5    but to ask Your Honor to approve paying seven professionals

6    for a single client in very unusual circumstances.

7           Now Mr. Huebner said something suggested that it

8    would somehow be a breach of trust if these fees are not

9    paid.  He made his promise.  Of course, Your Honor, Mr.

10   Huebner knows as the Court does that the only thing Mr.

11   Huebner could promise was to make this motion.

12          And moreover, Your Honor, the ad hoc committee

13   that he was negotiating with when they came up with this

14   seven or eight professional arrangement is represented by

15   highly experienced and sophisticated counsel.  They are in

16   the room today.

17          It cannot have been a surprise to them that there

18   could be headwinds for a motion of this kind at this stage

19   in the cases, particularly when you are insisting on seven

20   or eight professionals representing a single non-fiduciary.

21          The committee was prepared to be reasonable in

22   this, but no compromise could be reached before today.  That

23   leaves the debtors in the unenviable position not only of

24   having to carry their burden of proving this is in the best

25   interest of the estates to pay a non-fiduciary at this stage

Page 100

1    in the cases, but to pay the fees of seven professionals for

2    a non-fiduciary at this stage in the cases.  The official

3    committee submits they can't do it and they haven't done it.

4            I want to talk about the standard for a moment.

5    So Mr. Huebner referenced the Orion case which is a case

6    that Your Honor has yourself cited in describing how the

7    business judgment standard is applied within this Circuit.

8            According to Orion, "Bankruptcy Courts sit as an

9    overseer of the wisdom with which the estate's property is

10   being managed."

11           The Second Circuit in the Nastas (ph) case citing

12   Orion provided, "Assumption of a contract requires a

13   judicial finding up front that it was in the best interest

14   of the estate and the unsecured creditors for the debtor to

15   assume the contract."

16           This is not a deferential standard.  It is a

17   standard that requires the Bankruptcy Court to step in,

18   examine the evidence and reach an independent conclusion

19   about whether the proposed decision is in the best interests

20   of the estate.

21           Now, when examining whether a proposed decision is

22   in the best interests of the estate, of course it is

23   necessary to consider, not just potential benefits, but also

24   potential burdens of the decision.

25           On the burden front, the Debtors' motion fails

Page 101

1    completely with any evidence.  The Debtors did not come

2    forward with any projections; that's how much they think

3    this is going to cost.

4          The ad hoc committee, in its papers, also didn't

5    submit evidence, a declaration or anything.  But, in their

6    brief, they say that probably it'll be a million and half to

7    two million dollars just for the four law firms, per month;

8    another million per month for FTI and they don't say

9    anything about how much Colter and Compass are going to cost

10   going forward.  Let's just assume, for sake of argument,

11   that it's $3 million a month.

12         So if this goes on for say six months, we're

13   talking about probably close to $20 million in fees over

14   that period of time.

15         And the question is what can we be sure, at this

16   stage of the cases, are the estates going to get in return

17   for that $20 million.  And the answer is nothing.  Okay?

18         They refer to the fee letter to say that there are

19   some obligations on the part of the ad hoc committee here

20   but there really aren't.

21         What the fee letter says is that the ad hoc's

22   professionals only will get reimbursed if they do certain

23   things.  They don't have to do those things.  But, if they

24   want to get paid, they have to do work within the scope.

25         That scope includes doing the diligence that A lot

Page 102

1    of other parties in here also want to do to try to evaluate

2    whether the settlement framework makes sense in these cases;

3    whether it's something that the parties really want to

4    advance to a final deal.  That's part of it.

5         But this is really important. Part of it, and the

6    Debtors have been really up front about this, and the ad hoc

7    committee has been really up front about this, they except

8    the estates for pay for them, to negotiate allocation, their

9    groups against all the other groups, okay?

10        So that means, as a practical matter, Your Honor,

11   we could be in a position; I hope we won't, and I'm not

12   saying we will, but it's a risk, that this group of ad hoc

13   folks with their seven professionals are billing the estates

14   for six months or eight months, diligencing the case, try to

15   negotiate a deal that's acceptable to them and they can't.

16   And everybody else, but the ad hoc group, says we think we

17   have a path to exit.  Here's the plan we want to proceed

18   with.  The ad hocs, at that juncture, after getting 20, 30

19   40 million dollars of estate money can say, I don't like it.

20   And now not only am I not going to aid an early, an early

21   reorganization, I'm going to spend the next six months

22   fighting it.

23        Like I said, I hope that doesn't happen but it

24   could happen.  And how do you avoid, how do you be sure,

25   that that doesn't happen in a case like this?

Page 103

1          The code and the bankruptcy case law provides an

2     answer.  So one way is through 503(b).  You don't actually

3     pay the non-fiduciary's fees until they have actually been

4     able to come to the Court and demonstrate I actually did

5     what I said I was going to do.

6          The Court knows, at that point, and they can make

7     a judgment about whether that warrants payment.

8          Another possibility was with respect to an RSA,

9     new financing, new money; where there is some kind of

10    concrete commitment; with some kind of concrete steps that

11    are going to be taken, that people can get behind.

12         And, again, we're in a situation where there is

13    not one single party that has stood and said that it

14    currently believes the settlement framework is in the best

15    interests of the estates.  Not the Debtors, not the ad hoc

16    committee.  That doesn't mean it's not but we're not there

17    yet.

18         So that's part of the, I guess, the potential

19    downside that's you wind up spending a lot of money and

20    getting nothing from it.

21         But I want to talk a little bit about in the best

22    interests balancing, the benefits that the Debtors say go

23    along with granting this motion.

24         So they put them really in two buckets.  There's

25    the buck of benefits that they say have already been

Page 104

1    conveyed by the ad hoc committee and that bucket includes

2    advancing the settlement negotiations towards the framework,

3    supporting the injunction, obtaining disclosures from the

4    Sacklers, among others, and with respect to those items,

5    they say that, for instance, they believe that the ad hoc

6    committee support for the injunction was very important to

7    it being granted.

8              There's only person in this room that can answer

9    that question.  But we'll assume, for the sake or argument,

10   their a hundred percent right about that.

11             And although it seems like there may be a little

12   bit of revisionist history about who was involved in getting

13   us as far down the field as we are, I think it was more than

14   just the ad hoc committee, but I'm sure they had a valuable

15   influence on that process and they also were helpful in

16   obtaining disclosures from the Sacklers and we appreciate

17   all of that work.

18             But assuming that everything they say about those

19   kind of cost benefits is a hundred percent accurate, Your

20   Honor, there's still past benefits.  They are things that

21   have already been done and so that's what a substantial

22   contribution motion is for.

23             And, in fact, Your Honor, the U.S,. Trustee said,

24   in their papers, look, it's too early to know whether or not

25   the ad hocs are going to make a substantial contribution.

1    And Debtors responded specifically by saying you're wrong.

2    We know already.  They did these three things.

3           Well, if that's the case, Your Honor, that's what

4    503(b) is for, substantial contribution would be appropriate

5    for those kind of past benefits.  They don't justify go

6    forward fees.

7           Now with respect to the benefits that the Debtors

8    say will accrue to them if the motion is granted going

9    forward, and I want to talk about them in two ways.

10           First, and I'm going to get to this in a minute,

11    these benefits, of course, are material to the extent that

12    the actual relief sought by the motion is necessary to get

13    them, right?

14           And the Debtors say something like this in their

15    papers that they bring this motion, something like "to allow

16    the ad hoc committee to participate and continue its role in

17    these cases".  Okay.

18           And in a minute I'm going to talk about why I

19    think they haven't carried their burden to show that the

20    relief they seek is actually necessary to get any of these

21    benefits.

22           But I want to go through them quickly.  These are

23    the kind of go forward items that we've heard Mr. Huebner

24    discuss.

25           So first is continuing to gather discovery from

Page 106

1    the Sacklers.  We encourage them to do that.  We hope they

2    will alongside the official committee alongside the non-

3    consenting estates committee and a lot of other parties, who

4    all also are going to be doing that.

5             The official committee has a stipulation.  The

6    non-consenting group is working on a stipulation that would

7    get them access to the same information.

8             We welcome the ad hoc committee doing the same

9    thing as well.

10             But there are others that are working on the
     same thing.

11             Using their police powers to "leverage" a better

12    deal from the Sacklers.  Of course, the ad hoc committee

13    members aren't the only members, constituents in this case

14    that have police powers.  The constituent members of the

15    non-consenting group to some of the members represented on

16    our -- as I've -- on our committee do as well now and, to

17    some degree, it's really the non-consenting estates that in

18    a way would have more credibility about trying to increase

19    the value of the settlement because, unlike the ad hoc

20    committee, they've said, we're not agreeing to this unless

21    it gets better.

22             So, there will be help there even if for whatever

23    reason the ad hoc committee decided they weren't going to

24    continue based on this motion which is, I'll get to in a

25    second, I think is implausible.

1              They say that is saves an administrative burden to

2    have the ad hoc committee involved and they say without the

3    ad hoc committee, they would have to communicate separately

4    with thousands of municipalities and tribes.

5              But, Your Honor, at the same time, they say it's

6    the PEC speaks for those thousands of administrative -- of

7    municipalities and tribes., right?  I mean, that's why the

8    ad hoc committee is helpful is because the PEC is on it and

9    they contend, I don't know whether it's true or not, but

10   they contend that the PEC is the voice for those thousands

11   of municipalities.  Obviously the PEC isn't going to disband

12   depending on what happens with this motion.

13             In addition, they say they would have to work with

14   dozens of different States, 24 of them are organized in a

15   different group, 10 States of privately engaged with Kramer

16   Levin.  So, there are -- the States are organized in other

17   ways in addition to the ad hoc group.

18             And then finally they want the ad hoc group to be

19   involved, to be able to turn the settlement framework into a

20   confirmable plan.

21             Again, we're just, you know, in the official

22   committee's view, not close to being -- having a consensus

23   of creditors that are ready to say it's time to move this to

24   a confirmable plan.  I think everybody wants to do what the

25   ad hoc committee is saying it's going to do, to learn more

Page 108

1   about the settlement framework and decide whether it makes

2   sense to advance it to a confirmable plan.

3          And there is a concern among some quarters that by

4   agreeing to pay fees for a party that at least has suggested

5   it might support the framework that kind of puts the thumb

6   on the scale in that direction, it may be the right outcome

7   eventually but I think that determination is still a long

8   ways off.

9          Now I want to turn to the question -- and, again,

10  we hope the ad hoc committee participates and we think they

11  can bring things to the table but from the official

12  committee's perspective it hasn't been shown -- not just

13  hasn't been proven, but it hasn't even been indicated that

14  it's plausible that this -- the relief that's on today, an

15  order requiring the estates to pay the ad hoc committee's

16  fees on a current basis, like maybe they could come back

17  later, but on a current basis that that somehow was going to

18  result in the ad hoc committee diminishing its participation

19  in these cases.

20         There's some reasons given for why that might be

21  true.  I don't think they really withstand much scrutiny.

22  There's been a suggestion that states and municipalities

23  can't pay private attorney's fees and there'll be a lot of

24  evidence that that's not true.

25         You have the non-consenting group that has a law

1    firm working for it.  They're not here asking for their

2    fees.

3              If you look at the exhibit for the by-laws of the

4    consenting group you can see that virtually all of the

5    municipalities have engaged private counsel one way or the

6    other.  So that doesn't seem likely.

