DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**SECOND SUPPLEMENTAL DECLARATION OF JON LOWNE IN SUPPORT OF THE
MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS
TO (A) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND
OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS
AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND
RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION
CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
<u>RELATED CHECKS AND TRANSFERS</u>**

   I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of

my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1.      I am a Senior Vice President and the Chief Financial Officer of Purdue Pharma

L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**,"

the "**Company**" or "**Purdue**").   I was first employed by Purdue as Senior Internal Auditor in

1995 and gained increasing responsibility in the Company's finance team over time, including as

Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017

to February 2018. Since March 2018, I have been the Chief Financial Officer of PPLP.  I am

familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      I submit this declaration (this "**Declaration**") in further support of the *Motion of

Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries,

Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and

Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with

Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and

Process Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**").[2]  I am authorized

to submit this Declaration on behalf of the Debtors.

3.      On September 15, 2019 (the "**Petition Date**"), the Debtors each commenced with

this Court a voluntary case under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**").  On September 18, 2019, the Court entered the *Interim Order Authorizing

(I) Debtors to (A) Pay Prepetition Employee Benefits and Other Compensation and (B) Maintain

Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and

Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial

Institutions to Honor and Process Related Checks and Transfers* [Docket No. 62] (the "**Interim

Wages Order**").  On September 18, 2019, the Court entered the *Final Order Authorizing (I)*

---

[2] Capitalized term used but not otherwise defined herein shall have the meanings ascribed to such terms in
the Wages Motion.

*Debtors to (A) Pay Prepetition Employee Benefits and Other Compensation and (B) Maintain*

*Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and*

*Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial*

*Institutions to Honor and Process Related Checks and Transfers* [Docket No. 309] (the "**Final**

**Wages Order**").

4.      The Debtors agreed to adjourn consideration of certain relief sought in the Wages

Motion to a hearing currently scheduled for December 4, 2019.  The Debtors have engaged in

extensive negotiations with and provided copious additional data regarding such relief to various

parties in interest.  The Debtors are pleased to report that the Debtors and the Official Committee

of Unsecured Creditors (the "**UCC**") have agreed to certain modifications of the relief sought by

the Debtors, which are reflected in a revised proposed order (the "**Revised Proposed Order**")

filed contemporaneously herewith.

5.      Paragraphs 10 through 57 of this Declaration describe the structure of the relevant

Employee Programs before giving effect to changes to the scope of the authorization provided

for in the Revised Proposed Order.  Such changes and their expected financial impact are

described in the section entitled "Changes Reflected in Revised Proposed Order" in paragraphs

58 through 73 of this Declaration.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my review of relevant documents, information provided to me by

employees working under my supervision, or my opinion based upon experience, knowledge and

information concerning the operations of the Debtors and the pharmaceutical industry as a whole.

If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.      For the avoidance of doubt, under the Wages Motion, the Debtors are not

requesting the authority to make any payments to any member of the Sackler family and are not seeking authority to implement any new compensation programs. The Debtors seek authority only to continue certain pre-existing compensation programs, which I believe are critically necessary to maintain employee morale, ensure retention of critical Employees, and protect the value of Purdue's business. Other than the CEO, none of the named defendants in the litigation against the Debtors are current Employees, nor are they eligible to receive any payments under these compensation programs.

### Purdue's Work Environment

8.    Purdue continues to be a difficult place to work, and retaining and motivating Employees continues to be a challenge. In recent weeks, Employees have received an unprecedented barrage of calls from recruiters. Indeed, since the Petition Date, which was less than three months ago, at least 24 employees have resigned. Further, just since the Debtors filed the *Supplemental Declaration of Jon Lowne in Support of Motion For Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, (II) Employee and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 236] (the "**Supplemental Declaration**") on October 8, 2019, at least 15 employees have resigned. These employees worked in a variety of roles, including human resources, legal, information technology, manufacturing and quality control, and replacing them can be challenging and expensive. On average, non-exempt roles (i.e., not exempt under the Fair Labor Standards Act (generally hourly employees)) remain open for 45 days and exempt roles (i.e., exempt under the Fair Labor Standards Act (generally salaried employees)) remain open for 60 days. In addition to a loss of productivity during these vacancy periods, the Debtors are forced to incur recruiting,

4

job posting and onboarding costs to hire new employees.   In order to fill some roles, the Debtors may have to pay a contingency search fee which, depending on seniority, can range from 25% of an employee's first year salary to 33% of an employee's first year salary plus their first year target bonus amount.   For relatively senior employees, such as managers or directors, the Debtors may also have to offer sign-on bonuses in order to induce the candidate to accept an offer of employment with the Debtors.   With respect to lost productivity, the Debtors may be forced to rely on additional support from their advisors in the event of additional open positions in certain roles given that other employees are already significantly burdened with existing responsibilities. As an illustrative example, if a manager or director level employee on the finance team resigns and the position remains open for 60 days, the combined cost of replacing the employee in a case where payment of a contingency search fee and sign-on bonus is necessary and the Debtors must rely on additional support from AlixPartners to fill the role during the period while the position remains open could easily exceed 100% of such employee's base salary

9.      The Debtors fear that the failure to obtain the approval of the employee compensation programs discussed herein on a final basis would significantly accelerate the already damaging attrition faced by the Debtors.   I therefore believe that it is critical for the Company to continue to honor its commitments to its Employees to mitigate ongoing attrition, strengthen employee morale and maximize value of the Debtors' businesses.

**Annual Incentive Plan**

10.      As discussed in the Wages Motion, the Purdue Debtors maintain a long-standing annual incentive program ("**Purdue AIP**") for their Employees in the ordinary course of business.  The Purdue AIP has been in place substantially in its current form for over thirty years. The Rhodes Debtors similarly maintain a long-standing annual incentive plan ("**Rhodes AIP**"

5

and together with the Purdue AIP, the "**Debtors' AIPs**") for their Employees in the ordinary course of business, which has been in place substantially in its current form for over 10 years. For the avoidance of doubt, neither the Purdue AIP nor the Rhodes AIP was altered or amended in any way in conjunction with or in anticipation of these chapter 11 cases.

