DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF DEBTORS' KEY
EMPLOYEE PLANS**

I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am a Director at Willis Towers Watson PLC ("**WTW**" or "**Willis Towers Watson**"). WTW has been engaged by Purdue Pharma L.P. and its above captioned wholly-owned direct and indirect subsidiaries (collectively, the "**Debtors**") to provide compensation

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

consulting services. I am familiar with the structure of the Debtors' prepetition compensation plans which Debtors wish to continue, including the Annual Incentive Plan ("**AIP**"), the Long-Term Results Plan (**"LTRP"**), and the "**Non-Executive Retention Plan**" (sometimes collectively referred to herein as, "**Key Employee Plans**"). Descriptions of the Key Employee Plans are set forth in the *Debtors' Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**").[2]

2.      I submit this declaration (this "**Declaration**") in further support of Wages Motion. I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the Key Employee Plans, my team's and my research into compensation practices for companies in the biopharma industry and general industry, as well as other companies that have recently filed for chapter 11 protection, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      I am informed by the Debtors and Debtors' other advisors that the Debtors originally sought authority to continue their Key Employee Plans in the same manner that they have existed historically, but subsequently engaged in extensive negotiations with the Official

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Wages Motion.

Committee of Unsecured Creditors (the "**Committee**") and other parties in interest and agreed to certain modifications to certain of the programs in order to secure the support of the Committee for the continuation of the Key Employee Plans as modified.

5.      This Declaration describes the Key Employee Plans as they existed prior to any of the modifications that the Debtors have agreed to with the Committee. It is my understanding that these modifications reduce the amount of payments made under certain of the Key Employee Plans. Accordingly, certain compensation levels would actually be lower on both an absolute and relative basis than is described herein.

6.      I am further informed that the Debtors made no changes to the AIP or LTRP in anticipation of the chapter 11 filing.  Last, I understand that Debtors seek approval of post-filing payments that are due in 2020 under the Non-Executive Retention Plan, which are necessary to maintain employee morale, mitigate attrition, and protect the value of Purdue's business during this bankruptcy.  The Non-Executive Retention Plan was not specifically implemented in anticipation of a chapter 11 filing, but was put in place to respond to attrition risks in connection with the distress the company was facing. Based on my team's and my review of the Non-Executive Retention Plan, the post-filing payments for which Debtors seek approval are not new awards; rather, upon their dates of grant, they were simply scheduled for payment on dates that will now occur post-filing given the current circumstances of the Debtors.

7.      Note that references in this Declaration to "executives" and "middle management plus professional" are not intended to serve as any reference point other than to map job levels and respective compensation to survey data.  This Declaration applies to "insiders," as that term is defined in the Bankruptcy Code, only because the insiders participate in the AIP and LTRP.

# QUALIFICATIONS AND BACKGROUND

A. **Qualifications**

8. I received my Juris Doctor from University of San Diego School of Law in 1998, graduating Magna Cum Laude and Order of the Coif, and my Bachelor of Arts in international business from San Diego State University in 1994. After working at Gibson Dunn as an associate in the corporate practice, Pillsbury Winthrop as an associate in the executive compensation practice, and The Loftin Firm, P.C where I was a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014. I joined Willis Towers Watson in 2016 where I have been continuously employed ever since.

9. Willis Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. Willis Towers Watson designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. Willis Towers Watson focuses on four key business segments: corporate risk and brokering; human capital and benefits; exchange solutions; and investment, risk, and reinsurance.

10. My responsibilities at Willis Towers Watson have primarily involved consulting to for-profit companies and not-for profit organizations, specifically regarding executive compensation. I routinely work with public and private companies in various industries regarding compensation philosophy, pay competitiveness, incentive plan design, and other compensation-related analyses and have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

11. I am highly experienced in executive, management, and employee compensation

4

with over 20 years of experience in the field. During my tenure at Willis Towers Watson, I have worked closely with a range of companies undergoing a financial restructuring in developing a variety of pre-petition and post-petition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees. Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. 2018); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. 2018); *In re Claire's Stores Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re FULLBEAUTY Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. 2019); *In re Parker Drilling Company*, No. 18-36958 (MI) (Bankr. S.D. Tex. 2018); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. 2018).

