DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors. [1] | (Jointly Administered) |

**DEBTORS' SUPPLEMENTAL OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PRE-PETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS <u>RELATED CHECKS AND TRANSFERS</u>**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................6

I.      The Debtors Have Identified Insiders Consistent with the Bankruptcy Code and
        Applicable Precedent ...............................................................................................6

II.     Continuation of the Pre-Existing Incentive Plans and the Non-Executive Retention
        Plan Satisfies the Bankruptcy Code and Is a Sound Exercise of the Debtors' Business
        Judgment .................................................................................................................7

        A.      Continuation of the Incentive Plans and the Non-Executive Retention Plan Is a
                Reasonable Exercise of the Debtors' Business Judgment ......................................7

        B.      Continuation of the Incentive Plans for Insiders Is Not Governed by Section
                503(c)(1) ..............................................................................................................14

III.    Payment of the Sign-On Bonuses Is Permitted by Section 503(c)(3) Because It Is
        Both Within the Ordinary Course of the Debtors' Business and Justified by the Facts
        and Circumstances .................................................................................................19

CONCLUSION ....................................................................................................................21

## TABLE OF AUTHORITIES

### CASE(S)

PAGE(S)

*In re Borders Grp., Inc.*,
    453 B.R. 459 (Bankr. S.D.N.Y. 2011)........................................................7, 12, 20

*In re Dana Corp.*,
    351 B.R. 96 (Bankr. S.D.N.Y. 2006).................................................................15

*In re Dana Corp.*,
    358 B.R. 567 (Bankr. S.D.N.Y. 2006)............................................7, 8, 14, 15, 20

*In re Global Aviation Holdings Inc.*,
    478 B.R. 142 (Bankr. E.D.N.Y. 2012) ..............................................................12

*In re Global Home Prods., L.L.C.*,
    369 B.R. 778 (Bankr. D. Del. 2007)......................................................7, 14, 18

*In re Mesa Air Grp., Inc.*,
    No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) ......................7, 18

*In re Nellson Nutraceutical, Inc.*,
    369 B.R. 787 (Bankr. D. Del. 2007)..................................................................15

*In re Patriot Coal Corp.*,
    492 B.R. 518 (Bankr. E.D. Mo. 2013)...............................................................11

*In re Pernix Sleep, Inc.*,
     Case No. 19-10323 (Bankr. D. Del. Apr. 15, 2019) .............................................18

*In re Residential Capital, L.L.C.*,
    478 B.R. 154 (Bankr. S.D.N.Y. 2012)................................................7, 15, 17, 20

*In re Velo Holdings, Inc.*,
    472 B.R. 201 (Bankr. S.D.N.Y. 2012)..........................................................7, 12, 15

### STATUTES & RULES

11 U.S.C. § 363...........................................................................................17

11 U.S.C. § 363(b) ...............................................................................7, 8, 20

11 U.S.C. § 503(c) ...................................................................................6, 20

11 U.S.C. § 503(c)(1)............................................................................ *passim*

11 U.S.C. § 503(c)(2)...........................................................................................................................7

11 U.S.C. § 503(c)(3).................................................................................................................7, 8, 19

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") respectfully submit this omnibus reply (this "**Reply**") in support of the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**" or the "**Motion**")[2] and in response to the objections (the "**Objections**"),[3] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      In the time since the Debtors filed the Wages Motion, the Debtors have worked tirelessly to address the concerns of all parties in interest with respect to the relief sought in the Wages Motion.  These efforts have been successful, and have resulted in a consensual agreement between the Debtors and the Committee, the terms of which are reflected in a form of proposed supplemental order (the "**Proposed Supplemental Final Wages Order**") attached hereto as **Exhibit A**.  The support of the Committee for the requested relief – after close scrutiny of and multiple changes to the compensation plans – underscores the importance of the requested relief in maximizing the value of the Debtors' estates for the benefit of all stakeholders.  At the time of

---

[2] Except where otherwise indicated, capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Wages Motion or the *Second Supplemental Declaration of Jon Lowne in Support of Wages Motion* ("**Second Lowne Supp. Decl.**" or "**Second Supplemental Lowne Declaration**"), filed contemporaneously herewith.

[3] Objections were filed by the following parties: The United States Trustee for Region 2 (the "**U.S. Trustee**") [Docket No. 134] (the "**UST Objection**"); Nevada Counties and Municipalities [Docket No. 190]; the Ad Hoc Group of Non-Consenting States (the "**Ad Hoc Committee of Non-Consenting States**")  [Docket No. 197]; the Commonwealth of Pennsylvania [Docket No. 196]; and the State of Arizona [Docket No. 201] (the parties collectively, the "**Objectors**"). The New York State Department of Financial Services also submitted an informal objection [Docket No. 99].

filing this Reply, the Debtors understand that the objections of the Ad Hoc Committee of Non-Consenting States and the Nevada Counties and Municipalities have been resolved except with respect to the incentive compensation of the Debtors' CEO. The Debtors do not know the current position of the U.S. Trustee or the State of Arizona.

2.    Pursuant to the agreement with the Committee, the Debtors will limit payments made under the Debtors' AIPs to both insiders and non-insiders such that payments in the aggregate will not exceed the target AIP payment amounts (i.e., the amounts that would be paid upon achieving a 100% Corporate Objective Results Percentage) even though the actual Corporate Objective Results Percentage is expected to be approximately 118% of target. Second Lowne Supp. Decl. ¶ 59. The AIP payment to the General Counsel, after applying the cap, will be reduced by a further $250,000. *Id.* In addition, after extensive negotiations with the Committee, the Debtors have agreed that the CEO's AIP payment will not exceed 50% of his target AIP payment. *Id.* Except for hourly Employees, payments under the Debtors' AIP will also be subject to deferred payment dates and clawback provisions requiring Employees to repay substantial portions of their AIP payment if they resign from the Company prior to certain dates. *Id.* at ¶¶ 60, 66.

