PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
31 West 52nd Street
New York, New York 10019
212-858-1000

*Counsel to the Ad Hoc Group of Non-Consenting States*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.,* [1] <br> Debtors. | Case No. 19-23649 (RDD) <br><br> (Jointly Administered) |

**THE STATES' NOTICE OF PUBLIC HEALTH INFORMATION**
**TO PROTECT PURDUE PATIENTS**

---

[1] The Debtors in these cases (collectively, "Purdue"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

To the Honorable, Robert D. Drain, United States Bankruptcy Judge:

Twenty-four States and the District of Columbia (the "<u>States</u>")[2] respectfully submit this notice of important public health information to protect Purdue patients from injury and death. The States' most recent data, obtained in October and November 2019, show that patients who have taken and patients who are taking Purdue opioids continue to face life-threatening danger. The evidence demonstrates that specific patients are at the greatest risk of fatal overdoses: those who have taken Purdue opioids at the highest doses for the longest time.  Patients who are prescribed Purdue's most dangerous pill, 80 mg OxyContin, die of opioid-related overdoses at a rate of almost 2%.  The data indicate that, unless effective measures are taken, thousands of Purdue patients will die of overdoses during this case.

Information from the States, the U.S. Centers for Disease Control, and other health experts points to specific actions Purdue should take to protect patients as soon as possible.  Nine possible initiatives to protect patients are identified at the end of this filing.  The States' data can also support work by the independent monitor, which Purdue is required to hire in the coming weeks to protect the public health.[3]

**PURDUE PATIENTS ARE STILL DYING**

Tens of thousands of Americans have suffered addiction from Purdue's dangerous drugs, many have overdosed, and many have died.  Thousands of the people who died were Purdue's most profitable patients, who took Purdue's drugs just as Purdue's leaders intended: at high doses

---

[2] California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

[3] *See* Hr'g Tr. 74:5-6, Oct. 11, 2019 ("[I]s there any openness to having a third-party monitor of the injunction? … I'm suggesting a public health person who has credibility."); *Third Am. Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. for a Prelim. Inj.* at 21, Nov. 20, 2019 [Adversary Docket No. 115].

and for long periods of time.[4]  In the law enforcement investigations that led to the bankruptcy, officials identified hundreds of Purdue patients who died of opioid-related overdoses in one state alone.[5]  Purdue reports that it stopped promoting opioids to doctors in February 2018, after the States began investigating.  *See* Debtors' Informational Br. at 32 [Docket No. 17].

But Purdue patients are still dying.  Attached as Exhibit 1 are data from the Massachusetts Prescription Monitoring Program showing patients who filled prescriptions for OxyContin and died of opioid-related overdoses.  In Massachusetts, which contains just two percent of the U.S. population, at least 53 Purdue patients died of opioid-related overdoses in the first half of 2019 — an average of two deaths per week.  Nationwide, it is likely that a dozen Purdue patients die of overdoses every day.  Unless effective measures are taken, thousands of Purdue patients will die of overdoses during this case.

---

[4] *See, e.g.*, Letter to Judge Drain, Nov. 7, 2019, Docket No. 443 (regarding Purdue patient who died).
[5] MA Compl. ¶ 22.



*MA AGO graph from MA Department of Public Health data*

The prescription records of Purdue patients who die of overdoses demonstrate the danger of taking OxyContin at high doses and for long periods of time. Pages 4-257 of Exhibit 1 show the detailed OxyContin prescription records of patients who filled at least ten prescriptions for OxyContin and died of opioid-related overdoses. The doses prescribed to these patients were extremely high. Opioids can be measured in morphine milligram equivalents (MME). The CDC advises that prescribers should "carefully reassess evidence of individual benefits and risks" for doses above 50 MME/day. The CDC warns that prescribers "should avoid" increasing doses to 90 MME/day or carefully justify prescriptions at that high dose. These actual Purdue patients, who overdosed and died, were prescribed OxyContin at an *average* dose of more than 180 MME/day — twice the highest level that the CDC warns against.

The duration of these patients' exposure to OxyContin was long and dangerous. Among patients who died of overdoses after ten or more OxyContin prescriptions, the average number of prescriptions was 34; the average number of pills was 2,370; and the average period on OxyContin was more than two years. These data confirm what public health authorities found in an earlier study of more than a million patients: taking prescription opioids for longer periods of time increases the danger of overdose and death. That study found that patients prescribed opioids for more than six months are 46 times more likely to overdose and die.[6]

Purdue patient records also identify one Purdue product as especially dangerous: the 80 mg OxyContin pill. In Massachusetts, from January 1, 2009 through November 20, 2019, approximately 7,437 patients filled prescriptions for 80 mg OxyContin. At least 140 of those Purdue patients have died of opioid-related overdoses — a death rate of 1.9%. Patients targeted by Purdue's marketing campaign were at even higher risk: the one hundred prescribers who were

---

[6] CT Compl. ¶ 91; ID Compl. ¶ 62; MA Compl. ¶ 86.

5

visited most often by Purdue sales representatives prescribed 80 mg OxyContin to hundreds of patients, and those patients died of opioid-related overdoses at a rate of 3.9%.

The data also show that the dangers of opioid addiction, overdose, and death continue after a patient's OxyContin prescription ends. The Purdue patients who died of opioid-related overdoses after filling prescriptions for OxyContin in Massachusetts include scores of patients who died within weeks of filling their last OxyContin prescription and also include patients who died of overdoses months or years after their prescriptions ended.

As Purdue has known for years, the lives lost to fatal overdoses are only part of the damage to patients and communities. Purdue staff told its Board of Directors that overdose deaths were only the "tip of the iceberg." Staff reported that, for every death, there were more than a hundred people suffering from prescription opioid dependence or abuse.[7]

**PROTECTING PATIENTS CAN PROTECT THE ESTATE FROM POST-PETITION LIABILITY**

At a recent hearing, Purdue stated: "the world deserves to be very, very comfortable" that Purdue's ongoing operation "will not in any way potentially be used for harm." Hr'g Tr. 76:1-2, Oct. 11, 2019.

Protecting Purdue patients is especially important because patients are taking OxyContin today as a consequence of Purdue's decades-long, illegal marketing campaign. When Purdue decided to disband its sales force in February 2018, it knew that its past marketing would continue to drive OxyContin prescriptions in the future. In November 2017, Purdue determined that OxyContin sales were "mainly from carry-over." A Purdue presentation that was uncovered in the

---

[7] CA Compl. ¶ 192; DE Compl. ¶ 177; MA Compl. ¶ 396; NV Compl. ¶ 195; NJ Compl. ¶ 296; NY Compl. ¶ 370; VT Compl. ¶ 279.

States' investigation is attached as Exhibit 2.[8] Purdue calculated that <u>96% of OxyContin prescriptions</u> were carry-over from the past. Ex. 2 at slide 6. The presentation noted that the carry-over analysis was "rigorous" and "industry standard," with results down to the level of individual doctors, and it had been validated by consultants at McKinsey, ZS Associates, and KMK Consulting. *Id.* at slide 5. Because OxyContin is a "matured product" with 96% carry-over, Purdue could eliminate its sales force and still expect to collect hundreds of millions of dollars of profit from OxyContin every year through 2022. *Id.* at slide 23.[9]

Protecting patients is the highest priority because it saves lives. It is also appropriate to act because, if thousands more patients are injured and die, Purdue may face post-petition claims by States and others for administrative expense liability that wipes out assets available for existing claims. In another important chapter 11 case, the Pacific Gas and Electric Company filed for bankruptcy in January of this year to address liability from past wildfires. In March, the Court overseeing that case gave a prophetic warning: "there's an elephant in the room … We all know there is a risk we will have [post-petition] 2019 wildfires … And if there's a post-petition tragedy such as happened in the past two years – there could be an astronomical claim, that, at least absent some other outcome, would be administrative priority."[10] In October, there was indeed a post-petition tragedy — the Kincade Fire — that burned thousands more acres and may now consume resources of that bankruptcy estate.[11]

---

[8] The presentation was produced by McKinsey & Company in response to a civil investigative demand and is filed with this pleading pursuant to Massachusetts General Laws chapter 93A section 6(6).

[9] With its sales force, Purdue expected to collect $1.4 billion from OxyContin in the two years of 2018 and 2019; without the sales force, Purdue still expected to collect $1.343 billion from OxyContin — 96% of the earlier forecast. Ex. 2 at slides 13, 15.

[10] Mar. 13, 2019 Hr'g Tr. at 39, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal.) (Docket No. 885).

[11] *See, e.g.*, Peg Brickley & Gretchen Morgenson, *PG&E Bankruptcy Protections Could Mean Less Money for Wildfire Victims*, Wall Street Journal, Nov. 8, 2019, at https://www.wsj.com/articles/pg-e-bankruptcy-protections-could-mean-less-money-for-wildfire-victims-11573252033 ("Bankruptcy rules put victims of the Kincade Fire ahead of others. By law, claims made after PG&E's January filing must be fully paid on or before the day the utility exits

The imperative to avoid committing torts during the bankruptcy is an important safety feature in the law:

> Businesses operating in bankruptcy that were excused from tort liability would have an inefficient competitive advantage over their solvent competitors — and deficient incentives to use due care in the operation of the business. It could indeed be argued that in the interest of safety, insolvent firms, not being deterrable by threat of tort suits, should not be allowed to operate at all. *Reading* [*v. Brown*] strikes a compromise between the safety interest and the interest in saving bankrupts from premature liquidation: the bankrupt that continues to operate (normally under Chapter 11) must give its tort victims priority access to such assets as the bankrupt estate retains.

*In re Resources Tech. Corp.*, 662 F.3d 472, 476 (7th Cir. 2011) (Posner, J.).[12]

In this case, the States will file more reports of Purdue patient deaths when the data are available. As Purdue patients die, their families and the States necessarily will consider whether Purdue should have acted differently during this bankruptcy to prevent that harm.[13]

**ALL STAKEHOLDERS SHOULD CONSIDER ACTION TO PROTECT PURDUE PATIENTS**

Based on the States' investigations, the States believe Purdue should do more to protect patients now. All parties should work to find ways to prevent injuries and deaths, and that effort should include input from survivors, people in recovery, public health experts, and professionals engaged in prevention and treatment, as well as Purdue's monitor. This urgent and important work should consider at least the following questions, to identify actions that Purdue should take during this bankruptcy:

---

bankruptcy."). An attorney for PG&E victims emphasized: "this debtor is still manufacturing the dangerous product." *Id.*

[12] *See also Reading v. Brown Co.*, 391 U.S. 471, 485 (1968) (damages resulting from post-petition negligence were entitled to administrative priority under the Bankruptcy Act).

[13] Post-petition liability will depend on the facts and circumstances of Purdue's conduct, the deaths and injuries that occur, and the legal grounds for post-petition claims. The States do not assert a claim today. Instead, the States call on Purdue to protect the public so that patients do not overdose and die.

1. Should Purdue support the provision of naloxone for patients who have taken OxyContin at high doses or for long periods of time?[14]

2. Should Purdue support the provision of substance use treatment for patients who are diagnosed with a substance use disorder after taking OxyContin?[15]

3. Should Purdue act to protect patients who are taking low doses of Purdue opioids against the danger of escalating to higher doses?[16]

4. Should Purdue act to support safe tapering of patients down from high doses of OxyContin in a manner that protects patients' health?[17]

5. Should Purdue act to support the transition of patients away from Purdue opioids to less dangerous methods for the treatment of pain, including low-risk, non-pharmacological therapy?[18]

6. Should Purdue retract, disclaim, or undo any of its past marketing?

7. Should Purdue ask the FDA to add warnings or restrictions to the OxyContin label?[19]

---

[14] For example, Purdue could contract with pharmacies to pay for naloxone dispensed together with Purdue opioids. The CDC recommends that patients taking high doses of opioids should be given access to naloxone. *See* CDC Guidelines, Recommendation #8 at http://dx.doi.org/10.15585/mmwr.rr6501e1. The CDC found that many naloxone prescriptions require a co-pay and nearly 9 million more naloxone prescriptions could have been dispensed in 2018 if every patient with a high-dose opioid prescription were offered naloxone. https://www.cdc.gov/media/releases/2019/p0806-naloxone.html.

[15] For example, Purdue could contract with insurers to pay part or all of the cost of substance use treatment for Purdue patients diagnosed with opioid use disorder. The CDC recommends that patients with opioid use disorder should be offered treatment. *See* CDC Guidelines, Recommendation #12. The patients in Exhibit 1, who were prescribed Purdue opioids again and again, and then died of opioid-related overdoses, provide examples of circumstances in which patients' lives might be saved.

[16] Purdue designed its marketing to push doctors and patients towards higher doses, even though they were the most dangerous, because they were the most profitable. CA Compl. ¶¶ 126-131; CO Compl. ¶¶ 283-287; CT Compl. ¶¶ 41-47; DC Compl. ¶¶ 112-129; ID Compl. ¶¶ 40-49; IA Compl. ¶¶ 127-131; MD Compl. ¶¶ 108-117; MA Compl. ¶¶ 67-83; NJ Compl. ¶¶ 484-486; VT Compl. ¶¶ 441-443. Now, Purdue may have an opportunity and an obligation to reduce the danger it created.

[17] The CDC recommends: "Clinicians should evaluate benefits and harms of continued therapy with patients every 3 months or more frequently. If benefits do not outweigh harms of continued opioid therapy, clinicians should optimize other therapies and work with patients to taper opioids to lower dosages or to taper and discontinue opioids." CDC Guidelines, Recommendation #7.

[18] Purdue designed its marketing to push doctors and patients away from safer alternatives to increase its own opioid sales. CA Compl. ¶¶ 135-140; CO Compl. ¶¶ 361-363; CT Compl. ¶¶ 68-73; DC Compl. ¶¶ 80-88; ID Compl. ¶¶ 73-83; IA Compl. ¶¶ 133-137; MA Compl. ¶¶ 98-111; MN Compl. ¶¶ 178-196; NV Compl. ¶ 274; NY Compl. ¶¶ 296-299; NC Compl. ¶¶ 62-68; VA Compl. ¶¶ 138-152; WA Compl. ¶¶ 4.79-4.80. Now, Purdue may have an opportunity and an obligation to reduce the danger it created.

[19] Purdue has sought FDA restrictions on opioids in the past. In 2013, Purdue persuaded the FDA to prohibit generic versions of any of Purdue's past OxyContin pills on the basis that they could harm patients. CO Compl. ¶¶ 305-309; NJ Compl. ¶ 123; WA Compl. ¶¶ 4.187-4.191.

8. Should Purdue stop selling 80 mg OxyContin?[20]

9. Should Purdue disclose to insurance companies, medical boards, or law enforcement information that Purdue possesses about prescribers suspected of dangerous prescribing, diversion, or abuse?[21]

Beyond these nine questions, people concerned about this case should come forward with facts, ideas, and expertise to save lives. Work to protect Purdue patients can complement the important work of launching an Emergency Fund to assist victims of the opioid epidemic, and it can also help to accomplish the goal of patient safety sought by the appointment of a monitor and the voluntary injunction. The States shared this notice with Purdue on December 2, 2019.

Dated: December 9, 2019

/s/ *Andrew M. Troop*
Andrew M. Troop
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019-6118
(212) 858-1660
andrew.troop@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*

---

[20] For example, in 2001, Purdue voluntarily suspended distribution of its highest dose OxyContin; it was then the 160 mg pill. *See* Debtors' Informational Br. at 31 & n.79 [Docket No. 17].

[21] For years, Purdue kept internal reports of doctors that Purdue staff suspected of dangerous prescribing. Purdue urged some of those same doctors to prescribe more Purdue opioids. *See, e.g.*, CO Compl. ¶ 384; IA Compl. ¶¶ 160-175; MA Compl. ¶¶ 117-122, 128-153, 720-732. In other cases, sales representatives stopped visiting the suspect doctors, but the Purdue Board of Directors got reports on how much revenue those doctors generated for Purdue. *See* CA Compl. ¶ 182; CO Compl. ¶¶ 575-579; CT Compl. ¶¶ 81-84; DE Compl. ¶ 241; ID Compl. ¶¶ 140-141; MA Compl. ¶¶ 310-313; MN Compl. ¶ 271; NJ Compl. ¶ 212; NC Compl. ¶¶ 58-59; VA Compl. ¶179; VT Compl. ¶ 204. One employee urged Purdue to share its information on dangerous prescribers, so it could be used to screen suspicious prescriptions, writing in an internal email: "At a basic level, it just seems like the right and ethical thing to do." MA Compl. ¶ 736.

# **CERTIFICATE OF SERVICE**

I, Andrew M. Troop, hereby certify that, on December 9, 2019, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service and (ii) by email upon the parties set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases.

In addition, on December 9, 2019, I caused true and correct copies of the document to be served on the following:

Attn: Paul K. Schwartzberg
Office of the United States Trustee
Southern District of New York
201 Varick Street, Suite 1006
New York, NY 10014
***Via Overnight Delivery Mail***

/s/ *Andrew M. Troop*
Andrew M. Troop