# EXHIBIT B

## 2018 Audit Engagement Letter



**EY**
Building a better
working world

Ernst & Young LLP
300 First Stamford Place
Stamford, CT  06902-6765

Tel: +1 203 674 3000
ey.com

Mr. Jon Lowne
Vice President, Chief Financial Officer
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901

November 7, 2018

Ladies and Gentlemen:

1.  This agreement (together with all attachments hereto, the "Agreement") confirms the engagement of Ernst & Young LLP ("we" or "EY") to audit and report on the consolidated financial statements of Purdue Pharma L.P. and **certain** Associated Companies as listed on Exhibit C (the "Consolidated Financial Statements") for the year ended December 31, 2018 and 2017. Purdue Pharma L.P. and **certain** Associated Companies included in the Consolidated Financial Statements are collectively referred to herein as the "Companies." In connection with our audit of the Consolidated Financial Statements, we also will issue an elements report as of December 31, 2018 in connection with the License Agreement, dated March 21, 2011, between AbbVie, Inc. and Purdue Pharma L.P., as amended by Amendment No.1, dated April 15, 2011, and Amendment No.2, dated February 20, 2014 (as so amended, the "AbbVie License Agreement"). All of the services described in this paragraph are referred to collectively as either the "Audit Services" or the "audit." The term "Associated Companies" as used herein shall mean with respect to the Companies, any person, firm, trust, corporation or other entity or combination thereof that directly or indirectly owns or controls the Companies, is owned or controlled by the Companies or is under common ownership or control the Companies; the terms "control" and "controlled" meaning ownership of more than fifty percent (50%), including ownership by one or more trusts with substantially the same beneficial interests, of the voting and equity rights of such person, firm, trust, corporation or other entity or combination thereof or the power to direct the management of such person, firm, trust, corporation or other entity or combination thereof.

**Audit responsibilities and limitations**

2.  The objective of the audit is to express an opinion on whether the Consolidated Financial Statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles. Should conditions not now anticipated preclude us from completing the audit and issuing a report, we will advise you and the Executive Audit Committee promptly and take such action as we deem appropriate.

3.  We will conduct the audit in accordance with auditing standards generally accepted in the United States, as established by the American Institute of Certified Public Accountants (the "AICPA"). Those standards require that we obtain reasonable, rather than absolute, assurance that the Consolidated Financial Statements are free of material misstatement whether caused by error or fraud. As management is aware, there are inherent limitations in the audit process, including, for



**EY**

Building a better
working world

example, selective testing and the possibility that collusion or forgery may preclude the detection of material error, fraud or non-compliance with laws and regulations. Accordingly, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with auditing standards generally accepted in the United States, as established by the AICPA. Also, an audit is not designed to detect error or fraud that is immaterial to the Consolidated Financial Statements.

4.   As part of the audit, we will consider, solely for the purpose of planning the audit and determining the nature, timing and extent of our audit procedures, the Companies' internal control. Our consideration of internal control for the audit of the Consolidated Financial Statements will not be sufficient to enable us to express an opinion on the effectiveness of internal control or to identify all significant deficiencies and material weaknesses.

5.   In accordance with AICPA auditing standards, we will communicate certain matters related to the conduct and results of the audit to the Executive Audit Committee. Changes to the scope of the Audit Services may occur as a result of the issuance of new standards and interpretations or inspections findings. We will communicate any changes in the scope of the Audit Services and related procedures to management and the Executive Audit Committee on a timely basis.

6.   If we are made aware of evidence that fraud or possible non-compliance with laws and regulations may have occurred that could have a possible material and adverse impact to the Consolidated Financial Statements, we will bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether committed by senior management or other employees) that causes a material misstatement of the Consolidated Financial Statements, we will report this matter directly to the Executive Audit Committee. We will determine that the Executive Audit Committee and appropriate members of management are adequately informed of instances of non-compliance with laws and regulations that come to our attention. We also will inform the Executive Audit Committee and appropriate members of management of significant corrected misstatements and uncorrected misstatements noted during our audit procedures other than those that are clearly trivial. Notwithstanding the foregoing, we will inform appropriate members of management of uncorrected misstatements above $2.0 million that we obtain actual knowledge of during our audit procedures.

7.   We will communicate in writing to management and the Executive Audit Committee all significant deficiencies and material weaknesses identified during the audit, including those that were remediated during the audit. We also will communicate any significant deficiencies and material weaknesses communicated to management and the Executive Audit Committee in previous audits that have not yet been remediated.

8.   We also may communicate other opportunities we observe for economies in or improved controls over the Companies' operations.

A member firm of Ernst & Young Global Limited



**EY**

Building a better
working world

## Management's responsibilities and representations

9.  The Consolidated Financial Statements (including disclosures) are the responsibility of management. Management also is responsible for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to error or fraud, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the Consolidated Financial Statements, in conformity with U.S. generally accepted accounting principles. Management also is responsible for the identification of, and for the Companies' compliance with, laws and regulations applicable to its activities. In addition, management also is responsible for compliance with the terms, covenants, provisions, or conditions of the AbbVie License Agreement.

10. Management is responsible for adjusting the Consolidated Financial Statements to correct material misstatements. Management also will affirm to us in its letter of representations certain representations made to us during the performance of the Audit Services, including that the effects of any uncorrected misstatements aggregated by us during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the Consolidated Financial Statements as a whole.

11. Management is responsible for communicating to us on a timely basis all instances of alleged, identified or suspected non-compliance with laws and regulations that could have more than an inconsequential impact on the financial statements or whose effects of which should be considered by management when preparing the financial statements, and all instances of alleged, identified or suspected financial improprieties of which management or the Executive Audit Committee is aware (regardless of the source or form in which they may have been discovered or communicated to them and including, without limitation, instances identified by "whistle-blowers") and providing us full access to information and any internal investigations related to them. Such instances include, without limitation, manipulation of financial results by management or employees, misappropriation of assets by management or employees with a significant role in internal control, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading EY, or other alleged, identified or suspected illegal acts or fraud that could result in a material misstatement of the Consolidated Financial Statements or otherwise materially adversely affect the financial reporting of the Companies. If the Companies limits the information otherwise available to us under this paragraph (based on the Companies' claims of attorney/client privilege, work product doctrine or otherwise), the Companies will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of the audit and may prevent us from opining on the Companies' Consolidated Financial Statements; alter the form of report we may issue on such financial statements; or otherwise affect our ability to continue as the Companies' independent auditors. We will disclose any such withholding of information to the Executive Audit Committee.

A member firm of Ernst & Young Global Limited



**EY**

Building a better
working world

12. Management is responsible for providing us access to: all information of which management is aware that is relevant to the Audit Services, such as records, documentation and other matters to complete the Audit Services on a timely basis; additional information that we may request from management for purposes of the audit; and unrestricted access to persons within the Companies from whom we determine it necessary to obtain audit evidence. We will provide the Companies with notice, to the extent reasonably possible and consistent with our professional obligations prior to seeking such access. Management's failure to do so may cause us to delay our report, modify our procedures, or even terminate the Audit Services.

13. As required by AICPA auditing standards, we will make specific inquiries of management about the representations contained in the Consolidated Financial Statements. AICPA auditing standards also require that, at the conclusion of the applicable Audit Services, we obtain a letter of representations from certain members of management about these matters and to represent that management has fulfilled its responsibilities as set forth in this Agreement, including that all material transactions have been recorded in the accounting records and are reflected in the Consolidated Financial Statements. The responses to those inquiries, the written representations, and the results of our procedures comprise evidence on which we will rely in completing the applicable Audit Services.

14. Management shall make appropriate inquiries to determine whether the Companies have a capital lease, material cooperative arrangement or other business relationship with EY or any other member firm of the global Ernst & Young organization (any of which, an "EY Firm") other than one pursuant to which an EY Firm performs professional services.

15. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence with respect to the Audit Services or otherwise with respect to EY's role as the Companies' independent auditors.

16. The Companies shall be responsible for its personnel's compliance with the Companies' obligations under this Agreement.

**Limited scope benefit plan engagement**

17. In addition to the Audit Services, we also will audit and report on the financial statements and supplemental schedules of the Companies and Participating Associated Companies Retirement Savings 401(k) Plan and Pension Plan (collectively, the "Plans"), for which the Companies act as the sponsors ("Plan Sponsor"), respectively, for the year ended December 31, 2018 (the "Plan Engagement" or the "Plan Services"), which are to be included in the Companies and P.F. Laboratories Inc. Form 5500 filings with the Employee Benefits Security Administration of the Department of Labor (the "DOL"). In connection with the Plan Services for P.F. Laboratories Inc., references to "management" shall mean management of the P.F. Laboratories Inc., acting for the Plan Sponsor in its capacity as such.

A member firm of Ernst & Young Global Limited



**EY**

Building a better
working world

18. We will conduct the Plan Engagement in accordance with auditing standards generally accepted in the United States, as established by the AICPA, except that, as permitted by Regulation 2520.103-8 of the DOL's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974 as amended (ERISA), and as instructed by the Plan Sponsors, we will not perform any audit procedures with respect to the certified investment information, other than comparing that information with the related information included in the financial statements are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles and whether the and supplemental schedules. We have been informed that a certification from an entity that meets the requirements of Regulation 2520.103-8 will be provided to us. Because of the significance of the information that we will not audit, we will not express an opinion on the Plans' financial statements and supplemental schedules. The form and content of the information included in the Plans' financial statements and supplemental schedules, other than that derived from the certified investment information, will be audited by us in accordance with AICPA auditing standards generally accepted in the United States and will be subjected to tests of your accounting records and other procedures as we consider necessary to enable us to express an opinion as to whether they are presented in compliance with the DOL's Rules and Regulations under ERISA. Should conditions not now anticipated preclude us from completing the engagement and issuing a report, we will advise the Investment Committee, in its capacity as the Plans' Audit Committee or equivalent, and management promptly and take such action as we deem appropriate.

19. AICPA auditing standards require that we obtain reasonable rather than absolute assurance that the Plans' financial statements are free of material misstatement whether caused by error or fraud. As management is aware, there are inherent limitations in the audit process, including, for example, selective testing and the possibility that collusion or forgery may preclude the detection of material error, fraud, non-compliance with laws and regulations, including prohibited transactions with parties in interest and other violations of the DOL's Rules and Regulations under ERISA. Accordingly, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with auditing standards generally accepted in the United States, as established by the AICPA. Also, the Plans' Services are not designed to detect error or fraud that is immaterial to the financial statements.

20. The provisions of paragraphs 4, 5, 6, 7 and 8 above shall apply to the Plans' Services. Any reference to the Audit Committee shall be deemed to apply to the Audit Committee overseeing the Plan.

21. As a part of the Plan Engagement, we will perform certain procedures, as required by AICPA auditing standards, directed at considering the Plans' compliance with applicable Internal Revenue Code ("IRC") requirements for tax-exempt status, including reading the Plans' latest tax determination letter from the Internal Revenue Service ("IRS"). As we conduct the Plans' Services, we may become aware of the possibility that events affecting the Plans' tax status may have

A member firm of Ernst & Young Global Limited



**EY**
Building a better
working world

occurred. Similarly, we may become aware of the possibility that events affecting the Plans' compliance with the requirements of ERISA may have occurred. We will inform the Plan Sponsors of any instances of tax or ERISA noncompliance that come to our attention during the course of our engagement. The Plan Sponsors should recognize, however, that the Plans' Services are not designed, nor are they intended, to verify the Plans' overall compliance with applicable provisions of the IRC or ERISA, including but not limited to the Plans' Sponsors deduction limits, and, accordingly, we assume no responsibility for failure to detect instances of noncompliance with applicable provisions of the IRC or ERISA.

22. As part of the Plans Services, we will consider, solely for the purpose of planning the engagement and determining the nature, timing, and extent of our procedures, the Plans' internal control, except for the investment information which is excluded as described in paragraph 21. This consideration will not be sufficient to enable us to provide assurance on the Plans' internal control or to identify all significant deficiencies and material weaknesses.

23. Management shall have the responsibilities for the financial statements of the Plans as set forth in paragraphs 9 and 10 above, and otherwise as set forth in paragraphs 11, 12, 13, 14, 15, and 16 with respect to the Plans and the Plans' Services.

24. Management is responsible for the preparation of the supplemental schedules and the form and content of the financial statements and supplemental schedules in conformity with the DOL's Rules and Regulations for Reporting and Disclosure under ERISA. For any document that contains the supplemental schedules and indicates that we have issued a report on the supplemental schedules, management will include our report on such supplemental schedules. The supplemental schedules will be presented with the audited Plans' financial statements. Management will make appropriate representations to us regarding these matters.

25. Management is responsible for informing EY about any related party transactions, including transactions with parties in interest, as defined in ERISA section 3(14) and the regulations thereunder, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties. We will assess whether all identified prohibited party-in-interest transactions are included in the supplemental schedule of nonexempt transactions.

26. The financial statements of the Plans' are required to be filed with the Form 5500. AICPA auditing standards require that we read the Plans' Form 5500 prior to its filing. The purpose of this procedure is to consider whether such information, or the manner of its presentation in the Form 5500, is materially inconsistent with the information, or the manner of its presentation, appearing in the financial statements and supplemental schedules. These procedures are not sufficient, nor are they intended, to determine that the Form 5500 is completely and accurately prepared. Accordingly, the Plan Sponsors understands and agrees that we do not assume any responsibility for the completeness and/or accuracy of the Form 5500 as part of the Plans' Services. In the event

A member firm of Ernst & Young Global Limited



**EY**
Building a better
working world

that our report is issued prior to our having read the Plans' Form 5500, the Plan Sponsors agrees not to attach our report to the financial statements of the Plans included with the Form 5500 filing until we have read the completed Form 5500.

27. We may be requested to make certain workpapers relating to the Plans' Services available to the DOL pursuant to authority given to it by law or regulation. If requested, access to such workpapers will be provided under the supervision of our personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to the DOL. We will label all workpapers as confidential and maintain control over their duplication.

28. The terms, conditions and provisions applicable to the Audit Services and the Companies, as set forth in the paragraphs under "Fees and billings," "Confidentiality" and "Other matters" below and in the final two paragraphs of this Agreement, shall apply equally to the Plans' Services and the Plan Sponsors, and any reference therein to "Audit Services" shall be deemed to include the Plan Services and any reference to the "Companies" shall be deemed to apply to it in its capacity as the Plan Sponsor.

29. Fees and billing

30. We estimate that our fees for the 2018 Audit Services of the Consolidated Financial Statements and the Plans will be $665,000 and $56,000, respectively, plus expenses. These fee estimates are based on estimated hours of 3,100 for the audit of the Consolidated Financial Statements and 600 for the audits of the Plans. However, our actual fees may exceed the top of this range based on changes to the business (e.g., nature of the business or change in business entities) or additional unplanned effort. Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Audit Services, all of which the Company shall pay (other than taxes imposed on our income generally). We will submit our invoices as outlined in Exhibit B, attached hereto and incorporated herein and payment will be made within thirty (30) days of receipt of our invoice other than with respect to amounts that are disputed in good faith, which reflects our estimated fees. However, we may submit additional invoices resulting from changes in the business or additional unplanned effort as set forth in this paragraph. You agree to pay our undisputed invoices upon receipt. Unless we agree otherwise in writing, our fees for the Plans' audits shall be paid directly by the Plan Sponsors or from assets of the Plans.

31. In addition, the Companies shall reimburse us for direct expenses incurred in connection with the performance of the Audit Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. EY may receive rebates in connection with certain purchases, which are used to reduce charges that EY would otherwise pass on to its clients.

32. Our estimated pricing and schedule of performance are based upon, among other things, our preliminary review of the Companies' records and the representations Companies personnel have



**Building a better
working world**

made to us and are dependent upon the Companies' personnel providing a reasonable level of assistance Should our assumptions with respect to these matters be incorrect or should the condition of records, degree of cooperation, or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimates are based, we may adjust our fees and planned completion dates. Fees for any special audit-related projects, such as proposed business combinations or research and/or consultation on special business or financial issues, will be billed separately from the fees referred to above and will be the subject of other written agreements.

33. If we are requested or authorized by the Companies or are required by government regulation, subpoena or other legal process to produce our documents or our personnel as witnesses with respect to the Audit Services for the Companies, the Companies will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such requests. In the event that production of documents or use of EY personnel as witnesses is required as described above, we will, unless otherwise prohibited by law, inform the Companies of such intended disclosure and, to the extent reasonably possible and consistent with our obligations under law, regulation and professional standards, afford the Companies a reasonable opportunity to protect their interests.

**Confidentiality**

34. The Companies acknowledge their obligation to maintain a relationship of candor and full disclosure and to furnish or cause to be furnished to us such information as required by this Agreement or as we otherwise deem necessary in connection with our Audit Services. We hereby acknowledge and agree that information furnished to us by or on behalf of the Companies, as well as any information that we may derive there from (collectively, the "Information"), is client confidential information and will be maintained as confidential in accordance with professional standards of the accounting profession applicable to us, including, without limitation, the American Institute of Certified Public Accountants Code of Professional Conduct, ET Section 1.700.001, Confidential Client Information in effect as of the date hereof, a copy of which is attached hereto as Exhibit A. We further agree that we will use the Information only in connection with providing our professional services to the Companies.

35. Notwithstanding the foregoing, we may disclose without violation of this Agreement such portion of the Information as is required or permitted to be disclosed by law, regulation, legal process or professional standards promulgated by the AICPA or PCAOB or this Agreement. If we are required by law or pursuant to legal process to disclose Information, we will, to the extent reasonably possible and consistent with our legal and professional obligations, first advise the Companies of such intended disclosure so that the Companies may have a reasonable opportunity to protect its interests.

A member firm of Ernst & Young Global Limited



**EY**
Building a better
working world

36. Upon your request, we will return to you the Information, including all copies thereof, except we may keep Information as may be required by law, the Professional Standards or our standard procedures. This Agreement is not intended to preclude us from maintaining copies of our own working papers.

**Other matters**

37. From time to time, and depending on the circumstances, (1) we may subcontract portions of the Audit Services to other EY Firms (listed at www.ey.com), who may deal with the Companies or certain of their respective Associated Companies directly, although EY alone will remain responsible to you for the Audit Services, and (2) personnel (including non-certified public accountants) from an affiliate of EY or another EY Firm or any of their respective affiliates, or from independent third-party service providers (including independent contractors), may participate in providing the Audit Services. Unless prohibited by applicable law, we may provide Companies information to other EY Firms and their personnel, as well as third-party service providers acting on our or their behalf, who may collect, use, transfer, store or otherwise process (collectively, "Process") it in various jurisdictions in which they operate to facilitate performance of the Audit Services, to comply with regulatory requirements, to check conflicts, to provide financial accounting and other administrative support services, or for quality and risk management purposes. We shall be responsible to you for maintaining the confidentiality of the Companies' and their Associated Companies' information, regardless of where or by whom such information is Processed on our behalf. Either EY or the Companies may use electronic media to correspond or transmit information relating to the Audit Services, and such use will not, in itself, constitute a breach of any confidentiality obligations.

38. The Companies shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of EY, solicit for employment or a position on its Board of Directors, or hire or appoint to its Board of Directors, any current or former partner, principal, or professional employee of EY, any affiliate thereof, any other EY Firm or any of their respective affiliates (collectively, "EY Professionals") if any such professional either: (i) performed any audit, review, attest, or related service for or relating to the Companies at any time (a) during the then current fiscal year of the Companies up to and including the date of the audit report for that year, or (b) in the 12 months ended on the audit report date for the immediately preceding fiscal year; or (ii) influences EY's operations or financial policies or has any capital balances or any other continuing financial arrangement with EY; provided that the Companies shall not breach this obligation by generally advertising available positions without targeting any specific EY professionals.

39. EY shall remain fully responsible for the Audit Services and for all of its other responsibilities, covenants and obligations under this Agreement, notwithstanding that we may subcontract portions of the Audit Services to other EY Firms or that other EY Firms may participate in the provision of the Audit Services. The Companies may not make a claim or bring proceedings



**EY**
Building a better
working world

relating to the Audit Services or otherwise under this Agreement against any other EY Firm and EY shall not contest its responsibility for the Audit Services on the basis that any of them were performed by another EY Firm. The Companies shall make any claim or bring proceedings only against EY. This paragraph is intended to benefit the other EY Firms, which shall be entitled to enforce it. Each EY Firm is a separate legal entity.

40. If we Process Companies information that can be linked to specific individuals ("Personal Data"), we will Process it in accordance with paragraph 46 of this Agreement, as well as applicable law and professional regulations, including, where applicable, the EU-U.S. Privacy Shield Framework, administered by the U.S. Department of Commerce ("Privacy Shield"), to which EY has self-certified. Further information (including disclosures required by Privacy Shield) is set out at www.ey.com/us/privacyshield. We will require any service provider that Processes Personal Data on our behalf to provide at least the same level of protection for such data as is required by Privacy Shield and other legal and regulatory requirements applicable to us. If any Companies information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. The Companies warrants that it has the authority to provide the Personal Data to EY in connection with the performance of the Audit Services and that the Personal Data provided to us has been Processed in accordance with applicable law.

41. In order to provide the Audit Services, we may need to access Personal Data consisting of protected health information, financial account numbers, Social Security or other government-issued identification numbers, or other data that, if disclosed without authorization, would trigger notification requirements under applicable law ("Restricted Personal Data"). In the event that we need access to such information, you will consult with us on appropriate measures (consistent with professional standards applicable to us) to protect the Restricted Personal Data, such as deleting or masking unnecessary information before it is made available to us, encrypting any data transferred to us, or making the data available for on-site review at a Companies' site. You will provide us with copies of any Restricted Personal Data only in accordance with mutually agreed protective measures.

42. You acknowledge that to the extent the Companies is regulated by or under the supervision of a federal, state or other regulator of banking or financial services (including, without limitation, the Board of Governors of the Federal Reserve, the Office of the Comptroller of the Currency and the New York State Department of Financial Services) (collectively, "Regulators"), you may be in possession of confidential supervisory information as defined in relevant law or regulations ("CSI"), including without limitation documents and information comprising CSI arising from, relating to, or concerning inspections and examinations by such Regulator. As set forth in paragraph 12, we may require access to such CSI in order to perform the Audit Services. However, CSI may be subject to regulatory restrictions on disclosure to and/or use by third parties. Accordingly: (1) management will identify to EY the Regulators that regulate and/or exercise

supervisory oversight over the Companies; (2) management will identify to EY all CSI in your possession; (3) to the extent management's provision of CSI to EY is not authorized by applicable law or regulation absent Regulator approval, management will obtain authorization from the applicable Regulator to provide us access to any and all CSI for the purposes of performing the Audit Services with respect to CSI already in its possession immediately following execution of this Agreement (and with respect to any later-identified CSI immediately upon learning of the examination, inspection or other activity that could result in such materials being deemed CSI); and (4) management will not provide any such access prior to having received such authorization and having identified to EY with specificity the information that constitutes CSI. You acknowledge that any failure to provide any such information could be considered a restriction on the scope of the audit, and the parties agree that they shall engage in good faith discussions regarding the effect of any withholding on the Audit Services.

43. By your signature below, you confirm that the Companies, through its Board of Directors, has expressly authorized you to enter into this Agreement on behalf of, and to bind, the Companies. In addition, you confirm that management agrees to, acknowledges, and understands its responsibilities as outlined in "Management's responsibilities and representations." Either EY or the Companies may execute this Agreement (and any supplements or modifications hereto) by electronic means, and each of EY and the Companies may sign a different copy of the same document.

44. EY retains ownership in the workpapers compiled in connection with the performance of the Audit Services.

45. This Agreement, and any non-contractual matters or obligations arising out of this Agreement or the Audit Services, including (without limitation) claims arising in tort, fraud, under statute or otherwise relating to the Audit Services, or questions relating to the scope or enforceability of this paragraph, shall be governed by, and construed in accordance with, the laws of New York applicable to agreements made, and fully to be performed, therein by residents thereof. Except for a claim limited solely to seeking non-monetary or equitable relief, any dispute or claim arising out of or relating to the Audit Services, this Agreement, or any other services provided by or on behalf of EY or any of its subcontractors or agents to the Companies or at the Companies' request, shall be resolved by mediation or arbitration as set forth in the attachment to this Agreement, which is incorporated herein by reference. Judgment on any arbitration award may be entered in any court having jurisdiction.

46. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This Agreement applies to all Audit Services (as defined in paragraph 1) and Plan Engagement (as defined, respectively in paragraphs 17 and 28), including any such services performed or begun before the date of this Agreement.

A member firm of Ernst & Young Global Limited



**EY**

Building a better
working world

To the extent that EY agrees to perform Audit Services for a subsequent fiscal year, the terms and conditions set forth in this Agreement shall apply to the performance of such Audit Services, except as specifically modified, amended or supplemented in writing by the parties. Changes in the scope of the Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental agreements. We may terminate performance of the Audit Services and this Agreement upon written notice if we reasonably determine that we can no longer provide the Audit Services in accordance with applicable law or professional obligations. Upon any termination of the Audit Services or this Agreement, the Companies shall pay EY for all work-in-progress, Audit Services already performed and expenses incurred by us up to and including the effective date of such termination. In the event of such termination, those provisions of this Agreement which should by their terms survive such termination, including, but not limited to, any confidentiality obligations hereunder, shall continue to survive.

EY appreciates the opportunity to be of assistance to the Companies. If this Agreement accurately reflects the terms on which the Companies has agreed to engage EY, please sign below on behalf of the Companies and return it to Devon Brady, 300 First Stamford Place, Stamford, CT 06902.

Very truly yours,

Agreed and accepted by:

Purdue Pharma L.P.

By its general partner, Purdue Pharma Inc.

By: _____

Jon Lowne
Vice President, Chief Financial Officer

A member firm of Ernst & Young Global Limited

## Dispute resolution procedures

### Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of any EY Firm audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

### Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of any EY Firm audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction. In deciding the dispute, the arbitration panel shall apply the limitations period that would be applied by a court deciding the matter in the same jurisdiction, and shall have no power to decide the dispute in any manner not consistent with such limitations period.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

# Exhibit A

**Rule 1.700 Confidential Information**

**1.700.001 Confidential Client Information Rule**

.01 A member in public practice shall not disclose any confidential client information without the specific consent of the client.

.02 This rule shall not be construed (1) to relieve a member of his or her professional obligations of the "Compliance With Standards Rule" [1.310.001] or the "Accounting Principles Rule" [1.320.001], (2) to affect in any way the member's obligation to comply with a validly issued and enforceable subpoena or summons, or to prohibit a member's compliance with applicable laws and government regulations, (3) to prohibit review of a member's professional practice under AICPA or state CPA society or Board of Accountancy authorization, or (4) to preclude a member from initiating a complaint with, or responding to any inquiry made by, the professional ethics division or trial board of the Institute or a duly constituted investigative or disciplinary body of a state CPA society or Board of Accountancy. Members of any of the bodies identified in (4) above and members involved with professional practice reviews         identified in (3) above shall not use to their own advantage or disclose any member's confidential client information that comes to their attention in carrying out those activities. This prohibition shall not restrict members' exchange of information in connection with the investigative or disciplinary proceedings described in (4) above or the professional practice reviews described in (3) above. [Prior reference: paragraph .01 of ET section 301]

**Interpretations Under the Confidential Client Information Rule 1.700.050 Disclosing Client Information in Connection With a Review of the Member's Practice**

.01 For purposes of the "Confidential Client Information Rule" [1.700.001], a review of a member's professional practice includes a review performed in conjunction with a prospective purchase, sale, or merger of all or part of a member's practice. Such reviews may threaten a member's compliance with the "Confidential Client Information Rule." To reduce the threat to an acceptable level, a member must take appropriate precautions (for example, through a written confidentiality agreement with the prospective purchaser) to help ensure that the prospective purchaser does not disclose any confidential client information obtained in the course of the review.

.02 Members who perform such reviews shall not use to their advantage or disclose any confidential client information that comes to their attention during the review. [Prior reference: paragraph .04 of ET section 301]

[Effective December 15, 2014]

## Exhibit B

<u>Consolidated Financial Statements</u>

| | |
|---|---|
| December 15, 2018 | $200,000 |
| January 1, 2019 | $200,000 |
| February 1, 2019 | $200,000 |
| March 1, 2019 | $65,000 |

<u>Employee Benefit Plans</u>

| | |
|---|---|
| April 30, 2019 | $30,000 |
| June 1, 2019 | $20,000 |
| July 31, 2019 | $6,000 |

## Exhibit C

List of Associated Companies within the Consolidated Financial statements, as defined in the first paragraph.

- Purdue Pharma L.P.
- Nayatt Cove Lifescience
- Mundipharma LLC
- Purdue Pharmaceuticals L.P.
- Purdue Neuroscience Company
- Purdue Pharma of Puerto Rico
- Purdue Pharma Products L.P.
- Purdue Transdermal Technologies L.P.
- Avrio Health L.P (formerly Purdue Products L.P.)
- Purdue Pharmaceutical Products L.P.
- Purdue Pharma Manufacturing, L.P.
- PharmIT L.P.
- Imbrium Therapeutics L.P.
- Greenfield BioVentures L.P.
- Adlon Therapeutics L.P.