Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   December 4, 2019

17                   2:03 PM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  SHEA/JUSTIN

Page 2

1    HEARING re

2    Motion to Authorize/Motion of Debtors for Entry of an Order

3    Authorizing (I) Debtors to (A) Pay Pre-Petition Wages,

4    Salaries, Employee Benefits and Other Compensation and (B)

5    Maintain Employee Benefits Programs and Pay Related

6    Administrative Obligations, (II) Employees and Retirees to

7    Proceed with Outstanding Workers Complication Claims and

8    (III) Financial Institutions to Honor and Process Related

9    Checks and Transfers (ECF 6)

10

11   Objection of the United States Trustee (ECF 134)

12

13   Nevada Counties and Municipalities' Joinder to the Objection

14   of the United States Trustee (ECF 190)

15

16   The Commonwealth of Pennsylvania's Joinder to the Objection

17   of the United States Trustee (ECF 196)

18

19   Joinder/Objection by the Ad Hoc Group of Non-Consenting

20   States (ECF 197)

21

22   Joinder of the State of Arizona to the Objection of the

23   United States Trustee (ECF 201)

24

25

Page 3

1   HEARING re (Cont'd.)

2

3   Letter of Linda A. Lacewell, Superintendant of New York

4   State Department of Financial Services (ECF 99)

5

6   Letter of Dan Colucci (ECF 103)

7

8   Letter of John Taormina (ECF 327)

9

10   Statement of the Ad Hoc Group of Non-Consenting States

11   Maintaining Its Objection to Purdue's Wage Motion (ECF 557)

12

13   State of Maryland's Additional Statement (ECF 559)

14

15   Debtors' Omnibus Reply (ECF 235)

16

17   Debtors' Supplemental Omnibus Reply (ECF 556)

18

19

20

21

22

23

24

25   Transcribed by:  Lorie Cook

1    A P P E A R A N C E S :

2

3    AKIN GUMP STRAUSS HAUER & FELD

4         Attorneys for Official Creditors' Committee

5         One Bryant Park

6         Bank of America Tower

7         New York, NY 10036-6745

8

9    BY:  Arik Preis, Esquire

10

11   Schulte Roth & Zabel LLP

12        Ad Hoc Group of Hospitals

13        919 Third Avenue

14        New York, NY 10022

15

16   BY:  Kristine Manoukian, Esquire

17

18   DAVIS POLK & WARDWELL LLP

19        Debtors

20        450 Lexington Avenue

21        New York, NY 10017

22

23   BY:  Marshall S. Huebner, Esquire

24

25

Page 5

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   U.S. DEPARTMENT OF JUSTICE - OFFICE OF THE UNITED STATES

 4   TRUSTEE

 5        Attorneys for United States Trustee

 6        U.S. Federal Office Building

 7        201 Varick Street, Suite 1006

 8        New York, NY 10014

 9

10   BY:  Paul K. Schwartzberg, Esquire

11

12   PILLSBURY WINTHROP SHAW PITTMAN LLP

13        Debtors

14        31 West 52nd Street

15        New York, NY 10019-6131

16

17   BY:  Andrew Troop, Esquire

18

19   DAVIS POLK & WARDWELL LLP

20        Debtors

21        450 Lexington Avenue

22        New York, NY 10017

23

24   BY:  James I. McClammy, Esquire

25
```

```
1    A P P E A R A N C E S (Cont'd):

2

3    MASSACHUSETTS ATTORNEY GENERAL'S OFFICE

4         Debtors

5         False Claims Division

6         Office of the Attorney General

7         One Ashburton Place

8         Boston, MA 02108

9

10   BY:  Gillian Feiner, Esquire

11

12   SPEARS & IMES LLP

13        Attorneys for Dr. Landau

14        51 Madison Avenue

15        New York, NY 10010

16

17   BY:  Linda Imes, Esquire

18

19

20

21

22

23

24

25
```

Page 7

| | WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|---|
| 1 | WITNESSES: | DX | CX | RDX | RCX |
| 2 | JON LOWNE | | | | |
| 3 | By Mr. Schwartzberg | 45 | | 75 | |
| 4 | By Mr. Troop | | 60 | | |
| 5 | By Mr. McClammy | | | 66 | |
| 6 | | | | | |
| 7 | JOSEPHINE GARTRELL | | | | |
| 8 | By Mr. Schwartzberg | 77 | | | |
| 9 | By Mr. Troop | | 80 | | |
| 10 | By Mr. McClammy | | | 86 | |
| 11 | By Mr. Troop | | | | 89 |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

Page 8

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Okay.  Good afternoon, In Re Purdue
 3    Pharma, L.P., et al.
 4            MR. PREIS:  Good afternoon, Your Honor.
 5            THE COURT:  Good afternoon.
 6            MR. PREIS:  Arik Preis from Akin Gump Strauss
 7    Hauer & Feld on behalf of the Official Creditors' Committee.
 8    First of all, thank you to Your Honor and Your Honor's
 9    chambers for --
10            THE COURT:  You got here.
11            MR. PREIS:  -- accommodating, yes.  We do
12    appreciate it.
13            THE COURT:  On time.
14            MR. PREIS:  Yes.  So thank you, very much for
15    that.
16            THE COURT:  It's fine.
17            MR. PREIS:  Your Honor, just before we start with
18    the actual agenda today, I wanted to note for you last night
19    there's an Ad Hoc Group of Hospitals that filed a Rule 2019
20    statement, and they just wanted to speak for two minutes at
21    the beginning of this hearing just to introduce themselves
22    and let you know kind of who they are, and then we can go on
23    with the agenda if you --
24            THE COURT:  Okay.  They're not appearing on this
25    particular matter --
```

1          MR. PREIS:  No, no.

2          THE COURT:  -- they just want to introduce

3     themselves.

4          MR. PREIS:  Correct.

5          THE COURT:  All right.  That's fine.

6          MR. PREIS:  Thank you, Your Honor.

7          MS. MANOUKIAN:  Good afternoon, Your Honor.

8     Kristine Manoukian, Schulte Roth & Zabel, appearing for the

9     Ad Hoc Group of Hospitals.  We appreciate the opportunity to

10    speak to you briefly.

11         As Mr. Preis noted, we did file the 2019 last

12    night, which goes into greater detail about who we are, the

13    nature and the magnitude of the hospitals claims, and the

14    damages that they have suffered as a result of the opioid

15    crisis.  But I did want to take this opportunity to

16    introduce our group to the court and just to highlight a

17    couple key points.

18         The Ad Hoc Group of Hospitals as the 2019

19    statement states currently consists of over 550 hospitals

20    across the country, which represents approximately 10

21    percent of the hospitals in the United States.  These

22    hospitals, including the members of the Ad Hoc Group hold

23    approximately over 303 billion dollars of claims against

24    debtors that arise from among other things, RICO violations

25    and state law equivalents, negligence, nuisance, conspiracy,

1    and other causes of action.

2          If the RICO or state law equivalent violations or

3    allegations are proven to be successful, the hospitals will

4    have trouble damages.  And, of course, we're aware that

5    there are other parties that have asserted similar claims

6    and allegations, and if those are successful, they may also

7    assert trouble damages as well.

8          THE COURT:  I'm sorry.  What was the number again?

9          MS. MANOUKIAN:  303 billion dollars.

10         THE COURT:  Okay.

11         MS. MANOUKIAN:  I recognize it is a staggering

12   number.

13         THE COURT:  All right.

14         MS. MANOUKIAN:  But at the appropriate time the Ad

15   Hoc Group of Hospitals will be able to demonstrate how that

16   number was arrived.

17         THE COURT:  Okay.

18         MS. MANOUKIAN:  As the Creditors' Committee notes

19   in its 2019 statement and has continued to note throughout

20   these cases, the debtor's creditors include a substantial

21   number of private litigation claimants with very significant

22   claims.  It is important to note that the vast majority of

23   the hospitals are not represented by the states and

24   municipalities that have brought similar cases against the

25   debtors.

Page 11

1          Nevertheless, as much as any other litigation

2    claimant, hospitals directly and monetarily bear the brunt

3    of the opioid crisis.  They have incurred and continue to

4    incur millions of dollars in damages associated with the

5    expense of uncompensated and undercompensated care that they

6    must provide to opioid-affected patients.

7          Hospitals have been uniquely impacted by the

8    opioid epidemic that in part has been caused by actions or

9    admissions of the debtors.  The reason for that, Your Honor,

10   is that the hospitals are required to treat patients with

11   opioid-related conditions.

12          Among the damages that have been caused to the

13   hospitals by this epidemic are their substantial increased

14   operational costs resulting from treatments that are more

15   complex and expensive than they otherwise would be when the

16   patient's not opioid affected, increased patient admissions,

17   and increased psychiatric care.

18          We did touch upon the amount of the claim, and as

19   I mentioned, at the appropriate time we will demonstrate how

20   that number was calculated.  But unlike creditors with soft

21   money claims, the hospitals are actually capable of

22   demonstrating the actual cost that they have incurred in

23   connection with treating opioid-affected patients.  The cost

24   of the opioid epidemic to the hospitals has been, and will

25   continue to be for the foreseeable future, enormous.

Page 12

1           In sum, Your Honor, hospitals are fighting

2     effectively for their survival in the face of this epidemic

3     and are incurring demonstrable and significant damages.

4     While admittedly we're a little late to these cases, there

5     is a hospital on the Creditors Committee, and the Ad Hoc

6     Group of Hospitals intends to get more actively involved in

7     and work constructively with the debtors, the committee, and

8     the other stakeholders in these cases.

9           Thanks, Your Honor, for giving us the opportunity

10    to introduce ourselves.

11          THE COURT:  Okay, thanks.

12          MR. HUEBNER:  Good afternoon, Your Honor.  For the

13    record, I am Marshall Huebner of Davis Polk & Wardwell, LLP

14    on behalf of the debtors.  Obviously I take no view on the

15    assertions of claim and size and damage, but, you know, it's

16    another hearing, so we have to have a new committee and

17    we'll obviously work with where we go from there.

18          Your Honor, a couple of very quick precatory

19    things on my end.  Number one, as The Court of course surely

20    remembers, on November 6 the injunction order -- the

21    injunction hearing was held that included the voluntary

22    agreed form of self-injunction.  I just wanted to give The

23    Court comfort on a couple of things to show you how

24    seriously the debtors continue to take everything in this

25    case, but among other things those types of things.

1          By November 14, every single Purdue employee,

2     every one, had received a copy of the voluntary injunction

3     along with a memorandum outlining its key aspects.  It was

4     also put on the employee website.  The company has conducted

5     multiple -- I think we're up to nine or ten by now -- in-

6     person and WebEx training sessions with all the relevant

7     departments and people with over 100 people getting the

8     extended training sessions, the self-injunction.  The

9     external communications consultants have gotten those.  The

10    board of directors is getting a training session, and there

11    are -- I have a whole page of follow-up steps I'm not going

12    to review, as I don't think that's necessary.

13         We do want to give The Court comfort that The

14    Court and all parties deserve that.  You know, when we say

15    we're going to do things, we try to do them acidulously and

16    seriously with alacrity, and I believe that that

17    characterizes the company's actions with respect to the

18    voluntary self-injunction.

19         Number two, Your Honor, just to get a detail out

20    of the way, the court, as I'm sure is the case, since it's

21    always the case with the court, has probably read the

22    proposed order and noticed the American Express black line

23    and language in there.

24         Just as a quick reminder, 'cause I actually didn't

25    remember it, shame on me, that of the October 16 final wages

Page 14

1    order on lots of other topics, had a paragraph nine that

2    related to American Express, which was the card purchasing

3    program.  It provided that they don't have to continue with

4    the program.  They can shut it down unless we waive

5    avoidance actions against them.

6              And there was originally a deadline of November 20

7    for us to get this waiver.  They then extended it to

8    December 5.  We then worked with the Creditors' Committee

9    and gave them the details on the American Express card

10   purchasing program, and the debtors and the committee got

11   comfortable with the proposed waiver.

12             And so if you look in paragraph three of the

13   proposed supplemental final order, it's the same as the old

14   paragraph nine from October 16 with only two changes.  One,

15   it now says the debtors are authorized as opposed to

16   authorized but not directed, whatever.

17             And then two, the language that required us to go

18   get the avoidance action waiver is replaced with language

19   that actually deemed us to have waived avoidance actions

20   against American Express and their related entities that are

21   listed.  Again, full indulgence by the Creditors' Committee,

22   reviewed the purchasing program, and people decided that

23   this was the right deal.

24             And I realize it wasn't expressly discussed in the

25   debtors' onerous reply, because we weren't replying to

1    anything.  It's just something that we said we would come

2    back with after the October 16 hearing, which I think is now

3    done.

4            THE COURT:  Is this just in respect of

5    reimbursement of credit card obligations, 'cause they have

6    other relationships with the debtors?

7            MR. HUEBNER:  Yeah.  I actually don't -- I don't

8    think these entities have other relationships with the

9    debtors.  This is the card -- these are the card purchasing

10   entities that are pretty specific.  This is what they do.

11   And as you know, we have no funded debt, and if we did, it

12   wouldn't be from American Express.

13           THE COURT:  Okay.

14           MR. HUEBNER:  So unless somebody corrects me, I'll

15   look around the room, no one is going to come to you saying,

16   wait, wait, wait, there's something else.  So I think

17   that's, I think people are comfortable with the language.

18           So, Your Honor, we're here for what is hopefully

19   the final of, I think by now, maybe four hearings on the

20   debtor's wages motion issues.  The things that are left are

21   the AIP, the LTRIP [ph], and in essence two sign-on bonuses

22   for people who were brought to the debtors from other

23   employers with sign-on bonus as part of the package.

24           You know, honestly, in hindsight I really wonder,

25   'cause it's something that I think about whenever we're

Page 16

1    filing a case, which is which things do you actually put in

2    motions and describe and which things do you take the view

3    or ordinary course.  In looking at these programs which have

4    been running for 10 years, 20 years, 30 years and were

5    unchanged with connection with the bankruptcy and

6    preexisted, you know, candidly there was a view that in

7    hindsight I probably still would not have taken, 'cause our

8    way is always the way of disposure and putting things before

9    a court.

10          I never want anybody to say, you know, how could

11   you not have let the world know about this, but I do know,

12   you know, as sort of an aside that now that sort of the

13   evidence is in about the nature of these plans and just how

14   long they've been running and how unchanged they were, that

15   there really is an argument that, in fact, they don't need

16   court approval at all.

17          In fact, as Your Honor noted at our October 10

18   hearing in connection with the severance plan, you know, and

19   I quote on page 115 of the transcript, "If the program was

20   adopted on the eve of the filing of the bankruptcy case or

21   otherwise would appear to be questionable, then it would be

22   subject to review, but if it has been long in place as is

23   the case here, it's subject to the general rules pertaining

24   to the allowance and payment of administrative expenses.

25          So, you know, arguably maybe you would say, you

1    know, horizontal test, vertical test, these programs are 20

2    or 30 years old.  They're industry standard.  Everybody does

3    them.  They don't actually meet court approval at all, but

4    that's not our --

5              THE COURT:  I wouldn't say that in these cases.

6              MR. HUEBNER:  Correct.  And we did not.  We did

7    not obviously.  And so what we've done instead, obviously,

8    is spend incredible amounts of time in the last few months

9    endlessly negotiating and discussing and diligencing [ph]

10   these programs with various constituencies, including having

11   moved the hearing three times to allow for more time on

12   these sort of, you know, obviously controversials, since

13   we're all here today, issues.

14             So here's how the parties line up.  The Creditors'

15   Committee, as I believe you'll hear later today, is firmly

16   and definitively onboard with everything that is in the

17   proposed order and described in the reply brief.  We

18   negotiated with them.  It's held like around the clock for

19   weeks and weeks.  And they are amply satisfied with where we

20   ended up.

21             The Ad Hoc Committee of Consenting States has no

22   objection.  They, you know, largely worked -- in this case,

23   they had ceded in parts of the Creditors' Committee, but

24   obviously were kept informed as well, and they are not

25   objecting.

1          The Ad Hoc Committee of Consenting States, who I

2    assume will speak for themselves, as well as Arizona,

3    Pennsylvania, and the Nevada Counties and Municipalities.

4    My understanding is they have no objection at all to

5    anything other than the AIP proposed for the debtors' chief

6    executive officer, Dr. Craig Landau.

7          Late Monday night Maryland filed an untimely

8    joinder to the joinder of the 18dissenting states.  And, you

9    know, we thought hard about what to do about that.  I mean,

10   I think the objection deadline was actually October 3.  And

11   while the dissenting states at least filed a two-page

12   joinder to the U.S. Trustee's motion months ago, timely,

13   that just said, we adopt the U.S. Trustee's objection and we

14   likewise object, Maryland actually filed nothing at all.

15         And candidly, I'm not sure there's such a thing as

16   a joinder to a joinder.  Your Honor has already made it very

17   clear to all parties in this case how you view joinders in

18   general under the case management order is actually even

19   more clear, which actually says the debtors or moving

20   parties don't even have to respond to a joinder and The

21   Court "Shall not consider arguments or factual allegations

22   contained only in the joinder."

23         So more on that later, but because in essence

24   Maryland is taking the same view as other people who they're

25   at least not double joinders, they're single joinders.  You

Page 19

1    know, we didn't want to go to the -- for any number of

2    reasons the step of moving to strike as late filed or things

3    like that, but, you know, candidly the flexibility with

4    which parties are viewing the docket at this case is not

5    something that is without burden and cost.

6              So in a case that has, you know, about eight

7    committees and a new one as you just heard a few minutes

8    ago, as of last night, 48 state governments, five occupied

9    territories or inhabited territories, and of course, the

10   District of Columbia and about a million cities and

11   counties, we have reached global peace --

12             THE COURT:  Are there unoccupied territories?

13             MR. HUEBNER:  Yes, there are uninhabited U.S.

14   territories.

15             THE COURT:  Okay.  All right.

16             MR. HUEBNER:  There are five inhabited U.S.

17   territories, and there are other --

18             THE COURT:  Learn something new every day.

19             MR. HUEBNER:  Hawaii, by the way, has over 600

20   islands for the record.

21             THE COURT:  That's a state, though.

22             MR. HUEBNER:  I know, but, no, I'm just saying you

23   think of it as like five islands, but it's actually quite a

24   few islands.

25             THE COURT: Okay.

1          MR. HUEBNER:  So we should not lose sight of what

2     we have accomplished, which is leaving aside the U.S.

3     Trustees.  In just another moment, in a very complex,

4     difficult case we're essentially down to one person's 2019

5     bonus as the only contested matter.  And obviously people

6     are very focused and involved in this case in ways that are

7     even atypical, even within the often challenging world of

8     restructuring.

9          The U.S. Trustee is in a different place.  And I

10    guess I -- you know, we heard from them as to their position

11    last night at 10:17 p.m. for the first time.  I wasn't sure

12    if they were not objecting at all, which was certainly my

13    hope, or if they were objecting only in part.  You know, I

14    know that their office is very stressed and burdened, but to

15    be fair to us, we actually did keep them updated as things

16    were going along and seek calls with them multiple times

17    last week to see where we were and if they needed more

18    information.

19          And in the end, I actually think they're pressing

20    quite a broad objection, which is unfortunate, both to the

21    AIP and to the LTRIP and even to the signing bonuses, which

22    is candidly very disappointing.  Given that, you know, the

23    number of parties in the case who were actively involved in

24    this and got comfortable and yet again I find myself at the

25    podium, you know, addressing something that no party in the

Page 21

1    entire case other than the U.S. Trustee is objecting to, and

2    obviously we're going to be here for quite a bit longer

3    today, having to defend everything other than a single part.

4    I respect their right to do so, but obviously it would have

5    been, you know, nice if it were otherwise.

6              And, Your Honor, it's with very good reason

7    frankly that all the economic stakeholders, both

8    governmental and non-governmental in this case are, in fact,

9    99 percent onboard with the exception of a single AIP

10   payment.  Because the settlement and compromises that we

11   reach with the U.S. Trustee are for substantially less money

12   than was actually earned by the employees under these

13   longstanding programs.

14             There are new and huge retentive holds that the

15   trustee -- that the UCC, you know, got us to agree to that

16   take 2019 compensation that's normally paid in March and

17   hold people through most, or in a couple of cases maybe even

18   all of 2020, using that compensation with clawbacks an

19   extended payment schedules.  We're not paying incentive

20   amounts for 2017 or before for anyone except for much lower-

21   level employees, and there were other concessions, more than

22   that in amount ultimately by senior-level employees that

23   more than made up for that economically.

24             The cuts that were done, as they should be, were

25   massively progressive, not regressive in the sense that the

1   cuts are by far the deepest at the top.  And if you look at

2   the LTRIP cuts, for example, they literally cascade from

3   very big cuts to medium cuts to much smaller cuts as you

4   move down.  And the payment terms, you know, don't effect,

5   for example, hourly employees where they really shouldn't.

6   And that, in my experience, is always the right way to do

7   things when you do have to make concessions, and because it

8   is actually critically needed.

9         We pay these amounts.  You know, holding this

10  company together, which I know the court is sensitized to

11  from watching so many companies over the decades in

12  unthinkably challenging circumstances.  You know, the

13  declarations as well as the motion papers are very clear

14  about the attrition problem that the company quite

15  understandably continues to face.

16        This is a difficult and frankly, you know, often

17  vitriolic working environment with respect to Purdue and

18  various parties abused in public positions on the company.

19  In fact, Your Honor, again, not to over-quote you, I won't

20  do it too many more times, but as The Court note on October

21  10, and I quote from page 120, "It is hard to say that there

22  is any true comparator to these debtors, given the adverse

23  publicity that these debtors have received and that these

24  six individuals have to contend with."  This was the little

25  $115,000 bonus plan that Your Honor approved on that day.

1          And, of course, there's also the 67 percent

2     downsizing that was done on top of that in the last two

3     years.  So I think -- I don't think anybody can gainsay,

4     which is why almost everyone is comfortable with almost

5     everything than paying people what they actually have earned

6     under longstanding programs is very important.

7          Then, the last issue which I'll be discussing in

8     somewhat more detail in a few minutes is that with respect

9     to Dr. Landau, who we understand is categorically slightly

10    different and maybe somewhat different certainly in the

11    minds of the objectors, he is the only employee in the

12    entire company who is named in any of the 2,760 lawsuits

13    against Purdue, and we understood that.

14          And we drafted for it, and we and the Creditors'

15    Committee discussed it at great length and actually put it,

16    and this we'll talk about a little bit later, four different

17    special provisions that apply only to him to acknowledge and

18    balance that fact out, provisions that frankly in the

19    debtors' view should have been much more than enough or at

20    least should have been enough to satisfy people who have

21    concerns, which, again, I'll talk about more in a few

22    moments.

23          Your Honor, if it made sense to you, and I'm

24    happy to either do it or not do it, I can do a very quick

25    rundown of what all the changes were, or if the answer is,

1    you know, I've read your papers very carefully, I don't need

2    you to do a super summary of the changes, I'm happy to skip

3    them and proceed with a little bit more advocacy.

4            THE COURT:  Well, I think Mr. Lowne's second

5    supplemental declaration and the proposed order laid them

6    out, so.

7            MR. HUEBNER:  Perfect.  I'm delighted.

8            THE COURT:  So as far as, you know, how they're

9    worded and the like --

10           MR. HUEBNER:  Yeah.  Perfect.

11           THE COURT:  -- I kind of pieced together how the

12   10 million is derived, but I don't think you need to go

13   through the agreement that's been reached with the

14   Creditors' Committee.

15           MR. HUEBNER:  Perfect.  So then, Your Honor, let

16   me then turn to a few salient facts, both on the program as

17   a whole, in light of what I believe is coming from the U.S.

18   Trustee, and then obviously some more specific facts with

19   respect to Dr. Landau, which is what has drawn the objection

20   of a few other parties.

21           Number one, Your Honor has now twice ruled on who

22   is an insider.  So that is behind us.  I mean, the debtors

23   have actually taken a pretty expansive view, as we had lots

24   of testimony already.  There are 10 insiders, and they

25   actually reach reasonably far down in the organization

1    frankly, I think, farther down than is typical.  And it is

2    uncontested that there are no insiders at all in the

3    nonexecutive retention plan.  There are obviously insiders

4    in the annual incentive plan, which is for every employee in

5    the company, as well as in the LTRIP, which is for

6    everybody, I believe, above the level of director.  So I

7    don't think we're going to have to retread a third time who

8    is an insider at Purdue.

9            Two, because of this, the relief is all governed

10   by 503(I)(3), which is the Dana II factors.  And, again, as

11   Your Honor surely remembers, you actually ruled extensively

12   on the that and laid out your view of it.  This is found on

13   page 118 of the October 10 transcript, and actually

14   unsurprisedly matches very closely the legal standard that

15   we lay out, I think, in great detail with lots and lots of

16   case law in our reply brief.

17           Three, I think there are many other things that

18   are uncontested, and frankly I think that they should be

19   enough to make this hearing actually relatively

20   straightforward as everybody but Dr. Landau.

21           One, these are very old longstanding programs.

22   The Purdue AIP is more than 30 years old.  The Rhodes AIP is

23   more than 10 years old.  The LTRIP is more than 20 years

24   old.  Two, they were not modified in connection with these

25   Chapter 11 filings.  These are just the AIP and the LTRIP.

1         Three, the structure of these plans is typical for

2    this industry, which is also found in the declarations.

3    Four, all of these plans in combination are necessary to

4    keep Purdue's employees from not being paid below median

5    comp.  As I'm sure Your Honor saw in the Willis Tower

6    Declaration, even if you take away only the non-executive

7    retention plan, that actually drops those employees below

8    the median in a situation where, you know, there's some

9    people we can't hold for love or money, given the

10   circumstances.

11        And to say that people would be willing to stay

12   here having what they view as longstanding expected promises

13   to them breached, compensation they've relied on for years

14   or decades coming in March of the following year and be

15   below market median to boot is simply a bridge way, way too

16   far.

17        Four, the challenging situation in connection with

18   Purdue is there for all to see, the 67 percent downsizing,

19   the substantial continuing attrition.  Again, John Lowne's

20   declaration lays out that we've lost 24 more people that we

21   did not want to lose since the petition date, including

22   people who were in the retention plan, who walked away from

23   pending retention payments because they wanted to leave, and

24   the fact that people have been counting on this compensation

25   for many years as part of their annual expected complainant.

1           And then, if you look at the Lowne declaration as

2    well, he actually, I think, has a very helpful and

3    instructive paragraph about the extreme cost and burden to

4    the debtors to fill positions between gap filling while

5    we're trying to find someone new, the time period the

6    positions stay open, the head hunter and related fees to

7    fill the positions and the like, can easily exceed an entire

8    year's compensation for the position at issue.

9           Five, as we lay out in our reply brief, we are

10   very comfortable and, in fact, delighted with the case law

11   that actually governs this motion.  Whether you look at

12   RezCap or MESSA or Global Home or Pernix or Dana or Your

13   Honor's sort of, you know, ruling on October 10, we think

14   the law is actually exactly where it should be and where we

15   need it to be, because at the end of the day courts

16   obviously apply the facts to the law.

17          Six, the declarations provide, I think,

18   overwhelming and clear evidence of every single factor

19   contained in the case law.  The design of the program, their

20   conservatism, their typicality, the need for the program,

21   the reasonableness of the cost compared to the size and

22   values of the debtors, industry standards, the due diligence

23   that was done, seeking independent advice with respect to

24   the plans, and severe harm if not paid.

25          And the Willis Towers' declaration, this is really

1    worth calling out.  All of their analysis that they did and

2    all their support for the members in the plan and the

3    economics are before the UCC compromise is taken into

4    account.  So they couldn't recalibrate all their numbers in

5    time, 'cause I guess it's very complicated to do that.

6          So it's all sort of A4CR [ph] squared, because

7    everything that they testified to and all the numbers that

8    they ran through were assuming we were paying it all as

9    opposed to paying it all minus all the concessions, which

10   go, certainly as to the LTRIP, all the way down the line,

11   and their declaration, which just gives these sort of

12   medians and market -- doesn't actually take into account at

13   all the new retentive hold.

14          I mean, the debtors, it's sort of like a buy one

15   get one free where, you know, we're not only taking 2019

16   compensation down, you know, materially, but we're also

17   turning it into, at the committee's request, a 2020

18   retention plan essentially for no extra cost, which

19   obviously makes it, you know, in terms of a true comparator,

20   it makes it an unfair comparator because we're sort of

21   dragging the sea anchor now in terms of people at other

22   companies who get this type of money early the following

23   year, and they could quit the next day and take a new job

24   and negotiate for a new package there.

25          With respect to the two sign-on bonuses, Your

1    Honor, and I'll be relatively brief, 'cause I think it's

2    addressed at some length in the brief and the declarations,

3    this one I just -- it's genuinely hard for me to understand

4    the object to this.  These were agreements reached with

5    people before they joined the company to induce them to join

6    the company.

7            It can't possibly be a disguised retention plan,

8    'cause a retention plan is designed to get someone to stay,

9    not to get someone to please come to a company.  And as the

10   testimony in the declaration makes clearer, they were

11   largely structured to compensate for the loss of large

12   equity packages that people held at other companies that

13   vested over time, and it was the company that negotiated to

14   pay the sign-on bonuses over time as opposed to upfront

15   because it's better for the company as opposed to giving

16   somebody a huge, sort of, lump sum on the day they start and

17   then sort of hoping it pans out.

18           In the case of the general counsel, for example,

19   the bonuses are much, much less than the value of the equity

20   package that he gave up when he left his 27 billion dollar

21   market tap prior employer, and he was considering multiple

22   other offers, some of which were substantially more

23   compensatory than Purdue, to take a package that was

24   actually less, and people coming to the company have no

25   LTRIP obviously for a while.

Page 30

1              And so the committee, which it's their job, I

2    guess, except when I'm opposite them, and then it's not

3    their job, this is exactly what they diligenced very

4    thoroughly.  And they asked for data and numbers and proof

5    and examples and the like, and that is how they got totally

6    comfortable that these things were appropriate.  And, again,

7    you know, it's not only about the facts, it's about the law.

8              And our reply brief lays out at length that the

9    law is also very clear here.  Even if it is true that

10   something like a sign-on bonus has some retentive effect,

11   that's not the test.  The test is, is this designed as a

12   retention thing.  Is it primarily retentive?  And we cited

13   RezCap and Dana and Zello [ph] and Nelson, and those are

14   incentive plans.

15             When someone's already at the company and you're

16   incentivizing them, these are people we lured from the

17   outside, and, you know, you also saw, as I'm sure you did,

18   you know, I think more than two pages, paragraphs 50 to 54,

19   of the Lowne declaration that provide extensive evidentiary

20   support for the sign-on bonuses.  This practice has been

21   going on for more than 20 years.

22             I mean, all companies lure people in with signing

23   bonuses.  That's not news.  It's commonplace in the

24   industry.  It mirrors forfeited payments, and it's

25   negotiated entirely prior to people accepting employment.

Page 31

1    You can't come to the company and then negotiated a sign-on

2    bonus.  That's not how it works, and that's not how these

3    worked.

4           And here also by the way, the UCC hammered us and

5    said even for this we want changes.  And so we agreed to

6    move people's payments out 90 days each, and they have to

7    stay until 12/31/2020, or else these payments can be clawed

8    back.

9           So, you know, we really think that it has really

10   pushed things forward candidly, Your Honor.  I originally --

11   I'm not going to do it.  I'll do it later if I have to, but,

12   you know, I was going to potentially take the court and the

13   people in the courtroom through a 2-minute walk through the

14   two declarations, because the shear amount of evidence -- I

15   mean, the Lowne's declaration is about 35 pages of just pure

16   density on the nature of these plans and they're

17   longstanding.  But obviously knowing that The Court is a

18   reader, I will forebear for now and obviously will pullout

19   tendrils of the undisputed and hopefully undisputable

20   evidence as we need it after others speak.

21          So let me then turn from the part in here I hope

22   didn't -- I hope not to have to do at all.  It's a part of

23   the hearing that I knew a few days ago we were likely to

24   have to do, which is the 1.313 annual incentive payment

25   contemplated for the CEO.

1          So, Your Honor, here's how the debtors see it.

2   Number one, Dr. Landau is named in two attorney general

3   lawsuits out of the 48.  I'm aware that the word multiple

4   means more than one, but in the dissenting states pleading

5   to repeatedly say multiple Ags, multiple Ags, multiple Ags,

6   when it's actually two is not like exactly, I think, quite

7   fair.

8          Two Ags have named Dr. Landau in their complaints.

9   The others have not, nor is he actually, to our knowledge,

10  named in scores of other lawsuits.  We believe that he is

11  named in 11 other lawsuits against the company, which is out

12  of 2,760, and there are about 30 other lawsuits as Your

13  Honor certainly remembers in the injunction hearing, a very

14  recent trend as our filing was getting close, where the

15  people have filed lawsuits against everybody but Purdue.

16  And so there are a couple of dozen of those as well, but

17  obviously it is a tiny fraction of the lawsuits that are

18  pending.

19          But again, we don't know where history is going to

20  take us.  The Creditors' Committee and the debtors were very

21  sensitive to the fact that Dr. Landau is named in some

22  lawsuits, unlike every other employee of the company.  And

23  so we did four different things in contemplation and to

24  accommodate that reality.

25          Number one, his LTRIP amount is zero, and his AIP

Page 33

1    amount is reduced to 50 percent, which is a cut far, far,

2    far deeper than anyone else.  And he did that largely to

3    lead by example because the committee just demanded a

4    certain level of economic concessions separate apart from

5    the analytics and the framework.  And so, you know, by our

6    and my math, Mr. Preis' math and my math, I think that's

7    about a 62 percent cut in his earned, under these

8    longstanding plans, compensation.

9              Two, Dr. Landau alone has June 1, 2020 and

10   September 1, 2020, payment dates.  Those are seven and ten

11   months away.  And if he chooses to resign without cause

12   before either of those payment dates, he does not get any

13   remaining funds that will be payable after the date of the

14   resignation.  So his -- he's now being held all the way

15   until September 2020 on his 2019 compensation.

16             Three, there's an express provision in the order

17   that his AIP payment -- payments, there are two of them --

18   are subject to reconsideration as he is found liable by

19   final order.  So, you know, this sort of seemed like

20   whoever's right, it works because if it turns out that

21   someday, you know, the accusations of some of the plaintiffs

22   turn out to be correct, then people -- and it might even be

23   the debtors, might be the committee, might be the state that

24   prevails has an absolute clear and in order to come back and

25   say, if you knew then what you know now, you probably

Page 34

1    wouldn't have done this.

2              And look, and I don't know.  The answer may be if

3    he's found liable for $100,000 of damages, maybe the answer

4    is he needs to just pay that in full.  I don't know what's

5    going to happen.  As I'll talk about in a few minutes,

6    saying that right now he should be forced to work for very,

7    very, very off-market compensation because of the risk that

8    someday someone might find that he's liable, is actually --

9    I think has no home anywhere in American law either in or

10   out of Chapter 11.

11             And four, the exact anti-secretion language

12   verbatim that everybody agreed was good enough for the

13   Sacklers, who are alleged to have billions and billions of

14   dollars, that the estate or others either are going to or,

15   you know, seek to get at was agreed to by Dr. Landau.  So it

16   will be there if we need to try to get it back someday.

17             Your Honor, with these changes, according to the

18   Willis Towers declaration, Dr. Landau is now 21 percent

19   below the 50th percentile on median compensation and only 12

20   percent above the 25th percentile.  So, you know, it's not

21   an interpolation.  So you can't say he's in the 29th

22   percentile, 'cause that's now how comp consultants think

23   about things, but those are their numbers.

24             THE COURT:  It is -- is it contemplated that Ms.

25   Gartrell is going to be cross-examined on this?

1              MR. HUEBNER:  I assume so.  She's here.  I mean,

2       yes.

3              THE COURT:  Well, I'm looking at the objectors.

4       If not, I have a question now, but I'll wait for cross-

5       examination if there's objection.

6              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

7       for the U.S. Trustee's Office.  I have two or three

8       questions.

9              THE COURT:  Okay.  Does anyone else contemplate?

10             MR. TROOP:  It depends on what Mr. Schwartzberg's

11      questions are, Your Honor.

12             THE COURT:  Okay.  So I'll save my question.

13             MR. SCHWARTZBERG:  I guess I'm going first.

14             MR. HUEBNER:  But of course, Your Honor, it's

15      worse than that because it's not just that he's 21 percent

16      below the 50th percentile.  It's that unlike all the other

17      CEOs, he doesn't get paid in the early part of the next year

18      and then is free to do what he would like with his life.  He

19      is bound to stay all the way until September in order to get

20      his prior year's compensation, and he's subject to both

21      forfeiture and nonpayment obviously under the terms of the

22      board.

23             So, Your Honor, in our view, 'cause, you know, we

24      took this all very seriously, as certainly did the UCC, who

25      is no, kind of, you know, look tell with respect to the

1    debtors and executives and all the like.  We thought this

2    was more than enough, that the structure is appropriately

3    protective of the estate.  He's well below median.

4            And then there are the things that are a little

5    bit more complicated to wade into, but they're unavoidable.

6    And so, it's unfortunate, but here we go.

7            So to say it most simply, Your Honor, I have

8    personally myself asked various lead representatives of the

9    dissenting states on multiple occasions, I would even use

10   the phrase again and again, the following.  If there are

11   things about Dr. Landau that you think we need to know, and

12   you think he engaged in wrongdoing, and you have evidence or

13   documents, you need to tell us because we need to know.

14   Because if actually it turns out that Dr. Landau is a

15   wrongdoer and people have proof of that, there are going to

16   be consequences that might flow from that.

17           The response to request after request after

18   request has been nothing.  No one has ever given the debtor

19   a single document other than see what -- go see what we said

20   in our complaints, which are allegations, in response to

21   those requests.

22           Number two, for worse or for better I have now

23   been personally working on this case just about full time

24   for 21 months.  And I have talked to scores, certainly way

25   more than dozens, employees, directors, advisors, counsel,

Page 37

1      counsel for various parties, and for what it is worth, and

2      obviously I'm not testifying.  I'm just telling you why the

3      debtors believe this is the right balance of all these

4      issues, I have not seen a document or had one brought to my

5      attention that suggests to me misconduct, certainly of the

6      type that would suggest that Dr. Landau should be working

7      for what would be about 50 percent of median pay, i.e. base

8      salary only.

9              And had someone brought those things to our

10     attention or had we seen them ourselves, we certainly would

11     have been obligated to bring them to the board's attention

12     and possibly also to The Court's attention.

13             Your Honor, in this country we are innocent until

14     proven otherwise, and there is no doctrine that says that an

15     employee has to work for one half of median market pay

16     because 1 percent of the litigants suing his employer also

17     named him in their complaints.  There's certainly no remedy

18     remotely like that outside of the bankruptcy system where

19     you could say I brought a lawsuit or a charge against the

20     company and I want their employees to start working for half

21     pay until my lawsuit is resolved.  It's just not the way it

22     works.  We needed a structure to address the concern, and

23     the structure was meticulous and thoughtful.

24             Now, what might the dissenters say back to this,

25     'cause obviously they're going to speak next.  And our goal

1    in trying to work this out, and we tried desperately hard to

2    work it out.  In fact, two of the four prongs we offered

3    unilaterally after we were done with the UCC just to try to

4    see if we could bring everybody else on board.

5              The first thing they're going to say, 'cause they

6    say it in their papers, is but, Your Honor, we're enjoined

7    at present.  So we can't really prove our case.  Yeah, that

8    doesn't do much for me because they've had years of

9    discovery, and they say that they knew enough to name him

10   personally in their complaints and how seriously they take

11   that, and I assume that that means that if they have stuff,

12   they already have it, and they should show it to us.

13             There are 50 million produced documents.  The fact

14   that right now there's a Temporary Stay of Discovery doesn't

15   mean that the CEO should not get below market but reasonable

16   compensation for now.

17             The second thing they may say, and this is

18   specific to Massachusetts, is we survived a Motion to

19   Dismiss.  True, but not particularly meaningful.  'Cause of

20   course as everyone in the courtroom knows very well, under

21   signing a Motion to Dismiss, all facts alleged are assumed

22   as they are required to be as true.  So it doesn't actually

23   prove even a peppercorn of the ultimate merits of someone's

24   case that they got to pass the Motion to Dismiss.

25             And candidly, Your Honor, I don't know if you read

1    all of the Massachusetts rulings that they appended, I did,

2    and I actually found it kind of surprising that when The

3    Court ruled on the Motion to Dismiss of the three named

4    defendants, the only actual documents and facts he cited

5    related to the other two about their involvement.  They

6    actually didn't cite a single thing, literally not one about

7    Dr. Landau, which I actually was kind of shocked by, 'cause

8    I assumed that that would have not been the case.

9            Three, although actually under the CMO I'm not

10   supposed to have to respond to the new evidence brought only

11   in their joinders, and I'm not sure they're even allowed to

12   argue it, let's put that aside.  'Cause for now we'll

13   reserve, you know, assuming that everyone can say what they

14   want.

15           So as proof that Dr. Landau may be a bad guy, they

16   cite nine words from one document from 2017.  So let's talk

17   about that for a minute.

18           Number one, that document is subject to a

19   protective order.  So I don't -- unfortunately, I'm actually

20   not at liberty to tell you about what that document actually

21   says, which is really a shame.  Because I actually think

22   that you'd be probably pretty satisfied if you read that

23   document on the issues for which it cited.

24           Two, that document was written by Dr. Landau while

25   he was not an employee of Purdue.  He was working up in

Page 40

1    Canada where he had been since 2013, and he was essentially

2    auditioning for the job to be CEO of Purdue.  And what he

3    said, and they quote, these were their quotes, that he was

4    pitching a "Opioid consolidation strategy" and was

5    suggesting that Purdue become, you know, bigger in the

6    opioid space "As other companies abandoned the space."

7             Those were -- that's it.  Opioid consolidation

8    strategy as other companies abandoned the space.  How that

9    suggests misconduct or active participation in misbranding

10   or any of the other allegations against the company is

11   beyond me entirely.  And as I said, you know, we went back

12   and forth because we're very wary about improper de-

13   designation of documents, and so we're in an extremely

14   unfair position where for whatever reason, I'm sure it's

15   legitimate, I'm not saying it's not, they're somehow allowed

16   to quote from a document that we're not, but that's what the

17   litigators told me is probably right.  So I'm not going to

18   quote from it.

19            But even the quotes they do bring in their joinder

20   where they're actually not allowed to do that, in fact, I

21   just don't even think they're troubling, for the record.  If

22   he was suggesting improper pathways to becoming a bigger

23   company -- I'm not planning to show a movie, Your Honor,

24   just for the record.  Fine.  Does this mean I should -- I'm

25   almost done.  Every hearing something happens to tell me

Page 41

1    it's time to sit down.

2            So that's 2017.  That's the one document, and

3    those are the nine words, which, you know, candidly I -- it

4    is what it is.

5            The last issue, Your Honor, is that the period

6    that we're talking about for which this AIP payment reduced

7    by 62 percent was actually earned is 2019.  And there are no

8    allegations of any kind, of any kind by anybody, even a

9    whisper of a hint that Dr. Landau was within 1,000 country

10   miles of misconduct in 2019.

11           As a reminder, Dr. Landau joined Purdue near the

12   end of 2017, and quite quickly oversaw as the CEO of the

13   company the entire dismantling of the sales force, the

14   firing of the entire sales force, the cessation of

15   promotion, and then in 2018 and '19 the exiting of the

16   shareholders from the board and ultimately the settlement

17   framework and ultimately the Chapter 11, and frankly held

18   the company together in impossibly difficult circumstances

19   during that period.

20           So I do want to be clear.  I'm not saying, 'cause

21   I don't know, and I want to be very clear about this.  I'm

22   in no position to say, Your Honor, we did a forensic

23   investigation, we spent 12,000 hours, we've read every email

24   of Dr. Landau's for the last 12 years, we know there's

25   nothing here, because we don't know that.  You know, that's

1    not something that had to be done at this point in time.

2    It's something that may or may not ever have to be done.

3           But what I do know is that we understood the

4    problem.  We structured very thoughtfully and deliberatively

5    with -- for that problem with the UCC.  And as of now we

6    don't know of anything that suggests that Dr. Landau was

7    engaged in misconduct.  If we did know that or believed

8    that, or if anyone had brought us any documents that

9    suggested that, we would be in a different place, but we're

10   not.

11          So I stand kind of very firmly by the four-prong

12   compromise, which again, I never seen anything like it

13   before, but our job is to constantly adjust to the

14   circumstances, and we believe that we've done so quite

15   appropriately.  And to say that the remedy for allegations

16   that are made is that he should work for base pay only,

17   which would put him at about a half of industry-median pay.

18   This is not something that we think is appropriate.

19          So, Your Honor, I will save everything else for

20   later, but that is the company's view on the things up for

21   today.

22          THE COURT:  Okay.

23          UNIDENTIFIED SPEAKER:  Did you want to hear

24   evidence first and then go to argument, or how did you --

25          THE COURT:  Yes.  Unless certainly someone wants

1    to say, you know, their narrowing issues.

2              MR. HUEBNER:  Yeah.  So, Your Honor, at this point

3    I think probably we move to admit the declarations of our

4    two declarants into evidence.

5              THE COURT:  Okay.  So that would be Mr. Lowne's

6    second supplemental declaration.

7              MR. HUEBNER:  Yes, Your Honor.

8              THE COURT:  And Ms. Gartrell's declaration.  Okay.

9    So it would be those two.

10             MR. HUEBNER:  Yes, Your Honor.

11             THE COURT:  All right.  Does anyone want to

12   question either of those two people?

13             MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

14   for the U.S. Trustee's Office.  I would like to question

15   both of them.  I have just a few short --

16             THE COURT:  Okay.  All right.  So who do you want

17   to call, Mr. Lowne, first?

18             MR. HUEBNER:  This is Mr. McClammy's show now.

19             THE COURT:  Oh, okay.

20             MR. MCCLAMMY:  Yes, Your Honor.  I think it makes

21   sense to call Mr. Lowne first.

22             THE COURT:  Okay.  So could he take the stand?

23   Would you raise your right hand, please?

24   //

25   //

Page 44

```
 1    WHEREUPON,

 2                              JON LOWNE,

 3    called as a witness, and having been first duly sworn to

 4    tell the truth, the whole truth and nothing but the truth,

 5    was examined and testified as follows:

 6                   THE COURT:  Mr. Lowne, you submitted a second

 7    supplemental declaration in connection with this motion.

 8    It's dated December 2, 2019, and it's intended to be your

 9    direct testimony in support of the remaining aspects of the

10    motion that was originally filed.  You understand that,

11    right?

12                   THE WITNESS:  Yes.

13                   THE COURT:  And is there anything in it that

14    you -- you know, we dropped their competitor.  Maybe we'll

15    drop them, too.

16                   I'm referring not to you, Mr. Lowne, but -- court

17    call.

18                   Is there anything in your declaration you wish to

19    change?

20                   THE WITNESS:  No, there isn't, no.

21                   THE COURT:  Okay.  So I will admit it as your

22    direct testimony.  I've reviewed it.  So does anyone want to

23    cross-examine Mr. Lowne?

24                   MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

25    for the U.S. Trustee's Office.
```

 1            THE COURT:  Okay.

 2                    DIRECT EXAMINATION

 3  BY MR. SCHWARTZBERG:

 4       Q    Good afternoon, Mr. Lowne.

 5       A    Good afternoon.

 6       Q    Pleasure to see you again.  First, just for the

 7  record I want to confirm what we discussed last time as to

 8  the determination of insiders.  You submitted a supplemental

 9  declaration.  I think it's Docket Number 236.  Do you recall

10  that declaration?

11       A    Yes.

12       Q    And in that declaration you list 10 individuals

13  that the debtor admits are insiders.  Is that correct?

14       A    That's correct.

15       Q    Do you need to see that again, or you're happy

16  with -- you're comfortable that those 10 are the insiders?

17       A    I'm comfortable that those 10 are the insiders.

18       Q    I want to -- do you have a copy of your

19  declaration?

20            MR. HUEBNER:  Which one?

21            MR. SCHWARTZBERG:  Oh, I apologize.

22  BY MR. SCHWARTZBERG:

23       Q    Then this week you filed a second supplemental

24  declaration.  Do you have a copy of that declaration?

25       A    I don't have it in front of me, no.

Page 46

1          MR. HUEBNER:  Do you need one?

2          MR. MCCLAMMY:  May I approach, Your Honor?

3          THE COURT:  Sure.

4    BY MR. SCHWARTZBERG:

5          Q    Can I refer you to paragraph 39?  And I don't want

6    to beat a dead horse, but I hadn't seen this phrase or this

7    term before.  On page 21 of the declaration you refer to the

8    CEO's executive committee.  What is the role of the CEO's

9    executive committee?

10         A    The role of the CEO's executive committee, they're

11   the more senior management levels of the organization, and

12   they're a group of individuals that we try and keep briefed

13   on important matters that impact the business.

14         Q    And if I'm correct, there's seven insiders on that

15   committee?

16         A    I believe all of the insiders are on that

17   committee from -- if you go to the insiders' list, I think

18   they're all on that committee.

19         Q    I'm looking at paragraph 39, of note 16.  It

20   indicates there are seven insiders.

21         A    Okay.

22         Q    Are you saying there are 10 insiders?

23         A    Can you give me the insiders' lister, and I'll

24   tell you if any of them are -- actually, I think you're

25   right.  Yeah.  There are a couple of insiders that aren't on

1   it, yes.

2        Q    Would you like the list?  I can get --

3        A    If you can give me the list, I can tell you the

4   insiders that aren't on there.

5             MR. SCHWARTZBERG:  May I approach the witness,

6   Your Honor.

7             THE COURT:  Yes.

8             MR. SCHWARTZBERG:  Your Honor, may I approach?

9             THE COURT:  Oh, I said yes.

10  BY MR. SCHWARTZBERG:

11       Q    To call your attention, in that document I believe

12  it's page nine, footnote four.

13       A    Are you sure you've given me the right document,

14  'cause page nine, I don't see a footnote four.

15       Q    Oh, I apologize, paragraph nine.

16       A    Oh, okay.  Yes, I now see it, yes.

17       Q    So are there seven or ten insiders on the CEO's

18  objective committee?

19       A    Seven is the correct number.

20       Q    Okay.  The 10 people that are not in paragraph

21  nine, footnote four, the admitted insiders, what are their

22  titles?

23       A    The titles of the three that aren't on the

24  executive committee?

25       Q    The titles of the 10 that are on the executive

Page 48

1    committee --

2         A    Oh, okay.

3         Q    -- that are not admitted insiders.

4         A    So I mean just to go through them, Craig Landau is

5    on the executive --

6              THE COURT:  No, no.  I think you misunderstood his

7    question.

8              THE WITNESS:  Okay.

9              THE COURT:  What Mr. Schwartzberg wants to know is

10   what are the titles of the 10 non-insiders that are on the

11   executive committee.

12             THE WITNESS:  I don't know if I know all of their

13   titles off the top of my head, but I could give you a couple

14   of examples.  Our head of security is on the executive

15   committee.  I'm not sure of his exact title.  Our head of

16   compliance is on the executive committee.  I'm not sure of

17   her exact title.  Our second in command in our medical

18   affairs group is on the executive committee.  There are

19   three people that come to mind.

20   BY MR. SCHWARTZBERG:

21        Q    Do you know if there are any officers, if any of

22   those 10 people are officers?  Are any of those 10 people

23   officers if you know?

24        A    No, I don't believe so.

25        Q    They're not officers or you don't know?

1          A     I'm pretty sure they're not.

2          Q     Okay.  And do you know how the people on the CEO's

3     executive committee were selected?

4          A     I think it's based upon seniority in the company

5     and based upon generally keeping people informed on a

6     relatively senior level, informed about what's going on with

7     the business.

8          Q     And do any of the 10 non-insiders on the CEO's

9     executive committee report to the board or just the CEO?

10         A     They certainly don't report to the board.  I'm,

11    I'm not sure if any of them report even to the CEO directly.

12         Q     Okay.  Thank you.  How many -- I'm going to now

13    turn to the incentive plan.

14         A     Yes.

15         Q     And I ask those questions.  I had not seen that

16    term before.  It popped up for the first time.

17         A     Sure.

18         Q     So I was curious about that.  How many insiders

19    participate in the Purdue annual incentive plan?

20         A     All of them.

21         Q     Okay.  And how many insiders participate in the

22    Rhodes annual incentive plan?

23         A     All of the persons employed by Rhodes participate

24    in the Rhodes annual incentive plan.

25         Q     And how many is that?  I'm hearing three in the

Page 50

1   background.

2       A    Yeah.  Three.

3       Q    So three of the seven.

4       A    Yes.

5       Q    Okay.  All right.  Is it correct that the bonuses

6   for both the Rhodes and the Purdue incentive plans are based

7   on employee performance and the performance of the company?

8       A    That is correct.

9       Q    Okay.  Isn't it true you do not disclose the

10  specific employee metrics of the 10 insiders in your

11  declaration?

12      A    You're referring to the individual objectives of

13  the 10 people, I believe, then, that's correct.

14      Q    I want to turn to the company's performance or the

15  company's metrics.

16      A    Sure.

17      Q    The largest metric for the 2019 is the operating

18  profit margin, correct?

19      A    That is correct.

20      Q    And that's 60 percent?

21      A    Yes.

22      Q    And the operating profit margin metric for Purdue

23  is negative 30 million, correct?

24      A    That is correct.

25      Q    And the estimated operating profit margin is

1    actually a positive 48 million, correct?

2        A    Yes.

3        Q    Okay.  Can I turn to paragraph 22?  Isn't it true

4    if there's a negative 89 million dollar operating profit

5    margin, there's still a benefit towards the -- how to define

6    at the corporate objective results percentage?

7        A    That is correct.  But it would be prorated between

8    the negative 70 million and the 90 million, yes.

9        Q    So the 90 million is a zero threshold.

10       A    That's right.

11       Q    Has there ever been a year when determining an

12   annual incentive payment that the assigned score percentage

13   for the operating profit margin metric was zero?

14       A    I don't recall in my tenure that we've ever paid

15   out zero on the operating profit margin metric.

16       Q    So you've never fallen at or below the threshold?

17       A    The threshold for zero, correct.

18       Q    All right.  I want to turn to the Rhodes incentive

19   plan on paragraph 15 discussion.

20       A    Okay.

21       Q    The operating profit margin listed metric is a

22   negative 10 million, correct?

23       A    That is correct.

24       Q    And the actual operating margin is negative 26

25   million, correct?

Page 52

1       A    These are all estimated numbers, obviously at this

2    stage.  That's correct.

3       Q    Actually -- okay.  So despite failing to reach the

4    negative 10 million operating profit margin, isn't it

5    correct that 75 percent is still accredited towards the

6    corporate objective results percentage?

7       A    That's correct.

8       Q    Okay.  And as long as the operating profit margin

9    is above negative 70 million, which is seven times the

10   negative ten amount, there's a benefit towards the corporate

11   objection results percentage, correct?

12      A    That's correct.

13      Q    Okay.  Incidentally, if the sale of opioids

14   increases, does the operating profit margin increase?

15      A    Yes.

16      Q    So the more opioids sold indirectly it'll affect

17   the bonus.

18      A    That is correct.  We were a for-profit company,

19   and we're an opioid company.

20      Q    Okay.  Let me turn to paragraph 23.  This is the

21   bonus for achieving milestones.  Isn't it correct that if

22   they are two quarters late, it's still a benefit towards the

23   corporate objection results percentage?

24      A    That is correct.

25      Q    Okay.  Let me turn to paragraph 24 regarding

Page 53

1    business plans.  The metric is three business plans,

2    correct?

3         A    That is correct.

4         Q    Isn't it true there's still a credit towards the

5    corporate objecting results percentage if only one business

6    plan is presented?

7         A    That is correct.

8         Q    Okay.  Let me turn to paragraph 25, the metric is

9    three initiatives, correct?

10        A    Correct.

11        Q    Isn't it true if you just launch one initiative,

12   there's still a credit towards the corporate objective

13   results percentage?

14        A    Of 25 percent, yes.  Yeah.

15        Q    Okay.  The, I guess you call it, estimated

16   corporate objective results percentage for 2019 is 118.

17   Isn't that correct?

18        A    That was an estimate, yes.

19        Q    Did you disclose the corporate objection results

20   percentage of 2018?

21        A    Sorry.  Could you repeat the question?

22        Q    Isn't it correct that you did not disclose the

23   corporate objection results percentage for 2018 for the 2018

24   incentive plan?

25        A    Disclose it to who?

Page 54

1       Q     In your declaration.

2       A     I thought the 118 percent was mentioned.  If it

3   wasn't, I'm mistaken.

4       Q     Maybe I spoke too quickly.  The corporate

5   objection and resultant percentage for 2018.

6       A     Oh, sorry, I misheard you.  I don't think we

7   disclosed it in this declaration.

8       Q     Do you know what it was?

9       A     I don't recall, but I recall it being above 100

10  percent.

11      Q     Did you disclose the corporate objection result

12  percentage for 2017?

13      A     Not in this declaration we didn't, no.

14      Q     Okay.  Did you disclose the corporate results

15  percentage for the 2016 incentive plans?

16      A     I don't think we disclosed anything prior to

17  current year.

18      Q     Do you know what they were?

19      A     I don't recall all of them, but we've had,

20  certainly had years where they've been above 100 percent,

21  sometimes significantly.  There have been years where they

22  have been below.

23      Q     When was the last year an incentive payout was not

24  made because the metrics were not met?

25      A     I don't recall what year that was.  I think it --

Page 55

1    I believe in the last five years we've had payouts less than

2    100 percent.

3         Q    Excuse me.  You must have misheard me.

4         A    I'm sorry.

5         Q    When was the last year payments were not met

6    because the -- were not made because the metrics were met?

7    So you paid above the threshold below the target.  Have you

8    ever had a year when zero incentive bonuses were paid?

9         A    We haven't had a year where there's been zero

10   percent paid.

11        Q    Okay.  Okay.  I'm going to turn to the long-term

12   results plan.  I believe it's paragraph 36 if that helps.

13        A    Okay.

14        Q    There are nine insiders that participate in the

15   long-term results plan.

16        A    That is correct.

17        Q    According to the declaration, your declaration,

18   the metrics for the 2017 Rhodes long-term results plan to be

19   paid, I believe, in March 2020, are the same as the Rhodes

20   annual incentive plans -- are the same metrics that were

21   used in the Rhodes annual incentive plan, correct?

22        A    That is correct.

23        Q    Okay.  Isn't it also correct that you did not

24   disclose the 2017 and the 2018 metrics of the Rhodes annual

25   incentive plan?

Page 56

1       A       That is correct.

2       Q       Okay.  When was the last year that no payment was

3    made on the Rhodes long-term results plan because metrics

4    were not achieved?

5       A       Rhodes has only been a subsidiary of Purdue since

6    May of this year.  So I'm not that familiar with the

7    history, but I'm not sure that I'm aware that they've ever

8    paid zero percentage.

9       Q       Okay.  Can I turn to paragraph of 44 of your --

10       A       Sure.

11       Q       And we're switching to the Purdue long-term

12    results plan.  It's correct the Purdue long-term results

13    plan metrics are a three-year operating profit margin and

14    three-year next sales targets from the products other than

15    OxyContin, 50 percent for each, correct?

16       A       That is correct, for the 2017, yes.

17       Q       So just referencing the operating profit margin,

18    if Purdue reaches 80 percent of that operating margin

19    target, they get 80 percent of the bonus which you reached

20    for that metric.  Is that correct?

21       A       That is mathematically how it's calculated, yes.

22       Q       If they reach 20 percent or only reach 20 percent,

23    they get 20 percent of the bonus attributed to that metric.

24    Is that correct?

25       A       That is correct.

1          Q      So unless operating profits are zero and the net

2     sales from OxyContin -- non-OxyContin products are zero, a

3     bonus will be paid, correct?

4          A      Correct.

5          Q      Okay.  When was the last year when there were no

6     payouts under the Purdue long-term results plan?

7          A      I don't recall ever a zero percentage payout.

8          Q      Okay.  I just want to turn your attention to the

9     sign-on bonuses, paragraph 51.  There are two insiders

10    receiving sign-on bonuses, correct?

11         A      Correct.

12         Q      Okay.  Who are they?

13         A      Christian Mazzi and Marc Kesselman.

14         Q      And what are their titles?

15         A      Marc is our general counsel.  Christian Mazzi, I'm

16    going to go to the other declaration to get his exact title.

17    He is the president and the executive medical director Adlon

18    Therapeutics LP.

19         Q      And what are the sign-on bonuses that are supposed

20    to be paid under these agreements for the -- let's start

21    with the GC.  What's his sign-on bonus?

22         A      I don't know the exact split between the two

23    individuals, but in combined they're 1,987,500, which is in

24    paragraph 51.  My understanding is that directionally, I

25    don't have the exact numbers in front of me, Christian is

Page 58

1    around 600,000, and Marc is 1.3.  But I may be wrong because

2    it's been a while since I've looked at it.

3         Q    And is that the sum and total of the sign-on bonus

4    as it existed when they actually got entered, or is that the

5    remaining amount?

6         A    That would be the remaining amount.

7         Q    Do you know what the actual aggregate sign-on

8    bonus is for -- the aggregate amount, so you don't have to

9    split it up between the two of them.

10        A    All right.  So it's the full amount for Christian

11   Mazzi.  He has no -- actually, let me rewind that.  There

12   certainly has been payments prior to these amounts.  So I

13   don't know -- I don't recall what they were.

14        Q    But they were to be above the 1.987 million.

15        A    That is correct.

16        Q    Okay.

17        A    This is -- the 1,987,500 represents the remaining

18   payments.

19        Q    And these individuals executed or made these

20   agreements prior to the filing of this bankruptcy case,

21   correct?

22        A    That is my understanding, yes.  Yes, that is the

23   case.

24        Q    How come the full amounts were not paid when

25   either they signed on or their first day of employment?

1       A    So I'll repeat what Marshall said in his opening

2   remarks, is typically when someone joins the company, it's a

3   negotiation of the signing of this amount, because they're

4   giving something up to come to the company.  Typically what

5   they're giving up may be a combination of, for example, an

6   annual bonus or some long-term incentive at their previous

7   company, or some kind of equity award that invests over a

8   period of time.

9            So as a company we try and negotiate as best as we

10  can to have a delayed payment schedule as part of that sign-

11  on agreement.  It's a negotiation that happens when we're

12  trying to induce someone to join the company.

13      Q    Why do you delay the payments?

14           THE COURT:  Oh, come on.  Because it's a cash flow

15  issue.  You don't need to answer that question.

16           THE WITNESS:  Okay.

17           THE COURT:  That's obvious.

18  BY MR. SCHWARTZBERG:

19      Q    I have one last question.  Actually, can you hold

20  on for a moment?

21      A    Sure.

22           MR. SCHWARTZBERG:  Your Honor, I have no more

23  questions.

24           THE COURT:  Okay.  Any redirect?  Oh, I'm sorry.

25  This is on Mr. Landau, right?

1          MR. TROOP:  This is on Mr. Landau, yes.

2          THE COURT:  Okay, all right.

3          MR. TROOP:  Having a fact witness up there might

4     answer a question that Mr. Huebner raised, and then also

5     address some issues that were raised in objection.

6                          CROSS EXAMINATION

7     BY MR. TROOP:

8          Q     You were in the courtroom when Mr. Huebner wasn't

9     testifying when he started earlier today, correct?

10         A     Yes.

11         Q     Okay.  And you heard Mr. Huebner talk about a

12    statement, a written statement by Mr. Landau in 2017.  Is

13    that correct?

14         A     I heard that, yes.

15         Q     Yes.  And he said that was before he was employed

16    by Purdue.  Is that correct?

17         A     I -- that's what I've heard, yes.

18         Q     But he was the CEO of Purdue Canada at that time,

19    wasn't he?

20         A     He was the CEO of Purdue Canada before he came to

21    Purdue U.S., yes.

22         Q     Okay.  Now, as I understand it, you're declaration

23    confirms that there have been no changes to the terms of the

24    specific bonus plans for a long period of time.  Is that

25    correct?

Page 61

```
 1        A    That's correct.

 2        Q    But your affidavit doesn't talk about, for

 3   example, the changes of the impact of the terms of Mr.

 4   Landau's compensation prior to the filing on his rights or

 5   benefits under the plan, does it?

 6        A    It doesn't, no.

 7        Q    Okay.  So let's walk through that for a little bit

 8   and see if we can understand that just for a moment.  First

 9   of all, when Mr. Landau was employed by Purdue U.S., he

10   started working in May of 2017, give or take, May 22, 2017.

11        A    Yes.

12        Q    And the employment agreement was signed on October

13   5, 2017.  Is that correct?

14        A    I don't recall the date, but I know he started

15   work in '17.

16        Q    So under his original employment agreement as the

17   CEO of Purdue U.S., his base salary was 1.25 million

18   dollars, correct?

19        A    I don't recall the exact amount, but I'm sure

20   that's correct.

21        Q    And he was promised retention payments totaling 3

22   million dollars per year, which were to be paid in 2020,

23   2022, 2024, and 2026, correct?

24        A    I'm not sure the exact details of those amounts,

25   but I'm aware that the CEO has a retention.
```

1      Q     Can you remind me when you became CFO of Purdue

2    U.S.?

3      A     On a permanent basis I believe it was February of

4    2018.

5      Q     Okay.  And before that on a non-permanent basis?

6      A     On the interim basis in August of 2017.

7      Q     Okay.  So you were the interim CFO at the time

8    that the employment agreement was executed in October of

9    2017, correct?

10     A     That is correct.

11           THE COURT:  Did I understood -- was the question 3

12   million each of those years or 3 million over the entire --

13           MR. SCHWARTZBERG:  Three million each of those

14   years, Your Honor.

15           THE COURT:  Okay.

16   BY MR. TROOP:

17     Q     And it was 3 million of each of those years.

18   That's my understanding.  Is that correct, Mr. --

19     A     I don't, I don't recall the exact details.  I

20   don't have his employment agreement in front of me.

21     Q     Do you recall Mr. Landau's employment agreements

22   being amended in June of 2018?

23     A     I, I know his compensation has changed.  I don't

24   remember the timing of when the changes were made.

25     Q     You were CFO in June of 2018, correct?

Page 63

1         A    That is correct.

2         Q    If I represent to you that the contract was

3    amended on June 8, 2018, do you have any reason to doubt

4    that that's true?

5         A    No.

6         Q    Was that about three months after Davis Paul got

7    retained to provide insolvency-related advice to the

8    company?

9         A    I don't recall the exact date that they were

10   retained, but I'm sure you've done the research, and that's

11   probably correct.

12        Q    I think Mr. Huebner told us today it's been --

13             MR. HUEBNER:   Twenty-one.

14             MR. TROOP:   -- 21 months, so almost two years,

15   that would put us back into March.

16             THE WITNESS:   That's definitely correct.

17   BY MR. TROOP:

18        Q    Okay.  So I got the timing of that sequence

19   correct.  So in connection with that amendment, do you

20   recall that Mr. Landau's base salary increased from 1.25

21   million dollars to 2.5 million dollars?

22        A    I don't remember the exact amount before or after,

23   but that doesn't sound as though that's -- that's incorrect.

24        Q    Is his current base salary 2.5 million dollars?

25        A    I'm not sure his exact base salary today.

Page 64

1       Q     Forgive me, but, again, you are not CFO of this

2    company, correct?

3       A     Yes.  But I don't recall everyone's base pay.  I

4    apologize.

5       Q     Okay.  He's the CEO of the company.  He's not

6    everyone.  Is he?

7       A     No, actually, no.

8       Q     Okay.  Do you also recall that two of the

9    retention payments that were supposed to be paid in 2020,

10   2022, '24, and '26 got accelerated such that they were paid

11   in -- such that they've been paid already?

12      A     He certainly had some retention payments that have

13   been paid already.

14      Q     So he's been paid 6 million out of the 12 million

15   that he was entitled to get paid under his contract in years

16   to come pre-petition.

17      A     He has been paid some amounts pre-petition.

18      Q     And do you have any reason to doubt that that's 6

19   million dollars?

20      A     No.

21      Q     Okay.  So half of the total retention payments,

22   correct?

23      A     Well, I can certainly say that there was amounts

24   paid pre-petition.

25      Q     And they were paid again in June or after June of

Page 65

1    2018 when the contracts were amended.

2        A    Probably around that timeframe.  I don't recall

3    exactly.

4            MR. TROOP:  Excuse me, Your Honor.  One second.

5    BY MR. TROOP:

6        Q    Did you review the statement of financial affairs

7    of this company before they were filed?

8        A    I did.

9        Q    Is it true that Mr. Landau received a total of

10   about 9 million dollars in payments the year before the

11   filing?

12       A    I'm -- I don't have it in front of me, but I'm

13   sure that's the right number.

14       Q    Had you calculated whether as a result of the

15   changes in Mr. Landau's compensation and applying the

16   reductions that have been negotiated with the Creditors'

17   Committee whether Mr. Landau is now getting more or less

18   than he would have gotten had his contract not been amended?

19       A    I haven't run any calculations of that sort.

20       Q    So you wouldn't be able to confirm or deny that

21   even with the reductions he's getting $550,000 more out of

22   the retention payments with the reductions than had his

23   contract not been changed and he got the full amounts that

24   he was entitled to under the agreements?

25       A    I haven't run those calculations.

1          Q     Okay.  I'll ask the compensation consultant, then.

2                MR. TROOP:  That's it, Your Honor.  Thank you.

3                THE COURT:  Okay.  Any redirect?

4                MR. MCCLAMMY:  Thank you, Your Honor.  For the

5     record, Jim McClammy of Davis Polk & Wardwell.

6                          REDIRECT EXAMINATION

7     BY MR. MCCLAMMY:

8          Q     First, good afternoon, Mr. Lowne.

9          A     Good afternoon.

10         Q     You were just asked some questions about Dr.

11    Landau's compensation.  Were you involved in making any

12    decisions related to Dr. Landau's compensation?

13         A     I was not.

14         Q     To your knowledge, who was responsible for making

15    those decisions?

16         A     My understanding is that Dr. Landau's compensation

17    is ultimately the compensation committee and then the board

18    that approves his compensation.

19         Q     And that would have been true for his agreement in

20    October 2017?

21         A     That is correct.

22         Q     And that would have also been true with respect to

23    any amendments or changes that have been made since then.

24    Is that correct?

25         A     That is correct.

Page 67

1        Q     Now, Mr. Lowne, I'd like to turn you to some of

2    the questions that you were asked with respect to the

3    incentive programs that are in place by the U.S. Trustee's

4    Office.  I believe you mentioned that both programs have

5    been in place for a long time.  Is that correct?

6        A     That is correct.

7        Q     To your recollection, how long was the AIP in

8    place for Purdue?

9              THE COURT:  It's in your affidavit already.

10             MR. MCCLAMMY:  Okay.

11             THE COURT:  I don't need -- we don't need to go

12   over this.

13             MR. MCCLAMMY:  Okay.  All right.  No worries, Your

14   Honor.  I will move on from there.

15   BY MR. MCCLAMMY:

16       Q     You stated in your declaration that these are

17   performance-based incentive plans.  Is that correct?

18       A     That is correct.

19       Q     And that there's a link between employees'

20   compensation and the achievement of the companies and/or

21   Rhodes' annual business objectives and individual

22   performance, correct?

23       A     That is correct.

24       Q     And if you turn to your declaration in paragraph

25   15, there's a chart that sets out a number of objective and

1    their subweights.  And I believe you were asked some

2    questions about the Purdue debtors operating profit margin

3    of negative 30 million dollars.  Do you recall that?

4        A    Yes.

5        Q    How was that negative 30 million dollar operating

6    profit margin set as an objective?

7        A    It was the board-approved budget for Purdue that

8    was approved before the year commenced.

9        Q    And when the year commenced, was it thought that

10    that goal would be something that was easily met?

11        A    We set a budget to always be -- have some

12    challenges within achieving the budget.

13        Q    And what were some of the challenges that Purdue

14    would have faced to try to hit that budget?

15        A    I mean, some examples of some of the things that

16    we did this year that were -- we closed down our Treyburn

17    manufacturing facility.  We had certainly some staff

18    reductions, albeit on a more limited basis than previous

19    years.  We had certain cost reduction targets by function.

20    And obviously we've been operating in the face of some

21    challenges as a company.

22            So it's our attempt to have a profitability target

23    for the business that brings all of our employees together,

24    whether it's their departmental budgets or their functional

25    areas to come together to try and achieve a financial

1    target.

2         Q     And the Rhodes debtors' operating profit margin

3    was set at negative 10 million dollars, correct?

4         A     That is correct.

5         Q     And, again, can you tell us how was that negative

6    10 million dollars set?

7         A     That was set before Rhodes became a wholly owned

8    subsidiary of Purdue.  They had their own board at that time

9    that was independent of the Purdue board, and that was their

10   original budget approved by the Rhodes board.

11        Q     And was that target met?

12        A     It will definitely not be met, no.

13        Q     Okay.  In fact, it's estimated that it will be at

14   75 percent.  Is that correct?

15        A     That's correct.

16        Q     You have some other objectives listed here.  I

17   just want to point to your -- draw your attention to a

18   couple of those.  There is in your chart in the 30 percent

19   area it says "Progress and achieve the following major

20   milestone subjectives for the top three projects currently

21   in development for Rhodes.  Do you see that?

22        A     I do.

23        Q     And right after each of those three, it's

24   estimated that it would be at 100 percent, correct?

25        A     That is correct.

1       Q    To your understanding, does that 100 percent

2   number still hold?

3       A    I was on a call yesterday with the Rhodes team to

4   review the status of projects, and as of last night, I was

5   informed that the number two or number three on this list

6   are looking as though they may miss by one quarter.

7       Q    Okay.  So would that change the number then to 75

8   percent for at least two of those?

9       A    Yes.

10      Q    Okay.  I believe you also were asked questions

11  about the 2017 year AIP and whether or not the corporate

12  objective had been met for that year.  Do you recall if the

13  corporate objective for 2017 was less than 100 percent?

14      A    I apologize.  I don't remember by year whether we

15  were higher or lower.  I just remember in the last handful

16  of years we -- we've been -- we've had a year or years less

17  than 100 percent.

18      Q    You were also asked some questions about the sign-

19  on bonuses with respect to two of the insiders.  Do you

20  recall that?

21      A    Yes.

22      Q    What is your understanding as to why those sign-on

23  bonuses were paid?

24          THE COURT:  Again, this is in his declaration,

25  unless you want him to amplify on that somehow.

Page 71

1           MR. MCCLAMMY:  Given the challenges that were made

2    in the public forum, I would like to have an amplify on

3    that.

4           THE COURT:  Okay.

5           THE WITNESS:  These two individuals in my mind are

6    no different to other individuals that we pay sign-on

7    bonuses to.  I mean, we're incenting people to leave their

8    prior employer, to give up vested either annual incentive

9    bonuses or some kind of long-term incentive or equity.  And

10   to give that up, we have to financially incent them to join

11   Purdue.

12   BY MR. MCCLAMMY:

13       Q    And each of these were agreed with respect to

14   these two individuals prior to their being employed at

15   Purdue.  Is that correct?

16       A    That is correct.

17       Q    And I believe you mentioned in your declaration

18   that it was meant to compensate them for some of the things

19   that they would be giving up, correct?

20       A    That is correct.

21       Q    And in the case of Mr. Kesselman, in fact, he may

22   have been signing on and taking less than he was giving up

23   by joining Purdue.  Is that correct?

24       A    That is correct.

25           MR. MCCLAMMY:  Thank you.  No further questions.

1          THE COURT:  Okay.  Any re-cross?

2          MR. SCHWARTZBERG:  No, Your Honor.

3          THE COURT:  Mr. Lowne, I have one -- could we go

4     back to the corporate performance targets that are on page

5     12 of your second supplemental declaration?

6          THE WITNESS:  Yes.

7          THE COURT:  Are those -- is the 30 million -- I'm

8     sorry, the negative 30 million target, can you -- I think I

9     heard your answer to this, but I want to just make sure.  Is

10    that used for any other purpose than setting the AIP of 100

11    percent figure?

12         THE WITNESS:  So it's used, and it's our board-

13    approved budget.  So we'll have our financial reporting

14    every month, whether it's on a department basis or a total

15    company is reported against the -- the various makeups of

16    the 30 million dollars.

17         THE COURT:  Okay.  And when that number is set, do

18    the participants in the AIP know how that relates to their

19    target, or does that come later?

20         THE WITNESS:  So we typically share the -- we call

21    it our corporate performance scorecard.  That's shared with

22    the employees after we have the board approval of the

23    budget.  But certainly everyone in the company that is

24    within a -- sorry, I don't want to say everyone in the

25    company.  Certainly every department head knows their budget

1     for their department and how that rolls up into the total

2     performance or budget of our company.

3              THE COURT:  My question was -- let me back up.

4     I'm assuming that each of those people has some input in

5     advising their bosses and ultimately through them, the

6     board, as to what a reasonable, if somewhat aggressive

7     budget would be, correct?

8              THE WITNESS:  That is correct.  We have a very

9     lengthy and detailed process to come up with the budget.

10             THE COURT:  And are there checks on what they

11    recommend?  Do other parties look at what they recommend as

12    far as their share of that?

13             THE WITNESS:  So we have a detailed review of the

14    budget before we get to the board with senior members of the

15    management team, which would be our CEO, myself, Marc, for

16    example, and we literally have a number of days of meetings

17    with every single functional head where they come with their

18    budget proposal, and we have pushbacks and adjustments to

19    their budget where -- in areas where we're not comfortable

20    with their budget proposals.  So that's the type of process

21    we go through.

22             THE COURT:  And is their share or their

23    entitlement to compensation under the AIP and all involved

24    in that process, or is the AIP process separate from that

25    process that you just described to me?

1          THE WITNESS:  Well, the AIP process is separate in

2     the sense that all employees are paid out based upon the

3     totality of the corporate performance, objective scorecards,

4     and every single employee has the same contribution to their

5     annual bonus based upon performance against, for example, in

6     this case the 30 million loss or operating profit margin.

7          THE COURT:  I guess, but my question is a little

8     different, which is how do you ensure that the information

9     they provide to you upon which you can build a budget is not

10    tainted by their desire to get as much as they can as far as

11    an AIP?

12         THE WITNESS:  That's the very detailed process we

13    go through of reviewing their budget with senior members of

14    the management team and adjusting their budget so that they

15    truly are stretch objectives, whether it's timelines of our

16    R and D development, or whether it's the expenses or

17    headcount that we're authorizing people to either hire

18    against, or in recent years it's been reductions in

19    operating expenses that have required people to take actions

20    to achieve the operating expense profile that we've set for

21    the company.

22         THE COURT:  So are there times when you ask them

23    for more results than they proposed?

24         THE WITNESS:  Significantly more.  And I mean over

25    the last couple of years, I mean, we've unfortunately had to

Page 75

1    reduce our workforce by about 67 percent directionally,

2    which has been obviously tough for many people.

3              THE COURT:  Okay.  Any questions on that?

4              MR. SCHWARTZBERG:  Your Honor.  I just have a few

5    follow up.

6              THE COURT:  Okay, that's fine.

7                        REDIRECT EXAMINATION

8    BY MR. SCHWARTZBERG:

9         Q    I think on redirect your counsel asked or you

10   elicited, there are various reasons why you came up with the

11   negative 30 AIP.  And three of them -- and maybe I wrote

12   them down wrong, so correct me if I'm wrong, was staff

13   reductions, closing down the Treyburn facility, and cost

14   reduction targets.  Is that correct?

15        A    I described certain things in terms of why we

16   performed better than the 30 million.  I mean, this 30

17   million had some cost reduction targets in it.  The reason

18   we're at a loss this year in the budget was because of the

19   legal fees burden of the company.

20        Q    But when did the staff reductions take place?

21        A    Most of the staff reductions happened in 2018, but

22   we have had on a limited basis staff reductions in 2019.

23        Q    And the cost reductions, when did they take place?

24        A    We're continually looking at continuously

25   improving the cost profile of the business.  So we've done

Page 76

1   cost reduction initiatives every year that we're in business

2   as a company.

3       Q    So that's something you do -- it's taken into

4   consideration every budget.

5       A    Every budget we --

6       Q    Or every operating profit margin.

7       A    Every time we do an annual budget we're always

8   looking for operational efficiency initiatives and cost-

9   saving initiatives where we can.

10      Q    And closing down of the Treyburn facility, that

11  was post-petition, correct?

12      A    We haven't actually closed down the facility yet.

13  The deal was done in August, and we continue to operate the

14  facility through the end of November, and then we have a

15  two-week window in December to remove certain items of

16  machinery and relocate them to our Wilson facility.

17      Q    Thank you.

18          THE COURT:  Okay.  You can sit down, Mr. Lowne.

19  Thank you.  Okay.  And is Ms. Gartrell here?

20          MS. GARTRELL:  Yes, Your Honor.

21          THE COURT:  If you could come up to the stand,

22  please.  Could you raise your right hand, please?

23  //

24  //

25  //

Page 77

1   WHEREUPON,

2                        JOSEPHINE GARTRELL,

3   called as a witness, and having been first duly sworn to

4   tell the truth, the whole truth and nothing but the truth,

5   was examined and testified as follows:

6            THE COURT:  And could you spell your name for the

7   record?

8            THE WITNESS:  J-O-S-E-P-H-I-N-E, G-A-R-T-R-E-L-L.

9            THE COURT:  Okay.  And, Ms. Gartrell, you

10  submitted a declaration intended to be your direct testimony

11  in this -- in connection with this motion.  It's dated

12  December 2.  You understand that would be your direct

13  testimony?

14           THE WITNESS:  I do.

15           THE COURT:  And is there anything that you wish to

16  change?

17           THE WITNESS:  No.

18           THE COURT:  Okay.  So I'll admit as the direct

19  testimony of Ms. Gartrell.

20                        DIRECT EXAMINATION

21  BY MR. SCHWARTZBERG:

22       Q    Good afternoon.

23       A    Hello.

24       Q    My name is Paul Schwartzberg.  I'm an attorney

25  with the U.S. Trustee's Office.  Do you have a copy of your

1   declaration?

2       A    Not in front of me.

3           MR. HUEBNER:  Would you like me to provide one?

4           MR. SCHWARTZBERG:  Sure.  I could give you my copy

5   or Counsel could -- yeah, I can -- is it okay if I approach

6   the witness, Your Honor?

7           THE COURT:  Yes.

8           THE WITNESS:  Thank you.

9   BY MR. SCHWARTZBERG:

10      Q    Can I refer you to paragraph 13?

11      A    Sure.

12      Q    I'll just read it, so it's easier, the part that

13  I'm -- "As part of this process, Willis Towers Watson

14  conducted pay benchmarking by gathering and analyzing

15  relevant market compensation data, including total direct

16  compensation offered by participants in Willis Tower

17  Watson's 2018 pharmaceutical executive compensation and

18  middle management professional and support service."

19      A    Yes.

20      Q    Do you know how many pharmaceutical companies are

21  in the United States?

22      A    Yes.  They are in the United States or they are

23  global companies that have operations in the United States.

24      Q    I'm sorry.  You might not have heard my question.

25  How many pharmaceutical companies are there in the United

Page 79

1    States?

2         A    Oh, well, thousands.

3         Q    Okay.  Thousands?

4         A    Thousands.

5         Q    How many pharmaceutical companies participate in

6    the Willis Tower Watson 2018 pharmaceutical executive

7    compensation in middle management professional and support

8    service?

9         A    So it varies between the two.  As you can see,

10   there is a split between the executive survey and the middle

11   management and professional survey.  So in the middle

12   management and professional survey, I believe it's around

13   84.  It's over 80, under 90 and similar to the executive,

14   although that one has a few more participants.

15        Q    And I did some poking around on the web.  Is it

16   correct that it cost $8,500 to participate in the survey?

17        A    I don't work in the data services department.  So

18   I can't say.  What I can tell you is that you do have to be

19   a participant in the plan to access the data.

20        Q    And to be a participant you have to pay?

21        A    I don't know whether you have to pay.  Some of our

22   surveys you have to pay for and some you don't.

23             MR. SCHWARTZBERG:  I don't have any more

24   questions, Your Honor.

25             THE COURT:  Okay.  Any questions?

Page 80

```
 1              MR. TROOP:  I do.

 2                        CROSS-EXAMINATION

 3   BY MR. TROOP:

 4        Q    Ms. Gartrell, my name's Andrew Troop.  I recommend

 5   the -- so-called dissenting states.

 6        A    Mm-hmm.

 7        Q    I'd like to focus you on paragraph 44.

 8        A    Forty-four, okay.

 9        Q    Forty-four.

10        A    Mm-hmm.

11        Q    And in particular, the carryover onto page 18.

12        A    Yes.

13        Q    And just so I -- again, so I can understand, and

14   my questions again will be focused on Dr. Landau.

15        A    Okay.

16        Q    Some of the information that you've heard.  And I

17   apologize, Your Honor, I believe that I called Dr. Landau,

18   Mr. Landau in questions before, and I meant no disrespect to

19   his title.

20             Could you just briefly describe to me what -- I'm

21   looking at the chart --

22        A    Okay.

23        Q    -- that starts with CEO TTDC.

24        A    Yes.

25        Q    Could you tell me what -- tell The Court what that
```

Page 81

1    means?

2        A    Yes.   That means the CEO's total target direct

3    compensation.   And it's listed in millions of dollars, which

4    is why it has the figure right there below the heading.

5    This particular table is based on the renegotiated contract

6    or renegotiated compensation, which reflects the reduction

7    in the AIP, which is the annual incentive plan, as well as

8    the zero-out of the LTRIP.

9        Q    Okay.   And then I'm going to try to run this

10   quickly just so I --

11       A    Okay.

12            THE COURT:   I'm sorry.   I just want to make this

13   clear.

14            MR. TROOP:   Yes, Your Honor.

15            THE COURT:   So the 3994 is the current target

16   under the agreement with the Creditors' Committee?

17            THE WITNESS:   That's correct.

18            THE COURT:   Okay.

19   BY MR. TROOP:

20       Q    Before we leave that total --

21       A    Target direct compensation.

22       Q    -- target direct compensation, would that include

23   retention payments that there were to be paid in a

24   particular year?

25       A    It does not include retention payments.   It only

Page 82

1    includes base salary, annual incentives and long-term

2    incentives.

3        Q    Does your survey calculate or contemplate, account

4    for retention payments in determining overall

5    appropriateness of compensation?

6        A    Generally speaking, compensation surveys that

7    report on target total direct compensation do not take into

8    consideration retention.  They are inclusive of the three

9    items that I mentioned earlier, which is base salary, annual

10   incentives, and long term.

11       Q    I understand you said generally.  My question was,

12   does your surveys --

13       A    No.

14       Q    -- account for that information?

15       A    No.

16       Q    So just help me with a little math for a second.

17   If the retention payment that was supposed to have been made

18   to Dr. Landau in 2020 had been paid, it was 3 million

19   dollars, in connection with this reduced projected

20   compensation, right, his total compensation for the year

21   would have been 6.94 million dollars.  Is that math correct?

22       A    It's technically correct, although we would have

23   somehow figured out to spread the retention over the

24   retention period.  So if I were thinking of it from a total

25   compensation perspective, I would probably think of

1    certain -- if it's a three-year period, I might put a --

2    think of it as a million dollars per year.  But yes, if

3    you're thinking of exactly how much he would have been paid

4    in 2020 with the addition of the 3 million, then you are

5    correct.

6         Q    And assuming -- again, I'm just trying to

7    understand the concept here.

8         A    Mm-hmm.

9         Q    If that compensation would have been 6.9, let's

10   say 7 million dollars, would be easier for me to say, 7

11   million dollars, that would put him pretty close -- if I'm

12   understanding this, what you're identifying as the 75th

13   percentile of comparable compensation.

14        A    Well, the only problem with that analysis is that,

15   that P75 again only includes the base salary, the AIP, and

16   the LTRIP, and we don't have any information about what

17   other incumbents in the surveys have from a retention

18   perspective.  So they could have their own retention bonus

19   agreements and we wouldn't -- that would not be inclusive in

20   that P75 number.

21        Q    Okay.  So then is it fair to say that your

22   analysis, in fact, doesn't compare the actual cash that Dr.

23   Landau will have received against the actual cash that other

24   CEOs receive?

25        A    Our analysis is an apples to apples comparison of

1    the three elements of pay that are reportable in target

2    total direct compensation, and it does not take into

3    consideration the retention payment because we don't have

4    access to that data.

5        Q    Okay.  Just 'cause I'm a simpleton, so the answer

6    to my question was yes.

7        A    Yep.

8        Q    Okay.  Let's continue on that trend for just a

9    second.

10       A    Okay.

11       Q    In looking at Dr. Landau's, the CEO's

12   compensation, did you, in fact, take into account the 9

13   million dollars that he was paid over the last year as

14   reflected in the debtors' statement of affairs?

15       A    I did not.  This is a forward-looking analysis of

16   only total target direct compensation.

17       Q    So if he would have been prepaid amounts in the

18   last year, if I understood what you said before, you would

19   have actually spread those payments out over a period of

20   time, probably in this case, future-looking, to try to

21   create a picture of what total compensation would --

22       A    No, I would be, I would be thinking about the

23   retention payments over the course of the retention period.

24   There are different methodologies as far as how you consider

25   those retention payments, but we did not consider the

1   retention payments for purposes of any of our analysis.

2        Q    Okay.  In connection with your surveys, do you

3   account for whether or not the CEO has been named as a

4   defendant in connection with litigation like Dr. Landau has

5   been named a defendant?

6        A    No.  Survey data does not take into consideration

7   alleged wrongdoing or no wrongdoing or anything else that

8   has to do with the CEO.

9        Q    So then you have no idea whether or not your

10  comparables are for people who are comparably situated to

11  Dr. Landau in connection with claims being asserted against

12  them?

13       A    So companies pay their compensation to their

14  incumbents based on a variety of factors, like criticality

15  and performance and tenure and experience, but our

16  comparables don't take those into consideration.  It's for

17  the company to assess those items and figure out where they

18  should place their executive with respect to the market

19  data.

20            MR. TROOP:  Your Honor, just one second, please.

21  I have no further questions.

22            THE COURT:  Okay.  Is there any --

23            MR. MCCLAMMY:  A couple questions on redirect,

24  Your Honor.

25            THE COURT:  Sure.

Page 86

```
 1   REDIRECT EXAMINATION

 2   BY MR. MCCLAMMY:

 3        Q     Again, for the record, Jim McClammy from Davis

 4   Polk.  Ms. Gartrell, just a couple of questions to follow up

 5   on the questions that Mr. Troop asked.

 6        A     Mm-hmm.

 7        Q     First, what is your understanding of why companies

 8   pay retention payments?

 9        A     They pay retention payments because they have a --

10   they have identified a critical employee that they need for

11   a variety of different reasons, and they expect to retain

12   that person to keep them in their seat for a specific period

13   of time that they determined critical.

14        Q     Okay.  And you view that as distinct from direct

15   compensation.

16        A     I do.

17        Q     And if it were truly a retention payment, you

18   would include that as part of your analysis of comparing

19   direct compensation between your sample group.  Is that

20   correct?

21        A     We would not include that in the TTDC analysis,

22   no.

23        Q     Okay.  And if you look at your chart in your

24   declaration on page 18 --

25        A     Mm-hmm.
```

Page 87

1      Q      -- which is the carryover of paragraph 44, you

2   mentioned that the 3.94 million dollar number, that is

3   already accounting for the reductions that have been agreed

4   to.  Is that correct?

5      A      That's correct.

6      Q      And that places the salary at 12 percent above the

7   25th percentile, but 21 percent below the 50th percentile.

8   Is that correct?

9      A      Almost.  It places the total direct compensation,

10   not just the salary.  So yes, it places the total direct

11   compensation, which includes the base salary, the bonus, and

12   the LTRIP, which is non-existent at this point, and that's

13   where it's placed in the market data.

14      Q      Okay.  That's the median?

15      A      It's between the median and -- or it's between P25

16   and the median, but it's actually closer in to the P25.

17      Q      I'm sorry.  When it says P50, is that the mean,

18   the median?

19      A      That's the median.

20      Q      The median.

21      A      So it's 25th percentile median and 75th

22   percentile.

23      Q      Okay.  And did Mr. Landau's total direct

24   compensation -- I'm sorry, Dr. Landau's total -- if Dr.

25   Landau's total direct compensation were reduced even further

Page 88

1       to take away the AIP, it would be his base salary of 2.6

2       million dollars.  Is that correct?

3            A    That's correct.

4            Q    And that would place Dr. Landau's total direct

5       compensation at even below the 25th percentile.  Is that

6       correct?

7            A    That's correct.

8            Q    And nearly 50 percent below the mean.  Is that

9       correct?

10           A    That's correct.  Median.

11           Q    The median, I'm sorry.

12           A    Yes.

13           Q    And do you view that as competitive?

14           A    No.

15           Q    What do you consider competitive compensation to

16      be?  What range is considered to be competitive?

17           A    Well, it depends on the particular needs of a

18      company and where they feel that person should be placed,

19      but somewhere around median is considered competitive, or

20      median 75th percentile.

21           Q    Okay.  So even at his current contemplated total

22      direct compensation at the 3.94, that might be considered

23      less than competitive.  Is that correct?

24           A    That's correct.

25                MR. MCCLAMMY:  Thank you, Your Honor.  No further

1    questions.

2            THE COURT:  Okay.  Anything else?

3            MR. TROOP:  I'm sorry, Your Honor.  There's just

4    one thing that became unclear to me.

5            THE COURT:  Okay.

6    RE-CROSS-EXAMINATION

7    BY MR. TROOP:

8        Q    In calculating Dr. Landau's total --

9        A    Yes.  Direct compensation.

10       Q    -- direct compensation, did you get a breakdown

11   from the debtors as to what was included in that, or did

12   they just give you a total number?

13       A    Well, this particular number is based on the data

14   that was supplied to us, so, and it's based on the most

15   recent agreement.  So it's modified from the original.  So

16   it is a base salary, 50 percent of his AIP, and that's

17   expressed as 50 percent of his base and no LTRIP.  So

18   that --

19       Q    And so would it include a housing allowance if he

20   was allowed one?

21       A    No.  Total target direct compensation does not

22   include executive benefits and perquisites.

23       Q    Would it include supplemental income?

24       A    No.

25       Q    Would it include relocation expenses?

```
 1         A     No.

 2         Q     Would it include access to private jet

 3    transportation?

 4         A     No.

 5               MR. TROOP:  I think that's it, Your Honor, thank

 6    you.

 7               THE COURT:  Okay.

 8               MR. SCHWARTZBERG:  Nothing further, Your Honor.

 9               THE COURT:  All right.  You can step down.

10               THE WITNESS:  Thank you.

11               THE COURT:  Thanks.

12               MR. HUEBNER:  So, Your Honor, in terms of order of

13    operations -- well, just one clarifying thing, which Mr.

14    Schwartzberg asked about that I was able to get the answer

15    to background, just for his benefit, as the witness did not

16    know it, none of the 10 members who attend executive

17    committee meetings who are not insiders are board-appointed

18    officers.  That was a question that Mr. Lowne did not

19    know -- I checked with the assistant corporate secretary,

20    and that's the answer.

21               I assume that supporter should go forth and then

22    objectors, and then we'll finish up.

23               THE COURT:  Okay.

24               MR. TROOP:  Your Honor, I apologize, but between

25    the car ride here and the time that we've been here, I need
```

1    a five-minute break.

2              THE COURT:  Okay.  That's fine.  Let's get back

3    together a little after 4:00.

4              MR. TROOP:  Thank you.

5              (Off the record.)

6              THE COURT:  Okay.  We're back on the record at In

7    Re Purdue Pharma.

8              MR. MCCLAMMY:  Your Honor, briefly, Ms. Gartrell

9    has just finished testifying has a flight to catch.

10             THE COURT:  That's fine.

11             MR. MCCLAMMY:  -- she's no longer needed.

12             THE COURT:  I -- that's correct.

13             MR. MCCLAMMY:  Thank you.

14             THE WITNESS:  Thank you.

15             MR. MCCLAMMY:  Thank you, very much, Your Honor.

16             THE COURT:  No witnesses are needed further.

17   Okay.  I'm happy to hear a brief argument from the

18   company's -- if people supporting the relief that's being

19   sought wish to speak, I'm happy to hear them, too.

20             MR. PREIS:  Good afternoon, Your Honor, Arik Preis

21   from Akin Gump Strauss Hauer & Feld on behalf of the

22   Creditors' Committee.  Your Honor, before I go through kind

23   of my remarks about my support, in conversation with my

24   colleagues we had a disagreement.

25             At some point I think earlier some -- there was a

1    mentioning of the 10 million of savings between the pre-

2    bankruptcy various plans and what the new deal is.  And I

3    thought that you said you were unclear how we got to that 10

4    million, like how it adds up to 10 million, and maybe I

5    misheard.

6              THE COURT:  No, I, I think I understand it.

7              MR. PREIS:  Okay.  Okay.  I just didn't -- so then

8    I won't --

9              THE COURT:  And no one has questioned it.

10             MR. PREIS:  Okay.

11             THE COURT:  So I'm comfortable with that.

12             MR. PREIS:  Okay.  I'm going to dispense, then,

13   with that.

14             THE COURT:  Okay.

15             MR. PREIS:  Your Honor, I think it's important to

16   recall who the Creditors' Committee is.  It's two trade

17   creditors of PBGC, an insurance carrier plaintiff, a

18   hospital, but four individuals.  One individual who is a

19   victim, one individual whose son is a victim, one

20   grandfather of a child with NAS, and one mother of a child

21   with NAS.

22             I think it's fair to say without breaking

23   privilege that had the debtors sought to have this motion

24   approved the first two weeks of the case when we had been

25   first formed, we would have been objected.  In fact, we

Page 93

1    probably would have objected months into the case.

2          We had a lot of difficult conversations as a

3    Creditors' Committee about the relief requested here, and it

4    has been an education.  And that is why, as Mr. Huebner

5    said, we asked for a lot of information.  And I think it's a

6    testament to the committee that they were able to put aside

7    a lot of their own personal views to get to the deal that we

8    struck.

9          That isn't to say it's a perfect deal, and it's

10   not to say something that we wouldn't have liked more, but

11   it's what we were comfortable with for something that we

12   felt wouldn't harm the debtors' enterprise.  So I'd like to

13   go through kind of briefly why we were not comfortable with

14   where we landed.

15         So at the beginning of the case I think you know,

16   this was before we got here, that there was a lot of press

17   about the fact that there were 40 million dollars plus of

18   bonuses and incentive plans.  We weren't obviously involved,

19   but we read that.  And the first thing we did when we got

20   involved and we asked the debtors about this, they said to

21   us two things.

22         First thing is, these incentive-type plans are

23   basically part of the employee's compensation.  In other

24   words, if you take away the money, these employees will be

25   getting 50 percent, 60 percent, the comp of a comparable

1   company.  And we didn't know yet.  We hadn't done any work,

2   and so we just -- we listened.

3         The second thing the debtors said was most of the

4   money, most of that 47 million dollars is going to non-

5   insiders.  After getting past the injunction hearing and the

6   stipulation with the debtors and the Sacklers and litigating

7   the issue that we we're here for two weeks ago, we turned

8   our attention to these issues.  And around the second week

9   of November, about the same time that the dissenting states

10  got the information, we got the information about all of

11  these programs.

12        We got the various Willis Towers Watson reports.

13  We had a number of calls with the debtors.  We have our own

14  financial advisors who did their own work and did their own

15  comparables.  And I can say that after doing the work, we

16  agree kind of with some of the things the debtor said, but

17  frankly we didn't agree with some of the other things.  And

18  that's why we said to the debtors we wanted three things

19  changed from the programs.

20        The first was that there should be no payments

21  made for anything that occurred 2017 and backwards.  So

22  obviously the LTRIP is the only program that falls into that

23  category.  And because the LTRIP rewards for performance of

24  the company prior to 2018, we said to the debtors, look, all

25  of that money needs to come out of the program.

1           And the debtors said to us, well, we can't do that

2    exactly because some of that money comes from not really

3    lower level employees.  And so we'll get to it in a second

4    how we basically got that money back elsewhere.

5           The second thing we said to the debtors is look,

6    this case is going to last potentially a while.  We don't

7    want it to, but it looks like it potentially will.  We need

8    employees to stay.  And if that means converting this to a

9    retentive plan, so be it.  We understand that we're not in a

10   situation where we want to reward people for business

11   incentives, but we do want the enterprise not to be harmed.

12          And the third is our overall sense just looking at

13   the total dollar figures that the numbers should come down.

14   So we began negotiations with the debtors, and as Mr.

15   Huebner correctly points out, the negotiations were -- we

16   went a few rounds, a lot more than I think we're used to.

17   So how did we address each one of these?

18          On the first one, so no employee with a title of

19   vice president or above is receiving any payment based on

20   the company's performance from -- prior to 2018.   In

21   addition, there is a portion of the non-insiders lower than

22   VP who are receiving payments as a result of the company's

23   performance prior to 2018.  It's a small amount.

24          What we said to the debtors is if we don't want to

25   take the money from them because frankly they probably had

Page 96

1    nothing to do with any of the actions of the company that

2    are alleged to have occurred, take that money elsewhere.

3    But we have to get back all of that value.  And indeed

4    that's what happened.

5            The second thing about changing the plans to make

6    them retentive as opposed to incentive, there's a bunch

7    of -- as you know there's a payment schedule and clawback

8    mechanics.  And this is important because for the non-

9    insiders they receive their full payment on April 1, but

10   then there's a clawback on 7/1 if they're not there.

11           For the insiders, they actually have to wait for

12   their payments.  They only get 50 percent on 4/1 and 50

13   percent on 7/1.  And then they're subject to a clawback of

14   25 percent on 9/1.

15           For the CEO, and we'll get to Dr. Landau in a

16   second, obviously his payments are 6/1 and 9/1.  There's no

17   clawback because the second payment's on 9/1.  Again, we

18   felt that was more applicable in this situation as opposed

19   to having incentive-based payments.

20           Third, the overall reduction, as I mentioned, you

21   said you understand how we got to the 10 million.  So I'm

22   not going to go through that, but that's 10 million off of

23   47, which is about -- it's a little less than a quarter.

24   It's about 21.2 percent.

25           The non-consenting group has objected for the two

1    reasons you've heard --

2              THE COURT:  And can I just say, when you say 47,

3    that includes everything, right?  That's not just the AIP

4    and the -- I mean, that includes --

5              MR. PREIS:  It's the AIP, the LTRIP, the non-

6    executive retention plan that there's been no discussion

7    about, but that's also part of it.

8              THE COURT:  Right.  Right.

9              MR. PREIS:  And it includes the two sign-on

10   bonuses.  So there's four, but there's only two for

11   insiders, yes.

12             THE COURT:  Okay.  All right.

13             MR. PREIS:  The underlying premise of the Ad Hoc's

14   objection is that no payments -- well, the underlying

15   premise of part of their objection is that no payments

16   should be made to Mr. Landau -- Dr. Landau, unless and until

17   he's cleared of any wrongdoing.

18             As I said earlier, obviously if that ultimately is

19   what The Court decides that that shouldn't be -- like

20   that's -- if that doesn't harm the debtors' enterprise,

21   which we believe, based on everything we've seen that it

22   could, that's why we cut the deal that we did.  But to be

23   clear, when one reads that objection, one may come to the

24   conclusion that we didn't consider this, that we didn't

25   consider the fact that he is a defendant, but we did.

1              And Mr. Huebner went through the various things

2       that we negotiated, but I want to hit very specifically the

3       point that I -- that made us the most comfortable, which is

4       the following.

5              Right now, the preliminary injunction ends April

6       8.  Dr. Landau doesn't get his first payment until June 1.

7       Therefore, if at any time after the injunction is over, if

8       the dissenting states or anybody wants to add the claim

9       against Dr. Landau for his -- to enjoin the payment to him,

10      they actually have the ability to do that within that 45-

11      day, or 50-day period.  And that is something that frankly

12      we got comfortable with.

13              THE COURT:  Enjoined where?

14              MR. PREIS:  They could -- because they will have

15      the -- because the injunction against him will have ended.

16              THE COURT:  No, but what would they -- okay.  I

17      guess I understand.

18              MR. PREIS:  And look, we also --

19              THE COURT:  Although, I don't know whether the

20      court in Massachusetts could enjoin -- judgment attachment.

21              MR. PREIS:  But they will have the ability --

22              THE COURT:  The Supreme Court dealt with those

23      issues a few years ago, so.

24              MR. PREIS:  But they will have the ability to come

25      and try to stop it at that point.  And they also have the

1    ability that we, that we have negotiated with the debtors as

2    well, which is if at any time he's found liable, the judge

3    is able to consider that --

4              THE COURT:  Right.  That's in the order.

5              MR. PREIS:  Correct.

6              THE COURT:  The proposed order.

7              MR. PREIS:  So, Your Honor, the estate made -- I

8    would just say two other things about what was raised by --

9    in some of the cross-examination.  Some of it at best shows

10   that if you were to look back at Dr. Landau's 2018 agreement

11   that indeed his new payments are $550,000 more than he would

12   have received in 2018 had you applied that agreement.

13   That's obviously not the facts we're in, right, where he has

14   a new agreement and we're living off of those facts.

15             Second thing, a lot of these -- the issues that

16   Mr. Troop raised on cross-examination, those are potential

17   causes of action and avoidance actions against for any sort

18   of amounts that were paid during the one-year period to Dr.

19   Landau.  Those are causes of action that are not released

20   under this order.  And we -- to the extent that those causes

21   of action are valid, we would vigorously prosecute them.  So

22   I don't think there's anything being given up by the fact

23   that there were payments made to Dr. Landau in the year

24   prior to the Chapter 11 filing.

25             In light of all of this, Your Honor, the committee

Page 100

```
 1    believes that what was negotiated is reasonable.  Is it
 2    perfect?  It's not perfect, but it's reasonable and fair,
 3    and that's why we support it.
 4              THE COURT:  Okay.  Okay.  Why don't I hear briefly
 5    from the objectors?
 6              MR. SCHWARTZBERG:  Good evening, Your Honor.  As
 7    we set forth in our papers on the first day, we believe that
 8    the bonus must comply with the section 503(c)(1).  These are
 9    transfers to insiders, and we believe --
10              THE COURT:  Well, which are you -- I'm not even
11    sure what you're objecting to at this point.
12              MR. SCHWARTZBERG:  We're objecting to the
13    payments, the incentive payments and the long-term payments
14    to the 10 insiders that were referenced in the initial
15    supplement.
16              THE COURT:  Okay.
17              MR. SCHWARTZBERG:  And we believe -- we don't
18    believe they qualify under 503(c)(1).  First, the debtors
19    don't even list the individual metrics for the annual
20    incentive plans.  So ti makes it difficult, if not
21    impossible to determine if they represent difficult hurdles
22    or even reasonable.  And then we also -- as the testimony
23    showed, the metrics are so low that they seem to be more of
24    retentive basis than, as they're calling them, an incentive
25    plan.
```

Page 101

1              For example, although they set a metric at 30

2     million dollars as the target metric, the threshold metric

3     goes down to 90 million -- negative 90 million, excuse me.

4     And for a metric for the business plans, where they need to

5     complete three business plans, a bonus is still going to be

6     paid or they're going to get credit towards the bonus if

7     only one plan is completed.

8              And in fact, actually, Your Honor, the testimony

9     showed that in every year a bonus has been paid on the

10    incentive plans, and in no year was nothing paid because the

11    metrics were not met.

12             Similarly, with the long-term result plans, the

13    debtors don't list the metrics for the 2017 Rhodes long-term

14    results plan for -- they don't list the 2017 or the 2018

15    metrics, once again making it hard to determine if they're

16    difficult hurdles or if the plan is even reasonable.  And

17    once again, the testimony shows that every year a bonus is

18    paid under the long-term results plan, and no year was the

19    metrics not met.

20             THE COURT:  Well, when you say that, the metrics,

21    you mean in no year there was no bonus paid.

22             MR. SCHWARTZBERG:  Correct.

23             THE COURT:  That's different than saying in no

24    year was the metrics -- were the metrics not met, 'cause

25    they were -- there was definitely testimony --

Page 102

```
1            MR. SCHWARTZBERG:  I think not, not met.  In no

2    year were they -- did they ever fall below the threshold.

3    For instance, in no year --

4            THE COURT:  But the -- what we're talking about

5    here is in all likelihood a full bonus for Purdue and a 75

6    percent bonus for Rhodes, right?

7            MR. SCHWARTZBERG:  Based on the metrics that were

8    estimated for 2019.

9            THE COURT:  Right.

10           MR. SCHWARTZBERG:  Correct.

11           THE COURT:  Okay.  So I just -- I think you're

12   using threshold and metrics loosely.  There's a chart where,

13   yes, if the company does considerably worse than that, which

14   is not what is anticipated on December 4, so we're pretty

15   close to knowing, they still would get something.  But I

16   think what we should be dealing with is the reality, which

17   is the 100 percent and the 75 percent.

18           MR. SCHWARTZBERG:  Well, if you --

19           THE COURT:  And is that somehow impermissible

20   under 503(c)(1)?

21           MR. SCHWARTZBERG:  Well, I believe, Your Honor,

22   that they set the threshold so low that every year there's a

23   guaranteed payment.

24           THE COURT:  Some payment, but not the full

25   payment.
```

Page 103

1                MR. SCHWARTZBERG:  That's correct.

2                THE COURT:  But let me explore that before we --

3       is salary retentive?

4                MR. SCHWARTZBERG:  Obviously, Your Honor --

5                THE COURT:  It's not, right?  I mean, it's not

6       barred by being retentive.

7                MR. SCHWARTZBERG:  Correct.

8                THE COURT:  So the testimony, which I think is --

9       I'm leaving Dr. Landau out of this for now, but the

10      testimony is to everyone else, which I think is unrefuted,

11      is that without this, which you're correct, there's a

12      expectation of getting payment every year in some amount.

13      Sometimes it's 100 percent.  There have been some years

14      where it was over 100 percent.  There have been years when

15      it was less than 100 percent.

16               But there was an expectation every year, whether

17      it was 30 years, 20 years, or 10 years, depending on the

18      particular plan, that there would be a payment in that type

19      of range.  And the Towers current testimony is that even

20      with that they're compensated at the -- well, it's like 6

21      percent above the mean.

22               MR. SCHWARTZBERG:  Well, Your Honor, regarding

23      Towers --

24               THE COURT:  Before that, before the reductions

25      with the committee -- below the mean -- excuse me, before

Page 104

1     the reductions with the committee.  So to me this seems a

2     lot more like salary than a bonus plan, even though it's

3     referred to as a bonus plan.  It clearly -- to do really

4     well, to get above the mean, they have to do really, really

5     well.  They have to get like 150 percent.

6                 MR. SCHWARTZBERG:  Your Honor, I do believe they

7     are bonus plans.  They have separate documents setting

8     forth --

9                 THE COURT:  They're called a bonus plan, but in

10    practical terms it really seems like salary with the fact

11    that -- however, there's a performance element to it where

12    it goes up or down on the -- not even the margins, on

13    depending on how the company performs.

14                It can go well above 100 percent.  It can go well

15    below 100 percent.  It's unlikely that it would go to zero.

16    In fact, it never has, but it has gone both below and above

17    100 percent.  And at 100 percent, before the agreement with

18    the articular Creditors' Committee, they're still somewhat

19    below the mean, which the uncontroverted testimony says is

20    competitive.

21                So I appreciate that you can phrase this in a way

22    to say that this is a bonus program, but if the bonus is to

23    just get you -- if the company does what is, as I questioned

24    Mr. Lowne, you know, meets what is a rigorous expectation or

25    an expectation that's arrived at through a rigorous process

Page 105

1   and it's used for a lot of other measurements of the

2   company, they're just going to get what makes them in the

3   middle, makes them competitive.  To me that's not a bonus.

4           MR. SCHWARTZBERG:  Your Honor, just --

5           THE COURT:  Even though it's called a bonus, it

6   doesn't -- and I think that's what persuaded the committee

7   that -- all right, you see the newspaper story that says

8   that Purdue plans to make 40-some million dollars in

9   bonuses, it really isn't that -- if you look at that story,

10  if you scratch the surface of that story, that's not the

11  case.  Particularly as negotiated by the committee where

12  it's going to be guaranteed to be less than the mean

13  compared to their competitors who -- in terms of what you

14  know they're going to be getting as far as their

15  competitors.

16          So they can look at, I don't know, they --

17  whatever 5,000 pharmaceutical companies are out there or the

18  84 and say, well, you know, they know they're going to get

19  this amount.  We know today that we're going to get it.  We

20  didn't know it when the targets were set.  It happened that

21  we're going to get it, although in fact now we're not going

22  to get it because it's a lower amount, and it's over time.

23          I just -- there's a -- I think, to me, I have a

24  serious question about whether it is a positive bonus as

25  opposed to a negative bonus.  I mean, you know, the risk

Page 106

1    they run is they get less than their competitors.  So I

2    appreciate that this is -- to get 100 percent here is not to

3    win the Heisman Trophy, I understand that.  You know, this

4    area is filled with sports metaphors, the layups and -- this

5    isn't the Heisman Trophy to get 100 percent.

6           But at the same time, you know, it's -- to play in

7    the same league that you'd be playing in to get the Heisman

8    trophy, they have to get this.  It's not like they're

9    somehow jumping ahead to, you know, to some super league.

10          MR. SCHWARTZBERG:  The only point I would like to

11   make just to -- since Your Honor's relying on the market

12   analysis, they indicated there are thousands of participants

13   or thousands of -- only 84 participated.

14          THE COURT:  That's a lot.

15          MR. SCHWARTZBERG:  If there were --

16          THE COURT:  That's a big survey.  I mean, this is

17   a billion dollar company.  How many -- you didn't ask for

18   this, but how many companies in this space are over the

19   market cap of this company?

20          MR. SCHWARTZBERG:  I think there are, and I could

21   be wrong, but I think there are about 684 that are over 500

22   million.

23          THE COURT:  Okay.  Well, that's more than --

24   that's smaller than this company.  I'm looking at the --

25   anyway, that record is just not -- I mean, if you're

1    basically saying that their survey was too narrow, I don't,

2    I don't buy that.  I just don't, I don't see that.  That's a

3    lot of companies.

4             MR. SCHWARTZBERG:  The last point I need to make,

5    Your Honor, regarding the sign-on bonuses.

6             THE COURT:  Right.

7             MR. SCHWARTZBERG:  They were entered into pre-

8    petition.  Clearly there's no hurdle here.  I believe the --

9             THE COURT:  But let's stop.  They're entered into

10   pre-petition.  I don't, I don't get it.

11            MR. SCHWARTZBERG:  Then --

12            THE COURT:  I mean, look.  If I accepted the U.S.

13   Trustee's objection, right, and many of these people left

14   because they make more at another company, and they're mad

15   because they were pretty much assured that they'd get

16   something above 50 percent, let's say of this, what's being

17   called a bonus.

18            As Mr. Lowne's declaration says, the company would

19   be hiring someone else and paying more, right?  And that

20   wouldn't be objected to, would it?  How could complying with

21   Congress' demand lead to the company not being able to hire

22   someone as a consequence of not complying with what you say

23   is Congress' demand?  It's not a bonus.  That's not -- it's

24   a signing bonus, but it's not the type of bonus they're

25   talking about here.  It's to come onboard, to join the

Page 108

1    company.  I mean, you'd leave them with nobody.

2             There's no evidence in other words that the

3    bonuses themselves are out of line, which in any event, they

4    would be a pre-petition avoidance action I suppose.  Now,

5    the committee was able to negotiate off of those bonuses to

6    some extent, but it's just -- it just -- again, it doesn't

7    fit the statute.  It's a pre-petition agreement.

8             It's paid out over time, that's fair, but again,

9    the company does have a choice.  They can say, we don't want

10   to pay that amount 'cause we think we can hire someone else

11   for less who can do as good a job or better, but that's not

12   covered by 503.  I don't see how this is even within 503.

13   It's a pre-petition agreement, a signing bonus.

14            MR. SCHWARTZBERG:  It should be an unfair claim,

15   then, Your Honor.

16            THE COURT:  No, it's part of their salary.  It's

17   agreed to be paid.  Now if -- again, if you want to object

18   to the claim, you can do that, but in the meantime, it's

19   owed.  It's part of their -- it's not covered by 503 in

20   other words.  It's a pre-petition claim.  And I, you know, I

21   suppose they could make the business decision that we don't

22   want to pay that amount and you'll have your claim that's

23   capped under 502(b)(7) I think, but they'd have to hire

24   someone else.

25            There's absolutely no evidence that they could

1    hire someone else who's just as good for less money.  So I

2    assume that's the analysis the committee went through, and

3    they got some concessions on those payments, but it's not

4    covered by 503.

5         It's a determination that you make as to whether

6    you want to hire someone new, which I don't think would be

7    covered by 503 either because you're hiring them to come

8    into the company.

9         MR. SCHWARTZBERG:  I think 503(c)(3).

10        THE COURT:  Well, but it's -- I don't think

11   Congress meant to say that when a company can pay out over

12   time, which saves the company the time value of that money,

13   and that would be barred by 503(c).  The company has to pay

14   now the full amount.  It doesn't compute.  I mean that's --

15   Congress could not have possibly wanted that.  It's worse

16   for everybody.

17        MR. SCHWARTZBERG:  I won't beat a dead horse, Your

18   Honor.  Thank you.

19        THE COURT:  Okay.  All right.  I mean I -- look, I

20   think it's no longer the case, and nothing that I've heard

21   today changes it that the company engaged in the proper

22   process to determine whether someone was an insider or not.

23   Nothing I've heard today changes that analysis, and I'll

24   rest on my rulings on that point.

25        The U.S. Trustee does not appear to be challenging

Page 110

1    at this point anything other than the participation of the

2    10 -- or actually it's nine, right, because Dr. Landau's not

3    participating in the LTRIP, and 10 who are participating in

4    the annual incentive plan.

5           The case law is properly briefed by both sides on

6    this point under 503(c) of the bankruptcy code.  Congress

7    made it virtually impossible to have a retention plan that

8    involves insiders.  It did not, however, make it improper or

9    unauthorized to have an incentive plan that's not primarily

10   retentive.  Any form of compensation has some retentive

11   element to it, because if you're unhappy with your

12   compensation, you'll leave if you have another opportunity.

13          But The Courts have made it clear that if a

14   company adopts a proper incentive plan under 503(c) of the

15   bankruptcy code, one reviews that plan as to whether it

16   makes proper business sense to enter into it.  And those

17   factors have been well-established and are discussed in the

18   case law dating back to In Re Dana Corp 358BR567576377

19   Bankruptcy SDNY 2006.

20          Is there a reasonable relationship between the

21   plan proposed and the results to be obtained?  I.e., is the

22   plan calculated to achieve the desired performance?  Is the

23   cost of the plan reasonable in the contacts of debtors'

24   assets, liabilities and earning potential?  Is the scope of

25   the plan fair and reasonable?  Does it apply to all

Page 111

1   employees?

2           Does it discriminate unfairly?  Is the plan of

3   proposal consistent with industry standards?  What was the

4   due diligence efforts of the debtor in investigating the

5   need for such a plan, analyzing which key employees need to

6   be incentivized?  What is available and who was generally

7   applicable in a particular industry?  And did the debtor

8   receive independent counsel in performing due diligence and

9   then creating and authorizing the incentive compensation?

10          See also In Re Borders Group Inc., 453BR459473,

11  and In Re Global Home Products LLC, 369BR778 Bankruptcy D.

12  Delaware.  The statue, of course, doesn't lay this out.

13  This is case law driven, but ultimately I believe the

14  proposed compensation plan needs to be justified in terms of

15  obtaining the results that it's supposed to obtain.

16          And here in addition to the debtors' process of

17  analyzing it, which involved independent counsel, the

18  Compensation Committee of the board, and Watson Towers

19  Perrin's advice, the plans were subject to substantial due

20  diligence by the official unsecured creditors committee and

21  other parties that have a substantial stake in these cases.

22          I believe that Counsel for the committee was being

23  diplomatic in seeing that it was unlikely that without that

24  substantial due diligence they would ever have signed off to

25  this proposal given the context of these cases.  And that it

Page 112

1    was a difficult process for them to get to supporting the

2    revised terms.

3            So-called bonus plans always are a lightning rod

4    in a Chapter 11 case.  I think there are probably, in fact,

5    the judge's least favorite litigation in a Chapter 11 case

6    because you have to make very difficult decisions about on

7    the one hand what's necessary for the debtors continued

8    survival and hopefully successful performance, which means

9    have a proper compensation structure, and not favoring

10   employees over others, particularly not favoring insiders

11   over others.

12           In addition, it is inevitable that the press will

13   report these issues in a way that catches people's eye

14   without really getting in depth into the nuances.  Any

15   reader of a blog or person that watches a TV segment that

16   says, with a lifted eyebrow, can you believe company X

17   that's in Chapter 11 just got approval of a bonus plan, is

18   going to really enjoy that story because it gets a wonderful

19   reaction, i.e. can you believe that.

20           It's much more nuance than that, and I think the

21   committee properly went through that analysis and obtained,

22   it appears to be, a very fair result.  I have had the

23   opportunity to engage in the same analysis with the benefit

24   of the record before me brought out by the U.S. Trustee, and

25   frankly I do not see anything wrong with the committee's

Page 113

1    approach to this matter.

2            It's been clear since the start of this case that

3    the creditors, who as far as I can see, are in one way or

4    another every person in the United States, own this company.

5    And if they own the company, they need to make sure that it

6    has a proper compensation structure.  Because otherwise what

7    they own is going to deteriorate.  I believe the committee

8    took that into account.

9            I believe also in the context of these particular

10   cases, which as I just noticed are unique in that almost

11   everyone in the United States is a creditor in some way,

12   shape, or form, one needs to properly address any notion

13   that people are being rewarded for potential misconduct.

14           And as far as the overall treatment here

15   negotiated by the committee is concerned, I think they

16   properly addressed that by making sure that for senior

17   executives and not just insiders there would be no rewards

18   for the pre-2018 period, and that there would be some

19   additional deductions recognizing that it would be some

20   compensation through these plans for the pre-2018 period for

21   lower level employees, but that that would be made up for by

22   deductions from senior levels ones.

23           It appears to me also that the committee property

24   negotiated a second look, if it turns out that someone was

25   more to blame than we know today.

1          On that score, before I forget, I would change the

2     word open for reconsideration to some term that doesn't

3     argue that this is a rule 60 motion over a rule 59 motion

4     with its own standards.  I think it just should be open to

5     the colloquial sense of reconsideration.

6          MR. HUEBNER:  Okay.  Your Honor, for the record,

7     that's clearly our understanding.

8          THE COURT:  I understand, but it's a term that

9     could be read two different ways.

10         MR. HUEBNER:  Right.  We'll figure out another

11    word, but for the avoidance of doubt we all agree this is

12    not by any 60(b) standard.

13         THE COURT:  Right.

14         MR. HUEBNER:  It's consideration by the court.

15         THE COURT:  Right.  And I'm -- beyond that, I

16    compared the wording in the Insys Order to this paragraph,

17    and I'm leaning a little more towards the Insys wording on a

18    lookback.  It was attached to one of the joinders.  It's

19    paragraph -- what I'm referring to is paragraph eight.

20         MR. PREIS:  You mean the severance order.

21         THE COURT:  Sorry.

22         MR. PREIS:  It was a severance order in Insys.

23         THE COURT:  Yes.  Yes.

24         MR. PREIS:  Okay.

25         THE COURT:  Paragraph eight.  I'm not saying

Page 115

1    that's the magic language.  I'm still open to discussing

2    that.  But I've gone off on a tangent.  I -- more than most

3    cases, I think those types of issues which aren't

4    necessarily immediate employee issues, they don't come up in

5    most normal analyses.  In fact, the only case I think that

6    they've ever -- those types of issues have come up in is the

7    PG&E case that's cited by the U.S. Trustee.

8          But I don't view these plans as being analogous to

9    the PG&E plans.  And I don't view the circumstances upon

10   which they've been proposed and due diligence is similar to

11   the PG&E plan.  So while I agree thoroughly with Judge

12   Montali that one element of the analysis here is simply do

13   you need to make this type of payment to get what you're

14   supposedly getting for it.

15         He, I think, from the outside correctly concluded

16   in PG&E you don't.  I think here you do given the testimony

17   I received.  Because it's essentially salary with some

18   modifications or risks on either side, depending on how you

19   perform and the company performs.

20         So I will overrule the U.S. Trustee's objection.

21   As far as the signing bonus is concerned, I think I've said

22   enough on that already.

23         That leaves Dr. Landau.  And I guess I got to give

24   that objection -- 'cause I -- pretty sure I said at the

25   beginning of this ruling that I'm looking at these plans

Page 116

1    separate and apart from Dr. Landau.

2              MR. TROOP:  Thank you, Your Honor.  Andrew Troop

3    from Pillsbury again on behalf of the non-consenting states

4    or dissenting states.  At some point we'll agree.

5              Your Honor, with The Court's indulgence I'm going

6    to talk about a few overall issues.

7              THE COURT:  I'm sorry.  Can I interrupt you one --

8              MR. TROOP:  Of course.

9              THE COURT:  I apologize.

10             MR. TROOP:  No problem, Your Honor.

11             THE COURT:  I always seen to be interrupting you,

12   and I apologize for that, but I don't want to forget this.

13   One individual, I think he's a former employee, filed a

14   letter, and he filed a follow-up letter where he says he

15   would like to get paid severance.  That's not before me

16   today, but he expressed a concern, which I believe is

17   unfounded.

18             I just want confirmation of this, that part of the

19   agreement between the debtors and the Creditors' Committee

20   is that the debtor would be abolishing severance.

21             MR. HUEBNER:  So, Your Honor, just to help --

22             THE COURT:  That's not -- I'm not being asked to

23   approve that today, am I?

24             MR. HUEBNER:  No, there were two letters on the

25   docket.  One was a gentleman named Dan Colucci, whose issue

1    was that he believes he had done work after leaving that was

2    improperly characterized as severance.  We fixed that three

3    hearings ago, and we actually paid him, and that's resolved.

4             And the second letter, we actually discussed that

5    briefly in one of the hearings, if my memory is right.  The

6    second letter, which I think is the one you're referring to

7    by John Taromina, is just lamenting the fact that the

8    Creditors' Committee would not agree, and therefore it's not

9    in a relief we are seeking for us to pay severance to people

10   who had left the debtors' employer prior to the petition

11   date.

12            THE COURT:  Okay.

13            MR. HUEBNER:  We're also not paying LTRIP to

14   people who left prior to the petition date and frankly

15   people quite before any of the payment dates because of the

16   re-retentive structure, even people who were here after,

17   they don't get it, so.

18            THE COURT:  But this is not something I'm

19   approving.  It's just a, it's a fact.

20            MR. HUEBNER:  Correct.  You ruled on the severance

21   two hearings ago, as we cited Straus-Duparquet --

22            THE COURT:  Right.

23            MR. HUEBNER:  -- excessively and respectively --

24            THE COURT:  If you leave post-petition.

25            MR. HUEBNER:  Correct.

1              THE COURT:  But said differently, if someone is

2      entitled to severance because they left pre-petition, they

3      will have a claim for that.

4              MR. HUEBNER:  Correct.

5              THE COURT:  And your deal with the committee is

6      not that those claims are to be disallowed.

7              MR. HUEBNER:  No, no, of course they have a claim.

8              THE COURT:  Okay.  All right.

9              MR. HUEBNER:  We're just -- we're not paying it

10     currently.

11             THE COURT:  I just wanted the record to be clear

12     on that.

13             MR. HUEBNER:  Yes, Your Honor.

14             THE COURT:  Okay.  Sorry.  Go ahead.

15             MR. TROOP:  No problem, Your Honor.  Your Honor,

16     with your indulgence, and we promise to be brief, very brief

17     between us, Ms. Feiner and I are going to split up this

18     closing argument.

19             Your Honor, first of all, I think it's -- I think

20     I'm stating the obvious here when I say that like the

21     committee, the dissenting states went through their own

22     diligence process and also considered carefully the

23     concessions of the Creditors' Committee was able to

24     negotiate, and for rank and file employees it was -- I think

25     give is the wrong word, Your Honor.  It was easy not to

Page 119

1    maintain an objection with regard to the payments to rank

2    and file employees.

3              With regard to other senior executives --

4              THE COURT:  It was easy once you did the due

5    diligence.

6              MR. TROOP:  Exactly, once we did the due

7    diligence.

8              THE COURT:  Right.  Okay.

9              MR. TROOP:  It was not as easy, but with the

10   concessions we were able to get there with regard to more

11   senior executives, except for Mr. Landau.  And our objection

12   to Mr. Landau, Your Honor, is a -- it is of a different

13   character in some respects.

14             I start with this, Your Honor, as I think was made

15   clear in my cross-examination of Mr. Lowne.  The idea of

16   trying to separate Dr. Landau from the company's pre-2017 or

17   pre-2018 conduct is illusory.  He was the president.  He was

18   the CEO of Purdue Canada.  He was part of this corporate

19   structure, and there's absolutely no evidence, no evidence

20   that he wasn't involved in sales and promotional and

21   marketing evidence then.  I just point that out.

22             The second thing, Your Honor, is that --

23             THE COURT:  Well, okay.  But that's a -- you're

24   stating that in the negative.  So sometimes I refer to that

25   as History Channel pleading.  You know, there's no evidence

Page 120

1    that the martians didn't participate in Thanksgiving, you

2    know, those things.

3              MR. TROOP:  I'm actually giving up for that, Your

4    Honor, because that's not my burden.

5              THE COURT:  Okay.  Well, look -- and let me -- if

6    I can reassure you a little bit though.  Look, at the senior

7    levels a person's compensation is really sui generis.  And

8    it really ties very much to that person.  And I think that

9    was brought out in your question of Ms. Gartrell.  You know,

10   how do you determine what's mean or median?  You may have an

11   absolute all star who's a CEO, and you may have someone

12   who's not.

13             I mean there was I think only one thing that

14   people agreed on in GM at the start of the case, which is

15   the guy who was running GM should go, right.  I don't get

16   that sense here.  There's a sense that there may be an issue

17   about liability in the future.  I understand that point, and

18   I understand the public perception point.  I understand that

19   point, too, I think.

20             But to me, particularly if you beef up the

21   language a la the Insys order, I am -- and you recognize

22   that there's the same no-secretion language, which is better

23   than a pre-judgment attachment, which you probably wouldn't

24   be able to get, I'm not sure what more can be said at this

25   point.

1          MR. TROOP:  So, Your Honor, then let me just sort

2    of jump right to that point.

3          THE COURT:  Okay.

4          MR. TROOP:  Okay.  Because there are two

5    assumptions embedded in the clawback provision.  One Mr.

6    Preis articulated, which is that the stay won't continue

7    voluntarily or involuntarily past April 8, 2020, and

8    therefore parties will be able to pursue claims.

9          THE COURT:  Yeah.  I didn't really accept that.

10          MR. TROOP:  Okay.  So, Your Honor --

11          THE COURT:  If the case goes well, it should

12    continue.

13          MR. TROOP:  And, Your Honor, without predicting

14    how you will rule at that point in time, I would predict

15    that you would rule that way if you think the case is going

16    well.  So the point of deferring the payments until after

17    April 8 is potentially illusory.  It's -- and given where we

18    are right now --

19          THE COURT:  Well, except that, again, you could

20    get it back, that he can't -- that he's agreed that he won't

21    put it off in a bank in Panama or wherever.

22          MR. TROOP:  So, Your Honor, that's what takes us

23    to the second assumption, right.  And no one's asked you to

24    rule on releases, and I'm not asking you to rule on releases

25    now or not.  But the same potential exists in this case if

1    the debtors seek releases for Dr. Landau.

2              THE COURT:  Right.

3              MR. TROOP:  And then the states will be -- if you

4    enter that order, right, the states will be barred from

5    proving up their claims against Dr. Landau.

6              THE COURT:  Right.

7              MR. TROOP:  Right.

8              THE COURT:  It'll be a choice that they will have

9    to make whether they want to oppose that order or not, that

10   request.

11             MR. TROOP:  But, Your Honor, then are we prepared

12   to agree now, and I think we're not, right, that -- or if we

13   are, maybe I would think about this differently, right, that

14   ultimately our release against Mr. Landau is going to have

15   to be consensual.

16             THE COURT:  No, but you know how hard it is to get

17   a non-consensual release in the Second Circuit, but it's not

18   impossible.

19             MR. TROOP:  Well, true.  Your Honor, so in

20   asking --

21             THE COURT:  But you could certainly take discovery

22   as part of that as to whether there's some reason beyond

23   what I read in the complaint, and I did read that the

24   complaint and the two rulings by the Massachusetts Court --

25   I have that information.  That's all I have right now as far

Page 123

1    as, you know, potential liability, and taking discovery in a

2    State Court action isn't the only way you can get discovery.

3    You can certainly take discovery as part of a release

4    dispute in connection with a confirmation hearing.

5            MR. TROOP:  I'll take that as a ruling in favor of

6    discovery at that time in --

7            THE COURT:  Well, you have that right.  You have

8    the right to do that.

9            MR. TROOP:  All right.  But, now, Your Honor, and

10   I'm not trying to be difficult, but when I was -- it doesn't

11   matter.  I hear you, Your Honor.  But it does potentially

12   mean that a clawback is illusory and that payments will be

13   made to someone who was a bad actor.

14           THE COURT:  Well --

15           MR. TROOP:  And that --

16           THE COURT:  We don't know that today, though, by

17   any means.

18           MR. TROOP:  No, Your Honor.  We don't know it, but

19   the question is, if we don't know it and we set up a system

20   where there is a potential, it will never be known.

21           THE COURT:  Well, that I don't understand.

22   Because, again, you have, you know, I think this would come

23   to a head first in connection with plan confirmation, and

24   you could take your discovery then.  But can I jump ahead,

25   because I --

1              MR. TROOP:  Sure.

2              THE COURT:  While this aspect of your argument

3     didn't move me that much just based on the record.  I mean,

4     you know, if -- again, every senior executive is different.

5     The impression I get of Mr. Landau, just based on today's

6     record, is that, you know, he -- there's no impediment to

7     him running this company at this point as the CEO under all

8     the supervision that he's under.

9              I'm more inclined or more favorably inclined to

10    your argument that if you just look again at the purpose of

11    the AIP and whether it's buying what it's supposed to buy,

12    it doesn't meet that test, and that's based upon two things.

13    One of which I think is taken care of by the committee

14    settlement, which is that the AIP is reduced by 50 percent,

15    which to my mind I don't know why -- I wasn't there for

16    renegotiations obviously, but if the base salary upon which

17    it's calculated was doubled in 2018, that would help to

18    argue why it would be -- the AIP would be reduced or cut in

19    half.  I understand that.

20             I think that there's a logic there.  Now, it may

21    be that that wasn't in anyone's mind, and Dr. Landau just

22    said I'm willing to take less because I'm the CEO and you

23    lead form the top.  That's possible, too.

24             But there's 6 million dollars accelerated, and,

25    you know, depending on whether you earn 5 percent or 10

1    percent or 25 percent, which is what last year's stock

2    market earned, that acceleration is more than the million

3    three, which is an issue here, which you're objecting to.

4              MR. TROOP:  Yes, Your Honor.

5              THE COURT:  So in terms of this year's AIP, I

6    think that I don't have the type of record that I have with

7    everyone else that first of all this wasn't clear to me.

8    Ms. Gartrell's chart actually focuses on the post-Creditors'

9    Committee deal.  It doesn't reflect the 6 million, and she

10   says, well, we never reflect retention payments, but the

11   purpose of the retention payment is to stay, but it's been

12   accelerated.  So it's not really a retention payment.

13             To me that raises serious issues as to whether

14   under the Dana II standard I should approve this because it

15   actually, to me, takes it without the additional AIP for

16   2019 into the median or mean.

17             MR. TROOP:  I don't need to say the rest.

18             THE COURT:  Well, I think that was your argument,

19   right?

20             MR. TROOP:  Yes, it was, Your Honor.

21             THE COURT:  And it didn't really become clear --

22   it didn't come clear, and I mean this is -- I need to hear

23   from the debtors on this, but it didn't come clear to me

24   until the factual record was developed because the objection

25   just said we understand there was a change in the

1    compensation, and I didn't know how much.  I didn't know --

2    I had the issues on Ms. Gartrell's declaration as to what

3    she was comparing and anyway.

4              So I am looking at this, Mr. Huebner as there is a

5    background sense in how this company is perceived today is

6    important, and in that sense I think it's worth including

7    this in the analysis under the Dana case and other cases

8    that it may turn out that Dr. Landau has some cloud over

9    here.  It's not here today as far as I can see other than

10   just the fact that he was at the company, you know, in a

11   fairly high position.

12             To me, that wouldn't -- all other things

13   considered, that would not, I think, ultimately change the

14   reaction.  I mean, it's the heat that I would have to take,

15   that the committee would have to take, that anyone would

16   have to take who's not objective.  That look, when you look

17   at this on the facts, you need to have a CEO who's properly

18   compensated.

19             And no one is saying he's the type of CEO that

20   just has to go.  We're not happy with him.  I don't hear

21   that.  So while it's in the background, I don't think it's

22   anywhere close to being dispositive, particularly given that

23   you protect the company and the creditors as the order

24   would.

25             But I do have concerns about how the compensation,

Page 127

1    in light of the acceleration of the retention amounts and

2    the increase in the salary, the base salary, although I

3    think that's already addressed relates to Ms. Gartrell's

4    testimony.  So that's one of my questions for you --

5              MR. TROOP:  Your Honor, I believe Ms. Feiner is --

6    we decided she's not going to --

7              THE COURT:  Okay.

8              MR. TROOP:  And, thank you.

9              THE COURT:  Okay.

10             MR. HUEBNER:  Your Honor, these are all the right

11   questions, and I'm hoping that I'm going to have some

12   hopefully relatively to pretty convincing answers.

13             THE COURT:  Okay.

14             MR. HUEBNER:  Number one, I do want to note that

15   it was really -- to say that there was minimal notice to us

16   as the movant that this would be the gravamen of today's

17   hearing would be an understatement.  As Your Honor knows,

18   this was sort of the last paragraph mentioned in the 2018

19   changes in passing, but it's still my burden and I'm not

20   complaining.

21             I'm just saying, have they actually called us and

22   said Marshall, can we talk about this.  We want to

23   understand what happened in 2018.  We actually would have

24   had a full record, or frankly as an objector, although it's

25   strange to say this, have they actually asked for a

1    discovery, they would have had a full record.

2             THE COURT:  Okay.

3             MR. HUEBNER:  So let me explain what actually

4    happened.

5             THE COURT:  Well, could I -- look, I'm happy to

6    adjourn this one portion and you could have those

7    discussions.

8             MR. HUEBNER:  Well, Your Honor --

9             THE COURT:  'Cause one thing I want to be clear

10   about is that even at a senior level, there's no more senior

11   person in this company than the CEO and the board members.

12   I'm always uncomfortable, I think all bankruptcy judges are,

13   in getting into the details of people's compensation.  You

14   know, at some level those are important to a company, but --

15            MR. HUEBNER:  Right.  Right.  But, Your Honor --

16            THE COURT:  They raise all sorts of issues that

17   don't need to be raised.

18            MR. HUEBNER:  Right.

19            THE COURT:  And I'm happy to adjourn it so you

20   could have those discussions.

21            MR. HUEBNER:  Yeah.  So, Your Honor, I think for

22   kind of integrity purposes, because, in fact, there was

23   implicit testimony, in fact, about the 6 million in 2018

24   that's actually not correct and is, in fact, misleading.  I

25   actually need to correct the record from the podium.

Page 129

1            THE COURT:  Okay.

2            MR. HUEBNER:  Because it's actually important.

3     And, again, had they asked, they would have known what

4     happened, and then they wouldn't have said things that, in

5     fact, are not, in fact, quite right at all.

6            THE COURT:  Okay.

7            MR. HUEBNER:  So what actually happened is that

8     before Davis Polk was involved, in March 2018, Dr. Landau

9     was prepaid 6 million dollars of retention.  So another

10    insinuation in their pleading that appears three times,

11    three months after Davis Polk was retained, ta da, the

12    bankruptcy lawyers worked this out, is false.

13           So we inherited a situation where he had already

14    been paid 6 million dollars of retention. In the middle of

15    2018, Dr. Landau went to the board and said, in light of

16    where all of this is going, these numbers make my base

17    salary and my target bonus -- don't -- they're just not

18    fair.  They're not reasonable.  They don't work.  I'm

19    terribly undercompensated.  My words not his, to be clear,

20    and probably injudicious words.  I am undercompensated.

21           And, in fact, if you look at the study that you

22    have in front of you, there's no question that that's true

23    because even the 25th percentile at the median is 3.5.

24           COURT REPORTER:  There's 6 million dollars.

25           MR. HUEBNER:  Your Honor, I'm getting there.  I

Page 130

1    understand the questions at bar, and I'm going to address

2    them.

3            THE COURT:  Okay.

4            MR. HUEBNER:  Right.  So the 6 million had already

5    been paid.  What happened in June 2018 when we were involved

6    was that there was a much more fundamental restructure of

7    his contract.  And the 6 million that was already paid,

8    'cause it was already paid, he got it in March without our

9    involvement, was allocated to one time period.  His overall

10   retention payments for the period that was measured,

11   actually went down by 2 million dollars.

12           But much more importantly or equally importantly,

13   his termination payment, what would happen if he was

14   terminated -- 'cause bankruptcy was by no means a known

15   certainty in June of 2018, actually went down by over 7

16   million dollars.  Because the original constructs actually,

17   which is not unusual at all in my experience, had an

18   acceleration of all remaining retention payments if someone

19   is terminated.  'Cause you know, you promise them this is

20   where you're going to get to stay, but if we fire you

21   without cause, you get it.

22           So Dr. Landau actually gave back, again, based on

23   the contract before we were on scene multiple millions of

24   dollars.  So then you get to the base fact, which remains,

25   which I'm going to address right now, which is that's

1    interesting and that's something with a very different

2    complexion than sort of the clever bankruptcy lawyers

3    slipped Dr. Landau 6 million dollars, which is completely

4    false and really without foundation and inappropriate.

5            What actually happened was that -- and then you

6    say, well, now let's look at the numbers again.  And let's

7    actually do it -- even though the testimony, 'cause there

8    was evidence on this, is that you look at the period.  You

9    don't allocate it to what year, but let's just do that.

10   Let's assume arguendo, as they would have you do, that you

11   allocate all 3 million dollars of half of the retention

12   payment to 2019 alone.

13           And you say, well, I want to take the chart on

14   page 18 of the Gartrell declaration that with the UCC deal

15   has them at 394, and I just want to add proforma 3 million

16   to it, 'cause that's the allocable amount for 2019, 'cause

17   the 6 million covers 2019 and 2020.  Understood, let's do

18   the math.

19           So 394 of total comp becomes in the objector's

20   mind 694 total comp.

21           THE COURT:  But he got 6 million.

22           MR. HUEBNER:  Correct.  And to cover -- and he has

23   to give it back.  If he leaves before the end of 2020, he

24   has to give back half of it.  If he leaves before the end of

25   this year, which is obviously not happening, and he has to

Page 132

1   give back the other half if he leaves before the end of next

2   year.

3              THE COURT:  And I -- look, I appreciate you

4   wanting to correct the facts, and you've done that.  Right

5   now, I think, it would really benefit for people sitting

6   down and going over this in private as opposed to doing --

7              MR. HUEBNER:  Sure.

8              THE COURT:  -- the math on the fly.  I think that

9   would be warranted.

10             MR. HUEBNER:  Yeah.

11             THE COURT:  I think you've made it clear that

12  there is a reasonable belief that this wasn't a grab, you

13  know, an improper grab, but on the other hand, I think it

14  would be worthwhile to get an assessment of how this -- the

15  entire compensation package works.  Hopefully, I won't have

16  to do it, that the objector will understand it with your

17  input and we'll reach some result.

18             MR. HUEBNER:  Sure.  Your Honor, we obviously will

19  always take The Court's lead, and of course, we will go and

20  do that.  It's just, I do want to --

21             THE COURT:  I just, you know, I want -- I'm sorry.

22  These types of compensation packages, because they're for

23  senior people, are complicated.  You know, they're lawyers

24  that spend their whole careers working on these things.  And

25  you've given me highlights, but I think it's worth

1   separately going through carefully and -- among other

2   things, the committee has pointed out that I think correctly

3   they added a retentive feature to their deal.  I don't know

4   how the waivers and all those tie into timelines for the

5   case, 'cause they don't have Dr. Landau's agreement in front

6   of me.  In fact, I didn't even know it existed until about

7   an hour ago.

8           So I think -- and I'm not blaming anyone for that,

9   but I think it's worthwhile for people to go through that.

10           MR. HUEBNER:  Your Honor, we will do that without

11   question.  I do want to close with this, though, 'cause

12   obviously, you know, the stewardship and the credibility is

13   in --

14           THE COURT:  Yeah.

15           MR. HUEBNER:  Importance to us.  The debtors and

16   the Creditors' Committee went through all these things in

17   detail.  And had others called, I'll just make it personal,

18   me personally, I would have been happy to explain it.  This

19   all came up for us as much on the fly at this hearing as it

20   did for you, and it also should be noted, as I said at the

21   outset, his give-up is not only 50 percent of the AIP, it's

22   also 100 percent LTRIP.

23           THE COURT:  No, I understand.  I understand.

24           MR. HUEBNER:  And so it's actually 62 percent.  So

25   we'll do the numbers, and we'll explain 2018 a little bit

1    better, but there were a series of both factual statements

2    that were just wrong and insinuations that were improper

3    that I thought had to be cleared.

4              THE COURT:  Okay.

5              MR. HUEBNER:  I do want to note, though, that at

6    the end of the day the objector's primary objection, I think

7    was really to the fact that he is a potential wrongdoer,

8    'cause unlike others he is named.  It sounds to me that

9    although you haven't ruled, that that's not the part where

10   The Court is focused.

11             THE COURT:  No, it's not.

12             MR. HUEBNER:  The structure with potential Insys

13   language changes will address that.  Now, we just need to

14   take another run through the numbers.

15             THE COURT:  It seems to me, first that I don't

16   have the record before me that would come close to

17   suggesting that there should be some thumb on the scales for

18   Dr. Landau because of past events.  It would seem to me that

19   if that were, in fact, the case, there should be a different

20   CEO.  I mean ultimately that's what we're talking about.  I

21   don't have that sense today.  I really don't have that

22   feeling.

23             MR. HUEBNER:  And that's why we've asked them

24   multiple times if they have things we should have.

25             THE COURT:  Well, all right.  But so I think that

Page 135

1    on the other hand, and this does go to the context point I

2    was taking.  That context is always there in this case.  And

3    as Mr. Troop said, it's going to come up again when a plan

4    is put before everyone.  So it may ultimately be that

5    particularly given the payment pre-petition, it made sense

6    to defer, just to see how the case goes.  And maybe you

7    change the severance portion.  I don't know.

8             MR. HUEBNER:  No, severance is --

9             THE COURT:  It's all part of a discussion.

10            MR. HUEBNER:  Yeah.  Your Honor, we as -- for

11    worse or for better, I think --

12            THE COURT:  And I appreciate that Dr. Landau may

13    be a highly talented CEO who could leave tomorrow, that may

14    be the case.  I would hope he wouldn't do that, that he took

15    on this task knowing that it's a monumental task and that he

16    could take some real pride in shepherding this company

17    through a bankruptcy case that sends its value out to the

18    claimants.

19            MR. HUEBNER:  Right.

20            THE COURT:  And that's something that he will be

21    remembered for.  I don't think, given what I've heard today,

22    he's going to be suffering, you know, paycheck to paycheck.

23            MR. HUEBNER:  That's true, Your Honor.

24            THE COURT:  So while these disputes understandably

25    may rub him the wrong way that his integrity is being

1    challenged or the like, it may well make sense to have a

2    larger discussion that may not be ended until months from

3    now.

4             MR. HUEBNER:  Yeah.  And, Your Honor, to be fair

5    to Dr. Landau, you know, the -- as this hearing amply

6    evidences, it's more than just the potential upside of

7    ultimately being known as the person who oversaw this.

8    Obviously, the news articles that come out tomorrow may well

9    be about the worries or concerns or accusations --

10            THE COURT:  I hope that's not the case.  I mean, I

11   usually don't even consider how a case is perceived

12   publically, but this is a very public case.

13            MR. HUEBNER:  Right.

14            THE COURT:  I think that would be a real

15   disservice to the case and to Dr. Landau.

16            MR. HUEBNER:  Right.  And that --

17            THE COURT:  It shouldn't -- that shouldn't be the

18   headline.

19            MR. HUEBNER:  Right.

20            THE COURT:  The headline should be that the

21   company and the committee and the economic parties of

22   interest were able to agree on 99 percent of the

23   compensation structure of the creditors' company and that

24   issues with respect to Dr. Landau's compensation are being

25   adjourned for further analysis.

Page 137

1          MR. HUEBNER:  Yeah, Your Honor.  I, I agree.

2          THE COURT:  It's not really, you know --

3    unfortunately, that may not be news, but that's the truth.

4          MR. HUEBNER:  Yeah.  Well, the truth is not always

5    news, and news is unfortunately not always the truth.

6          THE COURT:  Well --

7          MR. HUEBNER:  But we will sit down with the folks

8    and walk them through this.  And obviously you've asked us

9    to look at the Insys order and change the nomenclature from

10   reconsideration, and so, you know, hopefully we can work

11   this all out.

12         THE COURT:  Yeah.  I want to enter a new order on

13   the 99 percent.  I think you should be submitting that order

14   to me promptly.  You don't need to formally settle it.

15   There will probably be a change on it.  One paragraph with

16   reservation of rights, you know, as to everybody if

17   someone's found to be -- when I find an order libel in

18   paragraph eight of the Insys severance --

19         MR. HUEBNER:  Sure.  Well, we'll prepare

20   something.

21         THE COURT:  And because I do think that the people

22   whose money was at stake here realized that it's important

23   to clarify to the personnel at this company what they may be

24   getting.

25         MR. HUEBNER:  No.  And, Your Honor, we need that

1      order unheard.  That's an excellent point.  I mean, again,

2      for the company's perspective, the employees have watched

3      this motion get adjourned and adjourned and adjourned and --

4             THE COURT:  Right.

5             MR. HUEBNER:  -- we can only hold them so long

6      with it's coming.  So we will prepare a formal order

7      forthwith.

8             THE COURT:  Okay.

9             MR. HUEBNER:  Thank you, Your Honor.

10            MS. FEINER:  May I just a make a very brief point

11     as on the background.

12            THE COURT:  Okay.

13            MS. FEINER:  My name is Gillian Feiner.  I

14     represent the Commonwealth of Massachusetts, and I'm a part

15     of the non-consenting states group.

16            THE COURT:  Right.

17            MS. FEINER:  First off, I just want to note that

18     we have been meaningfully and constructively engaged.  And I

19     think that that's most obviously from the scope of our

20     objection.

21            THE COURT:  I agree with that.

22            MS. FEINER:  To the extent that suggestions have

23     been made otherwise, I just wanted to clarify the record.

24            THE COURT:  I think that's fine.

25            MS. FEINER:  Okay.  The second point that I wanted

1    to make was that Mr. Huebner, it is true, has asked on

2    numerous occasions for more evidence of Mr. Landau's

3    wrongdoing.  In fact, he asked me on at least one occasion

4    for a Landau dossier.

5           I would just note that given where we are, our

6    current posture, we're not, you know, in active litigation

7    in this case, I should not be expected to try my case

8    against Mr. Landau to Judge Huebner.

9           THE COURT:  No, but it's really a different -- I'm

10   making a different point, which is if there is some sort of

11   ground swell that Mr. Landau isn't the right person now,

12   today, that should be known to the debtors, not to me.  You

13   should discuss it with the debtors first.  I, you know, but

14   the record before me doesn't show that.  That's all I'm

15   saying.

16          MS. FEINER:  Well, I would just make one --

17          THE COURT:  And I'm not faulting you for not

18   establishing it.

19          MS. FEINER:  I appreciate that.  I appreciate

20   that.  But I would just make one observation on that point,

21   which is that Purdue has been very silenced in general about

22   the allegations of misconduct against Dr. Landau.

23          THE COURT:  Well --

24          MS. FEINER:  And that's strangely, I would say

25   inconsistent with the position that it's taken on the

Page 140

1    Sacklers, as to whom the states have raised the some more

2    allegations.  As to the Sacklers, Purdue has committed

3    publically to take very seriously the allegations of

4    deceptive conduct, and even appointed a special committee of

5    the board to handle all of the Sackler-facing issues.

6           As to Dr. Landau, Purdue has been silent and now

7    asks for your permission to give a bonus.  So I mean there's

8    just an inconsistency that at least I view as somewhat

9    difficult to square.  That's the only other point that I

10   want to make, Your Honor, because it's clear that you

11   understand the issues, relates to the document that Mr.

12   Huebner referenced, that we cite in our complaint.

13          He made mention of it that it was subject to a

14   protective order.  That's Purdue's document.  At any

15   point -- Purdue has made on numerous occasions that we've

16   cherry-picked documents, that we've taken things out of

17   context.  In the context that the motions are dismissed,

18   they made these arguments.  At every point they have

19   resisted making any of their documents public.  They're

20   their documents.  They can publish them.

21          THE COURT:  Well, look, I don't know.  Is this one

22   of -- is this my protective order or someone else's

23   protective order?

24          MS. FEINER:  It's every protective order in place

25   and every piece of litigation by Purdue.  In our case, it's

Page 141

1    the Massachusetts protective order and the RDL [ph]

2    protective order.  Those issues were overseen by both of

3    those --

4              THE COURT:  -- there must be some process for --

5              MS. FEINER:  It's their documents.

6              THE COURT:  -- my protective orders there's a

7    process.  If someone wants to use a document, they ask

8    permission.

9              MS. FEINER:  So the point that I'm making not only

10   is that we went through that process in connection with our

11   complaint and we were completely appropriate in the way that

12   we used the documents and quoted them, but that if Purdue

13   has a concern about the fact that we have taken something

14   out of context, at any time they can choose to publish the

15   entire document.

16             THE COURT:  All right.  But this is, again, this

17   is not -- it isn't affecting my ruling one way or the other.

18             MS. FEINER:  I appreciate that, Your Honor, but if

19   it's being said on the record, I feel that it needs to be

20   corrected.

21             THE COURT:  Okay.

22             MS. FEINER:  Thank you.

23             THE COURT:  Okay.

24             MS. IMES:  Your Honor, we have --

25             THE COURT:  Okay.

1          MS. IMES:  I apologize.  I'm Linda Imes.  I am

2     counsel for Dr. Landau.

3          THE COURT:  Yes.

4          MS. IMES:  And I would really appreciate your

5     indulgence.  I know it's a late hour, and I apologize for

6     that, but I'd like to be heard on behalf of Dr. Landau if I

7     may.

8          THE COURT:  okay.

9          MS. IMES:  So to start out with, I've heard where

10    your ruling is headed and what you've asked the parties to

11    do, but I do want to address some of the things that have

12    been said.  You know, this is just -- it's a wages motion,

13    right?  And Dr. Landau is being frankly dragged through the

14    mud here in some respects.

15         THE COURT:  I don't -- look --

16         MS. IMES:  I know you don't see it that way, Your

17    Honor, but if I may just speak and address it.

18         THE COURT:  Okay.

19         MS. IMES:  There are two things I wanted to convey

20    to you.  I want to talk a little bit about who this guy is

21    that we're talking about, and secondly, I just want to

22    briefly address the allegations.

23         I know you've already said those are in the

24    background, and I appreciate that, but I'd like to put them

25    even further in the background if I may.  So we disagree,

Page 143

1      Your Honor, in the strongest possible terms with the non-

2      consenting states characterization of him.

3              The picture they paint of Dr. Landau really

4      couldn't be further from the truth.  He's a good and

5      honorable man.  And just as a little bit of background about

6      why is this guy the CEO right now, the reason is pretty

7      simple.  He's a physician by training, a career-long

8      interest in treating pain.  He got his medical degree from

9      Mount Sinai.  He did his registry in anesthesiology at Yale,

10     and he has served in the U.S. Army Reserve Medical Corps

11     between 1992 and 2006, including providing pain management

12     for troops.

13             And I want to just talk about, you know, the nub

14     of the complaints that the two AGs and these other

15     complainants have brought are all circling on the sale of

16     opioids.  And in that context I want to just inform The

17     Court that during the time that Dr. Landau worked in the

18     United States for Purdue, which was between 1999 and 2013,

19     in that entire timeframe his work was on the clinical

20     research and medical side.  He was basically a doctor

21     developing medicines.

22             The sales side was not his responsibility,

23     notwithstanding what the allegations in some of these

24     complaints say where they just lump him together with 20

25     other people for a 20-year timeframe.  And I think that's

                                                      Page 144

1      important for The Court to understand in connection with

2      weighing the allegations.

3               Just quickly I want to talk a little bit about the

4      allegations.  The allegations in these complaints have not

5      been proven in any court, in any jurisdiction.  In every

6      single one of the complaints Dr. Landau was being lumped

7      together with others over a long period of time.  We

8      vigorously dispute the allegations.  The complaints are

9      deeply flawed.

10              They deploy improper group pleading, and they use

11     conclusory allegations without specifics about Dr. Landau,

12     and they repeatedly mischaracterize underlying evidence,

13     which is profoundly unfair to Dr. Landau.  None of them

14     contain well-pled substantiated allegations demonstrating

15     that Dr. Landau participated in wrongdoing whatsoever.

16              And I realize what you said about those being in

17     the background, but I think it's important context for you

18     to have.

19              And finally, with regard to the document that my

20     colleague here and also Mr. Huebner referred to earlier,

21     there's an important point about this document, which is

22     that the rationale behind the statement in that document was

23     to ensure that patients who required paid medicines would

24     have access in the face of manufacturers dropping out of the

25     business.

Page 145

1          And part of Dr. Landau's proposal was, in fact, to

2    interface with the FDA on that and also to do what

3    ultimately happened, which was to curtail and completely

4    eliminate the sales force that Purdue had.

5          So that's the person, the human being that we're

6    talking about here.  And when you made the reference to --

7    you know, you said some CEOs are stars and others are not,

8    Dr. Landau is a star, and he is a star that Purdue should

9    have working for it during this incredibly challenging time.

10   Because of his long tenure there, he has the confidence of

11   its employees where retention is an ongoing problem.

12         Your Honor, I'm so grateful for your letting me

13   speak.  If you don't have -- oh, I wanted to also reference

14   just before I forget that if you want to go back to Dr.

15   Landau's background, Schedule 10 of the original affidavit

16   has his whole bio in there.  You can find out exactly what

17   he's all about.

18         Again, I appreciate your time, and apologize for

19   being the last one to speak.

20         THE COURT:  Okay.

21         MS. IMES:  Presumably the last one to speak,

22   anyway.

23         THE COURT:  That's fair.

24         MS. IMES:  Thank you.

25         THE COURT:  All right.  So I think you should

Page 146

1    circulate the proposed order to the usual suspects, and then

2    you could email it to Chambers.  And just get -- I don't

3    think I need any more evidence on this.  I just -- unless

4    the parties want to have more evidence on the remaining open

5    issue.  I'm just -- I'm hoping that the parties can have a

6    discussion and come to some resolution on it frankly.

7            It's clear to me that the economic terms of Dr.

8    Landau's compensation are complex and really not appropriate

9    to bring out on the fly today.  And hopefully they can be

10   gone through with a resolution that given the record today

11   would not need an additional hearing.

12           MR. HUEBNER:  Your Honor.  We will certainly

13   engage the remaining objectors on that.

14           THE COURT:  Okay.  All right.  We're done.

15

16

17

18

19

20

21

22

23

24

25

1                               I N D E X

2

3                               RULINGS

4                                              Page        Line

5

6    Jon Lowne Supplemental Declaration [ECF No. 236]

7    Granted                                   43          21

8

9    Josephine Gartrell Declaration

10   Granted                                   77          18

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 148

```
 1                   C E R T I F I C A T I O N

 2

 3        I, Lorie Cook, certified that the foregoing transcript

 4   is a true and accurate record of the proceedings.

 5

 6

 7

 8   Lorie Cook

 9

10

11

12

13

14

15

16

17

18

19   Veritext Legal Solutions

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23

24   Date:  December 9, 2019

25
```

Lorie Cook

Digitally signed by Lorie Cook
DN: cn=Lorie Cook, o, ou,
email=digital@veritext.com, c=US
Date: 2019.12.09 15:56:11 -05'00'