

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P.,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  December 19, 2019

17                  2:03 PM

18

19

20

21  B E F O R E :

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:   UNKNOWN

1    HEARING re Notice of Agenda for December 19, 2019 Omnibus

2    Hearing (ECF 659)

3

4    Motion to Extend Time/Motion of Debtors for Entry of an

5    Order Extending the Deadline to Assume or Reject Unexpired

6    Leases of Nonresidential Real Property (ECF 599)

7

8    Motion to Extend Time/Motion of Debtors to Extend the Time

9    to File Notices of Removal of Civil Actions (ECF 600)

10

11   Application of the Debtors for an Order Authorizing Them to

12   Retain and Employ Jones Day as Special Counsel, Nunc Pro

13   Tunc to the Petition Date (ECF 601)

14

15   Declaration of John J. Normile in Support of the Application

16   of the Debtors for an Order Authorizing Them to Retain and

17   Employ Jones Day as Special Counsel, Nunc Pro Tunc to the

18   Petition Date (ECF 603)

19

20   Application to Employ PJT Partners LP as Investment Banker /

21   Debtors Application for Authority to Employ PJT Partners LP

22   as Investment Banker Nunc Pro Tunc to the Petition Date

23

24   Objection of the United States Trustee to Entry of an Order

25   Approving the Retention of PJT Partners LP as Investment

Page 3

1   Banker for the Debtors (related document(s) 430) filed by

2   Brian S. Masumoto on behalf of the United States Trustee

3   (ECF 471)

4

5   The United States Trustee's (i) Supplemental Objection to

6   the Retention of PJT Partners as Investment Banker for the

7   Debtors (ii) Objection to PJT's Motion to Seal and (iii)

8   Request to Unseal PJT's Client Information (related

9   document(s) 589, 430) filed by Brian S. Masumoto on behalf

10  of United States Trustee (ECF 6446)

11

12  Reply to Motion the United States Trustee's (I) Initial and

13  Supplemental Objections (ECF 656)

14

15  Application to Employ Ernst & Young as Auditor / Debtor's

16  Application to Employ Ernst & Young as its Auditor, Nunc Pro

17  Tunc to the Petition Date (related document(s) 432) filed by

18  Eli J. Vonnegut on behalf of Purdue Pharma L.P. (ECF 499)

19

20  Objection of the United States Trustee to Entry of an Order

21  Approving the Retention of Ernst & Young LLP as the Auditor

22  for the Debtors (related document(s) 432) filed by Brian S.

23  Masumoto on behalf of United States Trustee (ECF 485)

24

25  Transcribed by:  Sonya Ledanski Hyde

Page 4

1   A P P E A R A N C E S :

2

3   UNITED STATES DEPARTMENT OF JUSTICE

4        Attorneys for the U.S. Trustee

5        201 Varick Street, Suite 1006

6        New York, NY 10014

7

8   BY:  PAUL SCHWARTZBERG

9

10   DAVIS POLK & WARDWELL LLP

11        Attorneys for Debtors

12        450 Lexington Avenue

13        New York, NY 10017

14

15   BY:  CHRISTOPHER ROBERTSON

16

17   DEBEVOISE & PLIMPTON LLP

18        Attorneys for Beacon Company

19        919 Third Avenue

20        New York, NY 10022

21

22   BY:  JASMINE BALL

23

24

25

1   BROWN RUDNICK LLP

2       Attorneys for the Ad Hoc Committee of Supporting

3       Claimants

4       7 Times Square

5       New York, NY 10036

6

7   BY:  DAVID J. MOLTON

8

9   MILBANK, TWEED, HADLEY & MCCLOY LLP

10      Attorneys for the Raymond Sackler Family & Rosebay

11      Medical LP

12      28 Liberty Street

13      New York, NY 10005

14

15  BY:  GERARD UZZI

16      ALEX LEES

17

18  PILLSBURY WINTHROP SHAW PITTMAN LLP

19      Attorneys for Ad Hoc Group of Non-Consenting States

20      31 West 52nd Street

21      New York, NY 10019

22

23  BY:  ANDREW M. TROOP

24

25

Page 6

1   JOSEPH HAGE AARONSON LLC

2        Attorneys for the Raymond Sackler Family & Rosebay

3        Medical LP

4        485 Lexington Avenue

5        New York, NY 10017

6

7   BY:  GREGORY P. JOSEPH

8

9   OFFICE OF THE ATTORNEY GENERAL

10  HEALTH CARE and FAIR COMPETITION BUREAU

11       Attorneys for the State of Massachusetts

12       100 Cambridge Street, 11th Floor

13       Boston, MA 02108

14

15  BY:  GILLIAN FEINER

16

17  KRAMER LEVIN NAFTALIS & FRANKEL LLP

18       Attorneys for the Ad Hoc Committee

19       1177 Avenue of the Americas

20       New York, NY 10036

21

22  BY:  KENNETH H. ECKSTEIN

23

24

25

Page 7

1   AKIN GUMP STRAUSS HAUER & FELD LLP

2       Attorneys for Unsecured Creditors Committee

3       One Bryant Park

4       New York, NY 10036

5

6   BY:  SARA L. BRAUNER

7

8   KELLER LENKNER LLC

9       Attorneys for the State of Arizona

10       150 N. Riverside Plaza, Suite 4270

11       Chicago, IL 60606

12

13   BY:  SETH A MEYER

14

15   OFFICE OF THE ATTORNEY GENERAL STATE OF NEW YORK

16       Attorneys for Opioids & Impact Litigation, Executive

17       Division

18       28 Liberty Street

19       New York, NY 10005

20

21   BY:  DAVID E. NACHMAN

22

23

24

25

1                  P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay, good

3        afternoon.  In re Purdue Pharma, et al.

4              MR. HUEBNER:  Good afternoon, Your Honor.  For the

5        record, Marshall Huebner of Davis Polk & Wardwell, LLP on

6        behalf of Purdue Pharma, LLP, its 22 subsidiaries and Purdue

7        Pharma, Incorporated, its general partner.

8              Your Honor, before we begin addressing the very

9        few items on the agenda, I wanted to provide a few status

10       updates as we approach year end.  I think most of them are

11       positive and highlight the progress that has been made on

12       many fronts in the first 90 days of this exceedingly

13       complicated situation.

14             THE COURT:  Okay.

15             MR. HUEBNER:  Number one, we have been advised

16       that no dissenting states are exercising the first of their

17       two offramps to flip into enjoined status, and begin their

18       appeal.  That deadline today for the first of the two, the

19       second is February 21.  So we all continue to push forward

20       with diligence and negotiation, lots of things going on as

21       you'll hear in a few minutes, hopefully at least until April

22       8th, if not beyond.

23             Number two, as Your Honor may know, either from

24       the docket or from the many news reports, the report of the

25       special committee detailing all cash transfers to the

Page 9

1    shareholders on and after January 1, 2008 was filed on the

2    docket on Monday night, weighing in at 366 pages.  Report 1A

3    catalogues all cash distributions to or for the benefit of

4    the shareholders, including salary, benefits, expense, and

5    indemnity reimbursements, as well as the distributions since

6    January 1, 2008.

7           To give the Court comfort, the numbers in Report

8    1A line up with extreme precision to numbers that the

9    Debtors themselves previously disclosed or mentioned to the

10   Court, either at prior hearings or in our pleadings.  There

11   also is actually a reconciliation in the report of the full

12   25-year distribution history that was given to the MDL

13   plaintiffs, many of the States and other governmental

14   entities 14 months ago in October 2018, that I also referred

15   to at prior hearings.

16          I think the reconciliations of that long period

17   are extremely minor, but to show the special committee's

18   attention and focus on cataloguing every penny, I think

19   again the Debtors' notable commitment to quite an unusual

20   level of transparency continues to be proven out, which is

21   one of the reasons that we decided that it was appropriate

22   to file it publicly.

23          Number three, Your Honor, is with respect to Dr.

24   Landau, as a quick refresh the Debtors reached a $1.3

25   million settlement with the UCC on his 2019 incentive

1    compensation, prior to the December 4 wages hearing.  The

2    U.S. Trustee, by the way, with whom I spoke this week

3    considers their objection resolved by Your Honor's ruling,

4    because they were really objecting, as you may remember, to

5    everything on the grounds that it was disguised retention

6    plans.  They have no remaining objection to press at this

7    time as per Mr. Schwartzberg.

8            With respect to Dr. Landau, the accommodation that

9    was reached, or the settlement that was reached, I should

10   say, represents a 62 percent reduction of the originally

11   proposed incentive compensation.  It also includes moving

12   the payment date from what has been true for several decades

13   of March, to instead being 50 percent on each of June 2020

14   and September 2020, essentially having his 2019 incentive

15   comp become kind of almost de facto 2020 retention.

16           It also layers in the same anti-secretion

17   provision that's applicable to the Sacklers themselves, and

18   contains the identical claw back provisions that Your Honor

19   has already approved for all of the participants, and that

20   all the parties to the last hearing, including the

21   dissenting states, negotiated with us and signed off on.

22   All that said, we are reluctantly going to adjourn this last

23   matter on our wages until the January hearing, as we got a

24   rolling list of questions from non-consenting states after

25   the hearing.  I think those questions have now been

Page 11

1    answered, (indiscernible) one last charge just to confirm a

2    number.

3            And we were a little bit surprised that it ended

4    up being a bit of post-hearing discovery, candidly, months

5    or weeks after the objection deadlines, but we are trying

6    very hard to get this done consensually, and so rather than

7    push it at today's hearing, we hope that maybe a couple of

8    more weeks of conversation and a couple of more creative

9    ideas will maybe get this off of the contested docket, and

10   we can move something forward consensually.

11            THE COURT:  Okay.

12            MR. HUEBNER:  Relatedly, Your Honor, the Board of

13   Directors of Purdue received a letter on Tuesday from 11

14   senators, nine of whom represent the non-consenting states,

15   parenthetically four of whom are running for president of

16   the United States, attacking the company and making what we

17   believe to be unfounded claims against both Dr. Landau and

18   Purdue.  The letter says things like "Purdue is still more

19   concerned with motivating high-level employees to sell more

20   drugs than it is with public health, or helping states

21   ravished by the opioid crisis."  First of all, I clearly

22   think they meant ravaged, not ravished.  We'll leave that

23   alone.

24            Second of all, and much more importantly, this is

25   just, as I believe the Court knows, and I actually hope that

Page 12

1    all parties in the court today know, accusations like his

2    are just untrue, flatly untrue, and quite unhelpful.  What

3    the current teams at Purdue and their advisors are doing,

4    frankly, day and night, is working to preserve and maximize

5    the company's valued for very good reason, because one

6    hundred percent of that value, as we seem to have to discuss

7    at virtually every hearing, is slated to be devoted to,

8    contributed to and devoted to addressing the opioid crisis,

9    and minimizing harm and doing good in society.

10          I am of course not going to belabor the myriad

11   steps that the company has taken, most or many under the

12   Court's supervision, on its pathway to becoming a public

13   benefit corporation, because Your Honor is well aware, as

14   these senators seemingly are not, of the PVC model itself,

15   which is the raison d'etre of these cases, the massive self-

16   injunction agreed to, our staunch and continued support of

17   the emergency relief fund, more on that in a few minutes,

18   the total lack of promotion and detailing of opioids since

19   2018, and the prepetition elimination of 100 percent of the

20   opioid sales force.  It is really very unfortunate that so

21   many either don't understand or are refusing to admit that

22   they understand how radically this company is transforming

23   itself on its way of becoming a public benefit entity.

24          Number four, the selection of the monitor for the

25   self-injunction, as originally suggested by the Court, is

Page 13

1   very close to done.  Although it is the Debtor's hire, we

2   have run I think an extremely inclusive process, and have

3   both included candidates for consideration that were put

4   forward and have conducted interview sessions including both

5   states' groups and of course the UCC.

6           The hope is that we will be in a position after

7   another call or two to actually hire a candidate and can get

8   that in place.  You know, unfortunately there are lots of

9   lines, and lots of people, and lots of calls on really, many

10  optics in this case, and just, you know, we should have a

11  full-time company that just does meetings logistics, because

12  it often feels like we need one.

13          Another positive report, Your Honor, number five

14  of my list of nine is the protective order.  I don't usually

15  say praise the lord at hearings, but the protective order is

16  very, very, very close to done and might actually even be

17  done as of very late last night.  And so hopefully we will

18  be able to bring that forward to the Court quite soon.  It

19  has been very complicated in part because it obviously

20  involves family information, shareholder information,

21  company information, and many, many parties at different

22  levels who want access to all sorts of different levels of

23  information, I think will actually provide for more access

24  to confidential information than any deal I have ever seen

25  in more than a quarter of a century of practice.

1              Number six, Your Honor, as the Court probably

2    would not remember, given the endless things that the Court

3    juggles, Paragraph 17(b) of the stipulation entered and

4    approved by the Court among the Debtors, the UCC and the

5    shareholders, contemplated that a presentation be made by

6    the shareholders detailing their defenses, essentially, and

7    their point  of view on the liability.

8              On Friday, December 9th about, I don't know, 70 or

9    so people met in person, with dozens more on the phone, in

10   fact I think the phone system crashed about four times

11   because of the sheer weight of the participants from the

12   Debtors, the unsecured creditors' committee, the ad hoc

13   committee and the dissenting states' committee, met to hear

14   the shareholder presentations required by the stipulation.

15   I think the presentations, I actually think they were over

16   700 pages in length, and I think it's fair to say are still

17   being digested by multiple parties with lots of follow-up.

18             But just to give the Court comfort that, you know,

19   obviously the docket is just the tip of the iceberg.  This

20   and many other categories of diligence information flow,

21   diligence request, diligence demands continue to be underway

22   among various parties in the case.

23             Number seven, the stipulations with the two groups

24   of states, although we're actually in part at least living

25   under them already, as we are living under the protective

Page 15

1    order, although it's not actually entered yet.  We

2    constantly send things, you know, to be governed by the

3    terms of the (indiscernible) protective order are also

4    taking their hopefully final short laps, and we can bring

5    those forward soon for approval by the Court, I hope.

6            Number eight is the emergency relief fund.  This

7    is moving much more slowly than the Debtors would like, and

8    that is the source of a little bit of frustration to us.

9    The good news is that we have been advised by the states

10   that they met in-person last week.  The consenting and

11   consenting together on a lot, of many other issues as well.

12   I will be given a joint proposal that was promised for this

13   week.  We hope it's still this week.  If not we assume it

14   will be very, very early next week.

15           The UCC is also very hard at work, as are we, on

16   kind of structural issues and putting together the meat on

17   bones.  We very much hope to bring this forward formally,

18   efficiently and definitively in January for launch.  There

19   will obviously be things that have to be done after launch,

20   you know:  personnel, grant-making, structure, where the

21   money goes, all that is a complicated issue.  It's a lot of

22   money, and its stakeholders' money, and it is a complicated

23   issue.  But it's getting time to get this done and start

24   getting this money out, you know, three months of all saying

25   that, you know, many of us think this is a good idea, is

1   long enough for money to be sitting in a bank waiting to

2   start saving lives.

3            Number nine, Your Honor, is a brand-new

4   development as of, sort of-ish last night.  An issue was

5   raised to us, I think 15, 16 or so ago days by the DOJ, and

6   we have round robin-ed it in the last 18 hours with the

7   creditors' committee and a couple of the other groups,

8   including the states' groups.  It's actually pretty

9   technical, but it is very important to them, and one of the

10  things I learned on is that in general, if one can

11  accommodate the Department of Justice, that often appears to

12  be a better approach than declining to do so.

13           So here we go.  We have agreed to seek to extend

14  for 90 days, subject to further extensions, the Rule 4007(c)

15  deadline for filing a complaint to determine the

16  dischargeability of certain debts as set forth in Section

17  523 of the Bankruptcy Code.  We will be filing a motion,

18  potentially on presentment in the very near future possibly

19  as early as tomorrow.  What's the issue?  The issue is as

20  follows.

21           THE COURT:  I'm sorry, if there's an agreement,

22  I'm not sure why you need a motion.

23           MR. HUEBNER:  Yes, because it actually would apply

24  to all parties in the case, not just to the DOJ.  Their

25  concern, based on the Hawker Beechcraft decision was later

1    reversed, is that possibly there's a 60-day deadline after

2    the 341 meeting to file non-dischargeability complaints.

3    Since we have no desire in the world for anyone to start

4    filing those, this is kind of a comfort order that can be

5    entered.

6              THE COURT:  Okay.

7              MR. HUEBNER:  And make clear that at -- and

8    without taking any views on whether there I such a deadline,

9    or whether there are non-dischargeable --

10             THE COURT:  But the point is, it would apply to

11   everyone, not just signatories.

12             MR. HUEBNER:  Exactly.  Yeah, it's not a stip just

13   with the DOJ.

14             THE COURT:  Okay.

15             MR. HUEBNER:  It's a motion just extending, to the

16   extent that any deadline exists, and frankly not at all sure

17   one does, but again, it's easier to file motions like this.

18   The, the, the date in this case, because it is keyed off of

19   the 341 meeting, is actually January 6.  I think there are

20   expectations, that if the Court is okay with it, since we

21   don't want to put a special hearing on for this, that either

22   the order could be entered before then, or that the

23   deadline, if there is one, would be deemed bridged until we

24   get to our January omnibus hearing when it can be heard.

25   We've actually discussed the issue with the UCC and the

1    States.

2           THE COURT:  I'm happy to sign a bridge order if

3    someone thinks there needs to be a bridge order, but I don't

4    think there needs to be one.

5           MR. HUEBNER:  Yeah, I'm guessing that's probably

6    all the comfort the parties need, since again, the one

7    potentially negative decision was actually reversed.  So

8    this I think is appropriately being very cautious, since

9    this obviously is a case where one could imagine that there

10   were people who would want to talk about governmental claims

11   that give rise to non-disagreeability, and we understand

12   that.  And so as long as that's okay with Your Honor, we

13   will be filing a motion.  And obviously it's 90 days for

14   now, Judge, to extension.

15          Candidly at the end of the day, I get -- our view

16   would likely be that we should extend this to the end of the

17   case or something like that.  Because as of right now, there

18   doesn't seem to be a reason to sort of force people to

19   consider filing non-dischargeability complaints when we're

20   in the middle of trying to work out the whole case.  But

21   we'll see what the new year brings us, and we'll see what

22   happens when the initial request, the 90-day period is

23   potentially up for expiration.

24          So in summary, Your Honor, I think that we

25   collectively, and collectively is really, I think every

1    group that is in this room, although the days have not

2    always been easy, the nights have not always been easy, I

3    think we have actually accomplished an extraordinary amount.

4    The intense and often hard-fought first 90 days, the arena

5    and architecture of the case has now been built.  We have at

6    least 100 remaining days in front of us until April 8th, and

7    hopefully thereafter.  And the focus and the first part of

8    2020, we trust will be very much on advancing the case.

9              On company and shareholder diligence, in

10    furtherance of the PVC term sheet that was agreed to with

11    the ad hoc committee and the shareholders which continues to

12    be our plan structure that we are advancing, meeting with

13    various credit constituencies.  This is an initiative that

14    the Debtors and the UCC are jointly undertaking to have

15    people come in and explain both the merits and the amounts

16    of each sort of (indiscernible) category of claim, so we can

17    begin to form our views on allocation as a fiduciary, taking

18    very much in mind of Your Honor's repeated admonitions that

19    there has to be a way to cut through the gordian knot of

20    this case, and not have it devolve into what could be in

21    fact years of litigation and contested matters, sort of how

22    to divide the pie up, et cetera, that Purdue's asset base

23    represents in the public service.

24              And to that end, our hope is that 2020 will enable

25    both us and others to keep their focus on the future, and

1    how to ensure that the best possible outcome is achieved

2    that does the most to put Purdue's substantial asset base to

3    work wholly and exclusively, to help our country address and

4    ameliorate the horrific opioid crisis that has hit so many.

5    As Your Honor has noted I think that three different

6    hearings already, Purdue can't give more than 100 percent of

7    itself, though 100 percent has been on offer since even

8    before we filed the proceedings, and working to make that

9    100 percent as impactful and socially improving, improving

10   socially the U.S. system is what lies before all of us.

11            Your Honor, I'll turn the podium over now to Chris

12   Robertson, because I do think we need to get through the

13   agenda and make sure we get our orders entered, and then

14   I'll come up to address one final topic at the conclusion of

15   the hearing.  Unless, of course, the Court has questions.

16            THE COURT:  Well, before you do that, I had a

17   question about the interim distribution emergency fund.  You

18   said that the Debtors and the committee were working

19   together, and you were waiting for having had some

20   discussions for a response from the States.  Has there been

21   more interaction in that, among those three groups?

22            MR. HUEBNER:  Yeah, sorry, Your Honor, I probably

23   spoke poorly.  Let me explain -- Mr. Preis is welcome to --

24            MR. PREIS:  Can I address that, Your Honor?

25            THE COURT:  Sure.

1          MR. HUEBNER:  Oh, yes --

2          MR. PREIS:  You want me to do it here or there?

3          THE COURT:  That's fine, the microphone will pick

4     you up.

5          MR. PREIS:  Your Honor, I don't want to -- I am

6     going to disagree with Mr. Huebner for a second, and the

7     things he said about the states is not exactly correct.  We

8     had an initial call, meeting with the states, the Debtors,

9     and the creditors' committee a while ago.  We all agree that

10    the creditors' committee, because we are the ones who kind

11    of raised this issue, would take pen to paper first, we then

12    get -- send it to the Debtors, and then we send it to the

13    states.  So that's the process that's been going on.

14          THE COURT:  All right.

15          MR. PREIS:  We are at the point now where I think

16    tomorrow we're sending, going to be sending it to the

17    Debtors.  It's taken us a while as a committee to put

18    together the architecture for it.  I know the States are

19    also working on something, and we've told them, look, we --

20    once, we're happy to obviously get whatever proposals they

21    have, but the idea would be -- you know, they asked us to

22    put pen to paper and actually write out the proposal, which

23    is what we're doing.  So that's --

24          THE COURT:  And you're going to be sharing that

25    with them.

1          MR. PREIS:  Of course, of course.  I mean, that's

2     the idea, is it goes to them.

3          THE COURT:  Okay, fine.

4          MR. PREIS:  And there's no confusion about that.

5          THE COURT:  And I don't -- okay, this is an

6     important issue, and I -- Mr. Huebner is talking through a

7     number of points quickly.  I just want to make sure I

8     understood the process there.

9          MR. HUEBNER:  To be clear, I actually don't think

10    we said different things.

11         THE COURT:  No, it was just, I want to make sure I

12    understand what was going on on that point.

13         MR. HUEBNER:  The, the --

14         THE COURT:  And who was involved at what stage,

15    and --

16         MR. HUEBNER:  The parties are all interacting,

17    Your Honor.  You know, the goal is to ultimately end up as

18    sort of a committee of sorts that works this forward.  My

19    understanding, and maybe I'm slightly misinformed, and so be

20    it, was that in part, what we were getting back was a

21    substantive proposal about where the money should actually

22    go, not just a structural proposal about how to set it up,

23    but I guess we'll see when it comes in.

24         And but again, to the extent that your thought was

25    only we're talking and then they're going to drop something

Page 23

1    in, not at all.  There's already you know, each of the four

2    sort of legs of this table have nominated specific

3    individuals.  Their request was to have people with public

4    health actually expertise and experience to be involved in

5    these issues, and there is kind of a working group to set

6    up.  It's just moving too slowly, and we're trying to figure

7    out how to, how to accelerate --

8              THE COURT:  And one level, I suppose that's true,

9    because everyone would like to have it happen sooner rather

10   than later.  But on the other level, I understand that not

11   only the structure for this, but also as you said, where the

12   funds go, is something that people should consider

13   carefully, and reach as much agreement on as they can, just

14   as you would whenever you were spending significant amounts

15   of money on something important.  So I, I appreciate the

16   update.  I am glad that people are working on it at this

17   level, and I fully believe, based on everything that I've

18   heard in the case, filings in the case, that people will

19   continue to work very diligently on it.

20             MR. HUEBNER:  And again, Your Honor, I think look,

21   to be fair, I think we've actually discussed this at greater

22   length, and probably with more sophistication at prior

23   hearings, we don't minimize obviously any of that.  How the

24   money gets spent, where the money gets spent, who decides

25   how it gets spent are issues that cut horizontally and

Page 24

1    vertically across many different stakeholders and their own

2    legal, sworn obligations, oaths of office that are on

3    constituencies, people who come at it obviously from the

4    perspective of victims and families who have lost loved

5    ones, who have their own views, including their own views on

6    the government's role and the like, it is very complicated.

7            I was, I was making only a general point, and

8    there was no criticism of any party, even remotely

9    suggested, that you know, Purdue has a fair amount of cash

10   on its balance sheet, and has been trying to figure out a

11   way for a while how to put more of it to use, to start

12   helping immediately, and maybe, you know, I don't want my

13   personal hope that we can get this going and start actually

14   using the money for good to suggest that anybody's not doing

15   what they're supposed to on the right schedule.

16            THE COURT:  Okay.

17            MR. HUEBNER:  So with that, let me turn it over --

18            THE COURT:  Well, just one other comment.  I'm

19   also pleased to hear that you're close on the monitor

20   appointment, and I think both of those things, the emergency

21   distribution and the monitor appointment, highlight that the

22   parties in interest in this case are working diligently to

23   use the Debtors' resources in a proper way.

24            And I always take seriously when elected officials

25   file documents in my cases, but there is a difference

1    between courts and elected officials, and courts need to

2    proceed in the way that courts are set up to proceed.

3    Thankfully, Bankruptcy Court being courts that preside over

4    collective proceedings can have the input of very

5    sophisticated, intelligent, responsible people, which is

6    what I think is happening here.

7          And we are answerable to the public in different

8    ways than politicians are, and I understand that, too.  But

9    I'm mindful of everyone's concern to use the Debtor's

10   resources in a proper way.  So I appreciate the update.

11          MR. HUEBNER:  Thank you, Your Honor.  Mr.

12   Robertson?

13          MR. ECKSTEIN:  If I may, just very briefly,

14   Kenneth Eckstein on behalf of the ad hoc committee.  Just to

15   close this issue out, I did want to briefly just address the

16   issue of the emergency relief fund.

17          THE COURT:  Right.

18          MR. ECKSTEIN:  I want to assure the Court from the

19   standpoint of the ad hoc committee, that we're working

20   extremely diligently, and coordinating with both the states

21   and with the municipalities on the committee, as well as

22   with the dissenting states, to try to come together as

23   quickly as possible with the governmental view of how the

24   $200 million can get out as quickly as possible, as

25   efficiently as possible, and the expectation is that will

Page 26

1    ultimately be coordinated with the Debtor and the creditors'

2    committee, and it is very, very high on our priority list

3    right now, and I wanted the Court to appreciate the degree

4    of attention that the matter is getting from the standpoint

5    from the state and municipalities.

6                THE COURT:  Great, thank you.

7                MR. TROOP:  Your Honor, (indiscernible).

8                THE COURT:  You're all working together.

9                MR. TROOP:  Spent a lot of time (indiscernible)

10               THE COURT:  Okay.  That was Mr. Troop, by the way,

11   for the transcript.

12               MR. TROOP:  Your Honor, probably (indiscernible).

13               THE COURT:  Okay.

14               MR. ROBERTSON:  Thank you.  Your Honor, for the

15   record, Christopher Robertson, Davis Polk & Wardwell on

16   behalf of the Debtors.  There are five uncontested matters

17   on the agenda today.  There are two extension, motions to

18   extend time, one to assume or reject leases.  The other

19   three remove actions to the Bankruptcy Court, and there are

20   three uncontested retention applications.

21               THE COURT:  Right.

22               MR. ROBERTSON:  We filed certificates of no

23   objection with respect to the four matters for which no

24   objections were filed.  With respect to the PJT, the U.S.

25   Trustee had filed an objection.  That objection was resolved

Page 27

1    and withdrawn, unless anybody has any questions, or you have

2    any questions, Your Honor, we would ask that these orders be

3    entered.

4             THE COURT:  Okay, does anyone have anything to say

5    on the testimony to extend the assumption rejection deadline

6    on the leases?  On the removal deadline extension motion?

7    On the retention of Jones Day and Arnold & Porter Kay

8    Scholer as special 327(e) counsel for the purposes stated in

9    those applications?  Or the PJT retention application?

10            Okay, I've reviewed each of those motions and

11   applications, and I'll grant each of them, based on my

12   review.  I have, I believe an emailed order on the 365

13   motion.  I don't think I have orders on the other one, so if

14   you could just send those in.

15            MR. ROBERTSON:  Certainly.

16            THE COURT:  I'd appreciate it.

17            MR. ROBERTSON:  Will do, and thank you, Your

18   Honor.

19            THE COURT:  Okay.

20            MR. ROBERTSON:  The only contested item on today's

21   agenda is the Debtor's application to employ Ernst & Young

22   as its auditor.  There is one objection to the application

23   from the United States Trustee.  Frankly, Your Honor, we

24   made every effort to present an uncontested agenda today.

25   The application, the objection, our reply papers were all on

1    file in November before the November 19 hearing date, before

2    we adjourned this matter to today.  We made an effort to use

3    the additional month productively, twice reaching out to the

4    U.S. Trustee to see if we could provide any additional

5    information, assurances, or explanation to resolve the

6    objection.

7              Without going into great detail, the U.S. Trustee

8    raised a handful of questions on the calls that we had, and

9    we diligently responded to every information request.  We

10   received no inbounds from the U.S. Trustee's office with

11   respect to the application.  Between November --

12             THE COURT:  I'm sorry, you received no what?

13             MR. ROBERTSON:  Inbound requests for information.

14             THE COURT:  Okay.

15             MR. ROBERTSON:  Between November 15th, when the

16   objection was filed, and today.  Look, I only say this

17   because I hope that the Trustee's concerns are not grounded

18   in a lack of information regarding EY's historical or

19   current role.  And so unfortunately, we believe that this

20   matter is unresolvable without appearing before Your Honor.

21             THE COURT:  Okay.

22             MR. ROBERTSON:  I will briefly touch only on four

23   points.

24             THE COURT:  Well, can I -- is this, have you

25   narrowed down the issues at all?  I mean, as I understand

1   it, there's a -- I have a supplemental and a first

2   supplemental or second supplemental --

3            MR. ROBERTSON:  Certainly.

4            THE COURT:  -- declaration by Devon Brady on this.

5            MR. ROBERTSON:  I'll speak to that briefly.  Look,

6   I think in all honesty, the answer to your question is no.

7   The first supplemental declaration we've prepared in very

8   short order, you know, there's a three-day reply period.  We

9   had a preview, I think, of the U.S. Trustee's objection.  We

10  had prepared that for a supplemental reply, provided by

11  draft of the U.S. Trustee to try to see if the disclosures

12  in that reply, I'm sorry, in that supplemental rejection, in

13  that supplemental declaration would resolve the Trustee's

14  concerns.

15           Unfortunately they did not, but we filed the

16  supplemental declaration.  In any event, the second

17  supplemental declaration is just mechanical, Your Honor.

18  The Debtors and EY --

19           THE COURT:  It attaches the executed retention

20  agreement.

21           MR. ROBERTSON:  It has nothing really to -- no, I

22  think material bearing on the matter before you today.

23           THE COURT:  Okay.

24           MR. ROBERTSON:  And so I like to touch only on the

25  four points:  who is EY, what is the scope of their

1      retention, what is entirely outside of the scope of EY's

2      retention, and why EY does not hold or represent adverse

3      interest to the Debtors, and is disinterested, for purposes

4      of 327(a) of the Bankruptcy Code.

5              So first, the Debtors seek to retain a specific

6      legal entity, which is Ernst & Young LLP, a U.S. entity as

7      their auditor.  So when I refer to EY, I'm referring to the

8      specific U.S. entity.  As stated in Paragraph 5 of the first

9      supplemental declaration of Mr. Davon Brady in support of

10     the application, who is here today, the deal team that

11     performs auditing services for Purdue audits just one other

12     shareholder-owned entity, which is the Debtor's landlord.

13     There is no rule that I've ever heard of that says that an

14     auditor cannot also audit a company, a company, also its

15     landlord.

16             As Mr. Brady explains, any work performed for

17     shareholder-owned entities outside of the U.S. are performed

18     by other member firms of Ernst & Young Global, Limited.

19     This work is not simply done by different deal teams, it's

20     done by separate legal entities, with different individual

21     members and personnel.  And so it would be grossly

22     misleading to say that quote-unquote Ernst & Young is the

23     auditor for all of the shareholder entities -- for the

24     shareholder-owned entities.

25             Second, the scope of EY's audit work is clearly

Page 31

1   set forth in the application.  EY is being retained to

2   finalize the audit for the Debtor's 2018 consolidated

3   financial statements -- audit the 2019 financial statements,

4   and audit and report on the financial statements of certain

5   401k and pension plans for which certain Debtors act as

6   sponsors.

7            Your Honor, at the risk of oversimplifying, the

8   Debtor's management is responsible for the preparation and

9   fair presentation of financial statements in conformity with

10  GAAP that are free of material misstatement.  And it's EY's

11  responsibility to express an opinion as to the financial

12  statements based on this audit, on their audit.  Generally

13  applicable accounting standards require that EY plan and

14  perform the audit to obtain reasonable assurance about

15  whether the financial statements are free of material

16  misstatement.  An audit involves performing procedures to

17  obtain audited evidence about the amounts and disclosures in

18  the financial statements.

19            There's much more to it, and a cursory read of our

20  -- of the Debtor's customer programs motion will demonstrate

21  how complex the Debtor's sales and distribution chain is.

22  But at a high level, that's what we're talking about here.

23  We're talking about retaining EY as the Debtor's independent

24  external auditor.

25            Testing distribution transactions with the

1    shareholder entities, if any, is just one miniscule part of

2    the audit process of the Debtor's year-end financial

3    statements.  In fact, the Debtors have not made any

4    distributions to the shareholders since 2017.  But because

5    it's the focus of the U.S. Trustee's objection, I'd like to

6    briefly address it.  To be clear, all decisions and

7    diligence as to the structure of actual payments, if any,

8    from the Debtors to their shareholders were made by the

9    Debtors and their advisors, with no input from EY.  EY's

10   testing of any --

11             THE COURT:  I'm sorry, can you say that again?

12             MR. ROBERTSON:  Gladly, Your Honor.  all decisions

13   and diligence as to the structure of actual payments, if

14   any, in any given year, were made by the Debtors and their

15   advisors, with no input from EY.  EY's testing of any such

16   distributions is limited to validating payments already made

17   to shareholders through tracing the disbursements of the

18   payments by one, examining evidence such as bank wire

19   support for bank disbursement information, and two,

20   confirming that the amounts of any dividends or

21   distributions so tested were authorized in the minutes of

22   the Board of Directors.

23             THE COURT:  But this is -- but they're completing

24   the audit for 2018, and then doing 2019, and the Debtors

25   have a company by company-wide policy of making no

Page 33

1    distributions to shareholders, so there's nothing to test.

2              MR. ROBERTSON:  That's correct, Your Honor.  So on

3    a go-forward basis, and for what we're engaging EY, there's

4    absolutely nothing to test in this regard.

5              THE COURT:  Okay.

6              MR. ROBERTSON:  The trustee's objection, as I

7    understand it, raises questions about what EY did in years

8    prior, when the Debtors were making distributions.  And so,

9    what I mean to clarify here is this is the process, this is

10   what EY's auditor was doing with respect to these

11   distributions in historical areas.

12             THE COURT:  Okay.

13             MR. ROBERTSON:  Look, EY is the right auditor to

14   provide these services.  I'm not going to belabor this

15   point, but the trustee raises a concern, or a point in the

16   reply to the effect that there's no efficiency exception for

17   the conflicts rules.

18             And we think that's right, but I think it's worth

19   noting that engaging another auditor here would be insanely

20   and unnecessarily expensive.  It will cost about $75,000 to

21   finish 2018 audit.  To redo that audit, if it's even

22   possible at this point, would be much more expensive with

23   another auditing firm.  Going forward, EY's familiarity with

24   the business will make it much more efficient to do the 2019

25   audit than engaging a new external auditor.  And finally, as

Page 34

1    we note in our reply, failure to do the audit of the 401(k)

2    and pension plans may result in fines as high was $1100 a

3    day.  So this is important for the Debtors.

4            Third is maybe the most important point, which is

5    what EY is not doing.  So EY is not advising whether to

6    pursue, or strategically how to pursue any potential

7    litigation claims against the Debtors' shareholders.  EY

8    does not sign off on, in the words of the trustee's

9    objection, any transaction between the Debtors and the

10   shareholders in any way.  EY only tests the distributions,

11   and they described previously.  EY is not reviewing or

12   investigating historical transactions related to

13   distributions of the Debtors' shareholders.

14           And the last point is worth pausing on.  You know,

15   on Page 2 of the objection, and again on Page 8, the Trustee

16   states that consideration of the amount of the cash

17   contribution will require a review or investigation of any

18   transactions relating to distributions to the consenting

19   shareholders.  We agree, Your Honor, as evidenced by the

20   350-plus page report of the special committee that we filed

21   on Monday evening.  Tellingly, EY had nothing to do with the

22   production of that report.  It is also telling that the

23   economic parties in interest in these cases who have every

24   incentive to ensure that no professional serving the estates

25   is compromised by any entanglement with the Debtor

Page 35

1    Shareholders has objected to EY's role in these cases.

2            And fourth, very briefly, EY does not hold or

3    represent any interest, material or adverse to the Debtor's

4    estates as a disinterested person, as such term is defined

5    in Section 101(14) of the Bankruptcy Code, as required under

6    Section 327(a) of the Bankruptcy Code.  And we address this

7    point extensively in our reply.

8            But you know, I would note that the U.S. Trustee

9    does not explain how the fact that independent member firms

10   of Ernst & Young Global Limited -- excuse me, Your Honor --

11   performing services for shareholder entities in foreign

12   jurisdictions, to give EY any incentive to act contrary to

13   the interest of the Debtors' estates.  The simple fact is

14   that there is no such incentive, and if the basis of the

15   objection is that EY signed off on, quote-unquote, or is

16   investigating historical transfers from the Debtors to their

17   shareholders, the premise of the objection is fundamentally

18   flawed.

19           At this time, I would like to admit the three

20   objections submitted by Mr. Brady into evidence.  The

21   initial declaration is attached as Exhibit B to the Debtor's

22   application to retain EY.  There is also a supplemental

23   declaration Docket Number 499, and a second supplemental

24   declaration at Docket 673.  As I noted earlier, Mr. Brady is

25   in the courtroom today, and I understand that Mr. Masumoto

Page 36

1    would like to ask Mr. Brady a few questions.  I would cede

2    the podium to Mr. Masumoto unless Your Honor has any

3    questions.

4              THE COURT:  Okay, Mr. Brady, if you could come up

5    to the witness stand, please?

6              MR. ROBERTSON:  Thank you, Your Honor.

7              THE COURT:  Have a seat.  Would you raise your

8    right hand, please?  Do you swear or affirm to tell the

9    truth, the whole truth, and nothing but the truth, so help

10   you God?

11             MR. BRADY:  I do.

12             THE COURT:  And it's D-E-V-O-N, B-R-A-D-Y?

13             MR. BRADY:  Yes.

14             THE COURT:  Okay, and Mr. Brady, I have three

15   declarations that you submitted as your -- in support of the

16   application to retain Ernst & Young, LLP.  The first one's

17   dated November 5, 2019.  Second one, which is labeled

18   supplemental declaration, is dated November 18, 2019.  And

19   the last is dated, which is labeled second supplemental

20   declaration, is dated December 18, 2019.  Sitting here

21   today, and knowing that these would be used as your direct

22   testimony, is there anything in them you'd wish to change?

23             MR. BRADY:  No.

24             THE COURT:  Okay, so they're admitted as Mr.

25   Brady's direct testimony.

1          (Brady Declarations Admitted as Direct Testimony)

2          THE COURT:  You can go ahead, Mr. Masumoto.

3              CROSS-EXAMINATION OF DEVON BRADY

4    BY MR. MASUMOTO:

5    Q    Thank you, Your Honor.  Good afternoon.  My name is

6    Brian Masumoto for the Office of the United States Trustee.

7    Good afternoon, Mr. Brady.

8    A    Good afternoon.

9    Q    MR. Brady, with respect to your -- I'll refer to them

10   as your initial declaration, first supplemental and second

11   supplemental, is that all right?

12   A    Yes.

13   Q    With respect to your first, the initial declaration,

14   the disclosures you made with respect to the Sacklers were

15   contained in Paragraph 27 and 28, is that correct?

16   A    Yes.

17   Q    Okay.  In Paragraph 27, you refer to Ian White.  Ian

18   White provides the Sackler -- when I refer to Sackler, it's

19   the Sackler, the trusts and any of the related entities --

20   certain services for the Sackler Family, is that correct?

21   A    Yes.

22   Q    And similarly, there was a reference to the Ernst &

23   Young Global Limited member firms outside the United States

24   providing services to various Sackler entities, is that

25   correct?

Page 38

1    A    Yes.

2    Q    All right, in your first supplemental declaration, you

3    provided some additional detail as to those services, is

4    that correct?

5    A    Yes.

6    Q    With respect to the initial declaration, did you draft

7    that declaration in its entirety?

8    A    The initial one?

9    Q    Yes.

10   A    With the help of internal counsel and external counsel,

11   yes.

12   Q    So with respect to Paragraph 27 and 28, did you provide

13   that language or was that language drafted by counsel?

14   A    I don't exactly remember.  It was a combination of all

15   parties.

16   Q    Okay, at the time you drafted that declaration -- I'm

17   sorry, was it your individual counsel, or was it Debtor's

18   counsel that worked with you on the declaration?

19   A    It would be --

20   Q    Or both?

21   A    I'd be both, I believe.

22   Q    Okay, so at the time the initial declaration was

23   drafted, and Paragraphs 27 and 28 were drafted, did you

24   disclose, or were all of the -- were all counsel aware of

25   the information that you provided in your supplemental

Page 39

1   declaration?  Your initial, first supplemental declaration.

2   A    I believe we were waiting for consent, to be able to

3   provide the additional information that's in the first

4   supplemental declaration.

5   Q    I'm sorry, what consents did you require in the first

6   supplemental?

7   A    We were waiting for consents to disclose the additional

8   information, the nature of the services that's in the first,

9   the first supplemental disclosure.

10  Q    Was there any reason why you didn't make reference to

11  the consents and the intent to supplement the disclosure?

12  A    In which, in which --

13  Q    In your initial disclosure, in your initial

14  declaration, did you indicate that you would be filing a

15  more detailed supplemental declaration regarding those

16  services?

17  A    I don't remember at the moment.  I don't have the

18  declaration in front of me.  I don't remember if it was

19  stated or not.

20  Q    Okay, if -- with respect to Paragraph 27, it states in

21  addition to its work for the Debtors, EY, LLP provides

22  services for various trusts that are held by members of the

23  Sackler Family (Sackler Trusts) and for certain entities

24  that are owned by one or more Sackler Trusts, or by members

25  of the Sackler Family, (Sackler Entities).  So does that

Page 40

1   refresh your recollection as to whether or not you were

2   advising as to any supplemental disclosures?

3   A     I'm sorry, I'm not understanding the question.

4            THE COURT:  I'm not either.  And why are we

5   bothering with this, since there is a supplement?

6            MR. MATSUMOTO:  Well, Your Honor part of the

7   concern in this case is what details should have been

8   provided at the outset.  Why wasn't the more detailed and

9   expanse of services indicated in the original retention?

10  Quite frankly, it raises concerns from my perspective that

11  these detailed services were not initially identified.  Or,

12  at the very least, if as testified, the reason it wasn't

13  disclosed is because they intended to follow up with such

14  more detailed description.

15           Part of the concern is whether or not the

16  intention was in fact minimized, the relationship with the

17  E&Y entities and the Sackler entities.

18           THE COURT:  Well, why don't you ask that question?

19  BY MR. MASUMOTO:

20  Q     Well, Mr. Brady, was there an intent to, attempt to

21  minimize the nature of the services that were being rendered

22  to the Sackler entities in your first initial declaration?

23  A     No.

24  Q     So what, when you drafted the initial declaration, it's

25  your representation that you intended to file a supplement

1    with the more detailed services?

2    A    I don't remember exactly, but we were waiting for

3    consents to be able to disclose the nature of those services

4    that are provided by Ernst & Young Global firms.

5    Q    All right, let me ask you a question with respect to

6    the audit report that was recently filed with the Bankruptcy

7    Court, the work being performed by --

8              THE COURT:  It's not an audit report.

9    BY MR. MASUMOTO:

10   Q    I'm sorry, the special cash transaction report that was

11   filed with the Court.  Are you familiar with that report?

12   A    I'm familiar with it from media outlets, yes.

13   Q    Do you know -- was E&Y consulted when that work on the

14   report was commenced?

15   A    We were asked to participate in an interview by

16   AlixPartners, but we did not end up participating at all.

17   Q    Okay, when did that request occur?

18   A    June of '19.  June of 2019.

19   Q    Okay.  And you said who made the request?

20   A    AlixPartners.

21   Q    AlixPartners requested to interview you?

22   A    Yes.

23   Q    And you said that that interview did not occur?

24   A    I referred it to my counsel, and I don't know where it

25   went from there, but we did not participate.

Page 42

1   Q    Okay.  Was there any reason why, to your knowledge, was

2   there any reason why E&Y wasn't requested to perform that

3   report?

4   A    I am not aware of any reasons.

5   Q    Would E&Y have been capable of providing that report?

6   A    To be honest, I don't know.  I'd have to go and check

7   our independence rules and our service protocols.  But I

8   don't know if we would be able to or not.

9   Q    Okay.  During the course of that, the preparation of

10  that report, were you aware as to whether or not the audit

11  report -- I'm sorry, the special report investigated or

12  analyzed your compliance with the accounting rules?

13          MR. TOBAK:  Mark Tobak, Davis Polk & Wardwell for

14  the Debtors.  I hesitate to make the first evidentiary

15  objection in these matters, but I'm not sure that there's

16  been any foundation laid to why Mr. Brady would understand

17  when, the various time that report was being prepared, which

18  was the basis of this question.  So if we could be a little

19  bit clearer for the record about the question being asked.

20  BY MR. MATSUMOTO:

21  Q    The question being asked is whether or not Mr. Brady

22  was aware of whether AlixPartners was analyzing or reviewing

23  its audit statements for compliance with accounting

24  standards.

25          MR. TOBAK:  Mark Tobak, Davis Polk and Wardwell,

Page 43

1   for the Debtors.  I hesitate to make the first evidentiary

2   objection to these matters, but I'm not sure that there's

3   been any foundation laid to why Mr. Brady would understand

4   when the period of time that report was being prepared,

5   which is the basis of this question.  So, if we could be a

6   little bit clearer for the record about the question being

7   asked.

8           MR. MASUMOTO:  The question that's being asked is

9   whether or not Mr. Brady was aware of whether AlixPartners

10  was analyzing or reviewing its audit statements for

11  compliance with accounting standards.

12  A   I was aware, only because they asked to interview me,

13  so I just -- I drew that conclusion.  But there was no other

14  communication or requests after that first request for an

15  interview.

16  Q   Are you aware that the special report indicates in the

17  disclaimer section that AlixPartners has not subjected the

18  information contained herein to an examination in accordance

19  with generally accepted auditing or attestation standards.

20          THE COURT:  He hasn't read the report.  He just

21  knows about it from media outlets.

22          MR. MASUMOTO:  Your Honor, again, once again, I

23  have no idea, again, what sort of contact he had with

24  AlixPartners.

25          THE COURT:  He testified to that, that was in

Page 44

1    answer to a question about five minutes ago.

2              MR. MASUMOTO:  Very well, Your Honor.

3    Q    Mr. Brady, how long have you been involved in audits

4    with respect to the Debtor?

5    A    I've been on the Audit Team for 19 years.

6    Q    So, you were involved with the audit of Purdue and its

7    related entities in 2015?

8    A    Yes.

9    Q    Were you familiar with the engagement letter that was

10   executed between the Debtor and E&Y?

11   A    Yes.

12   Q    Did you sign it or would someone else have signed it?

13   A    It's signed by a member, the Debtor's management, and

14   it's signed by Ernst & Young.

15   Q    Okay.  Are you aware of any changes to E&Y's

16   responsibility as auditor between 2015 and subsequent years?

17   A    No, no.

18             MR. MASUMOTO:  Your Honor, may I approach the

19   witness with a copy of the engagement letter for 2015?

20             THE COURT:  Okay.

21   Q    Mr. Brady, may I direct your attention to the second

22   page, paragraph six of that engagement letter, which is

23   dated December 15, 2015?  Do you see paragraph six?

24   A    Yes, yes.

25   Q    Paragraph six, the first sentence in paragraph six is,

Page 45

1   if we determine that there is evidence that fraud or

2   possible illegal acts may have occurred, we will bring such

3   matters to the attention of the appropriate level of

4   management.  Is that a correct recitation of that provision?

5   A    Yes.

6   Q    Okay.  Is that different from the language with respect

7   to the 2018 and 2019 engagement letters?

8   A    I don't have the letter in front of me.  I would think

9   they were similar language.

10  Q    I'm looking at your second supplemental declaration,

11  which attaches a copy of the November 7, 2018 engagement

12  letter.  In paragraph six it reads, "If we are made aware of

13  evidence that fraud or possible noncompliance with laws and

14  regulations may have occurred, that could have a possible

15  material and adverse impact to the consolidated financial

16  statements.  We will bring such matters to the attention of

17  the appropriate level of management."  Does that sound like

18  an accurate recitation of the provision?

19  A    I don't have it in front of me but it sounds correct.

20  Q    Is there any reason for the difference in language,

21  whereas, wherein the 2018 you say, "If you're made aware of

22  evidence that fraud …," etc., and the 2015 language, "If we

23  determine that there is evidence of fraud …"?

24  A    I'm not sure.  I don't know.

25  Q    Was there any change in E&Y's obligation to investigate

1    or uncover fraud between those two different engagement

2    letters?

3    A    I'm not aware of any.  I don't know the reason why the

4    language changed.  I'd have to ask my company.  But I don't

5    know.

6    Q    All right.  Just a final question.  If, for example,

7    it's determined that there were errors or omissions in prior

8    audits, and there are potential causes of action against

9    E&Y, what would E&Y's position be?  Would you be able to

10   continue the performance of your services?

11   A    If there was what?  Please explain that.

12   Q    If, in fact, based upon examination by other

13   individual, other entities, there is some concern about your

14   prior audit reports, the audit statements that you filed in

15   prior years, and there is a cause of action brought against

16   you, is there any -- what is E&Y's position with respect to

17   its ongoing performance of its audit services for 2018 and

18   2019?

19   A    We stand behind our previously issued reports.  If some

20   party came to Ernst & Young with an accounting problem, it

21   would be evaluated for potentially restatement of the

22   financial statements, but that exercise would have to be

23   gone through by all parties and agreed to by EY.  If there

24   was some -- someone told EY that they believed that the

25   financial statements were materially misstated, that would

Page 47

1    be evaluated.  It would have to be evaluated by the parties

2    in EY to make a determination if it had to be restated.

3    Q    Would it affect your performance of the services for

4    which you're seeking to be retained, i.e., the completion of

5    2018 and the audit for 2019?

6    A    The individual situation would have to be evaluated on

7    its seriousness and its merits.

8            MR. MASUMOTO:  No further questions, Your Honor.

9            THE COURT:  Okay.  Any redirect?

10       MR. TOBAK:  Just a few questions, Your Honor.  CROSS-

11                          EXAMINATION

12   BY MR. TOBAK:

13   Q    Good afternoon, Mr. Brady.

14   A    Good afternoon.

15   Q    Mark Tobak, Davis Polk & Wardwell LLP for the Debtors.

16   You were asked a series of questions by Mr. Matsumoto about

17   the difference between disclosures in your declaration and

18   in your first supplemental declaration.  Do you recall that?

19   A    Yes.

20   Q    Do you recall the date of your first declaration?  Was

21   it November 5th?

22   A    Yes.

23   Q    Okay.  And is it correct that your supplemental

24   declaration was filed on November 18?

25   A    Yes.

1   Q     Only a few weeks afterwards, is that correct?

2   A     Yes.

3   Q     At the time, why is it that there's more detail about

4   work that EY LLP performed for members of the Sackler

5   Family, and trusts for the benefit of the Sackler Family in

6   the first supplemental declaration than there is in the

7   initial declaration?

8   A     We were waiting for consents from the correct parties

9   to be able to disclose the nature of services provided by

10  global EY firms.

11  Q     And when you say consents, could you explain a little

12  bit on what a consent is that you were waiting for?

13  A     We were waiting for the ability to disclose the nature

14  of the services in the declaration, from the, essentially,

15  the clients abroad.

16  Q     And is it correct that -- you say the ability in

17  consent, is that because you have a professional obligation

18  not to disclose confidential information without the

19  client's consent?

20  A     Correct.

21  Q     And were you waiting for that consent at the time you

22  filed your declaration on November 5th?

23  A     Yes.

24  Q     No further questions.

25        THE COURT:  Okay.  You could step down.

```
 1              MR. HUEBNER:  Your Honor, before I turn the podium
 2      back to Mr. Robertson, just because the Special Committee
 3      Report has been referred to several times and that's not
 4      something that has visibility into, there's one thing that I
 5      do want to make very clear, both for the Court and for
 6      everyone:  The AlixPartners report, which obviously, that
 7      Davis Polk special (indiscernible) lawyers, were deeply
 8      involved in, has, very early on, an entire page called
 9      "Sources Relied Upon," and I do think it's important just to
10      pause for a minute, that everybody understand the
11      extraordinary depth and breadth of the work that was done.
12      And there are 13 items.  One of the 13 items is the audited
13      financials from the past.  The other 12 were independent
14      verification of every single dollar that left the company.
15      And so, it's important, just for the avoidance of doubt, the
16      13 items are:  the entity organizational charts; the SAP
17      accounting system information; internally prepared
18      distribution reports, audited financial statements; internal
19      financial statements reports, schedules and SAP accounting
20      records; accounting and approved documentation for cash
21      distributions; the complaints filed by the states; payroll
22      and compensation records; legal expense reports prepared by
23      the legal department; pension benefit records and related
24      documentation; T and E reports (indiscernible) directly;
25      fringe benefit records and interviews of Purdue, PPI,
```

1       Rhodes, TXP and One Stanford Realty employees.

2               And so, just to be clear, I don't think a special

3       committee would have agreed to retain E&Y to work and

4       prepare the reports for any number of reasons.  A, because

5       it's not the appropriate function of the company's auditor;

6       B, because they've been around for a long time, and part of

7       what's, I think, very important for the Court and the world,

8       is that new professionals with no prior connectivity to the

9       situation, who were not there prior to 2018, did all of the

10      work of verification.  And so, again, just for the avoidance

11      of doubt, cross-checking their like line item by line item

12      work in the Debtor's accounting records against the audited

13      financials, there's only one of 13 sources of information

14      that the Special Committee Report Team relied upon.  And

15      just to reinforce what Your Honor said, as far as we know,

16      and I think we know, there were no distributions in 2018,

17      whose audit is just about over.  And there certainly will be

18      none in 2019, which is the time period for the

19      (indiscernible) that we're talking about.

20              So, just from the sort of, you know, purity of

21      process, integrity of independent analysis and

22      investigation, I think the fact that they are being retained

23      as the auditor is something that I want to make sure that

24      there's no chance it gets lost in the shuffle.  They're not

25      doing any of the advocacy and analysis work there.  And I

Page 51

1    apologize to E&Y, they are just the auditor and not more

2    than that.  Mr. Robertson?

3              MR. ROBERTSON:  Thank you.  For the record again,

4    Christopher Robertson, Davis Polk on behalf of the Debtors,

5    just three very, very brief points.

6              THE COURT:  I think we should hear the objection

7    first.  I mean I still don't really quite understand the

8    objection, but why don't we hear it?  I mean, you can

9    respond to the objection.

10             MR. MASUMOTO:  Thank you.

11             THE COURT:  I understand that the Debtors have the

12   burden of proof, but you already had opening argument, which

13   I normally have after the evidence, but let's just go to the

14   objection.

15             MR. MASUMOTO:  Brian Masumoto for the Office of

16   the United States Trustee.  Your Honor, the concern that the

17   US Trustee has, is that E&Y, as a retained professional, has

18   certain fiduciary obligations to the estate.  What

19   seemingly, belatedly was disclosed, was that they also

20   represent the Sackler family which, in this context is a

21   critical component of this bankruptcy.  Part of the main

22   structure of the going-forward effort of this case is to

23   determine whether or not the proposed $3 billion

24   contribution by the Sacklers is adequate.  The cash transfer

25   itself indicated that there's about $10.4 billion that the

Page 52

1    Debtors, since 2008, distributed to the Sacklers.  In

2    addition, as indicated in this special report, the special

3    report does not include non-cash transfers which,

4    apparently, AlixPartners is ongoing.  It's been -- I've been

5    advised that the amount of non-cash transactions is

6    significantly less than the amount of the cash transaction.

7    But we're talking about fairly large numbers.  I believe the

8    non-consenting states filed it in their objection.

9              THE COURT:  They're providing -- they're doing an

10   audit.

11             MR. MASUMOTO:  Yes, Your Honor, and the audit

12   would presumably, in the past, have audited those transfers

13   that were made to --

14             THE COURT:  Adverse interest is defined in the

15   present tense.

16             MR. MASUMOTO:  That's correct, Your Honor, and it

17   seems to me that certainly some of the transfers that have

18   occurred may have subsequent repercussions or consequences

19   in subsequent years.

20             THE COURT:  How, in an audit, of the new years,

21   where there's absolutely no evidence that there will be any

22   -- there have been or will be, in the two audit years that

23   they're being retained to handle?

24             MR. MASUMOTO:  Your Honor, I'm not an accountant,

25   I can't say, but I would --

1          THE COURT:  No, you're not, but you do have an

2     obligation to explain to me why there is an adverse interest

3     here as opposed to mere speculation --

4          MR. MASUMOTO:  Your Honor, the distributions that

5     occurred --

6          THE COURT:  -- of a potential lawsuit over

7     something that may have happened in the past, where here's

8     no allegation of any auditing issue whatsoever, unlike in

9     the WorldCom case, unlike in the Delphi case, where there

10    was.  And nevertheless, the Courts in both of those cases

11    said that the concern raised by the objectors, was not even

12    a potential actual conflict but a hypothetical, speculative

13    conflict.  And consistent with AroChem, that is not a

14    disqualifying adverse interest, period.

15         MR. MASUMOTO:  Your Honor, from the standpoint of

16    view as Trustee, the fact that it had substantial experience

17    and background with respect to the Debtors prior financial

18    condition, could have a potential impact upon its -- the

19    performance of the services currently.

20         THE COURT:  How, in the conduct of an audit?  How

21    would you even be motivated to somehow do that in an

22    unprofessional or conflicted manner?  The only issue you've

23    raised is one over transactions with members of the Sackler

24    family or their trust, but it is -- the record is crystal

25    clear, for 2018 and 2019, there are no such transactions.

1           MR. MASUMOTO:  Your Honor, I can't necessarily

2    predict whether or not there may be any subsequent

3    ramifications as a result of prior audits, whether or not

4    there are any flow-through or follow-on effects from prior

5    audits.  And in that context if, in fact, there were any

6    problems that did occur in the prior years, it would seem to

7    me that they would have a concern as to whether or not their

8    current audit --

9           THE COURT:  But Mr. Masumoto, that's entirely

10   hypothetical.  I mean, you're imagining something where

11   there isn't even an allegation as far as audit problems as

12   opposed to the problems, the issues, the very serious issues

13   that the Debtors have separately, with separate

14   professionals, investigated and are continuing to

15   investigate, with the Creditors Committee and multiple other

16   interested parties, including state governments.  Whereas,

17   in WorldCom, there were restated financial statements;

18   whereas in Delphi, there were ongoing class action lawsuits

19   against the auditor.  And even there, the courts found that

20   this was too speculative an objection.  I just -- I don't

21   see it here.  I understand the US Trustee is a watchdog.

22   And I understand that the initial disclosure was, in fact,

23   vague as to what the role was on an ongoing basis, a present

24   tense basis.  But given that they are solely being an

25   auditor, and given that you would have to get through

Page 55

1    enormous levels of oversight as far as transfers to the

2    Sacklers, which would be the only thing they'd be auditing

3    in 2018 and 2019 that would raise a conflict, either direct

4    or indirect -- I just -- this is -- this should -- I'm going

5    to deny this objection.  I mean, this just -- it doesn't

6    make sense.  I'm sorry.

7              Under the case law, which is clear, you have to

8    have shown to be retained that you do not hold or represent

9    an adverse interest to the bankruptcy estate, and that you

10   must be disinterested.  I don't believe there is any

11   allegation that the whole point exists here.

12             It's just based on representing an adverse

13   interest which, frankly, under the case law, is recognized

14   by multiple cases, overlaps with the disinterestedness

15   standard, although the disinterestedness standard lays out

16   various types of representations that can be a case where

17   one is interested if they are materially adverse.

18             I just don't see material adversity here.  The

19   cases are clear, stemming from In Re AroChem 176 F.3d 610

20   623 (2d Cir. 1999), "The term adverse interest means one, to

21   possess or assert any economic interest that would tend to

22   lessen the value of the bankruptcy estate, or that would

23   create either an actual or potential dispute in which the

24   estate is a rival claimant; or two, to possess a

25   predisposition under circumstances that render such a bias

1    against the estate."

2           Now, the courts, in interpreting that language,

3    have dealt with the issue of a potential conflict, not an

4    actual current conflict, but a potential one, and repeatedly

5    have held that a professional has a disabling conflict if it

6    has either a meaningful incentive to act contrary to the

7    best interests of the estate and its sundry creditors; an

8    incentive sufficient to place those parties at more than

9    acceptable risk, or a reasonable perception of one.  That's

10   Granite Partners, 219 B.R. 22, at page 33, (Bankr. S.D.N.Y.

11   1998).

12          Leslie Fay has held, or has added a third fillip

13   on that concept of plausibility in saying that if an

14   incentive exists it would tend to lessen the value of the

15   estate or predisposition of bias against the estate.

16   There's a disabling conflict.  But the Courts have then gone

17   onto say, repeatedly, and as most recently by the Second

18   Circuit at In re Ampal-American Israel Corp, 691 Fed. Appx.

19   12, (2d. Circuit, May 24, 2017).  They have to be presently

20   competing adverse interests.  So, you look at the present

21   tense.

22          And further, as stated in AroChem, and is

23   reiterated in Enron, WorldCom and in re Delphi Corp. 2006,

24   US District Lexus 34423, (SDNY May 30, 2006).

25          Speculative concerns about potential conflicts

Page 57

1    that are not currently actual, or rise to the level of a

2    reasonable, plausible legitimate conflicts that are not

3    currently actual or rise to the level of a reasonable,

4    plausible legitimate concern that a separate economic

5    interest will lessen the value of the services to the

6    bankruptcy estate or somehow affect the diligence of the

7    professional in dealing with bankruptcy estate, is not

8    enough.  You need more than that.

9         And the WorldCom case that I referenced earlier,

10   311 B.R. 151 (Bankruptcy SDNY 2004), and the Delphi case

11   that I just cited, both involved firms that were hired to do

12   audits, who had previously worked for the Debtors when there

13   was far more concern about the audits themselves that had

14   previously been done by those firms.  But the role in the

15   particular audit didn't tie into their conflict, which is

16   with regard to a past audit.

17        Here there's no conflict raised with regard to a

18   past audit.  And the conflict that they have admittedly, the

19   potential conflict here, is because they represent Sackler

20   entities.  And the they we're talking about here is E&Y LLP,

21   with regard to the landlord doing their audit, when there's

22   no issue that the rent has been too low or mischaracterized,

23   and foreign E&Y entities with regard to foreign Sackler

24   entities.

25        But again, we're talking about an audit of a

1    company that's not making any transfers to any of the

2    Sacklers.  It doesn't exist.  If the issue comes up ever,

3    they have a duty to disclose before they get paid.  And

4    frankly, they have a duty to disclose it promptly if there

5    ever is something more than a speculative conflict.  But it

6    just, on this record, it doesn't exist.  It's not --

7    therefore, at this point -- it was when you filed it -- at

8    this point it's not an appropriate objection under the facts

9    of this case.  So, I'm going to deny the objection and grant

10   the application.

11            MR. MASUMOTO:  Very well, Your Honor.  Thank you.

12            THE COURT:  Okay.

13            MR. HUEBNER:  Your Honor, one last, I guess, note

14   on this point.  I don't want to -- it's dangerous to

15   prognosticate, but I'm quite confident that had this special

16   committee's work uncovered that when the actual ledger,

17   cross-checks and SAP payment crosschecks system were done,

18   that had the things that Mr. Masumoto is worried might be

19   the case, which is that the audits inaccurately stated or

20   understated or hid or didn't have distributions to

21   shareholders, the probability that theirs would be

22   proceeding today with (indiscernible) of ENY is that a

23   minimum --

24            THE COURT:  Maybe.  You don't know.  As both the

25   WorldCom and Delphi cases that I cited state, there are

1    problems with audits but they come in different degrees.

2    Some of them are just involved, just involve exercises of

3    judgment, and you can sue over exercises of judgment.  It's

4    much harder to win on exercises of judgment.  And if there's

5    clear fraud or clear negligence, it's another story.  So,

6    you just don't know, but no new allegations anywhere here.

7           MR. HUEBNER:  That's even better then.  That's my

8    point, which is E&Y's cataloging of the distributions has

9    now been crosschecked in a 400-page report by a subsequent

10   professional who went back to the ledger, and we actually

11   don't know of any difference.  And that, I think is a

12   fortiori squared in the other direction.

13          If a problem comes up, we will certainly move to

14   address it and discuss it, but in fact, their work has been

15   checked by AlixPartners and the Special Committee and it

16   appears to be accurate from what we know.

17          THE COURT:  Okay, in any event, that's --

18   certainly, no one has said anything to the contrary.  S, I

19   really think we are in the realm of pure speculation at this

20   point.

21          MR. HUEBNER:  Agree, Your Honor.

22          THE COURT:  And the case law is clear, that's not

23   a basis to disqualify a professional retention.

24          MR. HUEBNER:  Thank you, Your Honor.  We'll submit

25   an order.  So, Your Honor, there is one last item on the

Page 60

1    agenda, and actually, not a bad segue from integrity and

2    transparency from the perspective of the Debtors.

3            Your Honor, when you were speaking at the end of

4    the introductory session, and you referenced that the Court

5    takes very seriously filings made by political entities who

6    wear sort of two hats, I wasn't sure if you were referring

7    to the quote, notice with respect to public health filed.

8            THE COURT:  Anyone who -- frankly, anyone who

9    files something I take seriously.  But that includes

10   politicians.  They're not in a lesser category.  But I was

11   referring to the letters from senators.

12           MR. HUEBNER:  I wasn't sure.  So, Your Honor, I'm

13   going to begin and then pause for a minute because I think

14   that the Court's reflection back actually matters how we

15   proceed from there.

16           Your Honor, as the Court may be aware, ten days

17   ago the Ad Hoc Group of Consenting States filed a pleading -

18   - dissenting states, apologies -- denominated the states'

19   notice of public health information to protect Purdue

20   patients, even though it was actually filed by the

21   dissenting states, not by the states.

22           This so-called notice is very troubling to the

23   Debtors both procedurally and substantively.  It is a

24   pleading that is not only, not only for today, but really

25   for any hearing ever, because it seeks no relief of any

1    kind, either from this Court or any other court.  Rather, it

2    is essentially a position paper that makes a variety of

3    claims and, in essence, levels some quite serious and

4    unfounded accusations against the Debtors.

5           The non-consenting states courteously sent us a

6    draft of it before they filed it.  We strongly and

7    repeatedly asked them to please not file it, but instead set

8    up meetings, calls with us that we are ready to do, starting

9    almost immediately, to discuss the substance of the issues

10   in the document.  They refused to do that and instead chose

11   to file the pleading.

12          So, Your Honor, here's sort of the choice.  I have

13   five brief points that sort of part of me wants to make,

14   because there things in this pleading that we find very

15   difficult to leave on the record without response, including

16   things with respect to potential gargantuan administrative

17   claims that are currently being incurred, which has

18   implications to all parties in the case.

19          On the other hand, candidly, I don't want to --

20   part of what I would be talking about is that taking the

21   docket of a Federal Court and turning it into a public blog

22   where people can just file things that they would like other

23   people to read is one of my five points as to its

24   impropriety and I'm actually also a little bit wary and

25   reluctant in balancing, trying to not let what in many cases

Page 62

1    are statements -- statements of law, statements of fact --

2    and accusations go unresponded to.

3            On the other hand, I -- for example, if the Court

4    says, I haven't read it, I'm not going to read it, I don't

5    think it belongs on the docket and no one else should be

6    doing things like this, then maybe I can desists, but if

7    those things are not true, we're just -- we're put in a very

8    difficult situation.  When people file pleadings that seek

9    relief and attach admissible evidence, as lawyers, we know

10   what to do.

11           We try to work it out.  If not, we file responsive

12   pleadings.  There's a hearing scheduled.  There are rules

13   that govern.  When people just file missiles at us on the

14   docket of our own case, it's much more challenging to know

15   what to do and so, again, I only have five points to make,

16   Your Honor.

17           THE COURT:  Well, I would encourage you not to

18   make them.  I think that -- I mean, I have read the notice

19   and I have it in front of me, actually.  And maybe it would

20   help you to hear how I view it.  First of all, this isn't

21   just a blog notice.  The states and governmental entities

22   that file this notice are active players in this case and

23   they have taken serious positions in the case when matters

24   were before me to be decided, so I don't discount it.

25           On the other hand, it's very clear from the notice

Page 63

1    that this does not seek relief.  So I viewed it as, in some

2    respects, simply showing the parties in interest in the case

3    that these states are thinking seriously about the problems

4    that they address, but that they're not seeking relief.

5    They're not invoking a request for findings.  They're just

6    stating their views.  I also think they were careful to say

7    that they actually don't believe that there are any claims

8    today, but that they have a concern.

9            I'll also note that the nine actions listed in the

10   notice are all listed in the form of questions and that's

11   fair because they acknowledge that these issues are issues

12   to think about, not to act on.  They're asking, I believe,

13   the Debtors and other parties in interest to think about

14   these issues and that's all I took it as.  Part of those

15   issues may -- some of those issues may relate to the

16   emergency fund, maybe, because some of the questions could

17   be answered with the expenditure of money.

18           Some really involve public relations.  Some are

19   probably appropriate for a monitor to consider.  And I'm

20   sure there are answers that other parties in interest in the

21   case could provide in a dialog that should be behind the

22   scenes, not open in public at this point.  So I don't think

23   the Debtors or any other party in interest is waiving any

24   rights by not responding to this.  The more one does it, the

25   less meaningful it is.  I'm looking over at counsel for the

1    24 states at that point.

2            MR. TROOP:  (indiscernible).

3            THE COURT:  Well, what I'm saying is, what I'm

4    saying is, fine to do it once.  You don't want to just keep

5    doing it because it just loses its effect and it becomes

6    more of a statement that's more for people outside the case

7    and that that's really -- loses its meaning as far as what's

8    actually being done.  So I think we should leave it at that.

9            MR. HUEBNER:  That --

10           THE COURT:  People should discuss these points as

11   well as other points that are relevant to, again, how should

12   the Debtor properly address the opioid crisis.  How should

13   address it?  It is a legitimate question to ask whether

14   there should be some tradeoff between the value of the

15   Debtor and actions that might reduce the value of the

16   Debtor.  That's a legitimate question.

17           MR. HUEBNER:  We certainly agree.

18           THE COURT:  I think that's something that a

19   monitor would address as well as the Debtors and the

20   Creditors Committee and everyone else in the case.  I view

21   this as trying to break down that question into little more

22   detail.  And I'm sure, since these nine points are not

23   demands, they are questions that people could ask questions

24   back.  I would strongly request that they not be filed on

25   the docket as questions because that doesn't really mean

Page 65

1    anything, but that dialog or multiparty discussion occur

2    behind the scenes.

3            And I'm assuming it is occurring and will occur in

4    the first instance as part of discussing the emergency fund,

5    but also in connection with the plan.  I mean, just the

6    first four of these cases are things that, for example, the

7    Debtors discuss like providing naloxone.

8            MR. HUEBNER:  Yes.

9            THE COURT:  The Debtor raised that on the first

10   day of the case.  The emergency fund could well include, for

11   example, providing, in effective ways, for substance use

12   treatment.  An emergency fund and a plan could provide in

13   effective ways for PR and whether it's the FDA or not -- and

14   I said this at the injunction hearing -- the parties have

15   the ability in this case to set a standard, not an FDA

16   standard but a best practices standard.  They can do that.

17           So I don't necessarily view this as a hostile

18   pleading.  It doesn't seek relief.  It just raises points

19   that I firmly believe that the parties are already

20   discussing and the Debtors have raised themselves.

21           MR. HUEBNER:  So, Your Honor, I will, of course

22   take the Court's direction.  It's actually more complicated

23   than that and, frankly, the refusal to engage in dialog and

24   instead file it was a complicate choice and some of the

25   items that are raised in the nine questions are expressly

1    items that were addressed differently in the injunction and

2    self-injunction agreed to, negotiated, and executed by this

3    Court and now, we get a pleading a few weeks later,

4    essentially, to

5              THE COURT:  Well --

6              MR. HUEBNER:  So, look, I will refrain --

7              THE COURT:  But they're stated as questions, not

8    demands -- although that's how it was reported -- and I

9    believe that --

10             MR. HUEBNER:  But Your Honor --

11             THE COURT:  -- a little slack needs to be given

12   because you're dealing with so many governmental entities,

13   so many political agendas.  It's hard to corral folks

14   sometimes.

15             MR. HUEBNER:  Yeah.

16             THE COURT:  I would urge everyone, as I think both

17   their counselors said, all 50 states -- well, maybe 48

18   because of the two settlements, but then --

19             MR. HUEBNER:   Right.

20             THE COURT:  -- you have D.C. and the territories -

21   -

22             MR. HUEBNER:  And, Your Honor, your example --

23             THE COURT:  -- should be working together with the

24   Debtors and this is give an take and, frankly, if you do it

25   behind the scenes and come up with a result that hasn't yet

Page 67

1   been come up with on a national basis for sure, to me,

2   politically, everyone's ahead of the game as well as, of

3   course, societally.  So please get on with it.

4           MR. HUEBNER:  Yeah.  So Your Honor, I'll --

5           THE COURT:  That's to everyone here, not just to

6   the Debtors.  That's to everyone here.

7           MR. HUEBNER:  Yeah.  Understood for today.  Again,

8   because some of these issues are, in fact, before the FDA,

9   required to be before the FDA, as also set forth in this

10  self-injunction, there are things in here including -- which

11  I'm not going to get into today -- the statistics and the

12  allegations that we actually don't think we can even respond

13  to, because candidly, harming at this point the estate is

14  actually detracting from the ability to provide naloxone and

15  provide rescue therapies and provide amelioration.

16          THE COURT:  This is a discussion that should be

17  had behind the scenes.

18          MR. HUEBNER:  We've --

19          THE COURT:  If someone want to object to an actual

20  proposal, they'll have the ability to do so.  Hopefully,

21  they won't.  Hopefully, it'll be consensual.

22          MR. HUEBNER:  And that was our primary point, Your

23  Honor, which I think we've achieved which is hopefully we'll

24  have more productive behind the scenes conversations as Your

25  Honor has abjured us at multiple hearings.

Page 68

1              THE COURT:  Okay.

2              MR. HUEBNER:  We have nothing further, then, Your

3     Honor.  I think --

4              THE COURT:  Okay.

5              MR. HUEBNER:  -- you've addressed this last issue

6     which was of grave concern to us and we'll figure out the

7     way forward in light of the Court's direction.

8              THE COURT:  Okay.

9              MR. TROOP:  And, Your Honor, if I may, just a

10    couple of minutes?

11             THE COURT:  Briefly, okay.

12             MR. TROOP:  Sure, just a couple things.  On this

13    last point, we are -- we, the members of our group, are

14    prepared to discuss every one of those and other issues that

15    address public health on a current basis with the Debtors

16    and other constituents, but there were a couple of things

17    earlier in the case I just want to confirm for you, although

18    I -- just to be clear.

19             THE COURT:  All right.

20             MR. TROOP:  No dissenting state is exercising its

21    (indiscernible) rights today.  On the AlixPartners report,

22    we think the Debtors, we're sure that others besides our

23    group asked them to put it on the docket as a way to avoid

24    fights over what it was and what it said and we think that's

25    extremely important.

1              On Landau, Your Honor, there is some information

2    confirmation that we're still waiting.  I don't want to

3    suggest to you that we will actually get to a compromise on

4    Landau, but if we don't, we're working to make sure with the

5    Debtors that what you have in front of you is a full record

6    of what Dr. Landau received in payments prior to the

7    filling, which I think is the factual issue that --

8              THE COURT:  And what he gave up.  And what he gave

9    up.

10             MR. TROOP:  Absolutely, Your Honor.  Both sides of

11   that equation.

12             THE COURT:  Okay.

13             MR. TROOP:  Nothing to say further on the monitor,

14   the protective order.  The defense presentation on the state

15   stipulations, Your Honor, we are making progress.  There

16   continues to be an open issue about whether there should be

17   a distinction between what members of the non-consenting

18   state group get and members of the consenting state group

19   get.  We're trying to work around that creatively, but we

20   might need to be back to you on some help.

21             On ERF, I reiterate what I said earlier about

22   we're all working on that as well.  Lots of time has been

23   spent.  On the dischargeability objection issue, and I'm

24   sure that this is embedded in what will happen in the bridge

25   order, that whatever -- if there's some interim relief given

1    with regard to the deadline, it will need to extend beyond

2    the date on which there's a hearing on the motion to extend

3    the deadline because otherwise, there'll be a disconnect, so

4    just in terms of that from a logic perspective, I talked to

5    Mr. (indiscernible) about it earlier today.

6             He completely understood it, but just so you know

7    when you see the bridge order, if there's not something that

8    lines up between the hearing date and the bridged extension

9    of the deadline, it's to address to the --

10            MR. HUEBNER:  Well, I mean, I don't -- I think the

11   Court will agree we don't need a bridge order.

12            THE COURT:  I don't think you need a bridge order

13   because it's not worded in the sense that -- I mean, there

14   will be a hearing on it and under the local rules that

15   extends to the date of the hearing and I will rule from the

16   bench and everyone will rely on it and --

17            MR. TROOP:  I guess I'm just identifying what I

18   see as a --

19            THE COURT:  I don't --

20            MR. TROOP:  -- as an issue on the bridge order,

21   but on the local rules --

22            THE COURT:  I don't think it is.  I mean, I think

23   -- there's no such thing as so ordering a record, but

24   frankly, this is a pretty simple order to so order and if it

25   doesn't get entered that day, I will state my ruling on the

Page 71

1    record and everyone can rely on it.

2         MR. HUEBNER:  Yeah.  Your Honor, for

3    (indiscernible), our hope is that there'll be a notice of

4    presentment and that hopefully there'll be able to object --

5         THE COURT:  Right.

6         MR. HUEBNER:  -- and it'll even be entered before

7    the January 6 (indiscernible).  We'll just -- we'll figure

8    it out.

9         MR. TROOP:  That'll be great.

10        THE COURT:  Okay.

11        MR. TROOP:  Thank you, Your Honor.

12        THE COURT:  All right.

13        MR. TROOP:  Just didn't (indiscernible).

14   Appreciate your time.

15        THE COURT:  Okay.  All right.

16        MR. HUEBNER:  Your Honor, I hope it's not out of

17   order to wish everybody happy holidays.  It's been --

18        THE COURT:  Happy holidays to everyone.

19   Everyone's entitled to take a few days off, I suppose.

20        MR. HUEBNER:  Your Honor, we're going to take that

21   as an order of the Court.

22        THE COURT:  And one more cliché, I hope everyone

23   here does not let the perfect become the enemy of the good

24   and sometimes a lot of hot air can be spent on these issues

25   when really compromise is warranted, and these issues now,

Page 72

1    I'm talking about the emergency fund and ultimately a

2    distribution mechanism under a plan.  So I don't mind

3    raising questions about big thought issues, but narrow it

4    down, quickly.

5              MR. HUEBNER:  Thank you.

6              THE COURT:  Okay.

7

8              (Whereupon these proceedings were concluded at

9    3:32 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya
                              Landanski Hyde
     Landanski Hyde          DN: cn=Sonya Landanski Hyde, o,
7                            ou, email=digital1@veritext.com,
                             c=US
                             Date: 2019.12.26 10:14:49 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 24, 2019