George R. Calhoun V (pro hac vice)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
george@ifrahlaw.com

Counsel for Ironshore Specialty Insurance Company,
formerly known as TIG Specialty Insurance Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>PURDUE PHARMA L.P., *et al.*,[1]<br><br>　　　　　　Debtors. | Chapter 11<br><br>**Case No. 19-23649-rdd**<br><br>**(Jointly Administered)** |

**MEMORANDUM IN SUPPORT OF MOTION FOR**
**RELIEF FROM THE AUTOMATIC STAY**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Ironshore Specialty Insurance Company, formerly known as TIG Specialty Insurance Company ("TIG") by and through its undersigned counsel, hereby file this Memorandum in Support of its Motion Relief from the Automatic Stay and states as follows:

## INTRODUCTION

TIG, The Purdue Frederick Company, Inc. ("Purdue Frederick") and Debtors Purdue Pharma L.P., Purdue Pharma Inc., and Purdue Pharmaceuticals L.P. (collectively with Purdue Frederick, "Purdue") currently are parties to an arbitration proceeding pending in London in connection with the parties' respective rights and obligations under an insurance policy. The parties' disputes as to their rights and obligations under the policy are non-core matters that are subject to mandatory arbitration. Because arbitration is mandated, cause exists to lift the automatic stay and allow the arbitration to proceed. Cause for relief also exists under the 12 factor *Sonnax* test. It would be a more efficient use of judicial resources to allow the appropriate arbitration to move forward forthwith rather than to continue to delay. By way of this motion, TIG seeks relief from the stay to proceed with the foreign arbitration proceeding.

## STATEMENT OF JURISDICTION AND RELIEF REQUESTED

The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334. This Motion to Lift Stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

The Court has the authority to grant the relief requested pursuant to 11 U.S.C. § 362(d) and the decisions cited herein. This is TIG's first request for the relief sought herein.

2

## BACKGROUND

### A. The Claims

In the 1970s, Napp Pharmaceutical Group LP ("Napp") created what came to be known as the "Contin" system, which is a drug delivery system used in the development of tablet forms of sustained-release drugs, including, aminophylline, theophylline, morphine, and other drugs. In 1981, Napp introduced a time-release morphine pill in the United Kingdom using the Contin delivery system.

Six years later, Purdue brought the same drug to market in the United States as MS Contin. In 1995, the U.S. Food and Drug Administration ("FDA") approved Purdue's OxyContin for the treatment in the U.S. of chronic or long-term pain. In or about 1996, Purdue launched OxyContin tablets in the United States.

Purdue has been named as a defendant in hundreds of lawsuits filed in various jurisdictions across the United States since the early 2000s arising out of the manufacture, sale, and distribution of OxyContin, among other opioids (referred to collectively as "OxyContin").

The actions against Purdue involve claims brought by various counties, Municipalities, states, medical providers, third-party benefit payers, and/or state or municipal social service administrative agencies, among other entities, for various pecuniary losses, including, but not limited to, increased costs of medical treatment, social services, law enforcement, prisons, job service programs, premiums, resources, and manpower ("the Complaints").

Plaintiffs in the Complaints generally allege that Purdue has substantially contributed to, and illicitly and tortiously benefited financially from, the prescription drug

3

abuse problem in various jurisdictions. Among other things, the underlying plaintiffs have alleged in the Complaints that:

1. Purdue, through their sales representatives and various advertising campaigns, provided misleading information to physicians and consumers regarding the proper use of and risks associated with OxyContin from as early as when OxyContin was first released into the marketplace in 1996 and at least through 2001. That misleading information in turn prompted the over-prescription of OxyContin that, in part, led to an opioid epidemic.

2. Despite receiving notices from the FDA as early as May 2000 about misrepresentations in its advertisements, Purdue continued to run deceptive advertising schemes all throughout the first decade of the 2000s.

3. Purdue has long been aware of, and has profited from, the misuse and diversion of OxyContin. The first reports of diversion and abuse of OxyContin appeared in about 2000, and there have been countless news reports, lawsuits, government surveys and other data describing the rising toll of addiction, overdose and death from OxyContin since then.

4. Since 2002, Purdue has kept a database of thousands of doctors suspected of inappropriately prescribing its drugs, but did not alert law enforcement or medical authorities to all but a few of these doctors.

4

### B.    The Policy

TIG provided cover to Purdue under a contract of insurance contained in or evidenced by Policy No. XLX 38822826/XEX (the "Policy"). *See* Declaration of George Calhoun, Ex. A.

The period of the Policy was initially July 1, 2000 to October 1, 2002 but was subsequently cancelled with effect from January 8, 2002. The Policy has a Retroactive Coverage Date of July 1, 2000.

The Policy provides cover with limits of $25 million part of $75 million excess $915 million per occurrence excess of underlying limits ("the Attachment Point").

The Policy is subject to New York law, and contains a lengthy arbitration provision that compels arbitration in London. That provision states, in relevant part:

> Any dispute arising under this policy shall be finally and fully determined in London, England under the provisions of the English Arbitration Act of 1950, as amended and supplemented, by a Board composed of three arbitrators to be selected for each controversy as follows:
>
> Any party to the dispute may, once a claim or demand on his part has been denied or remains unsatisfied for a period of twenty (20) calendar days by any other, notify the others of its desire to arbitrate the matter in dispute, and at the time of such notification the party desiring arbitration shall notify any other party or parties of the name of the arbitrator selected by it. Any party or parties who have been so notified shall within ten (10) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator. If the party or parties notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within ten (10) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period often (10) calendar days, apply to a judge of the High Court of England for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator. The two arbitrators, chosen as above provided, shall within ten (10) calendar days after the appointment of the second arbitrator choose a third arbitrator. In the event of the failure of the first two arbitrators to agree on a third arbitrator within said ten (10) calendar

5

day period, any of the parties may within a period of ten (10) calendar days thereafter, after notice to the other party or parties, apply to a judge of the High Court of England for the appointment of a third arbitrator, and in such case the person so appointed shall be deemed and shall act as the third arbitrator. Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed. All claims, demands, denials of claims and notices pursuant to this Section (o) of the Policy shall be deemed made if in writing and mailed to the last known address of the other party or parties.

The Board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may in said written notice or at the time of the commencement of said hearing, at the option of said Board, prescribe reasonable rules and regulations governing the course and conduct of said hearing.

The Board shall within ninety (90) calendar days following the conclusion of the hearing, render its decision on the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto. In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board and the same shall be final and binding on the parties thereto, and such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of fraud or collusion.

All costs of arbitration shall be borne equally by the parties to such arbitration.

* * *

*See* Calhoun Decl, Ex. A., Policy at Section V. Conditions (o).

### C.    Purdue's Assertion of an Entitlement to Coverage

On or about May 10, 2001, Purdue (through its insurance broker) provided notice of four summons and one Complaint to TIG. On or about October 26, 2001, Marsh, on behalf of Purdue, provided TIG with a "Notice of Integrated Occurrence/Declaration of Integrated Occurrence," which explained that it was Purdue's intention to report a "batch occurrence" with regard to the various Complaints. On January 28, 2005, Marsh again on behalf of Purdue wrote to TIG, updating its "batch occurrence" and "integrated

6

occurrence" notice. The May 10, 2001, October 26, 2001, and January 28, 2005 correspondences are referred to as the "Notifications."

### D. The Pending Arbitration

TIG initiated an arbitration against Purdue concerning the Policy by serving a Notice to Arbitrate on October 8, 2018. After the panel was established, TIG served its Statement of Claim on February 28, 2019. Through the arbitration, TIG seeks the following declaratory relief:

a. a declaration that there is no cover under the Policy in respect of the liabilities alleged in the Complaints and/or the Notifications;

b. a declaration that the damages claimed in the Complaints are not damages "on account of" "personal injuries" within the meaning of the Policy;

c. a declaration that any damages claimed in the Complaints "on account of" "personal injuries" within the meaning of the Policy are not covered because the "personal injuries" were incurred prior to inception or after the expiration of the Policy;

d. a declaration that any damages claimed in the Complaints "on account of" "personal injuries" within the meaning of the Policy are not covered "occurrences" because the "personal injuries" resulting from the use of OxyContin were expected or intended by Purdue;

e. a declaration that any liability which Purdue has or may have in respect of the Complaints would otherwise be covered by the Policy is an amount sufficient to reach or exceed the Attachment Point;

f. a declaration that liability under the Policy is excluded by Exclusion (o)(9);

g. a declaration that Purdue has breached the Assignment Condition of the Policy;

7

      h.    a declaration that TIG is not bound by any purported assignment of the Policy by Purdue save where TIG's consent to the assignment has been endorsed on the Policy …

TIG's arbitration claim does not seek any monetary relief against the Debtors.[2]

On or about May 15, 2019, the Debtors filed a Statement of Defence in which they challenged the merits and timing of TIG's claims. TIG filed its Reply on or about June 26, 2019.

On August 29, 2019, the parties attended a case management conference before the arbitration panel. In connection with that conference, they agreed that two preliminary issues should be decided:

    a.    Do the underlying plaintiffs … assert a liability on the part of Respondents for *"damages" "on account of" "personal injury," "property damage," or "advertising liability"* within the meaning of Section I of the Policy? and

    b.    If so, are there any heads of loss claimed by those underlying plaintiffs which are not *"damages" "on account of" "personal injury", "property damage"* or *"advertising liability"* within the meaning of Section I of the Policy and if so which?

The parties were in the process of finalizing a case management order and agreeing upon a hearing date (which had preliminarily been agreed to be scheduled for as soon as possible after June 29, 2020).

On or about September 15, 2019, however, the Purdue debtors filed for protection in this Court under chapter 11 of the United States Bankruptcy Code. Following Purdue's bankruptcy filings, TIG informed the chair of the arbitration panel that they could not proceed with any hearing unless and until they received relief from the automatic stay. Purdue refused to agree to stay relief.

---

[2] TIG does, however, seek an award of costs and fees.

# ARGUMENT

Section 362(d)(1) of the Bankruptcy Code provides that a court "shall grant relief from the stay, . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C. § 362(d)(1).  Because the Code does not define "cause," courts must consider whether cause exists on a case-by-case basis. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).  The movant bears the initial burden of making a showing of "cause" for relief from the stay, but the ultimate burden of persuasion rests with the debtor to show an absence of "cause." *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999); *see also In re Sonnax*, 907 F.2d at 1285 ("The burden of proof on a motion to lift or modify the automatic stay is a shifting one.  Section 362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the burden of proof on the debtor for all issues other than 'the debtor's equity in property.'").  Here, cause exists for relief from the automatic stay, (i) because arbitration is mandatory, and (ii) under application of the relevant *Sonnax* factors.

## I.    Cause Exists to Lift the Stay Because the Underlying Dispute is Subject to Mandatory Arbitration

Cause exists to grant relief from the automatic stay because the Federal Arbitration Act compels arbitration of the dispute between TIG and Purdue.  The Federal Arbitration Act creates a presumption in favor of arbitration. *See Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (instructing that the Arbitration Act establishes a federal policy favoring arbitration); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir. 2000).  Because of the federal policy favoring arbitration, the traditional *Sonnax* balancing test does not apply. *In re Hagerstown Fiber Ltd. P'ship*, 277

9

B.R. 181, 204 (Bankr. S.D.N.Y. 2002) ("*Sonnax* balancing does not apply, and the strong federal policy favoring arbitration trumps the usual considerations of judicial economy and efficiency which are important factors under Sonnax."). Thus, arbitration may be necessary even though it could require multiple litigations. *Id.* ("The recent Second Circuit and district court decisions ... have clarified and circumscribed the bankruptcy court's discretion to deny arbitration.").

In the Second Circuit, a court considering relief from the stay in favor of arbitration must apply a four part inquiry: (1) did the parties agree to arbitrate; (2) does the dispute fall within their arbitration clause; (3) if federal statutory claims are raised, did Congress intend those claims to be arbitrable; and (4) if the court concludes that some but not all of the claims are arbitrable, should it stay the non-arbitrable claims pending the conclusion of the arbitration? *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 789 (Bankr. S.D.N.Y. 2008); *In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 198 (Bankr. S.D.N.Y. 2002) (Discussing test and noting that "The FAA signifies a congressional declaration of a liberal federal policy favoring arbitration agreements.") (*citing Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987). Application of that test mandates relief from the stay here.

There is no dispute here concerning the first two factors. The parties' contract (the Policy) contains a broad arbitration clause that encompasses the dispute. *See supra* at 5-6. Moreover, the parties already have commenced arbitration, which has been pending since February 2019. Although Purdue has raised various defenses, it has not contended that the parties did not agree to arbitrate or that the dispute is not arbitrable.

The fourth factor is irrelevant; there are no non-arbitrable claims involved.

10

The third factor mandates relief. There are no federal statutory claims at issue. In evaluating this factor in the bankruptcy context, courts consider whether the underlying dispute is a core or non-core matter. The Second Circuit has stated that bankruptcy courts may not deny a motion to compel arbitration of a non-core proceeding. *In re Crysen*, 226 F.3d. at 166 ("The Third Circuit's *Hays* decision--holding that district courts must stay non-core proceedings in favor of arbitration--is generally accepted."). In practice, the Second Circuit's directions that bankruptcy courts may not deny a motion to compel arbitration of a non-core proceeding means that cause exists for granting relief from the stay with respect to arbitrable matters.[3]

Whether a matter is core or non-core depends on the nature of the proceeding. *See In re Best Products Co.*, 68 F.3d 26, 31 (2d Cir. 1995). Although core proceedings are not statutorily defined, section 157(b)(2) offers a nonexclusive list of such actions. A proceeding that involves rights created by bankruptcy law, or that could arise only in a bankruptcy case, is a core proceeding. *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108–109 (2d Cir. 2006); *McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502, 506 (S.D.N.Y. 1993). A claim is non-core if it "does not depend on bankruptcy laws for its existence and ... could proceed in a court that lacks federal bankruptcy

---

[3] The policy in favor of arbitration is sufficiently strong that even core claims may be referred to arbitration. For example, this Court considered this issue in the Enron bankruptcy, stating: "[E]ven when presented with a core proceeding, a bankruptcy court may not preclude arbitration unless the proceeding is premised on Bankruptcy Code provisions that 'inherently conflict' with the FAA or where arbitration would jeopardize objectives of the Bankruptcy Code." *In re Enron Corp.*, 364 B.R. 489, 517 (Bankr. S.D.N.Y. 2007) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999)). Concluding that there were no such conflicts, the court lifted the stay to allow arbitrable claims to move forward.

11

jurisdiction." *N. Am. Energy Conservation, Inc. v. Interstate Energy Res., Inc.*, 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 10, 2000). State law insurance coverage proceedings are non-core. *See DeWitt Rehab. And Nursing Cntr, Inc. v. Columbia Gas Co.,* 464 B.R. 587 (2012); see also *In re Burger Boys, Inc.*, 183 B.R. 682 (S.D.N.Y. 1994) (declaratory judgment action to resolve coverage disputes was non-core); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993) (insurance coverage action was non-core), *cert. denied*, 511 U.S. 1026 (1994); *In re United States Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997) (same).

Here, the insurance coverage matter involved in the arbitration is indisputably non-core. TIG's claims are neither specifically delineated as core proceedings in 28 U.S.C. § 157(b), nor do they invoke any right under the Bankruptcy Code. The arbitration could not invoke rights under the Bankruptcy Code or depend upon it because it was filed months before the filing of the Debtors' bankruptcy.

Although arising in a slightly different context, Judge Glenn of this Court recently considered a similar case involving the arbitrability of an insurance coverage dispute.[4] *See In re MF Global Holdings Ltd.,* 571 B.R. 80, 96 (Bankr. S.D.N.Y. 2017) ("the strong 'policy favoring arbitration agreements' outweighs whatever 'federal interests embodied in the Bankruptcy Code' might feasibly arise as this coverage dispute progresses"). The *MF Global Holdings* court carefully considered whether the coverage action was core or non-core. Based on Judge Glenn's conclusion that the coverage proceeding was non-core, despite its potential impact on the estate, the court compelled arbitration.

---

[4] The analysis of arbitrability is the same regardless whether raised in a motion to compel or a motion for relief from stay. *In re Enron*, 364 B.R. at 517; *In re Argon Credit, LLC*, 2018 WL 4562542 at *4 (Bankr. N.D. Ill., September 21, 2018).

12

Courts in other districts also reach the same result. For example, the Bankruptcy Court for the Northern District of Illinois recently lifted the stay to allow arbitration in *In re Argon Credit, LLC*, 2018 WL 4562542 (Bankr. N.D. Ill., September 21, 2018). As that court stated succinctly:

> Since the claims sought to be arbitrated are non-core, and since they are covered by an arbitration clause by which FRS is bound, the court has no discretion to override the parties' pre-petition bargain. The motion to modify the automatic stay is granted.

*Id*. at *1. Similarly, in *In re Phico Group, Inc.*, 304 B.R. 170 (M.D. Pa. 2003) the bankruptcy court lifted the automatic stay to proceed with arbitration because it could find no adverse impact on the bankruptcy proceeding that would override the strong federal presumption in favor of arbitration. In *In re Farmland Indus., Inc.*, 309 B.R. 14 (Bankr. W.D. Mo. 2004), the bankruptcy court granted relief from the automatic stay so that the movant could proceed with an arbitration proceeding. *Id.* ("Generally, a court has little reason to ignore non-executory contractual arbitration clauses, and a court should give effect to a contractual arbitration term in the same manner as the court gives effect to any other non-executory contract in bankruptcy, especially considering the strong federal policy favoring arbitration."). *See also In re American Classic Voyages Co.*, 298 B.R. 222, 226 (D. Del. 2003) (When deciding if a disputed claim should be allowed to proceed in arbitration or by the bankruptcy court, this Court should yield to agreed-upon arbitration unless doing so "would seriously jeopardize the objectives of the [Bankruptcy] Code.") (quoting, with substitution, *Hays & Co. v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155-1157 (3d Cir. 1989)).

13

As in those cases cited above, the arbitration agreement in the Policy at issue governs the pending dispute. The pending arbitration does not involve any core bankruptcy matter and the arbitration presents no conflict with the Bankruptcy Code. Under the liberal federal policy in favor of arbitration, and the precedent established by the Second Circuit, the Court should lift the automatic stay and allow the arbitration to move forward.

**II.     The Sonnax Test Compels Relief from the Stay**

Although the Court need not consider the *Sonnax* test when faced with a motion for relief from the stay to pursue arbitration, application of those factors weighs in favor of relief. Thus, cause also exists to grant relief from the stay under the twelve-factor approach adopted by the Second Circuit in *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Application of the relevant *Sonnax* factors[5] demonstrates that relief from the automatic stay is appropriate:

> (1) *whether relief would result in a partial or complete resolution of the issues* -- The pending arbitration would resolve all of the relevant insurance coverage issues.
>
> (2) *whether there is a lack of any connection with or interference with the bankruptcy case* -- There is little connection between the proposed arbitration and the bankruptcy case. The dispute could have arisen entirely outside of bankruptcy, and there will be no interference with the bankruptcy case. To the contrary, the arbitration will facilitate, rather than interfere with, the bankruptcy case, by clarifying the assets of the bankruptcy estate.
>
> (3) *whether the other proceeding involves the debtor as a fiduciary* -- The arbitration will not involve the debtor as a fiduciary.
>
> (4) *whether a specialized tribunal with the necessary expertise has been established to hear the cause of action* – The arbitration panel consists of

---

[5] All of the factors will not be relevant in every case, nor must a court accord equal weight to each factor. *In re Enron Corp.*, 306 B.R. 465, 476 (S.D.N.Y. 2004). Here, the 5th, 8th and 9th factors are inapplicable.

14

practitioners with substantial experience in resolving the type of coverage dispute involved here.

(6) *whether the action primarily involves third parties* – The only third party involved is non-debtor Purdue Frederick. Although the action does not *primarily* involve third parties, the stay does not prevent the action from proceeding against Purdue Frederick, nor does the stay bind the foreign arbitral panel.

(7) *whether litigation in another forum would prejudice the interests of other creditors* -- The arbitration will not prejudice the interests of other creditors because it does not threaten a piecemeal liquidation of the bankruptcy estate. Instead, resolution of the arbitration will clarify the scope of the debtor's insurance coverage.

(10) *the interests of judicial economy and the expeditious and economical resolution of litigation* -- Relief from the automatic stay would strongly advance judicial economy because arbitration will resolve the disputed coverage issues expeditiously, and because - pursuant to the FAA - the court lacks discretion to resolve these important issues. Moreover, pursuant to the Debtors' proposed settlement, any insurance coverage will remain with the company, but ownership of the company will change. Under the circumstances, prompt relief benefits creditors as there is no possible cost saving from delay.

(11) *whether the parties are ready for trial in the other proceeding* -- The eleventh factor weighs slightly in favor of relief. The arbitration is not near trial, but resolution of potentially dispositive, threshold issues is expected in the summer of 2020. The arbitration was commenced approximately six months prior to the bankruptcy filing.

(12) *impact of the stay on the parties and the balance of harms* -- The balance of harms necessarily favors relief because adjudication of the scope of its interest in property of the estate would not prejudice the debtor. Indeed, the debtor and creditors would likely benefit from clarity on this issue.

As shown above, the *Sonnax* factors weigh heavily in favor of lifting the stay to permit the arbitration to move forward. Factors 1, 2, 4, 6, 7, 10 and 12 all strongly support lifting the stay. The remaining factors are largely inapplicable, or greatly outweighed by the others. Granting relief from the stay will not harm the Debtor, and

15

will benefit the estate by resolving an important issue concerning the scope of the Debtor's interest in the subject Policy.[6]

WHEREFORE, TIG respectfully requests that this Court enter an order lifting the automatic stay to permit TIG to proceed with the pending insurance coverage arbitration and granting such other and further relief as may be just.

Dated:  December 30, 2019
         New York, NY                          Respectfully submitted,

                                               __/s/ George Calhoun_____
                                               George R. Calhoun V (pro hac vice)
                                               IFRAH PLLC
                                               1717 Pennsylvania Avenue NW
                                               Suite 650
                                               Washington, DC 20006-2004
                                               (202) 524-4140 – Tel.
                                               (202) 524-4141 – Fax
                                               george@ifrahlaw.com

---

[6] It is debatable whether the automatic stay applies to such declaratory actions. Section 362 stays actions seeking to obtain possession or control of property of the estate. 11 U.S.C. § 362(a)(3).  The issue here "is the scope of the insurance policies, an issue of contractual interpretation, not their ownership." *In re U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997).