George R. Calhoun V (pro hac vice)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
george@ifrahlaw.com

Counsel for Ironshore Specialty Insurance Company,
formerly known as TIG Specialty Insurance Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>PURDUE PHARMA L.P., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>**Case No. 19-23649-rdd**<br><br>**(Jointly Administered)** |

**DECLARATION OF GEORGE CALHOUN IN SUPPORT OF MOTION FOR RELIEF**
**FROM AUTOMATIC STAY**

I, George R. Calhoun, V, hereby declare as follows:

1.      I am a partner with Ifrah PLLC and represent Ironshore Specialty Insurance

Company, formerly known as TIG Specialty Insurance Company ("TIG") in the above-captioned

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's registration number
in the applicable jurisdiction are as follows:  Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486),
Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue
Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745),
Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue
Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902),
Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502),
Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals
L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc.
(4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard,
Stamford, CT  06901.

action.  I am providing this Declaration in support of TIG's Motion for Relief from the Automatic

Stay.

2.      A true and accurate copy of the policy of insurance issued by TIG pursuant to which

the Debtor claims insurance coverage is attached hereto as Exhibit A.

3.      The Policy contains a lengthy arbitration provision, which provides:

Any dispute arising under this policy shall be finally and fully determined in
London, England under the provisions of the English Arbitration Act of 1950, as
amended and supplemented, by a Board composed of three arbitrators to be selected
for each controversy as follows:
Any party to the dispute may, once a claim or demand on his part has been denied
or remains unsatisfied for a period of twenty (20) calendar days by any other, notify
the others of its desire to arbitrate the matter in dispute, and at the time of such
notification the party desiring arbitration shall notify any other party or parties of
the name of the arbitrator selected by it. Any party or parties who have been so
notified shall within ten (10) calendar days thereafter select an arbitrator and notify
the party desiring arbitration of the name of such second arbitrator. If the party or
parties notified of a desire for arbitration shall fail or refuse to nominate the second
arbitrator within ten (10) calendar days following the receipt of such notification,
the party who first served notice of a desire to arbitrate will, within an additional
period often (10) calendar days, apply to a judge of the High Court of England for
the appointment of a second arbitrator and in such a case the arbitrator appointed
by such a judge shall be deemed to have been nominated by the party or parties
who failed to select the second arbitrator. The two arbitrators, chosen as above
provided, shall within ten (10) calendar days after the appointment of the second
arbitrator choose a third arbitrator.  In the event of the failure of the first two
arbitrators to agree on a third arbitrator within said ten (10) calendar day period,
any of the parties may within a period of ten (10) calendar days thereafter, after
notice to the other party or parties, apply to a judge of the High Court of England
for the appointment of a third arbitrator, and in such case the person so appointed
shall be deemed and shall act as the third arbitrator. Upon acceptance of the
appointment by said third arbitrator, the Board of Arbitration for the controversy in
question shall be deemed fixed. All claims, demands, denials of claims and notices
pursuant to this Section (o) of the Policy shall be deemed made if in writing and
mailed to the last known address of the other party or parties.
The Board of Arbitration shall fix, by a notice in writing to the parties involved, a
reasonable time and place for the hearing and may in said written notice or at the
time of the commencement of said hearing, at the option of said Board, prescribe
reasonable rules and regulations governing the course and conduct of said hearing.
The Board shall within ninety (90) calendar days following the conclusion of the
hearing, render its decision on the matter or matters in controversy in writing and
shall cause a copy thereof to be served on all the parties thereto. In case the Board

2

fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board and the same shall be final and binding on the parties thereto, and such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of fraud or collusion.

All costs of arbitration shall be borne equally by the parties to such arbitration.

4.      TIG initiated an arbitration against Purdue concerning the Policy by serving a Notice to Arbitrate on October 8, 2018.  After the panel was established, TIG served its Statement of Claim on February 28, 2019.  Through the arbitration, TIG seeks the following declaratory relief:

a.   a declaration that there is no cover under the Policy in respect of the liabilities alleged in the Complaints and/or the Notifications;

b.   a declaration that the damages claimed in the Complaints are not damages "on account of" "personal injuries" within the meaning of the Policy;

c.   a declaration that any damages claimed in the Complaints "on account of" "personal injuries" within the meaning of the Policy are not covered because the "personal injuries" were incurred prior to inception or after the expiration of the Policy;

d.   a declaration that any damages claimed in the Complaints "on account of" "personal injuries" within the meaning of the Policy are not covered "occurrences" because the "personal injuries" resulting from the use of OxyContin were expected or intended by Purdue;

e.   a declaration that any liability which Purdue has or may have in respect of the Complaints would otherwise be covered by the Policy is an amount sufficient to reach or exceed the Attachment Point;

f.   a declaration that liability under the Policy is excluded by Exclusion (o)(9);

g.   a declaration that Purdue has breached the Assignment Condition of the Policy;

h.   a declaration that TIG is not bound by any purported assignment of the Policy by Purdue save where TIG's consent to the assignment has been endorsed on the Policy …

5.      On or about May 15, 2019, the Debtors filed a Statement of Defence in which they challenged the merits and timing of TIG's claims.  The actual arbitration pleadings are confidential, but are in the Debtors' possession.

6.      TIG filed its Reply on or about June 26, 2019.  The arbitration was subsequently stayed when the Debtors filed for bankruptcy protection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2019.

*/s/ George R. Calhoun*
George R. Calhoun, V
george@ifrahlaw.com

# EXHIBIT A

## EXCESS LIABILITY POLICY

Named Insured: As stated in item 1 of the Declarations forming a part hereof (hereinafter called the "Named Insured").

### INSURING AGREEMENTS

### 1. COVERAGE

The TIG Specialty Insurance Company (the "Company") hereby agrees subject to the limitations, terms exclusions and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability imposed upon the Insured by law or assumed under contract or agreement by the Insured for damages on account of

    (1)    personal injury,
    (2)    property damage or
    (3)    advertising liability
    anywhere in the universe, resulting from:

**Coverage (A):**    an occurrence (as defined herein), notice of which shall have been given by the Named Insured to the Company prior to the expiration of the Coverage A in accordance with Section (d) of Article V (Conditions) hereof ("Coverage A"), or

**Coverage (B):**    an occurrence (as defined herein), notice of which shall have been given by the Named Insured to the Company during the Discovery Period in accordance with Section (d) of Article V (Conditions) hereof ("Coverage B"), but only if the Named Insured shall have elected to obtain Coverage B pursuant to Section (u) of Article V (Conditions) hereof (or if a former subsidiary, affiliate or associated company of the Named Insured shall have Coverage B by virtue or Section (w) of Article V(Conditions) hereof);

provided, however, that the aggregate limit, the per occurrence limit, the per occurrence retention, and the terms, conditions and exclusions of coverage shall be determined under the Policy as in effect at the time notice of the occurrence for which coverage is asserted is first given pursuant to Section (d) of Article V (Conditions) hereof.

### II. LIMIT OF LIABILITY

    (a)    Subject to all the provisions hereof, for each layer of coverage as set forth in item 2(a) of the Declarations the Company shall be liable only for that amount of ultimate net loss for each occurrence covered pursuant to Article 1 hereof in excess of the greater of either:

        (1)    the limits (to the extent not exhausted by actual payment of claims) of the underlying insurance listed on the present and/or any prior Scheduled B hereto (hereinafter called the "underlying limits"), as to which the Company and the Named Insured expressly agree that the insurance provided by this Policy shall (A) be in excess in respect of such occurrences covered by said underlying insurances (it being understood that this Policy shall in no way be subject to, or affected by, the terms, conditions, or limitations of said underlying insurances), and (B) apply only as if such underlying insurances were fully available and collectable for all occurrences covered thereunder,

        or

(2) the per occurrence retention amount set forth in the item 2(a) of the Declarations, and the only up to a further sum as stated in item 2 (a) of the Declarations in respect of each layer for each occurrence subject to the limit as stated in item 2(b) of the Declarations in the aggregate for each annual period for all occurrences covered hereunder of which notice is first given during such annual period (or during the Discovery Period with respect to the immediately preceding annual period or portion thereof) irrespective of the period over which the losses, injuries, damages or liabilities occur or the number of such losses, injuries, damages or liabilities.

(b) The inclusion or addition hereunder of more than one Insured shall not operate to increase the Company's limits of liability beyond those set forth herein.

## III. DEFINITIONS

This Policy is subject to the following definitions:

(a) **Insured**

(1) The unqualified word "Insured" includes:

(A) the Named Insured, and, if the Named Insured is designated in Item 1 of the Declarations as a partnership or joint venture, the partnership or joint venture so designated and each partner or member thereof but only with respect to his liability as such;

(B) (i) any subsidiary or affiliate of the Named Insured for any annual period whose accounts as of the date of the financial statements of the Named Insured submitted to the Company most recently prior to the rating of the premium for such annual period (x) are consolidated in the financial statements of the Named Insured in accordance with generally accepted accounting principles in the United States of America (or, in the case of any foreign Named Insured, any subsidiary or affiliate whose accounts would be consolidated in the financial statements of such Named Insured if such accounts would have been consolidated in accordance with generally accepted accounting principles in the United States of America), or (y) were eligible for such consolidation and whose financial statements were submitted to the Company with such financial statements of the Named Insured as of such date; and/or (ii) any subsidiary, affiliate or associated company of the Named Insured listed on Schedule A hereto:

(C) any present or former officer, director, stockholder or employee of any person or entity named in paragraph (A) or (B) above or (F) below, but only with respect to liability for acting within the scope of his duties as such an officer, director, stockholder or employee, and any organization or proprietor with respect to any liability for providing real estate management for any such person or entity named in paragraph (A) or (B) above or (F) below:

(D) any person, organization, trustee or estate to whom any person or entity named in paragraph (A) or (B) above or (F) below is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this Policy, but only to the extent of such obligation and only in respect of operations (other than commercial insurance operations) by or on

behalf of such person or entity named in paragraph (A) or (B) above or
(F) below or of facilities owned or used by such person or entity named in
paragraph (A) or (B) above or (F) below;

(E)   with respect to any automobile owned by any person or entity named in
paragraph (A), (B) or (C) above or (F) below or hired for use on behalf or
any such person of entity, any person or organization legally responsible
for the use thereof, provided the actual use of the automobile is with the
permission of such person or entity;

(F)   any joint venture, con-venture, joint lease, joint operating agreement or
partnership (hereinafter called "Joint Venture") in which the Insured has
an interest, but only if:

(i)    · the Insured has sole responsibility for the Joint
Venture, or
(ii)   the Insured is obligated to provide insurance for the Joint
Venture in its entirety such as is afforded by this Policy.

(2)   (A)   It is hereby understood and agreed by each Insured and the Company
that, as regards any liability of an Insured which arises in any manner
whatsoever out of the operations or existence of any Joint Venture in
which such Insured has an interest, the liability of the Company under
this Policy in each layer shall be limited to the product of (a) the
percentage interest of the Insured in such liability of such Joint Venture
(whether direct or by virtue of the insolvency of others interested in such
Joint Venture) and (b) the total limit of liability insurance afforded such
Insured for such layer by this Policy.

(B)   It is further understood and agreed that in circumstances where
paragraph (A) applies to limit the liability of the Company under this
Policy, the Company shall be liable for each layer in respect of the
liability of the Insured in excess of the greater of (i) the product of the per
occurrence retention amount specified in Item 2(a) of the Declarations
and the percentage interest of the Insured in such liability of such Joint
Venture as determined pursuant to paragraph (A). or (ii) the underlying
limits (as such may be reduced if the underlying insurances have been
reduced by a clause having the same effect as paragraph (A)).

(C)   It is further understood and agreed that paragraphs (A) and (B) of this
subsection (2) shall not apply if;

(i)    the insured has sole responsibility for the Joint Venture, or
(ii)   the Insured is obligated to provide insurance for the Joint
Venture in its entirety such as is afforded by this Policy.

(3)   It is agreed to automatically include as an Insured without adjustment of premium
under this Policy for any annual period any entity acquired or formed by or merged
with an Insured (a "Potential Additional Insured") during such annual period provided
that (a) the fair value of the sum of all cash, securities, assumed indebtedness and
other consideration expended by all Insureds for any such acquisition, formation or
merger or any series of interrelated acquisitions, formations or mergers does not
exceed 5% of the total assets of the Named Insured and its consolidated subsidiaries
and affiliates as most recently reported to the company for rating purposes prior to

such annual period, (b) the incremental annual gross revenues attributable to such acquisition, formation or merger of any series of interrelated acquisitions, formations or mergers do not exceed 5% of the total annual gross revenues of the Named Insured and its consolidated subsidiaries and affiliates as most recently reported to the Company for rating purposes prior to such annual period; and (c) neither the operations of the Potential Additional Insured prior to such acquisition, formation or merger or any series or interrelated acquisitions, formations or mergers nor the resultant combined or consolidated operations of such Insured and Potential Additional Insured subsequent to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers are materially different from those of such Insured prior to such acquisition, formation or merger or any series of interrelated acquisitions, formations or merger. Unless notice to the Company shall have been given and additional premium, if any, shall have been paid in respect of the acquisition or formation of or merger with any Potential Additional Insured not meeting the criteria set forth herein, such Potential Additional Insured shall not be an Insured hereunder. With respect to any occurrence giving rise to liability of any Potential Additional Insured that qualifies to be an Insured hereunder, the Inception Date (for the first and all subsequent annual periods) shall be the date of merger with or acquisition or formation of the Potential Additional Insured by an Insured or such other date as may be agreed between the Named Insured and the Company.

(b) **Personal Injury**

The term " personal injury" means, but is not limited to, bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation, and all libel, slander or defamation of character or invasion of rights of privacy.

(c) **Property Damage**

The term "property damage" means (1) physical injury to or destruction of tangible property including the loss of use thereof at any time resulting therefrom, (2) loss of use of tangible property which has not been physically injured or destroyed, or (3) evacuations losses arising from actual or threatened physical injury to or destruction of tangible property or bodily injury.

(d) **Advertising Liability**

The term " advertising liability" means for damages on account of:

(1)  libel, slander or defamation;
(2)  any infringement of copyright or of title or of slogan;
(3)  piracy or misappropriation of ideas under an implied contract;
(4)  any invasion of right of privacy;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Insured's advertising activities.

(e) **Occurrence**

The term "occurrence" means

(i)   an event or a continuous, intermitted or repeated exposure to conditions which
causes, allegedly causes or is deemed to cause personal injury or property
damages or gives rise to advertising liability, which event or conditions
commence at or subsequent to the Inception Date (or, if applicable, the
Retroactive Coverage Date) and prior to the expiration of Coverage A, or

(ii)   use of the insured's products which causes, allegedly causes or is deemed to
cause personal injury or property damage taking place both prior to the
expiration of Coverage A and at or subsequent to the Inception Date (or, if
applicable, the Retroactive Coverage Date),

and which injury, damage or liability is neither expected nor intended by the Insured.
Where certain actual or alleged injury, damage or liability is expected or intended by
the Insured or the Insured has historically experienced a level or rate of actual or
alleged injury, damage or liability associated with given products or operation and
actual or alleged injury, damage or liability fundamentally different in nature or vastly
greater in order of magnitude occurs, such actual or alleged injury, damage or
liability shall not by virtue or such expectation, intent or historical experience be
deemed expected or intended to the extent and only to the extent it is different or
incrementally greater.

(f)   **Occurrence Integration**

Where a series of and/or several actual or alleged losses, injuries, damages or
liabilities occur which are attributable directly, indirectly or allegedly to the same
actual or alleged event, condition, cause, defect or hazard or failure to warn of such,
all such actual or alleged losses, injuries, damages or liabilities shall be added
together and treated as one occurrence irrespective of the period or area over which
the actual or alleged losses, injuries, damages or liabilities occur or the number of
such actual or alleged losses, injuries, damages or liabilities. So far as losses,
injuries, damages or liabilities resulting or alleged to result from the design,
formulation, manufacture, distribution, use, operation, maintenance or repair of an
Insured's product or the failure to warn as to the use, operation or maintenance of an
Insured's product, the term "the same actual or alleged event, condition, cause
defect or hazard or failure to warn of such" means any such design, formulation,
manufacture, distribution, use, operation, maintenance, repair or failure to warn, as
the case may be, as to which such losses, injuries or damages are directly, indirectly
or allegedly attributable.

(g)   **Damages**

The term "damages" means all forms of compensatory damages, monetary damages
statutory damage and punitive or exemplary damages and costs of compliance with
equitable relief (other than governmental or criminal fines or penalties), and legal
expenses or other costs which the Insured shall be obligated to pay by reason of
judgment (or, where applicable, settlement) for liabilities on account of personal
injury, property damage and advertising liability including, but not limited to, hospital,
medical and funereal charges and all sums paid as salaries, wages, compensation,
fee charges and laws costs, premiums on attachment or appeal bonds, interest,
expenses for doctors, lawyers, nurses and investigators and other persons, and for
litigation (including, but not limited to, attorneys' fees and disbursements),
settlement, adjustment, and investigation of claims and suits which are paid as a
consequence of an occurrence covered hereunder, excluding only the salaries,
wages and benefits of the Insured's employees.

(h)     **Ultimate Net Loss**

The term "ultimate net loss" means the total sum which the insured (or an underlying insurer) shall become obligated to pay in respect of any one occurrence for damages on account of personal injury, property damage or advertising liability, either through adjudication or (subject to Section (g) of Article V (Conditions) hereof) compromise.

(i)     **Automobile**

The term "automobile" means a land motor vehicle, trailer or semi-trailer.

(j)     **Watercraft**

The term "watercraft" means any ship or vessel of whatever type, including, but not limited to, cargo vessels, passenger vessels, other vessels used for transport, towboats and barges, vessels used in the construction of pipelines, platforms or other facilities, storage vessels, tanker vessels, drill ships, drilling rigs and barges (including, without limitation, submersible drill rigs and barges, semi-submersible drill rigs and barges and self-elevating drill rigs and barges) and all other vessels of whatever nature and description, all whether or not self-propelled but shall not include an offshore oil or gas platform secured in place for drilling and/or producing operations.

The term "incidental watercraft use" means use by the Insured of any owned, leased or chartered watercraft less than 75 feet in length but shall not include:

(i)     use of watercraft for the commercial carriage of paying passenger or cargo for parties other than the Insured in exchange for a fee;
(ii)     use of watercraft in connection with the commercial provision of marine services to others for a fee;
(iii)     use of any watercraft held in inventory or otherwise for lease or charter to another person by an Insured in the business of lease or charter of watercraft; or
(iv)     use of watercraft owned by a party other than the Insured which is being serviced, maintained, fueled, or tested or otherwise is in the temporary care, custody or control of the Insured in connection with any business operations of the Insured relating to watercraft servicing, maintenance, fueling, testing, storage or associated or similar matters.

(k)     **Aircraft**

The term "aircraft" means any heavier than air or lighter than air aircraft, missile or spacecraft.

(l)     **Annual Period**

The term "annual period" means the annual period commencing at (i) the Inception Date or each anniversary date and time of the Inception Date for the Named Insured, or (ii) with respect to Coverage B, at the expiration of Coverage A or each anniversary date and time of such expiration; provided, however, that if the Retroactive Coverage Endorsement is purchased, the first "annual period" shall be the period from the Retroactive Coverage Date until the first anniversary date and time of the Inception Date.

(m)     **Discovery Period**

The term "Discovery Period" means the period, if applicable, commencing upon the expiration of Coverage A of this Policy and ending on the date provided in Section (u) or (w) of Article V (Conditions) hereof.

(n)     **Product Liability**

The term "product liability" means liability for personal injury or property damage arising out of the end-use of goods or products manufactured, sold, tested, handled or distributed by the Insured or others trading under its name if such use occurs after possession of such goods or products has been relinquished to others by the Insured or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the Insured; provided such goods or products shall be deemed to include any container thereof other than a vehicle, watercraft or aircraft.

(o)     **Industrial Aid Aircraft Use**

The term "industrial aid aircraft use" means use by the Insured of any owned, non-owned, leased or chartered aircraft principally for the transportation of officers and employees of the Insured and invited guests having a seating capacity (exclusive of cockpit crew but inclusive of cabin crew) of no more than 20 persons (whether or not all such seats are occupied) but shall not include (i) use of any aircraft for commercial airline operations, (ii) use of any aircraft held in inventory or otherwise for sale, lease, charter or delivery to another person by an Insured in the business of manufacture, sale, lease or charter of aircraft; (iii) use of aircraft for product testing or demonstration purposes; (iv) use of aircraft owned by a party other than the Insured which is being serviced, maintained, fueled or tested or otherwise is in the temporary care, custody or control of the Insured in connection with any business operations of the Insured relating to aircraft servicing, maintenance, fueling, testing, storage or associated or similar matters; or (v) use of any aircraft giving rise to product liability of the Insured.

(p)     **Insured's Products**

The term "Insured's products" means goods or products manufactured, sold, tested, handled or distributed by the insured or others trading under its name or materials that were the subject of completed or abandoned operations of the Insured.

## IV. EXCLUSIONS

This policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of, the following:

(a)     any liability or alleged liability for personal injury or property damage taking place prior to Inception Date (or, if applicable, the Retroactive Coverage Date), notwithstanding any other provision of this Policy.

(b)     any obligation for which the Insured or any company as its insurer may be held liable under any workers' compensation, unemployment compensation or disability benefits law; provided, however, that his exclusion does not apply to liability of others assumed by the Insured under contract or agreement or to liability arising under the Federal Employers' Liability Acts, the Jones Act or, in the case of any Insured which is an authorized self-insurer, the Longshoremen's and Harbor Workers' Compensation Act.

(c)     liability or alleged liability for property damage arising or alleged to arise out of any act, error or omission in the rendering of professional services, other than

architectural and engineering services (which are nonetheless subject to the other exclusions herein, including, without limitation, exclusion (e) below), including, but not limited to, the rendering of legal, accounting, data processing, consulting, or investment advisory services.

(d)   property damage to:

(1)   property owned or occupied by or rented to the Insured:
(2)   property loaned to the Insured;
(3)   personal property in the care, custody or control of the Insured; or
(4)   that particular part of real property or fixtures on which the Insured or any contractors or subcontractors working directly or indirectly on behalf of the Insured are performing operations, if such property damage arises out of such operations:

provided, however, that subsections (2), (3) and (4) of this exclusion (d) do not apply to liability assumed under a sidetrack agreement.

(e)   liabilities or alleged liabilities of the Insured:

(1)   resulting from or alleged to result from the failure of the Insured's products or work completed by or on behalf of the Insured to meet any warranty or representation by the Insured as to the level of performance, quality, fitness or durability or perform the function or serve the purpose intended by the Insured to the extent that such liability or alleged liability from such failure relates to the diminished value or economic utility of the insured's products or work completed by or on behalf of the Insured:

(2)   with respect to personal property, on account of property damage to any part of the Insured's products or of work performed by or on behalf of the Insured, if such property damage arises out or is alleged to arise out of the particular part of such products or work, or out of materials, parts or equipment furnished in connection therewith;

(3)   for the withdrawal, inspection, repair, replacement, or, in connection with any of the foregoing, loss of use of the Insured's products or work completed by or for the Insured or of any property of which such products or work form a part; or

(4)   in respect of loss of use tangible property which has not been physically injured or destroyed attributable to any failure to performance or inadequate performance of any contractual or legal obligation by the Insured, except where such loss of use results from unexpected and unintended physical injury to or destruction of tangible property.

(f)   with respect to advertising activities, liabilities or alleged liabilities of the Insured for:

(1)   breach of contract, but this shall not relate to claims for unauthorized appropriation of ideas based upon alleged breach of an implied contract;
(2)   infringement of registered trademarks, service mark or trade name by use thereof as the registered trademark, service mark, or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;
(3)   mistake in advertised price; or

(4)   the failure of goods, products or services to conform to advertised quality or performance.

(g)   except in respect of personal injury or property damage taking place in and caused by events or conditions occurring in the land area of the United States of America, its territories or possessions or Canada, any personal injury, property damage or advertising liability of the Insured directly or indirectly occasioned by, happening through or in consequence of war, invasion, hostile action of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

(h)   personal injury, property damage or advertising liability arising out of, or alleged to arise out of, the manufacture and/or distribution and/or installation and/or removal and/or utilization and/or ingestion or inhalation of, or exposure to, as the case may be, products manufactured, distributed, sold or installed by the Insured containing or consisting of:

(1)   asbestos fibers,
(2)   tobacco or tobacco products,
(3)   2,4,5 trichlorophenoxyacetic acid ("2,4,5T").
(4)   asbestiform talc,
(5)   diethylstilbesterol ("DES") or
(6)   any intra-uterine device ("IUD");

provided, however, that this exclusion shall not apply to personal injury or property damage caused by an occurrence where such personal injury or property damage is not related to the asbestos, tobacco, or other consumed portion of a tobacco product, 2,4,5-T, asbestiform talc, DES or IUD content or nature of the product or completed operations. The listing of products herein shall not give rise to an inference that personal injury, property damage or advertising liability attributable to other products was neither expected nor intended by the Insured.

(i)   any liability or alleged liability for damages arising out of, or alleged to arise out of, the design, manufacture, construction, maintenance, service, use or operation of any aircraft, or any component part or equipment thereof, or any other airplane navigational or aviation related equipment or any other actual or alleged liability, personal injury, property damage or advertising liability directly or indirectly arising out of a crash, hijacking or other circumstance in connection with the operation of an aircraft; provided, however, that this exclusion shall not apply:

(1)   in respect of aircraft fueling and related operations with respect to personal injury or property damage occurring at the time of such operation, i.e., while the aircraft involved in any occurrence is on the ground and motionless;

(2)   to liability or alleged liability in respect of any item of goods intended to be a component part of an aircraft or aircraft equipment where such part or equipment has not yet been incorporated into any aircraft (other than an incomplete aircraft which is in the process of initial manufacture at an indoor premises and which has never been used for self-propelled movement either on the ground or in the air) and such liability or alleged

liability and the personal injury, property damage or advertising liability giving rise thereto do not arise directly or indirectly out of a crash, hijacking or other circumstance in connection with the operation of any aircraft;

(3)     to liability or alleged liability in connection with manufacturing and associated operations in respect of aircraft or any component part thereof or any aircraft equipment where all personal injury and property damage giving rise to such liability or alleged liability take place at a manufacturing, storage or associated premises on the ground (or in connection with on the ground transportation by other than an aircraft) and such liability or alleged liability and the personal injury, property damage or advertising liability giving rise thereto do not arise directly or indirectly out of a crash, hijacking or other circumstance in connection with the operation of any aircraft;

(4)     in respect of the Insured's products which consist of or are incorporated into cabin furnishings, food service equipment or other materials or equipment used in the interior of an aircraft which are not necessary to or integrally related with flight, take-off, landing or navigation of the aircraft;

(5)     in respect of the Insured's products which are of a type and grade sold principally for purposes other than use in aircraft or aviation which are incorporated into aircraft hulls or components or aviation related equipment (e.g., microchips used principally in personal computers which also are used in flight computers or a grad of aluminum ingot suitable for a broad range of commercial uses which is used in an aircraft wing); or

(6)     to liability or alleged liability for physical property damage to third parties or personal injury arising out of or allegedly arising out of industrial aid aircraft use, but in respect of any occurrence arising out of industrial aid aircraft use the per occurrence retention amount shall be the greater of the amount set forth in item 2(a) of the Declarations or $100,000,000. "Physical property damage to third parties" shall include only physical damage to other aircraft or to tangible property on the ground occurring upon the physical impact of the aircraft owned, leased or chartered by the Insured or the debris thereof with such other aircraft or property on the ground (as well as associated debris removal) and shall not include, without limitation, property damage to the hull or any other portion of the aircraft, owned, used, leased or chartered by the Insured or to its cargo or other contents.

(j)  any liability or alleged liability for personal injury, property damage or advertising liability in any manner arising out of or alleged to arise out of the design, construction, maintenance, sale, manning, ownership or operation of any watercraft, including, by way of illustration but not by limitation, liability arising out of or alleged to arise out of any collision, explosion, fire, sinking or debris involving watercraft, liabilities arising out of alleged to arise out of the discharge, dispersal, release or escape of cargo, ballast, fuel, pollutants or any other matter from any watercraft, or any liability of the Insured arising under or alleged to arise under the terms of the International Convention on Civil Liability for Oil Pollution Damage, including any amendments or supplemental agreements thereto or extensions thereof, and any future conventions (as amended,

supplemented or extended) of a similar nature or purpose which are applicable to watercraft; provided, however, that this exclusion does not apply to:

(1)     watercraft or risks listed on Schedule C hereto and any additional watercraft acquired in the ordinary course of business during the annual period of a similar type and use as vessels listed on Schedule C, subject to the limitation that the aggregate gross registered tonnage of all such additional watercraft of any given type and use shall not exceed 20% of the gross registered tonnage of vessels of such type and use listed on Schedule C;

(2)     loading or unloading of any watercraft at premises owned, leased or controlled by the Insured;

(3)     liability or alleged liability for any personal injury or property damage to third parties arising out or allegedly arising out of incidental watercraft use (provided that damage to the hull or any portion, component or equipment of the watercraft owned, leased or chartered by the Insured or to its cargo or other contents shall not constitute property damage to third parties);

(4)     liability or alleged liability for personal injury, property damage advertising liability arising out of or alleged to arise out of the design construction, maintenance or sale by the Insured of any watercraft less than 75 feet in length; or

(5)     liability or alleged liability for personal injury, property damage or advertising liability arising out of or alleged to arise out of design, manufacture, maintenance or sale by the Insured of any component part or equipment of any watercraft.

(k)     (1)     (A)    except as provided in subsection (2) below, any

liability or alleged liability of the Insured for personal injury, property damage or advertising liability arising out of or alleged to arise out of the discharge, dispersal, release, or escape of pollutants into or upon land or other real estate, atmosphere, any watercourse or body of water whether above or below ground or otherwise into the environment: or

(B)     to any liability or alleged liability, loss, cost or expense of the Insured arising out of direction or request, whether governmental or other, that the Insured test for, monitor, clean up, remove, contain, treat detoxify or neutralize pollutants.

(C)     It is understood and agreed that this exclusion shall apply whether or not the discharge, dispersal, release or escape:

(i)     results from the Insured's activities or the activities of any other person or entity;

(ii)    is sudden, gradual, accidental, foreseeable, expected or fortuitous (except as provided in subsection (2) below).

(D)   This exclusion shall not apply as respects any intentional discharge or dispersal of any substance for the purpose of mitigating or avoiding personal injury or property damage which, subject to satisfaction of the per occurrence retention amount and/or exhaustion of underlying limits, would be covered under this Policy.

(2)    (A)   The exclusion set forth in subsection (1) above does not apply

to any liability of the insured (i) for product liability; or (ii) for personal injury or property damage caused by an occurrence constituting from the standpoint of the Insured an unexpected and unintended discharge, dispersal, release or escape of pollutants but only if the Insured becomes aware of the commencement of the discharge, dispersal, release or escape within seven (7) day of such commencement and complies with the special notice provisions of paragraph (B) of this subsection (2).

(B)   Notwithstanding anything in this Policy to the contrary, the Company shall not be liable to the Insured by virtue of paragraph (2) (A) (ii) of this Section (k) unless the Named Insured provides the Company with notice in writing of the commencement of such discharge, dispersal, release or escape within forty (40) day of such commencement.  The Insured shall otherwise comply with all the conditions et forth in this Policy.

The term "pollutant" shall mean any solid, liquid, gaseous or thermal irritant, contaminate or toxic or hazardous substance or any substance which may, does, or is alleged to affect adversely the environment, property, persons or animals, including smoke, vapor, soot, fumes, acids alkalis, chemicals and waste.  "Waste" includes, without limitation, materials to be recycled, reconditioned or reclaimed.

(l)    liability or alleged liability for:

(1)    personal injury, property damage or advertising liability in the United States, its territories or possessions, Puerto Rico or the Canal Zone (A) with respect to which an Insured under the Policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limited liability or (B) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the Insured is or, had this Policy not been issued, would be entitled to indemnity from the United States of America or any agency thereof under any agreement entered into by the United State of America or any agency thereof with any person or organization;

(2)    medical or surgical relief or expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operations of a nuclear facility by any person or organization in the United States, its territories or possessions, Puerto Rico or the Canal Zone;

(3)     injury, sickness, disease, death or destruction resulting from hazardous
properties of nuclear material, if (A) the nuclear material (i) is at any
nuclear facility owned by or operated by or on behalf of an Insured in the
United States, its territories or possessions, Puerto Rico or the Canal
Zone or (ii) has been discharged or disperse therefrom. (B) such nuclear
material is contained in spent fuel or waste at any time possessed,
handled, used, processed, stored, transported or disposed by or on
behalf or an Insured in the united States its territories or possessions,
Puerto Rico or the Canal Zone or (C) the injury arises out of the
furnishing by an Insured of services, materials, parts or equipment in
connection with the planning,      construction, maintenance, operation or
use of a nuclear facility, but if such facility is located within the United
States of America, its territories or possesions or Canada, this clause (3)
(C) applies only to injury to or destruction of property at such nuclear
facility.

(4)   As used in this Section (l):

(A) "hazardous properties" include radioactive, toxic or explosive
properties; "nuclear material" means source material, special nuclear
material or by-product material; "source material" "special nuclear
material" and "by-product material" have the meanings given them by
the Atomic Energy Act of 1954 or in law amendatory thereof; "spent
fuel" means any fuel element or fuel component, solid or liquid which
has been used or exposed to radiation in a nuclear reactor; "waste"
means any waste material (i) containing by-product materials and (ii)
resulting from the operation by a person or organization of a nuclear
facility included within the definition of nuclear facility under clauses
(B) (i) or (B) (ii) (below);

(B) "nuclear facility" means

(i)   any nuclear reactor;

(ii)  any equipment or device designed or used for (x) separating the
isotopes of uranium or plutonium, (y) processing or utilizing spent
fuel, or (z) handling, processing or packaging waste;

(iii) any equipment or device used for the processing, fabricating or
alloying of special nuclear material if at any time the total amount
of such material in the custody of the Insured at such premised
where such equipment or device is located consists of or
contains more than 25 grams of plutonium or uranium 233 or
combination thereof or more than 250 grams of uranium 235;

(iv) any structure, basin, excavation, premises or place prepared for
storage or disposal of waste.

(C) "Nuclear facility' includes the site on which any of the foregoing is
located, all operations conducted on such site and all premised used
for such operations.

(D) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain critical mass of fissionable material.

(E) with respect to injury or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property or loss of the use thereof.

(m)   liability or alleged liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity outside the United States, its territories or possessions, Puerto Rico or the Canal Zone from any nuclear fuel or from any nuclear waste from the combustion, fission or fusion of nuclear fuel.

(n)   (1) any liability or alleged liability arising out of or alleged to arise out of any negligent act, error or omission of the Insured, or any other person for whose acts the Insured is legally liable in the administration of the Insured's Employee Benefits Program, as defined in subsection (2) below, including, without limitation, liability or alleged liability under the Employee Retirement Income Security Act of 1974, as amended, and/or any similar Federal State or local statutory or common law.

(2) As used in this Section (n), the term "Employee Benefits Programs" means group life insurance, group accident, or health insurance, profit sharing plans, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social benefits, disability benefits, and any other similar employee benefits.

(3) As used in this Section (n), the unqualified word "administration" means:

(A)   giving counsel to employees with respect to the Employee Benefits Programs;

(B)   interpreting the Employee Benefits Programs;

(C)   handling of records in connection with the Employee Benefits Programs; and/or

(D)   effective enrollment, termination or cancellation of employees under the Employee Benefits Programs; provided all such acts are authorized by the Insured.

(o)   any personal injury, property damage or advertising liability asserted in any claim, action, investigation or proceeding, including, without limitation, any private lawsuit (legal, equitable or otherwise) or proceeding, any derivative or class action commenced by shareholders of an Insured or any action, investigation or proceeding brought by any governmental department, agency or other body, on account of any liability arising or alleged to arise under any law, rule or regulation, whether established pursuant to legislative, administrative, judicial, executive or other authority, of any nation or federal, state, local or other governmental or political body or subdivision thereof relating to:

(1)   the purchase, sale or distribution of securities or offers to purchase or sell securities, or investment counseling or management, including, without

limitation, liability under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Public Utility Holding Company Act of 1935, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the so-called "blue-sky" laws of the various state or other jurisdictions;

(2)   antitrust or the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce including, without limitation, the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act and the Hart-Scott Rodino Antitrust Improvements Act;

(3)   fraud or breach of fiduciary duty;

(4)   criminal penalties;

(5)   the failure to pay when due any governmental tax (including, without limitation, income, excise, property, value added and sales tax) or tariff, license free or other governmental fee which is incidental to the conduct of business or any assessment, fine, or penalty related thereto;

(6)   copyright, patent or trademark infringement (other than advertising liability with respect to titles or slogans);

(7)   any defect in or impairment to title to real property, including fixtures, whether or not owned by an Insured;

(8)   disclosure or other regulation of sales of, and offers to sell, real property; or

(9)   any liability or alleged liability arising out of employee, officer or director dishonesty or any liability of an employee, officer or director of an Insured to such Insured.

No inference shall be made from the express exclusion of liabilities in this Section (o) that this Policy would otherwise cover such liabilities or covers similar liabilities.

## V. CONDITIONS

This Policy is subject to the following conditions:

(a)  **Premium**

Unless otherwise provided, the premium for each annual period under their Policy is a flat premium and is not subject to adjustment except as otherwise provided herein.  The premium shall paid to the Company.

(b)  **Inspection**

The Company shall be permitted but not obligated to inspect the Insured's property and operations at any time.  Neither the Company's right to make inspections nor the making thereof nor a report thereon shall constitute an undertaking on behalf of or for the benefit of the Insured or others to determine or warrant that such property or operations are safe or are in compliance with any law, rule or regulation.

(c)    **Cross Liability**

In the event of claims being made by reason of personal injury suffered by an employee of one Insured hereunder for which another Insured hereunder is or may be liable, this Policy shall cover such Insured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Insured hereunder.

In the event of claims being made by reason of damage to property belonging to any Insured hereunder for which another Insured hereunder is or may be liable, this Policy shall cover such Insured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Insured hereunder.

Nothing contained herein shall operate to increase the Company's limit of liability as set forth in Item 2 of the Declarations.

(d)    **Notice of Occurrence and Claim**

If a manager or equivalent level employee of the risk management, insurance or law department or any executive officer of the Named Insured shall become aware of an occurrence likely to involve this Policy, the Named Insured shall as soon as practicable, as a condition precedent to the rights of any Insured under their Policy, give written notice containing particulars sufficient to identify the Insured and the occurrence and also such reasonably detailed information as the Company may request regarding the occurrence to the Company. Failure to provide such written notice as required herein shall result in a forfeiture of any rights to coverage hereunder. If any claim is made against any Insured likely to involve this Policy, the Named Insured shall, as a condition precedent to the rights of any Insured under the Policy, give written notice thereof to the Company as soon as practicable and shall promptly forward to the Company copies of any written claim, demand, notice, summons, complaint or other process received by the Insured or its representatives or agents. Failure to provide such written notice as required herein shall result in a forfeiture of any rights to coverage hereunder. Where applicable notice of occurrence or claim shall identify an occurrence in respect of actual or alleged personal injury and/or property damage arising from two or more units of a product as a "batch occurrence." A batch occurrence exists where actual or alleged personal injury and/or property damage arising out of two or more units of a product is attributable directly, indirectly of allegedly to the same event, condition, cause, defect or hazard or failure to warn of such but only if such occurrence is identified in a notice hereunder as a "batch occurrence". With respect to any batch occurrence. (1) all actual or alleged personal injury and/or property damage attributable to the same actual or alleged event, condition, cause, defect or hazard or failure to warn of such shall be added together and treated as one occurrence irrespective of the period or area over which the actual or alleged injuries or damages occur or the number of such actual or alleged injuries or damages, and (2) the aggregate limit, the per occurrence limit and the terms, conditions and exclusions of coverage shall be determined under the annual period of the Policy as in effect at the time such notice of such batch occurrence if first given ("batch policy period") notwithstanding that prior notice may have been given with respect to such occurrence other than as a batch occurrence; provide, however, that if such prior notice was given, then the ultimate net loss with respect thereto shall be included with the ultimate net loss in respect of such batch occurrence for all purposes, and appropriate adjustments shall be made in the prior annual period of such notice and in the batch policy period to transfer any loss payments and erosion of limits from the former to the latter. Notwithstanding Sections (e) and (f) of Article III, if an occurrence arising out of a unit of a product is not identified in the notice thereof as a "batch Occurrence," then, subject to the preceding sentence, actual or alleged personal injury

and/or property damage in connection therewith shall be deemed to arise from a
separate occurrence from which actual or alleged personal injury and/or property
damage arises from any other unit of such product.

(e)  **Assistance and Cooperation**

The company shall not be called upon to assume charge of the settlement or defense of
any claim made or suit brought or proceeding instituted against an Insured, but the
Company shall have the right and shall be given the opportunity to associate at its own
expense with the Insured or the Insured's underlying insurers or both in the defense and
control of any claim, suit or proceeding relative to any occurrence where the claim or
suit involves, or appears reasonably likely to involve, the Company in which event the
Insured and the Company shall cooperate in all things in the defense of such claim, suit
or proceeding.

(f)  **Appeals**

In the event the Insured or the Insured's underlying insurers elect not to appeal a
judgment in excess of the underlying limits, the Company may elect to make such
appeal at its own cost  and expense and shall be liable for the taxable costs and
disbursements or interest on judgments incidental thereto, but in no event shall liability
of the Company for ultimate net loss exceed the amount set forth in Item 2 of the
Declarations for any one occurrence and in addition the cost and expense of such
appeal.

(g)  **Loss Payable**

Liability under this Policy with respect to any occurrence shall not attach unless and
until the Insured and/or the Insured's underlying insurer(s) shall have paid the amount of
the underlying limits or the retention amount set forth in Item 2(a) of the Declarations as
provided in this Policy and, with respect to the Insured's liability on account of personal
injury, property damage or advertising liability, unless and until the Insured's liability
shall have been fixed and rendered certain either by final judgment against the Insured
after actual trial or by settlement approved in writing by the Company.  The Insured shall
make a definite demand for payment for any amount of the ultimate net loss for which
the Company may be liable under this Policy within twelve (12) months after the Insured
shall have paid such amount. If any subsequent payments shall be made by the Insured
on account of the same occurrence or claim, additional demands for payment should be
made similarly from time to time.  Such losses shall be due and payable by the
Company within thirty (30) days after they are respectively demanded and proven in
conformity with this Policy.  If judgment is rendered, settlement is denominated or
another element of damages is stated in a currency other than the applicable currency
under Section (n) below, payment under this Policy shall be made in such applicable
currency at the rate of exchange prevailing on the date the final judgment is rendered,
the amount of the settlement is agreed upon or the other element of damages is due,
respectively.

(h)  **Representation**

The Named Insured or such other person as it shall designate in Item 5 of the
Declarations shall represent the Named Insured and any and all Insureds hereunder in
all matters under the Policy, including, without limitation, payment or premium,
negotiation of the terms of renewal and/or reinstatement and the adjustment, settlement
and payment of claims.

(i) **Other Insurance**

Subject to Article IV, Section (a) above, if other valid and collectable insurance with any other insurer (whether issued prior hereto, simultaneously herewith or subsequent hereto) is available to the Insured covering a loss covered by this Policy other than insurance which is expressly and specifically excess of the limits of, or quota share on the same layer as, this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance. If this Policy shall be deemed to contribute to a loss with other insurance and such contribution arises in whole or part from the failure of the Named Insured to list such other insurance (whether issued prior hereto, simultaneously herewith or subsequent hereto) on Schedule B hereto in accordance with the instructions on such Schedule B, then the Named Insured shall indemnify the Company for the amount of any such contribution and this Policy shall provide coverage as if such other insurance had been so listed.

(j) **Subrogation**

Inasmuch as this Policy is excess coverage, the Insured's right of recovery against any person or other entity cannot be exclusively surrogated to the Company. It is, therefore, understood and agreed that in case of any payment hereunder, the Company will act in concert with all other interests (including the Insured) concerned in the exercise of such rights of recovery. The apportioning of amounts which may be so recovered (net of associated expenses) shall follow the principle that any interests (including the Insured's) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the Company is then to be reimbursed out of any balance then remaining up to the amount paid hereunder, lastly, the interests (including the Insured's) of which this coverage is in excess are entitled to claim the residue, if any.

(k) **Changes**

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or stop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part hereof, signed by the Company or its authorized representative.

(l) **Assignment**

Assignment of interest under this Policy shall not bind the Company unless and until consent is endorsed hereon.

(m) **Cancellation**

This Policy may be cancelled on a pro rata basis:

(1) at any anniversary date of this Policy by the Named Insured delivering prior written notice to the Company or by the Company delivering prior written notice to the Named Insured, or

(2)    at any time by the Named Insured by delivering written notice to the Company
       stating when, but in no event prior to the date the notice is delivered, cancellation
       shall be effective, or

(3)    except as provided in Section  (u) below, at any time by the Company by
       delivering written notice to the Named Insured stating when, not less than ninety
       (90) day from the date the notice is delivered, cancellation shall be effective, or

(4)    at any time by the Company, effective fifteen (15) days after delivering written
       notice to the Named Insured, if any payment of premium is not made when due
       and payable.

(n)    **Currency**

The premiums and losses under this Policy are payable in the currency set forth in item
7 of the Declarations.  Unless otherwise specified in such Item 7. the currency shall be
United States dollars.

(o)    **Arbitration**

Any dispute arising under this policy shall be finally and fully determined in London.
England under the provisions of the English Arbitration Act of 1950, as amended and
supplemented, by a Board composed of three arbitrators to be selected for each
controversy as follows:

Any party to the dispute may, once a claim or demand on his part has been denied or
remains unsatisfied for a period of twenty (20) calendar days by any other, notify the
others of its desire to arbitrate the matter in dispute, and at the time of such notification
the party desiring arbitration shall notify any other party or parties of the name of the
arbitrator selected by it. Any party or parties who have been so notified shall within ten
(10) calendar days thereafter select an arbitrator and notify the party desiring arbitration
of the name of such second arbitrator.  If the party or parties notified of a desire for
arbitration shall fail or refuse to nominate the second arbitrator within ten (10) calendar
days following the receipt of such notification, the party who first served notice of a
desire to arbitrate will, within an additional period of ten (10) calendar days, apply to a
judge of the High Court of England for the appointment of a second arbitrator and in
such a case the arbitrator appointed by such a judge shall be deemed to have been
nominated by the party or parties who failed to select the second arbitrator.  The two
arbitrators, chosen as above provided, shall within ten (10) calendar days after the
appointment of the second arbitrator choose a third arbitrator.  In the event of the failure
of the first two arbitrators to agree on a third arbitrator within said ten (10) calendar
day period, any of the parties may within a period of ten (10) calendar days thereafter, after
notice to the other party or parties, apply to a judge of the High Court England for the
appointment of a third arbitrator, and in such case the person so appointed shall be
deemed and shall act as the third arbitrator.  Upon acceptance of the appointment by
said third arbitrator, the Board of Arbitration for the controversy in question shall be
deemed fixed.  All claims, demands, denials of claims and notices pursuant to this
Section (o) of the Policy shall be deemed made if in writing and mailed to the last known
address of the other party or parties.

The Board of Arbitration shall fix, by a notice in writing to the parties involved, a
reasonable time and place for the hearing and may in said written notice or at the time
of the commencement of said hearing, at the option of said Board, prescribe reasonable
rules and regulations governing the course and conduct of said hearing. The Board

shall, within ninety (90) calendar days following the conclusion of the hearing, render its
decision on the matter or matters in controversy in writing and shall cause a copy
thereof to be served on all the parties thereto. In case the Board fails to reach a
unanimous decision, the decision of the majority of the members of the Board shall be
deemed to be the decision of the Board and the same shall be final and binding on the
parties thereto, and such decision shall be a complete defense to any attempted appeal
or litigation of such decision in the absence of fraud or collusion. All costs of arbitration
shall be borne equally by the parties to such arbitration. The Company and the Insured
agree that in the event that claims for indemnity or contribution are asserted in any
action or proceeding against the Company by any of the Insured's other insurers in any
jurisdiction or forum other than that set forth in this Section (o), the Insured will in good
faith take all reasonable steps requested by the Company to assist the Company in
obtaining a dismissal of these claims (other than on the merits) and will, without
limitation, undertake to the court or other tribunal to reduce any judgment or award
against such other insurers to the extent that the court or tribunal determines that the
Company would have been liable to such insurers for indemnity or contribution pursuant
to this Policy. The Insured shall be entitled to assert claims against the Company for
coverage under this Policy, including, without limitation, for amounts by which the
Insured reduced its judgment against such other insurers in respect of such claims for
indemnity or contribution, in an arbitration between the Company and the Insured
pursuant to this Section (o); provided, however, that the Company in such arbitration in
respect of such reduction of any judgment shall be entitled to raise any defenses under
this Policy and any other defenses (other than jurisdictional defenses) as it would have
been entitled to raise in the action or proceeding with such insurers.

(p)   **Conflicting Statutes**

In the event that any provision of this Policy is unenforceable by the Insured under the
laws of any State of other jurisdiction wherein it is claimed that the Insured is liable for
any injury covered hereby, because of non-compliance with any statute therein, then
this Policy shall be enforceable by the Insured with the same effect as if it complied with
such statute.

(q)   **Governing Law and Interpretation**

This Policy shall be governed by and construed in accordance with the internal laws of
the State of New York, except insofar as such laws may prohibit payment in respect of
punitive damages hereunder and except insofar as such laws pertain to regulation by
the Insurance Department of the State of New York of insurers doing insurance
business or issuance or delivery of policies of insurance within the State of New York;
provided, however, that the provisions, stipulations, exclusions and conditions of this
Policy are to be construed in an evenhanded fashion as between the Insured and the
Company; without limitation, where the language of this Policy is deemed to be
ambiguous or otherwise unclear, the issue shall be resolved in the manner most
consistent with the relevant provisions, stipulations, exclusions and conditions (without
regard to authorship of the language, without any presumption or arbitrary interpretation
or construction in favor of either the Insured or the Company and without reference to
parol evidence).

(r)   **Liability of the Company**

The Named Insured and the Insured agree that the liability and obligations of the
Company hereunder shall be satisfied form the funds of the company alone and that the

individual shareholders of the Company shall have no liability hereunder to the Named Insured or the Insured.

(s)    **Policy Extension**

Coverage A of this Policy may be extended at the expiration of each annual period for another annual period, subject only to agreement between the Company and the Named Insured as to the applicable premium and such other terms and conditions as the Company and the Named Insured may mutually deem appropriate.

(t)    **Reinstatement**

At the time of each annual policy extension, the aggregate limit of liability set forth in Item 2(b) of the Declarations shall, unless otherwise agreed by the Named Insured and the Company, automatically be reinstated with respect to covered occurrences of which notice is first given during the following annual period (but there shall be no reinstatement in respect of the Discovery period which, if applicable, is subject to the remaining limit for the preceding annual period).  There shall be no separate premium charged for this automatic reinstatement in addition to that provided for in Section (s) above.

If during any annual period the aggregate limit of liability set forth in Item 2(b)  ("Original Aggregate Limit") of the Declarations is or may be impaired by virtue of occurrence(s) of which notice has been given previously during such annual period, then the Named Insured shall be entitled to one restatement of all or any portion of such aggregate limit, based on the following terms and conditions:

(1)    Such reinstatement must be elected in writing by the Named Insured, which election shall specify the amount being reinstated (not to exceed the amount of the Original Aggregate Limit) ("Reinstatement Amount") and must be accompanied by payment of the reinstatement premium as provided in paragraph 3 below.  Such reinstatement shall be effective as of the date of the receipt by the Company of such written election and premium ("Reinstatement Date").

(2)    The aggregate limit of liability for all occurrences and claims of which notice is first given to the Company during the portion of the annual period prior to the Reinstatement Date shall be the Original Aggregate Limit.  The aggregate limit of liability for all occurrences and claims of which notice is first given to the Company during the portion of the annual period on and subsequent to the Reinstatement Date (and during any Discovery Period in the event Coverage A terminates at the end of such annual period) shall be the lesser of the Original Aggregate Limit or the sum of the Reinstatement Amount and any unused portion of the Original Aggregate Limit pertaining to the portion of the annual period prior to the Reinstatement Date.  In no event shall the aggregate limit of liability of the Company in respect of all occurrences and claims of which notice is first given to the Company during the entire annual period exceed the sum of the Original Aggregate Limit and the Reinstatement Amount.

(3)    The reinstatement premium shall be an amount determined by the Company but in no event shall this amount exceed one hundred and twenty-five percent (125%) of the total premium (including any Reserve Premium offset) for the annual period in which the reinstatement takes place.

(u)    **Optional Extension of Reporting Period**

Page 21 of 22

In the event of expiration of Coverage A, other than by reason of cancellation for non-payment of premium, the Named Insured may elect, prior to expiration of any of the coverages hereunder, to secure (or in the case of extension, continue) Coverage B for such annual periods

(which total period shall be the Discovery Period) and for such Insureds as the Named Insured shall designate by giving the Company written notice of such election and paying to the Company the annual premium(s) as set forth in the attached Schedule D no later than the date(s) of commencement of the annual period(s) to which such coverage will apply.  Where first notice of an occurrence is given during the Discovery Period, it shall be deemed to have been given in the immediately preceding annual period or portion thereof

(v)  **Expiration Date**

Except as otherwise provided in Section (w) of this Article V, Coverage A shall expire upon cancellation thereof or at the end of an annual period if not extended.  Coverage B shall expire upon termination of the Discovery Period.

(w)  **Former Subsidiaries, Affiliates and Associated Companies**

If any subsidiary, affiliate or associated company of the Named Insured which is an Insured hereunder by virtue of paragraph (1) (B) or subsection (3) of Section (a) of Article III hereof shall cease to be such a subsidiary, affiliate or associated company of the Named Insured, then at such time Coverage A shall automatically expire as to such former subsidiary, affiliate or associated company (although Coverage A shall continue with respect to the Named Insured and any other entity which remains an Insured as respects its own liability, if any, arising out of its prior ownership of or affiliation or association with the former subsidiary, affiliate or associated company) and Coverage B shall (unless the Named Insured otherwise specifies) automatically incept as to such former subsidiary, affiliate or associated company and continue in force until termination of the annual period (which portion of such annual period shall be the Discovery Period) in which such cessation takes place, without additional payment or refund of any premium.  Prior to the end of such annual period, such former subsidiary, affiliate or associated company may, with the written consent received by the Company from the Named Insured, elect to extend Coverage B (and the Discovery Period) beyond the end of such annual period on such terms and conditions, for such period, subject to such limits and for such additional premium(s) as may be agreed with the Company.

(x)  **Headings**

The description in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms of conditions hereof.

(y)  **Notice**

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, airmail, telex or telecopier properly addressed to the appropriate party.  Notice to any Insured may be given to the Named Insured at the address shown in Item 1 of the Declarations or to such other person as it shall designate in Item 5 of the Declarations.  Notice to the Company shall be given to the party indicated in Item 6 of the Declarations.  Notice given as above shall be deemed to be received not later than one day following the date such notice is given.

TIG Specialty Insurance Company
Service of Suit Endorsement

We agree that if we fail to pay any amount claimed to be due under this Policy we will, at your request, submit to the jurisdiction of any court of competent jurisdiction in the United States of America and we will do whatever is necessary to give that Court jurisdiction, and all matters arising under this policy will be determined in accordance with the law and practice of that Court.

We also agree that Service of Process in that suit may be made upon William Huff, TIG Specialty Insurance Company, or his nominee at 5205 North O'Connor Blvd., Irving, TX, 75039 and that we will abide by the final decision of such Court or by any Appellate Court in the event of an appeal.

The above named will accept service of process on behalf of the Company in any such suit, or on your request will give you a written undertaking to enter a general appearance on behalf of the Company if such suit is started.

And further, in accordance with the statutes of any state, territory, or district of the United States of America, we hereby designate the Superintendent, Director or Commissioner of Insurance or other officer specified in the statute as our true and lawful attorney upon whom may be serviced any lawful process in any action, suit or proceeding instituted by you or on your behalf arising out of this contract of insurance, and we hereby designate the above named William Huff as the person to whom the said officer is authorized to mail such process.

ZC 25655

12/97

**Endorsement #1**

## <u>NAMED INSURED ENDORSEMENT</u>

It is understood and agreed that Named Insured includes all listed below on A. COMPANIES or B. OWNERS.

A.  COMPANIES

Any subsidiary, including subsidiaries thereof; organization; partnership (general or limited); limited liability company; firm; company; corporation; or other similar legal entity, which is owned, and/or associated, and/or affiliated, and coming under financial or operational or managerial, or administrative control of any Named Insured (A. COMPANIES or B. OWNERS), as now or may hereafter be constituted, including all predecessor and/or successor name or any Named Insured (A. COMPANIES or B. OWNERS), and all names used by any Named Insured for doing or conducting business, and including any legal entity for which any Named Insured is required to provide this insurance.  All operations or legal entities which have been merged or liquidated or dissolved or sold or no longer exist as a legal entity, or for which any Named Insured may be liable.

B.  OWNERS

All direct and indirect owner or stockholder, including owner or stockholder thereof, of each Named Insured covered under Section A.  above, including any person and/or individual and/or organization and/or partnership (general or limited) and/or limited liability company and/or trust and/or other similar legal entity, and their directors, officers, partners (general or limited), members, managers, trustees, protectors, grantors, settlors, beneficiaries including, as respects to the business activity insured by this policy, all family members of such direct and indirect owners or stockholders.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Endorsement #2

## KNOWN OCCURRENCE EXCLUSION ENDORSEMENT

(1)     In consideration that retroactive coverage is being afforded under the Policy to the date set forth in Item 4 of the Declarations, it is condition precedent to the rights of any Insured under this policy with respect to any Occurrence which otherwise would be subject to coverage because the Retroactive Coverage Date precedes the date listed below that any Insured was not aware of such Occurrence at the date listed below.

(2)     The Insured shall be deemed to have been aware of an Occurrence if any officer of it or if the manager or equivalent level employee of its risk management, insurance or law department was aware, in the case of an Occurrence under subparagraph (i) of Definition (e), of any of the event, exposure to conditions, Personal Injury, Property Damage or Advertising Liability referred to therein or, in the case of subparagraph (ii) of such Definition, of any of the Personal Injury or Property Damage referred to therein, in each case irrespective of whether or not such person was aware that such Occurrence was likely to involve this Policy.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #3**

## PROFESSIONAL SERVICES EXCLUSION

This Policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of liability or alleged liability for property damage arising or alleged to arise out of any act, error or omission in the rendering of professional services, other than Clinical Trials / Medical Services and other than architectural and engineering services (which are nonetheless subject to the other exclusions herein, including, without limitation, exclusion (e) including, but not limited to, the rendering of legal, accounting, data processing, consulting, or investment advisory services.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #4**

## CROSS SUITS EXCLUSION

This Policy is amended in that, notwithstanding Section (c) of Article V (Conditions) hereof, this Policy shall not apply to and the Company shall have no liability hereunder to the Insured in respect of personal injury, property damage or advertising liability arising out of any injuries initiated, alleged, or caused to be brought about by a Named Insured covered by this Policy against any other Named Insured covered by this Policy.

However, this exclusion shall not apply to any State, County, or Municipal Government Agency or Political subdivision which has issued a permit or has Additional Insured status by virtue of a contract or agreement.


ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #5**

## <u>FIDUCIARY EXCLUSION</u>

This Policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of personal injury, property damage or advertising liability directly or indirectly arising out of, or alleged to arise out of any fiduciary, including escrow responsibilities.


ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #6**

## A.I.D.S. EXCLUSION

This Policy is amended in that it shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of, personal injury, property damage or advertising liability directly or indirectly arising out of, or alleged to arise out of:

(1)    the Human Immune Deficiency Virus (HIV);

(2)    the Acquired Immune Deficiency Syndrome Related Complex (ARC):

(3)    the Acquired Immune Deficiency Syndrome (AIDS);

(4)    any virus, complex or syndrome that is related to the foregoing.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

Endorsement #7

## <u>LIMITED NON – F.D.A. APPROVED PRODUCTS EXCLUSION</u>

This Policy is amended in that it shall not apply to any claim or claims for Personal Injuries in respect of Loss or Losses arising from any of the Insured's Products which are:

1) subject to approval by the United States Food and Drug Administration (FDA), or would be subject to such approval if sold or distributed in the United States, and which have not been so approved prior to sale or distribution, and for which the FDA has issued notice in writing that approved applications are required, which notice has not been challenged by the Insured (unless the notice states that there is a reasonable probability that the use of the product will cause serious adverse health consequences or death or words to that effect, in which case it makes no difference that the notice has been challenged by the Insured); or

2) used in violation of any law, statute, or regulation promulgated in the United States at the express or implied direction of the Insured.

However, this exclusion does not apply to those Insured's Products that:

A. have not been so approved prior to such sale or distribution, but have been listed with the FDA under 21 C.F.R. Part 207 and for which the FDA has not issued in writing that approved applications are required; or

B. have been manufactured solely for use in human clinical trials conducted in compliance with the Code of Federal Regulations; however coverage hereon shall apply solely where the conduct of such clinical trials relate to bioequivalency or bioavailability testing.

Except for those clinical trails specified above, this Policy shall not provide coverage for any other clinical trails, other than as may be disclosed to and agreed by Underwriters hereon and specifically endorsed to this Policy; or

C. are to be or are exported from the United States under either an approved application or an export authorization issued under 21 U.S.C. 382.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

Endorsement #8

## AMENDED EXCLUSION (h)

This Policy is amended in that Exclusion (h) has been cancelled and replaced by the following:

(h)     Personal Injury, Property Damage or Advertising Injury arising out of, or alleged to arise out of the
manufacture and/or distribution and/or sale and or installation and/or removal and/or utilization and/or
ingestion or inhalation of, or exposure to, as the case may be, products manufactured, distributed, sold or
installed by the Insured containing or consisting of:

       1)     tobacco or tobacco products,

       2)     2,4,5 trichlorophonoxyacetic acid ("2,4,5-T),

       3)     diethylstilbestrol ("DES") or

       4)     any intra-uterine device ("IUD");

provided, however, that this Exclusion (h) shall not apply to Personal Injury or Property Damage caused
by an occurrence where such Personal Injury or Property Damage is not related to the tobacco (or other
consumed portion of a tobacco product), 2,4,5-T and/or DES or IUD content or nature of the product or
completed operations.

The listing of products herein shall not give rise to an inference that Personal Injury, Property Damage or
Advertising Liability attributable to other products was Neither Expected nor Intended by the Insured.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #9**

### L-TRYPTOPHAN EXCLUSION

This Policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of personal injury, property damage or advertising liability directly or indirectly arising out of, or alleged to arise out of the manufacture, handling, distribution, advertising, labelling, sale, application, ingestion, consumption, exposure to or use of L-tryptophan or products of any kind or nature which contain L-tryptophan or any derivative thereof, regardless of whether the product is designated as L-tryptophan or given any other appellation.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #10**

### CLINICAL TRIALS/MEDICAL SERVICES ENDORSEMENT

This Policy is amended in that, nothwithstanding Section (c) of Article IV (Exclusions) hereof, coverage shall apply to the rendering of or failure to render Medical Services to any Subject during the course of (1) any testing or clinical trial of any substance manufactured or prepared by the Insured or by others on behalf of the Insured whether at the premises owned by, or rented to the Insured or at premises of others and (2) any testing or clinical trial conducted by the Insured or at the direction of the Insured on any substance for others.

The term "Medical services", is defined as services rendered or which should have been rendered or which should have been rendered by the Insured of a medical nature. In respect of the foregoing the following operations shall be deemed Medical Services:

    (a)    medical, surgical, dental or nursing treatment or services, including the furnishing of food or beverages in connection therewith;

    (b)    furnishing or dispensing of drugs or medical, dental or surgical supplies and/or appliances;

    (c)    handling of or performing post-mortem examinations on human bodies.

The term "Subject" is defined as any person or human body receiving, or having previously received, Medical Services (as defined above) in relation to or in the course of any testing or clinical trial afforded coverage as defined in the first paragraph of this endorsement.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #11**

### MULTIYEAR POLICY CONTIDITONS

1)      No new products outside of the Insured's core business introduced during the Policy Period.

2)      No Acquisition or creation of an entity outside the Insured's core business.

3)      No losses paid or reserved in excess of $25,000,000

4)      Growth in revenues not to exceed 25% of the preceding years figures, subject to an overall cap of 60% for the period.

Underwriters will require an annual declaration, not less than 30 days prior to anniversary date from Insured, confirming no breach of the foregoing conditions.  In the event of such, Underwriters reserve the right to amend the terms, conditions and premium of this Policy.  Underwriters will also require updated information on any new Clinical Trials at the anniversary date.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #13**

## <u>ASBESTOS EXCLUSION</u>

This Policy is amended in that the following Exclusion shall apply:

(h)  ASBESTOS

Personal Injury, Property Damage or Advertising Injury directly or indirectly arising out of, or alleged to arise out of Asbestos.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

Endorsement #14

## EXCLUSION

This Policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of personal injury, property damage or advertising liability directly or indirectly arising out of, or alleged to arise out of:

(1)    asbestos;

(2)    diethrylstilbestrol ("DES") or dienestrol ("DEN");

(3)    swine flu vaccine;

(4)    isotretinoin or accutane;

(5)    simplast;

(6)    any birth control pills, contraceptives, fertility drugs or prenatal drugs and products designed for use during and in connection with pregnancy however this exclusion shall not apply to the two fertility drugs distributed by MNB, being Human Chronic Gonadotrophin and Human Menopausal Gonadotrophin.


ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.

**Endorsement #15**

## SENKOT LITIGATION EXCLUSION

This Policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of personal injury, property damage or advertising liability directly or indirectly arising out of, or alleged to arise out of any Senekot Products.

This exclusion also applies to any pending or prior litigation related to Senekot Products.

ALL OTHER TERMS AND CONTIONS OF THIS POLICY REMAIN UNCHANGED.