DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING DEADLINES FOR FILING PROOFS OF CLAIM AND PROCEDURES RELATING THERETO, (II) APPROVING THE PROOF OF CLAIM FORMS, AND (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PAGE

Preliminary Statement.................................................................................................1

Argument ....................................................................................................................5

I.      The Bar Dates .................................................................................................5

II.     Notice of the Bar Dates...................................................................................8

        A.      The Requirement to Provide Claimants with Reasonable Notice...........8

        B.      Notice to Known Claimants....................................................................9

        C.      Notice to Unknown Claimants..............................................................14

                1.      *Publication Notice in Other Mass Tort Bankruptcies*................15

                2.      *The Debtors' Proposed Supplemental Notice Program* ...........17

III.    The Proof of Claim Forms ............................................................................22

        A.      Legal Precedent for Detailed Proof of Claim Forms ............................22

        B.      The Debtors' Proposed Proof of Claim Forms .....................................27

Conclusion ................................................................................................................31

i

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*A.H. Robins Co.,*
862 F.2d 1092 (4th Cir. 1988) ...................................................................... 22, 23

*In re Amdura Corp.,*
170 B.R. 445 (D. Colo. 1994) ................................................................................ 9

*In re Best Prods. Co.,*
140 B.R. 353 (Bankr. S.D.N.Y. 1992) ................................................................. 15

*Chemetron Corp v. Jones,*
72 F.3d 341 (3d Cir.1995) ................................................................... 9, 10,13,14

*City of New York v. New York, N.H. & H.R. Co.,*
344 U.S. 293 (1953) ............................................................................................ 8

*In re Crystal Oil Co.,*
158 F.3d 291 (5th Cir. 1998) ............................................................................. 10

*In re Eagle-Picher Indus., Inc.,*
137 B.R. 679 (Bankr. S.D. Ohio 1992) ........................................................... 5, 21

*Fogel v. Zell,*
221 F.3d 955 (7th Cir. 2000) ........................................................................... 9, 12

*In re Keene Corp.,*
188 B.R. 903 (Bankr. S.D.N.Y. 1995) ............................................................... 5, 9

*In re Motors Liquidation Co.,*
598 B.R. 744 (Bankr. S.D.N.Y. 2019) ................................................................. 9

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
339 U.S. 306 (1950) ............................................................................... 8, 10, 13

*In re New Century TRS Holdings, Inc.,*
450 B.R. 504 (Bankr. D. Del. 2011) ................................................................... 11

*In re New England Compounding Pharmacy, Inc. Prods. Liability Litig.,*
MDL No. 13-2419, 2013 WL 6058483 (D. Mass. Nov. 13, 2013) ....................... 12

*In re Penn Cent. Transp. Co.,*
771 F.2d 762 (3d Cir. 1985) ................................................................................ 9

*In re Residential Capital, LLC,*
No. 12-12020, 2015 WL 2256683 (Bankr. S.D.N.Y. May 11, 2015) .................... 15

*In re Smidth & Co.*,
    413 B.R. 161 (Bankr. D. Del. 2009) ............................................................................... 5

*In re Thomson McKinnon Sec. Inc.*,
    130 B.R. 717 (Bankr. S.D.N.Y. 1991) ........................................................................... 14

*Tulsa Prof'l Collection Serv. Inc. v. Pope*,
    485 U.S. 478 (1988) ...................................................................................................... 9

*In re U.S.H. Corp. of New York.*,
    223 B.R. 654 (Bankr. S.D.N.Y. 1998).......................................................................... 9, 13

*Vancouver Women's Health Collective Soc. v. A.H. Robins Co.*,
    820 F.2d 1359 (4th Cir. 1987) ...................................................................................... 9

*In re XO Commc'ns, Inc.*,
    301 B.R. 782 (Bankr. S.D.N.Y. 2003) .......................................................................... 14

## STATUTES & RULES

11 U.S.C. § 365 ........................................................................................................................ 7

11 U.S.C. § 1141 ...................................................................................................................... 9

Fed. R. Bankr. P. 2002(a)(7) ............................................................................................... 7, 8

Fed. R. Bankr. P. 3001(a) .................................................................................................. 7, 23

Fed. R. Bankr. P. 3003(c)(2) ................................................................................................... 6

Fed. R. Bankr. P. 3003(c)(3) ....................................................................................... 6, 14, 26

C.F.R. § 164.512(e)(1)(ii)(B) ................................................................................................. 12

## PRELIMINARY STATEMENT[2]

This Memorandum and the accompanying Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof (the "**Motion**") set forth the factual and legal grounds for approving the Debtors' proposed bar dates, proof of claim forms, and notice program.  Faced with over 2,700 cases pending in different state and federal courts around the country alleging that Purdue Pharma L.P. ("**PPLP**") and certain of its affiliates that are debtors and debtors in possession in these proceedings (collectively, with all of PPLP's debtor-affiliates, the "**Debtors**," the "**Company**," or "**Purdue**") and other co-defendants acted improperly in the marketing and sale of certain FDA-approved opioid medications (the "**Pending Actions**"),[3] the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code. Without chapter 11 relief, the Pending Actions and the resulting litigation costs, drain on the Debtors' human capital, disruption to the Debtors' day-to-day operations, and operational challenges were guaranteed to erode the value of the Debtors' estate, benefiting neither the Debtors nor their creditors.  Thus, bankruptcy was the only rational way to swiftly and effectively resolve the massive amount of litigation claims facing the Debtors while preserving the value of the estates for equitable distribution to creditors.

[2] Capitalized terms used in this Memorandum of Law and not otherwise defined shall have the meanings ascribed to them in the Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof (the "**Motion**").

[3] Certain of the Debtors are also named in 13 actions in Canada ("**Canadian Actions**").  *See, e.g.*, Compl. for Injunctive Relief, Ex. C, *Purdue Pharma L.P., et al. v. Commw. of Mass., et al*,  at No. 19-09289 (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 1-3 ("**Ex. C to Compl. for Inj. Relief**").  The Canadian Actions raise claims predicated on similar allegations and causes of action as the Pending Actions in the United States.

The vast majority of plaintiffs in the Pending Actions—approximately 2400, or more than 85% in number—are governmental entities.[4]  These governmental plaintiffs include the attorneys general of 49 states and the District of Columbia, analogous officials of U.S. territories, and thousands of tribal, county, and municipal governments.  *See, e.g.*, Ex. C to Compl. for Inj. Relief (identifying known pending actions to date).  The Pending Actions also include many nongovernmental plaintiffs asserting claims arising from Purdue's alleged conduct in connection with the marketing and/or sale of its opioid products.  Plaintiffs in the Ohio MDL, for example, include third-party payors, such as hospitals, treatment centers, and insurance companies; purchasers of private health insurance; over 100 Native American and Alaska Native tribes; over 100 private putative class actions on behalf of NAS/monitoring claimants; and various individuals and estates alleging personal injury or wrongful death claims arising from opioid use, addiction or overdose.  To date, Rule 2019 statements have been filed in these cases by counsel representing various categories of claimants,[5] and the Debtors anticipate that there will be a substantial number of such claims filed.

The Canadian Actions are brought on behalf of both private individuals and governmental entities.  The Canadian Actions consist of: (i) ten class actions on behalf of private individuals in each province except Manitoba and are subject to a conditional national settlement; (ii) a proposed class action commenced by Her Majesty the Queen in Right of the

---

[4] For the avoidance of doubt, this percentage is not an indication of any future allocation of distribution in these cases.

[5] (*See, e.g.*, Dkt. No. 333 (statement filed by counsel representing certain purchasers of private health insurance that are named plaintiffs in pending class actions); Dkt. No. 341 (statement filed by counsel representing those born with NAS syndrome or other opioid dependent symptoms); Dkt. No. 348 (statement filed by counsel for certain individuals asserting personal injury or wrongful death claims); Dkt. No. 409 (statement filed by counsel representing more than 1,000 cities, counties or other governmental entities, as well as certain tribal nations, hospital districts, medical groups, funds and a veterans' class); Dkt. No. 577 (statement filed by counsel representing certain hospitals, including named plaintiffs in a pending class action).)

2

Province of British Columbia on behalf of all federal, provincial and territorial governments and

agencies against numerous purported manufacturers and distributors of opioids, including Purdue

Pharma; (iii) a recent proposed class action commenced in Ontario against numerous purported

manufacturers and distributors of opioids, including Purdue Pharma; and (iv) an action

commenced in British Columbia by an individual.  *See* Second Report of the Info. Officer, *In the*

*Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, As Amended & In*

*the Matter of Purdue Pharma L.P., et al*, ¶ 24, No. CV-19-627956 (Ont. Super. Ct. of Justice

(Comm. List) Nov. 22, 2019).  The Debtors anticipate that a number of claims related to the

Canadian Actions will be filed in these chapter 11 cases.

Given the active participation of the Official Committee of Unsecured Creditors

appointed in these chapter 11 cases (the "**Creditors' Committee**" or "**UCC**") and the various

public and private ad hoc creditor groups that have formed, the Debtors are hopeful that

meaningful and productive discussions about a path forward and the allocation of value between

and among the Debtors' creditors will commence without delay and that costly litigation over the

validity of claims can be avoided.  Establishing a Bar Date at this time, however, is an important

next step that ensures that these cases will be best positioned to proceed without undue delay,

including in the event that a global agreement on claims allocation cannot be reached.  In the

absence of agreement on a path forward that resolves issues of allocation between the various

creditor groups, addressing the validity and value of those claims will be a core part of the

ultimate resolution of these chapter 11 cases.

After the Bar Dates have been established, the Debtors intend to provide actual written

notice of the Bar Dates and the need to file a proof of claim to all known claimants.  Known

claimants include: (i) persons or entities that have filed proofs of claim as of the Bar Date Order;

3

(ii) all creditors and other known holders of claims (including those listed on the Debtors'

Schedules); (iii) all counterparties to the Debtors' executory contracts and unexpired leases;

(iv) all current parties to litigation with the Debtors; (v) current, former, and retired employees,

officers, and directors; and (vi) parties known to the Debtors as having potential claims against

the Debtors.  As part of the Bar Date Notice Package, all known claimants will receive the

appropriate proof of claim form(s) to be filed on or before the appropriate Bar Date.  All other

claimants are unknown claimants and thus, will receive constructive notice by publication and

numerous other means through the Debtors' robust Supplemental Notice Plan.  Unknown

claimants receiving constructive notice by publication will be able to request a proof of claim

form from the Debtors' claims and noticing agent, Prime Clerk, or download a form from the

website established by Prime Clerk for these chapter 11 cases.

Providing notice to claimants and such claimants filing proofs of claim on or before the

Bar Dates will bring known and unknown claims against the Debtors into these proceedings in a

timely and consolidated manner.  In turn, and to the extent a creditor-driven negotiation of

allocation among creditors does not result in a settlement, this will allow the Debtors (working

with the Creditors' Committee) to review, reconcile, and analyze the claims; determine their

liability for and the value of the claims; and, ultimately, bring the bankruptcy to resolution.  For

these reasons, and as discussed further herein, prompt establishment of the Bar Dates and

approval of the proposed proof of claim forms, along with execution of a Court-approved notice

program, are all necessary initial steps for the successful and efficient administration of these

chapter 11 cases.  The Debtors have extensively negotiated with the Unsecured Creditors'

Committee all of the materials that have been included in this Motion, and while some items

continue to be negotiated and finalized, the Creditors' Committee has informed the Debtors that

4

it is generally supportive of the relief requested.[6]  In addition, the Debtors also have engaged

constructively with the Multi-State Governmental Entities Group (the "**MSGE Group**"),[7] which

supports the Debtors' Motion to establish the Bar Dates and commence the notice program.

## ARGUMENT

### I.      The Bar Dates

It is well-established that "[t]he bar date is critically important to the administration of a

successful chapter 11 case, and the reorganization process." *In re Keene Corp.*, 188 B.R. 903,

907 (Bankr. S.D.N.Y. 1995).  Setting the bar date begins the claim resolution process by

establishing an end date for potential claims, thereby "fixing the universe of claims." *In re*

*Eagle-Picher Indus., Inc.*, 137 B.R. 679, 682 (Bankr. S.D. Ohio 1992).  Establishing the universe

of claims against the debtor "contributes to one of the main purposes of bankruptcy law,

securing, within a limited time, the prompt and effectual administration and settlement of the

debtor's estate." *In re Smidth & Co.*, 413 B.R. 161, 165 (Bankr. D. Del. 2009).  Setting the Bar

Dates will allow the Debtors (working with the Creditors' Committee) to begin processing and

analyzing the claims against them.  And, as discussed in detail below, the Debtors' use of the

proposed proof of claim forms to be submitted on or before the appropriate Bar Date will further

streamline and expedite the administration of these cases by allowing the Debtors (working with

the Creditors' Committee) to determine the viability and value of the claims.

---

[6] The Creditors' Committee retains the right to file an objection to the Motion to the extent that circumstances arise prior to the Objection Deadline that would make the Creditors' Committees support of the Debtors' Motion no longer possible.

[7] The MSGE Group is represented by Caplin & Drysdale, and consists of 1,222 entities total, including 1,172 cities, counties and other governmental entities, seven tribal nations, six hospital districts, thirty-four medical groups, two funds, and one veterans' class across thirty-six states. (Dkt. No. 409).

Claimants asserting "disputed, contingent, or unliquidated" claims against the Debtors must file a proof of claim by a certain date in order to be treated as a creditor in these proceedings.  Fed. R. Bankr. P. 3003(c)(2).  This Court has the authority to "fix . . . the time within which proofs of claim or interest may be filed," i.e., the bar dates.  *Id.* at 3003(c)(3).  The Debtors request that the Court establish 5:00 pm (Prevailing Eastern Time) on June 30, 2020, as the General Bar Date—applicable to all claimants, including individuals, partnerships, corporations, joint ventures, trusts, governmental units, and Native American Tribes.  The General Bar Date provides ample time to prepare and file proofs of claim while also allowing the Debtors to settle their estates within a reasonable amount of time.  It is also consistent with 11 U.S.C. § 502(b)(9), which provides that the "claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief," i.e. the petition date.  Indeed, the proposed General Bar Date provides approximately 100 days beyond the required 180 day period for governmental units.

The General Bar Date, which will be approximately 150 days from entry of the Bar Date Order sought by this Motion, is not only consistent with, but in many cases exceeds, the time allowed for the filing of proofs of claim in other mass tort cases.  *See* Order Pursuant to 11 U.S.C. §§ 502(b)(9) & 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005 & 9007 & Local Rules 2002-1(e), 3001-1 & 3003-1 for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form & Manner of Notice Thereof & (III) Approve Procedures for Providing Notice of Bar Date & Other Important Deadlines at 2, *In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del. July 15, 2019), ECF No. 294 (hereinafter "***Insys* Bar Date Order**") (approving 45-day bar date notice period for all claims except claims brought by governmental units and Native American Tribes); Order Granting Mot. for Order Under 11 U.S.C. §§ 105 &

6

502 & Fed. R. Bankr. P. 2002(a)(7), 3001(a), 3003(c) & 9007:  (I) Approving Procedures for

Filing Proofs of Claim Regarding Blitz Personal Injury Claims; (II) Approving Proof of Claim

Forms; (III) Establishing Suppl. Bar Date for Filing Proofs of Claim Related to Blitz Personal

Injury Claims; & (IV) Approving the Form & Manner of Notice of Suppl. Bar Date for Filing

Proofs of Claim Regarding Blitz Personal Injury Claims at 3, *In re Blitz U.S.A.*, No. 11-13603

(Bankr. D. Del. Aug. 14, 2013), ECF No. 1619 (approving 61-day bar date notice period for

personal injury claims).  Furthermore, given that the Purdue bankruptcy has garnered nationwide

attention and the status of these cases continues to be highly publicized in the media, the Debtors

anticipate that the Bar Date Order and the Bar Date Notice similarly will garner such attention.

In light of this publicity, as well as the noticing strategy prepared by Prime Clerk and the

involvement of counsel representing each of the various groups from which claims are expected,

the General Bar Date provides more than adequate time for the filing of claims.

        In addition to the General Bar Date, the Debtors propose two additional bar dates, both of

which are consistent with the United States Bankruptcy Court for the Southern District of New

York Procedural Guidelines for Filing Requests for Orders to Set the Last Date for Filing Proofs

of Claim (the "**Guidelines**").  First, in the event that the Debtors reject any executory contracts

or unexpired leases, the Debtors request that the Court establish the later of: (i) the General Bar

Date; or (ii) 30 days after entry of any order authorizing the rejection of such lease or executory

contract (the "**Rejection Damages Bar Date**") as the deadline for filing proofs of claim for

claims asserted in connection with the Debtors' rejection of such executory contract or unexpired

lease pursuant to section 365 of the Bankruptcy Code.  Second, the Debtors have the right to

amend their Schedules to add an entity not currently listed therein or to alter the amount, priority,

classification, or other status of a listed claim.  In response, claimants affected by the Debtors'

amendment or supplement may be entitled to file amended or original proofs of claim to take

into account the amendment or supplement to the Schedules.  To accommodate these claimants,

the Debtors request that the Court establish the later of: (i) the General Bar Date; or (ii)  30 days

after the claimant is served with notice of the amendment (the "**Amended Schedules Bar Date**")

as the deadline for filing such claims.

## II.    Notice of the Bar Dates

### A.    The Requirement to Provide Claimants with Reasonable Notice

Both the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the U.S.

Constitution require that debtors provide claimants with reasonable notice of the bankruptcy and

the bar dates.  The Bankruptcy Rules require that debtors give at least 21 days' notice to

claimants regarding bar dates.  *See* Fed. R. Bankr. P. 2002(a)(7).  The foundation of this notice

requirement "embodies a basic principle of justice—that a reasonable opportunity to be heard

must precede judicial denial of a party's claimed rights."  *City of New York v. New York, N.H. &

H.R. Co.*, 344 U.S. 293, 297 (1953).  Even in the absence of a statutory requirement, due process

would require adequate notice.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306,

314 (1950).  To comport with due process, notice must be "reasonably calculated, under all

circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections."  *Id.*  Moreover, "[t]he notice must be of such nature as

reasonably to convey the required information . . . and it must afford a reasonable time for those

interested to make their appearance."  *Id.* (citation omitted).

Although "the purpose of the notice requirement is to advise individuals who will be

affected by the outcome of any proceeding of the impending *hearing* so that they can take steps

to safeguard their interests," it "is not necessarily intended to advise them of the nature of those

interests." *In re Penn Cent. Transp. Co.*, 771 F.2d 762, 768 (3d Cir. 1985). Rather, "the right to adequate notice simply requires that the proposed form of notification be *reasonably certain* to inform those affected." *Vancouver Women's Health Collective Soc. v. A.H. Robins Co.,* 820 F.2d 1359, 1364 (4th Cir. 1987) (emphasis added). To guide debtors, courts have developed general guidelines for the content of a bar date notice, holding that the bar date notice must include notice of: (i) the bar date; (ii) any impending hearings so that notice recipients can take steps to safeguard their interests; (iii) information on the effect of not filing a proof of claim by the bar date; and (iv) information on who must file a proof of claim. *See, e.g.*, *In re Keene Corp.*, 188 B.R. at 908; *In re Amdura Corp.*, 170 B.R. 445, 452 (D. Colo. 1994).

The importance of reasonable notice to claimants cannot be overstated. Generally, "confirmation of the debtor's reorganization plan discharges all prior claims against the debtor." *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) (citing 11 U.S.C. § 1141). To receive the benefit of the discharge, however, reasonable notice must be provided to all claimants. *See In re Motors Liquidation Co.*, 598 B.R. 744, 752 (Bankr. S.D.N.Y. 2019) ("The due process prerequisite for discharging a creditor's claim in bankruptcy requires that the creditor be given proper notice."). "Thus, if a creditor is not given reasonable notice of the bankruptcy proceeding and the relevant bar dates, its claim cannot be constitutionally discharged." *In re U.S.H. Corp. of New York*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998).

## B.    Notice to Known Claimants

Whether notice is reasonable or adequate depends on whether the claimant is known or unknown to the debtor. *See Fogel v. Zell*, 221 F.3d 955, 963 (7th Cir. 2000). "As characterized by the Supreme Court, a 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.'" *Chemetron Corp.*, 72 F.3d at 346 (quoting *Tulsa Prof'l Collection*

*Serv. Inc. v. Pope*, 485 U.S. 478, 490 (1988)).  "A creditor is 'reasonably ascertainable' if it can be discovered through 'reasonably diligent efforts.'"  *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998) (citation omitted).  However, "[r]easonable diligence does not require 'impracticable and extended searches . . . in the name of due process.'"  *Chemetron Corp.*, 72 F.3d at 346 (second alteration in original) (citing *Mullane*, 339 U.S. at 317).

Known claimants "must be provided with actual written notice of a debtor's bankruptcy filing and bar claims date."  *Id.*  As described above, for the Debtors, known claimants include: (i) persons or entities that have filed proofs of claim as of the Bar Date Order; (ii) all creditors and other known holders of claims (including those listed on the Debtors' Schedules); (iii) all counterparties to the Debtors' executory contracts and unexpired leases; (iv) all current parties to litigation with the Debtors; (v) current, former, and retired employees, officers, and directors; and (vi) parties known to the Debtors as having potential claims against the Debtors.  Parties known to the Debtors as having *potential* claims against the Debtors include: (w) prescribers of Purdue brand name medications[8]; (x) Purdue Opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (y) callers to Purdue who have threatened, but not filed, litigation and provided contact information; and (z) entities and individuals that have requested indemnification.  Although the Debtors' access to name and address information for the above-listed potential claimants "reflect[s] that [they are] known *customers* [or otherwise have some connection to Purdue or its products] . . . without more, it [does] not make them 'known *creditors*'" or claimants entitled to actual written notice.

---

[8]  Although the Debtors' take no position as to whether prescribers of Purdue brand name medications have claims against the Debtors, the Debtors are hopeful that such prescribers will be willing to assist the Debtors in notifying the prescribers' patients regarding the Bar Date and these chapter 11 cases.  *See, e.g.*, *infra* at 14, fns. 8-9.

10

*In re New Century TRS Holdings, Inc.*, 450 B.R. 504, 512 (Bankr. D. Del. 2011). Nonetheless, out of an abundance of caution, the Debtors will treat these claimants as known claimants.

Known claimants will receive the Bar Date Notice Package, which will include: (a) the Bar Date Notice, annexed as Exhibit 1 to the Bar Date Order; and (b) the appropriate proof of claim form(s) and instructions. Among other things, the Bar Date Notice Package will: (i) identify the Bar Dates; (ii) include procedures for submitting proofs of claim; (iii) list parties not required to submit a proof of claim; (iv) describe the consequences of not filing a proof of claim in accordance with the Bar Date Order; (v) provide claimants with the name and telephone number of the Claims Agent—Prime Clerk—where questions may be addressed; and (vi) notify claimants that their claims must be filed with an original signature. The proposed notice to these known claimants, i.e., the Bar Date Notice Package, satisfies due process for known claimants by providing actual written notice of the Bar Dates.

The Debtors are aware that there may be individuals or entities that have not yet filed a proof of claim; are not known creditors; are not counterparties to the Debtors' executory contracts or unexpired leases; are not current, former, or retired employees; are not prescribers of Purdue brand name medications; are not included in an adverse event report; have not filed a product complaint; have not threatened or filed litigation; and have not requested indemnification, but that, nonetheless, *may* have a claim against the Debtors—individuals who were prescribed a Purdue Opioid, for example. However, with the exception of Purdue Opioid users who are included in an adverse event report and provided contact information, Purdue Opioid users who have filed a product complaint and provided contact information, and callers who have threatened litigation and provided contact information, the Debtors do not have name and address information for these potential claimants, and such information is not "reasonably

11

ascertainable."  In fact, because of the Health Insurance Portability and Accountability Act of 1996, to even attempt to obtain the name and address of each person in the United States who was prescribed a Purdue Opioid, the Debtors would first have to obtain a protective order from the Court and then subpoena each insurance provider, healthcare provider, and healthcare clearinghouse.  *See* 45 C.F.R. § 164.512(e)(1)(ii)(B).  There is, of course, no guarantee that such subpoenas would be granted or that the recipients of such subpoenas would not seek to quash such subpoenas, and litigation with respect to such issues would take months.  The Debtors and the Creditors' Committee, therefore, reserve the right to seek to take such extraordinary action to the extent that the noticing strategy proves ineffective.

Conducting such a burdensome search, however, is still not guaranteed to reach all potential claimants, and at least one court has prevented parties from obtaining protected health information from non-parties for the purpose of providing notice to potential claimants.  *See In re New England Compounding Pharmacy, Inc. Prods. Liability Litig.*, MDL No. 13-2419, 2013 WL 6058483, at *1 (D. Mass. Nov. 13, 2013) (granting a motion to quash subpoenas seeking "to obtain patient medical records or other patient information as to individuals who are not parties to any action presently pending in th[e] [c]ourt for the purpose of providing notice to possible claimants").

Additionally, when examining the appropriate level of notice, courts consider the cost of providing actual written notice to all potential claimants.  *See Fogel*, 221 F.3d at 963 ("Notice by publication may thus be entirely appropriate when potential claimants are numerous, unknown, or have small claims (whether nominally or . . . realistically)—all circumstances that singly or in combination may make the cost of ascertaining the claimants' names and addresses and mailing each one a notice of the bar date and processing the responses consume a disproportionate share

of the assets of the debtor's estate."). Feasibility aside, the Debtors are simply not required to conduct such a "vast, open-ended investigation" into all potential claimants. *See Chemetron Corp.*, 72 F.3d at 346 (quoting *Mullane*, 339 U.S. at 317). In fact, it is well-established that "[d]ebtors cannot be required to provide actual notice to anyone who potentially could have been affected by their actions [because] such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates." *In re U.S.H. Corp.*, 223 B.R. at 659. Rather, "[t]he requisite search instead focuses on the debtor's own books and records." *Chemetron Corp.*, 72 F.3d at 346.

The Debtors have collected name and address information for approximately 998,500 prescribers[9] of Purdue brand name medications to which the Debtors will provide the Bar Date Notice Package.[10] In addition, the Debtors have identified: (i) approximately 38,500 Purdue Opioid users who have reported adverse events after taking a Purdue Opioid and provided contact information; (ii) approximately 2,300 Purdue Opioid users who have filed product complaints related to Purdue Opioids and provided contact information; and (iii) approximately 20 callers who have threatened litigation and provided contact information. These individuals will receive the Bar Date Notice Package. The approximately 317 entities and individuals that have requested indemnification from the Debtors will also receive the Bar Date Notice Package.

---

[9] The Debtors are aware that prescribers of Purdue brand name medications may themselves be defendants in the nationwide opioid litigation and therefore, are not relying on such prescribers to be the sole or primary source of publication notice. Further, to the extent that prescribers do not reasonably cooperate, the Debtors and the Creditors' Committee reserve their rights to seek the extraordinary relief set forth above regarding seeking to obtain patient information for all Purdue Opioid prescriptions.

[10] In addition to the Bar Date Package, prescribers of Purdue brand name medications will also receive a plain language, one-page notice of the bar dates to be posted or provided to patients or customers. *See Infra* p. 19; Finegan Decl. ¶ 74.

Contact information for all other potential claimants, including all persons prescribed a

Purdue Opioid (other than those discussed above who made themselves known to the Debtors

through adverse event reporting, product complaints, or threatened litigation), and persons who

used Purdue Opioids without a prescription, is not part of the Debtors' "books and records."

Therefore, those claimants are unknown claimants, and publication notice is sufficient. *See*

Order Pursuant to 11 U.S.C. §§ 105(a) & 502(b)(9), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005 &

9007 & Local Rules 2002-1(e), 3001-1 & 3003-1 for Auth. to (I) Establish Deadlines for Filing

Proofs of Claim (II) Establish the Form & Manner of Notice Thereof, & (III) Approve

Procedures For Providing Notice of Bar Date & Other Important Deadlines & Info. to Potential

PSAN Inflator Claimants ¶ 14, *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Oct. 4,

2017), ECF No. 959 (hereinafter "***Takata* Bar Date Order**") (holding that the "identities and

contact information of [potential claimants] other than [the listed known claimants] are not

reasonably ascertainable and that such parties therefore are unknown creditors with respect to

any claims they may have against the [d]ebtors' estates, for whom notice by publication pursuant

to Bankruptcy Rule 2002(l) is appropriate and sufficient").

### C.    Notice to Unknown Claimants

"An 'unknown' creditor is a claimant whose identity or claim is not 'reasonably

ascertainable' or is merely 'conceivable, conjectural or speculative.'" *In re XO Commc'ns, Inc.*,

301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (quoting *In re Thomson McKinnon Sec., Inc.*, 130

B.R. 717, 720 (Bankr. S.D.N.Y. 1991)). "It is well established that, in providing notice to

unknown creditors, constructive notice of the bar claims date by publication satisfies the

requirements of due process." *Chemetron Corp.*, 72 F.3d at 348. Additionally, "[t]he court may

14

order notice by publication if it finds that notice by mail is impracticable or that it is desirable to

supplement the notice." Fed. R. Bankr. P. 2002(l).

### 1.    *Publication Notice in Other Mass Tort Bankruptcies*

"The proper inquiry in evaluating notice is whether the party giving notice acted

reasonably in selecting means likely to inform persons affected, not whether each person actually

received notice." *In re Residential Capital, LLC*, No. 12-12020, 2015 WL 2256683, at *6

(Bankr. S.D.N.Y. May 11, 2015) (quoting *In re Best Prods. Co.*, 140 B.R. 353, 357-58 (Bankr.

S.D.N.Y. 1992)).  As such, courts have approved a wide spectrum of publication notice programs

with varying media, effective reach rates, and message frequencies, depending on the facts of the

case.

For example, the court-approved publication notice program in *In re TK Holdings* was

designed to reach 95% of the target audience at a frequency of four (4) times and involved: (i)

publication of the bar date notice once in the national editions of each of *The Wall Street*

*Journal*, *The New York Times*, and *USA Today*; (ii) publication of the bar date notice once in

each of *Los Angeles Times*, *The Mercury News*, *The Dallas Morning News*, *Houston Chronicle*,

*Miami Herald*, *Tampa Bay Times*, and *Automotive News*; (iii) publication of the bar date notice

in fifty-eight (58) international publications in thirty-eight (38) countries; (iv) an informational

release; and (v) a dedicated website and call center. *Takata* Bar Date Order at 12, No. 17-11375,

ECF No. 959.  The court held that the publication notice was "reasonably calculated to provide

notice to unknown creditors." *Id.* at 13.

The court-approved publication notice program in *In re The Babcock & Wilcox Co.*

included dissemination of the bar date notice using the following: eleven (11) magazines,

nineteen (19) print insertions, 900 Sunday newspapers, 104 television spots, a dedicated website,

search engine website ads, press releases, radio public service announcements, and news articles.

*See* Exhibit G to Order Regarding Debtors' Mot. for Entry of an Order Establishing a Bar Date,

Approving the Proof of Claim Forms & Approving the Form & Manner of Notice, No. 00-CV-

0558 (E.D. La. Oct. 30, 2000), ECF No. 70 (hereinafter "***Babcock* Bar Date Order**").  The

program was designed to reach 94% of men 55 years and older 4.4 times each; 90.7% of men 35

years and older 3.9 times each; and adults 18 years and older 3.6 times each.  *Id.*

Dow Corning's media, or publication notice, program was part of its "Domestic Legal

Notification Plan" and included: (i) official announcements on five (5) television and radio

networks, in nine (9) national news services and print media, in additional local news outlets, and

in selected trade journals and news columns; (ii) a two-column article provided to 10,000

newspapers; (iii) a public service announcement distributed to 1,500 radio stations; (iv)

information published on online bulletin boards; (v) an advertising campaign that included 30

thirty-second television commercials per week and ten (10) insertions in print media outlets; and

(vi) a toll-free number.  Ex. 1, Order Regarding Debtor's Renewed Mot. for Order (1) Setting

Bar Date for Filing Proof of Claim; (2) Approving Alternative Proof of Claim Forms for Filing

Certain Proofs of Claim; (3) Modifying Local Rule 2.02; & (4) Approving Domestic Notice

Procedures, *In re Dow Corning Corp.*, No. 95-20512 (Bankr. E.D. Mich. Aug. 7, 1996), ECF

No. 7171 (hereinafter "***Dow Corning* Bar Date Order**").  The plan was designed to reach 95%

of the U.S. audience 18 years and older, specifically 96% of women at a frequency of 5.4 times

and 96% of adults 50 years and older at a frequency of 5.8 times.  *Id.*  Approving the plan, the

court stated that it "provid[ed] adequate and reasonable notice . . . to all claimants."  *Id.* ¶ 6.[11]

2.    *The Debtors' Proposed Supplemental Notice Program*

In light of bankruptcy courts' authority to approve a wide spectrum of publication notice

programs to suit the circumstances of a particular case, the Debtors have developed a robust

notice program that will provide notice by publication via various media and social media outlets

that is designed to reach an estimated 95% of the adult U.S. population and over 80% of the adult

Canadian population, thereby giving sufficient notice to any unknown creditors under the

circumstances of these cases.  The Debtors' comprehensive plan for providing publication notice

to unknown claimants in the United States and Canada (the "**Supplemental Notice Plan**"), as

described in the declaration of Jeanne C. Finegan filed contemporaneously herewith (the

"**Finegan Declaration**"), was designed with the help of Prime Clerk, a leader in bankruptcy

administration.

The U.S. portion of the Supplemental Notice Plan is designed to reach an estimated 95%

of all U.S. adults 18 years old and older (the target audience) at a frequency of six (6) times.

Finegan Decl. ¶ 4.  It uses multiple, interrelated, and complementary components to ensure a

wide reach to potential claimants.  *Id.* ¶ 32.  It also focuses on regional media, which takes into

consideration various cultural backgrounds and geographical concentrations across multiple

languages.  *Id.* ¶¶ 34-36.  The U.S. portion of the Debtors' Supplemental Notice Plan proposes to

---

[11] The Debtors are aware that the cases cited herein are somewhat older and that the means and methods of
publication have changed over the years.  As such, the Debtors and Prime Clerk have and will continue to work
ensure that current mainstream media channels are utilized in order to ensure proper notice is effectuated in these
chapter 11 cases.  Further, the Debtors are acutely aware of the vast number of potential claimants in this case and,
therefore, have attempted to design a noticing strategy that employs creative methods to reach as many potential
claimants as possible, including some methods that are not contemplated by the Motion or the Finegan Declaration,
but that may be added by the time of the hearing on the Motion.

use the following media to provide notice to unknown claimants: (i) broadcast, cable, and

advanced digital television, radio (terrestrial and streaming), and traditional print media such as

magazines and newspapers; (ii) various online displays, videos, and podcasts on websites such as

YouTube and Google; (iii) social media, networking, and engaging influencers on websites such

as Facebook, Instagram, Twitter, and LinkedIn; (iv) static and digital billboards located in high

traffic areas and video ads in certain movie theaters; (v) press releases; and (vi) community

outreach via a one-page notice to all prescribers of Purdue name brand medications, U.S.

pharmacies and institutions that received Purdue Opioids, and third-party organizations.  *Id.* ¶¶

19, 37-74.

In the United States, the Debtors will air television commercials on ABC, NBC, CBS,

CNN, FOX, HIST, HGTV, and Galavision (Spanish), and air radio commercials on both

terrestrial and streaming radio.  *Id.* ¶¶ 39-45.  Through topic-specific Facebook and Instagram

pages, Twitter hashtags, and LinkedIn profiles, the Debtors will use social media and networking

sites to reach young adults—one of the largest groups of abusers of prescription opioids.  *Id.*

¶¶ 46-50.  In addition, the Debtors will identify and engage influencers with a significant

following within the young adult age demographic to post and share information regarding these

chapter 11 cases on social media platforms such as Instagram, Facebook, and Twitter, as well as

popular podcasts and blogs.  *Id*. ¶ 74.  Banner ads in both English and Spanish, Google and Bing

keyword search terms, and video ads on YouTube will also be used to distribute notice of the Bar

Dates.  *Id.* ¶¶ 52-57.  At least sixty (60) static and digital billboards will be posted along major

interstates, highways, and other highly traveled areas for four (4) weeks in the highest opioid-

affected states of West Virginia, Kentucky, Tennessee, and Alabama.  *Id.* ¶ 64.  In addition, over

the course of four (4) weeks the Debtors will air 30-second video ads in over 300 AMC,

Cinemark, and Regal movie theaters across seventeen (17) states identified as having higher levels of opioid use.  *Id.* ¶ 65.

In addition to the more robust and innovative methodologies that the Debtors are employing to ensure effective notice in these chapter 11 cases, the Debtors will also undertake more traditional noticing strategies.  Specifically, the Debtors will publish the full Bar Date Notice in the national editions of each of *The Wall Street Journal*, *The New York Times*, and *USA Today*.  *Id.* ¶ 61.  A summary of the Bar Date Notice will be published in approximately eighty (80) local U.S. newspapers across eleven (11) states based on demographic and geographic research, and in various trade magazines for health insurance providers, physicians and nurses, military personnel, and addiction abuse treatment and pain management centers, among others.  *Id.* ¶¶ 60, 62.  In addition, numerous local print publications such as newspapers as well as nationally circulated titles will be used to reach Native American populations.  *Id.* ¶ 64.  The U.S. portion of the Debtors' Supplemental Notice Plan also includes publishing a summary of the Bar Date Notice in numerous general circulation magazines including *People Magazine*, *Sports Illustrated*, *People En Espanol*, *National Geographic*, *Men's Health*, *Good Housekeeping*, *Parents*, and *Parents Latina*.  *Id.* ¶ 59.  Several press releases will be issued across various newslines including the PR Newswire, US1 plus Hispanic, and PR Newswire newslines to the U.S. Territories, and the Native American/First Nations newslines.  *Id.* ¶ 68.

The community outreach element of the Debtors' plan will include distribution of a plain language, one-page notice to (i) all prescribers of Purdue brand name medications, (ii) U.S. pharmacies and institutions that received Purdue Opioids, including those that received Purdue Opioids under the Federal Supply Schedule and 340B Drug Pricing Program, and (iii) third-party organizations, such as community leaders, veterans' organizations, mining organizations and

19

trade unions, health centers, mobile health teams in fourteen (14) states, and addiction and rehab centers, among others, to be posted or provided to patients, customers, or members. *Id.* ¶¶ 70, 72-73.   In addition, the Debtors' plan will include a "boots-on-the-ground" approach to enhance notice of the Bar Date, including by attending various community events and making the full Bar Date Notice and other materials available to attendees. *Id.* ¶ 71.

The U.S. portion of the Debtors' Supplemental Notice Plan also includes outreach to the U.S. Territories of Guam, U.S. Virgin Islands, Marianas, American Samoa, and Puerto Rico using local newspapers, digital outreach, and, where available, television and radio. *Id.* ¶ 66.   In addition, press releases will be sent to television stations, radio stations, and newspapers. *Id.*

The Canadian portion of the Debtors' Supplemental Notice Plan will reach over 80% of Canadian adults 18 years old and older with an estimated frequency of three (3) times. *Id.* ¶ 75. The Debtors will publish a half-page summary of the Bar Date Notice in each of the following English national publications: *Canadian Geographic*, *Canadian Living*, *Chatelaine*, *Maclean's*, and *Reader's Digest*, as well as the following French national publications: *Coup de Pouce*, *Chatelaine*, *L'actualite*, and *Reader's Digest*. *Id.* ¶ 78.   A plain-language summary of the Bar Date Notice will also be included in both the weekday and Saturday editions of *The Globe & Mail*, *National Post*, and *Le Journal de Montreal*. *Id.* ¶ 79.   Press releases will be issued across the Canadian Bilingual General Media Newsline in English and French. *Id.* ¶ 82.   The Canadian portion of the plan also includes an online and social media program in both English and French using Google keyword search terms, Facebook, Instagram, and YouTube, the inclusion of which goes far beyond international publication notice approved by courts in other mass tort bankruptcies. *Id.* ¶¶ 80-81; s*ee, e.g., Takata* Bar Date Order at 12, No. 17-11375, ECF No. 959 (approving an international publication notice plan using only newspaper publications).

20

It is well-established that the Debtors' proposed publication notice program must provide "greater specificity" than simply identifying the "media which are expected to be used." *In re Eagle-Picher Indus.*, 137 B.R. at 682; *see, e.g.*, Ex. G, *Babcock* Bar Date Order, No. 00-05588, ECF No. 70 (court-approved "Bar Date Notice Dissemination Plan" discussed the target audience; media selection; schedule optimization; U.S. plan delivery; net reach/average frequency; effective frequency; effective reach; geographic coverage; online, earned media, direct, third-party, television, and print circulation notice; a Canadian notice program; and other foreign notice program). As such, the Finegan Declaration, which describes the Debtors' Supplemental Notice Plan, includes a more detailed discussion of why the particular media was chosen to distribute the notice of the bar dates; additional information about the target population, effective reach of the program, and the frequency of the message; and a variety of other details regarding the scope and manner in which the publication program will be implemented. Finegan Decl. ¶¶ 4-7, 21-90. It also includes: (i) a list of proposed national cable channels that will air commercials and a summary of radio networks that will air radio ads, annexed thereto as Exhibit B; (ii) a list of the local U.S. newspapers in which a summary of the Bar Date Notice will be published, annexed thereto as Exhibit C; (iii) a list of the Native American newspapers to be used in the plan, annexed thereto as Exhibit D; (iv) a list of news media that will be used to distribute notice in the U.S. Territories, annexed thereto as Exhibit E; and (v) a partial list of media outlets and contacts that will be used to distribute press releases, annexed thereto as Exhibit F.

The Debtors' proposed Supplemental Notice Plan is not only consistent with, but in many cases more robust than other court-approved publication, or supplemental, notice programs. Accordingly, the program will provide adequate and reasonable notice to unknown claimants

and, thus, should be approved.  The Debtors believe that these proposed noticing strategies,

including the use of numerous media platforms, appropriately account for the unique facts and

circumstances of these chapter 11 cases (and the potential claimants).

### III.    The Proof of Claim Forms

The proposed proof of claim forms are necessary and appropriate under the

circumstances of the case and will allow the Debtors (working with the Creditors' Committee) to

effectively and efficiently evaluate the claims against them to begin the process of bringing these

chapter 11 cases to resolution (including to the extent necessary if a negotiated resolution of

allocation is not possible).  The Debtors seek approval of four proof of claim forms—a Non-

Opioid Claimant Proof of Claim Form that substantially conforms to Official Form 410, and

three opioid proof of claim forms.  The opioid proof of claim forms include: (i) a Governmental

Opioid Claimant Proof of Claim Form; (ii) a General Opioid Claimant Proof of Claim Form; and

(iii) a Personal Injury Claimant Proof of Claim Form (together, the "**Opioid Proof of Claim**

**Forms**").  The Opioid Proof of Claim Forms seek certain baseline information that will be

important for evaluating those claims.

### A.    Legal Precedent for Detailed Proof of Claim Forms

It is well-established that the Court may authorize modifications of the Official Form

410.  *See In re A.H. Robins Co.*, 862 F.2d 1092, 1093 (4th Cir. 1988) (authorizing use of a

detailed questionnaire as part of the proof of claim form); Order Approving Debtor's Mot. for

Order Establishing Deadlines for Filing Proofs of Claim & Approving Form & Manner of Notice

Thereof at Ex. 2, *In re USA Gymnastics*, No. 18-09108 (Bankr. S.D. Ind. Feb. 25, 2018), ECF

No. 301 (hereinafter "*USA Gymnastics* **Bar Date Order**") (approving the detailed "Sexual

Abuse Proof of Claim Form"); Order (A) Setting Bar Date for Filing Asbestos Proofs of Claim,

(B) Approving the Form of & Manner for Filing Asbestos Proofs of Claim, & (C) Approving

Notice Thereof, at Ex. 2, *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.

July 30, 2015), ECF No. 5171 (approving the "Unmanifested Asbestos Injury Claim Form," and

requiring claimants to identify the plant in which they or their family member worked, the

location of the plant, the type of asbestos exposure, and the estimated exposure dates); *Babcock*

Bar Date Order at 4, 10, No. 00-05588, ECF No. 70 (approving a detailed personal injury proof

of claim form).

Indeed, it is common for courts to require tort claimants to either complete a detailed

proof of claim form that does not "conform substantially to the . . . Official Form" or submit a

separate questionnaire or addendum to the Official Form. *See id.*; Fed. R. Bankr. P. 3001(a).

For example, in *In re A.H. Robins*, one of the seminal mass tort cases addressing proof of claim

forms, the court required claimants to file a questionnaire as "an essential part of their proofs of

claims." 862 F.2d at 1092. In that case, filing a proof of claim involved a two-step process:

first, the claimant filed a form containing only the claimant's name and address; second, the

claimant was required to file a detailed questionnaire. *Id.* at 1093. "The questionnaire itself

requested first, some basic information such as the claimant's name, address, telephone number,

social security number, date of birth, and, secondly, information of the claimant's use of the

Dalkon Shield, such as dates of insertion and removal, the type of injury alleged and the names

of physicians or clinics visited by the claimant." *Id.*

In *In re Dow Corning*, the court approved a detailed "Implant Proof of Claim Form" to be

used for both breast implant and other implant claims. *See Dow Corning* Bar Date Order, ¶ 7,

No. 95-20512, ECF No. 7171. The approved form requested information concerning why the

claim was filed, the implant manufacturer, the type of implant, the dates of insertion and

removal, and history of payments related to the implant for a judgment or settlement.  *Id.* at Ex.

4.  In *In re The Babcock & Wilcox Co.*, the court approved the use of a detailed personal injury

proof of claim form, holding that it was "fair and reasonable."  *See Babcock* Bar Date Order at 4,

10, No. 00-05588, ECF No. 70.  The court-approved form requested information concerning the

type of injury, year of diagnosis, certain test results, and exposure to Babcock & Wilcox

equipment, including the facility, industry, and occupation when exposed.  *Id.* at Ex. B.  The

instructions further required claimants to include certain diagnostic reports.  *Id.*  In *In re*

*Specialty Products Holding Corp.*, the court ordered all mesothelioma claimants to complete and

submit a questionnaire as part of their proof of claim.  *See* Order Granting in Part & Denying in

Part Debtor's Mot. for an Order Directing Submission of Info. by Current Asbestos Claimants at

¶ 8, No. 10-11780 (Bankr. D. Del. July 20, 2011), ECF No. 1466 (hereinafter "**Specialty Prods.**

**Bar Date Order**").  The questionnaire requested information concerning disease diagnosis,

asbestos exposure from the debtors' products as well as asbestos exposure from other products,

and litigation related to the asbestos exposure.  *Id.* at Ex. A, ECF No. 1466-1.

Detailed proof of claim forms have also become increasingly common in mass tort sexual

assault cases.  The proof of claim form for claimants asserting sexual misconduct claims in *In re*

*Archdiocese of Milwaukee* required claimants to submit supporting documentation and answer a

series of questions related to the nature of the abuse, the impact of the abuse, whether and when

the claimant reported the abuse, whether the claimant sought treatment or counseling, and

whether the claimant had previously commenced a lawsuit.  Ex. B, Order Approving Debtor's

Mot. for Order Establishing Deadlines for Filing Proofs of Claim & Approving Form & Manner

of Notice Thereof, No. 11-20059 (Bankr. E.D. Wis. July 14, 2011), ECF No. 331.  Although the

form sought extremely personal and traumatic details, the court held that the information sought

24

in the "Abuse Survivors Proof of Claim Form [was] necessary and appropriate under the

circumstances of [the] case." *Id.* at 3.  Similarly, in *In re Christian Brothers Institute*, this Court

approved the use of a detailed "Sexual Abuse Proof of Claim Form."  *See* Order Approving

Debtors' Mot. for Order Establishing Deadlines for Filing Proofs of Claim & Approving Form &

Manner of Notice Thereof at 2, No. 11-22820 (Bankr. S.D.N.Y. Feb. 10, 2012), ECF No. 244

(hereinafter "*Christian Bros.* **Bar Date Order**").  The proof of claim form requested

information concerning the perpetrator of the abuse, the perpetrator's title or relationship to the

claimant, when and where the abuse occurred, the type of abuse, whether the abuse was reported,

and injuries suffered and treatment and counseling sought.  *Id.* at Ex. B, ECF No. 244-2.

Moreover, in *In re USA Gymnastics*, the court agreed that a detailed proof of claim form was

"necessary to evaluate the Sexual Abuse Claims" and approved the "Sexual Abuse Proof of

Claim Form."  *See* Debtor's Mot. for Order Establishing Deadlines for Filing Proofs of Claim &

Approving Form & Manner of Notice Thereof ¶ 50, No. 18-09108 (Bankr. S.D. Ind. Jan. 31,

2019), ECF No. 230; *USA Gymnastics* Bar Date Order ¶ 3, No. 18-09108, ECF No. 301.  The

form required claimants to answer approximately 30 questions concerning sexual abuse by Larry

Nassar, whether the claimant reported the abuse, whether anyone else was present during the

abuse, the number of assaults, the claimant's connection to USA Gymnastics and Michigan State

University, medical and mental health treatment (including mental health treatment related *and

unrelated* to Nassar's abuse), damages, and prior lawsuits and settlements.  *See USA Gymnastics*

Bar Date Order at Ex. 2, No. 18-09108, ECF No. 301.

        Most recently, in *In re Insys Therapeutics*, the MDL Claimants filed an objection to Insys

Therapeutics' Bar Date Motion requesting that all claimants filing a claim against Insys

Therapeutics be required to file a detailed questionnaire, the Plaintiff Fact Sheet, in addition to

the debtors' proposed proof of claim form, Official Form 410. *See* Limited Obj. of the MDL

Plaintiffs to Mot. of the Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) & 105 (a), Fed. R. Bankr. P.

2002, 3003(c)(3), 5005 & 9007 & Local Rules 2002-1(e), 3001-1 for Auth. to (I) Establish

Deadlines for Filing Proofs of Claim, (II) Establish the Form & Manner of Notice Thereof, &

(III) Approve Procedures for Providing Notice of Bar Date & Other Important Deadlines ¶ 6, *In*

*re Insys Therapeutics*, No. 19-11292 (June 25, 2019), ECF. No. 158 (hereinafter "**MDL Obj. to**

***Insys*** **Bar Date Motion**"). The MDL Claimants noted that "it is customary and unremarkable

for courts to require tort creditors to use a specialized proof of claim form or submit an

addendum to the standard proof of claim form to elicit information unique to a tort-based claim."

*Id.* at 3. They further noted that additional information received through detailed proof of claim

forms enables debtors "to evaluate the quality and value of tort claims against the estates." *Id.*

        The *Insys* court ultimately approved a "Confidential Personal Injury Information Form"

(or "**PI Addendum**") for personal injury claimants and a "General Opioid Claimant Information

Form" (or "**General Opioid Addendum**") for all other claimants to be submitted with Official

Form 410. *Insys* Bar Date Order ¶ 2, No. 19-11292, ECF No. 294. The PI Addendum requested

information concerning prescriptions for and the usage of Subsys; prescribing physicians,

hospitals, and clinics; the medical condition or diagnosis for which Subsys was prescribed; the

alleged injuries and harm; damages and injunctive relief sought; lawsuits or civil actions filed;

disability claims filed; and the claimant's medical insurance. *Id.* at Ex. B-1, ECF No. 294-1.

That addendum also required that the claimant attach supporting documentation of the

prescriptions for and usage of Subsys, the medical condition or diagnosis for which the drug was

prescribed, and lawsuits or civil actions the claimant filed against the debtors. *Id.* The General

Opioid Addendum requested information concerning the details of pending or threatened

litigation against the debtors; attorneys' names and contact information; the date (month and

year) the claimant was first injured; the conduct that resulted in injuries or damages; the alleged

causes of action; and the amount and type of damages sought. *Id.* at Ex. B-2, ECF No. 294-1.

That addendum also required that the claimant "[p]rovide all documentation supporting [the]

claim including, but not limited to: any Plaintiff Fact Sheet prepared in the [Ohio] MDL . . . any

complaint, petition, information or similar pleading filed in any civil or criminal proceeding

involving the [d]ebtors; and any records supporting [the] claims of damages." *Id.* Both

addendums state that "additional information and documentation may be requested." *Id.* at Exs.

B-1 & B-2.

### B.    The Debtors' Proposed Proof of Claim Forms

In view of the sensitive nature of the opioid crisis, in consultation with the Creditors'

Committee and numerous other parties in interest in these cases, and in light of the various

groups of creditors' stated intent to attempt to reach a negotiated resolution on allocation issues,

the Debtors, ultimately, propose the use of proof of claim forms that are more simplified than

those used in the above-referenced cases at this stage in these cases.

Like the proof of claim forms discussed above, the Debtors' proposed Opioid Proof of

Claim Forms request information not contained in the Official Form that will assist the Debtors,

the UCC and other creditor constituencies, and ultimately, the Court in assessing claim validity

and value and the feasibility of any plan of reorganization. The proposed forms will not be

overly burdensome on claimants. As the MDL Claimants pointed out in *In re Insys*

*Therapeutics*, a detailed proof of claim form is not burdensome but rather is beneficial to all

legitimate claimants. *See* MDL Obj. to *Insys* Bar Date Mot. ¶ 3, No. 19-11292, ECF No. 158.

Using detailed proof of claim forms provides debtors with the necessary information to ensure

that only legitimate claimants are able to recover and that each valid claimant recovers the appropriate amount.

The Opioid Proof of Claim Forms will assist the Debtors, the Creditors' Committee, and various public and private ad hoc creditor groups in developing a fair and equitable plan for allocation that effectively addresses the opioid crisis.  The Debtors believe that the forms will help bring various creditor constituencies into discussions about a path forward; educate the Debtors, creditor constituencies, experts, advisors, and any mediators about the merits and value of the claims; assist in the claims estimation process; and ultimately inform any equitable plan for allocation.  If the Debtors and creditor constituencies are unable to reach agreement on allocation, the Opioid Proof of Claim Forms would also assist the Debtors in seeking a series of threshold legal rulings on a variety of issues.  These rulings would help determine which claims have no legal basis, streamlining claims resolution and providing legitimate claimants with the maximum recovery.  The Opioid Proof of Claim Forms avoid undue delay by reducing the need for individualized discovery, and request no more information than necessary to advance the claims resolution process.  Moreover, as discussed above, the Opioid Proof of Claim Forms are consistent with proof of claim forms approved for use in other mass tort bankruptcies.

The Governmental Opioid Claimant Proof of Claim Form includes 14 questions, several of which are derived from the much more extensive set of questions from the Government Plaintiff Fact Sheet that was extensively negotiated and used in the Ohio MDL, and that the MDL Claimants initially requested be used in *In re Insys Therapeutics* as an addendum to Official Form 410.  *See* MDL Obj. to *Insys* Bar Date Mot. at 5, No. 19-11292, ECF No. 158. Like the Government Plaintiff Fact Sheet used in the Ohio MDL, the Debtors' Governmental Opioid Claimant Proof of Claim Form seeks information concerning the alleged injury, conduct,

28

the type and amount of damages or monetary relief sought, and opioid-related overdose data for the claimant's residents.  *See* Fact Sheet Implementation Order*, In re National Prescription Opiate Litigation* at Ex. A, No. 17-02804, MDL No. 2804 (N.D. Ohio June 19, 2018), ECF No. 638-1.  The form also seeks information regarding causes of action and legal theories of recovery.  For 7 out of the 14 questions on the form, governmental units may rely on their Government Plaintiff Fact Sheet submitted in the Ohio MDL or any complaint filed against the Debtors, provided that they authorize the Debtors to make their Governmental Plaintiff Fact Sheet[12] or complaint available to Prime Clerk, the Court, and any party who agrees to be bound by the Protective Order to be submitted for entry by the Court, for use in connection with their proof of claim form and these chapter 11 cases.  Thus, because many of the same governmental units that are claimants in these cases are parties to the Ohio MDL and have already completed the Government Plaintiff Fact Sheet, there will be no burden on them.  For non-Ohio MDL governmental units and Native American Tribes, the Governmental Opioid Claimant Proof of Claim Form is only minimally burdensome.  In fact, the Debtors are only requesting that governmental units and Native American Tribes answer 3 of the approximately 50 questions on the Government Plaintiff Fact Sheet and, as noted above, may rely on any complaint filed against the Debtors for 7 out of the 14 questions.  Moreover, as discussed above, the benefits of requiring claimants to complete a more detailed proof of claim form greatly outweigh the burden.

Recognizing that the Governmental Opioid Claimant Proof of Claim Form seeks information specific to governmental units and Native American Tribes that is not relevant to

---

[12] For the avoidance of doubt, only governmental units that have filed litigation that is part of the Ohio MDL, and not governmental units that are part of the negotiation class in the Ohio MDL but have not otherwise filed litigation that is part of the MDL, may rely on their Government Plaintiff Fact Sheet to complete these questions.

certain other private claimants including hospitals, insurers, and third-party payors, the Debtors

propose that all other opioid claimants alleging a claim against the Debtors based on the Debtors'

marketing and sale of any Purdue Opioid, excluding claims for personal injury, be required to

complete the General Opioid Claimant Proof of Claim Form.  The General Opioid Claimant

Proof of Claim Form includes 14 questions and is almost identical to the General Opioid

Addendum approved for use in *In re Insys Therapeutics*.  It seeks information concerning the

alleged injury, conduct, causes of action, sources of damages, and legal theories of recovery; the

type and amount of damages or monetary relief sought; and lawsuits or civil actions filed by the

claimant.  *See Insys* Bar Date Order at Ex. B-1, No. 19-11292, ECF No. 294-1.  The proof of

claim form is narrowly tailored to the type of claimant that will complete the form, seeks only

pertinent information, and thus minimizes the burden on these claimants.

The Personal Injury Claimant Proof of Claim Form includes 17 questions and is similar

to personal injury proof of claim forms used in other mass tort cases.  Like the PI Addendum

approved for use in *In re Insys Therapeutics*, the Debtors' personal injury form seeks

information concerning the alleged injury, type and amount of damages sought, and prior or

currently pending litigation.  *See Insys* Bar Date Order at Ex. B-1, No. 19-11292, ECF No. 294-

1.  Similar to the questionnaire used in *In re Specialty Products* for mesothelioma claimants, the

Debtors' proposed form requests information related to the claimant's use of opioids other than

Purdue Opioids.  *See Specialty Prods.* Bar Date Order, Ex. A, No. 10-11780, ECF No. 1466-1

(questionnaire requesting information concerning asbestos exposure from the debtors' products

*as well as* asbestos exposure from other products).  The form also seeks basic information

concerning the basis for the claim.

30

The information sought in the Personal Injury Claimant Proof of Claim Form is necessary for the Debtors to validate and value the personal injury claims.  Moreover, using the proposed proof of claim form will limit time-consuming and expensive discovery while providing claimants with an opportunity to simply and efficiently prove the validity of their claims. Further, the proposed Personal Injury Claimant Proof of Claim Form is not overly burdensome because the information sought, though different from the information sought in Official Form 410, is the type of information a plaintiff would have typically gathered prior to seeking recovery for personal injuries.

Due to sensitive information requested in the Personal Injury Claimant Proof of Claim Form and consequential HIPAA concerns, the Debtors propose that all Personal Injury Claimant Proof of Claim Forms and any supporting documentation submitted with the forms remain confidential and not be made available to the public.  Copies of Personal Injury Claimant Proof of Claim Forms and supporting documentation shall be treated as Confidential and, as applicable, as Information Protected Pursuant to HIPAA as set forth in the Protective Order to be submitted for entry by the Court, and made available only to the Court and to those that agree to be bound by the Protective Order.  Courts commonly require that proof of claim forms requesting personal or sensitive information be kept confidential and not made available to the public.  *See USA Gymnastics* Bar Date Order ¶ 12, No. 18-09108, ECF No. 301; *Christian Bros. Bar Date Order* ¶ 13, No. 11-22820, ECF No. 244.

## CONCLUSION

For the above reasons, the Debtors respectfully request that this Court grant the Debtors' Motion for Entry of an Order Establishing Deadlines for Filing Proofs of Claim and Procedures

Relating Thereto, Approving the Proof of Claim Forms, and Approving the Form and Manner of

Notice Thereof.

*[Remainder of page intentionally left blank]*

Dated:  January 3, 2020
New York, New York

/s/ James I. McClammy

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors*
*and Debtors in Possession*