DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' OBJECTION TO TIG's MOTION FOR RELIEF FROM THE AUTOMATIC STAY

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .......................................................................................................................2

ARGUMENT ............................................................................................................................5

    I.      The Decision to Lift the Stay Is Committed to the Discretion of the
Bankruptcy Court as Guided by the *Sonnax* Factors .......................................................5

    II.    No Cause Exists to Lift the Automatic Stay of the Prepetition TIG Arbitration...........10

      A.    Lifting the Stay Would Impose Unnecessary Costs and Distraction
on the Debtors .........................................................................................................10

      B.    Lifting the Stay Would Frustrate the Debtors' Reorganization .................................14

CONCLUSION........................................................................................................................18

## TABLE OF AUTHORITIES

PAGE(S)

### CASES

*Anderson v. Credit One Bank, N.A.* (*In re Anderson*),
  884 F.3d 382 (2d Cir. 2018) ................................................................................. 9

*In re Argon Credit, LLC*,
  No. 16-39654, 2018 WL 4562542 (Bankr. N.D. Ill. Sept. 21, 2018) ....................... 8

*Atlantic Marine, Inc. v. Am. Classic Voyages* (*In re Am. Classic Voyages Co.*)
  298 B.R. 222 (D. Del. 2003) ................................................................................. 8

*In re Bally Total Fitness of Greater N.Y., Inc.*,
  402 B.R. 616 (Bankr. S.D.N.Y. 2009) .................................................. 11, 12, 15, 16

*Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.*),
  390 B.R. 784 (Bankr. S.D.N.Y. 2008) ................................................................... 8

*Cardali v. Gentile* (*In re Cardali*),
  Adv. Pro. No. 10-3531, 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010) ....................... 7

*Credit One Fin. v. Anderson* (*In re Anderson*),
  553 B.R. 221 (S.D.N.Y. 2016) ............................................................................. 13

*Crysen/Montenay Energy Co. v. Shell Oil Co.* (*In re Crysen/Montenay Energy Co.*),
  226 F.3d 160 (2d Cir. 2000) ................................................................................. 8

*In re Enron Corp.*,
  306 B.R. 465 (Bankr. S.D.N.Y. 2004) .................................................................. 4

*Grayson v. WorldCom, Inc.* (*In re WorldCom, Inc.*),
  No. 05 Civ. 5704, 2006 WL 2255071 (S.D.N.Y. Aug. 4, 2006) ............................ 16

*Kittay v. Landegger* (*In re Hagerstown Fiber Ltd. P'ship*),
  277 B.R. 181 (Bankr. S.D.N.Y. 2002) .................................................................. 7

*Kraken Invs. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*),
  475 B.R. 9 (S.D.N.Y. 2012) ................................................................................. 7

*Law v. Siegel*,
  571 U.S. 415 (2014) ............................................................................................. 9

*In re MPM Silicones, LLC*,
  No. 14-22503, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014),
  *appealed on other grounds and aff'd*, 531 B.R. 321 (S.D.N.Y. 2015),
  *aff'd in part, rev'd in part, and remanded*, 874 F.3d 787 (2d Cir. 2017).................................. 6

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
 139 S. Ct. 1881 (2019) ........................................................................................... 8

*Phico Grp., Inc. v. Persofsky* (*In re Phico Grp., Inc.*),
 304 B.R. 170 (Bankr. M.D. Pa. 2003) ...................................................................... 8

*In re Residential Capital, LLC*,
 No. 12-12020, 2012 WL 3249641 (Bankr. S.D.N.Y. Aug. 7, 2012) ....................................... 11

*In re Residential Capital, LLC*,
 No. 12-12020, 2012 WL 3556912 (Bankr. S.D.N.Y. Aug. 16, 2012) .................... 6, 11, 12, 13

*Sonnax Indus. v. Tri Component Prods. Corp.* (*In re Sonnax Indus., Inc.*),
 907 F.2d 1280 (2d Cir. 1990) ..................................................................... 6, 10, 11

*In re SunEdison, Inc.*,
 557 B.R. 303 (Bankr. S.D.N.Y. 2016) ............................................................ 10, 12

*U.S. Bank Tr. Nat'l Ass'n v. AMR Corp.* (*In re AMR Corp.*),
 730 F.3d 88 (2d Cir. 2013) ....................................................................................... 6

*U.S. Lines (S.A.) Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.* (*In re U.S. Lines, Inc.*),
 197 F.3d 631 (2d Cir. 1999) ................................................................................. 8, 9

*In re U.S. Brass Corp.*,
 110 F.3d 1261 (7th Cir. 1997) ................................................................................ 8

<u>STATUTES & RULES</u>

11 U.S.C. § 105 ..................................................................................................... 1

11 U.S.C. § 362 ........................................................................................... *passim*

Purdue Pharma L.P. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), submit this objection to the *Motion for Relief from the Automatic Stay* (the "**Motion**") submitted by Ironshore Specialty Insurance Company, formerly known as TIG Specialty Insurance Company, ("**TIG**") and respectfully state as follows:

## PRELIMINARY STATEMENT

The automatic stay and the additional stay of litigation that the Court has ordered pursuant to section 105(a) of the Bankruptcy Code are absolute prerequisites for the orderly proceeding of these chapter 11 cases and the preservation of the Debtors' assets. Thousands of pending actions against the Debtors and related parties have been stayed, and twenty-five States and the District of Columbia, while opposed to the section 105(a) stay, have voluntarily agreed not to commence or continue litigation in conformity with the Court's order.

Against this backdrop, TIG asks the Court to lift the automatic stay of section 362 of the Bankruptcy Code so that TIG may prosecute an arbitration in London against certain Debtors and their affiliate, The Purdue Frederick Company, Inc., concerning the scope of insurance coverage TIG provides. But to obtain the relief TIG seeks, TIG must demonstrate sound reasons why its arbitration should proceed now while myriad other claims—including any claims that could give rise to liability covered by TIG's policy—are stayed. TIG's silence on this critical question is deafening and revealing.

Instead of addressing the well-established *Sonnax* factors that provide the relevant inquiry for a lift-stay motion, TIG first argues that its Motion should be evaluated as a motion to compel arbitration, not as a motion to lift the stay. But TIG has no persuasive legal authority to support this radical proposition, which relies on scattered quotes pulled from cases addressing the entirely different scenario in which a <u>debtor</u> pursues in court claims that may be subject to an

arbitration agreement.  As a result, TIG mistakes the question at issue here:  the question is not
<u>where</u> TIG's dispute with the Debtors should ultimately be litigated, if necessary; it is <u>whether</u> it
should be litigated <u>now</u>.

To this, TIG has no answer.  Allowing TIG's arbitration to proceed would squander
estate assets, distract the Debtors from the important work of advancing these chapter 11 cases,
and threaten to upset the claim allowance, evaluation, and allocation discussions that are at the
heart of efforts to develop a global resolution.  In addition, TIG's arbitration would likely touch
off a flurry of similar motions by the Debtors' many other insurers, leading to multiple,
uncoordinated, and potentially inconsistent arbitration proceedings.  TIG has not articulated any
reason why the Debtors, their estates, and all stakeholders should have to bear these costs and
distractions, or what benefits the Debtors, or even TIG, would secure in exchange for this
expensive and time-consuming frolic and detour about insurance coverage relating to underlying
litigation that has been stayed.  Because the stay preserves value and facilitates the orderly
progress of these cases, because active arbitration with TIG would do the opposite, and for all the
reasons set forth below, the automatic stay should remain in place and TIG's motion should be
denied.

## BACKGROUND

TIG is only one of the nineteen insurers who, through more than a dozen different
insurance policies, provide the Debtors and certain related parties with the remaining
approximately $725 million of the approximately $1 billion of general liability coverage,
including product liability coverage, for which an occurrence was reported in 2001.  (*See*
Declaration of Benjamin S. Kaminetzky ("**Kaminetzky Decl.**") at ¶ 3; Motion for Relief from
Automatic Stay, ECF No. 712 ("**TIG Mot.**") at 6-7.)  TIG contracted to provide up to $25
million of coverage to The Purdue Frederick Company, Inc. ("**Purdue Frederick**") and its

associated and affiliated companies, including certain Debtors, pursuant to a policy bearing

policy number XLX 38822862 / XEX 37690728 (the "**Policy**"), if, and only if, the covered

entities' defense and indemnity costs reach the $915 million attachment point of the Policy

pursuant to various terms and conditions.  (*See* Kaminetzky Decl. Ex. A (Policy) at Policy

Signature Endorsement, Art. II (a), Endorsement #1.)  The covered entities, including Debtors

Purdue Pharma L.P., Purdue Pharma Inc., and Purdue Pharmaceuticals L.P., and related party

Purdue Frederick (collectively, "**Debtor-Respondents**"), have not yet made any demand for

coverage from TIG.  (*See* Kaminetzky Decl. at ¶ 4.)  The Policy is governed by New York law.

(Kaminetzky Decl. Ex. A (Policy) at Art. V (q).)  Like many of the more than a dozen

aforementioned policies, the Policy also contains an arbitration provision.  (*Id*. at Art. V (o);

Kaminetzky Decl. at ¶ 3.)

   As TIG notes in its statement of facts, on or about October 26, 2001, Debtors' insurance

broker provided TIG with a "Notice of Integrated Occurrence/Declaration of Integrated

Occurrence" regarding multiple opioid-related lawsuits that had been filed and which might in

the future continue to be filed against Debtor-Respondents which could, potentially, give rise to a

demand for coverage from TIG under the Policy.  (TIG Mot. at 6-7.)

   On October 8, 2018, despite never having received a demand for coverage under the

Policy, TIG submitted a notice to arbitrate against the Debtor-Respondents pursuant to the

arbitration provision of the Policy.  (*See* Kaminetzky Decl. at ¶ 4; TIG Mot. at 7.)

   As set forth in TIG's Statement of Claim, submitted in the arbitration on February 28,

2019, TIG seeks eight declarations from the arbitral panel, including, *inter alia*, a declaration that

certain types of claims, of the thousands of opioid-related claims against the Debtors and related

parties, do not give rise to "damages on account of 'personal injuries' within the meaning of the

Policy" (TIG Mot. at 7-8; *see* Kaminetzky Decl. Ex. A (Policy) at Art. III (b)), and thus that TIG

is not obligated to cover any damages attributable to such claims (*see* TIG Mot. at 7-8).  On May

15, 2019, Debtor-Respondents filed a Statement of Defense which asserted a number of

defenses.  (*See* TIG Mot. at 8.)  TIG filed its Reply Submissions on June 26, 2019.  (*See id.*)

Thereafter, TIG and Debtor-Respondents (which reserved their rights with respect to

certain defenses, including justiciability) began negotiating two initial issues for the arbitral

panel to decide with respect to one of the eight declarations sought by TIG (the "**Preliminary**

**Issues**") and a schedule for the arbitral panel's consideration.  (*See* TIG Mot. at 8.)  The

Preliminary Issues, characterized by TIG as "potentially dispositive, threshold issues" (TIG Mot.

at 15), were designed to be only potentially dispositive with respect to certain, but not all, claims

that could potentially give rise to coverage under the Policy.  The schedule for discovery and for

consideration of the Preliminary Issues had not been approved by the arbitral panel at the time

the Debtors sought chapter 11 protection.  (*See* TIG Mot. at 8.)

On September 15, 2019, the Debtors each commenced a voluntary case under chapter 11

of the Bankruptcy Code.  Upon the Debtors' filings, TIG's arbitration against the Debtors was

automatically stayed pursuant to 11 U.S.C. § 362(a)(1).[2]  On October 11, 2019, after an all-day

hearing, this Court issued an order enjoining active opioid-related proceedings against the

Debtors and related parties (as defined therein) by governmental entities and private parties

through November 6, 2019, when a further hearing was scheduled to be held.  *See* Order

---

[2] TIG incorrectly suggests, in a footnote on the last page of the Motion, that there is some doubt as to whether the automatic stay applies to TIG's arbitration.  (*See* TIG Mot. at 16 n.6.)  There is no doubt TIG's arbitration is stayed.  The automatic stay of "the . . . continuation . . . of a judicial . . . or other action or proceeding against the debtor that was . . . commenced before the commencement of the case under this title" under section 362(a)(1) applies to declaratory judgment actions.  *See In re Enron Corp.*, 306 B.R. 465, 475 (Bankr. S.D.N.Y. 2004) ("The automatic stay applies to the commencement or continuation of declaratory judgment actions against the debtor.").

Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Mot. Prelim. Inj., *Purdue Pharma L.P. v.
Commw. of Mass.* (*In re Purdue Pharma L.P.*), Adv. Pro. No. 19-08289 (RDD) (Bankr.
S.D.N.Y. Oct. 11, 2019), ECF No. 82.  On November 6, 2019, after that additional hearing, the
Court entered an order enjoining active opioid-related litigation against Debtors and related
parties (as defined therein) by governmental entities[3] and private parties through April 8, 2020,
fully and finally resolving Debtors' Motion for a Preliminary Injunction.  *See* Second Amended
Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. Prelim. Inj., *Purdue Pharma L.P. v.
Commw. of Mass.* (*In re Purdue Pharma L.P.*), Adv. Pro. No. 19-08289 (RDD) (Bankr.
S.D.N.Y. Nov. 6, 2019), ECF No. 105.

On December 30, 2019, approximately three and a half months after the Debtors sought
chapter 11 protection, approximately two and a half months after this Court issued the first
iteration of the preliminary injunction order, approximately seven and a half weeks after this
Court issued the November 6, 2019 order fully and finally resolving Debtors' Motion for a
Preliminary Injunction, and approximately eighteen years after TIG was first notified of a
potential demand for coverage, TIG filed the instant Motion in order to continue its arbitration in
London against Debtor-Respondents.

### ARGUMENT

I.      **The Decision to Lift the Stay Is Committed to the Discretion of the Bankruptcy
Court as Guided by the *Sonnax* Factors**

The standard for lifting the automatic stay in the Second Circuit is well settled.  Section
362(d)(1) of the Bankruptcy Code provides that "the court shall grant relief from the stay . . . for

---

[3] Certain governmental entities voluntarily consented to abide by the terms of the preliminary injunction
orders.  *See, e.g.*, Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. Prelim. Inj. at 5
n.3, *Purdue Pharma L.P. v. Commw. of Mass.* (*In re Purdue Pharma L.P.*), Adv. Pro. No. 19-08289 (RDD)
(Bankr. S.D.N.Y. Nov. 6, 2019), ECF No. 105.

cause." 11 U.S.C. § 362(d)(1).  The determination of whether cause exists to lift the automatic

stay is committed to the sound discretion of this Court, as guided by the factors set forth in

*Sonnax Industries, Inc. v. Tri Component Products Corp.* (*In re Sonnax Industries, Inc.*), 907

F.2d 1280, 1286 (2d Cir. 1990).  *See, e.g.*, *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp.* (*In re AMR

Corp.*), 730 F.3d 88, 112 (2d Cir. 2013); *In re MPM Silicones, LLC*, No. 14-22503, 2014 WL

4436335, at *22-23 (Bankr. S.D.N.Y. Sept. 9, 2014) (Drain, J.) (discussing *Sonnax* factors),

*appealed on other grounds and aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part,

and remanded*, 874 F.3d 787 (2d Cir. 2017).  A party seeking relief from the stay bears the

burden of making an initial showing of cause to lift the stay, and if the movant fails to make that

showing the court should deny relief from the stay without requiring any showing from the

debtor.  *In re Sonnax Indus., Inc.*, 907 F.2d at 1285.  And where, as here, a party that is not a

secured creditor seeks relief from the stay, that party must demonstrate "extraordinary

circumstances . . . to justify such relief."  *In re Residential Capital, LLC*, No. 12-12020, 2012

WL 3556912, at *2 (Bankr. S.D.N.Y. Aug. 16, 2012).

TIG attempts to side-step the Court's discretion to deny lift-stay relief under *Sonnax* by

arguing that the Court should—or must—lift the stay if TIG makes the four-part showing that

generally governs motions to compel arbitration.  (TIG Mot. at 10.)  According to TIG, if a

dispute may be arbitrated, then cause exists to lift the stay.  (TIG Mot. at 11 ("[C]ause exists for

granting relief from the stay with respect to arbitrable matters").)  This argument fails.  There is

simply no support in the text of the Bankruptcy Code for an "arbitration exception" to the

automatic stay, nor is there reason to apply to this lift-stay motion the standard applicable to

motions seeking entirely different relief.

TIG's basic error is to confuse the question presented by a motion to compel arbitration—<u>where</u> litigation should be conducted—with the question presented here—<u>whether</u> arbitration should proceed <u>now</u>, notwithstanding the automatic stay.  The standard governing a motion to compel arbitration applies when a debtor or its successor attempts to litigate in court claims that an opposing party argues should instead proceed in arbitration.  For example, *In re Hagerstown Fiber Limited Partnership*, which TIG cites on pages 9 and 10 of its Motion, addressed whether a chapter 7 trustee should be compelled to arbitrate claims that the trustee commenced against certain counterparties to a prepetition contract.  *Kittay v. Landegger* (*In re Hagerstown Fiber Ltd. P'ship*), 277 B.R. 181, 187-88 (Bankr. S.D.N.Y. 2002).  As a proceeding commenced by—and not against—a debtor, the adversary proceeding at issue in *Hagerstown* was not subject to the automatic stay of proceedings against a debtor under section 362(a)(1).  In that context, Judge Bernstein applied the four-part standard for a motion to compel arbitration and observed "*Sonnax* balancing does not apply."  *Id.* at 204.[4]  That four-part standard, however, does not apply to a motion to lift the stay to allow prepetition arbitration to proceed <u>against</u> a debtor.  Indeed, Judge Bernstein specifically contrasted a motion to compel arbitration with a motion to lift the automatic stay to permit prepetition arbitration to proceed, noting that, in the

---

[4] The Debtors are aware of a bankruptcy court opinion and district court opinion—neither of which TIG cites—that could be read as taking Judge Bernstein's statement that "*Sonnax* balancing does not apply" to mean that the standard for a motion to compel arbitration displaces the traditional *Sonnax* analysis where the automatic stay is sought to be lifted to permit arbitration.  Neither of these opinions stands for that proposition.  In *In re Salander-O'Reilly Galleries, LLC*, Judge Seibel affirmed Judge Morris's decision not to compel arbitration of a dispute between a creditor and a post-confirmation liquidation trust. *Kraken Invs. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*), 475 B.R. 9, 34 (S.D.N.Y. 2012).  There, Judge Seibel confronted the question relevant to a motion to compel—whether litigation should proceed in the bankruptcy court or in arbitration—not the question on this Motion, which is whether litigation should proceed at all.  *Id.* at 19.  Likewise, in *In re Cardali*, Judge Lane quoted *Hagerstown*, but faced the question of whether a debtor could pursue an arbitrable claim in bankruptcy court, or whether the adversary proceeding should be stayed in favor of arbitration.  *Cardali v. Gentile* (*In re Cardali*), Adv. No. 10-3531, 2010 WL 4791801 at *8 (Bankr. S.D.N.Y. Nov. 18, 2010).  Neither of these cases give any reason to displace the Second Circuit's *Sonnax* analysis here.

latter, a bankruptcy court exercises "considerable discretion . . . based upon the application of the *Sonnax* factors." *Id.* The other cases upon which TIG relies similarly arise in the context of a motion to compel arbitration arising out of a proceeding <u>commenced</u> by a debtor or a debtors' successor in interest.[5]

The general policy favoring arbitration is no reason to displace the *Sonnax* test—and the Court's discretion—when assessing whether to lift the automatic stay of prepetition arbitration. Congress has already determined that the Federal Arbitration Act's presumption in favor of arbitration does not constrain the Court's discretion to maintain the automatic stay. The Bankruptcy Code was enacted fifty-two years after the Federal Arbitration Act, and Congress crafted the Code against the backdrop of the Federal Arbitration Act. *See, e.g.*, *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) ("It is a commonplace [canon] of statutory interpretation that Congress legislates against the backdrop of existing law."). Yet, the automatic stay of any "judicial, administrative, or other action or proceeding against the debtor"

---

[5] In *In re Crysen/Montenay Energy Co.*, which TIG cites on page 9 of its Motion, the Second Circuit affirmed Judge Blackshear's decision to stay an adversary proceeding that a debtor brought against a contract counterparty to allow arbitration of that dispute; neither party sought relief from the automatic stay under section 362. *Crysen/Montenay Energy Co. v. Shell Oil Co.* (*In re Crysen/Montenay Energy Co.*), 226 F.3d 160, 167 (2d Cir. 2000). Likewise, in *In re Bethlehem Steel Corp.*, Judge Glenn used the four-part test TIG cites to evaluate (and deny) motions to compel arbitration of four adversary proceedings brought by a debtor's successor liquidating trust; again, relief from the automatic stay under section 362(a)(1) was neither sought nor needed. *Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.*), 390 B.R. 784, 793-95 (Bankr. S.D.N.Y. 2008). These cases do not—and cannot—stand for the proposition that TIG's motion should be evaluated as a motion to compel arbitration. The same is true for a number of the decisions cited by TIG from outside of the Second Circuit. *See Phico Grp. Inc. v. Persofsky* (*In re Phico Grp. Inc.*), 304 B.R. 170, 174-75 (Bankr. M.D. Pa. 2003) (defendant filed motion seeking to pursue arbitration regarding claims on which Debtor had sought declaratory relief in an adversary proceeding); *see also In re U.S. Brass Corp.*, 110 F.3d 1261, 1265 (7th Cir. 1997) (analyzing a motion to remand, not a lift-stay motion or a motion to compel, related to certain state court cases referred to the bankruptcy court). The two cases that TIG cites in which courts seem to have altered the motion to lift the stay analysis, *Atlantic Marine, Inc. v. American Classic Voyages, Co.* (*In re American Classic Voyages, Co.*), 298 B.R. 222 (D. Del. 2003) and *In re Argon Credit, LLC*, No. 16-39654, 2018 WL 4562542 (Bankr. N.D. Ill. Sept. 21, 2018), were, respectfully, wrongly decided and furthermore are contrary to guiding Second Circuit precedent and thus not persuasive.

under section 362(a)(1) applies equally to arbitration. *U.S. Lines (S.A.) Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.* (*In re U.S. Lines, Inc.*)*, 197 F.3d 631, 640 (2d Cir. 1999) ("[T]he scope of section 362(a)(1) is broad, staying all proceedings, including arbitration."). And Congress did not include any stay exception for arbitration—as it did for other kinds of proceedings set forth in section 362(b). *See* 11 U.S.C. § 362(b). Accordingly, no policy of favoring arbitration over the automatic stay can or should be inferred. *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The [Bankruptcy] Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exemptions to those exemptions confirms that courts are not authorized to create additional exceptions."). Furthermore, the Second Circuit's caselaw addressing the scenario—not presented here—where bankruptcy principles clash with the Federal Arbitration Act holds that bankruptcy courts may decline to enforce and "override even international arbitration agreements" when permitting arbitration to proceed would prejudice efforts to preserve and equitably distribute estate assets.[6] *In re U.S. Lines, Inc.*, 197 F.3d at 639, 641 (upholding bankruptcy court's decision to deny a motion to compel arbitration of an action that a debtor's successor trust brought to determine the scope of insurance coverage); *see also, e.g.*, *Anderson v. Credit One Bank, N.A.* (*In re Anderson*), 884 F.3d 382 (2d Cir. 2018). That bankruptcy courts may decline to enforce arbitration clauses when doing so furthers important bankruptcy interests only underscores that a general policy preference for arbitration does not trump the operation of essential bankruptcy precepts such as the automatic stay.

---

[6] Because TIG seeks relief from the automatic stay, and not to compel arbitration, the distinction between "core" and "non-core" claims is not relevant to this motion. To avoid any doubt, the Debtors dispute, and in no way concede, TIG's assertion that its arbitration is not a "core" proceeding, and reserve all rights with respect to this issue.

## II.    No Cause Exists to Lift the Automatic Stay of the Prepetition TIG Arbitration

Applying the correct standard to the question presented by this Motion, it is clear that the

automatic stay should not be lifted to permit TIG's arbitration to proceed.  TIG has entirely

failed to demonstrate "cause" to lift the stay, as the *Sonnax* factors—both individually and

together—compel denying the motion to lift the stay.  The twelve *Sonnax* factors are:

> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case;
> (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a
> specialized tribunal with the necessary expertise has been established to hear the
> cause of action; (5) whether the debtor's insurer has assumed full responsibility
> for defending it; (6) whether the action primarily involves third parties;
> (7) whether litigation in another forum would prejudice the interests of other
> creditors; (8) whether the judgment claim arising from the other action is subject
> to equitable subordination; (9) whether movant's success in the other proceeding
> would result in a judicial lien avoidable by the debtor; (10) the interests of judicial
> economy and the expeditious and economical resolution of litigation;
> (11) whether the parties are ready for trial in the other proceeding; and (12) the
> impact of the stay on the parties and the balance of harms.

*In re Sonnax Indus., Inc.*, 907 F.2d at 1286.  While the factors have varying relevance in each

case—and a court need not assign equal weight to each factor, *see, e.g., In re SunEdison, Inc.*,

557 B.R. 303, 307-08 (Bankr. S.D.N.Y. 2016)—in this case, each of the relevant factors weighs

in favor of denying relief from the automatic stay.

### A.    Lifting the Stay Would Impose Unnecessary Costs and Distraction on the Debtors

Allowing TIG's arbitration in London to proceed would cause significant harm to the

Debtors and their estates—at a time when the Court has acted to protect the Debtors and all

stakeholders from value-destructive litigation.

10

First, allowing TIG's arbitration to proceed against Debtors[7] and a related party[8] would necessarily impose on Debtors the costs of litigating, including the costs of paying arbitrators, retaining counsel in multiple jurisdictions, and incurring witness expenses and other discovery costs, during the pendency of these chapter 11 cases. Every dollar spent defending TIG's arbitration now is a dollar that will no longer be available for distribution, to the detriment of all of the Debtors' stakeholders—no matter which party may prevail in the arbitration. Such prejudicial squandering of the estates' assets weighs heavily against lifting the stay. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020, 2012 WL 3249641, at *6 (Bankr. S.D.N.Y. Aug. 7, 2012) (explaining that costs associated with litigating in a separate forum prejudice other creditors by depleting the value of the Debtors' estates available for distribution).[9]

Second, if TIG's arbitration proceeds, the Debtors will be forced to divert time and attention that the Debtors' management and employees would (and should) otherwise dedicate to

---

[7] TIG concedes (TIG Mot. at 14) that all of the Debtor-Respondents are sued in their full capacity, rather than as fiduciaries. This further weighs in favor of denying the instant Motion. *See In re Sonnax* 907 F.2d at 1285-86 (explaining that, as relevant to Factor 3, "[g]enerally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his estate from his creditors.").

[8] Purdue Frederick, while not a Debtor, is an affiliate of the Debtors and a related party protected by the Court's preliminary injunction order staying prepetition litigation. *See, e.g.*, Fifth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. Prelim. Inj. at 2 n.2, *Purdue Pharma L.P. v. Commw. of Mass.* (*In re Purdue Pharma L.P.*), Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Jan. 2, 2020), ECF No. 132. In addition, all of the claims in TIG's Statement of Claim are directed at all four Debtor-Respondents, which weighs in favor of denying the instant Motion. *Cf. In re Residential Capital, LLC*, 2012 WL 3556912, at *3 (holding that the inclusion of a third party did not weigh in favor of granting the motion to lift the stay where all claims but one were directed at debtors).

[9] The Debtors will also be required to bear the full weight of defense expenses for the TIG arbitration, further weighing against relief from the automatic stay. *See, e.g.*, *In re Residential Capital, LLC*, 2012 WL 3556912, at *3 (holding *Sonnax* Factor 5 weighed against lifting the stay where "[n]o insurer has assumed responsibility for the action here, and the [d]ebtors would therefore need to pay all expenses in litigating the action with out-of-pocket funds from the bankruptcy estate"); *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009) (denying motion to lift the stay where debtors "d[id] not have insurance coverage with respect to the claims asserted" in the litigation sought to be prosecuted).

these chapter 11 cases and to the Debtors' business.  That diversion of essential resources would prejudice the Debtors and all creditors, and weighs heavily against lifting the automatic stay.  *In re SunEdison, Inc.*, 557 B.R. at 308 (holding that allowing another proceeding to continue would prejudice creditors' interests by diverting the debtors' resources and personnel); *In re Residential Capital, LLC*, 2012 WL 3556912, at *3 (*Sonnax* factors weighed against lifting the stay where doing so would "forc[e] the [d]ebtors to utilize time and resources that would otherwise be spent resolving the chapter 11 cases"); *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 623-24 (Bankr. S.D.N.Y. 2009) (denying motion to lift stay as allowing action to proceed would prejudice creditors by distracting debtors' management from the bankruptcy proceeding and by hindering management's ability to maximize the value of debtors' estate).  Moreover, the Debtors would be forced to divert estate assets and resources only to address the hypothetical, academic question at issue in TIG's arbitration:  whether there are certain types of claims for which TIG might not have to provide coverage, <u>if</u> Debtors were to incur liability on account of those types of claims and <u>if</u> Debtors made a demand of TIG for coverage for those claims because the $915 million attachment point for coverage under the Policy had been reached.

<u>Third</u>, the costs and distraction caused by TIG's arbitration will be significant, and significantly increasing as TIG's arbitration proceeds from its present, nascent state.  As TIG effectively admits (TIG Mot. at 15), the arbitration is nowhere near trial.  To the contrary, it is in its infancy.  TIG initiated arbitration in October 2018,[10] more than one year ago (TIG Mot. at 7), and filed its Statement of Claim approximately four and a half months later, on February 28,

---

[10] TIG suggests that the arbitration has been pending since February 2019.  (*See* TIG Mot. at 10, 15.)  That is incorrect.  TIG initiated its arbitration on October 8, 2018 (*see* TIG Mot. at 7), but did not file its Statement of Claim for over four months.  TIG then allowed another six months to pass before TIG and the Debtor-Respondents requested that the arbitral panel consider a schedule for the Preliminary Issues.

2019 (*Id.*).  Under the schedule proposed—but not adopted by the arbitral panel—"potentially dispositive, threshold issues," such as whether potential damages attributable to certain claims might assert a liability on the part of Debtor-Respondents for injuries covered by the Policy (assuming the attachment point is reached), would be submitted for decision in June 2020.  (*See* TIG Mot. at 8, 15.)  There is significant reason to doubt even these issues would be ready for adjudication in June, as no discovery or motion practice related to the Preliminary Issues has yet occurred.  And even if the Preliminary Issues were resolved, that decision would determine less than meets the eye, as it would resolve only one of eight of TIG's requests for declaratory judgment, only in the abstract, and only with respect to certain claims.

Fourth, permitting TIG's arbitration to proceed now would also risk "open[ing] the floodgates," *In re Residential Capital, LLC*, 2012 WL 3556912 at *3, to concurrent copycat arbitrations by each of the Debtors' insurers, compounding the costs to the estates and the potential interference with restructuring negotiations, as discussed further below.  *See* Kaminetzky Decl. at ¶ 3 (noting that the many of Debtors' insurance policies contain arbitration provisions); *see also Credit One Fin. v. Anderson* (*In re Anderson*), 553 B.R. 221, 234-35 (S.D.N.Y. 2016) (noting that concerns of judicial economy addressed by *Sonnax* factor 10 are particularly acute where other parties could "assert claims under virtually identical agreements").  These potential copycat arbitrations, if allowed to proceed, would create a situation in which each insurance policy would be subject to separate arbitration.  The multitude of separate arbitrations could reach wildly inconsistent results, as one arbitral panel is not bound by the decision of another arbitral panel.  *In re Anderson*, 553 B.R. at 234 (explaining that arbitration presents a greater risk that multiple proceedings will reach inconsistent decisions).

If TIG's Motion were to be granted, the costs of arbitration will continue to grow, to the detriment and prejudice of all estate stakeholders.  Accordingly, a number of *Sonnax* factors strongly weigh in favor of maintaining the automatic stay of TIG's arbitration:  the issues are far—perhaps years—from resolution (*Sonnax* factor 1), the arbitration involves Debtors in a direct, non-fiduciary capacity (*Sonnax* factor 3), no insurer will cover the costs of the arbitration (*Sonnax* factor 5), the arbitration involves only Debtor entities and a related party (*Sonnax* factor 6), the arbitration will prejudice other creditors by decreasing the value of Debtors' estates (*Sonnax* factor 7), lifting the stay would risk copycat arbitrations that would increase Debtors' costs and interfere with the restructuring negotiations (*Sonnax* Factor 10), and the arbitration is not ready for trial (*Sonnax* factor 11).

### B.    Lifting the Stay Would Frustrate the Debtors' Reorganization

The harm to the Debtors of allowing TIG's arbitration to proceed is not limited to the direct and indirect costs and burdens that arbitration would impose.  The central question of TIG's arbitration is whether the Policy covers certain types of claims against the Debtors.  (TIG Mot. at 7-8.)  Litigating that issue now is at best futile, and also risks undermining a key effort in these cases, because TIG's arbitration necessarily touches on—and presumes answers to—the essential questions of this case:  the scope, validity, nature, and amount of claims against the Debtors, on the one hand, and the scope of assets available to satisfy those claims, on the other.

The automatic stay and this Court's preliminary injunction order are designed to allow the Debtors and all estate stakeholders to address the critical issues of claim allowance, evaluation, and allocation without the costs and distractions of litigation.  *See* Hr'g Tr. at 264:22-265:1, *Purdue Pharma L.P. v. Commw. of Mass.* (*In re Purdue Pharma L.P.*), Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Oct. 11, 2019) ("[O]ne of the main purposes of the preliminary injunction is to enable the parties to analyze whether they would support such a plan [of

reorganization], their support being a major element in the Court's determination of that issue.");
*see also id.* at 149:7-11 (stating that the purpose of preliminary injunction is to give the parties a
"clear shot at negotiating an overall settlement of what amounts to a three-cornered battle");
150:6-8 ("[C]oming up with a mechanism without continued litigation to allocate that money
would seem to be to be in the public interest and worth . . . explor[ing].").

Allowing TIG's arbitration to proceed while litigation of opioid-related claims against the
Debtors is stayed is therefore futile. At best, the arbitration could resolve the question of
whether the Policy, under its terms, would cover certain types of claims in the pending litigations
if those claims were to result in a finding of liability against the Debtors. Whether and to what
extent TIG will have to pay under the Policy cannot be answered because the relevant underlying
suits against the Debtors have been stayed. The Debtors and all stakeholders should not have to
bear the cost and distraction of an essentially academic arbitration over the meaning of a policy
that covers claims that might arise out of litigation that has been stayed.[11]

But even though TIG's arbitration is likely to be futile, allowing it to proceed would pose
meaningful risks to the Debtors' reorganization. The value and allocation of Debtors' insurance
proceeds are likely to be important components of any plan of reorganization, and such issues are
best addressed in connection with negotiations among Debtors and their numerous classes of
creditors. If TIG's arbitration proceeds while critical claim allowance, evaluation, and allocation
negotiations are ongoing, some creditor groups may argue that TIG's arbitration demonstrates

---

[11] Contrary to TIG's assertions (TIG Mot. at 14-15), the arbitral tribunal here is not a "specialized tribunal."
The Policy is a contract governed by New York law. (Kaminetzky Decl. Ex. A (Policy) at Art. V (q).) New
York law is not an area of unique expertise or of specialized knowledge—especially for arbitrators sitting
in London. *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R at 624 (rejecting argument that the
California State Court's Complex Litigation Panel was a "specialized tribunal" weighing in favor of lifting
the automatic stay because the Bankruptcy Court for the Southern District of New York "has significant
experience in applying state law and is well equipped to handle [the action].").

that portions of the Debtors' insurance coverage are not available at all, or available only for certain classes of claimants. This, in turn, risks frustrating negotiations by putting a proverbial "thumb on the scale" in favor of one claimant constituency over another. TIG's unsupported assertion that resolving the arbitration would "clarify[] the assets of the bankruptcy estate" (TIG Mot. at 14), thus fails. A ruling that the Policy covers or does not cover certain claims, even in the abstract, will only frustrate allowance and allocation negotiations at a time when neither TIG, nor the Debtors, nor any stakeholder knows exactly what valid claims the Debtors face or the value of any such valid claims.

TIG's Motion provides no response to this significant concern, and instead focuses only on whether allowing TIG's arbitration to proceed would lead to an "expeditious[]" resolution of the issues being arbitrated. (TIG Mot. at 15.) Putting aside that any resolution of the arbitration will not be expeditious—taking years, not months—as discussed above, TIG focuses on the wrong inquiry. Properly considered, cause to lift the stay exists when it will facilitate expeditious and economical resolution of the bankruptcy case—which, in a mass tort bankruptcy such as this, necessarily involves the multi-party settlement processes—not just of the narrow issue sought to be pursued by a single party. *See, e.g.*, *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. at 624 (concluding *Sonnax* Factor 10 weighed against lifting the stay because "forcing Debtors to litigate . . . during the pendency of these chapter 11 cases would hinder Debtors' efforts for a speedy and effective reorganization process"); *see also Grayson v. WorldCom, Inc.* (*In re WorldCom, Inc.*), No. 05 CIV. 5704, 2006 WL 2255071, at *9 (S.D.N.Y. Aug. 4, 2006) (holding that, under *Sonnax*, continued prosecution of claims in other courts would substantially interfere with the bankruptcy case because the purpose of the automatic stay "would be undermined by constant disruption").

16

Ultimately, as demonstrated by the above and contrary to TIG's unsupported contentions, the balance of harms tilts in favor of denying the motion to lift the stay.  The harm to the Debtors and to the reorganization process from lifting the stay is significant.  By contrast, the harm to TIG of the stay continuing is *de minimis*—all TIG is being asked to do at this time is to wait. That the arbitration was commenced before Debtor-Respondents made any demand for coverage, and has hardly advanced in the last year, suggests that there is no urgent need for its resolution.

Because TIG's arbitration would impede these bankruptcy proceedings, a number of *Sonnax* factors strongly weigh against granting the instant Motion.  In particular, interference with the bankruptcy case (*Sonnax* factor 2), lack of a specialized tribunal (*Sonnax* factor 4), prejudice to other creditors by distracting Debtors from resolution of the bankruptcy cases (*Sonnax* factor 7), hindering the Debtors' reorganization efforts by undermining negotiations (*Sonnax* factor 10), and that all of these the harms to the Debtors—and all creditors—outweigh the *de minimus* harm to TIG (*Sonnax* Factor 12) all weigh strongly in favor of denying TIG's motion.  Accordingly, all of the relevant *Sonnax* factors, when properly analyzed in light of the law in the Second Circuit and the facts here, weigh in favor of denying TIG's motion to lift the stay.

## **CONCLUSION**

For the reasons set forth above, Debtors respectfully request that the Court deny in its entirety TIG's motion to lift the automatic stay.

Dated:    January 17, 2020                Respectfully Submitted,
           New York, New York

                                             */s/ Benjamin S. Kaminetzky*
                                             DAVIS POLK & WARDWELL LLP
                                             450 Lexington Avenue
                                             New York, New York 10017
                                             Telephone: (212) 450-4000
                                             Facsimile: (212) 701-5800
                                             Marshall S. Huebner
                                             Benjamin S. Kaminetzky
                                             James I. McClammy
                                             Marc J. Tobak
                                             Gerard X. McCarthy

                                             *Counsel to the Debtors*
                                              *and Debtors in Possession*