AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel:  (212) 872-1000
Fax:  (212) 872-1002
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Sara L. Brauner

*Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE MOTION OF IRONSHORE SPECIALTY INSURANCE COMPANY
FOR RELIEF FROM AUTOMATIC STAY AND JOINDER TO THE
DEBTOR'S OBJECTION TO SUCH MOTION**

The Official Committee of Unsecured Creditors (the "Committee") of Purdue Pharma L.P.,

*et al.*, (collectively, the "Debtors") by and through its undersigned counsel, hereby submits this

objection (the "Objection") to the *Motion for Relief from Stay* [ECF No. 712] (the "Lift-Stay

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Motion")[2] filed by Ironshore Specialty Insurance Company ("TIG") and joinder to the *Debtors'*
*Objection to TIG's Motion for Relief from Automatic Stay* [ECF No. 753] (the "Debtors'
Objection"). In support of this Objection, the Committee respectfully states as follows.

## PRELIMINARY STATEMENT

1.      Since the outset of these chapter 11 cases, the Debtors, the Committee and this
Court have recognized the importance of providing the Debtors with a breathing spell to allow for
an orderly process by which the parties in interest in these cases can attempt to reach a consensual
resolution of the myriad disputes surrounding these Debtors and their ultimate shareholders, the
Sacklers. In fact, a respite from the thousands of pending actions—and the erosive impact such
actions could have on the value of the Debtors' estates—was so critical to the trajectory of these
cases that the Debtors, the Committee and other key stakeholders spent the first several weeks
following the Petition Date negotiating the terms of a preliminary injunction in respect of all
litigation against both the Debtors and the Sacklers to ensure a broader reprieve than the automatic
stay alone could provide. Critical to this interlude has been a halt on attempts by all parties to take
actions that would impair creditors' access to potential sources of recovery—including, most
significantly, a stay on all actions against the Sacklers in recognition of the likelihood that the
Sacklers' assets will be necessary for any global settlement.

2.      The Lift-Stay Motion is nothing more than a thinly guised attempt by a relatively
minor insurer, in the absence of any unique circumstances or urgency, to threaten this uneasy peace
that the estate fiduciaries and numerous other parties in interest fought hard to ensure. Allowing
TIG to charge ahead with the Arbitration underlying the Lift-Stay Motion will clarify nothing and,
instead, could significantly impair efforts to resolve these cases on a consensual basis.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Lift-Stay Motion.

3.      The Debtors' products liability insurance policies—which, as TIG itself observes, provide approximately $1 billion in collective limits—represent an important and significant source of potential recovery for creditors.  In light of the value of these insurance policies, any global settlement in these cases likely will require substantial involvement from the Debtors' insurers.  The $25 million excess coverage Policy in question, which was issued in the early 2000s, sits near the top of a nearly billion dollar tower, and kicks in only after $915 million attachment point has been reached.

4.      The present stage of the Arbitration (referred to in the Debtors' Objection as the "Preliminary Issues") concerns the question of whether TIG is required to cover certain types of claims.[3]  In light of TIG's small and marginal position within the Debtors' products liability tower (approximately 2.5% near the very top), however, it is not clear at this point—and will not become clear unless and until the entire landscape of claims against the Debtors is liquidated—whether claims similar to those at issue in the Arbitration will fall within TIG's coverage obligations.

5.      Instead of explaining why its situation is unique or urgent (it is neither) or offering an explanation of the safeguards that will ensure the pending Arbitration will not impede the parties' ability to negotiate a global resolution of these chapter 11 cases (no such safeguards exist), TIG has invented a legal standard which it claims governs the ultra-specific class of lift-stay motions seeking permission to litigate non-core civil actions against the Debtors before an arbitral tribunal.  This new standard—which would render the facts of these highly unique cases, the interests of creditors and the needs of the Debtors irrelevant to the Court's determination—has almost no basis in law and is entirely contrary to binding Second Circuit precedent.  Under the

---

[3] Upon information and belief, the claims addressed in the Arbitration likely will **not** include direct personal injury claims held by individuals.  *See* Lift-Stay Motion at 8 (the Preliminary Issues address whether "the underlying plaintiffs . . . assert a liability on the part of respondents for *'damages' 'on account of' 'personal injury,' 'property damage,' or 'advertising liability'* within the meaning of . . . the Policy").

appropriate standard, which is set out in the Second Circuit's *Sonnax* opinion, the Motion should be denied.

## OBJECTION

6.      As multiple courts have recognized, debtors' insurance policies can be a key source of recovery for creditors.  *See, e.g.*, *United States Lines, Inc. v. Am. S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 639 (2d Cir. 1999) (noting that declaratory judgment actions relating to a debtor's insurance policies "directly affect the bankruptcy court's core administrative function of asset allocation among creditors, and for that reason . . . are core").  This is particularly true in these cases, where—by TIG's own calculation— the Debtors have nearly $1 billion of coverage in the tower to which TIG's Policy belongs.  *See* Lift-Stay Motion at 5.

7.      The unique facts and circumstances here only amplify this reality.  Indeed, the questions presented in the Arbitration go to the core issues of these chapter 11 cases, including the liquidation of litigation claims, the identification of sources of recovery and the allocation of value among creditors.  As such, permitting the Arbitration to proceed at this time will create two major obstacles to the resolution of these chapter 11 cases, each of which is a sufficient reason to deny the Lift-Stay Motion.

8.      First, central to these chapter 11 cases is the question of how to allocate available value between various types of creditors whose claims arise under a wide array of legal theories. As discussed in the Debtors' Objection, the present stage of the Arbitration will concern the question of whether certain types of claims are covered under the Policy.  *See* Debtors' Objection at 3–4.  A determination of these issues at this time, however, would significantly interfere with

the ultimate resolution of these issues by predetermining the allocation of a source of recovery with respect to some, but not all, claimants.

9.      Indeed, whether the question raised by the Arbitration is even a live dispute between TIG and the Debtors, rather than merely an academic exercise, depends on whether claims similar to those to be addressed in the Arbitration are among those that will eventually fall within TIG's 2.5% of the tower to which it belongs.[4]  Determining which claims belong to TIG's slice of the tower, however, in turn depends on the full landscape of claims against the Debtors—not just the claims that are similar to the those addressed in the arbitration.  But as this Court has recognized, such a determination—*i.e.*, the liquidation of the claims of thousands of litigants against the Debtors—cannot be resolved by litigation without risking the severe diminution of the Debtors' estates. *See generally, Fifth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Pro. No. 19-08289 [ECF No. 132] (the "Preliminary Injunction Order").

10.      Second, permitting the Arbitration to proceed now threatens the Debtors' ability to reach a settlement with their other insurers because the resolution of the Arbitration in favor of either party will affect coverage determinations by other insurers (particularly with respect to the $60 million in excess of the TIG Policy).

11.      Accordingly, for the reasons set forth herein and in the Debtors' Objection, the Lift-Stay Motion should be denied.

---

[4] Within this significant pool of insurance policies, TIG provides a small tranche of coverage near the top of the Debtors' insurance tower.  Lift-Stay Motion at 5 ("The Policy provides cover with limits of $25 million[,] part of $75 million excess of $915 million per occurrence.").  Critically, while the Debtors have provided Notifications to TIG of claims made under the Policy since 2001, no demands have been made under the Policy for coverage drawing on its portion of the tower. *Id.* at 6–7; Debtors' Objection at 3.  Instead, TIG waited more than 17 years after it first received notice (and after receiving numerous subsequent Notifications) to commence the Arbitration.  Lift-Stay Motion at 7–8.

### A.    The *Sonnax* Factors Strongly Disfavor Relief from the Automatic Stay.

12.    In the Second Circuit, a motion seeking relief from the stay to proceed with litigation in a nonbankruptcy forum is governed by the 12-factor test articulated in *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).[5]  While the entire *Sonnax* analysis disfavors granting the Lift-Stay Motion, in light of the unusual facts of these cases, three important and significant *Sonnax* factors militate particularly heavily against TIG.

13.    One of the most important questions under *Sonnax* is whether the subject proceeding in another forum has a "lack of connection with or interference with" the ongoing bankruptcy case.  *Sonnax*, 907 F.2d at 1285.  As discussed above, whether claims like those at issue in the Arbitration are covered by the Policy depends not only on the terms of the Policy, but also on the nature and extent of the damages for which the Debtors are liable—determination or settlement of which is a core function of any chapter 11 case involving significant litigation claims. Moreover, interference with a significant source of recovery for creditors (here, the Debtors' insurance proceeds) constitutes interference with the bankruptcy case.  *See In re Congregation Birchos Yosef*, 535 B.R. 629, 635 (Bankr. S.D.N.Y. 2015) (imposing sanctions for engaging in an arbitration designed to dissuade the debtor from pursuing a potentially valuable adversary proceeding); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2261, at *24 (Bankr.

---

[5] The *Sonnax* factors are: (1) whether relief from the stay would result in partial or complete resolution of the relevant issues; (2) lack of connection with or interference with bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with necessary expertise has been established to hear the cause of action the movant seeks to litigate; (5) whether the debtor's insurer has assumed full defense responsibility; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim that would arise from the other action would be subject to equitable subordination; (9) whether the movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) the impact of the stay on parties and balance of harms.

S.D.N.Y. Jan. 13, 2003) (action to equitably subordinate debtor's claim in an unrelated bankruptcy case was a stay violation).

14.    Ignoring these critical concerns, TIG argues that the Arbitration will not interfere with the chapter 11 cases because "the dispute [between TIG and the Debtors] could have arisen entirely outside of bankruptcy." Lift-Stay Motion at 14.  It is sufficient to note that this in no way distinguishes TIG's action from the thousands of litigation claims pending against the Debtors, each of which was brought as a civil action in another jurisdiction and is subject to the automatic stay.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio 2017) (consolidating over 1,000 cases against the Debtors, all of which are stayed pursuant to these chapter 11 cases).  For these reasons and those set forth in the Debtors' Objection, this factor weighs strongly against granting the Lift-Stay Motion.

15.    Another *Sonnax* factor with particular relevance here poses the question of whether the Arbitration risks prejudicing other creditors in these cases.  *See Sonnax*, 907 F.2d at 1285. TIG's bald assertion that there will be no prejudice because the Arbitration "does not threaten piecemeal liquidation of the bankruptcy estate" is unconvincing.  TIG seeks to determine on a one-off basis the availability of a single source of recovery for creditors without taking into account other such sources.  Significantly, the Arbitration will also dilute recoveries to unsecured creditors generally, not only by requiring the Debtors to expend estate resources to contest the Arbitration— the very harm that motivated the entry of the Preliminary Injunction Order—but also potentially by requiring the Debtors' estates to cover the costs and fees incurred by TIG in the Arbitration if TIG were to prevail.  *See* Lift-Stay Motion at 8 n.2.  Therefore, this factor also strongly weighs in favor of maintaining the stay.

16.    In addition, *Sonnax* also requires this Court to ask whether the Arbitration will result in partial or complete resolution of the disputes at issue.  TIG argues that the Arbitration would resolve "all of the relevant insurance coverage issues."  Lift-Stay Motion at 14.  As this Court has recognized, however, this *Sonnax* factor takes into account the work that would remain to be done by the bankruptcy court following the completion of proceedings before another tribunal.  *See DiPietro v. 21st Century Oncology Holdings, Inc. (In re 21st Century Oncology Holdings, Inc.)*, No. 17-22770 (RDD), Adv. Pro. No. 17-08284, Hr'g Tr. Jan. 30, 2018 at 64:6–14 [ECF No. 23].  Determining that claims like those to be addressed in the Arbitration are ***not*** entitled to coverage—the only possible final outcome at this stage of the Arbitration—will not meaningfully advance the allocation issues before this Court.  Moreover, the results of the Arbitration similarly will not bind any creditors who might have independent rights to recover under the Policy but for these chapter 11 cases.  Thus, this factor weighs against granting relief from the stay.

17.    The other *Sonnax* factors similarly disfavor relief from the automatic stay.

- **Debtor as Fiduciary:**  TIG correctly notes that the Arbitration does not involve the Debtors as fiduciaries.  Lift-Stay Motion at 14.  Accordingly, this factor does not favor relief from the stay.

- **Specialized Tribunal:**  TIG attempts to argue that the "substantial experience" of the arbitral panel's members "in resolving the type of coverage dispute involved here" qualifies the panel as a "specialized tribunal" for purposes of *Sonnax*.  Lift-Stay Motion at 14–15.  But experience alone does not make a tribunal "specialized" in this context—the question is not whether the other tribunal would handle the matter well, but whether the issues "are ones that the Bankruptcy Court is capable of resolving on the merits."  *See DiPietro v. 21st Century Oncology Holdings, Inc. (In re 21st Century Oncology Holdings, Inc.)*, No. 17-22770 (RDD), Adv. Pro. No. 17-08284, Hr'g Tr. Jan. 30, 2018 at 66:8–10 [ECF No. 23] (District Court where case had been pending was not specialized tribunal for purposes of federal False Claims Act *qui tam* litigation); *see also Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 10 Civ. 36(RJH), 2010 U.S. Dist. LEXIS 125182, at *13-14 (S.D.N.Y. Nov. 8, 2010).  Here, this Court is not only capable of resolving the issues in the

8

Arbitration, but uniquely well-situated to do so.  Thus, this factor does not favor relief from the stay.

- **Insurer Assumption of Defense Responsibilities:**  No insurer has assumed responsibility for defending the Debtors in the Arbitration.  Thus, this factor does not favor relief from the stay.

- **Primary Involvement of Third Parties:**  TIG makes a halfhearted attempt to argue that the involvement of nondebtor Purdue Frederick Company, Inc. ("Purdue Frederick") somehow tilts this factor in its favor, but reluctantly admits that the Arbitration does not "*primarily* involve third parties." Lift-Stay Motion at 15.[6]  Thus, this factor favors maintaining the stay.

- **Equitable Subordination/Judicial Lien:**  Neither of these factors applies to the Lift-Stay Motion.

- **Judicial Economy:**  TIG's reliance on the arbitration clause in the Policy to suggest that this Court lacks jurisdiction to resolve any dispute between TIG and the Debtors is overly restrictive.  While this Court could abstain from hearing any litigation to finally resolve the scope of coverage, nothing prevents this Court from entering an order approving a settlement of the coverage dispute (or of the scope of coverage with multiple insurers at once).  *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986); *In re G-I Holdings Inc.*, 420 B.R. 216 (D.N.J. 2009); *In re Maremont Corporation*, 601 B.R. 1 (D. Del. 2019).  Moreover, nothing prevents this Court from entering any number of orders that could avoid the need for the Arbitration, including confirmation of a plan.[7]  Because these chapter 11 cases may obviate the need for the Arbitration to proceed, this factor weighs against relief from the stay.

- **Ready for Trial:**  TIG suggests that the pending entry of a case management order that would set certain potentially dispositive motions for hearing in the next five months is a substitute for the *Sonnax* factor asking whether the other proceeding is trial-ready.  Suffice to say, this factor inquires about trial, not dispositive motions, and relates more closely to the status of discovery than to the earliest point in litigation at which a matter might possibly be resolved.  *See, e.g.*, *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 624 (S.D.N.Y.

---

[6] TIG somewhat confusingly adds that "the stay does not prevent the [Arbitration] from proceeding against Purdue Frederick, **nor does the stay bind the foreign arbitral panel**." Lift-Stay Motion at 15 (emphasis added).  For the avoidance of doubt, the automatic stay **does** prevent the foreign arbitral panel from proceeding as against the Debtors, particularly to the extent that the governing documents require the Debtors to pay any costs of the arbitration using estate assets.  Moreover, while Purdue Frederick is not a Debtor, it is a "Related Party" pursuant to the Preliminary Injunction Order, and actions against it are stayed by order of this Court.  *See* Preliminary Injunction Order at 2 n.2.

[7] TIG also suggests that allowing the Arbitration to proceed would advance the interests of judicial economy because under the Debtors' proposed settlement framework, insurance coverage will remain with the Debtors and only ownership of the company will change hands.  It is not clear what this has to do with judicial economy, and in fact this possibility supports the fact that this Court may resolve these chapter 11 cases without any need for resolution of the issues before the arbitral panel.

2009) (proceeding was not trial-ready under *Sonnax* where "the parties ha[d] not even started conducting the extensive discovery necessary" for disposition of the case).

- **Impact of Stay/Balance of Harms:** The balance of harms strongly opposes relief from the stay. At worst, the stay delays TIG's resolution of a limited coverage question that has been open since 2005, but which TIG only saw fit to raise in 2018, and which has not yet matured into a demand by the Debtors. By contrast, the harm to the Debtors and their creditors from lifting the stay is clear and multifaceted, including, among other things: (a) the obligation to devote estate resources to participating in the Arbitration (and in any arbitrations to which similarly-situated insurers would argue they are entitled); (b) potentially inconsistent results with respect to coverage disputes that could prejudice the estates' access to other policies; and (c) distraction of the Debtors' management at a key point in the chapter 11 cases.

18.     Thus, application of the *Sonnax* factors clearly demonstrates that TIG has failed to satisfy its burden of proving it is entitled to relief from the automatic stay.[8]

        **B.     The *Bethlehem Steel* Factors Are Not Applicable to the Lift-Stay Motion.**

19.     Perhaps recognizing the weakness of its Motion under the *Sonnax* analysis, TIG argues for the application of an entirely different standard derived from *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784 (Bankr. S.D.N.Y. 2008). Under this standard, the Court must only look at: (1) whether the parties agreed to arbitrate; (2) whether the dispute falls within the arbitration clause; (3) whether any federal statutory claims raised in the dispute were intended by Congress to be non-arbitrable; and (4) if some but not all of the claims are non-arbitrable, whether the non-arbitrable claims should be stayed pending the resolution of the arbitration. Lift-Stay Motion at 10; *Bethlehem Steel*, 390 B.R. at 789. The nature of the test itself should give the Court pause: indeed, such a test would favor claims governed by arbitration

---

[8] One case cited by TIG, *DeWitt Rehab. & Nursing Ctr. v. Columbia Cas. Co.*, 464 B.R. 587 (S.D.N.Y. 2012), while inapposite in the current context, is particularly instructive on the *Sonnax* analysis. Although *DeWitt* involved withdrawal of the reference, rather than relief from the stay, it stemmed from an adversary proceeding commenced by a debtor in which all of its insurers were joined as defendants, in order to provide a single forum in which a court could determine which insurer bore responsibility for particular claims. Such a proceeding, in contrast to the Arbitration, might provide the "clarity" TIG claims will result from granting the Lift-Stay Motion.

agreements over claims brought in state or federal court by exempting only arbitrable claims from any consideration of the facts and circumstances of the bankruptcy case, and would permit creditors to contract around the effects of the automatic stay by agreeing to arbitrate.[9]

20.     It will come as no surprise, therefore, that the *Bethlehem Steel* standard has no application to the lift-stay context, and instead governs situations where affirmative litigation brought on behalf of a debtor's estate is subject to an agreement to arbitrate. *Bethlehem Steel*, 390 B.R. at 789.  In *Bethlehem Steel*, a post-confirmation liquidating trust sued a third party under a contract subject to a binding arbitration clause, and the defendant argued that an arbitral panel, rather than the bankruptcy court, should hear the dispute. *Id.* at 786.  In other words, *Bethlehem Steel* did not involve a lift-stay motion, nor did the automatic stay apply at the time of the decision because the debtor's plan been consummated. *See id.* at 794; 11 U.S.C. 362(c)(2)(C).  The same general posture (involving litigation by, rather than against, the debtor or a successor, which would not be subject to the automatic stay in the first place) is found in all but one of the other cases cited by TIG in support of its proposed new standard.[10]

---

[9] Even if the *Bethlehem Steel* test were to apply here, the subject matter of the Arbitration is core. *See United States Lines*, 197 F.3d at 639 (declaratory judgment actions regarding debtors' insurance policies were core because of importance of insurance to administration of the estate).  Because the *Bethlehem Steel* test looks to determine whether a matter is better heard within the federal bankruptcy system or before an arbitral tribunal, the Court need not inquire whether a claim that is statutorily core under *United States Lines* (*i.e.*, one that should remain within the federal system) is also constitutionally core (*i.e.*, whether this Court or a District Court has the power to enter a final order under *Stern v. Marshall*, 564 U.S. 462 (2011)).

[10] *See Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160 (2d Cir. 2000) (affirming bankruptcy court decision to stay adversary proceeding commenced by debtor where dispute was governed by contract with binding arbitration clause); *McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502 (S.D.N.Y. 1993) (district court denying motion to withdraw the reference with respect to adversary proceeding commenced by debtor); *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181 (Bankr. S.D.N.Y. 2002) (staying adversary proceeding commenced by chapter 7 trustee for involuntary debtor because estate claim was governed by contract containing binding arbitration clause); *Phico Grp., Inc. v. Persofsky (In re Phico Group, Inc.)*, 304 B.R. 170 (Bankr. M.D. Pa. 2003) (debtor had commenced adversary proceeding regarding the subject of the arbitration); *MF Global Holdings LTD v. Allied World Assurance Co. (In re MF Global Holdings LTD)*, 571 B.R. 80 (Bankr. S.D.N.Y. 2017) (granting defendant insurer's request to stay an adversary proceeding commenced by the debtor to permit resolution of debtor's claim by Bermuda arbitral tribunal); *Enron Power Marketing, Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty. (In re Enron Corp.)*, 364 B.R. 489 (Bankr. S.D.N.Y. 2007) (staying adversary proceeding commenced by post-confirmation chapter 11 debtor under power purchase agreement); *MBNA Am. Bank. N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006) (holding that proceeding commenced by post-discharge chapter 7 debtor to

21.     The one exception to the foregoing is *In re Argon Credit, LLC*, 2018 WL 4562542 (Bankr. N.D. Ill. Sept. 21, 2018), which TIG cites for the proposition that "the analysis of arbitrability is the same regardless whether raised in a motion to compel [arbitration] or a motion for relief from stay." Lift-Stay Motion at 12 n.4. *Argon Credit* does address a lift-stay motion, but offers no support for this proposition beyond a citation to *Enron*, which it wrongly characterizes as "employing this analysis in discussing whether to lift the stay." *Argon Credit* at *4. As Judge Gonzalez made clear in *Enron*, a key component of his decision to allow an arbitration to proceed was that two and a half years after the expiration of the stay on the effective date of a plan, the case had arrived at the stage where "an orderly process could [be] developed to send the individual adversary proceedings to arbitration without disrupting the Debtors' restructuring." *Enron*, 364 B.R. at 517. In any event, *Argon Credit* cannot be interpreted to have overruled *Sonnax* in the Second Circuit.

22.     Thus, the *Bethlehem Steel* standard is designed for the situation where all parties agree that a dispute should be heard ***now***, but disagree as to ***where***.[11] In the instant case, the question is not whether the (only arguably live) dispute should be determined by a London arbitral panel or by this Court—it is whether such a dispute should proceed now, or wait to be resolved later. This question has already been answered by Congress when it required "cause" for relief from the automatic stay, and by this Court when it entered the Preliminary Injunction Order.

---

recover damages for violation of the automatic stay was arbitrable); *cf. Anderson v. Credit One Bank (In re Anderson)*, 884 F.3d 382, 390 (2d Cir. 2018) (noting that *Hill* rested on the Second Circuit's determination that Hill no longer required the protection of the automatic stay because her estate had been fully administered). *Atlantic Marine, Inc. v. Am. Classic Voyages, Co. (In re Am. Classic Voyages, Co.)*, 298 B.R. 222 (Bankr. D. Del. 2003) did involve a lift-stay motion, but did not apply TIG's proposed test, instead remanding the motion for further analysis where the Bankruptcy Court had not considered "the [debtor's] apparent position[] in favor of arbitration at the Bankruptcy Court hearing[.]"

[11] In fact, when a debtor commences an adversary proceeding while the stay still applies, some courts have applied the *Sonnax* factors as an overlay in connection with the *Bethlehem Steel* test. *See, e.g.*, *Kraken Invs. v. Jacobs (In re Salander-O'Reilly Galleries, LLC)*, 475 B.R. 9 (S.D.N.Y. 2012).

Accordingly, the Lift-Stay Motion fails to satisfy the standard for relief from the automatic stay and should be denied.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein and in the Debtors' Objection, the Committee respectfully requests that the Court: (i) deny the Lift-Stay Motion; and (ii) grant such other and further relief as is just and proper.

Dated:  New York, New York  
        January 17, 2020

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  /s/ Arik Preis  
    Ira S. Dizengoff  
    Arik Preis  
    Mitchell Hurley  
    Sara L. Brauner  
    One Bryant Park  
    New York, New York 10036  
    Tel: (212) 872-1000  
    Fax: (212) 872-1002  
    idizengoff@akingump.com  
    apreis@akingump.com  
    mhurley@akingump.com  
    sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*