| | |
|---|---|
| KRAMER LEVIN NAFTALIS<br>& FRANKEL LLP<br>Kenneth H. Eckstein<br>David E. Blabey Jr.<br>Rachael Ringer<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 715-9100 | GILBERT LLP<br>Scott D. Gilbert (admitted *pro hac vice*)<br>Craig Litherland (admitted *pro hac vice*)<br>Kami E. Quinn (admitted *pro hac vice*)<br>100 New York Ave, NW, Suite 700<br>Washington, D.C. 20005<br>Telephone: (202) 772-2200 |
| BROWN RUDNICK LLP<br>David J. Molton<br>Steven D. Pohl<br>7 Times Square<br>New York, NY 10036<br>Telephone: (212) 209-4800 | OTTERBOURG P.C.<br>Melanie L. Cyganowski<br>Jennifer S. Feeney<br>230 Park Avenue<br>New York, NY 10169<br>Telephone: (212) 661-9100 |

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
: 
In re:                                                           :    Chapter 11
                                                                 : 
PURDUE PHARMA L.P., *et al.*,                                    :    Case No. 19-23649 (RDD)
                                                                 : 
             Debtors.                                        :    (Jointly Administered)
                                                                 : 
------------------------------------------------------------------ X

## AD HOC COMMITTEE'S STATEMENT IN SUPPORT OF DEBTORS' OBJECTION TO TIG'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The ad hoc committee of governmental and other contingent litigation claimants (the "**Ad Hoc Committee**") hereby submits this statement in support of the objection [Dkt. No.753] (the "**Objection**") filed by Purdue Pharma L.P. and its affiliated debtors (collectively, "**Purdue**" or the "**Debtors**") in response to the Motion for Relief from the Automatic Stay [Dkt. No. 712] (the "**Motion**") submitted by Ironshore Specialty Insurance Company, formerly known as TIG Specialty Insurance Company ("**TIG**").

## PRELIMINARY STATEMENT

1.     In order to preserve Debtors' assets and allow for efficient negotiations between Debtors and their claimants, this Court has stayed all litigation pertaining to Debtors, most recently through April 8, 2020. *See* Second Am. Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. Prelim. Inj., *In re Purdue Pharma L.P.*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Nov. 6, 2019), ECF No. 105.

2.     In the Motion, TIG seeks an exception from the stay to prosecute an arbitration it filed against certain of the Debtors and their affiliate, the Purdue Frederick Company ("**Purdue Frederick**"), concerning one of hundreds of insurance policies that are assets of the Debtors, and which may respond to pay the claims of its creditors, including the Ad Hoc Committee's constituencies (the "**Arbitration**").[1]

3.     Notwithstanding this Court's decision to provide Debtors, their affiliates, and others the benefit of a pause in which to reach a negotiated plan of reorganization, TIG seeks to upend that pause for the purpose of addressing the single insurance policy that is the subject of the

---

[1] The Objection refers to TIG as "only one of the nineteen insurers who, through more than a dozen different insurance policies, provide the Debtors and certain related parties with the remaining approximately $725 million of the approximately $1 billion of general liability coverage." *See* Objection at 2. The distinction is that Debtors are referring to a single year and single category of insurance coverage in which the TIG policy is contained, whereas the Ad Hoc Committee is referring to multiple years and categories of insurance coverage that may be relevant to these proceedings.

Arbitration. *See* Objection at 1–2. Contrary to the standard TIG cites, the issue is not whether the pending arbitration is the appropriate forum to resolve the coverage, but instead, whether TIG, among all other litigants with claims against the Debtor-related entities, is entitled to prosecute the arbitration <u>now</u>.

4. Debtors object to TIG's request, arguing that granting the Motion would "squander estate assets," *see* Objection at 2; *see generally id.* at 10–14, whereas denying the Motion would "preserve[] value and facilitate[] the orderly progress of these cases," *see id.* at 2; *see generally id.* at 14–17. The Ad Hoc Committee agrees with Debtors and adopts their arguments. In particular, the Ad Hoc Committee notes that involvement in a foreign arbitration over the complex insurance coverage issues raised in the Arbitration would be a significant distraction for the Ad Hoc Committee and all of the other creditor constituencies from their efforts to resolve the central issues in this case.

5. The Ad Hoc Committee adds that it is typical in mass tort bankruptcies for insurance disputes to be addressed at a time and in a manner that claimants—as beneficiaries of debtors' insurance assets—agree is appropriate. Often, that time is post-confirmation when the insurance rights are under the consolidated control of a trust that represents the interests of all claimants. In other cases, it becomes necessary to determine certain insurance-related issues in the context of the bankruptcy case <u>after</u> agreement has been reached among the debtors and the creditors about the structure of a plan and distribution of assets. In any event—as evidenced by the fact that both the Ad Hoc Committee and the official committee of unsecured creditors (the "**Creditors' Committee**") oppose the Motion—that time is not now.

## BACKGROUND

A. **Debtors' Bankruptcy Proceedings**

6. The Settlement Structure upon which Debtors have premised their bankruptcy cases lays the framework for a chapter 11 plan that will provide a comprehensive and expeditious resolution of Debtors' role in the national opioid crisis. Following months of negotiations with claimant representatives, this framework was put in place shortly before the Petition Date (September 15, 2019).

7. Purdue recognized that without the support of a significant number of claimants it could never hope to achieve global resolution of the litigation that threatened to destroy the company. Thus, as an integral part of the Settlement Structure, Purdue requested that a subset of the supporting governmental claimants (which, according to the U.S. Trustee, could not serve on the Creditors' Committee) form an ad hoc group whose principal role would be to coordinate with other claimants and negotiate with Debtors.

8. The result was the Ad Hoc Committee, which consists of (i) ten States, (ii) the court-appointed Plaintiffs' Executive Committee in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804 (N.D. Ohio) (the "**PEC**"), (iii) six political subdivisions of States, and (iv) one federally recognized American Indian tribe, as identified in the verified statement filed pursuant to Bankruptcy Rule 2019 at Docket Number 279. Collectively, the members of the Ad Hoc Committee hold or represent the interests of a substantial number of the claims against Debtors, measured in both number and dollar amount.

9. In order to efficiently resolve these proceedings for the benefit of claimants, the Ad Hoc Committee intends to negotiate with Debtors and other creditors, including the Creditors'

Committee, to effectuate the Settlement Structure and resolve the remaining issues among Debtors, their affiliates, the Sacklers, and the various creditor constituencies to achieve a chapter 11 plan that fairly resolves Debtors' role in the national opioid crisis and the resulting claims.

10. On October 8, 2019, Debtors filed the settlement term sheet they negotiated with the Ad Hoc Committee and others (the "**Term Sheet**").

11. Relevant to the Motion, under the Term Sheet:

> Pursuant to the chapter 11 plan, 100% of the assets or equity of Purdue – which together with its subsidiaries constitutes 100% of Purdue's U.S. pharmaceutical business – will be placed under a trust or similar post-emergence structure, for the benefit of claimants and the U.S. public (the "**Trust**").[2]
>
> For the avoidance of doubt, the contribution of Purdue includes all property, interests and assets of the Debtors and their estates as such terms are understood and defined under the Bankruptcy Code, including, without limitation: (i) all cash on their balance sheets; (ii) insurance policies and proceeds therefrom; and (iii) all other estate assets including causes of action belonging to the Debtors or their estates.[3]
>
> The company ("**NewCo**") and the Trust will be run by independent directors or trustees disclosed to the Bankruptcy Court and selected by creditors or their representatives (subject to reasonable approval by the Ad Hoc Committee) pursuant to a proceed reasonably acceptable to the Ad Hoc Committee and Debtors. The Trust will own NewCo.[4]
>
> Prior to the effective date of a chapter 11 plan (the "**Effective Date**"), the Debtors, with Bankruptcy Court approval and after consultation with the Creditors' Committee and the Ad Hoc Committee, may settle claims and coverage disputes with any of Purdue's insurers. Following the Effective Date, NewCo and/or the Trust, as applicable, will have all rights with respect to the insurance, including, without limitation, the authority to assert, pursue and settle such claims and coverage disputes with Purdue's insurers.[5]

---

[2] Notice of Filing of Term Sheet with Ad Hoc Committee [Dkt. No. 257], Exhibit A ¶ 2.

[3] Term Sheet at 1 n.1.

[4] Term Sheet ¶ 2.

[5] Term Sheet ¶ 7.

4

**B.    The Arbitration**

12.    TIG issued to Purdue Frederick and certain of the Debtors Policy XLX 38822862 / XEX 37690728 (the "**Policy**"), which has policy limits of $25 million. *See* Objection at 2.

13.    The Policy is one of hundreds of insurance policies that are included within Debtors' assets, and provides a fraction of the limits potentially relevant to these proceedings. *See id.*

14.    In 2001, Debtors' insurance broker provided notice to TIG of multiple claims that could give rise to a demand for coverage under the Policy. *See id.* at 3. However, neither Purdue Frederick nor Debtors has yet demanded coverage under the Policy. *See id.*

15.    By agreement between TIG, Debtors, and Purdue Frederick, the Arbitration currently is set to address only coverage for specific sample claims. *See id.* Any ruling will leave undetermined coverage under the Policy for claims that differ materially from those specific claims. *See id.*

## STATEMENT IN SUPPORT

16.    As an initial matter, the Ad Hoc Committee agrees with Debtors that the question raised by the Motion is <u>when</u>, not in what forum, to address disputes regarding application of the Policy. *See id.* at 2. That is, TIG is not asking the Court to rule that the Policy must be addressed through arbitration rather than litigation.[6] Rather, TIG is asking the Court to rule that the

---

[6] When this issue is before the Court, the Ad Hoc Committee will address it in full. For the time being, the Ad Hoc Committee notes that mass tort insurance coverage matters are rarely—if ever—efficiently addressed piecemeal (as would be the case if the Arbitration proceeds concerning only a single policy, as TIG suggests it should). Rather, it is most efficient and economical to address all potentially applicable layers, years, and categories of insurance coverage comprehensively. In fact, as discussed below, the only opinion that the Ad Hoc Committee has found in the Second (or any) Circuit that granted a motion to lift a bankruptcy stay in favor of an insurance arbitration did so in significant part because—unlike in this case—that arbitration was in "the interests of judicial economy and . . . expeditious and economical resolution" because it included "the vast majority of the liability limits," likely would "resolve most of the dollars in dispute," and might well have led to "complete resolution of the issues" regarding insurance. *See Cont'l Cas. Co. v. Pfizer, Inc. (In re Quigley Co.)*, 361 B.R. 723, 744 (Bankr. S.D.N.Y. 2007).

5

Arbitration should proceed now—while the stay is in place and negotiations between Debtors and their claimants are ongoing.

17. The court should deny the Motion.

**A.  As Debtors Establish, Granting the Motion Would Squander Assets, Whereas Denying the Motion Will Preserve Value and Facilitate Orderly Resolution**

18. As Debtors state in the Objection, *see generally id.* at 5–9, whether to grant the Motion and lift the stay requires a showing of cause, *see* 11 U.S.C. § 362(d)(1), is a matter of discretion, *see, e.g.*, *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 112 (2d Cir. 2013), and is guided by the factors set forth in *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990). The Ad Hoc Committee adopts Debtors' arguments as to why this is the appropriate standard (as opposed to that proffered by TIG).

19. The Ad Hoc Committee also agrees with and adopts Debtors' arguments as to why TIG does not meet this standard.

20. Specifically, as Debtors detail, lifting the stay now would "squander estate assets" because "[e]very dollar spent defending [the A]rbitration now is a dollar that will no longer be available for distribution, to the detriment of all of the Debtors' stakeholders—no matter which party may prevail in the arbitration." Objection at 2, 11; *see generally id.* at 10–14.

21. Debtors also explain that lifting the stay would harm pending negotiations regarding reorganization because "[t]he value and allocation of Debtors' insurance proceeds are likely to be important components of any plan of reorganization, and such issues are best addressed in connection with negotiations among Debtors and their numerous classes of creditors," rather than through multiple piecemeal arbitration proceedings with potentially inconsistent results and no precedential value. *Id.* at 15; *see generally id.* at 14–17. This is particularly true here, where

6

the bankruptcy proceedings are in early stages and consensus has not been reached on the number, type, or allocation of claims that Debtors face and their insurers may be asked to cover.

22.     It bears emphasis that the Arbitration will not resolve any significant or overarching issues concerning the availability of Debtors' insurance assets to pay creditors' claims. Indeed, the Arbitration will have no bearing on the hundreds of millions of dollars of insurance issued by other carriers, or types of claims other than the specific sample claims at issue. This stands in stark contrast to the only case the Ad Hoc Committee has found in the Second (or any) Circuit that granted a motion to lift a bankruptcy stay in favor of insurance arbitration. There insurers sought to file a single arbitration concerning "the vast majority of the liability limits" relevant in the bankruptcy, which were provided under policies issued by 42 companies. *See Cont'l Cas. Co. v. Pfizer, Inc. (In re Quigley Co.)*, 361 B.R. 723, 744 (Bankr. S.D.N.Y. 2007). Additionally, the court found that that arbitration was likely to "resolve most of the dollars in dispute," and might well lead to "complete resolution [of the insurance disputes] in one forum." *See id.*[7] Finally, the parties in that bankruptcy proceeding had reached substantial agreement regarding the number and type of claims faced, *see id.* at 737, and the debtors stated that resolving insurance coverage issues would not interfere with the confirmation process, *see id.* at 745. As a result, that court found that the *Sonnax* factors weighed in favor of lifting the stay. *See id.* at 744.

23.     None of the above is true for the TIG Arbitration. Unlike in *Quigley*, the Arbitration includes only one insurer, one policy, and $25 million in limits—not multiple insurers, multiple policies, and the "vast majority of liability limits" that potentially are relevant. *See* Objection at 2; *see also supra* note 1. The Arbitration also is not likely to achieve "complete resolution [of the

---

[7] The court also noted that if lifting the stay led "arbitrations [to] proliferate," it would "reconsider the matter, and if necessary, reimpose the stay." *Id.*

7

insurance disputes] in one forum." To the contrary, at least as it currently stands, the Arbitration will resolve only how one policy applies to specific sample claims. *See* Objection at 4. Finally, there is not yet substantial agreement regarding the number and type of claims faced by Debtors, and Debtors have stated that resolving the insurance coverage issues now would interfere with ongoing negotiations. *See generally id.* at 14–17. For those reasons, as Debtors detail in the Objection, the *Sonnax* factors weigh against lifting the stay, and the Motion should be denied.

B. **Denying the Motion Would be Consistent with the Typical Treatment of Insurance in Mass Tort Bankruptcies**

24. The Ad Hoc Committee adds in support of the Objection that it is typical in mass tort bankruptcies for insurance disputes to be addressed after claimants and Debtors have agreed to the treatment of the potentially covered claims, and at the direction of the claimants who are the ultimate beneficiaries of the insurance coverage. Indeed, under many plans of reorganization in the mass tort context, debtors' insurance assets transfer to a post-bankruptcy entity that acts for the benefit of claimants, and insurance coverage disputes are resolved by that entity. *See, e.g.*, *re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. 2017); *Matter of Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986), *aff'd sub nom, In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *see also In re Palmaz Sci., Inc.*, No. 16-50552-CAG, 2018 WL 3343597 (Bankr. W.D. Tex. June 4, 2018); *In re Liquidation of Integrity Ins. Co./Celotex Asbestos Tr.*, 214 N.J. 51 (2013); *Biltmore Assocs., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663 (9th Cir. 2009); *Armstrong World Indus., Inc. Asbestos Pers. Injury Settlement Tr. v. Liberty Mut. Ins. Co.*, No. 04-cv-00499-RBS (E.D. Pa. 2004); *Brauer Supply Co. 524(g) Asbestos Pers. Injury Tr. v. Atlanta Int'l Ins. Co. & Pa. Gen. Ins. Co.*, No 4:09-cv-01640 (E.D. Mo. 2009); *Shook & Fletcher Asbestos Settlement Tr. v. Safety Nat'l Cas. Corp.*, No. CIV.A. 04C-02-087MMJ, 2005 WL 3007806 (Del. Super. Ct. Oct. 27,

8

2005); *Fed. Mogul Asbestos Pers. Injury Tr. v. Cont'l Ins. Co.*, 666 F.3d 384 (6th Cir. 2011); *In re Ambassador Ins. Co.*, No. s-444-1-83 WNC (Vt. Super. Ct.); *Celotex Asbestos Settlement Tr. v. Certain London Market Ins. Cos.*, CPR File No. W-01-18 (CPR Inst. For Dispute Resolution).

25. But, even should there be some appropriate time to address insurance issues during the pendency of the bankruptcy case, it is most appropriate for claimants, as the real party in interest, to control litigation and potential resolution of disputes with insurers. The Term Sheet expressly provides that Debtors' insurance asset will transfer to "a trust or similar post-emergence structure, for the benefit of claimants and the U.S. public (the '**Trust**')." *See* Term Sheet ¶ 2, 1 n.1.

26. The Term Sheet further provides that "Following the Effective Date, NewCo and/or the Trust, as applicable, will have all rights with respect to [Debtors'] insurance, including, without limitation, the authority to assert, pursue and settle such claims and coverage disputes with Purdue's insurers." *Id.* ¶¶ 2, 7. Conversely, before the Effective Date, Debtors may only resolve disputes with insurers "with Bankruptcy Court approval and after consultation with the Creditors' Committee and the Ad Hoc Committee." *Id.* ¶ 7. This reinforces that the Trust, rather than Debtors, have the right to control (or at least strongly influence) the pursuit and resolution of Debtors' insurance. In any event, because the claimant-creditors are the real party in interest with respect to the insurance rights, it is efficient and appropriate for them to be substantially involved in any coverage dispute.

27. Where creditors must control any litigation of the insurance coverage issues, it makes little sense to permit that process to proceed where, as here, the multiple diverse creditors groups have not yet reached agreement among themselves as to the disposition of the insurance asset, which claims will be asserted against it, or how those claims will be valued. Continuing

9

with the Arbitration now requires each separate creditor group (and Debtor) to monitor or participate in the Arbitration to protect the value of the coverage for their specific claims. This will unnecessarily deplete estate assets.

28.     Moreover, the various creditor groups will be forced to address disputes among themselves regarding the availability of the insurance for particular types or subsets of claims piecemeal, and in multiple contexts (e.g., the bankruptcy case and the Arbitration) rather than focusing their efforts on an overall resolution of how assets will be allocated in this bankruptcy case. In contrast, addressing insurance disputes after creditors have reached agreement among themselves is more efficient and reduces costs. In that circumstance, the creditors can have a consolidated approach to coverage, and address only those claims or types of claims they have agreed will access the coverage.

29.     Addressing the insurance dispute after creditors have reached agreement with Debtors on the value of claims, or how those claims will ultimately be valued also increases efficiency and reduces costs. After an agreement with its creditors, there is little reason for Debtors to be involved in addressing coverage issues, further reducing the number of entities involved in the Arbitration.

30.     Moreover, the remaining parties can address only those types of underlying claims to which coverage potentially will apply in the context of the actual agreed values or procedures. For example, if post-confirmation Debtors no longer face underlying claims in the tort system, coverage for defense costs may no longer be relevant. Similarly, there may be fewer factual issues to be developed regarding the claims to which the insurance will apply. In both instances, litigation or arbitration will be more streamlined, leading to decreased expense and depletion of the estate.

31.   Conversely, TIG asks the Court to create a special exception to the generally applicable stay now—when the parties are working through the number, type, and allocation of claims that Debtors face and its insurers may be asked to cover, and how the available insurance may relate to an overall plan to resolve the liabilities of the estate.  Far from benefiting the estate, allowing the Arbitration to proceed would increase litigation surrounding intra-creditor disputes regarding the relative merit of their claims and their entitlement to Debtors' insurance assets, dramatically increase the number of parties-in-interest who must be involved in the litigation, and distract Debtors and claimants when they should be focused on reaching consensus.  It is therefore not surprising that both the Ad Hoc Committee and the Creditors' Committee oppose addressing coverage issues now.

## CONCLUSION

WHEREFORE, for the foregoing reasons and those set forth in Debtors' Objection, the Ad Hoc Committee respectfully requests that the Court deny the Motion.


Dated:  January 17, 2020                                Respectfully submitted,


                                                        /s/      Scott D. Gilbert_____
                                                        Scott D. Gilbert (admitted *pro hac vice*)
                                                        Craig Litherland (admitted *pro hac vice*)
                                                        Kami E. Quinn (admitted *pro hac vice*)
                                                        GILBERT LLP
                                                        100 New York Ave, NW, Suite 700
                                                        Washington, D.C. 20005
                                                        Telephone: (202) 772-2200
                                                        Email: gilberts@gilberlegal.com
                                                                     litherlandc@gilbertlegal.com
                                                                     quinnk@gilbertlegal.com

Kenneth H. Eckstein
David E. Blabey Jr.
Rachael Ringer
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email:  keckstein@kramerlevin.com
       dblabey@kramerlevin.com
       rringer@kramerlevin.com

David J. Molton
Steven D. Pohl
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email:  dmolton@brownrudnick.com
       spohl@brownrudnick.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email:  mcyganowski@otterbourg.com
       jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*