DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.** [1] | **(Jointly Administered)** |

**DEBTORS' SECOND SUPPLEMENTAL OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PRE-PETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) EMPLOYEES AND RETIREES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ......................................................................................................................4

I.    Procedural History .........................................................................................................4

    A.    The Debtors Seek Approval to Make Payments Under the Debtors' AIPs .............4

    B.    The Debtors Worked Constructively with the UCC and Other Stakeholders to
    Resolve Objections to the Debtors' AIPs ..............................................................6

    C.    The Non-Consenting States Group and the State of Maryland Impermissibly
    Raise New Legal and Factual Arguments through a Joinder to a Now-
    Overruled Objection............................................................................................7

II.   Dr. Landau's Compensation ...........................................................................................8

REPLY................................................................................................................................14

I.    The Proposed 2019 Purdue AIP Payment to Dr. Landau Should Be Approved................14

    A.    The Proposed 2019 Purdue AIP Payment to Dr. Landau Is a Sound Exercise
    of the Debtors' Business Judgment......................................................................16

    B.    Any Objections Based on the Allegations Against Dr. Landau Are Effectively
    Mooted by the Proposed Second Supplemental Final Wages Order ....................19

CONCLUSION.....................................................................................................................20

## TABLE OF AUTHORITIES

CASES

PAGE(S)

*In re Dana Corp.*,
    358 B.R. 567 (Bankr. S.D.N.Y. 2006) ...................................................................... 14, 15, 18

*In re Glob. Home Prods., LLC*,
    369 B.R. 778 (Bankr. D. Del. 2007) ......................................................................... 14

*In re Mesa Air Grp., Inc.*,
    No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) ........................ 14

*In re Residential Cap., LLC*,
    478 B.R. 154 (Bankr. S.D.N.Y. 2012) ................................................................... 14

*In re Velo Holdings, Inc.*,
    472 B.R. 201 (Bankr. S.D.N.Y. 2012) ................................................................... 14

STATUTES & RULES

11 U.S.C. § 363 ........................................................................................................ 5, 14

11 U.S.C. § 503 ........................................................................................................ 5, 14

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**" or "**Purdue**") respectfully submit this supplemental reply (this "**Supplemental Reply**") in further support of the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 6] (the "**Wages Motion**" or the "**Motion**")[2] and in response to any Joinder that the Court considers outstanding,[3] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The only remaining issue before the Court is whether the $1,313,250 proposed 2019 incentive payment to the Debtors' CEO, Dr. Craig Landau ("**Dr. Landau**") under the 2019 Purdue AIP—reflecting a 63% reduction negotiated with the Official Committee of Unsecured Creditors (the "**UCC**"), and subject to payment terms and conditions to which no other employee is subject (the "**Reduced 2019 Payment**")—is a sound exercise of the Debtors' business judgment.  The record before the Court demonstrates that this standard is easily satisfied:  Dr. Landau's total 2019 compensation, including the Reduced 2019 Payment, is below market, and payment will be subject

---

[2] Except where otherwise indicated, capitalized terms used but not defined in this Supplemental Reply have the meanings ascribed to them in the Wages Motion or the *Second Supplemental Declaration of Jon Lowne in Support of Wages Motion* [Docket No. 554] ("**Second Lowne Supp. Decl.**").

[3] The United States Trustee for Region 2 (the "**U.S. Trustee**") filed an objection to the Wages Motion [Docket No. 134] (the "**UST Objection**"). The following parties filed joinders (the "**Initial Joinders**") to the UST Objection: Nevada Counties and Municipalities [Docket No. 190]; the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States Group**") [Docket No. 197] (the "**Non-Consenting States Group Joinder**"); the Commonwealth of Pennsylvania [Docket No. 196]; and the State of Arizona [Docket No. 201]. The Non-Consenting States Group later filed a statement maintaining its joinder [Docket No. 557] (the "**Statement of the Non-Consenting States Group**") and the State of Maryland filed a joinder to the statement filed by the Non-Consenting States Group [Docket No. 559] (the "**Maryland Joinder**") (together with the Statement of the Non-Consenting States Group and the Initial Joinders, the "**Joinders**," and the parties that filed Joinders collectively, the "**Joinder Parties**").

to a number of additional protections that preserve rights with respect to any potential claims of past misconduct by Dr. Landau and go well beyond the provisions already agreed to by all parties, including the Joinder Parties, applicable to all other Purdue AIP participants.

2.     The Debtors' Wages Motion was one of the first motions filed in these chapter 11 cases.  After much hard work with many stakeholders, the vast majority of the Debtors' requested relief with respect to the Wages Motion has been granted.  In the face of the Board's business judgment that Dr. Landau is the right CEO for the Debtors, and despite (i) the support of the UCC, the fiduciary for all unsecured creditors in these chapter 11 cases, for the deeply concessionary settlement with Dr. Landau and (ii) a yet further material concession offered to them (described below) after the December 4, 2019 hearing, the Non-Consenting States Group unfortunately continues to press its Joinder to a now-resolved objection by the U.S. Trustee.

3.     Dr. Landau had, as part of a complex agreement covering all employees reached with the UCC prior to the December 4, 2019 hearing (described below), agreed to (i) a clawback provision that preserves parties' rights to seek disgorgement if he is found to have knowingly participated in criminal conduct or failed to report the fraudulent or criminal conduct of others, (ii) an anti-secretion provision that prohibits him from taking any action that has the material effect of frustrating enforcement of any potential judgment (applicable only to him), (iii) the latest payment terms of any employee, that *de facto* turn his earned 2019 incentive compensation into a 2020 retention plan and (iv) a 63% reduction in his 2019 incentive compensation (by far the deepest cut of any participant).

4.     After the December 4, 2019 hearing, the Debtors worked hard to address the Non-Consenting States Group's questions, quickly responded to all information requests and attempted to find creative compromises.  Unfortunately, the parties have been unable to resolve this issue.

5.       Having had, well before the Petition Date, access to and knowledge of the details of Dr. Landau's 2018 retention payment, and also full disclosure of all payments to Dr. Landau made in the year before the Petition Date (set forth in Purdue Pharma L.P.'s Statement of Financial Affairs [Docket No. 358]), and in the face of the resolution of the primary issue raised in its "Statement", the Non-Consenting States Group now appears to be centering its objection on the aggregate amounts of Dr. Landau's 2018 and 2019 compensation.  *See* Statement of the Non-Consenting States Group. In the face of this shifting landscape, Purdue and Dr. Landau proposed yet further concessions after the December 4, 2019 hearing to address any remaining concerns.  As reflected in the form of proposed supplemental order (the "**Proposed Second Supplemental Final Wages Order**") attached hereto as <u>**Exhibit A**</u>—and despite the continuing objection of the Non-Consenting States Group—the Debtors and Dr. Landau have agreed (assuming the relief requested herein is granted) to defer until December 31, 2020 the vesting of the final $3 million of Dr. Landau's 2018 retention payment that otherwise would have vested in less than six weeks on March 1, 2020.  This change is of great value to the Debtors due to its retentive attributes, and also effectively reduces Dr. Landau's 2019 compensation by $1.14 million, by "spreading" this retention payment over 22 months instead of 12.  Dr. Landau's and the Debtors' willingness to make repeated concessions with respect to his compensation reflects his and their commitment to stewarding the Debtors properly through these chapter 11 cases, while still compensating Dr. Landau appropriately for the extraordinarily difficult work he is being asked to undertake.

6.       Moreover, while the Debtors believe that no procedurally proper objections remain on the docket, and that the Court would be fully justified, under both the Case Management Order and the Chambers Rules, in disregarding the Non-Consenting States Group's Joinder and Statement, and Maryland's improperly and untimely Joinder to the Joinder, the Debtors have

nonetheless acted yet again to address any potentially remaining issues. As this Court stated, this Motion is not an occasion for the Court or any party to pass judgment—explicitly or implicitly—on Dr. Landau's alleged role in any of the alleged misconduct attributed to the Debtors. The Debtors submit this Supplemental Reply to clarify the requested relief and respectfully request that the Court approve the remaining 2019 incentive payments to Dr. Landau on the terms set forth herein as squarely within the Debtors' sound business judgment.

## BACKGROUND

I.    **Procedural History**

A.    **The Debtors Seek Approval to Make Payments Under the Debtors' AIPs**

7.    The Wages Motion was filed on September 16, 2019, shortly after the Debtors filed their petitions. One aspect of the payments for which the Debtors sought approval in the Wages Motion was the Debtors' AIPs, which are long-standing, performance-based annual incentive programs, designed to motivate employees to achieve specific performance goals and compensate them for doing so. *See* Second Lowne Supp. Decl., ¶¶ 10-11. It is uncontested that the Purdue AIP has been in place substantially in its current form for over 30 years and that it was not altered or amended in conjunction with or in anticipation of these chapter 11 cases. *Id*., ¶ 10. In an effort to build stakeholder support for the Debtors' AIPs and because payments under the Debtors' AIPs were not imminent, the Debtors did not seek approval of the Debtors' AIPs at the first day hearing, and the Court entered the Interim Wages Order on September 18, 2019.

8.    The Interim Wages Order required any objections or responses to the entry of a final order to be filed by 4 p.m. Eastern Time on October 3, 2019. On September 27, 2019, the U.S. Trustee filed an objection to the Debtors' Wages Motion, arguing, among other things, that (i) the Debtors did not provide sufficient information about certain employee programs and program participants, (ii) the incentive plans were disguised retention plans that should be

4

evaluated under section 503(c)(1) of the Bankruptcy Code because they include insiders, and (iii) the Debtors had failed to offer sufficient evidence to meet the business judgment standard even if such plans were governed by sections 503(c)(3) and 363 of the Bankruptcy Code. *See* UST Objection at 2-3. The UST Objection made no specific mention of, or objection to, Dr. Landau in particular.

9.    On October 3, 2019, the Non-Consenting States filed a two-sentence joinder to the UST Objection, stating only that "[t]he Court should deny the relief sought in the Wage Motion with respect to the Severance Program, Incentive Plans and Sign-on Bonuses (as defined in the [UST Objection]) for the reasons set forth in the [UST Objection]" and that "Ad Hoc Group of Non-Consenting States adopts, incorporates and joins in the [UST Objection], and the arguments made therein, as if fully set forth here." Non-Consenting States Group Joinder, ¶¶ 1-2.

10.    The *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. 498] (the "**Case Management Order**") provides that the Court "shall not consider any arguments or factual allegations contained in a Joinder but not in the related Court Filing" and a joinder does not entitle a party to: "(a) be an independent proponent of the Court Filing; (b) independently support or oppose any related Court Filings; (c) independently settle the underlying Request for Relief that is the subject of the applicable Court Filing; or (d) independently receive a ruling from the Court on the Court Filing." Case Management Order, ¶ 39. The Court has also made plain that "a joinder is a very – in terms of one's rights in court a very weak pleading, including if someone withdraws an objection that you've joined to, you are essentially erased." Hr'g Tr. 110:18-22, October 10, 2019.

**B.**     **The Debtors Worked Constructively with the UCC and Other Stakeholders to Resolve Objections to the Debtors' AIPs**

11.     By December 2, 2019, the Debtors' efforts to resolve concerns of all parties in interest regarding the Wages Motion brought about a consensual agreement between the Debtors and the UCC, and the lack of an objection from the Ad Hoc Committee of Supporting States (as defined herein) and many other parties, under which the Debtors and their employees—including Dr. Landau—made a number of material concessions that reduced certain payments proposed to be made under the 2019 Debtors' AIPs and changed their terms, including payment dates.

12.     As part of these concessions, Dr. Landau agreed to forgo 100% of his Purdue LTRP grant payable in 2020 and to cap his 2019 Purdue AIP payment at 50% of the target amount.  As compared to his previously expected payout under these programs in 2020, this reflected a $2,223,420 or 63% voluntary reduction.

13.     In addition, Dr. Landau agreed that 50% of his payment under the 2019 Purdue AIP would be paid on or about June 1, 2020 and that the remaining 50% would be paid on or about September 1, 2020—rather than 100% being paid on March 15, 2020 as otherwise provided under the 2019 Purdue AIP and consistent with longstanding practice.[4]  Dr. Landau further agreed that payments made to him under the 2019 Purdue AIP would be (i) subject to reconsideration by the Court (which may be requested by any party in interest in these chapter 11 cases, including any state of the United States) in the event that he is finally determined to be liable with respect to his actions as an employee of the Debtors in connection with the sale of opioid products by a final non-appealable judgment of a court of competent jurisdiction and (ii) subject to the condition that

---

[4] *See Debtors' Supplemental Omnibus Reply in Support of Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 556], Exhibit A.

he shall not take any action with respect to any amounts received in respect of the 2019 Purdue AIP with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these chapter 11 cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts. *See id.*

### C.    The Non-Consenting States Group and the State of Maryland Impermissibly Raise New Legal and Factual Arguments through a Joinder to a Now-Overruled Objection

14.    On December 2, 2019, only two days before the hearing and 60 days after the objection deadline,[5] the Non-Consenting States Group filed a seven-page "Statement Maintaining Its Objection" (i.e., maintaining its two-sentence joinder) that raised new factual and legal allegations with respect to Dr. Landau's compensation.  *See* Statement of the Non-Consenting States Group.  Later that day, the State of Maryland—having not previously filed <u>any</u> pleadings on the Wages Motion—filed a separate untimely and improper "Additional Statement With Respect to the Payment of Bonuses Under Purdue's Wage Motion to Any Recipient Who Participated in Debtors' Unlawful Conduct," which "join[ed] the Committee's Statement Maintaining Its Objection to Purdue's Wage Motion"—which was itself not an objection, but rather a two-sentence Joinder.  *See* Maryland Joinder.  This "joinder to a statement in support of a joinder" largely reiterated the issues raised in the Non-Consenting States Group's supplemental pleading and argued that the Debtors should be obligated to conduct an investigation into the conduct of all employees receiving incentive payments. *See* Maryland Joinder.

15.    These two pleadings argued that Dr. Landau should not receive the Reduced 2019 Payment because (1) he is named as a defendant in two of the 48 lawsuits brought by state attorneys

---

[5] The Debtors extended the objection deadline only for the UCC and ad hoc committee of governmental and other contingent litigation claimants represented by Kramer Levin Naftalis & Frankel LLP, Brown Rudnick LLP, Gilbert LLP and Otterbourg P.C (the "**Ad Hoc Committee of Supporting States**"). *See Amended Agenda for Second Day Hearing* [Docket No. 274] .

general regarding the Debtors' prescription opioid business; and (2) certain changes were made to Dr. Landau's compensation in 2018.  Statement of Non-Consenting States Group, ¶ 5; Maryland Joinder.

16.     At the December 4, 2019 hearing, the Court overruled the remaining portions of the UST Objection and thereafter entered an agreed form of a Supplemental Final Wages Order [Docket No. 629] approving the 2019 Debtors' AIP and LTRP other than with respect to Dr. Landau, as to whom it was further adjourned.  The Court determined that the legal and factual bases set forth in the Motion and at the December 4, 2019 hearing with respect to the UCC compromise established that the requested relief was justified and payment of amounts requested was a proper exercise of the Debtors' business judgment.  Supplemental Final Wages Order. Notably, as directed by the Court, the Supplemental Final Wages Order includes a clawback provision, mirroring the language in an order approving a severance program in *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (Bankr. D. Del. Sept. 19, 2019), covering payments to any participant in the 2019 Debtors' AIPs who is later determined by final order of a court of competent jurisdiction to have knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors, or been aware of and failed to report fraudulent or criminal acts of others.  Supplemental Final Wages Order, ¶ 12.  All parties signed off on the language used. Because the UST Objection was overruled at the December 4, 2019 hearing, and because the U.S. Trustee is not pursuing a further objection to the Wages Motion, the Joinders have been "essentially erased," and as a procedural matter no objection to the Wages Motion remains.

## II.    <u>Dr. Landau's Compensation</u>

17.     Despite the deeply concessionary deal reached with the UCC after many weeks of negotiation and the record made at the December 4 hearing, which included two witnesses, the

Debtors have made yet another concession and file this pleading to leave no ambiguity about Dr. Landau's compensation.

18.     Between October 1999 and July 2013, Dr. Landau was employed in various roles at Purdue and related entities.  From July 2013 to June 2017, Dr. Landau served as the Chief Executive Officer and President of Purdue Pharma (Canada) ("**Purdue Canada**"), a non-debtor affiliated company not owned by Purdue.  Dr. Landau returned to Purdue as Chief Executive Officer and President in June 2017.  Since assuming that role, under Dr. Landau's leadership, Purdue voluntarily stopped promoting opioid pain medications to prescribers through sales representatives and via other channels, such as in medical journals, and eliminated its opioid medication sales force. Purdue no longer has any sales representatives promoting any opioid product to prescribers.  Dr. Landau's experience and expertise, as well as his leadership, are sorely needed in these critical and challenging times.  Moreover, under Dr. Landau's stewardship, Purdue entered chapter 11 to implement the settlement framework, which includes transferring 100% of Purdue to allowed claimants—who collectively constitute the American people—despite having no funded debt or a single judgment pending against them.  Hr'g Tr. 13:17-25; 25:16-19; 91:12-18, September 17, 2019.  Dr. Landau has also been instrumental in advancing the work of the Public Health Initiatives that are part of the settlement framework—which includes the development of innovative opioid overdose reversal medications.

19.     Dr. Landau has been named as a defendant in only two of the 48 complaints filed by state attorneys general.  He has been named in an even smaller proportion of the over 2,700 litigations facing the Debtors.  As Dr. Landau's counsel noted at the December 4, 2019 hearing, Dr. Landau vigorously contests the allegations against him, and he has never been found guilty or liable for any wrongdoing by any court.  Hr'g Tr. 144:4-15, December 4, 2019. Given the

protections for the estate built into the Proposed Second Supplemental Final Wages Order, these allegations should not affect the analysis of Dr. Landau's compensation. *See, e.g., id.* at 126:19-22 (Court noting that "no one is saying [Dr. Landau]'s the type of CEO that just has to go" and that the allegations about Dr. Landau are not "anywhere close to being dispositive.").

20.     A review of Dr. Landau's compensation history shows that the Board is exercising reasonable business judgment in seeking authority to pay the Reduced 2019 Payment agreed to with the UCC.  As of January 1, 2018, Dr. Landau's base salary was $1.25 million (subsequently adjusted in the normal course to $1.275 million), his target Purdue AIP payment was 70% of his base salary, his LTRP target was $600,000 and he was entitled to 24 months' base salary in severance upon termination by the Company without "cause" or voluntary resignation within six months of a change of control for "good reason."

21.     In March 2018, to incentivize him to remain with the Company in increasingly complex and challenging circumstances and with his wife and children having relocated to Canada, the Company, working with labor, tax and corporate attorneys from Norton Rose Fulbright, agreed to provide Dr. Landau a retention agreement that provided for a $6 million retention payment, paid in a lump sum, that vested upon the earlier of (A) a termination by the Company without cause or (B) continued employment, on the following schedule: (i) 50% on March 1, 2020 and (ii) 100% on March 1, 2022.  The retention agreement also provided for (i) an additional $3 million retention payment payable upon the earlier of (A) termination by the Company without cause or (B) continued employment with the Company on March 1, 2024 (six years later) and (ii) another $3 million retention payment payable upon the earlier of (A) termination by the Company without cause or (B) continued employment with the Company on March 1, 2026 (eight years later).

22.     In June 2018, the Company restructured Dr. Landau's retention and severance package to ensure Dr. Landau's continued employment with the Company and his needed leadership as it faced a growing onslaught of litigation and an increasingly uncertain future.  The June 2018 modifications: (i) increased Dr. Landau's base salary, (ii) increased his target Purdue AIP payment from 70% to 100% of base salary, (iii) reduced his future retention payments from $6 million to $4 million, (iv) adjusted the vesting schedule for the $6 million retention payment that was already paid from four years to two years and (v) materially reduced his potential severance amounts—from $14.5 million to approximately $7.8 million.

23.     Dr. Landau's 2018 total direct compensation ("**TDC**") consisted of: (i) $1,980,288 in base salary, (ii) $3,442,500 in AIP payments and (iii) $665,333 in LTRP payments.  This 2018 TDC falls below the midpoint of the 50th and 75th percentiles, as described in more detail below.  Using a straight line amortization of the $6 million retention payment that was paid in March 2018 (which at that point in time covered a two-year period), Dr. Landau also received $2,500,000 in retention payments attributable to 2018 (which, as discussed below, are not part of TDC).

24.     In February 2019, Dr. Landau's base salary increased to $2,626,500 in the ordinary course.  His 2018 Purdue LTRP target (potentially payable in 2021) increased from $600,000 to $1,530,000 to correct the Company's failure to adjust his Purdue LTRP target on June 8, 2018 concomitantly with the other changes that were made to Dr. Landau's compensation at that time.  Dr. Landau was also granted a 2019 Purdue LTRP (potentially payable in 2022) with a target of $1,575,900.  No amounts have been paid with respect to these LTRP grants (nor are the Debtors seeking approval at present to pay those amounts).

25.     During 2019, Dr. Landau also voluntarily relinquished various of the benefits he had been receiving, resulting in more than $250,000 in annual savings to Purdue.

26.     After giving effect to the settlement with the UCC and the new concessions outlined above, Dr. Landau's proposed 2019 TDC will consist of: (i) $2,608,846 in base salary, (ii) $1,313,250 in Purdue AIP payments and (iii) $0 in Purdue LTRP payments.  The proposed TDC is $3.922 million, which is close to the 25th percentile of $3.51 million and well below the uncontested median of $5.015 million based on 2018 survey data for similarly situated CEOs. Willis Towers Decl., ¶ 44.

27.     Moreover, with both the UCC and the final post-hearing concessions, moving the vesting date of the second $3 million of Dr. Landau's March 2018 retention payment from March 1, 2020 to December 31, 2020, one would at most attribute $1.86 million of his 2018 retention payment to 2019 (for reasons described below), and now both his 2019 AIP payments and the unvested portion of his 2018 retention payment are retentive and, moreover, arguably largely attributable to 2020.  For example, were Dr. Landau to resign before June 1, 2020, he would forfeit 100% of his 2019 AIP and his $3 million unvested 2018 retention payment (which he would have to repay), leaving him with just his base salary of $2.608 million for 2019, well <u>below</u> the TDC 25th percentile.  If he resigned after June 1, 2020 but before September 1, 2020, he would forfeit 50% of his 2019 AIP and his $3 million unvested 2018 retention payment (which he would have to repay), and his 2019 compensation would be $3.26 million, well <u>below</u> the TDC 50th percentile. If he resigned after September 1, 2020 but before December 31, 2020, he would forfeit his $3 million unvested 2018 retention payment (which he would have to repay), leaving him with $3.92 million for 2019, also well <u>below</u> the TDC 50th percentile of $5.015 million.

28.     As mentioned above, following the December 4, 2019 hearing, the Debtors worked hard to address all of the Non-Consenting States Group's information requests.  In connection with such requests, the Debtors provided a comprehensive summary of Dr. Landau's TDC, benefits and

expense reimbursements attributable to 2018 and 2019, which also assumed the latest and final concession offered.

29.     While it is true that the arithmetic total of CEO compensation, reimbursements, indemnification, and other total payments attributable to 2018 and 2019, prior to the payment of the reduced 2019 AIP, is approximately $17.21 million, this figure standing alone, while admittedly material, paints a misleading picture of the value of these payments to Dr. Landau.

30.     As discussed above, Dr. Landau's 2018 TDC was $6.088 million, falling below the midpoint of the 50th and 75th percentiles, and his base salary for 2019 was $2.609 million— collectively accounting for $8.697 million of the total payments.  Assuming the relief requested herein is granted, the $6 million retention payment made in March 2018 will vest over a 34-month period (March 1, 2018 to December 31, 2020), making $4.363 million of the payment attributable to 2018 and 2019.

31.     This leaves $4.15 million in "other payments" for 2018 and 2019. While at first blush a material sum, indemnification of legal fees paid directly to attorneys accounts for nearly $1.2 million of this amount.  Expenses associated with Dr. Landau's prior employment and residence in Canada, such as the continued costs of providing Dr. Landau with commuting, reimbursement, housing and a vehicle while living separate from his family (who has remained in Canada), and associated tax equalization payments account for the vast majority of the remaining sum.  Approximately $336,000 constitutes regular expense reimbursements.  And none of them constitute TDC.

32.     Moreover, in connection with a detailed review of a variety of compensation matters in the summer of 2019, it was determined that Dr. Landau erroneously received from Purdue, over a three-year period, continued payment of a tax equalization benefit that was paid to

him while CEO of Purdue Canada in the aggregate amount of $658,794. These payments ceased

in July 2019 once this determination was made, and will be repaid to Purdue by Dr. Landau in

2020.  $500,545 of this amount is attributable to 2018 and 2019 and thus lowers the $4.15 million

figure referenced in paragraph 31 by $500,545.

33.    Moreover, as discussed in more detail in paragraph 42 below, the inclusion of

benefits and expense reimbursements in Dr. Landau's TDC—as Ms. Gartrell testified—would be

improper.

## REPLY

### I.    The Proposed 2019 Purdue AIP Payment to Dr. Landau Should Be Approved

34.    The only remaining question before the Court is whether payment of $1,313,250 to

Dr. Landau under the 2019 Purdue AIP—50% on June 1 and 50% on September 1 and subject to

both clawback and anti-secretion provisions—is a sound exercise of the Debtors' business

judgment, especially in light of the most recent concession on the remaining $3 million almost-

vested retention payment.  Because Dr. Landau's overall compensation package was designed in

light of his essential role to the Debtors' businesses, and because there is no evidence in the record

calling that judgment into question, this payment should be approved.

35.    The governing legal standards are not in dispute.  An incentive plan providing for

payments to insiders and that is outside the ordinary course of business is analyzed under section

503(c)(3).  *See In re Residential Cap., LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012).  Courts

have held that section 503(c)(3) is essentially a reiteration of the traditional business judgment rule

otherwise applicable to a debtor's decision to use, sell or lease assets outside the ordinary course

of business under section 363(b).  *See In re Velo Holdings*, 472 B.R. 201, 212 (Bankr. S.D.N.Y.

2012); *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) ("*Dana II*"); *In re Glob.

Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007); *In re Mesa Air Grp., Inc.*, No. 10-

10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010). The factors set forth in *Dana II* to determine whether the business judgment standard has been met are: (1) whether the plan is calculated to achieve the desired performance; (2) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential; (3) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (4) whether the plan is consistent with industry standards; (5) whether the debtor performed due diligence in investigating the need for the plan; and (6) whether the debtor received independent counsel in performing due diligence and creating and authorizing the plan. *Dana II*, 358 B.R. at 576-77.

36.     This Court has already concluded that the UCC compromise reached with respect to the Purdue AIP satisfies the *Dana II* factors generally with respect to all participants other than Dr. Landau. *See* Hr'g Tr. 111:13-115:20, December 4, 2019. Because the Reduced 2019 Payment negotiated with the UCC with respect to Dr. Landau—which reflects much deeper cuts than those applicable to any other plan participant—is reasonable under the circumstances, consistent with industry standards, critical to ensuring his continued leadership and the success of these chapter 11 cases, and in the best interests of the Debtors' estates, the Debtors submit that the *Dana II* factors are also satisfied with respect to Dr. Landau's Reduced 2019 Payment.

37.     The Joinder Parties argue that the Reduced 2019 Payment should not be permitted because (i) Purdue made a $6 million retention payment to Dr. Landau in March 2018 and he is overcompensated and (ii) he should not receive any incentive payments before the allegations against him with respect to alleged pre-2019 conduct are resolved. The former argument should be rejected for the reasons set forth herein; the latter is fully addressed by the modified *Insys* language agreed to by all parties contained in the Supplemental Final Wages Order that applies to all employees and the additional provisions that govern only Dr. Landau.

38.    The 2018 retention payment, which was agreed to and made approximately 18 months before the Petition Date without the involvement of the Debtors' restructuring counsel (and will now cover a three-year period), was designed to retain Dr. Landau for a specified period of time and should not be included when evaluating the competitiveness of Dr. Landau's 2019 TDC.  Hr'g Tr. 81:22–82:13, 86:7–86:22, December 4, 2019.  The Joinder Parties have not offered any evidence that undermines the Debtors' business judgment with respect to the Reduced 2019 Payment.

A.    **The Proposed 2019 Purdue AIP Payment to Dr. Landau Is a Sound Exercise of the Debtors' Business Judgment**

39.    As demonstrated by the *Declaration of Josephine Gartrell in Support of Debtors' Key Employee Plans* [Docket No. 555] (the "**Willis Towers Decl.**"), the 25th percentile for CEO TDC based on 2018 survey data is $3.51 million, the 50th percentile is $5.015 million, and the 75th percentile is $7.165 million.  Willis Towers Decl., ¶ 44.  Dr. Landau's proposed 2019 TDC of $3.92 million (consisting of base salary, the proposed $1.3 million Reduced 2019 Payment and a $0 proposed LTRP payment) is close to the 25th percentile and well below the market median.  Willis Towers Decl. ¶ 44; Hr'g Tr. 81:20-82:2; 87:9-88:14, December 4, 2019.   Without the Reduced 2019 Payment, his 2019 TDC ($2.6 million) would be far below the 25th percentile.  *Id.*  Josephine Gartrell's uncontested testimony at the December 4, 2019 hearing was that TDC is considered competitive when it falls "around median . . . or [between] median [and the] 75th percentile."  Hr'g Tr. 88:17-20, December 4, 2019.  Accordingly, Dr. Landau's 2019 TDC—inclusive of the $1.3 million Reduced 2019 Payment—is far below the 50th percentile and can reasonably be considered "less than competitive."  Hr'g Tr. 88:21-24, December 4, 2019.

40.    Dr. Landau's compensation is significantly under the market median because the reductions agreed to as a part of the UCC settlement reduced his payments under the Purdue LTRP

and Purdue AIP by a combined <u>63%</u>.  They also, its bears mention, spread out his Purdue AIP payment dates—in effect using his incentive payments as a 2020 retention plan (through September 1, 2020) at no cost to the Debtors.  This retentive element will be further materially strengthened by the Proposed Second Supplemental Final Wages Order, which provides that $3 million of Dr. Landau's March 2018 retention payment will not vest until December 31, 2020 (instead of in less than six weeks on March 1), meaning that the Debtors are now effectively getting robust 2020 retention at no additional cost.  Dr. Landau's willingness to agree to extended payment and vesting dates yet further demonstrates his commitment to leading the Debtors through these chapter 11 cases.  The requested relief is necessary and appropriate to allow the Debtors to provide certainty to Dr. Landau and to ensure his continued leadership of the Company at this difficult and critical time.

41.     Based on the uncontested evidence adduced at the December 4, 2019 hearing, the March 2018 retention payment to Dr. Landau is not germane to market benchmarks of the compensation at issue.  As Ms. Gartrell testified on December 4, retention payments are paid to employees a company has deemed as critical whom the company hopes to retain for a specific period of time.  *See* Hr'g Tr. 86:7-22, December 4, 2019.  The Company's decision in March 2018 to offer Dr. Landau retention payments, and in June 2018 to alter the vesting schedule for those payments, while at the same time lowering their total quantum and materially reducing Dr. Landau's severance rights, was intended to ensure Dr. Landau would remain at the helm of the Company through these turbulent times.

42.     The uncontroverted testimony of Ms. Gartrell is that retention payments and perquisites are distinct from, and are not analyzed as part of, TDC.  Hr'g Tr. 82:6-10, December 4, 2019 ("[C]ompensation surveys that report on compensation do not take into consideration

retention. They are inclusive of [] three items . . . base salary, annual incentives, and long-term [incentives].”); *id.* 86:9-22; 89:21-22 (“Total direct compensation does not include executive benefits and perquisites.”).    There is therefore no evidence in the record that would support “adding” any allocable portion of the March 2018 retention payment, or perquisites (several of which were unilaterally relinquished by Dr. Landau prepetition), to Dr. Landau’s 2019 TDC for purposes of comparing Dr. Landau’s compensation to market standards.    Ms. Gartrell testified that the Willis Towers Watson survey does not account for any retention payments that comparable companies may pay to their chief executives, or for perquisites.    Hr’g Tr. 81:22–82:14, 86:7–86:22, December 4, 2019 (“We would not include [retention payments] in the TTDC analysis.”).    As a result, comparing the sum of Dr. Landau’s 2019 (i) TDC, (ii) attributable retention payments, and (iii) perquisites, on the one hand, to the market percentiles of TDC, on the other, would be a quintessential apples to oranges comparison.    Not only would such a comparison be unfair to Dr. Landau, but it would defy both the expert testimony adduced and basic logic.

43.    All of that said, even if it is assumed for the sake of argument—though contrary to fact and uncontroverted expert testimony—that Dr. Landau’s March 2018 retention payments attributable to 2019 should be “included” in his 2019 TDC, the requested relief still comfortably satisfies the *Dana II* standard.    As noted, a $6 million retention payment was made in March 2018, with $3 million vesting a year later on March 1, 2019 (more than six months before the Petition Date).    Of that amount, $500,000 can be considered related to 2019 (i.e., the pro rata amount for the first two months of 2019).    If the relief requested herein is granted, a second $3 million will not vest until December 31, 2020 and will cover a 22-month period, resulting in $1,363,636 attributable to 2019 (i.e., the pro rata amount for the first 10 months of the 22-month period).    Thus, even if one *arguendo* adds the 2019 retention payments to TDC, Dr. Landau’s 2019 TDC would

total $5,785,732 ($2,608,846 in base salary, $1,313,250 of reduced AIP, $500,000 from the first

$3 million of the March 2018 payment (attributable to January and February 2019) and $1,363,636

of the second $3 million (attributable to the balance of the year)).  This total is only 15% above

the 50th percentile and well below the 75th percentile of $7.165 million.  Willis Towers Decl. ¶

44.  Dr. Landau is responsible for guiding the Debtors through extraordinarily difficult

circumstances, while being subjected to a great deal of public scrutiny and opprobrium.  It is both

reasonable and well within the Debtors' business judgment to pay their CEO within this range.

And of course, this perfectly matches the expert testimony that market compensation is between

the 50th and 75th percentile, or between $5.015 million and $7.165 million, respectively—which

$5.8 million squarely is.  In fact, it is below the midpoint.

44.     The Reduced 2019 Payment and the additional retention that will be provided by

the Second Supplemental Final Wages Order are crucial to the Debtors' reorganization efforts and

the ultimate success of these chapter 11 cases.  Not only does the requested relief preserve value

by avoiding the unnecessary and potentially very material expense of searching for and retaining

a new CEO, but it also ensures that Dr. Landau will continue to lead the Debtors through this

difficult time and provide invaluable input that will maximize the value of the estates, which

benefits all stakeholders.

**B.     Any Objections Based on the Allegations Against Dr. Landau Are Effectively
        Mooted by the Proposed Second Supplemental Final Wages Order**

45.     To the extent any of the Joinder Parties maintain that Dr. Landau should not be

entitled to the Reduced 2019 Payment until the allegations against him are resolved, such

objections should be overruled.

46.     At the December 4, 2019 hearing, the Court indicated that modified language from

*Insys* addressed concerns voiced by the Joinder Parties as to any alleged wrongdoing.  Hr'g Tr.

120:20-25; 137:12-18, December 4, 2019.  Following the hearing, all parties agreed to modified *Insys* language for all AIP participants other than Dr. Landau, and this Court approved the agreed language in the Supplemental Final Wages Order.

47.    The Proposed Second Supplemental Final Wages Order of course applies the same *Insys* provision to Dr. Landau.  The Debtors, like the Court, are "not sure what more can be said at this point," because, as this Court recognized, this modified *Insys* language combined with the anti-secretion provision—which applies only to Dr. Landau—is "better than a pre-judgment attachment."  Hr'g Tr. 120:20-25, December 4, 2019.  The anti-secretion provision prohibits Dr. Landau from taking <u>any</u> action with respect to the Reduced 2019 Payment with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these chapter 11 cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts.  In other words, if any of the current allegations against Dr. Landau, or if any future allegations against Dr. Landau, result in a judgment against Dr. Landau or in Dr. Landau's otherwise being held financially liable, the Proposed Second Supplemental Final Wages Order preserves the status quo for the purposes of enforcement.

48.    Thus, any stayed or future actions brought by certain of the Joinder Parties are not prejudiced by the requested relief, and the *Insys* and anti-secretion provisions in the Proposed Second Supplemental Final Wages Order fully address any objection to the Reduced 2019 Payment based on allegations against Dr. Landau.  *See* Hr'g Tr. 120:20-25, December 4, 2019.

## CONCLUSION

WHEREFORE, for the foregoing reasons and the reasons stated in the Motion, the Debtors respectfully request that the Court overrule the Joinders and grant the relief requested in the Motion.

Dated:    January 17, 2020
          New York, New York

                              DAVIS POLK & WARDWELL LLP
                              By:   */s/ Marshall S. Huebner*

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile:  (212) 701-5800
                              Marshall S. Huebner
                              Benjamin S. Kaminetzky
                              Timothy Graulich
                              James I. McClammy
                              Eli J. Vonnegut

                              *Counsel to the Debtors*
                              *and Debtors in Possession*