AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Sara L. Brauner

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

--------------------------------------------------------------

**STATEMENT AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING DEADLINES FOR FILING PROOFS OF CLAIM AND PROCEDURES RELATING THERETO, (II) APPROVING THE PROOF OF CLAIM FORMS, AND (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

The Official Committee of Unsecured Creditors (the "Committee")[2] of Purdue Pharma L.P., et al., (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

[2] The Committee currently comprises the following members: (1) Blue Cross and Blue Shield Association; (2) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health, L.L.C.; (3) Ryan Hampton; (4) Cheryl Juaire; (5) LTS Lohmann Therapy Systems, Corp.; (6) Pension Benefit Guaranty Corporation; (7) Walter Lee Salmons; (8) Kara Trainor; and (9) West Boca Medical Center, plus two *ex officio* members, Cameron County, Texas on behalf of the

this statement and reservation of rights (the "Statement and Reservation of Rights") in respect of the Debtors' *Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [ECF No. 717] (the "Bar Date Motion")³ and respectfully states as follows.

## STATEMENT AND RESERVATION OF RIGHTS

1. By the Bar Date Motion, the Debtors seek approval of proof of claim forms and methods for providing notice of the Bar Date and the proof of claim process to the Debtors' creditors. In light of the unique facts and circumstances of these chapter 11 cases, the Debtors' noticing strategy contemplates, among other thing, a broad-reaching "Supplemental Notice Plan" to provide additional notice to unknown claimants, including, in particular, the numerous individual victims (including children, parents and guardians) of the opioid crisis.⁴ The Committee—through its members and their vast array of contacts, including victim advocacy groups, not for profit organizations and peer support centers—is uniquely qualified to understand and help develop the messaging necessary to reach individual claimants impacted by Purdue's products and the opioid crisis generally (such as several of the Committee members themselves). As such, the Committee and its advisors have worked closely with the Debtors over the past several months to ensure that the proof of claim forms are clear and that the contemplated noticing strategy—which, if approved, will cost the Debtors' estates (and thus its creditors) approximately

---

Multi-State Governmental Entities Group, and the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors.

³ Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bar Date Motion.

⁴ In the *Declaration of Jeanne C. Finnegan* [ECF No. 719] (the "Finnegan Declaration") accompanying the Bar Date Motion, the Debtors describe the Supplemental Notice Plan as a comprehensive program "compris[ing] an extensive advertising campaign utilizing network broadcast and cable television, terrestrial and streaming radio, newspaper, magazine, advanced television, out-of-home advertising, online video, online display, and social media." Finnegan Decl. ¶ 6.

$23.75 million—not only provides broad and robust notice to the target audience, including thousands (if not more) of potential claimants, but also delivers the message in a way that is meaningful to victims.

2. Although discussions between the Debtors and the Committee—particularly those over the last ten days—have been productive and extensive, the Committee and the Debtors continue to discuss certain issues in respect of specific media campaigns the Debtors intend to launch as part of the Supplemental Notice Plan.  The Committee believes that the Debtors will continue to collaborate with the Committee to ensure that the Debtors' media strategy is effective and reaches as many potential claimants as reasonably practicable in a meaningful rather than perfunctory manner, but files this Statement and Reservation of Rights out of an abundance of caution and to inform the Court that to the extent these constructive efforts do not continue, the Committee reserves the right to file an objection to the Bar Date Motion prior to the hearing scheduled for January 24, 2020 or raise other objections during such hearing or at any other hearing on the Bar Date Motion.

3. Prior to filing the Bar Date Motion, the Debtors worked with the Committee and other creditors on the proposed proof of claim forms, which were subject to numerous rounds of comments and revisions before they were finalized.  The Debtors' efforts in this regard are appreciated and, indeed, to their credit, the Debtors continued to take additional comments on the proof of claim forms after the filing of the Bar Date Motion.  In late December and early January (and again, immediately prior to the filing of the Bar Date Motion), the Committee and the Debtors also engaged in a number of preliminary discussions regarding the Supplemental Notice Plan. Specifically, the Debtors and the Committee discussed, among other things, the "earned media" strategy that the Debtors propose to employ to provide notice of the Bar Date and procedures for

filing proofs of claim through news platforms and other media outlets.[5]  In light of the parties' focus on the proof of claim forms, and the fact that the Debtors had not yet worked out the specifics of their media strategy, however, the Debtors and the Committee agreed that the details of the Supplemental Notice Plan would be determined after the filing of the Bar Date Motion, and that the Debtors and the Committee would engage in a transparent and collaborative process regarding such plan, including determining the specific content of scripted commercials and the use of various media platforms to assist with messaging.[6]

4. The Committee fervently shares the Debtors' stated goal that the noticing strategy is effective, reaches in a meaningful way the victims of the opioid crisis and otherwise avoids the result that has occurred in another recent chapter 11 case.[7]  Indeed, as of the filing of this Statement and Reservation of Rights, the Debtors and the Committee are in agreement regarding most aspects of the Supplemental Notice Plan—including, among other things, the Debtors' engagement of an

---

[5] The Supplemental Notice Plan seeks to employ four types of media advertising: "paid (advertising you control and pay for), earned (news content, mentions you earn), shared (user generated social content and social media), and owned (content you generate on a platform you own such as a blog)." Finnegan Decl. ¶ 4 n. 3.

[6] In their Memorandum of Law accompanying the Bar Date Motion, the Debtors note that notwithstanding the Committee's general support for the relief requested, certain items "continued to be negotiated and finalized" and expressly state that the Committee retains the right to object to the Bar Date Motion to the extent agreement cannot be reached.  See *Debtors' Memorandum of Law in Support of Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [ECF No. 718] at 4-5 & n. 6.

[7] In the recent mass tort bankruptcy of *PG&E*, the debtors' noticing strategy was subject to significant scrutiny notwithstanding robust and expensive efforts on the part of the debtors and their noticing agent.  Indeed, although the *PG&E* debtors were authorized to spend up to $22 million on noticing to reach victims that were only in a single state, the initial notice program was woefully inadequate such that the bankruptcy court was obligated to take the rare step of extending the bar date to give creditors additional time to submit claims.  See *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. May 1, 2019), *Motion of Debtors Pursuant to 11 U.S.C. § 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005 and 9007, and L.B.R. 30031- for Order (I) Establishing Deadline for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to All Creditors and Potential Creditors* [ECF No. 1784]; *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. Nov. 1, 2019), *Order Extending Bar Date for Fire Claimants and Appointing Claims Representative* [ECF No. 4672].  In light of the paramount importance of reaching individual victims of the California wild fires, the bankruptcy court also appointed a specialist to undertake ground-level efforts to locate victims and assist them with the process of submitting claims. *Id.; see also* Ivan Penn, *He is Trying to Get Fire Victims Paid.  He Has to Find Them First*, N.Y. TIMES (Dec. 26, 2019), https://www.nytimes.com/2019/12/26/business/energy-environment/pge-wildfire-victims-claims.html, attached hereto as **Exhibit A**.

4

additional earned media expert, as well as most of the content of messages for social media and other platforms. However, in light of limited open issues, the Committee files this Statement and Reservation of Rights to preserve its right to object to the Bar Date Motion as and when necessary.

5. This Statement and Reservation of Rights is submitted without prejudice to, and with a full reservation of, the Committee's rights, claims, defenses and remedies, including the right to amend, modify or supplement this Statement and Reservation of Rights, to raise additional objections and to introduce evidence at any hearing relating to the Bar Date Motion, and without in any way limiting any other rights of the Committee to further object to the Bar Date Motion, on any grounds, as may be appropriate.

| | |
|---|---|
| Dated: New York, New York<br>January 21, 2020 | AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>By: /s/ *Arik Preis*<br>Ira S. Dizengoff<br>Arik Preis<br>Mitchell Hurley<br>Sara L. Brauner<br>One Bryant Park<br>New York, New York 10036<br>Tel: (212) 872-1000<br>Fax: (212) 872-1002<br>idizengoff@akingump.com<br>apreis@akingump.com<br>mhurley@akingump.com<br>sbrauner@akingump.com<br><br>*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.* |

5

**Exhibit A**

19-23649-shl    Doc 763    Filed 01/21/20    Entered 01/21/20 14:13:02    Main Document
Pg 6 of 10

**Exhibit A**

# The New York Times

## He is Trying to Get Fire Victims Paid. He Has to Find Them First.

With days left to seek damages from a giant utility, a team fans out in a hard-hit area to get the word to those eligible.

 By Ivan Penn

Dec. 26, 2019

PARADISE, Calif. — Unlike a typical holiday food giveaway, the ham, mashed potatoes and green beans packed in bags at Paradise Alliance Church came with a grim reminder of an even deeper need.

Next to the counter where hundreds picked up meals, a table had been set up by an envoy from United States Bankruptcy Court. His mission: to make sure residents had a chance to seek compensation from California's largest utility for wildfires like the one that laid waste to their town.

Victims have until Tuesday to submit claims against Pacific Gas & Electric, which filed for bankruptcy protection in January after amassing tens of billions of dollars in liabilities from years of wildfires. The court overseeing the case assigned Michael Kasolas, an accountant, to track down those eligible. But some are homeless and hard to find. Some have moved out of state. Some have struggled to submit the paperwork and have not known whom to call.

So Mr. Kasolas and a team working with him are racing to find as many as possible. A recent day's efforts included taping fliers to boxes at a neighborhood pizzeria, meeting with wildfire response agencies and working the food line at the church.

"Trying to find these people, especially those outside of California, is challenging," said Mr. Kasolas, president of Michael Kasolas & Company, a Bay Area accounting firm. "We're just trying to find everybody."



Fliers urging Camp Fire victims to file a claim against PG&E before the Dec. 31 deadline.  Max Whittaker for The New York Times



Michael Kasolas, center, spread the word about the claims process at Paradise Alliance Church. Max Whittaker for The New York Times

That could mean thousands, even tens of thousands of people — many of whom have scattered across the country.

As daunting as it would be, a federal judge charged with estimating PG&E's total wildfire liability said that "someone should be going door to door" to get victims to file claims, after it was estimated in early October that little more than 30,000 people had submitted paperwork before the initial deadline that month.

The bankruptcy court gave victims more time as lawyers argued that there might be as many as 70,000 more victims who should file claims for their losses and suffering.

"All I'm saying is it would be a heartbreaking shame if even 10 percent of the eligible victims don't file claims for whatever reason," the judge, James Donato, said. "If we're talking about 50 percent not filing, that's — that's intolerable."

It has been just over a year since the Camp Fire, the most devastating wildfire in California history, destroyed the town of Paradise and killed 85 people. Investigators attributed the fire to an equipment failure on a 100-year-old tower owned by PG&E.

Signs of catastrophe endure: the towering pine trees with burns from top to bottom, the whirring of chain saws, the charred cars still firmly planted on roadsides, the barren lots where houses stood.

Though filing a claim might seem an obvious step for victims trying to rebuild a normal life, it hasn't been so easy. The emotional trauma has weighed as heavily as the property losses themselves.

Some have had difficulty staying focused enough to get the paperwork done.

Karen Gowins lost her home in the Paradise fire, along with family heirlooms. All that escaped destruction were six trees and her family's pontoon boat.

Ms. Gowins was chosen to be a victims' representative in the bankruptcy case, and she has been working with Mr. Kasolas to help people file claims.


Signs of the disaster endure around Paradise, including barren lots and burned trees. Max Whittaker for The New York Times

"Even answering the questions like 'What's your name?' is difficult for some," she said. "It's been draining. My heart is breaking for my community."

In November, the judge overseeing the bankruptcy case, Dennis Montali, made it Mr. Kasolas's job to find victims and help them file claims. He and his staff have mailed tens of thousands of fliers that have included information in English and Spanish. They have published advertisements in newspapers and on radio and television, and posted notices on Facebook and Instagram. They have opened a call center to provide information and assist with claims. And they have created a website for people filing on their own.

"We're doing all we can," Mr. Kasolas said. "I just don't have airplanes with banners, yet."

At stake is a pot of money worth $13.5 billion, a figure negotiated between PG&E and victims' representatives in the bankruptcy case. The settlement divides those funds among victims, their lawyers, and federal and state agencies that responded to the disaster.

The parties in the bankruptcy continue to spar over whether the money will be all in cash or half in cash and half in PG&E stock.

On the weekslong journey Mr. Kasolas was commissioned to undertake, he and his staff have directly encountered only a few victims who have not filed claims. But he cited other signs of headway: The team has received more than 700 phone calls, recently fielding 40 a day, along with thousands of visits to the website. Since the deadline was extended, he said, 4,370 fire-related claims have been filed.


Danielle Foreman, a college student, was hired to help spread the word about filing claims. She taped fliers to pizza boxes. Max Whittaker for The New York Times

"More often, it's someone who knows someone who hasn't filed a claim," said Danielle Foreman, a senior majoring in cellular and molecular biology at California State University, Chico, about 15 miles west of Paradise.

Ms. Foreman, 22, was hired by Mr. Kasolas to help spread the word about filing claims. She spent her day taping fliers to pizza boxes at Red Lion Pizza in Magalia, just north of Paradise, and handing out others to churches and agencies, hoping it would prompt even one more person to file a claim.

But time is short, and a bigger problem persists.

"We know there was significant post-fire displacement — people had to move away," said Steven Skikos, a lawyer appointed by the court to represent victims' interests. "But we don't know the specifics of who ended up where. That's a real problem."

An analyst at Chico State provided Mr. Kasolas with a map produced from United States Postal Service information showing that wildfire victims had moved to almost every state, with significant clusters in the Pacific Northwest, Arizona, Texas and Tennessee. But the map does not provide addresses.

For its part, PG&E said it had employed a broad campaign to ensure that wildfire victims received information about filing claims, including newspaper, magazine, radio, social media and digital advertisements. The utility sent emails to about four million customers and claim forms by mail to more than six million customers.

"We feel this is the most robust noticing effort in bankruptcy history, including outreach through national publications," Paul Moreno, a PG&E spokesman, said.

But sometimes the trouble with filing a claim is more a problem with the process.

Rosemary Peterson had traveled from Magalia for the food giveaway at Paradise Alliance Church when she saw the table with the information about filing a claim.

Ms. Peterson, 88, had tried to submit a claim online but struggled to complete it on her own. Although her home survived the Camp Fire, smoke damage required some restoration. The trees in her yard have died. And her friends and neighbors have scattered.



Rosemary Peterson was frustrated by the claims process until she got help at the church gathering. Max Whittaker for The New York Times

"There's nothing in front of me but dead trees," Ms. Peterson said.

Before her recent visit to the church, Ms. Peterson was about to give up on ever submitting a claim.

But she was greeted not only by the staff members celebrating Christmas with meals for those in need, but also by people wearing shirts commemorating last year's disaster with messages like "We Stand Together."

"I wouldn't have done it had I not been here," Ms. Peterson said. "I said, I'm going to need help with it. I started to work on it on the internet, but I wasn't able to do it."

The drive at the church on this day added her and one other victim to the claim applicants. Perhaps one small victory, but a victory nevertheless.

Dave Bruns, an associate pastor, said the church had been physically spared from the fire and had worked to help the community recover. While the church has long provided food during the Christmas season, this year the congregation doubled the effort to about 300 meals, while also providing information about filing claims. The goal is to help restore the town and its people's hope.

"We kind of shuffled our focus," Mr. Bruns said. "This is kind of a rallying point. The real purpose of the meal this year wasn't just to give people food. It was to invite people to feel normal again."

Ivan Penn is a Los Angeles-based reporter covering alternative energy. Before coming to The Times in 2018 he covered utility and energy issues at The Tampa Bay Times and The Los Angeles Times.  @ivanlpenn

A version of this article appears in print on Dec. 28, 2019, Section B, Page 1 of the New York edition with the headline: A Race to Help Fire Victims Get Paid