George R. Calhoun V (pro hac vice)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
george@ifrahlaw.com

Counsel for Ironshore Specialty Insurance Company,
formerly known as TIG Specialty Insurance Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | **Case No. 19-23649-rdd** <br> **(Jointly Administered)** |
| Debtors. | |

**CONSOLIDATED REPLY IN SUPPORT OF IRONSHORE SPECIALTY INSURANCE COMPANY, FORMERLY KNOWN AS TIG SPECIALTY INSURANCE COMPANY'S <u>MOTION FOR RELIEF FROM THE AUTOMATIC STAY</u>**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

Ironshore Specialty Insurance Company, formerly known as TIG Specialty Insurance Company ("TIG") respectfully submits this reply to the Objections to its Motion for Relief from Stay filed by the Debtors [Dkt. # 753], the Official Committee of Unsecured Creditors [Dkt. # 756], and the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants [Dkt. # 757]. The arguments of all three objectors boil down to the same thing: they don't want anyone to know whether TIG's policy (or any other policy, apparently) provide coverage for any of the claims asserted against the Debtors. The reasoning for this is unclear, but each objector makes sweeping and unsupported statements concerning the supposed dire impacts that would ensue if the parties knew whether TIG's policy provided coverage. That parade-of-horribles has no factual basis and should not dissuade this court from granting relief from the stay.

**I.     The Necessity of Arbitration Supports Stay Relief**

The Debtors and other objectors contend that TIG has confused a motion to compel arbitration with a motion for relief from the automatic stay. *See* Debtors' Opp'n at 7. It has not. Relief from the stay may be granted when it is "necessary to permit litigation to be concluded in another forum, particularly if the non-bankruptcy suit involves multiple parties or is ready for trial." *In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D. N.J. 1999). (citation omitted). The legislative history to section 362(d) (1) supports this position:

> [I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

*See,* S.Rep. No. 95-989 at 50 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5836. The FAA as interpreted by the Supreme Court dictates that an arbitration clause should be enforced in a bankruptcy case "unless [doing so] would seriously jeopardize the objectives of the [Bankruptcy]

2

Code." *U.S. Lines* 197 F.3d at 640 *(quoting Hays Co. v. Merrill Lynch, Pierce, Fenner Smith, Inc.*, 885 F.2d 1149, 1161 (3d Cir. 1989)).  As discussed below, there is no such jeopardy here.

Consistent with this authority and the legislative intent of Congress, the Southern District of New York (on a bankruptcy appeal) has acknowledged that "[t]raditional Sonnax balancing does not apply … on a motion to lift the automatic stay to allow arbitration to proceed, although courts do not agree on the extent to which some Sonnax factors are still relevant." *In re Salandar-O Reilly Galleries LLC,* 475 B.R. 9, 20-21 (S.D.N.Y. 2012).  Courts in this district routinely have granted relief from the stay to allow arbitration to proceed. *See, e.g., Cardali v. Gentile (In re Cardali)*, No. 10-3531, 2010 WL 4791801, at *4 (Bankr. S.D.N.Y. Nov. 18, 2010) ("Because of the strong federal policy favoring arbitration, the traditional [Sonnax] balancing test ... for seeking relief from the automatic stay does not apply."); *Cont'l Cas. Co. v. Pfizer, Inc. (In re Quigley Co.)*, 361 B.R. 723, 744 (Bankr. S.D.N.Y. 2007) (lifting stay to allow arbitration to be filed and staying adversary proceeding filed by other insurers); *In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 204 (Bankr. S.D.N.Y. 2002) (on motion to lift stay to compel arbitration "Sonnax balancing does not apply, and the strong federal policy favoring arbitration trumps the usual considerations of judicial economy and efficiency which are important factors under Sonnax.").

That the arbitrability of a dispute is raised in a motion for relief from the stay rather than a motion to compel arbitration makes no difference.  "Where a party has agreed to arbitrate the dispute at issue or is otherwise bound to arbitrate the dispute at issue, the court generally has no discretion to continue staying the arbitration proceedings unless the arbitration proceedings are 'core' proceedings; that is, non-core issues properly covered by the arbitration clause must be submitted to arbitration where the parties have so agreed or where a party is otherwise bound by

3

the arbitration agreement." *In re Argon Credit, LLC,* 2018 WL 4562542 at *4 (Bankr. N.D. Ill., September 21, 2018) (citing *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006); *Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1066 (5th Cir. 1997); *Nw. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 321 B.R. 120, 122–23 (Bankr. D. Del. 2005)). Bankruptcy courts generally do not have discretion to refuse to compel arbitration of non-core matters. *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d at 108; *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir .2000). The arbitration analysis is the same even where the issue is presented by way of a motion to modify the automatic stay rather than as a motion to compel arbitration. *In re Argon Credit, LLC,* 2018 WL 4562542 at *4 *(citing In re Enron Corp.*, 364 B.R. 489, 517 (Bankr. S.D.N.Y. 2007) (employing arbitration analysis in discussing whether to lift the stay).

None of the objections seriously challenge the fact that the pending arbitration is the only venue in which the issue of TIG's coverage may be decided. The pending coverage proceeding is a non-core matter, is governed by a binding arbitration provision, and is subject to mandatory abstention. That the pending arbitration is non-core is demonstrated axiomatically by the fact that it was brought prior to the bankruptcy and does not depend on any Bankruptcy Code provision or principle for its resolution. *Cf.* 28 U.S.C. 157. The TIG arbitration was commenced outside the bankruptcy context on the basis of rights arising under state contract and insurance law. *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84, 87 (1982) (a debtor's action for breach of a pre-petition contract – an action "involv[ing] a right created by state law, a right independent of and antecedent to the reorganization petition" – is a non-core proceeding). Because the issue of coverage under an insurance policy is a question of state law that routinely arises outside the context of a bankruptcy case, claims for insurance coverage typically are

considered non-core. *See In re United States Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir.1997) (reasoning that "the claimed right to insurance coverage is a creation of state contract law and one that could be vindicated in an ordinary breach of contract suit if [the insured] were not bankrupt."); *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 267 (3d Cir. 1991) (holding that an action is a core proceeding "if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case"); *Amatex Corp. v. Aetna Cas. & Surety Co.*, 107 B.R. 856, 863 (E.D. Pa. 1989), *aff'd* 908 F.2d 961 (3d Cir. 1990); *In re Longview Power, LLC*, 515 B.R. 107, 115 (Bankr. D. Del. 2014) (coverage proceeding was non-core despite significance to proposed reorganization); *In re G–I Holdings, Inc.*, 278 B.R. 376, 382 (Bankr. D. N.J. 2002) (noting that an insurance coverage action "bears no resemblance" to other examples of core proceedings.).

Although the Second Circuit has found an insurance coverage dispute to be core under the facts of one asbestos bankruptcy case, that decision was wrong and is inapplicable here. *See United States Lines, Inc. v. American S.S. Owners Mut. Protection Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999) ("*U.S. Lines*").  As an initial matter, this aspect of the *U.S. Lines* holding is of questionable validity following the Supreme Court's ruling in *Stern v. Marshall*, which held that core proceedings are "those that arise in a bankruptcy case or under Title 11." 564 U.S. 462, 476 (2011).  Because TIG's arbitration was commenced prior to bankruptcy, it cannot have arisen in a bankruptcy case or under Title 11.

*U.S. Lines* also is distinguishable.  The policies in *U.S. Lines* were "pay first" policies that required the debtors to pay any claims and then seek indemnification from insurers.  The court determined that those provisions would have made any recovery impossible because the debtor in that case had no assets to satisfy those obligations. *See U.S. Lines* at 637-38. *See also*,

5

*In re Residential Capital, LLC,* 2015 WL 9302834 * 4 (S.D.N.Y. December 21, 2015) (holding that potential consequences of insurance coverage suit did "not warrant departure from the general principle that 'traditional contract actions arising under state law' are non-core"); *DeWitt Rehab. and Nursing Cntr, Inc. v. Columbia Cas. Co.,* 464 B.R. 587, 592 (S.D.N.Y. 2012) (concluding that insurance coverage was non-core and distinguishing *U.S. Lines* because it found coverage issues to be core "only because [of] 'pay-first' provisions in [the] insurance policies which required U.S. Lines to satisfy claims from its own funds before seeking indemnification, would have been largely impossible to meet without allocating assets otherwise earmarked for other creditors."). There are no similar allegations in that case.

The *U.S. Lines* Court also based its determination that coverage issues were core on its finding that insurance proceeds "represent the only potential source of cash available to [personal injury] creditors." *Id.* at 638. That finding cannot be made here. The Debtors are assigning a multi-billion-dollar ongoing business for the benefit of creditors.[2] *See* Term Sheet (Dkt. # 257) at 1; *see also Mt. McKinley Ins. Co. v. Corning, Inc.*, 399 F.3d 436, 449 (2d Cir. 2017) (distinguishing *U.S. Lines* where insurance was not sole asset for distribution). Here, the Debtors and other objectors concede that TIG's policy is a relatively minor player – not an asset upon which the bankruptcy hinges. *See* Debtors' Opp'n at 2; Committee Opp'n at 2, Ad Hoc Committee Opp'n at 7 (conceding that resolution of the Arbitration will not resolve "any significant or overarching issues concerning the availability of Debtors' insurance assets to pay creditors' claims."). But even if it were not, the importance of an action does not render it core.

---

[2] Indeed, the *U.S.* Lines Court reaffirmed its holding in *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1102 (2d Cir. 1993) that "where the insurance proceeds would only *augment* the assets of the estate for general distribution, the effect on the administration of the estate [is] insufficient to render the proceedings core." *Id.* at 639 (emphasis added). Here, Debtors propose to distribute billions in non-insurance assets.

*See, e.g., In re Enron Power Marketing, Inc.,* 2003 WL 68036 at *8 (S.D.N.Y. January 8, 2003) (rejecting contention that centrality to administration of estate would render a claim core) (*citing Ben Cooper, Inc. v. The Insurance Co. of the State of Pennsylvania (In re Ben Cooper)*, 896 F.2d 1394, 1398 (2d Cir.1990). ("Matters that concern the administration of the bankrupt estate tangentially are related, non-core proceedings.")). Consistent with this, courts in this District continue to hold that coverage disputes are non-core. *See, e.g., In re MF Global Holdings, Ltd.*, 571 B.R. 80, 96 (2017) (coverage action was non-core despite potential impact on estate).

Cause exists to lift the stay where the federal courts are prevented from hearing a state court action due to abstention or other doctrines (such as the FAA). *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997). This Court would be required to abstain from hearing the TIG coverage action if the Debtors attempted to remove it. Pursuant to 28 U.S.C. § 1334(c)(2), the Court must abstain from hearing actions like the arbitration which is based on state law and could not otherwise proceed in federal court. Courts across the country have found that stay relief is appropriate in this circumstance. *See, e.g., In re AOG Entertainment, Inc.*, Case No. 16-01074-SMB, Dkt. # 27 (Bankr. S.D.N.Y. 2016) (Memorandum opinion concluding that stay relief "is inseparable from the decision to abstain. The Court must grant stay relief to permit [parties] to decide the issues as to which the Court has abstained."); *In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. 111, 129-30 (D. N.J. 2003) (granting stay relief after determining that court would abstain from hearing state law claims); *In re Congoleum*, Case No. 03-51524-KCF, Dkt. # 497 (Bankr. D. N.J. 2004) ("relief from the stay (if applicable) is hereby granted for cause under 11 U.S.C. § 362(d) of the Bankruptcy Code upon this Court's finding that all the factors for mandatory abstention have been established…"). For these reasons, the pendency of TIG's arbitration is grounds for granting its motion for relief from the stay.

## II.     The Sonnax Factors Favor Lifting of the Stay

The Debtors and other objectors also contend, incorrectly, that TIG did not address Sonnax or distinguish TIG's arbitration from potential claims by any other insurer. TIG's motion did, indeed, address the Sonnax factors (*see* Motion at 14-16). Those factors weigh in favor of allowing TIG's arbitration to proceed now. TIG responds to the Objectors' contrary contentions below.

### A. Allowing TIG's Arbitration to Proceed Will Not Incur Unnecessary Costs

The Debtors contend that allowing the arbitration to proceed will necessitate the Debtors to incur unnecessary costs.[3] While it is true that the Debtors must pay to defend the arbitration, they will have to do so sooner or later. There is no potential loss to the estate or creditors because the Debtors proposes to transfer all of their assets for the benefit of creditors. The question is one of timing, not costs. The debtor in *Quigley* made the same argument, which Judge Bernstein rejected, noting: "any coverage disputes … must be resolved through arbitration, and the same dollars, must, therefore, be spent either by Pfizer and Quigley or the Asbestos PI Trust to resolve it." *Quigley*, 361 B.R. at 745. A quick resolution is more likely to save estate assets than to squander them.

---

[3] The Committee makes a similar argument. *See* Committee Opp'n at 7 (The "Arbitration will also dilute recoveries to unsecured creditors  generally, not only by requiring the Debtors to expend estate resources to contest the Arbitration—the very harm that motivated the entry of the Preliminary Injunction Order—but also potentially by requiring the Debtors' estates to cover the costs and fees incurred by TIG in the Arbitration if TIG were to prevail.")

8

### B. Arbitration Will Not Distract From the Debtors' Reorganization

The Debtors' second (and third) argument is that allowing the arbitration to proceed will distract its management from its chapter 11 case and its business. Purdue is a multi-billion dollar business with approximately 5,000 employees and a sophisticated corporate legal department and highly competent outside counsel. There is no serious likelihood that resolution of the one pending coverage arbitration will distract it from its reorganization. Despite filing a declaration in support of its opposition, the Debtors offer no support for their "distraction" argument. Contrary to the Debtors' bald contention, courts typically conclude that there is no risk of diversion where a debtor has separate litigation counsel, as Debtors do here. *See In re SCO Grp., Inc.*, 395 B.R. 852, 858 (Bankr. D. Del. 2007) (noting presence of separate litigation counsel). The arbitration presents straightforward legal and factual issues that may be resolved in the normal course. There simply is no reason that the Debtors' management or its bankruptcy counsel would be consumed by that action.

The arbitrators have proposed to resolve certain threshold issues by June, 2020. The Debtors suggest that there may be follow on issues. While that is likely, if TIG is correct, the question of TIG's coverage will likely be resolved quickly, in any event, by TIG's central argument that most (if not all) of the opioid-related claims asserted against the Debtors do not trigger the insuring agreement in Section I of TIG's policy on the basis that they do not allege liability on the part of the Debtors for "damages" "on account of" "personal injury," "property damage," or "advertising liability," as those terms are understood and defined in TIG's policy. Hence, the arbitration presents a forum in which the coverage dispute may be timely resolved.

**C. There Is No Risk of a "Flood" of Claims**

The Debtors' next argue that allowing TIG's arbitration to proceed risks opening the "floodgates" to copycat arbitrations. Although Mr. Kaminetzky claims that many of the Debtors' insurance policies contain arbitration clauses, he does not state which ones or what positions those insurers have taken. Notably, however, not one of those other insurers filed a pre-petition arbitration proceeding. Because TIG did file such a proceeding, however, that arbitration is subject to mandatory abstention and cannot be heard by this Court. The other insurers are not in a similar position and this Court can, of course, exercise its power to decide how to address any "flood" of claims if multiple claims were to arise.

**D. TIG's Claims Would Not Frustrate The Reorganization.**

The Debtors contend that "TIG's arbitration necessarily touches on—and presumes answers to—the essential questions of this case: the scope, validity, nature, and amount of claims against the Debtors, on the one hand, and the scope of assets available to satisfy those claims, on the other." Debtors' Opp'n at 14. This is simply not true. TIG's claims have nothing to do with what assets are available to satisfy claims. TIG's arbitration raises questions of applicable coverage law and concern only whether TIG's policy contains exclusions or otherwise provides coverage for the types of claims as to which TIG has been notified by the Debtors and as those claims are alleged. Whether those claims are valid against the Debtor has little to do with coverage and nothing to do with TIG's claims. There is no need for an underlying court to decide the "nature" of any underlying claims.[4] TIG's coverage claims looks to the allegations of the underlying claims.

---

[4] To be sure, if a court were to determine that any claim was invalid, TIG would have no obligation to pay it, but that is because there would be no liability, not because there was no coverage.

Debtors' responses are also quite telling. They contend that "the value and allocation of Debtors' insurance proceeds are likely to be important components of any plan of reorganization, and such issues are best addressed in connection with negotiations among Debtors and their numerous classes of creditors." Debtors' Opp'n at 15. Although all of the objectors contend that TIG's policy is relatively minor, the objectors nonetheless assign it the outsized power to totally derail the process of this case. Debtors contend, for example, that "[i]f TIG's arbitration proceeds while critical claim allowance, evaluation, and allocation negotiations are ongoing, some creditor groups may argue that TIG's arbitration demonstrates that portions of the Debtors' insurance coverage are not available at all, or available only for certain classes of claimants. This, in turn, risks frustrating negotiations by putting a proverbial "thumb on the scale" in favor of one claimant constituency over another." *Id.* at 15-16. The Court should disregard the argument that the sophisticated counsel involved in this case might be unaware that coverage defenses exist with respect to many of the underlying claims involved.

In essence, Debtors contend that the fact that they are negotiating a plan should trump all other matters, including allowing them to decide what happens to insurance without the interference of their insurers. As the caselaw and statutes cited above demonstrate, that is not how it works. The creditors do not get to divide insurance assets without regard to potential coverage defenses. When Debtors made clear that they sought coverage from TIG, and coverage disputes were apparent, TIG properly sought a prompt resolution of those issues through arbitration. That proceeding cannot be decided by this Court. Moreover, if creditor constituencies have clarity as to whether insurance coverage is available, that is likely to lead to a quicker resolution of any dispute they may have with the Debtors. Negotiation without the benefit of these rulings provides for greater uncertainty and thus a more difficult negotiation.

11

Pretending that coverage issues do not exist is not going to help the Debtors negotiate more quickly. In any case, Debtors do not and cannot contend that resolution of the arbitration will prevent them from confirming a plan.

Debtors' contention that allowing the TIG arbitration to proceed will derail their negotiations is illusory. As shown in the Term Sheet, the Debtors have already promised creditors everything they have. Any ongoing negotiations are not about the Debtors' assets, but about the third-party protections and payments being offered to/from the Sacklers. Under the facts of the case as they stand presently, the reorganized debtor (or trust if so structured) will receive all of the Debtors' assets. Whether there is coverage for certain claims is irrelevant as to that issue. Debtors' contention to the contrary are not supported by any evidence and appear to be a mere contrivance to argue against relief.

In contrast, since arbitration is the only forum that can decide the coverage issues, the Court should lift the stay to allow a resolution of those issues, which will provide greater clarity to all parties and fully resolve TIG's claims.

### E.  Other Sonnax Factors Support Relief

The Debtors content that the arbitral panel is not a specialized tribunal, citing to a case considering the California State Court's Complex Litigation Panel was not a specialized tribunal. Here, however, the parties all have selected arbitrators well versed in insurance coverage law. In similar circumstances, Judge Bernstein concluded that the arbitral panel did constitute a specialized tribunal for the purposes of Sonnax Factor No. 4. *In re Quigley Co.*, 361 B.R. at 744.

**II.     The Official Committee of Unsecured Creditors' Objection Should be Overruled**

Calling TIG a "relatively minor insurer," the Official Committee also objects to TIG's motion, contending that TIG's arbitration will "clarify nothing" and could impair efforts to resolve these cases.  Committee Opp'n at 2.  But the arbitration will resolve all coverage issues pending between TIG, the Debtors, and non-debtor Purdue Frederick.  It can do nothing more and nothing less.  That the arbitration will not resolve the bankruptcy in its entirety is a basis to grant relief, not to deny it.

The Committee's objection is based on the incorrect presumption that:

> [T]he questions presented in the Arbitration go to the core issues of these chapter 11 cases, including the liquidation of litigation claims, the identification of sources of recovery and the allocation of value among creditors.

Committee Opp'n at 4.  The Committee similarly contends that:

> A determination of these issues at this time, however, would significantly interfere with the ultimate resolution of these issues by predetermining the allocation of a source of recovery with respect to some, but not all, claimants.

*Id.* at 4-5.  Both contentions are wrong.  The arbitration will decide only coverage issues.  No claim will be liquidated.  No sources of funding will be identified or allocated among creditors.  To be sure, the scope of TIG's coverage will be ascertained with certainty, which can only clarify the estate's and creditors' rights.  It will have no adverse impact on any creditor because the arbitration panel will only be deciding what coverage is available from TIG's policies – an issue that must be decided before any creditor could access the policy proceeds.

The Committee's fear that the arbitration will decide allocation is wrong.  If there is no coverage, then the Debtors and creditors cannot "allocate" TIG policy proceeds to claims that are not covered by TIG's policy.  Only the arbitrators may decide the pending coverage questions.  Similarly, the Committee simply is wrong that TIG's arbitration rests upon the resolution of "the

13

nature and extent of the damages for which Debtors are liable." Committee Opp'n at 6. The arbitration raises coverage issues and does not seek to resolve, and does not rely upon resolution of, underlying claims. As such, contrary to the Committee's argument, the TIG arbitration "lacks a connection with" and does not interfere with the ongoing bankruptcy case. *Sonnax*, 907 F.2d at 1285.

The Committee also argues that the arbitration will threaten the Debtors' ability to reach settlement with their other insurers. The Committee has no basis for this statement. Arbitration will not have preclusive effect on any other insurer. Because the arbitration is confidential, no other insurer should even know of the outcome.

### III.    The Ad Hoc Committee Objection Provides No Grounds to Deny Relief

The Ad Hoc Committee joins in the Debtors' objection but separately filed its own objection raising a distorted view of mass tort bankruptcies and insurance. The Ad Hoc Committee contends that: (1) claimants should be in control of coverage issues (Ad Hoc Committee Opp'n at 9), and (2) that it is atypical for coverage disputes to proceed prior to the resolution of a bankruptcy case (Ad Hoc Committee Opp'n at 8). Neither contention is accurate.

Contrary to its contentions, numerous courts have lifted the automatic stay to allow insurance coverage issues to proceed – either to arbitration or to pending state court coverage actions. In this district, courts regularly grant relief from the stay and/or compel arbitration of coverage disputes. *See, e.g., In re MF Global Holdings, Ltd.*, 571 B.R. 80 (2017) (compelling arbitration); *In re Quigley Co.*, 361 B.R. at 744 (lifting stay to allow arbitration to be filed). In *Quigley*, the court considered both a motion to stay an adversary proceeding in favor of arbitration of a bankruptcy adversary proceeding filed by an insurers **and** a motion to lift the stay to allow the filing of that arbitration (both of which were drafted by the undersigned counsel).

*Id.* While the Court noted that a majority of the coverage was covered by the same arbitration agreement in that asbestos bankruptcy case, that was not the governing rationale of his decision. Judge Bernstein noted:

> Given the conclusion regarding arbitration, the Sonnax question comes down to one of timing. This Court cannot hear the portion of the coverage dispute subject to mandatory arbitration; the arbitrator will have to resolve that issue. Thus, the only question is whether the Court should allow the Certain Insurers to proceed with arbitration *now*.

*Id.* (emphasis added). After weighing nearly identical arguments raised by the Ad Hoc Committee and other objectors here, he concluded that the Sonnax factors weighed in favor of granting immediate relief from the stay to proceed with arbitration. *Id.* at 744-745. Resolution of the arbitration will resolve all issues as to TIG, but will have no impact on the bankruptcy case or the Debtors' other insurers, who are not a party to the arbitration and thus are not bound by it. Just as Judge Bernstein did in *Quigley*, the Court should allow the arbitration to proceed.

The Ad Hoc Committee's primary argument is that creditors should control disputes with insurers. Insurance coverage disputes do not routinely involve claimant participation because claimants are strangers to the insurance contract and have no standing to participate in prejudgment coverage litigation. *See, e.g., Commonwealth Land Title Ins. Co. v. American Signature Services, Inc.*, 2014 WL 672926 (E.D.N.Y. 2014) (holding that claimants had no standing to bring claim against tortfeasor's insurer).[5] Nonetheless, the Ad Hoc Committee contends that the fox should run the henhouse and that only they should get to control the how, when and what of insurance coverage. *See* Ad Hoc Committee Opp'n at 9. That the proceeds of

---

[5] Under [New York] common law, "an injured person possessed no cause of action against the insurer of the tort feasor." *See Lang v. Hanover Ins. Co.*, 787 N.Y.S.2d 211, 820 N.E.2d 855 (2004) (*quoting Jackson v. Citizens Cas. Co.*, 277 N.Y. 385, 389, 14 N.E.2d 446 (1938*)); see also Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 175 (2d Cir. 2010).

TIG's policies may be used to pay *covered* claims does not mean that strangers to the contract have standing to address what is covered. To the contrary, New York law is unequivocal that they do not have the right to act directly against insurers.

## CONCLUSION

For all of the above reasons, the Court should overrule the objections and grant TIG's Motion for Relief from the Automatic Stay.

Dated: January 22, 2020
      New York, NY

Respectfully submitted,

_/s/ George Calhoun_____
George R. Calhoun V (pro hac vice)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
george@ifrahlaw.com