## Exhibit C

**Form of 2021 Headquarters Lease**

**ONE STAMFORD REALTY L.P.**

Landlord

TO

**PURDUE PHARMA L.P.,**

Tenant

------------------------

**Lease**

------------------------

Dated as of January ___, 2020

**LEASE**, dated as of January __, 2020 (as may be amended, modified or supplemented from time to time, this "**Lease**"), between **ONE STAMFORD REALTY L.P.**, a Delaware limited partnership, whose address is One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 ("**Landlord**"), and **PURDUE PHARMA L.P.**, a Delaware limited partnership, whose address is One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 ("**Tenant**").

## W I T N E S S E T H

**WHEREAS**, Landlord and Tenant entered into a lease dated as of December 18, 2015, as amended, for the Project (the "**Rejected Lease**") which the Tenant has rejected as part of the bankruptcy proceedings relating to Tenant.

**WHEREAS**, without waiving any rights in regard to damages in connection with the Rejected Lease, Landlord is willing to lease to Tenant and Tenant is willing to hire from Landlord, on the terms and conditions hereinafter set forth, certain space in the office building located at One Stamford Forum, Stamford, Connecticut (the "**Building**") on the land more particularly described in **Exhibit A** (the "**Land**"; the Land and the Building are collectively called the "**Project**").

**NOW, THEREFORE**, Landlord and Tenant agree as follows:

ARTICLE 1

**Premises; Term; Use**

1.01    **Demise**. (a) Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, subject to the terms and conditions of this Lease, the 9th and 10th floors of the Building and the Ancillary Space. "**Ancillary Space**" means the portion of the P-3 floor of the Building shown on the plans of such floor attached hereto as **Exhibit B**. The 9th and 10th floors of the Building are collectively called the "**Office Premises**"; the Office Premises and the Ancillary Space are collectively called the "**Premises.**"

(b)    Landlord and Tenant confirm that (i) the Building is deemed to contain 450,768 rentable square feet, (ii) the Office Premises is deemed to contain 103,733 rentable square feet and (iii) the Ancillary Space is deemed to contain 16,650 rentable square feet, as set forth on **Exhibit C** attached hereto. As used in this Lease the term "**Tenant's Share**" shall mean twenty-three percent (23%), computed by dividing Tenant's Office Premises (i.e. 103,733) by the rental square footage of the Building (450,768).

(c)    The leasing of the Premises by Tenant shall include (i) the right of Tenant to use the plazas, lobbies, corridors, stairways, elevators and other public and common areas of the Building and the Land, as same may exist from time to time, in common with other tenants in the Building and (ii) all fixtures, improvements and betterments owned or leased by Landlord which, at any time during the Term, are attached to or installed in the Premises.

1.02    **Term**. (a) The term of this Lease (the "**Term**") shall commence on January 1, 2021 (the "**Commencement Date**").

1

8336763v2

(b)    The Term shall end, unless sooner terminated as herein provided, on December 31, 2023 (the "**Expiration Date**").

(c)    Landlord shall deliver to Tenant possession of the Premises in "As-Is" condition as of the Commencement Date. The Landlord shall have no Landlord Work or other condition with regard to the Premises or otherwise.

1.03    **Use**. (a) The Premises may be used and occupied solely as general, professional, administrative and executive offices, including such ancillary uses in connection therewith (but excluding the uses prohibited under Section 1.03(b) below).

(b)    Anything contained in Section 1.03(a) to the contrary notwithstanding, in no event shall the Premises be used for any of the following: (A) any retail use serving the public on an off-the-street basis; (B) a medical facility; and (C) for so long as Landlord continues to operate the Building Amenities in a first-class manner sufficient to meet the reasonable needs of Tenant and the occupants of the Premises and their employees, (i) kitchens, cafeterias or dining facilities for the preparation and sale of food and beverages, or (ii) an exercise facility; if the uses as set forth in clause (i) or (ii) shall be permitted as provided in the previous sentence, such uses will only be permitted to service the needs of the Tenant's employees and with the Landlords permission, other tenants or the Building, but not the general public.

1.04    **Early Termination by Landlord**. At any time on or after January 1, 2020 (and whether or not the Commencement Date shall have occurred), the Landlord shall have the right to accelerate the Expiration Date to a date which is no sooner than twelve (12) months from the date of Landlord's notice (the "**Accelerated Expiration Date**"). The Landlord may set a later Accelerated Expiration Date (provided such date falls on or before December 31, 2023), but not an earlier Accelerated Expiration Date (i.e. less than twelve (12) months from the date of the Landlord's notice). If the Landlord shall set an Accelerated Expiration Date, then the Tenant may apply the Prepaid Rent toward the payment of the Fixed Rent for the final six (6) months of the Term of this Lease.

ARTICLE 2

**Rent**

2.01    **Rent**. "**Rent**" shall consist of Fixed Rent and Additional Rent.

2.02    **Fixed Rent**. (a) "**Fixed Rent**" shall be paid in accordance with the schedule set forth in **Exhibit G** annexed hereto.

(b)    Fixed Rent shall be payable by Tenant in 12 equal monthly installments in advance, the first payment of which shall be paid by or on the Commencement Date, and on the date which is five (5) calendar days prior to the first Business Day of each calendar month thereafter to and including the Expiration Date.

(c)    If any condition shall arise whereby Tenant would be entitled to an abatement of Fixed Rent and/or Additional Rent, then Tenant shall receive the benefit of such

2

abatement beginning on the first date thereafter upon which Fixed Rent and/or Additional Rent would otherwise have again become payable by Tenant in respect of such portion of the Premises.

2.03    **Additional Rent**. "**Additional Rent**" means all other sums of money at any time payable by Tenant under this Lease, all of which Additional Rent shall be deemed to be Rent. By way of example without limitation, charges for security pursuant to Section 3.01(i), after-hours electric charges pursuant to Section 3.01(a) and other matters.

2.04    **Electric Charges**. (a) With respect to the Office Premises, Tenant's demand for, and consumption of, electricity in the Premises shall be determined by meter or meters installed by Landlord on or before the Commencement Date. Tenant shall pay for electric consumption within 30 days after rendition of a bill therefor. The Landlord shall base the Tenant's electric charge upon the Landlord's actual out of pocket costs (without markup), for electricity furnished to the Premises.

(b) Unless and until the electricity to floor P-3 is separately metered or submetered, the electricity charge for the electricity service to the P-3 portion of the Premises shall be based upon a fixed charge to be paid as Additional Rent based upon Landlord's estimate of cost, the initial charge shall equal $2.25 per rentable square foot of floor P-3 (the "**Fixed P-3 Electric Charge**"). The Fixed P-3 Electric Charge is based upon the provision of electric service to P-3 during Business Hours on Business Days, and the Landlord may bill for additional electric usage for additional time periods. Further, if and to the extent that the electric charges paid by Landlord shall increase during the Term of the Lease, the Landlord shall have the right to make reasonable increases to the Fixed P-3 Electric Charge (based on such actual increases). The Fixed P-3 Electric Charge shall be paid monthly in advance together with the Fixed Rent. For the avoidance of doubt, the Fixed P-3 Electric Charge shall be in addition to the electric charge for the Office Premises.

2.05    Prepaid Rent. Simultaneous with the execution of this Lease, the Tenant shall prepay to Landlord an amount equal to $2,828,341.50 (the "**Prepaid Rent**"), which Prepaid Rent represents the last six (6) months of Fixed Rent due and payable by Tenant under this Lease. Provided that (i) no monetary default or material non-monetary default has occurred and is continuing under this Lease, then Tenant shall have the right to request that Landlord apply the Prepaid Rent to the final six (6) months of Fixed Rent for the Lease Term (provided, however, as noted in Section 1.04, in the event that Landlord accelerates the Expiration Date, then subject to the foregoing limitations as set forth in this Section 2.05, Tenant may request that Landlord apply the Prepaid Rent to the final six (6) months of Fixed Rent for the Lease Term). The Landlord shall, at any time, have the right to draw upon the Prepaid Rent to cure, or attempt to cure any monetary default or material non-monetary default. The Landlord shall not be required to hold the Prepaid Rent in a segregated account and Landlord may comingle the Prepaid Rent with other monies held by Landlord. Landlord shall not be required to pay any interest or other amount in respect of the Prepaid Rent. If and to the extent that Landlord has not applied the Prepaid Rent to amounts provided for in this Section 2.05 or otherwise pursuant to this Lease, then the Landlord will return any such unapplied Prepaid Rent not later than thirty (30) days following the Expiration Date or the Accelerated Expiration Date, as applicable.

2.06    **Manner of Payment**. Subject to the last sentence of this Section 2.06, Tenant shall pay all Rent as the same shall become due and payable under this Lease, at Landlord's election,

3

8336763v2

either by wire transfer of immediately available federal funds as directed by Landlord, in accordance with wiring instructions given by Landlord at least 30 days in advance, or by check drawn on a New York Clearing House Association member bank, in each case at the times provided herein and, except as otherwise provided in this Lease, without notice or demand and without setoff, credit, counterclaim or abatement. All Rent shall be paid in lawful money of the United States to Landlord at its office or such other place (which shall be located in the continental United States if Tenant is paying Rent by check) as Landlord may from time to time designate. If Tenant fails to pay any Rent within two (2) Business Days after the date same is due, Tenant shall pay interest thereon from the date when such Rent became due to the date of Landlord's receipt thereof at the Default Rate as set forth in Section 4.06. Any Additional Rent for which no due date is specified in this Lease, or which this Lease describes as being due "upon demand" (or like words), shall be due and payable on the 15th day after Landlord's provision to Tenant of an invoice therefor. Notwithstanding the foregoing attached as Schedule 2.06 is account information for a lock box directed account; the Tenant shall make all payments to such account by method of wire transfer, until otherwise directed by the Lender or the Servicer identified on said Schedule 2.06.

ARTICLE 3

**Landlord Covenants**

3.01    **Landlord Services**. From and after the Commencement Date, Landlord, at Landlord's expense (except as otherwise expressly provided), shall furnish Tenant with the following services to the Premises (collectively, "**Landlord Services**"):

(a)    Heat, ventilation and air-conditioning ("**HVAC**") during Business Hours on Business Days substantially in accordance with the design specifications set forth in **Exhibit F** attached hereto. If Tenant shall request that Landlord provide HVAC service through the Building's systems at any other times, Landlord shall furnish such service (i) in the case of a Business Day, upon receiving notice from Tenant by 3:00 p.m. of such Business Day, or (ii) in the case of a non-Business Day, upon receiving notice from Tenant by 3:00 p.m. of the immediately preceding Business Day, and Tenant shall pay to Landlord, within 30 days after demand, Landlord's actual cost (excluding any depreciation of the Building's piping and other equipment used to supply HVAC) of providing such HVAC. As of the date of this Lease, such actual cost is $100 per hour, per zone, and for such purpose, the 6th through the 10th floors of the Building constitute one zone. If Tenant and any other tenant or occupant of the Building shall each request overtime HVAC for the same zone, the cost thereof shall be appropriately prorated. Landlord shall provide at the Building an operating engineer to manage the Building's HVAC systems during Business Hours on Business Days, which operating engineer shall be on call on a 24 hour per day, 7 day per week basis; provided, that Tenant shall reimburse Landlord for the actual costs charged to Landlord by such operating engineer for its services requested by Tenant at times other than Business Hours on Business Days. Tenant may install in the Premises such supplementary HVAC units as Tenant may elect. Tenant shall have the right, without charge, to tap into the Building's condenser water system in any one or more locations in order to allow Tenant to receive such condenser water service in such amounts per floor as Tenant may elect but in no event more than 200 tons in the aggregate. Tenant, at Tenant's expense, shall install any such additional pumps as may be necessary in order to provide adequate water flow to the base Building units, but in no event shall the flow of condenser water fall below 1,400 gpm to each

4

8336763v2

base Building unit as the result of any work done by Tenant. Tenant shall install at Tenant's expense a meter to measure Tenant's consumption of condenser water, and Tenant shall pay to Landlord for Tenant's condenser water usage as shown on such meter, on a per ton per hour basis, within 30 days after rendition of a bill therefor, an amount equal to Landlord's actual cost of providing such condenser water, and which amount may be increased by Landlord from time to time to reflect actual increases in Landlord's cost of providing such condenser water. Upon 30 days' prior notice, Landlord shall perform any draindowns and refills required for Tenant's connection to the Building's condenser water without charge to Tenant.

(b)    (i) Non-exclusive use of all passenger elevators to provide passenger elevator service to the applicable floors of the Premises 24 hours per day, 365 days per year, and (ii) loading dock and freight elevator access to the Premises 24 hours per day, 365 days per year, provided, that at times other than Business Hours on Business Days, a representative of Tenant must be present at the loading dock to receive all deliveries to Tenant. Landlord shall maintain and operate the Building elevators in a manner equal to or better than that existing as of the date of this Lease. Subject to availability, Tenant shall be permitted to use (without charge) the Building loading dock and freight elevator 24 hours per day, 7 days per week in connection with the performance of Alterations and Tenant's move into the Premises.

(c)    Reasonable quantities of hot and cold water to the floors on which the Premises is located for core lavatory, private showers, pantry and cleaning purposes only and cold water to the floors on which the Premises is located for lavatories and water cooler purposes only. If Tenant requires water for any other purpose, Landlord shall furnish cold water at the Building core riser through a capped outlet located on the floor on which such water is required (within the core of the Building); Tenant shall install in accordance with Landlord's specifications, and Landlord shall maintain, at Tenant's reasonable expense, meters to measure Tenant's consumption of water for such other purposes in which event Tenant shall reimburse Landlord for the actual cost of the quantities of water shown on such meters, within 30 days after receipt of an itemized bill therefor.

(d)    Electric energy in an amount not less than Tenant's Share of the electric energy provided to the Building. At least 5 watts demand load per rentable square foot included in the Premises (exclusive of any electric energy required to operate Building HVAC or other Building equipment on floors included in the Premises) shall be available on the floors of the Premises, and any cost to bring electricity in excess of such amount to the Premises shall be borne by Tenant. Tenant shall have the right to redistribute the electric energy provided to Tenant between the floors of the Premises; provided, that Tenant, at Tenant's expense, performs such work in compliance with the provisions of Section 4.01 and all applicable Laws and installs any additional meters necessary to measure such redistributed electric energy.

(e)    Cleaning services in accordance with **Exhibit H** attached hereto. Tenant shall pay to Landlord, within 30 days after receipt of an itemized bill therefor, the reasonable actual costs incurred by Landlord for cleaning services in excess of those set forth on **Exhibit H**. Tenant shall retain Landlord's cleaning contractor or any other contractor reasonably acceptable to Landlord (which will utilize the same union local as Landlord's cleaning contractor) to perform such cleaning at Tenant's expense. Landlord's cleaning contractor shall have access to the Premises after 6:00 p.m. and before 8:00 a.m. and shall have the right to use, without charge

5

therefor, all light, power and water in the Premises reasonably required to clean the Premises. Tenant shall have the right (x) to use Tenant's employees to perform day porter services in the Premises and/or (y) to hire day porters to perform day porter services in the Premises.

(f)    Subject to the reasonable rules and regulations for the use now or hereafter adopted by Landlord in accordance with the provisions of Section 8.02, Tenant shall have the right, at no additional cost, to use up to 208 parking spaces, from time to time. Except as otherwise expressly provided in this paragraph, such parking spaces shall be provided on an unreserved "first-come, first-served" basis in areas not designated for the exclusive use of other tenants. The initial parking plan is attached hereto as **Exhibit Q** which reflects 35 reserved spaces for Tenant's exclusive use on Level P-1 (such 35 spaces being a portion of the 208 parking spaces in total allocated to Tenant).

(g)    The operation and maintenance of the auditorium, break-out rooms and fitness center located on Level P-1 of the Building, the cafeteria and designated Building common conference rooms located on the Plaza Floor of the Building and the five (5) acre landscaped Plaza (all of the foregoing are collectively called the **"Building Amenities"**) in a manner comparable to similar first-class buildings in Stamford, Connecticut and generally sufficient to meet the reasonable needs of the occupants of the Premises and their employees, and Tenant, the occupants of the Premises and their employees shall have the right to use the Building Amenities, subject to such reasonable rules, regulations and policies for the use of said areas now or hereafter adopted by Landlord in accordance with the provisions of Section 8.02 or otherwise.

(h)    Landlord shall operate and maintain the Building and all systems servicing the Building in a manner consistent with comparable first-class buildings in Stamford, Connecticut.

(i)    Subject to those matters stated in **Exhibit J** and as provided for in this Lease, Landlord shall provide Building security substantially in accordance with the specifications and qualifications attached to this Lease as **Exhibit J**; provided, that Landlord shall have the right to modify such specifications during the Term so long as Building security is provided in a manner which is equal to or better than the level of security set forth in the specifications attached to this Lease as **Exhibit J**, and Tenant shall pay Landlord for the actual cost of providing certain security services requested by Tenant as set forth on **Exhibit J** or as provided in this Section below. Landlord and Tenant shall each give the other prompt notice of any advisories, notices or similar communications received by Landlord or Tenant, as the case may be, from a governmental authority specifically in respect of all or any portion of the Project and which relates to the security therefor, unless Landlord or Tenant, as the case may be, is prohibited by such governmental authority from disclosing the content of such advisory, notice or communication. Tenant shall designate a representative to act as Tenant's security liaison with the Building management office (or another representative designated by Landlord) regarding security matters affecting the Project and the Premises. Landlord's representative shall reasonably cooperate with Tenant's representative on an ongoing basis during the Term with respect to sharing information about security for the Project, coordinating fire drills and other related security procedures and planning for special security needs with respect to particular events or visits by third parties to the Premises. Upon either party's request from time to time, Landlord and Tenant shall cause their representatives to meet to keep each other advised as to the status of

6

8336763v2

the respective security specifications and the strategies to be employed by Landlord and Tenant in connection therewith. Landlord shall consider in good faith Tenant's reasonable recommendations with respect to security for the Project, and Tenant shall pay Landlord for actual increases in the cost of security for the Project by reason of Landlord implementing a Tenant security recommendation. Landlord shall advise Tenant of any impending material change in the security system or procedures for the Project promptly after Landlord makes its decision to effect such change. Landlord shall cooperate with Tenant in connection with Tenant's security program (for example, in coordinating Tenant's evacuation drills). In addition to those matters set forth on **Exhibit J** , the Landlord in its sole discretion, upon notice to Tenant (except in the case of an emergency, in which case no such notice need be provided) shall have the right to take reasonable security measures (e.g. including without limitation additional security personal and/or electric surveillance) at the cost and expense of Tenant, if Landlord reasonably determines that Tenant's business activities, public reputation and/or community reaction to Tenant and/or its business (e.g. public protests in regard to Opioid matters), creates a threat either to person(s), property or to the efficient operation of the Building and/or that of other tenants or occupants of the Building.

(j)     Landlord shall make available to Tenant, without charge, such space in the Building core and Building shafts as may reasonably be required by Tenant and in such locations as may reasonably be requested by Tenant (subject, however, to Landlord's reasonable approval, which approval shall take into account, without limitation, the respective costs to Tenant of using different locations) for Tenant's telephone, telecommunications, data transmission systems or other services; Tenant shall be permitted throughout the Term to use, and Landlord shall reserve for Tenant's use, Tenant's Share of all space in the Building core and shaft for such purposes. Landlord shall permit Tenant's telephone, telecommunications and data transmission cables to be run from the street through the Building's core telephone closets to Tenant's telephone, telecommunications and data systems within the Premises. Tenant shall have access at all times to the Building's core telephone closets on each floor of the Premises. There shall be no Landlord restrictions with respect to the identity of Tenant's telecommunications and data carriers and Landlord will not charge Tenant or its carriers any access, use or other fees in connection with Tenant's telecommunications and data services.

(k)     Tenant, to the extent permitted by Law, may use the fire stairs between the floors included from time to time in the Premises and secure the doors of the Premises leading off such fire stairs.

(l)     Tenant shall have access to the Premises on a 24 hours per day, 365 days per year, basis.

3.02    **General Provisions**. (a) Except as provided elsewhere in this Lease, Landlord shall have no liability to Tenant by reason of any stoppage or interruption of any Landlord Service, electricity or other service or the use of any Building facilities and systems. Landlord shall provide Tenant with such advance notice, if any, as is reasonable under the circumstances of such stoppage or interruption. Landlord shall use commercially reasonable efforts (including the use of overtime labor to the extent that the curing of the problem in question is within Landlord's reasonable control and is reasonably necessary to avoid unreasonable interference with Tenant's business operations) to begin and diligently prosecute to completion such repairs as may be required to machinery or equipment within the Project to provide restoration of any Landlord Service as

7

promptly as possible and in a manner so as to minimize interference with Tenant's use and enjoyment of the Premises, and, where the cessation or interruption of such Landlord Service has occurred due to circumstances or conditions beyond the Project boundaries, to cause the same to be restored by diligent application or request to the provider. To the extent reasonably possible, Landlord shall confine all such stoppages within Landlord's reasonable control to times that are not Business Hours. Notwithstanding the foregoing, if for any reason, including, without limitation, Force Majeure (but not by reason of (i) a Casualty or (ii) any act or (where Tenant has an affirmative obligation to act pursuant to the terms of this Lease) omission of Tenant or any person claiming through or under Tenant or any of their respective agents, employees, contractors or (while in the Premises invitees), there is a failure to furnish any of the services which Landlord is required to furnish pursuant to this Lease, or to make any repairs or replacements which Landlord is required to make pursuant to this Lease, or to perform any other obligation of Landlord under this Lease or if Landlord performs any repair, replacement, alteration, addition, improvement or installation in or about the Premises which Landlord is required or permitted to make under this Lease and as a result of any of the foregoing all, or any portion of the Premises shall be materially and adversely affected for 5 days (one day in the case of any such event resulting from the willful misconduct of Landlord) after notice from Tenant, then Fixed Rent and Additional Rent, if any, payable with respect to the portion or portions of the Premises that are so affected shall be abated from the day after such 5 day (or 1 day, as applicable) period until such space is no longer so affected.

(b)    "**Business Hours**" means 8:00 a.m. to 6:00 p.m., Monday through Friday. "**Business Days**" means all days except Saturdays, Sundays and days which are observed by both the federal and the state governments as legal holidays.

(c)    Prior to the first billing (and any time thereafter at the request of Tenant) of any Landlord Service for which the payment that Landlord is entitled to be reimbursed by Tenant requires a computation to determine Landlord's cost of providing such service, Tenant shall be given a reasonable opportunity to review such computation. With respect to all Additional Rent invoiced by Landlord to Tenant, Landlord shall provide to Tenant, within 5 Business Days after notice from Tenant, such back-up as Tenant may reasonably request with respect to the amount of such invoice.

## ARTICLE 4

### Leasehold Improvements; Tenant Covenants

4.01    **Alterations**. (a) Tenant shall make no improvements, changes or alterations in or to the Premises ("**Alterations**") which constitute Material Alterations without Landlord's prior approval, which approval may be withheld by Landlord in its sole discretion. "**Material Alteration**" means any Alteration that (i) affects the exterior (including the appearance) of the Building, or any floors in the Building other than the 9th or 10th floors, (ii) affects the structural integrity of the Building or (iii) adversely affects the usage or the proper functioning of any of the Building systems and/or increases the Landlord's operating costs for the Building (other than nominally). Any Alteration that does not constitute a Material Alteration may be made by Tenant without Landlord's approval, but shall be subject to reasonable requirements of Landlord.

8

(b)     Tenant shall obtain all necessary governmental permits and certificates for the commencement and prosecution of Alterations and for final approval thereof upon completion, and shall cause such Alterations to be performed in compliance therewith, with all Laws. Alterations shall be performed in a good and workmanlike manner, using materials and equipment at least equal in quality and class to the then standards for the Building reasonably established by Landlord. Alterations shall be performed by architects, engineers and contractors selected by Tenant. The performance of any Alteration shall not be done in a manner which would disturb harmony with any trade engaged in performing any other work in the Building outside the Premises or create any actual interference with the operation of the Building outside the Premises. Tenant shall stop the performance of any Alteration if Landlord notifies Tenant that continuing such Alteration would so disturb harmony with any trade engaged in performing any other work in, or create any actual interference with the operation of, the Building outside the Premises, and Landlord and Tenant shall cooperate to eliminate such interference. Tenant may at any time utilize Tenant's employees to perform Alterations, whether or not such employees shall be unionized.

(c)     Throughout the performance of Alterations, Tenant shall carry worker's compensation insurance in statutory limits, "**all risk**" Builders Risk coverage and general liability insurance, with completed operation coverage, for any occurrence arising from the performance of such Alterations in or about the Project, under which Landlord, its managing agent and any Superior Lessor and Superior Mortgagee whose name and address have been furnished to Tenant shall (in the case of such general liability insurance only) be included as additional parties insured as their interest may appear, in such limits as Landlord may reasonably require (but not in excess of such limits as are set forth in Section 7.02 or as are customarily required by landlords of similar office buildings located in the vicinity of the Building for similar jobs costing the amount of the particular job being performed for Tenant). Upon request by Landlord, Tenant shall furnish Landlord with evidence that such insurance is in effect during the performance of Material Alterations.

(d)     Should any mechanics' or other lien be filed against any portion of the Project by reason of the acts or (where Tenant has an affirmative obligation to act pursuant to the terms of this Lease) omissions of, or because of a claim against, Tenant, any subtenant of Tenant or any of their respective agents, employees or contractors, Tenant shall cause the same to be canceled or discharged of record by bond or otherwise within 30 days after notice from Landlord. If Tenant shall fail to cancel or discharge any such lien within said 30 day period, Landlord may cancel or discharge the same only by bonding the same, in which event Tenant shall obtain and substitute a bond for Landlord's bond and reimburse Landlord for all reasonable costs incurred in canceling or discharging such liens (including, without limitation, the cost of Landlord's bond and of any security posted to obtain Landlord's bond), together with interest thereon at the Default Rate from the date incurred by Landlord until repaid by Tenant, such substitution to be effected and reimbursement to be made within 30 days after receipt by Tenant of a detailed written statement from Landlord as to the amount of such bond and costs. Except if and to the extent arising from an act or (where such party has an affirmative obligation to act pursuant to the terms of this Lease) omission of any Landlord Indemnified Party, Tenant shall indemnify and hold all Landlord Indemnified Parties harmless from and against all costs (including, without limitation, reasonable attorneys' fees and disbursements and costs of suit), losses, liabilities or causes of action caused by the performance of any Alteration, including, without limitation, any mechanics' or other liens asserted in connection with the performance of such Alteration.

9

8336763v2

(e)     At Landlord's request, Tenant shall deliver to Landlord, within 60 days after the completion of any Alteration for which Tenant prepared plans, either **"as-built"** drawings thereof or the final working drawings therefor marked with field changes.

(f)     Landlord shall reasonably and diligently cooperate with Tenant in the performance of Alterations, including, without limitation, by signing such applications for governmental permits and certificates as Tenant may reasonably require.

(g)     If, in connection with the performance of any Alteration, or in connection with any change of use of the Premises (whether or not physical alterations are involved), there is any violation of Laws, the compliance with which is the responsibility of Landlord in accordance with this Lease ("**Landlord's Violations**"), which (A) shall materially delay (or prevent) Tenant from obtaining any governmental permits, consents, approvals or other documentation required for the lawful occupancy of such portion of the Premises upon completion of such Alterations therein or otherwise, or required by Tenant to perform such Alterations, or (B) shall prevent Tenant from commencing, or shall materially delay Tenant in completing such Alterations or in occupying such portion of the Premises (it being understood that the imposition of conditions requiring the cure of any Landlord Violation by a governmental authority as a condition precedent to obtaining any such governmental permits, consents, approvals or other documentation which shall so delay Tenant from obtaining any governmental permits, consents, approvals or other documentation shall if material, be deemed such a prevention or delay), then Landlord shall promptly and diligently proceed to cure and remove of record such Landlord's Violations.

(h)     If at any time during the Term, Tenant shall deliver a certification of a qualified asbestos hygienist certifying that asbestos and/or asbestos containing materials (collectively, "**ACM**") is located in the Premises and is in violation of Laws, Landlord shall, upon Tenant's request, at Landlord's sole cost and expense, remove such ACM in compliance with Laws and restore any Alterations previously performed in such portion of the Premises; and from the date Tenant delivers such certification to Landlord, through the completion date of such ACM removal and restoration work by Landlord, Fixed Rent shall abate as to the affected portion of the Premises to the extent, and for the period of time, that Tenant shall actually be unable to occupy, and shall not be occupying, such portion of the Premises as a result of the presence of such ACM and such work by Landlord.

(i)     Any dispute between Landlord and Tenant arising with respect to any Alterations shall be resolved by arbitration conducted in accordance with the provisions of <u>Section 8.09</u>.

4.02     **Landlord's and Tenant's Property**. (a) All fixtures, equipment, improvements and appurtenances attached to or built into the Premises, whether or not at the expense of Tenant, which cannot be removed without significant damage to Premises or the Building (collectively, "**Fixtures**"), shall be and remain a part of the Premises, and shall not be removed by Tenant (but subject to Tenant's rights to alter or remove Fixtures in connection with any Alteration). All Fixtures shall be the property of Tenant during the Term and, upon expiration or earlier termination of this Lease, shall become the property of Landlord.

8336763v2

(b)    All fixtures, equipment, improvements and appurtenances which do not constitute Fixtures and all furniture, furnishings and other articles of movable personal property located in the Premises (collectively, "**Tenant's Property**") shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term; provided, that if any Tenant's Property is removed, Tenant shall repair any damage to the Premises which Tenant is required to repair in accordance with Section 4.04(a) resulting from the installation and/or removal thereof.

(c)    At or before the Expiration Date, or within 15 days after any earlier termination of this Lease, Tenant, at Tenant's expense, shall, unless Landlord agrees otherwise in writing, remove Tenant's Property from the Premises, and Tenant shall repair any damage to the Premises which Tenant is required to repair in accordance with Section 4.04(a) resulting from any installation and/or removal of Tenant's Property. Notwithstanding the foregoing, any items of Tenant's Property which remain in the Premises after the Expiration Date, or after 15 days following any earlier termination date, shall, after Landlord delivers 10 days' notice to Tenant (except that, in the case of an earlier termination of this Lease by reason of a default by Tenant, such notice shall not be required), be deemed to have been abandoned and may be retained by Landlord as Landlord's property or disposed of by Landlord, without accountability, in such manner as Landlord shall determine, at Tenant's expense.

4.03    **Access and Changes to Building**. (a) Landlord reserves the right, at any time, to make changes in or to the Project (other than within the Premises except as provided in the further provisions of this Section 4.03 or elsewhere in this Lease) as Landlord may deem necessary or desirable, and Landlord shall have no liability to Tenant therefor; provided, that any such change does not interfere with Tenant's reasonable access to the Premises and does not affect the first-class nature of the Project. Nothing contained in the preceding sentence shall be deemed to relieve Landlord of any of its obligations expressly set forth elsewhere in this Lease. Landlord may install and maintain pipes, fans, ducts, wires and conduits within or through the walls, floors or ceilings of the Premises; provided, that the same (i) are concealed behind walls, below floors or above ceilings and (ii) do not reduce the usable area of the Premises. In exercising its rights under this Section 4.03, Landlord shall (x) use commercially reasonable efforts (including the use of overtime labor if the performance of any work by Landlord shall materially interfere with Tenant's use of the Premises for the ordinary conduct of Tenant's business) to minimize any interference with Tenant's use of the Premises for the ordinary conduct of Tenant's business by reason of the performance of any work by Landlord and (y) use best efforts to prevent any permanent interference with Tenant's use of the Premises for the ordinary conduct of Tenant's business by reason of any installation or change made by Landlord.

(b)    Landlord and persons authorized by Landlord shall have the right, upon reasonable prior notice to Tenant (except in an emergency, in which case upon such notice, if any, as is feasible), to enter the Premises (together with any necessary materials and/or equipment) to inspect or perform such work as Landlord may reasonably deem necessary or desirable and as is permitted under this Lease, or to exhibit the Premises to prospective purchasers. Landlord shall have no liability to Tenant by reason of any such entry; provided, that (i) Landlord shall use commercially reasonable efforts (unless a higher standard provided elsewhere in this Lease is applicable to such entry by Landlord) to minimize interference with Tenant's use and enjoyment of the Premises and to exercise due care in entering or exhibiting the Premises and (ii) Landlord

11

shall repair any damage caused by Landlord in the Premises during such entry, including, without limitation, any repair or replacement required to any finishes in the Premises as a result of such entry. During the performance of any work by Landlord in any portion of the Premises, Landlord shall have the right to store materials and equipment utilized in connection with such work in the portion of the Premises where such work is being performed, but only if Landlord would suffer a hardship if Landlord were required to remove such materials and equipment at the end of each day's work. Except in an emergency, Landlord shall not enter the Premises unless accompanied by a representative of Tenant; provided, that Tenant makes such representative available to Landlord upon reasonable prior notice.

4.04    **Repairs**. (a) Except if and to the extent the following shall be Landlord's obligation pursuant to the express provisions of this Lease, Tenant shall keep the Premises (including, without limitation, all Fixtures) in good condition and, upon expiration or earlier termination of the Term, shall surrender the same to Landlord in its then **"as is"** (as of the Commencement Date) condition (but subject to Section 4.02). All damage caused by Tenant, its agents, subtenants and its and their respective employees, contractors and invitees (so long as such invitees are in the Premises) to the equipment and other installations in the Premises shall be repaired by Tenant if and to the extent that Tenant's failure to repair such damage causes or is reasonably likely to cause any loss, cost, liability, damage, harm, material inconvenience or expense to Landlord or any other tenant of the Building. Neither Tenant nor Tenant's agents, subtenants and their respective employees, contractors and invitees (so long as such invitees are in the Premises) shall commit any waste or damage to any portion of the Premises or the Building.

(b)    Except if and to the extent the following shall be Tenant's obligation pursuant to the express provisions of this Lease, Landlord shall, at Landlord's cost and expense (except as otherwise provided for in this Lease) operate, maintain, repair and replace (if reasonably necessary) (i) all structural portions of the Building (whether located within or outside of the Premises), such as, by way of example only, the roof, foundation, footings, exterior walls, load-bearing columns, ceiling and floor slabs, windows, window sills and sashes, (ii) all common and public service areas of the Building, including, without limitation, all elevators, corridors, lobbies, core lavatories (including all fixtures therein), core electric closets, core telecommunication closets, core janitor closets, mechanical rooms, the parking areas of the Building and the curbs and sidewalks adjacent to the Building, and (iii) all Building systems (whether such Building systems are located within or outside of the Premises) serving the common and public service areas and the Premises (other than any distribution of such systems located in the Premises and installed by Tenant, unless such distribution was installed by Tenant in place of Landlord by reason of Landlord's failure to do the same) (the areas described in clauses (i), (ii) and (iii) are collectively called the **"Landlord Obligation Areas"**), in each case throughout the Term, and in such manner as is consistent with the maintenance, operation and repair obligations associated with first-class office buildings located in the vicinity of the Building.

4.05    **Compliance with Laws**. (a) Tenant shall comply with all laws, ordinances, rules, orders and regulations (present, future, ordinary, extraordinary, foreseen or unforeseen) of any governmental, public or quasi-public authority having jurisdiction over the Premises, at any time duly in force (collectively **"Law"** or **"Laws"**), but only if and to the extent such compliance obligation is the result of any Alteration or particular manner of use by Tenant (in contrast to use

12

by Tenant for customary office purposes) of the Premises or any part thereof; it being acknowledged that (i) all Laws affecting Tenant's occupancy of the Premises (as opposed to Laws requiring physical changes to the Premises) shall be Tenant's obligation and (ii) in no event shall Tenant be required to comply with any Laws requiring structural changes to the Building. Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot which is allowed by applicable Law. Landlord and Tenant shall reasonably cooperate with each other to ensure that all Laws affecting the Premises and the Building are complied with. Tenant shall not be required to comply with any Laws for so long as Tenant shall be contesting, through appropriate proceedings brought in accordance with applicable Law, Tenant's obligation to comply therewith; provided, that Tenant shall indemnify Landlord from and against any and all claims arising therefrom or in connection therewith in accordance with the terms and procedures set forth in Section 6.08.

(b)    Except as otherwise expressly made the obligation of Tenant pursuant to this Lease, Landlord shall, at Landlord's own cost and expense (subject to the terms of this Lease), comply with all Laws affecting the Landlord Obligation Areas and all Laws that require physical changes in or to the Premises. Without limiting the generality of the foregoing, Landlord shall maintain in effect a certificate of occupancy for the Building that shall allow the Premises to be used as general, professional, administrative and executive offices.

4.06    **Right to Perform Other Party's Covenants**. (a) If Tenant fails to perform any of its obligations under this Lease, Landlord, any Superior Lessor or any Superior Mortgagee (each, a "**Curing Party**") may perform the same at the reasonable expense of Tenant (i) after such notice, if any, as is feasible under the circumstances in the case of emergency, imminent violation of any Law, imminent cancellation of any insurance policy maintained by Landlord, imminent threat of danger to the health or safety of persons, imminent risk of civil or criminal liability of Landlord, material adverse effect on the Project or any portion thereof or Landlord's interest therein or unreasonable interference with the use of another tenant's space or the operation of the Building, and (ii) in any other case, if such failure continues after notice and beyond all applicable grace periods provided in this Lease, and thereafter such failure is not remedied within 10 days after a second notice to Tenant (in which the Curing Party notifies Tenant that the Curing Party will undertake such performance at Tenant's expense). If a Curing Party performs any of Tenant's obligations under this Lease pursuant to the immediately preceding sentence, Tenant shall pay to such Curing Party (as Additional Rent) the reasonable costs thereof, together with interest at the Interest Rate from the date such costs were incurred by the Curing Party until paid by Tenant, within 30 days after receipt by Tenant of a detailed statement as to the amounts of such costs. "**Prime Rate**" means an annual interest rate equal to the prime or base rate from time to time announced by Citibank, N.A. (or, if Citibank, N.A. shall not exist or shall cease to announce such rate, such other New York Clearing House Association member bank, as shall be designated by Landlord in a notice to Tenant) to be in effect at its principal office in New York, New York. "**Interest Rate**" means an annual interest rate equal to the lesser of (A) the Prime Rate plus 2% or (B) the maximum rate permitted by Law. "**Default Rate**" means an annual interest rate equal to the lesser of (x) the Prime Rate plus 5% or (y) the maximum rate permitted by Law.

(b)    If Landlord fails to perform any of Landlord's obligations under this Lease, and such failure materially and adversely impacts the Tenant's ability to operate its business from the Premises, then Tenant may perform the same at the reasonable expense of Landlord (i) after

13

such notice, if any, as is feasible under the circumstances in the case of emergency, imminent violation of any Law, imminent cancellation of any insurance policy maintained by Tenant, imminent threat of danger to the health or safety of persons, imminent risk of civil or criminal liability of Tenant or material impairment of the conduct of Tenant's normal operations in the Premises, and (ii) in any other case, if such failure continues for 10 days after a notice to Landlord (in which Tenant notifies Landlord that Tenant will undertake such performance at Landlord's expense). If Tenant performs any of Landlord's obligations under this Lease pursuant to the immediately preceding sentence, unless Landlord reasonably disputes same, Landlord shall pay to Tenant the reasonable costs thereof, together with interest at the Interest Rate from the date such costs were incurred by the Tenant until paid by Landlord, within 30 days after receipt by Landlord of a detailed statement as to the amounts of such costs.

ARTICLE 5

**Assignment and Subletting**

5.01   **Assignment; Etc.**. (a) Subject to the further provisions of this Article 5, Tenant shall not have the right to assign or otherwise transfer this Lease (directly or indirectly, including, without limitation, by operation of law) without Landlord's prior written consent. Notwithstanding anything to the contrary contained in this Lease, provided that (i) no Event of Default shall exist pursuant to this Lease, and (ii) the herein named Tenant shall not be released from any liability whatsoever, the Tenant shall have the right, without Landlord's consent and without Landlord having the right to share in any profits, to assign this Lease to (A) an Affiliate (as hereinafter defined) or (B) a Permitted Transferee (as hereinafter defined).

(b)   **"Affiliate"** means, as to any designated person or entity, any other person or entity which controls, is controlled by, or is under common control with, such designated person or entity. **"Control"** (and with correlative meaning, **"controlled by"** and **"under common control with"**) means ownership or voting control, directly or indirectly, of more than 50% of the voting stock, partnership interests or other beneficial ownership interests of the entity in question. If any person or entity to whom Tenant shall have assigned this Lease or sublet all or any portion of the Premises pursuant to and in accordance with this Section 5.01 shall thereafter cease to be an Affiliate of Tenant, then no consent of Landlord shall be required for the continuation of such person's or entity's tenancy or subtenancy, as applicable. **"Permitted Transferee"** means (1) a successor corporation, company, partnership, trust or other person or entity, whether by merger, consolidation or otherwise, or any corporation, company, partnership, trust or other person or entity that purchases all or substantially all of Tenant's assets or stock or all or substantially all of the beneficial interests in Tenant and/or (2) a trust (including a public trust) or other person or entity that holds all or a material portion of Tenant's assets following the effective date of a plan of reorganization or liquidation in the bankruptcy cases filed on September 15, 2019 by Tenant and certain of its affiliates under chapter 11 title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 19-23649 (RDD), or any other proceeding superseding or related to the foregoing (the **"Pending Bankruptcy Proceeding"**).

(c)   In addition to those matters stated in Section 5.01(a), it is contemplated that substantially all of the assets of the Tenant may be conveyed to a Trust or other entity in connection

14

with the Pending Bankruptcy Proceeding (the "**Tenant Successor Entity**"). Without releasing the herein named Tenant from liability pursuant to this Lease, and notwithstanding the restrictions set forth in Section 5.01(a), the Tenant shall cause such Tenant Successor Entity to assume and be bound by all of the terms and conditions of this Lease and shall not make an objection to same in the Pending Bankruptcy Proceeding. Any Permitted Transferee shall assume and be bound by all of the terms and conditions of this Lease.

5.02    **Sublease**. (a) In addition to the restriction on assignment and other transfers as set forth in Section 5.01, Landlord shall not permit Tenant to sublease all or any part of the Premises, and shall not permit any portion of the Premises to be used under so-called "**desk sharing**" or other temporary arrangements. However, provided that (i) no Event of Default shall exist pursuant to this Lease, and (ii) the herein named Tenant shall not be released from any liability whatsoever, the Tenant shall have the right to sublet all (not part) of the Premises to an Affiliate with the prior approval of the Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)    If no Event of Default shall exist pursuant to this Lease, and Tenant desires to sublet (to a non-Affiliate) all (not part) of floor 9 and/or 10, and/or P-3, Tenant shall give to Landlord notice ("**Tenant's Offer Notice**") thereof, specifying the location of the space to be marketed for sublet. For the avoidance of doubt, the Tenant shall have no right to sublet a portion of a floor which comprises the Premises. Further, and notwithstanding the foregoing, the Tenant shall not have the right to market the Premises for sublet. The Tenant's Offer Notice shall constitute express permission being granted by Tenant to Landlord, for Landlord to take commercially reasonably steps to market the Premises for lease or sublet with equal priority as Landlord shall market all other available space in the Building. In such case, Landlord shall provide Tenant with regular reporting and updates on the marketing of the Premises and all other available space in the Building. Landlord shall have no liability whatsoever for the failure to lease or sublease the Premises. Further in addition to granting the Landlord the right to market the Premises, the Tenant's Offer Notice shall be deemed an irrevocable offer from Tenant to Landlord either (i) to terminate this Lease if the proposed transaction is a sublease of all or substantially all of the Premises, or (ii) to terminate this Lease as to the portion of the Premises proposed for sublet, if the proposed transaction is a sublease of part of the Premises. Said option may be exercised by Landlord by notice to Tenant at any time after receipt of the Tenant's Offer Notice, it being expressly understood that the Landlord has no liability for leasing or subleasing the Premises, and Landlord has no obligation to recapture the Premises or any part thereof. Among the rights of Landlord pursuant to this 5.02 is to determine when and if Landlord desires to terminate all or a portion of this Lease if and when a replacement tenant is located (and subject to the obligation of Tenant to pay the Rental Shortfall as provided for below).

(c)    If Landlord exercises its option under Section 5.02(b)(i) to terminate all of this Lease, then this Lease shall terminate as of the date specified on Landlord's notice to Tenant, and all Rent shall be paid and apportioned to such date. However, and notwithstanding the foregoing, if and to the extent that the rentals for the Premises following termination of this Lease shall be less than the Fixed Rent as provided for in Section 2.02, the Tenant shall remain liable to pay any such shortfall monthly as same shall accrue, such payment shall be made within fifteen (15) days of demand by Landlord (the "**Rental Shortfall**"), the obligation to pay the Rental Shortfall shall survive the termination and/or expiration of this Lease. The Rental Shortfall shall

15

be calculated after deduction for all of Landlord's reasonable out of pocket costs and expenses in connection with the subleasing/leasing of the Premises, including without limitation reasonable legal and professional fees, brokerage fees and expenses, landlord work costs and other tenant inducement costs. Section 6.07 shall be applicable to Landlord's enforcement of the obligation to pay Rental Shortfall. The Tenant shall execute any and all documentation as reasonably requested to memorialize the Rental Shortfall within ten (10) days of request by Landlord, however the failure to execute such documentation shall not limit in any manner whatsoever the Tenant's obligation to pay the Rental Shortfall.

(d)    If Landlord exercises its option under Section 5.02(b)(ii) to terminate this Lease with respect to the portion of the Premises covered by a proposed sublease, then (i) from and after such date the Rent shall be adjusted to reflect a pro rata reduction of Tenant's Rent obligations and (ii) this Lease shall terminate with respect to such part of the Premises on the effective date of the proposed sublease. However, and notwithstanding the foregoing, if and to the extent that the rentals for that portion of the Premises for which termination shall occur shall be less than the Fixed Rent as provided for in Section 2.02, the Tenant shall remain liable to pay any Rental Shortfall as same shall accrue, such payment shall be made within fifteen (15) days of demand by Landlord, the obligation to pay the Rental Shortfall shall survive the termination and/or expiration of this Lease. The Rental Shortfall shall be calculated after deduction for all of Landlord's reasonable out of pocket costs and expenses in connection with the subleasing/leasing of such premises including without limitation reasonable legal and professional fees, brokerage fees and expenses, landlord work costs and other tenant inducement costs. Section 6.07 shall be applicable to Landlord's enforcement of the obligation to pay Rental Shortfall. The Tenant shall execute any and all documentation as reasonably requested to memorialize the Rental Shortfall within ten (10) days of request by Landlord, however the failure to execute such documentation shall not limit in any manner whatsoever the Tenant's obligation to pay the Rental Shortfall.

As stated above, Landlord shall have no liability for failure to lease or sublease the Premises. Among the reasons why Landlord may choose to reject a potential lease or sublease may include, without limitation, the following: (i) the assignment or subletting would increase the operating costs for the Building or the burden on the Building services, or generate material additional foot traffic, elevator usage or security concerns in the Building, or create a demonstrable increased probability of the comfort and/or safety of Landlord and other tenants in the Building being compromised or reduced, (ii) the proposed assignee or subtenant is a prospective tenant of the Building with whom Landlord has entered into a letter of intent or exchanged an offer and counteroffer or similar correspondence (including a draft lease) within the preceding ninety (90) day period, or is a current tenant of the Building; (iii) Landlord reasonably disapproves of the combined creditworthiness of the Tenant and the proposed assignee or subtenant (provided that Landlord shall not object to such creditworthiness if it is equal to or better than that of Tenant as of the date of this Lease); (iv) Landlord reasonably determines that the reputation of the assignee or subtenant or the character of the business that would be conducted by the proposed assignee or subtenant at the Premises, or the manner of conducting such business, would be inconsistent with the character of the Building as a first-class office building; (v) the proposed assignee or subtenant is an entity or an affiliate of an entity with whom Landlord or any Affiliate of Landlord has been engaged in litigation or who has asserted a legal claim against Landlord or an Affiliate of Landlord or against whom Landlord or an Affiliate of Landlord has asserted a legal claim; (vi) the assignment or subletting may conflict with any exclusive uses granted to other tenants of the Real

16

Property, or with the terms of any easement, covenant, condition or restriction, or other agreement affecting the Building; (vii) the assignment or subletting would involve a change in use from that expressly permitted under this Lease; or (viii) as of the date Tenant requests Landlord's consent or as of the date Landlord responds thereto, an Event of Default by Tenant under this Lease shall have occurred and be continuing.

5.03    **General Provisions**. (a) If this Lease is assigned, Landlord may collect rent from the assignee. If the Premises or any part thereof are sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant in the payment of any sum payable under this Lease after notice and beyond applicable grace periods, collect rent from the subtenant or occupant (but not in excess of the total amount of such monetary defaults by Tenant which exist at such time). In either event, Landlord shall apply the net amount collected against Rent.

(b)    Notwithstanding any assignment or transfer, and notwithstanding the acceptance of any Rent by Landlord from an assignee, transferee or any other party, the original named Tenant and each successor Tenant shall remain fully liable for the payment of the Rent and the performance of all of Tenant's other obligations under this Lease. The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant shall not be discharged, released or impaired in any respect by any agreement made by Landlord extending the time to perform, or otherwise modifying, any of the obligations of Tenant under this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of Tenant under this Lease; provided, that (i) in the case of any modification of this Lease made after the date of an assignment or other transfer of this Lease by Tenant, if such modification increases or enlarges the obligations of Tenant or reduces the rights of Tenant, then the Tenant named herein and each respective assignor or transferor that has not consented to such modification shall not be liable under or bound by such increase, enlargement or reduction (but shall continue to be liable under this Lease as though such modification were never made) and (ii) in the case of any waiver by Landlord of a specific obligation of an assignee or transferee of Tenant, or an extension of time to perform in connection therewith, such waiver and/or extension shall also be deemed to apply to the immediate and remote assignors or transferors of such assignee or transferee.

(c)    If this Lease shall have been assigned by the initially named Tenant (other than to an Affiliate of the Initially Named Tenant), Landlord shall give the initially named Tenant (or any entity which directly or indirectly succeeds to the interest of the initially named Tenant) (the "**Initially Named Tenant**") a copy of each notice of default given by Landlord to the then current tenant under this Lease. Except if Landlord shall execute and deliver a written instrument releasing the Initially Named Tenant from any further liability under this Lease, Landlord shall not have any right to terminate this Lease, or otherwise to exercise any of Landlord's rights and remedies hereunder (other than Landlord's self-help remedy in accordance with Section 4.06(a)), after a default by such current tenant, unless and until (A) Landlord shall have made a demand on the then tenant to cure the default in question, (B) the Initially Named Tenant receives a copy of the default notice in question, and (C) the Initially Named Tenant has an opportunity to remedy such default within the time periods set forth in this Lease (such time periods, with respect to the Initially Named Tenant, being deemed to run from the date that Landlord gives such Initially Named Tenant a copy of the default notice in question). Landlord shall accept timely performance by the Initially Named Tenant of any term, covenant, provision or agreement contained in this Lease on the then current tenant's part to be observed and performed with the same force and

17

effect as if performed by the then current tenant. If the Initially Named Tenant shall cure the default by such current tenant, or if the default shall be incurable (such as bankruptcy), and Landlord or the current tenant seeks to terminate this Lease, then the Initially Named Tenant shall have the right to enter into a new lease with Landlord upon all of the then executory terms of this Lease and to resume actual possession of the Premises for the unexpired balance of the Term.

## ARTICLE 6

### Subordination; Default; Indemnity

6.01    **Subordination**. This Lease is subject and subordinate to each mortgage (a "**Superior Mortgage**") and each underlying lease (a "**Superior Lease**") which may now or hereafter affect all or any portion of the Project or any interest therein; provided, that (i) in the case of any Superior Lease which may hereafter affect all or any portion of the Project or any interest therein, the Superior Lessor shall have executed, acknowledged and delivered a non-disturbance and attornment agreement containing the same substantive provisions as those set forth in the form attached to this Lease as **Exhibit O**, and (ii) in the case of any Superior Mortgage which may now or hereafter affect all or any portion of the Project or any interest therein, the Superior Mortgagee thereunder shall have executed, acknowledged and delivered to Tenant a non-disturbance and attornment agreement containing the same substantive provisions as those set forth in the form attached to this Lease as **Exhibit P**. If the foregoing conditions are satisfied, Tenant shall execute, acknowledge and deliver such instrument as may be reasonably requested by Landlord, a Superior Lessor or Superior Mortgagee to evidence the subordination described in this Section 6.01, but no such instrument shall be necessary to make such subordination effective. Tenant shall execute any amendment of this Lease requested by a Superior Mortgagee or a Superior Lessor; provided, that any such amendment shall not reduce or extend the Term, increase the Rent, reduce the area of the Premises or, except to a *de minimis* extent, increase Tenant's obligations or decrease Tenant's rights under this Lease or decrease Landlord's obligations or increase Landlord's rights under this Lease. In the event of the enforcement by a Superior Mortgagee of the remedies provided for by law or by such Superior Mortgage, or in the event of the termination or expiration of a Superior Lease, Tenant, upon request of such Superior Mortgagee, Superior Lessor or any person succeeding to the interest of such mortgagee or lessor (each, a "**Successor Landlord**"), shall automatically become the tenant of such Successor Landlord without change in the terms or provisions of this Lease (it being understood that Tenant shall, if requested, enter into a new lease on terms identical to those in this Lease). Upon request by such Successor Landlord, Tenant shall execute and deliver an instrument or instruments, reasonably requested by such Successor Landlord, confirming the attornment provided for herein, but no such instrument shall be necessary to make such attornment effective. The lessor under a Superior Lease is called a "**Superior Lessor**" and the mortgagee under a Superior Mortgage is called a "**Superior Mortgagee**".

6.02    **Estoppel Certificate**. Each party shall, at any time and from time to time, within 20 days after request by the other party, execute and deliver to the requesting party (or to such person or entity as the requesting party may designate) a statement substantially in the form attached hereto as **Exhibit M**, certifying (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (b) the Commencement Date, the Expiration Date and the dates to which the Fixed Rent and, if applicable Additional Rent have been paid, (c) the address to which all

18

Notices under this Lease are to be sent, (d) whether or not, to the best knowledge of such party, the other party is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default of which such party shall have knowledge, and (e) any other matters reasonably requested by the requesting party; it being intended that any such statement shall be deemed a representation and warranty to be relied upon by the party to whom such statement is addressed.

6.03    **Default**. (a) Each of the following events or occurrences shall be an "**Event of Default**" under this Lease:

(i)    if Tenant defaults in the payment when due of any installment of Fixed Rent, and such default continues for 5 Business Days after a notice specifying such default has been given by Landlord to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to Section 5.03(c) above); or

(ii)    if Tenant defaults in the payment when due of any installment of Additional Rent, and such default continues for fifteen (15) days after a notice specifying such default has been given by Landlord to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to Section 5.03(c) above); or

(iii)    if Tenant defaults in the keeping, observance or performance of any covenant or agreement of this Lease on Tenant's part to be kept, observed or performed (other than a default of the character referred to in Section 6.03(a)(i) or (ii)), and if such default continues and is not cured within 30 days after Landlord gives to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to Section 5.03(c) above) a notice specifying the same, except that if such default is of such a nature that it cannot with due diligence be cured within such 30-day period, and the continuance of which for the period required for such cure will not (A) subject Landlord or any Superior Lessor or any Superior Mortgagee to prosecution for a crime or any other fine or charge (unless Tenant agrees, in a writing reasonably satisfactory to Landlord, to pay and discharge such fine or charge), (B) subject the Premises, the Project or any part thereof to being condemned or vacated or to any lien or encumbrance, which lien or encumbrance is not discharged or bonded within 30 days after notice from Landlord, or (C) result in the termination of any Superior Lease or foreclosure of any Superior Mortgage, respectively, then Tenant shall be entitled to such reasonable additional period of time to effectuate the cure or remedy of such default or failure, provided, that Tenant shall (x) duly advise Landlord of its intention to take all necessary steps to remedy or cure such default or failure and commence the prosecution of such cure or remedy, all within such 30-day period, (y) thereafter diligently prosecute to completion all steps necessary to remedy or cure the default or failure, and (z) complete such remedy or cure within a reasonable time after the date of said notice from Landlord but not in excess of ninety (90) days; or

(iv)    (1)    if Tenant shall commence or institute any case, proceeding or other action (a) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debt under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency,

19

8336763v2

reorganization or relief of debtors, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

      (2)    if Tenant shall make a general assignment for the benefit of creditors; or

      (3)    if any case, proceeding or other action shall be commenced or instituted against Tenant (a) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which in either of such cases (i) results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect and (ii) remains undismissed for a period of 90 days or;

      (4)    if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant which appointment is not vacated or stayed within 90 days (the aforesaid events set forth in this Section 6.03(a)(iv) are hereinafter referred to individually as a "**Bankruptcy Event**" or collectively, as "**Bankruptcy Events**").

      (5)    Notwithstanding anything to the contrary contained in this Lease, Tenant's Pending Bankruptcy Proceeding shall not constitute or give rise to an Event of Default under this Lease.

      (b)    If an Event of Default described in Section 6.03(a) (other than a Bankruptcy Event) shall occur, then (i) immediately in the case of an Event of Default described in Section 6.03(a)(i) or (ii) and (ii) in the case of an Event of Default described in Section 6.03(a)(iii), following the expiration of the applicable notice and grace period set forth therein (A) Landlord gives to Tenant a notice specifying the applicable default, and (x) the amount required to be paid by Tenant to cure such default or (y) the action required to be taken by Tenant to cure such default, as applicable, referring to this Section 6.03(b) and containing on the first page thereof, in capital letters, the following legend: "AS MORE FULLY SET FORTH IN SECTION 6.03(b) OF THE LEASE, YOUR FAILURE TIMELY TO [PAY THE AMOUNT SET FORTH HEREIN] [CURE THE DEFAULT SET FORTH HEREIN] MAY RESULT IN THE TERMINATION OF THE LEASE" and (B) such default continues for a period of 5 Business Days after the giving of the notice described in clause (A) above; then, in the case of clause (i) or clause (ii) above, Landlord shall be entitled to give to Tenant a notice of intention to end the Term at the expiration of 10 Business Days from the date of the giving of such notice, and, in the event such notice is given, this Lease and the term and estate hereby granted shall terminate upon the expiration of such 10

8336763v2

Business Days with the same effect as if the last of such 10 Business Days were the Expiration Date, but Tenant shall remain liable for damages as provided herein or pursuant to law.

(c)    If any Bankruptcy Event shall occur, or this Lease shall be terminated as provided in Section 6.03(b), Landlord, without notice, may reenter and repossess the Premises and dispossess Tenant by summary proceedings or other lawful means.

6.04    **Remedies and Damages**. (a) If there shall occur any Event of Default, and this Lease and the Term shall expire and come to an end as provided in Section 6.03 hereof:

(i)    Tenant shall quit and peacefully surrender the Premises to Landlord, and Landlord may, without notice, re-enter the Premises and dispossess Tenant and/or the legal representative of Tenant or any other occupant of the Premises, respectively, by summary proceedings or other lawful means, and may in accordance with applicable Law repossess the Premises and remove therefrom the contents and effects of Tenant and/or the legal representative of Tenant or any other occupant, and hold the Premises as if this Lease had not been made.

(ii)    Landlord may, at its option, relet the whole or any portion or portions of the Premises, at any time or from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord in its sole discretion, may determine; provided, that Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for failure or refusal to relet the Premises, or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise affect any such liability, and in no event shall Tenant be entitled to receive any excess of net rentals collected over the rent and additional rent payable by Tenant hereunder, and Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability. Notwithstanding the foregoing, Landlord shall exercise reasonable efforts to mitigate Landlord's damages by reletting the Premises from time to time to other tenants in bona fide arm's-length transactions: provided, that Landlord shall not be required to give preferential treatment to the Premises over other comparable vacant space in the Building.

(b)    (i) Tenant hereby waives the service of any notice of intention to re- enter or to institute legal proceedings to that end which may otherwise be required to be given under any present or future law. Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, does further hereby waive any and all rights which Tenant and all such persons might otherwise have under any present or future law to redeem the Premises, or the re-enter or repossess the Premises, or to restore the operation of this Lease, after (A) Tenant shall have been dispossessed by a judgment or by warrant of any court or judge, or (B) any other lawful re-entry by Landlord, or (C) any expiration or termination of this Lease and the Term,

21

8336763v2

whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. Tenant also waives the right to seek a delay in levy of execution in case of any eviction or dispossession for nonpayment of rent. Landlord and Tenant each waive trial by jury in any action in connection with this Lease.

(ii)    The words "**re-enter**", "**re-entry**" and "**re-entered**" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

(c)    If this Lease and the Term shall expire and come to an end as provided in Section 6.03(b) hereof, or by or under any summary proceeding or any other action or proceeding by Landlord against Tenant or any person claiming by, through or under Tenant, or if Landlord shall re-enter the Premises as provided in Section 6.04(a)(i), or by or under any summary proceeding or any other action or proceeding, respectively, then, in any of said events:

(i)    Tenant shall pay to Landlord all Fixed Rent, Additional Rent and other charges payable under this Lease by Tenant to Landlord to the later to occur of (A) the date upon which this Lease and the Term shall have expired or has been terminated and come to an end, and (B) the date of re-entry upon the Premises by Landlord, as the case may be;

(ii)    Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as advanced Rent, security deposit or otherwise, but such monies shall be credited by Landlord against any damages payable by Tenant to Landlord;

(iii)    Tenant also shall be liable for and shall pay to Landlord as liquidated damages, any deficiency (the "**Deficiency**") between the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term or re-entry by Landlord (conclusively presuming the Additional Rent to be the same as was payable for the year immediately preceding such termination or re-entry) and the net amount, if any, of rents collected under any reletting of all or part of the Premises for any part of such period, after first deducting from the rents actually collected under any such reletting, all of Landlord's expenses in connection with the termination of this Lease and Landlord's re-entry upon the Premises and in connection with such reletting including, without limitation, all repossession costs, brokerage commissions, legal expenses, reasonable attorneys' fees, court costs and disbursements, alteration costs and other expenses of preparing the Premises for such reletting, and the amount of rent concessions, construction allowance and the like granted in connection with such reletting (collectively, the "**Default Expenses**"); provided, that if the Premises or any part thereof should be relet in combination with other space, or for a term longer than the Term, then proper apportionment shall be made of the rent received from such reletting and of the Default Expenses; it being agreed and understood by Tenant that any such Deficiency shall be paid in monthly installments of Fixed Rent, and that Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise, and no suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

22

(iv)    whether or not Landlord shall have collected any monthly Deficiencies as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiencies (other than the Default Expenses), as and for liquidated and agreed final damages, and not as penalty, a sum equal to the amount by which the sum of the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term, or re-entry by Landlord (conclusively presuming the Additional Rent to be the same as was payable for the year immediately preceding such termination or reentry) exceeds the then fair and reasonable rental value of the Premises for the same period, both discounted to the then present value of such sum at the rate equal to the rate of U.S. Treasury obligations having a maturity closest to such unexpired portion of the Term, and less the aggregate amount of Deficiencies theretofore collected by Landlord pursuant to the provisions of <u>Section 6.04(c)(iii)</u> above, for the same period; it being agreed and understood by Tenant that if before presentation of proof of such liquidated damages to any court, commission or tribunal, the Premises, or any part thereof, shall have been relet in a bona fide arm's length transaction by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be presumptively deemed to be fair and reasonable rental value for the part of the whole of the Premises so relet during the term of the reletting.

(d)    In the event of a breach or threatened breach by Tenant or Landlord of any of the covenants or provisions hereof, the other party shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this Lease of any particular remedy, shall not preclude Landlord or Tenant from any other remedy, at law, in equity or otherwise, except as specifically set forth herein. Tenant shall in no event be entitled to any rents collected or payable under any reletting, whether or not such rents shall exceed the Fixed Rent reserved in this Lease. Nothing contained in <u>Section 6.03</u> or this <u>Section 6.04</u> shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this <u>Section 6.04</u>, except as otherwise specifically set forth herein.

(e)    Anything to the contrary contained in this Lease notwithstanding, in no event shall Landlord or Tenant be liable to the other for consequential damages under or in connection with this Lease.

6.05    <u>**No Waiver**</u>. Failure by either party to declare any default immediately upon its occurrence or delay in taking any action in connection with such default shall not waive such default but such party shall have the right to declare any such default at any time thereafter. If either party designates by notice to the other party that a payment made by the paying party is to be applied by the receiving party to a particular item then owing by the paying party to the receiving party, then the receiving party shall apply such payment to such particular item. Any amounts paid by Landlord or Tenant to the other party, without notice of a particular item to which such payment is to be applied, may be applied by the receiving party, in its discretion, to any amounts then owing by the paying party to the receiving party. Receipt by Landlord of a partial payment shall not be deemed to be an accord and satisfaction (notwithstanding any endorsement

23

or statement on any check or any letter accompanying any check or payment), nor shall such receipt constitute a waiver by Landlord of Tenant's obligation to make full payment. No act or thing done by Landlord or its agents shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord and by each Superior Lessor and Superior Mortgagee with whom Tenant has (or is deemed to have) in effect a binding non-disturbance and attornment agreement.

6.06    **Holding Over**. If Tenant holds over without the consent of Landlord after the expiration or termination of this Lease, Tenant's occupancy shall be on a month-to-month basis, and Tenant shall pay as holdover rental for each month of the holdover tenancy an amount equal to the greater of (a) the fair market rental value of the Premises for such month or (b) the product of (i) the Holdover Percentage multiplied by (ii) the Fixed Rent and recurring Additional Rent, if any, which Tenant was obligated to pay for the month immediately preceding the end of the Term. **"Holdover Percentage"** means, with respect to any holdover by Tenant after the expiration or termination of this Lease, 200%; provided, that if Tenant gives to Landlord notice not less than 90 days before the scheduled expiration of this Lease of Tenant's intention to hold over beyond such expiration date for a period not exceeding 90 days, then for the first 90 days of such holdover tenancy, the Holdover Percentage shall be 100%. No holding over by Tenant after the Term shall operate to extend the Term. Notwithstanding the foregoing, the acceptance of any rent paid by Tenant pursuant to this <u>Section 6.06</u> shall not preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding.

6.07    **Attorneys' Fees**. If either party places the enforcement of this Lease or any part thereof, or the collection of any Rent or other payment due or to become due hereunder, or recovery of the possession of the Premises, in the hands of an attorney, or files suit upon the same, the prevailing party shall be reimbursed by the losing party, within 30 days after demand, for its reasonable attorneys' fees and disbursements and court costs.

6.08    **Indemnification**. (a) Subject to the provisions of <u>Section 7.03</u>, Tenant shall indemnify and hold harmless Landlord, all Superior Lessors and all Superior Mortgagees and each of their respective partners, directors, officers, shareholders, principals, agents and employees (each (including Landlord and such superior parties), a **"Landlord Indemnified Party"**), from and against any and all claims arising from or in connection with (i) the conduct or management of the Premises or of any business therein, or any work or thing done, or any condition created, in the Premises; provided, that Tenant's indemnity pursuant to this clause (i) shall not apply to the extent such claim results from the acts or (where a Landlord Indemnified Party has an affirmative obligation to act pursuant to the terms of this Lease) omissions of any Landlord Indemnified Party, or (ii) any negligence or willful misconduct of Tenant or any person claiming through or under Tenant or any of their respective partners, directors, officers, agents, employees, contractors or invitees (so long as such invitees are in the Premises) with respect to any accident, injury or damage occurring in, at or upon the Project; provided, that Tenant's indemnity pursuant to this clause (ii) shall not apply to the extent such claim results from the negligence or willful misconduct of any Landlord Indemnified Party, in each case together with all reasonable costs and expenses incurred in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and disbursements.

24

(b)     Subject to the provisions of Section 7.03, Landlord shall indemnify and hold harmless Tenant and Tenant's partners, directors, officers, shareholders, principals, agents and employees (each (including Tenant), a **"Tenant Indemnified Party"**), from and against any and all claims arising from or in connection with (i) the conduct or management of the Building, or any work or thing done, or any condition created, in the Building; provided, that Landlord's indemnity pursuant to this clause (i) shall not apply to the extent such claim results from the acts or (where a Tenant Indemnified Party has an affirmative obligation to act pursuant to the terms of this Lease) omissions of any Tenant Indemnified Party, or (ii) any negligence or willful misconduct of Landlord or any Landlord Indemnified Party with respect to any accident, injury or damage occurring in, at or upon the Project; provided, that Landlord's indemnity pursuant to this clause (ii) shall not apply to the extent such claim results from the negligence or willful misconduct of any Tenant Indemnified Party, in each case together with all reasonable costs, expenses and liabilities incurred in connection with each such claim or action or proceeding brought thereon, including, without limitation, all attorneys' fees and disbursements.

(c)     If any claim that is within the scope of the indemnities set forth in this Section 6.08 is asserted against any indemnified party, then the indemnified party shall give prompt written notice (each, an **"Indemnified Party Notice"**) thereof to the indemnifying party (i.e., within a time period so as not to prejudice the indemnifying party's or its insurer's ability to defend effectively any action or proceeding brought on such claim) and the indemnifying party shall have the right to defend and control the defense of any action or proceeding brought on such claim with counsel chosen by the indemnifying party subject to the approval of the indemnified party (such approval not to be unreasonably withheld) or by the indemnifying party's insurance company. If the indemnified party fails promptly to give such notice or if the indemnified party shall not afford the indemnifying party the right to defend and control the defense of any such action or proceeding then, in either of such events, the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts. If the indemnifying party shall defend any such action or proceeding, then the following shall apply:

(i)     the indemnified party shall cooperate with the indemnifying party (or its insurer) in the defense of any such action or proceeding in such manner as the indemnifying party (or its insurer) may from time to time reasonably request and the indemnifying party shall not be liable for the costs of any separate counsel employed by the indemnified party;

(ii)     the indemnifying party shall not be liable for any settlement made without the indemnifying party's consent;

(iii)     if such action or proceeding can be settled by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall have the right to settle such action or proceeding without the indemnified party's consent and the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts if the indemnified party refuses to agree to such a settlement; and

8336763v2

(iv)    if such action or proceeding cannot be settled merely by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall not settle such action or proceeding without the indemnified party's consent (which consent shall not be unreasonably withheld, conditioned or delayed) and if the indemnified party unreasonably withholds, conditions or delays its consent to any such settlement, then the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts.

If an indemnifying party shall, in good faith, believe that a claim set forth in an Indemnified Party Notice is or may not be within the scope of the indemnifying party's indemnity set forth in this Lease then, pending determination of that question, the indemnifying party shall not be deemed to be in default under this Lease by reason of its failure or refusal to indemnify and hold harmless any indemnified party therefrom or to pay such costs, expenses and liabilities; provided, that if it shall be finally determined by a court of competent jurisdiction or by arbitration in accordance with Section 8.09 that such claim was within the scope of such indemnifying party's indemnity set forth in this Lease then such indemnifying party shall be liable for any judgment or reasonable settlement or any reasonable legal fees incurred by the party entitled to indemnity hereunder.

(d)    The provisions of this Section 6.08 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 7

### Insurance; Casualty; Condemnation

7.01    **Compliance with Insurance Standards**. (a) Neither Tenant nor any person claiming through or under Tenant, nor any of their respective agents, employees, contractors or invitees (so long as such invitees are in the Premises) shall violate any reasonable condition imposed by any insurance policy then issued in respect of the Project or do or keep anything in the Premises which would subject Landlord, any Superior Lessor or any Superior Mortgagee to any liability or responsibility for personal injury or death or property damage, or which would increase any insurance rate in respect of the Project over the rate which would otherwise then be in effect or which would result in insurance companies of good standing refusing to insure the Project in amounts reasonably satisfactory to Landlord, or which would result in the cancellation of, or the assertion of any defense by the insurer in whole or in part to claims under, any policy of insurance in respect of the Project; but nothing in this Section 7.01(a) shall be construed to prohibit Tenant's use of the Premises for the uses permitted under Section 1.03 or to impose any liability on Tenant solely by reason of Tenant's use of the Premises for the purposes stated in Section 1.03.

(b)    If, as a direct result of any failure of Tenant to comply with this Lease, the premiums on Landlord's insurance on the Project shall be higher than they otherwise would be, Tenant shall reimburse Landlord, within 60 days after notice from Landlord, for that part of such premiums paid by reason of such failure on the part of Tenant; provided, that said demand shall be accompanied by a statement from the insurer which shall expressly identify the specific act or activity of Tenant causing the increase in the insurance rate. Landlord shall reasonably cooperate with Tenant, at Tenant's expense, in order to eliminate any such increased premiums.

26

(c)     Landlord, at Landlord's expense, shall maintain at all times during the Term, with a reputable insurance company authorized to write insurance in the State of Connecticut and rated by Best's Key Rating Guide or any successor publication of comparable standing as A- or better or the then equivalent of such rating, the following insurance: (i) commercial general liability insurance against all claims, demands or actions for injury to or death of person or property having a limit of not less than $10,000,000 per occurrence and/or in the aggregate, including contractual liability and independent contractors' coverage, arising from or related to, the conduct of Landlord, the operation of the Project and/or caused by the acts or omissions of Landlord, the managing agent for the Building and their respective employees; (ii) if there is a boiler or other similar refrigeration equipment or pressure object or other similar equipment in the Building, steam boiler, air conditioning and machinery insurance written on broad form basis with a limit of not less than the full replacement value of such equipment; (iii) "all-risk" insurance, to the extent of 100% of the replacement cost of the Building (including, without limitation, the Landlord Obligation Areas) and of all Fixtures, (iv)worker's compensation, disability and such other similar insurance covering all persons employed in connection with Landlord's maintenance, repair and management of the Project and with respect to whom death or bodily injury claims could be asserted against Landlord, Tenant, the Premises or the Building, and (v) such types and amounts of other insurance as shall be consistent with that maintained by owners of first-class office buildings located within the vicinity of the Building.

(d)     Within 30 days after Landlord's receipt of notice from Tenant requesting same, Landlord shall give Tenant reasonable evidence that the insurance required to be carried by Landlord under Section 7.01(c) is in full force and effect.

7.02    **Tenant's Insurance**.  Tenant shall maintain at all times during the Term (a) "all risk" property insurance covering all of Tenant's Property to a limit of not less than the full replacement cost thereof, (b) commercial general liability insurance, including contractual liability and personal injury liability coverage, in respect of the Premises and the conduct or operation of business therein, with Landlord and its managing agent, if any, and each Superior Lessor and Superior Mortgagee whose name and address shall have been furnished to Tenant as additional insureds, with limits of not less than $7,000,000 combined single limit for bodily injury and property damage liability in any one occurrence, and (c) when Alterations are in process, the insurance specified in Section 4.01(c) hereof. Such insurance may be carried under blanket and/or umbrella policies covering the Premises and other properties owned or leased by Tenant. The limits of the insurance required under this Section 7.02 shall not limit the liability of Tenant. Upon request of Landlord, Tenant shall deliver to Landlord and any additional insureds certificates of insurance evidencing the insurance required to be maintained by Tenant under this Section 7.02 issued by the insurance company or its authorized agent. Tenant shall procure renewals of such insurance from time to time before the expiration thereof, and, if requested by Landlord, Tenant shall deliver to Landlord and any additional insureds such renewal certificate within thirty (30) days after the policy renews. All such policies shall be issued by a reputable insurance company and all such policies shall contain (if commercially available) a provision whereby the same cannot be canceled unless Landlord and any additional insureds are given at least 30 days' prior written notice of such cancellation. Landlord and Tenant shall cooperate with each other in connection with the collection of any insurance monies that may be due in the event of loss and Landlord and Tenant shall execute and deliver to each other such proofs of loss and other instruments which may be required to recover any such insurance monies. Landlord may from time to time (but not

8336763v2

more frequently than once every 3 years) require that the amount of the insurance to be maintained by Tenant under this Section 7.02 be increased, so that the amount thereof is equal to the amount of insurance which landlords of office buildings located in the vicinity of the Building comparable to the Building are then requiring tenants to carry to the extent that the increase is commercially available to Tenant. At any time, Tenant may satisfy these insurance requirements via a captive insurance company that is capitalized at one hundred percent (100%) of the insurance limit. Tenant will provide Landlord with evidence of such capitalization promptly upon request. If at any time Tenant shall insure through a captive insurance company for less than the limits required to be insured against by Tenant under this Lease, then Tenant shall carry umbrella coverage in excess of such captive insurance coverage, up to the limits required to be insured against by Tenant under this Lease. Tenant shall have no claim against Landlord for any damage, loss or injury which would have been covered by an insurance policy required under this Lease even if Tenant is insuring through a captive insurance company for all or a portion of such insurance coverage, giving full effect to the waiver of subrogation provisions of Section 7.03.

7.03    **Subrogation Waiver**. Landlord and Tenant shall each include in each of its respective insurance policies insuring the Building, any portion thereof or any property therein against loss, damage or destruction by fire or other casualty, a waiver of the insurer's right of subrogation against the other party during the Term or, if such waiver should be unobtainable or unenforceable, (a) an express agreement that such policy shall not be invalidated if the assured waives the right of recovery against any party responsible for a casualty covered by the policy before the casualty or (b) any other form of permission for the release of the other party. Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the Term to the extent to which it is, or is required to be, insured under a policy or policies containing a waiver of subrogation or permission to release liability. Nothing contained in this Section 7.03 shall be deemed to relieve either party of any duty imposed elsewhere in this Lease to repair, restore or rebuild or to nullify any abatement of rents provided for elsewhere in this Lease.

7.04    **Condemnation**. (a) If there shall be a total taking of the Building in condemnation proceedings or by any right of eminent domain, this Lease and the term and estate hereby granted shall terminate as of the date of taking of possession by the condemning authority and all Rent shall be prorated and paid as of such termination date. If there shall be a taking of the Land or the Building (whether or not the Premises are affected by such taking) of such scope such that the untaken part thereof would be in Landlord's reasonable judgment uneconomic or undesirable to operate, then Landlord may terminate this Lease and the term and estate granted hereby by giving notice to Tenant within 60 days after the date of taking of possession by the condemning authority; provided, that if no part of the Premises is subject to such taking, Landlord shall have no right to terminate this Lease without the consent of Tenant. If there shall be a taking of the Premises of such scope that the untaken part of the Premises would in Tenant's reasonable judgment be uneconomic or undesirable to operate, then Tenant may terminate this Lease and the term and estate granted hereby by giving notice to Landlord within 60 days after the date of taking of possession by the condemning authority. If either Landlord or Tenant shall give a termination notice as aforesaid, then this Lease and the term and estate granted hereby shall terminate as of the date of such notice and all Rent shall be prorated and paid as of such termination date. In the event of a taking of the Premises which does not result in the termination of this Lease, the term and

8336763v2

estate hereby granted with respect to the taken part of the Premises shall terminate as of the date of taking of possession by the condemning authority and all Rent applicable to the taken part of the Premises shall be appropriately abated for the period from such date to the Expiration Date.

(b)    In the event of any taking of all or a part of the Building, Landlord shall be entitled to make a claim for and receive the entire award in the condemnation proceeding made for the value of the estate vested by this Lease in Tenant or any value attributable to the unexpired portion of the Term and for the costs to perform the repairs to the Building and the Premises which Landlord is required to perform pursuant to Section 7.04(d); provided, that nothing shall preclude Tenant from intervening in any such condemnation proceeding to claim or receive from the condemning authority, any compensation to which Tenant may otherwise lawfully be entitled in such case in respect of Tenant's Property, the unamortized cost of all Alterations made by Tenant to the Premises, higher rent costs or moving expenses, so long as no such claim by Tenant shall include any value of the estate vested by this Lease in Tenant or of the unexpired portion of the Term, and such claim does not reduce the amount available to Landlord or delay the payment thereof.

(c)    If all or any part of the Premises shall be taken for a limited period, Tenant shall be entitled, except as hereinafter set forth, to that portion of the award for such taking which represents compensation for the use and occupancy of the Premises, for the taking of Tenant's Property and for moving expenses, and Landlord shall be entitled to that portion which represents reimbursement for the cost of restoration of the Premises (including Tenant's Alterations). Notwithstanding anything to the contrary contained in this Section 7.04(c), if any such temporary taking shall continue for a period in excess of 6 months, the same shall be deemed a permanent taking, and the provisions of Sections 7.04(a) and (b) shall apply thereto. This Lease shall remain unaffected by such taking (unless such taking exceeds 6 months and one of the parties terminates this Lease under the preceding sentence), and Tenant shall continue responsible for all of its obligations under this Lease to the extent such obligations are not affected by such taking and shall continue to pay in full all Rent when due. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award which represents compensation for the use and occupancy of the Premises shall be apportioned between Landlord and Tenant as of the Expiration Date. Any award for temporary use and occupancy for a period beyond the date to which the Rent has been paid shall be paid to, held and applied by Tenant as a trust fund for payment of the Rent thereafter becoming due.

(d)    In the event of any taking which does not result in termination of this Lease, Landlord, whether or not any award shall be sufficient therefor, shall proceed with reasonable diligence to repair the remaining parts of the Building and the Premises (including all Fixtures, but excluding Tenant's Property) to substantially their former condition to the extent that the same may be feasible (subject to reasonable changes which Landlord deems desirable consistent with first-class office buildings located in the vicinity of the Building) and so as to constitute a complete and rentable Building and Premises.

7.05    **Casualty**. (a) If the Building or the Premises shall be partially or totally damaged or destroyed by fire or other casualty (each, a "**Casualty**") and if this Lease is not terminated as provided below, then (i) Landlord shall repair and restore the Building and the Premises (including, without limitation, the Fixtures, but excluding Tenant's Property) with due diligence (provided,

29

8336763v2

that Landlord shall not be required to perform the same on an overtime or premium pay basis except to the extent the insurance carrier agrees to pay for such overtime without reducing the total insurance proceeds available to be paid to Landlord) after Landlord has actual knowledge of such Casualty and (ii) Tenant shall repair and restore, in accordance with <u>Section 4.01</u>, all of Tenant's Property with reasonable dispatch after the Casualty.

(b)    If, by reason of a Casualty, all or part of the Premises shall be rendered untenantable, whether by reason of damage to the Premises or by reason of damage to other portions of the Building which results in a lack of reasonable access to, or a material interference with the ability to use, the Premises, the Fixed Rent shall be abated in the proportion that the untenantable area of the Premises bears to the total area of the Premises, for the period from the date of the Casualty to the earlier of (i) the date (the "**Substantial Completion Date**") that Landlord substantially completes the repair and restoration to the portions of the Building and the Premises (including, without limitation, Fixtures, but excluding Tenant's Property) necessary in order to render the Premises tenantable (the "**Required Restoration Work**") or (ii) the date Tenant or any subtenant reoccupies a portion of the Premises for the conduct of Tenant's normal business operations therein (in which case the Fixed Rent allocable to such reoccupied portion shall be payable by Tenant from the date of such occupancy). Landlord's determination of the Substantial Completion Date shall be controlling unless Tenant disputes same by notice to Landlord within 30 days after Landlord shall have given notice of such determination to Tenant. For purposes of this <u>Section 7.05(b)</u>, in the case of any Casualty which renders all or part of the Premises untenantable, the Required Restoration Work shall be deemed to be substantially completed on the date upon which such work is completed other than minor details or adjustments to such work, but only if such details or adjustments shall not interfere in any material respect with Tenant's ability to repair and restore Tenant's Property in the portion of the Premises rendered untenantable by such Casualty or thereafter use and occupy such portion of the Premises for the ordinary conduct of Tenant's intended use of such portion of the Premises.

(c)    If by reason of a Casualty (i) the Building shall be totally damaged or destroyed, or (ii) the Building shall be so damaged or destroyed (whether or not the Premises are damaged or destroyed) and in either such case such that Landlord shall determine not to restore the same, then in any such case Landlord may terminate this Lease upon not less than 90 days' notice given to Tenant within 180 days after the Casualty.

(d)    (i) Within 45 days after Landlord has actual knowledge of any Casualty, Landlord shall deliver to Tenant an estimate prepared by a reputable contractor selected by Landlord and reasonably acceptable to Tenant setting forth such contractor's estimate as to the time reasonably required to repair the damage in order to make the Premises no longer untenantable: provided, that if Landlord shall fail to deliver such estimate within said 45-day period, Tenant may designate a contractor (subject to Landlord's reasonable approval thereof); to prepare the same (the contractor designated by either Landlord or Tenant pursuant to this sentence is called the "**Contractor**" and the estimate prepared by the Contractor is called the "**Estimate**").

(ii)    If the period set forth in the applicable Estimate exceeds 180 days from the date of such Casualty, Landlord or Tenant may elect to terminate this Lease with respect to the Casualty Terminated Space by notice (a "**Termination Notice**") to the other given not later than 30 days following the receipt of such Estimate.

30

(iii)    If the time period set forth in the applicable Estimate does not exceed 180 days from the date of such Casualty and for any reason whatsoever Landlord shall not substantially complete the Required Restoration Work on or before the date (the "**First Outside Date**") which is 210 days after the date of such Casualty (provided, that the First Outside Date shall be extended by up to 60 days to the extent that Landlord is delayed by reason of Force Majeure), then Tenant shall have the right to terminate this Lease with respect to the Casualty Terminated Space by giving a Termination Notice to Landlord on or before the earlier to occur of (x) the date that Landlord substantially completes the Required Restoration Work or (y) the date that is 30 days after the First Outside Date.

(iv)    If the time period set forth in the applicable Estimate exceeds 180 days from the date of such Casualty and Landlord or Tenant have not elected to terminate this Lease under Section 7.05(d)(ii), and for any reason whatsoever Landlord shall not substantially complete the Required Restoration Work on or before the date (the "**Second Outside Date**") that is 30 days after the date set forth in the applicable Estimate as the date by which the repair and restoration should reasonably be completed (provided, that the Second Outside Date shall be extended by up to 60 days to the extent that Landlord is delayed by reason of Force Majeure), then Tenant shall have the right to terminate this Lease with respect to the Casualty Terminated Space by giving a Termination Notice to Landlord on or before the earlier to occur of (x) the date that Landlord substantially completes the Required Restoration Work or (y) the date that is 30 days after the Second Outside Date.

(v)    If Tenant timely gives a Termination Notice pursuant to this Section 7.05(d), this Lease shall terminate with respect to the Casualty Terminated Space on the date set forth in the Termination Notice (which shall be not less than 30 nor more than 180 days after the giving of the Termination Notice) and Tenant shall vacate the Casualty Terminated Space and surrender the same to Landlord in accordance with the terms of this Lease. Upon any such termination, Tenant's liability for Fixed Rent and Additional Rent, if any, hereunder with respect to the Casualty Terminated Space shall cease as of the date of such termination, and any prepaid portion of Rent with respect to the Casualty Terminated Space for any period after such date shall be refunded by Landlord to Tenant within 30 days after such termination date. Upon a termination of this Lease with respect to less than the entire Premises, there shall be a pro rata reduction of Tenant's Rent obligations to reflect such partial termination, and Landlord and Tenant shall promptly enter into an instrument evidencing such partial termination and the reduced rentable area of the Premises (such rentable area to be determined in a manner consistent with the methods used in calculating the rentable area of the Premises initially demised under this Lease); provided, that the failure to enter into such instrument shall not affect the effectiveness of such partial termination.

(vi)    Anything to the contrary contained in this Section 7.05(d) notwithstanding, if any Casualty occurs during the last 2 years of the Term, all references in this Section 7.05(d) to "**180 days**" and "**210 days**" shall be deemed to be replaced with the following number of days:

31

(A)    if such Casualty occurs during the 12 month period commencing on the date that is 2 years prior to the last day of the Term, "**120 days**" and "**150 days**", respectively; and

(B)    if such Casualty occurs during the last 12 months of the Term, "**60 days**" and "**75 days**", respectively.

(vii)    "**Casualty Terminated Space**" means, at Tenant's election as specified in the applicable Termination Notice, either (A) the entire Premises or (B) a portion of the Premises consisting of entire floors of the Building.

(viii)    Time is of the essence with respect to all of the time periods set forth in this Section 7.05(d).

(e)    Landlord shall not be obligated to repair or replace Tenant's Property, notwithstanding that Landlord may carry its own insurance covering the same. Tenant shall look solely to its insurance for recovery of any damage to or loss of Tenant's Property. Tenant shall not be obligated to repair or replace the Building or the Premises, notwithstanding that Tenant may carry its own insurance covering the same. Landlord shall look solely to its insurance for recovery of any damage to or loss of the Building or the Premises.

(f)    If in case of a Casualty, Landlord shall be delayed in completing the repair and restoration that Landlord is obligated to perform under this Section 7.05 by reason of Force Majeure, Landlord shall promptly notify Tenant of the occurrence of such Force Majeure and, to the extent possible, Landlord's good faith estimate of the duration of such Force Majeure delays and, if requested by Tenant from time to time, Landlord shall update Tenant as to the status of such Force Majeure delays.

(g)    In case of any Casualty which renders all or part of the Premises untenantable, prior to the substantial completion of the repair and restoration that Landlord is obligated to perform under this Section 7.05, Landlord shall provide Tenant and Tenant's contractors access to the Premises to repair and restore the Premises on the following terms and conditions. Tenant shall not commence work in any portion of the Premises until the date specified in a notice from Landlord to Tenant (which notice shall be given by Landlord to Tenant as soon as the giving of such notice shall be feasible) stating that the repairs required to be made by Landlord have been or will be completed to the extent reasonably necessary, in the reasonable opinion of Landlord, to permit the repair and restoration by Tenant of the portion of the Premises in question then prudent to be performed in accordance with good construction practice without interference with, and consistent with the performance of, the repairs and restoration, remaining to be performed by Landlord.

ARTICLE 8

**Miscellaneous Provisions**

8.01    **Notice**. All notices, demands, consents, approvals, advices, waivers or other communications (each, a "**Notice**") which may or are required to be given by either party to the

32

other under this Lease shall be in writing and, unless otherwise required by any Laws, shall be sent
(a) by hand or (b) by a nationally recognized overnight carrier, to the parties at the following
addresses or at such other addresses as the parties may designate by written notice from time to
time:

      (i)     addressed to Tenant at:

Purdue Pharma L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901
Attention: Jonathan Lowne

with a copy to:

Wiggin and Dana LLP
437 Madison Avenue, 35th Floor
New York, New York 10022
Attention: Andrew J. Pal, Esq.

      (ii)    addressed to Landlord at:

One Stamford Realty L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901
Attention: Diana Lenkowsky & Edward Mahony

with a copy to:

Shipman & Goodwin LLP
300 Atlantic Street
Stamford, Connecticut 06902
Attention: Kent S. Nevins

Notices by either party may be given by the attorney for such party. Each Notice shall be deemed
to have been given on the date such Notice is actually received as evidenced by a written receipt
therefor, and in the event of failure to deliver by reason of changed address of which no Notice
was given or refusal to accept delivery, as of the date of such failure.

     8.02    **Building Rules**. Tenant shall comply with the rules, regulations and policies of the
Building set forth in **Exhibit D**, as the same may be reasonably modified or supplemented by
Landlord from time to time upon not less than 30 days' notice to Tenant (sometimes referred to as
the "rules and regulations" and/or the "Building Rules"), provided, that in the case of any express
conflict between the provisions of this Lease and such policy, rule or regulation, the provisions of
this Lease shall control; and provided further, that if Tenant disputes the reasonableness of any

33

8336763v2

rule, policy or regulation, the dispute shall be determined by arbitration in accordance with <u>Section 8.09</u>, and Landlord shall not enforce such contested rules, policies or regulation pending resolution of such dispute, however to the extent determined in favor of Landlord in regard to a fee or payment to be charged, such determination shall be applied retroactively to the date the applicable policy, rule or regulation was adopted. Landlord shall enforce the policies, rules and regulations and the terms, covenants or conditions in any other lease against any other tenant if the failure to do so would adversely affect Tenant. In enforcing the policies, rules and regulations, Landlord shall not discriminate against Tenant and shall treat similarly situated tenants in a similar fashion.

8.03    <u>**Severability**</u>. If any term or provision of this Lease, or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected, and each provision of this Lease shall be valid and shall be enforceable to the extent permitted by Law.

8.04    <u>**Certain Definitions, Etc.**</u>. (a) "**Landlord**" means only the owner, at the time in question, of the Building or that portion of the Building of which the Premises are a part, or of a lease of the Building or that portion of the Building of which the Premises are a part, so that in the event of any transfer or transfers of title to the Building or of Landlord's interest in a lease of the Building or such portion of the Building, the transferor shall be and hereby is relieved and freed of all obligations of Landlord under this Lease accruing from and after the date of such transfer, and it shall be deemed, without further agreement, that such transferee has assumed all obligations of Landlord during the period it is the holder of Landlord's interest under this Lease.

(b)    Wherever in this Lease it is provided that a party shall not unreasonably withhold a consent or approval, such party shall also not unreasonably delay or condition such consent or approval.

8.05    <u>**Quiet Enjoyment**</u>. During the Term, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises, subject to the other terms of this Lease and to Superior Leases and Superior Mortgages.

8.06    <u>**Limitation of Landlord's Personal Liability**</u>. (a) Tenant shall look solely to Landlord's interest in the Project for the recovery of any judgment against Landlord, and no other property or assets of Landlord or Landlord's partners, officers, directors, shareholders or principals, direct or indirect, disclosed or undisclosed, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. For purposes of the preceding sentence, "**Landlord's interest in the Project**" shall be deemed to include (a) all rent or other consideration received by Landlord in respect of the Building, (b) proceeds of a sale (net of transaction costs), financing or refinancing (but only to the extent the proceeds of a financing or refinancing exceed (i) the amount of any indebtedness that was paid with the proceeds of such financing or refinancing plus (ii) all transaction costs associated with such financing or refinancing) of the Building or the Project (or any portion thereof), or of Landlord's (or such lessor's) estate or interest therein, or in any property, equipment or improvements in the Project (or any portion thereof), (c) any insurance proceeds or condemnation awards relating to any portion of the Project (to the extent in excess of any restoration costs and

34

8336763v2

net of all costs of obtaining such proceeds or awards), and (d) any security at any time posted by Landlord with Tenant to secure Landlord's obligations under this Lease.

(b)    Wherever in this Lease Landlord's consent or approval is required, if Landlord refuses to grant such consent or approval, whether or not Landlord expressly agreed that such consent or approval would not be unreasonably withheld, and provided Landlord did not act in bad faith in withholding such consent, Tenant shall not make, and Tenant hereby waives, any claim for money damages (including any claim by way of set-off, counterclaim or defense) based upon Tenant's claim or assertion that Landlord unreasonably withheld or delayed its consent or approval. Tenant's sole remedy (absent bad faith on the part of Landlord) shall be an action or proceeding to enforce such provision by specific performance, injunction or declaratory judgment or arbitration in accordance with Section 8.09 hereof.

8.07    **Counterclaims**. If Landlord commences any summary proceeding or action for nonpayment of Rent or to recover possession of the Premises, Tenant shall not interpose any counterclaim of any nature or description in any such proceeding or action, unless Tenant's failure to interpose such counterclaim in such proceeding or action would result in the waiver of Tenant's right to bring such claim in a separate proceeding under applicable law.

8.08    **Survival**. All obligations and liabilities of Landlord or Tenant to the other which accrued before the expiration or other termination of this Lease and all such obligations and liabilities which by their nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after such expiration or other termination, shall survive the expiration or other termination of this Lease. Without limiting the generality of the foregoing, the rights and obligations of the parties with respect to any indemnity under this Lease and any other amounts payable under this Lease, shall survive the expiration or other termination of this Lease.

8.09    **Arbitration**. (a) Either party shall have the right to submit a dispute relating to (i) the reasonableness of the grant or denial of a consent or other determination by the other party where, pursuant to the provisions of this Lease, such other party's consent was not to be unreasonably withheld or (ii) any other matter for which arbitration is expressly provided as a means of dispute resolution pursuant to the terms of this Lease, to binding arbitration under the Expedited Procedures provisions (Rules E-1 through E-10 in the edition in effect on the date of this Lease, as the same may be modified or supplemented from time to time) of the Commercial Arbitration Rules of the American Arbitration Association (together with its successors, the "**AAA**"). In cases where the parties utilize such arbitration: (i) the parties will have no right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Rule E-5, (ii) the first hearing shall be held within 7 Business Days after the appointment of the arbitrator, (iii) if the arbitrator shall find that a party acted unreasonably in withholding or delaying a consent or approval, such consent or approval shall be deemed granted, and (iv) the losing party in such arbitration shall pay the arbitration costs charged by AAA and/or the arbitrator. The decision of the arbitrators shall be conclusively binding on the parties, and judgment upon the decision may be entered in any court having jurisdiction.

(b)    Landlord and Tenant agree to sign all documents and to do all other things necessary to submit any such matter to arbitration and further agree to, and hereby do, waive any and all rights they or either of them may at any time have to revoke their agreement hereunder to

35

submit to arbitration and to abide by the decision rendered thereunder. For such period, if any, as this agreement to arbitrate is not legally binding or the arbitrator's award is not legally enforceable, the provisions requiring arbitration shall be deemed deleted and matters to be determined by arbitration shall be subject to litigation.

8.10    **No Offer**. The submission by Landlord of this Lease in draft form shall be solely for Tenant's consideration and not for acceptance and execution. Such submission shall have no binding force or effect and shall confer no rights nor impose any obligations, including brokerage obligations, on either party unless and until both Landlord and Tenant shall have executed a lease and duplicate originals thereof shall have been delivered to the respective parties.

8.11    **Captions; Construction**. The table of contents, captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation. This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.

8.12    **Amendments**. This Lease may not be altered, changed or amended, except by an instrument in writing signed by the party to be charged.

8.13    **Merger**. Tenant acknowledges that neither Landlord nor its agents have made or are making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease. This Lease embodies the entire understanding between the parties with respect to the subject matter hereof, and all prior agreements, understanding and statements, oral or written, with respect thereto are merged in this Lease.

8.14    **Successors**. This Lease shall be binding upon and inure to the benefit of Landlord, its successors and assigns, and shall be binding upon and inure to the benefit of Tenant, its successors and assigns.

8.15    **Applicable Law**. This Lease shall be governed by, and construed in accordance with, the laws of the State of Connecticut, without giving effect to any principles of conflicts of laws.

8.16    **Signage**. Subject to Landlord's prior reasonable approval, Tenant, at its cost, shall have the right to (i) include its name in the directory located in the lobby of the Building, and (ii) have identification signage on floors 9 and 10 to be located in the elevator lobbies of such floors.

8.17    **Force Majeure**. If, by reason of strike, lockouts or other labor or industrial troubles, governmental pre-emption in connection with a national emergency, any rule, order or regulation of any governmental agency applicable to the Building or to the party obligated to perform, conditions of supply or demand that are affected by war or other national, state or municipal emergency, fire or other casualty, acts of God such as (by way of example only) tornado, earthquake, hurricane, washout or storm, civil disturbance, act of the public enemy, riot, sabotage, blockade, embargo, explosion or any other cause beyond a party's reasonable control, whether or not similar to any of the causes hereinabove stated (collectively, "**Force Majeure**"), such party shall be unable to perform any obligation that such party is obligated to perform, then such party's obligation to perform shall be excused for the duration of such Force Majeure, and, except as

36

otherwise set forth in this Lease, this Lease and the other party's rights and obligations hereunder shall not be affected, impaired or excused. Notwithstanding anything to the contrary contained in this Section 8.17, any party's failure timely to fulfill an obligation required to be fulfilled by such party under this Lease shall not be excused or deemed to be an event of Force Majeure if (a) said obligation is an obligation to pay money, (b) said failure shall be attributable to such party's lack of funds, (c) said obligation relates to Tenant's obligation to vacate the Premises or any applicable portion thereof at the end of the term of this Lease applicable thereto (in which case Section 4.04 shall apply thereto), (d) said failure is due to the holding over of any tenant or other occupant of the Premises, or (e) the provisions of this Lease expressly limit the amount of time by which such obligation shall be excused by reason of Force Majeure.

8.18    **Notice of Lease**. Upon the request of Tenant, Landlord shall, contemporaneously with the execution of this Lease, execute, acknowledge and deliver to Tenant a notice of lease substantially in the form attached hereto as **Exhibit L**, together with such other instruments as may be reasonably necessary to record such notice. Recording, filing and like charges imposed by any governmental agency to effect such recording shall be paid by Tenant. Upon the expiration or termination of this Lease, Tenant, at Landlord's request, shall execute, acknowledge and deliver to Landlord all necessary instrument(s) in recordable form evidencing a termination of this Lease and sufficient to discharge any notice hereof of record, and Tenant shall pay for all recording, filing and like charges imposed by any governmental agency to effect such recording.

8.19    **Tenant's Right to Interest on Late Payments**. Any amounts payable by Landlord to Tenant under this Lease shall be due and payable on the 20th day after the date of invoice, unless a different due date is specified in this Lease. If Landlord fails to pay any amount which is due and payable to Tenant under this Lease on or before the due date therefor, Landlord shall pay interest thereon at the Interest Rate from the date when such amount became due and payable to the date of Landlord's payment of such amount.

8.20    **Broker.**  Landlord and Tenant represent and warrant to each other that they have not had any dealings with any broker, agent or finder in connection with this Lease.  Landlord and Tenant shall each indemnify and hold the other harmless from all costs, liabilities and expenses (including without limitation, reasonable attorneys' fees and disbursements) arising from any claim for brokerage commission in connection with this Lease resulting from their breach of the foregoing representation and warranty.

ARTICLE 9

**Landlord Special Rights**

9.01    (a)    It is recognized that Tenant currently has occupancy and/or lease rights to Floors 7 and 8 and other portions of the of the Building, pursuant to such leases, subleases and/or occupancy agreements for such space (the "**Current Sublease Rights/Obligations**"). Without limiting, modifying or altering any Current Sublease Rights/Obligations of Tenant (including the obligation of Tenant to pay rent and other amounts in connection with such Current Sublease Rights/Obligations), Landlord upon reasonable prior notice to Tenant shall have the right to enter upon such Floors 7 and/or 8 at reasonable times to show same for lease for a term commencing on and after the date that Tenant's Current Sublease Rights/Obligations expire (i.e. which is intended

37

to be on and after January 1, 2021). Further, without limiting modifying or altering any Current Sublease Rights/Obligations of Tenant (including the obligation of Tenant to pay rent and other amounts in connection with such Current Sublease Rights/Obligations), and provided that (i) the applicable entire floor has been vacated by Tenant and other occupants and (ii) Landlord has provided Tenant with a certificate of insurance evidencing the insurance required to be maintained by Landlord under Section 7.01(c) of this Lease with respect to Landlord's activities on such applicable floor(s), Landlord upon reasonable prior notice to Tenant may demolish and remove all improvements on such applicable floor(s), and clear any debris.  Landlord shall indemnify and hold harmless each Tenant Indemnified Party from and against any and all claims arising from or in connection with Landlord's activities on the applicable floors conducted pursuant to this Section 9.01(a), together with all reasonable costs, expenses and liabilities incurred in connection with each such claim or action or proceeding brought thereon, including, without limitation, all attorneys' fees and disbursements; provided, that Landlord's indemnity pursuant to this clause shall not apply (A) with respect to any consequential, special or punitive damages; or (B) to the extent such claim results from the acts or (where a Tenant Indemnified Party has an affirmative obligation to act pursuant to the terms of this Lease) omissions of any Tenant Indemnified Party.

(b)     Without limiting, modifying or altering any obligations of Tenant herein (including the obligation to pay Rent), Landlord upon reasonable prior notice to Tenant shall have the right to enter upon the Premises at reasonable times to show same for lease for a term commencing on and after the end of the Term.

(c)     Tenant has entered into certain subsubleases (the "**PPLP Subleases**") with third parties (the "**PPLP Subtenants**").  Tenant hereby grants permission to Landlord to directly negotiate with the PPLP Subtenants to modify the PPLP Subleases, including, without limitation, in order to terminate any such PPLP Subleases and/or Landlord's entering into new direct leases with any such PPLP Subtenants (and Tenant hereby agrees to reasonably cooperate with Landlord in connection therewith, including, without limitation, executing any termination agreements or modifications thereof); provided, however, that (i) any such modification(s) do not decrease in any material manner any of Tenant's rights under the PPLP Subleases (other than in connection with a termination thereof) or increase any of Tenant's obligations under the PPLP Subleases beyond a *de minimis* extent, and (ii) Landlord shall reimburse Tenant lost sublet income relating to any such PPLP Subleases from the date of the modification through December 31, 2020, and for out of pocket costs and expenses in connection with such modifications to the PPLP Subleases (except that such reimbursement shall not be applicable to any legal or professional fees).  In no event shall any such modification to a PPLP Sublease limit, modify or alter any Current Sublease Rights/Obligations of Tenant (including the obligation or Tenant to pay rent and other amounts in connection with such Current Sublease Rights/Obligations).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.]

8336763v2

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first written above.

**LANDLORD:**

**ONE STAMFORD REALTY L.P.**

By: One Stamford Land Inc.,
     its General Partner

     By:_____
        Name: Edward Mahony
        Title:   Vice President

**TENANT:**

**PURDUE PHARMA L.P.**

By:_____
   Name: Jonathan Lowne
   Title:   Senior Vice President, Chief Financial
   Officer

1

Exhibit A

## LEGAL DESCRIPTION OF LAND

TRACT A:

All that certain piece or parcel of land, situated in the City of Stamford, County of Fairfield and State of Connecticut, and being shown and designated as Disposition Parcel 33A on a certain map or plan entitled, "Disposition Map #33A" dated March 10, 1971, prepared by Parsons, Bromfield and Redniss, Registered Surveyors and certified substantially correct, which map or plan is on file in the Office of the Town Clerk of the City of Stamford as Map No. 9079, reference thereto being hereby had, and being more particularly bounded and described as follows:

Beginning at a point in the north line of Beckley Avenue, which the same is intersected by the division line between the premises herein described and land now or formerly of Guta Fischel and Bella Webski, which point is designated on said map as "Point of Beginning"; thence running North 3° 20' 49" East 70.00 feet to a point; thence running North 86° 39' 11" West 0.75 feet to a point; thence running North 3° 20' 49" East 388.092 feet to the south line of Willow Street; thence running along said south line of Willow Street in an east direction along the arc of a curve to the left having a radius of 1516.00 feet 41.203 feet to a point; thence running still along said south line of Willow Street in an east direction on the arc of a curve to the left having a radius of 240.00 feet 73.959 feet to a point; thence running still along said south line of Willow Street in an east direction on the arc of a curve to the right having a radius of 220.00 feet 49.930 feet; thence running still along said south line of Willow Street in an east direction along the arc of a curve to the left having a radius of 1500.00 feet 334.369 feet to the west line of Pacific Street; thence running along the west line of Pacific Street South 7° 26' 50" West 412.628 feet to the north line of North State Street; thence running along said north line of North State Street South 60° 45' 25" West 368.962 feet to a point; thence along in a west direction along the north line of North State Street and along the north line of Beckley Avenue, in part by each, on the arc of a curve to the right having a radius of 223.792 feet 126.540 feet to the point or place of beginning.

TRACT B:

All that certain piece or parcel of land, situated in the City of Stamford, County of Fairfield and State of Connecticut, shown and designated on a certain map or plan entitled, "Property to be transferred from Urban Redevelopment Commission, City of Stamford, Conn. to abutting property owner, Willow Street Associates, Disposition Parcel No. 33 (B)" certified substantially correct, William D. Sabia, P.E., Stamford, Conn, May 3, 1973, which map or plan is on file in the Office of the Town Clerk of the City of Stamford as Map No. 9357, reference

1

thereto being hereby had, and being more particularly bounded and
described as follows:

Beginning at a point on the north side of North State Street
where said street is intersected by the division line between the
west line of the premises herein described and the east line of
other lands now or formerly of Willow Street Associates shown as
Disposition Parcel No. 33 (A) on Map No. 9079, which map is on
file in the Office of the Stamford Town Clerk; thence running
North 07° 26' 50" East along said Parcel 33 (A), 412.628 feet to
the south line of Willow Street; thence running east along the
said south line of Willow Street on the arc of a curve to the
left having a radius of 1500.00 feet 18.69 feet to a point;
thence running South 26° 39' 11" East 66.083 feet to a point;
thence running South 07° 51' 40" West 145.389 feet to a point;
thence running South 82° 08' 20" East 67.730 feet; thence running
South 02° 15' 50" West 142.227 feet to the north side of North
State Street; thence running along said north side of North State
Street the following three (3) courses and distances:  (1) South
68° 07' 18" West 81.411 feet to a point; (2) West along the arc
of a curve to the left having a radius of 432.50 feet 55.593 feet
to a point; and (3) South 60° 45' 25" West 18.029 feet to the
point or place of beginning.

## TRACT C:

All that certain piece or parcel of land, situated in the
City of Stamford, County of Fairfield and State of Connecticut,
and being shown and designated as Disposition Parcel 33C on a
certain map or plan entitled, "Property to be conveyed by the
Urban Redevelopment Commission, City of Stamford, Conn. to Willow
Street Associates and 3d Stamford New Urban Corp.", which map or
plan is on file in the Office of the Town Clerk of the City of
Stamford as Map No. 9655, reference thereto being hereby had,
and being more particularly bounded and described as follows:

Beginning at a point on the north side of North State Street
where said street is intersected by the division line between
the west line of the premises herein described and the east line
of Parcel 33-B as shown on Map No. 9357, which map is on file in
the Office of the Stamford Town Clerk; thence running along said
division line between the herein described premises and Parcel
33-B the following three (3) courses and distances:  (1) North
02° 15' 50" East 142.23 feet to a point; (2) North 82° 08' 20"
West 67.73 feet to a point; and (3) North 07° 51' 40" East 145.39
feet to the west line of Parcel 33-D as shown on Map No. 9655,
which map is on file in the Office of the Stamford Town Clerk;
thence running South 26° 39' 11" East 232.314 feet to a point and
South 03° 54' 11" East 61.106 feet to the north line of North
State Street; thence running along the north line of North State

2

Street South 68° 07' 35" West 24.142 feet to a point and South
68° 07' 18" West 47.822 feet to the point or place of beginning.

**TRACT D**

ALL THAT real property situated in the City of Stamford, County of Fairfield and
State of Connecticut, known and designated as Disposition Parcel 33D on a certain map entitled,
"Property To Be Conveyed By The Urban Redevelopment Commission, City of Stamford,
Connecticut to Willow Street Associates And 3d Stamford New Urban Corp." and on file in the
Stamford Land Records, as Map No. 9655. Said piece or parcel of land is bounded and described
as follows:

BEGINNING at a point on the Northerly side of North State Street where said
street is intersected by the division line between Lots 33-C and 33-D on Map No. 9655 of the
Stamford Land Records.

Running thence North 03°54'11" West along said division line 61.106 feet; thence
North 26°39'11" West still along said division line and along the division line between said parcel
33-D and parcel 33-B as shown on Map No. 9357 of the Stamford Land Records, 298.394 feet to
the Southerly line of Tresser Boulevard, thence Easterly along the Southerly line of Tresser
Boulevard the following two (2) courses and distances:

(1) Northeasterly along the arc of a curve bearing to the left having a radius of 1500.00 feet a
distance of 27.288 feet to a point of reverse curve;

(2) Northeasterly along the arc of a curve bearing to the right having a radius of 290.00 feet a
distance of 68.027 feet to the extreme Westerly end of a curve connecting the Southerly
side of Tresser Boulevard with the Westerly side of Canal Street;

thence Southeasterly along the arc of said curve having a radius of 30.00 feet a distance of 43.671
feet to the Westerly side of Canal Street, thence Southerly along the Westerly side of Canal Street
and along the arc of a curve bearing to the right having a radius of 140 feet a distance of 42.659
feet; thence South 03°54'11" East still along the Westerly side of Canal Street 285.940 feet to a
point;

thence Southwesterly along the arc of a curve bearing to the right having a radius of 20.00 feet a
distance of 25.142 feet to a point in the Northerly side of North State Street; thence South
68°07'35" West along the Northerly side of North State Street 1.231 feet to the point or place of
beginning

3

## Exhibit B

## FLOOR PLAN



1

## Exhibit C

### RENTABLE SQUARE FOOTAGE

| Floor | Rentable Area |
|-------|---------------|
| P-3 | 16,650 |
| 9 | 52,600 |
| 10 | 51,133 |

8300400v2

## Exhibit D

## RULES AND REGULATIONS



BUILDING DIRECTORY AND REGULATIONS

**Alcoholic Beverages:**

The consumption of alcoholic beverages on premises is prohibited other than as part of an authorized special event. Building Management must be advised in advance of company sponsored special events where alcohol will be served.

**Animals:**

Other than authorized Service Animals, Working Animals, and Emotional Support Animals, animals are not permitted on One Stamford Forum premises, including the building, grounds and parking garage. Service Animals, Working Animals and Emotional Support Animals must be registered with Building Security on Level P-1 upon entering the building. The Americans with Disabilities Act (ADA) defines Service Animals as any animal individually trained to do work or perform tasks for the benefit of an individual with a disability. Working animals include goose dogs, pest control animals, etc. Owners of Emotional Support Animals must present confirmation of animal training, proof of the animal's immunization records and a letter from a doctor or licensed mental health professional confirming their support of the request for the Emotional Support Animal.

All animals must be leashed or caged when outside of Tenant Space while on One Stamford Forum premises.

**Auditorium and Break-out Room:**

The Auditorium and Break-out Room, located on the Lobby Level, are available to all tenants on a first come, first served basis. Reservations are required.

203-588-7029

**Building Management:**

All routine requests should be directed to One Stamford Realty ("Building Management") at 203- 588-8700 or 203-588-7029 during the regular business day.

1

8300400v2

Emergency requests should be directed to Building Security at 203-588-8880 during non-business hours.

**Catering:**

Catering is provided through the 201 Tresser Boulevard dining services.

Catering Manager:  203-588-8740

**Conference/Dining Rooms:**

The following spaces are available to tenants on a first come, first served basis.  Reservations are required.

- Auditorium (Lobby Level)
- Auditorium Break-out Room (Lobby Level)
- Conference Room PL-B (Plaza Level)
- Conference Room PL-E (Plaza Level)
- Garden Room (Plaza Level)
- Outdoor Activity Space (Plaza Level)
- Stamford Room (Plaza Level)

Reservations:  203-588-7029

**Convenience Stop:**

The Convenience Stop, is open 24-hours on a self-serve basis.

**Deliveries:**

The loading dock is open from 8:30 am to 4:30 pm on regular business days.  For off-hour deliveries, contact Building Security at 588-8880. Truck clearance at the dock is 13'6". Please advise Mail Room or Building Security of all deliveries with as much advance notice as possible.

Regular Business Hours:  Mail Room at 203-588-7049

Off-hour Deliveries:        Building Security at 203-588-8880

**Dining Services:**

The Plaza Level cafeteria is open for breakfast from 7:30 am to 10:30 and lunch from 11:45 am to 2:00 pm on regular business days.  Please see "Catering" for additional services.

2

8300400v2

Dining Services Manager:  203-588-8737

**Emergencies:**

All emergencies must be reported to Building Security at 203-588-8888.

Building Security must be notified when an emergency vehicle has been called to the building.

**Fire and Emergency Evacuation:**

In the event of a building evacuation, all occupants must follow the emergency evacuation procedures, attached.

**Fitness Center:**

The Fitness Center is available 24-hours to building tenants.  The Center is located on the P-1 Level and is not staffed.

Enrollment information:  203-588-7424.

**Hours of Operation:**

The building is open 24 hours, 365 days a year.

**Housekeeping:**

Housekeeping Supervisor:    203-943-0917, 203-588-8780

**Lactation/Mothers Room:**

The lactation/mothers room is located adjacent to the P-1 Level Fitness Center and is available on a first come, first served basis.

Information:  203-588-7029

**Mail Room:**

The mail room is located on the P-3 Level.

203-588-7049

**Parking:**

Tenants may park only in the areas designated for their company or in undesignated spaces.

8300400v2

No vehicles may be left in the garage overnight without the approval of Building Security.

**Security:**

Building Security is staffed 24 hours, 365 days a year.

| | |
|---|---|
| Lobby Reception: | 203-588-8890 |
| Routine inquiries: | 203-588-8880 |
| Emergencies only: | 203-588-8888 |
| Badging: | 203-588-7384 |

**Smoking:**

There is no smoking, including the use of smoking substitutes such as e-cigarettes, in the building or on 201 Tresser Boulevard grounds, other than in the designated smoking areas. Tenant smoking area is located on Parking Level P-3. Level P-1 Smoking area, located outside the garage entrance closest to the auditorium, is designated for visitors.

Building Management reserves the right to close or relocate designated smoking areas.

**Visitors:**

Visitors use the main parking lot entrance on Tresser Boulevard.

Visitor parking is on Parking Level P-1.

All visitors must enter the lobby from Tresser Boulevard or through entrance located on Parking Level P-1.

All visitors are required to sign-in at the reception desk and will receive a picture ID badge, which is to be worn while on premises.

All visitors must be escorted by their host tenant while in the common areas of the building.

---

**Building Management reserves the right to modify the Building Directory and Regulations from time to time. If you have any questions regarding this document, please contact One Stamford Realty at 203-588- 8700.**

---

Attachment:  Emergency Evacuation Procedures

8300400v2



EMERGENCY EVACUATION PROCEDURES



**When the alarm/strobe lights are activated, EVACUATE IMMEDIATELY.**

**Leave the building by one of the designated evacuation routes described below.**

**Do not attempt to use the elevators.**

**Area of Refuge (AOR): Individuals requiring assistance should report to Stair Tower A on the north wall. Use the phone to dial Building Security at 8888 (instructions are posted). Fire Department personnel will provide assistance.**

Keep unnecessary conversation to a minimum and listen for instructions from emergency personnel.

Do not carry food, beverages or bulky items when evacuating.

Follow Evacuation Warden's instructions.

Report to the nearest staging area and remain there until you receive further instruction.

Do not block building entrances or exits.

Re-entry to the building is not permitted until the "all clear" is given by a Security Officer.

Proper identification must be shown for re-entry.

8300400v2

## ONE STAMFORD FORUM EVACUATION PLAN



TRESSER BLVD

**Staging areas are located at the four (4) corners of the property:**

Tresser toward Atlantic

Tresser toward Greyrock

North Street toward Atlantic

North State toward Greyrock

2

8300400v2

Fire Stairs Floors 2 - 10      Tresser Blvd.



North State Street

**One Stamford Forum Evacuation
Routes**

**FLOORS 2 – 10**

There are four main Fire Stairwells, A,
B, C and D, located on each floor.

Stairwell A is the AOR (Area of Refuge)
and should be used by all mobility-
impaired   individuals or persons needing
assistance.  Use the phone to dial
Building Security at 8888 (instructions
are posted).

Please wait in the AOR for assistance
from Fire Department personnel.

**FIRE STAIR A/ AREA OF REFUGE (AOR)**

- ➢ To PLAZA Level
- ➢ To Outside Plaza West (Café)
- ➢ To Outside Fire Stair 1 and exit onto Tresser Boulevard
- ➢ OR to Outside Fire Stair 2 and exit onto North State Street

**FIRE STAIR B**

- ➢ To P-3 and cross over to Stair C
- ➢ Exit into Parking Garage and follow arrows to North State Street

**FIRE STAIR C**

- ➢ To Level L (P-1)
- ➢ Exit into Parking Garage and follow arrows to North State Street

**FIRE STAIR D**

- ➢ To P-3 and cross over to Stair E
- ➢ To Level L (P-1)
- ➢ Exit onto Tresser Boulevard

3

8300400v2



Fire Stairs Plaza Level

## PLAZA LEVEL

- ➢ Stairwell E is located on the plaza level next to the convenience store and exits at the Lobby Level near the security console.
- ➢ Stairwells 1 & 2 are located outside on the Plaza Level. Stairwell 1 exits onto Tresser Boulevard and Stairwell 2 exits onto North State Street.

## FIRE STAIR E

- ➢ To Level L (P-1)
- ➢ Exit onto Tresser Boulevard
- ➢ FIRE STAIR C and D as above
- ➢ FIRE STAIRS 1 & 2 as above (Exterior)

## PARKING LEVELS

**P-3** - FIRE STAIR C or E as above

**P-2** - FIRE STAIR E or Exterior Stair 2 as above

**P-1 (East)/Lobby Level** - Use FIRE STAIR F and Exit onto Tresser Boulevard

**P-1 (West)/Lobby Level** - Exit through Lobby onto Tresser Boulevard

4

8300400v2

## Exhibit F

## HVAC SPECIFICATIONS

The Building HVAC system shall supply the Premises with a minimum of 0.3 C.F.M. of outside air per usable square foot.

Inside conditions throughout the Premises shall be maintained, at a minimum, at 72°F with 40% to 60% humidity when outside conditions are at 95°F dry bulb with 75°F wet bulb or when outside conditions are at 0°F dry bulb.

Toilet exhaust shall be provided at a minimum of 20 air changes per hour.

1

8300400v2

## Exhibit G

## FIXED RENT

The Fixed Rent for each floor of the Premises demised under this Lease shall be as follows:

With respect to floors 9 and 10 of the Building

| Year | Rentable Square Feet | Rate per Rentable Square Foot | Annual Fixed Rent | Monthly Fixed Rent |
|------|------|------|------|------|
| 2021 | 103,733 | $49.00 | $5,082,917.00 | $423,576.42 |
| 2022 | 103,733 | $50.00 | $5,186,650.00 | $432,220.83 |
| 2023 | 103,733 | $51.00 | $5,290,383.00 | $440,865.25 |

With respect to P-3 of the Building:

| Year | Rentable Square Feet | Rate per Rentable Square Foot | Annual Fixed Rent | Monthly Fixed Rent |
|------|------|------|------|------|
| 2021-2023 | 16,650 | $22.00 | $366,300.00 | $30,525.00 |

8300400v2

**Exhibit H**

**CLEANING SPECIFICATIONS**

1.  Corridors - carpet

| Task Description | Annual Frequency |
| --- | --- |
| Vacuum corridor carpets. | 260 |
| Dust corridor furniture, spot clean all horizontal and vertical surfaces Including interior and door glass. | 260 |
| Clean and polish drinking fountains. | 260 |
| Clean elevator walls, doors, carpets, ceiling and stainless steel. | 260 |
| Spot clean interior partition and door glass. | 260 |
| Vacuum under furniture, along edges and in corners with canister or backpack vacuum. | 52 |
| Dust areas above shoulder level and below knee level. | 52 |
| Vacuum elevator track. | 52 |
| Dust or vacuum air vents to remove loose dust, soil and cobwebs. | 4 |
| Vacuum fabric furniture. | 4 |
| Damp wipe light fixture exteriors to remove stains, dust and cobwebs. | 1 |
| Wash trash containers to remove soil and stains. | 1 |

2. Kitchen & Pantry

| Task Description | Annual Frequency |
| --- | --- |
| Empty kitchen trash, replace liners, and clean exterior of containers. | 260 |
| Damp clean kitchen including sinks, walls and floors. | 260 |
| Damp wipe interior and exterior of microwave oven to remove all food and stains. | 260 |
| Dust and damp wipe refrigerator exterior. | 260 |
| Remove food trays and return to cafeteria. | 260 |
| Wash trash containers to remove soil and stains. | 12 |
| Scrub hard surface floors. | 12 |
| Damp wipe air vents to remove dust, soil and cobwebs. | 4 |
| Damp wipe light fixture exteriors to remove stains, dust and cobwebs. | 3 |

3. Offices - General

| Task Description | Annual Frequency |
| --- | --- |
| Empty general and recyclable trash, replace liners when soiled or torn. Remove trash to designated area. | 260 |
| Spot clean interior partition and door glass. | 52 |
| Vacuum carpets to remove visible dirt, dust, and debris. | 52 |
| Dust furniture and spot clean all horizontal and vertical surfaces. | 52 |
| Dust areas above shoulder level and below knee level. | 52 |
| Spot clean telephones and sanitize receivers. | 52 |
| Vacuum fabric furniture. | 4 |
| Clean glass on all partitions. | 4 |
| Dust or vacuum air vents to remove loose dust, soil and cobwebs. | 4 |
| Dust window dressings and including horizontal and vertical blinds. | 2 |
| Dust light fixtures to remove exterior dust and cobwebs. | 1 |
| Wash trash containers to remove soil and stains. | 1 |

4. Restrooms

| Task Description | Annual Frequency |
| --- | --- |
| Perform all daily restroom cleaning procedures; apply germicidal cleaner to all fixtures, refill dispensers, empty trash and replace liners, spot clean mirrors and partitions, wipe fixtures clean. | 260 |
| Clean fixtures, and other hard surfaces. | 260 |
| Sweep and mop floors with germicidal cleaner. | 260 |
| With a germicidal cleaner, completely damp wipe restroom partitions including high/low areas. | 52 |
| Clean floor drain surfaces, remove debris and pour water to flush drain. | 52 |
| Dust or vacuum air vents to remove loose dust, soil and cobwebs. | 12 |
| Wash restroom walls with germicidal cleaner. | 12 |
| Machine scrub restroom floors with germicidal cleaner. | 12 |
| Dust and spot clean exterior of lockers, spray interiors with disinfectant. | 12 |
| Damp wipe light fixture exteriors to remove stains, dust and cobwebs. | 1 |
| Wash trash containers to remove soil and stains. | 1 |

5. Window Cleaning: Billed Per Occurrence

| Task Description | Annual Frequency |
| --- | --- |
| Clean exterior perimeter glass to include interior of these windows. | 1 |
| Clean interior and exterior of all transom glass | 1 |

6. Garages

| Task Description | Annual Frequency |
| --- | --- |
| Sweep parking garages using a ride-on sweeper | 52 |

Additional Billable Services available

| | Annual Frequency |
| --- | --- |
| Dedicated porter service | Daily |

Carpet shampooing                                              As requested

## Exhibit J

### SECURITY SPECIFICATIONS

One Stamford Realty will provide Building Security comparable to other multi-tenant Class A office properties in Stamford's Central Business District.

The Landlord ("Building Security") will provide the following security services to the Tenant (and Landlord shall be responsible for the maintenance and repair of any equipment used in connection therewith):

- 24-hour building access
- 24-hour on-site contract security staffing
- Building Access Control System
- Visitor Management System
- CCTV Surveillance cameras in common areas with 24-hour monitoring (which includes monitoring of access points through elevator banks and/or stairwells)

Tenant is responsible for the installation, maintenance and monitoring of all electronic equipment within Tenant's premises that is over and above the Landlord provided Building Security described above. Tenant may contract with Building Security under a separate agreement for these services.

Landlord will schedule emergency evacuation drills as required by local fire code and will provide Fire Marshal Training to Tenant's designated Marshals.

---

**Staffed Security Posts:**

M – F, excluding holidays

      Security Console: 24 hours

      Roving Security: 24 hours

      Tresser Blvd. Garage Entrance: 6 am – 10 pm

      Elevator Lobby/P-1 Level: 6 am – 6 pm

      Lobby Desk: 6 am – 6 pm

Holidays and Weekends

      Security Console: 24-hours

---

8300400v2

Roving Security:  6 am to 6 pm

At Tenant's own expense and with Landlord's knowledge and consent, Tenant may contract for additional common area contract security staffing through Building Security.

If Landlord reasonably determines that Tenant's presence in the building creates the requirement for additional security staffing or electronic surveillance equipment, Landlord has the right to add security staffing at its own discretion, so long as Tenant has been notified.

8300400v2

<u>Exhibit L</u>

**FORM OF NOTICE OF LEASE**

<u>NOTICE OF LEASE</u>

Notice is hereby given of the following Lease:

1.    Name and address of parties:

      Landlord:    One Stamford Realty L.P.

      Tenant:      Purdue Pharma L.P.

2.    Said Lease was entered into on the __ day of January, 2020.

3.    The term of said Lease is anticipated to commence on January 1, 2021 and to expire on December 31, 2023.

4.    The premises consists of a portion of P3 and the 9th and 10th floors of the Building.

5.    Said Lease is on file at the office of One Stamford Realty L.P., One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

    IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this _____ day of January, 2020.

ONE STAMFORD REALTY L.P.

By:    [_____],
        its General Partner

        By:_____
          Name:
          Title:

PURDUE PHARMA L.P.

By: _____
    Name:
    Title:

L-1

STATE OF _____ )
                        ) ss.:
COUNTY OF _____ )

On this _____ day of _____, 2020, before me, appeared _____, who acknowledged himself to be the _____ of _____, a _____, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the [corporation] by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal


_____
Notary Public

STATE OF _____ )
                        ) ss.:
COUNTY OF _____ )

On this _____ day of _____, 2020, before me, appeared _____, who acknowledged himself to be the _____ of _____, a _____, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the [corporation] by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal


_____
Notary Public

L-2

8326762v2

Exhibit A

**Description of Land**

8326762v2

Exhibit M

**FORM OF ESTOPPEL CERTIFICATE**

ESTOPPEL CERTIFICATE

[DATE]

Re:    Lease, dated as of January [ ], 2020, between
One Stamford Realty L.P. and Purdue Pharma L.P.

Ladies and Gentlemen:

The undersigned certifies to _____ as of the date hereof as follows:

      1.    It is the _____ under the lease (the "Lease"), dated as of January [__], 2020, between One Stamford Realty L.P. as landlord ("Landlord"), and Purdue Pharma L.P. as tenant ("Tenant") for premises demised thereunder (the "Premises") located at One Stamford Forum, Stamford, Connecticut (the "Building"). All capitalized terms not otherwise defined herein shall have the meaning provided in the Lease.

      2.    The Premises consist of floors _____ of the Building.

      3.    The Lease is in full force and effect. The Lease has not been amended, modified or supplemented *[, except for _____ ].*

      4.    The term of the Lease commenced on _____ *[modify as appropriate on a floor-by-floor basis]* and expires on _____.

      5.    The monthly Fixed Rent under the Lease is $_____ and has been paid through _____ . All Additional Rent under the Lease due and payable through the date hereof has been paid in full.

      6.    To the best knowledge of the undersigned, neither Tenant nor Landlord is in default of any of their respective obligations under the Lease.

      7.    Except for those rights expressly provided for in the Lease, there are no purchase options, rights of first refusal or rights of first offer with respect to the Premises or the Building.

      8.    All notices and communications under the Lease are to be sent to the undersigned at *[the addresses set forth in Section 8.01 of the Lease][specify other]*

      9.    *[such other matters reasonably requested]*

*[For certificates by Tenant:]* Nothing contained in this Certificate is intended to constitute a waiver of any right Tenant may have in accordance with the provisions of the Lease to challenge

M-1

whether any amount of Additional Rent heretofore paid by Tenant was properly payable under the Lease.

*[For certificates by Landlord:]* Nothing contained in this Certificate is intended to constitute a waiver of any right Landlord may have in accordance with the provisions of the Lease to correct or adjust any amount of Additional Rent heretofore paid by Tenant under the Lease.

This Certificate is intended solely as an estoppel certificate and [Tenant/Landlord] shall not have any liability to any party relying on this Certificate, the sole consequence of the delivery of this Certificate being that [Tenant/Landlord] shall be estopped from denying the accuracy of the statements certified to herein.

The undersigned individual hereby certifies that he or she is duly authorized to execute this Estoppel Certificate on behalf of _____.

Very truly yours,

_____

By:_____
    Name:
    Title:

M-2

Exhibit O

## FORM OF NON-DISTURBANCE AND ATTORNMENT AGREEMENT FOR SUPERIOR LEASES

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement"), dated as of _____, between _____, a _____, having an office at _____ ("Ground Landlord") and Purdue Pharma L.P. ("Tenant").

RECITALS:

WHEREAS, Ground Landlord is the sole owner in fee simple of (x) that certain piece, parcel or tract of land (the "Land") that is lying and being in the County of Fairfield, City of Stamford and State of Connecticut and that is more particularly described in Schedule A attached hereto and (y) the building (the "Building") that is located on the Land and that is commonly known as One Stamford Forum, Stamford, Connecticut (the "Property"); and

WHEREAS, Ground Landlord, as lessor, and One Stamford Realty L.P., a Delaware limited partnership ("Landlord"), as tenant, are parties to a lease dated _____ __, ____ (said lease, as the same may hereafter be amended and/or restated from time to time, is hereinafter referred to as the "Ground Lease"), pursuant to which Ground Landlord has leased to Landlord the Land and the Building; and

WHEREAS, Tenant has entered into a Lease dated as of January [ ], 2020 (the "Lease") with Landlord, for a portion or portions of the Building more fully described in the Lease; and

WHEREAS, Ground Landlord has agreed to recognize the status of Tenant in the event of a termination of the Ground Lease, and Tenant has agreed to attorn to Ground Landlord in any such event.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, promise, covenant and agree as follows:

1.      Tenant hereby acknowledges that the Lease is and shall remain subordinate to the Ground Lease.

2.      Ground Landlord agrees that, so long as Tenant is not then in default under any of the terms, covenants or conditions of the Lease or this Agreement, beyond any applicable notice and cure periods, (a) the Lease shall continue in full force and effect in the event that Successor Landlord (defined below) succeeds to the interests of Landlord under the Lease by reason of termination of the Ground Lease, upon and subject to all of the terms, covenants and conditions of the Lease, for the balance of the term of the Lease (subject to the provisions hereof), (b) Successor Landlord shall not terminate the Lease, or disturb, interfere with or otherwise affect, Tenant's leasehold estate, use, possession and right to quiet enjoyment of the Premises under the terms of

O-1

the Lease or any of Tenant's other rights under the Lease in the event the Ground Lease is terminated and (c) Tenant shall not be named or joined in any action or proceeding to terminate the Ground Lease. For purposes hereof, the term "Successor Landlord" shall be defined as Ground Landlord, anyone claiming by, through or under Ground Landlord and their respective successors and assigns.

3.    In the event that Successor Landlord succeeds to the interest of Landlord under the Lease and/or Landlord's leasehold interest in the Property by reason of termination of the Ground Lease, Successor Landlord and Tenant hereby agree to recognize one another as landlord and tenant, respectively, under the Lease and to be bound to one another under all of the terms, covenants and conditions of the Lease (subject to the provisions hereof), and Successor Landlord shall assume all of the obligations of Landlord under the Lease (subject to the provisions hereof). Accordingly, from and after Successor Landlord succeeds to the interest of Landlord, Successor Landlord and Tenant shall have the same remedies against each other for the breach of any agreement contained in the Lease as Tenant and Landlord had before Successor Landlord succeeded to the interest of Landlord; provided, however, that Successor Landlord shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord); it being understood that the foregoing is not intended to relieve Successor Landlord of any liability arising by reason of its acts or omissions from and after the date it succeeds to the interests of the Landlord, including a continuation of the failure of the prior Landlord to perform its obligations under the Lease, in which case Successor Landlord upon receipt of notice of such continuation from Tenant shall have a reasonable period of time to remedy same; or

(b)    subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord) relating to any event or occurrence before the date Successor Landlord succeeds to the interests of Landlord, other than offsets expressly provided for in the Lease; or

(c)    bound by any rent or additional rent that Tenant might have paid more than one month in advance of the due date therefor to any prior landlord (including Landlord), unless Successor Landlord approved such payment in writing; or

(d)    bound by any material amendment or modification of the Lease made after the date of this Agreement without Ground Landlord's prior written consent, to the extent such modification materially and adversely affects Successor Landlord's interests, releases Tenant from any obligations under the Lease or provides for the reduction of rent, a reduction of the Lease term or a reduction in the Premises; or

(e)    liable for return of any security deposit not delivered to Successor Landlord by Landlord or Tenant.

4.    Although the foregoing provisions of this Agreement shall be self-operative, Tenant agrees to execute and deliver to Ground Landlord or to any person to whom Tenant herein agrees to attorn, such other instrument or instruments as Ground Landlord or such other person shall from time to time reasonably request in order to confirm such provisions.

O-2

5.    Tenant hereby warrants and represents, covenants and agrees to and with Ground Landlord:

(a)    not to materially amend or modify the Lease to materially and adversely affect Successor Landlord's interests, release Tenant from any obligations thereunder or reduce the rent, the Lease term or the Premises, without prior written consent of Ground Landlord;

(b)    to deliver to Ground Landlord at the addresses provided for in this Agreement a duplicate of each notice of default delivered to Landlord at the same time as such notice is given to Landlord;

(c)    that as of the date of this Agreement Tenant is the sole owner of the leasehold estate created by the Lease and shall not hereafter transfer the Lease except as permitted by the terms thereof;

(d)    not to seek to terminate the Lease by reason of any default of Landlord without prior written notice thereof to Ground Landlord and the lapse thereafter of such time as under the Lease was offered to Landlord in which to remedy the default, and the lapse of an additional 30 days after the expiration of such time as Landlord was permitted to cure such default; provided, however, that with respect to any default of Landlord under the Lease which cannot be remedied within such time, if Ground Landlord commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Ground Landlord shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Ground Landlord or Landlord does not cure or commence curing such default within the time provided to Landlord under the Lease and the nature of the default materially threatens Tenant's ability to conduct its daily business for an extended period of time or threatens to materially or adversely damage Tenant's property located on the Premises, Tenant shall be permitted to exercise its rights under the Lease;

(e)    not to pay any rent or other sums due or to become due under the Lease more than 30 days in advance of the date on which the same are due or to become due under the Lease; and

(f)    to certify promptly in writing to Ground Landlord in connection with any proposed assignment of the Ground Lease, whether or not, to Tenant's knowledge, any default on the part of Landlord then exists under the Lease.

6.    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

7.    Tenant agrees that neither the officers, nor the directors, employees, agents or shareholders of Ground Landlord shall be personally liable hereunder.

8.    Ground Landlord's address for notices shall be:

_____

O-3

8326762v2

Tenant's address for notices shall be:

_____

9.       Except as expressly provided for in this Agreement, Ground Landlord shall have no obligations to Tenant with respect to the Lease.

10.       The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State of Connecticut, excluding its principles of conflict of laws.

11.       This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

12.       This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*[NO FURTHER TEXT ON THIS PAGE]*

8326762v2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers as of the date and year first above written.

GROUND LANDLORD

_____

By:_____
      Name:
      Title:


TENANT:

PURDUE PHARMA L.P.

By:_____
      Name:
      Title:

8326762v2

STATE OF _____ )
                         ) ss.:
COUNTY OF _____ )

On this ____ day of _____, before me, appeared _____,
who acknowledged himself to be the _____ of _____, a
_____, and that he as such _____, being authorized so to do, executed the
foregoing instrument for the purposes therein contained, by signing the name of the [corporation]
by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

STATE OF _____ )
                         ) ss.:
COUNTY OF _____ )

On this ____ day of _____, before me, appeared _____,
who acknowledged himself to be the _____ of _____, a
_____, and that he as such _____, being authorized so to do, executed the
foregoing instrument for the purposes therein contained, by signing the name of the [corporation]
by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public

8326762v2

<u>Schedule A</u>

**LEGAL DESCRIPTION**

O-7

Exhibit P

**FORM OF NON-DISTURBANCE AND ATTORNMENT AGREEMENT
FOR SUPERIOR MORTGAGES**

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS    SUBORDINATION,    NON-DISTURBANCE    AND    ATTORNMENT
AGREEMENT (this "Agreement"), dated as of _____, between _____, a
_____, having an office at _____ ("Lender") and Purdue Pharma L.P.
("Tenant").

RECITALS:

WHEREAS, Tenant has entered into a Lease dated as of January [__], 2020 (the "Lease")
with One Stamford Realty L.P., a Delaware limited partnership ("Landlord"), covering certain
premises more fully described in the Lease (the "Premises"), which Premises are a part of the real
property known as One Stamford Forum, Stamford, Connecticut (the "Property"), which Property
is more fully described in Schedule A attached hereto; and

WHEREAS, Lender is making a mortgage loan (the "Mortgage Loan") to Landlord as
borrower in the original principal amount of $_____, which Mortgage Loan is evidenced
by a Mortgage Note (the "Mortgage Note"), and is secured, inter alia, by a Mortgage (the
"Mortgage") and an Assignment of Leases and Rents (the "Assignment"); and

WHEREAS, Lender requires as a condition of the making of the Mortgage Loan that the
Mortgage shall unconditionally be and remain at all times a lien or charge upon the Property, prior
and superior to the Lease and the leasehold estate created thereby; and

WHEREAS, Tenant has agreed to the subordination of the Lease to the Mortgage on the
condition that it is assured of continued occupancy of the Premises under the terms of the Lease
and this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements
herein contained, the parties hereto, intending to be legally bound hereby, promise, covenant and
agree as follows:

1.    The Lease and all estates, rights, options, liens and charges therein contained or
created under the Lease are and shall be subject and subordinate to the lien, provisions and effect
of the Mortgage insofar as it affects the real and personal property described therein of which the
Premises form a part, and to all renewals, modifications, consolidations, replacements and
extensions thereof, and to all advances made or to be made thereunder, to the full extent of amounts
secured thereby and interest thereon.

P-1

2.     In the event Lender takes possession of the Property, as mortgagee-in-possession or otherwise, or forecloses the Mortgage or otherwise causes the Property to be sold pursuant to the Mortgage, Lender agrees that, so long as Tenant is not then in default under any of the terms, covenants or conditions of the Lease or this Agreement, beyond any applicable notice and cure periods, (a) the Lease shall continue in full force and effect as a direct Lease between the succeeding owner of the Property and Tenant, upon and subject to all of the terms, covenants and conditions of the Lease, for the balance of the term of the Lease (subject to the provisions hereof), (b) Lender shall not terminate the Lease, or disturb, interfere with or otherwise affect, Tenant's leasehold estate, use, possession and right to quiet enjoyment of the Premises under the terms of the Lease or any of Tenant's other rights under the Lease in the exercise of Lender's rights under the Mortgage and (c) Tenant shall not be named or joined in any foreclosure action or other proceeding to enforce the Mortgage, unless such joinder shall be required by law and shall not result in termination of the Lease.

3.     In the event that Lender succeeds to the interest of Landlord under the Lease and/or Landlord's leasehold interest in the Property, or if anyone else (other than the Landlord) acquires Landlord's leasehold interest in the Property or the right to possession of the Property upon the foreclosure of the Mortgage or by other sale pursuant to the Mortgage, or upon the sale of the Property by Lender or its successors or assigns after foreclosure or other sale pursuant to the Mortgage or acquisition of title in lieu thereof or otherwise, Lender or its successors or assigns or the then owner or holder of Landlord's leasehold interest in the Property after foreclosure or other sale pursuant to the Mortgage (hereinafter collectively referred to as "Successor Landlord") and Tenant hereby agree to recognize one another as landlord and tenant, respectively, under the Lease and to be bound to one another under all of the terms, covenants and conditions of the Lease (subject to the provisions hereof), and Successor Landlord shall assume all of the obligations of Landlord under the Lease (subject to the provisions hereof). Accordingly, from and after any such event described above in this paragraph, Successor Landlord and Tenant shall have the same remedies against each other for the breach of any agreement contained in the Lease as Tenant and Landlord had before Successor Landlord succeeded to the interest of Landlord; provided, however, that Successor Landlord shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord); it being understood that the foregoing is not intended to relieve Successor Landlord of any liability arising by reason of its acts or omissions from and after the date it succeeds to the interests of the Landlord, including a continuation of the failure of the prior Landlord to perform its obligations under the Lease, in which case Successor Landlord upon receipt of notice of such continuation from Tenant shall have a reasonable period of time to remedy same; or

(b)     subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord) relating to any event or occurrence before the date Successor Landlord succeeds to the interests of Landlord, other than offsets expressly provided for in the Lease; or

(c)     bound by any rent or additional rent that Tenant might have paid more than one month in advance of the due date therefor to any prior landlord (including Landlord), unless Successor Landlord approved such payment in writing; or

P-2

(d)     bound by any material amendment or modification of the Lease made after the date of this Agreement without Lender's prior written consent, to the extent such modification materially and adversely affects Successor Landlord's interests, releases Tenant from any obligations under the Lease or provides for the reduction of rent, a reduction of the Lease term or a reduction in the Premises; or

(e)     liable for return of any security deposit not delivered to Successor Landlord by Landlord or Tenant.

4.     Although the foregoing provisions of this Agreement shall be self-operative, Tenant agrees to execute and deliver to Lender or to any person to whom Tenant herein agrees to attorn, such other instrument or instruments as Lender or such other person shall from time to time reasonably request in order to confirm such provisions.

5.     Tenant hereby warrants and represents, covenants and agrees to and with Lender:

(a)     not to materially amend or modify the Lease to materially and adversely affect Successor Landlord's interests, release Tenant from any obligations thereunder or reduce the rent, the Lease term or the Premises, without prior written consent of Lender;

(b)     to deliver to Lender at the addresses provided for in this Agreement a duplicate of each notice of default delivered to Landlord at the same time as such notice is given to Landlord;

(c)     that as of the date of this Agreement Tenant is the sole owner of the leasehold estate created by the Lease and shall not hereafter transfer the Lease except as permitted by the terms thereof;

(d)     not to seek to terminate the Lease by reason of any default of Landlord without prior written notice thereof to Lender and the lapse thereafter of such time as under the Lease was offered to Landlord in which to remedy the default, and the lapse of an additional 30 days after the expiration of such time as Landlord was permitted to cure such default; provided, however, that with respect to any default of Landlord under the Lease which cannot be remedied within such time, if Lender commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Lender shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Lender or Landlord does not cure or commence curing such default within the time provided to Landlord under the Lease and the nature of the default materially threatens Tenant's ability to conduct its daily business for an extended period of time or threatens to materially or adversely damage Tenant's property located on the Premises, Tenant shall be permitted to exercise its rights under the Lease;

(e)     not to pay any rent or other sums due or to become due under the Lease more than 30 days in advance of the date on which the same are due or to become due under the Lease; and

P-3

(f)    to certify promptly in writing to Lender in connection with any proposed assignment of the Mortgage, whether or not, to Tenant's knowledge, any default on the part of Landlord then exists under the Lease.

6.    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

7.    Tenant agrees that neither the officers, nor the directors, employees, agents or shareholders of Lender shall be personally liable hereunder.

8.    Lender's address for notices shall be:

_____

Tenant's address for notices shall be:

_____

9.    Tenant acknowledges and agrees that it has notice that Landlord's interest in the Lease may be assigned from Landlord to Lender as further security for the Mortgage Loan.

10.    Except as expressly provided for in this Agreement, Lender shall have no obligations to Tenant with respect to the Lease.

11.    The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State of Connecticut, excluding its principles of conflict of laws.

12.    This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

13.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*[NO FURTHER TEXT ON THIS PAGE]*

P-4

8326762v2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers as of the date and year first above written.

LENDER:

_____

By:_____
    Name:
    Title:


TENANT:

Purdue Pharma L.P.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:


STATE OF _____)
                  ) ss.:
COUNTY OF _____)

On this ____ day of _____, before me, appeared _____,
who acknowledged himself to be the _____ of _____, a
_____, and that he as such _____, being authorized so to do, executed the
foregoing instrument for the purposes therein contained, by signing the name of the [corporation]
by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____

Notary Public

8326762v2

STATE OF _____ )
                        ) ss.:
COUNTY OF _____ )

     On this _____ day of _____, before me, appeared _____,
who acknowledged himself to be the _____ of _____, a
_____, and that he as such _____, being authorized so to do, executed the
foregoing instrument for the purposes therein contained, by signing the name of the [corporation]
by himself as _____.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public

P-6

8326762v2

Schedule A

**LEGAL DESCRIPTION**

8326762v2

## Exhibit Q

## PARKING PLAN



8300400v2

<u>Schedule 2.06</u>

**<u>LOCKBOX DIRECTED ACCOUNT INFORMATION</u>**

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, National Association |
| ABA: | 121000248 |
| Account Name: | One Stamford Realty L.P. |
| Account Number: | 4539813253 |
| Reference: | PPLP Sublease |

8300400v2