## Exhibit D

### Existing PPLP Lease

ONE STAMFORD REALTY L.P.,

Landlord

TO

PURDUE PHARMA L.P.,

Tenant

————————————————

**Lease**

————————————————

Dated as of April 6, 2006

# TABLE OF CONTENTS

ARTICLE 1 Premises; Term; Use;  UBS ......................................................................1
    1.01 Demise ............................................................................1
    1.02 Term ...............................................................................1
    1.03 Use .................................................................................2
    1.04 UBS ................................................................................3

ARTICLE 2 Rent ........................................................................................3
    2.01 Rent ................................................................................3
    2.02 Fixed Rent .......................................................................3
    2.03 Additional Rent ................................................................4
    2.04 Tax Payments ...................................................................4
    2.05 Operating Payments ...........................................................6
    2.06 Tax and Operating Provisions ............................................14
    2.07 Electric Charges ..............................................................15
    2.08 Manner of Payment .........................................................16

ARTICLE 3 Landlord Covenants ...................................................................16
    3.01 Landlord Services ...........................................................16
    3.02 General Provisions ..........................................................21

ARTICLE 4 Leasehold Improvements; Tenant Covenants ...................................23
    4.01 Alterations .....................................................................23
    4.02 Landlord's and Tenant's Property .......................................25
    4.03 Access and Changes to Building .........................................26
    4.04 Repairs ..........................................................................27
    4.05 Compliance with Laws .....................................................28
    4.06 Right to Perform Other Party's Covenants ...........................28

ARTICLE 5 Assignment and Subletting ..........................................................29
    5.01 Assignment; Etc .............................................................29
    5.02 Landlord's Right of First Offer .........................................30
    5.03 General Provisions ..........................................................30

ARTICLE 6 Subordination; Default; Indemnity ...............................................33
    6.01 Subordination .................................................................33
    6.02 Estoppel Certificate .........................................................33
    6.03 Default ..........................................................................34
    6.04 Remedies and Damages ....................................................36
    6.05 No Waiver ......................................................................39
    6.06 Holding Over ..................................................................39
    6.07 Attorneys' Fees ..............................................................39
    6.08 Indemnification ..............................................................39

ARTICLE 7 Insurance; Casualty; Condemnation ..............................................41
    7.01 Compliance with Insurance Standards .................................41

7.02  Tenant's Insurance...................................................................42
7.03  Subrogation Waiver................................................................43
7.04  Condemnation.......................................................................44
7.05  Casualty ................................................................................45

ARTICLE 8  Miscellaneous Provisions .............................................48
8.01  Notice....................................................................................48
8.02  Building Rules .......................................................................49
8.03  Severability............................................................................49
8.04  Certain Definitions ...............................................................50
8.05  Quiet Enjoyment...................................................................50
8.06  Limitation of Landlord's Personal Liability ...........................50
8.07  Counterclaims .......................................................................51
8.08  Survival..................................................................................51
8.09  Arbitration ............................................................................51
8.10  No Offer ...............................................................................51
8.11  Captions; Construction .........................................................52
8.12  Amendments..........................................................................52
8.13  Broker ...................................................................................52
8.14  Merger ...................................................................................52
8.15  Successors..............................................................................52
8.16  Applicable Law......................................................................52
8.17  Security Deposit ....................................................................52
8.18  Signage ..................................................................................53
8.19  Rooftop Equipment...............................................................53
8.20  Force Majeure .......................................................................54
8.21  Notice of Lease .....................................................................54
8.22  Tenant's Right to Interest on Late Payments..........................55
8.23  Tenant's Set-Off Right ..........................................................55
8.24  Effectiveness..........................................................................55

**EXHIBITS**

| | |
|---|---|
| A | Description of Land |
| B | Floor Plans |
| C | Rentable Square Footage |
| D | Fixed Rent |
| E | Rules and Regulations |
| F | [Intentionally Omitted] |
| G | HVAC Specifications |
| H | [Intentionally Omitted] |
| I | Standard Cleaning Specifications |
| J | [Intentionally Omitted] |
| K | [Intentionally Omitted] |
| L | [Intentionally Omitted] |
| M | [Intentionally Omitted] |
| N | Form of Notice of Lease |
| O | Form of Estoppel Certificate |
| P | Form of Non-Disturbance and Attornment Agreement for Tenant's Subtenants |
| Q | Form of Non-Disturbance and Attornment Agreement for Superior Leases |
| R | Form of Non-Disturbance and Attornment Agreement for Superior Mortgages |

## INDEX OF DEFINED TERMS

Definition                                    Where Defined

AAA ................................................................................ Section 8.09
ACM ............................................................................... Section 4.01
Acceleration Notice .......................................................... Section 1.02
Additional Rent................................................................ Section 2.03
Affiliate ........................................................................... Section 5.01
Alterations ....................................................................... Section 4.01
Average Cost Per KWHR .................................................. Section 2.07
Bankruptcy Event(s) ......................................................... Section 6.03
Base Cleaning Cost .......................................................... Section 3.02
Base Operating Amount .................................................... Section 2.05
Base Operating Year ......................................................... Section 2.05
Base Tax Amount ............................................................. Section 2.04
Base Tax Year .................................................................. Section 2.04
Broker ............................................................................. Section 8.13
Building ........................................................................... Recitals
Building Amenities............................................................ Section 3.01
Business Days................................................................... Section 3.02
Business Hours ................................................................. Section 3.02
Casualty ........................................................................... Section 7.05
Casualty Terminated Space ............................................... Section 7.05
Commencement Date ........................................................ Section 1.02
Contractor ........................................................................ Section 7.05
Control ............................................................................. Section 5.01
Curing Party..................................................................... Section 4.06
Default Expenses .............................................................. Section 6.04
Default Rate ..................................................................... Section 4.06
Deficiency ........................................................................ Section 6.04
Delivery Condition ........................................................... Section 1.02
Direct Cleaning Notice ...................................................... Section 3.02
Estimate ........................................................................... Section 7.05
Event of Default................................................................ Section 6.03
Expiration Date................................................................. Section 1.02
First Outside Date ............................................................. Section 7.05
Fixed Cleaning Rent ......................................................... Section 3.02
Fixed Rent........................................................................ Section 2.02
Fixtures ............................................................................ Section 4.02
Force Majeure .................................................................. Section 8.19
GAAP .............................................................................. Section 2.05
Holdover Percentage......................................................... Section 6.06
HVAC .............................................................................. Section 3.01
Identified Ancillary Uses................................................... Section 1.03
Initial Expiration Date ...................................................... Section 1.02
Initially Named Tenant ..................................................... Section 5.03

Interest Rate .................................................................... Section 4.06
Land ............................................................................... Recitals
Landlord ......................................................................... Introduction
Landlord Indemnified Party ........................................... Section 6.08
Landlord Obligation Areas ............................................ Section 4.04
Landlord Services .......................................................... Section 3.01
Landlord's Rate ............................................................. Section 2.07
Landlord's Violations .................................................... Section 4.01
Laws .............................................................................. Section 4.05
Lease ............................................................................. Introduction
Lobby Position .............................................................. Section 3.01
Material Alteration ........................................................ Section 4.01
Notice ............................................................................ Section 8.01
Offset Amount ............................................................... Section 8.22
Operating Expenses ....................................................... Section 2.05
Operating Payment ........................................................ Section 2.05
Operating Statement ...................................................... Section 2.05
Operating Year .............................................................. Section 2.05
Premises ........................................................................ Section 1.01
Prime Rate ..................................................................... Section 4.06
Project ........................................................................... Recitals
Purdue ........................................................................... Section 1.03
Records .......................................................................... Section 2.05
Rent ............................................................................... Section 2.01
Rent Commencement Date ............................................ Section 2.02
Required Restoration Work ........................................... Section 7.05
Rooftop Equipment ....................................................... Section 8.19
Second Outside Date ..................................................... Section 7.05
Substantial Completion Date ........................................ Section 7.05
Successor Landlord ....................................................... Section 6.01
Superior Lease ............................................................... Section 6.01
Superior Lessor ............................................................. Section 6.01
Superior Mortgage ........................................................ Section 6.01
Superior Mortgagee ...................................................... Section 6.01
Tax Bill ......................................................................... Section 2.04
Tax Payment .................................................................. Section 2.04
Tax Statement ............................................................... Section 2.04
Tax Year ........................................................................ Section 2.04
Taxes ............................................................................. Section 2.04
Tenant ............................................................................ Introduction
Tenant Indemnified Party .............................................. Section 6.08
Tenant's Offer Notice .................................................... Section 5.02
Tenant's Property .......................................................... Section 4.02
Tenant's Share ............................................................... Section 2.04
Tenant's Statement ........................................................ Section 2.05
Term .............................................................................. Section 1.02

Termination Notice................................................................... Section 7.05
UBS ....................................................................................... Section 1.04
UBS Lease .............................................................................. Section 1.04
UBS Taken Space .................................................................... Section 1.04

LEASE, dated as of April 6, 2006 (as may be amended, modified or supplemented from time to time, this "Lease"), between ONE STAMFORD REALTY L.P., a Delaware limited partnership, whose address is One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 ("Landlord"), and PURDUE PHARMA L.P., a Delaware limited partnership, whose address is One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 ("Tenant");

W I T N E S S E T H

WHEREAS, Landlord is willing to lease to Tenant and Tenant is willing to hire from Landlord, on the terms and conditions hereinafter set forth, certain space in the office building located at One Stamford Forum, Stamford, Connecticut (the "Building") on the land more particularly described in Exhibit A (the "Land"; the Land and the Building are collectively called the "Project");

NOW, THEREFORE, Landlord and Tenant agree as follows:

## ARTICLE 1

### Premises; Term; Use;  UBS

**1.01    Demise.**  (a) Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, subject to the terms and conditions of this Lease, the P-1 floor (including but not limited to the data centers), the P-2 floor, the P-3 floor, the plaza floor, the 4th floor, the 5th floor, the 6th floor, the 7th floor, the 8th floor, the 9th and 10th floors of the Building (collectively, the "Premises"), substantially as shown on the plans thereof attached hereto as Exhibit B.

(b)    Landlord and Tenant confirm that (i) the Building is deemed to contain 504,471 rentable square feet, and (ii) each floor comprising the Premises is deemed to contain the number of rentable square feet specified therefor on Exhibit C attached hereto.

(c)    The leasing of the Premises by Tenant shall include (i) the right of Tenant to use the plazas, lobbies, corridors, stairways, elevators and other public and common areas of the Building and the Land in common with other tenants in the Building and (ii) all fixtures, improvements and betterments owned or leased by Landlord which, at any time during the Term, are attached to or installed in the Premises.

**1.02    Term.**  (a) The term of this Lease (the "Term") shall commence effective as of January 1, 2006 (the "Commencement Date").

(b)    The Term shall end, unless sooner terminated as provided in the UBS Lease for any portion of the Premises, on December 31, 2020 (the "Expiration Date").

(c)    Tenant hereby acknowledges that it has on the Commencement Date accepted possession of the Premises in its "as is" condition.

**1.03**  **Use.**  (a) Tenant may use the Premises as general, professional, administrative and executive offices, or for any other legal use not adversely affecting the value of the Building, including such ancillary uses in connection therewith as may be necessary or desirable in the operation of the business conducted in the Premises (but excluding the uses prohibited under Section 1.03(b) below).  Ancillary uses shall consist of the following:

(i)  one or more data centers for computer and other electronic data processing and business machine operations;

(ii)  duplicating, photographic reproduction and/or offset printing facilities;

(iii)  pantries and vending machines for use by the occupants of the Premises and their employees;

(iv)  storage space, file rooms, mail room and messenger center facilities;

(v)  board rooms, conference rooms, meeting rooms and conference centers and facilities;

(vi)  training facilities, classrooms and library facilities for the occupants of the Premises and their employees;

(vii)  secured facilities for the storage of equipment, books, records, files and other items;

(viii) travel services or agencies serving the occupants of the Premises and their employees;

(ix)  to the extent permitted by applicable Law, a day care facility serving the occupants of the Premises and their employees;

(x)  vaults;

(xi)  automatic teller machines serving the occupants of the Premises and their employees;

(xii)  subject to Section 1.03(b) below, such other ancillary uses as may be requested by Tenant and approved by Landlord from time to time, which approval shall not be unreasonably withheld, conditioned or delayed; provided, that Landlord's approval shall not be required for ancillary uses which are customary in first-class office buildings similar to the Building.

The ancillary uses described in clauses (i) through (xii) above are called the "Identified Ancillary Uses".  Notwithstanding anything in Section 4.05 or elsewhere in this Lease to the contrary, Tenant shall be responsible for complying with all Laws applicable to the use of the Premises for

2

the Identified Ancillary Uses and for obtaining, at Tenant's expense, all consents, approvals and permits (including, without limitation, any amendment to the certificate of occupancy for the Building) required by reason of any such use. Landlord, at Tenant's reasonable expense, shall cooperate with Tenant's efforts to obtain any such consents, approvals and permits, including, without limitation, executing and delivering any documents or instruments reasonably required by Tenant in connection therewith. If Tenant shall be unable to obtain any such consent, approval or permit by reason of any violation noted against the Building (other than a violation that, pursuant to this Lease, is the obligation of Tenant to remove) Landlord shall, promptly after notice of such violation from Tenant, commence and diligently pursue the removal of such violation, and the provisions of Section 4.01(h) shall apply thereto.

(b)    Anything contained in Section 1.03(a) to the contrary notwithstanding, in no event shall the Premises be used for any retail use serving the public on an off-the-street basis.

**1.04    UBS.** (a) By lease (the "UBS Lease") dated as of December 30, 2005, between Landlord, as landlord, and UBS AG ("UBS"), as tenant, Landlord leased to UBS certain space in the Building. A copy of the UBS Lease has been delivered by Landlord to Tenant.

(b)    Under the UBS Lease, UBS has the right to lease from Landlord portions of the P-1 and P-2 floors, the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th and 10th floors, and all of the space shown on the P-1, P-2, P-3 and plaza floors (subject to Tenant's right to continue to occupy the data centers) of the Building substantially as shown on the plans of such floors. Any space as and when so taken by UBS is hereinafter referred to as "UBS Taken Space".

(c)    Landlord agrees to provide Tenant with any notices given by UBS under the UBS Lease with respect to the leasing by UBS of space in the Building.

## ARTICLE 2

## Rent

**2.01    Rent.** "Rent" shall consist of Fixed Rent and Additional Rent.

**2.02    Fixed Rent.** (a)    "Fixed Rent" shall be as set forth in Exhibit D.

(b)    The Rent Commencement Date (the "Rent Commencement Date") shall be January 1, 2006; provided that Tenant shall no longer be liable for payment of Rent for any portion of the Premises leased by UBS commencing on the date when UBS becomes liable for payment of rent for such portion under and pursuant to the UBS Lease as currently written. For the sake of clarity, Rent paid by Tenant under this Lease for any UBS Taken Space shall cease to be paid by Tenant when rent commences under the UBS Lease for such UBS Taken Space.

(c)    Fixed Rent shall be payable by Tenant in 12 equal monthly installments in advance on the Rent Commencement Date and on the first Business Day of each calendar month thereafter to and including the applicable Expiration Date.

3

(d)    If any condition shall arise whereby Tenant would be entitled to an abatement of Fixed Rent and/or Additional Rent pursuant to any provision of this Lease for all or any portion of the period prior to the Rent Commencement Date, then Tenant shall receive the benefit of such abatement beginning on the first date thereafter upon which Fixed Rent and/or Additional Rent would otherwise have again become payable by Tenant in respect of the Premises.

2.03    **Additional Rent.**  "Additional Rent" means Tax Payments, Operating Payments and all other sums of money at any time payable by Tenant under this Lease, all of which Additional Rent shall be deemed to be rent.

2.04    **Tax Payments.** (a) "Base Tax Amount" means:

(i)    the Taxes for the Tax Year commencing on January 1, 2006, and ending on December 31, 2006 (the "Base Tax Year");

If Landlord shall at any time, as part of any settlement, compromise or other disposition, settle, compromise or otherwise dispose of applications or other proceedings for the reduction of Taxes with respect to more than one Tax Year, which settlement, compromise or disposition includes one or more of the Base Tax Years, Landlord shall not agree to any settlement, compromise or other disposition that would result in the overall reduction of Taxes for the applicable Tax Years being inequitably allocated to any Base Tax Year so as to reduce the Base Tax Amount by more than the Base Tax Amount would have been reduced if Landlord had compromised, settled or otherwise disposed of the Taxes for the Base Tax Year in question without reference to any compromise, settlement or other disposition of Taxes for any other Tax Year.  In the event of a breach of the preceding sentence by Landlord, the Taxes for the Base Tax Year in question shall be modified to be the Taxes for such Tax Year that would have applied had Landlord complied with the terms hereof, and Landlord shall refund to Tenant the amount, if any, overpaid by Tenant in respect of any Tax Payment by reason of Landlord's failure to comply with the terms of this Section 2.04(a), together with interest on such amount at the Interest Rate from the date of the applicable payment by Tenant through the date of refund by Landlord.   Any dispute concerning this Section 2.04(a) shall be resolved by arbitration in accordance with Section 8.09.

(b)    "Taxes" means amounts actually payable for (i) the real estate taxes, assessments and special assessments levied, assessed or imposed upon or with respect to the Project by any federal, state, municipal or other government or governmental body or authority (provided, that the same shall be reflected in a tax bill rendered with respect to the Project (a "Tax Bill")), calculated as if the Building and the Land were Landlord's sole assets, and giving effect (except for purposes of determining any Base Tax Amount, which shall be computed without giving effect) to any and all abatements, refunds, reductions, credits and the like and (ii) any reasonable out-of-pocket expenses incurred by Landlord in contesting such taxes or assessments and/or the assessed value of the Project, which expenses shall be allocated to the Tax Year to which such expenses relate. If at any time the method of taxation shall be altered so that in lieu of, or as a substitute for, the whole or any part of such real estate taxes, assessments and special assessments now imposed on real estate, there shall be levied, assessed or imposed (x) a tax, assessment, levy, imposition, fee or charge wholly or partially as a capital levy or

4

otherwise on the rents received therefrom, or (y) any other such substitute tax, assessment, levy, imposition, fee or charge, then all such taxes, assessments, levies, impositions, fees or charges or the part thereof so measured or based shall be included in "Taxes". "Taxes" shall not include (A) any succession, gains, recording, income, franchise, transfer, inheritance, capital stock, excise, excess profits, occupancy or rent (except as permitted pursuant to clause (x) above), gift, estate, foreign ownership or control, mortgage recording, transfer, payroll or stamp tax of Landlord or any superior party, (B) any other tax, assessment, charge or levy on the rent reserved under this Lease, or (C) any penalties or late charges imposed against Landlord or any superior party with respect to real estate taxes, assessments and the like; provided, that, to the extent that such penalties or late charges are incurred by Landlord as a result of a failure by Tenant to pay any installment of any Tax Payment in a timely manner in accordance with Section 2.04(e), Tenant shall pay to Landlord the amount of such penalties or late charges for which Tenant is responsible within 30 days after demand therefor by Landlord. If, by Law, any amount that is included in Taxes may be divided and paid in installments, then (1) such amount shall be deemed to have been so divided and to be payable in the maximum number of installments permitted by Law, and (2) there shall be deemed included in Taxes for each calendar year only the installments of such amount deemed to be payable during such calendar year. Landlord acknowledges that Landlord was entitled to a benefit program pursuant to which the Taxes on the Property were reduced for the Tax Year commencing July 1, 2005 and ending June 30, 2006 and prior Tax Years, and that Landlord is not entitled to any further reduction of Taxes beyond such Tax Year under such program or any other tax benefit program in effect on the date of this Lease.

(c)     "Tax Year" means each period of 12 months, commencing on Janaury 1 of each such period, in which occurs any part of the Term, or such other period of 12 months occurring during the Term as hereafter may be adopted as the fiscal year for real estate tax purposes of the City of Stamford, Connecticut.

(d)     "Tenant's Share" means a fraction, expressed as a percentage, the numerator of which shall be the rentable square feet of space from time to time included in the Premises as set forth on Exhibit C annexed hereto and the denominator of which shall be 504,471.

(e)     If Taxes for any Tax Year shall exceed the Base Tax Amount, Tenant shall pay to Landlord (each, a "Tax Payment") Tenant's Share of the amount by which Taxes for such Tax Year are greater than the Base Tax Amount; provided, that Tenant shall in no event be required to make a Tax Payment in respect of any period prior to the Rent Commencement Date. The Tax Payment for each Tax Year shall be due and payable in installments in the same manner that Taxes for such Tax Year are due and payable by Landlord to the City of Stamford. Tenant shall pay Tenant's Share of each such installment within 30 days after the rendering of a statement therefor (a "Tax Statement") by Landlord to Tenant, but in no event shall Tenant be required to pay Tenant's Share of any Taxes more than 10 days prior to the date such Taxes first become due. The Tax Statement to be rendered by Landlord shall set forth in reasonable detail the computation of Tenant's Share of the particular installment(s) being billed, and a copy of the relevant Tax Bill shall accompany each Tax Statement. If there shall be any increase in the Taxes for any Tax Year, whether during or after such Tax Year, or if there shall be any decrease

in the Taxes for any Tax Year, the Tax Payment for such Tax Year shall be appropriately adjusted and paid or refunded, as the case may be, in accordance herewith.  In no event, however, shall Taxes be reduced below the Base Tax Amount.

(f)    If, in respect of any Taxes for which Tenant has paid Tenant's Share, Landlord shall receive a refund of such Taxes or shall become entitled to a credit against a future payment of Taxes, Landlord shall (i) in the case of a refund, pay to Tenant within 30 days after Landlord's receipt thereof or (ii) in the case of a credit, permit Tenant to credit against the Tax Payment applicable to the payment of Taxes against which Landlord will take such credit (unless such payment of Taxes is due and payable after the end of the Term, in which event Landlord shall pay to Tenant at the time Landlord makes such Tax Payment), in any such case an amount equal to Tenant's Share of such refund or credit (after deducting from such refund or credit the actual costs and expenses of obtaining the same, including, without limitation, appraisal, accounting and legal fees, if and to the extent that (A) such legal fees have not already been deducted by the party conducting the contest on behalf of Landlord prior to Landlord's receipt of such refund and (B) such costs and expenses were not included in the Taxes for such Tax Year); provided, that such payment to Tenant shall in no event exceed Tenant's Tax Payment paid for such Tax Year.  The reference to "Tenant's Share" in this Section 2.04(f) shall be deemed to mean Tenant's Share in effect during the Tax Year to which the applicable refund relates; provided, that if Tenant's Share changed during such Tax Year, any refund to which Tenant is entitled under this Section 2.04(f) shall be appropriately adjusted.

(g)    Landlord shall promptly give to Tenant a copy of any notice received by Landlord establishing or revising the assessed valuation of the Project or any portion thereof. Within 30 days after receipt by Landlord of any such notice, Landlord shall advise Tenant whether or not Landlord intends to take action to seek a reduction of such assessed valuation.  If Landlord elects to take such action, Landlord shall proceed to take all commercially reasonable action in pursuit of such reduction and Landlord shall not settle any such action or proceeding without the prior consent of Tenant.  If Landlord elects not to take such action, then Tenant, at Tenant's expense, shall have the right to contest the amount or validity, or otherwise seek an exemption or abatement of, any Taxes, by appropriate proceedings diligently conducted in good faith.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by Law, shall join with Tenant in the prosecution thereof.  Tenant shall be entitled to Tenant's Share of any refund (after expenses incurred by Landlord and/or Tenant in connection therewith are paid to the party which incurred such expense) of any Taxes and penalties or interest thereon refunded to Tenant or Landlord, whether or not such refund was a result of proceedings instituted by Tenant.

**2.05    Operating Payments**.  (a) "Base Operating Amount" means Operating Expenses for the Base Operating Year.

(b)    "Base Operating Year" means calendar year 2006.

(c)    (i) "Operating Expenses" means all commercially reasonable expenses actually paid or incurred (without any mark-up by Landlord and without duplication) by or on

6

behalf of Landlord in respect of the maintenance, repair and management of the Project which are properly chargeable thereto in accordance with generally accepted accounting principles consistently applied ("GAAP") and sound management practices together with and including (without limitation) the costs of gas, oil, steam, water, sewer rental, electricity, HVAC and other utilities furnished to the Building and utility taxes, and the expenses incurred in connection with the maintenance, repair and management of the Project, such as insurance premiums, auditing and other professional fees and expenses, but specifically excluding (or deducting, as the case may be):

     (1)    Taxes,

     (2)    transfer, gains, franchise, inheritance, estate, succession, gift, corporation, unincorporated business, gross receipts, profit and income taxes imposed upon Landlord,

     (3)    mortgage interest and amortization,

     (4)    all leasing costs, including, without limitation, leasing and brokerage commissions and similar fees, and accounting and appraisal fees relating to determinations of fair market rent,

     (5)    the cost of electrical energy furnished to any space leased or available for lease in the Building,

     (6)    the cost of tenant installations and decorations incurred in connection with preparing space for a tenant, and any other contribution by Landlord to the cost of tenant improvements,

     (7)    salaries, fringe benefits and other compensation of personnel of Landlord or Landlord's Affiliates above the grade of building manager (or the person performing the functions of a building manager if Landlord itself manages the Building),

     (8)    ground rent or any other payments paid under Superior Leases (other than payments which, independent of the Superior Lease, would constitute an Operating Expense hereunder),

     (9)    depreciation and amortization, except as provided herein,

     (10)    advertising, entertainment and promotional costs for the Building,

     (11)    costs and expenditures payable to any Affiliate of Landlord, or (A) to an entity in which Landlord directly or indirectly owns at least a 20% interest or (B) to any shareholder owning at least 20% of the common stock, any general partner, any officer or member of any board of directors of Landlord or of any entity described in this clause (11) or (C) to any person who is a relative by blood or marriage of any such persons, in each case in excess of the amount which would be paid in the absence of such relationship (it

7

being agreed that such fees and expenditures may only be included if Landlord shall notify Tenant and specify in reasonable detail in its Operating Statement which fees and expenditures were payable to any such Affiliate or other such person with such a relationship to Landlord),

(12)    costs incurred with respect to a sale or transfer of all or any portion of the Building or any interest therein or in any person or entity of whatever tier owning an interest therein,

(13)    financing and refinancing costs,

(14)    except as otherwise provided herein, the cost of any improvement, repair, alteration, addition, change, replacement or other item which under GAAP is properly classified as a capital expenditure, including, without limitation, rental payments for any equipment ordinarily considered to be of a capital nature,

(15)    lease takeover or takeback costs incurred by Landlord in connection with leases in the Building,

(16)    costs for which Landlord receives compensation through the proceeds of insurance or for which Landlord would have been compensated by insurance had it carried the coverage required under this Lease or for which Landlord receives compensation from any other source,

(17)    expenses incurred in connection with services or other benefits of a type or at a level not provided to Tenant (or provided at separate or additional charge) but that are provided to another tenant or occupant of the Building,

(18)    legal fees, expenses and disbursements (including, without limitation, those incurred in connection with leasing, sales, financing or refinancings or disputes with current or prospective tenants),

(19)    amounts otherwise includable in operating expenses but reimbursed to Landlord directly by Tenant or other tenants (other than through provisions similar to this Section 2.05),

(20)    to the extent any costs includable in operating expenses are incurred with respect to both the Building and other properties (including, without limitation, salaries, fringe benefits and other compensation of Landlord's personnel who provide services to both the Building and other properties), there shall be excluded from Operating Expenses a fair and reasonable percentage thereof which is properly allocable to such other properties,

(21)    the cost of any judgment, settlement or arbitration award resulting from any liability of Landlord (other than a liability for amounts otherwise includable in Operating Expenses hereunder) and all expenses incurred in connection therewith,

8

(22)    the cost of providing any service customarily provided by a managing agent and the cost of which is customarily included in management fees (e.g., bookkeeping and accounting costs),

(23)    the cost of acquiring or replacing any separate electrical meter Landlord may provide to any of the tenants in the Building,

(24)    costs relating to withdrawal liability or unfunded pension liability under the Multi-Employer Pension Plan Act or other Law,

(25)    the cost of installing, operating and maintaining any specialty facility such as an observatory, broadcasting facilities, luncheon club, athletic or recreational club or other exercise facility, medical facility or child care or similar facility or cafeteria or dining facility; provided, that the costs of operating and maintaining the cafeteria which is included in the Building Amenities shall be includable in Operating Expenses, other than any amount paid to a cafeteria operator,

(26)    any interest, fine, penalty or other late charges payable by Landlord, incurred as a result of late payments, except to the extent the same was with respect to a payment, part or all of which, was the responsibility of Tenant hereunder and with respect to which Tenant did not make in a timely fashion or did not make at all,

(27)    any compensation paid to clerks, attendants or other persons in commercial concessions operated by Landlord,

(28)    costs of acquiring, leasing, installing, maintaining, restoring, displaying, insuring or protecting (A) sculptures, (B) paintings and (C) other objects of art located within or outside the Building,

(29)    expenditures for repairing and/or replacing any defect in any work performed by Landlord pursuant to the provisions of this Lease,

(30)    costs incurred to remedy violations of Laws that arise by reason of Landlord's (or any prior landlord's) failure to construct, maintain or operate the Building or any part thereof in compliance with such Laws,

(31)    expenses allocable directly and solely to any retail space of the Building (including, without limitation, plate glass insurance),

(32)    costs incurred in connection with making any additions to, or building additional stories on, the Building or its plazas, or adding buildings or other structures adjoining the Building, or connecting the Building to other structures adjoining the Building,

(33)    costs incurred in connection with the acquisition or sale of air rights, transferable development rights, easements or other real property interests,

9

(34)    any insurance costs that are not customary for first-class office buildings located in the vicinity of the Building and any increased insurance costs reimbursed directly to Landlord by a tenant, including, without limitation, Tenant, pursuant to their respective leases,

(35)    costs incurred by Landlord which result from Landlord's or other tenant's breach of a lease or Landlord's tortious or negligent conduct,

(36)    the cost of repairs or replacements or restorations by reason of fire or other casualty or condemnation (except for the amount of any commercially reasonable deductibles),

(37)    costs and expenses incurred by Landlord in connection with any obligation of Landlord to indemnify any Building tenant (including Tenant) pursuant to its lease or otherwise,

(38)    the cost paid or incurred in connection with the removal, replacement, enclosure, encapsulation or other treatment of any asbestos, PCB's or other hazardous materials in the Building,

(39)    management fees in excess of management fees charged by first-class management firms at buildings comparable to the Building for services comparable to those services being provided at the Building; provided, that if the management fee included in Operating Expenses in any year subsequent to the Base Operating Year shall be computed at a rate greater than that used to compute the management fee included in Operating Expenses in the Base Operating Year, then the Operating Expenses for the Base Operating Year shall be grossed up to include the amount of management fee that would have been incurred in the Base Operating Year had Landlord paid a management fee in the Base Operating Year at such greater rate,

(40)    any profits Landlord earns or receives on so-called sundry charges to individual tenants,

(41)    the cost of electricity and overtime HVAC (including utility taxes payable with respect to the same) furnished to the Premises or any other rentable space in the Building whether or not leased to tenants,

(42)    the amount of any actual incremental costs incurred by Landlord in the operation, maintenance or repair of any Building system or facility within any portion of the Building core or any other portion of the Building common areas as the result of non-standard installations (including, without limitation, raised flooring) made by other Building tenants within such portion of the Building core and/or common areas,

(43)    new categories of Operating Expenses not customarily offered in first-class office buildings comparable to the Building and not included in the Operating Statement for the Base Operating Year; provided, that any such new category of Operating Expenses may be included in Operating Expenses, if, from and after the Operating

10

Year in which such new category is first included in Operating Expenses, the Operating Expenses for the Base Operating Year are grossed up to include the amount of such new category of Operating Expenses that would have been incurred in the Base Operating Year had Landlord provided such service or incurred such expense in the Base Operating Year,

(44)    all costs of Landlord's general corporate and general administrative and overhead expenses,

(45)    any bad debt loss, rent loss or reserves for bad debts or rent loss,

(46)    all costs associated with Landlord's political, civic or charitable contributions,

(47)    the cost of temporary exhibitions located at or within the Project,

(48)    the cost of any service provided by Landlord to the extent such service is provided at a level in excess of the level that is commercially reasonable in comparable buildings in the vicinity of the Building (but the foregoing shall not diminish Tenant's obligation to pay for premium security services or increased costs of security in accordance with the provisions of Section 3.01(j)),

(49)    all costs associated with any management office in the Building in excess of 2,500 rentable square feet or with any off-site offices of Landlord, and

(50)    the cost of purchasing insurance on the property of any other tenant if, pursuant to this Lease, Tenant is required to purchase such insurance on the same type of property owned by Tenant.

(ii)    Any insurance proceeds received with respect to any item previously included as an Operating Expense shall be deducted from Operating Expenses for the Operating Year in which such proceeds are received. All Operating Expenses shall be without any profit whatsoever to Landlord or any Affiliate of Landlord (except to the extent permitted under clause (11) above).

(iii)    If any capital improvement is made during any Operating Year that is (A) required by any Laws that enacted on or after the date of this Lease or (B) for the purpose of saving or reducing Operating Expenses (as, for example, a labor-saving improvement), then the amortized cost of such improvement (i.e., the cost of such improvement amortized over the useful life thereof in accordance with GAAP) shall be included in Operating Expenses for the Operating Year in which such improvement was made and subsequent Operating Years; provided, that in the case of capital improvements described in clause (B) above, the amount of any such costs attributable to such capital improvement relating to any particular Operating Year that may be included in Operating Expenses for such Operating Year shall not exceed the actual savings realized for such Operating Year as a result of such expenditures by Landlord,

11

which actual savings shall be as determined by a reputable, independent licensed engineer or other professional consultant having expertise in the area.

(d)    "Operating Statement" shall mean a statement in reasonable detail setting forth a comparison of the Operating Expenses for an Operating Year with the Base Operating Amount and the Operating Expenses for the preceding Operating Year pursuant to the provisions of this Section 2.05. Each Operating Statement shall be verified as correct in a certificate signed by Landlord and delivered to Tenant.

(e)    "Operating Year" means each calendar year in which occurs any part of the Term.

(f)    For each Operating Year, Tenant shall pay (each, an "Operating Payment") Tenant's Share of the amount by which Operating Expenses for such Operating Year exceed the applicable Base Operating Amount; provided, that Tenant shall in no event be required to make an Operating Payment in respect of any period prior to the Rent Commencement Date.

(g)    If during any relevant period, including the Base Operating Year, (i) any rentable space in the Building shall be unoccupied, and/or (ii) the tenant or occupant of any rentable space in the Building undertook to perform work or services therein in lieu of having Landlord perform the same, such work or services are of the same type as Landlord is required to provide to Tenant under this Lease and the cost thereof would have been included in Operating Expenses, then, in any such event, the Operating Expenses for such period shall be increased to reflect the additional expenses (exclusive of any additional management fee that would have been payable by reason of such increased expenses) that would have been incurred, if any, if 100% of the rentable space in the Building were occupied by tenants during such period or if Landlord had performed such work or services with respect to 100% of the rentable space in the Building, as the case may be.

(h)    Landlord may furnish to Tenant, prior to the commencement of each Operating Year, a statement substantially in the form attached to this Lease as Exhibit F setting forth Landlord's reasonable estimate of the Operating Payment for such Operating Year.  In estimating the Operating Payment for any Operating Year, the percentage increase in Operating Expenses for such Operating Year over the Operating Expenses for the prior Operating Year shall not exceed 105% of the Operating Expenses for the prior Operating Year, unless Landlord reasonably demonstrates to Tenant that a larger increase is justified due to increases in expenses. Tenant shall pay to Landlord on the first day of each month during such Operating Year, an amount equal to 1/12th of Landlord's estimate of the Operating Payment for such Operating Year.  If Landlord shall not furnish any such estimate for an Operating Year or if Landlord shall furnish any such estimate for an Operating Year subsequent to the commencement thereof, then (A) until the first day of the second month following the month in which such estimate is furnished to Tenant, Tenant shall pay to Landlord on the first day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this Section 2.05 in respect of the last month of the preceding Operating Year; (B) after such estimate is furnished to Tenant, Landlord shall notify Tenant whether the installments of the Operating Payment previously made for such

12

Operating Year were greater or less than the installments of the Operating Payment to be made in accordance with such estimate, and (x) if there is a deficiency, Tenant shall pay the amount thereof within 30 days after demand therefor, or (y) if there is an overpayment, Landlord shall within 30 days refund to Tenant the amount thereof; and (C) on the first day of the second month following the month in which such estimate is furnished to Tenant and monthly thereafter throughout such Operating Year Tenant shall pay to Landlord an amount equal to 1/12th of the Operating Payment shown on such estimate.  Landlord may, not more often than once during each Operating Year, furnish to Tenant a revised statement of Landlord's estimate of the Operating Payment for such Operating Year, and in such case, the Operating Payment for such Operating Year shall be adjusted and paid or refunded as the case may be, substantially in the same manner as provided in the preceding sentence; provided, that any such revised Landlord's estimate shall be calculated in accordance with the limitation specified in the second sentence of this Section 2.05(h).

(i)    Landlord shall furnish to Tenant an Operating Statement for each Operating Year within 120 days after the end of such Operating Year.  If the Operating Statement shall show that the sums paid by Tenant, if any, under Section 2.05(h) exceeded the Operating Payment to be paid by Tenant for the applicable Operating Year, Landlord shall within 60 days refund to Tenant the amount of such excess, together with interest thereon at the Prime Rate from the date of the applicable payment by Tenant through the date of refund by Landlord; provided, that if in any Operating Year the sums paid by Tenant under Section 2.05(h) exceeded the actual Operating Payment by more than 5%, then such refund shall include interest thereon at the Interest Rate from the date of the applicable payment by Tenant through the date of refund by Landlord; and if the Operating Statement shall show that the sums so paid by Tenant were less than the Operating Payment to be paid by Tenant for such Operating Year, Tenant shall pay the amount of such deficiency within 30 days after demand therefor; provided, that if the sums paid by Tenant under Section 2.05(h) were less than the actual Operating Payment by reason of the limitation specified in the second sentence of Section 2.05(h), then such payment by Tenant to Landlord shall include interest thereon at the Prime Rate from the date such payments by Tenant would have been due but for said limitation through the date of payment by Tenant pursuant to this Section 2.05(i).

(j)    (i) Tenant, upon notice given within 180 days after Landlord furnishes to Tenant an Operating Statement with respect to any Operating Year, may elect to have an independent certified public accountant (designated by Tenant in such notice) examine such of Landlord's books and records (collectively, "Records") as are relevant to such Operating Statement.  "Records" shall include, without limitation, sales tax reports and sales tax returns, receipts, bank and check books and records supporting data maintained by Landlord and related to Operating Expenses.  Such accountant shall be permitted to examine the Records at the office of Landlord or Landlord's managing agent in Stamford, Connecticut or elsewhere in the New York metropolitan area at such time or times during normal business hours as Landlord shall reasonably designate, and Tenant shall be entitled, at its expense, to make copies of such documents as pertain to the audit findings.  Tenant and Tenant's employees, accountants and agents shall treat all Records as confidential, and, upon request by Landlord, shall confirm such confidentiality obligation in writing.  In no event shall the preceding sentence be deemed to limit Tenant's rights of discovery and disclosure in any action or proceeding or be construed so as to

13

prohibit Tenant from complying with the directive of any court or arbitrator.  If Tenant fails to give notice to Landlord within such 180-day period of Tenant's election to examine such Records, Tenant's right to dispute the particular Operating Statement shall be deemed waived.

(ii)    Tenant, within 180 days after the date on which the Records are made available to Tenant in response to a request by Tenant pursuant to Section 2.05(j)(i) above, may send a notice ("Tenant's Statement") to Landlord that Tenant disagrees with the applicable Operating Statement, specifying in reasonable detail the basis for Tenant's disagreement and the amount of the Operating Payment Tenant claims is due.  If Tenant fails to send a Tenant's Statement to Landlord within said 180 day period, Tenant's right to dispute the particular Operating Statement shall be deemed waived and Tenant shall have no right thereafter to dispute such Operating Statement.  If Tenant timely gives a Tenant's Statement, Landlord and Tenant shall attempt to resolve such disagreement.  If they fail to do so within 90 days after the date that Tenant gives Tenant's Statement to Landlord, either Landlord or Tenant may notify the other that such party desires to have such disagreement determined by arbitration in accordance with Section 8.09.  Pending resolution of such disagreement, Tenant shall nevertheless pay to Landlord the Operating Payment in accordance with the Operating Statement in question.  If the arbitrator shall determine that any disputed portion of such Operating Payment was not required to be paid by Tenant, Landlord shall pay to Tenant, within 30 days after such determination, such disputed amount, together with interest thereon at the Prime Rate from the date the disputed amount was paid by Tenant through the date of reimbursement by Landlord to Tenant of such disputed amount.

(iii)    Operating Expenses for the Base Operating Year shall remain subject to audit until the last date on which Tenant may audit the third Operating Year after the applicable Base Operating Year.

(iv)    If it is determined as a result of any examination by Tenant of the Records that the sums paid by Tenant under Section 2.05(h) exceeded the actual Operating Payment by more than 5%, then Landlord shall reimburse Tenant for the reasonable and customary out-of-pocket cost of Tenant's examination.

(v)    Landlord shall retain all Records that are subject to audit relating to payment of Operating Expenses for a period of 3 years after the applicable Operating Year, except that Landlord shall retain the Records relating to payment of Operating Expenses for the Base Operating Year for 5 years after the end of the Base Operating Year.  Tenant's payment of any Operating Payment shall not preclude Tenant from later disputing the correctness of any Operating Statement, subject to the time limitations set forth in Sections 2.05(j)(i) and (ii).

**2.06    Tax and Operating Provisions.**  (a)  In any case provided in Section 2.04 or 2.05 in which Tenant is entitled to a refund, Tenant may elect to receive a credit against future installments of Rent.  If this Lease shall expire before any such credit shall have been fully applied, then Landlord shall, within 30 days thereafter, refund to Tenant the unapplied balance of such credit.

14

(b)     If Landlord shall fail to deliver an Operating Statement with respect to any Operating Year, or a Tax Statement with respect to any Tax Year, within 120 days after the end of such Operating Year or Tax Year, and if such failure continues and is not cured within 30 days after Tenant notifies Landlord of such failure, then Landlord shall be deemed to have waived its right to claim or receive any additional Operating Payment for such Operating Year or Tax Payment for such Tax Year, as the case may be. Landlord shall have no right to render a corrected Operating Statement for any Operating Year or a corrected Tax Statement for any Tax Year more than one year after the end of the applicable Operating Year or Tax Year.

(c)     Each Tax Payment in respect of a Tax Year, and each Operating Payment in respect of an Operating Year, which ends after the expiration or earlier termination of this Lease, and any tax refund pursuant to Section 2.04(g), shall be prorated to correspond to that portion of such Tax Year or Operating Year occurring within the Term.

**2.07    Electric Charges.** (a) Tenant's demand for, and consumption of, electricity for the Premises shall be determined by meter or meters installed by Landlord on or before the Commencement Date. Tenant shall pay for electric consumption within 30 days after rendition of a bill therefor (but in no event more than 15 days before Landlord's payment for the applicable period is due to the public utility), which bill shall reflect the aggregate charge for electricity for the Premises, as determined by or on behalf of Landlord separately for each meter.

(b)     The amount payable by Tenant for electricity consumed within the Premises for any applicable billing period shall be equal to the product of (i) the Average Cost Per KWHR for such period multiplied by (ii) Tenant's usage (KWHR) of electricity in the Premises during such period as shown by the meter(s) serving the Premises. "Average Cost Per KWHR" means the quotient obtained by dividing (x) the amount (as adjusted from time to time, "Landlord's Rate") at which Landlord purchases electricity for the same period from the utility company (including all demand charges, consumption charges, surcharges, taxes, fuel adjustments, taxes passed on to consumers by the public utility and other sums required to be paid to the public utility for such electricity) by (y) the number of KWHR's consumed by the Building as set forth on the utility company invoice for such period; it being the intention that Landlord shall not realize any mark-up in connection with the amounts paid by Tenant, and that such amounts equal Landlord's actual out-of-pocket costs, for electricity furnished.

(c)     At Tenant's option, Landlord shall furnish and install all replacement lighting, tubes, lamps, bulbs and ballasts required in the Premises, and Tenant shall pay to Landlord or its designated contractor, within 30 days after receipt of an itemized bill, the actual cost incurred by Landlord therefor.

(d)     Tenant shall be entitled to 100% of the benefit of any payment or credit received by Landlord from the public utility or other provider supplying electricity to the Building by reason of energy saving devices installed by Tenant in the Premises. Any application for such benefits or for any similar benefit program shall be made by Tenant; provided, that at Tenant's request and at Tenant's expense (if and to the extent Landlord incurs any out-of-pocket expenses therefor), Landlord shall sign any application required for Tenant to obtain such benefits and shall otherwise reasonably cooperate with Tenant's efforts to obtain

15

such benefits. Any payment received by Landlord by reason of energy saving devices or programs installed or implemented by Landlord in the Building shall be deducted from Operating Expenses, net of any investment cost to Landlord to realize such savings.

(e)     Tenant acknowledges that Landlord may now, or in the future, have the right to select the entity or entities which will provide electrical power to the Building (including, the Premises). Landlord shall have the right, in its sole discretion, to select any entity or entities which it desires to have as the electrical service provider to the Building (including, the Premises); provided, that Landlord shall use its best efforts in selecting such provider to minimize the cost of electricity provided to the Building. Landlord shall not select a provider that is an Affiliate of Landlord without Tenant's consent.

**2.08    Manner of Payment.**    Tenant shall pay all Rent as the same shall become due and payable under this Lease, at Tenant's election, either by wire transfer of immediately available federal funds as directed by Landlord, in accordance with wiring instructions given by Landlord at least 30 days in advance, or by check drawn on a New York Clearing House Association member bank, in each case at the times provided herein and, except as otherwise provided in this Lease, without notice or demand and without setoff, credit, counterclaim or abatement except such set-offs, credits and abatements to which Tenant may be entitled pursuant to the express provisions of this Lease. All Rent shall be paid in lawful money of the United States to Landlord at its office or such other place (which shall be located in the continental United States if Tenant is paying Rent by check) as Landlord may from time to time designate. If Tenant fails to pay any Rent within 10 days after the due date therefor, Tenant shall pay interest thereon from the date when such Rent became due to the date of Landlord's receipt thereof at the Default Rate. Any Additional Rent for which no due date is specified in this Lease, or which this Lease describes as being due "upon demand" (or like words), shall be due and payable on the 30th day after the date of invoice.

## ARTICLE 3

### Landlord Covenants

**3.01    Landlord Services.**    From and after the Commencement Date Landlord, at Landlord's expense (except as otherwise expressly provided and subject to reimbursement as part of Operating Expenses to the extent properly includable therein), shall furnish Tenant with the following services to the Premises (collectively, "Landlord Services"):

(a)     Heat, ventilation and air-conditioning ("HVAC") during Business Hours on Business Days in accordance with the design specifications set forth in Exhibit G attached hereto. If Tenant shall request that Landlord provide HVAC service through the Building's systems at any other times, Landlord shall furnish such service (i) in the case of a Business Day, upon receiving notice from Tenant by 3:00 p.m. of such Business Day, or (ii) in the case of a non-Business Day, upon receiving notice from Tenant by 3:00 p.m. of the immediately preceding Business Day, and Tenant shall pay to Landlord, within 30 days after demand, Landlord's actual cost (excluding any depreciation of the Building's piping and other equipment used to supply HVAC) of providing such HVAC. As of the date of this Lease, such actual cost is $100 per hour

per zone, and for such purpose, the 2nd through the 5th floors of the Building constitute one zone and the 6th through the 10th floors of the Building constitute one zone. If Tenant and any other tenant or occupant of the Building shall each request overtime HVAC for the same zone, the cost thereof shall be appropriately prorated. Landlord shall provide at the Building an operating engineer to manage the Building's HVAC systems during Business Hours on Business Days, which operating engineer shall be on call on a 24 hour per day, 7 day per week basis; provided, that Tenant shall reimburse Landlord for the actual costs charged to Landlord by such operating engineer for its services at times other than Business Hours on Business Days. To the extent necessary, Tenant shall have access to the HVAC ductwork located on the Plaza Floor of the Building which services the 2nd floor of the Premises; provided, that in no event shall Tenant disrupt HVAC service to the Plaza level of the Building during Business Hours on Business Days. Tenant may install in the Premises such supplementary HVAC units as Tenant may elect. Tenant shall have the right, without charge, to tap into the Building's condenser water system in any one or more locations in order to allow Tenant to receive such condenser water service in such amounts per floor as Tenant may elect but in no event more than 200 tons in the aggregate. Tenant, at Tenant's expense, shall install any such additional pumps as may be necessary in order to provide adequate water flow to the base Building units, but in no event shall the flow of condenser water fall below 1,400 gpm to each base Building unit as the result of any work done by Tenant. Tenant shall install at Tenant's expense a meter to measure Tenant's consumption of condenser water, and Tenant shall pay to Landlord for Tenant's condenser water usage as shown on such meter, on a per ton per hour basis, within 30 days after rendition of a bill therefor, an amount equal to Landlord's actual cost of providing such condenser water, and which amount may be increased by Landlord from time to time to reflect actual increases in Landlord's cost of providing such condenser water. Upon 30 days' prior notice, Landlord shall perform any draindowns and refills required for Tenant's connection to the Building's condenser water without charge to Tenant (subject to reimbursement as part of Operating Expenses to the extent properly includable therein). Tenant shall have the right to connect Tenant's supplementary HVAC units to the Building's building management system and to use the GE programmable lighting system for lighting control within the Premises and Tenant shall have the right to remotely monitor such systems via the Building's building management system; provided, that any cost for necessary software or hardware or for connections and programming shall be paid by Tenant.

(b)      (i) Non-exclusive use of all passenger elevators to provide passenger elevator service to the applicable floors of the Premises 24 hours per day, 365 days per year, and (ii) loading dock and freight elevator access to the Premises 24 hours per day, 365 days per year, provided, that at times other than Business Hours on Business Days, a representative of Tenant must be present at the loading dock to receive all deliveries to Tenant. Landlord shall maintain and operate the Building elevators in a manner equal to or better than that existing as of the date of this Lease. Subject to availability, Tenant shall be permitted to use the Building loading dock and freight elevator 24 hours per day, 7 days per week in connection with the performance of Alterations.

(c)      Reasonable quantities of hot and cold water to the floors on which the Premises is located for core lavatory, private showers, pantry and cleaning purposes only and cold water to the floors on which the Premises is located for lavatories and water cooler purposes

17

only.  If Tenant requires water for any other purpose, Landlord shall furnish cold water at the Building core riser through a capped outlet located on the floor on which such water is required (within the core of the Building); Tenant shall install in accordance with Landlord's specifications, and Landlord shall maintain, at Tenant's reasonable expense, meters to measure Tenant's consumption of water for such other purposes in which event Tenant shall reimburse Landlord for the actual cost of the quantities of water shown on such meters, within 30 days after receipt of an itemized bill therefor.

(d)    Electric energy in an amount not less than Tenant's Share of the electric energy provided to the Building.  At least 5 watts per rentable square foot from time to time included in the Premises (exclusive of any electric energy required to operate Building HVAC or other Building equipment on floors included in the Premises) shall be available on the floors of the Premises, and any cost to bring electricity in excess of such amount to the Premises shall be borne by Tenant.  Tenant shall have the right to redistribute the electric energy provided to Tenant between the floors of the Premises; provided, that Tenant, at Tenant's expense, performs such work in compliance with the provisions of Section 4.01 and all applicable Laws and installs any additional meters necessary to measure such redistributed electric energy.  At any time Tenant may request that additional electricity capacity (specifying the amount requested) be made available to Tenant.    Landlord, in Landlord's reasonable judgment (taking into consideration the potential needs of present and future tenants of the Building and the Building itself) shall determine if the same is available through the existing Building facilities and, if and to the extent the same is so available, Landlord shall furnish same to Tenant.  If sufficient additional capacity shall necessitate installation of an additional riser, risers or other proper and necessary equipment, including, without limitation, any switchgear, the same shall, at Tenant's request, be diligently installed by Landlord and the commercially reasonable actual cost thereof (or the pro rata portion thereof, if such capacity is in excess of that being provided to Tenant) shall be paid by Tenant within 30 days after the completion and rendition of a bill to Tenant therefor.  Landlord shall not hereafter agree to provide any other tenant of the Building with rights to obtain additional electricity that are more favorable to such tenant than the provisions of this Section 3.01(d).

(e)    Subject to Section 3.02(c), cleaning services in accordance with Exhibit I attached hereto.  Tenant shall pay to Landlord, within 30 days after receipt of an itemized bill therefor, the reasonable actual costs incurred by Landlord for cleaning services in excess of those set forth on Exhibit I.  Tenant shall retain Landlord's cleaning contractor or any other contractor reasonably acceptable to Landlord (which will utilize the same union local as Landlord's cleaning contractor) to perform such cleaning at Tenant's expense.    Landlord's cleaning contractor shall have access to the Premises after 6:00 p.m. and before 8:00 a.m. and shall have the right to use, without charge therefor, all light, power and water in the Premises reasonably required to clean the Premises.  Tenant shall have the right (x) to use Tenant's employees to perform day porter services in the Premises and/or (y) to hire day porters to perform day porter services in the Premises.

(f)    Tenant shall have the exclusive right, at no additional cost, to use Tenant's Share from time to time of the total number of parking spaces in the parking area designated for tenants of the Building for the parking of automobiles of permitted occupants of the Premises

18

and their invitees, subject to such reasonable rules and regulations for the use of said area now or hereafter adopted by Landlord in accordance with the provisions of Section 8.02.

(g)    Subject to any rights of UBS under the UBS Lease regarding the operation and maintenance of the Building Amenities, Landlord shall be responsible for the operation and maintenance of the auditorium and break-out rooms located on Level P1 of the Building and the cafeteria, break-out rooms, exercise facility and medical facility located on the Plaza Floor of the Building (all of the foregoing are collectively called the "Building Amenities") in a first-class manner sufficient to meet the reasonable needs of Tenant and the occupants of the Premises and their employees, and Tenant, the occupants of the Premises and their employees shall have the right, at no additional cost, to use the Building Amenities, subject to such reasonable rules and regulations for the use of said areas now or hereafter adopted by Landlord in accordance with the provisions of Section 8.02.

(h)    Landlord shall reasonably cooperate with Tenant, at Tenant's expense (if Landlord incurs any out-of-pocket expenses therefor), so that Tenant may obtain gas service from the public utility or other provider and, upon reasonable prior notice from Tenant, shall provide any necessary shutdowns required for Tenant's tap into the gas riser, and Tenant shall pay to Landlord the actual out-of-pocket costs incurred by Landlord in connection with such shutdown.

(i)    Landlord shall employ, or cause to be provided, the services of a staff comparable to the staffs of comparable first-class office buildings located in the vicinity of the Building to perform all of the services that Landlord is obligated to perform pursuant to this Lease. Landlord shall operate and maintain the Building and all systems servicing the Building in a first-class manner.

(j)    Landlord shall provide Building security in accordance with generally accepted practices and in accordance with this Section 3.01(j). Landlord shall provide for the Building a restricted access program for all Building tenants and the employees and visitors of all Building tenants, which program shall consist of (i) controlled electronic access to the Building through the electronic proximity cards with picture identifications enabling such Tenant employees to access lobby areas and the office tower of the Building (and Landlord shall install at all such controlled access points card readers capable of reading Tenant's electronic proximity cards), (ii) electronic surveillance and (iii) uniformed security guards to monitor and record activity within the Building 24 hours per day, 7 days per week. In addition, Tenant may install additional security personnel in such locations in or about the Building as Tenant may from time to time desire, but the same shall not in any way diminish Landlord's obligation under this Section 3.01(j). Landlord and Tenant shall each give the other prompt notice of any advisories, notices or similar communications received by Landlord or Tenant, as the case may be, from a governmental authority specifically in respect of all or any portion of the Project and which relates to the security therefor, unless Landlord or Tenant, as the case may be, is prohibited by such governmental authority from disclosing the content of such advisory, notice or communication. Tenant shall have the right to designate a representative to act as Tenant's security liaison with the Building management office (or another representative designated by Landlord) regarding security matters affecting the Project and the Premises. Landlord's

19

representative shall reasonably cooperate with Tenant's representative on an ongoing basis during the Term with respect to sharing information about security for the Project, coordinating fire drills and other related security procedures and planning for special security needs with respect to particular events or visits by third parties to the Premises. Upon either party's request from time to time, Landlord and Tenant shall cause their representatives to meet to keep each other advised as to the status of the their respective security specifications and the strategies to be employed by Landlord and Tenant in connection therewith. Landlord shall consider in good faith Tenant's reasonable recommendations with respect to security for the Project, and Tenant shall pay Landlord for actual increases in the cost of security for the Project by reason of Landlord implementing a Tenant security recommendation. Landlord shall advise Tenant of any impending material change in the security system or procedures for the Project promptly after Landlord makes its decision to effect such change. Landlord shall cooperate with Tenant in connection with Tenant's security program (for example, in coordinating Tenant's evacuation drills).

   (k) Tenant, at Tenant's expense, may install a computerized Building directory, containing the name of Tenant and/or Tenant's permitted subtenants, and the names of their respective officers and employees. Tenant shall maintain such directory and may include therein the names of other occupants of the Building.

   (l) Landlord shall at all times provide a lobby attendant during Business Hours on Business Days to direct visitors to the tenants of the Building. In addition, Tenant shall have the right to maintain in the Building lobby employees of Tenant at the Building's concierge desk (the "Lobby Positions") and to install, at Tenant's expense, such telephone, computer and communication installations (including connections to the Premises) as may be reasonably required by Tenant in connection with the Lobby Positions. Landlord shall permit Tenant's representatives assigned to the Lobby Positions to use any restrooms and locker room facilities that Landlord makes available to Landlord's own lobby personnel. If Tenant maintains the Lobby Positions, Landlord and Tenant shall cooperate with each other to coordinate receiving visitors in the Building lobby, including, without limitation, having the Building concierge handle overflow traffic headed to the Premises .

   (m) Landlord shall make available to Tenant, without charge, such space in the Building core and Building shafts as may reasonably be required by Tenant and in such locations as may reasonably be requested by Tenant (subject, however, to Landlord's reasonable approval, which approval shall take into account, without limitation, the respective costs to Tenant of using different locations) for Tenant's telephone, telecommunications, data transmission systems or other services and to accommodate the exhaust from any kitchen facility located within the Premises. Tenant shall be permitted throughout the Term to use, and Landlord shall reserve for Tenant's use, Tenant's Share of all space in the Building core and shaft for such purposes. Landlord shall permit Tenant's telephone, telecommunications and data transmission cables to be run from the street through the Building's core telephone closets to Tenant's telephone, telecommunications and data systems within the Premises, and from the Premises to any Rooftop Equipment installed by Tenant. Tenant shall have access at all times to the Building's core telephone closets on each floor of the Premises.

(n)     Tenant, to the extent permitted by Law, may use the fire stairs between the floors included from time to time in the Premises and secure the doors of the Premises leading off such fire stairs.

(o)     Tenant shall have access to the Premises on a 24 hours per day, 365 days per year, basis.

(p)     Landlord shall maintain the existing emergency generators in the Building and, in the event of an emergency, shall operate such generators for the benefit of Tenant, including, without limitation, for the operation of life safety systems of the Building.

**3.02   General Provisions**.  (a) Except as provided elsewhere in this Lease, Landlord shall have no liability to Tenant by reason of any stoppage or interruption of any Landlord Service, electricity or other service or the use of any Building facilities and systems.  Landlord shall provide Tenant with such advance notice, if any, as is reasonable under the circumstances of such stoppage or interruption.  Landlord shall use commercially reasonable efforts (including the use of overtime labor to the extent that the curing of the problem in question is within Landlord's reasonable control and is reasonably necessary to avoid unreasonable interference with Tenant's business operations) to begin and diligently prosecute to completion such repairs as may be required to machinery or equipment within the Project to provide restoration of any Landlord Service as promptly as possible and in a manner so as to minimize interference with Tenant's use and enjoyment of the Premises, and, where the cessation or interruption of such Landlord Service has occurred due to circumstances or conditions beyond the Project boundaries, to cause the same to be restored by diligent application or request to the provider.  To the extent reasonably possible, Landlord shall confine all such stoppages within Landlord's reasonable control to times that are not Business Hours.  Notwithstanding the foregoing, if for any reason, including, without limitation, Force Majeure (but not by reason of (i) a Casualty or (ii) any act or (where Tenant has an affirmative obligation to act pursuant to the terms of this Lease) omission of Tenant or any person claiming through or under Tenant or any of their respective agents, employees, contractors or (while in the Premises) invitees), there is a failure to furnish any of the services which Landlord is required to furnish pursuant to this Lease, or to make any repairs or replacements which Landlord is required to make pursuant to this Lease, or to perform any other obligation of Landlord under this Lease or if Landlord performs any repair, replacement, alteration, addition, improvement or installation in or about the Premises which Landlord is required or permitted to make under this Lease and as a result of any of the foregoing all, or any portion of the Premises shall be materially and adversely affected for 3 days (one day in the case of any such event resulting from the willful misconduct of Landlord) after notice from Tenant, then Fixed Rent and Additional Rent payable with respect to the portion or portions of the Premises that are so affected shall be abated from the day after such 3 day (or 1 day, as applicable) period until such space is no longer so affected.

(b)     "Business Hours" means 8:00 a.m. to 6:00 p.m., Monday through Friday. "Business Days" means all days except Saturdays, Sundays and days which are observed by both the federal and the state governments as legal holidays.

21

(c)    (i)    Tenant may, upon not less than 60 days' prior notice to Landlord (the "Direct Cleaning Notice"), elect to contract directly with Landlord's cleaning contractor or with another cleaning contractor reasonably acceptable to Landlord for the cleaning of the Premises. If Tenant retains a contractor other than Landlord's contractor, then (A) Tenant's contractor shall have the right to use the janitor closets on each floor of the Premises to store such equipment, supplies and materials; and (B) upon request by Tenant, Landlord shall lease to Tenant up to 200 rentable square feet in a location in the Building selected by Landlord (provided Landlord shall endeavor to select a location at which running water is available) for locker space for Tenant's cleaning contractor (and Landlord and Tenant shall execute and deliver an amendment to this Lease to reflect the leasing of such locker space by Tenant; provided, that (1) Tenant shall not pay Fixed Rent, Tax Payments or Operating Payments in respect of such space, nor shall Tenant's Share be affected by the leasing of such space and (2) Landlord shall not be required to perform any work or pay any amounts in connection with such space). Tenant shall pay the contractor retained by Tenant directly for the cost of cleaning the Premises, and Landlord shall not be required to clean the Premises or any part thereof and only Tenant shall have the right to enforce the contractor's obligations.

(ii)    If and so long as Tenant obtains cleaning services under Section 3.02(c)(i) above, then (A) there shall be excluded from Operating Expenses all costs incurred for the cleaning of the Premises and the cleaning of all other tenant areas of the Building, (B) Operating Expenses for the Base Operating Year shall be reduced by the cost (the "Base Cleaning Cost") incurred by Landlord in the Base Operating Year for the cleaning of the Premises and the cleaning of all other tenant areas of the Building (provided that there shall be no retroactive Operating Payment resulting from such reduction in the Base Operating Year), and (C) the Fixed Rent provided in Section 2.02 shall be reduced by an amount equal to the Fixed Cleaning Rent. "Fixed Cleaning Rent" means the amount determined from time to time by multiplying (1) the quotient obtained by dividing the Base Cleaning Cost by the Building Denominator, and (2) the number of rentable square feet from time to time constituting the Premises.

(iii)    If Tenant shall elect to contract directly with a cleaning contractor in accordance with Section 3.02(c)(i) above for the provision of cleaning services to the Premises, Tenant may discontinue obtaining cleaning services from such contractor and require Landlord, upon not less than 60 days' prior notice, to clean the Premises in accordance with the provisions of Section 3.01(e). If Tenant elects to have Landlord resume furnishing cleaning services to the Premises, then if and so long as Tenant receives such cleaning services from Landlord, (A) there shall be included in Operating Expenses the cost and expenses incurred for the cleaning of the Premises and the cleaning of all other tenant areas of the Building, (B) Operating Expenses for the Base Operating Year shall be increased by the Base Cleaning Cost, and (C) the Fixed Rent provided in Section 2.02 shall be increased by the Fixed Cleaning Rent.

(d)    Prior to the first billing (and any time thereafter at the request of Tenant) of any Landlord Service for which the payment that Landlord is entitled to be reimbursed by Tenant requires a computation to determine Landlord's cost of providing such service, Tenant shall be given a reasonable opportunity to review such computation. With respect to all

22

Additional Rent invoiced by Landlord to Tenant, Landlord shall provide to Tenant, within 5 Business Days after notice from Tenant, such back-up as Tenant may reasonably request with respect to the amount of such invoice.

## ARTICLE 4

### Leasehold Improvements; Tenant Covenants

**4.01    Alterations.** (a) Tenant shall make no improvements, changes or alterations in or to the Premises ("Alterations") which constitute Material Alterations without Landlord's prior approval, which approval shall not be unreasonably withheld or delayed. "Material Alteration" means any Alteration that (i) affects the exterior (including the appearance) of the Building, (ii) adversely affects the structural integrity of the Building or (iii) adversely affects the usage or the proper functioning of any of the Building systems. Any Alteration that does not constitute a Material Alteration may be made by Tenant without Landlord's approval.

(b)    Tenant shall obtain all necessary governmental permits and certificates for the commencement and prosecution of Alterations and for final approval thereof upon completion, and shall cause such Alterations to be performed in compliance therewith, with all Laws. Alterations shall be performed in a good and workmanlike manner, using materials and equipment at least equal in quality and class to the then standards for the Building reasonably established by Landlord. Alterations shall be performed by architects, engineers and contractors selected by Tenant. The performance of any Alteration shall not be done in a manner which would disturb harmony with any trade engaged in performing any other work in the Building outside the Premises or create any actual interference with the operation of the Building outside the Premises. Tenant shall stop the performance of any Alteration if Landlord notifies Tenant that continuing such Alteration would so disturb harmony with any trade engaged in performing any other work in, or create any actual interference with the operation of, the Building outside the Premises, and Landlord and Tenant shall cooperate to eliminate such interference. Tenant may at any time utilize Tenant's employees to perform Alterations, whether or not such employees shall be unionized.

(c)    Throughout the performance of Alterations, Tenant shall carry worker's compensation insurance in statutory limits, "all risk" Builders Risk coverage and general liability insurance, with completed operation endorsement, for any occurrence arising from the performance of such Alterations in or about the Project, under which Landlord, its managing agent and any Superior Lessor and Superior Mortgagee whose name and address have been furnished to Tenant shall (in the case of such general liability insurance only) be named as additional parties insured as their interest may appear, in such limits as Landlord may reasonably require (but not in excess of such limits as are customarily required by landlords of similar office buildings located in the vicinity of the Building for similar jobs costing the amount of the particular job being performed for Tenant). Upon request by Landlord, Tenant shall furnish Landlord with evidence that such insurance is in effect during the performance of Material Alterations.

(d)      Should any mechanics' or other lien be filed against any portion of the Project by reason of the acts or (where Tenant has an affirmative obligation to act pursuant to the terms of this Lease) omissions of, or because of a claim against, Tenant, any subtenant of Tenant or any of their respective agents, employees or contractors, Tenant shall cause the same to be canceled or discharged of record by bond or otherwise within 30 days after notice from Landlord.  If Tenant shall fail to cancel or discharge any such lien within said 30 day period, Landlord may cancel or discharge the same only by bonding the same, in which event Tenant shall obtain and substitute a bond for Landlord's bond and reimburse Landlord for all reasonable costs incurred in canceling or discharging such liens (including, without limitation, the cost of Landlord's bond and of any security posted to obtain Landlord's bond), together with interest thereon at the Default Rate from the date incurred by Landlord until repaid by Tenant, such substitution to be effected and reimbursement to be made within 30 days after receipt by Tenant of a detailed written statement from Landlord as to the amount of such bond and costs.  Except if and to the extent arising from an act or (where such party has an affirmative obligation to act pursuant to the terms of this Lease) omission of any Landlord Indemnified Party, Tenant shall indemnify and hold all Landlord Indemnified Parties harmless from and against all costs (including, without limitation, reasonable attorneys' fees and disbursements and costs of suit), losses, liabilities or causes of action caused by the performance of any Alteration, including, without limitation, any mechanics' or other liens asserted in connection with the performance of such Alteration.

(e)      At Landlord's request, Tenant shall deliver to Landlord, within 60 days after the completion of any Alteration for which Tenant prepared plans, either "as-built" drawings thereof or the final working drawings therefor marked with field changes.

(f)      Landlord shall reasonably and diligently cooperate with Tenant in the performance of Alterations, including, without limitation, by signing such applications for governmental permits and certificates as Tenant may reasonably require and returning same to Tenant within 2 Business Days after receipt of Tenant's request therefor.

(g)      If, in connection with the performance of any Alteration, or in connection with any change of use of the Premises (whether or not physical alterations are involved), there is any violation of Laws, the compliance with which is the responsibility of Landlord in accordance with this Lease ("Landlord's Violations"), which (A) shall delay (or prevent) Tenant from obtaining any governmental permits, consents, approvals or other documentation required for the lawful occupancy of such portion of the Premises upon completion of such Alterations therein or otherwise, or required by Tenant to perform such Alterations, or (B) shall prevent Tenant from commencing, or shall delay Tenant in completing such Alterations or in occupying such portion of the Premises (it being understood that the imposition of conditions requiring the cure of any Landlord Violation by a governmental authority as a condition precedent to obtaining any such governmental permits, consents, approvals or other documentation which shall so delay Tenant from obtaining any governmental permits, consents, approvals or other documentation shall be deemed such a prevention or delay), then (x) Landlord shall promptly and diligently proceed to cure and remove of record such Landlord Violations and (y) Tenant shall be entitled to an abatement of Rent equal to the Fixed Rent and Additional Rent allocable to the portion of the Premises in which such Alterations are prevented from being performed or completed (but

24

only to the extent of any actual delay resulting therefrom), or the portion of the Premises prevented from being occupied by Tenant, as applicable.

(h)    If at any time during the Term, Tenant shall deliver a certification of a qualified asbestos hygienist certifying that asbestos and/or asbestos containing materials (collectively, "ACM") is located in the Premises, Landlord shall, upon Tenant's request, at Landlord's sole cost and expense, remove such ACM in compliance with applicable Law and restore any Alterations previously performed in such portion of the Premises; and from the date Tenant delivers such certification to Landlord, through the completion date of such ACM removal and restoration work by Landlord, Fixed Rent and Additional Rent shall abate as to the affected portion of the Premises to the extent, and for the period of time, that Tenant shall actually be unable to occupy, and shall not be occupying, such portion of the Premises as a result of the presence of such ACM and such work by Landlord.

(i)    Tenant shall have the exclusive right to construct, use, operate, maintain and dismantle internal staircases connecting contiguous floors of the Premises, subject to and in accordance with the terms, covenants and conditions of this Lease; provided, that Tenant shall not have the right to dismantle or alter the fire stairs in the Building, except to the extent necessary in connection with Tenant's installation of raised flooring in the Premises and, if Tenant shall perform any structural alterations within the fire stairwells of the Building, Tenant shall, on or before the expiration or within 30 days after any earlier termination of this Lease (unless Landlord requests that such alterations remain), restore the fire stairwells to the condition existing before such structural alterations.  Subject to and in accordance with the terms, covenants and conditions of this Lease, Tenant shall have the right to structurally reinforce any of the floors of the Premises.

(j)    Any dispute between Landlord and Tenant arising with respect to any Alterations shall be resolved by arbitration conducted in accordance with the provisions of Section 8.09.

**4.02    Landlord's and Tenant's Property.**  (a) All fixtures, equipment, improvements and appurtenances attached to or built into the Premises, whether or not at the expense of Tenant, which cannot be removed without significant damage to Premises or the Building (collectively, "Fixtures"), shall be and remain a part of the Premises, and shall not be removed by Tenant (but subject to Tenant's rights to alter or remove Fixtures in connection with any Alteration).  All Fixtures shall be the property of Tenant during the Term and, upon expiration or earlier termination of this Lease, shall become the property of Landlord.

(b)    All fixtures, equipment, improvements and appurtenances which do not constitute Fixtures and all furniture, furnishings and other articles of movable personal property located in the Premises (collectively, "Tenant's Property") shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term; provided, that if any Tenant's Property is removed, Tenant shall repair any damage to the Premises which Tenant is required to repair in accordance with Section 4.04(a) resulting from the installation and/or removal thereof.

25

(c)    At or before the Expiration Date, or within 15 days after any earlier termination of this Lease, Tenant, at Tenant's expense, shall, unless Landlord agrees otherwise in writing, remove Tenant's Property from the Premises, and Tenant shall repair any damage to the Premises which Tenant is required to repair in accordance with Section 4.04(a) resulting from any installation and/or removal of Tenant's Property.  Notwithstanding the foregoing, any items of Tenant's Property which remain in the Premises after the Expiration Date, or after 15 days following any earlier termination date, shall, after Landlord delivers 10 days' notice to Tenant (except that, in the case of an earlier termination of this Lease by reason of a default by Tenant, such notice shall not be required), be deemed to have been abandoned and may be retained by Landlord as Landlord's property or disposed of by Landlord, without accountability, in such manner as Landlord shall determine, at Tenant's expense.

**4.03    Access and Changes to Building.**  (a)  Landlord reserves the right, at any time, to make changes in or to the Project (other than within the Premises except as provided in the further provisions of this Section 4.03 or elsewhere in this Lease) as Landlord may deem necessary or desirable, and Landlord shall have no liability to Tenant therefor; provided, that any such change does not interfere with Tenant's reasonable access to the Premises and does not affect the first-class nature of the Project.  Nothing contained in the preceding sentence shall be deemed to relieve Landlord of any of its obligations expressly set forth elsewhere in this Lease.  Landlord may install and maintain pipes, fans, ducts, wires and conduits within or through the walls, floors or ceilings of the Premises; provided, that the same (i) are concealed behind walls, below floors or above ceilings and (ii) do not reduce the usable area of the Premises.  In exercising its rights under this Section 4.03, Landlord shall (x) use commercially reasonable efforts (including the use of overtime labor if the performance of any work by Landlord shall materially interfere with Tenant's use of the Premises for the ordinary conduct of Tenant's business) to minimize any interference with Tenant's use of the Premises for the ordinary conduct of Tenant's business by reason of the performance of any work by Landlord and (y) use best efforts to prevent any permanent interference with Tenant's use of the Premises for the ordinary conduct of Tenant's business by reason of any installation or change made by Landlord.

(b)    Landlord and persons authorized by Landlord shall have the right, upon reasonable prior notice to Tenant (except in an emergency, in which case upon such notice, if any, as is feasible), to enter the Premises (together with any necessary materials and/or equipment) to inspect or perform such work as Landlord may reasonably deem necessary or desirable and as is permitted under this Lease, or to exhibit the Premises to prospective purchasers or, during the last 12 months of the Term, to prospective tenants.  Landlord shall have no liability to Tenant by reason of any such entry; provided, that (i) Landlord shall use commercially reasonable efforts (unless a higher standard provided elsewhere in this Lease is applicable to such entry by Landlord) to minimize interference with Tenant's use and enjoyment of the Premises and to exercise due care in entering or exhibiting the Premises and (ii) Landlord shall repair any damage caused by Landlord in the Premises during such entry, including, without limitation, any repair or replacement required to any finishes in the Premises as a result of such entry.  During the performance of any work by Landlord in any portion of the Premises, Landlord shall have the right to store materials and equipment utilized in connection with such work in the portion of the Premises where such work is being performed, but only if Landlord would suffer a hardship if Landlord were required to remove such materials and equipment at the

26

end of each day's work.  Except in an emergency, Landlord shall not enter the Premises unless accompanied by a representative of Tenant; provided, that Tenant makes such representative available to Landlord upon reasonable prior notice.

(c)     Landlord shall not change the address of the Building at any time.

(d)     Without limiting the generality of the foregoing and notwithstanding anything to the contrary contained herein, Landlord shall not change (except to a de minimis extent) the current character or configuration of the lobby of the Building, the Building plaza or the Building Amenities without Tenant's prior consent.

**4.04    Repairs.**    (a) Except if and to the extent the following shall be Landlord's obligation pursuant to the express provisions of this Lease, Tenant shall keep the Premises (including, without limitation, all Fixtures) in good condition and, upon expiration or earlier termination of the Term, shall surrender the same to Landlord in its then "as is" condition (but subject to Section 4.02).  All damage caused by Tenant, its agents, subtenants and its and their respective employees, contractors and invitees (so long as such invitees are in the Premises) to the equipment and other installations in the Premises shall be repaired by Tenant if and to the extent that Tenant's failure to repair such damage causes or is reasonably likely to cause any loss, cost, liability, damage, harm, material inconvenience or expense to Landlord or any other tenant of the Building.  Neither Tenant nor Tenant's agents, subtenants and their respective employees, contractors and invitees (so long as such invitees are in the Premises) shall commit any waste or damage to any portion of the Premises or the Building.

(b)     Except if and to the extent the following shall be Tenant's obligation pursuant to the express provisions of this Lease, Landlord shall, at Landlord's cost and expense (subject to reimbursement by Tenant as Operating Expenses, but only if and to the extent such costs and expenses are not excludable therefrom pursuant to the express provisions of Section 2.05), operate, maintain, repair and replace (if reasonably necessary) (i) all structural portions of the Building (whether located within or outside of the Premises), such as, by way of example only, the roof, foundation, footings, exterior walls, load-bearing columns, ceiling and floor slabs, windows, window sills and sashes, (ii) all common and public service areas of the Building, including, without limitation, all elevators, corridors, lobbies, core lavatories (including all fixtures therein), core electric closets, core telecommunication closets, core janitor closets (unless and for so long as Tenant elects to contract directly with a contractor to clean the Premises in accordance with Section 3.02(c) above), mechanical rooms, the parking areas of the Building and the curbs and sidewalks adjacent to the Building, and (iii) all Building systems (whether such Building systems are located within or outside of the Premises) serving the common and public service areas and the Premises (other than any distribution of such systems located in the Premises and installed by Tenant, unless such distribution was installed by Tenant in place of Landlord by reason of Landlord's failure to do the same) (the areas described in clauses (i), (ii) and (iii) are collectively called the "Landlord Obligation Areas"), in each case throughout the Term, and in such manner as is consistent with the maintenance, operation and repair obligations associated with first-class office buildings located in the vicinity of the Building.   Landlord shall obtain and comply with the terms of commercially reasonable warranties in connection with the installation by Landlord in the Building of any item, if the cost

of maintaining, repairing and replacing such item would otherwise be payable by Tenant, whether by way of Operating Expenses or otherwise.

**4.05** **Compliance with Laws.** (a) Tenant shall comply with all laws, ordinances, rules, orders and regulations (present, future, ordinary, extraordinary, foreseen or unforeseen) of any governmental, public or quasi-public authority having jurisdiction over the Premises, at any time duly in force (collectively "Laws"), but only if and to the extent such compliance obligation is the result of any Alteration or particular manner of use by Tenant (in contrast to use by Tenant for customary office purposes) of the Premises or any part thereof; it being acknowledged that (i) all Laws affecting Tenant's occupancy of the Premises (as opposed to Laws requiring physical changes to the Premises) shall be Tenant's obligation, (ii) all Laws governing Tenant's use of the Premises for the Identified Ancillary Uses shall be Tenant's obligation and (iii) in no event shall Tenant be required to comply with any Laws requiring structural changes to the Building. Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot which is allowed by applicable Law. Landlord and Tenant shall reasonably cooperate with each other to ensure that all Laws affecting the Premises and the Building are complied with. Tenant shall not be required to comply with any Laws for so long as Tenant shall be contesting, through appropriate proceedings brought in accordance with applicable Law, Tenant's obligation to comply therewith; provided, that Tenant shall indemnify Landlord from and against any and all claims arising therefrom or in connection therewith in accordance with the terms and procedures set forth in Section 6.08.

(b)    Except as otherwise expressly made the obligation of Tenant pursuant to this Lease, Landlord shall, at Landlord's own cost and expense (subject to reimbursement as Operating Expenses to the extent such costs and expenses are includable therein), comply with all Laws affecting the Landlord Obligation Areas and all Laws that require physical changes in or to the Premises. Without limiting the generality of the foregoing, Landlord shall maintain in effect a certificate of occupancy for the Building that shall allow the Premises to be used as general, professional, administrative and executive offices (but Landlord shall have no obligation to modify such certificate of occupancy to permit any of the Identified Ancillary Uses; provided, that if such certificate of occupancy shall permit any of the Identified Ancillary Uses in the Premises, then Landlord shall not cause such certificate of occupancy to be modified so as to prohibit Tenant from using such portion of the Premises for such permitted Identified Ancillary Uses).

**4.06** **Right to Perform Other Party's Covenants.** (a) If Tenant fails to perform any of its obligations under this Lease, Landlord, any Superior Lessor or any Superior Mortgagee (each, a "Curing Party") may perform the same at the reasonable expense of Tenant (i) after such notice, if any, as is feasible under the circumstances in the case of emergency, imminent violation of any Law, imminent cancellation of any insurance policy maintained by Landlord, imminent threat of danger to the health or safety of persons, imminent risk of civil or criminal liability of Landlord, material adverse affect on the Project or any portion thereof or Landlord's interest therein or unreasonable interference with the use of another tenant's space or the operation of the Building, and (ii) in any other case, if such failure continues after notice and beyond all applicable grace periods provided in this Lease, and thereafter such failure is not remedied within 10 days after a second notice to Tenant (in which the Curing Party notifies

28

Tenant that the Curing Party will undertake such performance at Tenant's expense). If a Curing Party performs any of Tenant's obligations under this Lease pursuant to the immediately preceding sentence, Tenant shall pay to such Curing Party (as Additional Rent) the reasonable costs thereof, together with interest at the Interest Rate from the date such costs were incurred by the Curing Party until paid by Tenant, within 30 days after receipt by Tenant of a detailed statement as to the amounts of such costs. "Prime Rate" means an annual interest rate equal to the prime or base rate from time to time announced by Citibank, N.A. (or, if Citibank, N.A. shall not exist or shall cease to announce such rate, such other New York Clearing House Association member bank, as shall be designated by Landlord in a notice to Tenant) to be in effect at its principal office in New York, New York. "Interest Rate" means an annual interest rate equal to the lesser of (A) the Prime Rate plus 2% or (B) the maximum rate permitted by Law. "Default Rate" means an annual interest rate equal to the lesser of (x) the Prime Rate plus 5% or (y) the maximum rate permitted by Law.

(b)    If Landlord fails to perform any of Landlord's obligations under this Lease, Tenant may perform the same at the reasonable expense of Landlord (i) after such notice, if any, as is feasible under the circumstances in the case of emergency, imminent violation of any Law, imminent cancellation of any insurance policy maintained by Tenant, imminent threat of danger to the health or safety of persons, imminent risk of civil or criminal liability of Tenant or material impairment of the conduct of Tenant's normal operations in the Premises, and (ii) in any other case, if such failure continues for 10 days after a notice to Landlord (in which Tenant notifies Landlord that Tenant will undertake such performance at Landlord's expense). If Tenant performs any of Landlord's obligations under this Lease pursuant to the immediately preceding sentence, Landlord shall pay to Tenant the reasonable costs thereof, together with interest at the Interest Rate from the date such costs were incurred by the Tenant until paid by Landlord, within 30 days after receipt by Landlord of a detailed statement as to the amounts of such costs.

## ARTICLE 5

### Assignment and Subletting

5.01    **Assignment; Etc.**  (a) Subject to the further provisions of this Article 5, and subject to any rights of UBS under the UBS Lease, Tenant shall have the right, without Landlord's consent and without Landlord having any right to share in profits, at any time and from time to time, to permit the Premises then leased by Tenant from Landlord to be used by Affiliates of Tenant (with or without a sublease), to assign or otherwise transfer this Lease (directly or indirectly, including, without limitation, by operation of law and by merger, reorganization or recapitalization of or with Tenant), to sublease all or any portion of the Premises, to permit further subleases of any tier and assignments of subleases and to permit portions of the Premises to be used under so-called "desk sharing" or other temporary arrangements.

(b)    "Affiliate" means, as to any designated person or entity, any other person or entity which controls, is controlled by, or is under common control with, such designated person or entity. "Control" (and with correlative meaning, "controlled by" and "under common control with") means ownership or voting control, directly or indirectly, of 25% or more of the

29

voting stock, partnership interests or other beneficial ownership interests of the entity in question. If any person or entity to whom Tenant shall have assigned this Lease or sublet all or any portion of the Premises pursuant to and in accordance with this Section 5.01 shall thereafter cease to be an Affiliate of Tenant, then no consent of Landlord shall be required for the continuation of such person's or entity's tenancy or subtenancy, as applicable.

    5.02    **Landlord's Right of First Offer.** (a) Notwithstanding anything contained in Section 5.01(a) to the contrary, but subject to the provisions of Section 5.02(e), and subject to any rights of UBS under the UBS Lease, if Tenant desires to assign this Lease or to sublet all or part of the Premises (other than to an Affiliate of Tenant, a purchaser of all or substantially all of Tenant's assets or by reason of a merger, reorganization or recapitalization of or with Tenant) for all or substantially all of the remainder of the Term, Tenant shall give to Landlord notice ("Tenant's Offer Notice") thereof, specifying (i) in the case of a proposed subletting, the location of the space to be sublet and (ii) the proposed assignment or sublease commencement date.

    (b)    Tenant's Offer Notice shall be deemed an offer from Tenant to Landlord whereby Landlord shall have a one-time right with respect to such space, at Landlord's option (but only if Landlord shall in good faith require such space for use by Landlord or any Affiliate of Landlord), (i) to terminate this Lease (if the proposed transaction is an assignment or a sublease of all or substantially all of the Premises), or (ii) to terminate this Lease with respect to the space covered by the proposed sublease (if the proposed transaction is a sublease of part of the Premises). Said option may be exercised by Landlord by notice to Tenant within 30 days after receipt of the Tenant's Offer Notice. If Landlord fails to give notice to Tenant within such 30 day period, Landlord's right to exercise such option shall be deemed waived.

    (c)    If Landlord exercises its option under Section 5.02(b)(i) to terminate this Lease, then this Lease shall terminate on the proposed assignment or sublease commencement date specified in the applicable Tenant's Offer Notice and all Rent shall be paid and apportioned to such date.

    (d)    If Landlord exercises its option under Section 5.02(b)(ii) to terminate this Lease with respect to the space covered by a proposed sublease, then (i) from and after such date the Rent shall be adjusted, based upon the proportion that the rentable area of the Premises remaining bears to the total rentable area of the Premises, and (ii) this Lease shall terminate with respect to such part of the Premises on the effective date of the proposed sublease.

    (e)    Notwithstanding anything to the contrary contained in this Section 5.02, the foregoing provisions of this Section 5.02 shall be of no further force and effect, and Tenant shall have no obligation to give to Landlord a Tenant's Offer Notice in respect of any proposed assignment or subletting if Landlord shall no longer be an Affiliate of Tenant.

    5.03    **General Provisions.** (a) If this Lease is assigned, Landlord may collect rent from the assignee. If the Premises or any part thereof are sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant in the payment of any sum payable under this Lease after notice and beyond applicable grace periods, collect rent from the subtenant or

occupant (but not in excess of the total amount of such monetary defaults by Tenant which exist at such time). In either event, Landlord shall apply the net amount collected against Rent.

(b)    Notwithstanding any assignment or transfer, and notwithstanding the acceptance of any Rent by Landlord from an assignee, transferee or any other party, the original named Tenant and each successor Tenant shall remain fully liable for the payment of the Rent and the performance of all of Tenant's other obligations under this Lease. The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant shall not be discharged, released or impaired in any respect by any agreement made by Landlord extending the time to perform, or otherwise modifying, any of the obligations of Tenant under this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of Tenant under this Lease; provided, that (i) in the case of any modification of this Lease made after the date of an assignment or other transfer of this Lease by Tenant, if such modification increases or enlarges the obligations of Tenant or reduces the rights of Tenant, then the Tenant named herein and each respective assignor or transferor that has not consented to such modification shall not be liable under or bound by such increase, enlargement or reduction (but shall continue to be liable under this Lease as though such modification were never made) and (ii) in the case of any waiver by Landlord of a specific obligation of an assignee or transferee of Tenant, or an extension of time to perform in connection therewith, such waiver and/or extension shall also be deemed to apply to the immediate and remote assignors or transferors of such assignee or transferee.

(c)    If this Lease shall have been assigned by the initially named Tenant (other than to an Affiliate of the Initially Named Tenant), Landlord shall give the initially named Tenant (or any entity which directly or indirectly succeeds to the interest of the initially named Tenant) (the "Initially Named Tenant") a copy of each notice of default given by Landlord to the then current tenant under this Lease. Except if Landlord shall execute and deliver a written instrument releasing the Initially Named Tenant from any further liability under this Lease, Landlord shall not have any right to terminate this Lease, or otherwise to exercise any of Landlord's rights and remedies hereunder (other than Landlord's self-help remedy in accordance with Section 4.06(a)), after a default by such current tenant, unless and until (A) Landlord shall have made a demand on the then tenant to cure the default in question, (B) the Initially Named Tenant receives a copy of the default notice in question, and (C) the Initially Named Tenant has an opportunity to remedy such default within the time periods set forth in this Lease (such time periods, with respect to the Initially Named Tenant, being deemed to run from the date that Landlord gives such Initially Named Tenant a copy of the default notice in question). Landlord shall accept timely performance by the Initially Named Tenant of any term, covenant, provision or agreement contained in this Lease on the then current tenant's part to be observed and performed with the same force and effect as if performed by the then current tenant. If the Initially Named Tenant shall cure the default by such current tenant, or if the default shall be incurable (such as bankruptcy), and Landlord or the current tenant seeks to terminate this Lease, then the Initially Named Tenant shall have the right to enter into a new lease with Landlord upon all of the then executory terms of this Lease and to resume actual possession of the Premises for the unexpired balance of the Term.

(d)    With respect to any sublease (including a further sublease by a subtenant of Tenant) other than to an Affiliate of Tenant, and which (i) is for not less than 30,000 rentable

31

square feet of the Premises, (ii) is for a term of not less than 5 years and (iii) provides for a rental which, after taking into account any free rent periods, credits, offsets or deductions to which the subtenant may be entitled thereunder, is equal to or in excess (on a per rentable square foot basis) of the Fixed Rent and recurring Additional Rent payable hereunder by Tenant with respect to such space from time to time throughout the Term (or if less (on a per rentable square foot basis) than the Fixed Rent and recurring Additional Rent payable hereunder by Tenant, if such subtenant agrees, in the non-disturbance and attornment agreement hereinafter referred to, that such rental will automatically and without condition become so equal, if, as and when the attornment provided for in such non-disturbance and attornment agreement becomes effective between Landlord and the subtenant following the termination of this Lease), Landlord shall, at Tenant's request, execute and deliver to such subtenant a non-disturbance and attornment agreement substantially in the form of Exhibit P attached hereto.  Notwithstanding anything to the contrary set forth in this Section 5.03(d), any non-disturbance and attornment agreement delivered by Landlord pursuant to this Section 5.03(d) shall, pursuant to this Lease, be conditional and by its terms expressly contain the condition such that, in the event of any termination of this Lease other than by reason of Tenant's default (e.g., by reason of a casualty pursuant to Section 7.05), then any non-disturbance and attornment agreement to a subtenant shall, automatically and without further act of the parties, terminate and be of no further force or effect from and after the applicable termination date; provided, that if (A) this Lease is terminated with respect to less than all of the Premises, or (B) Tenant exercises any renewal option with respect to less than all of the Premises, only such non-disturbance and attornment agreements to subtenants who sublease any of such space with respect to which this Lease is terminated or not renewed, as the case may be, shall, automatically and without further act of the parties, terminate and be of no further force or effect from and after the applicable termination date or the day preceding the commencement of any applicable renewal term, as the case may be.

(e)    In no event shall Tenant be required to make any profit or rent sharing payment or pay any other consideration to Landlord by reason of, or in connection with, any assignment or subletting.

(f)    If this Lease shall be assigned to and assumed by any partnership it shall be deemed to have been assumed by such partnership only and not by its constituent partners and Landlord shall look only to the assets of the partnership for the collection of a judgment (or other judicial process) requiring the payment of money by such assignee, and no other property or assets of any of the partners of such partnership shall be subject to levy, lien, attachment, execution or other enforcement procedure for the satisfaction of Landlord's rights and remedies under this Lease or Tenant's use and occupancy of the Premises.

(g)    Provided Landlord does not have comparable space available in the Building for lease at or about the relevant time required by Tenant, (A) Tenant shall be permitted to sublet space in the Building from another tenant of the Building notwithstanding any prohibition against such subletting in the relevant lease between Landlord and such other tenant and (B) Landlord agrees not to enforce any right that it may have under such relevant lease to prohibit such subletting.  Upon Tenant's request, Landlord shall confirm the foregoing to such other tenants of the Building that have an interest in subleasing space to Tenant at that time.

# ARTICLE 6

## Subordination; Default; Indemnity

**6.01    Subordination.** (a) This Lease is subject and subordinate to each mortgage (a "Superior Mortgage") and each underlying lease (a "Superior Lease") which may now or hereafter affect all or any portion of the Project or any interest therein; provided, that (i) in the case of any Superior Lease which may hereafter affect all or any portion of the Project or any interest therein, the Superior Lessor shall have executed, acknowledged and delivered a non-disturbance and attornment agreement containing the same substantive provisions as those set forth in the form attached to this Lease as Exhibit Q, and (ii) in the case of any Superior Mortgage which may now or hereafter affect all or any portion of the Project or any interest therein, the Superior Mortgagee thereunder shall have executed, acknowledged and delivered to Tenant a non-disturbance and attornment agreement containing the same substantive provisions as those set forth in the form attached to this Lease as Exhibit R.  If the foregoing conditions are satisfied, Tenant shall execute, acknowledge and deliver such instrument as may be reasonably requested by Landlord, a Superior Lessor or Superior Mortgagee to evidence the subordination described in this Section 6.01(a), but no such instrument shall be necessary to make such subordination effective.  Tenant shall execute any amendment of this Lease requested by a Superior Mortgagee or a Superior Lessor; provided, that any such amendment shall not reduce or extend the Term, increase the Rent, reduce the area of the Premises or, except to a de minimis extent, increase Tenant's obligations or decrease Tenant's rights under this Lease or decrease Landlord's obligations or increase Landlord's rights under this Lease.  In the event of the enforcement by a Superior Mortgagee of the remedies provided for by law or by such Superior Mortgage, or in the event of the termination or expiration of a Superior Lease, Tenant, upon request of such Superior Mortgagee, Superior Lessor or any person succeeding to the interest of such mortgagee or lessor (each, a "Successor Landlord"), shall automatically become the tenant of such Successor Landlord without change in the terms or provisions of this Lease (it being understood that Tenant shall, if requested, enter into a new lease on terms identical to those in this Lease).  Upon request by such Successor Landlord, Tenant shall execute and deliver an instrument or instruments, reasonably requested by such Successor Landlord, confirming the attornment provided for herein, but no such instrument shall be necessary to make such attornment effective.  The lessor under a Superior Lease is called a "Superior Lessor" and the mortgagee under a Superior Mortgage is called a "Superior Mortgagee".  Landlord represents to Tenant that as of the date of this Lease there are no Superior Leases, and the only Superior Mortgage is a mortgage held by U.S. Bank, N.A., as Trustee.

**6.02    Estoppel Certificate.** Each party shall, at any time and from time to time, within 20 days after request by the other party, execute and deliver to the requesting party (or to such person or entity as the requesting party may designate) a statement substantially in the form attached hereto as Exhibit O, certifying (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (b) the Commencement Date, the Expiration Date and the dates to which the Fixed Rent and Additional Rent have been paid, (c) the address to which all Notices under this Lease are to be sent, (d) whether or not, to the best knowledge of such party, the other party is in default in performance of any of its obligations under this Lease, and, if so, specifying

33

each such default of which such party shall have knowledge, and (e) any other matters reasonably requested by the requesting party; it being intended that any such statement shall be deemed a representation and warranty to be relied upon by the party to whom such statement is addressed.

     **6.03**   <u>Default</u>.  (a) Each of the following events or occurrences shall be an "<u>Event of Default</u>" under this Lease:

          (i)    if Tenant defaults in the payment when due of any installment of Fixed Rent, and such default continues for 5 Business Days after a notice specifying such default has been given by Landlord to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to <u>Section 5.03(c)</u> above); or

          (ii)    if Tenant defaults in the payment when due of any installment of Additional Rent with respect to Tax Payments and charges for electricity, and such default continues for 10 Business Days after a notice specifying such default has been given by Landlord to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to <u>Section 5.03(c)</u> above); or

          (iii)   if Tenant defaults in the payment when due of any installment of Additional Rent other than with respect to Tax Payments and charges for electricity, and such default continues for 20 days after a notice specifying such default has been given by Landlord to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to <u>Section 5.03(c)</u> above); or

          (iv)   if Tenant defaults in the keeping, observance or performance of any covenant or agreement of this Lease on Tenant's part to be kept, observed or performed (other than a default of the character referred to in <u>Section 6.03(a)(i)</u>, <u>(ii) or (iii)</u>), and if such default continues and is not cured within 30 days after Landlord gives to Tenant (and, if applicable, to the Initially Named Tenant if required pursuant to <u>Section 5.03(c)</u> above) a notice specifying the same, except that if such default is of such a nature that it cannot with due diligence be cured within such 30-day period, and the continuance of which for the period required for such cure will not (A) subject Landlord or any Superior Lessor or any Superior Mortgagee to prosecution for a crime or any other fine or charge (unless Tenant agrees, in a writing reasonably satisfactory to Landlord, to pay and discharge such fine or charge), (B) subject the Premises, the Project or any part thereof to being condemned or vacated or to any lien or encumbrance, which lien or encumbrance is not discharged or bonded within 30 days after notice from Landlord, or (C) result in the termination of any Superior Lease or foreclosure of any Superior Mortgage, respectively, then Tenant shall be entitled to such reasonable additional period of time to effectuate the cure or remedy of such default or failure, <u>provided</u>, that Tenant shall (x) duly advise Landlord of its intention to take all necessary steps to remedy or cure such default or failure and commence the prosecution of such cure or remedy, all within such 30-day period, (y) thereafter diligently prosecute to completion all steps necessary to remedy or cure the default or failure, and

(z) complete such remedy or cure within a reasonable time after the date of said notice from Landlord; or

(v)     (1)     if Tenant shall commence or institute any case, proceeding or other action (a) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debt under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(2)     if Tenant shall make a general assignment for the benefit of creditors; or

(3)     if any case, proceeding or other action shall be commenced or instituted against Tenant (a) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which in either of such cases (i) results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect and (ii) remains undismissed for a period of 90 days or;

(4)     if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant which appointment is not vacated or stayed within 90 days (the aforesaid events set forth in this Section 6.03(iv) are hereinafter referred to individually as a "Bankruptcy Event" or collectively, as "Bankruptcy Events").

(b)     If an Event of Default described in Section 6.03(a) (other than a Bankruptcy Event) shall occur, then (i) immediately in the case of an Event of Default described in Section 6.03(a)(i), (ii) or (iii) and (ii) in the case of an Event of Default described in Section 6.03(a)(iv), following the expiration of the applicable notice and grace period set forth therein (A) Landlord gives to Tenant a notice specifying the applicable default, and (x) the amount required to be paid by Tenant to cure such default or (y) the action required to be taken by Tenant to cure such default, as applicable, referring to this Section 6.03(b) and containing on the first page thereof, in capital letters, the following legend: "AS MORE FULLY SET FORTH IN SECTION 6.03(b) OF THE LEASE, YOUR FAILURE TIMELY TO [PAY THE AMOUNT SET FORTH HEREIN] [CURE THE DEFAULT SET FORTH HEREIN] MAY RESULT IN THE TERMINATION OF THE LEASE" and (B) such default continues for a period of 5 Business Days after the giving of the notice described in clause (A) above; then, in the case of clause (i) or clause (ii) above, Landlord shall be entitled to give to Tenant a notice of intention to end the Term at the expiration of 10 Business Days from the date of the giving of such notice,

35

and, in the event such notice is given, this Lease and the term and estate hereby granted shall terminate upon the expiration of such 10 Business Days with the same effect as if the last of such 10 Business Days were the Expiration Date, but Tenant shall remain liable for damages as provided herein or pursuant to law.

(c)    If any Bankruptcy Event shall occur, or this Lease shall be terminated as provided in Section 6.03(b), Landlord, without notice, may reenter and repossess the Premises and dispossess Tenant by summary proceedings or other lawful means.

6.04    **Remedies and Damages**. (a) If there shall occur any Event of Default, and this Lease and the Term shall expire and come to an end as provided in Section 6.03 hereof.

(i)    Tenant shall quit and peacefully surrender the Premises to Landlord, and Landlord may, without notice, re-enter the Premises and dispossess Tenant and/or the legal representative of Tenant or any other occupant of the Premises, respectively, by summary proceedings or other lawful means, and may in accordance with applicable Law repossess the Premises and remove therefrom the contents and effects of Tenant and/or the legal representative of Tenant or any other occupant, and hold the Premises as if this Lease had not been made.

(ii)    Landlord may, at its option, relet the whole or any portion or portions of the Premises, at any time or from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the applicable Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord in its sole discretion, may determine; provided, that Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for failure or refusal to relet the Premises, or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise affect any such liability, and in no event shall Tenant be entitled to receive any excess of net rentals collected over the rent and additional rent payable by Tenant hereunder, and Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.  Notwithstanding the foregoing, Landlord shall exercise reasonable efforts to mitigate Landlord's damages by reletting the Premises from time to time to other tenants in bona fide arm's-length transactions; provided, that Landlord shall not be required to give preferential treatment to the Premises over other comparable vacant space in the Building.

(b)    (i)    Tenant hereby waives the service of any notice of intention to re-enter or to institute legal proceedings to that end which may otherwise be required to be given under any present or future law.  Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, does further hereby waive any and all rights

36

which Tenant and all such persons might otherwise have under any present or future law to redeem the Premises, or the re-enter or repossess the Premises, or to restore the operation of this Lease, after (A) Tenant shall have been dispossessed by a judgment or by warrant of any court or judge, or (B) any other lawful re-entry by Landlord, or (C) any expiration or termination of this Lease and the Term, whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. Tenant also waives the right to seek a delay in levy of execution in case of any eviction or dispossession for nonpayment of rent. Landlord and Tenant each waive trial by jury in any action in connection with this Lease.

(ii)    The words "re-enter", "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

(c)    If this Lease and the Term shall expire and come to an end as provided in Section 6.03(b) hereof, or by or under any summary proceeding or any other action or proceeding by Landlord against Tenant or any person claiming by, through or under Tenant, or if Landlord shall re-enter the Premises as provided in Section 6.04(a)(i), or by or under any summary proceeding or any other action or proceeding, respectively, then, in any of said events:

(i)    Tenant shall pay to Landlord all Fixed Rent, Additional Rent and other charges payable under this Lease by Tenant to Landlord to the later to occur of (A) the date upon which this Lease and the Term shall have expired or has been terminated and come to an end, and (B) the date of re-entry upon the Premises by Landlord, as the case may be;

(ii)    Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as advanced Rent, security deposit or otherwise, but such monies shall be credited by Landlord against any damages payable by Tenant to Landlord;

(iii)    Tenant also shall be liable for and shall pay to Landlord as liquidated damages, any deficiency (the "Deficiency") between the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term including any Renewal Term exercised by Tenant prior to the termination of this Lease or re-entry by Landlord (conclusively presuming the Additional Rent to be the same as was payable for the year immediately preceding such termination or re-entry) and the net amount, if any, of rents collected under any reletting of all or part of the Premises for any part of such period, after first deducting from the rents actually collected under any such reletting, all of Landlord's expenses in connection with the termination of this Lease and Landlord's re-entry upon the Premises and in connection with such reletting including, without limitation, all repossession costs, brokerage commissions, legal expenses, reasonable attorneys' fees, court costs and disbursements, alteration costs and other expenses of preparing the Premises for such reletting, and the amount of rent concessions, construction allowance and the like granted in connection with such reletting (collectively, the "Default Expenses"); provided, that if the Premises or any part thereof should be relet in combination with other space, or for a term longer than the Term, then proper apportionment shall be made of the rent received from such

37

reletting and of the Default Expenses; it being agreed and understood by Tenant that any such Deficiency shall be paid in monthly installments of Fixed Rent, and that Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise, and no suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

    (iv) whether or not Landlord shall have collected any monthly Deficiencies as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiencies (other than the Default Expenses), as and for liquidated and agreed final damages, and not as penalty, a sum equal to the amount by which the sum of the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term, including any Renewal Term exercised by Tenant prior to the termination of this Lease or re-entry by Landlord (conclusively presuming the Additional Rent to be the same as was payable for the year immediately preceding such termination or reentry) exceeds the then fair and reasonable rental value of the Premises for the same period, both discounted to the then present value of such sum at the rate equal to the rate of U.S. Treasury obligations having a maturity closest to such unexpired portion of the Term, and less the aggregate amount of Deficiencies theretofore collected by Landlord pursuant to the provisions of Section 6.04(c)(iii) above, for the same period; it being agreed and understood by Tenant that if before presentation of proof of such liquidated damages to any court, commission or tribunal, the Premises, or any part thereof, shall have been relet in a bona fide arm's length transaction by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be presumptively deemed to be fair and reasonable rental value for the part of the whole of the Premises so relet during the term of the reletting.

    (d) In the event of a breach or threatened breach by Tenant or Landlord of any of the covenants or provisions hereof, the other party shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this Lease of any particular remedy, shall not preclude Landlord or Tenant from any other remedy, at law, in equity or otherwise, except as specifically set forth herein. Tenant shall in no event be entitled to any rents collected or payable under any reletting, whether or not such rents shall exceed the Fixed Rent reserved in this Lease. Nothing contained in Section 6.03 or this Section 6.04 shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 6.04, except as otherwise specifically set forth herein.

    (e) Anything to the contrary contained in this Lease notwithstanding, in no event shall Landlord or Tenant be liable to the other for consequential damages under or in connection with this Lease.

**6.05    No Waiver.** Failure by either party to declare any default immediately upon its occurrence or delay in taking any action in connection with such default shall not waive such default but such party shall have the right to declare any such default at any time thereafter. If either party designates by notice to the other party that a payment made by the paying party is to be applied by the receiving party to a particular item then owing by the paying party to the receiving party, then the receiving party shall apply such payment to such particular item. Any amounts paid by Landlord or Tenant to the other party, without notice of a particular item to which such payment is to be applied, may be applied by the receiving party, in its discretion, to any amounts then owing by the paying party to the receiving party. Receipt by Landlord of a partial payment shall not be deemed to be an accord and satisfaction (notwithstanding any endorsement or statement on any check or any letter accompanying any check or payment), nor shall such receipt constitute a waiver by Landlord of Tenant's obligation to make full payment. No act or thing done by Landlord or its agents shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord and by each Superior Lessor and Superior Mortgagee with whom Tenant has (or is deemed to have) in effect a binding non-disturbance and attornment agreement.

**6.06    Holding Over.** If Tenant holds over without the consent of Landlord after the expiration or termination of this Lease, Tenant's occupancy shall be on a month-to-month basis, and Tenant shall pay as holdover rental for each month of the holdover tenancy an amount equal to the greater of (a) the fair market rental value of the Premises for such month or (b) the product of (i) the Holdover Percentage multiplied by (ii) the Fixed Rent and recurring Additional Rent which Tenant was obligated to pay for the month immediately preceding the end of the Term. "Holdover Percentage" means, with respect to any holdover by Tenant after the expiration or termination of this Lease, (A) for the first 90 days of such holdover tenancy, 100% and (B) thereafter, 200%. No holding over by Tenant after the Term shall operate to extend the Term. Notwithstanding the foregoing, the acceptance of any rent paid by Tenant pursuant to this Section 6.06 shall not preclude Landlord from commencing and prosecuting a holdover or summary eviction proceeding.

**6.07    Attorneys' Fees.** If either party places the enforcement of this Lease or any part thereof, or the collection of any Rent or other payment due or to become due hereunder, or recovery of the possession of the Premises, in the hands of an attorney, or files suit upon the same, the prevailing party shall be reimbursed by the losing party, within 30 days after demand, for its reasonable attorneys' fees and disbursements and court costs.

**6.08    Indemnification.** (a) Subject to the provisions of Section 7.03, Tenant shall indemnify and hold harmless Landlord, all Superior Lessors and all Superior Mortgagees and each of their respective partners, directors, officers, shareholders, principals, agents and employees (each (including Landlord and such superior parties), a "Landlord Indemnified Party"), from and against any and all claims arising from or in connection with (i) the conduct or management of the Premises or of any business therein, or any work or thing done, or any condition created, in the Premises; provided, that Tenant's indemnity pursuant to this clause (i) shall not apply to the extent such claim results from the acts or (where a Landlord Indemnified Party has an affirmative obligation to act pursuant to the terms of this Lease) omissions of any Landlord Indemnified Party, or (ii) any negligence or willful misconduct of Tenant or any person

39

claiming through or under Tenant or any of their respective partners, directors, officers, agents, employees, contractors or invitees (so long as such invitees are in the Premises) with respect to any accident, injury or damage occurring in, at or upon the Project; provided, that Tenant's indemnity pursuant to this clause (ii) shall not apply to the extent such claim results from the negligence or willful misconduct of any Landlord Indemnified Party, in each case together with all reasonable costs and expenses incurred in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and disbursements.

(b)    Subject to the provisions of Section 7.03, Landlord shall indemnify and hold harmless Tenant and Tenant's partners, directors, officers, shareholders, principals, agents and employees (each (including Tenant), a "Tenant Indemnified Party"), from and against any and all claims arising from or in connection with (i) the conduct or management of the Building, or any work or thing done, or any condition created, in the Building; provided, that Landlord's indemnity pursuant to this clause (i) shall not apply to the extent such claim results from the acts or (where a Tenant Indemnified Party has an affirmative obligation to act pursuant to the terms of this Lease) omissions of any Tenant Indemnified Party, or (ii) any negligence or willful misconduct of Landlord or any Landlord Indemnified Party with respect to any accident, injury or damage occurring in, at or upon the Project; provided, that Landlord's indemnity pursuant to this clause (ii) shall not apply to the extent such claim results from the negligence or willful misconduct of any Tenant Indemnified Party, in each case together with all reasonable costs, expenses and liabilities incurred in connection with each such claim or action or proceeding brought thereon, including, without limitation, all attorneys' fees and disbursements.

(c)    If any claim that is within the scope of the indemnities set forth in this Section 6.08 is asserted against any indemnified party, then the indemnified party shall give prompt written notice (each, an "Indemnified Party Notice") thereof to the indemnifying party (i.e., within a time period so as not to prejudice the indemnifying party's or its insurer's ability to defend effectively any action or proceeding brought on such claim) and the indemnifying party shall have the right to defend and control the defense of any action or proceeding brought on such claim with counsel chosen by the indemnifying party subject to the approval of the indemnified party (such approval not to be unreasonably withheld) or by the indemnifying party's insurance company. If the indemnified party fails promptly to give such notice or if the indemnified party shall not afford the indemnifying party the right to defend and control the defense of any such action or proceeding then, in either of such events, the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts. If the indemnifying party shall defend any such action or proceeding, then the following shall apply:

(i)    the indemnified party shall cooperate with the indemnifying party (or its insurer) in the defense of any such action or proceeding in such manner as the indemnifying party (or its insurer) may from time to time reasonably request and the indemnifying party shall not be liable for the costs of any separate counsel employed by the indemnified party;

40

(ii)    the indemnifying party shall not be liable for any settlement made without the indemnifying party's consent;

(iii)    if such action or proceeding can be settled by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall have the right to settle such action or proceeding without the indemnified party's consent and the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts if the indemnified party refuses to agree to such a settlement; and

(iv)    if such action or proceeding cannot be settled merely by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall not settle such action or proceeding without the indemnified party's consent (which consent shall not be unreasonably withheld, conditioned or delayed) and if the indemnified party unreasonably withholds, conditions or delays its consent to any such settlement, then the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts.

If an indemnifying party shall, in good faith, believe that a claim set forth in an Indemnified Party Notice is or may not be within the scope of the indemnifying party's indemnity set forth in this Lease then, pending determination of that question, the indemnifying party shall not be deemed to be in default under this Lease by reason of its failure or refusal to indemnify and hold harmless any indemnified party therefrom or to pay such costs, expenses and liabilities; provided, that if it shall be finally determined by a court of competent jurisdiction or by arbitration in accordance with Section 8.09 that such claim was within the scope of such indemnifying party's indemnity set forth in this Lease then such indemnifying party shall be liable for any judgment or reasonable settlement or any reasonable legal fees incurred by the party entitled to indemnity hereunder.

(d)    The provisions of this Section 6.08 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 7

### Insurance; Casualty; Condemnation

**7.01    Compliance with Insurance Standards.**    (a) Neither Tenant nor any person claiming through or under Tenant, nor any of their respective agents, employees, contractors or invitees (so long as such invitees are in the Premises) shall violate any reasonable condition imposed by any insurance policy then issued in respect of the Project or do or keep anything in the Premises which would subject Landlord, any Superior Lessor or any Superior Mortgagee to any liability or responsibility for personal injury or death or property damage, or which would increase any insurance rate in respect of the Project over the rate which would otherwise then be in effect or which would result in insurance companies of good standing refusing to insure the

41

Project in amounts reasonably satisfactory to Landlord, or which would result in the cancellation of, or the assertion of any defense by the insurer in whole or in part to claims under, any policy of insurance in respect of the Project; but nothing in this <u>Section 7.01(a)</u> shall be construed to prohibit Tenant's use of the Premises for the uses permitted under <u>Section 1.03</u> or to impose any liability on Tenant solely by reason of Tenant's use of the Premises for the purposes stated in <u>Section 1.03</u>.

(b)    If, as a direct result of any failure of Tenant to comply with this Lease, the premiums on Landlord's insurance on the Project shall be higher than they otherwise would be, Tenant shall reimburse Landlord, within 60 days after notice from Landlord, for that part of such premiums paid by reason of such failure on the part of Tenant; <u>provided</u>, that said demand shall be accompanied by a statement from the insurer which shall expressly identify the specific act or activity of Tenant causing the increase in the insurance rate.  Landlord shall reasonably cooperate with Tenant, at Tenant's expense, in order to eliminate any such increased premiums.

(c)    Landlord, at Landlord's expense, shall maintain at all times during the Term, with a reputable insurance company authorized to write insurance in the State of Connecticut and rated by Best's Key Rating Guide or any successor publication of comparable standing as A/X or better or the then equivalent of such rating, the following insurance: (i) commercial general liability insurance against all claims, demands or actions for injury to or death of person or property having a limit of not less than $25,000,000 per occurrence and/or in the aggregate, including contractual liability and independent contractors' coverage, arising from or related to, the conduct of Landlord, the operation of the Project and/or caused by the acts or omissions of Landlord, the managing agent for the Building and their respective employees; (ii) if there is a boiler or other similar refrigeration equipment or pressure object or other similar equipment in the Building, steam boiler, air conditioning and machinery insurance written on broad form basis with a limit of not less than the full replacement value of such equipment; (iii) "all-risk" insurance, to the extent of 100% of the replacement cost of the Building (including, without limitation, the Landlord Obligation Areas) and of all Fixtures, (iv) worker's compensation, disability and such other similar insurance covering all persons employed in connection with Landlord's maintenance, repair and management of the Project and with respect to whom death or bodily injury claims could be asserted against Landlord, Tenant, the Premises or the Building, and (v) such types and amounts of other insurance as shall be consistent with that maintained by owners of first-class office buildings located within the vicinity of the Building.

(d)    Within 10 days after Landlord's receipt of notice from Tenant requesting same, Landlord shall give Tenant reasonable evidence that the insurance required to be carried by Landlord under <u>Section 7.01(c)</u> is in full force and effect.

**7.02    <u>Tenant's Insurance</u>.**  Tenant shall maintain at all times during the Term (a) "all risk" property insurance covering all of Tenant's Property to a limit of not less than the full replacement cost thereof, (b) commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, in respect of the Premises and the conduct or operation of business therein, with Landlord and its managing agent, if any, and each Superior Lessor and Superior Mortgagee whose name and address shall have been furnished to

42

Tenant as additional insureds, with limits of not less than $10,000,000 combined single limit for bodily injury and property damage liability in any one occurrence, (c) steam boiler, air conditioning or machinery insurance, if there is a boiler or pressure object or similar equipment in the Premises, with limits of not less than the full replacement value of such equipment, and (d) when Alterations are in process, the insurance specified in Section 4.01(c) hereof. Such insurance may be carried under blanket and/or umbrella policies covering the Premises and other properties owned or leased by Tenant.    The limits of the insurance required under this Section 7.02 shall not limit the liability of Tenant.    Upon request of Landlord, Tenant shall deliver to Landlord and any additional insureds certificates of insurance evidencing the insurance required to be maintained by Tenant under this Section 7.02 issued by the insurance company or its authorized agent.    Tenant shall procure renewals of such insurance from time to time before the expiration thereof, and, if requested by Landlord, Tenant shall deliver to Landlord and any additional insureds such renewal certificate before the expiration of any existing policy.    All such policies shall be issued by companies of recognized responsibility authorized to write insurance in the State of Connecticut and rated by Best's Key Rating Guide or any successor publication of comparable standing as A/X or better or the then equivalent of such rating, and all such policies shall contain a provision whereby the same cannot be canceled unless Landlord and any additional insureds are given at least 30 days' prior written notice of such cancellation.    Landlord and Tenant shall cooperate with each other in connection with the collection of any insurance monies that may be due in the event of loss and Landlord and Tenant shall execute and deliver to each other such proofs of loss and other instruments which may be required to recover any such insurance monies.    Landlord may from time to time (but not more frequently than once every 3 years) require that the amount of the insurance to be maintained by Tenant under this Section 7.02 be increased, so that the amount thereof is equal to the amount of insurance which landlords of office buildings located in the vicinity of the Building comparable to the Building are then requiring tenants to carry.    At any time, Tenant may self-insure for any risk required to be insured under this Lease; provided, that if at any time Tenant shall self-insure for less than the limits required to be insured against by Tenant under this Lease, then Tenant shall carry umbrella coverage in excess of such self-insurance, up to the limits required to be insured against by Tenant under this Lease.    Tenant shall have no claim against Landlord for any damage, loss or injury which would have been covered by an insurance policy required under this Lease even if Tenant is self-insuring for all or a portion of such insurance, giving full effect to the waiver of subrogation provisions of Section 7.03.

    **7.03    Subrogation Waiver.**    Landlord and Tenant shall each include in each of its respective insurance policies insuring the Building, any portion thereof or any property therein against loss, damage or destruction by fire or other casualty, a waiver of the insurer's right of subrogation against the other party during the Term or, if such waiver should be unobtainable or unenforceable, (a) an express agreement that such policy shall not be invalidated if the assured waives the right of recovery against any party responsible for a casualty covered by the policy before the casualty or (b) any other form of permission for the release of the other party.    Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property occurring during the Term to the extent to which it is, or is required to be, insured under a policy or policies containing a waiver of subrogation or permission to release liability. Nothing contained in this Section 7.03 shall be deemed to relieve either party of any duty

43

imposed elsewhere in this Lease to repair, restore or rebuild or to nullify any abatement of rents provided for elsewhere in this Lease.

**7.04**    **Condemnation.**    (a) If there shall be a total taking of the Building in condemnation proceedings or by any right of eminent domain, this Lease and the term and estate hereby granted shall terminate as of the date of taking of possession by the condemning authority and all Rent shall be prorated and paid as of such termination date.  If there shall be a taking of the Land or the Building (whether or not the Premises are affected by such taking) of such scope such that the untaken part thereof would be in Landlord's reasonable judgment uneconomic or undesirable to operate, then Landlord may terminate this Lease and the term and estate granted hereby by giving notice to Tenant within 60 days after the date of taking of possession by the condemning authority; provided, that if no part of the Premises is subject to such taking, Landlord shall have no right to terminate this Lease without the consent of Tenant.  If there shall be a taking of the Premises of such scope that the untaken part of the Premises would in Tenant's reasonable judgment be uneconomic or undesirable to operate, then Tenant may terminate this Lease and the term and estate granted hereby by giving notice to Landlord within 60 days after the date of taking of possession by the condemning authority.  If either Landlord or Tenant shall give a termination notice as aforesaid, then this Lease and the term and estate granted hereby shall terminate as of the date of such notice and all Rent shall be prorated and paid as of such termination date.   In the event of a taking of the Premises which does not result in the termination of this Lease, the term and estate hereby granted with respect to the taken part of the Premises shall terminate as of the date of taking of possession by the condemning authority and all Rent applicable to the taken part of the Premises shall be appropriately abated for the period from such date to the applicable Expiration Date.

(b)    In the event of any taking of all or a part of the Building, Landlord shall be entitled to make a claim for and receive the entire award in the condemnation proceeding made for the value of the estate vested by this Lease in Tenant or any value attributable to the unexpired portion of the Term and for the costs to perform the repairs to the Building and the Premises which Landlord is required to perform pursuant to Section 7.04(d); provided, that nothing shall preclude Tenant from intervening in any such condemnation proceeding to claim or receive from the condemning authority, any compensation to which Tenant may otherwise lawfully be entitled in such case in respect of Tenant's Property, the unamortized cost of all Alterations made by Tenant to the Premises, higher rent costs or moving expenses, so long as no such claim by Tenant shall include any value of the estate vested by this Lease in Tenant, or of the unexpired portion of the Term and does not reduce the amount available to Landlord or delay the payment thereof.

(c)    If all or any part of the Premises shall be taken for a limited period, Tenant shall be entitled, except as hereinafter set forth, to that portion of the award for such taking which represents compensation for the use and occupancy of the Premises, for the taking of Tenant's Property and for moving expenses, and Landlord shall be entitled to that portion which represents reimbursement for the cost of restoration of the Premises (including Tenant's Alterations).  Notwithstanding anything to the contrary contained in this Section 7.04(c), if any such temporary taking shall continue for a period in excess of 6 months, the same shall be deemed a permanent taking, and the provisions of Sections 7.04(a) and (b) shall apply thereto.

44

This Lease shall remain unaffected by such taking (unless such taking exceeds 6 months and one of the parties terminates this Lease under the preceding sentence), and Tenant shall continue responsible for all of its obligations under this Lease to the extent such obligations are not affected by such taking and shall continue to pay in full all Rent when due.  If the period of temporary use or occupancy shall extend beyond the applicable Expiration Date, that part of the award which represents compensation for the use and occupancy of the Premises shall be apportioned between Landlord and Tenant as of the applicable Expiration Date.  Any award for temporary use and occupancy for a period beyond the date to which the Rent has been paid shall be paid to, held and applied by Tenant as a trust fund for payment of the Rent thereafter becoming due.

(d)    In the event of any taking which does not result in termination of this Lease, Landlord, whether or not any award shall be sufficient therefor, shall proceed with reasonable diligence to repair the remaining parts of the Building and the Premises (including all Fixtures, but excluding Tenant's Property) to substantially their former condition to the extent that the same may be feasible (subject to reasonable changes which Landlord deems desirable consistent with first-class office buildings located in the vicinity of the Building) and so as to constitute a complete and rentable Building and Premises.

**7.05    Casualty.**  (a) If the Building or the Premises shall be partially or totally damaged or destroyed by fire or other casualty (each, a "Casualty") and if this Lease is not terminated as provided below, then (i) Landlord shall repair and restore the Building and the Premises (including, without limitation, the Fixtures, but excluding Tenant's Property) with due diligence (provided, that Landlord shall not be required to perform the same on an overtime or premium pay basis except to the extent the insurance carrier agrees to pay for such overtime without reducing the total insurance proceeds available to be paid to Landlord) after Landlord has actual knowledge of such Casualty and (ii) Tenant shall repair and restore, in accordance with Section 4.01, all of Tenant's Property with reasonable dispatch after the Casualty.

(b)    If, by reason of a Casualty, all or part of the Premises shall be rendered untenantable, whether by reason of damage to the Premises or by reason of damage to other portions of the Building which results in a lack of reasonable access to, or a material interference with the ability to use, the Premises, the Fixed Rent and Additional Rent shall be abated in the proportion that the untenantable area of the Premises bears to the total area of the Premises, for the period from the date of the Casualty to the earlier of (i) the date (the "Substantial Completion Date") that Landlord substantially completes the repair and restoration to the portions of the Building and the Premises (including, without limitation, Fixtures, but excluding Tenant's Property) necessary in order to render the Premises tenantable (the "Required Restoration Work") or (ii) the date Tenant or any subtenant reoccupies a portion of the Premises for the conduct of Tenant's normal business operations therein (in which case the Fixed Rent and the Additional Rent allocable to such reoccupied portion shall be payable by Tenant from the date of such occupancy).    Landlord's determination of the Substantial Completion Date shall be controlling unless Tenant disputes same by notice to Landlord within 30 days after Landlord shall have given notice of such determination to Tenant.  For purposes of this Section 7.05(b), in the case of any Casualty which renders all or part of the Premises untenantable, the Required Restoration Work shall be deemed to be substantially completed on the date upon which such

45

work is completed other than minor details or adjustments to such work, but only if such details or adjustments shall not interfere in any material respect with Tenant's ability to repair and restore Tenant's Property in the portion of the Premises rendered untenantable by such Casualty or thereafter use and occupy such portion of the Premises for the ordinary conduct of Tenant's intended use of such portion of the Premises.

(c)     If by reason of a Casualty (i) the Building shall be totally damaged or destroyed, or (ii) the Building shall be so damaged or destroyed (whether or not the Premises are damaged or destroyed) and in either such case such that Landlord shall determine not to restore the same, then in any such case Landlord may terminate this Lease upon not less than 90 days notice given to Tenant within 180 days after the Casualty.

(d)     (i) Within 45 days after Landlord has actual knowledge of any Casualty, Landlord shall deliver to Tenant an estimate prepared by a reputable contractor selected by Landlord and reasonably acceptable to Tenant setting forth such contractor's estimate as to the time reasonably required to repair the damage in order to make the Premises no longer untenantable; provided, that if Landlord shall fail to deliver such estimate within said 45-day period, Tenant may designate a contractor (subject to Landlord's reasonable approval thereof; provided, that if Landlord fails to approve or disapprove any contractor designated by Tenant within 10 days after the giving of notice by Tenant, such contractor shall be deemed to be approved by Landlord) to prepare the same (the contractor designated by either Landlord or Tenant pursuant to this sentence is called the "Contractor" and the estimate prepared by the Contractor is called the "Estimate").

(ii)     If the period set forth in the applicable Estimate exceeds 270 days from the date of such Casualty, Tenant may elect to terminate this Lease with respect to the Casualty Terminated Space by notice (a "Termination Notice") to Landlord given not later than 30 days following Tenant's receipt of such Estimate.

(iii)     If the time period set forth in the applicable Estimate does not exceed 270 days from the date of such Casualty and for any reason whatsoever Landlord shall not substantially complete the Required Restoration Work on or before the date (the "First Outside Date") which is 300 days after the date of such Casualty (provided, that the First Outside Date shall be extended by up to 60 days to the extent that Landlord is delayed by reason of Force Majeure), then Tenant shall have the right to terminate this Lease with respect to the Casualty Terminated Space by giving a Termination Notice to Landlord on or before the earlier to occur of (x) the date that Landlord substantially completes the Required Restoration Work or (y) the date that is 30 days after the First Outside Date.

(iv)     If the time period set forth in the applicable Estimate exceeds 270 days from the date of such Casualty and Tenant has not elected to terminate this Lease under Section 7.05(d)(ii), and for any reason whatsoever Landlord shall not substantially complete the Required Restoration Work on or before the date (the "Second Outside Date") that is 30 days after the date set forth in the applicable Estimate as the date by which the repair and restoration should reasonably be completed

46

(<u>provided</u>, that the Second Outside Date shall be extended by up to 60 days to the extent that Landlord is delayed by reason of Force Majeure), then Tenant shall have the right to terminate this Lease with respect to the Casualty Terminated Space by giving a Termination Notice to Landlord on or before the earlier to occur of (x) the date that Landlord substantially completes the Required Restoration Work or (y) the date that is 30 days after the Second Outside Date.

(v)    If Tenant timely gives a Termination Notice pursuant to this <u>Section 7.05(d)</u>, this Lease shall terminate with respect to the Casualty Terminated Space on the date set forth in the Termination Notice (which shall be not less than 30 nor more than 365 days after the giving of the Termination Notice) and Tenant shall vacate the Casualty Terminated Space and surrender the same to Landlord in accordance with the terms of this Lease. Upon any such termination, Tenant's liability for Fixed Rent and Additional Rent hereunder with respect to the Casualty Terminated Space shall cease as of the date of such termination, and any prepaid portion of Rent with respect to the Casualty Terminated Space for any period after such date shall be refunded by Landlord to Tenant within 30 days after such termination date. Upon a termination of this Lease with respect to less than the entire Premises, there shall be a pro rata reduction of Tenant's Rent obligations to reflect such partial termination, and Landlord and Tenant shall promptly enter into an instrument evidencing such partial termination and the reduced rentable area of the Premises (such rentable area to be determined in a manner consistent with the methods used in calculating the rentable area of the Premises initially demised under this Lease); provided, that the failure to enter into such instrument shall not affect the effectiveness of such partial termination.

(vi)    Anything to the contrary contained in this <u>Section 7.05(d)</u> notwithstanding, if any Casualty occurs during the last 3 years of the Term, all references in this <u>Section 7.05(d)</u> to "270 days" and "300 days" shall be deemed to be replaced with the following number of days:

(A)    if such Casualty occurs during the 12-month period commencing on the date that is 3 years prior to the last day of the Term, "180 days" and "210 days", respectively;

(B)    if such Casualty occurs during the 12-month period commencing on the date that is 2 years prior to the last day of the Term, "120 days" and "150 days", respectively; and

(C)    if such Casualty occurs during the last 12 months of the Term, "60 days" and "75 days", respectively.

(vii)    "<u>Casualty Terminated Space</u>" means, at Tenant's election as specified in the applicable Termination Notice, either (A) the entire Premises or (B) a portion of the Premises consisting of entire floors of the Building (or so much of any floor as shall then be part of the Premises).

(viii) Time is of the essence with respect to all of the time periods set forth in this Section 7.05(d).

(e)     Landlord shall not be obligated to repair or replace Tenant's Property, notwithstanding that Landlord may carry its own insurance covering the same. Tenant shall look solely to its insurance for recovery of any damage to or loss of Tenant's Property. Tenant shall not be obligated to repair or replace the Building or the Premises, notwithstanding that Tenant may carry its own insurance covering the same. Landlord shall look solely to its insurance for recovery of any damage to or loss of the Building or the Premises.

(f)     If in case of a Casualty, Landlord shall be delayed in completing the repair and restoration that Landlord is obligated to perform under this Section 7.05 by reason of Force Majeure, Landlord shall promptly notify Tenant of the occurrence of such Force Majeure and, to the extent possible, Landlord's good faith estimate of the duration of such Force Majeure delays and, if requested by Tenant from time to time, Landlord shall update Tenant as to the status of such Force Majeure delays.

(g)     In case of any Casualty which renders all or part of the Premises untenantable, prior to the substantial completion of the repair and restoration that Landlord is obligated to perform under this Section 7.05, Landlord shall provide Tenant and Tenant's contractors access to the Premises to repair and restore the Premises on the following terms and conditions. Tenant shall not commence work in any portion of the Premises until the date specified in a notice from Landlord to Tenant (which notice shall be given by Landlord to Tenant as soon as the giving of such notice shall be feasible) stating that the repairs required to be made by Landlord have been or will be completed to the extent reasonably necessary, in the reasonable opinion of Landlord, to permit the repair and restoration by Tenant of the portion of the Premises in question then prudent to be performed in accordance with good construction practice without interference with, and consistent with the performance of, the repairs and restoration, remaining to be performed by Landlord.

## ARTICLE 8

### Miscellaneous Provisions

**8.01    Notice.**  All notices, demands, consents, approvals, advices, waivers or other communications (each, a "Notice") which may or are required to be given by either party to the other under this Lease shall be in writing and, unless otherwise required by any Laws, shall be sent (a) by hand or (b) by a nationally recognized overnight carrier, to the parties at the following addresses or at such other addresses as the parties may designate by written notice from time to time:

(i)     addressed to Tenant at:

Purdue Pharma L.P.
One Stamford Forum
Stamford, Connecticut  06901
Attention: Michael X. Friedman

48

with a copy to:

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
Attention: Anthony M. Roncalli

(ii)    addressed to Landlord at:

One Stamford Realty L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901
Attention: Edward B. Mahony

with a copy to:

One Stamford Realty L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901
Attention: Howard R. Udell

Notices by either party may be given by the attorney for such party.  Each Notice shall be deemed to have been given on the date such Notice is actually received as evidenced by a written receipt therefor, and in the event of failure to deliver by reason of changed address of which no Notice was given or refusal to accept delivery, as of the date of such failure.

**8.02    Building Rules.**  Tenant shall comply with the rules of the Building set forth in Exhibit E, as the same may be reasonably modified or supplemented by Landlord from time to time upon not less than 30 days notice to Tenant, provided, that in the case of any conflict between the provisions of this Lease and such rule or regulation, the provisions of this Lease shall control; and provided further, that if Tenant disputes the reasonableness of any rule or regulation, the dispute shall be determined by arbitration in accordance with Section 8.09, and Landlord shall not enforce such rule or regulation pending resolution of such dispute.  Landlord shall enforce the rules and regulations and the terms, covenants or conditions in any other lease against any other tenant if the failure to do so would adversely affect Tenant.  In enforcing the rules and regulations, Landlord shall not discriminate against Tenant and shall treat similarly situated tenants in a similar fashion.

**8.03    Severability.**  If any term or provision of this Lease, or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to

49

which it is invalid or unenforceable, shall not be affected, and each provision of this Lease shall be valid and shall be enforceable to the extent permitted by Law.

**8.04   Certain Definitions, Etc.** (a) "Landlord" means only the owner, at the time in question, of the Building or that portion of the Building of which the Premises are a part, or of a lease of the Building or that portion of the Building of which the Premises are a part, so that in the event of any transfer or transfers of title to the Building or of Landlord's interest in a lease of the Building or such portion of the Building, the transferor shall be and hereby is relieved and freed of all obligations of Landlord under this Lease accruing from and after the date of such transfer, and it shall be deemed, without further agreement, that such transferee has assumed all obligations of Landlord during the period it is the holder of Landlord's interest under this Lease.

(b)   Wherever in this Lease it is provided that a party shall not unreasonably withhold a consent or approval, such party shall also not unreasonably delay such consent or approval.

**8.05   Quiet Enjoyment.** During the Term, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises, subject to the other terms of this Lease and to Superior Leases and Superior Mortgages.

**8.06   Limitation of Landlord's Personal Liability.** (a) Tenant shall look solely to Landlord's interest in the Project for the recovery of any judgment against Landlord, and no other property or assets of Landlord or Landlord's partners, officers, directors, shareholders or principals, direct or indirect, disclosed or undisclosed, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. For purposes of the preceding sentence, "Landlord's interest in the Project" shall be deemed to include (a) all rent or other consideration received by Landlord in respect of the Building, (b) proceeds of a sale (net of transaction costs), financing or refinancing (but only to the extent the proceeds of a financing or refinancing exceed (i) the amount of any indebtedness that was paid with the proceeds of such financing or refinancing plus (ii) all transaction costs associated with such financing or refinancing) of the Building or the Project (or any portion thereof), or of Landlord's (or such lessor's) estate or interest therein, or in any property, equipment or improvements in the Project (or any portion thereof), (c) any insurance proceeds or condemnation awards relating to any portion of the Project (to the extent in excess of any restoration costs and net of all costs of obtaining such proceeds or awards), and (d) any security at any time posted by Landlord with Tenant to secure Landlord's obligations under this Lease.

(b)   Wherever in this Lease Landlord's consent or approval is required, if Landlord refuses to grant such consent or approval, whether or not Landlord expressly agreed that such consent or approval would not be unreasonably withheld, and provided Landlord did not act in bad faith in withholding such consent, Tenant shall not make, and Tenant hereby waives, any claim for money damages (including any claim by way of set-off, counterclaim or defense) based upon Tenant's claim or assertion that Landlord unreasonably withheld or delayed its consent or approval. Tenant's sole remedy (absent bad faith on the part of Landlord) shall be an action or proceeding to enforce such provision by specific performance, injunction or declaratory judgment.

**8.07    Counterclaims.**  If Landlord commences any summary proceeding or action for nonpayment of Rent or to recover possession of the Premises, Tenant shall not interpose any counterclaim of any nature or description in any such proceeding or action, unless Tenant's failure to interpose such counterclaim in such proceeding or action would result in the waiver of Tenant's right to bring such claim in a separate proceeding under applicable law.

**8.08    Survival.**  All obligations and liabilities of Landlord or Tenant to the other which accrued before the expiration or other termination of this Lease and all such obligations and liabilities which by their nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after such expiration or other termination, shall survive the expiration or other termination of this Lease.  Without limiting the generality of the foregoing, the rights and obligations of the parties with respect to any indemnity under this Lease, and with respect to Tax Payments, Operating Payments and any other amounts payable under this Lease, shall survive the expiration or other termination of this Lease.

**8.09    Arbitration.**  (a) Either party shall have the right to submit a dispute relating to (i) the reasonableness of the grant or denial of a consent or other determination by the other party where, pursuant to the provisions of this Lease, such other party's consent was not to be unreasonably withheld or (ii) any other matter for which arbitration is expressly provided as a means of dispute resolution pursuant to the terms of this Lease, to binding arbitration under the Expedited Procedures provisions (Rules E-1 through E-10 in the edition in effect on the date of this Lease, as the same may be modified or supplemented from time to time) of the Commercial Arbitration Rules of the American Arbitration Association (together with its successors, the "AAA").  In cases where the parties utilize such arbitration: (i) the parties will have no right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Rule E-5, (ii) the first hearing shall be held within 7 Business Days after the appointment of the arbitrator, (iii) if the arbitrator shall find that a party acted unreasonably in withholding or delaying a consent or approval, such consent or approval shall be deemed granted, and (iv) the losing party in such arbitration shall pay the arbitration costs charged by AAA and/or the arbitrator.  The decision of the arbitrators shall be conclusively binding on the parties, and judgment upon the decision may be entered in any court having jurisdiction..

(b)    Landlord and Tenant agree to sign all documents and to do all other things necessary to submit any such matter to arbitration and further agree to, and hereby do, waive any and all rights they or either of them may at any time have to revoke their agreement hereunder to submit to arbitration and to abide by the decision rendered thereunder.  For such period, if any, as this agreement to arbitrate is not legally binding or the arbitrator's award is not legally enforceable, the provisions requiring arbitration shall be deemed deleted and matters to be determined by arbitration shall be subject to litigation.

**8.10    No Offer.**  The submission by Landlord of this Lease in draft form shall be solely for Tenant's consideration and not for acceptance and execution.  Such submission shall have no binding force or effect and shall confer no rights nor impose any obligations, including brokerage obligations, on either party unless and until both Landlord and Tenant shall have executed a lease and duplicate originals thereof shall have been delivered to the respective parties.

51

**8.11    Captions; Construction.** The table of contents, captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation. This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.

**8.12    Amendments.** This Lease may not be altered, changed or amended, except by an instrument in writing signed by the party to be charged.

**8.13    Broker.** Each party represents to the other that such party has dealt with no broker in connection with this, and each party shall indemnify and hold the other harmless from and against all loss, cost, liability and expense (including, without limitation, reasonable attorneys' fees and disbursements) arising out of any claim for a commission or other compensation by any broker who alleges that it has dealt with the indemnifying party in connection with this Lease.

**8.14    Merger.** Tenant acknowledges that neither Landlord nor its agents have made or are making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease. This Lease embodies the entire understanding between the parties with respect to the subject matter hereof, and all prior agreements, understanding and statements, oral or written, with respect thereto are merged in this Lease.

**8.15    Successors.** This Lease shall be binding upon and inure to the benefit of Landlord, its successors and assigns, and shall be binding upon and inure to the benefit of Tenant, its successors and assigns.

**8.16    Applicable Law.** This Lease shall be governed by, and construed in accordance with, the laws of the State of Connecticut, without giving effect to any principles of conflicts of laws.

**8.17    Security Deposit.** On execution of this Lease Tenant shall deposit with Landlord a cash security deposit in the amount of $7,500,000 ("Security Deposit"), and the same shall be held as security for the full and faithful payment and performance by Tenant of Tenant's obligations under this Lease. If Tenant defaults in the full and prompt payment and performance of any of its obligations under this Lease, including, without limitation, the payment of Rent, Landlord may use, apply or retain the whole or any part of the Security Deposit to the extent required for the payment of any Rent or any other sums as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of Tenant's obligations under this Lease, including, without limitation, any damages or deficiency in the reletting of the Demised Premises, whether such damages or deficiency accrue before or after summary proceedings or other re-entry by Landlord. If Landlord shall so use, apply or retain the whole or any part of the security, Tenant shall upon demand immediately deposit with Landlord a sum equal to the amount so used, applied and retained, as security as aforesaid. If Tenant shall fully and faithfully pay and perform all of Tenant's obligations under this Lease, the Security Deposit or any balance thereof to which Tenant is entitled to shall be returned or paid over to Tenant after the date on which this Lease

shall expire or sooner end or terminate, and after delivery to Landlord of entire possession of the Premises. In the event of any sale or leasing of the Building, Landlord shall have the right to transfer the security to which Tenant is entitled to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return or payment thereof; and Tenant shall look solely to the new landlord for the return or payment of the same; and the provisions hereof shall apply to every transfer or assignment made of the same to a new landlord. Tenant shall not assign or encumber or attempt to assign or encumber the monies deposited herein as security, and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

8.18   **Signage.** Tenant, at Tenant's expense, shall have the non-exclusive right to place signs containing Tenant's name in the lobby of the Building.

8.19   **Rooftop Equipment.** (a) Tenant may, subject to and in accordance with the provisions of this Section 8.19, use a portion of the roof of the Building, without charge, to install, maintain and operate antennas, microwave dishes and/or satellite dishes and related equipment, mountings and support structures and to install HVAC and other mechanical equipment (collectively, the "Rooftop Equipment") and to run lines therefrom into the Premises, as shall be reasonably required in connection with the operation of the Rooftop Equipment. Landlord shall reserve for Tenant's use not less than Tenant's Share of the space available on the roof of the Building for such purposes. Landlord shall permit Tenant to construct risers along a path that is reasonably acceptable to Landlord and Tenant to connect the Rooftop Equipment to the Premises, and Landlord shall cooperate with Tenant to provide Tenant with access to other tenants' premises to the extent required to construct such riser. Tenant's use of the roof of the Building is a non-exclusive use, and Landlord may permit the use of any other portion of the roof by any other person for any use including installation of other antennas and related equipment and support structures, and Landlord shall have no obligation to remove any equipment of Landlord or any other party located on the roof. Landlord shall use reasonable efforts (at no cost to Tenant, subject to reimbursement as part of Operating Expenses if and to the extent properly includable therein) to ensure that such use does not impair Tenant's data transmission and reception via Tenant's Rooftop Equipment. Tenant shall use reasonable efforts to ensure that its use of the roof does not impair such other person's data transmission and reception via its respective antennas and support equipment. If Tenant's construction, installation, maintenance, repair, operation or use of the Rooftop Equipment shall interfere with the rights of Landlord (including, without limitation, Landlord's right reasonably to use the remainder of the roof) or other tenants in the Building, Tenant shall cooperate with Landlord or such other tenants in exercising reasonable efforts in eliminating such interference; provided, that the cost of remedying such interference shall be borne by the party which is suffering such interference, unless such party was using the roof in the manner suffering such interference prior in time to the use of the Rooftop Equipment in the manner causing such interference by Tenant, in which case the cost of remedying such interference shall be borne by Tenant.

(b)   Tenant shall comply with all Laws applicable to the Rooftop Equipment. Landlord makes no warranties as to the permissibility of any Rooftop Equipment under applicable Law or the suitability of the roof of the Building for the installation thereof. If Landlord's structural engineer reasonably deems it necessary that there be structural

53

reinforcement of the roof or other structural requirements in connection with the installation of the Rooftop Equipment, Tenant shall perform same at Tenant's expense. If Tenant disputes the need for any such structural reinforcement or other structural requirements or whether such need arises out of Tenant's installation of the Rooftop Equipment, then, pending the resolution of such dispute in accordance with Section 8.09, Tenant shall not perform the installation of the Rooftop Equipment until such dispute is resolved and any structural reinforcement or other structural requirements determined by such arbitration as necessary are completed. The installation of Rooftop Equipment shall be an Alteration subject to Article 4. For the purpose of installing, servicing or repairing the Rooftop Equipment, Tenant shall have access to the roof of the Building at reasonable times upon reasonable notice to Landlord, and Landlord shall have the right to require, as a condition to such access, that Tenant (or its employee, contractor or other representative) at all times be accompanied by a representative of Landlord whom Landlord shall make available upon reasonable notice (except that such accompaniment shall be required in the case of an emergency only if practicable).

(c)      The rights granted in this Section 8.19 are given in connection with, and as part of the rights created under this Lease, and are not separately transferable or assignable other than to a permitted assignee of this Lease or a permitted subtenant of the Premises or any portion thereof.

**8.20    Force Majeure.** If, by reason of strike, lockouts or other labor or industrial troubles, governmental pre-emption in connection with a national emergency, any rule, order or regulation of any governmental agency applicable to the Building or to the party obligated to perform, conditions of supply or demand that are affected by war or other national, state or municipal emergency, fire or other casualty, acts of God such as (by way of example only) tornado, earthquake, hurricane, washout or storm, civil disturbance, act of the public enemy, riot, sabotage, blockade, embargo, explosion or any other cause beyond a party's reasonable control, whether or not similar to any of the causes hereinabove stated (collectively, "Force Majeure"), such party shall be unable to perform any obligation that such party is obligated to perform, then such party's obligation to perform shall be excused for the duration of such Force Majeure and, except as otherwise set forth in this Lease, this Lease and the other party's rights and obligations hereunder shall not be affected, impaired or excused. Notwithstanding anything to the contrary contained in this Section 8.20, any party's failure timely to fulfill an obligation required to be fulfilled by such party under this Lease shall not be excused or deemed to be an event of Force Majeure if (a) said obligation is an obligation to pay money, (b) said failure shall be attributable to such party's lack of funds, (c) said obligation relates to Tenant's obligation to vacate the Premises or any applicable portion thereof at the end of the term of this Lease applicable thereto (in which case Section 6.10 shall applies thereto), (d) said failure is due to the holding over of any tenant or other occupant of the Premises, any Option Space or any portion of any thereof on or after the date Landlord is obligated under this Lease to deliver same to Tenant, or (e) the provisions of this Lease expressly limit the amount of time by which such obligation shall be excused by reason of Force Majeure.

**8.21    Notice of Lease.** Upon the request of Tenant, Landlord shall, contemporaneously with the execution of this Lease, execute, acknowledge and deliver to Tenant a notice of lease substantially in the form attached hereto as Exhibit N, together with such other instruments as

54

may be reasonably necessary to record such notice. Recording, filing and like charges imposed by any governmental agency to effect such recording shall be paid by Tenant. Upon the expiration or termination of this Lease, Tenant, at Landlord's request, shall execute, acknowledge and deliver to Landlord all necessary instrument(s) in recordable form evidencing a termination of this Lease and sufficient to discharge any notice hereof of record, and Tenant shall pay for all recording, filing and like charges imposed by any governmental agency to effect such recording.

**8.22    Tenant's Right to Interest on Late Payments.**    Any amounts payable by Landlord to Tenant under this Lease shall be due and payable on the 30th day after the date of invoice, unless a different due date is specified in this Lease. If Landlord fails to pay any amount which is due and payable to Tenant under this Lease on or before the due date therefor, Landlord shall pay interest thereon at the Interest Rate from the date when such amount became due and payable to the date of Landlord's payment of such amount.

**8.23    Tenant's Set-Off Right.**    If Landlord fails to pay any amount that is due and payable to Tenant under this Lease on or before the due date therefor and such failure continues for 30 days after Tenant notifies Landlord of such failure (which notice shall state that Tenant intends to set-off such amount against the next installment of Rent unless Landlord pays such amount to Tenant), Tenant may set-off such amount, together with interest thereon at the Default Rate from the date such amount was due and payable by Landlord until offset as herein provided (collectively, the "Offset Amount"), against the next installments of Rent coming due. If any portion of any Offset Amount shall not have been credited as of the end of the Term, Landlord, within 30 days after the end of the Term, shall pay such amount to Tenant. The preceding sentence shall survive the expiration or earlier termination of this Lease.

**8.24    Effectiveness.**    Notwithstanding anything in this Lease to the contrary, this Lease shall not become effective until the existing mortgage on the Premises has been repaid in full and new financing has been closed.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first written above.

Landlord:     ONE STAMFORD REALTY L.P.

By:  One Stamford Land Inc.,
      its general partner

By:_____
Name:
Title:

Tenant:     PURDUE PHARMA L.P.

By:_____
Name:
Title:

<u>Exhibit A</u>

**DESCRIPTION OF LAND**

TRACT A:

     All that certain piece or parcel of land, situated in the
City of Stamford, County of Fairfield and State of Connecticut,
and being shown and designated as Disposition Parcel 33A on a
certain map or plan entitled, "Disposition Map #33A" dated March
10, 1971, prepared by Parsons, Bromfield and Redniss, Registered
Surveyors and certified substantially correct, which map or plan
is on file in the Office of the Town Clerk of the City of
Stamford as Map No. 9079, reference thereto being hereby had, and
being more particularly bounded and described as follows:

     Beginning at a point in the north line of Beckley Avenue,
which the same is intersected by the division line between the
premises herein described and land now or formerly of Guta
Fischel and Bella Webski, which point is designated on said map
as "Point of Beginning"; thence running North 3° 20' 49" East
70.00 feet to a point; thence running North 86° 39' 11" West 0.75
feet to a point; thence running North 3° 20' 49" East 388.092
feet to the south line of Willow Street; thence running along
said south line of Willow Street in an east direction along the
arc of a curve to the left having a radius of 1516.00 feet 41.203
feet to a point; thence running still along said south line of
Willow Street in an east direction on the arc of a curve to the
left having a radius of 240.00 feet 73.959 feet to a point;
thence running still along said south line of Willow Street in an
east direction on the arc of a curve to the right having a radius
of 220.00 feet 49.930 feet; thence running still along said south
line of Willow Street in an east direction along the arc of a
curve to the left having a radius of 1500.00 feet 334.369 feet
to the west line of Pacific Street; thence running along the
west line of Pacific Street South 7° 26' 50" West 412.628 feet to
the north line of North State Street; thence running along said
north line of North State Street South 60° 45' 25" West 368.962
feet to a point; thence along in a west direction along the north
line of North State Street and along the north line of Beckley
Avenue, in part by each, on the arc of a curve to the right
having a radius of 223.792 feet 126.540 feet to the point or
place of beginning.

TRACT B:

     All that certain piece or parcel of land, situated in the
City of Stamford, County of Fairfield and State of Connecticut,
shown and designated on a certain map or plan entitled, "Property
to be transferred from Urban Redevelopment Commission, City of
Stamford, Conn. to abutting property owner, Willow Street
Associates, Disposition Parcel No. 33 (B)" certified
substantially correct, William D. Sabia, P.E., Stamford, Conn.
May 3, 1973, which map or plan is on file in the Office of the
Town Clerk of the City of Stamford as Map No. 9357, reference

-2-

thereto being hereby had, and being more particularly bounded and described as follows:

Beginning at a point on the north side of North State Street where said street is intersected by the division line between the west line of the premises herein described and the east line of other lands now or formerly of Willow Street Associates shown as Disposition Parcel No. 33 (A) on Map No. 9079, which map is on file in the Office of the Stamford Town Clerk; thence running North 07° 26' 50" East along said Parcel 33 (A), 412.628 feet to the south line of Willow Street; thence running east along the said south line of Willow Street on the arc of a curve to the left having a radius of 1500.00 feet 18.69 feet to a point; thence running South 26° 39' 11" East 66.083 feet to a point; thence running South 07° 51' 40" West 145.389 feet to a point; thence running South 82° 08' 20" East 67.730 feet; thence running South 02° 15' 50" West 142.227 feet to the north side of North State Street; thence running along said north side of North State Street the following three (3) courses and distances:  (1) South 68° 07' 18" West 81.411 feet to a point; (2) west along the arc of a curve to the left having a radius of 432.50 feet 55.593 feet to a point; and (3) South 60° 45' 25" West 18.029 feet to the point or place of beginning.

TRACT C:

All that certain piece or parcel of land, situated in the City of Stamford, County of Fairfield and State of Connecticut, and being shown and designated as Disposition Parcel 33C on a certain map or plan entitled, "Property to be conveyed by the Urban Redevelopment Commission, City of Stamford, Conn. to Willow Street Associates and 3d Stamford New Urban Corp.", which map or plan is on file in the Office of the Town Clerk of the City of Stamford as Map No. 9655, reference thereto being hereby had, and being more particularly bounded and described as follows:

Beginning at a point on the north side of North State Street where said street is intersected by the division line between the west line of the premises herein described and the east line of Parcel 33-B as shown on Map No. 9357, which map is on file in the Office of the Stamford Town Clerk; thence running along said division line between the herein described premises and Parcel 33-B the following three (3) courses and distances:  (1) North 02° 15' 50" East 142.23 feet to a point; (2) North 82° 08' 20" West 67.73 feet to a point; and (3) North 07° 51' 40" East 145.39 feet to the west line of Parcel 33-D as shown on Map No. 9655, which map is on file in the Office of the Stamford Town Clerk; thence running South 26° 39' 11" East 232.314 feet to a point and South 03° 54' 11" East 61.106 feet to the north line of North State Street; thence running along the north line of North State

-3-

Street South 68° 07' 35" West 24.142 feet to a point and South
68° 07' 18" West 47.822 feet to the point or place of beginning.

## TRACT D

ALL THAT real property situated in the City of Stamford, County of Fairfield and
State of Connecticut, known and designated as Disposition Parcel 33D on a certain map entitled,
"Property To Be Conveyed By The Urban Redevelopment Commission, City of Stamford,
Connecticut to Willow Street Associates And 3d Stamford New Urban Corp." and on file in the
Stamford Land Records, as Map No. 9655. Said piece or parcel of land is bounded and described
as follows:

BEGINNING at a point on the Northerly side of North State Street where said
street is intersected by the division line between Lots 33-C and 33-D on Map No. 9655 of the
Stamford Land Records.

Running thence North 03°54'11" West along said division line 61.106 feet; thence
North 26°39'11" West still along said division line and along the division line between said parcel
33-D and parcel 33-B as shown on Map No. 9357 of the Stamford Land Records, 298.394 feet to
the Southerly line of Tresser Boulevard, thence Easterly along the Southerly line of Tresser
Boulevard the following two (2) courses and distances:

(1)    Northeasterly along the arc of a curve bearing to the left having a radius of 1500.00 feet a
distance of 27.288 feet to a point of reverse curve;

(2)    Northeasterly along the arc of a curve bearing to the right having a radius of 290.00 feet a
distance of 68.027 feet to the extreme Westerly end of a curve connecting the Southerly
side of Tresser Boulevard with the Westerly side of Canal Street;

thence Southeasterly along the arc of said curve having a radius of 30.00 feet a distance of 43.671
feet to the Westerly side of Canal Street; thence Southerly along the Westerly side of Canal Street
and along the arc of a curve bearing to the right having a radius of 140 feet a distance of 42.659
feet; thence South 03°54'11" East still along the Westerly side of Canal Street 285.940 feet to a
point;

thence Southwesterly along the arc of a curve bearing to the right having a radius of 20.00 feet a
distance of 25.142 feet to a point in the Northerly side of North State Street; thence South
68°07'35" West along the Northerly side of North State Street 1.231 feet to the point or place of
beginning

Exhibit B

**FLOOR PLANS**



P1 Floor Legend:
Shafts/Vertical Penetrations
Building Common
Tenant
Data Centers

PERKINS EASTMAN
Stamford, CT

Purdue Pharma L.P.: Level P1
Stamford , CT
November 17, 2005  Not to scale

T-1

T-2

N

P2 Floor Legend:
Shafts/Vertical
Penetrations
Building
Common

Tenant

ERKINS EASTMAN
amford, CT

Purdue Pharma L.P.: Level P2
Stamford ,CT
December 29th, 2005. Not to scale



P3 Floor Legend:
Shafts/Vertical Penetrations
Building Common
Floor Common
Tenant





**Plaza Floor Legend:**

| | |
|---|---|
| ▓ | Shafts/Vertical Penetrations |
| | Building Common |
| | Floor Common |
| | Tenant |



ERKINS EASTMAN
amford, CT

*Purdue Pharma L.P.: Plaza Floor*
*Stamford, CT*
*July 22, 2005  Not to scale*





**4th Floor Legend:**

| | |
|---|---|
|  | Shafts/Vertical Penetrations |
| | Building Common |
| | Floor Common |
| | Tenant |

ERKINS EASTMAN
amford, CT

Purdue Pharma L.P.: 4th Floor
Stamford ,CT
July 22, 2005  Not to scale





5th Floor Legend:
  Shafts/Vertical
Penetrations
Building
Common
Floor
Common
Tenant

PERKINS EASTMAN
Stamford, CT

Purdue Pharma L.P: 5th Floor
Stamford, CT
July 22, 2005  Not to scale





6th Floor Legend:
Shafts/Vertical
Penetrations
Building
Common
Floor
Common
Tenant

ERKINS EASTMAN
amford, CT



Purdue Pharma L.P. 6th Floor
Stamford ,CT
July 22, 2005  Not to scale





7th Floor Legend:
Shafts/Vertical Penetrations
Building Common
Floor Common
Tenant



8th Floor Legend:
Shafts/Vertical Penetrations
Building Common
Floor Common
Tenant





Purdue Pharma L.P: 8th Floor
Stamford, CT
July 22, 2005   Not to scale

PERKINS EASTMAN
Stamford, CT





**9th Floor Legend:**



Shafts/Vertical
Penetrations
Building
Common
Floor
Common
Tenant

PERKINS EASTMAN
Stamford, CT

Purdue Pharma L.P. 9th Floor
Stamford, CT
July 22, 2005  Not to scale





**10th Floor Legend:**

Shafts/Vertical
Penetrations

Building
Common

Floor
Common

Tenant



ERKINS EASTMAN
amford, CT

*Purdue Pharma L.P.: 10th Floor*
*Stamford ,CT*
*July 22, 2005  Not to scale*

<u>Exhibit C</u>

**RENTABLE SQUARE FOOTAGE**

| Floor | Rentable Area |
|-------|---------------|
| P-1 | 16,307 |
| P-2 | 3,467 |
| P-3 | 34,441 |
| Plaza | 18,157 |
| 4 | 45,906 |
| 5 | 43,563 |
| 6 | 53,482 |
| 7 | 50,670 |
| 8 | 61,377 |
| 9 | 47,977 |
| 10 | 46,666 |

<u>Exhibit D</u>

**FIXED RENT**

A.        In respect of the Data Center:

From January 1, 2006 through December 31, 2020     $75x11,696=          $73,100 per month

B.        In respect of the P-1 and P-2 Floors (together):

From January 1, 2006 through December 31, 2010     $15x8,078=          $10,097.50 per month

From January 1, 2011 through December 31, 2015     $16.50x8,078=       $11,107.25 per month

From January 1, 2016 through December 31, 2020     $18x8,078=          $12,117.00 per month

C.        In respect of the P-3 Floor

From January 1, 2006 through December 31, 2020     $20x34,441=         $57,401.66 per month

D.        In respect of the Plaza Floor:

From January 1, 2006 through December 31, 2008     $39 x 18,157 =      $59,010.25 per month

From January 1, 2009 through December 31, 2010     $40 x 18,157 =      $60,523.33 per month

From January 1, 2011 through December 31, 2015     $41 x 18,157 =      $62,036.42 per month

From January 1, 2016 through December 31, 2020     $43 x 18,157 =      $65, 062.58 per month

E.        In respect of the 6th Floor:

From January 1, 2006 through December 31, 2008     $39 x 53,482 =      $173,816.50 per month

From January 1, 2009 through January 31, 2009      $40 x 53,482 =      $178,273.33 per month

F.        In respect of the 7th Floor:

From January 1, 2006 through December 31, 2008     $39 x 50,670 =      $164,677.50 per month

From January 1, 2009 through January 31, 2009      $40 x 50,670 =      $168,900.00 per month

G.    In respect of the 8th Floor:

From January 1, 2006 through December 31, 2008    $39 x 61,377 =    $199,475.25 per month

From January 1, 2009 through December 31, 2010    $40 x 61,377 =    $204,590.00 per month

From January 1, 2011 through December 31, 2015    $41 x 61,377 =    $209,704.75 per month

From January 1, 2016 through December 31, 2020    $43 x 61,377 =    $219,934.25 per month

H.    In respect of the 9th and 10th Floors (together):

From January 1, 2006 through December 31, 2007    $45 x 94,643 =    $354,911.25 per month

From January 1, 2008 through December 31, 2008    $46 x 94,643 =    $362,798.16 per month

From January 1, 2009 through December 31, 2010    $47 x 94,643 =    $370,685.08 per month

From January 1, 2011 through December 31, 2015    $48 x 94,643 =    $378,572.00 per month

From January 1, 2016 through December 31, 2020    $50 x 94,643 =    $394,345.83 per month

<u>Exhibit E</u>

**RULES AND REGULATIONS**

<u>Building Management</u>:

All routine requests should be directed to Building Management at 588-8700 during the regular business day.

Emergency requests should be directed to Building Security at 588-8880 during non-business hours.

<u>Deliveries</u>:

The loading dock is open from 8:30 AM to 4:30 p.m.  For off-hour deliveries, contact Building Management at 588-8700 or Building Security at 588-8880.

<u>Emergencies</u>:

All emergencies must be reported to Building Security at 588-8888.

Building Security must be notified in the event that an emergency vehicle has been called to the building.

All environmental health and safety emergencies must be reported to 588-8888.

<u>Fire and Emergency Evacuation</u>:

In the event of a building evacuation, all occupants must follow the emergency evacuation procedures, following.

<u>Hours of Operation</u>:

The building is open 24 hours a day, 365 days a year.

<u>Parking</u>:

Parking is in designated areas only.

No vehicle may be left in the garage overnight without the approval of Building Security.

<u>Smoking</u>:

There is no smoking in the building, common areas or on One Stamford Forum grounds other than in designated smoking areas. These areas are located on Parking Level P-2 and on the East Plaza, adjacent to the building. Subject to applicable law, Building Management reserves the right to close or relocate designated smoking areas.

<u>Consumption of Alcoholic Beverages</u>:

For so long as Purdue is occupying space above the Plaza level of the Building, consumption of alcoholic beverages on Premises is prohibited other than as officially authorized by Tenant's management and as set forth in the next paragraph. Building management must be advised of company sponsored special events where alcohol will be served.

With respect to Tenant's practice of delivering alcoholic beverages to the Premises on a once-per-week basis (usually on Friday afternoons), the following rules shall apply:

- Beverages will be delivered by Tenant's catering company directly to the pantries on respective floors.

- Tenant will not allow employees to transport alcoholic beverages into common areas or between floors either by elevator or common fire stairs.

- All alcoholic beverages must be consumed within Tenant's Premises.

If the above rules are not followed or if any incident can be attributed to the consumption of alcohol on Premises, Landlord will expect that Tenant's management will take appropriate action. In the event of serious or repeated violations, Landlord reserves the right to suspend Tenant's consumption of alcohol within Tenant's Premises.

<u>Visitors</u>:

The Visitor's Entrance is on Tresser Boulevard.

Visitor parking is on Parking Level L.

All visitors must enter the lobby from Tresser Boulevard or through the Visitor Entrance located on Parking Level L.

All visitors are required to sign-in at the reception desk and will receive a picture ID badge, which is to be worn while on premises

All visitors must be escorted while in the common areas of the Building.

Other Security Procedures:

All employees are required to wear Management or Tenant issued identification badges at all times while in the Building.

All packages and briefcases may be subject to inspection by security upon entering and exiting.

No cameras, cell phones with cameras, video cameras, or recording devices are permitted in the building without prior authorization from Building Security.

No solicitation is permitted in this facility or its surroundings.

EVACUATION PROCEDURES

- Evacuate immediately

- Leave the building by one of the designated evacuation routes described below and do not attempt to use the elevators

- Individuals requiring assistance should report to Stair Tower A on the north wall and use the intercom to contact Building Security

- Remove any shoes or boots with high-heels and carry them

- Follow Safety Marshal's instructions

- Report to your designated staging area and remain there until you receive further instructions

- Do not block building entrances or exits

- Re-entry to the building is not permitted until the "all clear" is given by a Security Officer

- Proper identification must be shown for re-entry

**One Stamford Forum Evacuation Routes**

## FLOORS 2 – 10

There are four main Fire Stairwells, A, B, C and D, located on each floor. Stairwell A is the AOR (Area of Refuge) and should be used by all handicapped individuals or persons needing assistance.  An intercom has been installed on each of the floors in the AOR.  Once the receiver is picked up, the phone will automatically dial Building Security.

Please wait in the AOR for assistance from Fire Personnel.

- FIRE STAIR A – AREA OF REFUGE (AOR)
  - ➢ To PLAZA Level
  - ➢ To Outside Plaza West (Café)
  - ➢ To Outside Fire Stair 1 and exit onto Tresser Boulevard
  - ➢ OR To Outside Fire Stair 2 and exit onto North State Street
- FIRE STAIR B
  - ➢ To P-3 and cross over to Stair C
  - ➢ Exit into Parking Garage and follow arrows to North State Street
- FIRE STAIR C
  - ➢ To Level L (P-1)
  - ➢ Exit into Parking Garage and follow arrows to North State Street
- FIRE STAIR D
  - ➢ To P-3 and cross over to Stair E
  - ➢ To Level L (P-1)
  - ➢ Exit onto Tresser Boulevard

## PLAZA LEVEL

Stairwell E is located on the plaza level next to the convenience store and exits at the Lobby Level near the security console.

Stairwell F is located beyond the Fitness Center and exits onto Tresser Boulevard.

Stairwells 1 & 2 are located outside on the Plaza Level.  Stairwell 1 exits onto Tresser Boulevard and Stairwell 2 exits onto North State Street.

- FIRE STAIR E

  - To Level L (P-1)

  - Exit onto Tresser Boulevard

- FIRE STAIR C and D as above

- FIRE STAIRS 1 & 2 as above (Exterior)


**PARKING LEVELS**

P-3

- FIRE STAIR C or E as above

P-2

- FIRE STAIR E as above

- FIRE STAIR 2 as above

P-1 (East)/Lobby Level

Use FIRE STAIR F

  - Exit onto Tresser Boulevard

P-1 (West)/Lobby Level

  - Exit through Lobby onto Tresser Boulevard

Exhibit F

**[INTENTIONALLY OMITTED]**

<u>Exhibit G</u>

## HVAC SPECIFICATIONS

The Building HVAC system shall supply the Premises with a minimum of 0.3 C.F.M. of outside air per usable square foot.

Inside conditions throughout the Premises shall be maintained, at a minimum, at 72°F with 40% to 60% humidity when outside conditions are at 95°F dry bulb with 75°F wet bulb or when outside conditions are at 0°F dry bulb.

Toilet exhaust shall be provided at a minimum of 20 air changes per hour.

G-1

<u>Exhibit H</u>

**[INTENTIONALLY OMITTED]**

<u>Exhibit I</u>

## STANDARD CLEANING SPECIFICATIONS

## <u>Daily Cleaning Specifications</u>

### *Entrances and Lobbies*

| Location | Task Description |
|---|---|
| P1 Entrance from parking lot | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum - entire lobby area and inside elevators |
| | Spot clean walls and elevator buttons |
| | Dust furniture |
| | Monitor all the above throughout the day |
| Visitor South Entrance | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum |
| | Spot clean walls |
| | Dust furniture |
| | Monitor all the above throughout the day |
| Lobby Entrance at Reception Desk | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum - reception area including revolving door entrance and plant areas. |
| | Spot clean walls |
| | Clean reception area |
| | Dust all half high horizontal walls |
| | Monitor all the above throughout the day |
| North State Street Employee Entrance (Train Station) | Dust glass |
| | Vacuum |
| | Monitor throughout the day for trash |

| | |
|---|---|
| Security Entrance | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum |
| | Monitor all the above throughout the day |
| | |
| P2 Entrance | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep or vacuum |
| | Clean glass |
| | Spot clean walls and elevator buttons |
| | Dust furniture |
| | Monitor all above throughout the day |
| | |
| P3 Front Entrance | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep or vacuum |
| | Clean glass |
| | Spot clean walls and elevator buttons |
| | Dust furniture |
| | Monitor all the above throughout the day |
| | |
| P3 Back Entrance | Empty trash and replace liners |
| | Clean ashtrays and replace sand |
| | Sweep or vacuum |
| | Clean glass |
| | Spot clean walls and elevator buttons |
| | Dust furniture and outside ledge |
| | Monitor all the above throughout the day |
| | |
| Plaza Floor | Clean spills and black marks from tile floors |
| | Spot clean walls and elevator buttons |
| | Empty trash and replace liners |
| | Sweep or vacuum |
| | Clean glass |
| | Dust furniture |
| | Monitor all the above throughout the day |
| | |
| Loading dock | Empty trash and replace liners |
| | Remove skids |
| | Clean ashtrays and replace sand |
| | Sweep dock and surrounding area |
| | Dust and vacuum Facility office |
| | Clean Maintenance workstations |
| | Clean two bathrooms |
| | |
| Back loading dock - lift gate | Empty trash and replace liners |
| | Sweep areas or machine blow |

| | |
|---|---|
| Loading dock stairwell landing | Empty trash and replace liners<br>Sweep areas or machine blow<br>Spot clean walls<br>Vacuum walk-off mats<br>Mop tile floor |
| Outside Plaza | Empty trash and replace liners<br>Wipe down furniture<br>Pick up ground trash or machine blow<br>Clean ashtrays and replace sand<br>Clean glass doors<br>Monitor all the above throughout the day |
| Guard Station Gate 1 & 2<br>Main employee entrance and exit | Empty trash and replace liner<br>Sweep and mop floor<br>Clean glass |
| Guard Station Gate 3<br>Visitors entrance | Empty trash and replace liner<br>Sweep and mop floor<br>Clean glass |
| Guard Station Gate 4<br>Visitors exit | Empty trash and replace liner<br>Sweep and mop floor<br>Clean glass |
| Guard Station Gate 5 & 6<br>Loading dock | Empty trash and replace liner<br>Sweep and mop floor<br>Clean glass |
| Guard Station Gate 7<br>Main employee exit Back Gate | Empty trash and replace liner<br>Sweep and mop floor<br>Clean glass |
| Side Walks & Grounds | Machine sweep or machine blow perimeter of building<br>Pick up all trash around plants and trees<br>Empty ashtrays and replace sand<br>Monitor all the above throughout the day |
| Parking Garage Cleaning | All parking levels machine swept semi-annually.  Railings and handrails power washed semi-annually.  Garage ramps machine swept weekly. |
| Window Cleaning | Window cleaning, both interior and exterior done annually. |

## *Men's Rest Rooms*

Replenish all products :
 Toilet paper
 Hand towels
 Toilet seat covers
 Kleenex (2,3 or 4 boxes depending upon size of room)
 Air freshener (2 matching cans)
 Refill wall mounted air fresheners
Wipe down sinks, counter tops and mirrors
Clean toilets and urinal with a disinfectant detergent
Clean pipe behind toilet and ledge of toilet
Wipe finger prints from all doors, walls, partitions and dispensers
Empty trash and replace trash can liner
The above should be performed 3 times a day

## Ladies Rest Rooms

Replenish all products :
 Toilet paper
 Hand towels
 Toilet seat covers
 Tampons
 Stayfree pads #4
 Kleenex (2,3 or 4 boxes depending upon size of room)
 Air freshener (2 matching cans)
 Refill wall mounted air fresheners
Wipe down sinks, counter tops and mirrors
Clean toilets with a disinfectant detergent
Clean pipe behind toilet and ledge of toilet
Wipe finger prints from all doors, partitions and dispensers
Empty trash and replace trash can liner
The above should be performed 3 times a day

## Conference Rooms

Wipe fingerprints off glass doors
Empty trash and replace trash can liner
Clean tables
Clean white boards
Remove used easel paper
Coordinate the above tasks with the days meeting schedule

## Auditorium, Break Room and Service Room

Lobby Level

Empty trash and replace trash can liner
Clean tables
Wipe finger prints off glass doors and walls
DO NOT clean white boards
DO NOT remove used easel paper
DO NOT move equipment
Vacuum carpet
Coordinate the above tasks with the days meeting schedule

## Café

Plaza Level                          Vacuum carpet when necessary
                                     Return tables and chairs to proper location at 2:30 PM
                                     Spot clean walls
                                     Monitor all the above throughout the day

## Fitness Center

Fitness Center - Exercise Area       Replenish tissues
10:30 - 11:30 am                     Empty trash and replace trash can liner
2:30 - 3:30 pm                       Clean glass doors and mirrored walls
                                     Wipe down equipment with germicidal cleaner
                                     Vacuum
                                     Set up towels throughout day (approx. 200 per day)
                                     Collect dirty towels and bring to laundry room
                                     Dust mop aerobic room floor
                                     Damp mop aerobic room floor when necessary

Wellness room                        Replenish paper products
                                     Sweep and mop floor
                                     Empty trash and replace trash can liner

Lactation room                       Replenish paper products
                                     Sweep and mop floor
                                     Empty trash and replace liner

Men's Locker Room                    Replenish all products :
10:30 - 11:30 am                         Shampoo, cream rinse, hair spray, deodorant and body lotion
2:30 - 3:30 pm                           Toilet paper
                                         Hand towels
                                         Toilet seat covers
                                         Kleenex (2,3 or 4 boxes depending upon size of room)
                                         Air freshener (2 matching cans)
                                         Refill wall mounted air fresheners
                                     Wipe down sinks, counter tops and mirrors
                                     Clean toilets with a disinfectant detergent
                                     Clean pipe behind toilet and ledge of toilet
                                     Wipe finger prints from stall doors, partitions and dispensers
                                     Empty trash, replace liner and wipe exterior of can
                                     The above should be performed 2 times a day

| Ladies Locker Room<br>10:30 - 11:30 am<br>2:30 - 3:30 pm | Replenish all products :<br>    Shampoo, cream rinse, hair spray, deodorant and body lotion<br>    Toilet paper<br>    Hand towels<br>    Toilet seat covers<br>    Tampons<br>    Stayfree pads #4<br>    Kleenex (2,3 or 4 boxes depending upon size of room)<br>    Air freshener (2 matching cans)<br>    Refill wall mounted air fresheners<br>Wipe down sinks, counter tops and mirrors<br>Clean toilets with a disinfectant detergent<br>Clean pipe behind toilet and ledge of toilet<br>Wipe finger prints from stall doors, partitions and dispensers<br>Empty trash, replace liner and wipe exterior of can<br>The above should be performed 2 times a day |

## *Data Centers*
## *Specialty Rooms*

| Console Security Office, Security Managers<br>Office and Security Break Room | Empty trash and replace liner<br>Dust furniture<br>Vacuum |
| PL Gift Store | Empty trash and replace liner<br>Vacuum |
| Laundry Room | Sweep and mop<br>Check lint screens of dryers |
| PL Garden Room and hallway<br>11:30 AM | Vacuum<br>Spot clean area |
| P3 Medical records | Empty trash and replace liner<br>Dust and vacuum as requested |

## *Additional Responsibilities*

| Respond to all housekeeping emergencies<br>(Including but not limited to those identified) | Coffee spills<br>Toner spills<br>Loading dock spills<br>Treat parking lot oil spills<br>Clean toilet over flows<br>Mop floors<br>Respond to conference room requests |

# **Nightly Cleaning Specifications**

## *Entrances and Lobbies*

| Location | Task Description |
|---|---|
| Main Lobby from parking lot | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum - entire lobby area and inside elevators |
| Visitor's South Entrance | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep areas or machine blow |
| | Clean glass |
| | Sweep and mop terrazzo tile floor |
| | Vacuum exterior carpet |
| Front Entrance at Reception Desk | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum |
| | Clean reception desk |
| | Dust all half walls |
| | Spot clean walls |
| North State Street Employee Entrance | Vacuum carpet |
| | Dust handrails |
| | Clean glass on wall hangings |
| Security entrance | Empty trash and replace liners |
| | Clean ashtrays |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum |
| | Spot clean walls |
| P2 - Entrance | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum |
| | Spot clean walls |
| | Sweep and mop tile floors |

| | |
|---|---|
| P3 - Front entrance | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep and mop tile floors |
| | Clean glass |
| | Vacuum |
| | Spot clean wall |
| | |
| P3 - Back entrance | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep areas or machine blow |
| | Clean glass |
| | Vacuum |
| | Spot clean wall |
| | |
| Loading dock | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep |
| | |
| Back loading dock - lift gate | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep |
| | |
| Loading dock stairwell landing | Empty trash and replace liners and replace liners |
| | Clean ashtrays |
| | Sweep |
| | Mop tile floor |
| | Spot clean wall |
| | Vacuum |
| | |
| Elevators | Clean inside and outside of stainless steel doors |
| | |
| Stairwells | Spot clean stairwells |
| | Inspect stairs for litter |
| | |
| Coffee Rooms | Clean walls |
| | Dust furniture and equipment |
| | Clean exterior of refrigerator |

## *Men's Rest Rooms*

Replenish all products :
    Toilet paper
    Hand towels
    Toilet seat covers
    Kleenex (2,3 or 4 boxes depending upon size of room)
    Air freshener (2 matching cans)
    Refill wall mounted air fresheners
Clean toilets and urinals
Clean pipe behind toilet and ledge of toilet
Wipe down sinks, counter tops and mirrors
Empty trash and replace liners
Clean all stainless steel in bathrooms including partitions
Sweep and mop floors with disinfectant detergent

## Ladies Rest Rooms

Replenish all products :
    Toilet paper
    Hand towels
    Toilet seat covers
    Hand soap
    Tampons
    Stayfree pads #4
    Kleenex (2,3 or 4 boxes depending upon size of room)
    Air freshener (2 matching cans)
    Refill wall mounted air fresheners
Clean toilets
Clean pipe behind toilet and ledge of toilet
Wipe down sinks, counter tops and mirrors
Empty trash and replace liners
Clean all stainless steel in bathroom including partitions
Sweep and mop floors with disinfectant detergent

## Conference Rooms

Wipe fingerprints off glass doors
Empty trash and replace liners
Clean tables
Clean white boards
Remove used easel paper
Return conference room equipment to proper location
Place telephone directory under telephone
Vacuum carpet

## Auditorium, Break room and Service Room

Lobby Level

Empty trash and replace liners
Clean tables
Clean glass
DO NOT clean white boards
DO NOT remove used easel paper
Vacuum carpet

## Café

| Plaza Level | Fully vacuum carpet areas from wall to wall |
| | Spot clean walls |
| | Clean glass doors |
| | Dust bottom of window edge |
| | Return table and chairs to proper locations |

Kitchen and food service tile floors — Dust mop and wet mop floors in kitchen, food service and dish drop-off area with product provided

## Fitness Centers

| Fitness center | Replenish tissues |
| | Clean all equipment |
| | Empty trash and replace liners |
| | Clean glass doors and mirrored walls |
| | Vacuum |

| Wellness room | Wipe down furniture |
| | Empty trash and replace liners |
| | Vacuum |
| | Mop floors |

| Lactation room | Wipe down furniture |
| | Empty trash and replace liners |
| | Vacuum |
| | Mop floors |

| Men's and Ladies Locker rooms | Replenish all paper products, soaps, conditioners and lotions |
| | Wipe down lockers and furniture |
| | Empty trash and replace liners |
| | Clean mirrors |
| | Vacuum |

## Corridors

| All Floors | Empty general and recyclable trash |
| | Replace liners in general trash cans |
| | Vacuum corridor carpet |
| | Dust  corridor furniture |
| | Spot clean all horizontal and vertical surfaces including glass |
| | Clean and polish drinking fountains |
| | Clean elevator walls, doors, carpets, ceiling and stainless steal |

## Offices

| All Floors | Empty general and recyclable trash |
| | Replace liners in general trash cans |
| | Vacuum carpet |
| | Dust  furniture |

## Specialty Rooms

| Lobby | Spot clean walls and elevator buttons |
| | Empty trash and replace liners |
| | Dust furniture |
| | vacuum |
| | Clean glass |

| P2 | Spot clean walls and elevator buttons |
| | Empty trash and replace liners |
| | Dust furniture |
| | vacuum |
| | Clean glass |

| P3 | Spot clean walls and elevator buttons |
| | Empty trash and replace liners |
| | Dust furniture |
| | vacuum |
| | Clean glass |

| Plaza | Clean spills and black marks from tile floor |
| | Spot clean walls and elevator buttons |
| | Empty trash and replace liners |
| | Dust furniture |
| | vacuum |
| | Clean glass |

| Lobby Security Office and Break Room | Empty trash and replace liners |
| | Dust furniture |
| | Vacuum |

| PL Kitchen offices | Empty trash and replace liners |
| | Dust furniture |
| | Vacuum |
| | Clean glass |

| PL Garden Room and Hallway | Vacuum |
| | Spot clean entire area |

## *Additional Responsibilities*

| Respond to all housekeeping emergencies (Including but not limited to those identified) | Coffee spills |
| | Toner spills |
| | Loading dock spills |
| | Treat parking lot oil spills |
| | Clean toilet over flows |
| | Mop floors |
| | Respond to conference room requests |

## *TripleS Carpet Cleaning*

Nightly Cleaning Specifications

| Location | Task Description |
| --- | --- |

**Hallways**                Hallways and common areas are extracted semi- annually
**Offices**                 Private offices are extracted  annually
**Cube areas**              Cube/workstations are extracted semi- annually
**Conference Rooms**        Rooms are extracted quarterly
**Elevator Lobbies**        Lobbies are extracted monthly

**Spotting of spills and stains**    Areas spotted on Monday, Wednesday, and Friday evenings

Exhibit J

**[INTENTIONALLY OMITTED]**

<u>Exhibit K</u>

**[INTENTIONALLY OMITTED]**

Exhibit L

**[INTENTIONALLY OMITTED]**

Exhibit M

**[INTENTIONALLY OMITTED]**

Exhibit N

**FORM OF NOTICE OF LEASE**


NOTICE OF LEASE


Notice is hereby given of the following Lease:

1.      Name and address of parties:

      Landlord:      One Stamford Realty L.P.

      Tenant:        Purdue Pharma L.P.

2.      Said Lease was entered into as of the 6th day of April, 2006.

3.      The term of said Lease is anticipated to commence effective as of January 1, 2006 and to expire on December 31, 2020.

4.      The premises consists initially of the P-1 floor (including but not limited to the data centers), the P-2 floor, the P-3 floor, the plaza floor, the 4th floor, the 5th floor, the 6th floor, the 7th floor, the 8th floor, the 9th and 10th floors of the Building.

5.      Said Lease is on file at the office of One Stamford Realty L.P., One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this
_____ day of April, 2006.

ONE STAMFORD REALTY L.P.

By:    [_____],
       its General Partner


       By:_____
       Name:
       Title:


PURDUE PHARMA L.P.


By:_____
Name:
Title:

STATE OF _____)
                        ) ss.:
COUNTY OF _____)

On this _____ day of _____, 200__, before me, appeared _____, who acknowledged himself to be the _____ of _____, a _____, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the [corporation] by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public

STATE OF _____)
                        ) ss.:
COUNTY OF _____)

On this _____ day of _____, 200__, before me, appeared _____, who acknowledged himself to be the _____ of _____, a _____, and that he as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the [corporation] by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

_____
Notary Public

Exhibit O

**FORM OF ESTOPPEL CERTIFICATE**

[DATE]

ESTOPPEL CERTIFICATE

Re:    Lease, dated as of April [ ], 2006, between
       One Stamford Realty L.P. and Purdue Pharma L.P.

Ladies and Gentlemen:

The undersigned certifies to _____ as of the date hereof as follows:

1.    It is the _____ under the lease (the "Lease"), dated as of April [ ], 2006, between One Stamford Realty L.P. as landlord ("Landlord"), and Purdue Pharma L.P. as tenant ("Tenant") for premises demised thereunder (the "Premises") located at One Stamford Forum, Stamford, Connecticut (the "Building"). All capitalized terms not otherwise defined herein shall have the meaning provided in the Lease.

2.    The Premises consist of floors _____ of the Building.

3.    The Lease is in full force and effect. The Lease has not been amended, modified or supplemented *[, except for _____]*.

4.    The term of the Lease commenced on _____ *[modify as appropriate on a floor-by-floor basis]* and expires on _____.

5.    The monthly Fixed Rent under the Lease is $_____ and has been paid through _____. All Additional Rent under the Lease due and payable through the date hereof has been paid in full.

6.    To the best knowledge of the undersigned, neither Tenant nor Landlord is in default of any of their respective obligations under the Lease.

7.    There are no purchase options, rights of first refusal or rights of first offer with respect to the Premises or the Building.

8.    All notices and communications under the Lease are to be sent to the undersigned at *[the addresses set forth in Section 8.01 of the Lease][specify other]*

9.    *[such other matters reasonably requested]*

*[For certificates by Tenant:]* Nothing contained in this Certificate is intended to constitute a waiver of any right Tenant may have in accordance with the provisions of the Lease

to challenge whether any amount of Additional Rent heretofore paid by Tenant was properly payable under the Lease.

*[For certificates by Landlord:]*  Nothing contained in this Certificate is intended to constitute a waiver of any right Landlord may have in accordance with the provisions of the Lease to correct or adjust any amount of Additional Rent heretofore paid by Tenant under the Lease.

This Certificate is intended solely as an estoppel certificate and [Tenant/Landlord] shall not have any liability to any party relying on this Certificate, the sole consequence of the delivery of this Certificate being that [Tenant/Landlord] shall be estopped from denying the accuracy of the statements certified to herein.

The undersigned individual hereby certifies that he or she is duly authorized to execute this Estoppel Certificate on behalf of _____.

Very truly yours,

_____

By:_____
    Name:
    Title:

<u>Exhibit P</u>

**FORM OF NON-DISTURBANCE AND ATTORNMENT AGREEMENT
FOR TENANT'S SUBTENANTS**

<u>SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "<u>Agreement</u>"), dated as of _____, between ONE STAMFORD REALTY L.P., a Delaware limited partnership, having an office at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 ("<u>Landlord</u>") and _____, a _____, with offices at _____ ("<u>Subtenant</u>").

RECITALS:

WHEREAS, Landlord is the landlord under that certain Lease dated as of April [ ], 2006 (the "<u>Lease</u>"), made by Landlord, as landlord, and Purdue Pharma L.P., a Delaware limited partnership, as tenant ("<u>Sublandlord</u>"), which Lease covers certain premises more fully described in the Lease (the "<u>Premises</u>"), which Premises are a part of the real property known as One Stamford Forum, Stamford, Connecticut (the "<u>Property</u>"), which Property is more fully described in <u>Schedule A</u> attached hereto; and

WHEREAS, Sublandlord and Subtenant have entered into a certain agreement of sublease, dated as of _____, [DESCRIBE ANY AMENDMENTS] (the "<u>Sublease</u>") initially covering [a portion of the Premises (the "<u>Subleased Premises</u>") in the building forming a part of the Property].

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, promise, covenant and agree as follows:

1.      The Sublease and Subtenant's interest thereunder is now and at all times shall continue to be unconditionally subject and subordinate in each and every respect to the Lease.

2.      Landlord agrees that, so long as Subtenant is not then in default under any of the terms, covenants or conditions of the Sublease or this Agreement, beyond any applicable notice and cure periods, (a) the Sublease shall continue in full force and effect in the event that Successor Landlord (defined below) succeeds to the interests of Sublandlord under the Lease by reason of termination of the Lease, upon and subject to all of the terms, covenants and conditions of the Sublease, for the balance of the term of the Sublease (subject to the provisions hereof), (b) Successor Landlord shall not terminate the Sublease, or disturb, interfere with or otherwise affect, Subtenant's leasehold estate, use, possession and right to quiet enjoyment of the Subleased Premises under the terms of the Sublease or any of Subtenant's other rights under the Sublease in the event the Lease is terminated and (c) Subtenant shall not be named or joined in any action or proceeding to terminate the Lease.  For purposes hereof, the term "<u>Successor Landlord</u>" shall be defined as Landlord, anyone claiming by, through or under Landlord and their respective successors and assigns.

3.      In the event that Successor Landlord succeeds to the interest of Sublandlord under the Sublease and/or Sublandlord's leasehold interest in the Property by reason of termination of the Lease, subject to <u>Section 6</u> below, Successor Landlord and Subtenant hereby agree to

P-1

recognize one another as sublandlord and subtenant, respectively, under the Sublease and to be bound to one another under all of the terms, covenants and conditions of the Sublease (subject to the provisions hereof), and Successor Landlord shall assume all of the obligations of Sublandlord under the Sublease (subject to the provisions hereof). Accordingly, from and after Successor Landlord succeeds to the interest of Sublandlord, Successor Landlord and Subtenant shall have the same remedies against each other for the breach of any agreement contained in the Sublease as Subtenant and Sublandlord had before Successor Landlord succeeded to the interest of Sublandlord; provided, however, that Successor Landlord shall not be:

(a)    liable for any act or omission of any prior sublandlord (including Sublandlord); it being understood that the foregoing is not intended to relieve Successor Landlord of any liability arising by reason of its acts or omissions from and after the date it succeeds to the interests of the Sublandlord, including a continuation of the failure of the prior Sublandlord to perform its obligations under the Sublease, in which case Successor Landlord upon receipt of notice of such continuation from Subtenant shall have a reasonable period of time to remedy same; or

(b)    subject to any offsets or defenses that Subtenant might have against any prior sublandlord (including Sublandlord) relating to any event or occurrence before the date Successor Landlord succeeds to the interests of Sublandlord, other than offsets expressly provided for in the Sublease; or

(c)    bound by any rent or additional rent that Subtenant might have paid more than one month in advance of the due date therefor to any prior sublandlord (including Sublandlord), unless Successor Landlord approved such payment in writing; or

(d)    bound by any material amendment or modification of the Sublease made after the date of this Agreement without Landlord's prior written consent, to the extent such modification materially and adversely affects Successor Landlord's interests, releases Subtenant from any obligations under the Sublease or provides for the reduction of rent, a reduction of the Sublease term or a reduction in the Subleased Premises; or

(e)    liable for return of any security deposit not delivered to Successor Landlord by Sublandlord or Subtenant.

4.    Although the foregoing provisions of this Agreement shall be self-operative, Subtenant agrees to execute and deliver to Landlord or to any person to whom Subtenant herein agrees to attorn, such other instrument or instruments as Landlord or such other person shall from time to time reasonably request in order to confirm such provisions.

5.    Subtenant hereby warrants and represents, covenants and agrees to and with Landlord:

(a)    not to materially amend or modify the Sublease to materially and adversely affect Successor Landlord's interests, release Subtenant from any obligations thereunder or reduce the rent, the Sublease term or the Subleased Premises, without prior written consent of Landlord;

(b)    to deliver to Landlord at the addresses provided for in this Agreement a duplicate of each notice of default delivered to Sublandlord at the same time as such notice is given to Sublandlord;

(c)    that as of the date of this Agreement Subtenant is the sole owner of the leasehold estate created by the Sublease and shall not hereafter transfer the Sublease except as permitted by the terms thereof;

(d)    not to seek to terminate the Sublease by reason of any default of Sublandlord without prior written notice thereof to Landlord and the lapse thereafter of such time as under the Sublease was offered to Sublandlord in which to remedy the default, and the lapse of an additional 30 days after the expiration of such time as Sublandlord was permitted to cure such default; provided, however, that with respect to any default of Sublandlord under the Sublease which cannot be remedied within such time, if Landlord commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Landlord shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Landlord or Sublandlord does not cure or commence curing such default within the time provided to Sublandlord under the Sublease and the nature of the default materially threatens Subtenant's ability to conduct its daily business for an extended period of time or threatens to materially or adversely damage Subtenant's property located on the Subleased Premises, Subtenant shall be permitted to exercise its rights under the Sublease;

(e)    not to pay any rent or other sums due or to become due under the Sublease more than 30 days in advance of the date on which the same are due or to become due under the Sublease; and

(f)    to certify promptly in writing to Landlord in connection with any proposed assignment of the Lease, whether or not, to Subtenant's knowledge, any default on the part of Sublandlord then exists under the Sublease.

6.    Subtenant agrees that, to the extent that the Sublease provides for a rental which, after taking into account any free rent periods, credits, offsets or deductions to which Subtenant may be entitled thereunder, is less than (on a per rentable square foot basis) the Fixed Rent and recurring Additional Rent (as such terms are defined in the Lease) payable by Sublandlord from time to time throughout the term of the Lease with respect to the Subleased Premises (the "Overlease Rent"), the rent payable under the Sublease will automatically and without condition become equal to the Overlease Rent (on a per rentable square foot basis), if, as and when (and for all periods of the Sublease term from and after the date that) the attornment provided for herein becomes effective between Landlord or any other Successor Landlord and Subtenant (and upon such attornment, the Sublease shall, automatically and without further act required on the part of any party, be deemed amended to accomplish the foregoing provisions of this Section 6).

7.    Subtenant agrees that, to the extent that the Sublease grants to Subtenant services or rights in excess of those which would otherwise be available to Subtenant under the Lease if Subtenant were leasing directly from Landlord only the Subleased Premises, then, such excess services or rights will automatically cease if, as and when (and for all periods of the Sublease

term from and after the date that) the attornment provided for herein becomes effective between Landlord or any other Successor Landlord and Subtenant (and upon such attornment, the Sublease shall, automatically and without further act required on the part of any party, be deemed amended to accomplish the foregoing provisions of this Section 7).

8.      This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

9.      Subtenant agrees that neither the officers, nor the directors, employees, agents or shareholders of Landlord shall be personally liable hereunder.

10.      Landlord's address for notices shall be:

_____

Subtenant's    address for notices shall be:

_____

11.      In the event of the termination of the Lease other than by reason of Sublandlord's default thereunder (e.g., by reason of a casualty pursuant to Section 7.05 of the Lease) this Agreement shall, automatically and without further act of the parties, terminate and be of no further force or effect from and after the applicable termination date; provided, that if (a) (i) the Lease is terminated with respect to less than all of the Premises, or (i) Sublandlord exercises any renewal option with respect to less than all of the Premises, and (b) the Sublease is for space with respect to which the Lease is terminated or not renewed, then this Agreement shall, automatically and without further act of the parties, terminate and be of no further force or effect from and after the applicable termination date or the day preceding the commencement of the applicable renewal term, as the case may be.

12.      Except as expressly provided for in this Agreement, Landlord shall have no obligations to Subtenant with respect to the Sublease.

13.      The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State of Connecticut, excluding its principles of conflict of laws.

14.      This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

15.      This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers as of the date and year first above written.

LANDLORD:

ONE STAMFORD REALTY L.P.

By:_____,
    its general partner

    By:_____
Name:
Title:

SUBTENANT:

_____

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

STATE OF _____ )
                       ) ss.:
COUNTY OF _____ )


        On    this    _____    day    of    _____,    before    me,    appeared
_____, who acknowledged himself to be the _____
of _____, a _____, and that he as such _____,
being authorized so to do, executed the foregoing instrument for the purposes therein contained,
by signing the name of the [corporation] by himself as _____.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal



                        _____
                        Notary Public


STATE OF _____ )
                       ) ss.:
COUNTY OF _____ )


        On    this    _____    day    of    _____,    before    me,    appeared
_____, who acknowledged himself to be the _____
of _____, a _____, and that he as such _____,
being authorized so to do, executed the foregoing instrument for the purposes therein contained,
by signing the name of the [corporation] by himself as _____.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal



                        _____
                        Notary Public

Schedule A

**LEGAL DESCRIPTION**

Exhibit Q

**FORM OF NON-DISTURBANCE AND ATTORNMENT AGREEMENT
FOR SUPERIOR LEASES**

<u>SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "<u>Agreement</u>"), dated as of _____, between _____, a _____, having an office at _____ ("<u>Ground Landlord</u>") and Purdue Pharma L.P., a Delaware limited partnership, with offices at One Stamford Forum, Stamford, Connecticut 06901 ("<u>Tenant</u>").

RECITALS:

WHEREAS, Ground Landlord is the sole owner in fee simple of (x) that certain piece, parcel or tract of land (the "<u>Land</u>") that is lying and being in the County of Fairfield, City of Stamford and State of Connecticut and that is more particularly described in <u>Schedule A</u> attached hereto and (y) the building (the "<u>Building</u>") that is located on the Land and that is commonly known as One Stamford Forum, Stamford, Connecticut (the "<u>Property</u>"); and

WHEREAS, Ground Landlord, as lessor, and One Stamford Realty L.P., a Delaware limited partnership ("<u>Landlord</u>"), as tenant, are parties to a lease dated _____ __, ____ (said lease, as the same may hereafter be amended and/or restated from time to time, is hereinafter referred to as the "<u>Ground Lease</u>"), pursuant to which Ground Landlord has leased to Landlord the Land and the Building; and

WHEREAS, Tenant has entered into a Lease dated as of April [__], 2006 (the "<u>Lease</u>") with Landlord, for a portion or portions of the Building more fully described in the Lease; and

WHEREAS, Ground Landlord has agreed to recognize the status of Tenant in the event of a termination of the Ground Lease, and Tenant has agreed to attorn to Ground Landlord in any such event.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, promise, covenant and agree as follows:

1.    Tenant hereby acknowledges that the Lease is and shall remain subordinate to the Ground Lease.

2.    Ground Landlord agrees that, so long as Tenant is not then in default under any of the terms, covenants or conditions of the Lease or this Agreement, beyond any applicable notice and cure periods, (a) the Lease shall continue in full force and effect in the event that Successor Landlord (defined below) succeeds to the interests of Landlord under the Lease by reason of termination of the Ground Lease, upon and subject to all of the terms, covenants and conditions of the Lease, for the balance of the term of the Lease (subject to the provisions hereof), (b) Successor Landlord shall not terminate the Lease, or disturb, interfere with or otherwise affect, Tenant's leasehold estate, use, possession and right to quiet enjoyment of the Premises under the terms of the Lease or any of Tenant's other rights under the Lease in the event the Ground Lease is terminated and (c) Tenant shall not be named or joined in any action or proceeding to

Q-1

terminate the Ground Lease. For purposes hereof, the term "Successor Landlord" shall be defined as Ground Landlord, anyone claiming by, through or under Ground Landlord and their respective successors and assigns.

3.      In the event that Successor Landlord succeeds to the interest of Landlord under the Lease and/or Landlord's leasehold interest in the Property by reason of termination of the Ground Lease, Successor Landlord and Tenant hereby agree to recognize one another as landlord and tenant, respectively, under the Lease and to be bound to one another under all of the terms, covenants and conditions of the Lease (subject to the provisions hereof), and Successor Landlord shall assume all of the obligations of Landlord under the Lease (subject to the provisions hereof). Accordingly, from and after Successor Landlord succeeds to the interest of Landlord, Successor Landlord and Tenant shall have the same remedies against each other for the breach of any agreement contained in the Lease as Tenant and Landlord had before Successor Landlord succeeded to the interest of Landlord; provided, however, that Successor Landlord shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord); it being understood that the foregoing is not intended to relieve Successor Landlord of any liability arising by reason of its acts or omissions from and after the date it succeeds to the interests of the Landlord, including a continuation of the failure of the prior Landlord to perform its obligations under the Lease, in which case Successor Landlord upon receipt of notice of such continuation from Tenant shall have a reasonable period of time to remedy same; or

(b)     subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord) relating to any event or occurrence before the date Successor Landlord succeeds to the interests of Landlord, other than offsets expressly provided for in the Lease; or

(c)     bound by any rent or additional rent that Tenant might have paid more than one month in advance of the due date therefor to any prior landlord (including Landlord), unless Successor Landlord approved such payment in writing; or

(d)     bound by any material amendment or modification of the Lease made after the date of this Agreement without Ground Landlord's prior written consent, to the extent such modification materially and adversely affects Successor Landlord's interests, releases Tenant from any obligations under the Lease or provides for the reduction of rent, a reduction of the Lease term or a reduction in the Premises; or

(e)     liable for return of any security deposit not delivered to Successor Landlord by Landlord or Tenant.

4.      Although the foregoing provisions of this Agreement shall be self-operative, Tenant agrees to execute and deliver to Ground Landlord or to any person to whom Tenant herein agrees to attorn, such other instrument or instruments as Ground Landlord or such other person shall from time to time reasonably request in order to confirm such provisions.

5.      Tenant hereby warrants and represents, covenants and agrees to and with Ground Landlord:

(a)    not to materially amend or modify the Lease to materially and adversely affect Successor Landlord's interests, release Tenant from any obligations thereunder or reduce the rent, the Lease term or the Premises, without prior written consent of Ground Landlord;

(b)    to deliver to Ground Landlord at the addresses provided for in this Agreement a duplicate of each notice of default delivered to Landlord at the same time as such notice is given to Landlord;

(c)    that as of the date of this Agreement Tenant is the sole owner of the leasehold estate created by the Lease and shall not hereafter transfer the Lease except as permitted by the terms thereof;

(d)    not to seek to terminate the Lease by reason of any default of Landlord without prior written notice thereof to Ground Landlord and the lapse thereafter of such time as under the Lease was offered to Landlord in which to remedy the default, and the lapse of an additional 30 days after the expiration of such time as Landlord was permitted to cure such default; provided, however, that with respect to any default of Landlord under the Lease which cannot be remedied within such time, if Ground Landlord commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Ground Landlord shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Ground Landlord or Landlord does not cure or commence curing such default within the time provided to Landlord under the Lease and the nature of the default materially threatens Tenant's ability to conduct its daily business for an extended period of time or threatens to materially or adversely damage Tenant's property located on the Premises, Tenant shall be permitted to exercise its rights under the Lease;

(e)    not to pay any rent or other sums due or to become due under the Lease more than 30 days in advance of the date on which the same are due or to become due under the Lease; and

(f)    to certify promptly in writing to Ground Landlord in connection with any proposed assignment of the Ground Lease, whether or not, to Tenant's knowledge, any default on the part of Landlord then exists under the Lease.

6.    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

7.    Tenant agrees that neither the officers, nor the directors, employees, agents or shareholders of Ground Landlord shall be personally liable hereunder.

8.    Ground Landlord's address for notices shall be:

_____

Tenant's address for notices shall be:

_____

9.      Except as expressly provided for in this Agreement, Ground Landlord shall have no obligations to Tenant with respect to the Lease.

10.     The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State of Connecticut, excluding its principles of conflict of laws.

11.     This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

12.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*[NO FURTHER TEXT ON THIS PAGE]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers as of the date and year first above written.

GROUND LANDLORD:

_____

By:_____
    Name:
    Title:

TENANT:

PURDUE PHARMA L.P.

By:_____
    Name:
    Title:

STATE OF _____ )
                           ) ss.:
COUNTY OF _____ )

        On    this    _____    day    of    _____,    before    me,    appeared
_____, who acknowledged himself to be the _____
of _____, a _____, and that he as such _____,
being authorized so to do, executed the foregoing instrument for the purposes therein contained,
by signing the name of the [corporation] by himself as _____.

           IN WITNESS WHEREOF, I hereunto set my hand and official seal


                                    _____
                                    Notary Public


STATE OF _____ )
                           ) ss.:
COUNTY OF _____ )


        On    this    _____    day    of    _____,    before    me,    appeared
_____, who acknowledged himself to be the _____
of _____, a _____, and that he as such _____,
being authorized so to do, executed the foregoing instrument for the purposes therein contained,
by signing the name of the [corporation] by himself as _____.

           IN WITNESS WHEREOF, I hereunto set my hand and official seal


                                      _____
                                    Notary Public

<u>Schedule A</u>

**LEGAL DESCRIPTION**

<u>Exhibit R</u>

## FORM OF NON-DISTURBANCE AND ATTORNMENT AGREEMENT
## FOR SUPERIOR MORTGAGES

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement"), dated as of _____, between _____, a _____, having an office at _____ ("Lender") and Purdue Pharma L.P., a Delaware limited partnership, with offices at One Stamford Forum, Stamford, Connecticut 06901("Tenant").

RECITALS:

WHEREAS, Tenant has entered into a Lease dated as of April [   ], 2006 (the "Lease") with One Stamford Realty L.P., a Delaware limited partnership ("Landlord"), covering certain premises more fully described in the Lease (the "Premises"), which Premises are a part of the real property known as One Stamford Forum, Stamford, Connecticut (the "Property"), which Property is more fully described in Schedule A attached hereto; and

WHEREAS, Lender is making a mortgage loan (the "Mortgage Loan") to Landlord as borrower in the original principal amount of $_____, which Mortgage Loan is evidenced by a Mortgage Note (the "Mortgage Note"), and is secured, inter alia, by a Mortgage (the "Mortgage") and an Assignment of Leases and Rents (the "Assignment"); and

WHEREAS, Lender requires as a condition of the making of the Mortgage Loan that the Mortgage shall unconditionally be and remain at all times a lien or charge upon the Property, prior and superior to the Lease and the leasehold estate created thereby; and

WHEREAS, Tenant has agreed to the subordination of the Lease to the Mortgage on the condition that it is assured of continued occupancy of the Premises under the terms of the Lease and this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, promise, covenant and agree as follows:

1.    The Lease and all estates, rights, options, liens and charges therein contained or created under the Lease are and shall be subject and subordinate to the lien, provisions and effect of the Mortgage insofar as it affects the real and personal property described therein of which the Premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all advances made or to be made thereunder, to the full extent of amounts secured thereby and interest thereon.

2.    In the event Lender takes possession of the Property, as mortgagee-in-possession or otherwise, or forecloses the Mortgage or otherwise causes the Property to be sold pursuant to the Mortgage, Lender agrees that, so long as Tenant is not then in default under any of the terms, covenants or conditions of the Lease or this Agreement, beyond any applicable notice and cure

periods, (a) the Lease shall continue in full force and effect as a direct Lease between the succeeding owner of the Property and Tenant, upon and subject to all of the terms, covenants and conditions of the Lease, for the balance of the term of the Lease (subject to the provisions hereof), (b) Lender shall not terminate the Lease, or disturb, interfere with or otherwise affect, Tenant's leasehold estate, use, possession and right to quiet enjoyment of the Premises under the terms of the Lease or any of Tenant's other rights under the Lease in the exercise of Lender's rights under the Mortgage and (c) Tenant shall not be named or joined in any foreclosure action or other proceeding to enforce the Mortgage, unless such joinder shall be required by law and shall not result in termination of the Lease.

3.    In the event that Lender succeeds to the interest of Landlord under the Lease and/or Landlord's leasehold interest in the Property, or if anyone else (other than the Landlord) acquires Landlord's leasehold interest in the Property or the right to possession of the Property upon the foreclosure of the Mortgage or by other sale pursuant to the Mortgage, or upon the sale of the Property by Lender or its successors or assigns after foreclosure or other sale pursuant to the Mortgage or acquisition of title in lieu thereof or otherwise, Lender or its successors or assigns or the then owner or holder of Landlord's leasehold interest in the Property after foreclosure or other sale pursuant to the Mortgage (hereinafter collectively referred to as "Successor Landlord") and Tenant hereby agree to recognize one another as landlord and tenant, respectively, under the Lease and to be bound to one another under all of the terms, covenants and conditions of the Lease (subject to the provisions hereof), and Successor Landlord shall assume all of the obligations of Landlord under the Lease (subject to the provisions hereof). Accordingly, from and after any such event described above in this paragraph, Successor Landlord and Tenant shall have the same remedies against each other for the breach of any agreement contained in the Lease as Tenant and Landlord had before Successor Landlord succeeded to the interest of Landlord; provided, however, that Successor Landlord shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord); it being understood that the foregoing is not intended to relieve Successor Landlord of any liability arising by reason of its acts or omissions from and after the date it succeeds to the interests of the Landlord, including a continuation of the failure of the prior Landlord to perform its obligations under the Lease, in which case Successor Landlord upon receipt of notice of such continuation from Tenant shall have a reasonable period of time to remedy same; or

(b)    subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord) relating to any event or occurrence before the date Successor Landlord succeeds to the interests of Landlord other than offsets expressly provided for in the Lease; or

(c)    bound by any rent or additional rent that Tenant might have paid more than one month in advance of the due date therefor to any prior landlord (including Landlord), unless Successor Landlord approved such payment in writing; or

(d)    bound by any material amendment or modification of the Lease made after the date of this Agreement without Lender's prior written consent, to the extent such modification materially and adversely affects Successor Landlord's interests, releases Tenant

from any obligations under the Lease or provides for the reduction of rent, a reduction of the Lease term or a reduction in the Premises; or

(e)    liable for return of any security deposit not delivered to Successor Landlord by Landlord or Tenant.

4.    Although the foregoing provisions of this Agreement shall be self-operative, Tenant agrees to execute and deliver to Lender or to any person to whom Tenant herein agrees to attorn, such other instrument or instruments as Lender or such other person shall from time to time reasonably request in order to confirm such provisions.

5.    Tenant hereby warrants and represents, covenants and agrees to and with Lender:

(a)    not to materially amend or modify the Lease to materially and adversely affect Successor Landlord's interests, release Tenant from any obligations thereunder or reduce the rent, the Lease term or the Premises, without prior written consent of Lender;

(b)    to deliver to Lender at the addresses provided for in this Agreement a duplicate of each notice of default delivered to Landlord at the same time as such notice is given to Landlord;

(c)    that as of the date of this Agreement Tenant is the sole owner of the leasehold estate created by the Lease and shall not hereafter transfer the Lease except as permitted by the terms thereof;

(d)    not to seek to terminate the Lease by reason of any default of Landlord without prior written notice thereof to Lender and the lapse thereafter of such time as under the Lease was offered to Landlord in which to remedy the default, and the lapse of an additional 30 days after the expiration of such time as Landlord was permitted to cure such default; provided, however, that with respect to any default of Landlord under the Lease which cannot be remedied within such time, if Lender commences to cure such default within such time and thereafter diligently proceeds with such efforts and pursues the same to completion, Lender shall have such time as is reasonably necessary to complete curing such default. Notwithstanding the foregoing, in the event either Lender or Landlord does not cure or commence curing such default within the time provided to Landlord under the Lease and the nature of the default materially threatens Tenant's ability to conduct its daily business for an extended period of time or threatens to materially or adversely damage Tenant's property located on the Premises, Tenant shall be permitted to exercise its rights under the Lease;

(e)    not to pay any rent or other sums due or to become due under the Lease more than 30 days in advance of the date on which the same are due or to become due under the Lease; and

(f)    to certify promptly in writing to Lender in connection with any proposed assignment of the Mortgage, whether or not, to Tenant's knowledge, any default on the part of Landlord then exists under the Lease.

6.    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

7.    Tenant agrees that neither the officers, nor the directors, employees, agents or shareholders of Lender shall be personally liable hereunder.

8.    Lender's address for notices shall be:

_____

Tenant's address for notices shall be:

_____

9.    Tenant acknowledges and agrees that it has notice that Landlord's interest in the Lease may be assigned from Landlord to Lender as further security for the Mortgage Loan.

10.    Except as expressly provided for in this Agreement, Lender shall have no obligations to Tenant with respect to the Lease.

11.    The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State of Connecticut, excluding its principles of conflict of laws.

12.    This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

13.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*[NO FURTHER TEXT ON THIS PAGE]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officers as of the date and year first above written.

LENDER:

_____

By:_____
     Name:
     Title:

TENANT:

PURDUE PHARMA L.P.

By:_____
     Name:
     Title:

STATE OF _____)
                       ) ss.:
COUNTY OF _____)

        On    this    _____    day    of    _____,    before    me,    appeared
_____, who acknowledged himself to be the _____
of _____, a _____, and that he as such _____,
being authorized so to do, executed the foregoing instrument for the purposes therein contained,
by signing the name of the [corporation] by himself as _____.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal


                                 _____
                                 Notary Public


STATE OF _____)
                       ) ss.:
COUNTY OF _____)

        On    this    _____    day    of    _____,    before    me,    appeared
_____, who acknowledged himself to be the _____
of _____, a _____, and that he as such _____,
being authorized so to do, executed the foregoing instrument for the purposes therein contained,
by signing the name of the [corporation] by himself as _____.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal


                                 _____
                                 Notary Public

Schedule A

**LEGAL DESCRIPTION**