## Exhibit E

**UBS Sublease**

## SUBLEASE

SUBLEASE, dated as of August 10, 2009, between **UBS AG**, a Swiss banking company acting through its Stamford Branch, whose address is 677 Washington Boulevard, Stamford, Connecticut 06901 ("Sublandlord") and **PURDUE PHARMA L.P.**, a Delaware limited partnership having an office at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901 ("Subtenant").

## W I T N E S S E T H:

WHEREAS, Sublandlord is the lessee under a certain lease, dated as of December 30, 2005 (the "Lease"), with One Stamford Realty, L.P., as landlord ("Prime Lessor"), and Sublandlord, as tenant, which Lease demises the premises (the "Prime Leased Premises") covering portions of the P-1 and P-2 floors and the entire 2nd through 8th floors in the building known as One Stamford Forum, Stamford, Connecticut (the "Building"); and

WHEREAS, Subtenant desires to sublet the entire 3rd floor of the Building (the "3rd Floor"), the entire 4th floor of the Building (the "4th Floor"), the entire 5th floor of the Building (the "5th Floor"), the entire 6th floor of the Building (the "6th Floor"), the entire 7th floor of the Building (the "7th Floor") and the entire 8th floor of the Building (the "8th Floor"; each of the 3rd Floor, the 4th Floor, the 5th Floor, the 6th Floor, the 7th Floor and the 8th Floor is called a "Floor", and all of the Floors are collectively called the "Premises") from Sublandlord, and Sublandlord is willing to sublet the same to Subtenant, on the terms and conditions hereinafter set forth;

NOW, THEREFORE, Sublandlord and Subtenant agree as follows:

1.    Demise; Term.  (a) Sublandlord hereby subleases to Subtenant, and Subtenant hereby hires from Sublandlord, the Premises for a term to commence (subject to the provisions of Section 1(d) hereof) with respect to each Floor of the Premises, on the later of (i) the Scheduled Commencement Date applicable to such floor and (ii) the date Sublandlord delivers to Subtenant vacant possession of the applicable Floor of the Premises (the later of such dates is called the "Commencement Date") and to expire (unless sooner terminated in accordance with this Sublease or applicable law) on December 30, 2020 (the "Expiration Date"), both dates inclusive.

(b)    "Scheduled Commencement Date" means":

(i)    with respect to the 7th Floor and the 8th Floor, September 1, 2009;

(ii)    with respect to the 6th Floor, January 1, 2010;

(iii)    with respect to the 3rd Floor and the 5th Floor, September 1, 2010; and

(iv)    with respect to the 4th Floor, July 1, 2013.

(c)    If Sublandlord fails to deliver to Subtenant possession of all or any portion of a Floor on or before the applicable Scheduled Commencement Date for such Floor, then for each day that the Commencement Date for such Floor occurs after the Scheduled Commencement Date for such Floor (provided, that a Scheduled Commencement Date shall be extended by up to 90 days to the extent that Sublandlord is delayed in delivering the applicable Floor by reason of Force Majeure (as defined in the Lease)), the Rent Commencement Date for such Floor shall be postponed beyond the date on which such Rent Commencement Date otherwise would have occurred pursuant to Section 2(d) below (i) by one day for each of the first 90 days, and (ii) by two days for each day thereafter.

(d)    If the Commencement Date for any Floor does not occur on or before the date which is 180 days after the Scheduled Commencement Date for such Floor, then Subtenant may give to Sublandlord 30 days notice of Subtenant's intent to terminate this Sublease with respect to such Floor (and, at Subtenant's option, any other Floor in respect of which the Commencement Date has not yet occurred).  If Subtenant gives such notice, and Sublandlord fails to deliver to Subtenant possession of the applicable Floor within 30 days after the giving of Subtenant's notice, then this Sublease shall terminate as to the Floor(s) specified in such notice and neither Sublandlord nor Subtenant shall have any further liability or obligation to the other in respect of such Floor(s), except such rights or obligations that are expressly stated to survive the termination of this Sublease.  If Sublandlord delivers to Subtenant possession of the applicable Floor within such 30 day period, then Subtenant's notice shall be void and of no force or effect.

2.    Fixed Rent.  (a) Subtenant shall pay to Sublandlord a fixed basic rent ("Fixed Rent") per annum equal to the product of (x) the fixed rent per rentable square foot payable from time to time in respect of the Premises as set forth below, multiplied by (y) the rentable square footage of the space from time to time included in the Premises and in respect of which a Rent Commencement Date has occurred.  Exhibit A annexed hereto sets forth the annual and monthly Fixed Rent for each Floor for each applicable period.  The Fixed Rent per rentable square foot shall be as follows:

(i)    $30.00 per rentable square foot per annum for the period beginning on the Rent Commencement Date in respect of each Floor and ending on December 31, 2016 (the "First Rent Period"); and

(ii)    $33.00 per rentable square foot per annum for the period beginning on January 1, 2017 and ending on the Expiration Date (the "Second Rent Period").

(b)    Subtenant shall pay the Fixed Rent in equal monthly installments in advance commencing on the applicable Rent Commencement Date, and with each monthly installment to be received by Sublandlord not later than the third business day prior to the first day of each month thereafter during the term of this Sublease.  Subtenant shall make all payments of Fixed Rent and all other sums of money as shall become due and payable by Subtenant to Sublandlord under this Sublease ("Additional Rent") to Sublandlord's office at

-2-

1000 Harbor Boulevard, 5th Floor, Weehawken, New Jersey 07086, Attention: Lease Administration, or at such other place as Sublandlord may designate in writing, without demand (except as expressly provided in this Sublease) and without any abatement, set-off or deduction whatsoever (except as expressly provided in this Sublease).

(c)     If the Rent Commencement Date for any Floor occurs on a day other than the first day of a calendar month, the Fixed Rent for such partial calendar month shall be prorated.

(d)     "Rent Commencement Date" means, subject to the provisions of Section 1(c) above:

(i)     with respect to the 6th Floor, the 7th Floor and the 8th Floor, March 1, 2012;

(ii)     with respect to the 3rd Floor and the 5th Floor, November 1, 2012; and

(iii)     with respect to the 4th Floor, May 1, 2014.

(e)     Notwithstanding the preceding provisions of this Section 2, on or before September 1, 2009, Subtenant shall pay to Sublandlord $10,769,000.00, which amount shall be credited against the first payments of Fixed Rent thereafter coming due under this Sublease.

3.     Additional Rent. (a) Subtenant shall pay to Sublandlord, as Additional Rent, from and after the applicable Commencement Date with respect to each Floor (whether or not the applicable Rent Commencement Date for such Floor has occurred), the following:

(i)     Subtenant's share of all amounts which are payable by Sublandlord pursuant to Section 2.04 of the Lease, but only to the extent such amounts exceed the amounts finally determined to be payable under Section 2.04 of the Lease by Sublandlord for the Tax Year (as such term is defined in the Lease) (A) with respect to the 4th Floor, commencing July 1, 2013 and ending June 30, 2014 (i.e., for purposes of this Sublease, with respect to the 4th Floor, the "Base Tax Year" shall be deemed to be the Tax Year commencing July 1, 2013 and ending June 30, 2014), and (B) with respect to the remainder of the Premises, commencing July 1, 2010 and ending June 30, 2011 (i.e., for purposes of this Sublease, with respect to the Premises other than the 4th Floor, the "Base Tax Year" shall be deemed to be the Tax Year commencing July 1, 2010 and ending June 30, 2011) (as the same shall be appropriately adjusted in each case in the case of any partial Tax Year occurring during the term of this Sublease);

(ii)     Subtenant's share of all amounts which are payable by Sublandlord pursuant to Section 2.05 of the Lease, but only to the extent such amounts exceed the amounts finally determined to be payable under Section 2.05 of the Lease by

-3-

Sublandlord, (A) with respect to the 4th Floor, for the calendar year 2013 (i.e., for purposes of this Sublease, with respect to the 4th Floor, the "Base Operating Year" shall be deemed to be the calendar year 2013) and (B) with respect to the remainder of the Premises, calendar year 2010 (i.e., for purposes of this Sublease, with respect to the Premises other than the 4th Floor, the "Base Operating Year" shall be deemed to be the calendar year 2010) (as the same shall be appropriately adjusted in each case in the case of any partial Lease Year occurring during the term of this Sublease);

(iii)    all amounts which are payable by Sublandlord pursuant to Section 2.07 of the Lease or otherwise on account of electricity supplied to the Premises (as the same shall be appropriately adjusted in the case of any partial Lease Year occurring during the term of this Sublease) (it being acknowledged that the Premises is separately submetered from the portion of the Prime Leased Premises that is not included in the Premises); and

(iv)    the full amount of any other charge, fee, cost, sum or expense which Sublandlord pays or incurs on or after the first Commencement Date to occur (x) for the provision of, or in connection with, any services or supplies provided to or for the Premises (or any part thereof) at the request of Subtenant and (y) as may be required pursuant to the terms and provisions of the Lease with respect to the Premises.

"Subtenant's Share" means, from time to time during the term of this Sublease, the fraction (expressed as a percentage) having as its numerator the number of rentable square feet of space from time to time included in the Premises as set forth on Exhibit B annexed hereto and as its denominator the number of rentable square feet then comprising the Prime Leased Premises (which shall be deemed to be 330,796 rentable square feet as of the date of this Sublease).

(b)    All payments of Additional Rent shall be paid by Subtenant to Sublandlord within 30 days after Sublandlord's submission to Subtenant of an invoice therefor, except that with respect to recurring monthly payments of Operating Expenses payable pursuant to Section 3(a)(ii) above, provided that Sublandlord has given to Subtenant at least 30 days notice of the monthly amount that is due, such recurring monthly payments shall be payable together with the monthly payments of Fixed Rent.

4.    Use.    The Premises shall be used only for general and executive offices and for uses incidental thereto permitted under the terms of the Lease, and for no other purpose.

5.    Incorporation; Lease.  (a) Except as may be inconsistent with the terms of this Sublease, all of the terms, covenants and conditions of the Lease are hereby made a part of this Sublease with the same force and effect as if fully set forth at length herein and the term "Landlord" in the Lease shall mean Sublandlord herein and the term "Tenant" in the Lease shall mean Subtenant herein and the term "Lease" in the Lease shall mean this Sublease. Without limiting the generality of the foregoing, Sublandlord and Subtenant acknowledge that the

-4-

following provisions of the Lease are inconsistent with the terms of this Sublease and therefore are not incorporated into this Sublease: Article 1, Article 2 (other than Section 2.08), Section 3.01(l), Section 3.02(c), Section 4.01(k), Section 6.01, Section 8.01, Section 8.04(b), Section 8.13, Section 8.17, Section 8.18, Section 8.21, Article 9 and Article 10. Except as expressly set forth herein, in any case where the consent or approval of Prime Lessor under the Lease is required, Sublandlord's consent shall also be required hereunder. Subtenant represents that it has read and is familiar with the terms of the Lease.

(b)     Except as otherwise provided herein, the time limits contained in the Lease for the giving of notices, making payments or demands or performing of any act, condition or covenant on Sublandlord's part, as tenant thereunder, are changed for the purposes of incorporation herein by reference by shortening same in each instance by 5 days, so that Subtenant shall have a lesser time to observe or perform under this Sublease than Sublandlord has under the Lease. In no event, however, shall Subtenant have less than 2 business days to so observe or perform. If Sublandlord or Subtenant receives any notice or demand from Prime Lessor relating to this Sublease or the Premises or Subtenant receives any notice or demand from Prime Lessor under the Lease, said party shall promptly give a copy thereof to the other.

(c)     Subject to the provisions of <u>Section 5(a)</u>, Subtenant shall comply with all of the terms, covenants and conditions of the Lease on the part of tenant therein named to be performed thereunder.

(d)     Performance by Prime Lessor under the Lease shall be deemed and accepted by Subtenant as performance by Sublandlord under this Sublease. Sublandlord shall not be responsible for any breach of the Lease by Prime Lessor or any nonperformance or noncompliance with any provision thereof by Prime Lessor, including, without limitation, the failure of Prime Lessor to provide any services, utilities and/or repairs. Sublandlord makes no representation that Prime Lessor will provide any or all of the services, utilities and/or repairs referred to and incorporated by reference into this Sublease.

(e)     Subtenant shall not do nor permit anything to be done which would violate or breach the terms and provisions of the Lease or cause the Lease to be terminated or forfeited by reason of any right of termination or forfeiture reserved or vested in Prime Lessor under the Lease.

(f)     Sublandlord hereby waives, and agrees not to exercise, the following rights which Sublandlord possesses under the Lease: (i) Sublandlord's expansion option with respect to the 9th and 10th floors of the Building pursuant to Section 1.04 of the Lease; (ii) Sublandlord's renewal options pursuant to Article 9 of the Lease; and (iii) Sublandlord's right of first offer to purchase the Building pursuant to Article 10 of the Lease. Prime Lessor shall be a third-party beneficiary of this <u>Section 5(f)</u>.

6.     <u>Remedies</u>. (a) Sublandlord shall have the same rights and remedies with respect to a breach of this Sublease by Subtenant as Prime Lessor has with respect to a breach of the Lease, as if the same were more fully set at length herein, and Sublandlord shall have,

us\YASHAJE\7394792.7

with respect to Subtenant, this Sublease and the Premises, all of the rights, powers, privileges and immunities as are had by Prime Lessor under the Lease.

(b)    If Prime Lessor, in writing, shall claim or otherwise allege that a use of, action or inaction involving, or other circumstances concerning, the Premises is in violation of any provision of or may become a default under the Lease, in addition to Sublandlord's other rights hereunder and at law, Subtenant, promptly after notice from Sublandlord, shall cease such use or action, take such action or cause such circumstance to be changed so that the basis or alleged basis for such claim or allegation shall no longer exist.

7.    Termination of Lease. Provided that Subtenant is not in default under this Sublease, Sublandlord covenants and agrees not to voluntarily cancel or surrender the Lease (other than pursuant to the exercise of a termination right provided for in the Lease) or voluntarily modify the Lease so as to deprive Subtenant of any material rights under this Sublease, without the prior written consent of Subtenant; provided, that, Sublandlord may voluntarily cancel or surrender the Lease if Prime Lessor agrees to recognize this Sublease as a direct lease between Prime Lessor and Subtenant. Notwithstanding anything to the contrary contained herein, if the Lease is terminated for any reason whatsoever, whether by operation of law or otherwise (other than Sublandlord's breach of the first sentence of this Section 7), Sublandlord shall not be responsible for such termination or the termination of this Sublease as a result thereof.

8.    Subordination. This Sublease is subject and subordinate to the Lease and to all other matters and interests to which the Lease is or shall be subordinate. In the event of termination, re-entry or dispossession by Prime Lessor under the Lease, Prime Lessor may, at its option, take over all of the right, title and interest of Sublandlord under this Sublease and Subtenant shall, at Prime Lessor's option, attorn to Prime Lessor pursuant to the then executory provisions of this Sublease.

9.    Assignment and Subleasing. Subtenant shall have the same rights as are applicable to Sublandlord as tenant under the Lease, to assign this Sublease, or to sublet the Premises in whole or in part or permit the Premises or any part thereof to be used by others. Without limiting the generality of the foregoing, Subtenant shall have the right, without Sublandlord's consent and without Sublandlord having any right to share in profits, at any time and from time to time, to permit the Premises to be used by Affiliates (as defined in the Lease) of Subtenant (with or without a sublease), to assign or otherwise transfer this Sublease (directly or indirectly, including, without limitation, by operation of law and by merger, reorganization or recapitalization of or with Subtenant), to sublease all or any portion of the Premises, to permit further subleases of any tier and assignments of subleases and to permit portions of the Premises to be used under so-called "desk sharing" or other temporary arrangements. For purposes of Section 5.02(a) of the Lease as incorporated in this Sublease, the reference therein to "Affiliate" of Subtenant shall be deemed to include Affiliates (as defined in the Lease) as well as any other entity in which Tenant, an Affiliate of Tenant or a member of the Sackler family has a material interest.

-6-

10.    <u>No Services</u>. Notwithstanding anything contained in this Sublease to the contrary (including, without limitation, any provision incorporated herein by reference), Sublandlord shall have no obligation to (i) perform any services under this Sublease (including, without limitation, the providing of electrical energy), (ii) make any repairs or restorations, (iii) comply with any laws or requirements of any governmental authorities, (iv) provide any insurance with respect to the Building, the Premises or the improvements therein, (v) remove, encapsulate or otherwise treat any asbestos-containing materials or other hazardous materials located in the Premises and/or the Building, or (vi) take any other action that Prime Lessor is obligated to provide, make, comply with or take, or cause to be done, under the Lease (collectively, "<u>Services</u>") and the only Services or rights to which Subtenant is entitled under this Sublease, including, without limitation, any right to repairs, elevator, water, utilities, heating and air conditioning, are those to which Sublandlord is entitled as the tenant under the Lease, and for all such services and rights, Subtenant will look solely to Prime Lessor. Sublandlord assumes no liability for any covenants, representations or warranties made by Prime Lessor under the Lease. Sublandlord shall take all reasonable steps to assist Subtenant as Subtenant may from time to time request, at Subtenant's sole expense and without liability to Sublandlord, in seeking such services and rights from Prime Lessor; <u>provided</u>, that Subtenant indemnifies and reimburses Sublandlord as to any cost or expense incurred with respect thereto. In no event, however, shall Sublandlord be required to commence or cooperate with any litigation against Prime Lessor or any agent, employee or affiliate thereof. Nothing contained in this Sublease shall be deemed a waiver of Sublandlord's rights to receive Services from Prime Lessor. Sublandlord shall in no event be liable to Subtenant for any failure to render any of the Services, nor shall any such failure entitle Subtenant to any abatement or reduction in Fixed Rent or Additional Rent payable under this Sublease (unless Sublandlord is entitled to a corresponding abatement) or to any right to terminate this Sublease. Notwithstanding the foregoing, if Sublandlord would be entitled to an abatement of rent in respect of the Premises under the provisions of Section 3.02(a) of the Lease, but for the provisions of clause (ii) thereof (i.e., the circumstances in question result from an act or (where Sublandlord has an affirmative obligation to act pursuant to the terms of the Lease) omission of Sublandlord or any person claiming through or under Sublandlord or any of their respective agents, employees, contractors or (while in the Premises) invitees), then Subtenant shall nevertheless be entitled to an abatement subject to and in accordance with the provisions of Section 3.02(a) of the Lease.

11.    <u>Broker</u>. Each party represents to the other that it has dealt with no broker other than CB Richard Ellis, Inc. ("<u>Broker</u>") in connection with this Sublease. Each party shall indemnify and hold the other harmless from all costs, liabilities and expenses (including, without limitation, reasonable attorneys fees and disbursements) arising from any claim for brokerage commission made by any party other than Broker claiming to act for or on behalf of the indemnifying party in this Sublease. Sublandlord shall be responsible for payment of any commission due to Broker in connection with this transaction pursuant to a separate agreement. Each party's obligations under this <u>Section 11</u> shall survive the termination of this Sublease.

12.    <u>Holdover</u>. Upon the expiration or other termination of the term of this Sublease, Subtenant shall quit and surrender the Premises as provided in the Lease. The parties

-7-

recognize and agree that the damage to Sublandlord resulting from any failure by Subtenant timely to surrender the Premises will be substantial, will exceed the amount of monthly rent theretofore payable hereunder, and will be impossible to accurately measure. If Subtenant holds over in the Premises after the date of the expiration or sooner termination of this Sublease, Subtenant agrees that the provisions of Section 6.06 of the Lease shall apply and Subtenant shall be responsible to Sublandlord for holdover damages thereunder with respect to the Premises only; provided that, notwithstanding the foregoing limitation, Subtenant shall be responsible for holdover damages under Section 6.06 of the Lease for the entire Prime Leased Premises if (a) the term of the Lease is ending concurrently with (or, as the case may be, the day after) the term of this Sublease (whether pursuant to the expiration or sooner termination of the Lease), and (b) Sublandlord is not holding over in any portion of the Prime Leased Premises at the time of said expiration or sooner termination of the Lease. Nothing contained in this Sublease shall be deemed a consent by Sublandlord or Prime Lessor to the holding over by Subtenant, nor a waiver of any other remedy which may be available to Sublandlord or Prime Lessor. Subtenant's obligations under this Section 12 shall survive the termination of this Sublease.

13.    Insurance. Subtenant, at Subtenant's expense, shall throughout the term of this Sublease, maintain all property, liability and other insurance required by Section 7.02 of the Lease in accordance therewith. On or prior to the first Commencement Date to occur, Subtenant shall deliver to Sublandlord certificates of insurance naming Sublandlord, Prime Lessor and such other parties as are required to be named pursuant to the Lease as additional insureds.

14.    As Is. Subtenant shall accept the Premises "as is," including all furniture, fixtures and equipment in the Premises (and including the uninstalled lighting fixtures located on the 7th Floor), at the time possession thereof is delivered to Subtenant free of any occupancy and Sublandlord shall have no obligation to perform any alterations, work or repairs on behalf of Subtenant. Prior to the delivery of possession to Subtenant, Sublandlord may remove from the Premises all personal property, all artwork, all leased equipment (including, without limitation, vending machines, coffee machines and plants), all computers and telephones and related computer and telephone network equipment, all audio/visual equipment, and all proprietary security equipment (including without limitation, panels, cameras and card readers); provided, that Sublandlord shall use reasonable efforts to minimize damage to the Premises during such removal. Sublandlord shall leave (a) all data and telephone cabling and wiring in the Premises and (b) the security equipment located as of the date of this Sublease on the 7th Floor and the 8th Floor, which security equipment shall remain connected to Prime Lessor's security system. Subtenant acknowledges that no representations with respect to the condition of the Premises, or with respect to the condition of any furniture, fixtures or equipment therein contained, have been made to Subtenant. Subtenant shall have the same rights as are applicable to Sublandlord as tenant under the Lease, to perform any work or alterations in preparing the Premises for occupancy, or otherwise during the term of this Sublease. All such work and alterations shall be performed in full compliance with the applicable provisions of the Lease. All furniture, fixtures and equipment in the Premises shall, upon the applicable Commencement Date, be the property of Subtenant, and Subtenant shall be solely responsible for the maintenance, repair and replacement thereof.

-8-

15.    <u>Merger</u>. All prior understandings and agreements between the parties are merged within this Sublease, which alone fully and completely sets forth the understanding of the parties. This Sublease may not be changed or terminated orally or in any manner other than by an agreement in writing and signed by the party against whom enforcement of the change or termination is sought.

16.    <u>Notices</u>. Any notice or demand which either party may or must give to the other hereunder shall be in writing and given in accordance with Section 8.01 of the Lease, addressed as follows:

If to Sublandlord:    UBS Financial Services Inc.
1000 Harbor Boulevard
Fifth Floor
Weehawken, New Jersey 07086
Attention: Corporate Real Estate

with a copy to:

UBS
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Executive Director - Corporate Real Estate

and a copy to:

UBS Financial Services Inc.
1000 Harbor Boulevard
Fifth Floor
Weehawken, New Jersey 07086
Attention: Managing Attorney - Real Estate

If to Subtenant:    Purdue Pharma L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901

Attention: Edward B. Mahony

with a copy to:

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
Attention: H. Hedley Stothers, Esq.

-9-

Either party may, by like notice, direct that future notices or demands be sent to a different address.

17.    <u>Work Allowance</u>.    Sublandlord shall pay to Subtenant an allowance toward the hard and soft costs of alterations to be performed by Subtenant in the Premises, as follows:

| Floor | Work Allowance |
|:-----:|:--------------:|
| 3 | $1,283,835.00 |
| 4 | $1,606,710.00 |
| 5 | $1,524,705.00 |
| 6 | $1,871,870.00 |
| 7 | $2,026,800.00 |
| 8 | $2,455,080.00 |

The work allowance in respect of the 7th Floor and the 8th Floor shall be paid on the later of January 1, 2010 and the Commencement Date applicable to such Floors. The work allowance in respect of each other Floor shall be paid on the Commencement Date applicable to such Floor.

18.    <u>Certain Services</u>.

(a)    For purposes of Section 3.01(f) of the Lease, Subtenant and Sublandlord shall mutually agree on the location of the parking spaces allocated to each party.

(b)    As of the date of this Sublease, Tenant's Generator System (as defined in the Lease) provides emergency back-up generator service to the Building's central systems and to the Premises. Sublandlord may, but shall have no obligation to, continue to operate Tenant's Generator System. Whether or not Sublandlord continues to operate Tenant's Generator System, Sublandlord shall have the right to disconnect Tenant's Generator System from the Building's central systems and to the Premises, and Subtenant shall have no right to the service provided by Tenant's Generator System. If Sublandlord does continue to operate Tenant's Generator System for the benefit of the Building and/or Subtenant, Sublandlord makes no representation or warranty to Subtenant with respect to the condition of Tenant's Generator System, its merchantability or fitness for any particular purpose or that the same will operate as contemplated.

(c)    Sublandlord hereby waives its right to install turnstiles in the Building pursuant to Section 3.01(j) of the Lease.

(d)    The reference in Section 8.19(a) of the Lease to "Tenant's Share" shall be deemed to refer to "Subtenant's Share", and Subtenant shall be entitled to Subtenant's Share of the space otherwise available to Sublandlord on the roof of the Building.

-10-

19.    <u>Damage by Fire or Other Cause; Condemnation</u>.  Notwithstanding any contrary provision of the Lease incorporated herein by reference, Subtenant shall have no right (a) to terminate this Sublease as to all or any part of the Premises by reason of a casualty on condemnation unless Sublandlord is entitled to a corresponding termination under the Lease or (b) to an abatement of Fixed Rent or Additional Rent by reason of a casualty or condemnation, unless Sublandlord is entitled to a corresponding abatement with respect to its corresponding obligation under the Lease.

20.    <u>Security</u>.  (a)  Subtenant represents to Sublandlord that (i) as of December 31, 2008, Subtenant, together with the entities (the "<u>Companies</u>") defined as "Companies" in the Audited Combined Financial Statements for years ended December 31, 2008 and 2007 prepared by Ernst & Young LLP, has a net worth determined in accordance with generally accepted accounting principles consistently applied in excess of $650,000,000.00 and (ii) the patent protection for OxyContin in the United States is, as of the date of this Sublease, scheduled to expire on April 16, 2013.  Subtenant shall provide to Sublandlord (A) quarterly unaudited financial statements of the Companies within 60 days after the end of each calendar quarter and (B) audited financial statements of the Companies for each calendar year within 120 days after the end of each calendar year.  If (1) any such quarterly or annual statement reflects a net worth for the Companies of less than $500,000,000.00, (2) Subtenant fails to deliver any such quarterly or annual statement within the time periods set forth in the preceding sentence, (3) OxyContin receives generic competition in the United States (other than short term licensed generic competition given in connection with the settlement of pending or threatened litigation), (4) the drug application, NDA No. 22-272, as may be modified, before the Food and Drug Administration for a new formulation of OxyContin is not approved on or before December 31, 2012, or (5) Subtenant shall be in monetary default under this Sublease beyond applicable notice and grace periods, then in any such case, within 5 business days, Subtenant shall deliver to Sublandlord a $10,000,000.00 unconditional, irrevocable letter of credit substantially in the form annexed hereto as <u>Exhibit C</u> and issued by a bank reasonably satisfactory to Sublandlord (the "<u>Letter of Credit</u>") to secure Subtenant's obligations under this Sublease.  The Letter of Credit shall provide that it is assignable by Sublandlord without charge and shall either (x) expire on the date which is 60 days after the expiration or earlier termination of this Sublease (the "<u>LC Date</u>") or (y) be automatically self-renewing until the LC Date.  If any Letter of Credit is not renewed at least 30 days prior to the expiration thereof or if Subtenant holds over in the Premises without the consent of Sublandlord after the expiration or termination of this Sublease, Sublandlord may draw upon the Letter of Credit and hold the proceeds thereof as security for the performance of Subtenant's obligations under this Sublease.  Sublandlord may draw on the Letter of Credit (or the proceeds thereof) to remedy defaults by Subtenant beyond applicable notice and cure periods in the payment or performance of any of Subtenant's obligations under this Sublease.  If Sublandlord shall have so drawn upon the Letter of Credit (or the proceeds thereof), Subtenant shall upon demand deposit with Sublandlord a sum equal to the amount so drawn by Sublandlord.

(b)    If Subtenant has delivered a Letter of Credit to Sublandlord pursuant to <u>paragraph (a)</u> above, provided Subtenant is not in default under this Sublease and Subtenant has

-11-

surrendered the Premises to Sublandlord in accordance with all of the terms and conditions of this Sublease, on or before the LC Date: (i) Sublandlord shall return to Subtenant the Letter of Credit (or the proceeds thereof) then held by Sublandlord or (ii) if Sublandlord shall have drawn upon such Letter of Credit (or the proceeds thereof) to remedy defaults by Subtenant in the payment or performance of any of Subtenant's obligations under this Sublease, Sublandlord shall return to Subtenant that portion, if any, of the proceeds of the Letter of Credit remaining in Sublandlord's possession.

(c)    If the existing Superior Mortgagee (as defined in the Lease) consents in writing to the terms contained in clauses (i), (ii) and (iii) below, then the requirements in the preceding paragraph to provide financial statements and the Letter of Credit (if applicable) shall be waived by Sublandlord and any Letter of Credit provided to Sublandlord shall be returned to Subtenant.

(i) Sublandlord shall not be in default under the Lease as a result of any non-monetary default under this Sublease by Subtenant or anyone claiming by, through or under Subtenant;

(ii) If Subtenant fails to make any payment due under this Sublease and such failure continues beyond applicable notice and grace periods, Sublandlord may offset such amount against rent due under the Lease; and

(iii) If Subtenant defaults in its obligations under this Sublease beyond any applicable notice and grace periods or if Subtenant rejects this Sublease in bankruptcy, Sublandlord shall have the right to terminate the Lease.

21.    Offer Space Option. (a) As used herein:

"Available" means, as to any Offer Space, that Sublandlord is seeking to sublease such Offer Space to a third party. Anything to the contrary contained herein notwithstanding, Subtenant's right of first offer pursuant to this Section 21 shall be subordinate to (i) any recapture rights of Prime Lessor, (ii) occupancy by Sublandlord and/or any of Sublandlord's Affiliates, and (iii) Sublandlord's rights to renew or extend the term of any sublease to another subtenant, whether or not pursuant to an option or right set forth in such other subtenant's sublease.

"Offer Space" means all space in the Building leased by Sublandlord and not included in the Premises.

(b)    If at any time during the term of this Sublease any Offer Space either becomes, or Sublandlord reasonably anticipates that any Offer Space will become, Available, Sublandlord shall give to Subtenant notice (an "Offer Notice") thereof, specifying (A) the Offer Space which is Available or which Sublandlord so reasonably anticipates will

-12-

become Available, (B) the rentable square footage of such Offer Space and, in the case of a partial floor, accompanied by a floor plan showing the space in question, (C) if the date of the giving of the Offer Notice to Subtenant is on or after January 1, 2012, Sublandlord's good faith determination of the Fair Offer Rent for such Offer Space, (D) the date or estimated date that the Offer Space has or shall become Available (the "<u>Anticipated Inclusion Date</u>"), which date shall be not less than 90 days, nor more than 15 months, after the giving of the applicable Offer Notice and (E) such other matters as Sublandlord may deem appropriate for such Offer Notice. "<u>Fair Offer Rent</u>" means the fixed annual rent that a willing lessee would pay and a willing lessor would accept for the applicable Offer Space in an arms-length transaction, taking into account all relevant factors at the time in question..

(c)    Subtenant shall have the option (the "<u>Offer Space Option</u>"), exercisable by notice (an "<u>Acceptance Notice</u>") given to Sublandlord on or before the date that is 30 days after the giving of the applicable Offer Notice (time being of the essence) to include such Offer Space in the Premises.  If the date of the giving of the Offer Notice to Subtenant is on or after January 1, 2012, the Acceptance Notice shall not be effective unless such notice states therein either that (i) Subtenant accepts Sublandlord's determination of the Fair Offer Rent or (ii) Subtenant disputes Sublandlord's determination of the Fair Offer Rent and sets forth Subtenant's good faith determination of the Fair Offer Rent.  If Subtenant disagrees with such determination by Sublandlord, and such dispute is not resolved between the parties within 60 days after the giving of the Acceptance Notice, such dispute shall be settled in the same manner as disputes regarding Fair Market Rent pursuant to Section 9.02(d) of the Lease; <u>provided</u>, that all references in said Section 9.02(d) to "Fair Market Rent" shall be deemed to refer to "Fair Offer Rent", all references to "Landlord" shall be deemed to refer to "Sublandlord" and all references to "Tenant" shall be deemed to refer to "Subtenant".  The fees and expenses of any arbitration of the Fair Offer Rent for any Offer Space shall be borne by the parties equally, but each party shall bear the expense of its own arbitrator, attorneys and experts and the additional expense of presenting its own proof.  If any such dispute shall not have been resolved on or before the Offer Space Inclusion Date, then pending such resolution, Subtenant shall pay as annual fixed rent for the applicable Offer Space the Fair Offer Rent as determined by Sublandlord.  Within 30 days after the final determination of Fair Offer Rent, an adjustment, if any, required to correct the amounts previously paid on account thereof shall be made by the appropriate party.

(d)    If Subtenant timely delivers an Acceptance Notice, then, on the date on which Sublandlord delivers vacant possession of the applicable Offer Space to Subtenant (the "<u>Offer Space Inclusion Date</u>"), such Offer Space shall become part of the Premises, upon all of the terms and conditions set forth in this Sublease, except:

(i)    if the date of the giving of the Offer Notice to Subtenant is on or before December 31, 2011, then (A) from and after the Offer Space RCD (as defined below) for such Offer Space, Fixed Rent shall be increased by the product of (x) the fixed rental rates per annum set forth in <u>Section 2(a)</u> above multiplied by (y) the rentable square footage of such Offer Space, (B) the "<u>Offer Space RCD</u>" in respect of such Offer Space shall be the date that is 300 days after the applicable Offer Space

-13-

Inclusion Date, (C) Sublandlord shall pay to Subtenant on the Offer Space Inclusion Date a work allowance equal to the product of (1) the number of rentable square feet in the applicable Offer Space and (2) $35.00, (D) from and after the Offer Space Inclusion Date, Subtenant's Share shall be increased to take into account the rentable square footage of such Offer Space, (E) the base year for the purpose of calculating Taxes in respect of such Offer Space under clause (i) of Section 3(a) shall be the 12 month period from July 1 through June 30 in which the Offer Space Inclusion Date occurs, (F) the base year for the purpose of calculating Operating Expenses in respect of such Offer Space under clause (ii) of Section 3(a) shall be the calendar year in which the Offer Space Inclusion Date occurs, (G) Sublandlord shall not be required to perform any work or to pay any amounts other than as set forth in clause (C) above, or to render any services to make the Building or such Offer Space ready for Subtenant's use or occupancy or to provide any abatement of Fixed Rent (other than as set forth in clause (B) above or Additional Rent, and Subtenant shall accept such Offer Space in its "as is" condition on the Offer Space Inclusion Date and (H) as may be otherwise set forth in the Offer Notice.

(ii)    if the date of the giving of the Offer Notice to Subtenant is on or after January 1, 2012, then (A) from and after the Offer Space RCD for such Offer Space, Fixed Rent shall be increased by the Fair Offer Rent, (B) from and after the Offer Space Inclusion Date, Subtenant's Share shall be increased to take into account the rentable square footage of such Offer Space, (C) Sublandlord shall not be required to perform any work or to pay any amounts or to render any services to make the Building or such Offer Space ready for Subtenant's use or occupancy or to provide any abatement of Fixed Rent or Additional Rent, and Subtenant shall accept such Offer Space in its "as is" condition on the Offer Space Inclusion Date and (D) as may be otherwise set forth in the Offer Notice.

(e)    If Sublandlord is delayed in delivering possession of the applicable Offer Space to Subtenant by more than 90 days beyond the Anticipated Inclusion Date, then Subtenant shall have the right, by notice given to Sublandlord, to withdraw Subtenant's exercise of the Offer Space Option with respect to such Offer Space. Sublandlord shall use commercially reasonable efforts to deliver possession of the applicable Offer Space to Subtenant on or before the Anticipated Inclusion Date therefor, including the institution and prosecution of eviction or other appropriate proceedings against any occupant of the Offer Space.

(g)    If Subtenant shall fail timely to give the Offer Acceptance Notice with respect to any Offer Notice, then, except as otherwise provided in this Section 21(g), (i) Subtenant shall be deemed to have irrevocably waived the Offer Space Option as to the particular transaction described in the applicable Offer Notice, (ii) Sublandlord shall have no further obligation to offer such Offer Space to Subtenant unless and until such space is leased after Subtenant's waiver of the Offer Space Option in question and again becomes Available and (iii) Sublandlord may lease such Offer Space to any third party upon such terms as Sublandlord shall determine. Notwithstanding the foregoing provisions of this Section 21(g), if, with respect to any Offer Notice, Sublandlord does not lease all of the Offer Space in question to one or more

-14-

third parties within one year after the last date on which Subtenant was entitled to give an Offer Acceptance Notice with respect thereto, and if such Offer Space or any portion thereof is then Available or is anticipated within the next 12 months to become Available, then Sublandlord shall so notify Subtenant and the provisions of this Section 21 shall again be operative with respect to such Offer Space or applicable portion thereof.

(h)    Promptly after the occurrence of the Offer Space Inclusion Date, Sublandlord and Subtenant shall confirm the occurrence thereof and the inclusion of the Offer Space in the Premises by executing an instrument reasonably satisfactory to Sublandlord and Subtenant; provided, that failure by Sublandlord or Subtenant to execute such instrument shall not affect the inclusion of the Offer Space in the Premises in accordance with this Section 21.

22.    Signage.    Sublandlord hereby waives Sublandlord's right to name the Building pursuant to Section 8.18(b) of the Lease.  Subtenant may remove, or cause to be removed, at Subtenant's expense, the sign bearing Sublandlord's name at the top of the Building. On or after July 1, 2013, Subtenant may remove, or cause to be removed, at Subtenant's expense, Sublandlord's name from the canopy signage over the main entrance to the Building.  All other signage of Sublandlord currently in place at the Building shall remain until the expiration of the Lease.

23.    Authority.    To induce Sublandlord to enter into this Sublease, Subtenant hereby represents to Sublandlord that (i) Subtenant is a duly formed and validly existing limited partnership with full power and authority to enter into this Sublease and to perform Subtenant's obligations under this Sublease in accordance with its terms and (ii) this Sublease has been duly authorized, executed and delivered by Subtenant and constitutes the legal, valid and binding obligation of Subtenant.

24.    Counterparts.    This Sublease may be executed in any number of counterparts, each of which, when taken together, shall constitute but one original.

[NO FURTHER TEXT ON THIS PAGE]

-15-

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the day and year first above written.

**SUBLANDLORD:**

UBS AG, STAMFORD BRANCH

By: _____
   Name:   Michael P. Lagana, Jr.
   Title:    Executive Director

By: _____
   Name:   Terry Ann Goulard
   Title:    Authorized Signatory

**SUBTENANT:**

PURDUE PHARMA L.P.

By: _____
      Edward B. Mahony, Executive Vice President

-16-

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the day and year first above written.

**SUBLANDLORD:**

UBS AG, STAMFORD BRANCH

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**SUBTENANT:**

PURDUE PHARMA L.P.

By: _Edward B. Mahony_ _____
      Edward B. Mahony, Executive Vice President

-16-

us\YASHAJE\7394792.7

Exhibit A

**FIXED RENT**

The Fixed Rent for each Floor initially demised under this Sublease shall be as follows:

With respect to the 3rd floor of the Building:

| Period | Annual | Monthly |
|---|---|---|
| First Period | $1,100,430.00 | $91,702.50 |
| Second Period | $1,210,473.00 | $100,872.75 |

With respect to the 4th floor of the Building:

| Period | Annual | Monthly |
|---|---|---|
| First Period | $1,377,180.00 | $114,765.00 |
| Second Period | $1,514,898.00 | $126,241.50 |

With respect to the 5th floor of the Building:

| Period | Annual | Monthly |
|---|---|---|
| First Period | $1,306,890.00 | $108,907.50 |
| Second Period | $1,437,579.00 | $119,798.25 |

With respect to the 6th floor of the Building:

| Period | Annual | Monthly |
|---|---|---|
| First Period | $1,604,460.00 | $133,705.00 |
| Second Period | $1,764,906.00 | $147,075.50 |

With respect to the 7th floor of the Building:

| Period | Annual | Monthly |
|---|---|---|
| First Period | $1,520,100.00 | $126,675.00 |
| Second Period | $1,672,110.00 | $139,342.50 |

With respect to the 8th floor of the Building:

| Period | Annual | Monthly |
|---|---|---|
| First Period | $1,841,310.00 | $153,442.50 |
| Second Period | $2,025,441.00 | $168,786.75 |

Exhibit B

## RENTABLE SQUARE FOOTAGE

| Floor | Rentable Area |
|-------|---------------|
| 3 | 36,681 |
| 4 | 45,906 |
| 5 | 43,563 |
| 6 | 53,482 |
| 7 | 50,670 |
| 8 | 61,377 |

Exhibit C

**FORM OF LETTER OF CREDIT**

[LETTERHEAD OF ISSUING BANK]

Irrevocable Letter of Credit No. _____

AMOUNT:  [$_____]
ISSUANCE DATE:  _____
EXPIRATION DATE:  [ONE YEAR FROM ISSUANCE]


BENEFICIARY:
UBS AG, Stamford Branch
c/o UBS
1000 Harbor Boulevard, 5th Floor
Weehawken, New Jersey 07086
Attn: Director of Lease Administration


Re:    IRREVOCABLE LETTER OF CREDIT
Applicant's Name:    Purdue Pharma L.P.
Property Address:    One Stamford Forum
Stamford, Connecticut


Ladies and Gentlemen:

We hereby establish in your favor our Irrevocable Letter of Credit No. _____, in the amount of [_____], which is unconditionally available for payment by your draft at sight.

It is a condition of this Letter of Credit that it shall be deemed to be automatically extended for a period of one (1) year from the present or any future expiration date unless we shall notify you by written notice mailed by certified mail, return receipt requested, at least 30 days prior to such expiration date that we elect not to renew for such additional period. In the event we elect not to renew, the amount of this Letter of Credit is available for payment of your draft credit at sight.

We hereby engage with you that your drawings in conformity with the terms of this Letter of Credit will be duly honored upon presentation of your sight draft in the form of Exhibit A attached hereto at our office at [_____, New York, New York] (if Letter of Credit is issued by Bank of America, N.A., we hereby agree that all drafts drawn under and within the terms and amount of this credit, that all such drafts will be duly honored upon presentation in person or by nationally recognized overnight courier to Bank of America, One

Fleet Way, Scranton, PA 18507) and will be honored on the next Banking Day (as hereinafter defined) received if presented at such office prior to 2:00 P.M. All drafts presented at such office after 2:00 P.M. will be duly honored on the second succeeding Banking Day. For the purposes hereof, "Banking Day" means a day of the year on which banks in New York, New York are not required or authorized, by applicable law, to close.

This Letter of Credit is payable in multiple drafts. This Letter of Credit is transferable in full and not in part. Any transfer made hereunder must conform strictly to the terms hereof and to the conditions of Rule 6 of the International Standby Practices--ISP98, fixed by the International Chamber of Commerce, Publication No. 590 ("ISP"). Should you wish to effect a transfer under this Letter of Credit, such transfer will be subject to the return to us of the original credit instrument, accompanied by our form of transfer, properly completed and signed by an authorized signatory of your firm, bearing your bankers stamp and signature authentication and payment of our transfer fee.

This Letter of Credit is assignable in full or in part. Any assignment made hereunder must conform strictly to the terms hereof and to the conditions of Rule 6 of the ISP. Should you wish to effect an assignment under this Letter of Credit, such assignment will be subject to our form of assignment, properly completed and signed by an authorized signatory of your firm, bearing your bankers stamp and signature authentication and payment of our assignment fee. All fees, including transfer fees, are the responsibility of the Applicant.

If a demand for payment made by you hereunder does not, in any instance, conform to the terms and conditions hereof, we will notify you on the day of presentation [by facsimile to 201-352-4815] stating the reasons therefor and advising you that we are holding the documents presented at your disposal or are returning them to you, as you may elect by notice to us in writing. Upon being notified that the purported presentation was not effected in conformity with this Letter of Credit, you may attempt to correct any such nonconforming demand for payment.

Except as expressly stated herein, this undertaking is not subject to any agreements, requirements or qualifications. Our obligation under this Letter of Credit is our individual obligation and is in no way contingent upon reimbursement with respect thereto, or upon our ability to perfect any lien, security interest or any other reimbursement. This Letter of Credit is not subject to offset of any kind by the Issuer, whether for claims against you, the Applicant or any other person or entity, regardless of how such claims arise. This Letter of Credit may not be revoked or amended without your written approval and shall remain in full force and effect until it expires in accordance with the terms hereof.

If Applicant becomes a debtor in a case under title 11 of the United States Code (the "Bankruptcy Code"), or in any other insolvency or similar proceeding, the obligations of Issuer to You hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended, stayed, terminated or otherwise affected by reason thereof or by reason of any provisions of the

-20-

Bankruptcy Code (including, but not limited to, sections 362 and 502(b) of the Bankruptcy Code), or the provisions of any other insolvency or similar law.

       Except as set forth herein, this Letter of Credit is subject to the ISP and as to matters not governed by the ISP, shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

       Sincerely yours,

       [_____ BANK]

       By_____

       Its:_____

us\YASHAJE\7394792.7

## EXHIBIT A TO LETTER OF CREDIT

For value received

Pay at sight by wire transfer in immediately available funds to _____ the sum of

U.S. _____ Dollars ($_____) drawn under Irrevocable Letter of Credit

No. _____ dated _____ ___, 200__ issued by _____.

To:    [*Issuer Of Letter Of Credit*] _____

New York, New York

-22-

us\YASHAJE\7394792.7