DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF JON LOWNE IN SUPPORT OF DEBTORS' MOTION FOR AUTHORIZATION TO ENTER INTO DEVELOPMENT AGREEMENT

I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am a Senior Vice President and the Chief Financial Officer of Purdue Pharma L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**,"

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

the "**Company**" or "**Purdue**").  I was first employed by Purdue as Senior Internal Auditor in 1995 and gained increasing responsibility in the Company's finance team over time, including as Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017 to February 2018. Since March 2018, I have been the Chief Financial Officer of PPLP.  I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2. I make this declaration (the "**Declaration**") in support of the *Debtors' Motion for Authorization to Enter into Development Agreement* (the "**Development Agreement Motion**"). All capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## The Development Agreement

4. I have reviewed the proposed Development Agreement between Greenfield and the Technology Partner.  I have also discussed the rationale for entering into the Development Agreement and the process of negotiating the Development Agreement and evaluating alternatives to the Development Agreement with the rest of the Purdue management team and other relevant employees with respect to its review thereof.

5. The Debtors have been developing an injectable form of nalmefene hydrochloride as a new option for overdose rescue treatment that can be administered by means of an

2

autoinjector (the "**Product**"). This solution must be capable of remaining at the ready in the autoinjector device for months or more before use and have an acceptably quick onset of action. Purdue is developing a formulation suitable for use in an autoinjector, as well as other applications.

6. I understand that available opioid reversal medications, including naloxone (which is sold under the brand name Narcan, among others), when timely administered, can quickly restore normal respiration to a person whose breathing has slowed or stopped as a result of a prescription or illicit opioid overdose. But these medications may not be sufficiently powerful or long-acting to reverse the effects of synthetic opioids such as fentanyl (which is approximately fifty times more potent than heroin). Because synthetic opioids are so potent, multiple doses of naloxone may be required to reverse their effects. Even multiple doses of naloxone cannot revive every patient who has overdosed from large amounts of fentanyl or other synthetic opioids. In addition, naloxone has a significantly shorter half-life and corresponding duration of action than fentanyl, which presents a significant risk that the naloxone may "wear off" before the fentanyl. By contrast, Nalmefene's half-life is longer than that of fentanyl. Specifically, I understand that studies have shown that the half-life for naloxone ranges from 1.85 to 2.09 hours following intranasal administration and 1.24 hours following intramuscular administration per the package inserts of Narcan products and that the half-life of fentanyl is about 8-10 hours. Naloxone's shorter half-life can result in a patient experiencing a second overdose without taking any additional fentanyl or other opioid, creating a particularly high-risk situation if the patient is not in a medical care setting at that time.

7. The Technology Partner is a specialty pharmaceutical company that develops and commercializes drug device combinations based on its proprietary autoinjector platform. The

3

Technology Partner's technology is simple and easy to use, as it requires no mixing of ingredients, includes a pre-filled syringe with the autoinjector device and shields the needle after injection. The Product is expected to be extremely reliable as well, based on the Technology Partner's proven track record of successful development and registration of other autoinjector-based drug device combinations. Moreover, the Technology Partner is the only company of those considered by the Debtors with a successfully registered an autoinjector-based drug device for emergency use in the United States that was available to license.

8.      The Debtors selected the Technology Partner through a competitive process. Management began by defining the required performance characteristics for the autoinjector technology and identified companies with potentially suitable devices to evaluate further. Based on this initial screening, the Debtors chose to conduct a review of seven companies, five of which were developing autoinjectors for emergency use, with a focus on technical capability, soundness of platform and likelihood of delivering a finished product for emergency use within an acceptable timeframe. At the conclusion of that review, the Debtors selected four companies with which to engage in diligence and negotiation of potential deal terms and executed nondisclosure agreements with each of them. Certain of the companies declined to move forward with negotiations. Of the four companies, the Technology Partner was selected as the preferred partner because, among other things, it has the most experience in the field and has a commercially proven technology, and because it is the only company with a successfully registered autoinjector device for emergency use in the United States that was available to license. I believe that the Debtors conducted a competitive evaluation process and that the Debtors made a reasonable determination that Counterparty offered the most attractive terms from a financial and technological standpoint. I believe that the Development Agreement

4

presents a reasonable cost structure with substantial potential to advance the development of the Product.

9. The Development Agreement provides the Debtors with the right to terminate on ▮▮▮▮▮ notice at any time. This provision, which was specifically negotiated by the Debtors, allows the Debtors to limit the amount expended to significantly less than the total estimated development costs and milestone if the Debtors determine in the future that the Product will not deliver on its promise for any reason. If the Debtors terminate the Development Agreement prior to receipt of New Drug Application approval, they will have to make a termination payment of ▮▮▮▮▮.

10. The Development Agreement provides that Technology Partner has the unilateral right to terminate the Development Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Technology Partner insisted on these rights as part of the general agreement reflected in the Development Agreement. I do not believe that the Technology Partner would have agreed to enter into the Development Agreement without these provisions, so the inclusion of these provisions, although undesirable from the perspective of the Debtors, was necessary to realize the potential significant benefits of the Development Agreement as a whole.

11. Therefore, I believe that the relief requested in the Development Agreement Motion is in the best interests of the Debtors' estates, creditors and all parties in interest.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 11, 2020
New York, New York

By: */s/ Jon Lowne*

Jon Lowne
Senior Vice President and
Chief Financial Officer
Purdue Pharma L.P.