## Exhibit B

**Form of Supply Agreement**

**Purdue Pharma (Canada)**

**and**

**Purdue Pharma L.P.**

**NON-EXCLUSIVE SUPPLY
AGREEMENT**

**February [●], 2020**

## TABLE OF CONTENTS

1.    DEFINITIONS...................................................................................................2
2.    EFFECTIVENESS.............................................................................................5
3.    DEVELOPMENT, MANUFACTURE, PACKAGE AND SUPPLY. ............................6
4.    SUPPLY INTERRUPTION...............................................................................12
5.    PRICE AND PAYMENT TERMS.......................................................................13
6.    REGULATORY MATTERS...............................................................................13
7.    INSURANCE....................................................................................................15
8.    INDEMNIFICATION.......................................................................................16
9.    REPRESENTATIONS; WARRANTIES. ............................................................17
10.    TERMINATION.............................................................................................19
11.    CONFIDENTIALITY.......................................................................................19
12.    DISPUTE RESOLUTION. ..............................................................................22
13.    INDEPENDENT CONTRACTOR....................................................................22
14.    MISCELLANEOUS. .......................................................................................23

Exhibit A       Products, Product Specifications and Packaging Specifications
Exhibit B       Quality Agreement

Exhibit C       Summary Pricing & Payment Terms
Exhibit D       Shelf-Life
Exhibit E       Development Costs and Work to be Completed by PPLP
Exhibit F       Commercial Pricing
Exhibit G       Initial Rolling Forecast
Exhibit H       Legacy Stability Transfer for ██████ and ████████

US 167288098v4

## NON-EXCLUSIVE SUPPLY AGREEMENT

**THIS NON-EXCLUSIVE SUPPLY AGREEMENT**, dated as of February [●], 2020, is made by and between Purdue Pharma (Canada), with a place of business at 575 Granite Court, Pickering, Ontario, Canada L1W 3W8 ("**Purdue Pharma (Canada)**") and Purdue Pharma L.P. ("**PPLP**"), a Delaware limited partnership having a place of business at One Stamford Forum, 201 Tresser Blvd., Stamford, CT 06901-3431. Purdue Pharma (Canada) and PPLP may be referred to as "Party" or "Parties," as applicable.

### RECITALS:

**WHEREAS**, PPLP is the supplier of and owner of certain rights in respect of the Products (as defined below); and

**WHEREAS**, Purdue Pharma (Canada) markets and distributes prescription medicines, including finished dosage prescription medicines in the Territory; and

**WHEREAS**, subject to the terms and conditions set forth herein, PPLP is agreeable to performing certain development work, manufacturing, packaging, and supplying the Products for distribution by Purdue Pharma (Canada) as provided herein.

**NOW, THEREFORE,** in consideration of the premises and the covenants, representations, warranties, terms, conditions, and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1.    DEFINITIONS.

The terms listed below will have the meanings set forth herein or, as noted below or in the Quality Agreement.

**1.1**    "**Agreement**" means this Non-Exclusive Supply Agreement and any and all exhibits attached hereto and duly incorporated herein, as may be amended, modified or supplemented from time to time in accordance with the terms hereof.

**1.2**    "**Approval Order**" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Parties, approving PPLP's and Purdue Pharma (Canada)'s entry into this Agreement.

**1.3**    "**Associated Company(ies)**" means any person, firm, trust, corporation or partnership or other entity that directly or indirectly owns or controls a party, is owned or controlled by a party, or is under common ownership or control with a party. The terms "control" and "controlled" means for purposes of this definition the direct or indirect ownership of fifty percent (50%) or more, including ownership by one or more trusts with substantially the same beneficial interests, of the voting and equity rights of such Person, or the power to direct the management of such Person. For the purposes of this Agreement, Purdue Pharma (Canada) and PPLP shall not be considered Associated Companies of one-another.

2

**1.4**    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

**1.5**    **"Binding Forecast"** has the meaning set forth in Section 3.5.

**1.6**    **"Business Day"** means any day other than a day on which the commercial banks in New York City are authorized or required to be closed.

**1.7**    **"Calendar Month"** means a month that is one of the twelve (12) months that comprise a Calendar Year.

**1.8**    **"Calendar Year"** means the twelve (12) month period from January 1st through December 31st.

**1.9**    **"Capacity Agreement"** has the meaning set forth in Section 3.5.

**1.10**    **"Chapter 11 Cases"** means the bankruptcy cases filed on September 15, 2019 by Purdue Pharma L.P. and certain of its affiliates under chapter 11 of the United States Code in the Bankruptcy Court and jointly administered under Case. Nos. 19-23649 (RDD).

**1.11**    **"Commercially Reasonable Efforts"** means, with respect to a given goal, the efforts, consistent with the practice of comparable drug manufacturing and distribution companies with respect to a drug product owned by it or to be manufactured and distributed by it or to which it has rights of comparable market potential at a similar stage in its product life (taking into account the competitiveness of the marketplace, the proprietary position of the applicable active ingredient, the regulatory structure involved, and the profitability of the product), that a reasonable person in the position of the obligor would use so as to achieve that goal in a reasonably expeditious manner.

**1.12**    **"Confidential Information"** has the meaning set forth in Section 11.

**1.13**    **"DIN"** means the Drug Identification Number as defined by Health Canada.

**1.14**    **"Effective Date"** has the meaning set forth in Section 2 of this Agreement.

**1.15**    **"Excess Orders"** has the meaning set forth in Section 3.6(b).

**1.16**    **"Food and Drugs Act"** shall mean the *Food and Drugs Act*, RSC 1985, c F-27, and its associated regulations, guidance documents and policies, as amended and in effect from time to time.

**1.17**    **"Food and Drug Regulations"** shall mean the *Food and Drug Regulations,* CRC C 870, as amended and in effect from time to time.

**1.18**    **"GMPs"** or **"cGMPs"** means current Good Manufacturing Practices, as defined in Part C, Division 2 of the Food and Drug Regulations., as amended and in effect from time to time.

**1.19**    **"Health Canada"** means Health Canada, the department of the government of Canada that is responsible for national public health, and any successor thereof.

3

**1.20**    **"Indemnified Party"** means that Party to whom the obligation of indemnity under this Agreement exists.

**1.21**    **"Indemnifying Party"** means that Party which has an obligation to indemnify the Indemnified Party as set forth in this Agreement.

**1.22**    **"Losses"** means any liabilities, damages, costs, or expenses (including reasonable attorney's fees), incurred by either Party which arise or result from any claim, lawsuit, or other action by a Third Party.

**1.23**    **"Maximum Agreed Capacity"** has the meaning set forth in Section 3.5.

**1.24**    **"NDS"** means a Health Canada New Drug Submission or similar approval in any other country.

**1.25**    **"Notice of Compliance"** means the notification, issued pursuant to paragraph C.08.004(1)(a), indicating that a manufacturer has complied with sections C.08.002 or C.08.003 and C.08.005.1 of the Food and Drug Regulations.

**1.26**    **"Packaging"** means final, finished packaging, including labeling and all other Packaging Components, produced by PPLP in accordance with Packaging Specifications.

**1.27**    **"Packaging Components"** means all content of labels, labeling, inserts, containers (including cartons, shipping cases and other like matter) used in Packaging or accompanying the Products developed by Purdue Pharma (Canada) specific to Territory.

**1.28**    **"Packaging Specifications"** means the specifications for the Packaging and Packaging Components to be mutually agreed and attached as Exhibit A hereto, as the same may be amended or supplemented from time to time by mutual agreement and any such amendments or supplements will be documented under PPLP's change control system under the Quality Agreement.

**1.29**    **"Permits"** has the meaning set forth in Section 9.1(g).

**1.30**    **"Person"** means an individual, firm, trust, corporation, partnership, limited liability company, governmental authority or other entity or combination thereof.

**1.31**    **"PPLP"** has the meaning set forth in the first paragraph of this Agreement.

**1.32**    **"Product"** or **"Products"** means those finished products, including bulk products manufactured and packaged by PPLP, as set forth in Exhibit A attached hereto.

**1.33**    **"Product Specifications"** means those specifications for Products set forth in Exhibit A attached hereto for the applicable Product, as the same may be amended or supplemented from time to time by mutual agreement and any such amendments or supplements will be documented under PPLP's change control system under the Quality Agreement.

**1.34**    **"Purchase Orders"** has the meaning provided in Section 3.6.

4

**1.35** **"Quality Agreement"** means the Quality Agreement substantially in the form attached hereto and hereby incorporated herein as Exhibit B, as may be amended, modified or supplemented, together with its exhibits if any. The Quality Agreement will be executed by the Parties within one-hundred twenty (120) days following the Effective Date.

**1.36** **"Raw Material(s)"** means all bulk ingredients (active and inactive), Packaging Components and other related items necessary or required for and supplied by PPLP for manufacture and packaging of the Products in accordance herewith, including but not limited to Packaging Components.

**1.37** **"Rolling Forecast"** has the meaning set forth in Section 3.5.

**1.38** **"Specifications"** means both the Product Specifications and the Packaging Specifications.

**1.39** **"Supply Interruption"** has the meaning set forth in Section 4.1.

**1.40** **"Term"** has the meaning set forth in Section 2.

**1.41** **"Territory"**: Canada, including its territories and possessions.

**1.42** **"Third Party"** means any party other than Purdue Pharma (Canada), PPLP and their respective Associated Company(ies).

**1.43** The following terms have the meanings ascribed to them in the Quality Agreement:

    (a)    **"Adverse Event"** or **"AE"**

    (b)    **"Applicable Law(s)"**

    (c)    **"Certificate of Analysis"**

    (d)    **"Certificate of Conformance"**

    (e)    **"Safety Alert"**

    (f)    **"Product Quality Complaint"**

    (g)    **"Recall"**

    (h)    **"Seizure"**

**2.**    **EFFECTIVENESS.**

This Agreement shall become effective and binding on the Parties upon the execution of this Agreement following the entry of the Approval Order by the Bankruptcy Court (such date, the

US 167288098v4

"**Effective Date**"), and will continue through the 31th day of December 2024 unless sooner terminated or extended as set forth in this Agreement (the "**Term**").

## 3.    DEVELOPMENT, MANUFACTURE, PACKAGE AND SUPPLY.

**3.1    Development Obligations.**  Prior to PPLP manufacturing and supplying Product to Purdue Pharma (Canada), and Purdue Pharma (Canada) establishing a Rolling Forecast (other than the initial Rolling Forecast attached as Exhibit G) or Binding Forecast, PPLP shall use Commercially Reasonable Efforts to perform the development activities in respect of the Products as outlined in Exhibit E (the "**Development Activities**").  For clarity, except for the Development Activities, Purdue Pharma (Canada) shall be solely responsible for all regulatory activities in respect of the Product, in accordance with Section 6.  PPLP has provided estimated timelines for the completion of each phase of the Development Activities in Exhibit E, provided, for clarity, that the Parties acknowledge and agree that pharmaceutical development activities are by their nature speculative and PPLP does not guarantee or warrant as to the success or timeliness of any aspect the Development Activities, and Purdue Pharma (Canada) acknowledges and expressly disclaims any such guarantee or warranty.  Purdue Pharma (Canada) shall pay PPLP for the Development Activities on the terms stated in Exhibit C.

**3.2    Manufacture & Supply Obligations.**

(a)    PPLP shall manufacture, test and supply to Purdue Pharma (Canada), Purdue Pharma (Canada)'s demand for the Products subject to Section 3.5 and in accordance with the Product Specifications during the Term in accordance with the terms and conditions of this Agreement. PPLP shall be responsible for the procurement and testing of all Raw Materials, in accordance with cGMPs, required to manufacture and supply of the finished Product pursuant to this Agreement.  PPLP shall be fully responsible to Purdue Pharma (Canada) for all manufacture and supply of Product and all obligations hereunder, in compliance with this Agreement and the Quality Agreement, including but not limited to, responsibility for compliance with all Product Specifications and Applicable Laws.

(b)    PPLP shall ensure availability of sufficient stock of Raw Materials and Packaging Components to meet the Binding Forecast (as defined below). However, in any event, where a change to the Product Specifications is requested by Purdue Pharma (Canada), which results in the Raw Materials and/or Packaging Components becoming unusable, Purdue Pharma (Canada) will be responsible for no more than the cost of the excess Raw Materials and Packaging Components that would have been required to fulfill 6 months of the Rolling Forecast (as defined below).

(c)    PPLP shall be responsible for the quality control and proper storage at its expense of the Raw Materials and Packaging Components and any other items required for the supply of the Products in compliance with the Product Specifications, Quality Agreement and the provisions of this Agreement.

(d)    Purdue Pharma (Canada) has provided its initial Rolling Forecast setting for its estimated requirements of the Products on Exhibit G attached hereto. PPLP and Purdue Pharma (Canada) acknowledge and agree that during the term of this Agreement, subject to Section

6

3.6, that actual quantities that Purdue Pharma (Canada) shall purchase will be provided on a monthly basis by Purchase Order.

### 3.3    Packaging Specifications.

(a)    All Products will be packaged in accordance with the Packaging Specifications and the terms of this Agreement.

(b)    Either Party will submit any modifications it proposes to make to the Packaging Specifications or Packaging Components to the other Party for written prior approval.

(c)    Purdue Pharma (Canada) will provide to PPLP camera-ready readable digital copy of the artwork for all Packaging Components to be used by PPLP in the Product Packaging. Purdue Pharma (Canada) also will provide to PPLP all current, approved label copy for each Product and all labeling die lines necessary to create finished artwork. All labeling will be subject to the requirements set forth in the Quality Agreement. Purdue Pharma (Canada) shall be responsible for the content of all labeling and promotional materials relating to the Products and for insuring that the contents conform with any Applicable Laws and do not infringe on the intellectual property of any Third Parties.

(d)    Purdue Pharma (Canada) may from time to time request in writing and obtain from PPLP, modifications to the Packaging Specifications (including regarding artwork). If PPLP anticipates in good faith that such requested modifications made to the Packaging Specifications after PPLP has accepted a Purchase Order will impact delivery timelines despite PPLP's Commercially Reasonable Efforts to meet such timelines, then PPLP will inform Purdue Pharma (Canada) in writing of the extent of such anticipated delay and Purdue Pharma (Canada) may rescind its change request as it relates to such Purchase Order in its sole discretion. For clarity, any delay caused by such change request may impact Product shelf-life requirements as set forth in Exhibit D. If Purdue Pharma (Canada) requires that changes to artwork on Packaging for an accepted Purchase Order be made, then Purdue Pharma (Canada) will reimburse PPLP for the reasonable, direct, out-of-pocket costs incurred as a result of such request by Purdue Pharma (Canada). PPLP shall inform Purdue Pharma (Canada) in advance of such financial impact. In the event of reimbursement by Purdue Pharma (Canada) in accordance with this Section 3.3(d), Purdue Pharma (Canada) will instruct PPLP to either destroy or ship to Purdue Pharma (Canada) (in Purdue Pharma (Canada)'s sole discretion and at Purdue Pharma (Canada)'s cost) Packaging or Packaging Components that cannot be used as a result of such changed artwork.

### 3.4    Stability Testing.
PPLP shall be responsible for and will conduct routine stability testing for commercial Products in accordance with the terms set forth in the Quality Agreement ("Stability Testing"). Purdue Pharma (Canada) shall reserve the right to allow Third Party testing at Purdue Pharma (Canada)'s sole election or discretion at Purdue Pharma (Canada)'s sole expense. In addition, PPLP shall be responsible for legacy Stability Testing in accordance with Exhibit H hereto on Product samples transferred to PPLP in accordance with Exhibit H hereto. Purdue Pharma (Canada) will pay each undisputed invoice pursuant to the terms set forth in Exhibit H. All payments will be made in U.S. Dollars. Purdue Pharma (Canada) shall be liable for all costs

7

and expenses incurred as a result of the failure of any Products to meet minimum stability requirements for Products as set forth in the Quality Agreement ("Minimum Stability Requirements").

    **3.5**    **Forecasts; Excess Orders; Capacity.** Purdue Pharma (Canada) shall, by the ████████ business day of each Calendar Month during the Term, provide PPLP, with an updated rolling forecast for the upcoming ███████ of the Term, with a reasonable estimate of the quantity of Product it requires during such period (each, a "**Rolling Forecast**"). The first ██████ months of such Rolling Forecast shall be binding on both Parties (each, a "**Binding Forecast**"), and Purdue Pharma (Canada) will issue monthly Purchase Orders in accordance with Section 3.6. The remaining ██████ months of each Rolling Forecast may vary by +/- fifty percent (50%) of the immediately previous Binding Forecast but otherwise constitute an estimate of Purdue Pharma (Canada)'s requirements for the Products, is supplied for the convenience of PPLP and is not binding on either Party; provided, that, if at any point during the Term Purdue Pharma (Canada)'s estimated requirements for Products would exceed ████ ████████████████████ of the initial Rolling Forecast set forth on Exhibit G (the "**Maximum Agreed Capacity**"), the Parties shall in good faith discuss whether, and on what terms, PPLP would be able to manufacture and supply quantities of Products in excess of the Maximum Agreed Capacity to Purdue Pharma (Canada) (a "**Capacity Agreement**"). For clarity, in the circumstances described in the immediately preceding sentence, unless and until the Parties agreed in writing on a Capacity Agreement, PPLP shall not be required to supply Purdue Pharma (Canada) quantities of Product in excess of the Maximum Agreement Capacity.

    **3.6**    **Purchase Orders**.

    (a)    Purdue Pharma (Canada) will submit to PPLP, together with each Rolling Forecast, a monthly purchase order for Products ("**Purchase Orders**") corresponding to the next-to-occur month of the applicable Binding Forecast. Each Purchase Order submitted to PPLP by Purdue Pharma (Canada) will be in writing on paper or in electronic form sent via email to PPLP and will specify the delivery date, package sizes, quantities, and destination for each Product subject to the Purchase Order. PPLP shall have ten (10) Business Days to accept the Purchase Order. PPLP shall accept all Purchase Orders that are in material compliance with the requirements of this Agreement, including adherence to the Binding Forecast to which the Purchase Order relates. If PPLP does not respond within ten (10) Business Days, the Purchase Order will be deemed accepted. The delivery dates specified in Purdue Pharma (Canada)'s Purchase Orders will not be less than ninety (90) days from the dates of such Purchase Orders. In the even that a Purchase Order is less than ninety (90) days from the date of order, PPLP will use Commercially Reasonable Efforts to meet the increased demand for the Product. After placing a Purchase Order, Purdue Pharma (Canada) may modify or cancel such Purchase Orders, provided that Purdue Pharma (Canada) shall remain responsible for all reasonable costs already incurred (as of the date of such requested modification or cancellation) by PPLP solely and exclusively to fill such Purchase Order.

    (b)    For the avoidance of doubt, Purdue Pharma (Canada) must place a Purchase Order for at least the aggregate amount indicated in the Binding Forecasts issued during the Term. If Purdue Pharma (Canada) fails to place a Purchase Order with a Rolling Forecast or

informs PPLP that it will not be placing a Purchase Order, Purdue Pharma (Canada) shall be liable to PPLP for all reasonable cost based on the then-current Binding Forecast.

(c)    PPLP shall notify Purdue Pharma (Canada) at least 10 days prior to the planned dispatch of Product.

**3.7    Product Samples**. PPLP will retain samples in accordance with the Quality Agreement.

**3.8    Delivery**.

(a)    PPLP will use Commercially Reasonable Efforts to deliver the Products manufactured and/or packaged at PPLP in accordance with Section 3.6, and the Specifications and in accordance with the quantities and delivery dates specified in Purdue Pharma (Canada)'s Purchase Orders. The Product upon delivery shall have a remaining shelf life as set forth in Exhibit D. PPLP will promptly notify Purdue Pharma (Canada) in writing of any anticipated delay. Such notice by PPLP will specify an alternative delivery date which will not be more than five (5) Business Days after Purdue Pharma (Canada)'s originally specified delivery date, to the extent practicable, or such later date as the Parties may agree in writing.

(b)    The Products will be delivered as set forth in Exhibit C. PPLP will include in each shipment of the packaged Products delivered to Purdue Pharma (Canada) an itemized packing list, Certificate of Analysis and Certificate of Conformance, batch record lot number and will, at the same time, provide to Purdue Pharma (Canada) copies thereof and of any other documentation required to be delivered to Purdue Pharma (Canada) pursuant to the Quality Agreement.

(c)    The Parties will work in good faith to develop a lot configuration system to avoid the existence of duplicate lots.

**3.9    Acceptance and Rejection**.

(a)    Within thirty (30) days of receipt of packaged Product by Purdue Pharma (Canada), its Associated Company(ies), agents, sub-distributors or authorized carriers or the like at the specified delivery location, if for any reason Purdue Pharma (Canada) becomes aware of (i) a Product which does not meet the Specifications (except those proven to be caused by mishandling after delivery to Purdue Pharma (Canada) or as a result of a failure of Products Minimum Stability Requirements or (ii) a breach of any applicable requirement or warranty under this Agreement or the Quality Agreement, then Purdue Pharma (Canada) will have the right to reject (or revoke acceptance of) such non-conforming shipment of the Products or the non-conforming portion thereof, as Purdue Pharma (Canada) may elect by giving written notice of such rejection or revocation of acceptance to PPLP and specifying the grounds for rejection or revocation of acceptance to PPLP. Product not rejected within such thirty (30) day period will be deemed accepted, which acceptance may not be revoked except in the case of a Latent Defect, as defined below. In the event a defect in the Product that could not reasonably be discovered within this thirty (30) day period (other than a defect that is the result of a failure

9

of Products to meet Minimum Stability Requirements ("**Latent Defect**"), Purdue Pharma (Canada) shall have the right to reject such Product within thirty (30) days after discovering the Latent Defect. At PPLP's option, but subject to Section 3.9(b), the non-conforming shipment of the Products, or the non-conforming portion thereof, will be disposed of by Purdue Pharma (Canada), or will be returned to PPLP, in each case at PPLP's expense. With respect to such non-conforming Product, PPLP and Purdue Pharma (Canada) will jointly discuss and agree whether PPLP will (i) provide a refund to Purdue Pharma (Canada), including shipping and other related costs; or (ii) use its Commercially Reasonable Efforts to promptly replace the shipment of the non-conforming Products with conforming Products at no cost to Purdue Pharma (Canada) within ninety (90) days of the receipt of the written notice from Purdue Pharma (Canada).

(b)    If PPLP disputes Purdue Pharma (Canada)'s grounds for rejecting (or revoking its acceptance of) all or part of any shipment of the Products as set forth above, and such dispute is not resolved by mutual agreement of the Parties within forty-five (45) days of Purdue Pharma (Canada)'s notice of rejection (or revocation of acceptance), such dispute will be resolved by an independent FDA-approved testing organization mutually agreed upon by the Parties, the appointment of which will not be unreasonably delayed by either Party. The determination of such testing entity with respect to all or part of any shipment will be final and binding upon all Parties, but only as to reasons given by Purdue Pharma (Canada) in rejecting (or revoking acceptance of) the shipment or portion thereof and will have no effect on any matter for which such testing organization did not render a determination. The fees and expenses of the testing organization will be paid by the Party against which the determination is made.

3.10    **Documentation; Inspection.** PPLP will maintain true and complete documentation of all data relating to the manufacturing, packaging, and stability testing of the Products hereunder and related receipt, testing, storage and/or shipment thereof in accordance with the Quality Agreement. Once per Calendar Year with sixty (60) days' notice, Purdue Pharma (Canada) will have the right to inspect and review facilities where product is manufactured and where Product is stored prior to shipment to Purdue Pharma (Canada), and Product documentation, in accordance with the Quality Agreement.

3.11    **Third Party Contractors.** Subject to the written consent of Purdue Pharma (Canada), which consent will not be unreasonably withheld, delayed or conditioned, PPLP may contract with one or more qualified Third Parties for the manufacture, packaging and stability testing of Products hereunder (and/or related storage and testing thereof); provided, however, that: (i) PPLP will cause each and every such Third Party to agree in writing to comply fully with the terms and conditions set forth in this Agreement and in the Quality Agreement; (ii) PPLP will remain fully liable to Purdue Pharma (Canada) for the Products and for the manufacture, packaging and stability testing of such Products and any related obligations hereunder contracted by PPLP to any such Third Party, as well as for any liability related thereto; and (iii) PPLP will notify Purdue Pharma (Canada) in writing at least ninety (90) days in advance of its intention to contract all or some of its manufacture, packaging and stability testing or other obligations hereunder to a Third Party. Purdue Pharma (Canada) may, within such ninety (90) day period, give PPLP written notice rejecting the use of such Third Party on any reasonable grounds.

10

### 3.12    Improvements.

(a)    In the event that Purdue Pharma (Canada) provides PPLP with any formulas, mixing or production directions or other information relating to the manufacture of the Product under this Agreement, Purdue Pharma (Canada) shall clearly identify such information as Purdue Pharma (Canada)'s **"Confidential"** or **"Proprietary Information"** and such information shall remain Purdue Pharma (Canada)'s exclusive property to be used solely for Purdue Pharma (Canada) and shall be used for no other customers or for PPLP's own benefit without Purdue Pharma (Canada)'s specific written consent.

(b)    Notwithstanding Section 3.3(a), any directions related to label copy, labeling die lines and artwork, is and will remain Purdue Pharma (Canada)'s Confidential Information (as defined in and subject to the terms of Section 11 hereof) and (together with all rights therein) Purdue Pharma (Canada)'s exclusive property to be used solely for Purdue Pharma (Canada) and will not be used for any of PPLP's other customers.

### 3.13    Trademarks.    Purdue Pharma (Canada) shall be permitted to sell the Product under any trademark or trademarks of its choice (provided such trademarks do not infringe any of PPLP's trademarks) and PPLP acknowledges that such trademarks shall be owned by Purdue Pharma (Canada) or its designee and shall remain vested in Purdue Pharma (Canada) or its designee both during the term of this Agreement and thereafter. PPLP agrees that it shall not at any time use any of such Purdue Pharma (Canada) trademarks. Notwithstanding anything to the contrary in this Agreement, Purdue Pharma (Canada) owns rights to all artwork, labels, label claims and trademarks relating to the Product. Purdue Pharma (Canada) represents and warrants to PPLP that it owns or has license to use any and all trademarks that it may use or ask PPLP to apply in the labeling of any Products or Promotional Materials.

### 3.14    Specification Approval.    PPLP will use only Specifications agreed to in writing by Purdue Pharma (Canada) for the Products delivered to Purdue Pharma (Canada). PPLP will provide to Purdue Pharma (Canada) a copy of (a) Certificate of Analysis, (b) Specifications, (c) batch record and any other document that PPLP may consider relevant and necessary to execute this contractual Agreement or may be required by applicable laws and regulations.

### 3.15    Specification Changes.    Any proposed change to Product stability or other testing methods or, Raw Materials, Specifications, processes, procedures and/or controls, equipment, facilities or Third- Party laboratories, suppliers or packagers utilized by PPLP for the manufacturing, packaging and testing of Products that is required by any governmental authority or proposed by either Party will be made only in accordance with the Quality Agreement.

### 3.16    Principal Contact and Supply & Operations Committee.

(a)    Each Party shall designate a principal contact ("Principal Contact") to address any day to day issues that arise during the Term and relate to this Agreement. The Principal Contacts shall coordinate and cooperate with each other and shall bring all unresolved issues to the Supply & Operations Committee for resolution. Either Party may remove and replace its designated Principal Contact upon written notice to the other Party.

US 167288098v4

(b)    Simultaneously with the execution of this Agreement, the Parties shall establish an operating committee (the "Supply & Operations Committee"), which shall meet monthly and be responsible for addressing all unresolved issues arising in association with this Agreement. The members of the Supply & Operations Committee shall work together to create a remediation plan to address any issues arising under this Agreement.

(c)    In the event that the Parties are unable to reach an agreement on material issues, the issues shall be addressed in accordance with Section 12 (Dispute Resolution).

(d)    Each Party shall bear its own expenses arising out of its participation (and the participation of its representatives) in the Supply & Operations Committee or any other committee formed pursuant to this Agreement.

## 4.    SUPPLY INTERRUPTION

**4.1    Supply Interruption**.  If for any reason: (a) PPLP is unable to fully deliver more than twice during a Calendar Year, any packaged Products ordered by Purdue Pharma (Canada) pursuant to Section 3.6 and in a manner fully in accordance with Purdue Pharma (Canada)'s purchase order, the Specifications, and PPLP's obligations under this Agreement, ("**Supply Interruption**") then at Purdue Pharma (Canada)'s option and notwithstanding the provisions of Section 14.1: (i) PPLP will supply such packaged Products at a future date agreed upon by the Parties (as to which a failure to deliver will be deemed to be an additional Supply Interruption), or (ii) Purdue Pharma (Canada) will have the right to cancel, in whole or in part, any existing and further orders for such Product and Purdue Pharma (Canada) shall not be liable to PPLP for any financial compensation for such cancelled orders unless Products have already departed from PPLP's warehouse. Purdue Pharma (Canada) shall have the right to obtain Products from another manufacturer, subject to 4.2 below and shall not be obligated to purchase from or make any payment to PPLP pursuant to this Agreement for any Products supplied by another manufacturer due to a Supply Interruption. Notwithstanding any other provision in this Agreement, the remedies set forth in this Section 4.1 shall be Purdue Pharma (Canada)'s sole remedy in respect of any Supply Interruption under this Agreement.

**4.2    Resumption of Supply**.

(a)    If after the commencement of a Supply Interruption PPLP is ready to fully resume its obligations to supply packaged Product to Purdue Pharma (Canada) in accordance with this Agreement, PPLP will notify Purdue Pharma (Canada) in writing of its ability to resume supply of all Purdue Pharma (Canada) orders ("**Resumption Notice**").    The Resumption Notice must: (i) list a date on which PPLP will be able to fully resume supply; (ii) include reasonable evidence of PPLP's ability to resume such obligations by that date; and (iii) provide assurances, reasonably acceptable to Purdue Pharma (Canada), of PPLP's ability to successfully meet its obligations by such resumption date and (as applicable) thereafter.

(b)    If, after Purdue Pharma (Canada)'s receipt of a Resumption Notice, Purdue Pharma (Canada) accepts PPLP's evidence and assurances contained therein, then subject to the expiration of Purdue Pharma (Canada)'s obligations to other suppliers entered into as a

12

result of the Supply Interruption, Purdue Pharma (Canada) will resume purchasing Products from PPLP, in accordance with the terms of this Agreement.

## 5.   PRICE AND PAYMENT TERMS.

**5.1   Price**. Purdue Pharma (Canada) will pay to PPLP, during the Term of this Agreement, the applicable prices as set forth in Exhibit C attached hereto for the packaged Products accepted by Purdue Pharma (Canada) pursuant to the terms of this Agreement.

**5.2   Payment**. Upon Purdue Pharma (Canada) providing a Purchase Order and delivery of the packaged Products as set forth in Section 3.6, PPLP will invoice Purdue Pharma (Canada) thereof. Purdue Pharma (Canada) will pay each undisputed invoice pursuant to the terms set forth in Exhibit C, unless such shipment is rejected or its acceptance revoked by Purdue Pharma (Canada) in accordance herewith. All payments will be made in U.S. Dollars.

## 6.   REGULATORY MATTERS.

### 6.1   General Regulatory and Legal Matters.

Purdue Pharma (Canada), will have responsibility to maintain proper labelling with respect to the Products after release by PPLP. PPLP will be responsible for obtaining and maintaining the manufacturing site registration for the Product and ensuring that Product manufacturing and Raw Materials comply with Applicable Laws.

**6.2   Communications with Health Canada and other Regulatory Authorities**. Subject to this Section 6.2, Purdue Pharma (Canada) will coordinate all communications with Health Canada relating to the Product. Any communications relating to the manufacturing facility will be provided to PPLP and PPLP shall be permitted to communicate directly with Health Canada in respect of the manufacturing facility for the Product. Except to the extent otherwise set forth in this Agreement or in the Quality Agreement, each Party will provide to the other copies of correspondence to and from Health Canada and any other regulatory authority relating to or impacting any Product or the manufacturing, packaging or related testing of any Product, including but not limited to the production processes used in such manufacturing, packaging or testing. Copies so provided may be redacted to the extent necessary to prevent the disclosure of Confidential Information.

**6.3   Complaints and Adverse Event Reports**. Purdue Pharma (Canada) shall have the sole responsibility for responding to questions and complaints from Purdue Pharma (Canada) customers as defined in the Quality Agreement. Questions or complaints received by PPLP from Purdue Pharma (Canada) customers shall be promptly referred to Purdue Pharma (Canada). PPLP shall co-operate as reasonably required to allow Purdue Pharma (Canada) to determine the cause of and resolve any customer questions and complaints. Such assistance could include, if requested by Purdue Pharma (Canada), follow-up investigations including testing. If it is reasonably determined that the cause of any customer complaint or adverse event resulted from a breach by PPLP of the Specifications, PPLP will cover all such reasonable costs related to such customer complaint or adverse event. Product Quality Complaints and Adverse Event Reports for the Products will be handled as set forth in the Quality Agreement.

13

**6.4    Regulatory Information.**   Each Party shall provide the other Party with all reasonable assistance and take all reasonable actions requested by the other Party that are necessary or desirable to enable the other Party to comply with any law or regulation applicable to any Product manufactured and/or packaged and tested by PPLP, including, but not limited to, compliance with obligations to provide Adverse Event reports and serious Adverse Event reports to Health Canada, and/or other regulatory authorities.  Such assistance and actions will include, without limitation, keeping the other Party informed of any action by, or notification or other information which it receives (directly or indirectly) from Health Canada or any other regulatory authority which (a) raises any material concerns regarding the marketability, safety or efficacy of any Product or Product Packaging, (b) indicates or suggests a potential material liability for either Party to Third Parties arising in connection with any Product or Product Packaging, or (c) is reasonably likely to lead to a Safety Alert, Recall, market withdrawal or Seizure of any Product or Product Packaging; *provided* that neither Party will be obliged to disclose information in breach of any contractual restriction.

**6.5    Quality Agreement Compliance.**   Each of the Parties will comply with the warranties set forth in the Quality Agreement.  If PPLP's failure to comply with such warranties causes a Supply Interruption, Section 4 of this Agreement will apply.

**6.6    Product Recall or Seizure.**   The provisions of the Quality Agreement and this Section 6.6 will govern any Recall or Seizure.

(a)    To the extent a Recall or Seizure is due to acts or omissions by PPLP or any of its Associated Company(ies), agents, third party contractor, subcontractors, retained by PPLP in connection with this Agreement, PPLP will (i) pay or reimburse, as the case may be, all reasonable direct out-of-of pocket costs, including but not limited to reasonable attorney's fees and expenses and credits and Recall or Seizure expenses claimed by and paid to customers, as well as the costs associated with such Recall or Seizure, incurred by and paid to customers, as well as the costs associated with such Recall or Seizure, incurred by Purdue Pharma (Canada) or PPLP in connection with performing any such Recall or responding to any such Seizure, and (ii) at Purdue Pharma (Canada)'s option, (1) replace the amount of Products or Raw Materials subject to such Recall or Seizure or give a refund to Purdue Pharma (Canada) for same, or (2) give credit to Purdue Pharma (Canada), against outstanding receivables due from Purdue Pharma (Canada) and future purchases of the packaged Product in an amount equal to the amount paid by Purdue Pharma (Canada) for the Product subject to such Recall or Seizure or otherwise owing by Purdue Pharma (Canada) hereunder.

(b)    To the extent a Recall or Seizure is due to acts or omissions by Purdue Pharma (Canada) or any of its Associated Company(ies) in connection with this Agreement or a failure of Products to meet Minimum Stability Requirements, Purdue Pharma (Canada) will pay or reimburse, as the case may be, all reasonable direct out-of-of pocket expenses, including but not limited to reasonable attorney's fees and expenses and credits and Recall or Seizure expenses claimed by and paid to customers, as well as the costs associated with such Recall or Seizure, incurred by PPLP or PPLP's Associated Company(ies), agents, subcontractors retained by PPLP in connection to this Agreement in connection with performing such Recall or responding to any such Seizure.

14

(c)    Prior to any reimbursement pursuant to this Section 6.6, the Party claiming reimbursement will provide the other Party with reasonably acceptable documentation of all reimbursable costs.

(d)    For greater certainty, in the event of a Recall or Seizure, neither Party nor its Associated Company(ies) will profit from any out-of-pocket expenses incurred by it in connection with such Recall or Seizure for which it is reimbursed by the other Party and, except where the Recall or Seizure relates directly to an intentional breach of a representation or warranty contained in this Agreement or arises directly out of a willful breach by a Party of any of its duties or obligations hereunder, neither Party will have a claim against the Party for any damages, losses or expenses which it suffers or incurs as a result of such Recall or Seizure except to the extent contemplated in this Section 6.6.    Further, each of the Parties acknowledges and agrees that the remedies set forth in this Section 6.6 will be the sole and exclusive remedy with respect to any Recall or Seizure in connection with any Products manufactured and/or packaged by PPLP for Purdue Pharma (Canada) or its Associated Company(ies) pursuant to this Agreement.

(e)    Notwithstanding any other provision in this Agreement, the remedies set forth in this Section 6.6 shall be each Party's sole remedy in respect of any Recall or Seizure of Product supplied under this Agreement.

## 7.    INSURANCE

**7.1**    Purdue Pharma (Canada) shall maintain in effect at all times during the Term of this Agreement, and for a period of at least two (2) years after its termination or expiration the following insurance coverage:

(a)    Commercial General Liability (Public Liability) including liability coverages for Premises Operations, Blanket Contractual, Personal Injury and Advertising Injury in amounts not less than████████per occurrence and████████aggregate; and

(b)    Products Liability Insurance in amounts not less than████████per occurrence and████████aggregate; and Workers' Compensation: Compulsory coverage as mandated by local laws.

(c)    Automobile Liability in amounts not less than████████per occurrence and████████annual aggregate covering all owned, hired and non-owned automobile equipment; and

(d)    Excess Liability Insurance in amounts not less than████████per occurrence and████████aggregate; and

**7.2**    PPLP shall maintain in effect at all times during the Term of this Agreement, and for a period of at least two (2) years after its termination or expiration the following insurance coverage:

(a)    Commercial General Liability (Public Liability) including liability coverages for Premises Operations, Blanket Contractual, Personal Injury and Advertising Injury in

15

amounts not less than ▆▆▆▆ per occurrence and ▆▆▆▆ aggregate, which can be satisfied in part in full through umbrella coverage; and

(b)     Products Liability Insurance in amounts not less than ▆▆▆▆ per occurrence and ▆▆▆▆ annual aggregate; and Workers' Compensation: Compulsory coverage as mandated by local laws.

(c)     Automobile Liability in amounts not less than ▆▆▆▆ per occurrence and ▆▆▆▆ annual aggregate covering all non-owned automobile equipment; and

**7.3     General**. The insurance requirements of Section 7 shall apply during the Term of this Agreement and for two (2) years following this Agreement's termination or expiration. Purdue Pharma (Canada) shall be included as additional insured under PPLP's insurance coverage program. PPLP shall be included as additional insured under Purdue Pharma (Canada) insurance program. Each Party will present to the other a valid certificate of insurance demonstrating its compliance with the above obligations, if such request is made in writing during the Term or within the two (2) year period following this Agreement's termination or expiration.

## 8.     INDEMNIFICATION

**8.1**     PPLP shall indemnify, defend and hold Purdue Pharma (Canada), each Associate Company of Purdue Pharma (Canada) and the officers, directors and employees thereof (each a **"Purdue Pharma (Canada) Indemnified Party"**) harmless from and against any and all losses, liabilities, damages, claims, expenses, suits, recoveries, judgments and fines (including interest, penalties and reasonable attorneys' fees and expenses but excluding any indirect, special, punitive or consequential losses such as loss of profits or goodwill) (collectively **"Losses"**) that are incurred by any Purdue Pharma (Canada) Indemnified Party as a result of third party claims, actions or proceedings (collectively, **"Third Party Claims"**) arising out of or resulting from (i) the breach of this Agreement by PPLP or (ii) the negligence or willful misconduct of a PPLP Indemnified Party (as defined below) in undertaking this Agreement, except, in each case, to the extent such Losses are attributable to the negligence or willful misconduct of Purdue Pharma (Canada) or any of its Associated Company(ies) or any of its or their officers, directors and/or employees or Purdue Pharma (Canada)'s breach of this Agreement.

**8.2**     Purdue Pharma (Canada) shall indemnify, defend and hold PPLP, each Associate Company of PPLP and the officers, directors and employees thereof (each a **"PPLP Indemnified Party"**) harmless from and against any and all Losses that are incurred by any PPLP Indemnified Party as a result of Third Party Claims arising out of or resulting from (i) the breach of this Agreement by Purdue Pharma (Canada), (ii) the negligence or willful misconduct of an Purdue Pharma (Canada) Indemnified Party in undertaking this Agreement, and (iii) the infringement, or claim of infringement, of any intellectual property rights of a Third Party by the trademarks and other intellectual property rights in respect of the Products which are owned or controlled by Purdue Pharma (Canada), except, in each case, to the extent such Losses are attributable to the negligence or willful misconduct of PPLP or any of its Associated Company(ies) or any of its or their officers, directors and/or employees or PPLP's breach of this Agreement.

**8.3**     Any Indemnified Party will notify the other Party in writing, within thirty (30) days after the assertion of any claim against the Indemnified Party, that it intends to assert a claim for

indemnification.  An Indemnified Party's failure to so notify the other Party will not, however, relieve the Indemnifying Party from any liability under this Agreement with respect to such claim except to the extent that the Indemnifying Party actually suffers or otherwise incurs additional liquidated or other readily quantifiable damages as a result of such failure.  The Indemnifying Party, while reserving the right to contest its obligations to indemnify hereunder, will be responsible for the defense of any claim, demand, lawsuit or other proceeding in connection with which the Indemnified Party claims indemnification hereunder.  The Indemnified Party may at its own expense participate jointly with the Indemnifying Party in the defense of any such claim, demand, lawsuit or other proceeding.  With respect to any issue involved in such claim, demand, lawsuit or other proceeding with respect to which the Indemnifying Party has acknowledged its obligation to indemnify the Indemnified Party hereunder, the Indemnifying Party will have the sole right to select counsel, settle, try or otherwise dispose of (including through settlement) or handle such claim, demand, lawsuit or other proceeding on such terms as the Indemnifying Party deems appropriate, subject to the consent of the Indemnified Party, which consent will not be unreasonably withheld.  Notwithstanding the foregoing, an Indemnified Party will have no obligation to consent to any settlement that would require an Indemnified Party to admit fault, or that otherwise imposes on the Indemnified Party any liability or obligation that cannot be assumed or performed in full by the Indemnifying Party, including, without limitation, any settlement that would require injunctive or other non-monetary relief.

**8.4    Limitation of Liability**.  EXCEPT (i) IN THE EVENT OF THE FRAUD OF A PARTY OR OF A PARTY'S BREACH OF ITS OBLIGATIONS UNDER SECTION 11, OR (ii) TO THE EXTENT ANY SUCH DAMAGES ARE REQUIRED TO BE PAID TO A THIRD PARTY AS PART OF A CLAIM FOR WHICH A PARTY PROVIDES INDEMNIFICATION UNDER THIS SECTION 8, NEITHER PARTY NOR ANY OF ITS AFFILIATES OR (SUB)LICENSEES SHALL BE LIABLE IN CONTRACT, TORT, NEGLIGENCE, BREACH OF STATUTORY DUTY OR OTHERWISE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE, REMOTE, EXEMPLARY OR SPECULATIVE DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS ARISING FROM OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF ANY NOTICE OF THE POSSIBILITY OF SUCH DAMAGES OR THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY REMEDY.

**8.5    Liability Cap**.  In no event shall PPLP be liable to Purdue Pharma (Canada) for any liabilities, damages, costs or expenses (including reasonable attorney's fees) under this Agreement in excess of the amount of money received by PPLP from Purdue Pharma (Canada) in the twelve (12) months immediately preceding the event alleged to have caused the harm suffered by Purdue Pharma (Canada).

## 9.    REPRESENTATIONS; WARRANTIES.

**9.1    By PPLP**.  PPLP hereby represents and warrants to Purdue Pharma (Canada) as follows:

(a)    PPLP is a limited partnership duly organized, validly existing and in good standing under the laws of Delaware;

17

(b)    PPLP has the requisite corporate authority to execute and deliver this Agreement and to perform its obligations hereunder;

(c)    PPLP has the requisite capacity to perform its obligations in accordance with the terms of this Agreement;

(d)    The execution and performance of PPLP's obligations hereunder do not and will not conflict with any obligation it may have to any Third Party, and other than entry of the Approval Order by the Bankruptcy Court, PPLP does not need the consent or approval of any Third Party or, except as set forth in paragraph (f) below, of any judicial or governmental agency to execute this Agreement or perform any of its obligations hereunder;

(e)    PPLP is not debarred, and PPLP will not use in any capacity the services of any Person debarred under, Subsection 306(a) or (b) of the Generic Drug Enforcement Act of 1992;

(f)    Prior to PPLP's first delivery of packaged Product to Purdue Pharma (Canada) under this Agreement, PPLP will have received, will be in current compliance with, and will use commercial best efforts to maintain throughout the Term, all permits, licenses, registrations, and other forms of governmental authorizations and approvals ("**Permits**") required to be obtained and maintained by PPLP in order for PPLP to execute and deliver this Agreement and to perform its obligations hereunder in accordance with all Applicable Laws and will otherwise perform its obligations hereunder in a manner which complies in all material respects with Applicable Laws.

**9.2    By Purdue Pharma (Canada).**  Purdue Pharma (Canada) represents and warrants to PPLP as follows:

(a)    Purdue Pharma (Canada) is an Ontario partnership duly organized and in good standing under the laws of Ontario, Canada;

(b)    Purdue Pharma (Canada) has the requisite authority to execute and deliver this Agreement and to perform its obligations hereunder;

(c)    The execution and performance of Purdue Pharma (Canada)'s obligations hereunder do not and will not conflict with any obligations it may have to any Third Party, and Purdue Pharma (Canada) does not need or already possesses the consent or approval of any Third Party or judicial or governmental agency to execute this Agreement or perform any of its obligations hereunder;

(d)    Purdue Pharma (Canada) has all valid Permits required to conduct this business in Territory.

(e)    In performing its obligation hereunder, Purdue Pharma (Canada) will not infringe on or otherwise misappropriate any patents or other intellectual property rights of any Third Party. Purdue Pharma (Canada) is the holder of or has license to any patent necessary for the production and sale of the Products.

18

**9.3    No Other Representations or Warranties**. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR NON-MISAPPROPRIATION OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, ARE MADE OR GIVEN BY OR ON BEHALF OF A PARTY, AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE, ARE HEREBY EXPRESSLY EXCLUDED.

**10.    TERMINATION.**

**10.1    Termination**.  Prior to expiration of the Term set forth in Section 2 above, this Agreement may be terminated as follows:

(a)    by either Purdue Pharma (Canada) or PPLP, upon ███████ days' written notice of termination, if the other Party breaches or defaults in the performance or observance of any of its material obligations under this Agreement and such breach or default is not cured within ███████ days after receipt of written notice from the non-breaching Party specifying the nature of such breach or default;

(b)    by Purdue Pharma (Canada), immediately, in the event that a DIN or Notice of Compliance (or any other marketing authorization or right to market) for any of the Products is cancelled, withdrawn or suspended by a governmental agency in any country of the world because of safety, efficacy or similar problems;

(c)    by PPLP, upon ███████ months' prior written notice, with respect to one or more of the Products or the entire Agreement at any time for any reason.

(d)    by Purdue Pharma (Canada) upon ███████ months' prior written notice with respect to one or more of the Products or the entire Agreement at any time for any reason.

**10.2    Post-Termination**.  Expiration or termination of this Agreement will not relieve the Parties of any obligations accruing prior to such expiration or termination.

**11.    CONFIDENTIALITY.**

**11.1**    For purposes of this Agreement, the following terms will have the following meanings. **"Disclosing Party"** means the Party disclosing, or on whose behalf Confidential Information is disclosed to the Receiving Party. **"Receiving Party"** means the Party receiving Confidential Information from or on behalf of the Disclosing Party. **"Confidential Information"** means any information that the Receiving Party receives from or on behalf of the Disclosing Party during the Term, whether disclosed directly or indirectly in writing, orally, electronically or by drawings or observation, including, without limitation: any such trade secrets; know-how; clinical or other research, studies; patent applications; regulatory data or plans; clinical data or plans; products and product plans (including but not limited to the Products and plans related thereto), or product candidates; markets; inventions; manufacturing, production, supply, Packaging and distribution costs, specifications (including but not limited to Specifications), components and materials (including but not limited to Raw Materials), equipment and processes; compounds,

19

formulas and formulations; solutions; technology; designs; marketing, forecasts, or market research; litigation matters and strategies; auction and sales data; approved vendors and sources of components or materials; and finance or capitalization or other business information.

**11.2**    In consideration of the contemplated disclosures, the Receiving Party agrees that any Confidential Information of the Disclosing will be kept by the Receiving Party in confidence and not revealed to anyone except the Receiving Party's directors, officers, counsel, professional advisors, employees, consultants, lenders, suppliers and authorized agents, and its Associated Companies, and then only to the extent that they need to receive the Confidential Information in order to further the activities contemplated by this Agreement, are made aware of the confidential nature of such information, and are bound by obligations of confidentiality and non-use no less stringent than those set forth in this Agreement. The Receiving Party further agrees that it will use the Confidential Information only for the purposes of performing its obligations under this Agreement, and the Receiving Party will not, directly or indirectly, make any other use of or aid any Third Party to make any other use of such Confidential Information without the Disclosing Party's prior written consent.

**11.3**    Obligations of confidentiality and non-use shall continue to apply for a period of five (5) years from the date of termination or expiration of this Agreement or, with respect to specific items of Confidential Information, five years from the date of the first disclosure of such information made under this Agreement, whichever is later. Confidential Information shall not include information which:

(a)    was in the Receiving Party's possession and known to the Receiving Party, without any restrictions on its use or disclosure, prior to the Disclosing Party's initial disclosure; or

(b)    is now generally known to the public, or later becomes so through no breach of this Agreement by the Receiving Party; or

(c)    comes to the Receiving Party, without any restrictions on its use or disclosure, from a Third Party that, to Receiving Party's knowledge, did not receive it directly or indirectly from the Disclosing Party and that is not, to Receiving Party's knowledge, bound by any obligation of non-use or non-disclosure or otherwise prohibited from transmitting it to the Receiving Party; or

(d)    is developed independently by Receiving Party without use of or reliance on the Confidential Information of Disclosing Party.

**11.4**    The above exceptions will not apply to (a) any individual parts of the Confidential Information merely because such parts are included in more general information, or (b) any specific combination of the items found in the Confidential Information merely because such combination can be pieced together from multiple sources, none of which shows the whole combination.

**11.5**    Notwithstanding the foregoing and subject to the terms of this paragraph, the Receiving Party may disclose without violation of its confidentiality obligations under this Agreement, with the exercise of discretion, such portions of the Disclosing Party's Confidential

20

Information to governmental agencies as, in the Receiving Party's judgment, is essential to the manufacture or sale of a Product pursuant to this Agreement. In addition, subject to the terms of this paragraph, the Receiving Party may disclose without violation of its confidentiality obligations under this Agreement such portions of the Disclosing Party's Confidential Information as are required or permitted to be disclosed by law or pursuant to legal process. With respect to the disclosures permitted under this paragraph, the Receiving Party will, to the extent lawfully able to do so either prior to any such disclosure, if possible, or otherwise promptly thereafter, inform the Disclosing Party of such intended disclosure, use reasonable efforts to limit the disclosure and maintain the confidentiality of the disclosed information to the extent reasonably possible, and provide the Disclosing Party with the opportunity to seek appropriate judicial or administrative relief to avoid, or obtain confidential treatment of, such disclosure, and at Disclosing Party's request, shall provide Disclosing Party reasonable assistance in doing so, at Disclosing Party's sole cost and expense.

**11.6** Except as otherwise set forth in this paragraph or elsewhere in the Agreement, to the extent requested in writing by the Disclosing Party, the Receiving Party will, at the Disclosing Party's option, return to the Disclosing Party or destroy the Confidential Information of the Disclosing Party, including all copies, excerpts and summaries thereof contained on any media. Notwithstanding the foregoing, (i) the Receiving Party may keep a reasonable number of archival copies of the Confidential Information as may be required by its standard document retention policies, law or any applicable self-regulatory agency to which the Receiving Party is subject, and (ii) the Receiving Party will not be required to erase electronically stored Confidential Information that has been saved to a back-up file or other electronic medium in accordance with its ordinary back-up practices, which shall instead be destroyed upon the normal expiration of its back-up files and practices. The Receiving Party shall continue to be bound by the terms and conditions of this letter agreement with respect to any such Confidential Information retained in accordance with the foregoing sentence.

**11.7** The Receiving Party acknowledges that damages may not be an adequate remedy for any breach of the confidentiality obligations contained herein and that, in addition to any other remedy to which the Disclosing Party may be entitled at law or in equity, the Disclosing Party will be entitled to the remedies of injunction and other equitable relief for any threatened or actual breach by the Receiving Party of such obligations. Receiving Party waives any requirements for security or the posting of any bond in connection with such remedies.

**11.8** All Confidential Information of the Disclosing Party is Disclosing Party's sole and exclusive property, and the permitted use thereof by the Receiving Party for the purposes of the Receiving Party's performance of its obligations under this Agreement will not be deemed a grant by the Disclosing Party to the Receiving Party of any license or other right under the intellectual property of the Disclosing Party to use such Confidential Information for any other purpose.

**11.9** **Reference.** Neither Party will use or make reference to, or authorize others to use or make reference to, the other Party's name, trademark, and the like, or to the relationship between the Parties, or to any of the terms of this Agreement or the Quality Agreement, unless authorized in writing by the other Party or required by law or regulation.

21

## 12.    DISPUTE RESOLUTION.

In the event of a dispute or difference (other than those to be determined in accordance with the Quality Agreement) between the Parties arising out of or relating to this Agreement, including but not limited to the formation (including any claim as to fraud in the inducement), breach, performance, interpretation, or termination thereof, the Parties shall make Commercially Reasonable Efforts to resolve the dispute by amicable negotiations.   In this regard, senior representatives of each Party shall, as soon as practicable and in any event no later than thirty (30) days after a written request from either Party to the other Party, meet in good faith to resolve a Commercial Dispute within a reasonable time.   In all events, if a Commercial Dispute is unresolved within thirty (30) days of a Party's initial written request to resolve the dispute, the Commercial Dispute shall, at the request of either Party, be referred to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Three arbitrators (one arbitrator if the subject of the dispute involves less than $100,000) shall conduct the arbitration in the English language in Stamford, Connecticut. The arbitrators must be independent of both Parties, and knowledgeable or experienced in the consumer health industry. Each Party will, within twenty (20) days of the date on which arbitration is requested, select one arbitrator and advise the other Party of the name of that arbitrator, and those two arbitrators will select a third arbitrator.  If the two arbitrators selected by the Parties are unable to agree upon a third arbitrator within forty (40) days of the date on which arbitration is requested, the third arbitrator will be appointed by the American Arbitration Association. The decision of any two of the three arbitrators will be the decision of the arbitrators.   The Parties shall bear their own attorneys' fees and costs and shall share equally the fees for the Arbitration. Any determination as to the arbitrability of an issue or dispute shall be made by the arbitrators.  A proceeding to arbitrate any claim subject to arbitration under this Agreement must be initiated within the same time period that would apply for bringing such claim in court under the governing law specified in Section 14.3 of this Agreement. Notwithstanding anything contained herein to the contrary, the terms and provisions of this Section shall not preclude any Party hereto from seeking, or a court of competent jurisdiction from granting, a temporary restraining order, temporary injunction or other equitable relief for any breach of any restrictive covenant or confidentiality covenant in this Agreement.   The arbitrator's decision shall be reduced to writing and shall be binding on the Parties.  Judgment upon the award(s) rendered by the arbitrator may be entered and execution had in any court of competent jurisdiction or application may be made to such court for a judicial acceptance of the award and an order of enforcement. In arbitration, all privileges under state and federal law, including attorney-client and work-product privileges, shall be preserved and protected to the same extent that such privileges would be protected in a federal court in the United States proceeding applying the internal law of the State of Connecticut (without reference to the law of conflicts of any jurisdiction).

## 13.    INDEPENDENT CONTRACTOR.

The relationship between PPLP and Purdue Pharma (Canada) is that of independent contractors and nothing herein will be deemed to constitute or give rise to any employer-employee, agency, partnership or joint venture relationship among or between the Parties.  Neither Party will

US 167288098v4

have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party.

## 14.    MISCELLANEOUS.

**14.1    Force Majeure.** Except as otherwise set forth in Section 4 of this Agreement, neither Party will be liable for failure or delay in the performance of any of its obligations hereunder if such failure or delay is due to causes beyond its reasonable control (other than those causes resulting from acts or omissions of such Party) including, without limitation, acts of God, earthquakes, fires, floods, hurricanes, tornados or other wind or water damage, strikes, acts of war, acts of terrorism, government proclamations, or intervention of any governmental authority. Failure to perform as a result of such Party's violation of or non-compliance with any law, order or regulation, or failure to obtain (or loss of) any regulatory approval, will not be deemed to be beyond a Party's reasonable control and therefore will not be considered an event of Force Majeure. A Party shall be deemed not to be in default with respect to non-performance of any of its obligations under this Agreement, if and so long as such non-performance is due in whole or in some material way to an event of Force Majeure and that Party has used Commercially Reasonable Efforts to remove the event of Force Majeure and to perform its obligations under the Agreement. If an event of Force Majeure occurs, the Party affected shall promptly notify the other Party of the occurrence of the event, its extent and probable duration. Subject to this Section 14.1, if PPLP is unable to supply Purdue Pharma (Canada) with its requirements of Products by reason of Force Majeure, Force Majeure shall excuse PPLP's performance until the Force Majeure has ceased and for a reasonable period of time thereafter to allow PPLP to restore its ability to provide such supply of Products. Within thirty (30) days of notification by PPLP that it is able to resume the necessary supply of the Products to Purdue Pharma (Canada), Purdue Pharma (Canada) shall resume obtaining its requirements of Products from PPLP pursuant to the terms of this Agreement. PPLP shall suffer no penalty or incur any liability for its inability to perform hereunder by reason of Force Majeure. If a Party fails to perform any of its obligations under this Agreement by reason of Force Majeure and such non-performance continues for a period of ninety (90) days from the first occurrence of the event of Force Majeure, the other Party may terminate this Agreement immediately by providing written notice to that effect to the non-performing party. In the event of such termination, both Parties' respective rights and obligations under this Agreement shall terminate except for any amounts due and owing prior to the effective date of termination by one Party to the other Party and except for any other obligations which this Agreement expressly provides shall survive termination.

**14.2    Assignment.** Except as provided otherwise in this Agreement, either Party may without the consent of the other Party, assign or transfer this Agreement, in whole or in part,(a) to any of its Associated Companies, or (b) to any successor by merger, or (c) upon a sale or transfer of all or substantially all of its assets, or the assets of that portion of its pharmaceutical business, involving the Products. This Agreement will be binding upon and will inure to the benefit of the Parties and their successors and permitted assigns.

**14.3    Governing Law.** This contract will be governed by, and construed in accordance with, the laws of the State of Connecticut without giving effect to its choice of law rules. The Parties hereby agree to the jurisdiction of the Connecticut courts, both state and federal.

23

**14.4    Notice**.  All notices and other communications required or permitted to be given or made pursuant to this Agreement shall be in writing signed by the sender and shall be deemed duly given (a) on the date delivered, if personally delivered, (b) on the date sent by telecopier with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the Business Day after being sent by FedEx or another recognized overnight mail service which utilizes a written form of receipt for next day or next Business Day delivery, or (d) two (2) Business Days after mailing, if mailed by U.S. postage-prepaid certified or registered mail, return receipt requested, in each case addressed to the applicable Party at the address set forth below; provided that a Party may change its address for receiving notice by the proper giving of notice hereunder:

| | |
|---|---|
| If to PPLP: | Purdue Pharma L.P.<br>One Stamford Forum<br>201 Tresser Blvd.<br>Stamford, CT 06901-3431<br>Attention: General Counsel<br>Telephone: 203-588-7169<br>Facsimile: 203-588-6026<br>PPLP |
| With Copies to: | Purdue Pharmaceuticals L.P.<br>4701 Purdue Drive<br>Wilson, NC 27893<br>Attention: Donogh McGuire<br>Donogh.mcguire@pharma.com<br>Telephone: 252-265-1908 |
| For Quality Matters an additional copy to: | Purdue Pharmaceuticals L.P.<br>4701 Purdue Drive<br>Wilson, NC 27893<br>Attention: Joe Northington<br>Joseph.northington@pharma.com<br>Telephone: 252-265-1997 |
| If to Purdue Pharma (Canada): | Purdue Pharma (Canada)<br>575 Granite Court<br>Pickering, Ontario<br>Canada L1W 3W8<br>Attention: Vice President, Legal |
| For Quality Matters an additional copy to: | 575 Granite Court<br>Pickering, Ontario<br>Canada L1W 3W8<br>Attention: Head of Quality |

24

**14.5    Amendments**.  Any amendment or modification of this Agreement will only be valid if made in writing and signed by an authorized representative of each of the Parties.

**14.6    Counterparts**.  This Agreement may be executed in counterparts, signatures to which may be exchanged in .pdf format, each of which counterparts will be deemed an original and all of which will constitute a single document.

**14.7    Entire Agreement; Conflict Between Provisions**.  This Agreement together with the Quality Agreement represents the entire agreement of the Parties with respect to the subject matter hereof; superseding all prior agreements and understandings, written or oral. Notwithstanding the foregoing, any prior confidentiality agreement between the Parties will remain in effect in accordance with its terms with respect to previously disclosed information unless agreed to otherwise in writing.  In the event of any conflict, inconsistency or duplication between any of the terms of this Agreement and the terms of the Quality Agreement, the terms of this Agreement will take precedence and govern, unless this Agreement or the Quality Agreement expressly states that the relevant terms of the Quality Agreement takes precedence and governs notwithstanding any contrary provision in this Agreement.

**14.8    Benefit; Binding Effect**.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**14.9    Survival**.  Notwithstanding anything to the contrary contained in this Agreement, the provisions of Sections 1, 5, 8, 9.3, 10.2, 11, 12, 13, and 14 will survive any expiration or termination of this Agreement.

**14.10    Further Assurances**.  The Parties will take all appropriate actions, including, without limitation, the execution or filing of any documents or instruments, which may be reasonably necessary or advisable to carry out the intent and accomplish the purposes of any of the provisions hereof.

**14.11    Severability**.  If any provision of this Agreement is held invalid or unenforceable for any reason by a court of competent jurisdiction, such provision or part thereof will be considered separate from the remaining provisions of this Agreement, which will remain in full force and effect.

**14.12    Waiver of Rights**.  Exercise by any Party of any of its rights under this Agreement will not be deemed to limit any other right or remedy that such Party may have in law or equity. No waiver by any Party of any default or breach by the other of any provision hereof will be deemed to be a waiver of any subsequent default or breach of that or any other provision hereof.

**14.13    Captions**.  The captions used in this Agreement are solely for convenience and will have no part in the interpretation of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

US 167288098v4

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed as of the Effective Date by their duly authorized representatives.

**PURDUE PHARMA (CANADA)**          **PURDUE PHARMA L.P.**


By: _____          By: _____

Name:                                                        Name:

Title:                                                          Title:

26

## **EXHIBIT A**

Products, Product Specifications and Packaging Specifications

Products:



Product Specifications

27

 Specifications

## Document Details

**Document No:** ▇▇▇▇▇▇

**Document Title:** ▇▇▇▇▇▇▇▇▇

**Document State:**      Effective

**Document Version:**      1.0

**Release Date:**      ▇▇▇▇▇▇

**Description:**      ▇▇▇▇▇▇▇

**Signatures:**
Signed By : Bredin John (bredijo)
Decision : Approved
Decision Date : 26 Nov 2019 07:59:38 (GMT-05:00)
Role : Qstd QA Approver Role
Purpose : New Quality Standards
Meaning Of Signature : TOT_As the QA Approver, I have reviewed this
document for GXP compliance and verify its adherence to company procedure.

Signed By : Thornton, Colleen (thornco)
Decision : Approved
Decision Date : 26 Nov 2019 11:58:42 (GMT-05:00)
Role : TOT QStd Approver Role
Purpose : New Quality Standards
Meaning Of Signature : TOT_QualStd Approver's signature indicates (if
approved) that the quality standard   has been approved for implementation; (if
disapproved) the quality standard has been disapproved for implementation.

Signed By : Sparta, Greg (spartag)
Decision : Approved
Decision Date : 26 Nov 2019 12:36:53 (GMT-05:00)
Role : Qstd RA Approver Role
Purpose : New Quality Standards
Meaning Of Signature : Qstd RA Approver's signature indicates (if approved)
that the quality standard   has been approved for implementation; (if
disapproved) the quality standard has been disapproved for implementation.

Signed By : Cheerla, Rakesh (cheerra)
Decision : Approved

Decision Date : 26 Nov 2019 14:41:42 (GMT-05:00)
Role : TOT QStd Author Role
Purpose : New Quality Standards
Meaning Of Signature : TOT_QualStd Author's signature indicates (if
approved) that the document has been written in conformance with all
requirements for the subject material or finished product; (if disapproved) that
the requirement has not been met.

Signed By : Thornton, Colleen (thornco)
Decision : Approved
Decision Date : 26 Nov 2019 14:42:43 (GMT-05:00)
Role : Qstd Mgr Approver Role
Purpose : New Quality Standards
Meaning Of Signature : Qstd Mgr Approver's signature indicates (if approved)
that the quality standard   has been approved for Implementation; (if
disapproved) the quality standard has been disapproved for implementation.

**Owning Departments:**
WIL Quality Control

**Cross Ref Departments:**

**Printed On:**      05 Feb 2020 (GMT-05:00)      11:51:15 AM (GMT-05:00)
**Printed For:**     Thornton, Colleen (thornco)
**Printed By:**      Thornton, Colleen (thornco)
**Print Reason:**    Review

29



Intermediate Quality Standard for ████████████████

Specification Number ███████

| TEST | SPECIFICATION/LIMIT | TEST METHOD |
|------|---------------------|-------------|
| Appearance | ████████████ | Visual |
| Assay: mg of ███████ | ████████ | ██████ |
| ████████████ | ████████████ | ██████ |

30

US 167288098v4

 Intermediate Quality Standard for ███████

Specification Number: ███████

**Testing Requirement Matrix**

| TEST | RELEASE TESTING | RE-ASSAY |
|------|-----------------|----------|
| Appearance | X | X |
| Assay: ██████████████ | X | X |
| ████████████████ | X | X |

**Revision History:**

**Version 1.0**    - First issuance of quality standard

Document Name: ███████          Page 2 of 2                    Printed By: Thornton, Colleen (thornco)
Version: 1.0 Effective date (if applicable): 26 Nov 2019 14:46:22 (GMT-04:00)    05 Feb 2020 (GMT-05:00) - 11:51:15 AM (GMT-05:00)

31

US 167288098v4

██████████ Specifications

## Document Details

| | |
|---|---|
| Document No: | ██████████ |
| Document Title: | ██████████ |
| Document State: | Effective |
| Document Version: | 1.0 |
| Release Date: | 28 Jan 2020 08:43:03 (GMT-05:00) |
| Description: | ██████████ |

Signatures:
Signed By : Thornton, Colleen (thornco)
Decision : Approved
Decision Date : 21 Jan 2020 17:28:04 (GMT-05:00)
Role : TOT QStd Approver Role
Purpose : ██████████
Meaning Of Signature : TOT_QualStd Approver's signature indicates (if
approved) that the quality standard   has been approved for implementation; (if
disapproved) the quality standard has been disapproved for implementation.

Signed By : Bredin John (bredijo)
Decision : Approved
Decision Date : 22 Jan 2020 18:05:29 (GMT-05:00)
Role : Qstd QA Approver Role
Purpose : ██████████
Meaning Of Signature : WIL_As the QA Approver, I have reviewed this
document for GXP compliance and verify its adherence to company procedure.

Signed By : Sparta, Greg (spartag)
Decision : Approved
Decision Date : 27 Jan 2020 10:32:44 (GMT-05:00)
Role : Qstd RA Approver Role
Purpose : ██████████
Meaning Of Signature : Qstd RA Approver's signature indicates (if approved)
that the quality standard   has been approved for implementation; (if
disapproved) the quality standard has been disapproved for implementation.

Signed By : Cheerla, Rakesh (cheerra)
Decision : Approved
Decision Date : 27 Jan 2020 20:13:18 (GMT-05:00)
Role : TOT QStd Author Role

32

Purpose : ████████████████████████
Meaning Of Signature : TOT_QualStd Author's signature indicates (if
approved) that the document has been written in conformance with all
requirements for the subject material or finished product; (if disapproved) that
the requirement has not been met.

Signed By : Thornton, Colleen (thornco)
Decision : Approved
Decision Date : 28 Jan 2020 08:27:27 (GMT-05:00)
Role : Qstd Mgr Approver Role
Purpose :████████████████████
Meaning Of Signature : Qstd Mgr Approver's signature indicates (if approved)
that the quality standard   has been approved for implementation; (if
disapproved) the quality standard has been disapproved for implementation.


**Owning Departments:**
WIL Quality Control

**Cross Ref Departments:**


**Printed On:**    05 Feb 2020 (GMT-05:00)     8:38:45 AM (GMT-05:00)
**Printed For:**    Thornton, Colleen (thornco)
**Printed By:**    Thornton, Colleen (thornco)
**Print Reason:**    Review

33



Specification Number: ███████

| TEST | SPECIFICATION/LIMIT | TEST METHOD |
|------|---------------------|-------------|
| Appearance | ██████ | Visual Examination |
| Assay: ████████ | ██████ | ████ |
| Assay ████████ | For Manufacturing Information Only | ████ |
| ████████ | ██████ | ████ |

**Document Name:** ████████     **Page 1 of 2**     **Printed By: Thornton, Colleen (thornco)**
Version: 1.0 Effective Date (if applicable): 28 Jan 2020 08:43:03 (GMT-05:00)     05 Feb 2020 (GMT-05:00) - 8:38:45 AM (GMT-05:00)

34

US 167288098v4



Specification Number: ███████

Material and MPN Numbers

| Material Number | MPN Number |
|-----------------|------------|
| ██████████ | ██████████ |

Testing Requirement Matrix

| TEST | RELEASE TESTING | RE-ASSAY |
|------|-----------------|----------|
| Appearance | X | X |
| Assay | X | X |
| ████████████████ | X | X |

Revision History:

**Version 1.0**    – First issuance of quality standard

US 167288098v4

Packaging Specifications

To be Attached after Mutual Agreement

US 167288098v4

## EXHIBIT B

## FORM OF QUALITY AGREEMENT

Quality Agreement when completed pursuant to this Agreement will be executed by the Parties within one-hundred twenty (120) days of the Effective Date and attached hereto.

37

## EXHIBIT C

### SUMMARY PRICING & PAYMENT TERMS

**PRICING & DELIVERY COMMERCIAL UNITS**: Product prices, in final packaged form including all raw materials and packaging components, secondary packaging and including all shipping and delivery costs are set forth on Exhibit F. All Product shall be delivered FOB (PPLP designated warehouse) (Incoterms 2010) by PPLP designated carrier. Title and risk of loss of Product transfers to Purdue Pharma (Canada) upon delivery at PPLP's designated warehouse.

**PRICING PRE-COMMERICAL WORK TO BE COMPLETED BY PPLP:**

**Full itemized details on Exhibit E**

| | |
|---|---|
| **TOTAL FEES PRODUCT DEVELOPMENT, QUALITY AND OPS/ESTIMATED HOURS. ANY OVERAGES TO BE APPROVED BY PURDUE PHARMA (CANADA) VIA APPROVED CHANGE ORDER** |  |

**PAYMENT TERMS DEVELOPMENT ACTIVITIES:**



**PAYMENT TERMS COMMERCIAL UNITS:**



US 167288098v4

**EXHIBIT D**

**SHELF-LIFE**

Product shall be manufactured as Make-To-Order. At the time of delivery to the designated US port of entry the Products shall have a ███████████ of shelf life for Products manufactured with ████████████ of shelf life for Products ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ The Product shall be manufactured with a minimum shelf-life of ███████████████ for ██████████ and ████

████████████ Purdue Pharma (Canada) may reject that shipment or parts of it, at its own discretion. PPLP will be responsible for all costs associated with the rejected shipment including but not limited to, any freight and destruction costs.

US 167288098v4

**EXHIBIT E**

**DEVELOPMENT COSTS AND WORK TO BE COMPLETED BY PPLP**

Cost for development of ████ and ████ products manufactured by PPLP ████ ████ will be the responsibility of Purdue Pharma (Canada).

| Project | Type | Saleable? | Product / Strength | Cost per batch | Nbr of Batches | Total Cost |
|---------|------|-----------|-------------------|----------------|----------------|------------|
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **PROJECT TOTAL** | | | | | **21** | ████ |

(a)

| Project | Type | Saleable? | Product / Strength | Cost per batch | Nbr of Batches | Total Cost |
|---------|------|-----------|-------------------|----------------|----------------|------------|
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| ████ | Registration/Validation | Y | ████ | ████ | 3 | ████ |
| Methods Development | | | | ████ | | |
| | | | | | | |
| | | | | | | |
| **PROJECT TOTAL** | | | | | **24** | ████ |

(b)

Purdue Canada ████ Total Development Costs (a + b)    ████

Development costs as shown assume all registration /validation batches are saleable. Costs above do not include the value of the individual batches, which will be sold to Purdue Pharma (Canada) at pricing as shown in Exhibit F.

US 167288098v4

**EXHIBIT E (continued)**

**Development Costs**

Cost for development of ███████████████████████████████████████████
███████████████████████████████████████████████████

| Project | Type | Saleable? | Product / Strength | Cost per batch | Nbr of Batches | Total Cost w/ ████ |
|---------|------|-----------|--------------------|----------------|----------------|--------------------|
| ████████ | Registration/Validation | Y | ████ | | 3 | ████████ |
| ████████ | Registration/Validation | Y | ████ | ████ | 3 | ████████ |
| ████████ | Registration/Validation | Y | ████ | ████ | 3 | ████████ |
| ████████ | Registration/Validation | Y | ████ | ████ | 3 | ████████ |
| ████████ | Registration/Validation | Y | ████ | ████ | 3 | ████████ |
| ████████ | Registration/Validation | Y | ████ | ████ | 3 | ████████ |
| ████████ | Registration/Validation | Y | ████ | ████ | 3 | ████████ |
| ████████ | Experimental ████ | N | | ████ | 12 | ████████ |
| ████████ | Experimental ████ | N | | ████ | 3 | ████████ |
| ████████ | Registration ████ | N | | ████ | 3 | ████████ |
| | | | | | | |
| **PROJECT TOTAL** | | | | | **39** | ████████ |

(c)

Purdue Pharma (Canada ████████ of development costs ████ of c)
████████

Development costs as shown assume all registration /validation batches are saleable but with
limited product dating due to the time required for submission and approval. Costs above include
the value of the individual batches. If the submission approval timing allows for sale of these
batches, associated development costs will be reduced by the value of the saleable batches.

Total Purdue Pharma (Canada ████████ development costs (a + b + c)
████████

## EXHIBIT F

## COMMERCIAL PRICING

Pricing for ██████████████████ manufactured by PPLP ██████████████
████████



All ████████ pricing is based on ████ manufacturing batch size for ██████████████
████████ strength as indicated above.

████████ pricing is based on a ██████ manufacturing batch size ████████████
strength as indicated above

All pricing is based on ██████████████████████ per the current PPLP supply contract.

████████ pricing is based on current ████████████████ for ██████████████
for ██████

42

Revisions to pricing for these purchased materials will result in comparable revisions to ▪▪▪▪
or ▪▪▪▪ prices as quoted. Documentation will be provided by PPLP for all price revision
requests.

Orders placed for quantities less than specified batch sizes would result in an upcharge that would
vary based on the quantity ordered.

▪▪▪▪ or ▪▪▪▪ products manufactured by
PPLP at ▪▪▪▪ batch scale including API but excluding the cost ▪▪▪▪
▪▪▪▪

All pricing is based on ▪▪▪▪ per the current PPLP supply contract.

Conversion pricing above is for reference only and does not reflect the full cost per finished unit.
Finished unit pricing would vary ▪▪▪▪

Orders placed for quantities less than specified batch sizes would result in an upcharge that would
vary based on the quantity ordered.

Pricing for all ▪▪▪▪ products is based on current ▪▪▪▪ pricing as indicated. Revisions
to pricing for these purchased materials will result in comparable revisions to ▪▪▪▪
prices as quoted. Documentation will be provided by PPLP for all price revision requests

▪▪▪▪ products are expected to be available beginning in ▪▪▪▪.

43

## EXHIBIT F (continued)

## COMMERCIAL PRICING

Pricing for ▇▇▇▇▇ products manufactured by PPLP ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ batch sizes



All ▇▇▇▇ pricing is based on ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

All pricing is based on ▇▇▇▇▇▇▇▇▇▇▇▇ per the current PPLP supply contract.

Pricing for ▇▇▇▇▇▇▇▇ products is based on current ▇▇▇▇▇▇▇ pricing as indicated. Revisions to pricing for this purchased material will result in comparable revision to ▇▇▇▇▇▇ as quoted. Documentation will be provided by PPLP for all price revision requests

Orders placed for quantities less than specified batch sizes would result in an upcharge that would vary based on the quantity ordered.

▇▇▇▇▇▇▇▇▇ products are expected to be available for commercial sale by ▇▇▇▇▇▇

US 167288098v4

## EXHIBIT G

## INITIAL ROLLING FORECAST



45

US 167288098v4

EXHIBIT H

## **Legacy Stability Transfer for** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Define the Legacy Stability Project Workload Scope, Volume and Operational Cost for
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## **Background:**

Stability testing is a regulatory requirement all pharmaceutical companies are subjected to comply to ensure products meet the efficacy and safety up to their defined expiry. To ensure these quality attributes are continuously being monitored, trended and assessed companies are required to establish an Annual Commitment Plan.

The Annual Commitment Plan requires one (1) lot of each SKU to be placed in stability at controlled conditions and tested at a defined interval as per approved stability protocols for each product.

Based on the current approved protocols, every year, ▮▮▮▮▮ are placed in stability, equivalent to ▮▮▮▮▮▮▮▮ These samples will be tested over a period of up to 5 years. This process is repeated every year.



will have to be transferred to Wilson Site to continue being tested, trended and assessed to meet the regulatory commitments. Here are the details of the products, strengths and workload that will be transferred to the Wilson Site.

| Product | Strength / Pkg Config |
|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮ |

The transfer of these samples will take place within the first ▮▮▮▮▮▮ The products to be transferred, required testing hours and cost are defined as follow:

The list of products to be transferred were pulled from the stability management systems (Scientek and LIMS) and ▮▮▮▮▮▮▮▮▮▮ The complete list of lots available to transfer is available for review. Follow are the workload details for this project

1. The breakdown *Number of Samples* per site per year is listed below
2. The breakdown *Number of Testing Hours* per site per year is listed below.
3. The *Testing Total Cost* is defined by the testing standard times at a rate ▮▮▮▮▮▮ listed below

1

US 167288098v4



| Workload / Year | | | | | | Grand Total |
|---|---|---|---|---|---|---|
| No. Samples | ████ | ████ | ████ | | ████ | |
| No. Testing Hours | ████ | ████ | ████ | | | ████ |
| **Total Cost @** | ████ | | | | | |
| ████ | ████ | ████ | ████ | | ████ | |

The Total Cost estimated for the Legacy Stability samples being transferred to Wilson is ████ ████

Legacy stability costs will be ████ based on the number of stability pulls during the period. Payment shall be due from Purdue Pharma (Canada) within ████ such invoice by Purdue Pharma (Canada).

| | Product Testing Standard Times | | |
|---|---|---|---|
| **1** | **2** | **3** | **4** |
| Source | Product | Testing Scheme | Hours |
| Stability | ████ | Full | ████ |
| Stability | ████ | Full | ████ |

| Product | Product Strength / Pkg Config | SKU | Details Shelf Life (month) | Brackets Matrix | Micro | 0 | 3 | 6 | 9 | 12 | 15 | 18 | 24 | Timepoints expiry | 30 | 36 | 48 | count | Yearly Testing Timepoints |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ████ | ████ | | 8 | | N | x | x | x | x | x | | x | x | x | | x | | | 9 | 32 | 16 | 16 | 8 | 0 |
| | | | 7 | M | N | x | x | x | x | x | | x | x | x | | | | | 8 | 28 | 14 | 14 | 0 | 0 |

US 167288098v4