



UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 19-23649-rdd

Adv. Case No. 19-08289-rdd

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

PURDUE PHARMA L.P.,

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PURDUE PHARMA L.P., et al.,

Plaintiffs,

v.

COMMONWEALTH OF MASSACHUSETTS et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States Bankruptcy Court
300 Quarropas Street, Room 248
White Plains, NY 10601

March 18, 2020
10:05 AM

B E F O R E :
HON ROBERT D. DRAIN
U.S. BANKRUPTCY JUDGE

ECRO: N. RAI

HEARING re Notice of Agenda /Agenda for March 18, 2020 Omnibus Hearing Document#: 959

HEARING re Debtors' Motion for Authorization to Enter into Supply Agreement [ECF No. 879]

HEARING re Motion to Authorize / Motion of Debtors for Entry of an Order (I) Authorizing the Assumption of a Certain Unexpired Lease and (II) Further Extending the Debtors Deadline to Assume or Reject Certain Unexpired Leases with the Prior Written Consent of the Lessors under such Leases (ECF #898) Document #: 898

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Motion to Extend Time/ Motion to Extend the Preliminary Injunction (ECF #146) Document #: 146

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Memorandum of Law in Support of Motion (ECF #147)

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Declaration of Benjamin S. Karninetzy in Support of Debtors' Motion to Extend the Preliminary Injunction (ECF # 148)

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Objection to Motion (The Non-Consenting States' Voluntary Commitment and Limited Opposition in Response to Purdue's Motion to Extend the Preliminary Injunction) (related document(s)146) filed by Andrew M. Troop on behalf of Ad Hoc Group of Non-Consenting States (ECF #150)

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Objection to Motion/ Restatement of Limited Objection and Response of Tennessee Public Officials to Debtors Motion to Extend the Preliminary Injunction for Richard Sackler (related document(s)146) Document #: 152

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Reply of the Raymond Sackler Family to the Objection of the Non-Consenting States to the Debtors' Motion to Extend the Preliminary Injunction [ECF No. 154]

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al

Reply Memorandum of Law in Support of Motion to Extend Preliminary Injunction [ECF No. 156]

HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al v. Commonwealth of Massachusetts et al Reply of the Doctor Mortimer Sackler Family Former Directors to the Objection of the Non-Consenting States to the Debtors' Motion to Extend the Preliminary Injunction [ECF No. 157]

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

DAVIS POLK & WARDWELL LLP

Attorneys for the Debtor

BY: MARSHALL HUEBNER (TELEPHONICALLY)

MILBANK, TWEED, HADLEY & MCCLOY LLP

Attorneys for Creditor, Dr. Richard Sackler, et al.

BY: GERARD UZZI (TELEPHONICALLY)

AKIN GUMP STRAUSS HAUER & FELD LLP

Attorneys for Creditor, The Official Committee of Unsecured Creditors of Purdue Pharma, et al.

BY: MITCHELL HURLEY (TELEPHONICALLY)

DEBEVOISE & PLIMPTON LLP

Attorneys for

BY: JASMINE BALL (TELEPHONICALLY)

PILLSBURY WINTHROP SHAW PITTMAN LLP

Attorneys for Interested Party, Non-Consenting States

BY: ANDREW TROOP (TELEPHONICALLY)

GODFREY & KAHN, S.C.

Attorneys for Tennessee DA's

BY: KATHERINE STADLER (TELEPHONICALLY)

ALSO PRESENT TELEPHONICALLY:

EVAN M. JONES

SYDENHAM ALEXANDER

JOSE AUFFANT

MICHAEL BAIRD

BROOKS K. BARKER

AGUSTINA BERRO

SHEILA BIMBAUM

PEG A. BRICKLEY

MICHELLE BURKART

MARIA CHUTCHIAN

DYLAN CONSLA

DONALD E. CREADORE

HEATHER M. CROCKETT

BRIAN EDMUNDS

GILLIAN FEINER

CAROLINE F. GANGE

JEFFREY K. GARFINKLE

ERIC M. GOLD

THOMAS HALS

TRICIA HERZFELD

JEREMY HILL

DAVID S. JONES

GREGORY JOSEPH

BENJAMIN KAMINETZKY

JEREMY C. KLEINMAN

NATASHA LABOVITZ

JENNIFER LEE

ALEX LEES

NICOLE LEONARD

MARK LIGHNER

JOHN LONGMIRE

TIMOTHY LUNDGREN

EMILY MACKAY

KEVIN MACLAY

BRIAN MASUMOTO

JAMES MCCCLAMMY

SETH A. MEYER

DAVID J. MOLTON

MAURA MONAGHAN

GEOFF MULVIHILL

S. MICHAEL MURPHY

BRETT V. NEWMAN

ROBERT P. PADJEN

JEREMY PEARLMAN

WILLIAM R. PEARSON

MICHAEL PERA

DANIEL PORAT

ARIK PREIS

RACHAEL RINGER

EVAN S. ROMANOFF

JEFFREY ROSEN

MEGAN RUNDLET

JEREMY W. RYAN

PAUL SCHWARTZBERG

CATRINA SHEA

ATEM SKOROSTENSKY

RYAN SLAUGH

TRUDY SMITH

DANIEL E. STROIK

WILLIAM THOMAS

MELISSA VAN ECK

BRANDY C. WILLIAMSON

HAROLD WILLIFORD

ELIE J. WORENKLEIN

LOUIS TESTA

KEVIN M. ECKHARDT

ADAM HABERKORN

RICHARD F. HOLLEY

ANDREW KINCAID

KATHERINE STADLER

RICHARD ARCHER

P R O C E E D I N G S

THE COURT: This is Judge Drain, and except for my clerk and the Ecro operator, I'm speaking to an empty courtroom, but I know I have many people on the phone as I directed in light of the present health crisis and the number of people who've expressed an interest in this hearing and in this adversary proceeding in particular that's on the agenda. I did not want people sitting elbow-to-elbow in the courtroom, and I appreciate that everyone has, in fact, appeared by phone, which should generally be the approach going forward until further notice.

So I'm not going to take everyone's appearance now. If you speak, however, I would ask you to identify yourself and the clients you're representing. So do I have someone on the phone for the Debtors.

MR. HUEBNER: Good morning, Your Honor. Marshall Huebner of Davis Polk on behalf of the Debtors. Can the Court hear me clearly?

THE COURT: Good morning. So I have the agenda for today's hearing. The first two matters are uncontested. I had a busy couple of days yesterday and Monday and did not have the chance to review these motions until yesterday afternoon. I don't have any issues with them. Does anyone have anything further to say on them? They are the supply agreement motion and the lease assumption motion. Okay.

Hearing no one, I will enter orders granting both of those motions. You can email those to chambers.

MR. HUEBNER: Thank you, Your Honor. So I think that that brings up the third and only remaining item on the agenda. And so if it would be the Court's pleasure, and that can be fairly clearly (indiscernible) proposed to proceed.

THE COURT: Okay, that's fine. And that's the motion to extend the preliminary injunction that's currently in effect in the Purdue Pharma LP et al v. Commonwealth of Massachusetts adversary proceeding. I have a form of that proposed extension, which would be the eighth amended order. I've reviewed the pleadings on this, I believe, which are listed on the agenda, so you should assume that, but the parties can go ahead with whatever they want to say as well.

MR. HUEBNER: Sure, Your Honor, so let me pick it up. I will actually be far briefer than I normally am, which may or may not be saying much, in light of the context and obviously the extraordinary situation. Let me first thank the Court and all of the people connected to chambers and to the Court for obviously helping to keep our governments running, and I hope Your Honor extend my personal wish that every person on this call stays good and healthy and well and provision in these genuinely unprecedented times.

With respect to preliminary matters, Your Honor, I will only give (indiscernible) update on (indiscernible) matter on which mediation is well underway. The mediators, as they promised they would, walk back multiple full days per week for the balance of March and a chunk of April, and I believe some times -- 6, 7, 8, 9, 10 hours a day, I believe that the various parties and during that (indiscernible) court date and if (indiscernible).

THE COURT: Okay. Well, I hope they're practicing social distancing, but I'm grateful that they are proceeding with that effort, notwithstanding the health crisis.

MR. HUEBNER: Yeah. So, Your Honor, I will be relatively brief. Obviously, you know, obviously (audio distortion) must include a motion in the case -- I'm sorry (indiscernible).

THE COURT: Mr. Huebner, can I interrupt you? I think you're going to have to speak a little slower. The phone, it's harder to pick you up because you're on the phone.

MR. HUEBNER: Is this actually better?

THE COURT: Well, I'll let you know. I think so.

MR. HUEBNER: Okay. I will also speak more slowly.

THE COURT: Yes, that is better.

MR. HUEBNER: Okay, terrific.

THE COURT: Okay.

MR. HUEBNER: So, Your Honor, I guess to begin with, our view, and we filed relatively detailed books and papers and the trial papers, is that the case for the preliminary injunction today is actually even stronger than it was in October when the Court first entered it. Back then, we were just beginning this venture today with obviously, you know, hundreds of interested governmental parties and thousands or tens of thousands of interested parties overall.

And I think it is fair to say that the preliminary injunction has actually done almost everything that we very much hoped it would in terms of replacing (indiscernible) destructive litigation chaos, disagreeing prior to the first weeks in the Debtors' bankruptcy and during the first weeks of the bankruptcy and it's facilitated a lot of important progress.

Very quickly, since the Court knows it, there is substantial information sharing going on certainly from the Debtors. There has already been substantial information always is current and is substantial information sharing from the shareholders; otherwise, I'm sure we will talk about later today. There's certainly more to come on both of those fronts, and I think no one is alleging to the contrary.

We now have the former U.S. Secretary of Agriculture and Iowa Governor Thomas Vilsack as the voluntary injunction monitor. The bar date, as Your Honor knows, perhaps the most reticulated bar date administering program possibly in U.S. Bankrtupcy history is now well underway. And then, of course, the mediation, which as the Court knows well, you know, there's been herculean efforts by multiple parties who had vastly different views on the structure of mediation, (indiscernible) mediation, number of mediators, and really (indiscernible) imaginable.

And, ultimately, yet again, were able to hobble together a fully consensual motion for a critical issue that the Court has been focused on since the opening moments of the case.

That said, though, the Debtors, of course, like other parties, are not fully satisfied with the progress that had been made to date on the variety of issues in the case, and we continue to work in the days remotely but nonetheless tirelessly to try to prevent them. I genuinely believe, or I obviously would not say it, that virtually none of the items that have been progressed since the case began -- and I'm leaving out, obviously, many more items large and small, both that have been the subject of successful motions and have not needed court approval. Virtually, every one of those things would have not only

been impossible, but probably even unthinkable (indiscernible) climate without, you know, a space within which to try to work collectively the next months.

So where are we today? So perhaps in its own testament enforcing the (indiscernible) rate them with respect to how it helped us craft the initial injunction, there is not a single party, zero, objects to a 180-day extension with respect to the Debtors, and we shouldn't let that go by without stopping and noting it because that is itself a remarkable accomplishment that bears testament to what we have accomplished.

With respect to the shareholders, there are a total of two objections: one from what I'll call the Tennessee objectors, who seek to pursue the essentially single lawsuit against a single Sackler; and then there's the objection of (audio distortion) states request authority to pursued only on behalf of themselves, only in their current lawsuits with respect to nine of the dozens of Sackler parties that either are or eventually could be defendants.

So while we have two very important things to resolve, it should be noted that there is also a tremendous amount that are uncontested and that I think bears at least a quick mention. So let me turn to those very quickly, and then actually just turn the podium over to other people who

would like to speak.

The consenting states (audio distortion) unsurprisingly spent most of my time, seeks permission for only themselves and for no one else to litigate against nine members of the Sackler family through the motion to dismiss stage of their action, including any appeals that might be taken from the trial court resolution of those motions that are available.

Our briefing is actually quite complete, I think, Your Honor, so I will be very quick and make a few points. One, we believe their fundamental premise that resolution of these motions to dismiss will advance the case. It's just simply flawed and not correct at all. We actually think there would be, in fact, nothing to advance these cases, but rather will retard their development substantially.

The Court certainly knows better than anyone on the phone what the motion to dismiss is and what it is not. It takes all facts given as true. It is a preliminary pleading that normally leads to lots of appeals, then summary judgment and obviously a trial. And I think we covered this at length (audio distortion) about how with all the money, a small number of motions to dismiss in either parties' favor is highly unlikely to fundamentally change anyone's view, so that'd be point number one.

Number two is that we think the requests is just

completely unfair and inappropriate and actually goes extreme directly against the very core of what a bankruptcy proceeding is and what collective action and approach is and what the quality of treatment and fundamental fairness in the bankruptcy context is all about.

As Your Honor knows, that is from the papers, they request authority only for themselves to essentially advance their own litigations and bring them much more close to the trial phase. The ECT, which obviously speaks for creditors and the consenting states which speaks for the other half of the states, you know, you got to understandably make the point that it cannot possibly be right that only a tiny number of plaintiffs get to progress their litigations on the issue of (audio distortion) and engagement potentially in a Chapter 11.

The issue of preferential treatment, the issue of if the case falls apart being sort of ready to go to trial where obviously hundreds and probably thousands of entities, governmental and private, who would sorely (audio distortion) and unjust that they are not able themselves either commence new actions against the Sacklers or advance their actions the Sacklers, and I see no reason to give super-priority beyond all imagining preference to the dissenting states.

Number three is the mediation and allocation and

the forward progress in the case. Again, you know, I don't know more than anyone else, but it is very difficult to imagine that the progress they may have been making will not be potentially quite substantially derailed by the fact that, you know, that 24 consenting states will be turning their attention to state court litigation and discovery and jurisdictional discovery and motions to dismiss.

And, frankly, I think that many other creditors see the perceived extreme unfairness that some entities can proceed with their litigation, but the other hundreds or thousands cannot, will inevitably change the atmosphere for everybody, including my insured. The pleadings already tell us, and it makes perfect sense, perceptions of extreme unfairness. And I think also, frankly, have a very deleterious effect on the mediation itself, which is so important and is proceeding in terms of other issues in the case and the Court and many others believe is (indiscernible).

Number four, Your Honor, is from this fundamental risk to the bankruptcy case for a different reason, which is if you were to read their pleadings, you would think, you know, sort of like you're heading out to the store, you'll be back in a week. This really (audio distortion) discovery outside of this Court. But, of course, that's actually not the real world.

The 22 action that they would like to pursue here comprised (audio distortion) of pages of pleadings just to complete themselves. Your Honor, there have been 7,500 separate individual allegations in the Complaint at issue. In 14 of the actions, the defendants, Sackler defendants have not even filed a motion to dismiss yet at all; there's nothing (audio distortion). And in six of the others, for a total of 20 to 22, briefing is not complete.

So we're essentially talking about a multi-(audio distortion) to litigate motions to dismiss to conclusion. I'm thinking one of the two shareholder family brief, they bring statistics from the official courts in some way that it takes almost three years on average to go from sort of, I guess, briefing and initially through appeal on motions to dismiss in each state court systems. It's just even to talk about a one year or two year, let alone a three-year period, to proceed in parallel with the bankruptcy case, it's just simply untenable.

This case and this company, these assets, the cash list to the assets cannot possibly support a detour and the lack of full drive even, you know, a third or a quarter or maybe less would actually attain (audio distortion).

The last thing, Your Honor, I'll make, which is number five, is that the notion that this is really just litigation against the Sacklers is, of course, just not

correct. This is, make no mistake, litigation against the Debtors and (audio distortion) liability in virtually every possible way. So the notion that the Debtors could sit by and just sort of, you know, find out later what happened is obviously just completely not possible. Virtually every single one of the hundreds and hundreds of counts in these Complaints that the Sackler's never saw or caused or directed, et cetera, Purdue to do things, and this is data that some could various parties' pleadings.

So I'll end with that, except to note that this Court has already ruled on this very issue. It's already been argued and resolved. On Page 167 of the Court's transcript ruling on the preliminary injunction last fall at (audio distortion) the Courts specifically found that the Debtors could not possibly sit by and let motions to dismiss or related things against the family that, in essence, determine risks and the (audio distortion) to the company be determined without full participation.

So we don't think it's (audio distortion), but we understand obviously that if states are over you, they tend to do very well in motions to dismiss and that that would change the negotiating landscape and we get it. We all understand sort of what their aims are here and the view on the part of the parties that the shareholders are simply not changed enough and that things need to change if it's a

different deal. This is just, there's no world in which the Debtors could ever see that this is (audio distortion) way to do that.

The last point, Your Honor, I want to make is because (audio distortion) is on Pages 13 and 14 of their brief, they talk about third-party releases and the fact that they believe that they in (audio distortion) jurisdiction. Very oddly, of course, they cited off (audio distortion). What they don't cite is one actually governing law in this jurisdiction, which obviously the Court knows extremely well (indiscernible), I guess is (indiscernible). In Paragraph 26, they cite the U.S. -- United States amicus brief in (indiscernible), but don't point out either that that was this Court's ruling, that the Court was affirmed by Judge McMahon, (audio distortion) this injunction that Judge McMahon found that the majority of circuits have ruled in favor of (indiscernible), and that Judge McMahon was affirmed by the Second Circuit.

So, you know, the notion that they try to get at is sort of the planned structure that's being contemplated here is presumptively, quote, "unlawful" to use their words, closed quote, it'd have to be taken with a boulder of salt in the direction throughout the side be controlling the precedent to this Court, which among other things, arises out of this Court's rulings in several matters.

But, again, that's on for today. It just was kind of a strange detour. I did not want the Court to think in any way, shape, or form that the Debtors struck, you know, leaving the nanogram that may be about (audio distortion) third-party releases. The citation to, you know, (audio distortion) into the Defendants' states brief.

Your Honor, with respect to Tennessee, you know, I'll be very brief. I feel that while I certainly respect the positions they are taking, I think that it's literally identical to the positions that they took almost verbatim in last rounds, and there's just nothing new here for their flatly incorrect and unsupported allegations that no progress is being made or has been made in the cases.

They're aware they've got the knowledge to say that no creditor has changed their view on any topic or has made progress with the Debtors, beyond that it's shown not record evidence and, obviously, we have briefings largely completed on these very arguments before Judge McMahon. We imagine when we need them at the right time, our papers go into much more detail on Tennessee. And so, unless the Court has any questions and under the circumstances, I would propose to stop there.

THE COURT: Okay.

MR. HUEBNER: So in terms of, like, order of operations, Your Honor, I guess there are -- I'm assuming

that it would be the Court's preference that those are in favor of the relief will probably go next and then the two objectors go last and then we'll sort of see if anything needs to be addressed on a rebuttal. Does that seem like that's the way to proceed?

THE COURT: That's fine. Although if parties who are in favor of the relief just want to note that and save any of their powder for rebuttal, that's fine too.

MR. HUEBNER: Sure. So let me -- and there's no magic to any of this, but I'm going to get either of the shareholder representatives who want to be heard next.

MR. UZZI: Yes. Thank you, Marshall, and thank you, Your Honor. This is Gerard Uzzi of Milbank on behalf of the Raymond Sackler family. I do have on the phone with me my partner Alex Lees, as well as my co-counsel, Greg Joseph from the Joseph Hague firm.

Your Honor, we did file a statement in support, but more importantly, a reply submission by the non-consenting states. We don't have anything further to add with respect to that or to the comments made by Mr. Huebner. Obviously, if you have any questions for us, we're happy to answer those. However, we may ask to be heard with respect to rebuttal or any comments that are made that we feel should be responded to.

THE COURT: Okay. Well, I have a question both

for you and counsel for the other Sackler parties that responded and, frankly, also for the Debtors and maybe the committee. Obviously, the Judge sees only a small portion of the case when there are hearings. There is a statement in the non-consenting states pleading, and maybe a suggestion in Tennessee's pleading, that negotiations over a plan, and in particular the related parties' role in that plan, are at an impasse, which I take to mean they're over.

My sense of this case is that that would be a premature statement based upon my understanding that, although a tremendous amount of information has been shared, there is still more information to be provided and analyzed. And the issue of allocation as between the states and other parties may well have a major bearing on the related party Sackler aspect of the plan.

So I'm just going to ask you. Do you believe that those negotiations regarding the related parties, and that's the defined term in the injunction, are at an end?

MR. UZZI: No, Your Honor. You know, I think that to put it in the broader context, there's a lot of -- there's several constituencies in this case. And I can't speak for the non-consenting states, you know, whether -- what they believe they will ever do as the case progresses. We have been working with the parties, all of the parties, including the UCC, including the consenting states.

There's a tremendous amount of what I'll call diligence going on right now. A lot of it relates to BIACs, but there's also diligence that is quasi-discovery going on right now that relates to parties, at least the UCC's assessment, I think of the overall deal. I think that, you know, there are some gaining items. I think that allocation is a gaining item as it relates to any exit of these Chapter 11 cases.

I think you'll hear from the UCC, and I don't want to speak for them, but we allude to it in our papers as well that with respect to the information sharing, neither party are behaving in good faith, but we do have some differences. We're hoping to resolve those behind the scenes, as is typical in these cases. But as is typical in any case I've ever been in, I think we expect to have some issues we'll have to bring before you.

So I think it's premature, we'll say. But to say that the case is at an impasse, I don't know whether the consenting states, frankly, I can't speak for how they feel, but we don't feel that way, Your Honor.

THE COURT: Okay, thank you.

MR. HUEBNER: Your Honor, we asked the Debtors for their view as well. And I want to be careful here because obviously we are, you know, on the one hand, the owners of a fraudulent transfer and the breach of fiduciary claims

automatically as a matter of law as of the filing date. I've never had, you know, and as I think the Court well knows by now, we view ourselves in many ways as facilitator and so, you know, deal advancer. And obviously, I'm not going to speak for the consenting states or the Sacklers to their views opposite another (audio distortion) value.

But I would say this, I was very surprised at a minimum to see the phrase we are at an impasse. You know, there is obviously an order of operations here that I believe that many people share. And I think that, you know, many of us were of the view and had only agreed on the (audio distortion), which involved extended conversations about who is participating and who is not yet participating, who is admission to a party and who is not.

I think that the overall kind of that then shown was the approach was that we would be doing (indiscernible) allocation first if at all possible. We're also working on several governmental issues which are being worked on day and night, although they're not mediated issues per say, and that if and when the kind of governmental and creditor world has figured out how to resolve things or share things or (indiscernible) approach things among themselves, and in the interim is concerned and diligence, including by the Debtors.

I don't want the shareholders to just not forget

the special committee is getting part of the work, in itself has a fair number of information requests out that are in the process of being satisfied that that would be the appropriate juncture to turn to, you know, potentially an additional round or multiple rounds because, you know, negotiations or deal structurings of the shareholder deal.

We understood so well that, you know, right now, there is not a critical mass of creditor support to get this deal in its exact incarnation over the line, but a bunch of things have to happen, frankly, for months I think before we at least are really to say we are at an impasse and a radical change of circumstance to see how we might not achieve a deal.

MS. MONAGHAN: Your Honor, this is Maura Monaghan from Debevoise & Plimpton. I'm Mr. Uzzi's counterpart for the other side of the shareholders clerk, and I just would echo what Mr. Uzzi and Mr. Huebner had said that we believe that any statement that the discussions are at an impasse (audio distortion). And, otherwise, we stand by our papers and are prepared to answer any questions.

THE COURT: Okay, thank you.

MR. PREIS: Your Honor, this is Arik Preis from Akin Gump Strauss Hauer & Feld on behalf of the committee. Can we go now as we're next in order?

THE COURT: Sure.

MR. PREIS: Okay. Let me just first answer the question you just asked about the factors and about the negotiations being at an impasse. Without getting into (indiscernible) these protective discussions, the only thing I will say is I have no idea why the consenting states would say that negotiations are at an impasse. We'll just leave it at that.

THE COURT: Okay.

MR. PREIS: Your Honor, with respect to the injunction, we actually made two rather short submissions with respect to the Debtors motion. The first was a statement in support, which we prepared prior to the consenting states filing on Thursday night, and we filed that on Friday and noted in our submission, we'd addressed the consenting states submission separately. We then filed a short statement on Monday in response to the consenting states submission.

THE COURT: Right. I've read both of them.

MR. PREIS: Okay, great. I'm going to very briefly speak about our submission in response to the consenting states, and we think it's important for you to hear from the creditor fiduciary. Many of the things that Mr. Huebner said, I'll try not to repeat and my promise to be pretty brief. We then are, you know, going to have my partner, Mr. Hurley, address that submission on Friday,

especially now that Mr. Uzzi just foreshadowed for you something about what we will say about discovery.

That's basically the explanation as to the fact that, and though our initial case stipulation still remains in effect, there are certain parts of it that are no longer going to be in effect during the injunction period, extend the injunction period if you grant it. And Mr. Hurley will address for you the things that Mr. Uzzi just foreshadowed with regard to discovery so that you can understand how we see that period going.

With respect to consenting submission, Your Honor, the UCC does not support the relief requested, because basically it would create a number of outcomes that do not benefit the unsecured creditor body as a whole. There are four reasons for that, and some of these again are things that Mr. Huebner said that I just want to elaborate on a few of them.

First, if the non-consenting states request is granted, they would obtain a significant head start in the race to judgment against the Sacklers and gain an unfair advantage in the event the Debtors are unable to confirm a plan that has third-party releases for the Sacklers. In other words, all the thousands of claimant would be initially stayed would be significantly disadvantaged because they'd have to sit and wait.

Moreover, by something we said six months ago, that the Sacklers can conclude that their motions to dismiss were likely to be denied, in which case, they might settle if one or more of the non-consenting states knew to avoid an adverse ruling; thereby, potentially redistributing value away from all unsecured creditors into only the non-consenting states.

Absent these (indiscernible) by the non-consenting states and every other litigant with claims against the Sacklers would be (indiscernible). Any recovery of claims in those actions would be contributed back into the Debtors' estate to be allocated in accordance with the plan, the non-consenting states request resulting in a material (audio distortion) fair to all other creditors.

Second, as Mr. Huebner mentioned, there's still a lot of work they've required in this case to determine whether parties support the settlement framework or they don't; and if they don't, the (indiscernible) in support. Mr. Hurley's going to address, their approaches to the motion process potentially on discovery.

If the non-consenting requesting states is granted, the Sackler focus will shift to responding from responding to the committee's discovery to engaging in litigation and discussions of the non-consenting states, which is even more unpalatable given that we're now engaged

in allocation mediation.

If the non-consenting states approach were adopted, the Debtors in non-consenting states would have to devote significant time and resources in assisting defending state litigation instead of allocation medication, again, which would have the potential to harm all outcomes.

Third, as Mr. Huebner mentioned, and I just want to put a final point on this, we're involved in allocation medication. The non-consent states, like everyone even talking about mediation has supreme confidence in the merits of their claim. But if only they're allowed to seek favorable rule and no one else, then only they will be able to use that in the allocation mediation. And as you can imagine, one tool the mediators may use when accepting claims is going to be the likelihood of success in litigation. If they had that tool and no one else did, then all us creditors in mediation would be (audio distortion).

Finally, one thing that the non-consenting states (indiscernible) to justify their relief, and I don't know that Mr. Huebner hit on this point, is that the non-consenting states believe that if they can continue with their litigation, they will bring into the public domain information regarding the strength of their claims, but up until now, it's been kept confidential.

If the decision's up to date in those motions to

dismiss has not resulted in substantial additional public disclosure, and we think this public disclosure is what they would like. And, frankly, we are -- at some point in this case, we've all talked about the fact that there will be public disclosure. They should work with the official committee in uncovering more evidence against Purdue and the Sacklers in procedure and practically for everyone, all creditors who are participating.

And with that, Your Honor, I'd like to let Mr. Hurley address why we support the injunction. But more specifically, why certain parts of our stipulation are no longer continuing with regard to discovery, again, what Mr. Uzzi had foreshadowed that we would discuss with regard to how discovery is going to go forward.

THE COURT: Okay.

MR. HURLEY: Thank you, Your Honor. Good morning, it's Mitch Hurley with Akin Gump on behalf of the official committee. Your Honor, the official committee does support extension of the injunction by 180 days for all the reasons identified in our March 13th submission. I won't repeat them all. As Mr. Preis emphasized, again, one of the key reasons was that we believe that outside litigation would district the Debtors and the Sacklers from what we think they should be focused on in these cases. That includes but isn't limited to making comprehensive disclosures of

documents and information relating to their liability in the states claims against the Sacklers and other third parties.

The official committee has been focused on getting disclosures from the Sacklers and others for months. I mean, in our papers and Mr. Preis noted again, we're approaching a point where we think court intervention will likely be required, at least with respect to the Sacklers side. Procedurally, we're at a bit of an eventual situation. Under the case stipulation among the official committee, the Debtors and the Sacklers, the official committee was not permitted to serve compulsory discovery until January 19th.

The situation did contemplate a voluntary process and we'd all work together to try and obtain voluntary disclosures for a period. So, for instance, the official committee served informal voluntary requests on the Debtors in October, on the Debtors and the Sacklers on November 25th and January 2nd, and a handful of follow-up requests in February and March.

The Sacklers have actually taken the position that documents in the immediate possession of certain Sackler affiliates and advisors are not in their possession, custody or control. So we, the official committee also provided those same requests to Norton Rose, who the Sacklers identified as counsel for IATs, and to counsel for some

other family advisors while reserving the official committee's right to argue that the Sacklers themselves are obligated to gather and produce documents in the immediate possession of their advisors and affiliates.

We have met and conferred on multiple occasions with Debevoise for what's been referred to in the case as a side aid to the Sackler family on the Mortimer side; Milbank for the side B or Richard's side, and with Norton Rose on behalf of the IATs. Some, but not all, of the meet and confer sessions have included representatives of the consenting states and of the Debtors. The official committee has also met and conferred with the Debtors on multiple occasions regarding our requests to the Debtors.

The process continues and we hope to narrow many of the parties' disputes; that is clear there will be disputes. And when ready, we as official committee want to be able to que those disputes up for resolution as efficiently as possibly, while, of course, preserving the official committee's ability to serve additional requests if necessary or appropriate.

As of yesterday, we've begun discussing options for how best to proceed with Milbank and the lawyers and the Debtors. And to their credit, everyone we've spoken with so far has been open to the idea of a streamlined approached. And considering that the parties' formal discovery has been

served, have gone very far down the meet and confer wave already, there are a few issues that we can find where producing parties have not yet had an opportunity to serve formal objections and responses; that's, of course, the requests have been to date have been involved and informal and for the same reason the committee does not yet have a formal discovery device on which to base a motion to compel.

Frankly, everyone preliminarily agrees -- and this, of course, is subject to caveat that people haven't' had a chance yet to completely work through this or maybe at all with their clients yet. But I think some of in the initial calls with counsel, people were generally in agreement that we should address these issues before embarking on motion practice to try to do it in a way that is expedited given the work that's already been done so we're not going back to square one.

We talked yesterday about pockets where the official committee could effectively only serve its outstanding voluntary requests, actually including a few additional requests, with the (indiscernible) party serving objections in response on an accelerated basis, which would give the parties for some additional meet and confer work and then be able to proceed promptly getting us to motion practice.

So ordinarily, of course, to get authorization to

serve formal requests, we've moved via 2004. From the committee's perspective, part of what we want to do if possible is to avoid having a 2004 hearing on the issuance of the discovery itself. Given where we are in the process, it seems like that would be a wasteful delay, instead of admit that (indiscernible) request had been in the possession of the responding parties for months.

We have considered a few ways for proceeding that we think would be more efficient and have talked, again a very preliminary basis, with counsel for the other parties about them. If first, of course, if the official committee were permitted to serve 2004 ex parte, that's one way for the parties to potentially move swiftly to objections and responses on an accelerated basis and motion practice if necessary.

Alternatively, we spoke very preliminarily with Milbank yesterday about the possibility of some kind of stipulation permitting formal service of requests and objections and responses. And in that conversation and result of some preliminary talk about potentially streamlining the motion practice itself maybe by going via Debtor breach, for instance, rather than formal motion by notice of the motions to compel. And the committee would be open to considering those kind of ideas and really any practical way of making the process more streamlined and

efficient.

A couple of final points. The official committee is, of course, as Mr. Huebner just referenced, not the only party-in-interest that has asked for disclosures from the Sacklers. The Debtors have separately asked the Sacklers to produce some documents. The Debtors also participated alongside the official committee in meet and confers with the Sacklers and have interest in obtaining many of the same documents from the Sacklers as the official committee. The ad hoc group of consenting states likewise has asked that the Sacklers provide copies to them of anything that it's produced to the official committee and has participated in some of the meet and confers.

Our hope would be that whatever procedure we land on would permit the Debtors and the consenting states to move side by side, if they so desire, with the official committee in seeking to resolve this kind of first round of discovery disputes.

I want to note also that the official committee does have a voluntary request out to the Debtors, and to the extent weren't able to resolve those disputes, we would hope we could bring them to the Court's attention by a similarly streamlined process. But we suspect that if we are unable to resolve disputes with the Debtors, it would probably be on a little more extended timeline before we bring disputes

to the Court's attention. I think we're probably a little bit closer with the Debtors to get into (indiscernible).

So finally, I just want to be that this is not the end of the official committee document discovery efforts, of course. It's highly likely that when the official committee starts to get more of the documents that they asked for, some follow-up discovery requests will be required, and then we have a sufficient discovery record. And that'll give the official committee to seek depositions with important witnesses.

What we're talking about now, formalizing and resolving disputes concerning the outstanding voluntary discovery and will not be the end of our efforts. It's a really important part of the process. And we had been very gratified by the response of counsel for the other parties to date and the interest they have shown and arriving at a practical efficient approach to getting through this kind of first stage.

And, of course, to the extent the Court has any comments or guidance it wishes to share on process in particular, we'd be very happy to hear. So that is my update, and with that, I will move before Your Honor. Thank you.

THE COURT: Okay.

MR. ECKSTEIN: Your Honor, this is Kenneth

Eckstein. Would it be appropriate for me to be heard briefly at this point?

THE COURT: Well, I'm going to hold you off for a second, Mr. Eckstein, because I want to just address the discovery point that was raised because I have a couple of questions and then perhaps a couple of thoughts on it.

Obviously, if either the Debtors or the Sacklers' representatives disagree with the posture that has been described to me of where we are in the process by committee counsel, you should let me know. But at least from reading the pleadings, it does appear to me to be the case that there has been extensive voluntary production consistent with the parties' agreements, but that there are some disputes that may not be resolvable simply between the parties as to what more should be produced in that phase of document production, including from third parties.

So all parties have talked about, somewhat generically, the need for Court intervention. My thought on that request is really twofold. First, it may be simplest if the parties have actually identified, or will in the coming day identify, the specific issues that they can't agree on to raise them with me in a discovery conference even before there is any formal discovery vehicle, because I can give you my preliminary view, which would in all likelihood be the final view too if someone forced a ruling

as to where I would come out on those issues. And I think that would save considerable time and money if you actually identify the areas where you're at some disagreement and haven't been able to resolve them in your meet and confer process.

Secondly, my practice and the practice of my colleagues is to enter Rule 2004 orders ex parte if, on the face of it, they lay out cause. We generally will then be fairly liberal with requests to quash. But, again, if someone thinks that you need a formal vehicle, in part because you're just not sure what you want and you want to force someone to actually produce everything beyond what's already been produced that's responsive, I would suggest you go down that route and then promptly arrange for a conference if there is a disagreement about how to respond to the Rule 2004 order.

My general practice with discovery disputes is to have the parties, as you've done here, meet and confer and use their best efforts to resolve it. And if you can't, email chambers brief letters explaining your positions and requesting a conference, which I will hold and go over the issues. It's rare that those conferences are even on the record.

So I would encourage you to streamline this even more than you have been discussing. To the extent that you

already know what the disputes are going to be, just raise it with me even before you file any documents by email to chambers, you know, letters -- obviously copying the other side -- or jointly, and we'll have a conference on it. And if you believe that you need to illicit a formal response, you can do that through a Rule 2004 ex parte motion and order.

Although, again, I would urge you to, as you say you're doing, so I'm not -- think I'm surprising you here, look only for stuff that has not yet been produced and identified promptly any issues that you may have and we'll have a conference in the context of that formal vehicle. And if the conference doesn't work, I'll have a ruling on the record with a hearing.

MR. HUEBNER: So, Your Honor, we would also share the Debtors' views on Mr. Hurley's remarks. I mean, to be fair, they were quite extensive and (audio distortion) their entirety of it. In general terms, I would say strongly agree with the core principles, which are, you know, a year (indiscernible) those arguments, which is all about efficiency and cost reduction and moving sort of structurally and well and (audio distortion) would sort of want the protective motion. It's all about collective action and sort of the (indiscernible) of settlement. And hearing that, you know, frankly, the parties are directed to

crystallize their disputes and then when a person thinks just call, that the court would not recall, but I do recall, you know, my encouraging words at the first day hearing were, "For god's sake, please don't just file papers; just call us, we're waiting by the phone 24 hours a day." And we can probably narrow issues dramatically, if not resolve them, if people would just call us and tell us whatever needs to be discussed, so that's the thoughts we always bring.

And as Your Honor also heard, the Debtors and the committee are actually, you know, have been sharing a lot of stuff and are much farther along, and I think the probability is certainly not zero by any stretch and I don't want to suggest that. I don't think we need the Court's intervention between the Debtors provisional information and if they just shared published, I think right now appears much lower and (audio distortion) situated and that's okay.

So I don't want to say more on that. I don't want to go by point by point. But the overall view of more information is going to be needed. We need a highly efficient process, additional talking to chambers a lot first and then talk to the Court if (indiscernible) of pleadings begin (audio distortion), which the Debtors very strongly agree.

THE COURT: Okay.

MR. UZZI: Your Honor, it's Gerard Uzzi of Milbank again on behalf of the Raymond Sackler family. I'm not going to split hairs on nuances, even if I could with anything that Mr. Hurley said, I think we agree. I think what we're guided by here is an effort to be efficient and an effort to advance these cases, and it's in that spirit that we've had conversations that are not surprisingly consistent with the suggestions that the Court just made.

I think we would like the opportunity, you know, to crystallize a little bit better where the disputes are. And it's always my experience when you make that effort, the disputes become narrower, and then have the opportunity to bring, you know, crisp disputes in front of you if we need to. And I think we likely will, but I'm also optimistic if we do, it will be -- well, hopefully narrow. But that's a long way of saying I don't have an issue with anything Mr. Hurley said.

THE COURT: Okay.

MS. BALL: Your Honor, this is Jasmine Ball from Debevoise & Plimpton for the other side of the family. We'll just concur with what Mr. Uzzi said, that we don't have an issue with the idea of trying to crystallize our disputes and doing it efficiently.

THE COURT: Okay, very well. I'm not by the phone 24 hours a day, but I am by it enough where I actually read

my emails so that if, after you've finished the meat and confer process and you still have concrete discovery issues, I would urge you to send me a letter or letters by email and we'll set up a call to discuss them, preferably before any motion papers have been filed; although, again, I understand that a party may want to have some sort of final mechanism to ensure that everything that's been produced is responsive and that nothing's been held back, but maybe your stipulations can deal with that as well as a court order.

So as far as the discovery resolution process, I think we're all in the -- discovery dispute resolution process, I think we're all on the same page, which is the parties meet and confer, try to resolve all the issues. To the extent they can't, be in a position to describe them to the Court before filing any sort of discovery request, and we'll see if we can resolve them on a call there after.

So, Mr. Eckstein, I cut you off, but you were going to speak next.

MR. ECKSTEIN: Your Honor, thank you very much. I didn't mean to interrupt the flow of the discussion on this discovery.

THE COURT: That's fine.

MR. ECKSTEIN: I'll be happy to speak now. This is Kenneth Eckstein from Kramer Levin on behalf of the ad hoc committee. Your Honor, I trust that you saw that we've

filed a brief pleading, and I'd like to just make a few remarks to elaborate on the thinking of the ad hoc committee on this motion.

THE COURT: Right.

MR. ECKSTEIN: I appreciate that, Your Honor. This is an important motion, Your Honor, and I want to impress upon the Court that the decision by the ad hoc committee not to object to the relief was not a simple decision. And as we said in our pleading, we sympathize and share many of the views that have been expressed both by the official committee and by the ad hoc committee of non-consenting states.

And in particular, we believe that there needs to be significantly more progress made in the near term in connection with a resolution of the agreement reached with the members of the Sackler family, with the implementation of a restructure and support agreement, and with -- New York needed to file a plan and disclosure statement in the near term.

That said, we concluded that we would not object to this relief. And one of the things that influenced us greatly in this case is the fact that the parties in this case have all effectively agreed upon and implemented a mediation process that we believe is an extremely constructive step toward resolution in this case. And

without getting into any of the substance of the mediation, I'm encouraged by the fact that the mediation is up and running quite actively and we believe the most useful step that all of the parties in this case can take in the near term to make real progress.

That said, we are quite focused on the fact that more work does need to be done in connection with the resolution of the settlement with the Sacklers. And toward that end, we've agreed with the Debtors that we would extend out the deadline in our term sheet for the filing of a restructure and support agreement to early July.

And we're mindful, Your Honor, of the fact that their deadline right now to file a plan is late July, and we believe that both of those deadlines are important. And we trust that the outcome of this motion today is not going to in any way undermine, we think, the important deadlines that remain in this case and that are going to be respected.

So on balance, Your Honor, with those admonitions, we've determined not to object to the relief. We are very, very mindful, however, of the concerns raised by the non-consenting states regarding the vital public interest that is at stake in this case, and we encourage all the parties to really double down on trying to move this case toward a point where there is broad and substantive consensus in the next several weeks and months.

Thank you, Your Honor.

THE COURT: Okay. All right. I think that was everyone who filed pleadings, with the exception of the 24 so-called non-consenting states and the State of Tennessee. So unless someone else wants to speak, I'll hear from them now.

MR. TROOP: Thank you, Your Honor. This is Andrew Troop from Pillsbury on behalf of the non-consent state court. Your Honor, I apologize in advance if you hear construction in the background.

THE COURT: No, I don't hear any noises, so you're coming through clearly.

MR. TROOP: Okay. Okay, but you might because they just turned on the power saw.

THE COURT: Okay.

MR. TROOP: Which we need to get done to shelter in place or socially distant apart for a while. Your Honor, I get it, right, apparent to you that our request was not intended to be more than a small step to advance for these prior actions was limited and there were interruption to be tried for running process, leaving you with control over the extent or amount of discovery and how intrusive it might be, and to not harmed the Debtors in any way.

But it does emanate from -- and I'm not going to repeat our last visit on these issues, significantly, you

know, or much at all. But it does reflect it back that states believe federal actions are different than your regular creditor claims, and the idea that practically states would get any real advantage in terms of timing and have actions proceed through the motion to dismiss stage. It was to be private litigants that the Sacklers could settle with us separately practically makes no sense, Your Honor.

And ultimately, given the limited relief debt or carveout that debt that non-consenting states asked for it in respect -- in exchange or the voluntary commitment stand down for the entire period, vis-à-vis the Debtors and all related parties other than the nine Sacklers is appropriate. To take two things here that out of order from the outline, Your Honor, just because it came up.

This group represents this group, and the idea that we should ask for relief for everyone is inappropriate. But, of course, if others wanted that relief, they could jump on and be heard as well. In that regard, in fact, Your Honor, we made a proposal to share 20 slots, so to speak, with other governmental agencies or entities, and they declined the offer.

This is really designed to address the second point I'm going to make now, which is the entire discussion about impasse. Your Honor, I went back and read a pleading

while you were discussing the question of impasse. And apparently it wasn't clear enough, but we thought we tried to make it very clear that the impasse was there (audio distortion) is completely diametric view about the legal liability of the state claims against the Sacklers, and that in argue a resolution of that issue won't advance the Chapter 11 process.

There seems to be some sense by parties here -- and forgive me for getting a little colloquial, but that the non-consenting state groups and the Sacklers can't walk and chew gum at the same time. It is not only possible, but it's routine that a litigation proceeds that parties participate constructively in settlement and on mediation processes, and we can do that as well. These are not mutually exclusive, and as I said, they often advance successful consensual resolution.

Your Honor, we do think, and we propose this alternative, this potential, this plausible way to deal with the restriction of truly important state law, state rights to enhance the bankruptcy process and not make it interminable.

Your Honor, there's a lot of hinting about this in both the Debtors' pleadings and Mr. Uzzi's statements today, but our group has been extremely constructively engaged and committed to the Chapter 11 process. Let me give you a few

examples, some of which we talked about a little bit, but I'm (audio distortion) we're fully engaged, exchanging draft, negotiating the hard points being referenced in the Debtors' pleading, but with the goal to quickly come to consensual resolution.

On discovery, the UCC noted that we've been involved with meet and confer. We horned our way into that process, Your Honor, because we don't want to duplicate efforts. We want to coordinate, we want to ensure an efficient process, and I think if asked the committee would acknowledge that hard discussions with them have been helpful. And they crafted their own thinking about discovery and narrowing the issues.

With the Debtors, Your Honor, we met last week with the Debtors' special committee lawyers for basically the same purpose. Please advise us, keep us up to date, tell us where you are in your analysis of the Debtors' claims against the Sacklers; all critical information for us to be able to move decisions, but not exclusive.

And on mediation, Your Honor, as Mr. Huebner noted, that was fully consensual. We were part of that 12 consensus, and we've been fully engaged. So far, we've actually participated in two sessions with the mediators -- I'm not going to give anything mediation confidential away -- and they're working hand in glove with the ad hoc

committee in connection with the mediation process to advance it, to define it, to be able to forge consensus among us. And, hopefully, with luck and hard work, consensus among all parties and on many of the types of issues in this case and not just allocation.

But, Your Honor, these are police power actions, and you know we don't agree with your prior ruling that wouldn't have applied to you to the other actions. You know, these actions are more than just, you know, regular police power seat, there are lawsuits, you know, they're high powered lawsuits, all right. You know, people have died from this crisis and now (indiscernible) one family alleged to be the root cause of much of this.

What we've tried to present is an opportunity for the Court not to fully enjoin these actions where there's a plausible alternative, one that allows police power to be exercised and one that respects to a significant extent the coordinated and collective that we're all trying to achieve through the Chapter 11.

THE COURT: Okay. I want to go back to --

MR. TROOP: Your Honor?

THE COURT: I'm not sure I fully heard you on your point about what this group met by impasse. I think -- and pardon me, it's because I may not have heard you clearly, is this group was concerned about the Sacklers' position that

they have no legal liability. Did I hear that right?

MR. TROOP: That's correct, Your Honor. And we are quite clear to say that our proposal is intended to break this log jam, this log jam over liabilities issue. It's not to say that there aren't discussions going forward with the Debtors on a plan of reorganization, on allocation, on things that are going on in the case, but it is to say that there's a fundamental difference here that is rooted in state police power.

THE COURT: But can I just --

MR. TROOP: And, Your Honor, that sort of goes to the (audio distortion).

THE COURT: I want to just focus -- I'm sorry, Mr. Troop, I just want to just focus on the impasse point. Because the argument -- and I appreciate here that the argument or the issue here is cast as a narrow one, which is that everything can be enjoined except for proceeding to motion to dismiss in 24 lawsuits. And you've clarified that you actually offered to let other states that are not in your group have that type of relief within the rubric of 24 lawsuits.

But I want to make sure I understand the benefit from that. I would understand if there was a true impasse, but it seems to me that at this stage in the case where information is still being exchanged and analyzed, that,

frankly, if I were on one side of this, I would say in my settlement negotiations I don't have liability, just as your clients will say you absolutely do have liability. Because there's no reason yet because of all of the other moving parts, i.e., the fraudulent transfer, breach of fiduciary duty, valuation and allocation analyses to get out ahead of one's self.

Point two is there already have been motions to dismiss decided. Your pleading cites two where your clients have wone and none where, as against your clients, the Sacklers have won, although I understand from other pleadings that at least in one other state, the Sacklers have won. But in any event, just on motions to dismiss, they're batting only 333, which gets you in the hall of fame in baseball, but not necessarily in settlement discussions if you're just focusing on motions to dismiss.

So I just don't see why, other than perhaps optics, permitting or having a process where there would be 24 motions to dismiss to go on really achieves anything as far as the ultimate result, which is negotiating a resolution and breaking an impasse, which, frankly, I don't think exists now, but I don't see how these would break an impasse in the future. Although I suppose if the Sacklers won many of them, it might; but on the other hand, losing a motion to dismiss, as we all know, is just a start.

MR. TROOP: Your Honor, first off, I agree with you. I think that this could maybe be taken with and pursuing this path. But it does reflect that the core stake value is at the heart of policing regulatory powers, right, and that is if something should be regulated, if people's conduct should be regulated, if people should be found to have broken the law and that's what should happen.

And if courts find that's not what happened, it's not appropriate, there wasn't a violation, states take that risk and that happens to, that's the core state value here. What is being imposed on that value is the bankruptcy preference and in the 547 sense, right, the bankruptcy policy, if you use that word instead, to encourage consensual resolutions and the State has said clearly that these would be the Debtors. We will see three within this process, but the line that we have to draw here is with respect to the (indiscernible) with respect to the third parties where there is an extremely important stake value at play and in light of my -- I hear you and others about Motions to Dismiss and I don't completely agree, Your Honor. As I said, we're taking some risk, there are purely legal questions at play here, preemption, (indiscernible) director and if that (indiscernible) issue gets broken either way, it could have some impact on how the case may proceed and Your Honor, I (indiscernible) analysis success will

(indiscernible), but I also don't think that doesn't mean you don't learn a lot from a ruling on 12(b)(6) Motion and I may get accused of testifying here, but it's my personal experience.

Just last week, we had a $200-300 million complaint dismissed, admittedly with leave to reprieve, but dismissed where a key allegation was that our client engaged in a bribe and the Court found that the well pled facts in the Complaint failed to articulate a bribe. That's a very important ruling.

THE COURT: Well, I agree but --

MR. TROOP: (indiscernible)

THE COURT: But there's a big distinction between winning a Motion to Dismiss and losing one. Clearly, if you lose one and the Court hasn't given you a road map on how to amend your Complaint, it's the end of the game. But if you win and it's fact based, then obviously it's not based on the end of the game because the facts are taken as true, as properly pleaded in the Complaint. So, I don't know. I mean, there already are two Motions to Dismiss that have survived. There are two litigations that have survived the Motion to Dismiss. I'm not sure what another 22 will add to that, although of course, it's a step and it's a step that the Defendants would have to take seriously. But I guess I'm still struggling to see, particularly since this is

civil litigation and people are still focused on the payment of money, how this is somehow central to the police power or overrides the adverse effect on the bankruptcy case.

MR. TROOP: Your Honor, the fact that money might be at issue in many of these cases, is no different than the false claim act. The police power acts because the underlying conduct that's being challenged and found to comply or not with legal requirements provides a road map not only to the Debtor but to others and the Code -- I understand you used your bona fide power, but 352(b) recognizes that distinction by allowing those kinds of claims to go forward and to cause the monetary amounts to end up back in the case. But we all know that, Your Honor. The issue here is, whether -- it's two-fold, Your Honor, and again, we tried to craft this in a way that both highlights the independent police power purpose in proceeding (indiscernible), in proceeding with these actions and to do it in a way which we think will not harm the course of the case. The main facts have benefits for it, and we'd ask you to consider that carefully.

As I started off, I do hope you appreciate (indiscernible) thoughtful and focused and to advance and Your Honor, regardless of the result here today, if the voluntary approach doesn't work, as we said in our papers, we stand on our prior objections and substantively and

legally, there was no additional evidence presented here today and we will make our decisions accordingly. But no-one needs to think that we're not showing (indiscernible) fully engaged and fully devoted to see if there's a way to reach a resolution in this case. But, even in that context, Your Honor, the limiting states in the prosecution of the police power actions is extreme acts and this practical, plausible, limited alternative is a fair one under all the circumstances.

Finally, Your Honor, just to make the numbers clear, 24 states, plus the District of Columbia, others 25, 24 asserted claims against (indiscernible) -- I'm sorry, 22 asserted claims against (indiscernible) could have been decided so that only 20, not 24 that might proceed.

THE COURT: Okay. Thank you.

MR. HUEBNER: Your Honor, if I might suggest, before we turn to Tennessee because I think that is adequately separate. I think it has 180 seconds (indiscernible), by the way, that's probably all I need or all I would burden the parties with me asking for. If that meets the Court's desires.

THE COURT: Okay.

MR. HUEBNER: So, Your Honor, we get it, right? And we understand and we understand that, at some point, the current tools that we're all (indiscernible) may not be

sufficient to get us to a deal and other things may be needed. And we fully respect that the objectors here are sovereigns and sovereigns are different and we respect that. But, at the end of the day, I think nothing you have heard even touches the many points that we and the Creditors' Committee and, to somewhat of a lesser extent, the consenting states, have made, so let me just say nine things very quickly.

One, it will not advance the case. It will be a massive setback by taking us out of a collective action, hopefully pressurized situation, which is exactly (indiscernible) which Your Honor ruled in October and you talked, at great length, about the collective action (indiscernible) of the federal system, including the quality of treatment and the quality of position. Including among governments because they're not the only governments in this case.

Two, it will take years, which they had nothing to say to. It's three years according to the statistics that were provided to take Motion to Dismiss and in 14 of the 20 cases, there haven't even been motions filed yet.

Three, it will likely destroy the mediation. I have no doubt, zero doubt, that this mistreatment of clients will absolutely show up tomorrow morning for the mediation with all the same purpose they would have had otherwise.

But that wasn't our point. The point is there are many parties and the parties see asymmetry and feel unfairness and feel that others are getting a leg up or trying multiple routes while they're constrained to one route. It just changes things fundamentally.

Four, we already discussed it. I just don't see that we're at an impasse. There hasn't even -- and we're not going to get into substance, but there hasn't even been bids and asks and bids and asks. We're just doing other things right now in terms of setting the table to create a climate for what is probably the final stage issue in this case.

Five, there's no distinction at all about how this will break the (indiscernible) as the Court has made clear. Some may win, some may lose. Everyone's got to appeal, everyone has passionate views. I doubt there's too many parties who would say, "I hereby pledge that I will be down forever by the Motion to Dismiss outcome and I will not appeal the initial Court's plans by plans without merit."

Six, the police power issue was addressed, at great length, back in October, and I actually don't even think was pre-briefed right now, but obviously the Bankruptcy Code has very well-trodden law, only where appropriate and in special circumstances for having the federal system and the unitary equality of treatment

approach override even police powers. And here, as Your Honor noted, only money at this point is at issue.

Eight, any Motion to Dismiss will fully and completely involve the Debtors, which they also utterly failed to address at all. The nature of every single claim is that the Sacklers controlled, directed, forced, caused, appeared Purdue. No-one is saying that the Sacklers themselves took suitcases of Oxycontin and went and sold it themselves. And so, this is litigation against the Debtors, and it will divert the estate itself massively (indiscernible) or not the actual moving parties on the Motions.

And the last point is the unfairness. This hearing is the first I've ever heard that "20 slots were offered to others". Again, I don't begrudge. People are welcome not to tell us stuff and drop it in the hearing if they choose to, but the unfairness, even if they said, (indiscernible) we'll only take 4 slots, we'll give away 20. That 20 individual creditors chosen by someone out of the potential thousands who already -- hundreds -- I think it's upwards of 600, who have sued the shareholders and thousands who, I'm sure, would love to, get to progress to litigation. Even if it's not the intent of the Defendant states to essentially jump all the way to trial when everyone else can't even file complaints yet, it is an outcome of being

allowed to progress your litigation while others are frozen solid by a federal court injunction.

So, I understand the motivating egos, which is, at this point, we're relatively far away from seeing a pathway to getting to a deal. There are a lot of very, involved, passionate, caring people trying to advance this thing towards appeal and the Debtors respectfully have heard nothing that changes their view that the limited objection to this critical motion will do that and everything that we have heard leads us to believe that will be extraordinarily damaging to further progress.

THE COURT: Okay.

MR. TROOP: Your Honor (indiscernible) for honestly 60 seconds. On the injunction issue, those private creditors are enjoined by virtue -- automatically by virtue of the Automatic Stay.

THE COURT: I'm sorry. That just didn't come through on the phone, Mr. Troop. You'll have to say it again.

MR. TROOP: My apologies, Your Honor. The notion that there are thousands of private creditors that will be disadvantaged. They are disadvantaged because of the way -- because they are automatically stayed. The balance here, Your Honor, is between -- is about whether states should be stayed where the Code doesn't otherwise do that. And that's

the balance (indiscernible). And to be perfectly clear, the offer was made to the other governmental agencies through the ad hoc committee of states and municipalities. So there -- I guess just so there's no confusion in the Court's mind.

MR. HUEBNER: Your Honor, unfortunately there is confusion. This is about third parties, not the Debtors and the other parties are not stayed by the Automatic Stay. That is flatly incorrect. They are stayed only by this Court's injunction. We're talking about their request to continue against the shareholders, not against the Debtors, which they have agreed not to do and that is an issue related to the injunction, not the Automatic Stay. So, it's not the Code that stops these actions against the shareholders, it's this Court's injunction.

MR. TROOP: That's a really interesting point Mr. Huebner and you're right. I should have made the appropriate distinction. Your Honor, when I first practicing law, there was a judge, he has passed away since, (indiscernible) and he issued a decision, admittedly many years ago in 1984, but it involved a case where the Debtors were seeking to protect their officers and directors from lawsuits -- a lawsuit being pursued by the federal government with response -- in connection with (indiscernible) for trust fund taxes. And Judge (indiscernible) struggled with the competing federal policy

between Chapter 11, the organization and police power actions against non-Debtors. And he resolved that by saying, is there an alternative that can accommodate policies and the answer to that is yes, that is if the Sacklers could seek bankruptcy relief. They could seek protection of the Bankruptcy Code and they could then be required to engage in the open communal effort by statute and by code.

And so, again, Your Honor, I apologize for my overstating before, but the point here is actually further underscored that it is not simply if for these power actions. It's the Debtor that's been enjoined, but against the power third parties who haven't sought bankruptcy protection. And in that case, Your Honor, in case you ever want to look at it, is entitled -- it's found at 40(b)R531 and it's called (indiscernible). And Judge (indiscernible) a short, but simple balancing test here as to how do you accommodate the competing policies and his answer is a very rational one.

THE COURT: Okay.

MR. TROOP: Thank you, Your Honor.

THE COURT: All right. We don't need to go further on this. I've already cited the rationale for 105 injunction here in my prior ruling and the authorities that supported it, including the statute's legislative history

itself and cases such as Penn Terra Ltd. v. Department of Environment Resources 733(f)2d, 267 Third Circuit 1983.

So, is someone on the phone for the State of Tennessee?

MS. STADLER: Yes, Your Honor. This is Katherine Stadler appearing for the Tennessee District Attorney.

THE COURT: Good morning.

MS. STADLER: And I will keep my remarks brief.

THE COURT: Okay.

MS. STADLER: Mr. Huebner is mostly correct, that the legal basis of our argument on jurisdiction under 28USC 1334(a) is the same as the arguments that Your Honor rejected nearly six months ago and we articulate them here merely to preserve the arguments that we have made on appeal of that decision and don't intend to rehash them. But the statement that nothing has changed in the last six months about the arguments that the State -- the District Attorneys of Tennessee are making, is not entirely correct.

Two things have changed; one, six months have passed and even the supporting states and unsecured creditors are getting restless with the level of disclosure and transparency being provided with regard to the Sackler related parties. We hear a lot in these cases about efficiency, cost control, interest in consensual resolution. What we are not hearing is, one of the other primary

purposes of the Bankruptcy Code and bankruptcy protection is to provide transparency so that constituents, claimholders, interested parties, are able to see how the bankruptcy process guarantees that the extraordinary relief of the bankruptcy code is not handed out without very specific compliance from Debtors and without very specific disclosures from Debtors that are made in exchange for the Bankruptcy Code's protection. That is the interest that is not advanced when all of the discovery, all of the document exchange happens off-line, behind closed doors, as part of an ex-party process.

The Tennessee District Attorneys and other public officials here need to answer to their constituents if they are going to consent to a Plan of Reorganization that absolves individual non-Debtor wrongdoers. They need to explain to their constituents what it is that has satisfied them that agreeing to that is in the best interest of the citizens they represent. And that is the objective that is not being met through the process that we've been discussing all morning.

The second thing that's changed --

THE COURT: Can I interrupt you on that point?

MS. STADLER: -- is that the Debtors have now --

THE COURT: Ma'am, can I interrupt you on that point?

MS. STADLER: Yes.

THE COURT: I don't know the answer to this. Is -- in the Tennessee action, as I understand it, you are at the Summary Judgement stage, right?

MS. STADLER: That's correct. Mm hmm.

THE COURT: Was -- so I'm assuming there had been fairly substantial discovery in that action?

MS. STADLER: No. In fact, the discovery, in the form of request for admission, was not answered and so the basis for the Summary Judgment Motion is deemed admission of the factual assertions as set out in the Request for Admissions to Richard Sackler.

THE COURT: Okay, you haven't had discovery in the Tennessee action that's been -- other than Request for Admission?

MS. STADLER: With respect to the individual claims against Richard Sackler, that is correct.

THE COURT: Were there any confidentiality stipulations with respect to discovery in the Tennessee action?

MS. STADLER: That I am not sure. Our co-counsel from Tennessee is on a listen-only line and she would be able to answer that question. I wonder if there's a way she could raise her hand and answer that question.

THE COURT: I don't know the answer,

unfortunately, to that.

MS. STADLER: Oh, I just got a text from her. She says, "Yes. Yes, there are confidentiality protections in place." I apologize. We are bankruptcy counsel, not Debtor's counsel.

THE COURT: No, that's fine.

MS. STADLER: She says, "There is a confidentiality agreement in place."

THE COURT: Okay. So, when you're discussing the level of disclosure and transparency in the bankruptcy case, are you suggesting that there should not be similar agreements here as part of the development of the facts?

MS. STADLER: No, I'm not suggesting that at all. What I'm suggesting is that the concessions and the benefits that the non-Debtors in the bankruptcy case are seeking to obtain through this process requires some corollary disclosure on their part. The confidentiality as part of the litigation and negotiation process is one thing, but at the end of the day, the non-Debtor related parties, including Richard Sackler, are going to need to voluntarily disclose something about their financial condition. Something about the extent of the wealth that they have extracted from the opioid trade.

THE COURT: Okay. All right.

MS. STADLER: There is no suggestion that we would

not honor confidentiality. The suggestion is, that, as part of a deal in either the State Court litigation or in the bankruptcy, there has to be some disclosure from the non-Debtor parties and that's not happening.

THE COURT: Okay and I'm going to ask you the same question I've asked everyone else, do you believe that we're at the point here in this case where we're at an impasse on such a deal or are the facts still being developed and the outcome still subject to negotiation?

MS. STADLER: I don't think the word "impasse" came from our documents.

THE COURT: No, it didn't. I’m just asking you the question.

MS. STADLER: Yes. I don't think that I would characterize that way with the important caveat that there are groups of non-consenting State and local government officials, there's an ad hoc committee and that counsel for that group is participating directly in the process of negotiating discussion. And pursuant to the Protective Order that is in place, certain categories of information are not available to the general public and are limited to certain identified participants in those groups. So, I can't speak with an extreme authority about the impasse or no impasse.

What I do know is that you have even the states

that are consenting to the proposed Settlement and to the extension of the injunction, are telling the Court that they are weary of any construct under which non-Debtor Defendants may seek to obtain indefinite respite from litigation without the provision of meaningful concessions and the real prospect of a negotiated resolution in exchange. That is directly from the Ad Hoc Committee of Consenting States' Reply at Docket #158. That doesn't sound, to me, like a group of government entities that are satisfied with the level of non-Debtor disclosure that they're getting through the process.

MR. HUEBNER: Your Honor, may I be heard on behalf of the Debtor.

THE COURT: No, I don’t think counsel is finished yet.

MR. HUEBNER: Oh, I'm sorry. I apologize. Please forgive me.

THE COURT: Okay.

MS. STADLER: Well, no. I wanted to address the two things that have changed. But I just want to reiterate the overall purpose of our arguments and our disputes and what we're arguing and what we're not arguing. No-one is disputing that the Bankruptcy Code has proven itself as a tool for the management of unmanageable liability and the Order Reliquidation and Distribution of Assets to Tort

Victims.

What is in dispute is whether the Bankruptcy Code's protection should extend insulate individual, not corporate wrongdoers, who have extracted billions in personal wealth from the widespread suffering and staggering social costs opioids have inflicted. The bankruptcy certainly can -- the Bankruptcy Court certainly can enjoin action against individual non-Debtors if the litigation has a conceivable effect on the Debtors' restructuring. And with this proceeding and the appellate proceedings that stem from it, this Court is defining the outer limits of the conceivable effects to us, creating new law that will determine whether the Bankruptcy Courts have become a haven for wrongdoers after all.

The arguments we have heard today are -- can be distilled as follows: anything that might distract the Debtors or the related parties from a protected, largely private restructuring negotiation process, has a conceivable effect and triggers the Bankruptcy Court's jurisdiction to stop State Court litigation and exercise of police powers under State Statutes that have no other basis for federal jurisdiction. And that is what the Tennessee District Attorneys say can't be the conclusion without a substantive evidentiary record of the bases for jurisdiction, which would include discovery of the non-Debtor parties. A 2004

or a deposition of Richard Sackler to determine the basis for his denial that he's subject to the jurisdiction of the Tennessee Court and in support of his ultimately substantive contribution to a consensual Plan of Reorganization.

THE COURT: I'm sorry. I just didn't follow that. When you -- in the pleading, you asked -- you said that there needed to be discovery as to the basis for jurisdiction. But I didn't understand that to mean that it would be discovery as to whether Tennessee would have jurisdiction over Richard Sackler. Would that -- that's the discovery you're talking about?

MS. STADLER: No, I'm sorry. That was -- that was inartfully stated. No. The discovery we're asking for in this Court, as a prerequisite to a determination about this Court's jurisdiction over the Tennessee cause of action has to do with the conceivable effects of continued litigation against Richard Sackler on the bankruptcy restructuring process. There is a parallel stayed at the moment disputing the Tennessee Court over whether he is subject to personal jurisdiction in Tennessee. The federal court concluded and ordered --

THE COURT: And I -- okay. Right. So, it's really -- you think that it should be discovery as to the role that Mr. Sackler would play in the Debtor's reorganization?

MS. STADLER: Yes, as a basis for this Court's jurisdiction. That's correct.

THE COURT: Okay. Now, he has agreed with the Debtors and with the consenting group to be among those that would fund a Chapter 11 Plan with, on its face, substantial assets. The evaluation of that Agreement obviously has been under way since the injunction was entered back last Fall. There is a suggestion in the pleading that there needed to be an identity of interest between Mr. Sackler and the Debtors or some form of indemnification to establish jurisdiction. But is that what -- I'm still trying to figure out what discovery you're asking for other than the analysis that's actually ongoing, which is the support as a negotiation matter of the Agreement that he's already entered into.

MS. STADLER: Right. First, let me be clear. The indemnification obligation of a Debtor is one of any number of factors that can establish the basis for jurisdiction or related to jurisdiction. It is, in many of the cases, it is established as a point of fact and a fact-finding in the record. That doesn't mean that that's the only way or that the Court has to have to find an identity of interest. There are other ways shared. Insurance, for example, if the non-party is directly participating in the operation of the Debtor in Possession, there are other factors that the law

recognizes.

THE COURT: Such as a statutory --

MS. STADLER: The indemnification though --

THE COURT: I'm sorry. Such as a statutory right of contribution?

MS. STADLER: Right. That would fall under the general umbrella of the indemnification obligation, but since we're at the discovery question, it needs to be asked. Whether there is a statutory or contractual indemnification obligation, we have heard representations from the Debtors and the Sacklers that no payments are being made to any of the Sackler family members pursuant to any Indemnification Agreement or obligation. And the question that has not been answered is, has Richard Sackler permanently waived his entitlement to indemnification from the Debtors? The term sheet on file suggests that he may have because one of the conditions of the Settlement Agreement reached before the bankruptcy case was filed was that the non-Debtor parties waive all of their claims against the estate. But we don't know. The question has been posed, it hasn't been answered and we think it's a crucial question that needs to be answered to establish the jurisdiction of this Court because if Richard Sackler has waived any right of indemnification has as as part of an agreement, leading to this bankruptcy case or an agreement in principal outlining the settlement

term sheet, that's very relevant as to whether the action against him has a conceivable effect on the bankruptcy case.

THE COURT: You're aware that the Tennessee statute that's the basis for the claim against him has a contribution provision in it?

MS. STADLER: I am.

THE COURT: Okay. And you're also aware, I think, because you said, that the Agreement is an agreement in principal?

MS. STADLER: I am.

THE COURT: Okay. So, I think we should move off of that point. But, I guess, then beyond that, you're looking to take discovery as to the identity of interest between the Sacklers and the Debtors?

MS. STADLER: Well, in this case, our argument is that, to establish jurisdiction, that discovery would be necessary.

THE COURT: Okay, but doesn't that confuse --

MS. STADLER: (indiscernible) determination was already made.

THE COURT: Doesn't that confuse the notion of whether the Automatic Stay would apply under Queenie vs. Nygard as opposed to jurisdiction under 28USC 1334 and 157?

MS. STADLER: It's an interesting question, Your Honor (indiscernible)

THE COURT: No, I mean, I -- there's nothing in the caselaw that talks about an identity of interest other than in the stay context. There's nothing in the jurisdictional caselaw that talks about an identity of interest. The Supreme Court in the Celotex case doesn't talk about an identity of interest. It talks about a conceivable effect.

MS. STADLER: No. Correct. It talks about a conceivable effect and the identity of interest or the specific indemnification obligation can be one (indiscernible) of that effect. That's correct.

THE COURT: Okay. All right. Anything else?

MS. STADLER: No, Your Honor. Thank you.

THE COURT: Okay.

(Crosstalk)

MR. HUEBNER: Can I interject with one technical comment? I don't mean get in the way of the argument.

THE COURT: Sure.

MR. HUEBNER: I just wanted to make it clear on the record -- I just want to make it clear on the record because sometimes, (indiscernible) is not as clear, that the argument that was just presented was made on behalf of District Attorneys for certain local governments in Tennessee and it was not on behalf of the State of Tennessee. The State of Tennessee is a member of the ad hoc

group and I just didn't want there to be confusion in the transcript.

THE COURT: Okay. That's helpful. I think I may have contributed to that by referring to the State of Tennessee.

MR. HUEBNER: That's why I thought it would be useful for me to interject. I appreciate it, Your Honor. Thank you.

THE COURT: Thank you.

MR. HUEBNER: So, Your Honor, I will try to be brief and efficient. Number one, this is a -- essentially, as a reminder, we have this argument and this is now on appeal and I think that appeal will hopefully be decided in a relatively near term and then we will know what the District Court thinks about these particular injunctions as to these specific counts.

Number two, I feel a little bit like I dialed into the oral argument in a different case in certain parts of what I just heard. The (indiscernible) secretive, private process -- all we have done, almost every single work day for the last six months and most weekend days, is interact with various groups of creditors and procure and share and meet and design and get information and diligence of all kinds. Again and again, I've been a lawyer for two counties in one state purports to speak to the state of mind of the

creditor body as a whole for sovereign states in both camps. And again, that's just -- it's just inappropriate and there's no basis for doing that.

With respect to, at some point the Sacklers need to describe or someone in the world deserves to know what they took out of Purdue, I'd just remind counsel that the Debtor has published, on the docket in the public domain, a 365-page report listing to the penny, every single dollar that went out to the shareholders of the dividends or distributions, for a more than 10-year period, totaling $10.4 billion with extraordinary detail. But any suggestion that there is some sort of secretive, improper protection from information being facilitated by this Court is frankly, somewhere between untrue and offensive.

The next issue, and the (indiscernible) for wrongdoers is also just inappropriate. I'd remind everyone that our initial injunction and UCC Debtor Shareholder (indiscernible) Stipulation contains things, that as the Court noted, could likely never have been obtained by any domestic litigant, including at this stage, anti-secretion provisions, consent to jurisdictions by multiple foreign parties who may have limited to no ties in the United States and material financial disclosure that everyone acknowledges, while there's more to come, has been provided a detail on an initial basis.

With respect to the sub-position, no-one ever called me and asked about this. I'm not sure who they think they asked about whether any of the Sacklers have already permanently waived their rights to indemnity or a stay of all contribution rights. The Court, I think, already dealt with that point. The answer is no and it's pretty simple. All we have, at this point, although it's very important, is an unsigned, non-binding, term sheet filed on the docket, that if this deal were to be fully documented and go through, ultimately one of its many provisions that there would be a waiver in the future. But of course, Your Honor's point was, as always is true, the right one, which is, that's actually not the jurisdictional test here for what we're talking about with respect to related to jurisdiction.

As we said at length in our papers, which is why I could not speak to it at all -- the identity of interest, leaving aside indemnity and mandatory contributions, is established about a hundred times over by their own Complaint, which makes clear that their allegations are entirely about the conduct of Purdue that they believe was caused, facilitated, directed, encouraged, by Richard Sackler. So, you don't need to take our word for it, you just need to take their word for it by reading their Complaint and once again seeing, as I said before in the

different context a few minutes ago, that this litigation is really all about the harm that Purdue allegedly caused within this case, one specific Sackler, that's sort of an alleged puppeteer or mastermind.

And let me just say one last thing, because I think the Court probably knows it, but I think it's worth saying out loud. Our fiduciary duty is to maximize value, minimize costs and try to get these cases done and transfer as much value as we can as quickly as we can to stakeholders, creditors, governments, etc. If the Debtors and their professionals and the special committee were to come to believe that the path that we are on, which involves both very importantly things into which the Court and the public -- the entire public, not just stakeholders, have visibility, including mediation, were no longer likely -- or no longer had a reasonable hope or had led to an actual impasse, I think we would be among the first people to come to the Court, as we may do on individual issues, as well as the case as a whole and say, "Your Honor, we no longer see a path to a resolution", including, for example, because of the burden requirements which are rather high for a (indiscernible) in the case. And that's our job and that's our duty.

So, I do want to give the Court, and all parties, both objectors and supporters alike, complete comfort that

if we had meant that only our view matters, but that if we come to be of the view that there is truly an impasse in this case, we actually have an obligation as a matter of federal law, to come to the Court and try to figure out what new -- either new or new roads we might lay down together to get through that impasse and on the other side.

And so, Your Honor, I think that's probably about all you need to hear from me today on this Motion. Let me end where I began, which is, I don't feel -- we have a stream to cross for sure with the two objections, but I don't want the river that we've crossed already to be lost. (indiscernible), no-one is objecting to the injunction against the Debtors' being extended for 180. No-one is objecting to the injunction against most of the related parties. We're down to one request for nine people, one request for only one of those nine.

Our final point on the form of Order, Your Honor, despite the fact that there are objections from the consenting states, we try to always, sort of, do the right thing as best we know how. And so the form of Order both, again, allows them to choose to voluntarily comply if, as we hope the injunction is extended, so that they don't have -- I won't to speak for them -- for whatever their issues were last time and they made a lot of sense with being involuntarily enjoined and even though, again, this was just

something we voluntarily drafted in, we once again put in an off ramp because we understand that 180 days is not a short time. The only thing that's going to be needed here because this is, in fact, one of the most complex Chapter 11 cases yet filed as Your Honor well knows. There will be, you know, probably tens of thousands of Creditors asserting probably trillions of dollars of claims.

But nonetheless, you know, we could have just sought a flat injunction for six-months period. We didn't put in the same offramp that ultimately led us to a -- after, you know, Your Honor's rulings -- a consensual form of order the first time, so we're trying to be standup and give people what we think is the right package, even if we had to have a contested hearing and we're not backing away that irrespective of the Court's ruling. The form of order we submitted that provides for those two, hopefully, attractive enhancements within the rubric of 180-day period are things that we fully intend and are willing to have part of the package.

THE COURT: Okay. All right. Anything else? Okay. I have before me the Debtors in this case's motion to extend the preliminary injunction that has been in effect now for several months in this case. That injunction goes beyond the automatic stay under Section 362(a) of the bankruptcy code in two respects.

First, because the Debtors, I think, wisely decided not to engage in a count-by-count or state-by-state or governmental-entity-by-governmental-entity analysis of the applicability of the exception to the automatic stay under 362(b)(4), the so-called police and regulatory exception, they are seeking to obtain an injunction on the terms of the proposed order to protect themselves. It is not coextensive with the automatic stay because the injunction includes important voluntary agreements and undertakings by the Debtors, but it would largely serve the function of a Section 362 stay, albeit that it's under Section 105 of the bankruptcy code.

The proposed order consistent with the order originally entered by the Court addresses legitimate concerns that the states and governmental entities had with respect to the ongoing enforcement of their police and regulatory power, including, among other things, voluntary restrictions on how they engage in their business and the appointment of a monitor. In addition, as the Debtor's counsel just said, the proposed order like the prior versions of it, also permits governmental entities to agree to the order as opposed to having a precedential order that would be imposed upon them under Section 105 of the bankruptcy code.

Secondly, the injunction seeks to -- or would --

continue to enjoin litigation against the so-called related parties, largely the Sackler family members, that were pending and would be arising thereafter throughout the country based on their role with Purdue and the other Debtors -- a so-called third-party preliminary injunction.

The injunction, as I said, has been in place since October and was the subject of extensive briefing and hearings back in October of 2019, and I issued a fairly brief bench ruling at the time, starting at page 253 of the transcript of that October hearing that laid out the basis on which I determined to -- that one should evaluate the motion and my determination to grant it, albeit with the changes that I directed and were made in the proposed order. I won't repeat that ruling today. Rather, it appears to me that I instead should analysis the facts as they apply today under the same standard that I articulated at the October hearing.

The motion is largely unopposed. First, no party has objected to the continuation of the injunction as to the Debtors. I will state a caveat to that. The so-called non-consenting states have stated in their pleading that they agree to the foregoing and the extension of the injunction to the related parties for another 180 days on the condition that motions to dismiss be permitted to go forward with respect to nine related parties by up to 20 of the states.

And it's not clear to me whether, if I deny that portion of that objection, they are objecting to the extension of the injunction to the Debtors. But, again, in my ruling on the initial request dated back on October 11, 2019, again, starting at page 253, I gave the basis for the issuance of such relief on an uncontested basis and I believe that that case law and rationale continues to apply, including, as far as the Debtors are concerned, the fact that thousands of ongoing litigations would severely disrupt the constructive process that has ensued since the issuance of the injunction in October. As I stated then, in addition to the disruptive effect of that litigation, the Debtors and their Creditor constituents, which are diverse, need to address several important tasks before they collectively can make the most of this Chapter 11 case, not the least of which is a reasonable allocation of the Debtor's resources and potentially the resources of the related parties who have in a term sheet with the so-called governmental group agreed to, on their face, substantial contributions to a Chapter 11 plan -- how those resources that is should be allocated to Creditors and to alleviating what each Creditor has asserted which is the adverse effects of allegedly improper uses of opioids throughout the nation.

In addition, substantial work needed to be done with respect to estate causes of action, potentially,

against the related parties, as well as, of course, due diligence on the proposed settlement. It was my belief then and continues to be my belief now that if that work is not conducted, the ongoing litigation, particularly given the Debtor's agreement to turn over all of their value to a as-yet to be defined Creditor body in an as-yet to be defined allocation, would cease and go to waste.

Those critical issues, to me, were barely addressed in the litigation over the last few years, and any meaningful settlement of such litigation, I believe, would have to address them, because otherwise the defendants would not obtain meaningful finality. I believe the fact that no one is seeking, I believe, to undo the injunctive relief for at least the next 180 days is a testament to that Debtors and the other key constituents in this case pursing, in an orderly and reasonable way, those tasks. I will note that I do have a declaration of one of the Debtor's counsel, Mr. Kaminetsky, which lays out in more detail than I have just done the work that has ensued since the issuance in October of the preliminary injunction on each of those matters. No one has contested those statements and I believe it's also a matter that I can take judicial notice of based on the hearings before me since October.

Frankly, if it takes six months to a year to have a final ruling on a motion to dismiss in one litigation, one

would expect that it would take more than six months -- hopefully not more than a year, particularly with the talented professionals on all sides here -- to undertake in a meaningful way the tasks that I just outlined. And one hopes to further negotiate a Chapter 11 plan that allocates the Debtor's resources and to the extent a settlement can be negotiated, the related parties' resources fairly.

There are two objections to the motion styled as limited objections. I will deal first with the limited objection of the Tennessee counties which seeks to pursue through determination of liability a pending lawsuit against Dr. Richard Sackler one of the related parties. The objection is premised on two arguments. The first I've largely addressed, again, in the October 11th bench ruling. The Tennessee plaintiffs contend that this Court lacks jurisdiction under 28 U.S.C. Section 1334(a) to issue an injunction here under Section 105(a) of the bankruptcy code. I had previously considered that argument and ruled against it on October 11th, and it is now up on appeal to the district court. Apparently, the same judge who I favorably cited in concluding that at a minimum I had related to jurisdiction under Section 1334 and the conceivable effect test articulated by the Second Circuit, then most recently in SPV OSUS Limited v UBS AG 882 F3rd 333 340 2nd Circuit 2018. I would only add three things to that point.

First, I neglected to cite, although I should have cited, Celotex Corp v Edwards 514 U.S.300 at 307 through 311, 1995. The Supreme Court found at least related to jurisdiction existed in the bankruptcy court which enjoined the drawing by a third party on a surety bond where no conditions to the draw remained. Although the bond itself was not property of the estate, the Supreme Court found related to jurisdiction because of the conceivable effect that that draw would have on the Celotex bankruptcy case, including among other things, its effect any potential future settlement with insurers.

Secondly, I would note that one of the case I cited for the general proposition that a court has jurisdiction over a third party injunction, In Re (indiscernible) SARL 592 VR 504 through 05 -- I'm sorry -- 504 -- excuse me -- STNY 2018 was affirmed in December at 792 Fed Appendix 99 December 20, 2019.

Finally, although this I did not address at all, it appears to me that not only do I have related to jurisdiction, but given the ultimate basis or a primary basis here for the injunction of continued litigation, that is Debtor-related litigation, against the related parties is their agreement with the settling governmental entities to fund a plan that I have arising in jurisdiction under 2080 U.S.C. Section 1338(a). As the Second Circuit said in

Elliott v GM LLC -- I'm sorry -- yeah, LLC -- In re Motors Liquidation Company 829 F3rd 135 153 2nd Circuit 2016, circ. denied 137 Supreme Court 1813 2017, quote, at a minimum, a bankruptcy court's arising in jurisdiction includes claims that are not based on any right expressly created by Title XI but nevertheless would have no existence outside of the bankruptcy. The injunction here of course if based on 105 which would arising under jurisdiction, but also, the underlying basis for the injunction primarily is to enable there to be time to do due diligence on and finally negotiate the proposed settlement with the related parties including Richard Sackler and to see whether, if that particular settlement cannot be negotiated, some other settlement under which they would be similarly contributing meaningful amounts under a plan could be negotiated and approved as part of a Chapter 11 plan.

Of course, there are other grounds for jurisdiction here, including the fact that the complaint against Richard Sackler is in almost every paragraph premised upon his role at Purdue and his causing allegedly Purdue to take the actions under which he is now being sued. And, secondly, the fact that under the applicable Tennessee statute, if he were found to be liable ultimately, he would have a right of action for contribution against another person subject to liability under this Chapter, Tennessee

Code Annotated 29-38-112. Both of things I believe as conceded by counsel for the Tennessee plaintiffs also with support at a minimum related to jurisdiction.

So clearly, the bankruptcy court has subject matter jurisdiction to issue an injunction here. The Tennessee plaintiffs also contend that the current status of this case warrants not extending the injunction and permitting them to pursue Richard Sackler in the pending litigation. Frankly, the argument for this, I believe, shows why the injunction should be extended. It is premised in large measure on the notion that a party who has the benefit of a third-party injunction needs to engage in a significant level of disclosure supporting his, her, or its significant contribution to the Chapter 11 case.

At oral argument, counsel has stated that there has not been a level of transparency in that the Tennessee counties are restless about the level of disclosure in the case. At the same time, I believe it's acknowledged that that transparency ultimately needs to be, quote, at the end of the day when a proposed third-party injunction to release is up for confirmation. In the meantime, the record is crystal clear that there has been substantial disclosure and that that disclosure is ongoing, not only with respect to the role that the related parties including Richard Sackler played when they were controlling parties at Purdue which

goes to the heart of the Tennessee litigation, but also to facilitate due diligence on their settlement proposal and the estates and the other parties and interests, including the official creditors committee and other major constituents in the case need to conduct to evaluate the settlement in the context of estate causes of action or potential estate causes of action against the related parties.

The notion that such disclosure should immediately be flushed out to the public, I think, is belied by every party and interests' willingness to enter into an agreed protective order and the use of such protective order as in discovery generally, including, I gather, in the Tennessee action itself. The record, I believe, is clear that in addition to the disclosure that has occurred thus far and will be continuing, the injunction itself also contemplates a level of monitoring and compliance that would not be achieved without the injunction and agreements by the related parties with respect to accepting the Court's jurisdiction, an issue that still exists in Tennessee, and agreeing not to make transfers as laid out in the injunction.

Clearly when one balances the harms and applies the other factors that need to be applied for a 105 injunction of the bankruptcy case as laid out by, among

other courts, Lautenberg Foundation v Picard, In re Bernard L. Madoff Investors Securities LLC 512th at Appendix 18 2nd Circuit 2013 and In re Lyondell Chemical Company 402 BR571 587 through 589 Bankruptcy STNY 2009. See also Caesars Entertainment Operating Company v BOKFNA In re Caesars Entertainment Operating Company 808 F3rd 1186, 1188 through 1189 7th Circuit 2015, namely whether there's a likelihood of successful reorganization, whether there's an imminent irreparable harm to the estate in the absence of an injunction, whether the balance and harm tips in favor of the moving party, and whether the public interest weights in favor of an injunction. Each of those factors has been established.

I conclude that there is a likelihood of a successful reorganization here. We are in the early stages still of that process but the parties are doing what they need to do as have been previously identified in October and that process does not happen overnight. It requires significant legal and business resources as well as the good faith commitment of key constituents to use the information generated to negotiate in good faith.

Secondly, there is imminent and irreparable harm to the estate. In the absence of an injunction, I believe that if the Tennessee litigation were to proceed, the Debtors would need to get involved and other parties would

rightfully say at that point, we need to do -- we need to be involved, too. We need to have our litigation proceed. There's nothing fundamentally different in the Tennessee County litigation than hundreds of other litigations pending against the Sacklers.

For the same reasons that I found in October, if the focus of these cases turns to litigating the merits which would take years, it would be disastrously diverted from the tasks that have been undertaken and that are going to be continued to be undertaken with the benefit of the injunction in this case. As I noted, the balance of harm tips in favor of the Debtors here and it's really not just the Debtors. It's all of the Creditors as well. On the other side are the parochial interests of the two Tennessee counties but obviously, if I lifted or didn't extend the injunction as to them, everyone else would have the same right to be involved which creates the chaotic effect of moving the focus of this case away from allocation of the value and the due diligence related to it to simply establishing liability at a time when substantial amounts of value have already been offered.

Obviously where a governmental entity is involved I take seriously whether the public interest weighs in favor of an injunction against that public entity. On the other hand, it's recognized that such an injunction may be issued

and the standard for analyzing it generally is the same as I ruled again in the bench ruling in October. See, generally, Penn Terra Limited v Department of Environmental Resources 733 F2nd 267 3rd Circuit 1983 and the legislative history of Section 362(b)(4). Here, the interests alleged, since it's acknowledged that only liability would be established, is, I believe, an interest in transparency and I believe that as committed to by the Debtors at the initial hearing on the injunction, there will be transparency as to what happened here upon confirmation of a plan and thereafter, so that reporters, professors, and the public will have a record that they can analyze. In the meantime, proper transparency is taking place in this case as far as the due diligence that I've already described.

So I will deny the objection by the Tennessee plaintiffs. The remaining objection is by the so-called non-consenting states. The states are careful to point out that they do not seek to undermine the process that has been taking place in this case since the issuance of the injunction in October and in fact before then as well. And I can take to note judicial notice of the fact that at least in hearings before me parties have acknowledged that the so-called non-consenting group has in fact engaged actively in the due diligence and consensual planned process including in laying in on the proposed mediation parameters and in

engaging in the mediation itself.

The non-consenting states nevertheless believe that the injunction should not be continued as against certain related parties -- nine members of the Sackler family -- to permit pending motions to dismiss and potential additional motions to dismiss to proceed through a determination of such motions and apparently no other litigation.

It is stated, quote, in the next few months, rulings on the legal sufficiency of the state's allegations against the Sacklers could provide important information to enable the parties to analyze whether they would support a plan to release the state's claims against the Sacklers, along with the stronger basis to determine what terms such a plan should require and how it could be justified to the parties, the public, and the Court. The objection notes that two of those states have already won motions to dismiss and none of them have lost a motion to dismiss. I will note -- I can take judicial notice of this -- that a motion to dismiss has been granted not against one of these states but in other litigation brought by a state.

But in weighing the objection, I must necessarily weigh the rationale for it which is that, again, in the next few months, determination of one or more motions to dismiss would provide important information. I must weigh that

against the effects of permitting those motions to proceed that would have an adverse impact on these cases, again, consistent with the legal standard that I've already summarized and recognizing already -- I won't repeat this -- the beneficial effects of an injunction generally.

Both the Debtors and the official unsecured creditors committee have listed a number of reasons why permitting the motions to dismiss to be brought and decided would have an adverse effect on these cases, and I generally agree with their analysis, especially as follows: the pursuit of the litigation which again is tied directly to these individual's role in the Debtors necessarily also involves the Debtors. More importantly than that even, the claims are similar to claims brought by other governmental entities and those governmental entities would also want to pursue the litigation.

In addition, winning a motion to dismiss, assuming it would be won, would put those states that would pursue it ahead of the litigation timeline versus everyone else. Naturally, those other people would say they want to have the same right. In addition, it appears to me that while I trust that the non-contending states will continue to engage in all of the constructive work that they had been doing in this case, a natural focus on that work will be diverted, including by the Sacklers, to the litigation. And those

parties who are not pursing the litigation and who may be assuming that their recovery comes under other theories or under the same theories would feel themselves to be at a disadvantage in the ongoing mediation process over allocation.

As against those considerations, the non-consenting states again say that, nevertheless, this would be an important data point to have and that the litigation would further the public interest in bringing claims against the Sacklers into the public domain. On the latter point, it would appear to me that the states' interest while generally strong is not strong here with respect to this particular request. The motion to dismiss is just a motion to dismiss. It's not a public record other than a test as to the legal sufficiency of a complaint where all the facts alleged in it are assumed to be true, i.e., it's a one-sided story, not particularly a transparent one.

Secondly, I cannot believe that the pursuit of motions to dismiss that admittedly would not be decided for months and in some cases years is a gatekeeper for negotiations. Indeed, the record of this hearing is clear. We're not even at the point of negotiations other than the agreement that's on the table. If there have been bids and asked, I would be very surprised, given the fact that due diligence is still ongoing.

Moreover, a victory in defeating a motion to dismiss merely leads to the next step in a litigation. Lawyers are perfectly capable of evaluating litigation without going through a motion to dismiss. My attitude would be different if I believed that these nine related parties had said, we're not contributing anything. We will win. See us in court. Or alternatively, the due diligence shows that they really aren't contributing anything. But we're at neither of those points. So it would appear to me that the only use for not extending the injunction as to the motions to dismiss would be to create some form of leverage in negotiations among Creditors which would be improper here. Or alternatively -- prematurely -- to address negotiations with the Sacklers. I say prematurely because it does not appear to me that those negotiations are anywhere close to breaking down.

So again, in evaluating the factors that I must, it appears to me that all four of them support continuation of the injunction in all respects. As I said before, this is not a free pass to the related parties but I don't believe they think it is and no one in the public should think it is, given the state of the record. And, of course, ultimately, it is every politician's duty to act on the facts as it is the judges. Judges can be wrong but simply throwing out statements to the contrary, i.e., the Sacklers

are getting a free pass or should not get free pass, does no one any good and, frankly, paints people into a corner they may not want to sit in in the future.

I generally have allowed and discounted statements like that in pleadings by the governmental entities knowing that there is a political brain at work as well a legal brain, but I trust that in actuality all of the public stewards here like the creditors committee and the Debtors will be doing their utmost to maximize the value of the Debtor's estates and distribute and agree on a reasonable allocation of how it's to be distributed.

To my mind, it is highly likely that ultimately that will include a substantial contribution by the related parties. It is also possible, given the political brain, that someone nevertheless will not agree to it. The notion that that one entity could hold up something that is good for all, to me, is almost repulsive.

So I'm prepared to let the process continue on this basis. I do want to hear, though, if anyone that's playing a major role in this case is somehow not participating in it because I believe that is something where there needs to be transparency.

Lastly, on the subject of transparency, there is some brief discussion in the objection apparently faulting the Sacklers for having briefly filed their point of view on

the docket and then retracting it. The reason they retracted it is that I concluded that the filing, while understandable since they have not had the public forum to set forth their point of view on these issues, would severely retard the progress of this case, inevitably eliciting responses by every other party in this case and completely diverting the parties' attention from the tasks that need to be undertaken and completed. So I directed them to withdraw it as I believe the 24 states know, but if they don't, they know it now. They should not be faulted for it. They were not trying to be opaque.

So I urge the parties to continue what they're doing and, if possible, to redouble their efforts. In particular, I would urge them to complete the proposal for Court consideration of the emergency fund motion. Everyone here says they want to devote the Debtor's resources to resolving the opioid crisis. There's general agreement that a big chunk of those resources should be devoted now. That agreement is right. It doesn't have to be perfect just like a plan doesn't have to be perfect. Congress recognized that in the bankruptcy code. It has to be good enough and I urge you to agree on what's good enough and put it before me.

So I'll look for, in addition to the two orders on the 363(b) and 365(g) matters that I dealt with at the beginning of this hearing, the order granting the motion to

extend the preliminary injunction and overruling the two objections.

MR. HUEBNER: Thank you, Your Honor. We will send it in and I think it's probably fair to say that everyone on the phone takes those admissions and the guidance very seriously and people are deeply engaged and obviously, we'll have to keep and our families safe, but this is -- no foot is coming off the gas pedal to the extent humanly possible on progressing. So I -- nothing else from the Debtors.

THE COURT: Okay. And I have no doubt everyone is deeply engaged and maybe I was just trying to give you a pep talk in time that are somewhat dark, generally. Thank you.

MR. HUEBNER: Thank you, Your Honor.

MAN: Thank you, Your Honor.

(Whereupon these proceedings were concluded at 1:00 PM)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: March 20, 2020