AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
jsorkin@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Purdue Pharma L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

***EX PARTE* MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF PURDUE PHARMA, *ET AL.*, FOR AN ORDER AUTHORIZING EXAMINATIONS**
**PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND 9006**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ......................................................................................1

JURISDICTION AND VENUE ......................................................................................3

RELEVANT BACKGROUND .......................................................................................4

RELIEF REQUESTED ...................................................................................................7

BASIS FOR RELIEF ......................................................................................................8

      I.      Examinations Are Warranted under Bankruptcy Rule 2004. ...................................8

COMPLIANCE WITH RULES .....................................................................................11

NOTICE ........................................................................................................................11

NO PRIOR REQUEST .................................................................................................11

RESERVATION OF RIGHTS ......................................................................................11

CONCLUSION ..............................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Drexel Burnham Lambert Grp., Inc.*,
  123 B.R. 702 (Bankr. S.D.N.Y. 1991) .......................................................................................9

*In re Ecam Publ'ns, Inc.*,
  131 B.R. 556 (Bankr. S.D.N.Y. 1991) .......................................................................................9

*In re Enron Corp.*,
  281 B.R. 836 (Bankr. S.D.N.Y. 2002) .......................................................................................9

*In re Hughes*,
  281 B.R. 224 (Bankr. S.D.N.Y. 2002) .......................................................................................9

*In re Madison Williams & Co., LLC*,
  No. 11-15896, 2014 WL 56070 (Bankr. S.D.N.Y. Jan. 7, 2014) ........................................8, 9

*In re Metiom, Inc.*,
  318 B.R. 263 (S.D.N.Y. 2004) .................................................................................................10

*In re Recoton Corp.*,
  307 B.R. 751 (Bankr. S.D.N.Y. 2004) ...............................................................................8, 9, 10

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re: Bernard L.
  Madoff)*,
  No. 09-11893 (SMB), 2014 WL 5486279 (Bankr. S.D.N.Y. Oct. 30, 2014) ......................8, 9

**Statutes**

11 U.S.C. § 105 ...............................................................................................................................4

11 U.S.C § 1103 ..............................................................................................................................9

28 U.S.C. § 157 ...............................................................................................................................3

28 U.S.C. § 1334 .............................................................................................................................3

28 U.S.C. § 1408 .............................................................................................................................4

28 U.S.C. § 1409 .............................................................................................................................4

Bankr. S.D.N.Y. R. 9013-1(a) ......................................................................................................11

Fed. R. Bankr. P. 2004 ............................................................................................................ *passim*

Fed. R. Bankr. P. 9006 ................................................................................................................4

Fed. R. Bankr. P. 9016 .............................................................................................................4, 7

Fed. R. Civ. P. 45(d)(2)(B) .........................................................................................................7

The Official Committee of Unsecured Creditors (the "Official Committee") of Purdue

Pharma L.P. ("Purdue") and its affiliated debtors and debtors-in-possession (collectively, the

"Debtors," and together with their non-Debtor affiliates, the "Company"), by and through its

undersigned counsel, hereby submits this *ex parte* motion (the "Motion") for entry of an order

authorizing it to conduct an examination of and seek discovery from the Initial Covered Sackler

Persons, including certain issue of Mortimer Sackler (the "Mortimer Side," represented in these

cases by Debevoise & Plimpton LLP) and certain issue of Raymond Sackler (the "Raymond

Side," represented in these cases by Milbank and Joseph Hage Aaronson LLC) pursuant to Rule

2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[2]  In support of

this Motion, the Official Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      As previewed for the Court during the hearing held on March 18, 2020  (the

"March 18 Hearing"), the Official Committee wishes to engage in formal Rule 2004 discovery of

the Initial Covered Sackler Persons.[3]  The Official Committee notified each of the Debtors, the

ad hoc group of non-consenting states (the "Non-Consenting States"), the Mortimer Side and the

Raymond Side of its intention to file this Motion.  The Official Committee understands that the

Debtors and Non-Consenting States may also seek authority to take discovery from the Initial

Covered Sackler Persons.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors, and Certain Related Parties* dated November 11, 2019 [ECF No. 518] ("Case Stipulation").  For ease of reference, a copy of the Case Stipulation is attached hereto as **Exhibit A**.

[3] The Official Committee believes the Initial Covered Sackler Persons have possession, custody or control over information in the immediate possession of certain other parties, including without limitation, the Additional Covered Sackler Persons and the IACs, but that question is not presented for determination on this Motion.

2.     The Official Committee believes that it is necessary to replace and supplement

informal requests that the Official Committee provided to the Initial Covered Sackler Persons on

a voluntary basis pursuant to the Case Stipulation with formal discovery pursuant to Rule 2004.

The Official Committee does not seek by this Motion to disrupt or derail ongoing "meet and

confer" efforts with the Initial Covered Sackler Persons regarding the appropriate scope of

discovery in these cases.  On the contrary, the Official Committee wishes to continue and further

those efforts against the backdrop of formal discovery devices, and formal responses and

objections thereto.  If and when this process leads to crystalized disputes, the Official Committee

would seek intervention by the means the Court outlined during the March 18 Hearing.

3.     The standard for authorizing the issuance of an order on an ex parte basis under

Rule 2004 and the Court's Chambers Rules is readily met here.  For months, the Official

Committee has sought to investigate enormously valuable claims against the Initial Covered

Sackler Persons and others that would be released under the proposed Settlement Framework.

The requested examination is designed to advance that aim, including by allowing the Official

Committee to serve subpoenas similar, but not identical, to the voluntary requests that the parties

have been working with for months.  Indeed, the Official Committee believes that the Initial

Covered Sackler Persons do not quarrel with the *issuance* of formal discovery in these cases,

though the parties likely will disagree over *compliance* with that discovery.  The instant Motion

seeks only to establish the predicate necessary for the Official Committee to issue subpoenas

with any disputes over responses brought to the Court's attention separately, and in due course

4.     To date, the parties' meet and confer efforts based on the voluntary requests

generally have been productive.  The Initial Covered Sackler Persons have produced some

responsive documents already, and have refused (at least so far) to produce others.  And the

Initial Covered Sackler Persons appear willing to make more substantial productions in the future, including based on the use of electronic search criteria, though those productions have not yet begun, do not sufficiently address the Official Committee's requests, and are subject to continuing negotiations. The Official Committee believes a Rule 2004 order, and the exchange of formal disclosure devices and responses and objections is necessary and will be productive. Stepping through individual definitions, instructions, requests, objections, and responses tends to sharpen the parties' understanding of one another's positions, and provides an opportunity for the parties to reflect on whether an adjustment to their own stance is prudent.

5.      In addition, as the Court correctly surmised during the March 18 Hearing, the Official Committee also seeks to serve formal discovery so that responding parties are obliged to make their productions consistent with applicable rules, including by producing documents that the Official Committee may not even know exist, and that the Official Committee therefore cannot specifically identify in motion practice or otherwise. *E.g.,* March 18 Tr. at 46:6-16 ("[I]f someone thinks you need a formal vehicle" because you cannot specifically identify all potentially material documents, "and you want to force someone to actually produce everything beyond what's already been produced that's responsive, I would suggest you go down that route and then promptly arrange for a conference if there is a disagreement about how to respond to the Rule 2004 order"). And of course when disputes are ready for resolution by the Court, it is the formal discovery devices that will form the basis for the Official Committee's applications for relief. For all these reasons, and those discussed below, the Official Committee respectfully asks the Court to grant its Motion for an examination under Rule 2004.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

7.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are Bankruptcy Code section 105 and Bankruptcy Rules 2004, 9006, and 9016.

### **RELEVANT BACKGROUND**

9.      No formal discovery has been served under the Federal Rules of Bankruptcy Procedure.  However, the Official Committee directed voluntary informal document requests to, among others, the Initial Covered Sackler Persons (on both the Mortimer Side and Raymond Side) primarily in letters dated November 25, 2019 and January 2, 2020.  The Official Committee provided to the Initial Covered Sackler Persons the Official Committee's first proposed group of custodians and search terms for locating and producing electronically stored information ("ESI") on February 4, 2020.  Also on February 4, the Official Committee added four new requests relating to a matter that became public after January 2.  One more informal request was added on March 3, 2020.  Counsel for both the Debtors and the Ad Hoc Group of Dissenting States (the "Dissenting States") asked to be provided with copies of any information supplied by the Initial Covered Sackler Persons to the Official Committee.

10.     The Official Committee indicated that it was prepared to meet and confer regarding all of its requests and proposals.  Respective counsel for the Mortimer Side, the Raymond Side, and the Official Committee have engaged in multiple good faith meet and confer discussions on these topics.  Counsel for the Debtors and the Dissenting States participated in many of the conversations as well.  While the Official Committee is hopeful the parties' disputes can be narrowed, it is apparent there some of their disagreements are likely to require resolution by the Court.

11.     So far, there has been no dispute over the Official Committee's general right to obtain (or at least its interest in obtaining) additional information from the Initial Covered

Sackler Persons in these cases.  On the contrary, the Initial Covered Sackler Persons have

produced some responsive documents, and refused for now to produce others.  They also

indicated that they may be prepared to produce more substantial responses to the Official

Committee's informal requests as well.  Any disputes therefore likely will center on the scope of

productions to be made by the Initial Covered Sackler Persons in these cases, beyond the

documents they produced pre-petition, and may yet agree to produce in response to the Official

Committee's requests.

12.     As required by the Case Stipulation, the Official Committee understands that it

now has access to most of the discovery produced in prepetition civil litigation arising from or

relating to the Debtors' involvement in the opioid crisis, including in the Ohio-based multi-

district litigation before Judge Polster (the "MDL").[4]  It appears, however, that many documents

relevant to these bankruptcy cases have not yet been disclosed to any litigants, at any time.

These documents include at least two broad categories:  (1) documents related to estate claims,

and (2) documents, which were not produced in prepetition litigation, concerning Purdue's

"primary liability" for claims arising out of the opioid crisis (an issue that is also integral to the

claims in these proceedings).  While other disclosures from the Initial Covered Sackler Persons

and others may be appropriate in connection with 2004 examinations, these two categories have

informed and been the focus of the Official Committee's disclosure efforts to date.

13.     First, the plaintiffs in the MDL and other prepetition litigations were

understandably focused on Purdue's "primary liability" arising out of the opioid crisis—*i.e.*,

claims against Purdue and others for, among other things, deceptive marketing, negligence, and

nuisance.  While a handful of later-filed complaints in the MDL included fraudulent conveyance

---

[4] The Initial Covered Sackler Persons have promised to provide the productions made in other proceedings but have not yet completed those productions.

claims against certain members of the Sackler family, other types of claims important to these cases did not feature in the prepetition litigations at all.  As a result, prepetition discovery was not specifically directed at developing facts regarding claims of the kind that are salient in these chapter 11 cases, including claims for intentional and constructive fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, illegal dividends, and others. Prepetition plaintiffs thus did not specifically request from any custodian documents relevant to these estate claims, and the electronic search criteria employed prepetition did not include (at least not deliberately) terms and custodians directed to such claims.

14.     Second, prepetition discovery concerning Purdue's "primary liability" for claims arising out of the opioid crisis was not yet complete when the Debtors filed these cases. Discovery regarding Purdue's primary liability bears directly on the Debtors' estate claims.  For example, the size of Purdue's accrued liability arising from the opioid crisis is directly relevant to Purdue's insolvency at key junctures, which in turn is important to a number of claims against the Initial Covered Sackler Persons and others, including fraudulent conveyance and breach of fiduciary duty.  Similarly, the degree to which the Initial Covered Sackler Persons and other Purdue board members, key executives, and decision-makers were aware of, or concerned about, that potential liability may be relevant to the estates' claims for intentional fraudulent conveyance, breach of fiduciary duty and unjust enrichment, among other claims and issues.

15.     To be sure, substantial evidence of Purdue's primary liability was produced in prepetition discovery.  Nevertheless, some additional related discovery is appropriate in these cases.  Of particular significance, during prepetition discovery, the Debtors and the Initial Covered Sackler Persons were not required to conduct any searches of certain key custodians. For example, custodial files of just two of the eleven members of the Sackler family who served

6

on Purdue's board of directors were subject to discovery of any kind in the MDL, while two

other Sacklers produced only a comparatively small number of additional documents in the

Oklahoma litigation.  These are the only Purdue board members whose custodial files were ever

searched, and long-time Sackler and Purdue advisors, executives, employees, and affiliates also

escaped discovery entirely.  To properly investigate estate claims, it is critical that the Official

Committee gain access to documents from additional custodians.

16.     Some of the Initial Covered Sackler Persons have produced some documents in

response to the Official Committee's informal requests already, and refused to produce others (at

least for now).  However, the Initial Covered Sackler Persons have been unwilling to disclose as

much as the Official Committee believes is necessary, and even the productions that some of the

Initial Covered Sackler Persons appear willing to make in the future remain subject to ongoing

negotiations.  The Official Committee believes that the exchange of formal discovery requests,

objections and responses that the Official Committee seeks to precipitate by this Motion will, in

its view, advance the parties' meet and confer efforts, and may narrow the range of disputes

between them.  And critically, formal discovery will serve as the predicate for any motion

practice that may be required.

### RELIEF REQUESTED

17.     The Official Committee respectfully requests that the Court enter an order

pursuant to Bankruptcy Rule 2004, substantially in the form of the Proposed Order attached to

this Motion as **Exhibit B**.  Upon entry of the Rule 2004 order, the Official Committee intends to

serve subpoenas (the "Requests") on the Initial Covered Sackler Persons pursuant to Rule 2004.

The subpoenas will call for responses—which presumably will be in the form of objections

pursuant to Federal Rule of Civil Procedure 45(d)(2)(B), made applicable to bankruptcy

proceedings by Bankruptcy Rule 9016—within seven days.  The Official Committee believes

this is a reasonable time for the preparation of written objections considering that most of the requests contemplated hereby were provided to the responding parties informally months ago.  If the Initial Covered Sackler Persons indicate that seven days is not enough time to serve written responses, the Official Committee will of course consider their views in good faith, and will continue to meet and confer with those parties regarding timing for their actual production of responsive documents.

## **BASIS FOR RELIEF**

### I.    **Examinations Are Warranted under Bankruptcy Rule 2004.**

18.    Bankruptcy Rule 2004(a) provides, in relevant part, that "[o]n motion of any party in interest, the court may order examination of any entity."  Under Bankruptcy Rule 2004, a party-in-interest like the Official Committee may request discovery related to "acts, conduct, or property, or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."  Fed. R. Bankr. P. 2004(b).

19.    The purpose of Bankruptcy Rule 2004 is to "assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred."  *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004).  Rule 2004 permits discovery "to determine the extent of the estate's assets and recover those assets for the benefit of creditors."  *In re Madison Williams & Co., LLC*, No. 11-15896, 2014 WL 56070, at *3 (Bankr. S.D.N.Y. Jan. 7, 2014); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re: Bernard L. Madoff)*, No. 09-11893 (SMB), 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) ("The underlying purpose of Rule 2004 is to 'allow the court to gain a clear picture of the condition and whereabouts of the

bankrupt's estate.'" (quoting *Keene Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 42 B.R. 362, 364 (S.D.N.Y. 1984))).

20.     The scope of discovery allowed under Bankruptcy Rule 2004 is "'very broad and great latitude of inquiry is ordinarily permitted.'" *In re Madison Williams*, 2014 WL 56070, at *3 (quoting *In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985)).  Courts repeatedly have recognized that discovery provided for under Rule 2004 encompasses "broader discovery than is available under the Federal Rules of Civil Procedure." *In re: Bernard L. Madoff*, 2014 WL 5486279, at *2 (citing *In re Recoton Corp.*, 307 B.R. at 755); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[T]he scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a "'fishing expedition.'"); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (same).

21.     Bankruptcy Rule 2004 permits discovery of any party, including third parties, "if they have knowledge of the debtor's affairs." *In re Ecam Publ'ns, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991); *see also In re Recoton Corp.*, 307 B.R. at 755 ("Any third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation"); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("[T]he Court may authorize the examination of third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate.").

22.     Bankruptcy Code section 1103 expressly authorizes the Official Committee "to investigate the acts, conduct, assets, liabilities and financial condition of the Debtors." *In re Recoton Corp.*, 307 B.R. at 755.  The Official Committee requires the discovery requested in this Motion, which "may affect the administration of the debtor[s'] estate[s]," in order to investigate

potential estate claims. Fed. R. Bankr. P. 2004(b). With the requested discovery, the Official

Committee can investigate whether the Debtors' estates may hold valuable claims in connection

with, among other things, the estate claims outlined above, including but not limited to

intentional and constructive fraudulent conveyance and breach of fiduciary duty claims. The

information sought through this Motion relates directly to the "acts, conduct, or property or to

the liabilities and financial condition" of the Debtors and bears directly on the potential estate

claims. *See* Fed. R. Bankr. P. 2004(b). Thus, the discovery requested in this Motion is "*prima*

*facie* consistent with the Rule's . . . purposes of allowing the Committee to obtain information

necessary to determine whether claims beneficial to the estates exist and whether to pursue such

claims." *See In re Recoton Corp.*, 307 B.R. at 756.

23.     The discovery sought by the Official Committee through this Motion is critical to

its investigation of the Debtors' estate claims. On information and belief, the prepetition

discovery from the Debtors was not designed to address potential claims against the Initial

Covered Sackler Persons and others for intentional or constructive fraudulent transfer or breach

of fiduciary duty. The prepetition discovery directed to the Debtors was also far from complete

on other potential claims. And comparatively little discovery has been taken on any topics from

the Initial Covered Sackler Persons and other key decision-makers and defendants. Because an

"examination is necessary to establish the claim[s]" that the estate could pursue to benefit its

creditors, good cause exists to grant this Motion. *See In re Metiom, Inc.*, 318 B.R. 263, 268-270

(S.D.N.Y. 2004) (internal citations and quotations omitted) (affirming bankruptcy court's order

granting Bankruptcy Rule 2004 examination).

24.     Furthermore, while the Official Committee is engaged in good faith negotiations

with the Initial Covered Sackler Persons and others regarding the scope of those parties'

responses to the Official Committee's voluntary requests for information, it appears likely that disputes will soon crystallize regarding the responding parties' production obligations. Without an order pursuant to Bankruptcy Rule 2004 in place, the Official Committee will be hamstrung in its ability to bring such disputes before the Court for appropriate resolution.

### COMPLIANCE WITH RULES

25.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. The Committee submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

### NOTICE

26.     The Official Committee is proceeding with this Motion on an *ex parte* basis. Nevertheless, the Official Committee has provided informal notice of this Motion to the Initial Covered Sackler Persons (on both the Mortimer Side and Raymond Side).

### NO PRIOR REQUEST

27.     No prior request for the relief sought in this Motion has been made.

### RESERVATION OF RIGHTS

28.     The Official Committee and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Motion, to seek additional discovery, add additional parties, or to raise additional grounds for granting this Motion during any hearing on the Motion.

### CONCLUSION

29.     The Official Committee respectfully requests that the Court enter an order, substantially in the form of **Exhibit B**, that authorizes the Official Committee to undertake a Rule 2004 examination of the Initial Covered Sackler Persons.

New York, New York

Dated:  March 25, 2020

AKIN GUMP STRAUSS HAUER & FELD LLP


By: /s/ *Mitchell P. Hurley*

Ira S. Dizengoff
Arik Preis
Mitchel P. Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
jsorkin@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma, L.P., et al.*

# EXHIBIT A

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**AMENDED AND RESTATED CASE STIPULATION AMONG THE DEBTORS, THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND CERTAIN RELATED
PARTIES**

　　　　Purdue Pharma L.P. ("**PPLP**") and certain of its affiliates that are debtors in possession

in these chapter 11 cases (collectively, the "**Debtors**," the "**Company**" or "**Purdue**")[2], the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Although only certain of the Debtors (Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Purdue Transdermal Technologies L.P.; Purdue Pharmaceutical Products L.P.; Purdue Pharma of Puerto Rico; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; and Avrio Health L.P.) are defendants in the over 2,625 civil actions pending against the Debtors in various state and federal courts and other fora across the United States and its territories, the term "Debtors" is used for ease of reference.

1

Official Committee of Unsecured Creditors Committee appointed in the Debtors' chapter 11 cases (the "**UCC**"), and Beacon Company and Rosebay Medical Company L.P. (together, the "**Shareholder Parties**", and together with the Debtors and the UCC, the "**Parties**"), by and through their undersigned counsel, hereby stipulate and agree as set forth below.

## Recitals

A.  On September 15, 2019 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

B.  On September 18, 2019, the Debtors filed the *Motion for a Preliminary Injunction* ("**Preliminary Injunction Motion**").

C.  On September 26, 2019, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the UCC.

D.  On October 11, 2019, the Debtors, the Shareholder Parties, and the UCC entered into a "Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties" (D.I. 291) (the "**UCC Stipulation**").

E.  The Parties have conferred, and will continue to confer, in good faith on a variety of matters with respect to these cases, including the Preliminary Injunction Motion, and have reached the agreements set forth below, which amend and restate the UCC Stipulation.

NOW, THEREFORE, IT IS HEREBY STIPULATED AS FOLLOWS:

1.      For purposes of this Stipulation, "**Initial Covered Sackler Person**" shall mean the estate of Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of

2

the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such), each

Shareholder Party and each other entity or person that directly or indirectly owns equity in, or

has voting control over, any of the Debtors; and "**Additional Covered Sackler Person**" shall

mean, to the extent not an Initial Covered Sackler Person, any issue of Mortimer Sackler or

Raymond Sackler, any spouse of such person, any trusts of which any of the foregoing are

beneficiaries and the trustees thereof (solely in their capacity as such). The Shareholder Parties

represent that the Initial Covered Sackler Persons collectively own, directly or indirectly, each of

the entities to be listed pursuant to Item 7 on Exhibit B – Diligence List (each entity an "**IAC**"

and, together with all other such entities, the "**IACs**").

2.       Provided that there are no modifications to the proposed form of Stay Order (as

defined below) filed with the Bankruptcy Court on September 18, 2019 (other than those that are

consistent with this Stipulation or are otherwise agreed by the Debtors and the UCC), the UCC

consents to and supports the relief requested in the Preliminary Injunction Motion (the

"**Preliminary Injunction**") for an initial period of 180 days (the "**Initial Stay Period**") from

October 15, 2019 pursuant to an order of the Bankruptcy Court approving the Preliminary

Injunction (such order, with any changes to the proposed order filed with the Bankruptcy Court

on September 18, 2019 satisfactory to the Debtors and the UCC, the "**Stay Order**"), and the

Debtors hereby agree to seek an Initial Stay Period of 180, not 270, days[3]; *provided, however*

that nothing herein shall prohibit the Debtors or the UCC from seeking or objecting to any relief

sought by any party with respect to the Preliminary Injunction for any period after the Initial Stay

Period that they deem necessary or appropriate. For the avoidance of doubt, the Debtors and

---

[3] For the avoidance of doubt, nothing herein is intended to limit or otherwise modify the scope of the injunctive
relief requested by the Debtors in the Preliminary Injunction Motion.

#92509903v45

UCC may jointly decide to seek to extend the Initial Stay Period by joint motion at any time (any such extended period, together with the Initial Stay Period, the "**Stay Period**").

3.     The Debtors agree that during the Initial Stay Period they will not file (i) a chapter 11 plan (a "**Plan**") or disclosure statement for any of the Debtors, or (ii) a motion seeking approval of a restructuring support agreement (or similar agreement) with any party, in each case absent the support of the UCC.

4.     Prior to the date that is 60 days after the date of expiration of the Initial Stay Period, the UCC shall not seek, directly or indirectly support, or encourage any other party to seek, and shall join and support the Debtors in opposing any motion by any party to (i) terminate, shorten, condition or otherwise modify the Debtors' exclusive periods to file or solicit votes on a Plan (the "**Exclusive Periods**"), (ii) obtain co-exclusivity with the Debtors, or (iii) obtain any other similar relief.  The UCC shall support a motion by the Debtors to extend the Exclusive Periods for the duration of the Initial Stay Period.

5.     During the Initial Stay Period, the Debtors shall not file (i) any motion seeking approval of any settlement of any estate causes of action or other claims of the Debtors against the Initial Covered Sackler Persons and the Additional Covered Sackler Persons (together, the "**Covered Parties**") or (ii) any other motion seeking approval of any terms of a Plan or a resolution of a material portion of the Debtors' opioid litigation (other than with respect to the Department of Justice), in each case without the consent of the UCC.  Where it is, in the Debtors' discretion, practicable to do so without causing harm, risk or prejudice to their negotiations with the Department of Justice, the Debtors shall in good faith consult with the UCC regarding such negotiations.

4

6.      During the Initial Stay Period, the UCC shall not file, directly or indirectly support, or encourage any other party to file, and shall join the Debtors in opposing, any motion by any party seeking (i) to investigate or prosecute, or standing to investigate or prosecute, estate claims or causes of action, (ii) the appointment of a trustee, examiner (with or without expanded powers), responsible person, or any similar relief with respect to the Debtors' or this Bankruptcy Court's current rights, powers, authority and obligations, or (iii) the dismissal or conversion of these chapter 11 cases to chapter 7 cases.

7.      During the Stay Period, the Debtors shall provide the UCC and its professionals (on a professionals' eyes-only basis until a suitable protective order has been agreed to and entered by the Bankruptcy Court, and then in accordance with the terms of such order, which shall also provide for appropriate professionals' eyes-only designation, and materials provided before entry of the order will be designated or re-designated by the Debtors in accordance with the order and subject to its terms) with information that is reasonably requested and necessary or appropriate to perform due diligence (the "**Company Diligence**") regarding matters relating to the Debtors' chapter 11 cases, without the need for the UCC to file formal discovery.  The Company Diligence shall include, without limitation:

   a.  Any final reports prepared for, by or on behalf of the Special Committee of the Board of Directors, identifying, evaluating and/or valuing transactions between the Debtors and the Shareholder Parties and/or their respective affiliates and reasonable substantive updates with respect to the developing content of such reports, prior to their finalization, including privileged analysis and conclusions subject to and protected by common interest;

5

b.  Year-to-date August 2019 financials for each of the Debtors, on a consolidating as well as on a consolidated basis. Audited financial statements for Purdue Pharma L.P., Rhodes Technologies, Rhodes Pharmaceuticals L.P. and combined entities, for 2018 and prior, where available for the time period 1996-2017 and unaudited financials to the extent audited financials are not available. For the avoidance of doubt, the Debtors shall not be required to create any new work product;

c.  Final business plans and forecasts for the Debtors as well as detailed historical financial information of the Debtors and other financial and operational diligence reasonably requested by the UCC (including, without limitation, all returns in the Debtors' possession that were filed with the IRS or other taxing authorities whether as a taxpayer or pass-through entity for the past 20 years);

d.  Customary legal diligence reasonably requested by the UCC;

e.  Unless disclosure is prohibited by the applicable agreement, and in which case subject to the Debtors providing the counterparty or counterparties with any required notice and opportunity to object to such disclosure, copies of the Debtors' material contracts, including all contracts with any  Shareholder Party, or any affiliated entity (including any IAC) – it being understood and agreed that no Covered Party may prohibit such disclosure;

f.  Reasonable access, pursuant to reasonable protocols to be established, by UCC professionals to members of the Debtors' management team to answer questions and elaborate on Company Diligence materials;

6

g.  Minutes, board materials, and presentations with respect to any meetings of the Debtors' Board of Directors or any committee of the Board of Directors, provided such documents are reasonably available, for the past 20 years;

h.  Access by counsel to the UCC to the documents produced by the Debtors or the Shareholder Parties in the MDL proceeding captioned, *In re: National Prescription Opiate Litigation*, Case No.: 1:17-md-2894-DAP (the "**MDL litigation**"), in a word searchable OCR format along with reasonable access to the Debtors' litigation counsel to assist the UCC in locating produced documents with respect to identified subject matters, provided that UCC counsel shall have executed the MDL protective order dated as of May 15, 2018 (the "**MDL Protective Order**"), with any amendments necessary solely to permit the appropriate use of such documents by the UCC in these chapter 11 cases.  For the avoidance of doubt, the Debtors shall take all steps reasonably necessary to aid the UCC in obtaining any such necessary amendments, and, upon the execution of such documents, the Debtors will provide the MDL litigation documents within three (3)  business days;

i.  Copies of all of the Debtors' insurance policies and any insurance policy in which the Debtors may incur any liability (including to the extent relating to a non-Debtor entity or person), including, without limitation, copies of all D&O and products liability insurance policies, where available, since 1999;

j.  Communications and analysis with respect to the Debtors' D&O and product liability insurance coverage and the potential settlement of any coverage disputes with the insurance carriers under such policies (the "**Insurance Carriers**");

7

k.  Information with respect to the maximization of value of the Debtors' assets, as well as information with respect to the potential plan structure described in the informational brief, and the Debtors' present and developing opioid overdose reversal and addiction treatment medications; and

l.  Information and reasonable updates, including as reasonably requested by the UCC, with respect to the ongoing investigations by and on behalf of the Special Committee of the Board of Directors with respect to potential claims and causes of action against the Covered Parties and any final reports, presentations or other materials prepared for, by or on behalf of the Special Committee of the Board of Directors regarding such matters, including privileged analysis and conclusions subject to and protected by common interest; and

m.  Access by counsel to the UCC on a prompt and rolling basis to all documents produced by the Debtors in pending civil litigation other than the MDL litigation (which is addressed in Paragraph 7(h) above) and with respect to the Department of Justice, in a word searchable OCR format along with reasonable access to the Debtors' litigation counsel to assist the UCC in locating produced documents with respect to identified subject matters.

8.  During the Initial Stay Period, neither the Debtors nor any Covered Party shall (i) engage in any insurance settlement communications with the Insurance Carriers without consulting the UCC or (ii) file any motion seeking to settle (or otherwise settle, or seek to settle) any coverage dispute or liability with any of the Insurance Carriers without the consent of the UCC.

8

9.      The Debtors agree promptly to commence and thereafter work during the Stay Period with the UCC on issues with respect to claims allowance, categorization and classification, including with respect to methods of allowance, distribution and allocation.  The Debtors and the UCC will work with a broad array of governmental and non-governmental claimants to attempt to resolve disputes regarding intercreditor issues expeditiously and minimize, to the extent possible, litigation and claims disputes.

10.     During the Stay Period, the Debtors and the UCC shall engage in good faith discussions and explore all options for the Debtors' business and assets, with the twin goals of value maximization and promoting the public health and welfare.

11.     The Debtors and the UCC agree to work to build creditor support for the utilization of $200 million (the "**Emergency Fund**") from the Debtors' balance sheet to provide emergency relief and assistance with respect to the opioid crisis during the first six months after the approval of this Order, and, only after having achieved substantial support, including without limitation, from the Ad Hoc Group of supporting parties, to move the Bankruptcy Court for authority to establish such Emergency Fund. The Debtors agree to consider in good faith the items listed on **Exhibit A** as proposed by the UCC, and to solicit the view of other stakeholders, as to potential uses of such monies in the Emergency Fund.

12.     The Debtors and the UCC hereby agree, and the Bankruptcy Court hereby finds that (i) the Debtors and the UCC, as estate fiduciaries, have a common interest in the matters discussed herein (but solely to the extent provided herein), (ii) there shall be common interest and joint defense privileges for all communications, work product, documents, analyses, and other materials shared between or among the Debtors and the UCC and their respective professionals as to the matters discussed and to the extent provided herein (the "**Materials**"), (iii)

9

the Materials shall be confidential and shall not be subject to discovery by or other disclosure to any other party on account of having been provided to the Debtors or the UCC, and (iv) the provision of the Materials by the Debtors and the UCC to one another shall not operate as a waiver of any privilege or allow any third-party any rights with respect to the Materials.  For the avoidance of doubt, nothing in this Stipulation requires the Debtors or UCC to provide to the other or to any other party (x) any privileged or work product documents or information (except as expressly set forth herein), (y) any privileged information or analysis with respect to which there is no unity of interest between the Debtors and UCC, or (z) any documents or information that could be asserted to be a waiver of privilege as to third parties.

13.     Prior to the date that is 30 days after the expiration of the Stay Period, no Covered Party shall take any action with respect to any material amount of his, her, or its property that is located inside or outside the United States with the intent or material effect of frustrating enforcement of any potential judgment of this Court in these chapter 11 cases or any other actions pending against them in any other court or jurisdiction.

14.     Each Shareholder Party shall provide a copy of this Stipulation to each of its known related Covered Parties[4] within five (5) business days of entry of the order affirming this Stipulation and shall certify upon completion to the Debtors and the UCC that it has done so.  To the extent a Shareholder Party discovers or becomes aware of a related Covered Party that has not been provided a copy this Stipulation, it shall promptly provide such copy and supplement its certification to the Debtors and the UCC.

---

[4] With respect to Beacon Company, the related Covered Parties shall mean the issue of Mortimer Sacker, and with respect to Rosebay Medical Company LP shall mean the issue of Raymond Sackler, and in each case, any spouse of such person, any trusts of which any of the foregoing are beneficiaries and the trustees thereof (solely in their capacity as such).

10

15.    Upon delivery of a copy of this Stipulation to an Additional Covered Sackler Person, as required by Paragraph 14 hereof, such Additional Covered Sackler Person shall be deemed to be a Covered Party for all purposes under this Stipulation, unless it files, which may be under seal, with the Bankruptcy Court within ten (10) business days following such delivery, an opt-out notice to this Stipulation and serves such notice on counsel to each of the Debtors and the UCC.  Upon the filing of an opt-out notice by or on behalf of an Additional Covered Sackler Person (and written notice to the Debtors and the UCC that shall include sufficient information to identify such Additional Covered Sackler Person, including the name and address thereof or of any trustees thereof (subject to reasonable confidentiality protections)), such Additional Covered Sackler Person shall be deemed not to be a Covered Party for any purpose under this Stipulation. The filing of an opt-out notice shall not be deemed to be a consent to jurisdiction of this Court for any purpose.

16.    Each Covered Party consents, or shall be deemed to have consented, to Paragraph 13 hereof and to the jurisdiction of the Bankruptcy Court for the sole purpose of enforcing (1) all provisions hereof that are expressly applicable to such Covered Party and (2) all provisions of the order granting the Preliminary Injunction Motion expressly applicable to such Covered Party, including, in each case, the enforcement of any sanctions, penalties or any other remedies imposed by the Bankruptcy Court in each case in connection with a violation of Paragraph 13 or other applicable provision hereof or thereof that are expressly applicable to such Covered Party. For the avoidance of doubt, (i) no Initial Sackler Covered Person shall have any right to opt out, and all such persons shall be bound by the provisions of this Stipulation expressly applicable to them, and (ii) the Debtors and the UCC reserve all of their rights with respect to each Additional Covered Sackler Person that has delivered an opt-out notice, including without limitation,

11

#92509903v45

discovery pursuant to Bankruptcy Rule 2004 or otherwise, and prejudgment attachment under applicable law.

17.    Each Shareholder Party or Initial Covered Sackler Person, as applicable, agrees to make available, or cause to be made available, to the Debtors and the UCC the information set forth in Exhibit B hereto and as described in Exhibit B of that certain Summary Term Sheet filed in the Debtors' chapter 11 cases at Docket No. 257, as well as all diligence (whether in written or narrative form) that has been or may be provided to the Ad Hoc Group of Supporting Parties or the Ad Hoc Group of Non-Consenting States ("**Non-Consenting State Group**")[5], on no more restrictive terms than as given to the Ad Hoc Group of Supporting Parties or Non-Consenting State Group, and substantially simultaneously with the provision of such diligence to the Ad Hoc Group of Supporting Parties or Non-Consenting State Group, with the understanding that there will be cooperation among the professionals of the Ad Hoc Group of Supporting Parties, the Non-Consenting State Group, the Debtors and the UCC with regard to receipt of information from the Shareholder Parties and the IACs. The Covered Parties will produce the information identified in the preceding sentence on a rolling basis and will work in good faith to complete their production by January 9, 2020.  The Covered Parties shall also cooperate in good faith to permit prompt and full UCC access to documents produced by the Covered Parties in the MDL litigation and all other civil litigation other than with respect to the Department of Justice, by October 25, 2019, and will consider in good faith the provision of any extant indexes or similar documents that would assist in the navigation of such produced documents.  In addition, subject to the confidentiality agreement entered into between the Shareholder Parties and the UCC on or around October 31, 2019, to be superseded by a confidentiality order agreed among the Parties

---

[5] The Bankruptcy Rule 2019 statement for the Non-Consenting State Group is filed at Docket No. 296.

12

and entered by the Bankruptcy Court (which the Parties shall use good faith efforts to agree as promptly as is reasonably practicable), the Shareholder Parties will provide the following to the legal and financial advisors to the Debtors and the UCC:

> (a) By no later than November 22, 2019, an explanation and analysis regarding where the assets held by the Initial Covered Sackler Persons are located; in what format (trust, corporation, partnership, etc.) they are held; why the applicable Initial Covered Sackler Person selected such format (*i.e.*, tax or other reasons, etc.), if known; a general understanding of the type of such assets; whether, in their view, any individual Initial Covered Sackler Person (and such person's assets) are subject to the jurisdiction of the Bankruptcy Court; and, no later than January 15, 2020, (i) a report setting forth the net assets of the Initial Covered Sackler Persons, which report will set forth the approximate aggregate value of the assets owned by category (e.g. cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category, and (ii) an attestation from a responsible person or independent third party as to the accuracy of the report (it being expressly understood and agreed that nothing in this subparagraph (a) shall prejudice the rights of the Debtors or the UCC to seek additional discovery, information or diligence from the Covered Parties pursuant to the terms of this paragraph 17); and

> (b) By no later than November 25, 2019, substantial information with respect to a thorough explanation and analysis of the defenses that the Shareholder Parties intend to make with regard to any and all causes of action that have been or

#92509903v45

may be (within the reasonable expectation of the Shareholder Parties) brought

against them, including, as necessary, caselaw support for such defenses.

Notwithstanding anything to the contrary herein, the Debtors and the UCC shall, after written

notice to the Covered Parties delivered on or after (but not prior to) January 19, 2020, have the

right to seek discovery of the Covered Parties whether under Rule 2004 of the Federal Rules of

Bankruptcy Procedure or otherwise, and, should the Debtors or the UCC seek such discovery, all

voluntary diligence and informational obligations of the Covered Parties hereunder shall

immediately terminate. The Debtors and the UCC may request additional information and

diligence from the Covered Parties on a voluntary basis, including prior to January 19, 2020, and

the Covered Parties reserve all their rights with respect to any such requests.

18.    To the extent that at any point during the Stay Period, the Debtors or the UCC

believe that the Shareholder Parties are not acting in good faith or cooperating or communicating

and working productively with the Debtors or the UCC, as applicable, or not otherwise abiding

by this Stipulation, the Debtors and the UCC, as applicable, may provide notice to Shareholder

Parties.  If, within five (5) business days, the Debtors or the UCC, as applicable, are not satisfied

that such issues have been remedied, the Debtors or the UCC, as applicable, shall have the right

to request a chambers conference with the Bankruptcy Court (where only the UCC, the Debtors,

and the Shareholder Parties shall participate) wherein the Bankruptcy Court will be asked to

determine (i) whether the Shareholder Parties are failing to abide by this Stipulation and order,

and (ii) the appropriate remedy therefor.

19.    To the extent that at any point during the Stay Period either the Debtors or the

UCC believe that the other is not acting in good faith with respect to their obligations under this

Stipulation, each shall have the right to provide detailed written notice by electronic mail to the

14

other.  If, within five (5) business days of sending such notice, the sender believes in good faith that the recipient has or will not cure their non-compliance with this Stipulation, the sender shall have the right to request a chambers conference with the Bankruptcy Court (where only the UCC and the Debtors shall participate) wherein the Bankruptcy Court will be asked to determine (i) whether the recipient is not abiding by this Stipulation, and (ii) the appropriate remedy therefor.

20.    The Debtors and the UCC agree to cooperate with one another with respect to and as set forth herein, and believe that entry into this Stipulation is consistent with their fiduciary duties.

21.    In the event of the death of a Covered Party who is a natural person, other than a natural person who is a Covered Party solely in the capacity of a trustee, the estate of such person shall become (to the maximum extent permissible under local law) a Covered Party under this Stipulation.

22.    The Initial Covered Sackler Persons agree not to actively engage in the opioid business in the United States (other than by virtue of their ownership of beneficial interests in the Debtors), and that they will not take any action that would interfere with the Debtors' compliance with its obligations under the Voluntary Injunction.

23.    The "Execution Date" shall be the date on which the Debtors, the Shareholder Parties, and the UCC have all signed this Amended and Restated Stipulation.

24.    Upon the Execution Date, this Amended and Restated Stipulation shall supersede the UCC Stipulation in all respects.

25.    In the event that the stipulation with the Ad Hoc Group of Supporting Parties and/or the Ad Hoc Group of Non-Consenting States (as such stipulation may be amended, modified or supplemented from time to time) shall include any provision that could be deemed to

15

be more favorable in any respect to the rights granted to the UCC, the Shareholder Parties and/or the Debtors in this Stipulation, such provisions shall automatically be incorporated herein by reference with the same force and effect as though fully set forth herein.

26.    The Shareholder Parties represent and warrant that they or their undersigned counsel are authorized to bind and commit the Initial Covered Sackler Persons.

*[Remainder of page intentionally left blank]*

STIPULATED AND AGREED:

Dated:    November 5, 2019
              New York, New York

                                        DAVIS POLK & WARDWELL LLP

                                        By:   /s/ Timothy Graulich

                                        450 Lexington Avenue
                                        New York, New York 10017
                                        Telephone: (212) 450-4000
                                        Facsimile:  (212) 701-5800
                                        Marshall S. Huebner
                                        Benjamin S. Kaminetzky
                                        Timothy Graulich
                                        Eli J. Vonnegut

                                        *Proposed Counsel to the Debtors*
                                        *and Debtors in Possession*

Dated:    November 5, 2019
              New York, New York

                                        AKIN GUMP STRAUSS HAUER & FELD LLP

                                        By:   /s/ Arik Preis

                                        One Bryant Park
                                        Bank of America Tower
                                        New York, New York 10036
                                        Telephone: (212) 872-1000
                                        Facsimile: (212) 872-1002
                                        Ira S. Dizengoff
                                        Arik Preis
                                        Mitchell Hurley
                                        Sara L. Brauner

                                        *Proposed Counsel to the Unsecured Creditors*
                                        *Committee*

17

STIPULATED AND AGREED:

November 5, 2019
New York, New York

                              MILBANK LLP

                              By:   /s/ Gerard Uzzi _____

                              Gerard Uzzi
                              55 Hudson Yards
                              New York, NY 10001
                              Telephone: (212) 530-5000

                              *Counsel to Rosebay Medical Company L.P.*

November 5, 2019
New York, New York

                              DEBEVOISE & PLIMPTON LLP

                              By:   /s/ Jeffrey J. Rosen _____

                              Jeffrey J. Rosen
                              Maura Kathleen Monaghan
                              M. Natasha Labovitz
                              919 Third Avenue
                              New York, NY 10022
                              Telephone: (212) 909-6000
                              Fax: (212) 909-6836

                              *Counsel to Beacon Company*

Dated:  White Plains, New York
         November 20, 2019                /s/Robert D. Drain _____
                                          Honorable Robert D. Drain
                                          United States Bankruptcy Judge

                                      18

## Exhibit A

- Provide immediate, life-saving recovery support services to victims of the opioid crisis who lack financial resources or access to private or state treatment providers, including, among other things, assessments, treatment placement (as assessed), harm reduction, naloxone distribution, housing, employment, long-term care, mobile outreach units, medical services, family support, peer counseling and peer recovery support services. Distributions of funds for account of recovery support services may be streamlined through qualified non-profit recovery community organizations ("RCOs") that provide such services as recognized by the federal government's Substance Abuse and Mental Health Services Administration (SAMHSA). The amount of funding received by states with qualified RCOs will be determined, and may be proportional to the states' respective overdose rates. Guidelines and an application process will be created to allow such organizations to apply for grants to receive funding from the Emergency Fund. Qualified 501c3 not-for-profits in the process of becoming qualified recovery community organizations in states without an existing RCO may have access to funds, with a qualified RCO acting as mentor organization and/or fiscal agent while pending qualification on a case-by-case basis.

- Harm reduction services for individuals in underserved communities that continue to suffer from opioid use disorder. Such services include, among other things, overdose prevention, naloxone and syringe access services. Funds used for harm reduction services may be distributed through qualified non-profit community-based organizations ("CBOs") in all 50 states in consultation with the Harm Reduction Coalition national organization. The amount of funding received by states with qualified CBOs will be determined, and may be proportional to the states' respective overdose rates.

- (a) provide peer support services for families of those lost to opioid addiction and those still struggling with opioid use disorder, (b) provide assistance to centers where children are born with Neonatal Abstinence Syndrome ("**NAS**") facing immediate medical issues upon birth, and (c) assist with maternal addiction treatment centers (i.e. funds for centers that treat pregnant addicted women). Funds used for these services may be made available to qualified not-for-profit 501(c)(3) organizations (or other centers) whose mission statements include providing direct services to such family members, children, or women, as described above. Guidelines and an application process would be created to allow such organizations to apply for grants to receive funding from the Emergency Fund, and amounts provided to such organizations will be determined by the geographic areas served by such organizations and other criteria.

19

## Exhibit B - Initial Diligence

The following shall be provided initially on a Professionals' Eyes Only ("**PEO**") basis to the Debtors and the UCC, to the extent the documents listed below are available:

1.  IAC presentation materials, including a copy of the investment banker presentation made available to certain parties prior to the petition date (the **"IB Presentation"**), historical financial results, accounting of excess cash for 2019, current projections, business plans and valuations, on an entity level basis where available, and other customary financial, operational, and legal diligence reasonably requested by the Debtors or the UCC.

2.  Updated financials for each of the IACs.

3.  Reasonable access by the professionals to the Debtors and the UCC to members of the IACs' management teams.

4.  Reasonable access to books and records of the IACs.

5.  Tax information generally necessary to understand the tax liability set forth in the clause (i) referenced in the definition of Net Proceeds set forth in the Summary Term Sheet, with information necessary to determine such tax liability to be provided subsequently.[6]

6.  Quarterly reports listing the material legal and other fees and expenses incurred by the Shareholder Parties in connection with the chapter 11 cases and the Ex-U.S. Sales.

7.  An accurate and complete list of all Ex-U.S. pharmaceutical entities, related businesses, joint ventures, or other holdings directly or indirectly owned or controlled by any Shareholder Party, and that are included in the financial information provided in the IB Presentation.

8.  An accurate and complete list of all Initial Covered Sackler Persons and, contemporaneously with delivery thereof to the Ad Hoc Group of supporting parties, any proposed releasees as contemplated under the Summary Term Sheet.

9.  Reasonably promptly following the presentation by the Shareholder Parties of a proposed allocation among payors of the proposed Consenting Shareholder Cash Contribution, information necessary to assess the reasonableness of such proposed allocation and to determine the assurances that are necessary regarding the ability of the Shareholder Parties to satisfy the Guaranteed Contribution in full when due, taking into account the results of diligence regarding the IACs.

10. Information with respect to the payment to state, federal and non-U.S. taxing authorities of amounts received by Covered Parties from the Debtors as tax distributions.

---

[6] All capitalized terms used in this Exhibit B that are not otherwise defined herein shall have the meanings ascribed to them in that certain Summary Term Sheet filed in the Debtors' chapter 11 cases at Docket No. 257.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER PURSUANT TO FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE 2004 AND 9016 AUTHORIZING**
**EXAMINATION OF THIRD PARTIES**

Upon the motion, dated March 25, 2020 (the "Motion"), of the Official Committee of

Unsecured Creditors (the "Official Committee") of Purdue Pharma L.P. ("Purdue") and its

affiliated debtors and debtors-in-possession (collectively, the "Debtors," and together with

their non-Debtor affiliates, the "Company") for an order pursuant to the Federal Rules of

Bankruptcy Procedure 2004 and 9016 authorizing an examination; and the Court having

jurisdiction over the Motion pursuant to 28 U.S.C. § 1334(a); and the venue of these chapter

11 cases and the Motion being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409;

and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and no additional

notice being required except as provided herein; and, after due deliberation and good and

sufficient cause appearing therefor; now, therefore,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable
jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal
Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium
Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp.
(4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue
Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805),
Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes
Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC
Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard,
Stamford, CT 06901.

**IT IS HEREBY ORDERED THAT:**

1.      The Official Committee is authorized, pursuant to Fed. R. Bankr. P. 2004, to conduct

an examination of the Initial Covered Sackler Persons, as defined in the Motion.

2.      This Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated:  White Plains, New York

_____          _____

THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE