

**MITCHELL P. HURLEY**
+1 212.872.1011/fax: +1 212.872.1002
mhurley@akingump.com

April 26, 2020

VIA ELECTRONIC COURT FILING
Hon. Robert D. Drain
U.S. Bankruptcy Court for the
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

      Re:    In re Purdue Pharma L.P., et al. ("Purdue" or "Debtors"), No. 19-23649 (RDD)

Dear Judge Drain:

      After extensive meet and confer efforts, certain preliminary discovery disputes have arisen between the Official Committee of Unsecured Creditors (the "UCC") and members of the Sackler family.  Accordingly, the UCC respectfully asks the Court to:

(1) Order (i) Side A[1] of the Sackler family to expand the responsive period for its search and production of electronically stored information ("ESI") and (ii) set a schedule on which Side A and Side B must begin and complete initial rolling ESI productions;

(2) For purpose of responding to the Subpoenas (defined below), deem the ICSPs[2] to be in "possession, custody or control" of documents that are in the immediate possession of the ICSP-owned and controlled Independent Affiliated Companies ("IACs");

(3) Require production of documents responsive to the Subpoenas from all Sackler Covered Parties; and

(4) Forbid the ICSPs from redacting portions of responsive documents on alleged "confidentiality" and "relevance" grounds.

---

[1] The Sacklers often refer to the issue of Mortimer Sackler as "Side A" (represented by Debevoise & Plimpton) and the issue of Raymond Sackler as "Side B" (represented by Milbank and Joseph Hage Aaronson).

[2] The Initial Covered Sackler Persons ("ICSPs") are (i) from Side A, Mortimer D.A., Ilene, Kathe, and Theresa, (ii) from Side B, Richard S., Jonathan D., David A., and the estate of Beverly Sackler (collectively the "Named ICSPs") plus, in each case, their trusts and affiliates and any "other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors."  Nov. Amended Case Stipulation [ECF No. 518] ("Case Stipulation") ¶ 1.  Covered Parties include any other issue of Mortimer or Raymond who chose not to "opt out" of the Case Stipulation. *Id.* ¶¶ 14, 15.  The UCC understands none did.



Hon. Robert D. Drain
April 26, 2020
Page 2

## BACKGROUND

The UCC is investigating Purdue and Sackler conduct that allegedly contributed to a devastating public health crisis, caused staggering personal and financial harm, and made the Sacklers one of the wealthiest families in the world.  All members of the Sackler family seek creditor support for a proposed Settlement Framework that, if agreed, would forever release them and all of their respective trusts and affiliates from liability of any kind arising from the opioid crisis.[3]  From the perspective of the UCC and other creditor groups, no such releases can be provided, nor any settlement evaluated, without exhaustive discovery.

Among other things, the UCC must assess the strength of the claims against the Sacklers and Purdue and consider whether the proposed consideration for the releases is adequate.  The UCC has been provided with millions of documents produced in the MDL and other pre-petition litigations, but that discovery omitted many custodians and concepts critical to these cases.  For instance, most members of the Sackler family—including most Sackler board members—**were not subject to searches of any kind**.  Moreover, it appears **no custodians** were subject to searches aimed at developing certain claims vital to these cases, including claims for intentional and constructive fraudulent conveyance, breach of fiduciary duty, aiding and abetting, illegal dividends and others.  Debtor-held custodial files of just two of the eleven members of the Sackler family who served on Purdue's board were subject to discovery in the MDL, while a small number of Debtor-held documents from two other Sacklers were produced in the Oklahoma litigation.  Only one Sackler ever searched and produced personal emails and ESI in these pre-petition litigations.  No other Purdue board member custodial files were ever searched in these litigations, and long-time Sackler and Purdue advisors, executives, employees and affiliates escaped discovery entirely.

The UCC has sought to fill these critical gaps for over six months, and comprehensive discovery is required to do so.  Indeed, the UCC supported the injunction largely so that the Debtors and Sacklers could focus on "producing detailed and voluminous information" in these cases, and noted that the UCC would consider "any hint that the [Sacklers] are using the injunction to evade" such discovery as "bad faith."  ECF No. 292 ¶¶ 2, 4.  In contrast, the Sacklers have expressed a preference for confining their disclosures primarily to PowerPoint and

---

[3] *See* Summary Term Sheet [ECF No. 257] at 2 (identifying term sheet as "by and among the Debtors, the Ad Hoc Committee and the Shareholder Parties") & ¶ 6 (defining "Shareholder Parties" as all claimants, the existing shareholders, including trusts, beneficiaries, companies, affiliates, [Sackler] *family members and any similar related parties*" and providing for "comprehensive releases" for the Shareholder Parties (emphasis added)).



Hon. Robert D. Drain
April 26, 2020
Page 3

other presentations prepared by their counsel.[4]  While they have said they will produce materials in addition to those supplied in support of their presentations, so far Side A has produced less than 800 such documents, while Side B has produced less than 6,000.

The UCC has given the Sacklers and the Debtors every chance to make the disclosures necessary to test the merits, *vel non,* of the Settlement Framework.  As required under the Case Stipulation, the UCC first proceeded on a voluntary basis, providing the Sacklers with informal discovery requests on November 25, 2019 and January 2, 2020, and proposed ESI search criteria on February 4, 2020.[5]  The UCC thereafter engaged in more than ten meet and confer calls with the Sacklers, and revised and narrowed its proposed search criteria three times in response to burden concerns expressed by Side B, and twice in response to Side A (who waited two months to respond to the UCC's first proposal).  While cordial, those conversations yielded little in the way of actual production by the Sacklers of—or even commitments to produce—ESI and other information sought by the UCC.[6]  Under the Case Stipulation, the UCC agreed not to seek 2004 discovery against any of the Covered Parties prior to January 19, 2020.  ECF No. 518 ¶ 17.  Ultimately the UCC gave the Covered Parties still more time, believing sincerely, but incorrectly, that the Sacklers would come around on ESI issues and relent on some of their more aggressive stands concerning issues like possession, custody, or control of IAC documents and redactions contrary to the terms of the Protective Order.  Unfortunately, they did not.  On March 31, 2020, the UCC served formal identical subpoenas on Sides A and B (the "<u>Subpoenas</u>"), and received responses on April 21, 2020.  Certain initial disputes have now been crystalized, as discussed below.

I.      **Side A Must Expand Its Search Period, and Both Sides Must Be Given Deadlines for Starting and Completing Initial ESI Productions**

It was not until the Court scheduled the hearing on this motion that the Sacklers agreed to go beyond terms used in the MDL and produce documents returned by search terms proposed specifically for these cases.  They continue to refuse, however, to include ESI from key

---

[4] The presentations by the Sacklers' counsel included about 700 supporting documents, most of which were publicly available or were produced before in the MDL.  The UCC is an estate fiduciary and cannot rely on the advocacy of the Sacklers' counsel in considering a settlement of claims against the Sacklers themselves.

[5] The UCC added a few discrete additional requests on February 4 and one more on March 3.  As part of the ordinary meet and confer process, the UCC also exchanged many letters and emails with the Sacklers' counsel in an effort to identify and narrow the scope of disputes regarding the UCC's outstanding requests.

[6] Side B agreed to apply search terms used in the MDL—which, as noted, were not directed to key claims in these cases—to four custodians.  While Side A made a representation that it too would apply the MDL terms (with certain limitations) to a handful of custodians, it has not commenced any actual review or production.



Hon. Robert D. Drain
April 26, 2020
Page 4

custodians in their review (discussed in more detail below) or provide any estimate for how long their initial ESI reviews and productions will take to complete.

Side B has agreed to review ESI for Richard, Jonathan and David Sackler, from 1995 (or as far back as ESI is available) through the petition date. Side B ran the UCC's February 4 search criteria against ESI for its preferred custodians but asserted they were too burdensome. Reserving all its rights to insist on additional custodians, the UCC revised its search terms three more times, substantially reducing the returned documents to approximately 475,000.[7] Side B again claimed undue burden, but declined the UCC's request to detail its claim by providing, *e.g.*, per-day review rates and costs, number and cost of available contract and other lawyers, vendors, etc. Ex. 1 (Apr. 20 Ltr. Akin to Milbank). Rather than provide the requested information, Side B said it would simply review the 475,000 documents, but only if the UCC agreed in advance not to propose modified terms for those custodians in the future. But as the UCC pointed out, once Side B begins its review, modifications are likely to be appropriate (*id.*)—indeed some could even *reduce* Side B's burden. Side B retracted its condition after the Court scheduled the hearing on these disputes, but would not estimate when its production would begin or end.

For its part, Side A has agreed to review ESI of Ilene, Kathe, Mortimer D.A., and Theresa Sackler, from 2010 through June 29, 2019.[8] Side A did not provide any hit report for the February 4 terms until April 4, though the title of Side A's report ("UCC Search Term Report – 20200310") suggests it was available by March 10, 2020. After Side A claimed undue burden, and despite its delay, the UCC promptly proposed narrowed terms that yielded approximately 308,000 documents.[9] Side A again claimed undue burden, but provided no details to help the UCC assess its claim, and would not identify any target number of documents that Side A would consider not unduly burdensome. After the Court scheduled the hearing in this dispute, Side A advised it would review the 308,000 documents, but declined the UCC's request for an estimate of when that rolling production would begin or end.

---

[7] Side B never gave the UCC a report of hits returned by the UCC's third revised criteria but represented that the total was within this range.

[8] Side A also has indicated it might be willing to expand its search back to 2008, but during a meet and confer call on April 24, its counsel was unsure whether it still had the source "devices." Previously, Side A also agreed to review and produce ESI of former Purdue director Samantha Sackler, but has removed her name from its list of custodians. Ex. 2 at 2 (Mar. 2 Ltr. Akin to Debevoise and others).

[9] *See* Ex. 3 (Apr. 25 Email Akin to Debevoise). As recently as April 24, however, Side A still was unable to advise with certainty whether the documents had been "de-duped" against materials produced pre-petition—a step that could greatly reduce the volume of documents for Side A's review.



Hon. Robert D. Drain
April 26, 2020
Page 5

Side A should be required, like Side B, to gather and produce ESI dating back as far as it exists, or to the introduction of OxyContin, whichever is more recent. What the Sacklers knew, and when they knew it, are questions that must be answered definitively before Purdue's creditors can seriously consider releases for the Sacklers. Sackler custodial documents concerning OxyContin, its addictive properties and potential for abuse, Purdue's potential exposure to opioid liability, the billions of dollars transferred from Purdue to Sackler family trusts and the IACs and other issues may also be critical to estate claims. Limiting these inquiries to 2010 or 2008 is not reasonable (as even Side B appears to recognize). Indeed, some of the most probative evidence on these subjects would likely coincide with key inflection points in Purdue's history that predate Side A's arbitrary cutoff, like the drug's introduction in 1995, the rapid expansion of Purdue's sales force through the end of the 1990s, high profile media reports on opioids in the early 2000s, the conduct to which Purdue admitted in connection with its $634 million settlement in 2007, and more.

Side A may argue that searching prior to 2010 or 2008 would increase its burden unduly, but at least as of April 24, Side A had not determined the extent of any added burden. But even if the Sacklers were required to review vastly more documents—and the UCC submits they should be required to gather ESI from additional custodians—the burden still would be comparatively light in the context of these cases. "Proportionality," the touchstone for evaluating whether or not a discovery burden is "undue," requires the Court to consider factors like "the importance of the issues at stake in the action," the "amount in controversy," the responding "parties' resources," and the need "for discovery in resolving the issues," among other factors. Fed. R. Civ. P. 26(b)(1). Here the resources of the Sacklers are vast, the claims at stake are of national significance, and damages are in the hundreds of billions of dollars (at least). Moreover, significant creditors have indicated they will not consider any settlement absent searching discovery from the Sacklers.[10]

In this context, the Sacklers' burden is not close to undue. Indeed, courts have imposed far greater burdens in cases involving large financial stakes and issues of great public concern. *See, e.g., John B. v. Goetz*, 879 F. Supp. 2d 787 (M.D. Tenn. 2010) (review and production of 15 million documents at cost of $10 million not undue in class action of great public concern); *Carusone v. Kane*, No. 16 Civ. 1944, 2019 WL 5424333. At *1 (M.D. Pa. Oct. 23, 2019) (discovery proportional in case "significant to the public" absent "showing" that discovery "is unimportant . . . and the burden . . . is excessive in comparison to the size of [the] litigation"); *Gen-Probe Inc. v. Becton, Dickinson & Co.*, No. 09 Civ. 2319, 2011 WL 13100706 (S.D. Cal.

---

[10] ████████████████████████████████████████
████████████████████████████████████████████



Hon. Robert D. Drain
April 26, 2020
Page 6

Aug. 25, 2011) (production of 450,000 documents at cost of $1 million ordered even though party already spent $1 million in discovery).

A firm deadline for completing the Sacklers' initial ESI productions also is required. These cases are more than six months old, and important aspects of written discovery, including the Sacklers' production of ESI, have not even begun, or have barely begun, and depositions will be required. Critically, all of this work must precede any serious settlement talks. It is therefore urgent that the Sacklers be required to complete the initial phase of ESI production on a reasonable schedule.[11] As described above, the Sacklers have been unwilling to detail their anticipated review process. However, based on the experience of its own counsel, the UCC believes the Sacklers should be required to begin their initial rolling ESI productions no later than May 15, and finish by no later than July 1, 2020.

## II.    The ICSPs Should Be Deemed to Have Possession, Custody, and Control of Documents in the Immediate Possession of IACs

The UCC has not had the opportunity to negotiate with the Sacklers over the appropriate scope of disclosure of documents in the immediate possession of the IACs because the Sacklers have refused to acknowledge that such documents are in the Sacklers' "possession, custody or control." *E.g.*, (Apr. 18 Email Debevoise to Akin ("On the IACs we continue to believe that our clients do not have possession, custody and control of the IAC documents and are not waiving any arguments or objections related thereto.")). The Sacklers are mistaken. "The concept of 'control' has been construed broadly." *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007). "[C]ontrol does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Id.* For this reason, "[i]t is well-established that an individual party to a lawsuit can be compelled to produce relevant information and documents relating to a non-party corporation of which it is an officer, director or shareholder." *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) (alterations omitted); *accord In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 181-82 (S.D.N.Y. 2006).

The ICSPs expressly admit that they own all of the IACs. ECF No. 518 ¶ 1. ███████

*See,*

---

[11] Indeed, some creditors have begun to suspect that the Sacklers' strategy is to induce fatigue in the hopes creditors will lose resolve and agree to a settlement that undervalues the estates' claims. These concerns might have been assuaged had the Sacklers engaged more cooperatively in discovery.



Hon. Robert D. Drain
April 26, 2020
Page 7

*e.g.*, Ex. 4 at 4-5; Ex. 5 at 10-11. That is unsurprising considering that the family has the power to sell, and has offered to sell, the IACs as a part of the Settlement Framework. Under these circumstances, there can be no serious doubt that the Sacklers have the "practical ability"—at least—to obtain IAC documents.

While continuing to deny control over the IACs, the Sacklers say effectively that they will "do their best" to "request" and obtain documents from the IACs if possible. They warn the UCC, however, that the IACs might conclude the Sacklers' "requests" for compliance with the UCC's Subpoenas are a "distraction" from their businesses and refuse to comply. When queried, the Sacklers were unable to identify a single example of an IAC defying them in this manner. The Sacklers also note they own the IACs collectively, and that no one of them alone can obtain documents from the IACs. If they want releases from this Court, however, the Sacklers must act collectively to the extent necessary to comply with the Subpoenas, and should be deemed to have control over IAC documents for that purpose, unless they supply concrete proof to the contrary. *See Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984) (responding party required to produce documents held by overseas affiliate where it was "inconceivable" that responding party would not have access to the documents, and where party "submitted nothing more than conclusory statements to show that these documents [were] not in its custody or control").

This is not an academic issue. The IACs number at least 127 and are almost all located abroad. It would be impractical for the UCC to serve subpoenas on them all, and certainly not in a reasonable period of time. The Sacklers, in contrast, already are subject to this Court's power, and are obliged by the Subpoenas' express instructions to gather IAC documents for use in these cases. During the voluntary phase of discovery, as an accommodation and subject to a full reservation of its rights, the UCC addressed IAC-related questions to Norton Rose Fulbright ("NRF"), a firm the Sacklers identified as "counsel for the IACs."[12] That approach was not satisfactory.[13] For example, on January 24, 2020, NRF advised it would run MDL search terms against "IAC-hosted or IAC-domain and email addresses . . . for any members of the Sackler family" and certain other key custodians, and produce responsive documents "on a rolling basis beginning next week." Ex. 8 (Jan. 24 letter ¶¶ 2, 3, 4). The UCC does not know why, but that promised production never occurred. NRF also failed to provide a list of roles of Sackler family

---

[12] NRF also acted as longtime counsel to the Sacklers themselves, and one of its partners, Stuart Baker, served in various positions at Purdue over the years ██████████████████████████████████████. Ex. 6.

[13] Remarkably, after the UCC complied with the Sacklers' suggestions that it provide its request to separate counsel for the IACs and other Sackler affiliates, Side B complained that the UCC had issued its requests "without regard to which counsel should receive them, thereby requiring coordination of responses and information gathering among various law firms." *See* Ex. 7 at 1 (Mar. 21 letter from Akin to Milbank).



Hon. Robert D. Drain
April 26, 2020
Page 8

members and others that NRF promised on February 24, and has not responded to a UCC email on these topics since February 28, 2020.[14]

To be sure, the IACs have produced about 4,700 documents, mainly financial diligence in considering the market value of the IACs. But the IACs also may have documents of great significance to litigation issues here. The Sacklers caused Purdue to transfer cash and property worth billions to the IACs, in some cases for little or no value. Purdue also may have entered into one-sided licensing deals and royalty agreements granting the IACs valuable IP rights at below market value. It also is possible that members of the Sackler family and others with knowledge of Purdue's value transfers and other affairs have IAC-hosted email accounts and other ESI that must be searched. Because many of the IACs are in the business of selling opioids, it also is likely that MNC directors, members of IAC compliance committees, and other personnel have relevant information, including relating to opioid addiction, abuse and diversion, the risk of liability accompanying the sale and marketing of opioids, and the waves of litigation confronting Purdue.

IAC documents of this kind will likely warrant production. But the UCC has not yet had the chance to engage in a meet and confer with the Sacklers concerning the IACs, their operations, and the types of documents that may be in their immediate possession. The UCC needs a partner that is accountable to the Court to engage in these negotiations. As long as the Sacklers are permitted to deny control of IAC documents, it will lack that partner.

### III.    Documents in the Immediate Possession of Sackler Covered Parties

All Covered Parties, not just the Named ICSPs, should be required to produce documents responsive to the Subpoenas. The Sackler parties certified that they contacted all known "issue" of Mortimer and Raymond, as well as "any spouse of such person, any trusts of which any of the foregoing are beneficiaries and the trustees thereof," and gave them an opportunity to "opt out" as required under the Case Stipulation. Exs. 10, 11; *see also* Case Stipulation ¶¶ 14-15. None appear to have done so, and thus all are Covered Parties. That means they all have enjoyed the protection of the injunction for more than six months, they all originally were immune from UCC 2004 discovery, and, of course, they all seek releases from the Court. ECF No. 518 ¶ 17. Notably, the Case Stipulation contemplates that *all* Covered Parties engage in disclosures, not

---

[14] NRF resurfaced on Friday, April 24, minutes after the UCC completed a meet and confer call with Milbank and Debevoise, providing by email a list of three Sacklers and their IAC email addresses. Ex. 9 (Email from NRF to Akin dated April 24, 2020). The email appears to have left out at least one Sackler ███████████████████, and does not include certain other information the UCC has long requested. The timing of NRF's email was not a coincidence, even noting that it was sent "[f]urther to [the UCC's] call with counsel to the Families earlier this evening."



Hon. Robert D. Drain
April 26, 2020
Page 9

just the Named ICSPs. *Id.* (requiring "Covered Parties" to "produce [certain] information identified" in the Case Stipulation, and "cooperate in good faith to permit prompt and full UCC access" to other materials). The UCC also believes that many of these Covered Parties themselves are represented by Debevoise or Milbank in these cases.[15]

It appears, however, that the Covered Parties are unwilling to cooperate by making responsive documents available for use in responding to the Subpoenas. The UCC does not believe it should be required to spend time and, more importantly, estate resources seeking to serve individual subpoenas on Covered Parties, and negotiating their separate compliance merely because they claim not to be ICSPs. In fact, the ICSPs arguably have possession custody or control over Covered Party documents to the extent they have the practical ability to obtain them from the other Covered Parties – the ICSPs' siblings, children and other family and affiliates. At a minimum, the named ICSPs should be ordered at least to *ask* the Covered Parties to provide responsive documents. If any Covered Party refuses, the named ICSPs should be required to detail that refusal for the Court and, in the UCC's view, should be carved out of any contemplated releases, as well as the protection of the Court's injunction.

The ICSPs argue that only Named ICSPs are likely to have relevant information. The UCC disagrees. First, each Covered Party received or benefited from billions of dollars in transfers from Purdue, and each may potentially be held liable as a subsequent transferee. Discovery of Covered Party ESI is therefore essential to anticipate and rebut any "good faith" defense. In addition, many Covered Parties likely have evidence relevant to other important issues, including whether Purdue transfers were fraudulent in the first instance. Regardless of their role at Purdue, each Covered Party had a stake in the billions of dollars generated by Purdue's activities, and may well have information about the litigation risk faced by Purdue at various times, and potential transfers to the family trusts.



---

[15] The UCC asked the Sacklers to provide a complete list of all Covered Parties and their counsel, but has not yet received that information. Ex. 12 (Email from Akin to Debevoise dated Apr. 24, 2020).



Hon. Robert D. Drain
April 26, 2020
Page 10

████████████████████████████████████████████████

In short, the Covered Parties likely are in possession of evidence probative of the estates' claims, and the UCC believes discovery is essential.[16] Nevertheless, the UCC has proceeded reasonably and sought compromise. For example, the UCC offered to limit searches of other Covered Parties to persons who had a Purdue email address and proposed substantially narrower search terms for them. The Sacklers rejected the UCC's offer, made no counterproposal, and insisted they have no "responsibility" to obtain such documents.

## IV.    Selective Redactions for Confidentiality and Responsiveness Are Inappropriate

The Sacklers elected unilaterally to redact from responsive documents the names of "investor counterparties" and personally identifying information ("PII") of certain Sacklers, contrary to the terms of the Protective Order. [ECF No. 969 ¶ 37]; *see* Exs. 20, 21 (examples of redacted documents). In negotiating the Protective Order, and after extensive negotiations, the parties agreed PII could be redacted during the voluntary phase of discovery, but that a further Court order would be required for redactions after service of Rule 2004 discovery. ECF No. 969 ¶ 37. The parties' bargain should be honored.

In any case, the Sacklers' approach to redactions is not justified. To the extent they claim information is highly sensitive, that is exactly what the Protective Order is designed to address. The Protective Order includes four separate levels of confidentiality designation. Documents marked at the most restrictive level, "Outside Professionals' Eyes Only," not only are protected from disclosure to the public, they cannot even be shared with principals. Nor should the Sacklers be permitted to selectively redact production documents on the grounds of "responsiveness." Certainly, the identities of investor counterparties and PII in these cases could well be relevant to the UCC's investigation, including concerning the scale, liquidity and location of the Sacklers' wealth. But neither the UCC nor the Court should be required to make these judgments in the dark. Instead, responsive documents should be produced in full, pursuant to appropriate designation under the protective order, and the parties and the Court can make up their own minds regarding relevance. Selective redaction of documents for responsiveness should be avoided because it "may deprive the reader of context," and tends to "breed suspicions." *In re State Street Bank and Trust Co. Fixed Income Funds Investment Litigation,*

---

[16] The threshold for justifying Rule 2004 discovery is not high, and is easily met here with respect to the Covered Parties. *See, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("Rule 2004 discovery is broader than discovery under the Federal Rules of Civil Procedure, and has fewer procedural safeguards. It can be legitimately compared to a fishing expedition.").



Hon. Robert D. Drain
April 26, 2020
Page 11


No. 08-md-1945, 2009 WL 1026013 (S.D.N.Y. Apr. 8, 2009); *see also John Wiley and Sons Inc. v. Book Dog Books LLC*, 298 F.R.D. 184 (S.D.N.Y. 2014) (similar); *United States v. Davis*, No. 85 Civ. 6090, 1988 WL 96843, at *3 (S.D.N.Y Sept. 13, 1988) (similar).  Finally, the Sacklers' approach also would place unwarranted burdens on the UCC and the estates, and would likely require regular "meet and confers" to test the propriety of particular redactions, motion practice, and requests for *in camera* review.  In light of the comprehensive terms of the existing Protective Order, that additional burden cannot be justified.

For all the foregoing reasons, the UCC respectfully asks the Court to enter the relief identified on the first page of this submission.

Respectfully submitted,


/s/ Mitchell P. Hurley

# EXHIBIT 1

# Redacted

# EXHIBIT 2

# Redacted

# EXHIBIT 3

# Redacted

# EXHIBIT 4

# Redacted

# EXHIBIT 5

# Redacted

# EXHIBIT 6

# Redacted

# EXHIBIT 7

**Redacted**

# EXHIBIT 8

# Redacted

# EXHIBIT 9

# Redacted

# EXHIBIT 10

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

<u>**Certification of Notice with Regard to Stipulation [Docket No. 291]**</u>

Pursuant to paragraph 14 of that certain *Case Stipulation Among the Debtors, the Office*

*Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 291] (the

"<u>Stipulation</u>"), filed with the Court in the above-referenced chapter 11 cases on October 11, 2019,

Beacon Company ("<u>Beacon</u>") hereby certifies to the Debtors and the UCC[2] as follows:

On or about October 23, 2019, in accordance with the Stipulation, Beacon caused a copy

of the Stipulation to be delivered to each of its then-known related Covered Parties via email and

FedEx. Thereafter through November 8, 2019, as additional related Covered Parties became

known to Beacon, it caused copies of the Stipulation to be delivered via email and FedEx to such

additional related Covered Parties.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Stipulation.

DATED: November 20, 2019

**BEACON COMPANY**

**Stanhope Gate Corp. as Managing General Partner**

..........................................................
Director

JONATHAN G. WHITE

Full Name

[SIGNATURE PAGE TO CERTIFICATION OF NOTICE]

# EXHIBIT 11

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | |
| | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | |
| | **Case No. 19-23649 (RDD)** |
| **Debtors.** | |
| | **(Jointly Administered)** |

**Certification of Notice with Regard to Stipulation [Docket No. 291]**

Pursuant to paragraph 14 of that certain *Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 291] (the "Stipulation"), filed with the Court in the above-referenced chapter 11 cases on October 11, 2019, Rosebay Medical Company L.P. ("Rosebay") hereby certifies to the Debtors and the UCC[1] as follows:

On October 18, 2019, in accordance with the Stipulation, Rosebay caused a copy of the Stipulation to be delivered to each of its then-known related Covered Parties via email and FedEx, provided that, in one instance, a copy of the Stipulation was delivered only by email where the relevant related Covered Party acknowledged receipt by phone also on October 18, 2019.[2]

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Stipulation.

[2]     After October 18, 2019, Rosebay discovered that it inadvertently left off of its initial list of related Covered Parties six trusts (the "Six Trusts") for which the trustees are Covered Parties in other capacities and otherwise received notice on October 18, 2019 in such other capacities. Although Rosebay believed that the notice delivered on October 18, 2019 was effective with respect to the Six Trusts, in the interest of caution, Rosebay independently confirmed with each trustee that the October 18, 2019 notice was effective as of October 18, 2019 with respect to the Six Trusts.

DATED: November 8, 2019

**Rosebay Medical Company L.P.**
by its general partner, Rosebay
Medical Company, Inc.

By: _____
Name:  Stephen A. Ives
Title:  Vice President

[SIGNATURE PAGE TO CERTIFICATION OF NOTICE]

# EXHIBIT 12

# Redacted

# EXHIBIT 13

# Redacted

# EXHIBIT 14

# Redacted

# EXHIBIT 15

# Redacted

# EXHIBIT 16

# Redacted

# EXHIBIT 17

# Redacted

# EXHIBIT 18

# Redacted

# EXHIBIT 19

# Redacted

# EXHIBIT 20

**Redacted**

# EXHIBIT 21

# Redacted