Hearing Date: May 1, 2020 at 2:00 p.m.

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PURDUE PHARMA L.P., *et al*., | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**STATEMENT OF THE PRIVATE INSURANCE CLASS CLAIMANTS CONCERNING DISCOVERY DISPUTES BETWEEN OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE SACKLERS AND APPLICATION UNDER BANKRUPTCY RULE 2004**

Eric Hestrup, *et al*. (collectively, "Private Insurance Plaintiffs"), in their individual and representative capacities (and with the class members, collectively, the "Private Insurance Class Claimants") in their respective actions (the "Private Insurance Class Actions"), in support of (a) the positions taken by the Official Committee of Unsecured Creditors ("UCC") in its April 26, 2020 Letter to the Honorable Judge Robert D. Drain [Docket No. 1089] (the "UCC Letter")[2] concerning ongoing discovery disputes with the Sacklers, and (b) Private Insurance Plaintiffs' application under Rule 2004 of the Federal Rules of Bankruptcy Procedure, respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows:  Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms not defined herein have the meanings ascribed thereto in the UCC Letter.

**Preliminary Statement.**

1.  The Private Insurance Plaintiffs are one of the ten parties, and one of the five private side creditor groups, currently engaged in the mediation of the allocation of value between the public and private side creditor groups.[3] As such, Private Insurance Plaintiffs have been recognized by this Court, the Debtors, the UCC and others as an important constituency in these cases. Private Insurance Plaintiffs have engaged with the Mediators and other parties in good faith, will continue to do so, and have no reason to believe that the other parties are not acting in good faith.

2.  Private Insurance Plaintiffs hope that the mediation will be successful, but note that such success would still leave a number of unanswered questions, including most importantly for purposes hereof - an appropriate resolution of the exposure of the Sacklers. To date, without hesitation, Private Insurance Plaintiffs have supported a consensual resolution of all issues in these cases including without limitation the imposition of a preliminary injunction to enable creditor due diligence in support of negotiation of a global settlement with the Sacklers. However, the Sacklers are obviously not entitled to releases from litigation claims unless: first, they make full financial disclosure, and second, they make a financial contribution that Private Insurance Plaintiffs and other creditors believe is commensurate with the Sacklers' potential exposure. The UCC, the Debtors, and various states are currently seeking discovery under Rule 2004 from the Sacklers and financial institutions with whom they have relationships. In order to have any chance of reaching a consensual resolution in this case, all mediation parties should be accorded broad discovery from the Sacklers to the extent they seek such relief.

---

[3] *See* Order Appointing Mediators [Hon. Layn Phillips & Mr. Kenneth Feinberg], dated March 4, 2020 [Docket No. 895] at ¶4(x).

3.   If the Sacklers are unwilling to make full financial disclosure to the UCC, Private Insurance Plaintiffs and other major constituencies, then there is no reason for the continuance of the preliminary injunction. This is especially the case where, as here, the Sacklers are resisting production of documents that they would be required to produce under Bankruptcy Rule 2004 irrespective of the preliminary injunction that is currently protecting them during settlement negotiations.

4.   The fact that the Sacklers are unwilling to provide financial disclosure, which is a minimal *quid pro quo* for the injunctive relief they are benefiting from, adds insult to injury. In short, the Sacklers should be given one last chance to make full financial disclosure. If they fail to honor their legal obligations under both Bankruptcy Rule 2004 and the preliminary injunction, then the injunction should be immediately dissolved.

5.   While Private Insurance Plaintiffs prefer a consensual resolution, we are unwilling to be taken advantage of, and we are certainly unwilling to negotiate in a vacuum or provide the Sacklers with a gratuitous release of what may be billions of dollars of exposure to the estates. The estates currently have over $1.4 billion in free cash.[4] This cash hoard can easily be utilized to enable confirmation of a plan that does not release the Sacklers, but instead adequately funds (a) an emergency relief fund, (b) very significant initial distributions to creditors, and (c) a litigation trust to pursue appropriate litigation claims against the Sacklers. Private Insurance Plaintiffs would prefer a consensual resolution over litigation, but one cannot settle a complex case such as this if the parties on the other side are unwilling to engage in an appropriate manner. The Sacklers should be directed to make full financial disclosure forthwith

---

[4] Corporate Monthly Operating Report (for February 2020) [Docket No. 1014].

SL1 1637656v1 113572.00002

to the UCC, the Private Insurance Plaintiffs, and all other creditor groups taking an active role in these cases.

**Purdue's Role in the Opioid Crisis.**

6. Purdue Pharma L.P. and its affiliates (collectively, "Purdue") created the opioid epidemic and profited from it through a web of illegal deceit. First, Purdue deceived doctors and patients to induce more and more people to take its dangerous drugs. Second, Purdue misled them to take higher and more dangerous doses. Third, Purdue deceived them to stay on its drugs for longer and more harmful periods of time. All the while, Purdue peddled falsehoods to keep patients away from safer alternatives.

7. Purdue took advantage of addiction to make money. For decades, physicians reserved opioids for treating short-term severe pain, or for patients near the end of life. But the traditional practice of limiting opioids to short-term treatments ended after Purdue introduced OxyContin. OxyContin's sole active ingredient is oxycodone, a molecule nearly identical to heroin. Purdue later introduced other dangerous opioids.

8. Aware that selling OxyContin only in compliance with its FDA-approved label would not generate the substantial revenue that it desired, Purdue devised a subversive and illegal plan to promote OxyContin for uses beyond the sole, narrow indication for which it had sought and received FDA approval. Specifically, Purdue (i) directed its sales force to push healthcare providers to write OxyContin prescriptions for more patients and at higher doses to treat chronic pain of any type, despite the known attendant dangers; (ii) paid those prescribers to essentially shill for it through sham speaking and consulting fees and other items of value; and (iii) fraudulently induced insurers to pay for the off label prescriptions, including by misrepresenting patients' diagnoses and treatment histories.

4

9. Patients who survive addiction need lengthy, difficult, and expensive treatment. People who are addicted to opioids are often unable to work. Babies are born addicted to opioids, because they are exposed to the drugs in the womb. In addition to this tragic human cost, Purdue's misconduct has imposed a heavy financial burden on the health care sector. Intensive care for a newborn who has been harmed by opioids can cost $200,000, even before the baby comes home from the hospital. The injuries from addiction and overdose are staggering. On October 28, 2019, the White House Council of Economic Advisers ("CEA") issued a report estimating that the opioid crisis "cost $696 billion in 2018—or 3.4 percent of GDP—and more than $2.5 trillion for the four-year period from 2015 to 2018."[5]

**Purdue's Role in the Opioid Crisis Is the Proximate Cause of Private Insurance Plaintiffs' Damages.**

10. Purdue's conduct has created higher demand and thus higher prices for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for residents of the United States.

11. The direct and proximate consequence of Purdue's misconduct is that every purchaser of private health insurance in the United States paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Purdue and passed all or virtually all of these increased costs through to insureds in the form of higher premiums, deductibles and co-payments.

---

[5] *The Full Cost of the Opioid Crisis: $2.5 Trillion Over Four Years* (Oct. 28, 2019), available at: https://www.whitehouse.gov/articles/full-cost-opioid-crisis-2-5-trillion-four-years/ (last visited 4/29/20).

5

12. While insurance companies may refuse to cover ineffective or dangerous treatments, they too were misled by Purdue's pervasive campaign to convince the healthcare industry that opioids were effective and necessary for long-term pain management. Insurers paid Purdue for the care ordered by patients' doctors, as well as for the resulting costs of addiction: treatment, emergency room care and other claims. Most of those costs were ultimately passed along by insurers to Private Insurance Class Claimants.

13. Superseding causes that are foreseeable or the normal incidents of the risks created by Purdue, such as doctors who prescribed the opioids (so-called "learned intermediaries") and patients who became addicted, will not break the chain of causation and relieve Purdue of liability as to the Private Insurance Class Claimants.

14. It was entirely foreseeable that Purdue's products would be sold in pharmacies; that a fraudulent marketing scheme would deceive doctors into prescribing medically unnecessary opioids; that patients would trust their doctors and fill their prescriptions; that Purdue's misconduct would result in insurers' initial losses in the form of overpayment for ineffective drugs and massive healthcare costs associated with opioid addiction; and that insurance companies would pay for and pass these costs on to their customers. Purdue needed to deceive the entire medical community so that health insurers—and ultimately those who purchase health insurance—would pay for OxyContin and Purdue's other opioids.

**Pending Private Insurance Class Actions.**

15. The Private Insurance Class Claimants consist of all persons (including natural persons and entities) who purchased health insurance policies in the United States from 1996 through the present, and all persons who paid for any portion of employer provided health insurance from 1996 through the present. The Private Insurance Plaintiffs filed 28 separate

6

Private Insurance Class Actions in their respective states of residence.[6] All of the Private Insurance Class Actions are currently stayed in connection with *In re National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio) (the "MDL").

16.    As a result of Purdue's bankruptcy petition, other Private Insurance Class Claimants have been prohibited from filing new Private Insurance Class Actions in their respective states of residence. However, on December 27, 2019, Private Insurance Class Claimants filed a nationwide class action complaint in the United States District Court for the Northern District of Illinois, *Hestrup v. Mallinckrodt PLC*, et al., Case No. 19–cv–08453 ("*Hestrup* Complaint").[7]

17.    Accordingly, Eric Hestrup will seek authority to file a class proof of claim on behalf of all Private Insurance Class Claimants in all U.S. states and territories, seeking to hold Purdue accountable for the economic harm it has imposed on all United States purchasers of private health insurance.

18.    Generally, the filed Private Insurance Class Actions assert state law claims for public nuisance, unjust enrichment, negligence, and civil conspiracy and federal claims under The Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO").

19.    Multiple courts have found opioid manufacturers owe a duty of care to claimants injured by their irresponsible conduct. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 2018 WL

---

[6] Those states consist of Alabama, Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wisconsin.

[7] As explained in paragraph 41 of the *Hestrup* Complaint, Purdue was not named as a defendant therein because of the automatic stay and the injunctive relief granted by the Bankruptcy Court. The *Hestrup* Complaint was subsequently transferred to the MDL and all proceedings in connection therewith are currently stayed.

6628898 at *18-19 (finding that opioid manufacturers owed a duty of care to local governments because it was "foreseeable that [they] will be responsible for combatting the creation of [a black] market [for opioids] and mitigating its effects"); *Alaska v. Purdue Pharma LP*, 2018 WL 4468439, at *4 (finding Purdue "had a duty to the State and its residents (1) to exercise due care in the advertising, marketing, promotion, and sale of opioid drugs; (2) not to make false, misleading, or deceptive statements about opioids and treatment for chronic pain; and (3) to report suspicious prescribes"); *In re Opioid Litigation*, 2018 WL 3115102, at *26 (rejecting opioid manufacturers' argument that they had no duty "to refrain from the lawful distribution of a non-defective product"); *City of Everett*, 2017 WL 4236062, at *4 (finding that the plaintiff had adequately pled the existence of a duty because it had alleged that "Purdue engaged in an affirmative act which created or exposed [the city] to a high degree of risk of harm"); *see also In re Opioid Litigation*, 2018 WL 4827862, at *16 (finding the plaintiffs have "adequately pled the existence of a duty owed by [opioid] distributor defendants by alleging that societal expectations required different behaviors on their part, including, but not limited to, refusing to fill suspicious orders for opioids").

**Private Insurance Class Claimants' Damages.**

20.     While Private Insurance Plaintiffs have been precluded from conducting discovery because of the stay imposed in connection with the MDL (and more recently due to the automatic stay), Private Insurance Plaintiffs preliminarily estimate that Purdue and other parties associated with the opioid crisis, including manufacturers, distributors and pharmacies, are jointly and severally liable to Private Insurance Class Members in an amount exceeding $282 billion plus interest, subject to trebling under RICO.

21.     The Centers for Disease Control and Prevention's estimate of total spending for healthcare costs attributable to the opioid epidemic is $28 billion per year. Statistics generated

8

by the Center for Medicare and Medicaid Services indicate that 34% of national healthcare spending is on private health insurance. This means that $9.52 billion of the $28 billion per year is borne by private health insurance. Private Insurance Plaintiffs can establish that insurance carriers passed through all or virtually all of their increased costs to Private Insurance Class Claimants. The time frame at issue covers 24 years (1996 to 2019), which works out to $225.9589 billion. At present value (2020), that amount increases to $282,415,726,440 in damages borne by private health insurance plus interest, subject to trebling under RICO.

22.     The Private Insurance Class Claimants' $282,415,726,440 in damages (over 24 years) is entirely consistent with the CEA's estimate referenced above that the opioid crisis has cost more than $2.5 trillion for the four-year period from 2015 to 2018.

23.     Even if one were to set aside joint and several liability of other participants in the opioid crisis (which Private Insurance Plaintiffs do not concede is appropriate), Purdue's stand-alone share of Private Insurance Class Claimants' $282,415,726,440 in damages is at least $45 billion plus interest, subject to trebling under RICO. That share reflects Purdue's 16% market share, and may be subject to an upward adjustment based on various aggravating factors including (a) Purdue's principal role in creating the opioid crisis, (b) that Purdue was one of the most egregious malefactors, (c) Purdue's efforts facilitated sales of other manufacturer's opioids, for which Purdue is partly to blame, and (d) initially government plans did not reimburse OxyContin, and Medicaid has never embraced reimbursing OxyContin, so private insurance likely paid a disproportionate share of the costs for OxyContin.

24.     Citing a Drug Enforcement Administration ("DEA") database, Purdue has claimed it only sold 3.3% of the prescription opioid pain pills in the U.S. from 2006 to 2012. However, as a recent ProPublica article noted, "the percentage of sales doesn't take the potency

9

and dose of the pills into account."[8] Instead, Purdue's favored analysis treats every pain pill as the same, whether it is a 5 milligram Percocet or an 80 milligram OxyContin – "analogous to measuring alcohol sales by equating a 12-ounce glass of 100-proof whiskey with a similar-sized can of light beer." *Id*. After analyzing the same data set touted by Purdue but accounting for the wide variation in strengths of prescription painkillers, including the amount and potency of opioid that they contained, ProPublica concluded that Purdue's market share was actually 16%, making Purdue the third-largest seller of opioids from 2006 to 2012. *Id*. Therefore, 16% is an appropriate market share for Purdue.

**New York State Has Filed Similar Claims On Behalf of its Health Insurance Consumers.**

25. It is noteworthy that Private Insurance Plaintiffs' theories have been expressly endorsed by New York State. For instance, on September 23, 2019, Linda A. Lacewell, the Superintendent of the Department of Financial Services of the State of New York, filed a letter with this Court objecting to Purdue's then pending request to pay $34 million in bonuses. [Docket No. 99] ("Lacewell Letter"). After describing some of Purdue's "intentional misrepresentations" which "helped cause the terrible opioid crisis we are facing as a nation," the Lacewell Letter focused on the health insurance consequences of the opioid epidemic: "More specifically, those misrepresentations appear to have caused a huge volume of unnecessary opioid prescriptions, thereby costing the insurance companies (and ultimately, consumers) not only tremendous sums in fraudulent prescription claims but also in follow-on claims for opioid-related treatment. This egregious behavior of some in the opioid industry has taken a terrible toll in human terms, as has been laid out in grave detail by others. It has also taken a tremendous

---

[8] David Armstrong and Jeff Ernsthausen, *Purdue Pharma touts data that downplay its role in the opioid epidemic, new analysis shows* (Sep. 9, 2019), available at: https://www.statnews.com/2019/09/09/purdue-pharma-data-downplay-its-role-in-opioid-epidemic/ (last visited 4/29/20).

SL1 1637656v1 113572.00002

<u>financial toll on the more than five million New York health insurance consumers who have been forced to pay ever-increasing premiums. The cost of that coverage has dramatically risen, in part as the direct result of increasing opioid-related claims. The Department estimates that New York consumers have overpaid an estimated $2 billion in insurance premiums over the past 10 years due to the costs associated with opioid manufacturers and others misrepresenting the safety and efficacy of opioids.</u>" *Id*. (emphasis added).[9]

26. More recently, on April 21, 2020, New York Governor Andrew M. Cuomo announced that the New York State Department of Financial Services has initiated administrative proceedings and filed charges against another opioid manufacturer, Mallinckrodt plc and its subsidiaries ("Mallinckrodt"), seeking to hold Mallinckrodt accountable for the harm caused by the opioid crisis and incurred by the New York insurance industry and consumers of private commercial health insurance policies.[10] The foregoing claims asserted by New York State are precisely the claims that Private Insurance Plaintiffs have asserted on behalf of class members.

**The Sacklers.**

27. Purdue and its associated companies are part of a complex web of entities which the Sacklers own and control. The Sacklers include Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Beverly Sackler, Theresa Sackler, Ilene Sackler Lefcourt,

---

[9] Moreover, in a November 13, 2019 story, Reuters reported that "New York Governor Andrew Cuomo said in September the state would launch a legal action against drug companies and distributors that sell opioids in order to recoup about $2 billion in insurance rate increases that were passed on to New York consumers because of opioids. Premiums surged because insurers had to cover prescription costs and opioid-related issues such as emergency room visits and addiction treatments, Cuomo had said." N.Y. insurance regulator notifies opioid makers, distributors of enforcement action –sources, Nov. 13, 2019 (Reuters) available at https://finance.yahoo.com/news/1-n-y-insurance-regulator-145554228.html (last visited 4/29/20).

[10] *See* Governor Cuomo Announces First Insurance Fraud Action Against Major Opioid Manufacturer in New York Market, available at https://www.governor.ny.gov/news/governor-cuomo-announces-first-insurance-fraud-action-against-major-opioid-manufacturer-new and Statement of Charges and Notice of Hearing, available at https://www.dfs.ny.gov/system/files/documents/2020/04/ea20200417_statement_charges_notice_hearing_mallinckrodt_specgx.pdf (last visited 4/29/20).

11

David Sackler and Raymond Sackler Trust. All of Purdue's and its associated companies' profits go to Sackler trusts and entities.

28. The Sacklers have been named as defendants in multiple lawsuits for their misconduct relating to the opioid crisis, as well as for having extracted over $12 billion from an insolvent Purdue in the midst of the opioid crisis. Various sources have claimed that the Sacklers have a net worth of at least $14 billion and have transferred over $1 billion in assets to foreign jurisdictions in order to hinder, delay and defraud creditors such as Private Insurance Plaintiffs.

29. Before a plan can be formulated, creditors need to conduct a thorough investigation of these and other issues, including without limitation whether the contributions proposed to be made by the Sacklers are substantial under the circumstances of these cases. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–43 (2d Cir. 2005) (third-party releases should only be granted under unique circumstances where non-debtor co-liable parties make substantial financial contributions).

**Purdue's Proposed Settlement Structure.**

30. The Condensed Consolidated Balance Sheet (Unaudited) as of August 31, 2019 annexed as Schedule 4 to the First Day Declaration of Jon Lowne, Senior Vice President and the Chief Financial Officer of Purdue Pharma L.P. [Docket No. 3], discloses total assets in the amount of $1.972 billion, total liabilities in the amount of $562 million and total equity in the amount of $1.41 billion. In fact, virtually all of Purdue's liabilities consist of tort claims arising from more than 2,600 lawsuits filed throughout the state and federal court systems. *See* Debtors' Informational Brief dated September 15, 2019 [Docket No. 17] ("Brief") at pp. 36-40.

31. In the Brief, Purdue disclosed that it has negotiated what it referred to as an "agreed-upon Settlement Structure" that then had the support of 24 states ("Consenting States"),

five U.S. territories, the Plaintiffs' Executive Committee (PEC) and Co-Lead Counsel in the Ohio MDL, under which: "(1) Purdue's existing shareholders will relinquish all of their equity interests in the Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-emergence structure for the benefit of claimants and the U.S. public, 'free and clear' of Purdue's liabilities to the fullest extent permitted by law; (2) Purdue's existing shareholders will engage in a sale process for their ex-U.S. pharmaceutical companies; and (3) Purdue's existing shareholders will contribute an additional $3 billion over seven years (in addition to 100% of the value of all 24 Debtors), with the hope of substantial further contemplated contributions from the sales of their ex-U.S. pharmaceutical businesses." Brief at p. 44.

32. Purdue contended that: "Implementing the Settlement Structure through these chapter 11 proceedings is the only sensible way forward because continued litigation of thousands of Pending Actions to judgment and through appeals outside of bankruptcy benefits no one. Indeed, continued litigation threatens the success of these chapter 11 proceedings and will only result in the substantial depletion of the Debtors' assets that would otherwise be available for distribution to appropriate stakeholders." Brief at p. 45.

33. There is an *ad hoc* committee of states that does not presently support the Settlement Structure, as well as various municipalities that presently oppose the Settlement Structure. Private litigants have not publicly taken a position to date.

34. On October 8, 2019, the Debtors filed a Term Sheet negotiated with the Consenting States and the Sacklers [Docket No. 257] ("Term Sheet"). Private Insurance Plaintiffs did not support the Term Sheet because, *inter alia*, the UCC would not play a central role in the plan negotiating process, there was no articulated role for private litigants, the consideration appeared to be inadequate, a 7-year payout is too long, there were concerns

13

regarding the security for payment, there would be little or no financial disclosure by the Sacklers, the consenting shareholder cash contribution is going to be allocated among the shareholder parties but they would not be jointly and severally liable, and there was an absence of the appropriate safeguards and restrictions in consideration for a six-month standstill such as prohibitions on the Debtors' ability to file a plan or Rule 9019 motion.

35. Thereafter, the UCC negotiated an Amended and Restated Case Stipulation [Docket No. 431] that assuaged many of the Private Insurance Plaintiffs' concerns.

36. At the Debtors' request, the Court has entered multiple orders granting a preliminary injunction through October 5, 2020. Certain dissenting states and municipalities agreed to abide by the terms of such orders, subject to certain opt-out rights. Private Insurance Plaintiffs did not oppose the injunctive relief based on the belief that it would provide needed breathing space to allow Purdue, the Sacklers and the Debtors' various creditor groups, including the Private Insurance Plaintiffs, an opportunity to explore whether a consensual resolution could be achieved.

### The Sacklers Must Make Full Financial Disclosure to the UCC

37. There are a host of potential litigation claims against the Sacklers arising from their misconduct. For instance, it has been publicly disclosed that the Sacklers received over $12 billion in dividends from the Debtors. As a result thereof, depending on when the Debtors became insolvent, the Sacklers could have exposure to the estates for, *inter alia*, (a) avoidance action claims such as intentional and constructive fraudulent transfer, and (b) derivative claims such as breach of fiduciary duty and declaration of illegal dividends.

38. As a matter of law, the Debtors did not receive any consideration for the payment of dividends to the Sacklers. Therefore, insolvency is the only issue the estates will need to establish in order to avoid dividend payments as constructive fraudulent transfers. Insolvency is

14

also a "badge of fraud" that is likely to be relevant to any intentional fraudulent transfer claims. It cannot be gainsaid that the Debtors currently face massive insolvency. However, creditors cannot use 20/20 hindsight to establish insolvency at the time that dividends were paid to the Sacklers. Therefore, the then current state of mind of the Sacklers[11] and what a reasonable person would have concluded about the Debtors' tort liability exposure are likely to be highly relevant in evaluating the merits of the estates' claims against the Sacklers. Creditors have a right to know what discovery of such issues will confirm.

39. Moreover, once such exposure is determined, creditors still need to know the Sacklers' ability to satisfy a judgment or a settlement that is proposed be paid over many years. This necessarily requires an in-depth analysis of all of their directly and indirectly owned assets, as well as other financial data.

40. Therefore, Private Insurance Plaintiffs agree with the UCC that it (and other mediation parties) should be provided with broad financial disclosure by the Sacklers, and the Sacklers' attempts to resist such disclosure must cease.

**The Sacklers Must Make Full Financial Disclosure to Private Insurance Plaintiffs**

41. For the same reasons, Private Insurance Plaintiffs also seek entry of an order, in the form annexed hereto as Exhibit A, requiring the production of documents by the Sacklers pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

42. On January 28, 2020, the Court entered a Protective Order [Docket No. 784] (the "Protective Order"), governing access to confidential information to be provided by Purdue and the Sacklers to key constituencies in the case including the Private Insurance Plaintiffs.

---

[11] For example, did the Sacklers begin transferring billions from Purdue because they recognized decades ago that it would ultimately succumb to massive tort liabilities?

43.     On January 29, 2020, the undersigned counsel to the Private Insurance Plaintiffs executed and delivered to Purdue's counsel the Acknowledgement and Agreement to Be Bound by Protective Order.  At the Debtors' request, on January 31, 2020, the Private Insurance Plaintiffs provided a written document request to Purdue.  After weeks of unexplained delays, by email dated March 9, 2020, the Debtors advised that such document requests should instead be directed to the Sacklers, which Private Insurance Plaintiffs promptly did.

44.     Over the ensuing weeks, Side A initially provided some access to documents (but did not even come close to complying with Private Insurance Plaintiffs' document request), but then withdrew such access, and Side B never produced any documents.  On March 23, 2020, respective counsel for the Sacklers emailed Private Insurance Plaintiffs' counsel requesting a "meet and confer" concerning the Private Insurance Plaintiffs' document requests.  On March 24, 2020, the parties held their "meet and confer"; thereafter, the Sacklers continue to stonewall the Private Insurance Plaintiffs.

45.     As major creditors herein who will likely be asked to support broad plan releases for the Sacklers, Private Insurance Plaintiffs are clearly entitled to relief under Rule 2004 of the Federal Rules of Bankruptcy Procedure.  In fact, it is clear that private claimants, including without limitation Private Insurance Plaintiffs, third party payers, hospitals, NAS babies and personal injury claimants, have significant claims and are entitled to a very significant percentage of Purdue's assets.  For instance, one recent study estimates that private parties suffered more than 70% of the total harm inflicted by the opioid crisis.[12]  Thus, private claimants

---

[12] *See* Stoddard Davenport, MPH, Alexandra Weaver, ASA, MAAA and Matt Caverly, *Economic Impact of Non-Medical Opioid Use in the United States* (Oct. 2019), at p. 4 ("It is important to recognize who bears these economic burdens.  In total, we estimate $186 billion (29%) of the total economic burden of the opioid crisis was borne by federal, state and local governments, while the remainder was borne by the private sector and individuals."), available at: https://www.soa.org/globalassets/assets/files/resources/research-report/2019/econ-impact-non-medical-

16

may have a veto over any plan to be proposed in these cases, and thus are entitled to appropriate due diligence to assess litigation claims against the Sacklers and any proposed settlement thereof.

46.     Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). Bankruptcy Rule 2004(b) further provides that upon the motion of a party in interest, the Court may order the examination of any entity relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate …." Fed. R. Bankr. P. 2004(b).

47.     Bankruptcy Rule 2004 permits the Court to compel the production of any documents relating to such property or liabilities of the debtor. Fed. R. Bankr. P. 2004(c). Rule 2004 is known as the "basic discovery device used [in] bankruptcy cases." *In re French,* 145 B.R. 991, 992 (Bankr. D.S.D. 1992). The purpose of Rule 2004 is to permit broad investigation into a debtor's financial affairs to ensure the proper administration of the debtor's estate. *See In re Symington,* 209 B.R. 678, 683 (Bank. D. Md. 1997). The scope of Rule 2004 discovery is broader than the scope of discovery under the Federal Rules of Civil Procedure. *In re Recoton Corp.,* 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citing *In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991)).

48.     Rule 2004 discovery is not limited to use by debtors and official committees. To the contrary, courts have repeatedly recognized that creditors and other parties in interest may obtain Rule 2004 discovery consistent with the express language of Rule 2004. *See In re Lehman Bros. Inc.,* No. 08-01420, 2008 WL 5423214, at *2-3 (Bankr. S.D.N.Y. Nov. 26, 2008) (granting motion filed by individual creditors to conduct Rule 2004 examination for the purpose of

---

opioid-use.pdf (last visited 4/29/20).

SL1 1637656v1 113572.00002

"determining what is owed to these individuals" and whether there are other parties entitled to relief); *People's Bank v. Poirier (In re Poirier),* 214 B.R. 53, 58 (Bankr. D. Conn. 1997) ("The broad scope and ready availability of a Rule 2004 Examination *provides a forum for an individual creditor* to question a debtor at great length on all matters relevant to the Debtors' financial affairs ….") (emphasis added).

49. The Private Insurance Plaintiffs are a "party in interest" with standing to seek authorization for, and to undertake, a Rule 2004 examination. *See* 11 U.S.C. § 1109(b) ("A party in interest, including … a creditor … may raise and may be appear and be heard on any issue in a case under this chapter.").

50. In order to afford sufficient notice of this relief, Private Insurance Plaintiffs request that the relief they seek for themselves under Rule 2004 of the Federal Rules of Bankruptcy Procedure be scheduled for hearing at the next available date, which currently is May 21, 2020 at 10:00 a.m.

## CONCLUSION

51. For all the foregoing reasons, Private Insurance Plaintiffs request that the Court direct the Sacklers to make full financial disclosure forthwith to the UCC, the Private Insurance Plaintiffs, and all other creditor groups taking an active role in these cases.

Respectfully submitted,

Dated:  April 29, 2020

By: */s/Nicholas F. Kajon*
Attorneys for Private Insurance Plaintiffs

Nicholas F. Kajon
nfk@stevenslee.com
Constantine D. Pourakis
cp@stevenslee.com
STEVENS & LEE, P.C.
485 Madison Avenue, 20th Floor
New York, NY  10022

SL1 1637656v1 113572.00002

Tel: 212.319.8500

James Young*
jyoung@ForThePeople.com
MORGAN & MORGAN, P.A.[13]
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
Tel: 904.361.0012

Juan R. Martinez*
juanmartinez@ForThePeople.com
MORGAN & MORGAN, P.A.
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813.223.5505

*Admitted Pro Hac Vice

*Counsel for Private Insurance Plaintiffs and the Putative Classes*

---

[13] Morgan & Morgan, P.A. also represent clients in diverse other matters pending against Debtors, as specified in the Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Procedure 2019, dated October 21, 2019. [Docket No. 333].