PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
31 West 52nd Street
New York, New York 10019
212-858-1000

*Counsel to the Non-Consenting States*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*,[1] | Case No. 19-23649 (RDD) |
| **Debtors.** | (Jointly Administered) |

**REPLY IN SUPPORT OF *EX PARTE* MOTION OF THE AD HOC
GROUP OF NON-CONSENTING STATES FOR AN ORDER AUTHORIZING
EXAMINATIONS OF CERTAIN FINANCIAL INSTITUTIONS PURSUANT TO
RULES 2004 AND 9016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of their federal tax identification numbers, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' principal offices are at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1
REPLY ............................................................................................................................................5
CONCLUSION .............................................................................................................................12

**TABLE OF AUTHORITIES**

Cases

*Christine Asia Co., Ltd. v. Alibaba Group Holding Ltd.*,
    327 F.R.D. 52 (S.D.N.Y. 2018) ................................................................................................6

*Cyris Jewels v. Casner*,
    No. 12-CV-1895 (KAM)(SLT), 2016 WL 2962203 (E.D.N.Y. 2016) ...................................6

*Durling v. Papa John's Int'l, Inc.*,
    No. 16-CV-03592 (CS) (JCM), 2018 WL 557915 (S.D.N.Y. Jan. 24, 2018) .......................6

*In re Indep. Serv. Organizations Antitrust Litig.*,
    162 F.R.D. 355 (D. Kan. 1995) ................................................................................................8

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
    298 F.R.D. 184 (S.D.N.Y. 2014) .............................................................................................8

*Trevino v. ACB Am., Inc.*,
    232 F.R.D. 612 (N.D. Cal. 2006) .............................................................................................8

Rules and Regulations

Federal Rules of Bankruptcy Procedure,
    Rule 9037 .............................................................................................................................7, 8

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

The Ad Hoc Group of Non-Consenting States[2] (the "Non-Consenting States") submits this reply (the "Reply") (a) in support of its *Ex Parte Motion of the Ad Hoc Group of Non-Consenting States for an Order Authorizing Examinations of Certain Financial Institutions Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure* [Docket No. 1019] (the "Motion")[3] and (b) in response to (i) the *Limited Objection of the Raymond Sackler Family to the Ad Hoc Group of Non-Consenting States Rule 2004 Motion* [Docket No. 1087] (the "Side B Objection") filed by the Raymond Sackler Family ("Side B") and (ii) the *Limited Objection of Mortimer Sackler Initial Covered Sackler Persons to Ex Parte Motion of the Ad Hoc Group of Non-Consenting States for an Order Authorizing Examinations of Certain Financial Institutions Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure* [Docket No. 1088] (the "Side A Objection" and together with the Side B Objection, the "Objections") filed by the Mortimer Sackler Initial Covered Persons ("Side A" and together with Side B, the "Sacklers").

**INTRODUCTION**

1. These cases are at a critical juncture. Representatives of public and private creditors are in the midst of an important, complex, and expensive multi-party mediation designed to allocate the value of these Debtors' estates – including any payment from the Sacklers. The proposed Sackler payment is to be made in exchange for the broad release of estate and non-estate

---

[2] California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

[3] Capitalized terms used in this Reply but not otherwise defined have the meanings given to them in the Motion or the Objections (as defined below). Further, the relief requested by the Non-Consenting States has been modified from the original form of order submitted with the Motion as set forth in the Notice of Telephonic Hearing [Docket No. 1085], attached again here for ease of reference as **Exhibit A**.

(third-party) claims they seek from this Court, *for every member of the Sackler family*.[4] The proposed Sackler payment, however, is exponentially less than even the reportedly $10 billion in just cash dividends or distributions generated by opioid sales they took from Purdue.[5]

2. Yet, rather than providing sufficient, primary source data and documents that are necessary for parties to verify, among other things, the Sacklers' wealth and interfamily direct and indirect transfers, not only of money received from Purdue but value from all sources,[6] quickly, the Sacklers have produced very few primary documents in the more than six months provided to them to make voluntary disclosures. As detailed in the UCC's request to take compulsory discovery from the Initial Covered Sackler Persons [Docket No. 981] and its more recent letter to the Court filed on April 26, 2020 [Docket No. 1089], the Sacklers have slow-rolled and resisted discovery requests at nearly every turn. Indeed, the Sacklers and the UCC are still working through search terms because the Sacklers maintain that the UCC's reasonable requests are too burdensome for them to process.

3. In addition, the Sacklers have designated, and appear intent on continuing to designate, documents under the Protective Order in ways that make their review more costly, more laborious, and more time-consuming than is necessary or appropriate to keep information

---

[4] As the Court and other interested parties know, the Non-Consenting States oppose, on legal and other grounds, the imposition of any non-consensual release of their non-estate claims against the Sacklers. Nothing in this Reply is to the contrary. But assuming, *arguendo*, that non-consensual releases could be imposed, the discovery requested by the Non-Consenting States and the UCC should result in the production of information from independent and non-biased sources that must be evaluated when deciding whether non-consensual releases should even be considered.

[5] The Debtors currently are evaluating whether the Sacklers and their other companies received non-cash value through undervalued commercial transactions and this reference to $10 billion in dividends or distributions is not intended in any way to limit the amount of value, derived from opioid sales or otherwise, transferred by Purdue to the Sacklers.

[6] The States' claims, for which releases are intended to be sought, are not in any way limited to transfers of value from the Debtors, making the Sacklers' efforts to limit or regulate discovery of the who, what, when and to whom of their financial transactions improper.

confidential. This is particularly true for the Non-Consenting States in connection with their Motion to take limited discovery from Financial Institutions. Financial Institution documents would be reviewed by Attorneys' General's offices, their States' chief law enforcement officers, who are entrusted with vast amounts of truly confidential information daily, and who are bound, and have acknowledged in writing that they are bound, by this Court's Protective Order.[7]

4. Nonetheless, to address confidentiality concerns raised by the Sacklers, the Non-Consenting States have proposed that responses from Financial Institutions automatically will be designated Professional Eyes' Only/Confidential ("PEO"), which means that the documents can only be viewed on a regulated platform by a limited number of specifically identified individuals from Non-Consenting States' Attorneys General offices and not downloaded or printed by them. Protective Order at ¶¶ 30 and 41.[8] The Non-Consenting States have proposed this restriction, even

---

[7] Although Side B claims it "does not seek to litigate old grievances here," (Side B Objection ¶ 13), it spends almost an entire page of its objection insinuating an earlier violation of the protective order in the New York action discussed in the Motion (at ¶¶ 5-7). In fact, no such violation occurred. The Sacklers and the New York Attorney General's Office disagreed, in good faith, over whether the protective order in that action applied to the banks' document productions. Following that, the State filed a revised affirmation that redacted the information objected to by the Sacklers; and no motion for protective relief was filed. Here, in contrast, there is no disagreement concerning the Financial Institutions' ability to designate their records as confidential under the bankruptcy Protective Order. On the contrary, the Non-Consenting States have affirmatively agreed to (i) provide the Protective Order to the Financial Institutions with the subpoenas, to alert them to their ability to designate information; (ii) copy the Sacklers' counsel on that correspondence; (iii) preliminarily designate all information produced by the Financial Institutions as PEO, so in fact, the Financial Institutions need make no designations at all; and (iv) host documents produced by the Financial Institutions on the Debtors' view-only platform, consistent with their PEO designation. Moreover, Rule 2004 discovery in this chapter 11 case is qualitatively different than any prepetition discovery by individual states against the Sacklers.

[8] Under the Protective Order, a party may designate "Discovery material produced by itself" as "Protected Information." Protective Order ¶ 35. The Non-Consenting States, however, are seeking discovery from third-party financial institutions in the Motion. As such, while the Sacklers may designate banking information produced themselves as Protected Information, they have no right to designate information produced by others as Protected Information by the Protective Order's terms. For this reason, the concession to preliminarily designate documents produced by the Financial Institutions as PEO is already far greater than the Sacklers would be entitled to under the Protective Order.

3

though they do not think that a PEO designation is warranted. And, again, each individual in this limited group has agreed in writing to be bound by the terms of the Protective Order.[9]

5. Yet, the Sacklers want more. They want Financial Institution documents to be received by Non-Consenting States Attorneys General only after redaction by them for "irrelevant information or Personally Identifying Information" (Side B Objection ¶ 2). In addition to adding a layer of complexity and potential dispute, putting the Sacklers in the middle of Financial Institution discovery to redact unilaterally designated irrelevant information or Personally Identifying Information that is protected from disclosure by the Protective Order will unnecessarily increase the cost incurred by the Non-Consenting States to their outside counsel to review and analyze documents.

6. The Sacklers are demanding an extraordinary release. If the Sacklers expect creditors to support any chapter 11 plan that broadly releases third-party claims against their entire family and related entities, then the Sacklers need to start producing documents immediately to the UCC and the Non-Consenting States (as already ordered by the Court) and to permit third-party discovery to proceed as requested by the Motion. They cannot stand in the way of transparency, which is not only critical to decision-making by creditors but also to the integrity of this bankruptcy process, and expect to get any release (consensual or not).

---

[9] The Sacklers' concern about the number of people who would have access to documents is a red herring. As noted, only a limited number of people from each State will have access to documents produced by Financial Institutions; their identities will be known; and their access will be logged. Further, these documents cannot be replicated or made public absent further court order. But the concern also misses the point. The Non-Consenting States will independently of each other need to decide whether to agree to a release or challenge any proposed non-consensual release. In either case, Attorneys General need access to all data to make their decisions.

4

**REPLY**

7.    In the Objections, the Sacklers contend that they are entitled to interfere with, and filter the responses to, routine, extremely limited and focused discovery requests to independent Financial Institutions. These contentions are without precedent and unpersuasive.[10]

8.    First, there is no known precedent for allowing individual account holders to redirect discovery directed at their financial institutions to them as requested by the Sacklers (Side B Objection ¶ 2; Side A Objection ¶ 6). Further, there is no known precedent that entitles the Sacklers to ask their Financial Institutions to produce account information and provide a certification in lieu of a subpoena being served by the Non-Consenting States. Side A Objection ¶ 6. Nor would there be. The whole purpose of third-party discovery is to compel the direct production to the requesting party of documents from non-biased independent parties to get a complete and accurate picture of financial information, not only for the requesting party but also for the Court. The need for independent verification is particularly acute here where the discovery is needed to verify financial information about the Sackler family, who want to retain billions of dollars while demanding extraordinarily broad releases of third-party claims pursuant to an order of this Court over creditors' objection.

9.    Second, relevance is not the standard for redactions under Rule 2004 (or frankly any federal court) document discovery as implied by the Sacklers (Side B Objection ¶ 2). Accordingly, there is no authority allowing the Sacklers to scrub responses from Financial Institutions to redact information they unilaterally deem irrelevant. To the contrary, the ability to

---

[10] There is no dispute that the discovery requests proposed by the Non-Consenting States are consistent with the Court's guidance given at a chamber's conference held on April 9, 2020, that the requests to the Financial Institutions not be open ended or require "ESI" discovery. The Non-Consenting States modified the original draft of their requests in response to a comment by Side B to make it clear that ESI was not inadvertently implicated by the Non-Consenting States' discovery requests.

make relevancy redactions in discovery has been largely rejected by courts in the Second Circuit, particularly where, as here, a stipulated protective order is in place. *Christine Asia Co., Ltd. v. Alibaba Group Holding Ltd.*, 327 F.R.D. 52, 54 (S.D.N.Y. 2018) ("The weight of authority in [the Second Circuit] goes against allowing a party to redact information from admittedly responsive and relevant documents based on that party's unilateral determinations of relevancy." (citation omitted)); *Cyris Jewels v. Casner*, No. 12-CV-1895 (KAM)(SLT), 2016 WL 2962203, at *4 (E.D.N.Y. 2016) ("The City has cited no authority — and the court has found none — upholding a party's right to redact from admittedly responsive and relevant documents information based on that party's unilateral determinations of relevancy. Indeed, courts in this circuit have often rejected defendants' requests for redaction of irrelevant text within relevant documents."); *Durling v. Papa John's Int'l, Inc.*, No. 16-CV-03592 (CS) (JCM), 2018 WL 557915, at *9 (S.D.N.Y. Jan. 24, 2018) ("Redactions on grounds of non-responsiveness or irrelevance are generally impermissible, especially where . . . a confidentiality stipulation and order . . . is in place.").

10. In *Christine Asia*, the defendant redacted thousands of documents, claiming the redacted information was not relevant. The court found that relevance-based redactions in discovery "breed suspicions and deprive the reader of context." 327 F.R.D. at 54. The court also found that the stipulated protective order "addresses any concerns that Defendants may have regarding the confidential or sensitive nature of the information redacted from documents." *See* 327 F.R.D. at 55. The same is true in this case.

11. But even if relevance were an applicable redaction standard under Rule 2004, it is inconceivable that obtaining a complete picture of every aspect of the finances and financial transactions from all Sackler family members is not relevant. The proposal being evaluated is that every Sackler family member, related trust, or other related entity will benefit from a broad release

of trillion of dollars of liability through these chapter 11 cases. Under these circumstances, it is difficult to conceive that anything about the Sacklers and their Financial Institution accounts could be off limits or irrelevant.

12.     Third, there is no legitimate basis to allow the Sacklers to redact information from the Financial Institutions' productions.

13.     Specifically, Side B wants to redact "highly sensitive . . . or Personally Identifying Information" (Side B Objection ¶ 2) and "the names of investment/business counterparties and investment advisors with respect to third-party investments and business relationships (for example, hedge funds and other investment funds) that are currently held by the targeted individuals, trusts, or entities," (Side B Objection ¶ 6). Side A also wants to redact Personally Identifying Information or "the names or other identifying information of investments, investment or business counterparties, investment advisors with respect to third-party investments, or business relationships that are, in each case, currently held by any Covered Sackler Person." Side A Objection ¶ 3. A full understanding of the extended Sackler family and related entities' finances and financial transactions, however, would be incomplete, and thus inadequate, if *any of* the from whom, to whom, what, from what account, to which account, how much, when, and related information were redacted from the Financial Institutions' responses.

14.     Further, there is no need to redact this information to protect any claim that the information is and must be kept confidential. A PEO designation is the second highest designation under the Protective Order. PEO designated documents cannot be downloaded or copied by parties other than retained professionals. They cannot be made public by anyone. Before they can be used publicly, even in this case, the Sacklers would receive notice, and have the opportunity to try to limit unredacted public disclosure. Protective Order at ¶ 64. Accordingly, even though

7

Bankruptcy Rule 9037 requires the redaction of certain personally identifiable information, *e.g.*, portions of a social security number, the year of an individual's birth, and a minor's full name, in court filings, those restrictions do not apply here in respect of discovery (not filed in court) responses. *See* Fed. R. Bankr. P. 9037. Rather, courts have held that the Federal Rules of Civil Procedure do not provide a "blanket authorization" for a court to prohibit disclosure of information, but rather to impose conditions where there would be a "clearly defined and serious injury." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) (citation omitted). The Sacklers have failed to demonstrate a "clearly defined and serious injury" caused by disclosure to the parties in these cases under the stringent protections of the Protective Order, especially because the purpose of the discovery is to confirm the Sacklers' financial condition.

15. Furthermore, the States are not competitors, who might misuse information to gain a commercial advantage. Side B's reliance, therefore, on *In re Indep. Serv. Organizations Antitrust Litig.*, 162 F.R.D. 355, 357-58 (D. Kan. 1995), where redactions of trade secrets were permitted in discovery, is misplaced because that case involved a commercial dispute among commercial entities where disclosure would interfere with the plaintiff's business. The Sacklers are not a commercial entity (and neither are the Non-Consenting States nor the UCC), nor is the information the Sacklers seek to redact a trade secret. *See Trevino v. ACB Am., Inc.*, 232 F.R.D. 612, 617 (N.D. Cal. 2006) (ordering the parties to submit a protective order and defendants to produce an unredacted version of agreement that the defendants claimed contained confidential financial information after finding that (i) the defendants offered no evidence that the information to be redacted was a trade secret and (ii) the plaintiffs were not competitors of the defendants).

16. Also, as noted above, limiting access to Attorneys General to redacted documents will only increase cost and expense and introduce additional delay.

17. Fourth, the Sacklers assert they will be harmed by the disclosure of "third-party counterparty and advisor information" if they are not permitted to redact that information, and they point to "banking relationship ruptures that followed the issuance [of subpoenas] by New York State to financial institutions in the fall of 2019." Side B Objection ¶¶ 9-10.[11] Side A asserts their banking relationships will be harmed by the mere issuance of the subpoenas. Side A Objection ¶ 9. But their concerns lack substance and do not justify the denial of compulsory discovery from the Financial Institutions for the following non-exclusive reasons:

    a. Financial Institutions receive and respond to subpoenas daily. Accordingly, it seems improbable that the mere service of a subpoena with limited discovery requests would disrupt the Sacklers' banking relationships. Moreover, it would be most efficient for Financial Institutions to respond directly to the requesting party pursuant to a subpoena rather than through some other contrived process as proposed by Side A. A subpoena also is the most direct way to ensure that all responsive documents are produced and to enforce compliance by any subpoenaed party, if required.

    b. It is inconceivable that the Financial Institutions are not aware of alleged wrongdoing by the Sacklers. The service of a subpoena issued from this case seeking only account-related documents, where it is public knowledge that the Sacklers owned the Debtors, took out more than $10 billion from the Debtors and are demanding a release of claims, should surprise no one. Furthermore, because the discovery requests relate only to non-ESI financial

---

[11] While Side B's redaction argument is addressed below, it is important to note here that their concerns about harm to their banking and other financial relationships presuppose that counterparty and advisor information would be publicly disclosed. Those concerns are obviated by the concessions already made by the Non-Consenting States to treat all Financial Institution documents as PEO.

9

documents and statements, nothing in the subpoena itself calls out the Sacklers' misconduct as alleged by the States.

        c.     Side A's position that Financial Institutions would be more receptive to requests for records and "certifications" of completeness from the Sacklers than to subpoenas makes no sense and only adds confusion to the straightforward third-party subpoena process. As noted above, Financial Institutions are specifically equipped to respond to subpoenas and the limited nature and scope of this proposed subpoena, frankly, eliminate any guesswork by the responding Financial Institutions. In addition, if the Sacklers are correct that the service of a subpoena might disrupt their banking relationships (which they are not), then their out-of-the-ordinary request to their banks to respond to an identified list of discovery requests and certify compliance pursuant to an order of this Court necessarily would yield the same or even more risk than the simple service of a run-of-the-mill subpoena.[12] If the Sacklers want to manage their banking relationships to minimize any perceived harm, there is nothing to stop them from communicating appropriately with those Financial Institutions now.

        d.     Any concern about the impact of identifying counterparty and advisor identity also is misplaced. The information will be designated PEO and can only be made public by the limited number of people with access, if ever, over the Sacklers' objection if the Court orders its disclosure, after notice and hearing. Furthermore, knowing with whom and how the Sacklers' wealth is invested is integral to answering questions about that wealth and evaluating the releases the Sacklers' demand. There is no basis to require redaction of this information.

---

[12] The lack of any reference to compulsory production in Side A's proposed letter to financial institutions attached as Exhibit A to the Side A Objection's proposed order increases the likelihood of delay and further litigation over discovery.

10

e. There is no support for the inference urged by Side A that the mere issuance and service of subpoena resulted, and will result, in the termination of Sackler banking relationships. Side A Objection ¶ 9. The one example of a termination provided to counsel for the Non-Consenting States and the UCC, on a retained professionals' eyes only basis, was sent *months* after the New York subpoena was served, and on its face, the letter is completely unrelated to service of the subpoena.[13] When pressed to demonstrate a causal connection between the issuance of the New York subpoena and the termination of the identified, or any other, banking relationship, Side A counsel responded by email stating:

> We think you may have misunderstood what we were trying to convey with our discussion and our provision to you of the example letter from a bank that represented one of the family's long time and historic banking relationships. We were not attempting to provide proof of causality in the past or proof that a wave of third party subpoenas would cause dislocation and interruption in the future.

The only connection that Side A has identified between the alleged terminations and the New York subpoena, therefore, is temporal, and even there, there is a multi-month gap between issuance of the subpoena and the sample termination letter.

18. If damaging an existing banking relationship were a viable reason to avoid compulsory discovery of financial institutions, there would be legions of cases so holding, but there are none that endorse such a blanket or *per se* rule. The reasons given by the Sacklers to chart a different course here are unpersuasive, particularly given the issues in play and the extraordinary releases being requested.

---

[13] Requests by the UCC and the Non-Consenting States made prior to the filing of the Objections for other examples of terminated banking relationships went unanswered, and no evidence of any other termination or the reasons for any termination has been presented by the Sacklers.

11

## CONCLUSION

19. In sum, there is no basis to deny the Motion or alter the relief sought on the attached Exhibit A.

20. In contrast, the equal administration of justice would suffer if the Sacklers are able to alter the normal course of third-party discovery from their banks, when similar requests from other litigants (particularly from litigants of more modest means) would never be made or seriously considered.

21. For these reasons and the reasons set forth above, the Non-Consenting States request that the Court overrule the Objections, authorize the Non-Consenting States to conduct an examination of and seek discovery from the financial institutions in accordance with the terms of the proposed order attached as Exhibit A, and grant them such other relief as is just and proper.

Dated: April 29, 2020
New York, New York

Respectfully submitted,

By:     */s/ Andrew M. Troop*
PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
Andrew V. Alfano
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
Email: andrew.troop@pillsburylaw.com
       andrew.alfano@pillsburylaw.com

Jason S. Sharp, admitted *pro hac vice*
2 Houston Center
909 Fannin, Suite 2000
Houston, TX 77010
Telephone: (713) 276-7600
Email: jason.sharp@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*