Gerard Uzzi
Alexander B. Lees
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Gregory P. Joseph
Mara Leventhal
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:  (212) 407-1200
Facsimile:  (212) 407-1280

*Counsel for the Raymond Sackler Family*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

## RESPONSE OF THE RAYMOND SACKLER FAMILY TO THE OFFICIAL COMMITTEE'S APRIL 26 DISCOVERY LETTER AND OBJECTION TO RELIEF REQUESTED THEREIN

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .................................................................................................................... 4

    A.    Disclosures Under the Case Stipulation................................................................ 4

    B.    The UCC's Informal Discovery Requests ............................................................ 6

    C.    The UCC's Subpoena ........................................................................................... 7

    D.    Productions to Date and Commitments to Produce More ..................................... 7

    E.    Productions by the Debtors ................................................................................... 9

ARGUMENT .......................................................................................................................... 9

    A.    The Committee's Demands for R-ACSP Documents Should be Rejected............. 9

        1.    The R-ACSPs' Documents Are Not Relevant or Proportional................. 10

        2.    R-ICSPs Do Not Have Possession, Custody, or Control of R-ACSP
            Documents. ............................................................................................... 16

    B.    The UCC's Request for an Order as to the IACs Should Be Denied. .................. 17

    C.    The UCC's Request to Impose a Deadline For ESI Productions is Premature. ... 19

    D.    Limited Redactions Are Appropriate.................................................................... 20

CONCLUSION...................................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews v. Cruz*,
  No. 04 CIV. 0566 PAC RLE, 2006 WL 1984650 (S.D.N.Y. July 14, 2006) .........................21

*Blackrock Allocation Target Shares: Series S Portfolio*, *v. Wells Fargo Bank, N.A.*,
  14-CV-09764 (KPF)(SN), 2017 WL 9401102 (S.D.N.Y. Mar. 2, 2017) ................................14

*Chaveriat v. Williams Pipe Line Co.*,
  11 F.3d 1420 (7th Cir. 1993) .................................................................................................17

*Cooper Indus., Inc. v. British Aerospace, Inc.*,
  102 F.R.D. 918 (S.D.N.Y. Aug. 28, 1984) ............................................................................20

*In re Gawker Media LLC*,
  No. 16-11700 (SMB), 2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017) .........................10

*Golden Trade S.r.L. v. Lee Apparel Co.*,
  143 F.R.D. 514 (S.D.N.Y. Aug. 17, 1992) .............................................................................17

*Lerman v. SEC*,
  928 F. Supp. 2d 798 (S.D.N.Y. Mar. 8, 2013) .......................................................................15

*In re McVane*,
  44 F.3d 1127 (2d Cir. 1995) ...........................................................................................14, 15

*In re Nortel Networks Corp. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 19129 Civ. 1855 (RMB)(MHD), (S.D.N.Y. Sept. 21, 2004) ......17, 18

*In re NTL, Inc. Securities Litigation*,
  244 F.R.D. 179 (S.D.N.Y. Jan. 30, 2007) ..............................................................................19

*Parris v. Pappas*,
  No. 3:10CV1128 (WWE), 2017 WL 3314001 (D. Conn. Aug. 3, 2017) ...............................17

*SEC v. Credit Bancorp, Ltd.*,
  194 F.R.D. 469 (S.D.N.Y. July 28, 2000) ..............................................................................16

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*
  490 F.3d 130 (2d Cir. 2007) ............................................................................................16, 19

*Sicav v. Wang*,
  No. 12 CIV. 6682 PAE, 2014 WL 2624753 (S.D.N.Y. June 12, 2014) .................................19

*In re SunEdison Inc.*,
    562 B.R. 243 (Bankr. S.D.N.Y. Jan. 18, 2017)............................................................11, 13, 14

*In re Texaco Inc.*,
    79 B.R. 551 (Bankr. S.D.N.Y. Oct. 30, 1987) ..................................................................10, 11

*In re Transmar Commodity Grp. Ltd.*,
    No. 16-13625-JLG, 2018 WL 4006324 (Bankr. S.D.N.Y. Aug. 17, 2018)...........................15

*In re Vivendi Universal, S.A. Sec. Litig.*,
    No. 02 CIV. 5571 RJH HBP, 2009 WL 8588405 (S.D.N.Y. July 10, 2009) .........................19

**Other Authorities**

Fed. R. Bankr. P. 2004...........................................................................................................10, 13

Fed. R. Bankr. P. 9016.................................................................................................................10

Fed. R. Civ. P. 26........................................................................................................................15

Fed. R. Civ. P. 45........................................................................................................................10

The Raymond Sackler family,[2] by and through its undersigned counsel, hereby submits this response to the April 26, 2020 letter [ECF No. 1089] (the "**Letter**"), from the Official Committee of Unsecured Creditors (the "**UCC**"), and its objection to the relief requested in the Letter.[3]

**PRELIMINARY STATEMENT**

The UCC's Letter suggests that months have elapsed since the petition date with creditors receiving minimal information and the Raymond Sackler family refusing to provide anything additional. Nothing could be further from the truth. Putting aside the tens of millions of pages of information the UCC has received from the Debtors, including from the files of individual Raymond-side Initial Covered Sackler Persons[4] ("**R-ICSPs**") who served on the board of the Debtors, the UCC already has access to extensive information, with far more to come. Among other things, the UCC already has received:

- More than 80,000 pages of financial due diligence concerning the IACs, including board minutes and board decisions, as well as dozens of hours of IAC management interviews;

- Detailed information about the nature, reason for, and structure of the entities and trusts that hold the Raymond Sackler family's wealth;

- Detailed information about how much wealth the family possesses and in what form; and

- Approximately 50,000 pages of electronically-stored information ("**ESI**") and other documents from the personal files of the R-ICSPs, including every document produced by them in other litigations and proceedings concerning Purdue's sale of opioids.

---

[2]    The Raymond Sackler family includes Richard Sackler, Jonathan Sackler, David Sackler, and the estate of the late Beverly Sackler.

[3]    Capitalized terms not defined herein have the same meanings as in the Letter. Emphasis is added to, and internal quotations, brackets, ellipses, and citations omitted from, quoted material in this brief, unless otherwise indicated. As used herein, "**UCC Ex.**" refers to the Letter's exhibits; "**Ex.**" refers to the exhibits to this brief.

[4]    "**Initial Covered Sackler Person**" is a term defined in the Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties [Dkt. No. 518] (the "**Stipulation**"). That term includes Sackler family members who previously served on the board of Purdue Pharma Inc., trusts for their benefit, and each entity or person that directly or indirectly owns or exerts voting control over any Debtors. *See* Stipulation ¶ 1.

The R-ICSPs also have committed to producing much more in response to the UCC's extraordinarily broad Rule 2004 subpoena:

- They have agreed to produce more than a decade's worth of information about each of the R-ICSPs, including financial statements, bank records, tax filings, and audit reports.

- They are in the process of reviewing nearly 500,000 documents – constituting millions of pages – from the personal ESI files of Richard, Jonathan, and David Sackler, who are the only custodians on the Raymond-side who had material positions at Purdue and who have personal ESI to search.

- They have agreed to gather, review, and produce even more personal ESI from those three custodians and from yet another custodian who manages the Raymond Sackler family office and provides accounting and tax services to the family.

- They have agreed to provide a detailed accounting of the sources and uses of funds in the Raymond-side trusts that received distributions from the Debtors, or were spun off from such trusts.

Despite the extraordinary disclosures and commitments made by the Raymond Sackler family already, the UCC now wants the R-ICSPs to conduct enormously expensive and time-consuming ESI searches of an unspecified number of additional custodians – many of whom were not even identified as requested custodians during the meet-and-confer process– using dozens of expansive search strings and date parameters reaching back to 1996, regardless of the proposed custodians' connections to the Debtors, if any, or the likelihood that they will have relevant documents in their personal ESI files.

The so-called "Additional Covered Sackler Persons" on the Raymond side ("**R-ACSPs**") are Raymond's children, grandchildren and great grandchildren, their spouses, and the trustees of any trusts for their benefit, who are not "Initial Covered Sackler Persons." Stipulation § 1. The UCC strains to find explanations for why these individuals are likely to have incremental relevant information in their personal ESI files. None is persuasive. The UCC already has information showing that, ███████████████, almost none of the R-ACSPs ever worked at the Debtors. The UCC has and will receive more documents showing most of the R-ACSPs never

received direct or indirect distributions from the Debtors. And any relevant correspondence they had with the agreed-upon ESI custodians will be picked up by ESI searches that the R-ICSPs have already agreed to conduct. Unless the R-ICSP discovery shows that further discovery into the R-ACSPs is warranted, there is no reason to devote time and resources pursuing discovery directly from the R-ACSPs. The UCC also requests an order declaring the R-ICSPs are in control of the ESI of their family members. They are not: people cannot compel their adult family members to share their private emails. This issue is an unnecessary distraction, however, because the UCC has not met its burden of showing that its requested ESI searches of all R-ACSPs are relevant, much less proportional, and that ends the inquiry.

As to the IACs, the UCC's arguments about possession, custody, or control miss the mark. The IACs are 127 companies, spread across 50 jurisdictions around the world. Some of the R-ICSPs collectively are indirect, 50% beneficial owners of the equity of certain IACs. They do not have possession or custody of the IACs' documents. And the mere fact of their indirect 50% ownership stake does not give them "control" of the documents either. But this issue is moot. The R-ICSPs who hold beneficial interests in the IACs have agreed to use whatever authority they have to instruct the IACs to produce documents to the UCC in accordance with the R-ICSPs' responses and objections to the subpoena. This includes, for example, tax filings, financial statements, bank records, and audit reports, among many other things. Given this, it is difficult to understand what else the UCC wants the R-ICSPs to do with respect to the IACs.

The remaining requests in the UCC's Letter should be denied. *First*, the R-ICSPs agree to July 1 as the date for substantial completion of their production of ESI from the 475,000 documents recalled by the UCC's proposed search terms for Richard, Jonathan, and David Sackler's already-collected ESI, but it is premature to establish deadlines for substantial completion of *all* ESI

searches.  There is still substantially more ESI to collect.  This will cause the review burden to

balloon further, but the resulting burden for that additional discovery is currently undeterminable.

Further, as of today, the parties have not even had a chance to meet and confer about the specific

written responses to the UCC's subpoena, which were served on April 21.  *Second*, the UCC's

request for an order forbidding redaction of personally identifying information and names of

current third-party investment counterparties should be denied.  For the reasons advanced in the

Raymond Sackler family's Limited Objection of April 26 to the Ad Hoc Group of Non-Consenting

States' Rule 2004 motion, such redactions are necessary, appropriate, and in the best interests of

all constituents in these cases.

## BACKGROUND

The present discovery dispute largely turns on the relevance, reasonableness, and

proportionality of the UCC's discovery requests.  As such, it is essential for those requests to be

considered against the background of information that the UCC has already received or been

promised in these cases.

### A.    Disclosures Under the Case Stipulation

Shortly after this case began, the parties entered into a Stipulation under which the Sackler

families agreed to provide the UCC detailed presentations of information while Rule 2004

discovery was held in abeyance.  *See* Stipulation ¶ 17.  The intended goal of this agreement was

to streamline the disclosure process, reduce the burden on the estate, and facilitate a timely close

to these cases – which will expedite providing settlement proceeds to ailing communities.  In

accordance with the Stipulation, the UCC received vast quantities of information through

presentations totaling 1,152 slides and spanning two full business days.  These include:

- A presentation on November 22, 2019, providing extensive information about each Initial
  Covered Sackler Person.  The presentation provided details about the identities of all the

4

R-ICSPs, their assets, locations, and (for trusts and entities) reasons for formation and
relationships to one another and the Debtors.

- A presentation on December 6, 2019, containing detailed information relevant to claims
  raised against both sides of the Sackler family and explaining the defenses that the family
  raised or intends to raise in the litigations against them.

- A presentation on January 15, 2020, which provided the net assets of the R-ICSPs,
  including how much wealth they possess, where it is located, and what assets comprise it.

Other than the December 6 presentation, which was intended to lay out litigation positions,
the presentations are not "advocacy of the Sacklers' counsel." Letter at 3 n.4. They contain *facts*,
which are organized and summarized for the UCC, and accompanied by attestations to their
accuracy. In this sense, the presentations are akin to interrogatory responses, designed to convey
*information* rather than mere *data*, and to streamline and expedite the cases so that estate resources
do not have to be expended by the UCC to reconstruct knowledge that the Raymond Sackler family
already possesses. As a result of these presentations, the UCC knows how much wealth the
Raymond Sackler family has; what form it takes and where it is located; and what defenses the
family would assert to liability if litigation resumed. This is exactly the kind of information needed
to assess the merits of the proposed settlement framework. The Raymond Sackler family is
prepared to make each of these presentations available to the Court, if it so prefers, for *in camera*
review to demonstrate the depth and breadth of the information provided.

Also in accordance with the Stipulation, the UCC has received substantial IAC-related due
diligence. The IACs have provided the UCC with over 80,000 pages of detailed business plans,
financial reports, management and board presentations, and sales-related and other materials
spanning, in many instances, decades. The UCC has been given extensive access to the entire
senior management team of the IACs and their advisors. At the request of the UCC's advisors, as
well as advisors to other parties such as the Ad Hoc Committee and the Debtors, the IACs have

organized over 60 hours of calls and 8 days of in-person meetings with IAC management and advisors.

### B.    The UCC's Informal Discovery Requests

Beginning in November 2019, before the Raymond Sackler family had finished providing information in accordance with the Stipulation, the UCC propounded broad discovery requests, seeking production of documents and ESI relating to 61 topics, and dating back 25 years, from every person in the Sackler families, regardless of any such person's relationship to the Debtors, the events underlying the pre-petition litigation, or the issues in the bankruptcy. *See* Ex. A.  On January 2, 2020, the UCC sent another list of 22 document requests, expanding the search universe to include "all personal and professional email accounts and other means of electronic communication of the Sacklers" and "other potentially key witnesses" of whom it enumerated a non-exhaustive list of 23 individuals. *See* Ex. B.  The UCC further asked to apply the search terms agreed upon in the pre-petition multidistrict litigation to the ESI of numerous custodians, including (among others) Jonathan, Richard, and David Sackler.

Over the course of subsequent letters and email exchanges, the UCC added further requests for documents and information on January 22, February 4, February 5, February 13, February 20, February 26, and March 2. *See* Exs. C-I.  On February 4, the UCC initially proposed approximately 90 ESI search strings – to be applied in addition to the MDL search terms – that yielded hundreds of thousands of documents for review; the UCC then revised these search terms on March 3 and March 25, but each iteration failed to meaningfully reduce the volume to be reviewed.  On April 17, 2020, the UCC provided another revised set of search strings on a take-it-or-leave-it basis, and refused to agree that the search strings would not be changed or expanded in the future.

### C.    The UCC's Subpoena

During negotiations of the above requests, the UCC obtained authorization under Rule 2004 to serve formal discovery requests.  On March 31, 2020, the UCC issued a subpoena (the "**Subpoena**") to the R-ICSPs, who collectively consist of four individuals (one deceased), 47 trusts, and six entities.  The Subpoena is staggering in scale.  It contains 88 document requests (122 requests including subparts) calling for documents and communications dating as far back as 1996.  *See* Ex. J.  Many of the requests are worded to have the most expansive breadth possible, seeking "all" communications relating to a multitude of subjects.

The Subpoena was directed only to the R-ICSPs.  During the meet-and-confer process, however, the UCC made clear that it believes the R-ICSPs are responsible for collecting and producing documents belonging to a host of non-subpoenaed parties, including all R-ACSPs.  The UCC further made clear that it believes the R-ICSPs are responsible for collecting and producing documents from all of the IACs, which include 127 foreign entities operating in over 50 jurisdictions worldwide.  *See* Exhibit B to UCC Subpoena, Ex. J.  Jurisdictions where the IACs are located include Australia, Bermuda, Brazil, China, Colombia, United Arab Emirates, Egypt, England, France, Germany, Indonesia, Luxembourg, Netherlands, Singapore, Switzerland, and Taiwan.  *Id.*  Collectively, the R-ICSPs hold indirect, 50% equity stakes in many of the IACs.  No R-ICSP possesses the corporate records of the IACs.

### D.    Productions to Date and Commitments to Produce More

The Raymond Sackler family has been producing documents to the UCC on a voluntary and rolling basis since October 23, 2019, well before the Subpoena was issued.  It will continue to do so.  To date, the Raymond Sackler family has produced over 50,000 pages of documents in response to the UCC's informal diligence requests, including documents produced in the pre-petition proceedings and investigations, documents supporting presentations given under the

Stipulation, and documents relating to family trusts, among other things. The R-ICSPs agreed to the UCC's request that they apply the MDL search terms to the personal files of Richard, David, and Jonathan Sackler – the Raymond-side family members who served on the board of Purdue Pharma Inc. and have personal ESI to search. These custodians have at least ██ non-Purdue email accounts, and the Raymond Sackler family has agreed to produce ESI for these custodians dating as far back as files are available. Application of the MDL search terms to these files resulted in review of 63,627 documents, which is expected to expand as additional data through the petition date is collected. Despite demanding that these searches be undertaken, the UCC now describes its own request for these documents as "not directed to key claims in these cases." Letter at 3, n.6.

In their responses and objections to the Subpoena, the responding R-ICSPs committed to provide much more. *See* Ex. K. They agreed, among other things, to produce tax filings, financial statements, audit reports, and bank records for all responding R-ICSPs, including 44 trusts, the R-ICSP Shareholder Entities,[5] and Richard, David, Jonathan, and Beverly Sackler, for the period January 1, 2008, through March 31, 2020.

In addition, the responding R-ICSPs committed to expand their ESI searches. They agreed to search the ESI of Richard, David, and Jonathan Sackler recalled by 89 additional search strings demanded by the UCC, which results in over 475,000 documents for review when applied to already-collected data. This review burden will expand when additional data (extending through the petition date) is collected and subjected to the same searches. In addition, the R-ICSPs agreed to run searches against the files of a fourth individual, who has served for decades managing the

---

[5]    The Raymond Side Shareholder Entities include ███████████████████████████████████
████████

Raymond Sackler family office, providing accounting and tax services. This too will increase the review burden substantially.

### E. Productions by the Debtors

Beyond all the information provided by the Raymond Sackler family itself, the UCC has received still additional voluminous discovery from the Debtors and will receive more. The Debtors have advised that they produced millions of documents in prepetition litigation, which have been provided to the UCC in these cases. More than 45,000 of these documents were sent to or from Richard, Jonathan, or David Sackler. The Debtors further advise that they are continuing to negotiate with the UCC about additional productions based on searches of records that include custodial files of Sackler family members that had Purdue-hosted email accounts.

## ARGUMENT

### A. The Committee's Demands for R-ACSP Documents Should be Rejected.

The Subpoena was served on most of the R-ICSPs,[6] a group that includes approximately 60 individuals, entities, and trusts. During the meet-and-confer process, the UCC asked undersigned counsel also to search the ESI for 6 individuals who are R-ACSPs, and whom the UCC identified as once having had Purdue-hosted email addresses. For the first time, in its Letter to the Court, the UCC expanded its demand to include documents from all "Covered Parties," which is defined in the Stipulation to encompass both the Initial Covered Sackler Persons and the Additional Covered Sackler Persons. The R-ACSPs comprise a large group that includes Raymond Sackler's non-ICSP grandchildren and great grandchildren and any of their spouses

---

[6]    Two individuals who are trustees of R-ICSP trusts (⬛⬛⬛ and ⬛⬛⬛) are not represented by undersigned counsel and did not authorize undersigned counsel to accept the subpoena on their respective behalves. All but three of the R-ICSP trusts of which ⬛⬛⬛ and/or ⬛⬛⬛ serve as trustees have co-trustees for whom service was accepted. Those trusts' documents therefore will be produced, consistent with the responses and objections to the subpoena.

(approximately 16 additional individuals), as well as the trustees of any non-ICSP trusts for their

benefit. *See* Stipulation, ¶1. The UCC's request should be denied.

### 1.    The R-ACSPs' Documents Are Not Relevant or Proportional.

The UCC argues that the documents of R-ACSPs must be reviewed and produced for three

speculative reasons: (1) each "*may potentially* be held liable as a subsequent transferee" whose

ESI may "rebut any 'good faith' defense"; (2) they "*likely have* evidence relevant to . . . whether

Purdue transfers were fraudulent in the first instance"; and (3) they "*may well have* information

about litigation risk faced by Purdue at various times and potential transfers to the family." Letter

at 9 (emphasis added). None of these arguments withstand analysis.

The central problem for the UCC is its failure to demonstrate that its requested ESI searches

are either relevant or proportional to the needs of the case. Discovery under Federal Rule of

Bankruptcy Procedure 2004 "is not limitless." *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr.

S.D.N.Y. Oct. 30, 1987). Discovery, of course, must always be relevant, as defined by Rule 2004,

and if it is not, the inquiry ends. But "relevance alone is not sufficient" to justify production of

materials. *In re Gawker Media LLC*, No. 16-11700 (SMB), 2017 WL 2804870, at *5 (Bankr.

S.D.N.Y. June 28, 2017). Even if proposed discovery is relevant, it must be "proportional to the

needs of the case, considering . . . the importance of the discovery in resolving the issues, and

whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* These

criteria are not satisfied.

Under Federal Rule of Civil Procedure 45(d)(1), made applicable here by Bankruptcy

Rules 2004 and 9016, a "party . . . issuing . . . a subpoena must take reasonable steps to avoid

imposing undue burden or expense on a person subject to the subpoena." Under Rule 45(e)(1)(D),

subpoena recipients "need not provide discovery of electronically stored information from sources

that the[y] identif[y] as not reasonably accessible because of undue burden or cost." In considering

10

the Subpoena, the Court must "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *In re SumEdison Inc.*, 562 B.R. 243, 249 (Bankr. S.D.N.Y. Jan. 18, 2017) (quotations omitted). Discovery is not permitted where the requests are "so broad as to be more disruptive and costly to the [subpoenaed party] than beneficial to the [examining party]." *Texaco*, 79 B.R. at 553.

The UCC's request that the personal files of all "Covered Parties" be reviewed and produced does not conform to the proportionality standard. Not even the six individual R-ACSPs whose ESI was requested in the meet-and-confer process – ███████████████████

████████████████████████████████████████████

█████████████ – had any meaningful involvement with the Debtors. Although the Debtors have advised the UCC that each of these six individuals at one time had a Purdue-issued email account – the responsive substance of which, if any, the UCC is able to request from the Debtors – each of their respective roles while holding a Purdue-issued email account ranged from insignificant to non-existent:



---

[7]    *See* Cash Transfer of Value Analysis filed by the Special Committee of the Board of Purdue with this Court on December 16, 2019 [Dkt. 654-1], p. 12 n.1 ("The Sackler Family members included herein received healthcare benefits under Purdue's employee benefits program during the period.").



In the meet-and-confer process, the Raymond Sackler family repeatedly informed the UCC about these attenuated connections to the Debtors. The UCC responded with its so-called "offer[]" to limit search of other Covered Parties" (Letter at 10); but that "offer" called for the application of 41 search term strings to personal ESI of each of these individuals for the time period starting in January 1, 1995 ███████████████████████████████████████████████ ████████ through the petition date. *See* Ex. M.

The remaining individual R-ACSPs have no connection to the Debtors whatsoever, except through their family members. ███████████████████████████████████████ ████████████████████████████████████████████████████████ None of these individuals ever had the ability to authorize transfers by Purdue. None had access to internal Debtor information about distributions or related to litigation risk when any such distributions were made. Far from being "unwilling to cooperate by making responsive documents available"

---

[8] ███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

in response to the Subpoena as the UCC argues (Letter at 9), the R-ACSPs' minimal or non-existent roles at the Debtors do not satisfy the relevance or proportionality requirements and therefore do not warrant including any of them as custodians for collection and searches of their personal documents. *See SunEdison*, 562 B.R. at 249-52 (observing that the use of Rule 2004 discovery to conduct a "fishing expedition" pre-dated the era of ESI discovery and requiring "reasonable limits on the sources or types of information that the debtors must search for and retrieve").

The UCC's contention that the R-ACSPs still should be required to produce ESI to "rebut any 'good faith' defense" in connection with transfers they may have received as the beneficiaries of trusts that indirectly own Purdue (*see* Letter at 9) misses the mark. There is no reason to believe these individuals' personal documents are going to be relevant to any good-faith defense to a fraudulent transfer claim that has not been proved, and it would be totally disproportional to require all of their ESI to be searched on the off chance that such an email could conceivably exist.

The superfluity of the R-ACSPs' documents is even more pronounced when the scores of documents and information the UCC already has and will receive are considered. The UCC speculates that the R-ACSPs may have personal files relating to distributions, if any, that they received from trusts, which in turn received distributions from Purdue. But the R-ICSPs have already agreed to produce audit reports, bank records, financial statements, and tax filings for each of the R-ICSP trusts, which include all of the Raymond-side trusts that directly and indirectly own or receive distributions from the Debtors. The UCC and the Ad Hoc Committee of Non-Consenting States also are seeking bank records dating back to 2006 from financial institutions for a long list of parties, including many of the Covered Parties. *See* Notice of Electronic Hearing, Exhibit A [ECF No. 1085-1]. The Raymond Sackler family also has repeatedly told the UCC that

it will provide a comprehensive spreadsheet accounting for the sources and uses of funds that flowed in and out of the trusts that received Debtor distributions, dating back to 2008. In light of this voluminous information that the UCC already has or will soon receive concerning distributions from the Debtors, the UCC cannot demand that the R-ACSPs "search every document, email and byte of data" for information potentially related to the same transfers. *See SunEdison*, 562 B.R. at 252 ("it should be sufficient for CSI if the Debtors produce information showing how the money moved from SEK to SEPS and beyond"); *Blackrock Allocation Target Shares: Series S Portfolio, v. Wells Fargo Bank, N.A.*, 14-CV-09764 (KPF)(SN), 2017 WL 9401102, at *2 (S.D.N.Y. Mar. 2, 2017) (grounds for denying motion to compel subpoena include "that many of the documents and much of the information" sought were "available from plaintiffs").

In the analogous context of subpoenas by administrative agencies, the Second Circuit held that "heightened scrutiny" is required when discovery is sought not of the principal targets of a dispute, but their family members. *In re McVane*, 44 F.3d 1127, 1131 (2d Cir. 1995); *see also id.* at 1138 (referring to "enhanced scrutiny"). In *In re McVane*, the subpoena proponent argued that it was necessary for the spouses and family members of directors who were under investigation to produce financial documents so that it could determine whether the directors had "transferred assets to family members." *Id.* at 1139. The Second Circuit rejected the part of the subpoena aimed at family members because the proponent had not shown that it could not make this determination by seeking documents "limited either to the Directors' financial records, or, if some familial documents were needed, to records of transfers of assets from the Directors." *Id.* Similarly, in *Lerman v. SEC*, Judge Koeltl rejected a subpoena directed at the spouse of a target who allegedly received assets from her husband because the SEC had not shown why it could not obtain the relevant information through a "subpoena directed at [the target's] bank statements."

928 F. Supp. 2d 798, 804-05 (S.D.N.Y. Mar. 8, 2013). The UCC stands in the same position: it cannot show why it cannot obtain the relevant information from bank statements and discovery from the R-ICSPs.

Nevertheless, the UCC has made it clear that it wants to explore the minutia of the Sackler family's conversations for the last 25 years. *See* Letter at 9-10 ██████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████ There is no reason to use estate resources to explore these topics, at least until some threshold showing of relevance and proportionality has been established through discovery of the R-ICSPs. The R-ICSPs have already agreed to review and produce ESI from Richard, Jonathan and David Sackler, as well as a fourth individual who manages the Raymond Sackler family office, which will entail the review of *at least* 500,000 emails and other documents – and certainly far more once additional collections are completed. If any of those individuals communicated with any R-ACSP about the subject matters of interest to the UCC, those communications will be included in the review and production. *In re Transmar Commodity Grp. Ltd.*, No. 16-13625-JLG, 2018 WL 4006324, at *9 (Bankr. S.D.N.Y. Aug. 17, 2018) (rejecting Rule 2004 request where trustee was "in possession of at least 5,942 documents" relating to request "that he obtained from [other] parties").

Just as the UCC argues that it should not "be required to spend time, and, more importantly, estate resources seeking to serve individual subpoenas on Additional Covered Sackler Persons" (Letter at 9), neither should the R-ICSPs be compelled to seek these documents from the R-ACSPs in light of the relevance and proportionality considerations described above. The fact that the R-ACSPs may be released under the proposed settlement framework (*see* Letter at 9), if agreed and approved, does not mean that the discovery of their personal documents is mandated. The

proposed releases under the proposed settlement are to ensure that any settlement achieves peace and cannot be undermined by attacking the principal settling parties' family members or beneficiaries: they do not show the relevance or proportionality of the Additional Covered Sackler Persons' personal documents.

### 2. R-ICSPs Do Not Have Possession, Custody, or Control of R-ACSP Documents.

The lack of relevance and proportionality of R-ACSP documents is enough to end this portion of the discovery dispute.  Yet there is another, independent reason why the Court should not compel the R-ICSPs to produce documents that belong to their "siblings, children and other family and affiliates":  they are not in possession, custody, or control of the requested information. It is well-settled that a party is not obligated to produce information "that it does not possess or cannot obtain." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.* 490 F.3d 130, 138 (2d Cir. 2007).  If the requested documents are in the possession of a third-party, the responding party will be deemed to "control" the documents if he has the "legal right, authority, or practical ability" to obtain or access the requested documents "upon demand." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. July 28, 2000).

"In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion." *Golden Trade S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 525 n.7 (S.D.N.Y. Aug. 17, 1992).  The requesting party must show that the requested party "has either the legal right or the practical ability to obtain the documents in question from their custodian." *In re Nortel Networks Corp. Sec. Litig.*, 01 Civ. 1855 (RMB)(MHD), 2004 U.S. Dist. LEXIS 19129, at *6 (S.D.N.Y. Sept. 21, 2004).  A party does not have practical control of discovery materials where the materials are in the hands of a third party and the third party will not agree to produce the documents. *Id.* at *11.

The UCC has not satisfied its burden here. It argues that the ICSPs have possession, custody, or control over Additional Covered Sackler Person documents "to the extent they have the practical ability to obtain them" from "the ICSPs' siblings, children and other family and affiliates." *See* Letter at 9. As the UCC apparently concedes, in the absence of any legal right to access the documents, the R-ICSPs need the consent and cooperation of the Additional Covered Sackler Persons to access their personal data. *See, e.g., Parris v. Pappas*, No. 3:10CV1128 (WWE), 2017 WL 3314001, at *2 (D. Conn. Aug. 3, 2017) (finding no control where subpoenaed party requested the responsive documents from his girlfriend who denied the request). The fact of their personal relationships with the R-ACSPs does not mean the R-ICSPs are obligated to undertake to collect, review, and produce their documents. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993) ("the fact that a party could obtain a document if it tried hard enough . . . does not mean that the document is in its possession, custody, or control; in fact it means the opposite").

### B.    The UCC's Request for an Order as to the IACs Should Be Denied.

The UCC seeks an order declaring that the R-ICSPs have "control" of the documents possessed by the IACs. Letter at 6-7. There is no need for the Court to rule on this subject. The R-ICSPs made it clear in their responses and objections to the subpoena that, while they do not have possession or custody of the documents held by the IACs, they would "*do what is within their practical ability to ask the IACs* . . . to provide non-privileged documents responsive to the Requests," subject to applicable objections. Ex. K at 10 (emphasis added). The responses and objections therefore stated that the R-ICSPs would request from the IACs documents responsive to over twenty of the enumerated document requests. *See* Ex. K at 13, 43-56, 65-76, 83-84. The R-ICSPs have already begun this process by asking counsel for the IACs to collect and prepare to produce documents as set forth in the responses and objections. The R-ICSPs that own indirect equity positions in the IACs informed the UCC that they would send a letter to the IACs instructing

17

them to gather and produce documents in response to the subpoena.

There is accordingly no real dispute before the Court concerning the IACs. If, as the UCC argues, "control" over documents must be equated with the "practical ability" to obtain documents, then the R-ICSPs have already committed to discharge their obligations by *using whatever practical ability they have* to direct the IACs to respond to the subpoena. There is nothing more that should be asked of them.

Should the Court nevertheless decide to entertain the UCC's request for an order declaring the R-ICSPs to be in "control" of IAC documents, that request must be denied on the merits. "It is the discovering party's burden to demonstrate that the requested entity has either the legal right or the practical ability to obtain the documents in question from their custodian." *In re Nortel Networks Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 19129, at *6 (denying motion to enforce subpoena). The UCC makes no showing that the R-ICSPs have the legal right to documents held by the IACs in 50 different jurisdictions – including, for example, a showing that in each of those jurisdictions, a company's board or management is obligated to honor requests by a shareholder to produce documents to a third party. *See Shcherbakovskiy*, 490 F.3d at 139 (subpoenaed party is not responsible for producing documents held by foreign corporation in which it owns equity if production is not permitted by applicable foreign law). This is quite unlike the UCC's cited case, *In re NTL, Inc. Securities Litigation*, 244 F.R.D. 179, 195 (S.D.N.Y. Jan. 30, 2007) (Letter at 6), where the court was presented with evidence that the subpoena recipient had entered into an agreement with a non-subpoenaed party containing a "document sharing clause."

It is well-established, moreover, that equity ownership – even 100% ownership – is not alone sufficient to prove that a subpoena recipient has the practical ability to produce a non-party's documents; rather, ownership is "only one factor to consider." *Sicav v. Wang*, No. 12 CIV. 6682

PAE, 2014 WL 2624753, at *5 (S.D.N.Y. June 12, 2014) ("all cases from this District of which this Court is aware, engage in a factual inquiry into practical control, of which ownership is but one part."). In *Sicav*, for example, Judge Engelmayer denied a motion to compel the production of documents from several wholly owned domestic and foreign subsidiaries where: (1) there was no "track record" showing that the parent company had "actually exerted control" over its subsidiaries (*id.* at *6); (2) the subpoena proponent made no showing that the parent company and its subsidiaries "operate as one entity" (*id.* at *7); (3) the record showed that the parent company had "at best very limited and tenuous access to any documents of its subsidiaries" (*id.* at *9); and (4) there was no "agency relationship" between the parent and its subsidiaries (*id.*). *Accord In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 CIV. 5571 RJH HBP, 2009 WL 8588405, at *3 (S.D.N.Y. July 10, 2009) (denying motion to compel production of documents from wholly owned corporation based on analysis of same factors). Here, as in *Sicav*, the UCC has not made the requisite showing; it has relied solely on the fact of indirect ownership, which is not enough.[9]

## C.    The UCC's Request to Impose a Deadline For ESI Productions is Premature.

The UCC's request to impose a July 1 deadline for completion of document productions (Letter at 6) is premature. As to the approximately 475,000 documents that were generated by the UCC's search terms of April 17, 2020, as applied to the already-collected ESI of Jonathan, Richard, and David Sackler, the Raymond Sackler family is committed to substantially completing its review and production by July 1. It also will continue to meet and confer with the UCC about

---

[9]    The UCC faults counsel for being unable to "identify a single example of an IAC defying" a request that the IACs produce documents. Letter at 7. That is because R-ICSP counsel is not aware of the R-ICSPs making a request for a production of documents as expansive and burdensome as is called for by the Subpoena here. The UCC's failure to show that the R-ICSPs have had access to the IACs' documents in the past also distinguishes this case from *Cooper Industries, Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 919–20 (S.D.N.Y. Aug. 28, 1984), on which the UCC relies. Letter at 7. In *Cooper*, the court found that a subpoena recipient had custody of documents in the files of a related company because it had access to its affiliate's documents in the ordinary course of its business. *Id.* at 920.

other discovery issues, and to gather and produce other documents consistent with its responses and objections.

Setting additional deadlines for the Raymond Sackler family is not currently possible, however. Responses and objections to the Subpoena were served little more than a week ago on April 21 and the parties have yet to meet and confer about the specific responses. Further, the UCC settled on proposed search terms for the ESI of Jonathan, Richard, and David Sackler only on April 17, 2020, and the UCC knows that additional ESI from these custodians remains to be collected and subjected to the search criteria to determine the additional volume to be reviewed. In addition, the ESI of the fourth agreed custodian has been obtained only recently (after technical difficulties associated with gathering electronic data remotely during the pandemic), and the parties have not had a chance to test and negotiate search terms for this custodian's electronic files. All of this means that the total review burden – just for the ESI component of this massive discovery project – is still unknown. There is no way to assess whether a deadline for substantial completion of the entire production by July 1 is reasonable or even feasible.

### D.    Limited Redactions Are Appropriate.

The UCC disputes the propriety of the limited redactions that R-ICSPs seek to apply to protect two narrow categories of information: Personally Identifying Information (as defined in the Amended Protective Order) and information relating to R-ICSPs' current third-party investments and business counterparties. The requested redactions are necessary to protect against the irreparable damage disclosures may occasion for the reasons set forth in the Raymond Sackler family's Limited Objection to the Ad Hoc Group of Non-Consenting States' Rule 2004 Motion [ECF No. 1087], which the Raymond Sackler family incorporates by reference herein. *See Andrews v. Cruz*, No. 04 CIV. 0566 PAC RLE, 2006 WL 1984650, at *3 (S.D.N.Y. July 14, 2006) ("Although there is a protective order in effect in this case, the Court finds that the redaction of

social security numbers, home addresses, and family information is appropriate to protect personal and private information.").

## CONCLUSION

For the foregoing reasons, the Raymond Sackler family respectfully requests that the Court deny the relief requested in the UCC's Letter as to the Raymond Sackler family and R-ICSPs; grant authority to the Raymond Sackler family and R-ICSPs to redact documents produced in response to the UCC's Subpoena, consistent with the parameters set forth in the Raymond Sackler family's Limited Objection to the Ad Hoc Group of Non-Consenting States' Rule 2004 Motion [ECF No. 1087]; and grant the Raymond Sackler family and R-ICSPs such other and further relief as is just and proper.

Dated:    April 29, 2020
          New York, New York

Respectfully submitted,


*/s/ Gerard Uzzi*

Gerard Uzzi
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219


*/s/ Gregory P. Joseph*

Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:    (212) 407-1200
Facsimile:    (212) 407-1280


*Counsel for the Raymond Sackler Family*

# Exhibit A

Redacted

# Exhibit B

Redacted

# Exhibit C

Redacted

# Exhibit D

Redacted

# Exhibit E

Redacted

# Exhibit F

Redacted

# Exhibit G

Redacted

# Exhibit H

Redacted

# Exhibit I

Redacted

# Exhibit J

Redacted

# Exhibit K

Redacted

# Exhibit L

Redacted

# Exhibit M

Redacted

## CERTIFICATE OF SERVICE

I, Gerard Uzzi, hereby certify that, on April 29, 2020, I caused true and correct copies of the foregoing document to be serviced by the Court's Case Management/Electronic Case File (CM/ECF) System, which sends notices of electronic filings to parties of record. I also certify that service is being made via email or first class mail upon the parties set forth in the Master Service List. Further service is made upon the Chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

*/s/ Gerard Uzzi*

Gerard Uzzi
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219