

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

April 29, 2020

VIA ECF

Honorable Robert D. Drain
U.S. Bankruptcy Court for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

*In re: Purdue Pharma L.P. et al.*, **No. 19-23649 (Bankr. S.D.N.Y.)**

Dear Judge Drain:

The Mortimer Sackler ICSPs[1] respectfully submit the following response to the letter from the UCC, dated April 26, 2020.[2] The UCC submitted four issues for the Court's consideration. The Mortimer Sackler ICSPs can first inform the Court that there is no longer a dispute about the time period for ESI discovery. Although the Mortimer Sackler ICSPs continue to believe that a shorter time period would be more appropriate, the Mortimer Sackler ICSPs agree to collect and search personal[3] ESI for each Mortimer Sackler Covered Sackler Person who served on the board of Purdue Pharma, Inc. from 1995, to the extent ESI is available. The Mortimer Sackler ICSPs believe that this resolves the dispute over the relevant period of ESI discovery from Ilene Sackler Lefcourt, Kathe Sackler, Mortimer D.A. Sackler, Theresa Sackler, and Samantha Hunt.

The Mortimer Sackler ICSPs have agreed to undertake the review of more than 300,000 documents yielded by the UCC's revised search terms and appreciate the UCC's participation in a productive meet-and-confer process to narrow those search

---

[1] The Mortimer Sackler ICSPs preserve, and do not waive, all defenses, including without limitation defenses based on lack of personal jurisdiction.

[2] Capitalized terms used not otherwise defined herein have the meaning set forth in the UCC's Letter dated April 26, 2020, filed at Docket No. [1089].

[3] ESI associated with the ICSPs in the custody of the Debtors will be produced by the Debtors following review as agreed by the parties, including data in the files associated with the ICSPs' Purdue email addresses.

Honorable Robert D. Drain                  2                  April 29, 2020

terms.[4] The Mortimer Sackler ICSPs will further agree to set May 15, 2020 as the start date for the production of documents from this ESI discovery.[5]

The remaining issues before the Court are: (*i*) collection of documents from the IACs; (*ii*) collection of documents from Additional Covered Sackler Persons; (*iii*) redaction of two narrow categories of confidential information; and (*iv*) whether it is appropriate at this time to impose a deadline for the completion of ESI discovery in response to the Subpoena.

### I. The UCC Has Received and Will Receive Substantial Quantities of Information.

The Mortimer Sackler ICSPs recognize the central role the UCC plays in evaluating the proposed settlement and the importance of information for it to carry out the functions assigned to it by the Code. In that spirit, the UCC has already received (or, where noted below, commitments that they will receive) substantial amounts of information regarding the issues in these cases, including but not limited to:

- A detailed report by Alix Partners covering all transfers of value from Purdue for the benefit of any Covered Sackler Person or IAC, including not only distributions, but also more minor benefits like health insurance and cellular telephone services.

- All documents that the Debtors and ICSPs had previously produced in any related civil litigation. From the Debtors, the UCC received over 45 million pages of documents, including numerous emails to, from, or copying one or more Mortimer Sackler ICSP. As the UCC recognizes, those materials

---

[4] As the Mortimer Sackler ICSPs informed the UCC, the search terms were applied to certain ESI previously collected from four custodians within a date range that is significantly shorter than the time period sought by the UCC. The ultimate number of documents within the review universe will thus be greater than 300,000, and potentially significantly so.

Regarding footnote 9 in the UCC Motion, the Mortimer Sackler ICSPs can confirm that they understand that documents searched had been de-duplicated to the extent possible, but that certain data is hosted in a jurisdiction subject to the GDPR and cannot be de-duped against data currently hosted outside of that jurisdiction prior to review and appropriate redactions pursuant to the requirements of the GDPR.

[5] The Mortimer Sackler ICSPs understand the UCC's interest in receiving documents responsive to its requests at the earliest possible time. As reflected in the 88 requests in the UCC's Subpoena, the parties' discussions about the scope of discovery has had to cover numerous issues, including topics, timeframe, and custodians, and the parties have been working through a significant number of good faith disagreements. The complexity of this meet-and-confer process is not in any way probative of the pace at which the document review and production will occur once the search parameters and scope of responsiveness are finalized. The Mortimer Sackler ICSPs and their counsel will undertake every effort to provide documents and conclude their review at the earliest practicable date.

Honorable Robert D. Drain                                                3                                                April 29, 2020

include a production from (*i*) Mortimer D.A. Sackler's custodial file in the Oklahoma litigation, and (*ii*) Kathe Sackler's custodial file (including responsive documents scanned from Kathe Sackler's hard copy files maintained at Purdue's Stamford office dating back to 1995). The Mortimer Sackler ICSPs are currently in the process of producing thousands of documents previously produced based on searches of personal ESI obtained from the four individual ICSPs.

- A transcript of a deposition of Kathe Sackler taken on April 1, 2019, which included extensive questioning concerning, *inter alia*, the issues cited in the UCC's letter, including the sale and marketing of OxyContin, risks of addiction associated with OxyContin, and transfers of value from Purdue for the benefit of members of the Sackler families. The UCC also received transcripts of two depositions of Richard Sackler as well as depositions of dozens of other former and current Purdue employees in civil litigation that preceded this bankruptcy proceeding.

- Dozens of expert reports from the preceding civil litigation, covering every issue from sales and marketing practices to causation and damages.

- Over 80,000 pages of documents regarding the IACs' respective finances, business plans, management and board presentations, corporate structure and other materials to a data room. The IACs have further made senior executives available for numerous and substantial interviews concerning the IACs' business that lasted more than 60 hours in total. This effort included in-person management presentations that took place over the course of two weeks in London, Cambridge and Dubai, and included tours of the IAC research and development, manufacturing and quality assurance facilities.

- Nearly 10,000 pages of documents pertaining to the creation and administration of the trusts for the benefit of the Mortimer Sackler ICSPs, including the trusts that are the ultimate shareholders of the IACs and the Debtors.

- Comprehensive presentations on the Mortimer Sackler ICSPs' finances and defenses, as requested by the UCC, including (*i*) a 130-slide presentation that detailed the structure and location of all entities and trusts that hold the Mortimer Sackler ICSPs' assets; (*ii*) a 128-slide presentation providing an extensive overview of the Mortimer Sackler ICSPs' factual and legal defenses, accompanied by approximately 130 source documents[6]; and (*iii*) received a

---

[6]    The UCC appears to characterize many of the documents provided in support of this presentation as "publicly available," *see* UCC Letter at 3 n.4, but that misunderstands the purpose of those documents. The selection of public documents in that analysis represents the results of extensive work to preview for the UCC certain factual defenses that would have been developed through expert discovery in the civil litigation that is now stayed by this

Honorable Robert D. Drain                          4                          April 29, 2020

      168-slide presentation that provided net asset information for the US and ex-US assets of each Mortimer Sackler ICSP (four individuals and 77 trusts) broken out into twelve categories, net liabilities broken out into eight categories, and attestations from the individuals who collected the source materials and third-party organization that performed the analysis.

- An agreement by the Debtors to review and produce non-privileged documents from the Mortimer Sackler ICSPs' custodial files in the Debtors' possession, which includes all ESI associated with the Mortimer Sackler ICSPs' Purdue email addresses.

- A commitment by the Mortimer Sackler ICSPs (as stated in their Limited Objection to the Rule 2004 Motion by the Ad Hoc Group of Non-Consenting States [D.N. 1088]) to provide extensive bank records in response to requests from the UCC and the Ad Hoc Group.

The Mortimer Sackler ICSPs have agreed to provide additional information based on extensive searches and upcoming review of hundreds of thousands of documents obtained from data in their personal email accounts and electronic devices. The issues raised by the UCC's Letter concern the production of even more information on top of the preceding information they have or will receive. As explained below, the Mortimer Sackler ICSPs have already undertaken efforts to assist the UCC in obtaining documents from the IACs. However, the Mortimer Sackler ICSPs respectfully submit that the additional discovery sought by the UCC in its Letter exceeds the needs of this case.

    **II. It Is Unnecessary to Address the Issue of whether the Mortimer Sackler ICSPs Have Custody or Control of Documents in the IACs' Immediate Possession Because They Are Already Seeking Full Cooperation from the IACs**

The IACs are neither Debtors in these bankruptcy cases nor defendants in the underlying litigation.[7] For the reasons explained in the Response submitted by the Raymond Sackler ICSPs, documents in the IACs' possession are not in the custody or control of the ICSPs either individually or collectively. *See* Response of The Raymond Sackler Family to The Official Committee's April 26 Discovery Letter And Objection to Relief Requested Therein [D.N. 1112, at 17-19]. However, the ICSPs have already exercised whatever practical ability they have to request that the IACs voluntarily participate in this discovery process by being prepared to transmit letters

---

    Court's injunction. As such, these documents are highly relevant to the UCC's weighing of the strengths and weaknesses of the litigation claims against the Mortimer Sackler ICSPs.

[7] In over 2600 cases in the preceding litigation in federal and state courts, we are aware of only one that named a single IAC as a defendant.

Honorable Robert D. Drain 5 April 29, 2020

to counsel for the IACs and the II-Way Entities (which the ICSPs previously informed the UCC that the ICSPs were willing to do), communicating the UCC's requests to the IACs and asking the IACs to voluntarily provide the information sought as limited by the responses in the Mortimer Sackler ICSPs' and the Raymond Sackler ICSPs' responses and objections. Based on the IACs' ongoing fulsome participation in the diligence process already underway (including the provision of 80,000 pages of documents and extensive interviews with executives), the Mortimer Sackler ICSPs have no reason to doubt that the IACs will similarly provide the UCC with the information sought through the Rule 2004 Subpoena.

### III. The Mortimer Sackler ICSPs Have Agreed to Provide ESI for the Relevant Custodians on the List of Custodians Requested by the UCC

As explained above, the Mortimer Sackler ICSPs are agreeing to collect ESI from the period of time requested by the UCC, to run search terms as agreed upon by the Mortimer Sackler ICSPs and the UCC, and review according to the scope of responsiveness agreed upon by the parties (or ordered by the Court) for each Mortimer Sackler Covered Party who has ever served as a director of PPI (even if that service was brief and long ago). The UCC now requests that the Mortimer Sackler ICSPs ask all other Additional Covered Sackler Persons ("ACSPs") to provide their ESI for review and production to the UCC. Such additional discovery is unnecessary and could potentially significantly delay resolution of these chapter 11 cases. Nor do the UCC's authorities on proportionality support the position that this further expansion of discovery is appropriate here. *In re SunEdison, Inc.*, 562 B.R. 243, 250 (Bankr. S.D.N.Y. 2017) (noting that "the cost of compliance [with Rule 2004 discovery] has increased substantially" in the era of ESI discovery and that the Federal Rule of Civil Procedure "spirit of proportionality is consistent with the historic concerns regarding the burden on the producing party and is relevant to the determination of cause").[8]

---

[8] In *John B. v. Goetz*, the court's determination of proportionality hinged on the fact that the discovery arose from "repeated judicial findings of the Defendants' violations of children's rights to medical care under federal law, and not "unproven claims." 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010) ("[I]f Plaintiffs were individuals with unproven claims, then the expenditure of the Defendants' estimated millions of dollars for electronic discovery, after the balancing equities, might be unjustified. Yet, with repeated judicial findings of the Defendants' violations of children's rights to medical care under federal law, any cost of ESI discovery is far outweighed by the benefits of the improved health of the children in this state."). Here, no claimant has ever established liability against any of the Mortimer Sackler ICSPs, and no claimant has even named a Mortimer Sackler ACSP. *Carusone v. Kane* appears to have involved a much shorter timeframe and the custodians were all employees of a single government agency, not dozens of private individuals in multiple locations inside and outside the United States. *See Carusone v. Kane*, No. 1:16-CV-1944, 2019 WL 5424333, at *1 (M.D. Pa. Oct. 23, 2019) (noting that "OAG has agreed to provide email-by-email review of all emails involving a select group of people during the timeframe of September 15, 2014 through October 5, 2014"). *Gen-Probe Inc. v. Becton, Dickinson & Co.* is simply inapt. The discovery dispute arose in patent litigation involving 140 claims under

Honorable Robert D. Drain 6 April 29, 2020

The Mortimer Sackler ACSPs include 33 individual members of the Mortimer Sackler family, including 15 minor children.[9]  None of the ACSPs has had any material involvement with Purdue's business or with prescription opioids.  Collection of these individuals' ESI (dating back to 1995), particularly in light of the logistical problems created by the COVID-19 pandemic, would require extraordinary effort and cost.

None of these individuals were named in any of the hundreds of lawsuits that preceded these chapter 11 cases.  They are highly unlikely to have any additional relevant information.  The UCC has not pointed to a single document suggesting any involvement by any of the 33 Mortimer Sackler ACSP individuals that would warrant radically expanding the scope of ESI discovery to include them.[10]  The UCC's argument to the contrary depends on the unlikely scenario that any of these individuals used their personal email accounts to communicate about relevant topics without including any of the four former Mortimer Sackler ICSP directors or any Purdue custodian.

The UCC has also requested that the Mortimer Sackler ICSPs collect, search, and review ESI from certain additional individuals who are members of or related to the Mortimer Sackler Family who ever had email addresses with a Purdue domain.  The UCC's proposal assumes there is some significance to an individual receiving such an email address.  In fact, most of the individuals at issue never used the Purdue email address and certain individuals didn't even know that they had been issued a Purdue email address.  The ESI of these individuals is highly unlikely to shed any light at all on issues of significance to the bankruptcy process.

- *Mortimer D. Sackler*:  Mortimer D. Sackler died in 2010, at the age of 93 and his estate has long since wrapped up.  The Mortimer Sackler ICSPs have identified one email address used by Mortimer D. Sackler for personal emails and are currently investigating whether any ESI associated with that account still exists, which persons, if any, have possession, custody, or control of any

---

multiple patents—in other words, litigation that inherently involves numerous documents. No. 09CV2319 BEN (NLS), 2011 WL 13100706, at *4 (S.D. Cal. Aug. 25, 2011) ("[T]he facts [the party resisting discovery] relies upon do not speak to undue burden but rather to the fact that this is a large document case. This is not surprising, given that this is a patent case with approximately 140 asserted claims, resulting from multiple claims asserted under seven different patents.  There are also numerous invalidity contentions and prior art references.").  By contrast, the UCC's request is based on pure speculation that an ACSP might have a small number of relevant documents somewhere among twenty-five years' worth of ESI.

[9] The Mortimer Sackler ICSPs have not agreed to provide ESI from the trustees of trusts that are Mortimer Sackler Covered Sackler Persons.

[10] The Mortimer Sackler ICSPs understand that the Raymond Sackler ICSPs will respond separately to the UCC's statements concerning Beth Sackler, Marianna Frame, and beneficiaries' meetings.

such ESI, and whether the Mortimer Sackler ICSPs have the authority to collect, review, and produce any such ESI responsive to the UCC's requests. The Mortimer Sackler ICSPs further understand that Mortimer D. Sackler had an email address hosted by one of the Debtors and refer the UCC to any such ESI, to the extent it exists, in the Debtors' possession, custody, or control.

- *Muriel Sackler*: Muriel Sackler died in 2009.[11] Mortimer D. Sackler and Ms. Sackler divorced in the 1950s. The Mortimer Sackler ICSPs are unaware of any involvement by Ms. Sackler in the Debtors' business at any time, including following the introduction of OxyContin in 1995, decades after the divorce. Her estate too was long since concluded and the undersigned counsel is unaware of any ESI formerly belonging to Muriel Sackler and now within the possession, custody, or control of any Covered Sackler Person.

- *Gertraud "Gheri" Sackler*: Mortimer D. Sackler and Ms. Sackler divorced in the 1970s. Ms. Sackler currently resides in Vienna, Austria. The Mortimer Sackler ICSPs are unaware of any involvement by Ms. Sackler in the Debtors' business at any time, including following the introduction of OxyContin in 1995. Indeed, the Mortimer Sackler ICSPs were unaware that Ms. Sackler had a Purdue email address and suspect that some error must have been made.

- *Jeffrey Lefcourt*: Mr. Lefcourt has never worked at or been involved with Purdue other than to receive health insurance from Purdue as a family member of Ilene Sackler Lefcourt. The Mortimer Sackler ICSPs believe that the only reason Mr. Lefcourt would have an email address at Purdue is for administrative purposes related to such health insurance.

- *Karen Lefcourt-Taylor*: Ms. Lefcourt-Taylor has never worked at or been involved with Purdue other than to receive health insurance from Purdue as a family member of Ilene Sackler Lefcourt. The Mortimer Sackler ICSPs believe that the only reason Ms. Lefcourt-Taylor would have an email address at Purdue is for administrative purposes related to such health insurance.

- *Susan Shack Sackler*: Ms. Shack Sackler is married to Kathe Sackler. The Mortimer Sackler ICSPs believe that the only reason Ms. Shack Sackler would have an email address at Purdue is for administrative purposes related to health insurance coverage.

The health benefits set forth above were analyzed by Alix Partners and included in their Cash Transfers of Value Analysis [D.N. 654-1, at 38 nn.1-2]. That report shows no significant transfers of value from Purdue to any of those individuals. In the

---

[11] *Paid Notice: Deaths – Sackler, Muriel Lazarus*, N.Y. TIMES (Oct. 9, 2009), *available at* https://archive.nytimes.com/query.nytimes.com/gst/fullpage-9A07E3D71E3AF93AA35753C1A96F9C8B63.html

Honorable Robert D. Drain                                 8                                 April 29, 2020

interests of efficiency and conservation of estate resources, the Mortimer Sackler ICSPs therefore do not believe the gathering of ESI from these custodians or any other ACSP is appropriate.

To the extent that the UCC locates documents in the course of their review of responsive ESI collected from any of the Mortimer Sackler Covered Sackler Persons who were former board members of Purdue Pharma, Inc., or from the Debtors that demonstrate a need to collect, search, and review ESI from any of the ACSPs, the Mortimer Sackler ICSPs are willing to meet and confer regarding the appropriate scope of discovery from any such custodian at that time.

### IV. The Court Should Permit Redaction of Certain Personally Identifying Information and Investment Counterparties

Redaction of two narrow categories of information is appropriate under the circumstances of this case. As explained by the Raymond Sackler ICSPs, whose request the Mortimer Sackler ISCPs join, the identity of third-party investment counterparties is particularly sensitive information in this proceeding. Certain investment relationships have been adversely affected or terminated following publicity concerning involvement by certain members of the Sackler Families. To the extent that the Court determines that redaction of this information is inappropriate, the Mortimer Sackler ICSPs request that they be permitted to designate such information "Outside Professionals' Eyes Only" under the terms of the Protective Order [ECF No. 969].

Separately, redaction of personally identifying information ("PII") pertaining to minor children of Covered Sackler Persons is necessary. Redaction or anonymization of minors' names and other personally identifying information is an accepted practice in litigation under appropriate circumstances. *See, e.g.*, *Doe v. Solera Capital LLC*, No. 18 CIV. 1769 (ER), 2019 WL 1437520, at *6 (S.D.N.Y. Mar. 31, 2019) ("[C]ourts have been readier to protect the privacy interest of minors in legal proceedings than of adults."), *reconsideration denied*, No. 18 CIV 1769 (ER), 2019 WL 5485210 (S.D.N.Y. Oct. 25, 2019). The personal lives of Covered Sackler Persons have been scrutinized by the media and the Sackler Families, including certain of them by name, have been the subject of disturbing and violent threats. *Cf. Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981) (permitting minor plaintiffs to proceed anonymously; "The gravity of the danger posed by the threats of retaliation against the Does for filing this lawsuit must also be assessed in light of the special vulnerability of these child-plaintiffs."); *Doe v. MacFarland*, 66 Misc. 3d 604, 632, 117 N.Y.S.3d 476 (N.Y. Sup. Ct. 2019) ("The court is particularly mindful of the impact of social media and the extent to which children can be readily exposed to taunting and harassing behaviors through such medium."). It is therefore essential to protect the identity of children. While the Mortimer Sackler ICSPs appreciate the restrictions of the Protective Order, they are nonetheless sensitive to any risk of accidental disclosure. If the UCC provides the Mortimer Sackler ICSPs with a

Honorable Robert D. Drain					9					April 29, 2020

specific reason following their review of documents provided in discovery in this proceeding that the de-anonymization of any minor individual's name or other PII is necessary, the Mortimer Sackler ISCPs are willing to meet and confer about reasonable accommodations at that time with regard to any such minor individuals.

### V. It Is Unnecessary to Impose a Deadline for the Completion of Discovery in Response to the Subpoena.

Finally, while the Mortimer Sackler ICSPs understand the UCC's request to set a date certain for the completion of ESI discovery, they submit that it would be premature do so at the present time. The Mortimer Sackler ICSPs understand the need to progress discovery as quickly as practicable and agree to do so, but current circumstances relating to the COVID-19 pandemic have injected significant uncertainties into all litigation, including this discovery process. For example, it will be more difficult while social distancing (including many office closures) is in place to collect hard copy documents and ESI stored on the hard drives of devices not currently within any individual's physical possession. Discussion of the timeframe for review will also be more productive after the ICSPs have started the review based on the current search parameters, at which time the parties will be better informed regarding practicable rate of review of documents and may also be in a position to meet-and-confer to refine the discovery process.[12]

**Conclusion**

For the foregoing reasons, the Mortimer Sackler ICSPs respectfully request that the Court (*i*) deny the relief requested by the UCC in its Letter dated April 26, 2020, and (*ii*) clarify that the ICSPs are permitted to redact certain personally identifying information and certain confidential information concerning third-party investment counterparties.

Respectfully submitted,


*/s/ Jasmine Ball*
Jasmine Ball

---

[12] The Mortimer Sackler ICSPs appreciate that the UCC has agreed to be available to meet and confer further at that point about potential adjustments to the search terms to enhance the efficiency of the review process for all parties.