Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 19-23649-rdd

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  PURDUE PHARMA L.P.,

8

9           Debtor.

10 - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    May 1, 2020

17                    2:10 PM

18

19

20

21 B E F O R E :

22 HON ROBERT D. DRAIN

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO: ART

1   HEARING re Ex Parte Motion of the Ad Hoc Group of Non-

2   Consenting States for an Order Authorizing Examinations of

3   Certain Financial Institutions Pursuant to Rules 2004 and

4   9016 of the Federal Rules of Bankruptcy Procedure filed by

5   Andrew M. Troop on behalf of Ad Hoc Group of Non-Consenting

6   States (ECF #1019)

7

8   Limited Objection of The Raymond Sackler Family to the Ad

9   Hoc Group of Non-Consenting States Rule 2004 Motion (related

10  document(s)1019) (ECF #1087)

11

12  Limited Objection of Mortimer Sackler Initial Covered

13  Sackler Persons to Ex Parte Motion of the Ad Hoc Group of

14  Non-Consenting States for an Order Authorizing Examinations

15  of Certain Financial Institutions Pursuant to Rules 2004 and

16  9016 of the Federal Rules of Bankruptcy Procedure (related

17  document(s)1019) filed by Jasmine Ball on behalf of Beacon

18  Company (ECF #1088)

19

20  STATEMENT OF THE PRIVATE INSURANCE CLASS CLAIMANTS

21  CONCERNING DISCOVERY DISPUTES BETWEEN OFFICIAL COMMITTEE OF

22  UNSECURED CREDITORS AND THE SACKLERS AND APPLICATION UNDER

23  BANKRUPTCY RULE 2004 (related document(s)1019) filed by

24  Nicholas F. Kajon on behalf of Eric Hestrup, et al. (ECF

25  #1099)

1    Reply in Support of its Ex Parte Motion of the Ad Hoc Group

2    of Non-Consenting States for an Order Authorizing

3    Examinations of Certain Financial Institutions Pursuant to

4    Rules 2004 and 9016 of the Federal Rules of Bankruptcy

5    Procedure (related document(s)1019) (Troop, Andrew)(ECF

6    #1106)

7

8    The Ad Hoc Group of Non-Consenting States' Letter to the

9    Honorable Judge Robert D. Drain Regarding Discovery Disputes

10   Between the UCC and Members of the Sackler Family Filed by

11   Andrew M. Troop on behalf of Ad Hoc Group of Non-Consenting

12   States (Troop, Andrew)(ECF #1107)

13

14   The Official Committee of Unsecured Creditors' Joinder In,

15   and Statement with Respect to, Reply in Support of Ex Parte

16   Motion of the Ad Hoc Group of Non-Consenting States for an

17   Order Authorizing Examinations of Certain Financial

18   Institutions Pursuant to Rules 2004 and 9016 of the Federal

19   Rules of Bankruptcy Procedure (related document(s)1106)

20   filed by Ira S. Dizengoff on behalf of The Official

21   Committee of Unsecured Creditors of Purdue Pharma L.P., et

22   al. (ECF #1109)

23

24

25

Page 4

1    Declaration of Arik Preis in Support of the Official

2    Committee of Unsecured Creditors' Joinder In, and Statement

3    with Respect to, Reply in Support of Ex Parte Motion of the

4    Ad Hoc Group of Non-Consenting States for an Order

5    Authorizing Examinations of Certain Financial Institutions

6    Pursuant to Rules 2004 and 9016 of the Federal Bankruptcy

7    Procedure (related document(s) 1109) filed by Ira S.

8    Dizengoff on behalf of The Official Committee of Unsecured

9    Creditors of Purdue Pharma L.P., et al. (ECF #1110)

10

11    Ad Hoc Committees Statement Regarding Discovery Disputes

12    (related document(s)1019, 1087, 1089, 1088) filed by Kenneth

13    H. Eckstein on behalf of Ad Hoc Committee of Governmental

14    and Other Contingent Litigation Claimants. (Eckstein,

15    Kenneth) (ECF #1111)

16

17    Response of The Raymond Sackler Family to The Official

18    Committee's April 26 Discovery Letter And Objection to

19    Relief Requested Therein (related document(s)1089) filed by

20    Gerard Uzzi on behalf of The Raymond Sackler Family. (ECF

21    #111)

22

23

24

25

Page 5

1    Response of Beacon Company to The Official Committee's April

2    26 Discovery Letter and Objection to Relief Requested

3    Therein (related document(s)1089) filed by Jasmine Ball on

4    behalf of Beacon Company. (Ball, Jasmine) (ECF #1113)

5

6    Reservation of Rights in Connection with Statement and

7    Application of the Private Insurance Class Claimants

8    Concerning Discovery Disputes (related document(s)1099)

9    filed by Gerard Uzzi on behalf of The Raymond Sackler

10   Family. (ECF #1119)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    DAVIS POLK & WARDWELL LLP

4         Attorneys for the Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  MARSHALL HUEBNER (TELEPHONICALLY)

9         BENJAMIN KAMINETZKY (TELEPHONICALLY)

10        JAMES MCCLAMMY (TELEPHONICALLY)

11

12   U.S. DEPARTMENT OF JUSTICE

13        Attorney for the U.S. Trustee

14        86 Chambers Street

15        New York, NY 10007

16

17   BY:  DAVID JONES (TELEPHONICALLY)

18        BRIAN MASUMOTO (TELEPHONICALLY)

19        PAUL SCHWARTZBERG (TELEPHONICALLY)

20

21

22

23

24

25

Page 7

1    PILLSBURY WINTHROP SHAW PITTMAN LLP

2         Attorneys for Ad Hoc Group of Non-Consenting States

3         31 West 52nd Street

4         New York, NY 10019

5

6    BY:  ANDREW M. TROOP (TELEPHONICALLY)

7

8    CAPLIN & DRYSDALE

9         Attorneys for Multi-State Governmental Entities Group

10        One Thomas Circle, NW, Suite 1100

11        Washington, DC 20005

12

13   BY:  GEORGE M. O'CONNOR (TELEPHONICALLY)

14

15   SCHULTE ROTH & ZABEL LLP

16        Attorney for Beth Cohen

17        919 Third Avenue

18        New York, NY 10022

19

20   BY:  TALEAH JENNINGS (TELEPHONICALLY)

21

22

23

24

25

Page 8

1   STEVENS & LEE

2        Attorney for Putative Class Claimants

3        485 Madison Avenue, 20th Floor

4        New York, NY 10022

5

6   BY:  NICHOLAS KAJON (TELEPHONICALLY)

7        CONSTANTINE DEAN POURAKIS (TELEPHONICALLY)

8

9   NEIGER LLP

10        Attorney for Ad Hoc Group of Individual Victims

11        151 West 46th Street

12        New York, NY 10036

13

14   BY:  EDWARD NEIGER (TELEPHONICALLY)

15

16   DEBEVOISE & PLIMPTON LLP

17        Attorneys for Beacon Company

18        919 Third Avenue

19        New York, NY 10022

20

21   BY:  JASMINE BALL (TELEPHONICALLY)

22        NATASHA LABOVITZ (TELEPHONICALLY)

23        MAURA MONAGHAN (TELEPHONICALLY)

24        DANIEL E. STROIK (TELEPHONICALLY)

25        WILLIFORD HAROLD (TELEPHONICALLY)

Page 9

```
 1   MILBANK TWEED
 2         Attorney for Raymond Sackler Family
 3         55 Hudson Yards
 4         New York, NY 10001
 5
 6   BY:  ALEX LEES (TELEPHONICALLY)
 7         GERARD UZZI (TELEPHONICALLY)
 8
 9   AKIN GUMP
10         Attorney for Official Committee of
11         Unsecured Creditors
12         One Bryant Park
13         New York, NY 10036
14
15   BY:  MITCHELL P. HURLEY (TELEPHONICALLY)
16         ARIK PREIS  (TELEPHONICALLY)
17
18   JOSEPH HAGE AARONSON LLC
19         Attorney for Raymond Sackler Family
20         485 Lexington Avenue
21         New York, NY 10017
22
23   BY:  GREGORY JOSEPH (TELEPHONICALLY)
24         MARA LEVENTHAL (TELEPHONICALLY)
25
```

Page 10

1   POTTERY ANDERSON & CARROON LLP

2        Attorney for Walmart, Inc.

3        1313 N. Market Street

4        Wilmington, DE 19801

5

6   BY:   JEREMY RYAN   (TELEPHONICALLY)

7

8   PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL

9        Attorney for the Commonwealth of Pennsylvania

10        Strawberry Square

11        Harrisburg, PA 17120

12

13   BY:   MELISSA VAN ECK (TELEPHONICALLY)

14

15   KRAMER LEVIN

16        Attorney for Ad Hoc Committee of

17        Governmental and Other Contingent

18        Litigation Claimants

19        1177 Avenue of the Americas

20        New York, NY 10036

21

22   BY:   CAROLINE GANGE (TELEPHONICALLY)

23

24

25

Page 11

```
 1    ALSO APPEARING TELEPHONICALLY:

 2    RAMON NAGUIAT

 3    DANIELLE GENTIN-STOCK

 4    THOMAS MAEGLIN

 5    MEGAN RUNDLET

 6    SHEILA BIRNBAUM

 7    HAYDEN COLEMAN

 8    LAWRENCE FOGELMAN

 9    ALICE TSIER

10    ANDREW ALFANO

11    DANIELLE LEVINE

12    BROOKS BARKER

13    RICK ARCHER

14    MUHAMMAD KHAN

15    SHAYNA SACKS

16    JENNIFER CHRISTIAN

17    ERIC HWANG

18    JONATHAN LIPSON

19    BRADY WILLIAMSON

20    SYDENHAM ALEXANDER

21    CAROLINE GANGE

22    JEREMY KLEINMAN

23    ARTEM SKOROSTENSKY

24    MARIANNA UDEM

25    MARGARET BRICKLEY
```

Page 12

1   JEREMY PEARLMAN

2   JESSE CLOYD

3   NICHOLAS PREY

4   PATRICK HOLOHAN

5   JOHN DOUGHERTY

6   DAVID ZWALLY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good afternoon.  This is Judge Drain.

3    We're here in In re Purdue Pharma, L.P., et al.  This is a

4    hearing scheduled after a discovery conference held by the

5    Court and certain of the parties who filed pleadings for

6    consideration today on discovery issues in these cases.

7    It's an entirely electronic hearing -- I'm sorry -- entirely

8    telephonic hearing and therefore, in addition to identifying

9    yourself and your client when you speak first, I may ask you

10   to do that again later on if I feel that the court reporter

11   preparing the transcript would not be able to identify you.

12             The transcript will be prepared from the recording

13   which is the only official recording of this hearing

14   emanating from Court Solutions.  No one else should be

15   recording this hearing.

16             So with that, I have a motion by the ad hoc group

17   of nonconsenting states for a Rule 2004 examination of

18   document production.  I think I've read all the pleadings in

19   connection with it.  Why don't we begin with that?

20             MR. TROOP:  Thank you, Your Honor.  This is Andrew

21   Troop from Pillsbury Winthrop Shaw Pittman on behalf of the

22   ad hoc group of nonconsenting states.  Your Honor, we're

23   happy to go in whatever order you'd like.  The creditors

24   committee had asked whether they might be able to go first,

25   in part given the additional background and context that

Page 14

1    goes along with their request and their discovery disputes.

2    But again, we'll do this in any order you'd like, Your

3    Honor, of course.

4            THE COURT:  Well, reading the responses to your

5    motion, Mr. Troop, it seems like there are only a relatively

6    small number of issues that remain open so I'd rather start

7    with your side of things.

8            MR. TROOP:  Yes, Your Honor.  Thank you.  Your

9    Honor, the ad hoc committee of nonconsenting states filed a

10   Rule 2004 motion just over three weeks ago on April 7th

11   seeking to take discovery from financial institutions.  Your

12   Honor, we're here on a compulsory basis because the

13   voluntary time period during which at least the

14   nonconsenting states expected that the Sacklers would be

15   inundating all of us, not only with their own advocacy

16   presentations but also with underlying primary documents,

17   was not forthcoming, and that those presentations themselves

18   at the time they were given and since they were given were -

19   - it was made clear, Your Honor, that not only the

20   nonconsenting states but also the creditors committee and

21   the ad hoc committee as well as other interested parties

22   would need to be in a position to look at and verify data

23   and information.

24            And that verification, Your Honor, is not simply

25   of, you know, what we're told but what we're not told, and

Page 15

1    I'm not suggesting at all that anyone intends to keep

2    information or data from anyone.  Although that may turn out

3    to be the case, I don't expect it to be anyone's intention.

4    And that the effort here was to start the process of doing

5    the fundamental third-party, independent, non-biased

6    productions relating to the financial -- the finances of the

7    Sacklers.

8              And, Your Honor, admittedly there are lots of

9    individuals and entities with respect to which this kind of

10   discovery will be required, but that flows from the nature

11   of the releases that we expect and that have been confirmed

12   to us by the Sacklers that they seek.  Those releases are

13   not only for estate claims but for third-party non-estate

14   claims.  That in and of itself creates an interesting puzzle

15   to piece together because while estate claims themselves may

16   flow -- or not -- but may flow directly from transfers from

17   the debtors to or for the benefit of the Sacklers or their

18   enterprises, third-party claims are not so limited as they

19   relate to the Sacklers and accordingly extremely broad

20   discovery is required here.

21             The claims that are potentially to be released are

22   in the billions of dollars, potentially, for estate claims

23   and trillions of dollars for public entity side claims.

24             THE COURT:  Can I interrupt you, Mr. Troop?

25             MR. TROOP:  Sure.  Of course.

1           THE COURT:  I want to focus just on the open

2    issues as between you and the objectors to the motion which

3    again, I believe are -- I think there are three of them and

4    they're pretty narrow at this point.  Can we just focus on

5    those?  I think everyone understands that discovery is

6    warranted here and as I see it in looking at the responses,

7    and they're somewhat different -- slightly different --

8    there's the Raymond Sackler family response which proposes a

9    mechanism whereby the -- that group would have -- or their

10   counsel -- would have the opportunity to review the

11   information in advance and/or it objects to the designation

12   of professional's eyes only as opposed to outside

13   professional's eyes only, and the right not only to redact -

14   - firstly, identifying information but also information

15   consisting of the names of business -- current business

16   counterparties and advisors.  I think that's what it's

17   limited to.

18           The Mortimer Sackler group proposes that there be

19   a somewhat different mechanism, although ultimately not

20   materially based on considerations other than what the

21   Raymond Sackler group said, whereby they would provide the

22   information -- the third-party information -- and then have

23   a certificate be executed by the third parties.

24           I'm not aware of other differences as between your

25   request and the two Sackler family groups than those, and I

1  appreciate we have the UCC issues, but that's a separate set

2  of issues.

3            MR. TROOP:  Yes, Your Honor.  I think that that

4  accurately describes the three areas.

5            THE COURT:  Okay.

6            MR. TROOP:  I think I'll take the first two

7  together, Your Honor.

8            THE COURT:  Well, could I make a suggestion on

9  that?

10            MR. TROOP:  Sure.  Yes, sir.

11            THE COURT:  And this, I think, would simply leave

12  the redaction issue but maybe I'm missing something.  What

13  is the harm in designating this material outside

14  professional's eyes only as opposed to professional eyes

15  only subject to further ability to come back to the Court?

16            MR. TROOP:  So, Your Honor, the nature of the ad

17  hoc -- of the nonconsenting group's clients are that they

18  are all attorneys for their own states, and that they, for

19  the variety of reasons and honestly as I noted in the

20  pleading, cost, are heavily involved in many aspects of this

21  case, particularly the review of factual data and the like.

22  And the -- and they have agreed, Your Honor, to not only

23  keep this information confidential but to have it be

24  provided to them through a mechanism whereby their access is

25  logged.  They are unable to copy or download, but they are

Page 18

1    able to review the documents directly and, in many cases --

2    and, frankly, save money in the process -- but that's one of

3    the considerations.

4          The other consideration is, Your Honor, that these

5    states are going to have to conclude on their own what

6    they're going to do in this case, and interposing a level of

7    distance between them and the documents themselves is

8    unnecessary and burdensome and unhelpful, particularly where

9    the law in the Second Circuit, Your Honor, and I know this

10   is in the redaction context, but the law in the Second

11   Circuit is that you really don't get to keep discovery from

12   people who are subject to a protective order and have agreed

13   to be bound by the protective order.

14         There's an irrational concern about allowing the

15   chief law enforcement agents -- in my case of 24 states and

16   the District of Columbia and I assume this would extend to

17   the ad hoc committee -- to the balance of the states save

18   three, to have access to the crucial information in

19   connection with decision-making in this case about whether

20   and under what conditions, if at all, the Sacklers will

21   retain billions and billions of dollars.  And --

22         THE COURT:  What about the concern that this

23   information would be leaked or based on, at least the

24   allegation in paragraph 12 of the Raymond Sackler's family's

25   response, under similar confidentiality orders has -- there

Page 19

1    have been leaks in the past?

2            MR. TROOP:  So, Your Honor, there is, in my

3    opinion, a good faith dispute about whether information was

4    leaked or not or leaked inappropriately or not, but here,

5    Your Honor, there's a -- there could be no confusion by any

6    party that these documents are confidential and cannot be

7    made public.  There's -- there can't even be the basis for a

8    good faith dispute over that issue given the fact that the

9    documents are going to be loaded to a PEO view-only, clearly

10   restricted, signed-up-to-by-everybody platform.

11           THE COURT:  So if there were a leak and it could

12   be identified then clearly it would be a breach.  That's

13   what you're saying, right?

14           MR. TROOP:  That's right, Your Honor.  And there's

15   no reason to presume that there will be a leak.  These are

16   attorney generals who have bound themselves to an order of

17   your court, Your Honor.

18           THE COURT:  Okay.

19           MR. TROOP:  That's why I say the concern is

20   irrational.

21           THE COURT:  All right.  And we might as well

22   address the next point which is simply -- not raised by the

23   Raymond Sackler family but by the Mortimer Sackler group --

24   which is to propose the two-step process as opposed to the

25   one-step process whereby the group would transmit your

Page 20

1    client's discovery request as opposed to you doing it

2    directly to the financial institutions and have it be

3    provided with a certificate back and then be produced by the

4    Mortimer Sackler group.  It appears to me from that

5    proposal, at least as laid out in paragraph 8 of the

6    objection, that -- well, a) the counsel for that group would

7    review for redaction and confidentiality designations,

8    although I guess your point is that it would all be covered

9    by the designation you propose which is attorneys only, and

10   b), and this is a little less clear, but it suggests that

11   notwithstanding that earlier I said the ICSPs would transmit

12   the nonconsenting states discovery requests to the financial

13   institution, paragraph 8 says, it will enable counsel to the

14   ICSPs who would be most knowledgeable about the ICSPs

15   financial arrangements to request records from the financial

16   institutions in an appropriately targeted manner which

17   suggests that there would be some limitation imposed by them

18   on your discovery request.

19          I don't know if I have counsel for -- I think I do

20   -- for the Mortimer Sackler group.  Is that what you have in

21   mind or will you just pass along under this proposal the ad

22   hoc committee's requests?

23          MS. MONAGHAN:  No, Your Honor, we weren't

24   proposing to limit their requests in any way.  If there was

25   an additional financial institution that they had missed we

Page 21

1    would add it.

2             THE COURT:  All right.  So you wouldn't change

3    their requests?

4             MS. MONAGHAN:  No.  It's possible that somebody

5    would tell us we don't have any accounts at such-and-such a

6    bank and then we would go back to counsel and say that, but

7    we would not unilaterally limit their request.

8             THE COURT:  Okay.  And could you just state your

9    name for the record?

10            MS. MONAGHAN:  Oh, I'm sorry, Your Honor.  This is

11   Maura Monaghan from Debevoise & Plimpton.  I represent the

12   Mortimer Sackler initial covered Sackler parties.

13            THE COURT:  Okay.  Very well.  So Mr. Troop, on

14   this point, which is separate from the shared point about

15   confidentiality I think we've already discussed, you propose

16   simply sending it directly to the financial institutions,

17   right?

18            MR. TROOP:  Yes, Your Honor.  We propose and

19   actually think it's absolutely appropriate that typical

20   third-party -- a typical third-party record subpoena be

21   issued.

22            THE COURT:  Have you -- are you also subpoenaing

23   the Mortimer Sackler group for this same information that's

24   in their possession?

25            MR. TROOP:  We haven't done that, Your Honor.  We

Page 22

1    have authority to take discovery from the Mortimer Sackler

2    group, but this list of people extends to all of the --

3    potentially all of the Sacklers for whom releases are being

4    sought, and as will be discussed later in this hearing, I

5    believe that the Mortimer Sackler side of the family wants

6    to limit the people with respect to whom discovery is

7    sought.

8              THE COURT:  Well, but that's not in this

9    objection.  I guess we can deal with that when we deal with

10   the UCC issue if that's -- if they're going to come back on

11   that point, too.  But I'm really just focusing on avoiding

12   duplicate discovery so how would you avoid doing that?

13             MR. TROOP:  Well, I assume that if the financial

14   institutions produce all of these documents the Sacklers

15   don't have to produce them a second time.

16             THE COURT:  Okay.

17             MR. TROOP:  Right?  So -- and Your Honor, I think

18   you need to read paragraphs 8 and 12 of the letter -- of the

19   pleading -- together with the proposed letter that's been

20   attached.  The letter is conspicuously silent that the

21   production from the financial institutions is compulsory.

22             THE COURT:  Well, I understand that.

23             MR. TROOP:  Right?  And so --

24             THE COURT:  I get that but that's a separate --

25   I'm just focusing now on the big picture.  Normally, I think

Page 23

1    you would seek this banking or financial information first

2    from the party which is the Sackler group and then so as not

3    to burden the third party and not to have undue delay

4    because there's more delay with third parties including

5    their argument that we're being unduly burdened because

6    you've already got nine-tenths of the information already,

7    that's how you proceed.  Why vary it here?

8            MR. TROOP:  Well, Your Honor, in part it's because

9    this case is not -- well, let me answer it in two ways.  The

10   first way, Your Honor, is that to date, we have very few of

11   these relevant documents and none of these financial records

12   as far I'm aware from any of the Sackler parties.

13           THE COURT:  All right.  But you would be compelled

14   -- but they -- I'm sorry.  Let me interrupt.  They would be

15   compelled to produce them now under a Rule 2004 order and

16   then as it's I think normally done, then you would, if

17   you're not satisfied with that production -- you think

18   there's more or even if you just want to confirm there's not

19   more -- you'd get a 2004 order from me to get the documents

20   from the third parties, the financial institutions, and in -

21   - then serving that subpoena, you'd work out with them a

22   mechanism whereby they wouldn't have to do -- they would

23   search their files but they'd know what to search for.  And

24   they wouldn't have to produce more than what is not -- they

25   don't have to produce what has not been produced by the

Page 24

1    Sacklers and that would be under penalty of perjury. They'd

2    be compelled to do it but, you know, that way the burden is

3    less on the financial institutions.

4            MR. TROOP:  Although, Your Honor, I'm not sure

5    that's the case, right?  That presumes that the Sacklers had

6    in their possession all -- substantially all -- of these

7    banking records and are not themselves required to go to the

8    financial institutions and request them from the financial

9    institutions in order to produce them, one.  Two --

10           THE COURT:  Well, that usually happens.  I mean,

11   that is often the case, that people go and request their

12   banking records to the extent they don't have them from the

13   financial institutions.  There are times when the financial

14   institutions balk at that at which point there's a subpoena

15   on the financial institution.

16           MR. TROOP:  So, Your Honor, then the second point

17   is, is that given the pace at which parties are trying to

18   push this case forward, it will delay process to do this in

19   a series.  It will --

20           THE COURT:  Well, the financial institutions

21   aren't here.  They haven't gotten this 2004 request yet.

22   Let me ask Ms. Monaghan.  How quickly do you believe that

23   the Mortimer Sackler parties could respond to this request

24   with regard to the information that is also being sought of

25   the financial institutions?

1           MS. MONAGHAN:  So, Your Honor, I think we could

2     respond very quickly with the information that's in our

3     possession and that we would promptly ask the financial

4     institutions for anything that we think we don't have.  You

5     know, these various family members have family offices that

6     keep these types of records so I would think that we could

7     do it in -- I don't want my colleagues to crucify me because

8     I'm always underestimating the amount of time discovery

9     takes, but I would think we could put it in 30 days.

10           THE COURT:  Okay.

11           MS. MONAGHAN:  There may be periods longer ago

12    that would take longer so we might start with the more

13    recent periods, but --

14           THE COURT:  Well, it would seem to me that if you

15    get top cooperation from the financial institutions that

16    process makes sense.  If you don't, then I think a subpoena

17    should go out to the financial institutions.

18           MS. MONAGHAN:  Yes, Your Honor.  And we could

19    commit to keeping Mr. Troop and if necessary, the Court

20    updated on that.

21           THE COURT:  Okay.

22           MR. TROOP:  Your Honor, for what it's worth, my

23    experience has not been the same as yours.  My experience is

24    that when serving discovery on banks, particularly discovery

25    limited to non-ESI discovery like this is, they are

1   extremely efficient at gathering the documents and producing

2   them, that they are -- and there's no question about the

3   completeness.  So reversing this process adds at least one

4   and maybe more potential for, a) incomplete documents and

5   delay because --

6           THE COURT:  Well, you don't have --

7           MR. TROOP:  -- because it will --

8           THE COURT:  Mr. Troop, can I interrupt you?  At

9   this point -- I appreciate maybe some of these people are in

10  their offices -- but I think your normal experience isn't

11  the case now.  I don't think this is particularly high on

12  their list.  It should be high on the Sackler's list to get

13  done.  I think you may well get a response from any one of

14  these that, our resources are stretched.  We're trying to

15  figure out how to manage a multi-trillion dollar loan

16  program and our legal staff will get to this when we get to

17  it.

18          MR. TROOP:  And, Your Honor, if that's --

19          THE COURT:  And again, if they don't promptly

20  respond to the Sackler's counsel, then you would issue the

21  subpoena immediately and the order would provide for that.

22  So I think that's how it should go and if -- the Raymond

23  Sacklers haven't proposed that then I guess they're more

24  comfortable just with having it go out to the banks, but I

25  don't see -- to me, it seems more efficient to do it that

Page 27

1    way.

2              I agree with you that the certificate notion

3    doesn't work.  You should be entitled to subpoena the banks

4    after you get the production from the Sacklers or if the

5    banks are not being cooperative with the Sacklers.  And if

6    it -- 30 days is sufficient.  So part of that would be that

7    the Sacklers would have to make the request of the banks

8    right away, like within seven days.

9              MR. TROOP:  And, Your Honor, in connection with

10   the request, is the request as set forth in their exhibit or

11   the request -- does the request have to say --

12             THE COURT:  It has to follow your discovery

13   request.  It has to be your discovery request.

14             MR. TROOP:  But doesn't it also have to tell the

15   financial institutions that this is -- the process is being

16   undertaken pursuant --

17             THE COURT:  Just tell them --

18             MR. TROOP:  -- to a court order.

19             THE COURT:  -- it should tell -- I'm sorry.  I'm

20   talking over you.  I apologize with the problem of being on

21   the phone.  It should say that if you do not promptly

22   respond, you'll get your own subpoena.

23             MR. TROOP:  Your --

24             THE COURT:  No, I agree with that part of your

25   response on this.  This is just to avoid undue burden on the

1    banks, and to have the Sacklers, you know, show that they're

2    on top of this by replying promptly and getting the

3    information from the banks.  If it doesn't come, then they

4    need to tell you right away.  They need to tell the banks

5    right away that if, you know, like at the very beginning

6    that they should -- they need to produce it to the Sacklers.

7    And if it's not produced, then there will be -- they're

8    under an obligation and a court order to inform you, and you

9    are authorized by court order to issue the subpoena

10   immediately to the bank for it.

11          And you're also authorized to issue a subpoena to

12   the bank after the production just to -- you know, so that

13   they can respond by seeing -- by then going through with you

14   what has been produced.  They can limit their search, and

15   then they can tell you what else, if anything, they have or

16   certify, as you need to when you get a subpoena, I don't

17   have any other responsive documents.

18          MR. TROOP:  Your Honor, the process that you laid

19   out strikes me that it has at least three places where it

20   could hiccup that are all avoided through the issuance of

21   the subpoena.  And it is in the initial request, it's when

22   the documents are received and whether they're completed,

23   and then having to go back to the banks a third time.

24          THE COURT:  Well, you would be going to the banks

25   --

1          MR. TROOP:  And --

2          THE COURT:  But, I'm sorry, you'd be going to the

3    Sacklers too.  You have the same steps with going to them

4    after the banks' production.

5          MR. TROOP:  But -- well, Your Honor, this -- I

6    don't think that there can really be a dispute that getting

7    the documents directly from the banks is the cleanest way to

8    assure that fully responsive documents are received based on

9    what the banks have in their possession.  And whatever

10   delays may be occasioned because of the -- if banks are

11   going to take the position that they can't respond because

12   of the other pressures that are on them right now, those

13   same responses are going to go to the Sacklers.

14         THE COURT:  Did you serve your 2004 request on the

15   banks?

16         MR. TROOP:  (indiscernible), Your Honor, we did

17   serve them with that.

18         THE COURT:  So, they have not yet responded to it.

19         MR. TROOP:  As they generally would not, right,

20   Your Honor?

21         THE COURT:  Right.  But isn't your experience that

22   when they get these, they do respond eventually?

23         MR. TROOP:  I can only tell you that when -- and I

24   don't really want to get on a tangent from the New York

25   subpoenas.  But as a factual matter, when the New York

Page 30

1    subpoenas were served, banks started producing documents

2    within days.  And here, Your Honor, unless, which I don't

3    think (indiscernible) --

4            THE COURT:  Had the Sacklers already been

5    subpoenaed at that point?

6            MR. TROOP:  I do know that discovery was out to

7    the Sacklers.  I didn't -- I don't represent New York in

8    that litigation.  New York is on a listen-only line today.

9    I will look for an email response.

10           THE COURT:  And you say this does not seek ESL

11   searches.  It wasn't clear to me that that was the case.

12           MR. TROOP:  It looks for account information,

13   transfers in and out.  It is focused.  We changed language

14   at the request of, I forget which side of the family.  We

15   changed -- I think we took out pertaining to because of a

16   concern that that would invite ESI discovery.  And we asked

17   for -- and, Your Honor, there's one interrogatory that says

18   where else might you have documents.  We don't say produce

19   those documents, but where else you might have documents so

20   that if we have to go back, we have a roadmap there.

21           But it's -- but we listened very hard during the

22   April 9th chambers conference, Your Honor.  We focused very

23   carefully.  We thought very hard about the propriety of

24   proceeding now, both in the context of where the case is,

25   the decisions that parties are going to be asked to make or

Page 31

1    not during the course of this mediation.

2              And the reality that to date -- and the committee

3    will talk about this more, that one would expect where

4    someone wants a release of such significant potential

5    liability is the inundation of information and data and

6    underlying documents, particularly when they're on notice

7    that it is the underlying documents people want to see,

8    they're not getting turned over.

9              THE COURT:  So let me just make sure I understand

10   then.  The subpoena you would be authorized to issue if I

11   granted your order would be limited to account records; not

12   like general description of banking relationships or, you

13   know, correspondence, but account records, transfer records,

14   things like that.

15             MR. TROOP:  Yeah.  I mean, I'll look again, Your

16   Honor, but that's really what we -- we're focused on.  You

17   know, this --

18             THE COURT:  All right.  Well, that does change my

19   analysis because that -- if I were an in-house lawyer at one

20   of these banks, if it's limited to that, I would understand

21   it's relatively easy and it's probably information I should

22   be given and the fact there's any way they would ask me for

23   it.

24             If it was more than that, I'd say in response to

25   you when I called you up after I got the order, why aren't

Page 32

1    you asking the Sacklers for this stuff first.  But if it's

2    the account records, that should be relatively easy, you

3    know, that sort of stuff.  So I understand your point on

4    that, Mr. Troop.

5              MR. TROOP:  Look, since the only one honestly,

6    Your Honor, that might go farther than that is a request for

7    loan correspondence files, right, letters to the bank,

8    letters from the bank, notes, memoranda, et cetera to the

9    file.  And if we need to cut that one back, we'll cut it

10   back, but otherwise --

11             THE COURT:  I think you should.  Get that first

12   from the Sacklers.  And if there's some reason that you

13   think you still need that, you know, you can come back to

14   me.

15             MR. TROOP:  Okay.  But, otherwise, Your Honor, so

16   you know, it's -- just so that you can hear it, it's

17   signature cards, board authorizations, account statements,

18   canceled checks, deposit tickets, items deposited, credit

19   and debit memos, certain tax forms, applications, ledger

20   sheets, documents that show how loan repayments were made,

21   documents reflecting disbursement of loan payments, bank

22   checks, credit memos, cash auth tickets, wires out, right,

23   collateral agreements.

24             THE COURT:  Well, let me ask you -- let me ask the

25   Sacklers' counsel.  Is that the type of information that you

Page 33

1    don't have to formulate search terms for, but you can simply

2    search with those names to come up with?

3              MS. MONAGHAN:  Your Honor, I think some of it is

4    information that wouldn't require a search term.  I'm not

5    sure that all of it is.

6              THE COURT:  Well, wouldn't be?  I mean, when I say

7    -- I mean, actually, you've got one search term.  I'm just,

8    you know, I don't want to impose upon a bank unnecessarily

9    the need to come up with, to think through and to debate

10   with Mr. Troop's litigators what are the appropriate search

11   terms.  I want it to be self-evident.  What isn't self-

12   evident in that list?

13             MS. MONAGHAN:  I think the loan documents that Mr.

14   Troop referenced are not self-evident.  To the extent he's

15   just looking for account activity, that wouldn't require

16   search terms as I understand it, but that also would be

17   something that the family would be able to obtain quickly as

18   well.

19             THE COURT:  Well, so with the caveat that the, you

20   know, the loan file.  And if you can identify anything

21   reasonable that would require more than one or two search

22   terms, you can come back to me on that, but I don't think we

23   need to go through the two-step process that you've

24   outlined.

25             Let's go back then to the professional eyes

Page 34

1    only/confidential -- slash confidential versus outside

2    professionals' issue.  I've not heard from counsel for the

3    Raymond Sackler group that I think has taken the lead on

4    this point for both groups.  Mr. Uzzi or Mr. Joseph, do you

5    want to address it and why relying only on professional eyes

6    only/confidential as opposed to outside professional eyes

7    only/confidential is necessary here?

8            MR. JOSEPH:  Your Honor, thank you.  This is

9    Gregory Joseph for the Raymond Sackler side.  If there's

10   going to be a designation that is produced for the documents

11   that we're concerned about, we'd want outside professionals'

12   eyes only/highly confidential.  The professional eyes

13   only/confidential information is a large, large number of

14   people.  It is every member of every committee, outside of

15   market participants, so that's private parties, states,

16   municipalities, and unspecified number of designees,

17   attorneys, but not just attorneys.

18           It's also staff, so we multiply it by more than 50

19   because we have all the states, plus we have municipalities

20   and private parties.  There's going to be no tracing any

21   leak, and there is just too much media attention on this.

22   As the New York experience shows, there's just too much

23   media attention and too great a risk for a leak.

24           And that's why, Your Honor, I'm not going to speak

25   on anything you don't want me to speak on, but I would like

Page 35

1    to address those two categories of redaction that we've

2    requested the ability to make.  The first is personally

3    identifying information; that's email addresses, physical

4    addresses, home phone numbers, social security numbers for

5    family members that had no role in any of the challenged

6    actions.  There are a lot of threats against family members

7    on the Internet.  These people had nothing to do with

8    anything.  There's no reason not to permit the redaction of

9    their email addresses, their home address and phone number,

10   and their social security number.

11           And on the business and investment counterparties,

12   all we're talking about, as Your Honor said, current

13   counterparties, and we don't -- we're not going to redact

14   anything relating to former ones.  But the history of the

15   last two years shows that counterparties pull away if their

16   names are publicly associated with the family.  That's not

17   going to serve anybody's interests.  It's going to be

18   counterproductive to the success of the cases if the

19   family's wealth is harmed by disclosing counterparty names

20   because relationships are terminated, or redemptions are

21   forced.

22           And they can't show good cause for this

23   information.  You know, they have not even attempted in

24   their reply brief to state good cause for personally

25   identifying information of uninvolved individuals that are

1    family members.  And the only thing they say in attempting

2    to show good cause is the counterparty information is this

3    sentence on Page 10, Item D of their reply brief.

4              Knowing with whom and how much the Sacklers'

5    wealth is integral to answer questions about that wealth and

6    evaluate the releases the Sacklers demand.  That's a

7    conclusion; it's not an explanation.  They know now much

8    wealth the family has, and when we get to the UCC motion,

9    I'll go through all of the information they already have.

10   But knowing that money is invested today with hedge fund A

11   as opposed to hedge fund B does not help them evaluate

12   releases.  They're not auditing the quality of our

13   investments.

14             You know, they can't make a showing that there's

15   any undue hardship or injustice if they don't get that

16   information.  And they can't show, you know, the SunEdison

17   quotes the 26(b)(1) standard to have to show the importance

18   of the discovery in resolving the issues.  They can't make

19   that showing for either of these categories.

20             So we have no problem with the subpoena being

21   issued to the banks.  We don't have a problem with subpoenas

22   being issued to additional financial institutions.  We've

23   had very productive meet and confers with Mr. Troop and his

24   firm.  The only issue we've got are the redactions.  We just

25   want 14 days to be able to redact those two limited pieces

Page 37

1   of information.

2           THE COURT:  So mechanically how it would work is

3   the information would be still provided directly to the

4   subpoenaing party, but it would be only to outside counsel.

5   You would have 14 -- and to you, of course, and you would

6   have 14 days to designate it -- put in the redactions,

7   correct?

8           MR. JOSEPH:  That's fine, Your Honor.  We had

9   suggested that the information come to us because we didn't

10  want the information to get out altogether.  But outside

11  counsel is acceptable; that's perfectly fine.  We have

12  complete confidence in Mr. Troop and the outside counsel for

13  the other committees.

14          THE COURT:  Okay.  So, Mr. Troop, what is the --

15  let's go to the identification point.  What does it matter

16  if today, as opposed to, you know, a year ago, the current

17  financial institution or investment advisor; why is that

18  identity important for your client or individual attorneys'

19  general.

20          MR. TROOP:  Your Honor, as you may recall, the

21  proposal from the Sacklers is that their contribution will

22  be in the form of a guaranteed payment at the end of a

23  particular period in time.  Therefore, the fact that a fund

24  might have a value of X today is only part of the analysis

25  that parties in this case are going to have to undertake in

Page 38

1    determining whether that kind of structure and whatever that

2    amount is is a worthwhile risk taking.

3            Because if X today is in a series -- is, by way of

4    example, Your Honor, because I have no idea, right.  But if

5    X is -- if X was valued in a presentation in October of last

6    year and X was a series of bonds held in exploration and

7    production oil and gas companies through a fund, then that

8    information is critically important to being able to assess

9    the proposal by any party in this case.

10           THE COURT:  But --

11           MR. TROOP:  And so, Your Honor, I --

12           THE COURT:  Can I interrupt you?  Unless the fund

13   itself is the credit entity, you -- I guess I don't

14   understand why that can't be done generically, unless you're

15   telling me that the attorney general of the State of New

16   York wants to evaluate funds by who their managers are.  I

17   don't -- I don't get it.

18           MR. TROOP:  Your Honor, I actually -- I'm trying

19   to think about how to explain the issue clearer or

20   differently.  The information that's provided and has been

21   provided without the name of the counterparties gives no

22   clue as to how the money is invested or through whom.  And

23   if the money -- and so I use by way of example, if it's

24   invested in a fund which is an oil and gas fund, that is an

25   important piece of information for people to know.

Page 39

1          THE COURT:  Well, Mr. Joseph --

2          MR. TROOP:  And, frankly, knowing who it is is

3    important as well because some are doing well and some

4    aren't, right?  So the information that was received was

5    static and static before a period where oil prices arguably

6    have gone negative, okay, so if there's no basis upon which

7    to make that analysis or do that evaluation, and having the

8    information provides the basis to determine whether further

9    inquiry is required.

10         THE COURT:  Well, that's what you have financial

11   advisors for, right?

12         MR. TROOP:  But I don't have a financial advisor,

13   Your Honor, and I'm sharing with the AHC.

14         THE COURT:  Well, they have one.

15         MR. TROOP:  We're the ones who aren't getting paid

16   by the estate.

17         THE COURT:  They have the same interests.  They

18   have the same interests and they're well paid.  I just don't

19   understand -- I mean, to me, before you run the risk of the

20   leaks, it would seem to me that you would have to have a

21   good reason to get it.  If your financial advisor has it,

22   what's the point of having them or using them if you can't

23   rely on them and instead you need to rely on a lawyer in

24   house.

25         I mean, I had thought maybe I could go with your

Page 40

1    way and just say that if there's any leak, the claim of the

2    state that leaked it would be equitably subordinated.  But I

3    tend to agree, if the numbers are so great here and, of

4    course, the press would not leak it.  I mean, a leak in a

5    pleading obviously is easy.  But if it's a leak to the

6    press, it'll be impossible to trace, so I'm not sure that

7    5(10)(c) determination in advance is enough of a threat,

8    particularly in today's world where shaming has become a

9    litigation tool.  And, to me, it's even worse with the PII,

10   right?  Why would that need to be disclosed, beyond someone

11   who could just do the diligence and say, oh yeah, that is

12   the person who, you know.  I don't understand why the PII

13   would even be an issue here.

14          MR. TROOP:  Your Honor, I'll share briefly my

15   thinking, but I don't think it's going to persuade you.

16   Okay?  You know, part of the information that we've been

17   given is that -- and, look, Your Honor, we're trying to

18   figure out how to prove something that hasn't been

19   disclosed, right; that it's part of the exercise.

20          So if grandchild X is getting account statements

21   at an address in -- pick your state -- Ohio, but the

22   information that we've been provided shows an address of

23   Florida, that provides a piece of information that would be

24   appropriate for us to follow up on and that we won't --

25   well, I guess, I'll know about it.

 1            THE COURT:  Well, again, I think people at some

 2    point have to rely on their outside counsel to do that basic

 3    due diligence.

 4            MR. TROOP:  As I said, Your Honor, I didn't think

 5    I was going to persuade you.

 6            THE COURT:  Well, okay.

 7            MR. TROOP:  But you took a deep breath, so I

 8    thought I had to take a shot.

 9            THE COURT:  Well, that's all right.  That's fine.

10    If this weren't such a large group, but at this point, it's

11    an unmanageable group for tracing purposes unless the

12    agreement would be violated in a pleading, which would be

13    easy.  But to me, the purpose for this less than highest

14    level of protection on disclosure isn't really served by

15    these two categories of information and for two different

16    reasons.

17            On the PII, it's easy for one person to do the

18    matching exercise and that person will be free to do that,

19    whoever that person is designated to be in the outside

20    counsel realm of getting this information.  So that's easy

21    to do, and there's no reason to have, you know, 5 to 10

22    people in 50 different states plus municipalities and other

23    governmental entities doing the same thing.  Again, that's

24    why they hire counsel, one of the reasons.

25            The other piece of information.  The analysis is

Page 42

1   sophisticated.  The name doesn't necessarily help that much.

2   It's the nature of the investment that's the key, and I

3   gather the nature of the investment would be disclosed; it's

4   just where it's held that's the sticking point.  And at that

5   point, you're looking at evaluating fund X from fund Y based

6   on who runs it and their track record.  And to me, that's

7   something that, if you're going to rely on it at all, why

8   you have an investment banker.  And you're sharing one and

9   I'm grateful that you're sharing the cost on that, but

10  they're quite capable and they should be able to do that

11  exercise.

12         So I think those two pieces of information should

13  be designated outside professionals only/confidential.  And,

14  again, that's not limited to lawyers, right?  Your financial

15  advisor can look at that?

16         MR. TROOP:  My understanding, Your Honor.

17         THE COURT:  Okay, all right.  Well, if for some

18  reason when people go back and look at the designation, it's

19  limited to lawyers, it shouldn't be.  It should cover the

20  outside financial advisor too.

21         MR. JOSEPH:  It does.  Your Honor, Gregory Joseph.

22  It does include outside professionals --

23         THE COURT:  Okay.

24         MR. JOSEPH:  -- hired by outside counsel.

25         THE COURT:  All right, so I think that covers the

Page 43

1    narrow issues raised by the motion.  Although when we turn

2    to the UCC letter, I think probably with good reason, Mr.

3    Troop expects that there would be the same types of disputes

4    -- but maybe I'm wrong -- with regard to the production he's

5    seeking, or now we've resolved he's entitled to, as is the

6    case with the 2004 order that the UCC has that other parties

7    are also enabled to participate in.  So why don't we turn to

8    that and, unless I'm wrong, the rulings I'll make in

9    connection with this will go to the other similar types of

10   discovery.

11              MR. TROOP:  And, Your Honor, just so we're all

12   clear.  Can I summar- -- and assuming that you're going to

13   want us to draft the order and circulate it.

14              THE COURT:  Yes.

15              MR. TROOP:  Can I summarize my understanding of

16   the executable parts of your order?

17              THE COURT:  Yes, that's a good idea.

18              MR. TROOP:  So, Your Honor, I understand that the

19   order -- that the motion will be granted with the following

20   limitations: that the productions from the financial

21   institutions will come out on an outside professional eyes

22   only basis; they will then be provided to the Sackler

23   counsel, who will have 14 days to redact --

24              THE COURT:  Well, can I interrupt you there?

25              MR. TROOP:  Yeah.

19-23649-shl   Doc 1139   Filed 05/05/20   Entered 05/11/20 10:50:18   Main Document
Pg 44 of 131

Page 44

1          THE COURT:  I was okay with -- and I think Mr.

2     Joseph confirmed this, that they could be provided to you

3     and the Sacklers will have 14 days to redact.

4          MR. TROOP:  I'm sorry, that --

5          THE COURT:  And if you have a disagreement about

6     their redaction, then you can raise it with me.

7          MR. TROOP:  But, I'm sorry, I didn't mean to

8     misspeak.  I meant to say that the production will be made

9     to us because we'll get it --

10         THE COURT:  Right.

11         MR. TROOP:  -- on an unredacted basis, right?

12         THE COURT:  Correct, the outside professionals.

13         MR. TROOP:  Outside professionals.

14         THE COURT:  Yes.

15         MR. TROOP:  Then the unredacted production will

16    either simultaneously or through us, depending upon how the

17    production is made, be delivered to the Sackler counsel,

18    Sackler lawyers.  The Sackler lawyers will then have 14 days

19    to redact personally identifiable information and current

20    counterparties and financial advisors; and that once that is

21    done, the documents will then be available on a confidential

22    basis to parties subject to the protective order.

23         THE COURT:  Yes.

24         MR. JOSEPH:  Your Honor, it's still professional

25    eyes only.  Excuse me, I'm sorry.  Gregory Joseph.

1                 THE COURT:  Yes, professional/confidential.

2                 MR. TROOP:  That's --

3                 THE COURT:  Although, again, the unredacted

4       information, notwithstanding the redactions by the Sacklers,

5       is still available to the outside professionals.

6                 MR. TROOP:  Understood, Your Honor.  It was really

7       that last point, and I think Mr. Joseph for jumping in.  It

8       was unclear to me what was supposed to happen after the

9       redactions.

10                THE COURT:  Well, that's a good point.  What did

11      you -- I don't know; that hadn't really been discussed.

12      What does the case order say?

13                MR. TROOP:  I mean, it actually doesn't say, Your

14      Honor.  They can still designate the documents and, in

15      certain cases, be PEO, right, professional eyes only --

16                THE COURT:  right.

17                MR. TROOP:  -- which would include attorney

18      general lawyers or not.  And then --

19                THE COURT:  Well, I mean, look, if it's redacted,

20      I'm not sure -- I think that you should go down to the

21      lowest common denominator for the rest of the information,

22      whatever that is.

23                MR. JOSEPH:  Your Honor, Gregory Joseph.  The

24      request that they had was for a subpoena that was

25      professional eyes only/confidential information.  It was

Page 46

1   never a request that the information would go out to the

2   public at large, all these financial records.

3           THE COURT:  Okay.  Well then whatever the subpoena

4   would provide, then that's how it should be.

5           MR. JOSEPH:  Okay.

6           MR. TROOP:  And, Your Honor, and I guess I'm sorry

7   to beat this, but there are designations lower than, so to

8   speak, professional eyes only in the protective order that

9   still require parties to keep it confidential.  And it seems

10  to me that --

11          THE COURT:  Right.  All I'm saying is I think you

12  guys agreed on the rest of the order covering this.  So what

13  that agreement provides should be how it is and, you know, I

14  don't think we need to go beyond that.

15          MR. TROOP:  So then the last part of the

16  executable part of the order will be that once redacted, the

17  documents will be made available on the view only,

18  professional eyes only -- view only, professional eyes only

19  database.

20          THE COURT:  Correct.

21          MR. TROOP:  Okay.

22          THE COURT:  And, you know, again, I think that the

23  next topic may -- you may want to bake in because the

24  resolution of the discussions are all going to be enough

25  just so that we don't have to do this twice, but let's turn

Page 47

1   to that then, the committee letter.

2           MR. TROOP:  Thank you, Your Honor.

3           MR. HURLEY:  Your Honor, it's Mitch Hurley with

4   Akin Gump on behalf of the Official Committee of Unsecured

5   Creditors.

6           THE COURT:  Yes.

7           MR. HURLEY:  Before we move on, Your Honor, could

8   I just confirm that copies of those documents that are going

9   to go to Mr. Sackler's firm in the first instance will also

10  go to Akin Gump, consistent with the process that's been

11  described.

12          THE COURT:  Well, I thought the way we're doing

13  this discovery is that you and the Debtors and the non-

14  consenting states and the consenting states all get it,

15  right?  I thought that's how it works.

16          MR. HURLEY:  That's fine.  That's fine, as long as

17  it's clear that we also have access, whether we get it from

18  Mr. Troop or directly.

19          THE COURT:  Everyone gets it simultaneously; let's

20  put it that way.

21          MR. HURLEY:  Got you, okay.  Thank you, Your

22  Honor.

23          THE COURT:  And I want the provision that's in the

24  existing order in all of these orders, which is the weekly

25  conferring about keeping the costs down.

Page 48

1              MR. HUEBNER:  Your Honor, one clarification on

2      that provision.  It's Marshall Huebner with David Polk.

3      When you say that provision, that paragraph has two

4      components to it, just so that we all have clarity.  One is

5      the conferring to keep costs down; the other is reporting

6      the costs actually spent.  Do you mean both of those or only

7      the first of those in orders?

8              THE COURT:  Well, I don't know -- I mean, I'm very

9      concerned that this is going to be a -- has been and will

10     continue to be, particularly with the number of firms

11     involved, a very expensive exercise.  I need some teeth in

12     it.

13             MR. HUEBNER:  Your Honor, we --

14             THE COURT:  Not necessarily reported to me, but it

15     needs to be reported to somebody so that someone can say,

16     you know, this is -- when you measure the cost versus the

17     benefit, it's getting ridiculous.  I'm not saying that we're

18     at that point, but I'm worried that at some point, we will

19     get there.

20             MR. HUEBNER:  Okay, Your Honor.  I was not pushing

21     back on the inclusion.  It's just when you referenced that

22     paragraph, and some of will need to draft these things, I

23     assumed that you probably did mean both pieces.

24             THE COURT:  I did.

25             MR. HUEBNER:  I just wanted to confirm.

Page 49

1          THE COURT:  Yeah, no, I meant the whole thing.

2          MR. HUEBNER:  Okay, thank you.

3          THE COURT:  Okay.  Look, litigators -- this is no

4    knock on litigators, right, litigators are wonderful people

5    and they do a great job, certainly this group collectively.

6    But they have one task, which is to get ready for trial and

7    get as much information as they can to do that, particularly

8    when the bankruptcy lawyers are in charge of, you know, the

9    bankruptcy case and settlements.  But that's not ultimately

10   how bankruptcy needs to work.  The bankruptcy lawyers need

11   to stay on top of this so that the money that's going to go

12   to creditors doesn't get eaten up in preparing for a perfect

13   litigation.

14          MR. HUEBNER:  We understand, Your Honor.

15          THE COURT:  Okay, and that's not a knock on

16   anyone.  I just -- the bankruptcy lawyers are stretched

17   thin, been working on a lot of things in this case -- in

18   these cases.  And I know it's going to be hard for them to

19   monitor what their litigators are doing, but there needs to

20   be some process to do that, and it's more than just, you

21   know, telling them to turn the lights off when they leave

22   the office.  I don't want to see at the end of this case fee

23   applications for four or five different sets of lawyers all

24   doing the same thing in these discovery matters.

25          MR. LEES:  Your Honor, this is Alex Lees at

Page 50

1    Milbank.  I had one further question on the provision that

2    has been referenced, particularly in light of Your Honor's

3    reference just now to fee applications.  We just wanted to

4    obtain clarity as to whether the keeping track of and

5    sharing of information about discovery costs was intended to

6    apply also to the families --

7              THE COURT:  No.

8              MR. LEES:  -- or whether the intention was to

9    limit to --

10             THE COURT:  No.

11             MR. LEES:  -- the state action.

12             THE COURT:  No, it wasn't.  No, it wasn't, just to

13   the people who are likely to -- well, who will or are likely

14   to as part of a consensual plan be submitting their bills to

15   the estate.

16             MR. LEES:  Thank you, Your Honor.

17             MR. HUEBNER:  Your Honor, to be fair, we will do -

18   - I assume that we will simply do and revised the provision

19   that you personally drafted and insert it in the order,

20   transpose it into this new order and we know who it covers.

21             THE COURT:  Okay.  Thank you, Mr. Huebner.  Okay.

22   All right, so Mr. Hurley, you were about to jump into your

23   letter from April 26th.

24             MR. HURLEY:  I was, Your Honor, thank you.  So,

25   Your Honor, I have four argument points.  I think I'll

Page 51

1    actually take them out of order because of the discussion

2    that we just finished having about redactions; that was my

3    last point.  But I want to address it first because it may

4    be that based on what -- where Your Honor's coming out that

5    we don't have a serious problem with that issue.

6             So first of all, you'd asked Mr. Troop what his

7    position was with respect to the designation of information

8    as outside professional eyes only in connection with the

9    bank's subpoena.  And from the committee's perspective, we

10   don't have an issue with outside professional eyes only

11   designations generally to the extent that the designation

12   can be justified -- obviously, all of this is subject to the

13   parties' challenge rights -- but that's not a serious

14   concern for the committee.

15            What is a serious a serious concern for the

16   committee is the idea that there will be selective

17   redactions of any documents, whether in response to the

18   bank's subpoenas or otherwise.

19            Now, if the way we're coming out here is just that

20   there will be some versions of documents that have selected

21   redactions and those versions will be supplied, you know, to

22   people under professional eyes only basis.  But there still

23   will be a completely unredacted version available to outside

24   professionals that I don't think there's any issue, at least

25   from the committee's perspective.

Page 52

```
 1              The concern that we would have is if no one,

 2    including outside counsel and outside advisors, that are

 3    going to have access to particular words or lines included

 4    in a document that is otherwise been deemed responsive.

 5              THE COURT:  So this is not a privilege redaction;

 6    this is just based on relevance or confidentiality you're

 7    focusing on?

 8              MR. HURLEY:  Exactly, Your Honor, correct.

 9              THE COURT:  Right.

10              MR. HURLEY:  Exactly, Your Honor.

11              THE COURT:  I tend to -- I mean, that sounds

12    reasonable to me.  You should be able, as the outside

13    professional, to say, well, wait a minute, I think this is

14    relevant or, you know, explain to me why this is

15    confidential.

16              MR. HURLEY:  Yeah.  The committee believes that's

17    exactly right, and we'll just add -- I won't belabor the

18    issue because I think you hit the nail on the head.  It also

19    creates, like, a pretty substantial additional burden when

20    you have individual words and lines from documents being

21    excised.

22              THE COURT:  Right.

23              MR. HURLEY:  Because, you know, receiving party

24    really can't just take the other side's word for it.

25              THE COURT:  No, I understand.
```

1           MR. HURLEY:  Yeah.

2           THE COURT:  I think -- I mean, unless I'm missing

3    something, this level of response doesn't let the cat out of

4    the bag like a privilege or work product would, so I think

5    what you're saying is fine.

6           MR. HURLEY:  Excellent.  Then I will move on to

7    the other aspects of my presentation.  So by its motion, the

8    official committee is asking the Court to first set an

9    initial disclosure schedule, meaning to order members of the

10   Sackler family and their affiliates to begin and complete

11   their initial ESI productions by May 15th and July 1,

12   respectively.

13          And number two, we ask the Court to hold that the

14   initial covered Sackler persons have possession, custody or

15   control over documents in the possession of the IACs for

16   purposes of responding to the subpoenas.  And three, enter

17   relief so that documents that are possessed by other covered

18   Sackler parties can also be made available for discovery in

19   these cases.  My fourth point was with respect to

20   redactions, but I think that may have been resolved.

21          So in their opposition papers, the Sacklers have

22   pointed out that the official committee already has access

23   to a large volume of prepetition discovery material and, of

24   course, that's true.  As we explained in our 2004 motion,

25   millions of documents were produced mostly by Purdue in the

Page 54

1    MDL and those have been made available to us, but that

2    discovery wasn't aimed at claims that are critical in these

3    cases.

4            For instance, I think as everyone by now is aware,

5    between approximately 2008 and 2016, a very substantial

6    amount was transferred out of Purdue, and I won't say more

7    than that because this is a public line.  The estates are

8    pursuing intentional and constructive fraudulent conveyance

9    claims against the Sacklers and their trusts with respect to

10   those transfers.  And while in the MDL, there were a few

11   late filed complaints that raised fraudulent conveyance

12   claims, those claims just were not the focus of prepetition

13   discovery.  And of course, there are other estate claims

14   like breach of fiduciary duty and illegal dividends and

15   aiding and abetting that were not a part of those cases at

16   all.

17           And in addition to those admitted concepts, there

18   were key custodians who weren't searched at all; that

19   includes nearly all of the members of the Sackler family.

20   There was just one Sackler, whoever conducted searches of

21   personal non-Purdue-hosted ESI for any purpose, and only a

22   handful who even had their Purdue ESI searched and

23   (indiscernible).

24           THE COURT:  Can I interrupt you on this?

25           MR. HURLEY:  Of course.

1            THE COURT:  When you say key custodians, key

2    custodians of what do you mean by that, of what information?

3            MR. HURLEY:  Well, the type of information, I

4    would say, largely but not exclusively are emails, text

5    messages and other electronically stored information.

6            THE COURT:  From Purdue or among -- could you just

7    elaborate some more on that?

8            MR. HURLEY:  This motion is directed at the

9    Sacklers and at -- and not with respect to Purdue-hosted

10   Sackler emails, for instance, but with respect to ESI; that

11   is, like, personal emails for the Sacklers, for instance, or

12   emails that are hosted by Sackler affiliates, other than

13   Purdue, that are in the Sacklers possession, custody or

14   control, as opposed to in Purdue's possession, custody or

15   control.

16            So that's the focus of the current motion is what

17   the Sacklers documents.  And like I said, there's only been

18   one Sackler who's ever had to do any searching of documents

19   in that category.  There had been a handful that have had

20   their Purdue documents searched, but we believe

21   substantially more searching and disclosure has to be done

22   with respect to those Purdue accounts as well.  But that's

23   not what this motion is about; it's directed to the Sacklers

24   and their hosted information.  Does that answer your

25   question, Your Honor?

Page 56

1                THE COURT:  Yes, thanks.

2                MR. HURLEY:  Okay.  Other folks that escaped

3       disclosure entirely, including -- include the Sacklers

4       longtime accounting and legal advisors, handpicked board

5       members.  Some of that material may be in the possession,

6       custody or control of Purdue; some of it may not.  None of

7       this is to cast blame on the prepetition process; they were

8       focused on different things.  But the fact is that discovery

9       that's critical to these cases has not yet been taken,

10      especially with respect to the Sacklers, and we submit it

11      absolutely is essential that it be taken.

12               So this is not an ordinary bankruptcy case.  It

13      doesn't involve only commercial parties or issues.  Purdue,

14      under the Sacklers' leadership, is alleged -- and I

15      emphasize alleged but by thousands of private and public

16      plaintiffs, including all of the states in the country -- to

17      have marketed and sold opioids in a manner that not only

18      made the Sackler family rich almost beyond imagination, but

19      also caused thousands of people in this country to suffer

20      with an addiction injury and death, is alleged to have

21      caused harm estimated by some in the hundreds of billions or

22      trillions of dollars.

23               If the settlement framework were adopted, it would

24      result in every single member of the Sackler family,

25      including every single covered person and all of their

1    trusts and affiliates being absolved of responsibility and

2    liability for the opioid crisis for all time.  Under the

3    settlement framework, the Sackler family would remain

4    billionaires many times over, largely as a result of

5    Purdue's activities.  Now these are circumstances that the

6    committee submits, perhaps uniquely, justify searching --

7    perhaps burdensome, perhaps intrusive -- discovery into the

8    Sacklers affairs, including all of the covered parties.

9          There are important creditor groups in these

10   cases, Your Honor, including I believe some of the states

11   that have indicated that they can't even seriously consider

12   a settlement with the Sacklers that releases the Sacklers on

13   any terms until comprehensive disclosures have been made by

14   the Sacklers, respecting their and Purdue's role in the

15   opioid crisis, the transfers that I referenced before from

16   Purdue that the Sacklers and Sackler trusts and the current

17   amount and location of their wealth.

18         Now, from the beginning of these cases, the

19   Sacklers assured the official committee that they would make

20   the disclosures that are necessary to satisfy its creditors

21   on these points because they said that doing so was in their

22   own interest.  And we really took the Sacklers at their word

23   and we gave them enough time -- and arguably, maybe we gave

24   them too much time; if we did, that's on us -- to follow

25   through, and it just hasn't happened.

1           The Sacklers point to millions of documents

2    produced by Purdue and the MDL.  But in these cases, other

3    than the presentations that were prepared by their advisors

4    and the IAC financial diligence, the Sacklers have produced

5    very little.  When the official committee filed its motion

6    on Sunday, side A had produced about 700 documents, side B

7    about 6,000.  That 6,000 side B touts is including 50,000

8    pages, but it's worth noting that that 50,000 pages includes

9    17,000 that consist of documents supporting the advisor-

10   created presentations that I referenced before and most of

11   those documents are publicly available or were already

12   produced by the Debtors in the MDL.

13           So by any measure, we submit, that the Sacklers'

14   disclosures to date have been very disappointing.  And it's

15   unfortunate, but from the committee's perspective, the

16   voluntary approach just hasn't worked.  We tried and it

17   hasn't worked.  Based on our experience, the Sacklers are

18   not going to engage in discovery in a manner that's

19   sufficient, at least to the creditors, except under very

20   specific compulsion by this Court in the form of orders on

21   discovery.

22           And that brings me, Your Honor, to the first of my

23   remaining three argument points, which is that a schedule

24   for disclosures is required.  Excuse me for a moment.  In

25   opposition to the committee's motion, the Sacklers made some

Page 59

1    concessions for the first time.  But, unfortunately, those

2    concessions don't actually eliminate the scheduling

3    controversy.

4            So side B, represented by Milbank and Joseph Hage,

5    has agreed to review and produce 475,000 documents returned

6    by applying official committee crafted search terms dated

7    April 17th to ESI, including emails and text messages, of

8    Richard, David and Jonathan Sackler from 1995 to the date

9    each resigned from the board.  Okay?  The cutoff from the

10   board resignation date was their original position -- theirs

11   being side B -- and that's what generated the 475.  Side B

12   has agreed that they will -- again, for the first time in

13   their papers in opposition to our motion, they agreed that

14   they would complete the production of the 475,000 by July 1,

15   2020.

16           But there are other aspects of the production to

17   which they have not agreed to a deadline and have not

18   proposed an alternative deadline.  For instance, side B also

19   has agreed that it will expand its search terms for those

20   three custodians through the petition date, but it says it

21   can't promise to finish their review by July 1 and, as I

22   said, didn't offer an alternative deadline.

23           Your Honor, side B has had plenty of time to

24   determine and provide to this Court information about the

25   incremental burden that would be associated by expanding the

Page 60

1    responsive period as they have agreed to do.  They note in

2    their papers that they only responded to our subpoena on

3    April 21st, but the parties have been negotiating search

4    criteria since February 4th, or at least side B and the

5    committee has.

6            Side B admits that it has had the current

7    committee search criteria since April 17th, close to 15

8    days, which we submit under the circumstances of this case

9    is more than enough time for them to have determined what

10   this additional -- what this extension of the responsive

11   period is going to do in terms of increasing their burden,

12   and either say we can do this by July 1st or make a specific

13   proposed based on an identified burden and an identified

14   process for getting those documents reviewed for completing

15   that production.  But they haven't done that; they've really

16   just said we want to leave it open ended with respect to

17   that additional material.

18           Under the law on these discovery motions, Your

19   Honor, when somebody is responding to a motion to compel,

20   they actually have the burden of proving that the burden

21   that goes along with the relief being sought by the moving

22   party on the motion to compel is not reasonable.  They have

23   to come forward with specific information to show that it's

24   not reasonable, and side B just hasn't done that with

25   respect to the additional ESI that it's agreed to review and

Page 61

1    with respect to its statement that it can't finish it by

2    July 1st.  But we submit that they should simply be ordered

3    to complete that review and production by July 1st as well.

4             THE COURT:  That, again, that's for the period

5    after the board resignations and up to the petition date?

6             MR. HURLEY:  That would be the additional ESI,

7    correct.

8             THE COURT:  But you've agreed on search terms and

9    the like.  This is just additional review for privilege and

10   things like that.

11            MR. HURLEY:  Correct.

12            THE COURT:  Okay.

13            MR. HURLEY:  Okay.  There's another category with

14   respect to side B, which is MDL search terms.  So, I'm

15   sorry, Your Honor, I'm going to have to switch from my

16   headphones here which are running out of batteries.  Just a

17   minute, I'm going to put you on speaker.  Apologies for

18   that.  Can you hear me, Your Honor?

19            THE COURT:  Yes, clearly.

20            MR. HURLEY:  Okay.  There's another piece of this

21   with side B, which is the MDL search terms.  So the

22   committee created search terms that were individually

23   crafted to reach fraudulent conveyance and other, like,

24   typical estate claims, and we asked parties to use those

25   terms to look for documents.  With respect to custodians who

Page 62

1    had never had their documents search for any reason, we also

2    asked them to use the MDL search criteria on those

3    documents.

4           And side B has, in fact, agreed to do that and

5    indicates -- they had told us at the meet and confer that

6    the MDL search terms across the three custodians resulted in

7    45,000 documents.  It sounds like it's a little bit more,

8    then maybe it's 60,000.  Again, they have agreed to review

9    and produce those documents yielded by the MDL search terms.

10   But I, unless I'm misunderstanding and I'm sure you'll

11   correct me if I am, they aren't committing to complete that

12   review by July 1st.  And, again, they don't offer any

13   alternative deadline to complete the review.

14          Make the same arguments I made before about the

15   burden on the responding party to actually prove that relief

16   sought on a motion to compel is unreasonable.  I would say

17   they have failed to meet that burden and, again, should be

18   ordered to complete their production by July 1st, including

19   with respect to the MDL search term documents.

20          The final category from side B relates to the

21   agreement by side B to produce ESI of a person named Stephen

22   Ives, who is a longtime accountant and employee of the

23   Sacklers and their, I believe, their family office.  Side B

24   has agreed that it will take on that it has possession,

25   custody or control, if you will, of Mr. Ives' documents, but

Page 63

1    has said that it doesn't yet know the burden that will be

2    associated with running the terms against Mr. Ives.  And so,

3    again, can't promise to produce those documents by July 1st

4    and, again, doesn't offer an alternative deadline or any

5    information about what would be reasonable.

6            So we would submit again that what we need here is

7    an order, a very clear and very specific order, that

8    requires side B to begin and end its rolling production by

9    date certain.  We proposed May 15th and July 1 for the 475

10   Sacklers, or side B obviously, agreed that they would do

11   that.  We think the same deadlines should be applied across

12   the board.

13           Side A also has made some concessions for the

14   first time in its opposition to the official committee's

15   motion.  Side A agreed to apply the MBL search terms and the

16   official committee's search terms to ESI of four Sacklers --

17   Theresa, Kathy, Mortimer, and Samantha -- beginning, they've

18   agreed now to begin that search in 1995, the introduction of

19   OxyContin.  Previously, they had said they would cut it off

20   at 2010 or 2008.  But they have, since we made our motion,

21   have relented on that and say they'll go back to 1995, and I

22   understand through the petition date.

23           They have agreed to begin the production by May

24   15th as we had proposed.  And, again, they agreed to that

25   for the first time in response to our motion, but they say

Page 64

1    can't commit to any deadline for completion.  Now, the

2    documents compiled based on running the search terms against

3    those four custodians from 2010 forward, we understand from

4    side A, a total of 309,000 documents approximately.  They

5    will add additional documents by bringing that period of

6    time back to 1995.

7            But just like side B, they haven't actually

8    detailed the number of additional documents that that search

9    will yield or what the additional burden of reviewing it

10   would entail.  They have just said, you know, because we

11   don't know how many documents ultimately we're going to

12   have, we can't commit to completing the production by July

13   1st.

14           I don't want to be a broken record, but they have

15   the burden under the case law when you make a motion to

16   actually establish what their burden is and that it's not

17   reasonable to comply with the relief that's sought by the

18   committee, and they have not done that here.  So we would

19   submit that, again, they ought to be required to produce,

20   make all of their productions with respect to these initial

21   ESI review and complete them by July 1st.

22           I refer to it as initial ESI very deliberately,

23   thinking that Milbank, whether there was some question about

24   whether we were suggesting that absolutely every scrap of

25   ESI that the committee is going to seek needs to be produced

Page 65

1    by July 1st and that's absolutely not the case.  As you can

2    tell from the rest of our motion, the committee believes

3    that there is substantial work that still remains to be

4    done, both the Sacklers and others in terms of gathering

5    additional documents that are going to need to be searched.

6    Unfortunately because of where we are procedurally, we're

7    not actually ready to queue up the specific dispute about

8    ordering the production of particular volumes of documents

9    with respect to the other categories, but this is, in fact,

10   a request that there be a deadline set for the initial ESI.

11   We believe there will be more, but obviously, that may be an

12   issue that will be brought to the Court's attention at some

13   point in the future.

14           So that covers my first point, Your Honor, which

15   is really the nature of schedule.  And I think absent a very

16   concrete, and very specific and unmistakable schedule, it's

17   just going to be very difficult to keep these cases moving

18   forward.

19           THE COURT:  How recently were these agreements

20   reached?

21           MR. HURLEY:  So, how recently were the agreements

22   reached?

23           THE COURT:  The years that -- the search terms to

24   go back to 1995, et cetera.

25           MR. HURLEY:  Relatively recently.  I'm in a

Page 66

1    struggle to give you the exact dates, Your Honor, but

2    certainly relatively recently.  The terms themselves that we

3    are talking about, we revised them at the request of the

4    Sacklers.  You know, we would send over terms and they would

5    come back and say this return is too many documents.  The

6    Committee would then take a crack at changing them, so they

7    returned fewer documents.  And we went through that process

8    beginning on February 4th with Side B, and the last

9    iteration of search terms that we supplied, the ones we're

10   talking about now, we gave to Side B and actually to Side A

11   as well on April 17th.

12           The actually commitments -- well, first of all,

13   Side B's commitment to produce the 475,000 documents by a

14   date certain was obviously very recent.  They made that

15   commitment after we filed our motion.  And I would say that

16   they made the commitment with respect to actually reviewing

17   and producing the 475 without estimating how long it would

18   take, probably within the past seven days.  I apologize, I

19   can't be more specific than that.

20           THE COURT:  Okay.  Do I have the same lawyers for

21   the Side B and Side A that we did on the last matter?

22           MR. JOSEPH:  Yes, Your Honor.  Gregory Joseph for

23   Side B.

24           THE COURT:  Okay.  Mr. Joseph, has there been any

25   more thought as to how long it would take to complete the

Page 67

1    review from the resignations to the petition date?

2            MR. JOSEPH:  Your Honor, that one, I don't have a

3    number for because that's very recent.  And we are currently

4    reviewing the 63,000 documents applying the MDL search

5    terms, and Monday we're expanding it to the 475,000

6    documents.  And that's using 65 lawyers, maybe more than 80,

7    but a minimum of 65 lawyers.  And it's millions of pages.

8    And we've committed to do that by July 1, that we saw their

9    request in their brief.  We made the commitment to review

10   them before they filed that brief, so they knew that we had

11   already agreed to do that.

12           You know, we have now ascertained that Mr. Ives'

13   documents, subject to any tweaking of the search terms as

14   they agreed to for others, produce 340,000 documents.

15   That's millions more.  And there's just a finite amount of

16   time and people to be able to do all this.  So we can get

17   the first 535,000 done by July 1, but the truth is, we

18   didn't get search terms agreed to until April 17th.

19           And we agreed to the search terms and we've agreed

20   not only to this, we've already agreed, before they even

21   filed their brief, to produce tax filings, financial

22   statements, audit reports, bank records going back to 2008

23   for 44 trusts and six companies that are ICSPs on the

24   Raymond side, and for Richard, Jonathan, David and Beverly

25   individually.

1          THE COURT:  How soon would you be in a position to

2     know reasonably when you would be able to provide the other

3     information that you haven't committed to provide by July 1?

4          MR. JOSEPH:  Correct.  Your Honor, I mean, I've

5     asked -- I mean, I can give you a preliminary estimate.  I

6     would like a chance to refine it.  We believe that we can

7     get this done by September 1.  There is a lot involved here,

8     but we believe we can get that done by September 1.  I am

9     going to say I may have to come back to the Court to ask for

10    some leave on that, but that's why we've got up to 80

11    lawyers looking at this information to try and turn it

12    around as quickly as possible.

13         THE COURT:  Well what -- I'm sorry.  What if the -

14    - when Mr. Hurley went through it, it seemed as if most of

15    the information was covered by what you committed to do by

16    July 1st.  I didn't understand there to be a --

17         MR. JOSEPH:  Well, the Stephen Ives information,

18    Your Honor, that's millions of more pages.

19         THE COURT:  Oh, okay.  So that --

20         MR. JOSEPH:  We just got it in in a reviewable

21    form, I understand, last week.  So that's a burden of

22    millions of pages, on top of the millions of pages we've

23    committed to for July 1, plus, you know, getting all the tax

24    filings, financial statements and audit reports, and all

25    that, going back to 2008.  I just want to make sure we

Page 69

1    produce everything, and we produce it completely.  Nobody

2    wants this process to get finished any faster than we do.

3            The family's reputation is never going to be

4    rehabilitated ever while this process is going on, but

5    there's only so much we can physically get done.

6            THE COURT:  As far as Ives is concerned, is there

7    information that you could prioritize after speaking to each

8    other or him?

9            MR. JOSEPH:  We can certainly talk about that.

10   Remember that a lot of Ives' information, to the extent its

11   communications with Richard, Jonathan and David, will be

12   produced in the 475,000 --

13           THE COURT:  Right.  That's what I was thinking.

14   Is there a way to...

15           MR. JOSEPH:  We're happy to confer on that and

16   we're happy to do this in some orderly fashion.  But I'm

17   just saying, the last thing that's true is any suggestion

18   that we have not been cooperative in providing information.

19   They're the ones that asked for what were two full days of

20   presentations, you know, 1,100 PowerPoints.  You know, I

21   mean --

22           THE COURT:  No, I...  Look, I want to come back to

23   the purpose of this discovery.  There are two reasons for

24   this discovery.  The first is a occasion by the fact that

25   the Debtors are proposing a plan that would provide a Debtor

Page 70

1    release of claims that the Debtors' estates would have

2    against the various Sackler parties.  That goes to transfers

3    by the Debtors and causes of action that the Debtors would

4    have against those who had a fiduciary duty to the Debtors

5    in the Sackler group, which wouldn't be all the Sackler

6    group; it'd just be those who had a fiduciary duty.

7           The Committee already has the information from

8    Purdue as to what it transferred, I gather, right?  Mr.

9    Hurley?

10          MR. HURLEY:  We do have a report, a substantial

11   report to that effect, Your Honor.

12          THE COURT:  Okay.  And as far as breach of

13   fiduciary duty, that is limited to fiduciaries for the

14   Debtors.  So as far as Mr. Ives is concerned, he was not a

15   fiduciary for the Debtors, right?

16          MR. HURLEY:  Correct, Your Honor.

17          THE COURT:  And as far as transfers, it's more --

18   I mean, it's confirmatory, but in a sense the money has to

19   start somewhere, and it starts at Purdue in this case,

20   because it's money going out of Purdue.  It would seem to me

21   that except if you could identify stuff of his that is not

22   duplicative of the other Sackler discovery that's committed

23   to be done by July 1st, it's less important to get his

24   information on the same timeframe.

25          MR. HURLEY:  Mm hmm.  Well, Your Honor --

Page 71

1              THE COURT:  But let me -- on the first reason why

2    you're seeking discovery, which is a perfectly legitimate

3    reason, which is transfers by Purdue that might be avoidable

4    or breach of fiduciary duty claims.

5              The second reason is that the plan that is being

6    considered to be proposed contemplates a release of third-

7    party claims against a huge group of people, including the

8    Sacklers, but also affiliates and the like.  And those would

9    be claims that the Purdue creditors would theoretically have

10   against the released parties.

11             I could see why getting discovery of Mr. Ives'

12   information might be relevant there, although it goes more

13   to contentions that the Sacklers themselves would be making

14   that, well, you know, the grounds that you have for third-

15   party claims against us, you know, and we know the responses

16   to.  So tell me a little bit more why it's critical to get

17   his information by a date certain at the beginning of July

18   as opposed to say at the end of September>

19             MR. HURLEY:  Sure, absolutely, and I want to

20   address that question very specifically.  But let me just

21   start by making sure that something that may not be clear to

22   Your Honor yet becomes clear.

23             So as I said with respect to the other custodians

24   we talked about, we were provided what are called hit

25   reports by their lawyers, saying you gave us search terms,

1    the search terms yielded X number of documents.  Akin Gump

2    would then review those hit reports and make an effort to

3    narrow or carved down the responsive materials so it would

4    be less burdensome to actually review and produce.

5            With respect to Mr. Ives, we actually haven't had

6    a chance to engage in that process yet.  I think what

7    happened -- and I'm sure counsel will have more information

8    about this he can share if he wants to -- but my

9    understanding is a lot of the information was hosted at a

10   company that they weren't able to get access to, or there

11   tech person was not able to get access to, because of what's

12   been happening with COVID-19.

13           So it sounds like only very recently have they

14   actually obtained the Ives documents so that they can run

15   the searches.  And we at the Committee haven't yet seen a

16   hit report.  But we would be very happy to review that hit

17   report and see if we can work with Milbank to come up with a

18   compromise that would result in something far less

19   burdensome than what they're talking about.  And the hit

20   reports are pretty good.  They let you see which terms

21   they're picking up, a lot of documents, et cetera.

22           THE COURT:  Okay.

23           MR. HURLEY:  And there's one other point of

24   clarification.  There's software that allows you to de-

25   duplicate a whole group of emails against another group.  So

Page 73

1    we'd be very clear and certain to not be having them produce

2    documents twice.

3              Now let me just addressed briefly the question

4    about relevance.  So Mr. Ives --

5              MR. HUEBNER:  Mr. Hurley?

6              MR. HURLEY:  Yes.

7              MR. HUEBNER:  Mr. Hurley?  Let me, if I may --

8    it's Marshall Huebner.  Let me -- before we switch topics,

9    because there -- just for 20 seconds, which I think will

10   help the Court and other parties, and I do want to make sure

11   journalists don't get it wrong.

12             So, Your Honor, just as a reminder, because I

13   think we're going to be going to be going to a broader

14   place, it sounds like, for Your Honor before this day is

15   over.  Number one, Mr. Hurley was actually overcautious.

16   The Debtors put on the public docket the full report of

17   every penny that ever went to the shareholders, starting

18   from a period rather a long time ago.  I believe it was

19   January 2008.  That total is $10.4 billion-plus-odd dollars.

20   That is not private.  We put it out there for everyone to

21   see.

22             And as the report itself makes clear, that was

23   cross-checked, I think, 12 different ways by a team of

24   dedicated professionals working only for that Committee.  So

25   with respect to transfers out to the Sacklers, you know, we

1    designed this whole process, just as a reminder to the

2    Court, so that the data would be absolutely literally down

3    to one-dollar transfers.

4           What is very not public, just as this hearing

5    continues, is the wealth presentation that was made to the

6    parties bound by the protective order.  So I wanted to thank

7    Mr. Hurley for his extreme caution on confidentiality.  But

8    the Debtors actually thought that it was extremely important

9    to catalog all distributions and transfers and have it be

10   out there for the entire world to see.  And as the Court

11   remembers, something like 18,000 professional hours were

12   spent by forensic specialists doing that.

13          There is another report coming, just to remind all

14   parties and the Court -- and that report actually should be

15   coming quite soon -- which is all other non-cash

16   distributions or contractual arrangements that potentially

17   are undervalued transactions that the core parties in this

18   case, the Committees (indiscernible) the State's consenting

19   and dissenting, and of course UCC will also be getting.

20          We are very focused on not having to have 2, 3, 4,

21   5, 6 parties retread the same ground at extraordinary

22   expense to pull the data.  Which is not at all to say -- and

23   I want to be super clear -- I have no dog in the fight at

24   all on the additional items that the Committee of Non-

25   Consenting States are seeking, not for a nano second.

 1              I'm just reminding people that the Debtors'

 2   Special Committee is already going to be putting out to give

 3   people comfort that there is going to be a huge amount of

 4   data generated already about transfers, contracts,

 5   dividends, upstreams, transactions and royalties that is

 6   being done in a completely objective Special Committee

 7   dedicated advisor way.

 8              So I want to just thank Mr. Hurley, but you know,

 9   let everyone know, because I don't want journalists to

10   misremember and put out things that, you know, still don't

11   know -- it's still not public how much Sacker family

12   dividends from the company.  That was a huge report that was

13   put out many months ago on the docket of the case.

14              So, Mr. Hurley, sorry to interrupt you, but I

15   thought that might be helpful before we move to a new topic.

16              MR. JOSEPH:  Your Honor, Greggory Joseph.  If I

17   might just say, since that was done with the public in mind,

18   that about half of that 10 billion did go to taxes.

19              THE COURT:  Okay.  Mr. Hurley, I think you were

20   about to address the relevance point.

21              MR. HURLEY:  I was, Your Honor.  Thank you.  So

22   the requests which are -- or the ESI of Mr. Ives is actually

23   not -- it's seeking to like identify transfers, that sort of

24   thing.  Our understanding is that Mr. Ives has been a close

25   financial advisor and accountant for the Sackler family, I

Page 76

1    believe for decades, and would have information related to -

2    - we think, anyway -- things like estate planning decisions

3    made by the Sackler's, things like the Sacklers' wealth and

4    where it's located, information that we think will be really

5    clearly relevant to things, including potential fraudulent

6    conveyance and other fraudulent conveyance claims.

7              I do want to emphasize again --

8              THE COURT:  I'm sorry.  I have to interrupt you

9    here.  Why?  I don't get that.

10             MR. HURLEY:  Well, so --

11             THE COURT:  It would be relevant to perhaps a

12   remedy, tracing money, but as far as the transfers

13   themselves, it would --

14             MR. HURLEY:  No, I agree, Your Honor.  I'm sorry,

15   I may have misspoken.  This discovery is not directed at

16   identifying the transfers themselves.

17             THE COURT:  Okay.  It's really step two?

18             MR. HURLEY:  Pardon me?

19             THE COURT:  It's really step two of a fraudulent

20   transfer analysis, which is recoverability.

21             MR. HURLEY:  Well, it goes to recoverability; it

22   may very well go to Sackler family state of mind in terms of

23   why decisions were made to make particular transfers.  So,

24   you know, I think there's a host of fraudulent conveyance

25   related issues that could be implicated.

Page 77

1          But I do just want to be really clear.  We have

2     been and remain willing to negotiate reasonably about scope.

3     So I guess the concern that I have is everybody has a lot to

4     do, and if there isn't a deadline imposed, things tend to go

5     by the wayside.  So with Mr. Ives, for instance, if we could

6     have the opportunity, say in the next week, to get a hit

7     report with respect to Mr. Ives and try and do our best to

8     narrow that down substantially, and then maybe an

9     opportunity to bring that issue, if it's necessary, back to

10    the Court so that we have some resolution, which obviously

11    in part will depend ultimately on the number of documents

12    that we're proposing be reviewed --

13          THE COURT:  Okay.  That sounds reasonable to me.

14    I think that's what should happen.  And with regard to the

15    other stuff --

16          MAN 1:  Your Honor --

17          THE COURT:  -- the deadlines that have been agreed

18    are agreed.

19          MR. HURLEY:  I believe that's correct, Your Honor.

20          THE COURT:  Okay.  And then as to Side A, is there

21    any sense of when you would be complete at this point?

22          MS. BALL:  Your Honor, Jasmine Ball, from

23    Debevoise & Plimpton, for Side A.  We don't have a deadline

24    yet that we can actually propose.  We did not agree until

25    literally, as Mr. Hurley noted, their filings to go back

Page 78

1    further.  And our dataset, as we've explained to Mr. Hurley

2    previously, that was previously gathered before COVID only

3    went back to 2010.  And so we have actually in the last week

4    been talking with our vendor about how and whether we can

5    get the additional when, you know, we can get the additional

6    data back to 1995 or for as long as there was actually data

7    in those email accounts.

8              And they're trying to work through getting us

9    information as to what they would need to do in this new

10   environment to actually pull.  Because they do not have --

11   there was a question from Mr. Hurley -- they do not have on-

12   site all of the data from each of the five custodians that

13   we agreed to gather.

14             One of them, they don't have any data on, and for

15   the other four, there were date restrictions put in on data

16   that was pulled.  So they don't actually have it on-site and

17   they're going to have to go out and get it, at least from a

18   number of them.  So we're working through that,

19   unfortunately, right now

20             THE COURT:  Do you have a sense of how long it

21   would've taken if it was just going back to the dates that

22   you had proposed?

23             MS. BALL:  Well, we had -- as Mr. Hurley said, we

24   had 309,000 documents.  We have been looking at the numbers

25   as to whether we could get them done by July 1st, as the Bs

1    have been indicating as well.  But as Mr. Joseph noted, it's

2    millions and millions of documents.  But we're trying to get

3    that information to Mr. Hurley.

4            THE COURT:  Okay.  I think we should -- for that

5    universe, it should be July 1, and you and Mr. Hurley should

6    have the same type of process for the more recently-agreed

7    group, just as what's going to happen with the Ives group,

8    to come up with a reasonable deadline, hopefully.  And if

9    you can't find an agreement,  the parties should come back

10   to me promptly.

11           MS. BALL:  Understood, Your Honor.

12           THE COURT:  Okay.

13           MR. HURLEY:  Thank you, Your Honor.  And by the

14   way, I misspoke, and I appreciate Ms. Ball for correcting

15   me.  The custodians that they greed to run those terms

16   against were in fact not just the four identified.  It was

17   also -- so it was Theresa, Kathy, Mortimer, Samantha and

18   Ilene, I believe, just for the record.  Thank you.

19           So that brings me, Your Honor, to the question of

20   custody or control over the documents in the immediate

21   possession for the IACs.  So in response to the subpoenas,

22   the Sacklers have contended that they lack possession,

23   custody or control over those documents.

24           The contention really is, I guess, what we view as

25   an about-face from what the Sacklers represented in the case

Page 80

1    stipulation with the Committee.  And in that stipulation,

2    that they just flatly promised that they were going cause

3    the IACs to deliver documents to the Committee and to

4    others.  You know, that was with respect to primarily IAC

5    valuation documents that I think the Sacklers, frankly,

6    believed would be in their interest to make a part of the

7    record in these cases.

8              It was only when we served the subpoena that

9    called for a host of documents that the Sacklers may,

10   frankly, not want to produce, that they claimed that all

11   they can do is ask the IACs to provide documents, but the

12   IACs may say no.

13             Asking for voluntarily production is not good

14   enough, Your Honor, when a subpoena is served.  It imposes

15   diligence and other legal obligations on the recipient with

16   respect to all documents in the recipient's control.  And we

17   submit that they have possession, custody or control in the

18   initial covered Sackler persons, and they have to understand

19   by order of this Court that if they don't comply with their

20   obligations under the rules with respect to those documents,

21   they will be subject to the power of this Court.

22             I want to briefly address the law and facts that

23   we think clearly establish that the Sacklers have

24   possession, custody or control.  The legal standard is not

25   disputed.  A party has possession, custody or control over

Page 81

1    documents in the immediate possession of another if the

2    party has the legal right, authority or practical ability to

3    obtain documents in that other person's immediate

4    possession.  And the record that's already before the Court,

5    Your Honor, is more than sufficient to conclude that the

6    Sacklers have that level of control as matter of law.

7             First, I would point to Paragraph 1 of the case

8    stipulation that I referenced before between the Debtors,

9    the shareholder parties and the Official Committee.  And

10   Paragraph 1 provides, "The shareholder parties represent

11   that the initial covered Sackler persons collectively own,

12   directly or indirectly, each of the IACs."  Now, even the

13   Sacklers acknowledge that this factor points in favor of

14   possession, custody or control over the IAC documents.  But

15   there is more.

16            In our motion, the Committee suggested our

17   understanding that the Sacklers also have the power to

18   appoint and replace directors with individual IACs.  And we

19   don't have all the documents, but we were able to submit an

20   example from Napp Pharma Holdings, which is an IAC, that

21   appeared to prove that in fact the Sacklers have the ability

22   to --

23            THE COURT:  Could I --

24            MR. HURLEY:  Yes.

25            THE COURT:  Could I cut through this?

Page 82

1          MR. HURLEY:  Absolutely.

2          THE COURT:  It seems to me that you should do a

3   two-step process here, particularly since this has been

4   offered up by the B-Side parties.  B-Side parties say that

5   they will direct the IACs, using whatever authority they

6   have, which all the authority they have, to produce the

7   documents.  Let's see what happens and what reason is given

8   if there is a nonproduction, and then we can come back and

9   decide whether that nonproduction is within the control or

10  not of the Sacklers.

11         MR. HURLEY:  So, Your Honor, that approach raises

12  a couple of concerns from the Committee's perspective.  So

13  first of all, I think I want to be -- it's got to be clear,

14  I'm not sure that the Side B actually is -- at least Side B

15  -- is actually saying that we're going to ask the IACs to

16  provide documents responsive to the requests.  I believe

17  they actually identified a subset of 20 of the subpoena

18  requests that they say they're prepared to pass along to the

19  IACs and asked for a "voluntary production."

20         THE COURT:  Well, let's stop there.  Is that the

21  case?  I mean, Page 3 of the response says, the RICSPs who

22  hold beneficial interest in the IACs have agreed to use

23  whatever authority they have to instruct the IACs to produce

24  documents to the UCC, in accordance with the RICSP's

25  responses.  So is there some hidden -- is there some group

1    that you're not going to ask them to produce?

2            MR. HURLEY:  Your Honor --

3            MR. JOSEPH:  Your Honor, Greggory Joseph, for Side

4    B.  We've already sent demands to the Board of Directors

5    through their counsel, including all of the documents and

6    the responses and objections, and just given them to them.

7    And we fully expect them to comply.

8            THE COURT:  Okay.  So what's the other problem,

9    Mr. Hurley?

10           MR. HURLEY:  Well, so, Your Honor, I'm actually

11   looking at the letter that Milbank submitted, and they say

12   their responsive objections stated that the RICSPs would

13   request from the IACs documents responsive to over 20 of the

14   enumerated document requests, which strongly suggests to me

15   that they're requesting documents responsive to some but not

16   all for the requests.

17           THE COURT:  I'm sorry.  Which letter are you

18   referring to?

19           MR. HURLEY:  This is the Milbank letter, Your

20   Honor.

21           THE COURT:  To who?

22           MR. HURLEY:  To the Court.

23           THE COURT:  No, I'm quoting from the response.

24   And Mr. Joseph just told me they directed them to produce

25   everything.  So let's move on.

Page 84

1          MR. HURLEY:  Okay, fair enough.  So let me just --

2     with respect to --

3          MR. JOSEPH:  Your Honor, Greggory Joseph.  I just

4     want to be clear.  We have interposed responses and

5     objections and we've sent those along also.  We expect that

6     there's going to be a conferral process for all these

7     documents.  And we haven't even conferred on our responses

8     and objections for our documents.  But subject to that, we

9     haven't withheld any document requests.  We've sent

10    everything over, together with the responses and objections.

11         THE COURT:  Well, let me put it differently, Mr.

12    Joseph.  If you agree on behalf of the Sacklers to resolve

13    an objection in a particular way, you're not going to direct

14    -- or your clients are not going to direct the IACs to

15    resolve it differently, right?  It's going to be resolved

16    the same way.

17         MR. JOSEPH:  Correct, Your Honor.

18         THE COURT:  Okay.

19         MR. JOSEPH:  But we have 50 countries' law

20    involved.  I just don't know local law in every

21    jurisdiction.  So we're not going to direct them at all to

22    do something different.

23         THE COURT:  Right.  But you're going to direct

24    them to do what is consistent with what I directed you to

25    door you've agreed to do and -- this goes to the control

Page 85

1      point -- they may be under an obligation not to produce it

2      for some reason based on their own local law.  Is that fair?

3                  MR. JOSEPH:  Yes, Your Honor.

4                  THE COURT:  But other than that, you're not going

5      to give them different instructions.

6                  MR. JOSEPH:  No.  There's not going to be any lack

7      of transparency.  We're not going to be behind the scenes

8      telling them to do something different from what you've

9      ordered us to do or we've agreed to do.

10                 THE COURT:  Okay.  So what was your other concern,

11     Mr. Hurley?

12                 MR. HURLEY:  So, Your Honor, the concern is that

13     we don't have -- the committee doesn't have a party or

14     counsel or negotiate with that is negotiating on behalf of

15     the party that's subject to the Court's power, or even

16     counsel that's appearing here.  And what they've done in the

17     past, meaning the Sackler's counsel, is asked us to deal

18     directly with Norton Rose as counsel for the IACs.  And we

19     tried that at first, and it was not -- it wasn't

20     satisfactory.  We had some --

21                 THE COURT:  Can I interrupt you again?

22                 MR. HURLEY:  Sure.

23                 THE COURT:  It is conceivable to me that after the

24     Sacklers direct the IACs to produce document X, which they

25     have agreed on their end should be produced, at that point,

Page 86

1    that company will say no, we're not going to produce that

2    because that's not required under Thailand law.  And at that

3    point I'll decide whether they have -- the Sacklers -- have

4    the power to compel them to produce it.  I'm not going to

5    decide it in a vacuum, because the facts matter.

6          MR. HURLEY:  Understood.  So an issue is that when

7    a party receives a subpoena, they immediately have

8    obligations with respect to documents in their control with

9    respect to that subpoena.  For instance, do a reasonable

10   investigation to try to determine what documents exist that

11   are responses and what burden would be associated with

12   producing those documents, and then to meet and confer in

13   good faith with the requesting party to try to arrange some

14   kind of compromise.  And a major concern here is that nobody

15   is undertaking that diligence and investigation that has to

16   occur for us to even have a reasoned conversation about what

17   should be produced from the IACs.

18          THE COURT:  Okay.  I view that as a separate

19   point.  What happened with the -- I understand what you're

20   saying about the Norton Rose thing, but from the Side B

21   perspective, what happened there?  It sounds like they sort

22   of disappeared.

23          MR. JOSEPH:  Your Honor, Gregory Joseph.  We are

24   not counsel to the IACs under the -- we represent the

25   parties that received the subpoena, but we're not counsel to

1    the IACs.  I can't address a specific conversation between

2    Norton Rose and Mr. Hurley.

3              THE COURT:  Okay.  Well --

4              MR. JOSEPH:  I can tell you that we have issued a

5    demand to the board of directors to comply with the

6    subpoena.

7              THE COURT:  Well, I think it should go further and

8    direct the IAC's directors to appoint one or more counsel to

9    interact with Akin Gump unless they're prepared to defer to

10   you on this with regard to the subpoenas.

11             MR. JOSEPH:  That's fine, Your Honor.  We will

12   issue that direction.

13             MR. HURLEY:  Your Honor, can we go one step

14   further and ask for a direction that the IACs consent to

15   have subpoenas served on them in these cases so that there

16   is process active against them?  And then obviously they

17   would still have all their objections that any party can

18   make to respond to a subpoena.  But at least they would be

19   before the Court.

20             MR. JOSEPH:  Your Honor, Gregory Joseph.  The

21   problem is I don't know what local law is in 50 different

22   countries and whether that's problematic.  I know certain

23   kinds of actions are problematic.

24             THE COURT:  Well, I think that, again, in the same

25   way you're directing them without hiring a counsel or

Page 88

1    counsels, a joint counsel or separate counsel, they can be

2    directed to promptly accept service of a subpoena or explain

3    why they can't.

4            MR. JOSEPH:  That we can do, Your Honor.

5            THE COURT:  Okay.

6            MR. TROOP:  Your Honor, this is Andrew Troop.  And

7    I'm not sure that it's -- I just think you need to know this

8    fact as you think about all of these issues.  And that is

9    that I appreciate the legal niceties of the arguments that

10   Mr. Joseph is making about the various IACs.  But as a

11   practical matter in this case more than once, and in fact as

12   recently as yesterday, Norton Rose has responded to requests

13   for information about the IACs saying that it needs to get

14   direction from family counsel.  And yesterday there was an

15   issue.  I made the request to family counsel and within

16   hours I got a response that said, oh, we don't have an

17   objection, expect to hear from Norton Rose that you're going

18   to get the documents.  There's a level of practicality here

19   and sufficiency --

20           THE COURT:  So I appreciate that information.  I

21   just did not have a whole lot of information about what was

22   going on with Norton Rose.  The impression I got from the

23   letter is that they basically ceased being involved.  It

24   seems to me that after this direction, promptly after it,

25   whoever is coordinating this -- I don't know if it's Mr.

1   Joseph or Mr. Uzzi.  Whoever is doing it from the family

2   side should get on a call with Mr. Hurley and Mr. Troop and

3   the lead person from Norton Rose and work through a process

4   for dealing with this.

5           MR. HURLEY:  Your Honor, can it also be provided

6   that we'll get a copy of the direction letter and the

7   direction letter will issue --

8           THE COURT:  I would assume that would be the case.

9           MR. HURLEY:  Okay.

10           THE COURT:  I would assume that would be the case.

11           MR. HURLEY:  And perhaps that the direction letter

12   would issue by a date certain?

13           THE COURT:  I'm assuming Monday or Tuesday.

14           MR. HURLEY:  Thank you, Your Honor.

15           MR. TROOP:  Yeah.  And, Your Honor, for the

16   avoidance of doubt where we're talking about we, again, I

17   assume all of this is covered by the pre-existing court

18   orders and the --

19           THE COURT:  This is the --

20           MR. TROOP:  It's the four.

21           THE COURT:  Yeah, four parties --

22           MR. TROOP:  Exactly.  Right.  So we always means

23   four.  Because, again, the Debtors obviously are in a

24   slightly different role.  But all the information and all

25   the discovery is obviously critically important to the work

Page 90

1    of the (indiscernible) committee and the (indiscernible).

2              THE COURT:  And it's critical that the parties

3    coordinate.

4              MR. TROOP:  Correct.

5              THE COURT:  Good point.

6              MR. TROOP:  Thank you, Your Honor.

7              THE COURT:  So I think that covers category two in

8    the letter.

9              MR. HURLEY:  I believe that's right, Your Honor.

10   Thank you.  So that brings me to what perhaps will be the

11   last category that maybe there will be questions about the

12   redactions.

13             So from the committee's perspective it's critical

14   that the other related cover parties participate in

15   discovery, not just in the cases -- not just the initial

16   covered Sackler parties.  I just want to remind quickly the

17   Court who the covered parties are.  Under the case

18   stipulation, each shareholder party is required to contact

19   every known issue of Mortimer and Raymond and their trusts

20   and affiliates, provide a copy of the case stipulation, and

21   give them a chance to opt out of the stipulation.  And the

22   shareholder parties certified that they did that.  And no

23   Sackler ever filed, at least to the committee's knowledge, a

24   notice opting out.  So they're all covered parties.  They

25   are all beneficiaries, direct or indirect, of the billions

Page 91

1    in transfers from Purdue.  They're all enjoying the

2    protection of the Court's injunction, and they all intend to

3    seek releases.

4          Now, the stipulation itself contemplates that

5    covered parties will produce documents to the committee and

6    the Debtors, including, for example, in Paragraph 17 where

7    they agree to provide a host of documents, which actually

8    includes IAC books and records.  The official committee's

9    informal and formal requests both sought documents from all

10   covered parties.  And we have a basis for believing that all

11   family members could indeed have information of great

12   relevance to the cases whether or not they were employed by

13   or had a role at Purdue.

14          So, for instance, the broader Sackler family

15   apparently had beneficiary meetings, that included Purdue

16   directors and advisors, to discuss Purdue's affairs.

17          I would direct Your Honor's attention to Exhibit

18   19 to the committee's submission, which is an email

19   attaching and discussing an agenda for one such meeting in

20   May of 2012.  That meeting is described as a, quote,

21   "Special family/board/lawyers/et al. meeting".  The agenda

22   includes first, distribution policies.  The fourth item is

23   opioid direction.  The sixth is senate investigation.  The

24   seventh, divestment diversification.  Eighth, how do we

25   measure performance of the business?  Fourteen, future

Page 92

1    plans.

2           We understand that there were meetings of this

3    kind with some regularity.  And while the Sacklers have

4    tried to confine discovery just to directors of Purdue, any

5    Sackler who attended a meeting like the one I've just

6    described could very well have information of critical

7    relevance to these cases, including the state of mind of the

8    Sacklers and the motivation for very important decisions

9    that were made in these cases about things like transfers of

10   money that happen to be transfers away from creditors of

11   Purdue.  And that's true regardless of whether they worked

12   at Purdue.

13          Now, it is true that as a compromise in the meet

14   and confer, we proposed narrower search terms for these

15   additional related covered parties and proposed that in a

16   first instance we would reduce the number of covered parties

17   just to those who had at one time a Purdue email address.

18   We actually -- every time that we made that offer, we were

19   very clear that we didn't agree that it was a principled

20   distinction, but that it was a compromise that would reduce

21   the number of actual custodians.

22          The Sacklers never made a counter.  They just said

23   no.  And we told them that if they refused our compromise

24   and we were required to make a motion to compel that our

25   motion would not be limited to the compromise that we had

Page 93

1    proposed.

2          But that doesn't mean, Your Honor, that the

3    committee isn't prepared to be reasonable.  Once orders are

4    entered in the case that ensure one way or the other that

5    covered party documents will at least be a part of the case

6    and we can have a reasoned discussion about the scope of

7    disclosures, if any, that should be provided by them, we are

8    absolutely prepared to meet and confer in good faith over

9    the scope of searches and productions.

10          So the committee sees at least two ways to address

11   this issue to make sure that these covered party documents

12   are at least available for potential consideration for

13   production by the parties and maybe ultimately by the court.

14          So one is what we proposed in the letter, which is

15   directing the initial covered Sackler persons to ask their

16   related covered parties.  Give them a copy of the subpoena

17   and ask them if they will make documents that are in their

18   immediate possession available for potential review and

19   production.  Subject of course to the ordinary set of

20   objections, relevance, burden, et cetera.  But just make

21   them available so that a negotiation can be had over what

22   should or should not be produced.  And then have the initial

23   covered Sackler persons document the response.  So if a

24   related covered party refuses that request, that refusal

25   should be documented and it should be made available to the

Page 94

1    Court and parties in these cases for consideration in

2    connection with, for instance, whether a release should be

3    granted to that covered party, whether the Court's

4    injunction should continue to protect that covered party.

5    And so the committee believes that is a way forward.

6           Alternatively, the committee has asked repeatedly

7    of the shareholder parties that they provide us with a list

8    that identifies every covered party, that identifies, to the

9    extent they know, counsel for every identified covered party

10   and whether such counsel is authorized to accept service of

11   a subpoena on behalf of the covered party.

12          Now, we understand, or we believe anyway, with

13   respect to a lot of these -- maybe many, maybe close to all

14   covered parties, that they may well be represented by

15   Milbank and Debevoise themselves.  But that's obviously part

16   of the information that we would be seeking.  And at least

17   if we had that list, the committee, we would know how to

18   take steps to try to engage with someone who actually has

19   knowledge of the information that those additional covered

20   parties may have with respect to these cases and we can have

21   a discussion about what is appropriate for production.

22          And I would note, you know, you have here the

23   initial covered Sackler person, side A and side B, opposing

24   really any investigation into the documents that these folks

25   have.  While denying that they have the ability to get their

Page 95

1    documents, they also seem pretty confident about denying

2    that those materials -- that they would have relevant

3    materials.  We think we have reason to believe that they do.

4    But it's not like we're going to just make a motion instant,

5    we have somebody who can negotiate on their behalf.  We want

6    to talk about it.  And if we can't reach a reasonable

7    arrangement, we'll bring it to the Court.  But it has -- the

8    committee's view anyway, there has to be a process to allow

9    the meet and confer to play out and for there to be an

10   opportunity for a decision about what the proper scope of

11   disclosures for these folks would be.

12           THE COURT:  So you don't have a list of who these

13   people are?

14           MR. HURLEY:  We do not, Your Honor.

15           THE COURT:  Okay.

16           MR. HURLEY:  We have asked several times.  And the

17   information is definitely available, because by definition

18   the shareholder parties reached out to them and gave them a

19   copy.

20           THE COURT:  right.

21           MR. HURLEY:  So they definitely -- right.  So I

22   think it should be relatively easy for them to give a list

23   and identify counsel, which is what we've asked for.

24           THE COURT:  Right.  Okay.  So I can certainly

25   imagine some discovery from these people.  Is it all people

1    or is there other entities involved, too?  It's just people

2    I guess, right?

3                MR. HURLEY:  By definition it can include

4    entities.  I don't know if it does, because we don't have a

5    list.  But the contact requirement was with respect to known

6    issue of Mortimer and Raymond and their -- I believe it was

7    like their affiliated trusts and corporate entities,

8    something like that.

9                THE COURT:  Okay.

10               MR. HURLEY:  So it could include entities, but I

11   don't know if it does.

12               THE COURT:  All right.  So I can imagine that in

13   addition to relevance, which is a low standard, the burden

14   would not be material, at least in some respects.  I could

15   also imagine, however, that it would be perfectly reasonable

16   to respond to the communication from your first alternative

17   with a no and that that would not be cause necessarily to

18   say that they haven't done enough to comply with the

19   requirements to get a release, just that they were not

20   prepared to respond to discovery that, as you said, could

21   easily be overly broad.

22               So it would seem to me there should be some

23   mechanism, like we just dealt with with the IACs, where they

24   can engage you about what is appropriate to be produced.

25   Again, looking at the purposes for this discovery as far as

Page 97

1    avoidable transfers are concerned, we know where the money

2    went originally.  It's not clear that there would be any

3    reason at this point to track it beyond there if the money

4    is going to be appropriately dealt with in a settlement.

5    And at best it's relevant only with respect to a defense by

6    an immediate or intermediate transferee, which is probably

7    not worth either side pursuing at this time.

8            I don't think any of these people were

9    fiduciaries, right?  Almost by definition they're not

10   fiduciaries.  It's the other -- it's the ICSPs who were

11   within the subset of fiduciaries.  So again we are focusing

12   on whether there are claims either against these people on a

13   reasonable basis that creditors of Purdue would have, or --

14   and this is where I think it might be really worth the

15   candle -- they have information that wouldn't be produced

16   already as to whether there are claims against one or more

17   of the ICSPs.

18           So it would seem to me that it would be pretty

19   important to get down to those brass tacks with someone on

20   their end to see whether there even is an issue as to making

21   production.  I mean, it would seem to me that if they want a

22   release, they should produce something like their notes of

23   meetings where potential liability of either themselves or

24   others who would be getting a release would be discussed.

25   Although of course how much of that would be privileged is

Page 98

1    another story.

2            So that's my initial take on this, that there

3    shouldn't be an absolute bar to getting documents from them,

4    but at the same time there should be a process similar to

5    the IAC process where they're put on notice that they need

6    to step up and at least get someone to discuss with you --

7    and again, we've defined you as the four -- what discovery

8    is warranted.

9            MR. HURLEY:  That's really all we're looking for,

10    Your Honor, is a way to be able to do that.

11            THE COURT:  Okay.  So again, Mr. Joseph, I don't

12    know if you are the person that is in charge of interacting

13    with the Sackler-covered parties or if it's someone at

14    Milbank or -- you know.  But I think that needs to happen.

15    They need to know that it needs to happen if they're going

16    to expect getting a release.

17            MR. JOSEPH:  Your Honor, Gregory Joseph.  I just

18    want to correct one thing Mr. Hurley said.  And we of course

19    will do whatever the Court wishes us to do.  But we did give

20    them a list and a letter I'm looking at from April 23

21    identifying the additional covered Sackler parties.  On our

22    side it's 16 individuals, six of whom are minors, and ten of

23    whom never had any involvement at Purdue.  And the others

24    were things like summer interns.  But that doesn't mean that

25    we can't see if they have notes from meetings in years gone

Page 99

1    by about beneficiaries or anything.

2              THE COURT:  But again, I don't know if you all are

3    representing them or if they have separate counsel.  But --

4              MR. JOSEPH:  We represent some, Your Honor.  We

5    represent some, but not all.

6              THE COURT:  Well, maybe the first step -- because,

7    look, logically I would assume, but maybe this is wrong,

8    that someone who would actually go and hire your firm or

9    Milbank would be more eager to get a release and worried

10   about litigation than someone who is ten years old.  You

11   know --

12             MR. JOSEPH:  Your Honor, there are just some

13   technical issues.  One of the additional covered Sackler

14   parties is an ex-wife.  She is separately represented.

15             THE COURT:  Okay.

16             MR. JOSEPH:  I mean, there are just practical

17   issues.

18             THE COURT:  I would think that some of this

19   discussion could take place right away as to the people that

20   you or Milbank represent and that the others should be

21   promptly notified that if they actually do expect to get a

22   release, they need to engage in this process at least to

23   discuss what would be reasonable discovery.  And if they

24   said, well, you know, that's fine but we're going to force

25   you to serve us.  I may not approve a release for them at

Page 100

1   that point.  I don't know.  That's premature to decide at

2   this point.  But I think the process needs to start now.

3               MR. JOSEPH:  Understood, Your Honor.  And we look

4   forward to getting specific requests tailored to these

5   people.

6               MR. HURLEY:  And, Your Honor, it's Mr. Hurley

7   again.  We would respectfully ask for an instruction that

8   Side A provide a list of all covered parties, and to the

9   extent they know, identify counsel for the covered parties.

10  I would actually ask that the instruction be given to Side B

11  as well.  I know that we got a list from Side B, but my

12  understanding was that it was not represented to be a

13  comprehensive list of all covered parties.  So I think it

14  would be very valuable for us to at least note definitively

15  who those parties are and if they have counsel.

16              MS. BALL:  Your Honor, it's Jasmine Ball from

17  Debevoise and Plimpton for Side A.

18              THE COURT:  Yes.

19              MS. BALL:  We are happy to provide Mr. Hurley with

20  the list.

21              THE COURT:  Okay.  And, Ms. Ball, do you represent

22  any of these people?

23              MS. BALL:  Yes, we do.

24              THE COURT:  Okay.  So --

25              MS. BALL:  And we can pass on the message that you

Page 101

1    requested that we pass on.

2              THE COURT:  All right.  So then I'm going to bury

3    a little bit what Mr. Hurley said.  I think the discussions

4    should first take place between him and on your end someone

5    at Debevoise, and on Side B end somebody either at Milbank

6    or Joseph firm.  Because, frankly, I think your efforts to

7    resolve what would be a reasonable request considering not

8    just relevance but burdensomeness.  And, frankly, again, I

9    am concerned about the cost here.  I don't think it really

10   makes sense to get confirmation that someone who is a ten-

11   year-old really would have anything -- that there would be

12   any real benefits of getting anything from them.  And then

13   you can talk with individual lawyers where the work's

14   already been done.  And hopefully they will see the light

15   that they shouldn't be going to their clients to get a

16   better deal.  Particularly since I think I've laid out what

17   I think is the proper subject and scope of this type of

18   discovery.

19              MR. HURLEY:  Thank you, Your Honor.

20              THE COURT:  So I think that discussion should

21   happen very early next week.  And I would like -- rather

22   than getting a revised request, I'd like the parties just to

23   sit down and go through what they think should be covered.

24   And then you can give the request, and hopefully it will be

25   consistent with what you all agreed upon.

Page 102

1                For example, I don't think at this point it makes

2      sense to get detailed financial information from all of

3      these people.  When you have detailed financial information

4      from other people that shows that they can pay and they were

5      the immediate transferee, why you would need detailed

6      information from subsequent transfers, for example.

7                MR. HURLEY:  Your Honor, with this group of

8      people, the committee has shown in the past a willingness to

9      offer compromise in terms of scope.

10               THE COURT:  Okay.

11               MR. HURLEY:  We think we can get a counter, but

12     we'll still be willing to do that.  I apologize for being

13     dense, but will a list be provided of the covered parties?

14     Because that would be helpful for us to --

15               THE COURT:  I think both counsel said yes.

16               MR. HURLEY:  Thank you.  Okay.

17               THE COURT:  Okay.  Is there anything else?

18               MR. HURLEY:  So that only brings us back to

19     redaction, Your Honor.  And it may be that there's no

20     controversy there.  I already gave our view, assuming that

21     there aren't going to be -- no documents are going to be

22     redacted from outside professionals, the committee doesn't

23     have a concern.  And I think maybe that's the case.  But

24     obviously if there are others on the phone that have a

25     different view of how it's going to work, you know, we need

1    to know that.

2              THE COURT:  Okay.  Well, I think the silence is

3    your answer.

4              MR. HURLEY:  Yeah, it sounds like it.

5              MR. JOSEPH:  Yes, Your Honor.  Gregory Joseph for

6    Side B.  We understand that the responsive documents will be

7    provided to outside professionals without redactions, which

8    we'll actually expedite it since we won't need a redaction

9    log.

10             THE COURT:  Right.  Exactly.

11             MR. JOSEPH:  Agreed.

12             THE COURT:  All right, very well.  So I think

13   we're done on this.  Obviously, I stand ready if for some

14   reason some disagreement emerges out of this.  But I think

15   the record's pretty clear, and there is in fact a record of

16   this, and you can go and check it.

17             The last point I'd like to say is that I actually

18   believe a lot of information has been provided.  I fully

19   appreciate that the creditors here need material due

20   diligence to support the plan structure that has been

21   proposed.  But I think it's always important to focus on the

22   two aspects of that due diligence.  One is as to avoidable

23   transfer issues and claims that the Debtor might have, and

24   that other is on the third party release issues.  And at

25   some point the information process needs to stop because

Page 104

1    you're going to reach the point of diminishing returns in

2    terms of the cost versus the value.  We're not there at this

3    point.

4            I am pleased that the parties have been able to

5    reach agreement after already I think a considerable amount

6    of information that at least enables parties to perform due

7    diligence on a major portion of the issues before them.  So

8    I think that the schedule as laid out works for the rest.  I

9    trust that the parties are going to continue full-bore on

10   the mediation that they're engaged in and that this should

11   not slow that up.  But that as far as overall plan support

12   is concerned, the remaining discovery that we've just gone

13   through needs to happen.

14           So unless there are any more questions, I think

15   that concludes today's hearing.

16           MR. HURLEY:  Thank you, Your Honor.

17           MR. JOSEPH:  Thank you, Your Honor.

18           THE COURT:  All right, very well.  Thank you.  So

19   I'm going to sign off now, which will end the transcript.

20   Have a good weekend, everyone.

21               (Whereupon these proceedings were concluded

22               at 4:45 PM)

23

24

25

Page 105

1               C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 5, 2020

[& - accountant]                                                                              Page 1

| & | | | |
|---|---|---|---|

**&**   6:3 7:8,15 8:1
  8:16 10:1 21:11
  77:23

| 1 |
|---|

**1**   1:16 36:17 53:11
  59:14,21 63:9
  67:8,17 68:3,7,8
  68:23 77:16 79:5
  81:7,10
**1,100**   69:20
**10**   36:3 40:7 41:21
  75:18
**10.4**   73:19
**10001**   9:4
**10007**   6:15
**10017**   6:6 9:21
**10019**   7:4
**10022**   7:18 8:4,19
**10036**   8:12 9:13
  10:20
**1019**   2:6,10,17,23
  3:5 4:12
**10601**   1:14
**1087**   2:10 4:12
**1088**   2:18 4:12
**1089**   4:12,19 5:3
**1099**   2:25 5:8
**1100**   7:10
**1106**   3:6,19
**1107**   3:12
**1109**   3:22 4:7
**111**   4:21
**1110**   4:9
**1111**   4:15
**1113**   5:4
**1119**   5:10
**11501**   105:23
**1177**   10:19
**12**   18:24 22:18
  73:23
**1313**   10:3

**14**   36:25 37:5,6
  43:23 44:3,18
**15**   60:7
**151**   8:11
**15th**   53:11 63:9
  63:24
**16**   98:22
**17**   91:6
**17,000**   58:9
**17120**   10:11
**17th**   59:7 60:7
  66:11 67:18
**18,000**   74:11
**19**   72:12 91:18
**19-23649**   1:3
**19801**   10:4
**1995**   59:8 63:18
  63:21 64:6 65:24
  78:6
**1st**   60:12 61:2,3
  62:12,18 63:3
  64:13,21 65:1
  68:16 70:23 78:25

| 2 |
|---|

**2**   74:20
**20**   73:9 82:17
  83:13
**20005**   7:11
**2004**   2:3,9,15,23
  3:4,18 4:6 13:17
  14:10 23:15,19
  24:21 29:14 43:6
  53:24
**2008**   54:5 63:20
  67:22 68:25 73:19
**2010**   63:20 64:3
  78:3
**2012**   91:20
**2016**   54:5
**2020**   1:16 59:15
  105:25
**20th**   8:3

**21st**   60:3
**23**   98:20
**24**   18:15
**248**   1:13
**26**   4:18 5:2 36:17
**26th**   50:23
**2:10**   1:17

| 3 |
|---|

**3**   74:20 82:21
**30**   25:9 27:6
**300**   1:13 105:22
**309,000**   64:4
  78:24
**31**   7:3
**330**   105:21
**340,000**   67:14

| 4 |
|---|

**4**   74:20
**44**   67:23
**45,000**   62:7
**450**   6:5
**46th**   8:11
**475**   59:11 63:9
  66:17
**475,000**   59:5,14
  66:13 67:5 69:12
**485**   8:3 9:20
**4:45**   104:22
**4th**   60:4 66:8

| 5 |
|---|

**5**   40:7 41:21 74:21
  105:25
**50**   34:18 41:22
  84:19 87:21
**50,000**   58:7,8
**52nd**   7:3
**535,000**   67:17
**55**   9:3

| 6 |
|---|

**6**   74:21
**6,000**   58:7,7

**60,000**   62:8
**63,000**   67:4
**65**   67:6,7

| 7 |
|---|

**700**   58:6
**7th**   14:10

| 8 |
|---|

**8**   20:5,13 22:18
**80**   67:6 68:10
**86**   6:14

| 9 |
|---|

**9016**   2:4,16 3:4,18
  4:6
**919**   7:17 8:18
**9th**   30:22

| a |
|---|

**aaronson**   9:18
**abetting**   54:15
**ability**   17:15 35:2
  81:2,21 94:25
**able**   13:11,24 18:1
  33:17 36:25 38:8
  42:10 52:12 67:16
  68:2 72:10,11
  81:19 98:10 104:4
**absent**   65:15
**absolute**   98:3
**absolutely**   21:19
  56:11 64:24 65:1
  71:19 74:2 82:1
  93:8
**absolved**   57:1
**accept**   88:2 94:10
**acceptable**   37:11
**access**   17:24
  18:18 47:17 52:3
  53:22 72:10,11
**account**   30:12
  31:11,13 32:2,17
  33:15 40:20
**accountant**   62:22
  75:25

accounting 56:4
accounts 21:5
  55:22 78:7
accurate 105:4
accurately 17:4
acknowledge
  81:13
action 50:11 70:3
actions 35:6 87:23
active 87:16
activities 57:5
activity 33:15
actual 92:21
ad 2:1,5,8,13 3:1,8
  3:11,16 4:4,11,13
  7:2 8:10 10:16
  13:16,22 14:9,21
  17:16 18:17 20:21
add 21:1 52:17
  64:5
addiction 56:20
addition 13:8
  54:17 96:13
additional 13:25
  20:25 36:22 52:19
  60:10,17,25 61:6
  61:9 64:5,8,9 65:5
  74:24 78:5,5
  92:15 94:19 98:21
  99:13
address 19:22
  34:5 35:1,9 40:21
  40:22 51:3 71:20
  75:20 80:22 87:1
  92:17 93:10
addressed 73:3
addresses 35:3,4
  35:9
adds 26:3
admits 60:6
admitted 54:17
admittedly 15:8

adopted 56:23
advance 16:11
  40:7
advisor 37:17
  39:12,21 42:15,20
  58:9 75:7,25
advisors 16:16
  39:11 44:20 52:2
  56:4 58:3 91:16
advocacy 14:15
affairs 57:8 91:16
affiliated 96:7
affiliates 53:10
  55:12 57:1 71:8
  90:20
afternoon 13:2
agenda 91:19,21
agents 18:15
ago 14:10 25:11
  37:16 73:18 75:13
agree 27:2,24
  40:3 76:14 77:24
  84:12 91:7 92:19
agreed 17:22
  18:12 46:12 59:5
  59:12,13,17,19
  60:1,25 61:8 62:4
  62:8,24 63:10,15
  63:18,23,24 67:11
  67:14,18,19,19,20
  77:17,18 78:13
  79:6 82:22 84:25
  85:9,25 101:25
  103:11
agreement 41:12
  46:13 62:21 79:9
  104:5
agreements 32:23
  65:19,21
ahc 39:13
aiding 54:15
aimed 54:2

akin 9:9 47:4,10
  72:1 87:9
al 2:24 3:22 4:9
  13:3 91:21
alex 9:6 49:25
alexander 11:20
alfano 11:10
alice 11:9
allegation 18:24
alleged 56:14,15
  56:20
allow 95:8
allowing 18:14
allows 72:24
alternative 59:18
  59:22 62:13 63:4
  96:16
alternatively 94:6
altogether 37:10
americas 10:19
amount 25:8 38:2
  54:6 57:17 67:15
  75:3 104:5
analysis 31:19
  37:24 39:7 41:25
  76:20
anderson 10:1
andrew 2:5 3:5,11
  3:12 7:6 11:10
  13:20 88:6
answer 23:9 36:5
  55:24 103:3
anybody's 35:17
anyone's 15:3
anyway 76:2
  94:12 95:8
apologies 61:17
apologize 27:20
  66:18 102:12
apparently 91:15
appeared 81:21
appearing 11:1
  85:16

appears 20:4
application 2:22
  5:7
applications
  32:19 49:23 50:3
applied 63:11
apply 50:6 63:15
applying 59:6
  67:4
appoint 81:18
  87:8
appreciate 17:1
  26:9 79:14 88:9
  88:20 103:19
approach 58:16
  82:11
appropriate
  21:19 33:10 40:24
  94:21 96:24
appropriately
  20:16 97:4
approve 99:25
approximately
  54:5 64:4
april 4:18 5:1
  14:10 30:22 50:23
  59:7 60:3,7 66:11
  67:18 98:20
archer 11:13
areas 17:4
arguably 39:5
  57:23
argument 23:5
  50:25 58:23
arguments 62:14
  88:9
arik 4:1 9:16
arrange 86:13
arrangement 95:7
arrangements
  20:15 74:16
art 1:25

artem 11:23
ascertained 67:12
asked 13:24 30:16
 30:25 51:6 61:24
 62:2 68:5 69:19
 82:19 85:17 94:6
 95:16,23
asking 32:1 53:8
 80:13
aspects 17:20 53:7
 59:16 103:22
assess 38:8
associated 35:16
 59:25 63:2 86:11
assume 18:16
 22:13 50:18 89:8
 89:10,17 99:7
assumed 48:23
assuming 43:12
 89:13 102:20
assure 29:8
assured 57:19
attached 22:20
attaching 91:19
attempted 35:23
attempting 36:1
attended 92:5
attention 34:21,23
 65:12 91:17
attorney 6:13
 7:16 8:2,10 9:2,10
 9:19 10:2,8,9,16
 19:16 38:15 45:17
attorneys 6:4 7:2
 7:9 8:17 17:18
 20:9 34:17,17
 37:18
audit 67:22 68:24
auditing 36:12
auth 32:22
authority 22:1
 81:2 82:5,6,23

authorizations
 32:17
authorized 28:9
 28:11 31:10 94:10
authorizing 2:2
 2:14 3:2,17 4:5
available 44:21
 45:5 46:17 51:23
 53:18 54:1 58:11
 93:12,18,21,25
 95:17
avenue 6:5 7:17
 8:3,18 9:20 10:19
avoid 22:12 27:25
avoidable 71:3
 97:1 103:22
avoidance 89:16
avoided 28:20
avoiding 22:11
aware 16:24
 23:12 54:4

b

b 1:21 20:10
 36:11,17 58:6,7
 59:4,11,11,18,23
 60:4,6,24 61:14
 61:21 62:4,20,21
 62:23 63:8,10
 64:7 66:8,10,21
 66:23 82:4,4,14
 82:14 83:4 86:20
 94:23 100:10,11
 101:5 103:6
b's 66:13
back 17:15 20:3
 21:6 22:10 28:23
 30:20 32:9,10,13
 33:22,25 42:18
 48:21 63:21 64:6
 65:24 66:5 67:22
 68:9,25 69:22
 77:9,25 78:3,6,21
 79:9 82:8 102:18

background
 13:25
bag 53:4
bake 46:23
balance 18:17
balk 24:14
ball 2:17 5:3,4
 8:21 77:22,22
 78:23 79:11,14
 100:16,16,19,21
 100:23,25
bank 21:6 28:10
 28:12 32:7,8,21
 33:8 67:22
bank's 51:9,18
banker 42:8
banking 23:1 24:7
 24:12 31:12
bankruptcy 1:1
 1:12,23 2:4,16,23
 3:4,19 4:6 49:8,9
 49:10,10,16 56:12
banks 25:24 26:24
 27:3,5,7 28:1,3,4
 28:23,24 29:4,7,9
 29:10,15 30:1
 31:20 36:21
bar 98:3
barker 11:12
based 16:20 18:23
 29:8 42:5 51:4
 52:6 58:17 60:13
 64:2 85:2
basic 41:2
basically 88:23
basis 14:12 19:7
 39:6,8 43:22
 44:11,22 51:22
 91:10 97:13
batteries 61:16
beacon 2:17 5:1,4
 8:17

beat 46:7
beginning 28:5
 57:18 63:17 66:8
 71:17
behalf 2:5,17,24
 3:11,20 4:8,13,20
 5:4,9 13:21 47:4
 84:12 85:14 94:11
 95:5
belabor 52:17
believe 16:3 22:5
 24:22 55:20 57:10
 62:23 65:11 68:6
 68:8 73:18 76:1
 77:19 79:18 82:16
 90:9 94:12 95:3
 96:6 103:18
believed 80:6
believes 52:16
 65:2 94:5
believing 91:10
beneficial 82:22
beneficiaries
 90:25 99:1
beneficiary 91:15
benefit 15:17
 48:17
benefits 101:12
benjamin 6:9
best 77:7 97:5
beth 7:16
better 101:16
beverly 67:24
beyond 40:10
 46:14 56:18 97:3
biased 15:5
big 22:25
billion 73:19
 75:18
billionaires 57:4
billions 15:22
 18:21,21 56:21
 90:25

bills  50:14
birnbaum  11:6
bit  62:7 71:16
101:3
blame  56:7
board  32:17 56:4
59:9,10 61:5
63:12 83:4 87:5
91:21
bonds  38:6
books  91:8
bore  104:9
bound  18:13
19:16 74:6
brady  11:19
brass  97:19
breach  19:12
54:14 70:12 71:4
breath  41:7
brian  6:18
brickley  11:25
brief  35:24 36:3
67:9,10,21
briefly  40:14 73:3
80:22
bring  77:9 95:7
bringing  64:5
brings  58:22
79:19 90:10
102:18
broad  15:19 96:21
broader  73:13
91:14
broken  64:14
brooks  11:12
brought  65:12
bryant  9:12
bs  78:25
burden  23:3 24:2
27:25 52:19 59:25
60:11,13,20,20
62:15,17 63:1
64:9,15,16 68:21

86:11 93:20 96:13
burdened  23:5
burdensome  18:8
57:7 72:4,19
burdensomeness
101:8
bury  101:2
business  16:15,15
35:11 91:25

c

c  6:1 13:1 40:7
105:1,1
call  89:2
called  31:25 71:24
80:9
canceled  32:18
candle  97:15
capable  42:10
caplin  7:8
cards  32:17
carefully  30:23
caroline  10:22
11:21
carroon  10:1
carved  72:3
case  1:3 15:3
17:21 18:6,15,19
23:9 24:5,11,18
26:11 30:11,24
37:25 38:9 43:6
45:12 49:9,17,22
56:12 60:8 64:15
65:1 70:19 74:18
75:13 79:25 81:7
82:21 88:11 89:8
89:10 90:17,20
93:4,5 102:23
cases  13:6 18:1
35:18 45:15 49:18
53:19 54:3,15
56:9 57:10,18
58:2 65:17 80:7
87:15 90:15 91:12

92:7,9 94:1,20
cash  32:22 74:15
cast  56:7
cat  53:3
catalog  74:9
categories  35:1
36:19 41:15 65:9
category  55:19
61:13 62:20 90:7
90:11
cause  35:22,24
36:2 80:2 96:17
caused  56:19,21
causes  70:3
caution  74:7
caveat  33:19
ceased  88:23
certain  2:3,15 3:3
3:17 4:5 13:5
32:19 45:15 63:9
66:14 71:17 73:1
87:22 89:12
certainly  49:5
66:2 69:9 95:24
certificate  16:23
20:3 27:2
certified  90:22
105:3
certify  28:16
cetera  32:8 65:24
72:21 93:20
challenge  51:13
challenged  35:5
chambers  6:14
30:22
chance  68:6 72:6
90:21
change  21:2 31:18
changed  30:13,15
changing  66:6
charge  49:8 98:12
check  103:16

checked  73:23
checks  32:18,22
chief  18:15
christian  11:16
circle  7:10
circuit  18:9,11
circulate  43:13
circumstances
57:5 60:8
claim  40:1
claimants  2:20
4:14 5:7 8:2 10:18
claimed  80:10
claims  15:13,14
15:15,18,21,22,23
54:2,9,12,12,13
61:24 70:1 71:4,7
71:9,15 76:6
97:12,16 103:23
clarification  48:1
72:24
clarity  48:4 50:4
class  2:20 5:7 8:2
cleanest  29:7
clear  14:19 20:10
30:11 43:12 47:17
63:7 71:21,22
73:1,22 74:23
77:1 82:13 84:4
92:19 97:2 103:15
clearer  38:19
clearly  19:9,12
61:19 76:5 80:23
client  13:9 37:18
client's  20:1
clients  17:17
84:14 101:15
close  60:7 75:24
94:13
cloyd  12:2
clue  38:22
cohen  7:16

[coleman - contact]                                                    Page 5

coleman 11:7
collateral 32:23
colleagues 25:7
collectively 49:5
  81:11
columbia 18:16
come 17:15 22:10
  28:3 32:13 33:2,9
  33:22 37:9 43:21
  60:23 66:5 68:9
  69:22 72:17 79:8
  79:9 82:8
comfort 75:3
comfortable
  26:24
coming 51:4,19
  74:13,15
commercial 56:13
commit 25:19
  64:1,12
commitment
  66:13,15,16 67:9
commitments
  66:12
committed 67:8
  68:3,15,23 70:22
committee 2:21
  3:14,21 4:2,8,13
  9:10 10:16 13:24
  14:9,20,21 18:17
  31:2 34:14 47:1,4
  51:14,16 52:16
  53:8,22 57:6,19
  58:5 59:6 60:5,7
  61:22 64:18,25
  65:2 66:6 70:7
  72:15 73:24 74:24
  75:2,6 80:1,3 81:9
  81:16 85:13 90:1
  91:5 93:3,10 94:5
  94:6,17 102:8,22
committee's 4:18
  5:1 20:22 51:9,25

58:15,25 63:14,16
  82:12 90:13,23
  91:8,18 95:8
committees 4:11
  37:13 74:18
committing 62:11
common 45:21
commonwealth
  10:9
communication
  96:16
communications
  69:11
companies 38:7
  67:23
company 2:18 5:1
  5:4 8:17 72:10
  75:12 86:1
compel 60:19,22
  62:16 86:4 92:24
compelled 23:13
  23:15 24:2
compiled 64:2
complaints 54:11
complete 37:12
  53:10 59:14 61:3
  62:11,13,18 64:21
  66:25 77:21
completed 28:22
completely 51:23
  69:1 75:6
completeness 26:3
completing 60:14
  64:12
completion 64:1
comply 64:17
  80:19 83:7 87:5
  96:18
components 48:4
comprehensive
  57:13 100:13
compromise
  72:18 86:14 92:13

92:20,23,25 102:9
compulsion 58:20
compulsory 14:12
  22:21
conceivable 85:23
concepts 54:17
concern 18:14,22
  19:19 30:16 51:14
  51:15 52:1 77:3
  85:10,12 86:14
  102:23
concerned 34:11
  48:9 69:6 70:14
  97:1 101:9 104:12
concerning 2:21
  5:8
concerns 82:12
concessions 59:1
  59:2 63:13
conclude 18:5
  81:5
concluded 104:21
concludes 104:15
conclusion 36:7
concrete 65:16
conditions 18:20
conducted 54:20
confer 62:5 69:15
  86:12 92:14 93:8
  95:9
conference 13:4
  30:22
conferral 84:6
conferred 84:7
conferring 47:25
  48:5
confers 36:23
confidence 37:12
confident 95:1
confidential 17:23
  19:6 34:1,1,6,7,12
  34:13 42:13 44:21
  45:1,25 46:9

52:15
confidentiality
  18:25 20:7 21:15
  52:6 74:7
confine 92:4
confirm 23:18
  47:8 48:25
confirmation
  101:10
confirmatory
  70:18
confirmed 15:11
  44:2
confusion 19:5
connection 5:6
  13:19 18:19 27:9
  43:9 51:8 94:2
consensual 50:14
consent 87:14
consenting 2:2,5,9
  2:14 3:2,8,11,16
  4:4 7:2 47:14,14
  74:18,25
consider 57:11
considerable
  104:5
consideration
  13:6 18:4 93:12
  94:1
considerations
  16:20 18:3
considered 71:6
considering 101:7
consist 58:9
consistent 47:10
  84:24 101:25
consisting 16:15
conspicuously
  22:20
constantine 8:7
constructive 54:8
contact 90:18
  96:5

[contemplates - creditors]                                          Page 6

contemplates  71:6
91:4
contended  79:22
contention  79:24
contentions  71:13
context  13:25
18:10 30:24
contingent  4:14
10:17
continue  48:10
94:4 104:9
continues  74:5
contracts  75:4
contractual  74:16
contribution
37:21
control  53:15
55:14,15 56:6
62:25 79:20,23
80:16,17,24,25
81:6,14 82:9
84:25 86:8
controversy  59:3
102:20
conversation
86:16 87:1
conveyance  54:8
54:11 61:23 76:6
76:6,24
cooperation  25:15
cooperative  27:5
69:18
coordinate  90:3
coordinating
88:25
copies  47:8
copy  17:25 89:6
90:20 93:16 95:19
core  74:17
corporate  96:7
correct  37:7 44:12
46:20 52:8 61:7
61:11 62:11 68:4

70:16 77:19 84:17
90:4 98:18
correcting  79:14
correspondence
31:13 32:7
cost  17:20 42:9
48:16 101:9 104:2
costs  47:25 48:5,6
50:5
counsel  16:10
20:6,13,19 21:6
26:20 32:25 34:2
37:4,11,12 41:2
41:20,24 42:24
43:23 44:17 52:2
72:7 83:5 85:14
85:16,17,18 86:24
86:25 87:8,25
88:1,1,14,15 94:9
94:10 95:23 99:3
100:9,15 102:15
counsels  88:1
counter  92:22
102:11
counterparties
16:16 35:11,13,15
38:21 44:20
counterparty
35:19 36:2
counterproducti...
35:18
countries  84:19
87:22
country  56:16,19
105:21
couple  82:12
course  14:3 15:25
31:1 37:5 40:4
53:24 54:13,25
74:19 93:19 97:25
98:18
court  1:1,12 13:2
13:5,10,14 14:4

15:24 16:1 17:5,8
17:11,15 18:22
19:11,17,18,21
21:2,8,13,22 22:8
22:16,22,24 23:13
24:10,20 25:10,14
25:19,21 26:6,8
26:19 27:12,17,18
27:19,24 28:8,9
28:24 29:2,14,18
29:21 30:4,10
31:9,18 32:11,24
33:6,19 37:2,14
38:10,12 39:1,10
39:14,17 41:1,6,9
42:17,23,25 43:14
43:17,24 44:1,5
44:10,12,14,23
45:1,3,10,16,19
46:3,11,20,22
47:6,12,19,23
48:8,14,24 49:1,3
49:15 50:7,10,12
50:21 52:5,9,11
52:22,25 53:2,8
53:13 54:24 55:1
55:6 56:1 58:20
59:24 61:4,8,12
61:19 65:19,23
66:20,24 68:1,9
68:13,19 69:6,13
69:22 70:12,17
71:1 72:22 73:10
74:2,10,14 75:19
76:8,11,17,19
77:10,13,17,20
78:20 79:4,12
80:19,21 81:4,23
81:25 82:2,20
83:8,17,21,22,23
84:11,18,23 85:4
85:10,21,23 86:18
87:3,7,19,24 88:5

88:20 89:8,10,13
89:17,19,21 90:2
90:5,7,17 93:13
94:1 95:7,12,15
95:20,24 96:9,12
98:11,19 99:2,6
99:15,18 100:18
100:21,24 101:2
101:20 102:10,15
102:17 103:2,10
103:12 104:18
court's  85:15 91:2
94:3
court's  65:12
cover  42:19 90:14
covered  2:12 20:8
21:12 53:14,17
56:25 57:8 68:15
80:18 81:11 89:17
90:16,17,24 91:5
91:10 92:15,16
93:5,11,15,16,23
93:24 94:3,4,8,9
94:11,14,19,23
98:13,21 99:13
100:8,9,13 101:23
102:13
covering  46:12
covers  42:25
50:20 65:14 90:7
covid  72:12 78:2
crack  66:6
crafted  59:6 61:23
created  58:10
61:22
creates  15:14
52:19
credit  32:18,22
38:13
creditor  57:9
creditors  2:22
3:14,21 4:2,9 9:11
13:23 14:20 47:5

[creditors - directed]                                                Page 7

49:12 57:20 58:19
71:9 92:10 97:13
103:19
**crisis**  57:2,15
**criteria**  60:4,7
62:2
**critical**  54:2 56:9
71:16 90:2,13
92:6
**critically**  38:8
89:25
**cross**  73:23
**crucial**  18:18
**crucify**  25:7
**current**  16:15
35:12 37:16 44:19
55:16 57:16 60:6
**currently**  67:3
**custodians**  54:18
55:1,2 59:20
61:25 62:6 64:3
71:23 78:12 79:15
92:21
**custody**  53:14
55:13,14 56:6
62:25 79:20,23
80:17,24,25 81:14
**cut**  32:9,9 63:19
81:25
**cutoff**  59:9

**d**

**d**  1:22 3:9 13:1
36:3
**daniel**  8:24
**danielle**  11:3,11
**data**  14:22 15:2
17:21 31:5 74:2
74:22 75:4 78:6,6
78:12,14,15
**database**  46:19
**dataset**  78:1
**date**  23:10 31:2
58:14 59:8,10,20

61:5 63:9,22
66:14 67:1 71:17
78:15 89:12
105:25
**dated**  59:6
**dates**  66:1 78:21
**david**  6:17 12:6
48:2 59:8 67:24
69:11
**davis**  6:3
**day**  73:14
**days**  25:9 27:6,8
30:2 36:25 37:6
43:23 44:3,18
60:8 66:18 69:19
**dc**  7:11
**de**  10:4 72:24
**deadline**  59:17,18
59:22 62:13 63:4
64:1 65:10 77:4
77:23 79:8
**deadlines**  63:11
77:17
**deal**  22:9,9 85:17
101:16
**dealing**  89:4
**dealt**  96:23 97:4
**dean**  8:7
**death**  56:20
**debate**  33:9
**debevoise**  8:16
21:11 77:23 94:15
100:17 101:5
**debit**  32:19
**debtor**  1:9 69:25
103:23
**debtors**  6:4 15:17
47:13 58:12 69:25
70:1,3,3,4,14,15
73:16 74:8 75:1
81:8 89:23 91:6
**decades**  76:1

**decide**  82:9 86:3,5
100:1
**decision**  18:19
95:10
**decisions**  30:25
76:2,23 92:8
**declaration**  4:1
**dedicated**  73:24
75:7
**deemed**  52:4
**deep**  41:7
**defense**  97:5
**defer**  87:9
**defined**  98:7
**definitely**  95:17
95:21
**definition**  95:17
96:3 97:9
**definitively**
100:14
**delay**  23:3,4 24:18
26:5
**delays**  29:10
**deliberately**  64:22
**deliver**  80:3
**delivered**  44:17
**demand**  36:6 87:5
**demands**  83:4
**denominator**
45:21
**dense**  102:13
**denying**  94:25
95:1
**department**  6:12
**depend**  77:11
**depending**  44:16
**deposit**  32:18
**deposited**  32:18
**described**  47:11
91:20 92:6
**describes**  17:4
**description**  31:12

**designate**  37:6
45:14
**designated**  41:19
42:13
**designating**  17:13
**designation**  16:11
20:9 34:10 42:18
51:7,11
**designations**  20:7
46:7 51:11
**designed**  74:1
**designees**  34:16
**detailed**  64:8
102:2,3,5
**determination**
40:7
**determine**  39:8
59:24 86:10
**determined**  60:9
**determining**  38:1
**didn't**  68:16
**differences**  16:24
**different**  16:7,7
16:19 41:15,22
49:23 56:8 73:23
84:22 85:5,8
87:21 89:24
102:25
**differently**  38:20
84:11,15
**difficult**  65:17
**diligence**  40:11
41:3 58:4 80:15
86:15 103:20,22
104:7
**diminishing**  104:1
**direct**  82:5 84:13
84:14,21,23 85:24
87:8 90:25 91:17
**directed**  55:8,23
76:15 83:24 84:24
88:2

**directing** 87:25
93:15
**direction** 87:12,14
88:14,24 89:6,7
89:11 91:23
**directly** 15:16
18:1 20:2 21:16
29:7 37:3 47:18
81:12 85:18
**directors** 81:18
83:4 87:5,8 91:16
92:4
**disagreement**
44:5 103:14
**disappeared**
86:22
**disappointing**
58:14
**disbursement**
32:21
**disclosed** 40:10,19
42:3
**disclosing** 35:19
**disclosure** 41:14
53:9 55:21 56:3
**disclosures** 57:13
57:20 58:14,24
93:7 95:11
**discovery** 2:21 3:9
4:11,18 5:2,8 13:4
13:6 14:1,11
15:10,20 16:5
18:11 20:1,12,18
22:1,6,12 25:8,24
25:24,25 27:12,13
30:6,16 36:18
43:10 47:13 49:24
50:5 53:18,23
54:2,13 56:8 57:7
58:18,21 60:18
69:23,24 70:22
71:2,11 76:15
89:25 90:15 92:4

95:25 96:20,25
98:7 99:23 101:18
104:12
**discuss** 91:16 98:6
99:23
**discussed** 21:15
22:4 45:11 97:24
**discussing** 91:19
**discussion** 51:1
93:6 94:21 99:19
101:20
**discussions** 46:24
101:3
**dispute** 19:3,8
29:6 65:7
**disputed** 80:25
**disputes** 2:21 3:9
4:11 5:8 14:1 43:3
**dissenting** 74:19
**distance** 18:7
**distinction** 92:20
**distribution** 91:22
**distributions** 74:9
74:16
**district** 1:2 18:16
**diversification**
91:24
**divestment** 91:24
**dividends** 54:14
75:5,12
**dizengoff** 3:20 4:8
**docket** 73:16
75:13
**document** 2:10,17
2:23 3:5,19 4:7,12
4:19 5:3,8 13:18
52:4 83:14 84:9
85:24 93:23
**documented**
93:25
**documents** 14:16
18:1,7 19:6,9
22:14 23:11,19

26:1,4 28:17,22
29:7,8 30:1,18,19
30:19 31:6,7
32:20,21 33:13
34:10 44:21 45:14
46:17 47:8 51:17
51:20 52:20 53:15
53:17,25 55:17,18
55:20 58:1,6,9,11
59:5 60:14 61:25
62:1,3,7,9,19,25
63:3 64:2,4,5,8,11
65:5,8 66:5,7,13
67:4,6,13,14 72:1
72:14,21 73:2
77:11 78:24 79:2
79:20,23 80:3,5,9
80:11,16,20 81:1
81:3,14,19 82:7
82:16,24 83:5,13
83:15 84:7,8 86:8
86:10,12 88:18
91:5,7,9 93:5,11
93:17 94:24 95:1
98:3 102:21 103:6
**dog** 74:23
**doing** 15:4 20:1
22:12 39:3 41:23
47:12 49:19,24
57:21 74:12 89:1
**dollar** 26:15 74:3
**dollars** 15:22,23
18:21 56:22 73:19
**don't** 39:12
**door** 84:25
**doubt** 89:16
**dougherty** 12:5
**download** 17:25
**draft** 43:13 48:22
**drafted** 50:19
**drain** 1:22 3:9
13:2

**drysdale** 7:8
**due** 41:3 103:19
103:22 104:6
**duplicate** 22:12
72:25
**duplicative** 70:22
**duty** 54:14 70:4,6
70:13 71:4

**e**

**e** 1:21,21 6:1,1
8:24 13:1,1 105:1
**eager** 99:9
**earlier** 20:11
**early** 101:21
**easily** 96:21
**easy** 31:21 32:2
40:5 41:13,17,20
95:22
**eaten** 49:12
**ecf** 2:6,10,18,24
3:5,12,22 4:9,15
4:20 5:4,10
**eck** 10:13
**eckstein** 4:13,14
**ecro** 1:25
**edward** 8:14
**effect** 70:11
**efficient** 26:1,25
**effort** 15:4 72:2
**efforts** 101:6
**eighth** 91:24
**either** 36:19 44:16
60:12 97:7,12,23
101:5
**elaborate** 55:7
**electronic** 13:7
**electronically**
55:5
**eliminate** 59:2
**email** 30:9 35:3,9
78:7 91:18 92:17
**emails** 55:4,10,11
55:12 59:7 72:25

emanating  13:14
emerges  103:14
emphasize  56:15
  76:7
employed  91:12
employee  62:22
enable  20:13
enabled  43:7
enables  104:6
ended  60:16
enforcement
  18:15
engage  58:18 72:6
  94:18 96:24 99:22
engaged  104:10
enjoying  91:1
ensure  93:4
entail  64:10
enter  53:16
entered  93:4
enterprises  15:18
entire  74:10
entirely  13:7,7
  56:3
entities  7:9 15:9
  41:23 96:1,4,7,10
entitled  27:3 43:5
entity  15:23 38:13
enumerated  83:14
environment
  78:10
equitably  40:2
eric  2:24 11:17
escaped  56:2
esi  25:25 30:16
  53:11 54:21,22
  55:10 59:7 60:25
  61:6 62:21 63:16
  64:21,22,25 65:10
  75:22
esl  30:10
especially  56:10

essential  56:11
establish  64:16
  80:23
estate  15:13,13,15
  15:22 39:16 50:15
  54:13 61:24 76:2
estates  54:7 70:1
estimate  68:5
estimated  56:21
estimating  66:17
et  2:24 3:21 4:9
  13:3 32:8 65:24
  72:21 91:21 93:20
evaluate  36:6,11
  38:16
evaluating  42:5
evaluation  39:7
eventually  29:22
everybody  19:10
  77:3
evident  33:11,12
  33:14
ex  2:1,13 3:1,15
  4:3 99:14
exact  66:1
exactly  52:8,10,17
  89:22 103:10
examination
  13:17
examinations  2:2
  2:14 3:3,17 4:5
example  38:4,23
  81:20 91:6 102:1
  102:6
excellent  53:6
excised  52:21
exclusively  55:4
excuse  44:25
  58:24
executable  43:16
  46:16
executed  16:23

exercise  40:19
  41:18 42:11 48:11
exhibit  27:10
  91:17
exist  86:10
existing  47:24
  89:17
expand  59:19
expanding  59:25
  67:5
expect  15:3,11
  31:3 83:7 84:5
  88:17 98:16 99:21
expected  14:14
expects  43:3
expedite  103:8
expense  74:22
expensive  48:11
experience  25:23
  25:23 26:10 29:21
  34:22 58:17
explain  38:19
  52:14 88:2
explained  53:24
  78:1
explanation  36:7
exploration  38:6
extend  18:16
extends  22:2
extension  60:10
extent  24:12
  33:14 51:11 69:10
  94:9 100:9
extraordinary
  74:21
extreme  74:7
extremely  15:19
  26:1 74:8
eyes  16:12,13
  17:14,14 33:25
  34:5,6,12,12
  43:21 44:25 45:15
  45:25 46:8,18,18

51:8,10,22

**f**

f  1:21 2:24 105:1
face  79:25
fact  19:8 31:22
  37:23 56:8 62:4
  65:9 69:24 79:16
  81:21 88:8,11
  103:15
factor  81:13
facts  80:22 86:5
factual  17:21
  29:25
failed  62:17
fair  50:17 84:1
  85:2
faith  19:3,8 86:13
  93:8
families  50:6
family  2:8 3:10
  4:17,20 5:10 9:2
  9:19 16:8,25
  19:23 22:5 25:5,5
  30:14 33:17 35:5
  35:6,16 36:1,8
  53:10 54:19 56:18
  56:24 57:3 62:23
  75:11,25 76:22
  88:14,15 89:1
  91:11,14,21
family's  18:24
  35:19 69:3
far  23:12 69:6
  70:12,14,17 72:18
  76:12 96:25
  104:11
farther  32:6
fashion  69:16
faster  69:2
favor  81:13
february  60:4
  66:8

**federal**  2:4,16 3:4
  3:18 4:6
**fee**  49:22 50:3
**feel**  13:10
**fewer**  66:7
**fiduciaries**  70:13
  97:9,10,11
**fiduciary**  54:14
  70:4,6,13,15 71:4
**fight**  74:23
**figure**  26:15 40:18
**file**  32:9 33:20
**filed**  2:4,17,23
  3:10,20 4:7,12,19
  5:3,9 13:5 14:9
  54:11 58:5 66:15
  67:10,21 90:23
**files**  23:23 32:7
**filings**  67:21
  68:24 77:25
**final**  62:20
**finances**  15:6
**financial**  2:3,15
  3:3,17 4:5 14:11
  15:6 20:2,12,15
  20:15,25 21:16
  22:13,21 23:1,11
  23:20 24:3,8,8,13
  24:13,15,20,25
  25:3,15,17 27:15
  36:22 37:17 39:10
  39:12,21 42:14,20
  43:20 44:20 46:2
  58:4 67:21 68:24
  75:25 102:2,3
**find**  79:9
**fine**  37:8,11 41:9
  47:16,16 53:5
  87:11 99:24
**finish**  59:21 61:1
**finished**  51:2 69:2
**finite**  67:15

**firm**  36:24 47:9
  99:8 101:6
**firms**  48:10
**first**  13:9,24 17:6
  23:1,10 32:1,11
  35:2 47:9 48:7
  51:3,6 53:8 58:22
  59:1,12 63:14,25
  65:14 66:12 67:17
  69:24 71:1 81:7
  82:13 85:19 91:22
  92:16 96:16 99:6
  101:4
**firstly**  16:14
**five**  49:23 78:12
**flatly**  80:2
**floor**  8:3
**florida**  40:23
**flow**  15:16,16
**flows**  15:10
**focus**  16:1,4 54:12
  55:16 103:21
**focused**  30:13,22
  31:16 56:8 74:20
**focusing**  22:11,25
  52:7 97:11
**fogelman**  11:8
**folks**  56:2 94:24
  95:11
**follow**  27:12
  40:24 57:24
**following**  43:19
**force**  99:24
**forced**  35:21
**foregoing**  105:3
**forensic**  74:12
**forget**  30:14
**form**  37:22 58:20
  68:21
**formal**  91:9
**former**  35:14
**forms**  32:19

**formulate**  33:1
**forth**  27:10
**forthcoming**
  14:17
**forward**  24:18
  60:23 64:3 65:18
  94:5 100:4
**four**  49:23 50:25
  63:16 64:3 78:15
  79:16 89:20,21,23
  98:7
**fourteen**  91:25
**fourth**  53:19
  91:22
**framework**  56:23
  57:3
**frankly**  18:2 39:2
  80:5,10 101:6,8
**fraudulent**  54:8
  54:11 61:23 76:5
  76:6,19,24
**free**  41:18
**full**  69:19 73:16
  104:9
**fully**  29:8 83:7
  103:18
**fund**  36:10,11
  37:23 38:7,12,24
  38:24 42:5,5
**fundamental**  15:5
**funds**  38:16
**further**  17:15
  39:8 50:1 78:1
  87:7,14
**future**  65:13
  91:25

**g**
**g**  13:1
**gange**  10:22 11:21
**gas**  38:7,24
**gather**  42:3 70:8
  78:13

**gathered**  78:2
**gathering**  26:1
  65:4
**general**  10:8
  31:12 37:19 38:15
  45:18
**generally**  29:19
  51:11
**generals**  19:16
**generated**  59:11
  75:4
**generically**  38:14
**gentin**  11:3
**george**  7:13
**gerard**  4:20 5:9
  9:7
**getting**  28:2 29:6
  31:8 39:15 40:20
  41:20 48:17 60:14
  68:23 71:11 74:19
  78:8 97:24 98:3
  98:16 100:4
  101:12,22
**give**  66:1 68:5
  75:2 85:5 90:21
  93:16 95:22 98:19
  101:24
**given**  13:25 14:18
  14:18 19:8 24:17
  31:22 40:17 82:7
  83:6 100:10
**gives**  38:21
**go**  13:23,24 21:6
  24:7,11 25:17
  26:22,24 28:23
  29:13 30:20 32:6
  33:23,25 36:9
  37:15 39:25 42:18
  43:9 45:20 46:1
  46:14 47:9,10
  49:11 63:21 65:24
  75:18 76:22 77:4
  77:25 78:17 87:7

87:13 99:8 101:23
103:16
**goes** 14:1 60:21
70:2 71:12 76:21
84:25
**going** 18:5,6 19:9
22:10 28:13,24
29:2,3,11,13
30:25 34:10,20,24
35:13,17,17 37:25
40:15 41:5 42:7
43:12 46:24 47:8
48:9 49:11,18
52:3 58:18 60:11
61:15,17 64:11,25
65:5,17 67:22
68:9,25 69:3,4
70:20 73:13,13,13
75:2,3 78:17,21
79:7 80:2 82:15
83:1 84:6,13,14
84:15,21,23 85:4
85:6,7 86:1,4
88:17,22 95:4
97:4 98:15 99:24
101:2,15 102:21
102:21,25 104:1,9
104:19
**good** 13:2 19:3,8
35:22,24 36:2
39:21 43:2,17
45:10 72:20 80:13
86:13 90:5 93:8
104:20
**gotten** 24:21
**governmental**
4:13 7:9 10:17
41:23
**grandchild** 40:20
**granted** 31:11
43:19 94:3
**grateful** 42:9

**great** 34:23 40:3
49:5 91:11
**greed** 79:15
**greggory** 75:16
83:3 84:3
**gregory** 9:23 34:9
42:21 44:25 45:23
66:22 86:23 87:20
98:17 103:5
**ground** 74:21
**grounds** 71:14
**group** 2:1,5,9,13
3:1,8,11,16 4:4
7:2,9 8:10 13:16
13:22 16:9,18,21
19:23,25 20:4,6
20:20 21:23 22:2
23:2 34:3 41:10
41:11 49:5 70:5,6
71:7 72:25,25
79:7,7 82:25
102:7
**group's** 17:17
**groups** 16:25 34:4
57:9
**guaranteed** 37:22
**guess** 20:8 22:9
26:23 38:13 40:25
46:6 77:3 79:24
96:2
**gump** 9:9 47:4,10
72:1 87:9
**guys** 46:12

**h**

**h** 4:13
**hage** 9:18 59:4
**half** 75:18
**handful** 54:22
55:19
**handpicked** 56:4
**happen** 45:8
77:14 79:7 92:10
98:14,15 101:21

104:13
**happened** 57:25
72:7 86:19,21
**happening** 72:12
**happens** 24:10
82:7
**happy** 13:23
69:15,16 72:16
100:19
**hard** 30:21,23
49:18
**hardship** 36:15
**harm** 17:13 56:21
**harmed** 35:19
**harold** 8:25
**harrisburg** 10:11
**hayden** 11:7
**head** 52:18
**headphones** 61:16
**hear** 32:16 61:18
88:17
**heard** 34:2
**hearing** 2:1 13:4,7
13:8,13,15 22:4
74:4 104:15
**heavily** 17:20
**hedge** 36:10,11
**held** 13:4 38:6
42:4
**help** 36:11 42:1
73:10
**helpful** 75:15
102:14
**hestrup** 2:24
**hiccup** 28:20
**hidden** 82:25
**high** 26:11,12
**highest** 41:13
**highly** 34:12
**hire** 41:24 99:8
**hired** 42:24
**hiring** 87:25

**history** 35:14
**hit** 52:18 71:24
72:2,16,16,19
77:6
**hmm** 70:25
**hoc** 2:1,5,9,13 3:1
3:8,11,16 4:4,11
4:13 7:2 8:10
10:16 13:16,22
14:9,21 17:17
18:17 20:22
**hold** 53:13 82:22
**holdings** 81:20
**holohan** 12:4
**home** 35:4,9
**hon** 1:22
**honestly** 17:19
32:5
**honor** 13:20,22
14:3,8,9,12,19,24
15:8 17:3,7,16,22
18:4,9 19:2,5,14
19:17 20:23 21:10
21:18,25 22:17
23:8,10 24:4,16
25:1,18,22 26:18
27:9 28:18 29:5
29:16,20 30:2,17
30:22 31:16 32:6
32:15 33:3 34:8
34:24 35:12 37:8
37:20 38:4,11,18
39:13 40:14,17
41:4 42:16,21
43:11,18 44:24
45:6,14,23 46:6
47:2,3,7,22 48:1
48:13,20 49:14,25
50:16,17,24,25
52:8,10 55:25
57:10 58:22 59:23
60:19 61:15,18
65:14 66:1,22

67:2 68:4,18
70:11,16,25 71:22
73:12,14 75:16,21
76:14 77:16,19,22
79:11,13,19 80:14
81:5 82:11 83:2,3
83:10,20 84:3,17
85:3,12 86:23
87:11,13,20 88:4
88:6 89:5,14,15
90:6,9 93:2 95:14
98:10,17 99:4,12
100:3,6,16 101:19
102:7,19 103:5
104:16,17
**honor's** 50:2 51:4
91:17
**honorable** 3:9
**hopefully** 79:8
101:14,24
**host** 76:24 80:9
91:7
**hosted** 54:21 55:9
55:12,24 72:9
**hours** 74:11 88:16
**house** 31:19 39:24
**hudson** 9:3
**huebner** 6:8 48:1
48:2,13,20,25
49:2,14 50:17,21
73:5,7,8
**huge** 71:7 75:3,12
**hundreds** 56:21
**hurley** 9:15 47:3,3
47:7,16,21 50:22
50:24 52:8,10,16
52:23 53:1,6
54:25 55:3,8 56:2
61:6,11,13,20
65:21,25 68:14
70:9,10,16,25
71:19 72:23 73:5
73:6,7,15 74:7

75:8,14,19,21
76:10,14,18,21
77:19,25 78:1,11
78:23 79:3,5,13
81:24 82:1,11
83:2,9,10,19,22
84:1 85:11,12,22
86:6 87:2,13 89:2
89:5,9,11,14 90:9
95:14,16,21 96:3
96:10 98:9,18
100:6,6,19 101:3
101:19 102:7,11
102:16,18 103:4
104:16
**hwang** 11:17
**hyde** 5:25 105:3,8

**i**

**iac** 58:4 80:4
81:14,20 91:8
98:5
**iac's** 87:8
**iacs** 53:15 79:21
80:3,11,12 81:12
81:18 82:5,15,19
82:22,23 83:13
84:14 85:18,24
86:17,24 87:1,14
88:10,13 96:23
**icsps** 20:11,14,14
67:23 97:10,17
**idea** 38:4 43:17
51:16
**identifiable** 44:19
**identification**
37:15
**identified** 19:12
60:13,13 79:16
82:17 94:9
**identifies** 94:8,8
**identify** 13:11
33:20 70:21 75:23
95:23 100:9

**identifying** 13:8
16:14 35:3,25
76:16 98:21
**identity** 37:18
**ilene** 79:18
**illegal** 54:14
**imagination** 56:18
**imagine** 95:25
96:12,15
**immediate** 79:20
81:1,3 93:18 97:6
102:5
**immediately**
26:21 28:10 86:7
**implicated** 76:25
**importance** 36:17
**important** 37:18
38:8,25 39:3 57:9
70:23 74:8 89:25
92:8 97:19 103:21
**impose** 33:8
**imposed** 20:17
77:4
**imposes** 80:14
**impossible** 40:6
**impression** 88:22
**inappropriately**
19:4
**include** 42:22
45:17 56:3 96:3
96:10
**included** 52:3
91:15
**includes** 54:19
58:8 91:8,22
**including** 23:4
52:2 56:3,16,25
57:8,10 58:7 59:7
62:18 71:7 76:5
83:5 91:6 92:7
**inclusion** 48:21
**incomplete** 26:4

**increasing** 60:11
**incremental** 59:25
**independent** 15:5
**indicated** 57:11
**indicates** 62:5
**indicating** 79:1
**indirect** 90:25
**indirectly** 81:12
**indiscernible**
29:16 30:3 54:23
74:18 90:1,1
**individual** 8:10
37:18 52:20 81:18
101:13
**individually**
61:22 67:25
**individuals** 15:9
35:25 98:22
**inform** 28:8
**informal** 91:9
**information** 14:23
15:2 16:11,14,14
16:22,22 17:23
18:18,23 19:3
21:23 23:1,6
24:24 25:2 28:3
30:12 31:5,21
32:25 33:4 34:13
35:3,23,25 36:2,9
36:16 37:1,3,9,10
38:8,20,25 39:4,8
40:16,22,23 41:15
41:20,25 42:12
44:19 45:4,21,25
46:1 49:7 50:5
51:7 55:2,3,5,24
59:24 60:23 63:5
68:3,11,15,17
69:7,10,18 70:7
70:24 71:12,17
72:7,9 76:1,4 78:9
79:3 88:13,20,21
89:24 91:11 92:6

94:16,19 95:17
97:15 102:2,3,6
103:18,25 104:6
**initial** 2:12 21:12
28:21 53:9,11,14
64:20,22 65:10
80:18 81:11 90:15
93:15,22 94:23
98:2
**injunction** 91:2
94:4
**injury** 56:20
**injustice** 36:15
**inquiry** 39:9
**insert** 50:19
**instance** 47:9 54:4
55:10,11 59:18
77:5 86:9 91:14
92:16 94:2
**instant** 95:4
**institution** 20:13
20:25 24:15 37:17
**institutions** 2:3,15
3:3,18 4:5 14:11
20:2,16 21:16
22:14,21 23:20
24:3,8,9,13,14,20
24:25 25:4,15,17
27:15 36:22 43:21
**instruct** 82:23
**instruction** 100:7
100:10
**instructions** 85:5
**insurance** 2:20
5:7
**integral** 36:5
**intend** 91:2
**intended** 50:5
**intends** 15:1
**intention** 15:3
50:8
**intentional** 54:8

**interact** 87:9
**interacting** 98:12
**interest** 57:22
80:6 82:22
**interested** 14:21
**interesting** 15:14
**interests** 35:17
39:17,18
**intermediate** 97:6
**internet** 35:7
**interns** 98:24
**interposed** 84:4
**interposing** 18:6
**interrogatory**
30:17
**interrupt** 15:24
23:14 26:8 38:12
43:24 54:24 75:14
76:8 85:21
**introduction**
63:18
**intrusive** 57:7
**inundating** 14:15
**inundation** 31:5
**invested** 36:10
38:22,24
**investigation**
86:10,15 91:23
94:24
**investment** 35:11
37:17 42:2,3,8
**investments** 36:13
**invite** 30:16
**involve** 56:13
**involved** 17:20
48:11 68:7 84:20
88:23 96:1
**involvement**
98:23
**ira** 3:20 4:7
**irrational** 18:14
19:20

**issuance** 28:20
**issue** 17:12 19:8
22:10 26:20 28:9
28:11 31:10 34:2
36:24 38:19 40:13
51:5,10,24 52:18
65:12 77:9 86:6
87:12 88:15 89:7
89:12 90:19 93:11
96:6 97:20
**issued** 21:21
36:21,22 87:4
**issues** 13:6 14:6
16:2 17:1,2 36:18
43:1 56:13 76:25
88:8 99:13,17
103:23,24 104:7
**it'd** 70:6
**it'll** 40:6
**item** 36:3 91:22
**items** 32:18 74:24
**iteration** 66:9
**it's** 65:16
**ives** 62:22,25 63:2
67:12 68:17 69:6
69:10 70:14 71:11
72:5,14 73:4
75:22,24 77:5,7
79:7

**j**

**james** 6:10
**january** 73:19
**jasmine** 2:17 5:3,4
8:21 77:22 100:16
**jennifer** 11:16
**jennings** 7:20
**jeremy** 10:6 11:22
12:1
**jesse** 12:2
**job** 49:5
**john** 12:5
**joinder** 3:14 4:2

**joint** 88:1
**jonathan** 11:18
59:8 67:24 69:11
**jones** 6:17
**joseph** 9:18,23
34:4,8,9 37:8 39:1
42:21,21,24 44:2
44:24,25 45:7,23
45:23 46:5 59:4
66:22,22,24 67:2
68:4,17,20 69:9
69:15 75:16,16
79:1 83:3,3,24
84:3,3,12,17,19
85:3,6 86:23,23
87:4,11,20,20
88:4,10 89:1
98:11,17,17 99:4
99:12,16 100:3
101:6 103:5,5,11
104:17
**journalists** 73:11
75:9
**judge** 1:23 3:9
13:2
**july** 53:11 59:14
59:21 60:12 61:2
61:3 62:12,18
63:3,9 64:12,21
65:1 67:8,17 68:3
68:16,23 70:23
71:17 78:25 79:5
**jump** 50:22
**jumping** 45:7
**jurisdiction** 84:21
**justice** 6:12
**justified** 51:12
**justify** 57:6

**k**

**kajon** 2:24 8:6
**kaminetzky** 6:9
**kathy** 63:17 79:17

**keep** 15:1 17:23
18:11 25:6 46:9
48:5 65:17
**keeping** 25:19
47:25 50:4
**kenneth** 4:12,15
**key** 42:2 54:18
55:1,1
**khan** 11:14
**kind** 15:9 38:1
86:14 92:3
**kinds** 87:23
**kleinman** 11:22
**knew** 67:10
**knock** 49:4,15
**know** 14:25 18:9
20:19 23:23 24:2
25:5 28:1,5,12
30:6 31:13,17
32:3,13,16 33:8
33:20 35:23 36:7
36:14,16 37:16
38:25 40:12,16,25
41:21 45:11 46:13
46:22 48:8,16
49:8,18,21 50:20
51:21 52:14,23
63:1 64:10,11
66:4 67:12 68:2
68:23 69:20,20
71:14,15,15 73:25
75:8,9,10,11
76:24 78:5 80:4
84:20 87:21,22
88:7,25 94:9,17
94:22 96:4,11
97:1 98:12,14,15
99:2,11,24 100:1
100:9,11 102:25
103:1
**knowing** 36:4,10
39:2

**knowledge** 90:23
94:19
**knowledgeable**
20:14
**known** 90:19 96:5
**kramer** 10:15

**l**

**l.p.** 1:7 3:21 4:9
13:3
**labovitz** 8:22
**lack** 79:22 85:6
**laid** 20:5 28:18
101:16 104:8
**language** 30:13
**large** 34:13,13
41:10 46:2 53:23
**largely** 55:4 57:4
**late** 54:11
**law** 18:9,10,15
60:18 64:15 80:22
81:6 84:19,20
85:2 86:2 87:21
**lawrence** 11:8
**lawyer** 31:19
39:23
**lawyers** 42:14,19
44:18,18 45:18
49:8,10,16,23
66:20 67:6,7
68:11 71:25 91:21
101:13
**lead** 34:3 89:3
**leadership** 56:14
**leak** 19:11,15
34:21,23 40:1,4,4
40:5
**leaked** 18:23 19:4
19:4 40:2
**leaks** 19:1 39:20
**leave** 17:11 49:21
60:16 68:10
**ledanski** 5:25
105:3,8

**ledger** 32:19
**lee** 8:1
**lees** 9:6 49:25,25
50:8,11,16
**legal** 26:16 56:4
80:15,24 81:2
88:9 105:20
**legitimate** 71:2
**letter** 3:8 4:18 5:2
22:18,19,20 43:2
47:1 50:23 83:11
83:17,19 88:23
89:6,7,11 90:8
93:14 98:20
**letters** 32:7,8
**level** 18:6 41:14
53:3 81:6 88:18
**leventhal** 9:24
**levin** 10:15
**levine** 11:11
**lexington** 6:5 9:20
**liability** 31:5 57:2
97:23
**light** 50:2 101:14
**lights** 49:21
**limit** 20:24 21:7
22:6 28:14 50:9
**limitation** 20:17
**limitations** 43:20
**limited** 2:8,12
15:18 16:17 25:25
31:11,20 36:25
42:14,19 70:13
92:25
**line** 30:8 54:7
**lines** 52:3,20
**lipson** 11:18
**list** 22:2 26:12,12
33:12 94:7,17
95:12,22 96:5
98:20 100:8,11,13
100:20 102:13

**listen** 30:8
**listened** 30:21
**literally** 74:2
77:25
**litigation** 4:14
10:18 30:8 40:9
49:13 99:10
**litigators** 33:10
49:3,4,4,19
**little** 20:10 58:5
62:7 71:16 101:3
**llc** 9:18
**llp** 6:3 7:1,15 8:9
8:16 10:1
**loaded** 19:9
**loan** 26:15 32:7
32:20,21 33:13,20
**local** 84:20 85:2
87:21
**located** 76:4
**location** 57:17
**log** 103:9
**logged** 17:25
**logically** 99:7
**long** 47:16 66:17
66:25 73:18 78:6
78:20
**longer** 25:11,12
**longtime** 56:4
62:22
**look** 14:22 30:9
31:15 32:5 40:17
42:15,18 45:19
49:3 61:25 69:22
99:7 100:3
**looking** 16:6
33:15 42:5 68:11
78:24 83:11 96:25
98:9,20
**looks** 30:12
**lot** 35:6 49:17
68:7 69:10 72:9
72:21 77:3 88:21

94:13 103:18
**lots** 15:8
**low** 96:13
**lower** 46:7
**lowest** 45:21

**m**

**m** 2:5 3:11 7:6,13
**madison** 8:3
**maeglin** 11:4
**major** 86:14
104:7
**making** 18:19
71:13,21 88:10
97:20
**man** 77:16
**manage** 26:15
**managers** 38:16
**manner** 20:16
56:17 58:18
**mara** 9:24
**margaret** 11:25
**marianna** 11:24
**market** 10:3
34:15
**marketed** 56:17
**marshall** 6:8 48:2
73:8
**masumoto** 6:18
**matching** 41:18
**material** 17:13
53:23 56:5 60:17
96:14 103:19
**materially** 16:20
**materials** 72:3
95:2,3
**matter** 1:5 29:25
37:15 66:21 81:6
86:5 88:11
**matters** 49:24
**maura** 8:23 21:11
**mbl** 63:15
**mcclammy** 6:10

**mdl** 54:1,10 58:2
58:12 61:14,21
62:2,6,9,19 67:4
**mean** 24:10 31:15
33:6,7 39:19,25
40:4 44:7 45:13
45:19 48:6,8,23
52:11 53:2 55:2
68:4,5 69:21
70:18 82:21 93:2
97:21 98:24 99:16
**meaning** 53:9
85:17
**means** 89:22
**meant** 44:8 49:1
**measure** 48:16
58:13 91:25
**mechanically**
37:2
**mechanism** 16:9
16:19 17:24 23:22
96:23
**media** 34:21,23
**mediation** 31:1
104:10
**meet** 36:23 62:5
62:17 86:12 92:13
93:8 95:9
**meeting** 91:19,20
91:21 92:5
**meetings** 91:15
92:2 97:23 98:25
**megan** 11:5
**melissa** 10:13
**member** 34:14
56:24
**members** 3:10
25:5 35:5,6 36:1
53:9 54:19 56:5
91:11
**memoranda** 32:8
**memos** 32:19,22

**message** 100:25
**messages** 55:5
59:7
**milbank** 9:1 50:1
59:4 64:23 72:17
83:11,19 94:15
98:14 99:9,20
101:5
**millions** 53:25
58:1 67:7,15
68:18,22,22 79:2
79:2
**mind** 20:21 75:17
76:22 92:7
**mineola** 105:23
**minimum** 67:7
**minors** 98:22
**minute** 52:13
61:17
**misremember**
75:10
**missed** 20:25
**missing** 17:12
53:2
**misspeak** 44:8
**misspoke** 79:14
**misspoken** 76:15
**misunderstanding**
62:10
**mitch** 47:3
**mitchell** 9:15
**mm** 70:25
**moment** 58:24
**monaghan** 8:23
20:23 21:4,10,11
24:22 25:1,11,18
33:3,13
**monday** 67:5
89:13
**money** 18:2 36:10
38:22,23 49:11
70:18,20 76:12
92:10 97:1,3

**monitor** 49:19
**months** 75:13
**mortimer** 2:12
16:18 19:23 20:4
20:20 21:12,23
22:1,5 24:23
63:17 79:17 90:19
96:6
**motion** 2:1,9,13
3:1,16 4:3 13:16
14:5,10 16:2 36:8
43:1,19 53:7,24
55:8,16,23 58:5
58:25 59:13 60:19
60:22 62:16 63:15
63:20,25 64:15
65:2 66:15 81:16
92:24,25 95:4
**motions** 60:18
**motivation** 92:8
**move** 47:7 53:6
75:15 83:25
**moving** 60:21
65:17
**muhammad**
11:14
**multi** 7:9 26:15
**multiply** 34:18
**municipalities**
34:16,19 41:22

**n**

**n** 6:1 10:3 13:1
105:1
**naguiat** 11:2
**nail** 52:18
**name** 21:9 38:21
42:1
**named** 62:21
**names** 16:15 33:2
35:16,19
**nano** 74:25
**napp** 81:20

**narrow** 16:4 43:1
72:3 77:8
**narrower** 92:14
**natasha** 8:22
**nature** 15:10
17:16 42:2,3
65:15
**nearly** 54:19
**necessarily** 42:1
48:14 96:17
**necessary** 25:19
34:7 57:20 77:9
**need** 14:22 22:18
28:4,4,6,16 32:9
32:13 33:9,23
39:23 40:10 46:14
48:11,22 49:10
63:6 65:5 78:9
88:7 98:5,15
99:22 102:5,25
103:8,19
**needs** 48:15 49:10
49:19 64:25 88:13
98:14,15 100:2
103:25 104:13
**negative** 39:6
**negotiate** 77:2
85:14 95:5
**negotiating** 60:3
85:14
**negotiation** 93:21
**neiger** 8:9,14
**never** 46:1 62:1
69:3 92:22 98:23
**new** 1:2 6:6,15 7:4
7:18 8:4,12,19 9:4
9:13,21 10:20
29:24,25 30:7,8
34:22 38:15 50:20
75:15 78:9
**niceties** 88:9
**nicholas** 2:24 8:6
12:3

**nine** 23:6
**non** 2:1,5,9,14 3:2
3:8,11,16 4:4 7:2
15:5,13 25:25
47:13 54:21 74:15
74:24
**nonconsenting**
13:17,22 14:9,14
14:20 17:17 20:12
**nonproduction**
82:8,9
**normal** 26:10
**normally** 22:25
23:16
**norton** 85:18
86:20 87:2 88:12
88:17,22 89:3
**note** 60:1 94:22
100:14
**noted** 17:19 77:25
79:1
**notes** 32:8 97:22
98:25
**notice** 31:6 90:24
98:5
**notified** 99:21
**noting** 58:8
**notion** 27:2
**notwithstanding**
20:11 45:4
**number** 14:6
34:13,16 35:9,10
48:10 53:13 64:8
67:3 72:1 73:15
77:11 78:18 92:16
92:21
**numbers** 35:4,4
40:3 78:24
**nw** 7:10
**ny** 1:14 6,6,15 7:4
7:18 8:4,12,19 9:4
9:13,21 10:20
105:23

**o**

**o** 1:21 13:1 105:1
**o'connor** 7:13
**objection** 2:8,12
4:18 5:2 20:6 22:9
84:13 88:17
**objections** 83:6,12
84:5,8,10 87:17
93:20
**objective** 75:6
**objectors** 16:2
**objects** 16:11
**obligation** 28:8
85:1
**obligations** 80:15
80:20 86:8
**obtain** 33:17 50:4
81:3
**obtained** 72:14
**obviously** 40:5
51:12 63:10 65:11
66:14 77:10 87:16
89:23,25 94:15
102:24 103:13
**occasion** 69:24
**occasioned** 29:10
**occur** 86:16
**october** 38:5
**odd** 73:19
**offer** 59:22 62:12
63:4 92:18 102:9
**offered** 82:4
**office** 10:8 49:22
62:23
**offices** 25:5 26:10
**official** 2:21 3:14
3:20 4:1,8,17 5:1
9:10 13:13 47:4
53:8,22 57:19
58:5 59:6 63:14
63:16 81:9 91:8
**oh** 21:10 40:11
68:19 88:16

**ohio** 40:21
**oil** 38:7,24 39:5
**okay** 17:5 19:18
21:8,13 22:16
25:10,21 32:15
37:14 39:6 40:16
41:6 42:17,23
44:1 46:3,5,21
47:21 48:20 49:2
49:3,15 50:21,21
56:2 59:9 61:12
61:13,20 66:20,24
68:19 70:12 72:22
75:19 76:17 77:13
77:20 79:4,12
83:8 84:1,18
85:10 86:18 87:3
88:5 89:9 95:15
95:24 96:9 98:11
99:15 100:21,24
102:10,16,17
103:2
**old** 99:10 101:11
105:21
**once** 44:20 46:16
88:11 93:3
**ones** 35:14 39:15
66:9 69:19
**open** 14:6 16:1
60:16
**opinion** 19:3
**opioid** 57:2,15
91:23
**opioids** 56:17
**opportunity**
16:10 77:6,9
95:10
**opposed** 16:12
17:14 19:24 20:1
34:6 36:11 37:16
55:14 71:18
**opposing** 94:23

opposition 53:21 58:25 59:13 63:14
opt 90:21
opting 90:24
order 2:2,14 3:2 3:17 4:4 13:23 14:2 18:12,13 19:16 23:15,19 24:9 26:21 27:18 28:8,9 31:11,25 43:6,13,16,19 44:22 45:12 46:8 46:12,16 47:24 50:19,20 51:1 53:9 63:7,7 74:6 80:19
ordered 61:2 62:18 85:9
ordering 65:8
orderly 69:16
orders 18:25 47:24 48:7 58:20 89:18 93:3
ordinary 56:12 93:19
original 59:10
originally 97:2
ought 64:19
outlined 33:24
outside 16:12 17:13 34:1,6,11 34:14 37:4,10,12 41:2,19 42:13,20 42:22,24 43:21 44:12,13 45:5 51:8,10,23 52:2,2 52:12 102:22 103:7
overall 104:11
overcautious 73:15
overly 96:21

oxycontin 63:19

p

p 6:1,1 9:15 13:1
pa 10:11
pace 24:17
page 36:3 82:21
pages 58:8,8 67:7 68:18,22,22
paid 39:15,18
papers 53:21 59:13 60:2
paragraph 18:24 20:5,13 48:3,22 81:7,10 91:6
paragraphs 22:18
pardon 76:18
park 9:12
part 13:25 23:8 27:6,24 37:24 40:16,19 46:15,16 50:14 54:15 77:11 80:6 93:5 94:15
parte 2:1,13 3:1 3:15 4:3
participants 34:15
participate 43:7 90:14
particular 37:23 52:3 65:8 76:23 84:13
particularly 17:21 18:8 25:24 26:11 31:6 40:8 48:10 49:7 50:2 82:3 101:16
parties 13:5 14:21 16:23 21:12 23:4 23:12,20 24:17,23 30:25 34:15,20 37:25 43:6 44:22 46:9 51:13 53:18 56:13 57:8 60:3

61:24 70:2 71:10 73:10 74:6,14,17 74:21 79:9 81:9 81:10 82:4,4 86:25 89:21 90:2 90:14,16,17,22,24 91:5,10 92:15,16 93:13,16 94:1,7 94:14,20 95:18 98:13,21 99:14 100:8,9,13,15 101:22 102:13 104:4,6,9
parts 43:16
party 15:5,13,18 16:22 19:6 21:20 21:20 23:2,3 37:4 38:9 52:23 60:22 62:15 71:7,15 80:25 81:2 85:13 85:15 86:7,13 87:17 90:18 93:5 93:11,24 94:3,4,8 94:9,11 103:24
pass 20:21 82:18 100:25 101:1
patrick 12:4
paul 6:19
pay 102:4
payment 37:22
payments 32:21
pearlman 12:1
penalty 24:1
pennsylvania 10:8,9
penny 73:17
peo 19:9 45:15
people 18:12 22:2 22:6 24:11 26:9 31:7 34:14 35:7 38:25 41:1,22 42:18 49:4 50:13 51:22 56:19 67:16

71:7 75:1,3 95:13 95:25,25 96:1 97:8,12 99:19 100:5,22 102:3,4 102:8
perfect 49:12
perfectly 37:11 71:2 96:15
perform 104:6
performance 91:25
period 14:13 37:23 39:5 60:1 60:11 61:4 64:5 73:18
periods 25:11,13
perjury 24:1
permit 35:8
person 40:12 41:17,18,19 56:25 62:21 72:11 89:3 94:23 98:12
person's 81:3
personal 54:21 55:11
personally 35:2 35:24 44:19 50:19
persons 2:13 53:14 80:18 81:11 93:15,23
perspective 51:9 51:25 58:15 82:12 86:21 90:13
persuade 40:15 41:5
pertaining 30:15
petition 59:20 61:5 63:22 67:1
pharma 1:7 3:21 4:9 13:3 81:20
phone 27:21 35:4 35:9 102:24

physical 35:3
physically 69:5
pick 40:21
picking 72:21
picture 22:25
piece 15:15 38:25
  40:23 41:25 61:20
pieces 36:25 42:12
  48:23
pii 40:9,12 41:17
pillsbury 7:1
  13:21
pittman 7:1 13:21
place 73:14 99:19
  101:4
places 28:19
plains 1:14
plaintiffs 56:16
plan 50:14 69:25
  71:5 103:20
  104:11
planning 76:2
plans 92:1
platform 19:10
play 95:9
pleading 17:20
  22:19 40:5 41:12
pleadings 13:5,18
pleased 104:4
plenty 59:23
plimpton 8:16
  21:11 77:23
  100:17
plus 34:19 41:22
  68:23 73:19
pm 1:17 104:22
point 16:4 19:22
  20:8 21:14,14
  22:11 24:14,16
  26:9 30:5 32:3
  34:4 37:15 39:22
  41:2,10 42:4,5
  45:7,10 48:18,18

51:3 53:19 58:1
  65:13,14 72:23
  75:20 77:21 81:7
  85:1,25 86:3,19
  90:5 97:3 100:1,2
  102:1 103:17,25
  104:1,3
pointed 53:22
points 50:25
  57:21 58:23 81:13
policies 91:22
polk 6:3 48:2
portion 104:7
position 14:22
  29:11 51:7 59:10
  68:1
possessed 53:17
possession 21:24
  24:6 25:3 29:9
  53:14,15 55:13,14
  56:5 62:24 79:21
  79:22 80:17,24,25
  81:1,4,14 93:18
possible 21:4
  68:12
potential 26:4
  31:4 76:5 93:12
  93:18 97:23
potentially 15:21
  15:22 22:3 74:16
pottery 10:1
pourakis 8:7
power 80:21
  81:17 85:15 86:4
powerpoints
  69:20
practical 81:2
  88:11 99:16
practicality 88:18
pre 89:17
preis 4:1 9:16
preliminary 68:5

premature 100:1
prepared 13:12
  58:3 82:18 87:9
  93:3,8 96:20
preparing 13:11
  49:12
prepetition 53:23
  54:12 56:7
presentation 38:5
  53:7 74:5
presentations
  14:16,17 58:3,10
  69:20
press 40:4,6
pressures 29:12
presume 19:15
presumes 24:5
pretty 16:4 52:19
  72:20 95:1 97:18
  103:15
previously 63:19
  78:2,2
prey 12:3
prices 39:5
primarily 80:4
primary 14:16
principled 92:19
prioritize 69:7
private 2:20 5:7
  34:15,20 56:15
  73:20
privilege 52:5
  53:4 61:9
privileged 97:25
probably 31:21
  43:2 48:23 66:18
  97:6
problem 27:20
  36:20,21 51:5
  83:8 87:21
problematic
  87:22,23

procedurally 65:6
procedure 2:4,16
  3:5,19 4:7
proceed 23:7
proceeding 30:24
proceedings
  104:21 105:4
process 15:4 18:2
  19:24,25 24:18
  25:16 26:3 27:15
  28:18 33:23 47:10
  49:20 56:7 60:14
  66:7 69:2,4 72:6
  74:1 79:6 82:3
  84:6 87:16 89:3
  95:8 98:4,5 99:22
  100:2 103:25
produce 22:14,15
  23:15,24,25 24:9
  28:6 30:18 59:5
  62:9,21 63:3
  64:19 66:13 67:14
  67:21 69:1,1 72:4
  73:1 80:10 82:6
  82:23 83:1,24
  85:1,24 86:1,4
  91:5 97:22
produced 20:3
  23:25 28:7,14
  34:10 53:25 58:2
  58:4,6,12 64:25
  69:12 85:25 86:17
  93:22 96:24 97:15
producing 26:1
  30:1 66:17 86:12
product 53:4
production 13:18
  22:21 23:17 27:4
  28:12 29:4 38:7
  43:4 44:8,15,17
  59:14,16 60:15
  61:3 62:18 63:8
  63:23 64:12 65:8

[production - reasonable]

80:13 82:19 93:13
93:19 94:21 97:21
**productions** 15:6
43:20 53:11 64:20
93:9
**productive** 36:23
**professional**
17:14 33:25 34:5
34:6,12 43:21
44:24 45:1,15,25
46:8,18,18 51:8
51:10,22 52:13
74:11
**professional's**
16:12,13
**professionals** 34:2
34:11 42:13,22
44:12,13 45:5
51:24 73:24
102:22 103:7
**professional's**
17:14
**program** 26:16
**promise** 59:21
63:3
**promised** 80:2
**promptly** 25:3
26:19 27:21 28:2
79:10 88:2,24
99:21
**proper** 95:10
101:17
**proposal** 20:5,21
37:21 38:9
**propose** 19:24
20:9 21:15,18
77:24
**proposed** 22:19
26:23 59:18 60:13
63:9,24 71:6
78:22 92:14,15
93:1,14 103:21

**proposes** 16:8,18
**proposing** 20:24
69:25 77:12
**propriety** 30:23
**protect** 94:4
**protection** 41:14
91:2
**protective** 18:12
18:13 44:22 46:8
74:6
**prove** 40:18 62:15
81:21
**provide** 16:21
26:21 46:4 59:24
68:2,3 69:25
80:11 82:16 90:20
91:7 94:7 100:8
100:19
**provided** 17:24
20:3 37:3 38:20
38:21 40:22 43:22
44:2 71:24 89:5
93:7 102:13 103:7
103:18
**provides** 39:8
40:23 46:13 81:10
**providing** 69:18
**proving** 60:20
**provision** 47:23
48:2,3 50:1,18
**public** 15:23 19:7
46:2 54:7 56:15
73:16 74:4 75:11
75:17
**publicly** 35:16
58:11
**pull** 35:15 74:22
78:10
**pulled** 78:16
**purdue** 1:7 3:21
4:9 13:3 53:25
54:6,21,22 55:6,9
55:13,20,22 56:6

56:13 57:16 58:2
70:8,19,20 71:3,9
91:1,13,15 92:4
92:11,12,17 97:13
98:23
**purdue's** 55:14
57:5,14 91:16
**purpose** 41:13
54:21 69:23
**purposes** 41:11
53:16 96:25
**pursuant** 2:3,15
3:3,18 4:6 27:16
**pursuing** 54:8
97:7
**push** 24:18
**pushing** 48:20
**put** 25:9 37:6
47:20 61:17 73:16
73:20 75:10,13
78:15 84:11 98:5
**putative** 8:2
**putting** 75:2
**puzzle** 15:14

**q**

**quality** 36:12
**quarropas** 1:13
**question** 26:2
50:1 55:25 64:23
71:20 73:3 78:11
79:19
**questions** 36:5
90:11 104:14
**queue** 65:7
**quickly** 24:22
25:2 33:17 68:12
90:16
**quite** 42:10 74:15
**quote** 91:20
**quotes** 36:17
**quoting** 83:23

**r**

**r** 1:21 6:1 13:1
105:1
**raise** 44:6
**raised** 19:22 43:1
54:11
**raises** 82:11
**ramon** 11:2
**raymond** 2:8 4:17
4:20 5:9 9:2,19
16:8,21 18:24
19:23 26:22 34:3
34:9 67:24 90:19
96:6
**rdd** 1:3
**reach** 61:23 95:6
104:1,5
**reached** 65:20,22
95:18
**read** 13:18 22:18
**reading** 14:4
**ready** 49:6 65:7
103:13
**real** 101:12
**reality** 31:2
**really** 18:11 22:11
29:6,24 31:16
41:14 45:6,11
52:24 57:22 60:15
65:15 76:4,17,19
77:1 79:24 94:24
97:14 98:9 101:9
101:11
**realm** 41:20
**reason** 19:15
32:12 35:8 39:21
41:21 42:18 43:2
62:1 71:1,3,5 82:7
85:2 95:3 97:3
103:14
**reasonable** 33:21
52:12 60:22,24
63:5 64:17 77:13

79:8 86:9 93:3
95:6 96:15 97:13
99:23 101:7
**reasonably** 68:2
77:2
**reasoned** 86:16
93:6
**reasons** 17:19
41:16,24 69:23
**recall** 37:20
**received** 28:22
29:8 39:4 86:25
**receives** 86:7
**receiving** 52:23
**recipient** 80:15
**recipient's** 80:16
**record** 21:9,20
42:6 64:14 79:18
80:7 81:4 103:15
105:4
**record's** 103:15
**recording** 13:12
13:13,15
**records** 20:15
23:11 24:7,12
25:6 31:11,13,13
32:2 46:2 67:22
91:8
**recoverability**
76:20,21
**redact** 16:13
35:13 36:25 43:23
44:3,19
**redacted** 45:19
46:16 102:22
**redaction** 17:12
18:10 20:7 35:1,8
44:6 52:5 102:19
103:8
**redactions** 36:24
37:6 45:4,9 51:2
51:17,21 53:20
90:12 103:7

**redemptions**
35:20
**reduce** 92:16,20
**refer** 64:22
**reference** 50:3
**referenced** 33:14
48:21 50:2 57:15
58:10 81:8
**referring** 83:18
**refine** 68:6
**reflecting** 32:21
**refusal** 93:24
**refused** 92:23
**refuses** 93:24
**regard** 24:24 43:4
77:14 87:10
**regarding** 3:9
4:11
**regardless** 92:11
**regularity** 92:3
**rehabilitated** 69:4
**relate** 15:19
**related** 2:9,16,23
3:5,19 4:7,12,19
5:3,8 76:1,25
90:14 92:15 93:16
93:24
**relates** 62:20
**relating** 15:6
35:14
**relationships**
31:12 35:20
**relatively** 14:5
31:21 32:2 65:25
66:2 95:22
**release** 31:4 70:1
71:6 94:2 96:19
97:22,24 98:16
99:9,22,25 103:24
**released** 15:21
71:10
**releases** 15:11,12
22:3 36:6,12

57:12 91:3
**relented** 63:21
**relevance** 52:6
73:4 75:20 91:12
92:7 93:20 96:13
101:8
**relevant** 23:11
52:14 71:12 76:5
76:11 95:2 97:5
**relief** 4:19 5:2
53:17 60:21 62:15
64:17
**rely** 39:23,23 41:2
42:7
**relying** 34:5
**remain** 14:6 57:3
77:2
**remaining** 58:23
104:12
**remains** 65:3
**remedy** 76:12
**remember** 69:10
**remembers** 74:11
**remind** 74:13
90:16
**reminder** 73:12
74:1
**reminding** 75:1
**repayments** 32:20
**repeatedly** 94:6
**replace** 81:18
**reply** 3:1,15 4:3
35:24 36:3
**replying** 28:2
**report** 70:10,11
72:16,17 73:16,22
74:13,14 75:12
77:7
**reported** 48:14,15
**reporter** 13:10
**reporting** 48:5
**reports** 67:22
68:24 71:25 72:2

72:20
**represent** 21:11
30:7 81:10 86:24
99:4,5,20 100:21
**represented** 59:4
79:25 94:14 99:14
100:12
**representing** 99:3
**reputation** 69:2
**request** 14:1
16:25 20:1,15,18
21:7 24:8,11,21
24:23 27:7,10,10
27:11,11,13,13
28:21 29:14 30:14
32:6 45:24 46:1
65:10 66:3 67:9
83:13 88:15 93:24
101:7,22,24
**requested** 4:19
5:2 35:2 101:1
**requesting** 83:15
86:13
**requests** 20:12,22
20:24 21:3 75:22
82:16,18 83:14,16
84:9 88:12 91:9
100:4
**require** 33:4,15
33:21 46:9
**required** 15:10,20
24:7 39:9 58:24
64:19 86:2 90:18
92:24
**requirement** 96:5
**requirements**
96:19
**requires** 63:8
**reservation** 5:6
**resignation** 59:10
**resignations** 61:5
67:1

**resigned** 59:9
**resolution** 46:24
  77:10
**resolve** 84:12,15
  101:7
**resolved** 43:5
  53:20 84:15
**resolving** 36:18
**resources** 26:14
**respect** 3:15 4:3
  15:9 22:6 51:7
  53:19 54:9 55:9
  55:10,22 56:10
  60:16,25 61:1,14
  61:25 62:19 64:20
  65:9 66:16 71:23
  72:5 73:25 77:7
  80:4,16,20 84:2
  86:8,9 94:13,20
  96:5 97:5
**respectfully** 100:7
**respecting** 57:14
**respectively** 53:12
**respects** 96:14
**respond** 24:23
  25:2 26:20 27:22
  28:13 29:11,22
  87:18 96:16,20
**responded** 29:18
  60:2 88:12
**responding** 53:16
  60:19 62:15
**response** 4:17 5:1
  16:8 18:25 26:13
  27:25 30:9 31:24
  51:17 53:3 63:25
  79:21 82:21 83:23
  88:16 93:23
**responses** 14:4
  16:6 29:13 71:15
  82:25 83:6 84:4,7
  84:10 86:11

**responsibility**
  57:1
**responsive** 28:17
  29:8 52:4 60:1,10
  72:3 82:16 83:12
  83:13,15 103:6
**rest** 45:21 46:12
  65:2 104:8
**restricted** 19:10
**restrictions** 78:15
**result** 56:24 57:4
  72:18
**resulted** 62:6
**retain** 18:21
**retread** 74:21
**return** 66:5
**returned** 59:5
  66:7
**returns** 104:1
**reversing** 26:3
**review** 16:10
  17:21 18:1 20:7
  59:5,21 60:25
  61:3,9 62:8,12,13
  64:21 67:1,9 72:2
  72:4,16 93:18
**reviewable** 68:20
**reviewed** 60:14
  77:12
**reviewing** 64:9
  66:16 67:4
**revised** 50:18 66:3
  101:22
**rich** 56:18
**richard** 59:8
  67:24 69:11
**rick** 11:13
**ricsp's** 82:24
**ricsps** 82:21 83:12
**ridiculous** 48:17
**right** 16:13 19:13
  19:14,21 21:2,17
  22:17,23 23:13

24:5 27:8 28:4,5
  29:12,19,21 31:18
  32:7,22 38:4 39:4
  39:11 40:10,19
  41:9 42:14,17,25
  44:10,11 45:15,16
  46:11 47:15 49:4
  50:22 52:9,17,22
  69:13 70:8,15
  78:19 81:2 84:15
  84:23 89:22 90:9
  95:20,21,24 96:2
  96:12 97:9 99:19
  101:2 103:10,12
  104:18
**rights** 5:6 51:13
**risk** 34:23 38:2
  39:19
**road** 105:21
**roadmap** 30:20
**robert** 1:22 3:9
**role** 35:5 57:14
  89:24 91:13
**rolling** 63:8
**room** 1:13
**rose** 85:18 86:20
  87:2 88:12,17,22
  89:3
**roth** 7:15
**royalties** 75:5
**rule** 2:9,23 13:17
  14:10 23:15
**rules** 2:3,4,15,16
  3:4,4,18,19 4:6
  80:20
**rulings** 43:8
**run** 39:19 72:14
  79:15
**rundlet** 11:5
**running** 61:16
  63:2 64:2
**runs** 42:6

**ryan** 10:6

**s**

**s** 2:10,17,23 3:5
  3:19,20 4:7,7,12
  4:19 5:3,8 6:1
  13:1
**sacker** 75:11
**sackler** 2:8,12,13
  3:10 4:17,20 5:9
  9:2,19 16:8,18,21
  16:25 19:23,23
  20:4,20 21:12,12
  21:23 22:1,5 23:2
  23:12 24:23 34:3
  34:9 43:22 44:17
  44:18,18 53:10,14
  53:18 54:19,20
  55:10,12,18 56:18
  56:24 57:3,16
  59:8 70:2,5,5,22
  75:25 76:22 80:18
  81:11 90:16,23
  91:14 92:5 93:15
  93:23 94:23 98:13
  98:21 99:13
**sackler's** 18:24
  26:12,20 47:9
  76:3 85:17
**sacklers** 2:22
  14:14 15:7,12,17
  15:19 18:20 22:3
  22:14 24:1,5
  26:23 27:4,5,7
  28:1,6 29:3,13
  30:4,7 32:1,12,25
  36:4,6 37:21 44:3
  45:4 53:21 54:9
  55:9,11,13,17,23
  56:3,10,14 57:8
  57:12,12,14,16,19
  57:22 58:1,4,13
  58:17,25 62:23
  63:10,16 65:4

66:4 71:8,13
73:25 76:3 79:22
79:25 80:5,9,23
81:6,13,17,21
82:10 84:12 85:24
86:3 92:3,8,22
**sacks** 11:15
**samantha** 63:17
79:17
**satisfactory** 85:20
**satisfied** 23:17
**satisfy** 57:20
**save** 18:2,17
**saw** 67:8
**saying** 19:13
46:11 48:17 53:5
69:17 71:25 82:15
86:20 88:13
**says** 20:13 30:17
59:20 82:21
**scenes** 85:7
**schedule** 53:9
58:23 65:15,16
104:8
**scheduled** 13:4
**scheduling** 59:2
**schulte** 7:15
**schwartzberg**
6:19
**scope** 77:2 93:6,9
95:10 101:17
102:9
**scrap** 64:24
**search** 23:23,23
28:14 33:1,2,4,7
33:10,16,21 59:6
59:19 60:3,7 61:8
61:14,21,22 62:1
62:2,6,9,19 63:15
63:16,18 64:2,8
65:23 66:9 67:4
67:13,18,19 71:25
72:1 92:14

**searched** 54:18,22
55:20 65:5
**searches** 30:11
54:20 72:15 93:9
**searching** 55:18
55:21 57:6
**second** 18:9,10
22:15 24:16 71:5
74:25
**seconds** 73:9
**security** 35:4,10
**see** 16:6 26:25
31:7 49:22 71:11
72:17,20 73:21
74:10 82:7 97:20
98:25 101:14
**seeing** 28:13
**seek** 15:12 23:1
30:10 64:25 91:3
**seeking** 14:11
43:5 71:2 74:25
75:23 94:16
**seen** 72:15
**sees** 93:10
**selected** 51:20
**selective** 51:16
**self** 33:11,11,14
**senate** 91:23
**send** 66:4
**sending** 21:16
**sense** 25:16 70:18
77:21 78:20
101:10 102:2
**sent** 83:4 84:5,9
**sentence** 36:3
**separate** 17:1
21:14 22:24 86:18
88:1 99:3
**separately** 99:14
**september** 68:7,8
71:18
**series** 24:19 38:3
38:6

**serious** 51:5,13,15
51:15
**seriously** 57:11
**serve** 29:14,17
35:17 99:25
**served** 30:1 41:14
80:8,14 87:15
**service** 88:2 94:10
**serving** 23:21
25:24
**set** 17:1 27:10
53:8 65:10 93:19
**sets** 49:23
**settlement** 56:23
57:3,12 97:4
**settlements** 49:9
**seven** 27:8 66:18
**seventh** 91:24
**shaming** 40:8
**share** 40:14 72:8
**shared** 21:14
**shareholder** 81:9
81:10 90:18,22
94:7 95:18
**shareholders**
73:17
**sharing** 39:13
42:8,9 50:5
**shaw** 7:1 13:21
**shayna** 11:15
**sheets** 32:20
**sheila** 11:6
**shot** 41:8
**show** 28:1 32:20
35:22 36:2,16,17
60:23
**showing** 36:14,19
**shown** 102:8
**shows** 34:22 35:15
40:22 102:4
**side** 14:7 15:23
22:5 30:14 34:9
58:6,6,7 59:4,11

59:11,18,23 60:4
60:6,24 61:14,21
62:4,20,21,23
63:8,10,13,15
64:4,7 66:8,10,10
66:13,21,21,23
67:24 77:20,23
82:4,4,14,14 83:3
86:20 89:2 94:23
94:23 97:7 98:22
100:8,10,11,17
101:5 103:6
**side's** 52:24
**sign** 104:19
**signature** 32:17
**signed** 19:10
**significant** 31:4
**silence** 103:2
**silent** 22:20
**similar** 18:25 43:9
98:4
**simply** 14:24
17:11 19:22 21:16
33:1 50:18 61:2
**simultaneously**
44:16 47:19
**single** 56:24,25
**sir** 17:10
**sit** 101:23
**site** 78:12,16
**six** 67:23 98:22
**sixth** 91:23
**skorostensky**
11:23
**slash** 34:1
**slightly** 16:7
89:24
**slow** 104:11
**small** 14:6
**social** 35:4,10
**software** 72:24
**sold** 56:17

**solutions** 13:14
105:20
**somebody** 21:4
48:15 60:19 95:5
101:5
**somewhat** 16:7,19
**sonya** 5:25 105:3
105:8
**soon** 68:1 74:15
**sophisticated** 42:1
**sorry** 13:7 21:10
23:14 27:19 29:2
44:4,7,25 46:6
61:15 68:13 75:14
76:8,14 83:17
**sort** 32:3 75:23
86:21
**sought** 22:4,7
24:24 60:21 62:16
64:17 91:9
**sounds** 52:11 62:7
72:13 73:14 77:13
86:21 103:4
**southern** 1:2
**speak** 13:9 34:24
34:25 46:8
**speaker** 61:17
**speaking** 69:7
**special** 75:2,6
91:21
**specialists** 74:12
**specific** 58:20
60:12,23 63:7
65:7,16 66:19
87:1 100:4
**specifically** 71:20
**spent** 48:6 74:12
**square** 10:10
**staff** 26:16 34:18
**stand** 103:13
**standard** 36:17
80:24 96:13

**start** 14:6 15:4
25:12 70:19 71:21
100:2
**started** 30:1
**starting** 73:17
**starts** 70:19
**state** 7:9 21:8
35:24 38:15 40:2
40:21 50:11 76:22
92:7
**state's** 74:18
**stated** 83:12
**statement** 2:20
3:15 4:2,11 5:6
61:1
**statements** 32:17
40:20 67:22 68:24
**states** 1:1,12 2:2,6
2:9,14 3:2,8,12,16
4:4 7:2 13:17,22
14:9,14,20 17:18
18:5,15,17 20:12
34:15,19 41:22
47:14,14 56:16
57:10 74:25
**static** 39:5,5
**stay** 49:11
**step** 19:24,25
33:23 76:17,19
82:3 87:13 98:6
99:6
**stephen** 62:21
68:17
**steps** 29:3 94:18
**stevens** 8:1
**sticking** 42:4
**stipulation** 80:1,1
81:8 90:18,20,21
91:4
**stock** 11:3
**stop** 82:20 103:25
**stored** 55:5

**story** 98:1
**strawberry** 10:10
**street** 1:13 6:14
7:3 8:11 10:3
**stretched** 26:14
49:16
**strikes** 28:19
**stroik** 8:24
**strongly** 83:14
**structure** 38:1
103:20
**struggle** 66:1
**stuff** 32:1,3 70:21
77:15
**subject** 17:15
18:12 44:22 51:12
67:13 80:21 84:8
85:15 93:19
101:17
**submission** 91:18
**submit** 56:10
58:13 60:8 61:2
63:6 64:19 80:17
81:19
**submits** 57:6
**submitted** 83:11
**submitting** 50:14
**subordinated**
40:2
**subpoena** 21:20
23:21 24:14 25:16
26:21 27:3,22
28:9,11,16,21
31:10 36:20 45:24
46:3 51:9 60:2
80:8,14 82:17
86:7,9,25 87:6,18
88:2 93:16 94:11
**subpoenaed** 30:5
**subpoenaing**
21:22 37:4
**subpoenas** 29:25
30:1 36:21 51:18

53:16 79:21 87:10
87:15
**subsequent** 102:6
**subset** 82:17
97:11
**substantial** 52:19
54:5 65:3 70:10
**substantially** 24:6
55:21 77:8
**success** 35:18
**suffer** 56:19
**sufficiency** 88:19
**sufficient** 27:6
58:19 81:5
**suggested** 37:9
81:16
**suggesting** 15:1
64:24
**suggestion** 17:8
69:17
**suggests** 20:10,17
83:14
**suite** 7:10 105:22
**summar** 43:12
**summarize** 43:15
**summer** 98:24
**sunday** 58:6
**sunedison** 36:16
**super** 74:23
**supplied** 51:21
66:9
**support** 3:1,15
4:1,3 103:20
104:11
**supporting** 58:9
**supposed** 45:8
**sure** 15:25 17:10
24:4 31:9 33:5
40:6 45:20 62:10
68:25 71:19,21
72:7 73:10 82:14
85:22 88:7 93:11

**switch**  61:15 73:8
**sydenham**  11:20

**t**

**t**  105:1,1
**tacks**  97:19
**tailored**  100:4
**take**  14:11 17:6
  22:1 25:12 29:11
  41:8 51:1 52:24
  62:24 66:6,18,25
  94:18 98:2 99:19
  101:4
**taken**  34:3 56:9
  56:11 78:21
**takes**  25:9
**taleah**  7:20
**talk**  31:3 69:9
  95:6 101:13
**talked**  71:24
**talking**  27:20
  35:12 66:3,10
  72:19 78:4 89:16
**tangent**  29:24
**targeted**  20:16
**task**  49:6
**tax**  32:19 67:21
  68:23
**taxes**  75:18
**team**  73:23
**tech**  72:11
**technical**  99:13
**teeth**  48:11
**telephonic**  13:8
**telephonically**  6:8
  6:9,10,17,18,19
  7:6,13,20 8:6,7,14
  8:21,22,23,24,25
  9:6,7,15,16,23,24
  10:6,13,22 11:1
**tell**  21:5 27:14,17
  27:19 28:4,4,15
  29:23 65:2 71:16
  87:4

**telling**  38:15
  49:21 85:8
**ten**  98:22 99:10
  101:10
**tend**  40:3 52:11
  77:4
**tenths**  23:6
**term**  33:4,7 62:19
**terminated**  35:20
**terms**  33:1,11,16
  33:22 57:13 59:6
  59:19 60:11 61:8
  61:14,21,22,25
  62:6,9 63:2,15,16
  64:2 65:4,23 66:2
  66:4,9 67:5,13,18
  67:19 71:25 72:1
  72:20 76:22 79:15
  92:14 102:9 104:2
**text**  55:4 59:7
**thailand**  86:2
**thank**  13:20 14:8
  34:8 47:2,21 49:2
  50:16,21,24 74:6
  75:8,21 79:13,18
  89:14 90:6,10
  101:19 102:16
  104:16,17,18
**thanks**  56:1
**theirs**  59:10
**theoretically**  71:9
**theresa**  63:17
  79:17
**thin**  49:17
**thing**  36:1 41:23
  49:1,24 69:17
  75:24 86:20 98:18
**things**  14:7 31:14
  48:22 49:17 56:8
  61:10 75:10 76:2
  76:3,5 77:4 92:9
  98:24

**think**  13:18 16:3,5
  16:16 17:3,6,11
  20:19 21:15,19
  22:17,25 23:16,17
  25:1,4,6,9,16
  26:10,11,13,22
  29:6 30:3,15
  32:11,13 33:3,9
  33:13,22 34:3
  38:19 40:15 41:1
  41:4 42:12,25
  43:2 44:1 45:7,20
  46:11,14,22 50:25
  51:24 52:13,18
  53:2,4,20 54:4
  63:11 65:15 72:6
  73:9,13,23 75:19
  76:2,4,24 77:14
  79:4 80:5,23
  82:13 87:7,24
  88:7,8 90:7 95:3
  95:22 97:8,14
  98:14 99:18 100:2
  100:13 101:3,6,9
  101:16,17,20,23
  102:1,11,15,23
  103:2,12,14,21
  104:5,8,14
**thinking**  40:15
  64:23 69:13
**third**  7:17 8:18
  15:5,13,18 16:22
  16:23 21:20,20
  23:3,4,20 28:23
  71:6,14 103:24
**thomas**  7:10 11:4
**thought**  30:23
  39:25 41:8 47:12
  47:15 66:25 74:8
  75:15
**thousands**  56:15
  56:19

**threat**  40:7
**threats**  35:6
**three**  14:10 16:3
  17:4 18:18 28:19
  53:16 58:23 59:20
  62:6
**tickets**  32:18,22
**time**  14:13,18
  22:15 25:8 28:23
  37:23 57:2,23,24
  59:1,12,23 60:9
  63:14,25 64:6
  67:16 73:18 92:17
  92:18 97:7 98:4
**timeframe**  70:24
**times**  24:13 57:4
  95:16
**today**  13:6 30:8
  36:10 37:16,24
  38:3
**today's**  40:8
  104:15
**told**  14:25,25 62:5
  83:24 92:23
**tool**  40:9
**top**  25:15 28:2
  49:11 68:22
**topic**  46:23 75:15
**topics**  73:8
**total**  64:4 73:19
**touts**  58:7
**trace**  40:6
**tracing**  34:20
  41:11 76:12
**track**  42:6 50:4
  97:3
**transactions**
  74:17 75:5
**transcribed**  5:25
**transcript**  13:11
  13:12 104:19
  105:4

**transfer** 31:13
76:20 103:23
**transferee** 97:6
102:5
**transferred** 54:6
70:8
**transfers** 15:16
30:13 54:10 57:15
70:2,17 71:3
73:25 74:3,9 75:4
75:23 76:12,16,23
91:1 92:9,10 97:1
102:6
**transmit** 19:25
20:11
**transparency**
85:7
**transpose** 50:20
**trial** 49:6
**tried** 58:16 85:19
92:4
**trillion** 26:15
**trillions** 15:23
56:22
**troop** 2:5 3:5,11
3:12 7:6 13:20,21
14:5,8 15:24,25
17:3,6,10,16 19:2
19:14,19 21:13,18
21:25 22:13,17,23
23:8 24:4,16
25:19,22 26:7,8
26:18 27:9,14,18
27:23 28:18 29:1
29:5,16,19,23
30:6,12 31:15
32:4,5,15 33:14
36:23 37:12,14,20
38:11,18 39:2,12
39:15 40:14 41:4
41:7 42:16 43:3
43:11,15,18,25
44:4,7,11,13,15

45:2,6,13,17 46:6
46:15,21 47:2,18
51:6 88:6,6 89:2
89:15,20,22 90:4
90:6
**troop's** 33:10
**true** 53:24 69:17
92:11,13 105:4
**trust** 104:9
**trustee** 6:13
**trusts** 54:9 57:1
57:16 67:23 90:19
96:7
**truth** 67:17
**try** 68:11 77:7
86:10,13 94:18
**trying** 24:17
26:14 38:18 40:17
78:8 79:2
**tsier** 11:9
**tuesday** 89:13
**turn** 15:2 43:1,7
46:25 49:21 68:11
**turned** 31:8
**tweaking** 67:13
**tweed** 9:1
**twice** 46:25 73:2
**two** 16:25 17:6
19:24 23:9 24:9
33:21,23 35:1,15
36:25 41:15,15
42:12 48:3 53:13
69:19,23 76:17,19
82:3 90:7 93:10
103:22
**type** 32:25 55:3
79:6 101:17
**types** 25:6 43:3,9
**typical** 21:19,20
61:24

## u

**u.s.** 1:23 6:12,13
**ucc** 3:10 17:1
22:10 36:8 43:2,6
74:19 82:24
**udem** 11:24
**ultimately** 16:19
49:9 64:11 77:11
93:13
**unable** 17:25
**unclear** 45:8
**underestimating**
25:8
**underlying** 14:16
31:6,7
**understand** 22:22
31:9,20 32:3
33:16 38:14 39:19
40:12 43:18 49:14
52:25 63:22 64:3
68:16,21 80:18
86:19 92:2 94:12
103:6
**understanding**
42:16 43:15 72:9
75:24 81:17
100:12
**understands** 16:5
**understood** 45:6
79:11 86:6 100:3
**undertake** 37:25
**undertaken** 27:16
**undertaking**
86:15
**undervalued**
74:17
**undue** 23:3 27:25
36:15
**unduly** 23:5
**unfortunate**
58:15
**unfortunately**
59:1 65:6 78:19

**unhelpful** 18:8
**unilaterally** 21:7
**uninvolved** 35:25
**uniquely** 57:6
**united** 1:1,12
**universe** 79:5
**unmanageable**
41:11
**unmistakable**
65:16
**unnecessarily**
33:8
**unnecessary** 18:8
**unreasonable**
62:16
**unredacted** 44:11
44:15 45:3 51:23
**unsecured** 2:22
3:14,21 4:2,8 9:11
47:4
**unspecified** 34:16
**updated** 25:20
**upstreams** 75:5
**use** 38:23 61:24
62:2 82:22
**usually** 24:10
**uzzi** 4:20 5:9 9:7
34:4 89:1

## v

**vacuum** 86:5
**valuable** 100:14
**valuation** 80:5
**value** 37:24 104:2
**valued** 38:5
**van** 10:13
**variety** 17:19
**various** 25:5 70:2
88:10
**vary** 23:7
**vendor** 78:4
**verification** 14:24
**verify** 14:22

**veritext** 105:20
**version** 51:23
**versions** 51:20,21
**versus** 34:1 48:16
  104:2
**victims** 8:10
**view** 19:9 46:17
  46:18 79:24 86:18
  95:8 102:20,25
**violated** 41:12
**volume** 53:23
**volumes** 65:8
**voluntarily** 80:13
**voluntary** 14:13
  58:16 82:19

**w**

**wait** 52:13
**walmart** 10:2
**want** 16:1 23:18
  25:7 29:24 31:7
  33:8,11 34:5,11
  34:25 36:25 37:10
  43:13 46:23 47:23
  49:22 51:3 60:16
  64:14 68:25 69:22
  71:19 73:10 74:23
  75:8,9 76:7 77:1
  80:10,22 82:13
  84:4 90:16 95:5
  97:21 98:18
**wanted** 48:25
  50:3 74:6
**wants** 22:5 31:4
  38:16 69:2 72:8
**wardwell** 6:3
**warranted** 16:6
  98:8
**washington** 7:11
**way** 20:24 23:10
  24:2 27:1 29:7
  31:22 38:3,23
  40:1 47:12,20
  51:19 69:14 75:7

79:14 84:13,16
  87:25 93:4 94:5
  98:10
**ways** 23:9 73:23
  93:10
**wayside** 77:5
**we've** 21:15 35:1
  36:22,24 40:16,22
  43:5 67:8,19,20
  68:10,22 78:1
  83:4 84:5,9 85:9
  95:23 98:7 104:12
**wealth** 35:19 36:5
  36:5,8 57:17 74:5
  76:3
**week** 68:21 77:6
  78:3 101:21
**weekend** 104:20
**weekly** 47:24
**weeks** 14:10
**went** 66:7 68:14
  73:17 78:3 97:2
**west** 7:3 8:11
**white** 1:14
**wife** 99:14
**williamson** 11:19
**williford** 8:25
**willing** 77:2
  102:12
**willingness** 102:8
**wilmington** 10:4
**winthrop** 7:1
  13:21
**wires** 32:22
**wishes** 98:19
**withheld** 84:9
**wonderful** 49:4
**word** 52:24 57:22
**words** 52:3,20
**work** 23:21 27:3
  37:2 49:10 53:4
  65:3 72:17 78:8
  89:3,25 102:25

**work's** 101:13
**worked** 58:16,17
  92:11
**working** 49:17
  73:24 78:18
**works** 47:15
  104:8
**world** 40:8 74:10
**worried** 48:18
  99:9
**worse** 40:9
**worth** 25:22 58:8
  97:7,14
**worthwhile** 38:2
**would've** 78:21
**wrong** 43:4,8
  73:11 99:7

**x**

**x** 1:4,10 37:24
  38:3,5,5,6 40:20
  42:5 72:1 85:24

**y**

**y** 42:5
**yards** 9:3
**yeah** 31:15 40:11
  43:25 49:1 52:16
  53:1 89:15,21
  103:4
**year** 37:16 38:6
  101:11
**years** 35:15 65:23
  98:25 99:10
**yesterday** 88:12
  88:14
**yield** 64:9
**yielded** 62:9 72:1
**york** 1:2 6:6,15
  7:4,18 8:4,12,19
  9:4,13,21 10:20
  29:24,25 30:7,8
  34:22 38:16

**z**

**zabel** 7:15
**zwally** 12:6