# MASTER SERVICES AGREEMENT

This **MASTER SERVICES AGREEMENT** (the "Agreement") is made and entered into as of April 1, 2013 ("Effective Date") by and between [Pharma Co. X] or ("Company") with principal offices at [Pharma Co. X] and **PRACTICE FUSION, INC.** ("Practice Fusion") with its principal place of business at 420 Taylor Street, San Francisco, California 94102. Company and Practice Fusion are each hereafter referred to individually as a "Party" and together as the "Parties."

1  Engagement. Practice Fusion is engaged by [Pharma Co. X] and/or its Associated Companies[1] to provide consulting services ("Services" or "Project"), in each case as agreed upon by the parties in Statement(s) of Work, each of which will be in writing signed by both parties, will be made a part hereof and will include detailed information concerning the services to be performed. The primary contact at [Pharma Co. X] relating to the performance of services hereunder will be specified in each Statement of Work. Any conflict or inconsistency between the provisions of this Agreement and any executed Statement of Work shall be resolved by giving precedence to this Agreement and then to the Statement of Work under which the Services are to be performed. In the event a provision in the Statement of Work is intended to supersede a provision in this Agreement, then the Statement of Work must clearly state that the following provision in the Statement of Work will supersede the applicable provision in this Agreement.

2  Term. The term of this Agreement will begin on the Effective Date and continue for two years expiring March 31, 2015. This Agreement and any Statement of Work hereunder may be terminated by either Party at any time for any reason by providing fourteen (14) days' written notice. In the event of such cancellation, Practice Fusion shall immediately cease incurring any additional costs in connection with this Agreement or Statement of Work, and [Pharma Co. X] sole obligation to Practice Fusion shall be limited to payment of those costs and expenses, already incurred by Practice Fusion up to the date of cancellation, which are not cancelable or recoverable.

3  Compensation. Practice Fusion's fees for services will be detailed in each Statement of Work.

4  Travel Expenses. [Pharma Co. X] will reimburse Practice Fusion for reasonable travel, lodging and reasonable out-of-pocket expenses incurred in accordance with <u>Exhibit A</u> "Practice Fusion Vendor Travel and Expenses Policy" attached hereto and made a part hereof and any applicable Statement of Work, subject to the limitations set forth in each Statement of Work. Practice Fusion will obtain approval from [Pharma Co. X] prior to incurring any expenses associated with the performance of services hereunder. Practice Fusion will provide receipts and any other back-up documentation reasonably requested by [Pharma Co. X] ("Expense Documentation") for any expenses for which it seeks reimbursement hereunder and Practice Fusion acknowledges and agrees [Pharma Co. X] will have no obligation to reimburse for expenses for which no Expense Documentation is provided.

5  Payment Terms. [Pharma Co. X] will pay Practice Fusion's fees for services and will reimburse Practice Fusion for authorized travel expenses within forty five (45) days of receipt by [Pharma Co. X] of a correct and undisputed invoice from Practice Fusion. Invoices will state in detail the deliverables and amounts due, including the Practice Fusion's name, the work performed, the dates of performance, and when applicable, the time worked for each task. Invoices for allowable travel expenses incurred by Practice Fusion will be itemized. All invoices submitted by Practice Fusion will state amounts due in U.S.

---

[1] As used in this Agreement, "Associated Company(ies)" shall mean any person, firm, trust, partnership, corporation, company or other entity or combination thereof, which directly or indirectly, owns or controls [Pharma Co. X] is owned or controlled by [Pharma Co. X] or is under common ownership or control with [Pharma Co. X] The terms "control" and "controlled" mean ownership of fifty percent (50%) or more of the voting and equity rights of such person, firm, trust, partnership, corporation, company or other entity or combination thereof or the power by contract or otherwise to control or direct the management of such person, firm, trust, partnership, corporation, company or other entity or combination thereof.

dollars and all payments made by [Pharma Co. X] will be in U.S. dollars and will be sent to the address set forth above, or to such other address as [Pharma Co. X] may subsequently designate by notice.

6   Confidentiality.

    6.1 During the term of this Agreement, either Party ("the Receiving Party") may receive, learn or have access to confidential information of the other Party (the "Disclosing Party"), or third parties to whom the Disclosing Party has an obligation of confidentiality. The Receiving Party may also receive, learn or have access to additional confidential information of the Disclosing Party or its associated companies that is generated during the course of or as a result of performance of services hereunder. All such information will be deemed "Confidential Information". Such Confidential Information will not be subject to obligations of non-disclosure and non-use if it:

        6.1.1   was already known to the Receiving Party at the time of disclosure by or on behalf of the Disclosing Party or its associated companies as shown by prior written records; or

        6.1.2   is already available or becomes available in print or other tangible form, to the public through no fault of the Receiving Party; or

        6.1.3   was received by the Receiving Party from a third party who has the right to disclose it; and who did not receive it, directly or indirectly, from or on behalf of the Disclosing Party or its associated companies.

    6.2 For a period of ten (10) years from the date of disclosure, the Receiving Party will keep all Confidential Information in confidence, and will not disclose it to anyone (including through lecture, presentation, manuscript, abstract, poster or any other publication).

    6.3 Further, the Receiving Party will use the Confidential Information solely for the purpose of performing his/her obligations under this Agreement.

    6.4 The Receiving Party agrees to not make copies of any Confidential Information, aside from those copies required by the Receiving Party for performing his/her obligations under this Agreement. At any time upon the Disclosing Party's demand or upon termination of this Agreement, the Receiving Party will return to the Disclosing Party all such Confidential Information, including any copies.

    6.5 In the event that any Confidential Information is required to be disclosed pursuant to any judicial or government request, requirement or order, the Receiving Party shall take reasonable steps to provide the Disclosing Party with sufficient prior notice in order to allow the Disclosing Party to contest such request, requirement or order. In such event, the Receiving Party shall cooperate reasonably with the Disclosing Party, at the Disclosing Party's expense, in seeking confidential treatment of such requested or compelled disclosure.

    6.6 The Receiving Party will receive and transmit Confidential Information in a secure manner and store in a secure, private manner and not on servers accessible to an entity or person not bound by confidentiality under this Agreement.

    6.7 The Receiving Party will comply with all applicable federal, state, and local laws and regulations that require the Disclosing Party to disclose to governmental authorities certain information regarding compensation and expenses paid to or for the Receiving Party by the Disclosing Party in connection with this Agreement.

The obligations and restrictions set forth in this Section will survive the termination or expiration of this Agreement.

7 Protection of Personal Information. Performance under the Agreement may involve the exchange of certain information about individual persons including, without limitation, individually identifiable health information, employment information, insurance information, and family information ("Personal Information"). The Parties will transmit, handle, store, maintain, use and destroy Personal Information in a manner that will preserve its confidentiality and will not use or disclose it for any purposes other than the performance of this Agreement. The obligations and restrictions set forth in this Section will survive the termination or expiration of this Agreement.

8 Inventions and Patents.

    8.1 Except to the extent expressly provided otherwise in Section 8.2 below, all of [Pharma Co. X] Confidential Information, all [Pharma Co. X] Intellectual Property, inventions, discovery and derivative works, and all patents, copyrights, and other rights related thereto shall be and remain the sole property of [Pharma Co. X] (collectively, [Pharma Co. X] Intellectual Property"). Practice Fusion hereby assigns to [Pharma Co. X] any rights it may have or acquire in any and all such discovery and derivative works based on [Pharma Co. X] Confidential Information and/or [Pharma Co. X] Intellectual Property, and all patent, copyright and other rights related thereto, and Practice Fusion will not have any rights to disclose or otherwise use any [Pharma Co. X] Intellectual Property hereunder except with [Pharma Co. X] prior written consent. Practice Fusion agrees that Intellectual Property will be disclosed to [Pharma Co. X] in writing. Without charge to [Pharma Co. X] but at [Pharma Co. X] expense, Practice Fusion will execute, acknowledge and deliver all such further papers, including, without limitation, applications for patents, copyrights and specific assignments of invention or copyrights reasonably requested by [Pharma Co. X] To the maximum extent permitted by law, Practice Fusion will perform such other acts deemed necessary to obtain or maintain protection by way of patents, copyrights or otherwise for the Inventions in any and all countries and to vest title thereto in [Pharma Co. X] its Associated Companies, designees, successors and assignees. Practice Fusion agrees to assign and does hereby assign to [Pharma Co. X] all of Practice Fusion's worldwide right, title and interest in and to such [Pharma Co. X] Intellectual Property.

    8.2 It is acknowledge that Practice Fusion possess certain inventions, processes, know-how, trade secrets, computer technical expertise and software and other intellectual property all of which has been independently developed without the benefit of any Confidential Information or any other property of [Pharma Co. X] under this Agreement and which is owned or controlled by Practice Fusion (collectively, the "Practice Fusion Intellectual Property"). Practice Fusion and [Pharma Co. X] agree that any Practice Fusion Intellectual Property or any improvements thereto which are used, improved, modified or further developed solely by Practice Fusion during the performance of this Agreement, which are the product of Practice Fusion's technical expertise, which are related to Practice Fusion's line of business or the way Practice Fusion performs its services, and which do not use or include any of [Pharma Co. X] Confidential Information or any other property of [Pharma Co. X] under this Agreement, shall be and remain the property of Practice Fusion. It is expressly understood that no title to or ownership in the Practice Fusion Intellectual Property is transferred to [Pharma Co. X] under this Agreement.

    8.3 The rights and obligations set forth in this Section 8 will survive the termination or expiration of this Agreement.

9 Liability Insurance. Practice Fusion will, at Practice Fusion's sole cost and expense, procure and maintain during the term of this Agreement and for a period of two (2) years following the termination or expiration of this Agreement the following minimum insurance coverage, written by insurance companies authorized to do business in the applicable jurisdiction(s) with a minimum

OAJ:Practice Fusion, Inc.:MSA:032813 [Pharma Co. X]

3

financial rating of at least an "A-" or higher by the latest edition of A.M. Best or its equivalent, the policies for which will be primary and non-contributory:

a. Commercial General Liability including liability coverages for Premises Operations, Blanket Contractual, Personal Injury and Advertising Injury and Products/Completed Operations in amounts not less than $1,000,000 per occurrence and $2,000,000 annual aggregate; and

b. Employers Liability and Workers' Compensation Insurance:
   i. Employers Liability: in amounts not less than $1,000,000 per occurrence and $1,000,000 annual aggregate; and
   ii. Workers' Compensation: coverage as mandated by applicable state statutes.

c. Excess Liability Insurance in amounts not less than $4,000,000 per occurrence and $4,000,000 annual aggregate; and

d. Errors and Omissions Insurance in amounts not less than $1,000,000 per occurrence and $2,000,000 annual aggregate; and

[Pharma Co. X] reserves the right to ask for additional insurance coverage for specific Services in the applicable SOW.

Any insurance policies which are written on a "claims-made" basis shall be kept in force for not less than two years following termination or expiration of the Agreement. Evidence of successive policy periods shall be made by the annual issuance of a certificate of insurance to [Pharma Co. X] Alternatively, a copy of an "extended reporting period" endorsement, expiring no less than two years following completion of the work covered by this contract, shall be provided to [Pharma Co. X]

[Pharma Co. X] and its Associated Companies and their respective officers, directors, shareholders, employees, authorized agents and assigns are named as additional insureds under General Liability, Products Liability, Automobile Liability, and Excess Liability insurance coverage obtained by Practice Fusion.

Practice Fusion waives, and will require all of its insurers to waive, all rights of recovery against [Pharma Co. X] and its Associated Companies and their respective officers, directors, shareholders, employees, Practice Fusions, authorized agents and assigns, arising from any perils insured against in connection with this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise.

Before the commencement of the Services hereunder, Practice Fusion agrees to submit to [Pharma Co. X] a certificate of insurance ACORD Form 25-S (1/95), or latest edition. [Pharma Co. X] shall be provided with certified endorsements evidencing existence of the requirements contained above including an "extended reporting period" endorsement and primary and non-contributory endorsement. The COI must be signed by a duly authorized officer or agent of the insurer. In addition, Practice Fusion will provide [Pharma Co. X] with written notice at least thirty (30) days prior to cancellation, non-renewal or material change in such insurance. The standard certificate of insurance cancellation language shall be modified to comply with this requirement.

The obligations set forth in this Section shall survive the termination or expiration of this Agreement.

10  Performance of Services. Practice Fusion represents and warrants that he/she has the right to enter into and perform under this Agreement. Practice Fusion represents and warrants that all Projects will be performed in conformance with all applicable laws, regulations and rules governing the Projects. Practice Fusion will perform all Projects in accordance with this Agreement and with a high degree of care, skill, diligence, professional knowledge, judgment and expertise according to generally accepted

OAJ:Practice Fusion, Inc.:MSA:032813 [Pharma Co. X]

4


professional and industry standards, in a well-managed, organized, and efficient manner and to the reasonable satisfaction of Pharma Co. X

Each employee, contractor, or agent assigned to perform the Projects hereunder will have the proper skills and training so as to be able to perform in a competent and professional manner and will perform all work in accordance with the applicable Statement of Work. Furthermore, Practice Fusion, Practice Fusion's employees, contractors, and agents, will adhere to the standards of professional behavior followed by Pharma Co. X while on Pharma Co. X premises or while performing services for Pharma Co. X and will adhere to all security requirements particular to each work location.

Practice Fusion may designate the personnel to perform services pursuant to this Agreement; provided however that Pharma Co. X may request that remedial action, including the removal of any of Practice Fusion's personnel be taken if the conduct or performance of Practice Fusion's personnel is not in accordance with required standards. Promptly, upon Pharma Co. X request, Practice Fusion will use diligent efforts to replace the personnel with other personnel of Practice Fusion's who possess the necessary skills, knowledge and training to perform the services contemplated.

In addition, during the term of this Agreement, Practice Fusion agrees to report to Pharma Co. X any Adverse Event (any unintended medical or physical condition that is evidenced during the use of a Pharma Co. X product) or any complaint about a Pharma Co. X product that comes to Practice Fusion's attention. The requirements and procedures for Practice Fusion to report Adverse Events or Product Complaints are set forth in <u>Exhibit B</u> attached hereto.

11  <u>Indemnification</u>.  Each Party (the "Indemnify Party") will promptly indemnify, defend and hold harmless the other Party, its Associated Companies and its and their respective owners, officers, directors, agents, servants, employees, representatives or contractors (collectively, the "Indemnified Party") against any liability, damage, loss or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon the Indemnified Party to the extent arising from any willful misconduct, negligent act or omission, any breach of this Agreement, or any failure to comply with all relevant laws, regulations and rules governing the services.  The Indemnified Party will immediately notify the other Party of any such claim, suit, action, demand or judgment.  The obligations stated in this paragraph shall survive termination of this Agreement.

12  <u>Publications</u>.  Practice Fusion shall not use any results generated pursuant to the performance of services for teaching, research, education, clinical or publication purposes without the prior written consent of Pharma Co. X  The obligations of this Section will survive the termination or expiration of this Agreement.

13  <u>Representations and Warranties</u>.   Each Party represents and warrants that it has the legal right and authority to enter into and perform the obligations set forth under this Agreement.  Each Party represents and warrants that all services will be performed in conformance with all applicable laws, regulations and rules governing the performance of services hereunder.  Each Party will perform all services in accordance with this Agreement and with a high degree of care, skill, diligence, professional knowledge, judgment and expertise according to generally accepted professional and industry standards, in a well-managed, organized, efficient and workmanlike manner.

14  <u>Notices</u>.  All legal notices or demands provided for by this Agreement will be in writing and will be deemed to have been given when delivered by certified mail, return receipt requested, or by overnight courier.  All such communications should be addressed to the address of the respective party stated below or to such changed address as the party may have provided by notice:

PFDPA00000807

To [Pharma Co. X]

To [Pharma Co. X]

**Pharma Co. X**

To Practice Fusion:         Practice Fusion, Inc.
                            420 Taylor Street
                            San Francisco, California 94102
                            Attention: ▬▬▬▬▬▬▬▬▬▬

15  Assignment. Notwithstanding assignment to Associated Companies of the respective Parties, the Parties may not subcontract or assign the services and/or his/her obligations under this Agreement in whole or in part without the other Party's prior written consent.

16  Independent Contractor/Subcontractor. Practice Fusion is and will be treated as an independent contractor and not an agent, employee, joint venturer or partner of [Pharma Co. X]. Practice Fusion will not subcontract Services or any part thereof without [Pharma Co. X] written approval. Practice Fusion will pay, when due, salaries, wages and other forms of compensation or reimbursement and all applicable federal, state and local withholding taxes and unemployment taxes, as well as social security, state disability insurance and all other payroll charges payable to, or on behalf of, Practice Fusion's personnel working on any Project. No federal, state or local income or withholding taxes, no social security, state disability insurance, unemployment taxes or workers' compensation, life, casualty, or disability insurance, or health, retirement or any other employment benefits will be paid by [Pharma Co. X] to or for the benefit of Practice Fusion or Practice Fusion's employees, and Practice Fusion waives any right to such benefits.

17  Government Employment Status. [Pharma Co. X] is not permitted to retain individuals who work for, or provide services to, the federal government of the United States of America if such retention presents a real or apparent conflict of interest or if an honorarium or other compensation would constitute an unlawful gift or compensation to an employee of the federal government. If Practice Fusion works for or provides services to the federal government of the United States of America, whether as full- or part-time employee or special employee or Practice Fusion, Practice Fusion represents by signing this Agreement that no real or apparent conflict of interest exists by entering into this Agreement.

18  Applicable Law. This Agreement will in all respects be governed by, interpreted, construed and enforced in accordance with the laws of the [ **Pharma Co. X** ] USA, applicable to contracts executed and to be fully performed therein. Except for actions seeking injunctive relief initiated by either Party to protect a Party's Confidential Information which may be brought in any court of competent jurisdiction in the continental U.S., the parties agree that any action or proceeding arising out of or in connection with this Agreement will be in a federal or state court of appropriate venue and subject matter jurisdiction located in the [ **Pharma Co. X** ] USA. Each party hereto irrevocably consents to the personal jurisdiction of the courts in the [ **Pharma Co. X** ].

19  Entire Agreement. This Agreement, together with appendices, attachments and/or exhibits, constitutes the entire agreement between the Parties with respect to the subject matter contained herein, and this Agreement supersedes all prior understandings and agreements between the Parties with respect to the subject matter contained herein. This Agreement and the rights and obligations

OAJ:Practice Fusion, Inc.:MSA:032813 [Pharma Co. X]

6

hereunder may not be modified, amended or waived, whether in whole or in part, except by a writing signed by both parties.

20  Waiver. No waiver of any term, provision or condition of this Agreement whether by conduct or otherwise in any one or more instances will be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or of any other term, provision or condition of this Agreement.

21  Invalidity. The terms of this Agreement will be severable so that if any term, clause, or provision hereof is deemed invalid or unenforceable for any reason, such invalidity or unenforceability will not affect the remaining terms, clauses and provisions hereof, which will continue with full force and effect to the maximum allowable extent under applicable law.

22  Use of Name. Under no circumstances may one party use the name of the other party for promotional literature or advertising without the prior written permission and approval of the other party. Notwithstanding the foregoing, in the event that either party may be required to use the name of the other party in submissions to regulatory authorities, no prior consent for such use will be necessary.

23  Debarment. Practice Fusion represents that he/she is not and has never been (i) debarred under Section 306(a) or 306(b) of the United States Federal Food, Drug and Cosmetic Act, as may be amended and supplemented from time to time ("FDCA"); (ii) charged with, or convicted of, any felony or misdemeanor within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(l)-(3), or proposed for exclusion or (iii) excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. Federal or State health care programs (including convicted of a criminal offense that falls within the scope of 42 U.S.C. §1320a-7 but not yet excluded, debarred, suspended, or otherwise declared ineligible), or excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. Federal procurement or non procurement programs. Notwithstanding any provision in this Agreement to the contrary, Pharma Co. X may immediately terminate this Agreement if Practice Fusion violates this Section. Practice Fusion will notify Pharma Co. X immediately, but in no event later than five (5) business days, after knowledge of any such exclusion, debarment, suspension or otherwise ineligibility occurring during the term of this Agreement, or if any action or investigation is pending.

24  Force Majeure. Neither party will be liable for any delay or failure to perform as required by this Agreement to the extent that such delay or failure to perform is caused by circumstances reasonably beyond either party's control, such as labor disputes, accidents, any law, order or requirement of any governmental agency or authority, civil disorders or commotions, acts of aggression, fire or other casualty, strikes, acts of God, explosions, or material shortages. Performance time will be considered extended for a period of time equivalent to the time lost because of any such delay or failure to perform; however, in any event, this extension of time will not exceed fifteen (15) days unless the parties otherwise agree in writing.

25  Headings/Counterparts. The headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement. This Agreement may be executed in any number of counterparts, and each such counterpart hereof will be deemed to be an original and all such counterparts together will constitute one agreement.

26  Equal Employment Opportunity. Practice Fusion represents that Practice Fusion is in compliance with all applicable laws, regulations, and orders with respect to equal employment opportunity.

27  Behavior of Practice Fusion's Employees and Independent Contractors. In performing services under this Agreement, Practice Fusion, Practice Fusion's employees and independent contractors will: (i) not commit any act of sexual harassment nor discriminate on the basis of sex, race, religion, national origin, disability, marital status, Veteran's status and age and any other status protected by law; and

7

(ii) conduct themselves ethically and professionally. Practice Fusion will indemnify and hold harmless [Pharma Co. X] against any liability, losses, claims and expenses (including but not limited to attorneys' fees) arising from any breach of the foregoing obligations.

28  Requisites to Providing Service. At the request of [Pharma Co. X] prior to and/or during the performance of any Project, Practice Fusion will: (i) provide [Pharma Co. X] with any required business or tax information related to services performed under a SOW; and (ii) cause Practice Fusion's personnel to comply with all requirements specified by [Pharma Co. X] including without limitation: acknowledging in writing the obligations set forth in this Agreement; executing a confidentiality and/or invention agreement presented by [Pharma Co. X]

29  Review of Work; Audit. During the term of this Master Agreement and upon prior notice, Service Provider will provide [Pharma Co. X] Agents, reasonable access, at [Pharma Co. X] expense, to examine the work performed hereunder to determine that the Services are being conducted in accordance with the agreed terms.

30  Execution. This Agreement may be executed (including by facsimile or electronic submission) by one or more of the Parties on any number of separate counterparts. All of such counterparts taken together shall be deemed to constitute one and the same instrument, and (if by facsimile or electronic submission) each such facsimile or electronic submission shall have the same force and effect as if an original.

AGREED AND ACCEPTED as of the Effective Date set forth above.

**Pharma Co. X**

Date: 4/2/13

PRACTICE FUSION, INC.

Date: 3/29/13

## Exhibit A
## Practice Fusion / Vendor Travel and Expense Policy

### GENERAL

It is the policy of the Company to reimburse only those approved expenses that are identified in this document. The Company's designated travel agency (the "Travel Office") arranges for airline, car rental, hotel, and rail and must be used for all travel of this type unless otherwise approved by the Company in writing and in advance.

An original itemized receipt for all expenses of $25 or greater must be submitted to the Company with expense submissions, including itemized meal receipts, must show the number of people served, date, itemized order detail, and the amount of the expense approved out-out-pocket expenditures. A receipt for multiple persons must identify the name(s) of all persons in attendance, and the business purpose. The original e-ticket invoice and boarding pass receipt(s) must be attached with expense submissions as applicable.

### AIR TRAVEL

All domestic and international air travel will be arranged in Coach Class, utilizing the lowest applicable airfare, unless otherwise authorized. Air tickets will be charged to the Practice Fusion//Vendor's charge card. E-tickets will be issued for domestic and international travel as applicable. The original e-ticket invoice and boarding pass receipt(s) must be attached with expense submission.

It is the Practice Fusion/Vendor's responsibility to notify the Travel Office of any cancellations. Any fees associated with cancellations that are not at the Company's request will be the responsibility of the Practice Fusion/Vendor.

Reservations should be made at a minimum of 14-21 days in advance unless Company request is less than that time period.

Reimbursement will be authorized for the 1st checked bag when a fee is charged by the airline and accompanied by a receipt with expense submission. Reimbursement of a 2nd checked bag fee will be authorized only for trips of more than five (5) business days when a fee is charged by the airline and accompanied by a receipt with expense submission.

### AIRPORT PARKING

Parking on site at the airport will be reimbursed when travel is limited to two days or less. When travel exceeds two days the use of discount or offsite parking should be utilized. Reservations may be made through The Parking Spot: http://www.theparkingspot.com/Promotions/CorporateHome.aspx? Pharma Co. X Charges should be applied to Practice Fusion/Vendor's charge card.

### CELLULAR PHONES

Reasonable and customary calls for Company business purposes will be reimbursed with submission of a cellular phone bill that shows both the account owner and the call detail.

### DESIGNATED TRAVEL OFFICE – RESERVATION & PAYMENT PROCEDURES:

➢ **In General (unless an exception below applies):**
The designated Travel Office is Orbitz for Business, which offers service 24/7/365 via phone, mobile, and online.

9

OAJ:Practice Fusion, Inc.:MSA:032813 Pharma Co. X

A completed, approved "Non-Employee Notification of Travel" form must be submitted by a Company representative for <u>each</u> Practice Fusion/Vendor (and their employees) who will be submitting expenses, prior to travel arrangements being made. Then a separate e-mail from Orbitz for Business Traveler Care with a link to the Orbitz for Business system will be sent to the Practice Fusion/Vendor employee. This link will bring the Practice Fusion/Vendor employee into the Company's Orbitz for Business account where they will register as a Guest Traveler. Once the Practice Fusion/Vendor employee is registered as a guest, they will be able to log into the system with access to their own travel profile. A charge card must be entered in the profile under Billing Information for the purchase of an airline or rail ticket and to secure hotel and car reservations, for security reasons this information will not be fully viewable to anyone once entered.

> **Exception A. Speakers presenting at Product Theaters:**

Specific written direction from the Company or a 3rd Party Vendor concerning information on the program and the designated Travel Office the Practice Fusion/Vendor will use, and how to secure travel arrangements will be provided when a Statement of Work is signed and received by the Company. The following will apply:

The designated Travel Office must be utilized for all travel arrangements. The Company will pay directly for the airfare, rail and ground transportation charges as applicable. The Travel Office will reserve hotel and ground transportation (when applicable) for you. Hotel and other reimbursable business expenses will be paid by you and then reimbursed by the Company with appropriate documentation.

> **Exception B. Non-Product Theater Speaker Travel, Speaker Training and Advisory Board Meeting Travel:**

Specific written direction from the Company or a 3rd Party Vendor concerning information on the program and the designed Travel Office the Practice Fusion/Vendor will use, and how to secure travel arrangements will be provided when a Statement of Work is signed and received by the Company. The following will apply:

The designated Travel Office must be utilized for all travel arrangements. The Company or Designated 3rd Party Vendor will pay directly and secure airfare, rail, hotel, and ground transportation (when applicable). Taxi services or other incidental charges will be paid by you at the time charges are incurred, and then reimbursed by the Company with appropriate documentation.

## GROUND TRANSPORTATION

Practice Fusion/Vendor employees should use the most economical mode of transportation to and from airports, rail terminals, hotels and business destinations (*e.g.*, personal car, taxi, airport shuttle service, etc…).

Mileage for personal car use will be reimbursed at the standard IRS rate that is in effect at the time of travel.

If approved by the Company, Practice Fusion/Vendor employee will have use of a rental automobile at their destination. Use of a rental automobile is in the Company's sole discretion and is only approved when other forms of transportation are impractical, more expensive or not available, or if the destination is more than 200 miles round trip. Individuals will receive a mid-size car. Full size will be used if there are four (4) or more travelers riding together. Practice Fusion/Vendor employees are to return the rental car with a full tank of gas or the amount of gas as when the car was provided. Company does not reimburse for refueling charges by the car rental company, unless the rental will consume the majority of the tank of gas and pre-purchase of the gas becomes cost-effective. Company does not reimburse Practice Fusion/Vendor for Rental Car insurance coverage, and does not provide to r reimburse for any personal insurance coverage. Notwithstanding the foregoing, LDW (Loss Damage Waiver) and Accident Liability

OAJ:Practice Fusion, Inc.:MSA:032813 [Pharma Co.]

10

Insurance (minimum statutory limit) Rental Car insurance covering third party bodily injury and third party property damage will be provided if the Travel Office is able to utilize the Company's preferred rental car vendor and receive the Company's corporate rate. It is the <u>Practice Fusion/Vendor's sole responsibility</u> to (1) verify if the rental car vendor is the Company's preferred vendor and if so, that the car been reserved using the corporate rate, (2) decide the adequacy of any minimum statutory limit of LDW and Accident Liability Insurance provided and to pay for additional limits if deemed necessary in the Practice Fusion/Vendor's sole discretion. For all other occasions, it is recommended that Practice Fusion/Vendor purchase through the rental car vendor or otherwise arranges for, through a personal auto insurance policy, adequate limits of Accident Liability Insurance, as well as Collision, Comprehensive, Fire and Theft insurance coverage when renting a vehicle.

## LODGING

Business Class and Limited Service hotel accommodations must be used when making hotel arrangements. All room reservations must be made for a standard guest room not upgraded room categories. Additional charges for upgraded rooms to executive floors, concierge levels or suites will not be reimbursed. Deluxe hotels are not to be utilized. Deluxe chains include Four Seasons, JW Marriott Hotels & Resorts, Luxury Collection Starwood Hotels & Resorts, Mandarin Oriental, and Ritz Carlton Hotels & Resorts.

Reasonable and necessary laundry and dry cleaning services will be reimbursed for trips of more than five (5) business days.

Charges for mini-bar, in-room movies/games, personal items (*e.g.*, toiletries, magazines, aspirin, etc...) and health club charges will not be reimbursed.

## MEALS

Company will reimburse for meal expenses (breakfast, lunch, and dinner) actually incurred during business travel. Meals should not exceed $75 per day, including gratuity. Room service may be used within these cost guidelines.

An original itemized receipt must be obtained for all meals charges $25 or greater showing the number of people served, date, itemized order detail (*e.g.*, food and beverages), and the amount of the expense

## RAIL

All Amtrak reservations are to be booked through the Travel Office. Travelers from the NY/NJ area to Boston, Philadelphia and Washington D.C. may take advantage of Amtrak's Metroliner Service and Acela, using standard coach fares or Amtrak's Business Class Service. This option should be chosen when the use of the train proves to be cost effective and an efficient use of business time. Pre-paid tickets are issued as a standard and then tickets are obtained from the Amtrak kiosk or ticket counter on day of departure.

If a Metro-North or other local commuter train multi-ride pass is purchased, the Traveler may expense the pro rata share of the expense for the specific date of travel only (one-way or round trip).

## EXHIBIT B
## ADVERSE EVENTS AND PRODUCT COMPLAINTS FOR Pharma Co. X PRODUCTS

As part of doing business with Pharma Co. X we require our vendors to assist us in ensuring that Adverse Events (AEs) and Product Complaints (PCs) involving our products are appropriately captured. Therefore, **we expect you to notify each of your employees who provide services to Pharma Co. X of this policy.** You are free to reproduce this document for the notification process.

It is Pharma Co. X policy, as well as a legal obligation for Pharma Co. X to report Adverse Events (AEs) that occur in anyone that is taking any of our medications or Product Complaints (PCs) involving our products.

- An Adverse Event (AE) is any unintended event associated with the use of the marketed product, whether or not considered related to that particular product. Unintended means any event which is not a purpose of the product (i.e., respiratory depression, nausea, constipation etc...)

- A Product Complaint (PC) is any complaint about the physical characteristics of a product.

- Reporting: **Any person who is engaged in any type of work for** Pharma Co. X who hears about an Adverse Event (AE) involving a person receiving a Pharma Co. X product or a product (brand name is not known) with the same active ingredient as the Pharma Co. X product or becomes aware of a Product Complaint (PC), must report the incident immediately (within 48 hours) to the Pharma Co. X Pharma Co. X via

    Fax:
    Phone:
    E-mail:     **Pharma Co. X**

    You must report this information within 48 hours even if you are unsure whether the Adverse Event was caused by, or related to, the Pharma Co. X product or whether the Product Complaint concerned a Pharma Co. X brand product (brand name unknown).

If you have any questions about this policy, please contact the Pharma Co. X Pharma Co. X.