HENRICHSEN SIEGEL, PLLC
225 Broadway, Suite 1803
New York, New York 10007
(646) 378-4421 (phone)
Chiung-Hui Huang
Neil L. Henrichsen (motion *pro hac vice* pending)
Dawn C. Stewart (motion *pro hac vice* pending)

*Counsel to the Representatives of the Proposed Class*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.,* | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

**MOTION BY PUBLIC SCHOOL DISTRICTS FOR AN ORDER ALLOWING THEM TO PROCEED WITH A CLASS PROOF OF CLAIM AND CERTIFYING A CLASS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

Jurisdiction and Venue ........................................................................................ 1

Background ........................................................................................................... 2

Relief Requested .................................................................................................. 7

Argument .............................................................................................................. 7

I.      The Bankruptcy Code authorizes class proofs of claim. ........................... 7

II.     The Court should apply Bankruptcy R. 7023 and Fed. R. Civ. P. 23 to authorize school districts to proceed with a single, consolidated, class-wide proof of claim. 9

     A.     In the context of this case, authorizing school districts to proceed with a class-wide proof of claim will better serve the goals of bankruptcy and due process than any alternative procedure. .................................................. 9

         1.     School districts have distinct claims, but they will effectively be disenfranchised unless they can proceed with a consolidated, class-wide proof of claim. ............................................................................ 10

         2.     Most school districts will not file individual proofs of claim because—very understandably—they are unaware not merely of the bar date but also, more importantly, of the causal basis of their claim. Realistically, only a certified class can solve that problem. . 14

         3.     While school districts' claims are many billions of dollars in the aggregate, many individual school districts' claims are small, creating a collective action problem, which—once again—only a class action can solve. ........................................................................ 17

         4.     Certifying a class should also minimize the number of late-filed claims requiring case-by-case adjudications of "excusable neglect." ............................................................................................... 17

         5.     Certifying a class is consistent with focusing on abatement. .......... 18

     B.     The so-called "Musicland factors" likewise favor allowing a consolidated, class-wide proof of claim here. ..................................................... 18

     C.     Amidst the procedural and doctrinal issues, it is important not to lose sight of the stakes. ........................................................................... 22

III.    The proposed class satisfies all of Rule 23's requirements for certifying a class. . 22

A.    The proposed class fulfills all four prerequisites of Fed. R. Civ. P. 23(a). . 23

    1.    The Class is more than sufficiently "numerous."............................. 23

    2.    The key questions that school districts' claims raise, both legal and factual, are overwhelmingly "common." ........................................... 23

    3.    The Representatives of the Proposed Class have claims that are "typical" of the claims of all other class members. .......................... 25

    4.    Both the Representatives of the Proposed Class and Class Counsel can be trusted to adequately protect the interests of all class members. ............................................................................................ 26

B.    The Proposed Class also qualifies for certification under Rule 23(b) and should be certified, as a "limited fund" class, under subsection (b)(1)(B) of that Rule. ....................................................................................................... 26

Conclusion ........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Birting Fisheries v. Lane* (*In re Birting Fisheries, Inc.*), 92 F.3d 939 (9th Cir. 1996)................. 8

*Board of Educ. of the City of Chicago v. Cephalon, Inc., et al.*, No. 19-op-46042 (N.D. Oh.
    Nov. 20, 2019) ............................................................................................................. 2

*Conn v. Dewey & Leboeuf LLP* (*In re Dewey & Leboeuf LLP*), Nos. 12-12321-MG, 12-01672
    (MG), 2013 Bankr. LEXIS 1685 (Bankr. S.D.N.Y. Mar. 8, 2013)................................. 8

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ...................................... 23

*Doe v. Karadzic*, 192 F.R.D. 133 (S.D.N.Y. 2000) ...................................................................... 27

*Gentry v. Siegel*, 668 F.3d 83 (4th Cir. 2012) ................................................................................ 8

*In re Am. Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988)................................................. 8, 9, 16, 21

*In re Broadhollow Funding Corp.*, 66 B.R. 1005 (Bankr. S.D.N.Y. 1986) ................................... 8

*In re Chaparral Energy, Inc.*, 571 B.R. 642 (Bankr. D. Del. 2017) ........................................... 19

*In re Charter Co.*, 876 F.2d 866 (11th Cir. 1989) ................................................................... 8, 10

*In re Chateaugay Corp.*, 104 B.R. 626 (Bankr. S.D.N.Y. 1989) ............................................ 8, 21

*In re Connaught Grp., Ltd.*, 491 B.R. 88 (Bankr. S.D.N.Y. 2013) ............................................. 19

*In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1 (S.D.N.Y. 2005) .................................................... 8

*In re MF Global, Inc.*, 512 B.R. 757 (Bankr. S.D.N.Y. 2014)................................................ 8, 19

*In re Musicland Holding Corp.*, 362 B.R. 644 (Bankr. S.D.N.Y. 2007)................................. 9, 18

*In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804-DAP, ECF. 1 (N.D. Oh. Dec. 12, 2017) ............................................................................................................. 2, 24

*In re REA Express, Inc.*, 10 B.R. 812 (Bankr. S.D.N.Y. 1981) .................................................... 8

*In re WorldCom, Inc.*, 347 B.R. 123 (Bankr. S.D.N.Y. 2006) ..................................................... 8

*In re Zenith Labs., Inc.*, 104 B.R. 659 (Bankr. D.N.J. 1989) ................................................ 16, 17

*Lucas v. Dynegy, Inc.* (*In re Dynegy, Inc.*), 770 F.3d 1064 (2d Cir. 2014) ............................ 7, 8

*Marisol A. by Forbes v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) .................................................. 25

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................................................... 27, 28

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) ....................... 18

*Reid v. White Motor Corp.*, 886 F.2d 1462 (6th Cir. 1989) .......................................................... 8

*Schuman v. Connaught Grp., Ltd.* (*In re Connaught Grp., Ltd.*), 491 B.R. 88 (Bankr. S.D.N.Y. 2013) .................................................................................................................................. 8

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ....................... 22

*Stott v. Capital Fin. Servs.*, 277 F.R.D. 316 (N.D. Tex. 2011) ................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................ 24

**Statutes and Regulations**

11 U.S.C. § 1126 ........................................................................................................................ 28
28 U.S.C. § 1408 .......................................................................................................................... 2
28 U.S.C. § 1409 .......................................................................................................................... 2
28 U.S.C. § 157 ............................................................................................................................ 1
28 U.S.C. § 1334 .......................................................................................................................... 1
11 U.S.C. § 1122(a) .................................................................................................................... 27
20 U.S.C. § 1412(a)(10) ............................................................................................................... 4
34 C.F.R. § 104.35 .................................................................................................................. 4, 11

34 C.F.R. §§ 300.20-300.24 ........................................................................... 4, 11

34 C.F.R. § 300.101 ............................................................................................. 3

**Other Authorities**

Alan N. Resnick, BANKRUPTCY AS A VEHICLE FOR RESOLVING ENTERPRISE-THREATENING
    MASS TORT LIABILITY, 148 U. Pa. L. Rev. 2045 (June 2000) ................................. 27

Peter Muening, *Consequences in Health Status and Costs*, *in* THE PRICE WE PAY: ECONOMIC
    AND SOCIAL CONSEQUENCES OF INADEQUATE EDUCATION 125 (C. R. Belfield & H.M.
    Levin eds., 2007) ................................................................................................ 6

National Council on Disability, *Broken Promises: The Underfunding of IDEA* (Feb. 7, 2018),
    https://ncd.gov/sites/default/files/NCD_BrokenPromises_508.pdf ............................... 12

Dana Mitra, *Pennsylvania's Best Investment: The Social and Economic Benefits of Public
    Education* (2011), https://perma.cc/6CLA-VNP5 .................................................. 6

UNITED STATES CENSUS BUREAU, 2017 CENSUS OF GOVERNMENTS—ORGANIZATION, Table
    10. Elementary and Secondary School Systems by Enrollment-Size Group and State:
    2017, https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html...... 4

Stephen J. Carroll & Emre Erkut, *The Benefits to Taxpayers from Increases in Students'
    Educational Attainment* (2009), https://www.rand.org/content/dam/rand/pubs/
    monographs/2009/RAND_MG686.pdf................................................................ 6

Prime Clerk TV Commercial, "Purdue Pharma Claims" Featuring Héctor Elizondo,
    https://www.ispot.tv/ad/nVB9/prime-clerk-purdue-pharma-claims-featuring-hctor-
    elizondo .............................................................................................................. 20

Paula M. Lantz, et al., *Socioeconomic Factors, Health Behaviors, and Mortality: Results from a
    Nationally Representative Prospective Study of U.S. Adults*, 279 JAMA 1703 (1998) ............. 6

Lance Lochner & Enrico Moretti, *The Effect of Education on Crime: Evidence from Prison
    Inmates, Arrests, and Self-Reports,* 94 AM. ECON. REV. 155 (2004)........................ 6

Henry M. Levin et al., *The Public Returns to Public Educational Investments in African American Males,* 26 ECON. EDUC. REV. 699 (2007) ................................................................. 6

Jane Waldfogel et al., *Welfare and the Costs of Public Assistance, in* THE PRICE WE PAY ....... 6

Cecilia Elena Rouse, *Consequences for the Labor Market, in* THE PRICE WE PAY .................... 6

**Rules**

Fed. R. Civ. P. 23 .......................................................................................................... passim
Fed. R. Bankr. P. 1123(a)(4) ................................................................................................ 28
Fed. R. Bankr. P. 7023 .................................................................................................. passim
Fed. R. Bankr. P. 9006(b)(1) ............................................................................................... 17
Fed. R. Bankr. P.  9011 ....................................................................................................... 15
Fed. R. Bankr. P. 9014 .................................................................................... 1, 7, 22, 29

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

Pursuant to Rule 9014 and 7023 of the Federal Rules of Bankruptcy, the following school districts, Miami-Dade County Public Schools in Florida; Bullitt County School District, Hart County Schools, LaRue County Schools, Martin County Schools, and Owsley County School District in Kentucky; East Aurora School District 131, Thornton Township High School District 205, Thornton Fractional High School District 215, and Joliet Township High School District 204 in Illinois; and Gallup-McKinley County School District and Eunice Public Schools in New Mexico ("Representatives of the Proposed Class"), each of them creditors with class proofs of claim on file or soon to be filed in this proceeding, move for the following relief:

(a)    A determination that the goals of bankruptcy will be best served in this case by certifying a "limited fund" class—as authorized by Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure (made applicable to these proceedings by Bankruptcy Rule 7023)—of "all public school districts nationwide that are independent governmental entities"; and

(b)    The appointment of the school districts bringing this motion to serve as Representatives for the Class and their attorneys to serve as Class Counsel.

A draft order is attached as Exhibit E to this motion.

## Jurisdiction and Venue

**1.**    This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this

district under 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On September 15, 2019 and September 16, 2019, Purdue Pharma L.P. and

twenty-three affiliated debtors (collectively, the "Debtors") each filed voluntary

petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.

3.      On November 20, 2019, a class action was filed in the coordinated and

consolidated pretrial proceedings being conducted by Judge Polster, in the U.S. District

Court for the Northern District of Ohio, on behalf of "all public school districts which

are independent units of government," against more than a dozen producers and

distributors of opioids, seeking to recover the costs of providing special education

services to children exposed to opioids *in utero*. *See Board of Educ. of the City of Chicago v.

Cephalon, Inc., et al.*, No. 19-op-46042 (N.D. Oh. Nov. 20, 2019), ECF No. 1, consolidated

with *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804 (N.D. Ohio) ("the MDL").[2]

This class-action complaint on behalf of school districts, which is incorporated by

reference in the proofs of claim filed in this Court thus far by the Representatives of the

Proposed Class, contains thirty-three pages of allegations specifically against the

Debtors, alleging, among other things, the Debtors' production, marketing, and sale of

---

[2] A copy of the MDL, school-district, class-action complaint is attached as Exhibit A to this
motion.

OxyContin and other opioid drugs through a pattern of racketeering activity.

Importantly for this motion, both this class action complaint and the class proofs of

claim filed by Representatives of the Proposed Class in this Court identify and seek

damages that have not been separately calculated by any other governmental entity: the

cost to school districts of providing special education and related services to children

with developmental disabilities caused by exposure to opioids *in utero*.[3] Due to the

automatic stay and this Court's extension of it to eight members of the Sackler family,

the school districts' complaint does not name the Debtors or the Sacklers as party

defendants, instead identifying them as unnamed co-conspirators. *See id.* at ¶¶ 50, 59.

4.    On February 3, 2020, this Court entered an order fixing the bar date for

proofs of claim in these proceedings; approving the form of bar-date notice; and

directing, among other things, that notice of the procedures and the deadline for filing

proofs of claim be served by first-class mail on "all creditors and other known holders

of claims as of the date of the Bar Date Order," as well as "all parties known to the

Debtors as having <u>potential</u> claims against the Debtors' estates." ECF No. 800, ¶¶ 18d &

18i (emphasis in original).

---

[3] The NAS Children claimants have no cognizable claim for these expenses. Federal law requires public elementary and secondary school districts to provide a "free appropriate public education" to each qualified child with a disability in their jurisdiction. 34 C.F.R. 300.101. As a result, parents do not incur these costs, public schools do.

5.      Under this Court's order, public school districts are, or should be deemed, at the very least, "parties known to the Debtors as having <u>potential</u> claims against the Debtors' estates." Despite the wording of the Court's order and the Debtors' notice of the MDL proceedings, in which school districts have filed a class action complaint with extensive allegations against the Debtors, the Debtors have not directed written notice of proof-of-claim procedures and the bar date to our nation's public school districts.[4] On information and belief, only three school districts in the country have received mailed notice.[5] There are approximately 13,000 public school districts nationwide, and their existence and locations are readily ascertainable from public records. *See generally* UNITED STATES CENSUS BUREAU, 2017 CENSUS OF GOVERNMENTS—ORGANIZATION, Table 10. Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017, https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.

---

[4] For the sake of concision, this Motion will refer to public elementary and secondary school districts that are independent entities simply as "school districts." School districts are required by federal law to provide special education and other supplemental services to children with disabilities, including, as relevant here, to children with disabilities caused by their exposure to opioids while *in utero*. 34 C.F.R. §§ 300.20-300.24 (IDEA regulations); 34 C.F.R. § 104.35 (Section 504 regulations). In addition, school districts must also pay for services for students with disabilities at private schools within their boundaries. 20 U.S.C. § 1412(a)(10).

[5] Three districts, having been listed on debtors' schedules, may have received mailed notice: City of Anacortes and Sedro-Wooley School District; The Iberia Parish School Board; and The St. Mary Parish School Board. *See* ECF No. 357, Schedule of Assets and Liabilities for Purdue Pharma L.P., at 336, 682, 907; ECF No. 359, Schedule of Assets and Liabilities for Purdue Pharma Inc., at 172, 488, 696.

6.      On April 13, 2020, three of the Proposed Representatives of the Class—
The Board of Education of East Aurora, School District No. 131; The Board of Education
of Thornton Township, High School District No. 205; and The Board of Education of
Thornton Fractional Township, High School District No. 215—filed a motion, on behalf
of themselves and public schools nationally, to submit school districts' claims to
mediation before Mr. Feinberg and retired Judge Phillips. *See* ECF No. 1038. On April
21, 2020, the Court entered a stipulation and agreed order, *see* ECF No. 1073, giving
school districts an opportunity to present their claims to the mediators, which the
school districts did on May 5, 2020. Both before and since the mediation, the school
districts have also engaged in outreach to other committees of public-side claimants.

7.      Each of the Proposed Representatives of the Class has filed or will soon
file a timely class proof of claim in these proceedings, on behalf of school districts
nationwide.

8.      As the Representatives of the Proposed Class will explain below, children
exposed to opioids *in utero* are more than twice as likely as other children to need
special education services, which almost doubles the expected cost of their schooling
and puts a significant strain on school districts' budgets. These children are also much
more likely to need a variety of other supplemental educational services. And unless
they receive these special education and supplemental supports and services, which
only school districts are in a position to provide, and which offer the best hope for

helping these children stay in school, the consequences may be calamitous: low educational attainment is directly associated with increased rates of arrest and incarceration[6]; poor health; reliance on public health services[7]; dependence on public cash, food, and housing assistance programs[8]; and unemployment and low wages.[9]

**9.** Funding special education and supplemental education services for children exposed to opioids will be one of the best possible uses for the Debtors' funds and is also likely to have a positive multiplier effect on all other abatement efforts. Funding services for children will yield unmatched returns both now and for a long time to come.

---

[6] Lance Lochner & Enrico Moretti, *The Effect of Education on Crime: Evidence from Prison Inmates, Arrests, and Self-Reports,* 94 AM. ECON. REV. 155 (2004); Dana Mitra, *Pennsylvania's Best Investment: The Social and Economic Benefits of Public Education* (2011), https://perma.cc/6CLA-VNP5; Henry M. Levin et al., *The Public Returns to Public Educational Investments in African American Males,* 26 ECON. EDUC. REV. 699 (2007).

[7] Paula M. Lantz et al., *Socioeconomic Factors, Health Behaviors, and Mortality: Results from a Nationally Representative Prospective Study of U.S. Adults,* 279 JAMA 1703 (1998); Peter Muening, *Consequences in Health Status and Costs, in* THE PRICE WE PAY: ECONOMIC AND SOCIAL CONSEQUENCES OF INADEQUATE EDUCATION 125 (C. R. Belfield & H.M. Levin eds., 2007); Mitra, *supra* note 6.

[8] Jane Waldfogel et al., *Welfare and the Costs of Public Assistance, in* THE PRICE WE PAY, *supra* note 7 at 160-174; Stephen J. Carroll & Emre Erkut, *The Benefits to Taxpayers from Increases in Students' Educational Attainment* (2009), https://www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG686.pdf; Mitra, *supra* note 6.

[9] Cecilia Elena Rouse, *Consequences for the Labor Market, in* THE PRICE WE PAY, *supra* note 7 at 99-124; Mitra, *supra* note 6.

## Relief Requested

10.     By this Motion, the Representatives of the Proposed Class are asking this

Court to exercise its discretion under Bankruptcy Rule 9014 to: (a) apply Fed. R. Civ. P.

23 to their already-filed class proofs of claim; (b) certify a "limited fund" class, as

authorized by Fed. R. Civ. P. 23(b)(1)(B), of all public school districts nationwide that

are independent governmental entities; (c) appoint them as Representatives of the

Class; (d) appoint their attorneys as Class Counsel; and (e) subject to appropriate

proofs, allow the class proof of claim submitted by The Board of Education of East

Aurora School District 131, The Board of Education of Thornton Township High School

District 205, The Board of Education of Thornton Fractional High School District 215,

The Board of Education of Bullitt County School District, and The Board of Education of

Larue County Schools, on behalf of the proposed class.

## Argument

### I.     The Bankruptcy Code authorizes class proofs of claim.

11.     Bankruptcy Rule 7023 expressly makes Rule 23 of the Federal Rules of

Civil Procedure—the class action rule—applicable in adversary proceedings, while

Bankruptcy Rule 9014 gives the Court discretion, in addition, to apply Rule 7023 in

"contested matters." *Lucas v. Dynegy, Inc.* (*In re Dynegy, Inc.*), 770 F.3d 1064, 1068-69 (2d

Cir. 2014); *accord In re Am. Reserve Corp.*, 840 F.2d 487, 488 (7th Cir. 1988); *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 5-7 (S.D.N.Y. 2005).[10]

12.    Since all disputes in bankruptcy are either adversary proceedings or contested matters, *Lucas*, 770 F.3d at 1069; *In re Am. Reserve Corp.*, 840 F.2d at 488, the class action device is, therefore, available in all bankruptcy proceedings.

13.    In any non-adversary proceeding, when a proof of claim framed as a "class" claim is filed, it generally becomes a "contested" matter even before an objection. *In re Ephedra*, 329 B.R. at 6-7.

14.    After filing, to continue to pursue class certification, a creditor must take three further steps: "(1) make a motion to extend the application of Rule 23 to [the proof of claim], (2) satisfy the requirements of Rule 23, and (3) show that the benefits derived from the use of the class claim device are consistent with the goals of bankruptcy." *In re*

_____

[10] The Second Circuit approved the use of Rule 23 class actions in bankruptcy in *Lucas v. Dynegy*. Five other Circuit Courts of Appeal have also upheld their use. *See Gentry v. Siegel*, 668 F.3d 83 (4th Cir. 2012); *Birting Fisheries v. Lane* (*In re Birting Fisheries, Inc.*), 92 F.3d 939 (9th Cir. 1996); *Reid v. White Motor Corp.*, 886 F.2d 1462 (6th Cir. 1989); *In re Charter Co.*, 876 F.2d 866 (11th Cir. 1989); *In re Am. Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988). Historically, "[t]here is nothing unusual about representative litigation in bankruptcy cases. Quite the contrary, some of the earliest class suits were the creditors' bills that preceded the 1898 Code." *In re Am. Reserve Corp.*, 840 F.2d at 490. For examples of class actions in bankruptcy in this district, see *In re MF Global, Inc.*, 512 B.R. 757 (Bankr. S.D.N.Y. 2014); *Schuman v. Connaught Grp., Ltd.* (*In re Connaught Grp., Ltd.*), 491 B.R. 88 (Bankr. S.D.N.Y. 2013); *Conn v. Dewey & Leboeuf LLP* (*In re Dewey & Leboeuf LLP*), Nos. 12-12321-MG, 12-01672 (MG), 2013 Bankr. LEXIS 1685 (Bankr. S.D.N.Y. Mar. 8, 2013); *In re WorldCom, Inc.*, 347 B.R. 123 (Bankr. S.D.N.Y. 2006); *In re Chateaugay Corp.*, 104 B.R. 626 (Bankr. S.D.N.Y. 1989); *In re Broadhollow Funding Corp.*, 66 B.R. 1005 (Bankr. S.D.N.Y. 1986); and *In re REA Express, Inc.*, 10 B.R. 812 (Bankr. S.D.N.Y. 1981).

*Musicland Holding Corp.*, 362 B.R. 644, 651 (Bankr. S.D.N.Y. 2007). This motion executes

on all three steps. In the paragraphs that follow, the Representatives of the Proposed

Class request the application of Rule 23(b)(1)(B) to this case, to certify a "limited fund"

class; demonstrate why, under the circumstances of this case, authorizing school

districts to proceed with a single, consolidated, class-wide proof of claim is consistent

with the goals of bankruptcy—and, indeed, essential to carrying out those goals; and

explain how the proposed class fully complies with the requirements of Rule 23 of the

Federal Rules of Civil Procedure.

## II.    The Court should apply Bankruptcy R. 7023 and Fed. R. Civ. P. 23 to authorize school districts to proceed with a single, consolidated, class-wide proof of claim.

### A.    In the context of this case, authorizing school districts to proceed with a class-wide proof of claim will better serve the goals of bankruptcy and due process than any alternative procedure.

**15.**    Like the class action device, bankruptcy is itself a device for aggregating

claims. Chapter 11 concentrates substantially all creditors' pre-petition claims in a single

proceeding. However, the aggregating mechanism of a bankruptcy proceeding differs

from the aggregation achieved by Rule 23—because the default procedures in

bankruptcy contemplate individual proofs of claim, whereas a certified class, by

contrast, files a single, consolidated claim and offers class-wide proof on behalf of all

similarly situated creditors ("the class"), which brings forward claims "that otherwise

would otherwise lie dormant." *In re Am. Reserve Corp.,* 840 F.2d at 489. *See also In re*

*Charter Co.*, 876 F.2d 866, 871 (11th Cir. 1989) ("Applying Rule 23 to filing procedures will bring all claims forward, as contemplated by the Bankruptcy Code.").

16.     In some cases, for some classes of creditors, insisting on individual proofs of claim disenfranchises too many claimants and places too great a strain on due process, efficiency, and the goal of facilitating creditor compensation. In those cases, invoking Rule 23, to allow a class or classes of creditors to proceed by way of a class-wide proof of claim, becomes not only desirable but essential. Rule 7023, which authorizes the use of Rule 23 class action procedures in bankruptcy court, exists precisely for those cases. And *this* case is one of those cases.

17.     There are at least five reasons why this case is one where due process, efficiency, and equity in the distribution of the Debtors' estates make it essential to authorize school districts to proceed under Rule 23 as a class, with a single consolidated class-wide proof of claim.

### 1.     *School districts have distinct claims, but they will effectively be disenfranchised unless they can proceed with a consolidated, class-wide proof of claim.*

18.     School district claims are not derivative of other public entities' claims; and in ways that few, if any, other creditors (public or private) are, school districts are positioned to provide direct, remediating services to abate the ravages of the opioid crisis ignited by the Debtors. Furthermore, school districts will provide that abatement

to some of the most vulnerable victims of the crisis—children exposed to opioids while *in utero*.

19.    School districts should not be left to hope that others might ensure that a final plan of confirmation contains binding provisions (a "lockbox" approach) that specifically commit funds for special and supplemental education services for children damaged by their exposure to opioids *in utero*.

20.    Attached as Exhibits B and C to this motion are declarations from two preeminent experts, addressing both: (a) the effects of prenatal substance exposure on children; (b) the need for special education and other supplemental education services and interventions for these children; and (c) the costs that school districts nationwide have incurred and will incur to provide those services, costs that, conservatively estimated, will exceed 22 billion dollars (expressed in 2020 dollars).[11] These costs put a significant strain school districts' budgets.

21.    In providing these services, school districts carry out a significantly underfunded mandate: they are required by federal law to identify, locate, and evaluate children for special education services, and to provide those services, *see* 34 C.F.R. §§ 104.35, 300.20–300.24 (2020), even though federal funding, for these mandated

---

[11] *See* Declarations of Dr. Ira Chasnoff and Professor Tammy Kolbe, Exhibits B and C to this motion.

services, does not remotely cover their cost.[12] Furthermore, this funding problem has

been greatly aggravated by the opioid crisis, which has increased, and continues to

increase, the number of students needing special education interventions and services.

22.    The impetus for this motion is that—despite their need and their

entitlement to relief here—only a handful of school districts have filed proofs of claim in

this proceeding; and for reasons discussed below, that is not likely to change. At this

point, Rule 23(b)(1)(B) is the best, most efficient, timely, and effective mechanism this

Court has to give school districts a meaningful opportunity to bring their claims against

the Debtors, to prevent their disenfranchisement here, and to guarantee that a

meaningful portion of the Debtors' estates is spent to abate the ravages of the opioid

crisis that have been visited on children across the nation.

23.    Owing to the nature of the crisis that has given rise to them, these

proceedings are much more than a forum for discharging claims and working out an

appropriate "haircut." Inevitably, the outcome of these proceedings will be judged, in

part, by whether the recovery goes to the problem: whether the funds distributed here

go to the entities responsible for, and actually paying, the costs of abatement and

whether the funds are used to abate the opioid crisis—or instead, as with the Tobacco

---

[12] Regarding the underfunding of special education services, see generally National Council on
Disability, *Broken Promises: The Underfunding of IDEA* (Feb. 7, 2018),
https://ncd.gov/sites/default/files/NCD_BrokenPromises_508.pdf.

settlements in the 1990s, whether the funds are placed into "general revenue" and spent for other purposes.

24.     The costs falling on school districts are considerable; they can be estimated to a reasonable certainty; no other creditors appear as well positioned to provide direct, remediating abatement; and abatement efforts by school districts—which provide direct services to children from age three through high school—should have a positive multiplier effect on all other abatement efforts.[13]

25.     Last October, even before the onset of the coronavirus public health crisis and the resulting economic shutdown, this Court spoke about the risk that funds distributed in these proceedings might be diverted away from abatement, and that risk is even greater today. With 45 years of experience providing special education and supplemental education services, since the passage of the Education for All Handicapped Children Act in 1975 (now known as the Individuals with Disabilities Education Act), school districts are well positioned to put funds to work quickly and effectively, providing direct abatement—but as discussed below, they cannot do that unless their claims are aggregated in a single, consolidated class-wide proof of claim.

---

[13] Undersigned counsel, working with nationally renowned experts and school district leaders, have begun developing a focused abatement plan for high-impact direct services and innovation by and for school districts.

**2.      *Most school districts will not file individual proofs of claim because—very understandably—they are unaware not merely of the bar date but also, more importantly, of the causal basis of their claim. Realistically, only a certified class can solve that problem.***

26.      Although children exposed to opioids *in utero* are more than twice as likely as other children to require special education interventions and services, and the cost of those services doubles the cost of their education, at least three very substantial obstacles have prevented and will continue to prevent most districts from ascertaining their entitlement to a share of the Debtors' estates.

27.      First, under HIPAA's Privacy Rule, school districts generally do not have access to students' birth hospitalization records (let alone a parent's medical records), which prevents them from easily linking any particular student's disabilities to opioid exposure *in utero*.

28.      Second, even if schools had access to those records, few, if any districts would have the expertise or resources to investigate and discover the neurological links between opioid exposure *in utero* and educational impairment. *See* Declarations of Superintendents of East Aurora School District 131, Bullitt County School District, Martin County Schools, Hart County Schools, and LaRue County Schools, attached hereto as Exhibit D.

29.      Third, this bankruptcy proceeding is unfolding during an extraordinary time, in the midst of a world-wide pandemic. The current crisis, on top of the opioid crisis, has placed school districts under extraordinary pressure, as they fight to continue

to provide public education, so vital to our democracy, without risking the lives of

students, teachers, and other staff. Even under normal circumstances, the cost of

investing time and money to consult with neuroscientists and doctors or analyze the

neuroscientific literature to substantiate a claim to file in these proceedings, *see* Fed. R.

Bankr. P.  9011, would be too high for most school districts. But in the midst of the

current coronavirus pandemic—when school districts are overwhelmed by how to

finish this school year and whether and how to re-open school buildings in the fall—

taking the time to research,  evaluate and understand whether they have a claim to file

in a far-away bankruptcy court cannot be expected to be a priority for the vast majority

of school districts.

30.    As a result of these factors, truly unique to this case, a class-wide proof of

claim is, at this point, the only realistic option in these proceedings to avoid

disenfranchising thousands of our nation's school districts, with claims totaling billions

of dollars. For school districts, there is no adequate alternative to the class action device

in this proceeding. In particular, neither sending belated notice nor extending the

deadline for filing proofs of claim would be adequate substitutes for authorizing a class-

wide proof of claim—because most school districts are not only unaware of the

deadline for filing but also, and more importantly, they are also unaware of the basis of

their claim.[14] The capacity to address barriers like this, however, is part of the genius of the class action device.

31.    One of the primary purposes of the class action is to "provide[] a champion" for the class, *In re Zenith Labs., Inc.*, 104 B.R. 659, 663 n.3 (Bankr. D.N.J. 1989), with the expertise and resources to "identify and shape the claim[s]" that class members are not well positioned to identify for themselves, *In re Am. Reserve Corp.*, 840 F.2d at 489. That is a compelling reason to allow a class-wide proof of claim here.

32.    Because most school districts are not well positioned to commit resources to identifying, filing, and prosecuting a proof of claim in this proceeding—and particularly in these times—only a handful have filed a proof of claim, and that is not likely to change. Under present circumstances, the opportunity to recover from these Debtors' estates is, for most school districts, a "class action[ ] or nothing." *In re Am. Reserve Corp.*, 840 F.2d at 489. Unless the Court certifies a class of school districts under Rule 23, school districts—an entire class of approximately 13,000 creditors—will have no meaningful opportunity to receive any portion of the Debtors' estates (and, depending on whether a plan includes, and whether this Court allows, non-party releases, possibly no prospect of recovering from Sackler family members either).

---

[14] *See* superintendent declarations attached as Exhibit D.

**3.** *While school districts' claims are many billions of dollars in the aggregate, many individual school districts' claims are small, creating a collective action problem, which—once again—only a class action can solve.*

**33.** A *third* reason for invoking Rule 23 here is the problem of small claims and collective action. If every school district had to pursue its proof of claim separately, many would not, because the fractional recovery they would likely receive, compared to their total expenditures on special education and supplemental education services, would be too small to make the effort worthwhile. Only a class-wide proof of claim will enable smaller claims to come forward, solving the collective action problem—which, likewise, is one of the primary purposes of class actions. "[B]y aggregating … claims, [the class action procedure] effectively distributes the costs of investigation that would otherwise be borne on an individual basis over the class membership … [and] thus readjusts the cost-benefit analysis and ensures that smaller claims whose combined value is significant" are still brought forward. *In re Zenith Labs., Inc.,* 104 B.R. at 663 n.3.

**4.** *Certifying a class should also minimize the number of late-filed claims requiring case-by-case adjudications of "excusable neglect."*

**34.** A *fourth* reason for certifying a class here is that unless school districts are authorized to proceed with a single consolidated class-wide proof of claim, there will be some number of late-filed proofs of claim, each accompanied by a motion requesting an adjudication of "excusable neglect" for not filing sooner. Fed. R. Bankr. P. 9006(b)(1). The case-by-case due process analyses that would be required to resolve those motions,

*see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993), would be time consuming. Invoking Rule 23 to allow a single, consolidated, class-wide proof of claim, in which all school districts can join, avoids what might otherwise become a burden.

> **5.    *Certifying a class is consistent with focusing on abatement.***

36. A *fifth* reason for certifying a class here is that aggregating school districts' claims and specifically designating funds for school districts will set the stage for a court-supervised abatement trust or fund.

> **B.    The so-called "Musicland factors" likewise favor allowing a consolidated, class-wide proof of claim here.**

36. Although the decision whether to allow class proofs of claim is always case and fact specific, Judge Bernstein recommended a three-factor framework for weighing the decision in *In re Musicland Holding Corp.*, 362 B.R. 644. His proposed factors were: (1) whether the class was certified pre-petition, (2) whether the members of the putative class received notice of the bar date, and (3) whether class certification would adversely affect the administration of the case. *Id.* at 654-55. Judge Bernstein's factors are not exhaustive or dispositive. In any given case, any one of them, or other factors—such as the number of claimants at risk of being disenfranchised unless a class is certified, the reason(s) they risk being disenfranchised, and the extent to which certifying a class will facilitate creditor relief —may take on more or less importance.

No single factor, or combination of factors, is decisive. *In re Chaparral Energy, Inc.*, 571

B.R. 642, 646 (Bankr. D. Del. 2017).

37.    In this case, weighing the Musicland factors favors allowing a class proof

of claim.

38.    The first Musicland factor does not point decisively in either direction

here. No class of school districts bringing claims against the Debtors was certified in

any other court before the Debtors filed their petition here. But that is not a sufficient

reason for this Court to decline to certify one now. *See In re MF Global, Inc.*, 512 B.R. 757,

763-65 (Bankr. S.D.N.Y. 2014) (certifying a class though none was certified pre-petition);

*In re Connaught Grp., Ltd.*, 491 B.R. 88, 98-100 (Bankr. S.D.N.Y. 2013) (same). Due to the

automatic stay and the district court's stay of motion practice in the MDL, school

districts have been precluded from pursuing a class action against the Debtors and

members of the Sackler family outside of these proceedings.

39.    The second Musicland factor—the extent of notice provided (or denied) to

school districts—tilts strongly in favor of certifying a class here. School districts filed a

class action complaint in the MDL, a proceeding closely monitored by the Debtors, last

November—months before the Debtors disseminated mailed notice of these

proceedings. That class action complaint contains detailed and extensive allegations

aimed at the Debtors. Yet despite this Court's order—requiring mailed notice to "all

parties known to the Debtors as having <u>potential</u> claims against the Debtors' estates,"

ECF No. 800, ¶ 18(i) (emphasis in original)—the Debtors sent mailed notice of the

procedures and deadline for filing proofs of claim to very few school districts. None of

the Representatives of the Proposed Class received mailed notice.[15]

40.    The third Musicland factor—the likely effect of certifying a class on the

administration of the Debtors' estates—also strongly tilts toward certifying a class in the

circumstance of this case. The banal, reflexive response to a motion for the application

of Rule 7023 is almost always to assert that class certification might delay or otherwise

interfere with the progress of a bankruptcy case. But that concern is at its lowest ebb

when, as here, both a class proof of claim and a Rule 7023 motion have been filed before

the claims bar date and no plan of reorganization has been filed, let alone confirmed. In

addition, certifying a class here will add trivially little, if anything, to the work of claims

estimation: whether school districts' claims are disaggregated from other public sector

claims and included as a separate item (which is the best way to ensure that funds are

specifically and securely set aside for special education services) or instead made part,

---

[15] The television advertisement currently running on public airwaves focuses on individuals'
claims and is not effective notice to school districts of entity's potential claims, generally, or
about claims regarding neonatal abstinence syndrome stemming from students' opioid
exposure *in utero* in particular. *See* Prime Clerk TV Commercial, "Purdue Pharma Claims"
Featuring Héctor Elizondo, https://www.ispot.tv/ad/nVB9/prime-clerk-purdue-pharma-claims-
featuring-hctor-elizondo.

in some way, of a larger public sector "bucket" (from which, if past history is a guide,

funds risk being diverted), their value must be calculated.

41.     There is no persuasive reason, in this case, to think that permitting the filing of

class claims will cause any special delay or uncertainty in settling the debtors' estates. And

"[e]ven if this were not so, however, any potential marginal increase in delay or in

difficulty of valuation of claims would be justified in order to protect the right[s]" of

school districts "who might not otherwise be aware of the existence of or be able to

process their claims[] to be represented by the filing of a class proof of claim." *In re*

*Chateaugay Corp.*, 104 B.R. 626, 633 (S.D.N.Y. 1989). If anything, including school

districts on a class basis provides more certainty, closure and legitimacy to the process.

42.     In addition, only the use of a Rule 23 class can realistically prevent the

disenfranchisement of thousands of school districts nationwide, with tens of billions of

dollars in claims, and guarantee that a meaningful portion of the Debtors' estates is

spent on children damaged by opioids. Realistically, for most school districts, the

opportunity to recover from these Debtors' estates is a "class action[ ] or nothing." *In re*

*Am. Reserve Corp.*, 840 F.2d at 489.[16]

---

[16] *See* superintendent declarations attached as Exhibit D.

**C.** **Amidst the procedural and doctrinal issues, it is important not to lose sight of the stakes.**

43.     At bottom, the ultimate issue before this Court is straightforward. School districts across the country have collectively incurred and, more importantly, will continue to incur, billions of dollars of added costs to provide special education and supplemental education services to children who were exposed to opioids *in utero*. School districts have no choice except to provide these services. Under federal law, they are required to provided them, even though that mandate is underfunded. These costs, imposed by the Debtors' conduct, should rightly be defrayed by the Debtors. The question before this Court is whether school districts will have a meaningful opportunity to present their claims to have the Debtors defray those costs, and, once those claims are proven, to recover their equitable share from the Debtors' estates.

**III.** **The proposed class satisfies all of Rule 23's requirements for certifying a class.**

44.     If the Court exercises its discretion under Bankruptcy Rule 9014 to apply Rule 23 here, then the only remaining question will be compliance with the terms of Rule 23. For "[b]y its terms," Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the[se] specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Where the Rule is applicable, it does not allow a court to deny class certification on other grounds.

45.     Rule 23 imposes the following requirements before a class may be certified. First, a class must satisfy each of the four elements of Rule 23(a), namely, that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Then, the class must also satisfy the requirements of at least one subsection of Rule 23(b).

46.     Here, all elements of Rule 23(a) are satisfied, as are the requirements of Rule 23(b)(1)(B). Therefore, by the terms of Rule 23, a class should be certified.

**A.      The proposed class fulfills all four prerequisites of Fed. R. Civ. P. 23(a).**

**1.      *The Class is more than sufficiently "numerous."***

47.     Rule 23(a)(1) requires "numerosity," which is self-evident here. As a rule of thumb, as few as 40 class members raises a presumption of numerosity. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, there are approximately 13,000 public school districts nationwide.

**2.      *The key questions that school districts' claims raise, both legal and factual, are overwhelmingly "common."***

48.     Rule 23(a)(2) imposes a requirement that a class raise "questions of law or fact common to the class." A question is "common" if its answer will be the same for all

members of the class. "Even a single common question will do." *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 350 (2011).

49.    Here, there are numerous common questions. Indeed, in initiating the

MDL, the Judicial Panel on Multidistrict Litigation stated that all claims against opioid

manufacturer and distributor defendants, by all plaintiffs, fundamentally

> … involve common factual questions about, *inter alia,* the
> manufacturing and distributor defendants' knowledge of and
> conduct regarding the alleged diversion of these prescription
> opiates, as well as the manufacturers' alleged improper
> marketing of such drugs …. All of the actions can be expected to
> implicate common fact questions as to the allegedly improper
> marketing and widespread diversion of prescription opiates into
> states, counties and cities across the nation ….

*In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804-DAP, ECF. 1 (N.D. Oh.

Dec. 12, 2017).

50.    More particularly, the common questions present here include:

(a)    Whether the Debtors conspired to violate RICO in the marketing
and dissemination of prescription opioids;

(b)    Whether the Debtors were, or reasonably should have been, aware
that prescription opioids were causing an addiction epidemic
among pregnant women, are highly addictive, are not proper for
long-term treatment, and were being over-prescribed; and

(c)    Whether the Debtors were, or reasonably should have been, aware
that opioid exposure *in utero* leads to Neonatal Abstinence
Syndrome (NAS) and other complications;

(d)    Whether children exposed to opioids *in utero* exhibit higher rates of
behavioral and emotional disorders and cognitive disabilities and

disproportionately require and qualify for mandated enhanced
educational services, including special education services;

(e)     Whether the Debtors misrepresented that prescription opioids were
not highly addictive and were in fact proper for long term use; and

(f)     Whether the Debtors took reasonable steps to warn pregnant
women, doctors, pharmacists, and the public of the highly
addictive qualities of prescription opioids and the potentially
catastrophic results of opioid use during pregnancy.

**3.     *The Representatives of the Proposed Class have claims that are "typical"
of the claims of all other class members.***

51.     Rule 23(a)(3) imposes a requirement of "typicality," which "tend[s] to

merge" with the related requirement of commonality. *Marisol A. by Forbes v. Giuliani*,

126 F.3d 372, 376 (2d Cir. 1997). "Typicality" is satisfied when "when each class

member's claim arises from the same course of events, and each class member makes

similar legal arguments to prove the defendant's liability." *Id.* Here, every school district

will make not just similar but the same arguments to prove the Debtors' liability.

Although it has numerous epicenters, the opioid crisis is nationwide, and all school

districts have the same claims, based on the same legal theories (including conspiracy,

civil RICO, and public nuisance); alleging the same unlawful conduct (the Debtors'

conspiracy to deceptively market opioids as safe and effective and rarely, if ever,

addictive); and claiming the same damages (the costs of special education services

needed by children as a result of exposure to opioids *in utero*). In addition, although this

is not required, the Representatives of the Class reflect, collectively, both large and

small districts, from both urban and rural areas, and from different parts of the country.

The requirement of typicality is satisfied.

### 4. *Both the Representatives of the Proposed Class and Class Counsel can be trusted to adequately protect the interests of all class members.*

**52.**     Rule 23(a)(4) requires that the Class Representatives must "fairly and

adequately protect the interests of the class." That standard is met when the interests of

the Class Representatives are aligned with the interests of other class members; and

alignment is assured when, as here, both the Class Representatives and other class

members have suffered the same injuries and have the same interest in establishing the

defendants' liability. Rule 23(g) also requires the appointment of adequate counsel to

represent the class. Here, Class Counsel—from the law firms Henrichsen Siegel, PLLC,

Mehri & Skalet, PLLC, Hughes Socol Piers Resnick & Dym, Ltd., Himes Petrarca &

Fester, Chtd., and Terrell Hogan, P.A., are highly qualified and bring extensive class

action, complex litigation, and school-law experience to their representation of the class

in this case. The requirements of Rule 23(a)(4)—and Rule 23(b), discussed next—are

satisfied.

### B. **The Proposed Class also qualifies for certification under Rule 23(b) and should be certified, as a "limited fund" class, under subsection (b)(1)(B) of that Rule.**

**53.**     In addition to satisfying the requirements of Rule 23(a)(1) through (a)(4), a

class must also fulfill the requirements of at least one subsection of Rule 23(b).

26

54.    Here, the proposed class meets the requirements of, and should be certified under, Rule 23(b)(1)(B).

55.    The "paradigm suit under Fed. R. Civ. P. 23(b)(1)(B) is the limited fund class action," *Doe v. Karadzic*, 192 F.R.D. 133, 139 (S.D.N.Y. 2000), which describes this case.

56.    In a limited fund situation, many parties have claims against a limited fund, which will be inadequate to pay them all at full value.[17] That is the essence of this bankruptcy proceeding.[18]

57.    The Supreme Court has suggested, without requiring, a three-part standard for certifying a limited fund class under Rule 23(b)(1)(B).

58.    First, the fund available to satisfy aggregated liquidated claims, set at their maximum, must be inadequate to pay all of them. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815,

---

[17] The fact that the Debtors here will remain in possession of certain assets to continue operations does not preclude finding that the Debtors' estates (and the Sacklers' contributions to them) are a "limited fund." *Stott v. Capital Fin. Servs.*, 277 F.R.D. 316, 331 (N.D. Tex. 2011).

[18] Although a primary characteristic of most bankruptcies is the distribution of a limited fund, that in no way suggests that Bankruptcy R. 7023, and class-action treatment under Rule 23(b)(1)(B), will or should be used except seldomly. In fact, the use of Rule 23(b)(1)(B) in bankruptcy will remain relatively rare, because outside the mass tort context, very few "classes" of creditors for purposes of Bankruptcy Code § 1122(a) will ever be able to satisfy the more stringent "commonality" and "typicality" requirements that are conditions for certifying a "class" under Rule 23. The Bankruptcy Code gives debtors (or other plan proponents) significantly more flexibility in grouping claims than Rule 23 does. *See generally*, Alan N. Resnick, BANKRUPTCY AS A VEHICLE FOR RESOLVING ENTERPRISE-THREATENING MASS TORT LIABILITY, 148 U. Pa. L. Rev. 2045, 2060 & n. 55 (June 2000).

838 (1999). Second, the whole of the inadequate fund must be distributed to satisfy the claims. *Id.* at 839. Third, claimants identified by a common theory of recovery must be treated "equitably among themselves," *id,* a standard akin to the "same treatment for each claim or interest of a particular class" standard in Fed. R. Bankr. P. 1123(a)(4). Each of these three conditions are satisfied here, making certification of nationwide class of school districts appropriate under Rule 23(1)(b)(B).

59.     In appropriate cases, as here, a limited fund class action complements the bankruptcy process. As the Supreme Court was careful to note in *Fibreboard,* "there is no inherent conflict between a limited fund class action under Rule 23(b)(1)(B) and the Bankruptcy Code. 527 U.S. at 860 n.34.

60.     Indeed, in significant ways, a limited fund class action under Rule 23(b)(1)(B) is *more* attractive in bankruptcy than in Article III proceedings—because of the numerous due process protections that bankruptcy law provides, which would not be accorded to members of a Rule 23(b)(1)(B) mandatory class outside of bankruptcy. These include the right to vote, 11 U.S.C. § 1126; to notice, *id*. § 1125; and to dissent, *id*. §§ 1129(a)(7) and 1129(b)(1). Certifying a Rule 23(b)(1)(B) class does not circumvent any Bankruptcy Code protections, and it will advance important goals of this particular bankruptcy proceeding.

## Conclusion

At bottom, the question before this court is stark and straightforward: whether the approximately 13,000 school districts across the country—who, because of the Debtors' conduct, are collectively incurring billions of dollars of added costs to provide special education and supplemental education services to children exposed to opioids *in utero*—will have a meaningful opportunity to present their claims and, once proven, to participate in an equitable distribution of the Debtors' estates, like other creditors.

WHEREFORE, the Representatives of the Proposed Class respectfully request that the Court exercise its discretion under Bankruptcy Rule 9014 to apply Fed. R. Civ. P. 23 to their already-filed class proofs of claim; certify a class of "all public school districts nationwide that are independent governmental entities" under Fed. R. Civ. P. 23(b)(1)(B); appoint them as representatives for the class; and appoint their attorneys as Class Counsel. A draft order, which would provide this relief, is attached as Exhibit E to this motion.

Dated: June 1, 2020

> Respectfully Submitted,
>
> By: */s/  Matthew J. Piers*
>
> HENRICHSEN SIEGEL, PLLC
> Chiung-Hui Huang
> Neil L. Henrichsen (motion *pro hac vice* pending)
> Dawn C. Stewart (motion *pro hac vice* pending)

225 Broadway, Suite 1803
New York, New York 10007
(646) 378-4421 (phone)
chuang@hslawyers.com
nhenrichsen@hslawyers.com
dstewart@hslawyers.com

MEHRI & SKALET, PLLC
Cyrus Mehri (motion *pro hac vice* pending)
Steven A. Skalet (motion *pro hac vice* pending)
Joshua Karsh (motion *pro hac vice* pending)
Aisha Rich (motion *pro hac vice* pending)
1250 Connecticut Ave., NW
Washington, D.C. 20036
(202) 822-5100 (phone)
(202) 822-4997 (fax)
cmehri@findjustice.com
sskalet@findjustice.com
jkarsh@findjustice.com
arich@findjustice.com

HUGHES SOCOL PIERS RESNICK & DYM,
LTD.
Matthew J. Piers (*pro hac vice*)
Charlie D. Wysong (*pro hac vice*)
Margaret E. Truesdale (*pro hac vice*)
Emily R. Brown (*pro hac vice*)
Mark S. Dym (*pro hac vice*)
70 West Madison Street, Suite 4000
Chicago, Illinois 60602
(312) 604-2630 (phone)
(312) 604-2631 (fax)
mpiers@hsplegal.com
cwysong@hsplegal.com
mtruesdale@hsplegal.com
ebrown@hsplegal.com
mdym@hsplegal.com

HIMES PETRARCA & FESTER, CHTD.

Justino D. Petrarca (*pro hac vice*)

Two Prudential Plaza, Suite 3100

180 North Stetson

Chicago, Illinois 60601

(312) 565-3100 (phone)

(312) 565-0000 (fax)

jpetrarca@edlawyer.com


TERRELL HOGAN, P.A.

Wayne Hogan (*pro hac vice* to be applied for)

Leslie Goller (*pro hac vice* to be applied for)

233 E. Bay Street, Suite 804

Jacksonville, FL 32202

904.722.2228

hogan@terrellhogan.com

lgoller@terrellhogan.com