# EXHIBIT B

### DECLARATION OF DR. IRA J. CHASNOFF IN SUPPORT OF SCHOOL DISTRICT CREDITORS' MOTION FOR CLASS CERTIFICATION

IRA J. CHASNOFF, M.D., declares as follows:

1.      I am a Professor of Clinical Pediatrics at the University of Illinois College of Medicine.  I have been retained as an expert by counsel for several school districts related to their claim of damages from the opioid crisis.

2.      I am among the nation's leading researchers in the fields of child development and the effects of maternal drug and alcohol use on newborn infants and children.  I have conducted research and authored numerous articles regarding the long-term cognitive, behavioral, and educational development effects of prenatal exposure to alcohol and other drugs. I have also authored fourteen books, one of which, *Drugs, Alcohol, Pregnancy, and Parenting*, received the Book of the Year Award from the American Journal of Nursing.  A recent book of mine, *The Mystery of Risk*, which has also received numerous awards, explores the factors that impact the development of alcohol- and drug-exposed children and presents practical strategies for helping children reach their full potential at home and in the classroom.  I received my medical degree from the University of Texas Health Science Center at San Antonio.

3.      Neonatal Abstinence Syndrome ("NAS," also known as Neonatal Opioid Withdrawal Syndrome) is a diagnosed medical condition in infants caused by a mother's use of opioids during pregnancy.  The condition is caused by the infant's dependence on opioids and thus going through withdrawal from opioids after birth.  The great majority of babies born to a mother who used opioids while pregnant will be born with NAS.  The impact of NAS on children has been as broad and far reaching as the opioid crisis overall, impacting over 25,000 children every year.

4.      Since the late 1990s, the incidence of NAS has risen precipitously along with the

1

opioid crisis.  The NAS diagnosis is most often made in the first week of life.  Although the medical community now recognizes the significance and severity of NAS, procedures for identification, diagnosis, and reporting of NAS births have only been formalized over the last few years.  Thus, even reported data about NAS births certainly undercount the actual number of children born with NAS, especially over the last two decades.

5.      Prenatal opioid exposure causes permanent neurodevelopmental damage to the child *in utero*.  Even with early identification and treatment, there are limits to the impact of remedial measures.

6.      NAS is a significant medical condition that is linked with serious and likely permanent challenges for the child.  The impact of prenatal opioid exposure varies widely and can include profound and permanent problems with focus, attention span, self-control, hyperactivity, executive functioning, emotional self-regulation, impulse control, vision, motor control, physical development, attachment and emotional stability, sensory processing, inter-personal interactions, learning, cognitive processing, and behavior.

7.      The challenges children with NAS face frequently manifest in school as a disability or disabilities that require specialized intervention through the special education system.  Children born with NAS often present with disabilities and qualify for services through a range of eligibility categories under the IDEA.

8.      In addition, many children born with NAS experience challenges with learning, adaptation, and behavior in school that require significant discipline, behavior, and learning supports beyond and in addition to formal special education services, for example through Section 504 plans.  This is a type of plan schools develop for students with disabilities who require supports and accommodations to learn and succeed in school.

9.      There are also children who are exposed to opioids *in utero* who are not diagnosed with NAS during the newborn period or do not fit all of the criteria for a formal diagnosis of NAS who will, nevertheless, experience significant learning, functioning, and behavioral challenges that will require school support throughout their school career through special education services or otherwise.

10.      Based on my analysis of the relevant literature, I conclude that children with prenatal opioid exposure are 2.3 times more likely to require special education services than children who are otherwise similar.  At any given time, 30 percent of children born opioid exposed will need and receive special education services.  This rate is consistent with my experience in over forty years of clinical work treating children with prenatal opioid exposure and research on the impacts of prenatal opioid exposure.

11.      In addition to the 30 percent of children born with opioid exposure who require special education services under the IDEA, approximately another 20 percent of these children will require school-based services and supports through a Section 504 plan.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 29, 2020.

Ira J. Chasnoff, MD