# EXHIBIT C

## DECLARATION OF PROFESSOR TAMMY KOLBE IN SUPPORT OF SCHOOL DISTRICT CREDITORS' MOTION FOR CLASS CERTIFICATION

TAMMY KOLBE, declares as follows:

1. I am a tenured Associate Professor of Educational Leadership and Policy Studies at the University of Vermont. I received my doctorate in Educational Leadership and Policy Studies from the University of Vermont. I have taught courses on Cost and Cost Effectiveness Analysis of Education and Social Programs and the Economics of Education, among others, to graduate students and conduct research on education finance, particularly special education funding and the cost of educating students with disabilities.

2. I have been retained as an expert by counsel for several school districts related to their claim of damages from the opioid crisis.

3. I am among the nation's leading experts on the cost of special education and special education funding systems. My research focuses on applied policy analysis and includes, in particular, quantitative evaluations and other studies on the education of students with disabilities, along with related policy, program design, and funding issues. I consult regularly with governments and education agencies on special education policy, funding, and similar issues. I am a member of the editorial board of the Journal of Education Finance and the National Education Policy Center. I have published widely on economic issues in education, including recently for the National Education Policy Center (June 2019) a national assessment of special education funding systems, "Funding Special Education."

4. As stated in Dr. Chasnoff's declaration, accompanying mine, it is well established that children who are exposed to opioids *in utero*, including those with Neonatal Abstinence Syndrome ("NAS"), experience a range of disabilities and challenges in school that include problems with cognitive processing, executive functioning, emotional self-regulation, speech

1

delays, learning, and behavior. Due to these challenges, public schools provide a wide range of supports, services, and interventions for students exposed to opioids, often at great expense.

5. One subset of those costs is to provide special education and related services. A child born with NAS or with opioid exposure *in utero* is likely to be a "child with a disability," and thus entitled to a "free and appropriate public education" under the federal Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1412(a)(1). To provide the appropriate education mandated by federal law, schools provide special education and related supplemental education services appropriate to students' needs.

6. A school district must provide special education supports and related services to an eligible child with a disability from age 3 until graduation or his or her 22nd birthday.

7. Mandated special education, provided through Individual Education Programs or "IEPs" (34 C.F.R. §§ 300.320-300.328), includes a vast array of education related services, supports, and therapies including (a) individual and small group instruction; (b) behavior plans and supports; (c) social work services; (d) psychological services; (e) speech therapy; (f) physical therapy, (g) occupational therapy; (h) adaptations and modifications of curriculum, materials, buildings, and instruction; (i) specialized curriculum and methods of instruction from staff with particularized training and credentials; (j) behavior, functional, and psychological evaluations; (k) transition and practical life skills evaluations and instruction; (l) instructional programs, curricula, methods, and classrooms specifically designed and operated for students with disabilities; (m) adaptive technology; (n) the support of additional staff with expertise in special education and one-on-one dedicated staff members; and (o) day schools or residential schools that have special facilities, equipment, and staff with particular skills and expertise to facilitate student learning.

8. Special education services are both critically important for the student and tremendously expensive for schools. For FY2019, total spending for special education nationwide topped $80 billion. Moreover, the total cost of special education has steadily increased over time as the number of students with a disability has increased.

9. Although the services are mandated by federal law, in recent years the federal appropriations for special education have declined and now cover just about 15% of total special education costs. The remaining 85% of special education costs—totaling tens of billions of dollars each year—are paid for using state tax dollars and local taxes raised by school district levies. Regardless of the path and amounts of tax revenue received by public schools for special education, the mandate to provide the services at an adequate and legally compliant level does not change.

10. For a single student eligible for special education, the cost of those services can exceed $100,000 per year. While some students with special education services may have regular tutoring and social work sessions, for example, other students need a full-time dedicated staff person, very specialized small group learning environments with intensive daily services that can only be provided in a dedicated classroom with teachers who are trained and credentialed to provide those services, or even an entirely specialized school. A dedicated staff person can easily cost a school district over $50,000 per year, and a specialized school can cost well over $100,000 per student per year.

11. It is well established from federal data and numerous studies of the cost of special education that on average even a typical student with special education services, without moderate or significant needs, will cost the school at least 90% more than a student without special education services.

12. In addition to special-education specific costs, generally in the form of paying for services provided through IEPs, school districts provide a wide range of supports for students who have been exposed to opioids and have academic, socio-emotional, and behavioral challenges, and yet who do not receive special education services. Such services, generally provided through "Section 504 Plans" (34 C.F.R. § 104.35) include social work, therapy, academic accommodations, modifications, and interventions, and other supports. Services through Section 504 Plans or other interventions may include counseling, behavior assessments and evaluations, discipline and behavioral supports. They encompass non-special education academic supports such as small group tutoring, remedial lessons, intensive instruction and other teaching techniques, often through Response-to-Intervention (RTI) or Multi-Tiered Systems of Support (MTSS) programs. Every day, students with additional academic and behavior challenges require added time, instruction, and attention from the staff who run schools.

13. Like special education services, services provided under Section 504 plans and other interventions, are expensive. They require teachers, assistants, administrators, social workers, therapists, counselors, behavior intervention specialists, and other specialized support staff. These supports take staff time and may occur during or outside regular school hours (at an additional costs).

14. The cost of Section 504 plans and other supplemental education services is generally not captured by data on special education expenses. These are additional costs for educating students with academic and behavior challenges, including those exposed to opioids, over and above the tens of billions of dollars spent on special education.

15. I have calculated the estimated additional costs for schools to provide services to students impacted by prenatal opioid exposure based on (a) federal government data on NAS

diagnoses from 2000 to 2016 and using that data, projections of children born with NAS for later years, (b) Dr. Ira Chasnoff's opinion about the share of those children who will need special or supplemental services in school, and (c) the cost of those services.

16. Based on the data and information I have considered to date, with adjustments for interest and inflation, in 2020 dollars, the school expenses caused by the opioid crisis will be well in excess of $22 billion. Of that estimated minimum amount, $18 billion, or 80%, will be expended by schools in the coming years as students harmed by opioids move through the school system.

17. My current calculations materially underestimate the actual harm and cost to schools because, among other conservative factors used in my calculations I (a) count only students with a formal NAS diagnosis when it is well established that this is a subset of children affected by opioid use in utero, (b) calculate the special education costs only for routine special education interventions, when it is clear that many of these children require more intensive or expensive special education services, and (c) calculate the costs of services only for children ages 3 through 17, even though schools are mandated to, and do, provide specialized services until the child's 22nd birthday for the many children with disabilities who are not ready to graduate by age 18.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28, 2020.

_____
Tammy Kolbe