DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 501 AND FED. R. BANKR. P. 2002 AND 3003(c)(3) FOR ENTRY OF AN ORDER (I) EXTENDING THE GENERAL BAR DATE FOR A LIMITED PERIOD AND (II) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**," or "**Purdue**") submit this reply in support of the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 501 and Federal*

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Rules of Bankruptcy Procedure 2002 and 3003(c)(3) for Entry of an Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* (the "**Motion**" or "**Bar Date Extension Motion**")), and respectfully state as follows:

## Preliminary Statement

1. The Debtors' Bar Date Extension Motion demonstrates why cause exists to extend the General Bar Date[2] for only a limited thirty (30) days in order to resolve the competing views on what should be done in light of the ongoing COVID-19 pandemic, while remaining cognizant of the needs of—and costs of prolonged delay to—these chapter 11 cases. The Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), Multi-State Governmental Entities Group, and Ad Hoc Group of Individual Victims all support the Motion, and the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**") agree that, if an extension is to be granted, it should be for thirty (30) days. The only opposition, then, comes from the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**") and new participants in these cases who do not appear to represent a substantial stakeholder constituency or, at least, one that is not already represented by other groups that support the thirty (30) day extension.

2. As noted in the Bar Date Extension Motion, the Debtors were aware of the concerns raised in the Extension Requests. However, the Debtors believed that a prolonged, ninety (90) day extension of the General Bar Date was not warranted in light of the need to continue moving these cases toward emergence, in order to provide the ultimate relief

[2] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Motion.

contemplated by these cases—allocation of the Debtors' value to allowed claimants and abatement of the opioid crisis. The limited objections filed on behalf of the Non-Consenting States and the Ad Hoc Committee on Accountability (the "**AHCA**") in support of a ninety (90) day extension do not alter that conclusion. The Debtors were also aware of the concerns by the Ad Hoc Committee, which believes that no extension of the General Bar Date is necessary to accommodate any potential pressures caused by the pandemic. Although the Debtors share the concerns raised by the Ad Hoc Committee, including regarding the soft and hard costs of any delay in these cases, the Debtors continue to believe that a one-time, thirty (30) day extension appropriately resolves the competing views of key constituencies in these cases without overburdening the estates. However, the Debtors agree that any further extension of the General Bar Date cannot be justified based on the continued success of the Supplemental Notice Plan even in light of the COVID-19 pandemic and the needs of these cases.

3. Moreover, direct notice of the type contemplated in the limited objection filed by the AHCA is neither required nor warranted here. The AHCA's attempt to enlarge the Debtors' noticing requirements with respect to unknown claimants by converting them into "known" claimants can find no basis in the Bankruptcy Code, the applicable case law, or the practical realities of these cases, and should be rejected. As designed, the Debtors' robust and comprehensive Supplemental Notice Plan was and is sufficient to meet the notice requirements with respect to potential claimants whose names and addresses are not available to the Debtors.

4. Accordingly, the objections should be overruled in their entirety and the Debtors' Bar Date Extension Motion should be granted.

**Argument**

**A. No Cause Exists to Extend the General Bar Date for Ninety (90) Days**

5. The Non-Consenting States fail to demonstrate why anything more than a one-time, thirty (30) day extension of the General Bar Date is reasonable or satisfies the cause standard set forth in Federal Rule of Bankruptcy Procedure 3003(c)(3). The Debtors Supplemental Notice Plan is unprecedented, broad, multifaceted, and, as discussed below, has been providing (and will continue to provide) adequate notice to potential claimants, even when accounting for COVID-19. (Suppl. Finegan Decl. ¶¶ 4, 21) Like the Supplemental Notice Plan, the claims filing process has been designed so that it is able to continue without interruption during COVID-19, and generalized claims of difficulties in filing a claim cannot justify the costs to these cases of a prolonged delay. (*See* Bar Date Extension Mot. ¶ 26.) Moreover, if the thirty (30) day extension is granted, the bar date period will have run for 178 days. (*Id.* ¶ 28.) Thus, while every single party in these cases has sympathy for victims of COVID-19, there is simply no basis for an extension beyond the requested thirty (30) days. To the extent there are particularized cases of hardship that would justify the filing of a late claim, there are avenues for claimants to pursue appropriate relief on an individual basis, but a generally applicable ninety (90) day extension of the General Bar Date is not one of them. (*Id.* ¶ 26)

6. Nonetheless, the Non-Consenting States maintain that a ninety (90) day extension is necessary in order to afford claimants the time necessary to learn of the General Bar Date and file their claims in light of the ongoing COVID-19 pandemic. (*See* Ltd. Obj. of the Non-Consenting States to Debtors' Mot. Pursuant to 11. U.S.C. §§ 105(a) & 501 & Fed. R. Bankr. P. 2002 & 3003(c)(3) for Entry of an Order (I) Extending the General Bar Date For a Ltd. Period &

(II) Approving the Form & Manner of Notice Thereof (the "**Non-Consenting States Obj**."), ¶¶ 3-5 (May 31, 2020), Dkt. No. 1197.) They note that the Debtors' "noticing process . . . was predicated on conditions that existed before the COVID-19 pandemic" and "within weeks of entry of the Bar Date Order, the assumptions on which the Bar Date Order was predicated changed radically." (*Id.* ¶¶ 1-2.) While it is true that no one could have predicted the COVID-19 pandemic or the effect it would have on the United States and the world at the time that the Bar Date Order was entered, the fact is the Debtors' Supplemental Notice Plan is not static in nature. (Suppl. Finegan Decl. ¶ 15.) Rather, the Supplemental Notice Plan was designed to adapt to unpredictable external factors. (*Id.*)

7. From the beginning of the Supplemental Notice Plan, Prime Clerk has been actively managing and adjusting the plan to maximize its reach and frequency, and Prime Clerk continues to adjust and optimize the plan in response to the COVID-19 pandemic. (*Id.* ¶¶ 15-17.) As media usage across the United States reached historic highs as a result of the COVID-19 pandemic and resulting shutdowns, Prime Clerk modified the Supplemental Notice Plan to air television commercials during dayparts and on networks that were experiencing a thirty-five (35) percent increase in viewership. (*Id.* ¶ 17.) Following the closure of movie theaters across the country, Prime Clerk reallocated the movie theater budget to secure additional national TV spots and OTT in states where the movie theater advertisements would have run. (*Id.* ¶ 18) As a replacement for the originally planned "boots-on-the-ground" approach, Prime Clerk mailed the two-page, full-color summary flyer of the Bar Date Notice to 178 mobile health teams for distribution as feasible within the confines of applicable social-distancing guidelines. (*Id.* ¶ 19.) Thus, even when accounting for the impact of the COVID-19 pandemic, because of Prime Clerk's adjustments and optimizations, coupled with the increased media consumption during the

COVID-19 pandemic, the Supplemental Notice Plan is expected to be <u>more</u> effective than pre-COVID-19. (*Id.* ¶ 21.) In fact, it is exceeding the planned reach and frequency by reaching over ninety-five (95) percent of adults in the United States with an average frequency of message exposure of six (6) times, and eighty (80) percent of adults in Canada with an average frequency of message exposure of three (3) times. (*Id.*)

8. The Non-Consenting States suggest, without support, that the Debtors' rely only on "'hits' or 'views'" to the Claims Website as justification for a short extension. (Non-Consenting States Obj. ¶ 3.) With that straw man established, the Non-Consenting States argue that the real issue is not the success of the Supplemental Notice Plan in notifying claimants of the General Bar Date, but rather "the impact on creditors' ability to respond in light of an unforeseen, but very real challenge." (Non-Consenting States Obj. ¶ 3) Yet, the Non-Consenting States fail to address the many features of the Supplemental Notice Plan that guard against potential impacts that the COVID-19 pandemic could have on the claims filing process, as well as the importance of what "hits" or "views" mean to the process. (Bar Date Extension Mot. ¶ 26.) In particular, claimants can request to receive proof of claim forms by mail through the Claims Website or by contacting Prime Clerk through email, mail, or a toll-free phone number. (*Id.*) Claimants can complete the form at home and submit the form by mail to Prime Clerk. (*Id.*) Moreover, neither limited "access to medical records" nor the busyness of "state agencies and various personnel" prevent claimants from filing claims, (*see* Non-Consenting States Obj. ¶ 2), because: (i) the proof of claim forms do not require any supporting documentation (e.g., medical records); and (ii) claimants are allowed to submit supporting documentation or otherwise amend or supplement their claim at a later time. (Bar Date Extension Mot. ¶ 26.)

9. In addition, the proof of claim forms were designed to be straightforward, requiring certain baseline, necessary information be included at the time of the initial submission—thereby obviating the need for specific "personnel" or even an attorney to file a claim. (*Id.*) These features have allowed the Debtors' claims filing process to continue, even in the midst of the pandemic. Finally, the entire program was designed to drive potential claimants—the same claimants the Non-Consenting States assert may have difficulty filing clams without a prolonged extension—to the website where they may file claims electronically or where they may obtain more information regarding the same. (*Id.*) Thus, "hits" and "views" are precise metrics by which such engagement can be measured. As such, based on all of these features, extending the General Bar Date ninety (90) days "to permit life to return sufficiently to normal," (Non-Consenting States Obj. ¶ 4)—assuming life will return to normal during that period—is unnecessary and, as discussed below, risks incurring unnecessary costs and delays to the detriment of these chapter 11 cases.

10. The Non-Consenting States incorrectly assert that the Debtors can extend the General Bar Date by ninety (90) days "with a relatively small increase in the budget originally proposed to the Court." (Non-Consenting States Obj. ¶ 5.) However, as explained in the Motion, the "additional approximately $1.4 million," (*id.*), above the Debtors' estimated $700,000 cost for the Extended Notice Plan accounts for only the additional costs of the noticing plan. (*See* Suppl. Finegan Decl. ¶ 23 n. 16). This figure overlooks the soft and hard costs that would certainly run into the tens of millions of dollars as a result of incremental professional fees and the risk and pressure of further delay on the Debtors' operations—all of which negatively impact the Debtors' stakeholders. In addition, a prolonged, ninety (90) day extension of the General Bar Date has the potential to unduly delay ongoing negotiations and the Debtors'

emergence from these chapter 11 cases—thereby postponing the transfer of the value of the estate to allowed claimants and the American people, and further delaying abatement of the opioid crisis.

11. While the Non-Consenting States have not demonstrated the cause necessary to justify a ninety (90) day extension, the Debtors believe that the Ad Hoc Committee's view that no extension at all is warranted also does not strike the right balance. The Ad Hoc Committee argues that any extension of the General Bar Date should be denied in light of the Debtors' robust noticing program, the cost of continuing the noticing program, and the other avenues available to claimants that are unable to file by the General Bar Date. (Ad Hoc Comm. Obj. to Requests to Extend the Bar Date ("**Ad Hoc Comm. Obj.**"), ¶ 3 (May 31, 2020), Dkt. No. 1202.) Although the Debtors agree that "there is no evidence, nor reason to believe, that the current public health crisis has prevented any material number of potential claimants from either receiving notice of the [General] [B]ar [D]ate or filing timely proofs of claim," (Ad Hoc Comm. Obj. ¶ 2), the Debtors believe that a thirty (30) day extension is reasonable in light of the COVID-19 pandemic, the various competing requests for and objections to an extension, and the need to move these cases toward confirmation and emergence, and thus, satisfies the cause standard.

12. The Ad Hoc Committee argues that "an arbitrary 30-day bar date extension" will likely delay these chapter 11 cases and "prolong the amount of time it takes for the Debtors' estates to be deployed to abate the ongoing opioid crisis." (Ad Hoc Comm. Obj. ¶¶ 3, 9.) As fiduciaries of the estates, the Debtors' main goal has always been—and continues to be—to reorganize the Debtors as quickly and effectively as possible in order to transfer the value of the Debtors' estates for the benefit of allowed claimants, and ultimately, the American people. As

such, when faced with the question of how to handle the unprecedented challenge of a world-wide pandemic, the Debtors carefully considered a number of factors, including: (i) numerous requests for a ninety (90) day extension of the General Bar Date, as well as objections to any extension; (ii) the possible effects of the COVID-19 pandemic on the Debtors' potential claimants; (iii) the cost of the Extended Notice Plan, particularly where the Debtors and certain of their creditor constituencies, including the Creditors' Committee and the Ad Hoc Committee, believe notice is adequate; (iv) the straightforward nature and simplicity of the proof of claim forms; (v) the mechanisms available for potential claimants who wish to assert individualized claims of difficulties to seek appropriate relief; (vi) the needs of these cases; and (vii) the substantial costs of delay. The decision reached was anything but "arbitrary." Rather, the Debtors believe that the competing factors listed above counsel in favor of a one-time, thirty (30) day extension of the General Bar Date, rather than solely relying on the ability of potential claimants to use "other avenues of relief" available to them, such as "petition[ing] this Court for an extension of the [General] [B]ar [D]ate." (*See id.* ¶ 11.) The Debtors' proposed extension is reasonable and, given the progress of the ongoing mediation and the parties' desire to emerge from these chapter 11 cases in the near future, a thirty (30) day extension will not cause undue delay to the administration of these chapter 11 cases. However, as discussed above and noted in the Ad Hoc Committee's objection, anything more than a one-time, thirty (30) day extension of the General Bar Date is unnecessary and risks incurring additional hard and soft costs and delays that have "the potential to derail these chapter 11 cases." (*Id.* ¶ 13.)

13. The Ad Hoc Committee also argues that an extension of the General Bar Date is expensive and unlikely to "alleviate any COVID-19-related difficulties claimants may be facing in filing their proof[s] of claim[]." (Ad Hoc Comm. Obj. ¶¶ 8-9.) The Ad Hoc Committee is

correct that the Debtors' Supplemental Notice Plan and claims process "already includes several mechanisms that assuage the difficulties caused by COVID-19." (*Id.* ¶ 9.) However, these helpful mechanisms do not undercut the Debtors' reasons for requesting a short extension of the General Bar Date. Rather, the mechanisms noted by the Ad Hoc Committee, coupled with an additional thirty (30) days to file a claim, will undoubtedly help alleviate the potential added pressures caused by the COVID-19 pandemic. Moreover, and as discussed above, the Debtors carefully considered the cost of the Extended Notice Plan when deciding to request a thirty (30) day extension of the General Bar Date. Although $700,000 is not a trivial amount, the Debtors believe that the cost of the Extended Notice Plan is reasonable in light of the unprecedented circumstances and the need to make claimants aware of the Extended General Bar Date.

**B. Adequate Notice Is Being Provided to "Unknown" Claimants Through the Debtors' Supplemental Notice Program**

14. The Debtors have employed one of the most comprehensive and expansive noticing programs in chapter 11 history in order to provide adequate notice to a measureless category of unknown potential claimants, including those prescribed a Purdue opioid, who may believe they have claims against the Debtors in these cases. (*See generally* Finegan Decl.; Suppl. Finegan Decl.) The AHCA asserts that certain allegations in an information filed against a third party somehow alter the Debtors' legal noticing obligations with respect to certain unknown potential claimant-patients. (Mem. of Points & Auths. in Supp. of the Ad Hoc Comm. on Accountability's Ltd. Obj. to Debtors' Mot. ("AHCA Mem. of Law"), at 3-11 (May 31, 2020), Dkt. 1188.) The AHCA's attempt to rely on a third party's prosecution in order to justify the additional costs and further delay to these cases that would result from the direct noticing they envision is unavailing.

15. The Debtors are required to provide claimants with notice of the General Bar Date that, under the facts and circumstances of these cases, is "reasonably calculated to reach all interested parties," in order to inform such claimants of the need to file a proof of claim or risk their claims being barred. *In re U.S.H. Corp. of New York*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *see also* Fed. R. Bankr. P. 2002(a)(7). Whether notice is reasonable under the circumstances will depend on whether the claimant is "known" or "unknown" to the Debtors. *In re U.S.H. Corp.*, 223 B.R. at 658. Importantly, "actual notice is necessary only as to known creditors while constructive notice is sufficient for unknown creditors." *Id.* "[A] 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.'" *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) (quoting *Tulsa Prof'l Collection Serv. Inc. v. Pope*, 485 U.S. 478, 490 (1988)). "A creditor's identity is 'reasonably ascertainable' if that creditor can be identified through 'reasonably diligent efforts.'" *Id.* (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983)). However, "[r]easonable diligence does not require 'impracticable and extended searches . . . in the name of due process.'" *Id.* (second alteration in original) (citing *Mullane*, 339 U.S. at 317). A creditor may not be "reasonably ascertainable" and, thus, may be "unknown," even where "they could be discovered upon investigation," and even if they are "reasonably foreseeable," if they would not be discovered by the debtor in the "due course of business." *Id.* at 346-47.

16. As the AHCA correctly noted, the patients they argue are "known" claimants—and, thus, purportedly entitled to actual written notice—are not in the Debtors' books and records. (AHCA Mem. of Law at 11.) In the course of reviewing their books and records, the Debtors were aware, however, that, arguably, every person who was prescribed a Purdue opioid

may believe they have a potential claim against the Debtors. (Debtors' Mem. of Law in Supp. of Mot. for Entry of An Order (I) Establishing Deadlines for Filing Proofs of Claim & Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, & (III) Approving The Form & Manner of Notice Thereof, at 11-12 (Jan. 3, 2020), Dkt. No. 718.) As a result, there were potentially an untold number of persons who might assert claims against the Debtors but for whom the Debtors were (and are) not in possession of personal contact information. Thus, in developing the noticing strategy, the Debtors, in consultation with the Creditors' Committee and key creditor constituencies, considered how best to reach those potential claimants. It was clear that attempting a scorched-earth search to obtain—from HIPAA-protected medical records—the name and address of each such person, from numerous and different kinds of third parties, through means such as protective orders and subpoenas, and then potentially needing to litigate any resulting motions to quash in order to provide actual written notice, would have been impracticable and costly and caused undue delay to these chapter 11 cases. (Debtors' Mem. of. Law. in Supp. of Bar Date Mot. at 12). As a result, such persons were (and are) the very definition of "unknown claimants" because their identities are not "reasonably ascertainable" and, thus, publication notice is sufficient for these potential claimants.

17. The cases relied on by the AHCA support the Debtors' decision to provide notice to potential patient-claimants who are not in the Debtors' books and records through the Supplemental Notice Plan. Those cases—particularly, *In re Motors Liquidation* and *In re TK Holdings*—stand for the principle that fashioning adequate notice will depend on the circumstances of the particular case, and, in some cases, more than an examination of a debtor's books and records may be required in order to satisfy the "reasonably ascertainable" standard. *See, e.g., In re Motors Liquidation Corp.*, 2015 Bankr. LEXIS 4445, at *83-86 n.115 (Bankr.

S.D.N.Y. June 1, 2015) (quoting *Chemetron*, 72 F.3d at 347 n.2) (noting that "[e]fforts beyond careful examination of [the debtor's own books and records] are generally not required" but acknowledging that "situations could arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records")).

18. The AHCA's reliance on *In re Motors Liquidation* for the notion that adequate notice requires the Debtors to seek the personal information of potentially tens of millions of patients is misplaced. (AHCA Mem. of Law at 10.) In *In re Motors Liquidation*, the court found that the claims of certain owners of vehicles with ignition defects were "known" claims where there was evidence that the debtors knew of the defect and because the contact information for those potential claimants was "reasonably ascertainable" where the Safety Act required vehicle manufacturers—the debtors in that case—to keep records of vehicle ownership, including the names and addresses of such vehicle owners, in order to be able to provide recall notices based on such defects. 529 B.R. 510, 557 (Bankr. S.D.N.Y. 2015), *aff'd and vacated in part and rev'd in part on other grounds sub nom In Matter of Motors Liquidation Co*., 829 F.3d 135 (2d Cir. 2016). As a result, based on the unique circumstances of that case, the court found that the publication notice utilized—"which otherwise would have been perfectly satisfactory (especially given the time exigencies)"—was insufficient given the debtors' pre-petition failure to utilize the contact information in their possession to provide the statutorily-required recall notice under the Safety Act. *Id.* at 560.

19. The AHCA's reliance on *In re TK Holdings* for its assertion that the Debtors were required to seek personal contact information for unknown claimants in these cases is also misplaced. (AHCA Mem. of Law at 11.) There, the debtors sought information from one third party and its subsidiary—and eventually the California Department of Motor Vehicles—for

contact information contained in the registration records of certain potential claimants in those cases. *See, e.g.*, Order . . . (I) Approving the Form & Manner of Notice of Commencement; (II) Limiting Notice Required with Respect to Potential PSAN Claimants, Pending Further Order; & (III) Authorizing the Release of Records Necessary to Implement Special Noticing Procedures for Potential PSAN Claimants, *In re TK Holdings Inc*., No. 17-11375, ¶ 7 (Bankr. D. Del. June 27, 2017), Dkt. No. 110 (directing information provider to release information from records of registered owners of vehicles); Order in Furtherance of Notice of Commencement Order Directing California Department of Motor Vehicles to Release California Requested Record Information, *In re TK Holdings Inc*., No. 17-11375 (Bankr. D. Del. Sept. 28, 2017), Dkt. No. 882 (directing California DMV to release contact information from driving records); *see also* Mot. of Debtors . . . for Entry of an Order (I) Approving the Form & Manner of Notice of Commencement; (II) Limiting Notice Required with Respect to Potential PSAN Claimants, Pending Further Order; & (III) Authorizing the Release of Records Necessary to Implement Special Noticing Procedures for Potential PSAN Claimants, *In re TK Holdings Inc.*, No. 17-11375-BLS, ¶ 16 (Bankr. D. Del. June 26, 2017), Dkt. No. 9. However, here, in addition to involving HIPAA-protected medical records, the potential third parties in possession of such information would have extended beyond just the one third party and the potential patient-claimants that the AHCA cherry-picks in their limited objection. Indeed, all individual claimants will likely assert that some allegedly improper conduct on the part of Purdue has resulted in their injuries and so—by the AHCA's logic—the Debtors would need to seek out and obtain personal contact information for <u>all</u> such potential claimants from third parties and provide direct notice to <u>all</u> such potential claimants who have received a prescription for a Purdue opioid—a number potentially in the tens or hundreds of millions. Based on the already substantial cost of the

noticing in these cases, the alternative direct noticing efforts that the AHCA envisions would have undoubtedly depleted a substantial portion of the value of the Debtors' estates.

20. In the end, the cases cited by the AHCA espouse the principle that—although the adequate notice inquiry is heavily fact-driven—circumstances where, like here, potential claimants are so numerous that it would be "wholly unreasonable to expect individual mailed notice," or "the urgency of the situation is a hugely important factor," are "exactly the kind of situation[s] for which notice by publication would be the norm." *In re Motors Liquidation*, 529 B.R. at 556. Acknowledging that actual written notice was not only not legally required for unknown claimants in these cases, but also entirely impractical, the Debtors and Prime Clerk, in consultation with the Creditors' Committee and key creditor constituencies, developed a supplemental noticing program that is designed to reach 95% of the U.S. adult population an average of six times and over 80% of the Canadian adult population an average of three times—and it is on track to exceed these targets. (Bar Date Extension Mot. ¶ 19; Suppl. Finegan Decl. ¶ 4.) Notably, based on the far-reaching scope of the program, it is highly likely that the patients that the AHCA reference (to the extent they even exist) have already been given or will be given notice of the General Bar Date before June 30, 2020.

21. Similar to what occurred in *In re Motors Liquidation*, here, actual notice went to those potential claimants who were known to the Debtors because they were in the categories previously enumerated by the Debtors, (Bar Date Mem. of Law at 13), <u>and</u> the Debtors had access to their names and addresses, which resulted in 1.2 million mailings. Because attempting to obtain the contact information and provide direct mailed notice to the much broader category of all potential claimants who were prescribed a Purdue opioid would have been "wholly

unreasonably" and inconsistent with the needs of these cases, the Debtors fashioned a publication notice program suited to the circumstances of these cases.

## **Conclusion**

For the reasons set forth above, in the Bar Date Extension Motion, and in the Supplemental Finegan Declaration, the Debtors respectfully request that the Court overrule the objections to the Bar Date Extension Motion and enter the Proposed Order attached to the Bar Date Extension Motion as Exhibit A, extending the General Bar Date by thirty (30) days and approving the extended notice plan described in the Supplemental Finegan Declaration.

Dated: June 2, 2020
New York, New York

*/s/ James I. McClammy*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors*
*and Debtors in Possession*