# Exhibit D

# Funding Agreement (Blackline)

# FUNDING AGREEMENT

This Funding Agreement ("Agreement") is dated as of _____, 2020 between Harm Reduction Therapeutics, Inc., a nonstock Maryland not-for-profit corporation ("HRT"), and Purdue Pharma L.P., a Delaware limited partnership ("PPLP").  (As used herein, each of HRT and PPLP is referred to as a "Party" and collectively as the "Parties.")

WHEREAS, PPLP is committed to addressing the opioid addiction crisis and is seeking partners to support and accelerate impactful initiatives and scientific discoveries;

WHEREAS, HRT is interested in developing, marketing, seeking Regulatory Approval of, and distributing solely in the Territory a single dose, over-the-counter, naloxone intranasal spray product intended to prevent opioid overdose deaths (the "Product");

WHEREAS, PPLP, has previously provided HRT funding to begin development of the Product including pursuant to prior written agreements between the Parties (the "Prior Agreements"); and

WHEREAS, PPLP and HRT wish to enter into this Agreement pursuant to which PPLP will fund the continuation of HRT's development work in connection with the Product with the goal of having HRT seek Regulatory Approval of the Product and ultimately for HRT to be able to provide the approved Product to first responders, government agencies, not-for-profit entities, communities and individuals (collectively, "Contemplated Product Users"), subject to the terms and conditions set forth below.

NOW THEREFORE, HRT and PPLP, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1   "Approval Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Parties, approving PPLP's entry into this Agreement.

1.2   "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.3   "Chapter 11 Cases" means the bankruptcy cases filed on September 15, 2019 by PPLP and certain of its affiliates under Chapter 11 of the United States Code in the Bankruptcy Court and jointly administered under Case No. 19-23649 (RDD).

1.4   "Claim" means, with respect to any Person, any claim, demand, action, proceeding, judgment, damage, loss, cost, expense, or liability whatever, incurred or suffered by or brought, made, or recovered against such Person (whether or not presently ascertained, immediate, future, or contingent) arising out of or relating to the sale or use of the Product by HRT or by any holder or user of the Product that in the chain of distribution came from or through HRT.

US 167648486v27

1.5    "Cost" means HRT's cost of goods sold for PPLP Funded Products (as defined in Section 2.3), on a fully absorbed basis, including general and administrative expenses, in accordance with United States generally accepted accounting principles, applicable federal excise taxes and other federal, state and local taxes, if applicable, based on the PPLP Funded Products.

1.6    "FDA" means the United States Food and Drug Administration, or any successor entity.

1.7    "Further Approval Order" has the meaning set forth in Section 2.1.

1.8    ~~1.7~~ "GMP" means the then-current good manufacturing practices set forth in the quality system regulation 21 C. F. R. Part 820, governing the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use, as such practices may be updated from time to time.

1.9    ~~1.8~~ "IND" means an Investigational New Drug Application as defined in the Federal Food, Drug and Cosmetic Act ("FD&C Act").

1.10    ~~1.9~~ "Milestone Event" means any of the events set forth in Section 2.2 under the column "Milestone Event~~"~~."

1.11    ~~1.10~~ "Milestone Payment" means any of the payments set forth in Section 2.2 under the column "Milestone Payment~~"~~."

1.12    ~~1.11~~ "NDA" means a New Drug Application as defined in the FD&C Act.

1.13    ~~1.12~~ "Person" means any natural person, corporation (including any non-profit corporation), cooperative, company, foundation, general partnership, limited partnership, limited liability company, unlimited liability company, joint venture, estate, trust, association, organization, labor union, governmental body, custodian, nominee and any other individual or entity.

1.14    ~~1.13~~ "Product Registration" means, in relation to the Product, an NDA that has been approved by the FDA, including any amendments or supplements.

1.15    ~~1.14~~ "Regulatory Approval" means drug approval and all other approvals necessary for the distribution of Product in the Territory.

1.16    ~~1.15~~ "Regulatory Authority" means any federal, state, local, municipal, provincial or other governmental authority of any nature (including any governmental division, prefecture, subdivision, department, agency, bureau, branch, office, commission, council, court or other tribunal).

1.17    ~~1.16~~ "Regulatory Materials" means regulatory applications, submissions, notifications, communications, correspondence, registrations, drug approvals or other filings made to,

2

US 167648486v~~2~~7

received from or otherwise conducted with a Regulatory Authority to develop, manufacture, market, sell or otherwise distribute Product in the Territory.

1.18    ~~1.17~~ "Territory" means the United States of America, including its territories and possessions.

## ARTICLE II
## EFFECTIVENESS; FINANCIAL ASSISTANCE

2.1    **Effectiveness**.  This Agreement shall, upon entry of the Approval Order by the Bankruptcy Court and subsequent execution and delivery by the Parties, become effective and binding upon the Parties (such date, the "Effective Date"); provided, that, PPLP's obligation to make the Milestone Payment of $5,000,000 described in Section 2.2(b) below, in PPLP's sole discretion, shall be conditioned upon PPLP seeking and the entry of a subsequent order of the Bankruptcy Court approving such Milestone Payment (the "Further Approval Order").  PPLP shall notify HRT of the entry of the Approval Order ~~by the Bankruptcy Court~~ and, if sought and entered, the Further Approval Order.

2.2    **Financial Assistance; Milestone Payments**.

(a)    HRT will use commercially reasonable efforts to develop the Product and will use the funding provided by PPLP and referenced below only for (i) the development of the Product, (ii) other related activities, and (iii) general working capital, including legal and compliance costs and expenses.

(b)    PPLP hereby agrees to provide funding to HRT in the form of Milestone Payments to encourage HRT's continued development of the Product in the Territory, payable after the achievement of certain Milestone Events.  The Milestone Payments are described below:

| Milestone Event And Primary Purpose | Milestone Payment | Expected Milestone Achievement/ Expected Payment Date |
|---|---|---|
| Start of Scale-up Batch at Catalent (Development: Formulation Development Activities, Stability, Autoclave & Preparation for Clinical Study) | $2,500,000 | Targeted completion date: May 1, 2020<br><br>Payment Due Date: ~~June 1, 2020 (One (1) month~~ Three (3) business days after HRT delivers a written notice to PPLP that the applicable milestone has been met~~)~~ |
| Start of Phase 1 Study First Patient In (FPI) (Development: Stability, Autoclave, Clinical Studies & Consumer Research) | $4,000,000 | Targeted completion date: August 15, 2020<br><br>Payment Due Date: ~~September 15, 2020 (One (1) month~~ Three (3) |

3

| Milestone Event And Primary Purpose | Milestone Payment | Expected Milestone Achievement/ Expected Payment Date |
|---|---|---|
| | | business days after HRT delivers a written notice to PPLP that the applicable milestone has been met) |
| Completion of Phase 1 Study's Clinical Study Report (CSR) (Development: Stability, NDA preparation and device components for commercial batches) | $5,000,000 | Targeted completion date: December 31, 2020<br><br>Payment Due Date: ~~January 31, 2021~~ Three (~~One (1) month~~3) business days after HRT delivers a written notice to PPLP that the applicable milestone has been met~~)~~; provided that the Bankruptcy Court has entered the Further Approval Order |

The above referenced milestone achievement dates are expected dates only, are not intended to be deadlines and do not trigger any Milestone Payments (unless the Milestone Event has actually occurred).  Each Milestone Payment is a one-time only payment based on the first achievement of the Milestone Event; provided, that no Milestone Payment will be made unless the previously listed Milestone Event has been achieved.  Promptly after HRT determines that it has achieved a Milestone Event, HRT shall provide notice thereof to PPLP in accordance with Section 9.2 hereof, which notice shall include sufficient detail of the achievement of such Milestone Event to enable PPLP to verify whether it agrees with HRT's determination.  If, after receipt of the foregoing notice, PPLP agrees, reasonably and in good faith, that a Milestone Event has been achieved by HRT, PPLP shall pay the corresponding Milestone Payment to HRT within the time period set forth in the above chart after the date the Milestone Event was achieved or at such later time as HRT may request; provided, in no event will the Milestone Payment be due prior to the corresponding expected Payment Date set forth in the above chart. If PPLP does not agree that a Milestone Event has been achieved, the Parties will work in good faith to resolve any such dispute.

The aggregate amount of the Milestone Payments shall not exceed eleven million five hundred thousand dollars ($11,500,000).  Additionally, PPLP shall not be required under this Agreement to fund more than six million five hundred thousand dollars ($6,500,000) of Milestone Payments in 2020 and five million dollars ($5,000,000) of Milestone Payments in 2021 plus any amount not funded in 2020. Any amounts not funded in 2021 will be funded in the subsequent year; provided, that PPLP shall in no event be required to fund any amounts after January 31, 2022, regardless of whether a Milestone Event is achieved after such date.

Notwithstanding the foregoing, (i) if HRT licenses from a third party an FDA-approved product (i.e., with a Regulatory Approval) to serve as the Product, PPLP shall not make

4

the Milestone Payments referred to above, but the Parties will discuss in good faith any alternative funding that may be required by HRT to obtain approval for the Product (i.e., with a Regulatory Approval) to be distributed over-the-counter and (ii) if HRT receives any funding from any third party ~~to develop the Product prior to all of the Milestone Payments having been made, such~~that is based on a new request or application made or submitted solely after the Effective Date to fund the development of the Product pre-commercialization, and such third party financing is received, prior to the $5,000,000 Milestone Payment having become due (which is subject to the Further Approval Order), such third party funding will reduce the amount of ~~any~~the $5,000,000 Milestone ~~Payments not yet paid~~Payment by the amount of such third party funding (~~but~~with the understanding that it will not reduce any other Milestone Payment hereunder and that HRT will have no obligation to return any Milestone Payments previously paid to HRT). ~~The amount by which the Milestone Payments have been reduced shall be made available to HRT by PPLP for activities required~~ for supply readiness and launch of the Product ~~at such times as are mutually agreed by the Parties.~~

2.3    **Financial Assistance for HRT's Manufacture and Distribution of Product.**

As provided in the Prior Agreements and subject to the terms set forth therein, as part of PPLP's public health initiatives, after FDA Regulatory Approval of HRT's NDA for the Product, PPLP intends to provide funds to HRT to enable HRT to manufacture up to the following units of Product ("PPLP Funded Products") so that such units can be donated free-of-charge or sold at Cost to Contemplated Product Users:

| Market Forecast of OTC Naloxone | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 632 | 1,347 | 1,754 | 1,936 (in thousands) | 2,063 | 2,086 | 2,103 | 2,114 | 549 | 14,584 |

At least two (2) months prior to each calendar quarter HRT and PPLP will agree upon a written annual forecast of PPLP Funded Products to be manufactured and donated free-of-charge or sold at Cost to the Contemplated Product Users as follows:

(i) a binding forecast for the quantities of PPLP Funded Products to be manufactured and donated free-of-charge or sold at Cost to the Contemplated Product Users during the upcoming calendar quarter, with projected delivery dates, sizes, strengths and ultimate destinations, as well as other relevant manufacturing and delivery information. PPLP shall fund one hundred percent (100%) of such agreed upon forecast of PPLP Funded Products;

(ii) an estimate of the quantities of PPLP Funded Products to be manufactured and donated free-of-charge or sold at Cost to the Contemplated Product Users during the calendar quarter following the upcoming calendar quarter. PPLP shall fund at least fifty percent (50%) of such forecast of PPLP Funded Products; and

5

    (iii) a non-binding estimate of the forecast of PPLP Funded Products HRT intends to manufacture and which will be donated free-of-charge or sold at Cost to the Contemplated Product Users for the third and fourth calendar quarters of such forecast.

Each subsequent written forecast shall update the prior estimate and include an estimate of requirements for the next additional calendar quarter, so that estimates for a rolling one- (1-)year period are provided.

For avoidance of doubt, HRT shall not be obligated to produce and deliver any PPLP Funded Product to any Contemplated Product User, unless PPLP has funded the applicable verifiable Cost related thereto, sufficient time in advance, as agreed upon by the Parties, in accordance with the forecasts set forth above or otherwise (at an agreed upon rate reasonably calculated to allow HRT to diligently produce the Product). If HRT donates or sells PPLP Funded Products to third parties at Cost, any funds previously advanced by PPLP for such Products will be credited to the next forecasted quantities of PPLP Funded Products. Following the filing of an NDA for the Product, PPLP and HRT shall further refine the forecasting provisions set forth above.

2.4 **Audit Rights.**

 (a) Commencing as of the Effective Date and ending on the earlier of (i) termination or expiration of this Agreement, or (ii) the third anniversary of the latest delivered Milestone Payment, PPLP shall have the right to conduct audits of HRT's data and its books and records to reasonably determine whether Milestone Events have been achieved.

 (b) Commencing as of the Effective Date of this Agreement, PPLP shall have the right to conduct audits of the books and records of HRT not more than once during each calendar year (i) until the date of Regulatory Approval of HRT's NDA for the Product, to determine that the funds provided by PPLP have been used in a manner consistent with Section 2.2 (a) and (ii) after FDA Regulatory Approval of HRT's NDA for the Product and until the termination of this Agreement, to verify HRT's Cost related to units of Product.

 (c) PPLP may exercise the audit rights described in (a) and (b) above by providing written notice to HRT and any such audit shall be conducted during normal business hours. HRT shall make available to PPLP such accounting and other books and records, reasonably requested by PPLP to exercise its rights hereunder.

2.5 **Reports**.

At least once during each ~~calendar quarter~~month until the last Milestone Event has been achieved, HRT shall provide a written report to PPLP regarding its progress toward developing the Product and achieving the Milestone Events, including an update on the Expected Milestone Achievement Date for each such Milestone Event. Each report will account for HRT's expenditures of funding provided by PPLP allocated among the three categories set forth in Section 2.2(a). HRT shall also report on any funding that it

6

received from third parties in connection with the Product, promptly after it comes aware of such funding.

## ARTICLE III
## INTELLECTUAL PROPERTY

3.1    **Ownership of Data; Product Registrations**.  HRT will be the sole owner of (a) all the data generated by HRT supporting development and registration of the Product, (b) the database of such data, (c) all Regulatory Approvals and Product Registrations in the Territory, and (d) all Regulatory Materials, except as may be set forth in any other agreement between the Parties.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

4.1    **Mutual Representations and Warranties**.  Each Party hereby represents and warrants to the other Party as of the date hereof and as of the Effective Date as follows:

   A.    **Authority**.  It is validly existing and in good standing or active under the laws of the jurisdiction of incorporation or organization, has the power and authority to enter into this Agreement and has taken all necessary actions on its part required to authorize the execution and delivery of this Agreement.  This Agreement has been duly executed and delivered by such Party and constitutes the valid and binding obligation of such Party, enforceable against it in accordance with its terms except as enforceability may be limited by bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equitable principles.  The execution, delivery and performance of this Agreement has been duly authorized by all necessary action on the part of such Party, its officers, directors, members and/or managers, as applicable.

   B.    **No Conflict**.  The execution, delivery and performance of this Agreement by such Party does not, to such Party's knowledge, violate any material law or regulation or any order of any court, governmental body or administrative or other agency having authority over them.  It is not currently a party to any material agreements, oral or written, that would cause it to be in breach of its obligations under this Agreement, and execution and delivery of this Agreement does not and will not conflict with, violate or breach any contractual obligations of such Party.

4.2    **HRT Representations, Warranties and ~~Covenant~~Covenants**.  HRT hereby further represents, warrants and covenants to PPLP that:

   A.    As of the Effective Date, HRT is and, during the term of this Agreement will continue to be, a nonstock corporation organized under the laws of the State of Maryland. HRT shall not contemplate pecuniary gain or profit, incidental or otherwise, and no part of the net earnings of HRT shall inure to the benefit of or be distributed to any director or officer of HRT, or to any other private person, except

7

US 167648486v~~2~~7

    that HRT shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of its charitable and/or public benefit purposes.

  B. HRT will not use any funding supplied by PPLP for any activity that might be considered a form of lobbying or any activity related to lobbying. Advocacy by HRT before any Regulatory Authority regarding Regulatory Approval of the Product shall not be deemed to violate this Section 4.2(B).

  C. HRT will develop the Product, manufacture PPLP Funded Products, and sell or donate PPLP Funded Products, in compliance with all applicable laws, including any applicable state transparency laws and applicable guidelines such as GMP (as and to the extent applicable to the PPLP Funded Products), then-current good clinical practice standards and procedures promulgated or endorsed by the FDA (as and to the extent applicable), then-current good laboratory practice standards promulgated or endorsed by the FDA and guidelines issued by the International Council for Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use (as and to the extent applicable).

  D. HRT will use commercially reasonable efforts (taking into account the applicable global and local economic, health/pandemic and market conditions, as well as availability of funding) to obtain funding from third parties for the development of the Product and to supply funding for supply readiness and launch of the Product.

  E. If HRT is no longer organized for charitable or public benefit purposes or no longer otherwise qualifies as any of (i) a non-stock corporation, (ii) a benefit corporation, or (iii) another form of entity acceptable to PPLP, (x) HRT will provide written notice to PPLP that it is no longer so organized or no longer so qualifies, (y) HRT will repay to PPLP all amounts provided to it by PPLP under this Agreement no later than one (1) year after written request for such repayment is made by PPLP and (z) in PPLP's sole discretion but subject to HRT's receipt of any necessary governmental or regulatory approvals and compliance with applicable laws, PPLP will be entitled to twenty percent (20%) of all of the equity interests in HRT. For clarity, denial of HRT's application for treatment as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, by itself, will not mean that HRT no longer qualifies as an entity described above.

ARTICLE V
TERM AND TERMINATION

5.1 **Term**.  This Agreement shall become effective on the Effective Date and shall remain in effect until terminated pursuant to Sections 5.2, 5.3 or 5.4.

5.2 **Termination for Material Breach**.  Either Party shall have the right to terminate this Agreement in the event that the other Party commits a material breach of this Agreement by giving written notice of such breach to the breaching Party.  Termination shall be effective

ninety (90) days after the giving of such notice unless the breaching Party has remedied the breach within such ninety (90) day period.

5.3    **Termination for Bankruptcy or Change of Status**. PPLP may terminate this Agreement upon notice to HRT if HRT becomes insolvent, makes any assignment for the benefit of its creditors, is placed in receivership, liquidation or bankruptcy or if it is no longer organized for charitable, or public benefit purposes or no longer otherwise qualifies as any of (i) a non-stock corporation, (ii) a benefit corporation, or (iii) another form of entity acceptable to PPLP. PPLP's right to terminate under this Section 5.3 is in addition to any of its rights under Section 4.2 E. of this Agreement.

5.4    **Termination by PPLP**. PPLP may terminate this Agreement, upon (x) fifteen (15) days' prior written notice if HRT has not achieved a Milestone Event set forth in Section 2.2 within one hundred eighty (180) days of the Targeted Completion Date set forth with respect to such Milestone Event or (y) sixty (60) days' prior written notice, if HRT has stopped using commercially reasonable efforts to develop Product in the Territory (during which sixty (60)-day period HRT may resume using such efforts and upon PPLP's reasonable satisfaction that such efforts have resumed such notice shall be withdrawn).

5.5    **Publicity Upon Termination**. If either Party terminates this Agreement for any reason, the Parties will agree upon the wording of any public announcement of such termination and, if the Parties are unable to reach such agreement, neither Party shall release any public announcement relating to such termination without the other Party's written consent. Following any termination of this Agreement, HRT will not make any public statements about this Agreement, the circumstances surrounding the termination or the relationship between the Parties without the prior written consent of PPLP, except for any such statements required pursuant to legal process. PPLP will give HRT prior written notice of any statement it proposes to make following such termination and, except for statements made pursuant to legal process, will take into consideration any comments HRT may have with respect to such statements. Notwithstanding the above, HRT may disclose the termination of this Agreement to any of its vendors or suppliers.

## ARTICLE VI
## INDEMNIFICATION

6.1    **Indemnification by HRT**. Except as otherwise specifically provided herein, HRT shall indemnify and hold harmless PPLP and its officers, directors, agents, employees, distributors, successors and assigns from and against all Claims, actions, losses, damages, costs, expenses or other liabilities in respect of any third party Claims arising out of (a) the use, development, marketing, seeking Regulatory Approval of or distribution of the Product by HRT, (b) breach of any of HRT's material obligations under this Agreement, including HRT's representations and warranties, or (c) the willful misconduct or grossly negligent acts of HRT, or the officers, directors, employees, or agents of HRT; provided that HRT shall have no liability or indemnification obligation under this Section 6.1 arising from liabilities to third parties principally caused by the acts or omissions of PPLP.

9

6.2 **Limitation of Liability**.  EXCEPT WITH RESPECT TO A BREACH OF THE CONFIDENTIALITY PROVISIONS SET FORTH IN ARTICLE VII AND INDEMNIFICATION OBLIGATIONS FOR THIRD PARTY CLAIMS PURSUANT TO SECTION 6.1, NO PARTY SHALL BE ENTITLED TO RECOVER FROM ANY OTHER PARTY ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT.

## ARTICLE VII
## CONFIDENTIALITY AND NONDISPARAGEMENT

7.1 **Confidentiality**.  Except as otherwise agreed in writing between the Parties, the Parties will keep the terms of this Agreement confidential; provided, however, that either Party may disclose such terms to the extent required by applicable law, to obtain Bankruptcy Court approval of the Approval Order, or pursuant to any request for information from any other governmental entity or any compulsory legal process.

7.2 **Nondisparagement**.  PPLP and HRT each agree that for a period of five (5) years from the Effective Date of this Agreement, neither Party will disparage, portray in a negative or false light, or take any action that would lead to unfavorable publicity for the other Party or its employees or owners, whether such disparagement, portrayal, or action is made publicly or privately, in the form of opinion or otherwise and including, without limitation, in any and all interviews, verbal statements, written materials, and electronically-displayed materials; all of the above, only to the extent that such disparagement, portrayal, publicity or action relates to this Agreement, the Parties' on-going relationship, or PPLP's funding and support for HRT's development of the Product. Neither Party shall be deemed to be in breach of this Section 7.2 if the alleged disparagement, portrayal, publicity or action by such Party is truthful and is made in connection with legally required testimony, pleading, investigation or any legal proceeding in front of a court, an arbitration panel or any governmental agency or entity.

## ARTICLE VIII
## COMMUNICATIONS, COOPERATION AND PRESENTATION OF RESEARCH

8.1 **Collaboration**.  PPLP and HRT will collaborate on a public communications strategy related to HRT's development of the Product and PPLP's support thereof and will align on scheduled milestones for joint communications (e.g., press releases, social media, and statements), which may include up to four (4) opportunities per year.

8.2 **Presentation of Research**.  If HRT intends to present research data related to the Product at a scientific forum or other  public venue, it will notify PPLP not less than forty-five (45) days in advance of such event and HRT and PPLP will discuss whether and how PPLP's support of HRT and HRT's development will be referenced; provided that no such reference  may be made without PPLP's prior written consent, which will not be unreasonably withheld. HRT and PPLP will also agree upon any press releases, social media releases or other announcements proposed to be made regarding such presentation.

8.3  **Websites and Social Media**.  PPLP and HRT will continue to include information about funding and support provided by PPLP on both Parties' websites and through social media channels.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

9.1  **Assignment**.  HRT shall not assign this Agreement without PPLP's prior written consent, which consent shall not be unreasonably withheld, provided however, that no such consent will be required in connection with the sale or transfer of all or substantially all of HRT's assets, provided that the successor to HRT shall be (a) a not for profit organization, (b) a benefit corporation or (c) another entity reasonably acceptable to PPLP, and shall have assumed, in a writing delivered to PPLP, all of the duties and obligations of HRT and shall agree to make all of the representations and warranties and observe all of the covenants of Section 4.2.  PPLP may assign this Agreement, provided that no such assignment shall be binding and valid until and unless the assignee shall have assumed, in a writing delivered to HRT, all of the duties and obligations of PPLP.

9.2  **Notices**.  Any notice or other communication which shall or may be given pursuant to this Agreement shall be in writing and shall be delivered by certified mail or by facsimile transmission confirmed by certified mail, addressed to the Parties' respective addresses as set forth below:

| | |
|---|---|
| If to HRT: | Harm Reduction Therapeutics, Inc.<br>4800 Montgomery Lane, Suite 400<br>Bethesda, MD  20814<br>Attn:  President |
| With a copy to: | K&L Gates LLP<br>K&L Gates Center<br>210 Sixth Avenue<br>Pittsburgh, PA 15222-2613<br>Attn:  Oded Green |
| If to PPLP: | Purdue Pharma L.P.<br>One Stamford Forum<br>201 Tresser Boulevard<br>Stamford, Connecticut 06901<br>Attn:  General Counsel |
| With a copy to: | Purdue Pharma L.P.<br>One Stamford Forum<br>201 Tresser Boulevard<br>Stamford, Connecticut 06901<br>Attn:  Chief Financial Officer |

        and

        Arnold and Porter Kaye Scholer LLP
        250 West 55th Street
        New York, New York 10019-9710
        Attn:  Rory Greiss and Eric Rothman

Any Party may change its address by notice to the other Party.

9.3    **Further Assurances**.  Each Party shall take all such steps, execute all such documents and do all such acts and things as may be reasonably required by the other Party to give effect to any of the transactions contemplated by this Agreement.

9.4    **Agency and Representation**.  The legal relationship between the Parties shall not be construed such that any Party is deemed a partner or agent of the other Party, nor will it confer upon any Party the right or power to bind the other Party in any contract or to the performance of any obligations as to any third party.  Each Party shall conduct its transactions and operations with the other as an independent contractor.

9.5    **Non-Waiver**.  Neither the failure of any Party to enforce at any time any of the provisions of this Agreement nor the granting of any time or other indulgence shall be construed as a waiver of that provision or of the right of that Party thereafter to enforce that or any other provision.

9.6    **Severability**.  In the event that any provision of this Agreement would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

9.7    **Costs**.  Each Party shall bear its own costs arising out of the negotiation and preparation of this Agreement.

9.8    **Entire Agreement**.  Except as set forth in the next sentence, this Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof and supersedes all prior written or oral agreements.  This Agreement does not amend or limit, in any way, the provisions of the Prior Agreements, which agreements remain in full force and effect.

9.9    **Amendment**.  This Agreement may not be amended except by a further written agreement duly executed by authorized representatives of the Parties.

9.10 **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to its choice of law and conflicts of law provisions.

9.11 **Counterparts**.  This Agreement may be executed in two or more counterparts (including by facsimile or other electronic transmission), each of which shall be deemed an original, but all of which together shall constitute a single agreement.

9.12 **Third-Party Beneficiaries**.  Except as specifically provided herein, this Agreement is not intended to confer upon any non-party any rights or remedies hereunder.

9.13 **Survival**.  The provisions of Section 3.1 and Articles VI, VII and IX shall survive the termination of this Agreement.

9.14 **Force Majeure**.  Each Party will be excused for delays in performing or from its failure to perform hereunder to the extent that the delays or failures result from causes beyond the reasonable control of such Party; provided that, in order to be excused from the delay or failure to perform, such Party much act diligently to remedy the cause of the delay or failure.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their duly authorized representatives as of the date first written above.

**HARM REDUCTION THERAPEUTICS, INC.**

_____
BY:    Michael Hufford, Ph.D.
TITLE: CHIEF EXECUTIVE OFFICER

**PURDUE PHARMA L.P.**

By: PURDUE PHARMA INC., ITS GENERAL PARTNER

_____
BY:    Philip C. Strassburger
TITLE: SENIOR VICE PRESIDENT, INTELLECTUAL PROPERTY
       LAW & PUBLIC HEALTH INITIATIVES

13

14

US 167648486v27

| Summary report: Litera® Change-Pro for Word 10.7.0.7 Document comparison done on 6/9/2020 10:51:13 PM ||
|---|---|
| **Style name:** Color Legislative Moves+Images ||
| **Intelligent Table Comparison:** Active ||
| **Original filename:** Exhibit D - Original - #167648486v2_US_ - HRT-PPLP Funding Agreement (Feb. 2020).DOCX ||
| **Modified filename:** Exhibit D - Modified - HRT-PPLP Funding Agreement_(US_167648486_7).DOCX ||
| **Changes:** ||
| Add | 37 |
| Delete | 39 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 78 |