AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Sara L. Brauner
Edan Lisovicz

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS WITH RESPECT TO THE AMENDED MOTION OF DEBTORS FOR AUTHORIZATION TO ENTER INTO FUNDING AGREEMENT

The Official Committee of Unsecured Creditors (the "Official Committee") of Purdue Pharma L.P., *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this statement (the "Statement") in response to the *Amended Motion of Debtors for*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

*Authorization to Enter into Funding Agreement* [ECF No. 1249] (the "Amended Motion")[2] and respectfully states as follows.

## PRELIMINARY STATEMENT

1.     At the outset of these cases, the Debtors announced their desire to transform Purdue into a public benefit company, including through a series of public health initiatives (collectively, the "Public Health Initiative" or the "PHI"). *See* Transcript of October 10, 2019 Hearing 11:23-12:2 (Counsel for the Debtors). Four months ago, the Debtors moved for authorization to pursue their goal through the development of an autoinjectable formulation of nalmefene (the "Nalmefene Initiative").[3] On April 1, the Debtors sought to take the next step towards their vision for Purdue's future by requesting authorization to provide Harm Reduction Therapeutics, Inc. ("HRT"), a non-profit pharmaceutical company, with funding to develop an over-the-counter ("OTC") naloxone nasal spray device (the "Product" and such effort, the "Naloxone Initiative"), which, once developed, would be donated free-of-charge or sold at cost to the general public. *See Motion of Debtors for Authorization To Enter into Funding Agreement* [ECF No. 1005] (the "Initial Motion").[4] The Debtors have framed each of these initiatives as a necessary component of an altruistic scheme to repair the devastation inflicted upon the American public by the opioid crisis, and indeed by the Debtors' own hands.[5]

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Motion.

[3] An order in respect of the *Debtors' Motion for Authorization To Enter into Development Agreement* [ECF No. 826] was entered on February 24, 2020 [ECF No. 868].

[4] The third project currently comprising the PHI, an effort to develop a generic version of a leading opioid addiction drug (Suboxone), similarly seeks to use estate value that would otherwise satisfy creditor claims to benefit the American public generally by distributing "millions of doses of this valuable treatment at low or no cost." *Debtors' Informational Brief* [ECF No. 17] (the "Informational Brief") at 13.

[5] The Official Committee recognizes the complex and highly politicized nature of these chapter 11 cases, particularly when it comes to issues relating to the future of the Debtors' businesses. The Official Committee understands that the Debtors are working to find ways to abate the opioid crisis in furtherance of the greater public good, and the Official Committee appreciates these efforts. However, as discussed in further detail herein, the Official Committee is troubled by the Debtors' repeated attempts—whether deliberate or not—to couch business judgment determinations that

2

2. The Official Committee understands the catastrophic impact the opioid epidemic has had on this country and recognizes the "flesh and blood" nature of these cases.[6] As such, the Official Committee supports in principle any effort to contribute meaningfully to the amelioration of the damage Purdue's drugs have caused. In fact, one of the Official Committee's first actions was to try to foster consensus regarding an emergency relief fund that would take $200 million from the Debtors' balance sheets to combat the opioid crisis ***now*** (not two or three years from now) by getting critical funding to the front lines. The Official Committee believed—and continues to believe—that distributing some of the Debtors' value to underfunded programs imminently will save the lives of numerous victims who truly cannot wait for these highly complex cases to run their course.

3. Neither the Official Committee nor any of the other primary creditor constituencies in these cases, however, has made a final determination as to whether the PHI represents the most beneficial outcome for the Debtors' estates, the entire value of which belongs to creditors. Indeed, the Official Committee continues to question whether committing estate value—value that otherwise would be available to individual victims, children born with NAS and others who have suffered unparalleled harm—to fund programs that ***may, in a few years***, provide opioid overdose reversal medications and addiction treatment to the general public on a nonprofit basis is the optimal outcome here.

4. With respect to the Nalmefene Initiative, the Official Committee believed the Debtors' motion was premature, but determined not to object to such effort because of the

---

implicate value belonging solely to their creditors as a dichotomy of right and wrong, thus attempting to insulate the Debtors' request(s) from challenge.

[6] Transcript of June 3, 2020 Hearing 95:14-16 (THE COURT: "I will be taking steps to move the case along separately, and it's shame on us if we don't do that. ***This is flesh and blood***.") (emphasis added).

3

relatively small amount of money at stake as well as the Debtors' assurances that the Nalmefene Initiative would in no way bind the Debtors or creditors to the PHI. *See Statement of the Official Committee of Unsecured Creditors With Respect To the Debtors' Motion for Authorization to Enter Into Development Agreement* [ECF No. 849]. The Official Committee did, however, explain its view of three potential scenarios in which it believed the PHI might make sense, a view that the Court appeared to share:[7] (i) if all of the Debtors' significant creditor constituencies agree that the PHI is a worthy and attainable goal such that they are willing to forego the estate value devoted to such projects; (ii) if the Debtors develop and commercialize the products underlying the PHI in a manner that affords creditors the option to monetize such assets for the benefit of the estates; or (iii) if creditors that affirmatively support the PHI are willing to accept the value of such initiatives as payment on their claims. *Id.* ¶ 9.

5.  In turn, with respect to the Naloxone Initiative, the Official Committee—following discussions with various creditor consistencies—again raised these and other concerns with the Debtors. Specifically, both prior to and after the filing of the Initial Motion, creditor constituencies questioned the Debtors' desire to make an $11.5 million charitable contribution to fund an initiative for which HRT was unable to obtain any other financing. These concerns were amplified when it became clear that, at the time, ***none*** of the Debtors' other creditor constituencies (public or private) affirmatively supported these efforts. Prior to the hearing on the Initial Motion, and at least in part due to concerns raised by creditors, the Debtors determined to adjourn their request, first to the May omnibus hearing and then again to June.

---

[7] Transcript of February 21, 2020 Hearing 34:6-9 (THE COURT: "The Committee laid out three scenarios where this clearly makes sense, recognizing that there may be scenarios where it doesn't make sense.").

6. Now, by the Amended Motion, the Debtors renew their efforts with respect to the Naloxone Initiative. But notwithstanding the submission of an entirely redrafted motion, the Debtors have done little to address the core concerns raised by the Official Committee. In fact, the only material modifications to the requested relief are: (i) the Debtors' decision to limit the proposed funding to the amount necessary to complete the Phase I clinical study of the Product's safety and efficacy (thereby cutting nearly in half the Debtors' financial commitment); and (ii) HRT's agreement that, in addition to the return of prior contributions, Purdue will be entitled to 20% of HRT's equity interests *in the unlikely event* that HRT later becomes a for-profit entity. *See* Amended Mot. ¶ 16 ("To be clear, HRT has informed the Debtors that it has no intention of attempting to become a for-profit company, and as a practical matter the Debtors understand that such a conversion is not possible under applicable law.").[8]

7. The Official Committee continues to have no fewer than three serious concerns with respect to the Naloxone Initiative, none of which has been addressed by the Amended Motion. *First*, the Debtors' plan to develop OTC naloxone **cannot possibly** result in any direct monetary benefit to the Debtors' creditors and, as such, is tantamount to a charitable donation to an organization of the Debtors' choosing.[9] *Second*, the Official Committee still is unaware of any creditor that has agreed to take its recovery in these cases in the form of "value to the American public" supplied through the PHI. *Finally*, there is substantial—if not universal—agreement among the Debtors' significant creditor constituencies that programs in furtherance of the PHI

---

[8] For the avoidance of doubt, the Official Committee requested that HRT consent to the 20% profit sharing structure described above. The Official Committee appreciates the Debtors' and HRT's willingness to accede to this request, notwithstanding the fact that HRT "has no intention" of becoming a for-profit company. At no time, however, did the Official Committee suggest that it would support the Naloxone Initiative if the Debtors limited their requested relief to Phase I and, indeed, made clear to the Debtors and other parties that if the Official Committee determined not to object, it would file with the Court a statement explaining its views.

[9] Indeed, upon information and belief, the only other potential sources of funding for the Naloxone Initiative were charitable foundations or individual philanthropists. Amended Mot. ¶ 24 *et seq.*

5

should not be considered until after, or as a part of, the ongoing mediation (the "Mediation"), at which time parties hopefully will have a greater understanding of the future of Purdue and which of the Debtors' creditors (if any) may be willing to accept value to the American public in lieu of payment on their claims.

8. Notwithstanding these concerns, the Official Committee acknowledges that the Amended Motion seeks authorization to make a relatively small funding commitment in connection with Phase I trials and, more importantly, recognizes the significant benefits that potentially could result from the successful development of OTC naloxone for distribution to the American public at cost.[10] In addition, the Official Committee shares the Court's view that the distinctively human nature of these chapter 11 cases demands significant compromises to avoid causing very real, additional harm. *See* Transcript of June 3, 2020 Hearing 95:16; *id.* at 94:17-21 ("The Parties in this case need to realize that the result in this case cannot be exactly what they want; perfection is not achievable here, and an effort to achieve perfection will leave the people who are suffering at greater harm."). Therefore, after a careful balancing of these complex issues, the Official Committee has determined not to object to the limited relief sought in the Amended Motion. For the avoidance of doubt, however, the Official Committee's decision should not be

---

[10] For the avoidance of doubt, the Official Committee does not share unequivocally the Debtors' views regarding the potential value of the Naloxone Initiative. Numerous to-be-determined factors will influence the ultimate benefit to the American public. For example, the Official Committee believes that the Debtors' projections as to value of the Naloxone Initiative will be affected by a recent decision invalidating four patents related to Narcan®, the branded naloxone nasal spray used to treat opioid overdoses, which will enable manufacturers to produce generic versions of naloxone. *See Order, Adapt Pharma Operations Limited v. Teva Pharmaceuticals USA, Inc.*, Case No. 2:16-cv-7721 (BRM) (JAD), D.N.J. (June 5, 2020) [ECF No. 342]. If upheld on appeal, the decision is expected to reduce dramatically the cost of prescription naloxone and, in turn, the cost-avoidance value of the Debtors' OTC naloxone product. In connection with their consideration of the Amended Motion, the Official Committee, along with other creditor consistencies, also heard from an expert working with members of the ad hoc committee of governmental and other contingent litigation claimants (the "Consenting Ad Hoc Group"), regarding the merits of OTC naloxone. The Official Committee found compelling the expert's views regarding certain of the benefits that could derive from easy and inexpensive access to naloxone, but have not yet heard a compelling rationale for why the Debtors—without the affirmative support of their creditors—must fund this initiative.

6

misconstrued as support for the Naloxone Initiative or the PHI in general. Indeed, unless and until one of the three scenarios outlined above is present, the Official Committee expects that it will object to any future efforts by the Debtors to commit estate resources to furthering the PHI.

## BACKGROUND

9.     The Debtors' proposal to provide HRT with funding to develop OTC naloxone is a critical step in the Debtors' proposed PHI, which, in turn, is a component of the public benefit corporation contemplated by the settlement framework (the "Settlement Framework") among the Debtors, the Consenting Ad Hoc Group and certain trusts and other entities associated with the Sackler family (and the Sacklers themselves) announced at the outset of these cases. *See* Initial Mot. ¶ 10; Informational Brief at 12-13; *Notice of Filing of Term Sheet with Ad Hoc Committee* [ECF No. 257].[11] Notably, however, the proposed framework is not binding on any party and the Debtors have made clear that they have not yet concluded that the Settlement Framework is in the best interests of their estates and creditors. *See* Transcript of November 6, 2019 Hearing 72:15-16 ("[N]o one has yet signed on any particular final outcome of this case") (Counsel for the Debtors); *id*. at 72:10-12 ("[W]e're not getting to future gates in this case unless we have a real deal that we believe as fiduciaries is the appropriate one.") (Counsel for the Debtors). And as this Court is aware, not a single significant creditor constituency other than the Consenting Ad Hoc Group currently supports the Settlement Framework. Specifically, the creditor groups that have not yet agreed to such framework include: (i) a group comprising 25 states (the "Ad Hoc Group of Non-Consenting States"); (ii) a group comprising 1,222 governmental entities (the "MSGE Group") representing the interests of municipalities and Native American Tribes; and (iii) the numerous ad

---

[11] The Settlement Framework contemplates, among other things, that upon the effective date of a chapter 11 plan, the Debtors will transfer all of their assets to a trust or similar structure for the benefit of all claimants, which will be run by independent directors selected by creditors or their representatives. *Id.* ¶ 2.

hoc groups that have formed to represent, respectively, the interests of private claimants, including hospitals, individuals (two separate groups), babies born with NAS, certain third party payors and health insurance premium payors.

10. Notwithstanding the lack of creditor support for the PHI, the Debtors initially sought authority to provide $11.5 million of funding[12] to HRT, a non-profit independent pharmaceutical company founded in 2017 by John Pinney and Michael R. Hufford for the sole purpose of developing OTC naloxone, one of the three primary pillars of the PHI. Prior to and following the filing of the Initial Motion, the Official Committee and other creditor constituencies raised a number of questions with respect to the Naloxone Initiative. Among these questions were whether HRT was the right company to undertake the Naloxone Initiative,[13] whether it was appropriate for the Debtors to make the unilateral determination to fund a project that furthered the PHI without broad creditor support and whether a motion seeking authorization to pursue the Naloxone Initiative while the parties are involved in the ongoing Mediation was timely. In light of these questions (and others), and as a result of the strong urging by their primary creditor constituencies, the Debtors agreed (twice) to adjourn the motion in an effort to address creditor concerns.

11. Over the past two months, and in an effort to obtain creditor support for the Naloxone Initiative, the Debtors responded diligently to information requests concerning HRT and offered to make certain changes to the motion, including limiting the proposed funding to Phase I

---

[12] Such amounts were in addition to the $5.92 million Purdue or the Debtors have provided HRT to support the development of OTC naloxone since November 2018, including $2.5 million in November 2019—*i.e.*, **after** the Petition Date. *Id.* ¶ 17.

[13] In the Amended Motion, the Debtors provide additional information regarding HRT's connections to Pinney Associates, Inc. ("Pinney Associates"), a for-profit consulting firm founded by Mr. Pinney in 1994 that had a longstanding relationship with Purdue. The Official Committee performed diligence with respect to these connections, both prior to and following the filing of the Amended Motion.

8

absent further order of the Court. During these discussions, the Official Committee made clear that these modifications, while appreciated, failed to address the key issue raised by the Naloxone Initiative—namely, whether the Debtors should continue to devote estate resources to the PHI before any creditor constituency has determined to support this approach and accept the value provided through such initiative as consideration in respect of its claims.

12. Notwithstanding these concerns, the Debtors filed the Amended Motion, which, if granted, will enable HRT to complete the Phase 1 Study to evaluate the Product's safety and efficacy. Amended Mot. ¶ 26. Subject to HRT's completing the Phase 1 Study, the Debtors intend to seek authorization to provide HRT with the remaining $5 million prior to the end of 2020. *Id.* ¶ 20. Thereafter, if HRT meets certain additional milestones and obtains the requisite regulatory approvals and the Debtors are otherwise able to implement the PHI as they intend, the Debtors and/or the successor public benefit company will need to contribute **hundreds of millions of dollars** of additional estate value towards development and manufacturing in order for the Product to be brought to market for free or at cost. *Id.* ¶ 17.

## STATEMENT

### I. Commitments in Furtherance of the PHI Should Be Deferred to After, or Considered During, the Mediation

13. After the filing of the Initial Motion, the Official Committee and other creditors questioned the Debtors' insistence upon seeking approval of the Funding Agreement at this stage of the cases. The Debtors explained that their unwillingness to accede to their creditors' request to further adjourn the Naloxone Initiative was rooted in their desire to make OTC naloxone available to the public as soon as possible. While there can be no doubt this is a laudable goal, the Official Committee believes it would be more appropriate to address issues related to the PHI as

part of the Mediation.[14] This is particularly true in light of the Debtors' professed intention to turn over the entire value of their estates to their creditors, who singlehandedly will determine the future of Purdue. *See, e.g.*, Transcript of September 17, 2019 Hearing 25:12-16 ("Purdue is also here to build further support for the settlement framework that would transfer 100 percent of the debtors to its contingent claimants. Your Honor, Purdue is not shielding itself from these claimants. It's giving itself to these claimants.") (Counsel for the Debtors); *see also* Transcript of November 19, 2019 Hearing 159:16-19 (THE COURT: "[T]he Debtors are largely in a *sua generous* [sic] position whereby they have already agreed to turn over all of their value to their creditors.").[15]

14. To understand why the Official Committee believes it would be more appropriate to address relief related to the PHI during the Mediation, it is important to appreciate certain key differences among the various claims against the Debtors' estates. The Debtors' opioid litigation claimants may be categorized broadly into two groups—public and private—and the primary purpose of the Mediation is to determine an appropriate allocation between these groups of the value/proceeds of the Debtors' estates. *See* Mediation Order ¶ 3. Public opioid creditors in these cases include the federal government,[16] states, the District of Columbia and U.S. territories, political subdivisions of the states and Native American Tribes (collectively, the "<u>Public Claimants</u>"). Private opioid creditors include private parties such as hospitals, health insurance carrier plaintiffs and other third party payors, purchasers of private health insurance, various

---

[14] Although the Mediation is focused on determining the issue of the allocation of estate value among Private Claimants and Public Claimants, the Mediation Order contemplates that the mediators may consider additional related issues and that the scope of the Mediation may be expanded with the consent of the Mediation parties. *See Order Appointing Mediators* [ECF No. 895] (the "<u>Mediation Order</u>") ¶ 3.

[15] Indeed, the Official Committee is concerned that, despite the Debtors' purported commitment to their creditors, they are only willing to turn over the value of their business on their specific terms—terms which include the PHI.

[16] The Federal Government is participating in the Mediation solely as an observer at this stage. "Public Claimants," as defined in the Mediation Order, include only the states and U.S. territories, all political subdivisions of the states and Native American Tribes, and does not include the Federal Government. *See* Mediation Order.

10

individuals and decedent estates alleging personal injury or wrongful death claims (including guardians asserting claims on behalf of minors born with NAS due to exposure to opioids *in utero*) and a putative class of NAS children seeking medical monitoring funding (the "Private Claimants").[17]

15. An important, but not immediately apparent, distinction between the Public Claimants and the Private Claimants involves the nature of the claims asserted and remedies sought by each of the two groups. As a general matter, the Public Claimants' claims have focused on theories of liability grounded in public nuisance and have sought abatement remedies.[18] In other words, the Public Claimants generally have focused on "forward-looking" remedies that involve funding programs and services to combat the opioid crisis in the future. On the other hand, while the Private Claimants recognize the importance of combatting the opioid crisis[19] (and certain Private Claimants have asserted nuisance claims against the Debtors and have sought abatement remedies as well), many Private Claimants are more focused on recovering compensation for past damages.

16. At its core, the PHI is an ***abatement measure*** proposed by the Debtors in an effort to remediate past harms with future programs, but without any admission or finding of liability of the sort that would result from a damages award. Indeed, a forward-looking strategy enables the Debtors to focus on alleviating a public health crisis without acknowledging the pivotal role they and their shareholders played in the catastrophic destruction caused by the Debtors' opioids.

---

[17] Public Claimants and Private Claimants collectively are represented by approximately ten separate ad hoc groups, most of which have filed Rule 2019 statements and appeared in these cases.

[18] For the avoidance of doubt, Public Claimants have asserted other types of claims and have sought other types of damages as well.

[19] As noted, one of the first actions taken by the Official Committee (which includes six Private Claimants, two trade creditors and The Pension Benefit Guaranty Corporation, in addition to two *ex officio* members, Cameron County, Texas, on behalf of the MSGE Group, and the Cheyenne and Arapaho tribes, on behalf of certain Native American Tribes and Native American affiliated creditors) was to promote the concept of the emergency relief fund.

11

Although no creditor can be forced to do so, certain creditors may be willing to accept the value distributed through the PHI as recovery in respect of their claims. As a general matter, but solely if they wish to receive their distribution in such form, the most logical candidates are the Public Claimants, as they presumably are better situated than most Private Claimants to play a role in distributing the products the Debtors seek to develop. Indeed, many states and/or their political subdivisions have already received significant funding for programs that provide the public with opioid addiction or overdose reversal products similar to those the Debtors seek to develop and have used existing infrastructures to distribute grant money and the proceeds of settlements of litigation claims against opioid defendants specifically for such purposes.[20]

17. Critically, however, and notwithstanding the foregoing, the Official Committee is aware of **no** creditor constituency—public or private—that has committed to accept the value of the PHI as part of its recovery in these cases. To the contrary, based on numerous discussions with the significant creditor constituencies in these cases, it appears that nearly all creditors share the Official Committee's view that the PHI should not be considered at least until it is a part of, the Mediation, when the parties (hopefully) will have a much better understanding as to the amounts and forms of recoveries they will receive in these cases and a clearer picture of the future of Purdue. Indeed, absent agreement, it is nearly impossible to determine how to value the PHI for allocation

---

[20] *See, e.g.*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Office of the Inspector General, *States' Use of Grant Funding for a Targeted Response to the Opioid Crisis* (Mar. 18, 2020) (by the end of fiscal year 2020, states will have received $3.9 billion since 2017 through just two federal opioid grant programs—the State Targeted Response to the Opioid Crisis Grant Program and the State Opioid Response grant program—which include funding to allow the states to purchase naloxone for distribution); Jeremy Newman, THE SCIOTOPOST, *Hamilton Ohio Has Successfully Reduced OverDose Related Services by Take Home Narcan* (Dec. 17, 2018), http://www.sciotopost.com/hamilton-ohio-successfully-reduced-overdose-related-services-take-home-narcan/ (describing "Narcan Distribution Collaborative" pursuant to which Hamilton County, Ohio distributed 25,000 doses of Narcan, a brand name version of Naloxone, to a broader section of the community); Jackie Fortier, KGOU, *Here's What Happened to $829 Million Oklahoma Was Awarded to Treat Opioid Addiction* (Jan. 16, 2020), https://www.kgou.org/post/here-s-what-happened-829-million-oklahoma-was-awarded-treat-opioid-addiction (noting that approximately $20 million of Oklahoma's settlement with Purdue would be used to provide medication to addicted individuals).

or Mediation purposes, as the value of the PHI depends on the weight (if any) that claimants place on the Debtors' contention that hundreds of millions of dollars in value will be generated or saved for the American public. Until these issues are resolved, the Debtors should not be committing additional estate resources to the PHI.

**II.    The Debtors' Efforts To Advance the PHI Are Inconsistent with the Business Judgement Rule**

18.    By the Amended Motion, the Debtors argue that their request to use estate property outside of the ordinary course of business is subject to the "business judgment rule" and should be approved if such request is "based on the debtor's sound business judgment in light of 'all salient factors' relating to the bankruptcy case." Amended Mot. ¶ 37 (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)). As this Court has explained on numerous occasions, however, the applicable standard is not blindly deferential to a debtor's opinion, but instead requires the bankruptcy court to reach its own conclusion about the propriety of the proposed action. Transcript of Nov. 19 Hearing 158:8-15 ("[N]otwithstanding the *Integrated Resources* case often cited by debtors in Section 363(b) motions, the Second Circuit has made it clear since that case that ultimately the bankruptcy judge has to make the decision as to whether the debtor has exercised proper business judgment in taking the action out of the ordinary course.") (citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993)). In other words, a bankruptcy court should not merely apply the deferential "state law 'business judgment' standard [used by courts to] review . . . corporate decision making." *See In re The Great Atlantic & Pac. Tea Co., Inc.,* 544 B.R. 43, 48-49 (Bankr. S.D.N.Y. 2016) (RDD). Specifically, in considering a motion under Bankruptcy Code section 363(b), "the Court should not simply defer, even when there is no objection, to a . . . debtor in possession's business judgment . . . but rather apply its own judgment based on the record before

13

it to the proposed transaction or settlement." Transcript of August 3, 2018 Hearing 96:19-97:6, *In re Eljamal*, No. 15-22872 (Bankr. S.D.N.Y.).

19. Moreover, where a motion under Bankruptcy Code section 363 is objected to "by parties with a general stake in the decision, the bankruptcy court [must] "plac[e] itself in the position of the . . . debtor-in-possession and determin[e] whether" the proposed action "would be a good business decision or a bad one." *In re The Great Atlantic & Pac. Tea Co., Inc.,* 544 B.R. at 48-49 (citing *Orion*, 4 F.3d at 1099); Transcript of Nov. 19, 2019 158:25-159:4 ("Where there are objections in particular, the Court needs to carefully weigh all of the opposing views as well as the views stated in support of the motion to determine, in its judgment, whether the decision is a good or a bad one."). Thus, creditor support (or the lack thereof) is an essential factor in determining whether to approve a transaction pursuant to Bankruptcy Code section 363, with courts weighing most heavily the positions of the creditors affected most directly by the proposed transaction. *See In re Republic Airways Holdings Inc.*, 2016 Bankr. LEXIS 1927, at *25 (Bankr. S.D.N.Y. May 3, 2016) ("Based on the current status of the case, therefore, the party that would have concerns about the [settlement] reducing their recovery would be the Official Committee of Unsecured Creditors. But the Official Committee supports [the settlement].").

20. The Debtors argue that entering into the Funding Agreement is in the best interests of their estates and thus a sound exercise of business judgment because developing the Product (and presumably the PHI as a whole) will help to abate the opioid crisis, which, in turn, will benefit "all of the Debtors' contingent creditors and the American public at large." Amended Mot. ¶ 39. The Official Committee understands the argument that *if* OTC naloxone is brought to market in the future at cost or for free, *it likely will* result in a benefit to the American public, which, in turn, will provide a benefit to hospitals, third party payors and various public entities. It is undisputable,

14

however, that *none* of these will redound to the benefit of any creditor on account of damages that Purdue and its controlling shareholders have caused such creditor in the past. In spite of the moral and political appeal of the Debtors' narrative, acting in accordance with fiduciary obligations and for the benefit of creditors is not one in the same as making charitable contributions in furtherance of an amorphous "public good."

21.     Conspicuously absent from the Amended Motion is a description of *any* benefits that will accrue directly to creditors. The reason for this omission is simple: by its very terms, the Funding Agreement may be, at least in part, inconsistent with creditor interests because it *takes estate value that would otherwise go to creditors and seeks to give it away to the American public for free with no assurance (or indeed any expectation) of return*. Specifically, the Debtors do not seek authority to develop a proprietary product themselves, nor will they own intellectual property or any other valuable rights should the Product be developed successfully. Amended Mot., Ex. B § 3.1. Instead, the Debtors propose to give money to HRT to develop the Product with the ultimate humanitarian goal of distributing millions of doses of such Product to the American public at no cost. To be clear, while the Official Committee shares the Debtors' desire to use these chapter 11 cases to provide much-needed relief to victims of the opioid crisis, creditors—not the Debtors—must make the crucial determinations regarding the best way to accomplish this goal.[21]

22.     Nevertheless, the Official Committee ultimately determined not to object to the Amended Motion for two reasons. *First*, regardless of whether it agrees with the value the Debtors attribute to the Naloxone Initiative, the Official Committee acknowledges that successfully

---

[21] In the event that creditors in these cases determine not to support further steps towards the development and distribution of OTC naloxone because it is determined to be inconsistent with their broader goals in these cases, the Official Committee very much hopes that a philanthropic organization or other third party—including perhaps a creditor constituency in these cases interested in taking its recovery in this form—is willing and able to provide HRT with necessary funding to bring the Product to market for the benefit of the American public.

developing OTC naloxone may, in fact, result in significant benefits to the American public at some point in the future. This potential for good, coupled with the relatively modest sum contemplated for Phase I and the ability for creditors to object to requests for additional funding in the future, caused the Official Committee to conclude that the potential benefits of the limited relief requested in the Amended Motion likely outweigh any Pyrrhic victory that could be achieved by litigating an objection. *Second*, the Official Committee has taken to heart the Court's words regarding the need for compromise and the value of alignment among the "twin fiduciaries" as a means for advancing the chapter 11 cases,[22] and is committed to doing what is necessary to move these cases forward in a cost-effective manner.[23] The Official Committee hopes the Debtors pay similar heed to the Court's instructions by abstaining from any future requests for relief related to the PHI unless and until they have significant creditor support.

## CONCLUSION

23.     The Official Committee believes the parties should focus on reaching resolution in the Mediation before committing to the Funding Agreement or any other significant expenditures in furtherance of the PHI, and leave questions as to the future of Purdue for a later date. For the reasons set forth above, however, the Official Committee has determined not to object to the relief requested in the Amended Motion. The Official Committee reserves all rights with respect to the

---

[22] *See* June 3, 2020 Hr'g Tr. 95:3-5 (THE COURT: "I want this case to move, and I will make it move if the parties don't start accommodating each other. And one way to do that is to tell the Debtors we don't need consensus on everything. You have an active, well-informed and diligent official creditors committee that represents everyone.").

[23] The Official Committee's commitment to this goal is evidenced most recently by the filing of a discovery and information-sharing stipulation [ECF No. 1231], which provides creditors with nearly unprecedented access to privileged information and work product from the Official Committee's advisors. As of the date hereof, the Debtors and the Official Committee have not yet been able to finalize the revised form of Protective Order in connection therewith due to informal objections raised by the Sackler family, which the Official Committee is attempting to resolve. If these issues cannot be resolved consensually, the Official Committee may seek the Court's assistance in the near term.

Amended Motion, including the right to amend or supplement this Statement, submit additional briefing, participate in any discovery and be heard at any hearing related to the Amended Motion.

Dated: New York, New York
       June 16, 2020

AKIN GUMP STRAUSS HAUER & FELD LLP

By: /s/ *Arik Preis*
    Ira S. Dizengoff
    Arik Preis
    Mitchell Hurley
    Sara L. Brauner
    Edan Lisovicz
    One Bryant Park
    New York, New York 10036
    Tel: (212) 872-1000
    Fax: (212) 872-1002
    idizengoff@akingump.com
    apreis@akingump.com
    mhurley@akingump.com
    sbrauner@akingump.com
    elisovicz@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.*, et al.