EISENBERG & BAUM

June 29, 2020

VIA ELECTRONIC COURT FILING

Honorable Robert D. Drain
U.S. Bankruptcy Court for the
Southern District of New York
300 Quarropas Street, Room 248
White Plains, NY 10601

Re: *In re: Purdue Pharma L.P. et al., No. 19-23649 (Bankr. S.D.N.Y.)*

Dear Judge Drain,

The Ad Hoc Committee on Accountability writes to address the issue that two corporate creditors, CVS[1] ("CVS") and Blue Cross Blue Shield ("BCBS") (collectively the "corporate creditors") may have acted in concert with Purdue to injure creditors with public nuisance, personal injury, wrongful death and Neonatal Abstinence Syndrome claims (collectively the "victim creditors").[2]

For years, big pharmacy companies, including CVS, were keenly aware of the illegal oversupply of prescription opioids.[3] CVS collected sales information and maintained a prescription database in its role as a retail seller of opioids.[4] The pharmacy giant was slow to take meaningful action to stem the flow of addictive drugs in the communities it serviced.[5] Instead, CVS profited in the oversupply of Purdue opioids, such as OxyContin.

---

[1] The named CVS Health creditors in the bankruptcy are CVS Caremark Part D Services L.L.C. and CaremarkPCS Health, L.L.C. The Ad Hoc Committee on Accountability is beginning to assess past corporate representation of CVS Health by the Debtors' law firm, Davis Polk. See Straquadine, Matt, *Davis Polk Handles $1.5 Billion in Bonds for CVS,* The AmDaily, September 14, 2009, https://amlawdaily.typepad.com/amlawdaily/2009/09/davis-polk-handles-15-billion-in-bonds-for-cvs.html ("Davis Polk has handled corporate work for CVS since it was spun out from now-defunct Melville Corp. in 1996.").

[2] Jan Hoffman, *Big Pharmacy Chains Also Fed the Opioid Epidemic, Court Filing Says*, N.Y. Times, May 27, 2020, https://www.nytimes.com/2020/05/27/health/opioids-pharmacy-cvs-litigation.html ("CVS worked with Purdue Pharma, the maker of OxyContin, to offer promotional seminars on pain management to its pharmacists so they could reassure patients and doctors about the safety of the drug."); Kate Thomas & Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers*, N.Y. Times, September 17, 2017, https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurance-companies.html ("Leo Beletsky, an associate professor of law and health sciences at Northeastern University, went further, calling the insurance system "one of the major causes of the crisis" because doctors are given incentives to use less expensive treatments that provide fast relief.").

[3] *See generally* Supplemental and Amended Allegations to be Added to Short Form for Supplemental Complaint, ¶ 74, *County of Lake v. CVS Health Corp.*, Case No. 17-md-2804, (N.D. Ohio 2020), Docket No. 3327.

[4] *Id.*

[5] Randy Ellis, *Cherokee Nation Lawsuit to Become Test Case in Search for Global Resolution to Expansive Opioid Litigation*, The Oklahoman, February 7, 2020, https://oklahoman.com/article/5654328/cherokee-nation-lawsuit-to-become-test-case-in-search-for-global-solution-to-expansive-opioid-litigation; *see also Cherokee Nation v.*

EISENBERG & BAUM

In this bankruptcy, CVS is seeking claims for money owed by Purdue on "payer rebates."[6] Rebates are paid to pharmacies to encourage the increased sale and use of prescription drugs. That CVS is now looking to recoup money owed from these schemes only evidences one of the tactics Purdue employed to expand the use of its opioids. Beyond these paybacks, CVS partnered directly with Purdue to target doctors and to "influence" pharmacists that the risk of addiction from OxyContin was very low.[7] Such misleading messaging formed the basis of Purdue's 2007 criminal guilty plea.

There are reasons to be concerned that BCBS may have also played a role in the opioid epidemic. Insurance practices have been reported to contribute to the over-prescription of opioids.[8] Based on profit motive, carriers pushed patients toward opioid use instead of steering them toward safer pain treatments.[9] Insurers cut reimbursements for non-opioid pain treatments or not covered them at all. According to Dr. Stuart Schweitzer, a professor of Health Policy and Management at the UCLA Fielding School of Public Health, if insurers "don't allow us to treat pain effectively, then this is what you get. You go down to the lowest-cost option that is authorized, and it is painkillers."[10]

By its own account, in 2015, twenty-one percent (21%) of BCBS commercially insured members filled at least one opioid prescription.[11] From 2012 to 2017, while the trend in overall number of first-time opioid prescription for BCBS patients declined, there was an increase in the

---

*McKesson Corp.*, Case No. 6:18-cv-00056-RAW-SPS (E.D. Okla. 2018); Nate Hegyi, *Cherokee Nation Sues Wal-mart, CVS, Walgreens Over Tribal Opioid Crisis*, NPR, April 25, 2017, https://www.npr.org/sections/codeswitch/2017/04/25/485887058/cherokee-nation-sues-wal-mart-cvs-walgreens-over-tribal-opioid-crisis ("'There are safeguards that are supposed to be followed — federal laws — that they turn a blind eye to because their profits are much more important to them,' Hembree says. 'We were being [overrun] by the amount of opioids being pushed into the Cherokee Nation.'").

[6] Verified Statement of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., *In re: Purdue Pharma, L.P.*, Case No. 19-23649 (RDD), Docket No. 1294.

[7] *See* Supplemental and Amended Allegations to be Added to Short Form for Supplemental Complaint, ¶ 455-50, *County of Lake v. CVS Health Corp.*, Case. No. 17-md-2804, (N.D. Ohio 2020), Docket No. 3327. A few brochures and posters are attached. *See also* Exhibit A.

[8] David Chase, *The Opioid Crisis is partly fueled by insurers' and employers approach to back pain*, STAT News, March 27, 2019, https://www.statnews.com/2019/03/27/opioid-crisis-insurers-employers-back-pain/.

[9] *Id.* ("Our entire health care system is built on a vast web of incentives that push patients down the wrong paths. And in most cases it's the entities that manage the money — insurance carriers — that benefit from doing so."); James Hayward, Christopher Jones, Wilson Compton, et. al., *Coverage of Nonpharmacologic Treatments for Low Back Pain Among US Public and Private Insurers*, Jama Network, October 5, 2018, https://jamanetwork.com/journals/jamanetworkopen/article-abstract/2705853 ("Several barriers to expanding coverage of nonpharmacologic treatment options for chronic, non-cancer pain were mentioned by interviewees, including an inadequate evidence base, cost concerns, and the potential for inappropriate use of some therapies, such as yoga and therapeutic massage. Some informants mentioned the increased administrative burden of expanded coverage, such as the resources required to process prior authorization and step therapy requirements for new therapies. For example, [one] interviewee mentioned wanting step therapy for steroid injections, but that the extra paperwork would require the services of an outside vendor. Interviewees also noted the potential for adverse selection should competitors choose not to expand coverage in a similar manner.").

[10] *Id.*

[11] *America's Opioid Epidemic and its Effects on the Nation's Commercially-Insured Population*, bcbs.com, June 29, 2017, https://www.bcbs.com/the-health-of-america/reports/americas-opioid-epidemic-and-its-effect-on-the-nations-commercially-insured.

EISENBERG & BAUM

prescription of long term, high-dose opioids.[12] Another study showed that effort of Blue Shield of California to reduce the authorization of extended release opioid prescriptions was offset by an increased sale of short-acting opioids.[13]

Before the Court approaches decisions about subordination of creditor claims under sections 509 and 510(c) of the U.S. bankruptcy code, it is important to have transparency on the complicity or misconduct of corporate creditors. The Court should consider the role corporate creditors played as co-debtors and examine how various insurer and pharmacy benefit policies may have been influenced by Purdue. It is inappropriate to leave it to Purdue and its long-time industry allies to voluntarily disclose harmful business practices. An independent examiner may be the solution to this problem.[14]

The lack of serious factual investigation in this proceeding should not be considered an achievement.[15] "The need for swiftness and finality in bankruptcy court proceedings often necessitates compromise of other judicial values, such as thoroughness and accuracy. Yet, these are compromises to be tolerated where necessary, not glorified as a matter of course."[16] Without a public examination into the parties and practices that contributed to the prescription opioid crisis, money will be taken out of the hands of the people by the companies that harmed them. Even worse, the court will have bargained away the health and safety of the next generation.

Very truly yours,

/s/   Michael S. Quinn
Michael S. Quinn (mq-1640)
mquinn@eandblaw.com

*Counsel to the Ad Hoc Committee on Accountability*

---

[12] Wenjia Zhu, Michael Chernew, Tisamarie Sherry, *Initial Opioid Prescriptions among U.S. Commercially Insured Patients, 2012-2017*, The New England Journal of Medicine, 2019, https://www.nejm.org/doi/pdf/10.1056/NEJMsa1807069.
[13] Michael Barnett, Andrew Olenski, Ateev Mehrotra, *A Health Plan's Formulary Initiative Led to Reduced Use of Extended-Release Opioids but Not Overall Opioid Use*, Health Aff (Millwood), September 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6407123/
[14] Gerald Posner, *How to Hold Purdue Pharma accountable for its role in the opioid epidemic*, LA Times, May 17, 2020, https://www.latimes.com/opinion/story/2020-05-17/sacklers-opioid-epidemic-bankruptcy; Jonathan Lipson, November 5, 2019 Letter to Trustee, *In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.).
[15] The lack of any formal discovery should not be applauded. During the June 23, 2020 hearing, the Debtors' attorney gleefully declared that no formal discovery has yet occurred. See June 23, 2020 Transcript, In re Purdue Pharma pg. 40, lines 15-18 ("If anybody sort of had taken bets on the opening day of the case whether nine months later there would be not[*sic*] be a single discovery request[*sic*] having been filed against the debtors, I don't think anybody would have taken that side of the bet. And I do want to sort of give a shout out to many people for the fact that with respect to the debtors, the UCC and the debtors and many other parties have worked out I think literally all or virtually all sort of information requests.").
[16] G. Marcus Cole and Todd J. Zywicki, *The New Forum Shopping Problem in Bankruptcy*, pg. 24, Stanford Law and Economics Olin Working Paper, No. 376; George Mason Law and Economics Research Paper, No. 09-29 (2009), https://law.stanford.edu/wp-content/uploads/sites/default/files/publication/258941/doc/slspublic/Cole%20Forum%20Shopping.pdf