1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                 United States Bankruptcy Court

13                 300 Quarropas Street, Room 248

14                 White Plains, NY 10601

15

16                 June 23, 2020

17                 10:06 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JUSTIN WALKER

Page 2

1    HEARING re Notice of Agenda for June 23, 2020 Hearing

2

3    HEARING re Amended Motion of Debtors for Authority to Enter

4    into a Motion for Funding Agreement (related document(s)

5    1005) filed by Marshall Scott Huebner on behalf of Purdue

6    Pharma L.P. (ECF # 1249)

7

8    HEARING re Notice of Hearing on Application of Stikeman

9    Elliott LLP as an Ordinary Course Professional for

10   Compensation for Services Rendered in Excess of the Tier I

11   OCP Cap for the Period from September 15, 2019 through

12   November 30, 2019 [Telephonic]

13   (related document(s)l 126, 548)

14

15   HEARING re Application of the Official Committee of

16   Unsecured Creditors for Entry of an Order Authorizing

17   Retention and Employment of Bedell Cristin Jersey

18   Partnership as Special Foreign Counsel, Nunc Pro Tune to

19   February 27, 2020 filed by Ira S. Dizengoff on behalf of The

20   Official Committee of Unsecured Creditors of Purdue Pharma

21   L.P., et al. (ECF #1244)

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   DAVIS POLK & WARDWELL LLP

4         Attorneys for the Debtor

5         450 Lexington Avenue

6         New York, NY 10017

7

8   BY:  MARSHALL HUEBNER (TELEPHONICALLY)

9         CHRISTOPHER ROBERTSON (TELEPHONICALLY)

10

11   PILLSBURY WINTHROP SHAW PITTMAN LLP

12         Attorneys for the Ad Hoc Group of Non-Consenting States

13         31 West 52nd Street

14         New York, NY 10019

15

16   BY:  ANDREW TROOP (TELEPHONICALLY)

17

18   AKIN GUMP STRAUSS HAUER & FELD LLP

19         Attorneys for the Official Committee of Unsecured

20         Creditors

21         One Bryant Park

22         New York, NY 10036

23

24   BY:  ARIK PREIS (TELEPHONICALLY)

25         MITCHELL P. HURLEY (TELEPHONICALLY)

Page 4

```
 1   MILBANK, TWEED, HADLEY & MCCLOY LLP

 2        Attorneys for the Raymond Sackler Family

 3        28 Liberty Street

 4        New York, NY 10005

 5

 6   BY:  ALEX LEES (TELEPHONICALLY)

 7

 8   ALSO PRESENT TELEPHONICALLY:

 9

10   BROOKS BARKER

11   SHEILA BIRNBAUM

12   HAYDEN COLEMAN

13   EDWARD DRUMMOND

14   GEORGE O'CONNOR

15   ALICE TSIER

16   JASMINE BALL

17   JEFFREY ROSEN

18   NATASHA LABOVITZ

19   MAURA MONAGHAN

20   DANIEL E. STROIK

21   HAROLD WILLIFORD

22   CHRISTOPHER ROBERTSON

23   MARC SKAPOF

24   DANIELLE LEVINE

25   KEVIN MACLAY
```

1   ARTEM SKOROSTENSKY

2   NICHOLAS KAJON

3   CONSTANTINE DEAN POURAKIS

4   GREGORY JOSEPH

5   NICHOLAS PRETY

6   GERARD UZZI

7   KENNETH H. ECKSTEIN

8   CAROLINE GRANGE

9   JEREMY KLEINMAN

10   RAMON NAGUIAT

11   M. VIOLA SO

12   CATRINA SHEA

13   LOWELL FINSON

14   DENNIS CHU

15   JON LOWNE

16   JAMES MCCLAMMY

17   MATTHEW PIERS

18   PAUL SCHWARTZBERG

19   GREGORY KOPACZ

20   EMILY F. MACKAY

21

22

23

24

25

Page 6

1                        P R O C E E D I N G S

2              THE COURT:  Good morning.  This is Judge Drain.

3     We're here on In re Purdue Pharma, L.P., et al.  This is a

4     completely telephonic hearing, so I will ask you to identify

5     yourself and your client the first time you speak.  I may do

6     so thereafter if I think the court reporter might not be

7     able to put together your voice with your name.

8              There's one authorized recording of this hearing

9     or this set of hearings.  It's taken by Court Solutions.

10    Court Solutions provides it to out clerk's office on a daily

11    basis.  If you want a transcript, you should contact the

12    clerk's office to arrange for one.

13             So, with that introduction, I have the amended

14    agenda for today's hearing.  And I'm happy to go down the

15    amended agenda.

16             MR. HUEBNER:  Sure.  Good morning, Your Honor.

17    For the record, it's Marshall Huebner of Davis Polk on

18    behalf of the debtors.  Can you hear me clearly?

19             THE COURT:  Oh, yes, fine; thanks.

20             MR. HUEBNER:  Okay; terrific.  So this should be a

21    very brief and hopefully positive and excellent hearing.

22    I'm happy to report that we're starting to build a bit of a

23    track record of uncontested hearings, which is obviously

24    very good progress given that this is a case of great

25    complexity and, obviously, many people for valid reasons

1    have very strong views on many topics.

2         The HRT motion as has been substantially amended

3    by the debtors, as Your Honor's no doubt saw in the papers,

4    is really about one thing, which is at this point we're

5    seeking authority to pay $6.5 million in additional

6    incremental funding to a non-profit pharmaceutical company

7    that as far as we understand, I don't think anybody

8    disagrees, is kind of very much in first place on the

9    progress chart of trying to get over-the-counter naloxone or

10   generic over-the-counter Narcan, one of the most important

11   and (indiscernible) commonly found opioid overdose reversal

12   medications to market.

13        I'm pretty confident that every single person,

14   entity, and government and practically every stakeholder in

15   this case agrees in concept that having low cost over-the-

16   counter naloxone could potentially be very, very important

17   as a new tool in battling the opioid epidemic.  As we lay

18   out in our papers, obviously, OTC naloxone as opposed to

19   prescription, expensive, branded Narcan has the ability to

20   increase access very dramatically and, God willing, save

21   ultimately thousands if not more lives.

22        We originally filed the motion back on April 7th.

23   We twice adjourned it.  As Your Honor knows, we worked very

24   hard to build consensus wherever possible and avoid

25   contested hearings.  Those efforts bore fruit even though

1    HRT is now just about literally out of money and down to

2    fumes.  And we could not adjourn it a third time because

3    they would have actually run out of money, and we told

4    everybody that.

5         And the good news is that those efforts worked.  I

6    think as the UCC and others acknowledge, we provided an

7    incredible amount of diligence to multiple parties on many

8    topics: financial, historical, pharmacological, meetings,

9    calls, spreadsheets, and data.  We also made a variety of

10   changes to the motion.  As Your Honor no doubt saw on the

11   papers, we were originally requesting 11.5 million given

12   that for right now the most important thing is to get

13   through the phase one trial and if the phase one trial

14   succeeds, then hopefully wonderful things will happen and

15   maybe lots of other people will be running in excitement to

16   help fund HRT.  And maybe we never even have to move to

17   collect five million because someone else has picked up the

18   slack.  Obviously, if the phase one trial goes in a

19   different direction, naloxone may dictate different

20   outcomes.

21        But just like injectable Nalmafene, which we

22   talked about a couple of hearings ago, and there's another

23   potentially very promising initiative, they're keeping this

24   moving along at a relatively low cost.  And I would note --

25   actually, it's (indiscernible) an hour ago that our most

Page 9

1    recent reported unrestricted cash balance is $1.409 billion,

2    which means that this 6.5 million is under one-half of one

3    percent of the debtors' cash.  And it's not that every

4    dollar isn't precious because it is, but the question is,

5    you know, is this reasonable in the context of the overall

6    situation.

7         And so, with genuine thanks and appreciation to

8    many people because some people two months were ready to go

9    to war over this motion, some people were pretty sure they

10   were objecting, some people were moderately sure they were

11   objecting, and I think we listened hard.  We made a variety

12   of changes.  As Your Honor knows, not only did we cut the

13   relief basically in half, there are, you know, reporting

14   obligations we were happy to agree to because we want the

15   Court to see and be alongside us and either agree that this

16   continuously should develop and is exciting or potentially

17   not.  There's certainly nothing to sort of, you know, not be

18   information-sharing -- in information-sharing mode about

19   with respect to the key stakeholders.

20        While I don't think there's any realistic chance,

21   legal or practical, that a non-profit could ever convert to

22   a for-profit company, HRT was instantly and easily happy to

23   agree that if that kind of unthinkable eventuality somehow

24   happened, I actually thing it's probably illegal under state

25   law and I've never heard of such a thing.  But, you know,

Page 10

1    it's easier to say, sure, we'll put that in than to say

2    that's just totally unneeded.  So we put in other provisions

3    that do things like require that they pay back all the money

4    and give us the royalties and all that kind of stuff in case

5    the unthinkable happens and they somehow become for-profit.

6    And, again, the whole vision of this company from inception

7    was to be a non-profit specifically for these purposes.

8            The Committee filed a pleading and, in part,

9    because Your Honor is a careful reader.  Your Honor has read

10   a variety of those things in the pleading.  I'm going to

11   touch it very lightly.  You know, candidly, there is a lot

12   in there with which we don't quite agree.  There's some

13   things which we really don't agree.  But given that it's not

14   an objection and the goal is to get through this hearing as

15   happily and consensually as possible, I'm just going to tap

16   very lightly five points.  I could have picked two, I could

17   have picked ten.  But I just do want the record to be clear

18   for the Court's benefit since some of these things may

19   return later in the case where, you know, we don't quite see

20   it the same way.

21           We obviously decided not to file a reply because I

22   felt that would have been silly overkill and not a good use

23   of estate money.  We're all trying to preserve as best we

24   can.  So I'm just going to tap them for two minutes and then

25   sort of end where I began on this point.

Page 11

1           One, the statement that OTC and naloxone cannot

2    possibly result in any direct monetary benefit to any

3    creditor in this case and that this is merely a charitable

4    donation, the short answer is we just don't agree with that.

5    And I don't really thing we need to go into why.  Over time,

6    you know, OTC and naloxone being developed could actually

7    benefit many creditors in this case, including current

8    creditors, including directly and economically.  But, again,

9    it's not up for today, so I just want to note that we see

10   the world a little bit differently.

11          Two, just I do want to note that I'm going to say

12   it for like the fifth time, we said either two or three

13   times in the motion and many times to people on the phone,

14   this is not a referendum on the form of a plan of

15   reorganization.  And this is not a vote, and nobody is

16   silent or support of the motion or lack of objection or

17   filing a statement or not filing a statement should be taken

18   as their consent or support or passion in any direction

19   about what the post-emergence company should be doing with

20   respect to public health initiatives.  I think we made that

21   screamingly clear in the amended motion to give everybody

22   comfort on that point.

23          To be clear, the debtors continue to believe very

24   strongly and are advocating that the post-emergence company

25   should continue and be engaged in doing good and saving

Page 12

1    lives and levering its assets in potentially very unique

2    ways that others could not.  But today is not that day.  The

3    relief, it's very clear and extraordinarily limited, which

4    is $6.5 million to one non-profit entity.

5         Three, there is a repeated statement in the UCC

6    filing that sort of no creditors support the PHI or no

7    credit groups support the PHI.  I don't want to get into

8    that today.  Again, it's just not to the issue.  I don't

9    actually think that statement is quite right, and I at least

10   certainly would not be comfortable myself representing what

11   each and every creditor or credit group in this entire case

12   feels or doesn't feel.  But, again, it's just not up for

13   today because, as we made clear and one of the main reasons

14   we filed the amended motion in addition to highlighting all

15   the concessions was to sort of say in writing again and

16   again what we told people again and again which is that this

17   motion is not in any way to be seen as viewing, soliciting,

18   accepting, you know, or anything really with respect to the

19   views of other parties than the debtors with respect to the

20   PHI.

21        Four, the supposition, which I actually think is

22   sort of in bold, maybe even bold and italics, that hundreds

23   of millions of dollars of additional money from Purdue will

24   be needed to bring this product to market, I don't think

25   that's right either.  That's one possibility, which is if

Page 13

1    Purdue or Reorganized Purdue -- which certainly will be

2    named something else, I would imagine -- the reorganized

3    debtors were to fund the entire thing and provide X doses

4    for free for Y years, you know, and shoulder every single

5    cost, that certainly could totally hundreds of millions of

6    dollars.  I'm sure there are sort of spreadsheets that say

7    that.  But there are many possibilities here.

8            And like with injectable Nalmafene, the goal is to

9    be nimble and flexible and, frankly, many of those decisions

10   will be in the hands of the reorganized company whose

11   decisors will be people appointed by the creditors.  So

12   whether they want to sort of do it at cost and sell it at

13   cost and recoup the initial development cost and it doesn't

14   cost anything more or relatively minimal costs, whether they

15   want to sort of have funded the initial cost and then have

16   it be self-sufficient going forward, whether ultimately

17   there are distributor settlements in the opioid larger

18   situation and distributors distribute it for free or help in

19   other ways, those are all chapters that are left to be

20   written and many of those chapters will be written, frankly,

21   after the emergence date when others are presumably in

22   control of these entities.

23           But, again, it's important that the Court and

24   everyone understand that this is not a foot in the door to a

25   commitment by or on behalf of the debtors that is hundreds

Page 14

1    of millions.  It may not even be tens of millions.  It may

2    not even be millions, depending on sort of which way it

3    goes.

4            The last topic I just want -- I guess I'll touch

5    on the lightest because, actually, either late last night or

6    this morning, the Ad Hoc Committee did file its own

7    statement on this point, so I'm going to go a little bit

8    lighter, which is the UCC statement sort of thinks out loud

9    about some of its views on public versus private creditors

10   and what each one wants and what each one may logically

11   agree to take it to distribution, and all that stuff.

12           My only point is I just don't really think that's

13   up for today, and I don't think it's helpful for me to sort

14   of muse back, in part, because there are great many people

15   in this case with a great many views and I have yet to find

16   anyone who is not comfortable articulating their own views

17   when they believe it is necessary and, in part, because I

18   just don't think I should be sort of trying to describe what

19   other people's views are, what they may or may not do under

20   a plan.

21           But let me end where I started, which is I think a

22   very important and appropriate focus on the positive.  Many

23   people came together to think hard about this "economically

24   rather modest but for one reason or another important to

25   them" motion in a constructive way over an extended period.

1   They asked a lot of questions.  They got many answers.  Many

2   of them moved off of positions that they felt strongly

3   about.  Many members of the UCC, many people who are on the

4   states and other governmental side, many people who felt

5   passionately about the ERF and, like us, are incredibly

6   frustrated that the larger initiatives with, you know, price

7   tags, you know, many, many, many multiples of 6.5 million

8   are not already underway and an initiative that while it has

9   the potential, as many of the papers lay out, to be truly

10   material, is still a couple of year away when we're not

11   doing things that could have impact starting tomorrow.  And

12   that's a source of frustration to people.

13        But all those people, because there's not a single

14   objector out of all the thousands of stakeholders in this

15   case, has decided to object.  And so we are grateful for

16   that.  We actually hope that it continues to be a harbinger

17   of sort of green chutes and increased productive engagement

18   among many parties who have strong views on many topics.

19        And with respect to the product itself, you know,

20   I think we all share the view that, you know, we all hope

21   that phase one is a redounding success and that this product

22   takes a leap forward, not just a step forward, in bringing

23   over-the-counter easily-available very-low-cost naloxone out

24   to the world, to America but also the rest of the world.

25   You know, the FDA, as the Court saw in the pleadings, has

Page 16

1    done something I was told they've never done before ever for

2    any product, which is they actually did the label themselves

3    so that that could clear a hurdle and wouldn't have to sort

4    of joust with them and get approval.  The AMA obviously

5    thinks this is a very important product, as well, with

6    incredible life-saving potential, and we are delighted to

7    bring the uncontested motion to the Court.

8            So let me stop there unless the Court has any

9    questions.  It may be that, you know, a couple of other

10   people want to say a few words.  I guess I'd also move the

11   declaration of Jon Lowne or the amended declaration of Jon

12   Lowne into evidence so we have the appropriate evidentiary

13   support for the motion formerly sort of accepted into the

14   record, although obviously no one is cross-examining him.

15   There are no objections, but I think just as a matter of

16   housekeeping, that's probably appropriate to do.  And that

17   completes my remarks on the first item on the agenda.

18           THE COURT:  Okay.  Thank you.  Does anyone want to

19   question Mr. Lowne on his amended declaration?

20           (No audible response)

21           THE COURT:  All right.  I have reviewed it, and I

22   will accept it as his direct testimony.

23           (Declaration of Jon Lowne received in evidence)

24           THE COURT:  Does anyone else have anything to say

25   on the motion?

Page 17

1                     MR. TROOP:  Your Honor, this is Andrew Troop.

2      Just very briefly, and I -- and the non-consenting states do

3      not object to the motion.  Last night the Ad Hoc Committee

4      filed a statement and, in light of that, I do feel I need to

5      say something very quickly.  As I said, the non-consent

6      states do not object to the motion.  We haven't -- we don't

7      affirmatively support it either.  And there may be some more

8      discovery that needs to be taken before this path is done

9      further and all those rights are reserved.  We appreciate

10     the changes that the debtors made to the motion to make it

11     clear that this is not a referendum on public health

12     initiatives or use in the future.

13                     And, in that regard, I just wanted to underscore

14     that the non-consenting states agree with the Ad Hoc

15     Committee's statements in its filing that are consistent

16     with the amended motion.  The motion's not a referendum.

17     Public entities' claims include all claims defined in the

18     Bankruptcy Code, past, present, and future claims.  And

19     that, you know, from our perspective, we're not sure the UCC

20     was saying anything different, but having joined the issue

21     by the AHC, we just thought it made sense to make it clear

22     on the record where the non-consenting states stand.

23                     THE COURT:  Okay.

24                     MR. TROOP:  That's all I have to say, Your Honor.

25     Thank you.

Page 18

1           THE COURT:  Okay.

2           MR. PREIS:  Your Honor, this is Arik Preis from

3    Akin Gump Strauss Hauer & Feld on behalf of the Committee.

4    Can I just say probably less than one minute?

5           THE COURT:  Sure.

6           MR. PREIS:  Just as Mr. Huebner pointed out, this

7    is an uncontested motion.  We are -- we don't think we need

8    to say anything more than what was in our papers.  I would

9    just say two things.  One, Mr. Huebner pointed out a few

10   points earlier.  I don't think it's necessary for us to

11   respond.  Our papers said what they said.  Two, as Mr. Troop

12   just pointed out, I don't think we said what the consenting

13   group seems to imply that we said in our papers.  But,

14   again, that's not in front of you today, Your Honor, so I --

15   with that, there's nothing further from us on this matter.

16          THE COURT:  Okay.  Anyone else?

17          (No audible response)

18          THE COURT:  All right.  I have before me an

19   unopposed motion for authorization of the debtors' entry

20   into an amended funding agreement to fund the next two

21   stages or tranches in the development process of either

22   easily-obtained or non-prescription naloxone/Narcon by a

23   not-for-profit entity, HRT.  The total funding is -- that is

24   sought to be approved here is 6.5 million.  It's part of a

25   process that the debtors began pre-petition as part of their

Page 19

1    own not-for-profit efforts to develop and facilitate the

2    development of ways to control or prevent either the abuse

3    or the consequences of taking opioids.

4         It appears to me that in the context of this case,

5    as articulated in the motion, the continued funding of this

6    project is warranted and it's a proper exercise of the

7    debtor's judgment.  The failure to fund the project, in my

8    view, would result in its likely ending.  At a minimum, it

9    would result in a substantial suspension of the project.

10   But, as a practical matter, it would appear to me that the

11   chance of the project proceeding to a result would be

12   unlikely.

13        So, therefore, in light of that and the due

14   diligence that has been done on the project to confirm that

15   at least as of today, this isn't an investment based on

16   misguided focus on costs but on a belief that the project

17   will in fact bear fruit or at least a reasonable belief that

18   that's the case.  This appears to me to be appropriate use

19   of the debtors' funds.

20        So the debtors can email the order granting the

21   amended motion and approving the amended funding agreement

22   to chambers.

23        I did read the other pleadings that were submitted

24   in connection with this, and it's clear to me that a

25   substantial amount of time, effort, and money was spent in

1    connection with analyzing this project.  As I've said before

2    in many cases, including this one, the bankruptcy judge sees

3    only about five percent of the case.  I don't know and I

4    don't need to know all the work that goes on behind the

5    scenes in connection with motions.

6             I also don't want to seem to be a scold, but it

7    appears to me that, notwithstanding the large value of these

8    debtors well over a billion dollars, there remains a common-

9    sense principle in all bankruptcy cases where, as is the

10   case here, it would appear to me that the debtors are

11   insolvent.  Mainly, people should do only the due diligence

12   that's necessary and approach these matters with a fair

13   measure of common sense.  I think, ultimately, that happened

14   here, but given the amount that's being spent, I would hate

15   to think that the cost of analyzing this was even one-tenth

16   of that amount.  And I trust that it was far less than that.

17            I would also note that I hope that the parties are

18   coming to the end of their mediation process as regards to

19   the overall occasion among public claimants on one side and

20   private claimants on the other.  I don't want to step on

21   them, but I also want to reiterate what I said last time

22   this needs to move forward promptly.

23            And I would urge the parties to recognize that

24   there is not a bright line distinction between abatement and

25   satisfying claims.  In many, perhaps, most cases, people --

Page 21

```
 1    individuals who have been injured by the debtor's product

 2    and would have a claim as a result of it would benefit by

 3    abatement in one form or another.  So my hope is that

 4    parties focus on proper due diligence as to reasonable

 5    parameters for a program that contemplates abatement, taking

 6    into account the interest of individual creditors and their

 7    rights but recognizing that many, if not most of them, would

 8    benefit from programs that treat and help resolve opioid

 9    addiction and that provide resources to various groups to

10    facilitate that.

11             Again, I don't know where you are in your

12    mediation.  I don't want to hear where you are today.  But I

13    want to make it clear again that, ultimately, there's a

14    tradeoff between having the best possible plan that parties

15    can imagine and getting it done so the money can get out to

16    people promptly.  I agreed reluctantly to defer the roughly

17    $200-million emergency program in the hope that that would

18    happen promptly, that effort of getting a plan done.  It

19    just needs to get done.

20             So, again, Mr. Huebner, you could submit the order

21    on this motion which obviously, as everyone has said, stands

22    on its own and is not to be taken as any sort of adoption of

23    any other expenditure of the debtors' funds.

24             MR. HUEBNER:  Thank you, Your Honor.  We will do

25    so.  I would be, by the way, genuinely remiss, although it's
```

1   rare I do something like this if I actually did not call out

2   my colleague Christopher Robertson, who I'm about to turn

3   over the podium for the second matter.  I mean he really did

4   work almost night and day for months with many stakeholder

5   groups who had, you know, as you said, the Court sees five

6   percent where we (indiscernible) 95 percent.  And I think

7   that his stewardship candidly was mission-critical to this

8   motion getting to where it got today, which is uncontested

9   and ready for entry.

10          So with thanks to Mr. Robertson, let me also turn

11  over the podium to Mr. Robertson.  I also did want to note

12  that the UCC when we're done with the formal agenda has I

13  think an item or two that they would like to bring up with

14  the Court, and I had told our -- I told Mr. Price last night

15  I would mention that.  I realized I had forgot to do it, so

16  that's coming when our three quick agenda items dictates.

17  So, for now, let me turn the podium over -- the virtual

18  podium to Mr. Robertson.

19          THE COURT:  Okay.

20          MR. ROBERTSON:  Thank you, Marshall, and thank

21  you, Your Honor.  Your Honor, Christopher Robertson,  Davis

22  Polk & Wardwell, on behalf of the debtors.  Can you hear me

23  clearly?

24          THE COURT:  Yes; thanks.

25          MR. ROBERTSON:  Thank you.

1           The next item on the agenda is the application of

2    Stikeman Elliott, debtors' Canadian counsel, for fees in

3    excess of the Tier 1 OCP cap for the period from September

4    15th through November 30th.  Your Honor, very briefly, the

5    OCP order provides that if the Tier 1 OCPs exceed $150,000

6    per month on average over a rolling three-month period, that

7    OCP must file a fee application and seek court approval for

8    the excess amount.  Thus far in the case, this is the only

9    such excess fee application.  And Stikeman's fees for the

10   three-month period ending November 30th exceeded this cap by

11   an aggregate amount of $38,999.  The fee examiner appointed

12   in these cases has reviewed Stikeman's application and filed

13   his final report yesterday evening at Docket Number 1292.  A

14          As stated in the final report, Stikeman and the

15   fee examiner have agreed to a recommended reduction of $754

16   of fees.  And Stikeman is, therefore, requesting allowance

17   of compensation in excess of the Tier 1 OCP cap of $38,245

18   for the applicable period.  And there were no other

19   objections and, as such, this application is unopposed.

20          I would note, Your Honor, that the fee examiner,

21   David Clouter (phonetic), is on the phone and available to

22   address any questions.  Otherwise, on behalf of Stikeman, we

23   would as that Your Honor approve the application subject to

24   the recommended reduction in the amount of $38,245.  We have

25   prepared a form of order to submit to chambers if Your Honor

Page 24

1     so decides.

2          THE COURT:  Okay.  I will grant the application in

3     the revised amount.  Let me also note that I do not expect

4     any further filings by the fee examiner unless it's an

5     objection.  If I have to amend the order to do that, I'll do

6     it after my earlier remarks about due diligence, costs, and

7     the like.  I don't want any more filings on fee applications

8     unless there's an objection by the examiner.

9          MR. ROBERTSON:  Thank you, Your Honor.

10          THE COURT:  And I think the parties understand

11    why.  These are publications.  I'm not a big fan of fee

12    examiners, as a concept.  I agreed to one here because it's

13    a public case.  But, again, people have to use common sense.

14          MR. HUEBNER:  And, Your Honor, with that, before

15    the turn the podium over to Akin for the third matter, to

16    the fee examiner's great credit, they actually deserve a

17    shout-out of their own because they have actually gone

18    through every single interim application from the first

19    period, at least to the ones with (indiscernible), caught a

20    bunch of stuff and asked for a reasonable thoughts on

21    appropriate changes.  And I think they have actually worked

22    out the entire first four-and-a-half-month period with

23    virtually everybody consensually and quickly.  And we hope

24    to submit a revised -- an order as early as later today.

25          So I do want to give the Court comfort that that

Page 25

1    actually is proceeding with extraordinary speed and

2    efficiency, and there will be I think all in several hundred

3    thousand dollars of reductions because they did catch a

4    bunch of stuff that people agreed to.  And so, you know,

5    although it's very strange I guess for a debtors' primary

6    counsel to thank or praise the fee examiner who frankly, you

7    know, nobody sort of throws a party when they get one

8    imposed on them or they agree to one.  It's actually gone

9    quite efficiently and well so far.  So I did want to give --

10           THE COURT:  Okay.  Well, that's good to hear.

11   And, again, I had the holdback in the first interim

12   application because I did want the fee examiner to look at

13   them.  And I'm glad that that's happened promptly and

14   resulted in a consensual order.  And that's all I need.  I

15   don't need a further report.  I trust the examiner's doing

16   his job and if I get a disagreement, then I'll need

17   something.  But, otherwise, I won't.  So I'm grateful that

18   that's happened as you reported it, Mr. Huebner.

19           MR. HUEBNER:  Perfect.  Okay.  (Indiscernible) is

20   going very well.

21           So now let me turn the podium over, I believe, to

22   Ms.

23           For item number three which is the retention of

24   Jersey counsel by the UCC.

25           THE COURT:  All right.

Page 26

1          MS. BRAUNER: Good morning, Your Honor.  Sara

2     Brauner --

3          THE COURT: This is the bailiwick of Jersey, not

4     New Jersey.

5          MR. HUEBNER:  That is correct.

6          MS. BRAUNER:  That is correct, Your Honor.

7          THE COURT:  Okay.

8          MR. HUEBNER:  This is old -- well, I guess the

9     original Jersey was in England, so this is intermediate

10    Jersey.  It's neither old nor new.

11         THE COURT:  Right.  Across the Atlantic Jersey.

12         MS. BRAUNER:  Good morning, Your Honor.  For the

13    record, Sara Brauner, Akin Gump, on behalf of the Official

14    Committee.  As Your Honor saw, on June 9th the Committed

15    filed an application to retain Bedell Cristin Jersey

16    Partnership, not New Jersey, at ECF Number 1244 as special

17    foreign counsel to analyze certain issues related to Jersey

18    law, including, among other things, the location and

19    recoverability of certain assets held by members of the

20    Sackler family in trust created under the laws of Jersey.

21         As Your Honor certainly saw, no objections were

22    received in respect of the application.  In advance of

23    filing the application, the Committee's advisors discussed

24    Bedell's retention with the debtors, and the debtors

25    indicated that they would not be objecting.  The Committee

1    also shared the application with the U.S. Trustee in advance

2    of filing and made minor modifications to address certain

3    questions the U.S. Trustee raised.

4              Edward Drummond, the proposed lead partner on the

5    matter and declarant in respect to the application is on the

6    line to the extent Your Honor has questions about his

7    declaration or otherwise.  Absent any questions, we

8    respectfully request that you approve the application in its

9    current form.  Thank you, Your Honor.

10             THE COURT:  Okay.  I don't have any questions.  I

11   noticed that the firm listed its rate in dollars.  Is that

12   something the firm normally does with U.S. clients?

13             MS. BRAUNER:  I would defer to Mr. Drummond, but

14   we asked that the firm do so with respect to this matter,

15   and they were happy to oblige.

16             THE COURT:  Okay.  All right.  Based on the

17   (indiscernible) in the application, including the

18   declaration in support, I'll grant the application.  So you

19   can email the order as modified to reflect the comments from

20   the U.S. Trustee to chambers.

21             MS. BRAUNER:  We will, Your Honor.  Thank you.

22             THE COURT:  Okay; thanks.

23             MR. PREIS:  Your Honor, this is Arik Preis from

24   Akin Gump Strauss Hauer & Feld on behalf of the Creditor's

25   Committee.  That ends the formal part of the agenda.  But

Page 28

1    we, as Mr. Huebner noted, we have two items that we wanted

2    to address this morning in the way of updates to Your Honor

3    regarding items that were placed on the docket just to keep

4    you apprised of developments in the case.  I don't think

5    it's going to take more than five minutes.

6            May I proceed?

7            THE COURT:  Sure.

8            MR. PREIS:  Okay.  The first topic, last night we

9    filed an amended Rule 2019 statement on the docket.  As we

10   noted in that filing, we've officially added a third public

11   side ex-officio member to the Official Committee, which is

12   Thornton Township High School District 205 in Illinois,

13   which is a representative public-school district of the

14   group that the parties in the case have been colloquially

15   referring to as the public-school districts.

16           That group consists of school districts in

17   Florida, Kentucky, Illinois, and New Mexico and is seeking

18   to represent a class of approximately 13,000 public school

19   districts nationwide.  The public-school districts assert

20   claims for damages against the debtors, including the

21   increased cost of public school, special education, and

22   supplementary services to children with disabilities due to

23   prenatal opioid exposure.

24           The public-school districts assert that their

25   claims are distinct from those of the other public side

Page 29

1    creditors.  Just as a reminder to you, the public-school

2    districts filed two pleadings in this case over the past

3    three months.  First, in early April, they filed a motion to

4    participate in mediation on behalf of the public-school

5    districts.  That was ECF Number 998 and 1038.  Shortly

6    thereafter, they -- and the parties in interest in the

7    mediation agreed to a stipulation resolving that motion.

8    That was ECF Number 1073 pursuant to which they are now

9    involved in the mediation.

10           Second, in early June, they filed a motion seeking

11   the right to file a class proof of claim.  That's ECF Number

12   1211, which as you know, they voluntarily adjourned to the

13   July omnibus hearing.  We are very pleased to add another

14   public side voice to the Creditors Committee, and we just

15   wanted to make you aware of that.

16           THE COURT:  Okay.

17           MR. PREIS:  The second major topic we would like

18   to address this morning is an update on our investigation of

19   the settlement framework and, specifically, developments

20   regarding discovery.  To that, I'm going to cede the podium

21   to my partner, Mitch Hurley, who will speak just on a few

22   things.

23           MR. HURLEY: Thank you, Your Honor.  It's Mitch

24   Hurley.  Can you hear me?

25           THE COURT:  Yes; good morning.

Page 30

1          MR. HURLEY:   Good morning.   So, again, Mitch

2    Hurley with Akin Gump on behalf of the Official Committee of

3    Unsecured Creditors.

4          Your Honor, I wanted to provide a very brief

5    update on discovery in the cases, and I think there is some

6    good news to report on that front.   First, on June 5th, 2020

7    at Docket Number 1231, the Official Committee filed with the

8    Court an agreed-upon stipulation among various creditor

9    groups in the case, including the non-consenting state group

10   and numerous private-side creditor groups.   The stipulation

11   would provide the Official Committee with the ability to

12   share with its signatories privileged work product and

13   analysis of the Committee and its counsel and professionals.

14   And in exchange and subject to the terms and the stipulation

15   itself, of course, those groups would agree not to seek

16   reimbursement from the estates for undertaking certain kinds

17   of activities.

18          I understand from my bankruptcy colleagues that

19   this stipulation is at least quite unusual in the exchange

20   of consideration, if you will, that it represents between

21   the creditor groups.   And we think it will be very valuable.

22   It followed weeks of negotiation.   We think it's going to

23   streamline discovery in the case and save very substantial

24   estate resources.

25          I also want to note I think it will really enhance

Page 31

1    the quality of the ongoing investigation of the claims as

2    it's going to allow an even deeper coordination between the

3    Official Committee's professionals and -- professionals for

4    the many public and private groups who are involved these

5    cases and who have, in some cases, years of experience in

6    facility with the claims arising out of the opioid crisis

7    and other matters of great importance to the cases.  So we

8    think that coordination will be valuable in terms of

9    enhancing the quality in investigation and further

10   streamlining the investigation.

11          The stipulation requires a modification to the

12   protective order in order for it to work.  The way the

13   protective order reads now, it forbids a receiving party

14   from sharing protected material with other receiving

15   parties, which obviously would be a problem if the Committee

16   is going to be sharing its work product and analysis with

17   signatories to the stipulation.

18          We have been negotiating with representatives of

19   the Sacklers a modification to the protective order in an

20   effort to get that change done without requiring court

21   intervention.  And we're hopeful that we're going to get

22   there.  We aren't there quite yet, but we're hopeful that we

23   will get there.  If we don't, of course, we'll have to come

24   back to Your Honor.  But we're doing our best to avoid that

25   so that the protective order can be amended on consent.

1           And then, finally, the ad hoc group of consenting

2    states is not a signatory in the stipulation, as I'm sure

3    Your Honor noticed.  The ad hoc group, of course, can speak

4    for itself if they like but, in general, they have asked to

5    negotiate a side agreement with the Committee, the potential

6    terms of which are still under discussion.  But it's our

7    hope that we will also soon reach an agreement with the ad

8    hoc group that would allow us to share official Committee

9    work product and analysis with them and their professionals

10   under terms that, as noted, are still being negotiated.

11          We're going to work hard towards that goal because

12   we think that would also be very effective in help

13   streamlining the process going forward.  Unless Your Honor

14   has any questions about the stipulation, I want to turn to a

15   very brief update about where we are in our discovery

16   disputes with the Sacklers.

17          THE COURT:  No, I don't have any questions.  I do

18   have a comment, which is that I'm glad that you've proceeded

19   with this.  Obviously, people gave some thought to the

20   general concern that had led me to add the reporting and

21   analysis aspect to the discovery orders that I signed.  So,

22   as you know, I'm all for streamlining that process given the

23   number of parties involved here.  So I'm pleased that the

24   parties on the creditors' side have done that.

25          MR. HURLEY:  Excellent.  Thank you, Your Honor.

Page 33

```
 1              So I will turn now to the update on where we are

 2    in the discovery disputes with the Sacklers and the

 3    Sacklers' affiliates and wholly-owned companies, including

 4    the IACs.  Again, there's some good news.  The parties have

 5    agreed on certain matters related to discovery as embodied

 6    in the three stipulations that we filed last night.  The

 7    stipulations are between the Official Committee and the

 8    Mortimer side of the Sackler family, sometimes referred to

 9    as Side A and a stipulation between the Committee and the

10    Raymond or Side B Sacklers and a third stipulation between

11    the Committee and the IAC entities that are owned jointly by

12    Side A and Side B and that are referred to by the defined

13    term "stipulating entities" or "stipulating IACs" in the

14    stipulation.

15              First, I want to thank the Court for helping to

16    break what was an existing log jam.  As Your Honor knows,

17    the Committee submitted a letter to the Court on June 2nd

18    and on June 5th received -- the Court received I think six

19    different responses from different law firms representing

20    the Sacklers and their various affiliates.  On June 8th,

21    Your Honor, instructed the parties to renew their meet-and-

22    confer efforts, and we believe that instruction coupled with

23    the comments the Court made on the record during the June

24    3rd hearing really helped propel the parties to an

25    agreement.
```

Page 34

1          Certainly before filing its letter, the Official

2   Committee had engaged in numerous meet and confers with the

3   stipulating parties and their counsel.  And, at least from

4   our perspective, the meet and confers that followed the

5   submission of the letters and Your Honor's comments and

6   instructions were vastly more productive than the ones that

7   preceded those events and have led now to agreements with

8   the Sacklers that we believe represent very substantial

9   progress in terms of creating a schedule for rolling

10  disclosures and privilege logs by Side A and Side B of the

11  Sackler family to be substantially completed in the next few

12  months.

13          I want to make a quick side note here with respect

14  to a person named Beth Cohen (phonetic).  Ms. Cohen is,

15  within the definitions provided in the case stipulation, is

16  a Side B additional-covered Sackler party.  But Ms. Cohen is

17  not represented by Milbank.  She is represented by the

18  Schulte Law Firm.  We believe that the Official Committee

19  will soon have agreement with Ms. Cohen on terms that are

20  substantially similar to those agreed to between the

21  Official Committee and Side B.  And we hope to provide that

22  stipulation to the Court promptly.  We just aren't there

23  yet, but we think that is very soon to occur.

24          I want to turn now to the IACs.  As the Court is

25  aware, they have new counsel and the IACs are farther behind

1    in discovery than some of the other parties.  So regarding

2    scheduling, the IAC stipulation really describes more of an

3    agreement to agree on a schedule but with a near-term

4    deadline for reaching that agreement or having one imposed

5    by Your Honor, if that becomes necessary, which we of course

6    hope it will not.

7            I also want to note that as the stipulations in

8    some case expressly contemplate, the Official Committee s

9    soon will move for authorization to serve some additional

10   subpoenas.  That's including with respect to the IACs,

11   potentially other entities jointly owned by our affiliate or

12   with the Sacklers as well as Stewart Baker, the Sackler's

13   long-time outside counsel who also had hundreds of executive

14   titles at Purdue and the IACs.

15           Regarding the IACs, we have made clear to them and

16   their counsel that the Official Committee really feels that

17   it must proceed where possible and appropriate by formal

18   subpoenas.  This is in part because, frankly, the Official

19   Committee tried to get discovery from the IACs informally

20   before without success.  And without on this call getting

21   into the details the way our request for IAC discovery were

22   handled, any information we were provided about who their

23   counsel was and what that counsel is doing was deeply

24   problematic and troubling.

25           And, again, I'm not going to get into the details

1    of that on this call.  I don't raise it to point fingers and

2    certainly not at you, counsel for the IACs, which is the

3    Royer Cooper firm.  That firm wasn't here and wasn't

4    involved during January and February, March, and April when

5    information was being provided to the Official Committee

6    concerning the IAC's counsel that turned out, for whatever

7    reason, not to be accurate.

8             I raise the point only to help explain why from

9    the Official Committee's perspective it's practically

10   inconceivable to us that we could proceed at this point with

11   IAC discovery by anything but formal process because of

12   everything that's happened.  And that doesn't mean that our

13   work with the IACs isn't going to wait for service of

14   subpoenas.  If Your Honor's had a chance to read it, of

15   course, it was -- they were filed late last night, so

16   certainly may not have yet.  You'll see that the stipulation

17   expressly provides that we and counsel for the IACs are

18   going to start the meet-and-confer process very promptly.

19   And we have, the Committee has been encouraged by the

20   cooperative approach that Royer Cooper has taken, especially

21   in working over the past couple of weeks towards a

22   stipulation that was filed last night.  And we hope, and we

23   do expect, that that's going to continue, that that has been

24   productive -- a productive relationship so far.

25             But as we told Royer Cooper from the beginning

1    really, we do still intend to seek those formal subpoenas

2    and we will be looking for great expedition from the IACs

3    given the circumstances that led us to where we are now.

4    And I'm hopeful, and as I said, expect that we can continue

5    to work productively towards that goal with Royer Cooper.

6              I'll also note that our agreement with the

7    Sacklers calls for the production of privilege logs on a

8    regular basis beginning on July 22nd and after other

9    production deadlines that are contemplated under the

10   stipulations.  This is a very important aspect of the

11   agreements from the Committee's perspective.  As we

12   anticipate, there may be substantial disagreement among the

13   parties about the viability of privilege claims in the

14   cases, including but not only because, as I alluded to

15   before, certain of the Sacklers (indiscernible) has also

16   held key executive positions at Purdue and the IACs.  And

17   since there may be many thorny issues to be resolved, we're

18   very pleased that we now have agreement for production logs

19   to be produced by both sides of the family on a regular

20   basis going forward.

21             And, with that, Your Honor, that really covers the

22   summary I think of where we are now with the Sackler

23   discovery.  I'd yield the phone, though I understand there

24   may be other creditors' side representatives who may wish to

25   speak briefly about discovery.  And, of course, if Your

1       Honor has any questions for me, I'd be happy to answer them.

2              THE COURT:  Okay.  Well, before I hear from anyone

3       else, I am pleased that -- by your report and by the fact

4       that I haven't received any more discovery letters for about

5       three weeks.  I am not particularly troubled by the issuance

6       of subpoenas.  I mean Bankruptcy Rule 2004(c) specifically

7       contemplates it.  On the other hand, I am going to remind

8       everyone, although I think the litigators here on all sides

9       are familiar with the bankruptcy process, that this is

10      bankruptcy discovery.  It's not in the context of an

11      adversary proceeding or contested matter.  This is to

12      perform due diligence.  It's very important due diligence,

13      but it's to perform due diligence.

14             So those who practice the bankruptcy area should

15      know the difference.  And, again the cost/benefit analysis

16      is important, recognizing though, as I've said repeatedly

17      that this is one area in this case where the creditors' side

18      really does need to become comfortable with the facts in

19      order to negotiate a plan that would involve the Sacklers.

20             MR. LEES:  Your Honor, this is Alex Lee at

21      Milbank.  May I be heard briefly?

22             THE COURT:  Sure.  I was going to say I don't know

23      if anyone else has anything more to say on this, but you're

24      free to if you want to.

25             MR. LEES:  Thank you, Your Honor.  Alex Lees of

Page 39

1    Milbank for the Raymond Sackler family.  Mr. Hurley said

2    quite a bit in his presentation, and I don't think it would

3    be productive or useful to try to get into a tit-for-tat

4    about everything.

5            But one particular comment that I did not want to

6    leave hanging out there was his suggestion that somehow, we

7    or our clients were not being cooperative in discovery until

8    the Official Committee filed its letter a few weeks ago.  We

9    view that as not an accurate presentation of the facts.  We

10   believe that the meet-and-confer process was working and

11   that we were being cooperative and offering compromises,

12   albeit in the context of bona fide disputes which happened

13   here.  And we don't think that the letter served as a

14   catalyst for any level of cooperation that wasn't already

15   there.  And I didn't want --

16            THE COURT:  Okay.

17            MR. LEES:  -- our silence on the issue to be taken

18   as suggesting our acquiescence in the presentation of the

19   facts.  That's all, Your Honor.

20            THE COURT:  That's fine.  I'm not sure what the

21   facts of discovery really matter anyway.  The ultimate

22   result is what counts, so -- but thank you.

23            MS. BALL:  Your Honor, apologies; this is Jasmine

24   Ball from Debevoise & Plimpton for the Mortimer side.  I'm

25   just going to echo what Mr. Lees just said just for the

Page 40

1    record for purposes --

2             THE COURT:  Okay.  Thank you.

3             MS. BALL:  Thank you.

4             MR. HUEBNER:  Your Honor, this is Marshall Huebner

5    for a minute from the debtors' perspective, I should note I

6    think we are something like nine months and eight days into

7    the case.  I think that, you know, Your Honor actually made

8    other comments before that I think relate to everything that

9    we all are doing.  You know, there is obviously a balance to

10   be struck between a run rate that is now growing rather

11   torrid on discovery issues with very, very legitimate needs

12   of the creditor body ideally through efficient processes

13   that many of us have authored and championed and co-authored

14   to get it done the right way.

15            I should also note that I think that if anybody

16   sort of had taken bets on the opening day of the case

17   whether nine months later there would be note be a single

18   discovery requesting having been filed against the debtors,

19   I don't think anybody would have taken that side of the bet.

20   And I do want to sort of give a shout out to many people for

21   the fact that with respect to the debtors, the UCC and the

22   debtors and many other parties have worked out I think

23   almost literally all or virtually all sort of information

24   requests.  We're very close to I think agreement on the

25   smaller many issues.  Those are obviously largely handled by

Page 41

1    others and really not very much at all by me, but it is a

2    tremendous, tremendous work stream.

3            I see, you know, dozens of emails a week with this

4    custodian and this and search terms and parameters and hits

5    and de-duping and re-duping, and QC.  And, again, the Court

6    should know just for a glimmer since I don't give sort of

7    full State of the Union reports to the Court, but when the

8    topic does come up that there's just a massive amount of

9    work that has gone on in good faith by many parties.  And

10   while there may be subpoenas and 2004 (indiscernible)

11   Sacklers, I didn't want to leave it entirely unmentioned

12   that there has been not one against Purdue and that's for

13   very good reason, which is a tremendously cooperative and

14   also intense and also expensive and the like process.

15           So I did want to just quickly note that.  Your

16   Honor, we have no other items before --

17           MR. TROOP:  Actually, Mr. Huebner, before you wrap

18   up, if I may?

19           MR. HUEBNER:  Sure.

20           MR. TROOP:  Thank you.

21           Your Honor, this is Andrew Troop and the non-

22   consenting state group.  I didn't think that Mr. Huebner was

23   going to go where he did.  But, again, in an effort of full

24   transparency with the Court and with the parties, first off,

25   we are fully committed to working to enhance the quality of

Page 42

```
1    the investigation and be efficient with the UCC.  And, in

2    that regard, we have with the UCC engaged in substantial

3    what I'm going to call non-compulsory discovery requests

4    with the debtors.

5              And I am hopeful, like Mr. Huebner is hopeful,

6    that with the couple of open issues that remain, those --

7    with the debtors, those will be resolved soon this week.

8    But as a heads up, I think that with the support of the

9    Committee, the Creditor's Committee, if we can't resolve

10   those issues this week, we may need to bring those remaining

11   few meaningful categories of disagreement before you.

12             I am very hopeful that is not where we will end

13   up, but the open requests are ones that really go to the

14   heart of the issues that you've described as being on the

15   creditors' plate for confirmation understanding.  And we'll

16   need to get to the bottom of that, as well, given everyone's

17   effort I think to try to move this case as long as quickly

18   as possible.  We're probably getting to the point where we

19   can't delay talking with you about the issue, the issues if

20   we can't resolve them this week.

21             So just so that you know, Your Honor, that's out

22   there.

23             THE COURT:  Okay.

24             MR. TROOP:  And --

25             THE COURT:  I'm hopeful, too, that you won't need
```

Page 43

1   to.  But if you do, you know, you can schedule a call.  But

2   I'm hopeful you'll be able to work them out as you worked

3   out the others ones with (indiscernible).

4               MR. TROOP:  Yes, Your Honor.  Thank you.

5               THE COURT:  Okay.  All right.

6               Mr. Huebner, I think you were about to say we're

7   done?

8               MR. HUEBNER:  Yeah.  No, so we ended up 97 percent

9   joy, 3 percent buzz stop, but I think we are now definitely

10  done.

11              THE COURT:  All right.  Very well.  I'm going to

12  ring off then.  There are no other matters on this morning's

13  calendar, so thank you all.

14              COUNSEL:  Thank you, Your Honor.

15              THE COURT:  Bye bye.

16              (Whereupon these proceedings were concluded)

17

18

19

20

21

22

23

24

25

Page 44

1                          I N D E X

2

3                          RULINGS

4                                          Page        Line

5    Amended Motion of Debtors for Authority        18          18

6    to Enter into a Motion for Funding

7    Agreement - Granted

8

9    Application of Stikeman Elliott, LLP,          24           2

10   As an Ordinary Course Professional for

11   Compensation of Services Rendered in

12   Excess of the Tier 1 OCP Cap for the

13   Period from September 15, 2019 through

14   November 30, 2019 - Granted

15

16   Application of the Official Committee of       27          18

17   Unsecured Creditors for Entry of an Order

18   Authorizing Retention and Employment of

19   Bedell Cristin Jersey Partnership as

20   Special Foreign Counsel, Nunc Pro Tunc

21

22

23

24

25

Page 45

```
 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 24, 2020
```