## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PURDUE PHARMA L.P., *et al*., | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

### MOTION OF THE PRIVATE INSURANCE CLASS CLAIMANTS
### FOR LEAVE TO FILE CLASS PROOFS OF CLAIM

Eric Hestrup, *et al*. (collectively, "Private Insurance Plaintiffs" or "Movants"), in their individual and representative capacities (and with the class members, collectively, the "Private Insurance Class Claimants") in their respective actions (the "Private Insurance Class Actions"), hereby respectfully move this Court (the "Motion"), pursuant to Rule 23 of the Federal Rules of Civil Procedure (the "Rules"), made applicable to this matter by Rules 7023 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order granting the Private Insurance Plaintiffs leave to file one or more class proofs of claim, as may be appropriate.  In support of the Motion, the Private Insurance Plaintiffs respectfully state as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows:  Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## PRELIMINARY STATEMENT

**Purdue's Chapter 11 Filing.**

1.      On September 15, 2019, Purdue Pharma L.P. and 23 of its affiliates (collectively, "Purdue" or "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in this District.

2.      The Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed herein.

3.      On September 26, 2019, the United States Trustee appointed an official statutory committee of creditors in these Chapter 11 Cases ("UCC"). There are also multiple sets of *ad hoc* committees including consenting and non-consenting states, municipalities and other public and private creditor groups.

4.      The Condensed Consolidated Balance Sheet (Unaudited) as of August 31, 2019 annexed as Schedule 4 to the First Day Declaration of Jon Lowne, Senior Vice President and the Chief Financial Officer of Purdue Pharma L.P. [Dkt. No. 3], discloses total assets in the amount of $1.972 billion, total liabilities in the amount of $562 million and total equity in the amount of $1.41 billion. In fact, virtually all of Purdue's liabilities consist of tort claims arising from more than 2,600 lawsuits filed throughout the state and federal court systems. *See* Debtors' Informational Brief dated September 15, 2019 [Dkt. No. 17] ("Brief") at pp. 36-40.

5.      By order dated June 3, 2020 [Dkt. No. 1221], this Court extended the original bar date of June 30, 2020 to July 30, 2020 ("Bar Date") as the deadline by which claims must be filed to share in a distribution from the Debtors' estates.

6.      The Private Insurance Plaintiffs are one of the original ten creditor groups, and one of the five private side creditor groups, currently engaged in mediation for the allocation of value

between the public and private side creditor groups.[2]  As a dedicated participant in these efforts, Private Insurance Plaintiffs have been recognized by this Court, the Debtors, the UCC and others as an important constituency in these cases.  Private Insurance Plaintiffs have engaged with the Mediators and other parties in good faith, will continue to do so, and have no reason to believe that the other mediation parties are not acting in good faith.

7.    Private Insurance Plaintiffs believe that if the mediation is successful, the mediation parties would likely agree that Private Insurance Plaintiffs and other mediation parties will allow class claims in stipulated amounts, as was the result in the Chapter 11 case of opioid manufacturer Insys Therapeutics.[3]  While progress is being made, it appears unlikely that the mediation will reach a successful conclusion prior to the current Bar Date.  Although all mediation parties wish to avoid unnecessary litigation during the mediation, Private Insurance Plaintiffs are thus compelled to file this Motion in order to preserve their rights.

**Purdue's Role in the Opioid Crisis.**

8.    Purdue created the opioid epidemic and profited from it through a web of illegal deceit.  First, Purdue deceived doctors and patients to induce more and more people into taking its dangerous drugs.  Second, Purdue misled them into taking higher and more dangerous doses. Third, Purdue deceived them into staying on its drugs for longer and more harmful periods of time. All the while, Purdue peddled falsehood after falsehood to keep patients away from safer alternatives.

---

[2] *See* Order Appointing Mediators [Hon. Layn Phillips & Mr. Kenneth Feinberg], dated March 4, 2020 [Dkt. No. 895] at ¶ 4(x).

[3] 19-11292-KG (Del.).  *See* Order Approving Stipulation By and Between The Debtors, The Official Committee of Unsecured Creditors, and The Insurance Ratepayer Claimants Establishing Class Claims Procedures [Insys Dkt. No. 982]; Insys Plan § 4.5 [Insys Dkt. Nos. 1095 & 1115].

SL1 1647874v3 113572.00002

9.      Purdue took advantage of addiction to make money.  For decades, physicians reserved opioids for treating short-term severe pain, or for patients near the end of life.  But the traditional practice of limiting opioids to short-term treatments ended after Purdue introduced OxyContin.  OxyContin's sole active ingredient is oxycodone, a molecule nearly identical to heroin.  Purdue later introduced other dangerous opioids.

10.      Aware that only selling OxyContin in compliance with its FDA-approved label would not generate the substantial revenue that it desired, Purdue devised a subversive and illegal plan to promote OxyContin for uses beyond the sole, narrow indication for which it had sought and received FDA approval.  Specifically, Purdue (i) directed its sales force to push healthcare providers to write OxyContin prescriptions for more patients and at higher doses to treat chronic pain of any type, despite the known attendant dangers; (ii) paid those prescribers to essentially shill for it through sham speaking and consulting fees and other items of value; and (iii) fraudulently induced insurers to pay for the off label prescriptions, including by misrepresenting patients' diagnoses and treatment histories.

11.      Patients who survive addiction need lengthy, difficult, and expensive treatment. People who are addicted to opioids are often unable to work.  Babies are born addicted to opioids because they are exposed to the drugs in the womb.  In addition to this tragic human cost, Purdue's misconduct has imposed a heavy financial burden on the health care sector.  Intensive care for a newborn who has been harmed by opioids can cost $200,000, even before the baby comes home from the hospital.  The injuries from addiction and overdose are staggering.  On October 28, 2019, the White House Council of Economic Advisers ("CEA") issued a report estimating that the opioid

4

crisis "cost $696 billion in 2018—or 3.4 percent of GDP—and more than $2.5 trillion for the four-year period from 2015 to 2018."[4]

## Purdue's Role in the Opioid Crisis Is the Proximate Cause of Private Insurance Plaintiffs' Damages.

12.     Health insurance is made up of policies purchased by individuals or groups for hospital, medical, surgical, and/or prescription drug benefits.

13.     Many Americans obtain health insurance through their employers; others obtain individual health insurance.  Participants in group insurance policies may pay all or part of the premium directly, or their employers may pay all or part of the premium.  Individual purchasers (or members of their family) pay the entire premium themselves.  The "deductible" in a health-insurance plan is the amount the insured must pay each period (usually annually) before insurance begins to cover healthcare costs.  A "co-payment" is a flat amount the insured pays per claim, such as a doctor visit or prescription.  "Co-insurance" is the percentage of a bill that the insured pays under some plans after the deductible is met.  Deductibles and co-payments often are higher under individual plans.

14.     Purdue's conduct has facilitated higher demand through addiction—and thus increased cost for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for purchasers of private health insurance.

15.     The direct and proximate consequence of Purdue's misconduct is that every purchaser of private health insurance in the United States paid higher premiums, co-payments, and deductibles.  Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related coverage.  "Prescription drugs…are key

---

[4] *The Full Cost of the Opioid Crisis: $2.5 Trillion Over Four Years* (Oct. 28, 2019), available at:
https://www.whitehouse.gov/articles/full-cost-opioid-crisis-2-5-trillion-four-years/ (last visited 7/1/20).

drivers of premium increases" for insurance companies.[5]  Because premiums in health-insurance markets do not reflect individual differences in costs, *all* insureds bear higher costs inflicted by the highest-risk insureds.  Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Purdue and passed virtually all of these increased costs through to insureds in the form of higher premiums, deductibles and co-payments.

16.    Insurance companies charge premiums based on assigned rate classes, a pool of insured individuals with similar health status.  Because the premium charged is uniform for the entire risk class, excessive claims experienced by others raise premiums for everyone.  This empirical reality makes economic sense; as Blue Cross Blue Shield ("BCBS"), a prominent health insurer, itself acknowledges, "when medical costs rise, so do our health insurance premiums."[6]  Insurers cannot know *ex ante* if an individual insured will take and become addicted to opioids, with the corresponding costs that ensue for that patient.  So insurers charge every insured a higher premium—including the majority of insureds who never take opioids—to pay for the risk of future opioid-related insurance coverage and associated costs because "private health insurance companies pass on the cost of prescription drug abuse to consumers in the form of high premiums" according to the Coalition Against Insurance Fraud.[7]

17.    This is partially because insured patients with opioid abuse or dependence diagnoses cost health insurers more than average patients.  In 2015, total annual per-patient charges (the costs of

---

[5] *UnitedHealth Group Brief Reveals Key Drivers of Health Care Premium Increases*, UnitedHealth Group (2019), https://www.unitedhealthgroup.com/newsroom/2019/2019-05-16-key-drivers-premium-increases.html (last visited 7/1/20).

[6] *Sticker shock: The impact of hidden medical costs*, BlueCross BlueShield (2014), https://www.bcbs.com/articles/sticker-shock-impact-hidden-medical-costs (last visited 7/1/20).

[7] *Prescription Drug Abuse Leads to Higher Health Care Premiums, Fraud Group Says*, Partnership for Drug-Free Kids (2012), available at https://drugfree.org/learn/drug-and-alcohol-news/prescription-drug-abuse-leads-to-higher-health-care-premiums-fraud-group-says (last visited 7/1/20).

SL1 1647874v3 113572.00002

providing a health service) and allowed amounts (the maximum an insurer will pay for a covered health service) for services for patients with opioid abuse and dependence diagnoses were 550% higher than for the average insured patient.

18.     While insurance companies may refuse to cover ineffective or dangerous treatments, they too were misled by Purdue's pervasive campaign to convince the healthcare industry that opioids were effective and necessary for long term pain management.  Insurers paid Purdue for the care ordered by patients' doctors, as well as for the resulting costs of addiction: treatment, emergency room care and other claims.  These costs were ultimately passed along by insurers to Private Insurance Class Claimants.

19.     As the opioid crisis has barreled across the country, so has the pressure on insurance companies to raise premiums.  For instance, one BCBS affiliate acknowledged in a 2017 rate change application that period benefit expenses would have to increase "in accordance with the 2017 mandates requiring coverage of [] opioid treatment."[8]   Indeed, by one estimate, private insurance claims related to opioid dependence rose by an astonishing 3,200% nationwide from 2007 to 2014, with the brunt of this burden falling on those aged 19 to 35.  This makes sense in light of the demonstrated increase in opioid-related emergency room visits and treatment center admissions, along with the growth in the percentage of privately insured Americans over this period.  Similarly, professional charges and allowed amounts grew by over 1,000% for patients diagnosed with opioid abuse or dependence from 2011 to 2015, further increasing insurance companies' incentive to increase their customers' rates.

20.     The costs that Purdue's conduct inflicted on the insurance market cannot be and have not been confined to opioid users because of such risk pooling. Empirical evidence evaluated by

---

[8] Empire HealthChoice HMO, Inc. 2Q18 LG HMO Rate Filing, available at https://myportal.dfs.ny.gov/web/prior-approval/empirehchmo/lghmo-awlp-131154455 (last visited 7/1/20).

leading economists confirms this common-sense conclusion. In addition, many of the costs that Purdue has inflicted on the health system involve risks that insurers may not refuse to cover as a matter of law and regulation, since "all states have mandated certain benefits that must be included in the health insurance package of that state, most commonly for substance abuse." Jonathan Gruber and Helen Levy, *The Evolution of Medical Spending Risk*, JOURNAL OF ECONOMIC PERSPECTIVES, 23(4), pp. 25-48, at 32 (2009). New Jersey, for example, implemented the Substance Abuse Disorder law in May of 2017, which insurers like BCBS's Horizon Healthcare of New Jersey, Inc. understood would "enhance[] the treatment of substance abuse, and will increase our liability for these services."[9]

21.    The precise costs imposed on the insurance ratepayer market are more nefarious because Purdue knows those costs are veiled by the inner workings of the insurance industry and rate-setting mechanisms that insurers keep shrouded in secrecy. Because health insurance carriers refuse to voluntarily produce this information and facilitate the claims process, the Private Insurance Plaintiffs are serving subpoenas under Bankruptcy Rules 9014 and 9016 in order to further substantiate their claims beyond the common sense reality that insureds pool the costs of medical treatment through insurance payments.

22.    Superseding causes that are foreseeable or the normal incidents of the risks created by Purdue, such as doctors who prescribed the opioids (so-called "learned intermediaries") and patients who became addicted, will not break the chain of causation and relieve Purdue of liability as to the Private Insurance Class Claimants.

23.    It was entirely foreseeable that Purdue's products would be sold in pharmacies; that a fraudulent marketing scheme would deceive doctors into prescribing medically unnecessary

---

[9] Horizon Healthcare of New Jersey, Inc. 2018 Products Rate Filing Actuarial Memorandum, available at https://ratereview.healthcare.gov/files/441597_FederalAM_2018_IND_HMO_v2.0_redacted.pdf (last visited 7/1/20).

opioids; that patients would trust their doctors and fill their prescriptions; that Purdue's misconduct would result in insurers' initial losses in the form of overpayment for ineffective drugs and massive healthcare costs associated with opioid addiction; and that insurance companies would pay for and pass these costs on to their customers.  Purdue needed to deceive the entire medical community so that health insurers—and ultimately those who purchase health insurance—would pay for OxyContin and Purdue's other opioids.

24.     Indeed, at all relevant times, Purdue knew that the likely consequences of its actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation, while imposing tremendous medical and other costs that would be borne by all purchasers of health insurance.

**Pending Private Insurance Class Actions.**

25.     The Private Insurance Class Claimants consist of all persons (including natural persons and entities) who purchased health insurance policies in the United States from 1996 through the present, and all persons who paid for any portion of employer provided health insurance from 1996 through the present.  The Private Insurance Plaintiffs filed 30 separate Private Insurance Class Actions in federal court in their respective states of residence.[10]  The Private Insurance Class Actions pending in federal court are currently stayed in connection with *In re National Prescription Opiate Litigation*, No. 1:17 md 2804 (N.D. Ohio) (the "MDL").  A schedule of all of the Private Insurance Class Actions is annexed hereto as Exhibit A.

26.     As a result of Purdue's bankruptcy petition, other Private Insurance Class Claimants have been prohibited from filing new Private Insurance Class Actions in their respective

---

[10] Those states consist of Alabama, Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wisconsin.

SL1 1647874v3 113572.00002

states of residence.  However, on December 27, 2019, Private Insurance Class Claimants filed a nationwide class action complaint in the United States District Court for the Northern District of Illinois, *Hestrup v. Mallinckrodt PLC, et al.*, Case No. 19-cv-08453, a copy of which is annexed hereto as Exhibit B ("Hestrup Complaint").[11]

27.     Accordingly, Eric Hestrup hereby seeks authority to file a class proof of claim on behalf of all Private Insurance Class Claimants in all U.S. states and territories, seeking to hold Purdue accountable for the economic harm it has imposed on all United States purchasers of private health insurance.

28.     Generally, the filed Private Insurance Class Actions assert state law claims for public nuisance, unjust enrichment, negligence, and civil conspiracy and federal claims under The Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. ("RICO").  A schedule of the claims asserted in each state and territory is annexed hereto as Exhibit C.

29.     Multiple courts have found opioid manufacturers owe a duty of care to claimants injured by their irresponsible conduct.  *See, e.g., In re Nat'l Prescription Opiate Litig.,* 2018 WL 6628898 at *18-19 (finding that opioid manufacturers owed a duty of care to local governments because it was "foreseeable that [they] will be responsible for combatting the creation of [a black] market [for opioids] and mitigating its effects"); *Alaska v. Purdue Pharma LP*, 2018 WL 4468439, at *4 (finding Purdue "had a duty to the State and its residents (1) to exercise due care in the advertising, marketing, promotion, and sale of opioid drugs; (2) not to make false, misleading, or deceptive statements about opioids and treatment for chronic pain; and (3) to report suspicious prescribes"); *In re Opioid Litigation*, 2018 WL 3115102, at *26 (rejecting opioid

---

[11] As explained in paragraph 41 of the *Hestrup* Complaint, Purdue was not named as a defendant therein because of the automatic stay and the injunctive relief granted by the Bankruptcy Court.  The *Hestrup* Complaint was subsequently transferred to the MDL and all proceedings in connection therewith are currently stayed.

manufacturers' argument that they had no duty "to refrain from the lawful distribution of a non-defective product"); *City of Everett v. Purdue Pharma L.P.,* No. C17-209RSM, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017), at \*4 (finding that the plaintiff had adequately pled the existence of a duty because it had alleged that "Purdue engaged in an affirmative act which created or exposed [the city] to a high degree of risk of harm"); *see also In re Opioid Litigation*, 2018 WL 4827862, at \*16 (finding the plaintiffs have "adequately pled the existence of a duty owed by [opioid] distributor defendants by alleging that societal expectations required different behaviors on their part, including, but not limited to, refusing to fill suspicious orders for opioids").

## **Private Insurance Class Claimants' Damages.**

30.     While Private Insurance Plaintiffs have been precluded from conducting discovery because of the stay imposed in connection with the MDL (and more recently due to the automatic stay), Private Insurance Plaintiffs preliminarily estimate that Purdue and other parties associated with the opioid crisis, including manufacturers, distributors and pharmacies, are jointly and severally liable to Private Insurance Class Members in an amount exceeding $282 billion plus interest, subject to trebling under RICO.

31.     The Centers for Disease Control and Prevention's estimate of total spending for healthcare costs attributable to the opioid epidemic is $28 billion per year.  Statistics generated by the Center for Medicare and Medicaid Services indicate that 34% of national healthcare spending is on private health insurance.  This means that $9.52 billion of the $28 billion per year is borne by private health insurance.  Private Insurance Plaintiffs will establish that insurance carriers passed through all or virtually all of their increased costs to Private Insurance Class Claimants. The time frame at issue covers 24 years (1996 to 2019), which works out to $225.9589 billion.  At

11

present value (2020), that amount increases to $282,415,726,440 in damages borne by private health insurance plus interest, subject to trebling under RICO.

32.     The Private Insurance Class Claimants' $282,415,726,440 in damages (over 24 years) is entirely consistent with the CEA's estimate referenced above that the opioid crisis has cost more than $2.5 trillion for the four-year period from 2015 to 2018.

33.     Even if one were to set aside joint and several liability of other participants in the opioid crisis (which Private Insurance Plaintiffs do not concede is appropriate), Purdue's stand-alone share of Private Insurance Class Claimants' $282,415,726,440 in damages is at least $45 billion plus interest, subject to trebling under RICO.  That share reflects Purdue's 16% market share, and may be subject to an upward adjustment based on various aggravating factors including (a) Purdue's principal role in creating the opioid crisis, (b) that Purdue was one of the most egregious malefactors, (c) Purdue's efforts facilitated sales of other manufacturer's opioids, for which Purdue is partly to blame, and (d)  government plans did not initially reimburse OxyContin, and Medicaid has never embraced reimbursing OxyContin, so private insurance likely paid a disproportionate share of the costs for OxyContin.

34.     Citing a Drug Enforcement Administration ("DEA") database, Purdue has claimed it only sold 3.3% of the prescription opioid pain pills in the U.S. from 2006 to 2012.  However, as a recent ProPublica article noted, "the percentage of sales doesn't take the potency and dose of the pills into account."[12]  Instead, Purdue's favored analysis treats every pain pill as the same, whether it is a 5 milligram Percocet or an 80 milligram OxyContin – "analogous to measuring alcohol sales by equating a 12-ounce glass of 100-proof whiskey with a similar-sized can of light beer."  *Id*.

---

[12] David Armstrong and Jeff Ernsthausen, *Purdue Pharma touts data that downplay its role in the opioid epidemic, new analysis shows* (Sep. 9, 2019), available at: https://www.statnews.com/2019/09/09/purdue-pharma-data-downplay-its-role-in-opioid-epidemic/ (last visited 7/1/20).

After analyzing the same data set touted by Purdue but accounting for the wide variation in strengths of prescription painkillers, including the amount and potency of opioid that they contained, ProPublica concluded that Purdue's market share was actually 16%, making Purdue the third-largest seller of opioids from 2006 to 2012. *Id.* Therefore, 16% is an appropriate market share for Purdue.

## New York State Has Filed Similar Claims On Behalf of its Health Insurance Consumers.

35.    Private Insurance Plaintiffs' theories of liability have been expressly endorsed by New York State. For instance, on September 23, 2019, Linda A. Lacewell, the Superintendent of the Department of Financial Services of the State of New York, filed a letter with this Court objecting to Purdue's then pending request to pay $34 million in bonuses. [Docket No. 99] ("Lacewell Letter"). After describing some of Purdue's "intentional misrepresentations" which "helped cause the terrible opioid crisis we are facing as a nation," the Lacewell Letter focused on the health insurance consequences of the opioid epidemic:

> "More specifically, those misrepresentations appear to have caused a huge volume of unnecessary opioid prescriptions, thereby costing the insurance companies (and ultimately, consumers) not only tremendous sums in fraudulent prescription claims but also in follow-on claims for opioid-related treatment. This egregious behavior of some in the opioid industry has taken a terrible toll in human terms, as has been laid out in grave detail by others. It has also taken a tremendous financial toll on the more than five million New York health insurance consumers who have been forced to pay ever-increasing premiums. The cost of that coverage has dramatically risen, in part as the direct result of increasing opioid-related claims. The Department estimates that New York consumers have overpaid an estimated $2 billion in insurance premiums over the past 10 years due to the costs associated with opioid manufacturers and others misrepresenting the safety and efficacy of opioids." *Id.* (emphasis added).[13]

---

[13] Moreover, in a November 13, 2019 story, Reuters reported that "New York Governor Andrew Cuomo said in September the state would launch a legal action against drug companies and distributors that sell opioids in order to recoup about $2 billion in insurance rate increases that were passed on to New York consumers because of opioids. Premiums surged because insurers had to cover prescription costs and opioid-related issues such as emergency room visits and addiction treatments, Cuomo had said." N.Y. insurance regulator notifies opioid makers, distributors of enforcement action –sources, Nov. 13, 2019 (Reuters) available at https://finance.yahoo.com/news/1-n-y-insurance-regulator-145554228.html (last visited 7/1/20).

36.    More recently, on April 21, 2020, New York Governor Andrew M. Cuomo announced that the New York State Department of Financial Services has initiated administrative proceedings and filed charges against another opioid manufacturer, Mallinckrodt plc and its subsidiaries ("Mallinckrodt"), seeking to hold Mallinckrodt accountable for the harm caused by the opioid crisis and incurred by the New York insurance industry and consumers of private commercial health insurance policies.[14]  The foregoing claims asserted by New York State are precisely the claims that Private Insurance Plaintiffs have asserted on behalf of class members.

## JURISDICTION, VENUE, CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER, AND STANDING

37.    The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(1) and (2)(A).  Venue is proper in this district under 28 U.S.C. § 1408.

## SUMMARY OF RELIEF REQUESTED

38.    By this motion, the Private Insurance Plaintiffs seek entry of an order, substantially in the form annexed hereto as Exhibit D, authorizing them to file one or more class proofs of claim (the "Class Proofs of Claim")[15] for all monetary components of the relief sought in the Private Insurance Class Actions, including (but not limited to) money damages, restitution, statutory and civil penalties, and any claim for counsel fees and expenses.

39.    The Private Insurance Class Actions allege and seek compensation for, and the Class Proof of Claim will seek compensation for (among other things), Debtors' cunning and

---

[14] *See* Governor Cuomo Announces First Insurance Fraud Action Against Major Opioid Manufacturer in New York Market, available at https://www.governor.ny.gov/news/governor-cuomo-announces-first-insurance-fraud-action-against-major-opioid-manufacturer-new and Statement of Charges and Notice of Hearing, available at https://www.dfs.ny.gov/system/files/documents/2020/04/ea20200417_statement_charges_notice_hearing_mallinckrodt_specgx.pdf (last visited 7/1/20).

[15]  A sample Class Proof of Claim is attached hereto as Exhibit E.  If the Motion is granted, Private Insurance Plaintiffs intend to file one such Class Proof of Claim against each Debtor.

14

deceptive marketing scheme to encourage doctors and patients to use opioids to treat chronic pain. In doing so, Debtors falsely minimized the risks of opioids, overstated their benefits, and generated far more opioid prescriptions than there should have been.

40.    The opioid epidemic is the product of the Debtors' deliberately crafted, well-funded campaign of deception.  For years, Debtors misrepresented the risks posed by the opioids they manufacture and sell, misleading susceptible prescribers and vulnerable patient populations.  As families and communities suffered from the scourge of opioid abuse, Debtors earned billions in profits as a direct result of the harms it imposed.  The direct and proximate consequence of Debtors' misconduct is that every purchaser in the United States of private health insurance paid higher premiums, co-payments, and deductibles.  Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related costs and coverage.  Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Debtors and charged that back to insureds in the form of the higher costs referred to above.

41.    Private Insurance Plaintiffs respectfully submit it is in the interests not only of the Private Insurance Class Claimants, but also of all other creditors, for these claims to proceed on a class basis, and such relief is certainly within the sound discretion of the Court.

42.    In fact, failure to grant the relief sought hereunder would risk disenfranchising millions of creditors because it is unlikely that they will all be reached by or understand the Bar Date notice, whereas Movants can take appropriate steps to ensure the Private Insurance Class Claimants receive notice of their rights to a distribution.  Moreover, it will be far more efficient for Movants to file one or more Class Proofs of Claim than to have millions of purchasers of

15

insurance file their own individual claims, which would inundate the Court and whoever will be appointed to analyze claims and make distributions.

43.     Therefore, pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7023, Private Insurance Plaintiffs seek leave to file the Class Proofs of Claim under the standards set forth in Federal Rule of Civil Procedure 23.

44.     The proposed Class Proofs of Claim to be submitted, subject to this Court's granting the relief sought herein, would not include claims for administrative expenses, which will be made prior to the Bar Date, and which are estimated to be substantial in amount.

45.     Courts routinely grant motions for class proofs of claims. *See In re Connaught Grp., Ltd.*, 491 B.R. 88, 100 (Bankr. S.D.N.Y. 2013); *In re Thomson McKinnon Sec., Inc.*, 141 B.R. 31, 33 (S.D.N.Y. 1992); *In re Chateaugay Corp.*, 104 B.R. 626, 634 (S.D.N.Y.1989), *appeal dismissed*, 930 F.2d 245 (2d Cir.1991); *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882, 2016 WL 3564484 (Bankr. D. Del. June 22, 2016); *In re Chaparral Energy, Inc.*, 571 B.R. 642 (Bankr. D. Del. 2017); *In re First Interregional Equity Corp.*, 227 B.R. 358 (Bankr. D.N.J. 1998); *In re CommonPoint Mortgage Co.*, 283 B.R. 469, 475-76 (Bankr. W.D. Mich. 2002); *In re Livaditis*, 122 B.R. 330 (Bankr. N.D. Ill. 1990); *In re Matter of Ret. Builders, Inc.*, 96 B.R. 390 (Bankr. S.D. Fla. 1988).

46.     Recently, the Debtors themselves acknowledged the legitimacy of the class proof of claim mechanism in the context of these Chapter 11 cases. *See* Notice of Presentment of Stipulation and Order Permitting the Filing of a Class of Proof of Claim Solely for Administrative Convenience in order to Effectuate Potential Settlement in Respect of Certain Canadian Litigation [Dkt. No. 1313] (authorizing a class claim to implement a settlement of ten Canadian class actions

16

relating to the manufacture, marketing, sale, distribution, labelling, prescription and use of OxyContin and OxyNEO in Canada).

47.    Accordingly, and for the reasons set forth below, Private Insurance Plaintiffs' request for leave to file the Class Proofs of Claim should be granted.

48.    Private Insurance Plaintiffs do not seek the allowance of the Class Proofs of Claim in any amount, nor the determination that the Class Proofs of Claim are entitled to any particular priority under the Bankruptcy Code.  The grant of the relief sought hereunder will not be applied to prejudice any defense of law or fact of the alleged breaches of federal or state law by the Debtors.

### ALLEGATIONS OF THE PRIVATE INSURANCE CLASS ACTIONS; FACTUAL AND PROCEDURAL BACKGROUND

49.    The Private Insurance Class Action complaints allege that Debtors' concerted scheme to misrepresent the risks of their opioid drugs improperly increased the number opioid prescriptions.  This in turn increased the costs of Private Insurance Class Claimants' health insurance in order for Private Insurance Class Claimants' insurers to pay for both Debtors' addictive drugs and the health effects of addiction they caused.

50.    In settlements with state regulators, Debtors have entered agreements prohibiting them from making misrepresentations identified in the Private Insurance Class Action complaints. Through discovery in the MDL and other proceedings in state and federal court, Debtors have demonstrated their intentional, multifaceted scheme designed to sell more pills, cognizant that costs associated therewith would be disproportionately borne by Private Insurance Class Claimants, among others.

51.    Counsel to Private Insurance Plaintiffs and the putative Private Insurance Class Claimants diligently pursued class certification in the Private Insurance Class Actions but no

17

determination of the propriety of class certification had been made by the time the commencement of these cases stayed all proceedings in state and federal court.

52.     Without filing one or more class proofs of claim, it is unlikely Private Insurance Class Claimants will be able to obtain relief against Debtors.  While the class claims are many billions of dollars in the aggregate, many individual ratepayer's claims are fairly modest, creating a collective action problem, which only a class action can solve.

53.     This may be Private Insurance Class Claimants' only opportunity to investigate not only Debtors' illegal marketing of opioids, but also any appropriate litigation claims against officers, directors, shareholders, and other insiders, and those who aided and abetted their improper conduct.

54.     Certifying a class should also minimize the number of late-filed claims by ratepayers who may not learn of or understand the Bar Date in time, which would require a case-by-case adjudications of "excusable neglect."

## PRIVATE INSURANCE PLAINTIFFS SHOULD BE ALLOWED TO FILE CLASS PROOFS OF CLAIM

### Legal Standard.

55.     As this Court explained in *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2005 WL 8146313, at *2 (Bankr. S.D.N.Y. Jan. 3, 2005), a claim cannot be allowed as a class claim until the bankruptcy court directs that Rule 23 apply.  "It can only make this direction in a pending contested matter, which the mere filing of the claim does not initiate.  In the absence of an objection, however, the proof of claim is deemed allowed." *Id.* (quoting *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 369 (Bankr. S.D.N.Y. 1997)).[16]

---

[16]  While Rule 7023 generally applies in adversary proceedings, it may also be appropriate in a contested matter by invoking Bankruptcy Rule 9014.  Bankruptcy Rule 9014(c) provides that the "court may at any stage in a particular

56.     After determining whether Federal Bankruptcy Rule 7023 should be invoked and that Rule 23 applies, the court must next determine whether the requirements of Federal Rule 23 have been met.  *In re MF Glob. Inc.*, 512 B.R. 757, 763 (Bankr. S.D.N.Y. 2014) ("The exercise, then, is really a two-step process:  First, the Court must exercise its discretion whether to apply Rule 23 to the proposed class claim.  Second, the Court must determine whether the proposed class claim satisfies the requirements of Rule 23 for class certification.").

57.     Though the Second Circuit has yet to review the issue, virtually all courts of appeals that have addressed the issue have concluded that class claims are permissible.  *See In re Wilborn,* 609 F.3d 748 (5th Cir. 2010); *In re Am. Reserve Corp.,* 840 F.2d 487 (7th Cir. 1988); *Birting Fisheries, Inc. v. Lane (In re Birting Fisheries, Inc.),* 92 F.3d 939 (9th Cir. 1996); *In re Charter Co.,* 876 F.2d 866 (11th Cir. 1989); *Reid v. White Motor Corp.,* 886 F.2d 1462 (6th Cir. 1989). "[L]ower courts in the Second Circuit have followed *American Reserve*," and found that district courts have discretion to permit class proofs of claim.  *In re Worldcom, Inc.*, 2005 WL 8146313, at *2.

## The Court Should Invoke Federal Bankruptcy Rule 7023.

58.     The Court should invoke Federal Bankruptcy Rule 7023 in determining whether Private Insurance Plaintiffs should be granted leave to file Class Proofs of Claim for themselves and all other Private Insurance Class Members.

59.     Rule 7023 of the Federal Rules of Bankruptcy Procedure expressly allows class action proceedings, thus applying the class action requirements under the Federal Rules of Civil Procedure.   See FED. R. BANKR. P. 7023; *see also In re MF Glob. Inc.*, 512 B.R. at 762

---

matter direct that one or more of the other rules in Part VII shall apply."  Thus, a class may be certified under Bankruptcy Rule 7023 and Rule 23 in either an adversary proceeding or a contested matter.

("Bankruptcy Rule 7023 expressly allows class certification in adversary actions by incorporating Federal Rule of Civil Procedure 23."); *In re Am. Reserve Corp.*, 840 F.2d 487, 489 (7th Cir. 1988) (The Bankruptcy Rules "allow[] bankruptcy judges to apply Rule 7023–and thereby Fed. R. Civ. P. 23, the class action rule–to 'any stage' in contested matters. Filing a proof of claim is a 'stage'"); *In re Chateaugay Corp.*, 104 B.R. 626, 630 (S.D.N.Y. 1989) ("Rule 7023 would be meaningless if § 501 was deemed to bar class proofs of claim.") (citation omitted).

60.    "Federal Civil Rule 23 does not apply automatically to contested matters, *see* Fed. R. Bankr. P. 9014, and the decision to extend its application is committed to the Court's discretion." *In re Musicland Holding Corp.*, 362 B.R. 644, 650 (Bankr. S.D.N.Y. 2007) (citing *Reid v. White Motor Corp.,* 886 F.2d 1462, 1470 (6th Cir. 1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); and *Chateaugay Corp.*, 104 B.R. at 633; *In re Craft*, 321 B.R. 189, 198 (Bankr. N.D. Tex. 2005)).

61.    The Bankruptcy Court for the Southern District of New York has articulated several factors to determine if the court should exercise its discretion to apply Rule 23 and permit the filing of a class proof of claim.    The factors are "(1) whether the class was certified pre-petition, (2) whether the members of the putative class received notice of the bar date, and (3) whether class certification will adversely affect the administration of the case." *Musicland*, 362 B.R. at 654-55 (internal citations omitted).

62.    The court in *Musicland* further explained that the analysis of the third factor "centers on (a) the timing of the motion for certification, and (b) whether a plan has been negotiated, voted on or confirmed." *Id.* at 655 (internal citations omitted).

63.    Applying these factors, the court in *Musicland* ultimately held that class certification was not warranted where the class claimants had individual notice of the bar date and

20

the parties seeking class certification were the only parties who actually filed individual proofs of claims. The court reasoned that "[a]llowing the class proof of claim would extend the bar date for those creditors who failed to file a timely claim to the prejudice of those creditors who did." *Id.* at 656. Lastly, the *Musicland* court held that certifying the class would adversely affect the administration of the case as the plan had already been negotiated, thereby raising the issue of feasibility and extending proceedings indefinitely.

64. The *Musicland* factors weigh heavily in favor of permitting Private Insurance Plaintiffs to file Class Proofs of Claim. The conditions leading the *Musicland* court to deny class certification are not present here. Unlike the situation faced by Your Honor in the *Sears* case[17] and Judge Bernstein in *Musicland*, this case is in its infancy, a plan has not yet been negotiated and the mediation has not yet borne fruit (although Private Insurance Plaintiffs believe that if and when a settlement is reached, such settlement would likely provide for allowance of class proofs of claim as in the Insys Therapeutics case). If this Motion is granted, Private Insurance Plaintiffs can easily file Class Proofs of Claim prior to the Bar Date, thereby avoiding the prejudice to creditors and the estate that warranted denial of class certification in *Musicland*.

65. While none of the classes sought by Private Insurance Plaintiffs were certified pre-petition, that is solely because of the stay imposed in the MDL pending resolution of the bellwether cases, and not due to any infirmity in Private Insurance Plaintiffs' claims. Moreover, even if this Court were to find that this factor weighed against exercising its discretion to permit class claims, the lack of pre-petition certification is not, on its own, a sufficient basis for the Court to decline to

---

[17] *See* Motion of Nina and Gerald Greene to Extend Application of Federal Rule of Civil Procedure 23 to Class Proofs of Claim ("Motion to Extend Rule 23"), dated April 12, 2019 (Dkt. No. 3170), *In re Sears Holdings Corporation*. 18-23538 (RDD). The court in Sears has not yet resolved the pending Motion to Extend Rule 23 and the claimants have since filed a Motion for Stay Relief to Pursue the Class Action. Prior to the Coronavirus pandemic the parties agreed to a pre-trial discovery schedule with regard to the Motion for Stay Relief but, in light of the pandemic, the matter has been adjourned *sine die*.

21

exercise its discretion to permit Plaintiff's Class Claims. *In re MF Global Inc.*, 512 B.R. 757, 763-65 (Bankr. S.D.N.Y. 2014) (allowing the filing of a class proof of claim where class was not certified pre-petition); *In re Connaught Group, Ltd.*, 491 B.R. 88, 98-100 (Bankr. S.D.N.Y. 2013) (same).

66.     Furthermore, there is no evidence that class certification will adversely affect the administration of the case.  In fact, Class Proofs of Claim will facilitate the proceedings in this matter by streamlining potentially millions of unsecured claims against Purdue's assets into manageable claims filed by Private Insurance Plaintiffs; granting leave to file Class Proofs of Claim will aid Purdue in providing this Court with a consensual resolution with this creditor group.

67.     Here, the Court should follow Bankruptcy Rule 7023 and apply the class action requirements under Rule 23 of the Federal Rules of Civil Procedure.

## Class Members Satisfy the Requirements for Class Certification Under Rule 23.

68.     In order to satisfy the Rule 23 requirements, Private Insurance Plaintiffs must first show that the four elements – numerosity, commonality, typicality and adequacy – have been met variously as to the Class Members, themselves as class claimants, and their counsel.  *See* FED. R. CIV. P. 23(A).  Further, Rule 23 also requires that Class Members must satisfy at least one of the subdivisions of Rule 23(b).

69.     Applying these requirements, courts routinely uphold the jurisdiction of bankruptcy courts over class actions when the Rule 23 requirements are satisfied.  *See In re Connaught Grp., Ltd.*, 491 B.R. 88, 100 (Bankr. S.D.N.Y. 2013) (certifying class of claimants); *In re United Companies Fin. Corp.*, 276 B.R. 368, 371 (Bankr. D. Del. 2002) (granting motion to certify class to permit the filing of a class proof of claim); *In re First Interregional Equity Corp.*, 227 B.R. 358 (Bankr. D. N.J. 1998) (granting motion to file class proof of claim); *In re Trebol Motors Distrib.*

22

*Corp.*, 220 B.R. 500 (B.A.P. 1st Cir. 1998) (affirming district court's decision to grant motion for class proof of claim); *In re Livaditis*, 122 B.R. 330 (Bankr. N.D. Ill. 1990) (granting plaintiffs' motion to certify class for purposes of filing a class proof of claim and granting plaintiffs' motion to file a class proof of claim); *In re Matter of Ret. Builders, Inc.*, 96 B.R. 390 (Bankr. S.D. Fla. 1988).

70.    As set forth below, Class Members satisfy all of the requirements for class certification under Rule 23.

**The Rule 23(a) Requirements are Satisfied.**

Numerosity is Satisfied.

71.    A class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).  Numerosity is presumed at a class size of 40 members.  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 341 (S.D.N.Y. 2015) ("A class of more than 40 commands a presumption of sufficient numerosity.").

72.    Although the exact number of Class Members is unknown at this time, it is beyond fair dispute that many millions of residents in the United States purchased private health insurance or paid for a portion of employer-provided health insurance during the period at issue.

73.    Here, upon information and belief, the millions of Class Members will ultimately be easily identified through third-party business records.

Commonality is Satisfied.

74.    The commonality requirement is satisfied when "there are questions of law or fact common to the class."  *See* FED. R. CIV. P. 23(a)(2)

75.    In *Wal-Mart Stores, Inc. v. Dukes*, the United States Supreme Court held that a case met the commonality requirement whenever the plaintiffs raised a common contention and the "determination of its truth or falsity will resolve an issue that is central to the validity of each one

23

of the claims in one stroke." 564 U.S. 338, 350 (2011). The Court went on to hold that, "[w]e quite agree that for purposes of Rule 23(a)(2), even a single common question will do . . ." *Id.* at 359 (internal quotations omitted).

76.    While there need to be *common* claims, they "need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members." *Vargas v. Howard*, 324 F.R.D. 319, 325 (S.D.N.Y. 2018) (citations omitted).

77.    These cases easily meet the commonality requirement. Class Members here claim to have been injured by policies that allegedly violate the same or similar laws in each of the states and territories of the United States. Additionally, the common legal and factual questions are uniform for all Class Members and include, but are not necessarily limited to the following:

- whether Purdue made material misrepresentations regarding the benefits and risks of its products;

- whether Purdue acted intentionally with respect to the foregoing;

- whether Purdue was negligent in the distribution of its products;

- whether Purdue acted in violation of state and federal law;

- whether the Class is entitled to restitution and/or disgorgement, in addition to or as a substitute for damages under the laws of the individual States; and

- whether the Class Claimants are entitled to damages and/or injunctive relief.

78.    If, after discovery, this Court were to find that variations in insurance rate-setting by state or insurer coverage criteria were to so warrant, any such issue that might impede the commonality of the Private Insurance Plaintiffs' claims could be easily resolved through the use of subclasses.

79.    Once liability is established, damages (by whatever formula is established) for individual Class Members can be calculated mechanically by reviewing Class Members' insurance

companies' records. Further, commonality is not defeated by the need for an individualized damages determination. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Accordingly, commonality is easily satisfied here.

> Typicality is Satisfied.

80.     Typicality is established where the "claims or defenses of the representative parties are typical of the claims or defenses of the class . . ." FED. R. CIV. P. 23(a)(3).

81.     Generally, "the commonality and typicality requirements" tend to merge. *Dukes*, 564 U.S. at 349. Indeed, as with commonality, "small variances . . . do not defeat typicality." *Vargas*, 324 F.R.D. at 327; *In re United Cos. Fin. Corp.*, 276 B.R. 368, 373 ("like commonality, the typicality requirement does not mandate that all class members share identical claims"); *see also Driver v. Apple Illinois, LLC*, 265 F.R.D. 293, 304 (N.D. Ill. 2010) ("typicality is a 'low hurdle' that requires neither complete coextensively nor even substantial identity of claims."). Typicality is satisfied "if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) (citation omitted); *Driver*, 265 F.R.D. at 304 ("[t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff."). Further, factual differences do not defeat typicality. *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002); *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011) ("Where the named plaintiff as well as members of the proposed class all have similar claims arising from the same scheme, the typicality requirement is satisfied regardless of whether different facts underlie each class member's claim.") (internal quotations and citation omitted).

25

82.     In *Driver*, the court held that typicality was satisfied because the class representatives' claims were typical of the class.  *Driver,* 265 F.R.D. at 304.  In particular, there was no suggestion that the proposed class representatives were treated differently from other class members as a result of the defendant's conduct.  *Id.; Mooney v. Domino's Pizza, Inc.*, No. 1:14-CV-13723-IT, 2016 WL 4576996, at *7-8 (D. Mass. Sept. 1, 2016).

83.     Each of the Private Insurance Plaintiffs purchased health insurance during the applicable time period.  Further, Private Insurance Plaintiffs and Class Members have been injured in the same manner by the same Debtors and Private Insurance Plaintiffs seek the same relief as and for each Class Member in their respective Class Actions.  Therefore, the proposed representatives' claims have the same essential characteristics as the claims of the class at large, and the typicality requirements of Rule 23 are met.

Adequacy is Satisfied.

84.     The final requirement of Rule 23(a)—whether the representative parties will fairly and adequately protect the interests of the class—is also satisfied here.

85.     Adequacy is satisfied if (1) counsel for the named plaintiffs is able to competently handle the suit; and (2) the class representative's interests are not antagonistic to those of the class members.  *See Vargas*, 324 F.R.D. at 327.

86.     In *Vargas*, the court held that adequacy was satisfied because plaintiffs' counsel had "the requisite experience and qualifications to represent the class."  *Id*.  Further, the named plaintiff had the same interests as putative class members and there appeared to be no claims conflicts with putative class members.  *Id*. at 327-28; *see also Driver*, 265 F.R.D. at 301; *Mooney*, 2016 WL 4576996, at *8.

26

87.     Here, Private Insurance Plaintiffs have no interests that diverge from those of their respective classes, and their claims are typical of the claims of their Classes.  As noted above, they have been injured in the same manner (by Purdue's misconduct) and seek the same relief as each Class Member.  Further, the same strategies that will vindicate Private Insurance Plaintiffs' claims will vindicate those of their respective Classes.

88.     Thus, Private Insurance Plaintiffs are adequate representatives for the Class Proofs of Claim.  Additionally, counsel is qualified and able to litigate the claims.  Morgan & Morgan P.A. has substantial experience in prosecuting complex litigation and class actions and has the financial resources to do so.  *See* Exhibit F.

89.     Thus, Private Insurance Plaintiffs and their counsel will adequately represent the proposed classes in accordance with Rule 23(a)(4).

**The Rule 23(b) Requirements are Satisfied.**

90.     Once the requirements of Rule 23(a) are met, plaintiffs must also satisfy the requirements of at least one of the subdivisions of Rule 23(b).  Here, Private Insurance Plaintiffs satisfy the requirements of Rule 23(b)(1)(B) and Rule 23(b)(3).

Private Insurance Plaintiffs Satisfy Rule 23(b)(1)(B).

91.     Federal Rule of Civil Procedure 23(b)(1)(B) authorizes certification of a class action if the prerequisites of Rule 23(a) are satisfied and if "prosecuting separate actions by or against individual class members would create a risk of [] adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).  Rule 23(b)(1)(B) is applicable in so-called "limited fund" cases: "A limited fund exists when a fixed asset or piece of property exists in which all class members have a preexisting interest, and an apportionment or determination of the

27

interests of one class member cannot be made without affecting the proportionate interests of other class members similarly situated." 2 Newberg On Class Actions § 4:9 (4th ed. 2009).

92.     The United States Supreme Court has identified three common characteristics of "limited fund" cases: (i) "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitively at their maximums, demonstrate the inadequacy of the fund to pay all the claims;" (ii) "the whole of the inadequate fund was to be devoted to the overwhelming claims;" and (iii) "the claimants identified by a common theory of recovery were treated equitably among themselves." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 838-39 (1999).

93.     All three factors are present in these bankruptcy proceedings. The Debtors concede that they will be unable to satisfy all claims asserted against them, and their bankruptcy and proposed settlement is their way of attempting to resolve this issue. Second, under their settlement proposal, all of the Debtors' assets will be applied to satisfying tort claims arising from the opioid epidemic. Third, while there may be disagreements among the various classes of creditors and other stakeholders as to what percentage of the Debtors' assets should be allocated to each of them, there should be no disagreement that those creditors within each class should and will be treated equitably.

94.     Each of the Private Insurance Plaintiffs purchased health insurance during the applicable time period. Private Insurance Plaintiffs and Class Members have been injured in the same manner by the same Debtors and seek recompense for increased health insurance costs attributable to said misconduct. Finally, the same strategies that will vindicate Private Insurance Plaintiffs' claims will vindicate those of their respective Classes. For these reasons, Private Insurance Plaintiffs satisfy Rule 23(b)(1)(B).

<u>Private Insurance Plaintiffs Also Satisfy Rule 23(b)(3)</u>.

28

95.     Rule 23(b)(3) applies if (1) Class Members' claims not only have common questions of law or fact but they also predominate over any individual questions; and (2) the class action is the superior method to adjudicate the action fairly and efficiently.   Fed. R. Civ. P. 23(b)(3).

Common Questions of Law and Fact Predominate.

96.     The Class Members' claims easily meet Rule 23(b)(3)'s requirement that the questions of law or fact common to the class members predominate over any individual questions. FED. R. CIV. P. 23(b)(3).

97.     When all Class Members were injured by the same challenged conduct, the common questions and methodology in the litigation predominate over individual issues.  *See Clark v. Honey-Jam Cafe, LLC*, No. 11 C 3842, 2013 WL 1789519, at *2 (N.D. Ill. Mar. 21, 2013).

98.     Courts routinely find the predominance factor has been met where, as here, Class Members' claims will be determined based on common proof.  *See Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 273 (E.D.N.Y. 2019) ("If the most substantial issues in controversy will be resolved by reliance primarily upon common proof, class certification will generally achieve the economies of litigation that Rule 23(b)(3) envisions.") (citation omitted); *Mooney*, 2016 WL 4576996, at *7.  For instance, in *Mooney*, the court held that predominance was satisfied because records and representative testimony "would allow a common answer to the common question."  *Id*.

99.     Additionally, the relevant inquiry under Rule 23(b)(3) of whether common issues will predominate does not require a determination of whether plaintiffs will actually prevail on the merits.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 408 (S.D.N.Y. 2015) ("Rule 23(b)(3)

29

requires only a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (internal quotation marks and citation omitted); *Clark*, 2013 WL 1789519, at \*2 ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.") (internal citation omitted); *In re United Cos. Fin. Corp.*, 276 B.R. at 372; *Driver*, 265 F.R.D. at 300.

100.    Here, the claims for recompense for increased health insurance costs attributable to Purdue's misconduct predominate over individual issues.  Additionally, the resolution of that issue will require common proof and predominate over any individualized issues; indeed, the only individual issue would appear to be the amount by which each Class Member has been injured. Therefore, predominance is satisfied.

The Class Action is the Superior Method of Adjudication.

101.    Additionally, the Class Members' claims also meet Rule 23(b)(3)'s requirement that a class action be a superior method of adjudicating this matter.  Rule 23(b)(3) includes a list of factors for courts considering the superiority requirement, including: (1) interest of members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of litigation already commenced by class members; (3) the desirability of concentrating litigation of claims in a particular forum; and (4) the difficulties likely to be encountered in managing a class action.  FED. R. CIV. P. 23(b)(3).

102.    Here all of the factors demonstrate that a class action is the superior method of adjudicating this matter.  First, Private Insurance Plaintiffs expect that few if any individual proofs of claim will have been made by the Bar Date as applicable to general unsecured and priority unsecured claims; accordingly, it will have been made clear that Class Members do not have a significant interest in individually prosecuting their claims.  Moreover, many of the Class Members

30

would be discouraged from vindicating their rights if they were required to pursue their claims on an individual basis.  Second, this forum certainly has the capacity and experience to handle this litigation.  Third, given the common issues in this case, there will be little difficulty in the management of a class action.  Indeed, this procedure is far superior to other methods, which would likely overburden the court and claims administration systems with individuals trying to navigate through them without legal representation, or which would entirely foreclose *any* private health insurance purchaser from *any* relief.

103.    Therefore, Private Insurance Plaintiffs have demonstrated that all the requirements of Rule 23(b)(3) have been satisfied.

## CONCLUSION

104.    For all the foregoing reasons, Private Insurance Plaintiffs requests that the Court grant their request to file the Class Proofs of Claim.

Respectfully submitted,

Dated:  July 2, 2020                    By: /s/ *Nicholas F. Kajon*
                                        One of the Attorneys for Private Insurance
                                        Plaintiffs

                                        Nicholas F. Kajon
                                        nfk@stevenslee.com
                                        Constantine D. Pourakis
                                        cp@stevenslee.com
                                        STEVENS & LEE, P.C.
                                        485 Madison Avenue, 20th Floor
                                        New York, NY  10022
                                        Tel:  212.319.8500

                                        James Young*
                                        jyoung@ForThePeople.com
                                        MORGAN & MORGAN, P.A.[18]

---

[18]  Morgan & Morgan, P.A. also represent clients in diverse other matters pending against the Debtors, as specified in the Second Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Procedure 2019, dated May 26, 2020.  [Dkt. No. 1181].

31

COMPLEX LITIGATION GROUP

COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL  32202
Tel:  904.361.0012

Juan R. Martinez*
juanmartinez@ForThePeople.com
MORGAN & MORGAN, P.A.
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida  33602
Tel:  813.223.5505

*Admitted Pro Hac Vice

Counsel for Private Insurance Plaintiffs and the
Putative Classes