**Hearing Date and Time: July 23, 2020, at 2:00 p.m. (prevailing Eastern Time)**
**Objection Date and Time: July 16, 2020, at 4:00 p.m. (prevailing Eastern Time)**

**TARTER KRINSKY & DROGIN**
*Counsel for Plaintiffs*
1350 Broadway, 11th Floor
New York, NY 10018
Tel: (212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
Michael Z. Brownstein, Esq.

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PURDUE PHARMA, L.P., *et al.*, | Case Nos.19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**NAS GUARDIANS ON BEHALF OF THE NAS CHILDREN'S ABATEMENT
CLASS ACTION CLAIMANTS MOTION FOR ENTRY OF AN ORDER PURSUANT
TO FED. R. BANKR. P. 9014 AND 7023 PERMITTING THEM TO FILE A CLASS
PROOF OF CLAIM AND GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Adlon Therapeutics L.P. (6745), Greenfield Bio Ventures L.P. (6150), Imbrium Therapeutics L.P. (8810) Seven Seas Hill Corp. (4591), Ophir Green Corp (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' mailing address is One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901. For ease of reference, the term "Purdue" as used herein, refers to Debtors. For the purposes of this Motion, all allegations set forth herein related to or pertaining to "Manufacturers" apply equally to Purdue.

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF CONTENTS......................................................................................i

TABLE OF AUTHORITIES ...........................................................................iv

I.    INTRODUCTION .....................................................................................4

    II.    JURISDICTION AND VENUE ...........................................................8

III.    STATEMENT OF FACTS ........................................................................8

    A.  Background:  Purdue's Role in the Opioid Crisis................................8

    B.  Purdue Files for Bankruptcy and Abatement Claims Not
    Addressed .................................................................................................12

    IV.    ARGUMENT ....................................................................................14

    A.  The Court Should Exercise its Discretion and Permit the
    NAS Children to File a Class Proof of Claim and Make Rule
    7023 Applicable to the NAS Children's Abatement Class........................14

    1.  The Court has the Discretion to Apply Rule 7023 to Proofs of
    Claim.........................................................................................................15

    a.  This Motion is Timely and Promotes the Efficient
    Administration of The Estate....................................................................17

    b.  The Inability of the NAS Children's Abatement Class to
    Receive Certification Prior to the Debtors' Bankruptcy is an
    Insufficient Reason to Prevent Class Treatment ......................................19

    c.  The Bar Date Notice did not Reach Members of the NAS
    Children's Abatement Class......................................................................20

    B.  Applying Rule 7023, the Court Should Grant the NAS

{Client/085978/1/02135389.DOCX;2 }

Plaintiffs Children's Abatement Class Claimant Motion to
Proceed as an NAS Children's Abatement Class.......................................21

1.  The Class is Ascertainable and Based on Objective Criteria. ..............23

2.  All of the Rule 23(a) Factors are Satisfied. .........................................24

a.  (Numerosity) A Class in Excess of 100,000 NAS Children is
so Numerous that it is Impracticable to Bring All Class
Members Before the Court .......................................................................24

b.  (Commonality) Common Factual and Legal Questions Exist .............25

c.  (Typicality) The NAS Children Represented by the
Guardians are Typical of the Class...........................................................28

d.  (Adequacy) The Guardians of the NAS Children and their
Attorneys are Adequate Representatives...................................................29

3.  The NAS Children Satisfy the Requirements of Rule 23(b). ...............30

a.  The NAS Children Satisfy the Requirements of Rule 23(b)(2) ...........30

b.  The NAS Children Satisfy the Requirements of Rule 23(b)(1)
as the Debtors have Insufficient Funds with Which to Satisfy the
Overwhelming Claims Against Them ........................................................31

c.  The NAS Children also Satisfy the Requirements of Rule
23(b)(3) .....................................................................................................33

i.  (Predominance) Common Questions Predominate Over
Individual Issues .......................................................................................33

ii.  (Superiority)  The Filing of a Class Claim is the Superior
Method of Proceeding...............................................................................35

V.  CONCLUSION ...........................................................................................37

{Client/085978/1/02135389.DOCX;2 }

## EXHIBITS

Exhibit A - Proposed Purdue NAS Children's Abatement Class
    Complaint:  Class Action Complaint in Abatement for Medical
    Monitoring and Surveillance and Creation of a Science Panel

Exhibit B -  NAS Children's Abatement Class Proposed Proof of
    Claim Form

Exhibit C -  Complaint, Erin Doyle, et al. vs. Purdue Pharma, Inc.,
    et al, before the Common Pleas Court of Ross County, Ohio,
    Case No. 18 CI 201, filed May 9, 2018

Exhibit D -  Complaint, *Jennifer Artz, et al. vs. Purdue Pharma
    L.P., et al.*, before the United States District Court for the
    Northern District of Ohio, Eastern Division, Case No. 1:19-op-
    45459-DAP, Doc. 1, filed June 17, 2019

Exhibit E -  07/08/2020 Declaration of Scott R. Bickford

Exhibit F -  Amended Complaint, *Michelle Frost, et. al. vs. Endo
    Health Solutions Inc., et al.*, (MDL Case No. 1:18-op-46327-
    DAP), 1:17-MD-2804, Doc. 2745 (the "Ohio Class")

Exhibit G -  Amended Complaint, *Jennifer Artz, et al. vs. Endo
    Health Solutions Inc., et al.*, (MDL Case No. 1:19-op-45459-
    DAP), 1:17-MD-2804, Doc. 2747 (the "National Class")

Exhibit H -  01/07/2020 Motion for Class Certification in MDL

Exhibit I -  12/18/2019 Declaration of Dr. Kanwaljett S. Anand

Exhibit J -  07/09/2020 Declaration of Harold D. Israel

Exhibit K - Proposed Order Granting Permission to File Class
    Proof of Claim and Granting Related Relief

{Client/085978/1/02135389.DOCX;2 }

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)...................................................................................... 33

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  568 U.S. 455 (2013)................................................................................. 23, 33

*Baker v. Washington Mutual Finance Group, LLC,*
  193 Fed. Appx. 294 (5th Cir. 2006)........................................................... 32

*Cason-Merenda v. VHS of Mich., Inc.,*
  296 F.R.D. 528 (E.D. Mich. 2013) ............................................................ 22

*Dillworth v. Case Farms Processing, Inc.,*
  2010 WL 776933 (N.D. Ohio Mar. 8, 2010) ............................................ 35

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974).................................................................................... 23

*Gentry v. Siegel,*
  668 F.3d 83 (4th Cir. 2012) ....................................................................... 16

*In re American Reserve Corp.,*
  840 F.2d 487 (7th Cir. 1988) ......................................................... 15, 16, 17

*In re Bally Total Fitness of Greater New York, Inc.,*
  402 B.R. 616 (Bankr. S.D.N.Y. 2009)................................................. 16, 17

*In re Birting Fisheries, Inc.,*
  92 F.3d 939 (9th Cir. 1996) ....................................................................... 16

*In re Cardizem CD Antitrust Litig.,*
  200 F.R.D. 297 (E.D. Mich. 2001) ........................................................... 34

*In re Chaparral Energy, Inc.,*
  No. BR 16-11144 (LSS), 2019 WL 4643849 (D. Del. Sept. 24, 2019)............. 15, 17

*In re Charter Co.,*
  876 F.2d. 866 (11th Cir. 1989) .................................................................. 16

*In re Chateaugay Corp.,*
  104 B.R. 626 (S.D.N.Y. 1989).................................................................... 16

*In re Chiang,*
  385 F.3d 256 (3rd Cir. 2004) ............................................................... 23, 25

*In re Connaught Grp., Ltd.,*
  491 B.R. 88 (Bankr. S.D.N.Y. 2013).......................................................... 18

*In re Corrugated Container Antitrust Litig.,*
  643 F.2d 195 (5th Cir. 1981) ..................................................................... 29

*In re DaimlerChrysler AG Sec. Litig.,*
  216 F.R.D. 291 (D. Del. 2003) .................................................................. 24

{Client/085978/1/02135389.DOCX;2 }

*In re Ephedra Prods. Liab. Litig.*,
    329 B.R. 1 (S.D.N.Y. 2005) ............................................................................................ 16
*In re Foundry Resins Antitrust Litig.*,
    242 F.R.D. 393 (S.D. Ohio 2007) ....................................................................... 25, 34, 36
*In re MF Glob. Inc.*,
    512 B.R. 757 (Bankr. S.D.N.Y. 2014) ............................................................................ 15
*In re Musicland Holding Corp.*,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007) ...................................................................... passim
*In re Pacific Sunwear of California*,
    2016 WL 3564484 (Bankr. D. Del. June 22, 2016) ................................................... 18, 19
*In re Silicone Gel Breast Implant Prods. Liab. Litig.*,
    No. 2:97-CV-11441-RDP, 2010 WL 11506713 (N.D. Ala. May 19, 2010) .................... 32
*In re Spring Ford Indus.*,
    2004 WL 231010 (Bankr. E.D. Pa. Jan. 20, 2004) ......................................................... 23
*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004) ...................................................................................... 35
*In re Think Fin., LLC*,
    No. 17-33964 (HDH), 2018 WL 9801454 (Bankr. N.D. Tex. Aug. 30, 2018) ........... 15, 17, 20
*In re Trebol Motors Distrib. Corp.*,
    220 B.R. 500 (1st Cir. 1998) ........................................................................................... 16
*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3rd Cir. 2004) ........................................................................................... 22
*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ..................................................................... 23, 25, 28, 33
*In re Woodward & Lothrop Holdings, Inc.*,
    205 B.R. 365 (Bankr. S.D.N.Y. 1997) ............................................................................ 16
*In re Zenith Labs, Inc.*,
    104 B.R. 659 (D.N.J. 1989) ............................................................................................. 16
*In re: Orthopedic Bone Screw Products Liab. Litig.*,
    176 F.R.D. 158 (E.D. Pa.1997) ....................................................................................... 32
*Johnston v. HBO Film Mgmt.*,
    265 F.3d 178 (3rd Cir. 2001) ............................................................................... 25, 29, 35
*Juris v. Inamed Corp.*,
    685 F.3d 1294 (11th Cir. 2012) ...................................................................................... 32
*Marcus v. Dep't of Revenue*,
    206 F.R.D. 509 (D. Kan. 2002) ....................................................................................... 30
*Neal v. Casey*,
    43 F.3d 48 (3rd Cir. 1994) .............................................................................................. 25
*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 ............................................................................................................. 31, 32
*Reid v. White Motor Corp.*,
    886 F.2d 1462 (6th Cir. 1989) ........................................................................................ 16
*Reyes*,
    802 F.3d ........................................................................................................................... 34

v

*Stewart v. Abraham*,
  275 F.3d 220 (3rd Cir. 2001) ........................................................................... 24
*Stott v. Capital Fin. Servs., Inc.*,
  277 F.R.D. 316 (N.D. Tex. 2011) ..................................................................... 32
*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................... 22, 23
*Young v. Nationwide Mut. Ins. Co.*,
  693 F.3d 532 (6th Cir. 2012) ........................................................................... 23
*Zapata v. IBP, Inc.*,
  167 F.R.D. 147 ................................................................................................ 30

Statutes

18 U.S.C. § 1961 ................................................................................................ 3, 4
28 U.S.C. § 157(b)(2) ............................................................................................. 8
28 U.S.C. §§ 157 and 1334 ..................................................................................... 8
28 U.S.C. §§ 1408 and 1409 ................................................................................... 8

Rules

FED. R. BANKR. P. 9014 AND 7023 ............................................................. i, 1, 15
Fed. R. Bankr. P. 9014(c) ..................................................................................... 15
Fed. R. Civ. P. 23 ........................................................................................ passim
Fed. R. Civ. P. 23(a) ..................................................................... 3, 22, 24, 33
Fed. R. Civ. P. 23(a)(2) ................................................................................. 25, 27
Rule 23(a)(1) ........................................................................................................ 25
Rule 23(a)(3) ........................................................................................................ 28
Rule 23(a)(4) ........................................................................................................ 29
Rule 23(b) ................................................................................................. 3, 22, 30
Rule 23(b)(1) ............................................................................................. 31, 32, 33
Rule 23(b)(1)(B) ................................................................................................... 31
Rule 23(b)(3) ........................................................................................................ 33
Rule 23(g) ............................................................................................................ 29
Rule 7023 ....................................................................................................... passim
Rules 23(b)(2) ......................................................................................... 22, 30, 31

Other Authorities

1 Newberg on Class Actions § 3:29 (5th ed.) ..................................................... 28
2 NEWBERG ON CLASS ACTIONS § 4:9 (4th ed. 2009)..................................... 31

vi

TO:    THE HONORABLE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY JUDGE

Jacqueline Ramirez, Melissa Barnwell and Ashley Dawn Marie Poe, who are Legal

Guardians[2] of neonatal abstinence syndrome ("NAS")[3] Children R.R., C.G. and P.P.R.P.

(hereinafter, "Plaintiffs"),[4] hereby moves this Court (the "Motion") pursuant to Fed. R. Bankr. P.

9014 and 7023 for leave to file a proof of claim on behalf of the proposed NAS Children's

Abatement Class and for entry of an order making Fed. R. Civ. P. 23 applicable to the "NAS

Children's Abatement Class Proof of Claim" (sometimes, the "Class Proof of Claim"),[5]

permitting them to file the Class Proof of Claim and granting related relief.

### *Preliminary Statement*

The NAS Children's Abatement Class[6] is the optimal vehicle for meeting the Court's and

the Debtor's stated objective of abating the opioid crisis, as opposed to simply paying out

individual damages to individual claimants.  The class will help the most innocent victims of the

---

[2] The term "Legal Guardian" is defined as "any natural person or entity who has the primary legal responsibility under their respective laws of their state for an infant or child's physical, mental, and emotional development."  Expressly excluded from the class of "Legal Guardians" are any governmental entities.  "Legal Guardians" include natural and adoptive parents who have not otherwise lost legal custody of their children, legal custodians, legal caretakers, and court-appointed guardians (including guardians of the person), whether temporary or permanent.

[3] In addition to Neonatal Abstinence Syndrome, the term "NAS" is defined to include additional, but medically-symptomatic, terminology and diagnostic criteria, including Neonatal Opioid Withdrawal Syndrome (NOWS) and other historically and regionally used medical and/or hospital diagnostic criteria for infants born addicted to opioids.

[4] These individuals are class representatives in the Opioid MDL for claims substantially similar to the relief sought herein for class treatment of the proposed Class Proof of Claim form that seeks abatement relief in the form of medical surveillance and abatement of disabilities and birth defects sustained by children diagnosed at or near birth with NAS. Notably, Plaintiffs do not seek the recovery of injunctive or declaratory relief arising from the normal and regular costs of caring for a child or for routine pediatric and adolescent medical care; instead, they only seek abatement necessitated by the NAS diagnosis and underlying *in utero* opioid exposures of the NAS Children.

If this Motion is granted, Plaintiffs will substitute or add additional class representatives as set forth in the proposed Purdue NAS Children's Abatement Class Complaint.  A true and correct copy of the proposed Purdue NAS Children's Abatement Class Complaint is attached to this Motion as **Exhibit A**.

[5] A true and correct copy of the proposed Class Proof of Claim is attached to this Motion as **Exhibit B**.

[6] The NAS Children's Abatement Class is set forth at Paragraph 15 in the proposed Purdue NAS Children's Abatement Class Complaint.  *See* **Exhibit A**.

1

crisis—the hundreds of thousands of children born with NAS because they were exposed *in utero* to opioids who will have life-long needs for intervention and monitoring.

Indeed, the requested relief presents the Court with a profound and unique opportunity to salvage funding from the ashes of the Purdue corporate downfall to abate an ongoing tragedy visited upon hundreds of thousands of America's infants and children. Plaintiffs seek relief solely in their capacity as Legal Guardians and on behalf of all other Legal Guardians similarly situated (i.e. the NAS Children's Abatement Class) for the following: creation of an abatement trust that will fund ongoing medical monitoring and surveillance of the NAS Children, medical and developmental referral, provision of training and information for the Legal Guardians, a nationwide registry for NAS Children, and the convening and oversight of a Science Panel[7] for purposes of epidemiological studies of the NAS Children so that the implications of their additional risk of disease and injury may be properly addressed during the administration of the Science Panel. This equitable abatement relief is all medically necessary and arises because the Plaintiffs and the NAS Children's Abatement Class have an absolute duty of care for symptomatic NAS Children (over whom they also have dominion).

The Plaintiffs and the NAS Children's Abatement Class were injured as a result of Purdue and its co-conspirators' violations of RICO, negligence, negligence *per se*, civil conspiracy arising out of tort, violations of New York Bus. Law §§ 349 and 350, and acts giving rise to an independent legal claim for medical monitoring and surveillance. The damages caused by these injuries will be abated by the relief requested.

---

[7] The Science Panel would be composed of academic and medical institutions and/or professionals. A more detailed discussion about what a Science Panel may look like is discussed in the Plaintiffs' motion for class certification in the Opioid MDL, Doc. 3066-1, pp. 27-29. That motion is attached hereto as **Exhibit H**.

{Client/085978/1/02135389.DOCX;2 }

Critically, however, the requested abatement relief is viable only on a class-wide, non-individual basis. Efficacious relief requires that all similarly situated NAS Children and their Legal Guardians be enrolled in a comprehensive and uniform monitoring and surveillance plan with the class-wide resulting data driven into the supervisory Science Panel so that it may study and inform itself according to scientific and medical principals which require robust data sets and then make care recommendations for the NAS Children as a result. There can be no Science Panel convened for a single NAS Child, and certainly no epidemiological studies from a data set of "1." Only the rising tide of a class-wide monitoring and surveillance protocol and a supervising Science Panel can lift these boats.

The class representatives are themselves Legal Guardians of NAS children. They know the children's needs all too well. For years, they and their counsel fought, in courts across the country, to provide meaningful treatment to their children and others similarly situated.

The representatives meet all four certification requirements of Fed. R. Civ. P. 23(a)—numerosity, commonality, typicality, and adequacy—and at least one (indeed all) of the Rule 23(b) criteria. So, the Court should permit the filing of a NAS Children's Abatement Class Proof of Claim on behalf of the NAS abatement class and certify class treatment under Fed. R. Bankr. P. 7023.

Upon granting leave to file the NAS Children's Abatement Class Proof of Claim, Plaintiffs respectfully will request substitution of the proposed Purdue NAS Children's Abatement Class Complaint (sometimes, the "Purdue Complaint"),[8] which more accurately

---

[8] The proposed Purdue NAS Children's Abatement Class Complaint is attached hereto as **Exhibit A**. The complaint alleges claims against Purdue for (1) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"); (2) negligence; (3) negligence per se, (4) civil conspiracy; (5) violations of New York Bus. Law §§ 349 and 350; and (6) acts giving rise to an independent legal claim for medical monitoring and surveillance.

3

reflects the actions directly against Purdue and its coconspirators, as well as specific additional briefing on class certification.

In short, the abatement relief sought for the most blameless victims of the opioid crisis is intended to provide the greatest and most positive impact on their lives as possible by studying their condition and ensuring they receive proper medical treatment.  Neither the Legal Guardians nor their NAS Children will receive money damages.  Instead, they will receive the care and consideration they deserve.  But this can only be achieved through class-wide relief – it cannot be achieved through individual proofs of claim.

In support of this Motion, the Plaintiffs hereby represent as follows:

## I.        INTRODUCTION

1.        Over eighty (80) class and individual actions were asserted by Plaintiffs against the Debtors (sometimes hereinafter referred to as "Purdue") and other manufacturers and suppliers seeking relief for NAS Children in the form of abatement and medical surveillance, including an Ohio Class[9] and a California Class[10] which was converted to a National Class, for: (1) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO") and/or state law equivalents; (2) nuisance; (3) negligence; (4) civil conspiracy; and (5) violations of state consumer protection statutes.[11]

---

[9] *See Erin Doyle, et al. vs. Purdue Pharma, Inc., et. al.* before the Common Pleas Court of Ross County, Ohio, bearing case no. 18 CI 201, filed May 9, 2018.  A true and correct copy of the complaint for this lawsuit is attached to this Motion as **Exhibit C**.

[10] *See Jennifer Artz, et al. vs. Purdue Pharma L.P., et al.*, before the United States District Court for the Northern District of Ohio, Eastern Division, bearing Case# 1:19-op-45459-DAP, Doc. 1, filed June 17, 2019.  A true and correct copy of the complaint for this lawsuit is attached to this Motion as **Exhibit D**.

[11] *See* Declaration of Scott R. Bickford ("Bickford Decl. ¶___"), ¶2, Bickford.Exhibit 1 (constituting a list of all of these lawsuits).  A true and correct copy of Mr. Scott R. Bickford's declaration is attached to this Motion as **Exhibit E**.

{Client/085978/1/02135389.DOCX;2 }

2.      Each of these actions were removed from various state or federal jurisdictions and consolidated in the multi-district litigation styled *In re National Prescription Opiate Litig.*, Case No. 1:17-MD-2804 (N.D. Ohio) (the "Opioid MDL" or "MDL" or "MDL Proceeding").

3.      For over a year, these multiple actions, brought against the Debtors and others, were stayed[12] and counsel for Plaintiffs, in an effort to set these matters for class certification, went so far as to file and seek a separate multidistrict litigation, which was denied.[13]   In July 2019, the MDL Court granted the Plaintiffs leave to amend and proceed to class certification.[14] On September 15, 2019, the Debtors filed for Chapter 11 protection.

4.      On October 8, 2019, pursuant to the MDL's briefing schedule for class certification,[15] Plaintiffs filed amended complaints omitting Purdue as a defendant due to the automatic stay.  *See*, *e.g.*, *Michelle Frost, et. al. vs. Endo Health Solutions Inc., et al.*, (MDL Case No. 1:18-op-46327-DAP), 1:17-MD-2804, Doc. 2745 (the "Ohio Class"); *Jennifer Artz, et al. vs. Endo Health Solutions Inc., et al.*, (MDL Case No. 1:19-op-45459-DAP), 1:17-MD-2804, Doc. 2747 (the "National Class").[16]

---

[12] *See* 4/11/18 Case Management Order, Opioid MDL 2804, Doc. 232, p. 11 ("No party may file any motion not expressly authorized by this Order absent further Order of this Court or express agreement of the parties.").

[13] *See* December 6, 2018 MDL Panel Order, MDL No. 2872, Doc. 51 (concluding that "The identity of plaintiffs and their unique damages – which plaintiffs and *amici* assert include the need for a medical monitoring trust that funds prolonged, multidisciplinary care – do indeed differentiate these cases from those brought by the cities, counties and states that comprise the bulk of MDL No. 2804.  But these differences among claims and requested relief, in our opinion, do not justify the creation of a new MDL.").

[14] *See* 7/11/19 Court Order, Opioid MDL 2804, Doc. 1829, p. 3 (first order setting out briefing schedule "on the matter of class certification for a putative class of NAS Babies"); 10/07/19 Court Order, Opioid MDL 2804, Doc. 2738 (amended briefing schedule re same).

[15] *See* 10/07/19 Court Order, Opioid MDL 2804, Doc. 2738.

[16] Some of these complaints were later amended.  The complaints that serve as the basis for the Legal Guardians' motion for class certification are attached to this Motion as **Exhibit F** (the amended "Ohio Class" with Ashley Dawn Marie Poe as a plaintiff) and **Exhibit G** (the amended "National Class" with Jacqueline Ramirez and Melissa Barnwell as plaintiffs).

{Client/085978/1/02135389.DOCX;2 }

5.      On January 7, 2020, in the MDL the Plaintiffs moved for class certification for various classes of Legal Guardians representing the interests of NAS Children born after May 25, 2000, who were medically diagnosed with opioid-related NAS at or near birth and whose birth mother received a prescription for opioids or opiates prior to the child's birth and those opioids were manufactured or distributed by a Defendant.[17]  The relief sought by the Plaintiffs includes abatement in the form of a comprehensive medical monitoring program and all future medical care reasonably necessary to treat the NAS Children.[18]

6.      Had Purdue not filed a Chapter 11 petition, Plaintiffs would have named it in their class action lawsuit.

7.      The proposed Purdue NAS Children's Abatement Class Complaint seeks certification of various classes of NAS Children who are United States residents born after May 25, 2000, who were medically diagnosed with opioid-related NAS[19] at or near birth and whose birth mother received a prescription for opioids or opiates prior to the birth and those opioids or opiates were manufactured and/or distributed by Purdue or one of its co-conspirators.[20]

8.      Plaintiffs, through counsel, have prepared (and will file with leave in advance of the Bar Date) a Class Proof of Claim against Purdue for abatement[21] through medical surveillance and evaluation stemming from the Debtors' misconduct.[22]

---

[17] *See* MDL Motion for Class Certification, MDL Doc. 3066-1, pp. 10-13.  A true and correct copy of the MDL motion for class certification is attached to this Motion as **Exhibit H** (hereinafter "MDL Motion for Class Certification, Doc. 3066, p. ___").
[18] *See* MDL Motion for Class Certification, Doc. 3066, p. 4.
[19]  The term "NAS" is defined in footnote 3 *supra*.
[20] *See* Paragraph 15 of the proposed Purdue NAS Children's Abatement Class Complaint attached as **Exhibit A**
[21] Abatement is a form of injunctive relief.
[22] *See* the Class Proof of Claim attached as **Exhibit B**.

{Client/085978/1/02135389.DOCX;2 }

9.      It is well settled that class proofs of claim are permitted in bankruptcy proceedings. Here, the discretionary factors for applying FRCP Rule 23 militate in favor of permitting the proposed Class Proof of Claim because: (i) the instant Motion is timely and will not compromise the efficient administration of the Debtors' estates as no reorganization plan has been filed and it is consistent with this Court's abatement goal, (ii) discussions within the mediation are consistent with the relief sought herein, (iii) the Bar Date (as defined below) is almost one month away, (iv) the fact that the Plaintiffs' NAS Children's class is still pending certification in the Opioid MDL and that Purdue will not be considered in that class action; and (v) the fact that the proposed Purdue NAS Children's Abatement Class Complaint has not yet been certified should not prevent class notice.

10.      Further, the class relief the Plaintiffs are seeking herein is not related to a personal injury claim and there is reason to believe that few putative class members would know to file notice to seek injunctive relief to abate their existing injuries.  The scope of the class remedy is to provide medical evaluation and surveillance, collect data, establish national standards of care and to educate medical professionals and future mothers.

11.      It is also troubling to note that as the date hereof, on information and belief, under 500 proof of claim forms have been filed on behalf of NAS children.[23]  Yet, the number of babies born with NAS has skyrocketed in recent years, from *1.5/1000* in 1999 to *11.9/1000* in 2019.[24] Each state reports its own data about NAS hospital births, but the numbers and what those

---

[23] Plaintiffs' best estimate of the proof of claims filed on behalf of NAS children is 500 or less.  (The exact data is available to the Court.)  Plaintiffs' counsel intend to file approximately 3,000 individual claims for NAS children. These claims are the result of counsel's efforts to secure clients, not the national notice program.  Regardless, that figure pales in comparison to the almost 300,000 to 500,000 NAS children estimated in this country.

[24] *See* Declaration of Dr. Kanwaljett S. Anand, December 8, 2019 (the "Anand Decl., pp. ___"), pp. 3-4.  A true and correct copy of Dr. Anand's report is attached to this Motion as **Exhibit I**.

7

numbers represent vary widely because there is no uniform standard for assessing and collecting data.  From what we do know, however, the absolute numbers are staggering—at least 44,490 infants in 2019 alone were born with prenatal opioid exposure, at least 60-75% of whom suffer from NAS.[25]  These figures indicate that since the year 2000 some 300,000 to 500,000 children have been born with a diagnosis of NAS.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory bases for the relief requested herein are Rule 23 of the Federal Rules of Civil Procedure and Rules 7023 and 9014 of the of the Federal Rules of Bankruptcy Procedure.

## III.    STATEMENT OF FACTS

### A.  Background: Purdue's Role in the Opioid Crisis.

13.     Plaintiffs refer to and direct the Court to Paragraphs 7 to 32 of the Debtors' Informational Brief [Dkt. No. 17] and to Paragraphs 89 to 457 of Plaintiffs' proposed Purdue NAS Children's Abatement Class Complaint and incorporate same herein by reference.

14.    For many years the United States has been in the midst of an opioid epidemic caused by the aggressive promotion, marketing, sale, and distribution of prescription opioids by pharmaceutical manufacturers, distributors and retailers, resulting in addiction, criminal activity, serious health issues, and loss of life.[26]

---

[25] Anand Decl., pp 3-4.
[26] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic, and semi-synthetic opiates.

15.    The Debtors are pharmaceutical companies that manufacture, sell or distribute, among other products, opioid pain medications.[27]    Purdue's opiate products, including OxyContin® Extended-Release Tablets CII ("OxyContin"), Purdue Pharma's most prominent pain medication, have been the target of over 2,600 civil actions across the United States and its territories.[28]

16.    When Purdue Pharma introduced OxyContin in 1996, it was aggressively marketed and highly promoted.  Sales grew from $48 million in 1996 to almost $1.1 billion in 2000.[29]  The high availability of OxyContin correlated with increased abuse, diversion, and addiction, and by 2004 OxyContin had become a leading drug of abuse in the United States.[30]  According to the Centers for Disease Control ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.[31]  According to the CDC, opioid overdoses killed more than 45,000 people over a 12-month timeframe that ended in September 2017.[32]  It is already the deadliest drug epidemic in American history.[33]  If current trends continue, lives lost from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.

17.    Purdue's marketing plan used sophisticated marketing data to influence the rate and dose of physicians' prescriptions.  The plan was very successful.  Purdue compiled prescriber

---

[27] *See* Debtors' Informational Brief [Dkt. No. 17], *supra*.
[28] *Id*.
[29] "OxyContin Marketing Plan, 2002." Purdue Pharma, Stamford, CN, 2002.
[30] Cicero T, Inciardi J, Munoz A. Trends in abuse of OxyContin and other opioid analgesics in the United States: 2002–2004. J Pain 2005;6:662–672 [PubMed].
[31] Centers    for    Disease    Control    and    Prevention,    *Prescribing    Data,    available    at* https://www.cdc.gov/drugoverdose/data/prescribing.html, (last accessed August 1, 2018).
[32] The Editorial Board, *An Opioid Crisis Foretold*, THE NEW YORK TIMES (April 21, 2018), https://www.nytimes.com/2018/04/21/opinion/an-opioid-crisis-foretold.html.
[33] *Id*.

9

profiles on individual physicians—detailing the prescribing patterns of physicians nationwide.[34] One of the critical foundations of Purdue's marketing plan for OxyContin was to target the physicians who were the highest prescribers for opioids across the country.[35]  The resulting database helped Purdue identify physicians with large numbers of chronic-pain patients and the least discriminate physician prescribers.

18.    Prior to 2003 very few, if any, primary care physicians wrote opioid prescriptions. Thereafter, lucrative bonuses tied to sales and a sophisticated informational campaign promoting the liberal use of opioids among these primary care physicians resulted in half of OxyContin prescriptions in 2003 being written by them.  Purdue "aggressively" promoted the use of opioids for use in the "non-malignant pain market."[36]  A consistent feature was the systematic effort to minimize the risk of addiction in the use of opioids for the treatment of chronic non–cancer-related pain.  For example, "[o]ne of the most critical issues regarding the use of opioids in the treatment of chronic non–cancer-related pain is the potential of iatrogenic addiction. The lifetime prevalence of addictive disorders has been estimated at 3% to 16% of the general population."[37]  Purdue, however, trained its sales representatives to carry the message that the risk of addiction was "less than one percent."[38]

---

[34] Stolberg SG, Gerth J. High-tech stealth being used to sway doctor prescriptions. New York Times November 16, 2000. Available.
at: http://query.nytimes.com/gst/fullpage.html?res=9502EEDF153BF935A25752C1A9669C8B63&sec=&spon=&pagewanted=1.
[35] Zee, Art, *The Promotion and Marketing of Oxycontin; Commercial Triumph: Public Health Tragedy,* Am J Public Health. 2009 February; 99(2): 221–227.doi: 10.2105/AJPH.2007.131714.
[36] OxyContin Marketing Plan, 2002." Purdue Pharma, Stamford, CN, 2002.
[37] Zee, Art, *The Promotion and Marketing of Oxycontin; Commercial Triumph: Public Health Tragedy,* Am J Public Health. 2009 February; 99(2): 221–227.doi: 10.2105/AJPH.2007.131714.
[38] Meier B. Pain Killer Emmaus, PA: Rodale Press; 2003:99.

19.     Purdue has always been one of the largest opioid manufacturers and, equally, one of the most notorious; it is a member of a small group of corporations to have its senior management (and various other personnel) face criminal prosecution, only to evade conviction through settlement.

20.     Purdue is the manufacturer of OxyContin, a drug that has become ubiquitously prescribed and the source of damages to neonates and infants alike on a nationwide scale.  Through calculated deception, indifference and duplicitous behavior, Purdue and its agents promoted, sold, and distributed OxyContin throughout the United States.

21.     Through the practices noted above, and others, it is contended in all of Plaintiffs' class action complaints that Purdue manipulated the standard of care and treatment relative to the use of opioids.

22.     As set forth more fully in Plaintiffs' proposed Purdue NAS Children's Abatement Class Complaint, Paragraphs 89 to 457, despite there being a growing magnitude of thought that exposure to opioids in the womb had long-term consequences to children born dependent upon those opioids, Purdue ignored evidence of thousands of such births, failed to research the effects of their drugs, encouraged widespread use of their opioid-containing products in greater and greater doses, and failed to warn doctors and women of childbearing age of the consequences of dependency, addiction and the long-term harm to children born with NAS.

23.     Moreover, and as more fully set forth in the proposed Purdue NAS Children's Abatement Class Complaint, Purdue promoted an aggressive and misleading marketing scheme, made false reports concerning its drugs, and failed to prevent diversion and report suspicions opioid orders.

11

**B. Purdue Files for Bankruptcy and Abatement Claims Not Addressed.**

24.    On September 15, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On January 3, 2020, the Debtors filed their Motion (the "Bar Date Motion") for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving Proof of Claim Forms and (III) Approving the Form and Manner Thereof [Dkt. No. 717] and the noticing plan set forth in the accompanying Affidavit of Jeanne C. Finegan in support thereof [Dkt No. 719]. On February 3, 2020, this Court entered an Order fixing the deadline for filing proofs of claim against the Debtors' estates [Dkt. No. 800] (the "Bar Date Order"). Pursuant to the Bar Date Order, the bar date for general unsecured creditors to file a proof of claim (the "Bar Date") was June 30, 2020. On June 3, 2020, this Court entered an Order extending the Bar Date to July 30, 2020 [Dkt. No. 1221].

25.    No Chapter 11 plan has been filed by the Debtors. The Debtors and all other opioid claimants in these Chapter 11 cases are engaged in mediation to attempt to resolve the dispute(s) between the so-called "Non-Federal Public Claimants," on the one hand, and the "Private Claimants," on the other hand, as to the allocation of value/proceeds available from the Debtors' estates. The NAS Children's Ad Hoc Committee (the "NAS Ad Hoc") has been representing the interests of the NAS abatement/ medical surveillance plan as well as the individual interests of NAS children with personal injury actions against the Debtors in that mediation.

26.    Despite an extensive noticing program promulgated by the Debtors, in many cases it is apparent that notice may not have reached the parents and legal guardians of the hundreds of thousands of NAS Children born since 2000, most of whom are allegedly unknown to the Debtors. While counsel has not filed its claims which will exceed 3,000 individual NAS children proofs of

12

claim, on information and belief, presently under 500 proof of claim forms[39] have been filed for

NAS children as compared to the almost 100,000 claim forms filed in personal injury cases, who

are presumably persons who became opioid dependent.[40]   This means a vast majority of innocent

children affected by the opioid crisis have not sought relief from this bankruptcy through filing of

individual proofs of claim.   The proposed NAS abatement/ medical surveillance plan, while not

providing money damages to these hundreds of thousands of NAS Children, seeks to lessen their

learning, developmental and physical disabilities through abatement programs which will better

their conditions.   A class proof of claim will promote fairness and due process, and the Court

should exercise its discretion in allowing the class proof of claim and certifying the class as set

forth in detail below.

---

[39] *See* footnote 22, *supra*.

[40] The NAS Ad Hoc expressed concern that the Debtors' proposed noticing plan (the "Noticing Plan") would not reach the caregivers of the NAS Children as early as December 3, 2019, one month before the Bar Date Motion was filed. *See* December 3, 2019 email from Harold D. Israel to Debtors counsel attached to the Israel Declaration at ¶3, Israel.Exhibit A ("We think that we can all agree that constructive notice in this case will not reach all potential claimants.  Therefore, we need to protect the rights of  those who do not file proofs of claim due to (i) not receiving notice; (ii) initially not diagnosed with NAS due to poor medical care; and (iii) NAS Children that are being carried now and will not be delivered until after the bar date").  (A true and correct copy of the Declaration of Mr. Harold Israel is attached to this Motion as **Exhibit J**.)  These concerns were reiterated numerous times after the filing of the Bar Date Motion.  *See* letter dated January 7, 2020 from Scott Bickford to Debtors counsel attached to the Bickford Declaration at ¶3, Bickford.Exhibit 2 (The Noticing Plan "fails to recognize in substance or even in name the issue of the more than 500,000 children who were born diagnosed as NAS or under some other diagnostic classification indicating those children's exposure to an opiate in the womb and subsequent birth"); Conditional Consent with Reservation of Rights filed on January 17, 2020 [Docket 754] at ¶4 (NAS Children are unique; Debtors' noticing expert "had not previously constructed a notice plan for claimants like these").  The NAS Ad Hoc and the Debtors exchanged numerous communications and phone calls since entry of the Bar Date Order regarding the NAS Ad Hoc's concern that the Noticing Plan was not reaching the caregivers of NAS Children.  The facts bore these contentions out as claims filed on behalf of the NAS Children are miniscule in comparison to claims filed by personal injury claimants as a whole.  Recognizing this fact, on April 8, 2020, the Debtors agreed to expand their Noticing Plan with respect to social media sites and made further alterations as of May 7, 2020.  Unfortunately, these modifications did not cure the problem.

{Client/085978/1/02135389.DOCX;2 }

IV.    **ARGUMENT**

A.  **THE COURT SHOULD EXERCISE ITS DISCRETION AND PERMIT THE NAS CHILDREN TO FILE A CLASS PROOF OF CLAIM AND MAKE RULE 7023 APPLICABLE TO THE NAS CHILDREN'S ABATEMENT CLASS.**

27.    An abatement class of NAS Children is the most efficient and appropriate manner to use the assets of the Debtors' estates to abate the developmental, learning and medical disabilities faced by hundreds of thousands of NAS children.

28.    Upon granting leave to file the NAS Children's Abatement Class Proof of Claim, Plaintiffs respectfully request substitution of the proposed Purdue Complaint (**Exhibit A**) which more accurately reflects the actions directly against Purdue and its coconspirators, as well as specific additional briefing on class certification.

29.    Plaintiffs' request for class proof of claim for abatement and medical surveillance was considered and accepted in a similar opioid-related bankruptcy proceeding, *In re Insys Therapeutics*, where the U.S. Bankruptcy Court for the District of Delaware accepted and negotiated an abatement class for medical surveillance on behalf of NAS children providing funding that might be used in conjunction with other bankruptcies.[41]  This Court should similarly approve such a class for the benefit of all NAS Children.[42]

30.    Determining whether to permit a class action proof of claim is a matter of discretion for the bankruptcy court in a contested matter such as this.  *See* Fed. R. Bankr. P. 9014(c); Fed. R. Bankr. P. 7023; *In re Musicland Holding Corp.*, 362 B.R. 644, 650 (Bankr. S.D.N.Y. 2007)

---

[41] *In re Insys Therapeutics, Inc.,et al,*  Case No. 19-11292 (KG) (Bankr. D. Del December 5, 2019) [Dkt. No. 962].

[42] In the recent bankruptcy of Insys Therapeutics, Inc. (and related entities), another manufacturer of opioid products, in the United States Bankruptcy Court for the District of Delaware, the issue of a class proof of claim would be resolved through the mediation process.  *See* Order Approving Stipulation by and Between the Debtors, the Official Committee of Unsecured Creditors, and the NAS Claimants Establishing Class Claims Procedures, *In re Insys Therapeutics, Inc.*, No. 19-11292 [Dkt. No. 949] (Bankr. D. Del. Dec. 4, 2020).

14

("Federal Civil Rule 23 does not apply automatically to contested matters, see FED. R. BANKR.P. 9014, and the decision to extend its application is committed to the Court's discretion."). *See also*, *In re American Reserve Corp.*, 840 F.2d 487, 488 (7th Cir. 1988).

31.    Exercising that discretion is a two-step process: ***first***, the court must determine whether to apply, pursuant to Bankruptcy Rules 9014(c) and 7023, Rule 23 of the Federal Rules of Civil Procedure governing class actions to the claims administrative process; and ***second***, the court must determine whether the requirements of Rule 23 have been satisfied, such that a class proof of claim may be properly filed and considered. *See In re MF Glob. Inc.*, 512 B.R. 757, 762– 63 (Bankr. S.D.N.Y. 2014); *Musicland*, 362 B.R. at 651, 654-55; *In re Chaparral Energy, Inc.*, No. BR 16-11144 (LSS), 2019 WL 4643849, at *3 (D. Del. Sept. 24, 2019); *In re Think Fin., LLC*, No. 17-33964 (HDH), 2018 WL 9801454, at *3 (Bankr. N.D. Tex. Aug. 30, 2018).

32.    For the reasons set forth below, the Court should exercise its discretion in permitting a class action proof of claim and certify the NAS Children's Abatement Class for abatement and medical surveillance stemming from the Debtors' misconduct.

### 1.    The Court Has the Discretion to Apply Rule 7023 to Proofs of Claim.

33.    For nearly three decades, bankruptcy courts across the country, including this Court, have exercised their discretion and have permitted the filing of class proofs of claim. *See, e.g., American Reserve*, 840 F.2d at 493-94; *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 4–5 (S.D.N.Y. 2005) (adopting approach set forth in *American Reserve*, *supra*, which held that class proofs of claim may be allowed at the discretion of the bankruptcy court); *In re Zenith Labs, Inc.*, 104 B.R. 659, 662-663 (D.N.J. 1989); *In re Chateaugay Corp.*, 104 B.R. 626, 629-34 (S.D.N.Y. 1989); *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 369 (Bankr. S.D.N.Y. 1997); *In*

15

*re Charter Co.*, 876 F.2d. 866, 873 (11th Cir. 1989); *Reid v. White Motor Corp.*, 886 F.2d 1462,

1472 (6th Cir. 1989), *cert denied*, 494 U.S.1980 (1990); *In re Birting Fisheries, Inc.*, 92 F.3d 939

(9th Cir. 1996); *In re Trebol Motors Distrib. Corp.*, 220 B.R. 500, 502 (1st Cir. 1998); *Gentry v.

Siegel*, 668 F.3d 83, 91 (4th Cir. 2012).

34.     Thirteen years ago, this district considered class proofs of claim in *In re Musicland

Holding Corp.*, 362 B.R. 644 (Bankr. S.D.N.Y. 2007).  *Musicland* set forth a non-exclusive list of

factors that a bankruptcy court could consider in deciding to exercise its discretion to permit a

class proof of claim.  *Id.* at 654-55.  Those factors then included: (1) whether class certification

will adversely affect the administration of the estate—here, class certification will aid the estate;

(2) whether the class was certified pre-petition—here, it was not because a stay order was issued;

and (3) whether the members of the putative class received notice of the bar date—here, there are

excellent reasons to think they have not.  *Id.*

35.     In *In re Bally Total Fitness of Greater New York, Inc.*, the court considered "'the

benefits derived from the use of the class claim device [when] consistent with the goals of

bankruptcy.'"  *See In re Bally Total Fitness of Greater New York, Inc.* 402 B.R. 616, 620 (Bankr.

S.D.N.Y. 2009).  Here, the goal of this bankruptcy is abatement, which is identical to the proposed

class.

36.     In *Think Fin.*, the court considered the "fundamental goal of bankruptcy [of]

promot[ing] creditor participation."  *Think Fin.*, 2018 WL 9801454, at *5.  Here, the NAS

Children's Abatement Class provides a procedural vehicle to efficiently, equitably and fairly seek

to abate the ongoing plight of children born with an NAS diagnosis.

16

37.     Courts may also consider the "prejudice to putative class members[,]" *see Think Fin.*, 2018 WL 9801454, at \*3, "prejudice to the debtor," *ibid*, "efficient estate administration," *ibid*, the "putative class representatives' conduct in the bankruptcy case," *ibid*, the "status of proceedings in other courts," *ibid*, as well as the "benefits and costs of class litigation," *see American Reserve*, 840 F.2d at 492.  In the instant case, the NAS Children's Abatement Class creates an efficiency in estate administration.

38.     In all the cases cited above, all the courts agree that no single factor is dispositive, and the weight given any factor depends on the facts of each case.  *See Musicland*, 362 B.R. at 654-57; *Bally Total Fitness*, 402 B.R. at 620; *Think Fin.*, 2018 WL 9801454 at \*3.  *See also*, *Chaparral*, 2019 WL 4643849, at \*5-6.

39.     As discussed below, the facts as presented in the NAS Children's Abatement Class clearly weigh in favor of permitting a class proof of claim, and other relief, through application of Bankruptcy Rule 7023.

### a. This Motion is Timely and Promotes the Efficient Administration of The Estate.

40.     The NAS Children's Abatement Class is the optimal vehicle for meeting the Court's and the Debtor's stated objective of abating the opioid crisis.  The Class would facilitate assistance to myriad children whom have not filed claims in these proceedings and help abate the serious learning, developmental and physical disabilities they were born with.  The NAS Children's Abatement Class will, more than any other vehicle, advance nationally this Court's desire to assist victims of the opioid crisis.  It will do so in a meaningful way and in a manner that promotes the interests of fairness and equity.  Much has been said lately about the failure of not having national programs of testing for Covid-19; the same could also be said for NAS children.

17

There is no national diagnostic standard.  There is no national standard of care.  There is no centralized longitudinal collection of data to track these children once they leave the care of hospitals.  There is no national dissemination of data to municipalities, states and even schools on these children.  These are programs that no one town, city, county, parish or state can accomplish. And this is something, despite 24 years of NAS births, that has not been addressed.  This class is consistent with this Court's goals of abatement.

41.     Despite the fact the NAS Children's Abatement Class might advance substantially the Court's stated desires, the Court could also look to whether consideration of the motion might somehow delay the proceedings.  This consideration "often centers on (a) the timing of the motion for certification, … and (b) whether a plan has been negotiated, voted on or confirmed." *Musicland*, 362 B.R. at 655.  Those factors are not present in the instant case.

42.     Motions are timely when filed prior to the proof of claim bar date.  *See, e.g., In re Pacific Sunwear of California*, 2016 WL 3564484, at *6 (Bankr. D. Del. June 22, 2016) (finding no delay to the administration of the bankruptcy where the motion for approval of the class claim was filed before the bar date had passed); *see also In re Connaught Grp.*, Ltd., 491 B.R. 88, 97 (Bankr. S.D.N.Y. 2013) ("If the representative files a timely adversary proceeding or class proof of claim, and the Court denies a motion to certify the class, it should set a reasonable bar date to allow the members of the putative class to file individual claims.").  The Plaintiffs intend to file their Class Proof of Claim prior to the proof of claim bar date.  Accordingly, the Class Proof of Claim and the instant Motion will be both timely and will not implicate *any* delay, much less an *undue* delay.

18

43.      Also, as discussed above, allowing the NAS Children's Abatement Class will not delay the administration of the Debtors' estates as: (i) there is ongoing mediation, (ii) the Debtors have not yet filed a Chapter 11 plan,[43] (iii) discovery is ongoing against the Sackler families, (iv) the Bar Date is weeks away, and (v) the Debtors and their attorneys have known for months of the NAS Children's intent to ask for an abatement class action.

44.      Finally, if the Debtors (or others) dispute the NAS children's personal injury claims, class treatment as proposed here would streamline resolution of those objections.  *See Pacific Sunwear*, 2016 WL 3564484, at *6 ("application of Rule 7023 will not hinder the chapter 11 process, but rather will promote efficiency by placing potentially thousands of individual claims before the court in a single class claim with competent counsel representing the interests of the class.").

### b. The Inability of the NAS Children's Abatement Class to Receive Certification Prior to the Debtors' Bankruptcy is an Insufficient Reason to Prevent Class Treatment.

45.      As set forth above in Paragraphs 1 through 3, the NAS Children's abatement classes were filed on multiple occasions and stayed in the MDL.  When leave was finally allowed to amend and proceed to class certification in July 2019, the Debtors filed for Chapter 11 protection in September 2019.  Since then, the advent of COVID 19 has further delayed the actions on which class certification have been sought in the MDL and discovery has yet to be restarted on those motions, thus delaying any determination on the pending motion for class certification in the MDL.

---

[43] *Cf. Musicland*, 362 B.R. at 656 (determining delay would adversely affect administration of estate where "[b]y the time [the class representatives] made their certification motion, Musicland had negotiated and filed a Plan, the Court had approved the Disclosure Statement, the creditors had voted on the Plan and the Court had begun the confirmation hearing.").

> **c. The Bar Date Notice Did Not Reach Members of the NAS Children's Abatement Class.**

46.     Given the paucity of NAS Children proof of claims filed thus far into this proceeding, at least weighted against those of other personal injury claimants (*see* Paragraph 11 above), notice has been an ongoing issue with the Debtors in this matter.  Knowing that there are more than 300,000 children born with an NAS diagnosis, the number of claims filed thus far speaks volumes as to the seeming inadequacy of the Debtors' attempts to reach persons who would file claims on behalf of NAS Children.

47.     Consistent with *Musicland*, the NAS Children's Abatement Class promotes the fundamental goal of bankruptcy—creditor participation.  *See Think Fin.*, 2018 WL 9801454, at *5 ("A fundamental goal of bankruptcy is to promote creditor participation.  Having seen the results obtained by the [extensive] Notice Procedures, the Court is confident that application of the class procedures presents a superior option for administration of these claims, and therefore the notice provided to putative class members weighs heavily in favor of granting the 7023 Motions.").

## B. APPLYING RULE 7023, THE COURT SHOULD GRANT THE NAS PLAINTIFFS CHILDREN'S ABATEMENT CLASS CLAIMAINT MOTION TO PROCEED AS AN NAS CHILDREN'S ABATEMENT CLASS.

48.     In the abundance of caution, Plaintiffs advance their arguments raised in attached pleadings in other proceedings as to why this Court should apply Rule 7023 to the NAS Children's Abatement Class.  However, should the Court consider this application of Rule 7023, Plaintiffs respectfully reserve their right to supplement this Motion and substitute their proposed Purdue NAS Children's Abatement Class Complaint and class representatives.  Once the Court has

exercised its discretion to extend Rule 7023 to the NAS Children's Abatement Class Proof of

Claim, the court may then proceed to certify that class.

49.    The proposed NAS Children's Abatement Classes (collectively, the "NAS

Children's Abatement Class") are defined as:

**Class 1**: Legal Guardians of United States residents born after May 25, 2000, who were medically diagnosed with opioid-related "Neonatal Abstinence Syndrome" ("NAS") at or near birth and whose birth mother received a prescription for opioids or opiates prior to the birth and those opioids or opiates were manufactured and/or distributed by Purdue.

**Class 2**: Legal Guardians of United States residents born after May 25, 2000, who were medically diagnosed with opioid-related NAS at or near birth and whose birth mother received a prescription for opioids or opiates prior to the birth and those opioids or opiates were manufactured and/or distributed by one or more of Purdue's RICO Marketing Claim or RICO Supply Chain Claim co-conspirators.

**Class 3**: Legal Guardians of United States residents born after May 25, 2000, who were medically diagnosed with opioid-related NAS at or near birth and whose birth mother received a prescription for opioids or opiates in the ten months prior to the birth and those opioids or opiates were manufactured and/or distributed by Purdue.

**Class 4**: Legal Guardians of United States residents born after May 25, 2000, who were medically diagnosed with opioid-related NAS at or near birth and whose birth mother received a prescription for opioids or opiates in the ten months prior to the birth and those opioids or opiates were manufactured and/or distributed by one or more of Purdue's RICO Marketing Claim or RICO Supply Chain Claim co-conspirators.

Expressly excluded from the Classes are any infants or children who were treated with opioids neonatally, other than for pharmacological weaning.  Also excluded from the class are Legal Guardianships where a governmental agency, such as a public children services agency, has affirmatively assumed the duties of "custodian" of the child.[44]

---

[44] *See* Paragraph 15 of the proposed Purdue NAS Children's Abatement Class Complaint attached as **Exhibit A**.

{Client/085978/1/02135389.DOCX;2 }

50.      Claimants propose Jacqueline Ramirez, Melissa Barnwell and Ashley Dawn Marie Poe, who are Legal Guardians of NAS Children R.R., C.G. and P.P.R.P., as representatives of the class.[45]

51.      For the reasons stated below, the Plaintiffs' claim satisfies all the requirements of Fed. R. Civ. P. 23, incorporated and made applicable to this proceeding through Bankr. R. 7023.

52.      A court should certify a class where, as here, the class satisfies the four prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as one of the three subsections of Rule 23(b) (the Plaintiffs' claim meets the requirements of Rules 23(b)(2) (injunctive relief), 23(b)(1) (limited fund action) and 23(b)(3) (superiority and predominance)).  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3rd Cir. 2004).

53.      The Supreme Court recently reiterated that a trial court must conduct a "rigorous analysis" to confirm that Rule 23's requirements have been met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).   However, "the requisite 'rigorous analysis' of the record and consideration of the merits must be focused on and limited to the question whether the Rule's requirements have been established."  *Cason-Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 536 (E.D. Mich. 2013) (citing *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013)).   Thus, permissible inquiry into the merits of plaintiffs' claims at the class certification stage is limited.

54.      Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage.  Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are

---

[45] *See* footnote 4, *supra*.

{Client/085978/1/02135389.DOCX;2 }

satisfied. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Dukes*, 564 U.S. at 351 n.6). In other words, for the purposes of evaluating a motion for class certification, a court should assume that the substantive allegations of the complaint are generally true and not inquire into the merits of the case. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met"); *In re Chiang*, 385 F.3d 256, 262 (3rd Cir. 2004); *In re Whirlpool Corp.*, 722 F.3d at 851-52; *In re Spring Ford Indus.*, 2004 WL 231010, at *5 (Bankr. E.D. Pa. Jan. 20, 2004).

### 1. The Class is Ascertainable and Based on Objective Criteria.

55.     For a class action to be certified, the "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012). Administrative feasibility exists when membership can be determined on the basis of "objective criteria." *Id*. at 538-39. "[P]erfection" is not the standard. *Young*, *supra*.

56.     Whether a class member meets the three objective criteria of the class definitions can be determined on the basis of documentary evidence, as explained in the MDL Motion for Class Certification.[46]  Class Counsel are ready, willing, and able to gather the documents that are required.

57.     For these reasons, as well as for the reasons set forth in the MDL Motion for Class Certification,[47] the Proposed Purdue Classes are ascertainable and based on objective criteria.

---

[46] MDL Motion for Class Certification, Doc. 3066-1, pp. 29-32.
[47] MDL Motion for Class Certification, Doc. 3066-1, pp. 29-32.

{Client/085978/1/02135389.DOCX;2 }

58.     Here, as demonstrated below, even under a "rigorous analysis," the requirements of Federal Rule of Civil Procedure 23 are easily met.

**2.  All of the Rule 23(a) Factors are Satisfied.**

**a.  (Numerosity) A Class in Excess of 100,000 NAS Children Is So Numerous that it is Impracticable to Bring All Class Members Before the Court.**

59.     Since 2000, the start date for the putative classes, in excess of 100,000 children have been born with NAS.  The guardians for these children must be approximately equal in number and must also be widely dispersed.

60.     There is no "rigid minimum number of class members necessary to warrant certification; rather, joinder of all members need only be impractical, not impossible."  *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 295 (D. Del. 2003).  *See also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3rd Cir. 2001) ("[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

61.     The "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)."  *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 403 (S.D. Ohio 2007).

62.     For these reasons, as well as for the reasons set forth in the MDL Motion for Class Certification,[48] the numerosity requirement is plainly met.

---

[48] MDL Motion for Class Certification, Doc. 3066-1, p. 33.

{Client/085978/1/02135389.DOCX;2 }

### b.  (Commonality) Common Factual and Legal Questions Exist.

63.    Commonality only requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  While Rule 23(a)(2) speaks of questions of law or fact in the plural, "there need be only one common question to certify a class." *In re Whirlpool Corp.*, 722 F.3d at 853.  "[T]he commonality standard of Rule 23(a)(2) is not a high bar: it does not require identical claims or facts among class member[s], as 'the commonality requirement will be satisfied if the named plaintiffs share at least one question of law or fact in common with the grievances of the prospective class." *Chiang*, 385 F.3d at 265 (quoting *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3rd Cir. 2001)) (internal quotation marks omitted).  Thus, this requirement is "easily met." *Neal v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994).

64.    The "commonality" prerequisite is readily satisfied here because the factual liability and causation issues, as well as the legal theories asserted, are substantially identical for all putative class members seeking abatement relief on behalf of NAS Children.  Here, the Plaintiffs have identified the following issues common to the proposed class:

   a.  Did Purdue separately and/or in concert with the RICO Marketing Claim and RICO Supply Chain Claim co-conspirators fail to monitor, detect, investigate, refuse to fill, and/or report suspicious orders of prescription opioids?

   b.  Did Purdue separately, and/or in concert with the RICO Marketing Claim and RICO Supply Chain Claim co-conspirators fail to monitor, detect, investigate, refuse to fill, and/or report orders of prescription opioids which they knew or should have known were likely to be diverted for nonmedical purposes?

   c.  Did Purdue separately and/or in concert with the RICO Marketing Claim co-conspirators use false statements and omissions to promote and market opioids for treatment of chronic pain?

25

d.  Did Purdue separately and/or in concert with the RICO Marketing Claim co-conspirators use false statements and omissions to promote and market opioids for treatment of non-cancer, including but not limited to widespread conditions such as arthritis and joint pain?

e.  Did Purdue separately and or in concert with the RICO Marketing Claim co-conspirators use false statements and omissions to promote and market opioids as drugs without dose limits?

f.  Did Purdue separately and/or in concert with the RICO Marketing Claim co-conspirators make false statements and omit relevant facts to better promote and market opioids by misrepresenting the risks and benefits of prescribing and/or taking opioids?

g.  Did Purdue separately and/or in concert with the RICO Marketing Claim co-conspirators, negligently manufacture, market, promote, and sell opioids?

h.  Did Purdue separately and/or in concert with the RICO Marketing Claim and RICO Supply Chain Claim co-conspirators negligently sell and distribute opioids?

i.  Did Purdue separately and/or in concert with the RICO Marketing Claim and RICO Supply Chain Claim co-conspirators, recklessly, or with gross negligence manufacture, market, promote, and sell opioids?

j.  Did Purdue separately and/or in concert with the RICO Marketing Claim and RICO Supply Chain Claim co-conspirators wantonly, recklessly, or with gross negligence manufacture, sell and/or distribute opioids?

k.  Did Purdue separately and/or in concert with the RICO Marketing Claim co-conspirators manufacture and cause to be marketed opioids which it knew were being prescribed to pregnant women without adequately testing and/or issuing adequate warnings concerning the short-term and long-term risks to the fetus?

l.  Were Plaintiffs and the class members damaged as a direct and proximate result of Purdue' acts and omissions either separately or in concert with the RICO Marketing Claim and RICO Supply Chain Claim co-conspirators' acts and omissions?

26

    m. Are Plaintiffs' claims typical of those of the class and are based on the same legal theories as those of the class members?

    n. Do Plaintiffs' claims and those of the class members all arise from the same pattern or practice by Purdue acting separately, and/or in concert with RICO Marketing Claim and RICO Supply Chain Claim co-conspirators?

65.    Likewise, because the Plaintiffs and the NAS Children's Abatement Class request abatement relief, the remedy stage raises additional issues that are common to the class. At trial, common evidence will establish the necessary medical monitoring and assessment protocol to be followed for the NAS Children due to the known risks associated with their medically diagnosed conditions with the ability to gather and analyze the data arising from the monitoring and assessment of the NAS Children.

66.    Any one of these substantive issues would, standing alone, establish the requisite commonality under Rule 23(a)(2). Thus, for these reasons, as well as for the reasons set forth in the MDL Motion for Class Certification,[49] the commonality requirement is satisfied.

### c. (Typicality) The NAS Children Represented by the Guardians Are Typical of The Class.

67.    Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims'" such that "by pursuing their own interests, the class representatives also advocate the interests of the class members." *In re Whirlpool Corp.*, 722 F.3d at 852–53 (citation omitted). "[T]he plaintiffs' claims need not be identical to those of the class; typicality will be satisfied so long as "the named

---

[49] MDL Motion for Class Certification, Doc. 3066-1, pp. 33-34.

27

representatives' claims share the same essential characteristics as the claims of the class at large."
§ 3:29.Typicality: applicable standard, 1 Newberg on Class Actions § 3:29 (5th ed.).

68.    Here, the Plaintiffs seek abatement relief in the form of a comprehensive, national medical monitoring program designed to care for children diagnosed with NAS across the country. In fact, without widespread participation in the program, it would be completely ineffective in advancing the medical and scientific knowledge in treating those afflicted with NAS.[50]   Indeed, the Plaintiffs are, by definition, advocating for the interests of the putative class members when they pursue the relief sought.

69.    Further, Rule 23(a)(3) is satisfied because the NAS Guardian class representatives and the members of the proposed class are all victims of Purdue's, and the other manufacturers', fraudulent misrepresentations concerning the safety and efficacy of their products, as well as the conduct of Purdue, Manufacturers, and/or Distributors with respect to the distribution of the products (including the failure to report suspicious orders).

70.    Thus, for these reasons, as well as for the reasons set forth in the MDL Motion for Class Certification,[51] the typicality requirement is satisfied.

### d. (Adequacy) The Guardians of the NAS Children and their Attorneys are Adequate Representatives.

71.    Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In analyzing this factor, "the court must determine whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class."  *Johnston*, 265 F.3d at 185.  The Plaintiffs

---

[50] *See* MDL Motion for Class Certification, Doc. 3066-1, pp. 36-37.
[51] MDL Motion for Class Certification, Doc. 3066-1, pp. 34-37.

{Client/085978/1/02135389.DOCX;2 }

submit that they have no conflict with the proposed class because they and members of the proposed class all have NAS children who suffer from opioid-related conditions and are seeking the same relief in the form of abatement and treatment based on the same legal theories. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981). Additionally, the Plaintiffs, all while bearing the significant burdens of caring for NAS Children, have been active participants in the prosecution of these claims and have established through the discovery process that they meet all criteria set forth in the class definitions. Thus, for these reasons, as well as for the reasons set forth in the MDL Motion for Class Certification,[52] the class representatives satisfy all requirements of Rule 23(a)(4).

72.    Rule 23(g) also requires the court to examine the capabilities and resources of class counsel to determine whether they will provide adequate representation to the class. The proposed class is represented by counsel with extensive experience in class action litigation. They have vigorously prosecuted the class claims, and they will continue to do so through all phases of the litigation, including trial. *See Marcus v. Dep't of Revenue*, 206 F.R.D. 509, 512 (D. Kan. 2002) (citing *Zapata v. IBP, Inc.*, 167 F.R.D. 147. 161 (D. Kan. 2002)) ("In absence of evidence to the contrary, courts will presume the proposed class counsel is adequately competent to conduct the proposed litigation").

73.    The lead firms representing the Guardians of the NAS Children (and seeking appointment as class counsel) – Scott R. Bickford of Martzell, Bickford & Centola, Calvin C. Fayard, Jr. of the Law Offices of Calvin C. Fayard, Jr., Thomas and Kelly Bilek of the Bilek Law Firm, Donald Creadore of The Creadore Law Firm, and Kent Harrison Robbins of the Law Offices

---

[52] MDL Motion for Class Certification, Doc. 3066-1, pp. 37-38.

{Client/085978/1/02135389.DOCX;2 }

of Kent Harrison Robbins, P.A. – have considerable class action experience and have successfully

led a number of MDL actions.  Most of these firms have led the efforts on behalf of the NAS

Children in the Opioid MDL in the Northern District of Ohio, Case No. 1:17-md-02804-DAP, and

should be appointed class counsel here on behalf of the Legal Guardians of NAS Children.  For

these reasons, as well as for the reasons set forth in the MDL Motion for Class Certification,[53] the

adequacy requirement as to class counsel has been satisfied.

### 3.    The NAS Children Satisfy the Requirements of Rule 23(b).

### a.    The NAS Children Satisfy the Requirements of Rule 23(b)(2).

74.    The Guardians ask the Court to certify nationwide classes for injunctive and

declaratory relief under Rule 23(b)(2).  The Manual for Complex Litigation observes that "Rule

23(b)(2) generally applies when the relief sought is a court-supervised program for periodic

medical examination and research to detect diseases attributable to the product in question."  That

is the relief the Guardians seek.  Accordingly, for this reason, and for the reasons set forth in the

MDL Motion for Class Certification,[54] the Guardians have satisfied Rule 23(b)(2).

### b.    The NAS Children Satisfy the Requirements of Rule 23(b)(1) as the Debtors Have Insufficient Funds with Which to Satisfy the Overwhelming Claims Against Them.

75.    Rule 23(b)(1)(B), applicable in so-called "limited fund" cases, authorizes

certification when "prosecuting separate actions by or against individual class members would

create a risk of ... adjudications with respect to individual class members that, as a practical matter,

would be dispositive of the interests of the other members not parties to the individual

---

[53] MDL Motion for Class Certification, Doc. 3066-1, pp. 38-39.
[54] MDL Motion for Class Certification, Doc. 3066-1, pp. 39-43, 49-52.

{Client/085978/1/02135389.DOCX;2 }

adjudications or would substantially impair or impede their ability to protect their interests[.]" Fed.
R. Civ. P. 23(b)(1)(B).[55]  "A limited fund exists when a fixed asset or piece of property exists in
which all class members have a preexisting interest, and an apportionment or determination of the
interests of one class member cannot be made without affecting the proportionate interests of other
class members similarly situated."  2 NEWBERG ON CLASS ACTIONS § 4:9 (4th ed. 2009).

76.    In *Ortiz Fibreboard Corp.*, the Supreme identified three "common characteristics"
consistent with the "historical limited fund model."  527 U.S. 815, 838 (1999).  "The first and most
distinctive characteristic," *Ortiz* explains, "is that the totals of the aggregated liquidated claims and
the fund available for satisfying them, set definitively at their maximums, demonstrate the
inadequacy of the fund to pay all the claims."  *Ortiz*, 527 U.S. at 838.  The second historical
characteristic is that "the whole of the inadequate fund was to be devoted to the overwhelming
claims."  *Id.* at 839.  The third characteristic is that "the claimants identified by a common theory
of recovery were treated equitably among themselves."  *Id.*

77.    Courts have applied Rule 23(b)(1) to mass, or class, damages claims brought
against defendants who are in financial distress, both in and out of the bankruptcy context.  *See,
e.g., Baker v. Washington Mutual Finance Group, LLC,* 193 Fed. Appx. 294 (5th Cir. 2006)
(unreported); *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316 (N.D. Tex. 2011); *In re Silicone
Gel Breast Implant Prods. Liab. Litig.*, No. 2:97-CV-11441-RDP, 2010 WL 11506713 (N.D. Ala.
May 19, 2010), *aff'd sub nom. Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012), *cert. denied,*

---

[55] "In contrast to class actions brought under subdivision (b)(3), in cases brought under subdivision (b)(1), **Rule**
23 does not provide for absent class members to receive notice and to exclude themselves from class membership as
a matter of right. It is for this reason that such cases are often referred to as 'mandatory' class actions."  *Ortiz v.
Fibreboard Corp.,* 527 U.S. 815, 834 n. 13 (1999) (citation omitted).

568 U.S. 1124 (2013); *In re: Orthopedic Bone Screw Products Liab. Litig.,* 176 F.R.D. 158 (E.D. Pa.1997).  In *Silicone Gel Breast Implant Litig.*, for example, the court applied Rule 23(b)(1) to the claims against a breast implant manufacturer that was in difficult financial circumstances but had *not yet* filed for bankruptcy protection:

> The evidence shows, *inter alia*, that—absent the new capital contributed to the company conditioned upon approval of this settlement—Inamed has negative net worth, net liquidation value of essentially zero, and no resources to pay claims. The company has had to borrow heavily in order to stay afloat. The settlement is to be funded by additional borrowing available only in the context of this settlement, and the amount Inamed was able to raise for that purpose was constrained both by restrictions associated with its existing debt and the willingness of its lenders to assume the risk that the company's post-settlement operations would repay their investment. The record establishes that Inamed would be unable to raise such additional funds in the absence of this settlement, that the alternative of continued litigation of individual claims would drive Inamed to bankruptcy, and that the funds available to class members from this settlement are substantially greater than the funds, if any, that would remain for class members after an Inamed bankruptcy. Considering the record evidence of Inamed's financial condition, the court finds a substantial risk that an Inamed bankruptcy would leave all class members with nothing.

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 685 F.3d at 1307-08.

78.     Here, similarly, the three *Ortiz* factors are plainly satisfied.  First, and most importantly under *Ortiz*, the Debtors' estates have a negative net worth and the inability to satisfy the claims asserted against them.  Second, all of the assets of the Debtors' estates (after allowances for administrative expenses) will be applied to satisfying those claims.  Third, while there may be disagreements among the creditors and other stakeholders as to what percentage of the Debtors' assets should be allocated to the various classes of creditors, there is no disagreement that those creditors within each class (such as each NAS Child, within the greater category of NAS Children claimants) should and will be treated equitably (when compared to other claimants within their respective categories) within this process.  Certification of a Rule 23(b)(1) class would, in fact,

32

enhance the preservation of estate assets and enhance the equitable distribution of Purdue's limited assets as among this particular class of creditors.

### c. The NAS Children Also Satisfy the Requirements of Rule 23(b)(3).

79.     To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: (1) common questions must *predominate* over any questions affecting only individual members; and (2) class resolution must be *superior* to other available methods for the fair and efficient adjudication of the controversy.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614-615 (1997).  Both are met here.

### i. (Predominance) Common Questions Predominate Over Individual Issues.

80.     "Rule 23(b)(3) does not mandate that a plaintiff seeking class certification prove that each element of the claim is susceptible to class-wide proof."  *In re Whirlpool Corp.*, 722 F.3d at 859 (citing *Amgen*, 568 U.S. at 467-69).  Instead, "'[a] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individualized position.'"  *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 408 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001) (internal quotation marks omitted).

81.     "When Rule 23 is the mechanism to redress alleged RICO violations, predominance and commonality are satisfied if each element of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class."  *Reyes*, 802 F.3d at 489.  This is true even if "establishing an injury is not as conducive to common proof[,]" so long as a court is "satisfied that the plaintiffs have presented a plausible theory for

33

proving a class-wide injury as a result of the racketeering activities of the alleged enterprises at issue[.]" *Id.*

82.    The Guardians of NAS Children (and other NAS Children that have asserted claims) allege a single conspiracy relating to the sale and distribution of opioids from which all proposed class members' injuries arise, issues common to the proposed class members – for example, the existence and scope of the conspiracy among Debtor Purdue, Manufacturers, and/or the Distributors, the impact of their misrepresentations and omissions, the impact of their failures to report suspicious orders, and irregularities in opioid distribution patterns.    These issues predominate over any individual questions, and therefore class treatment of the claims is appropriate.    For these reasons, and the reasons set forth in the MDL Motion for Class Certification,[56] the predominance requirement is satisfied.

### ii.    (Superiority) The Filing of a Class Claim Is the Superior Method of Proceeding.

83.    Rule 23(b)(3) also requires that a class action be superior to other available methods of fairly adjudicating the controversy.    "Superiority mandates that the court determine that the class action is the best method of fairly and efficiently resolving the controversy." *Johnston*, 265 F.3d at 185.    "The superiority of class certification over other available methods is measured by consideration of certain factors, including: the class members' interests in controlling the prosecution of individual actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability of concentrating the litigation of

---

[56] MDL Motion for Class Certification, Doc. 3066-1, pp. 43-47.

{Client/085978/1/02135389.DOCX;2 }

various claims in the particular forum; and the likely difficulties in managing a class action."

*Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933, at \*4 (N.D. Ohio Mar. 8, 2010).

84.     Here, compared to the alternative of innumerable claims brought by individual class

members, a class claim is clearly the superior method of adjudication.  *See In re Terazosin*

*Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 700 (S.D. Fla. 2004) ("[m]ultiple lawsuits brought

by thousands of consumers and third-party payers in seventeen different states would be costly,

inefficient and would burden the court system.").  Indeed, it is unlikely that the class members, on

an individual basis, could obtain effective redress for the specific harms made the subject of the

Purdue NAS Children's Abatement Class Complaint (and indeed, relief for that harm can come

only through the class-wide abatement).  In other words, the abatement relief requested is only

effective and, therefore, available if provided on a class-wide basis.

85.     Further, the interests of the class members in this case in individually controlling

the pursuit of separate claims are also outweighed by the efficiency of the class mechanism.

Thousands of neonates and their caregivers have suffered from opioids; resolving these claims in

the context of a class claim would conserve both judicial and private resources and, also, conserve

the resources of the estate and expedite a recovery.  *See, e.g., In re Foundry Resins Antitrust Litig.*,

242 F.R.D. at 411-12 ("[r]epeatedly litigating the same issues in individual suits would produce

duplicate efforts, unnecessarily increase litigation costs, impose an unwarranted burden on this

Court and other courts, and create a risk of inconsistent results").  Indeed, the court system would

be adversely affected by such individualized litigation.  Individualized litigation would create the

danger of inconsistent or contradictory attempted abatements arising from the same set of facts.

Individualized litigation would also increase delay and expense to all parties and the court system

35

from the issues raised by this action.  In contrast, the class-action device provides the benefit of adjudication of these issues in a single proceeding, with economies of scale and comprehensive supervision by a single court.  For these reasons, as well as the reasons set forth in the MDL Motion for Class Certification,[57] the superiority requirement is satisfied.

### V.    CONCLUSION

86.    For the foregoing reasons, the Plaintiffs respectfully request this Court (i) grant the relief requested in this Motion an order substantially in the form of the proposed Order annexed hereto as **Exhibit K**; and (ii) such further relief as this Court deems just and equitable under the circumstances.

Dated:    July 9, 2020                              Respectfully submitted,
          New York, New York

                                                   */s/Scott S. Markowitz*
                                                   TARTER KRINSKY & DROGIN LLP
                                                   Scott S. Markowitz
                                                   1350 Broadway, 11th Floor
                                                   New York, NY  10018
                                                   Telephone: 212-216-8000
                                                   Facsimile: 212-216-8001
                                                   Email:  smarkowitz@tarterkrinsky.com

                                                   MARTZELL, BICKFORD & CENTOLA
                                                   Scott R. Bickford (LA 1165)
                                                   Spencer R. Doody (LA 27795)
                                                   338 Lafayette Street
                                                   New Orleans, LA 70130
                                                   Telephone: 504-581-9065
                                                   Facsimile: 504-581-7635
                                                   sbickford@mbfirm.com
                                                   srd@mbfirm.com
                                                   usdcndoh@mbfirm.com

---

[57] MDL Motion for Class Certification, Doc. 3066-1, pp. 47-49.

{Client/085978/1/02135389.DOCX;2 }

THE CREADORE LAW FIRM, P.C.
Donald Creadore (DEC-8984)
450 Seventh Avenue - 1408
New York, NY 10123
Telephone: 212-355-7200
Facsimile: 212-583-0412
Primary: donald@creadorelawfirm.com
Secondary: donald@aol.com

*Attorneys for Plaintiffs*