Hearing Date: July 23, 2020 at 2:00 p.m. (Prevailing Eastern Time)
Objection Deadline: July 20, 2020 at 4:00 p.m. (Prevailing Eastern Time)

Sander L. Esserman (admitted pro hac vice)
Peter C. D'Apice
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, TX 75201
Telephone:    214-969-4900
Facsimile:    214-969-4999
esserman@sbep-law.com
dapice@sbep-law.com
*Counsel to the C&A Tribes*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                              )
**In re**                                     )          **Chapter 11**
                                              )
**PURDUE PHARMA L.P.,** *et al.*,[1]          )          **Case No. 19-23649 (RDD)**
                                              )
        **Debtors.**                          )          **(Jointly Administered)**
                                              )
-----------------------------------------------------------x

**NOTICE OF HEARING ON MOTION BY CHEYENNE & ARAPAHO TRIBES AND**
**CERTAIN OTHER INDIAN TRIBES CLAIMANTS**
**PURSUANT TO FED. R. BANKR. P. 9014 AND 7023**
**TO PERMIT THE FILING OF A CLASS PROOF OF CLAIM**

        **PLEASE TAKE NOTICE** that on July 9, 2020, the "**Certain Tribes**" filed their *Motion*

*by Cheyenne & Arapaho Tribes and Certain Other Indian Tribes Claimants Pursuant to Fed. R.*

*Bankr. P. 9014 and 7023 to Permit the Filing of a Class Proof of Claim* (the "**Motion**"). A

hearing on the Motion will be held on **July 23, 2020, at 2:00 p.m. (Prevailing Eastern Time)**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014).

(the "**Hearing**") before the Honorable Judge Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**") or at such other time as the Bankruptcy Court may determine.

PLEASE TAKE FURTHER NOTICE that copies of the Motion may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion shall be in writing, shall comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399 and the Second Amended Order Establishing Certain Notice, Case Management, and Administrative

Procedures, entered on November 18, 2019 [Docket No. 498], so as to be filed and received no later than **Monday, July 20, 2020, at 4:00 p.m. (Prevailing Eastern Time)** (the "**Objection Deadline**").

      **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

      **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Certain Tribes may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

July 9, 2020
Dallas, Texas

                                    **STUTZMAN, BROMBERG, ESSERMAN**
                                    **& PLIFKA, A PROFESSIONAL**
                                    **CORPORATION**

                                    By: *Sander L. Esserman*

                                    Sander L. Esserman (admitted pro hac vice)
                                    Peter C. D'Apice
                                    2323 Bryan Street, Suite 2200
                                    Dallas, TX 75201
                                    Telephone:  (214) 969-4900
                                    Facsimile:  (214) 969-4999

                                    **COUNSEL TO THE C&A TRIBES**

Hearing Date: July 23, 2020 at 2:00 p.m. (Prevailing Eastern Time)
Objection Deadline: July 20, 2020 at 4:00 p.m. (Prevailing Eastern Time)

Sander L. Esserman
Peter C. D'Apice
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA,
A PROFESSIONAL CORPORATION
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
(214) 969-4900
(214) 969-4999 (facsimile)
esserman@sbep-law.com
dapice@sbep-law.com

T. Roe Frazer II
FRAZER PLC
30 Burton Hills Blvd., Ste 450
Nashville TN 37215
(T) 615.647.6464
(F) 866.314.2466
roe@frazer.law

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(T) 850.432.2451
jnd@beggslane.com
mjb@beggslane.com
jrz@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP, LLC
P.O. Box 2129
Fairhope, Alabama 36533
(T) 205.252.6127
ftk@thekuykendallgroup.com

*Counsel to the C & A Tribes*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| **PURDUE PHARMA, INC.,** *et al.,*[1] | **Case No. 19-23649 (RDD)** |
| **Debtors.** | **(Jointly Administered)** |

## MOTION BY CHEYENNE & ARAPAHO TRIBES
## AND CERTAIN OTHER INDIAN TRIBES CLAIMANTS
## PURSUANT TO FED. R. BANKR. P. 9014 AND 7023
## TO PERMIT THE FILING OF A
## CLASS PROOF OF CLAIM

---

[1] The Debtors in these Chapter 11 cases are: Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and other Purdue related entities or individuals. For ease of reference, "Purdue" as used herein, refers to all of the Debtor entities and persons.

# TABLE OF CONENTS

**JURISDICTION AND VENUE**.................................................................................................1

**BACKGROUND** ....................................................................................................................2

    **A.**   **The *Parens Patriae* Rights of Indian Tribes**...........................................................2

    **B.**   **The Debtors' Wrongful Conduct Harmed Tribal Members**..................................16

    **C.**   **Indian Tribes Are Suffering An Existential Threat**.............................................16

**MOTION AND RELIEF REQUESTED** .................................................................................17

**BASIS FOR RELIEF REQUESTED** .....................................................................................17

    **I.**     **THE COURT SHOULD EXERCISE ITS DISCRETION AND PERMIT THE C&A TRIBES CLAIMANTS TO FILE A CLASS CLAIM** ...............................................17

    **A.**   **The Court Has the Discretion to Apply Rule 7023 to Proofs of Claim.** ...............17

    **1.**    *Musicland* **Factor 1: This Motion Is Timely and Is Consistent with the Efficient Administration of the Estate.** ............................................................................20

    **2.**    *Musicland* **Factor 2: That a Class Was Not Certified Prior to the Bankruptcy Is Not a Sufficient Reason to Prevent Class Treatment.** ...............................................22

    **3.**    *Musicland* **Factor 3: The Members of the Putative Class Did Not Receive Notice of the Bar Date.** ........................................................................................................23

    **B.**   **Applying Rule 7023, the Court Should Grant the C&A Tribes' Motion to Proceed as a Class.** .............................................................................................................24

    **1.**    **The C&A Tribes Satisfy All of the Rule 23(a) Factors.** ......................................26

    **a.**   **Numerosity: The Class is So Numerous that It Is Impracticable to Bring All Class Members Before the Court.** ........................................................................26

    **b.**   **Commonality: Common Factual and Legal Question Exist.** ...............................27

    **c.**   **Typicality: The C&A Tribes Are Typical of the Class.** .......................................30

    **d.**   **Adequacy: The C&A Tribes and Their Attorneys Are Adequate.** .......................30

    **2.**    **The C&A Tribes Satisfy the Requirements of Rule 23(b).** ..................................32

**ALTERNATIVE MOTION AND REQUEST FOR RELIEF** ..................................................37

**CONCLUSION** ...................................................................................................................37

**NOTICE** .............................................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ..................................................... 34

*Amgen Ind. V. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455 (2013) ........................... 26

*Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565 (6th Cir. 2004) ........................... 27

*Baker v. Wash. Mut. Fin. Grp., LLC,* 193 Fed. App'x 294 (5th Cir. 2006)..................... 32

*Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3rd Cir. 1998) .............................................. 30

*Bradburn v. 3M,* No. Civ.A.02-7676, 2004 WL 1842987 (E.D. Pa. Aug. 18, 2004)................. 31

*Cason-Merenda v. VHS of Mich., Inc.* 296 F.R.D. 528 (E.D. Mich. 2013)..................... 25, 27, 35

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974)......................................................... 26

*Gentry v. Siegel,* 668 F.3d 83 (4th Cir. 2012)............................................................. 18, 22

*Golden v. City of Columbus,* 404 F. 3d 950 (6th Cir. 2005).............................................. 27

*Griffin v. Flagstar Bancorp Inc.* 2013 WL 6511860 (E.D. Mich. Dec. 12, 2013) ...................... 27

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996).................................................. 27

*In re Am. Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988)............................................... 18, 19

*In re Birting Fisheries, Inc.*, 92 F.3d 939 (9th Cir. 1996) .............................................. 18

*In re Chaparral Energy, Inc.,* 571 B.R. 642 (Bankr. D. Del. 2017)........................... 18, 19, 22, 23

*In re Charter Co.*, 876 F.2d. 866 (11th Cir. 1989) ...................................................... 18, 19

*In re Chiang,* 385 F.3d 2556 (3rd Cir. 2004)............................................................. 26, 28

*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380 (3rd Cir. 2015)......... 28

*In re Connaught Group, Ltd.*, 491 B.R. 88 (Bankr. S.D.N.Y. 2013).................................... 22

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ...................... 31

*In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003) ........................... 26

*In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1 (S.D.N.Y. 2005)....................................... 20

*In re First Interregional Equity Corp.*, 227 B.R. 358 (Bankr. D.N.J. 1998) .............................. 20

*In re Foundry Resins Antitrust Litig. Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2013
    WL 6511860, at *6 (E.D. Mich. Dec. 12, 2013)................................................... 30, 34

*In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007).................................... 27

*In re Kaiser Group Int'l Inc.,* 278 B.R. 58 (Bankr. D. Del. 2002) .............................. 19

*In re Kaiser Group Intern., Inc.,* 278 B.R. 58 (Bankr. D. Del. 2002) .............................. 22

*In re MF Glabal Inc.*, 512 B.R. 757  (Bankr. S.D.N.Y. 2014) ........................................ 22

*In re MF Global Inc.*, 512 B.R. 752 (Bankr. S.D.N.Y. 2014) ....................................... 23

*In re Motors Liquidation Co.*, 447 B.R. 150 (Bankr. S.D.N.Y. 2011) ........................... 20

*In re Musicland Holding Corp.*, 362 B.R. 644 (Bankr. S.D.N.Y. 2007) ............................... 19, 20

*In re Nat'l Prescription Opiate Litig.*, No. 1:17-CV-02804, 2019 WL 2477416 (N.D. Ohio Apr.
    1, 2019), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804,
    2019 WL 3737023 (N.D. Ohio June 13, 2019) ......................................................... 6

*In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-02804, 2019 WL 2468267 (N.D. Ohio Apr.
    1, 2019), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804,
    2019 WL 3737023 (N.D. Ohio June 13, 2019) ......................................................... 6, 7

*In re Pac. Sunwear of Cal, Inc.*, No. 16-10882, 2016 WL 3564484 (Bankr. D. Del. June 22, 2016)............................................................................................................................ 19, 20

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) ....................................... 34

*In re Sacred Heart Hosp.*, 177 B.R. 16 (Bankr. E.D. Pa 1995) ....................................... 23

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)................................ 34, 35

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, No. 2:97-cv-11441-RDP, 2010 WL 11506713 (N.D. Ala. May 19, 2010), *aff'd sub nom. Juris v. Inamed Corp.,* 685 F.3d 1294 (11th Cir. 2012)................................................................................................... 33

*In re Spring Ford Indus.*, 2003 WL 21785960 (Bankr. E.D. Pa. July 25, 2003)........................ 20

*In re Spring Ford Indus.*, No. 02-15015DWS, 2004 WL 231010 (Bankr. E.D. Pa. Jan. 20, 2004) ............................................................................................................................ 26

*In re Tarragon Corp.*, No. 09-10555 DHS, 2010 WL 3842409 (Bankr. D.N.J. Sept 24, 2010).. 20

*In re Trebol Motors Distrib. Corp.*, 220 B.R. 500 (1st Cir. 1998) ............................... 18

*In re United Cos. Fin. Corp.*, 276 B.R. 368 (Bankr. D. Del. 2002).............................. 19

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3rd Cir. 2004) ........................... 25

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) ....................................................................................................................... passim

*In re Zenith Labs, Inc.*, 104 B.R. 659 (D.N.J. 1989) ................................................ 18, 19

*In re: Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158 (E.D. Pa.1997) .................... 33

*Int'l Union v. Ford Motor Co.*, Nos. 05-74730, 06-10331, 2006 WL 1984363 (E.D. Mich. July 13, 2006).................................................................................................................... 30

*Johnston v. HBO Film Mgmt.*, 265 F.3d 178 (3rd Cir. 2001)................................... 28, 31

*Marcus v. Dep't of Revenue*, 206 F.R.D. 509 (D. Kan. 2002)....................................... 31

*McKay v. Novartis Pharm. Corp.*, 751 F.3d 694 (5th Cir. 2014)................................... 7

*Miccosukee Tribe of Indians of Fla. v. United States*, 680 F. Supp. 2d 1308 (S.D. Fla. 2010)...... 7

*Miccosukee Tribe of Indians of Fla. v. United States*, 716 F3d 535 (11th Cir. 2013)................... 7

*Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024 (2014) .......................................... 2

*Miller v. Univ. of Cincinnati*, 241 F.R.D. 285 (S.D. Ohio 2006) .................................. 26

*Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989) ........................... 6

*Neal v. Casey*, 43 F.3d 48 (3rd Cir. 1994) ...................................................... 28

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 259 F.3d 154 (3rd Cir. 2001)................. 30

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ............................................... 32, 33

*Powers v. Hamilton Cnty. Public Defender Comm*, 501 F.3d 592 (6th Cir. 2007) ...................... 35

*Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166 (N.D. Okla. 2009) .................... 7

*Reid v. White Motor Corp.*, 866 F.2d 1462 (6th Cir. 1989), *cert denied*, 494 U.S. 1080 (1990) .. 18

*Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3rd Cir. 2015) ....................................... 28, 35

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978).............................................. 2

*State Dept. of Health and Social Services v. Native Vil. of Curyung*, 151 P3d 388, 2006 WL 3691727 (Alaska 2006) .......................................................................................... 7

*Steward v. Abraham,* 275 F.3d 220 (3rd Cir. 2001)............................................. 26

*Stott v. Capital Fin. Servs., Inc.,* 277 F.R.D. 316 (N.D. Tex. 2011)............................... 33

*Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879 (9th Cir. 2001) .......... 7

*Thomas v. Bible*, 983 F.2d 152 (9th Cir.1993)................................................. 7

*United States v. Kagama*, 118 U.S. 375, 384 (1886) ...................................................... 3

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ......................................... 25, 26

*Worcester v. Georgia*, 6 Pet. 515, 559, 8 L.Ed. 483 (1832) ........................................ 2

## Statutes

11 U.S.C. § 105 .............................................................................................................. 1

11 U.S.C. § 501 ............................................................................................................ 18

25 U.S.C. § 1901 ............................................................................................................ 5

25 U.S.C. § 1901 (Supp. IV 2016) ............................................................................... 5

25 U.S.C. § 1901(3) ....................................................................................................... 5

25 U.S.C. § 1901(4), (5) ................................................................................................ 5

25 U.S.C. § 1911(a) ........................................................................................................ 6

25 U.S.C. § 1911(b) ........................................................................................................ 6

25 U.S.C. § 1915 ............................................................................................................ 6

28 U.S.C. § 1334 ............................................................................................................ 1

28 U.S.C. § 1408 ............................................................................................................ 1

28 U.S.C. § 157(b)(1) ..................................................................................................... 1

FEDERALLY RECOGNIZED INDIAN TRIBE LIST ACT OF 1994, PL 103–454, November 2, 1994, 108 Stat 4791 ....................................................................................................... 3

Indian Self-Determination and Education Assistance Act (ISDEAA), Pub. L. No. 93-638, 88 Stat. 2203 (codified as amended at 25 U.S.C. §§ 5301–5399) .................................... 5

U.S. CONST. art. I, § 8, cl. 3 ........................................................................................... 3

## Other Authorities

2 Newberg on Class Actions § 4:9 (4th ed. 2009) ...................................................... 32

84 Fed. Reg. 1200, 1204 (Feb. 1, 2019) ..................................................................... 27

Clifford E. Trafzer, As Long as the Grass Shall Grow and Rivers Flow: A History of Native Americans vii (2000) ..................................................................................................... 3

COHEN'S HANDBOOK, § 1.03[1] ...................................................................................... 5

David F. Herr, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 20.133 (4th ed. May 2019 Update) ................................................................................................................... 7

Geoffrey D. Strommer & Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 AM. INDIAN L. REV. 1, 21 (2015). .......................................................................................... 5

Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34863 (July 23, 2018) .................................................... 3

Indian Health Service, Opiod Crisis Data: Understanding the Epidemic, https://www.ihs.gov/opioids/data/ ................................................................................ 9

Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, "Illicit Drug Use, Illicit Drug Use Disorders, and Drug Overdose Deaths in Metropolitan and Nonmetropolitan Areas – United States," Oct. 20, 2017 (https://www.cdc.gov/mmwr/volumes/66/ss/pdfs/ss6619.pdf) ............................... 12

National Congress of American Indians, Policy Research Center, Research Policy Update: Responding to the Opiod Crisis: An Update for Tribal Leaders, http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief_NCAI_PRC_June_2017_FINAL.pdf ............................................. 9

National Congress of American Indians, Written Statement, U.S. Commission on Civil Rights Briefing, Feb. 19, 2016 (http://www.ncai.org/attachments/Testimonial_ljKocIPeClgYbRyqRUHwbKbLKaOPOpxgjXhliElDHxtqwlGkvZG_USCCR%20Briefing%20JJP%2002.19.16.pdf)................................... 14

Opioids in Indian Country: Beyond the Crisis to Healing the Community, Hearing Before the S. Comm. on Indian Affairs, 115th Cong. 15 (Mar. 14, 2018) ............................................... 11, 12

SAMHSA, "Results from the 2013 National Survey on Drug Use and Health:  Summary of National Findings," (https://www.samhsa.gov/data/sites/default/files/NSDUHresultsPDFWHTML2013/Web/NSDUHresults2013.pdf) ........................................................................................................ 13

SAMHSA, "Results From the 2016 National Survey on Drug Use and Health: Detailed Tables (https://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2016/NSDUH-DetTabs-2016.pdf) ............................................................................................................................. 12

Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 577 (J.P.M.L. 1978) ........................................................... 7

Statement by RADM Michael E. Toedt, MD, FAAFP, "Opioids in Indian Country:  Beyond the Crisis to Healing the Community," March 14, 2018 Hearing Before the U.S. Senate Committee on Indian Affairs,................................................................................................. 11

Suzette Brewer, Tribes lead the battle to combat a national opioid crisis , May 9, 2018 https://www.hcn.org/articles/tribal-affairs-tribes-lead-the-battle-to-combat-a-national-opioid-crisis ....................................................................................................................................... 14

Suzette Brewer, Tribes Lead the Battle to Combat a National Opioid Crisis, HIGH COUNTRY NEWS (May 9, 2018), https://www.hcn.org/articles/tribal-affairs-tribes-lead-the-battle-to-combat-a-national- opioid-crisis [https://perma.cc/7L5Q-BS5T] ............................................... 8

Swaim, R., et al, "Substance Use Among American Indian Youths on Reservations Compared With a National Sample of US Adolescents," JAMA Network Open, 2018; 1(1):e180382. doi:10.1001/jamanetworkopen.2018.0382 (https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2682593)............................ 13

Testimony of Christopher M. Jones, "Opioids in Indian Country:  Beyond the Crisis to Healing the Community," March 14, 2018 Hearing Before the U.S. Senate Committee on Indian Affairs (https://www.indian.senate.gov/sites/default/files/3.14.18_Opioids_SAMHSA%20Testimony.pdf) ...................................................................................................................................... 12

Tipps, R., et al, "The Opioid Epidemic in Indian Country, Jrl of Law, Medicine & Ethics, 46 (2018) 422-436, DOI: 10.1177/1073110518782950................................................................ 12

Treaty with the Flatheads, etc., arts. I, V, Flatheads-U.S., July 16, 1855, 12 Stat. 975, 975–77 ... 4

U.S. Commission on Civil Rights, "A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country,"  July, 2003  (https://archive.org/details/ERIC_ED480450) ...................................... 13

**Rules**

Fed. R. Bankr. P. 3001 ........................................................................................................ 1
Fed. R. Bankr. P. 3011 ...................................................................................................... 18
Fed. R. Bankr. P. 7023 ................................................................................................. passim
Fed. R. Bankr. P. 9014 ........................................................................................................ 1
Fed. R. Bankr. P. 9014(c) ............................................................................................. 17, 18
Fed. R. Civ. P. 23 .............................................................................................................. 18
Fed. R. Civ. P. 23(a) ..................................................................................................... 25, 30
Fed. R. Civ. P. 23(a)(1) ..................................................................................................... 27
Fed. R. Civ. P. 23(a)(2) ..................................................................................................... 27
Fed. R. Civ. P. 23(a)(3) ..................................................................................................... 30
Fed. R. Civ. P. 23(a)(4) ..................................................................................................... 30
Fed. R. Civ. P. 23(b) ..................................................................................................... 25, 34
Fed. R. Civ. P. 23(b)(1) ..................................................................................................... 32
Fed. R. Civ. P. 23(b)(1)(B) ............................................................................................... 32
Fed. R. Civ. P. 23(g) ......................................................................................................... 31

**Hearing Date: July 23, 2020 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Deadline: July 20, 2020 at 4:00 p.m. (Prevailing Eastern Time)**

Cheyenne & Arapaho Tribes, joined in this Motion by certain other Indian Tribes[2] (collectively, the "C&A Tribes"), on behalf of themselves and all other federally recognized Indian Tribes similarly situated, by and through their undersigned counsel, hereby move this Court pursuant to Section 105 of Title 11 of the United States Code ("Bankruptcy Code"), and Fed. R. Bankr. P. 9014 and 7023 for the entry of an order exercising this Court's discretion to apply Fed. R. Bankr. P. 7023 to the "Indian Tribes Class Proof of Claim" (hereinafter "Class Proof of Claim" or "Class Claim") pursuant to Fed. R. Bankr. P. 3001, and pursuant to Fed R. Bankr. P. 7023, to allow a Class Claim brought on behalf of the tribal members of all federally recognized Indian Tribes.

## JURISDICTION AND VENUE

The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(1) and (2)(A). Venue is proper in this district under 28 U.S.C. § 1408.

---

[2] Other federally recognized Indian Tribes joining in this Motion are: Bad River Band of Lake Superior Tribe of Chippewa Indians, Battle Mountain Band of Te-Moak Tribe of Western Shoshone Indians, Big Sandy Rancheria of Mono Indians, Big Valley Band of Pomo Indians, Cahto Tribe of the Laytonville Rancheria, Che-Ae Heights Indian Community of the Trinidad Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians, Chitimacha Tribe of Louisiana, Confederated Tribes of the Goshute Reservation, Coquille Indian Tribe, Coyote Valley Band of Pomo Indians, Elko Band of the Te Moak Tribe of Western Shoshone Indians, Ely Shoshone Tribe of Nevada, Ewiiaapaayp Band of Kumeyaay Indians, Fallon Paiute-Shoshone Tribe, Fond du Lac Band of Lake Superior Superior Chippewa, Guidiville Rancheria of California, Ho-Chunk Nation, Hopland Band of Pomo Indians, Koi Nation, Lac Courte Oreilles Band of Lake Superior, Lac du Flambeau Band of Lake Superior Indians, Manchester Band of Pomo Indians, Mentasta Traditional Council, Pinoleville Pomo Nation, Poarch Band of Creek Indians, Potter Valley Tribe, Pueblo of Pojoaque, Pyramid Lake Paiute Tribe, Red Cliff Band of Lake Superior Chippewa, Redwood Valley Tribe, Resighini Rancheria, Reno-Sparks Indian Colony, Robinson Rancheria of Pomo Indians, Round Valley Indian Tribes, Scotts Valley Band of Pomo Indians, Shinnecock Indian Nation, South Fork Band of the Te-Moak Tribe of Western Shoshone Indians, St. Croix Chippewa Indians of Wisconsin, Walker River Paiute Tribe, Wampanoag Tribe of Gay Head (Aquinnah), Narragansett Indian Tribe, Kickapoo Traditional Tribe of Texas, and Mohegan Tribe in Connecticut.

# BACKGROUND

The Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors continue to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code Sections 1007(a) and 1108. The United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors ("UCC") pursuant to Bankruptcy Code Section 1102. The movant here, the Cheyenne & Arapaho Tribes, serves as an *ex officio* member of the UCC. The Cheyenne & Arapaho Tribes is the only tribe on the UCC, and throughout its service, has sought to represent the sovereign interests, rights, and claims of all tribes in that *ex officio* capacity within this Bankruptcy proceeding.

## A.  The *Parens Patriae* Rights of Indian Tribes

Many Americans do not realize that Indian tribal governments continue to survive and thrive within the borders of the United States. Tribal sovereignty comes, first and foremost, from tribal law. Indian tribes are "separate sovereigns pre-existing the Constitution[,]" *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). The United States continues to recognize that Tribes persist as "'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo*, 436 U.S. at 55, (quoting *Worcester v. Georgia*, 6 Pet. 515, 559, 8 L.Ed. 483 (1832)).[3] Indian Tribes pre-existed every State, every State Attorney General's office, every city, and every county in the United States.[4] Likewise, the unique relationship of tribal governments and tribal members pre-existed these younger institutions. This understanding was

---

[3] When the United States organized itself under the Constitutional Convention, Tribes were not parties to the Convention, and unlike the States, Tribes did not consent to incorporation into the United States or surrender any sovereign rights as part of that Convention. *See, e.g., Bay Mills Indian Cmty.*, 134 S. Ct. at 2031.

[4]  Unlike states, cities, and counties, Indian tribes are not taxing authorities.

reflected in the Constitution, as well, which reserves for Congress the exclusive power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.[5]

Today, the United States federal government extends formal recognition to 574 tribal entities, commonly referred to as "federally recognized tribes." *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34863 (July 23, 2018). As a result of federal recognition, all recognized tribes "maintain[] a government-to-government relationship" with the United States, which in turn "recognizes the sovereignty of those tribes[.]"  FEDERALLY RECOGNIZED INDIAN TRIBE LIST ACT OF 1994, PL 103–454, November 2, 1994, 108 Stat 4791. Many of these tribes, including the Cheyenne & Arapaho Tribes, are recognized as sovereign governments by virtue of various treaties between the tribes and the U.S. Government. States and their political subdivisions, cities and counties, are not parties to these treaties and have no authority to interfere in any way with these treaties.[6]

Thus, "[i]n many ways, the past is the present in native history."[7] For tribes, the opioid crisis is another in a series of existential threats from non-Native Americans challenging their members' well-being and generational survival. The impacts of the opioid crisis in Indian Country, and the best hopes for sustaining tribal lives, are intertwined with historical and legal forces

---

[5] The apportionment clauses, by excluding "Indians not taxed" from the population count for purposes of representation in Congress, also appears to recognize the separate political status of tribes. *Id.* art I, § 2, cl. 3, *superseded by id.* amend. XIV, § 2 (apportioning representation according to population, "excluding Indians not taxed").

[6]  In *United States v. Kagama*, 118 U.S. 375, 384 (1886), the Supreme Court commented that Tribes "owe no allegiance to the States, and receive from them, no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies."

[7] Clifford E. Trafzer, As Long as the Grass Shall Grow and Rivers Flow: A History of Native Americans vii (2000) [hereinafter *Trafzer*]. Unless another source is specifically cited, the history that follows is outlined in Professor Trafzer's (Wyndot) book, although it is catalogued in many other sources and maintained through tribal oral histories.

shaping the everyday life of American Indian and Alaska Native people through the parens patriae exercise of tribal governmental authority. The importance of these historical lessons must not be underestimated.

Following the adoption of the United States Constitution, treaties between the United States and Indian tribes served as formal recognition of tribal sovereignty and government-to-government relationships. Federal Indian policy has undergone a series of pendulum swings, with relics of each policy era "on the books" today – a patchwork of conflicting policy goals, judicial decisions, Acts of Congress, executive orders, administrative rules and decisions, specialized federal agencies and departments, with an entire chapter in the U.S. Code bearing on nearly every aspect of tribal existence. In conjunction with these federal forces, the actions of state governments and private individuals, often seeking to encroach upon or profit from tribal land and resources through fraud, coercion, or outright violence, have left an indelible mark on Indian life over the years. Yet what has remained constant throughout the centuries is the *parens patriae* role of tribal governments into the minutiae of the daily lives of its tribal members.

Through most of the 19th century, the United States continued to enter into and honor—at least officially—treaties with Indian nations.  In many treaties, the United States agreed to take tribes under "protection" and provide annuities or payments, goods, supplies, health services, and educational resources in exchange for settlement rights to vast quantities of land and commitments of peace.[8]  The origins of many of the federal service programs for Indians today, including health care programs for Indians, can be traced to these treaty promises as well as the broader federal

---

[8] *See, e.g.*, Treaty with the Six Nations, preamble, Oct. 22, 1784, 7 Stat. 15, 15 ("The United States of America give peace to the Seneca's, Mohawks, Onondagas and Cayugas, and receive them into their protection[.]"); Treaty with the Flatheads, etc., arts. I, V, Flatheads-U.S., July 16, 1855, 12 Stat. 975, 975–77 (promising "to erect a hospital, keeping the same in repair, and provided with the necessary medicines and furniture, and to employ a physician" for a period of 20 years).

trust responsibility, which itself arose in part from the development and implementation of federal Indian laws and policies that otherwise benefitted white Americans at the expense of tribal interests. Thus, these trust services are viewed by Tribes as a continuing obligation arising from the cession of vast amounts of land, and other historical dealings.[9]

Many federal enactments put a spotlight on the *parens patriae* character of Indian tribes. For example, the Indian Self-Determination and Education Assistance Act (ISDEAA)[10] established statutory framework for the new federal policy of self-determination. The ISDEAA allows tribes to take over federal programs for Indians (including health programs) by contracting with the federal government to carry them out, "[i]n effect . . . step[ping] into the shoes of the federal [agencies]" that formerly provided those programs and services.[11] Over the years, the ISDEAA has had a profound impact on the personal delivery of governmental services by Indian tribes directly to Indian people.

Another example is the Indian Child Welfare Act ("ICWA"), 25 U.S.C. § 1901 *et seq*. In enacting the ICWA in 1978, Congress recognized "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children[.]" 25 U.S.C. § 1901(3). This is a truth that the C&A Tribes have known since time immemorial, but it was driven home by decades of unwarranted removals of Indian children from Indian families by non-Indian child welfare agencies and private adoption agencies, in many cases aided by the States and State courts. *See* 25 U.S.C. § 1901(4), (5) (Congressional findings). In a tragic reflection of the earlier boarding

---

[9] *See* COHEN'S HANDBOOK, § 1.03[1]; 25 U.S.C. § 1901 (Supp. IV 2016) ("Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources[.]").

[10] Pub. L. No. 93-638, 88 Stat. 2203 (codified as amended at 25 U.S.C. §§ 5301–5399).
[11] Geoffrey D. Strommer & Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 AM. INDIAN L. REV. 1, 21 (2015).

school policies, studies referenced in ICWA's legislative history revealed that large numbers of Indian children (between 25% - 35%) were being separated from their parents, extended families, and communities, with an overwhelming percentage (approximately 90%) placed outside of their families and communities—even when relatives were available. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32–33 (1989) (citing and summarizing legislative history and associated reports). To help abate this crisis, ICWA clarified the jurisdictional framework for child custody proceedings involving Indian children and families, providing tribes with federally authorized tools to try to reverse these trends. ICWA reinforced the C&A Tribes right to exercise its *parens patriae* authority to protect tribal children, families, and culture.[12]

The *parens patriae* character of the C&A Tribes has been recognized in the national prescription opiates litigation. The court in MDL 2804 established an "Indian Tribe Track" within the MDL so that the C&A Tribes would have autonomy within the greater litigation. The active litigation participation by the C&A Tribes resulted in an unprecedented amicus brief filed by 400+ tribes in support of all issues relating to tribes, including their substantive claims against the opioid industry defendants. Consequently, the MDL Court upheld *parens patriae* state-law claims against the opioid industry defendants filed by the Muscogee Creek (Oklahoma) and Blackfeet (Montana) Indian tribes.[13] Separate Reports and Recommendations in *Muscogee* and *Blackfeet* were adopted in all relevant respects in a single order by the MDL court on June 13, 2019.

---

[12] For example, ICWA confirms exclusive tribal court jurisdiction over on-reservation child custody matters, 25 U.S.C. § 1911(a); establishes a presumption for transfer to tribal court jurisdiction over off-reservation cases involving Indian children, 25 U.S.C. § 1911(b); and establishes preferences for placement of Indian children in foster care and adoptions, 25 U.S.C. § 1915.

[13] *In re Nat'l Prescription Opiate Litig.* (*"Muscogee"*), No. 1:17-MD-02804, 2019 WL 2468267, at *1 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019): *In re Nat'l Prescription Opiate Litig.* (*"Blackfeet"*), No. 1:17-CV-02804, 2019 WL 2477416, at *1 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019).

The MDL court found the claims were adequately pled and viable under Oklahoma law[14]. In both tribal bellwether cases, the MDL court found the tribes adequately pled *parens patriae* standing. *See Muscogee*, 2019 WL 2468267, at *32 (Report and Recommendation) (finding Muscogee "sufficiently ple[]d a right commonly held by Plaintiff's citizens to be free from a crisis of epidemic proportions that interferes with a general common right to public health, safety and welfare—a right exercised through the local government's provision of protective, preventative, and ameliorative services, which Plaintiff alleges are being consumed by the costs attending the opioid crisis."); *Blackfeet*, 2019 WL 2477416, at *6, 11–12.

Tribes have been allowed to pursue *parens patriae* claims in a number of contexts. *See Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1178 (N.D. Okla. 2009) (Indian tribes have standing to sue to protect *parens patriae* interests); *Miccosukee Tribe of Indians of Fla. v. United States*, 680 F. Supp. 2d 1308, 1315 (S.D. Fla. 2010) (holding that the Miccosukee Tribe alleged harm that was sufficient to support *parens patriae* standing) aff'd *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F3d 535 (11th Cir. 2013). *See also State Dept. of Health and Social Services v. Native Vil. of Curyung*, 151 P3d 388, 400, 2006 WL 3691727 (Alaska 2006) (finding that Alaska Native Villages have *parens patriae* standing when some of its members rights are violated);  *See Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 88 (9th Cir. 2001).

---

[14] The Cheyenne & Arapaho Tribes occupy a multiple-county area within the state of Oklahoma, and thus the MDL court's rulings would be directly applicable to their claims. As with any MDL proceeding, the "purpose and usefulness of transfer under Section 1407" would be "undermin[ed]" if "transfer judges were permitted to upset rulings of transferee judges" without good cause. David F. Herr, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 20.133 (4th ed. May 2019 Update) (*citing* Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575, 577 (J.P.M.L. 1978)).  "The law of the case doctrine requires attention to the special authority granted to the multidistrict transferee judge and ensures that transferor courts respect the transferee court's decisions." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 705 (5th Cir. 2014). Thus, the law of the case doctrine typically results in the following of transferee court rulings unless those rulings were "clearly erroneous" or there was an "intervening change in the law" or fact. *See Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir.1993).

### The Devastating Impacts of the Opioid Crisis on Indian People

For years, Indian Country has been flooded with opioid prescriptions that have led to escalating rates of addiction, disability, death, and harm to Indian people. The statistics are staggering and tell a horrific story of the impact of the opioids epidemic on American Indians and Alaska Natives ("AI/AN") that is disproportionate to the impact nationwide.  Grounded in inherent tribal sovereignty, the parens patriae authority of tribes has helped virtually all tribal members survive the opioid epidemic. Yet the opioid epidemic is overwhelming Indian people as they struggle to cope with a severe lack of resources, historical trauma to their people, and other challenges. The opioid crisis is not only the latest such challenge, but it is also proving to be one of the most costly in terms of the human costs to Indian lives, adults and children, their communities, and their cultures.  "Having survived numerous wars, famine, disease epidemics, the violent breakup of their territories and the consequent legal struggle to achieve sovereignty, the tribe now face[s] an existential crisis—one that ha[s] been brewing in the shadows long before anyone grasped its impact or could organize a response. No longer a discrete series of isolated incidences, opioid addiction had taken on a genuine sense of urgency." [15]

Data show higher rates of opioid prescriptions and adverse outcomes for those that are facing trauma and chronic pain; many tribes link opioid misuse to historical trauma. As one leader said, "There is common agreement that our community's drug epidemic is rooted in

---

[15] Suzette Brewer, Tribes Lead the Battle to Combat a National Opioid Crisis, HIGH COUNTRY NEWS (May 9, 2018), https://www.hcn.org/articles/tribal-affairs-tribes-lead-the-battle-to-combat-a-national- opioid-crisis [https://perma.cc/7L5Q-BS5T]

historical and generational trauma. There is also common agreement that, as a tribe, we are strong and resilient and can create support…in order to heal the next generation."[16]

According to CDC Wonder data, Native Americans have the highest rate of opioid-related deaths (per capita) than any other ethnic group, and the highest increase in number of deaths related to opioid-use disorder. In addition to this, they have significant barriers to receiving care – data shows that only one in eight Native Americans who needs treatment receives it. Data also shows that the projected non-medical use for Indian youth is twice the estimated rate for white youths.[17]

Also, American Indian women have the highest risk of dying from an opioid OD, and their babies have a high rate of being born with NAS. Recommendations were released in March 2019 to establish a unified pathway for OUD treatment in these women – universal screening, MAT, prenatal/postpartum care, and recovery. The opioid epidemic "tears at the social fabric of tribes, prevents transmission of cultural knowledge, and undermines the health of the whole community." It is causing an existential threat to tribal culture in a variety of ways. It is tearing apart communities, and it is causing a loss of cultural health. In addition, due to the nature of treatment currently, many who are suffering are removed from the community for treatment, which only exacerbates the issues around cultural health. Most importantly, there is a lost generation – many grandparents are now caring for their grandchildren as the middle generation is suffering from addiction or its impact. Not only does this impact tribal identity, it is having an impact on traditional identities within a tribe. The data collected across the country backs up the lived experiences of Native Americans.

---

[16] National Congress of American Indians, Policy Research Center, Research Policy Update: Responding to the Opioid Crisis: An Update for Tribal Leaders, http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief_NCAI_PRC_June_2017_FINAL.pdf
[17] Indian Health Service, Opioid Crisis Data: Understanding the Epidemic, https://www.ihs.gov/opioids/data/

According to the online National Survey on Drug Use and Health RDAS system:

- In 2006-2013, Native Americans comprised 2.0 % of the US population ages 12 and over but accounted for 2.7% of opioid misusers and 3.0% of people with opioid use disorders. Their relative risk of misuse was approximately 1.35 times the non-Native population and their relative risk of a use disorder was 1.5 times the non-Native populations.

- In 2006-2013, 16.3% of Native Americans ages 12 and over had ever misused prescription opioids, 6.3% currently were misusing, and 1.1% had active use disorders. These problem rates exceeded rates in the rest of the US population. Native Americans comprised 2.0% of the US population ages 12 and over but accounted for 2.4% of people who had ever misused prescription opioids, 2.7% of current misusers, and 3.0% of people with opioid use disorders. Their relative risk of current misuse was 1.34 times the non-Native population and their relative risk of a use disorder was 1.49 time the non-Native population.

- In 2015-2018, 10.6% of Native Americans ages 12 and over had ever used prescription opioids, 5.5% were currently misusing, and 1.1% had active use disorders. These problem rates exceeded the rates in the rest of the US population. Native Americans comprised 2.5% of the US population ages 12 and over but accounted for 2.6% of people who had ever misused prescription opioids, 3.3% of current misusers, and 3.9% of people with opioid use disorders. Their relative risk current misuse was 1.32 times the non-Native population and their relative risk of a use disorder was 1.63 times the non-Native population.

It should be noted that tabulating data from the National Survey on Drug Use and Health system indicates that the commonly used non-Hispanic Native American category in national statistics omits 30% of the Native American population.  As a result, the numbers above and those that follow often are significantly understated.

The depth of the crisis in Indian Country is not surprising given the high volume of opioid prescriptions dispensed to AI/ANs. Statistics on the Cherokee Nation, the largest federally recognized tribe in the United States, exemplify the opiate flood. Notably, the Oklahoma Bureau of Narcotics reported that in 2015 over 97 million dosage units (defined as one pill) of opioids were distributed in the 14 Oklahoma counties comprising part of the Cherokee Nation's tribal jurisdiction, which amounts to 107 opioid pills per every adult in those counties.[18] Data for 2016 reveal  distribution of over 87 million opioid pills, or 96 per every adult, in these same counties.[19]

Death rates attributable to opioids overdoses have steadily climbed over the years and reflect the severe impact of the opioids crisis on American Indians and Alaska Natives.[20] In fact, in less than a twenty-year period, AI/AN have experienced a fivefold increase in deaths by drug overdose.[21]In testimony before the U.S. Senate Committee on Indian Affairs, Dr. Michael Toedt, who serves as the Chief Medical Officer for the IHS, observed that "[t]he Centers for Disease Control and Prevention ("CDC") reported that American Indians and Alaska Natives had the highest drug overdose death rates in 2015 and the largest percentage increase in the number of deaths over time from 1999-2015 compared to other racial and ethnic groups."[22] For these

---

[18] *McKesson Corp., et al. v. Hembree*, No. 4:17-cv-00323-TCK-FHM (N.D. Okla. July 21, 2017), Doc. No. 87 (Declaration of Chrissi R. Nimmo in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction).
[19] *Id.*
[20] https://www.census.gov/newsroom/facts-for-features/2016/cb16-ff22.html.
[21] Opioids in Indian Country: Beyond the Crisis to Healing the Community, Hearing Before the S. Comm. on Indian Affairs, 115th Cong. 15 (Mar. 14, 2018) (statement of Rear Admiral Michael Toedt, Chief Medical Officer of the Indian Health Service).
[22] Statement by RADM Michael E. Toedt, MD, FAAFP, "Opioids in Indian Country:  Beyond the Crisis to Healing the Community," March 14, 2018 Hearing Before the U.S. Senate Committee on Indian Affairs,

indigenous people, the increase in drug-related deaths in those years was greater than 500 percent.[23]

The CDC WONDER database on causes of death reveals that the age-adjusted annual mortality rate for opioid overdose deaths among American Indians and Alaska Natives rose from 2.9 per 100,000 in 1999 to 13.9 per 100,000 in 2016, thus reflecting the steep rise.[24] In fact, in less than a twenty-year period, AI/AN have experienced a fivefold increase in deaths by drug overdose.[25]Sadly, due to race and ethnicity misclassifications on death certificates, these alarming statistics likely underestimate the true number of deaths by as much as 35 percent.[26] That said, experts agree that, in 2007-2017, at least 5,000 Native Americans died from opioid overdoses.

Drawing on data from the 2016 National Survey on Drug Use and Health, Dr. Christopher Jones, with the Substance Abuse and Mental Health Services Administration ("SAMHSA"), also testified in the Senate Committee on Indian Affairs hearing that "5.2 percent (72,000) of AI/AN aged 18 and older reported misusing a prescription drug in the past year and 4.0 percent (56,000) aged 18 and older reported misusing a prescription pain reliever in the past year."[27]    These and related data are particularly troubling as they are related to the health prospects of the next

(https://www.indian.senate.gov/sites/default/files/upload/HHS%20IHS%20testimony%20Opioids%20Indian%20Country%20SCIA%203-14-18%20revised.pdf.), citing to Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, "Illicit Drug Use, Illicit Drug Use Disorders, and Drug Overdose Deaths in Metropolitan and Nonmetropolitan Areas – United States," Oct. 20, 2017 (https://www.cdc.gov/mmwr/volumes/66/ss/pdfs/ss6619.pdf).
[23] Id.
[24] Tipps, R., et al, "The Opioid Epidemic in Indian Country, Jrl of Law, Medicine & Ethics, 46 (2018) 422-436, DOI: 10.1177/1073110518782950.
[25] Opioids in Indian Country: Beyond the Crisis to Healing the Community, Hearing Before the S. Comm. on Indian Affairs, 115th Cong. 15 (Mar. 14, 2018) (statement of Rear Admiral Michael Toedt, Chief Medical Officer of the Indian Health Service).
[26] Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, "Illicit Drug Use, Illicit Drug Use Disorders, and Drug Overdose Deaths in Metropolitan and Nonmetropolitan Areas – United States," Oct. 20, 2017, at 11 (https://www.cdc.gov/mmwr/volumes/66/ss/pdfs/ss6619.pdf).
[27] Testimony of Christopher M. Jones, "Opioids in Indian Country: Beyond the Crisis to Healing the Community," March 14, 2018 Hearing Before the U.S. Senate Committee on Indian Affairs (https://www.indian.senate.gov/sites/default/files/3.14.18_Opioids_SAMHSA%20Testimony.pdf), citing to SAMHSA, "Results From the 2016 National Survey on Drug Use and Health: Detailed Tables (https://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2016/NSDUH-DetTabs-2016.pdf).

generation of Native Americans: the projected nonmedical opioid use rate for AI/AN youth is twice the estimated rate for white youths.[28]

A recent population-based study further demonstrates the susceptibility of Native American youth to opioids abuse. The study surveyed American Indian students in the 8th, 10th, and 12th grades living on or near reservations and found that this group of young people "reported substantially higher lifetime and last-30 day substance use" than a national sample of students of comparable age.[29] SAMHSA also found in its 2013 survey on drug use that American Indians and Alaska Natives ages 12 and over used illicit drugs, including non-medical use of prescription pain relievers, at a rate of 12.3 percent, which is the second highest of any one ethnic group.[30]

The data thus makes clear that the harsh realities of the opioid crisis have hit tribal members in multiples over the general U.S. population. The devastating impact is exacerbated for American Indians and Alaska Natives by the shortage of resources and funding not only for opioid abuse treatment, but also for treatment of the root causes of chronic pain that lead to opioid use and related problems. In 2003, the U.S. Commission on Civil Rights examined the state of federal assistance programs for American Indians and Alaska Natives and concluded that:

> [F]ederal funding directed to Native Americans through programs at these agencies has not been sufficient to address the basic and very urgent needs of indigenous peoples. Among the myriad unmet needs are: heath care, education, public safety, housing, and rural development.[31]

---

[28] Addressing the Opioid Epidemic in American Indian and Alaska Native Communities, NAT'L INDIAN HEALTH BD., https://www.nihb.org/docs/09182017/Opioids%20One%20pager.PDF [https://perma.cc/CA8A-DYXD] (last visited Apr. 23, 2019).

[29] Swaim, R., et al, "Substance Use Among American Indian Youths on Reservations Compared With a National Sample of US Adolescents," JAMA Network Open, 2018; 1(1):e180382. doi:10.1001/jamanetworkopen.2018.0382 (https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2682593).

[30] SAMHSA, "Results from the 2013 National Survey on Drug Use and Health: Summary of National Findings," at 15, 26 (https://www.samhsa.gov/data/sites/default/files/NSDUHresultsPDFWHTML2013/Web/NSDUHresults2013.pdf).

[31] U.S. Commission on Civil Rights, "A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country," July, 2003, at 5 (https://archive.org/details/ERIC_ED480450).

In hearings held by the Commission in 2016 to update the status of these unmet needs, the National Congress of American Indians ("NCAI") noted that while funding has increased somewhat "many tribes have faced continued emergencies in meeting the basic public service needs of their citizens."[32] In light of these existing deficits, the opioid crisis has pushed many tribal communities to the breaking point.

Tribes in their *parens patriae* capacity see to the needs of the most vulnerable victims of the opioid epidemic: children and elders. "[T]he money that we're spending on treatment alone has impacted us to the point that we have exhausted all of our funding," says Kathleen Preuss, director of social services for the Upper Sioux Community in Granite Falls, Minnesota. "We spend approximately 70 to 80 percent of our time and resources on dealing with problems related to opiates," says Preuss. "We see what's happening to our people, and we are overwhelmed." [33]

The impact to children and families is devastating. In the years since ICWA was passed, tribes have implemented programs and established departments to utilize the opportunities provided by ICWA to protect Indian children and keep Indian families intact. In many tribal communities, there has been a significant rise in the number of children born to opioid-addicted parents. Often, this means both that the parents are unable to care for the child and that the child is born dependent on opioids. As a result, the tribe becomes responsible for taking care of children who are particularly vulnerable and in need of critical and continuing medical attention. Tribes have experienced a significant increase in the volume of child dependency cases as more and more tribal parents struggle with addiction and are unable to provide adequate care and supervision for

---

[32] National Congress of American Indians, Written Statement, U.S. Commission on Civil Rights Briefing, Feb. 19, 2016 (http://www.ncai.org/attachments/Testimonial_ljKocIPeClgYbRyqRUHwbKbLKaOPOpxgjXhliElDHxtqwlGkvZG_USCCR%20Briefing%20JJP%2002.19.16.pdf).
[33] Suzette Brewer, Tribes lead the battle to combat a national opioid crisis , May 9, 2018  https://www.hcn.org/articles/tribal-affairs-tribes-lead-the-battle-to-combat-a-national-opioid-crisis

their children.[34] In the hope of keeping tribal families together and preserving their cultural heritage, tribes work directly on dependency and placement issues to help affected children and their families.[35]

Despite their *parens patriae* care of their children, many tribes are finding it difficult to keep up with the number of children who end up in their care as a result of opioid addiction. For example, the Nez Perce Tribe's social services are committed to providing safe, enriching, and ongoing homes and services for children who have been removed from their homes. But, the scope of the opioid epidemic threatens to overwhelm the Tribe's limited resources.[36] The Nez Perce  take care of children who have been removed from parental care.[37] In prior years, six weeks might pass when no Nez Perce children were in the care of the Children's Home, allowing social workers and caregivers to clean and restock the facility.[38] Because of the opioid epidemic, however, the Children's Home has not been empty at any time for *years*,[39] primarily for infants experiencing withdrawal.[40] According to staff, one hundred percent of the children taken under care at the Nez Pearce Children's Home are referred because of drug abuse,[41] and that since June 2017, the number of children in care has increased by 265%.  The Lummi Nation estimates that addiction is the primary or secondary safety issue for approximately 95% of its child welfare cases.[42]

---

[34] *See, e.g.*, Tulalip Tribes Complaint ¶ 398. All references to a particular "Complaint" in the footnotes are to complaints filed in MDL No. 2804.
[35] *See, e.g.*, *id.*
[36] Nez Perce Complaint ¶ 390.
[37] *Id.* ¶ 394.
[38] *Id.* ¶ 20.
[39] *Id.*
[40] *Id.* ¶ 395.
[41] *Id.*
[42] Lummi Nation Complaint ¶ 19.

**B.   The Debtors' Wrongful Conduct Harmed Tribal Members**

The C&A Tribes will in the Class Proof of Claim set forth the facts showing the Debtors' culpability and the legal claims for relief, all of which are quite known to Debtors.

**C.   Indian Tribes Are Suffering An Existential Threat**

The Centers for Disease Control reported that American Indians and Alaska Natives had the highest drug overdose death rates in 2015 and the largest percentage increase in the number of deaths over time from 1999-2015 compared to other racial and ethnic groups. During that time, deaths rose more than 500% among American Indians and Alaska Natives. In addition, because of misclassification of race and ethnicity on death certificates, the actual number of deaths may be underestimated by up to 35%. Tribes that require a significant blood quantum for membership face an existential threat because entire age demographics have been impacted greatly from tribe to tribe.

Nonmedical use of opioids within American Indian and Alaskan Native youth over the age of 12 was reported to be twice the rate of whites and three times the rate for African Americans. All federally recognized Indian Tribes enjoy sovereign status within the United States, including *sui generis* authority to protect, bring, and enforce *parens patriae* claims on behalf of their tribal members in all courts, state and federal, in the United States. The *parens patriae* authority of Indian Tribes is completely unique and distinct of all categories of litigants in this Bankruptcy proceeding – no state, no county, no city, and not even the federal government retains such strong *parens patriae* interests in its citizens.

Certain members of Indian Tribes, and for which this Motion is interposed for class wide relief, have suffered the following:

a.  Misuse, addiction, therapy, hospitalization, and/or overdose of opioids among their members, with accompanying personal injuries and, in some instances, wrongful death;

b.  Babies born to opiate addicted mothers with the babies and children having personal injuries, physical disorders, Neonatal Abstinence Syndrome ("NAS"), mental disorders, and lifetime care and educational costs and expenses;

c.  Abused or neglected children whose parent(s) or guardian(s) are addicted to and/or dependent on opioids, and/or who must be placed in foster care or adoptive guardians who take on the role of caretaker, including grandparents; and

d.  Other damages suffered by their individual members related to opiate addiction.

## MOTION AND RELIEF REQUESTED

1.      The C&A Tribes respectfully request that this Court (a) exercise its discretion pursuant to Fed. R. Bankr. P. 9014(c) and apply Fed. R. Bankr. P. 7023 to the C&A Tribes' Proof of Claim; (b) accept for filing the C&A Tribes' Class Proof of Claim, filed on behalf of all similarly situated claimants, and certify the proposed Class as requested above; (c) appoint undersigned counsel for the C&A Tribes as Class Counsel; and (d) grant such further relief as this Court deems just and equitable under the circumstances.

## BASIS FOR RELIEF REQUESTED

### I.      THE COURT SHOULD EXERCISE ITS DISCRETION AND PERMIT THE C&A TRIBES CLAIMANTS TO FILE A CLASS CLAIM

#### A.  The Court Has the Discretion to Apply Rule 7023 to Proofs of Claim.

2.      Bankruptcy courts have regularly exercised their discretion to permit the filing of class proofs of claim by applying Fed. R. Bankr. P. 7023 to the proof of claims procedure set forth

in Fed. R. Bankr. P. 3011. *See, e.g., In re Am. Reserve Corp.*, 840 F.2d 487, 493 (7th Cir. 1988); *see also In re Zenith Labs, Inc.*, 104 B.R. 659, 662 (D.N.J. 1989).

3.     While Section 501 is silent on whether the Bankruptcy Code permits class claims, Fed. R. Bankr. P. 7023 adopts Fed. R. Civ. P. 23 and expressly permits class actions in adversary proceedings. Fed. R. Bankr. P. 7023 ("Rule 23 Fed. R. Civ. P. applies in adversary proceedings."). Outside of adversary proceedings, bankruptcy courts permit class claims pursuant to Fed. R. Bankr. P. 9014(c), which provides that a "court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." Fed. R. Bankr. R. 9014(c). As the Seventh Circuit observed, Rule 7023 is one of the rules, within Part VII, that the court may incorporate: "Filing a proof of claim is a "stage." All disputes in bankruptcy cases are either adversary proceedings or contested matters, so Fed. R. Civ. P. 23 may apply throughout a bankruptcy case at the bankruptcy judge's discretion." *In re Am. Reserve Corp.*, 840 F.2d at 488. Consistent with Fed. R. Bankr. P. 9014(c), the application of Fed. R. Bankr. P. 7023 to proofs of claim is at the court's discretion. *Id.* at 493. Indeed, every Court of Appeals that has addressed the question of whether class claims are permissible has answered in the affirmative. *See, e.g., In re Charter Co.*, 876 F.2d. 866, 873 (11th Cir. 1989); *Reid v. White Motor Corp.*, 866 F.2d 1462, 1472 (6th Cir. 1989), *cert denied*, 494 U.S. 1080 (1990); *In re Birting Fisheries, Inc.*, 92 F.3d 939 (9th Cir. 1996); *In re Trebol Motors Distrib. Corp.*, 220 B.R. 500, 502 (1st Cir. 1998); *Gentry v. Siegel,* 668 F.3d 83, 91 (4th Cir. 2012).

4.     Bankruptcy courts have addressed the issue and permitted class claims subject to the bankruptcy court's discretion. *See, e.g., In re Chaparral Energy, Inc.*, 571 B.R. 642 (Bankr. D. Del. 2017); *In re Pac. Sunwear of Cal, Inc.*, No. 16-10882, 2016 WL 3564484 (Bankr. D. Del.

June 22, 2016); *In re United Cos. Fin. Corp.*, 276 B.R. 368 (Bankr. D. Del. 2002); *In re Kaiser Group Int'l Inc.,* 278 B.R. 58 (Bankr. D. Del. 2002); *Zenith Labs,* 104 B.R. at 662.

5.      In addition to the consensus among the Circuit Courts regarding the construction of the Bankruptcy Rules set forth in *American Reserve,* other district courts have also articulated compelling arguments in support of class claims in bankruptcies. *Zenith Labs,* 104 B.R. at 644 ("the policies underlying the class action and Congress' explicit provision for the application of Fed. R. Civ. P. 23 to bankruptcy proceedings supports the view that [*In re American Reserve* and its progeny] set forth the better rule."). Further, such application of "Rule 23 [] is consistent with Congress' intention to make bankruptcy proceedings available to 'the widest possible range of players.'" *In re Charter Co.*, 876 F.2d. at 870 (internal citations omitted).

6.      In *In re Musicland,* the United States Bankruptcy Court for the Southern District of New York articulated the factors that a bankruptcy court should consider in deciding to exercise its discretion to permit a class proof of claims. *In re Musicland Holding Corp.*, 362 B.R. 644 (Bankr. S.D.N.Y. 2007). Those factors are: (a) whether class certification will adversely affect the administration of the estate; (b) whether the class was certified pre-petition; and (c) whether the members of the putative class received notice of the bar date. *See, e.g., In re Musicland,* 362 B.R. at 654 (the "*Musicland* Factors"). This Court adopted the *Musicland* Factors in *Chaparral Energy*, 571 B.R. at 646. In considering these factors, no single factor is dispositive, and the weight given to any factor depends on the facts of each case. *Id.*

7.      Here, where the *Musicland* factors weigh heavily in favor of allowing a class claim, this Court should exercise its discretion and apply Bankruptcy Rule 7023.

1.     ***Musicland* Factor 1: This Motion Is Timely and Is Consistent with the Efficient Administration of the Estate.**

8.     When deciding whether a claim is prejudicial to the debtor and will adversely affect the administration of the estate, the courts look first to the timeliness of the motion and the filing of the underlying proof of claim, for which certification is sought, and then to the overall delay in the administration of the estate. *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 6-7 (S.D.N.Y. 2005). Here, the C&A Tribes will file their Class Proof of Claim prior to the bar date. Accordingly, the Class Claim and the instant Motion are both timely and do not implicate any delay, much less an *undue* delay.

9.     Courts have uniformly held that a claimant's proof of claim is properly considered even if a motion for class certification is not yet pending. *See, e.g., In re Tarragon Corp.*, No. 09-10555 DHS, 2010 WL 3842409, at *7 (Bankr. D.N.J. Sept 24, 2010) ("[t]his court has held a motion for class certification was timely when filed with a proof of claim. Thus, the applicability of Rule 7023 is ripe and appropriately considered at this stage.") (internal citations omitted. *See also In re First Interregional Equity Corp.*, 227 B.R. 358 (Bankr. D.N.J. 1998) (same); *In re Motors Liquidation Co.*, 447 B.R. 150, 157 (Bankr. S.D.N.Y. 2011) (same). Thus, the timing of the C&A Tribes' filing of the instant Motion and Class Proof of Claim weighs in the C&A Tribes' favor because "[p]rejudice [only] occurs when the allowance of a *late* claim would injure or damage a bankruptcy debtor." *In re Spring Ford Indus.*, 2003 WL 21785960, at *14 (Bankr. E.D. Pa. July 25, 2003) (emphasis added). *See also In re Musicland Holding Corp.*, 362 Br. at 654. This Court has further held that motions are timely when filed prior to the proof of claim date – as is the case here. *See, e.g., In re Pacific Sunwear of Cal, Inc.*, Case No. 16-10882 (LSS) Jointly Administered), 2016 WL 3564484, at *6 (Bankr. D. Del. June 22, 2016) (finding no delay to the

administration of the bankruptcy where the motion for approval of the class claim was filed before the bar date had passed, and the "claims administration process was in its initial stages").

10.    Further, allowing the C&A Tribes' Class Claim will not delay the administration of the Debtors' estates. It is highly likely that a reserve of some amount will be set aside for Indian Tribes governmental claims in any plan of reorganization proposed to this Court as part of a an All Governments Abatement fund. There is no dispute among any of the governmental claimants that Tribes are due amounts for abatement within their reservation lands. While the C&A Tribes' participation in the All Governments Abatement fund will assist Tribes in abatement of the opiate crisis, this fund will not include monies for the Tribes' role as *parens patriae* for its own tribal members and citizens who have suffered personal injuries and death.

11.    Even if the Tribal claims herein were disputed, the filing of a Class Claim would streamline, and not complicate, the administration of this class of claims. If the Debtors (or others) dispute these claims, they will likely be disputed regardless of whether class treatment is permitted. Therefore, class treatment would streamline the resolution of any disputes over Indian Tribes claims of a *parens patriae* nature for its tribal members (*see* Section I(B)(2)(b)(ii), *infra,* concerning the superiority of class treatment).

12.    The C&A Tribes have a compelling, strong, cultural, and historical interest in representing their own members in a *parens patriae* capacity. The C&A Tribes have the natural, constitutional, legal, and U.S. treaty rights to bring these claims on behalf of its members.

13.    The Debtors clearly knew of the claims of the absent class members before the bankruptcy. Cases filed by Indian Tribes have been pending since 2018, and Purdue defended its interests in the MDL in many cases brought by Tribes seeking damages for the personal injuries

and damages of their individual members. Thus, there is no prejudicial delay, and this factor weight heavily in favor of allowing the C&A Tribes' class claim.

> ## 2. *Musicland* Factor 2: That a Class Was Not Certified Prior to the Bankruptcy Is Not a Sufficient Reason to Prevent Class Treatment.

14.    Almost all of the Indian Tribes' complaints in the MDL are by individual Indian Tribes. Because these complaints contained parens patriae claims of the nature sought by this Motion, there was no need for class treatment in the MDL of these claims. It was not until the mediation in this Bankruptcy proceeding that a line of demarcation arose between governmental claimants and non-governmental claimants. Indian Tribes are both, thus making this Motion necessary.[43]

15.    Nevertheless, even if this Court were to find that this factor weighed against exercising its discretion to permit class claims, the lack of pre-petition certification is not, on its own, a sufficient basis for the Court to decline to exercise its discretion to permit C&A Tribes' Class Claim. *In re Chaparral Energy, Inc.*, 571 B.R. at 646 (noting that a class was not certified prepetition but stating, "[n]onetheless, the Court would not be alone in exercising its discretion to apply Bankruptcy Rule 7023 in these circumstances"); *In re Kaiser Group Intern., Inc.*, 278 B.R. 58, 62-63 (Bankr. D. Del. 2002) (allowing the filing of a class proof of claim where class was not certified pre-petition); *Gentry v. Siegel,* 668 F.3d 83, 91 (4th Cir. 2012) (same); *In re MF Glabal Inc.*, 512 B.R. 757, 763-65 (Bankr. S.D.N.Y. 2014) (same); *In re Connaught Group, Ltd.*, 491 B.R. 88, 98-100 (Bankr. S.D.N.Y. 2013) (same).

16.    Thus, because the other factors weigh heavily in the C&A Tribes' favor, the fact that the Debtors filed for bankruptcy protection prior to the expected certification of a class should

---

[43] There are two class actions pending on behalf of Alaska Natives in the MDL, but no class has been certified because all Indian Tribes claims in the MDL are stayed pending resolution of the bellwether cases (or further order of the MDL Court).

not affect the C&A Tribes' ability to obtain class treatment for purposes of the individual *parens patriae* claims here.

### 3. *Musicland* Factor 3: The Members of the Putative Class Did Not Receive Notice of the Bar Date.

17.    Another factor in favor of permitting the Class is the Debtors' failure to provide notice to absent class members. As such, the final *Musicland* factor weighs heavily in favor of allowance of the Class Claim. In fact, one court has declared that the fact that the putative class members received no notice of the bar deadline may, alone, justify exercising discretion to apply Rule 7023. *In re MF Global Inc.*, 512 B.R. 752, 763 (Bankr. S.D.N.Y. 2014) ("[t]he filing of a class proof of claim is consistent with the Bankruptcy Code generally in two principal situations: (i) where a class has been certified prepetition by a non-bankruptcy court and (ii) where there has been ***no actual or constructive notice to the class member of the bankruptcy case and Bar Date***") (citations omitted and emphasis added). Similarly, in *Sacred Heart Hosp.*, the court determined that if the unnamed class members are largely a group which a debtor has refused to notify individually, as is the case here, then the class device provides the only form of notice available to those class members and is, therefore, particularly advisable. *In re Sacred Heart Hosp.*, 177 B.R. 16, 22 (Bankr. E.D. Pa 1995).

18.    This is true even if some members of the class received notice. For example, in *Chaparral Energy,* this Court found that this factor weighed in favor of permitting the class claim because the debtor had only provided notice to class members whose claims preceded the bankruptcy by three years, even though the class action litigation had commenced five years earlier. *Chaparral Energy, Inc.*, 571 B.R. at 646-47. The Court held that this notice was insufficient as to unnamed class members:

> The failure to notify each and every putative class member may not always be fatal to a class claim objection. But, under the facts of this case, the Debtors' failure to notice all Putative Class members weighs in favor of exercising discretion to apply Bankruptcy Rule 7023 to this class claim. To find otherwise would condone the Debtors' failure (albeit, perhaps unintentional) to provide actual notice to its known creditors, whose information was indisputable in the Debtors' books and records. *Id*. at 648 (emphasis added).

19.    Coupled with the devastating blow of Covid-19 to Indian Tribes, it is highly doubtful that the class members here, tribal members addicted to opiates, their wrongful death beneficiaries, and children under the age of 18 with physical and mental disabilities, received adequate notice of their claims. The effectiveness of any notice is suspect also because of the fact that tribal members depend on their Tribes to make *parens patriae* claims for them, including by way of the instant Motion. By extending the application of Rule 7023, this Court will ensure that the claimants' due process rights to notice are protected *en masse* and avert the judicial nightmare of an avalanche of case-by-case due process analyses required for individual claimants who, but for lack of notice, may have filed individual proofs of claim. Thus, this factor applies heavily in favor of applying Rule 7023.

20.    Because the great weight of the *Musicland* factors favors applying Rule 7023, the Court should exercise its discretion to permit the C&A Tribes to bring their Proof of Claim on a class-wide basis.

### B.    <u>Applying Rule 7023, the Court Should Grant the C&A Tribes' Motion to Proceed as a Class.</u>

21.    Once the Court has exercised its discretion to extend Rule 7023 to the C&A Tribes' Class Proof of Claim, the next inquiry is whether to certify the class for which the Proof of Claim governs. By this Motion, and for the purposes of its Proof of Claim, the C&A Tribes seek to certify a class defined as follows:

Individual members of all 574 federally recognized tribes within the boundaries of the United States of America, partially or wholly, as set forth in the list of federally recognized tribes updated annually by the Secretary of the Interior, the most recent version of which is published at 84 Fed. Reg. 1200, 1204, who have the following claims: (a) misuse, addiction, therapy, hospitalization, and/or overdose of opioids with accompanying personal injuries and, in some instances, wrongful death;(b) babies born to opiate addicted mothers with the babies and children having personal injuries, physical disorders, Neonatal Abstinence Syndrome ("NAS"), mental disorders, and lifetime care and educational costs and expenses; (c) abused or neglected children whose parent(s) or guardian(s) are addicted to and/or dependent on opioids, and/or who must be placed in foster care or adoptive guardians who take on the role of caretaker, including grandparents.

This Class excludes: all tribal members who make a timely election to be excluded from the proposed Class.

22.    For the reasons stated below, the C&A Tribes' claim satisfies all of the requirements of Fed. R. Civ. P. 23, incorporated and made applicable to this proceeding through Fed. R. Bankr. P. 7023.

23.    A court should certify a class, where, as here, the class satisfies the four prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as one of the three subsections of Rule 23(b). *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3rd Cir. 2004).

24.    The Supreme Court recently reiterated that a trial court must conduct a "rigorous analysis" to confirm that Rule 23's requirements have been met. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011). However, "the requisite 'rigorous analysis' of the record and consideration of the merits must be focused on and limited to the question whether the Rule's requirements have been established." *Cason-Merenda v. VHS of Mich., Inc.* 296 F.R.D. 528, 536 (E.D. Mich. 2013) (citing *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013)). Thus, permissible inquiry into the merits of plaintiffs' claims at the class certification stage is limited.

25.     Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage. Merits questions may be considered to the extent-but only to the extent-that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Amgen Ind. V. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 465-466 (2013) (citing *Dukes*, 564 U.S. at 351 n.6). In other words, for the purposes of evaluating a motion for class certification, a court should assume that the substantive allegations of the complaint are generally true and not inquire into the merits of the case. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met"); *In re Chiang*, 385 F.3d 2556, 262 (3rd Cir. 2004); *In re Whirlpool Corp.*, 722 F.3d at 851-52 ("[the courts] may not turn the class certification proceedings into a dress rehearsal for the trial on the merits") (internal quotation marks and citation omitted; *In re Spring Ford Indus.*, No. 02-15015DWS, 2004 WL 231010 (Bankr. E.D. Pa. Jan. 20, 2004). Here, as demonstrated below, even under a "rigorous analysis," the requirements of Rule 23 are easily met.

1. **The C&A Tribes Satisfy All of the Rule 23(a) Factors.**

   a. **Numerosity: The Class is So Numerous that It Is Impracticable to Bring All Class Members Before the Court.**

26.     There is no "rigid minimum number of class members necessary to warrant certification; rather, joinder of all members need only be impractical, not impossible." *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 295 (D. Del. 2003). *See also Steward v. Abraham,* 275 F.3d 220, 227-28 (3rd Cir. 2001) ("[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."); *Miller v. Univ. of Cincinnati,* 241 F.R.D. 285, 288 (S.D. Ohio 2006). A class representative need only show

that joining all members of the potential class is extremely difficult or inconvenient. *Golden v. City of Columbus,* 404 F. 3d 950, 965 (6th Cir. 2005). The "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 403 (S.D. Ohio 2007) (citing *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004)); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

27.    The Proposed Class includes the individual member of the 574 Indian Tribes who have suffered the injuries mentioned hereinabove. The Tribal members are so numerous and dispersed throughout the U.S. and beyond that individual adjudication for all of the class members is impractical. Because the class is defined by reference to the Federal Register and to the individual member records of the C&A Tribes, members of the proposed class are objectively determinable. *See* 84 Fed. Reg. 1200, 1204 (Feb. 1, 2019). Accordingly, the requirement in Fed. R. Civ. P. 23(a)(1) that "the class is so numerous that joinder of all members is impracticable" is met.

### b. Commonality: Common Factual and Legal Question Exist.

28.    Commonality only requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). While Rule 23(a)(2) speaks of questions of law or fact in the plural, "there need be only one common question to certify a class." *In re Whirlpool Corp.*, 722 F.3d at 853; *see also Cason-Merenda,* 296 F.R.D. at 536 (one common question of law or fact is sufficient); *Griffin v. Flagstar Bancorp Inc.* 2013 WL 6511860 (E.D. Mich. Dec. 12, 2013) (same). "[T]he commonality standard of Rule 23(a)(2) is not a high bar: it does not require identical claims or facts among class member[s], as 'the commonality requirement will be satisfied if the named plaintiffs share at least one question of law or fact in common with the grievances of the

prospective class." *Chiang*, 385 F.3d at 265 (quoting *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3rd Cir. 2001)). Thus, this requirement is "easily met." *Neal v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994).

29.     As noted by the Third Circuit, "a properly supported RICO allegation will often contain common issues because, like "commonality[, a RICO allegation,] is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members[.]" *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 487 (3rd Cir. 2015) (citing *Sullivan*, 667 F.3d at 297; and *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269-70). Accordingly, "[w]hether the evidence presented proves a RICO conspiracy []" is a question "common to each class member and will generate common answer [.]" *Reyes*, 802 F. 3d at 487 (quoting *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 399(3rd Cir. 2015)). Questions regarding whether Purdue's conduct constitutes a violation of the UTPA or gives rise to liability for fraud, public nuisance, unjust enrichment, negligence, product liability or civil conspiracy are also common to each class member.

30.     The C&A Tribes have identified the following issues common to the proposed class:

a.   Whether Purdue misrepresented the safety and efficacy of opioids to the detriment of the proposed class;

b.   Whether Purdue engaged in a conspiracy or conspiracies to promote the sales of opioids;

c.   Whether Purdue engaged in a conspiracy or conspiracies to suppress adverse information about opioids;

d.  Whether Purdue has made material misrepresentations of fact, or failed to state material facts regarding the addiction risks associated with opioids, which material misrepresentations or omissions operate as fraud upon the Class;

e.  Whether, in marketing and selling opioids, Purdue failed to disclose the dangers and risks to the heath of persons ingesting the drug;

f.  Whether Purdue failed to warn adequately of the adverse effects of opioids, including addition and overdose;

g.  Whether Purdue knew or should have known that the ingestion of opioids leads to serious adverse health effects and detrimental effects on the Tribe communities at large;

h.  Whether Purdue manufactured, marketed, distributed and sold opioids notwithstanding their knowledge of the drugs' dangerous nature;

i.  Whether Purdue knowingly omitted, suppressed and/or concealed material facts about the unsafe and defective nature of opioids form government regulators, the medical community and/or the consuming public;

j.  Whether Purdue engaged in conduct that violates federal RICO statutes;

k.  Whether Purdue engaged in conduct constituting a public nuisance;

l.  Whether Purdue unjustly enriched itself to the detriment of the class;

m.  Whether Purdue acted negligently and caused the Proposed Class to suffer harm:

n.  Whether Purdue violated the various state Unfair Trade Practices and Consumer Protection Acts;

o.  Whether the Sacklers have individual liability for any of the claims; and

p.  Whether the Class has been damaged, and if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or punitive damages to which the Proposed Class is entitled.

### c.  Typicality: The C&A Tribes Are Typical of the Class.

31.  Rule 23(a) requires typicality of the class representatives' claims. Fed. R. Civ. P. 23(a)(3). Like commonality, typicality is "broadly defined" and "focus[es] on similar aspects of the alleged claims." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 259 F.3d 154, 182 (3rd Cir. 2001) (quoting *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 141 (3rd Cir. 1998)). "The [typicality] requirements is not onerous," and courts liberally construe it. *Int'l Union v. Ford Motor Co.*, Nos. 05-74730, 06-10331, 2006 WL 1984363, at *19 (E.D. Mich. July 13, 2006) *see also In re Foundry Resins Antitrust Litig. Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2013 WL 6511860, at *6 (E.D. Mich. Dec. 12, 2013) (quotation marks and citation omitted).

32.  The C&A Tribes' claims are typical of all the other class members' claims. The Tribes' members claims for damages arise out of the same alleged conduct and resulting impacts, and have the same causes of action as a result of Purdue's uniform wrongful conduct, based upon the same conduct and interactions by Purdue made uniformly to the Tribes and their Members and the public. The Tribes and Members' claims arise out of the same common course of conduct giving rise to the claims of the other members. Accordingly, the requirement in Fed. R. Civ. P. 23(a)(3) that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" is satisfied.

### d.  Adequacy: The C&A Tribes and Their Attorneys Are Adequate.

33.  The final requirement of Rule 23(a) is that the representative parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In analyzing this factor, "the

court must determine whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class." *Johnston*, 265 F.3d at 185. The C&A Tribes submit that there are no conflicts between them and the proposed class because the damages to the C&A Tribes and members of the proposed class arise from the same set of alleged facts and the same legal theories regarding Purdue's liability for damages. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 2018 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes") (internal quotation marks and citation omitted). Indeed, a conflict "must be more than merely speculative or hypothetical before a named plaintiff can be deemed inadequate." *Bradburn v. 3M*, No. Civ.A.02-7676, 2004 WL 1842987, at *4 (E.D. Pa. Aug. 18, 2004) (quoting 5 James Wm. Moore, et. Al., Moore's Federal Practice 23.25[4][b][ii] (3rd ed. 2003)). Here, no such conflict exists.

34.    Rule 23(g) also requires the court to examine the capabilities and resources of class counsel to determine whether they will provide adequate representation to the class. The proposed class is represented by counsel with extensive experience in class action litigation. They have vigorously prosecuted the class's claims, and they will continue to do so through all phases of the litigation. *See Marcus v. Dep't of Revenue*, 206 F.R.D. 509, 512 (D. Kan. 2002) ("[i]n absence of evidence to the contrary, courts will presume the proposed class counsel is adequately competent to conduct the proposed litigation").

35.    The undersigned counsel to the C&A Tribes respectfully seek appointment as Class counsel.

## 2. **The C&A Tribes Satisfy the Requirements of Rule 23(b).**

36.     Rule 23(b)(1)(B) authorizes certification when "prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."[44] Rule 23(b)(1)(B) is applicable in so-called "limited fund" cases. "A limited fund exists when a fixed asset or piece of property exists in which all class members have a preexisting interest, and an apportionment or determination of the interests of one class member cannot be made without affecting the proportionate interests of other class members similarly situated." 2 Newberg on Class Actions § 4:9 (4th ed. 2009).

37.     In *Ortiz,* the Supreme Court identified three "common characteristics" consistent with the "historical limited fund model." *Ortiz,* 527 U.S. *Id.* at 838. "The first and most distinctive characteristic," *Ortiz* explains, "is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitively at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Id.* The second historical characteristic is that "the whole of the inadequate fund was to be devoted to the overwhelming claims." *Id.* at 839. The third characteristic is that "the claimants identified by a common theory of recovery were treated equitably among themselves." *Id.*

38.     Courts have applied Rule 23(b)(1) to mass, or class, damages claims brought against defendants who are in financial distress, both in and out of the bankruptcy context. *See, e.g., Baker v. Wash. Mut. Fin. Grp., LLC,* 193 Fed. App'x 294 (5th Cir. 2006) (unreported); *Stott*

---

[44] "In contrast to class actions brought under subdivision (b)(3), in cases brought under subdivision (b)(1), Rule23 does not provide for absent class members to receive notice and to exclude themselves from class membership as a matter of right. It is for this reason that such cases are often referred to as 'mandatory' class actions." *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 834 n. 13 (1999) (citation omitted).

*v. Capital Fin. Servs., Inc.,* 277 F.R.D. 316 (N.D. Tex. 2011); *In re Silicone Gel Breast Implant*

*Prods. Liab. Litig.*, No. 2:97-cv-11441-RDP, 2010 WL 11506713 (N.D. Ala. May 19, 2010), *aff'd*

*sub nom. Juris v. Inamed Corp.,* 685 F.3d 1294 (11th Cir. 2012); *In re: Orthopedic Bone Screw*

*Prods. Liab. Litig.*, 176 F.R.D. 158 (E.D. Pa.1997). In *Silicone Gel Breast Implant Litig.*, for

example, the court applied Rule 23(b)(1) to the claims against a breast implant manufacturer that

was in difficult financial circumstances but had not yet filed for bankruptcy protection:

> The evidence shows, inter alia, that – absent the new capital contributed to the company conditioned upon approval of this settlement-Inamed has negative net worth, net liquidation value of essentially zero, and no resources to pay claims. The company has had to borrow heavily in order to stay afloat. The settlement is to be funded by additional borrowing available only in the context of this settlement, and the amount Inamed was able to raise for that purpose was constrained both by restrictions associated with its existing debt and the willingness of its lenders to assume the risk that the company's post-settlement operations would repay their investment. The record establishes that Inamed would be unable to raise such additional funds in the absence of this settlement, that the alternative of continued litigation of individual claims would drive Inamed to bankruptcy, and that the funds available to class members from this settlement are substantially greater than the funds, if any, that would remain for class members after an Inamed bankruptcy. Considering the record evidence of Inamed's financial condition, the court finds a substantial risk that an Inamed bankruptcy would leave all class members with nothing. 685 F.3d at 1307-08.

39.     Here, similarly, the three *Ortiz* factors are plainly satisfied. First, and most

importantly under *Ortiz,* the Debtors' estate have a negative net worth and the inability to satisfy

the claims asserted against them. Second, all of the assets of the Debtors' estates (after allowances

for administrative expenses) will be applied to satisfying those claims. Third, while there may be

disagreements among the creditors and other stakeholders as to what percentage of the Debtors'

assets should be allocated to the various classes of creditors, there is no disagreement that those

creditors within each class should and will be treated equitably (when compared to other claimants

within their respective categories) within this process. Certification of a Rule 23(b)(1) class would,

in fact, enhance the preservation of estate assets and enhance the equitable distribution of Purdue's limited assets as among this particular class of creditors.

40.    To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: (1) common question must predominate over any questions affecting only individual members; and (2)) class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614-615 (1997) ("*Amchem*"); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008). Both are met here.

41.    The predominance requirement of Fed. R. Civ. P. 23(b)(3) is met because the common questions of law or fact predominate over any questions affecting only individual class members and the Proposed Class is sufficiently cohesive to warrant adjudication by representation. "Rule 23(b)(3) does not mandate that a plaintiff seeking class certification prove that each element of the claim is susceptible to classwide proof." *In re Whirlpool Corp.*, 722 F.3d at 859. Instead, "'[a] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individualized position.'" *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 408 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 307). Common questions need only predominate; they need not be dispositive of the litigation. *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. at 408 (citing *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995)); cf. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535-36 (6th Cir. 2008) (holding issues regarding the amount of damages do not destroy predominance). "[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class

action is impermissible." *Cason-Merenda*, 296 F.R.D. at 535 (quoting *Powers v. Hamilton Cnty. Public Defender Comm*, 501 F.3d 592, 619 (6th Cir. 2007)).

42.    When Rule 23 is the mechanism to redress alleged RICO violations, statutory violations, and common law claims, predominance and commonality are satisfied if each element of the alleged violations and claims involves common questions of law and fact capable of proof by evidence common to the class. *Reyes,* 802 F.3d at 489 (citing *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269-70). This is true even if "establishing an injury is not as conductive to common proof[,]" so long as a court is "satisfied that the plaintiffs have presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprises at issue[/]" *Reyes*, 802 F.3d at 489(citing *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 270 and  *Neale*, 794 F.3d at 374-75 & n. 10). Any inability to calculate damages (as opposed to fact of injury) on a classwide basis will not, on its own, bar certification. *Reyes*, 802 F.3d at 489 (citing *Neale*, 794 F.3d at 374-75 & n. 10 (collecting cases on this point)). *Accord In re Scrap Metal Antitrust Litig.* 527 F.3d at 535 (where common issues determine liability, fact that damages calculation may involve individualized issues does not defeat predominance). This is true as long as the common issues still outweigh the individual ones. *E.g.*, as long as a common theory can be alleged as to liability and impact that can be pursued by the class. *See, e.g., In re Whirlpool Corp.*, 722 F.3d at 861 ("[i]t remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." (internal quotation marks and citation omitted)).

43.    The Indian Tribes Class Members allege a single conspiracy relating to the sale and distribution of opioids from which all proposed class members' injuries arise. Issues common to the Tribes and their Members include the existence and scope of the conspiracy among defendants,

the impact of defendants' misrepresentations and omissions, the impact of defendants' failures to report suspicious orders, and irregularities in opioid distribution patterns. These issues predominate over any individual questions, and therefore class treatment of the claims is appropriate. Furthermore, the evidence that will prove a violation as to one class member is common to the class and will be sufficient to prove it as to all-the violative conduct of Purdue and the other defendants is not dependent on the separate conduct of the individual class members.

44.    Here, issues common to the proposed class predominate in this case-all the Tribes and their Members incurred costs that were caused by the defendants' (including Purdue's) illegal activities. Whether Purdue and the other defendants violated RICO, UTPA, and state common law will be determined by using evidence common to all class members. This is all common evidence that each class member would use to prove its case if this case were not permitted to proceed as a class action. Thus, common issues overwhelmingly predominate. The presence of these common issues of liability and impact predominates over any individual issues and strongly support certification of the proposed class.

45.    Under Fed. R. Civ. P. 23(b)(3), class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as requiring each of the members in the Proposed Class to bring a separate cause of action would unnecessarily flood the courts with lawsuits that are brought alleging the same federal causes of action that are based on the Purdue's uniform unlawful actions. Individual litigation by the Proposed Class members would increase the delay and expense to all parties. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured. In addition, the adjudication of this controversy

through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.

## ALTERNATIVE MOTIO7N AND REQUEST FOR RELIEF

46.    Alternatively, the C&A Tribes, for all the reasons stated hereinabove, move the Court to allow the filing of a Class Proof of Claim for the Cheyenne & Arapaho Tribes and for each of the individual tribes listed in footnote 2 hereinabove on behalf of each of the tribes members (in contrast to all 574 tribes).

## CONCLUSION

For the foregoing reasons, the C&A Tribes respectfully request that this Court (1) exercise its discretion pursuant to Fed. R. Bankr. P. 9014(c) and apply Fed. R. Bankr. P. 7023 to the C&A Tribes' Proof of Claim; (2) accept for filing the C&A Tribes' Class Proof of Claim, filed on behalf of all similarly situated claimants, and certify the class as requested above; (3) appoint counsel for the C&A Tribes as Class Counsel; and (4) grant such further relief as the Court deems just and equitable under the circumstances.

Alternatively, the C&A Tribes request the foregoing relief in the manner set forth in the Alternative Motion.

## NOTICE

Notice of this Application has been provided to the following parties: (i) the Debtors; (ii) co-counsel to the Debtors; (iii) each of the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iv) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (v) the Office of the U.S. Trustee. The C&A Tribes submit that, in light of the nature of the relief requested, no other or further notice is required.

DATED this 9th day of July 2020.

By:   STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, A PROFESSIONAL CORPORATION

By: _/s/ Sander L. Esserman_____

Sander L. Esserman (admitted pro hac vice)
Peter C. D'Apice
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999
esserman@sbep-law.com
dapice@sbep-law.com

T. Roe Frazer II
FRAZER PLC
30 Burton Hills Blvd., Ste 450
Nashville TN 37215
(T) 615.647.6464
(F) 866.314.2466
roe@frazer.law

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(T) 850.432.2451
jnd@beggslane.com
mjb@beggslane.com
jrz@beggslane.com

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP, LLC
P.O. Box 2129
Fairhope, Alabama 36533
(T) 205.252.6127
ftk@thekuykendallgroup.com

**COUNSEL TO THE C&A TRIBES**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                            )
In re                                       )          **Chapter 11**
                                            )
**PURDUE PHARMA L.P.,** *et al.,*[1]         )          **Case No. 19-23649 (RDD)**
                                            )
            **Debtors.**                     )          **(Jointly Administered)**
                                            )
-----------------------------------------------------------x

### ORDER ON MOTION FOR LEAVE TO FILE A CLASS
### PROOF OF CLAIM AND FOR CLASS CERTIFICATION

Upon consideration of the motion of the C&A Tribes, the class representatives, individually and on behalf of all other persons similarly situated (collectively, the "Class Members"), dated July 9, 2020, requesting leave to file a class proof of claim (the "Class Claim") and for certification of the class pursuant to Rules 9014 and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Federal Rule of Civil Procedure 23 ("FRCP 23"); and it appearing that this Court has jurisdiction over the matter; and it appearing that due and adequate notice of the motion having been given; and that no other or further notice need be provided; and it further appearing that the relief requested in the motion is in the best interests of the Class Members; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore; it is hereby ORDERED:

1.      The Motion is GRANTED as follows;

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014).

2.      The Court grants the C&A Tribes, as defined in the Motion, leave to file a class proof of claim on behalf of all putative Class Members;

3.      The Court sets _____ as the date for a hearing on the class certification motion;

4.      The Court reserves its ruling on class certification until after the hearing on that issue.

Dated: _____
       White Plains, New York


_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE