<u>**Exhibit A**</u>

Exhibit A

# QUEEN'S BENCH FOR SASKATCHEWAN

Citation: **2017 SKQB 287**

Date:              **2017 09 22**
Docket:           QBG 1073 of 2012
Judicial Centre:   Regina

BETWEEN:

DEMETRIOS PERDIKARIS

PLAINTIFF

- and -

PURDUE PHARMA, PURDUE PHARMA INC.,
PURDUE FREDERICK INC, THE PURDUE
FREDERICK COMPANY, INC. AND PURDUE
PHARMA LP

DEFENDANTS

**Counsel:**

E.F. Anthony Merchant, Q.C. for the plaintiff

Robert W. Leurer, Q.C. and Barry Glaspell for Purdue Pharma, Purdue
Pharma Inc. and Purdue Frederick Inc. (Purdue Canada)

David Byers for the Purdue Frederick Company, Inc. and Purdue Pharma
LP (Purdue U.S.)

**Also Appearing:**

Joel Rochon for Class Counsel

Clint Docken for Consortium Counsel

JUDGMENT                                                    BALL J.
September 22, 2017

[1]        The plaintiff applies for an order pursuant to *The Class Actions
Act*, SS 2001, c C-12.01 [*CAA*] approving a National Settlement Agreement
[Settlement Agreement] which provides for the settlement of claims against

2017 SKQB 287 (CanLII)

– 2 –

the defendants arising from, without limitation, the manufacture, marketing, sale, distribution, labelling, prescription and use of OxyContin® and OxyNEO® in Canada.

[2]        The Settlement Agreement is contingent upon court approval in this action [Saskatchewan Proceeding] and three other actions:

> •    Ontario Superior Court of Justice Action, File No. 07-CV-343201CP, in which Tim Reid and Sabine Reid are the plaintiffs [Ontario Proceeding];
>
> •    Superior Court of Quebec Action, File No. 200-06-000080-070, in which Claude Larose, Francois Michaud and Leo Michaud are the petitioners [Quebec Proceeding]; and
>
> •    Supreme Court of Nova Scotia Action, File No. Hfx. No. 285995, in which George Bellefontaine and Stephen MacGillivray are the plaintiffs [Nova Scotia Proceeding].

[3]        The plaintiffs in all four actions claim that the defendants breached their duty to warn consumers of the addictive properties of OxyContin and/or OxyNEO, an opioid analgesic painkiller, which one or more of the defendants manufactured, marketed and/or sold or otherwise placed in the stream of commerce in Canada.

[4]        Although the Settlement Agreement has received court approval in the Ontario, Quebec and Nova Scotia Proceedings, I have decided that it

2017 SKQB 287 (CanLII)

– 3 –

will not be approved in the Saskatchewan Proceeding. My reasons are set out in this decision.

**Events Leading to Settlement**

[5]        The Quebec Proceeding was commenced on May 11, 2007; the Ontario Proceeding on June 8, 2007; and the Nova Scotia Proceeding on September 26, 2007. Between September 26, 2007 and June 22, 2012, seven other class actions were commenced in various jurisdictions (three of them by plaintiffs' counsel in the Nova Scotia Proceeding) making essentially the same claims against essentially the same defendants. The Saskatchewan Proceeding was commenced on June 22, 2012.

[6]        Motions for certification were filed in the Saskatchewan Proceeding, the Ontario Proceeding and the Nova Scotia Proceeding. On June 25, 2015 the plaintiffs' motion for certification in the Saskatchewan Proceeding was scheduled to be heard during the week commencing April 18, 2016. The certification hearing in the Ontario Proceeding was ultimately scheduled for April 5, and 6, 2016. The certification hearing in the Nova Scotia Proceeding was scheduled for October 17 and 18, 2016.

[7]        With the assistance of a mediator, the parties in the Ontario, Nova Scotia and Quebec Proceedings met on March 10, 2016 to discuss potential settlement. They did not reach an agreement.

[8]        On March 18, 2016 the defendants filed a Statement of Defence in the Saskatchewan Proceeding along with an application for summary judgment based on the provisions of *The Limitations Act*, SS 2004, c L-16.1 and a Notice of Constitutional Question challenging the constitutionality of multi-

2017 SKQB 287 (CanLII)

− 4 −

jurisdiction opt out certification orders under the *CAA*. The defendants'
applications were returnable on April 18, 2016, being the first day of the
scheduled motion for certification.

[9]        On March 22, 2016 the defendants filed two applications in the
Ontario Proceeding with respect to evidentiary matters and a Notice of
Constitutional Question challenging the constitutionality of national opt out
certification orders under the Ontario *Class Proceedings Act, 1992*, SO 1992,
c 6. Those matters were scheduled to be heard on April 6, 2016.

[10]       On April 2, 2016, the mediator convened a second mediation
session by way of a teleconference with counsel in the Ontario, Quebec and
Nova Scotia Proceedings. No settlement was reached. However, on April 4,
2016, (being the day before the certification motion was scheduled to be heard
in the Ontario Proceeding) they reached what they called an "Agreement in
Principle".

[11]       At some point between April 4, 2016 and April 15, 2016 counsel
for the plaintiff in the Saskatchewan Proceeding, Merchant Law Group [MLG]
joined the discussions.

[12]       On Friday, April 15, 2016 counsel for the plaintiffs and
defendants in the Ontario, Quebec, Nova Scotia and Saskatchewan
Proceedings reached a second Agreement in Principle. That same day, Justice
Belobaba of the Ontario Superior Court of Justice granted a conditional
certification order in the Ontario Proceeding. The order stated that it was
being granted "for the purposes of implementing a National Settlement
Agreement dated April 15, 2016". Paragraphs 2 and 3 of the order stated:

2017 SKQB 287 (CanLII)

− 5 −

**2.** THIS COURT ORDERS that the action is hereby certified, for the purpose of and subject to implementation of the National Settlement Agreement, as a class proceeding pursuant to section 5 of *the Class Proceedings Act, 1992,* S.O. 1992, c. 6 *("Class Proceedings Act")* on behalf of the Class and the Family Class.

**3.** THIS COURT ORDERS that the Class be defined as:

a) All persons including their estates, who at any time between January l, 1996 and April 15, 2016 inclusive were prescribed in Canada and ingested OxyContin® tablets and/or OxyNEO® tablets, manufactured, marketed and/or sold or otherwise placed into the stream of commerce in Canada by one or more of the Defendants; and

b) All persons in Canada who by virtue of a personal relationship to a Class Member have a *Family Law Act* R.S.O. 1990, c. F. 3 ("*FLA*" or similar legislation in other provinces or territories) derivative claim ("*Family Class*").

[13]        Paragraph 8 of the order stated:

**8.** THIS COURT ORDERS that in the event the National Settlement Agreement referenced in this Order is not: (i) approved by this Court; (ii) recognized by the Courts in Nova Scotia, Quebec, Saskatchewan and British Columbia; and (iii) implemented in accordance with the terms of the proposed National Settlement Agreement, then the National Settlement Agreement shall become null and void pursuant to its terms, and the within Order certifying this class proceeding for settlement purposes is hereby set aside, without further Order of this Court.

[14]        On Monday, April 18, 2016 the certification hearing scheduled to commence in the Saskatchewan Proceeding was adjourned *sine die* at the request of both parties.

[15]        A copy of the Agreement in Principle (and/or "National Settlement Agreement") dated April 15, 2016 has not been filed with this Court. However, affidavit evidence in support of this application states that it provided for a payment of $18 million by the defendants to class members

2017 SKQB 287 (CanLII)

− 6 −

(less legal fees and other costs) plus a payment of $1 million to Provincial Health Insurers, for a total settlement payment of $19 million.

[16]    On March 8, 2017 the parties entered into the Settlement Agreement that is the subject of this application. One difference between the Agreement in Principle dated April 15, 2016 and the Settlement Agreement dated March 8, 2017 appears to be that the latter increased the total settlement payment by the defendants from $19 million to $20 million, with the additional $1 million (less $150,000.00 in legal fees) earmarked for Provincial Health Insurers.

[17]    Another difference between the April 15, 2016 Agreement in Principle and the March 8, 2017 Settlement Agreement was that the Agreement in Principle provided for one national class to be certified in the Ontario Proceeding alone, whereas the Settlement Agreement divided up the country into four different class descriptions and allocated one description to each of the Ontario Proceeding, the Quebec Proceeding, the Nova Scotia Proceeding and the Saskatchewan Proceeding.

**Conditional Certification Orders**

[18]    On March 27, 2017 Justice Belobaba of the Ontario Superior Court of Justice rescinded his conditional certification order dated April 15, 2016 and replaced it with a second order, the stated purpose of which was to implement the Settlement Agreement dated March 8, 2017. The March 27, 2017 order replaced the Canada wide national class description in the April 15, 2016 order with the following:

2017 SKQB 287 (CanLII)

− 7 −

**4.** THIS COURT ORDERS that the Class be collectively defined as:

a) All persons including their estates, who at any time between January 1, 1996 and February 28, 2017 inclusive were prescribed in Ontario or British Columbia and ingested OxyContin® tablets and/or OxyNEO® tablets, manufactured, marketed and/or sold or otherwise placed into the stream of commerce in Canada by one or more of the Defendants (the "Ontario Class"); and

b) All persons who by virtue of a personal relationship to a Ontario Class Member have a *Family Law Act* R.S.O. 1990, c. F. 3 ("*FLA*") or similar legislation or law in other provinces or territories' derivative claim (the "Family Class").

[19]      Paragraph 9 stated:

**9.** THIS COURT ORDERS that in the event the Settlement Agreement referenced in this Order is not: (i) approved by this Court; (ii) approved by the Courts in Nova Scotia, Quebec, Saskatchewan; and (iii) implemented through dismissals/discontinuances by the Courts of British Columbia; Alberta; Saskatchewan (in respect of the Saskatchewan Juchacz Proceeding); Prince Edward Island; New Brunswick; and Newfoundland and Labrador, then the Settlement Agreement shall become null and void pursuant to its terms, and the within Order certifying this class proceeding for settlement purposes is hereby set aside, without further Order of this Court.

[20]      On April 19, 2017 the Saskatchewan Proceeding was conditionally certified by way of a consent order which defined the class as follows:

(i) …All persons including their estates, who at any time between January 1, 1996 and February 28, 2017 inclusive were prescribed in Saskatchewan, Alberta, Manitoba, the Yukon, the Northwest Territories or Nunavut and ingested OxyContin® tablets and/or OxyNEO® tablets, manufactured, marketed and/or sold or otherwise placed into the stream of commerce in Canada by one or more of the Defendants. [Saskatchewan Class]; and

(ii) All persons who by virtue of a personal relationship to a Saskatchewan Class Member have derivative claim under any derivative claim statute as a result of the death or personal

2017 SKQB 287 (CanLII)

− 8 −

> injury of that class member, including but not limited to, derivative claims pursuant to *The Fatal Accidents Act*, RSS 1978, C F-11…[Family Class].

[21]      Similar conditional certification orders have been granted in the Quebec Proceeding and the Nova Scotia Proceeding. The "Quebec Class" in the Quebec Proceeding includes all persons who were prescribed OxyContin and/or OxyNEO in Quebec. The "Nova Scotia Class" in the Nova Scotia Proceeding includes all persons who were prescribed OxyContin and/or OxyNEO in Nova Scotia, Newfoundland and Labrador, New Brunswick and/or Prince Edward Island.

[22]      Thus, taken together, the class descriptions in the conditional certification orders granted in the four proceedings encompass all persons who, between January 1, 1996 and February 28, 2017 inclusive, ingested OxyContin and/or OxyNEO prescribed for them in Canada.

## Overview of the Settlement Agreement

[23]      The Settlement Agreement provides for the defendants to make a settlement payment as follows:

> "**Settlement Payment**" shall mean the payment of CAD$20,000,000.00, inclusive of all interest, taxes and costs, which shall be used to pay the Non-Refundable Expenses, other costs of notice and administration, compensation for Approved Claimants, amounts to satisfy the claims of Provincial Health Insurers and Class Counsel Legal Fees, as described herein.

[24]      The subrogated claims of Provincial Health Insurers against the defendants are dealt with in a number of provisions including the following (s. 6.2):

2017 SKQB 287 (CanLII)

– 9 –

> **6.2** Payments shall be made from the Escrow Settlement Payment to satisfy the claims of the Provincial Health Insurers. The claims administrator shall distribute these funds, less Class Counsel Legal Fees, a proportionate share of disbursements, and applicable taxes, to the Provincial Health Insurers in a manner to be agreed upon by Class Counsel and the Provincial Health Insurers, and approved by the Courts. These payments shall be in full and final satisfaction of Medical Services provided for and to be provided for Class Members, and the Provincial Health Insurers shall have no other claim.

[25]    Class Counsel state that they have reached an agreement to pay Provincial Health Insurers $2 million (less counsel fees of $150,000.00) out of the settlement payment in full satisfaction of their claims for medical services provided for, and to be provided for, class members. If that payment is approved by the court, it will leave $18 million to satisfy the costs of administering the Settlement Agreement, the legal costs of Class Counsel and the approved claims of all class members.

[26]    Class Counsel asks the court to approve payment of their legal fees totalling $4.65 million, plus disbursements of $348,519.92 and applicable taxes. The requested 4.65 million in fees is made up of $150,000.00 on the $2 million payment to Provincial Health Insurers and $4.5 million (equal to a 25% contingency fee) on the remaining $18 million settlement payment. If those fees are approved, Class Counsel advise that they will pay, out of their own fee, approximately $400,000.00 in fees to "Consortium Counsel", being the law firms representing the plaintiffs in the seven other class actions commenced between September 26, 2007 and June 22, 2012 (see para. 4 above). They advise that in return Consortium Counsel have agreed to discontinue all of those other actions.

2017 SKQB 287 (CanLII)

− 10 −

[27]          If the requested legal fees are approved, each of the four law firms comprising Class Counsel will receive approximately $1 million in fees. All of the law firms (Class Counsel and Consortium Counsel) will receive very close to 100% of their (unverified) docketed time.

[28]          The Settlement Agreement is not contingent upon court approval of the requested counsel fees.

**Approvals by Other Courts**

[29]          The Settlement Agreement and the legal fees, disbursements and applicable taxes requested by Class Counsel were approved in the Ontario Proceeding by Justice Belobaba on July 19, 2017. The approval order was accompanied by brief written reasons which did not consider the provisions of the Settlement Agreement relating to Provincial Health Insurers, nor indicate whether an agreement with the Provincial Health Insurers had been filed with the court.

[30]          The Settlement Agreement in the Nova Scotia Proceeding was approved by Justice Murphy of the Supreme Court of Nova Scotia on August 2, 2017. Justice Murphy granted a second order on the same date stating that Class Counsel legal fees in the amount of $4.65 million, plus disbursements of $348,519.92, plus applicable taxes of $558,378.56, for a total of $5,556,898.48, were "approved as being fair and reasonable". Neither of the approval orders were accompanied by written reasons. The orders themselves did not refer to the principles applicable to approving legal fees in class actions, nor to the provisions of the Settlement Agreement relating to

2017 SKQB 287 (CanLII)

– 11 –

Provincial Health Insurers, nor indicate whether an agreement with the Provincial Health Insurers had been filed with the court.

[31]        The Settlement Agreement in the Quebec Proceeding was approved by Justice Bouchard of the Quebec Superior Court on August 21, 2017. Justice Bouchard's order was not accompanied by separate reasons. The order itself referred to the fact that the Settlement Agreement had already been approved in the Ontario Proceeding and the Nova Scotia Proceeding. It did not indicate whether an agreement with the Provincial Health Insurers had been filed with the court, nor deal with the provisions of the Settlement Agreement as it related to the Provincial Health Insurers. Although the order did not provide for the payment of fees, disbursements and taxes requested by Class Counsel, Justice Bouchard may well have issued a separate fee order that has not yet been filed on this application.

[32]        Approval of the Settlement Agreement in the Ontario, Quebec and Nova Scotia Proceedings means that approval in the Saskatchewan Proceeding would undoubtedly promote coherence, efficiency and principles of comity in these multi-jurisdictional proceedings. That said, this Court must base its decision on the evidence and submissions presented to it on this application.

## ANALYSIS

**Preliminary Issue: Notice to the "Saskatchewan Class"**

[33]        The representative plaintiff in the Saskatchewan Proceeding claims to represent all persons who were prescribed OxyContin and/or OxyNEO in six jurisdictions including, *inter alia*, Northwest Territories, Nunavut and Yukon. There is no evidence that any potential class members in

2017 SKQB 287 (CanLII)

− 12 −

the three northern territories were known to Class Counsel, or that they had inquired into the existence of such class members, before the Settlement Agreement was finalized and this application for approval was filed. There is also no evidence that the Claims Administrator, RicePoint Administration Inc., delivered copies of the hearing notice, approval notice and opt out form directly to any potential class members in Northwest Territories, Nunavut or Yukon.

[34]      My concern is that the parties may have agreed to settle claims on behalf of all persons who were prescribed OxyContin and/or OxyNEO in Northwest Territories, Nunavut and Yukon without making any effort to identify those persons or provide them with notice of the settlement. This concern can be addressed in one of two ways. If I am wrong in my understanding of the evidence, the parties may deal with it by filing additional evidence. If my concern is well founded, the parties may propose supplementary notice provisions intended to reach potential class members in Northwest Territories, Nunavut and Yukon. (I note that amendments to the Notice Plan may be agreed upon by the parties pursuant to s. 14.1 of the Settlement Agreement.)

**The Issues**

[35]      This application asks the court to: (1) approve the fees, disbursements and applicable taxes requested by Class Counsel; (2) approve the Settlement Agreement as fair, reasonable and in the best interests of the Saskatchewan Class and Family Class members; and (3) approve the proposed payment of $2 million (less $150,000.00 in fees) to the Provincial Health Insurers.

2017 SKQB 287 (CanLII)

− 13 −

**Principles of Settlement Approval in Class Actions**

[36]        Applications for approval of settlement agreements in class actions are rarely opposed. They give rise to two principle concerns. One is that lawyers who have a self-interest in settling claims for class members, thereby securing large counsel fees, avoid conflict with the interests of the class. The other is that class members receive substantive justice for the harm done to them.

[37]        As stated by Warren K. Winkler, Paul M. Perell, Jasminka Kalajdzic & Alison Warner, *The Law of Class Actions in Canada* (Toronto: Thomson Reuters, 2014) at 301:

> Since most class actions settle, the integrity and the legitimacy of class actions as a means to secure access to justice largely depends upon the court properly exercising its role in the settlement approval process. Court approval of the settlement ensures that the immediate parties are not violating the legislation, abusing the administration of justice, or settling for improper or inadequate reasons. The court has an obligation under class proceedings legislation to protect the interests of the absent class members, both in determining whether the settlement meets the test for approval, and in ensuring that the administration and implementation of the settlement are done in a manner that delivers the promised benefits to the class members.

[38]        The court's role is made more difficult when it is given an incomplete picture of the legal and factual dynamics prompting settlement. In this case, Class Counsel have not disclosed basic information including the fee sharing agreement setting out how Class Counsel and Consortium Counsel propose to divide up some $4.5 million in legal fees, the Agreements in Principle dated April 4, 2016 and April 15, 2016 and the National Settlement Agreement referred to in Belobaba J.'s conditional certification order granted April 15, 2016 (if there was one).

2017 SKQB 287 (CanLII)

− 14 −

[39]        During the hearing of this application I asked Class Counsel why their fee sharing agreement had not been disclosed to the court. Class Counsel in the Ontario Proceeding replied that there is no written fee sharing agreement to disclose and that all of the law firms have nothing more than a "handshake agreement". With respect, I regard that as unlikely. It brings to mind Justice Belobaba's comments in *Sheridan Chevrolet Cadillac Ltd. v Furakawa Electric Co.*, 2016 ONSC 729 at paras 10-12:

> **10** It was the actual settlement that was problematic. I was not satisfied with what has now become an almost "boiler plate" formulation of the reasons for court approval that can be found in almost every plaintiff's factum. The boiler-plate for settlement approval comes down to something like this: "We're experienced class counsel; we know what we're doing; there were lots of litigation risks; we negotiated the best possible deal for the class members; trust us."

> **11** I am not denigrating class counsel - the vast majority of whom have enormous integrity and probably work very hard to achieve outcomes that are in the best interests of the class. I am criticizing the boiler-plate that is found in too many of the settlement approval facts and the judges who succumb to the "we're experienced class counsel - we know what we're doing -- trust us" kind of argumentation.

> **12** If class action judges are to do their job (and be more than rubber-stamps) in the settlement approval process, and ensure that the settlement amount is indeed fair and reasonable and in the best interests of the class (and not just class counsel) then at the very least class counsel should provide affidavit evidence explaining why the actual settlement amount is fair and reasonable or more specifically, clear reasons why the settlement amount is in the "zone of reasonableness."

2017 SKQB 287 (CanLII)

− 15 −

**The Role of Class Counsel Fees in the Negotiations**

[40]        The parties have provided the court with bits and pieces of evidence, but the dynamics of the settlement discussions have not been explained. If the court is to understand what really happened it must do its best to connect the evidentiary dots. Having done so, I will explain why I believe the issue of legal fees played a central role in Class Counsels' decision to settle.

[41]        In March 2016, plaintiffs' counsel in the four proceedings were faced with almost simultaneous certification hearings in the Ontario Proceeding and the Saskatchewan Proceeding. There was the potential for conflicting multi-jurisdictional certification orders, both of which would have been subject to a constitutional challenge by the defendants. There was also the potential for three of the four law firms to have their proceedings stayed, which would mean losing the ability to recover their legal fees for time spent pursuing their respective class actions.

[42]        Counsel for both sides in the Ontario, Quebec and Nova Scotia Proceedings began discussing settlement. On April 4, 2016, being the day before the certification hearing was scheduled to commence in the Ontario Proceeding, they reached an Agreement in Principle. To that point, plaintiff's counsel in the Saskatchewan Proceeding, MLG, had not participated in the discussions.

[43]        At that point, MLG faced the prospect of counsel representing the plaintiffs and defendants in the Ontario, Quebec and Nova Scotia Proceedings (perhaps supported by Consortium Counsel) obtaining a consent national

2017 SKQB 287 (CanLII)

− 16 −

certification order in Ontario. This raised the possibility that the Saskatchewan Proceeding would not be certified pursuant to s. 6.1(b) of the *CAA* whereupon MLG would not be able to recover its accumulated legal fees.

[44]    On April 15, 2016, being the last business day before the certification hearing was scheduled to commence in the Saskatchewan Proceeding, the four firms comprising Class Counsel entered into a second Agreement in Principle with the defendants. That same day they obtained a consent order in the Ontario Proceeding certifying a national opt out class in the Ontario Proceeding for the stated purpose of implementing "a National Settlement Agreement dated April 15, 2016".

[45]    It is a reasonable assumption that although the Agreement in Principle was put together rather hastily, it was not concluded until after Class Counsel had agreed upon how they would divide the 25% contingency fees ($4.5 million) they hoped to recover from the $18 million recovered for class members. Each apparently agreed to accept approximately one-quarter of that fee.

[46]    Not much seems to have occurred for the next almost 11 months, at least on the surface. Some of the affidavit evidence suggests that the only change of significance was that Class Counsel were able to extract another $1 million payment from the defendants for the Provincial Health Insurers. For that, they ask the court to approve their fee of $150,000.00

[47]    However, it is apparent that between April 15, 2016 and March 7, 2017 the basic structure of the settlement changed from an agreement to pursue only the Ontario Proceeding with a national opt out class description

− 17 −

(as set out in the conditional certification order granted by Belobaba J. on April 15, 2016) to an agreement to pursue court approval for four separate actions (the Ontario, Quebec, Nova Scotia and Saskatchewan Proceedings) with class descriptions encompassing all of Canada's provinces and territories as set out in the conditional certification orders described in paras. 17 to 21 of this decision.

[48]       Since the parties have not explained the rationale of this restructuring, I am left to draw my own conclusions.

[49]       On November 23, and 26, 2015 the Ontario Superior Court issued two decisions in *Bancroft-Snell v Visa Canada Corporation,* 2015 ONSC 7275 [*Bancroft-Snell SC1*] and 2015 ONSC 7411 [*Bancroft-Snell SC2*]. The decisions rejected a fee sharing agreement between two law firms engaged in a class action carriage dispute. One of the law firms (MLG) had agreed to accept a payment out of the other law firm's contingency fee in return for abandoning its competing class action.

[50]       In *Bancroft-Snell SC1*, the motion judge had expressed the view (at para. 64) that the fee sharing agreement, which had been negotiated at a judicial settlement conference convened by a judge of the Alberta Court of Queen's Bench, was not only unenforceable but "possibly illegal". Second, he had stated (at para. 65) that the fee agreement "undermined the integrity of the class action regime". Third, he stated (at paras. 85 and 86), that proceedings in multiple provinces provide no added value for class members, who should not be required to bear the costs – and in particular, the costs of a carriage dispute. Finally, he opined (at para. 79) that in carriage disputes class counsel would often be well advised to "fight the good fight" with competing counsel rather

2017 SKQB 287 (CanLII)

– 18 –

than taking the "discretion over valour cop-out" by paying what he referred to as "ransom".

[51]    For all those expressed reasons in *Bancroft-Snell SC1* and *Bancroft-Snell SC2*, the motion judge had reduced class counsel's proposed 25% contingency fee by 10%, which was slightly less than to what they had agreed to pay MLG to abandon its competing class action.

[52]    On November 28, 2016 the Ontario Court of Appeal issued its decision in *Bancroft-Snell v Visa Canada Corporation*, 2016 ONCA 896 [*Bancroft-Snell CA*] upholding the motion judge's decision to reduce class counsel's contingency fee. In doing so, Blair J.A. stated at para. 48:

> **[48]** The primary effect of a side agreement such as the fee sharing agreement between two sets of counsel fighting it out for the right to retain or obtain the brief to represent class members in a national class proceeding is that putative class counsel are "bought off" in the carriage settlement in exchange for their agreement to stay their competitive class proceeding in favour of successful class counsel's class proceeding. Where the price of that exchange is to be paid out of the proceeds of settlement and as part of the counsel fee provided for under the contingency fee agreement between class counsel and the representative party, I see no valid reason why the "shared fee payment", and the value, if any, flowing from the services it is said to represent, cannot be reviewed as a component of the fees encompassed by the contingency agreement and subject to court approval…

[53]    And at paras. 90-92:

> **[90]** While it may be that in an ideal world, the tools exist to enable class counsel to avoid the necessity of multiple parallel class proceedings in different provinces, we do not live in an ideal world and we do live in a Canada where jurisdictional competence is divided between the federal, provincial and territorial governments. There will be carriage disputes -- some justified, some perhaps not -- until there is a legislative or other effective solution to these

2017 SKQB 287 (CanLII)

− 19 −

problems. And, if there are carriage disputes, there will and should be carriage settlements such as occurred here.

[91] The issue on a fee approval motion is not so much whether the carriage dispute or the carriage settlement was justified. The issue is who should bear the cost of that fight -- the lawyer participants for whose primary benefit the struggle is waged, or the class members? It seems to me that it is the lawyer participants who should bear the costs.

[92] If class counsel see it in their best interests to resolve carriage disputes by agreeing privately, amongst themselves, to remunerate one set of class counsel for leaving the scene, that is a matter for their private business determination. But they should bear the cost of that business decision as well, in my view. The [page267] class members ought not to be exposed -- either directly or through some form of "potential carriage dispute mark-up" built into the contingency fee negotiated with the class members -- to having to pay for what is essentially a general business expense of the firm associated with the litigation and not an expense providing any added value to the class action itself.

[54]    And, at para. 98:

[98] If competing class counsel wish to engage in a competitive carriage dispute for the right to carry the class action and in the process make a side agreement respecting fees as a way to persuade one or the other to back away, they should pay the fees out of their own pockets as part of their variable costs of doing business and not expect that the counsel walking away will have direct access to payment out of the contingency fee. To hold otherwise would be to defeat the purpose of attempting to discourage these types of competing actions that provide little or no benefit to the members of the class.

[55]    Faced with those decisions by the Ontario courts, Class Counsel in this case, with the co-operation and agreement of counsel for the defendants, set out to restructure the Agreement in Principle dated April 15, 2016 in such a way that none of them would be perceived as "buying off" or paying "ransom" to any of the others. After all, none of them had chosen to

− 20 −

"fight the good fight"; all had instead chosen to take the "discretion over valour cop-out".

**Conclusion re: Legal Fees**

[56]        Absent a better explanation, I infer that the revised Settlement Agreement dated March 7, 2017 represented Class Counsel's response to the decisions of the Ontario courts in *Bancroft-Snell CA*. They restructured the settlement so that each of the four law firms could be seen as carrying on as representative plaintiff's counsel in separate, discrete class proceedings. They agreed that each would receive an amount equal to approximately one-quarter of the 25% contingency on the total recovery for class members, which coincidentally was the value of their (unverified) docketed time. Moreover, they agreed to pay fees to Consortium Counsel out of their own contingency fees in return for the abandonment of Consortium Counsel's parallel, duplicative actions in other jurisdictions.

[57]        In *Bancroft-Snell SC*, the motion judge had refused to approve a fee sharing agreement whereby Class Counsel had agreed to pay, out of their own 25% contingency fee, $400,000 to MLG to abandon a parallel, multi-jurisdictional class action. I note that in this case, Class Counsel have agreed to pay, out of their own proposed 25% contingency fee, $400,000 to Consortium Counsel to abandon seven parallel, duplicative proceedings.

[58]        Although the two situations appear to have been much the same, if not identical, the proposed payments to Consortium Counsel by Class Counsel in this case were of no concern to the courts approving the requested

2017 SKQB 287 (CanLII)

− 21 −

counsel fees in the Ontario, Quebec, and Nova Scotia Proceedings. None of those courts referenced the Ontario decisions in *Bancroft-Snell*.

[59]     Looking at the larger picture, one could ask whether the restructuring of the Settlement Agreement increased legal and administrative costs for the benefit of Class Counsel at the expense of class members.

[60]     However, the ultimate question is whether the counsel fees claimed are fair and reasonable. As stated in *The Law of Class Actions in Canada* at 399:

> At its core, the fairness and reasonableness of the fees awarded in respect of class proceedings is to be determined in light of the risk undertaken by the lawyer in conducting the litigation and the degree of success or result achieved.

[61]     In the *Bancroft-Snell* decisions the Ontario courts chose to focus, not on the risk and result, but on its own assessment of whether, and to what extent, MLG had contributed to the result. Their rationale was that lawyers who do not contribute to the recovery for class members should not be paid. That focus on the lawyer's contribution (or lack of contribution) is not necessarily compatible with an assessment based on risk undertaken and the degree of success or result achieved for class members.

[62]     In my respectful view, once it is determined that a recovery for class members warrants the payment of a 25% contingency fee for Class Counsel (as has already been determined by the courts in Ontario, Quebec, and Nova Scotia in this case) an attempt to measure whether any particular law firm or litigation decision contributed more or less to the end result would serve no useful purpose. Similarly, an effort to measure whether one or more

2017 SKQB 287 (CanLII)

– 22 –

of the parties to a fee sharing agreement contributed more or less time, knowledge and/or wisdom to the ultimate settlement would be ill advised, if for no other reason that such measurements cannot be made in a uniform and consistent manner. The settlement approvals in this case illustrate the point.

[63]     Every class action entails a myriad of litigation decisions. Every settlement is driven by its own dynamics. Very often, they are not known to the court. In this case, Class Counsel entered into an agreement that brought the high costs of parallel, competing multi-jurisdictional proceedings to an end. They agreed upon a single Claims Administrator to bring about a measure of cost efficiency. And, they capped the costs to class members at a 25% contingency no matter how many law firms shared in that amount. They agreed to pay Consortium Counsel fees out of their own fee. By doing so, to use the words in *Bancroft-Snell CA* at para 98, they "paid the fees out of their own pockets as part of the variable costs of doing business".

[64]     None of this means that I can, or will, approve the requested fees on this application. In a moment I will explain why I cannot approve the provisions of the Settlement Agreement. My decision may require the Settlement Agreement to be revised and a new application brought for its approval. At the very least, it will require substantial supplementary materials to be filed by Class Counsel. This will take time. My impending retirement must be taken into account. It means that a renewed application will likely be heard by a new case management judge to be appointed by the Chief Justice pursuant to the *CAA*.

[65]     Given these circumstances, I will not make a decision with respect to the approval of Class Counsels' legal fees now for two reasons.

2017 SKQB 287 (CanLII)

− 23 −

First, it is not necessary to this decision. Second, no decision regarding the approval of counsel fees should be made until the court is in a position to review and approve a Settlement Agreement, revised or otherwise. Those questions should appropriately be left to the unfettered discretion of the judge who will be hearing the matter.

**Settlement Payment for Class Members**

[66]        I turn to the question of whether the amount recovered for class members, after deducting legal fees and other expenses is fair, reasonable and in their best interests. Clearly, that question cannot be answered in isolation from the question of legal fees. It too will be left to the decision of a new case management judge. However, I will outline what I consider to be some of the most relevant facts to be considered.

[67]        This Court has not received any objections to the proposed settlement. The $18 million payment to class members has already been approved in the Ontario, Quebec and Nova Scotia Proceedings.

[68]        As is often the case, the court has limited capacity to value what class members will actually receive in the settlement. The Settlement Agreement requires class members to file claims before receiving any payment, with a complicated set of criteria for determining the amount of any recovery. It is difficult, perhaps impossible to predict the take up rate for potential claimants.

[69]        That said, the affidavit evidence asserts that the average pay out to the expected claimants will likely be in the range of $13,000 to $18,000 less costs. As noted by Belobaba J. in his reasons for approval dated July 19, 2017,

− 24 −

this is close to the average $13,000 pay out achieved for class members in the United States OxyContin settlements with Purdue.

[70]        Whether or not the Settlement Agreement is approved will depend on more than just the amount to be paid to class members. It is a lengthy, complicated document with provisions that are both favourable and unfavourable to the class members. The entire agreement will be considered in determining whether the settlement for class members, taking into account counsel fees, should ultimately be approved.

**Payments to Provincial Health Insurers**

[71]        I turn now to the provisions of the Settlement Agreement relating to the Provincial Health Insurers. Although principles of comity and a desire to promote coherency and efficiency in multi-jurisdictional class proceedings weigh in favour of approving them, I cannot do so based on the materials filed on this application.

[72]        For ease of reference, s. 6.2 of the Settlement Agreement states:

> **6.2** Payments shall be made from the Escrow Settlement Payment to satisfy the claims of the Provincial Health Insurers. The claims administrator shall distribute these funds, less Class Counsel Legal Fees, a proportionate share of disbursements, and applicable taxes, to the Provincial Health Insurers in a manner to be agreed upon by Class Counsel and the Provincial Health Insurers, and approved by the Courts. These payments shall be in full and final satisfaction of Medical Services provided for and to be provided for Class Members, and the Provincial Health Insurers shall have no other claim.

[73]        The terms "Provincial Health Insurers" and "Medical Claims" are defined in s. 2 of the Settlement Agreement as follows:

2017 SKQB 287 (CanLII)

− 25 −

> "**Provincial Health Insurers**" shall mean all provincial and
> territorial Ministries of Health or equivalents, provincial and
> territorial governments, and/or provincial and territorial plans
> funding Medical Services throughout Canada.
>
> "**Medical Services**" shall mean medical, paramedical,
> pharmaceutical and alternative non-medical treatment, nursing care,
> counselling, social work, hospital and homecare services provided
> and to be provided to Class Members relating to their use of
> OxyContin® and/or OxyNEO®.

[74]     Section 6.2 of the Settlement Agreement states that the amount to
be paid to the Provincial Health Insurers must be "agreed upon by Class
Counsel and the Provincial Health Insurers, and approved by the Courts".
MLG's submission in support of this application states:

> **47.** In satisfaction of Medical Services provided for, and to be
> provided for, Class Members, and Provincial Health Insurers are to
> be paid $2,000,000.00, pro rata based on population, from the
> Settlement Payment.

[75]     This presumably means that, Class Counsel entered into
negotiations with the Provincial Health Insurers and, in the result, agreed to
pay them $2 million out of the defendants' $20 million settlement payment.
For doing so, Class Counsel requests a fee of $150,000.00 leaving $1.85
million to be divided among all of the Provincial Health Insurers, *pro rata*
based on population.

[76]     At the hearing of this application, I asked counsel to provide a
best estimate of the amount to be received by the Provincial Health Insurers in
each province and territory in the Saskatchewan Class. Mr. Rochon, Class
Counsel in the Ontario Proceeding, replied that this information could only be
provided by a committee of Provincial Health Insurer representatives.

2017 SKQB 287 (CanLII)

− 26 −

[77]        Rather than incur the time and cost of convening that committee I
will, for the purpose of this decision take judicial notice of widely available
2016 census data. My preliminary estimate is that out of the proposed $1.85
net million payment, there would be a total of $344,470.00 paid for all of the
subrogated claims of Provincial Health Insurers in the three provinces and
three territories named in the Saskatchewan Class made up as follows:

|  | Population | % of Total Population | *Pro Rata* Amount |
|---|---|---|---|
| Canada | 35,151,728 | 100% | $1,850,0000 |
| Alberta | 4,067,175 | 11.6% | $214,600 |
| Manitoba | 1,278,365 | 3.6% | $66,600 |
| Saskatchewan | 1,098,352 | 3.1% | $57,350 |
| Northwest Territories | 41,786 | 0.12% | $2,200 |
| Nunavut | 35,944 | 0.10% | $1,850 |
| Yukon | 35,874 | 0.10% | $1,850 |
| **Total** | | **18.62%** | **$344,470** |

[78]        The court is asked to approve these payments in full settlement of
the claims of Ministries of Health in the above named provinces and territories
for all medical services provided and to be provided to class members as a
consequence of their use of OxyContin and/or OxyNEO. Having regard to the
scope of the claims to be settled, the proposed payments to the Provincial
Health Insurers seem paltry at best.

**Governing Legislation**

[79]        The Provincial Health Insurers' claims are not brought pursuant
to the *CAA*. They are not members of a class established by the court under the
*CAA*. Their claims are brought pursuant to dedicated legislation enacted in

2017 SKQB 287 (CanLII)

every province and territory of Canada prescribing the manner in which subrogated claims are made on behalf of Provincial Health Insurers.

[80]         The governing legislation in Saskatchewan is s. 19 of *The Health Administration Act*, RSS 1978, c H-0.0001 which states in part:

> **19**(1) In this section:
>
> (a) **Repealed.** 1997, c.34, s.9.
>
> (b) "**health services**" means:
>
> (i) insured services within the meaning of The Saskatchewan Medical Care Insurance Act;
>
> (ii) inpatient services or outpatient services provided in a hospital or any other health facility;
>
> (iii) services provided pursuant to section 10 that a physical therapist is authorized to provide; or
>
> (iv) any other services prescribed in the regulations.
>
> (2) Where, as a result of the negligence or other wrongful act of any other person, a beneficiary suffers personal injuries for which the beneficiary receives health services, the beneficiary has the same right to recover the cost of those services from the person guilty of the negligence or other wrongful act as the beneficiary would have had if he or she had been required to pay for the health services.
>
> (3) On the provision of health services to a beneficiary mentioned in subsection (2), the minister shall be subrogated to all rights of recovery of the beneficiary from any person with respect to the cost of those health services and may bring an action in the name of the beneficiary to enforce those rights.
>
> (4) Nothing in subsection (2) or (3) restricts the right of the beneficiary to recover any sum with respect to the personal injuries in addition to the cost of health services received by the beneficiary.
>
> (5) Where a beneficiary brings an action to recover any sum with respect to the personal injuries mentioned in subsection (4), the beneficiary shall, on behalf of the minister, include in his or her

2017 SKQB 287 (CanLII)

− 28 −

> claim a claim for the cost of health services received by the
> beneficiary.
>
> (6) Except with the written consent of the minister, no action
> mentioned in subsection (5) shall be settled without provision being
> made for payment in full of the cost of health services received by
> the beneficiary.

[81]      Section 19(6) of *The Health Administration Act* is clear: any
settlement without provision being made for payment in full of the cost of
health services requires the consent of the minister responsible for the
Provincial Health Insurers. This is based on the premise that the cost of health
services being claimed by a plaintiff on behalf of Provincial Health Services
must be quantified before settlement − an impossibility in this case until
approved claimants are identified. Even if it had been possible, there is no
evidence it was ever done.

[82]      Counterpart legislation to *The Health Administration Act* is in
place in every Canadian jurisdiction, including each of the other two provinces
and three territories named in the Saskatchewan Proceeding. The subrogated
claims of the Provincial Health Insurers are explicitly based on that
legislation, as set out in paras. 21 to 27 inclusive of the plaintiff's Third
Amended Statement of Claim.

[83]      I will assume that subrogated claims are now being advanced in
the Saskatchewan Proceeding on behalf of each of the Provincial Health
Insurers in Saskatchewan, Alberta, Manitoba, Northwest Territories, Nunavut
and Yukon, while subrogated claims on behalf of all of the other Provincial
Health Insurers in Canada are being pursued in the Ontario, Quebec and Nova
Scotia Proceedings.

− 29 −

[84]     To be clear, if the proposed settlement of the Provincial Health Insurers subrogated claims do not meet the requirements of the legislation on which they are based, the settlements will not be approved.

**Absence of Evidence**

[85]     The affidavit of Kate Boyle affirmed August 18, 2017 was filed in support of this application. It states (at para. 73):

> **73** Representatives for the Provincial Health Insurers have approved
> the terms of the Settlement Agreement.

[86]     During the hearing of this application, I asked plaintiff's counsel to file copies of the consents provided to them by the Provincial Health Insurers. I did not expect that request to be contentious.

[87]     In response, Class Counsel in the Ontario Proceeding, Mr. Rochon, alluded to communications that had taken place between Class Counsel and a representative of Provincial Health Insurers. He did not say whether the consents of the individual Provincial Health Insurers had ever been obtained.

[88]     Mr. Merchant's response was somewhat different. He asserted that although the representative plaintiff is pursuing subrogated claims on behalf of the Provincial Health Insurers, there is no obligation to obtain the Provincial Health Insurers consent to any settlement and, as I understood the argument, to even inform them of the terms of the proposed settlement.

[89]     Given this confusion, I have concluded that the court must be satisfied the individual Provincial Health Insurers have provided their

2017 SKQB 287 (CanLII)

− 30 −

informed consents to the payments provided for them by the Settlement Agreement in satisfaction of their claims.

**Perception of Potential Conflict of Interest / Collusion**

[90]        I have observed that s. 6.2 of the Settlement Agreement left the amount to be paid to the Provincial Health Insurers to be agreed upon, not between the defendants and the Provincial Health Insurers, but between Class Counsel and the Provincial Health Insurers. On its face, this created, if not a very real conflict, then at least a perception of conflict for Class Counsel. Quite simply, it obligated them to broker competing claims to the settlement payment on behalf of class members, on the one hand, and Provincial Health Insurers, on the other − both of whom were paying them fees. This placed them in what, on its face, was an untenable position, since every dollar recovered for one party would mean a dollar less for the other.

[91]        MLG, seemingly oblivious to the conflict, urges the court to find that the minimal payment amount negotiated for Provincial Health Insurers was a benefit for class members. Paragraph 149 of the brief filed by MLG in support of this application states:

> **149.** In many cases the health care costs incurred by the Provincial Health Insurers in treating addiction would be quite substantial and could exceed the claim of the individual Class Members. In these circumstances, Class Members receive an overall benefit through the lump sum settlement with the Provincial Health Insurers.

[92]        Class Counsels' potential conflict is not reduced by the fact that they seek approval for payment of fees at an effective rate of 7.5% on the $2 million recovered to compensate Provincial Health Insurers (no fee on the first

2017 SKQB 287 (CanLII)

– 31 –

$1 million, 15% on the second $1 million) but 25% of the remaining $18 million settlement payment.

[93]      Add to these concerns the fact that the Provincial Health Insurers were not parties to the Settlement Agreement. In their absence (and without any indication of their prior approval and consent) Class Counsel and the defendants placed the following provisions into the agreement:

> **10.3** Class Members and Family Class Members who do not opt out shall be bound by this Settlement Agreement. The Provincial Health Insurers do not have the right to opt out of this Settlement Agreement.
>
> …
>
> **16.1** This Settlement Agreement shall be the exclusive remedy for the Provincial Health Insurers and all Class Members and Family Class Members who do not Opt Out.

[94]      These provisions had the potential to dramatically alter the bargaining dynamics of the negotiations between Class Counsel and the Provincial Health Insurers. In my view, they raise serious concerns, not only of conflict, but of potential collusion between Class Counsel and the defendants for the purpose of reducing the Provincial Health Insurers negotiating strength.

**Conclusion re: Provincial Health Insurers**

[95]      My concerns about the provisions of the Settlement Agreement relating to the Provincial Health Insurers may be summarized as follows:

- The Provincial Health Insurers are not parties to the Settlement Agreement;

2017 SKQB 287 (CanLII)

− 32 −

2017 SKQB 287 (CanLII)

- The court has not received any evidence of an agreement between Class Counsel and individual Provincial Health Insurers as contemplated by s. 6.2 of the Settlement Agreement and the applicable legislation in each jurisdiction;

- The requirements of the legislation governing settlements of subrogated claims of Provincial Health Insurers do not appear to have been met;

- The structure of the Settlement Agreement raises concerns about a conflict of interest between Class Counsels' duty to class members, on the one hand, and Provincial Health Insurers, on the other;

- The specific provisions of the Settlement Agreement raises concerns about potential collusion between Class Counsel and the defendants; and

- The Provincial Health Insurers have not received notice of this application and an opportunity to be heard.

[96]    For these reasons, I decline to approve the provisions of the Settlement Agreement relating to the Provincial Health Insurers. This will leave the parties with at least three options:

1.    They may reapply for approval of the Settlement Agreement with supplementary material

− 33 −

addressing the concerns raised in this decision and on notice to the Provincial Health Insurers;

2.    They may agree to amend the Settlement Agreement by removing its provisions relating to the claims of the Provincial Health Insurers. They may then reapply for orders approving Class Counsel's fees and the remaining provisions of the Settlement Agreement; or

3.    They may return one or more of their motions for certification and other outstanding applications to a court of competent jurisdiction.

[97]    Because of my imminent retirement, I will be requesting the Chief Justice to appoint a judicial replacement to assume case management jurisdiction over this matter. Until that appointment is made, I will remain available to counsel in the usual manner.

_____ J.
D.P. BALL

2017 SKQB 287 (CanLII)