## Exhibit B

# QUEEN'S BENCH FOR SASKATCHEWAN

Citation: **2018 SKQB 86**

| | |
|---|---|
| Date: | **2018 03 15** |
| Docket: | QBG 1073 of 2012 |
| Judicial Centre: | Regina |

BETWEEN:

DEMETRIOS PERDIKARIS

PLAINTIFF

- and -

PURDUE PHARMA, PURDUE PHARMA INC.,
PURDUE FREDERICK INC., THE PURDUE
FREDERICK COMPANY, INC. and PURDUE
PHARMA LLP

DEFENDANTS

**Counsel:**

| | |
|---|---|
| E.F. Anthony Merchant, Q.C. | for the plaintiff, Demetrios Perdikaris |
| Michael Rob and Joel Rochon | Class counsel for Ontario, Quebec and Nova Scotia |
| Jason Mohrutter and Barry Glaspell | for Purdue Pharma, Purdue Pharma Inc. and Purdue Frederick Inc. |
| David Byers | for Purdue Frederick Company Inc. and Purdue Pharma LLP |
| Clint Docken, Q.C. | for the Juchacz, Black and Newton actions |
| Peter Lawless | for the BC Ministry of Attorney General and on behalf of Alberta, Saskatchewan, Ontario, Manitoba, Quebec, Nova Scotia, Prince Edward Island, New Brunswick, Newfoundland and Labrador |

JUDGMENT                                                 BARRINGTON-FOOTE J.
MARCH 15, 2018

2018 SKQB 86 (CanLII)

- 2 -

## INTRODUCTION

[1]        On August 18, 2017, the plaintiff applied pursuant to s. 38 of *The Class Actions Act*, SS 2001, c C-12.01 [*Act*] for the following orders in this OxyContin® and OxyNEO® class action:

1.    Approving a National Settlement Agreement [Settlement Agreement]; and

2.    Approving the fees, disbursements and applicable taxes requested by Wagners, Rochon Genova LLP, Siskinds LLP, and Merchant Law Group [MLG], the four firms that coordinated a national settlement of all class action litigation relating to the use of OxyContin® and OxyNEO® [class counsel].

[2]        Ball J. declined to grant that application, primarily as a result of concerns relating to the provisions of the Settlement Agreement which dealt with the subrogated claims of Provincial health insurers [PHIs] for the cost of health services provided or to be provided to class members: see *Perdikaris v Purdue Pharma*, 2017 SKQB 287 [*Perdikaris 2017*].

[3]        Ball J. did not decide whether the Settlement Agreement is fair and reasonable and in the best interests of the class, or whether the legal fees should be approved. Nor did he dismiss the applications. He left the parties the option to reapply, with supplementary material addressing the concerns raised in his decision, and on notice to the PHIs.

[4]        They have now done so, renewing their application for approval of the Settlement Agreement, and the fees, disbursements and taxes payable to

2018 SKQB 86 (CanLII)

- 3 -

2018 SKQB 86 (CanLII)

class counsel. For the reasons that follow, I am not prepared to grant that approval.

## A.    BACKGROUND

[5]        The representative plaintiff in this, the Saskatchewan action, claims on behalf of all persons who were prescribed OxyContin® and/or OxyNEO® [Oxy] in Saskatchewan, Alberta, Manitoba, the Northwest Territories, Nunavut and the Yukon. Their counsel is MLG. The claims of those in other provinces were asserted in class actions in Ontario, Nova Scotia and Québec. The events which resulted in the Settlement Agreement, and its conditional approval by courts in Ontario, Nova Scotia and Québec, are outlined in *Perdikaris 2017*, at paras 5-22, and 29-32. I will not repeat them here. Each of those approvals remains effective only if the Settlement Agreement is also approved in this, the Saskatchewan proceeding.

[6]        It is important to note that these actions, and the Settlement Agreement, do not deal with the claims of all of those who have suffered losses as a result of an addiction to Oxy. In particular, they do not claim on behalf of those introduced to these drugs through illicit recreational use. Rather, they deal with those who became addicted as a result of ingesting drugs they were prescribed, their family members, and PHIs who suffered losses as a result of their addiction. Nor does the proposed settlement deal with all potential defendants. It would resolve claims against four defendants who manufactured, marketed, or sold these drugs, or introduced them into the stream of commerce in Canada.

- 4 -

[7]        Class counsel emphasized that the Settlement Agreement would not preclude claims by class members against physicians who prescribed Oxy. I note, however, that this exception for physicians may well be of little value to class members. If a class member claimed against their physician and the physician claimed over against a defendant in this action, the Settlement Agreement would oblige the class member to seek dismissal of that claim over, and to substantially indemnify the defendant for their costs incurred as a result of the claim over.

[8]        The Settlement Agreement provides that class members and PHIs will release their claims for $20 Million, which will be used and distributed in accordance with the Settlement Agreement. In *Perdikaris 2017*, Ball J. briefly summarized the proposed allocation of settlement funds to fees, costs, class members, and PHIs, as follows:

### Overview of the Settlement Agreement

23    The Settlement Agreement provides for the defendants to make a settlement payment as follows:

> "**Settlement Payment**" shall mean the payment of CAD$20,000,000.00, inclusive of all interest, taxes and costs, which shall be used to pay the Non-Refundable Expenses, other costs of notice and administration, compensation for Approved Claimants, amounts to satisfy the claims of Provincial Health Insurers and Class Counsel Legal Fees, as described herein.

24    The subrogated claims of Provincial Health Insurers against the defendants are dealt with in a number of provisions including the following (s. 6.2):

> **6.2** Payments shall be made from the Escrow Settlement Payment to satisfy the claims of the

2018 SKQB 86 (CanLII)

2018 SKQB 86 (CanLII)

- 5 -

Provincial Health Insurers. The claims administrator shall distribute these funds, less Class Counsel Legal Fees, a proportionate share of disbursements, and applicable taxes, to the Provincial Health Insurers in a manner to be agreed upon by Class Counsel and the Provincial Health Insurers, and approved by the Courts. These payments shall be in full and final satisfaction of Medical Services provided for and to be provided for Class Members, and the Provincial Health Insurers shall have no other claim.

25    Class Counsel state that they have reached an agreement to pay Provincial Health Insurers $2 million (less counsel fees of $150,000.00) out of the settlement payment in full satisfaction of their claims for medical services provided for, and to be provided for, class members. If that payment is approved by the court, it will leave $18 million to satisfy the costs of administering the Settlement Agreement, the legal costs of Class Counsel and the approved claims of all class members.

26    Class Counsel asks the court to approve payment of their legal fees totalling $4.65 million, plus disbursements of $348,519.92 and applicable taxes. The requested 4.65 million in fees is made up of $150,000.00 on the $2 million payment to Provincial Health Insurers and $4.5 million (equal to a 25% contingency fee) on the remaining $18 million settlement payment. If those fees are approved, Class Counsel advise that they will pay, out of their own fee, approximately $400,000.00 in fees to "Consortium Counsel", being the law firms representing the plaintiffs in the seven other class actions commenced between September 26, 2007 and June 22, 2012 (see para. 4 above). They advise that in return Consortium Counsel have agreed to discontinue all of those other actions.

27    If the requested legal fees are approved, each of the four law firms comprising Class Counsel will receive approximately $1 million in fees. All of the law firms (Class Counsel and Consortium Counsel) will receive very close to 100% of their (unverified) docketed time.

28    The Settlement Agreement is not contingent upon court approval of the requested counsel fees.

- 6 -

[9]        Class counsel disclosed the evidence they used to generate their assumptions about the number of potential class members and potential total recovery. Those assumptions informed their negotiations with the defendants, which began with a mediation session March 2016, and resulted in an agreement in principle in April 2016. There were, as of March 2016, 1,618 potential claimants who had contacted Wagners, Rochon Genova LLP, and Siskinds LLP. Based on that number and past experience, those firms estimated that between 2,500 and 3,000 people would file claims if the action is settled. This estimate did not take account of potential claimants who contacted MLG, which was not yet a party to the negotiations.

[10]        Counsel also provided an estimate of the potential range of recovery by approved claimants. They were able to identify only a handful of cases that awarded damages for addiction, ranging between $2,000 and $25,000. On that basis, they concluded that a reasonable recovery range for total recovery was $5,000,000 to $75,000,000. Those totals are the product obtained by multiplying their $2,000 to $5,000 range by their estimate of the likely number of claimants. They did not include a discount for the litigation risks on certification, at any common issues trial, and at the individual issues stage. They identified, and provided some evidence and made some submissions, about those risks, including as to Oxy litigation and settlements in the United States.

[11]        Counsel also provided evidence of their estimate of average damages that would be recovered by each approved claimant if the Settlement Agreement is approved. They randomly selected 100 potential class members from the 1,618 contacts noted above, and reviewed the potential validity of

2018 SKQB 86 (CanLII)

2018 SKQB 86 (CanLII)

their claims based on their files. They concluded, based on that review, that "roughly" 1,475 to 1,770 of the 2,500 to 3,000 claimants would be approved. There was no evidence as to the likely accuracy of their sampling technique and analysis.

[12]      On the basis of those assumptions about potential class size and damages, class counsel estimated that average compensation for an approved claimant would be between $11,000 and $13,500, including legal fees. In their view, that range of recovery compared well with the average amount paid by drug companies to settle 9,975 US civil claims as a result of a $130 Million settlement with the US government. They also note it falls within the $2,000 to $25,000 range disclosed by the case law.

[13]      There was no evidence of the number of potential claimants who had contacted with MLG as of March 2016. There was evidence that 556 individuals provided their contact information on the MLG website by May 18, 2017, and that 592 had done so by December 19, 2017. That evidence is not addressed in class counsel's analysis or submissions. There was also evidence that class counsel received enquiries from 450 new prospective class members between May 12, 2017 and July 12, 2017. There was no evidence of the total number of potential class members who contacted class counsel between July and by December 2017, nor a comparative analysis of the initial assumptions described above with what actually occurred.

## B.      LAW: APPROVING CLASS ACTION SETTLEMENTS

[14]      The test to be applied on an application to approve a class action settlement pursuant to s. 38 of the *Act* is uncontroversial. Laing C.J.Q.B. (as

- 8 -

he was then) summarized that test in *Driediger v Ashley Furniture Industries Inc.*, 2010 SKQB 437, 364 Sask R 130 [*Driediger*]. As he there noted, the court must be satisfied that the settlement is fair, reasonable, and in the best interests of the class as a whole. As he also noted, citing *Parsons v Canadian Red Cross Society* (1999), 40 CPC (4th) 151 (Ont Sup Ct), the issue is not whether the settlement meets the demands of a particular member of the class. Nor is it whether the settlement is perfect, but whether it falls within a "zone of reasonableness".

[15]     Similarly, as Sharpe J. (as he then was) noted in *Dabbs v Sun Life Assurance Co of Canada* (1998), 40 OR (3d) 429 (WL) (Ont Ct J):

> 30     … settlements "must be seriously scrutinized by judges" and that they should be "viewed with some suspicion". On the other hand, all settlements are the product of compromise and a process of give and take and settlements rarely give all parties exactly what they want. Fairness is not a standard of perfection. Reasonableness allows for a range of possible resolutions. A less than perfect settlement may be in the best interests of those affected by it when compared to the alternative of the risks and costs of litigation.

[16]     The need for serious judicial scrutiny, to protect the rights of the many class members not before the court, also underpinned the following comments by Belobaba J. in *Sheridan Chevrolet Ltd. v Furukawa Electric Co.*, 2016 ONSC 729 [*Sheridan Chevrolet*]:

> 10     …The boiler-plate for settlement approval comes down to something like this: *"We're experienced class counsel; we know what we're doing; there were lots of litigation risks; we negotiated the best possible deal for the class members; trust us."* [emphasis in original]
>
> …
>
> 12     If class action judges are to do their job (and be more than rubber-stamps) in the settlement approval process, and

2018 SKQB 86 (CanLII)

- 9 -

2018 SKQB 86 (CanLII)

> ensure that the settlement amount is indeed fair and
> reasonable and in the best interests of the class (and not just
> class counsel) then at the very least class counsel should
> provide affidavit evidence explaining why the actual
> settlement amount is fair and reasonable or more specifically,
> clear reasons why the settlement amount is in the "zone of
> reasonableness."

[17]      I agree. Further, I agree with the following statement by Belobaba

J. in *Leslie v Agnico-Eagle Mines Ltd.*, 2016 ONSC 532, 90 CPC (7th) 201:

> 12      I agree with American jurist Richard Posner that "a
> high degree of precision cannot be expected in valuing a
> litigation, especially regarding the estimation of the
> probability of particular outcomes." However, as Posner goes
> on to explain, a "ball park valuation" is nonetheless
> achievable and he urges the settlement approval judge to
> make every effort to "translate his intuitions about the
> strength of the plaintiff's case and the range of possible
> damages ... into numbers that would permit a responsible
> evaluation of the reasonableness of the settlement. [footnotes
> omitted]

[18]      *Middlemiss v Penn West Petroleum Ltd.*, 2016 ONSC 3537

[*Middlemiss*], and *Sheridan Chevrolet* are to the same effect. In both of those

cases, Belobaba J. required the production of further evidence before

approving a settlement. In *Middlemiss*, he also noted that "[e]arly stage

settlements understandably attract more judicial scrutiny than, say, settlements

achieved in the eve of the common issues trial". In one sense, this is not an

early stage settlement, as the Ontario, Québec and Nova Scotia claims were all

filed in 2007. However, the settlement was concluded before any application

for leave or certification was heard.

[19]      Courts have proposed various non-exclusive lists of criteria that

may assist in determining whether a settlement is reasonable. *Driediger* dealt

with this issue as follows:

- 10 -

13    In *Jeffery v. Nortel Networks Corp.*, 2007 BCSC 69, 68 B.C.L.R. (4th) 317 (B.C. S.C.), Groberman J. at para. 18 noted the factors to be considered in approving a class proceeding settlement are now well established. He went on to recite them as follows:

1. Likelihood of recovery or likelihood of success;

2. Amount and nature of discovery, evidence or investigation;

3. Settlement terms and conditions;

4. Recommendations and experience of counsel;

5. Future expense and likely duration of litigation;

6. Recommendations of neutral parties, if any;

7. Number of objectors and nature of objections; and

8. The presence of arms-length bargaining and the absence of collusion.

At paras. 19 and 20, Groberman J. went on to note:

19 In *Fakhri v. Alfalfa's Canada Inc*., 2005 BCSC 1123, 20 C.P.C. (6th) 70 (B.C. S.C.) at para. 8, Gerow J. added two additional factors to this list:

9. degree and nature of communications by counsel and the representative plaintiffs with class members during litigation; [and]

10. information conveying to the court the dynamics of, and the positions taken by the parties during the negotiation.

20 In *Reid v. Ford Motor Co.* 2006 BCSC 1454 (B.C. S.C.), at paragraph 11, Gerow J.

2018 SKQB 86 (CanLII)

- 11 -

2018 SKQB 86 (CanLII)

produced a slightly different list, this time adding the following as a factor:

11. if counsel fees were negotiated in the settlement, and if so, how big a factor are they; ...

At para. 28, Groberman J. summarized the foregoing factors as follows:

28 In summary, then, the court must consider four broad questions before approving the settlement of a class actions:

• Has counsel of sufficient experience and ability undertaken sufficient investigations to satisfy the court that the settlement is based on a proper analysis of the claim?

• Is there any reason to believe that collusion or extraneous considerations have influenced negotiations such that an inappropriate settlement may have been reached?

• On a cost/benefit analysis, are the plaintiffs well-served by accepting the settlement rather than proceeding with the litigation? and

• Has sufficient information been provided to the members of the class represented by representative plaintiffs, and, if so, are they generally favourably disposed to the settlement.

[20]     Finally, I agree with class counsel that my task is different in relation to PHIs. As they note, PHIs are not members of the class. They must each approve the settlement of their subrogated claim. They, unlike individual litigants, are well able to protect their own interests. This issue is dealt with further below.

- 12 -

## C.    ANALYSIS

[21]        I shall deal first with the issues identified in *Perdikaris 2017*. I will then deal with whether the Settlement Agreement is fair, reasonable, and in the best interests of the class as a whole.

### 1.    Notice in the Territories

[22]        The first concern identified in *Perdikaris 2017* was inadequate evidence relating to notice to potential class members in the Northwest Territories, Nunavut and the Yukon [North]. Ball J. invited the parties (at para. 34) to provide further evidence, and if necessary, to propose supplementary notice provisions.

[23]        Additional evidence has been filed. It confirms notice was provided in accordance with the notice plan approved in the April 19, 2017 order of Ball J. Written notice of the hearing and opt out form was provided to all class members whose addresses were known, with best efforts to follow-up if delivery did not occur. Notices were published in newspapers in accordance with the notice plan, except that the notice published in the Yukon News and News North was published on a weekday, as there was no weekend edition. Notices were also sent for posting in six hospitals, and 97 doctors' offices. As of December 19, 2017, three additional individuals from the North had provided their contact information on the website maintained by plaintiff's counsel.

[24]        In the result, I am satisfied that appropriate notice has been given to potential class members in the North.

2018 SKQB 86 (CanLII)

- 13 -

## 2.    Provincial Health Insurers

[25]    The second area of concern identified in *Perdikaris 2017* related to settlement with the PHIs. Ball J. had several concerns on that account. As he commented:

> 95    My concerns about the provisions of the Settlement Agreement relating to the Provincial Health Insurers may be summarized as follows:
>
> • The Provincial Health Insurers are not parties to the Settlement Agreement;
>
> • The court has not received any evidence of an agreement between Class Counsel and individual Provincial Health Insurers as contemplated by s. 6.2 of the Settlement Agreement and the applicable legislation in each jurisdiction;
>
> • The requirements of the legislation governing settlements of subrogated claims of Provincial Health Insurers do not appear to have been met;
>
> • The structure of the Settlement Agreement raises concerns about a conflict of interest between Class Counsels' duty to class members, on the one hand, and Provincial Health Insurers, on the other;
>
> • The specific provisions of the Settlement Agreement raises concerns about potential collusion between Class Counsel and the defendants; and
>
> • The Provincial Health Insurers have not received notice of this application and an opportunity to be heard.

[26]    I will address each of those concerns.

2018 SKQB 86 (CanLII)

- 14 -

### a.    Approval by Provincial Health Insurers: Background

[27]        In each province and territory, there is legislation [subrogation legislation] to the effect that when health services are or will be provided by the PHI to a person who has suffered a personal injury caused by negligence or another wrongful act, the injured person has a right to recover the cost of those services. If the injured person brings an action, they are obliged to seek recovery of those costs on behalf of the PHI. The plaintiff has done so in this case, on behalf of all provinces and territories.

[28]        The effect of the subrogation legislation is that each PHI included in a national class action settlement must agree to compromise its claim. However, the legislative provisions relating to that agreement differs from jurisdiction to jurisdiction. The Alberta legislation, for example, provides that the Director may enter into a settlement respecting the Crown's right of recovery: see *Crown's Right of Recovery Act*, SA 2009, c C-35, s 8. Similarly, the Yukon legislation says that a settlement does not bind the Government of the Yukon unless the Minister or a designate has approved the release or settlement in writing: *Hospital Insurance Services Act*, RSY 2002, c 112, s 14.

[29]        Other legislation goes further, and explicitly requires that the PHI consent to the settlement not only of the PHI's subrogated claim, but the claim of the injured plaintiff. In Saskatchewan, for example, *The Health Administration Act*, RSS 1978, c H-0.0001 provides as follows:

- 15 -

2018 SKQB 86 (CanLII)

**19**    …

(5) Where a beneficiary brings an action to recover any sum with respect to the personal injuries mentioned in subsection (4), the beneficiary shall, on behalf of the minister, include in his or her claim a claim for the cost of health services received by the beneficiary.

(6) Except with the written consent of the minister, no action mentioned in subsection (5) shall be settled without provision being made for payment in full of the cost of health services received by the beneficiary.

…

[30]    Similarly, s. 13 of the *Health Care Costs Recovery Act*, SBC 2008 c 27 – which their counsel characterized as "draconian", but might better be described as clear – provides as follows:

**13** (1) A claim against a person alleged to be the wrongdoer for damages arising from or related to a beneficiary's personal injury or death must not be settled unless

(a)    the person who would be liable to make payments under the proposed settlement gives to the minister notice of the proposed terms of settlement, in the prescribed form and in accordance with the regulations, if any, under section 25 (2) (d) *[regulations]*, and

(b) the minister consents in writing to the proposed settlement.

…

[31]    In this case, a first version of the Settlement Agreement [original agreement] was concluded on April 15, 2016. The original agreement provided for payment of $18 million to class members, less legal fees and other costs, plus a payment of $1 million to PHIs, for a total of $19 million. The

- 16 -

Settlement Agreement, which is dated March 8, 2017, added an additional $1 million for PHIs, from which $150,000 in legal fees would be paid to class counsel. Ball J. was aware that representatives of PHIs instructed class counsel to seek that additional $1 million. However, he did not have the original agreement. Further, he had very little information about the course of dealings which led to that result. Those gaps in the evidence resulted in his concerns with potential conflicts, collusion and the role of PHIs.

[32]      The applicants have now provided additional evidence touching those issues. In her December 22, 2017 affidavit, Kate Boyle, a lawyer at Wagners, states that after PHIs were presented with the original agreement in principle, they advised class counsel that $1 million was insufficient compensation to compromise their claims. At a September 28, 2016 meeting, PHIs told class counsel they required $1 million more, and that this additional amount could not reduce the amount allocated to class members. As Ms. Boyle put it:

> 16.      Armed with these express instructions, Class Counsel negotiated with the Defendants to obtain the further $1 million for the Health Insurers submitted claims. Prior to the Defendants' agreement to provide that additional funding, the Health Insurers specifically confirmed they would accept that amount in satisfaction of their claims and would agree to the release language provided to the Health Insurers in December 2016 if the extra $1 million was paid.

> 17.      Prior to the settlement being finalized, the Health Insurers had an opportunity to consider and did, in fact, consent to the scope of the release.

> 18.      As part of Class Counsel's communications with the Health Insurers, the Health Insurers were provided an earlier draft of the proposed settlement agreement (as of June 1, 2016). … The final Settlement Agreement contained greater

2018 SKQB 86 (CanLII)

- 17 -

> detail than the June 1, 2016 version… The various drafts of
> the settlement agreement were not provided to the Health
> Insurers during the drafting process, nor was the final
> agreement dated March 8, 2017 although the quantum of the
> payment and the terms of the release were provided to and
> approved by the Health Insurers.

[33]     Ms. Boyle also provided further evidence as to the manner in
which PHIs agreed to compromise their claims for $2 Million. She deposed
that Peter Lawless, a lawyer representing the British Columbia PHI, acted as a
"liaison" for all PHIs in the negotiations with class counsel. Mr. Lawless
advised the plaintiffs in a January 10, 2017 email that he had "all 13
jurisdictions agreeing to the revised proposal of the second $1M" and that they
were "good to go" [January 2017 Agreement]. In response, the defendants
asked for copies of emails from each of the provinces and territories
confirming their consent. Mr. Lawless disclosed emails from officials in all
provinces and territories, except Nunavut and Newfoundland and Labrador.
Each of those emails to Mr. Lawless [approval emails], stated that the
province or territory named in the email:

> … agrees that in exchange for its pro-rata share of $2 million
> for subrogated health insurance claims (with fees of class
> counsel only taken on the second million), it agrees to all the
> terms of the Amended Settlement Agreement, including the
> language of the release.

[Exhibit A, Boyle January 5, 2018 Affidavit]

[34]     The "Amended Settlement Agreement" referred to in these emails
was not the Settlement Agreement, but the original agreement, which was
provided to the PHIs in June 2016. There were significant differences between
those two agreements. Ms. Boyle's summary of those differences (at para. 37

- 18 -

of her December 22, 2017 affidavit) referred, among other things, to the following items:

> 37.    …
>
>> (k)    The language in the release was amended to provide clarity and was restricted to exclude any claims that a Class Member may have against a prescribing physician for the benefit of Class Members;
>>
>> (l)    a detailed Claims Administration Protocol that governs how claims are to be compensated and for what injuries, was included as Schedule A to the Compensation Protocol;
>>
>> (m)    a comprehensive Compensation Protocol that establishes how the Settlement is to be administered, including what evidence is required and how the settlement funds are to be distributed, was completed and added to the Settlement Agreement;
>>
>> (n)    a detailed Notice Plan was prepared, in consultation with the Defendants and the Administrator;
>
> …

[35]    Mr. Lawless appeared at the hearing of this application as counsel for all of the provinces. Although his brief says it was also submitted on behalf of the territories, he advised that he was unable to finally get instructions from the territories. He confirmed that he acted as a clearinghouse or spokesperson – not as counsel – for all PHIs during the negotiations. His brief states that the provinces and territories, having now reviewed the Settlement Agreement in detail, are satisfied that it did not "materially alter what was consented to in the January 2017 Agreement". However, and given

2018 SKQB 86 (CanLII)

- 19 -

his lack of instructions from the territories, I took that as a statement of the provincial perspective, and not that of the territories.

[36]        Mr. Lawless also confirmed that in January 2017, he was advised by his contacts in all provinces and territories that they agreed to resolve their claims. He was, however, unable to confirm that they approved the settlement in accordance with the subrogation legislation. He advised that he does not, as a matter of practice in his liaison role, and did not in this case, look behind what he was told by the officials from other provinces.

### b.    *Approval by Provincial Health Insurers: Background and Positions of the Parties*

[37]        The provinces submit that the requirements of the provincial and territorial legislation must be met before the court can approve a settlement agreement that purports to settle their claims. That position accords with *Perdikaris 2017*, where Ball J. stated as follows:

> 84        To be clear, if the proposed settlement of the Provincial Health Insurers subrogated claims do not meet the requirements of the legislation on which they are based, the settlements will not be approved.

[38]        The provinces also take the position that the court should ensure that there is a proper foundation for the PHI's agreement to settle. As they put it in their brief:

> 16.        ...it is the court's additional role to ensure that the class counsel have not only properly consulted with the provinces and territories in resolving the health care costs claim, but that the formal requirements of the HCCR Legislation [the subrogation legislation], including consent to any settlement of the provinces and territories' claims, are upheld. ...

2018 SKQB 86 (CanLII)

- 20 -

2018 SKQB 86 (CanLII)

[39]        The provinces submit that the court should provide guidelines to ensure proper participation and approval by PHIs. In their view, class counsel should ensure provinces and territories have the information necessary to quantify their claims, and should obtain a discrete settlement mandate from PHIs in advance of negotiations with the defendants. In their view, class counsel must then pursue that mandate, separately from any settlement mandate for class members.

[40]        Provinces also take the position that it is inappropriate for class counsel to negotiate a global settlement which does not specify the amount payable to PHIs, or, as here, to negotiate without instructions from PHI's. In their view, a global settlement results in competition between PHIs and class members as to who gets what share of the proceeds, and thus, to a conflict of interest for class counsel. That position echoes Ball J.'s concern that class counsel would be forced to "broker" that allocation of funds. Provinces believe their proposed separate mandate approach avoids that conflict.

[41]        In this case, the negotiations did not proceed in a manner consistent with the approach now recommended by provinces.  PHIs did not – at least prior to the original agreement – have the information to quantify their claims. Class counsel did not get a separate negotiating mandate from PHIs prior to the mediation and negotiations with defendants, or at any time before concluding the original agreement. However, it is the provinces' position that the shortcomings with the process followed in this case – which they described as "rife with problems" – were effectively resolved by the September, 2016 instructions from PHIs to get $1 million more, without reducing the amount payable to class members. In their view, that resolved the conflict.

- 21 -

[42]        It is remarkable, given the purpose of the subrogation legislation, and the significance of these Oxy claims, that PHIs were nowhere to be seen prior to the conclusion of the original agreement. Quite apart from the readily apparent potential for a conflict between the interests of PHIs and class members, who was protecting the public purse? Why were no steps taken to ensure that past and potential future health care costs for PHIs were identified, and that PHIs gave instructions, before the March 2016 mediation and the April agreement? I agree with the provinces. The process followed in this case was rife with problems. I can only conclude, given what occurred after PHIs were told they would get $1 Million out of $19 Million, that class counsel picked that number out of the air.

[43]        However, the fact PHIs were out of the loop is also unremarkable. As I understood the representations of all counsel, the role played by PHIs in this case is consistent with past practice in class actions. Provinces and territories have not, in the past, insisted that negotiations are conducted in a manner that ensures they are involved soon enough, deal with class counsel in a manner that takes account of potential conflicts, and enables them to give instructions to those negotiating on their behalf. Class counsel noted that the court's intervention in this case represents a new high water mark for PHI involvement. It appears that *Perdikaris 2017* put the cat among the pigeons, where it belonged.

[44]        Class counsel conceded that in future cases it may be necessary to structure negotiations and settlements differently. They, like the provinces, take the position that there was ultimately no conflict between the interests of class members and PHIs in this case, as they were given and carried out

2018 SKQB 86 (CanLII)

2018 SKQB 86 (CanLII)

- 22 -

instructions from PHIs to get an additional $1 million. Indeed, they submitted that there is no conflict, as the relationship between class counsel and PHIs is imposed by the subrogation legislation.

[45]     As to the requirement for PHI approval, class counsel conceded that provinces and territories must agree to compromise their own subrogated claims. They did not agree that any PHIs must approve the settlement of the claims of class members. In their view, the question on this application is whether there is sufficient evidence of that approval. They submit that the evidence that all provinces and territories had agreed, together with copies of the emails from officials in 11 jurisdictions, is adequate. They say that if counsel for a province or territory confirms that their client approved a settlement, the court not only need not, but should not, demand more.

[46]     Class counsel strongly urged that I refuse the provincial invitation to delineate guidelines for class counsel dealing with PHIs. Indeed, they submitted that a requirement that <u>all</u> PHIs must approve settlements of national class actions would be inappropriate, as it would result in unacceptable delays and place new and inordinate bargaining power in the hands of a small hold-out jurisdiction. They hinted at potentially disastrous results. They noted that discussions are now ongoing between PHIs and class action counsel in relation to these subtle issues. In their view, those discussions should be left to run their course.

### c.     *Approval by Provincial Health Insurers: Conclusions*

[47]     The Settlement Agreement relates to a national settlement, and is designed accordingly. It would resolve all potential claims by PHIs. As noted

- 23 -

above, s. 6.2 provides that the payments made to PHIs "shall be in full and final satisfaction of Medical Services provided for and to be provided for Class Members, and the Provincial Health Insurers shall have no other claim". The following provisions of the Settlement Agreement are also relevant:

> 10.3    Class Members and Family Class Members who do not opt out shall be bound by this Settlement Agreement. The Provincial Health Insurers do not have the right to opt out of this Settlement Agreement.
>
> …
>
> 16.1    This Settlement Agreement shall be the exclusive remedy for the Provincial Health Insurers, and all Class Members and Family Class Members who do not Opt Out.

[48]     Class counsel advised that the reference to PHIs in s. 10.3 - a provision which was not disclosed to PHIs before the January 2017 Agreement – was not only unnecessary, but incorrect. As they note, PHIs are not class members and therefore have no right to opt out in any event. Nor are they parties to the Settlement Agreement. I agree.

[49]     Nonetheless, ss. 6.2, 10.3 and 16.1 reflect the fact that the proposed settlement provides for the resolution of the claims of all PHIs. For that reason, I cannot approve the Settlement Agreement unless it has been approved by all PHIs in accordance with their subrogation legislation. That is so because the parties chose to settle on these terms.

[50]     Further, and as noted above, the subrogation legislation of some provinces requires that the PHI consent to the settlement not only of the PHI's subrogated claim, but the claim of the injured plaintiff. By way of example,

2018 SKQB 86 (CanLII)

- 24 -

this is an "action" within the meaning of s. 19(5) of *The Health Administration Act* of Saskatchewan. Section 19(6) provides as follows:

> **19**(6)  Except with the written consent of the minister, no action mentioned in subsection (5) shall be settled without provision being made for payment in full of the cost of health services received by the beneficiary.

[51]      There is no evidence that the amount payable to Saskatchewan pursuant to the Settlement Agreement – which Ball J. estimated to be $57,350 – would constitute payment in full of the cost of health services provided or to be provided in Saskatchewan. The written consent of the Minister is accordingly required to settle the action. That would be so regardless of whether the Settlement Agreement contemplated settlement of Saskatchewan's claim.

[52]      The second question that arises is whether there is sufficient evidence that PHIs have approved the Settlement Agreement. One might have expected, given the questions raised in *Perdikaris 2017*, that class counsel would provide direct evidence from all provincial and territorial PHIs that they had approved the settlement in accordance with their subrogation legislation. The evidence did not meet that mark. Indeed, it suggests that PHIs did not grant that approval. The approval emails state that the jurisdiction in question "agrees to all the terms of the Amended Settlement Agreement, including the language of the release". It does not say they agreed to the agreement I am asked to approve, being the Settlement Agreement.

[53]      Mr. Lawless advised – speaking only for the provinces – that provinces and territories are satisfied that the Settlement Agreement does not

2018 SKQB 86 (CanLII)

- 25 -

materially alter what they consented to in the January 2017 agreement. The issue, however, is not whether provincial and territorial officials believe there have been no material alterations. It is clear that the Settlement Agreement contains material changes to the original agreement. The approval emails – other than that from Alberta – do not contemplate amendments to the original agreement.

[54]    In the result, I am not satisfied that PHIs granted approval in accordance with their subrogation legislation. I am, for that reason, unable to approve the Settlement Agreement.

[55]    There are two further issues to be addressed. First, I am satisfied that approval should not be denied as a result of class counsel representing the conflicting interests of class members and PHIs. As I understand the evidence and representations of counsel, PHIs were not advised by class counsel as to what they could or should demand for the release of their claims. Rather, PHIs independently decided they would settle for a $2 million, and instructed class counsel to get that amount, without reducing the amount payable to class members.

[56]    It is not necessary, and in my view, would not be appropriate, to demand further evidence that PHIs made an informed decision, based on proper considerations, or that the amount they received was reasonable, whether by comparison to the cost of health services, the damages that may be recoverable by class members, litigation risks, or otherwise. PHIs expressed discomfort as to the process which led to the original agreement. They did not suggest they were unable, as a result of the actions of class counsel or the

2018 SKQB 86 (CanLII)

2018 SKQB 86 (CanLII)

- 26 -

terms of the original agreement, to properly exercise their discretion under the subrogation legislation. A province or territory that was not satisfied with their *pro rata* share of $2 Million was not obliged to settle. Indeed, it is possible that some PHIs may not have approved the settlement, and as such, may still be in a position to refuse to settle on these terms.

[57]      I wish to be clear that my decision in relation to the potential conflict is based on the facts. I do not agree with class counsel that the subrogation legislation is a complete answer to the conflict question. The subrogation legislation does not say that plaintiff's counsel should or must proceed as they did in this case. Nor does it say class counsel should or must provide legal advice to PHIs at any stage as to the amount they should recover, or indeed, any legal advice at all. It is apparent that the provinces, at least, believe there are potential conflicts. It is apparent that the guidelines proposed by the provinces are a work in progress.

[58]      Second, I am satisfied with the assurances I have received from PHIs, defendant's counsel and class counsel that there was no collusion.

> **d.      Is the Settlement Agreement fair, reasonable and in the best interests of the class as a whole?**

[59]      There are factors which weigh in favour of approving the Settlement Agreement, subject to confirmation that it was properly approved by all PHIs. I note, for example, that able and experienced class counsel represented the plaintiffs in Ontario, Québec, Nova Scotia and Saskatchewan. They have identified what may be important litigation risks – although with very limited comments as to their assessment of the risks that would affect all

2018 SKQB 86 (CanLII)

- 27 -

or many class members – and have provided some useful evidence of the experience in the United States. There have been very few objections or opt outs.

[60]      I am aware the proposed settlement need only fall within a zone of reasonableness. I am keenly aware of the troubling shortcomings that are inherent in the settlement approval process, particularly in a case of this kind. The material provided by class counsel goes well beyond boilerplate.

[61]      I am, nonetheless, not satisfied that the Settlement Agreement is fair, reasonable and in the best interests of the class. Class counsel conducted these negotiations based on the assumptions outlined above as to the range of damages, total recovery, and the number of likely claimants. They also relied on those assumptions, and their estimate of average recovery, in their submissions in support of this application. For the following reasons, I am not satisfied with those assumptions and estimate.

[62]      First, counsel estimated average compensation of $11,000 to $13,500 would be payable to each approved claimant by dividing $20 Million by the estimated number of approved claimants. That approach did not account for the $2 Million payable to PHIs, or for Non-Refundable Expenses and other costs of notice and administration. Those amounts would be deducted from the $20,000,000 gross amount paid by the defendants, and reduce the amount available to class members.

[63]      Second, class counsel calculated total potential recovery on the basis of what they say were the damages awarded, or that a judge said might have been awarded, for non-pecuniary loss. They cited five cases in support of

- 28 -

their estimated range: *Sherman v Salsberg*, [1998] OJ No 3074 (QL) (Ont Ct J); *Norberg v Wynrib*, [1992] 2 SCR 226; *Occhipinti v National Car Rental*, 2003 BCPC 314 [*Occhipinti*]; *Picco v John Doe*, 2015 BCSC 1904; and *Mack v Enns*, [1981] BCJ No 1075 (BCSC). The majority of those cases – including *Occhipinti*, the case where the plaintiff was awarded $2,000 – are dated, and the damage awards have not been adjusted for inflation. The evidence and analysis in the case law relating to the award of damages for the addiction – other than in *Fabretti v Gill*, 2014 BCSC 899, 34 CCLI (5th) 263 [*Fabretti*], which was not cited – is very limited. These cases tend to focus on the injury that resulted in Oxy being prescribed, rather than the effect of the addiction itself.

[64]      Further, some of these cases did not relate to opiates at all. The unspoken assumption is that all addictions are a useful comparator, regardless of the addictive substance. There is, however, no evidence to justify that assumption. Indeed, there is no evidence as to the particular characteristics and impact of an addiction to Oxy, including as to the important issue of the risk of relapse, and the potential cost of treatment.

[65]      The plaintiffs were not aware of *Fabretti*. In that case, the plaintiff was awarded $100,000 general damages for soft tissue injuries resulting in continuing pain and disability, and a resulting drug addiction. Although Kloegman J. did not attribute a specific amount to the plaintiff's addiction, she did comment that "[m]ost of all, he suffers and will continue to suffer the pain and emotional stress of the life of a recovering drug addict". She also noted evidence that there was a high risk of a relapse.

- 29 -

[66]    Fourth, the calculation of average damages did not include any amount for loss of income or the costs of treatment and rehabilitation. I assume that some negative impact on income would not be an extraordinary event. *Fabretti* illustrates that very significant damages could be awarded on that account. Similarly, Demetrios Perdikaris, the representative plaintiff in this action, has deposed that his addiction had a devastating impact on his career, as follows:

> 13.    Being addicted to OxyContin has ruined my life. I have lost the ability to work, to support my family, and to live a normal life….
>
> 14.    For many years prior to my OxyContin addiction I was employed as an executive chef at several different restaurants, some of which were family-owned and others that were corporate-owned. At that time, I earned up to $10,000 per month as an executive chef. Because of my severe addiction and related issues, such as a rear swelling condition in my legs and feet caused by OxyContin, I have had to stop working as a chef and now depend on Canada Pension Plan disability benefits - less than $800 per month - for survival.

[67]    Fifth, the likely number of claimants was based solely on the 1,618 contacts appeared in the databases of three of the four class counsel firms, in March 2016. As is noted above, the analysis did not take account of those who contacted MLG prior to March 2016, which calls the proposed inference as to the total number of claimants into question. That missing data relates to the very claimant population with whom I am primarily concerned on this application. There is now evidence that 592 individuals provided their contact information to MLG by December 2017. Further, I am troubled by the limited explanation and lack of evidence as to the validity of class counsel's sampling technique, which is the foundation for the proposed inference as to the number of approved claimants, and as such, the average recovery.

2018 SKQB 86 (CanLII)

- 30 -

[68]      I am aware that the issue is not how the settlement compensates a single class member like Mr. Perdikaris. The issue is the best interests of the class as a whole. I am also aware of the difficulty of assessing the potential range of recovery in a case of this kind, and that this is only one of many relevant factors. It is, nonetheless, a factor that is not only properly taken into account in the cost-benefit analysis, but one which was used for that purpose by counsel.

[69]      For the reasons noted above, I am not satisfied that the assumptions identified by class counsel as to range of damages, average recovery, total recovery and the number of potential claimants were sound. That concern is sharpened by the fact that there is limited evidence and analysis as to the likelihood of success. I have inadequate information, for example, even to reach a conclusion as to whether counsel concluded there is a material risk that the action would not be certified. I am, in raising these concerns, also mindful of the fact that this was, in substance, an early stage settlement, concluded after a one-day mediation session and a conference call.

[70]      In the result, I am not yet satisfied that the Settlement Agreement is fair, reasonable and in the best interests of the class as a whole.

### D.    CONCLUSION

[71]      For these reasons, I am not prepared to grant the relief sought. If the plaintiff wishes to continue to pursue this application, he may reapply, with supplementary material addressing the concerns raised in this decision and on notice to the Provincial Health Insurers. In the alternative, he may apply for certification.

2018 SKQB 86 (CanLII)

- 31 -

[72]         I have, given this decision, neither approved nor rejected the fees and disbursements requested by the class counsel. I have, however, reviewed the evidence and representations of counsel, and would be strongly inclined to give my approval in the event that the Settlement Agreement is finally approved. I would also be inclined to approve payment of an honorarium to Mr. Perdikaris.

J.

B. A. BARRINGTON-FOOTE

2018 SKQB 86 (CanLII)