**Exhibit E**

# QUEEN'S BENCH FOR SASKATCHEWAN

Citation: **2019 SKQB 281**

Date:           **2019 10 31**
Docket:         QBG 1073 of 2012
Judicial Centre: Regina

BETWEEN:

DEMETRIOS PERDIKARIS,

PLAINTIFF

- and -

PURDUE PHARMA, PURDUE PHARMA INC.,
THE PURDUE FREDERICK INC., THE PURDUE
FREDERICK COMPANY, INC. and PURDUE
PHARMA LLP,

DEFENDANTS

**COUNSEL:**

**Plaintiffs:**

| | |
|---|---|
| E.F. Anthony Merchant, Q.C. | for the plaintiff, Demetrios Perdikaris |
| Michael G. Robb and Joel P. Rochon | Class counsel for the Ontario and Quebec Proceedings |
| Raymond F. Wagner, Q.C. | Class counsel for the Nova Scotia Proceedings |

**Defendants:**

| | |
|---|---|
| Jason W. Mohrbutter, Barry Glaspell and Allison Graham | for Purdue Pharma, Purdue Pharma Inc., and The Purdue Frederick Inc. |
| David Byers | for The Purdue Frederick Company, Inc., and Purdue Pharma LLP |

**Governmental Agencies:**

| | |
|---|---|
| Luciana P. Brasill and Avichay Sharon | for the Minister of Health for Alberta |
| Peter Lawless | for Ministry of Justice for British Columbia |
| Sonal Gandhi and Rita Bambers | for Ministry of the Attorney General for Ontario |
| Max T. Bilson | for Ministry of Justice and Attorney General for Saskatchewan |

FIAT                                      POPESCUL C.J.Q.B.
October 31, 2019

- 2 -

## I. INTRODUCTION

[1]        This decision relates to a third attempt to obtain court approval of a class action settlement agreement pursuant to s. 38 of *The Class Actions Act*, SS 2001, c C-12.01 [*Act*]. Before the reapplication can be considered three issues need to be determined. First, should the plaintiffs' counsel be removed from the action on account of them being in a conflict of interest? Second, should an affidavit sought to be filed by the plaintiffs be redacted on the basis that it discloses privileged information? Third, should a hearing be reconvened in order to determine whether a settlement agreement should be approved by this Court?

[2]        The parties have urged that a decision be rendered as soon as possible because of quickly moving circumstances that could impact this action. In an effort to provide a reasonably swift decision, I have of necessity, opted for brevity.

## II. BRIEF FACTUAL OVERVIEW AND ISSUES

[3]        A number of class actions were commenced by several representative plaintiffs [Plaintiffs] against the defendants relating to the manufacture, marketing, sale, distribution, labelling, prescription and use of OxyContin® and OxyNEO® in Canada.

[4]        Four law firms coordinated the class action litigation in Canada: Merchant Law Group LLP, Rochon Genova LLP, Siskinds LLP and Wagners [Plaintiffs' counsel].

[5]        A national settlement agreement [Settlement Agreement] which provides for the settlement of all claims was achieved. The Settlement Agreement was contingent upon court approval in this action and three others:

-        Ontario Superior Court of Justice action, file no. 07-CV-343201CP [Ontario Proceeding];

- 3 -

- Superior Court of Quebec action, file no. 200-06-000080-070 [Quebec Proceeding]; and

- Supreme Court of Nova Scotia action, file no. Hfx no. 285995 [Nova Scotia Proceeding].

[6]      Court approval was obtained in the Ontario Proceeding, the Quebec Proceeding and the Nova Scotia Proceeding.

[7]      An application pursuant to s. 38 of the *Act* for the approval of the Settlement Agreement in Saskatchewan came before The Honourable Justice Ball. He declined to grant the application, citing concerns relating to the provisions in the Settlement Agreement which dealt with the subrogated claims of Provincial Health Insurers [PHIs]. See *Perdikaris v Purdue Pharma*, 2017 SKQB 287, 14 CPC (8th) 402 [*Perdikaris 2017*].

[8]      After explaining the reasons for his decision, Ball J. concluded by providing the parties with three options:

1.  They may reapply for approval of the Settlement Agreement with supplementary material addressing the concerns raised in this decision and on notice to the Provincial Health Insurers;

2.  They may agree to amend the Settlement Agreement by removing its provisions relating to the claims of the Provincial Health Insurers. They may then reapply for orders approving Class Counsel's fees and the remaining provisions of the Settlement Agreement; or

3.  They may return one or more of their motions for certification and other outstanding applications to a court of competent jurisdiction.

(see *Perdikaris 2017* at para 96)

[9]      He then retired.

[10]      The Honourable Justice Barrington-Foote (as he then was), was

- 4 -

subsequently designated as Ball J.'s replacement.

[11]     The plaintiff, choosing option 1, reapplied for approval of the Settlement Agreement. Supplementary material was filed. Notice was given to the PHIs.

[12]     The reapplication was heard by Barrington-Foote J. He, too, declined to approve the Settlement Agreement, after explaining in his reasons for judgment the problems that he saw with the material before him. See *Perdikaris v Purdue Pharma*, 2018 SKQB 86, 17 CPC (8th) 119 [*Perdikaris 2018*].

[13]     Barrington-Foote J. ended his decision by leaving open the possibility of, once again, reapplying, with supplementary material, on notice to the PHIs. He said this:

> [71] For these reasons, I am not prepared to grant the relief sought. If the plaintiff wishes to continue to pursue this application, he may reapply, with supplementary material addressing the concerns raised in this decision and on notice to the Provincial Health Insurers. In the alternative, he may apply for certification.
>
> [72] I have, given this decision, neither approved nor rejected the fees and disbursements requested by the class counsel. I have, however, reviewed the evidence and representations of counsel, and would be strongly inclined to give my approval in the event that the Settlement Agreement is finally approved. I would also be inclined to approve payment of an honorarium to Mr. Perdikaris.

(see *Perdikaris 2018* at paras 71-72)

[14]     Subsequently, he was appointed to the Court of Appeal.

[15]     As Chief Justice, I then appointed myself to take over from Barrington-Foote J.

[16]     It became readily apparent that the various parties and participants could not agree as to how this matter should move forward. As a result, each party and interested participant was invited to file a "one to three page document outlining their

- 5 -

respective positions respecting a go-forward plan".

[17]     After digesting the various, and often diametrically opposed positions, I issued a fiat on April 2, 2019, directing that a two-day hearing be held to address the issues that needed to be determined before the action could move forward. The fiat reads, in part, as follows:

> [11] Unfortunately no consensus as to how this matter should move forward emerged. It is thus necessary for the court to attempt to sort through the various positions and posturings and arrive at a just, fair and efficient way forward.
>
> [12] I am not prepared to make any sort of definitive ruling on the merits of this application without a further hearing. To do so would not be fair. This is especially so when I am, by necessity, new to the file.
>
> [13] Ideally, a single hearing would be held to hear the submissions of the parties on all outstanding matters after which the Court would render its decision. However, given the preliminary matters raised respecting privileged communication, redacted affidavits, conflicts of interest and whether, indeed, a judicial ruling has been made that a second hearing can only be convened once a threshold evidentiary base has been laid, it may simply not be possible to accomplish all of this at one hearing. Whether there can/should be a second hearing to address the concerns raised by Barrington-Foote J. in his March 15, 2018 judgment can only be determined after the preliminary matters are determined.
>
> [14] Accordingly, I hereby direct the local registrar to schedule a two-day hearing [counsel has suggested one day, but I will set two days out of an abundance of caution], as soon as reasonably possible. The purpose of this hearing is to consider the proposed evidence and preliminary issues only to the extent necessary to decide what should occur next. The issues to be determined at that hearing are:
>
> (1) Can plaintiff's counsel continue to act in light of the alleged conflict of interest?
>
> (2) What affidavit material may be filed in support of the issues identified by Barrington-Foote J. and how should the issue of privileged information be resolved?
>
> (3) Is it necessary for the plaintiff to establish that new evidence capable of satisfying the concerns raised by Barrington-Foote J. be presented before a continuation can be scheduled. If so, is there sufficient evidence to justify the resumption of the application?

- 6 -

[18]        A hearing was held on September 4 and 5, 2019.

III. ANALYSIS

*(1) Can Plaintiffs' counsel continue to act in light of the alleged conflict of interest?*

[19]        The within action is one of a series of consumer class actions commenced between 2007 and 2012 across Canada in relation to OxyContin® and OxyNEO®. It was commenced on June 22, 2012. Initially, it did not make any reference to a claim for health care costs. However, on February 28, 2014, a "Second Amended Statement of Claim" was filed in which the plaintiff expressly sought to advance the health care cost claims on behalf of the PHIs.

[20]        Similar subrogated claims were made in the Ontario Proceeding, the Quebec Proceeding and the Nova Scotia Proceeding.

[21]        Barrington-Foote J. provided this helpful and succinct overview of subrogation legislation:

> 27 In each province and territory, there is legislation [subrogation legislation] to the effect that when health services are or will be provided by the PHI to a person who has suffered a personal injury caused by negligence or another wrongful act, the injured person has a right to recover the cost of those services. If the injured person brings an action, they are obliged to seek recovery of those costs on behalf of the PHI. The plaintiff has done so in this case, on behalf of all provinces and territories.
>
> 28 The effect of the subrogation legislation is that each PHI included in a national class action settlement must agree to compromise its claim. …

[22]        Plaintiffs' counsel in each of the four actions entered into settlement negotiations with the defendants. Ultimately, the Settlement Agreement was reached. The Settlement Agreement purports to include the subrogated claims of the various PHIs across the country. In essence, the Settlement Agreement, if approved,

- 7 -

extinguishes the rights of the PHIs to seek further damages from the named defendants in relation to any of the causes of action covered by the lawsuit. An issue has now arisen with respect to whether the PHIs consented to the Settlement Agreement.

[23]    The Plaintiffs say that they did. The PHIs say that they did not.

[24]    When the disagreement between the PHIs and the various Plaintiffs in the several class actions arose, Plaintiffs' counsel found themselves in a difficult position. The interests of the Plaintiffs and the PHIs diverged. Plaintiffs' counsel declared themselves to be in a conflict of interest, acknowledged that they could no longer act for the PHIs, and recommended that they seek independent counsel.

[25]    Some of the PHIs now take the position that Plaintiffs' counsel cannot just unilaterally declare a conflict and then purportedly withdraw from representing one client and carry on with representing another. In support of this proposition they rely on the principles enunciated in *Canadian National Railway Co. v McKercher LLP*, 2013 SCC 39, [2013] 2 SCR 649 [*McKercher*]. Plaintiffs' counsel do not dispute that they are now in a conflict of interest, *vis-à-vis*, the PHIs, but submit that this circumstance alone does not disqualify them from continuing to act on behalf of the Plaintiffs (and the class members).

[26]    In *McKercher*, the Supreme Court of Canada provided guidance with respect to issues relating to conflicts of interest.

[27]    After confirming that courts have inherent powers to resolve issues of conflicts in cases that came before them, the Supreme Court in *McKercher* affirmed and clarified the governing principles enunciated in *MacDonald Estate v Martin*, [1990] 3 SCR 1235; *R v Neil*, 2002 SCC 70, [2002] 3 SCR 631; and *Strother v 3464920 Canada Inc.*, 2007 SCC 24, [2007] 2 SCR 177, and then went on to discuss the factors in play when determining the remedy.

- 8 -

[28]    Since there is no real dispute respecting this court's jurisdiction to resolve the conflict issue nor with the reality that Plaintiffs' counsel are now in a conflict of interest with their former clients, the PHIs, the real focus relates to the question of appropriate remedy. Should Plaintiffs' counsel be disqualified?

[29]    In *McKercher*, the Supreme Court of Canada clearly set forth the factors and considerations a court should take into account when determining what remedy ought to be imposed when a conflict arises. Disqualification is one, but not the only, remedy.

[30]    At paras. 60 to 67, McLachlin C.J., writing for a unanimous court, made these comments:

> 60 I have concluded that accepting the Wallace retainer placed McKercher in a conflict of interest, and that McKercher breached its duties of commitment and candour to CN. The question is whether McKercher should be disqualified from representing the Wallace plaintiffs because its acceptance of the Wallace retainer breached the duty of loyalty it owed CN.
>
> 61 As discussed, the courts in the exercise of their supervisory jurisdiction over the administration of justice in the courts have inherent jurisdiction to remove law firms from pending litigation. Disqualification may be required: (1) to avoid the risk of improper use of confidential information; (2) to avoid the risk of impaired representation; and/or (3) to maintain the repute of the administration of justice.
>
> 62 Where there is a need to prevent misuse of confidential information, as set out in *Martin* [[1990] 3 SCR 1235], disqualification is generally the only appropriate remedy, subject to the use of mechanisms that alleviate this risk as permitted by law society rules. Similarly, where the concern is risk of impaired representation as set out in these reasons, disqualification will normally be required if the law firm continues to concurrently act for both clients.
>
> 63 The third purpose that may be served by disqualification is to protect the integrity and repute of the administration of justice. Disqualification may be required to send a message that the disloyal conduct involved in the law firm's breach is not condoned by the courts, thereby protecting public confidence in lawyers and deterring other law firms from similar practices.

- 9 -

64  In assessing whether disqualification is required on this ground alone, all relevant circumstances should be considered. On the one hand, acting for a client in breach of the bright line rule is always a serious matter that on its face supports disqualification. The termination of the client retainers - whether through lawyer withdrawal or through a client firing his lawyer after learning of a breach - does not necessarily suffice to remove all concerns that the lawyer's conduct has harmed the repute of the administration of justice.

65  On the other hand, it must be acknowledged that in circumstances where the lawyer-client relationship has been terminated and there is no risk of misuse of confidential information, there is generally no longer a concern of ongoing prejudice to the complaining party. In light of this reality, courts faced with a motion for disqualification on this third ground should consider certain factors that may point the other way. Such factors may include: (i) behaviour disentitling the complaining party from seeking the removal of counsel, such as delay in bringing the motion for disqualification; (ii) significant prejudice to the new client's interest in retaining its counsel of choice, and that party's ability to retain new counsel; and (iii) the fact that the law firm accepted the conflicting retainer in good faith, reasonably believing that the concurrent representation fell beyond the scope of the bright line rule and applicable law society restrictions.

66  Against this background, I return to this appeal. The motion judge concluded that the appropriate remedy was to disqualify McKercher from the Wallace action. He based this conclusion on a variety of factors - in particular, he focused on what he perceived to be CN's justified sense of betrayal, the impairment of McKercher's ability to continue to represent CN on the ongoing retainers, and the risk of misuse of confidential information. Some of these considerations were not relevant. Here, disqualification is not required to prevent the misuse of confidential information. Nor is it required to avoid the risk of impaired representation. Indeed, the termination of the CN retainers that McKercher was working on ended the representation. The only question, therefore, is whether disqualification is required to maintain public confidence in the justice system.

67  As discussed, a violation of the bright line rule on its face supports disqualification, even where the lawyer-client relationship has been terminated as a result of the breach. However, it is also necessary to weigh the factors identified above, which may suggest that disqualification is inappropriate in the circumstances. The motion judge did not have the benefit of these reasons, and obviously could not consider all of the factors just discussed that are relevant to the issue of disqualification. These reasons recast the legal framework for judging McKercher's conduct and determining the appropriate

- 10 -

remedy. Fairness suggests that the issue of remedy should be remitted
to the court for consideration in accordance with them.

[31]     Before embarking on a legal analysis wherein the above principles are
applied to the circumstances of this case, it is useful to highlight and sharpen some of
the facts alluded to above.

[32]     Plaintiffs' counsel in the various class action proceedings referred to,
have been involved in their pursuit of damages in respect to personal injuries against
the defendants on behalf of the representative Plaintiffs and class members for many
years. The subrogation legislation in each province and territory, albeit not identical,
obliges plaintiffs who bring personal injury actions alleging negligence or other
wrongful acts to seek recovery of health care costs on behalf of the appropriate PHI. It
is therefore common, and in most jurisdictions required, for an injured person to include
in his or her claim the cost of health services received by the beneficiary.

[33]     Accordingly, it is standard practice for the subrogated claim of PHIs to
be included in a plaintiff's claim.

[34]     If the matter proceeds to trial and the plaintiff is successful, the
subrogated interest of the PHI is normally paid by the defendant as part of the damages.
Counsel for the plaintiff is paid for their legal services in connection with recovering
the health care costs expended by the PHI based upon the governing legislation or
agreement.

[35]     If the matter is settled, counsel for the plaintiff is required to negotiate, in
good faith, on behalf of both the plaintiff and the PHI. Often, the amount by which a
claim is compromised or reduced in order to achieve a settlement is applied pro rata to
both the plaintiff's claim and the PHIs' claim. Needless to say, these types of
compromises do not easily lend themselves to precise mathematical calculations and a

- 11 -

degree of approximation and guestimation is often in play. The percentage reduction from the initial, and sometimes inflated and overly optimistic, claim necessary to induce settlement is highly susceptible to widely varying viewpoints and interpretation. It can lead to scenarios where a PHI's claim can be unfairly compromised by making too many assumptions unfavourable to the PHI. This might explain why, in all of the legislative schemes, actions cannot be settled for less than the full cost of recovery without the consent of the PHI. This provides the PHI with input and a degree of control with respect to settlements that result in less than full recovery.

[36]       Plaintiffs' counsel entered into settlement discussions with the defendants and eventually arrived at a tentative deal that provided for the payment of $18 million to class members, less legal fees and other costs, plus a payment of $1 million to the PHIs, for a total of $19 million.

[37]       The PHIs declined to provide their consent to the tentative deal. Plaintiffs' counsel then went back to the negotiation table at which time the Settlement Agreement was entered into which added an additional $1 million for the PHIs, from which $150,000 in legal fees would be paid to class counsel. The total compensation, including payment to the PHIs, less legal fees and costs was $20 million.

[38]       Whether the PHIs agreed to the Settlement Agreement is central to several of the issues now before the court. Counsel for the plaintiff say there was consent. The PHIs say there was not. When the dissention arose, a conflict was recognized, and Plaintiffs' counsel withdrew as counsel for the PHIs. The issue in need of resolution can be simply stated: do these circumstances require disqualification of Plaintiffs' counsel?

[39]       At para. 61 in *McKercher*, McLachlin C.J. opined that disqualification, in conflict of interest situations, may be required in one or more of three circumstances:

- 12 -

(1)    to avoid the risk of improper use of confidential information (where disqualification is generally the appropriate remedy);

(2)    to avoid the risk of impaired representation (where disqualification is generally required if the law firm continues to concurrently act for both clients); and/or

(3)    to maintain the repute of the administration of justice.

[40]    In this case, disqualification is not required to prevent the misuse of confidential information. There is no evidence before the court that tends to suggest that Plaintiffs' counsel has received confidential information in the form of actual subject matter or litigation attitudes and strategy. Nor is disqualification required to avoid the risk of impaired representation, since the withdrawal of services by Plaintiffs' counsel terminated their representation of the PHIs.

[41]    If there is a basis upon which to order disqualification it would be for the purpose of maintaining "repute of the administration of justice". With respect to this third prong, the Supreme Court directed that the motion's judge should consider all of the relevant factors, including:

1)    behaviour disentitling the complaining party from seeking the removal of counsel, such as delay in bringing the motion for disqualification;

2)    significant prejudice to the new clients' interest in retaining its counsel of choice, and that parties' ability to retain new counsel; and

3)    the fact that the law firm accepted the retainer in good faith, reasonably believing that the concurrent representation fell beyond the scope of the bright line rule and the applicable law society restrictions.

- 13 -

[42]     In my view, having regard to all of the circumstances, including the three factors enumerated above, disqualification is not the appropriate remedy.

[43]     Plaintiffs' counsel undertook significant and complex class action litigation and included, as they must, the subrogated claim of the PHIs as part of their claim. This practice is commonplace across Canada and would fall squarely within the description of "… accepting the retainer [from the PHIs] in good faith reasonably believing that concurrent representation fell beyond the scope of the bright line rule and applicable law society restrictions".

[44]     It would be a stretch, to be sure, to suggest that Plaintiffs' counsel ought not to have, at least at the time they agreed to act for the PHIs, agreed to act for the PHIs because it should have been self-evident that a conflict would arise.

[45]     Whether the practices respecting the way in which counsel who commence class action lawsuits interact with PHIs will change remains to be seen. As noted by Barrington-Foote J. in *Perdikaris 2018*, things may be different in the future:

> [43] However, the fact PHIs were out of the loop is also unremarkable. As I understood the representations of all counsel, the role played by PHIs in this case is consistent with past practice in class actions. Provinces and territories have not, in the past, insisted that negotiations are conducted in a manner that ensures they are involved soon enough, deal with class counsel in a manner that takes account of potential conflicts, and enables them to give instructions to those negotiating on their behalf. Class counsel noted that the court's intervention in this case represents a new high water mark for PHI involvement. It appears that *Perdikaris 2017* put the cat among the pigeons, where it belonged.
>
> [44] Class counsel conceded that in future cases it may be necessary to structure negotiations and settlements differently. They, like the provinces, take the position that there was ultimately no conflict between the interests of class members and PHIs in this case, as they were given and carried out instructions from PHIs to get an additional $1 million. Indeed, they submitted that there is no conflict, as the relationship between class counsel and PHIs is imposed by the subrogation legislation.

- 14 -

[46]     At the time the actions were commenced it is fair to say that Plaintiffs' counsel were acting in good faith, following standard accepted practices and could not be faulted for reasonably believing that concurrent representation would not be problematic. They agreed to act, as have many plaintiffs' counsel in the past, on the assumption that the interests of class plaintiffs and the PHIs were aligned and would not put them in conflict. When the conflict arose, they quite properly declared the conflict and withdrew as counsel for the PHIs. To suggest that Plaintiffs' counsel ought not to have taken on representation of PHIs to advance their subrogated interest because they should have somehow known that they would end up in conflict would be a drastic departure from the practice existing at the time.

[47]     Further, and in some respects most importantly, disqualifying Plaintiffs' counsel at this late stage would produce an unfair and perhaps disastrous result. It is well known that counsel who undertake to prosecute class action proceedings take on risk and considerable expense in initiating and pursuing a putative class action lawsuit. In this case, counsel for the various Plaintiffs have spent years and untold resources to move the lawsuit a considerable distance. Removing them at this point would create upheaval and leave the individual representative Plaintiffs and the countless members of the class in chaos from which they may never recover. Attempting to transition a multi-jurisdictional complex class action proceedings, such as this, from one set of counsel to another would be next to impossible and could result in the extinguishment of the class members' potential claims as a result of an unforeseen and unanticipated circumstance. This is, quite simply, not fair to the representative Plaintiffs, the class members, Plaintiffs' counsel or the defendants.

[48]     On the flipside, the PHIs are well represented and are quite capable of insuring that their respective legal positions are advanced.

[49]     Permitting Plaintiffs' counsel to remain on the file would not bring the

- 15 -

administration of justice into disrepute; rather, the opposite is true. Removal of Plaintiffs' counsel would have such an effect.

[50]        Accordingly, I decline to order that Plaintiffs' counsel be disqualified on account of the conflict of interest that has arisen. They may continue to represent the representative Plaintiffs and the putative class.

*(2) What affidavit material may be filed in support of the issues identified by Barrington-Foote J. and how should the issue of privileged information be resolved?*

[51]        In *Perdikaris 2017*, Ball J. declined to approve the Settlement Agreement and expressed concerns about a number of shortcomings in the filed materials, including the provisions regarding the subrogated claims of the PHIs. He then gave the plaintiff the option to "reapply for approval of the Settlement Agreement with supplementary material addressing the concerns raised in this decision and on notice to the [PHIs]".

[52]        The plaintiff did reapply and did file supplementary material. Barrington-Foote J. replaced Ball J. as the case management judge after Ball J.'s retirement. A further hearing was held before Barrington-Foote J. He, too, declined to approve the Settlement Agreement. He, too, expressed concerns. He, too, gave the plaintiff the opportunity to "…reapply, with supplementary material addressing the concerns raised in this decision and on notice to the [PHIs]".

[53]        The concerns expressed by Barrington-Foote J. fell into two main categories: approval of the Settlement Agreement by the PHIs and whether the Settlement Agreement was "fair, reasonable and in the best interests of the class".

[54]        With respect to the issue of the PHIs' approval, he concluded that he "… cannot approve the Settlement Agreement unless it has been approved by all PHIs in

- 16 -

accordance with their subrogation legislation". See *Perdikaris 2018* at para 49. He then pointed out what he found to be deficiencies:

> [51] There is no evidence that the amount payable to Saskatchewan pursuant to the Settlement Agreement … would constitute payment in full of the cost of health services provided or to be provided in Saskatchewan. The written consent of the Minister is accordingly required to settle the action. That would be so regardless of whether the Settlement Agreement contemplated settlement of Saskatchewan's claim.
>
> [52] The second question that arises is whether there is sufficient evidence that PHIs have approved the Settlement Agreement. One might have expected, given the questions raised in *Perdikaris 2017*, that class counsel would provide direct evidence from all provincial and territorial PHIs that they had approved the settlement in accordance with their subrogation legislation. The evidence did not meet that mark. Indeed, it suggests that PHIs did not grant that approval. The approval emails state that the jurisdiction in question "agrees to all the terms of the Amended Settlement Agreement, including the language of the release". It does not say they agreed to the agreement. I am asked to approve, being the Settlement Agreement.
>
> [Emphasis in original]

[55]    This compelled the following conclusion:

> [54] In the result, I am not satisfied that PHIs granted approval in accordance with their subrogation legislation. …
>
> (*Perdikaris 2018*)

[56]    Insofar as the "fair, reasonable and in the best interests of the class as a whole" criterion, Barrington-Foote J. noted that there "… are factors which weigh in favour of approving" before outlining what he perceived to be deficiencies in the evidence before him.

[57]    As a consequence of these findings, his determination was this:

> [70] In the result, I am not yet satisfied that the Settlement Agreement is fair, reasonable and in the best interests of the class as a whole.
>
> (*Perdikaris 2018*)

- 17 -

[58]     The ultimate conclusion was a denial of the relief sought -- namely, the approval of the Settlement Agreement -- with leave to "… reapply, with supplementary material addressing the concerns raised in this decision …".

[59]     Plaintiffs' counsel has "reapplied" and has filed additional evidentiary material intended to address the concerns raised in *Perdikaris 2018*. Part of that material is an affidavit of Kate Boyle, a lawyer with Wagners. The affidavit purports to provide "additional evidence on the issue of the [PHIs'] consent to the Settlement Agreement". (See the affidavit of Kate Boyle affirmed September 5, 2019 [Boyle affidavit] at para 3.)

[60]     The PHIs, however, object to the filing of an unredacted copy of the affidavit because, they say, it contains privileged information.

[61]     Copies of the redacted and unredacted (sealed) affidavits were filed with the court on the understanding that the unredacted copy could be reviewed by the court if necessary to make the determination. Determining the issue of privilege by reviewing the redacted copy only was not possible. In order to fully understand the nature and extent of the privilege claimed, it was necessary for the court to review the unredacted copy - which did, in fact, occur.

[62]     A review of the relatively few proposed redactions reveals that they pertain directly to the matter currently in issue between the Plaintiffs and the PHIs -- namely, whether the PHIs provided their consent to the Settlement Agreement. Many of the communications sought to be suppressed were between Plaintiffs' counsel and Peter Lawless, counsel for the British Columbia Ministry of the Attorney General, who had assumed the role as "spokesperson for all of the Health Insurers". See Boyle affidavit at para 21(j).

[63]     The issue of privilege relates to instructions given to Plaintiffs' counsel

- 18 -

by the PHIs. Are these communications subject to solicitor-client privilege?

[64]      Solicitor-client privilege is rooted in the perceived and presumed sanctity in the relationship between a solicitor and his client. Clients seeking advice must be able to speak candidly with their lawyers knowing that whatever they say cannot be divulged without their consent. Without the privilege, clients would not be able to provide all the relevant information that lawyers need to properly advise their clients.

[65]      The solicitor-client privilege belongs to the client and continues after the solicitor-client relationship has been terminated. See *Bell v Smith*, [1968] SCR 664.

[66]      In *Pritchard v Ontario (Human Rights Commission)*, 2004 SCC 31, [2004] 1 SCR 809, Major J. provided this helpful overview of solicitor-client privilege:

> A. *Solicitor-Client Privilege Defined*
>
> 14 Solicitor-client privilege describes the privilege that exists between a client and his or her lawyer. Clients must feel free and protected to be frank and candid with their lawyers with respect to their affairs so that the legal system, as we have recognized it, may properly function: see *Smith v. Jones*, [1999] 1 S.C.R. 455, at para. 46.
>
> 15  Dickson J. outlined the required criteria to establish solicitor-client privilege in *Solosky v. The Queen*, [1980] 1 S.C.R. 821, at p. 837, as: "(i) a communication between solicitor and client; (ii) which entails the seeking or giving of legal advice; and (iii) which is intended to be confidential by the parties". Though at one time restricted to communications exchanged in the course of litigation, the privilege has been extended to cover any consultation for legal advice, whether litigious or not: see *Solosky*, at p. 834.
>
> 16 Generally, solicitor-client privilege will apply as long as the communication falls within the usual and ordinary scope of the professional relationship. The privilege, once established, is considerably broad and all-encompassing. In *Descôteaux v. Mierzwinski*, [1982] 1 S.C.R. 860, the scope of the privilege was described, at p. 893, as attaching "to all communications made within the framework of the solicitor-client relationship, which arises as soon as the potential client takes the first steps, and consequently even before the formal retainer is established". The scope of the privilege does not extend to communications: (1) where legal advice is not sought or offered; (2) where it is not intended to be confidential; or (3)

- 19 -

that have the purpose of furthering unlawful conduct: see *Solosky, supra*, at p. 835.

17  As stated in *R. v. McClure*, [2001] 1 S.C.R. 445, 2001 SCC 14, at para. 2:

> Solicitor-client privilege describes the privilege that exists between a client and his or her lawyer. This privilege is fundamental to the justice system in Canada. The law is a complex web of interests, relationships and rules. The integrity of the administration of justice depends upon the unique role of the solicitor who provides legal advice to clients within this complex system. At the heart of this privilege lies the concept that people must be able to speak candidly with their lawyers and so enable their interests to be fully represented.

The privilege is jealously guarded and should only be set aside in the most unusual circumstances, such as a genuine risk of wrongful conviction.

18  In *Lavallee, Rackel & Heintz v. Canada (Attorney General)*, [2002] 3 S.C.R. 209, 2002 SCC 61, this Court confirmed that the privilege must be nearly absolute and that exceptions to it will be rare. Speaking for the Court on this point, Arbour J. reiterated what was stated in *McClure*:

> ... solicitor-client privilege must be as close to absolute as possible to ensure public confidence and retain relevance. As such, it will only yield in certain clearly defined circumstances, and does not involve a balancing of interests on a case-by-case basis. [Emphasis in original.]

(Arbour J. in *Lavallee, supra*, at para. 36, citing Major J. in *McClure*, at para. 35.)

However, solicitor-client privilege may be waived by the client who holds it. The waiver can be express or implied. Since there is no suggestion of an express waiver, the analysis must focus on whether there was an implied waiver.

[67]      Implied waivers occur when the client voluntarily takes a position that is inconsistent with the maintenance of the privilege. The concept of implied waiver is, according to McLachlin J. (as she then was), in *S. & K. Processors Ltd. v Campbell Ave. Herring Producers Ltd.*, [1983] 4 WWR 762 (QL) (BCSC) at para 6, rooted in the pursuit of "fairness and consistency". It has been found to apply in a variety of limited circumstances, including where a client asserts reliance on legal advice (*R v Campbell*,

- 20 -

[1999] 1 SCR 565 at para 67, and *Vancouver Island Entertainment Inc. v Rotherham Holdings Ltd.*, 2005 BCCA 526 at paras 19-20), where the client alleges misconduct or incompetence of counsel (*R v Dunbar* (1982), 68 CCC (2d) 13 (QL) (Ont CA) at paras 68-72), where a client explains errors in affidavits or pleadings as a result of errors made by their solicitor (*Souter v 375561 B.C. Ltd.* (1995), 130 DLR (4th) 81 (BCCA); *Walji v Quraishi*, 2007 ABQB 643, 430 AR 350), and where the client denies having given instructions that the lawyer acted on (*Newman v Nemes*, [1978] OJ No 3101 (QL) (Ont H Ct J) [*Newman*]; *Bentley v Stone* (1998), 42 OR (3d) 149 (Ont Gen Div); *Tsakiris v Tsakiris* (2007), 45 RFL (6th) 186 (Ont Sup Ct)).

[68]      The examples above are taken from Professor Hamish Stewart's publication in *Halsbury's Laws of Canada, Evidence*, 1st ed (Markham: LexisNexis, 2010) at para HEV-178, which were commented on with approval in *Brown v Clark Wilson LLP*, 2014 BCCA 185 at para 26, 372 DLR (4th) 495.

[69]      Accordingly, a lawyer is not permitted and cannot be compelled to disclose communications with the client unless the client has waived the privilege, the privilege has been lost or it falls within one of the few exceptions of the privilege.

[70]      In this case, I have already found that Plaintiffs' counsel were in a solicitor-client relationship with the PHIs. It is alleged that the PHIs provided instructions to accept the terms of the Settlement Agreement which, if true, might be capable of satisfying one of the criteria which both *Perdikaris 2017 and Perdikaris 2018* said was not satisfactorily established. The PHIs contend that they did not consent and now resist the Plaintiffs' attempt to refute their position by asserting solicitor-client privilege respecting certain portions of the Boyle affidavit. All of the proposed redactions relate directly to the question of the PHIs' purported consent to the Settlement Agreement.

- 21 -

[71]     In my view, fairness dictates that the solicitor-client privilege be deemed to be waived on the basis that it would be unfair for the PHIs to retain the benefit of the privilege, if in fact they had given their consent. It would be grossly unfair to deny the Plaintiffs the opportunity to present evidence which they contend is determinative of the central issue and permit the PHIs to withhold critical information by invoking solicitor-client privilege. This would be akin to permitting a client to allege that their counsel was negligent or incompetent and then restrict that lawyer from defending himself on the basis that to do so would breach solicitor-client privilege.

[72]     Of course, whether the PHIs did or did not provide their informed consent is the centre of the dispute which will have to be sorted out at a later date. Nothing in this analysis is intended to touch on the merits of that determination. This ruling only decides that the evidence can be considered -- not what is to be made of that evidence.

[73]     Somewhat surprisingly, there is a dearth of decisions respecting implied waiver on account of disputed instructions. In *Newman*, Southey J. made the following concise statement, albeit, in *obiter*, at para. 8:

> … the defendant waived any privilege over the question of whether or not she gave the instructions by denying that she gave the instructions and thereby putting the question in issue.

[74]     Although this comment was made in *obiter*, it has been commented on, with approval, a number of times. See *Soprema Inc. v Wolrige Mahon LLP*, 2016 BCCA 471 at para 28, 405 DLR (4th) 594 and *Cameron v Nova Scotia (Attorney General)*, 2019 NSCA 38, 434 DLR (4th) 521.

[75]     Accordingly, I find that any solicitor-client privilege that may have been in existence was impliedly waived by the PHIs when they denied that they had done so. Fairness dictates that the unredacted Boyle affidavit be permitted to be filed and considered, and it is so ordered.

- 22 -

[76]        Although the above finding is determinative of the issue, there is another basis upon which the unredacted version of the Boyle affidavit is admissible despite the assertion of solicitor-client privilege. This relates to whether the provision of the instruction to settle (if, in fact, this was given) was intended to be a confidential communication between the lawyer and client.

[77]        In order to establish solicitor-client privilege, the client must satisfy the court that there has been:

- a communication between a lawyer and client;

- which entails the seeking or giving of legal advice;

- which is intended to be confidential as between the lawyer and client. See *Canada v Solosky*, [1980] 1 SCR 821 at 837.

[78]        Here, the third element is missing. The providing of instructions by the client to the solicitor -- whatever this may ultimately turn out to be -- was not intended to be a "confidential" communication. Quoting from *Newman*, at para. 8:

> ... a settlement is not a matter covered by the solicitor and client privilege because the instructions, if given, were in respect of a matter that was not confidential, but was by its very nature to have been communicated to the other side. ...

See also *Ioannidis v Ioannidis*, [1981] 4 WWR 269 (QL) (BCCA) at paras 12 and 13.

[79]        For this reason, as well, I find that the unredacted version of the Boyle affidavit may be filed, and considered, and is not covered by solicitor-client privilege.

*(3) Is it necessary for the plaintiff to establish that new evidence capable of satisfying the concerns raised by Barrington-Foote J. be presented before a continuation can be*

- 23 -

*scheduled? If so, is there sufficient evidence to justify the resumption of the application?*

[80]        As mentioned previously, *Perdikaris 2018* concluded that the plaintiff may "… reapply, with supplementary material addressing the concerns raised in this decision…".

[81]        The PHIs now argue, despite this clear and simple statement, that a rehearing would amount to a collateral attack on the decision made by Barrington-Foote J., which was made on a full record and after hearing submissions, and, thus, would amount to an abuse of process.

[82]        To advance this argument the PHIs argue that in *Perdikaris 2018*, Barrington-Foote J. conclusively decided that the PHIs did not consent to the final version of the Settlement Agreement. Since he made a final determination on this point, so the argument goes, there is nothing more that can be done. Consent is required. No consent has been established. Thus, the Settlement Agreement cannot be approved, full stop.

[83]        However, this position flies in the face of the decision, read reasonably, and, as a whole. A synopsis of the germane portions of *Perdikaris 2018*, for the purpose of this analysis, is as follows:

> I cannot approve the Settlement Agreement unless it has been approved by all PHIs in accordance with their subrogation legislation. (para 49)
>
> One might have expected, given the questions raised in *Perdikaris 2017*, that class counsel would provide direct evidence from all provincial and territorial PHIs that they had approved the settlement … The evidence did not meet that mark. (para 52)
>
> In the result, I am not satisfied that PHIs granted approval in accordance with their subrogation legislation. I am, for that reason, unable to approve the Settlement Agreement. (para 54)
>
> There are factors which weigh in favour of approving the Settlement

- 24 -

Agreement, subject to confirmation that it was properly approved by all PHIs. … (para 59)

… The material provided by class counsel goes well beyond boilerplate. (para 60)

I am, nonetheless, not satisfied that the Settlement Agreement is fair, reasonable and in the best interests of the class. (para 61)

In the result, I am not yet satisfied that the Settlement Agreement is fair, reasonable and in the best interests of the class as a whole. (para 70)

For these reasons, I am not prepared to grant the relief sought. If the plaintiff wishes to continue to pursue this application, he may reapply, with supplementary material addressing the concerns raised in this decision and on notice to the [PHIs]. In the alternative, he may apply for certification. (para 71)

[84]     A fair reading of the decision as a whole, and the particular passages reproduced above suggest that a final determination with respect to approval and best interests was not made.

[85]     Had it been the intention of Barrington-Foote J. to conclusively and finally rule that there was, in fact, no PHI consent and that, therefore the application to have the Settlement Agreement judicially approved must be dismissed -- he would have said so. There would be no need to provide the Plaintiffs the opportunity to "reapply".

[86]     Furthermore, if the court approval application was fatally flawed in relation to the alleged lack of PHI consent, and therefore, so to speak "dead in the water", there would be no need to go through the academic exercise of pointing out flaws and shortcomings respecting the "fair, reasonable and in the best interests of the class as a whole" component.

[87]     Finally, and perhaps most importantly, Barrington-Foote J. could have articulated, if it was his intention to do so, that the evidence before him in relation to the approval of the Settlement Agreement was insufficient and that, therefore, the

- 25 -

application should be <u>dismissed</u>. Instead, he chose to point out concerns and give the plaintiff another opportunity to "<u>reapply</u>" and provide "supplementary material <u>addressing the concerns raised</u> ...".

[88]    Accordingly, I find that the Plaintiffs are entitled to, once again, seek to have the Settlement Agreement approved by the court should they choose to do so. In arriving at this conclusion, I express no opinion whatsoever respecting the Plaintiffs' likelihood of success; nor should this decision be perceived as prejudging the merits of the reapplication. However, it is likely a fair observation that in light of the fact that this court has, on two previous occasions, pointed out shortcomings and expressed concern and then provided a further opportunity to file supplementary material, it is unlikely that further indulgences will be granted.

[89]    The reapplication for court approval of the Settlement Agreement may be set down for hearing at the first reasonable opportunity.

IV. CONCLUSION

[90]    Therefore, in conclusion:

(1)    Plaintiffs' counsel are not disqualified from continuing to act on behalf of the representative Plaintiffs and the class;

(2)    The unredacted affidavit may be filed;

(3)    The reapplication for the judicial approval of the Settlement Agreement may be set down for hearing at the first reasonable opportunity.

[91]    There will be no order as to costs.

- 26 -

## V. POSTSCRIPT

[92]        While this decision was under reserve, a letter was sent to the local registrar of the court by David Bish, counsel for Ernst & Young Inc., the Information Officer appointed by The Honourable Justice Hainey of the Ontario Superior Court of Justice (Commercial List), pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36 [*CCAA*]. The letter states that Purdue Pharma L.P. and 23 affiliated debtors each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Apparently, the cases are pending before The Honourable Robert D. Drain and are jointly administered under Case No. 19-23649.

[93]        The letter appears to be intended to advise the court that the effect of the orders made in Canada and the United States stays "all further proceedings in any action, suit or proceeding" against Purdue Pharma L.P. and 23 other affiliated debtors. However, at least one named defendant in this action, Purdue Pharma Inc., may not be caught by the *CCAA* orders. Mr. Bish's letter reads, in part, as follows:

> As a result of the foregoing, the Class Action Proceedings are stayed and suspended in respect of Purdue Pharma L.P., subject to further order of the CCAA Court. Please note that Purdue Pharma, Inc. -- a defendant in the    Class Action Proceedings and a Canadian incorporated entity -- is not a Debtor and is a separate legal entity from Purdue Pharma Inc. (which is a U.S. incorporated entity and a Debtor).
>
> [Emphasis in original]

[94]        Submissions from the parties and interested governmental agencies has not been sought or received. The effect of this development on this decision has not been determined. It remains, at this point, an open question.

_____    C.J.Q.B.
M.D. POPESCUL