DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Frances E. Bivens
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**DEBTORS' OMNIBUS OBJECTION TO MOTIONS BY
CERTAIN CLAIMANTS FOR AN ORDER ALLOWING THEM
TO PROCEED WITH A CLASS PROOF OF CLAIM AND CERTIFYING A CLASS**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

Preliminary Statement ..................................................................................................... 1

Background ....................................................................................................................... 6

Argument ........................................................................................................................ 14

    I.    This Court Should Not Exercise Its Discretion to Apply Rule 23 to the Movants'
    Proposed Class Claims ............................................................................................ 17

        A.    The "Musicland Factors" Demonstrate That Rule 23 Should Not Be Applied
            to the Proposed Class Claims. ............................................................... 17

            i.  There is No Certified Prepetition Class of Any of the Proposed Putative
            Classes .......................................................................................... 18

            ii.  Members of Each of the Proposed Putative Classes Have Received
            Adequate Notice of the General Bar Date ....................................... 20

            iii.  Certification of the Proposed Classes Will Adversely Affect the
            Administration of These Estates. .................................................... 24

        B.    None of the Purported Concerns Raised by the Movants Remotely Justify the
            Use of Class Proof of Claims Here ...................................................... 26

    II.    The Movants Fail to Satisfy the Requirements of Rule 23 ........................................ 30

        A.    The Movants' Expansive and Amorphous Class Definitions Do Not Identify
            Certifiable Classes ............................................................................... 31

        B.    Movants Do Not and Cannot Satisfy the Requirements of Rule 23(b) ................ 33

            i.  The Movants Fail to Satisfy the Predominance and Superiority
            Requirements of Rule 23(b)(3) ...................................................... 34

            ii.  Certification of a Rule 23(b)(1)(B) "Limited Fund" Class Is Wholly
            Inappropriate in This Bankruptcy Context ..................................... 42

            iii.  The NAS Guardians' Attempt to Certify a Mandatory Injunctive Relief
            Class Also Fails ............................................................................. 46

        C.    Movants Cannot Satisfy Rule 23(a)'s Requirements ............................................ 48

            i.  Commonality .................................................................................... 48

             ii.  Typicality and Adequacy of Representation .................................... 50

Conclusion ...................................................................................................................... 53

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Allegheny Gen. Hosp. v. Philip Morris Inc.*,
  228 F.3d 429 (3d Cir. 2000) ............................................................................. 41

*In re Am. Resv. Corp.*,
  840 F.2d 487 (7th Cir. 1988) ............................................................................. 4

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................. 34, 51

*Ball v. Union Carbide Corp.*,
  385 F.3d 713 (6th Cir. 2004) ............................................................................. 52

*In re Bally Total Fitness of Greater N.Y., Inc. (In re Bally),*
  402 B.R. 616 (Bankr. S.D.N.Y. 2009) ..................................................... 23, 25, 27

*In re Bally Total Fitness of Greater N. Y., Inc.*,
  411 B.R. 142 (S.D.N.Y. 2009) ............................................................................. 20

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ............................................................................. 47

*In re Baycol Prod. Litig.*,
  218 F.R.D. 197 (D. Minn. 2003) ............................................................................. 47

*Bergan Mercy Health Sys. v. Haven*,
  620 N.W.2d 339 (Neb. 2000) ............................................................................. 35

*In re Blockbuster, Inc.*,
  441 B.R. 239 (Bankr. S.D.N.Y. 2011) ..................................................... 20, 24, 27

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ............................................................................. 35

*Campbell v. Purdue Pharma L.P.*,
  2004 WL 5840206 (E.D. Mo. June 25, 2004) ........................................... 30, 50, 51

*In re Chaparral Energy, Inc.*,
  571 B.R. 642 (Bankr. D. Del. 2017) ..................................................... 15,17,19,24

*In re Chateaugay Corp.*,
  104 B.R. 626 (S.D.N.Y. 1989) ............................................................................. 15

*In re CommonPoint Mortgage Co.*,
  283 B.R. 469 (Bankr. W.D. Mich. 2002) ............................................................. 15

*In re Connaught Grp., Ltd.*,
    491 B.R. 88 (Bankr. S.D.N.Y. 2013) ............................................................ 15, 19

*In re Craft*,
    321 B.R. 189 (Bankr. N.D. Tex. 2005) ................................................................ 29

*Doe v. Karadzic*,
    192 F.R.D. 133 (S.D.N.Y. 2000) ........................................................................ 44

*In re Domestic Drywall Antitrust Litig.*,
    322 F.R.D. 188 (E.D. Pa. 2017) ......................................................................... 50

*In re Drexel Burnham Lambert Grp.*, Inc.,
    960 F.2d 285 (2d Cir. 1992) .......................................................................... 33, 43

*In re Ephedra Prod. Liab. Litig.*,
    329 B.R. 1 (S.D.N.Y. 2005) ....................................................................... *passim*

*Feinstein v. Firestone Tire and Rubber Company*,
    535 F. Supp. 595 (S.D.N.Y. 1982) ..................................................................... 52

*In re First Interregional Equity Corp.*,
    227 B.R. 358 (Bankr. D.N.J. 1998) ..................................................................... 15

*In re FIRSTPLUS Fin., Inc.*,
    248 B.R. 60 (Bankr. N.D. Tex. 2000) ......................................................... 5, 43, 45

*Foister v. Purdue Pharma L.P.*,
    2002 WL 1008608 (E.D. Ky. Feb. 26, 2002) ................................................ *passim*

*Gates v. Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) ............................................................................... 47

*Gentry v. Siegel*,
    668 F.3d 83 (4th Cir. 2012) ............................................................................... 19

*Gevedon v. Purdue Pharma L.P.*,
    212 F.R.D. 333 (E.D. Ky. 2002) ................................................................... 38, 51

*H.W. Urban GmbH v. Republic of Argentina*,
    2003 WL 21058254 (S.D.N.Y. May 12, 2003) ......................................... 4, 32, 33

*Haley v. Medtronic, Inc.*,
    169 F.R.D. 643 (C.D. Cal. 1996) ....................................................................... 35

*Harris v. Purdue Pharma L.P.*,
    218 F.R.D. 590 (S.D. Ohio 2003) ................................................................. 38, 47

*Howland v. Purdue Pharma L.P.*,
    821 N.E.2d 141 (Ohio Sup. Ct. 2004) ................................................................ 38

*Huey v. Meek*,
  419 S.W.2d 875 (Mo. Ct. App. 2013) ................................................. 35

*Hurtado v. Purdue Pharma Co.*,
  2005 WL 192351 (N.Y. Sup. Ct. Jan. 24, 2005) ................................. 20

*Isaacs v. Sprint Corp.*,
  261 F.3d 679 (7th Cir. 2001) ........................................................ 31, 32

*Johnson v. Abbott Labs.*,
  2004 WL 3245947 (Ind. Cir. Ct. Dec. 31, 2004) ..................... 38, 39, 51

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) ........................................................... 5, 35

*In re Joint E. & S. Dist. Asbestos Litig.*,
  14 F.3d 726 (2d Cir. 1993) ................................................................. 43

*Kaczmarek v. Int'l Bus. Machines Corp.*,
  186 F.R.D. 307 (S.D.N.Y. 1999) ........................................................ 35

*In re Kaiser Grp. Intern., Inc.*,
  278 B.R. 58 (Bankr. D. Del. 2002) ..................................................... 19

*Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*,
  211 F.R.D. 228 (S.D.N.Y. 2002) ................................................... 35, 49

*In re Livaditis*,
  122 B.R. 330 (Bankr. N. D. Ill. 1990) ................................................ 15

*Marshall v. Hyundai Motor Am.*,
  334 F.R.D. 36 (S.D.N.Y. 2019) .......................................................... 48

*Mat-Su Regional Med. Ctr., LLC v. Burkhead*,
  225 P.3d 1097 (Alaska 2010) ............................................................. 35

*In re MF Global Inc.*,
  512 B.R. 757 (Bankr. S.D.N.Y. 2014) ........................................*passim*

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) .................................................. 34, 37, 38

*In re Motors Liquidation Co.*
  447 B.R. 150 (Bankr. S.D.N.Y. 2011) ..................................... 16, 20, 45

*In re Musicland Holding Corp.*,
  362 B.R. 644 (Bankr. S.D.N.Y. 2007) .......................... 20, 23, 25, 27

*In re Nw. Airlines Corp.*,
  No. 05-17930 (ALG), 2007 WL 2815917 (Bankr. S.D.N.Y. Sept. 26, 2007) ................. 15, 21

*Ortiz* v. *Fibreboard Corp.*
   527 U.S. 815 (1999) ........................................................................... 43, 44, 45

*Owner-Operators Indep. Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*,
   2005 WL 6957703 (S.D. Ind. Sept. 27, 2005) ...................................... 36

*In re Pac. Sunwear of Cal., Inc.*,
   2016 WL 3564484 (Bankr. D. Del. June 22, 2016) .............................. 15

*Perry v. Am. Tobacco Co.*,
   2001 WL 686812 (E.D. Tenn. Apr. 12, 2001) ...................................... 40

*In re Prempro*,
   230 F.R.D. 555 (E.D. Ark. 2005) ........................................................ 47

*In re Ret. Builders, Inc.*,
   96 B.R. 390 (Bankr. S.D. Fla. 1998) .................................................. 15

*In re Rezulin Prod. Liab. Litig,*
   210 F.R.D. 61 (S.D.N.Y. 2002) .......................................................... 47

*Rhodes v. E.I. du Pont de Nemours & Co.*,
   253 F.R.D. 365 (S.D.W. Va. 2008) .................................................... 46

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
   601 F.3d 1159 (11th Cir. 2010)........................................................... 36

*In re Sacred Heart Hosp. of Norristown*,
   177 B.R. 16 (Bankr. E.D. Pa. 1995) ................................... 15, 18, 20, 23

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
   806 F.3d 71 (2d Cir. 2015) ................................................................. 38

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
   256 F.R.D. 284 (D. Conn. 2009) ........................................................ 35

*In re St. Jude Med., Inc.*,
   425 F.3d 1116 (8th Cir. 2005) ....................................................... 46, 47

*In re Think Finance, LLC*,
   No. 17-33964, 2018 WL 9801454 (N.D. Tex. Aug. 30, 2018) ............. 23

*Thompson v. Am. Tobacco Co.*,
   189 F.R.D. 544 (D. Minn. 1999) ........................................................ 52

*In re Thomson McKinnon Sec., Inc.*,
   141 B.R. 31 (S.D.N.Y. 1992) ............................................................. 15

*In re TWL Corp.*,
   712 F.3d 886 (5th Cir. 2013) ............................................................. 42

*UFCW Local 1776 v. Eli Lilly & Co.*,

620 F.3d 121 (2d Cir. 2010) ................................................................... 33, 37, 38

*In re USA Gymnastics Debtor,*
No. 18-09108-RLM-11, 2020 WL 1932340 (Bankr. S.D. Ind. Apr. 20, 2020) .................... 18

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ................................................................... 30, 48

*Walsh v. Ford Motor Co.,*
807 F.2d 1000 (D.C. Cir. 1986) ................................................................... <u>36</u>

*Wethington v. Purdue Pharma L.P.,*
218 F.R.D. 577 (S.D. Ohio 2003) ................................................................... 38

*Wilson v. Brush Wellman, Inc.*
817 N.E.2d 59 (Ohio 2004) ................................................................... 48

*In re Woodmoor Corp.,*
4 B.R. 186 (Bankr. D. Colo. 1980) ................................................................... 44

*In re Woodward & Lothrop Holdings, Inc.,*
205 B.R. 365 (Bankr. S.D.N.Y. 1997) ................................................................... 6, 31

*In re WorldCom, Inc.,*
343 B.R. 412 (Bankr. S.D.N.Y. 2006) ................................................................... 5, 35, 36

*In re WorldCom, Inc.,*
No. 02-13533 (AJG), 2005 WL 8146313 (Bankr. S.D.N.Y. Jan. 3, 2005) .......................... 32

*Wynn v. New York City Hous. Auth.,*
314 F.R.D. 122 (S.D.N.Y. 2016), *aff'd,* 730 F. App'x 92 (2d Cir. 2018) .......................... 48

*Zehel-Miller v. Astrazenaca Pharm., LP,*
223 F.R.D. 659 (M.D. Fla. 2004) ................................................................... 47

*Zinser v. Accufix Research Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ................................................................... 6, 36, 46

### STATUTES & RULES

Fed. R. Bankr. P. 2019 ................................................................... 8, 9, 10, 13

Fed. R. Bankr. P. 9014 ................................................................... 1

Fed. R. Civ. P. 23 ................................................................... *passim*

Fed. R. Civ. P. 23(a) ................................................................... *passim*

Fed. R. Civ. P. 23(a)(2) ................................................................... 48

Fed. R. Civ. P. 23(a)(4) ..................................................................................... 51

Fed. R. Civ. P. 23(b) ............................................................................... 30, 33, 53

Fed. R. Civ. P. 23(b)(1) ......................................................................... 42, 43, 44

Fed. R. Civ. P. 23(b)(1)(B) ...................................................................... *passim*

Fed. R. Civ. P. 23(b)(2) .............................................................................*passim*

Fed. R, Civ. P. 23(b)(3) ............................................................................ *passim*

Fed. R. Civ. P. 23(c)(2) ..................................................................................... 42

OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION, § 21.23 (4th ed. 2004))......................................36

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, "**Debtors**," "**Company**," or "**Purdue**") hereby submit this omnibus objection ("**Objection**") to the *Motion by Public School Districts for an Order Allowing Them to Proceed with a Class Proof of Claim and Certifying a Class* [Dkt. No. 1211] (the "**IPSDs Motion**"), the *Motion of the Private Insurance Class Claimants for Leave to File Class Proofs of Claim* [Dkt. Nos. 1321, 1334 (amended)] ("**Ratepayers Motion**"), the *Hospital Claimants' Motion Pursuant to Fed. Bankr. P. 9014 and 7023 for an Order Making Fed. R. Civ. P. 23 Applicable to These Proceedings, Permitting Them to File a Class Proof of Claim and Granting Related Relief* [Dkt. No. 1330-1] ("**Hospitals Motion**"), the *NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants Motion for Entry of an Order Pursuant to Fed. Bankr. P 9014 and 7023 Permitting Them to File a Class Proof of Claim and Granting Related Relief* [Dkt. No. 1362-1] ("**NAS Guardians Motion**"), and the *Motion by Cheyenne & Arapaho Tribes and Certain Other Indian Tribes Claimants Pursuant to Fed. R. Bankr. P. 9014 and 7023 to Permit the Filing of a Class Proof of Claim* [Dkt. No. 1363] ("**Tribes Motion**") (collectively, "**Class Claim Motions**").   In support of the Objection, the Debtors respectfully state as follows:

### Preliminary Statement

1.      Certain independent public school districts ("**IPSDs**"), an individual private health insurance purchaser on behalf of other purchasers ("**Ratepayers**"), hospitals ("**Hospitals**"), legal guardians of children with neonatal abstinence syndrome ("**NAS Guardians**"), and federally recognized Indian Tribes ("**Tribes**") (collectively, "**Movants**") have separately moved this Court to exercise its discretion under Bankruptcy Rule 9014 to apply Federal Rule of Civil Procedure 23 ("**Rule 23**") and permit them to file class proofs of claim on

1

behalf of various putative classes, as well as grant other related relief. Paying little heed to the applicable legal standards, the Movants contend that despite the robust notice campaign that has been undertaken in these chapter 11 cases (*to which the Movants did not object*, despite participating in these cases for months), the entities and individuals that make up their proposed classes are at risk of being "disenfranchised" from these proceedings or otherwise prejudiced in the absence of class certification.

2.     From the outset of these chapter 11 cases, the Debtors have acknowledged the far-reaching impact of the opioid crisis. Although they do not concede liability and would vigorously contest the basis of the Movants' claims if the issues were ripe, they remain committed to ensuring that one hundred percent of their assets are devoted to addressing the opioid crisis pursuant to a confirmed plan of reorganization. The Class Claim Motions, however, do not advance these goals and are unsupported by the applicable legal standards. They should be denied.

3.     Class proofs of claim are employed sparingly in the bankruptcy context, and they should not be permitted here. Not a *single one* of the factors courts typically consider in determining whether to exercise their discretion to permit class proofs of claims—commonly referred to as the "*Musicland* factors," *In re Musicland Holding Corp.*, 362 B.R. 644, 654 (Bankr. S.D.N.Y. 2007)—weighs in the Movants' favor. *First*, none of the proposed classes were certified prepetition. Indeed, three of the five putative classes (the IPSDs, the nationwide class of Ratepayers, and the tribal class) were never even asserted against the Debtors before the petition date despite the maelstrom of then-pending litigation. *Second*, the putative classes have received more than adequate notice of the bar date through the unprecedented Court-approved notice program. As these Movants well know, the Debtors' noticing plan is one of the most

2

extensive and expensive in history, was developed over an extended period in close consultation with multiple creditor constituencies, and was ultimately approved by the Court without objection. Although aware of the Debtors' bankruptcy long before the Debtors moved to establish a bar date and noticing procedures in January of 2020, counsel for all of the Movants except the NAS group never once contacted the Debtors to raise any concern about the adequacy of the noticing regime—and the Debtors have endeavored to accommodate the NAS group's suggestions where reasonable. Moreover, Movants did not raise any objection to the noticing plan in connection with the recent motion practice concerning the extension of the bar date in light of the COVID-19 pandemic. The Class Claims Motions would have been entirely without merit if filed months ago, but it is nothing short of shocking that the Movants have waited until the twelfth hour, launched this collateral attack on the bar date and noticing program, and noticed the hearing for literally a week before the expiration of the bar date—which was approved on February 3, 2020 and reaffirmed and extended on June 3, 2020. ***Finally***, there can be little doubt that certification of these purported classes would adversely affect the administration of the case and introduce needless complexity and cost to these already highly complicated and costly proceedings. Among other things, such delays and/or costs would be occasioned by discovery made more complex by class proofs of claim and, presumably (although the Movants are entirely silent on the point), implementation of some type of class notice and opt-out procedures for multiple classes. Moreover, certification of these claims would impose substantial cost and complexity post-emergence, which would decrease the funds going to stakeholders.

4.     Because the applicable factors cut so clearly against them, the Movants devote substantial portions of their papers to arguing the merits of their claims—which have little to no bearing on the inquiry at bar—or asserting that other considerations support class certification

here.  These, too, are unavailing.  The Movants will not, as many of them claim, be "disenfranchised" in the absence of class certification.  Their rights, whatever they might be, are adequately protected by the chapter 11 claims process itself.  They can fill out a proof of claim and, as many courts have observed, "participate for the price of a stamp."  *In re Musicland*, 362 B.R. at 650 n.8.  In addition, counsel for the Ratepayers, the Hospitals, the NAS Guardians, the Tribes, and certain of the IPSDs are participating in the mediation and have presented their views to the mediators and other estate constituencies.  Further, the Movants are represented by the Official Committee of Unsecured Creditors ("**Creditors' Committee**"), and two have membership on the Creditors' Committee in an *ex officio* capacity.  Simply put, under any view, the Movants have not been excluded from these proceedings.  If what the Movants are saying is that potential infirmities in their legal claims make it less likely that members of their purported classes would file a proof of claim, it is obvious that such considerations do not and cannot support an exercise of discretion to permit class certification here.

5.    The Movants' failures to satisfy the requirements of Rule 23 provide a separate and independent reason to deny their motions.  A "bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action" and renders class-based claims "'less desirable in bankruptcy than in ordinary civil litigation.'"  *In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005) (quoting *In re Am. Resv. Corp.*, 840 F.2d 487, 493 (7th Cir. 1988)).  Here, the five Movants seek to certify classes that together cover millions of potential individual claimants.  These classes are manifestly "too large, too diverse, and too vaguely defined to be the basis for a manageable class action."  *H.W. Urban GmbH v. Republic of Argentina*, No. 02 Civ. 5699(TPG), 2003 WL 21058254, at *2 (S.D.N.Y. May 12, 2003).

6.       Movants' proposed classes also raise far too many individual issues of fact and law to be addressed on a class-wide basis.  Common legal issues do not predominate, as each class complaint asserts state law claims that "would require the Court to apply the laws and the burdens of proof of numerous states to the individual [c]lass members' claims."  *In re WorldCom, Inc.*, 343 B.R. 412, 427 (Bankr. S.D.N.Y. 2006).  Courts regularly refuse to certify nationwide class actions because "the application of the different jurisdictions' laws . . . renders individual issues predominant and undercuts the superiority of trying the common issues on a classwide basis."  *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 148 (2d Cir. 2015) (vacating certification of class).

7.       Likewise, the nature of the Movants' claims—which are all grounded in the theory that Purdue's opioid products caused physical (and thus financial) injury—raise a host of individual issues (such as those relating to proximate causation) that cannot be certified as a class.  In fact, state and federal courts have consistently refused to certify class actions against Purdue based on the same type of allegedly improper marketing activity that undergirds the Movants' claims here.  *See Hurtado v. Purdue Pharma Co.*, No. 12648/03, 2005 WL 192351, at *11-14 (N.Y. Sup. Ct. Jan. 24, 2005) (citing cases rejecting class certification against Purdue).

8.       Certain Movants attempt to obfuscate these glaring defects by seeking a mandatory "limited fund" class action under subsection 23(b)(1)(B) and (in the case of the NAS Guardians) an injunctive relief class under subsection 23(b)(2).  Both attempts fail.  A limited fund class is inapplicable because the bankruptcy estate is already subject to multiple safeguards and does not constitute a limited fund that might be depleted by a single creditor in a race to the courthouse.  *In re FIRSTPLUS Fin., Inc.*, 248 B.R. 60, 75-76 (Bankr. N.D. Tex. 2000).  Similarly, the NAS Guardians' request for medical monitoring does not transform a damages

class into an injunctive relief class. *See Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195-96 (9th Cir. 2001) (request for medical monitoring does not constitute injunctive relief).

9.      Finally, and equally fundamentally, the Movants have not and cannot establish that certifying these massive class actions is the superior method for expeditiously resolving these chapter 11 cases. *In re Ephedra*, 329 B.R. at 9. To the contrary, "class litigation is inherently more time-consuming than the expedited bankruptcy procedure for resolving contested matters" and would, as noted above, most assuredly "'gum up the works' of distributing the estate." *Id.* at 5 (quoting *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 376 (Bankr. S.D.N.Y. 1997)).

10.     There is no basis upon which to permit the Movants to proceed with class claims—let alone ten months into the case and a week before the expiration of a six-month-long bar date period to which they never objected. Granting the Class Claim Motions would lead only to one inescapable result—this Court will be inundated with requests to certify yet further dubious classes, and the parties' focus on working to bring these chapter 11 cases to a consensual resolution will be materially diverted. For all of the foregoing reasons, and those that follow, the Motions should be denied.

## Background

### *The Pending Actions and the Debtors' Bankruptcy Filing*

11.     On September 15, 2019 ("**Petition Date**"), the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**"). The Debtors sought chapter 11 protection to stem the immense expenditures and massive value destruction that resulted from litigating 2,625 actions that had been filed against the Debtors by

governmental and private entities ("**Pending Actions**").  All of these actions arose out of the Debtors' manufacturing, marketing, and sale of prescription opioid medications.

12.      Among the Movants, the Hospitals purported to sue the Debtors on behalf of the class for which they seek certification here.  (Hospitals Mot. Ex. A ("**Hospitals Compl.**").)  Only three of the thousands of plaintiffs that had commenced suit against the Debtors in the years leading up to the Petition Date were school districts;[2] none were the IPSDs.  Although certain insurance ratepayers filed class action complaints against opioid manufacturers, including Purdue, on behalf of putative classes of insurance purchasers from their respective states (Ratepayers Mot. ¶ 25), no action was or has been commenced against Purdue on behalf of a nationwide class of Ratepayers.  Same with respect to the Tribes.  (Tribes Mot. ¶ 14 ("Almost all of the Indian Tribes' complaints in the MDL are by individual Indian Tribes.").)  And while the NAS Guardians filed putative class action complaints against the Debtors seeking to certify nationwide classes of minors with NAS, the MDL court expressly indicated that it "ha[d] great doubts whether this is a viable nationwide class action" given the individualized nature of the claims. (Aug. 7, 2019 Hr'g Tr. 4:16-24, 11:3-4, *In re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio), Dkt. No. 2151.)

13.      Counsel for the Movants have assuredly been aware of the Debtors' bankruptcy since the Petition Date, on account of the intense media coverage of the Debtors' chapter 11 petitions, counsels' representation of individuals and entities that had sued the Debtors prepetition, or otherwise.  At the absolute minimum, they were demonstrably aware shortly

---

[2] *See* Compl. & Jury Demand, *Iberia Par. Sch. Bd. v. Amerisourcebergen Drug Corp., et al*., No. 3:18-CV-00960 (M.D. La. Oct. 26, 2018), Dkt. No. 1; Compl. & Jury Demand, *St. Mary Par. Sch. Bd. v. Amerisourcebergen Drug Corp., et al*., No. 3:18-CV-00957 (M.D. La. Oct. 26, 2018), Dkt. No. 1; Compl. & Jury Demand, *City of Anacortes, & Sedro-Woolley Sch. Dist. v. Purdue Pharma, L.P. et al*., No. 2:18-CV-01853 (W.D. Wash. Dec. 21, 2018), Dkt. No. 1.

thereafter.  For example, on September 16, 2019, just one day after the Petition Date, counsel for

the Ratepayers filed a Bankruptcy Rule 2019 statement on behalf of twenty-five "persons in their

respective individual and putative capacities as proposed representatives of classes of privately

insured parties who are plaintiffs and proposed class representatives" in lawsuits against the

Debtors in their twenty-five respective states.  (V.S. of Stevens & Lee, P.C. Pursuant to Bankr.

R. 2019, at 1 (Sept. 16, 2019), Dkt. No. 24; *see also* Am. V.S. of Stevens & Lee, P.C. Pursuant

to Bankr. R. 2019, at 1 (Oct. 21, 2019), Dkt. No. 333.)   In October 2019, counsel for the NAS

Guardians filed a notice of appearance on behalf of the Ad Hoc Committee of NAS Babies (Not.

of Appearance & Req. for Serv. (Oct. 22, 2019), Dkt. No. 340), and counsel for the Tribes filed a

motion seeking appointment of an official committee of Native American creditors.  (Not. of

Hr'g on Mot. Seeking Appt. of Off. Comm. of Native Am. & Native Am. Affiliated Creditors

(Oct. 9, 2019), Dkt. No. 276.)   In November 2019, counsel for the IPSDs stated in a class action

complaint filed against ***other*** opioid manufacturers and distributors that they had not sued the

Debtors because of the Debtors' bankruptcy and application of the automatic stay.  (*See Bd. of

Educ. of the City of Chicago v. Cephalon, Inc*., *et al*., No. 19-op-46042, ¶¶ 13, n.15, 26, 50 (N.D.

Ohio Nov. 20, 2019), Dkt. No. 1 ("The Purdue Pharma entities are not listed as defendants at this

time because they recently filed for bankruptcy."); IPSDs Mot. ¶ 3.)   Finally, on December 3,

2019, a "group of hospitals . . . that have treated and treat patients for conditions related to the

use of opiates manufactured by Purdue" ("**Ad Hoc Group of Hospitals**") filed their Bankruptcy

Rule 2019 statement.  (V.S. of the Ad Hoc Grp. of Hosps. Pursuant to Bankr. R. 2019, at 1 (Dec.

3, 2019), Dkt. No. 577 ("**Hospitals Rule 2019 Statement**").)  The Ad Hoc Group of Hospitals is

represented by the same counsel as the Hospitals.[3]  (Hospitals Mot. at 29; Not. of Substitution of Counsel for the Ad Hoc Grp. of Hosps., at 1 (Apr. 23, 2020), Dkt. No. 1083.)

### *Establishment of a Bar Date and Notice Program and Approval of Proof of Claim Forms*

14.    The Debtors recognized from the very outset that defining and centralizing the claims against them was (and remains) a critical gating item to moving these chapter 11 cases toward a consensual plan of reorganization.   For this reason, they began the process of negotiating the bar dates, proof of claim forms, and noticing plan in earnest in October 2019, shortly after filing for bankruptcy.  (Decl. of Benjamin S. Kaminetzky, ¶ 16 (Mar. 4, 2020), Adv. Dkt. No. 148 ("**Kaminetzky Decl.**").)   Those negotiations intensified in late November and December 2019.  (*Id.*)  During that period, the Debtors participated in dozens upon dozens of calls and scheduled telephonic meetings with various creditor constituencies.  (*Id.*)  "The various creditor constituencies held differing, and often conflicting, positions regarding the establishment of the claims process and noticing plan that needed to be reconciled and resolved in order to achieve consensus"—and negotiations did not end with the filing of the Debtors' bar date motion on January 3, 2020.  (*Id.* ¶¶ 16-17.)  In fact, negotiations continued all the way through ultimate entry of the bar date order on February 3, 2020.[4]  (*Id.* ¶ 17.)

15.    Counsel for the Ad Hoc Group of Hospitals was engaged in these discussions and weighed in on a number of items, including the substance and format of the proof of claim forms.  (Am. Agenda for Jan. 24, 2020 Omnibus Hr'g, at 3 (Jan. 23, 2020), Dkt. No. 778; *see*

---

[3] Although represented by the same counsel as the Ad Hoc Group of Hospitals, the Hospitals here have expressly excluded the Ad Hoc Group of Hospitals from their purported class.  (Hospitals Mot. at 1 n.3.)

[4] *See* Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, & (III) Approving the Form and Manner of Notice Thereof (Feb. 3, 2020), Dkt. No. 800 ("**Bar Date Order**").

*also* Hospitals Rule 2019 Statement.)   Likewise, counsel for the Ad Hoc Committee of NAS

Babies provided input to the Debtors with respect to the notice program, which the Debtors took

into account and accommodated where reasonable and appropriate.   At no time during this

period, however, did the IPSDs, the Ratepayers, the Tribes, or their counsel raise an objection or

otherwise contact the Debtors or the Court to voice any concerns with respect to the noticing

plan.  Moreover, none of the Movants filed an objection to the noticing plan.[5]

16.    Soon after the Court entered the Bar Date Order, the Debtors commenced one of

the most extensive and expensive noticing regimes in chapter 11 history.  This noticing regime

has two distinct components: (1) a direct mailing campaign; and (2) a supplemental notice plan

aimed at providing broad publication notice (the "**Supplemental Notice Plan**").

17.    The direct mailing campaign targeted "known claimants."  As set forth in the

Debtors' papers in support of the bar date motion, known claimants were: (i) persons or entities

that had filed proofs of claim as of the Bar Date Order; (ii) all creditors and other known holders

of claims (including those listed on the Debtors' Schedules); (iii) all counterparties to the

Debtors' executory contracts and unexpired leases; (iv) all current parties to litigation with the

Debtors; (v) current, former, and retired employees, officers, and directors; and (vi) parties

known to the Debtors as having potential claims against the Debtors.  (Decl. of Jeanne C.

---

[5] The NAS group filed a "Conditional Consent with Reservation of Rights" to the Debtors' bar date motion. (*See* Conditional Consent with Reservation of Rights of the NAS Children Ad Hoc Comm. to Mot. of Debtors for Entry of Order (I) Establishing Deadlines for Filing Proofs of Claim & Procedures Relating Thereto, (II) Approving Proof of Claim Forms & (III) Approving the Form & Manner Thereof (Jan. 17, 2020), Dkt. No. 754.)  In that filing, the NAS group conceded that "the Noticing Plan has now been expanded to account for the unique nature of the putative claimants," but stated that its "approval of the noticing plan" was "conditional" and purported to reserve its rights. (*Id.* ¶ 5.)  The NAS group also observed that the Debtors afforded it the opportunity to comment and meaningfully engage with the Debtors on the noticing plan. (*Id.* ¶¶ 16-18.)  Although the NAS group noted in a stray sentence that it wanted to "register[] its objections to the Debtors' decision not to adopt the [entirety of the NAS group's] suggestions," (*id.* ¶ 16), the NAS group did not object to the noticing plan at the hearing held on the bar date and noticing program on January 24, 2020.

Finegan ¶ 20 (Jan. 3, 2020), Dkt. No. 719 ("**Finegan Declaration**").)  Parties known to have potential claims against the Debtors, in turn, included: "(i) prescribers of Purdue brand name medications; (ii) Purdue opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (iii) callers to Purdue who have threatened but not filed litigation and provided contact information; and (iv) entities and individuals, other than current, former, and retired employees, officers, and directors, that have requested indemnification."  (*Id.*)

18.    The Debtors' robust direct mailing campaign is backstopped by the extraordinary Supplemental Notice Plan, which "is one of the largest legal notice programs ever deployed," and was designed to reach an estimated *ninety-five percent* of all men and women over the age of eighteen in the United States *with an average frequency of message exposure of six times*. (*See* Finegan Decl. ¶ 4.)  It includes six important paid media components: (i) television; (ii) radio; (iii) print (including magazines and newspapers); (iv) online displays across multiple devices and videos (e.g., YouTube); (v) social media campaigns (e.g., Facebook, Twitter); and (vi) out-of-home advertising (e.g., billboards).  It also includes earned media (e.g., press releases, blogs) and community outreach.  (*See* Finegan Decl. ¶¶ 18-19, 37-74.)  A detailed overview of the progression and implementation of the Supplemental Notice Plan is set forth in the *Supplemental Declaration of Jeanne C. Finegan*, dated May 20, 2020 [Dkt. No. 1179] ("**Supplemental Finegan Declaration**").

*The Participation of Movants or Their Counsel in Mediation*

19.    This Court has repeatedly emphasized that resolution of disputes as to how the Debtors' assets should be allocated is crucial to achieving a consensual plan of reorganization.[6] As a result, the Debtors and key creditor constituencies reached an agreement to mediate the issue of allocation between the non-federal public claimants, on the one hand, and the private claimants, on the other hand ("**Mediation**").   On March 3, 2020, this Court entered an order appointing the Honorable Layn Phillips and Mr. Kenneth Feinberg as co-mediators.   (Order Appointing Mediators (Mar. 3, 2020), Dkt. No. 895 ("**Mediation Order**").)   The Ad Hoc Committee of NAS Babies (which is represented by counsel for the NAS Guardians), the Ad Hoc Group of Hospitals (which is represented by counsel for the Hospitals), and individual health insurance purchasers represented by the Ratepayers' counsel are designated mediation parties in the Mediation Order and have been participating in the Mediation as such.   (Mediation Order ¶ 4.)   Certain of the IPSDs, too, have been recognized as quasi-mediation parties and have been afforded the opportunity to present to the mediators and engage with other estate stakeholders on allocation issues.   (*See* Stip. & Agreed Order Resolving Mot. of the Bd. of Educ. of Thornton Twp. High Schs. Ill. Dist. No. 205, the Bd. of Educ. of Thornton Fractional Twp. High Schs. Ill. Dist. No. 215, & the Bd. of Educ. of East Aurora Ill. Sch. Dist. No. 131's Mot. to Submit Claims to Mediation, ¶ 5 (Apr. 21, 2020), Dkt. No. 1073.)[7]   Counsel for the Tribes have

---

[6] *See, e.g.*, Oct. 10, 2019 Second Day Hr'g Tr. 48:20-22 ("I think a fair amount of thought should be given here to allocation issues first."); Nov. 19, 2019 Omnibus Hr'g Tr. 160:1-6 ("The unusual perhaps unique issue in these cases is that there is a distinct possibility that the allocation issues could either be dealt with in an efficient and fair way that's respectful of the various parties-in-interest in this case or the parties can spend an inordinate amount of time disputing them to all their detriment."); *id.* at 165:3-7 ("[T]he next major step in this case . . . and I know I sound like a broken record, but I've said it two or three times now, [that] needs to be focused [on] is creative thinking about the allocation of the Debtors' assets.").

[7] On June 19, 2020, one of the IPSDs was appointed as an *ex officio* member of the Creditors' Committee to represent the school districts' interests.  (Second Am. V.S. of the Off. Comm. of Unsecured Creditors of Purdue (….continued)

also presented to the mediators.  Although actively engaged in the case, only counsel for the Ad

Hoc Committee of NAS Babies engaged Debtors' counsel in discussions as to the efficacy of the

notice program during this time, which resulted in the Debtors adopting additional NAS-specific

noticing measures (on top of the many that had already been undertaken).[8]

### Extension of the Bar Date

20.    On May 20, 2020, the Debtors requested that the Court extend the General Bar

Date by thirty days to **Thursday, July 30, 2020, at 5:00 p.m. (Prevailing Eastern Time)**

("**Extended General Bar Date**") in light of concerns regarding the ongoing COVID-19

pandemic.  (Debtors' Mot. Pursuant to 11 U.S.C. §§ 105(a) & 501 & Fed. R. Bankr. P. 2002 &

3003(c)(3) for Entry of an Order (I) Extending the General Bar Date for a Ltd. Period & (II)

Approving the Form & Manner of Notice Thereof (May 20, 2020), Dkt. No. 1178 ("**Bar Date**

**Extension Motion**").)  At this time, the Debtors were sixty-eight percent through the noticing

program timeline and the plan had "already over-delivered in a number of key areas" and was

expected to exceed the planned reach and frequency by June 30, 2020.  (Suppl. Finegan Decl.

¶¶ 4, 21.)

---

(continued….)

Pharma L.P., *et al.*, Pursuant to Bankr. R. 2019 to Disclose Addition of Third *Ex Officio* Member, ¶ 2 (June 22, 2020), Dkt. No. 1294 ("**Creditors' Committee Second Amended 2019 Statement**").)  The Cheyenne and Arapaho Tribes (Tribe Movants here) are also an *ex officio* member of the Creditors' Committee.  (*See id.*)  Walter Lee Salmons, who seeks to establish a medical monitoring program for children born with NAS, also sits on the committee, as does West Boca Medical Center, one of the largest hospital systems.  (*See id.* ¶ 7.)

[8] The Supplemental Notice Plan specifically targets parents and guardians of children with NAS, as well as those who may encounter parents and guardians of children with NAS.  For example, the Debtors' television commercial specifically mentioned legal guardians as being among the categories of people that may have claims, and NAS was included in the video scroll as a type of claim or injury for which people may file claims.  Similarly, the Debtors' radio commercial, which aired on terrestrial and streaming radio, identified legal guardians as being among the categories of people that may file claims and included NAS as a type of claim or injury for which people may file claims.  The Supplemental Notice Plan also includes print advertisements targeted at parents, guardians, caregivers, and those that may come into contact with parents or guardians of children with NAS as well as other measures designed to provide NAS-specific notice.

21.     On June 3, 2020, the Court granted the Bar Date Extension Motion.  (Order (I) Extending the General Bar Date for a Ltd. Period & (II) Approving the Form & Manner of Notice Thereof (June 3, 2020), Dkt. No. 1221 ("**Extended General Bar Date Order**").)  The Extended General Bar Date Order provides that "the Debtors ha[d] established good and sufficient cause for the requested extension and that any additional extension of the General Bar Date beyond that set forth in [the Extended General Bar Date] Order is not warranted." (Extended General Bar Date Order at 2.)  At the June 3, 2020 hearing on the Bar Date Extension Motion ("**Bar Date Extension Hearing**"), the Court observed that it "[did not] believe the extension [was] warranted based on any deficiencies in the notice program"—a program that this Court accurately characterized as "extraordinary." (June 3, 2020 Hr'g Tr. 89:4; 93:23-24.)

22.     *Not one* of the Movants filed an objection or response to the Bar Date Extension Motion or requested to be heard at the Bar Date Extension Hearing.  (Am. Agenda for June 3, 2020 Hr'g at 2-3 (June 2, 2020), Dkt. No. 1219.)  Moreover, none of the Movants contacted the Debtors regarding the effectiveness of the Debtors' Supplemental Notice Plan or the related proof of claim filing process.  (*Id.*)

<u>**Argument**</u>

23.     The Class Claim Motions should be denied because every factor that courts consider in determining whether to exercise discretion and extend Rule 23 to the proof of claim process weighs decidedly against the Movants.  In addition, each of the Movants has fallen far short of carrying their burden to establish the Rule 23 requirements for class certification.

24.     Although courts in this District have, on occasion, permitted the use of class proofs of claims in certain limited circumstances, the right to file one is far from "absolute." *In re Musicland*, 362 B.R. at 650 (citing *In re Ephedra*, 329 B.R. at 4-5).  To the contrary, courts

have repeatedly emphasized that "[c]lass action status is sparingly used in a bankruptcy case."[9]

*In re Nw. Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 2815917, at *3 (Bankr. S.D.N.Y. Sept. 26, 2007); *In re Sacred Heart Hosp. of Norristown*, 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995) ("[T]he class proof of claim device may be utilized in appropriate contexts, but . . . such contexts should be chosen most sparingly."). For good reason. "[B]ankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action." *In re Musicland*, 362 B.R. at 650. Indeed, bankruptcy already provides many of the "same procedural advantages as a class action," *id.* n.8, and many of the policy reasons that animate the use of class actions in ordinary civil litigation recede in the context of a bankruptcy.[10]

---

[9] The Ratepayers' bold assertion that courts "routinely grant motions for class proofs of claim," (Ratepayers Mot. ¶ 45), is belied by the numerous courts that have observed that class proofs of claim should be used "sparingly" and is wholly unsupported by the very cases that the Ratepayers cite. *See, e.g.*, *In re Connaught Grp., Ltd*., 491 B.R. 88, 96 (Bankr. S.D.N.Y. 2013) ("Class claims should be used sparingly in bankruptcy."); *In re Thomson McKinnon Sec., Inc*., 141 B.R. 31, 33 (S.D.N.Y. 1992) (affirming *denial* of the use of the class action device); *In re Chateaugay Corp*., 104 B.R. 626, 634-36 (S.D.N.Y. 1989) (allowing class proofs of claim because of unique circumstance where the employee union was an "authorized agent" of its members); *In re Chaparral Energy, Inc.*, 571 B.R. 642, 647-50 (Bankr. D. Del. 2017) (allowing class claim where the claim, among other reasons, could serve a deterrent function to ongoing misconduct); *In re Pac. Sunwear of Cal., Inc*., No. 16-10882 (LSS), 2016 WL 3564484, at *6 (Bankr. D. Del. June 22, 2016) (allowing the filing of a class claim because the debtors admitted that they had intentionally excluded the putative class members from the noticing program); *In re First Interregional Equity Corp*., 227 B.R. 358, 367 (Bankr. D.N.J. 1998) (allowing class claim where a prepetition class action could not have been initiated because the fraudulent activities were not discovered until after the SIPA proceedings were commenced); *In re CommonPoint Mortg. Co*., 283 B.R. 469, 480-82 (Bankr. W.D. Mich. 2002) (allowing class claim where only the debtor had the information necessary to ascertain whether the putative class members even had claims to assert); *In re Livaditis*, 122 B.R. 330, 333-34 (Bankr. N.D. Ill. 1990) (allowing class claim where class certified prepetition had obtained a prepetition judgment that was on appeal); *In re Ret. Builders, Inc*., 96 B.R. 390, 392 (Bankr. S.D. Fla. 1988) (allowing class claim for class certified prior to the petition date).

[10] Contrary to what the Ratepayers have claimed, the Debtors have not "acknowledged the legitimacy of the class proof of claim mechanism in the context of these [c]hapter 11 cases" by filing, on June 30, 2020, a stipulation to permit the filing of a class proof of claim solely to effectuate a potential settlement of certain Canadian litigation that was reached in 2017. (Ratepayers Mot. ¶ 46.) Far from it. The stipulation is the result of unique circumstances that make the proposed Canadian class claim easily distinguishable from the relief requested in the Class Claim Motions. Ten Canadian class actions were certified for settlement purposes only prior to the Petition Date and are subject to a conditional national class action settlement agreement, which has been approved by all of the relevant provincial courts except for one. (Stip. & Order Permitting the Filing of a Class Proof of Claim Solely for Admin. Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Litig. ¶¶ D-F (June 30, 2020), Dkt. No. 1313-1.) If the settlement agreement is approved by the final Canadian court, the members of the Canadian class actions will be paid solely out of a settlement trust that has been established and funded by Non-Debtor Purdue Pharma (Canada) and the claims against the Debtors will be discharged. (*Id.* ¶ G.) Conversely, if the settlement agreement is not approved, the class proof of claim will be "null and void," meaning (....continued)

15

25.     For example, in bankruptcy, creditors can participate in a collective process simply by filing a proof of claim and do not have to retain (or pay for) a lawyer.  *Id.*  And although class certification can provide a deterrent to tortious conduct in the context of ordinary civil litigation, it does not often have this same effect once a debtor has entered bankruptcy.  *Id.*  This is, of course, especially true in these chapter 11 cases, where the Debtors stopped the conduct complained of in the various suits against them long before the bankruptcy and have submitted, in connection with these proceedings, to an unprecedented voluntary injunction with compliance reviewed by a monitor.  (*See* Tenth Am. Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. for a Prelim. Inj. App. I (May 18, 2020), Adv. Dkt. No. 185.)

26.     The decision to extend the application of Rule 23 to the proof of claim context is, in all events, firmly "committed to the Court's discretion," which in turn "is informed by special considerations applicable in bankruptcy cases that are superimposed on those that apply in any determination under Civil Rule 23."  *In re Motors Liquidation Co.*, 447 B.R. 150, 157 (Bankr. S.D.N.Y. 2011).  Accordingly, the Court must **both** determine whether to "exercise its discretion . . . to apply Rule 23 to the proposed class claim" **and** "determine whether the proposed class claim satisfies the requirements of Rule 23 for class certification."  *In re MF Glob. Inc.*, 512 B.R. 757, 763 (Bankr. S.D.N.Y. 2014); *see also In re Musicland*, 362 B.R. at 650, 654 (finding it

---

(continued….)

that members of the Canadian class actions "need to file a proof of claim in the Debtors' cases to preserve their claims."  (*Id.* ¶ H.)  Here, not a single one of the classes was certified prepetition, and three of the five nationwide classes were not even asserted against the Debtors.

unnecessary to determine whether the proposed class satisfied Rule 23 where court declined to exercise its discretion to extend the application of Rule 23 to the proposed class claim).[11]

## I.    This Court Should Not Exercise Its Discretion to Apply Rule 23 to the Movants' Proposed Class Claims

### A.    The "*Musicland* Factors" Demonstrate That Rule 23 Should Not Be Applied to the Proposed Class Claims.

27.    In determining whether to apply Rule 23 as a threshold matter, courts often focus on three factors: (1) whether the class was certified prepetition; (2) whether members of the putative class received notice of the bar date; and (3) whether class certification would adversely affect the administration of the estate. *In re Musicland*, 362 B.R. at 654. These are commonly referred to as the "*Musicland* factors." Although no one factor is dispositive, *In re Chaparral Energy, Inc.*, 571 B.R. 642, 646 (Bankr. D. Del. 2017), courts have characterized the first two as "critical" because where a class has not been certified prepetition, its purported class members "lack[] a reasonable expectation that they d[o] not have to comply with the bar date." *In re Musicland*, 362 B.R. at 654-55 (citations omitted). Moreover, "[i]f the putative unnamed class members have clearly received actual or constructive notice of the bankruptcy case and the bar

---

[11] Contrary to the NAS Guardians' assertion that their request for a class proof of claim was "considered and accepted" by the bankruptcy court in the "similar" bankruptcy *liquidation* of Insys Therapeutics, Inc. (NAS Guardians Mot. ¶ 29), the class claim motions there were resolved by stipulation of the parties. *See, e.g.*, Order Approving Stip. By & Between the Debtors, the Off. Comm. of Unsecured Creditors, & the NAS Baby Claimants Establishing Class Claims Procedures, *In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del. Dec. 5, 2019), Dkt. No. 962; Order Approving Stip. By & Between the Debtors, the Off. Comm. of Unsecured Creditors, & the Insurance Ratepayer Claimants Establishing Class Claims Procedures, *In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del. Dec. 13, 2019), Dkt. No. 982. And whatever the NAS Guardians' or Ratepayers' beliefs may be about what is "likely" to happen here based on what occurred in *Insys*, (NAS Guardians Mot. ¶ 29; Ratepayers Mot. ¶ 7), in negotiating the settlement reached there, all of the parties expressly disclaimed any such comparison and "agreed [that] . . . no one is going to say, this is precedent for the next case." Jan. 16, 2020 Hr'g Tr., *In re Insys Therapeutics, Inc.*, No. 19-11292, at 102:4-10 (Bankr. D. Del. Jan. 16, 2020), Dkt. No. 1117; Disclosure Statement for Second Am. Joint Ch. 11 Plan of Liquidation Proposed by Insys Therapeutics, Inc. & Its Affiliated Debtors, *In re Insys Therapeutics, Inc.*, No. 19-11292, at 2 (Bankr. D. Del. Dec. 4, 2019), Dkt. No. 956 ("As all parties to the mediation agreed, the plan settlement is not intended to be a blueprint for other chapter 11 cases, nor is it intended to be used as precedent by any party.").

date, denial of the . . . class proof of claim device appears advisable." *Id.* at 654 (quoting *In re Sacred Heart Hosp.*, 177 B.R. at 22).  Here, all three factors weigh heavily against all of the Movants.

### i.    There Is No Certified Prepetition Class of Any of the Proposed Putative Classes

28.    The Movants concede, as they must, that not one of their putative classes has been certified, prepetition or otherwise.  (IPSDs Mot. ¶ 38; Ratepayers Mot. ¶ 65; Hospitals Mot. ¶ 27; NAS Guardians Mot. ¶¶ 1-5; Tribes Mot. ¶ 14.)  The putative class members, therefore, have no remotely reasonable expectation that they need not file a proof of claim, and the approved bar date materials and program assuredly did not so suggest.  *See In re Musicland*, 362 B.R. at 654. Accordingly, this *Musicland* factor weighs heavily against the relief the Movants seek, and, based on the failure to satisfy this factor alone, the majority of courts have denied the relief requested here.  *In re USA Gymnastics*, No. 18-09108-RLM-11, 2020 WL 1932340, at *4 (Bankr. S.D. Ind. Apr. 20, 2020) ("The majority of courts have denied application of Rule 7023 where the class had not been certified pre-petition." (citing *Musicland*, 362 B.R. at 656, and collecting cases)).

29.    The Movants strain to avoid this straightforward conclusion and contend, in sum and substance, that this first *Musicland* factor somehow does not cut against them.  (IPSDs Mot. ¶ 38; Ratepayers Mot. ¶ 65; Hospitals Mot. ¶¶ 27-28; NAS Guardians Mot. ¶ 45; Tribes Mot. ¶ 14.)  They are wrong.  Although the Movants cite two cases from this District where class treatment was approved in bankruptcy in the absence of a certified prepetition classes, (*id.*), these cases provide no support for the Movants' position.  Both involved employment claims that, in many ways, arose from and were caused by the bankruptcy itself.  *See In re MF Global*, 512 B.R. at 760 (former employees filed adversary complaints within weeks of debtors' petition

18

seeking relief under the WARN Act for termination of their employment without the statutorily required advance notice); *In re Connaught Grp.*, 491 B.R. at 98 ("In essence, this is a class created by the bankruptcy itself.").   In that unique circumstance, the issue of prepetition certification may arguably lose some of its relevance, "since there will seldom be time to file a class action complaint and certify a class before the petition date."  *In re MF Global*, 512 B.R. at 763.[12]

30.    Not so here.   The Movants are not correct that the putative classes were not certified "solely because of the stay imposed in the [Ohio MDL] pending resolution of the bellwether cases."  (Ratepayers Mot. ¶ 65; *see also* IPSDs Mot. ¶ 38; Hospitals Mot. ¶ 27; NAS Guardians Mot. ¶ 45.)  Indeed, none of the Ratepayers, IPSDs, or Tribes even filed a class action complaint against the Debtors on behalf of the nationwide classes they now seek to certify, let alone prevailed on class certification.  The NAS Guardians, for their part, have hardly moved with pace to certify their respective classes (no longer naming Purdue) in the Ohio MDL.  To the contrary, since the district court there permitted the NAS Guardians to move forward with class briefing, they have either jointly or unilaterally sought a number of extensions, including at least three extensions for their class briefing as well as additional extensions to conduct and complete discovery.  Under the current schedule, class certification briefing will not be completed until November 2020—***over a year*** after the MDL court lifted the stay.  In fact, these repeated extensions have so significantly delayed the adjudication of the NAS Guardians' class motion

---

[12] The additional authority relied on by the Hospitals and Tribes, (Hospitals Mot. ¶ 28, Tribes Mot. ¶ 15), provides no support to Movants here either.  *See Gentry v. Siegel*, 668 F.3d 83, 91, 95 (4th Cir. 2012) (affirming ***denial*** of motion to file class proofs of claim where no class had been previously certified); *In re Chaparral Energy, Inc.*, 571 B.R. 642, 647-650 (Bankr. D. Del. 2017) (finding application of Rule 7023 appropriate where, although no class was certified prepetition, the remaining two factors weighed decidedly in favor of allowing a class claim because the class action device would serve an important deterrent function to ongoing alleged misconduct and because the class had not received adequate notice); *In re Kaiser Grp. Intern., Inc.*, 278 B.R. 58, 62-64 (Bankr. D. Del. 2002) (pre-*Musicland* case with no discussion of *Musicland* factors).

that the MDL court recently ordered that "[n]o further deadline extensions will be granted." (Order at 1, *In re: Nat'l Prescription Opiate Litig*., No. 1:17-md-2804 (N.D. Ohio July 10, 2020), Dkt. No. 3375.) And there is little doubt that class certification would have been denied for all of the Movants in light of their clear-cut inability to satisfy Rule 23, as discussed in Part II, *infra*. Simply put, there is no basis whatsoever for the Movants to credibly assert that, but for the MDL stay, their putative classes would have been certified.

31.    For all of these reasons, this first *Musicland* factor weighs heavily against certification.

### ii.    *Members of Each of the Proposed Putative Classes Have Received Adequate Notice of the General Bar Date*

32.    It is equally obvious that the second *Musicland* factor—whether the putative class has received notice of the bar date—also weighs decidedly against certification here. Publication or constructive notice suffices; direct written notice is not required. *See, e.g.*, *In re Bally Total Fitness of Greater N. Y., Inc.*, 411 B.R. 142, 146 (S.D.N.Y. 2009) (holding that publication notice is "legally adequate"); *see also In re Blockbuster, Inc*., 441 B.R. 239, 240-41 (Bankr. S.D.N.Y. 2011) (holding that "actual or constructive notice of the bankruptcy case and bar date" is sufficient); *Musicland*, 362 B.R. at 657; *In re Sacred Heart Hosp.*, 177 B.R. at 23-24 ("[I]f the putative unnamed class members have clearly received actual or constructive notice of the bankruptcy case and the bar date, denial of the implementation of the class proof of claim device appears advisable."); *In re Motors Liquidation*, 447 B.R. at 168 (holding that notice was sufficient to deny class claim where the "bankruptcy was an event that got worldwide attention"). This accords with the Court's recent observation that, in light of the number of the Debtors' potential creditors, most of the notice in these chapter 11 cases "would [not] need to be . . . individualized," and its admonition that many claimants "should not expect . . . to be getting,

20

necessarily, an individual notice or letter." (June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 35:5-36:3;

87:24-88:20.) In any event, the relevant question is not whether notice here was reasonable—

although it surely was—but rather, "whether any notice issues are sufficient to require that the

class motion be granted." *In re Nw. Airlines*, 2007 WL 2815917, at *4. Given the

extraordinarily extensive notice that has been provided of the bar date in these chapter 11

cases—that touched virtually every American an average of six times—the answer is clearly no.

33.    It is no surprise, then, that the Movants' various approaches to address this factor

or otherwise attempt to recast it in their favor diverge greatly from one another. The Hospitals

concede that "many hospitals in the United States may have received actual notice of the Bar

Date in view of the expansive noticing strategy implemented in this case" and admit that "the

Debtors attempted to cast a wide net with respect to notice of the Bar Date." (Hospital Mot. ¶¶

3, 29.) The Ratepayers, for their part, do not even address this factor in their discussion of

*Musicland*. (Ratepayers Mot. ¶¶ 64-67.)

34.    Although the IPSDs contend that adequate notice has not been given to their

proposed putative class, their particular argument rests on a fundamental misapprehension of the

Bar Date Order. (IPSDs Mot. ¶ 39.) The IPSDs contend that the Bar Date Order required the

Debtors to provide ***direct mail notice*** to "all parties known to the Debtors as having potential

claims against the Debtors' estates" and that the Debtors should have read the Chicago School

Districts' November 2019 class action complaint against ***entities other than the Debtors*** and

understood that every school district had a potential claim against the Debtors. (IPSDs Mot. ¶ 39

(emphasis omitted).) The Debtors' papers in support of the Bar Date Order, however, expressly

defined "parties known to the Debtors as having potential claims," which does not include claims

21

of the type that may or may not be held by the IPSDs.[13]  And, of course, school districts are run

by superintendents and other administrators—ninety-five percent of whom are expected to

receive notice of the bar date through the Debtors' Supplemental Notice Plan, with an average

frequency of message exposure of six times.  (Finegan Decl. ¶ 14.)

35.    The NAS Guardians' notice objections fare no better.  Despite conceding that the

Debtors undertook "an extensive noticing program," (NAS Guardians Mot. ¶ 26), the NAS

Guardians assert that the relatively small number of claims filed so far by or on behalf of

children with NAS "speaks volumes as to the seeming inadequacy of the Debtors' attempts to

reach persons who would file claims on behalf of NAS children."  (NAS Guardians Mot. ¶ 46.)

But as the NAS group has previously observed, the Debtors expanded the noticing plan to, in the

NAS group's words, "account for the unique nature of the putative claimants"[14] and have made

further modifications at the suggestion of the NAS group.  (NAS Guardians Mot. ¶ 26 n.40

("[T]he Debtors agreed to expand their Noticing Plan with respect to social media sites and made

further alterations as of May 7, 2020.").)  There is simply no disputing that the noticing program

contains NAS-specific components.  To the extent that proposed class counsel is disappointed

with the number of claims filed on behalf of those with NAS thus far, it is exceedingly unlikely

that such disappointment has been occasioned by any infirmity in the Debtors' robust noticing

---

[13] "Parties known to the Debtors as having potential claims" were defined to include:  "(w) prescribers of Purdue brand name medications; (x) Purdue Opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (y) callers to Purdue who have threatened, but not filed, litigation and provided contact information; and (z) entities and individuals that have requested indemnification." (Finegan Decl. ¶ 20.)

[14] *See Conditional Consent with Reservation of Rights of the NAS Children Ad Hoc Committee to Motion of Debtors for Entry of an Order (I) Establishing Deadlines For Filing Proofs of Claims and Procedures Related Thereto, (II) Approving Proof of Claim Forms and (III) Approving the Form and Manner Thereof* ¶ 5 (Jan. 17, 2020), Dkt. No. 754.

regime—to which they did not object at not one but two hearings.[15]  Indeed, claims of those with NAS are highly individualized, and the issue could very well be an inability to show use of a Purdue opioid rather than any issue with notice.  In any event, the relevant inquiry under *Musicland* is not whether putative class members would submit claims after receiving notice of the bar date, but "whether members of the putative class received notice of the bar date" in the first place.  *In re Musicland*, 362 B.R. at 654.  In light of the Debtors' extensive noticing program, this *Musicland* factor indisputably weighs in favor of denial of the Class Claim Motions.

36.     Finally, the Tribes' argument is premised on a misreading of the cases they cite. Both *MF Global* and *Sacred Heart* make clear that "actual *or* constructive" notice of the bar date is sufficient, and in no way suggest that the Debtors' notice program, which is designed to reach ninety-five percent of the adults in the United States with an average frequency of six times, is in any way inadequate.  *In re Sacred Heart Hosp.*, 177 B.R. at 23-24 (emphasis added); *In re MF Global*, 512 B.R. at 763 (quoting *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 620 (S.D.N.Y. 2009)).  *Chaparral Energy* involved a debtor's failure to notify an easily ascertainable class of creditors (the names and addresses of whom the debtor had in its

---

[15] The NAS Guardians' extensive reliance on *In re Think Finance, LLC*, No. 17-33964, 2018 WL 9801454 (N.D. Tex. Aug. 30, 2018), is misplaced.  There, the debtors ran an illegal payday loan scheme and peddled usurious loans to over a million consumers nationwide.  *Id.* at *1.  Lawsuits filed by these consumers "largely caused" the debtors' bankruptcy.  *Id.*  Nevertheless, only 5,000 of these one million borrowers filed proofs of claim.  The Court found that was because "most consumer borrowers probably would not have recognized any of the entities identified on the postcard notice"; language on the notice may have dissuaded them from believing they had a claim; "expert testimony support[ed] a finding that the postcard notice did a poor job of communicating vital information to the consumer borrowers"; and there was a "great deal of confusion" caused by the notice, resulting in thousands of inquiries that were not "effectively addressed" by the debtors.  *Id.* at *5.  The result was that only an exceedingly small number of these creditors—creditors whose very lawsuits caused the bankruptcy—filed proofs of claims and could participate in distributions, despite the fact that they were all "known" claimants, since the debtors had their names and addresses.  None of this is true here, and there is no doubt that the Debtors' contingent tort creditors have and will continue to file a very significant number of claims and actively participate in the bankruptcy proceedings.

possession) that the debtor allegedly shortchanged in royalty payments, and is entirely distinguishable from the Tribes' putative class and the case at hand. *In re Chaparral Energy*, 571 B.R. at 648.[16]

37.     The fact remains that the Movants' counsel have all been aware of the Debtors' bankruptcy for some time, and well before the Bar Date Order was entered.  If counsel had seriously believed that the Debtors' extraordinarily extensive noticing regime was in any way inadequate—and, to be clear, it is not—counsel could have raised the issue with counsel for the Debtors, and, if counsel believed that the Debtors' response was not satisfactory, filed and pressed their objection with the Court.  They did not.  At a minimum, the Movants cannot now collaterally attack the notice program and hopscotch their affirmative decision not to object by now filing an unwarranted class certification motion.

### iii.     Certification of the Proposed Classes Will Adversely Affect the Administration of These Estates

38.     The last *Musicland* factor also weighs strongly against class certification because the Movants' requested relief will adversely affect the efficient administration of these cases.  At this step of the *Musicland* analysis, the "pervasive theme is avoiding undue delay in the administration of the estate." *In re MF Global*, 512 B.R. at 763 (quoting *In re Ephedra*, 329 B.R. at 5).  Here, granting the Class Claims Motions (more than ten months into the case and seven days before the end of the lengthy bar date period) would cause significant delay and add "layers of procedural and factual complexity . . . siphoning the Debtors' resources and interfering with the orderly progression of the reorganization." *In re Blockbuster*, 441 B.R. at 240-41

---

[16] In addition, the Supplemental Notice Plan includes airing the Debtors' radio commercial on a Native American-specific radio channel, (Finegan Decl. ¶ 44), Native American-related social media and online targeting, (*id.* ¶¶ 47, 55), local print publications such as newspapers, (*id.* ¶ 63), and issuance of the press release on a Native American newsline. (*id.* ¶ 68).

(quoting *In re Bally Total Fitness*, 402 B.R. at 620-21).  As this Court has repeatedly recognized, it is essential for this bankruptcy to "move forward promptly" "so the money can get out to people promptly."  (June 23, 2020 Omnibus Hr'g Tr. 20:17-22, 21:12-19.)  For that reason, any delay caused by granting the Class Claims Motions must be weighed against the real-life cost of allowing "ongoing harm . . . suffered by individuals . . . as well as the governments that serve them" to continue.  (June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 94:15-17.)

39.    None of the discovery that would be required to test the merits of the Movants' claims has been conducted, and while the Debtors are likely to resort to omnibus claims objections in some fashion, the burden and expense would only be increased in the event of class certification.[17]  As a result, the Debtors—and ultimately the Debtors' allowed claimants— "would be forced to incur substantial legal fees defending a class action—fees that would not be incurred if class members were required to file individual proofs of claim."  *In re Bally Total Fitness*, 402 B.R. at 621 n.4-5 (declining to apply Rule 23 where, "[i]f the [c]ourt ultimately certifie[d] a class . . . [t]he parties w[ould] then engage in merits discovery, which, in turn, w[ould] be followed by a complex and lengthy trial").  In light of the significant protections bankruptcy already affords the Movants' proposed class members, *In re Musicland*, 362 B.R. at 650, "the only real beneficiaries of applying Rule 23 would be the lawyers representing the class[es]."  *In re Ephedra*, 329 B.R. at 10.  In addition, although the Movants do not address it,

---

[17] The Ratepayers' assertion that allowing class claims "will be far more efficient . . . than . . . hav[ing] millions of purchasers of insurance file their own individual claims, which would [allegedly] inundate the Court and whoever will be appointed to analyze claims and make distributions," is false.  (Ratepayers Mot. ¶ 42.)   In fact, class claims would be inefficient and delay resolution of this bankruptcy because the class proofs of claim would not contain the "specific information as to each claim" necessary for the Debtors and other parties-in-interest to analyze and assess claim validity and value without significant additional discovery.  (Jan. 24, 2020 Omnibus Hr'g Tr. 39:7-15.)

still further noticing procedures would be required, introducing delay.  *In re Livaditis*, 122 B.R. at 339.  And this is not "a" class proof of claim; it would be many.[18]

40.     If the bar date means nothing here, then additional groups will undoubtedly come forward seeking a similar back door.  Were the Movants' untenable classes (discussed further below) to be certified, other supposed classes would be incentivized to file their own purported class claims.  This Court need only look to the motion practice before it as evidence of this phenomenon.  Within weeks of the filing of the IPSDs' Motion, the Ratepayers, the Hospitals, the NAS Guardians, and the Tribes filed their own motions to pursue class claims.  And on July 15, 2020, another individual filed a motion to permit a class proof of claim on behalf of certain infants in West Virginia with NAS, along with an accompanying motion to shorten the period to object to the motion.[19]  The attendant costs and distraction to the estates, harm to the public, and disruption of the progress of these cases toward a consensual resolution that would result from emboldening additional purported classes to file class claims would be material—all to the ultimate detriment of estate stakeholders.

B.     <u>None of the Purported Concerns Raised by the Movants Remotely Justify the Use of Class Proof of Claims Here.</u>

41.     Because the *Musicland* factors weigh so clearly against them, some of the Movants devote substantial portions of their briefs to articulating other concerns that, in their view, warrant the use of class procedures here.  None comes close to justifying the relief sought.

---

[18] In addition, administration of the claims could be an expensive drain on funds available to stakeholders.

[19] (*See* Mot. to Permit the Filing of a Class Proof of Claim (July 15, 2020), Dkt. No. 1408; Mot. to Shorten the Notice Period with Respect to the Mot. to Permit the Filing of a Class Proof of Claim (July 15, 2020), Dkt. No. 1409.)  Although the Debtors fully intend to object to both motions, such objections are beyond the scope of this Objection.

42.     *First*, none of the members of the Movants' proposed putative classes will be "disenfranchised" in the absence of class claims.  (IPSDs Mot. ¶¶ 18-29; Ratepayers Mot. ¶ 42; Hospitals Mot. ¶¶ 30-31.)   Courts have often emphasized that class status is unnecessary to protect the rights of various members of putative classes in the bankruptcy context because "their rights are amply protected by the chapter 11 claims process itself."  *In re Bally Total Fitness*, 402 B.R. at 621.    All of the claims against the Debtors have already been streamlined and consolidated "in one forum" by virtue of the bankruptcy itself and claimants have the ability "to file proofs of claim without counsel and at virtually no cost."  *In re Blockbuster*, 441 B.R. at 241-42; *see also In re Musicland*, 362 B.R. at 650-51.  In fact, as this Court has recognized, "the Debtors' program made filing a proof of claim easy, more easy than in most cases."  (June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 89:13-17.)  And just as importantly, certain members of all of the purported classes or their counsel have been afforded the right to participate in the mediation process and are communicating with the mediators, the Debtors, and other creditor constituencies regarding their claims, which has ensured that they have a "voice at the table."  They are also represented by the Creditors' Committee.  Under these circumstances, none of the Movants can credibly claim that class certification is required to remedy "disenfranchisement."

43.     Certain of the Movants further state that class certification is required because members of their putative classes will not file proofs of claim despite their ample opportunity to do so.  The IPSDs, for example, contend this is so because the claims are hard to investigate and, due to HIPAA regulations, school do not even have access to "students' birth hospitalization records (let alone a parent's medical records), which prevents them from easily linking any particular student's disabilities to opioid exposure *in utero*."  (IPSDs Mot. ¶¶ 27-28.)  Similarly, the Hospitals assert that potential class members "may not necessarily be *sensitized to the legal*

*basis for their claim* against the Debtors" or may not "recognize the *contours of the claim*." (Hospitals Mot. ¶¶ 4, 29 (emphasis added).)  In other words, what these Movants are contending is that most school districts and hospitals do not know that they have been harmed, a potential signal that their claims may be remote and that causation, at the very least, may be difficult to establish.  The Movants cannot convert this into a basis for class certification.  (Hospitals Mot. ¶ 29).[20]

44.    **Second**, certain of the Movants contend that invocation of Rule 23 would be appropriate here because members of their putative classes have small or modest claims that create a "collective action problem."  (IPSDs Mot. ¶ 33; Ratepayers Mot. ¶ 52; Hospitals Mot. ¶ 29.)  The fractional nature of each claim (a contention that is not obviously correct, given the types of harms alleged here), however, is not an issue uniquely faced by these potential class claimants, and is one that is addressed in large measure by the bankruptcy claims process itself. *See In re Ephedra*, 329 B.R. at 9 ("[The] superiority of the class action vanishes when the 'other available method' is bankruptcy, which consolidates all claims in one forum and allows claimants to file proofs of claim without counsel and at virtually no cost.  In efficiency, bankruptcy is superior to a class action because in practice small claims are often 'deemed allowed' under § 502(a) for want of objection, in which case discovery and fact-finding are avoided altogether.").

45.    **Third**, certain of the Movants contend that, in absence of a class proof of claim, there might be a number of late-filed proofs of claim, each accompanied by a motion requiring a

---

[20]  To the extent that the IPSDs' and Hospitals' arguments are premised upon difficulties occasioned by COVID-19, (IPSDs Mot. ¶ 29; Hospitals Mot. ¶¶ 5, 30), the Court has already extended the bar date to account for the pandemic, (*see* Extended General Bar Date Order), and noted that "[t]here is no real evidence that the filing of claims in these cases has, in fact, been materially affected by the COVID-19 crisis."  (June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 91:21:23).

case-by-case determination of whether the late filing was the result of excusable neglect.  (IPSDs Mot. ¶ 34; Ratepayers Mot. ¶ 54.)  Even if true (again, not obvious), that is hardly a reason for class certification.  If some number of these hypothetical motions (by school districts, private health insurance purchasers, or other claimants) are made at some point in the future, they can be addressed at that time, on their own merits.  In any event, as this Court has noted, "unless there's a good reason why the deadline could not be complied with, the request for an extension is normally denied . . . particularly . . . when there has been a lengthy [bar date] period, such as provided for here."  (June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 34:6-11.)

46.    *Finally*, the IPSDs' repeated reference to the general specter of diversion of funds from abatement and ameliorating the opioid crisis, (IPSDs Mot. ¶¶ 23, 25), does not support class certification here.  The Court, the Debtors, and key estate stakeholders are all aware of this risk and, in the Debtors' view, are committed to utilizing the tools uniquely available in bankruptcy to mitigate it.[21]  Indeed, many other major governmental entities are fully engaged in these cases and represent many of the IPSDs' interests.[22]  This is especially so given that, as set forth in the objection filed by the public claimants, a significant amount of school districts'

---

[21] *See, e.g.*, Oct. 10, 2019 Second Day Hr'g Tr. 47:25-48:6 ("I hope that you all will be able to work together to use the money as wisely as possible, and through a plan under which the Bankruptcy Code and ultimately the Constitution can, in fact, be binding forever, unlike individual settlements in a non-bankruptcy context, where funds dedicated to solving a public health crisis can and have been invaded for other purposes."); Jan. 24, 2020 Omnibus Hr'g Tr. 75:19-76:15 ("[I]f there is an allocation that leaves a substantial amount of the Debtor[s'] value to the states and territories, one of the primary benefits of a bankruptcy case is that . . . a plan can require how it's to be used.").

[22] *See In re Craft*, 321 B.R. 189, 199 (Bankr. N.D. Tex. 2005) (denying motion to file class claim where the claims were "being pursued . . . by various arms of local and state governments" so the "[i]nterests of class members will be protected by these governmental units").  As this Court has observed, "the states have a unique role in these cases because of their unique position" and, thus, they should act as "the coordinator for the victims in their state."  (Nov. 19, 2019 Omnibus Hr'g Tr. 160:25-161:22, 165:3-14; *see also* June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 87:12-23 ("[I]f one were to draw [venn] diagrams, one could conclude, given the presence of all but a couple of states . . . , that every citizen of every state in the United States is a claimant in one way or another, at least in terms of being represented by their state Attorneys' [sic] General or state governments, and in addition multiple governmental entities below the state level.").)

special education funding comes from these very entities. The IPSDs provide no credible explanation of how certification of their inappropriate class claim would meaningfully address misuse and diversion of the Debtors' assets. To the contrary, the costs and complexity added by class certification would cause diversion of funds.

47.    For all of the foregoing reasons, this Court should decline as a threshold matter the Movants' invitation to extend Rule 23 to this context.

## II.    The Movants Fail to Satisfy the Requirements of Rule 23

48.    The Movants' failures to establish the requirements of Rule 23 provide a separate and independent reason to deny their motions. Each Movant, as a putative class representative, bears the burden of proving the requisite elements of Rule 23 through competent record evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). This means that each Movant must identify competent record evidence to establish that at least one of the subsections under Rule 23(b) is satisfied. They must also establish ***all*** of the following under Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.

49.    Tellingly, none of the Movants even acknowledge, let alone address, the fact that numerous state and federal courts repeatedly denied class treatment of analogous marketing claims against Purdue in prior putative class actions brought against the Company.[23] These cases uniformly held that the multitude of individual issues demonstrated that plaintiffs could not satisfy the requirements of Rules 23(a) or 23(b). The same result is warranted here, especially

---

[23] *See Foister v. Purdue Pharma L.P.*, 2002 WL 1008608 (E.D. Ky. Feb. 26, 2002); *Gevedon v. Purdue Pharma L.P.*, 212 F.R.D. 333 (E.D. Ky. 2002); *Harris v. Purdue Pharma L.P.*, 218 F.R.D. 590 (S.D. Ohio 2003); *Wethington v. Purdue Pharma L.P.*, 218 F.R.D. 577 (S.D. Ohio 2003); *Campbell v. Purdue Pharma L.P.*, 2004 WL 5840206 (E.D. Mo. June 25, 2004); *Howland v. Purdue Pharma L.P.*, 821 N.E.2d 141 (Ohio Sup. Ct. 2004); *Johnson v. Abbott Labs.*, 2004 WL 3245947 (Ind. Cir. Ct. Dec. 31, 2004); *Hurtado v. Purdue Pharma Co.*, 2005 WL 192351 (N.Y. Sup. Ct. Jan. 24, 2005).

given the fact that these putative class claims are being advanced shortly before the bar date in these chapter 11 cases.

A. The Movants' Expansive and Amorphous Class Definitions Do Not Identify Certifiable Classes

50.    As an initial matter, each of the sweeping and amorphous classes that the Movants have put forth is "a nightmare of a class action" that cannot be certified without offending due process. *Isaacs v. Sprint Corp*., 261 F.3d 679, 682 (7th Cir. 2001) (Posner, J.). Rejecting such "nightmare class actions" is especially important in the bankruptcy context because allowing the Movants to proceed on behalf of significant swaths of individuals and entities in the United States would undoubtedly "'gum up the works' of distributing the estate." *In re Ephedra*, 329 B.R. at 5 (quoting *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 376 (Bankr. S.D.N.Y. 1997)).

51.    The IPSDs seek to certify a so-called "Nationwide Class" encompassing "[a]ll independent public school districts nationwide," which they estimate to be about 12,884 districts. (IPSDs Mot. Ex. A ("**IPSDs Compl.**") ¶ 573.) Hedging their bets, the IPSDs also seek an "Illinois Sub-Class" of at least 852 districts. The Hospitals seek to certify a nationwide class of "[a]ll acute care hospitals in the United States which treated, for opioid conditions, patients who have been prescribed prescription opioids," which they estimate to "include the vast majority of (well over 5,000) hospitals in the United States." (Hospitals Mot. ¶¶ 34, 38.)

52.    Not to be outdone, the Ratepayers seek to certify a class "of all persons . . . (including natural persons and entities) who purchased [or paid for] health insurance policies in the United States from 1996 through the present." (Ratepayers Mot. ¶ 25.) The Ratepayers, of course, cannot quantify its class members with any reliability, but estimate the number to be somewhere in the realm of "over 196 million people." (Ratepayers Mot. Ex. B ("**Ratepayers**

31

**Compl.**") ¶ 306.)   The NAS Guardians likewise have no idea who is in their class of legal guardians of infants born to mothers who were either prescribed an opioid manufactured by Purdue or another manufacturer (alleged "co-conspirators" of Purdue).   They estimate, however, that "in excess of 100,000 children have been born with NAS" whose mothers took an opioid manufactured by either Purdue or these so-called "co-conspirators," and that "[t]he guardians for these children must be approximately equal in number."  (NAS Guardians Mot. ¶ 59.)

53.     The Tribes seek to certify a class consisting of "[i]ndividual members of all 574 federally recognized tribes" who, in turn, purport to have claims for personal injury or wrongful death associated with opioid abuse, babies born to mothers who are addicted to opioids and who experienced cognitive and physical injuries as a result, including NAS, and the abused or neglected children of opioid-addicted parents or guardians.  (Tribes Mot. ¶ 21.)  The Tribes too have no idea how many of these individual personal injury claims are implicated nor how these putative class members can be reasonably ascertained.

54.     Together, the Movants seek to certify classes that cover hundreds of millions of potential claimants.  These classes—one of which includes a large portion of all working adults in the United States over a twenty-five-year period—are manifestly "too large, too diverse, and too vaguely defined to be the basis for a manageable class action."  *H.W. Urban GmbH v. Republic of Argentina*, No. 02-5699, 2003 WL 21058254, at *2 (S.D.N.Y. May 12, 2003).  In *WorldCom*, for example, the court denied certification of an analogous "'nightmare of a class action'" consisting of "thousands of members to the putative class."  No. 02-13533, 2005 WL 8146313, at *4 (Bankr. S.D.N.Y. Jan. 3, 2005) (quoting *Isaacs*, 261 F.3d at 682).  Similarly, here, and as the court observed in *H.W. Urban GmbH* in denying certification, "what is proposed [by each Movant] is not a reasonably manageable class action."  2003 WL 21058254 at *1.  Each

"class . . . would be massive, perhaps involving tens of thousands of persons," and would require

inquiring into "a thus far undefined number and variety" of interactions between Debtors and the

absent class members the Movants seek to represent, each "governed by the laws of different"

states. *Id.* This Court should, thus, reject the amorphous putative classes proposed by the

Movants right out of the gate.

B.    Movants Do Not and Cannot Satisfy the Requirements of Rule 23(b)

55.    Every class action must satisfy the strictures of one of Rule 23(b)'s subsections.

The Movants' varied reliance on the differing subsections of Rule 23(b) only underscores the

multitude of issues that preclude class treatment here.  The Ratepayers, NAS Guardians, Tribes,

and Hospitals move to certify their putative classes under Rule 23(b)(3), which is only

appropriate if the Court finds that "questions of law or fact common to class members

predominate over any questions affecting only individual members and that a class action is

superior to other methods of adjudication." *UFCW Local 1776 v. Eli Lilly & Co*., 620 F.3d 121,

131 (2d Cir. 2010) (internal quotation omitted).  These Movants, however, fall woefully short of

satisfying either of the predominance or superiority requirements.  Apparently recognizing the

futility of trying to proceed under Rule 23(b)(3), the IPSDs try to sidestep these requirements

altogether by only seeking certification under Rule 23(b)(1)(B)'s so-called "limited fund"

provision.  (IPSDs Mot. ¶ 10.)  They are joined by the Ratepayers, NAS Guardians, and Tribes,

which proffer a "limited fund" class as a backup.  (*See* Ratepayers Mot. ¶¶ 90-103; Tribes Mot.

¶¶ 36-45; NAS Guardians Mot. ¶¶ 74-85.)  "Limited fund" class actions, however, have little

place in bankruptcy as a general matter, *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285,

292 (2d Cir. 1992), and they certainly have no place here.  Finally, the NAS Guardians' fallback

claim that certification of a mandatory injunctive relief class under Rule 23(b)(2) is warranted

33

fails because, among other reasons, their proposed class is seeking little more than money damages masquerading as "injunctive" relief. Indeed, the NAS Guardians admit that their abatement class seeks the "creation of an abatement trust that will fund ongoing medical monitoring … and the convening and oversight of a Science Panel"—a trust that is to be funded by the Debtors. (NAS Guardians Mot. at 2; *Id.* Ex. H at 17, 21.)

### i.    The Movants Fail to Satisfy the Predominance and Superiority Requirements of Rule 23(b)(3)

#### a.    Predominance

56.    "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Predominance is "a more demanding criterion than the commonality inquiry under Rule 23(a)" and requires that each Movant make a qualitative showing that common issues predominate over individual issues. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). Multiple state and federal courts have repeatedly denied class treatment of analogous marketing claims against Purdue because the multitude of individual legal and factual issues overwhelm any purported common issue. These cases are no different.

<u>Common Legal Issues Do Not Predominate</u>

57.    Movants seek certification of nationwide classes asserting state law claims for fraud, negligence, public nuisance, unjust enrichment, and/or violations of state consumer protection statutes, among others. (*See, e.g.*, Ratepayers Mot. ¶ 28; Hospitals Mot. ¶ 1; NAS Guardians Mot. ¶ 1; Tribes Mot. ¶ 29.) Each of these claims requires application of the law of all fifty states. This alone ensures that common questions of law do not predominate. Courts regularly refuse to certify nationwide class actions because "the application of the different

34

jurisdictions' laws . . . renders individual issues predominant and undercuts the superiority of trying the common issues on a classwide basis." *Johnson*, 780 F.3d at 147 (vacating certification of class); *see also Kaczmarek v. Int'l Bus. Machines Corp*., 186 F.R.D. 307, 312-13 (S.D.N.Y. 1999); *see also Lewis Tree Serv.*, 211 F.R.D. at 235; *In re WorldCom*, 343 B.R. at 428; *In re Bridgestone/Firestone, Inc*., 288 F.3d 1012, 1018 (7th Cir. 2002); *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 305 (D. Conn. 2009) (no predominance where unjust enrichment claims involved different elements in different states); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 653 (C.D. Cal. 1996) (noting that negligence claims, "no matter how similar," will "have some differences" across the fifty states).

58.    Other aspects of the Movants' claims require a similar analysis of each state's laws on particular issues.  For example, the Hospitals seek billions of dollars in damages stemming from uncompensated costs allegedly spent treating patients with opioid-related conditions, including addiction, withdrawal, and overdoses.  (Hospitals Rule 2019 Statement ¶¶ 2-3.)  But whether each class member can bring such claims requires a state-by-state analysis because in some jurisdictions state law circumscribes the manner of recovery.  *See, e.g.*, *Huey v. Meek*, 419 S.W.3d 875, 880-81 (Mo. Ct. App. 2013) (concluding that the hospital lien "statute is exclusive"); *Mat-Su Reg'l Med. Ctr., LLC v. Burkhead*, 225 P.3d 1097, 1100-04 (Alaska 2010) (same); *Bergan Mercy Health Sys. v. Haven*, 620 N.W.2d 339, 345 (Neb. 2000) ("Forty-two states and the District of Columbia have laws authorizing liens for medical care provided for injuries resulting from an accident or wrongful act.").  At the certification stage, the Hospitals have a burden to demonstrate with competent evidence how this Court should deal with the various lien statutes, which will inevitably require a state-by-state analysis.  The Hospitals do not even acknowledge this burden, let alone attempt to meet it.

35

59.    Nor do the other Movants attempt to "creditably demonstrate through an extensive analysis of state law variances that class certification does not present insuperable obstacles." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (quotation omitted). For instance, although the Ratepayers concede that there may be "variations in insurance rate-setting by state," they attempt to overcome this insurmountable impediment by suggesting that any differences in state laws can be "easily resolved through the use of subclasses." (Ratepayer Mot. ¶ 78.)[24]  Their suggestion, however, is entirely devoid of content.  The Ratepayers have neither proposed any subclasses nor explained how subclasses would alleviate the Court's need to apply the laws from all fifty states.  In fact, the Ratepayers "have done little more than to suggest that appropriate subclasses could be crafted; they have not taken the time or made the effort to actually craft them, or to make the record necessary to support their certification." *Owner-Operators Indep. Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, Nos. IP 98-457-C-B/S, IP 98-458-C-B/S, 2005 WL 6957703, at *4 (S.D. Ind. Sept. 27, 2005).  In any event, proposing subclasses is not "an adequate response to the apparent differences in [applicable state] laws." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (denying class certification due to variances in state law despite plaintiff's argument that subclasses could take into account conflicts in state laws).

---

[24] Although the Ratepayers suggest that subclasses will resolve issues that "might impede commonality," state law variation also destroys predominance.  *See, e.g.*, *Sacred Heart Health Sys., Inc.*, 601 F.3d at 1180 ("Common sense tells us that '[t]he necessity of a large number of subclasses may indicate that common questions do not predominate.'") (quoting Manual for Complex Litigation § 21.23 (4th ed. 2004)); *see also In re WorldCom, Inc.*, 343 B.R. at 425.

<u>Common Factual Issues Do Not Predominate</u>

60.   The Movants' claims also involve myriad individual factual issues that vary considerably across class members.  This is especially apparent in relation to the causation inquiry required by the Movants' claims.

61.   *First*, each of the NAS Guardians, Tribes, Ratepayers, and Hospitals relies on complaints that contain hundreds of pages alleging that the Debtors engaged in a sweeping multi-decade-long "deceptive marketing campaign" carried out through "publications and websites, endless streams of sales representatives, [and] 'education' programs" that were all meant to "dramatically increase[] their sales of prescription opioids."  (Hospitals Compl. ¶ 51; *see also* NAS Guardians Mot. Ex. C ("**NAS Doyle Compl**.") ¶ 40 (alleging a "well-funded, sophisticated, and negligent marketing and/or distribution scheme . . . to spread misrepresentations"); Ratepayer Compl. ¶ 3 (alleging a "deliberately crafted, well-funded campaign of deception" by manufacturing defendants); Tribes Mot. ¶¶ 15 n.34, 36, 42 (citing complaints filed in MDL No. 2804).)  Yet, in order to now obtain class certification, these Movants attempt to squeeze their once sprawling allegations into "a single [RICO] conspiracy," which they argue involves a predominance of common issues concerning the Debtors' liability.  (Hospitals Mot. ¶ 53; NAS Guardians Mot. ¶ 82; Tribes Mot. ¶ 43; Ratepayers Mot. ¶ 101.)

62.   The Second Circuit, however, has rejected nearly identical arguments, finding that even if common issues exist concerning RICO liability (and here they do not), establishing that a defendants' allegedly fraudulent marketing *caused* class members RICO injuries requires establishing reliance, which "cannot be the subject of general proof."  *UFCW Local 1776*, 620 F.3d at 133; *see also*, *Moore*, 306 F.3d at 1253 (finding predominance not satisfied because "liability for fraudulent misrepresentations cannot be established simply by proof of a central,

coordinated scheme"). This is especially true where, as here, the Movants invoke theories of injury that "require[] them to prove third-party reliance by doctors on [the] alleged misrepresentations." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 91 (2d Cir. 2015). Because "individual physicians prescribing [the drug] may have relied on [manufacturer's] alleged misrepresentations to different degrees, or not at all," generalized proof will not suffice. *UFCW Local 1776*, 620 F.3d at 129.

63. **Second**, the NAS Guardians, Tribes, Ratepayers, and Hospitals' ability to establish that Purdue's conduct proximately caused their particular injuries all implicate complex factual issues that will differ considerably across each class member and overwhelm any common issues.

64. *NAS Guardians*: The NAS Guardians argue they are not asserting personal injury claims and therefore do not fall under the general rule that personal injury class actions cannot be certified. (NAS Guardians Mot. ¶ 10.) But the reasons courts uniformly reject personal injury putative classes—including nearly all of the courts who considered personal injury classes historically against Purdue—are the same reasons that the NAS Guardians' class cannot be certified: predominance cannot be met when a key question is whether a defendant's conduct caused a particular medical condition. *See, e.g.*, *Hurtado*, 2005 WL 192351, at *8-14 (collecting cases); *see also Foister*, 2002 WL 1008608, at *8; *Harris*, 218 F.R.D. at 596-97; *Wethington*, 218 F.R.D. at 588-89.

65. The NAS Guardians seek classes comprised of guardians of "hundreds of thousands of children born with NAS because they were exposed in utero to opioids." (NAS Guardians Mot. at 2.) Yet, each of these claims involves complex factual issues, such as whether a particular child developed NAS ***because of*** exposure to Debtors' opioids *in utero* and whether

38

that exposure was **because of** Debtors' promotional activities.    These issues will vary considerably across the estimated class members.    Each question involves different issues regarding: (i) each mother's use of other brand name and generic prescription opioid medications manufactured by numerous other companies; (ii) each mother's abuse of other illicit opioids, street drugs, or known teratogens during her pregnancy; (iii) each birth mother's physician's awareness of the risks of prescription opioids, whether that physician were exposed to any allegedly fraudulent statements made by Purdue, and if so, their physician's reliance on such messaging when making prescribing decisions; and (iv) other potential contributing factors such as the mother's prenatal health regimes.

66.    *Tribes*:  Unlike the NAS Guardians, the Tribes make no secret that their class comprises personal injury and wrongful death claimants.  (Tribes Mot. ¶ 21.)  But like the NAS Guardians, the Tribes' request for certification presents the same host of individualized issues that courts consistently found defeated Rule 23's predominance and commonality requirements in virtually identical class actions brought against Purdue historically.  As one court reasoned, "[C]laims will . . . vary from [p]laintiff to [p]laintiff because . . . any harm suffered by [p]laintiffs may be due to a number of factors, including, dosage, use and manner of administration of the drug, individual and family medical and psychological histories, level of personal awareness regarding the purported risks and medical reasons for use."  *Foister*, 2002 WL 1008608, at *8; *see also Johnson*, 2004 WL 3245947, at *4.

67.    *Ratepayers*:  Similar factual issues would bedevil the Ratepayers' purported class claims, just like (as discussed above) legal issues would.  The Ratepayers' claims stem from allegations that their insurance premiums increased as a result of Purdue's "deceptive marketing," which, in turn, induced more doctors to prescribe opioids and required their various

insurance companies to absorb the healthcare costs for opioid-related injuries.  (*See* Ratepayer Mot. ¶ 14.)  These theories raise, at the very least, the individualized issues that courts identified as defeating class certification in the earlier wave of personal injury litigation against Purdue.

68.    Courts have recognized that there are countless different—and inherently individual—reasons why a particular insurance company would increase their insurance premiums.  In *Perry v. Am. Tobacco Co.*, policyholders brought a putative class action against numerous tobacco companies asserting that the companies' fraudulent marketing resulted in smoking related injuries that ultimately caused their insurance premiums to increase.  The court noted that this theory was fraught with individual issues:  "In addition to the difficulties in proving damages which stem from individual smokers' decisions on whether, and how often, to smoke, there would be extreme difficulty in determining what portion of the smoker's medical costs were passed on to subscribers in the form of increased premiums and what portion is reflected in simply smaller profits for Blue Cross/Blue Shield in a competitive market."  2001 WL 686812, at *2 (E.D. Tenn. Apr. 12, 2001), *aff'd* 324 F.3d 845 (6th Cir. 2013).  This case is far more straightforward than *Perry*.  There the policyholders sought to establish that *one* insurer's rates went up as a result of smoking-related healthcare cost; here the Ratepayers are attempting to certify a class that consists of scores of different insurance companies and policies over a twenty-five year period.

69.    *Hospitals*:  The Hospitals' claims likewise stem from opioid-related injuries allegedly sustained by the Hospitals' patient population.  These claims present all of the same individualized issues that make certification of the NAS Claimants' and Tribes' untenable.  In *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, a group of hospitals sued a number of tobacco companies on the theory that the tobacco companies' fraudulent marketing practices absorb

40

increased cost for treating patients with smoking-related disease.  Like the *Perry* court, the Third Circuit found that the hospitals' theory raised a multitude of individual issues:  "the court would need to determine the extent to which their increased costs resulted from the tobacco companies' conspiracy to suppress health and safety information, as opposed to smokers' other health problems, smokers' independent (i.e., separate from the fraud and conspiracy) decisions to smoke, smokers' ignoring of health and safety warnings, etc."  228 F.3d 429, 444 (3d Cir. 2000).  The Hospitals' demand for class treatment here raises the same litany of individual issues and is exponentially complicated by the fact that the Hospitals attempting to establish a nationwide class of thousands of hospitals who treated millions of individual patients opioid-related conditions.

70.     In short, each of the Movants' sweeping and exceedingly broad putative classes relies on a kaleidoscope of individual issues of law and fact that ensure that common issues do not predominate.

### b.     Superiority

71.     The Movants attempting to rely on Rule 23(b)(3) must also establish that "a class is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3).  The Movants assert that class actions are the "superior method of adjudicating this matter" because "other methods . . . would likely overburden the [C]ourt and the claims administration system."  (Ratepayers Mot. ¶ 102.)  According to the Movants, class actions are "clearly" the superior method "compared to the alternative of innumerable claims brought by individual class members."  (*See, e.g.*, Hospitals Mot. ¶ 57; NAS Guardians Mot. ¶ 84.)  They predict "inconsistent or contradictory attempted abatements" if this Court proceeds with "individualized litigation."  (NAS Guardians Mot. ¶ 85.)  And, despite application of the

41

automatic stay, they predict that "each of the members . . . would unnecessarily flood the courts with lawsuits." (Tribes Mot. ¶ 45.)

72.     This is not correct. "Rule 23 necessarily suggests a comparative process." *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013); *see also id.* (explaining that superiority depends on "the relative advantages of alternative procedures for handling the total controversy") (quotation omitted). Here, the "superiority of the class action vanishes when the 'other available method' is bankruptcy, which consolidates all claims in one forum and allows claimants to file proofs of claim without counsel and at virtually no cost." *In re Ephedra*, 329 B.R. at 9.

73.     As discussed above, certification of the Movants' proposed classes is an unnecessary overlay that will only complicate the parties' and the Court's efforts to resolve this matter. Certification will require identifying not only the class members but also identifying and resolving overlap with the other putative class actions. As just one obvious example, the Ratepayers, which seemingly include hundreds of millions of working adults in the United States and their employers over a twenty-five-year span, will inevitably overlap with members of the NAS Guardians or Tribes classes. The Court would have to decide which proceeding disposes of their claims and how to reconcile competing class notices and opt-out procedures. *See* Fed. R. Civ. P. 23(c)(2).

> ii.     *Certification of a Rule 23(b)(1)(B) "Limited Fund" Class Is Wholly Inappropriate in This Bankruptcy Context*

74.     Perhaps recognizing that the legal and factual variations that consistently doomed previous class actions against Purdue under Rule 23(b)(3) also preclude a finding of "predominance" or common issues or "superiority" here, the IPSDs, Ratepayers, NAS Guardians, and Tribes attempt to invoke Rule 23(b)(1)(B) to certify a mandatory "limited fund" class. This fails for at least two reasons. ***First***, courts consistently hold that, as a general matter,

limited fund classes should not be certified as part of a bankruptcy proceeding. **Second**, the Movants have not and cannot establish facts proving that they have satisfied the requirements to certify a limited fund class.

75.    Limited fund class actions are "rare" in the bankruptcy context because courts find them unnecessary and duplicative of existing protections afforded by the bankruptcy rules. *In re FIRSTPLUS Fin.*, 248 B.R. at 75-76.    Limited fund classes and bankruptcy ordinarily operate in separate spheres, and the Second Circuit has made clear that the former cannot be employed to evade the bankruptcy system. *See In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 732 (2d Cir. 1993).

76.    Outside of bankruptcy, limited fund class actions are designed to prevent inequitable treatment among class members when the purported class can only recover from a limited fund that is inadequate to address all class members' claims in full.  The defining feature of a Rule 23(b)(1)(B) limited fund class is that it is *mandatory*, with no opt-out rights for class members. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 816 (1999).  A mandatory class ensures equitable treatment for all its members by preventing the limited fund from being paid out on a "first come, first served" basis and otherwise cannibalized by members of the class. *In re Drexel*, 960 F.2d 285, 292 (2d Cir. 1992) (observing that this rationale animates limited fund treatment in the non-bankruptcy context).  Limited fund "class action[s] will not be appropriate in most bankruptcy cases," *id.*,[25] because bankruptcy procedure already "provides for a pro rata

---

[25] In *In re Drexel*, the court was asked to certify a mandatory class under FRCP 23(b)(1)(B) in connection with a settlement to bind all private securities claimants subject to the settlement agreement.  960 F.2d at 292. Despite the Second Circuit's recognition that FRCP 23(b)(1)(B) was generally inapplicable in bankruptcy, it ultimately determined that it was appropriate to certify a class under this rule because of the unique circumstances of this case. *Id.*  The court found certification was necessary to prevent some securities claimants from opting out of the settlement and maintaining costly individual actions while Drexel's reorganization plan awaited final approval. *Id.*  Here, there is no settlement agreement between the 23(b)(1) claimants and the Debtors creating a limited fund (….continued)

distribution to all claimants with allowed claims and, thus, precludes . . . an unjust result" due to a limited fund and a race to be first past the post. *In re Woodmoor Corp.*, 4 B.R. 186, 190 (Bankr. D. Colo. 1980).

77.     Ignoring this backdrop, one of the Movants asserts that a "limited fund class action complements the bankruptcy process." (IPSDs Mot. ¶ 59.) Not so. As the Supreme Court made clear in *Ortiz*, "[M]andatory class treatment under a limited fund rationale must be confined to a narrow category of cases." *Doe v. Karadzic*, 192 F.R.D. 133, 139 (S.D.N.Y. 2000). "[T]he greater the leniency in departing from the historical limited fund model, the greater the likelihood of abuse." *Id.* (citing *Ortiz*, 527 U.S. at 817). The Movants' proposed limited fund classes here, in this context, are a radical and unprecedented "departure" from the "historical model" and must be rejected.[26]

78.     Given the conceptual mismatch between a bankruptcy proceeding and the limited fund class action paradigm, it is no surprise that the Movants here cannot satisfy Rule 23(b)(1)(B)'s requirements. Certification under Rule 23(b)(1)(B) is appropriate only where: (1) there is a limited fund inadequate to pay the claims of class members; (2) the entire limited fund is set to be distributed in its entirety to the class members; and (3) permitting any nonparty class

---

(continued….)

for the 23(b)(1) claimants, and there is no risk that an individual member of their purported classes could impair or impede the recovery of the class.

[26] In *Ortiz*, the Supreme Court discussed types of historical and "[c]lassic examples" of 23(b)(1)(B) limited fund classes—none of which come close to the facts presented here. *See* 527 U.S. at 833-34 (examples include "suits brought to reorganize fraternal-benefit societies; actions by shareholders to declare a dividend or otherwise 'fix [their] rights;' and actions charging 'a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class' of beneficiaries, requiring an accounting or similar procedure 'to restore the subject of the trust'") (citations omitted).

members to pursue an individual claim would impair or impede party class members' interests. *See Ortiz*, 527 U.S. at 838-39.  None of those requirements is satisfied here.

79.    ***First***, there is no "limited fund" that would be inadequate to satisfy the purported classes of the 23(b)(1) Movants' claims.  As the court explained in  *In re FIRSTPLUS Fin., Inc.*:

> Rule 23(b)(1)(B) refers to a situation where there is a finite amount of money to satisfy all claims and wherein one plaintiff could exhaust the fund to the detriment of the other potential claimants.   There is no such risk in the context of a bankruptcy case since bankruptcy procedures provide for a pro rata distribution to all claimants who have allowed claims.

248 B.R. at 75.  Here, Movants and their putative classes are able to submit claims against the full Purdue estate in the bankruptcy proceedings.  After submitting claims, they will be treated as any other creditor and may receive equitable distributions from the estate.

80.    ***Second***, the assets in the bankruptcy are not to be distributed only among the claimants in the purported classes.  Instead, the assets must be shared by all allowed Purdue creditors.  *In re Motors Liquidation*, 447 B.R. at 163 n.53 ("Old GM's available value is, of course, limited, but the claim to that 'limited fund' isn't limited to the putative class action claimants.  Old GM has a large number of other creditors who likewise have claims against Old GM's assets.  The 'limited fund' thus isn't to be shared solely amongst class action claimants, but instead must be shared by all of Old GM's creditors.").

81.    ***Third***, a mandatory class is unnecessary because permitting any nonparty class member to file and pursue their claims on their own would not "impair or impede" the ability of any 23(b)(1) claimant to protect their interests.   Indeed, procedures inherent in bankruptcy prevent this.

82.    The Movants have failed to satisfy the requirements of Rule 23(b)(1)(B), and this Court should deny their novel request to certify limited fund classes here.

45

### iii.    The NAS Guardians' Attempt to Certify a Mandatory Injunctive Relief Class Also Fails

83.    The NAS Guardians try another fallback:  seeking certification of mandatory injunctive relief under Rule 23(b)(2).  This strategy fails because the NAS Guardians are not seeking "final injunctive relief or corresponding declaratory relief [that is] appropriate respecting the class as a whole," as required for class certification under Rule 23(b)(2).  Fed. R. Civ. P. 23(b)(2).  Rather, they are seeking monetary relief in the form of having the Debtors fund a very costly medical monitoring program for their NAS children, as well as a court-supervised science panel to collect and analyze medical monitoring results.  (NAS Guardians Mot. Ex. H, Mem. of Law, at 17, 21.)  Calling such monetary damages "injunctive and declaratory relief," as the NAS Guardians do, does not actually transform monetary damages into injunctive relief.  To the contrary, where, as here, "[p]laintiffs seek the establishment of a 'reserve fund to pay for the cost of the medical monitoring program,'" any claimed injunctive relief is "merely incidental" to damages, and Rule 23(b)(2) is inapplicable.  *Zinser*, 253 F.3d at 1195; *accord In re St. Jude Med., Inc*., 425 F.3d 1116, 1122 (8th Cir. 2005).

84.    Though subsection 23(b)(2) does not have an express predominance requirement, the presence of individual issues of fact or law destroys the interclass cohesiveness necessary for uniform injunctive relief and makes certification under 23(b)(2) inappropriate.  *See Rhodes v. E.I. du Pont de Nemours & Co.*, 253 F.R.D. 365, 371 (S.D.W. Va. 2008) (cohesiveness requirement is similar to but "more stringent" than the commonality requirement of Rule 23(a)).

85.    In *Harris*, the court rejected an analogous attempt by a putative class to certify a medical monitoring class against Purdue.  There, the court held that the "cohesion of the medical monitoring class [was] in question" because there were a multitude of individual issues including "how the alleged marketing affected the judgment of physicians, how resulting prescriptions

46

affected patients, [and] how some patients allegedly used the drug improperly." *Harris*, 218 F.R.D. at 597.

86.     *Harris* is consistent with a long line of cases that have denied Rule 23(b)(2) certification of medical monitoring classes due to a lack of cohesiveness within the class.  In *In re Rezulin Prod. Liab. Litig.*, an action brought by prescription drug users against the manufacturer of the drug, the court denied certification of a medical monitoring class, finding that the proposed class did not meet the cohesiveness requirement of Rule 23(b)(2) where "the prerequisites to, and the availability *vel non* of, medical monitoring vary from state to state" and "the need and desire of individual subclass members for such a remedy varies considerably." 210 F.R.D. 61, 62 (S.D.N.Y. 2002); *see also Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998); *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011); *In re St. Jude Med., Inc.*, 425 F.3d at 1122 ("Proposed medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes."); *Zehel-Miller v. Astrazenaca Pharm., LP*, 223 F.R.D. 659, 664 (M.D. Fla. 2004) (noting that "all of the individual issues . . . destroy[ed] any semblance of cohesion"); *In re Prempro*, 230 F.R.D. 555, 569 (E.D. Ark. 2005) (noting that "a (b)(2) class should actually have more cohesiveness than a (b)(3) class"); *In re Baycol Prod. Litig.*, 218 F.R.D. 197, 211 (D. Minn. 2003) ("A class will not be cohesive if factual differences amongst the class members 'translate into significant legal differences.'") (citing *Barnes*, 161 F.3d at 143).

87.     The NAS Guardians' reliance on *Wilson v. Brush Wellman, Inc.*, 817 N.E.2d 59, 65 (Ohio 2004), (NAS Guardians Mot. Ex. H, Mem. of Law, at 33), is puzzling because the *Wilson* court *denied* plaintiffs' request to certify an analogous medical monitoring class under subsection (b)(2), on the basis that plaintiffs' demand that defendants pay for a medical

monitoring program "primarily sought damages," rendering it inappropriate as a 23(b)(2) class. *Wilson*, 817 N.E.2d at 65-66 (citing cases denying class status for medical monitoring classes). The same result is warranted here.

C.    Movants Cannot Satisfy Rule 23(a)'s Requirements

88.    Additionally, none of the Movants can satisfy Rule 23(a)'s requirement to establish: (a) commonality; (b) typicality; and (c) adequacy of representation.

i.    *Commonality*

89.    The Movants argue that, to satisfy Rule 23(a)(2)'s commonality requirement under *Dukes*, "[e]ven a single common question will do," and allege that here, common questions exist regarding Debtors' promotional activities, awareness of opioids' risks, and the impact of exposure to opioids *in utero*.  (IPSDs Mot. ¶¶ 48-50 (quoting *Dukes*, 564 U.S. at 338); Ratepayers Mot. ¶ 77; Hospitals Mot. ¶ 4; NAS Guardians Mot. ¶ 64; Tribes Mot. ¶ 30.)  But Movants ignore that *Dukes* "increased the 'rigor' with which courts must analyze the threshold element of 'commonality' under Rule 23(a)(2)."  *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 51 (S.D.N.Y. 2019) (citation and quotations omitted).

90.    For the same reasons that these Movants cannot establish predominance, they also cannot establish commonality.  *See supra* ¶¶ 56-70; *Wynn v. N.Y.C. Hous. Auth.*, 314 F.R.D. 122, 128 (S.D.N.Y. 2016), *aff'd*, 730 F. App'x 92 (2d Cir. 2018) (recognizing that the "inquiries into commonality . . . and predominance overlap").  None of the Movants even acknowledge—much less attempt to distinguish—the long line of past cases where courts refused to certify personal injury classes based on Purdue's allegedly improper marketing, including on lack of commonality grounds, "[b]ecause each of the claims depends upon questions of fact and of law peculiar to each class member" relating to "issues of reliance, causation, and damages." *Foister*, 2002 WL 1008608, at *8.  This case is no different.

48

91.     Though the ISPDs do not seek to certify a 23(b)(3) class, their claims lack common legal and factual questions for the same reasons as the other Movants.  *First*, the IPSDs' request to certify a nationwide class of all school districts will require not only the application of each state's public nuisance and negligence laws but also each state's highly individual scheme for funding special education programs.  As the public claimants highlight in their concurrently filed objection, the governance, funding structure, and what it even means to be an "independent" school district, can vary considerably within a state, and state to state, and would require the court to conduct the very type of individualized analyses and assessments that defeat class certification.  *Lewis Tree Serv.*, 211 F.R.D. at 236.

92.     *Second*, akin to the NAS Guardians and the Tribes, the IPSDs' claims are all related to personal injuries their students allegedly experienced as a result of their exposure to opioids *in utero* and, thus, implicate the same highly individualized issues relating to each student's birth mother's medical, addiction, and pregnancy history.  *See supra* ¶¶ 64-65.  The IPSDs' assert they are entitled to billions of dollars in damages arising from special educational and related costs, but these too turn on a host of fundamental individual issues such as whether any given student's need for special education and other support services was caused by a litany of genetic, socio-economic, or environmental factors rather than a Purdue opioid.  The IPSDs acknowledge that they are unable to identify which students were exposed to opioids and therefore, unable to determine the question of whether a student's birth mother ever took a Purdue opioid, much less received that opioid through a lawful prescription.  (IPSDs Mot. ¶¶ 27-28.)  Even assuming the IPSDs had the information necessary to make this determination, identifying what students have a connection, if any, to a Purdue opioid requires a detailed student-by-student analysis into each student's and their mother's medical, pregnancy, and

49

addiction history.   These are issues that will vary across each of the anticipated class members
and ensure the IPSDs, like the other Movants, cannot satisfy their burden to establish the
existence of common legal or factual issues.

### ii.    *Typicality and Adequacy of Representation*

93.    Movants also fail to meet their burden of establishing Rule 23(a)'s requirements
of typicality or adequacy of representation.    "Typicality and adequacy, though separate
requirements, are closely related and are often analyzed together.   Both requirements attempt to
prevent potential conflicts between the class representatives and the class members." *In re:
Domestic Drywall Antitrust Litig*., 322 F.R.D. 188, 198-99 (E.D. Pa. 2017) (citation omitted).
Importantly, "it is not a matter of requiring that [p]laintiffs have the same injury as other class
members 'for its own sake' but because the nature of their injury is 'critical to the ability to
recover under the applicable cause[s] of action.'" *Campbell*, 2004 WL 5840206, at *9.

94.    The Movants' classes all fail to meet Rule 23(a)'s requirements for typicality and
adequacy because, as courts denying prior putative class actions against Purdue have recognized,
"[p]laintiffs' allegations against [d]efendants are based on a complex course of conduct engaged
in over a long period of time," and as a result, "the claims of the [p]laintiffs are not typical of
those of the putative members." *Foister*, 2002 WL 1008608, at *10.

95.    A review of "pharmaceutical records illustrates the individual nature of any
inquiry into the essential element of causation, even as to the 'typical' claims of the putative
class representatives." *Campbell*, 2004 WL 5840206 at *9.   Consequently, "establishing the
facts required to prove the claims of the named [p]laintiffs will not prove the required elements
of the claims of those of the other members in the class because of the varying, individual
circumstances surrounding use of OxyContin." *Foister*, 2002 WL 1008608 at *9.   Movants'

50

claims will necessarily require consideration of each putative member's individual circumstances, and any number of "discrepancies between the [p]laintiffs' claims and those of the putative members [that may] exist." *Id*. at *9. Such individual issues "preclude a finding that [a member's] claims are typical of the class." *Campbell*, 2004 WL 5840206 at *9.

96.     None of the Movants address the extensive precedent finding that analogous putative classes lacked typicality and adequacy. To the contrary, the Movants' "allegations merely parrot the language of Rule 23(a)(4)." *Gevedon*, 212 F.R.D. at 341. In light of the individualized inquiries necessary to establish the elements of a claim for each class member, "the claims of any of these putative class representatives are not typical of those of the other putative class representatives, let alone those of all putative class members." *Johnson*, 2004 WL 3245947, at *5. Certification must therefore be denied.

97.     There are additional and unique flaws that preclude the NAS Guardians' class from satisfying typicality and adequacy. The NAS Guardians seek to represent a class containing both uninjured plaintiffs seeking future medical monitoring and plaintiffs allegedly already suffering from "developmental, learning and medical disabilities"—claims exclusive to personal injury actions. However, "the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future" is simply "not aligned" with those who allege they are "currently injured," *Amchem*, 521 U.S. at 626, because the exposure-only plaintiffs have an interest in maximizing the value of the medical monitoring funds, while the injured class members also want there to be sufficient funds dedicated to compensate them for past injuries. Therefore, "named plaintiffs who *already* have [NAS injuries] have fundamentally different interests than those named and unnamed plaintiffs who do not." *Ball v. Union Carbide Corp.*,

385 F.3d 713, 728 (6th Cir. 2004) (quotations omitted).   This conflict renders the NAS Guardians inadequate and atypical representatives for the class as a whole.

98.     The IPSDs' class presents further problems precluding a finding of typicality and adequacy.  Rather than litigate the full spectrum of claims allegedly held by the class, the IPSDs have cherry-picked a single issue to create an illusion of commonality.   Abandoning the vast majority of damages alleged in the class complaint (*see* IPSDs Compl. ¶ 34), the IPSDs now seek only a singular category of damages for certification: "added costs to provide special education services and supplemental education to children who were exposed to opioids in utero."  (IPSDs Mot. ¶ 43.)  Yet this "essentially cosmetic" improvement "was purchased at the price of presenting putative class members with significant risks of being told later that they ha[ve] impermissibly split a single cause of action." *Feinstein v. Firestone Tire & Rubber Company*, 535 F. Supp. 595, 606 (S.D.N.Y. 1982).   That the sole remaining damages are purportedly large is irrelevant.   The IPSDs have "jeopardized the class members' potential claims for [other] damages," and, therefore,  must be "deemed to have interests 'antagonistic' to those of the class." *Thompson v. Am. Tobacco Co*., 189 F.R.D. 544, 550 (D. Minn. 1999) (citations omitted).   Thus, the IPSDs' decision to abandon all damages except for special education costs renders the IPSDs unable to establish typicality and adequacy of representation.[27]

---

[27] The way the Hospitals define their putative class is far from a model of clarity but, if taken at face value, seems to raise a significant adequacy of representation issue.  The Hospitals state that "[f]or purposes of the Motion and the Class Proof of Claim only, the Ad Hoc Group of Hospitals (as defined below) is not included in the Hospitals' proposed class, as the Ad Hoc Group of Hospitals will be filing a separate combined proof of claim."  (Hospitals Mot. at 1 n.3.)  The Hospitals, however, appear to be included on the Ad Hoc Group of Hospitals' Rule 2019 statements.  (Ex. A, V.S. of the Ad Hoc Grp. of Hosps. Pursuant to Bankr. R. 2019, at 37, 49, 51 (Dec. 3, 2019), Dkt. No. 577-1; Ex. A, Am. V.S. of the Ad Hoc Grp. of Hosps. Pursuant to Bankr. R. 2019, at 22, 30, 43-44 (July 10, 2020), Dkt. No. 1368-1.)  If the Hospitals are not included in their own class, they cannot be adequate representatives of that class.

## **Conclusion**

The Class Claim Motions fall far short of demonstrating that class treatment is in any way appropriate here.  ***Every one*** of the factors courts commonly consider in determining whether, as a threshold matter, to exercise discretion and permit class proof of claims weighs heavily against each of the Movants.  And the Movants have not even come close to establishing that the requirements of Rule 23(a) or Rule 23(b) have been met.  For all of the foregoing reasons, the Class Claim Motions should be denied.

Dated:  July 16, 2020
      New York, New York

                               */s/ James I. McClammy*
                               DAVIS POLK & WARDWELL LLP
                               450 Lexington Avenue
                               New York, New York 10017
                               Telephone: (212) 450-4000
                               Facsimile: (212) 701-5800
                               Marshall S. Huebner
                               Frances E. Bivens
                               Benjamin S. Kaminetzky
                               Timothy Graulich
                               James I. McClammy

                               *Counsel to the Debtors*
                               *and Debtors in Possession*