AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | ) ) ) | Case No. 19-23649 (RDD) |
| Debtors.[1] | ) ) ) | (Jointly Administered) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**RESPONSE TO AND REQUEST FOR ADJOURNMENT OF CLASS**
**CLAIM MOTIONS UNTIL CONCLUSION OF MEDIATION**

The Official Committee of Unsecured Creditors (the "Official Committee") of Purdue Pharma L.P., *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this response to the Class Claim Motions and request that such motions be adjourned

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

pending the outcome of the ongoing mediation (the "Response").[2]  In support of this Response, the Official Committee respectfully states as follows.

## RESPONSE

1.  The Official Committee continues to believe that a consensual resolution of the issues subject to Mediation (as defined below) will produce the most beneficial outcome for the Debtors' creditors, who stand to receive the entire value of the Debtors' estates.  This is particularly true in light of the nature and sheer number of claims asserted against the Debtors and their shareholders.

2.  Accordingly, the Official Committee submits that parties in interest should continue their admirable efforts to maintain focus on settlement discussions rather than allowing premature and unnecessary litigation of matters properly within the purview of the Mediation—including allocation of value between and among creditor constituencies and various issues related thereto—to distract from this critical process.  Indeed, after four and a half months of Mediation, the Official Committee applauds all Mediation Parties for their continued steadfast engagement.  The risk that unilateral actions will undermine the Mediation process has long been and continues to be among the Official Committee's chief concerns since the Mediation began.  On three separate occasions,

---

[2] This Response constitutes the Official Committee's response to and request for adjournment of the following motions (collectively, the "Class Claim Motions"): (i) the *Motion by Public School Districts for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [ECF No. 1211] (the "Public School Districts Motion"); (ii) the *Motion of the Private Insurance Class Claimants for Leave to File Class Proofs of Claim* [ECF No. 1321] (the "Ratepayers Motion); (iii) the *Hospital Claimants' Motion Pursuant to Fed. Bankr. P. 9014 and 7023 for an Order Making Fed. R. Civ. P. 23 Applicable to These Proceedings and Permitting Them to File a Class Proof of Claim* [ECF No. 1330] (the "Hospitals Motion"); (iv) the *NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants Motion for Entry of an Order Pursuant to Fed. R. Bankr. P. 9014 and 7023 Permitting them to File a Class Proof of Claim and Granting Related Relief* [ECF No. 1362] (the "NAS Motion"); (v) the *Motion by Cheyenne & Arapaho Tribes and Certain Other Indian Tribes Claimants Pursuant to Fed. R. Bankr. P. 9014 and 7023 to Permit the Filing of a Class Proof of Claim* [ECF No. 1363] (the "Tribes Motion"); and the *Motion to Permit the Filing of a Class Proof of Claim* filed by Tiffany Dunford as Next Friend of T.N. Dunford [ECF No. 1408] (the "West Virginia Motion").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the applicable Class Claim Motion, except that for purposes of clarity: (a) the term "Public School Districts" shall have the meaning ascribed in the Public School Districts Motion to the term "Representatives of the Proposed Class"; and (b) the term "Tribe Movants" shall have the meaning ascribed in the Tribes motion to "C&A Tribes."

2

the Official Committee has asked the Court (or joined with other parties to ask the Court) to refrain from determining issues in favor of the Mediation.[3]  Similarly, on a number of occasions, the Official Committee has informally urged various creditors not to bring case-destructive litigation in favor of negotiating in good faith to a mediated outcome.

3. Against this backdrop, and by sheer happenstance of the calendar of these cases—including delays in Mediation due to the COVID-19 pandemic and the impending July 30 bar date—parties in interest and this Court are now faced with the Class Claim Motions. These motions raise myriad issues that go to the core of Mediation discussions, including the strengths and weaknesses of various claims. As such, and regardless of who prevails, litigating the motions now introduces into the Mediation extraneous factors, which the Mediation Parties expressly determined to exclude more than four months ago.

4. In recognition of the foregoing, and as discussed in further detail below, each of the movants has informed the Official Committee that it would be amenable to adjourning the Class Claim Motions. By contrast, and notwithstanding the impact a hearing on these matters could have on the Mediation, certain Mediation Parties vigorously oppose any such adjournment. Indeed, it appears that some of these parties are intent upon taking advantage of a convergence of circumstances beyond the control of the parties to compel litigation of these issues now. But the issues raised by the Class Claim Motions were not live when the Mediation began, and forcing a determination at this stage gives certain Mediation Parties a free shot at the claims of others, while precluding any reciprocation. Any such strategic advantage to be obtained by the objectors to the

---

[3] *See, e.g., Objection of the Official Committee of Unsecured Creditors to the Motion of Ironshore Specialty Insurance Company for Relief from the Automatic Stay and Joinder to the Debtors' Objection to Such Motion* [ECF No. 756]; *Statement of the Official Committee of Unsecured Creditors with Respect to the Amended Motion of Debtors for Authorization to Enter into Funding Agreement* [ECF No. 1278]; *see also* Transcript of April 22, 2020 Hearing at 17:10–18:19 (agreed statement by counsel to Debtors regarding Emergency Relief Fund negotiations).

3

Class Claim Motions is inappropriate. Despite protestations to the contrary, adjourning these motions during the pendency of the Mediation is neither extraordinary nor illogical. Rather, it is critical to these opioid crisis cases. And to be sure, any determination made by the Court in respect of the Class Claim Motions will be subject to appeal, which could cause additional delays in the Mediation and the cases overall.

5. The Official Committee, as the only creditor fiduciary in these cases, recognizes that thousands (if not more) of potential public and private creditors across the spectrum—who allegedly have been harmed by the historical conduct of the Debtors and the Sacklers—have not participated directly in the Mediation or in these cases generally, and are unlikely to do so in the future. As such, the Official Committee acknowledges that there will need to be a mechanism to ensure that the interests of all legitimate creditors are represented and to administer, in a meaningful and sensible way, the complex relief likely to be granted for the benefit of such creditors. The Official Committee also recognizes, however, that there may be valid counterarguments to the Class Claim Motions that outweigh these considerations. For the avoidance of doubt, this Response takes no position on the strengths and weaknesses of any Class Claim Motion or any possible objection thereto.[4] Instead, the Official Committee merely submits that adjudication of any issue that currently is the subject of the Mediation, including those raised by the Class Claim Motions, is premature while the Mediation is ongoing.

6. Accordingly, the Official Committee respectfully requests that the Court adjourn the Class Claim Motions to permit the Mediation Parties (as defined below) to reach a consensual allocation that will, among other things, hopefully resolve such motions. The Official Committee further requests that such adjournment be subject to an appropriate order, attached as **Exhibit A**

---

[4] Specifically, the Official Committee recognizes that each Class Claim Motion presents individualized and complex legal issues and does not address the individual features of any such motion.

4

hereto, that preserves the rights (including appellate rights) of both the movants and any objecting parties in the event that the Mediation is unsuccessful in resolving these issues, without conferring any advantage on putative class members who fail to file individual proofs of claim before the July 30 bar date.

**A.    The Status of the Pending Mediation**

7.    As this Court is aware, for more than four months, the Debtors, the Official Committee and numerous other key creditor constituencies[5] have been engaged in a highly complex mediation process (the "Mediation") in an effort to determine an appropriate allocation between and among public and private creditor groups of the value/proceeds of the Debtors' estates. To that end, the Mediation Parties, guided by the esteemed mediators appointed pursuant to the Mediation Order (the "Mediators"), have been grappling with numerous issues that impact

---

[5] The parties currently participating in the Mediation are: (i) the Debtors; (ii) the Official Committee; (iii) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the members of which are identified in a *Verified Statement Pursuant to Bankruptcy Rule 2019* [ECF No. 279] (the "Consenting Ad Hoc Group"); (iv) the Ad Hoc Committee of NAS Babies, the members of which are identified in the *Verified Statement of the Ad Hoc Committee of NAS Babies Pursuant to Federal Rule of Bankruptcy Procedure 2019* [ECF No. 341] (the "NAS Ad Hoc Group"); (v) the Ad Hoc Group of Hospitals, the members of which are identified in the *Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [ECF No. 1368] (the "Hospitals Ad Hoc Group"); (vi) the Ad Hoc Group of Non-Consenting States, the members of which are identified in the *Verified Statement of the Ad Hoc Group of Non-Consenting States Pursuant to Bankruptcy Rule 2019* [ECF No. 296] (the "Non-Consenting States"); (vii) the Multi-State Governmental Entities Group, the members of which are identified in the *Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [ECF No. 409] (the "MSGE Group"); (viii) the Ad Hoc Group of Individual Victims, the members of which are identified in the *Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 2019* [ECF No. 348] (the "Individual Victims Ad Hoc Group"); (ix) the Blue Cross Blue Shield Association and various other third party payors and health insurance carrier plaintiffs (the "TPP Group"); and (x) the lead plaintiffs in 28 putative class actions filed on behalf of individual health insurance purchasers, as identified in the *Amended Verified Statement of Stevens & Lee. P.C. Pursuant to Bankruptcy Rule 2019* [ECF No. 333] (the "Ratepayers Group" and, together with the Debtors, the Official Committee, the Consenting Ad Hoc Group, the NAS Ad Hoc Group, the Hospitals Ad Hoc Group, the Non-Consenting States, the MSGE Group, the Individual Victims Ad Hoc Group and the TPP Group, the "Mediation Parties"). The Public School Districts are participating in the Mediation pursuant to a consent order. *See Stipulation and Agreed Order Resolving Motion of The Board of Education of Thornton Township High Schools, Illinois District No. 205, the Board of Education of Thornton Fractional Township High Schools, Illinois District No. 215, and the Board of Education of East Aurora, Illinois School District No. 131's to Submit Claims to Mediation* [ECF No. 1073]. The Federal Government is participating in a more limited capacity. *See Order Appointing Mediators* [ECF No. 895] (the "Mediation Order") ¶¶ 6(a), 8.

an overall allocation, including, among other things, the quantum and strength of claims of various public and private constituencies.[6]

8. When the Court entered the Mediation Order on March 4, approving expenditures of $1 million in estate funds each month, each of the parties in interest had certain expectations regarding timing. Indeed, many Mediation Parties were hopeful that by this point in the cases (approximately four months after the Mediation began), the parties would have reached a consensual resolution with respect to allocation. Unfortunately (and unavoidably), however, the COVID-19 pandemic gripping this country (and the world) for the last four months has rendered impossible the lengthy, in-person meetings that typically are essential to a mediated resolution of complex issues.[7] The Official Committee also is well aware that public health officials who play critical roles in the public-side claimants' response to the opioid crisis have had their attention more than a little diverted by the emergence of a sudden and unforeseen health crisis. For the avoidance of doubt, the Official Committee understands that these delays in the Mediation are not necessarily a result of any party—public or private—failing to engage in good faith efforts to resolve their disputes.

9. Notwithstanding these obstacles, the Official Committee is encouraged by the perseverance of all Mediation parties, including since the last time the parties were in front of the Court. This progress is due in large part to the tireless efforts of the Mediation Parties—both public

---

[6] Although the Mediation is focused on determining the allocation of estate value between private claimants and public claimants, the Mediation Order provides that the Mediators may consider additional related issues and that the scope of the Mediation may be expanded with the consent of the Mediation Parties. *See* Mediation Order ¶ 3. Indeed, without divulging the subject matter of discussions, counsel to the Official Committee can confirm that the Mediation Parties and the Mediators have discussed hundreds of additional issues related to and impacted by allocation in this complex and delicate Mediation.

[7] The value and importance of such in-person meetings cannot be overstated, and it is the Official Committee's view that the use of Zoom, Skype and other digital platforms in place of conference rooms undoubtedly has had an effect on the Mediation. That said, the Official Committee and all other Mediation Parties are fully aware that such platforms are the "new normal," and have—at least in the Official Committee's view—adapted quite well to the unprecedented change in the way that our professions have all changed since mid-March.

and private—and the Mediators in pushing all parties forward towards a consensual resolution during these unprecedented events.

10.   More importantly in the present context, the Official Committee continues to be of the opinion that the Mediation, rather than litigation before this Court, will provide the best opportunity for parties to address allocation and related issues that are central to these cases. To be sure, the Mediation was designed to *avoid* dissipation of the Debtors' estates (the value of which is being turned over to creditors) through litigation by and among creditor groups over the appropriate division of that value. Thus, rather than litigate issues such as allowance, estimation[8] and subordination[9] of claims, as well as numerous other issues that could impact the Mediation, such as the best path forward for Purdue's business, the parties have set aside a race-to-the-courthouse mentality and sought to address such issues in good faith with the Mediators.

11.   The Official Committee is hopeful that the Mediation will result in a consensual resolution of these issues, and that such resolution will emerge in the near term. Achieving such an outcome, however, will require the uninterrupted focus of the Mediation Parties and guidance from the Mediators, without the distraction of extraneous legal bickering and, just as importantly, without the use by Mediation Parties of rulings on and in-court discussions regarding matters

---

[8] Many of the parties in these cases were also creditors in *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. 2019). In that case, the debtors filed an unusual first-day motion seeking to establish procedures by which categories of claims, rather than individual claims, would be estimated in an adversarial process pursuant to Bankruptcy Code section 502(c). *See Motion of Debtors for (I) Entry of Orders Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (A) Establishing Procedures and Schedule for Estimation Proceedings and (B) Estimating Debtors' Aggregate Liability for Certain Categories of Claims, (II) Entry of Protective Order, and (III) Subordination of Certain Penalty Claims* [*Insys* ECF No. 29]. In *Insys*, as here, the parties in interest sought to avoid such value-destructive litigation by embarking on first informal, then formal, mediation. *See Agreed Order Regarding Estimation Motion, PI Motion and Approving Case Procedures* [*Insys*, Adv. Pro. No. 19-50261 (KG), ECF No. 45].

[9] *See Objection of the Ad Hoc Group of Individual Victims to Creditors the Board of Education of Thornton Township High School District 205, the Board of Education of Thornton Fractional Township High School District 215, and the Board of Education of East Aurora School District 131's Motion to Submit Claims of Independent School Districts to Mediation* ¶ 5 ("As these cases proceed to the plan phase, the [Individual Victims] Ad Hoc Group is likely to ask this Court to strictly scrutinize . . . claims that, if allowed and not subordinated, would impermissibly dilute and reduce the recovery of the direct tort claimants.").

central to the Mediation to obtain an advantage (whether real or perceived) over other parties. This is particularly true here, where having a public hearing of the issues underlying the Class Claim Motions at this point in the Mediation—in and of itself—could preclude a mediated resolution of these cases.

**B.     The Class Claim Motions and the Primacy of Mediation**

12.     Against this backdrop, the movants, each of which is participating in the Mediation, seek application of Rule 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to their proofs of claim and certification of putative classes under Rule 23 of the Federal Rules of Civil Procedure ("Civil Rule 23").[10]

13.     As noted above, the Official Committee understands the basis upon which the movants believe that the class claim vehicle may be an appropriate mechanism for the resolution of claims against the Debtors in the context of any settlement emerging from the Mediation. The Official Committee also understands the bases upon which certain Mediation Parties may object to the relief sought by particular Class Claim Motions. But regardless of any Mediation Party's view on a given request, the Mediation Parties have elected to participate in a Mediation in which each party necessarily speaks for a group larger than itself or its direct clients. This structure is

---

[10] The relief requested by the Class Claim Motions has two distinct components. *First*, because Bankruptcy Rule 7023 does not apply by default to a contested matter, a court may use its discretion to apply such rule to a proof of claim. Bankruptcy Rule 9014(c); *see also In re Musicland Holding Corp.*, 362 B.R. 644, 654 (Bankr. S.D.N.Y. 2007). *Second*, having made Bankruptcy Rule 7023 applicable, a court must evaluate the putative class and determine whether certification is appropriate under the standards set forth in Civil Rule 23. If the Class Claim Motions were granted, counsel to the movants would be entitled to speak for creditors similarly situated to their clients, including during the Mediation. To certify a class under Civil Rule 23, a court must find that the requirements of Civil Rule 23(a)— numerosity, commonality, typicality and adequacy of representation—are met, and that the proposed class action is of a type described in Civil Rule 23(b). Where the analysis required under Civil Rule 23 "overlaps with an issue on the merits," a court is **required to make the relevant substantive findings** under Civil Rule 23 at the class certification stage. *Miles v. Merrill Lynch & Co. (In re Initial Public Offering Sec. Litig.)*, 471 F.3d 24, 41 (2d Cir. 2006). Here, in order to address the questions of commonality and typicality under Civil Rule 23(a), as well as predominance under Civil Rule 23(b)(3), the Court would be required (to some degree) to answer as-yet unsettled questions regarding the law governing the claims asserted in these cases.

8

the direct and necessary result of the sweeping devastation caused by the Debtors' products across the country.[11]

14.     Given this structure, a series of one-off hearings in respect of *certain of* the claims subject to the Mediation will impact the ability of the parties to reach resolution with respect to allocation and, thus, the outcome of the Chapter 11 Cases overall.  Indeed, central to the Mediation are complex and multifaceted questions regarding the relative entitlement of various creditor constituencies to the value of the Debtors' estates.  These questions can be answered only by considering, among other things, the amount and number of claims in each creditor group (and the relative strength of such claims), when compared to all others.  Any ruling on these issues, or even mere colloquy between counsel and the Court, could spur a furious round of additional analysis and more disputes among the Mediation Parties on issues that may have been near resolution.  As such, the Official Committee submits that any public hearing now regarding claims—including the Class Claim Motions—can only serve to upset the delicate balance of the Mediation and interfere with the numerous, complex and interconnected issues being discussed therein.  Moreover, conducting a hearing (and making a determination) regarding the claims of certain, but

---

[11] In fact, this structure has been apparent since the outset of the Mediation. The Mediation Order expressly identifies as Mediation Parties certain ad hoc groups and organizations of creditors. *See* Mediation Order ¶ 4. However, the subject matter of the Mediation relates not to the allocation of value solely among the members of those identified (and expressly represented) groups, but rather to the allocation of value "between the Non-Federal Public Claimants, on the one hand, and the Private Claimants, on the other." *Id.* ¶ 3. These two broad classes are not defined to comprise only the ad hoc groups and creditor organizations that are Mediation Parties. Instead, these terms refer to broad constituencies that extend far beyond those sitting around the (virtual) mediation table and, in certain instances, refer expressly to putative classes. *See id.* ¶ 6(a) ("'Non-Federal Public Claimants' . . . includes only the states, federal districts and U.S. territories, political subdivisions of the states and Native American Tribes . . . ."); *id*. ¶ 6(b) ("'Private Claimants' . . . includes . . . hospitals; health insurance carrier plaintiffs and third party payors; purchasers of private health insurance; various individuals and estates alleging personal injury or wrongful death claims, including guardian claimants asserting claims on behalf of minors born with NAS due to exposure to opioids in utero; ***and claimants comprising a putative class of NAS children seeking medical monitoring funding*** . . . .") (emphasis added). For the avoidance of doubt, the Official Committee is in no way suggesting that the language of the Mediation Order definitively determines the issues underlying the Class Claim Motions. Instead, the Official Committee submits that to the extent the Debtors or other parties in interest had concerns regarding the representative nature of the Mediation Parties (***for purposes of the Mediation***), they should have raised such issues in connection with the drafting of the Mediation Order, not as such process is nearing an apex.

9

not other, creditor constituencies undoubtedly will result in an uneven playing field.[12] Specifically, adjudicating the Civil Rule 23 issues raised by the Class Claim Motions now will force premature litigation in respect of the underlying merits of certain constituencies' claims and the very issues that parties are working hard to resolve consensually, while leaving other claims within the exclusive province of the Mediation.

15.    The Official Committee also has concerns regarding the scope of inquiry this Court would be required to undertake with respect to some, but not all, creditor constituencies in order to address the Class Claim Motions at this stage. For example, deciding the Class Claim Motions may require the Court to make findings regarding the size of some (but not all) claimant groups, as well as numerous other legal and factual issues.[13] Doing so in the middle of the Mediation would have the same impact as deciding issues of allowance, subordination, estimation, contributory negligence, comparative fault, standing, applicability of certain statutes or any of the numerous other legal issues governing various parties' claims. Such determinations, although perhaps necessary if no mediated settlement can be reached, also would preempt decisions by the tribunals where these issues have been percolating (in a fully-briefed form) for some time, including the Multidistrict Litigation in the Northern District of Ohio. *In re Nat'l Prescription Opiate Litig.*, Case No. 1:17-CV-2804 (N.D. Ohio 2017).

---

[12] A foretaste of the flyspecking the Official Committee is seeking to avoid can be found in *The State of Florida's Omnibus Objection to the Request by the Hospital Claimants, the Private Insurance Class Plaintiffs, the Independent Public School Districts, the NAS Guardians, and the Cheyenne and Arapaho Tribes for Leave to File Motions for Class Relief* [ECF No. 1415], which includes close to 10 pages of argument regarding the substantive law underlying the claims sought to be asserted on behalf of the various putative classes.

[13] Such determinations, for example, might include findings regarding the as-yet unsettled law governing the classes' underlying claims.

16.     Finally, any party may appeal a decision on a Class Claim Motion under Civil Rule 23(f).[14] The pendency of any such appeal could threaten the finality of any mediated settlement or proposed plan premised on resolution of the Class Claim Motion. By contrast, addressing any unresolved issues related to class certification after the conclusion of the Mediation will permit all Mediation Parties to work constructively and cooperatively to ensure that a mediated outcome is implemented and, in turn, enable a fair and achievable distribution of estate assets.

17.     The Official Committee understands that, in some instances, the threat of litigation can serve as a powerful incentive to settlement. But that is true primarily in cases where mediation is invoked to resolve a discrete dispute between hostile parties. The goal of *this* Mediation is global in nature and represents an attempt to resolve a complex question—at a high level, what to do with the Debtors' assets—without resorting to threats of litigation. No party in interest should be seeking to take advantage of the coincidental convergence of routine case deadlines and world events to force certain creditors to prosecute Class Claim Motions at this inopportune moment. Indeed, to the movants' credit, they waited until the very end of the permissible period to file the Class Claim Motions, so as not to interfere with the Mediation. And each is willing to agree to the Official Committee's request to adjourn such motions. Permitting litigation regarding only some claims as a result of this happenstance would advantage certain creditors in the Mediation, who can voice their views on the weaknesses of other parties' positions, while precluding similar judicial scrutiny of all other claims, including those belonging to the objecting parties.

## C.     The Official Committee's Proposed Resolution

18.     The timing of the Class Claim Motions vis-à-vis the Mediation is in no way the fault of the movants. Specifically, the Official Committee understands that the movants did not

---

[14] While a Court of Appeals has discretion to deny permission to appeal an order on class certification, the Official Committee believes that denial would be unlikely under the circumstances of these largely unprecedented cases.

intend to file the Class Claim Motions before seeing a settlement emerge from the Mediation, but were compelled to do so in light of the somewhat extended timeline of the Mediation (brought about by the COVID-19 pandemic, as noted above) and the impending July 30 deadline for filing proofs of claim.

19. In view of these facts, as well as the Official Committee's overarching concerns regarding the Class Claim Motions, prior to and after the filing of such motions, counsel to the Official Committee conferred with counsel the movants and the other Mediation Parties in an effort to obtain a consensual adjournment of these issues. Specifically, following numerous one-off discussions, on July 12, 2020, counsel to the Official Committee reached out by email to counsel to each of the movants who had filed Class Claim Motions as of that date, the Debtors, the Consenting Ad Hoc Group, the Non-Consenting States, and certain other parties in interest. By this correspondence, the Official Committee formally requested that the Class Claim Motions be adjourned and heard following the conclusion of the Mediation (to the extent they could not be resolved therein), subject to certain conditions designed not to prejudice the movants or those parties likely to oppose the Class Claim Motions.[15]

20. In each case, the movants were amenable to such an adjournment. Other Mediation Parties were not.[16] As the only fiduciary for all creditors in these cases, the Official Committee was disappointed by this response to a proposal designed to avoid premature litigation that may be rendered moot if the Mediation is successful.

---

[15] The proposed form attached as **Exhibit A** of order mirrors the proposal made in the correspondence sent by counsel to the Official Committee.

[16] The intercreditor disputes reflected in the Class Claim Motions are *not* a symptom of the "public/private split" that is so frequently the topic of discussion in these cases. The Class Claim Motions include four motions by private-side claimants (the Ratepayers Motion, the Hospitals Motion, the NAS Motion and the West Virginia Motion) and two motions by public-side claimants (the Public School Districts Motion and the Tribes Motion).

21.     In the first instance, the Official Committee submits that this Court should evaluate through a skeptical lens any objection filed by a Mediation Party that challenges the strength of other Mediation Parties' claims *in the midst of the Mediation*.  As noted above, such objections are largely misplaced at the class certification stage.[17]  Moreover, the Official Committee finds unsettling the Debtors' apparent willingness to go forward with case-by-case determinations of the Class Claim Motions now, notwithstanding their prior recognition of the potential danger of such an approach.  *See, e.g.*, Transcript of June 3, 2020 Hearing at 39:12–14 ("If we filed a plan tomorrow with the mediation midstream, other things unresolved, we think in this case that would be very counterproductive.") (Counsel to the Debtors).  Certainly, in a traditional chapter 11 case, a debtor has a legitimate basis upon which to seek to control the size of the claims pool in order to maximize value and permit distributions to equity.  But these are not traditional chapter 11 cases, and the Debtors announced during the first day hearing that their shareholders would retain no value in the reorganized enterprise (whatever form that may take), all of which would be turned over for the benefit of the individuals and other parties harmed by the Debtors' conduct.

22.     Under these circumstances, the *sole* function of the claims allowance process is to assist the Debtors and their creditors in assembling a plan of reorganization that will allocate value fairly among unsecured creditors.  As such, these cases differ from all others not only by virtue of the size and variety of the claims pool, but because almost every claim is grounded in long-running litigation against the Debtors for the harm caused by their products.  Placing the Debtors back into their familiar role as defendants with respect to certain claims, and inviting the Debtors to raise the arguments they have spent five years of litigation crafting in respect of such claims, would

---

[17] Dilution of claims outside a class is not relevant to the analysis the Court should perform in addressing the Class Claim Motions. *See In re Chapparal Energy, Inc.*, 571 B.R. 642, 649 (Bankr. D. Del. 2017) ("[A]ny dilution of recoveries to other unsecured creditors is simply a function of the filing of a claim, not the filing of a class proof of claim.").

undo the careful work the Official Committee—and numerous other parties in interest—have performed over the last nine months to divert these cases from a litigation track and resolve all issues in Mediation.

23. Because it is inappropriate and counterproductive to litigate issues central to Mediation during the pendency of such process, the Official Committee respectfully urges the Court to adjourn each Class Claim Motion until the conclusion of the Mediation. The Official Committee nevertheless recognizes that the movants face significant uncertainty in light of the impending bar date. The Official Committee therefore respectfully requests that the Court adjourn the Class Claim Motions by an order substantially in the form attached hereto as **Exhibit A**, which will avoid prejudice to the movants and any objectors by preserving their rights with respect to the Class Claim Motions following the expiration of the general bar date on July 30, 2020, but will *not* toll the bar date for any individual claimant filing an individual proof of claim.

## CONCLUSION

24. For the foregoing reasons, the Official Committee requests that the Court enter an order, in the form attached hereto as **Exhibit A**, adjourning the Class Claim Motions pending the outcome of the Mediation. The Official Committee reserves all rights with respect to the Class Claim Motions, including the right to amend or supplement this Response, submit additional briefing, participate in any discovery and be heard at any hearing related to any Class Claim Motion.

[*Remainder of page left blank intentionally.*]

19-23649-shl    Doc 1425    Filed 07/16/20    Entered 07/16/20 17:42:27    Main Document
Pg 15 of 18

Dated:  New York, New York  
        July 16, 2020

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  /s/ *Arik Preis*
    Ira S. Dizengoff
    Arik Preis
    Mitchell Hurley
    Sara L. Brauner
    One Bryant Park
    New York, New York 10036
    Tel: (212) 872-1000
    Fax: (212) 872-1002
    idizengoff@akingump.com
    apreis@akingump.com
    mhurley@akingump.com
    sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.,* et al.

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PURDUE PHARMA L.P., *et al.*, | ) | Case No. 19-23649 (RDD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## ORDER ADJOURNING CLASS CLAIM MOTIONS

Upon the motions (the "Class Claim Motions") of the Public School Districts [ECF No. 1211],[2] the Private Insurance Class Claimants [ECF No. 1321], the Hospital Claimants [ECF No. 1330], the NAS Guardians [ECF No. 1362], the Cheyenne & Arapaho Tribes and Certain Other Indian Tribes [ECF No. 1363] and Tiffany Dunford as Next Friend of T.N. Dunford [ECF No. 1408] (collectively, the "Movants"), for an order, pursuant to Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 9014 and 7023, making Bankruptcy Rule 7023 applicable to the contested matters raised by the Movants' proofs of claim, and certifying classes pursuant to Federal Rule of Civil Procedure 23(b)(1)(B), and upon all pleadings filed in connection with the Class Claim Motions, and upon the record of the hearing held by the Court on the Motion on [July 23, 2020], and the Court having jurisdiction to consider the Class Claim Motions pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2) and the *Amended Standing Order of Reference from the United States*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

[2] Capitalized terms used but not defined in this Order shall have the meanings ascribed to such terms in the respective Class Claim Motions.

*District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.), and venue for the Class Claim Motions being proper in this District and this Court pursuant to 28 U.S.C. §§ 1408 and 1409, and the Court having authority to enter final orders with respect to the Class Claim Motions consistent with Article III of the U.S. Constitution, and after due deliberation and good and sufficient cause appearing therefor; now, therefore, it is **HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Class Claim Motions are adjourned until the first possible hearing date that is at least 3 days after the Termination Date (as defined in the *Order Appointing Mediators* [ECF No. 895] (the "Mediation Order")) (such omnibus hearing date, the "Renewed Hearing Date").

2. If a Class Claim Motion is granted following the Renewed Hearing Date, then, notwithstanding anything to the contrary in the Bar Date Order, the applicable Movant shall be permitted to file a class proof of claim, and such proof of claim shall not be considered untimely solely due to the passage of the General Bar Date, until the date that is seven days after the entry of the order granting such Class Claim Motion.

3. Notwithstanding the foregoing, the pendency or denial of a Class Claim Motion shall not be deemed to toll the General Bar Date with respect to any individual proof of claim, whether or not such individual proof of claim asserts a claim that would have been encompassed by a class proof of claim filed pursuant to the preceding paragraph.

4. For the avoidance of doubt, nothing in this Order shall affect in any way the right of any party to appeal, or to participate in an appeal of, any future order of this Court with respect to any Class Claim Motion.

Dated: July __, 2020  
      White Plains, New York                 _____  
                                                THE HONORABLE ROBERT D. DRAIN  
                                                UNITED STATES BANKRUPTCY JUDGE