KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Kenneth H. Eckstein
David E. Blabey Jr.
Rachael Ringer
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

PILLSBURY WINTHROP SHAW
PITTMAN  LLP
Andrew M. Troop
31 West 52nd Street
New York, New York 10019
212-858-1000

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay (admitted *pro hac vice*)
James P. Wehner
Jeffrey A. Liesemer (admitted *pro hac vice*)
George M. O'Connor (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005

*Attorneys for the Ad Hoc Group of
Non-Consenting States*

*Attorneys for the Multi-State Governmental
Entities Group*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X
:
In re:                                                        :    Chapter 11
                                                             :
PURDUE PHARMA L.P., *et al.*,                                 :    Case No. 19-23649 (RDD)
                                                             :
                              Debtors.                       :    (Jointly Administered)
                                                             :
---------------------------------------------------------------- X

**PUBLIC CLAIMANTS' OMNIBUS OBJECTION TO MOTIONS
FOR LEAVE TO FILE CLASS PROOFS OF CLAIM**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

BACKGROUND ..................................................................................................... 4

    A.    The Putative Class Actions ................................................................... 4

          i.    The IPSD Class Action ............................................................ 4

          ii.    The Hospital Class Action ....................................................... 5

          iii.    The Private Insurance Plaintiff Class Action ........................... 7

          iv.    The NAS Guardian Class Action ............................................. 8

    B.    The Bar Date Order .............................................................................. 9

    C.    The Mediation ..................................................................................... 10

OBJECTION ........................................................................................................... 11

I.    THE COURT SHOULD NOT EXERCISE DISCRETION TO APPLY
BANKRUPTCY RULE 7023 ....................................................................... 13

    A.    The Proposed Classes Were Not Certified Pre-Petition ...................... 13

    B.    All Claimants Received Notice of the Bar Date .................................. 15

    C.    Class Certification Will Adversely Impact the Administration of the Estate ........ 18

    D.    Class Claims are Generally Disfavored in Bankruptcy ....................... 21

    E.    The Interests of Putative Class Members are Adequately Represented ............ 22

II.    THE PROPOSED CLASSES FAIL TO SATISFY THE REQUIREMENTS OF
FRCP 23 ....................................................................................................... 23

    A.    The Proposed Classes Are Not Sufficiently Defined ........................... 23

          i.    The IPSD Class is Vaguely Defined ....................................... 23

          ii.    The Private Insurance Plaintiff Class is Overbroad ................. 24

          iii.    The Hospital Class is Vaguely Defined .................................... 25

i

B.      The Proposed Classes Lack Commonality ............................................................26

        i.      The IPSDs Fail the Commonality Test .....................................................27

        ii.     The Hospitals Fail the Commonality Test .................................................29

        iii.    The Private Insurance Plaintiffs Fail the Commonality Test....................30

        iv.     The NAS Guardians Fail the Commonality Test .......................................30

C.      The Claims or Defenses of the Representatives Are Not Typical of the
        Class....................................................................................................................30

D.      The Movants Have Not Satisfied the Requirements of FRCP 23(b)....................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)............................................................................................................25

*Bailey v. Jamesway Corp. (In re Jamesway Corp.)*,
    No. 95 B 44821 (JLG), 1997 WL 327105 (Bankr. S.D.N.Y. June 12, 1997)...................12, 16

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    402 B.R. 616 (Bankr. S.D.N.Y. 2009) ............................................................................11, 12

*Board of Educ. of the City of Chicago v. Cephalon, Inc., et al.*,
    No. 19-op-46042 (N.D. Ohio).................................................................................................4, 5

*Carrera v. Bally Total Fitness (In re Bally Total Fitness of Greater N.Y., Inc.)*,
    411 B.R. 142 (S.D.N.Y. 2009).................................................................................................13

*In re Chaparral Energy, Inc.*,
    571 B.R. 642 (Bankr. D. Del. 2017) .......................................................................................14

*In re Connaught Grp., Ltd.*,
    491 B.R. 88 (Bankr. S.D.N.Y. 2013) ......................................................................................14

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992)....................................................................................................31

*In re Ephedra Products Liability Litigation*,
    329 B.R. 1 (S.D.N.Y. 2005).........................................................................................12, 13, 32

*Erin Doyle, et. al. v. Actavis Pharma, Inc., et al.*,
    No. 1:18-op-46327 (N.D. Ohio) ...............................................................................................8

*Gentry v. Siegel*,
    668 F.3d 83 (4th Cir. 2012) .....................................................................................................20

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016).....................................................................................................23

*Jamie S. v. Milwaukee Pub. Sch.*,
    668 F.3d 481 (7th Cir. 2012) ...................................................................................................26

*Jennifer Artz, et al. v. Purdue Pharma L.P., et al.*,
    No. 1:19-op-45459 (N.D. Ohio) ...............................................................................................8

*Kaczmarek v. Int'l Business Machines Corp.*,
    186 F.R.D. 307 (S.D.N.Y. 1999) ........................................................................26

*Luciano v. Eastman Kodak Co.*,
    05-cv-6463T, 2006 WL 1455477 (W.D.N.Y. May 25, 2006) .................................26

*Lundquist v. Security Pacific Automotive Fin. Services Corp.*,
    993 F.2d 11 (2d Cir. 1993)..................................................................................25

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 2012)............................................................................30, 31

*In re Motors Liquidation Co.*,
    447 B.R. 150 (Bankr. S.D.N.Y. 2011) .................................................................32

*In re Motors Liquidation Co.*,
    591 B.R. 501 (Bankr. S.D.N.Y. 2018) ...........................................................11, 21

*In re Musicland Holding Corp.*,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007) ................................................11, 12, 14, 15

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:17-md-2804 [Dkt. No. 1829] (N.D. Ohio July 11, 2019) ...............................8

*In re Nat'l Prescription Opiate Litig.*,
    No. 17-md-02804 [MDL Dkt. No. 2691] (N.D. Ohio Sept. 30, 2019) ...................15

*In re Pacific Sunwear of Cal., Inc.*,
    No. 16-10882(LSS), 2016 WL 4250681 (Bankr. D. Del. Aug. 8, 2016)..........14, 20

*In re Petrobras Securities*,
    862 F.3d 250 (2d Cir. 2017)................................................................................25

*In re Sacred Heart Hosp. of Norristown*,
    177 B.R. 16 (Bankr. E.D. Pa. 1995) ...................................................................16

*In re Verity Health System of Cal., Inc.*,
    No. 18-bk-20151-ER, 2019 WL 2461688 (Bankr. C.D. Cal. June 11, 2019) ..................31, 32

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................26

**Statutes and Rules**

11 U.S.C. § 502......................................................................................................33

Fed. R. Civ. P. 23............................................................................................ *passim*

Fed. R. Bankr. P. 7023 .................................................................................... *passim*

Fed. R. Bankr. P. 9014 ...................................................................................................11

**Other Authorities**

Aliyya Swaby, *Texas' School Finance System is Unpopular and Complex. Here's How it Works*, TEX. TRIB. (Feb. 15, 2019), https://www.texastribune.org/ 2019/02/15/texas-school-funding-how-it-work ...........................................27

*Arizona*, FUNDED, https://web.archive.org/web/20190604215134/ http://funded.edbuild.org/state/A ...............................................................27

DEP'T OF EDUC., https://www.hawaiipublicschools.org/ ConnectWithUs/Pages/Home.aspx (last visited Jun. 16, 2020)...............................24

*Glossary*, U.S. CENSUS BUREAU, https://www.census.gov/programs-surveys/school-finances/about/glossary.html ...................................................24, 28

*Identification and Characteristics: Southwest Mississippi Regional Medical Center*, AM. HOSP. DIRECTORY, https://www.ahd.com/free_profile/250097/Southwest_ Mississippi_Regional_Medical_Center/McComb/Mississipp...............................29

*Identification and Characteristics: West Boca Medical Center*, AM. HOSP. DIRECTORY https://www.ahd.com/free_profile/100268/ West_Boca_Medical_Center/West_Boca_Raton/Florida (last updated July 3, 2020) .....................................................................................................29

NAT'L CTR. FOR EDUC. STATISTICS, https://nces.ed.gov .........................................28

*Organization and State: 2017*, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html .........................24

ROCKEFELLER INST. OF GOVERNMENT (Feb. 15, 2018), https://rockinst.org/wp-content/uploads/2018/02/2018-02-15_SchoolAidBriefFINAL.pdf .........................28

*U.S. Hospitals, 2020*, AM. HOSP. ASS'N, https://www.aha.org/statistics/fast-facts-us-hospitals ...........................................................................................23, 25

*US Hospitals*, AM. HOSP. ASS'N, https://www.aha.org/system/files/2018-01/fast-facts-us-hospitals-2017_0.pdf ...................................................................25

The (i) Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**"), (ii) Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**"), and (iii) Multi-State Governmental Entities Group (the "**MSGE Group**," and, together with the Ad Hoc Committee and the Non-Consenting States, the "**Public Claimants**"[1]), hereby submit this omnibus objection (the "**Objection**") to the *Motion by Public Schools Districts for an Order Allowing them to Proceed with a Class Proof of Claim and Certifying a Class* [Dkt. No. 1211] (the "**IPSD Motion**"), the *Hospital Claimants' Motion Pursuant to Fed. Bankr. P. 9014 and 7023 for an Order Making Fed. R. Civ. P. 23 Applicable to these Proceedings, Permitting them to file a Class Proof of Claim and Granting Related Relief* [Dkt. No. 1330] (the "**Hospital Motion**"), the *Motion of the Private Insurance Class Claimants for Leave to File Class Proofs of Claim* [Dkt. No. 1334] (the "**Private Insurance Motion**"), and the *NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants Motion for Entry of an Order Pursuant to Fed. R. Bankr. P. 9014 and 7023 Permitting them to file a Class Proof of Claim and Granting Related Relief* [Dkt. No. 1362] (the "**NAS Guardian Motion**[2]," and together with the IPSD Motion, the Hospital Motion, and the Private Insurance Motion the "**Class Certification Motions**").[3]   In support of the Objection, the Public Claimants state as follows:

### PRELIMINARY STATEMENT

1.      Nearly six months after a bar date was established in these cases and after tens of millions of dollars of estate funds were spent ensuring the widest possible notice, four separate

---

[1] The members of the Ad Hoc Committee, the Non-Consenting States, and the MSGE Group are set forth in the 2019 statements filed, respectively, at Docket Numbers 279, 296, and 409.

[2] The State of Washington has not taken a position with respect to the NAS Guardian Motion.

[3] The Public Claimants intend to address the *Motion by Cheyenne & Arapaho Tribes and Certain Other Indian Tribes Claimants Pursuant to Fed. R. Bankr. P. 9014 and 7023 to Permit the Filing of a Class Proof of Claim* [Dkt. No. 1363] by a separate pleading on or before July 20, 2020.

creditor groups now seek to upend that process by certifying four classes of creditors consisting of

a broad range of claimants – *all of whom* had time and still have time to file proofs of claim in the

bankruptcy, and *none of whom* could have reasonably relied on the potential of class certification

to avoid filing proofs of claim due at the end of this month.  Certifying these creditor classes as

proposed would, at best, disrupt these cases and vitiate the extensive, expensive, and widely-vetted

bar date process, and, at worst, give credence to claims that, by the Movants' own admissions,

likely would never be pursued by the claimants who hold them.

2.      The Public Claimants, which collectively represent nearly all states and territories,

thousands of municipalities, and certain federally recognized Native American Tribes and view

appropriate abatement programs, including care, treatment and education as part of their public

responsibility, respectfully submit that the Class Certification Motions should be denied.  There is

simply no basis – legal, factual, discretionary, or otherwise – to allow the class claims sought by

the Class Certification Motions.

3.      *First*, there is no absolute right to file a class proof of claim under the Bankruptcy

Code.  By its terms, Bankruptcy Rule 7023 does not apply automatically to proofs of claim or even

to the contested matter that might arise from a claim objection.  Although courts *may* exercise

discretion to apply Bankruptcy Rule 7023 to proofs of claims under certain limited circumstances,

courts generally elect *not* to exercise their discretion where: (1) the class was not certified pre-

petition; (2) putative class members received notice of the general bar date; and (3) class

certification would adversely affect the administration of the case.  Each of these factors is present

here, disfavoring the exercise of discretion by the Court, and requiring denial of the Class

Certification Motions.  In addition, the vast majority of the Movants' critiques of the proof of claim

process could have been resolved in connection with the *initial* establishment of the bar date in

January or in connection with the successful efforts to *extend* the time to file claims in light of the COVID-19 pandemic.  But none of the Movants raised any issues at either time, and they should not now be permitted to use their inaction as an excuse (or basis) for the filing of impermissible class claims.

4.    *Second*, the Movants have been active participants in the Chapter 11 cases, with every opportunity to advocate on behalf of their respective constituencies.  In addition to their representation on various ad hoc committees, certain of the Movants sit on the Creditors Committee[4] and each of the Movants has participated in the ongoing Mediation.  The interests of the Movants are further protected, in a very real sense, by the efforts of the Public Claimants, who are united in agreement that any plan of reorganization should implement an appropriate structure aimed at abating the ongoing opioid epidemic.  In short, this is not a case in which the interests of a marginalized class will be disregarded absent the invocation of Rule 7023.  To the contrary, the Movants' active and intimate participation in these cases, combined with the Public Claimants' focus on developing an abatement plan for the benefit of all creditors, is yet one more reason for the Court to decline to exercise its discretion to apply Rule 7023.

5.    *Finally,* even if the Court might otherwise be inclined to exercise its discretion, the Proposed Classes do not satisfy the requirements for certification under Bankruptcy Rule 7023, including the requirements of "commonality," "typicality," "predominance," and "superiority." *See* FRCP 23(a)-(b).  As an initial matter, the Proposed Classes are imprecisely and ambiguously defined.  To the extent defined, the Proposed Classes consist of claimants whose interests – and the legal theories supporting them – will often diverge, both on an inter- and intra-state level.  The

---

[4] West Boca Medical Center and its affiliates sit on the Creditors Committee and Thornton Township High School District 205 is an *ex officio* member of the Creditors Committee.  *See Second Amended Verified Statement of the Official Committee of Unsecured Creditors Pursuant to Bankruptcy Rule 2019* [Dkt. No. 1294].

need for consideration of inconsistent sets of law and fact undercuts any purported benefits or efficiencies of certifying multiple nationwide classes of this sort (which efficiencies are, in any event, served by the bankruptcy process itself). Indeed, under the Movants own proposed class definitions, many (if not all) of the adult American population would likely fall into *at least* one of the Proposed Classes. Courts both in and outside the bankruptcy context consistently deny class certification for proposed classes of this nature.

6.      Accordingly, there is simply no justification to permit a class claim for the Proposed Classes. Any of the Proposed Classes' members who wish to file individual proofs of claim are free to do so in accordance with the extended bar date.

## BACKGROUND

### A.      The Putative Class Actions

#### i.      *The IPSD Class Action*

7.      On November 20, 2019 (over two months after the Petition Date and twenty-three months after the MDL was created), counsel for the public schools bringing the IPSD Motion filed a class action in the MDL (the "**IPSD Class Action**") captioned *Board of Educ. of the City of Chicago v. Cephalon, Inc., et al.*, No. 19-op-46042 (N.D. Ohio), on behalf of "all public school districts which are independent units of government." The IPSD Class Action, which lists several of the Debtors and members of the Sackler family as "[u]nnamed [c]o-[c]onspirators," names over a dozen manufacturers, distributors, and dispensers of opioids as defendants.

8.      The IPSD Class Action seeks to recover for each member of the proposed class, based on its own circumstances:

> (1) past, present, and future costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) past, present, and future costs associated with increased healthcare and healthcare insurance; (3) past, present, and future costs regarding disability

4

payments; (4) past, present, and future costs associated with increased educational services, including but not limited to special education needs, including, but not limited to, special programs for children with opioid-related learning disabilities, or for children in need of psychological counseling due to opioid-related family crisis; (5) past, present, and future costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation; (6) past, present, and future costs associated with increased school security in all facilities of the school board district; (7) loss of tax revenue; (8) disgorgement of Defendants' unjust enrichment; (9) all costs and means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct; (10) treble damages; (11) all other costs and damages specified herein; (12) attorneys' fees, costs, and expenses of suit; (13) pre- and post- judgment interest; and (14) such other relief as the Court deems appropriate.

*See* Class Action Complaint at 206-07, *Board of Educ. of the City of Chicago v. Cephalon, Inc., et al.*, No. 19-op-46042 [Dkt. No. 1] (N.D. Ohio Nov. 20, 2019).

9.     The putative class of IPSDs (the "**IPSD Class**") was not certified prepetition. Although the IPSD Motion was originally scheduled for hearing on June 23, 2020, the IPSDs unilaterally adjourned the hearing until July 23, 2020, just one week before the extended bar date.

### ii.     The Hospital Class Action

10.     On November 30, 2017, the Hospitals filed a class action complaint in the MDL, and subsequently amended their complaint (the "**Hospitals First Amended Complaint**") on March 11, 2019.  *See Southwest Miss. Reg'l Med. Ctr., et al v. AmerisourceBergen Drug Corp.*, et al, No. 17-op-45175 [Dkt. No. 1] (N.D. Ohio Nov. 30, 2017); *Southwest Miss. Reg'l Med. Ctr., et al v. AmerisourceBergen Drug Corp.*, et al, No. 1:17-op-45175 [Dkt. No. 31] (N.D. Ohio Mar. 11, 2019).

11.     In the Hospitals First Amended Complaint, four plaintiff hospitals asserted claims against the Debtors, members of the Sackler family, and over a dozen other manufacturers, distributors, and dispensers of opioids "under federal and state RICO laws, consumer protection statutes, and the common law of nuisance, negligence, fraud, unjust enrichment, and civil conspiracy, seeking . . . compensatory damages; treble damages; punitive damages; pre-judgment

5

and post-judgment interest; cost of suit; equitable relief, including injunctive relief, and all other

relief to which they may be entitled . . ." *See* Hospitals First Amended Complaint at 1-2.

12.    The Hospitals' proposed class (the "**Hospital Class**") is defined in the Hospital

Motion to include:

> All acute care hospitals in the United States which treated, for opioid
> conditions, patients who have been prescribed prescription opioids. "Opioid
> conditions" are defined as opioid overdose; opioid addiction (including that
> of babies born opioid addicted); related mental health treatment programs;
> and any other opioid comorbidities noted in the patient's record. Excluded
> from the Class are any hospitals (1) that file their own claim, and/or (2) are
> directly or indirectly owned or operated by (a) Debtors or Debtors' affiliated
> entities, or (b) the federal government.

Hospital Motion ¶ 34. The Hospital First Amended Complaint itself appears to define the class

differently and more broadly, including: "All hospitals in the United States which treated patients

with opioid conditions" and excluding: "any hospitals directly or indirectly owned or operated by

Defendants or Defendants' affiliated entities." Hospital First Amended Complaint at 287-88.

13.    The Hospital Motion, notes, however, that for purposes of the motion and the class

proof of claim only, the Ad Hoc Group of Hospitals (as defined therein) is not included in the

Hospital Class, and that the Ad Hoc Group of Hospitals will be filing a separate combined proof

of claim. Hospital Motion at 1 n.3. It also notes that "any other hospitals that will file an individual

proof of claim also will not be included in the Class Proof of Claim." *Id.* Thus, the actual

parameters of the class cannot be ascertained at this time.

14.    The putative class of Hospitals was not certified prepetition. The Hospital Motion

was filed on July 2, 2020 and scheduled for hearing on July 23, 2020, just one week before the

extended bar date.

### iii.   The Private Insurance Plaintiff Class Action

15.     On December 27, 2019, over three months after the Petition Date, the private insurance claimants (the "**Private Insurance Plaintiffs**") filed a nationwide class action complaint that was quickly transferred to the MDL, *Hestrup v. Mallinckrodt PLC*, et al., No. 20-op-45040 (N.D. Ohio) (the "**Private Insurance Plaintiffs Complaint**") naming certain non-Debtor manufacturers, distributors, and dispensers of opioids.  The Private Insurance Plaintiffs Complaint refers to Insys Therapeutics, Inc. and the Debtors as "Related Unnamed Parties" who were at the "center of the opioid epidemic" but have not been named as defendants in light of their bankruptcy cases.  *See* Private Insurance Plaintiffs Complaint at ¶¶ 38-40.  The Private Insurance Plaintiffs generally assert claims for public nuisance, unjust enrichment, negligence, and civil conspiracy and federal claims under RICO laws and assert damages in an amount exceeding $282 billion plus interest, subject to trebling under RICO.  *See* Private Insurance Plaintiffs Complaint at 101-116.

16.     The proposed class of Private Insurance Plaintiffs (the "**Private Insurance Class**") is defined to include: "all persons (including natural persons and entities) who purchased health insurance policies in the United States from 1996 through the present, and all persons who paid for any portion of employer provided health insurance from 1996 through the present."  Private Insurance Motion ¶25.

17.     Inherently recognizing state-by-state differences in claims, the Private Insurance Plaintiffs admit that, prior to commencing the nationwide class action for which they now seek certification, the Private Insurance Plaintiffs filed 30 separate Private Insurance class actions in federal court in their respective states of residence.  *Id.*  It was only in December 2019 that the proposed nationwide class complaint was filed.

18.     The Private Insurance Class was not certified prepetition.  The Private Insurance

Motion was filed on July 2, 2020, and scheduled for a hearing on July 23, 2020, just one week

before the extended bar date.

### iv.    The NAS Guardian Class Action

19.     Prior to the Petition Date, several class and individual actions were asserted in the

MDL against the Debtors and dozens of other manufacturers and suppliers of opioids seeking relief

on behalf of children born with neonatal abstinence syndrome who were exposed to opioids in

utero (the "**NAS Children**") in the form of abatement and medical surveillance.  In July 2019, the

MDL court directed the NAS Children to move to certify classes – a step which they had not

undertaken themselves.  *See* Order, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 [Dkt.

No. 1829] (N.D. Ohio July 11, 2019) (the "**MDL**").  On October 8, 2019, the NAS Children filed

amended complaints omitting Purdue as a defendant in light of these chapter 11 cases.  *See, e.g.,*

*Erin Doyle, et. al. v. Actavis Pharma, Inc., et al.*, No. 1:18-op-46327 (N.D. Ohio) (the "**Ohio**

**Class**"); *Jennifer Artz, et al. v. Purdue Pharma L.P., et al.*, No. 1:19-op-45459 (N.D. Ohio) (the

"**National Class**").

20.     On January 7, 2020, the NAS Children moved for class certification in the MDL

for various classes of legal guardians (the "**NAS Guardians**") representing the interests of NAS

Children born after May 25, 2000, who were diagnosed with opioid-related NAS at or near birth

and whose birth mother received a prescription for opioids manufactured by one of the defendants

prior to that child's birth.  *See* Motion for Class Certification [MDL Dkt. No. 3066].  The proposed

NAS guardian class (the "**NAS Guardian Abatement Class**," and, together with the IPSD Class,

the Hospital Class, and the Private Insurance Class, the "**Proposed Classes**") has since sought

three extensions of briefing on class certification, including prior to the onset of the COVID-19

pandemic, and sought another extension as recently as July 9, 2020.  *See* Joint Motion for an

Additional 60-Day Stay of all Remaining Class Certification Briefing Deadlines [MDL Dkt. No. 3372].

21.    Separate from the MDL, however, attached to the NAS Guardian Motion is a "Proposed Purdue NAS Children's Abatement Class Complaint."  NAS Guardian Motion, Ex. A. This complaint has not previously been filed in any court.

22.    The putative National Class of NAS Guardians in the MDL was not certified prepetition, nor was the proposed NAS Guardian Abatement Class.  The NAS Guardian Motion was filed on July 9, 2020 and scheduled for hearing on July 23, 2020, just one week before the extended bar date.

**B.    The Bar Date Order**

23.    On February 3, 2020, the Court entered an order establishing June 30, 2020 as the deadline for the filing of proofs of claim in these cases.  *Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [Dkt. No. 800] (the "**Bar Date Order**").  Thereafter, the Debtors embarked on an extensive process of providing notice of the bar date to creditors, including providing actual notice to known creditors and implementing a "Supplemental Notice Plan" designed to, among other things, reach 95 percent of all adults in the United States at an average frequency of message exposure of six times and expected to cost $23 million.  *See Debtor's Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [Dkt. No. 717] at ¶¶ 17-18.  The Supplemental Notice Plan included providing notice through print ads, website traffic, television ads, social media, and radio traffic, among other forms of notice.  Bar Date Order ¶ 19.

24.     On June 3, 2020, the Court entered an order extending the bar date by an additional 30 days for all creditors in the case, with an additional extended notice plan, expected to cost $700,000 and utilize many of the same varieties of media utilized by the initial Supplemental Notice Plan.  *Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [Dkt. No. 1221] (the "**Bar Date Extension Order**").

25.     None of the Movants objected to entry of the Bar Date Order or the Bar Date Extension Order (nor did they seek a longer extension of the Bar Date).[5]

## C.     **The Mediation**

26.     On March 3, 2020, this Court entered an order appointing the Honorable Layn Phillips and Mr. Kenneth Feinberg as co-mediators to mediate disputes between the Non-Federal Public Claimants, on the one hand, and the Private Claimants (collectively with the Non-Federal Public Claimants, the "**Mediation Parties**"), on the other, as to the allocation of value/proceeds available from the Debtors' estates (the "**Mediation**").  *Order Appointing Mediators* [Dkt. No. 895] (the "**Mediation Order**").

27.     The Mediation Parties include, among others, each of the Public Claimants, the Ad Hoc Group of Hospitals, the Ad Hoc Committee of NAS Babies, and the Insurance Purchasers. The IPSDs are not formal Mediation Parties, but the Debtors, the Ad Hoc Committee, the Non-Consenting States Group, the Creditors' Committee, and three IPSD representatives agreed to a stipulation (the "**Stipulation**"), entered by the Court on April 21, 2020 [Dkt. No 1073], pursuant to which the IPSDs are treated as "public claimants" for purposes of the Mediation.  Certain Public Claimants also agreed, as part of the Stipulation, to "reasonably coordinate with each other to the

---

[5] The NAS Guardians group did file a limited reservation of rights to the initial bar date motion, but consented to the creation of the bar date.  *Conditional Consent with Reservation of Rights of the NAS Children Ad Hoc Committee to Motion of Debtors for Entry of Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving Proof of Claim Forms and (III) Approving the Form and Manner Thereof* [Dkt. No. 754].

extent practicable, which may include sharing expert reports, in each case subject to appropriate protections for confidentiality and privilege, in connection with any determination of the magnitude of the overall public-side claims in connection with the mediation." Stipulation ¶ 5(e).

28.    Since the Court's entry of the Mediation Order and continuing through today, the Mediation Parties – including each of the Public Claimant groups – have been actively engaged in mediation to determine how to allocate value from the Debtors' estates among creditors. The Movants, including the IPSDs, have been closely involved in this process and have had the opportunity to present their claims, concerns, and goals to the Mediators, the Public Claimants, and the other Mediation Parties.

## OBJECTION

29.    The right to file a class claim in bankruptcy is "not absolute." *E.g. In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 619 (Bankr. S.D.N.Y. 2009); *In re Musicland Holding Corp.*, 362 B.R. 644, 650 (Bankr. S.D.N.Y. 2007) (internal citations omitted). For a class proof of claim to be permitted in a bankruptcy, the bankruptcy judge must first exercise discretion under Bankruptcy Rule 9014 to apply FRCP 23. *Musicland*, 362 B.R. at 650 ("Federal Civil Rule 23 does not apply automatically to contested matters and the decision to extend its application is committed to the Court's discretion." (internal citations omitted)). To properly put the question of certification before the bankruptcy court, the class proponent must "[1] make a motion to extend the application of [FRCP] 23 to some contested matter, [2] satisfy the requirements of [FRCP] 23, and [3] show that the benefits derived from the use of the class claim device are consistent with the goals of bankruptcy." *In re Motors Liquidation Co.*, 591 B.R. 501, 522, 523 n.23 (Bankr. S.D.N.Y. 2018) (internal citations omitted); *see also Bally*, 402 B.R. at 620; *Musicland*, 362 B.R. at 651.

30.    Courts generally do *not* exercise their discretion to consider certifying a class for filing a proof of claim under Bankruptcy Rule 7023 where: (1) the class was not certified pre-petition; (2) putative class members received notice of the general bar date; and (3) class certification would adversely affect the administration of the case. *Musicland*, 362 B.R. at 654. The first two of these factors are "critical." *Id.* at 655.

31.    Courts resist extending Bankruptcy Rule 7023 to class claims, in important part, because bankruptcies inherently perform many of the functions of a class action – providing notice to potential claimants, consolidating claims in a single forum and allowing for the efficient litigation of common issues. *See In re Ephedra Products Liability Litigation*, 329 B.R. 1, 5 (S.D.N.Y. 2005). Moreover, class actions disrupt the uniform application of bankruptcy bar dates by preserving the claims of class members who otherwise might not have asserted timely claims – a benefit that is not available to similarly situated creditors outside of the class. Timely filed claims are effectively diluted, which implicates due process concerns. *See Bailey v. Jamesway Corp. (In re Jamesway Corp.)*, No. 95 B 44821 (JLG), 1997 WL 327105, at *5 (Bankr. S.D.N.Y. June 12, 1997) ("[An] action which expands the bar date for notified creditors may . . . violate due process"). Further, because class litigation proceeds much slower than the expedited pace of a bankruptcy case, a class claim potentially may siphon estate resources and disrupt the orderly progression of the reorganization. "It follows that a court sitting in bankruptcy may decline to apply [FRCP] 23 if doing so would . . . 'gum up the works' of distributing the estate." *Ephedra*, 329 B.R. at 5 (quoting *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 376 (Bankr. S.D.N.Y. 1997)).

32.    In the atypical situation where discretion to consider class certification is exercised by a Bankruptcy Court, a putative class must then *also* satisfy (a) the four threshold requirements under FRCP 23(a) to achieve class certification, typically known as "numerosity," "commonality,"

12

"typicality," and "representation", and (b) the requirements of FRCP 23(b) (discussed further below), including, as applicable, "predominance" and "superiority." These requirements must be considered in the context of a bankruptcy case already tailored to expedite the processing of large numbers of claims. Indeed, a "bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action" and renders class-based claims "less desirable in bankruptcy than in ordinary civil litigation." *Ephedra*, 329 B.R. at 5 (quoting *In re American Reserve Corp.*, 840 F.2d 487, 493 (7th Cir. 1988)).

33.    Under the circumstances of this case, where none of the Proposed Classes have been certified prepetition and exercising discretion could upend the carefully implemented bankruptcy claim filing and reconciliation process, no class proofs of claim are warranted. All Class Certification Motions should be denied.

## I.    THE COURT SHOULD NOT EXERCISE DISCRETION TO APPLY BANKRUPTCY RULE 7023

34.    Here, none of the Proposed Classes was certified pre-petition, members of the Proposed Classes received sufficient notice of the bar date, and certifying the Proposed Classes would adversely affect the administration of the estates. Thus, the Court should not exercise its discretion to apply Bankruptcy Rule 7023.

### A.    The Proposed Classes Were Not Certified Pre-Petition

35.    Bankruptcy courts generally give substantial weight to whether a class was certified prepetition in evaluating whether to exercise their discretion to allow a Bankruptcy Rule 7023 motion. *See, e.g.*, *Carrera v. Bally Total Fitness (In re Bally Total Fitness of Greater N.Y., Inc.)*, 411 B.R. 142, 145 (S.D.N.Y. 2009) (upholding a bankruptcy court's decision to deny class certification, in part, because the class was not certified pre-petition); *In re Pacific Sunwear of Cal., Inc.*, No. 16-10882(LSS), 2016 WL 4250681, at *15 (Bankr. D. Del. Aug. 8, 2016) (declining

to allow class certification for portion of class that was not certified prepetition); *Musicland Holding Corp.*, 362 B.R. at 654. Here, because no Movant obtained class certification before the bankruptcy, this factor weighs heavily against certifying the Proposed Classes.

36.     The Movants' arguments to the contrary are unavailing. Certain of the Movants rely on cases where claimants were injured immediately before the bankruptcy filing, and pre-petition class certification was therefore not feasible. *See* IPSD Motion ¶ 38; Private Insurance Motion ¶ 65; Hospital Motion ¶ 28 (each citing *In re MF Global, Inc.*, 512 B.R. 757, 764 (Bankr. S.D.N.Y. 2014) and *In re Connaught Grp., Ltd.*, 491 B.R. 88, 98 (Bankr. S.D.N.Y. 2013)). Here, the situation is different. It is beyond dispute that the injuries alleged by each of the Proposed Classes occurred well before the Petition Date. Because class members could have, at a minimum, initiated suits against Purdue significantly in advance of the bankruptcy filing, they have no basis for the special treatment a few courts have given where pre-bankruptcy class certification was not feasible.[6]

37.     Several of the Movants also assert that a stay of motion practice in the MDL prevented them from obtaining pre-petition class certification. *See* IPSD Motion ¶ 38; Private Insurance Motion ¶ 65; Hospital Motion ¶ 27. Even if true, however, the reasons the classes were not certified is not relevant. The fact is, they were not certified, and in the absence of certification, no member of the putative classes could have reasonably expected that a class representative would have taken responsibility for filing a proof of claim on its behalf in these cases. *See, e.g.*, *Musicland*, 362 B.R. at 654 (noting that, in the absence of prepetition certification, "class members

---

[6] The Movants' reliance on *In re Chaparral Energy, Inc.*, 571 B.R. 642, 646 (Bankr. D. Del. 2017) is also misplaced. There, though the class had not been certified pre-petition, it was certified by the non-bankruptcy tribunal during the post-petition period, in advance of the class claim objection. In addition, the bankruptcy court found that (i) not all putative class members had been served with notice of the bar date, and (ii) certification would not adversely affect the administration of the estate. Here, by contrast, the noticing program was extensive and class claims would significantly interfere with the administration of the estate.

lack[] 'reasonable expectation' that they did not have to comply with the bar date") (citation omitted). In addition, the delays and inefficiencies associated with according class treatment to an uncertified class are the same regardless of the reason the class was not certified prepetition.

38.    Finally, the Movants' assertions that they were unable to obtain certification due to a stay in the MDL is in tension with the NAS Guardians' acknowledgment that they were able to obtain permission to seek class certification notwithstanding that stay. *See* NAS Guardians Motion ¶¶ 4, 5, 45. Indeed, the MDL Case Management Order cited by the NAS Guardians says only that no party can file a motion "absent further Order of this Court," not that such motions are per se disallowed. *See* NAS Guardians Motion ¶ 3 n.12 (citing MDL Case Management Order).[7]

### B.    All Claimants Received Notice of the Bar Date

39.    The second factor – whether members of a putative class received (or will receive) notice of the bar date – also weighs strongly against the Movants' positions. Indeed, counsel for the Proposed Classes and each of the proposed representatives for the putative classes received actual or constructive notice. Presumably, putative class members were afforded direct notice through their putative class counsel and/or class representatives.

40.    Further, notice of the bar date in this case has been, in the Court's words, "extraordinary," undermining any argument the Movants may premise on lack of notice. *See* Hr'g Tr., June 3, 2020 at 88:15-89:4 ("[T]he fact that under the Supreme Court and Second Circuit case

---

[7] The NAS Guardians assert that determination of their motion for class certification in the MDL (which does not name Purdue as a defendant) has been delayed due to COVID-19. NAS Guardians Motion at Ex. A, ¶ 87. It is important to note, however, that the NAS Guardians began seeking extensions of briefing on their class certification motion in the MDL as early as September 30, 2019, before any shutdowns and social-distancing measures were implemented. Amended Joint Proposed Scheduling Order and Positions on Scheduling, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804 [MDL Dkt. No. 2691] (N.D. Ohio Sept. 30, 2019) (proposing extension for filing of motion for class certification); *see also* NAS Baby Plaintiffs' Status Report in Response to this Court's Bench Order of August 7, 2019, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-02804 [MDL Dkt. No. 2489] (N.D. Ohio Aug. 19, 2019) (requesting additional time in connection with class certification process). The NAS Guardians filed their third extension of briefing on July 9, 2020, seeking an additional 60-day stay of all remaining class certification deadlines, raising questions to the NAS Guardians' confidence in the merits of their motion.

law on notice, much of that notice – most of that notice would need to be not individualized because the Debtors do not have readily ascertainable data to provide individual notices . . . *The notice here is indeed extraordinary*.") (emphasis added).  Each member of the Proposed Classes is – at a bare minimum – on constructive notice of the bar date through the Debtors' widespread noticing program that included publication notice, media notices, advertisements, and other methods of ensuring all potential creditors, nationwide, were and are aware of the bar date.  The Movants who intentionally *excluded* the Debtors from the complaints filed post-petition were obviously on notice of the bankruptcy, as were those Movants who filed amended complaints to exclude the Debtors post-petition.  Where members of a putative class have received actual or constructive notice of the bar date, courts decline to permit a class proof of claim due to a lack of prejudice to putative class members.  *See In re Sacred Heart Hosp. of Norristown*, 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995) ("[I]f the putative unnamed class members have clearly received actual or constructive notice of the bankruptcy case and the bar date, denial of the implementation of the class proof of claim device appears advisable."); *see also In re Jamesway Corp.*, No. 95 B. 44821 (JLG), 1997 WL 327105, at *9-10 (Bankr. S.D.N.Y. June 12, 1997).

41.     Significantly, the Movants had ample opportunity to raise any concerns about notice, including in connection with the Debtors' original bar date motion as well as the recent motion to extend the bar date.  They did not do so.  In contrast, numerous stakeholders filed papers and appeared at the June 3 hearing to debate the merits (and extent) of the proposed extension.  At the time of the hearing on the bar date extension, it was evident that the Mediation would not likely conclude prior to the bar date even with the proposed 30-day extension.  Yet, the Proposed Classes neither objected to nor sought a longer extension of the bar date (though some creditors, including the Non-Consenting States, sought a 90-day extension).  If the Proposed Classes truly believed

that the Supplemental Notice Plan or the new Extended Notice Plan was not providing adequate notice to the various claimants in these chapter 11 cases, the bar date extension hearing (and/or the original bar date hearing) was the appropriate opportunity to raise these concerns.

42.    No doubt aware of the unprecedented breadth of the notice given in these cases, the Movants raise various (and in some instances, contradictory) arguments seeking to discount its relevance, but none are persuasive:

- The class claim mechanism is not designed to create claims where none exist.  The IPSDs and the Hospitals acknowledge the breadth of the notice provided, but contend that class certification is nevertheless appropriate to preserve the claims of parties who would not otherwise choose to assert them or might not even recognize that they have a claim.  *See* IPSD Motion ¶¶ 26-32; Hospital Motion ¶ 29.  This is inappropriate.  Class claims are proper when they facilitate an orderly claims process, not as a substitute for parties who choose not to assert claims (whatever the reason) or do not believe that they hold them.

- Critiques of the Bar Date Order and notice program are untimely.  The Private Insurance Plaintiffs contend that it is unlikely that putative class members would "all be reached by or understand" the notice of the bar date.  Private Insurance Motion ¶ 42.  However, any purported issues with the bar date reaching or being understood by claimants should have been raised at the hearing on the bar date itself, where the notice plan was discussed at length.

- The impact of COVID-19 has already been specifically addressed.  The Hospitals concede that the Debtors cast a "wide net" with respect to notice of the bar date and that the Hospitals likely received *actual notice*, but contend that many Hospitals may not file a proof of claim in light of the COVID-19 crisis.  Hospital Motion ¶¶ 29-30.  However, this Court held a hearing on the bar date extension *specifically* to consider whether COVID-19 rendered the June 30, 2020 bar date impracticable.  That hearing would have been the appropriate time for the Hospitals to be heard on their challenges with the bar date in light of COVID-19.

- Class certification is not a tool to avoid litigation of late-filed claims.  The Private Insurance Plaintiffs argue that certifying a class would minimize the number of late-filed claims by ratepayers who did not learn of or understand the bar date in time.  Private Insurance Motion ¶¶ 42, 54.  To be sure, the absence of a bar date would in every case cure the problem of late-filed claims – but that is hardly a reason not to impose one.  Late-filed claims can be addressed if and when they are filed.

- The number of claims filed to date is not indicative of a failure of notice.  The NAS Guardians speculate that bar date notice did not reach members of the NAS Class, citing the fact that there are presently under 500 proof of claim forms filed on behalf

17

of NAS Children (out of an alleged 300,000 to 500,000 children born with NAS) compared with what they allege are nearly 100,000 proof of claim forms filed in personal injury cases. NAS Guardians Motion ¶¶ 11, 26. The NAS Guardians, however, provide no evidence of a causal connection between the notice provided and the number of proofs of claim filed. They have likewise failed to establish any relationship or correlation between the ratio of proofs of claim filed on behalf of NAS Children compared to the estimated number of NAS Children and the ratio of the number of proofs of claims filed by alleged personal injury victims and the total number of those alleged victims. The alleged disparity between total alleged personal injury claims and NAS children claims may be attributable to factors other than a failure of notice. Further this argument is premature given that, as of the date of the NAS Guardian Motion, some three weeks remained before the bar date and it is often the case that claimants file proofs of claim at or near the deadline.

43. The overall bar date process (including the Supplemental Notice Plan and the Extended Notice Plan), is on track to cost the Debtors over $23.7 million. *Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 501 and Fed. R. Bankr. P. 2002 and 3003(c)(3) for Entry of an Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [Dkt. No. 1178] at ¶ 28. Allowing the four Proposed Classes to assert class claims would obviate the need for a substantial portion of the Debtors overall claimants to file claims, and defeat the purpose of the $23 million Supplemental Notice Plan and the $700,000 Extended Notice Plan – i.e., providing widespread notice to ensure that all claimants who wish to file claims are able to do so. The Public Claimants submit that even if this Court otherwise found that the Proposed Classes met their burden to file class claims, class claims are not necessary in light of the expansive noticing program.[8]

### C.    Class Certification Will Adversely Impact the Administration of the Estate

44. Class certification will adversely impact the administration of these cases in several respects. First, the burden and costs imposed by the Class Certification Motions are already

---

[8] Moreover, according to the Movants (and without taking a position on the validity of any of the claims they assert), the claims of their putative class members are allegedly substantial – further distinguishing the claims of putative class members from a typical consumer case where individual claimants' claims may be economically irrational to pursue absent class action procedures.

substantial, and will only grow. While the threshold question of whether this Court should exercise

its discretion to apply Rule 7023 can and should be resolved on the pleadings against the Movants,

an analysis of the Rule 23(a) and (b) factors themselves is inherently factual and may require an

evidentiary hearing (assuming the Court does not find the allegations in the Motions insufficient

and unpersuasive on their face). The estates should not be forced to bear this burden when each

of the affected claimants could instead choose to participate in these cases through the simple and

inexpensive expedient of merely filing a proof of claim.[9]

45.    Second, exercising discretion to consider the Movants' requests for class

certification could open the floodgates for other subsets of creditors who, like the Proposed

Classes, received actual or constructive notice of the bar date through the Debtors' intentionally

broad and extensive noticing program and who have received additional time to file proofs of claim

as a result of the recent 30-day bar date extension. While the extension was precipitated by the

COVID-19 pandemic, the extension is not so limited. Members of the putative classes have had

the time and ability to file individual claims, and they should do so. All told, they will have had

178 days to file proofs of claim – more time than that provided in many cases. Moreover, members

of the Proposed Classes who timely filed proof of claims will be disadvantaged in that they would

now be responsible for monitoring the class proceedings in determining whether to "opt out" of

the class, and may lose control of their claims that they diligently filed.

46.    Finally, allowing class claims runs afoul of this Court's direction that, even in

instances where consolidated claims are permitted by the Bar Date Order, claimants should submit

individualized information. *See* Hr'g Tr., Jan 24, 2020 at 39:7-39:15 ("The point I want to make

---

[9] It also goes without saying that the estates should not be asked to bear the costs of the attorneys' fees of proposed class counsel, who, rather than seeking certification, could simply advise their clients to file proofs of claim.

19

sure is because the key reason for this relief is for the Debtors and the other parties-in-interest in the case to have a means to analyze who has what claims.  And so, I'm perfectly fine with having a consolidated claim, so you don't have to have 450 filings, but that claim should attach specific information as to each claim within that consolidated claim . . . .").  Class claims inherently undercut this Court's stated preference of having a "means to analyze who has what claims."  *Id.*

47.      In opposition to these considerations, the Hospitals and the NAS Guardians focus principally on the timeliness of their class certifications motions in arguing that grant of the Motions will not interfere with the efficient administration of the estate.  Hospital Motion ¶¶ 22-26; NAS Guardian Motion ¶¶ 40-43.  Similarly, the Private Insurance Plaintiffs contend that this case is in its "infancy."  Private Insurance Motion ¶ 64.  However, even leaving aside the absurdity of the statement that the cases are in their infancy, the timeliness of a motion is the bare minimum standard for its grant, and courts have frequently denied class certification motions notwithstanding their timeliness.  *See, e.g.*, *Gentry v. Siegel*, 668 F.3d 83, 92, 94 (4th Cir. 2012) (finding that the claimants motion was timely but upholding the bankruptcy court's decision to not permit a class proof of claim);[10] *In re Pacific Sunwear of Cal., Inc.*, No. 16-10882 (LSS), 2016 WL 4250681, at *14-15 (Bankr. D. Del. Aug. 8, 2016) (specifically finding that class proof of claim was filed in a timely manner, but nevertheless declining to apply FRCP 23).  Moreover, while a motion for an eve-of-bar-date hearing may *technically* be considered timely, this factor is much less compelling when the filing comes nearly six months *after* the establishment of the bar date.  And it remains obvious, with just a week until the extended bar date, that no purported class

---

[10] Certain Movants erroneously cite *Gentry* as an example of a class claim having been *allowed* (Hospital Motion ¶ 28; NAS Guardians Motion ¶ 33) when it in fact held the opposite.  *Gentry v. Siegel*, 668 F.3d 83, 94 (4th Cir. 2012) ("[T]he [bankruptcy] court could discern no substantial benefit in allowing the claimants to proceed through a class action process in this case, and we find no reason to find this to be an abuse of discretion.").

member could plausibly contend it had any reasonable expectation that someone else would be filing a proof of claim on its behalf.

### D.      Class Claims are Generally Disfavored in Bankruptcy

48.      Bankruptcy, by its very nature, provides *more* procedural advantages than a class action. Creditors do not need to hire a lawyer to file a proof of claim and can participate in estate distributions at virtually no cost. *Motors Liquidation*, 591 B.R. at 521-22 (quoting *Musicland*, 362 B.R. at 650 n.8). This is especially true in this case. The Bar Date Order includes several mechanisms that make asserting a claim even more streamlined and straightforward. For example, claimants here can (i) assert contingent, unliquidated claims on a standardized form that does not require consulting with counsel, (ii) file consolidated claims on behalf of multiple similarly situated parties-in-interest, subject to obtaining authority to assert that consolidated claim from the individual claimants, (iii) amend proofs of claim after they are filed, and (iv) file proofs of claim electronically. *See* Bar Date Order at ¶¶ 2, 7, 11. As an additional safeguard to ensure that all potential claimants can file claims with relatively little burden, "supporting documentation is not an absolute requirement" for filing a proof of claim. *See* Hr'g Tr., June 3, 2020 at 37:4-37:11.[11]

---

[11] The Private Insurance Plaintiffs assert that the Debtors have already acknowledged the "legitimacy" of class claims through their request for approval of a stipulation with certain Canadian litigation claimants. However, the instant Motions differ from the Canadian stipulation in material respects. First, the Canadian class was certified on April 15, 2016 – well in advance of the Petition Date – for settlement purposes. Moreover, CAD $20 million in settlement payments was deposited into a trust for the benefit of certain parties to the settlement agreement in advance of the Petition Date (though the propriety of that settlement is being challenged by certain Canadian governmental entities). *Objection of Her Majesty the Queen in Right of the Province of British Columbia to Presentment of Stipulation and Order Permitting the Filing of a Class Proof of Claim Solely for Administrative Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Litigation* [Dkt. No. 1369]. Further, the stipulation provides that Canadian plaintiffs may file a class proof of claim solely to implement a pre-petition settlement agreement. If the settlement agreement does not receive the requisite authorization in the Canadian courts, the stipulation provides that the class claim is void and withdrawn, and Canadian plaintiffs must rely on individual claims filed *before the current bar date.*

### E.    The Interests of Putative Class Members are Adequately Represented

49.    Finally, class certification is not needed (and therefore no exercise of discretion is warranted) to assure that any compensable harm suffered by claimants as a result of the Debtors' conduct is being considered and appropriately addressed.  Each of the Movants is represented on one ad hoc committee or another in these cases; certain of the Movants are members of the Creditors' Committee; and three of the four Movants are Mediation Parties, with the fourth participating in the Mediation under the terms of the Stipulation.

50.    In addition, the IPSDs, the Hospitals, and NAS Children, have each indicated that the majority of their claims are prospective claims for abatement.  IPSD Motion ¶ 24; Hospital Motion ¶ 5; NAS Guardian Motion at 1 n.4.  The Public Claimants are focused on these issues and, consistent with the Court's admonitions,[12] have united in their efforts to implement a model for this case that will advance abating the opioid crisis.  The Public Claimants are keenly aware that an effective abatement model must implement an overarching, forward-looking structure that provides funding to numerous programs throughout the country, including in areas where the Proposed Class claimants are located.  A class proof of claim to assert claims based on past damages will not provide any recovery that will meaningfully benefit any one class member nor will it further the Court's directive to abate the opioid crisis.[13]

---

[12] *See, e.g.*, Hr'g Tr., Nov. 19, 2019 at 165:3-165:14 ("I continue to believe that the states play a major role in that process.  The role I'm envisioning for them is not one where they say we get everything.  I think that should be clear and I think it is clear to them.  But, rather, where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state."); Hr'g Tr., Oct. 11, 2019 at 175:24-176:6 ("I also think, and again, I didn't say this lightly, that my hope in the allocation process is that there would be an understanding between the states and the municipalities and localities throughout the whole process that subject to general guidelines on how the money should be used, specific ways to use it would be left up to the states and the municipalities, with guidance from the states primarily.").

[13] The utility of the Proposed Classes is further undermined here, where there is clear overlap between certain of the class claims and the Public Claimants' claims.  For example, the Hospital Motion's proposed class appears to include 965 state and local hospitals, as well as certain Hospital districts or authorities, which are governmental entities.  *Fast Facts on U.S. Hospitals, 2020*, AM. HOSP. ASS'N, https://www.aha.org/statistics/fast-facts-us-hospitals (last visited July 13, 2020).  This simultaneously highlights the lack of commonality among putative class members within the

51.     Under these circumstances, the overall needs of the claimants in the Proposed

Classes are well represented in these cases, militating strongly against the need for class treatment.

## II.    THE PROPOSED CLASSES FAIL TO SATISFY THE REQUIREMENTS OF FRCP 23

52.     The Court should also deny the Class Certification Motions because, even if

discretion is exercised, the Movants, who bear the burden of proof,[14] have not shown that the

Proposed Classes meet the requirements of FRCP 23.

### A.    The Proposed Classes Are Not Sufficiently Defined

53.     As an initial matter, certain of the Proposed Classes are not sufficiently defined –

or are defined too broadly – and cannot be certified on that basis.

#### i.    The IPSD Class is Vaguely Defined

54.     The IPSD Motion seeks to certify a class of "all public school districts nationwide

that are independent governmental entities," (IPSD Motion at 29) but does not clearly define what

is meant by that term.  The Census Bureau (whose data is referenced in the IPSD Motion) describes

"independent" schools as "organized local entities providing public elementary, secondary,

special, and vocational-technical education, which, under the law, have sufficient administrative

and fiscal autonomy to qualify as governments," and "dependent" schools as ones that "lack

sufficient autonomy to be counted as separate governments and are classified as dependent

agencies of some other government – a county, municipality, township, or state government."

---

Hospital Class, as well as the fact that the claims of such creditors – if any – are already represented by the Public
Claimants.  Likewise, the Private Insurance Plaintiffs, in attempting to demonstrate the legitimacy of their claims,
admit that they have overlap with claims asserted by certain states, e.g., New York.  Private Insurance Motion at ¶ 35.
Additionally, both the NAS Guardians and the IPSDs seek to certify classes of creditors that appear to address the
claims of NAS Children – these conflicting and potentially overlapping proposed classes and class definitions strongly
undermines their legitimacy as a "class" in the bankruptcy proceedings.

[14] *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 538 (2d Cir. 2016) ("[The plaintiff] bore the burden of showing
. . . proposed class satisfied [the FRCP] requirements of: (1) numerosity; (2) commonality; (3) typicality; and (4)
adequacy of representation").

*Glossary*, U.S. CENSUS BUREAU, https://www.census.gov/programs-surveys/school-finances/about/glossary.html (last visited July 16, 2020).  The IPSDs do not indicate whether they are adopting the Census Bureau's division between "independent" and "dependent," nor attempt to explain how claimants, parties, or the Court should distinguish between the two.

55.    The distinction between independent and dependent school districts is critical in states such as North Carolina and Virginia, where the Census Bureau categorizes all public school districts as "dependent," and potentially *no* school districts in those states would be included in the IPSDs' proposed class.  *2017 Census of Governments – Organization*, *Table 9. Public School Systems by Type of Organization and State: 2017*, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html (last visited July 16, 2020).  Similarly, it is unclear how the proposed class definition would apply to Hawaii where a single state agency oversees all public schools.  *See Connect with Us*, HAW. ST. DEP'T OF EDUC., https://www.hawaiipublicschools.org/ConnectWithUs/Pages/Home.aspx (last visited Jun. 16, 2020) ("The Hawaii State Department of Education is the only statewide public school district in the country.").  Without a clearly defined class, the IPSDs cannot demonstrate that they satisfy FRCP 23.

### ii.    The Private Insurance Plaintiff Class is Overbroad

56.    The Private Insurance Plaintiffs include an incredibly broad definition of their proposed class: "all persons (including natural persons and entities) who purchased health insurance policies in the United States from 1996 through the present, and all persons who paid for any portion of employer provided health insurance from 1996 through the present."  Private Insurance Motion ¶ 25.  This definition encompasses a vast majority of adult Americans.  The Private Insurance Plaintiffs alone filed 30 separate class actions in their respective states.  *Id.* Classes defined in such a broad manner are routinely denied class certification under Rule 23.

24

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (noting that portions of FRCP 23 are designed to "block[] unwarranted or overbroad class definitions" and finding class definition too unwieldy to satisfy FRCP 23); *Lundquist v. Security Pacific Automotive Fin. Services Corp.*, 993 F.2d 11, 14 (2d Cir. 1993) ("We conclude that the district court did not abuse its discretion in finding that [the plaintiff] defined the class too broadly to meet the (a)(2) commonality and the (a)(3) typicality requirements."); *see also In re Petrobras Securities*, 862 F.3d 250, 264-65 (2d Cir. 2017) (discussing the implied "ascertainability" requirement of FRCP 23 which requires that "a class be defined using objective criteria that establish a membership *with definite boundaries*" (emphasis added)). As in those cases, there is similarly no rationale for allowing a class claim that is defined so broadly in these bankruptcy cases.

### iii.    *The Hospital Class is Vaguely Defined*

57.    Finally, the Hospitals seek to certify a class of all "acute care hospitals in the United States, which treated, for opioid conditions, patients who have been prescribed prescription opioids." Hospital Motion ¶ 25. Yet, the Hospitals do not define an "acute care hospital" or identify the number of hospitals that would be included in the proposed Hospital Class. While the Hospitals note that there are approximately 6,210 hospitals in the United States (Hospital Motion at ¶ 3 n.6) only a certain number of those 6,210 hospitals are acute care hospitals, and the number of acute care hospitals varies from year to year. For instance, the 2020 version of the American Hospitals Association indicates there are 5,198 acute care hospitals in the United States (a number that includes 965 state and local government hospitals). *Fast Facts on U.S. Hospitals, 2020*, Am. Hosp. Ass'n, https://www.aha.org/statistics/fast-facts-us-hospitals (last visited July 16, 2020). However, in the 2017 edition of the American Hospital Association study, the number of acute care hospitals was only 4,862. *Fast Facts on US Hospitals*, Am. Hosp. Ass'n, https://www.aha.org/system/files/2018-01/fast-facts-us-hospitals-2017_0.pdf (last visited July 16,

2020).  The Hospitals do not set forth any criteria to evaluate what Hospitals would be included in their proposed class nor do they provide guidance as to what number of claimants would be included in their proposed class, but they certainly cannot be proposing to file a claim on behalf of 6,210 Hospitals.[15]

### B.    The Proposed Classes Lack Commonality

58.    The Proposed Classes cannot demonstrate that their claims share common questions of law and facts as required by the "commonality" requirement of FRCP 23(a)(2).  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).  Many of the Proposed Classes' claims turn on questions of state law, which can vary significantly among jurisdictions.  These differences undercut any alleged "commonality" among purported class claims; superficially common questions (e.g., suffering violations of the same law) are not enough.[16]  *Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d 481, 497 (7th Cir. 2012) ("[S]uperficial common questions—like whether each class member . . . suffered a violation of the same provision of law—are not enough. . . . Rather, [c]ommonality requires the plaintiffs to demonstrate that the class members have suffered the same injury." (internal quotations omitted)); *Luciano v. Eastman Kodak Co.*, 05-cv-6463T, 2006 WL 1455477, at *3 (W.D.N.Y. May 25, 2006) ("Because adjudication of these claims would require the interpretation and application of several different laws of several different states and territories, I find that plaintiff has failed to establish that the state . . . claims of the purported class are common among the class.") (citing *Kaczmarek v. Int'l Business Machines Corp.*, 186 F.R.D. 307, 312-13 (S.D.N.Y. 1999)); *Kaczmarek*, 186 F.R.D. at 312-13 ("The prospect of determining the law of all

---

[15] The Hospitals acknowledge that their class will exclude members of the Ad Hoc Group of Hospitals and Hospitals that file claims in their individual capacity. They do not, however, exclude governmentally-owned Hospitals, though they cannot be purporting to file claims on their behalf, either.

[16] And even if the Proposed Classes *did* meet the bare minimum for "commonality" under FRCP 23(a) – which they do not – the differences between and among class members described in detail in this section clearly doom those classes' certification under FRCP 23(b)(3) for lack of predominance.

fifty states and then applying the materially different laws that exist . . . would make this class

action too complicated and unmanageable."); *see also Am. Honda Motor Co., Inc.,* 666 F.3d 581

(9th Cir. 2012) (vacating class certification ruling because differences between California law and

other jurisdictions were material and class members' claims were governed by consumer

protection laws of their own jurisdictions).

### i.    The IPSDs Fail the Commonality Test

59.    IPSDs have different relationships and funding structures with their respective state

and local governments, and these inter- and intra-state differences will require the sort of

individualized analyses and assessments that undermine the efficacy of the class action construct.

60.    By way of example:

- Arizona generally uses a student-based funding formula and assigns the costs of education of a student without special needs (the "base amount," which was $3,683.27 for FY2018) and adjusts for the additional costs of education for certain categories of students by applying multipliers to the base amount. *Arizona,* FUNDED, https://web.archive.org/web/20190604215134/ http://funded.edbuild.org/state/AZ (last visited July 16, 2020). Further, Arizona expects districts to contribute revenue to fund public schools, the amount of which is based on property values and tax rates (which vary based upon the level that they serve). *Id.*

- Texas has implemented a system whereby the state guarantees every school district a certain amount of funding per student to meet each student's educational needs. *See, e.g.*, Aliyya Swaby, *Texas' School Finance System is Unpopular and Complex. Here's How it Works,* TEX. TRIB. (Feb. 15, 2019), https://www.texastribune.org/ 2019/02/15/texas-school-funding-how-it-works. School districts tax their homes and businesses to raise the amount of money the State of Texas determines is needed; if they raise more than the necessary amount, the state "recaptures" the excess money. *Id.* For schools in districts that cannot raise enough tax revenue to satisfy their students' needs, the State provides them with additional funding. *Id.* Thus, funding for IPSDs in Texas clearly differ from other States (that do not use this type of funding mechanic), but each IPSD also differs from others *within* the State of Texas.

61.    Differences in funding also exist between districts within states, further

complicating this issue. For example, according to 2015-2016 data, New Mexico has ten

"independent" school districts – *i.e.*, school district governments organized under local entities, which provide elementary, secondary, special, and vocational education, and, have adequate administrative and fiscal authority to qualify as governments – and there is variation in the apportionment of state, local and federal funding among these districts (with the state funding ranging between 29 percent and 79 percent, local funding ranging between 9 percent and 34 percent, and federal funding ranging between 11 percent and 37 percent).  NAT'L CTR. FOR EDUC. STATISTICS, https://nces.ed.gov (last visited, Jun. 15, 2020); *see also Glossary*, U.S. CENSUS BUREAU,  https://www.census.gov/programs-surveys/school-finances/about/glossary.html  (last visited July 15, 2020) (defining "independent" school districts).  In New York, funding school districts is largely dependent on each community's relative wealth.  Nearly 42 percent of public school funding comes from New York State, and the remainder comes from local property taxes and federal aid, resulting in significant variations in funding among districts.  Jim Malatras, Young Joo Park & Urska Klancnik, *Does Education Aid Flow to the Schools that Need it the Most?*, ROCKEFELLER INST. OF GOVERNMENT (Feb. 15, 2018), https://rockinst.org/wp-content/uploads/2018/02/2018-02-15_SchoolAidBriefFINAL.pdf.

62.    Finally, in addition to these factual differences, the claims of the IPSDs, to the extent they rely on state common law, by definition lack a common legal basis.  It is notable that the named class representatives are also unlikely to fairly and adequately represent the interests of the class of IPSDs.  In the class proof of claim they seek authority to file *now*, the IPSDs propose to forgo most of the alleged class-wide harms in the their class action complaint in favor of one discrete category of damages – i.e., special education costs for NAS Children.  IPSD Motion ¶ 3.  Thus, it would appear that the IPSDs have eliminated a majority of their allegedly class-wide

damages to increase their odds of class certification, undermining their ability to adequately represent the interests of the absent class members.

### ii.    *The Hospitals Fail the Commonality Test*

63.    The different financial positions of the Hospitals, including as among public and for-profit hospitals, render them incapable of satisfying the "commonality" requirement of FRCP 23.  Among other things, certain of the Hospitals are considered financially distressed while others are highly profitable.  For example, West Boca Medical Center, a Hospital claimant, is a for-profit Tenet-owned 194-bed hospital, which is consistently profitable.  *See Identification and Characteristics:    West    Boca    Medical    Center*, AM. HOSP. DIRECTORY https://www.ahd.com/free_profile/100268/West_Boca_Medical_Center/West_Boca_Raton/Florida (last updated July 3, 2020).  Southwest Mississippi Regional Medical Center, another proposed class representative, is a governmental district 160-bed hospital, and is a distressed institution, with negative operating margins and net losses in recent years.  *Identification and Characteristics: Southwest    Mississippi    Regional    Medical    Center*, AM. HOSP. DIRECTORY, https://www.ahd.com/free_profile/250097/Southwest_Mississippi_Regional_Medical_Center/McComb/Mississippi (last updated June 24, 2020).  The Hospitals will undoubtedly be asserting varying amounts of damages based on their needs and the alleged overall impact of the opioid crisis on each respective Hospital, and the proposed class representatives cannot adequately represent thousands of hospitals with a litany of different needs.  The Hospitals assert that their losses, in part, stem from the fact that private insurance only covers a portion of their expenses.  Hospital Motion ¶ 33.  Government programs (such as Medicaid) and insurance payouts are not uniform among the Hospitals, further muddling the "commonality" among claims.  Lastly, like the IPSDs, the Hospitals assert claims grounded in state law, which will vary among states.

### iii.    The Private Insurance Plaintiffs Fail the Commonality Test

64.    The Private Insurance Plaintiffs filed 30 separate class actions in their respective states before seeking a nation-wide class, illustrating that their claims are likely not sustainable or appropriate for a nationwide class.  They admit as much by falling back on the idea of "subclasses" – potentially for each state – in the event the Court finds that the commonality factor is not satisfied in light of the variations of insurance rate-setting by state.  Private Insurance Motion ¶ 78.  It is hard to conceive of a set of claimants less suitable to class certification in bankruptcy than one that will require the addition of *30 subclasses* to what would otherwise be a straightforward, inexpensive, and streamlined proof of claim process.

### iv.    The NAS Guardians Fail the Commonality Test

65.    Finally, the NAS Children collectively have asserted over 80 class and individual actions against Purdue in the form of abatement and medical surveillance.  The NAS Children have asserted state law claims, which too, will vary significantly among states.  As with the Private Insurance Plaintiffs, these class claims are decidedly ill-suited to bankruptcy.

### C.    The Claims or Defenses of the Representatives Are Not Typical of the Class

66.    Because the Proposed Classes cannot satisfy the "commonality" requirement of FRCP 23(a)(2), they also cannot satisfy the "typicality" requirement of FRCP 23(a)(3).  *See e.g. Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 2012) (explaining that the "commonality" and "typicality" requirements tend to merge).  "The crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  *Id.*  (quoting *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13 (1982)).  While the injuries to each member of a Proposed Class arguably arise from a similar course of events, in light of the varied funding structures, governmental programs, and

30

state laws each Proposed Class member is subject to, each member of a Proposed Class will be asserting vastly different amounts of damages and will be relying on inconsistent sets of laws to prove its asserted claims. Each of the claims within a Proposed Class are far from "interrelated," undercutting any purported benefits of the class claims and resulting in an unwieldly claims process.

**D.    The Movants Have Not Satisfied the Requirements of FRCP 23(b)**

67.    In addition to their failure of proof on FRCP 23(a), the Movants fail to satisfy elements of the FRCP 23(b) analysis, as well. On this front, the Public Claimants highlight a few points that are particularly important in the context of the relief requested by the Proposed Classes.

68.    First, of the Motions, all but the Hospitals seek certification of their respective classes under Rule 23 (b)(1)(B) as "limited fund" classes – which the Second Circuit has made clear "will not be appropriate in most bankruptcy cases." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992). None of the Movants have established a basis for deviating from this principal here – particularly where the "limited funds" from which they are seeking distributions must be distributed to *all creditors*, not just creditors within their proposed putative classes. Courts have found that filing individual proofs of claim creates no risk of inconsistent decisions impairing creditors' ability to protect their interests, and particularly where the claims within the class are based on different facts or law – as discussed with respect to each of the Movants, above – creditors will not be prejudiced by decisions rendered with respect to proofs of claim based on applicable facts/law. *See In re Verity Health System of Cal., Inc.*, No. 18-bk-20151-ER, 2019 WL 2461688, at *15 (Bankr. C.D. Cal. June 11, 2019) (finding class could not be certified in bankruptcy for failure to satisfy Rule 23(b)(1)(B)).

69.    Perhaps cognizant of the difficulties in satisfying the Rule 23(b) standards, most of the Movants seek certification *both* under Rule 23(b)(1)(B) and, in the alternative, Rule 23(b)(3)

– which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* FRCP 23(b).[17] However, for the same reasons the Movants failed to establish commonality and typicality, discussed in detail above, they fail to satisfy the predominance test. *Verity Health*, 2019 WL 2461688, at *15 (citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)) (finding that lack of commonality and typicality meant lack of predominance); *see also In re Motors Liquidation Co.,* 447 B.R. 150, 159-60 (Bankr. S.D.N.Y. 2011) ("Civil actions involving mass torts are often not certified for class action treatment, even in non-bankruptcy plenary litigation, because so many individualized legal and individualized damages inquiries are ultimately required."). Likewise, when the class members' claims can be addressed by the bankruptcy court through the bankruptcy claims reconciliation process, it cannot be that a class action is "superior" to that already established and longstanding practice. *See Motors Liquidation Co.*, 447 B.R. at 163 ("[T]he inherent simplicity of the bankruptcy process tends to make class action treatment *not* superior, as a general matter and in this case, because an individual claimant would need only to fill out and return a proof of claim form."); *In re Ephedra*, 329 B.R. at 9 ("[The] superiority of the class action vanishes when the 'other available method' is bankruptcy, which consolidates all claims in one forum and allows claimants to file proofs of claim without counsel and at virtually no cost. In efficiency, bankruptcy is superior to a class action because in practice small claims are often 'deemed allowed' under § 502(a) for want of objection, in which case discovery and fact-finding are avoided altogether."). This reasoning stands true here. Where all of the Proposed Classes lack

---

[17] Only one of the Movants, the NAS Guardians, seeks a *third* alternative for class certification under Rule 23(b)(2). The flaws in this argument are addressed in the Debtors' opposition to the NAS Guardian Motion, and therefore are not duplicated here.

commonality and typicality and can be addressed through normal claims reconciliation processes, none of the Movants can establish *either* of the requirements for FRCP 23(b)(3).

WHEREFORE, for the foregoing reasons, the Public Claimants respectfully requests that the Court deny the Class Certification Motions.

Dated:  July 16, 2020                              Respectfully submitted,


                                                   /s/ *Kenneth H. Eckstein*
                                                   Kenneth H. Eckstein
                                                   David E. Blabey Jr.
                                                   Rachael Ringer
                                                   KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                                   1177 Avenue of the Americas
                                                   New York, NY 10036
                                                   Telephone: (212) 715-9100
                                                   Email: keckstein@kramerlevin.com
                                                          dblabey@kramerlevin.com
                                                          rringer@kramerlevin.com

                                                   Scott D. Gilbert (admitted *pro hac vice*)
                                                   Craig Litherland (admitted *pro hac vice*)
                                                   Kami E. Quinn (admitted *pro hac vice*)
                                                   GILBERT LLP
                                                   100 New York Ave, NW, Suite 700
                                                   Washington, D.C. 20005
                                                   Telephone: (202) 772-2200
                                                   Email: gilberts@gilberlegal.com
                                                          litherlandc@gilbertlegal.com
                                                          quinnk@gilbertlegal.com

                                                   David J. Molton
                                                   Steven D. Pohl
                                                   BROWN RUDNICK LLP
                                                   7 Times Square
                                                   New York, NY 10036
                                                   Telephone: (212) 209-4800
                                                   Email: dmolton@brownrudnick.com
                                                          spohl@brownrudnick.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: mcyganowski@otterbourg.com
        jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*

/s/ *Andrew M. Troop*
Andrew M. Troop
PILLSBURY WINTHROP SHAW PITTMAN
LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 858-1000
Email: andrew.troop@pillsburylaw.com

*Attorneys for the Ad Hoc Group of Non Consenting States*

/s/ *Kevin C. Maclay*
Kevin C. Maclay (admitted *pro hac vice*)
James P. Wehner
Jeffrey A. Liesemer (admitted *pro hac vice*)
George M. O'Connor (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle
NW, Suite 1100 Washington, DC 20005
Telephone: (202) 862-5000
Email: kmaclay@capdale.com
jwehner@capdale.com
 jliesemer@capdale.com
 goconnor@capdale.com

*Attorneys for the Multi-State Governmental Entities Group*

34