Hearing Date: July 23, 2020 at 2:00 p.m. (ET)
Objection Deadline: July 16, 2020 at 4:00 p.m. (ET)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>PURDUE PHARMA L.P., et al.,<br><br>Debtors.[1] | Chapter 11<br>Case Nos. 19-23649 (RDD)<br>Administratively Consolidated<br><br>**Related Docket Nos. 1330, 1424, 1461** |

## SUPPLEMENT TO HOSPITAL CLAIMANTS' OMNIBUS REPLY TO THE OBJECTIONS/RESPONSES FILED AT DOCKET NOS. 1415, 1421, 1423, 1425, AND 1431 TO HOSPITAL CLAIMANTS' MOTION PURSUANT TO FED. BANKR. P. 9014 AND 7023 FOR AN ORDER MAKING FED. R. CIV. P. 23 APPLICABLE TO THESE PROCEEDINGS, PERMITTING THEM TO FILE A CLASS PROOF OF CLAIM AND GRANTING RELATED RELIEF

The Hospital Claimants,[2] on behalf of themselves and a proposed class of similarly situated persons, by and through their undersigned counsel, hereby submit this supplemental submission for the purpose of providing the Court with the authorities and sources cited in the

---

[1]The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014).

Hospital Claimants' Reply [Dkt. No. 1461] that may not be readily available to the Court.

Dated: July 20, 2020

Respectfully submitted,

MCGRAIL & BENSINGER LLP

*/s/ Ilana Volkov*
Ilana Volkov
888-C 8th Avenue #107
New York, NY 10019
Ph: (201) 931-6910
ivolkov@mcgrailbensinger.com

John W. (Don) Barrett
David McMullan, Jr.
Richard Barrett
Sterling Starns
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Ph: (662) 834-2488
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
rrb@rrblawfirm.net
sstarns@barrettlawgroup.com

Jonathan W. Cuneo
Monica Miller
Evelyn Li
CUNEO GILBERT & LaDUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Ph: (202) 789-3960
jonc@cuneolaw.com
evelyn@cuneolaw.com
monica@cuneolaw.com

*Attorneys for the Hospital Claimants*

## INDEX

**Exhibit 1.** *B & R Supermarket, Inc. v. MasterCard International Inc.*, 2018 WL 1335355 (E.D.N.Y. Mar. 14, 2018)

**Exhibit 2.** *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010)

**Exhibit 3.** *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4178617 (N.D. Ohio Sept. 3, 2019)

**Exhibit 4.** *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3934597 (N.D. Ohio Aug. 20, 2019)

**Exhibit 5.** *Perry v. Am. Tobacco Co.,* 2001 WL 686812 (E.D. Tenn. Apr. 12, 2001), *aff'd* 324 F.3d 845 (6th Cir. 2013)

## Exhibit 1

*B & R Supermarket, Inc. v. MasterCard International Inc.*,
2018 WL 1335355 (E.D.N.Y. Mar. 14, 2018)

2018 WL 1335355
United States District Court, E.D. New York.

B & R SUPERMARKET, INC., d/b/a Milam's Market, Grove Liquors LLC, Strouk Group LLC, d/b/a Monsieur Marcel, Palero Food Corp. and Cagueyes Food Corp., d/b/a Fine Fare Supermarket, Plaintiffs,

v.

MASTERCARD INTERNATIONAL INC., Visa Inc., Visa U.S.A. Inc., Discover Financial Services and American Express, Defendants.

17-CV-02738 (MKB)
|
Signed 03/11/2018
|
Filed 03/14/2018

**Attorneys and Law Firms**

Thomas E. Egler, Alexandra Senya Bernay, Angel Puimei Lau, Carmen Anthony Medici, Lonnie Anthony Browne, Alexandra S. Bernay, Carmen A. Medici, David W. Mitchell, Eugene Mikolajczyk, Coughlin Stoia Geller Rudman & Robbins LLP, George C. Aguilar, Gregory E. Del Gaizo, Jenny L. Dixon, Lindsey C. Herzik, Michael Nicoud, Robbins Arroyo LLP, San Diego, CA, Armen Zohrabian, Robbins Geller Rudman and Dowd LLP, John William Devine, Lawrence Dean Goodman, Robert J. Kuntz, Jr., Devine Goodman Rasco Watts-Fitzgerald, LLP, Coral Gables, FL, Peter Barry Patterson, Jr., Thomas G. Amon, Law Offices of Thomas G. Amon, Patrick Joseph Coughlin, Robbins Geller, New York, NY, Randi D. Bandman, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, John William Devine, Lawrence Dean Goodman, Devine Goodman Rasco Wattsfitzgerald LLP, Coral Gables, FL, for Plaintiffs.

rue21, Inc., Warrendale, PA, pro se.

Robert John Vizas, Sharon D. Mayo, Stephanie Ilana Fine, Arnold & Porter Kaye Scholer LLP, Cheryl Ann Cauley, Stephen E. Taylor, Taylor & Patchen, LLP, Dana Lynn Cook-Milligan, Jeanifer Ellen Parsigian, Sean D. Meenan, Winston and Strawn LLP, Penelope Athene Preovolos, Alexandra Eve Laks, Morrison & Foerster LLP, Susan S. Joo, Hunton & Williams LLP, Paul Belonick, Sidley Austin, Peter K. Huston, Latham & Watkins, Scott D. Baker, Ashley Lynn Shively, Reed Smith LLP, David Carlyle Powell, Jamie Danielle Wells, McGuireWoods LLP, Paul Jeffrey Riehle, Alexander Guney, Dennis Francis Murphy, Sedgwick LLP, San Francisco, CA, Karen Otto, Mark R. Merley, Ron Ghatan, Laura J. Butte, Matthew A. Eisenstein, Michael Adam Rubin, Arnold & Porter Kaye Scholer LLP, Craig Benson, Adrienne J. Lighten, Catherine M. Yang, Diana Viggiano Valdivia, Jessica A. Morton, Kenneth A. Gallo, Melissa Alpert, Michelle Parikh, Michelle Katherine Parikh, Rosa V. Gilcrease-Garcia, Ross E. Weingarten, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Elizabeth P. Papez, Winston and Strawn LLP, Jane Petersen Bentrott, Morrison Foerster LLP, D. Bruce Hoffman, Ryan A. Shores, John Eliot Beerbower, Leslie Kostyshak, Hunton and Williams LLP, Washington, DC, Robert C. Mason, Arnold & Porter Kaye Scholer LLP, Christopher Tom, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Eva W. Cole, Jeffrey L. Kessler, Johanna Rae Hudgens, Kelli Lynn Lanski, Winston & Strawn LLP, Mark P. Ladner, Michael B. Miller, Tiffani B. Figueroa, Morrison & Foerster LLP, Evan R. Kreiner, Harry P. Koulos, Peter E. Greene, Four Times Square, Boris Bershteyn, Skadden, Arps, Slate, Meagher & Flom LLP, Jennifer Michelle Wong, Benjamin Robert Nagin, Melissa Colon-Bosolet, Sidley Austin LLP, New York, NY, James Franklin Herbison, Joseph Laurence Motto, Robert Yale Sperling, Winston and Strawn LLP, David Graham, David F. Graham, Sidley Austin Brown & Wood LLP, Chicago, IL, Natalie Anne Fleming Nolen, Morrison and Foerster, LLP, District of Columbia, DC, Raoul Dion Kennedy, Skadden Arps Slate Meagher & Flom LLP, Martha Corcoran Luemers, Dorsey & Whitney LLP, Palo Alto, CA, Conor Michael Shaffer, Courtney Bedell Averbach, Daniel I. Booker, Michelle Ann Mantine, Frederick N. Egler, Reed Smith LLP, Pittsburgh, PA, Casey Erin Lucier, Howard Feller, J. Brent Justus, McGuireWoods LLP, Richmond, VA, Andrew Baldwin Brantingham, Angela Maryssa Porter, Frederick Matthew Ralph, Dorsey and Whitney LLP, Minneapolis, MN, for Defendants.

**MEMORANDUM & ORDER**

MARGO K. BRODIE, United States District Judge

**\*1** Plaintiffs B & R Supermarket, Inc., doing business as Milam's Market, ("B & R Supermarket"), Grove Liquors LLC, Strouk Group LLC, doing business as Monsieur Marcel, ("Monsieur Marcel"), and Palero Food Corp. and Cagueyes Food Corp., doing business as Fine Fare Supermarket ("Fine Fare Supermarket"), commenced this class action against Defendants MasterCard International Inc. ("MasterCard"), Visa Inc., and Visa U.S.A. Inc. (collectively "Visa"), Discover

19-23649-shl    Doc 1462    Filed 07/20/20    Entered 07/20/20 16:16:17    Main Document
Pg 6 of 51

B & R Supermaket, Inc. v. MasterCard International Inc., Not Reported in Fed. Supp....
2018 WL 1335355, 2018-1 Trade Cases P 80,312

Financial Services ("Discover") and American Express, alleging violations of the Sherman Act, 15 U.S.C. §§ 1 and 3, and state antitrust and consumer protection laws of California, Florida, and New York. Plaintiffs' claims arose out of Defendants' process for adopting EMV technology for card transactions in the United States. [1] Plaintiffs allege that Defendants violated antitrust laws by entering into a conspiracy: (1) adopting the same policy for shifting liability from banks to merchants ("Liability Shift") for fraudulent charges ("chargebacks"); and (2) making the Liability Shift effective on the same day for all four networks to prevent merchants from steering customers to use cards with more lenient terms. [2] (Memorandum & Order dated Sept. 30, 2016, ("September 2016 Order") 4, Docket Entry No. 346.)

Currently before the Court is Plaintiffs' motion to certify a nationwide class to include merchants who were injured as a result of Defendants' alleged violations of the Sherman Act, and three subclasses to include impacted merchants located in California, Florida, and New York, for the violations of the respective state antitrust and consumer protection laws. (Pls. Mot. for Class Certification ("Pls. Mot."), Docket Entry No. 425.) Defendants oppose the motion for class certification on several grounds, including that Plaintiffs cannot satisfy: (1) ascertainability, impliedly required by Rule 23(a); and (2) predominance as required by Rule (23)(b)(3). (Defs. Opp'n to Pls. Mot. for Class Certification ("Defs. Opp'n"), Docket Entry No. 460 (citing Fed. R. Civ. P. 23(a) and 23(b))). For the reasons explained below, because Plaintiffs have not satisfied the ascertainability requirement, the Court denies, without prejudice, Plaintiffs' motion for certification of the nationwide class and the state law subclasses.

### I. Background

#### a. Procedural history

**\*2** Plaintiffs commenced this action in March of 2016 in the Northern District of California, before Judge William Alsup. (Compl., Docket Entry No. 1.) On July 15, 2016, Plaintiffs filed an Amended Complaint, [3] (Am. Compl., Docket Entry No. 291), and Defendants moved to dismiss it. [4] (Defs. Mot. to Dismiss, Docket Entry No. 303.) On September 30, 2016, Judge Alsup granted in part and denied in part Defendants' motions to dismiss the Amended Complaint. Judge Alsup dismissed the claims against all Defendants

other than against MasterCard, Visa, Discover and American Express. (September 2016 Order.)

By the same order, based on the forum selection provisions in American Express' Card Acceptance Agreements ("CAA") with merchants, Judge Alsup severed and transferred the claims by B & R Supermarket and Monsieur Marcel against American Express to the United States District Court for the Southern District of New York. (Id.) Judge Alsup also granted Plaintiff Fine Fare Supermarket's motion to intervene against the above-named Defendants, including American Express. [5] (Id.)

On March 10, 2017, Plaintiffs moved for class certification. The parties completed briefing the class certification motion on April 28, 2017, based on Ninth Circuit authority. (See Pls. Reply, Docket Entry No. 503.)

By order dated May 4, 2017, Judge Alsup transferred the case to this Court pursuant to 28 U.S.C. 1404(a), citing judicial efficiency and Discover's concerns with regard to potential inconsistent liability theories alleged by putative class members in this case and the cases consolidated in the Multi-District-Litigation, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., No. 05-MD-01720, pending before this Court. (Order Granting Mot. to Transfer dated May 4, 2017, Docket Entry No. 518.)

In September of 2017, the parties filed their supplemental briefing identifying Second Circuit authority where different from Ninth Circuit, in support of their respective class certification positions. (Pls. Supplemental Br. in Supp. of Mot. for Class Certification ("Pls. Suppl. Br."), Docket Entry No. 589; Defs. Supplemental Br. in Supp. of Opp'n to Mot. for Class Certification ("Defs. Suppl. Br."), Docket Entry No. 588.) The Court held a hearing on the motion on November 29, 2017.

#### b. Plaintiffs' motion for class certification

**\*3** Pursuant to Rule 23(b)(3), Plaintiffs seek to certify a damages class of "Merchants who have been unlawfully subjected to the Liability Shift for the assessment of MasterCard, Visa, Discover and/or American Express payment card chargebacks, from October 2015 until the anticompetitive conduct ceases." [6] (Pls. Mot. 2.) Plaintiffs also seek to certify three subclasses of merchants from California, Florida, and New York, each of whom brings

claims under their respective state's antitrust and consumer protection laws. [7] (*Id.*)

### c. Plaintiffs' claims

Plaintiffs allege that Defendants conspired by entering into an agreement: (1) adopting the same policy for Liability Shift for fraudulent charges; and (2) making it effective on the same day for all four networks to prevent merchants from steering customers to use cards with more lenient terms. (September 2016 Order 4.)

Prior to the adoption of EMV technology, credit cards used magnetic stripes to communicate relevant information such as the card number and expiration date. In contrast, EMV technology transmits card information by creating a unique electronic signature for each transaction, and is believed to be more secure than the magnetic stripe. (Am. Compl. ¶ 61.)

Prior to October 1, 2015, issuing banks generally absorbed liability for fraudulent transactions. (*Id.* ¶¶ 3, 84–85.) According to Plaintiffs, to facilitate the transition process from using magnetic stripe to EMV technology, Defendants conspired to establish October 1, 2015, as an artificial date by which merchants had to have installed and certified [8] the EMV technology, otherwise merchants, rather than the banks, would be responsible for any chargebacks. (Am. Compl. ¶¶ 286–92.) Thus, if on or after October 1, 2015, a customer presented an EMV chip card to a merchant but the merchant failed to use a certified EMV chip card reader to process the transaction (and instead used a magnetic stripe), the merchant became liable for any fraudulent charges incurred.

**\*4** Plaintiffs contend that merchants had to wait lengthy periods for Defendants to certify their EMV technology. Thus, even if a merchant installed the EMV technology, the merchant could still be subject to liability for fraudulent transactions if Defendants failed to timely certify the merchant's equipment. (*Id.*)

Plaintiffs further contend that imposing the Liability Shift on the same date was not necessary for transition to EMV technology. Plaintiffs allege that in other countries where Defendants introduced the EMV technology prior to its introduction in the United States, Defendants implemented liability shifts and transitioned to EMV technology at staggered times rather than on the same day. (*Id.* ¶ 107.) For example, in Canada, some Defendants gave merchants

a six-month extension to upgrade to EMV technology. (*Id.* ¶ 112.) In other countries, Defendants offered merchants interchange fee concessions to help defray the costs of the liability shift or offered to cover certain costs of upgrading to EMV technology. (*Id.* ¶¶ 108, 109.) In contrast, in the United States, Defendants implemented the Liability Shift on the same day through their individual networks, and did not offer any concessions to the merchants to ease the transfer process. (*Id.* ¶¶ 71, n.6, 75–76 (MasterCard); ¶¶ 77–78 (Visa); ¶¶ 79–80 (Discover); ¶ 81 (American Express).)

In support of their claims, Plaintiffs rely on the expert report of Dr. Micah S. Officer, Professor of Finance at Loyola Marymount University. (*See* Expert Report of Micah S. Officer in Supp. of Pls. Mot. for Class Certification ("Pls. Expert Report"), annexed to Bernay Decl. as Ex. 29, Docket Entry No. 424-32.)

### i. Plaintiffs' world without the alleged conspiracy

In his initial report, Dr. Officer contends that in the but-for world, [9] without Defendants conspiring to shift liability for the chargebacks on the same date, Plaintiffs would have been able to avoid these chargebacks between October 1, 2015, when Defendants imposed the Liability Shift, and "the present day," (presumably the date of Dr. Officer's submission—March of 2017, (Pls. Expert Report 10.)). Dr. Officer asserts that had Defendants not colluded to establish October 1, 2015 as the Liability Shift date, there would have been a competitive market, which would have triggered a competitive response from Defendants in reaction to each Defendants' implementation strategies. (Rebuttal Expert Report of Micah S. Officer in Support of Pls. Mot. for Class Certification 10 ("Pls. Expert Rebuttal"), annexed to Bernay Decl. as Ex. 33, Docket Entry No. 502-7.) Dr. Officer opines that such a response would have resulted in all Defendants delaying the October 1, 2015 Liability Shift date. (*Id.*)

In a subsequent report, Dr. Officer included a date by which Defendants would have introduced the Liability Shift in the but-for world. [10] Dr. Officer opines that Defendants would not have introduced the Liability Shift "at least" until the end of the period for which chargeback information was made available to him by Defendants, which is somewhere between thirteen to fifteen months after the October 1, 2015, depending on Defendant. (*Id.* at 10.)

**\*5** Dr. Officer also suggests October of 2017 and August of 2018 as two alternative dates by which Defendants would have imposed the Liability Shift had Defendants not engaged in the alleged conspiracy. [11] (*Id.* at 12.)

### ii. Methodology for determining injury and damages

Dr. Officer relied on data provided by Defendants, to determine injury and damages to merchants based on the chargebacks assessed to each merchant over a period of time. (Pls. Expert Report 14.) According to Dr. Officer, Defendants created new codes specifically for tracking chargebacks assessed as a result of the Liability Shift ("chargeback codes"). (Pls. Mot. 20; Pls. Expert Report 17.) Dr. Officer concludes that, because the amounts are listed by merchant, the direct injury and damages for each putative class member can be determined by adding all chargebacks for each merchant-putative class member using the chargeback codes. (*Id.*)

Defendants challenge Plaintiffs' methodology in three ways; Defendants argue: (1) the chargeback codes only track the chargebacks to bank-acquirers and do not identify whether they were passed on to merchants; (2) the chargebacks tracked by the chargeback codes include some chargebacks that are not related to the Liability Shift; and (3) the methodology does not account for the intervening causes that precluded merchants from timely installing and certifying their EMV technology. (*See* Defs. Opp'n.)

### 1. Tracking chargeback payments by merchants

Relying on their expert, Dr. Kaplan, Defendants argue that even though the data used by Dr. Officer identifies chargebacks by merchant, the data does not identify whether the merchants ultimately paid the chargebacks. (Expert Report of David P. Kaplan ("Defs. Expert Report") 56, annexed to Parikh Decl. as Ex. 1, Docket Entry No. 460-1.) Defendants assert, and Plaintiffs do not dispute, that the chargeback codes only track the chargebacks to the bank-acquirer, and do not identify whether the chargebacks were passed on to the merchants. [12] (Defs. Opp'n 3.) Dr. Kaplan challenges Dr. Officer's methodology as not accounting for the fact that some bank acquirers and other third parties offset the chargebacks by absorbing those chargebacks and therefore not passing them on to the merchants, or

reimbursing the merchants for the chargebacks. Plaintiffs contend, however, that the Court should assume that bank acquirers passed on those chargebacks to merchants because many major bank acquirers made statements that merchants will be responsible for chargebacks following the Liability Shift. [13] (Nov. 29, 2017 Hr'g Tr. 14–15; Am. Compl. ¶¶ 185–97.)

### 2. Non-Liability Shift chargebacks

**\*6** Defendants also argue that the chargeback codes that Plaintiffs rely on include chargebacks that are not related to the Liability Shift because some chargebacks would have been incurred regardless of the Liability Shift. (Defs. Opp'n 11–15.)

To refute Defendants' claim that the chargeback codes includes charges unrelated to the Liability Shift, Dr. Officer compares the pre- and post-Liability Shift chargeback data; Dr. Officer first identifies the monthly ratio of the non-Liability Shift chargebacks and compares it to monthly gross volume of sales transactions. (Pls. Expert Report 19–21.) Averaging this ratio for a twelve-month period to ensure that the data is representative of pre- and post-Liability Shift periods, he determines that the ratio of non-Liability Shift chargebacks to gross sales volume remained approximately the same before and after the Liability Shift was introduced. (*Id.*) Dr. Officer therefore concludes that, contrary to Defendants' claims, the chargeback codes do not include the non-Liability Shift chargebacks. (*Id.* at 21.)

### 3. Other intervening causes

Lastly, Defendants contend that Plaintiffs' methodology does not take into account the intervening causes that prevented timely certification of merchants' equipment, which in turn resulted in chargebacks to merchants. (Defs. Opp'n 10–11.) Defendants assert that the intervening causes that precluded timely certification were: (1) the independent business decisions by merchants not to seek certification before the deadline; and (2) conduct by other third parties (such as the equipment suppliers), who are not alleged to be a part of the conspiracy, which impacted the timing of the certification of the merchants. (*Id.* at 11–15.) Defendants argue that these alternative causes are particularly relevant because Plaintiffs' liability theory is based not only on the imposition of the Liability Shift by Defendants on the same date, but also

on the certification requirement imposed by Defendants in the United States, and Defendants' failure to certify many merchants before the Liability Shift date in October of 2015. (*Id.*)

Plaintiffs contend that merchants' decision not to seek certification by October of 2015 was not an independent intervening cause because that decision was affected by the costs and difficulty of certification, which was the result of the premature and simultaneous certification requirement designed by Defendants as a result of the conspiracy. [14] (Pls. Reply 9; Am. Compl. ¶¶ 264–269.)

## II. Discussion

### a. Standard of review

The purpose of the class action mechanism is to aggregate the numerous but relatively small potential recoveries associated with individual cases into a single action with a potential recovery that is sufficiently large to warrant an attorney's labor. *See Sykes v. Mel S. Harris & Assocs. LLC,* 780 F.3d 70, 81–82 (2d Cir. 2015) (citing *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997)); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997). However, because class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," to depart from the rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348-49 (2011).

**\*7** "To obtain certification of a class action for money damages, a plaintiff must satisfy prerequisites of numerosity, commonality, typicality, and adequacy of representation," pursuant to Rule 23(a), and "must also establish that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," pursuant to Rule 23(b)(3). *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 460 (2013); *Sykes,* 780 F.3d at 80.

In addition to the explicit requirements of Rule 23, the class must satisfy the implied requirement of ascertainability. *In re Petrobras Sec.,* 862 F.3d 250, 266 (2d Cir. 2017).

### b. Rule 23(a) explicit requirements

The Court first addresses whether Plaintiffs have satisfied the Rule 23(a) explicit requirements of numerosity, commonality, typicality, and adequacy of representation for class certification. Except for the American Express' challenge to the adequacy of class representation, Defendants do not otherwise challenge the satisfaction of the Rule 23(a) explicit requirements.

### i. Numerosity

In order to proceed as a class action, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of [forty] members." *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995).

Plaintiffs satisfy the numerosity requirement. The putative class consists of thousands of merchants who have accepted Defendants' cards. (Pls. Mot. 10–11.)

### ii. Commonality

Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see also Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or fact."). A question is common if it is "capable of classwide resolution—which means that determinations of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.,* 564 U.S. at 350. It is not enough to raise questions at such a high level of generality that they become common to the class. *Id.* Instead, plaintiffs must demonstrate "the capacity of a classwide proceeding to generate common answers apt to drive the resolution" of the case. *Id.* "Even a single common legal or factual question will suffice" to prove commonality. *Id.* at 357; *Freeland v. AT&T Corp.,* 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (citing *In re Agent Orange Prod. Liab.,* 818 F.2d 145, 166–67 (2d Cir. 1987)).

Plaintiffs satisfy the Rule 23(a)(2) commonality requirement. At a minimum, Plaintiffs share the common question of whether Defendants conspired to impose the same Liability

2018 WL 1335355, 2018-1 Trade Cases P 80,312

Shift date on all merchants in violation of antitrust laws. (Pls. Mot. 11.)

### iii. Typicality

The typicality prong of Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate analysis' of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A.*, 126 F.3d at 376). "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012) (citation and internal quotation marks omitted).

**\*8** Here, Plaintiffs satisfy the typicality requirement. Plaintiffs allege that they were harmed by the same conduct—Defendants' contemporaneous imposition of Liability Shift, and in the same manner—incurring chargebacks as putative class members.

### iv. Adequacy of representation

Rule 23(a)(4) provides that a class action is only appropriate if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose is to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "Determination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc.*, 502 F.3d at 99; *see also Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170–71 (2d Cir. 2001) ("A class representative must

be part of the class and possess the same interest and suffer the same injury as the class members.") (internal citations and quotation marks omitted). "[C]onflicts which are merely speculative ... should be disregarded at the class certification stage." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 102 (E.D.N.Y. 2011) (internal citations and quotation marks omitted). The Court separately discusses the adequacy of the class representatives and class counsel.

#### 1. Adequacy of class representatives

All named putative class representatives assert claims arising out of the same conduct and resulting in the same type of injuries—chargebacks imposed by Defendants as a result of the alleged conspiracy to impose the Liability Shift on the same date. Based on this alleged conduct, Plaintiffs claim that Defendants are jointly and severally liable. (Pls. Oct. 20, 2017 Letter, Docket Entry No. 604.)

American Express argues that there are two groups of Plaintiffs: (1) merchants who accept American Express cards and are asserting joint and several liability against Visa, MasterCard and Discover (because their claims against American Express have been severed and transferred to the Southern District of New York); and (2) merchants who do not accept American Express cards and are asserting joint and several liability against all Defendants—Visa, MasterCard, Discover, and American Express, represented by Fine Fare Supermarkets. (Defs. Letter dated Oct. 20, 2017, Docket Entry No. 603.)

American Express objects to the class (1) as "overbroad because it captures the claims of B & R Supermarket and Monsieur Marcel based on American Express' conduct, which cannot be brought in this Court"; and (2) because Fine Fare Supermarkets, as a merchant that does not accept American Express credit cards, cannot adequately represent those merchants who do accept the cards. (*Id.*) Based on these objections, American Express contends that the certification should be denied, or alternatively, the class should be divided into two subclasses, one that accepts American Express cards, and one that does not.

#### A. The class is not overbroad

American Express concedes that the case before the Court no longer includes any claims against American Express

2018 WL 1335355, 2018-1 Trade Cases P 80,312

by those merchants who have signed CAAs with American Express and are bound by the forum-selection clause in those CAAs. (*Id.* at 2.) American Express appears to argue, without any legal authority or factual support, that because of the forum selection clause in the CAA, Plaintiffs who are signatories to the CAA cannot maintain an action in this Court against the non-American Express Defendants for American Express' conduct, based on joint and several liability, because of the CAA and the action pending in the Southern District of New York.

**\*9** Determining the scope of a contract such as the CAA is fact-intensive and requires a court to review the scope of the clause at issue and its applicability to the facts of the particular case. *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* No 07-CV-5944, 2014 WL 2581581, at *3–4 (N.D. Cal. June 9, 2014)* ("As a matter of contract interpretation involving a forum-selection clause, the Court's task is, first, to decide the clause's scope and applicability, and, second, to determine whether the clause applies to the behavior at issue." (citing *Peterson v. Boeing Co.,* 715 F.3d 276, 280 (9th Cir. 2013))). In *re Cathode Ray Tube (CRT) Antitrust Litig.,* the court reviewed the contract clause in detail before determining that the forum-selection clause did not bar suits against the defendant based on joint and several liability outside of the agreed upon forum. *Id.* Similarly, in *Martinez v. Bloomberg LP,* 740 F.3d 211 (2d Cir. 2014), the Second Circuit engaged in a detailed analysis of the contractual language before determining the scope of the forum-selection clause. *Martinez,* 740 F.3d at 224–26.

Here, Defendants have not cited to any specific provision of the CAA in support of their argument that Plaintiffs who are signatories to the CAA, and whose direct claims against American Express have been transferred to the Southern District of New York, cannot maintain their claims against MasterCard, Visa, and Discover outside of the forum agreed to in the CAA, based on joint and several liability, when MasterCard, Visa, and Discover are not parties to the CAA. Thus, in the absence of any authority to the contrary, the Court rejects American Express' argument that these claims are not properly before the Court.

### B. Fine Fare Supermarkets can adequately represent the class

American Express argues that Fine Fare Supermarkets, as a merchant who does not accept American Express credit cards,

cannot adequately represent those merchants who do accept its cards, and, in any event, the American Express-accepting merchants are not properly in this Court. (American Express' Opp'n to Pls. Mot. for Class Certification ("Amex Opp'n") 2– 3, Docket Entry No. 463.) American Express cites to a line of cases where courts either denied class certification or created multiple subclasses because the class representatives were not in a position to assert defenses that were otherwise available to the putative class members. [15]

In the absence of any factual or legal authority that prevents merchants that accept American Express cards from bringing claims in this forum against Visa, MasterCard, and Discover jointly and severally to include American Express' conduct, the Court understands American Express' argument to mean that there is a conflict of interest between the two groups of classes—those merchants who accept American Express cards and the merchants who do not, that warrants denial of certification or should be cured by subclassing.

Generally, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir. 2001)* (internal citations omitted). One way to deal with the conflicts is to create subclasses. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 819 (1999)* (stating that creation of subclasses is a tool to deal with conflicts of interest among members of class); *Amchem Prod., Inc.,* 521 U.S. at 627* (discussing how subclassing can resolve the conflict between class members with current injuries and those with future claims). "Fundamental" conflicts that go "to the very heart of the litigation" may require separate representation of counsel for each subclass. *Charron v. Wiener,* 731 F.3d 241, 250 (2d Cir. 2013).* For example, in this action the Second Circuit reversed the certification of the subclasses for injunctive and monetary relief in part because they were represented by the same counsel. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 827 F.3d 223 (2d Cir. 2016).* The first subclass included claimants with future harms, while the latter was limited to those with current damages. *Id.* at 231.* The Second Circuit found that conflicts of interest between the two classes were fundamental, because they impacted the essential allocation decisions of plaintiffs' compensation and defendants' liability, *id.* at 234,* with the damages class "want[ing] to maximize cash compensation for past harm, and the [injunctive subclass] want[ing] to maximize restraints on network rules to prevent harm in the future." *Id.*

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*10** There is no conflict, fundamental or otherwise, between the two groups in this case, as the claims of joint and several liability are based on a conspiracy in which all Defendants are alleged to have participated. The only material difference between the two groups is their ability to recover against American Express if Plaintiffs obtain a favorable judgment. The success of the claims by the two groups of Plaintiffs is dependent on the same finding of liability against all Defendants. Accordingly, this difference does not defeat the adequacy of representation by named Plaintiffs. Neither does it warrant creation of subclasses. [16]

### 2. Adequacy of Counsel

In September of 2017, Plaintiffs informed the Court that Robbins Arroyo LLP ("Robbins Arroyo") is taking the lead position in the litigation, replacing Robbins Geller Rudman & Dowd LLP ("RGRD"). (Pls. Suppl. Br. at 1.) Upon the transfer of the case to the Eastern District of New York, RGRD withdrew from representation. (Order Granting Mot. for Leave to Withdraw as Counsel, dated July 11, 2017.) Robbins Arroyo had been involved in this litigation "for months" prior to taking on the lead role. (Mot. for Leave to Withdraw as Counsel, Docket Entry No. 567.) In addition, Robbins Arroyo's resume shows an extensive record of class action litigation. (*See* Robbins Arroyo's Resume annexed to Pls. Suppl. Br. as Ex. 1.) *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (Under Rule 23(a)(4) the Court reviews whether "the plaintiff's attorneys are qualified, experienced and able to conduct the litigation." (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992))). Moreover, no objections have been raised to the adequacy of the proposed lead counsel. The Court finds the representation to be adequate under Rule 23(a)(4).

### c. Rule 23(a) implied requirement of ascertainability

Plaintiffs' proposed class definition is: "Merchants who have been unlawfully subjected to the so-called Liability Shift for the assessment of MasterCard, Visa, Discover and/or American Express payment card chargebacks, from October 2015 until the anticompetitive conduct ceases." (Pls. Mot. 2.)

Defendants contend that Plaintiffs' class definition which describes the end date of the class period as "until the anticompetitive conduct ceases" makes the proposed class unascertainable because such a class period is not definitive and does not allow for a determination of which merchants fall within the class, and which merchants do not. [17] (Defs. Suppl. Br. 6.)

**\*11** Rule 23(a) contains an implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d at 266 ("Most circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement."). The Second Circuit does not have a "heightened" requirement of ascertainability, it only requires that a "class be defined using objective criteria that establish a membership with definite boundaries," and does not require "administrative feasibility" of identifying each class member based on that objective criteria. [18] *Id.* (distinguishing the Second Circuit's approach to ascertainability from the circuits with a heightened ascertainability requirement); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) ("The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.' " (quoting *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at \*2 (E.D.N.Y. Apr. 9, 2010))); *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("To be ascertainable, the class must be 'readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling.' " (quoting *McBean v. City of N.Y.*, 260 F.R.D. 120, 132–33 (S.D.N.Y. 2009))); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).

In *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221 (S.D.N.Y. 2010), tenants of rent-stabilized apartments brought a class action against the owner for wrongfully evicting tenants, in order to deregulate their apartments. The court found the class to be ascertainable and "defined by objective criteria," where the class membership was dependent on whether a given apartment [was] rent-regulated" and "owned by the [defendant corporation]; and whether the putative class member [was] a tenant on a fixed date."). Similarly, in *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002), private well owners brought actions against petroleum companies based on the alleged widespread contamination of groundwater as a result of the use of MTBE, a gasoline additive. The court found that the "plaintiffs' class definition refer[ed] only to objective criteria: Either a well has MTBE or it does not; either an individual has an ownership interest

B & R Supermarket, Inc. v. MasterCard International Inc., Not Reported in Fed. Supp....
2018 WL 1335355, 2018-1 Trade Cases P 80,312

in a well or she does not; either her property is located in a class state or it is not." *Id.*

The lack of a defined class period in some circumstances can make the class "insufficiently definite as a matter of law." *Brecher v. Republic of Argentina*, 806 F.3d 22, 25–26 (2d Cir. 2015). ("A class ... could hardly be called sufficiently definite and readily identifiable [if] it has no limitation on time or context."); *see also In re Petrobras Sec.*, 862 F.3d at 269 ("These criteria—securities purchases identified by subject matter, timing, and location—are clearly objective.");[19] Manual for Complex Litigation (Fourth) § 21.222, 2004 WL 258793, *2. ("The relevant time, often referred to as the "class period," is, for example, the period during which members of the proposed class incurred the claimed injury ... [which] should be included in the class definition.").

**\*12** In *Brecher*, creditors brought action against Argentina as a result of Argentina's default on its sovereign debt. *Brecher*, 806 F.3d at 25–26 (2d Cir. 2015). Initially, the class included bond holders "under a continuous holder requirement, i.e., the class contained only those individuals who ... possessed beneficial interests in a particular bond series issued by the Republic of Argentina from the date of the complaint—December 19, 2006—through the date of final judgment in the District Court." *Id.* Later, the District Court approved the removal of "continuous holder requirement" from the class definition "expanding the class to all holders of beneficial interests in the relevant bond series without limitation as to time held." *Id.* The Second Circuit reversed the modification of the class definition, because that the lack of a time period made the class unascertainable. *Id.*

In addition, the class definition, including the class period, must be consistent with the alleged liability theory. *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d at 259[20] (discussing temporal limitation and its relationship to the plaintiffs' reliance on the defendants' statements, in the context of a securities action, where reliance is one of the liability elements); *Pinnacle Grp. N.Y. LLC*, 269 F.R.D. at 228 (modifying class definition to ensure sufficient relationship between the definition and the claims alleged); *see also Comcast Corp. v. Behrend,* 569 U.S. 27, 38 (2013) (requiring alignment of the proposed liability theory and the proposed methodology for damages.);[21] Manual for Complex Litigation (Fourth) § 21.222, 2004 WL 258793, *2 (suggesting the period of incurred injury as a basis for setting class period).

**\*13** Plaintiffs' liability theory is based in part on the argument that had Defendants not conspired to set the Liability Shift for October 2015, each Defendant would have set its own date for Liability Shift for a later time period because there would have been competition between Defendants. (Pls. Expert Rebuttal 10.) Based on this theory, the logical end date for Plaintiffs' claims is the date by which Defendants would have imposed the Liability Shift, had they not conspired to set it for October 1, 2015.

Plaintiffs suggest several potential dates, including: (1) October of 2017, the date identified in Visa's plans for delaying the Liability Shift, (Pls. Expert Rebuttal 12); (2) a thirteen to fifteen month period after October of 2015 based on the timeframe for which the chargeback data was made available, (*id.* at 11); (3) August of 2018, by comparing Visa's implementation timeframe of the Liability Shift in the European Union (E.U.) and the United States from the date Visa announced its plans to adopt EMV in the E.U. and the United States respectively, (*id.* at 12); and (4) October of 2019, based on the four-year statute of limitations under the Sherman Act, which was proposed by Plaintiffs at the hearing.[22] (Nov. 29, 2017 Hr'g Tr. 20–22.) Any one of these dates could be acceptable to make the class ascertainable, if sufficiently substantiated.

Plaintiffs do not have to establish the Liabiltiy Shift date in the but-for world with absolute certainty. *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at *27 (S.D.N.Y. Mar. 28, 2014) ("It is unsurprising that [the expert] did not develop an opinion about many of the issues that [the defendant] contends are important features of a but-for world. After all, the but-for world does not exist."). However, to satisfy the ascertainability requirement, Plaintiffs must propose a class period that bears a relationship to Plaintiffs' proposed liability theory. Plaintiffs' proposal of four different class periods, some of which appear to be completely arbitrary, does not satisfy this requirement. Plaintiffs appear to lack the necessary information to satisfy this requirement at this stage of the litigation.[23] (Nov. 29, 2017 Hr'g Tr. 21–22.) The Court therefore denies Plaintiffs' motion for class certification without prejudice. The district court has authority to modify or consider a renewed motion for certification pursuant to Rule 23(c)(1)(C).[24] *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir 2007) ("District courts have ample discretion to consider (or to decline to consider) a renewed class certification motion after an initial denial.... Some district courts have explicitly reserved authority to revise a class certification ruling by

**B & R Supermarket, Inc. v. MasterCard International Inc., Not Reported in Fed. Supp....**
2018 WL 1335355, 2018-1 Trade Cases P 80,312

denying certification without prejudice.") (internal quotation marks and citations omitted); *see Sicav v. James Jun Wang, No. 12-CV-6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015)* (inviting plaintiffs to renew their motion for certification for the second time after denial.)

### III. Conclusion

**\*14** Because the proposed class is not ascertainable, the Court denies Plaintiffs' motion for class certification without prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1335355, 2018-1 Trade Cases P 80,312

---

Footnotes

1   EMV technology is a global standard for credit cards that uses computer chips and chip readers to authenticate (and secure) chip-card transactions. (Am. Compl. ¶ 61, Docket Entry No. 291.) It allows for secure transmittance of "dynamic" card information by creating a unique electronic signature for each transaction. Prior to the adoption of EMV technology, payment cards relied entirely on magnetic stripes, which can only communicate "static" information such as the card number and expiration date. (*Id.*)

2   Plaintiffs allege that had Defendants not conspired to impose the Liability Shift at the same time, at least one Defendant would have offered more lenient terms such as no "Liability Shift component, an exten[sion of the] Liability Shift date, a break on fees, equipment or other more favorable terms." (Am. Compl. ¶ 9.)

3   The Amended Complaint named the following additional Defendants: Bank of America, N.A., Barclays Bank Delaware, Capital One Financial Corporation, Chase Bank USA, National Association, Citibank, N.A., Citibank, N.A., PNC Bank, National Association, USAA Savings Bank, U.S. Bancorp National Association and Wells Fargo Bank, N.A. (collectively, the "Issuing Banks"), and EMVCo. (Am. Compl.)

4   Discover and the Issuing Banks, together with EMVCo, filed separate motions to dismiss Plaintiffs' Amended Complaint. (Bank Defs. Mot. to Dismiss, Docket Entry No. 301; Discover's Mot. to Dismiss, Docket Entry No. 305.)

5   Fine Fare Supermarket is not a party to a CAA with American Express and does not accept its cards. (Pls. Letter dated Oct. 20, 2017, Docket Entry No. 604.) Because Judge Alsup transferred B & R Supermarket's and Monsieur Marcel's direct claims against American Express to the Southern District of New York pursuant to the CAA, Fine Fare Supermarket is the only named Plaintiff with claims against American Express. However, because Fine Fare Supermarket does not accept American Express and has no agreement with American Express, it seeks only joint and several liability against American Express based on chargebacks by Visa, MasterCard, and Discover. (*Id.*)

6   In their moving papers, Plaintiffs proposed two classes—an injunctive relief class pursuant to Rule 23(b)(2) and a damages class pursuant to Rule 23(b)(3), (Pls. Mot. 2)—but now seek certification of a damages class only. (Pls. Supplemental Br. in Supp. of Mot. for Class Certification ("Pls. Suppl. Br.") 1, Docket Entry No. 589.)

7   Although Plaintiffs purport to move to certify subclasses, Plaintiffs have not shown if or how these subclasses satisfy the Rule 23 requirements. When establishing subclasses, each subclass must meet the Rule 23 class certification requirements. *See Williams v. Wallace Silversmiths, Inc., 566 F.2d 364, 365 (2d Cir. 1977)* (denying subclass certification for failing to meet Rule 23 requirements of commonality, typicality, and adequate representation); *Ramirez v. Riverbay Corp., 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014)*. The movant bears the burden of constructing the subclasses based on the requirements of Rule 23. *U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 408 (1980)*; *Fincher ex rel. Fincher v. Prudential Prop. & Cas. Ins. Co., 374 Fed.Appx. 833, 847 (10th Cir. 2010)*. Plaintiffs have not made any arguments in support of subclass certifications based on state antitrust and consumer protection laws. The Court therefore summarily denies the request for subclass certification.

8   The certification of the EMV payment system consists of multiple steps and involves "numerous entities," such as PIN pad manufacturers, EMVCo, bank-acquirers, and others. (Am. Compl. ¶ 85.) In addition, Defendants imposed their own certification requirement on the merchants, including "an end-to-end testing" to ensure proper data transmission between the merchants and Defendants. (*See* Document titled "Product Bulletin" annexed to Bernay Decl. as Ex. 21, GP-0000022, Docket Entry No. 433-22; Pls. Expert Rebuttal in Supp. of Pls. Mot. 14 ("Pls. Expert Rebuttal") annexed to Bernay Decl. as Ex. 33, Docket Entry No. 502-7.)

**B & R Supermarket, Inc. v. MasterCard International Inc., Not Reported in Fed. Supp....**
2018 WL 1335355, 2018-1 Trade Cases P 80,312

9    In price-fixing antitrust cases, injury and damages are typically determined by comparing prices resulting from the antitrust violation to prices in the world free of the defendants' antitrust violation. *See, e.g., Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 97 (2d Cir. 2007). This construct of the world without Defendants' antitrust violation is known as the "but-for world." *Id.; In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 91 (S.D.N.Y. 2017).

10    Although, Dr. Officer introduces this time period on rebuttal for the first time, he states that it was implied in his original report. (*See* Pls. Expert Rebuttal 11–12.)

11    In support of these suggested dates, Dr. Officer relies on: (1) an email from an American Express executive stating that issuers "will benefit for *years* by shifting fraud to the merchants"; (2) internal documents from Visa's executives recommending delaying Liability Shift implementation until October 2017; and (3) the timeline for implementing the EMV technology in other countries. (*Id.* at 12.)

12    The process of assessing chargebacks begins with a complaint for a fraudulent charge from a cardholder to the issuing bank. The chargeback is then traced from the issuing bank through the network to the acquiring bank. Plaintiffs argue that the chargebacks are then passed on to the merchants, but Defendants' data does not show whether any of the chargebacks are actually passed on to the merchants. (Nov. 29, 2017 Hr'g Tr. 36–38.)

13    Plaintiffs quote statements made by the top ten acquirers recognizing merchants' responsibility for chargebacks, following the Liability Shift date by the networks. For example, Plaintiffs quote Bank of America, the fourth largest acquirer, stating: "All of the card organizations have chosen October 1, 2015, as the date when liability for counterfeit fraudulent transactions will shift to the merchant if the merchant has not adopted POS [ (point of sale) ] solutions that are capable of processing EMV chip cards." (Am. Compl. ¶ 189.)

14    Plaintiffs do not address Defendants' second alleged intervening cause that prevented merchants' timely certification of their EMV equipment. (*See* Pls. Reply.)

15    American Express does not point to any defenses that the putative class members could assert against Defendants that could not be asserted by Fine Fare Supermarkets, and the Court is not aware of any.

16    Although the Court is not convinced of the need for compulsory subclassing, it recognizes that it has discretion to create permissive subclasses for manageability and efficiency purposes. *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (noting that subclassing may foster a "more orderly" trial); *Casale v. Kelly*, 257 F.R.D. 396, 408–09 (S.D. N.Y. 2009) (case-management subclasses are appropriate when "there is no actual conflict among class members in the underlying claims common to the entire class"). However, because the Court denies class certification on other grounds, it does not find it necessary to consider permissive subclassing at this stage.

17    Defendants also argue that the phrase "merchants who have been unlawfully subject" to Liability Shift makes class membership dependent on a finding that Defendants' actions were indeed unlawful and is therefore fail-safe. The implied requirement of ascertainability precludes certification of classes that are fail safe. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015) ("Class definitions have failed [the ascertainability] requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called 'fail-safe' classes)"); *see also Spread Enter., Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 69 (E.D.N.Y. 2014). "A fail-safe class is one whose definition 'shields the putative class members from receiving an adverse judgment....' " *Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329, 356–57 (W.D.N.Y. 2014) ("In a fail-safe class, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." (citing *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012))). Such a class would therefore be unfair to Defendants. *Spread Enters., Inc.*, 298 F.R.D. at 69 (E.D.N.Y. 2014) (finding certification impermissible when the proposed class consisted of class members who were "charged excessive fees," because that made class membership dependent on the courts' finding that the defendants indeed "overcharged" plaintiffs.) Where a proposed class definition is "fail-safe ... courts have the discretion 'to ... redefine the class to bring it within the scope of Rule 23.' " *Spread Enters., Inc.*, 298 F.R.D. at 70 (quoting *Mazzei*, 288 F.R.D. at 55).
Defendants are correct that "merchants who have been *unlawfully* subject" to Liability Shift makes class membership dependent on a finding that Defendants' actions were indeed unlawful. Plaintiffs conceded at the hearing that the definition is fail safe as proposed. (Nov. 29, 2017 Hr'g Tr. 28:18–19.) The Court therefore modifies the class definition by excluding the word "unlawfully."

18    The ascertainability requirement is more important in a Rule 23(b)(3) class than in a Rule 23(b)(2) class, because the former class members require notice, *see* Rule 23(c)(2), and the "chief objective of [Rule 23(b)(2) ] is to provide broad injunctive relief to 'large and amorphous' classes not capable of certification under Rule 23(b)(3)," *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) (quoting *Marisol*, 126 F. 3d at 378).

19    Some courts have stated that a class need not be ascertainable at the class certification stage, but must be ascertainable "at some point" in the case. *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. at 337 ("Class members need not be ascertained

19-23649-shl    Doc 1462    Filed 07/20/20    Entered 07/20/20 16:16:17    Main Document
Pg 16 of 51

B & R Supermarket, Inc. v. MasterCard International Inc., Not Reported in Fed. Supp....
2018 WL 1335355, 2018-1 Trade Cases P 80,312

prior to certification, but 'the exact membership of the class must be ascertainable at some point in the case.' " (quoting *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y. 19830)); *see also In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 44– 45 (2d Cir. 2006) (recognizing, without discussing, the possibility of establishing ascertainability after class certification); *cf. Bakalar v. Vavra,* 237 F.R.D. 59, 65–66 (S.D.N.Y. 2006) (necessity of inquiries into provenance of artwork made class insufficiently precise, objective and presently ascertainable (internal quotation marks omitted))). The Court understands these seemingly different views of ascertainability to suggest that even if class members cannot be ascertained at the class certification stage, the class can nevertheless be certified if class members can be ascertained at a later stage on the basis of "objective criteria" and "definite boundaries" proposed at the time of certification. *In re Petrobras Sec.,* 862 F.3d 250, 264–66 (2d Cir. 2017) (emphasizing the requirement for the class definition to be based on objective criteria that would make a class sufficiently definite without the requirement of "administrative feasib[ility]" of the class, at the class certification stage).

20 *In re Petrobras Sec.* was a securities class action brought by Petrobras shareholders alleging that Petrobus made misleading statements that impacted the price of shares. The Second Circuit noted that the class definition was temporally limited to securities purchases made "before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings," and that such limitation was appropriate "given the absence of any allegation that Plaintiffs relied on any such earnings statement." *In re Petrobras Sec.,* 862 F.3d 250, 259–60 (2d Cir. 2017).

21 In *Comcast,* the plaintiffs presented four theories of antitrust liability, with a damages model that calculated damages for the entire class based on all four theories. *Comcast Corp. v. Behrend,* 569 U.S. 27, 32 (2013). The district court accepted only one of the liability theories, rejecting the other three. *Id.* However, Plaintiffs' calculation method for damages did not isolate damages for each of the four theories, and the district court refused to review the inconsistency between the sole liability theory and the damages methodology which was based on all four liability theories, on the grounds that doing so would require reaching the merits of the claims. *Id.* The Supreme Court held that because only one of the four antitrust liability theories was approved by the court, the plaintiffs could not rely on a model that included damages for all four antitrust theories. *Id.* at 37. Thus, the Court understands *Comcast* to require courts to ensure consistency between the liability theory and damages proposed by the putative class. Although *Comcast* did not focus on class definition, it is relevant to the question of class boundaries because the Supreme Court reasoned that only damages that can be attributed to the defendant's misconduct should be considered. *Id.* at 38 ("Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here.").

22 Defendants argue that Plaintiffs changed their construction of the but-for world, because in the Amended Complaint Plaintiffs argued that absent the Defendants' alleged conspiracy, Defendants would have shifted liability to merchants in a staggered manner, but in the class certification motion, Plaintiffs argue that Defendants would have never imposed Liability Shift. (Defs. Opp'n 6.) At the hearing, Defendants conceded that Plaintiffs' argument was that Defendants would have imposed the Liability Shift at a later date, rather than never. (*See* Nov. 29, 2017 Hr'g Tr. 54:1-8.) Nevertheless, Defendants argue that these changes violate the Supreme Court's ruling in *Comcast* because the methodology for determining injury and damages is inconsistent with the liability theory and the but-for world alleged in the Amended Complaint. (*Id.* at 5–6.) The Court disagrees with Defendants' characterization of Plaintiffs' proposed but-for world, as Plaintiffs' proposal of a single end date is not inconsistent with the but-for world where each Defendant would have had a different date of Liability Shift. The Court understands Plaintiffs' proposed "single end date" to mean the earliest date by which any Defendant would have imposed a Liability Shift.

Moreover, as discussed above, *Comcast* requires consistency between the liability theory and the damages methodology in order to ensure that the damages are calculated based on the liability theory that is before the court at the time of the certification. Here, any change in Plaintiffs' liability theory is taking place prior to certification, and therefore, any such change does not present an issue under *Comcast.*

23 The Court notes that at the hearing, Plaintiffs argued that the class definition can be modified later based on additional information, suggesting that they may be able to obtain the necessary information to satisfy class ascertainability. (Nov. 29, 2017 Hr'g Tr. 21–22.)

24 Because Plaintiffs have not met the implied requirements of ascertainability under Rule 23, the Court declines to determine whether the proposed class satisfies Rule 23(b)(3) requirements of predominance and superiority. However, if Plaintiffs choose to renew their motion for class certification, in addition to addressing the ascertainability requirement, Plaintiffs must also further address the predominance issues raised by Defendants and discussed at the hearing, in particular, the issues of commonality of injury and causation.

**B & R Supermarket, Inc. v. MasterCard International Inc., Not Reported in Fed. Supp....**

2018 WL 1335355, 2018-1 Trade Cases P 80,312

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

**Exhibit 2**

*Gortat v. Capala Bros., Inc.*, 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010)

2010 WL 1423018
United States District Court,
E.D. New York.

Miroslaw GORTAT, et al., Plaintiffs,

v.

CAPALA BROTHERS, INC., et al., Defendants.

No. 07–CV–3629 (ILG).
|
April 9, 2010.

*MEMORANDUM AND ORDER*

GLASSER, Senior District Judge.

 **\*1** Defendants object to a combined report and order by
Magistrate Judge Steven M. Gold certifying a collective
action under the Fair Labor Standards Act ("FLSA")
and recommending that the Court certify a class action
for claims under the New York State Labor Law
("NYLL"). For the reasons stated below, the Court overrules
defendants' objections to Magistrate Judge Gold's report
and recommendation, adopts the report and recommendation
substantially in its entirety, and grants plaintiffs' motion for
class certification pursuant to Rule 23 of the Federal Rules of
Civil Procedure. For the reasons stated below, the Court also
overrules defendants' objections to Magistrate Judge Gold's
order certifying the collective action and directing plaintiffs
to submit a proposed notice of the collective and class actions.

**FACTS & PROCEDURAL HISTORY**

Plaintiffs are laborers and foremen formerly employed by
Capala Brothers, Inc. ("Capala"), a construction firm. They
allege that they were illegally underpaid and bring claims
against Capala and its principals, Pawel and Robert Capala,
under the Fair Labor Standards Act ("FLSA"), 29 U.S.C.
§§ 201 et seq., the Portal–to–Portal Act, 29 U.S.C. § 254,
and the New York State Labor Law ("NYLL"). On June
11, 2009, plaintiffs filed separate motions asking the Court
to certify a class action with respect to the NYLL claims
and to certify a collective action with respect to the FLSA
claims. [1] On October 16, 2009, Magistrate Judge Gold issued
a single opinion ("Order & Report") which both authorized
plaintiffs to proceed on the FLSA collective action and

recommended the certification of the NYLL class action. [2] In
addition to certifying the collective action and recommending
class certification, Magistrate Judge Gold issued instructions
regarding the proposed notice to be sent to putative members
of the collective and class actions. On October 28, 2009,
defendants filed objections to Magistrate Judge Gold's order
("Defs.' Objs. to Collective Action"), contesting both the
certification of the collective action and the form and contents
of the proposed notice. On November 3, 2009, defendants
filed objections to Magistrate Judge Gold's recommendation
of class certification ("Defs.' Objs. to Class Cert."). Plaintiffs
have not responded to either set of objections. The Court
assumes familiarity with this litigation generally, and with
Magistrate Judge Gold's October 16, 2009 Order & Report
specifically.

**DISCUSSION**

**1. Class Action**

**a. Standard of Review**
Under 28 U.S.C. § 636(b)(1)(A), a magistrate judge may
not decide a motion "to dismiss or to permit maintenance
of a class action." The district judge may, however,
refer such a motion to the magistrate judge for a report
and recommendation. 28 U.S.C. § 636(b)(1)(B). When
a magistrate judge issues a report and recommendation
regarding such a dispositive motion, "[t]he district judge
must determine de novo any part of the magistrate judge's
disposition that has been properly objected to." Fed. R. Civ.
Proc. 72(b)(3).

**b. Ascertainability**
 **\*2** Defendants first challenge the class certification on
the grounds of ascertainability. Although it is not one
of the formal prerequisites for class certification defined
in Rule 23(a) of the Federal Rules of Civil Procedure,
"courts have held that in order for a class to be certified,
the named plaintiffs must demonstrate that there is an
'identifiable class.' " *Cortigiano v. Oceanview Manor Home
For Adults,* 227 F.R.D. 194, 207 (E.D.N.Y.2005) (quoting
*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 209
F.R.D. 323, 336 (S.D.N.Y.2002)). This standard, however, is
not demanding. It is designed only to prevent the certification
of a class whose membership is truly indeterminable. *See,
e.g., Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983)
(narrowing class definition when proposed class would

Gortat v. Capala Bros., Inc., Not Reported in F.Supp.2d (2010)

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

require determination of the state of mind of numerous putative class members). It does not require that every class member be identifiable prior to class certification. *See Ashe v. Bd. of Elections in New York,* 124 F.R.D. 45, 47 (E.D.N.Y.1989); *Somerville v. Major Exploration, Inc.,* 102 F.R.D. 500, 503 (S.D.N.Y.1984). Rather, the Court need only "be able to ascertain the general boundaries of the proposed class." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 241 F.R.D. 185, 194 (S.D.N.Y.2007) (internal quotations omitted). Here, plaintiffs' proposed class is limited to persons employed by the defendants during a definite period of time. This easily satisfies the ascertainability requirement.

### c. Numerosity

Defendants next challenge the magistrate judge's finding of numerosity. According to records submitted by defendants, seventy-four foremen and laborers were employed by Capala during the relevant time period. [3] Under Second Circuit case law, a presumption of numerosity arises when a putative class contains at least forty members. *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). The primary area of contention is the significance of affidavits submitted by defendants purporting to demonstrate that forty-one of the potential class members are not properly within the class. The affidavits, characterized by defendants as "nonjoinder affidavits," are largely identical and contain the following language:

1. I [was/am] an employee of defendant in this action, Capala Brothers, Inc and I am aware of the litigation started in Federal Court by my former co-employees in this action claiming unpaid hours and wages from my employer.

   2. With such awareness and knowledge of these claims by them, I hereby provide notice of my knowledge of such litigation, the types of claims presented and what they are for, and declare that I do not join in claiming any unpaid hours or wages from the defendants in this action.

It is well-settled that prior to the certification of a class action, a defendant may seek settlements with potential class members. *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.,* 455 F.2d 770, 773 (2d Cir.1972). This is so even if the settlements might have the effect of destroying numerosity and thus preventing class certification. *Id.* There is a "strong judicial policy in favor of settlements, particularly in the class action context," *In re Painewebber Ltd. P'ships*

*Litig.,* 147 F.3d 132, 138 (2d Cir.1998). This policy applies with equal force to settlements entered into prior to class certification.

**\*3** In this case, however, the nonjoinder affidavits do not purport to be releases or to otherwise settle the claims that are the subject of this proposed class action. Defendants are quite clear about this, stating that "the 41 (forty-one) submitted nonjoinder affidavits ... do not constitute either a stipulation, or a settlement or a waiver of any statutory rights." [4] Defs.' Objs. to Class Cert. 15; *see also id.* at 10 ("[T]he affidavits executed retained legal rights for such affiants."). Rather, defendants are attempting via these affidavits to preemptively and vicariously opt these potential plaintiffs out of any class action that might be certified. Defendants have cited no precedent for such an approach and this Court is aware of none. [5] *See* 5 Newberg on Class Actions § 15:19 (4th ed.) ("Generally, affidavits of noninterest are inappropriate at the class certification hearing."); *see also* Fed. R. Civ. Proc. 23(c) (2)(B)(vi) (implicitly authorizing the court to define "the time *and manner* for requesting exclusion" (emphasis added)). Not only would giving effect to these nonjoinder affidavits fail to serve the purposes behind the courts' preference for settlements, but it would be contrary to the policy behind "the liberal provisions of the Federal Rules of Civil Procedure for joinder of parties and claims," *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 581, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005). This policy favoring the resolution of related claims in a single litigation also lies behind the availability of "opt out," but not "opt in" class actions under Rule 23, *see Kern v. Siemens Corp.,* 393 F.3d 120, 124–25 (2d Cir.2004). Defendants ask this Court to endorse a novel procedure which undermines these policies.

It is for this Court, not the defendants, to designate the appropriate means by which class members may opt out of a certified class action. The Federal Rules of Civil Procedure provide for court-approved notice to class members informing them not only of their right to opt out, but also of the nature of the action and their right to participate in it. *See* Fed. R. Civ. Proc. 23(c) (2)(B). The district court has broad supervisory authority over class actions, which extends even to communications with potential class members before an action has been certified. *See In re Currency Conversion Fee Antitrust Litig.,* 361 F.Supp.2d 237, 252 (S.D.N.Y.2005). It is certainly within this Court's discretion to disregard affidavits purporting to opt potential plaintiffs out of a class action when this Court had no role in supervising the communications that led to their creation.

Finally, the mere possibility that members of a potential class may choose to opt out in the future is not enough to preclude a finding of numerosity. *See Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519, 533 (S.D.N.Y.1972) ("Defendants' suggestion that many members of the class will elect to opt out after notice offers no basis for declining to make the class determination now."). Plaintiffs have met their burden of showing that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1).

### d. Typicality and Commonality

**\*4** Defendants also challenge the magistrate judge's findings of typicality and commonality. Defendants' primary concern is the potential inclusion of cash employees within the certified class. As an initial matter, because numerosity can be satisfied on the basis of the seventy-four on-the-books employees acknowledged by defendants, findings of typicality and commonality with respect to hypothetical cash employees are not necessary for class certification. Nevertheless, whether typicality and commonality are satisfied with respect to cash employees' claims may be relevant to the scope of the class defined by the Court.

Defendants argue that cash employees cannot be included within the class certified by the court on two related grounds: (1) defendants would have defenses to the claims of cash employees not applicable to the named plaintiffs; and (2) plaintiffs do not have standing to raise claims by cash employees. Neither of these arguments has merit.

First, while it is true that unique defenses may preclude a particular plaintiff from serving as a class representative, *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000), *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990), there is no requirement that all members of a class be subject to the same defenses, *In re Nassau County Strip Search Cases,* 461 F.3d 219, 225 (2d Cir.2006). Rather, to establish typicality plaintiffs need only show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir.2009) (quotations omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,*

987 F.2d 931, 936–37 (2d Cir.1993). The NYLL claims of cash employees, if any such employees exist, are fairly encompassed within the class action brought by the named plaintiffs.

Second, in order to have standing to bring claims on behalf of a class, it is necessary only that at least one named plaintiff have standing to bring each separate claim. *Comer v. Cisneros,* 37 F.3d 775, 788 (2d Cir.1994) ("For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim."). In order for standing to exist, three elements must be present: "(1) an injury in fact, by which is meant an invasion of a legally protected interest; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Fulton v. Goord,* 591 F.3d 37, 41 (2d Cir.2009) (internal quotations omitted). If potential class members allege the same injury as a named plaintiff, *i.e.* an invasion of the same legal right, caused by the same conduct, then the named plaintiff has standing to bring claims on their behalf in a class action. There is no requirement that the precise factual circumstances of each class plaintiff's claim be shared by a named plaintiff. In this case, if any cash employees exist, as long as they have claims under the same provisions of New York law for substantially similar conduct by defendants, the named plaintiffs have standing to represent them.

**\*5** Defendants' argument that recent employees cannot be part of the same class action fails for the same reasons. Defendants argue that because recent employees have signed an employment contract, defendants would have "separate and distinct defenses against these employees," which would prevent them from being part of a single class with named plaintiffs.[6] Defs.' Objs. to Class Cert. 4. As noted above, the existence of different defenses to the claims of different class members will not preclude a finding of typicality.

Finally, defendants argue that because the foremen claim they were not paid for hours at the end of the work day, while the laborers claim only unpaid time in the morning, there is insufficient commonality to allow the claims to be brought as a single class. The Court has previously addressed this issue:

> Lastly, the defendants argue that the foremen and laborers cannot comprise the same class because the foremen seek compensation for the work they

did between 4:00 p.m. and 5:30 p.m., a claim that the laborers do not make. These arguments are not persuasive.... As to the distinctions between ... the claims of the foremen and the laborers, the complaint and the proffered evidence suggest that any individualized questions regarding the number of hours that a specific employee worked will not predominate over the questions of fact and law that are relevant to all members of the purported class, including when and where the workday began.

*Gortat v. Capala Bros., Inc.,* 257 F.R.D. 353, 362 (E.D.N.Y.2009) (citations omitted). Typicality is also satisfied, especially in light of the fact that both foremen and a laborer are among the named plaintiffs.

### e. Adequacy of Representation

Defendants also challenge the named plaintiffs' ability to adequately represent the class, alleging "extensive evidence of perjury" by several of the plaintiffs. Defendants provide the Court with a laundry list of incidents of alleged perjury. The Court has already addressed many of these allegations.[7] *See Gortat,* 257 F.R.D. at 363–65. The Court will not indulge defendants by examining each of these allegations in detail; it suffices to note that most of them can be grouped into a few categories.

First, defendants allege perjury by plaintiffs on the basis of supposed inconsistencies in their testimony that, upon further examination, are revealed to be inconsequential or even non-existent. For example, defendants allege that plaintiff Filipkowski "committed perjury at his deposition when he testified that he never saw anybody else drink alcoholic beverages at the job." Defs.' Objs. to Class Cert. 22. Defendants assert that this contradicts another signed statement by Filipkowski. *Id.* But the deposition transcript reveals that Filipkowski was asked "Did you ever see anybody else *drink at the job* at Capala Brothers?" and answered "No." Deposition of Miroslaw Filipkowski, dated Sept. 12, 2008, at 48:4–7 (Dkt. No. 173, Ex. V) (emphasis added); *see also id.* 49:17–24. The signed statement, on the other hand, recounts Filipkowski's "impression" that a co-

worker "was under the influence of alcohol." Filipkowski Statement, dated Mar. 14, 2005 (Dkt. No. 171, Ex. B). There is no inconsistency or contradiction whatsoever between these two statements.

**\*6** In another example, discussed by Magistrate Judge Gold, defendants describe plaintiff Lapinski's testimony regarding the employees' morning routine as "conflicting and contradictory" because he inconsistently described preliminary activities as taking thirty, twenty, or fifty minutes to complete. Defs.' Objs. to Class Cert. 22. In fact, in Lapinski's declaration, he says the preliminary activities "would take around half an hour to finish," Declaration of Artur Lapinski, dated Jan. 14, 2009, at ¶ 7 (Dkt. No. 85), while at his deposition he testified that they typically left the shop between 7:20 and 7:50 a.m.,[8] *i.e.* twenty to fifty minutes, Deposition of Artur Lapinski ("Lapinski Dep."), dated Sept. 15, 2008, at 87:19–21 (Dkt. No. 173, Ex. U). As Magistrate Judge Gold noted, "[t]here is no meaningful inconsistency here." Order & Report 14. *See also* Lapinski Dep. 160:6–161:7.

Second, defendants allege perjury on the basis of factual disputes between plaintiffs' and defendants' affidavits. As this Court has already noted, to the extent that these disagreements are not related to the matter in dispute in this case, they are not relevant to the adequacy analysis. "Whether the Court should examine the named plaintiffs' overall character or should restrict its inquiry to their credibility, it is clear that the Court may not find them inadequate for conduct that does not touch upon the central issues in this litigation." *Gortat,* 257 F.R.D. at 364.

On the other hand, a factual dispute between the parties, even when the dispute does touch upon "central issues" in the litigation, merely serves to demonstrate the existence of a genuine issue of material fact. *See* Order & Report 13 n. 9. Resolving such disputes is the very reason trials exist and the trial process cannot be circumvented by characterizing these factual disputes as concerns about plaintiffs' credibility.

Third, defendants allege perjury solely on the basis of statements by plaintiffs that defendants regard as implausible. For example, defendants dispute the time that it would take to load vans in the morning, not on the basis of any testimony to that effect, but on the bare assertion that it "could not possibly take the three to five men crew 30 minutes to load and unload" and the complaint that "[i]t is truly incomprehensible how such false testimony can be given any plausible weight at

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

all.” Defs.' Objs. to Class Cert. 22. Similarly, defendants dispute Lapinski's testimony concerning the existence of cash employees, arguing that “it is inconceivable” that he would not remember their names, because it was “not that long ago” that his employment ended. *Id.* A credibility determination based solely on the alleged implausibility of a witness's statements of memory is a matter for the jury at trial.

Finally, it is worth noting that while defendants' allegations frequently provide tendentious interpretations of affidavits or deposition testimony without directly quoting that testimony, occasionally they cross into what is difficult to regard as other than intentional misrepresentation. For example, defendants assert that plaintiffs' counsel has admitted knowledge of incidents in which Filipkowski threatened a former plaintiff with physical violence. Defs.' Objs. to Class Cert. 26. The affidavit to which defendants cite, however, explicitly and unequivocally denies that the alleged incidents occurred. Declaration of Robert Wisniewski (“Wisniewski Decl.”), dated Jan. 15, 2009, at ¶ 24 (Dkt. No. 86).[9]

### f. Class Definition

**\*7** Rule 23(c)(1)(B) directs that as part of class certification, the district court must define the class and appoint class counsel. Magistrate Judge Gold's recommendation of certification does not explicitly define the class being certified, so this Court must do so in the first instance.[10] Plaintiffs propose the following class definition in their motion for certification:

all employees of the Defendants during the six years immediately preceding the initiation of this action up to the date of this decision, who performed work as roofers, bricklayers, masons, building laborers, drivers, foremen and other manual workers with the same or similar duties who are entitled to compensation from the Defendants for unpaid minimum wages, and/or overtime premium wages, and/or spread-of-hours wages, and/or other wages, and who are asserting claims under the New York State Labor Law, including without limitation, Sec. 190 et seq. and Sec. 650 et seq. as well as the wage orders promulgated thereunder.

Memorandum of Law in Support of Motion for Class Certification (“Pls.' Br. for Class Cert.”), dated June 11, 2009, at 1. Defendants argue that this class definition is inappropriate because it defines the class to include spread-

of-hours wage claims, which are not supported by the plaintiffs' factual allegations.

This argument has some force. Under New York State labor law, a “spread-of-hours” regulation requires in some cases the payment of an additional hour's wage to any employee who works in excess of ten hours in a single day. 12 N.Y.C.C.R. § 142–2.4. Aside from the proposed class definition, plaintiffs' motion for class certification mentions explicitly only unpaid wages and overtime wages, not spread-of-hours claims. In this case, plaintiffs were paid wages for eight hours of work per day, but allege that they were actually required to work an additional half hour in the morning, and the foremen were required to work up to an additional hour-and-a-half at the end of the day. Defendants argue that, because even the foremen's claims would amount to no more than ten hours per day, plaintiffs' allegations do not implicate the spread-of-hours requirements.

In response, plaintiffs argue that, although they agree with defendants that they were paid for eight hours of work per day, they dispute precisely which eight hours they were paid for. Defendants argue that they paid plaintiffs for the hours of 7:30 AM to 4:00 PM, with an unpaid thirty minute lunch. Plaintiffs describe the disagreement as follows:

Plaintiffs claim that Defendants' employees were obligated to report to Defendants' company shop at 7:00 am and foremen were required to return for a meeting at Defendants' company shop until 5:30 pm. While Defendants allege that they paid Plaintiffs for 7:30 am until 4:00 pm, Plaintiffs dispute that Defendants paid them for those particular hours. It is unclear whether Defendants promised to pay their employees for the half an hour lunch period and, accordingly, it remains an open question for which particular eight (8) hours Defendants paid their employees.

**\*8** Combined Reply Memorandum of Law in Support of Plaintiffs' Motion for Approval of Collective Action Notice and to Certify a Class under Rule 23(b)(3) (“Pls.' Reply Br.”), dated August 12, 2009, at 12–13. This, however, stands in stark contrast to plaintiffs' earlier statements waiving any

Gortat v. Capala Bros., Inc., Not Reported in F.Supp.2d (2010)

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

claim to payment for the lunch break. *See* Pls.' Br. for Class Cert. 5 n. 1 ("Although some plaintiffs recall it being Defendants' policy to pay their employees for the half an hour lunch break, plaintiffs are forgoing any claims for the lunch break."); *id.* at 17 n. 2 ("Although a number of plaintiffs recall being promised pay for lunch, for simplicity's sake, Plaintiffs are waiving claims for the half an hour lunch break."). This Court cannot see any way of reconciling these statements with the argument that payment for the lunch break is still in dispute. Furthermore, plaintiffs have not alleged that any other potential plaintiffs worked different or longer hours that might entitle them to spread-of-hours wages. *See* Pls.' Reply Br. 2 ("[A]ll of Defendants' manual laborers worked on similar construction sites, performing similar work, for virtually the same hours.").

The Court adopts the following modified definition for the certified class:

> All persons employed by Defendants as roofers, bricklayers, masons, building laborers, drivers, foremen and other manual workers with the same or similar duties during the six years immediately preceding the initiation of this action up to the date of this decision who are asserting claims under the New York State Labor Law for unpaid minimum wages or overtime premium wages.

In addition, the Court appoints plaintiffs' counsel, Mr. Wisniewski, as class counsel pursuant to Rule 23(g). *See Gortat,* 257 F.R.D. at 365 ("[T]he Court finds further that plaintiffs' counsel is qualified and able to represent the class and has demonstrated his willingness to do so.").

## 2. Collective Action

### a. Standard of Review

A magistrate judge has the authority to rule on nondispositive issues. Fed. R. Civ. Proc. 72(a). A motion to authorize a collective action is such a nondispositive action. *Mazur v. Olek Lejbzon & Co.,* No. 05 Civ. 2194(RMB)DF, 2005 WL 3240472, at *2 n. 1 (S.D.N.Y. Nov.30, 2005). When objections are filed to orders of the magistrate judge, the

district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. Proc. 72(a).

### b. Heightened Scrutiny

Defendants argue that, because the motion for collective action certification was made after discovery had already taken place, the magistrate judge should have applied a heightened level of scrutiny to the certification decision. The magistrate judge did in fact refer to this heightened level of scrutiny. Order & Report 17 ("Where, as here, plaintiffs move to proceed as collective action post-discovery, courts apply heightened scrutiny to this inquiry as compared to pre-discovery." (internal quotations omitted)). Defendants give no explanation as to why certification is inappropriate under this heightened scrutiny, and thus have not shown that the magistrate judge's decision was clearly erroneous or contrary to law. In addition, for the reasons that follow, the Court finds that such heightened scrutiny is not appropriate in this case.

**\*9** The process of certifying an FLSA collective action is not specified by the statute itself, which only provides, in relevant part, that:

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). To implement this standard, courts have developed a two-stage process.[11] *Morales v. Plantworks, Inc.,* No. 05 Civ. 2349(DC), 2006 WL 278154, at *1 (S.D.N.Y. Feb.02, 2006). First, plaintiffs may move to certify a collective action. *Id.* This preliminary certification allows notice to be sent to potential similarly situated plaintiffs inviting them to opt in to the collective action. *Id.* Second,

after discovery is complete, defendants may move the court to decertify the collective action. *Id.*

Defendants misconceive the function of this two-stage process. Because the statute of limitations for FLSA claims continues to run for each individual plaintiff until he or she opts in, *see* 29 U.S.C. § 256(b), early certification and notice are favored in order to protect plaintiffs' rights. Thus, only a minimal evidentiary burden is imposed in order to satisfy the "similarly situated" requirement. *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 262 (S.D.N.Y.1997) ("[C]ourts have endorsed the sending of notice early in the proceeding, as a means of facilitating the FLSA's broad remedial purpose and promoting efficient case management."); *see also Krueger v. N.Y. Tel. Co.,* Nos. 93 CIV. 0178(LMM), 93 CIV. 0179(LMM), 1993 WL 276058, at *2 (S.D.N.Y. July 21, 1993) (discussing the benefits of "reaching out to potential plaintiffs"). Because the putative "similarly situated" plaintiffs have not yet been joined, and may not even be known, the certification is viewed as preliminary and subject to revisitation by the court. *Bowens v. Atlantic Maint. Corp.,* 546 F.Supp.2d 55, 82 (E.D.N.Y.2008) ("FLSA's opt-in provision merely provides an opportunity for potential plaintiffs to join and is only a preliminary determination as to which potential plaintiffs may in fact be similarly situated.").

In each of the cases cited by defendants it is clear that the court envisions the heightened standard applying not only after discovery, but also *after notice and opportunity to opt-in. See Sipas v. Sammy's Fishbox, Inc.,* No. 05 Civ. 10319(PAC), 2006 WL 1084556, at *2 n. 1 (S.D.N.Y. Apr.24, 2006) ("If the Court finds that the plaintiffs are not similarly situated, the Court will decertify the collective action and *the claims of the opt-in plaintiffs will be dismissed before trial.*" (emphasis added)); *Laroque v. Domino's Pizza, LLC,* 557 F.Supp.2d 346, 352 (E.D.N.Y.2008) ("After discovery, a second inquiry begins, generally precipitated by a defendant's motion for decertification, in which the court examines with a greater degree of scrutiny whether the members of the plaintiff class—*including those who have opted in*— are similarly situated." (emphasis added)); *Sobczak v. AWL Indus., Inc.,* 540 F.Supp.2d 354, 362–63 (E.D.N.Y.2007) ("It also does not prejudice defendants because the determination to certify the class and *to permit notice to be sent* is merely preliminary." (emphasis added)); *Valcho v. Dallas County Hosp. Dist.,* 574 F.Supp.2d 618, 621 (N.D.Tex.2008) ("[T]he court reexamines the class *after notice, time for opting in, and discovery has taken place,* typically in response to defendant's motion. If it finds that the class is no longer

made up of similarly-situated persons, it decertifies the class." (citations omitted and emphasis added)); *Guzman v. VLM, Inc.,* No. 07–CV–1126 (JG)(RER), 2007 WL 2994278, at *2 (E.D.N.Y. Oct. 11, 2007) ("Due to the conditional nature of the certification contemplated *at the notice stage,* the burden on plaintiffs is not a stringent one, and the court need only reach a preliminary determination that potential plaintiffs are similarly situated." (internal quotations omitted and emphasis added)); *see also Patton v. Thomson Corp.,* 364 F.Supp.2d 263, 268 (E.D.N.Y.2005) ("It may be revisited if it later appears, after appropriate discovery, that *the additional plaintiffs who opt to join the lawsuit,* if any, are not similarly situated to [plaintiff]." (emphasis added)). [12]

**\*10** This case is unusual in that a motion for collective action certification did not occur much earlier, before discovery. Thus, unlike the situation in a typical decertification motion, the identities of potential "similarly situated" opt-in plaintiffs are still unknown, as no notice has yet been issued. The heightened scrutiny standard is only appropriate after the opt-in period has ended and the court is able to examine whether the *actual* plaintiffs brought into the case are similarly situated. *See Davis v. Lenox Hill Hosp.,* No. 03 Civ.3746 DLC, 2004 WL 1926086, at *7 (S.D.N.Y. Aug.31, 2004) ("The test is whether there is a 'factual nexus' between the claims of the named plaintiff and those who have chosen to opt-in to the action."); *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 101, 105 (S.D.N.Y.2003) ("Should it become clear later that the parties who have opted-in are not similarly situated to the Plaintiff here, I will make any rulings that are necessary and appropriate to ensure that the case is properly formed."); *see also Chowdhury v. Duane Reade, Inc.,* No. 06 Civ. 2295(GEL), 2007 WL 2873929, at *3 (S.D.N.Y. Oct.02, 2007) (discussing deposition of opt-in plaintiffs as part of discovery). [13] It would not sensibly serve the purposes of the two-step scheme to impose on plaintiffs a heightened burden of proving that as-yet-unknown plaintiffs are similarly situated.

Additionally, in this case, plaintiffs initially filed a motion for certification of the collective action on January 15, 2009, prior to the completion of discovery. On January 25, 2009, defendants moved to stay the determination of the collective action motion pending the resolution of defendants' own summary judgment motion, and ultimately, on February 12, 2009, entered into a stipulation with plaintiffs pursuant to which the motion for collective action certification was voluntarily dismissed. Defendants received the benefit of

Gortat v. Capala Bros., Inc., Not Reported in F.Supp.2d (2010)
2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

delaying the collective action certification and cannot now use that very delay as a weapon to defeat the certification.

### c. Lack of Proof of Additional Plaintiffs

Defendants also object to the certification of the collective action, arguing that plaintiffs provided insufficient proof of the existence of similarly situated plaintiffs. Specifically, they argue that plaintiffs have failed to show that any of the proposed similarly situated plaintiffs "desire to opt in" to the action. Defs.' Objs. to Collective Action 10. In support of this argument, defendants cite cases following the Eleventh Circuit's decision in *Dybach v. State of Florida Department of Corrections,* 942 F.2d 1562, 1567–68 (11th Cir.1991), which required the district court to find that potential plaintiffs exist "who desire to 'opt-in' and who are 'similarly situated.'" Although some district courts outside of the Eleventh Circuit have adopted *Dybach's* "desire to opt in" requirement, [14] no other Circuit Court has done so, and it is not the law of this Circuit. Moreover, this requirement has been strongly criticized by several courts outside the Eleventh Circuit. *See Delgado v. Ortho–McNeil, Inc.,* No. SACV07–263CJCMLGX, 2007 WL 2847238, at *2 (C.D.Cal. Aug.07, 2007) ("The *Dybach* court provided no explanation for requiring plaintiffs to show that other class members desire to opt in, nor does the County indicate why this Court should adopt such a rule. The Court finds the *Dybach* rule inappropriate at the 'notice stage.' Conditional certification at this stage is designed to provide notice to potential plaintiffs specifically because they might not yet be informed of the action or their ability to participate in it."); *Heckler v. DK Funding, LLC,* 502 F.Supp.2d 777, 780 (N.D.Ill.2007) ("Defendants' proposed rule does not make sense. It would essentially force plaintiffs or their attorneys to issue their own form of informal notice or to otherwise go out and solicit other plaintiffs. This would undermine a court's ability to provide potential plaintiffs with a fair and accurate notice and would leave significant opportunity for misleading potential plaintiffs. That aside, the logic behind defendants' proposed procedure—requiring [plaintiff] to show that others want to join in order to send them notice asking if they want to join—escapes the Court. Requiring a plaintiff to make an advance showing that others want to join would undermine the 'broad remedial goal' of the FLSA."); *Reab v. Elec. Arts, Inc.,* 214 F.R.D. 623, 629 (D.Colo.2002) ("The cited language in *Dybach* ... appears to conflict with United States Supreme Court's position that the Act should be liberally 'applied to the furthest reaches consistent with congressional direction.' " (quoting *Alamo*

*Found. v. Sec'y of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985))); *Reab,* 214 F.R.D. at 629 ("requiring plaintiffs in § 216(b) actions to have some unknown number of persons decide whether to opt in places plaintiffs in the position of communicating with potential litigants without court supervision or guidance, leaving plaintiffs subject to allegations of improper solicitation and 'tainting' of the putative class."). This Court similarly rejects the "desire to opt in" requirement, and follows the overwhelming majority of district courts outside of the Eleventh Circuit in requiring only a showing of similarly situated persons.

**\*11** Furthermore, even were this Court to adopt the *Dybach* standard, plaintiffs in this case have made an adequate showing. First, this case was not brought by a single plaintiff, but rather by a group of similarly situated plaintiffs, which is suggestive of a greater degree of interest in participation by similarly situated persons. *See Simmons v. T–Mobile USA, Inc.,* Civil Action No. H–06–1820, 2007 WL 210008, at *9 (S.D.Tex. Jan.24, 2007) (explaining that this issue has not reached the Fifth Circuit "presumably because generally there are *multiple plaintiffs* or several current or former employees that seek to join the suit" (emphasis added)). Second, and more importantly, in the course of this litigation, three additional plaintiffs joined the action after being subpoenaed for depositions. *See* Amended Complaint, dated Feb. 13, 2009, Ex. 1; Pls.' Reply Br. 8–9. This lends significant weight to the idea that other similarly situated persons would also choose to opt in if given notice. *See Dumitrescu v. Mr. Chow Enters., Ltd.,* No. 07 Civ. 3601(PKL), 2008 WL 2600667 (S.D.N.Y. June 30, 2008) (holding that "plaintiffs have adequately demonstrated that there is a class of people potentially interested in joining the collective action" by presenting evidence of "at least fifty other tipped employees who were subjected to the same policies as plaintiffs, two of whom have already come forth expressing interest in joining the suit.").

### d. Individualized Defenses

Defendants also argue that the magistrate judge failed to consider their individualized defenses against different plaintiffs in certifying the collective action. As an initial matter, defendants failed to make this argument in their brief opposing certification of the collective action, Memorandum in Opposition to Plaintiffs' Motion for Notice under Collective Action under 29 U.S.C.A. Sec. 216(B), dated June 30, 2009, and thus the argument is waived here. The Court is satisfied, however, that certification of the collective action

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

would be appropriate even if individualized defenses were considered.

Defendants suggest that they would have distinct defenses against two groups of potential plaintiffs: (1) cash employees, if any exist; [15] and (2) more recent employees who allegedly signed an employment agreement which explicitly addresses their working hours. [16] The key issue in dispute in this action, which is relevant to the claims of all potential plaintiffs, is whether Capala had a policy of routinely paying wages to employees for fewer hours than they were required to be present at work. The Court is satisfied that these core issues common to all plaintiffs are sufficient to make them similarly situated for purposes of the FLSA. *See Torres v. Gristede's Operating Corp.,* No. 04 Civ. 3316(PAC), 2006 WL 2819730, at *11 n. 10 (S.D.N.Y. Sept.29, 2006) ("[T]he standard of proof and required evidence under FLSA is not an individualized inquiry but one based on policy, practice, and conduct." (internal quotations omitted)). Furthermore, the Court is empowered to revisit this issue should substantially different defenses arise. At that point, with knowledge of the identities and circumstances of the plaintiffs who have actually chosen to join the action, the Court can dismiss dissimilar opt-in plaintiffs or subdivide the collective action as appropriate. *See Ayers v. SGS Control Servs., Inc.,* No. 03 Civ. 9077 RMB, 2007 WL 646326, at *6 (S.D.N.Y. Feb.27, 2007) ("[T]o the extent Defendants present individual defenses, the Court may grant collective action and bifurcate trial, as necessary, to address those defenses." (internal quotations omitted)); *accord Torres,* 2006 WL 2819730, at *11 n. 10.

### 3. Notice to Potential Plaintiffs

#### a. Standard of Review

 **\*12**  The form and content of notices to be issued to class members or potential collective action opt-in plaintiffs is a nondispositive matter upon which a magistrate judge may rule. *See, e.g., Jemine v. Dennis,* No. CV 2008–3072(RRM) (MDG), 2009 WL 837802 (E.D.N.Y. Mar. 26, 2009). The district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. Proc. 72(a).

#### b. Objections to Contents of Notice

Defendants raise various objections to Magistrate Judge Gold's determinations regarding the notice to be sent to members of the class action and to potential opt-in plaintiffs in the collective action. Some of these objections are directed at the content of the notice. Specifically, defendants argue that (1) the proposed notice does not sufficiently define those employees who are members of the class or are eligible to join the collective action, and (2) the proposed notice inappropriately fails to adequately advise class members or potential opt-in plaintiffs of their legal rights, including rights related to legal representation and legal fees.

These objections are premature. Magistrate Judge Gold's Order & Report, to which defendants object, did not approve plaintiffs' proposed notice, and in fact, instructed plaintiffs to submit a new proposed notice, after considering the magistrate judge's suggestions and the case law. At the time defendants filed these objections, plaintiffs' proposed notice had yet to be filed, [17] and as of now, Magistrate Judge Gold has not yet approved any specific notice language. Until Magistrate Judge Gold actually approves specific notice language there is simply nothing to which Capala can object. [18] This Court takes no position on the merits of defendants' arguments at this time, leaving it to the magistrate judge in the first instance to approve appropriate notice. [19]

#### c. Objections to Form of Notice

In addition to the objections to the content of the proposed notice, defendants object to the form of the notice approved by the magistrate judge. Specifically, defendants argue that (1) published notice is inappropriate given the small number of known potential plaintiffs, and (2) a single notice for both the collective and class actions is inappropriate. The Court will address these objections in turn.

In addition to sending a notice to employees on the list provided by defendants, plaintiffs proposed publishing the notice for five consecutive weekends in *Nowy Dziennik,* "a New York-based Polish language newspaper." Order & Report 20. The magistrate judge approved of this publication, but, due to the "lack of concrete information" about additional employees, he held that plaintiffs should bear the cost of publication unless a significant number of additional plaintiffs are identified as a result of the notice. [20] Order & Report 20–21. Defendants argue that because plaintiffs have not provided sufficient proof of other potential plaintiffs, this published notice is inappropriate. The cases cited give little support for this argument. [21] For example, defendants cite *Rubery v. Buth–Na–Bodhaige, Inc.,* 569 F.Supp.2d 334 (W.D.N.Y.2008), for the proposition that newspaper

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

publication is inappropriate unless plaintiffs can show that mailed or posted notice is insufficient. But *Rubery* did not involve newspaper publication, but rather publication in the *company newsletter. Id.* at 338. The court's reasoning was made clear in *Sherrill v. Sutherland Global Services, Inc.,* 487 F.Supp.2d 344, 351 (W.D.N.Y.2007), the case upon which *Rubery* relied, which grounded this limitation on notice in "minimizing any disturbance to [the] workplace." Despite this concern with avoiding workplace disruption, in both *Rubery* and *Sherrill,* the court did require employers to prominently post the notice on company bulletin boards. In this case, plaintiffs proposed newspaper notice does not require any affirmative steps by defendants or the commandeering of company resources. [22] Such notice is appropriate, and in any event, is not clearly erroneous or contrary to law.

**\*13** Defendants also argue that it is inappropriate to issue a single notice for both the class action and collective action, arguing that it is prejudicial due to the different statutes of limitations governing each of the claims. Because the statute of limitations for FLSA claims is only three years while the NYLL claims have a six-year limitations period, some plaintiffs may be members of the class action, but ineligible to join the collective action. Defendants argue that the inclusion of both claims in a single notice would cause confusion. The magistrate judge found, and this Court agrees, that more confusion is likely if two separate notices are sent concerning claims based on the same underlying facts. [23] Furthermore, it is difficult to see how defendants are seriously prejudiced if such a combined notice is received by a person who has claims that are more than three but less than six years old. Such a person would be entitled to notice of the class action and, if he attempts to opt in to the collective action, could simply be informed that he is ineligible.

Defendants cite four cases in which courts limited notice of FLSA claims to claims within the past three years. None of these cases supports their demand for separate notices of the class and collective actions. In each of these cases, the dispute concerned whether persons with claims between three and six years old should receive any notice whatsoever. Here, defendants concede, as they must, that once a class action has been certified notice is perfectly appropriate for the state law claims for the full six year period. These cases are not relevant to the question of whether a single combined notice is appropriate. In *Summa v. Hofstra University,* No. CV 07–3307(DRH)(ARL), 2008 WL 3852160 (E.D.N.Y. Aug. 14, 2008), plaintiffs brought no state law claims. The dispute regarding the temporal scope of the notice related

only to the availability of equitable tolling. In *Sobczak v. AWL Industries, Inc.,* 540 F.Supp.2d 354 (E.D.N.Y. Oct.22, 2007), and *LeGrand v. Education Management Corp.,* No. 03 Civ.9798(HB)(HBP), 2004 WL 1962076 (S.D.N.Y. Sept. 02, 2004), the courts declined to extend the notice period to cover state law claims, finding that no class action was available for the state law claims and thus notice was not appropriate for those claims. That is obviously inapplicable here where a class action has been certified on the state law claims. Finally, in *Suarez v. S & A Painting & Renovation Corp.,* No. 08–CV–2984 (CPS)(JO), 2008 WL 5054201 (E.D.N.Y. Nov. 21, 2008), the magistrate judge cited his lack of authority to certify a class action as precluding the authorization of notice regarding the state law claims. Again, in this case, where a class action has been certified by the Court, there is no such barrier to approving notice of the state law claims. [24]

In addition, several courts have approved a single notice of both FLSA and state law claims, covering the full six-year state law limitations period, even when no class action had yet been certified for the state law claims. *See Jemine,* 2009 WL 837802; [25] *Guzman,* 2007 WL 2994278; *Wraga v. Marble Lite, Inc.,* No. 05–CV–5038 (JG)(RER), 2006 WL 2443554 (E.D.N.Y. Aug. 22, 2006); *Harrington v. Education Management Corp.,* No. 02 Civ. 0787(HB), 2002 WL 1343753 (S.D.N.Y. June 19, 2002); *Realite v. Ark Restaurants Corp.,* 7 F.Supp.2d 303 (S.D.N.Y.1998). In this case, where both the class and collective actions have been certified, notice covering the full six-year period is clearly appropriate.

### 4. Motion for Recusal

**\*14** In their objections to the magistrate judge's Report, defendants accuse the Court of a "lack of objectivity and fairness" and ask leave of the Court to file a motion for recusal. Defs.' Objs. to Class Cert. 32. Defendants made a similar request in a submission to Magistrate Judge Gold. [26] Memorandum of Law in Opposition to Magistrate's Sua Sponte Order to Show Cause ("Defs.' Br. in Opp. to Show Cause Order"), dated October 29, 2009, at 19. No leave is required to file a recusal motion. *See Morisseau v. DLA Piper,* 532 F.Supp.2d 595, 622 (S.D.N.Y.2008). If defendants wish to file such a motion, they may do so.

On the other hand, while defendants surely have a right under 28 U.S.C. § 455 to request recusal, casting aspersions on this Court's integrity while holding out the threat of a recusal motion is wholly inappropriate. [27] If defendants have

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

concerns about the impartiality of this Court, those concerns should be raised in a proper recusal motion, or not at all.

are OVERRULED, and plaintiffs' motion for class action certification is GRANTED.

SO ORDERED.

### CONCLUSION

For the aforementioned reasons, defendants' objections to the magistrate judge's certification of the collective action are OVERRULED, defendants' objections to the magistrate judge's recommendation of class certification

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

Footnotes

1   FLSA claims may not be brought as part of a Rule 23 class action, but rather the FLSA provides for a special opt-in collective action procedure. *See Alleyne v. Time Moving & Storage Inc.,* No. 08CV1356ENVSMG, 2010 WL 322882, at *2 (E.D.N.Y. Jan.28, 2010) ("FLSA claims are ineligible for certification under Rule 23 and can only be certified as 'collective actions' pursuant to 29 U.S.C. § 216(b)").

2   A magistrate judge has the authority to authorize an FLSA collective action. *Mazur v. Olek Lejbzon & Co.,* No. 05 Civ. 2194(RMB)DF, 2005 WL 3240472, at *2 n. 1 (S.D.N.Y. Nov.30, 2005). A class action must be certified by the district court judge, 28 U.S.C. § 636(b)(1)(A), but the Court, on July 9, 2009, referred the class certification motion to Magistrate Judge Gold for a report and recommendation.

3   Plaintiffs have alleged that there were additional cash employees paid off the books who would also be members of the proposed class. Defendants vehemently deny this allegation. Because the seventy-four employees identified by defendants are sufficient to support numerosity, the existence of any such employees is irrelevant to the Court's numerosity determination.

4   Defendants actually attempt to have it both ways, referring to the affidavits as "releases" and citing settlement cases in support of defendants' right to negotiate settlements with plaintiffs prior to class certification, Defs.' Obj s. to Class Cert. 11–12 ("[T]he Second Circuit does favor settlement of claims by putative class members before the class action is certified."), while at the same time distinguishing cases in which the court exercised supervisory authority over such negotiations on the ground that in this case no rights are being waived by prospective plaintiffs, Defs.' Objs. to Class Cert. 9–10, 15. In the most extreme example, defendants endorse both of these contradictory positions within a single sentence. Defs.' Objs. to Class Cert. 16–17 ("... despite that this is not a stipulation and settlement agreement between the parties as to disputed claims between the affiants and the defendants, and despite that the release provisions of a sworn statement must be honored and respected ..." (emphasis omitted)).

5   Magistrate Judge Gold stated that "when asked during oral argument to identify any precedent addressing the effect of affidavits like the ones presented here, defendants were unable to do so," Order & Report 9. Defendants characterize this statement as "disregard[ing] the existing case law and the Second Circuit's [s]tated preference to allow settlements of putative class members' claims before the class is certified," Defs.' Objs. to Class Cert. 11–12. But the magistrate judge was requesting precedents regarding an "affidavit of non-participation" in a class action, specifically distinguishing it from a "release of a Minimum Wage Act claim under New York State Law." Tr. of 9/10/09, at 6–8. The oral argument transcript is crystal clear on this point. Defendants' only response was that "[t]here is no case law to the contrary to exclude them either," *id.* at 7; *see also id.* at 8. Their attempts to now argue otherwise are disingenuous.

6   Defendants accuse the magistrate judge of mischaracterizing their argument:

Footnote 6 of the [Order & Report] incorrectly asserts that defendants assert that employees who had been hired after the complaint filed [sic] are not part of this potential class action because they signed newly [sic] employer-employee regulations and policies stating clearly that work begins at 7:30 A.M., instead of the 7:00 A.M. claimed by the instant plaintiffs.

Defs.' Obj s. to Class Cert. 4. In fact, this is precisely what defendants argued in their brief opposing class certification: [S]uch workers signed receipts of policy and procedures acknowledging that work started at 7:30 A.M., even though they might have hired [sic] in 2007 before the complaint was served in August of 2007. The existence of these signed policy and procedures documents excludes these individuals from being in the same potential class as the present plaintiffs.

*Gortat v. Capala Bros., Inc., Not Reported in F.Supp.2d (2010)*

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

Defs.' Br. in Opp. to Class Cert. 16–17 (citation omitted). Magistrate Judge Gold stated:

> After the complaint was filed, defendants claim that they required new hires to sign "regulations of employment" acknowledging that the workday began at 7:30 a.m. To the extent defendants argue that these "regulations" are the equivalent of a release, this argument is rejected for the reasons stated in the text.

Order & Report 7 n. 6. There is no misrepresentation in the magistrate judge's opinion. Defendants' characterization of the argument as concerning *defenses* is new to their objections.

7    In its earlier opinion, the Court noted that:

> To substantiate their argument, the defendants highlight the allegations in their amended third counterclaim against the plaintiffs for tortious interference, the allegations that some of the plaintiffs have filed false unemployment insurance applications, and the fact that plaintiffs Filipkowski and Lapinski invoked their Fifth Amendment right against self-incrimination during their depositions. In addition, the defendants proffered affidavits from their employees that, in the defendants' words, "indicate the level of violence and threats that most of these plaintiffs have imposed on the workers who after one and half year [sic] of litigation have resisted their unsuccessful attempts to have them join this litigation."

> *Gortat*, 257 F.R.D. at 363 (footnote and citations omitted, alteration in original opinion). Defendants raise all of these arguments again in their opposition to class certification.

8    The full exchange was as follows:

> Q: So what time on the average was it, on the average, that you left the shop?
> A: At times, 7:20, other times ten or 15 to 8:00.
> Q: So somewhere between 7:20 and 7:50 a.m.?
> A: Approximately.
> Q: Most of the times it was 7:20 or closer to 7:50?
> A: I don't remember.

Lapinski Dep. 87:14–24.

9    The declaration states, in relevant part:

> Realizing that they needed evidence of threats of physical violence, and having identified Plaintiff Filipkowski as the alleged ringleader of Plaintiffs' alleged conspiracy to interfere with Defendants' contracts, Defendants, upon information and belief, apparently convinced former Plaintiff Drelich, as well as one of his colleagues, to file fraudulent criminal complaints against Plaintiff Filipkowski for harassment.

Wisniewski Decl. ¶ 24.

10    The magistrate judge quotes the class definition proposed by plaintiffs but never explicitly adopts that definition. Order & Report 3.

11    Technically speaking, there is no statutory requirement that a court "certify" a collective action under the FLSA. *See* 29 U.S.C. § 216(b). A court must, however, determine whether to permit notice to potential plaintiffs and must determine whether opt-in parties satisfy the statute's "similarly situated" requirement. This Court will follow the common usage of other courts in using the language of "certification" to refer to these determinations.

12    In one case cited by the magistrate judge, *Torres v. Gristede's Operating Corp.,* No. 04 Civ. 3316(PAC), 2006 WL 2819730, at *9 (S.D.N.Y. Sept.29, 2006), the court explicitly endorsed the application of heightened scrutiny in a post-discovery, pre-notice, context. *Torres* adopts this standard without discussion, and the case cited in support, *Harrington v. Educ. Mgmt. Corp.,* No. 02 Civ. 0787(HB), 2002 U.S. Dist. LEXIS 8823, at *4–5, 2002 WL 1009463 (S.D.N.Y. May 17, 2002), holds only that "[i]t is only later down the road that the court need engage in a second more heightened stage of scrutiny as to whether the plaintiffs are similarly situated for the purposes of maintaining the collective action," and citing in turn two cases more consistent with the view that heightened scrutiny is appropriate only after notice and opportunity to opt in. *See Jackson v. N.Y. Tel. Co.,* 163 F.R.D. 429, 431 (S.D.N.Y.1995) ("The inquiry at the inception of the lawsuit is less stringent than the ultimate determination that the class is properly constituted."); *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y.2001) (distinguishing the lenient standard "at the notice stage" from the second stage when "the case is ready for trial"). This Court declines to follow *Torres.*

13    Even in cases with language suggesting that the second stage review might occur prior to opt in, *see, e.g., Iglesias–Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 369 (S.D.N.Y.2007) ("If the fruits of full discovery reveal that plaintiffs are not, in fact, 'similarly situated' to defendants' other employees, or that only employees who worked at the same facility or engaged in a particular job are 'similarly situated,' I may later decertify the class or divide it into subclasses, if appropriate."), it is clear, reading the opinions in their entirety, that the court expected the second review to occur after opt in, *id.* at 367 ("If the claimants are indeed similarly situated, the collective action proceeds to trial, and if they are not,

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

the class is decertified, *the claims of the opt-in plaintiffs are dismissed* without prejudice, and the class representative may proceed on his or her own claims." (emphasis added)). *See also Lynch v. United Servs. Auto. Ass'n,* 491 F.Supp.2d 357, 368, 369 (S.D.N.Y.2007).

14   *See, e.g., Parker v. Rowland Express, Inc.,* 492 F.Supp.2d 1159, 1164–66 (D.Minn.2007) (defending the "desire to opt in" requirement and citing cases from outside the Eleventh Circuit applying it).

15   *See* Defs.' Objs. to Collective Action 8.

16   *See* Defs.' Objs. to Class Cert. 4.

17   Plaintiffs subsequently filed a proposed combined notice on November 4, 2009.

18   To the extent defendants object to Magistrate Judge Gold's rulings and recommendations regarding the form, as opposed to the content, of the notice, these objections are addressed below.

19   The magistrate judge instructed the parties as follows:

> Counsel shall submit a proposed notice for my review by November 4, 2009. In the event that the parties are unable to agree on a proposal, plaintiffs shall submit their proposed notice by November 4, 2009, and defendants will file objections one week thereafter.

> Order & Report 20. Although plaintiffs submitted their proposed notice on November 4, 2009, defendants have submitted no objections in response. The Court leaves it to the magistrate judge in the first instance to determine whether defendants have waived their opportunity to object, or whether their objections to the Order & Report might be construed as in response to plaintiffs' proposal.

20   The magistrate judge held as follows:

> [i]f a significant number of class members who were not on defendants' list of seventy-four employees join the class after publication, plaintiffs may seek to have the cost of publication shifted to defendants.

> Order & Report 20–21. The notice is directed at both members of the class action and potential collective action opt-in plaintiffs. Although the magistrate judge appears to be referring only to opt-in plaintiffs in the quoted language, the Court believes that cost-shifting would be appropriate if the notice results in a significant number of *either* new collective action opt-in plaintiffs *or* previously unidentified members of the class action, whether or not such persons choose to opt out of the class.

21   Amazingly, defendants cite an American Law Reports annotation, Wesley Kobylak, Annotation, *Notice to potential class members of right to "opt-in" to class action, under § 16(b) of Fair Labor Standards Act (29 U.S.C.A. § 216(b)),* 67 A.L.R. Fed. 282 (1984), for the proposition that there is a circuit split concerning whether courts have the authority to authorize collective action notice. The Supreme Court definitively resolved this split in favor of allowing notice *over twenty years ago. See Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Defendants have inexplicably failed to notice that this ALR annotation was originally published in 1984, and that all of the cases disapproving of notice cited therein predate *Hoffmann–La Roche.* Similarly, defendants cite *Montalto v. Morgan Guaranty Trust Co.,* 83 F.R.D. 150, 152 (S.D.N.Y.1979), wherein the district court held that "[n]o notice appears to be required by 29 U.S.C. s 216(b) and it would be inappropriate for the court to stimulate litigation by giving its imprimatur to any such procedure," while completely ignoring the Supreme Court's statement in *Hoffmann–La Roche* holding that "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) ... by facilitating notice to potential plaintiffs," *Hoffmann–La Roche,* 493 U.S. at 169.

22   And, as noted above, defendants will not even bear the costs unless a significant number of additional plaintiffs are identified as a notice.

23   Defendants' argument that it would be less confusing to publish two separate notices in the newspaper rather than a single combined notice is nonsensical. Since the newspaper advertisement isn't targeted to specific individuals, it would serve no purpose to separate the claims. Rather, it would increase the likelihood that former employees might fail to read one of the two notices.

24   Defendants mischaracterize the magistrate judge's opinion, claiming that he "states that these cases did not involve claims for years 3 through 6 by employees which would be covered by a class action pursuant to NYLL." Defs.' Objs. to Collective Action 9. In fact, the magistrate judge stated, accurately, that "none of the cases defendants rely upon involved motions to certify a Rule 23 class pursuant to NYLL." Order & Report 20 n. 15.

25   Defendants completely misrepresent the holding in *Jemine,* stating that "separating the collective action notice from the class action, that Magistrate reserved the class action notice for years 3–6 and addressed them on a separate notice." Defs.' Objs. to Collective Action 8–9. This description bears absolutely no resemblance to the actual holding of *Jemine* in which the magistrate judge approved a single notice for both the FLSA collective action and state claims Rule 23 class action, stating:

2010 WL 1423018, 16 Wage & Hour Cas.2d (BNA) 41

[T]he notice sent to putative plaintiffs should clearly distinguish between the time periods applicable to the federal law claim and the New York law claim and explain that plaintiffs may have claims under the FLSA if they worked more than forty hours per week during the last three years and/or claims under New York law if they worked more than forty hours per week or more than 10 hours per day during the last six years. The notice should further advise that failing to file a consent form affects only the FLSA portion of the case. Relatedly, the notice should provide that only the employees who worked for some time during the last three years may join the collective action. Finally, the notice should provide that those plaintiffs who have claims under New York law and join the collective action may waive their right to liquidated damages under New York state law and that they may want to contact plaintiffs' counsel or another attorney.

*Jemine,* 2009 WL 837802, at *2. This is entirely consistent with Magistrate Judge Gold's Order.

26    In their brief objecting to class certification, defendants state that "leave is requested for recusal by the Court and/or change of venue." Defs.' Objs. to Class Cert. 32. In the filing before Magistrate Judge Gold, defendants state more clearly that they are requesting "leave and adequate time to file a motion for recusal and/or change of venue." Defs.' Br. in Opp. to Show Cause Order 19. Because the language in their brief objecting to class certification is unclear, the Court will construe it consistently with their brief to the magistrate judge, filed only five days earlier, as requesting leave to file a motion, rather than actually making that motion.

27    It is worth noting however, that months have passed since defendants requested from Magistrate Judge Gold time to file a motion for recusal, and no recusal motion has been forthcoming.

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## **Exhibit 3**

*In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804,
2019 WL 4178617 (N.D. Ohio Sept. 3, 2019)

2019 WL 4178617
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION
This Document Relates to:
Track One Cases

MDL 2804
|
Case No. 1:17-md-2804
|
Signed 09/03/2019

**OPINION AND ORDER REGARDING
DEFENDANTS' SUMMARY JUDGMENT
MOTIONS ON CAUSATION**

DAN AARON POLSTER, UNITED STATES DISTRICT
JUDGE

**\*1** Before the Court are three related summary judgment
motions filed by Defendants: (1) the Pharmacy Defendants'
Motion for Summary Judgment on Causation (**Doc. #: 1885**);
(2) the Manufacturer Defendants' Motion for Summary
Judgment for Plaintiffs' Failure to Offer Proof of Causation
(**Doc. #: 1894**); and (3) the Distributor Defendants' Motion
for Summary Judgment on Proximate Causation Grounds
(**Doc. #: 1920**). For the reasons set forth below, the Motions
are **DENIED**.

**I. Legal Standard.**
The Court hereby incorporates the legal standards set forth in
the Court's Opinion and Order regarding Plaintiffs' Summary
Judgment Motions Addressing the Controlled Substances
Act, see Doc. #: 2483.

**II. Overview.**
Plaintiffs' remaining claims in this case are broadly based
on two theories of recovery: (1) public nuisance, and (2)
conspiracy. Under the theory of public nuisance, Plaintiffs
assert claims based on (a) Ohio statutory law; and (b)
Ohio common law, styled "absolute public nuisance." Under
the conspiracy theory, Plaintiffs assert claims based on (a)

the Racketeer Influenced and Corrupt Organizations Act
("RICO"); (b) the Ohio Corrupt Practices Act; and (c) civil
conspiracy under Ohio common law. Plaintiffs assert all
claims against all Defendants.

Against the Manufacturers, under each claim, Plaintiffs
assert two theories of relief: (1) fraudulent marketing; and
(2) failure to maintain effective controls against diversion.
Against the Distributors and Pharmacies, under each claim,
Plaintiffs assert only the latter theory of relief, *i.e.* failure
to maintain effective controls against diversion. With the
above-listed motions, Defendants seek summary judgment
on all claims, asserting Plaintiffs do not have sufficient
evidence of causation. The Court first examines the fraudulent
marketing claims against the Manufacturers, followed by the
claims against all Defendants for failure to maintain effective
controls against diversion.

**III. Analysis.**

**A. Fraudulent Marketing Claims Against
Manufacturers.**
The Manufacturers assert that, as a matter of law, Plaintiffs
cannot show their allegedly fraudulent marketing activities
proximately caused the harms that Plaintiffs seek to redress
in this lawsuit — that is, harms caused by an increase in and/
or oversupply of opioid prescriptions. More specifically, the
Manufacturers assert Plaintiffs cannot show: (1) the alleged
marketing misconduct caused medically unnecessary and/or
excess prescriptions in the *Track One* Counties; or (2) these
excess prescriptions proximately caused harm to Plaintiffs.
The Manufacturers also assert that Plaintiffs may not rely
on aggregate proof, but must prove causation individually,
connected to the specific conduct of each Defendant in the
case.

**1. Effect of Alleged Marketing Misconduct.**

The Manufacturers assert Plaintiffs cannot show their
allegedly fraudulent marketing activities resulted in
unnecessary and/or increased opioid prescriptions in the
*Track One* Counties. *See* Manuf. Brief at 6-8 (Doc. #:
1894-1). Plaintiffs respond with extensive evidence they
contend demonstrates, both collectively and individually, that
the Manufacturers engaged in a widespread promotion and
marketing campaign that trivialized the medical risks of
addiction and exaggerated the benefits of long-term opioid
use. *See* Pls. Opp. at 2-18 (Doc. #: 2204). Construed in the

*In re National Prescription Opiate Litigation, Slip Copy (2019)*
2019 WL 4178617

light most favorable to Plaintiffs, this evidence would allow a reasonable jury to find that each Manufacturer engaged in misleading marketing activities. *See, e.g., id.*; Perri Rpt. at 86-137 (listing marketing messages by defendant); Pls. Ex. 8 (Doc. #: 2404-1) (Mallinckrodt); Pls. Ex. 22 (Doc. #: 2408-2 (Allergan); Pls. Ex. 27 (Doc. #: 2408-7) (Mallinckrodt); Pls. Ex. 41 (Doc. #: 2414-7) (Allergan); Pls. Ex. 112 (Doc. #: 2424-4) (Teva); Pls. Ex. 146 (Doc. #: 2431-4) (Janssen).

**\*2** In addition, Plaintiffs point to evidence that suggests, over this same time period, the supply of prescription opioids dramatically increased. For instance, the expert opinion of Jonathan Gruber, a health economist, shows that, from 1997 to 2016, shipments of prescription opioids nationwide increased by more than 500 percent. [1] *See* Gruber Rpt. at 16 (Doc. #: 1916-5). Another expert, Meredith Rosenthal, a health economist, opines: "the combined effect of the Defendant [M]anufacturers' promotion of prescription opioids since 1995 was a substantial contributing factor to the increase in the use of prescription opioids" in the *Track One* Counties." [2] Rosenthal Rpt. ¶ 8 (Doc. #: 1913-4). Likewise, Matthew Perri, III, an expert in pharmaceutical marketing, states: "Defendants' approach to marketing opioids was purposeful, aggressive, and effective in increasing sales. The marketing outcomes, including Defendants' own internal metrics, support the fact that the Defendants were able to persuade prescribers and other stakeholders to increase the use of opioids for pain." Perri Rpt. at 139 (Doc. #: 1999-18). Construing this evidence in the light most favorable to Plaintiffs, a factfinder could easily conclude the Manufacturers' misleading marketing activities resulted in a substantial increase in the supply of prescription opioids. This conclusion is further buttressed by Defendants' own documents. *See, e.g.,* Pls. Ex. 91 (Doc. #: 2421-3) (Teva's marketing plan, noting consultant meetings and medical education programs proved incredibly effective in driving prescription growth).

On this record, the Court finds Plaintiffs have shown evidence sufficient to support their claim that the Manufacturers' allegedly fraudulent marketing activities caused an increase in the supply of prescription opioids in the *Track One* Counties.

### 2. Causation of Harm to Plaintiffs.

The Manufacturers assert Plaintiffs cannot show this increase in prescription opioids proximately caused harm to Plaintiffs. In response, Plaintiffs point to Gruber's expert report

that finds a direct causal relationship between Defendants' shipments of prescription opioids and the misuse and mortality from prescription opioids. *See* Gruber Rpt. at 8-10, 61 (Doc. #: 2000-6). Additionally, Plaintiffs' expert in health and public economics, David Cutler, performed a detailed analysis showing how the shipments of prescription opioids caused harm to the *Track One* Counties. [3] *See* Cutler Rpt. at 5-6, 13-80 (Doc. #: 1901-4). And Katherine Keyes, an epidemiologist, reviewed dozens of studies and concluded that increases in prescription opioids are causally related to increases in various opioid-related harms. [4] *See* Keyes Rpt. at 18-29 (Doc. #: 1868-4). Based on this evidence, a jury could reasonably conclude that the increases in prescription opioids proximately caused harm to Plaintiffs. *See, e.g.,* Order Adopting in Part R&R on Mtns. to Dismiss at 7-10 (allegations of deceptive marketing that worked to increase the supply of prescription opioids to the black market, and forced Plaintiffs to expend additional resources in response to associated harms, are sufficient to support a finding of proximate causation).

The Manufacturers contend Plaintiffs cannot show causation based on aggregate proof. *See* Manuf. Brief at 16-22 (Doc. #: 1894-1). As discussed above, Plaintiffs have presented evidence to support a finding that each Manufacturer engaged in deceptive marketing practices that resulted in an increased supply of prescription opioids and caused harm to Plaintiffs. Moreover, construing this evidence in the light most favorable to Plaintiffs, the record supports an inference that the conduct of each Manufacturer was a substantial factor in producing the harm. *See Pang v. Minch*, 53 Ohio St. 3d 186, 559 N.E.2d 1313, 1324 (Ohio 1990) (where plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is on the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm; thereafter, the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment). [5] Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have made a sufficient showing to withstand summary judgment on this issue. *See, e.g., BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011) ("Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation."). [6]

**\*3** Accordingly, the Court concludes the Manufacturers are not entitled to summary judgment on the fraudulent marketing claims.

### B. Failure to Maintain Effective Controls Against All Defendants.

Defendants assert Plaintiffs cannot show their alleged failure to maintain effective controls against diversion proximately caused harm to Plaintiffs. *See* Man. Brief. at 11-15 (Doc. #: 1894-1); Dist. Brief at 6-20 (Doc. #: 1920-1); Pharm. Brief at 4-11 (Doc. #: 1885-1). This Court has found that, as a matter of law, the Controlled Substance Act and its implementing regulations require registrants to: (1) design and operate a system to disclose to the registrant suspicious orders ("SOMS"); (2) inform the DEA of suspicious orders when discovered by the registrant; and (3) not ship a suspicious order unless due diligence reasonably dispels the suspicion. *See* Order on Pls. MSJ re CSA at 15, 18-19 (Doc. #: 2483) (citations omitted).

### 1. SOMS Claims Against the Manufacturers.

The Manufacturers assert the SOMS claims against them fail because Plaintiffs have no evidence to show the Manufacturers failed to maintain effective controls against diversion. *See id.* at 12-15. Specifically, the Manufacturers assert that, at most, Plaintiffs' evidence on this issue is only against the *Distributors*. *See id.* The Manufacturers are mistaken. Plaintiffs' expert, James Rafalski, is a former DEA Investigator with expertise in identifying methodologies available to flag potentially suspicious orders. *See* Order re Mtn. to Exclude Rafalski at 12 (Doc. #: 2494).[7] Rafalski reviewed each of the Manufacturers' SOMS and due diligence procedures and determined that each failed to contain key components that are necessary to maintain effective controls against diversion. *See* Rafalski Rpt. at ECF pp. 145-187 (Doc. #1999-21). Based on this evidence, a jury could reasonably conclude the Manufacturers, and each of them, failed to maintain effective controls against diversion. *See also* Pls. Opp. at 19-22 (citing evidence regarding specific Manufacturers' failure to maintain effective controls).

The Manufacturers next contend Plaintiffs cannot show their alleged failure to maintain effective controls caused excess shipments of prescription opioids into the *Track One* Counties. Specifically, the Manufacturers assert Plaintiffs

have failed to identify a single order they should not have shipped. *See* Man. Brief at 12-15 (Doc. #: 1894-1). For reasons similar to those stated above, the Court finds Plaintiffs' aggregate proof of causation sufficient to overcome summary judgment. In particular, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests there was a complete failure by Defendants to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs. *See Pang*, 559 N.E.2d at 1324. Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have demonstrated that summary judgment is unwarranted on this issue. *See, e.g., BCS Servs.,* 637 F.3d at 758.

### 2. SOMS Claims Against the Distributors and Pharmacies.

**\*4** The Distributors and Pharmacies similarly assert the SOMS claims against them fail because Plaintiffs cannot show their alleged failure to maintain effective controls caused the alleged injury to Plaintiffs. More specifically, the Distributors and Pharmacies assert Plaintiffs have not shown their alleged injury resulted from the diversion of suspicious orders, as opposed to an increase in good faith prescriptions based on the Manufacturers' alleged fraudulent marketing practices. *See* Dist. Brief at 7-14; Pharm. Brief at 5-11. This argument overlooks the fact that whether the alleged harm was caused by fraudulent marketing or ineffective controls, or a combination of both, involves questions of disputed facts for the jury to resolve. As with the SOMS claims against the Manufacturers, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs. *See Pang*, 559 N.E.2d at 1324. Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have done enough to withstand summary judgment on this issue. *See, e.g., BCS Servs.,* 637 F.3d at 758.[8]

### IV. Conclusion.

For the reasons stated above, the Court **DENIES** Defendants' Motions for Summary Judgment on Causation (**Docs. #: 1885, 1894 and 1920**). In so ruling, the Court notes that, at trial, it will have an opportunity to reevaluate the sufficiency of the evidence as to each Defendant and nothing in this Order prevents the Court from granting judgment as a matter of law, if warranted. *See* Fed. R. Civ. P. 50.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4178617

Footnotes

1    The Court overruled Defendants' motion to exclude Gruber's testimony. *See* Doc. #: 2531.

2    The Court overruled Defendants' motion to exclude Rosenthal's testimony. *See* Doc. #: 2495. Defendants' arguments that Rosenthal's opinions do not sufficiently link their allegedly deceptive practices to Plaintiffs' alleged losses go to the weight of this evidence. *See* Manuf. Brief at 7-8 (Doc. #: 1894-1); Order Denying Mtn. to Excl. Rosenthal at 13-14 (Doc. #: 2495).

3    The Court overruled Defendants' motion to exclude Cutler's testimony. *See* Doc. #: 2542. Defendants' challenges to Cutler's methodology go to the weight of this evidence. *See* Manuf. Brief at 9-11 (Doc. #: 1894-1); Order Denying Mtn. to Excl. Cutler at 5-7 (Doc. #: 2495).

4    The Court overruled Defendants' motion to exclude Keyes' testimony. *See* Doc. #: 2549.

5    In *Pang*, the Ohio Supreme Court noted the rationale behind this ruling:
     The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility. As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former.
     559 N.E.2d at 1324 (quoting Comment d to 2 Restatement of the Law 2d, Torts 442, Section 433B(2)). The same rationale applies here, *i.e.* Defendants should not be allowed to avoid responsibility for the alleged misconduct merely because it is difficult or impossible to trace individual harms to the conduct of individual Defendants.

6    The Court agrees with Plaintiffs that Defendants' arguments regarding market-share liability do not apply here. *See* Pls. Opp. at 37-38 (Doc. #: 2204). Plaintiffs do not allege that only one of the Defendants caused the alleged harm. *See, e.g., Sutowski v. Eli Lilly & Co.,* 82 Ohio St. 3d 347, 351-355, 696 N.E.2d 187, 190-192 (Ohio 1998) (the Ohio Products Liability Act does not provide for market-share liability, *i.e.* a plaintiff cannot recover from defendants who did not supply the product that caused the harm).

7    Except for statements about what the law requires or whether Defendants' conduct violated the law, the Court overruled Defendants' motion to exclude Rafalski's testimony. *See* Doc. #: 2549.

8    The Court rejects the Distributors' arguments that Plaintiffs' claims fail, as a matter of law, due to the fact that diversion involves intervening criminal conduct. For reasons stated, a jury could reasonably conclude diversion is a foreseeable consequence of the alleged misconduct. *See* Dist. Brief at 14-15. Likewise, the Distributors' arguments about the extent of harm caused by alleged wrongdoing involves questions of material fact for the jury to decide. *See* id. at 19-22.

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## **Exhibit 4**

*In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804,
2019 WL 3934597 (N.D. Ohio Aug. 20, 2019)

2019 WL 3934597
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION
This Document Relates to: Track One Cases

MDL 2804
|
Case No. 1:17-md-2804
|
Signed 08/20/2019

**ORDER DENYING MOTION
TO EXCLUDE ROSENTHAL**

DAN AARON POLSTER, UNITED STATES DISTRICT
JUDGE

*\*1* Before the Court is Defendants' Motion to Exclude
Meredith Rosenthal's Opinions and Proposed Testimony
(Doc #: 1913). For the reasons stated below, the motion is
**DENIED**.

**A. Legal Standards.**
The Defendants have filed over a dozen motions seeking
to exclude testimony from Plaintiffs' designated experts.
The Court sets out here, in its first *Daubert* opinion, the
legal standards it will apply when considering all of these
motions. The Court will not repeat these legal standards
in subsequent opinions, and instead incorporates them by
reference in advance.

The Defendants' motions ask the Court to apply *Daubert v.
Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993) and Rule
702 of the Federal Rules of Evidence. Rule 702 states:

A witness who is qualified as an expert by knowledge, skill,
experience, training, or education may testify in the form
of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized
knowledge will help the trier of fact to understand the
evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and
methods; and

(d) the expert has reliably applied the principles and
methods to the facts of the case.

FED R. EVID. 702. Rule 702 was amended in 2000 to
reflect the decisions in *Daubert* and *Kumho Tire Co., Ltd.
v. Carmichael,* 526 U.S. 137 (1999). These decisions, and
their progeny, emphasize the district court's role as the
gatekeeper tasked with insulating juries from inadmissible
expert testimony. *See In re Scrap Metal Antitrust Litig.,* 527
F.3d 517, 528 (6th Cir. 2008); *Surles ex rel. Johnson v.
Greyhound Lines, Inc.,* 474 F.3d 288, 295 (6th Cir 2007).
A court's gatekeeping function applies not only to scientific
expert testimony, but also to expert testimony involving
technical or specialized knowledge. *See Kumho Tire,* 526 U.S.
at 147; FED. R. EVID. 702(a).

In its role as gatekeeper, a court must "strike a balance
between a liberal admissibility standard for relevant evidence
on the one hand and the need to exclude misleading 'junk
science' on the other." *Ask Chems., LP v. Computer Packages,
Inc.,* 593 F. App'x 506, 509 (6th Cir. 2014) (quoting *Best
v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 176–77 (6th Cir.
2009); *see also Nelson v. Tennessee Gas Pipeline Co.,* 243
F.3d 244, 252 (6th Cir. 2001) ("close judicial analysis of
expert testimony is necessary because expert witnesses are
not necessarily always unbiased scientists.") (citations and
internal quotation marks omitted). A court is not required to
admit expert testimony that is "connected to existing data only
by the *ipse dixit* of the expert" and may conclude there is just
too great an analytical gap between the data and the opinion
proffered. *See Nelson,* 243 F.3d at 254; *see also Gen. Elec.
Co. v. Joiner,* 522 U.S. 136 (1997).

Due to the complexities inherent in their role as gatekeeper,
district courts possess broad discretion to make admissibility
determinations. *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th
Cir. 2000). Indeed, "the law grants a district court the same
broad latitude when it decides *how* to determine reliability as
it enjoys in respect to its ultimate reliability determination."
*Kumho Tire,* 526 U.S. at 142 (emphasis in original) (citing
*Joiner,* 522 U.S. at 143). "As a baseline premise, in rulings
on the admissibility of expert opinion evidence, the trial court
has broad discretion and its rulings must be sustained unless
manifestly erroneous." *Brainard v. American Skandia Life
Assur. Corp.,* 432 F.3d 655, 663 (6th Cir. 2005) (internal
quotation marks and citations omitted).

In re National Prescription Opiate Litigation, Slip Copy (2019)

2019 WL 3934597

**\*2** Although a court is given a wide berth to determine the admissibility of expert testimony, "*Daubert* did not work a seachange [sic]over federal evidence law, and the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *Burgett v. Troy–Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting FED. R. EVID. 702, advisory committee note, 2000 amend.)(internal quotation marks omitted). Accordingly, an expert's testimony should be excluded when it amounts to "mere guess or speculation;" in contrast, challenges to the accuracy of an expert's conclusions or factual basis generally "bear on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993). And courts will "generally permit" erroneous or weak expert testimony as long as it has "some support" in the record. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citations omitted). Once such evidence is admitted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Burgett*, 579 F. App'x at 377 (quoting *Daubert*, 509 U.S. at 596). Rejection of expert testimony is the exception, rather than the rule. *See Burgett*, 579 F. App'x at 376 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530).

The Sixth Circuit has identified three factors a court should consider when deciding whether expert testimony is admissible. First, the proposed expert must have the requisite qualifications. Second, the proposed testimony must be relevant. Third, the proposed testimony must be reliable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. Each of these factors is discussed below.

**Is the Expert Qualified?**
The first criterion for admission asks whether the witness is qualified to offer expert opinion testimony. An expert may be qualified by virtue of his or her "knowledge, skill, experience, training or education," or a combination of these factors. FED. R. EVID. 702. Trial "courts do not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.' " *Burgett*, 579 Fed. App'x. at 376 (citations omitted). In this regard, a trial court must determine whether the expert's training and qualifications relate to the specific subject matter of his or her proposed testimony. "Thus, for example, a witness qualified as an expert in cardiovascular pharmacology may be allowed to opine about how a drug affects the heart, but not on how obesity affects the heart." *In* 

*re Welding Fume Products Liab. Litig.*, 2005 WL 1868046, at \*5 (N.D. Ohio Aug. 8, 2005) (citations omitted). The proponent of the expert has the burden to demonstrate that the expert's testimony meets all of the *Daubert* criteria, including that of qualification. *Nelson*, 243 F.3d at 251.

In cases where the proffered expert relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702, advisory committee note, 2000 amend. Further, regardless of the basis for the expert's qualifications, that a "proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness'[s] credibility, not his qualifications to testify." *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984); *see also*, *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (unfamiliarity with only some aspects of banking relationships merely affects weight and credibility, not admissibility); *Surles*, 474 F.3d at 296 (expert with experience with the threat management unit of the Los Angeles Police Department was qualified to testify despite his lack of specific experience in commercial bus line threat assessment).

**Is the Proffered Testimony Relevant?**
**\*3** The second factor for admission of expert testimony requires the testimony to be relevant. The relevancy requirement has been described as the "fit" requirement—that is, the expert must "fit" the facts of the case into the principles and methodologies used to render his opinion. *Daubert*, 509 U.S. at 591; *United States v. Smithers*, 212 F.3d 306, 313, 325 (6th Cir. 2000); *see also Joiner*, 522 U.S. at 152. *Daubert*'s "fit" requirement seeks to ensure that a jury is presented with expert evidence only when that evidence is demonstrably germane to the facts of the case. At its core, the relevance standard, or fit requirement, is "a liberal one" premised on Federal Rule of Evidence 401. *Daubert*, 509 U.S. at 587 ("Relevant evidence is defined as that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (internal quotation marks omitted).

Because "[f]it is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," a court must perform a case-by-

case assessment to determine whether a particular expert's testimony will truly help the jury understand the evidence. *Daubert*, 509 U.S. at 591. Testimony based on theories that do not fit the facts is not helpful to the jury and is not relevant. Even testimony applying appropriate methodology that is not connected to the facts of the case renders the testimony irrelevant. Accordingly, Rule 702's "helpfulness" standard requires a valid connection to the pertinent inquiry as a precondition of admissibility. *See Daubert*, 509 U.S. at 591-92.

Other types of evidence may also be unhelpful to the jury and, therefore, not relevant. For example, if the jury does not require enlightenment from someone having specialized knowledge of a subject, the proffered expert will not assist them in their inquiries and his or her opinions are irrelevant. *See* FED. R. EVID. 702, advisory committee note, 2000 amend. ("There is no more certain test for determining when experts may be used than the common sense inquiry of whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in that dispute."); *see also* See *United States v. Smith*, 736 F.2d 1103, 1105 (6th Cir. 1984), *cert. denied*, 469 U.S. 868 (1984). In addition, expert testimony that offers nothing more than a legal conclusion and attempts to tell the jury what result it should reach is generally not helpful and should be excluded. *See Shahid v. City of Detroit*, 889 F.2d 1543, 1547-48 (6th Cir. 1989) (expert testimony found inadmissible where the proffered legal conclusions would confuse the jury and the opinions pertained to ultimate fact issues that should be determined based on the credibility of testimony); *see also Davis v. Cowan Systems, L.L.C.*, No. 1:03 CV 2358, 2005 WL 2338829, at *1-2 (N.D. Ohio Sept. 23, 2005).

**Is the Proffered Testimony Reliable?**
Testimony can be reliable if it is "based on sufficient facts or data" or "the product of reliable principles and methods" which the expert, in turn, has applied to the facts of the case. FED. R. EVID. 702. The requirement that expert testimony be evaluated to determine its "reliability" stems directly from *Daubert*, where the Supreme Court required trial courts to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93 (citations omitted). A touchstone of this analysis is whether the proffered expert "basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

**\*4** To assist in the analysis of reliability, the *Daubert* Court set forth the following non-exhaustive list of factors for trial courts to use in assessing the reliability of scientific expert testimony:

1. whether the expert's technique or theory can be or has been tested;

2. whether the technique or theory has been subject to peer review and publication;

3. the known or potential rate of error of the technique or theory when applied;

4. the existence and maintenance of standards and controls; and

5. whether the technique or theory has been generally accepted in the scientific community.

*Daubert*, 509 U.S. at 593–94; *see also United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (an expert's opinion may also be deemed reliable if supported by "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance of the scientific [or technical] community").

The *Daubert* Court emphasized the non-exclusivity of its list, noting that "[m]any factors will bear on [this] inquiry," that there is no "definitive checklist or test" that must be applied, and that the test is a "flexible one." *Daubert*, 509 U.S. at 594–95; *see also Kumho Tire*, 526 U.S. at 150. Although a court should focus on the principles and methodology of the expert and not on the conclusions they generate, "conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146. Additionally, the *Daubert* factors "should be applied only 'where they are reasonable measures of the reliability of expert testimony.' " *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting *Gross v. Commissioner of Internal Revenue*, 272 F.3d 333, 339 (6th Cir. 2001)). For example, where non-scientific expert testimony is involved, "the [*Daubert*] factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *Barreto*, 268 F.3d at 335 (citing *Kumho Tire*, 526 U.S. at 150)

(internal quotation marks omitted). Nevertheless, whether the proffered testimony is technical or otherwise specialized, an expert's testimony should not be treated more permissively simply because it is outside the realm of science. *See* FED. R. EVID. 702, advisory committee note, 2000 amend.

Although a district court has broad latitude in determining whether proffered expert testimony is reliable, the Sixth Circuit has developed some guidance: "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best*, 563 at 177). In addition, the Sixth Circuit often analyzes the "prepared-solely-for-litigation factor." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, (6th Cir. 2007); *Newell Rubbermaid*, 676 F.3d at 527. Under this factor, the Sixth Circuit "has recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Johnson*, 484 F.3d at 434; *see also Mike's Train House, Inc v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation....").

**\*5** In addition, although Federal Rule of Evidence 704 permits a witness to opine about an "ultimate issue to be decided by the trier of fact," FED. R. EVID. 704(a), the Sixth Circuit has explained that there are limits to this permission:

> When the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue. We would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact). The distinction, although subtle, is nonetheless important.

*Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Similarly, "[i]t is not for the witness to instruct the jury as to applicable principles of law, but for the judge." *Sahid v. City of Detroit*, 889 F.2d 1543, 1548 (6th Cir. 1989) (quoting *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)).

Neither should a district court permit an expert to offer his client's opinion as his own. *See Ask Chems.*, 593 F. App'x at 510 (expert's testimony properly excluded based on his wholesale adoption of plaintiff's estimates, without revealing or evaluating the bases for the estimates). Rank speculation is also impermissible. *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("no matter how good experts' credentials may be, they are not permitted to speculate ...; the courtroom is not the place for scientific guesswork, even of the inspired sort.") (internal quotation marks omitted). And, "cherry-picking" only favorable data for use by an expert can be just as bad as omitting or fabricating data. *United States v. Lang*, 717 Fed. App'x. 523, 534 (6th Cir. 2017) (citing *EEOC v. Freeman*, 778 F.3d 463, 468-71 (4th Cir. 2015) (Agee, J., concurring).

Nevertheless, "the *Daubert* standard is liberal, and does not require expert opinions to be bulletproof." *Lang*, 717 Fed. App'x. at 534. Instead, the Supreme Court prefers that litigants rely upon "the capabilities of the jury and of the adversary system generally," rather than "wholesale exclusion" of fairly supported, relevant testimony by the Court. *In re Welding Fume Product Liab. Litig.*, 2005 WL 1868046, at \*5 (quoting *Daubert*, 509 U.S. at 596). If the expert's testimony rests on "good grounds based on what is known," then the expert's theory should be submitted to the jury, rather than excluded "for fear that [the jurors] will not grasp its complexities or satisfactorily weigh its inadequacies." *Id*. (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 75, 85 (1st Cir. 1998) (quoting *Daubert*, 509 U.S. at 590). The Court's role is "that of gatekeeper[, not] that of armed guard." *Id*.

### B. Defendants' Motion to Exclude Rosenthal: Introduction.

Having set out the legal standards, the Court now examines Rosenthal's expert opinions. Rosenthal conducted an analysis of, and offers opinions on, the impact of Manufacturer Defendants' marketing on opioid sales in Cuyahoga and Summit Counties. *See* Report at Doc. #: 1913-4. She opines on whether "the combined effect of the Defendant manufacturers' promotion of prescription opioids since 1995

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    4

was a substantial contributing factor to the increase in the use of prescription opioids in the Bellwether communities." Report at ¶ 8 (Doc. #: 1913-4). She further assessed "whether the increase in the use of opioids would have occurred were it not for, i.e., 'but for,' the allegedly unlawful promotion of these products by Defendant manufacturers." *Id.* Rosenthal concludes she can "reasonably identify the extent to which the sale of prescription opioids (measured by the number of milligrams of morphine equivalents, or MMEs) was caused by any quantum of the Defendants' promotion efforts that counsel can prove was unlawful." *Id.* at ¶ 11.

**\*6** Rosenthal is the C. Boyden Gray Professor of Health Economics and Policy at the Harvard T.H. Chan School of Public Health and is a well-respected expert in the field of health economics. She has published widely using the methods of econometrics. Recognizing her expertise, numerous federal courts have admitted her testimony. *See, e.g., In re Neurontin Marketing & Sales Pracs. Litig.*, 712 F.3d 21 (1st Cir. 2013); *In re Solodyn Antitrust Litig.*, 2018 WL 563144 (D. Mass. Jan. 25, 2018); *U.S. ex rel. Bahnsen v. Boston Sci. Neuromodulation Corp.*, 2017 WL 6402633 (D.N.J. Dec. 15, 207); *In re Actiq Sales & Marketing Pracs. Litig.*, 2014 WL 3572932 (E.D. Pa. July 21, 2014); *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009); *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571 (E.D.N.Y. 2007). Defendants do not challenge her qualifications. But defendants also ask the Court to exclude Rosenthal's report and testimony for a number of other reasons, including lack of fit, flawed assumptions, and numerous other alleged methodological errors. The Court concludes defendants' attacks are not well-taken.

### C. Discussion.

### 1. Fit.

Defendants argue Rosenthal's opinions will not be helpful to the trier of fact because they do not fit what they view to be Plaintiffs' theory of the case. According to Defendants, Plaintiffs' case centers on the manufacturers' "massive marketing campaign premised on false and incomplete information," in which they "relentlessly and methodically, but untruthfully, asserted that the risk of addiction was low when opioids were used to treat chronic pain." Motion at 4 (Doc. #: 1913). Defendants stress the importance of key opinion leaders ("KOLs"), front groups, and continuing medical education ("CME") programs to Plaintiffs' theory

and note that Plaintiffs aim to recover costs "related directly to Defendants' *illegal* actions." *Id.* (emphasis in original).

To support their claim about fit, Defendants make four separate arguments. First, Defendants point out that Rosenthal's analysis assumes *all* of their sales calls on doctors – known as detailing – were unlawful. Consequently, she does not specifically measure the consequences of Defendants' *unlawful* actions versus any lawful actions. According to Defendants, by failing to distinguish between lawful and unlawful detailing, Rosenthal's analysis is inconsistent with Plaintiffs' theory of liability and thus not helpful to the trier of fact. *Id.* at 4-6; Reply at 2 (Doc. #: 2461).

Second, Defendants find fault with Rosenthal's treatment of all detailing contacts as uniform, rather than breaking them out by any number of categories they volunteer. Some of these suggested subgroups of detailing contacts relate to practice area or prescribing behavior (e.g., surgeons and oncologists, or those whose prescribing rates decreased after detailing visits), but Defendants also argue Rosenthal should have distinguished between rivalrous and non-rivalrous marketing efforts. (Rivalrous detailing refers to visits intended to "convert doctors who were prescribing one kind of opioid to another." Motion at 7 (Doc. #: 2313); Reply at 4 (Doc. #: 2461)). Defendants assert Rosenthal's failure to be more granular regarding these different types and objectives of detailing renders her opinions useless.

Defendants next criticize Rosenthal for failing to measure the separate effects of Defendants' other marketing techniques, such as their alleged deployment of key opinion leaders ("KOLs"), front groups, and continuing medical education ("CME") programs – marketing efforts which Plaintiffs also highlight in their complaint. Motion at 7-8 (Doc. #: 2313). Finally, Defendants fault Rosenthal for employing an aggregate approach to Defendants' marketing, rather than structuring her analysis to address the actions of individual manufacturers and the harms caused by each. *Id.* at 8-10. Again, Defendants insist Rosenthal's examination of their marketing efforts is too coarse to provide any help to a jury.

**\*7** The Court does not find these arguments persuasive. The Sixth Circuit has explained that "there must be a fit between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful." *United States v. Bonds*, 12 F.3d 540 at 555 (6th Cir. 1993). Defendants' arguments fail to show that Rosenthal's testimony "does not relate to any issue in the

In re National Prescription Opiate Litigation, Slip Copy (2019)
2019 WL 3934597

case." *Id*. To the contrary, the Court concludes Rosenthal's testimony will be helpful to a jury.

Plaintiffs, who of course are crafters of their own theory of the case, respond that Defendants mischaracterize it. Plaintiffs counter that their theory of liability "is that Defendants employed a marketing strategy designed to increase the demand and market for opioids." Plaintiff's Opposition (hereinafter "Opp.") at 4 (Doc. #: 2115). Plaintiffs assert they will prove that "*all* of Defendants' promotional activity was fraudulent because Defendants so thoroughly misrepresented the risks and benefits of opioids, and consistently omitted the true facts about tolerance, addiction, and withdrawal, that no doctor could make an appropriate prescribing decision." Opp. at 5 (Doc. # 2115) (emphasis added). Rosenthal's assumption that all of Defendants' detailing was unlawful is consistent with Plaintiffs' theory of liability. Defendants are free to challenge that assumption, of course, but the assumption does not cause a problem of fit, nor does it render her overall methodology unreliable.

Rosenthal's choice to treat all detailing data uniformly likewise does not present a problem of fit. This aggregate approach to detailing data, like Plaintiffs' other decisions to use aggregate data, is consistent with Plaintiffs' theory of liability. *See* Order Regarding Discovery Ruling No. 5 (Doc. #: 1047) (affirming discovery ruling regarding use of aggregate proof). Of course, Defendants are free to challenge Rosenthal's assumption - and Defendants may well convince a jury it is *not* true that all of defendants' detailing was fraudulent and tainted by misrepresentations - but her central assumption does not render her opinion inadmissible. See *Avery Dennison Corp. v. Four Pillars Enter. Co., 45 F. App'x 479, 487 (6th Cir. 2002)* ("Although a *Daubert* challenge may certainly include arguments that the expert theory is invalid because it has no basis in fact, we do not conclude that the district court abused its discretion by determining that [the expert's] theories were sufficiently factually supported. The 'facts' challenged by FP here are not scientific facts to be evaluated under *Daubert,* but are rather the central questions of liability in the case, which were properly presented to the jury.").

Rosenthal also explains why she chose to center her analysis on detailing, as opposed to various other forms of unbranded marketing, such as front groups or KOLs. Most important among these considerations was her conclusion that detailing was "by far the dominant form of promotion." Report at ¶ 56 (Doc. #: 1913-4). She also noted the relative incompleteness

of relevant data regarding other forms of marketing for some manufacturers and concluded reasonably that "from an econometric standpoint, detailing is a good proxy for total promotional effort." *Id*. Defendants may certainly challenge this assumption at trial as well, but the assumption does not render her opinions inadmissible.

Rosenthal's explanation of the absence of unbranded marketing efforts from her analysis is sufficient, and in any event, *Daubert* does not require that any single expert provide a comprehensive analysis of wide-ranging factual issues. Plaintiffs may, if they find it necessary, rely on other experts to explain the importance of front groups, KOLs, and CMEs.

**\*8** Defendants' fourth fit argument, challenging Rosenthal's decision to aggregate all manufacturers' marketing activities, is similarly unavailing. This choice is consistent with Plaintiffs' theory of liability, the collective nature of RICO and OCPA actions, and principles of joint and several liability; accordingly, it presents no problem of fit. *See, e.g., Capogreco v. Pro Ins. Agency, Inc.*, 2007 WL 4510266, at \*9 (N.S. Ohio Dec. 18, 2007) (applying joint and several liability in civil RICO action).

In sum, the Court does not find persuasive any of Defendants' arguments that Rosenthal's opinions fit the case poorly and would not be helpful to a jury.

### 2. Rosenthal's Assumptions

#### a. Rosenthal's Model Assumes that All Manufacturers' Promotion Was Unlawful.

Defendants' next basis for exclusion is that "Rosenthal's core assumption that all Defendant manufacturer promotion was unlawful is provably wrong." Motion at 10 (Doc. #: 1913). They cite four of Plaintiffs' experts who, in published writings or deposition testimony in this MDL, have asserted that drug promotion can be appropriate and salutary. *Id*. But the examples Defendants cite are not inconsistent with Rosenthal's and Plaintiffs' assumption. For example, in deposition testimony, Plaintiffs' marketing expert Matthew Perri III states that doctors must "keep current on – with their drug knowledge and their disease knowledge, and one of the ways they do that is the information provided by marketing." *Id*.; Perri Dep. at 111:14-23 (Doc. 1927-6). Similarly, Defendants characterize Plaintiffs' expert Dr. David Kessler as stating that "certain detailing activities

are appropriate," Motion at 10 (Doc. #: 1913), and quote Rosenthal's own deposition testimony, where she asserts "there is such a thing as lawful marketing, and it does generate sales." *Id.*; Rosenthal Dep. at 143:25-154:2 (Doc. 1913-5). But these innocuous statements that detailing *can* be lawful do not undercut Rosenthal's "core assumption," which is that all of the Defendants' detailing of opioids in *this* case was unlawful. There is nothing inconsistent between the assertions that: (1) detailing can sometimes be helpful to doctors, but (2) all of the defendant's actual detailing in this case "so thoroughly misrepresented the risks and benefits of opioids" that it amounted to consistent misrepresentation to doctors, and was unlawful.

Whether Plaintiffs are able to prove their claims about the extent of Defendants' alleged unlawful promotion remains to be seen. But it was not unreasonable for Rosenthal to premise her analysis on assumptions that were consonant with Plaintiffs' theory of liability. *See Avery Dennison Corp*, 45 Fed. App'x. at 487 ("The 'facts' challenged here are not scientific facts to be evaluated under *Daubert*, but are rather the central questions of liability in the case, which were properly presented to the jury.").

### b. Manipulation or Overfit of Model.

Defendants next contend that "Rosenthal's direct regression model purports to show that over 99 percent of opioid prescriptions were dispensed solely on the basis of manufacturer detailing." Motion at 11 (Doc. #: 1913). They assert this finding "shows that Rosenthal contorted and 'overfit' her model to ensure that the aggregate detailing data mapped perfectly onto the aggregate level of MME sales, ignoring economic literature and common sense." *Id.* But Defendants here purposely mischaracterize both Rosenthal's report and her deposition testimony, which clearly show Rosenthal found that detailing accounts for 99 percent of the *variation* in MME sales, not the total quantity. (Rosenthal Dep. at 388:22-25 (Doc. 1913-15) (Q: "So your model explains more than 99% of the variation in MMEs with promotion? A: That's correct, and price."); Report at ¶ 72 (Doc. 1913-4).

**\*9** On the basis of their distorted representation of Rosenthal's findings, Defendants argue incorrectly that she "manipulated her direct model to ensure her conclusions." Motion at 12 (Doc. #: 1913); Reply at 8-11 (Doc. #: 2461). Along the same lines, Defendants characterize her *finding* of a

"negative depreciation rate for promotion" as an *estimation of* a negative depreciation rate, and argue that such an "estimate" is an impermissible assumption that "deserves no credence and cannot be offered to a jury as a reliable means to prove causation." Motion at 13 (Doc. #: 1913). A negative depreciation rate simply means that the value of something, in this case all of manufacturer Defendants' detailing visits, increases over time. For example, an automobile tire has a positive depreciation rate; its value decreases with wear. By contrast, a negative depreciation rate for Manufacturers' detailing activity means the marketing impact of these promotional activities increases to some degree over time. Plaintiffs respond that the negative depreciation rate is a finding, and not an assumption, of Rosenthal's analysis. Opp. at 15 (Doc. #: 2115). Rosenthal, in her deposition, explains that a negative depreciation rate is theoretically consistent with an addictive drug, and her report points to academic literature that suggests that "promotional effects are long-lived." Report at ¶ 22 (Doc. #: 1913-4). Even if the negative depreciation rate functions as an assumption, it is not an assumption that is so clearly implausible that it undermines the reliability of her analysis. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (quoting *Daubert*, 509 U.S. at 590) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process— competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."). Defendants have not persuaded the Court that Rosenthal's finding of a negative depreciation rate mandates the exclusion of her analysis. The validity of the negative depreciation rate goes to the weight the trier of fact will accord this analysis, not its admissibility.

Defendants make two other arguments premised on their view that Rosenthal has manipulated her data. First, they claim her model is so malleable it can be used to demonstrate a causal relationship between detailing and sunspots, gold prices, or attendance at Cleveland Indians baseball games. Motion at 12 (Doc. #: 1913). Plaintiffs counter that Defendants themselves are manipulating the model by cherry-picking data to generate absurd results, and if Defendants had attempted to show the same results using a more complete data set, the whimsical causal relationship they generate disappears. Opp. at 16-17 (Doc. #: 2115). The Court agrees with Plaintiffs and rejects Defendants' contention that Rosenthal's model is so malleable that it is unreliable or unreliably applied.

In re National Prescription Opiate Litigation, Slip Copy (2019)

2019 WL 3934597

Second, Defendants argue that, "because she fits her model to the data, her model does not accurately predict real-world events that may have influenced opioid prescribing, like changing medical standards and drug reclassification." Motion at 13 (Doc. #: 1913). As discussed further below, Rosenthal made choices to control for a number of possible alternative causes; that her list does not include every possible alternative, such as drug reclassification, is bound to displease Defendants. More to the point, Rosenthal's choice not to control for every possible factor does not eviscerate the logic of her model. These arguments do not persuade the court that Rosenthal's opinions are inadmissible. *Daubert*, 509 U.S. at 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Defendants may challenge Rosenthal on these aspects of her analysis on cross-examination.

### 3. Other Challenges to Rosenthal's Methodology

Defendants make a number of other attacks on Rosenthal's methodology: (1) challenging her approach to testing whether the previous undertreatment of pain could explain the increase in opioid sales, (2) questioning whether she properly accounted for technical statistical concepts such as nonstationarity and endogeneity, and (3) faulting her choice of control variables. *Id.* at 13-18 (Doc. #: 1913). For the reasons discussed below, these attacks all go to weight and not admissibility.

### a. The Under-Treatment of Pain Hypothesis

Aware of the possibility that a rise in the *appropriate* treatment of pain over time could explain the increase in opioid sales, Rosenthal sought to test this hypothesis using epidemiologic data and what she described as a "simple simulation approach to approximate the portion of the increased prescribing caused by the allegedly unlawful promotion [that] could possibly be associated [instead] with using opioids to address ostensibly 'under-treated' pain." Report at ¶ 91 (Doc. 1913-4).

Defendants assert this simulation, which Rosenthal refers to at times as a "thought experiment," is inadmissible because it is mathematically simplistic, it relies on the analyses and judgments of other experts, and because it is not a peer-reviewed methodology with support in the relevant academic community (indeed, Defendants assert she "created her own" methodology). Motion at 15 (Doc. #: 1913). None of these criticisms is well-taken. Rosenthal explained in deposition that economists commonly use this allegedly "simplistic" methodology and informed Defendants' of three published articles that employ it. Rosenthal Dep. at 622:19-21; 623:1-624:21 (Doc. 1913-5). Moreover, Rosenthal's reliance on other experts for inputs beyond her own expertise poses no problems for admissibility under Daubert. See *Daubert*, 509 U.S. 579, 592 (1993) ("an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."); *E.I. Du Pont De Nemours & Co. C-8 Personal Injury Litig.*, 337 F. Supp. 3d 728, 743 (S.D. Ohio 2015) ("An expert is able to base an opinion on another expert witness for a point of expert knowledge not personally possessed."); *Ohio Envtl. Dev. Ltd. P'ship v. Envirotest Sys. Corp.*, 478 F. Supp. 2d 963, 974-75 (N.D. Ohio 2007) ("If an expert's consultation of another expert's opinion is a resource 'reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").

### b. Nonstationarity, Endogeneity, and Missing Variables

**\*10** Defendants also argue that Rosenthal failed to adequately consider econometric concepts such as nonstationarity and endogeneity in her analysis. Motion at 16-18 (Doc. #: 1913); Reply at 12-13 (Doc. #: 2461). Defendants cite deposition testimony where Rosenthal states she could not recall whether MME sales were stationary; but Defendants neglect to mention she testified that she performed "Dickey-Fuller" tests for stationarity early in her analysis. Rosenthal Dep. at 137:13-140:4 (Doc. 1913-5). Defendants will have the opportunity to cross-examine Rosenthal about nonstationarity, and they have not persuaded the court her methodology is so faulty it presents a basis to exclude her testimony. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).

Defendants next assert that "Rosenthal's model also suffers from endogeneity bias, which likewise could cause her to overstate the effect of promotion on prescribing." Motion at 17 (Doc. #: 1913). Rosenthal readily conceded she did not test for endogeneity and explained in detail why she did not consider it a weakness in her analysis. She explained that endogeneity would have been a problem for her results if she

In re National Prescription Opiate Litigation, Slip Copy (2019)
2019 WL 3934597

had focused her analysis at the level of individual physicians, but because she employed an aggregate approach embracing all products, manufacturers, and prescribers, endogeneity was not an issue. Rosenthal Dep. at 330:6 - 336:11 (Doc. 1913-5). Again, the significance of endogeneity relates to the weight, not the admissibility, of Rosenthal's report and testimony. *Ruiz-Troche*, 161 F.3d at 85.

The same can be said for Defendants' final argument against Rosenthal, that she failed to account for certain "key variables that might explain the increase in opioid prescriptions over the relevant time period." Motion at 18 (Doc. #: 1913). Rosenthal's report accounts for numerous potential other causes of the rise in opioid distribution, but inevitably left others out. These decisions, like many others she made, may be imperfections in her analysis, but they do not, either individually or in the aggregate, render her report unreliable. As the Sixth Circuit has stated, "the *Daubert* standard is liberal, and does not require expert opinions to be bulletproof." *United States v. Lang*, 717 Fed. App'x 523, 534 (6th Cir. 2010). Defendants can cross-examine Rosenthal at trial regarding these alleged other causes for increases in opioid prescriptions and whether her opinions are unsound because she did not address them.

**D. Conclusion**

For the foregoing reasons, Defendants' Motion to Exclude Meredith Rosenthal's Opinions and Testimony is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 3934597

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## **Exhibit 5**

*Perry v. Am. Tobacco Co.,* 2001 WL 686812
(E.D. Tenn. Apr. 12, 2001), *aff'd* 324 F.3d 845 (6th Cir. 2013)

2001 WL 686812
United States District Court, E.D. Tennessee.

Gregory Bennett PERRY and Steve Lloyd
Champion, on Behalf of Themselves
and All Others Similarly Situated
v.
AMERICAN TOBACCO COMPANY, INC., et al.

No. 00–CV–97.
|
April 12, 2001.

MEMORANDUM OPINION

JARVIS, J.

**\*1** This putative class action was removed to this court on the basis of federal question jurisdiction under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, et seq. Plaintiffs also raise multiple state law claims. Currently pending is the defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure [Court File # 9]. Because the purported class of plaintiffs lacks standing to pursue this action under any theory, the motion will be granted. [1]

This lawsuit was originally brought on behalf of all individuals and entities in the United States who have paid health insurance premiums to a Blue Cross or Blue Shield organization. Plaintiffs sought to recover the increase in health insurance premiums they claim was caused by the presence of consumers of tobacco products in the insurance pool. In plaintiffs' second amended complaint, plaintiffs limited the proposed class to the following:

> All individuals and entities in the
> State of Tennessee who have paid
> premiums to a Blue Cross or
> Blue Shield organization for medical
> insurance. Excluded from the class
> are all employees or officers of the
> Defendants.

The essence of the lawsuit is that plaintiffs claim that wrongful conduct by the defendants has caused injuries to smokers, that Blue Cross Blue Shield of Tennessee in turn has provided medical treatment for some of those injured smokers, and that Blue Cross Blue Shield of Tennessee ultimately passed the costs so incurred in treating smokers onto subscribers in the form of higher premiums. The damages sought are the amount of the premium increase ostensibly linked to costs paid by Blue Cross Blue Shield of Tennessee due to its payments to treat smoking-related diseases. In addition to its claim under the federal RICO statute, plaintiffs also claim violations of the Tennessee Consumer Protection Act, T.C.A. § 47–18–101, *et seq.,* the Tennessee anti-trust statutes, T.C.A. § 47–25–101, *et seq.,* breach of special duty, conspiracy, negligence, unjust enrichment/restitution, and fraudulent concealment. These claims, federal and state, as well as statutory and common law, have one element in common: proximate causation.

Because the plaintiffs' ability to establish proximate cause is a threshold issue with respect to all of their claims, the court will address all of the claims with respect to proximate causation/ standing together. In essence, defendants' argument is that the harm suffered by the plaintiffs is simply too remote to sustain this lawsuit.

Initially, it should be noted that multiple state and federal trial and appellate courts have considered the question of whether "cost recovery" claims asserted by third-party payors such as insurers against cigarette manufacturers must be dismissed as a matter of law because the alleged injuries are derivative and remote. Those courts, including a Tennessee appellate court, have almost uniformly held that these cost recovery claims must be dismissed on remoteness grounds. *See Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.,* 2000 Tenn.App. LEXIS 644, No. W1999–01061–COA– R9–CV, 2000 WL 1390171 at \*6–7 (Tenn.Ct.App.W.Sec. Sept. 26, 2000) (with multiple case citations to courts holding such injuries too remote at pp. 7–8). The injuries to the plaintiff subscribers in this case are even one more step remote than in the *Steamfitters* and other cost recovery lawsuits brought by third-party payors.

**\*2** Proximate cause is a generic label for "the judicial tools" courts use "to limit a person's responsibility for the consequence of that person's own acts." *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268, 117 L.Ed.2d 532, 112 S.Ct. 1311 (1992). The law does not

2001 WL 686812, RICO Bus.Disp.Guide 10,082

afford a remedy for "every conceivable harm that can be traced to alleged wrongdoing." *Id.* Among the "many shapes" the concept of proximate cause has taken, at a minimum, the law requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes,* 503 U.S. at 268. As a result, a plaintiff who complains of "harm flowing merely from the misfortunes vested upon a third person by the defendants' acts [is] generally said to stand at too remote a distance to recover." *Id.* at 268–69. Under the remoteness doctrine, relief, and therefore standing, to recover for damages is limited to those "directly" injured by a defendant's conduct.

Proximate cause involves two elements: (1) a policy element encompassing "concepts of equity and standing" and (2) foreseeability. *Regence BlueShield v. Philip Morris, Inc.,* 40 F.Supp.2d 1179, 1183 (W.D.Wash.1999). The first is a legal inquiry that examines the extent to which a defendant can and should be held liable for the consequences of his conduct. The second is a factual inquiry that limits a defendant's liability to foreseeable consequences of his actions. *Id.* In this case, the court concedes that the alleged consequences of defendants' actions are foreseeable; that is, that more Blue Cross/Blue Shield subscribers would contract cigarette-related discuses, that Blue Cross/Blue Shield would have to pay more of their medical expenses, and that Blue Cross/Blue Shield would pass along at least some of these increased costs to all Blue Cross/Blue Shield subscribers in the form of higher premiums. However, it is the remoteness element which is missing with respect to the subscribers' claim.

Standing under the RICO statute is determined by common law principles of proximate cause and remoteness of injury, and the United States Supreme Court has identified the following three factors which are relevant in the remoteness determination: (1) Are there more directly injured plaintiffs?; (2) Will there be difficulty in ascertaining plaintiff's damages?; and (3) Is there a possibility of multiple recoveries so that a court would have to fashion complex rules apportioning damages? *See Holmes,* 503 U.S. at 269–70. These same three factors are equally relevant with respect to plaintiffs' state law causes of action.

Applying these three factors to this case leads to the inescapable conclusion that these plaintiffs' damages are too remote to satisfy the requirements of proximate cause. First, the smokers with physical injuries are the more directly injured plaintiffs and may have causes of action against the defendants. Second, determining plaintiffs' damages in

a lawsuit such as this would be extremely problematic. In addition to the difficulties in proving damages which stem from individual smokers' decisions on whether, and how often, to smoke, there would be extreme difficulty in determining what portion of the smoker's medical costs are passed on to subscribers in the form of increased premiums and what portion is reflected in simply smaller profits for Blue Cross/Blue Shield in a competitive market. Finally, allowing recovery for the remote plaintiffs in this case would create the possibility of multiple recoveries. The potential of multiple plaintiffs seeking redress for the same injury would exist and the court would have to fashion complex rules for apportioning damages because there would be multiple levels of injured plaintiffs. Accordingly, the court concludes that none of the three *Holmes* factors are satisfied in this case.

**\*3** Finally, plaintiffs contend that they have a "direct" financial injury which they suffered as a result of the defendants' actions. The court disagrees. As the Tennessee Court of Appeals made clear in the *Steamfitters* case, the key inquiry regarding direct injury is "whether the damages a plaintiff sustains are derivative of an injury to a third party." *Steamfitters* at p. 8. Because the plaintiffs' injuries in this case are purely contingent on harm to the third-party smokers, these injuries are clearly indirect.

In light of the foregoing, defendants' motion to dismiss plaintiffs' second amended class action complaint for failure to state a claim upon which relief can be granted [Court File # 9] will be granted, and this action will be dismissed. The motions of BAT Industries and the Tobacco Institute to dismiss for lack of *in personam* jurisdiction [Court Files # 11, # 18] will be denied as moot.

Order accordingly.

ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that defendants' motion to dismiss plaintiffs' second amended class action complaint for failure to state a claim upon which relief can be granted [Court File # 9] is GRANTED, and this action is DISMISSED. The motions of BAT Industries and the Tobacco Institute to dismiss for lack of *in personam* jurisdiction [Court Files # 11, # 18] are DENIED AS MOOT.

2001 WL 686812, RICO Bus.Disp.Guide 10,082

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 686812, RICO
Bus.Disp.Guide 10,082

Footnotes

1    This decision renders moot defendant BAT Industries, PLC's motion to dismiss for lack of *in personam* jurisdiction [Court
     File # 11] and the Tobacco Institute, Inc.'s motion to dismiss for lack of *in personam* jurisdiction [Court File # 18]. It also
     renders moot issues regarding a number of other defenses addressed to the elements of each cause of action raised
     by the plaintiffs.