HENRICHSEN SIEGEL, PLLC
225 Broadway, Suite 1803
New York, New York 10007
(646) 378-4421 (phone)
Chiung-Hui Huang
Neil L. Henrichsen (*pro hac vice*)
Dawn C. Stewart (*pro hac vice*)

Counsel to the Representatives of the Proposed Class

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PURDUE PHARMA L.P., *et al.,*

           Debtors.[1]

Chapter 11

Case No. 19-23649 (RDD)

(Jointly Administered)

**OMNIBUS REPLY BY INDEPENDENT PUBLIC SCHOOL DISTRICTS IN
SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND A CLASSWIDE
<u>PROOF OF CLAIM</u>**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION……………………………………………………………………....1

ARGUMENT ............................................................................................................. 3

I.   Certifying a School District Class Will Simplify the Administration of the Case and the Distribution of the Estate. ................................................................................. 3

II.  Without a Class, School Districts' Interests Are Not Adequately Protected and There Will Be No Assurance That Any Portion of the Debtors' Estates Will Fund Special Education Services ........................................................................................... 6

    A.  Any abatement plan without substantial school district involvement will be deficient. ...................................................................................................... 8

    B.  It would be a serious error to assume that abatement funds will be earmarked or allocated for Public Schools' abatement efforts unless a class is certified. .................................................................................................... 9

    C.  Inevitably, the outcome of these proceedings will be judged by whether the Debtors' assets are spent on abatement; and entrusting the states to coordinate allocations within their jurisdictions without *requiring* funding for Public Schools' abatement efforts would be a monumental missed opportunity. ............................................................................................... 10

III. The Debtors' and the Objecting Public Claimants' Filings Indicate Several Fundamental Misunderstandings of Basic Class Action Law or Public Schools' Claims. ................................................................................................................ 11

    A.  The Public Schools' motion is significantly narrower than other movants' class motions. ............................................................................................ 11

    B.  The Debtors' estates are a "limited fund" within the meaning of Rule 23(b)(1)(B). ............................................................................................... 11

    C.  "Commonality" poses no obstacle to certifying a school-district class, and "predominance" is not a requirement. ......................................................... 12

        1.  The Objecting Public Claimants fundamentally misunderstand "commonality." ................................................................................. 12

        2. The Debtors' arguments about commonality are also unavailing. ........ 14

    D.  Allowing a school-district class will neither create due process concerns nor "defeat the purpose" of the notice plan. ................................................ 16

    E.   "Independent" public school districts is a satisfactory class definition .............................................................................................. 18

    F.  The Representatives of the Proposed Class adequately represent the interests of absent class members .............................................................. 18

CONCLUSION .................................................................................................... **20**

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Van Dorn Plastic Mach. Co.*,
    68 B.R. 495 (Bankr. E.D.N.Y. 1986)....................................................................17

*In re Am. Reserve Corp.*,
    840 F.2d 487 (7th Cir. 1988) ...............................................................................18

*Bridge v. Phoenix Bond & Indemnity Co.*,
    553 U.S. 639 (2008)...............................................................................................14

*In re Chapparal Energy, Inc.*,
    571 B.R. 642 (Bankr. D. Del. 2017) .....................................................................17

*In re Drexel Burnham Lambert Grp.*,
    960 F.2d 285 (2d Cir. 1992)...................................................................................11

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
    268 F.R.D. 181 (S.D.N.Y. 2010) .............................................................................4

*In re Ephedra Products Liability Litigation*,
    329 B.R. 1 (S.D.N.Y. 2005)......................................................................................5

*Glazer v. Whirlpool Corp.*,
    722 F.3d 838 (6th Cir. 2013) .................................................................................13

*Hameed v. Int'l Assoc. of Bridge*,
    637 F.2d 506 (8th Cir. 1980) .................................................................................16

*In re Joint E. & S. Dist. Asbestos Litig.*,
    982 F.2d 721 (2d Cir. 1992)...................................................................................11

*In re Musicland Holding Corp.*,
    362 B.R. 644 (Bankr. S.D.N.Y. 2007).................................................................3, 4

*In re Nat'l Prescription Opiate Litig.*,
    No. 17-MD-02804 (N.D. Ohio) ...........................................................2, 12, 14, 15

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)...............................................................................................12

iii

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)...................................................................13

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ........................................................................13

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ................................................................15

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010)................................................................15

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
  219 F.R.D. 661 (D. Kan. 2004)............................................................19

*Vaquero v. Ashley Furniture Indus.*,
  824 F.3d 1150 (9th Cir. 2016) .............................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................................12

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005)..................................................................19

*In re Zenith Labs., Inc.*,
  104 B.R. 659 (Bankr. D.N.J. 1989) .....................................................17

**Other Authorities**

*15 Years Later, Where Did All the Cigarette Money Go?*,
  NPR (Oct. 13, 2013, 5:52 PM), https://perma.cc/B8S4-Q4QK.............10

David Ramsey, *State Supreme Court Denies Attorney General Leslie Rutledge's
  Request to Pull Prosecutor from Opioid Lawsuit*, ARK. BLOG
  (Apr. 6, 2018, 8:00 PM), https://perma.cc/68FS-K785; ..........................7

Jim Estes, *How the Big Tobacco Deal Went Bad*,
  N.Y. TIMES (Oct. 6, 2014) ..................................................................10

Leana S. Wen, *A Lot Went Wrong with the Tobacco Settlement. Let's Not Make
  the Same Mistakes with Opioids*, THE WASHINGTON POST
  (Oct. 8, 2019, 2:47 PM), https://perma.cc/E4VU-WA8W ....................10

Margaret H. Lemos, *Aggregate Litigation Goes Public: Representative Suits By
  State Attorneys General,* 126 HARV. L. REV. 486 (2012) .........................9

Shaila Dewan, *Needy States Use Housing Aid Cash to Plug Budgets*,
  N.Y. TIMES (May 5, 2012) ..................................................................10

iv

United Hospital Fund, *The Ripple Effect: National and State Estimates of the U.S. Opioid Epidemic's Impact on Children*, Nov. 2019, https://perma.cc/Q4FM-4F75....................................................................................6

Wesley Brown, *AG Rutledge Loses 'Writ of Mandamus' Request, Second Opioid Lawsuit May Proceed with 'State Actor*,' TALK BUS. & POL. (Apr. 6, 2018, 4:29 PM), https://perma.cc/6WYG-9YG2. ........................................7

**Rules**

Bankruptcy Rule 7023 .............................................................................................16, 17

Bankruptcy Rule 9014 ...................................................................................................20

Fed. R. Civ P. 23 .................................................................................................. *passim*

Fed. R. of Civ. P. 23(b)(1)(B)..........................................................................11, 12, 15, 20

Fed. R. of Civ. P. 23(b)(3) ..............................................................................11, 12, 15

**Treatises**

3 Newberg on Class Actions § 7:27 (5th ed.) .............................................................18

3 Newberg on Class Actions § 7:31 (5th ed.) ...............................................................9

## INTRODUCTION

The representatives of independent public school districts now before the Court (the "Public Schools") reply as follows to the objections, filed by the Debtors and certain public claimants (the "Objecting Public Claimants"[2]), opposing the Public Schools' motion to allow a class proof of claim and to certify a class.[3]

Since almost the start of the opioid epidemic, the Public Schools have been engaged in an absolutely essential task of abatement: providing special education and related supplemental educational services to children suffering from developmental disabilities caused by their prenatal exposure to opioids. The Public Schools' abatement efforts are ongoing, and will increase in coming years, at a cost of tens of billions of dollars. With this motion to certify a class, the Public Schools are seeking to secure funding to continue these critical efforts; and as they laid out in their class motion, *see* Public Schools' Mot., ECF No. 1211 ("Public Schools' Mot."), funding these efforts, which help children with opioid-related disabilities stay in school and succeed in life, is one of the best possible uses for the Debtors' funds. Funding abatement efforts by the Public Schools will create positive multiplier effects, enhancing almost all other

---

[2] The Objecting Public Claimants comprise the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the Ad Hoc Group of Non-Consenting States, and the Multi-State Governmental Entities Group. Although they inaccurately call themselves the "the Public Claimants," they do not represent or include all public or governmental claimants. Accordingly, this reply refers to them as the "Objecting Public Claimants."

[3] The State of Florida and the Ad Hoc Group of Individual Victims have also filed objections to the Public Schools' motion, ECF Nos. 1415 and 1423. To the extent that Florida or the Ad Hoc Group make arguments applicable to the Public Schools, those arguments generally are not materially distinct from arguments made by the Debtors or the Objecting Public Claimants. However, the Ad Hoc Group of Individual Victims' argument that Public Schools "lack standing to assert class action claims for the injuries suffered by NAS children," ECF No. 1415 at 11, misstates Public Schools' claims—which are for direct injuries suffered *by Public Schools* due to *their* increased costs, resulting from providing educational services to children harmed by prenatal exposure to opioids. Public Schools' claims for those losses are neither "indirect" nor overlapping with the claims of either NAS children or other public claimants.

abatement efforts, including by reducing the amount that other public claimants will need to

spend in coming years on public assistance, criminal justice, and public health.

For Public Schools, the core issue raised by class certification is poignantly captured by the

following false statement in the objection filed by the Objecting Public Claimants:

> *The [i]nterests of [p]utative [school district] [c]lass [m]embers are
> [a]dequately [r]epresented …. [C]lass certification is not needed …* to assure
> that any compensable harm suffered by claimants as a result of the Debtors'
> conduct is being considered and appropriately addressed …. The Public
> Claimants are keenly aware that an effective abatement model must …
> provide[] funding to numerous programs throughout the country.

Objecting Public Claimants' Obj., ECF No. 1431 at 22 (emphasis added) ("Objecting Public

Claimants' Obj."). In fact, Public Schools' interests demonstrably are *not* protected by the

Objecting Public Claimants' general awareness of a need for "funding to numerous programs

throughout the country." That is abundantly clear. Forty-nine states and Washington, D.C. have

each filed suits to recover the costs they have incurred because of the Purdue Debtors' campaign

to expand the use and misstate the risks of prescription opioids. Only four of those fifty suits,

however, claim—or even allude in any way—to the increased costs incurred by school districts.

And only *two* of those four refer in any way to recovering schools' costs of educating students

with disabilities caused by prenatal opioid exposure. *See* Declaration of Benjamin Goldberg

(Exhibit A hereto).

The disregard that other public claimants have for Public Schools' interests is also apparent

in the MDL proceedings before Judge Polster. There, the Plaintiffs' leadership team filed its

motion to certify a "negotiation class" on behalf of cities and counties—and *excluded*

independent school districts. *In re Nat'l Prescription Opiate Litig.,* No. 17-MD-02804, ECF Nos.

1683 and 1690 (N.D. Ohio).

2

Quite demonstrably, none of the Objecting Public Claimants or their counsel are adequate representatives of Public Schools' interests. And at this point, as this reply brief will discuss, only a class of Public Schools will realistically lead to funding for an absolutely essential component of abatement: educational services for children suffering from prenatal exposure to opioids.

Section I of this reply explains why certifying a class of Public Schools will not "gum up" the works of distributing the Debtors' estates, neither adding costs nor delay in any material way, and, in fact, will make distribution of the Debtors' estates *more* efficient. Section II further elaborates on why, without a class, Public Schools' interests will not be adequately protected and why, unless they are protected, any abatement plan will be deficient. Section III addresses why the Debtors' and the Objecting Publics Claimants' narrow doctrinal arguments about Rule 23 are inapplicable, why their arguments do not justify denying a school-district class, and how most of the Debtors' and Objecting Public Claimants arguments have already been rejected by Judge Polster, when he considered, ruled on, and certified a Negotiation Class of cities and counties.

## ARGUMENT

**I.    Certifying a School District Class Will Simplify the Administration of the Case and the Distribution of the Estate.**

It is hard to read the Debtors' and the Objecting Public Claimants' filings without noticing how ineffectually they assert that a school-district class might impair the administration of the case. They scarcely make that case at all, which cannot be an oversight given that impact on the administration of the case is the third *Musicland* factor.

The Objecting Public Claimants vaguely allude to three notions about cost or delay in administering this case—but develop none of them. Objecting Public Claimants' Obj. ¶¶ 44–46. First, they say that resolving class certification here "may" require an evidentiary hearing. But

they do not identify any issue requiring an evidentiary hearing, they do not ask for one, and the

Public Schools' motion, like many class motions, can be resolved without one.[4]

Next, the Objecting Public Claimants speculate that certifying a school-district class "could

open the floodgates" to additional class motions. They ignore that the imminent July 30 bar date

will prevent that.

Third, they suggest that certifying a school-district class would "run afoul of this Court's

direction that even in instances where consolidated claims are permitted by the Bar Date Order,

claimants should submit individualized information." That overlooks a crucial distinguishing fact

about Public Schools' claims. For reasons explained in the attached declaration of Professor

Tammy Kolbe (Exhibit B to this reply), aggregate estimations of Public Schools' claims are

*more* rigorous and *more* reliable than individual proofs. Allowing the Public Schools to proceed

with a single, consolidated class-wide proof of claim will not prejudice the Court's or any party's

ability to analyze and assess school districts' claims or require significant additional discovery.

To the contrary, a class proof of claim, as Professor Kolbe explains, will be more efficient, easier

to verify or dispute, and more reliable than individual proofs of claim by individual school

districts ever could be. Allowing the Public Schools to proceed with a single, consolidated class-

wide proof of claim will not "adversely affect the administration of the case."

*In re Musicland Holding Corp.*, 362 B.R. 644, 654 (Bankr. S.D.N.Y. 2007). Rather, it will

simplify the administration of the case. First, class-wide proof will make any estimation of

---

[4] Because neither the Objecting Public Claimants nor the Debtors have requested an evidentiary hearing,
they cannot complain if a school district class is certified without one. *Edwards v. Publishers Circulation
Fulfillment, Inc.*, 268 F.R.D. 181, 185 n.11 (S.D.N.Y. 2010) ("Rule 23 does not require an evidentiary
hearing on the issues of class certification" and "may be waived if not requested.").

Public School claims both easier and more reliable. Second, a class claim resembles an ad hoc group's claim, which the Bar Date Order already contemplates. Third, the distribution of estate funds to Public Schools will be considerably facilitated if a single class administrator makes those distributions rather than with the uncertainty of 50 different states.

Similar to the Objecting Public Claimants' discussion, the Debtors' "gum up the works" discussion is also shallow. Debtors' Obj., ECF No. 1421 ¶¶ 38–40 (hereinafter "Debtors' Obj."). First, the Debtors breezily state that allowing a school-district class would cause "significant delay" and add "layers of procedural and factual complexity" because discovery might "be required to test the merits of Movants' claims." Yet, in the very same sentence, the Debtors acknowledge that their discovery in this case, if any, is in fact likely to be very modest because—in the Debtors' own words—they "are likely to resort to omnibus objections in some fashion" regardless of the outcome of this motion. *Id.* at ¶ 39; *see also id.* at ¶ 44 (quoting *In re Ephedra Products Liability Litigation*, 329 B.R. 1, 9 (S.D.N.Y. 2005), for the proposition that "in practice," small claims—which school district claims are in the relative context of these proceedings—are often deemed allowed under § 502(a), "in which case discovery and fact finding *are avoided altogether*" (emphasis added)).

Second, the Debtors also invoke the floodgates arguments—that allowing a school district class would "embolden" other creditors to file class motions too. But the Debtors, like the Objecting Public Claimants, never explain why the Bar Date Order wouldn't prevent that result.

Given the Debtors' indifferent invocations of cost and delay (which are understandable, given the implausibility of making a genuine case for cost or delay), it is difficult to discern why they oppose a school-district class. First, as the UCC notes in its filing, *see* ECF No. 1425 ¶¶ 21– 22, in a traditional chapter 11 case a debtor has a legitimate interest in reducing the size of the

claims pool to permit distributions to equity. But here, the Debtors announced at the outset that their shareholders would retain no value in the reorganized enterprise. Under these circumstances, the sole function of the claims process is to develop a plan of reorganization that will allocate value fairly—and that function is not served if the Public Schools are left out. The costs borne by the Public Schools were a foreseeable consequence of the Debtors' misconduct.[5] Second, the Debtors haven't filed a plan and appear to be, at a minimum, many weeks away from filing a plan, making it curious that they would suggest that certifying a class of Public Schools would cause any significant delay (which it will not).

In the end, neither the Objecting Public Claimants nor the Debtors have made a showing that allowing a school-district class would delay or add to the cost of these proceedings in any material way.

## II. Without a Class, School Districts' Interests Are Not Adequately Protected and There Will Be No Assurance That Any Portion of the Debtors' Estates Will Fund Special Education Services.

Independent public school districts are self-governing, corporate, governmental entities with the authority to sue and be sued. As a proximate result of the Debtors' conduct, they have lost—and continue to lose—very sizeable amounts of money. This is principally because of the surging costs of providing essential and required educational services to children exposed to opioids *in utero*.

Public Schools want that taxpayer money back from the Debtors—to help defray the growing financial burdens placed on them by the Debtors' conduct. And as a matter of

---

[5] *See* United Hospital Fund, *The Ripple Effect: National and State Estimates of the U.S. Opioid Epidemic's Impact on Children*, Nov. 2019, at Figure 7, https://perma.cc/Q4FM-4F75.

constitutional law, their right to represent themselves in recovering their costs cannot be commandeered by the states—as the Sixth Circuit has already signaled.[6] It would be an error, both legally and factually, and would also significantly alter and disrupt the political order within states, to relegate the legitimate claims of Public Schools to, as it were, a mere pledge by the Objecting Public Claimants that they intend to "do the right thing."

Even if the Sixth Circuit had not already spoken on this point, the Objecting Public Claimants (both consenting and nonconsenting) have made it unmistakably clear by their actions that they are not protecting Public Schools' interests. *See* Declaration of Benjamin Goldberg (Exhibit A hereto).

Based on their behavior to date, there is simply no reason to believe that any other set of claimants in these bankruptcy proceedings, public or private, can be trusted to designate any dollars for Public Schools in a consensual plan of allocation. In addition—and for understandable reasons, explained in the districts' class certification motion, *see* Public Schools' Mot. ¶¶ 26–33—very few school districts have filed proofs of claims. In combination, these two factors—the Objecting Public Claimants' hostility and school districts' claims rate—explain why, at this point, only a certified class can realistically ensure that Public Schools will receive funds from the Debtors' estates to defray the costs of their abatement efforts.

Because of the critical role that school districts will play in any successful abatement

---

[6] See, for example, the Sixth Circuit's order of October 10, 2019, available at https://perma.cc/XMY7-4HJU, rejecting the state of Ohio's bid to derail Ohio counties' claims by arguing that only the state, as a sovereign, has authority to pursue those claims. In addition, the Arkansas Supreme Court has similarly rejected that state's Attorney General's attempt to preempt opioid claims by local governmental units. *See* David Ramsey, *State Supreme Court Denies Attorney General Leslie Rutledge's Request to Pull Prosecutor from Opioid Lawsuit*, ARK. BLOG (Apr. 6, 2018, 8:00 PM), https://perma.cc/68FS-K785; Wesley Brown, *AG Rutledge Loses 'Writ of Mandamus' Request, Second Opioid Lawsuit May Proceed with 'State Actor*,' TALK BUS. & POL. (Apr. 6, 2018, 4:29 PM), https://perma.cc/6WYG-9YG2. Tellingly, no state has sought a court order to stop school districts' claims in these proceedings.

program, it is important both to give Public Schools true agency in these proceedings and to ensure them a definitive and binding award from the Debtors' estates; and it would be a serious error to assume that allowing the states to represent Public Schools' interests in these proceedings is constitutionally adequate—as matter of law or fact.

### A. Any abatement plan without substantial school district involvement will be deficient.

There are large stakes here—and not just for school districts, but also for successful abatement.

No party here has disputed the school districts' evidence that the opioid crisis is very present in the classroom and very costly to schools. *See* Ex. B to Public Schools' Mot. ¶¶ 6, 10 and Ex. C to Public Schools' Mot. ¶ 11 ( "NAS is a significant medical condition that is linked with serious and likely permanent challenges for the child …. [and] children with prenatal opioid exposure are 2.3 times more likely to require special education services," costing, on average, "at least 90% more than a student without special education services.").

One of the best possible uses of the Debtors' funds will be education services for the growing number of children harmed by prenatal exposure to opioids. Special education and supplemental supports and services offer the single best hope for helping these children stay in school and succeed in life, and without sufficient funding, the consequences may be calamitous. Low educational attainment and failure to complete a K-12 education are directly associated with increased rates of arrest and incarceration, poor health, reliance on public health services, dependence on cash assistance, food and housing assistance programs, and unemployment and low wages. *See* Public Schools' Mot. ¶¶ 8-9 and notes 6-9 (citing studies). Funding Public Schools' abatement efforts will have positive multiplier effects on almost all other abatement efforts, including by reducing the amount that the Objecting Public Claimants and other public

entities will need to spend in coming years on public assistance, criminal justice, and public health. *Id.*

Few, if any, other claimants are better positioned than public schools to provide direct remediating services to abate the ravages of the opioid crisis—and none are better positioned to provide them to children, some of the most vulnerable victims of the crisis. Guaranteeing schools a portion of the Debtors' estates is important for these reasons, and at this juncture, only class certification can realistically accomplish that.

### B.   It would be a serious error to assume that abatement funds will be earmarked or allocated for Public Schools' abatement efforts unless a class is certified.

None of the state attorneys general in these proceedings can adequately represent the rival interests of myriad political subdivisions within their jurisdiction (including counties, cities, public hospitals, and school districts) at the same time as their state's own interests. And their assertion that they can carry off that feat raises serious constitutional questions. Indeed, the risks to due process created by the conflicts under which they are so clearly operating explain why, in aggregate litigation under Rule 23 of the Federal Rules of Civil Procedure, there are procedures both for subdividing classes and requiring separate counsel for each subclass. 3 Newberg on Class Actions § 7:31 (5th ed.).

The inevitably conflicted representation that occurs when attorneys general purport to represent so many political subdivisions is a problem even when an attorney general is motivated solely by the pursuit of the public interest. *See* Margaret H. Lemos, *Aggregate Litigation Goes Public: Representative Suits By State Attorneys General,* 126 HARV. L. REV. 486, 489, 504, 514 (2012) (discussing how Rule 23 creates procedural protections designed to protect absent class members in private class action settings, whereas when state attorneys general attempt aggregate

litigation, without Rule 23, too often those protections "fall by the wayside," resulting in

"conflicted representation" and serious due process questions about adequate representation).

C. **Inevitably, the outcome of these proceedings will be judged by whether the Debtors' assets are spent on abatement; and entrusting the states to coordinate allocations within their jurisdictions without *requiring* funding for Public Schools' abatement efforts would be a monumental missed opportunity.**

The sad saga of the Tobacco Master Settlement Agreement is too well known to bear

repeating in detail here. From the largest settlement ever, very little ended up being spent on

abatement.[7] However, although it is the most notorious example, the tobacco settlement is not

the only example of the error of giving state attorneys general too much power over coordinating

allocations within their jurisdictions.

The more recent $2.5 billion multistate mortgage settlement, in 2012, is also illustrative.

Funds from that settlement were once again entrusted to the control of state attorneys general and

were supposed to help homeowners mitigate the effects of foreclosures. Yet within months of the

settlement, many states had announced that they would use all or most of the money for other

purposes.[8] Unfortunately, because of the very structure of state and local government, state

attorneys general are, too often, unable to be reliable fiduciaries for school districts or other local

governmental units.

---

[7] *See* Leana S. Wen, *A Lot Went Wrong with the Tobacco Settlement. Let's Not Make the Same Mistakes with Opioids*, THE WASHINGTON POST (Oct. 8, 2019, 2:47 PM), https://perma.cc/E4VU-WA8W; *15 Years Later, Where Did All the Cigarette Money Go?,* NPR (Oct. 13, 2013, 5:52 PM), https://perma.cc/B8S4-Q4QK; Jim Estes, *How the Big Tobacco Deal Went Bad,* N.Y. TIMES (Oct. 6, 2014), https://perma.cc/QHM3-FDNK.

[8] Shaila Dewan, *Needy States Use Housing Aid Cash to Plug Budgets*, N.Y. TIMES (May 5, 2012), https://perma.cc/WGG7-5LMH.

10

### III. The Debtors' and the Objecting Public Claimants' Filings Indicate Several Fundamental Misunderstandings of Basic Class Action Law or Public Schools' Claims.

#### A. The Public Schools' motion is significantly narrower than other movants' class motions.

The Public Schools' class motion is purposefully narrower than other movants' class motions, relying exclusively on this Court's authority to certify a mandatory "limited fund" class (under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure). Therefore, and *unlike* other movants' requests for class certification under Rule 23*(b)(3)*, granting the Public Schools' motion under Rule 23*(b)(1)(B)* would neither involve further noticing procedures nor give any creditor "opt out" rights. (Opt out rights are inimical to the goal of finality in bankruptcy proceedings.) The Debtors' objection overlooks this. *See, e.g.*, Debtors' Obj. ¶¶ 3, 39 & 73 (erroneously presuming, and protesting, that a grant of class certification would necessitate both further notice and opt out procedures).

#### B. The Debtors' estates are a "limited fund" within the meaning of Rule 23(b)(1)(B).

Contrary to both the Debtors' and the Objecting Public Claimants' positions, certifying a Rule 23(b)(1)(B) "limited fund" class of school districts will not circumvent the Bankruptcy Code. Also contrary to their positions, bankruptcy estates qualify as "limited funds" for purposes of that Rule, notwithstanding the Code's elimination of any possibility of first-come, first-served distributions exhausting estate assets. *See* Debtors' Obj. ¶¶ 74–82; Objecting Public Claimants' Obj. ¶ 68.

The Second Circuit has twice recognized the use of a Rule 23(b)(1)(B) "limited fund" class in bankruptcy cases, *see In re Drexel Burnham Lambert Grp.*, 960 F.2d 285 (2d Cir. 1992); *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 738–39 (2d Cir. 1992), and although both the Debtors and the Public Claimants eschew mentioning it, the Supreme Court has gone out of its

11

way to confirm that "there is no inherent conflict between a limited fund class action under Rule 23(b)(1)(B) and the Bankruptcy Code." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 n.34 (1999).

### C. "Commonality" poses no obstacle to certifying a school-district class, and "predominance" is not a requirement.

The other movants have all requested a class under Rule 23(b)(3); the Public Schools have not; and it is black letter law that moving for a class under any prong of Rule 23 other than Rule 23(b)(3) dispenses with any requirement to demonstrate that "common" questions "predominate."

For the "limited fund" class that the Public Schools seek, it is sufficient if there is "even a single common question," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), of either law or fact. Here, there are numerous such questions—as the Judicial Panel on Multidistrict Litigation (JPML) expressly found when initiating the MDL. *See* Public Schools' Mot. ¶¶ 49–50. In rejecting the argument that uncommon issues exist and would generate inefficiencies, the JPML concluded: "All of the actions can be expected to implicate common fact questions as to the allegedly improper marketing and widespread diversion of prescription opiates into states, counties and cities across the nation . . . ." *Id.* at ¶ 49. Likewise, Judge Polster also ruled that common questions exist, warranting class certification, when he certified a negotiation class of cities and counties. *See In re Nat'l Prescription Opiate Litig.,* No. 17-MD-02804, ECF No. 2590 at 17 (N.D. Ohio Sept. 11, 2019), available at https://perma.cc/K97R-UYWK .

### 1. *The Objecting Public Claimants fundamentally misunderstand "commonality."*

In presenting challenges to commonality, the Objecting Public Claimants are asking a lot. First, their assertion that "[t]he ISPDs [f]ail the [c]ommonality [t]est," *see* Objecting Public Claimants' Obj. at 27, asks this Court to disagree with the JPML, with Judge Polster, and with

12

the positions that certain of the objecting public claimants (cities and counties) have themselves

asserted when they moved for (and obtained) class certification in the MDL proceedings.

Second, Public Schools have identified not just one but six specific common questions, see

Public School Mot. ¶ 50, and the Objecting Public Claimants' objection does not directly address

*any* of them.

Third, without disputing either that a single common issue suffices or that the Public

Schools have identified many, the Objecting Public Claimants instead attempt distraction with an

entirely irrelevant issue—namely, differences in school districts' "funding structures," both

across states and within a state. Objecting Public Claimants' Obj. ¶¶ 59-61. Differences in

"funding structures"—that is, differences in how much of an independent school district's

spending on special education budget is self-funded and how much is funded by the state—have

no conceivable bearing on class certification. Those differences are irrelevant under the collateral

source doctrine, and even if that were not the case, they would bear, if at all, only on the size of

different districts' claims (i.e., whether there might be an offset, for some districts, for the

portion of their spending that is funded by state dollars). That is a *damages* issue. Variations in

individual claimants' damages—which exist in almost every class action—do not defeat class

certification. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).[9]

Fourth, the Objecting Public Claimants also assert that "to the extent they rely on state

common law [the Public Schools' claims] by definition lack a common legal basis." Objecting

---

[9] See also *Glazer v. Whirlpool Corp.* 722 F.3d 838, 861 (6th Cir. 2013) (noting that recognition that individual damages calculations do not preclude class certification "is well nigh universal" (internal quotation marks omitted)); *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016) (noting that damages are "invariably" an individual question, which does not defeat class action treatment, citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016), where "the Court held that class certification was appropriate even though class members might have to prove liability *and damages* individually.")

Public Claimants' Obj. ¶ 62. That, once again, is irrelevant. Five of the six common issues the school districts have identified are *factual* not legal and the sixth presents a common question of *federal* law (civil RICO) not state common law.

In addition, the Objecting Public Claimants' commonality objections also contradict their position in front of Judge Polster, where several members of the same group obtained class certification by arguing that "the core issues underlying claims against manufacturer defendants for their marketing practices turn on *common* evidence" and that "*common* questions regarding liability as to each as to each defendant's knowledge, conduct and duty at any given time, *cannot be said to vary* among individual class members*." In re Nat'l Prescription Opiate Litig.,* No. 17-MD-02804, ECF No. 1820-1 at 82–85 (N.D. Ohio July 9, 2019), available at

https://perma.cc/BP7A-D9BG.

### 2.    *The Debtors' arguments about commonality are also unavailing.*

For their part, the Debtors' make three arguments about commonality. All three are wrong. First, the Debtors point to "past cases"—from a period when much less was known about Purdue's misconduct than we know today—in which courts refused to certify *personal injury* classes against Purdue. Debtors' Obj. ¶ 49 & n.23. This case, the Debtors argue, "is no different" than those cases. *Id.* at ¶ 90. However, this case is very different:

- To begin with, the common facts about the Purdue Debtors' and the Sacklers' conduct creating and sustaining the opioid epidemic campaign, their concerted campaign to reverse understandings of the risks opioid use, and the resulting common harms are each far more developed and far stronger today than in 2005 (the date of the most recent personal injury case cited by the Debtors).

- Next, the school districts are not personal injury plaintiffs, bringing personal injury claims on personal injury theories. They have brought RICO claims. And whereas older personal injury cases tended to deny class certification by suggesting that each personal injury plaintiff would need to prove individualized reliance and causation, defeating commonality, the Supreme Court has since held that that is not true for RICO claims. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) (holding that a plaintiff

14

asserting a RICO fraud claim need not show reliance, either as an element of its claim or as a prerequisite to establishing proximate causation; no reliance showing is required to establish that an enterprise conducted its affairs through a pattern of racketeering activity).[10]

- In addition, the Debtors, like the Objecting Public Claimants, are also asking this Court to disagree with the JPML and Judge Polster—who specifically found that RICO claims, on these facts, present common questions. *See In re Nat'l Prescription Opiate Litig.,* No. 17-MD-02804, ECF No. 2590 at 27 (N.D. Ohio Sept. 11, 2019), available at https://perma.cc/K97R-UYWK ("Plaintiffs argue they suffered injuries because others (doctors, patients, etc.) relied on the Defendants' misrepresentations, enabling the Defendants to sell more opioids than the legitimate medical market could support. Whether there was such third-party reliance is a question susceptible to class-wide proof, justifying characterization of this issue as common.").

The Debtors' second challenge to commonality is also misplaced. They expressly incorporate the Objecting Public Claimants' arguments that variations in state law defeat commonality. And their argument fails for the same reasons: (a) common issues of *fact*, and school districts have identified five, are impervious to variations in state *law*; and (b) differences in "schemes" or "structures" for funding special education programs correspond, if at all, only to differences in the size of districts' claims (damages), and differences in class members' damages do not defeat certification.

Last, the Debtors argue, also in error, that Public Schools' proofs will necessitate "a detailed student-by-student analysis into each student's and their mother's medical, pregnancy, and addiction history," which will be the opposite of commonality. Debtors' Obj. ¶ 92. That

---

[10] Separately, the Debtors also argue that even if common issues exist concerning RICO liability, common issues will not "predominate," Fed. R. Civ. Proc. 23(b)(3), citing *UFCW Local 1776 v. Eli Lilly & Co*., 620 F.3d 121 (2d Cir. 2010). Debtors' Obj. ¶ 62. But because the school districts exclusively seek class certification under Rule 23(b)(1)(B), not 23(b)(3*), that argument does not apply* to the school districts. "Predominance" is not a requirement under Rule 23(b)(1)(B). In addition, the Second Circuit has subsequently distinguished and narrowed *UFCW,* which turned on the idiosyncratic liability theories that the plaintiffs in that case were pursuing. *See, e.g., In re U.S. Foodservice Inc. Pricing Litig*., 729 F.3d 108, 119–22 (2d Cir. 2013) (noting that neither issues of causation nor issues of reliance necessarily place RICO fraud claims "beyond the reach of Rule 23").

objection fundamentally misunderstands the class proof model. There are many class actions,

like this one, where the magnitude of the injury is measurable, but the specific identity of the

victims is unknowable. For example, in any class action challenging race or sex discrimination in

hiring or in promotions, where the number of members of the class exceeds the number of jobs

that were at issue, statistical methods can identify how many more women or African Americans

should have been promoted or hired ("the shortfall"), but no method of proof can ever specify

which women or African Americans would have received the positions but for the

discrimination. Courts do not withhold class certification on that basis. *See Hameed v. Int'l

Assoc. of Bridge*, 637 F.2d 506, 520–22 (8th Cir. 1980). Further, as Professor Kolbe explains in

her supplemental declaration (Exhibit B hereto), aggregate estimations of Public Schools' claims

are *more* rigorous and *more* reliable than individual proofs. A class proof of claim, as Professor

Kolbe explains, will be more efficient, easier to verify or dispute, and more reliable than

individual proofs of claim by individual school districts ever could be.

### D. Allowing a school-district class will neither create due process concerns nor "defeat the purpose" of the notice plan.

In passing, the Objecting Public Claimants make two bold, but spurious, arguments. First,

they contend that allowing a school-district class would mean that "timely filed claims are

effectively diluted, *which implicates due process concerns*." Objecting Public Claimants' Obj.

¶ 31 (emphasis added). If that were true, Bankruptcy Rule 7023 would violate due process. It

does not. Allowing class proofs of claim does not remotely deny any other claimant life, liberty,

or property without notice or an opportunity to be heard. (By contrast, *disallowing* a class proof

of claim can implicate the due process rights of members of the denied class). In addition, any

"dilution of recoveries to other unsecured creditors is simply a function of the filing of [*any*

*other*] claim, not the filing of a *class* proof of claim." *See In re Chapparal Energy, Inc.*, 571 B.R.

642, 649 (Bankr. D. Del. 2017) (emphasis added).

Second, the Objecting Public Claimants state that allowing a school-district class claim

would "*defeat the purpose* of the $23 million Supplemental Notice Plan and the $700,000

Extended Notice Plan." Objecting Public Claimants' Obj. ¶ 43 (emphasis added). Here, again,

the hyperbole is plain. If the existence of a notice program were sufficient to defeat requests for a

class, Rule 7023 would be a dead letter. Furthermore, the due process rights of victims of a

debtor's unlawful conduct are not protected merely by receiving notice of the debtor's

bankruptcy proceedings (actually or constructively)—absent practicable means of identifying the

claims they might have. *Acevedo v. Van Dorn Plastic Mach. Co.,* 68 B.R. 495, 499 (Bankr.

E.D.N.Y. 1986). As Public Schools explained in their motion, those practicable means have been

lacking for school districts here. *See* Ex. D. to Public Schools' Mot. (school district

superintendents' declarations attesting to school districts' lack of resources or expertise to

identify and shape claims). The notice program was very effective for personal injury plaintiffs

but not for schools. The TV commercials and radio commercials, which were a key component

of the noticing strategy, did not mention schools.  Schools were not included in the scroll.  There

was no picture of a school.  The ads were targeted to harmed individuals, not schools, and just as

the notice program started, schools closed.

Even in a case with perfect notice, there may be a role for a class. One of the primary

purposes of a class action in bankruptcy is to "provide[] a champion" for the class, *In re Zenith

Labs., Inc*., 104 B.R. 659, 663 n.3 (Bankr. D.N.J. 1989), with the expertise and resources to

"identify and shape the claim[s]" when class members lack the resources to frame claims for

themselves (or are prevented from doing so by circumstances beyond their control, like a

17

worldwide pandemic that shuts schools). Public Schools' claims are not simple accounts receivable that a school district bookkeeper could file.

The purpose of a class in bankruptcy is to bring forward claims that, if the court were to rely exclusively on notice, "otherwise would lie dormant," frustrating important goals of the Bankruptcy Code. *In re Am. Reserve Corp.*, 840 F.2d 487, 489 (7th Cir. 1988). There are compelling reasons here to allow a class-wide proof of claim for Public Schools.

### E.  "Independent" public school districts is a satisfactory class definition.

The Objecting Public Claimants also contend that the Public Schools' class motion should be denied because "the ISPD class is vaguely defined." Objecting Public Claimants' Obj. ¶¶ 54–55. They offer no standard against which a class definition should be measured, however, and they cite no authority. *Id.*

Simply put, a satisfactory class definition is one that makes membership "ascertainable," is not defined "only in reference to the harm alleged," and is not defined "in ways in which membership can only be subjectively determined." 3 Newberg on Class Actions § 7:27 (5th ed.). The proposed class here—"all public school districts nationwide that are independent governmental entities"—satisfies all three criteria. A school district is "independent" if it can sue or be sued.[11]

### F.  The Representatives of the Proposed Class adequately represent the interests of absent class members.

The Debtors and the Objecting Public Claimants also insinuate that there may be "antagonism" within the class, defeating "typicality and adequacy of representation," Debtors'

---

[11] The U.S. Census Bureau's Census of Governments provides an incomplete list of "independent" public schools because it applies a different standard.

Obj. ¶ 98, because "it would appear," Objecting Public Claimants' Obj. ¶ 62, that the

Representatives of the Proposed School District Class are too focused on recovering some costs

while neglecting others. Specifically, they suggest that the Representatives of the Proposed Class

are focused on the staggering costs of providing special education and related services to

children with prenatal exposure to opioids—while allegedly slighting, for example, the weaker

and smaller claims that some self-insured districts may have to recover sums they paid for health

coverage for staff with opioid-related diagnoses. This is a bizarre argument for at least three

reasons.

First, the foxes are trying to guard the henhouse—i.e., the Debtors, who are adverse to

absent members of the proposed class, but now apparently purport to speak for them—want to

deprive absent class members of a class "for their own good."

Second, while it is conceivable that class representatives might chose to pursue one claim

over another to advance their own interests at the expense of the class, there is absolutely no

evidence of that kind of conflict here, and "the mere fact" that a class representative (or here,

representative*s*) elect to pursue some claims but not others is not proof of a conflict. *In re

Universal Serv. Fund Tel. Billing Practices Litig*., 219 F.R.D. 661, 670 (D. Kan. 2004). Simply

put, in this Circuit "due process does not require that all class claims be pursued." *Wal-Mart

Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 113 (2d Cir. 2005).

Third, the rationale for policing adequacy of representation when the representative of a

proposed class elects not to pursue all available claims is a concern for the res judicata effect that

a judgment in the class suit might have on absent class members' ability to bring "omitted"

claims against the same defendants in a later suit. But that is a concern *wholly* inapplicable in

bankruptcy. The purpose of a bankruptcy is to finally resolve all pre-petition claims against the

19

debtor in one preceding. Even given the irony of their taking this position, the Debtors' professed

concern for *preserving* additional pre-petition claims, to be asserted in separate proceedings later,

is, quite simply, antithetical to the finality of a discharge order.

## CONCLUSION

For all the reasons stated above, and in the Public Schools' motion, this Court should

exercise its discretion under Bankruptcy Rule 9014 to apply Fed. R. Civ. P. 23 to allow and

approve the school districts' already-filed class proofs of claim; certify a class of "all public

school districts nationwide that are independent governmental entities" under Fed. R. Civ. P.

23(b)(1)(B); appoint the Proposed Representatives of the Class as representatives for the class;

and appoint their attorneys as Class Counsel.

Dated: July 21, 2020

Respectfully Submitted,

By: /s/ Joshua Karsh

MEHRI & SKALET, PLLC
Cyrus Mehri (*pro hac vice*)
Steven Skalet (*pro hac vice*)
Joshua Karsh (*pro hac vice*)
Aisha Rich (*pro hac vice*)
1250 Connecticut Ave., NW
Washington, D.C. 20036
(202) 822-5100 (phone)
(202) 822-4997 (fax)
cmehri@findjustice.com
sskalet@findjustice.com
jkarsh@findjustice.com
arich@findjustice.com

HENRICHSEN SIEGEL, PLLC
Chiung-Hui Huang
Neil L. Henrichsen (*pro hac vice*)
Dawn C. Stewart (*pro hac vice*)

20

225 Broadway, Suite 1803
New York, New York 10007
(646) 378-4421 (phone)
chuang@hslawyers.com
nhenrichsen@hslawyers.com
dstewart@hslawyers.com

HUGHES SOCOL PIERS RESNICK & DYM,
LTD.
Matthew J. Piers (*pro hac vice*)
Charlie D. Wysong (*pro hac vice*)
Margaret E. Truesdale (*pro hac vice*)
Emily R. Brown (*pro hac vice*)
Mark Dym (*pro hac vice*)
70 West Madison Street, Suite 4000
Chicago, Illinois 60602
(312) 604-2630 (phone)
(312) 604-2631 (fax)
mpiers@hsplegal.com
cwysong@hsplegal.com
mtruesdale@hsplegal.com
ebrown@hsplegal.com
mdym@hsplegal.com

HIMES PETRARCA & FESTER, CHTD.
Justino D. Petrarca (*pro hac vice*)
Two Prudential Plaza, Suite 3100
180 North Stetson
Chicago, Illinois 60601
(312) 565-3100 (phone)
(312) 565-0000 (fax)
jpetrarca@edlawyer.com

TERREL HOGAN, P.A.
Wayne Hogan (*pro hac vice*)
Leslie Goller (*pro hac vice*)
233 E. Bay Street, Suite 80
Jacksonville, FL 32202
904.722.2228
hogan@terrellhogan.com
lgoller@terrellhogan.com

21