## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PURDUE PHARMA L.P., *et al*., | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## REPLY OF THE PRIVATE INSURANCE CLASS CLAIMANTS IN FURTHER SUPPORT OF MOTION FOR LEAVE TO FILE CLASS PROOFS OF CLAIM

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows:  Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

Preliminary Statement......................................................................................................................1

Reply ...............................................................................................................................................4

Conclusion .....................................................................................................................................17

SL1 1649989v4 113572.00002

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States ex rel. Brown v. Celgene Corp.*, CV 10-3165-GHK SSX,
  *2014 WL 3605896 (C.D. Cal. July 10, 2014)* ............................................................................12

*Capital Health Sys., Inc. v. Veznedaroglu*,
  *2017 WL 751855 (D.N.J. Feb. 27, 2017)*....................................................................................12

*Carnegie v. Household Int'l, Inc.*,
  *376 F.3d 656 (7th Cir. 2004)*........................................................................................................8

*City of Everett v. Purdue Pharma L.P.*,
  *2017 WL 4236062 (W.D. Wash. Sept. 25, 2017)* ...............................................................11, 14

*Equiom (Isle of Man) Ltd. v. Jacobs*, CV 16-4362,
  *2017 WL 6550481 (D.N.J. Dec. 22, 2017)*.................................................................................12

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  *407 F. Supp. 3d 422 (S.D.N.Y. 2019)*........................................................................................11

*Hughes v. Ester C Co.*,
  *930 F. Supp. 2d 439 (E.D.N.Y. 2013)*........................................................................................12

*Johnson v. Nextel Commc'ns Inc.*,
  *780 F.3d 128 (2d Cir. 2015)*.........................................................................................................9

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
  *897 F.3d 88 (2d Cir. 2018)*...........................................................................................................8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB,
  *2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), on reargument in part sub nom.*
  *In re: LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB),*
  *2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016)*.............................................................................12

*Marchak v. JPMorgan Chase & Co.*,
  *84 F. Supp. 3d 197 (E.D.N.Y. 2015)*..........................................................................................10

*Moore v. PaineWebber, Inc.*,
  *306 F.3d 1247 (2d Cir. 2002)*.....................................................................................................10

*In re Nat'l Prescription Opiate Litig.*,
  *2018 WL 6628898 (N.D. Ohio Dec. 19, 2018)* ................................................................... 13-14

*In re Neurontin Mktg. & Sales Practices Litig.*,
  *712 F.3d 60 (1st Cir. 2013)* ..................................................................................................12, 14

*Pascazi v.Fiber Consultants, Inc.*,
    *445 B.R. 124 (S.D.N.Y. 2011)* ...............................................................................................15

*Matter of Sinclair's Suncoast Seafood, Inc.*,
    *140 B.R. 588 (Bankr. M.D. Fl. 1992)* ...................................................................................16

*Stewart v. Beam Global Spirits & Wines, Inc.*,
    *877 F. Supp. 2d 192 (D.N.J. 2012)* ......................................................................................13

*Sykes v. Mel S. Harris & Assocs. LLC*,
    *780 F.3d 70 (2d Cir. 2015)* ...................................................................................................10

*Thorogood v. Sears, Roebuck & Co.*,
    *547 F.3d 742 (7th Cir. 2008)* ..................................................................................................6

*In re U.S. Foodservice Inc. Pricing Litig.*,
    *729 F.3d 108 (2d Cir. 2013)* ...................................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
    *564 U.S. 338 (2011)* ................................................................................................................9

**State Cases**

*Alaska v. Purdue Pharma, L.P., et al.*,
    *2018 WL 4468439 (Super. Ct. Alaska, July 12, 2018)* ...................................................... 13-14

*Gennari v. Weichert Co. Realtors*,
    *148 N.J. 582 (N.J. 1997)* .......................................................................................................11

*In re Opioid Litigation*,
    *2018 WL 3115102 (N.Y. Sup. June 8, 2018)* .................................................................... 11-14

*In re Opioid Litigation*,
    *2018 WL 4827862 (N.Y. Sup. July 17, 2018)* .......................................................................14

**Federal Statutes**

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et
    seq. ...........................................................................................................................................2

**Rules**

Federal Rule of Bankruptcy Procedure 2019 ...................................................................................9

Federal Rule of Bankruptcy Procedure 7023 ...........................................................................6, 18

Federal Rule of Bankruptcy Procedure 9014 ...........................................................................6, 18

Federal Rule of Civil Procedure 23 ....................................................................................... *passim*

(iii)

Eric Hestrup, *et al*. (collectively, "Private Insurance Plaintiffs" or "Movants"), in their individual and representative capacities (and with the class members, collectively, the "Private Insurance Class Claimants" or "Ratepayers") in their respective actions (the "Private Insurance Class Actions"), submit this Reply in further support of their motion (the "Motion") for entry of an order granting the Private Insurance Plaintiffs leave to file one or more class proofs of claim (the "Class Proofs of Claim") for all monetary components of the relief sought in the Private Insurance Class Actions, including but not limited to money damages, restitution, statutory and civil penalties, and any claim for counsel fees and expenses, as may be appropriate.

This Reply responds to (A) the objections of certain co-creditors including the (i) State of Florida ("Florida") [Dkt. No. 1415], (ii) Ad Hoc Group of Individual Victims ("Victims Group") [Dkt. No. 1423] and (iii) Public Claimants (with Florida, "Public Claimants") [Dkt. No. 1431] (collectively, "Non-Debtor Objectors"); and (B) the objection of the Debtors [Dkt. No. 1421] (with the Non-Debtor Objectors, collectively, "Objectors"). In further support of the Motion, the Private Insurance Plaintiffs respectfully state as follows:

## Preliminary Statement

1.      The Ratepayers are one of the original ten creditor groups, and one of the five private side creditor groups, currently engaged in mediation for the allocation of value between the public and private side creditor groups.

2.      The Ratepayers Class consists of all persons (including natural persons and entities) who purchased health insurance policies in the United States from 1996 through the present, and all persons who paid for any portion of employer provided health insurance from 1996 through the present.

1

3.      The Ratepayers allege that the direct and proximate consequence of Purdue's misconduct is that every purchaser of private health insurance in the United States paid higher premiums, co-payments and deductibles.  The Ratepayers filed 30 separate Private Insurance Class Actions in federal court in their respective states of residence seeking to recover these damages.  On December 27, 2019, the Ratepayers filed a nationwide class action complaint in the United States District Court for the Northern District of Illinois.  Generally, the filed Private Insurance Class Actions assert state law claims for public nuisance, unjust enrichment, negligence, and civil conspiracy and federal claims under The Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. ("RICO").

4.      The Ratepayers hoped that the mediation would have concluded prior to the July 30, 2020 bar date (the "Bar Date") with an agreement that the Ratepayers and other similarly situated creditor groups would be allowed to file class claims in stipulated amounts.  Unfortunately, the mediation has not yet borne fruit.

5.      Accordingly, the Ratepayers moved for leave to file class proofs of claim on July 2, 2020 [Dkt. No. 1321], in order to preserve their claims in advance of the Bar Date.  The Ratepayers' Motion seeks leave to file the Class Proofs of Claim.  It does not seek the allowance of the Class Proofs of Claim in any amount, nor the determination that the Class Proofs of Claim are entitled to any particular priority under the Bankruptcy Code.

6.      Recognizing that these class claim issues should be resolved in the mediation, the UCC[2] suggested on July 12, 2020 that the class claim motions be adjourned and the Bar Date be extended for all movants pending the outcome of the mediation.  The Ratepayers and other class movants readily agreed to that reasonable proposal.  The Debtors and the Public Claimants refused,

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Motion.

filing objections to all of the class motions, even though creditors such as the Public Claimants have no standing to do so.

7.      The Ratepayers believe that the Court should follow the recommendation of the UCC and adjourn all of the class claim motions, preserve all parties' rights, and let these issues be addressed in the mediation as contemplated under this Court's original mediation order.  A handful of recalcitrant parties to the mediation should not be allowed to derail a delicate process that has been painstakingly negotiated for over four months.

8.      If the Court chooses to address the class claim motions, the Ratepayers believe that the objections should be overruled.  The facts underlying the Ratepayers' claims support the allowance of leave to file in order to preserve the rights of the Ratepayers' class.  The Ratepayers' claims are not amenable to discovery or quantification without the assistance of sophisticated counsel.  But for the allowance of a class claim, these claims will never be raised.

9.      There are millions of Ratepayers, all of whom have relatively modest and difficult to calculate claims.  This is the quintessential set of facts militating in favor of class claim treatment.  Millions of insurance purchasers with claims for hundreds or thousands of dollars each cannot reasonably be expected to ascertain whether they have a claim against Purdue, what that claim might be, and what legal bases there are for any such claim.  This is not because, as Debtors suggest, these claims are weak.  It is instead because Debtors' wrongdoing has such enormous effects on the marketplace.

10.     Discovering and proving that effect, however, would necessarily entail consultation with counsel, significant discovery, and expert analysis that would far outstrip the amount of their individual damages.  While preserving a straightforward trade claim may merely cost a postage stamp, that simply is not the case for the Ratepayers and similarly situated creditors.

3

11.     The purpose of the Debtors' claims notice program is to provide fair warning to all claimants, ensuring that those who wish to file a claim are able to do so by the Bar Date.  The Private Insurance Plaintiffs' Motion is intended to make certain that creditors who paid increased private health insurance costs as a result of the Debtors' misconduct are able to do just that.

12.     The Objectors seek to contravene this purpose.  By arguing against the filing of class claims, the Objectors seek to disenfranchise tens of millions of claimants from having a voice in these proceedings.  This will artificially reduce the pool of creditors, which only inures to the benefit of the Objectors, and runs counter to the express purpose of the claims notice procedure and the Bankruptcy Code.  As a result, if the Court determines not to adjourn the Motion as the UCC recommends, then the Private Insurance Plaintiffs respectfully request the Court overrule the various objections and grant the Motion.

## **Reply**

### *The Motion is timely*

13.     Despite Objectors' complaint regarding the timing of the Ratepayers' Motion, they have known since the earliest days of these cases that the Ratepayers and other creditor groups would seek class status.  *See, e.g.,* Debtors' Objection at ¶ 13 ("For example, on September 16, 2019, just one day after the Petition Date, counsel for the Ratepayers filed a Bankruptcy Rule 2019 statement on behalf of twenty-five 'persons in their respective individual and putative capacities as proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives' in lawsuits against the Debtors in their twenty-five respective states.");  Joinder of the Private Insurance Class Claimants to Objection of Official Committee of Unsecured Creditors to Debtors' Motion to Assume Pre-Petition Reimbursement Agreement with Ad Hoc

SL1 1649989v4 113572.00002

Committee at ¶¶ 2-8 (notifying all parties of the Ratepayers' claims in November 2019) [Dkt. No. 462].

14.     Nearly all of the same parties represented by the same counsel participated in the Chapter 11 case of *Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del.), filed in June 2019. In that case, the Ratepayers and other similarly situated parties filed motions seeking leave to file class claims, all of which were consensually resolved through mediation and plan negotiations. Thus, even before these Debtors filed Chapter 11, the Objectors knew that Ratepayers would assert class claims here.[3]

15.     Likewise, Objectors knew that the Ratepayers were selected to be one of the ten original mediation parties because they filed 30 <u>class action</u> lawsuits against Purdue and other opioid malefactors, including one nationwide class action. Objectors cannot plausibly claim surprise that is prejudicial to their interests.

16.     Because the mediation is ongoing, the Ratepayers and the other class claim movants reasonably determined that it would not be constructive to file motions concerning their class claims and risk disrupting the mediation process. However, the calendar eventually forced their hands. Movants should not be penalized for negotiating in good faith and attempting to avoid disrupting the mediation until they had no choice but to seek court relief.

> *A Class Proof of Claim is Necessary to Protect the Interests of the Ratepayers.*

17.     Citing the Debtors' "unprecedented" claims noticing program, Objectors argue that a class proof of claim is unnecessary.

---

[3] The Ratepayers do not mean to imply that what happened in the *Insys* case is binding here. They are simply pointing out further evidence that all parties had prior notice that class claims would be asserted against Purdue.

18.     The Debtors' claims noticing program was designed to reach as many prospective claimants as possible in order to advise them of the deadline to file claims against the Debtors' estates.  But the simple reality for individual private insurance payers and other similarly situated creditors pursuing class treatment, however, is that viewing or reading an advertisement would not rouse action to protect their rights.

19.     This is not a failing of the well-crafted notice program contemplated in these cases, but only the nature of twenty-first century life.  For the same reasons Fed. R. Civ. P. 23 allows certain claims to proceed in litigation on a class-wide basis due to their nature and magnitude in the trial court, Fed. R. Bankr. P. 7023 and 9014(c) afford the same at this phase.

20.     When a claim affects such a broad swath of the population, people from all walks of life and backgrounds, all levels of education, all socioeconomic backgrounds, all trying to survive during the COVID pandemic, the blunt reality is that notice will not inspire the righteous indignation of the masses or galvanize them to pursue relatively small claims against Debtors that have relied upon layers of obfuscation to protect themselves for decades.

21.     This is where the Private Insurance Plaintiffs and their counsel perform the vital role of not only deciphering the bankruptcy law for class claimants, but asserting and preserving the class claimants' right to a recovery from the Debtors.  As Judge Posner explained, that is why the class mechanism is our legal system's "ingenious device for economizing on the expense of litigation and enabling small claims to be litigated."  *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744 (7th Cir. 2008).

22.     The notice program did not, and could not, advise putative class members regarding their claim against Purdue for increased insurance premiums let alone stimulate filing given the relatively small value per claim.  Our civil court schema places that responsibility on class

6

representatives and their counsel.  Part and parcel with that charge, counsel to the Private Insurance

Plaintiffs are able and prepared to represent all similarly situated interests as a class before this

Court, which includes the preparation and filing of class claims.

23.     For the same reasons, the Public Claimants do not expect each taxpayer to file a

claim in these cases for increased taxes due to higher public health expenditures as a result of

Purdue's misconduct, but to rely on the instruments of the State to pursue that relief on their behalf.

24.     Debtors' claims noticing program was designed to give the largest number of

people who hold claims the ability to timely assert these claims.  Remarkably, however, the Public

Claimants make the following statement in direct contravention: "Allowing the four Proposed

Classes to assert class claims would obviate the need for a substantial portion of the Debtors overall

claimants to file claims, and defeat the purpose of the $23 million Supplemental Notice Plan and

the $700,000 Extended Notice Plan – *i.e.*, providing widespread notice to ensure that all claimants

who wish to file claims are able to do so."  Public Claimants Objection, ¶ 43.

25.     The purpose of Movant's pleading is simply "to ensure that all claimants who wish

to file claims are able to do so."  However, by opposing class claims here, the Public Claimants

and the Debtors would obfuscate that purpose, artificially limiting the pool of creditors and claims,

thereby unfairly inuring to the benefit of the Objectors.

26.     The Objectors are using their objections to the Motion as a *sub rosa* claims

objection without providing the Private Insurance Plaintiffs an opportunity to prove and establish

the quantum and entitlement to claims.  The objections run afoul of the role and purpose of

bankruptcy law and should be overruled.

7

*Ratepayers' Claims are Suitable for Class Treatment.*

27.       Objectors raise numerous arguments in opposition to class certification.  The Public Claimants and the Debtors argue that the Ratepayer class is too large to be certified.  Debtors Objection at ¶ 52; Public Claimants Objection at ¶ 56.  This is not a reason to deny class certification, especially given the purpose of Rule 23.  "The more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30."  *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  The Public Claimants' objection is particularly baffling, given that the Public Claimants themselves assert claims on behalf of tens of millions of their residents.  In fact, the 50 states collectively are asserting claims on behalf of over 330 million Americans; any size concerns regarding the Ratepayer class would only be exacerbated for the Public Claimants, yet they believe their own claims are manageable.

28.       The Public Claimants argue that there are no common questions of law or fact in the Ratepayers' claims because various state laws may apply.  Public Claimants Objection at ¶ 64.  Debtors argue the Ratepayers cannot prove predominance for the same reason.  Debtors Objection at ¶ 57.  However, it takes more than just supposing a court may have to apply the laws of other states to defeat a motion for class certification.  "Variations in state laws do not necessarily prevent a class from satisfying the predominance requirement."  *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 97 (2d Cir. 2018).  "The crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) (finding no predominance issue where defendant had alleged but not

8

proffered evidence to support its claim that variation in evidentiary standards among states overwhelmed the similarities). No objector has pointed to a single material conflict in any applicable law.

29.     A question is common to the class if it is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 250 (2011). Consideration of the commonality requirement obligates a district court to determine whether class members have "suffered the same injury." *Id.* at 349–50. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

30.     Ratepayers' claims are suitable for class-wide adjudication. The Ratepayers assert that Debtors' concerted scheme to misrepresent the risks of opioids improperly increased the number of opioid prescriptions. This in turn increased the costs of the Ratepayers' health insurance in order for the Ratepayers' insurers to pay for both Debtors' addictive drugs and the health effects of addiction they caused. These claims do not turn on the Ratepayers' actions or state of mind, and they will not be proven through the anecdotal testimony of consumers.

31.     Instead, these claims will be proven through Debtors' records, the health insurers' records, the Ratepayers' records, and the analysis of datapoints and actuarial assessments that will support the claims of thousands at a time. This data will be integrated to produce statistical evidence regarding the costs of covered medical treatments and prescriptions that resulted from opioid abuse, and the dollar amounts health insurers passed on to their insureds. This common evidence will answer whether Purdue violated state and federal law. Actuarial insurance analysis

9

required to justify premium changes will help identify the cause of any rate increase and the cost of Debtors' conduct to the Ratepayer class.

32.     At its core, predominance is a balancing test that asks whether common questions outweigh any individual questions.  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case … can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

33.     Because of this, the Ratepayers do not need to show that each element of their claims is susceptible to common proof, or that no individual questions will arise during the course of this litigation.  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015).  Instead, Ratepayers simply need to show that they can prove the "gravamen of every class member's claim" with common evidence, or that the "central component of every claim relies on the same core factual issues."  *Marchak v. JPMorgan Chase & Co.*, 84 F. Supp. 3d 197, 208 (E.D.N.Y. 2015).  That standard is met here.

34.     The Objectors also seem to misapprehend the nature of the relief requested at this time.  The Ratepayers are not asking the Court to make any finding as to the merits of the Ratepayers' claims.  The Ratepayers' Motion merely raises a threshold or gating issue: whether Movants should be permitted to file a class proof of claim prior to the Bar Date in order to preserve the rights of the health insurance Ratepayer class.

35.     The Ratepayers are not asking the Court to determine the validity or quantum of the Ratepayers' claim; all rights are expressly reserved with respect to the merits of any such claims.  Nevertheless, Objectors spill much ink attacking the merit of Ratepayers' claims.  These attacks are unfounded and premature.   "Although  factual  disputes  relevant  to  Rule  23's

10

requirements must be resolved, a court should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 407 F. Supp. 3d 422, 429 (S.D.N.Y. 2019).

### *The Private Insurance Plaintiffs Suffered Direct Harm as a Result of Debtors' Conduct.*

36.    The Non-Debtor Objectors argue the Private Insurance Plaintiffs hold derivative claims seeking to recover damages caused by other insureds' increased costs incurred as a result of taking Purdue's opioid products that were then passed on to the Private Insurance Plaintiffs in the form of increased insurance premiums.  To the contrary, the Private Insurance Plaintiffs suffered direct harm and ascertainable losses in the form of overpaying for their personal and for their families' health insurance over the past 25 years.

37.    The Private Insurance Plaintiffs assert that the purpose of Debtors' fraudulent conduct was to change the prevailing medical norms — which dictated that opioids should be used only in limited, narrow circumstances and never for common or chronic pain — so that Debtors could maximize profits.  To carry out this scheme, Debtors needed to — and did — induce health insurers not to question the practice of using opioids to treat chronic pain and to keep opioids in their formularies.  Given the mechanics of health insurance in this country, it was entirely foreseeable that the increased costs borne by health insurers would be passed directly to health insurance purchasers, including Private Insurance Plaintiffs and the Putative Class.  That is sufficient to show the Private Insurance Plaintiffs' injuries were a direct result of Debtors' misconduct.[4]

---

[4] It does not matter that Private Insurance Plaintiffs did not directly rely on Debtors' misrepresentations; consumer fraud statutes hold parties liable for misrepresentations when "any person has in fact been misled, deceived or damaged thereby." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607-08 (N.J. 1997) (citing New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2) (emphasis added).  *See also City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017) (finding the city had "adequately pled proximate cause to survive this Motion to Dismiss" and "[a]lthough not as direct as a car accident or slip-and-fall case, this causal chain is still a 'direct sequence'"); *In re Opioid Litigation*, 2018 WL 3115102, at *27 (N.Y. Sup. June 8, 2018) (finding that the plaintiffs "adequately pled

38.     Second, Debtors received a pecuniary benefit from Private Insurance Plaintiffs'
paying for the increased prescriptions of Debtors' opioids through higher health insurance costs.
Debtors created a body of false and misleading literature intended to shape the perceptions of,
among others, Private Insurance Plaintiffs' and the Putative Class's health insurers, "encouraging
them to pay for long-term opioid prescriptions and effectively depriving them of the chance to
exercise informed judgment." *In re Opioid Litigation*, 2018 WL 3115102, at *33. "[I]mplicit in
those allegations" is that Debtors knew Private Insurance Plaintiffs and the Putative Class "were
to be the source of a significant portion of their profits." *Id*.

39.     The Debtors are therefore "not merely an innocent third party." *Capital Health
Sys., Inc. v. Veznedaroglu*, 2017 WL 751855, at *11 (D.N.J. Feb. 27, 2017); *In re LIBOR-Based
Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *66 (S.D.N.Y.
Oct. 20, 2015), *on reargument in part sub nom. In re: LIBOR-Based Fin. Instruments Antitrust
Litig.*, No. 11 MD 2262 (NRB), 2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016) ("As a general and
unremarkable principle…liability for fraud can be imposed through communication by a third
party.") (quotations omitted).   Because Private Insurance Plaintiffs "plausibly contend[] that
[Debtors] orchestrated [a] wider fraudulent scheme," Debtors are removed "from the class of
innocent, attenuated third parties the direct relationship requirement is intended to protect."
*Equiom (Isle of Man) Ltd. v. Jacobs*, CV 16-4362 (CCC-JBC), 2017 WL 6550481, at *5 (D.N.J.
Dec. 22, 2017); *see also Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 471 (E.D.N.Y. 2013) (noting

---

that the alleged breach of the [opioid] manufacturer defendants' duty herein was a proximate cause of their injuries");
*United States ex rel. Brown v. Celgene Corp.*, CV 10-3165-GHK SSX, 2014 WL 3605896, at *8 (C.D. Cal. July 10,
2014) (finding proximate cause because a "drug manufacturer could reasonably foresee that a comprehensive
marketing scheme involving [a] large number of salespeople furnishing large number of physicians with information
about . . . the use of a drug in a manner which is not a medically accepted indication could cause providers to prescribe
the drug for those off-label indications") (citation omitted); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d
60, 67 (1st Cir. 2013) (finding proximate cause for injury to third-party payors because "Pfizer knew that the structure
of the American health care system meant that almost all off-label Neurontin prescriptions written by physicians would
be paid for by [third-party payors]").

"[u]nder New York law, unjust enrichment does not require a direct relationship between the parties" where plaintiff asserted said claim against manufacturer); *Stewart v. Beam Global Spirits & Wines, Inc.*, 877 F. Supp. 2d 192, 200 (D.N.J. 2012) (unjust-enrichment claim allowed where a plaintiff "alleges that a defendant manufacturer has made false claims or misrepresentations directed for the purpose of generating retail sales, and where those retail sales could have the effect of increasing the amount of wholesale sales to the manufacturer").

40.     As a result, several courts have allowed unjust enrichment claims to proceed against opioid manufacturers. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898 at *20-21 (N.D. Ohio Dec. 19, 2018) (unjust enrichment claim properly pled because the plaintiffs alleged they "conferred a benefit upon" opioid manufacturers by paying for the "harms caused by their improper distribution practices"); *In re Opioid Litigation*, 2018 WL 3115102, at *33 (unjust enrichment claim properly pled because opioid manufacturers "failed to explain why, as a pleading matter, the retention of profits wrongfully obtained would not be unjust"); *Alaska v. Purdue Pharma, L.P., et al.*, 2018 WL 4468439, at *6 (Super. Ct. Alaska, July 12, 2018) (unjust enrichment claim properly pled because the State alleged that "Purdue has unjustly retained a benefit, in revenue, while the State absorbed the cost of healthcare, addiction, and illegal activity related to the opioid epidemic"); *City of Everett*, 2017 WL 4236062, at *9 (unjust enrichment claim properly pled against opioid manufacturer).  Likewise, Private Insurance Plaintiffs have provided sufficient evidence of a direct claim against Debtors for damages incurred as a result of the increased premiums paid.

41.     Finally, there is no doubt Debtors owed a duty of care to Private Insurance Plaintiffs, such that any damages incurred by Private Insurance Plaintiffs are a direct result of the Debtors' deliberately false marketing of opioids.  It was undeniably foreseeable that Debtors'

13

actions would injure Private Insurance Plaintiffs by raising their health insurance costs.  This is precisely how health insurance works.  *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d at 67 (finding proximate cause for injury to third-party payors because "Pfizer knew that the structure of the American health care system meant that almost all off-label Neurontin prescriptions written by physicians would be paid for by [third-party payors]").  Moreover, if health insurers and the Ratepayers had stopped paying for opioids, then Purdue's fraudulent scheme would have collapsed.

42.    Private Insurance Plaintiffs' harms would not have occurred if Debtors had exercised care to prevent them.  This is why multiple courts have found similar duties of care for opioid manufacturers.  *See, e.g., In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) at *19 (finding that opioids manufacturers owed a duty of care to local governments because it was "foreseeable that [they] will be responsible for combatting the creation of [a black] market [for opioids] and mitigating its effects."); *Alaska*, 2018 WL 4468439, at *4 (finding Purdue "had a duty to the State *and its residents* (1) to exercise due care in the advertising, marketing, promotion, and sale of opioid drugs; (2) not to make false, misleading, or deceptive statements about opioids and treatment for chronic pain; and (3) to report suspicious prescribes [sic]") (emphasis added); *In re Opioid Litigation*, 2018 WL 3115102, at *26 (rejecting opioid manufacturers' argument that they had no duty "to refrain from the lawful distribution of a non-defective product"); *City of Everett*, 2017 WL 4236062, at *4 (finding that the plaintiff had adequately pled the existence of a duty because it had alleged that "Purdue engaged in an affirmative act which created or exposed [the city] to a high degree of risk of harm"); *see also In re Opioid Litigation*, 2018 WL 4827862, at *16 (N.Y. Sup. July 17, 2018) (finding the plaintiffs have "adequately pled the existence of a duty owed by [opioid] distributor defendants by alleging

14

that societal expectations required different behaviors on their part, including, but not limited to, refusing to fill suspicious orders for opioids").

43.     The Motion specifically states the Private Insurance Plaintiffs are not seeking an order validating the amount and/or priority of the Class Proofs of Claim, only authority to file Class Proofs of Claim.  At the appropriate time in these proceedings, Private Insurance Plaintiffs will prove the causation and damages outlined herein.[5]

### The Non-Debtor Objectors Lack Standing to Object to the Motion

44.     Claims objections are usually prosecuted by debtors, bankruptcy trustees, or other estate fiduciaries whose responsibility it is to assure that all creditors are treated fairly.  Although "the right of a creditor to object to the allowance of another creditor's claim should be undisputed on principle … the needs of orderly and expeditious administration do not permit the full and unfettered exercise of such right … it is the trustee who acts as the primary spokesman for all the creditors in the discharge of the trustee's duty."  4 Collier on Bankruptcy at ¶ 502.02[2][d] (16th ed. 2014) (quoting the Advisory Committee Note to Bankruptcy Rule 3007).  Thus, other than the Debtors, none of the Objectors have standing to levy these arguments.

45.     There is no evidence that the Debtors are unreasonably failing to object to claims. Plainly, the Debtors have objected to the Motion.  Additionally, the Bar Date has not yet passed, so there is no reason for the Debtors to analyze, much less object to, claims.  Unless and until there is evidence the Debtors have absconded their responsibility to analyze or object to claims, the Non-Debtor Objectors have no basis to step into the Debtors' shoes and object to the Motion.  *See Pascazi v. Fiber Consultants, Inc.*, 445 B.R. 124, 129 (S.D.N.Y. 2011) (creditor who did not have

---

[5] Private Insurance Plaintiffs will use statistical evidence to concretely show: (1) the quantity of opioids that were prescribed without medical justification as a result of Debtors' conduct; (2) the percentage of these over-prescriptions that were paid for by private health insurance plans; (3) the costs of covered medical treatments that resulted from opioid abuse; and (4) the dollar amounts health insurers passed on to their insureds.

15

standing to object to another creditor's proof of claim in Chapter 7 case in which trustee had been appointed could not circumvent such standing requirements by waiting for claim to be allowed and then filing motion for reconsideration; considerations that precluded creditor's standing to object to claim once trustee was appointed applied equally to motion to reconsider an allowed claim). *See also Matter of Sinclair's Suncoast Seafood, Inc.*, 140 B.R. 588, 591 (Bankr. M.D. Fl. 1992) ("The Congressional policy underlying the Bankruptcy Code as a whole is to provide the debtor with a fresh start, while at the same time providing fair treatment to creditors … [It] is designed to maximize the estate for the benefit of all general creditors; ***it is not designed to enable a lone creditor to act solely in his own self-interest*.**") (emphasis added).

46.     The Non-Debtor Objectors couch their objections in the language of "benefit to the estate" or to "minimize estate cost."   In reality, the only benefit the Non-Debtor Objectors are seeking is to their respective treasuries, litigating the validity and quantum of claims when these issues have yet to be brought before the Court.

### The Public Claimants' Criticisms Undermine Their Own Claims

47.     The Ratepayers claims mirror those of the numerous states, counties, and cities pursuing recovery against Purdue in these proceedings, whose largest category of alleged damages are increases to public healthcare spending.

48.     Thus, it is ironic that the Public Claimants object to use of the class claim procedure. Essentially, states, counties, cities, and other public entities are asserting the same types of aggregated claims, albeit on behalf of their myriad taxpayers who funded emergency medical and other costs stemming from the opioid crisis.  In the absence of existing governmental infrastructure to pursue collective tort claims borne by citizens through state and local taxes, including those for

16

increased health insurance costs, Movants must employ the class mechanisms on behalf of similarly afflicted private litigants.

49.     Moreover, New York State is asserting the same claims as Movants on behalf of its citizens who purchased health insurance.  See Motion at ¶¶ 35-36.  It cannot genuinely attack the viability of Movant's claims, particularly the identical causal chain upon which the State relies.

50.     The Private Insurance Plaintiffs and Public Claimants are each seeking to represent millions of individuals who rely on them to vindicate their rights; individuals who would otherwise be unable or unwilling to seek redress for Debtors' unlawful and devastating practices.  Every hurdle Public Claimants argue would impede the administration and maintenance of resolving the Ratepayers' claims stemming from the size or complexity of the issues in these cases can certainly be overcome by the Ratepayers' counsel and the efficacy of the Court.

**Conclusion**

51.     The Private Insurance Plaintiffs respectfully submit that it is in the interests not only of Ratepayers, but also of all other creditors, for these claims to proceed on a class basis.  Such relief is certainly within the sound discretion of the Court.

52.     Failure to grant the relief sought would disenfranchise millions of creditors.  The notice program did not, and could not, advise putative class members regarding their claims against Purdue for increased insurance premiums let alone stimulate filing given the relatively small value per claim.  Our legal system places that responsibility on class representatives and their counsel.  The Private Insurance Plaintiffs can take appropriate steps to ensure the Private Insurance Class Claimants receive notice of their rights to a distribution.  Moreover, it will be far more efficient for the Private Insurance Plaintiffs to file one or more Class Proofs of Claim than to have millions

SL1 1649989v4 113572.00002

of purchasers of insurance file their own individual claims, which would inundate the Court and whoever will be appointed to analyze claims and make distributions.

53.     Therefore, pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7023, Private Insurance Plaintiffs seek leave to file the Class Proofs of Claim under the standards set forth in Federal Rule of Civil Procedure 23.

Respectfully submitted,

Dated:  July 21, 2020          By:  /s/ *Nicholas F. Kajon*
                                    One of the Attorneys for Private Insurance
                                    Plaintiffs

                                    Nicholas F. Kajon
                                    nfk@stevenslee.com
                                    Constantine D. Pourakis
                                    cp@stevenslee.com
                                    STEVENS & LEE, P.C.
                                    485 Madison Avenue, 20th Floor
                                    New York, NY  10022
                                    Tel:  212.319.8500

                                    James Young*
                                    jyoung@ForThePeople.com
                                    MORGAN & MORGAN, P.A.[6]
                                    COMPLEX LITIGATION GROUP
                                    76 S. Laura St., Suite 1100
                                    Jacksonville, FL  32202
                                    Tel:  904.361.0012

---

[6] Morgan & Morgan, P.A. also represent clients in diverse other matters pending against the Debtors, as specified in the Second Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Procedure 2019, dated May 26, 2020.  [Dkt. No. 1181].

18

Juan R. Martinez\*
juanmartinez@ForThePeople.com
MORGAN & MORGAN, P.A.
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida  33602
Tel:  813.223.5505

\*Admitted Pro Hac Vice

*Counsel for Private Insurance Plaintiffs and the
Putative Classes*

SL1 1649989v4 113572.00002