# EXHIBIT 1





| **Derrick Johnson** | **Leon W. Russell** |
|---|---|
| *President and* | *Chairman* |
| *Chief Executive Officer* | *National Board of Directors* |

### OFFICE OF THE GENERAL COUNSEL

July 15, 2020

Dear Counselor,

On behalf of the National Association for the Advancement of Colored People ("NAACP"), I would like to thank your client in advance for considering our request to not oppose NAACP's motion to intervene on behalf of communities of color in the Purdue Pharma Bankruptcy matter.  The NAACP is filing this motion to intervene in order to be an advocate on behalf of underserved communities of color in the settlement process.  In prior instances where mass tort settlement money was intended, in part, for communities of color, the money ended up in areas where the people have the greatest political influence, rather than the greatest need.

The NAACP intends to work with all parties to craft protections using the unique powers of the Bankruptcy Court to place protections on the expenditure of the funds. It is not our intent to disturb agreements that are in place regarding the amount and division among the plaintiffs.  The NAACP is concerned about where the funds are distributed after it is awarded to the individual States, counties, municipalities and other public institutions.

The NAACP brings a singular contribution to this process because its focus, unlike any other party, will be on the historically underserved communities of color and with its unparalleled reach into those communities --through over 2200 units in every state in the union--it can give voice to their needs unlike any other organization.

Without  accountability regarding the manner in which these funds are ultimately spent, the communities of color across the United States that have been so injured by the opioid epidemic may not realize the drug treatment programs, social services programs, and other related services truly needed.   Help us make sure that through this mediation there is some accountability as to how the funds will be distributed.

July 5, 2020
Page 2

Please support us in protecting the most vulnerable segment of our society and help us provide real relief to our fellow citizens suffering through the consequences of the opioid epidemic.

Best regards,

*Janette Louard*

Janette Louard
Interim General Counsel
NAACP Empowerment Program

*Wilbur O. Colom*

Wilbur O. Colom
Special Counsel to NAACP

# EXHIBIT 2

# THE OPIOID CRISIS AND THE BLACK/AFRICAN AMERICAN POPULATION: AN URGENT ISSUE



SAMHSA
Substance Abuse and Mental Health
Services Administration
www.samhsa.gov

# THE OPIOID CRISIS AND THE BLACK/AFRICAN AMERICAN POPULATION: AN URGENT ISSUE

U.S. Department of Health and Human Services
Substance Abuse and Mental Health Services Administration
Office of Behavioral Health Equity

# Table of Contents

**Introduction** ................................................................................................................ 3

   i.  Purpose of the Issue Brief ........................................................................................ 3

   ii.  Sources of Information .......................................................................................... 4

**Opioids in Black/African American Communities: Context** ................................. 4

   i.  What Do the National Data Show? ......................................................................... 4

   ii.  Routes to Opioid Misuse and Overdose Deaths: Pain Management, Illicit Drug Use, and Opioid Comorbidities in Black/African American Communities ..................................... 6

   iii.  Challenges to Prevention, Treatment, and Recovery .................................................. 7

**Strategies to Address Opioid Misuse and OUD in Black/African American Communities** ............ 9

   i.  Standard Treatment ............................................................................................. 9

   ii.  Community-Informed Strategies to Address Opioid Misuse and OUD in Black/African American Communities .................................................................................................. 10

**Moving Forward** ......................................................................................................... 18

**Glossary** ..................................................................................................................... 19

**Resources** ................................................................................................................... 20

**References** .................................................................................................................. 21

# Acknowledgments

### This Report

*The Opioid Crisis and the Black/African American Population: An Urgent Issue* was prepared for the Substance Abuse and Mental Health Services Administration (SAMHSA), U.S. Department of Health and Human Services (HHS) by SAMHSA's Office of Behavioral Health Equity. Victoria Chau, MPH, Ph.D. served as the lead author.

### Disclaimer

The  views, opinions, and content of this publication are those of the author and do not necessarily reflect the views, opinions, or policies of SAMHSA. The listing of non-federal resources in this document is not comprehensive, and inclusion does not constitute endorsement by SAMHSA.

### Public Domain Notice

All material appearing in this publication is in the public domain and may be reproduced or copied without permission from SAMHSA. Citation of the source is appreciated. However, this publication may not be reproduced or distributed for a fee without the specific, written authorization of the Office of Communications, SAMHSA.

### Electronic Access and Copies of Publication

This publication may be downloaded or ordered at www.store.samhsa.gov or by calling SAMHSA at 1-877-SAMHSA-7 (1-877-726-4727).

### Recommended Citation

Substance Abuse and Mental Health Services Administration:  *The Opioid Crisis and the Black/African American Population: An Urgent Issue.* Publication No. PEP20-05-02-001. Office of Behavioral Health Equity. Substance Abuse and Mental Health Services Administration, 2020.

### Originating Office

Office of Behavioral Health Equity, Substance Abuse and Mental Health Services Administration, 5600 Fishers Lane, Rockville, MD 20857. Publication No. PEP20-05-02-001.

### Nondiscrimination Notice

SAMHSA complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. SAMHSA cumple con las leyes federales de derechos civiles aplicables y no discrimina por motivos de raza, color, nacionalidad, edad, discapacidad o sexo.

# Additional Acknowledgments

This publication was developed with significant contribution from national and community experts and federal staff.  We would also like to acknowledge communities across the country that are doing critical work at the local level to address the opioid crisis in Black/African American communities.

**Stephanie Schmitz Bechteler, Ph.D.** *Chicago Urban League*

**Alfiee Breland-Noble, Ph.D., MHSc.** *Independent Consultant*

**Juliet Bui, M.P.A., M.S.W.** *U.S. Department of Health and Human Services Office of Minority Health*

**Leon Caldwell, Ph.D.** *Caldwell & Associates, LLC*

**Rocio Chang, Ph.D.** *University of Connecticut Health Center*

**Rose Clervil, M.S.W., M.M.** *Luminosity Behavioral Health Services, Boston, MA*

**Sonsiere Cobb-Souza, M.H.A.** *U.S. Department of Health and Human Services Office of Minority Health*

**Benjamin Cook, Ph.D., M.P.H.** *Harvard Medical School/ Cambridge Health Alliance*

**Ricardo Cruz, M.D., M.P.H.** *Boston University School of Medicine/Boston Medical Center Project RECOVER (Empowered Communities for a Healthier Nation Initiative)*

**Marilyn Hughes Gaston, M.D.** *The Gaston & Porter Health Improvement Center, Inc.*

**Mildred Gonzalez** *Project Hospitality, Staten Island, NY*

**Helena B. Hansen, M.D., Ph.D.** *New York University School of Medicine*

**Viviana Hernandez** *Project Hospitality, Staten Island, NY*

**Andre Johnson, M.A.** *Detroit Recovery Project*

**Ayana Jordan, M.D., Ph.D.** *Yale University School of Medicine*

**Kathleen Kane-Willis, M.S.** *Chicago Urban League*

**Mary Langley, Ph.D., M.P.H., RN, ICPS** *Morehouse School of Medicine (Empowered Communities for a Healthier Nation Initiative)*

**Eric Lozada, LADC, CARC** *Boston Medical Center Project RECOVER (Empowered Communities for a Healthier Nation Initiative)*

**Dana Lucchese** *Project Hospitality, Staten Island, NY*

**Nandini Manne, BVSc. & A.H., M.S., Ph.D.** *Marshall University (Empowered Communities for a Healthier Nation Initiative)*

**Josephine Mogire** *Luminosity Behavioral Health Services, Boston, MA*

**Frances E. Morales, M.Ed.** *Luminosity Behavioral Health Services, Boston, MA*

**Wendy Orson, C.E.O.** *Behavioral Health Network, Bridges to Care and Recovery, St. Louis, MO*

**Gayle Porter, Psy.D.** *The Gaston & Porter Health Improvement Center, Inc.*

**Connie Priddy, MA, RN, MCCN** *Cabell County Emergency Medical Services/Huntington, WV QRT Coordinator (Empowered Communities for a Healthier Nation Initiative)*

**Phillip S. Ragland, M.D.** *Independent Practitioner*

**Devin Reaves, M.S.W., C.R.S.** *Pennsylvania Harm Reduction Coalition*

**Phoebe Soares, M.S.W.** *Luminosity Behavioral Health Services, Boston, MA*

**Gerlinda Somerville** *Substance Abuse and Mental Health Services Administration*

**Tressa Tucker, Ph.D.** *Tressa Tucker & Associates, LLC (Empowered Communities for a Healthier Nation Initiative)*

**Stacey Williams** *U.S. Department of Health and Human Services Office of Minority Health*

SAMHSA Office of Behavioral Health Equity

**Victoria Chau, Ph.D., M.P.H.**

**Larke Nahme Huang, Ph.D.**

**Roslyn Holliday Moore, M.S.**

# Introduction

The current opioid epidemic is one of the largest drug epidemics recorded in U.S. history for all racial and ethnic groups. From 1999 to 2017, there were nearly 400,000 overdose deaths involving opioids in the U.S.[1] In 2018, 10.3 million people misused opioids, including prescription opioids and heroin, and two million had an opioid use disorder (OUD).[2] In 2017, the opioid epidemic in the U.S. was declared a national public health emergency with 47,600 reported deaths from opioid-related overdoses, which accounted for the majority of overdose drug deaths.[3] With approximately 130 people dying each day due to an opioid-related overdose,[4] this epidemic has garnered nation-wide attention, generated significant federal and state funding for prevention, treatment, and recovery and shaped the priorities of many local communities.

Attention to this epidemic has focused primarily on White suburban and rural communities. Less attention has focused on Black/African American* communities which are similarly experiencing dramatic increases in opioid misuse and overdose deaths. The rate of increase of Black/African American drug overdose deaths between 2015-2016 was 40 percent compared to the overall population increase at 21 percent. This exceeded all other racial and ethnic population groups in the U.S.[5] From 2011-2016, compared to all other populations, Black/African Americans had the highest increase in overdose death rate for opioid deaths involving synthetic opioids like fentanyl and fentanyl analogs.[6]

Three decades ago, when opioids and crack cocaine were devastating Black/African American communities, the national response was "The War on Drugs." This resulted in widespread incarceration of drug users and disruption of primarily Black/African American families and communities. This population was criminalized for drug-related offenses at much higher rates than White Americans and this has had lasting effects through the present day.[7] In 2017, though Black/African Americans represented 12 percent of the U.S. adult population they made up a third of the sentenced prison population.[8] In 2012, they accounted for 38 percent of the sentenced prison population in the U.S. and 39 percent of the population incarcerated for drug-related offenses.[9]

**\*In this issue brief, Black/African American is used as an umbrella term to include those who identify as "African American" and/or "Black" in the U.S. When data are reported, if describing specifically the non-Hispanic Black population, "non-Hispanic Black" is used.**

Today, the response to the drug epidemic is framed as an urgent public health issue. Substance use disorders (SUDs) and addiction are now viewed as a health condition, a disease that needs to be prevented and treated, and where recovery is possible with appropriate services and supports.

**PURPOSE OF THE ISSUE BRIEF**

As Congress, federal agencies, state health departments, and other stakeholders mobilize to address the opioid epidemic, what is happening within the Black/African American communities? This issue brief aims to convey snapshots of how this population is impacted. Specifically, it aims to do the following:

a) Provide recent data on prevalence of opioid misuse and opioid overdose death rates in the Black/African American population in the U.S.;

b) Discuss contextual factors that impact the opioid epidemic in these communities, including challenges to accessing early intervention and treatment;

c) Highlight innovative outreach and engagement strategies that have the potential to connect individuals with evidence-based prevention, treatment, and recovery and;

d) Emphasize the importance of ongoing community voice and leadership in the development and implementation of solutions to this public health crisis.

## SOURCES OF INFORMATION

This issue brief includes information compiled from a variety of sources, including interviews with key informants, federal data, and the peer-reviewed research and policy literature. Key informants were selected for their expertise and current work to reduce opioid misuse and provide treatment and other services in Black/African American communities. They represented a range of roles—including community leader, person with lived experience, peer recovery coach, peer recovery supervisor, executive director and staff of community-based programs, evaluator, researcher, addiction psychiatrist, clinical psychologist, physician, social worker, nurse, and city representative.  The information they shared represents a snapshot of what is happening in selected Black/African American communities struggling with opioid misuse and is not a full comprehensive picture of this population across the country. Their direct statements, indicated by italics and quotation marks, are interspersed throughout the document.



Opioids In Black/African American Communities: Context

## WHAT DO THE NATIONAL DATA SHOW?

National and state opioid estimates are from the Substance Abuse and Mental Health Services Administration (SAMHSA) National Survey on Drug Use and Health,[10] and the Centers for Disease Control and Prevention (CDC) National Vital Statistics System.[11]  In the figures and tables below, the most recent available data are shown.

**Opioid misuse.** The opioid misuse rate among non-Hispanic Blacks is similar to the national population rate, about 4 percent.[2]  In 2018, 1.2 million non-Hispanic Blacks and 10.3 million people nationally, aged 12 and older, were estimated to have had opioid misuse in the past year.[2]

**Opioid-related overdose deaths and deaths involving selected drugs by race/ethnicity.**  The opioid-related overdose death rate for the national population increased from 2.9 deaths per 100,000 people in 1999[12] to 14.9 per 100,000 in 2017[3]—with a large increase in overdose deaths involving synthetic opioids other than methadone (synthetic opioids, i.e., fentanyl, fentanyl analogs, and tramadol) from 2013 to 2017.[3] In 2017, among non-Hispanic Blacks the opioid-related overdose death rate was 12.9 deaths per 100,000 people (Table 1). It was the third highest opioid-related overdose death rate compared to other race/ethnicities.[13]

**Synthetic opioids (other than methadone).** Data suggest that illicitly manufactured synthetic opioids are heavily contributing to current drug overdose deaths in the U.S.[3,14] The fast rise in overdose deaths involving synthetic opioids in recent years is alarming and data show that the mixing of synthetic opioids with other drugs occur across populations.[15]

Synthetic opioids are affecting opioid death rates among non-Hispanic Blacks more severely than other populations.[3,12-13] In 2017, non-Hispanic Blacks had the highest percentages of opioid-related overdose deaths and total drug deaths attributed to synthetic opioids when compared to other race/ethnicities and the national population (Table 1).[13] *Synthetic opioids accounted for nearly 70 percent of the opioid-related*

**Table 1. Number and age-adjusted rates[a] of drug overdose deaths[b] involving selected drugs by race/ethnicity—United States, 2017**

| Race/Ethnicity | Drug overdose deaths,[b] overall | | Drug overdose deaths involving: | | | | | | | | | |
| | | | Any opioid[c] | | Natural and semi-synthetic opioids[d] | | Synthetic opioids other than methadone[e] | | Prescription opioids[f] | | Heroin[g] | |
| | Deaths | Rate | Deaths | Rate | Deaths | Rate | Deaths | Rate | Deaths | Rate | Deaths | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 70,237 | 21.7 | 47,600 | 14.9 | 14,495 | 4.4 | 28,466 | 9.0 | 17,029 | 5.2 | 15,482 | 4.9 |
| non-Hispanic White | 53,516 | 27.5 | 37,113 | 19.4 | 11,921 | 5.9 | 21,956 | 11.9 | 13,900 | 6.9 | 11,293 | 6.1 |
| **non-Hispanic Black** | **8,832** | **20.6** | **5,513** | **12.9** | **1,247** | **2.9** | **3,832** | **9.0** | **1,508** | **3.5** | **2,140** | **4.9** |
| non-Hispanic Asian/Pacific Islander | 756 | 3.5 | 348 | 1.6 | 117 | 0.5 | 189 | 0.8 | 130 | 0.6 | 119 | 0.5 |
| non-Hispanic American Indian/Alaska Native | 672 | 25.7 | 408 | 15.7 | 147 | 5.7 | 171 | 6.5 | 187 | 7.2 | 136 | 5.2 |
| Hispanic | 5,988 | 10.6 | 3,932 | 6.8 | 994 | 1.8 | 2,152 | 3.7 | 1,211 | 2.2 | 1,669 | 2.9 |

Source: National Vital Statistics System, Mortality File

a Rate per 100,000 population age-adjusted to the 2000 U.S. standard population using the vintage year population of the data year. Rates are suppressed when based on <20 deaths.

b Deaths are classified using the International Classification of Diseases, Tenth Revision (ICD–10). Drug overdose deaths are identified using underlying cause-of-death codes X40–X44 (unintentional), X60–X64 (suicide), X85 (homicide), and Y10–Y14 (undetermined). Because deaths might involve more than one drug, some deaths are included in more than one category. On death certificates, the specificity of drugs involved with deaths varies over time. In 2016, approximately 15% of drug overdose deaths did not include information on the specific type of drug(s) involved.

c Drug overdose deaths, as defined using ICD-10 codes, that involve opium (T40.0), heroin (T40.1), natural and semi-synthetic opioids (T40.2), methadone (T40.3), synthetic opioids other than methadone (T40.4) and other and unspecified narcotics (T40.6).

d Drug overdose deaths, as defined, that involve natural and semi-synthetic opioids (T40.2).

e Drug overdose deaths, as defined, that involve synthetic opioids other than methadone (T40.4).

f Drug overdose deaths, as defined, that involve natural and semi-synthetic opioids (T40.2) and methadone (T40.3).

g Drug overdose deaths, as defined, that involve heroin (T40.1).



**Figure 1. Percent Increase from 2014 to 2017 in overdose death rates by drug among the non-Hispanic Black population in the United States,** *data from CDC National Vital Statistics System*

- Heroin 196%
- Prescription opioids 140%
- Synthetic opioids other than methadone 818%
- Natural and semi-synthetic opioids 145%
- Any opioid 230%
- All drugs, overall 196%

*See notes from Table 1 for details about drug definitions*

*overdose deaths and 43 percent of the total drug overdose deaths for non-Hispanic Blacks in 2017.[13]* Synthetic opioids are especially affecting the overdose death rates among older non-Hispanic Blacks.[16] From 2015-2017, non-Hispanic Blacks aged 45-54 and 55-64 had synthetic opioid-related overdose death rates double in large urban areas.[16]

**Percent increase in overdose death rates by drug among the non-Hispanic Black population.** From 2014-2017, among the non-Hispanic Black population drug overdose death rates involving all types of opioids increased, with the sharpest rise from synthetic opioids (Figure 1).[13,17] Death rates involving synthetic opioids increased by 818 percent, and was the highest for non-Hispanic Blacks compared to all other race/ethnicities (data not shown).[13,17]

**Table 2. Opioid Overdose Death Rates (age-adjusted per 100,000), Top 5 States and District of Columbia, by Total and non-Hispanic Black Populations, 2018**

| Total | | non-Hispanic Black | |
|---|---|---|---|
| 1. WV | 42.4 | 1. WV | 58.2 |
| 2. DE | 39.3 | 2. DC | 47.7 |
| 3. MD | 33.7 | 3. MO | 40.5 |
| 4. NH | 33.1 | 4. MD | 34.3 |
| 5. NJ | 29.7 | 5. IL | 31.3 |

**Table 3. Number of Opioid Overdose Deaths, Top 5 States, by Total and non-Hispanic Black Populations, 2018**

| Total | | non-Hispanic Black | |
|---|---|---|---|
| 1. OH | 3237 | 1. MD | 709 |
| 2. FL | 3189 | 2. IL | 598 |
| 3. NY | 2991 | 3. NJ | 459 |
| 4. PA | 2866 | 4. MI | 426 |
| 5. NJ | 2583 | 5. OH | 402 |

**Opioid-related overdose death rates by state.[18]** The picture of opioid-related overdose by state population varies depending on whether death rate or absolute number of deaths are being considered. When looking at the 2018 data using death *rates*, the opioid-related overdose death rates among non-Hispanic Blacks were the same or worse when compared to rates by total (all race/ethnicities combined) state population (Table 2). In 2018, the highest opioid-related overdose death rates by state were primarily in the Mid-Atlantic and Midwest regions. West Virginia (WV), and Maryland (MD) appear in the top five states with the highest opioid-related overdose death rate by both total state and non-Hispanic Black populations. Among non-Hispanic Blacks, the District of Columbia (DC) had the second highest opioid-related overdose death rate, 47.7 per 100,000 compared to all states. This death rate was higher than any total state opioid-related overdose death rate. Of DC's opioid-related overdose deaths, 89 percent were among non-Hispanic Blacks (data not shown). However, when looking at the state data by *number* of opioid-related overdose deaths instead of rates, DC does not appear in the top five states with opioid-related overdose deaths among non-Hispanic Blacks (Table 3) since DC's overall non-Hispanic Black population is smaller than many other states. Only two

states appear in the top five for both total state population and non-Hispanic Black population when looking at the data by the number of deaths (OH and NJ). Maryland has the highest number of opioid-related overdose deaths among non-Hispanic Blacks and outpaces the second highest state (IL) by over 100 deaths. Some states had insufficient data or did not report data specific to non-Hispanic Blacks and were excluded. Regardless of how the data are represented, it is clear that Black/African Americans across the U.S. are substantially affected by the opioid crisis.

**ROUTES TO OPIOID MISUSE AND OVERDOSE DEATHS: PAIN MANAGEMENT, ILLICIT DRUG USE, AND OPIOID COMORBIDITIES IN BLACK/AFRICAN AMERICAN COMMUNITIES**

For Black/African Americans, the current rise in opioid misuse and overdose deaths involves multiple pathways. One route to opioid misuse and overdose death is initiated through excessive prescribing and use of prescription opioids leading to OUD. For some individuals, as dependency grows on these pain medications, this evolves into the use of heroin, a cheaper and more readily accessible illicit opioid. Yet another pathway is initiated through the use of illicit drugs, i.e. heroin and cocaine, which has a history in low-income Black/African American communities dating back to the drug epidemics of the 1960s and 1970s. What is particularly dangerous now, is that these street drugs are increasingly laced with fentanyl and fentanyl analogues leading to more opioid-related overdose deaths.[7]

In terms of prescription opioids, it has been proposed that Black/African Americans may be insulated from fast-rising rates of opioid misuse and overdose deaths due to lack of access to these medications. The lack of access to prescription opioids is rooted in misperceptions and biases in the health care system including the undervaluing of Black/African Americans' self-reports of pain and stereotyping by providers.[19] A study of emergency departments found that Black/African Americans are significantly less likely to be prescribed opioid prescriptions for pain from medical providers than White patients.[20-21] A recent meta-analysis found that compared to Whites,

Black/African Americans were 29 percent less likely to be prescribed opioids for pain.[21] Racial and ethnic minorities are more likely to experience miscommunication or misinterpretation about their pain with their medical providers.[22] For example, Black/African Americans have higher self-reported pain scores when compared to Whites,[23] yet some doctors choose to believe that pain levels are lower for Black/African Americans compared to Whites[24] or that Black/African Americans are drug seekers.

This lower access to prescription opioids for Black/African Americans contributes to at least two adverse outcomes: a myth of Black/African Americans being "perversely protected" from the opioid crisis is spread[7,25] and the potential for severe under-treatment or mistreatment of pain for Black/African Americans with severely painful medical conditions such as sickle cell disease, certain cancers, HIV/AIDS and other autoimmune diseases.[22] The data show that Black/African Americans are not "protected" from this epidemic. And, under-prescribing in some cases may have life-threatening consequences for people affected with pain disorders.

## CHALLENGES TO PREVENTION, TREATMENT AND RECOVERY

The social determinants of health and other community and system level factors cannot be ignored when discussing the contextual factors associated with any major public health issue. Described below are some of the key challenges associated with opioid misuse and OUD within the Black/African American population.

**Negative representations, stereotyping and stigma.** Black/African Americans with SUDs are doubly stigmatized by their minority status and their SUD. Negative images of Black/African Americans with SUD contribute to mistreatment, discrimination and harsh punishment instead of treatment and recovery services. Even today, some Black/African American community leaders indicate that using words such as an "opioid epidemic" or "crisis" may be inflammatory in their communities, putting residents on high alert and triggering fears of incarceration. Mostly absent from this narrative are opportunities for compassion, understanding, treatment and recovery.

**Intergenerational substance use and polysubstance use.** For many families in the U.S., substance misuse is passed on from generation to generation and opioids are not the first or only drug being used. In some cases, multi-generational households are misusing opioids and other substances together. In communities with high poverty and economic disinvestment, intergenerational and polysubstance use are not uncommon nor unique to Black/African American communities. For many in these poor and low-income communities, using and/or selling drugs is a means of survival. Opioids are not the only substances of concern and are likely not being misused in isolation. An understanding that intergenerational and polysubstance use are common among some impoverished communities, and that disentangling the behaviors of a person's social network, including their family, are challenging yet critically necessary.

**Fear of legal consequences.** Only 10 percent of people with a SUD in the general population seek treatment.[2] This is magnified in the Black/African American community where there is significant historical mistrust of the health care, social services, and the justice system. For men, there is the looming fear that seeking treatment will result in severe sentencing and incarceration reminiscent of the harsh policies of the past.[7, 26] Stricter drug policies for possession or sale of heroin in New York known as the Rockefeller Laws were put into place in 1973, and the Anti-Drug Abuse Act of 1986 enforced across the country resulted in mandatory and severe sentencing for low-level, non-violent drug offenses, particularly related to cocaine, for a disproportionately high number of people of color compared to Whites.[7] These severe penalties have had lasting impacts on the current criminal justice system, where Black/African Americans represent a substantial percentage of drug offenders in federal prison[9] despite Whites representing the majority of illicit drug users in the U.S.[2] Black/African American women fear losing their children to the foster care system if they acknowledge a substance use problem and seek treatment.[27] These fears are a major

barrier to timely treatment and support for recovery.

**Misperceptions and faulty explanations about addiction and opioids.** Similar to society in general, in Black/African American communities there is a lack of understanding of SUD as a disease and the high risk for OUD from prescription opioid misuse. Within all communities, and especially Black/African American communities, as one key informant stated, people are hiding their SUD because "*addiction is seen as a weakness not a disease*" and another noted that solutions must discuss "*how addiction is a disease, not a moral failing.*" Misperceptions of current treatment options also exist among Black/African Americans and their families. According to key informants, many from this population are not informed about the standard treatment options for OUD, reducing the chance that evidence-based treatments will be sought.

**Lack of culturally responsive and respectful care.** While it can be challenging to take a holistic view of an individual and see more than the SUD, this may be even more so for the Black/African American who is subjected to the implicit biases of the health care system. Failing to bridge a racial cultural divide often contributes to premature termination of treatment among people of color. A shortage of Black/African American and Hispanic/Latino physicians, in general, and also clinicians who are waivered to prescribe buprenorphine exists.[28-30] Engaging in treatment is a difficult task for all populations. When the cultural context is ignored or misunderstood, respect for the patient is lacking, little hope is provided, and a lack of Black/African American practitioners who treat OUD exists, it becomes very difficult for a Black/African American with OUD to engage in treatment.

**Separate and unequal prevention and treatment.** Universal, broad, substance prevention campaigns have limited impact in diverse communities, including Black/African communities. The expectation that general prevention efforts and messaging will be equally relevant to Black/African Americans is unrealistic. Messages about SUD as described by a key informant cannot be "*easily uncoupled from disinvestment in our communities, mass incarceration, over-policing, over-traumatizing…when the messages*

*are devoid of the context, [they are] not effective and it feels naïve for the folks that are living it.*" The framing of a prevention message must be tailored to resonate with the community culture and be conveyed by a trusted messenger.

Unequal treatment is common in many Black/African American communities, where access to treatment options is more dependent on race, income, geography, and insurance status, rather than individual preferences, or medical or psychiatric indicators.[31-33] Research suggests that Black/African Americans with OUD have experienced limited access to the full range of medication-assisted treatment (MAT) when compared to Whites.[7,34-38] One study based in New York City found that the residential area with the highest proportion of Black/African American and Latino low-income individuals also had the highest methadone treatment rate, while buprenorphine and naloxone were most accessible in residential areas with the greatest proportion of White high-income patients.[36] Another study showed that in recent years buprenorphine treatment has increased in higher-income areas that have lower percentages of Black/African American, Hispanic/Latino and low-income residents while methadone rates have remained stable over time and continue to cluster in urban low-income areas.[34] Among individuals with OUD, Black/African Americans in the U.S. were less likely to receive buprenorphine compared to Whites, and those who self-pay or had private insurance represented nearly 74 percent of those who received buprenorphine from 2012-2015.[38]

This disparity in access to buprenorphine by race/ethnicity, geography, income, and insurance status, may be related to barriers for both the patient and clinician. Buprenorphine is generally a less stigmatizing treatment for people with SUD compared to methadone. It is an office-based treatment available for general/primary care practitioners to prescribe and administer. Office-based treatment programs only work for patients with access to primary care, something that may be inaccessible to many low-income or uninsured people of color. While in general it may be difficult to get physicians waivered, incentives to obtain a buprenorphine waiver are often lacking for

providers serving the publicly insured or uninsured population due to limited or low reimbursement rates and lack of time and resources to pursue the training and acquire the mentorship to properly administer and care for buprenorphine patients.[34,36] In contrast, methadone must be administered in a federally regulated opioid treatment program, which has strict regulations and is often located in low-income areas. Methadone, while an effective treatment, places more burdens on the patient such as daily clinic visits, regular and random drug testing, employment disruptions, required counseling, etc. Thus, methadone —stigmatized in many Black/African American communities and as one key informant noted, "*just doing one drug for another drug*"—is often viewed as the default treatment for Black/African Americans and often the only treatment option. Essentially, a two-tiered treatment system exists where buprenorphine is accessed by Whites, high-income, and privately insured, while methadone is accessed by people of color, low-income, and publicly insured.



Effective treatments for OUD have been developed and generally work across all adult populations.[39] However, access to these treatments is uneven,[34-38] with particular obstacles for minority populations. This section begins with a description of standard treatment for OUD and overdose. This is followed by innovative outreach and engagement strategies that have been used in Black/African American communities. These strategies, illustrated by snapshots from Black/African American communities, focus on outreach and engagement efforts that facilitate prevention, treatment and recovery. Supported by community-based participatory research efforts, these strategies are implemented by case managers, partnerships with community leaders and advocates, treatment providers, and peers/people with lived experience of a SUD.



Strategies to Address Opioid Misuse and OUD in Black/African American Communities

### STANDARD TREATMENT

The evidence-based treatment for an individual with OUD is MAT administered by qualified medical personnel, while for an opioid-related overdose, it is the administration of an opioid overdose reversal drug by a trained individual.

**Medication-Assisted Treatment (MAT).** MAT is the use of an FDA-approved medication in conjunction with a psychosocial intervention. Currently, three medications are approved for MAT: methadone, buprenorphine, and naltrexone.[40]

**Methadone:** a medication that reduces withdrawal symptoms and cravings and blocks the euphoric effects of opioids like heroin, morphine, oxycodone, and hydrocodone. For treatment of OUD, it must be prescribed and dispensed from a federally regulated opioid treatment program (OTP). It is taken daily and orally, typically in liquid form but can also be offered as a pill or wafer.  It may cause serious side-effects and can be addictive. [41-42]

**Buprenorphine:** a medication that treats withdrawal symptoms and cravings and is less likely than methadone to cause intoxication or dangerous side effects such as respiratory suppression. It is commonly administered as a pill or buccal film that must be dissolved sublingually or attached to the cheek. It is also available as a monthly injection or subdermal implant that lasts for approximately 6 months. It may be prescribed and dispensed outside of a licensed OTP by physicians or qualified medical practitioners who have completed requisite training and earned a DATA-2000 waiver. [42-43]

**Naltrexone:** a medication that blocks the euphoric and sedative effects of opioids. It is not an opioid and is neither intoxicating nor addictive. It is administered as a daily pill or monthly injection by any licensed medical practitioner or pharmacist. An extended-release injectable form, Vivitrol, is approved for treatment of opioid and alcohol use disorders and its effects last for about 28 days. [42,44]

**For additional information, see SAMHSA's TIP 63: Medications for Opioid Use Disorder.** [45]

The second component to MAT is the psychosocial or behavioral intervention.  Behavioral interventions target a broad range of problems and concerns not necessarily addressed by the medications (e.g. co-morbid mental health conditions, lack of social supports, risky behaviors, unstable housing, etc.).  A few behavioral interventions such as contingency management, cognitive behavioral, and structured family therapy approaches are widely accepted as effective when used in conjunction with medications.[39] Some research has indicated that motivational interviewing may also be an effective behavioral intervention, but more research is needed.[39]

**Opioid overdose reversal drugs.** Currently, naloxone is the one FDA-approved medication used to reverse an opioid-related overdose.

**Naloxone:** a prescription medication to prevent overdose of opioids such as heroin, morphine, and oxycodone by blocking opioid receptor sites to reverse the toxic effects of the overdose; it is given by intranasal spray, intramuscular (into the muscle), subcutaneous (under the skin), or intravenous injection.[46]

Efforts to expand the use and availability of naloxone nationwide through federal, state, and local initiatives is a key strategy to tackling opioid overdose. The effectiveness of naloxone (Narcan) and the critical need for it during this time prompted the U.S. Surgeon General to issue a public health advisory in April 2018.[47] This advisory recommends increased availability of naloxone in communities with high rates of opioid use, including administration by a wide array of health professionals, first responders, overdose survivors, and their family members.[47-48] Similarly, in December 2018, the U.S. Department of Health and Human Services released new guidance on co-prescribing naloxone for patients at high risk for opioid overdose.[49]

### COMMUNITY-INFORMED STRATEGIES TO ADDRESS OPIOID MISUSE AND OUD IN BLACK/AFRICAN AMERICAN COMMUNITIES

Five key strategies with specific community examples are described below. While not universally representative of all Black/African American communities, these strategies are examples of how some communities are addressing opioid misuse in their community.

### 1. Implement a comprehensive, holistic approach —*"Addiction is beyond the neuroreceptor level."*

A comprehensive, multi-layered approach is necessary to address opioid misuse and addiction. Some speculate that opioids are a way of coping in the absence of healing when a community has been traumatized by decades of violence, poverty, and neglect. As one key

informant noted, *"thirty percent of the black community is under poverty in the state…these stats play into the sense of hopelessness, [people are] working full-time but not making livelihood, [there is a] sense of hopelessness that is fixed by opioids…[it's] more than just getting people into treatment."*

Another key informant stated: *"So much evidence that addiction is beyond the neuroreceptor level—it's the criminal justice system, daily life, the neighborhood—all have an impact on outcomes in addiction treatment… Medication is essential but not a magic bullet for treating opioid use disorders, [you] need more to recover successfully… not a single med that sustains recovery on its own, especially for those living in toxic environments…Rather, a comprehensive, holistic approach tailored to the community is required. For African Americans, addiction is embedded in a community context marked by limited opportunity, economic disinvestment, violence and intergenerational trauma. Research has confirmed that strong neighborhood cohesion and social ties are correlated with lower drug rates and related consequences."*

Key informants emphasized the value of community-led needs assessments and routine check-ins with the community that address the social determinants of health. Having the community's first-hand knowledge about where people live, work, learn, play, worship and age and how these places promote healthy functioning and quality of life is essential to addressing opioid misuse and OUD. Aspects of a community such as community engagement, economic stability, and neighborhood safety all have an impact on the well-being and health of its residents. These factors, often addressed by case managers, are a key component of treatment planning.

Understanding the existing assets in a community is essential. Where residents go for information, whom they trust to deliver care, and who the explicit and implicit community leaders are is critical information. In some Black/African American communities, places such as barber shops, beauty salons, and the church or faith-based community are critical for delivering prevention education and linking to treatment.[50-51]

For residents reluctant to engage with the medical system, these "under the radar networks" are the essential entities to enlist in the opioid response. Using indigenous leaders, and individuals in recovery to spread education about naloxone kits, may have greater impact than the usual first responders such as police officers. Working with harm reduction networks and syringe services programs are needed to reduce harms among Black/African Americans who have an injection drug use problem, and among people who inject drugs, in general.[52] As noted by one key informant, *"Black community needs harm reduction because we are always under assault from drug use…[we] need prevention for STI (sexually transmitted infections). To not talk about this, [you are] not connected with Black communities."*

***Community Snapshot: Creating safe, comprehensive healing spaces—Bellevue Hospital.*** Bellevue Hospital created a holistic addiction clinic built on the creative arts, self-care, and a recovery network of support for Black/African Americans. The clinic built in patient governance and established linkages with the community. The clinic created a home-like, welcoming environment, centered on a kitchen and cooking groups to foster a mindset of healthy eating. Patients and physicians in the clinic cooked together which was a way of establishing relationships in a non-hierarchical manner and building patient trust in a medical center. Therapeutic approaches incorporated both the structured cognitive behavioral therapy and patient groups based on the creative arts and spirituality, both highly valued within Black/African American culture. For some Black/African American groups, the cultural arts—visual, musical and drama—were an important participatory process for emotional expression, tapping into traumatic memories, and getting a sense of meaning and resilience outside of the SUD. The clinic established relationships with the surrounding community, including collaborating with Black/African American community-based organizations for housing, employment supports, food banks, churches, church-based addiction services and other trusted entities where patients could get ongoing support. The clinic assumption was that healing rests on relationships, and as described by one key informant, *"[you] can't just drop bupe into a clinic—the*

*tenor of outreach and community relations is critical."*

## 2. Involve the community and develop multi-sectoral, diverse community partnerships— *"Community-based organizations are the engines managing crises before they get to the hospital."*

Involving the community—its residents, leaders and organizations—in solving community issues, particularly, opioid misuse, was underscored by the key informants. Involving the community in prevention, treatment, and recovery strategies relies on multi-sectoral partnerships and collaborations to leverage resources and expertise.

***Community Snapshot: Developing a wide and diverse network of partners—Detroit Recovery Project (DRP).*** DRP is a multi-service agency, focusing on Black/African Americans. It is dedicated to supporting recovery, which strengthens, rebuilds, and empowers individuals, families and communities affected by SUDs. The agency provides a wide spectrum of support services to the city's recovery community, including GED preparation; twelve-step support groups; housing assistance; job readiness and employment assistance; HIV prevention, testing, counseling services; and ex-offender programs. Essential to the work of DRP is its diverse collaborations and partnerships. Examples of partnerships include the University of Michigan Injury Prevention Center, which provides real-time data from emergency medical services to identify opioid-related overdose incidents in the city of Detroit that are mapped and reported to community programs. DRP partners with the Detroit Police Department, churches, local businesses and Detroit Public Schools on prevention events such as "Prescription Drug Take Back Day." DRP develops memorandum of agreements with providers for provision of MAT and partners with federally qualified community health centers to host recovery coaches in their clinics. In conjunction with community leaders, DRP facilitates regular town hall meetings to address the opioid epidemic in Detroit. These robust collaborations strengthen ongoing prevention, treatment, and recovery supports tailored to the specific Black/African American community.

***Community Snapshot: Building trust between community and law enforcement—Coffee with a Cop.[53]*** Efforts to address the distrust between Black/African Americans and law enforcement are underway in communities across the nation. Community-based organizations and counties are partnering with local law enforcement to create a program in which community members can have coffee with a police officer and talk about issues and community concerns without fear of being reported or arrested.[53] This strategy, "Coffee with a Cop" is taking place in Albany, Georgia to build rapport and trust between police officers and the local Black/African American community. The Morehouse School of Medicine—Dougherty Alliance for the Prevention of Opioid Use Disorders and Phoebe Putney Network of Trust School Health Program partnered with the Albany Police Department to implement "Coffee with a Cop" at the ASPIRE—The Change Center. The Change Center is an addiction recovery support center, which is peer-led and based on relationships that support a person's ability to promote their own recovery. This strategy allows for law enforcement and community members to get to know each other and to identify mutual community goals and common ground.

## 3. Increase culturally relevant public awareness–*"Campaigns are White-washed and make no sense in Black communities."*

The declaration of the opioid "epidemic" as a national emergency generated public awareness and social media campaigns. However, public awareness campaigns should be built on the needs assessments of the community. Communities are able to identify gaps in awareness and knowledge and provide key information in developing and tailoring health communication campaigns and subsequent prevention programs. Health communication campaigns on the opioid misuse and OUD in the Black/African American community need to include messages of hope and recovery and incorporate actors and images of people that look like the intended audience. They need to utilize communication mediums that are appealing and engaging for the community. There is high value placed on

interpersonal relationships and establishing one-on-one connections with someone who has had similar experiences. Ensuring opioid education campaigns include Black/African Americans that are relatable to the intended audience is key to having an impact. This establishes credibility and counteracts the common theme, *"Where are all the Black people?"* repeatedly shared by key informants. Using plain language and language that is culturally appropriate to the community in educational materials, awareness campaigns, and presentations is needed.  There is a lack of public awareness campaigns about opioid misuse and OUD for Black/African American communities, including campaigns focused on harm reduction strategies such as syringe services programs and naloxone education and distribution.

## 4. Employ culturally specific engagement strategies–*"The opposite of addiction is not abstinence, it's connection."*

A key component of some Black/African American cultures is the value placed on interpersonal relationships and one-on-one connections.  Entering a Black/African American community and sharing data and statistics that paint a negative picture of the population before establishing a trusted relationship is culturally inappropriate. Ignoring history and context breeds mistrust and a sense of devaluing the community.  Asking to learn from the community, recognizing their assets, and acknowledging failed and successful policies is critical to engaging the community.

**Connect with culturally similar support groups.**  For people with SUDs, support groups are often a key component of their recovery.  These groups bring together people who want a drug-free life, and to learn skills to conquer cravings. They are people who need support during difficult emotional times and who share similar life experiences around substance misuse and SUD.  Support groups focused on SUDs can be organized around the particular substance, or by age, gender, religion, or another affiliation.  These support groups bond individuals through a cultural tie.

***Community Snapshot: Tailoring to midlife Black/African American women with OUD—Prime Time Sister Circles.***  The Prime Time Sister Circles® (PTSC) is a program of The Gaston & Porter Health Improvement Center, Inc., a non-profit developed by two midlife Black women health professionals. PTSC addresses the unique impact of gender, race, age and class experienced by midlife (40-75 years of age) Black/African American women. These women, continually underserved in the health care system, are at high risk for developing chronic emotional and physical health problems including opioid/heroin misuse and OUD.  Even when they complete treatment programs, these women face stressors that often make it difficult for them to remain drug-free.

PTSC is an evidenced-based, culturally competent support group intervention that is community based, socially innovative, and holistic. The PTSC meets two hours a week for 13 weeks using a cognitive-behavioral approach.  It provides a safe, supportive space in which women can learn to see themselves as more than their OUD. The general PTSC curriculum was adapted to address issues relevant to midlife Black/African American women with OUD.  PTSC helps them address challenges such as single parenthood, incarceration, co-existing emotional and chronic



physical health conditions (e.g. depression, hypertension, diabetes, etc.), a history of childhood abuse, guilt and anger over their families' anger and lack of trust, difficulty in transitioning to a non-addiction culture, low self-esteem, and major financial difficulties. The PTSCs are conducted by trained facilitators and licensed and/or certified experts in mental health, hypertension, nutrition and fitness, who are all midlife Black/African American women.  They are trusted messengers who can help Black/African American women receive the tools, skills and motivation needed to appropriately address some of their recovery issues.

Partnerships with community-based organizations are a core component to PTSC.  The sites for the PTSC are in churches, public housing, and in health, recreation and substance abuse centers. Participants receive: a weekly ten-dollar stipend for transportation or child care costs; a blood pressure cuff, monitor and pedometer which they are taught to use; and a light meal to educate about healthy snacks. Women who participated in OUD focused PTSC shared that they valued the bonds with other Black/African American women, and made positive changes in their stress management, nutrition, fitness and blood pressure levels and increased their self-esteem.

**Collaborate and partner with faith-based organizations and institutions.**  Historically in the U.S., the Black/African American church has been a key institution for providing support and spiritual leadership in addressing unmet needs including health and social concerns in Black/African American communities.  Where traditional, mainstream social services have not addressed critical needs, the Black/African American church has stepped in.  Where social justice has floundered, the church has initiated advocacy and social movements. This role continues to evolve as the Black/African American community changes over generations and the Black/African American faith-based community becomes increasingly diverse. In some communities, faith-based organizations may retain a strong leadership role and organize to address social issues and be a valuable trusted entity for the community.  In other places, it may not assume such a position and may not be viewed as a critical leader or contributor to the overall well-being of the community. In this sense, it is important to have an understanding of the potential variability of faith-based institutions in different communities. For Black/African American communities in which the residents are engaged with the faith-based organizations, leveraging these organizations as trusted messengers may facilitate public awareness and linkage to prevention and treatment.

A common theme from the key informants was the use of faith leaders as trusted messengers to link faith communities to opioid prevention, education and treatment.  In such communities, faith leaders are major influencers in large social networks. They know their community and the associated health and social issues tied to the community.  They have been engaged in decades of health promotion.  This includes prevention of wide-ranging conditions like diabetes, hypertension, HIV, mental health and substance use.[54-55] They are well positioned to promote awareness and education about opioid misuse and OUD.  Most importantly, they know how to talk to their community, how to engage them in this issue more effectively than outsiders.

*Community Snapshot: Activating faith-based organizations to be bridges to health—Bridges to Care and Recovery.*
North St. Louis City and County have recognized that engaging faith-based organizations is a critical strategy to address behavioral health concerns for their predominantly Black/African American community. The Bridges to Care and Recovery is a community initiative with multisector partners including the faith community.  It relies on the faith community to serve as extenders in identifying mental and SUDs and linking individuals to care.  As of fall 2019, there were 65 churches engaged in the Bridges initiative and designated as "behavioral health- friendly churches." To receive this designation, church congregations completed 19 hours of training on basic behavioral health topics such as Mental Health Fist Aid, trauma awareness, and others.  As part of their designation, these churches provide monthly meetings and presentations on behavioral health topics to their congregations.  The Bridges initiative also has trained

220 church leaders and volunteers as Wellness Champions to reduce the stigma of mental illness. Community connectors are staff members who have established connections with the community and are able to link individuals to needed care and services. Pastors' wives, comprising the "First Ladies Network," are being trained as group facilitators and peer mentors for people with health and behavioral health conditions.  The Bridges initiative is also working with the Missouri Opioid State Targeted Response Team to facilitate Opioid Crisis Management Training to churches that are interested in providing naloxone kits onsite. Church-based participants in the training learn about the signs and symptoms of OUD, the impact of trauma and OUD, access to medication-first treatment programs, and use of naloxone.

### Community Snapshot: Providing support programs through the church—Imani Breakthrough Recovery Program.

The Imani Breakthrough Recovery Program, supported by the Connecticut State Department of Mental Health and Addiction Services, and the Psychiatry Department of the Yale School of Medicine, is a 12-week intervention program for people with SUD that utilizes faith as a key support in recovery.  Integral to the intervention is the involvement of faith-based entities like the church, which is why it is called Imani, meaning "faith" in Swahili.  The intervention program seeks to get people with SUD into treatment and has two components to the program—a faith-based support group and wellness coaching.

Facilitators who are people with lived experience and members from the church lead the intervention. The developers of the intervention train the facilitators. The intervention addresses eight dimensions of wellness—emotional, health, occupational, financial, spiritual, wellness, intellectual and physical—and has a curriculum focused on "the five R's" (roles, resources, responsibilities, relationships and rights).  The weekly meetings are held in church basements.  The church provides necessities, including a shared meal, and for some individuals, a space for showering. Participants receive a ten-dollar stipend at each meeting for transportation and other needs. Each meeting has a theme and provides a safe space to share thoughts and feelings. The facilitator presents various scenarios to be discussed, and conveys specific skills to be shared and tested. Developing self-advocacy is a major focus of the program. One participant of the program stated, *"One of the things this program has done for me is being able to advocate for myself. It has also given me an opportunity to find resources in the community…to have a community of like-minded individuals."*[56] Another stated, *"The program gave me the opportunity to open up to others. If you don't have a place to go where you can talk about what's going on in your life, you're subject to going out and taking drugs."*[56]

### Community Snapshot: Educating rural pastors on opioids and leveraging technology—Morehouse School of Medicine.

Churches are highly valued in Black/African American communities in rural Georgia. Morehouse School of Medicine in Atlanta has subcontracted with these churches to collaborate on addressing various public health efforts including opioid misuse and OUD. The *"dual mission of the faith community to provide spiritual support as well as attend to unmet social issues and needs in the community"* is the basis for this partnership.  Funding has supported collaborations among social service agencies and churches, and allowed for coordinated public awareness efforts. Pastors and faith leaders are included on advisory committees for grant funding to provide guidance on working with the faith community. In these communities, it is key to recognize the status of pastors in rural communities and connecting with pastor conferences to disseminate information and enlist support.

Morehouse has partnered with churches in micropolitan and rural settings that are leveraging technology such as radio broadcasts and podcasts to provide awareness and education on substance misuse and SUD. In one community, a faith leader after attending a training on the opioid crisis in the community, included the subject in a podcast with youth. Podcasts and similar online social media such as Facebook Live are innovative, current, inexpensive, and easily accessible ways to discuss important but stigmatized health issues with a community and particularly, the younger generations. Utilizing technology in the form of online sermons quickly—and at the convenience of the listener—provides

information that is compatible with the target audience's lifestyle. Talking about stigmatized health issues such as OUD is a first step to dispelling misinformation and reducing stigma. Pastors can use this medium to convey that these are diseases and illnesses, not sins. Pastors without an online presence but who are involved in or educated on health and social issues in their communities are more likely to discuss these issues, like the opioid epidemic, in their Sunday morning sermons from the pulpit.

**Identify community-embraced first responders.**

While the Surgeon General's call to action—for the use of naloxone for people living with OUD—may be embraced by mainstream, medically engaged communities, this is not always the case for communities that have historically been marginalized and underserved by the health care system. In some Black/African American communities, naloxone has had a mixed reception.  Some community members express concern that the availability of naloxone could promote substance use among Black/African Americans. They also fear that seeking naloxone from traditional first responders, such as law enforcement and emergency medical technicians (EMTs), may result in punitive consequences.

Despite the mixed reaction to naloxone from some Black/African Americans, some communities are identifying their own first responders.  These include community-based organizations, community health workers, family members, and faith-based leaders, and training them to administer naloxone.  More education and awareness tailored to Black/African American communities and conveyed by "trusted messengers" is essential to create support for and a sense of urgency regarding the use of naloxone as a life-saving medication.  Identifying where naloxone would make the most impact in saving lives within a community is critical.  Some local leaders have advocated for access to naloxone for individuals re-entering neighborhoods from incarceration, given the high risk for opioid overdose at re-entry.  By providing naloxone and training the use of it in prisons and jails before an individual's release, overall opioid-related overdose deaths could be reduced.  As one key informant suggested, *"the best strategy is getting naloxone into incarceration."*

***Community Snapshot: Engaging Black Pastors in the Quick Response Team (QRT)—City of Huntington QRT.*** The City of Huntington, WV partners with Cabell County Emergency Medical Services (EMS), Marshall University, local law enforcement, treatment and recovery providers, and pastors to form and deploy the QRT to locations with a high number of drug overdoses.  The QRT includes a paramedic, treatment provider, law enforcement officer, and unique to Huntington, is the inclusion of a faith leader. Although Cabell County has a low population of Black/African Americans, opioid overdose deaths in Cabell County occur at a disproportionately high rate compared to the national rate. The City of Huntington QRT's emphasis on involving the faith community, especially for Black/African American communities, has been pivotal in developing trust between people with SUD and who are at risk for opioid overdose. Initially, there was some reluctance among the faith leaders. But with the opportunity to connect one on one with people in their communities living with OUD, many faith leaders in this community have become champions of this cause and are helping engage individuals to seek treatment.  Faith leaders, spearheaded by the Huntington Black Pastors Association, are being trained in understanding opioid misuse and treatment and reducing stigma.  They are educating faith communities and families to be supports for people with SUDs.  As one key informant noted, *"With the Black community the stigma is there, even among the Black pastors. They felt individuals were replacing one drug for another (as in MAT programs), but now working on the streets [they] realize this is not the case."* The QRT offers their support in assisting high-risk individuals with OUD to not only seek treatment, but also educating about naloxone. They are linking with community partners to provide naloxone training and distribution to family members, individuals with OUD, and others in their community.

**5. Create a culturally relevant and diverse workforce–"[We] have trained Black peers, but not a Black supervisor."**

Communities know that when people feel welcomed, understood and comfortable, they are more likely to continue treatment.  In many situations, it is

important that staffing of treatment centers reflect the community being served. When Black/African Americans make the difficult decision to enter treatment, often they will not see any staff at the treatment facility that share a similar cultural background with them. Addressing the shortage of Black/African American medical personnel who are waivered to prescribe buprenorphine may reduce the inequity in access to evidence-based medications. Additionally, recruiting and training a diverse workforce and creating billable funding structures to pay for this workforce is critically needed. One key informant shared that although there is state funding allotted for peer mentoring there are policy barriers to hiring and paying Black/African American peer mentors, *"[We have] access to a peer mentor, but lack access to a supervisor. [We] can't bill without peer supervisor. [We] have trained Black peers, but not a Black supervisor. [We] don't have access to the other supervisors."* Adhering to the National Culturally and Linguistically Appropriate Services in Health and Health Care Standards (National CLAS Standards) can help provide a blueprint for organizations to provide quality and responsive care to diverse populations.[57]

**Meet people where they physically are, again and again.** To persuade someone to enter treatment for SUD is not simple. It is important to consider the context in which a person with SUD is living. It is equally important to consider the challenges that may prevent an individual with SUD from entering treatment. People are often unfamiliar with or untrusting of existing resources for SUD. They do not know who to ask for help nor what to ask for, or have a strong sense of belief that no one actually cares about them. The use of mobile outreach potentially increases the likelihood of getting people with SUD into treatment. This involves physically going to where people are, connecting with them, bringing authentic care and hope, and linking them with trusted treatment and recovery providers. Leveraging the experience and expertise of those with lived experience of having an OUD such as peer recovery coaches may be critical to getting a person into treatment.

*Community Snapshot: Going into the streets—Detroit Recovery Project Mobile Outreach Team.* DRP collaborates with local emergency departments to provide linkage to care for people with SUD in crises. The local hospital calls DRP to help get a patient with SUD into treatment. DRP responds by deploying a mobile outreach recovery van and peer recovery coach to the local site where the patient is. They provide the support and physical transportation needed to assist the patient in accessing and entering a treatment program. The DRP mobile outreach vans are custom-wrapped with images of Black/African Americans reflective of their community and include pictures and messages of hope and recovery. The mobile outreach team includes staff with lived experience or experience working with the population, ensuring a level of trust and understanding between the person with SUD and the outreach staff. In addition, the mobile outreach team knows the geography, neighborhoods, historical and social context of Detroit in order to know where to go to engage people on the street living with a SUD.

*Community Snapshot: Engaging peer recovery coaches—Project RECOVER.* In Boston, peer recovery coaches with ongoing supervision from a recovery coach supervisor are being used to link, engage and retain people with OUD in outpatient medication-based treatment for at least six months after completion of detoxification. Recent literature shows that the transition after completion of detoxification to be a critical touchpoint with elevated risk for opioid-related mortality.[58] Through a series of interventions including motivational interviewing, peer recovery supports, and strengths-based case management and development of recovery wellness plans, coaches work with individuals to address perceived barriers to one's recovery. The peer recovery coaches help link individuals to SUD focused primary care services where they can get comprehensive care (screening, treatment, and referral) for mental health disorders and injection related chronic diseases such as HIV and hepatitis B and C. Most importantly the peer recovery coaches provide overdose prevention education and naloxone distribution and training to all clients and a close member of their social network. In this model, the peer recovery coaches are from the Black/African American

or Latino community and are people with lived experience of SUD. Eligibility to be a peer recovery coach includes being in recovery for at least two years and completing an intensive five-day training that includes courses on motivational interviewing; ethical considerations; addiction 101; cultural awareness and responsiveness—knowing the "street" language used; wellness recovery plans; and linkages with community resources, such as housing and primary care to address related infectious diseases. The peer recovery coaches are required to complete 500 hours of recovery coach work with 35 hours under supervision from a peer recovery coach supervisor. Once eligibility is met, they are certified by the State and their services are billable.

The peer recovery coaches are critical in outreach and engagement; they know the community, know the resources, and are able to communicate effectively, and are able to draw upon their own experiences with SUD and recovery.  As one key informant noted, *"The key strength is that we [recovery coaches] understand addiction, we went through the same stuff.  Also not going to tell you what to do, it is self-directed…we don't have a timeframe. Recovery coach is there to support and give guidance. We connect them with MAT, help with job seeking, housing applications; if relapse, recovery coach is there to help you pick up there all the time…  sometimes can spend four hours in a day with getting them to appointments and assisting  transportation…we can sit with you 3 hours in a courtroom.  How many professionals can do that?"*  Recovery coaches develop a unique connection with the client and have said that the most difficult challenge is the family.  Families often do not understand SUD, have seen their family member relapse repeatedly, and do not believe in the possibility of recovery.  In cases where family members are using drugs, the peer recovery coach teaches refusal skills.

**Community Snapshot: Building and developing a culturally sensitive and diverse workforce—Detroit Recovery Project.**
DRP collaborates with local universities and Authority Health to establish DRP as a training facility for psychiatry and internal medicine interns and residents.[59] The partnership allows for mentoring the next generation of medical providers to be better equipped and experienced in working with low-income, Black/African Americans with SUD.

# Moving Forward

Opioid misuse, OUD, and opioid-related overdoses have affected all population groups in the U.S. Strategies to address this issue need to be tailored to the diversity of the communities affected. Promoting a one-size-fits-all strategy may inhibit access to appropriate, quality prevention and treatment for culturally diverse populations. To reduce the impact of opioid misuse, OUD, and opioid-related overdoses on the Black/African American population, it is critical to understand the contextual issues, the treatment barriers, and the community-informed strategies that are working in these communities.

Reducing opioid misuse and overdoses in Black/African American communities requires an interdisciplinary, multi-level team approach. Collaboration among community leaders, associations, advocates and residents with policymakers, government agencies, educators, prevention specialists, and treatment and recovery providers is urgently needed. All must mobilize to educate and engage one another and identify and implement evidence-based and community-informed strategies that work best for this population and save lives.



# Glossary

*(Definitions from SAMHSA[60] and CDC[3,61])*

**Fentanyl:** a synthetic opioid, approved for treating severe pain, typically advanced cancer pain. It is 50 to 100 times more potent than morphine. However, illegally made fentanyl is sold through illicit drug markets for its heroin-like effect, and it is often mixed with heroin or other drugs, such as cocaine, or pressed in to counterfeit prescription pills.

**Heroin:** an illegal, highly addictive opioid drug processed from morphine and extracted from certain poppy plants.

**Methadone:** a synthetic opioid that can be prescribed for pain reduction or for use in MAT for opioid use disorder (OUD). For MAT, methadone is used under direct supervision of a healthcare provider.

**Natural opioids:** a group of opioids that include such drugs as morphine and codeine.

**Opioid misuse:** any misuse of prescription opioids (also called prescription pain relievers) or the use of heroin (and synthetic opioids depending on the data source). Misuse of prescription opioids is the use of a prescription opioid in any way not directed by a doctor, including without a prescription of one's own; use in greater amounts, more often, or longer than told; or use in any other way not directed by a doctor. It is sometimes also called "nonmedical prescription opioid use" or "misuse of prescription pain relievers" dependent on the data source, and refers only to misuse of prescription opioids.

**Opioid use disorder (OUD):** having either a heroin use disorder (i.e., dependence or abuse) or pain reliever use disorder related to their misuse of prescription pain relievers in the past year, or if they had both disorders.

**Opioid use:** any use of prescription opioids, heroin, or synthetic opioids (e.g., fentanyl).

**Opioid-related overdose death:** death resulting from unintentional or intentional overdose involving an opioid.

**Prescription opioids:** Opioids are a group of chemically similar drugs that include prescription pain relievers such as hydrocodone (e.g., Vicodin®), oxycodone (e.g., OxyContin®), morphine, and others. They are sometimes called "prescription opioid analgesics" or "prescription pain relievers" depending on the source.

**Semi-synthetic opioids:** a group of opioids that include such drugs as oxycodone, hydrocodone, hyrdromorphone, and oxymorphone.

**Synthetic opioids other than methadone:** a group of opioids that include such drugs as fentanyl, fentanyl analogs, and tramadol.

# Resources

Centers for Disease Control and Prevention (CDC) Reducing Harms from Injection Drug Use and Opioid Use Disorder with Syringe Services Programs (Info Sheet) | https://www.cdc.gov/hiv/pdf/risk/cdchiv-fs-syringe-services.pdf

SAMHSA Opioid Prevention Toolkit (Toolkit) | https://store.samhsa.gov/product/Opioid-Overdose-Prevention-Toolkit/SMA18-4742

SAMHSA TIP 63: Medications for Opioid Use Disorder (Treatment Improvement Protocol) | https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder

SAMHSA Clinical Guidance for Treating Pregnant and Parenting Women with Opioid Use Disorder and Their Infants (Clinical Guidance) | https://www.store.samhsa.gov/product/Clinical-Guidance-for-Treating-Pregnant-and-Parenting-Women-With-Opioid-Use-Disorder-and-Their-Infants/SMA18-5054

SAMHSA Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings (Resource Guide) | https://store.samhsa.gov/product/Use-of-Medication-Assisted-Treatment-for-Opioid-Use-Disorder-in-Criminal-Justice-Settings/PEP19-MATUSECJS

SAMHSA Behavioral Health Barometer, Volume 5 (National Data Report) | https://store.samhsa.gov/product/Behavioral-Health-Barometer-Volume-5/sma19-Baro-17-US

SAMHSA Prevention Technology Transfer Center Network (Website) | https://pttcnetwork.org

SAMHSA Addiction Technology Transfer Center Network (Website) | https://attcnetwork.org/

SAMHSA TIP 59: Improving Cultural Competence (Treatment Improvement Protocol) | https://store.samhsa.gov/product/TIP-59-Improving-Cultural-Competence/SMA15-4849

National Standards for Culturally and Linguistically Appropriate Services in Health and Health Care (CLAS) (Webpage) | https://thinkculturalhealth.hhs.gov/clas

U.S. Department of Health and Human Services Office of Minority Health Improving Cultural Competency for Behavioral Health Professionals (Continuing Education e-Learning Program) | https://thinkculturalhealth.hhs.gov/education/behavioral-health

# References

1.    Centers for Disease Control and Prevention (CDC). Opioid overdose [Internet]. Atlanta, GA: CDC National Center for Injury Prevention and Control [updated 2018 Dec 19; cited 2019 Dec 12]. Available from: https://www.cdc.gov/drugoverdose/epidemic/index.html

2.    Substance Abuse and Mental Health Services Administration (SAMHSA). Reports and detailed tables from the 2018 National Survey on Drug Use and Health (NSDUH). [internet]. Rockville, MD: SAMHSA Center for Behavioral Health Statistics and Quality; 2019 Aug 20 [cited 2019 Dec 12]. Available from: https://www. samhsa.gov/data/nsduh/reports-detailed-tables-2018-NSDUH

3.    Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G. Drug and opioid-involved overdose deaths—United States, 2013–2017. Morbidity and Mortality Weekly Report 67(5152):1419. [internet]. Atlanta, GA: Center for Disease Control and Prevention; 2019 Jan 4 [cited 2019 Dec 12]. Available from: http://dx.doi.org/10.15585/mmwr.mm675152e1

4.    Centers for Disease Control and Prevention (CDC). CDC WONDER [Internet]. Hyattsville, MD: CDC National Center for Health Statistics [updated 2019 Nov 19; cited 2019 Dec 12]. Available from: http://wonder.cdc.gov

5.    Rossen LM, Bastian B, Warner M, Khan D, Chong Y. Drug poisoning mortality in the United States, 1999-2017. [internet]. Hyattsville, MD: CDC National Center for Health Statistics; 2019 [cited 2019 Dec 12]. Available from: https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/index.htm

6.    Spencer MR, Warner M, Bastian BA, Trinidad JP, Hedegaard H. Drug overdose deaths involving fentanyl, 2011-2016. National Vital Statistics Reports 68(3):1-9. [internet]. Hyattsville, MD: CDC National Center for Health Statistics; 2019 Mar [cited 2019 Dec 12]. Available from: https://www.cdc.gov/nchs/data/nvsr/nvsr68 nvsr68_03-508.pdf

7.    James K, Jordan A. The opioid crisis in Black communities. J Law Med Ethics [Internet]. 2018 Jun [cited 2019 Dec 12];46(2):404-21. Available from: https://doi.org/10.1177/1073110518782949

8.    Pew Research Center. Fact Tank: The gap between the number of Blacks and Whites in prison is shrinking [Internet]. Washington DC: Pew Research Center; 2019 Apr 30 [cited 2019 Dec 12]. Available from: https://www. pewresearch.org/fact-tank/2019/04/30/shrinking-gap-between-number-of-blacks-and-whites-in-prison/

9.    Taxy S, Samuels J, Adams W. Drug offenders in federal prison: Estimates of characteristics based on linked data. [internet]. Washington DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics; 2015 Oct [cited 2019 Dec 12]. Available from: https://www.bjs.gov/content/pub/pdf/dofp12.pdf

10.    Substance Abuse and Mental Health Services Administration (SAMHSA). SAMHDA [Internet]. Rockville, MD: SAMHSA Center for Behavioral Health Statistics and Quality; 2019 [cited 2019 Dec 12]. Available from: https://datafiles.samhsa.gov/

11.    Centers for Disease Control and Prevention (CDC). National Vital Statistics System [Internet]. Hyattsville, MD: CDC National Center for Health Statistics [updated 2019 Nov 27; cited 2019 Dec 12]. Available from: https://www.cdc.gov/nchs/nvss/index.htm

12.    Centers for Disease Control and Prevention (CDC). 2018 Annual surveillance report of drug-related risks and outcomes—United States. [internet]. Atlanta, GA: CDC National Center for Injury Prevention and Control; 2018 Aug 31 [cited 2019 Dec 12]. Available from: https://www.cdc.gov/drugoverdose/pdf/pubs/2018-cdc-drug-surveillance-report.pdf

13.    Centers for Disease Control and Prevention (CDC). 2019 Annual surveillance report of drug-related risks and outcomes—United States. [internet]. Atlanta, GA: CDC National Center for Injury Prevention and Control; 2019 Nov 1 [cited 2019 Dec 12]. Available from: https://www.cdc.gov/drugoverdose/pdf/pubs/2019-cdc-drug-surveillance-report.pdf

14.    Hedegaard H, Warner M, Miniño AM. Drug overdose deaths in the United States, 1999-2017. NCHS Data Brief No. 329 [internet]. Hyattsville, MD: CDC National Center for Health Statistics; 2018 Nov [cited 2019 Dec 12]. Available from: https://www.cdc.gov/nchs/products/databriefs/db329.htm

15.    Jones CM, Einstein EB, Compton WM. Changes in synthetic opioid involvement in drug overdose deaths in the United States, 2010-2016. JAMA [Internet]. 2018 May 1 [cited 2019 Dec 12];319(17):1819-21. Available from: https://doi.org/10.1001/jama.2018.2844

16.    Lippold KM, Jones CM, Olsen EO, Giroir BP. Racial/Ethnic and age group differences in opioid and synthetic opioid–involved overdose deaths among adults aged≥ 18 years in metropolitan areas—United States, 2015–2017. Morbidity and Mortality Weekly Report 68(43):967 [internet]. Atlanta: GA; Centers f or Disease Control and Prevention. 2019 Nov 1 [cited 2019 Dec 12]. Available from: https://dx.doi.org/10.15585%2Fmmwr.mm6843a3

17.    Centers for Disease Control and Prevention (CDC). 2017 Annual surveillance report of drug-related risks and outcomes—United States. [internet]. Atlanta, GA: CDC National Center for Injury Prevention and Control; 2017 Aug 31 [cited 2019 Dec 12]. Available from: https://stacks.cdc.gov/view/cdc/47832

18.    Kaiser Family Foundation. Opioid overdose deaths by race/ethnicity [Internet]. San Francisco, CA: Kaiser Family Foundation; 2019 [cited 2020 Feb 28]. Available from: https://www.kff.org/other/state-indicator/opioid-overdose-deaths-by-raceethnicity/

19.    Meghani SH, Byun E, Gallagher RM. Time to take stock: A meta-analysis and systematic review of analgesic treatment disparities for pain in the United States. Pain Med [Internet]. 2012 Feb 1 [cited 2019 Dec 12];13(2):150-74. Available from: https://doi.org/10.1111/j.1526-4637.2011.01310.x

20.    Heins JK, Heins A, Grammas M, Costello M, Huang K, Mishra S. Disparities in analgesia and opioid prescribing practices for patients with musculoskeletal pain in the emergency department. J Emerg Nurs [Internet]. 2006 Jun 1 [cited 2019 Dec 12];32(3):219-24. Available from: https://doi.org/10.1016/j.jen.2006.01.010

21.    Pletcher MJ, Kertesz SG, Kohn MA, Gonzales R. Trends in opioid prescribing by race/ethnicity for patients seeking care in US emergency departments. JAMA [Internet]. 2008 Jan 2 [cited 2019 Dec12];299(1):70-8. Available from: https://doi.org/10.1001/jama.2007.64

22.    Shavers VL, Bakos A, Sheppard VB. Race, ethnicity, and pain among the U.S. adult population. J Health Care Poor U [Internet]. 2010 Feb [cited 2019 Dec 12];21(1):177-220. Available from: https://doi.org/10.1353/hpu.0.0255

23.    Chen I, Kurz J, Pasanen M, Faselis C, Panda M, Staton LJ, O'Rorke J, Menon M, Genao I, Wood J, Mechaber AJ. Racial differences in opioid use for chronic nonmalignant pain. J Gen Intern Med [Internet]. 2005 Jul [cited 2019 Dec 12];20(7):593-8. Available from: https://doi.org/10.1111/j.1525-1497.2005.0106.x

24.    Staton LJ, Panda M, Chen I, Genao I, Kurz J, Pasanen M, Mechaber AJ, Menon M, O'Rorke J, Wood J, Rosenberg E. When race matters: Disagreement in pain perception between patients and their physicians in primary care. J Natl Med Assoc [Internet]. 2007 May [cited 2019 Dec 12];99(5):532. Available from: https://www.ncbi.nlm.nih.gov/pubmed/17534011

25.    National Public Radio. Why is the opioid epidemic overwhelmingly White [Internet]. Washington DC: National Public Radio; 2017 Nov 4 [cited 2019 Dec 12]. Available from: https://www.npr.org/2017/11/04/562137082/why-is-the-opioid-epidemic-overwhelmingly-white

26.    Hart CL, Hart MZ. Opioid crisis: Another mechanism used to perpetuate American racism. Cult Divers Ethn Min [Internet]. 2019 Jan [cited 2019 Dec 12];25(1):6. Available from: https://doi.org/10.1037/cdp0000260

27.    Substance Abuse and Mental Health Services Administration (SAMHSA). Substance abuse treatment: Addressing the specific needs of women [Internet]. Rockville, MD: SAMHSA Center for Substance Abuse Treatment; 2015 [cited 2019 Dec 12]. Available from: https://store.samhsa.gov/product/TIP-51-Substance-Abuse-Treatment-Addressing-the-Specific-Needs-of-Women/SMA15-442

28.    Xierali IM, Nivet MA. The racial and ethnic composition and distribution of primary care physicians. J Health Care Poor U [Internet]. 2018 [cited 2019 Dec 12];29(1):556. Available from: https://doi.org/10.1353/hpu.2018.0036

29.    Lett LA, Murdock HM, Orji WU, Aysola J, SebroR . Trends in racial/ethnic representation among us medical students. JAMA Netw Open [Internet]. 2019 Sep 4 [cited 2019 Dec 12];2(9):e1910490. Available from: https://doi.org/10.1001/jamanetworkopen.2019.10490

30.    Lin LA, Knudsen HK. Comparing buprenorphine-prescribing physicians across nonmetropolitan and metropolitan areas in the United States. Ann Fam Med [Internet]. 2019 May 1 [cited 2019 Dec 12];17(3):212-20. Available from: https://doi.org/10.1370/afm.2384

31.    Smedley BD, Stith AY, Nelson AR. Unequal treatment: Confronting racial and ethnic disparities in health care. [eBook]. Washington DC; National Academies Press; 2003 [cited 2019 Dec 12]. Available from: http://dx.crossref.org/10.17226/12875

32.    Paradies Y, Truong M, Priest N. A systematic review of the extent and measurement of healthcare provider racism. J Gen Intern Med [Internet]. 2014 Feb 1 [cited 2019 Dec 12];29(2):364-87. Available from: https://doi. org/10.1007/s11606-013-2583-1

33.    Williams DR, Wyatt R. Racial bias in health care and health: Challenges and opportunities. JAMA [Internet]. 2015 Aug 11 [cited 2019 Dec 12];314(6):555-6. Available from: https://doi.org/10.1001/jama.2015.9260

34.    Hansen H, Siegel C, Wanderling J, DiRocco D. Buprenorphine and methadone treatment for opioid dependence by income, ethnicity and race of neighborhoods in New York City. Drug Alcohol Depend [Internet]. 2016 Jul 1 [cited 2019 Dec12];164:14-21. Available from: https://doi.org/10.1016/j. drugalcdep.2016.03.028

35.    Hansen H. Sociocultural factors impacting access to MAT and care delivery, new qualitative data from buprenorphine prescribers in OTPs. Am J Addiction [Internet].  2017 Apr 1 [cited 2019 Dec 12];26(3):236. Available from:  https://doi-org.ezproxyhhs.nihlibrary. nih.gov/10.1111/ajad.12545

36.    Hansen HB, Siegel CE, Case BG, Bertollo DN, DiRocco D, Galanter M. Variation in use of buprenorphine and methadone treatment by racial, ethnic, and income characteristics of residential social areas in New York City. J Behav Health Serv Res [Internet]. 2013 Jul 1 [cited 2019 Dec 12];40(3):367-77. Available from: https://doi.org/10.1007/s11414-013-9341-3

37.    Saloner B, Feder KA, Krawczyk N. Closing the medication-assisted treatment gap for youth with opioid use disorder. JAMA Pediatr [Internet]. 2017 Aug 1 [cited 2019 Dec 12];171(8):729-31. Available from: https://dx.doi.org/10.1001%2Fjamapediatrics.2017.1269

38.    Lagisetty PA, Ross R, Bohnert A, Clay M, Maust DT. Buprenorphine treatment divide by race/ethnicity and payment. JAMA psychiatry [Internet]. 2019 May 8 [cited 2019 Dec 12];76(9):979-81. Available from: https://doi.org/10.1001/jamapsychiatry.2019.0876

39.    National Academies of Sciences, Engineering, and Medicine. Medications for opioid use disorder save lives. [internet]. Washington DC: National Academies Press; 2019 May 16 [cited 2019 Dec 12]. Available from: https://www.ncbi.nlm.nih.gov/books/NBK538936/

40.    Substance Abuse and Mental Health Services Administration (SAMHSA). Medication-Assisted Treatment (MAT) [Internet]. Rockville, MD: SAMHSA; 2019 Sep 9 [cited 2019 Dec 12]. Available from: https://www.samhsa.gov/medication-assisted-treatment

41.    Substance Abuse and Mental Health Services Administration (SAMHSA). Methadone [Internet]. Rockville, MD: SAMHSA; 2019 [cited 2019 Dec 12]. Available from: https://www.samhsa.gov/medication-assisted-treatment/treatment/methadone

42.    Substance Abuse and Mental Health Services Administration (SAMHSA). Use of medication-assisted treatment for opioid use disorder in criminal justice settings [Internet]. Rockville, MD: SAMHSA; 2019 Jul [cited 2019 Dec 12]. Available from: https://store.samhsa. gov/product/Use-of-Medication-Assisted-Treatment-for-Opioid-Use-Disorder-in-Criminal-Justice-Settings/PEP19-MATUSECJS

43.    Substance Abuse and Mental Health Services Administration (SAMHSA). Buprenorphine [Internet]. Rockville, MD: SAMHSA; 2019 [cited 2019 Dec 12]. Available from: https://www.samhsa.gov/medication-assisted-treatment/treatment/buprenorphine

44.    Substance Abuse and Mental Health Services Administration (SAMHSA). Naltrexone [Internet]. Rockville, MD: SAMHSA [updated 2019 Nov 22; cited 2019 Dec 12]. Available from: https://www.samhsa.gov/medication-assisted-treatment/treatment/naltrexone

45.    Substance Abuse and Mental Health Services Administration (SAMHSA). TIP 63: Medications for opioid use disorder [Internet]. Rockville, MD: SAMHSA; 2019 Jun [cited 2019 Dec 12]. Available from: https://www.store. samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document-Including-Executive-Summary-and-Parts-1-5-/SMA19-5063FULLDOC

46.    Substance Abuse and Mental Health Services Administration (SAMHSA). Naloxone [Internet]. Rockville, MD: SAMHSA [updated 2019 Sep 27; cited 2019 Dec 12]. Available from: https://www.samhsa.gov/medication-assisted-treatment/treatment/naloxone

47.    U.S. Department of Health and Human Services (HHS) Office of the Surgeon General. U.S. Surgeon General's advisory on naloxone and opioid overdose [Internet]. Washington DC: HHS; 2018 Apr 5 [cited 2019 Dec 12]. Available from: https://www.surgeongeneral. gov/priorities/opioid-overdose-prevention/naloxone-advisory.html

48.    Kerensky T, Walley AY. Opioid overdose prevention and naloxone rescue kits: What we know and what we don't know. Addict Sci Clin Pract [Internet]. 2017 Jan 7 [cited 2019 Dec 12];12(1):4. Available from: https://doi. org/10.1186/s13722-016-0068-3

49.    U.S. Department of Health and Human Services (HHS). Co-prescribing guidance for high-risk opioid overdose [Internet]. Washington DC: HHS; 2018 Dec 19 [cited 2019 Dec 12]. Available from: https://www. hhs.gov/about/ news/2018/12/19/hhs-recommends-prescribing-or-co-prescribing-naloxone-to-patients-at-high-risk-for-an-opioid-overdose.html

50.    Victor RG, Lynch K, Li N, Blyler C, Muhammad E, Handler J, Brettler J, Rashid M, Hsu B, Foxx-Drew D, Moy N. A cluster-randomized trial of blood-pressure reduction in Black barbershops. N Engl J Med [Internet]. 2018 Apr 5 [cited 2019 Dec 12];378(14):1291-301. Available from: https://doi-org.ezproxyhhs.nihlibrary. nih.gov/10.1056/NEJMoa1717250

51.    Linnan LA, Ferguson YO. Beauty salons: A promising health promotion setting for reaching and promoting health among African American women. Health Educ Behav [Internet]. 2007 Jun [cited 2019 Dec 12];34(3):517-30. Available from: https://doi.org/10.1177/1090198106295531

52.    Centers for Disease Control and Prevention (CDC). Reducing harms from injection drug use and opioid use disorder with syringe services programs. [internet]. Atlanta, GA: CDC National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention; 2017 Aug [cited 2019 Dec 12]. Available from: https://www.cdc.gov/hiv/pdf/risk/cdchiv-fs-syringe-services.pdf

53.    Hawthorne Police Department. Coffee with a cop [Internet].  Hawthorne, CA: Coffee with a Cop; 2018 [cited 2019 Dec 12]. Available from: https://coffeewithacop.com/

54.    Campbell MK, Hudson MA, Resnicow K, Blakeney N, Paxton A, Baskin M. Church-based health promotion interventions: Evidence and lessons learned. Annu RevPublic Health [Internet]. 2007 Apr 21 [cited 2019 Dec 12];28:213-34. Available from: https://doi.org/10.1146/annurev.publhealth.28.021406.144016

55.    DeHaven MJ, Hunter IB, Wilder L, Walton JW, Berry J. Health programs in faith-based organizations: Are they effective? Am J Public Health [Internet]. 2004 Jun [cited 2019 Dec 12];94(6):1030-6. Available from: https://doi.org/10.2105/ajph.94.6.1030

56.    Stannard E. Spiritual program brings people out of depths of addiction. New Hampshire Register [Internet] 2018 Oct 28 [cited 2019 Dec 12]. Available from: https://www.nhregister.com/news/article/Spiritual-program-brings-people-out-of-depths-of-13343417.php

57.    U.S. Department of Health and Human Services (HHS) Office of Minority Health. National CLAS Standards [Internet]. Rockville, MD: HHS Office of Minority Health; 2018 Oct 2 [cited 2019 Dec 12]. Available from: https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=2&lvlid=53

58.    Larochelle MR, Bernstein R, Bernson D, Land T, Stopka TJ, Rose AJ, Bharel M, Liebschutz JM, Walley AY. Touchpoints–Opportunities to predict and prevent opioid overdose: A cohort study. Drug Alcohol Depend [Internet]. 2019 Nov 1 [cited 2019 Dec 12];204:107537. Available from: https://doi.org/10.1016/j. drugalcdep.2019.06.039

59.    Authority Health. Authority Health GME [Internet]. Detroit, MI: Authority Health; 2014 Nov 26 [cited 2019 Dec 12]. Available from: http://www.authorityhealth. org/authority-health-gme/

60.    Substance Abuse and Mental Health Services Administration (SAMHSA). 2017 National Survey on Drug Use and Health Public use file codebook. [internet]. Rockville, MD: SAMHSA; 2018 Oct 23 [cited 2019 Dec 12]. Available from: http://samhda.s3-us-gov-west-1. amazonaws.com/s3fs-public/field-uploads-protected/studies/NSDUH-2017/NSDUH-2017-datasets/NSDUH-2017-DS0001/NSDUH-2017-DS0001-info/NSDUH-2017-DS0001-info-codebook.pdf

61.    Centers for Disease Control and Prevention (CDC). Opioid overdose: Commonly used terms [Internet]. Atlanta, GA: CDC National Center for Injury Prevention and Control [updated 2019 Feb 12; cited 2019 Dec 12]. Available from: https://www.cdc.gov/drugoverdose/opioids/terms.html

U.S. Department of Health and Human Services
Substance Abuse and Mental Health Services Administration
Office of Behavioral Health Equity

Photos are for illustrative purposes only.
Any person depicted in a photo is a model.

Publication No. PEP20-05-02-001.



# EXHIBIT 3

# The Effects of Opioid Addiction on the Black Community

## Clairmont Griffith[1], Bernice La France[1*], Clayton Bacchus[2], Gezzer Ortega[3]

[1]Department of Anesthesiology, Howard University Hospital and Howard University College of Medicine, US

[2]Inner City Family Services in Affiliation with Howard University, US

[3]Department of Surgery, Howard University Hospital and Howard University College of Medicine, US

**\* Corresponding author:** Bernice La France, Department of Anesthesiology, Howard University Hospital and Howard University College of Medicine, Washington, US, E-mail: bemore1576@gmail.com

## Abstract

This paper provides a detailed discussion of the effects caused by opioid addiction among Black Americans. Since the onset of the opiate effects crisis, the United States has reached the highest rates ever reported in its history. Drug overdose, which began as a problem for Caucasians entered urban settings affecting more members of Black ethnicity than any other ethnic group. Black communities suffer various effects from opioid addiction ranging from mental health, economic and social life. Since Black communities remain out of discussion the regarding treatment of opiate addiction, they end up dying in high rates. Opioid dependence has increased risks of liver and kidney failure conditions which are conditions already predisposition for Blacks. Instead of helping them recover, the government often has led Blacks to prison, separating them from their loved ones.

**Keywords:** Opioid addiction; Black community; Drug overdose

## Introduction

The United States grapples with one of its worst drug crises; the country loses more than 800 people each week from opioid-related overdoses. Drug overdose by race increased among Blacks in the urban settings by 41% in 2016, which outpaced any other race or ethnic group.[1] Drug overdose is a critical health issue in the country exceeding heart diseases in causing deaths among different races of the American population.[2] Opioid disorders have resulted in the recent advances such as rehabilitation programs, public health interventions, and treatment programs. Policymakers have developed various approaches to the opioid crisis in efforts to increase war on drugs and crackdowns on crime. The anti-drug trafficking programs emerged to address the new opioid addiction rates, which are growing among the Black Communities.[3] Widespread drug use has dumped the country into deaths attributed to pharmaceutical opioids such as heroin that accounted for 19 per cent of overdose deaths in 2013.[3] According to the New England Journal of Medicine, opioid addiction leads to public health risks.[3] Volkow and McLellan's research reflects on the scope of the epidemic among the Caucasian which exceeded Blacks' because minority races received under treatment for years. A similar study by JAMA in 2008 found that minority races are not likely to receive opioids for pain in an emergency department compared to the majority.[2] As a result, it is possible

that pills would be sold on the streets to Black patients. Despite stepped efforts to address the crisis, health experts say that overdose deaths keep climbing each year, especially among the Black race. Moreover, the office of Medical Examiner in Washington D.C reported that opioid overdose deaths among men aged 40 to 69 moved up in the period between 2014 and 2017.[4] Whereas previous data show that the drug addiction crisis started in rural America among the Caucasians, the overall opioid overdose death has increased among the Black community leading to a high number of deaths.[4]

## Methodology

This chapter provides details of the secondary methods used in effects of opioids research on the Black Community. The study obtained information from various sources such as libraries, local bodies, and Literature review and government websites. The Secondary research was vital for this study since existing information was highly useful in determining results.

### Methods

The study utilised a secondary analysis of existing data, with research "question driven" and "data-driven" approaches.[5] The two methods are significant in this paper as they focused on already existing data. The existing data used scholarly resources consisting of private and public information. There is an array of existing public data that address specific topics on effects of opioid addiction on health-related databases. Specifically, the research targeted existing data, and county and regional levels in the United States. The government websites provide up to date information related to opioid addiction in the US with the latest being 2016 statistics (Figure 1).[4] Variety of US-based government agencies offer online data with well-analysed frequencies and cross-tabulations. As a result, websites offer technical support that aided identification of potential data sources in the systems. The specific data provided current statistics on mortality and an array of health conditions related to opioid addiction.

While employing both questions-driven and data-driven methods for analysing existing data, the research considered possible variables for the research question. It implies that a comprehensive understanding of the credibility of data sources was employed to design quality control measures to assess information.[5] The chosen documents contained sufficient information with meaningful estimates about opioid addiction among members of the Black community. Before conducting the analysis, it was possible to generate outcome and confounding variables which were used during the review. The methods helped the research to recode original variables to meet the assumptions in the research question. Moreover, the secondary data research focused on the opioid addiction conditions.

## Discussion

### Death rates of opioids according to race

The number of Blacks dying from opioid has reached an extended rate higher than the general population in numerous states such as Missouri, Illinois, Minnesota, Wisconsin, West Virginia and Washington, D.C.[6] For instance, death rates in the states of Virginia and Wisconsin have numbers of Blacks with fatal overdose rate nearly double that of Caucasians. On the other hand, Illinois is the best example of effects of opioid epidemic among the Blacks. According to data from the Illinois Department of Public Health, all opioid deaths in the state doubled among Blacks than any other racial group during the

period from 2013 to 2016 with a 132% increase.[4] Despite making up to 15% of the Illinois population, Blacks account for about one-quarter of opioid overdose deaths. While the country focuses on rural areas for opioid addicts, the trend has shifted to urban areas which currently experience the crisis from day-to-day.[7] Chicago alone has had an extreme increase in a fatal opioid overdose, which sharply increased to 75%. In Chicago, Blacks make approximately 32% of the population, but they account for about half of all opioid deaths which are 48.4%. In 2016, the rate of African American deaths was 56% which was higher than Caucasians' death rate from opioids. Consequently, CDC data reveals that the 2016 Black's death in Chicago was almost four times higher than the national average rate in 2015.

### The most affected states with opioid addiction

Majority of the Blacks with opioid addiction come from the low-income families and rarely receive treatment, unlike the Caucasians who share these characteristics but end up enrolled to private insurances.[7] With little access to evidence-based treatment, the Black community has more people dying from opioid addiction epidemic. In fact, data show that the majority of Blacks live in Chicago however; the state has the lowest treatment capacity for buprenorphine. That is, Chicago is the third most depressed cities in the national rank such capacity rate makes services less available for Blacks in need of treatment.

The data presented in Table 1 shows that the states with more opioid-related cases have the highest numbers of Blacks living in the respective cities. It is a clear that Blacks are dying at a higher rate impacted by the epidemic which is a higher proportion than the general US population.[7] The top ten most affected States with the opioid crisis are in Midwest; they include Missouri, Wisconsin, Illinois, and Minnesota among others (Table 2). For example, Illinois alone has an opioid death rate for Blacks of 11.6 per 100,000 in 2015, compared to 10.4 for the general population. In some cases, some states had Blacks' opioid overdose rate exceeding other races. For example, Missouri and Wisconsin have 14.8 per 100,000 and 21.9 per 100,000 respectively.[6] Besides, other areas such as West Virginia have Black's overdose rates that doubled that of the Caucasian. Most Blacks face significant barriers that hinder them from accessing care; these issues include living in racially concentrated areas, lack of insurance, childcare, transportation issues and other issues. However, these issue not only do they affect the Blacks' living in poverty but also the Caucasians. The main contributors to lower life expectancies are the health disparities among Blacks.[4]

### Comparison between Chicago and Illinois in opioid addiction

**Illinois:** Table 3 presents excellent examples of how overdose rates related to opioids hit Black populations.[6] For instance, these cases increased in Illinois by 82% which corresponds to data from the Illinois Department for Public health that shows opioid deaths (heroin and pain pills) escalated faster among the Blacks more than any other race from 2013 to 2016.[6] Similarly, the period saw Black deaths from pain pills increasing to about three times the increase in the Caucasian fatalities. In other words, the Black community around the country have been stricken by the effects of opioid addiction, and continue to suffer.

**Chicago:** Chicago has had higher overdose rates in Black communities involving heroin, Fentanyl, and other opioids.[8] The effects of addiction are prevalent in the South and West sides, but Austin suffers the highest death rate than all the community areas. Chicago suffers from the high addiction of fentanyl-adulterated heroin, whose deaths represent 58% of opioid deaths in 2016, thrice deaths accounted for in 2015.[8] Some of the highest overdose regions include North Lawndale, East, and West Garfield Park, Austin, Fuller

Park, Humboldt and Englewood. All listed areas are made up of poverty concentrated areas, which are located in the South and West zones of Chicago.[8]

### Challenges of opioid addiction on the black community

The opioid epidemic has a social effect that leaves communities with visible impacts. Firstly, the problem has led to family disintegration especially with the massive rise in cracking down for drug addiction. It has emerged that the US government and judicial systems display matters of racial stereotypes as they try to fight drug use crisis.[9] Numerous data show the opiate issues have irreparably harmed the Black American youth. The opiate crisis has continuously pushed the Black community into devastation and crisis of incarceration, separating them from the rest of family members.[7] Notably, war on drugs policies is misused by the law enforcement authorities that target Black neighborhood. Initially, war on drugs declaration aimed at taking a stand on corrupt government members and criminal organizations that can deter the country from lucrative drug market.[2] In reality, these wars target Black communities, whereby law enforcement disproportionately focuses on people of color for drug violations. Previous studies show that despite drug use being similar between Caucasian and Blacks, Blacks have 13 times more chances to be arrested for buying, and using drugs.[4] However, in some states, rates are higher. For instance, Black and Hispanic population in 2013 represented 29 per cent of the US population however; they dominated in numbers of prisoners for drug offenses.[10] The US Sentencing Commission revealed that Blacks received longer prison sentences for drug-related offenses than other races in the country despite being convicted for crimes of similar weight. Bureau of Justice Statistics proves that in 2012, state prisons had 225,242 inmates for drug-related offenses.[10] However, 45% of inmates were Black and 30% Caucasian. Such statistics is an attribution of how often police were likely to arrest addicts in low-income ethnic minority neighborhoods. As stated earlier, Cooks County Illinois has 5.24 million residents, while a quarter of the population are Blacks. However, Black population represent more than 70% of the county's incarcerated population.[10] Consequently, those arrested are from low-income families, with low levels of education and have negligible job prospects. Most of these victims have a mental problem and might have had a history of childhood abuse and trauma. Besides, opioid addicts rarely have a stable family or social network on which they can rely but have offspring to support.

Another consequence of Black American addiction is lack of adequate representation to argue for reduced charges compared to other races.[9] As a result, Black Americans quickly get arrested and convicted due to the little resources to secure competent legal defense. Previous studies have proved that the United States is a race-based institution where only the Black Americans are arrested more often than Caucasian Americans for the same characteristics of drug-related offenses.[6] In 2000, New York City had arrested more addicts among Black Americans than Caucasians in four other states. Usually, police stopped and frisked young Black males, and when arrested, Blacks have to endure long waits in prisons before they receive a trial. Detailed investigation of the criminal justice system indicated that a high profile killing of the Black youth was made by police officers from other ethnic backgrounds.[11] For instance, the 2014 and 2015 report revealed that most lawyers and police officers in the US are of Caucasian origin. According to American Bar Associations reports, 88% of its lawyers are white while 4.8% are Blacks.[11] It indicates that Black Americans are exposed to more risks than Caucasian, which leads them to 10 times chances of arrest higher than those among the Caucasian.

847        *International Journal of Collaborative Research on Internal Medicine & Public Health*

*Government actions to help opioid addicted people*

In a report prepared by Roster of commissioners, the Federal government has programs directed towards prevention and treatment of the drug-related activities.[11] The Federal government has a recommendable history in developing evidence-based programs and policies that aim at reducing the number of people affected by opioids nationwide. Besides, the national government has launched prevention campaigns to address the use and abuse of illicit drugs as an alternative to prevent premature and preventable deaths or disabilities. There are national campaigns focused on opioids' risks and consequences, educating families on the warning signs, and channelling the message to specific populations such as elderly, college students, adolescent and pregnant women. Furthermore, the government has also reviewed the medical school's curricula to ensure that practitioners are trained to conduct proper prescription as a vital strategy to address the opioid epidemic.[11] Therefore, the government has set aside budgetary allocations to support Drug-Impaired Driving program, Anti-doping activities and Prevention research among others.[12]

## Limitations

Generally, secondary analysis of the existing data in its nature fails to address the particular research question. As viewed in the discussion, the data was not collected for the entire population subgroups for all regions in the United States. There is a probability that most crucial information on the zip codes and names if the primary sampling responded were omitted. Another major limitation of analysing the existing data is that the researcher is not the same person who conducted the primary data collection process. Therefore, it is probably right that the data may have specific glitches in the data collection process which may hinder the interpretation of the particular variables in the data. It is therefore hard to provide succinct documentation of valuable information presented in the document because the user may not show relevance in the submitted data.

## Conclusion

Drug overdose by race is a recent issue among the Black Community. These rates have escalated sharply among the Blacks in urban settings. For instance, some related opioid effects rose among the Blacks by 41% in 2016 outpacing any other race or ethnic group. As a result, drug overdose has become a significant health issue in the country surpassing heart illnesses as the leading cause of deaths among the different races of the American population. Opioid disorders have resulted in the recent advances in rehabilitation programs, public health interventions, and treatments programs. Numerous data show that opiate issues have irreparably harmed the Black American youth. The opiate crisis has continuously pushed them into devastation and crisis of incarceration, separating them from the rest of family members. Besides, there were wars on drug use policies that are misused by the law enforcement authorities, who target Black neighbourhoods.

Consequently, the number of Blacks dying from opioid has reached an extended rate higher than the general population in numerous states such as Missouri, Illinois, Minnesota, Wisconsin, West Virginia and Washington, D.C. For example, these rates in the States of Virginia and Wisconsin have the number of Blacks with fatal overdose nearly double that of Caucasian. The discussion provides more data in Chicago and Illinois which are the most affected cities. Despite making up to 15% of the Illinois population, Blacks account for about one-quarter of opioid overdose deaths.

848        *International Journal of Collaborative Research on Internal Medicine & Public Health*

On the other hand, Chicago alone has had an extreme increase in a fatal opioid overdose that rose up to 75%. Besides, Chicago has got approximately 32% of the population made of Black people but they account for about half of all opioid deaths which are 48.4%. Moreover, in 2016 Chicago that rate of Blacks' deaths was 56% which was higher than the white death rate from opioids. Consequently, the CDC data reveals that African American deaths in Chicago in 2016 were almost four times more elevated than the national average rate in 2015.

## References

1.  American Addiction Centers. Race and Addiction. 2018.

2.  Johnson RS. The racial divide in the opioid epidemic. Modern Healthcare. 2016.

3.  Volkow ND and McLellan TA. Opioid Abuse in Chronic Pain-Misconceptions and Mitigation Strategies. N Engl J Med. 2016; 374: 1253-1263.

4.  Confronting the Opioid crisis in the United States. Opioids.gov. 2018.

5.  Cheng HG and Phillips MR. Secondary analysis of existing data: opportunities and implementation. Shanghai Archives of Psychiatry. 2014; 26: 371-375.

6.  Bechteler SS and Kane-Willis K. The African American Opioid Epidemic. Chicago Urban League. 2017.

7.  Squires LE, Palfai TP, Allensworth-Davies D, Cheng DM, Bernstein J, et al. Perceived discrimination, racial identity, and health behaviors among black primary-care patients who use drugs. J Ethn Subst Abuse. 2017; 1-18.

8.  Chicago department of public health. Epidemiology report: Increase in overdose deaths involving opioids-Chicago, 2015-2016. 2017.

9.  Hansen H and Netherland J. Is the Prescription Opioid Epidemic a White Problem? American Journal of Public Health. 2016; 106: 2127-2129.

10. Escamilla J and Gatens A. Illinois opioid Prescription data. Criminal Justice data. 2018.

11. Roster of commissioners. The president's commission on combating drug addiction and the Opioid crisis. Whitehouse.gov. 2017.

12. Peteet BJ. Psychosocial risks of prescription drug misuse among U.S. racial/ethnic minorities: A systematic review. J Ethn Subst Abuse. 2017; 1-33.

**Table 1.** Major United States cities and corresponding countries by Buprenorphine treatment capacity, 2015.

| Rank | City | County | County population | Treatment capacity (n) | Capacity (Rate/ 100,000) |
|---|---|---|---|---|---|
| 1 | Philadelphia, PA | Philadelphia | 1,526,006 | 12,570 | 824 |
| 2 | New York, NY | Multiple | 8,175,133 | 63,840 | 781 |
| 3 | San Diego, CA | San Diego | 3,095, 313 | 15,970 | 516 |

| 4 | Phoenix, AZ | Maricopa | 3,817,117 | 15, 040 | 394 |
| 5 | San Jose, CA | Santa Clara | 1,781,642 | 6,630 | 372 |
| 6 | Los Angeles, CA | Los Angeles | 9,818,605 | 33,510 | 341 |
| 7 | Houston, TX | Harris | 4,092, 459 | 12,780 | 312 |
| 8 | Chicago, IL | Cook | 5, 194, 675 | 15, 360 | 296 |
| 9 | Dallas, TX | Dallas | 2, 368,139 | 6,820 | 288 |
| 10 | San Antonio, TX | Bexar | 1,714, 773 | 4, 810 | 281 |

**Data source:** Illinois Department of Public Health, Cook County Medical Examiner's Office, US Census Bureau.

**Table 2.** Top 10 States with the highest rate of opioid overdose deaths 2015. Data Source: Cook County Medical Examiner's Office, US Census Bureau.

| State | White | African American | General Population |
|---|---|---|---|
| Western Virginia | 36.2 | 55.5 | 36 |
| District of Columbia | NR | 22.8 | 14.5 |
| Wisconsin | 11.3 | 21.9 | 11.2 |
| Ohio | 27.7 | 15.2 | 24.7 |
| Maryland | 25 | 14.8 | 17.7 |
| Missouri | 11.9 | 14.8 | 17.7 |
| Massachusetts | 27.1 | 13.2 | 23.3 |
| Michigan | 14.7 | 12.4 | 13.6 |
| Illinois | 13.1 | 11.6 | 10.7 |
| Minnesota | 6 | 10 | 6.2 |
| United States | 13.9 | 6.6 | 10.4 |

**Data source:** Cook County Medical Examiner's Office, US Census Bureau.

**Table 3.** Illinois fatal overdoses from any opioid from 2013-2016.

850    *International Journal of Collaborative Research on Internal Medicine & Public Health*

| Racial Group | 2013 | 2014 | 2015 | 2016 | % Change |
|---|---|---|---|---|---|
| White | 758 | 876 | 1,029 | 1,230 | 62% |
| African American | 198 | 229 | 235 | 459 | 132% |
| Other | 12 | 7 | 8 | 24 | 100% |
| Latino | 104 | 91 | 110 | 204 | 96% |
| Total | 1,072 | 1,203 | 1,382 | 1,946 | 82% |

**Data source:** Cook County Medical Examiner's Office, US Census Bureau.



**Figure 1.** Chicago opioid death rate by race and the US total in 2016 (**Data source**: Cook County Medical Examiner).

# EXHIBIT 4



# ISSUE BRIEF

# Whitewashed:
# The African American Opioid Epidemic

**The Chicago Urban League**

**November 2017**

Prepared by
Chicago Urban League
**Research and Policy Center**

**Co-authored By:**
**Stephanie Schmitz Bechteler & Kathleen Kane-Willis**

Writing and research support:
Scott Metzger

*This is the inaugural issue brief in a series written by the Research and Policy Center (RPC) at the Chicago Urban League. The RPC will produce timely briefs in response to important issues that impact the African American community in Chicago.*

**EXECUTIVE SUMMARY**

The opioid epidemic has largely been portrayed as a problem affecting young whites in suburban and rural areas. In Illinois, the Midwest, and indeed much of the United States, this is a wholly inaccurate depiction. The prevailing narrative neglects how people of color have been profoundly impacted:

- African Americans are dying from opioid overdose at a rate higher than the general population in several states, including Illinois, Wisconsin, Missouri, Minnesota, and West Virginia, and in Washington, D.C.;
- In Wisconsin and West Virginia, the African American fatal overdose rate was nearly double that of whites.

Illinois provides a clear example of how hard African Americans have been hit by the opioid epidemic.

- Data from the Illinois Department of Public Health show that all opioid deaths (heroin and pain pills) in Illinois more than doubled among African Americans (132% increase) from 2013 to 2016, rising faster than for any other racial group during that period;
- Among African Americans, deaths from pain pills increased nearly nine-fold while white fatalities tripled.
- African Americans account for nearly *one quarter* of opioid overdose deaths despite making up about 15 percent of Illinois's population;

While much attention has been paid to suburban areas as the focus of the opioid crisis, the city of Chicago is a case study for multiple reasons: 1) the increase in opioid overdose deaths, 2) the rise of fentanyl, and 3) the impact on African Americans.

- Chicago has experienced an extreme increase in fatal opioid overdoses in just one year– an increase of nearly 75%.
- Black people make up approximately 32% of the population in Chicago but account for nearly half (48.4%) of all opioid deaths.
- In 2016, the African American death rate from opioids in Chicago was 56% higher than the white death rate in Chicago (39.3 vs 25.1).
- Compared to U.S. data from 2015, which is the most currently available data from the CDC, in Chicago the African American death rate in 2016 was nearly four times higher than the national average in 2015 (39.3 vs 10.4).
- The neighborhoods with the highest overdose death rate from fentanyl include East and West Garfield Park, North Lawndale, Austin, Humboldt Park, Fuller Park and Englewood – all racially concentrated areas of poverty.

It is good news that attention has now turned to taking a public health approach to addressing the opioid crisis. However, if a public health approach is to work, it is essential to ensure that treatment capacity meets treatment need. Unfortunately, this is not the case in Chicago or Illinois.

- Chicago has the lowest treatment capacity for medication-assisted treatment (buprenorphine) in the Midwest and is third lowest among large cities nationally;
- Low treatment capacity can have a disparate impact on African American communities, especially among those living in poverty, who often face multiple barriers to receiving treatment, including transportation and childcare.

Based on these data, African American people, families and communities should not be excluded from narratives told about the opioid epidemic. African Americans must be included in the development and implementation of national and local public health initiatives, as well as in treatment response plans.

2

**BACKGROUND**

Much local and national attention has been paid to the opioid crisis, the ever-increasing use of prescription pain pills, heroin and the synthetic drug fentanyl[1]. The President of the United States recently declared the epidemic a public health emergency and the President's Commission on Combating Drug Addiction and the Opioid Crisis, convened in March 2017, released its final report in November 2017. The crisis has been escalating for years—opioid-related deaths doubled from 2000 to 2015, and in the past few years, the situation has only worsened.[i] The most recent Centers for Disease Control and Prevention data demonstrate a 21% rise in overdose deaths in 2016, largely fueled by an increase in fentanyl-related deaths. Fentanyl, a powerful synthetic opioid, often enters the country in the form of adulterated heroin, which increases potency and reduces costs for distributors, but also increases a user's risk of overdose.[ii] Throughout 2016, a number of jurisdictions  saw  overdose fatalities increase significantly higher than in the U.S. as a whole, including Illinois (33%)..[iii]

The epidemic has largely been portrayed as a problem affecting young whites in suburban and rural areas. The Commission's report reserved only a few sentences in a nearly 150-page document for discussion of the epidemic's impact on our country's communities of color.[iv] In Illinois, and indeed much of the United States, this is a wholly inaccurate depiction.

The federal government's response to the opioid epidemic has lacked much, if any, focus on how African Americans are impacted. The final report of the President's Commission noted that the majority of black Americans with opioid use disorders (OUDs) fall in the lowest income bracket, rarely receive treatment, utilize public insurance programs like Medicare and Medicaid, and primarily live in metropolitan areas.[v] However, the majority of whites with OUDs share many of these same characteristics, the exception being a greater likelihood of being enrolled in private insurance.[vi]

Despite the fact that many who need and seek opioid treatment rely on public insurance, the current administration has backed federal legislation that cut or restricted these essential health benefits and federally-backed health centers during the spring and summer of 2017.  While none of these pieces of legislation came to fruition, there is no doubt that cuts to Medicaid and to subsidies under the Affordable Care Act (ACA) will have dire consequences for the opioid epidemic. Without insurance and health centers, people lack access to even basic health services, let alone access to medication- assisted treatment (MAT), the most effective treatment approach to reducing dependence on opioids and reducing overdose risk. Without access to evidence-based treatment, more people will die, even if the opioid epidemic were to plateau today. Unfortunately, the opioid overdose epidemic shows no signs of ebbing; rather, the evidence points to a fast and sharp increase in the number of deaths due to opioid overdose.

---

[1] Fentanyl is a synthetic opioid that is 40 to 100 times stronger than heroin.  While it is used as a prescription in hospitals and in very critical pain situations, the fentanyl crisis in the US is one of illicit fentanyl that is often mixed into heroin prior to it entering the US by drug trafficking organizations.

**CONFLICTING APPROACHES: PUBLIC HEALTH CRISIS VS THE WAR ON DRUGS**

Since the 1980s, the policies and practices promoted under the banner of the War on Drugs – which relies heavily on policing, arrests and mass incarceration – have been applied disproportionately to African American communities. This stands in stark contrast to the current compassionate response in the form of public health and treatment approaches to the "white" opioid epidemic.  African Americans made up just 13% of the U.S. population in 2016, but comprised 27% of all arrests for drug crimes. [vii] In contrast, non-Hispanic whites made up about 61% of the population and ~55% of drug arrests.[viii] While the total number of whites arrested on drug crimes was higher, a closer interpretation shows that African Americans' share of drug arrests was more than *twice* their share of the population. This is the type of disparity often found in the criminal justice system, particularly as it pertains to drug crimes.

This is not a new phenomenon—black Americans have been arrested for drug crimes at wildly disparate rates for decades under the War on Drugs. As crack cocaine devastated black communities in cities around the country during the 1980s, punishment was the only solution; countless families and communities were torn apart by the criminal justice system. Policies like mandatory minimum sentences and "stop and frisk" policing practices made black communities into sites of intense control and surveillance. And they remain so to this day.

An analysis conducted by Chicago Million Dollar Blocks, shows the neighborhoods that have been disproportionately been impacted by drug arrests and incarceration. For example, during the period from 2005-09, in Austin nearly $300M was spent on incarcerating individuals for drug crimes, and nearly 200M was spent in East and West Garfield Park[ix] to *total than half a billion dollars* in those three community areas.

The War on Drugs is alive and well in Chicago. From 2012 to 2016, the Chicago community areas with the highest rates of felony drug arrests were overwhelmingly the city's racially concentrated areas of poverty; the neighborhoods with the lowest rates were primarily white and wealthy. Setting aside arrests, black Chicagoans experience verbal and physical abuse at the hands of police on a regular basis. As evidenced in the Department of Justice's report last year, CPD officers call the black people they serve "savages," "animals," and "pieces of sh*t. " CPD received 354 complaints for officers' use of the word "n****r" from 2011 to 2016[x]. The same report showed that police used excessive force against black Chicagoans *10 times* more often than against whites, and when black people reported these abuses, their allegations were three times less likely to be upheld. It is no wonder that one young black Chicagoan described their neighborhood as, "an open air prison."[xi]

In recent years, as white Americans have increasingly felt the impact of the opioid epidemic, responses have softened, and white lawmakers and citizens now call for a "gentler War on Drugs."[xii] This sort of rhetoric is bittersweet. The War on Drugs *was* an abject failure, yet that failure is only recognized when white people suffer. We do not need a return to punitive policies or an increase in white drug arrests to balance this inequity. Rather, we need to acknowledge the systemic racism built into the War on Drugs

and move toward a public health approach to opioid use that accounts for how all Americans, including African Americans, are impacted by the current crisis.

**APPLYING A PUBLIC HEALTH MODEL TO THE OPIOID CRISIS**

Although the President called the opioid crisis a "public health" emergency, there may be misconceptions about what this approach looks like. The first essential component of a public health model is that any intervention is evidence-based. This means that any intervention uses methods that have been tested empirically by scientists and researchers and is proven to work. In terms of opioid use, there are three types of interventions that can be applied:

1. **Primary Prevention.** These prevention programs target drug use before it begins. Although the President recommended the use of advertising for primary prevention, these tactics have not been demonstrated to work, and may have unintended consequences that actually increase use.[xiii] However, there are many primary prevention programs that are evidence-based and do reduce drug use and other behaviors that may cause harm to an individual, the family, and society. These may be implemented in a variety of settings, with individuals, in schools or in the community.

2. **Secondary Prevention.** This is what most Americans think of when they think about opioid use disorders – it is treatment for a substance use disorder (SUD). The evidence shows that opioid agonist[2] medications, like the buprenorphine and methadone used in MAT programs, are the most effective methods of reducing injury and death in people with opioid use disorders. Medication-assisted therapy also reduces criminal justice involvement and health costs and is extremely cost effective, returning $12 for each dollar invested.[xiv]

3. **Tertiary Prevention**. Tertiary prevention refers to additional strategies and programs to help reduce morbidity and mortality among people who use drugs. The main focus of these programs is to reduce the harm associated with drug use, which is why they are often referred to collectively as "harm reduction" methods. Examples of tertiary prevention include syringe exchange; distribution of naloxone (the opioid overdose antidote) to people who use drugs and to first responders; drug checking kits to detect adulterants; and safe consumption facilities.  All of these interventions are evidence-based, reduce illness and death, and are extremely cost effective.

---

[2] Agonist treatments include methadone and partial agonists include buprenorphine.  These drugs fill the opioid receptors to prevent withdrawal and block other opioids from attaching to the opioid receptors at adequate medication levels.

**TREATMENT NECESSITY AND CAPACITY TO TREAT IN URBAN AREAS**

If a public health approach to the opioid crisis is to work, it is essential to ensure that treatment capacity meets treatment need. Although heavily populated central cities may have more treatment resources, they also have more people, which can put a strain on treatment capacity.  A recent analysis featured in the Huffington Post examined the availability of buprenorphine providers (doctors who actively prescribe and treat individuals with buprenorphine) showed a significant gap between need and capacity to provide this lifesaving and cost-saving treatment[xv].

It is not possible to calculate the treatment gap by city or county, but we are able to infer it based on gaps in state treatment provider data. For example, New York State has a very low treatment gap – for every 100,000 people, just 20 who need opioid use disorder treatment will not receive buprenorphine treatment based on the state's ability to provide it. On the other hand, Illinois has a gap that is much higher– 380 people who need treatment per 100,000 will not receive these essential services due to a lack of providers[xvi].

An inference can therefore be made regarding treatment capacity in large cities using New York State and New York City as a yardstick. The assumption we made based on treatment need and capacity is that a large city would need ~700 treatment slots per 100,000 individuals to be effective.  Most large cities do not have the capacity to treat all of those who need treatment – especially as the crisis escalates. (Table 1)

Data shows that Chicago has the lowest treatment capacity for buprenorphine treatment in the Midwest and is third lowest among cities nationally. In Illinois, the majority of African Americans live in Chicago. A low treatment capacity rate in urban cities like Chicago, makes these services less available to African Americans who need OUD treatment.[xvii] (Tables 1-2)

**Table 1: Major United States Cities and Corresponding Counties
by Buprenorphine Treatment Capacity, 2015[xviii]**

| Rank | City | County | County Population | Treatment Capacity (n) | Treatment Capacity (Rate/100,000) |
|------|------|--------|-------------------|------------------------|-----------------------------------|
| 1 | Philadelphia, PA | Philadelphia | 1,526,006 | 12,570 | 824 |
| 2 | New York, NY | Multiple | 8,175,133 | 63,840 | 781 |
| 3 | San Diego, CA | San Diego | 3,095,313 | 15,970 | 516 |
| 4 | Phoenix, AZ | Maricopa | 3,817,117 | 15,040 | 394 |
| 5 | San Jose, CA | Santa Clara | 1,781,642 | 6,630 | 372 |
| 6 | Los Angeles, CA | Los Angeles | 9,818,605 | 33,510 | 341 |
| 7 | Houston, TX | Harris | 4,092,459 | 12,780 | 312 |
| 8 | Chicago, IL | Cook | 5,194,675 | 15,360 | 296 |
| 9 | Dallas, TX | Dallas | 2,368,139 | 6,820 | 288 |
| 10 | San Antonio, TX | Bexar | 1,714,773 | 4,810 | 281 |

**Table 2: Major Midwestern Great Lakes Cities and Corresponding Counties
by Buprenorphine Treatment Capacity, 2015[xix]**

| Rank | City | County | County Population | Treatment Capacity (n) | Treatment Capacity (Rate/100,000) |
|------|------|--------|-------------------|------------------------|-----------------------------------|
| 1 | Columbus, OH | Franklin | 1,163,414 | 12,460 | 1,071 |
| 2 | Indianapolis, IN | Marion | 903,393 | 5,930 | 656 |
| 3 | Milwaukee, WI | Milwaukee | 947,735 | 6,220 | 656 |
| 4 | Cleveland, OH | Cuyahoga | 1,280,122 | 8,130 | 635 |
| 5 | Detroit, MI | Wayne | 1,820,584 | 10,940 | 601 |
| 6 | Minneapolis, MN | Hennepin | 1,152,425 | 5,540 | 481 |
| 7 | Chicago, IL | Cook | 5,194,675 | 15,360 | 296 |

**RACE IN THE NATIONAL PERSPECTIVE**

While the narrative around the opioid epidemic has been a story of white youth living outside central cities, this narrative neglects how people of color have been profoundly impacted by the epidemic.  For example, there are a number of states where African Americans are dying from opioid overdose at a rate higher than the general population.[3] Four of the top 10 states are located in the Midwest, including Wisconsin, Missouri, Illinois and Minnesota (Table 3). In Illinois the opioid overdose death rate for African Americans in 2015 was 11.6 per 100,000, compared to 10.4 for the general population. In some states, the African American opioid overdose death rate exceeds all other races, like in Missouri (14.8 per 100,000) and Wisconsin (21.9 per 100,000). Beyond the Midwest, in West Virginia the African American overdose rate was double that of whites, despite media coverage suggesting otherwise.

According to survey data[xx], OUDs occur less frequently among African Americans. Yet survey data of this nature may have limitations, especially people of color living in poverty and for stigmatized self-reported behaviors. But if we assume that the African American opioid use rate is lower than the rate among whites, then there is something else at play that is causing African Americans to experience such high death rates. One hypothesis is that many large cities do not have good treatment systems, or do not have treatment systems that can handle the capacity of need among potential patients. Treatment is a key component in preventing further injury and death. As African Americans with OUDs are likely to be in the lowest income group with less access to medical care overall, let alone addiction treatment services, it stands to reason that this lack of access could be a significant factor in the observed death rates for this group.

African Americans who live in poverty may face multiple barriers to accessing care – lack of insurance, transportation issues, childcare, among myriad other issues facing those living in racially concentrated areas of poverty often found in major metropolitan areas.  These issues are not confined to African Americans living in poverty – these same barriers to treatment can be issues for whites who live in poverty either in urban, suburban or rural areas. However, health disparities among African Americans are well documented and are a known contributor to lower life expectancies. Based on these issues and the escalating rise in overdoses in specific states, the Chicago Urban League's Research and Policy Center expects the number of African Americans dying from opioid overdoses to again rise once national data are updated for 2016.

---

[3] Many of these states have experienced significant rises in overdose deaths in 2016, but these data are not yet available for all states, nor are they available by race and ethnicity.

8

**Table 3: Top 10 States with the Highest Rate of Opioid Overdose Deaths among Whites, African
Americans and the General Population - 2015[xxi]**

| State | White | African American | General Population |
|---|---|---|---|
| **West Virginia[4]** | 36.2 | 55.5 | 36.0 |
| **District of Columbia** | NR | 22.8 | 14.5 |
| **Wisconsin** | 11.3 | 21.9 | 11.2 |
| **Ohio** | 27.7 | 15.2 | 24.7 |
| **Maryland** | 25.0 | 14.8 | 17.7 |
| **Missouri** | 11.9 | 14.8 | 11.7 |
| **Massachusetts** | 27.1 | 13.2 | 23.3 |
| **Michigan** | 14.7 | 12.4 | 13.6 |
| **Illinois** | 13.1 | 11.6 | 10.7 |
| **Minnesota** | 6.0 | 10.0 | 6.2 |
| ***United States*** | ***13.9*** | ***6.6*** | ***10.4*** |

---

[4] Text in red indicates a higher death rate among African Americans than among the general population in that state.

9

**RACE AND THE ILLINOIS EPIDEMIC**

The opioid overdose crisis in Illinois shows few signs of abating. In just three years, overdoses related to opioids increased by 82%. Illinois provides a clear example of just how hard African Americans have been hit by the opioid epidemic. Recent data from the Illinois Department of Public Health show that all opioid deaths (heroin and pain pills) in Illinois rose faster among African Americans than any other racial group from 2013 to 2016, more than doubling in just three years with a 132% increase (Table 4). Over the same time period, African American deaths from pain pills increased dramatically, by *nearly nine-fold*, compared to a three-fold increase in white fatalities (Table 5).

As of 2016, African Americans make up about 15% of Illinois's population, but account for nearly 1 out of 4 opioid overdose deaths in the state (Table 6). This disparity is missing from the current opioid narrative as discussion of African Americans who have died from overdose is significantly lacking. Various media outlets have reported on the "largely white opioid epidemic," or sought to answer, "why so many white American men are dying."[xxii]

**The issue here is not that white people aren't dying - they are and in record numbers, leaving families throughout the country devastated. The issue is that African Americans, who in some places are dying at rates *exceeding any other racial group*, are excluded from the conversation.** The "white" opioid epidemic is in truth no such thing. Black people around the country have been hit hard by this epidemic and will continue to suffer unless we recognize the full scope of the problem and advocate for evidence-based, public-health-focused solutions inclusive of all impacted people and communities.

**Table 4:  Illinois Fatal Overdoses from Any Opioid 2013-2016[xxiii]**

| Racial Group | 2013 | 2014 | 2015 | 2016 | % Change |
|---|---|---|---|---|---|
| White | 758 | 876 | 1029 | 1230 | 62% |
| African American | 198 | 229 | 235 | 459 | 132% |
| Other | 12 | 7 | 8 | 24 | 100% |
| Latino | 104 | 91 | 110 | 204 | 96% |
| Total | 1,072 | 1,203 | 1,382 | 1,946 | 82% |

**Table 5: Illinois Fatal Overdoses from Opioid Analgesics (Pills)[xxiv]**

| Racial Group | 2013 | 2014 | 2015 | 2016 | % Change |
|---|---|---|---|---|---|
| White | 286 | 374 | 491 | 804 | 181% |
| African American | 33 | 42 | 68 | 308 | 833% |
| Other | 4 | 5 | 3 | 19 | 375% |
| Latino | 21 | 20 | 27 | 135 | 543% |
| Total | 344 | 441 | 589 | 1,266 | 268% |

**Table 6:  African American Fatal Overdoses in Illinois as a % of All Overdoses 2013-2016**[xxv]

| 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|
| 18.5% | 19.0% | 17.0% | 23.6% |

**CHICAGO AS A CASE STUDY**

Chicago has experienced an increase in fatal opioid overdoses in a relatively small period of time – an increase of nearly 75% from 2015 to 2016 (Table 7). However, the opioid crisis in Chicago is truly an African American opioid crisis.  In 2016, the African American death rate from opioids in Chicago was 56% higher than the white death rate (39.3 vs 25.1%). Compared to U.S. data from 2015, which is the most currently available data from the CDC, the African American death rate in Chicago in 2016 was nearly four times higher than the national average in 2015 (Table 8)[xxvi].

Overdose death rates in Chicago involving heroin, fentanyl, and other opioids are highest in Black communities on the South and West sides, with Austin suffering the highest death rate of all community areas. Black people make up approximately 32% of the population in Chicago but account for nearly half (48.4%) of all opioid deaths (Table 9).

The rise of fentanyl-adulterated heroin plays a large role in Chicago's evolving crisis, much as it does in the rest of the United States. Fentanyl-related deaths represented nearly 58% of opioid deaths in 2016, more than three times fentanyl's share of deaths in 2015.[xxvii] The neighborhoods with the highest overdose death rate from fentanyl include East and West Garfield Park and North Lawndale, with Austin, Humboldt Park, Fuller Park and Englewood following just behind. All of these neighborhoods are racially concentrated areas of poverty on the South and West sides of Chicago.

**Table 7: Chicago Fatal Opioid Overdoses by Number, Rate per 100,000 and % Change 2015-2016[xxviii]**

| 2015 | | 2016 | | %Change |
|------|------|------|------|---------|
| # | R | # | Rate | 2015-16 |
| 426 | 15.5 | 741 | 26.7 | 73.9% |

Table 8: Chicago Opioid Death Rate by Race and US Total 2016

| Group | 2016 Rate |
|-------|-----------|
| African Americans | 39.3 |
| Whites | 25.1 |
| Latinos | 16.5 |
| US Rate 2015 | 10.4 |

**Table 9: Chicago Fatal Opioid Overdoses by Race 2015-2016[xxix]**

| Racial/Ethnic Group | 2016 | |
|---------------------|------|------|
| | # | % |
| African American | 357 | 48.4% |
| White | 251 | 34.1% |
| Latino | 123 | 16.7% |

**CONCLUSION: WHERE DO WE GO FROM HERE?**

A criminal justice system response to substance use has been the mainstay of drug policy and policing practices since the War on Drugs first came into being in the 1970s and was only heightened during increased enforcement efforts undertaken in the 1980s. Any effort to introduce a "kinder, gentler War on Drugs" is a preliminarily welcome start, but not all people and communities benefit from this change equally or equitably. Much of the movement toward embracing less punitive treatment and public health approaches to address substance abuse was born from the narrative surrounding the face of the new heroin user – one that is often young, white and suburban. These people and communities are absolutely being impacted in this epidemic, and should be recognized. But we must also be diligent in our efforts to recognize <u>all</u> people and communities impacted, particularly the Black people and communities that have not only borne the brunt of this epidemic for years, but have done so with relative silence from media and policymakers.

To ensure that we are equitably leveraging new treatment and public health resources across all populations and geographies in need of these services, the following guiding principles should be adopted when proposing and implementing policies and practices to address the opioid epidemic:

1. **Principle 1 – African American people, families and communities cannot be excluded from narratives told about the opioid epidemic, opioid overdose deaths or the needs of impacted individuals, families and communities**. There must be a deliberate and intentional effort to include these stories and experiences, highlighting not just commonalities with other groups, but also the set of characteristics or issues that make the opioid epidemic different for African American communities. It is through accurate depictions of a problem that policymakers will have the information they need to advance effective policy solutions.

2. **Principle 2 – The development and implementation of national and local public health policy and plans must include the participation of African American families, leaders and/or organizations through all phases of the planning process**. There must be a deliberate and intentional effort to include African American community members, community leaders and community organizations in the planning of national/local governmental and policy responses to the opioid epidemic. Experiences and issues unique to African American families and communities must be accounted for in the development of any programs, policies or initiatives designed to reduce opioid use, dependency and overdose. This will require grassroots efforts to identify and meaningfully connect with community members to engage in participatory research and decision-making processes. Governmental and policy planning often takes a top-down approach, but the lived experiences and preferences of impacted persons are crucial elements of creating sound, sustainable policy.

3. **Principle 3 – Public health and treatment interventions must be tailored to address the experiences and needs of the African American community.** Experiences and issues unique to African American families and communities must be accounted for in the development of any programs, interventions or initiatives designed to reduce opioid use, dependency and overdose.

Known social determinants of health, such as poverty, racism and discrimination, as well as environmental and community conditions, such as transportation and resource barriers, reduce service access and availability and discourage people from seeking help. Culturally, economically and geographically-tailored interventions ensure that educational materials, service locations and service models are developed in such a way to recognize the barriers, fears, needs and preferences of the community. Access to critical health and public health resources underpins much of the advocacy and planning efforts for people living in under-resourced neighborhoods. But there is also much work to be done to ensure that the resources and services delivered are reflective of, and responsive to, the people being served.

14

# CITATIONS

[i] Rose A. Rudd, Puja Seth, Felicita David, and Lawrence Scholl, "Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015," *Morbidity and Mortality Weekly Report* 65 (December 30, 2016):1445–1452.

[ii] Centers for Disease Control and Prevention, "Reported Law Enforcement Encounters Testing Positive for Fentanyl Increase Across US," last modified August 24, 2016, https://www.cdc.gov/drugoverdose/data/fentanyl-le-reports. html.

[iii] Centers for Disease Control, National Center for Health Statistics, "Provisional Counts of Drug Overdose Deaths,
as of 8/6/2017," https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[iv] Julie Netherland and Helena Hansen, "White Opioids: Pharmaceutical Race and the War on Drugs that Wasn't," *Biosocieties* 12, no. 2 (2017): 217 – 238.

[v] The President's Commission on Combatting Drug Addiction and the Opioid Crisis, "Final Report," November 1, 2017, https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf.

[vi] Ibid.

[vii] Federal Bureau of Investigation, Criminal Justice Information Services Division, "Crime in the United States 2016 – Table 21, Arrests by Race and Ethnicity, 2016," https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21.

[viii] Ibid.

[ix] http://chicagosmilliondollarblocks.com/

[x] United States Department of Justice, Civil Rights Division, "Investigation of the Chicago Police Department," January 13, 2017, https://www.justice.gov/opa/file/925846/download.

[xi] United States Department of Justice, Civil Rights Division, "Investigation of the Chicago Police Department," January 13, 2017, https://www.justice.gov/opa/file/925846/download.

[xii] Katharine Q. Seelye, "In Heroin Crisis, White Families Seek Gentler War on Drugs," *New York Times* (New York, NY), October 30, 2015, https://www.nytimes.com/2015/10/31/us/heroin-war-on-drugs-parents.html.

[xiii] Robert Hornick et al., "Effects of the National Youth Anti-Drug Media Campaign on Youths," *American Journal of Public Health* 98, no. 12 (2008): 2229-2236.

[xiv] World Health Organization, United Nations Office on Drugs and Crime, Joint United Nations Programme on HIV/AIDS, "Substitution maintenance therapy in the management of opioid dependence and HIV/AIDS prevention," 2004, http://www.who.int/substance_abuse/publications/en/PositionPaper_English.pdf.

[xv] Shane Shifflett, et al., "Not Enough Doctors Are Treating Heroin Addiction With A Life-Saving Drug," *Huffington Post*, December 30, 2015, http://projects.huffingtonpost.com/dying-to-be-free-heroin-treatment/opioid-abuse-outpace-treatment-capacity.

[xvi] Ibid.

[xvii] Christopher M. Jones, et al., "National and State Treatment Need and Capacity for Opioid Agonist Medication-Assisted Treatment," *American Journal of Public Health* 105, no. 8 (2015): e55-e63.

[xviii] Shane Shifflett, et al., "Not Enough Doctors Are Treating Heroin Addiction With A Life-Saving Drug," *Huffington Post*, December 30, 2015, http://projects.huffingtonpost.com/dying-to-be-free-heroin-treatment/opioid-abuse-outpace-treatment-capacity.

[xix] Ibid.

[xx] The President's Commission on Combatting Drug Addiction and the Opioid Crisis, "Final Report," November 1, 2017, https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf.

[xxi] The Henry J. Kaiser Family Foundation, "Opioid Overdose Deaths by Race and Ethnicity," https://www.kff.org/other/state-indicator/opioid-overdose-deaths-by-raceethnicity.

[xxii] Kevin McKenzie, "Largely White Opioid Epidemic Highlights Black Frustration," *U.S. News and World Report*, April 1, 2017, https://www.usnews.com/news/best-states/tennessee/articles/2017-04-01/largely-white-opioid-epidemic-highlights-black-frustration; Mike Mariani, "Why So Many White American Men Are Dying," *Newsweek*, December 23, 2015, http://www.newsweek.com/2016/01/08/big-pharma-heroin-white-american-mortality-rates-408354.html.

[xxiii] Illinois Department of Public Health, "Drug Overdose Deaths by Sex, Age Group, Race/Ethnicity and County, Illinois Residents, 2013-2016," November 2, 2017, http://www.dph.illinois.gov/sites/default/files/publications/Drug-Overdose-Deaths-November2017.pdf.

[xxiv] Ibid.

[xxv] Ibid.

[xxvi] Chicago Department of Public Health, "Epidemiology report: Increase in overdose deaths involving opioids – Chicago, 2015-2016," October 2017, https://www.cityofchicago.org/content/dam/city/depts/cdph/tobacco_alchohol_and_drug_abuse/2016ChicagoOpioidReport.pdf.

[xxvii] Chicago Department of Public Health, "Epidemiology report: Increase in overdose deaths involving opioids – Chicago, 2015-2016," October 2017, https://www.cityofchicago.org/content/dam/city/depts/cdph/tobacco_alchohol_and_drug_abuse/2016ChicagoOpioidReport.pdf.

[xxviii] Ibid.

[xxix] Ibid.