UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: PURDUE PHARMACEUTICALS L.P., *et al.*,<br><br>Debtors. | Chapter 11<br>No. 19-23649-RDD<br>(Jointly Administered) |
| BRYAN C. DUNAWAY., *et al.*,<br><br>Appellants,<br><br>-against-<br><br>PURDUE PHARMACEUTICALS L.P., *et al.*<br><br>Appellees. | Bankruptcy Appeals<br>No. 19 Civ. 10941 (CM)<br>No. 20 Civ. 03048 (CM)<br>(Jointly Administered)<br><br>Adv. Proc. No. 19-08289<br>(RDD) |

## DECISION AND ORDER AFFIRMING THE BANKRUPTCY COURT'S PRELIMINARTY INJUNCTIONS

McMahon, C.J.

Purdue Pharmaceutical, L.P. and certain of its affiliated entities and debtors (together, the "Debtors") filed for bankruptcy in this district on September 15, 2019. *In re Purdue Pharmaceuticals L.P., et al.*, No. 19-23649 (Bankr. S.D.N.Y.). At the time, the Debtors were facing over 2,600 governmental enforcement actions and private lawsuits in state and federal courts (the "Pending Actions"), each of which alleged that Purdue's manufacture, promotion, and sale of prescription painkillers contributed to the ongoing opioid crisis that has killed hundreds of thousands and left millions more struggling with addiction.

The federal actions against the Debtors are consolidated into a single multi-district litigation, *see In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 432 (N.D. Ohio 2019), while the state actions remain scattered across the country. There are also ongoing investigations by both law enforcement and regulatory agencies that have yet to culminate into either civil or criminal

actions, but may in the near future. The bankruptcy was designed to consolidate all of these

proceedings against the Debtors, as well as the claims against certain non-debtors, including

Purdue's former or current owners, directors, officers, and other associated entities (each a

"Related Party"; together, the "Related Parties"), so that the parties could work towards a global

settlement in a single forum.

Purdue Pharma, L.P., et al. v.

The instant appeal arises from the adversary proceeding *Purdue Pharma, L.P., et al. v.*

*Commonwealth of Massachusetts, et al.*, Adv. Pro. No. 19-08289 (the "Adversary Proceeding"),

which the Debtors filed in the Bankruptcy Court in order to temporarily halt the Pending Actions

against them and the Related Parties. The Debtors argued that the injunction was necessary to

allow Purdue's management and other stakeholders to focus on developing a confirmable plan of

reorganization that would include a reasonable settlement for all of the parties to the Pending

Actions. On November 6, 2019, the Bankruptcy Court, the Hon. Robert Drain, U.S.B.J., granted

the Debtors' motion for an order enjoining all of governmental and private plaintiffs from

continuing or commencing any judicial, administrative, or investigative actions, as well as any

other enforcement proceeding, against the Debtors or the non-debtor Related Parties. (A341-

347; the "Preliminary Injunction".)[1]

Appellants are five district attorneys from the state of Tennessee, and Baby Doe, an

infant born dependent on opioids, each of whom is a plaintiff in the lawsuit *Dunaway, et al. v.*

*Purdue Pharma L.P.*, No. CC1-2018-cv-6347 (the "*Dunaway* Action"), which is currently stayed

in the Circuit Court of Cumberland County, Tennessee, as a result of the Preliminary

Injunction. The *Dunaway* Action seeks damages under the Tennessee Drug Dealer Liability Act,

---

[1]    References to the record on appeal are designated "A__" when referring to the Appendix submitted by the
Appellants (Dkt. Nos. 13, 22) and "SA__" when referring to the Supplemental Appendix submitted by the
Appellees (Dkt. No. 24).

Tenn. Code Ann. § 29-38-101, *et seq.* (the "TDDLA") from, *inter alia*, Purdue and Purdue's

former president and co-chairman, non-debtor Dr. Richard Sackler, whose family has controlled

a majority of the company's stock for generations.

Appellants ask this Court to vacate the injunction as to their claims solely against Dr.

Sackler in the *Dunaway* Action, on the grounds that (1) the Bankruptcy Court lacks subject

matter jurisdiction over a government enforcement action between state officials and  a third

party non-debtor, and, (2) even if the court did enjoy such authority, the record evidence before

Judge Drain was insufficient to warrant granting Debtors' motion for a preliminary injunction.

As a matter of equity, the Appellants implore this Court to reverse the unprecedented protections

that have been afforded to the Related Parties in the form of injunctive relief, claiming that the

bankruptcy court has effectively extended immunity to individuals responsible for a nationwide

crisis of addiction and death.

For the reasons that follow, the Bankruptcy Court's order is AFFIRMED.

## BACKGROUND

### A.  The TDDLA and the *Dunaway* Action

The TDDLA provides a right of action for damages against "[any] person who knowingly

participates in the illegal drug market within [the] state [of Tennessee]."  Tenn. Code Ann. § 29-

38-105(a). Persons or entities found liable under the TDDLA may bring a claim for contribution

"against another person subject to liability under this chapter." Tenn. Code Ann. § 29-38-

112.  However, the statute forbids third parties from paying damages awarded under the TDDLA

"on behalf of an insured under a contract of insurance or indemnification." Tenn. Code Ann. §

29-38-108.  The goal of the statute is "to shift, to the extent possible, the cost of the damage

caused by the existence of the illegal drug market in a community to those who illegally profit

3

from that market." Tenn. Code Ann. § 29-38-102. The complaint in the *Dunaway* Action alleges that Purdue and Dr. Sackler were two such profiteers.

Appellants added Dr. Sackler as a defendant in the *Dunaway* Action on April 1, 2019 (*see* Adv. Dkt. 43 Ex. 3, Second Amended Complaint) and moved for summary judgment on the question of his liability on August 6, 2019, (*see* A734). In their memorandum of law in support of the summary judgment motion, Appellants argue that, by failing to respond to written requests for admission, Dr. Sackler is deemed to have admitted that he "directed Purdue to distribute opioids unlawfully in Tennessee," that "he personally participated in the illegal drug market in Tennessee from 2010 to the present," and that he did so knowingly. (A748); *see also Tenn. Dep't of Human Servs. v. Barbee*, 714 S.W.2d 263, 266 (Tenn. 1986) (citing Tenn. R. Civ. P. 36.01).

The *Dunaway* Plaintiffs did not seek summary judgment on the question of damages owed by Dr. Sackler, nor did they move for summary judgment against any other Debtor or non-debtor connected to Purdue.

**B. The Debtors initiate the adversary proceeding and seek injunctive relief based on their progress towards a global settlement.**

The Debtors declared bankruptcy on September 15, 2019, almost six months after Sackler was sued in the Tennessee state court. Three days later, they filed the Adversary Proceeding, naming all of the governmental actors and private plaintiffs that were then seeking redress against any of the Debtors or Related Parties as defendants in the Pending Actions. (A161.) The Debtors argued that continued prosecution, and Purdue's continued defense, of the Pending Actions "[would] eviscerate the fundamental goals of these bankruptcy cases" and would lead to "the value of the [Debtors'] estates . . . be[ing] rapidly eroded by the staggering direct and indirect costs of litigation." (A187.)

4

The Debtors sought a 270-day injunction of the Pending Actions, arguing that the

Bankruptcy Court had the authority under 11 U.S.C. § 105(a) to "enjoin suits that might impede

the reorganization process." (A198.) According to the Debtors, that meant the Bankruptcy Court

had the authority to, and should, enjoin the claims against the Debtors as well as the Related

Parties, because claims against those non-debtors "are based on conduct substantially identical

to, and inextricably intertwined with, that alleged to have been engaged in by the Debtors."

(A203.) This overlap justified injunctive relief to encourage the settlement negotiations, so that

the Debtors might avoid the "material risk" presented by the Related Party Actions "that there

would be findings of law or fact with respect to the Related Party Claims that would, at a

minimum, create an adverse record against the Debtors." (*Id.*)

As evidence of their progress in negotiations prior to their Motion, the Debtors provided

the Bankruptcy Court with a term sheet outlining a proposed settlement between themselves, the

Plaintiffs' Executive Committee appointed in the multidistrict litigation, the state attorneys

general, and other territorial law enforcement officials. (A188; *see also* SA003-014; Bkr. Dkt.

257, hereinafter, the "Settlement Structure".) The Settlement Structure was, and is, an

unexecuted term sheet, which proposes, *inter alia*, that "100% of the assets or equity of Purdue –

which together with its subsidiaries constitutes 100% of Purdue's U.S. pharmaceutical business –

will be placed under a trust . . . for the benefit of the claimants and the U.S. public." (SA006.)

Under the Settlement Structure, in exchange for a full release for Debtors and Related parties

alike, the Shareholder Parties (a group comprising the Debtors and the Official Committee of

Unsecured Creditors, but not Dr. Sackler) would make a contribution of $3 billion to a settlement

fund over seven years. (SA011.) To finance their contribution, the Shareholder Parties would

promise to sell certain divisions of Purdue that operate abroad, which are owned, directly or

indirectly, by members of the Sackler Family. (SA014; the "IACs.") For that reason, the

Settlement Structure, if executed, would prohibit certain members of the Sackler Family,

including Dr. Sackler, from "tak[ing] any action with respect to any material amount of his [or]

her . . . property . . . with the intent or material effect of frustrating enforcement of any potential

judgment of this Court." (SA014.)

Appellants were among the parties in the Pending Actions that were not amenable to

settling their case pursuant to the Settlement Structure.

No parties, including the Appellants, sought discovery in connection with the Debtors'

motion, although Debtors made their restructuring and financial advisors available for deposition

to attest to the effects that the volume of litigation was having on them, and the ways in which

that deluge threatened the Debtors' ability to comply with the terms of the Settlement Structure.

(*See* Adv. Dkt. Nos. 5, 6, 7.) They also offered documentary evidence of the potential impact

that litigation against Dr. Sackler would have on the *res* of the bankruptcy; one such item of

evidence was the Purdue Pharmaceutical Limited Partnership Agreement ("LPA"), which

provides that Purdue shall indemnify current and former directors and officers of the company

"so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that

the Indmenitee is *or was* . . . a director, officer or Agent of [the Purdue entities]." (SA630-31

(emphasis added).) The Debtors also made additional documents related to their past litigation

expenses available to the Appellants (and all other claimants) through an electronic data room.

(*See* Adv. Dkt. No. 14.) The Debtors relied on this record to estimate that their legal fees in the

Pending Actions would exceed one hundred million dollars for the calendar year 2019 if the

injunction did not issue. (SA332-33.)

### C. The Bankruptcy Court enjoins the Pending Actions.

The Bankruptcy Court held a full-day hearing on the Debtors' motion on October 11, 2019, after which it granted the Debtors' motion. (A366.)  In so ruling, Judge Drain made two findings now on appeal: the court could exercise jurisdiction over the Related Party Actions, and there was sufficient evidence to support issuance of the Preliminary Injunction.

Bankruptcy Courts have original jurisdiction over "all civil proceedings arising under title 11, or arising in and related to cases under title 11." 28 U.S.C. § 1334(b).  At the hearing, Judge Drain noted that a court grants "extraordinary relief" when it applies Section 1334 statute to enjoin litigation between third parties. (A626.)  Appellants argued that the bankruptcy court lacked jurisdiction to grant such extraordinary relief, because the claims against Dr. Sackler in the *Dunaway* Action neither "arise in" nor are "related to" the Debtors' bankruptcy, for several reasons: first, the claims were filed prior to the bankruptcy; second, they are creatures of a specific state law creating individual liability for drug dealers; and third they seek Dr. Sackler's personal assets, which are not essential to the Debtors' reorganization.

Judge Drain disagreed. Citing this Court's decision in *In re Fairpoint Communications, Inc.*, 452 B.R. 21 (S.D.N.Y. 2011) and the Second Circuit's ruling in *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012), he reiterated that any claim whose "outcome might have any conceivable effect on the bankruptcy estate" was "related to" the bankruptcy under Section 1334. (A628 (quoting *Quigley*, 676 F.3d at 57).)  Because Judge Drain found that the Debtors and non-Debtors shared an "identity of factual interest [if] not necessarily legal interest" – referring to the fact that the Appellants would rely on the same facts to prove the claims against Dr. Sackler as they would to prove Purdue's liability – he concluded that civil actions against the Sacklers, if pursued to judgment, could have a variety of "conceivable effects" on the Debtors' estate.

7

(A626-27.)[2]  For example, the court noted that the Appellants could not try a case against the

Related Parties without involving Purdue in discovery and related matters, which would impose

costs on the Debtors estate. (A477.) Judge Drain also considered the possibility that findings

made in any case against the Related Parties would have collateral estoppel effects on the cases

against the Debtors. (A531-32.)

    The Bankruptcy Court then ruled that the Debtors had satisfied the requirements for a

preliminary injunction under Section 105(a) and Rule 7065, in light of his conclusion that "the

continued pursuit of litigation [against the Debtors or the Related Parties, including Dr. Sackler],

even if only to establish liability against the Debtors . . . would materially and adversely affect

the Debtors' Chapter 11 process and estates." (A620.)  Injunctions under rule 7065 require a

similar showing to that under Federal Rule of Civil Procedure 65: irreparable harm to the

Debtors if the injunction does not issue, a likelihood that the injunction will aid the

reorganization efforts, a balance of hardships favoring the party seeking relief, and benefits to the

public interest. *See In re Lyondell Chem. Co.*, 402 B.R. 571, 587-88 (Bankr. S.D.N.Y. 2009).

    The court found that the Debtors had shown that the injunction would avoid irreparable

harm and increase the likelihood of a successful reorganization based on the argument that

allowing individual suits to proceed against either the Debtors or the Related parties carried the

potential of adding new creditors to the priority order of claims against the *res*, which would in

turn complicate and quite possibly obstruct the Debtors' attempts to resolve the disputes between

the estate and its current crop of creditors. (A626.)  In so ruling, Judge Drain overruled

objections, including those of the Appellants, that the reorganization process would preclude a

public airing of facts related to the opioid crisis and might result in a full release for all those

---

[2]    Judge Drain did not address "arising in" jurisdiction at the October or November hearings on the Preliminary
Injunction Motion.

involved, including Dr. Sackler.  He concluded that these concerns were unwarranted, since the

Settlement Structure, if executed, would require the Debtors to make certain disclosures to the

beneficiaries of the settlement fund. (A622-23.)  That said, while the Settlement Structure

specifically states that "further diligence and agreement is require with respect to any entities that

are controlled, or actively management, or 20% or more owned, by [the Sackler Family]," it does

not as presently structured contemplate any personal financial disclosures by Dr. Sackler or his

relatives. (SA011.) That may, of course, change – or it may not.

Furthermore, in the Bankruptcy Court's view, the balance of hardships and the public

interest factors also favored the Debtors, because the broad injunction was necessary to preserve

"any reasonable prospect of success" for a future reorganization plan. (A622.) Judge Drain's

rationale for protecting the Related Parties from further litigation stemmed from the fact that the

Settlement Structure depended on the sale of Purdue's overseas affiliates (the IACs), which were

not owned by the Debtors, but the Sackler Family. (A452-53; SA014.)  Therefore, he enjoined

all claims against Dr. Sackler and the other Related Parties, each of whom had consented to the

court's jurisdiction, because continued litigation against those non-debtors might reach the assets

invested in the IACs, and threaten the funding stream of the Settlement Structure.  (A631.)

On November 6, 2011, the bankruptcy court entered the first iteration of the Preliminary

Injunction, which ran until April 8, 2020. (A341.)  At the hearing preceding the final order,

Judge Drain rejected the suggestion by Appellants that the Preliminary Injunction amounted to a

full release for the individual Related Parties, including Sacklers.  To the contrary, he restated

that "the purpose of this injunction is to enable all of the states and all of the other claimants . . .

to perform due diligence to decide whether a plan [of reorganization] . . . should consider a

contribution by third parties." (A716.)

**D.  The Bankruptcy Court extends the injunction.**

The *Dunaway* Plaintiffs filed a timely appeal of the November 6 order.  (Dkt, No. 1.)  No

party requested that the appeal be expedited, and the Court entered a briefing schedule that

would have had the appeal fully briefed by March 27, 2020. (Dkt. No. 12.)  On March 4, 2020,

before the Debtors had filed their opposition brief, they moved for a 6-month extension of the

injunction. (A997.)

At a March 18, 2020 hearing on the extension motion, Judge Drain elaborated further

bases for the exercise of jurisdiction that were not addressed during the October and November

hearings. First, he opined that, in addition to satisfying the "related to" prong of section 1334, the

Pending Actions also fell within the court's "arising in" jurisdiction,

> "[which] includes claims that are not based on any right expressly created by [chapter 11]
> but nevertheless would have no existence outside of the bankruptcy.  The injunction here
> of course [is] based on [Section] 105 which would aris[e] under jurisdiction, but also, the
> underlying basis for the injunction primarily is to enable there to be time to do due
> diligence on and finally negotiate the proposed settlement with the related parties
> including Richard Sackler and to see whether, if that particular settlement cannot be
> negotiated, some other settlement under which they would be similarly contributing
> meaningful amounts under a plan could be negotiated and approved as part of a Chapter
> 11 plan . . . ."

(A1178-79.)

Second, returning to "related to" jurisdiction, the bankruptcy court noted a specific

"conceivable effect" that the continued prosecution of the *Dunaway* Action might have on the

Debtors, even if the Appellants only pursued the case as to Dr. Sackler: because the allegations

against Dr. Sackler were "premised upon his role at Purdue" and his role in causing Purdue to act

unlawfully, Judge Drain reasoned that "if [Dr. Sackler] were found to be liable . . . he would

have a right of action for contribution" against the Debtors' estate. (A1179-80.)

10

Finally, the Bankruptcy Court revisited the preliminary injunction factors, finding that the Debtors had once again demonstrated: (i) a good prospect of a successful reorganization, even in the "early stages" of the Chapter 11 proceeding, (A1182); (ii) that the Debtors would necessarily have to be involved in defending the *Dunaway* action, even if only the claims against Dr. Sackler were permitted to proceed, which would "disastrously [divert]" any attempts at reorganization, (A1182-83); (iii) that the balance of hardships tipped decidedly in favor of staying the *Dunaway* action along with all the other actions, since allowing *Dunaway* to go forward would harm not just the Debtors but their creditors as well; and (iv) the public interest in transparency could be served by the disclosures promised in the Settlement Structure just as easily as it could through a judgment against Dr. Sackler in Tennessee Circuit Court, (A1184).

After the extension hearing, the Appellants asked for an extension of the deadline to file their reply brief in connection with their appeal of the November 6 order, which the Court granted on March 30, 2020. (Dkt. No. 17.) That same day, the Bankruptcy Court granted the Debtors' extension motion, entering the operative Preliminary Injunction to run through October 5, 2020. (A1065-90.) The Appellants' appealed Judge Drain's March 30 order on substantially similar grounds as those set forth in their first appeal, *see Dunaway et al. v. Purdue Pharma. et al.*, No. 20-03048 (A1044), and the matters were consolidated before this Court (Dkt. No. 19.)

### ISSUES PRESENTED ON APPEAL

Appellants raised four grounds for vacating the Preliminary Injunction on appeal (*see* Dkt. 22, Appellants' Principal Brief ("Appellant's Brief" or "AB") at 3.):

*First*, that the Bankruptcy Court applied an overly expansive version of the "conceivable effects" test to find that the *Dunaway* Action claims against non-debtors were "related to" the bankruptcy;

*Second*, that there was insufficient evidence as of the date of the Preliminary Injunction for the Bankruptcy Court to find that the claims in the *Dunaway* Action against Dr. Sackler were either "related to" or "arising in" the bankruptcy;

*Third*, that the Debtors failed to satisfy their burden to establish the need for a preliminary injunction of the Related Party actions, including the *Dunaway* Action, under Federal Rule of Civil Procedure 65 and Federal Rule of Bankruptcy Procedure 7065; and

*Fourth*, that the Bankruptcy Court's decision to enjoin governmental actors exercising their police powers against non-debtors was inappropriate in light of the fact that such actions are excluded from the automatic stay provisions of the Bankruptcy Code set out in 11 U.S.C. § 362(b)(4).

In response to the Appellants' jurisdictional arguments, the Debtors argue that the Bankruptcy Court correctly held that jurisdiction was proper under 28 U.S.C. § 1334, because all of the facts underlying the *Dunaway* Action necessarily implicated the Debtors (on whose behalf Dr. Sackler was alleged acting), such that a finding of liability against Dr. Sackler would inevitably give rise to indemnification and contribution claims against the Debtors' estate. (*See* Dkt. 22, Brief of the Appellees ("Debtors' Brief" or "DB") at 25.) As for the preliminary injunction, the Debtors contend that Judge Drain did not abuse his discretion by concluding that continued proceedings against Dr. Sackler and other non-debtors could seriously threaten the global settlement, an essential ingredient to any confirmable reorganization plan. Finally, the Debtors argue that the fact that governmental actors exercising police powers are exempt from the automatic stay provision is irrelevant, because the injunction in this case imposes a discretionary stay that does not rely for its force on the automatic stay.

## STANDARDS OF REVIEW

On an appeal from the Bankruptcy Court, this court reviews conclusions of law *de novo*,

*see Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 152 (2d Cir. 2016)

(citing *In re Petrie Retail, Inc.*, 304 F.3d 223, 228 (2d Cir. 2002), while scrutinizing findings of

fact for clear error, *In re Republic Airways Holdings Inc.*, 582 B.R. 278, 281 (S.D.N.Y. 2018)

(citing *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000). A finding of fact is

clearly erroneous only if this Court is "left with the definite and firm conviction that a mistake

has been committed." *Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros. 3 Holdings*

*Inc.)*, 855 F.3d 459, 469 (2d Cir. 2017). Mixed questions of law and fact are generally subject to

*de novo* review, although the standard applied "depends . . . on whether answering it entails

primarily legal or factual work." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v.*

*Vill. at Lakeridge, LLC*, 200 U.S. 218, 138 S.Ct. 960, 962, 200 L.Ed.2d 218 (2018).  A

bankruptcy court's determination of its subject matter jurisdiction is a conclusion of law subject

to *de novo* review. *Elliot*, 829 F.3d at 152.

A bankruptcy court's decision to grant a preliminary injunction is reviewed for abuse of

discretion. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 206 (2d Cir. 2014).  The

bankruptcy court abuses its discretion "when its decision rests on an error of law or a clearly

erroneous factual finding, or when its decision cannot be located within the range of permissible

decisions." *Id.* (quoting *WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 278 (2d Cir.2012).

## DISCUSSION

**I.     The Bankruptcy Court Has Subject Matter Jurisdiction Over the Related Party
        Actions.**

Appellants do not dispute the Bankruptcy Court's authority to enjoin the claims against

the Debtors in the *Dunaway* Action. Rather, this appeal only seeks to define "practical limits" on

13

the court's ability to shelter non-debtors, and to establish that the Preliminary Injunction exceeds those limits when applied to the claims against Dr. Sackler in the *Dunaway* Action.

Title 28 U.S.C. § 1334 provides for original jurisdiction in the district courts for "all cases under title 11" and "all civil proceedings arising under title 11, or arising in or related to cases under title 11." Under 28 U.S.C. § 157(a), district courts may refer all cases or proceedings over which they have jurisdiction under 28 U.S.C. § 1334(a) or (b) to the bankruptcy courts. The Southern District of New York refers all cases arising under Title 11 to the bankruptcy court in this district. *See, e.g.*, *In re Fairpoint Commc'ns, Inc.*, 452 B.R. 21, 27 (S.D.N.Y. 2011).

The Supreme Court has instructed lower federal courts to construe the jurisdictional grants in Sections 1334 and 157 broadly, recognizing that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.3d 984, 994 (3d Cir. 1984).

I agree with Judge Drain that the Appellants' claims against Dr. Sackler fall within this broad grant of jurisdiction. However, they do so only insofar as they are "related to" the Chapter 11 proceeding; they do not "arise in" the bankruptcy.

### a. The Sackler Claims are "related to" the Bankruptcy Proceeding.

A bankruptcy court has "related to" jurisdiction over every case where "the action's outcome might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)). "If that question is answered affirmatively, the litigation falls within the 'related to' jurisdiction of the bankruptcy court." *In re Cuyahoga Equip. Corp.*, 980

14

F.2d 110, 114 (2d Cir. 1992). "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *SPV*, 882 F.3d at 340 (quoting *Celotex*, 514 U.S. at 308 n.6).

This construction of "related to" jurisdiction, which offers broad protection to both debtors and third parties, is consistent with the provisions of the Bankruptcy Code that give bankruptcy courts the power to issue any it deems orders "necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105. For example, in *Celotex Corp. v. Edwards,* 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) the Supreme Court held that a bankruptcy court had jurisdiction under Section 105 to enjoin derivative claims against a third party non-debtor who had made a loan to a debtor, finding such claims were "related to" the bankruptcy because a judgment against the third party would have given rise to a claim on the debtor's collateral, thus impacting the *res* of the bankruptcy proceeding. *Id.*

Yet cases "related to" the bankruptcy are not limited to the facts of *Celotex.* As the Second Circuit later explained, there is no requirement "that an action must both directly affect the estate *and* be derivative of the debtor's rights and liabilities for bankruptcy jurisdiction over the action to exist." *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012). Rather, "the touchstone for bankruptcy jurisdiction remains whether its outcome might have any conceivable effect on the bankruptcy estate," *i.e.*, whether one possible result of the suit "will be the removal of assets from the bankruptcy estate," *id.* at 57-58 (internal quotation marks and citations omitted).

The Bankruptcy Court was correct to conclude that Appellants' claims against Dr. Sackler are "related to" the bankruptcy proceeding, for two reasons.

i. The TDDLA claims against Dr. Sackler are highly interconnected with the claims against Purdue.

"The existence of strong interconnections between the third party action and the bankruptcy" has frequently served as the basis for "related to" jurisdiction. *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003) (listing cases). For instance, after telecommunications giant WorldCom filed for bankruptcy, a number of class actions sprung up suing WorldCom's executives, underwriters, directors, accountants, and analysts for their part in the company's fraudulent bookkeeping scheme. *Id.* at 312-13. The director and underwriter defendants sought a stay of those third-party actions, arguing that the claims against them had a "conceivable effect" on the debtors' estate, since a finding of liability against them required "a finding that WorldCom engaged in wrongful conduct." *Id.* at 321. Furthermore, they argued that a finding of liability would inevitably result in a claim of contribution against the bankruptcy estate. The court agreed and found that the third party litigation was subject to the jurisdiction of the bankruptcy court, noting that "the conduct of WorldCom and these Defendants was indisputable intertwined," and, therefore, "the theories of liability pressed by [the third party plantiffs] are necessarily interconnected with these Defendants' rights to contribution." *Id.*

The Second Circuit recently reaffirmed this principle in *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018), when it held that the Bankruptcy Court presiding over the Madoff Investments Chapter 11 proceeding had the power to stay a state court action against financial service providers who allegedly aided and abetted the Bernie Madoff Ponzi scheme. The ruling in *SPV* teaches that when one tortfeasor files for bankruptcy, any action against their co-tortfeasors for the same conduct falls within the bankruptcy court's "related to" jurisdiction, since a finding of joint and several liability against the whole group could impact the *res* of the insolvent party's estate. *Id.* at 342. That is because a trial on harms alleged to have been caused

16

in whole or in part by the debtor is "related to" the bankruptcy, whether or not they are named as

a defendant, because a judgment implicating the debtor's conduct could conceivably "alter the

debtor's rights, liability, options, or freedom of action." *SPV*, 882 F.3d at 34. Therefore, "related

to" jurisdiction may extend to litigation against third party non-debtors, because a plaintiff suing

non-debtor whose joint tortfeasor has filed for bankruptcy "can only proceed on [its] claims if it

establishes that the [debtor's misconduct] occurred." *Id.*

     *SPV* and *Worldcom* support the Bankruptcy Court's jurisdiction over the *Dunaway*

Action, because the complaint in *Dunaway* accuses Dr. Sackler and Purdue of interrelated

conduct that contributed to the same harms.  Thus, allowing the Appellants to proceed against

Purdue's former president and co-chairman could "conceivably affect" the *res* of the Debtors'

estate, because the individual case is likely to raise the issue of the corporate entity's liability,

even if only indirectly.

     Appellants dispute the similarities between this case and the situation presented in *SPV*,

where the third party's liability as a co-conspirator depended on a finding of liability against the

debtors, who were the primary wrongdoers. (AB at 18.)  While it is true that Purdue's liability

under the TDDLA is not a necessary element of Appellants' case against Dr. Sackler, that

distinction does not shield the Debtors' estate from the consequences of a finding of liability

against Dr. Sackler.  Purdue's liability as a corporate entity, to the extent it can be proven, must

be proven through the acts of its officers and directors.  *See, e.g.*, *In re Bennett Funding Grp.,

Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) ("[T]he fundamental principle of agency [is] that the

misconduct of management within the scope of their employment will normally be imputed to

the corporation.") (quoting *Wight v. Bankamerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000)).

Therefore, a finding of liability against Dr. Sackler arising from his work on behalf of Purdue is equivalent to finding that Purdue itself is liable under the TDDLA.

Furthermore, unlike the plaintiffs in *SPV* and *Worldcom*, who did not name the bankrupt entity in their complaints because they filed after those companies had petitioned for Chapter 11 protection, the Appellants here filed suit prior to the bankruptcy and made detailed (and virtually Identical) allegations against both Dr. Sackler and Purdue. (SA566-94.) As a result, Judge Drain had before him a  concrete record (not just hypothetical surmise), demonstrating that the Appellants would rely on the same facts to establish the liability of both parties.  For example, the *Dunaway* plaintiffs alleged that:

- "Richard Sackler pushed Purdue to market and promote OxyContin . . . regardless of the consequences and regardless of what he and Purdue actually knew about the risks and dangers of the product," (SA410 ¶ 154);

- "Richard Sackler was personally involved in pushing Purdue to engage in misconduct," (SA411 ¶ 160);

- "Richard Sackler knew and intended that Purdue sales representative in Tennessee spread misinformation concerning opioids and encourage prescribing practices that they knew would result in addiction, abuse, and diversion on a wide scale," (SA413 ¶ 164);

In other words, there is no way for the Appellants to pursue the allegations against Dr. Sackler without implicating Purdue, and vice versa.

In their papers submitted to the Bankruptcy Court in connection with the Preliminary Injunction Motion, the Appellants argued that the Debtors needed to show "identity of interests" between Purdue and Dr. Sackler, in addition to the similarity of the factual allegations, in order to for the Bankruptcy Court to find that their liabilities were "highly interconnected." Judge Drain made quick work of this argument, pointing out that "nothing in the jurisdictional caselaw . . . talking about an identity of interest . . . [i]t talks about a conceivable effect." (A1166.)  The

Appellants conceded the point at the March hearing, and, in so doing, admitted that no further evidence beyond the *Dunaway* complaint is necessary to find that Dr. Sackler's official acts as president and co-chairman of the board are deeply connected with, if not entirely identical to, Purdue's alleged misconduct.

At core, the *Dunaway* Action – like so many other cases brought against the Debtors and the Sackler family – rests on the theory that Purdue and its employees committed misconduct at the direction of Dr. Sackler and others who controlled the corporation and its actions.  It follows that Purdue's conduct and related liability "will remain at the heart" of any further litigation against Dr. Sackler. *SPV*, 882 F.3d at 342 (quoting *Worldcom*, 293 B.R. at 321).

Therefore, the claims against Dr. Sackler are "related to" the bankruptcy proceeding.

ii.  The *Dunaway* Action could result in claims of indemnification or contribution against the Debtors' estate.

The second reason why the Bankruptcy Court was correct to exercise its "related to" jurisdiction over the claims against Dr. Sackler in the *Dunaway* Action flows from the first: because the claims against Dr. Sackler and Purdue arise from their interrelated conduct, it is at the very least conceivable that a proceeding against Dr. Sackler could result in his asserting a claim for contribution or indemnification against Purdue – which is to say, against the Debtors' estate.

"Where a third party claim may give rise to a potential indemnification or contribution claim against the estate, the third party claim will have a conceivable effect on the estate, and accordingly, the Court has the jurisdiction to enjoin it." *In re SunEdison, Inc.*, 576 B.R. 453, 462–63 (Bankr. S.D.N.Y. 2017) (collecting cases).  Such a claim arising from third party litigation need not be certain to succeed in order for the bankruptcy court to exercise jurisdiction over the related case; "contingent outcomes can satisfy the 'conceivable effects' test, so long as

19

there is a *possibility* of an effect on the estate." *SPV*, 882 F.3d at 340 (emphasis in original) (quoting *N.Y. Comm. Bank v. Pullo*, No. 12-02052 (BRL), 2013 WL 494050, at *3 (Bankr. S.D.N.Y. Feb. 7, 2013)).

### 1.  Contribution

Appellants admit that even a limited lifting of the stay in the *Dunaway* Action could result in the entry of summary judgment against Dr. Sackler, which would give rise to a claim for contribution  against the Debtors' estate.  As they must: Purdue is both a Debtor and a defendant in the *Dunaway* Action, and any "person subject to liability under [the TDDLA] has a right of action against another person subject to liability under this chapter." Tenn. Code Ann. § 29-38-112.

Appellants argue that the fact of Dr. Sackler's statutory right to proceed against Purdue if he is found liable does not establish that the *Dunaway* Action is "related to" the bankruptcy, because Dr. Sackler could not bring his contribution claim "in the [*Dunaway*] action" as long as that action "is stayed as to all Debtors." (AB at 29 n.21.)  But the stay of that particular case does not abrogate Dr. Sackler's statutory right to contribution – which could be brought in the original action as a cross claim or in "a separate action." Tenn. Code Ann. § 29-38-112.  And it is Dr. Sackler's right to assert a claim for contribution – not whether he can bring his claim while the *Dunaway* action is stayed – that impacts the Debtors' estate, which would be chargeable with any successful claim. To suggest that a judgment against Dr. Sackler in *Dunaway* Action might not have a "conceivable affect" on the bankruptcy makes absolutely no sense.

2.  Indemnification

Because a claim for contribution is definitely permitted under the statute, we could stop right here. However, Dr. Sackler might also be able to bring an indemnification claim against the estate as a result of the *Dunaway* Action.

The Debtors argue that an indemnification action from Dr. Sackler is a conceivable effect under the indemnification provision applicable to executives and former executives of set forth in the LPA, which provides that Purdue shall indemnify such persons "so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemenitee is *or was . . . a director, officer or Agent of [the Purdue entities]*." (SA630-31 (emphasis added).) Those indemnification provisions are governed by Delaware law, which interprets "by reason of the fact" indemnity clauses to cover "all actions against an officer or director for wrongdoing that he committed in his official capacity, and for all misconduct that allegedly occurred in the course of performance his day-to-day managerial duties." *Suk Joon Ryu v. Hope Bancorp, Inc.*, No. 18-cv-236 (JSR), 2018 WL 1989591, at *8 (S.D.N.Y. Apr. 26, 2018), *appeal dismissed,* No. 18-1614, 2018 WL 6205526 (2d Cir. Sept. 4, 2018) (citations and quotation marks omitted).

It cannot be seriously disputed that the *Dunaway* Action seeks redress for the acts Dr. Sackler allegedly took in his official position to fuel the opioid crisis; therefore, it is conceivable that the *Dunaway* Action would give rise to a colorable indemnification claim under the LPA.[3]

Appellants contend that Dr. Sackler's purported right to indemnification cannot support a finding of "related to" jurisdiction, because: (i) the Debtors have not presented evidence establishing that Dr. Sackler has a right to indemnification against Purdue; (ii) the TDDLA bars liable parties from asserting indemnification claims against insurers or third parties, *see* Tenn.

---

[3]    In addition, there may be common-law rights to indemnification available in this jurisdiction. *See, e.g.*, *Perkins Eastman Architects, P.V. v. Thor Eng'rs, P.A.*, 769 F. Supp. 2d 322, 329-30 (S.D.N.Y. 2011).

Code Ann. § 29-38-108; and (iii) any claim for indemnification would be subject to equitable subordination in the claims process.

Each of those arguments ignores the low bar that the potential for an indemnification claim must meet in order to create "related to" jurisdiction over third party litigation in this Circuit.

Appellants ask this Court to apply the "related to" test adopted by the Third Circuit in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), which defines a suit "related to" the bankruptcy as one that "would affect the bankruptcy *without the intervention of another lawsuit*." *Id.* at 227 (emphasis added) (quoting *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002). The Court in *Combustion Engineering* vacated an injunction applicable to an action that the debtors claimed could give rise to a claim of indemnification, noting that an "extensive record" regarding the respective parties' insurance policies would have been necessary to enjoin such a suit, as well as "additional evidence of automatic liability against the debtor." *Id.* at 232-33.

Although the standard for finding "related to" jurisdiction set out in *Combustion Engineering* may be a wise policy, it is not the law in the Second Circuit. Courts in this Circuit have embraced neither an elevated evidentiary standard nor proof of "automatic liability" as prerequisites for the bankruptcy court's exercise of "related to" jurisdiction. As the Court of Appeals made clear in *SPV*, when deciding whether potentially time-barred claims could have a conceivable effect on the debtors' estate, even unsuccessful claims, or those raised in subsequent, untimely, and frivolous lawsuits can "result in the estate incurring costs," which directly impacts the *res* of the bankruptcy. *SPV*, 882 F.3d at 341. That the claims at issue in *SPV* do not meet the *Combustion Engineering* standard for "related to" jurisdiction – because they were asserted in a

new, tardy action – shows that this Circuit applies a more relaxed version of the "conceivable effects" than Plaintiffs want this Court to adopt.

In their reply brief, the Appellants argue that, without a more rigorous "legal standard that requires an evidentiary foundation for invoking a bankruptcy court's jurisdiction," the Debtors' application of the "conceivable effects" test "improperly expands the bankruptcy forum from a court of limited jurisdiction" to allow it "to suspend any dispute in any forum anywhere in the country that conceivably affects a debtor." (Dkt. No. 28, Appellants' Reply Br. ("Reply"), at 8.) They worry that a decision affirming the Preliminary Injunction would embolden – or at least permit – Judge Drain to expand his order to enjoin opioid litigation that is currently proceeding against non-debtor opioid producers and related parties, since rulings in those cases, such as the calculation of damages or the apportionments of liability, may be relevant precedent for determining the distribution of Purdue's assets.

As an initial matter, Appellants are wrong to suggest that Judge Drain lacked an evidentiary basis for concluding that the claims in the *Dunaway* Action against Dr. Sackler are "related to" the Chapter 11 proceeding. Their own complaint in the *Dunaway* Action, which establishes the identity of the factual allegations against Dr. Sackler and Purdue, shows how continued litigation against the former is likely to impact the legal rights and liabilities of the latter.

Moreover, this slippery slope argument is unfounded: neither the Second Circuit precedent nor this opinion stretches the Bankruptcy Court's jurisdiction under Section 1334 as far as the Appellants fear. The claims against Dr. Sackler in the *Dunaway* Action are "related to" the bankruptcy because Dr. Sackler's conduct occurred while he was working on behalf of Purdue; accordingly, proof of his liability would implicate the company and provide him with a

23

right of action for contribution, and possibly for indemnification (assuming the contract providing for that right were enforceable in light of the Tennessee statute) against the Estate. The claims against Dr. Sackler conceivably affect the bankruptcy because it is conceivable that "the direct result of [the *Dunaway* Action] . . . will be the removal of assets from the bankruptcy estate." *Quigley*, 676 F.3d at 58.

The same cannot be said of the "[o]pioid litigation continu[ing] against dozens of non-debtor defendants in the MDL and virtually every state and territory."  Appellants fear that these lawsuits might  be considered "related to" the bankruptcy because cases against other defendants in the opioid market involve claims and theories similar to those that Purdue would be defending against right now but for the preliminary injunction.  (Reply at 7.) But that is nonsense. While an unfavorable damages calculation entered against a different opioid manufacturer might set an unfavorable precedent for the Debtors, rulings in those cases do not "remov[e] the [Debtors'] assets from the bankruptcy estate."  That is because, unlike the case against Dr. Sackler, trying the cases against Purdue's coparticipants (but not coconspirators) in the opioid crisis – be they doctors, hospitals, pharmacies, or Purdue's competitors – does not entail proving facts that would also prove Purdue's own liability.  Furthermore, Purdue has no legal or contractual duty to indemnify those entities.  Therefore, this opinion does not amend or extend the outer bound of the conceivable effects test: the jurisdiction of the bankruptcy court remains "limited to actions that create contingent obligations against the estate." *FairPoint*, 452 B.R. at 29.

But Appellants are still not convinced that the threat of indemnification has a "conceivable effect" on the bankruptcy, because, under the TDDLA, "A third party shall not pay damages awarded under this chapter, or provide a defense or money for a defense, on behalf of an insured under a contract of insurance or indemnification." Tenn. Code Ann. § 29-38-108 (*see*

24

AB at 29). They also return to their overarching objection that Judge Drain entered the

Preliminary Injunction on a thin record, Appellants argue that Dr. Sackler's contingent

indemnification claim is "untested," and cite the fact that Purdue's Board has not committed to

continuing to honor the terms of the LPA going forward. (AB at 26-27.

Like so many of the Appellant's issues with the Preliminary Injunction orders, the scope

of the TDDLA bar on indemnification and the complaint that Purdue's indemnification

obligation to Dr. Sackler is "untested" raise questions that a court can answer if and when it

reaches the merits of that claim; they are not relevant to whether the Bankruptcy Court has

jurisdiction to reach the merits. Neither this Court nor the Bankruptcy Court is required to decide

whether Dr. Sackler will prevail on his indemnification claims in order to find the *Dunaway*

Action has a "conceivable effect" on the Debtors' estate. This Court is satisfied that the present

record raises at least the possibility that further litigation against Dr. Sackler in the *Dunaway*

Action could lead to a court fight over the scope of the LPA (which is nothing if not a contract to

indemnify) and then on whether the TDDLA bars such a claim in a contract that is not a contract

of insurance. Dr. Sackler could argue that Purdue is not a third party defendant in the *Dunaway*

Action, because has been sued for the same conduct pursuant to the same causes of action, and §

29-38-108 does not bar him from suing his co-defendant. The mere fact that such a dispute is

conceivable is enough to confer jurisdiction on the Bankruptcy Court. As the Second Circuit has

states, "The need for litigation to settle the issue of whether a[n indemnification] . . . claim

[against the estate] would be permitted does not militate against finding [such] litigation [is]

'related to' the bankruptcy proceeding." *SPV*, 882 F.3d at 841.

The same is true for the Appellants' equitable subordination argument. It may well be the

case that Dr. Sackler's claims against the Estate, should he assert any, should be subordinated in

the priority order. But it is too soon to reach the merits of such a claim, and it cannot be denied that litigation on the merits of an equitable subordination claim will cost the Estate money. Therefore, the *Dunaway* Action is "related to" the bankruptcy.

### b. The claims against Dr. Sackler in the *Dunaway* Action did not arise in the bankruptcy proceeding.

The Bankruptcy Court added a second ground for its jurisdiction over the Related Party Actions when it extended the injunction. It found that the Debtors' motion to stay the Related Party Actions "arose in" the Chapter 11 proceeding – meaning it "would have no existence outside of the bankruptcy" – because "the underlying basis for the injunction primarily is to enable there to be time to do due diligence on and finally negotiate the proposed settlement with the related parties including Richard Sackler," or for the parties to reach some other settlement as part of a confirmable Chapter 11 plan. (A1178-79.)

With this conclusion I respectfully disagree.

The Bankruptcy Code distinguishes between proceedings that "aris[e] in" the bankruptcy and those that are merely "related to" it. Matters that "arise in" the bankruptcy are identified as "core proceedings," and include a nonexclusive list of 16 types of cases that the bankruptcy courts may "hear and determine," and in which they may constitutionally enter orders and judgments. *See* 28 U.S.C. § 157(b); *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932, 1940, 191 L.Ed.2d 911 (2015). Bankruptcy courts do not enjoy the same level of authority in "non-core proceedings," *i.e.*, those that are "related to" but do not "arise in" the bankruptcy. *See, e.g.*, *In re Kirwan Offices S.a.r.l.*, 592 B.R. 489, 503 (S.D.N.Y. 2018), *aff'd sub nom. In re Kirwan Offices S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019). They may "hear and determine" non-core proceedings, and "enter appropriate orders and judgments," but only "with the consent of all the parties to the proceeding." *Id.* § 157(c)(2). "Absent consent, bankruptcy

courts in non-core proceedings may only 'submit proposed findings of fact and conclusions of law,' which the district courts review *de novo*." *Wellness*, 135 S.Ct. at 1940 (citing 28 U.S.C. § 157(c)(1)).  The core versus non-core distinction derives from the Supreme Court's acknowledgment that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights." *Wellness*, 135 S.Ct. at 1940 n.3 (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)).

While the precise scope of "arising in" jurisdiction beyond the proceedings enumerated in the Bankruptcy Code "may not be entirely clear . . . [a]t a minimum, a bankruptcy court's 'arising in' jurisdiction includes claims that 'are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy.'" *In re Motors Liquidation Company*, 829 F.3d 135, 153 (2d Cir. 2016), *citing Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010), *quoting In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). Courts have defined proceedings which have "no existence outside of the bankruptcy" as those "that by their nature cannot exist outside of bankruptcy, and not merely . . . actions that, as a factual matter, have their origins in events occurring during a bankruptcy proceeding." *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07-cv 4634 (GEL), 2007 WL 4323003, at *3 (S.D.N.Y. Dec. 10, 2007). For example, an action seeking "the enforcement or construction of a bankruptcy court order" arises in the Chapter 11 proceeding, because it raises a dispute created by the fact of the bankruptcy. *In re Sterling Optical Corp.*, 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003).  Put another way, whether a proceeding is core depends on "(1) whether [it] is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the

reorganization." *In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir. 2002) (quoting *In re United States Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999)).

Judge Drain's March 30, 2020 order extending the injunction identifies all of the Pending Actions, including all claims against both Debtors and non-Debtors pending in every state court, as "core proceeding[s]." (A1068.)  That designation is overbroad: the Bankruptcy Court cannot exercise "arising in" jurisdiction over the merits of the claims against Dr. Sackler in the *Dunaway* Action.  The TDDLA claims against Dr. Sackler are entirely independent of the bankruptcy proceeding; they arise under a state statute and they were filed months before there was any bankruptcy. Neither the TDDLA nor the lawsuit references or depends on any order of the Bankruptcy Court for their existence. Thus, Judge Drain exceeded his authority to "enforce or implement court orders" under Section 105 when he identified the *Dunaway* Action as a core proceeding.

Despite the law of this Circuit establishing that core versus non-core jurisdiction "depends upon the nature of the proceeding," *see, e.g.*, *In re Millennium Seacarriers, Inc.*, 419 F.3d 83, 97 (2d Cir. 2005) (internal quotation marks omitted), the Debtors argue that this Court should not assess "arising in" jurisdiction by focusing on the underlying claims in the disputed proceeding.  Rather, they claim that the Bankruptcy Court had the power to find that the injunction "arose in" the bankruptcy because it was entered in order to foster continued settlement negotiations. (DB at 33-34.) According to this view, Section 105 grants the Bankruptcy Court "arising in" jurisdiction over the injunction – and by extension, over the *Dunaway* Action – simply because the alternative would "impede or destroy a reorganization proceeding over which the court is presiding."  (DB at 33-34.)

28

There is, tellingly, no citation to support the Debtors' argument that "arising in" jurisdiction can expand at the bankruptcy's court's equitable discretion, depending upon the court's perception of how close the parties are to agreeing on a confirmable plan of reorganization. Such a construction of Section 105 is as unnecessary as it is contrary to law, since the Bankruptcy Court had the authority to enjoin the *Dunaway* Action under the "related to" prong of its jurisdiction. And, even if the Settlement Structure were a final, enforceable agreement that included a full release of the claims against Dr. Sackler in the *Dunaway* Action (which at this juncture it most certainly is not) – *and* if it were incorporated into a confirmable plan of reorganization – *and* if the "arising in" jurisdictional question arose in the content of a confirmation fight – the Bankruptcy Court would still not be exercising core jurisdiction over the TDDLA claims by confirming the plan. As this court explained in *Kirwan*, although a bankruptcy court's "consider[ation] [of] a third-party release as part of a proposed plan of reorganization . . . may have the *effect* of a ruling on the merits, it is *not* a ruling on the merits – and thus operates on an entirely different jurisdictional footing." 592 B.R. at 505 (emphasis in original). The Bankruptcy Court cannot now, nor will it ever be able to, adjudicate the *Dunaway* claims against Dr. Sackler without first being permitted to do so by this court, reviewing an order of the Bankruptcy Judge *de novo*.

Therefore, the Bankruptcy Court's exercise of "arising in" jurisdiction as alternative support for its jurisdiction over all of the Related Party Actions was contrary to law. So much of the Preliminary Injunction as refers to those actions as "core proceedings" is vacated as to the *Dunaway* Action, and remanded for further proceedings with respect to the other Related Party Actions that are not the subject of this appeal.

II.     **The Bankruptcy Court Did Not Abuse Its Discretion by Ordering the Preliminary Injunction.**

Before deciding whether the Bankruptcy Court made any mistakes of law or clearly erroneous factual findings when enjoining the Related Party Actions, I must clarify which provision of the Bankruptcy Code authorizes the order.

Section 105(a) – which Judge Drain cited numerous times during the hearings as the basis for the injunction (*see, e.g.*, A479, A618, A1154) – allows bankruptcy courts to issue injunctions as may be "necessary and appropriate" to facilitate confirmable reorganization plans under Chapter 11.  Nonetheless, Appellants imply several times in their papers that "police power litigation against a non-debtor" should be treated differently than other litigation stayed under a Section 105(a) order. (*See, e.g.*, AB at 28.) To support that position, they cite 11 U.S.C. § 362, the section of the Bankruptcy Code that automatically stays a wide range of pending cases against a debtor as soon as they file for Chapter 11 protection.  One exception to the automatic stay is any "action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power." 11 U.S.C. § 362(b)(4).

However, as Debtors correctly observe, the police powers exception is irrelevant to this appeal, because the Preliminary Injunction was not entered pursuant the automatic stay provision. Judge Drain reviewed hundreds of pages of briefing and a robust evidentiary record, and held three hearings, before exercising his statutory authority to enter an injunction that he found to be "necessary and appropriate" to the bankruptcy. Nothing in § 362(b)(4) constrained him from entering such an injunction, and nothing in the automatic stay provision prohibits this

court from analyzing the merits of Judge Drain's decision under the usual Section 105(a)

standard applicable to actions not automatically stayed.

### a.  Standards for issuance of Section 105(a) Injunction.

Second Circuit precedent holds that "§ 105(a) is properly used to enjoin creditors'

lawsuits against third parties where 'the injunction plays an important part in the debtor's

reorganization plan' or where the action to be enjoined 'will have an immediate adverse

economic consequence for the debtor's estate.'" *In re Bernard L. Madoff Inv. Sec., LLC*, 512 F.

App'x 18, 20 (2d Cir. 2013) (internal citations omitted) (quoting *SEC v. Drexel Burnham*

*Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.),* 960 F.2d 285, 293 (2d Cir.1992),

*and quoting Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287 (2d Cir.2003)). Courts decide those

questions by  "appl[ying] the 'traditional preliminary injunction standard as modified to fit the

bankruptcy context." *In re Lyondell Chem. Co.*, 402 B.R. 571, 587-88 (Bankr. S.D.N.Y. 2009)

(quoting *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007)); *see also* Fed. R. Bankr. P.

7065.

Although the Second Circuit has never explicitly established the standard for reviewing a

preliminary injunction issued under Section 105 of the Bankruptcy Code, various courts have

resolved the issue by evaluating four factors: (1) whether there is a likelihood of successful

reorganization, *id.*; (2), whether there is an imminent irreparable harm to the estate in the absence

of an injunction, although a limited exception permits an injunction to issue "whether the action

to be enjoined is one that threatens the reorganization process," if the threat is not imminent,

*Alert Holdings, Inc. v. Interstate Protective Servs., Inc.*, 148 B.R. 194, 200 (Bankr. S.D.N.Y.

1992); (3) the balance of "the comparative harm[s] to the debtor, and to [the] debtor's

reorganization, against that to the would-be-enjoined party should an injunction be issued,"

31

*Hawaii Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06-cv-5358 (PKC), 2006

WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006); and (4) whether the public interest weighs in

favor of an injunction, *see, e.g.*, *Lyondell*, 402 B.R. at 588.

### b.  Likelihood of Reorganization

The Appellants argue that the Debtors cannot establish the likelihood of a successful

reorganization based on the Settlement Structure, because "hundreds, if not thousands, of

government entities oppose any plan that would protect or immunize Dr. Sacker without

extensive financial due diligence," and their objections are "likely more than enough to block

any plan." (AB at 38-39.)  But the Appellants cannot say that a reorganization is unlikely simply

because they intend to object to the plan as presently constituted.  Nor can they presume that Dr.

Sackler will not ultimately be required to make "extensive" disclosure of his personal assets prior

to a plan's confirmation. As the court noted in *Lyondell*, debtors need not present "proof of the

uncertain" in order to demonstrate a "*reasonable* likelihood of a successful reorganization."

*Lyondell*, 402 B.R. at 589-90 (emphasis in original) (quoting *Hawaii Structural Ironworkers*

*Pension Tr. Fund v. Calpine Corp.*, No. 06-cv-5358 (PKC), 2006 WL 3755175, at *4 (S.D.N.Y.

Dec. 20, 2006)). It bears noting that the Settlement Structure is just that – a framework for

negotiation, not a final settlement – and its final form cannot be presumed to be one that

"hundreds, if not thousands, of government entities" will oppose. It cannot even be presumed

that Appellants will object to a final form of settlement.

Furthermore, the record tends to show that Dr. Sackler will not obtain a full release being

required to make substantial disclosures. Judge Drain has made clear that he shares the

Appellants' view that the Related Parties, including Dr. Sackler, will have to make financial

disclosures in order to obtain releases from individual liability. At the first injunction hearing, he

emphasized that the likelihood of successful reorganization depended upon the objectors'

"ability to perform due diligence," and encouraged the Debtors to continue "to engage in

meaningful discussions with representatives of the key objecting parties . . . [to reach] a

reasonable information sharing and milestone protocol." (A623-24.) He also suggested that the

Appellants' objections could be addressed through "more complete disclosure that . . . would

occur as a result of the plan . . . at the end of this case under the [Settlement Structure]."

(A624.)  That is why, before extending the injunction in March, Judge Drain made sure that the

parties were not at an impasse regarding their negotiations – to which the Appellants responded

that settlement and disclosure discussions were still "going forward," despite the parties'

disagreement over the question of Dr. Sackler's liability. (A1143.)

There may be bumps along the road, whether related to the adequacy of particular

disclosures or the parties' respective positions on the merits; but the fact that discussions are

continuing provides  support for the finding that continuing the injunction increases the

likelihood of a successful reorganization.  *See, e.g.*, *In re Omc, Inc.,* No. 10-14864 MC, 2010

WL 4026097, at *4 (Bankr. S.D.N.Y. Oct. 13, 2010) (debtor's ability to "work successfully" and

"consensually" with non-objecting creditors supported likelihood of reorganization).  The

settlement negotiations are continuing as Judge Drain anticipated they would when he first

ordered the Preliminary Injunction – an injunction entered for the sole purpose of giving the

parties "a clear shot at negotiating an overall settlement." *In re Caesars Entertainment Operating

Co.*, 808 F.3d 1186, 1189 (7th Cir. 2015).  As courts outside of this jurisdiction have held, a

reorganization may be considered likely to succeed so long as the prospects of reorganization

"remain viable," *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011), and if

"the Debtors are substantially more likely to reorganize" with the injunction in place, *In re*

*Lazarus Burman Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993). The Bankruptcy Court did

not abuse its discretion in finding that those conditions are satisfied here.

### c.  **Irreparable Harm**

There is also support in the record for Bankruptcy Court's conclusion that the Debtors

have shown that the *Dunaway* Action, if allowed to proceed against Dr. Sackler alone, "would

embarrass, burden, delay or otherwise impede the debtor's estate and reorganization prospects"

(DB at  38 (quoting *Alert*, 148 B.R. at 200)), which is sufficient to find that the action threatens

the reorganization.  Specifically, the Debtors raised concerns that lifting the stay on the *Dunaway*

Action will divert the attention of Purdue's management, and increase the Debtors' litigation

expenses as well as their liabilities, whether due to the collateral estoppel impact of findings

made against Dr. Sackler or as a result of his assertion of contribution and/or indemnification

claims.  (DB at 39.)  Judge Drain concurred, noting that "litigating the merits [of the *Dunaway*

Action] . . . would take years," and, as a result, the reorganization "would be disastrously

diverted." (A1183.)

The Appellants argue that these concerns are unfounded. They observe that Dr. Sackler

has failed to respond to requests for discovery, and that, under the Tennessee Rules of Civil

Procedure, this means that he has effectively admitted all the facts necessary to establish his

personal liability under the TDDLA.  (AB at 39-40.)  However, it is not clear – to this court,

anyway – that Dr. Sackler's failure to respond to requests for admission when the Debtors were

weeks away from filing for bankruptcy would be deemed an admission of the facts asserted; I

can confidently predict that there would be substantial litigation over whether an adverse

inference could be drawn against him if his "admissions" were deemed made under that scenario,

given the collateral consequences such an inference would have on the Debtors.

Moreover, even if a finding of Dr. Sackler's liability were all the Appellants sought in the *Dunaway* Action, Judge Drain was well within his discretion to find that such an outcome would have cascading effects. It would certainly embarrass Purdue for one of its largest shareholders and former leaders to be found culpable for the opioid epidemic. It could also burden the portions of the Settlement Structure that depend on the sale of his ownership staks in the international divisions, which are part of the proposed settlement funding mechanism. (*See* SA011-014; A1163 ("[Dr. Sackler] has agreed with the Debtors and with the consenting group to be among those that would fund a Chapter 11 plan with, on its face, substantial assets.").) Any judgment in the *Dunaway* Action might be subject to immediate appeal, even if only on an interlocutory basis, which could further delay the reorganization.

Finally, as Judge Drain said at the March hearing, Appellants offer no reason why their lawsuit should be treated differently from every other lawsuit that is subject to the injunction. Because I agree with the Bankruptcy Court there is "nothing fundamentally different" to distinguish the *Dunaway* Action from the thousands of other stayed proceedings (A1183), I have every reason to believe that lifting the stay would soon engulf the Debtors' and the Bankruptcy Court in appeals challenging the injunction's application to similar claims against Dr. Sackler or his family members in other fora. Analysis of irreparable harm, or threat to reorganization, favors upholding the Preliminary Injunction.

### d. Balance of Harms and the Public Interest

As for the balance of hardships and the public interest, the Appellants argue that the injunction deprives the public of their right under the TDDLA "to confront Dr. Sackler with the accusations against him and . . . require [him] to answer for his personal role in the opioid epidemic in Tennessee." (AB at 40-41.) Judge Drain characterized this interest as an issue of

35

transparency, and correctly so.  In light of that, he was right to conclude that the balance of hardships favored the Debtors, because finding otherwise and not enjoining the *Dunaway* Action would have "the chaotic effect of moving the focus of this case away from allocation of value and the due diligence related to it to simply establishing liability." (A1183.)

The first thing to note is that the alleged interest in transparency contradicts the other arguments that Appellants are making. If they are really seeking to lift the stay only so that the state court can find Dr. Sackler liable based on his default in making admissions, then there will be no need for any "confrontation" whatever – Appellants' position is that Dr. Sackler is liable because his default constituted an admission. And it is at the point of imposing damages when Dr. Sackler would presumably have to disclose details about his personal wealth; yet Appellants insist that they are not going to move on to an assessment of damages if the stay is lifted. Appellants argue out of both sides of their mouth.

Moreover, if all the Appellants seek is an opportunity to shine a light on Dr. Sackler's conduct in open court – without pursuing any material benefits for their constituents in the form of damages – then the loss they suffer due to the injunction is substantially outweighed by the ripple effect a finding of liability against one of Purdue's top executives and largest shareholders would have on the Debtors' estate.  And if the Appellants did decide to pursue damages, as is their right under the TDDLA, the effects on the estate would be that much worse.  That is all the more true since the Settlement Structure that is currently being used to structure the multilateral negotiations contains provisions that freeze the Sackler Family's assets and grant the Bankruptcy Court jurisdiction over their off-shore accounts.  (A625.)  Those aspects of the Settlement Structure increase the size of the potential asset pool upon which the reorganization plan may draw, thus ensuring the feasibility of the settlement fund, protecting the interests of the Creditors,

and even increasing the likelihood that the *Dunaway* Plaintiffs may one day receive some compensation for their TDDLA claims.  If this Court were to vacate the injunction and thus reduce the likelihood of Appellants and others agreeing to the Settlement Structure, the Sackler Family's current incentives to keep private gains from the opioid trade within the grasp of the federal courts would vanish.  That would not just harm the Debtors and the Appellants; it would also reduce the benefits that every other creditor could hope to realize from the bankruptcy.

Still, the Appellants are not satisfied that the injunction is a net positive,  given that it protects the person they believe to be the chief culprit in Purdue's wrongdoing: Dr. Sackler.  They argue that principles of fundamental fairness, and the *sui generis* nature of the Purdue bankruptcy, militate against affirming the Bankruptcy Court's "unprecedented" shielding of non-debtors who are alleged to have contributed to "the most pressing public health crisis in decades."  (Reply at 3-7.)

The Appellants acknowledge that other bankruptcies born out of an onslaught of public and private mass tort litigation – whether related to faulty airbags or Big Tobacco or asbestos – have resulted in safe harbors for non-debtors who were nonetheless primary players in wide-ranging schemes of corporate malfeasance.  (Reply at 4.)  However, they ask this Court to ignore those precedents and instead to recognize that no post-crisis opioid manufacturer bankruptcy proceeding has ever included an injunction as sweeping as the on entered by Judge Drain.  The sample size for this assertion is one: Appellants give great weight to the fact that the bankruptcy court in *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del.) ("*Insys*") did not enter an injunction that  prevented state attorneys general from exercising their police powers against non-debtors.

It is true that the state AGs remained free to prosecute individuals at Insys who were in a position comparable to Dr. Sackler's at Purdue during the Insys bankruptcy. But that is not because the Bankruptcy Court declined to enjoin them.  In *Insys*, as here, the debtors filed an adversary proceeding and a motion for preliminary injunction under Section 105(a) that sought, *inter alia*, to stay governmental actions pending in state courts.  *Insys Therapeutics, Inc., et al. v. State of Arizona, et al.* (Adv. Pro. No. 19-50261) ("*Insys* Adv.") (June 10, 2019).  The bankruptcy court never ruled on that motion, Instead, the  parties quickly agreed to a narrower injunction that would apply only to claims against the debtors, and that was conditioned on an information sharing agreement between the debtors, their creditors, and the governmental actors.  (*Insys* Adv. Dkt. 59 (July 12, 2019).) Appellants are not interested in entering into any such agreement, so nothing in *Insys* counsels against affirming Judge Drain's injunction. Indeed, the very fact that, in Insys, the parties concluded that a transparent global settlement based was preferable to a multi-state battle fought between public and private actors over a dwindling *res* suggests that the decision here appealed from was correct.[4]

Additionally, the state attorneys general in *Insys* conceded that the bankruptcy court had the power to enjoin third party litigation. They argued only that the power was wrongly applied

---

[4] The *Insys* debtors' decision to abandon their request for a broader injunction may be explained by the fact that they filed their first proposed Chapter 11 plan just two months later. (*Insys* Dkt. No. 611 (Sept. 17, 2019).)  The final confirmed plan of liquidation tracked what many may expect to occur here in two ways.  First, the *Insys* plan released all civil claims against the vast majority of Insys Pharmaceutical insiders (*Insys* Dkt. No, 1115, at 74 & Ex. E) – even including several who had been convicted on criminal charges for their involvement in a bribery scheme related to the sale of opioids, *see United States v Babich*, No. 16-cr-10343-ADB, 2020 WL 1235536, at *1 (D. Mass. Mar. 13, 2020).  Second, consistent with the view Judge Drain expressed at the March hearing, the *Insys* liquidation plan required the debtors to publicly disclose all documents relating to their manufacture, sale and promotion of prescription opioids (*Insys* Dkt. No. 1115, at 40 (Jan. 16, 2020)) – an outcome which at least one state attorney general touted as a victory, even though his state's chance to try individual wrongdoers was extinguished by the liquidation plan, (*see* "Attorney General Ellison and Pharmacy Board announce liquidation of opioid manufacturer Insys" (Jan. 17, 2020), *available at* https://www.ag.state.mn.us/Office/Communications/2020/01/17_Insys.asp (last visited Aug. 6, 2020)).

in that case – and then abandoned the argument. Appellants' argument rests on a reed far too slender to support it.

Therefore, whether one looks at the broad history of non-debtor protections in bankruptcies related to alleged mass torts, or only focuses on *Insys*, there is no reason to conclude that Judge Drain abused his discretion issuing the Preliminary Injunction based on his understanding that "there will be transparency as to what happened here upon confirmation of a plan and thereafter." (A1184.) Like the state attorneys general in *Insys*, the Appellants still have the opportunity to receive and publicly disclose documents revealing the extent to which Dr. Sackler was both involved in and benefitted from Purdue's sale of opioids.

Although they have not identified any reason why this court should vacate the Preliminary Injunction, the Appellants should recognize that their arguments are overblown. Judge Drain's injunction does not destroy Appellants' interest in transparency. It does not immunize  Dr. Sackler against personal liability and it does not protect him from having to disclose details about his personal wealth.  Whether Dr. Sackler gets the protection that Appellants fear (and oppose) will be decided in the context of other motions in this bankruptcy. And there is no timetable for addressing them, as Judge Drain remains "far from approving any sort of permanent injunction and release with respect to third 22 parties in this case." (A629.)

The balance of the hardships and the public interest favor leaving the injunction in place.  Accordingly, the orders of the Bankruptcy Court issuing and extending the Preliminary Injunction are affirmed.

## CONCLUSION

For the reasons stated, the Bankruptcy Court's orders entering and extending the Preliminary Injunction (Adv. Dkt. Nos. 105, 168) are AFFIRMED.

This constitutes the decision and order of the Court.  It is a written opinion.  The Clerk of

Court is respectfully directed to close this matter on the Court's docket.


Dated:  August 11,  2020
New York, New York


_____

                    Chief Judge

BY ECF TO ALL PARTIES