## **Exhibit B**

**Engagement Agreement**



# HEALTHPLAN DATA SOLUTIONS INC.

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") is entered into as of the date set forth on the signature page ("**Effective Date**") by **HEALTHPLAN DATA SOLUTIONS, INC.** ("**HDS**"), a Delaware corporation with principal place of business at 444 N. Front Street, Ste.101, Columbus, Ohio 43215, and **THOMAS J VILSACK** ("**Client**"), with principal place of business at 31169 Napa Valley Crest, Waukee, Iowa 50263.

### RECITALS

A.      HDS has developed a prescription payment integrity platform based on a proprietary data analytics engine which can be used to assess the integrity of payments, verify prescription claims and support pharmacy cost containment ("**HDS Platform**").

B.      HDS hosts the HDS Platform and makes it available, together with related services ("**Services**"), to employer groups and other businesses and organizations and their employees, insureds and other participants ("**Participants**") to identify errors, provide claim verification, and identify potential savings in their use of prescription medications and to provide information that assists in procurement, negotiations, monitoring, and improvement of prescription medication benefits and practices.  HDS data and reports also assist Participants in implementing organizational and other changes to improve prescription medication usage and cost effectiveness (collectively, "**Prescription Medication Practices**").

C.      Mr. Vilsack serves as duly appointed Monitor for Purdue Pharma L.P. ("**Purdue**") pursuant to a Protective Order issued in the Chapter 11 Bankruptcy proceeding  in the United States Bankruptcy Court for the Southern District of New York entitled *In re: Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (hereinafter "Bankruptcy Proceeding").

D.      In his duties and responsibilities as Monitor, Client desires to purchase certain HDS Services and access the HDS Platform in accordance with the terms of this Agreement and its Schedule(s).

E.      In providing its Services to Client pursuant to this Agreement, HDS is bound by the terms of the Protective Order.

In consideration of the foregoing and the following provisions, the parties agree as follows:

1.      **MASTER TERMS/SCHEDULES/RIGHTS GRANTED**

1.1     **Right to Use the HDS Platform and Deliverables.** This Agreement applies to all Services as well as reports ("**Reports**") (collectively, "**Deliverables**") provided by HDS to Client as described in one (1) or more "**Schedules**" entered into by the parties under the terms and conditions of this Agreement. For the duration of the Services term described in a Schedule, Client will have the non-exclusive, non-assignable, worldwide limited right to use the HDS Platform and Deliverables solely for his use in connection with his duties as Monitor. Client may provide a copy of any Report to Purdue, the Bankruptcy Court, and/or any party to the Bankruptcy Proceeding. Client is not granted any right to publish any Report or other Deliverable or to provide any Deliverable to any third party other than his employees, contractors, and advisors, except as permitted in this Section. Deliverables are provided as described in, and subject to, the provisions in the Schedule.

1.2     **Changes**.  Services provided under a Schedule may be changed by the parties by execution of a "Change Order" describing the change agreed to by the parties, and upon execution of the Change Order, it will become part of, and modify, the Schedule.

1.3 **Fees and Expenses**. Fees to use the HDS Platform and HDS' Deliverables ("**Fees**") will be set forth in each Schedule or Change Order.

1.4 **Payment.** Payment is due as set forth in each Schedule, or if not specified, then within thirty (30) days after Client's receipt of the HDS invoice. Late payments will accrue interest at the rate of 1.5% per month until paid or the maximum allowed by law, whichever is lower. Client will pay the costs incurred by HDS to collect amounts due, including collection agency fees, legal expenses and reasonable attorney's fees. Access to the HDS Platform and provision of Services may be suspended for the failure of Client to make any overdue payment that is not made within ten (10) days of written notice of suspension from HDS.

1.5 **Order of Precedence**. In the event of a conflict between the terms of this Agreement and the terms of a Schedule, this Agreement will control unless the parties specifically agree otherwise in a Schedule. This Agreement and all Schedules take precedence over any purchase order issued by Client, which may be accepted by HDS for administrative convenience only.

1.6 **Non-Exclusive Agreement**. The arrangement set forth in this Agreement is non-exclusive and this Agreement will not prevent or prohibit either party from entering into similar agreements with other providers or purchasers or licensors, as the case may be, of products or services similar to those under this Agreement.

2. **CLIENT RESPONSIBILITIES**

Under each Schedule, Client shall first provide information regarding items such as rebates, price protections or concessions, chargebacks, and administrative fees to HDS via email. The Parties shall discuss the information and reach agreement on the means of transmitting information to HDS. After such agreement, Client will (a) provide all information regarding Purdue as agreed in order for HDS to perform the Services ("**Participant Data**"), in an electronic form required by HDS, and will not provide any personal information other than Participant Data; (b) provide cooperation requested by HDS to assist in its performance; and (c) timely complete Client's responsibilities under the Schedule. Client warrants that he has the right to provide to HDS all Participant Data for use by HDS as set forth in this Agreement and applicable Schedules, and that Participant Data is true, accurate and complete to the best of Client's knowledge.

3. **TAXES**

All Fees are exclusive of taxes. Client will pay all sales, use or other taxes and government fees arising from the Deliverables, excluding taxes based on HDS' net income. Applicable taxes will be separately itemized on each invoice.

4. **WARRANTIES**

4.1 **Mutual Warranties**. Each party represents and warrants that its execution and performance under this Agreement has been authorized by all required corporate actions and is the binding obligation of the party enforceable against it according to its terms and will not breach any agreement to which it is a party or any other obligation it owes to any third party.

4.2 **Limited Warranty.** HDS provides the following "**Limited Warranty**": The HDS Platform and Deliverables will comply in all material respects with the applicable Schedule for a period of sixty (60) days following delivery ("**Warranty Period**"). During the Warranty Period, if Client determines that the HDS Platform or Deliverables do not satisfy the Limited Warranty, Client will provide written notice of the defect to HDS, including a reasonably detailed description of the defect. As Client's exclusive remedy for any failure of HDS to meet the Limited Warranty, HDS will re-perform the Services and deliver a new version of the corrected Deliverables within a reasonable time. If HDS does not correct the defect within a reasonable period of time, HDS will refund the amount paid by Client for the defective Deliverables within a reasonable time.

4.3 **Disclaimer of Other Warranties**. Except for the limited warranty set forth above, the HDS Platform and all Deliverables are provided "AS-IS" without any warranty express or implied. HDS makes no other

warranties and disclaims any warranties of merchantability, fitness for a specific purpose or non-infringement. HDS does not warrant that the HDS Platform, Services, data, or software will be error-free or that all errors will be corrected. HDS does not control the transfer of data over communications facilities, including the Internet; the HDS Platform may be subject to limitations, delays and other problems inherent in the use of such communications facilities. HDS is not responsible for any delays, delivery failures or other damage resulting from such problems. The provisions of the Uniform Computer Information Transactions Act, the Uniform Commercial Code and any other law that can be disclaimed by the parties are disclaimed and are not implied into this Agreement or the relationship between the parties. This is an agreement between legal entities, and claims arising from the actions of a party will only be brought against the party and not against any manager, employee, officer, director, or agent of the party.

4.4    **No Medical Advice.**  HDS is not licensed to provide, and does not provide, any medical, pharmaceutical, or other health-related advice. The recommendations made by HDS for behavioral changes or medication substitutions are only recommendations, and all decision for any Participant to change his or her behaviors or medication are intended to be confirmed by the Participant's primary care physician.

5.    **CONFIDENTIAL INFORMATION**

5.1    **Confidential Information**.  In the course of their dealings under this Agreement, each party may acquire Confidential Information of the other party (the party disclosing Confidential Information is the "**Disclosing Party**" and the party receiving Confidential Information of the Disclosing Party is the "**Receiving Party**"). "**Confidential Information**" means information about the Disclosing Party's (and its suppliers') business, activities, trade secrets, or technology that the Disclosing Party desires to remain confidential, and includes the terms and conditions of this Agreement, all business, financial, technical, and other information of the Disclosing Party marked or designated as "confidential" or information that, although unmarked or not designated confidential, by its nature or the circumstances surrounding its disclosure would reasonably be expected by the Receiving Party to be treated as confidential. Reports contain Purdue Confidential Information and Confidential Information of HDS.

5.2    **Protective Order Provisions**.  Each party acknowledges that there are specific and detailed requirements within the Protective Order governing the duties and obligations of Client as Monitor and thereby the duties and obligations of HDS as a provider of services to Client pursuant to this Agreement. Notwithstanding any other provisions in this Agreement, the parties agree that in any conflict of the terms of this Agreement with the terms of the Protective Agreement the terms of the Protective Agreement shall control. This is particularly applicable to the limits on the use and disclosure of Confidential Information provided to HDS by Client, and, to avoid any doubt, HDS hereby acknowledges that the terms of the Protective Order do hereby control its rights and responsibilities to the data provided by Client.

5.3    **Exclusions**.  Confidential Information will not include information that: (a) is in or enters the public domain without breach of this Agreement by the Receiving Party; (b) the Receiving Party lawfully receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation; (c) the Receiving Party knew before receiving such information from the Disclosing Party; or (d) the Receiving Party develops independently of any Confidential Information of the Disclosing Party.

5.4    **Nondisclosure and Nonuse**.  The Receiving Party agrees: (a) that it will not disclose to any third party or use any of the Disclosing Party's Confidential Information except as expressly permitted in this Agreement; and (b) that it will take all reasonable measures to maintain the confidentiality of all Confidential Information of the Disclosing Party in its possession or control, which will in no event be less than the measures it uses to maintain the confidentiality of its own information of similar importance.

5.5    **Suggestions**.  Client may submit to HDS, in writing or orally, suggestions for new Services, improvements to the HDS Platform or existing Services, or other suggestions relating to Prescription Medication Practices

("**Suggestions**"). Client grants HDS a nonexclusive, royalty free, perpetual and irrevocable right to use and have others use Suggestions in any way it determines without notice, payment or attribution to Client or HDS.

5.6     **Permitted Disclosures**.  Notwithstanding the foregoing, the Receiving Party may disclose the Disclosing Party's Confidential Information: (a) to the extent required by a court of competent jurisdiction or other governmental authority or otherwise as required by law, so long as the Receiving Party provides, to the extent legally permitted, an opportunity for the Disclosing Party to take such action as it determines to maintain the confidentiality of such Confidential Information; and (b) to those advisors and contractors needing to know such Confidential Information to assist the Receiving Party in performing under this Agreement and who are bound by law or written agreement to restrictions no less stringent than those binding on the Receiving Party under this Agreement.

6.      **OWNERSHIP OF INTELLECTUAL PROPERTY**

HDS represents that it owns or has valid licenses to the patents, copyrights, trade secrets, and all other proprietary rights in the HDS Platform, processes, software, heuristics, algorithms, templates, data (other than Participant Data) and methods of operation HDS will use to perform HDS' Services (collectively, "**Proprietary Materials**"). HDS retains all intellectual property rights in the Proprietary Materials. No part of these items may be reproduced or used in any form or by any means without the written permission of HDS. Client will not assign, delegate, distribute, or transfer any interest in the Proprietary Materials to any other party. Client will take reasonable steps to safeguard the confidentiality of such information. Client agrees that only HDS will have the right to alter, maintain, enhance, or otherwise modify the Proprietary Materials. Client will not modify, create derivative works, disassemble, decompile, or reverse engineer any software in the Proprietary Materials in any manner whatsoever, or otherwise use the Proprietary Materials except as expressly permitted pursuant to this Agreement.

7.      **INDEMNIFICATION**

8.1     **HDS' Obligations.** Subject to the limits of liability contained in this Agreement, HDS will indemnify, defend and hold Client harmless from and against any losses, claims, penalties, fines, judgments, damages, liabilities or expenses, including reasonable attorneys' fees ("**Losses**"), incurred by Client arising out of third party claims relating to, or in connection with, or based upon:

a.      any claim for bodily injury or death of any individual, or the loss, damage or destruction of any real or personal property, resulting from the willful, negligent, reckless, fraudulent or intentional acts or omissions of HDS;

b.      any breach by HDS of its warranties and representations set forth in this Agreement; or

c.      any claim, threatened claim, suit or proceeding made against Client that the Deliverables infringe any U.S. patent issued as of the Effective Date of this Agreement, or any trademark, copyright, or trade secret of a third party enforceable in the U.S. ("**Infringement Claim**"); provided, however, that HDS is not liable for any Infringement Claim to the extent that: (i) Client modified the applicable Deliverables and such claim would not have been made but for such modifications; or (ii) the applicable Deliverables were used in combination with services or products not provided by HDS and such claim would not have been made but for the combination; or (iii) the Claim is based upon a use for which the applicable infringing Deliverables were not designed and such Claim would not have been made but for the nonconforming use.

8.2     **Client's Obligations.** Subject to the limits of liability contained in this Agreement, Client will indemnify, defend and hold harmless HDS, its officers, directors, employees, shareholders and members from and against all Losses incurred by HDS arising out of third party claims relating to, incurred in connection with, or based upon:

a.  any claim for bodily injury or death of any individual, or the loss, damage or destruction of any real or personal property, resulting from Client's willful, negligent, reckless, fraudulent or intentional acts or omissions;

b.  any breach by Client of his obligations under this Agreement or duties as Monitor for Purdue; or

c.  any Infringement Claim asserted by any third party relating to any of materials provided by Client to HDS; provided, however Client is not liable for any Infringement Claim to the extent HDS modified the materials and such claim would not have been made but for such modifications.

**8.3**    **Procedure.**  Upon receiving notice of any third-party claim covered by the indemnity obligations set forth in this Section, the party entitled to indemnification (the "**Indemnified Party**") will promptly notify the other party (the "**Indemnifying Party**"). The Indemnifying Party, at its sole expense, will assume control of the defense of any such claim; the Indemnified Party may, at is sole cost and expense, participate in the defense. The Indemnifying Party will not settle any claim without the Indemnified Party's prior written consent, which will not be unreasonably withheld, conditioned or delayed.

**8.4**    **Option.** In addition to the foregoing indemnification obligations, if all or any part of a Deliverable is subject to an Infringement Claim, HDS will, at is discretion and expense, (a) procure for Client the right to continue using the Deliverable; or (b) modify or replace the allegedly infringing aspect of the Deliverable to make it non-infringing, provided, however, that such modification or replacement will not degrade the operation or performance of the Deliverable.  To the extent the foregoing is not commercially reasonable, HDS may terminate this Agreement and refund to Client the pro-rated amount of any Fees prepaid for the balance of the remaining term of the terminated Schedule(s).

**9.**    **LIMITATION OF LIABILITY**

**9.1**    **CAP ON DIRECT DAMAGES**

**Except for damages arising out of or relating to a party's indemnification obligations under Section 8.1 (a) in the case of HDS and 8.2 (a) in the case of Client, Client's obligation to pay fees and Client's breach of HDS' intellectual property rights under Section 7, or any other liability which may not be excluded by law, each party's aggregate liability to the other party arising under or in relation to this Agreement or a Schedule will be limited to the amount paid for the Services/Deliverables that are the subject of the claim during the six (6) months prior to the occurrence of the events giving rise to the claim.**

**9.2**    **LIMITATION ON TYPES OF RECOVERABLE DAMAGES**

**In no event will either party be liable for the following types of loss: loss of profits or revenue, loss of business or goodwill, loss of data or business interruption, or any punitive or indirect, special, or consequential damages arising out of this Agreement, a Schedule or the performance or breach thereof, whether based in contract, tort, or any other theory, even if a party has been advised of the possibility of such claim.**

**9.3**    **Acknowledgement.** Each party acknowledges and agrees that the negation of damages and the limitations of liability contained in this **Section 9** are fundamental elements of this Agreement and that the Services would not be provided without such limitations. Without limiting the foregoing, in the event any remedy under this Agreement is determined to have failed of its essential purpose, the parties intend that all limitations of liability and remedies, and all exclusions of damages, provided for in this Agreement will remain in full force and effect. Because some jurisdictions do not allow the exclusion or limitation of certain categories of damages, in such jurisdictions, the parties agree that the liability of each party will be limited to the fullest extent permitted by such jurisdiction.

**10.**    **TERM/SUSPENSION/TERMINATION**

**10.1**    **Term.** The term of this Agreement will begin on the Effective Date and will remain in full force and effect until the expiration or termination of all outstanding Schedules entered into between HDS and Client, unless

terminated earlier by mutual written agreement of the parties or by either party for cause, as described in **Sections 10.3,** in which case and all Schedules will also be terminated.

10.2    **Suspension of Services.** HDS may suspend Client's access to the HDS Platform and/or Services without liability if: (a) the HDS Platform or Services are being used in violation of this Agreement, including the Portal terms of use; (b) the HDS Platform or Services have been accessed or manipulated by a third party without HDS' consent; (c) HDS has not received applicable fees for the Services when due after five (5) days' written notice has been provided to Client; or (iv) as required by law. HDS will use its commercially reasonable efforts to provide advance notice of a suspension of Client's access to the HDS Platform and Services and opportunity to cure, unless suspension is necessary to protect Services or other clients from imminent and significant operational or security risk. If suspension results from a breach of this Agreement, fees for use of the HDS Platform and the Services during the suspension will continue to be charged. A reinstatement fee of 10% of the monthly fees may be charged upon reinstatement of suspended access to the HDS Platform or Services.

10.3    **Termination**.    Either party may terminate this Agreement on written notice (a) upon termination or expiration of all Schedules Schedule; (b) if the other party commits a material breach of this Agreement or a Schedule and the breach continues uncured for a period of thirty (30) days following the breaching party's receipt of written notice of the breach from the non-breaching party; (c) immediately if the other party becomes bankrupt, insolvent, has a receiver appointed for any portion of its business, liquidates, ceases to do business, is terminated as Monitor, or makes a general assignment for the benefit of its creditors; or after thirty (30) days' notice for any reason.

10.4    **Effect of Termination**.  Upon any termination of this Agreement, for any reason, the following will occur:
   **a.**  HDS will perform such termination transition activities as are set forth in a Schedule;

   **b.**  HDS will cease to provide all Services, and Client will have no further rights to access the HDS Platform, any Deliverables or HDS Confidential Information;

   **c.**  HDS will invoice Client any unbilled fees, and Client will timely pay such invoices; and

   **d.**  Within thirty (30) days of termination, the Receiving Party will return to the Disclosing Party or destroy all the Disclosing Party's Confidential Information and certify in writing that all such Confidential Information has been returned or destroyed.

10.5    **Survival**.  The following provisions of this Agreement will survive termination:  Sections 5, 7-9, 10.4, 10.5, 12, & 13.

11.    **AUDITS**

To the extent any employer or government agency requires that it audit HDS, HDS will cooperate with such audit on a time and materials basis, subject to HDS policies on security and confidentiality and the right of HDS to obtain a protective order or other protection for HDS Confidential Information, and Client will reasonably cooperate with the efforts of HDS to obtain such protection.

Client will provide HDS with statistical reports, on request, regarding the performance of Services. Such reports shall be in a form sufficient for HDS to confirm the Fees due and payable pursuant to this Agreement. Client will permit HDS, or its representative, to inspect and audit Client's records to determine Client's compliance with the terms of this Agreement. Such audit shall occur no more often than necessary, which in any event will not exceed twice in a one-year period.

12.    **CHOICE OF LAW AND DISPUTES**

This Agreement will be governed by and construed under the laws of the state of Ohio, excluding choice of law principles. Prior to the initiation of any lawsuit or other proceeding arising under or relating to this Agreement, except for temporary and preliminary equitable relief, a party is required to provide notice to the other party of the dispute that it desires to resolve, including a reasonable written description of the

dispute and the remedy it is seeking. The parties will for a period of sixty (60) days discuss the dispute in good faith, and if they are unable to resolve the dispute within such period, then either party may bring suit to resolve such dispute. Each party consents to the personal and subject matter jurisdiction and venue of the courts located in Franklin County, Ohio for the resolution all disputes arising under or relating in any way to this Agreement. Each party agrees that any trial under this Agreement will be without a jury, and hereby waives its right to a trial by jury. Each party agrees that any breach of the confidentiality will cause the non-breaching party irreparable harm for which monetary damages are inadequate, and in addition to any other remedies available at law or otherwise, the non-breaching party is entitled to injunctive relief and specific performance without the posting of bond or other security, or if required, then the minimum bond or security required.

**13.    ADDITIONAL PROVISIONS**

**13.1    Agreement.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and cancels any prior communications, representations, understandings and agreements. This Agreement may only be modified, or any rights under it waived, by a written document executed by both parties. No waiver of any breach or default will constitute a waiver of any other or subsequent breach or default. The parties agree that each has had such legal and other advice that it required, and this Agreement will be interpreted without regard to the extent to which each party participated in its drafting.

**13.2    Assignment.**  Neither party may assign this Agreement, in whole nor in part, without the other party's written consent which will not be unreasonably withheld, provided that no such consent will be required in connection with the assignment to a legal successor in interest that assumes all obligations under this Agreement as part of a merger, reorganization, or sale of all, or substantially all, of such party's assets. Any attempt to assign this Agreement other than as permitted in this Section will be null and void and a breach of this Agreement.

**13.3    Severability.**  If any provision of this Agreement is found to be invalid or unenforceable, it will be deemed to be modified to the minimum extent necessary to be valid and enforceable, and the remainder of this Agreement will not be affected and will be enforceable according to its terms.

**13.4    Notices.**  Any notice under this Agreement will be in writing and delivered by personal delivery, express courier, confirmed facsimile, or certified or registered mail, return receipt requested, and will be deemed given upon personal delivery, one (1) day after deposit with express courier, upon confirmation of receipt of facsimile (so long as an original is sent by regular mail promptly after sending such facsimile), or five (5) days after deposit in the mail. Notices will be sent to a party at its address set forth in this Agreement or such other address as that party may specify in writing pursuant to this Section.

**13.5    Independent Contractors; Non-Exclusive; No Agency.**  The parties are independent contractors and neither party has any power or authority to assume or create any obligation or responsibility on behalf of the other party. The employees and contractors of a party to this Agreement will not represent themselves to be employees of the other party. This Agreement does not, and will not be interpreted to, create or imply any partnership, agency, exclusivity or joint venture.

**13.6    Force Majeure.**  Any delay in or failure of performance by either party under this Agreement will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of such party, including power outages, telecommunication system failures, and governmental restrictions.

**13.7    Counterparts.**  This Agreement may be executed in counterparts, which together constitute a single agreement and each of which will serve as evidence of the parties' binding agreement. The parties agree

DocuSign Envelope ID: 80C70377-67E2-46F2-95B8-BFA0B0CCE743

that electronic versions of this Agreement, including any Schedules, may serve as originals, provided they have been signed by each party.

**13.8**    **Headings**.  The headings to this Agreement's provisions are for reference only and will not affect their interpretation.

*Remainder of Page Intentionally Blank*

*Signature Page Follows*

This Agreement shall be effective as of the last date indicated below ("**Effective Date**").


**HEALTHPLAN DATA SOLUTIONS, INC.**                    **CLIENT**


By:  GARY RUTHERFORD                                   By:    THOMAS J. VILSACK
       Co-Founder & Chief Clinical Officer                    Monitor

Date:  7/13/2020                                       Date:  7/9/2020



**Consulting Services**

**Schedule A**

This **Schedule A** ("Schedule") describes HealthPlan Data Solutions, Inc. ("HDS") consulting services to assist Thomas J. Vilsack, duly appointed Monitor ("Client") for Purdue Pharma ("Purdue"), in his duties and responsibilities as Monitor.

This Schedule is entered into as of the date set forth on the signature page ("Schedule Effective Date") under the Master Services Agreement executed by the parties ("Master Terms"). Capitalized terms not defined in this Schedule are defined in the Master Terms.

1. **Services.** HDS will provide the following Services under this Schedule:
   a. **HDS Analytics and Consulting**. HDS will review and analyze data and information related to rebates, price concessions and chargebacks received from Client. HDS based on the review will offer advice and direction as to additional data that requires review and analysis. Following the review and analysis, HDS may identify any rebate, price concession or chargeback, if any, that appears unreasonable or unnecessary given market conditions at the time the rebate, price concession or chargeback was made. HDS will provide additional services required by Client so long as they are reasonably related to the duties and responsibilities of Client as Monitor.
   b. **HDS Support of Client Education.** HDS will be available for meetings to assist with explanations of the documentation to support the findings in the HDS report throughout the PBM contracting process.
2. **Client Responsibilities**. Client will provide or direct Purdue to provide in an electronic form approved by HDS the data needed for the analysis and consulting directed by Client.
3. **Fees**. Fees for Services to be provided will be <u>on a time and materials basis at the rate of $250 to $400 per hour based on the individuals at HDS providing the research and reporting.</u> Travel and other incidental costs, if any, will be billed separately.
   a. Pharmacy Analyst = $250/hour
   b. Department manager (VP) = $300/hour
   c. Senior leadership and officers = $400/hour
4. **Schedule Term.** The initial term of this Schedule ("**Initial Term**") is for 12 months.
5. **Complete Agreement**. This Schedule and the Master Terms are collectively the entire agreement between the parties with respect to the subject matter of this Schedule, and supersedes and cancels any prior communications, representations, understandings, and agreements.

DocuSign Envelope ID: 80C70377-67E2-4952-95B8-BFA0B0CCE743



**Effective on the date of the last signature indicated below.**

**HEALTHPLAN DATA SOLUTIONS, INC.**          **THOMAS J. VILSACK**

By: _Gary Rutherford_____          By: _____

GARY RUTHERFORD                                    THOMAS J. VILSACK
Co-Founder & Chief Clinical Officer               Monitor

Date: ___7/13/2020_____          Date: ___7/9/2020_____