# EXHIBIT A

**Additional Agreement**

**EY**
Building a better
working world

Ernst & Young, LLP        Tel: +1 212 773 3000
5 Times Square            Fax: +1 212 773 3001
New York, NY 10036        ey.com

Purdue Pharma, L.P.                                            August 13, 2020
Attention: Jon Lowne
201 Tresser Blvd
Stamford, CT 06901

Dear Mr. Lowne:

Thank you for choosing Ernst & Young LLP ("we" or "EY") to perform professional services (the "Services") for Purdue Pharma, L.P. ("Purdue") on behalf of itself and its Subsidiaries (collectively, "you" or "Client") subsequent to Client filing a petition under Chapter 11 ("Chapter 11") of the United States Bankruptcy Code  ("Bankruptcy Code") on or about September 15, 2019 with the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). "Subsidiary" means, with respect to Purdue , any person, firm, trust, corporation, partnership or other entity or combination thereof that is, directly or indirectly, controlled by Purdue; for purposes of this definition, the term "controlled by" means direct or indirect ownership of fifty percent (50%) or more of the voting and equity rights of such person, firm, trust, corporation, partnership or other entity or combination thereof, or the power to direct the management of such person, firm, trust, corporation, partnership or other entity or combination thereof.

Our performance of Services is contingent upon the Bankruptcy Court's approval of our retention in accordance with the terms and conditions that are set forth in this Agreement and subject to the provisions of the *Order Approving Debtors' Employment of Ernst & Young as Their Auditor,* Nunc Pro Tunc *to the Petition Date* entered by the Bankruptcy Court on December 23, 2019. We appreciate the opportunity to assist you and look forward to working with you.

For each project that we agree to undertake for you, we will prepare a Statement of Work describing the particular Services, as well as any advice, presentations, or filings to be made, our fees therefor, and any other project-specific arrangements and shall be subject to approval of the Bankruptcy Court. All of the Services will be subject to the terms and conditions of this letter, its attachments, including the General Terms and Conditions, and the applicable Statement of Work (together, this "Agreement").

This Agreement shall be effective as of the date set forth above.



Ernst & Young, LLP    Tel: +1 212 773 3000
5 Times Square    Fax: +1 212 773 3001
New York, NY 10036    ey.com

Please sign this letter in the space provided below to indicate your agreement with these arrangements and return it to Devon Brady at your earliest convenience. If you have any questions about any of these materials, please do not hesitate to contact Devon Brady so that we can address any issues you identify before we begin to provide any Services.

Very truly yours,

*Brian DePersiis*
EE6A7AF0A42E4C5...

Ernst & Young LLP


AGREED:

Purdue Pharma, L.P., on behalf of itself and its Subsidiaries

By: _____ *Jon Lowne* _____
DABC89618EF9421...
Jon Lowne, VP, CFO

## General Terms and Conditions

### Our relationship with you

1.  We will perform the Services in accordance with applicable professional standards, including those established by the American Institute of Certified Public Accountants ("**AICPA**").

2.  We are a member of the global network of Ernst & Young firms ("**EY Firms**"), each of which is a separate legal entity.

3.  We will provide the Services to you as an independent contractor and not as your employee, agent, partner or joint venturer. Neither you nor we have any right, power or authority to bind the other.

4.  Subject to Bankruptcy Court approval, we may subcontract portions of the Services to other EY Firms, who may deal with you directly. Nevertheless, we alone will be responsible to you for the Reports (as defined in Section 11), the performance of the Services, and our other obligations under this Agreement. From time to time, non-CPA personnel may perform the Services.

5.  We will not assume any of your management responsibilities in connection with the Services. We will not be responsible for the use or implementation of the output of the Services, although we may otherwise provide advice and recommendations to assist you in your management functions and making decisions.

### Your responsibilities

6.  You shall assign a project manager or coordinator to oversee the Services. You are responsible for all management decisions relating to the Services, the use or implementation of the output of the Services and for determining whether the output of the Services are appropriate for your purposes.

7.  You shall provide (or cause others to provide) to us, on reasonable advance notice, the information, resources and assistance (including access to records, systems, premises and people) that we reasonably require to perform the Services.

8.  To the best of your knowledge, all information provided by you or on your behalf ("**Client Information**") will be accurate and complete in all material respects. The provision of Client Information to us will not infringe any copyright or other third-party rights.

9.  We will rely on Client Information made available to us and, unless we expressly agree otherwise, will have no responsibility to evaluate or verify it.

10.  You shall be responsible for your personnel's compliance with your obligations under this Agreement.

### Our Reports

11.  Any information, advice, recommendations or other content of any reports, presentations or other communications we provide under this Agreement ("**Reports**"), other than Client Information, are for your internal use only (consistent with the purpose of the particular Services).

12.  You may not disclose a Report (or any portion or summary of a Report) externally (including to your affiliates) or refer to us or to any other EY Firm in connection with the Services, except:

     (a) to your lawyers, (subject to these disclosure restrictions), who may review it only to give you advice relating to the Services,

     (b) to the extent, and for the purposes, required by subpoena or similar legal process (of which you will promptly notify us),

     (c) to other persons (including your affiliates) with our prior written consent, who have executed an access letter substantially in the form we prescribe, or

     (d) to your accountants, auditors, consultants and financial advisors  acting strictly in an advisory capacity to you, who may use it only to give you advice relating to the Services, provided they have agreed not to further disclose it without our prior written consent and not to bring any claims against us in connection therewith, provided further that in no event will any advisor (or any other person or entity) be permitted to obtain access, directly or indirectly, to any Reports pursuant to this subparagraph (d) in connection with any function other than for the provision of such advice, such as in connection with any fairness opinion, credit rating or credit enhancement, brokering or underwriting of any insurance, or financing (in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity),

     (e) to the extent it contains Tax Advice, as set forth in Section 13.

     If you are permitted to disclose a Report (or a portion thereof) externally, you shall not alter, edit or modify it from the form we provided.

13.  You may disclose to anyone a Report (or a portion thereof) solely to the extent that it relates to tax matters,

including tax advice, tax opinions, tax returns, or the tax treatment or tax structure of any transaction to which the Services relate ("**Tax Advice**"). With the exception of tax authorities, you shall inform those to whom you disclose Tax Advice that they may not rely on it for any purpose without our prior written consent.

14. You may incorporate into documents that you intend to disclose externally EY summaries, calculations or tables based on Client Information contained in a Report, but not our recommendations, conclusions or findings. However, you must assume sole responsibility for the contents of those documents and not refer to us or any other EY Firm in connection with them. This provision does not affect your ability to circulate Reports internally.

15. You may not rely on any draft Report. We shall not be required to update any final Report for circumstances of which we become aware, or events occurring, after its delivery.

## Limitations

16. You (and any others for whom Services are provided) may not recover from us, in contract or tort, under statute or otherwise, any consequential, incidental, indirect, punitive or special damages in connection with claims arising out of this Agreement or otherwise relating to the Services, including any amount for loss of profit, data or goodwill, whether or not the likelihood of such loss or damage was contemplated. This limitation will not apply to losses caused by our fraud or willful misconduct or to the extent prohibited by applicable law or professional regulations.

17. You (and any others for whom Services are provided) may not recover from us, in contract or tort, under statute or otherwise, aggregate damages in excess of the fees actually paid for the Services that directly caused the loss in connection with claims arising out of this Agreement or otherwise relating to the Services. This limitation will not apply to losses caused by our fraud or willful misconduct or to the extent prohibited by applicable law or professional regulations.

18. You shall make any claim relating to the Services or otherwise under this Agreement no later than two years after you became aware (or ought reasonably to have become aware) of the facts giving rise to any alleged such claim and in any event, no later than three years after the completion of the particular Services. This limitation will not apply to the extent prohibited by applicable law or professional regulations.

19. You may not make a claim or bring proceedings relating to the Services or otherwise under this

Agreement against any other EY Firm or our or its subcontractors, members, shareholders, directors, officers, partners, principals or employees ("**EY Persons**"). You shall make any claim or bring proceedings only against us. The provisions of Sections 16 through 20 are intended to benefit the other EY Firms and all EY Persons, who shall be entitled to enforce them.

## Indemnity

20. To the fullest extent permitted by applicable law and professional regulations, you shall indemnify us, the other EY Firms and the EY Persons against all claims by third parties (including your affiliates and attorneys) and liabilities, losses, damages, costs and expenses resulting from such claims by third parties (including reasonable external and internal legal costs), arising out of the disclosure of any Report (other than Tax Advice) or a third party's use of or reliance on any Report (including Tax Advice) disclosed to it by you or at your request. Notwithstanding any provision to the contrary contained in this Agreement, you shall have no obligation to indemnify us, the other EY Firms or the EY Persons to the extent any such liabilities, losses, damages, costs or expenses relate to the gross negligence or willful misconduct of EY, the other EY Firms or the EY Persons.

## Intellectual property rights

21. We may use data, software, designs, utilities, tools, models, systems and other methodologies and know-how that we own or license ("**Materials**") in performing the Services. Notwithstanding the delivery of any Reports, we retain all intellectual property rights in the Materials (including any improvements or knowledge developed while performing the Services), and in any working papers compiled in connection with the Services (but not Client Information reflected in them).

22. Upon payment for particular Services and subject to the other terms of this Agreement, you may use the Reports relating to those Services, as well as any Materials owned by us that are included therein, solely to the extent necessary to use the Reports.

## Confidentiality

23. Except as otherwise permitted by this Agreement, neither of us may disclose to third parties the contents of this Agreement or any information, including Client Information (other than Tax Advice) provided by or on behalf of the other that ought reasonably to be treated as

confidential and/or proprietary. Either of us may, however, disclose such information to the extent that it:

(a) is or becomes public other than through a breach of this Agreement,

(b) is subsequently received by the recipient from a third party who, to the recipient's knowledge, owes no obligation of confidentiality to the disclosing party with respect to that information,

(c) was known to the recipient at the time of disclosure or is thereafter created independently,

(d) is disclosed as necessary to enforce the recipient's rights under this Agreement,

(e) must be disclosed under applicable law, legal process or professional regulations or

(f) to the extent necessary to obtain or desirable to facilitate Bankruptcy Court approval.

24. Either of us may use electronic media to correspond or transmit information and such use will not in itself constitute a breach of any confidentiality obligations under this Agreement.

25. Unless prohibited by applicable law, we may provide Client Information to other EY Firms (which are listed at www.ey.com) and EY Persons, as well as external third parties providing services on our or their behalf, who may collect, use, transfer, store or otherwise process (collectively, "**Process**") it in various jurisdictions in which they operate in order to facilitate performance of the Services, to comply with regulatory requirements, to check conflicts, to provide financial accounting and other administrative support services or for quality and risk management purposes. We shall be responsible to you for maintaining the confidentiality of Client Information, regardless of where or by whom such information is Processed on our behalf.

26. With respect to any Services, if U.S. Securities and Exchange Commission auditor independence requirements apply to the relationship between you or any of your associated entities and any EY Firm, you represent, to the best of your knowledge, as of the date of this Agreement and as of the date of each Statement of Work hereunder, that neither you nor any of your affiliates has agreed, either orally or in writing, with any other advisor to restrict your ability to disclose to anyone the tax treatment or tax structure of any transaction to which the Services relate. An agreement of this kind could impair an EY Firm's independence as to your audit or that of any of your affiliates, or require

specific tax disclosures as to those restrictions. Accordingly, you agree that the impact of any such agreement is your responsibility.

## Data protection

27. If we Process Client Information that can be linked to specific individuals ("**Personal Data**"), we will Process it in accordance with Section 25 of this Agreement, as well as applicable law and professional regulations, including, where applicable, the EU-U.S. Privacy Shield Framework and the Swiss-U.S. Privacy Shield Framework, each administered by the U.S. Department of Commerce and to which EY has self-certified (collectively, the "Privacy Shield Framework"). Further information (including disclosures required by the Privacy Shield Framework) is set out at www.ey.com/us/privacyshield. We will require any service provider that Processes Personal Data on our behalf to provide at least the same level of protection for such data as is required by the Privacy Shield Framework and other legal and regulatory requirements applicable to us. If any Client Information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information.

28. You warrant that you have the authority to provide the Personal Data to us in connection with the performance of the Services and that the Personal Data provided to us has been Processed in accordance with applicable law. In order to provide the Services, we may need to access Personal Data consisting of protected health information, financial account numbers, Social Security or other government-issued identification numbers, or other data that, if disclosed without authorization, would trigger notification requirements under applicable law ("Restricted Personal Data"). In the event that we need access to such information, you will consult with us on appropriate measures (consistent with professional standards applicable to us) to protect the Restricted Personal Data, such as deleting or masking unnecessary information before it is made available to us, encrypting any data transferred to us, or making the data available for on-site review at a Client site. You will provide us with Restricted Personal Data only in accordance with mutually agreed protective measures.

## Fees and expenses generally

29. You shall pay our professional fees and specific expenses in connection with the Services as detailed in the applicable Statement of Work. You shall also reimburse us for other reasonable expenses incurred in

performing the Services. Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Services, all of which you shall pay (other than taxes imposed on our income generally). Unless otherwise set forth in the applicable Statement of Work, payment is due within 45 business days following receipt of each of our invoices or as quickly as the Bankruptcy Code, Bankruptcy Rules, Local Rules and any relevant orders of the Bankruptcy Court allow.

We may receive rebates in connection with certain purchases, which we use to reduce charges that we would otherwise pass on to you.

30.   Subject to Bankruptcy Court approval, if necessary, we may charge additional professional fees if events beyond our control (including your acts or omissions) affect our ability to perform the Services as originally planned or if you ask us to perform additional tasks.

31.   If we are required by applicable law, legal process or government action to produce information or personnel as witnesses with respect to the Services or this Agreement, you shall reimburse us for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request, unless we are a party to the proceeding or the subject of the investigation.

## Force majeure

32.   Neither you nor we shall be liable for breach of this Agreement (other than payment obligations) caused by circumstances beyond your or our reasonable control. To the extent that the provision of the Services is impacted by a pandemic (including COVID-19) and any reasonable concerns or measures taken to protect the health and safety interests of either Party's personnel, the Parties will work together to amend the SOW to provide for the Services to be delivered in an appropriate manner, including any resulting modifications with respect to the timelines, location, or manner of the delivery of Services.

## Term and termination

33.   This Agreement applies to the Services whenever performed after the date of your filing of a Chapter 11 petition (including before the date of this Agreement).

34.   This Agreement shall terminate upon the completion of the Services. This Agreement and/or any or all Statements of Work may be terminated at any time by you or us, but in any event this Agreement including all Statements of Work will expire upon the effective date

of your confirmed plan of reorganization, or liquidation of your assets under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.

35.   You shall pay us for all work-in-progress, Services already performed, and expenses incurred by us up to and including the effective date of the termination of this Agreement. Payment is due within 45 business days following receipt of our invoice for these amounts or as quickly as the Bankruptcy Code, Bankruptcy Rules, Local Rules and any relevant orders of the Bankruptcy Court allow.

36.   The provisions of this Agreement, including Section 14 and Section 37 and otherwise with respect to Reports, that give either of us rights or obligations beyond its termination shall continue indefinitely following the termination of this Agreement and shall survive completion of the Client's bankruptcy whether through a confirmed plan of reorganization under Chapter 11, liquidation of the Client's assets under Chapter 7 of the Bankruptcy Code, or otherwise, but our respective confidentiality obligations (other than those relating to Reports or under Section 14) shall continue thereafter for five years only.

## Governing law and dispute resolution

37.   This Agreement, and any non-contractual matters or obligations arising out of this Agreement or the Services, including (without limitation) claims arising in tort, fraud, under statute or otherwise relating to the Services, or questions relating to the scope or enforceability of this Section 37, shall be governed by, and construed in accordance with, the laws of New York applicable to agreements made, and fully to be performed, therein by residents thereof.  Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Client or its subsidiaries or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made.  If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and

all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in Appendix 1 to these Terms and Conditions. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon Client, EY and any all successors and assigns thereof.

## Miscellaneous

38.  This Agreement constitutes the entire agreement between us as to the Services and the other matters it covers, and supersedes all prior agreements, understandings and representations with respect thereto, including any confidentiality agreements previously delivered. In addition, any policy, protocol, agreement (other than this Agreement) or other instrument, in whatever form, imposed at any time that purports to obligate EY, any other EY Firm or any EY Person with respect to the use of Client Information shall be void and of no further effect, and you shall not seek to enforce any such obligation. Except as expressly provided otherwise herein, this Agreement does not modify the terms or provisions for other professional services executed prior to Client's filing of a Chapter 11 petition in the Bankruptcy Court.

39.  Both of us may execute this Agreement (including Statements of Work), as well as any modifications thereto, by electronic means and each of us may sign a different copy of the same document. Both of us must agree in writing to modify this Agreement or any Statement of Work hereunder, subject to Bankruptcy Court approval, if necessary.

40.  Each of us represents to the other that each person signing this Agreement or any Statement of Work hereunder on its behalf is expressly authorized to execute it and to bind such party to its terms. You also represent that this Agreement has, if necessary, been considered and approved by your Audit Committee. You represent that your Subsidiaries and any others for whom Services are performed shall be bound by the terms of this Agreement.

41.  You agree that we and the other EY Firms may, subject to professional obligations, act for other clients, including your competitors.

42.  Neither of us may assign any of our rights, obligations or claims arising out of or related to this Agreement or any Services.

43.  If any provision of this Agreement (in whole or part) is held to be illegal, invalid or otherwise unenforceable, the other provisions shall remain in full force and effect.

44.  If there is any inconsistency between provisions in different parts of this Agreement, those parts shall have precedence as follows (unless expressly agreed otherwise): (a) the Cover Letter, (b) the applicable Statement of Work and any attachments thereto, (c) these General Terms and Conditions, and (d) other attachments to this Agreement.

45.  Neither of us may use or reference the other's name, logo or trademarks publicly without the other's prior written consent.

46.  By agreement to the provision of the Services, we are not providing a guarantee to you that our performance of those services pursuant to the terms and conditions set forth in this Agreement will guarantee your successful reorganization under Chapter 11.

# Appendix 1

# Dispute resolution procedures

## Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of any EY audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

## Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. The arbitration shall be seated and take place in New York, New York. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director, or substantial equity owner of any EY audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction.  In deciding the dispute, the arbitration panel shall apply the limitations period that would be applied by a court deciding the matter in the same jurisdiction, and shall have no power to decide the dispute in any manner not consistent with such limitations period.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

**Statement of Work**

This Statement of Work ("SOW") dated August 13, 2020 (this "SOW") is made by Ernst and Young LLP ("we" or "EY") and Purdue Pharma, L.P. on behalf of itself and its Subsidiaries (collectively, "Purdue", "you", or "Client"), pursuant to the Main Agreement, dated July 31, 2020 (the "Agreement"), between EY and Purdue which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about September 15, 2019 with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and describes certain tax services that EY will perform for the Client during the Client's Chapter 11 proceedings.

This SOW shall be effective as of the date of execution of this SOW.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the Services covered by this SOW and not to Services covered by any other Statement of Work pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to you.

**Scope of Services**

Purdue management has requested EY to perform a maturity assessment of its information security program in alignment with leading practices, existing cyber threat landscape, and business and regulatory considerations. We will provide Services to you, contingent upon the Bankruptcy Court's approval of our retention in accordance with the terms and conditions that are set forth in the Agreement (inclusive of this SOW). The focus and proposed scope is documented within the table below. To meet these objectives, EY will work with Purdue to execute the following activities and produce the following work products, as defined within the table below:

| EY role/ responsibilities | Client role/ responsibilities | EY intended work product |
|---|---|---|
| • Provide kickoff deck<br>• Coordinate with Purdue to determine interviewees and establish interview schedules.<br>• Request relevant documentation, including security assessments, security framework, governance structure, policies, standards, playbooks, etc.<br>• Conduct kickoff meeting to review objectives, refine approach, and set project milestones.<br>• Inspect documentation of current information security framework to identify coverage | • Purdue management will make a project manager or coordinator available to help with arranging meetings, scheduling interviews, providing requested documentation, reviewing work products and answering any questions applicable to the in-scope assessment that may arise.<br>• Purdue management will make all decisions with respect to whether to implement, modify, or reject EY recommendations | • EY will provide an observations and recommendations report documenting observations on the Client's framework alignment to best practices as well as current state information security program and recommendations for Purdue management's consideration per leading practice.<br>• Any maturity rating contained in the reports will not represent any conclusion as to the effectiveness or adequacy |

| EY role/ responsibilities | Client role/ responsibilities | EY intended work product |
|---|---|---|
| and gaps in comparison to leading practice.<br>• Inspect documentation to establish baseline views of the capabilities across the enterprise<br>• Conduct stakeholder interviews to understand and evaluate the current state of Purdue's information security practices to the existing framework.<br>• Predefined maturity levels will be used as part of EY's Cybersecurity Program Maturity Assessment methodology and enablers using a 1-5 CMMI1 maturity scale, with 1 being the least mature and 5 being the most mature level, for each information security domain assessed.<br>• Maturity assessments will be based on industry leading practices and peer comparisons.<br>• Determine findings in capabilities associated with identifying, protecting, detecting, responding, and recovering to threats / risks.<br>• Provide recommendations for Purdue's consideration.<br>• Participate in meetings to validate findings and recommendations with Purdue management.<br>• Provide weekly progress updates to Purdue management on the status of the assessment engagement.<br>• Provide assessment findings and recommendations report for the assessment containing an executive summary, | | of Purdue's information security program, processes or controls (see section directly below for maturity ratings scale).<br>• EY will advise Purdue management in Purdue's preparation of executive summary level presentations and provide input into leading practices, as discussed and agreed to, related to the procedures performed and results obtained.<br>• EY will not make any decisions as to whether the recommendations arising out of this assessment are implemented by Purdue, nor the manner by which they are implemented. |

[1] CMMI, or the Capability Maturity Model Integration, is a process level improvement training and appraisal program administered by the CMMI Institute, a subsidiary of ISACA.

| EY role/ responsibilities | Client role/ responsibilities | EY intended work product |
|---|---|---|
| observations and recommendations.<br>• Present findings and report with Purdue management stakeholders and leadership. | | |

EY will provide relevant industry benchmarking insights to help Purdue management understand how its information security framework and program compares to companies in the Healthcare sector. In addition, EY will provide high-level recommendations to Purdue that may include possible alternatives for management to consider, leading practices in the Health sector, and other topical or functional recommendations for management's consideration.

## Ratings

We will assign evaluation ratings in our assessment as follows:

| | Evaluation assessment rating level descriptions |
|---|---|
| 1 | **Initial** – Basic, ad hoc, undocumented; changing capability may be in place with some technology and tools; limited local processes; limited organizational support. |
| 2 | **Managed** – Partial capability is in place with a combination of some technology and tools; local processes covering some regions/business units or processes are repeatable but may not be good practice or maintained; limited organizational support to implement good practice. |
| 3 | **Defined** – Defined capability is in place with significant technology and tools for some key resources and people; processes defined for some regions and/ or business units; organizational guidance and support is in place for some key regions and/or business units. |
| 4 | **Quantitatively Managed** – Mature capability is in place with advanced technology and tools for most key resources and people; consistent processes exist for most regions and/or business units; some governance is in place (accountability/responsibility/metrics) for most key regions and/or business units. |
| 5 | **Optimizing** – Advanced capability is in place which is leading-edge technology and tools for all key resources and people; consistent process across regions and business units; effective governance is in place (accountability / responsibility/continual monitoring for improvement). |

Our ratings do not represent any conclusion as to the effectiveness or adequacy of your information security function, program or controls. Only you can assess whether the controls, functions, processes or programs you have implemented are adequate to meet your strategic, operational, and compliance information security objectives.

The Services may be modified from time to time by our mutual written agreement and approval of the Bankruptcy Court, if required.

Client acknowledges and agrees that, whether or not this SOW has been approved by the Bankruptcy Court at the time any Report is rendered, any such Report rendered by EY prior to the delivery of its final Report is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.

## Out-of-Scope Services

Any activities not described as Services, as indicated above under Scope of Services, are not covered by the fees

stated herein. These services will be considered outside the scope of this SOW and are the responsibility of Client to perform on a timely basis unless otherwise agreed by the parties in writing (in a separate SOW or an amendment to this SOW) and approved by the Bankruptcy Court, if required.

## ENGAGEMENT ASSUMPTIONS:

► Purdue will make a project manager or coordinator available that will be responsible for executing the following tasks:
  - o Inform stakeholders and interviewees about the purpose of this engagement
  - o Obtain requested documentation, including relevant policies, procedures and guidelines to be evaluated
  - o Identify and make stakeholders available per the schedule agreed during the planning phase of the project
  - o Facilitate reviews of work products/documents
  - o Resolve escalated risks in a timely manner

► Purdue management will facilitate access to documentation and key IT, security and other applicable stakeholders for interviews, meetings and workshops as deemed necessary at the outset of the engagement.

► EY estimates 15-20 interviews max for purposes of performing walkthrough meetings to understand the information security maturity existing framework and practices.

► EY will review Purdue's current proprietary framework and conduct an assessment of all the information security domains identified in the EY CPA (Cyber Program Assessment) framework, not a deep-dive on any of the specific components or reviewing the design and configurations of security controls.

► Purdue Pharma and all wholly owned subsidiaries (Avrio Health, Imbrium Theraputics, Rhodes Pharma, Purdue Pharmaceuticals) are governed by standardized policies and procedures and managed in a consistent manner.

► Purdue Pharma's data centers are managed identically by a managed services provider and as such do not require additional assessment based on the number of data centers.

► Scope of the project does not include design or test of controls, including direct edits to policy documents (e.g., port scanning, vulnerability identification) or implementation of controls (e.g., deployment of identity and access management technology).

► Project timeline and proposed cost assumes policies and procedures are substantially centralized, with limited variations among the Purdue Pharma and the four wholly owned subsidiaries.

► EY will provide weekly status updates to inform Purdue management with updates regarding the progression of the assessment.

► Assessment will primarily rely upon information gathered during interview sessions. EY will request documentation to complement information gathered during interviews. Purdue management will work efficiently to provide requested documentation and information required by EY.

► Purdue management is responsible for final validation and acceptance of all engagement work products. Work products will be reviewed and commented as needed to complete the activities within the estimated timeframe and avoid impacting the overall schedule integrity and fees.

► Purdue management will provide adequate space for EY personnel throughout the project when engaging U.S.-based entities. This will include building access, workspace, network or wireless internet access for VPN usage, and a telephone with conference phone capability.

► Purdue management is responsible for managing dependencies with initiatives outside of the project. EY is only responsible for monitoring the dependencies reported within the project scope. If a dependency outside of the project causes significant impact to the project's plan, the change order process will be invoked.

► Purdue management will discuss proposed changes to the scope with our Engagement Partner and Project Lead so that expectations can be managed on both sides. Request for additional reports or presentation materials beyond the work products described will require additional funding.

► The Purdue project lead will be responsible for presenting the final Reports to relevant internal stakeholders.

- ► EY will not evaluate management's skill and competency level.
- ► EY will perform Services at the Purdue location in Stanford, Connecticut or from EY office locations.
- ► Any planned vacations or time off will be communicated by both parties in advance of fieldwork and a mutually agreed-upon plan will be executed to avoid impact to the overall schedule integrity and fees.
- ► Purdue will be responsible for compliance with all applicable laws and regulations, including relevant privacy concerns.
- ► Any change in scope requiring additional services to be provided by EY that result in increased fees will be mutually agreed to by EY and Purdue management in advance of the additional work being performed.

## TIMETABLE

Unless otherwise agreed, and subject to the General Terms and Conditions of the Agreement, we expect the services to take approximately six weeks and we expect to perform the services during the period from September 8, 2020 through October 16, 2020, with the following schedule in mind:

- ► Week 1:    Project kickoff and planning
- ► Week 2/3:    Conduct interviews and evaluate information security program
- ► Week 3/4:    Benchmarking analysis, Synthesize data, Design options, and Presentation draft
- ► Week 4/5:    Information security strategy recommendations, Presentation and finalization
- ► Week 5/6:    Presentation and finalization, Project wrap and final discussions

## CONTACTS

You have identified the following individuals as your primary contacts with whom we should communicate about these Services:

| Role | Name | Email |
| --- | --- | --- |
| Senior Director, PMO & Information Technology | Hussein Ghnaimeh | hussein.ghnaimeh@pharma.com |

Brian DePersiis (Principal) and Tunde Lawson (Senior Manager) will lead the EY team in providing the Services. If either of these individuals ceases to provide the Services to the Purdue pursuant to this SOW, EY will so advise management and, if either are replaced, we will provide management with the name of the professional's replacement. Such replacements will be of an experience level similar to that of the individuals replaced. Other staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

### Fees

The General Terms and Conditions of the Agreement address our fees and expenses generally. Fees for the Services described above are $150,000 US dollars.  Total engagement related travel expenses will not exceed $15,000 US dollars and are to be billed as incurred.

EY will invoice Purdue for the Services rendered with an initial invoice of $37,500 upon commencement of the engagement, with the remainder of the engagement fees to be billed upon completion of the engagement, including engagement related expenses incurred and taxes. Payment is due in accordance with the Agreement. The expenses will be billed at actuals within each of the engagement invoices.

You shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by you.

We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Rules") and any relevant administrative orders. We will submit our invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.

We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

## LIMITATIONS ON SCOPE

We will not identify, address or correct any errors or defects in your computer systems, other devices or components thereof ("Systems"), whether due to imprecise or ambiguous entry, storage, interpretation or processing or reporting of data. We will not be responsible for any defect or problem arising out of or related to data processing in any Systems.

We will not:

- ► Perform ongoing internal control monitoring activities or other control activities that affect the execution of transactions or confirm that transactions are properly executed and/or accounted for.
- ► Perform routine activities in connection with your financial processes that are equivalent to those of an ongoing compliance or quality control function.
- ► Perform monitoring, quality assurance or quality control for you.
- ► Provide comprehensive recommendations to substantially design your process(es) or system(s).
- ► Determine which, if any, recommendations for improving internal control should be implemented.
- ► Act on your behalf in reporting to your Board of Directors or Audit Committee.
- ► Authorize, execute or consummate transactions or otherwise exercise authority on your behalf.
- ► Prepare source documents on transactions.

## YOUR SPECIFIC OBLIGATIONS

You will not, and you will not permit others to, quote or refer to the Reports, any portion, summary or abstract thereof, or to EY or any other EY Firm, in any document filed or distributed in connection with (i) a purchase or sale of securities to which the United States or state securities laws ("Securities Laws") are applicable, or (ii) periodic reporting obligations under Securities Laws. You will not contend that any provisions of Securities Laws could invalidate any provision of this Agreement.

We also draw your attention to the reservations set out in paragraph 5 of the General Terms and Conditions of the Agreement, as well as your management responsibilities under paragraph 6, your obligations under paragraphs 11 and 12, and your representation, as of the date hereof, under paragraph 26 thereof. With respect

DocuSign Envelope ID: 4785F8951-B663-466C-B82B-85419C9A863B

to the Services and solely to the extent necessary, you have obtained the prior approval of your Audit Committee, or the preapproval of those charged with governance where an Audit Committee does not exist, as applicable.

You shall assign a project manager or coordinator to oversee the Services. You are responsible for all management decisions relating to the Services, the use or implementation of the output of the Services and for determining whether the Services are appropriate for your purposes.

## SPECIFIC ADDITIONAL TERMS AND CONDITIONS

The Services are advisory in nature. EY will not render an assurance report or opinion under the Agreement, nor will the Services constitute an audit, review, examination, or other form of attestation as those terms are defined by the American Institute of Certified Public Accountants. None of the Services or any Reports will constitute any legal opinion or advice. We will not conduct a review to detect fraud or illegal acts.

Notwithstanding anything to the contrary in the Agreement or this SOW, we do not assume any responsibility for any third-party products, programs or services, their performance or compliance with your specifications or otherwise.

We will base any comments or recommendations as to the functional or technical capabilities of any products in use or being considered by you solely on information provided by your vendors, directly or through you. We are not responsible for the completeness or accuracy of any such information or for confirming any of it.

Unless prohibited by applicable law, we may provide Client Information to other EY Firms, EY Persons and external third parties, who may collect, use, transfer, store or otherwise process such information in various jurisdictions in which they operate in order to provide support services to any EY Firm and/or assist in the performance of the Services.

Our written consent under the Agreement is required for you to disclose to a third party any of our Reports (other than Tax Advice) for which EY's involvement is known, or likely to be known, including Reports that are issued on EY letterhead or refer to EY in connection with the Services. If we provide written consent, we also require the third party to execute a letter substantially in the form of **Appendix A** to this SOW. Notwithstanding the foregoing, it is not expected that any of our Reports, on EY letterhead or referencing EY, will be distributed outside of the Client.

In performing the services, we will not take any action that we reasonably believe could impair our independence with respect to any of our audit clients or those of other EY Firms. For example, we will not instruct, supervise or contract with an entity, without having first determined that such action would not impair our independence.

We may retain, disclose and use Client Information that we collect in connection with any services we perform for you for research and thought leadership purposes, as well as for the purpose of providing services to other clients, as long as we identify you only in general terms in connection with such information (e.g., "a technology company").

DocuSign Envelope ID: 4785F851-B663-466C-B92D-85219C9A863B

Compliance with U.S. immigration requirements may require EY to provide certain information to the U.S. Citizenship and Immigration Services ("USCIS") to confirm that EY employees on certain visas are, in fact, EY employees and not employees of Client or other clients of EY.  This will include providing certain information regarding work locations to support compliance with the visa requirements.  As such, EY may disclose to USCIS information regarding this SOW, including Client's identity and location, as well as redacted agreements.  Upon providing this information, EY will request that USCIS keep any such information confidential.  In further support of these legal requirements, the U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding H-1B visas will be working on Client's premises.  EY and Client will work together to develop an appropriate notice as required.

EY resources will be operating at all times as an employee of and under the direction and control of Ernst & Young U.S. LLP's management, and all activities including supervision, hiring and firing decisions, and performance evaluations are controlled by Ernst & Young U.S. LLP. Client will not have the right to control EY resources. At all times, EY resources will receive direction from an EY Manager while on-site at Client premises.

In witness whereof, the parties have executed this SOW as of the date set forth above.

**Ernst & Young LLP**

By: _Brian DePersiis_
EE6A7AF0A42E4C5...

Name:   Brian DePersiis

Title:    Principal, Authorized Signatory

8/13/2020

Date:

**Purdue Pharma, L.P.**

By: _Jon Lowne_
DAB089616EF9421...

Jon Lowne

Name:

CFO

Title:

8/13/2020

Date:

**Appendix A**
Form of Access Letter
[Letterhead of EY]

[Addressee (e.g., third party seeking access to EY Report)]                    [Month XX, 20XX]
[Street Address]
[City, State  Zip]

Dear [_____] :

Purdue Pharma, Inc. (the "Client") has informed Ernst & Young LLP ("EY") that it wishes to disclose to [party seeking access]  (the "Recipient") EY's [describe report(s)] , dated [_____] , relating to [describe subject]  (the "Report(s)"). EY has not placed any limitations on the Client's ability to disclose any contents of the Report relating to the tax aspects or structure of any transaction proposed by the Client.

EY performed services only for the Client. EY did not undertake the services on behalf of, or to serve the needs of, the Recipient or any other third party. As part of such services, EY did not audit the Client's financial statements, subsequent to the date(**s**) of the Report(**s**).

EY prepared the Report(**s**) solely for the Client. The Report(**s**) address[ es]  only the issues identified by the Client, and [ is/are]  based solely on information obtained by EY using the procedures specified by the Client or otherwise provided by or on behalf of the Client. The Report(**s**) [ is/are]  subject to many limitations and [ do/does]  not provide any form of assurance with respect to any of the information referred to therein. The Recipient understands and accepts the scope and limitations of the Report(**s**).

Except (1) where compelled by legal process (of which the Recipient will immediately notify EY and tender to EY, if it so elects, the defense thereof), (2) with respect to any contents of the Report relating to the tax treatment and tax structure of the proposed transaction (including any facts that may be relevant to understanding the proposed tax treatment of the proposed transaction), or (3) with EY's prior written consent, the Recipient will not, circulate, quote, disclose or distribute any of the Report(**s**) or any information contained therein, or any summary or abstract thereof, or make any reference thereto or to EY, to anyone other than the Recipient's directors, officers or employees or legal advisors who, in each case, need to know its contents in order to _____ , and who have agreed to be bound by the terms and conditions of this agreement to the same extent as the Recipient.

The Recipient further agrees that it will not, and will not permit others to, quote or refer to the Report, any portion, summary or abstract thereof, or to EY, in any document filed or distributed in connection with (a) a purchase or sale of securities to which the United States or state securities laws ("Securities Laws") are applicable or (b) periodic reporting obligations under Securities Laws. The Recipient will not contend that any provisions of Securities Laws could invalidate any provision of this agreement.

In further consideration of EY allowing the Recipient access to the Report(s) and the information contained therein, the Recipient agrees that:

1. It does not acquire any rights against EY, and EY does not assume any duties or obligations to the Recipient or otherwise, as a result of such access.

2. It will not rely on the Report(**s**) or any portion thereof and will make no claim that it has done so.

3. It will make no claim against EY, its partners, employees or affiliates, or other members of the global Ernst & Young network (collectively, the "EY Parties" that relates in any way to the Report(**s**), any information contained therein, or the Recipient's access to the Report(**s**).

4. To the fullest extent permitted by applicable law, it will indemnify, defend and hold harmless the EY Parties from and against any claim or expense, including reasonable attorneys' fees, suffered or incurred by any EY Party relating to any breach by the Recipient of any of its representations or agreements contained herein or the use or disclosure of the Report(**s**) or any portion thereof by anyone who received it directly or indirectly from or at the request of the Recipient.

Very truly yours,

Ernst & Young LLP [replace with EY facsimile signature when final]

Accepted by:

[Addressee]

By:    _____