**Hearing Date and Time: September 30, 2020, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: September 16, 2020, at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## NOTICE OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PLAN AND A KEY EMPLOYEE RETENTION PLAN

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PLEASE TAKE NOTICE that on September 9, 2020, the above-captioned debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* (the "**Motion**"). A hearing on the Motion will be held on **September 30, 2020** at **10:00 a.m.** (prevailing Eastern Time) (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

PLEASE TAKE FURTHER NOTICE that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), the Hearing will be conducted telephonically.[2] Parties wishing to appear at, or attend, the Hearing must refer to and comply with the Bankruptcy Court's guidelines for telephonic appearances[3] and make arrangements with Court Solutions LLC by telephone at (917) 746-7476.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing. The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of

---

[2] A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/court-operations-under-exigent-circumstances-created-covid-19.

[3] The Bankruptcy Court's procedures for telephonic appearances are available at:
http://www.nysb.uscourts.gov/telephonic-appearances-white-plains.

Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **September 16, 2020** at **4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing and a failure to appear may result in relief being granted upon default; *provided* that objecting parties shall attend the Hearing **telephonically** so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma.   You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: September 9, 2020
New York, New York

**DAVIS POLK & WARDWELL LLP**


 /s/  Eli J. Vonnegut

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak

*Counsel to the Debtors
and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | **(Jointly Administered)** |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PLAN AND A KEY EMPLOYEE RETENTION PLAN

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the

"**Company**"), by and through their undersigned counsel, hereby submit this *Motion of Debtors for*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* (the "**Motion**").  In support of the Motion, the Debtors rely on the *Declaration of Jon Lowne in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* (the "**Lowne Declaration**" or "**Lowne Decl.**"), attached hereto as **Exhibit B**, and the *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* (the "**Willis Towers Declaration**" or "**Willis Towers Decl.**"), attached hereto as **Exhibit C**, and respectfully state as follows:

## JURISDICTION AND VENUE

1.       The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

2.       Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.       On September 15, 2019 (the "**Petition Date**"), the Debtors commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their

2

businesses and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

4.    On September 27, 2019, the United States Trustee for Region 2 appointed an

official unsecured creditors committee (the "**UCC**").  *See Notice Appointing Creditors Committee*

[ECF 131].  No trustee or examiner has been appointed in these Chapter 11 Cases.

5.    Information about the Debtors' businesses and the events leading up to the Petition

Date can be found in the *Debtors' Informational Brief* filed on September 16, 2019 [ECF 17],

which is incorporated herein by reference.

6.    The Debtors' Chapter 11 Cases are being jointly administered pursuant to

Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [ECF

59], entered by the Court on September 18, 2019 in each of the Chapter 11 Cases.

## PRELIMINARY STATEMENT

7.    Since the Petition Date, the Debtors and their advisors have worked tirelessly to

build support for a global settlement that would put the value of the Debtors' estates to work

helping address and combat the opioid crisis.  Through this period of extreme strain, the Debtors'

workforce remains relentlessly focused on shepherding the Debtors' assets and businesses through

these challenging Chapter 11 Cases to ensure that the reorganized Debtors will be well positioned

to put as much estate value as possible to work for the American people.

8.    That value—measured in the billions—derives in large part from the efforts,

experience, expertise and knowledge of the Debtors' highly skilled, trained and educated

workforce that must be retained and motivated to allow the Debtors to operate in their highly

regulated industry.  Motivation and retention of the Debtors' valuable key employees, through

continued appropriate and competitive compensation, are mission critical to maintaining and

driving productivity, morale and achievement to maximize value for the benefit of all stakeholders. This has never been more critical to the Debtors as they simultaneously navigate these Chapter 11 Cases and ask their workforce to continue working in the Debtors' production plants during the COVID-19 pandemic.

9.      Last year, over the course of three separate hearings spanning several months, this Court approved in full payments to be made in 2020 under the Debtors' consensually modified compensation programs, including under the 2019 Annual Incentive Plan implemented prior to the Chapter 11 Cases, payments under the Debtors' Long-Term Results Plan ("the **LTRP**") due in 2020, and the Debtors' Existing Non-Executive Retention Plan (as defined below) (collectively, the "**2019 Payments**").[2]  To achieve consensus on the vast majority of the modified compensation programs, the Debtors engaged in extensive negotiations with their various creditor constituencies, and agreed to make several carefully tailored reductions to payments under such programs resulting in the 2019 Payments.  This Court credited the testimony of the Debtors' CFO and the Debtors' independent compensation consultants at Willis Towers Watson in finding that the 2019 Payments were reasonable and necessary.[3]

---

[2] The 2019 Payments were approved in a combination of the following orders: the *Final Order Granting Motion Authorizing (1) Debtors to (A)Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 309] (the "**Final Wages Order**"); *Supplemental Final Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and; (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 629] (the "**Supplemental Final Wages Order**"); and the *Second Supplemental Final Order Authorizing (I) Debtors to (a) Pay Certain Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (b) Maintain Employee Benefits Programs and Pay Related Administrative obligations, (ii) Employees and Retirees to Proceed with Outstanding Workers Compensation Claims and (iii) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 783] (the "**Second Supplemental Wages Order**," and, together with the Final Wages Order and the Supplemental Final Wages Order, the "**Wages Orders**").

[3] *See, e.g.,* Hr'g Trs., 119:12-17, Oct. 10, 2019 ("I believe from Mr. Lowne's testimony that the program was designed in a way that the [D]ebtors would not be overspending and rather that it is designed to properly incentivize these individuals to do what appears to me to be important work, where an incentive program is an important aspect of their compensation as opposed to a flat salary."); Hr'g Trs., 108:5-12, Jan. 24, 2020 ("I held a hearing in early December on the Debtor's motion for approval of various compensation-related programs for 2019. And having heard testimony

4

10.    In designing the Proposed Compensation Plans (as defined below), the Debtors and their advisors have sought to maintain as much as possible the Debtors' historic compensation practices, adjusted as necessary to match the Debtors' current circumstances and planned restructuring activities.  The same declarants that the Debtors relied on last year with respect to the 2019 Payments now testify that the Proposed Compensation Plans are designed similarly to the 2019 Payments that were approved by this Court last year, and that the Proposed Compensation Plans are reasonable and targeted to protect and maximize the value of the Debtors' businesses. The Proposed Compensation Plans should therefore be approved for essentially the same reasons that the 2019 Payments were approved last year.

## **THE DEBTORS' HISTORICAL COMPENSATION PLANS**

11.    As set forth in greater detail in the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 6] (the "**Wages Motion**"),[4] for more than 30 years the Debtors have maintained a performance-based Annual Incentive Plan (the "**AIP**") for certain of their employees.  The AIP provides annual cash bonuses tied to achievement of company and individual performance metrics.  Lowne Decl. ¶ 4.  The Debtors have also maintained the LTRP (together with the AIP, the "**Existing**

_____

by the Debtor's compensation expert, Ms. Gartrell, and reviewed the factual record, I overruled the objections that were remaining to the modified relief that the Debtors were seeking, with one exception, which was the 2019 compensation proposal as modified again for the Debtor's CEO, Dr. Landau.").

[4] Additional information about the AIP and LTRP (each as defined below) can be found in the *Second Supplemental Declaration of Jon Lowne in Support of the Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 554] (the "**Second Supplemental Lowne Declaration**").

**Compensation Plans**") for nearly twenty years, under which eligible employees receive annual grants that may result in cash payouts based on achievement of performance goals measured over a three-year performance period. *Id.* The Existing Compensation Plans have been used effectively for years to drive performance and productivity. *Id.*

12.     The Debtors also have historically maintained various retention plans in the ordinary course of business, as needed, to retain key employees. Lowne Decl. ¶ 5. The Debtors implemented non-executive retention plans for certain executive and non-executive employees in both 2018 and 2019, which were carefully calibrated to ensure that key employees were incentivized to remain employed with the Debtors through the end of 2020, which was deemed a critical period for the Debtors. The then-current non-executive retention plan (the "**Existing Non-Executive Retention Plan**") approved by this Court in December 2019 provided for cash-based awards to approximately 120 non-insider employees and was structured to retain their services through December 31, 2020.[5] *Id.*

## APPROVAL OF 2019 PAYMENTS WITH NEGOTIATED ADJUSTMENTS

13.     In September 2019, the Debtors sought authority from this Court to make payments owed under the 2019 AIP, outstanding LTRPs with payments due in 2020 and the Existing Non-Executive Retention Plan.[6] The Debtors engaged in extensive negotiations with their various creditor constituencies, and ultimately secured the support or non-objection of all parties in the case (including the UCC) other than the Ad Hoc Group of Non-Consenting States (the "**NCSG**"). And even the NCSG objected only as to the reduced compensation package proposed for Purdue's President & Chief Executive Officer (the "**CEO**").[7] As a result of these negotiations, the Debtors

---

[5] *See* Supplemental Final Wages Order.
[6] *See* Wages Motion.
[7] *See Debtors' Supplemental Omnibus Reply in Support of Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed*

agreed to reduce the amounts payable to employees under these programs by approximately $10 million in the aggregate. These reductions included: (i) capping 2019 AIP payouts at the target payout even though the Debtors had exceeded the applicable targets, (ii) the CEO agreeing to total reductions of over $2.2 million, including full elimination of his 2020 LTRP payout, (iii) Purdue's Executive Vice President, General Counsel and Corporate Secretary (the "**General Counsel**") agreeing to a $250,000 reduction in his 2019 AIP payout, (iv) a 54% reduction in 2020 LTRP payouts for other insider employees, (v) a 44% reduction in 2020 LTRP payouts for employees holding a title of Vice President or more senior at the time of the grant, (vi) a 24% reduction in 2020 LTRP payouts for employees holding a title below the Vice President level at the time of the grant, and (vii) a further $500,000 reduction in total payments to insiders in a manner chosen by the Debtors. Lowne Decl. ¶ 6.

14.    In authorizing the Debtors to make the 2019 Payments with the negotiated reductions in the Wages Orders, this Court observed that the 2019 Payments were appropriate because the company should have ". . . a proper compensation structure. Because otherwise what they own is going to deteriorate." Hr'g Trs., 113:5-7, Dec. 4, 2019. The Court also determined that the Debtors had correctly identified their insider employees. Hr'g Trs., 109:19-24, Dec. 4, 2019 ("[T]he [C]ompany engaged in the proper process to determine whether someone was an insider or not. Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point."). The KEIP Participants (defined below) are employees previously identified as insiders. The Debtors are now in essence seeking approval to continue the compensation programs under which the 2019 Payments were approved last year—and again rely on Mr. Lowne's and Ms.

---

*with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 556].

Gartrell's testimony to establish that the Debtors' compensation programs are reasonable and necessary to maximize the value of their business.

## THE PROPOSED COMPENSATION PLANS

15.     To ensure the continued motivation, engagement and retention of their invaluable workforce and the maximization of the value of the Debtors' estate, the Debtors seek approval to implement compensation programs in place of the awards that would have been granted in 2020 consistent with past practice under the Existing Compensation Plans, as set forth in more detail below.  The Debtors strongly believe that maintaining compensation in line with the Debtors' historical practice is critical to their ability to motivate and retain their highly skilled workforce, without which the Debtors would not be able to complete a value-maximizing restructuring and emergence from bankruptcy.  Lowne Decl. ¶ 27.

16.     In designing the Proposed Compensation Plans (defined below), the Debtors have sought to balance two paramount needs.  First, the Debtors need to pay their employees competitive and motivating compensation and give their employees clarity regarding compensation to avoid further increases in attrition.  Lowne Decl. ¶ 7.  Second, the Debtors need to tailor their compensation practices to their present circumstances—in particular, the current phase and target trajectory of these Chapter 11 Cases.  *Id.*  The resulting package includes the following two components:[8]

> a) the key employee incentive plan (the "**KEIP**") described in Section I, below, for insider employees that continues and repurposes the 2020 AIP and the LTRP awards that otherwise would have been payable to them in 2021 into an incentive-based award, provides for a means to settle the LTRP payout due in 2022, and

---

[8] The Debtors also anticipate updating the definition of "compensation" under their retirement plans to include amounts payable under the Proposed Compensation Plans.

8

provides for a long-term award payable in 2023 in place of the LTRP grant that the KEIP Participants otherwise would have received in 2020; and

b)    the broadly applicable key employee retention plan (the "**KERP**" and, together with the KEIP, the "**Proposed Compensation Plans**") described in Section II, below, for non-insider employees that continues and repurposes the 2020 AIP and the LTRP awards that otherwise would have been payable to them in 2021 into a retention award, provides for a means to settle the LTRP payouts due in 2022 and 2023, provides for a long-term award payable in 2023 in place of the LTRP grant that KERP Participants otherwise would have received in 2020, and provides for additional targeted retention payments for certain employees.  Lowne Decl. ¶¶ 7-9.

17.    In designing the Proposed Compensation Plans, the Debtors and the Compensation and Talent Committee of the Board of Directors of Purdue Pharma Inc. (the "**Compensation Committee**") worked extensively with Willis Towers Watson as their independent compensation consultant to benchmark the Debtors' employee compensation against the market, taking into account the Debtors' unique circumstances.  Lowne Decl. ¶ 10; Willis Towers Decl. ¶¶ 8-10.

18.    The Debtors' employees bear uncommon burdens at present, including attrition that has led to ever-increasing workloads and severe strain, all of which has been amplified by COVID-19 pandemic work conditions and these complex and charged chapter 11 proceedings.  Lowne Decl. ¶ 11.  The Debtors' employees are tasked with achieving a unique and critically important goal—preserving the Debtors' estates' value while also positioning the Debtors' estates to be a uniquely powerful asset in the fight against the opioid crisis.  Under the current circumstances, departing from the Debtors' historic compensation practices could have a devastating effect on the Debtors' ability to retain and motivate the individuals they need to maintain their business

9

operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders. Lowne Decl. ¶¶ 12, 39.  The Proposed Compensation Plans would largely continue the Debtors' longstanding compensation practices.  Aggregate compensation—critically—remains consistent both with longstanding practice and with the levels negotiated with the UCC and approved by the Court for the 2019 Payments, with certain limited exceptions that are amply supported by business necessity.  The Debtors respectfully submit that the Proposed Compensation Plans are reasonably tailored and necessary to realize this objective.

## I.    The Proposed KEIP

### A.    Participants

19.    The proposed KEIP would apply to the Debtors' eight current insider employees (the "**KEIP Participants**"), consisting of the: (i) CEO; (ii) Executive Vice President, Chief Financial Officer ("**CFO**"); (iii) General Counsel; (iv) Senior Vice President, Intellectual Property Law & Public Health Initiatives; (v) Chief Technical Operations Officer; (vi) President, Imbrium Therapeutics; (vii) President, Rhodes Pharmaceuticals; and (viii) President, Rhodes Technologies. The Debtors believe that it is important to incentivize senior management as their institutional knowledge and skills continue to be essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates during the course of the Chapter 11 Cases.  Lowne Decl. ¶ 13.

20.    The KEIP Participants perform a variety of functions for the Debtors, including providing critical management, operations, finance and legal services.  KEIP Participants are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals.  Lowne Decl. ¶ 14.  In addition to these significant day-to-day responsibilities, these individuals' workloads have substantially increased as a result of the Chapter 11 Cases and

10

the Debtors' reduced workforce.  *Id.*  The KEIP Participants are making extraordinary efforts to shepherd the Debtors' businesses, maximize estate value and steer the Debtors through their overwhelmingly complex restructuring during these unprecedented times.  *Id.*  Accordingly, the Debtors believe that the KEIP Participants should be appropriately incentivized to ensure optimal recoveries for all stakeholders.  None of the KEIP Participants will be eligible to participate in the proposed KERP, and the purpose of the proposed KEIP is to incentivize the KEIP Participants. Lowne Decl. ¶ 14.

B.    Structure

21.    As further discussed below, each KEIP Participant will receive (i) an award (a "**KEIP Award**") with a target value, which is also the award's maximum value, set forth in **Table 1**, below, (ii) partial payment of prepetition LTRP grants that are payable in 2022 and (iii) a long-term incentive compensation grant payable in 2023.  Lowne Decl. ¶ 15.

22.    KEIP Award payments will be contingent upon the Debtors' achievement of certain performance metrics discussed in more detail below (the "**2020 Performance Metrics**"), as compared to the threshold and target performance levels, as applicable, with straight-line interpolation to be used if such actual performance falls between such amounts.  Lowne Decl. ¶ 16.  No payment under the KEIP Award would be paid to any of the KEIP Participants if the Debtors fail to meet the threshold level for the 2020 Performance Metrics.  The maximum cost of the KEIP Award is $9,866,000.  *Id.*

**TABLE 1**

| KEIP Participant | Payout Range = 75% to 100% | |
| --- | --- | --- |
| | Threshold KEIP Award | Target KEIP Award |
| President & Chief Executive Officer | $2,640,000 | $3,520,000 |

| | | |
|---|---|---|
| Executive Vice President, Chief Financial Officer | $750,000 | $1,000,000 |
| Executive Vice President, General Counsel and Corporate Secretary | $1,964,000 | $2,619,000 |
| Senior Vice President, Intellectual Property Law & Public Health Initiatives | $508,000 | $678,000 |
| Chief Technical Operations Officer | $519,000 | $691,000 |
| President, Imbrium Therapeutics | $468,000 | $624,000 |
| President, Rhodes Pharmaceuticals | $279,000 | $372,000 |
| President, Rhodes Technologies | $272,000 | $362,000 |
| **Total** | **$7,400,000** | **$9,866,000** |

23.     Each KEIP Participant's target KEIP Award is equal to the sum of the target amount of the 2020 AIP award that the participant otherwise would have been eligible to receive and a portion of the LTRP payout payable to that participant in 2021, with such LTRP payouts subject to a 25% reduction for KEIP Participants other than the CEO, who has agreed to a 47% reduction, and the General Counsel, who has agreed to a further $250,000 reduction in his compensation in addition to the 25% reduction in LTRP payouts.  Lowne Decl. ¶ 17.  Such reductions, together with reductions to the 2021 LTRP payout amounts of other participants as discussed below, are, in the aggregate, greater than the amount of the 2021 LTRP payouts tied to pre-2018 performance. *Id.*  As a show of good faith and to address any potential stakeholder concerns, these reductions are **greater** than the reductions that would have been made under the mechanism negotiated with the UCC and other creditor constituencies with respect to the LTRP payouts made in 2020 that are discussed *supra* ¶ 13.  Consistent with the reductions made to 2020 LTRP payouts, the Compensation Committee determined that more senior employees would bear the brunt of the reductions, so aggregate payments to all KEIP Participants have been significantly reduced despite the fact that only one KEIP Participant has any LTRP payouts due in 2021 that relate to pre-2018

performance.  Lowne Decl. ¶ 18.  That KEIP Participant has less than $30,000 in LTRP payouts

due in 2021 that relate to pre-2018 performance under an LTRP grant received in a prior role.  *Id.*

The reduction to that KEIP Participant's total KEIP Award as a result of the cuts described above

is far in excess of such $30,000 payout.  *Id.*  Accordingly, no KEIP Participant is receiving any

compensation that relates to pre-2018 performance.  The KEIP **repurposes** the 2020 AIP and the

LTRP payouts that would have been paid to the KEIP Participants in 2021 and the amounts are

**not** new or additive to past practice.

24.     The KEIP Award will be paid as follows: (i) 50% paid in October 2020 and (ii) the

remaining 50% paid in January 2021.  Lowne Decl. ¶ 19.  The October 2020 payment amount will

assume target level performance and the January 2021 payment will include a true-up, if any,

including a potential clawback of the prior payment if threshold or target performance is not met.

*Id.*  Payments will also be subject to clawback if the KEIP Participant resigns or is terminated for

any reason other than by the Debtors without cause prior to the earlier of the Debtors' emergence

from bankruptcy and March 15, 2021.  *Id.*  If the Debtors emerge at any time prior to any

outstanding payment date, the remaining full KEIP Award payment would be paid on the

emergence date at the KEIP Award value.  *Id.*  All amounts payable under the KEIP Award will

be subject to acceleration in the event of a termination of employment by the Debtors without

cause.  *Id.*  This structure keeps the compensation programs aligned with the compensation value

of the traditional AIP and LTRP amount—which typically are paid in March of the year following

the year in which they are earned.  *Id.*

25.     Consistent with Purdue's longstanding compensation practices, each KEIP

Participant will also receive a long-term award designed to mimic the economic structure of the

LTRP grant they otherwise would have received in 2020, payable in 2023.  Lowne Decl. ¶ 20.  The

target amount of these long-term awards includes a 50% concession as compared to the target 2020

LTRP grant that otherwise would have been received.  *Id.*  The actual payouts will be based on the

same 2020 Performance Metrics that apply to the KEIP Award that are described below, and

therefore will depend solely on the Company's performance in 2020.  *Id.*  These long-term awards

would **not** accelerate upon emergence from bankruptcy but will accelerate upon a termination of

employment by the Debtors without cause.  The maximum aggregate amount of such payments is

approximately $2,200,000.  *Id.*

26.    As in the case of the LTRP payments due in 2021, each KEIP Participant will also

be eligible to receive payment of LTRP amounts due in 2022, subject to a 22% reduction to the

payment due to the CEO and a 12% reduction for other KEIP Participants.  Lowne Decl. ¶ 21.  As

with the LTRP payments due in 2021, such reductions, together with reductions to the 2022 LTRP

payout amounts of other participants as discussed below, are, in the aggregate, greater than the

amount of the 2022 LTRP payouts tied to pre-2018 performance.  *Id.*  The Compensation

Committee again determined that the brunt of the reductions should continue to be borne by more

senior employees and therefore implemented reductions for all the KEIP Participants

notwithstanding the fact that only one KEIP Participant has any LTRP payouts due in 2022 that

are tied to pre-2018 performance.  *Id.*  The reductions to the LTRP payouts due in 2022 to that

KEIP Participant are far greater than the less than $10,000 in payouts that relate to pre-2018

performance.  *Id.*  The same 2020 Performance Metrics that apply to the KEIP Award will be

applied to uncompleted performance periods with respect to such LTRP, while completed

performance periods will remain subject to their existing performance scores.  *Id.*  Except as set

forth above, such payments will be paid under the existing LTRP terms but subject to acceleration

in the event of a termination of employment by the Debtors without cause. *Id.* The aggregate

target amount—and maximum amount—of such payments is approximately $3,700,000. *Id.*

C.    Metrics

27.    In early 2020, the Compensation Committee, with guidance from Willis Towers

Watson, identified and approved corporate performance objectives for 2020 performance. At that

time, further development of the 2020 compensation programs was paused due to uncertainty in

the Debtors' business outlook stemming from the COVID-19 pandemic. When discussion of the

2020 compensation programs was resumed, the Compensation Committee, with input from Willis

Towers Watson, determined that the previously selected 2020 Performance Metrics were well-

balanced to motivate the workforce and should apply to and govern the KEIP. Lowne Decl. ¶ 22;

Willis Towers Decl. ¶ 18. Given the uncertainty of the timing of emergence from these Chapter

11 Cases, the Compensation Committee determined that it was in the best interest of the Debtors

and the post-emergence entities to apply the 2020 metrics to the long-term award for years

subsequent to 2020. The KEIP would thus rely on the same three strategic pillars as the historic

and long-standing AIP: value creation (representing 40% of the Target KEIP Award), innovation

and efficiency (50% of the Target KEIP Award) and people and culture (10% of the Target KEIP

Award). Lowne Decl. ¶ 23. At the time the 2020 Performance Metrics were set by the

Compensation Committee, they were challenging, required extensive achievement and presented

a meaningful risk of not being met at the threshold level required for payment. Lowne Decl. ¶ 22.

The COVID-19 pandemic began subsequent to the adoption of the 2020 Performance Metrics and

added a further level of uncertainty. Lowne Decl. ¶ 23. Although the KEIP Participants have been

focused on driving the Debtors to meet these goals and it currently appears that some of the 2020

Performance Metrics may be achieved, others still require extensive work to be achieved, and it is

a virtual certainty that others will not be achieved. Lowne Decl. ¶ 22. This testifies to the successful effort exerted by the Compensation Committee in setting such "stretch" goals and ensures that the KEIP continues to have the intended incentivizing effect.

1.     Value Creation

28.     The value creation metric is designed to measure and reward long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to its testing and development of non-opioid products, including overdose treatment products. **Table 2** below sets forth certain key operational and developmental goals that the Debtors have identified as key to the long-term success of the Debtors' business. Lowne Decl. ¶ 24.

## TABLE 2

| 2020 Value Creation Performance Metrics | 2020 Performance Target | % of Value Creation | % of Target KEIP Award |
|---|---|---|---|
| *Public Health Initiatives*[9] | | | |
| ➢ **Intranasal Naloxone**: Formalize agreement(s) and provide support for the non-profit development of intranasal naloxone with HRT to allow first patient in Phase 1 | End of Q3 2020 | 45.0% | 18.0% |
| ➢ **Nalmefene**: ANDA Filed by Vial with Competitive Generic Therapy (CGT) Designation | End of Q4 2020 | | |
| ➢ **Nalmefene**: Complete Engineering Batches for Nalmefene Prefilled Syringe | End of Q4 2020 | | |
| ➢ **Nalmefene**: Complete Nalmefene Autoinjector Formulation Development Work | End of Q4 2020 | | |
| *Research & Development*[10] | | | |

---

[9] All medications referred to in this section are potential treatments for opioid overdose.
[10] OAG refers to a potential treatment for insomnia associated with alcohol cessation. Tinostamustine refers to a potential cancer treatment.

| | | | |
|---|---|---|---|
| ➢ **OAG**: Complete Last Patient Randomized in Proof-of-Concept Phase 2 Trial OAG2002 | End of Q4 2020 | 15.0% | 6.0% |
| ➢ **OAG**: Complete In Life Portion for Chronic Toxicology Studies, 6M rat and 9M dog | Q3 2020 and Q4 2020, respectively | | |
| ➢ **Tinostamustine**: Advancement of Clinical Program | Q3 2020 | 15.0% | 6.0% |
| *Rhodes* | | | |
| ➢ **Generic Medication-Assisted Treatment Product**: Launch | Q4 2020 | 2.5% | 1.0% |
| ➢ **Generic Migraine and COPD Medications**: Submit DHE ANDA | End Q4 2020 | 6.25% | 2.5% |
| ➢ **Generic ADHD Treatment**: ANDA Submission | Q2 2020 | 6.25% | 2.5% |
| ➢ **Generic Treatment for Intestinal Parasites**: ANDA Submission | Q3/Q4 2020 | 5.0% | 2.0% |
| ➢ **Generic Nausea Prevention Medication**: Manufacture Exhibit Batches and Close the BE Study | Q4 2020 | 5.0% | 2.0% |
| **Total** | | **100%** | **40%** |

2.      Innovation and Efficiency

29.      The innovation and efficiency metric is designed to capture key financial and operational goals, including important business metrics such as operating profits, net sales and operating losses.  **Table 3** below sets forth certain key financial and operational goals that the Debtors have identified as key to the long-term success of the Debtors' business.  Lowne Decl. ¶ 25.

**TABLE 3**

| 2020 Innovation and Efficiency Performance Metric[11] | 2020 Performance Target | % of Innovation and Efficiency | % of Target KEIP Award |
|---|---|---|---|
| Purdue Branded Business Operating Profit | $115M | 20% | 10% |
| Adhansia XR Net Sales | $18M | 10% | 5% |
| Adhansia XR Operating Loss[12] | ($44M) | 15% | 7.5% |
| Avrio Net Sales | $85M | 10% | 5% |
| Avrio Operating Profit | $8.6M | 15% | 7.5% |
| Rhodes (RALP) Operating Loss | ($35M) | 30% | 15% |
| **Total** | | **100%** | **50%** |

3.      People and Culture

30.      Finally, nurturing of the Debtors' human resources and organizational culture will be critical to keep the Debtors on the path to emergence and beyond. Such steps include organizational education to occur in the first three quarters of 2020 and the development of a transition plan by the end of the fourth quarter of 2020. This metric will be reviewed holistically to determine whether the Debtors have been properly positioned for their post-emergence roles, and will represent 10% of the KEIP. Lowne Decl.¶ 26.

D.      Commercial Reasonableness

31.      The KEIP is consistent with the Debtors' historical compensation practices, while the challenges faced by the KEIP Participants have only increased as they navigate the difficult terrain the Debtors face as they seek to emerge from bankruptcy. Lowne Decl. ¶ 27. During the

---

[11] Adhansia XR is a Central Nervous System (CNS) stimulant prescription medicine used for the treatment of ADHD in people six years of age and older. Avrio Health L.P. is a wholly owned subsidiary of the Debtors which produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

[12] The operating loss metric relates to Adhansia, which was recently launched and is still in the investment phase.

course of the Chapter 11 Cases, the challenges faced by the CEO, the CFO, the General Counsel and the other KEIP Participants have been significantly increased due to the extremely complex and highly litigious nature of these Chapter 11 Cases. *Id.* While the total cost of the proposed KEIP Awards is higher than the 2019 AIP and LTRP payouts agreed to in 2020, this difference is driven chiefly by (i) the CEO's agreement to an extremely substantial one-time reduction in compensation otherwise due to him in 2020 as a show of good faith to the Debtors' stakeholders and as part of an overall agreement to speed approval of incentive compensation programs for the rest of the workforce and (ii) the fact that the General Counsel, hired in 2018, was not entitled to an LTRP payout in 2020 but would be for the first time in 2021. *Id.*

32.     The CEO is critical to the Debtors' success. Since the commencement of these Chapter 11 Cases, he has assumed numerous additional responsibilities while leading the extremely challenging tasks of facilitating a successful restructuring and ensuring the future success of the Debtors and their estates for the public good. Lowne Decl. ¶ 28. The Debtors believe that it would be unfair to continue to insist upon a continuation of the extraordinary concessions the CEO made relating to his 2019 compensation—which total over $2.2 million—in order to facilitate a broad resolution of compensation for the balance of the workforce. *Id.* Accordingly, the Debtors have determined that the CEO should be compensated in line with market-based compensation rates. *Id.*

33.     The General Counsel is also critical to the Debtors' operations and the success of these Chapter 11 Cases. Having accepted the role at the Debtors when pre-bankruptcy litigation was already at a fever pitch, he has played a central role in the restructuring and has been at the forefront of ensuring the Debtors' success and their ability to successfully emerge from chapter 11. Lowne Decl. ¶ 29. Furthermore, as a show of good faith, the General Counsel agreed to a

$250,000 reduction in his compensation for both 2019 and 2020.  *Id.*  The General Counsel's compensation is appropriate and reasonable, particularly in light of the immense challenges he faces in his role with the Debtors, and in light of his past experience and expertise and the many other opportunities that have been and continue to be presented to him.  *Id.*; Willis Towers Decl. ¶ 29.

34.    Moreover, the KEIP Participants' compensation would be consistent with prior guidance from this Court.  As this Court has previously observed, a "senior level[] person's compensation is really sui generis" and "it really ties very much to that person."  Hr'g Trs., 120:5-12, Dec. 4, 2019.  This Court has also previously emphasized that it is "important . . . to keep in mind . . . that if you cannot get capable people to perform this type of work without paying them that amount of money or more, or alternatively the replacement cost is greater than what is being proposed, it's really not in the interest of the creditors and not appropriate to say, well, nevertheless they should take a haircut because it seems like a lot of money."  Hr'g Trs., 109:23-110:5, Jan. 24, 2020.  The Court went on to explain that "the universe of replacements, particularly in a situation like this in a complicated, difficult bankruptcy that raises unique issues that requires more than a fair amount of not only general business expertise, but knowledge about the industry and the like, you need someone to run the company.  And people don't work, generally speaking, for less than market, whether they're paid $30,000 a year, or $200,000 a year, or several million dollars a year."  Hr'g Trs., 110:11-20, Jan. 24, 2020.

35.    The CEO agreed to substantial concessions with respect to the 2019 Payments that resulted in well-below market compensation with respect to last year.  Hr'g Trs., 111:5-10, Jan. 24, 2020 ("And it is quite clear from the record that that total compensation or total base compensation [for the CEO] is well below the median.  In fact, at about the 25 percent range.").

Absent the KEIP, the CEO's compensation for 2020 would similarly be dramatically below market, falling well below the 25th percentile. Willis Towers Decl. ¶ 27. The CEO's participation in the KEIP—if the Company achieves the challenging performance metrics required for target compensation—will result in compensation this year near the middle of the 50th to 75th percentile range of market compensation for similar companies, as it falls 16% below the 75th percentile. Willis Towers Decl. ¶ 28. Willis Towers Watson concluded that such compensation is justified because of the CEO's extensive experience and expertise with the Debtors' business and his stewardship through the Chapter 11 Cases. *Id.* It is also consistent with this Court's observations that paying market rates is appropriate, particularly in a context where industry knowledge, rather than general business expertise alone, is key and the employee must face the unique challenges of operating in a difficult chapter 11 environment.

36.    While the General Counsel's participation in the KEIP would result in above-market compensation for an ordinary pharmaceutical company of Purdue's size, it is the Debtors' business judgment that they require significantly greater expertise and experience in a General Counsel than an ordinary peer might require given the Debtors' unique circumstances. This warrants compensation of the General Counsel at the high end of the peer group range, which the Court approved in connection with the 2019 Payments. In addition to managing all of the usual complex legal issues necessary to run a diversified pharmaceutical business, the Debtors' General Counsel is responsible for overseeing an extraordinarily complex restructuring process, including working to achieve a global resolution of over 2,800 lawsuits and filed claims seeking more than $10 trillion in the aggregate. Because legal issues are the key drivers of the Debtors' current situation and adeptly navigating the legal landscape remains paramount to the Debtors' viability, having an eminently well-qualified general counsel willing and able to undertake these

extraordinary challenges is critical.  Simply put, there is no industry standard that is truly applicable to this uniquely difficult role.[13]

37.     Historically, the LTRP has been an important component of the Debtors' overall compensation strategy, and something the Debtors rely on to ensure the total compensation of their senior executives is competitive with the market.  Lowne Decl. ¶ 30.  The Debtors accordingly believe that authorization to honor the LTRP payouts due to the KEIP Participants in 2022, and the grant to the KEIP Participants of a new long-term award payable in 2023, is necessary, appropriate, and consistent with the Debtors' historic compensation practices.  *Id.*  The loss of the LTRP payouts and grants without substitution would represent a significant decrease in overall compensation, which could jeopardize the Debtors' ability to incentivize the KEIP Participants and ensure stability in the workforce and the long-term value of the enterprise.  *Id.*

38.     The KEIP provides incentive compensation to KEIP Participants in line with the Debtors' historical practices and compares reasonably to market compensation levels for the Debtors' peers.  Given the challenging roles and responsibilities that the KEIP Participants must continue to fulfill, the extremely challenging nature of these jobs in the difficult context of these Chapter 11 Cases, and the efforts required to achieve the performance goals established for the KEIP, it is abundantly clear that this compensation is appropriate and necessary for the preservation of the value of the Debtors' estates.

---

[13] As noted above, as part of the agreement with the UCC and other creditor constituencies, the General Counsel volunteered a $250,000 reduction to his compensation under the 2019 Payments.  Because the General Counsel was hired in 2018, his first LTRP grant was made in 2018 and he has yet to receive a payment under the LTRP. While the General Counsel's compensation opportunity is increasing in absolute terms, the increase to a large extent is the result of his compensation opportunity under the KEIP reflecting that, for the first time, he would have LTRP grants coming due.

## II.   The Proposed KERP

A.   <u>Participants</u>

39.     The Debtors seek authorization to implement the KERP for virtually[14] all incentive-eligible employees other than the KEIP Participants (the "**KERP Participants**").   The KERP Participants have undertaken significant efforts to stabilize the Debtors' operations and lay the groundwork for a successful restructuring.   Lowne Decl. ¶ 31.   They have taken on this Herculean task under significant stresses, including significant employee attrition, which increased the burdens on many of the remaining employees and had a negative effect on morale, yet have nonetheless delivered extraordinary business results.   *Id.*   Approximately 614 employees will participate in the KERP, of which 17 would be Vice President or higher and 597 will be middle management and professional employees such as scientific researchers, as well as regulatory and compliance personnel.[15]   *Id.*

40.     This Court previously held that the KEIP Participants, none of whom is eligible to participate in the KERP, were insiders.   *See* Hr'g Trs.,109:19-24, Dec. 4, 2019 ("[T]he company engaged in the proper process to determine whether someone was an insider or not.   Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point.").   Applying the same criteria that the Debtors previously used to determine insider status last year, [16] no KERP Participant is an insider.

---

[14] A small number of employees either previously did not participate in the AIP and therefore will not participate in the KERP or currently are not eligible to participate in the KERP.

[15] In instances where the separation of existing KERP Participants from the Debtors results in increased responsibilities or new roles for other KERP Participants, or newly-hired employees take on such roles or responsibilities, the KERP would allow the Debtors to reallocate to such employees up to the amount of the unpaid portion of the KERP Award that corresponds to the target 2020 AIP award (defined below) that would otherwise be authorized to be paid to such separated KERP Participants in order to provide needed flexibility to effectively respond to such changes in circumstances.

[16] The Company categorized an employee as an insider if the employee met any one of the following five criteria. The employee: (1) is an officer appointed by the Board; (2) holds the title of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or Senior Vice President; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine

B.     Payout Structure

41.     As further discussed below, each KERP Participant will receive (i) an award (a

"**KERP Award**") comprised of an amount equal to the KERP Participants' target 2020 AIP and

LTRP payout due in 2021, (ii) a long-term incentive compensation grant payable in 2023, and (iii)

partial payment of prepetition LTRP grants that are payable in 2022 and full payment of the

prepetition grants that are payable in 2023.  Certain KERP Participants will also receive additional

targeted retention payments.  Lowne Decl. ¶ 32.

42.     Each KERP Participant's KERP Award is equal to the sum of the target amount of

the 2020 AIP award they otherwise would have been eligible to receive and the LTRP payout they

would otherwise have expected to receive in 2021.  Lowne Decl. ¶ 33.  As noted above, aggregate

2021 LTRP payments (considering both KEIP and KERP Participants) will be reduced in an

amount greater than the amount of the 2021 LTRP payouts tied to pre-2018 performance and

therefore in an amount greater than the reductions that would have been made under the

mechanism negotiated with the UCC and other creditor constituencies with respect to the LTRP

payouts made in 2020.  The reduction with respect to KERP Participants will consist of a 21%

reduction for KERP Participants with a title of Vice President or higher at the time of the grant

and 11% for KERP Participants with a title less senior than Vice President at the time of the grant.

*Id.*  As with the KEIP, the KERP **repurposes** the 2020 AIP award and LTRP payouts that would

ordinarily be due in 2021 and the amounts are **not** new or additive to past practice.

---

his or her own compensation. Notably, no insider employee of the Debtors is in a position to determine his or her own
compensation, which is the responsibility of the Compensation Committee and the Board.

43.     The KERP Award is not subject to performance criteria to provide the KERP Participants with greater compensation certainty.  This is expected to help retain KERP Participants under the present challenging and uncertain conditions.  Lowne Decl. ¶ 34.

44.     The KERP Award will be paid as follows: (i) 50% paid in October 2020 and (ii) the remaining 50% paid in January 2021.  Lowne Decl. ¶ 35.  Other than for hourly employees, KERP Award payments are subject to a clawback if the KERP Participant resigns or is terminated for any reason other than by the Debtors without cause on the earlier of March 15, 2021 and emergence.  *Id.*  Payments under the KERP Award will be subject to the KERP Participant's continued employment through the applicable payment date, with acceleration in the event of a termination of the KERP Participant's employment by the Debtors other than without cause.  *Id.* In the event the Debtors emerge from bankruptcy any time prior to a payment date, the remaining full amount of the KERP Award would accelerate and be payable.  *Id.*  The total aggregate target (and maximum) payment under the KERP Award is approximately $21,600,000.  *Id.*

45.     In addition, the Debtors believe that the Existing Non-Executive Retention Plan was particularly critical to preserving and maximizing the value of the Debtors' estates.  Lowne Decl. ¶ 36.  The Debtors therefore seek to provide additional targeted retention awards to an identified group of key employees on a similar basis in an aggregate amount of up to $8,100,000 (the "**Targeted Retention Awards**").  The Targeted Retention Awards will be payable 50% in January 2021, and 50% in April 2021.  *Id.*  Other than for hourly employees, Targeted Retention Award payments are subject to a clawback if the KERP Participant resigns or is terminated for any reason other than by the Debtors without cause before June 30, 2021.  *Id.*  Payments under Targeted Retention Awards will be subject to the Retention Eligible Employee's continued employment

through the applicable payment date, with acceleration in the event of a termination of the Retention Eligible Employee's employment by the Debtors other than without cause. *Id.*

46.    Prior to the commencement of the Chapter 11 Cases, certain of the KERP Participants were granted LTRP awards that are payable in 2022 and 2023.  Lowne Decl. ¶ 37. Each such KERP Participant[17] will be entitled to payment in 2022 and 2023 on account of such prepetition LTRP awards at target value (or, with respect to completed performance periods, the amount previously set based on achievement during such period).  *Id.*  As noted above, aggregate LTRP payments (considering both KEIP and KERP Participants) with respect to such years will be reduced by an amount greater than the amount of the LTRP payouts tied to pre-2018 performance and therefore in an amount greater than the reductions that would have been made under the mechanism negotiated with the UCC and other creditor constituencies with respect to the LTRP payouts made in 2020.  These reductions for KERP Participants will consist of a 9% reduction for KERP Participants with a title of Vice President or higher and a 5% reduction for KERP Participants with a title less senior than Vice President with respect to payouts in 2022 and no reduction with respect to payouts in 2023.  *Id.*  Except as provided above, such payments will be paid under the existing LTRP terms but subject to acceleration in the event of a termination of employment by the Debtors without cause.  *Id.*  The aggregate total of target LTRP payouts in 2022 and 2023 for all KERP Participants is approximately $10,100,000 and $1,150,000, respectively.  *Id.*

47.    Consistent with past practice, certain KERP Participants will receive a long-term award designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the KERP Participant in 2020 under Purdue's longstanding compensation

---

[17] KERP Participants include post-petition retirees for this purpose.

practices.  Lowne Decl. ¶ 38.  The amount of such grant will be equal to the target LTRP grants that otherwise would have been granted to the KERP Participant in 2020.  *Id.*  The grant will not be subject to performance metrics.  *Id.*  The aggregate total of these long-term awards for all KERP Participants is approximately $10,200,000.  *Id.*

C.    Commercial Reasonableness

48.    The KERP is commercially appropriate and reasonable.  Given the extraordinary burdens on the KERP Participants from the challenges of operating in chapter 11 and the negative press environment faced by Purdue, there is a very real risk that additional employees will continue to depart to work elsewhere.  Lowne Decl. ¶ 39.  Indeed, attrition has been high since the Petition Date, with 85 resignations through August 31, 2020, which represents an annualized voluntary turnover rate of 13.4%.  *Id.*  Further, in some cases, employees have timed their resignations to coincide with the end of clawback periods.  *Id.*  The strain of these bankruptcy cases creates the very real risk that without the KERP, the Debtors may lose an unacceptable number of their employees to competing employers able to offer market compensation and/or job security that the Debtors cannot match.  *Id.*  Additional defections among the Debtors' workforce would significantly hamper their operations and jeopardize the Debtors' emergence.  *Id.*  Moreover, it is extremely unlikely that the Debtors would be able to find sufficient, if any, qualified replacements during the critical period leading up to the Debtors' emergence.  *Id.*  If not for the compensation programs in place for 2019, and the Existing Non-Executive Retention Plan, the Debtors believe that the attrition rate would have been significantly higher.  *Id.*  Failure to implement the KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.  *Id.*

49.     The KERP Award is consistent with the Debtors' historical compensation practices. The KERP Award is substantially roughly equivalent to historical annual AIP and LTRP payouts. Lowne Decl. ¶ 40.  The clawback through March 15, 2021 provides a retentive element similar to the effect of AIP and LTRP payments typically being made in March of each year.  *Id.*  The LTRP payouts in 2022 and 2023 and long-term award payable in 2023 are consistent with the Debtors' historic compensation practices under the LTRP, and failing to replace such compensation under the KERP would represent a significant decrease in long-term compensation, likely negatively affecting the Debtors' ability to retain key employees.  *Id.*  Finally, the Debtors have identified KERP Participants to receive Targeted Retention Awards through a detailed and thorough process to identify employees whose services are particularly critical to preserving and maximizing the value of the Debtors' estates.  *Id.*  The Targeted Retention Awards are consistent with the amounts of awards under the prior targeted retention program, which have been only barely sufficient to stem the tide of attrition among these critical employees.  *Id.*

50.     In sum, the KERP compensates key employees in line with the Debtors' market-based historical practices and is critical to retaining the Debtors' employees, who are needed to preserve the value of the Debtors' estates.

## **RELIEF REQUESTED**

51.     By this Motion, and pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code, the Debtors seek entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit A**, authorizing the implementation of the KEIP and the KERP.

## **BASIS FOR RELIEF**

I. **Section 503(c)(1) of the Bankruptcy Code Does Not Bar the Proposed Compensation Plans**

    A.    <u>Section 503(c)(1) is Not Applicable to the KEIP Because It Is an Incentive Plan</u>

52.    Section 503(c)(1) of the Bankruptcy Code does not apply to the KEIP because it is designed to incentivize, rather than retain, the KEIP Participants.

53.    Section 503(c)(1) of the Bankruptcy Code, with limited exceptions, prohibits a transfer to an "insider of the debtor for the purpose of inducing such person to remain with the debtor's business." This provision, however, does not apply to performance-based incentive plans. *See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("§ 503(c)(1) does not prevent a debtor from adopting a plan that rewards insiders for achieving financial or other targets, rather than for simply remaining in the employment of the debtor, even though the incentive plan has a retentive effect."). Under section 503(c)(1), a debtor is required to show, by a preponderance of evidence, "that the [key employee incentive plan] is primarily incentivizing and not primarily retentive." *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012).

54.    A compensation plan that includes "some retentive effect" still passes muster under section 503(c)(1) where, as here, it is "overall . . . incentivizing in nature." *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006); *see also In re Residential Capital, LLC*, 478 B.R. at 171 ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)."). Courts routinely find that compensation plans are sufficiently incentivizing if they are "tied . . . to the achievement of particular financial milestones." *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 471-72 (Bankr. S.D.N.Y. 2011). When evaluating whether performance goals are sufficiently challenging, courts

do not analyze whether "the[] targets now appear achievable in hindsight" but rather "review[] [a compensation plan] that was designed to incentivize work" even if it "is already partially performed." *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG), 2018 WL 6060356, at *5 (Bankr. S.D.N.Y. Nov. 19, 2018).

55.      Here, the KEIP primarily incentivizes the KEIP Participants to achieve performance goals and thus is not prohibited by section 503(c)(1) of the Bankruptcy Code. As set forth above, all components of the KEIP are incentive-based: the KEIP Award and the long-term award payable in 2023 will be subject solely to satisfaction of the 2020 Performance Metrics. Lowne Decl. ¶ 20. With respect to the LTRP award payable in 2022, to the extent applicable, the performance achieved for 2019 will be applied with respect to the 2019 performance period and the performance achieved for 2020 will be applied to both 2020 and 2021 performance periods. These performance goals are neither bound to happen nor easily achievable.

56.      The 2020 Performance Metrics here are ambitious, having threshold targets that are difficult to achieve both individually and when considered in combination, and will require the KEIP Participants' diligent and committed efforts. Lowne Decl. ¶ 22. The 2020 Performance Metrics are tied not only to certain financial metrics but also to, among other things, value creation and innovation—all of which impact the long-term health of the Debtors' estates. The difficulty of achieving these already challenging 2020 Performance Metrics is compounded by the difficulty of operating in chapter 11, the reputational challenges faced by the Debtors and the recent high employee attrition rate. Moreover, this Court already found that the AIP and LTRP payable in early 2020 were incentivizing, and the KEIP is closely based on those programs. *See* Supplemental Final Wages Order.

57.     That some of the performance-based goals are now are in sight or have already been achieved does not render them as having been less challenging when originally designed, which is when the incentivizing nature is measured with respect to KEIPs that are already partially performed. *See Aralez Pharm.*, 2018 WL 6060356, at *5 (authorizing insider compensation plan based on the incentivizing nature of performance goals when originally developed).

58.     Accordingly, the KEIP should properly be evaluated under section 503(c)(3) of the Bankruptcy Code, rather than section 503(c)(1).

B.     Section 503(c)(1) Is Not Applicable to the KERP Because It Does Not Include Insiders

59.     Section 503(c)(1) likewise does not bar the KERP because that plan includes only non-insiders.  Section 503(c)(1) prohibits "a transfer made to . . . an insider of the debtor for the purpose of inducing such person to remain with the debtor's business," but it does not prohibit retention-oriented transfers to non-insiders. *See In re GT Advanced Techs., Inc.*, No. 14-11916-HJB, 2015 WL 5737181, at *4 (Bankr. D.N.H. Sept. 30, 2015) ("Section 503(c) distinguishes between those employees who are 'insiders' and those who are not . . . . Section 503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed retention payments be 'justified by the facts and circumstances of the case.'").

60.     This Court has previously ruled as to which employees of the Debtors are and are not insiders, and the Debtors have excluded all insiders from the KERP.[18]   Section 503(c)(1), therefore, does not prohibit the KERP.

---

[18] The Debtors relied on the Court's prior orders and guidance from various hearings to delineate between insiders and non-insiders. *See* Hr'g Trs., 138:5-18, September 17, 2019 (holding that "none of the beneficiaries [in the Existing Non-Executive Retention Plan] is an insider based on my evaluation of the testimony as opposed to the [D]ebtors simply saying they're not an insider. None of them is in a position effectively to determine his or her own award which is Congress' primary concern in Section 503(c) by those who have the ability to feather their own nest in a bankruptcy case shouldn't have that ability. Secondly, they clearly don't make policy generally and report to those who do"); Hr'g Trs., 116:14-19, Oct. 10, 2019 (noting that "the [D]ebtors undertook their own analysis of who would be an insider under applicable law, as summarized in the [D]ebtors' pleadings, and most importantly that includes their ability to

31

## II.    The Proposed Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 503(c)(3) of the Bankruptcy Code

61.    Both the KEIP and the KERP should be approved under section 503(c)(3) of the Bankruptcy Code because the Proposed Compensation Plans are essential to the success of the Debtors' restructuring efforts and reflect the sound exercise of the Debtors' business judgment.

62.    Section 503(c) of the Bankruptcy Code prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." "Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)." *In re Borders Grp., Inc.*, 453 B.R. at 473; *see also In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012) ("[T]he 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."). A debtor satisfies the business judgment standard if it shows that the proposal is "within the fair and reasonable business judgement of the [d]ebtors and thus within the zone of acceptability." *In re Dana Corp.*, 358 B.R. at 572.

63.    Courts have described the business judgment standard as "deferential," *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va.), *aff'd sub nom. United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc*., 553 B.R. 556 (E.D. Va. 2016), and a "more

---

influence major decisions or make major decisions by [D]ebtors, one or the other"); Hr'g Trs., 110:9-14, Oct. 10, 2019 (noting that the U.S. Trustee's concern that some Vice Presidents may be insiders is "a concern that doesn't seem to be supported by the evidence"); Hr'g Trs., 109:19-24, Dec. 4, 2019 ("[N]othing that I've heard today changes it that the [C]ompany engaged in the proper process to determine whether someone was an insider or not. Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point."); *Supplemental Final Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 629]. The number of insider employees for this Motion has been reduced as a result of two former insiders no longer being employed by the Company. The departed insiders' decision-making authority over their respective portions of the Debtors' business has been taken over by other insiders including the CEO, while some of their day-to-day duties have been delegated to non-insiders, in an effort to efficiently utilize the Debtors resources. The Debtors continue to pursue options to maximize the efficiency of their workforce on an ongoing basis.

liberal . . . review," *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007).

Additionally, "[w]here the debtor articulates a reasonable basis for its business decisions (as

distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v.*

*Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

      64.    In *In re Dana Corp.*, the court distilled six factors (the "***Dana II* Factors**") for

determining whether a compensation proposal satisfies the business judgment test.

- "Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?"

- "Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?"

- "Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?"

- "Is the plan or proposal consistent with industry standards?"

- "What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?" and

- "Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?"

358 B.R. at 576-77. The fact that all the *Dana II* Factors support approval of the KEIP and KERP,

as set forth below, further confirms that the Debtors exercised sound business judgment when

developing the KEIP and KERP.

      65.    *First*, with respect to the KEIP, the Debtors and their advisors designed the plan to

incentivize the KEIP Participants to work diligently to ensure that the Debtors will remain viable

and well-positioned to put the value of their estates to use upon emergence. As described above,

the Debtors carefully designed a well-balanced system of 2020 Performance Metrics in order to incentivize the KEIP Participants to focus on value creation, innovation and efficiency, and people and culture, each of which are important goals that will collectively enable the Debtors to best deliver value upon emergence for the benefit of all stakeholders and the American public generally. The payments under the KEIP are directly tied to specific and measurable goals within each of these categories. There is therefore a clear and reasonable relationship between the KEIP and the goals that the Debtors seek to achieve.

66.    With respect to the KERP, the Debtors appropriately tailored the plan to encourage non-insider employees to remain in their positions during the bankruptcy process. The Debtors largely based the KERP on their prepetition compensation plans, which were tailored to provide the market-levels of compensation necessary to retain key employees. Moreover, the Willis Towers Declaration confirms that the compensation provided under the KERP is in line with similarly-sized companies in chapter 11 proceedings. Willis Towers Decl. ¶¶ 47-53. In addition, with an annualized voluntary turnover rate of 13.4% from the Petition Date through August 31, 2020, the Debtors face a real and serious attrition problem that must be addressed. Lowne Decl. ¶ 39. The KERP and its Targeted Retention Awards, which were designed to ensure retention of the most critical employees are in line with an expiring program that had a critical and positive effect in retaining many employees, but still could not stop material attrition. A *reduction* in compensation would create a severe risk that the Debtors could experience an increased level of attrition that would be devastating to their business.

67.    *Second*, the KEIP is reasonable in the context of the Debtors' assets, liabilities and earning potential. The absolute maximum dollar cost of the KEIP Award at target value is $9.9 million, which represents 0.77% of Debtors' revenue. Willis Towers Decl. ¶¶ 33. As set forth in

34

the Willis Towers Declaration, the costs of the KEIP are in line with market standards for comparably sized companies in bankruptcy.  Compared to similar-sized companies in chapter 11 proceedings, the KEIP's costs, as measured by the target (maximum) costs, is between the 50th and 75th percentiles.  Willis Towers Decl. ¶¶ 31-33.  Additionally, the aggregate cost of compensation for the KEIP Participants, other than the CEO, is consistent with the agreed-upon reductions with the UCC and other creditor constituencies that were approved by the Court with respect to payments in early 2020, while the compensation of the CEO is directly in line with his prepetition compensation and consistent with CEO compensation at similar-sized companies, as set forth in the Willis Towers Declaration.  Willis Towers Decl. ¶ 28.

68.    The costs of the KERP Award and Targeted Retention Awards are also reasonable in the context of the Debtors' assets, liabilities, and earning potential.  As described in more detail in the Willis Towers Declaration, the cost of the KERP Award is approximately $21,600,000, which represents 1.68% of revenue, and the cost of the Targeted Retention Awards is up to $8,100,000, which represents 0.63% of revenue.  Willis Towers Decl. ¶¶ 52-53.  These costs are similar to the cost of the Debtors' previous compensation arrangements for the same categories of employees.  While the cost-to-revenue ratios for the KERP Award and Targeted Retention Awards represent above-market levels, the facts and circumstances of these cases justify such a costs.  The Debtors are managing through a uniquely complex chapter 11 process and significant reputational challenges, which have depressed employee morale and significantly hindered the Debtors' ability to retain key employees.  As the Debtors have suffered attrition, the workload on the remaining employees has only increased.  Mitigating attrition is vital to preserving the value of the Debtors' estates.  Moreover, the comparisons largely relate to bankruptcies where there is very little cash on the balance sheet, which is unlike this case where the Debtors have in excess of $1.3 billion.

Providing appropriate compensation—even at a larger-than-normal percentages of revenue—to help retain key employees is reasonable in this context and beneficial to all stakeholders.  And, importantly, the KERP Award and Targeted Retention Awards are sized in part to make up for comparatively low base salaries relative to market compensation and result in total direct compensation (as defined in the Willis Towers Declaration) below the 75th percentile for relevant groups of KERP Participants as described further below.  Willis Towers Decl. ¶ 49.

69.    *Third*, the KEIP is fair and reasonable and does not discriminate unfairly.  The KEIP Participants were chosen using the same criteria used with respect to the applicable AIP and LTRP payments previously approved by this Court and, accordingly, the list of participants largely overlaps.  *See* Wages Orders.  Moreover, the process for setting performance metrics, the nature of those performance metrics and the aggregate compensation payable on account of the KEIP Award are similar to the LTRP and AIP payments previously approved by the Court, with limited and well-justified exceptions.  Similarly, the components of the KEIP settling payment of outstanding LTRP grants otherwise payable in 2021 and 2022, granting long-term awards, and repurposing the 2020 LTRP grants use of the same 2020 Performance Metrics as the KEIP and generally closely mirror the structure of the previously approved Company AIP and LTRP awards.

70.    The alignment of the compensation level of the CEO with prepetition levels and market practice strongly supports that it is fair and well within the Debtors' reasonable judgment.  *See In re Velo Holdings, Inc.*, 472 B.R. at 213 ("[T]he KEIP does not unfairly discriminate and comports with industry standards, as it is nearly identical to the bonus plan that the Debtors had in place prepetition.").  Moreover, the substantial concessions that the CEO made with respect to the previously authorized payments, including a 63% reduction in his incentive compensation for 2019 resulting in **below-market** compensation, as a show of good faith and in the interests of allowing

the Debtors to move forward with other important issues in these Chapter 11 Cases ought not result in a continuous reduction in his compensation.  Indeed, when the CEO's compensation in 2019 and his proposed aggregate 2020 compensation are averaged, the blended package is positioned at just 8% above the 50th percentile and 25% below the 75th percentile.  Willis Towers Decl. ¶ 28.

71.    The KERP is also fair and reasonable.  First, the KERP is largely based on previously approved programs.  In addition, and consistent with past practice, all employees eligible to participate in the 2020 AIP and/or LTRP of the Debtors (approximately 614 employees) are KERP Participants.  Lowne Decl. ¶ 31.  Considering the Debtors' current headcount, retaining all KERP Participants is critical to the Debtors' ability to survive restructuring and remain viable in the long term.

72.    *Fourth*, the Debtors engaged Willis Towers Watson to assist in development of the KEIP and KERP and relied on its expertise to ensure that both the KEIP and KERP are in line with market standards for comparably sized companies in bankruptcy, other than with limited and well-justified exceptions carefully and deliberately chosen by the Debtors.  As fully explained in the Willis Towers Declaration, Willis Towers Watson surveyed recent key employee incentive programs and continuations of broad-based programs and undertook an extensive analysis to identify market standards.  Willis Towers Decl. ¶¶ 25-34, 47-54.  The Debtors relied on this work and collaborated with Willis Towers Watson to fashion the KEIP and KERP in line with those standards and Debtors' current compensation levels.  Lowne Decl. ¶ 10.

73.    As noted above, the costs of the KEIP align with market benchmarks and, as explained in the Willis Towers Declaration, the average compensation with the KEIP for the insiders (excluding the General Counsel's) is between the 50th and 75th percentile.  Willis Towers Decl. ¶ 25.  In addition to in-line costs, the metrics that inform the payment and grant amounts

under the KEIP are also consistent with typical practices generally and practices in the pharmaceutical industry specifically. Willis Towers Decl. ¶ 18. As described above, while the General Counsel's compensation would be above-market for an ordinary pharmaceutical company of Purdue's size, it represents compensation in-line with the market for other opportunities available to the General Counsel and is appropriate in light of his qualifications, which the Debtors determined were necessary for overseeing this extraordinarily complex legal situation.

74.    The Debtors determined that the cost of the KERP relative to market standards is justified by the recent high level of employee attrition that the Debtors must address and because, when considered in the context of the KERP Participants' base pay, the KERP is necessary to bring the total direct compensation of the KERP Participants in line with the total direct compensation provided to similarly situated employees of other pharmaceutical companies. Willis Towers Decl. ¶¶ 47-54. Specifically, the KERP Participant's total direct compensation including the KERP remains below the 75th percentile range of the market with respect to both non-insider executives and middle management, even taking into account retention awards to such employees that are not factored into total direct compensation in the market survey. Willis Towers Decl. ¶ 49.

75.    *Fifth*, the Debtors' Compensation Committee engaged in a rigorous process to develop the KEIP and KERP, including thorough due diligence regarding their proposed terms. Lowne Decl. ¶ 10; Willis Towers Decl. ¶¶ 8-10. Additionally, the KEIP and KERP are both largely continuations of the Debtors' prepetition compensation plans, which have "satisfied the independent 'test of time'" and previously withstood this Court's scrutiny. *See In re Global Home Prods. LLC*, 369 B.R. at 786 (emphasizing "identical" nature of the previously used and proposed plans under the business judgment standard).

76.    *Lastly*, the Debtors worked closely with Willis Towers Watson to design the KEIP and KERP, including consulting with Willis Towers Watson on how the KEIP and KERP compare to similar plans implemented by comparable chapter 11 debtors.  Willis Towers Decl. ¶¶ 8-10. This rigorous process and thorough consideration of advice from outside experts in designing the KEIP and KERP support the conclusion that approval of the KEIP and KERP represents a reasonable business judgment.

77.    For all of the aforementioned reasons, the Debtors exercised sound business judgment when developing the KEIP and KERP and respectfully submit that they satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.

## III.    The Proposed Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 363(b)(1) of the Bankruptcy Code

78.    The Proposed Compensation Plans should also be approved under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case.  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

79.    As set forth above, the Debtors have adequately shown that both of the Proposed Compensation Plans are reasonable exercises of their sound business judgment and thus permitted under section 363(b)(1).  The Proposed Compensation Plans are largely consistent with the Debtors' prior practices and were developed, with the assistance of independent experts, with market benchmarks in mind.  Both the KEIP and the KERP are necessary to the Debtors' current ability to operate and to preserving the value of the Debtors' estates.  Lowne Decl. ¶ 41.  Without the Proposed Compensation Plans, the Debtors are at serious risk of losing even more key employees—a problem compounded by the Debtors' difficulty in attracting new employees. Lowne Decl. ¶ 39.  This ominous combination threatens the viability of the Debtors' estates, and the Proposed Compensation Plans are directed at addressing this risk.  The Debtors and Willis Towers Watson carefully tailored these Proposed Compensation Plans to retain key employees, whose performance of their responsibilities is essential, now more than ever.  Lowne Decl. ¶ 12.

## NOTICE AND NO PRIOR REQUEST

80.    Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this motion.  The Debtors respectfully submit that no further notice is required.

81.    No prior motion for the relief requested herein has been made in this or any other Court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (i) enter the proposed order authorizing the Debtors to implement the KEIP and the KERP and (ii) grant such other and further relief as is just and proper.

Dated: September 9, 2020
      New York, New York

**DAVIS POLK & WARDWELL LLP**


/s/_ Eli J. Vonnegut_____

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak

*Counsel to the Debtors*
*and Debtors in Possession*