## Exhibit B

**Lowne Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JON LOWNE IN SUPPORT OF THE MOTION OF DEBTORS
FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF A KEY
EMPLOYEE INCENTIVE PLAN AND A KEY EMPLOYEE RETENTION PLAN**

I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.  I am an Executive Vice President and the Chief Financial Officer of Purdue Pharma

L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**," the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

"**Company**" or "**Purdue**"). I was first employed by Purdue as Senior Internal Auditor in 1995 and gained increasing responsibility in the Company's finance team over time, including as Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017 to February 2018. Since March 2018, I have been the Chief Financial Officer of PPLP. I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.       I submit this declaration (this "**Declaration**") in further support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* (the "**Motion**").[2] I am authorized to submit this Declaration on behalf of the Debtors.

3.       Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other employees of the Company and Willis Towers Watson, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**The Debtors' Historical Compensation Plans**

4.       For more than 30 years the Debtors have maintained a performance-based Annual Incentive Plan (the "**AIP**") for certain of their employees.  The AIP provides annual cash bonuses tied to achievement of company and individual performance metrics. The Debtors have also maintained a Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Existing Compensation Plans**") for nearly twenty years, under which eligible employees receive annual grants that may result in cash payouts based on achievement of performance goals

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion.

2

measured over a three-year performance period. The Existing Compensation Plans have been used effectively for years to drive performance and productivity.

5.      The Debtors also have maintained various retention plans in the ordinary course of business, as needed, to retain key employees. The Debtors implemented non-executive retention plans for certain executive and non-executive employees in both 2018 and 2019.  The non-executive retention plan in place as of September 2019 (the "**Existing Non-Executive Retention Plan**") was calibrated to incentivize key employees to remain employed with the Debtors through the end of 2020, which is a critical period for the Debtors.  The Existing Non-Executive Retention Plan provided for cash-based awards to approximately 120 employees who do not satisfy the criteria for being an "insider" as set forth in the Motion and whose services are intended to be retained through December 31, 2020.

<u>**Negotiated Adjustments to 2019 Compensation**</u>

6.      In September 2019, the Debtors sought authority from this Court to make payments owed under the 2019 AIP, outstanding LTRPs with payments due in 2020 and the Existing Non-Executive Retention Plan. Following extensive negotiations with their various creditor constituencies, the Debtors agreed to reduce the amounts payable to employees under these programs by approximately $10 million in the aggregate.  These reductions included: (i) capping 2019 AIP payouts at the target payout even though the Debtors had exceeded the applicable targets, (ii) Purdue's President & Chief Executive Officer (the "**CEO**") agreeing to total reductions of over $2.2 million, including full elimination of his 2020 LTRP payout, (iii) Purdue's Executive Vice President, General Counsel and Corporate Secretary (the "**General Counsel**") agreeing to a $250,000 reduction in his 2019 AIP payout, (iv) a 54% reduction in 2020 LTRP payouts for other insider employees, (v) a 44% reduction in 2020 LTRP payouts for

employees holding a title of Vice President or more senior at the time of the grant, (vi) a 24%

reduction in 2020 LTRP payouts for employees holding a title below the Vice President level at

the time of the grant, and (vii) a further $500,000 reduction in total payments to insiders in a

manner chosen by the Debtors.[3]

## The Proposed Compensation Plans

7.    When designing the proposed compensation package, the Compensation and

Talent Committee of the Board of Directors of Purdue Pharma Inc. (the "**Compensation**

**Committee**") sought to balance two paramount needs. First, the Debtors need to pay their

employees competitive and motivating compensation and give their employees clarity regarding

compensation to avoid further increases in attrition. Second, the Debtors need to tailor their

compensation practices to their present circumstances—in particular, the current phase and target

trajectory of these Chapter 11 Cases. The resulting package includes the following two

components: a key employee incentive plan (the "**KEIP**") for insiders and a broadly applicable

key employee retention plan (the "**KERP**" and, together with the KEIP, the "**Proposed**

**Compensation Plans**") for non-insiders.[4]

8.    The KEIP continues and repurposes the 2020 AIP and the LTRP awards that

otherwise would have been payable to the KEIP Participants in 2021 into an incentive-based

award.  The KEIP also provides for a means to settle the LTRP payout due in 2022 and provides

for a long-term award payable in 2023 in place of the LTRP grant that the KEIP Participants

otherwise would have received in 2020.

---

[3] These negotiated reductions included aggregate reductions in LTRP payouts that were greater than the aggregate
amount of applicable LTRP payouts that were tied to pre-2018 performance.
[4] The Debtors also anticipate updating the definition of "compensation" under their retirement plans to include
amounts payable under the Proposed Compensation Plans.

4

9.      The KERP continues and repurposes the 2020 AIP and the LTRP awards that

otherwise would have been payable to the KERP Participants in 2021 into a retention award.

The KERP also provides for a means to settle the LTRP payouts due in 2022 and 2023, provides

for a long-term award payable in 2023 in place of the LTRP grant that KERP Participants

otherwise would have received in 2020, and provides for additional targeted retention payments

for certain employees.

10.      In designing the Proposed Compensation Plans, the Compensation Committee and

management engaged in an iterative process with Willis Towers Watson, their independent

compensation consultant.  Willis Towers Watson prepared analyses based on aggregated market

data for compensation plans.  Willis Towers Watson also prepared comparisons of the Debtors'

compensation relative to the market that also took into account the Debtors' unique

circumstances.  The Compensation Committee and management reviewed these analyses, and

the Compensation Committee, management, and Willis Towers Watson each raised questions

and exchanged information while designing the Proposed Compensation Plans.

11.      The Debtors' employees bear uncommon burdens at present.  Employee attrition

has led to ever-increasing workloads and imposed severe strain on the Debtors' remaining

employees.  This strain has only been amplified by work conditions during the COVID-19

pandemic and these complex and charged chapter 11 proceedings.

12.      The Proposed Compensation Plans are generally similar to the Debtors'

compensation plans and practices in prior years.  I believe that departing from the Debtors' historic

compensation practices would make it much more difficult for the Debtors to retain employees

who are necessary to maintain the Debtors' business operations.  I believe that the Proposed

Compensation Plans are reasonably tailored and necessary to realize the Debtors' objective of a successful emergence from chapter 11.

## The KEIP

### *The KEIP Participants*

13.     The proposed KEIP would apply to eight of the Debtors' current employees (the "**KEIP Participants**").  The KEIP Participants are the only employees who meet at least one of the criteria for being an "insider" that are set forth in the Motion.  These employees' institutional knowledge and skills continue to be essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates during the course of the Chapter 11 Cases. The KEIP Participants consist of the: (i) CEO; (ii) Executive Vice President, Chief Financial Officer ("**CFO**"); (iii) General Counsel; (iv) Senior Vice President, Intellectual Property Law & Public Health Initiatives; (v) Chief Technical Operations Officer; (vi) President, Imbrium Therapeutics; (vii) President, Rhodes Pharmaceuticals; and (viii) President, Rhodes Technologies.

14.     The KEIP Participants perform a variety of critical functions for the Debtors, including with regard to management, operations, finance and legal services, and each is responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals. In addition to these significant day-to-day responsibilities, these individuals' workloads have substantially increased as a result of the Chapter 11 Cases and the Debtors' reduced workforce. The KEIP Participants are making extraordinary efforts to shepherd the Debtors' businesses, maximize estate value and steer the Debtors through their restructuring. Accordingly, the Debtors believe that the KEIP Participants should be appropriately incentivized to ensure optimal recoveries for all stakeholders. None of the KEIP Participants will be eligible to

participate in the proposed KERP, and the purpose of the proposed KEIP is to incentivize the KEIP Participants.

*The KEIP Structure*

15.    Each KEIP Participant will receive (i) an award (a "**KEIP Award**") with a target value, which is also the award's maximum value, set forth in __Table 1__, below, (ii) partial payment of prepetition LTRP grants that are payable in 2022 and (iii) a long-term incentive compensation grant payable in 2023.

16.    KEIP Award payments will be contingent upon the Debtors' achievement of certain performance metrics discussed in more detail below (the "**2020 Performance Metrics**"), as compared to the threshold and target performance levels, as applicable, with straight-line interpolation to be used if such actual performance falls between such amounts. No payment under the KEIP Award would be paid to any of the KEIP Participants if the Debtors fail to meet the threshold level for the 2020 Performance Metrics. The maximum cost of the KEIP Award is $9,866,000.

## TABLE 1[5]

| KEIP Participant | Payout Range = 75% to 100% | |
| --- | --- | --- |
| | **Threshold KEIP Award** | **Target KEIP Award** |
| President & Chief Executive Officer | $2,640,000 | $3,520,000 |
| Executive Vice President, Chief Financial Officer | $750,000 | $1,000,000 |
| Executive Vice President, General Counsel and Corporate Secretary | $1,964,000 | $2,619,000 |
| Senior Vice President, Intellectual Property Law & Public Health Initiatives | $508,000 | $678,000 |
| Chief Technical Operations Officer | $519,000 | $691,000 |

---

[5] The Target KEIP Awards set forth in Table 1 take into account the reductions described in paragraph 17 below.

7

| | | |
|---|---|---|
| President, Imbrium Therapeutics | $468,000 | $624,000 |
| President, Rhodes Pharmaceuticals | $279,000 | $372,000 |
| President, Rhodes Technologies | $272,000 | $362,000 |
| **Total** | **$7,400,000** | **$9,866,000** |

17.    Each KEIP Participant's target KEIP Award is equal to the sum of the target amount of the 2020 AIP award that the participant otherwise would have been eligible to receive and a portion of the LTRP payout payable to that participant in 2021, with such LTRP payouts subject to a 25% reduction for KEIP Participants, as determined by the Compensation Committee, other than the CEO, who has agreed to a 47% reduction, and the General Counsel, who has agreed to a further $250,000 reduction in addition to the 25% reduction in LTRP payouts.  Such reductions, together with reductions to the 2021 LTRP payout amounts of other participants as discussed below, are, in the aggregate, greater than the amount of the 2021 LTRP payouts tied to pre-2018 performance.

18.    Consistent with the reductions made to 2020 LTRP payouts, the Compensation Committee determined that more senior employees would bear the brunt of the reductions, so aggregate payments to all KEIP Participants have been significantly reduced despite the fact that only one KEIP Participant has any LTRP payouts due in 2021 that relate to pre-2018 performance.  That KEIP Participant has less than $30,000 in LTRP payouts due in 2021 that relate to pre-2018 performance under an LTRP grant received in a prior role.  The reduction to that KEIP Participant's total KEIP Award as a result of the cuts described above is far in excess of such $30,000 payout.  Accordingly, no KEIP Participant is receiving any compensation that relates to pre-2018 performance.  The KEIP repurposes the 2020 AIP and the LTRP payouts that

would have been paid to the KEIP Participants in 2021 and therefore provides for compensation largely consistent with past practice.

19.     The KEIP Award will be paid as follows: (i) 50% paid in October 2020 and (ii) the remaining 50% paid in January 2021. The October 2020 payment amount will assume target level performance and the January 2021 payment will include a true-up, if any, including a potential clawback of the prior payment if threshold or target performance is not met. Payments will also be subject to clawback if the KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to the earlier of the Debtors' emergence from bankruptcy and March 15, 2021.  If the Debtors emerge at any time prior to any outstanding payment date, the remaining full KEIP Award payment would be paid upon emergence at the KEIP Award value. All amounts payable under the KEIP Award will be subject to acceleration in the event of a termination of employment by the Debtors without cause.  This structure keeps the compensation programs aligned with the compensation value of the traditional AIP and LTRP amounts—which typically are paid in March of the year following the year in which they are earned.

20.     Each KEIP Participant will also receive a long-term award that is structured similarly to the LTRP grant that the participant would otherwise receive in 2020 and be paid in 2023. The target amount of these long-term awards is 50% less than the target 2020 LTRP that would otherwise be received. The actual payouts will be based on the same 2020 Performance Metrics that apply to the KEIP Award that are described below, which are based solely on the Company's performance in 2020. These long-term awards would **not** accelerate upon the effectiveness of a chapter 11 plan.  The long-term awards would accelerate upon a termination of

9

employment by the Debtors without cause.  The maximum aggregate amount of such payments is approximately $2,200,000.

21.    As in the case of the LTRP payments due in 2021, each KEIP Participant will also be eligible to receive payment of LTRP amounts due in 2022.  The LTRP payments due in 2022 will be subject to a 22% reduction to the payment due to the CEO and a 12% reduction for other KEIP Participants.  As with the LTRP payments due in 2021, such reductions, together with reductions to the 2022 LTRP payout amounts of other participants as discussed below, are, in the aggregate, greater than the amount of the 2022 LTRP payouts tied to pre-2018 performance. The Compensation Committee again determined that the brunt of the reductions should continue to be borne by more senior employees and therefore implemented reductions for all the KEIP Participants notwithstanding the fact that only one KEIP Participant has any LTRP payouts due in 2022 that are tied to pre-2018 performance.  The reductions to the LTRP payouts due in 2022 to that KEIP Participant are far greater than the less than $10,000 in payouts that relate to pre-2018 performance.  The same 2020 Performance Metrics that apply to the KEIP Award will be applied to uncompleted performance periods with respect to such LTRP.  Completed performance periods will remain subject to the performance scores that have already been assigned for such periods. Except as set forth above, such payments will be paid under the existing LTRP terms but subject to acceleration in the event of a termination of employment by the Debtors without cause. The aggregate target amount—and maximum amount—of such payments is approximately $3,700,000.

***The KEIP Metrics***

22.    In early 2020, the Compensation Committee, with guidance from Willis Towers Watson, identified and approved 2020 Performance Metrics for 2020 to be used to determine payment under any of the Debtors' payment compensation programs. These 2020 Performance

Metrics are ambitious, having threshold targets that are difficult to achieve both individually and

when considered in combination, and will require the KEIP Participants' diligent and committed

efforts. At the time the 2020 Performance Metrics were set by the Compensation Committee,

they were challenging, required extensive achievement and presented a meaningful risk of not

being met at the threshold level required for payment.  Although the KEIP Participants have been

focused on driving the Debtors to meet these goals and it currently appears that some of the 2020

Performance Metrics may be achieved, others still require extensive work to be achieved, and it

is a virtual certainty that others will not be achieved.

23.     After these 2020 Performance Metrics were established, further development of

the 2020 compensation programs was paused due to uncertainty in the Debtors' business outlook

stemming from the COVID-19 pandemic. When discussion of the 2020 compensation programs

was resumed, the Compensation Committee, with input from Willis Towers Watson, determined

that the previously selected 2020 Performance Metrics were well-balanced to motivate the

workforce and should apply to and govern the KEIP.  Given the uncertainty of the timing of

emergence from these Chapter 11 Cases, the Compensation Committee determined that it was in

the best interest of the Debtors and the post-emergence entities to apply the 2020 metrics to the

long-term award for years subsequent to 2020.  The 2020 Performance Metrics, and therefore the

payments under the KEIP, are based on the same three strategic pillars as the historic and long-

standing AIP: value creation (representing 40% of the Target KEIP Award), innovation and

efficiency (50% of the Target KEIP Award) and people and culture (10% of the Target KEIP

Award).

24.     The value creation metric is designed to measure and reward long-term success of

the Debtors' business based on certain nonfinancial operational goals, such as meeting certain

11

deadlines with respect to its testing and development of non-opioid products, including overdose treatment products. **Table 2** below sets forth certain key operational and developmental goals that the Compensation Committee approved as key to the long-term success of the Debtors' business.

**TABLE 2**

| 2020 Value Creation Performance Metrics | 2020 Performance Target | % of Value Creation | % of Target KEIP Award |
|---|---|---|---|
| *Public Health Initiatives*[6] | | | |
| ➤ **Intranasal Naloxone**: Formalize agreement(s) and provide support for the non-profit development of intranasal naloxone with HRT to allow first patient in Phase 1 | End of Q3 2020 | 45.0% | 18.0% |
| ➤ **Nalmefene**: ANDA Filed by Vial with Competitive Generic Therapy (CGT) Designation | End of Q4 2020 | | |
| ➤ **Nalmefene**: Complete Engineering Batches for Nalmefene Prefilled Syringe | End of Q4 2020 | | |
| ➤ **Nalmefene**: Complete Nalmefene Autoinjector Formulation Development Work | End of Q4 2020 | | |
| *Research & Development*[7] | | | |
| ➤ **OAG**: Complete Last Patient Randomized in Proof-of-Concept Phase 2 Trial OAG2002 | End of Q4 2020 | 15.0% | 6.0% |
| ➤ **OAG**: Complete In Life Portion for Chronic Toxicology Studies, 6M rat and 9M dog | Q3 2020 and Q4 2020, respectively | | |
| ➤ **Tinostamustine**: Advancement of Clinical Program | Q3 2020 | 15.0% | 6.0% |
| *Rhodes* | | | |

---

[6] All medications referred to in this section are potential treatments for opioid overdose.
[7] OAG refers to a potential treatment for insomnia associated with alcohol cessation. Tinostamustine refers to a potential cancer treatment.

| | | | |
|---|---|---|---|
| ➤ **Generic Medication-Assisted Treatment Product**: Launch | Q4 2020 | 2.5% | 1.0% |
| ➤ **Generic Migraine and COPD Medications**: Submit DHE ANDA | End Q4 2020 | 6.25% | 2.5% |
| ➤ **Generic ADHD Treatment**: ANDA Submission | Q2 2020 | 6.25% | 2.5% |
| ➤ **Generic Treatment for Intestinal Parasites**: ANDA Submission | Q3/Q4 2020 | 5.0% | 2.0% |
| ➤ **Generic Nausea Prevention Medication**: Manufacture Exhibit Batches and Close the BE Study | Q4 2020 | 5.0% | 2.0% |
| **Total** | | **100%** | **40%** |

25.    The innovation and efficiency metric is designed to capture key financial and operational goals, including important business metrics such as operating profits, net sales and operating losses.  **Table 3** below sets forth certain key financial and operational goals that the Debtors have identified as key to the long-term success of the Debtors' business.

### TABLE 3

| 2020 Innovation and Efficiency Performance Metric[8] | 2020 Performance Target | % of Innovation and Efficiency | % of Target KEIP Award |
|---|---|---|---|
| Purdue Branded Business Operating Profit | $115M | 20% | 10% |
| Adhansia XR Net Sales | $18M | 10% | 5% |
| Adhansia XR Operating Loss[9] | ($44M) | 15% | 7.5% |
| Avrio Net Sales | $85M | 10% | 5% |
| Avrio Operating Profit | $8.6M | 15% | 7.5% |

---

[8] Adhansia XR is a Central Nervous System (CNS) stimulant prescription medicine used for the treatment of ADHD in people six years of age and older. Avrio Health L.P. is a wholly owned subsidiary of the Debtors which produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).
[9] The operating loss metric relates to Adhansia, which was recently launched and still in the growth phase.

13

| | | | |
|---|---|---|---|
| Rhodes (RALP) Operating Loss | ($35M) | 30% | 15% |
| **Total** | | **100%** | **50%** |

26.    Finally, nurturing of the Debtors' human resources and organizational culture will be critical to keep the Debtors on the path to emergence and beyond. Such steps include organizational education to occur in the first three quarters of 2020 and the development of a transition plan by the end of the fourth quarter of 2020. This metric will be reviewed holistically to determine whether the Debtors' estates have been properly positioned for post-emergence roles, and will represent 10% of the KEIP.

### *Importance of the KEIP*

27.    The Debtors strongly believe that maintaining compensation in line with the Debtors' historical practice is critical to their ability to motivate and retain their highly skilled workforce.  The Debtors believe that appropriately compensating their employees is necessary to be able to complete a value-maximizing restructuring and emerge from bankruptcy.  The KEIP is largely consistent with the Debtors' historical compensation practices, while the challenges faced by the KEIP Participants have only increased as they navigate the difficult terrain the Debtors face as they seek to emerge from bankruptcy.  During the course of the Chapter 11 Cases, the challenges faced by on the CEO, the CFO, the General Counsel and the other KEIP Participants have been significantly increased due to the extremely complex and highly litigious nature of the bankruptcy case. While the total cost of the proposed KEIP Award is higher than the 2019 AIP and LTRP payouts agreed to in 2020, this difference is driven chiefly by (i) the CEO's agreement to an extremely substantial one-time reduction in compensation otherwise due to him in 2020 and (ii) the fact that the General Counsel, hired in 2018, was not entitled to an LTRP payout in 2020 but would be for the first time in 2021.

14

28.    The CEO is critical to the Debtors' success.  Since the commencement of these
Chapter 11 Cases, he has assumed numerous additional responsibilities while leading the
extremely challenging tasks of facilitating a successful restructuring and ensuring the future
success of the Debtors and their estates for the public good.  The Compensation Committee
determined that the Debtors should not insist upon a continuation of the extraordinary
concessions the CEO made relating to his 2019 compensation, which total over $2.2 million, and
that the CEO should be compensated in line with market-based compensation rates.

29.    The General Counsel is also critical to the Debtors' operations and the success of
these Chapter 11 Cases.  Having accepted the role at the Debtors when pre-bankruptcy litigation
was already at a fever pitch, he has played a central role in the restructuring in addition to managing
all of the usual complex legal issues necessary to run a diversified pharmaceutical business. The
General Counsel volunteered a $250,000 reduction in his compensation for both 2019 and 2020.
The Debtors determined that the General Counsel's compensation is appropriate and reasonable,
particularly in light of the immense challenges he faces in his role with the Debtors, his past
experience and expertise and the market for his services.

30.    Historically, the LTRP has been an important component of the Debtors' overall
compensation strategy.  The Debtors rely on the LTRP to ensure the total compensation of their
senior executives is competitive with the market. The Debtors accordingly believe that
authorization to honor the LTRP payouts due to the KEIP Participants in 2022, and the grant to
the KEIP Participants of a new long-term award payable in 2023, is necessary, appropriate, and
consistent with the Debtors' historic compensation practices. The loss of the LTRP payouts and
grants without substitution would represent a significant decrease in overall compensation, which
could jeopardize the Debtors' ability to incentivize the KEIP Participants and ensure stability in

15

the workforce and the long-term value of the enterprise.

## The KERP

### The KERP Participants

31.     The Debtors seek authorization to implement the KERP for virtually[10] all incentive-eligible employees other than the KEIP Participants (the "**KERP Participants**"). The KERP Participants have undertaken significant efforts to stabilize the Debtors' operations and lay the groundwork for a successful restructuring. They have taken on this Herculean task under significant stresses, including significant employee attrition, which increased the burdens on many of the remaining employees and had a negative effect on morale. They have nonetheless delivered extraordinary business results. Approximately 614 employees will participate in the KERP, of which 17 will be Vice President or higher and 597 will be middle management and professional employees, such as scientific researchers, as well as regulatory and compliance personnel.[11] None of the KEIP Participants are eligible to participate in the KERP.  No KERP Participant meets any of the criteria for being an insider as set forth in the Motion.

### The KERP Payout Structure

32.     Each KERP Participant will receive (i) an award (a "**KERP Award**") comprised of an amount equal to the KERP Participants' target 2020 AIP and LTRP payout due in 2021, (ii) a long-term incentive compensation grant payable in 2023, and (iii) partial payment of

---

[10] A small number of employees either previously did not participate in the AIP and therefore will not participate in the KERP or currently are not eligible to participate in the KERP.

[11] In instances where the separation of existing KERP Participants from the Debtors results in increased responsibilities or new roles for other KERP Participants, or newly-hired employees take on such roles or responsibilities, the Debtors seek the authority to reallocate to such employees up to the amount of the unpaid portion of the KERP Award that corresponds to the target 2020 AIP award (defined below) that would otherwise be authorized to be paid to such separated KERP Participants in order to provide needed flexibility to effectively respond to such changes in circumstances.

prepetition LTRP grants that are payable in 2022 and full payment of the prepetition grants that
are payable in 2023. Certain KERP Participants will also receive additional targeted retention
payments.

33.    Each KERP Participant's KERP Award is equal to the sum of the target amount
of the 2020 AIP award they otherwise would have been eligible to receive and the LTRP payout
they would otherwise have expected to receive in 2021 subject to a 21% reduction for KERP
Participants with a title of Vice President or higher at the time of the grant and 11% for KERP
Participants with a title less senior than Vice President at the time of the grant. As with the KEIP,
the KERP **repurposes** the 2020 AIP award and LTRP payouts that would ordinarily be due in
2021.  Such reductions, together with reductions to the 2021 LTRP payout amounts of other
participants as discussed in paragraph 17 above, are, in the aggregate, greater than the amount of
the 2021 LTRP payouts tied to pre-2018 performance.

34.    The KERP Award is not subject to performance criteria to provide the KERP
Participants with greater compensation certainty. The Debtors expect this structure to help retain
KERP Participants under the present challenging and uncertain conditions.

35.    The KERP Award will be paid as follows: (i) 50% paid in October 2020 and (ii)
the remaining 50% paid in January 2021. Other than for hourly employees, KERP Award
payments are subject to a clawback if the KERP Participant resigns or is terminated for any
reason other than by the Debtors without cause on the earlier of March 15, 2021 and emergence.
Payments under the KERP Award will be subject to the KERP Participant's continued
employment through the applicable payment date, with acceleration in the event of a termination
of the KERP Participant's employment by the Debtors other than without cause. In the event the
Debtors emerge from bankruptcy any time prior to a payment date, the remaining full amount of

17

the KERP Award would accelerate and be payable. The total aggregate target (and maximum)

payment under the KERP Award is approximately $21,600,000.

36.    In addition, the Debtors believe that the Existing Non-Executive Retention Plan

was particularly critical to preserving and maximizing the value of the Debtors' estates.  The

Debtors seek to provide additional targeted retention awards to an identified group of key

employees on a similar basis in an aggregate amount of up to $8,100,000 (the "**Targeted**

**Retention Awards**").  The Targeted Retention Awards will be payable 50% in January 2021,

and 50% in April 2021. Other than for hourly employees, Targeted Retention Award payments

are subject to a clawback if the KERP Participant resigns or is terminated for any reason other

than by the Debtors without cause before June 30, 2021.  Payments under the Targeted Retention

Awards will be subject to the Retention Eligible Employee's continued employment through the

applicable payment date, with acceleration in the event of a termination of the Retention Eligible

Employee's employment by the Debtors other than without cause.

37.    Prior to the commencement of the Chapter 11 Cases, certain of the KERP

Participants were granted LTRP awards that are payable in 2022 and 2023.  Each such KERP

Participant[12] will be entitled to payment in 2022 and 2023 on account of such prepetition LTRP

awards at target value (or, with respect to completed performance periods, the amount previously

set based on achievement during such period).  As noted above, aggregate LTRP payments with

respect to such years will be reduced by an amount greater than the amount of the LTRP payouts

tied to pre-2018 performance.  These reductions for KERP Participants will consist of a 9%

reduction for KERP Participants with a title of Vice President or higher and a 5% reduction for

---

[12] KERP Participants include post-petition retirees for this purpose.

KERP Participants with a title less senior than Vice President with respect to payouts in 2022 and no reduction with respect to payouts in 2023. As provided above, such payments will be paid under the existing LTRP terms but subject to acceleration in the event of a termination of employment by the Debtors without cause. The aggregate total of target LTRP payouts in 2022 and 2023 for all KERP Participants is approximately $10,100,000 and $1,150,000, respectively.

38.    Consistent with past practice, certain KERP Participants will receive a long-term award designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the KERP Participant in 2020 under Purdue's longstanding compensation practices. The amount of such grant will be equal to the target LTRP grants that otherwise would have been granted to the KERP Participant in 2020. The grant will not be subject to performance metrics. The aggregate total of these long-term awards for all KERP Participants is approximately $10,200,000.  This amount would be payable in 2023.

### *Importance of the KERP*

39.    The Debtors believe that the KERP is commercially appropriate and reasonable. Given the extraordinary burdens on the KERP Participants from the challenges of operating in chapter 11 and the negative press environment faced by Purdue, there is a very real risk that additional employees will continue to depart to work elsewhere. Indeed, attrition has been high since the commencement of these Chapter 11 Cases, with 85 resignations through August 31, 2020, which represents an annualized voluntary turnover rate of 13.4%.  In some cases, employees have timed their resignations to coincide with the end of clawback periods.  As the Debtors have suffered attrition, the workload on the remaining employees has only increased. The strain of these bankruptcy cases creates the very real risk that without the KERP, the Debtors may lose an unacceptable number of their employees to competing employers able to offer market

compensation and/or job security that the Debtors cannot match. Additional defections among the Debtors' workforce would significantly hamper their operations and jeopardize the Debtors' emergence. Moreover, it is extremely unlikely that the Debtors would be able to find sufficient, if any, qualified replacements during the critical period leading up to the Debtors' emergence. If not for the compensation programs in place for 2019, and the Existing Non-Executive Retention Plan, the Debtors believe that the attrition rate would have been significantly higher. Failure to implement the KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.

40.     The KERP Award is consistent with the Debtors' historical compensation practices. The KERP Award is roughly equivalent to historical annual AIP and LTRP payouts. The clawback through March 15, 2021 provides a retentive element similar to the effect of AIP and LTRP payments typically being made in March of each year. The LTRP payouts in 2022 and 2023 and long-term award payable in 2023 are consistent with the Debtors' historic compensation practices under the LTRP, and failing to replace such compensation under the KERP would represent a significant decrease in long-term compensation. Such a significant decrease in long-term compensation would likely make it more difficult for the Debtors to retain key employees. Finally, Compensation Committee and management selected KERP Participants to receive Targeted Retention Awards through a detailed and careful review of employee roles and job functions in order to identify employees whose services are particularly critical to preserving and maximizing the value of the Debtors' estates. The Targeted Retention Awards are consistent with the amounts of awards under the prior targeted retention program, which have been only barely sufficient to stem the tide of attrition among these critical employees.

## **Conclusion**

41.    I believe that the Proposed Compensation Plans are crucial to the Debtors' business operations during the pendency of the chapter 11 cases, as they will maintain employee morale, dedication, confidence, and cooperation and maximize the Debtors' ability to reorganize successfully.  The value of the Debtors' business derives in large part from the efforts, experience, expertise and knowledge of the Debtors' highly skilled, trained and educated workforce. The workforce must be retained and motivated in order to allow the Debtors to operate in their highly regulated industry. Motivation and retention of the Debtors' valuable key employees, through continued appropriate and competitive compensation are mission critical. This has never been more important to the Debtors as they simultaneously navigate these Chapter 11 Cases and ask their workforce to continue working in the Debtors' production plants during the COVID-19 pandemic.  I believe that the failure to authorize these programs would irreparably impair the Debtors' relationships with their employees, adversely impact the Debtors' ability to deliver to their customers superior products and services, and hinder the Debtors' restructuring efforts.

42.    In sum, I believe that the relief requested in the Motion is necessary to avoid irreparable harm to the Debtors and constitutes a critical element in maximizing the value of the Debtors' business.

*[Remainder of Page Intentionally Left Blank]*

43.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   September 9, 2020

By:   _/s/ Jon Lowne_____

Jon Lowne
Executive Vice President and Chief
Financial Officer