7              But I think more fundamentally you have -- when

8    you're thinking about the question of is the outcome of this

9    motion going to be dispositive about the participation of

10   the ad hoc committee, you have to look at what the ad hoc

11   committee and its constituents are themselves saying, okay?

12             The ad hoc committee filed papers on Friday and

13   one of the things that they said in their papers, it's a

14   theme that they've repeated and I've heard it repeated again

15   here by counsel for the Debtors, is this idea that they

16   believe because government entities don't sit on the

17   official committee that the official committee cannot

18   represent governmental units interests.

19             We've, the official committee, has assured and

20   reassured that we believe that is untrue.  We recognize our

21   fiduciary duties to all creditors.  Black letter law that

22   even -- that non-members enjoy that fiduciary obligation

23   just as much as creditor classes that are represented on the

24   committee.

25             We certainly have not, as suggested in one of the

Page 110

1    submissions, reached a conclusion about allocation.  We've

2    cited a study about the sort of 70 percent private versus 30

3    percent public breakdown, really to push back on the

4    contention that was made in the papers suggesting that the

5    ad hoc represents the majority of creditors.  It hasn't been

6    determined yet and the official committee has, in no way,

7    shape or form, taken a position.  But clearly it's not

8    certain on either side.  That's the reason we've cited that.

9           We also have gone out of our way to add as

10   (indiscernible) members the representative of municipalities

11   and the tribes to get their perspective.  So we are 100

12   percent confident that the official committee can represent

13   those interests.

14          But, for purposes of this motion, you have to take

15   at face value what the ad hoc committee is saying its

16   constituents believe and they say flatly that its

17   constituents believe the ad hoc committee is "essential"

18   because they believe the official committee can't represent

19   their interests.

20          Those interests, Your Honor, the constituents of

21   the ad hoc committee valued it multiple billions of dollars.

22   So the notion that if they really believe the ad hoc

23   committee is essential to representing those multi-billion

24   dollar valued interests that they would walk away from or

25   disband the ad hoc committee, the essential ad hoc

1    committee, over a dispute about whether their fees are going

2    to be paid now or potentially later, is, in our view, highly

3    implausible.

4         And if the ad hoc committee is going to

5    participate in these cases anyway, how can it be in the best

6    interests of the estate to pay for what they're going to get

7    anyway when you've got the ad hoc committee saying, we have

8    to be here because the official committee can't represent

9    us.

10        They've been involved for months without having

11    their fees paid by the estates.  I don't think there is a

12    scrap of evidence on the record that suggests that that's

13    going to change depending on the outcome of this motion.

14    And, again, we're not saying they'll never have an

15    opportunity to get paid by the estates.  There may come a

16    time that they have actually done and supplied the benefits

17    they say they're going to.  We can all come back here and

18    maybe, at that time, they satisfy 503(b) or otherwise.  So

19    this isn't necessarily the end.

20        So I want to come back briefly to the specific

21    terms of the engagement that has been proposed.  Again, you

22    know, we've obviously argued that we don't think really any

23    arrangement is appropriate yet.

24        But the arrangement that they're suggesting now is

25    particularly difficult for us to understand.  There are four

1   law firms as I mentioned before, each of those four law

2   firms simultaneously represents a creditor of Purdue, either

3   in this bankruptcy or otherwise in respect to the opioid

4   crisis.  That obviously is going to create some concerns

5   about conflicts going forward.  It's clear that the ad hoc

6   committee itself has thought about that.  Their by-laws

7   include a provision that frankly is unlike anything I've

8   ever seen that says that in the event that a member can

9   instruct one of those four law firms to take an action

10  that's contrary to the interests of the ad hoc committee

11  and, if that happens, their -- the other members can seek to

12  disqualify.

13          You know, obviously, it also says that they're

14  going to adhere to all of their professional obligations and

15  I'm sure they will but it's a very difficult situation for a

16  lawyer to be put in where that kind of conflict is

17  anticipated and it doesn't result in the usual agreement

18  which is the lawyer that represents two clients has to

19  withdraw from one of them.  It's the opposite.  It says, you

20  know, you can continue to act adverse to one another.  You

21  just have to do it within the bounds of your professional

22  obligations.

23          I'm not quite sure what means or how that would

24  happen but it -- a difficult position at least.

25          Also a real risk that --

Page 113

1                THE COURT:  They don't get for that though, right?

2                MR. HURLEY:  What's that?

3                THE COURT:  They Don't get paid for representing

4     individual clients.

5                MR. HURLEY:  That is -- that's the idea.

6                THE COURT:  I think it's actually in writing in

7     the order.

8                MR. HURLEY:  Right.

9                THE COURT:  So it's not an idea.

10               MR. HURLEY:  Correct.  That would be the

11    requirements.

12               THE COURT:  Okay.

13               MR. HURLEY:  I think that in practice it would

14    difficult for them to be able to divide this up and they

15    actually say something about this that I think is pretty

16    relevant.  By they, I mean the ad hoc committee.

17               At page -- paragraph 63 of the ad hoc committee's

18    submission on Friday, they say that if the motion isn't

19    granted there can be guarantee that the ad hoc committee

20    itself will continue to play the vital role it has played to

21    date or even exist in its current form if it is forced to

22    confront difficult issues of fee allocation among multiple

23    groups of creditors, the state, tribes and municipalities,

24    whose interests are frequently at odds.

25               So the ad hoc committee itself appears to be

1    acknowledging that it's going to be difficult some times to

2    know whether one of those four firms is doing something for

3    the ad hoc committee or for one of its members.

4            THE COURT:  Is that how you read that statement?

5            MR. HURLEY:  That is how I read that statement.

6            THE COURT:  Really?  I view it -- and this goes

7    back to something you said earlier which is that this motion

8    is largely, if not entirely, about setting the structure for

9    how the states deal with this case.

10           And the question for me is the cost of that

11   structure worth it or not.

12           And I think if you don't have that structure where

13   they actually do have a coordinated set of professionals you

14   run the risk, as they say in their pleading, of -- as

15   happened at the last hearing, someone just popping up and

16   saying, well, I'm from "X" county and "X" state and we

17   disagree with all of this.

18           And I think the more you have the structure, the

19   less that happens.

20           MR. HURLEY:  Your Honor, and I -- the official

21   committee recognizes that dynamic and we have sought to be

22   reasonable.  We have not been able to obtain a compromise

23   which is why I'm coming back to the specific engagement

24   they're asking Your Honor to adopt which includes the seven

25   professional firms.

Page 115

1           THE COURT:  Well, I'm not asking you to suggest

2     any or relate any settlement discussions.  But if you're

3     just proposing an all or nothing approach, either grant the

4     motion or deny it, then you run a big risk that I'll grant

5     it.

6           So maybe you suggest how this could be improved.

7           MR. HURLEY:  Sure.  So we've had multiple kinds of

8     discussions --

9           THE COURT:  No. No.  You don't need to get into

10    the discussions --

11          MR. HURLEY:  Oh.

12          THE COURT:  -- just how does the committee think

13    this could be improved?  Without waiving any of your rights

14    to object --

15          MR. HURLEY:  Understood.

16          THE COURT:  -- to the whole thing, of course.

17          MR. HURLEY:  Understood.

18          THE COURT:  All right.

19          MR. HURLEY:  Okay.

20          So the official committee, as Your Honor knows,

21    has been very very focused on the emergency relief fund from

22    the beginning of these cases.  And we have -- and I --

23    Mr. Preis may interrupt me to get some color on this because

24    he is more closely involved in the negotiations than I was,

25    but one of our thoughts was that the emergency relief fund,

Page 116

1    if we could get adequate support from the ad hoc committee

2    for moving that forward promptly that that might be a way to

3    resolve the objection so that we have money going out the

4    door to the people that really need it in the opioid crisis

5    before we're talking about more and more money for lawyers.

6    That was an idea.

7              THE COURT:  Okay.

8              MR. HURLEY:  Arik, do you want to -- do you have

9    anything to add?

10             MR. PREIS:  Can I address -- I know it's a little

11   bit irregular.

12             THE COURT:  Well, and I get that point.  If

13   there's some other point, I --

14             MR. PREIS:  No.  Well, Your Honor, we also --

15   obviously we had talked about, again without getting into

16   settlement negotiations.

17             THE COURT:  Right.

18             MR. PREIS:  But as a committee there are other

19   things that were important to us; things like should there

20   -- would we be okay with as the U.S. Trustee says

21   substantial contribution motions being filed.

22             Obviously that would have been fine with us as

23   well, you know, on a quarterly basis.

24             THE COURT:  Okay.

25             MR. PREIS:  The issue of -- just to go a little

Page 117

1    bit further on what Mr. Hurley said, which is that instead

2    of tying the emergency relief fund to this motion, what we

3    had suggested was perhaps allowing a work fee for a certain

4    period of time, call it 30, 50, 60 days but then having the

5    emergency relief fund and this motion rise and fall together

6    at the same time, at some time in January the idea being we

7    understand that they need to do work for a while but, at

8    some point, at some critical juncture, that has to stop.

9              We also thought and talked about size, scope,

10   number of firms, number of -- you know, capping amounts.

11   None of those things -- you know, we addressed them all both

12   as a committee and during settlement negotiations.  None of

13   which really got any traction.  So --

14             THE COURT:  Although I can that -- those points to

15   my mind are largely dealt with by the agreement for review

16   like all estate professionals are being reviewed.

17             MR. PREIS:  So if I could just address --

18             THE COURT:  I mean, I -- I'm not that proud of it

19   but I think I have the largest fee denial in history.

20             MR. PREIS:  I object, Your Honor.

21        (Laughter)

22             THE COURT:  And believe it or not it was Harvey

23   Miller's fee as an investment banker.  So --

24             MR. HURLEY:  I argued that motion.

25             MR. PREIS:  It was one of my objections, Your

1    Honor.

2              MR. HURLEY:  I argued that motion in front of you,

3    Your Honor.

4              THE COURT:  I know.  I remember.

5              MR. HURLEY:  Anyway.  Okay.

6              THE COURT:  It wasn't because of bad work you did.

7    It was just, as you know --

8              MR. HURLEY:  I remember.

9              THE COURT:  -- it was on different grounds.

10   But --

11             MR. HURLEY:  I remember.  So -- okay.  So if I

12   could just go through some of the changes that were made and

13   one of them is what you just referred to which is that now

14   there's going to be the opportunity for the committee to

15   review their --

16             THE COURT:  Well, everybody.

17             MR. HURLEY:  For everyone to review their bills.

18             THE COURT:  Right.

19             MR. HURLEY:  I mean, from the official committee's

20   perspective, of course, Your Honor I'm sure would gather not

21   satisfactory to us on this motion because our view on this

22   motion is that paying on a current basis in the first place

23   isn't appropriate and really what this would call for is

24   that as long as they can prove that they're acting within

25   the scope, which is somewhat vaguely defined, that the fees

Page 119

1    are going to get paid subject to some other qualifications.

2    So it's not satisfactory to the official committee but

3    that's really fundamental to the objection we're making

4    today.

5            I do think that some of the other changes like

6    that they're saying that if they can't get paid for

7    duplicative work that's sort of to use your term ice in

8    winter, they can't get paid for duplicative work anyway.  I

9    presume that would be sort of per se unreasonable if we

10   could identify things that were actually duplicative.

11           The notion of sharing FTI with the other states,

12   we think is a great idea.  But it's limited in that they

13   only -- it's subject to areas where they have common

14   interests with the non-consenting group.  Presumably, there

15   will be a fairly wide range of areas where they don't have a

16   common interest group.  But, moreover, the official

17   committee has made the same offer to all the creditors

18   including the states that, to the extent it's consistent

19   with the privilege, they will have access to province to to

20   Jeffries (ph).

21           The pre-petition cap of fees at 1.5 million was

22   surprising I guess to me partly because they in their 1219

23   statement, the ad hoc committee acknowledges that it was

24   initially formed on the petition date.  So it's hard for me

25   to understand how fees incurred before the client existed

Page 120

1    could be subject to reimbursement and to the extent they are

2    that again seems like the 503(b) paradigm.  It's like, well,

3    if it's already been done by definition rather than through

4    a motion of this kind.

5              THE COURT:  Well, of the RSA paradigm.

6              MR. HURLEY:  Or the RSA paradigm essentially.

7              THE COURT:  And it doesn't kick in until you have

8    an RSA or a --

9              MR. HURLEY:  Oh.  The -- I guess it goes with a --

10             THE COURT:  Well, you said you were going to

11   address the financial types beyond FTI.

12             MR. HURLEY:  Yes.  So the way the order reads is,

13   you know, it was a little confusing to me but it seemed like

14   what they're providing is, like I said, a distinction

15   without a difference for Compass and Colter.  The motion

16   does currently seek approval of retention of Compass and

17   Colter on a current basis.

18             They then say in the same paragraph that describes

19   the application process for the law firms and FTI, later in

20   the paragraph they say no fees will be paid to Compass or

21   Colter except in connection with an order in connection with

22   an application referred to above which seemed to me like

23   they were just saying you have to make an application for

24   payment of Compass and Colter as you do with respect to the

25   other five.

Page 121

1           I mean, I don't know if that's what they meant but

2    it was certainly how it read.

3           THE COURT:  I mean, I didn't --

4           MR. HURLEY:  And maybe we'll get clarification on

5    that.

6           THE COURT:   I didn't think -- I thought it was --

7    because that would have circular.  I thought it meant that

8    they don't get paid except on a separate retention.

9           MR. HURLEY:  Like a separate 363, 365 motion?

10          THE COURT:  Well, maybe you can just clarify.

11          MR. HUEBNER:  Yeah.  Sure.

12          Your Honor, it's actually in the middle of those

13   two things.  So let me just (indiscernible).

14          So, you know, we said four law firms, three FAs,

15   can we do something here.  And they said well, two of them

16   aren't even working right now.  And I said well, then, why

17   are we -- why does the initial draft of the paper say I

18   don't need these three FAs.  And so what we ended up with is

19   it's a hybrid which is we don't need to come back and make a

20   new motion because that's a lot of expensive paperwork that

21   makes no sense.

22          It's not circular and it's not a typo.  It's quite

23   in fact I think reticulated because they can't submit the

24   monthly bills if they start and get paid under the regular

25   monthly process.  They can't get paid a penny unless at the

1    next succeeding quarterly application, when everyone else's

2    fees are up, there's an explanation of Your Honor they

3    started work 41 days ago.  Here's why we need them.  Will

4    you allow them to be paid?

5             And if the Court says you know what, this start up

6    was not appropriate, then I'm denying it all.  They're not

7    getting paid anything and they lose the weeks that they

8    worked because they're not getting anything in the interim.

9             If you're -- I was just trying to save paperwork.

10   To make a separate motion for these two small firms when if

11   they start up they're not getting one red cent until -- one

12   penny until Your Honor has it front of you.  That was the

13   compromise we thought was quite sensible.

14            THE COURT:  Well -- so maybe the distinction then

15   is one that isn't necessarily in the code which is that --

16   well it is in the code but maybe not honored in practice

17   which is that as part of the reasonableness of them getting

18   paid is the reasonableness of them starting up work in the

19   first place.

20            MR. HUEBNER:  No.  And that's exactly -- that's

21   exactly why we did this which is we said to them you're

22   going to have to explain at the application if turns out

23   there was specialized work that I could not do alone, so we

24   restarted them and if Your Honor is not convinced and people

25   object, they will not get paid.  That was the exact

Page 123

1    approach.

2            But to file a whole new motion to say that when a

3    month or two later -- so we said no; just make them work

4    without current pay until the next application so we don't

5    have to another hearing and another motion and more wasted

6    money on nothing.  I actually did (indiscernible)

7    respectfully is actually quite thoughtful and does the job

8    that Mr. Hurley --

9            THE COURT:  Okay.  All right.

10           MR. HUEBNER:  -- and I and you are talking about.

11           THE COURT:  Okay.

12           MR. HURLEY:  Can I ask a clarifying question?

13           THE COURT:  Sure.

14           MR. HURLEY:  Would there be any limit to the

15   nature of the kinds of objections that could be made to

16   either the fact that they (indiscernible) or the amount that

17   you're proposing to pay them?

18           MR. HUEBNER:  No.  We -- no.  To be clear.

19   Nothing in this order limits any party.  As Your Honor often

20   says you can make a motion.  But you see lots of heads

21   nodding that Mr. Hurley is right.  If the objection is they

22   never should have started, this is wholly duplicative, and

23   I'm assuming the ad hocs will probably call a few people and

24   say, hey, just so you know, it turns out there's an

25   (indiscernible) tax question that we need this firm for that

Page 124

1    FTI can't answer, so we're going to start them.

2            And then we will say or the committee will

3    certainly say we reserve our rights.  We'll see you at the

4    application.  And if we don't think it's justified, we're

5    going to be objecting on all grounds including that you

6    didn't them at all and that it was the least -- it was not

7    the most cost effective way.

8            But I am speaking for a bunch of people here.  So

9    I'm looking for people to say like yes, Mr. Huebner, that's

10    sounds quite correct.

11        (Laughter)

12            MR. HUEBNER:  It sounds generally correct.

13        (Laughter)

14            THE COURT:  All right.

15            MR. HURLEY:  So just I guess wrapping up the

16    number of professionals has been a bit of a concern to the

17    committee.  And coming back to the question that Your Honor

18    asked about ways that we have considered that might make it

19    more reasonable.  We named a few of them.

20            Another that we certainly considered to be more

21    reasonable if there was a, for instance, a single

22    independent law firm representing the ad hoc group and one

23    or two advisors shared equally among all the states.  I

24    doubt we'd still be standing here if there was anything

25    closer to that.  But that's not what we have despite

Page 125

1    everyone's I'm sure best efforts.  We have the motion that

2    we have and we certainly object to that.

3            But just finally I guess I've been a bit of a

4    broken record on this the objection is not to the

5    participation of the ad hoc group.  We have -- we are

6    looking forward to working along side them; just to their

7    payment of their fees and just the payment of their fees

8    now.

9            Arik, do you need to address something?

10           MR. PREIS:  Yeah.

11           THE COURT:  You can stay there.  You don't need to

12   -- that mic will --

13           MR. HURLEY:  Unless Your Honor has some questions,

14   I'll --

15           MR. PREIS:  Your Honor, this is not by way of

16   argument but there are a number -- I don't want to really do

17   this but Mr. Huebner testified a number of times from the

18   podium earlier.  He said a number of things that were

19   affectively directed at me and at us about things that we

20   did or that we took part in that I happened to know what

21   happened.

22           So I don't want to get into a he said, she said

23   with him but -- and I prefer just to leave it at that or I

24   can explain to you kind of some of the things he said that

25   were just factually incorrect to us.

Page 126

```
 1            So again I don't want to have to do this but I --

 2    if you don't want to -- it's -- it doesn't change the

 3    argument we made but there were some things he said that

 4    were just --

 5            MR. HUEBNER:  Well, let me help for a second.  I

 6    certainly never planned to speak.  I don't think I wrote any

 7    of those down.

 8       (Laughter)

 9            MR. HUEBNER:  Let me just --

10            MR. PREIS:  Thank you.

11            MR. HUEBNER:  Let me say one thing.  To the extent

12    that I inaccurately or incorrectly described a conversation

13    with the FTCC stipulation, I apologize if I misspoke that

14    way Mr. Arik believes.  I don't think they're germane and

15    relevant and I didn't write them down anyway.  But I'll

16    figure out later where I might have misspoken.

17            MR. PREIS:  Okay.  Thank you.

18            THE COURT:  All right.

19       (Pause)

20            MR. SCHWARTZBERG:  Good afternoon, Your Honor.

21            Paul Schwartzberg for the U.S. Trustee's Office.

22            As Your Honor is aware, the Debtors moved under

23    363 and 365 to pay the professional fees of the ad hoc

24    committee.

25            The U.S. Trustee, however, believes that the code
```

1    has a more specific standard to pay the fees of an ad hoc

2    committee and that would be under 503(b)(3)(d) and (4) which

3    require the ad hoc committee to show a substantial

4    contribution before their fees can be paid.

5            And this insures that the Debtor received a

6    benefit from the ad hoc committee before its fees are

7    actually paid.  And this is higher standard than the Debtors

8    just -- are suggesting and we believe if you contrast -- and

9    the reason for that higher standard becomes obvious we

10   believe when you contrast it to what you see with the

11   official committee.

12           With the official committee you're having a

13   neutral third party, the U.S. Trustee, appoint that

14   committee under 1102.  The professionals of that official

15   committee are then vetted.  They have to file applications

16   under 327 and make disclosures under Rule 2014 and this

17   governs to make sure there are no disqualifying conflicts

18   that those professionals have.  And then their fees, of

19   course, are subject to 330 and 331, and those standards.

20           And the that committee has an obligation to the

21   estate and all creditors, a fiduciary obligation.  But you

22   don't have that with an ad hoc committee.  In fact, the

23   proposed order specifically disavows 327 and that rigorous

24   standard for the committee professionals.

25           So we believe that's the reason why the code set

1    forth 503(b) and a higher standard for the payment of the

2    fees of an ad hoc committee and we believe that there's a

3    specific standard set forth in the code and that that

4    specific standard is the standard that the Court is --

5    should follow and not the more vague and less direct

6    standard that's set forth under 363 and 365.

7                    THE COURT:  Okay.

8                    MR. SCHWARTZBERG:  And for that reason we object

9    to the motion.

10                   THE COURT:  Okay.

11                   MR. NEIGER:  Good afternoon, Your Honor.

12                   THE COURT:  Good afternoon.

13                   MR. NEIGER:  Edward Neiger of ASK LLP on behalf of

14   the ad hoc committee of individual victims in this case.

15                   We are very grateful to be here.  And before I get

16   into the substance of the objection which I assure Your

17   Honor after reading the briefs will be short.

18                   Since this is my first time appearing or the

19   committee's first time appearing in this case, we were

20   hoping for a brief indulgence to tell Your Honor a little

21   about the committee and its members and, more importantly

22   how it can make a positive contribution to these cases.

23                   The ad hoc committee is made up of a committee of

24   individuals that is made up of just eight members.  Seven of

25   the eight are victims of Perdue.  The eighth represents

Page 129

1    victims of Perdue who at least for now wish to remain

2    anonymous.

3              Each member is active in helping people suffering

4    from addiction and their families and works tirelessly to

5    prevent others from suffering they way they did.

6              Our members include a former governor and attorney

7    general as well as leaders of national prevention awareness

8    and recovery organizations including the CEO of Center on

9    Addiction which is the successor organization to the

10   partnership for a drug free America, which I'm sure Your

11   Honor is familiar with.  And they reach tens of millions of

12   people a year.

13             Other organizations that are members have

14   leadership roles and include team sharing, which is a

15   national non-profit organization dedicated to parents who

16   have lost children to substance abuse disorder; the

17   foundation for recovery, an organization dedicated to

18   removing social barriers and creating opportunities for

19   those seeking long term recovery; soldiers, a grassroots

20   organization helping individuals and families overcome

21   addiction, depression and homeliness and the voices project,

22   a non-profit organization, a national one, dedicated to the

23   eliminating the stigma associated with addiction.

24             Several of our committee members have suffered the

25   unthinkable; the loss of a child to overdose.  One of these

Page 130

1    members is here today and was sitting right next to me in

2    the last row.  Her name is DeeDee Yoder (ph) and if I could

3    just tell her story very briefly, not to be dramatic, but to

4    be able to give Your Honor an idea of where the committee is

5    coming from when it takes positions in this case; whether on

6    the matter before Your Honor today, or in the future.

7            Ms. Yoder was a single mom of an incredible son

8    named Chris.  Christ was her only child and was her entire

9    world.  Chris was a happy, smart and social kid who loved

10   the outdoors, love roller blading and skate boarding.

11           When he was 14, he broke his knee and had surgery.

12   It was just an accident.  It could have happened to any

13   teenager.

14           His doctors have him OxyContin for the pain and,

15   like so many others, he became addicted.  Chris spent his

16   high school years battling the addiction that started with

17   that very first dose.

18           Ms. Yoder did everything she could to save her

19   son's life.  That took a huge emotional and financial toll

20   on her but she never stopped fighting for Christ; no matter

21   what.

22           On April 19, 2017, DeeDee received the call that

23   so many parents of children fighting addiction dread.  She

24   was in the middle of a business meeting in Paris when it

25   came.  The voice at the other end of the line told her

Page 131

1    matter of factly, ma'am, there's no easy way to say this but

2    your son is deceased.

3            Chris was 21 years old.  He dies of an overdose of

4    heroin laced with fentanyl.

5            DeeDee is now an ambassador for Shatter Proof, a

6    national non-profit organization dedicated to reversing the

7    addiction crisis in America.

8            There's one more person, one more mother, in the

9    courtroom today and I don't have a long speech about here

10   not because she's not as important or I don't like her as

11   much but because I didn't know she would be here when I

12   drafted this text.

13           But I would be remiss if I didn't acknowledge her.

14   She came all the way from Boston, drove four hours to be

15   here today, Ms. Kay Scarpone, she's sitting in the second

16   row from the back, the third person from the right and I

17   would just like to acknowledge her son in the record, on the

18   record.  Kay lost her son, Joseph Scarpone, who was a U.S.

19   Marine.  He served our country from 2007 to 2011 including a

20   tour in Afghanistan.

21           When he got back from it, he was a Marine

22   Sergeant.  When he got back from Afghanistan, he was injured

23   and went to the VA where they gave him opioids.

24           Sadly, Joseph Scarpone died when he was 25 of

25   overdose and I know that Kay misses him dearly every day.

Page 132

1              So that's who we are, Your Honor.  We hope to

2      advocate for the individual victims in this case who have

3      suffered terribly.

4              But more importantly to make sure that no more

5      mothers go through what DeeDee and Kay went through ever

6      again.

7              Turning to the substance of our objection to the

8      Debtors' motion.  I think at best at this point my time and

9      everyone's time would be most useful if instead of going

10     through the objections I provide Your Honor and the other

11     parties here with ideas on how I think the order could be

12     approved.

13             In the revised order, the Debtors have -- sorry,

14     Your Honor.  I was on line for an hour.

15             In the revised order, the Debtors have put in a

16     provision that says that the ad hoc committee cannot use any

17     funds being paid by the Debtor to object to other creditors

18     in this case and I appreciate that.  I think that's an

19     improvement.

20             It shows that the Debtors acknowledge that

21     notwithstanding all the good that the states have done so

22     far, both consenting and non-consenting, which I acknowledge

23     strongly.  We would not be here today if not for all of the

24     hard work that the states have done.  They have essentially

25     brought Perdue to its knees and before Your Honor in the

Page 133

1    Bankruptcy Court which we think is a great thing, both for

2    the Debtor and for all the creditors.

3              So we say thank you to the states.

4              But it doesn't make sense for the states to be

5    able to use money from the estate to object to other

6    creditors.  I think the Debtors acknowledged that when they

7    changed the order.

8              The problem is this.  The way the states -- the

9    way the issues of allocation will ultimately get decided may

10   not come in the form of a formal objection.  It may come in

11   the form of an allocation that the Debtor and the ad hoc

12   committee put forth in a RSA or in a plan or reorganization

13   which may not come in a formal objection.

14             So what I would propose, Your Honor, is to make

15   more clear that the money that the ad hoc committee receives

16   from the estate could be used solely in connection with

17   bringing money into the estate, getting money from the

18   Sacklers or from the other sources of recovery, continuing

19   to do what they have done so well until now.

20             And that it not be used in connection with

21   anything, a formal objection or not formal objection, that

22   can hurt the other constituents, particularly the non-state

23   victims in the allocation proceeding.

24             So that would be my primary suggestion.

25             Mr. Preis mentioned the emergency relief fund.  I

Page 134

1   can tell Your Honor that that is extremely important to our

2   committee who know very well the problem that this country

3   is suffering from.  A 130 people die every single day from

4   overdose.  That's one person, every 11 minutes.  So, in the

5   time that I stood up here, one or two people have died from

6   overdoes.

7          That emergency relief fund is vital.  I don't know

8   where it stands or what's going on with it.  I just want to

9   say on the record that anything that Your Honor can do to

10  push the parties forward on that would be very much

11  appreciated by a lot of people in this country.

12         Those are the two things that I had, Your Honor.

13  Other than that, I'm happy to answer any questions Your

14  Honor has.

15         THE COURT:  Okay.  Thanks.

16     (Pause)

17         MR. MARKOWITZ:  It's Scott Markowitz, Carter,

18  Klinsky and Grogan.

19         Your Honor, we represent the ad hoc committee of

20  NAS Babies.  We appeared last time.  We joined in the

21  objection.  Some of the comments I have will be similar to

22  Mr. Neiger and it will be brief.

23         The NAS Babies are babies who were born neonatal

24  abstinence syndrome because their birth mother ingested

25  opioids during pregnancy.  There's hundreds of thousands of

Page 135

1    these babies around the United States in our group who

2    represents, in general, that group of babies we think are

3    claims in this case based upon both injuries and monitoring

4    continuing care.  It may be among the largest unsecured

5    claims in this case.

6           I'm not going to supplement any of the legal

7    arguments.  We've been here long enough.  We've heard them.

8    It's fully briefed.

9           Similar to Mr. Neiger, I would like the Court to

10   understand some of our constituents.  In Court today is

11   Kathleen Strain (ph).  She is sitting right here.  She has

12   custody of her four year old granddaughter.  She has

13   recently told me a story that she -- at school, the school

14   diagnosed her son who was diagnosed with neonatal abstinence

15   syndrome when he was born.  I'm sorry, granddaughter, was

16   delayed in development which these -- all these children are

17   generally delayed in development, was diagnosed  that way at

18   the school and got a referral to her local hospital in

19   Berk's County, Pennsylvania, to the pediatric rehabilitation

20   portion of the hospital.

21          She recently took her granddaughter there and they

22   said you're 700 on the waiting list.  We'll call you back in

23   the year 2021.

24          So we, too, are very concerned about this

25   emergency fund and it's very difficult for me, you have lay

1    people sitting here in Court and we talked a lot about

2    bankruptcy stuff today; it's very difficult for me to

3    explain to these -- my constituents why creditors like

4    states and governmental authorities who have -- ironically

5    have the financial ability to pay their own lawyers, which

6    is normally the case for unsecured -- you know, Chapter 11

7    cases.  Get their lawyers fees paid in this case when this

8    money could be used, for example, so that this hospital

9    might not have a 700 person waiting list.

10           So we would really like the Court to keep that in

11   mind.  We think that it sends the wrong message to really

12   the primary victims of the opioid crisis.  The opioid crisis

13   victims are individuals or they're individuals represented

14   by Mr. Neiger's group or they're our group of -- we think

15   are the most innocent.  These babies are born addicted to

16   opioids.  They have to put baby droppers in their eyes to

17   get them off of this opioid addiction.

18           So under these circumstances, we oppose the

19   motion.

20           THE COURT:  Okay.

21           MR. MARKOWITZ:  Thank you.

22       (Pause)

23           MR. CAGE:  Good afternoon, Your Honor.

24           Nicholas F. Cage, (indiscernible) Stevens & Lee.

25   We represent private purchasers of health insurance.

1              I'll be brief because I think we're all -- we've

2      all heard enough today.  But I just wanted to make a couple

3      points.

4              We joined in the official creditors committee's

5      objection and in our joinder we pointed out that there are

6      three over arching goals in this case and two of those goals

7      we believe are shared by all creditors.  One is to maximize

8      the size of the estate, including money that could be

9      recovered from the Sacklers, from DNO Insurance or other

10     sources.

11             One is to abate the opioid crisis.  But the third

12     goal is a goal where the creditors are going to be

13     diametrically opposed, i.e., inter-creditor issues; how --

14     you know, who -- which group has a claim in what amount and

15     how that stacks up against the other creditor group and an

16     over arching concern there is the so-called state, SMT

17     group, the states, municipalities and tribes versus the

18     private litigants like us and the two parties you just heard

19     from.

20             And the committee cited in its papers a report

21     that said that private litigants may be 70 percent of the

22     claims.  And I was happy to hear Mr. Huebner say, earlier

23     today, that even though he has said repeatedly that 85

24     percent of the litigations were brought by SMT claimants

25     that doesn't necessarily mean that they are 85 percent of

1   the class.

2         The SMT claimants think otherwise.  They say that

3   they are the overwhelming majority of the claims against

4   this estate and they say that right in their papers that

5   were filed in support of the motion.

6         I share Mr. Neiger's concern that the funds that

7   are going to be used from the estate not be used on any

8   inter-creditor issues.  It's not just object to claims.  But

9   one of the biggest fights in this case is going to be how

10   the value that is recovered is ultimately allocated under a

11   plan or otherwise among the various creditor groups.  And

12   they should not use our money to beat us up and get a better

13   deal for their class.  That's a parochial interest that they

14   have.  It's not something that benefits the estate in any

15   way, shape or form.

16         So, in our view, no inter-creditor issues should

17   be compensable from the estate.  We'd rather see the money

18   go to the innocent victims.

19         Thank you.

20      (Pause)

21         MR. ECKSTEIN:  Your Honor, Kenneth Eckstein of

22   Kramer, Levin again.

23         I don't have a lot but I think I need to add -- I

24   did appreciate the comments that were made by Mr. Neiger and

25   some of the other objectors and the recognition by

Page 139

1    Mr. Neiger that the order was clarified to make clear that

2    the scope does not include objecting to claims or litigating

3    a defense of an objection to a claim against members of the

4    ad hoc committee.

5            That said, we've always appreciated that one of

6    the critical components of getting to a confirmable plan of

7    reorganization is going to be one that is going to include a

8    resolution of allocation and we do expressly contemplate

9    that that is going to be part of our charge.  I know Your

10   Honor has admonished us to begin work on that immediately

11   and we do contemplate doing that but we contemplate doing

12   that in connection with the development of an RSA and a

13   plan, which we think is the appropriate way to deal with it.

14   We do not intend to deal with it in litigation and, in fact,

15   the scope expressly excludes litigation from the scope of

16   the ad hoc committee's role in the case, at least in terms

17   of being compensated by the estate.

18           I don't know if Your Honor has any other

19   questions.

20           THE COURT:  Well, I -- you know, I think there's

21   -- the issue of being compensated for work on allocation

22   issues is a complicated one I think because you can conceive

23   of a range of outcomes, many of which, most of which would

24   be ones that would warrant compensation to your group.

25           And that's why I think it wouldn't make sense

1    simply to rule it out as was perhaps suggested separate and

2    apart from litigation.

3          On the other hand, it's the type of issue that I

4    normally would look at when someone put an RSA in front of

5    me.  And as the bankruptcy lawyers here know, RSAs are --

6    it's rare that someone isn't objecting to an RSA.

7          The Court evaluates it and decides whether it

8    makes sense to approve it and in terms of dollars of cents

9    the issue is the fees.

10          So I have been considering whether just as the

11    pre-petition work is tied to the earlier of an RSA or a plan

12    any work done on allocation issues should also be tied to an

13    RSA or a plan.  Not that you would apply the 503(b) standard

14    to it but you just see how it shakes out at that point, you

15    know?

16          If an RSA that proposes an allocation that

17    everyone except -- I'm not suggesting this would be the

18    case, but everyone except the private purchasers of health

19    insurance, says, yes, we'll support this.  This is a good

20    path.  Then I think it would be pretty clear that I would

21    approve that.

22          On the other hand, if you all are the only people

23    standing up in favor of the RSA and the 24 other states are

24    saying no and the committees say no.  This is not -- this is

25    a waste of time, then I don't think that's really the type

1    that I would approve.

2            So it's clear to me that there's a real advantage

3    to the estate and all the creditors to have the states

4    focusing their energies through specific professionals,

5    working with the other constituents in the case, towards a

6    common goal, which is understanding the facts and dealing

7    with the issues that are inevitably going to arise in a

8    professional and organized way.

9            But I do understand the point about leverage and

10   there is some undue leverage if you guys are being paid to

11   push one allocation agenda in which everyone else is opposed

12   to.

13           I'm not saying that's what you're going to do.

14   So, in a way, I'm suggesting you -- maybe you all should

15   live with that type of limitation just as living with a

16   limitation on the pre-petition amounts.

17           MR. ECKSTEIN:  Your Honor, I will point out that

18   while we did hear Your Honor at the first day encourage us

19   to broaden our role as much as possible and I think toward

20   the end we entered into this understanding with the

21   dissenting ad hoc committee estates as well as with the

22   municipality ad hoc group that we would share the financial

23   advisory work with them.

24           I think they were very supportive of that and

25   frankly took a lot of comfort in that because I think the

Page 142

1   goal is in order to  build the broadest possible consensus,

2   we think that the states and municipalities each and all

3   need to be comfortable with not only the aggregate amount

4   but how the plan is going to allocate.

5           And so I think this technique is actually very

6   much supportive of getting to an agreed upon plan and I

7   actually would hope that we can utilize that sharing as a

8   way to sort of give the Court comfort that the allocation

9   issue, which is an important issue, is going to be managed

10  in a constructive and in an efficient way.

11          And I think that the Court will have the ability

12  -- and all parties will have the ability I think to review

13  the work that's being done.  And to the extent anybody

14  believes that the work is outside of the scope of getting

15  this case to a consensual resolution, people will raise

16  concerns I think at the time.

17          THE COURT:  Well, this also ends if you don't have

18  an RSA.

19          MR. ECKSTEIN:  That's obviously true Your Honor.

20  This can --

21          THE COURT:  Right.

22          MR. ECKSTEIN:  -- end and we're vulnerable to that

23  and we sort of recognize that and are living with that risk.

24          But Your Honor does appreciate that there are

25  timelines in this case that are important.  One of the over

1    arching factors that motivated the consenting states and

2    municipalities to support this settlement framework and

3    ultimately a term sheet was we believe this is the most

4    effective way to put billions of dollars from the company

5    and the Sacklers into this country to deal with the problem

6    and if we can get this done along the timeline that we've

7    contemplated, we think that is really the over arching

8    benefit that everybody is trying to work towards.

9            So we actually believe, quite firmly, this is a

10   structure that is going to ultimately lead to the most

11   effective and the swiftest resolution of this case, which

12   ultimately is going to have to be embodied in a plan that's

13   going to come before Your Honor for approval and we think

14   allocation obviously is as important as the aggregate

15   dollars that have come from the different quarters.

16           So we would hope that with the protections that we

17   have given the Court and all the parties in the case

18   sufficient comfort to believe that this can be reviewed on a

19   regular basis; the monthly statements with the quarterly

20   applications.  We believe we've actually gone over and above

21   in terms of what an ad hoc committee would do to try to make

22   sure that there's going to be complete transparency about

23   the role that's played.

24           THE COURT:  Okay.

25           MR. ECKSTEIN:  Thank you, Your Honor.

1           MR. HUEBNER:  Your Honor, I'll be about four

2    minutes in total and that's -- and then I think we're done.

3           There are eight very quick things that I think

4    need to be said by Debtors and then we have nothing else.

5           Number one, for the avoidance of doubt, I think I

6    was actually quite clear and I hope I was not misunderstood.

7    What I said was that it would have been a breach of trust if

8    the Debtors had said thanks for the support.  We're now

9    filing this motion.  Nobody ever said if the Court did not

10   grant the motion that that would be deemed to be perfidious

11   in any way.

12          Two, there are concerns about costs and

13   duplication.  We share them.  I mean, that's -- you know, as

14   I said in I think point number three, every dollar that is

15   spent during this case is a dollar that is not there at the

16   end of the case.  And the answers are the same.

17          We have built in a whole raft of search lights and

18   protection and judicial oversight in the amended order and

19   if people feel like the costs are not appropriate or the

20   duplication efficiency is not appropriate, I have no doubt

21   that the six other ad hoc committees or four other ad hoc

22   committees and the official committee and maybe the Debtors

23   will be objecting and this Court will decide.

24          So there's going to be a lot sunshine here.

25          Three, the Debtors are getting nothing in "return"

Page 145

1    from Mr. Hurley.  It's just not right and that's why I began

2    with the judicial notice point, Your Honor, and this Court's

3    ruling in Delphi.  I think that the injunctions support

4    something in return.  I think that the term sheet is

5    something in return.

6           I think that progressing the diligence and the

7    deal is something in return.

8           And, in fact, Your Honor, if it's necessary, it's

9    the rough Ascii, it's page 157 to 159, in the finished

10   transcript.  And we've been scrambling a little bit and I

11   apologize for shuffling the papers.  It's pages 164 to 166.

12          Mr. O'Connell actually testified under oath about

13   what we're getting in return including the states and their

14   advisors kind of glowering that the Sacklers never presented

15   in and getting a commitment on the spot including someone

16   getting on a plane to Asia to go unblocked diligence and get

17   information flowing.  Maybe we could have done that without

18   them.  Maybe we could have done it without them.  I don't

19   know.

20          Again I want to be careful not to deify them, you

21   know, without the states, all that's lost because, you know,

22   frankly, there are lots of people who deserve credit for

23   things here.  But there actually is sworn testimony on this

24   point in additional to all of the items on the docket so

25   far.

Page 146

1           Fourth, allocation.  It should not be minimized.

2      This is not a simple issue and I think what you heard \Mr.

3      Eckstein say is, you know, there's allocation and there's

4      allocation.  And as we're designing complicated mechanisms

5      for the best way to figure this out including at the Court's

6      constant urgings to be creative and thoughtful; that's one

7      type of allocation.

8           If it's like I get more and you get less.  That's

9      a very different type of allocation and, frankly, I think

10     many people will come roaring in if they start seeing on

11     monthly bills and whatever Your Honor ends up ruling, I

12     think no one in this courtroom could fail to understand that

13     Your Honor views that as potentially being categorically

14     different than growing the pie for all, which is where we

15     are I think certainly at this particular phase of the case.

16          But we did narrow the scope after listening to the

17     objectors to be clear about what we know it's not and what

18     it's not is saying the estate should pay me to say you don't

19     have claims but I do have claims.

20          Five, I agree with Mr. Hurley.  The opposing

21     states do have an important role to play and, you know,

22     whether you want to call this we have six good cops and four

23     bad cops or any sort of foolish metaphor, those aren't

24     really helpful.

25          The reality is multiple entities have a role to

Page 147

1    play but the opposing states are actually supporting this

2    motion.  So the very people that Mr. Hurley said maybe the

3    opposing states can do this better and advance -- and make

4    the deal yet better, they support today's relief, I think

5    because of the view that this is like a ratchet, right?

6            We get more diligence.  We get more information.

7    Then some people firm up the deal we currently have and

8    other people will undoubtedly be pushing for a better deal.

9    And as we move -- you know, I said already at two hearings,

10   they'll, you know, lock and build.  Lock and build.  So each

11   one of these bricks puts down an edifice that ultimately is

12   designed to get more value to the people in need.

13           Nobody disagrees with the need for diligence.  I'm

14   not going to repeat that.

15           With respect to 503, just to address the U.S.

16   Trustee very briefly, we don't take issue with the legal

17   principle, which I won't quote in Latin, that specific

18   provisions trump general provisions.

19           But it's just a different thing.  When a creditor

20   often opposed by the debtor or others, says look backwards.

21   I did great things.  Please give me unique (indiscernible)

22   being paid that's different than the debtor and others

23   looking prospectively and saying, we actually think this is

24   good use of money.  So, ultimately we're down to the common

25   benefit and we will (indiscernible) agreement.  And again I

Page 148

1   think our briefs are pretty clear on this and there's lots

2   and lots of RSA case law that Your Honor has already alluded

3   to.  So we know that 503(b) is not statutorily specific.

4           Eight, and with this, I will close, Your Honor,

5   you know hearing even just the tiniest fragment about the

6   unthinkable pain and loss suffered by people in the

7   courtroom today, you know, mothers and parents of victims

8   and victims themselves, you know, as Perdue's "lawyer" it's

9   not very easy for me to stand up and address that.

10          So, I'll say only a couple of things.  One, Davis

11  Polk arrived in March 2018 and since the day we arrived, our

12  firm and the Debtors, as opposed to whatever people will

13  ultimately figure out with respect to the past, are here to

14  do the most good for the most people with Perdue's assets as

15  expeditiously as that can be done.

16          And so ironically my first point of today is

17  actually my last point of today.  The opioid crisis is

18  unthinkably horrific.  It has scythed its way through our

19  country like a pharmacological grim reaper.

20          And we have a shared goal to do the best we can

21  for the most as quickly as possible; whether it's  getting

22  this case out more quickly, maximizing the value of the

23  estate or the emergency fund that the Debtors -- the

24  emergency relief fund that the Debtors firmly support and

25  have to figure out the details on, that's what we're all

Page 149

1    here to do.

2          This motion is not simple but for the reasons I

3    explained at length in my initial presentation, we do think

4    that especially with the modifications in the order, it is

5    -- painful as it is to talk about professional fees and not

6    saving the money for victims, ultimately we think that it

7    will get us all to more for those who need it most.

8          Thank you.

9          THE COURT:  Okay.  Anything else?

10         MR. PREIS:  Your Honor, did you want us to address

11   your idea about not having fees paid until an RSA is signed

12   with regard --

13         THE COURT:  Well, I was focusing on fees -- an

14   allocation as opposed to due diligence.

15         MR. PREIS:  Yes.

16         THE COURT:  You know, et cetera.

17         MR. PREIS:  Did you want us to address that?  I --

18         THE COURT:  Well, if you have any thoughts on it.

19         MR. PREIS:  Okay.  So a couple of things.  Again

20   because I don't want to get into settlement conversations et

21   cetera.

22         But one of the things that was absolutely

23   discussed -- you asked me earlier what other -- what

24   possibilities or what changes would we have made to the

25   order.

1          One of the things we did discuss was this

2     allocation issue and I told Mr. Huebner, we told

3     Ms. Eckstein the same thing, which is putting something in

4     the order that say you're not going to litigate about

5     allocation doesn't solve anything.

6          I think they all know.  In fact, I'm going to get

7     to why that I think they kind of all know this.  They all

8     know that the real issue here for the states is the

9     allocation issue which is why the first thing you said when

10    you raised the issue, Mr. Eckstein said, no, no, no.  That

11    -- we can't do that.  That's one of the most important

12    things we're doing because that's actually from their

13    perspective, almost as important as how much can we get for

14    the estate.

15         The second thing is from the dissenting state

16    perspective, it was kind of confusing to us why the

17    dissenting states decided to support the consenting states

18    having their fees paid when they're not getting paid.

19         And then it dawned on us, what's the common

20    interest they have?  And then we saw in the order, right,

21    FTIs, FTIs' work product only gets shared to the extent

22    there's a common interest.  Well, what's their common

23    interest?  Allocation.

24         And so the one thing that they're so focused on is

25    allocation.  And so if you were to say to them, no.  You

Page 151

1   actually can't get those fees paid until an RSA is signed

2   and then I'll make a decision at the time of the RSA, that

3   actually puts pressure on them to come to a reasonable

4   allocation as opposed to using -- as opposed to basically

5   weaponizing the fees of the estate to be used against

6   everybody else.

7          I think -- I just want to make sure that's --

8          THE COURT:  That rederick's a little inflammatory.

9   I -- you know, these are 48 states.

10      (Laughter)

11         THE COURT:  They have responsibilities to their

12  people and to the people that elect their government.

13         So I don't really view it as weaponizing.  But I

14  understand that when you're looking at the benefit for the

15  money spent, you want to have a benefit that is actually

16  reflected in as much achievement as you can.  So that's what

17  led me to suggest that as opposed to I think a strong

18  concern that the states, in fact, would do something that

19  literally made no sense and would probably get their

20  attorney generals perhaps having another job after the next

21  election.

22         So -- all right.  Having you been defended by Your

23  Honor -- by me, I don't know if you have anything more to

24  say on that.

25         MR. HUEBNER:  Your Honor, we rest on our papers.

Page 152

1          THE COURT:  Okay.  Thank you.

2      (Laughter)

3          MR. HUEBNER:  That's the only time in my life my

4  argument has been shorter than my opponents.

5      (Laughter.

6          THE COURT:  All right.  All right.

7          I have before me a motion by the Debtors for

8  either approval of their entry into or the approval of the

9  assumption of any fee reimbursement letter, a copy of which

10  is attached to the motion whereby they would agree to have

11  the estate pay the reasonable fees and expenses of certain

12  designated professionals for the loop of plaintiffs who pre-

13  bankruptcy had agreed to a settlement framework with the

14  Debtors.  That has now been embodied in a term sheet.

15          The agreement has been modified as reflected in

16  the proposed order submitted to chambers late last week and

17  discussed on the record today and provided to the parties.

18  But the basic concept is the same which is that the work

19  that the four designated law firms and currently one

20  designated financial advisor would be doing during the

21  course of this case, not subject to strong rights of the

22  Debtors to terminate the agreement, however, would be paid.

23          Because the Debtors are in bankruptcy such a

24  proposal needs to be put forth and subject to notice of a

25  hearing and the agreement has received a number of

Page 153

1      objections as well as support from the other large group of

2      states who have not yet agreed to a settlement framework in

3      this case but are, in certain respects, working with the ad

4      hoc committee that has reached a settlement framework.

5                  The first issue for me to consider is whether the

6      rubric under which the Debtors are seeking approval of the

7      reimbursement agreement is permissible.

8                  The United States Trustee has taken the position

9      that because fees are at issue and obviously these are not

10     the fees and expenses of professionals to be compensated

11     under Section 330 and 331 of the Code, and that they're not

12     retained under Section 327 or 1104 of the Code, that the

13     only source for the authority to pay such fees and expenses

14     appears in Section 503(b) of the Bankruptcy Code and

15     specifically 503(b)(3) or (4) of the Code.

16                 The Debtors, on the other hand, contend that I

17     have the separate power to approve their motion as the

18     assumption of a contract under Section 365 of the Code or

19     for a proposed use of the estate's assets, in this case

20     cash, under Section 363(b) of the Bankruptcy Code.

21                 Other courts have addressed this issue before.

22     The U.S. Trustee relies heavily, perhaps, you know, almost

23     exclusively on In Re. Lehman Brothers Holdings, Inc, David

24     V. Elliott Management Corp. 508 Br. 283 SDNY 2014, in which

25     the district court reversed the Bankruptcy Court on a

Page 154

1    reserved issue that was reserved at the time of the

2    confirmation of the Lehman Brothers Chapter 11 plan.

3            That issue was whether the plan itself could

4    provide for the payment of previously incurred fees and

5    expenses of committee -- creditors' committee members,

6    including their counsel, under a standard separate and apart

7    from Section 503(3) of the Bankruptcy Code.  For example,

8    under Section 1129(a)(4) of the Bankruptcy Code.

9            In that case, Judge Sullivan concluded that 503(b)

10   was the only source for paying such a claim and that

11   Congress had specifically deleted the types of fees for

12   committee members from the statute and therefore found that

13   that provision of the plan could not stand.

14           On the other hand, the issue was directly raised

15   on a case that I believe is much more on point in In Re.

16   Bethlehem Steel Corp., 2003 WL 217, 38964, SDNY July 23,

17   2003, in which District Judge Mukasey overruled an objection

18   by the U.S. Trustee made on essentially the same basis as

19   the objection before me and affirmed Bankruptcy Judge

20   Lifland's approval of the Debtors' payment of the ongoing

21   fees and expenses of the United Steelworkers of America

22   Captain, and subject to review, as set forth in that

23   agreement.

24           This was an unsecured -- this was a creditor that

25   held an unsecured claim.  It clearly was not being retained

Page 155

1    under Section 327 or 1104 and was not seeking payment under

2    503(b).  Nevertheless, in a thoughtful opinion, Judge

3    Mukasey affirmed Judge Lifland, in concluding that under

4    Section 363(b) the payment was warranted and not precluded

5    by Section 503 of the Bankruptcy Code.

6         The Court noted that these were for ongoing work.

7    These fees would be paid for ongoing work as opposed to for

8    past work and that the motion was made by the debtor as

9    opposed to by a creditor.

10        The Court further said that subsections

11   503(b)(3)(d) and (b)(4) are not rendered meaningless simply

12   because a certain unique -- in certain unique circumstances

13   the bankruptcy court approves a debtor's motion to enter

14   into an agreement to reimburse a creditor for professional

15   fees.

16        In most cases, a debtor will make no such motion

17   as it will not be in its business interest to do so or the

18   Court will refuse approval under Section 363(b).  That's in

19   most cases if the creditor wants to be reimbursed, it must

20   file an application under subsections 503(b)(3)(d) and

21   (b)(4).

22        Those provisions continue to serve a purpose, a

23   separate purpose.

24        I agree with that analysis and will note that just

25   as Judge Mukasey and Judge Lifland noted in Bethlehem Steel,

Page 156

1      there are a number of cases under the Bankruptcy Code are

2      fact patterns under the Bankruptcy Code where Courts have

3      approved payments of ongoing fees and expenses not under

4      Section 503(b) but under Section 363(b) or sometimes under

5      Section 365.

6              The most common is in connection with the debtor's

7      request for approval or a restructuring support agreement

8      that has garnered the support of some but not all of the

9      debtor's creditors.  Often those agreements are with secured

10     creditors but it's not clear whether they are over secured

11     and therefore would have a right to attorney's fee.  But

12     they are also in the past have been with unsecured

13     creditors.

14             As Judge Mukasey noted, Courts have also approved

15     paying reasonable fees and expenses of -- including legal

16     fees of proposed bidders for the debtor's assets under

17     Section 363 notwithstanding the potential applicability of

18     503.  In fact, the Third Circuit made a distinction in the

19     Applied Energy case discussed in Bethlehem Steel where there

20     was no advance approval of such a request.  The debtor

21     didn't seek approval until thereafter and the disappointed

22     bidder made its request, it had to make it under Section 503

23     and it was reviewed under 503.

24             But obviously the facts of the case are

25     distinguishable from countless cases where courts have

1    approved at the debtor's request the payment of fees and

2    expenses as part of (indiscernible) procedures.

3            Also courts have approved the fees and expenses of

4    secured creditors in the case fairly routinely in cash

5    collateral orders even where there's no showing that the

6    debtors -- that the collateral serving for the secured

7    creditor is sufficient to cover not only the debt but also

8    the fees and therefore the secured creditor would be

9    entitled to the fees.  And there's no showing of the need to

10   pay them as part of adequate protection.

11           Nevertheless, they're paid because of the role

12   that the secured creditor is playing in the case.

13           So I conclude that the proper standard to review

14   this motion under is, in fact, the standard applicable which

15   I believe is applicable to both sections, 363(b) and Section

16   365 of the Bankruptcy Code.

17           I will note that there is case law that --

18   including in this District declines to approve the

19   assumption of an agreement under Section 365 that provides

20   for the payment of the debtor's attorney fees.  See In Re.

21   Financial News Network, Inc., 134 Br. 732 Br. SDNY 1991,

22   which was a clear runaround the requirements of Section 330

23   and 331 of the Bankruptcy Code.

24           But, ultimately whether I'm applying 365 or 363(b)

25   here, I believe it's the same standard for me to apply which

Page 158

1    is whether the entry into the agreement and the performance

2    of it including the ongoing payment of the professional fees

3    is a proper exercise of business judgement and in the best

4    interest of the debtors and their estates and creditors.

5            The case law as to the determination of what is a

6    proper exercise of business judgment is I believe fairly

7    clear in the Second Circuit and it is clear that

8    notwithstanding the Integrated Resources case often cited by

9    debtors in Section 363(b) motions, the Second Circuit has

10   made it clear since that case that ultimately the bankruptcy

11   judge has to make the decision as to whether the debtor has

12   exercised proper business judgment in taking the action out

13   of the ordinary course and/or assuming a pre-petition

14   contract under Section 365.  See In Re. Orion Pictures

15   Corp., 4 F.3d, 1095, 1099, Second Circuit 1993.

16           Most of the time most actions out of the ordinary

17   course are unopposed.  If that's the case, the court

18   ordinarily will defer to the debtor's judgment in entering

19   into the agreement.  Although, even then, the court has an

20   obligation to make sure that that judgment makes sense.  See

21   In Re. Genco Shipping & Trading Ltd, 509 Br. 455, 463, Br.

22   SDNY 2014.

23           But I believe clearly given the fact that Congress

24   requires both under 363(b) and 365 of the Bankruptcy Code,

25   notice of the opportunity for a hearing that where there are

Page 159

1    objections in particular, the Court needs to carefully weigh

2    all the opposing views as well as the views stated  in

3    support of the motion to determine, in its judgment, whether

4    the decision is a good one or note.

5            The fact is that often in bankruptcy cases as much

6    as the code and courts urge parties in interest to work

7    together to a common goal, there are different points of

8    view that are almost structurally required and ultimately

9    that is why I believe Congress made the Court the final

10   arbiter as to what makes good business sense for something

11   like this.

12           Given my review of the motion and the supporting

13   papers, as well as the objections to the motion, as well as

14   oral argument today, it's first clear to me that the facts

15   are largely undisputed.

16           The Debtors' cases are highly unusual.  It may be

17   there are more like them in the future.  But the Debtors are

18   largely in a sua generous position whereby they have already

19   agreed to turn over all of their value to their creditors.

20           The question is whether that agreement should be

21   augmented by a specific set of terms basically agreed with

22   the ad hoc consenting group or whether additional terms can

23   be agreed to that pertain to third parties of the Debtors'

24   shareholders and further and as equally important how the

25   resulting estate should be distributed to the creditors.

1           The unusual perhaps unique issue in these cases is

2      that there is a distinct possibility that the allocation

3      issues could either be dealt with in an efficient and fair

4      way that's respectful of the various parties-in-interest in

5      this case or the parties can spend an inordinate amount of

6      time disputing them to all their detriment.

7           One would think if you sit in bankruptcy court

8      every day, as I do, that that issue also is common to

9      bankruptcy cases.  And, as I just articulated, it is.  What

10     is different here, however, is that this is a fundamentally

11     public health crisis driven case where the claimants, in one

12     sense, can be almost every citizen in the country.  That is

13     why every state, except the two states that have already

14     settled with these Debtors, has taken a highly active role

15     not only in this case but in the litigation that preceded

16     this case in federal and state court.

17          Thus deciding how the public at large is to

18     benefit from the agreement that the Debtors have already

19     made and a potential agreement from their shareholders is

20     truly unusual.

21          It appears clear to me that we would not be in

22     this place but for the work done by the states in general

23     and that has been acknowledged by those who have objected to

24     this motion as well as the Debtors.

25          It's also clear to me that the states have a

Page 161

1    unique role in these cases because of their unique position.

2    First of all, they are the sovereign state governments of

3    the 48 states involved.

4             Secondly,  because of that, they have unique

5    rights under the Bankruptcy Code.  Those rights can be

6    tested in a wasteful way or they can be reserved for a

7    future day if the states are satisfied that the process is

8    proceeding in a way that is credible and acceptable to them.

9             At this point in the case, the latter, to my

10   relief, appears to be the approach that the states have

11   taken.  Not only the ad hoc group of so-called settling

12   states but also the ad hoc group of non-settling states.

13            But those types of issues I believe need to be

14   dealt with sensitively throughout these cases.  I think it's

15   correct that the Debtors recognize the unique role that the

16   states have played and will continue to play in these cases.

17   And, frankly, I believe that such recognition is in the best

18   interests of all of the Debtors' creditors.

19            It is clear to me from today's record that the

20   states need to perform their own analysis, their own due

21   diligence, and be heavily involved in the rest of these

22   cases as they have been so far.

23            While it appears to me that we are quite fortunate

24   in this case to have an active and well represented official

25   committee of unsecured creditors, the states' interests are,

1   as I said before, unique and require unique steps to insure

2   that they are dealt with in a sensitive and an appropriate

3   way.

4           I believe it is reasonable for them to want to

5   perform their own due diligence, do their own analysis, and

6   it is in the interests of the Debtors' estates and creditors

7   that they do so in an efficient and organized way which

8   means focusing their work through point counsel and point

9   decision makers who then develop transparent ways to

10  communicate to their colleagues.

11          The question is is it necessary, or at least a

12  good business decision, to pay for that work at this time as

13  the motion proposes.

14          That is not an easy question to answer as

15  evidenced by the well argued objections under Section 363

16  while applying Section 363(b)'s standard and it's my job to

17  sift through whether this expenditure of that money just in

18  terms of sheer dollar amount as well as any affect that that

19  expenditure would have on these cases is a proper exercise

20  of business judgment.

21          Any dollar that the Debtor can spend to solve the

22  health crisis that is the reason for its case one would

23  believe is a dollar well spent.  So taking any dollar away

24  from that is a difficult decision to make.

25          However, it is also the case that because of the

Page 163

1    context of this case and the difficult issues it raises,

2    dollars will need to be spent to resolve those issues in an

3    efficient and fair way.  The Debtor just can't put a chest

4    of money out on the street and say come and get it.

5             Instead, the parties-in-interest need to approach

6    the problems that this case presents in a very thoughtful

7    and creative way.  That takes times and it takes money.

8             The creditors committee and its allies in

9    connection with the objection to this motion takes the view

10   that this -- the expenditure of any money here is premature

11   because we are not yet at the stage where -- let alone there

12   is a plan but there's not even a restructuring support

13   agreement.

14            It also notes that the cost of this motion could

15   be high although I take issue necessarily with the view that

16   it would be 15 to 20 million dollars because that is a cost

17   spread over several months and the Debtor has the right, at

18   any time, to opt out of this agreement and the agreement, in

19   any event, unless extended, ends, if there is no RSA, by, in

20   essence, a month of so from now.

21            So I view the issue about whether this relief is

22   premature a little differently.  It seems to me that with

23   the limitations imposed by the changes to the proposed

24   order, the work that would be compensated here would be

25   appropriately compensated and be to the benefit of all the

Page 164

1    parties in this case.  As far as the analyses of the Debtors

2    and their business, which includes difficult analyses about

3    not only their -- the value of those businesses but also how

4    to monetizes them including non-debtor entities and also due

5    diligence and work in connection with analyses of causes of

6    action that the Debtors have that may well be equal to or

7    greater than the value of their hard assets and their

8    businesses.

9            I believe that's what is now appropriately

10   compensated under this revised agreement.

11           The committee has argued that that work will be

12   done anyway if I don't approve this agreement and it is

13   possible that some portion of it will be.  However, as I

14   said during oral argument, this motion is as much, if not

15   more, about bringing structure to this case as it is about

16   the actual hard dollars spent on paying for the work to be

17   done.

18           I believe without such a structure, i.e., where

19   there are clear lines of communication and clearly defined

20   roles for the professionals for the ad hoc group, there

21   would be a substantial risk that the trust, based on

22   assessments of the Debtors' credibility, that has been

23   generated over the last three months or so, would be frayed

24   and potentially lead to what I believe would be a major step

25   back in this case which is or which would be various states

1    and the PEC group feeling that they were on their own and

2    taking therefore diverse and unorganized positions.

3          Besides the due diligence, the next major step in

4    this case, which I've already, and I know I sound like a

5    broken record, but I've said it two or three times now,

6    needs to be focused is creative thinking about the

7    allocation of the Debtors' assets.

8          I continue to believe that the states play a major

9    role in that process.  The role I'm envisioning for them is

10   not one where they say we get everything.  I think that

11   should be clear and I think it is clear to them.

12         But, rather, where they act as -- in the best

13   principles of federalism, for their state, the coordinator

14   for the victims in their state.

15         Thus, I would expect the people from Mr. Neiger's

16   group, for example, to be working with the states closely to

17   maximize benefits because it appears to me from his

18   description of his group that they're not so much focusing

19   on individual claims as a way to deal with a whole host of

20   individuals.

21         And there may be very good ways to do that in a

22   particular state and less good ways in another state and I

23   hope that the states will act as a way to coordinate that

24   type review.

25         There is a legitimate concern that those hopes

Page 166

1   will not be fulfilled.  I don't think that will be the case.

2   I think the states appreciate that this money needs to go

3   where it is most in need of going and that  we don't repeat

4   the experience of some states from the tobacco settlements,

5   for example.

6           But because of that concern, even though I believe

7   it is not the likely outcome in this case, I think that

8   there should be two additional conditions on certain of the

9   work reimbursement.

10          First, I believe work done on this critical issue

11  of allocation should, like the pre-petition work covered by

12  the agreement now, be payable upon the earlier of the

13  Court's approval of an RSA or confirmation of a plan.

14          For those of you who are not bankruptcy lawyers

15  that doesn't mean that I'm disapproving it.  Rather, I would

16  look at the time that an RSA is proposed and see whether it,

17  in fact, makes good business sense and that may not mean

18  that it has to be universally accepted but that it is a

19  focal point for moving the case to the next step.

20          I want to be clear that what I'm conditioning on

21  the approval of an RSA is not all of the work but just work

22  on the allocation issue and, knowing the professionals

23  involved, I know they know how to bill by separate tasks to

24  cover that.

25          Secondly, I believe that that RSA needs to have

Page 167

1    within it, if not -- and I'm not ruling out anything before

2    then, but it needs to have within it a valid and credible

3    proposal for the emergency use before confirmation of a

4    plan, of a substantial amount of the Debtors' cash because I

5    do think it is important for the parties-in-interest to be

6    focusing on that use now.

7            I appreciate that those two conditions put the ad

8    hoc group at some risk for some portion of the fees at issue

9    here.  On the other hand, I believe that that risk to them

10   is minimal given how they've conducted themselves so far in

11   this case and my belief that past is prologue, i.e., that

12   they will continue to be constructive; continue to try to

13   achieve consensus and, most importantly, consistent with

14   their roles as representatives of individual states as well

15   as the plaintiffs who have -- who brought the pre-petition

16   litigation, that brought us to where we are today, will see

17   the need to continue to contribute in these cases in a way

18   that brings the parties together in an efficient and fair

19   way.

20           So, with the changes that had previously been

21   agreed to, all of which I believe were well considered and

22   warranted, I will approve the motion with those two

23   additions.

24           MR. HUEBNER:  Your Honor, I would never agree to

25   leave a hearing with the Court having a potential factual

Page 168

1    mis-impression.  So there is one small thing you said that I

2    actually don't think is --

3              THE COURT:  The date for the RSA?

4              MR. HUEBNER:  Correct.  Let me explain because

5    it's actually three different documents have to actually all

6    be tracked to understand it.  In fact, everyone needs to

7    understand it and certainly the Court most of all.

8              The September 15th fee letter contains a

9    termination right for the Debtors if an RSA is not executed

10   by the parties by December 13th, 2019, unless extended by

11   the company.

12             THE COURT:  Right.

13             MR. HUEBNER:  So we have -- originally we were

14   trying to pace them to a fast schedule and we had a

15   termination right unless we chose to extend it.

16             THE COURT:  Right.

17             MR.  HUEBNER:  Then on October 11, that I'm pretty

18   sure I won't misspeak, because I actually have it in my

19   speech in a footnote in case it came up, the UCC stipulation

20   that we agreed to we discussed earlier today obligates us

21   not to get approval for an RSA unless the UCC consents to it

22   before April 8th, 2020.  The exact words for the avoidance

23   of doubt.

24             The Debtors agree that during the initial stay

25   period they will not, one, file a Chapter 11 plan, or

Page 169

1    disclosure statements for any of the Debtors or, two, a

2    motion seeking approval of a restructuring support agreement

3    or a similar agreement with any party, in each case, absent

4    the support of the UCC.  So, that's two.

5              Then three is the term sheet with the ad hoc group

6    that was entered into three days before.  That gives them a

7    right to seek to terminate the stay if we do not have an RSA

8    approved by (indiscernible).

9              So just -- unless I misheard --

10             THE COURT:  But you still have the right to

11   terminate it December 13th.

12             MR. HUEBNER:  A hundred percent, Your Honor.  My

13   only point is you -- I believe you said, and forgive me if I

14   misheard, although I don't think that I did, this may all be

15   resolved in a month anyway.

16             THE COURT:  Well, if the people aren't working

17   they way they're supposed to, you can terminate it.

18             MR. HUEBNER:  Yes.  My only point is we would be

19   violating our stip with the UCC.

20             THE COURT:  To file something.

21             MR. HUEBNER:  To --

22             THE COURT:  I understand that.

23             MR. HUEBNER:  -- move for approval which we have

24   no plans to do.

25             THE COURT:  I understand that.

1          MR. HUEBNER:  I apologize if I thought any one --

2     no one anything they don't already know but I just thought

3     that the interplay of the documents is not simple.

4          THE COURT:  Right.

5          MR. HUEBNER:  And I want -- I wanted to be clear

6     for myself.

7          THE COURT:  But you do have a reality check.  You

8     see --

9          MR. HUEBNER:  Every morning.

10          THE COURT:  -- that this is -- well.  But -- but I

11     mean you can --

12          MR. HUEBNER:  No, no.  That's not humor at all.

13          THE COURT:  No.  But you can literally opt out --

14          MR. HUEBNER:  Every morning.

15          THE COURT:  -- in a month.

16          MR. HUEBNER:  Or a week.  Or two weeks or three.

17          THE COURT:  Although I doubt you would do that.

18          MR. HUEBNER:  I think that's probably --

19          THE COURT:  So I guess the one aspect that I

20     should clarify is that the emergency fund point is like an

21     outside for the term sheet that I said because that would be

22     an April.

23          MR. HUEBNER:  After April frankly.

24          THE COURT:  Hopefully people will focus on that

25     before then, too.

Page 171

1          MR. HUEBNER:  Yeah.  Your Honor, you know, if

2    (indiscernible) and it's aftermath taught anybody wise

3    anything, it's that when Judge Drain expresses his views

4    very clearly several times in open court, it probably makes

5    sense to listen.

6          I'm pretty confident that parties understand

7    exactly what the Court believes is the right set of things

8    to do in the coming weeks.

9          The Debtors I believe certainly do and we'll be

10   back to the table as soon as we leave the courtroom.

11          THE COURT:  All right.  So you're going to have to

12   obviously revise the order somewhat.

13          MR. HUEBNER:  Yes.  And will settle it obviously

14   with the objectors.

15          THE COURT:  Well, you don't have to formally

16   settle it but you should circulate it.

17          MR. HUEBNER:  That's what I meant.  Yes.

18          THE COURT:  Okay.  All right.  Very good.  Thank

19   you.

20      (Whereupon, the proceedings were concluded at 2:24

21   p.m.)

22

23

24

25

Page 172

1                        I N D E X

2

3                        RULINGS

4                                                    Page

5    Motion of Debtors for Entry of an Order

6    (I) Authorizing the Rejection of Commercial Lease

7    and (II) Granting Related Relief filed by Eli J.

8    Vonnegut on behalf of Purdue Pharma L.P. (ECF 435)    19

9

10   Motion of Debtors for Authority to Employ

11   Professionals Used in the Ordinary Course of Business

12   Nunc Pro Tune to the Petition Date filed by Eli J.

13   Vonnegut on behalf of Purdue Pharma L.P. (ECF 128)    21

14

15   Debtors' Motion Establishing Procedures for Interim

16   Compensation and Reimbursement of Expenses for Retained

17   Professionals filed by Eli J. Vonnegut on behalf of

18   Purdue Pharma L.P. (ECF 434)                          22

19

20   Application of Debtors for Authority to Retain and

21   Employ Dechert LLP as Special Counsel to the Debtors

22   Nunc Pro Tune to the Petition Date filed by Eli J.

23   Vonnegut on behalf of Purdue Pharma L.P. (ECF 424)    25

24

25

Page 173

1                              I N D E X

2

3                              RULINGS

4                                                            Page

5    Application of Debtors for Authority to Retain and

6    Employ King & Spalding LLP as Special Counsel to the

7    Debtors Nunc Pro Tune to the Petition Date filed by

8    Eli J. Vonnegut on behalf of Purdue Pharma L.P.

9    (ECF 427)                                               25

10

11   Debtors' Application for Authority to Retain and

12   Employ AlixPartners, LLP as Financial Advisor Nunc

13   Pro Tune to the Petition Date filed by Eli J.

14   Vonnegut on behalf of Purdue Pharma L.P. (ECF 429)      27

15

16   Debtors' Application for an Order Authorizing

17   Employment and Retention of Prime Clerk LLC as

18   Administrative Advisor Nunc Pro Tune to the

19   Petition Date filed by Eli J. Vonnegut on behalf of

20   Purdue Pharma L.P. (ECF 439)                            27

21

22

23

24

25

Page 174

```
 1                         I N D E X

 2

 3                          RULINGS

 4                                                    Page

 5   Application of the Official Committee of Unsecured

 6   Creditors of Purdue Pharma L.P., et al. to Retain and

 7   Employ Akin Gump Strauss Hauer & Feld LLP as Counsel,

 8   Nunc Pro Tune to September 26, 2019 filed by Ira S.

 9   Dizengoff on behalf of The Official Committee of

10   Unsecured Creditors of Purdue Pharma L.P., et al.

11   (ECF 421)                                        25

12

13   Application of the Official Committee of Unsecured

14   Creditors for Entry of an Order Authorizing Retention

15   and Employment of Bayard, P.A. as Efficiency Counsel

16   to the Official Committee of Unsecured Creditors,

17   Nunc Pro Tune to September 29, 2019 filed by Ira S.

18   Dizengoff on behalf of The Official Committee of

19   Unsecured Creditors of Purdue Pharma L.P., et al.

20   (ECF 422)                                        25

21

22

23

24

25
```

Page 175

1                               I N D E X

2

3                               RULINGS

4                                                              Page

5    Application of the Official Committee of Unsecured

6    Creditors of Purdue Pharma L.P., et al. to Retain and

7    Employ Province, Inc. as Financial Advisor Nunc Pro

8    Tunc to October 1, 2019 filed by Ira S. Dizengoff on

9    behalf of The Official Committee of Unsecured Creditors

10   of Purdue Pharma L.P, et al. (ECF 423)                27

11

12   Application for Order Authorizing Employment and

13   Retention of Jefferies LLC as Investment Banker to

14   the Official Committee of Unsecured Creditors Nunc Pro

15   Tunc to October 4, 2019 filed by Ira S. Dizengoff on

16   behalf of The Official Committee of Unsecured Creditors

17   of Purdue Pharma L.R, et al. (ECF 425)                27

18

19   Application of the Official Committee of Unsecured

20   Creditors of Purdue Pharma L.P., et al. to Retain and

21   Employ Kurtzman Carson Consultants LLC as Information

22   Agent, Nunc Pro Tune to November 1, 2019 filed by Ira S.

23   Dizengoff on behalf of The Official Committee of

24   Unsecured Creditors of Purdue Pharma L.R, et al.

25   (ECF 426)                                             27

Page 176

1                          I N D E X

2

3                             RULINGS

4                                                          Page

5      Motion of the Official Committee of Unsecured

6      Creditors of Purdue Pharma L.R, et al. for Entry of

7      an Order Clarifying the Requirement to Provide Access

8      to Confidential or Privileged Information and Approving

9      a Protocol Regarding Creditor Requests for Information

10     filed by Ira S. Dizengoff on behalf of The Official

11     Committee of Unsecured Creditors of Purdue Pharma

12     L.R, et al. (ECF 415)                                28

13

14     Motion of Debtors for Entry of Interim and Final

15     Orders Authorizing (I) Debtors to Continue to Use

16     Existing Cash Management Systems and Maintain Existing

17     Bank Accounts and Business Forms and (II) Financial

18     Institutions to Honor and Process Related Checks and

19     Transfers filed by Eli J. Vonnegut on behalf of Purdue

20     Pharma L.R (ECF 5)                                   51

21

22     Application of Debtors for Authority to Employ and

23     Retain Davis Polk & Wardwell LLP as Attorneys for the

24     Debtors Nunc Pro Tune to the Petition Date filed by Eli

25     J. Vonnegut on behalf of Purdue Pharma L.R (ECF 419)   38

1                              I N D E X

2

3                              RULINGS

4                                                              Page

5     Application of Debtors for Authority to Retain and

6     Employ Skadden, Arps, Slate, Meagher & Flom LLP as

7     Special Counsel to the Debtors Nimc Pro Tune to the

8     Petition Date filed by Eli J. Vonnegut on behalf of

9     Purdue Pharma L.R (ECF 438)                             38

10

11    Application of Debtors for Authority to Retain and

12    Employ Wilmer Cutler Pickering Hale and Dorr LLP as

13    Special Counsel to the Debtors Nunc Pro Tune to the

14    Petition Date filed by Eli J. Vonnegut on behalf of

15    Purdue Pharma L.R (ECF 427)                             38

16

17    Motion to Assume the Prepetition Reimbursement

18    Agreement with Ad Hoc Committee, and to Pay the Fees

19    and Expenses of the Ad Hoc Committee's Professionals

20    filed by Eli J. Vonnegut on behalf of Purdue Pharma

21    L.P. (ECF 394)                                          167

22

23

24

25

Page 178

1                    C E R T I F I C A T I O N

2

3        We, Sherri L. Breach & Penny Skaw, certify that the

4   foregoing transcript is a true and accurate record of the

5   proceedings.

6   Sherri L                Digitally signed by Sherri L Breach
                             DN: cn=Sherri L Breach, o, ou,
7   Breach                   email=digital1@veritext.com,
                             c=US
8   _____ Date: 2019.11.22 12:20:11 -05'00'

9   Sherri L. Breach, Approved Transcriptionist

10

11  Penny                    Digitally signed by Penny Skaw
                             DN: cn=Penny Skaw, o, ou,
12  Skaw                     email=digital1@veritext.com,
                             c=US
13  _____ Date: 2019.11.22 12:20:48 -05'00'

14  Penny Skaw, Approved Transcriptionist

15

16

17  Date:  November 22, 2019

18

19

20

21

22  Veritext Legal Solutions

23  330 Old Country Road

24  Suite 300

25  Mineola, NY 11501