11.    The Debtors' AIPs are not retention plans premised solely on continuing employment – they are performance-based incentive plans designed to motivate Employees to achieve specific performance goals and compensate them for doing so.  The Debtors' AIPs have been a longstanding and substantial component of Employees' annual compensation packages for decades, and were the Debtors to withhold the payments contemplated by the Debtors' AIP, the Employees' overall total cash compensation would drop compared to their past experience and relative to their current expectation.  In addition, this could result in a situation where the Debtors' total compensation package is not competitive or comparable to other companies in the industry or with which the Debtors otherwise compete for talent.  I believe that denying participating Employees the chance to earn performance-based compensation consistent with past practice could create the risk of them being severely de-motivated and/or leaving Purdue.  I also believe it would be wholly inconsistent with maximizing the value of the Debtors' estates.

12.    The Debtors' long-standing AIPs are designed to provide a strong link between an Employee's compensation and the achievement of the Company's and/or Rhodes' annual business objectives and individual performance.  Under the AIPs, every year, in addition to base salary, Employees have the opportunity to earn a certain percentage of their compensation based upon the performance of the Company in achieving its business goals and the Employee's individual performance goals (discussed below).  For 2019, the Company maintains a single scorecard to measure performance against the Company's objectives for both the Rhodes

6

Debtors and Purdue Debtors, as described more fully below.  Due to the way the incentive payments under the Debtors' AIPs are calculated, they are an "at risk" component of a participant's compensation and vary based upon the Company's achievement of defined performance goals.  The design is consistent with the Company's pay for performance philosophy and allows for compensation decisions that better incentivize performance and the maximization of Purdue's enterprise value.

13.    All of the Debtors' 684[3] Employees are eligible for bonuses under the Purdue AIP or Rhodes AIP, as applicable.  Ten of the participants are insiders.  None of the remaining 674 participants covered by the Debtors' AIPs are insiders under the Bankruptcy Code.

### AIP Corporate Performance Targets

14.    As in past years, in 2019, the corporate objectives for the corporate scorecard were developed by the Company's senior management based on the Company's strategic priorities that are most relevant to the Company's success after extensive discussion with the Company's various business line leaders.  The 2019 corporate scorecard was then presented to the Board of Directors of Purdue Pharma Inc. (the "**Board**") for review and approval.  Within the corporate scorecard, each corporate objective is assigned a weight, an expected performance target, and threshold levels of achievement necessary to achieve minimum (0%) and maximum (150%) performance levels (such percentage, the "**Corporate Objective Results Percentage**").  Achievement of the 2019 corporate objectives and the Corporate Objective Results Percentage will be measured by senior management and presented to the Compensation and Talent

---

[3] Employees that have notified the Debtors that they are resigning but have yet to separate from the Debtors are excluded from this figure.

7

Committee of the Board (the "**Compensation and Talent Committee**")[4], which will determine and approve the Corporate Objective Results Percentage and report it to the Board.

15.    The Company's current 2019 corporate objectives, applicable to both the Purdue AIP and Rhodes AIP, are measured based on a scorecard of (i) 60% efficiency and process optimization (operating profit) metrics, (ii) 30% value creation / pipeline metrics, and (iii) 10% people and culture metrics.  These metrics will determine the Corporate Objective Results Percentage. More specifically, the 2019 corporate objectives for the Company and estimated achievement levels are as follows:

| Strategic Pillar | Pillar Weight | Objectives (sub-weight) | Estimated 2019 Score |
|---|---|---|---|
| Efficiency and Process Optimization | 60% | Purdue Debtors Operating Profit Margin of -$30 million (**50%**) | 139% |
| | | Rhodes Debtors Operating Profit Margin of -$10 million (**10%**) | 75% |
| Value Creation | 30% | NAL: Complete First Subject Enrolled in PhI Bioavailability study by end of Q2 2019 (**6%**) | 100% |
| | | NAG: Complete First Patient Enrolled in proof-of-concept PhII IAAC study by end of Q3 2019 (**6%**) | 100% |
| | | Adhansia XR: Launch Adhansia XR by end of Q3 2019 (**6%**) | 100% |
| | | Progress and achieve the following major milestones objectives for the Top 3 Projects currently in development for Rhodes Pharmaceuticals LP (**6% - each sub-objective weighted at 2%**)<br><br>(1) Initiate clinical study in Q4 2019 for Methylphenidate ER Tablets (Concerta);<br><br>(2) Completion of Manufacturing Exhibit Batches by the end of Q4 2019 for Scopolamine TDS;<br><br>(3) Initiate Pivotal Clinical Study in Q4 2019 for Nitazoxanide Tablet. | 100% |
| | | Present business plan for Rhodes / NC by late Q4 to Board that reflects the following key items (**6%**):<br><br>(1) An economically justified Product Portfolio diversification plan with a key focus on opioid/non-opioid;<br><br>(2) Leadership, management and headcount plan that reflects inherent synergies and simplification of the business;<br><br>(3) 2020 Budget and long term plan that reflect savings and investment rationale that support driving to a profitable business for RALP by 2022. | 100% |

---

[4] The Compensation and Talent Committee must consist of at least three members of the Board and members of the Compensation and Talent Committee are Board-appointed.

| People and Culture | 10% | Launch new Purpose and Values and implement with a minimum of three strategic initiatives by Q4 2019 **(10%)** | 110% |
|---|---|---|---|

16.     At the end of the year, the Corporate Objective Results Percentage is calculated by measuring the Company's actual performance against the scorecard. The Compensation and Talent Committee ultimately approves and reports to the Board the final Corporate Objective Results Percentage.  Throughout the course of the year, the scorecard may be adjusted to account for unanticipated or extraordinary events, such as the sale of a line of business, in order to ensure that the metrics remain relevant.

17.     The Company's performance metrics are carefully selected to incentivize Employees and maximize the value of the Company's businesses.  Importantly, the corporate objectives are not easily achievable and provide a necessary incentive to the Debtors' Employees. There was no certainty that any of the 2019 corporate objectives would be achieved when they were set.  Should the Company fail to meet its corporate objectives, a nontrivial percentage of Employees' compensation would be at risk.  Therefore, these performance metrics play a crucial role in incentivizing Employee performance.

*AIP Target Payouts*[5]

18.     The total targeted payout under the Purdue AIP related to calendar year 2019 would be $20,650,000, with a maximum potential Purdue AIP payout of $30,970,000.   The estimated actual payout based on 2019 performance to date would be approximately $24,360,000, with participants receiving approximately $51,186 on average.   Consistent with past practice, any amounts earned under the Purdue AIP would normally be paid by March 15, 2020.   The

---

[5] For the avoidance of doubt, this section describes target payouts before giving effect to the changes contemplated by the Revised Proposed Order.

estimated Purdue AIP payout amounts for 2019 are based on 476 eligible employees, assume an estimated 118% Corporate Objective Results Percentage, are calculated using a defined methodology and are necessary and appropriate under the Debtors' circumstances.[6]   Current performance against the Company's 2019 objectives (a single scorecard for the Rhodes Debtors and Purdue Debtors) is described below.

19.    Other than to its hourly non-exempt employees who are separately discussed below, the total targeted payout under the Rhodes AIP related to calendar year 2019 would be $4,790,000, with a maximum potential Rhodes AIP payout of $6,590,000.   The estimated total actual payout based on 2019 performance to date would be approximately $5,440,000, with participants receiving approximately $26,154 on average.   Consistent with past practice, any amounts earned under the Rhodes AIP would normally be paid by March 15, 2020.   The total estimated Rhodes AIP payout amounts for 2019 are based on 208 eligible employees, assumes an estimated 118% Corporate Objective Results Percentage, a 100% Individual Performance Percentage, are calculated using a defined methodology and are necessary and appropriate under the Debtors' circumstances.

20.    For its hourly non-exempt Employees, Rhodes funds an annual bonus pool equal to a target bonus of 6% of the total earnings for each of hourly non-exempt Employees for the period from November 1 through October 31, pro-rated for any partial year worked.   The bonus pool is then divided among active non-exempt hourly Employees, with amounts determined below, at, or above target, based on the determination of management as to the performance of each Employee.   Consistent with its practice for at least the last 20 years, for 2019 Rhodes will

---

[6] The estimated 118% represents the estimated Corporate Objective Results Percentage based on eleven months of actual results.   The actual results would be determined in January after review with the Compensation Committee.

pay such bonuses in mid-December 2019.  There are currently 62 Rhodes hourly non-exempt employees, and the annual bonus pool for 2019 is estimated to be $385,000, with participants receiving approximately $5,000 on average.  Payment of these amounts is necessary and appropriate under the Debtors' circumstances.

21.    In 2008, the Company moved to a broad band pay system.  The current incentive payment targets under the Debtors' AIPs, as a percentage of base salary, were established for each band level, to have an escalating percentage of the relevant Employee's compensation be "at risk" as seniority level increases as follows:

| Level | Payment Target (% of base salary) |
|---|---|
| Non-Exempt | 6% |
| MGT 1 – Appropriate Functional Title, e.g., Specialist | 7% |
| MGT 2 – Appropriate Functional Title, e.g., Senior Specialist | 10% |
| MGT 3 - Manager | 15% |
| MGT 4 – Senior Manager | 18% |
| MGT 5 – Associate Director | 21% |
| MGT 6 – Director MD 1 – Associate Medical Director, MD | 22% |
| MGT 7 – Executive Director MD 2 – Medical Director, MD | 26% |
| MGT 7HD – Head of Department MD 3 – Senior Medical Director, MD | 28% |
| MD 4 – Executive Medical Director, MD | 32% |
| Purdue Vice Presidents | 30% - 50% |
| Rhodes Vice Presidents | 45% - 60% |
| Above Vice President | 50%[7] |

---

[7] Payment Targets for persons above Vice President are 50% of base salary, unless otherwise negotiated. Currently, such payment targets range from 50% to 100% of base salary.

*AIP Measurement Against Corporate Performance Targets*

22.    For the 2019 Corporate Objective Results Percentage, performance against the operating profit metrics (weighted 60%) will be measured according to the scoring thresholds as follows, with the score percentage varying based on whether Purdue or Rhodes have fallen short of, met, or exceeded the operating profit margin targets set in the fourth quarter of 2018:

| Resulting 2019 Purdue Operating Profit Margin | Assigned Score Percentage |
|---|---|
| $70 million | 150% |
| $50 million | 140% |
| $30 million | 130% |
| $10 million | 120% |
| Negative $10 million | 110% |
| Negative $30 million | 100% |
| Negative $50 million | 70% |
| Negative $70 million | 40% |
| Negative $90 million | 0% |

| Resulting 2019 Rhodes Operating Profit Margin | Assigned Score Percentage |
|---|---|
| $10 million | 125% |
| $0 | 113% |
| Negative $10 million | 100% |
| Negative $30 million | 67% |
| Negative $50 million | 33% |
| Negative $70 million | 0% |

23.    Four of the value creation objectives are linked to specific timelines, related to the achievement of key milestones for certain of Purdue's NAL, NAG, and Adhanasia XR products and Rhodes' top three projects currently in development. As such, for 2019,

performance against these metrics will be determined based on whether achievement of these milestones was early, on-time, or late:[8]

| Timing of Completion | Assigned Score Percentage |
|---|---|
| Two quarters early | 150% |
| One quarter early | 125% |
| On-time | 100% |
| One quarter late | 75% |
| Two quarters late | 50% |
| Three quarters late | 0% |

24.    For 2019, Performance against the value creation objective related to presenting a business plan for Rhodes to the Board will be measured based on the number of the three goals that are completed to the satisfaction of the Board:[9]

| Number of Goals Satisfied | Assigned Score Percentage |
|---|---|
| 3 of 3 completed | 100% |
| 2 of 3 completed | 67% |
| 1 of 3 completed | 33% |

25.    For 2019, performance against the people and culture objective will be measured based on the number of strategic initiatives that are launched:[10]

| Strategic Initiatives Launched | Assigned Score Percentage |
|---|---|
| Four initiatives | 110% |
| Three initiatives | 100% |
| Two initiatives | 50% |
| One initiative | 25% |
| No initiatives | 0% |

---

[8] The Compensation and Talent Committee has the authority to recommend an alternate payout percentage based on the quality of the objective achievement.

[9] The Compensation and Talent Committee has the authority to recommend an alternate payout percentage based on the quality of the number of goals satisfied.

[10] The Compensation and Talent Committee has the authority to recommend an alternate payout percentage based on the quality of the strategic initiatives launched.

26.    Progress against the 2019 corporate objectives will be assessed according to the measurement methodologies discussed above, none of which are based on the promotion of any opioid products to prescribers.  Progress for 2019 is estimated as follows:

(a)    The operating profit targets assume operating conditions that may not be realized, and 60% of the scorecard metrics are tied to operating profit margin. The Purdue Debtors' business plan presented to the Board in June 2019 estimated an operating profit of negative $27 million for 2019, which is $3 million higher than the corporate scorecard target. Based on an October 2019 estimate, Purdue is estimated to achieve an operating profit of $48 million (139% estimated achievement);

(b)    the Rhodes Debtors business plan presented to the Board in June 2019 estimated an operating profit of negative $32 million for 2019, which is $22 million lower than the corporate scorecard target of negative $10 million. Based on an October 2019 estimate, Rhodes is estimated to achieve an operating profit of negative $26 million (75% achievement);

(c)    the Purdue value creation metrics with respect NAL, NAG and Adhansia are estimated to be completed on time (100% estimated achievement);

(d)    the Rhodes Pharmaceutical LP value creation metrics are estimated to be completed on time (100% estimated achievement);

(e)    the three goals under the Rhodes business plan objectives (product portfolio diversification, a headcount plan, and a 2020 budget) are on track to be completed (100% estimated achievement); and

(f)    under the people and culture objectives the Company has launched or is on track to launch the following five strategic initiatives (110% estimated achievement):

14

(i)     relaunch and rebranding of the Company's reward and recognition platform to be aligned with new values such that recognition and reward is provided for exhibiting the values;

(ii)    launch of an employee led Purpose and Values Activation Team;

(iii)   implemented individualized leader purpose and values coaching and developed a leader toolkit;

(iv)    created and distributed individual Executive Committee leader purpose and values blogs; and

(v)     conducted employee focus groups to identify and develop the Top 10 values-based behaviors and utilized results in mid-year performance discussions.

27.     Given the highly volatile nature of the bankruptcy process, and these chapter 11 cases in particular, at the time the scorecard was developed, it was not certain whether the Company would meet all of the individual targets for the 2019 Scorecard.  Based on the methodology described and based on performance to date, the estimated payout is 118%.  This payout percentage would be subject to final 2019 results/performance and Compensation and Talent Committee review, determination and approval.

28.     The 2019 corporate objectives are consistent with and are a continuation of past practice.  For example, the 2018 corporate objectives for the Purdue AIP were also based on a scorecard of (i) 60% efficiency and process optimization (operating profit), (ii) 30% value creation / pipeline, and (iii) 10% people and culture metrics. The 2018 corporate objectives for the Rhodes AIP[11] were similarly based on a combination of financial performance, value creation

---

[11] Prior 2019, the Rhodes AIP and the Purdue AIP had separate corporate objectives.

and people and culture metrics. For Rhodes Technologies, the 2018 AIP objectives and corresponding weights were: (i) increase shareholder value (20%), (ii) operational and commercial excellence (e.g., achieving operational expense budgets) (30%), (iii) regulatory and compliance excellence (20%), (iv) talent development (10%) and (v) advance portfolio diversification (20%). For Rhodes Pharmaceuticals, the 2018 AIP objectives and corresponding weights were: (i) value creation (strengthen business and shareholder value) (25%), (ii) achieve operational excellence (manage to budget) (25%), (iii) advance portfolio diversification (25%), (iv) talent development (15%) and (v) advance portfolio diversification through business development (10%).

### AIP Individual Performance Targets

29.    An individual's performance is measured based on his or her success in achieving individual annual objectives established at the beginning of the plan year. Individual annual objectives are set by the Employees' managers, in consultation with the Employees (with the exception of the CEO, as discussed below). Based on achievement of these objectives, an individual's performance level can range from 0% to 150% (such percentage, the "**Individual Performance Factor Percentage**"). An Employee's manager has the discretion to determine such Employee's Individual Performance Factor Percentage, which is then reviewed, adjusted as needed and approved by senior management or the Board, depending on level of seniority. Recommendations regarding insiders' Individual Performance Factor Percentage are presented to the Compensation and Talent Committee, which determines, approves and reports to the Board regarding the achievement of incentive compensation metrics for Executive Officers. With respect to the CEO, the Compensation and Talent Committee will identify, review and

recommend to the Board both the goals and objectives relevant to the compensation of the CEO, and will review and recommend to the Board for approval the compensation of the CEO.

30.     The individual annual objectives are designed to reflect concrete goals that are above and beyond Employees' day-to-day responsibilities. Individual performance metrics are linked to, and support the achievement of, the broader corporate objectives of (i) efficiency and process optimization (operating profit), (ii) value creation / pipeline, and (iii) people and culture. Within these three categories, metrics are individualized such that they can relate to specific departmental objectives or to individual objectives that the employee is responsible for leading.

***AIP Payout Structure and Calculation of Payment***

31.     The Purdue AIP applies both the Corporate Objectives Results Percentage and the Individual Performance Factor Percentage to the applicable target payment. An Employee's initial target payment is first multiplied by the Corporate Objectives Results Percentage, which yields an adjusted payment target. The adjusted payment target is then multiplied by the Employee's Individual Performance Factor Percentage. As an example, an employee with a $100,000 salary and a $10,000 target payment, with a Corporate Objective Results Percentage of 105% and an Individual Performance Factor Percentage of 95%, would receive an AIP payout of $9,975 ($10,000 * 1.05 * 0.95 = $9,975). This formula applies to both exempt and non-exempt Employees under the Purdue AIP.  The above is illustrative at the individual employee level.  It is important to note that the aggregate Purdue AIP payment pool for the Purdue Debtors, i.e., total payouts under the Purdue AIP, is fixed at the total of all target payments *multiplied by* the Corporate Objective Results Percentage, so Individual Performance Factor Percentages assigned to individual Employees must be managed within the confines of this total payment pool. Purdue

AIP payouts to both exempt and non-exempt Employees would normally be made by March 15, 2020.

32.    For Rhodes AIP exempt Employees, the Rhodes AIP applies the Corporate Objectives Results Percentage (as defined below) to 75% of the applicable payment target and the Employee's Individual Performance Factor Percentage (as defined below) to 25% of the applicable payment target, the sum of which determines the Employee's total AIP payout.  Under this formula, the employee described above ($100,000 salary and a $10,000 target payment, with a Corporate Objective Results Percentage of 105% and an Individual Performance Factor Percentage of 95%) would receive a payout of $10,250 ($10,000 * 0.75 * 1.05) *plus* ($10,000 * 0.25 * 0.95).  The above is illustrative at the individual employee level.  It is important to note that the aggregate AIP payment pool for the Rhodes Debtors is fixed at the sum of (i) 75% of the aggregate target AIP payments *multiplied by* the Corporate Objective Results Percentage and (ii) 25% of the aggregate target AIP payments, so Individual Performance Factor Percentages assigned to Employees must be managed within the confines of the 25% portion of the payment pool.  Rhodes AIP payouts to exempt Employees would normally be made by March 15, 2020. Rhodes non-exempt hourly Employees' 2019 payouts would normally be made in December 2019, at which time the Corporate Objectives Results Percentage would not yet be available. As a result, AIP payouts to Rhodes non-exempt Employees are paid at target (i.e., 6% of base salary) unless managers decide otherwise based upon an individual's performance.  However, the aggregate payout pool for Rhodes non-exempt Employees is fixed at the aggregate target amount of all Rhodes non-exempt hourly Employees so individual payouts must be managed within the confines of this fixed payout pool.

**Long-Term Results Plan**

33.    As discussed in the Motion, the Purdue Debtors and the Rhodes Debtors maintain

long-term results plans for Employees at the Director level and above (the "**Purdue LTRP**" and the "**Rhodes LTRP**," collectively, the "**Debtors' LTRPs**"), which have each been in place substantially in their current forms for nearly twenty years. The Debtors' LTRPs were most recently modified in 2019 to harmonize the vesting schedule below Vice President with the vesting schedule for Vice President and above, as described in more detail below. Neither of the Debtors' LTRPs were altered or amended in any way in conjunction with or in anticipation of these chapter 11 cases.

34.     The Debtors' LTRPs are long-term cash incentive programs that provide annual grants to eligible Employees, with the actual payments varying based on a performance factor percentage measured over a three-year performance period, as discussed in more detail below. Like the Debtors' AIPs, the Debtors' LTRPs are a longstanding component of eligible Employees' regular incentive package and, without the payments contemplated by the Debtors' LTRPs, I believe Employees' overall compensation would not be sufficiently competitive with those offered by other companies in the industry or with which the Debtors otherwise compete for talent. The Debtors LTRPs are not retention plans – they are longstanding incentive plans designed to compensate performance and motivate Employees to achieve specific performance goals.

35.     Employees at the Director level and above are positioned to significantly drive the Company's long-term performance and creation of value. As such, the Company believes that a long-term plan that adequately incentivizes successful outcomes is important and necessary. In designing the Debtors' LTRPs, the Company carefully considered the need for a long-term incentive plan and has carefully evaluated the continued need for a long-term incentive plan throughout the years.

19

36.     103 of the Debtors' current Employees, and 45 of the Debtors' former employees, are eligible for payments under the Purdue LTRP or Rhodes LTRP, as applicable, in 2020. Nine of the insiders are eligible for payments in 2020, while one does not become eligible for payments until 2021. None of the remaining 139 Employees eligible for payments in 2020 under the Debtors' LTRPs, and none of the former employees covered by the Debtors' LTRPs, are insiders.[12]

37.     The total targeted payout amount under the Purdue LTRP for current employees in March 2020 is approximately $5,680,000 and the estimated actual total payout is approximately $4,690,000, with participants receiving approximately $54,497 on average.[13] These payout amounts are necessary in light of the Debtors' circumstances.

38.     The total targeted payout under the Rhodes LTRP in March 2020 is approximately $1,170,000 for current employees, and the estimated payout is approximately $1,210,000,[14] with participants receiving approximately $67,465 on average.[15] These payout amounts are necessary in light of the Debtors' circumstances.

39.     Under the Debtors' LTRPs, the amount of the annual grant is generally equal to a percentage of the eligible Employee's base salary.  In 2019, the Purdue LTRP and the Rhodes LTRP were modified such that for eligible Employees below the Vice President level, the amount of the annual grant is equal to the Employee's AIP target percentage.  For Vice

---

[12] Although former employees eligible for payments under the Debtors' LTRPs have requested to be paid, the Debtors have agreed with the UCC not to make such payments.

[13] For the avoidance of doubt, such payouts are described before giving effect to the changes contemplated by the Revised Proposed Order.

[14] This estimate is based on the assumption that the 2019 Rhodes AIP payout percentage will be 113.5% for each individual.

[15] For the avoidance of doubt, such payouts are described before giving effect to the changes contemplated by the Revised Proposed Order.

Presidents in the Purdue LTRP, the amount of the annual grant is also equal to the Employee's AIP target percentage, with the exception of Employees who are members of the CEO's Executive Committee.[16]  With respect to the CEO's Executive Committee, as well as for Purdue Senior Vice Presidents and the CEO, the annual grant is a fixed dollar amount that is determined based on competitive external benchmark information for each role, which is then presented to and approved by the Compensation and Talent Committee.   For Vice Presidents in the Rhodes LTRP, the amount of the annual grant is equal to 25% of base salary.   For the Senior Vice President who participates in the Rhodes LTRP, the annual grant is a fixed dollar amount that is determined by assessing the applicable competitive external benchmark for that role, which is then presented to and approved by the Compensation and Talent Committee.  Each grant has a three-year performance period. Based on applied performance factor metrics during this period, Purdue LTRP and Rhodes LTRP participants may receive a payout that is less than or more than the amount of the target grant.

40.    For participants in the Debtors' LTRPs at the Vice President level or above, the annual LTRP grants vest and pay out at the end of the three-year performance period. Prior to the 2019 annual grants, for Purdue and Rhodes LTRP participants below the Vice President level, the annual grants vest and are paid at 33% over a three-year period, following the three-year performance period. Beginning with the 2019 annual grants, the vesting schedule for Purdue LTRP and Rhodes LTRP participants below the Vice President level was harmonized with the Vice President and above vesting schedule, i.e., the annual LTRP grants will vest and pay out at the end of the three-year performance period.

41.    For annual grants made in 2016 and earlier, under both the Purdue LTRP and

---

[16] The Executive Committee consists of 17 Employees (including seven insiders).

Rhodes LTRP, the performance metrics were set and determined for each of the three years during the three-year performance period. The payout for each participant was equal to the average of the participant's AIP performance factors determined for each of the three years within the three-year performance period. This design remains in place for the Rhodes LTRP.

42.    For the 2017 Rhodes LTRP grant, the performance metrics for each of the three years during the performance period are the same performance metrics used under the Rhodes AIP for the applicable year.  Therefore, the March 2020 payments for the 2017 Rhodes LTRP grant will be determined based on the average of the level of the performance factors achieved under the Rhodes AIP for 2017, 2018 and 2019.  For example, an individual who achieved a Rhodes AIP payout percentage of 110% in 2017, 80% in 2018, and 113.5% in 2019 would have a Rhodes LTRP performance factor of 101.16%, the average over the three years.

43.    For annual grants made in 2017 and later, the Purdue LTRP was redesigned such that performance factor metrics for each annual grant are determined based on the Company's most critical long-term strategic priorities measured over a three-year performance period, rather than each year within the three-year period. At the end of the cumulative three-year period, the final award to be paid out is determined based on actual achievement against the three-year target (i.e., the grant amount *multiplied by* the three-year performance factor). This design remains in place for the Purdue LTRP.

44.    The key metrics for the 2017 Purdue LTRP grant for the three-year performance period from 2017 to 2019 are as follows: (i) Board approved cumulative three-year operating profit margin (50%) and (ii) Board approved cumulative three-year net sales target from products other than OxyContin (50%).

45.     For the 2017 Purdue LTRP grant, the performance factor is a weighted average of the attainment of each of the two metrics discussed above. For example, if Purdue achieves an operating profit margin of $900 million against a target of $1 billion, it will have attained 90% of this performance metric; if the Company achieves non-OxyContin net sales of $700 million against a target of $1 billion, it will have attained 70% of this performance metric. The weighted average of these two percentages would be 80%, (0.5 * 90%) *plus* (0.5 * 70%), which would present the total performance factor for the relevant three-year performance period.  Based on this methodology, the total estimated performance factor for the 2017-2019 performance period under the Purdue LTRP is 72.9%, as illustrated by the table below.  For participants with a title of Vice President or more senior, such amount is scheduled to be paid in March 2020; for other participants, one-third of such amount is scheduled to be paid in March 2020, with two additional payments of one-third of such amount scheduled to be paid in March 2021 and March 2020.

| Performance Measure | Target | Projected Actual | Attainment % | Weight | Estimated Performance Factor |
|---|---|---|---|---|---|
| **Operating Profit Margin** | $1,259 million | $857 million | 68.1% | 50% | |
| **Net Sales from products other than OxyContin** | $963 million | $748 million | 77.7% | 50% | **72.9%** |

46.     The factors that drove the estimated performance factor to be below 100% include: the increased legal cost burden associated with the ongoing litigation against the Company, the divesting of Symproic, eliminating the sales force, accelerating market decline rates and the reduction of the employee workforce over the three-year period.

47.     For the sake of clarity, the amount paid in March 2020 for Purdue would be the following:

| Performance Period | Payout |
|---|---|
| 2015-2017 (actual) | $830,000 |
| 2016-2018 (actual) | $1,050,000 |
| 2017-2019 (estimated) | $2,810,000 |
| TOTAL | $4,690,000 |

48.    For the sake of clarity, the amount paid in March 2020 for Rhodes would be the following:

| Performance Period | Payout |
|---|---|
| 2015-2017 (actual) | $110,000 |
| 2016-2018 (actual) | $120,000 |
| 2017-2019 (estimated) | $980,000 |
| TOTAL | $1,210,000 |

49.    Both the Purdue LTRP and Rhodes LTRP incentivize leaders to meet and exceed the Company's strategic objectives. The Debtors' longstanding LTRPs are critical to the Company's long term viability, essential to the Debtors' reorganization efforts and in the best interests of the Debtors' estates.

**Sign-On Bonuses**

50.    In the ordinary course of business, the Company offers Sign-On Bonuses to certain prospective employees in order to encourage those people to accept an offer to work at Purdue and, where applicable, compensate prospective employees for some aspect of compensation that they might be forfeiting by leaving their current employer (e.g., an annual bonus, stock options or grants, or long-term incentive payments). The Company has been

24

offering Sign-On Bonuses to prospective employees for at least twenty years. Sign-On Bonuses are negotiated at arm's length between the Company (or at times a third-party search firm on behalf of the Company) and prospective employees (or their representatives) prior to their employment to induce the Employees to accept their offers of employment (i.e., the Company does not negotiate Sign-On Bonuses with Employees after they are actually employed).

51.    The amount and timing of any Sign-On Bonus is determined on a case-by-case basis by the HR Department (usually a combination of the HR Business Partners, Talent Acquisition and the Total Rewards teams). 12 Employees, 10 of which are non-insider Employees, were scheduled to receive Sign-On Bonuses as of the Petition Date, and one non-insider Employee has been granted a Sign-On Bonus following the Petition Date, in each case payable so long as they are in active, full-time employment with the Debtors as of each applicable payment date. As of the date hereof, the Debtors expect to pay $169,000 in Sign-On Bonuses to eight non-insider Employees and $1,987,500 in Sign-On Bonuses to two insider Employees.

52.    In most cases, Employees who received Sign-On Bonuses had a vested interest in equity-based compensation, a bonus or other benefits at the company at which they previously worked, and had to forfeit such compensation or benefits in connection with accepting employment at Purdue. These Employees are highly skilled individuals who have other options for employment, and may not have chosen to work at Purdue without a Sign-On Bonus or may elect to not continue to work at Purdue if the promised Sign-On Bonuses are not paid. It is commonplace in the pharmaceutical industry to offer incentives like the Sign-On Bonuses to prospective employees. It is also typical for Sign-On Bonuses to be paid both on the first day of employment and at future dates to mirror the payments the prospective employee is forfeiting by

25

accepting employment at Purdue and/or to provide a retentive effect.

53.     Two insiders are scheduled to receive Sign-On Bonuses—Christian Mazzi (Senior Vice President; President and Executive Medical Director of Adlon Therapeutics L.P.) and Marc L. Kesselman (Senior Vice President, General Counsel and Secretary).  The Company negotiated these Sign-On Bonuses with them prior to their employment, and the Sign-On Bonuses were necessary to induce them to accept their positions at Purdue.  With respect to Marc L. Kesselman, the Sign-On Bonus was intended to compensate him for the equity forfeited by leaving his former employer, the value of which was greater than the amount of his Sign-On Bonus, and to incentivize him to accept employment with Purdue over potential employment opportunities at other companies with very competitive compensation packages.

54.     If the Sign-On Bonuses were not to be paid, there could be a substantial impact on Employee morale. Further, the non-payment of these Sign-On Bonuses would create doubt about the Company's willingness and ability to honor various other Employee programs, and would create a risk that other employees will leave the Company, taking this as a sign of things to come. I therefore believe the payment of the Sign-On Bonuses is necessary to maximize the value of the Debtors' estates for all stakeholders and is in the best interests of the Debtors' estates.

### Non-Executive Retention Plan

55.     The Non-Executive Retention Plan provides for a cash-based incentive to be paid to approximately 110 critical non-insider Employees, generally quarterly through either April 1, 2020 or October 1, 2020, provided that the relevant Employee is in active, full-time employment with the Debtors as of each payment date. In 2020, the Debtors estimate they will pay approximately $8,068,654 with respect to Employees of the Purdue and Rhodes Debtors, with participants receiving approximately $73,351 on average.

56.     The Non-Executive Retention Plan was developed in 2018, in consultation with

our external advisors, to aid in the retention of Employees critical to the ongoing operations of different parts of the Debtors business. The Non-Executive Retention Plan was most recently modified in July 2019 (with Board approval) to add certain participants and extend payments for certain participants to October 2020. I was involved in the process of deciding which Employees were critical for the Company and who should be a participant in the Non-Executive Retention Plan. We evaluated the nature of the jobs held by these Employees and the functions of each role in determining criticality. All of the participants under Non-Executive Retention Plan are essential to the Company's reorganization efforts. Further, all insiders were excluded from participation in the Non-Executive Retention Plan.

57.     I believe the Debtors face a very real risk that some or all of the participants in the Non-Executive Retention Plan will depart for other employment opportunities if the Non-Executive Retention Plan is not approved on a final basis.  The Debtors have struggled to retain Employees in recent years. Twenty-four employees have left just since the Petition Date, and two of those employees left notwithstanding the fact that they were scheduled to receive meaningful retention payments under the Non-Executive Retention Plan. The uncertainty surrounding the Debtors' bankruptcy filing, compounded by the thousands of lawsuits and extreme negative publicity faced by the Debtors, has made retention extremely challenging. All of the participants in the Non-Executive Retention Plan are highly skilled and would easily find a new role at another company. The participants are critical to the Debtors' operations and would be very difficult to replace. It would cause irreparable harm to the Company if these Employees were to leave. For these reasons, the Non-Executive Retention Plan is necessary under the circumstances and in the best interests of the Debtors' and their estates.

## Changes Reflected in Revised Proposed Order

58.     The Revised Proposed Order would provide for the following limitations on the

authorization to continue the Debtors' AIP, Debtors' LTRP and Non-Executive Retention Plan and to pay Sign-On Bonuses that in total reduce the expected amount of payments by approximately $10 million.

### *Insider Participation in AIP*

59.     The Debtors have agreed to cap the authorization to make payments to Insider Employees on account of the Debtors' AIP for 2019 at the amount that would be payable if the Corporate Objective Results Percentage were 100%, rather than the maximum Corporate Objective Results Percentage of 150% (or the anticipated Corporate Objective Results Percentage of approximately 118% for the Debtors' AIP for 2019). The Debtors have further agreed that the authorization to make payments to the Debtors' CEO will be capped at 50% of the amount otherwise payable and the authorization to make payments to the Debtors' General Counsel will be capped at $250,000 less than the amount otherwise payable, in each case after giving effect to the cap on the Corporate Objective Results Percentage. With respect to the Debtors' CEO, the Debtors have also agreed that payments made to him under the 2019 Purdue AIP shall be (y) subject to reconsideration by the Court in the event that he is finally determined to be liable with respect his actions as an employee of the Debtors in connection with the sale of opioid products by a final non-appealable judgment of a court of competent jurisdiction and (z) subject to the condition that he shall not take any action with respect to any amounts received in respect of the 2019 Purdue AIP with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these chapter 11 cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts.

60.     In addition, the Debtors have agreed that the authorization to make payments to each Insider Employee on account of the Debtors' AIP will be subject to the 100% cap on the Corporate Objective Results Percentage and the conditions that (i) 50% of such amount due may

be paid no earlier than April 1, 2020 and 50% of such amount due may be paid no earlier than July 1, 2020 and (ii) such Insider Employee must agree to repay 25% of the aggregate amount received if such Insider Employee resigns prior to September 1, 2020 (the "**Insider Payment and Clawback Schedule**").

61.     These changes are expected to reduce the total amount of payments to Insider Employees on account of the Debtors' AIP for 2019 by approximately $2.8 million or 33%.

### *Insider Participation in LTRP*

62.     The Debtors have agreed to cap the authorization to make payments to Insider Employees that would be due in 2020 on account of the Debtors' LTRP at 46% of the amounts otherwise payable. This reduction in authorization effectively includes the elimination of authorization to pay any amounts under the Debtors' LTRP that are on account of the Debtors' performance with respect to opioid-related metrics in 2017 or earlier, which constitutes less than 54% of the amounts otherwise payable in 2020.  The Debtors have further agreed not to seek authorization to make any payments to the Debtors' CEO under the Debtors' LTRP in the Revised Proposed Order.

63.     In addition, the Debtors have agreed that authorization to make payments to Insider Employees that would be due in 2020 on account of the Debtors' LTRP would be subject to the Insider Payment and Clawback Schedule.

64.     These changes are expected to reduce the total amount of payments to Insider Employees on account of the Debtors' LTRP in 2020 by approximately $1.2 million or 65%.

### *Non-Insider Participation in AIP*

65.     The Debtors have agreed to cap the authorization to make payments to non-Insider Employees on account of the Debtors' AIP in the aggregate at the amount that would be payable to such non-Insider Employees if the Corporate Objective Results Percentage were

100%, rather than the maximum Corporate Objective Results Percentage of 150% (or the estimated expected Corporate Objective Results Percentage of approximately 118% the Purdue AIP for 2019). The Debtors would be authorized to vary the amount paid to individual employees (up to an individual cap of 150% of the target payment amount of each applicable employee) within the confines of such aggregate cap.

66.    The Debtors have agreed authorization to make payments to each non-Insider Employee under the Debtors' AIP that is exempt from the Fair Labor Standards Act subject to the conditions that (i) such amount may be paid no earlier than April 1, 2020 and (ii) such Employee must agree to repay 50% of the aggregate amount received if such Employee resigns prior to July 1, 2020 and 25% (without duplication) of the aggregate amount received if such Employee resigns prior to September 1, 2020 (the "**Non-Insider Payment and Clawback Schedule**").  Payments to non-Insider Employees under the Debtors' AIP that are not exempt from the Fair Labor Standards Act would be authorized to be made on the preexisting schedule and would not be subject to such clawback provisions.

67.    The Debtors are also not seeking authorization to make payments with respect to the Debtors' AIP to former Employees that that had separated from the Debtors prior to the Petition Date or Employees that resign prior to the applicable payment date.

68.    These changes are expected to reduce the total amount of payments to non-Insider Employees on account of the Debtors' AIP for 2019 by approximately $3.1 million or 15%.

### *Non-Insider Participation in LTRP*

69.    The Debtors have agreed to cap the authorization to make payments to non-Insider Employees on account of the Debtors' LTRP due in 2020 at 56% of the amounts otherwise due with respect to grants to Employees with the job title of Vice President at the time

of the grant (there are no non-Insiders with job titles more senior than Vice President[17]) and 76% of the amounts otherwise due with respect to grants to Employees with job titles less senior than Vice President at the time of the grant. With respect to Employees with Vice President job titles, this reduction in authorization effectively includes the elimination of authorization to pay any amounts under the Debtors' LTRP that are on account of the Debtors' performance with respect to opioid-related metrics in 2017 or earlier, which constitutes less than 44% of the amounts otherwise payable in 2020 to such Employees. In addition, the Debtors have agreed that authorization to make payments to non-Insider Employees that are due in 2020 on account of the Debtors' LTRP would be subject to the Non-Insider Payment and Clawback Schedule.

70.    The Debtors are also not seeking authorization to make payments with respect to the Debtors' LTRP to former Employees that that had separated from the Debtors prior to the Petition Date or Employees that resign prior to the applicable payment date.

71.    These changes are expected to reduce the total amount of payments to non-Insider Employees on account of the Debtors' LTRP in 2020 by approximately $2.4 million or 45%.

### *Sign-On Bonuses*

72.    The Debtors have agreed to seek authorization to pay currently outstanding Sign-On Bonuses to Insider Employees on the condition that such payments not be made until three months after the date that such Sign-On Bonus payments are currently due and that such payments be conditioned on the relevant Insider Employee agreeing to repay 100% of the amount received if such Insider Employee resigns prior to December 31, 2020.

### *Other Reductions*

73.    The Debtors have also agreed to reduce aggregate payments to insiders under the

---

[17] *See* Supplemental Declaration ¶ 9 (noting that all Employees with the title of Senior Vice President or more senior are considered insiders).

Debtors AIPs, Debtors' LTRPs and/or Sign-on Bonuses by an additional $500,000 by means of the Debtors' choice.

## Advancement of Legal Expenses

74.     The ability of Purdue to advance legal fees to current and former employees is critical to the Debtors' reorganization efforts. There would be an irreparable harm to Purdue if it were unable to advance these legal fees. For the avoidance of doubt, Purdue is not seeking authority to advance legal fees for any member of the Sackler family, and ceased doing so on March 1, 2019.

75.     Purdue faces an unprecedented number of lawsuits. The amount of litigation and the uncertainty that it creates has created a stressful and unsettling work environment. These Employees never previously considered that they would have to hire a lawyer, and the thought of doing so is worrisome. In addition, the possibility of having to pay for legal fees out-of-pocket would be economically devastating to many Employees, the majority of whom are only making $100,000 to $200,000 a year.

76.     I believe it is critical for the Company to continue to stand behind its Employees and assist them if they are named in a lawsuit, subpoenaed or otherwise become involve in a legal action, and consequently it is necessary for the Company to be able to cover the legal expenses of current and former employees. The coverage of former employees is important because all current Employees fear they may one day be former employees. In addition, covering former employees is an important morale issue, as many former employees remain friends with current Employees.

77.     If Purdue were to cease advancing legal fees, there is a significant risk that Employees would resign due to a fear of becoming involved in litigation and having to incur substantial costs. Any Employees that remain would likely be scared, distracted and have a

difficult time continuing to perform at the highest level. All of this would cause economic harm to the Company.

78.    Purdue is taking unprecedented precautions to ensure that the advancement of legal fees is proper and in Purdue's best interests. First, any decision to advance legal fees must be approved by the Special Committee of the Board, which consists solely of directors with no affiliation with the Sackler family. Second, Purdue is requiring each person for whom the Company is advancing legal fees to agree to reimburse the Company should it be determined that such person did not act in good faith, or, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful, or is otherwise not entitled to be indemnified under the terms of PPLP's Fifth Amended and Restated Limited Partnership Agreement, dated as of June 20, 2019 (the "**LPA**"). Third, Purdue is also requiring each indemnitee to sign an affirmation that he or she has conducted himself or herself in good faith and reasonably believes that his or her conduct was in the best interest of the Debtors, and acknowledging the standards with respect to indemnification set forth in the LPA, including the requirement to repay advances as described above.

79.    For the foregoing reasons, I believe that advancing legal fees and expenses to current and former employees as set forth in the Wages Motion is in the best interests of the Debtors and their estates.

## Conclusion

80.    I believe that continuation of the foregoing Employee Programs is crucial to the Debtors' business operations during the pendency of the chapter 11 cases, as they will maintain employee morale, dedication, confidence, and cooperation and maximize the Debtors' ability to reorganize successfully. The failure to honor these programs would irreparably impair the Debtors' relationships with their Employees, adversely impact the Debtors' ability to deliver to their

33

customers superior products and services, and hinder the Debtors' restructuring efforts.

81.    In sum, the relief requested in the Wages Motion is necessary to avoid irreparable harm to the Debtors, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and constitutes a critical element in maximizing value for all stakeholders. Accordingly, on behalf of the Debtors, I respectfully submit that all of the relief requested in the Wages Motion should be approved on a final basis to the extent not already approved.

*[Remainder of Page Intentionally Left Blank]*

82.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   December 2, 2019

By:   */s/ Jon Lowne*
      Jon Lowne
      Senior Vice President and Chief
      Financial Officer