**B. Background**

12.  The Debtors retained Willis Towers Watson to serve as advisors to the Board's Compensation Committee. Willis Towers Watson's first assignment was to review the Non-Executive Retention Plan. Since Willis Towers Watson was retained by the Debtors, I, in coordination with my team at Willis Towers Watson, have familiarized myself with the Debtors' operations, business goals and other Key Employee Plans. The Key Employee Plans were designed by the Debtors and their other advisors.

13.  As part of this process, Willis Towers Watson conducted pay benchmarking by gathering and analyzing relevant market compensation data, including total direct compensation offered by participants in Willis Towers Watson's 2018 Pharmaceutical Executive Compensation and Middle Management, Professional and Support Surveys. Willis Towers Watson conducted pay benchmarking for a representative sample of non-insider employees; namely those who

participate in the Non-Executive Retention Plan. Willis Towers Watson also conducted pay benchmarking for the insiders.

14. Willis Towers Watson also reviewed and commented on the plan design and total cost of the Non-Executive Retention Plan as compared to Key Employee Retention Plans ("**KERPs**") recently implemented by other companies in chapter 11 bankruptcy. My team and I commented on the design and total cost of the AIP and LTRP as compared to other companies in the market.

15. It is my understanding that prior to Willis Towers Watson's engagement by the Debtors, the Key Employee Plans were subject to oversight, review, and approval by the Board of Directors.

## CONTINUATION OF ANNUAL AND LONG-TERM RESULTS PLAN

### A. Analysis of AIP Design (Applies to Insiders and Non-Insiders)

16. The AIP for the 2019 performance period (the "**2019 AIP**") has the following design features:

 (a) Performance based on three metrics: 60% operating profit margin, 30% value creation / pipeline, and 10% people and culture;
 (b) Payout range is 0% at threshold to 150% payout at maximum;
 (c) Regardless of participant job level, average target bonuses as a percentage of base compensation are below market averages (ranging between 4 and 11 percentage-points below market depending on base compensation level).

17. Based on a review of a combination of biopharma and cross-industry publicly disclosed data (proxies), survey data and WTW's consulting experience, my team and I observed the following components in the annual incentive plans in the market:

 (a) Performance based on three to four metrics: 62% of companies use operating income/profit measures; 67% use operating / strategic measures;
 (b) Median threshold to maximum payout range is 0% at threshold to 200% payout at maximum;
 (c) Median percentage of performance maximums for bottom-line metrics is 120%.

6

18. I found the 2019 AIP to align with general market practices. Specifically, as compared to market practice, the performance metrics under the 2019 AIP are consistent with those of other companies in the market, the upside payout under the AIP is conservative and the AIP plan design is consistent with those of other companies in the market.

19. The 2019 AIP applies to all employees, including the insiders. This is consistent with participation rates in the market, where most employees participate in variable-pay incentive programs similar to the AIP. Accordingly, I have found that that annual incentive opportunities are necessary to include in employees' total pay mix to have competitive compensation programs.

20. Last, it is my understanding that certain AIP performance metrics under the 2019 AIP have already been achieved based on actual performance and therefore amounts under the 2019 AIP would be payable but for the Company's Chapter 11 filing.

**B. Compensation Market Positioning of AIP For Non-Insiders**

21. Across all base compensation levels, the aggregate target payouts under the AIP fall below the average aggregate target payouts in the biopharma industry.

22. Purdue AIP average target bonuses (green text shown below) as a percent of base are below pharmaceutical and health sciences market averages (purple bars shown below). We have shown maximums in parentheses. According to Willis Towers Watson's consulting experience, large US-based pharmaceutical companies have tended to pay out bonuses at or above target over the last five years.

7



### C. Analysis of LTRP Design (Applies to Insiders and Non-Insiders)

23. The LTRP has the following design features:

    (a) Performance measured over a three-year period;
    (b) For the most recent LTRP grants to employees of the Purdue Debtors, performance is based on two metrics: 50% operating profit margin, and 50% R&D / pipeline (four pipeline goals, each equally weighted at 12.5%);
    (c) For LTRP grants to employees of the Rhodes Debtors, performance for each year in a three-year performance cycle is based on the same metrics applied to the AIP for the applicable year;
    (d) Payout range is 0% at threshold; there is no maximum;
    (e) Performance / vesting cycle: 100% cliff vest and payment after three-year performance cycle; except that for grants made prior to 2018 to employees below-VP levels payment is subject to further vesting schedule of one-third each year after the three-year performance cycle.

24. Based on a review of a combination of biopharma and cross-industry publicly disclosed data (proxies), survey data and WTW's consulting experience, my team and I observed the following components in the long-term incentive plans of companies in the market:

    (a) Performance based on multiple metrics: two to three measures at 50th and 75th percentiles respectively; exclusive of public company-only metrics (e.g., TSR), the most prevalent metrics among companies include: revenue (28%), profit measures (18%) and strategic milestones (16%);
    (b) Median threshold to maximum payout range is 50% at threshold to 200% payout at maximum (several companies use 0% threshold); 52% of observed companies

8

        paid 50% for threshold performance, and 22% of observed companies paid 0% for threshold performance;

   (c)  Performance / vesting cycle: median performance cycle is three years; 91% of companies have 100% cliff vesting at the end of the applicable performance cycle.

25.    I found the LTRP to align with general market practices. Specifically, although the LTRP design differs in that it does not have a stated maximum, the performance metrics and general design are consistent with those of other companies in the market.

26.    I also found that for LTRP-eligible employees, long-term incentive opportunities are necessary to include in such employees' total pay mix to have competitive compensation programs.

### D. Compensation Market Positioning of LTRP For Non-Insiders

27.    The median target payments under the LTRPs are, across all base salary ranges, below biopharma market medians.

28.    Purdue LTRP median values (green text shown below) as a percent of base are below pharmaceutical and health sciences market medians (purple bars shown below).



## CONTINUATION OF NON-EXECUTIVE RETENTION PLAN

**A. Analysis of Non-Executive Retention Plan Design (Applies Only to Non-Insiders)**

29. The Non-Executive Retention Plan has a smaller subset of participants than the AIP and the LTRP as its purpose it to retain a small percentage of critical non-insiders.

30. The Non-Executive Retention Plan includes certain key, non-insider employees who I understand are central to the successful completion of the Debtors' restructuring, and therefore, critical to retain. This is typical of retention programs for distressed companies to retain critical, hard-to-replace employees. I understand that the 110 Non-Executive Retention Plan Participants represent a cross-section of various functions, including, but not limited to, human resources, accounting, legal, analytics, business intelligence, information technology, finance, operations, R&D, medical and engineering. The typical frequency of payment under the Non-Executive Retention Plan —in quarterly installments—is consistent with industry standards.

31. In evaluating the effectiveness of the Non-Executive Retention Plan designed by the Debtors and their other restructuring advisors, my team and I reviewed retention opportunities and design features in key employee retention plans filed in other chapter 11 cases. With respect to this analysis, my team and I analyzed 37 companies that implemented a Non-Executive Retention Plan with revenues between approximately $500 million and approximately $5 billion and submitted chapter 11 petitions within the past five years (the "**KERP Peer Group**"). The companies in the KERP Peer Group are:

| | |
|---|---|
| Aceto Corporation | Gordmans Stores, Inc. |
| Aéropostale, Inc. | Hexion Holdings LLC |
| American Apparel, Inc. (2015) | hhgregg, Inc. |
| American Apparel, Inc. (2016) | Linn Energy |
| Appvion, Inc. | Nine West Holdings, Inc. |
| Boomerang Tube LLC | Pacific Sunwear of California, LLC |

| | |
|---|---|
| BPS US Holdings Inc. (Performance Sports Group) | Patriot Coal Corporation |
| Breitburn Energy Partners LP | Quiksilver Inc. |
| Bristow Group Inc. | RadioShack (RS Legacy Corporation) |
| Caesars Entertainment Operating Company, Inc. | Republic Airways Holdings Inc. |
| Cenveo, Inc. | Roadhouse Holding Inc. |
| Chassix Holdings, Inc. | SunEdison |
| Ciber, Inc. | Tidewater Inc. |
| Claire's Inc. | Tops Holding II Corporation |
| Cloud Peak Energy Inc. | Ultra Petroleum Corp. |
| FirstEnergy Solutions Corp. | Walter Energy, Inc. |
| Fresh & Easy, LLC | Welded Construction, L.P. |
| FTD Companies, Inc. | Westinghouse Electric Company LLC |
| Gander Mountain Company Inc. | |

32. In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of retention plans generally for other companies in chapter 11.

33. The Non-Executive Retention Plan has the following primary design features:

(a) Cash retention plan for certain individuals or groups, with payments based on continued employment according to the following schedules:
  (1) 55 employees (46 Rhodes employees and 9 Purdue employees) receive payments with claw-back schedules as follows:
    i. Payments made in 2020 will be subject to clawback if employee leaves before 12/31/20.
  (2) 44 receive payments with claw-back schedules as follows:
    i. Payments made in Jan 2020 and April 2020 are subject to clawback if employee leaves before 6/30/20.
    ii. Payments made in July 2020 and October 2020 are subject to clawback if employee leaves before 12/31/20.
  (3) 8 were granted awards in July 2019 with payments beginning in 2020.
    i. Those amounts are subject to clawback if employee leaves before 12/31/20.
  (4) 2 receive payments with the following clawback schedule :
    i. Any payments made are subject to clawback if employee leaves within one year of payment date.
  (5) 1 receives payments with the following clawback schedule :
    i. Granted award in July 2019 with payments beginning in 2020. Those amounts are subject to clawback if employee leaves before 12/31/20. Payments made in 2019 are subject to clawback if employee leaves before 12/31/19 .

11

        ii. Granted award in March 2019 with payments in 2020. Payment is subject to clawback if employee leaves before 6/30/20.

(b) Participants comprise 110 non-insiders of varying levels throughout the organization; of which a representative sample of 92 participants were matched into either our executive survey or middle management and professional survey based on responsibilities associated with each role. I understand that Non-Executive Retention Plan participant selection was based on a variety of factors (not all applying to every participant), including, but not limited to, breadth and depth of responsibility; the effectiveness and need for an individual's leadership through the chapter 11 process or a critical skill set that would be difficult to replace during the bankruptcy process; belief that there will likely be a continuing role for an individual post-emergence; an individual's ability to provide departmental leadership during the Chapter 11 process; as well as the increased workload/responsibility expected to be imposed on such individuals as a result of staff reductions.

(c) Estimated cost of the remaining payments to be made under the Non-Executive Retention Plan post-filing is approximately $8 million.

(d) Average retention payment is approximately $73,000.

(e) Award opportunities as a percentage of salary ranged from 6% to 100% (6 participants); with the average award as a percentage of base salary is 28%.

(f) A Non-Executive Retention Plan Participant who is terminated without "Cause" or terminates for "Good Reason" (as defined by Debtors) before the end of the retention period will receive the full award; and

(g) A Non-Executive Retention Plan Participant who voluntarily leaves the Debtors' employment or is terminated with Cause forfeits any unpaid amounts.

34. Based on a review of the key employee retention plans implemented by the KERP Peer Group, my team and I observed the following components:

(a) Payments are typically cash-based;

(b) 46% provided installments, while 43% provided only lump sum payments; four companies (11%) provided both lump sum and installment payments with the form of payment varying by employee group;

(c) Payments are typically earned based on continued employment through specified dates (i.e., performance conditions do not typically apply);

12

(d) Participation ranges from 7 to 1,424 employees. The Debtors' Non-Executive Retention Plan participation of approximately 110 participants falls between the market 75th percentile of 84 participants and the 90th percentile of 166 participants;

(e) Award opportunities typically vary by employee level or tier; and

(f) The number of participants expressed as a percentage of headcount is 15.07%; this approximates the market 90th percentile (15.74%).

### B.    Compensation Market Positioning of Non-Executive Retention Plan

35.    I found the Non-Executive Retention Plan awards across individuals and in the aggregate to have a retentive effect; particularly given my experience that retention in highly distressed companies is more difficult than for normal course companies. Increasing total direct compensation through retention will have more likelihood of incenting critical talent to remain with an extremely strained company. In the aggregate, total direct compensation (base salary plus annual and long-term incentive opportunities) market positioning for executive survey employees moves from 7% below median without retention to 17% above median but 23% below the 75th percentile with retention. In the aggregate, total direct compensation market positioning for middle management and professional survey employees moves from 9% below median without retention to 6% above median but 11% below the 75th percentile with retention. These results are shown in tabular form below for clarity:

|  | Variance | | | |
|---|---|---|---|---|
|  | Incumbent TDC vs. Survey TDC Median | Incumbent TDC + Retention vs. Survey TDC Median | Incumbent TDC vs. Survey TDC 75th percentile | Incumbent TDC + Retention vs. Survey TDC 75th percentile |
| Executive | -7% | +17% | -39% | -23% |
| Middle Management + Professional | -9% | +6% | -24% | -11% |

13

36. Competitive positioning is largely a result of the following factors:

- Pharmaceutical & Health Sciences Industry pay is typically higher than general industry pay, hence any comparison to general industry Chapter 11 cases will be higher given pay levels for the industry;

- Debtors' need to offer more generous retention payments to right-size compensation opportunities in a distressed scenario than compared to market in certain instances to retain the most critical non-executive employees; and

- Due to attrition over the last couple of years, a large percentage of Debtors' non-executive employees are critical and remain a continuous flight risk, resulting in the number of participants as a percentage of headcount exceeding market norms.

37. Absent approval to continue the Non-Executive Retention Plan, the Debtors' ability to retain their key talent will be challenged given the general uncertainties attendant to chapter 11, and their specific, unique retention challenges given the on-going public scrutiny and media coverage. Specifically, I understand that in 2017 and 2018 overall Company headcount, exclusive of the Rhodes Debtors, was reduced by over 1,000 employees—a 67% reduction with 856 of those reductions occurring in 2018. I also understand that from 2018 to date the Company has experienced an attrition rate of over 19% among the top tier of employees (which includes Employees at the Associate Director level and above). According to the Debtors, the litigation faced by the Debtors has consumed a significant amount of employee time and energy, and put a tremendous strain on employee morale.

14

**CURRENT TOTAL DIRECT COMPENSATION MARKET POSITIONING**

38. In the aggregate, total direct compensation market positioning (which includes participants' base salaries and incentive opportunities under the AIP and LTRP) for non-insider is as follows: 7% below median for executive survey employees and 9% below median for middle management and professional survey employees.

39. The Non-Executive Retention Plan is necessary to move such employee's compensation above the median for middle management and professional survey employees. In the aggregate, total direct compensation (base salary plus annual and long-term incentive opportunities) market positioning for executive survey employees moves from 7% below median without retention to 17% above median but 23% below the 75th percentile with retention.

40. In the aggregate, total direct compensation market positioning for middle management and professional survey employees moves from 9% below median without retention to 6% above median but 11% below the 75th percentile with retention. These results are shown in tabular form below for clarity:

|  | Variance | | | |
|---|---|---|---|---|
|  | Incumbent TDC vs. Survey TDC Median | Incumbent TDC + Retention vs. Survey TDC Median | Incumbent TDC vs. Survey TDC 75th percentile | Incumbent TDC + Retention vs. Survey TDC 75th percentile |
| Executive | -7% | +17% | -39% | -23% |
| Middle Management + Professional | -9% | +6% | -24% | -11% |

41. Because all of the Debtor's employees have been participating in the AIP and many of the Debtors employees have been participating in the LTRP, failure to provide these programs would result in a significant cut to total direct compensation. In addition, for

15

participants in the Non-Executive Retention Plan, cutting AIP and LTRP would result in aggregate market positioning of total direct compensation below market median (14% below median for executives and 8% below median for middle management and professional employees).

42. Last, on a case-by-case basis, failure to provide incentive opportunities under the AIP and LTRP to eligible participants who are not included in the Non-Executive Retention Plan would result comparatively in an even larger compensation reduction. We have shown aggregate variances by scenario in tabular form below for additional clarity:

|  | Variance | | | |
| --- | --- | --- | --- | --- |
|  | Incumbent TDC vs. Survey TDC Median | Incumbent TDC + Retention vs. Survey TDC Median | Incumbent TDC vs. Survey TDC 75th percentile | Incumbent TDC + Retention Vs. Survey TDC 75th percentile |
| Executive Survey Employees | -7% | +17% | -39% | -23% |
| Middle Management + Professional Survey Employees | -9% | +6% | -24% | -11% |

|  | Variance | | |
| --- | --- | --- | --- |
|  | Incumbent Base vs. Survey TDC 25th percentile | Incumbent Base vs. Survey TDC Median | Incumbent Base vs. Survey TDC 75th percentile |
| Executive Survey Employees | -24% | -44% | -63% |
| Middle Management + Professional Survey Employees | -16% | -29% | -41% |

If the programs were reduced to 75% of LTRP and 50% of Retention, Purdue's aggregate pay competitiveness for non-insiders would be as follows:

16

|  | Variance | | | |
|---|---|---|---|---|
|  | Incumbent TDC vs. Survey TDC Median | Incumbent TDC + Retention vs. Survey TDC Median | Incumbent TDC vs. Survey TDC 75th percentile | Incumbent TDC + Retention vs. Survey TDC 75th percentile |
| Executive Survey Employees | -12% | 0% | -42% | -34% |
| Middle Management + Professional Survey Employees | -10% | -3% | -25% | -19% |

43.  As noted earlier, I understand that the Debtors have now reached an agreement with the Committee to materially reduce certain payments under the Key Employee Plans. Accordingly, the aggregate total direct compensation market positioning for non-insiders would be even further below the median than described above in the absence of either the Non-Executive Retention Plan or the AIP and LTRP. These changes further reinforce the need for the Debtors to be able to continue to provide the Non-Executive Retention Plan, AIP and LTRP to their employees in order to offer a competitive total compensation package.

44.  In addition, I understand that the Debtors have reached an agreement with the Committee to materially reduce payment to the CEO under the AIP by 50% and eliminate LTRP opportunities ("CEO Compensation Agreement"). The CEO Compensation Agreement also changes the payouts due in 2020 for 2019 performance from a single lump-sum payout to the following: 50% of total payout to be paid on 6/1/2020; 50% of total payout to be paid on 9/1/2020; and 25% of total payout subject to a clawback in the event of the CEO's resignation before 9/1/2020. Competitive positioning for the CEO reflecting the terms of the CEO Compensation Agreement is shown below for total direct compensation (Base Salary, AIP, and LTRP). Note that we are applying the terms of the CEO Compensation Agreement to 2019 target

17

compensation in order to do a benchmarking comparison, although the CEO Compensation Agreement applies to AIP and LTRP to be paid in 2020.

| CEO TTDC ($000s) | Survey Market TTDC ($000s) | | | Variance (%) | | | Variance ($) | | |
|---|---|---|---|---|---|---|---|---|---|
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| $3,940 | $3,510 | $5,015 | $7,165 | 12% | -21% | -45% | $430 | -$1,075 | -$3,225 |

Incumbent pay components:

| Base | Target Bonus % | TCC | LTI | TDC |
|---|---|---|---|---|
| $2,627 | 50% | $3,940 | $ - | $3,940 |

## **Conclusion**

45.     Based on my education, experience, and the work I have done in this case and in similar cases, I believe that approval of the Key Employee Plans will be effective in mitigating attrition at the Company given the facts and circumstances of these chapter 11 cases.

*[Remainder of Page Intentionally Left Blank]*

46. I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   December 2, 2019

By: */s/ Josephine Gartrell*
Josephine Gartrell
Director
Willis Towers Watson PLC