3.    The Debtors will also reduce payments made under the Debtors' LTRPs (together with the Debtors' AIPs, the "**Incentive Plans**"), paying only 46% of the expected payment amounts to insiders, 56% to non-insiders with the job title of Vice President (there are no non-insiders with job titles more senior than Vice President[4]), and 76% to non-insiders with job titles less senior than Vice President. *Id.* at ¶¶ 62, 69. The Debtors' CEO will not receive any

---

[4] *See* Lowne Supp. Decl. ¶ 9 (noting that all Employees with the title of Senior Vice President or more senior are considered insiders).

2

payments under the Debtors' LTRP. *Id.* at ¶ 62. These reductions effectively eliminate all amounts payable under the Debtors' LTRPs on account of the Company's performance prior to 2018 for all Employees with a job title of Vice President and above.   Payments under the Debtors' LTRPs will also be deferred and subject to clawback. *Id.* at ¶¶ 63, 69.

4.       The Committee agreed that no changes will be made to the Non-Executive Retention Plan as it is  an essential program for retaining critical non-insider Employees.   In addition, the Debtors do not seek the authority to make payments under the Incentive Plans to Employees who departed from the Debtors prior to the Petition Date (including retirees), or who resign prior to the applicable payment date.   Employees who retire following the Petition Date will remain eligible for payment under the terms of the Debtors' LTRPs.   Outstanding Sign-On Bonuses to insiders will be deferred by three months from the current scheduled payment date and  will be subject to clawback provisions. *Id.* at ¶ 72.   Finally, the Debtors have also agreed to reduce the aggregate payments to insiders under the Incentive Plans and/or Sign-On Bonuses by an additional $500,000 by means of the Debtors' choice. *Id.* at ¶ 73. In the aggregate, the Debtors expect that the agreed modifications will reduce the amounts paid out under the Incentive Plans by approximately $10 million.

5.       The settlement with the Committee should be approved as a fair outcome and a sound exercise of the Debtors' business judgment.   While the U.S. Trustee has not withdrawn its objection[5] as of the date hereof, the Debtors are hopeful that the U.S. Trustee will choose to do so, or substantially narrow its objection, upon the opportunity to more fully consider the recently-agreed and documented modifications to the relief sought by the Debtors.   However,

---

[5] Although various parties have also joined the UST Objection, this Court has noted that "[a]s the case management order makes it clear, a joinder is a very -- in terms of one's rights in court a very weak pleading, including if someone withdraws an objection that you've joined to, you are essentially erased." Hr'g Trs. 110:18-22, October 10, 2019.

absent the withdrawal of the U.S. Trustee's Objection, the Debtors submit this Reply to address the points raised by the U.S. Trustee in the early days of these chapter 11 proceedings and joined by others.

6.      First, the U.S. Trustee objected on the grounds that the Debtors' Employees were involved in or may benefit from Purdue Frederick Company, Inc.'s long past criminal misconduct.  The misconduct pointed to by the U.S. Trustee related to the mis-marketing (misbranding) of OxyContin between December 1995 and June 2001 by certain supervisors and employees in the sales and marketing departments.  The entire opioid sales force at Purdue was terminated in 2018 and, as reflected in the settlement with the Committee, the Debtors are not seeking authority to make any payments that are tied to the Company's performance prior to 2018 for Employees with the job title of Vice President or more senior.  As the Debtors have made clear in open court and in the *Debtors' Informational Brief* [Docket No. 17], Purdue no longer has any sales representatives promoting any opioid products to any prescribers. Nor does Purdue market opioids through journal advertisements or promotional pieces.  Only four current Employees were members of the sales force prior to June 2001, and the federal government never alleged that any of those Employees committed any of the admitted criminal misconduct.[6]

7.      Second, the U.S. Trustee objected to the Incentive Plans, which have been part of the Debtors' compensation programs for decades.  The result of denying the requested relief would not be a denial of an increase in employee compensation, but rather would be reduction in pre-existing and expected pay—an excessive result particularly in light of the reduced payments the Debtors have now agreed to with the Committee.  There is a substantial and important

---

[6] Moreover, other than the CEO, none of the named defendants in any of the more than 2,600 lawsuits against the Debtors are currently employed by the Debtors or are eligible to receive payments under the Debtors' compensation programs. Second Lowne Supp. Decl. ¶ 7.

difference to the Debtors' critical Employees between being told that a new increase in compensation will not occur and being told that the current compensation they have long expected to receive will now be taken away.  The Debtors are only seeking relief with respect to the existing compensation of the Debtors' dedicated and talented workforce, without whom the value of the enterprise would shrivel, and the safety and security of the Debtors' operations would be at risk.

8.      Third, the U.S. Trustee argued that he lacks information necessary to evaluate the Wages Motion. The Debtors always planned to supplement the record with additional information to address any concerns raised and have now done so.  The *Supplemental Declaration of Jon Lowne in Support of Wages Motion* [Docket No. 236] (the "**Supplemental Lowne Declaration**") and the Second Supplemental Lowne Declaration contain extensive additional information responsive to requests lodged by the U.S. Trustee and others.  In addition, between the first day hearing and the filing of this Reply, the Debtors and their advisors have worked tirelessly to respond to various requests from the Committee, the ad hoc committee of governmental and other contingent litigation claimants, the Ad Hoc Committee of Non-Consenting States and other parties in interest. Any objections based on purported insufficiency of information have been addressed.

9.      Purdue has a highly skilled, trained and educated workforce that must be retained and motivated to allow Purdue to operate in its highly regulated industry. The collective knowledge, experience and expertise of Purdue's Employees is essential to the Debtors' reorganization efforts and maximizing value for all stakeholders.  It is imperative that the Debtors be authorized to honor their preexisting compensation programs so that they can maintain and drive Employee productivity, morale and achievement in these difficult times.

**ARGUMENT**

**I.    The Debtors Have Identified Insiders Consistent with the Bankruptcy Code and Applicable Precedent**

10.    The Court has repeatedly expressed approval for the criteria that the Debtors have consistently applied to identify insiders and the conclusion that the Debtors have ten insiders Employees as a result of applying the criteria.[7]   At the first day hearing on September 17, 2019, the Court found, based on the Debtors' criteria, that none of the participants in the Non-Executive Retention Plan (including a participant who reports to the CEO) are insiders, primarily because none of them is in a position to effectively determine his or her own award and because they clearly do not make policy generally, but rather report to those who do.  Hr'g Trs. 138:5-18, September 17, 2019 (holding that "none of the beneficiaries [in the Non-Executive Retention Plan] is an insider based on my evaluation of the testimony as opposed to the [D]ebtors simply saying they're not an insider. None of them is in a position effectively to determine his or her own award which is Congress' primary concern in section 503(c) by those who have the ability to feather their own nest in a bankruptcy case shouldn't have that ability. Secondly, they clearly don't make policy generally and report to those who do").  The Court again emphasized at the second day hearing on October 10, 2019 that the factors that the Debtors looked to were consistent with applicable law. Hr'g Trs. 116:14-19, October 10, 2019 (noting that "the debtors undertook their own analysis of who would be an insider under applicable law, as summarized in

---

[7] As previously set forth in the Supplemental Lowne Declaration filed on October 8, 2019, the Company categorized an Employee as an insider if the Employee met any one of the following five criteria.  The Employee: (1) is an officer appointed by the Board; (2) holds the title of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or Senior Vice President; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine his or her own compensation. Lowne Suppl. Decl. ¶ 9. Notably, none of the insiders of the Debtors is actually in a position to determine his or her own compensation. *Id.*

the debtors' pleadings, and most importantly that includes their ability to influence major decisions by the debtors, one or the other").

11.     As the Court concluded at the second day hearing, the U.S. Trustee's concern that some Vice Presidents may be insiders is "a concern that doesn't seem to be supported by the evidence." Hr'g Trs. 110:9-14, October 10, 2019. It should be clear that the Debtors have, after careful analysis, correctly identified their insider Employees.

## II.    Continuation of the Pre-Existing Incentive Plans and the Non-Executive Retention Plan Satisfies the Bankruptcy Code and Is a Sound Exercise of the Debtors' Business Judgment

### A.    Continuation of the Incentive Plans and the Non-Executive Retention Plan Is a Reasonable Exercise of the Debtors' Business Judgment

12.     An incentive plan that is outside the ordinary course of business—even an incentive plan that contains insiders—is analyzed under section 503(c)(3). *See In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) (applying section 503(c)(3) to a KEIP that included insiders). A retention plan that is outside the ordinary course of business and does not include insiders is also analyzed under section 503(c)(3). *See In re Borders*, 453 B.R. at 473 (analyzing a KERP that does not include insiders under section 503(c)(3)). Many courts, both in this district and elsewhere, have held that section 503(c)(3) is essentially a reiteration of the traditional business judgment rule that is otherwise applicable to a debtor's decision to use, sell or lease assets outside the ordinary course of business under section 363(b). *See In re Velo Holdings*, 472 B.R. at 212; *In re Dana Corporation*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) ("*Dana II*"); *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007); *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010). Stated succinctly, primarily retentive or severance-based compensation plans for insiders must comply with section 503(c)(1) or section 503(c)(2), respectively, while primarily

incentivizing programs for insiders and non-insider programs (regardless of whether they are

retentive or incentivizing) outside the ordinary course must only comply with section 503(c)(3).

### *The Incentive Plans and the Non-Executive Retention Plan Satisfy the Dana II Factors*

13.     The factors set forth in *Dana II* to determine whether the business judgment

standard has been met are:

> (1)    whether the plan is calculated to achieve the desired performance;
>
> (2)    whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential;
>
> (3)    whether the scope of the plan is fair and reasonable or discriminates unfairly among employees;
>
> (4)    whether the plan is consistent with industry standards;
>
> (5)    whether the debtor performed due diligence in investigating the need for the plan; and
>
> (6)    whether the debtor received independent counsel in performing due diligence and creating and authorizing the plan.

*Dana II*, 358 B.R. at 576-77.

14.     Based on the evidence before the Court, including the Second Supplemental

Lowne Declaration, each of the *Dana II* factors favors approval of the Incentive Plans and the

Non-Executive Retention Plan. The Debtors have met their burden of demonstrating that

continuation of the Non-Executive Retention Plan and longstanding Incentive Plans is in the best

interests of the Debtors' estates, and they should be approved under sections 363(b) and

503(c)(3) as within the Debtors' sound business judgment.   Importantly, the Committee has

specifically agreed that no changes will be made to the Non-Executive Retention Plan and no

other parties have objected to the continuation of the Non-Executive Retention Plan.

### *Factor 1: There Is a Reasonable Relationship Between the Employee Compensation Plans and the Desired Results*

15.    The Debtors' AIPs are designed with annual performance metrics that are reasonable and challenging business targets, specifically crafted to motivate the Debtors' employees to help the Debtors achieve their annual financial and operational goals.  By linking the participants' incentive payments to these critical performance metrics, the Debtors' AIPs directly encourage participants to work toward maximizing the Company's performance, which will in turn maximize the value of the Debtors' estates and facilitate a successful reorganization and preserve value for the claimants as the soon to be owners of the business. Similarly, the Debtors' LTRPs are designed with performance metrics measured over a three-year performance period, motivating participants to maximize the long-term value of the Company, which in turn maximizes value for all stakeholders. Thus, the Incentive Plans are clearly designed to "achieve the desired performance."

16.    The Debtors' Non-Executive Retention Plan is designed to foster retention of the Debtors' critical non-insider Employees during this uncertain and difficult time.  The Debtors' need for a retention program is clear—the Debtors have experienced significant attrition in the past several months, and that trend has accelerated during the first couple months of these chapter 11 cases, with 24 voluntary resignations since the Petition Date alone. Second Lowne Supp. Decl. ¶ 57. The Non-Executive Retention Plan is designed to address this need. Under the plan, cash-based retentive payments are paid out on a quarterly basis provided that the Employee remains in active, full-time employment with the Debtors on each payment date. *Id.* at ¶ 55. The Employees eligible under the Non-Executive Retention Plan are those that are most essential to the Debtors' reorganization efforts. *Id.* at ¶ 56. By conditioning payments on the continued employment of a limited and key subset of Employees, the Non-Executive Retention Plan is

reasonably calculated to mitigate the erosive effect of attrition and maximize value for the Debtors' estates.

> ### *Factor 2: The Costs of the Incentive Plans and Non-Executive Retention Plan are Reasonable in the Context of the Debtors' Assets, Liabilities and Earning Potential*

17.    When evaluating the reasonableness of the cost of the Incentive Programs, it is important to keep in mind the context of these chapter 11 cases, which includes both the fact that Purdue will ultimately be owned by its claimants and thus value must be preserved for them, and the unrelenting litigation pressure and corresponding negative publicity faced by Purdue, which places an extreme strain on its Employees and makes employee retention and motivation extremely challenging.  In this context, and given both the need to preserve and maximize value for the benefit of Purdue's claimants and the fact that the payment amounts under the Incentive Plans have been reduced pursuant to an agreement with the Committee, the payouts under the Incentive Plans are more than reasonable.

18.    As demonstrated by the *Declaration of Josephine Gartrell in Support of Debtors' Key Employee Plans* (the "**Willis Towers Declaration**" or "**Willis Towers Decl.**"), filed concurrently with this Reply, the cost of the Debtors' Incentive Plans, even before taking into account any reductions pursuant to the agreement with the Committee, is reasonable in light of market standards.  Across all salary levels, the aggregate target payouts under the Debtors' AIPs fall below the average aggregate target payouts in the pharmaceutical and health sciences industry. Willis Towers Decl. ¶ 21. The median payments under the LTRPs are also, across all salary ranges, below market medians. Willis Towers Decl. ¶ 27. Moreover, as agreed to with the Committee, payments under the Incentive Plans will be significantly reduced, so the payments under the Incentive Plans are undeniably reasonable.

19.    The cost of the Non-Executive Retention Plan is also reasonable. Although the specific cost of the Non-Executive Retention Plan is toward the higher end of the industry, when viewed in the broader context of the total compensation package available to the Debtors' Employees, these costs are reasonable.  Without the retention payments, compensation at the Debtors (when including the full amount of the Incentive Plans) would be below the industry median. Willis Towers Decl. ¶ 35. The Non-Executive Retention Plan is necessary to bring total compensation levels to a more modestly competitive level that is still below the 75th percentile of total compensation at peer companies, *id.*, especially given the challenging conditions of the Debtors' working environment, including the exacting public scrutiny and lack of job security, and the Debtors' agreement to further reduce the Incentive Plan payment amounts under the agreement with the Committee.

### Factor 3: The Scope of the Incentive Plans and Non-Executive Retention Plan Is Fair and Reasonable and Does Not Discriminate Unfairly

20.    The Debtors' AIPs apply to all Employees and continue pre-Petition practice. This is consistent with participation rates in the industry, where most employees participate in variable-pay incentive programs similar to the Debtors' AIP. Willis Towers Decl. ¶ 19. The Debtors' AIPs are therefore fair, reasonable and do not discriminate unfairly. *See In re Patriot Coal Corp.*, 492 B.R. 518, 534 (Bankr. E.D. Mo. 2013) ("The Court concludes that the scope of the 2013 AIP is fair and reasonable, particularly since it applies to all employees. As such, the 2013 AIP does not discriminate unfairly.").

21.    The Debtors' LTRPs include approximately 103 Employees.  The Debtors' LTRPs are targeted at Employees at the Director level and above because those Employees are best positioned to significantly drive the company's long-term performance and creation of value.  Second Lowne Supp. Decl. ¶ 35.  While not all Employees are included in the Debtors'

LTRPs, it is entirely reasonable and permissible for payout opportunities to reflect reasonable differentiation between the Employees based on their relative contribution to the reorganization effort and to preserve prepetition practices. *See In re Global Aviation*, 478 B.R. at 152 ("Discrimination is permitted so long as it is fair because different employees may have different values to the debtor's reorganization effort."); *In re Velo Holdings, Inc.*, 472 B.R. 201 at 212 ("[T]he KEIP does not unfairly discriminate and comports with industry standards, as it is nearly identical to the bonus plan that the Debtors had in place prepetition."); *In re Borders*, 453 B.R. at 476 ("Since the Executives are the ones that will effectively guide the Debtors through bankruptcy, it is reasonable that they should receive additional compensation if they are ultimately successful.").

22.    The Debtors' Non-Executive Retention Plan applies to approximately 110 non-insider Employees. Second Lowne Supp. Decl. ¶ 55.  The scope of the Non-Executive Retention Plan was determined by the senior management of the Debtors, who carefully evaluated the nature of each employee's job and function to determine how critical such job and function is to the Debtors, in consultation with external advisors.  *Id.* at ¶ 56.  All of the participants in the Non-Executive Retention Plan are critical to the Debtors' operations and would be very difficult to replace, and it would cause irreparable harm to the Debtors if these Employees were to leave. *Id.* at ¶ 57. Because the participants in the Non-Executive Retention Plan were carefully selected and identified as the most critical Employees, the scope is reasonable and does not discriminate unfairly.

### Factor 4: The Incentive Plans and Non-Executive Retention Plan Are Consistent with Industry Standards

23.    In addition to design, cost and scope, other aspects of the Debtors' Incentive Plans are consistent with industry standards. In terms of compensation level, cutting the Incentive

Plans from Employees' compensation packages wholesale would result in total compensation that is well below market levels of pay. And it is entirely consistent with industry standard to layer incentive-based compensation plans on top of base salary to provide a competitive total compensation package. Willis Towers Decl. ¶¶ 18, 25. When the target payouts (even before accounting for the settlement with the Committee) under the Debtors' Incentive Plans are included in non-insider Employees' compensation, the total level of compensation remains below the range of median market levels of total compensation before the Non-Executive Retention Plan, and below the 75th percentile even after accounting for the Non-Executive Retention Plan. Willis Towers Decl. ¶ 35.

24.     The metrics that inform the payment amounts under the Debtors' AIPs, such as operating profit margin, are also in-line with typical biopharma practices. Willis Towers Decl. ¶ 17. The payout ranges under the Debtors' AIPs and the form of the AIP payments are also consistent with industry practice. *Id.* The same largely holds true for the Debtors' LTRPs—the metrics which determine LTRP payments and their vesting schedule are typical of similar programs across the industry. Willis Towers Decl. ¶ 24.

25.     The Non-Executive Retention Plan is also consistent with industry standards. *See* Willis Towers Decl. ¶¶ 33, 34. Like the Debtors' Non-Executive Retention Plan, it is market practice for retention programs to be limited to critical, hard-to-replace employees. Willis Towers Decl. ¶ 30.  The frequency of payment—in quarterly installments—is also consistent with market standards. *Id.* When viewed as part of the Debtors' overall compensation package, payments under the Non-Executive Retention Plan are also in-line with market practice. Willis Towers Decl. ¶¶ 39, 40.  Thus, the Non-Executive Retention Plan reflects a standard market tool that provides the retentive effect the Debtors need to remain viable as an on-going enterprise.

> ***Factor 5 and Factor 6: The Incentive Plans Have Satisfied the Test of Time and the Non-Executive Retention Plan Was Carefully Designed with Independent Advisors***

26.    The Incentive Plans were not developed in contemplation of a bankruptcy filing. Indeed, none of the Incentive Plans were altered or amended in conjunction with or in anticipation of these chapter 11 cases.  Second Lowne Supp. Decl. ¶¶ 10, 33.  The Incentive Plans are longstanding pre-Petition incentive plans that have "satisfied the independent 'test of time.'"  *In re Global Home Prods. LLC*, 369 B.R. at 786. ("While the evidence indicates that Debtors did not use independent counsel, these are not "new" compensation programs but, instead, are nearly identical to plans previously used, and approved by a compensation committee and board of directors. In other words, the Plans have satisfied the independent 'test of time.'").

27.    The Non-Executive Retention Plan was developed in 2018, and was designed in consultation with external advisors. Second Lowne Supp. Decl. ¶ 56.  The Debtors performed due diligence in designing the Non-Executive Retention Plan and have established, based on a subsequent independent analysis, that the Non-Executive Retention Plan is in-line with market practices. Willis Towers Decl. ¶¶ 33, 34, 36.  The Debtors' senior management determined the scope of the Non-Executive Retention Plan by carefully analyzing whether each role was critical to the Company.  The Non-Executive Retention Plan was then presented to and approved by the full Board.  These steps demonstrate that the Debtors carefully and diligently assessed the need to establish the Non-Executive Retention Plan.

### B.    Continuation of the Incentive Plans for Insiders Is Not Governed by Section 503(c)(1)

28.    The Incentive Plans are primarily incentive-based, so 503(c)(1) does not apply. Section 503(c)(1) only "applies to those employee retention provisions that are essentially 'pay

to stay' key employee retention programs." *Dana II*, 358 B.R. at 571.  "When a plan is designed to motivate employees to achieve specific performance goals, it is primarily incentivizing and thus not subject to section 503(c)(1)."  *In re Residential Capital, LLC*, 478 B.R. at 171.  An incentive plan may contain some retentive effect and still remain <u>primarily</u> incentive-based.  *Id.* at 170 (observing that a valid incentive plan must be "primarily incentivizing and not primarily retentive"); *see also In re Velo Holdings*, 472 B.R. at 209 (same); *Dana II*, 358 B.R. at 572 ("[I]ncentivizing plans with some components that arguably have a retentive effect do not necessarily violate section 503(c)."); *In re Dana Corp.*, 351 B.R. 96, 103 (Bankr. S.D.N.Y. 2006) ("*Dana I*") (same); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (interpreting section 503(c)(1) to apply to "a transfer made to an insider of the debtor for the *primary* purpose of inducing such person to remain with the debtor's business" (internal quotation marks and alterations omitted)).

### *The Debtors' AIPs Are Primarily Incentivizing*

29.    Here, the Incentive Plans are primarily incentivizing.  Payments under the Debtors' AIPs are based upon a combination of the Company's business goals and individual performance goals.  Second Lowne Supp. Decl. ¶ 12.  Each year, corporate objectives are determined based on the Company's strategic priorities.  *Id.* ¶ 14.  A range of performance measures are established for the corporate objectives, including the weight given to each objective, the expected target performance and the level of performance necessary to achieve minimum (0%) and maximum (150%) performance levels.  *Id.*  The Company's current 2019 corporate objectives, applicable to both the Purdue AIP and Rhodes AIP, are (i) 60% efficiency and process optimization (operating profit), (ii) 30% value creation / pipeline and (iii) 10% people and culture.  *Id.* ¶ 15.  The Debtors' performance metrics are carefully selected to incentivize Employees and maximize the value of the Debtors' businesses.  Importantly, the

corporate objectives are not easily achievable and should the Debtors fail to meet these objectives, a significant percentage of Employees' compensation would be at risk. *Id.* ¶ 17. At the time the 2019 corporate objectives were set there was no certainty that any of the objectives would be achieved. *Id.*

30.    In addition to achieving company-level objectives, Employees under the Debtors' AIPs must also achieve an individual level of performance, as measured relative to other employees, in order to receive above-target payouts. An individual's performance is measured based on his or her success in achieving individual annual objectives established at the beginning of the plan year. *Id.* ¶ 29. Individual annual objectives are set by the participants' managers, in consultation with the participants. *Id.* An individual's performance level can range from 0% to 150% (such percentage, the "**Individual Performance Factor Percentage**"). *Id.* The individual performance metrics are linked to, and support the achievement of, the broader corporate objectives of efficiency and process optimization (operating profit), value-creation / pipeline, and people and culture but are individualized such that they can relate to specific departmental objectives or to individual objectives that the Employee is responsible for leading. *Id.* ¶ 30. The individual performance metrics are also designed to reflect goals that are above and beyond an Employee's day-to-day responsibilities. *Id.*

31.    It is important to note that the aggregate Purdue AIP payment pool for the Purdue Debtors is fixed at the aggregate target payments *multiplied by* the Corporate Objective Results Percentage, so Individual Performance Factor Percentages assigned to individual Employees must be managed within the confines of this total payment pool. *Id.* ¶ 31. With respect to the Rhodes AIP, the aggregate AIP payment pool is fixed at the sum of (i) 75% of the aggregate target AIP payments *multiplied by* the Corporate Objective Results Percentage and (ii) 25% of

the aggregate target AIP payments, so Individual Performance Factor Percentages assigned to Employees must be managed within the confines of the 25% portion of the payment pool. *Id.* ¶ 32. Therefore, the Debtors' AIPs are designed such that Employees are directly compared against one another, which provides a strong incentive for Employees to perform.

### The Debtors' LTRPs Are Primarily Incentivizing

32.    The Debtors' LTRPs also are not retention plans—these long-term results plans are longstanding long-term cash incentive programs designed to tie compensation to performance and motivate Employees to achieve specific performance goals. *Id.* ¶ 34. Payment under the Debtors' LTRPs are similarly based on a combination of corporate and individual achievement.    Under the Rhodes LTRP, the performance factor metric is equal to the participant's actual payout percentage under the Rhodes AIP for each of the three years within the three-year performance period. *Id.* ¶ 42. The Purdue LTRP utilizes performance metrics that are set annually for each grant, are determined by the Company's senior leaders to be the metrics that are most critical to the Company's achievement of long-term strategic priorities and are approved by the Board. *Id.* ¶ 43. The key metrics that are utilized include financial metrics (generally weighted at 50%) and the achievement of milestones related to the progression of research projects and/or the on-time launch of new products (generally weighted at 50%). *Id.* ¶ 44.

33.    The performance-based structure of the Incentive Plans contrasts sharply with the structure of programs that have been deemed retentive in nature.  In *Residential Capital*, for example, the bankruptcy court found that the plan was not primarily incentivizing because it "allow[ed] for nearly two thirds of the [awards] to vest upon the closing of two section 363 asset sales that were negotiated before the commencement of the[] [chapter 11] cases" and did "not impose any additional financial metrics or hurdles in order for those [awards] to vest."  478 B.R.

at 172.   As the court explained: "[T]riggering bonus awards solely on the basis of a sale transaction, confirming a reorganization plan or exiting bankruptcy are not sufficient" to avoid section 503(c)(1), because if the "vesting of an award only require[s] the eligible recipients to remain with the debtors until the effective date," then "such an award cannot be fairly characterized as primarily incentivizing." *Id.* at 172-73.

34.    Here, the payments under the Incentive Plans are tied to the achievement of performance-based goals, and the payments do not vest solely upon a closing, sale or transaction that is bound to occur regardless of performance. *See In re Mesa Air Grp., Inc.*, No. 10-10018, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (finding that incentive plan was not retentive because it was "tied to certain performance goals," such as "maintenance of flight schedules" and "efficient return of aircraft").   Further, the Debtors' AIPs and Debtors' LTRPs have been in place for decades, long before retention could reasonably be considered the motive. *See In re Global Home Prods. LLC*, 369 B.R. at 786 ("The Court is wholly satisfied, and so finds, that the Plans are primarily incentivizing and only coincidentally retentive because Debtors employed virtually identical plans prepetition when retention was not the motive."). The fact that certain of the metrics in the Incentive Plans have already been achieved or partially achieved should not change the analysis because the Debtors' Employees relied on the Debtors' historical practice of providing payouts under the Incentive Plans and were incentivized at the time of performance.   *See Id.* at 786-87 (rejecting an argument that compensation plans that included metrics related to fiscal quarters that had already occurred were retentive on the grounds that the beneficiaries were performing in response to a financial incentive, because the beneficiaries relied upon Debtors' historical practice of providing performance bonuses and the Debtors told the beneficiaries that they would ask the court to approve the incentive plans); *see*

18

*also In re Pernix Sleep, Inc.*, Case No. 19-10323 (Bankr. D. Del. Apr. 15, 2019), Hr'g Trs.
40:20–41:20 (holding that a KEIP that provided for payouts in connection with an asset sale was
still incentivizing notwithstanding the fact that the Debtors had a stalking horse purchase
agreement that was negotiated and executed prepetition). Therefore, contrary to the suggestion
made by the U.S. Trustee, the restrictions in section 503(c)(1) of the Bankruptcy Code are
inapplicable to the Incentive Plans.

### III.    Payment of the Sign-On Bonuses Is Permitted by Section 503(c)(3) Because It Is Both Within the Ordinary Course of the Debtors' Business and Justified by the Facts and Circumstances

35.     In the ordinary course of business, the Debtors offer Sign-On Bonuses to certain
prospective employees in order to encourage those people to accept an offer to work at Purdue.
Second Lowne Supp. Decl. ¶ 50.    The Debtors have been offering Sign-On Bonuses to
prospective employees for at least 20 years. *Id.* The U.S. Trustee's attempt to characterize the
Sign-On Bonuses as impermissible retention payments under section 503(c)(1) of the
Bankruptcy Code is incorrect.  Sign-On Bonuses are not offered to prospective employees so that
they **remain** employed with the Debtors (as they are not yet employed), but rather Sign-On
Bonuses are offered to induce prospective employees to **accept** employment with the Debtors
and compensate them for benefits or compensation they are forfeiting by leaving their current
employer (e.g., annual bonus, a long-term incentive, stock options or grants).  *Id.*

36.     The Employees receiving Sign-On Bonuses are highly skilled individuals who
had many options for employment when they chose Purdue, and may not have chosen to work at
Purdue without a Sign-On Bonus. *Id.* at ¶ 52.  Further, it is commonplace in the pharmaceutical
industry to offer incentives like the Sign-On Bonuses to prospective employees. *Id.* It is also
typical for Sign-On Bonuses to be paid both on the first day of employment and at future dates to
either mirror the payments the prospective employee is forfeiting by accepting employment at

Purdue or to provide a retentive effect. *Id.* However, any retentive effect of the Sign-On Bonuses is incidental (indeed any component of an individual's compensation has a retentive effect) and such effect does not make each component subject to section 503(c)(1). *See Dana II* at 571 ("[M]erely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature."); s*ee also In re Residential Capital*, 478 B.R. at 171; *In re Borders*, 453 B.R. at 471. These Sign-On Bonuses are part and parcel of customary compensation practice in the Debtors' industry and necessary to incentivize prospective employees to accept employment in light of forfeited compensation at their previous employers, and accordingly honoring such obligations represents a reasonable exercise of the Debtors' business judgment. *See Dana II*, 358 B.R. at 577-78 (finding that the debtors' assumption of pension plans for senior executives was within debtors' business judgment, in part because the pension plans were customary and provided to compensate the executives for forgoing their retirement plans at former employers).

37.     Sign-On Bonuses are negotiated at arm's length between the Debtors (or a third-party search firm on behalf of the Company) and prospective employees (or their representatives), Second Lowne Supp. Decl. ¶ 50, obviating the policy concerns underlying the limitations with respect to insider compensation set forth in section 503(c) of the Bankruptcy Code.  Thus, the payment of the Sign-On Bonuses should be authorized under section 363(b) of the Bankruptcy Code as an exercise of the Debtors' sound business judgment.

*[Remainder of page intentionally left blank]*

20

**CONCLUSION**

WHEREFORE, for the foregoing reasons and the reasons stated in the Motion, the

Debtors respectfully request that the Court overrule the Objections and promptly grant the relief

requested in the Motion.

Dated:    December 2, 2019
          New York, New York

DAVIS POLK & WARDWELL LLP
By:    /s/ *Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Supplemental Final Wages Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### SUPPLEMENTAL FINAL ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS <u>RELATED CHECKS AND TRANSFERS</u>

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 362(d) and 363(b) of the Bankruptcy Code, for entry of an interim order and a final order (this "**Order**") authorizing (i) the Debtors to (a) pay certain prepetition wages, salaries, and other compensation owing to Employees and Retirees and, (b) maintain the Employee Programs and pay related administrative obligations, (c) permit Employees and Retirees with claims under the Workers' Compensation Programs to proceed with such claims and insurers to continue using collateral and security under the Workers' Compensation Programs, and (d) authorize applicable

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

banks and other financial institutions to receive, process, honor and process related checks and transfers; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Debtors having revised the relief requested in the Motion after discussion and negotiation with the Official Creditors' Committee; and the Court having reviewed the Motion and the proposed amended form of order and the second supplemental Lowne declaration filed on December 2, 2019 (the "**Second Supplemental Lowne Declaration**") and the Gartrell declaration filed on December 2, 2019, and held an evidentiary hearing to consider the relief requested in the Motion and the form of amended proposed order on a final basis (the "**Hearing**"); and upon the Lowne Declaration filed contemporaneously with the Motion at Docket No. 3, and the Second Supplemental Lowne Declaration filed at Docket No. 554, and the Gartrell declaration filed at Docket No. 555; and the record of the Hearing; and after due deliberation and for the reasons stated by the Court at the Hearing the Court having determined that the legal and factual bases set forth in the Motion, the various declarations that have been filed and at the Hearing establish good and sufficient cause for the relief granted herein, in that such relief provides a benefit to the Debtors' estates and creditors after taking into account the Bankruptcy Code's priority scheme, such relief is a proper exercise of business judgment and in the best interests of the Debtors, their estates, creditors and all parties in interest; now, therefore,

**IT IS HEREBY ORDERED THAT**

1.        The Motion is further granted on a final basis as set forth herein.

2.        The Debtors are authorized, but not required, in their sole discretion, to (a) pay all Sign-On Bonus payments when due, *provided* that Sign-On Bonus payments due to insiders outstanding as of the date of entry of this Order shall be paid on or about (i.e., to be paid on the regularly scheduled employee payment date closest to such date) three months after such Sign-On Bonus payments are currently due, and conditioned upon the written agreement of the recipients thereof to repay such Sign-On Bonuses if such recipients resign prior to December 31, 2020 (which agreement shall be enforceable by the Debtors, the Creditors' Committee or any successor to the Debtors or the Creditors' Committee), (b) pay the amounts under the Non-Executive Retention Plan when due, (c) pay any amounts due on account of the Advancement of Expenses and (d) pay any amounts when due on account of the 2019 Purdue AIP, the 2019 Rhodes AIP, the Purdue LTRP and the Rhodes LTRP, *provided* that (i) the authorization of the Debtors to make such payments under the 2019 Purdue AIP and the 2019 Rhodes AIP shall be (A) limited to the aggregate amounts that would be due if the Corporate Objective Results Percentage[3] were 100% or less, (B) with respect to the Chief Executive Officer, (1) limited to 50% of the amount otherwise payable thereunder, (2) with 50% paid on or about (i.e., to be paid on the regularly scheduled employee payment date closest to such date) June 1, 2020 and 50% paid on or about (i.e., to be paid on the regularly scheduled employee payment date closest to such date) September 1, 2020, (3) subject to reconsideration by this Court (which may be requested by any party in interest in these chapter 11 cases, including any state of the United

---

[3] Such term shall have the meaning ascribed to it in the *Second Supplemental Declaration of Jon Lowne in Support of the Motion of Debtors For Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees And Retirees to Proceed With Outstanding Workers' Compensation*.

States) in the event that he is finally determined to be liable with respect his actions as an employee of the Debtors in connection with the sale of opioid products by a final non-appealable judgment of a court of competent jurisdiction, (4) subject to the condition that the Chief Executive Officer shall not take any action with respect to any amounts received in respect of the 2019 Purdue AIP with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these chapter 11 cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts, (C) with respect to the General Counsel, capped at $250,000 less than the amount otherwise payable thereunder, (D) with respect to insider Employees other than the Chief Executive Officer, 50% shall be paid on or about (i.e., to be paid on the regularly scheduled employee payment date closest to such date) April 1, 2020 and the remaining 50% on or about (i.e., to be paid on the regularly scheduled employee payment date closest to such date) July 1, 2020, subject to the written agreement (which agreement shall be enforceable by the Debtors, the Creditors' Committee or any successor to the Debtors or the Creditors' Committee) of the applicable Employee to repay 25% of the amount received if such Employee resigns prior to September 1, 2020 (the "**Insider Payment and Clawback Schedule**"), (E) with respect to non-insider Employees who are classified as exempt under the Fair Labor Standards Act, payment shall be made on or about (i.e., to be paid on the regularly scheduled employee payment date closest to such date) April 1, 2020 and subject to the written agreement (which agreement shall be enforceable by the Debtors, the Creditors' Committee or any successor to the Debtors or the Creditors' Committee) of the applicable Employee to repay 50% of the amount due if such Employee resigns prior to July 1, 2020 and 25% (without duplication) of the amount due if such Employee resigns prior to September 1, 2020 (the "**Non-Insider Payment and Clawback Schedule**"), and (ii) the authorization of the

4

Debtors to make such payments under the Purdue LTRP and the Rhodes LTRP shall be (A) with respect to insider Employees other than the Chief Executive Officer, limited to 46% of the amounts that would otherwise be due, and subject to the Insider Payment and Clawback Schedule, (B) with respect to the Chief Executive Officer, not authorized, (C) with respect to non-insider Employees with job titles of Vice President or above, limited to 56% of the amounts that would otherwise be due and subject to the Non-Insider Payment and Clawback Schedule, and (D) with respect to non-insider Employees with job titles less senior than Vice President, limited to 76% of the amounts that would otherwise be due, and subject to the Non-Insider Payment and Clawback Schedule, *provided further* that the aggregate amount that the Debtors are authorized to pay to insider Employees with respect to Sign-On Bonuses, the 2019 Purdue AIP, the 2019 Rhodes AIP, the Purdue LTRP, and the Rhodes LTRP in 2020 shall be *additionally (i.e. in addition to the various deductions noted above)* $500,000 less than the aggregate amount otherwise authorized to be paid to insider Employees with respect to such Employee Program hereunder (and which deduction shall be disclosed to the advisors to the Creditors' Committee no later than March 1, 2020). Notwithstanding the foregoing, the Debtors shall not be authorized to pay any amounts (including, without limitation, pro-rated amounts) on account of the 2019 Purdue AIP, the 2019 Rhodes AIP, the Purdue LTRP, the Rhodes LTRP or the Sign-On Bonuses to any Employee that resigns prior to the applicable payment dates. For the avoidance of doubt, the Non-Insider Payment and Clawback Schedule shall not apply to non-insider Employees who are classified as non-exempt with respect to the Fair Labor Standards Act.

3.     The Debtors are authorized to continue the Debtors' corporate employee credit card and company purchasing card programs (collectively, the "**Card Programs**") with

American Express Travel Related Services Company, Inc. ("**TRS**") in the ordinary course of business and consistent with prepetition practices, including by using the credit cards issued thereunder and timely paying any prepetition and postpetition obligations outstanding with respect thereto. The Debtors are further authorized to continue operating the collateral account with American Express National Bank ("**AENB**") ending in 5041, which serves as a collateral account for obligations under the Card Programs (the "**Collateral Account**"), in the ordinary course of business. The terms and conditions of the Card Programs and the pledge agreement with respect to the Collateral Account shall remain in effect, TRS shall continue to have a perfected, first priority security interest in the Collateral Account to secure all prepetition obligations with respect to the Card Programs, TRS shall also have a perfected, first priority security interest in the Collateral Account to secure all obligations with respect to the Card Programs arising postpetition, and the Debtors shall hereby be deemed to have waived any avoidance claims arising under chapter 5 of the Bankruptcy Code or similar state law against TRS or AENB relating to the Card Programs or any transfers in connection therewith, without any additional documentation executed between the Debtors and TRS or AENB.

4.      Nothing in the Motion or this Order, nor any payments made pursuant to this Order, shall be deemed to be or constitute an admission as to the validity or priority of any claim against the Debtors, or constitute an assumption or post-petition reaffirmation of any agreement, plan, practice, program, policy, executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or a waiver of any rights of the Debtors.

5.      Nothing in the Motion or this Order shall impair the ability of the Debtors or the Creditors' Committee to contest the validity or amount of any payment made pursuant to this Order.

6.        Nothing in the Motion or this Order shall be construed as impairing the Debtors' or the Creditors' Committee right to contest the validity or amount of any Pre-petition Employee Obligation, including payroll taxes that may be due to any taxing authority.

7.        Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, for cause, and the terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

8.        The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

9.        The Debtors are authorized to take all such actions as are necessary or appropriate to implement the relief granted in this Order.

10.        The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order including, without limitation, the provisions of paragraph 2.

White Plains, New York
Dated: _____, 2019

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE