## Exhibit C

**Willis Towers Watson Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF THE MOTION OF
DEBTORS FOR ENTRY OF ORDER AUTHORIZING IMPLEMENTATION OF A KEY
EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN**

I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best

of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the
applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal
Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium
Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp.
(4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue
Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805),
Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes
Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC
Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard,
Stamford, CT 06901.

1.       I am a Director at Willis Towers Watson PLC ("**Willis Towers Watson**"). Willis

Towers Watson has been engaged by Purdue Pharma L.P. and its above captioned wholly owned

direct and indirect subsidiaries (collectively, the "**Debtors**" or the "**Company**") to provide

compensation consulting services and to serve as advisors to the Board's Compensation and

Talent Committee (the "**Compensation Committee**"). I am familiar with the structure of the

Debtors' pre- and post- petition compensation plans, including the Debtors' proposed key

employee incentive plan (the **"KEIP"**) and the Debtors' key employee retention plan (the

**"KERP"**).

2.       I submit this declaration (this "**Declaration**") on behalf of Willis Towers Watson

in support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of a Key

Employee Incentive Plan and a Key Employee Retention Plan.* [2] I am authorized to submit this

Declaration on behalf of the Debtors.

3.       Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my review of the KEIP and KERP, my team's and my research into

compensation practices for companies in the biopharma industry and general industry, as well as

other companies that have recently filed for chapter 11 protection, and information supplied to me

by members of the Debtors' management team and the Debtors' other advisors. For the reasons

described below, it is my opinion that the KEIP and KERP are appropriate and reasonable. If called

upon to testify, I would testify competently to the facts set forth in this Declaration.

## QUALIFICATIONS AND BACKGROUND

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in
the *Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a
Key Employee Retention Plan*.

### A.  Qualifications

4.      I received my Juris Doctor from University of San Diego School of Law in 1998,
graduating Magna Cum Laude and Order of the Coif, and my Bachelor of Arts in international
business from San Diego State University in 1994. After working at Gibson Dunn as an associate
in the corporate practice, Pillsbury Winthrop as an associate in the executive compensation
practice, and The Loftin Firm, P.C. where I was a partner and then of counsel in the corporate
practice, I became an executive compensation consultant at the Hay Group LLC in 2014. I joined
Willis Towers Watson in 2016 where I have been continuously employed ever since.

5.      Willis Towers Watson is an international professional services firm that offers a
wide variety of services to public and private clients, including expert analysis of executive and
management compensation. Willis Towers Watson designs and delivers solutions that manage
risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen
institutions and individuals. Willis Towers Watson focuses on four key business segments:
corporate risk and brokering; human capital and benefits; exchange solutions; and investment, risk,
and reinsurance.

6.      My responsibilities at Willis Towers Watson have primarily involved consulting to
for-profit companies and not-for profit organizations, specifically regarding executive
compensation. I routinely work with public and private companies in various industries regarding
compensation philosophy, pay competitiveness, incentive plan design, and other compensation-
related analyses and have participated in the development and design of hundreds of management
and employee incentive plans for companies in and outside of bankruptcy.

7.      I am highly experienced in executive, management, and employee compensation
with over 20 years of experience in the field. During my tenure at Willis Towers Watson, I have

worked closely with a range of companies undergoing a financial restructuring in developing a variety of pre-petition and post-petition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees. Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including *Aegean Marine Petroleum Network Inc., et al.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re ATD Corporation, et al.*, Case No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores Inc., et al.*, Case No. 18-10584 (MFW), (Bankr. D. Del.); *In re Cloud Peak Energy Inc.*, Case No. 19-11047 (CSS) (Bankr. D. Del.); *In re FULLBEAUTY Brands Holdings Corp., et al.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Company, et al.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re PES Holdings, LLC*, Case No. 19-11626 (LSS) (Bankr. D. Del.); *In re Westmoreland Coal Company, et al.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.).

## B. Background

8.    Since Willis Towers Watson was retained by the Debtors, I, in coordination with my team at Willis Towers Watson, have familiarized myself with the Debtors' operations, business goals, pre- and post-petition compensation practices and the proposed KEIP and KERP. As part of this process, Willis Towers Watson conducted pay benchmarking for all employees by gathering and analyzing relevant market compensation data, including total direct compensation offered by companies in Willis Towers Watson's 2019 CDB Pharmaceutical and Health Sciences Executive Compensation Survey Report and participants in Willis Towers Watson's 2019 Pharmaceutical Executive Compensation and Middle Management, Professional and Support Surveys. Among other things, my team and I provided input and advice on the design, structure, and total cost of the KEIP and KERP. In connection with this process, Willis Towers Watson worked closely with

4

the Debtors' senior management team and its other advisors. Additionally, Willis Towers Watson leveraged its own experience designing programs for similarly situated companies, both inside and outside of chapter 11 bankruptcy. The KEIP and KERP reflect the input and guidance provided by myself and my colleagues at Willis Towers Watson.

9.      Importantly, the KEIP and the KERP were subject to oversight, review, and approval by the Compensation Committee, and the CEO's proposed participation in the KEIP was additionally reviewed and approved by the Board. Willis Towers Watson was involved in and consulted on the design of the KEIP and the KERP, and prior to approval of the KEIP and the KERP, Willis Towers Watson presented its analysis of their appropriateness and reasonableness to the Debtors' senior management, the Compensation Committee and, with respect to the CEO's participation in the KEIP, the Board. Willis Towers Watson's primary goal in the course of these interactions was to develop its independent assessment of the KEIP and the KERP as appropriate and reasonable drawing directly upon the specific needs of the Debtors, relevant market data and Willis Towers Watson's experience in designing comparable programs for similarly situated companies.

10.     The Debtors commenced these Chapter 11 Cases to maximize the value of the Debtors' estates for their stakeholders. Recognizing the unique facts of these Chapter 11 Cases and that employee performance will play a critical role in achieving a favorable outcome for all parties, the Debtors in conjunction with Willis Towers Watson and their other advisors undertook a deliberative process to design appropriate and reasonable compensation programs for 2020 and with respect to the treatment of LTRP awards scheduled to vest and/or be paid in the future. The culmination of that work resulted in the KEIP, which is designed to incentivize eight crucial senior level insider employees (the "**KEIP Participants**") to achieve challenging financial and

operational targets, and the KERP, which is designed to retain all other eligible employees of the

Debtors (the "**KERP Participants**") during the pendency of these Chapter 11 Cases.

## KEY EMPLOYEE INCENTIVE PLAN

**A.      Overview of the KEIP.**

11.      Prior to commencing these Chapter 11 Cases, Purdue maintained a performance-based annual incentive plan ("**AIP**") for executives and select employees, as well as a performance-based long-term results plan ("**LTRP**") for executives and select senior level employees. The proposed KEIP is, in many ways, an extension of the executive level pay-for-performance standard that was established through the prepetition AIP and LTRP.

12.      The KEIP is designed to incentivize the KEIP Participants to achieve the targeted business performance goals (the "**Performance Metrics**") set out in Purdue's 2020 Corporate Scorecard (the "**Scorecard**"). The KEIP Participants were identified by the Debtors' management team with the advice of its other advisors.

13.      The KEIP establishes a sliding scale of potential award opportunities based on the extent to which the Debtors succeed in accomplishing the goals set out in the Scorecard. The table below shows two levels of weighted performance targets which modify KEIP awards to potentially be earned based on the Scorecard performance, with interpolation for performance between the levels:

| Threshold | Target/Max |
|-----------|------------|
| 75% | 100% |

14.      The fiscal year 2020 total maximum potential award opportunity under the KEIP will not exceed $9,866,000 in the aggregate and is to be paid 50% in October 2020 and the remaining 50% in January 2021 (the "**KEIP Award**"). The October 2020 payment will assume target level performance and the January 2021 payment will include a true-up, if any, including a

6

potential clawback of the prior payment if threshold or target performance is not met. Payments will also be subject to clawback if the KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to the earlier of the Debtors' emergence from these Chapter 11 Cases or March 15, 2021. If the Debtors emerge from these Chapter 11 Cases at any time prior to any outstanding payment date, any remaining KEIP Award payments would be accelerated and paid at the target KEIP Award value. All amounts payable under the KEIP Awards will be subject to acceleration in the event of a termination of employment by the Debtors without cause.  This structure maintains the inherent retention value of the historic payment of AIP and LTRP amounts in March of the year following the year in which they are earned.

15.    The titles of the individual KEIP Participants and their respective proposed KEIP Award opportunities are identified in the table below. The target KEIP Award amounts reflect for each KEIP Participant the sum of (a) the target amount of the 2020 AIP award the KEIP Participant otherwise would have been eligible to receive, and (b) the LTRP payout otherwise due to be paid to the KEIP Participant in 2021, with such LTRP payouts subject to a 25% reduction for KEIP Participants other than the CEO, who has agreed to a 47% reduction, and the General Counsel, who has agreed to a further $250,000 reduction in his compensation in addition to the 25% reduction in LTRP payouts.  I understand that the Company calculated that such reductions, together with reductions to the 2021 LTRP payout amounts of other participants as discussed below, are, in the aggregate, greater than the amount of the 2021 LTRP payouts tied to pre-2018 performance.  So that the brunt of the brunt of the 2021 LTRP reductions would not be on non-insider employees, I understand that the Compensation Committee determined that the reductions should be implemented for all KEIP Participants.

| KEIP Participant | Payout Range = 75% to 100% | |
| --- | --- | --- |
| | Threshold KEIP Award | Target/Max KEIP Award |
| President & Chief Executive Officer | $2,640,000 | $3,520,000 |
| Executive Vice President, General Counsel | $1,964,000 | $2,619,000 |
| Executive Vice President, Chief Financial Officer | $750,000 | $1,000,000 |
| Senior Vice President, Intellectual Property Law & Public Health Initiatives | $508,000 | $678,000 |
| Chief Technical Operations Officer | $519,000 | $691,000 |
| President, Imbrium Therapeutics | $468,000 | $624,000 |
| President, Rhodes Pharmaceuticals | $279,000 | $372,000 |
| President, Rhodes Technologies | $272,000 | $362,000 |
| **Total** | **$7,400,000** | **$9,866,000** |

16.     The Target KEIP Award **replaces** the 2020 AIP and the LTRP payouts that would have been paid to the KEIP Participants in 2021 and is **not** new or additive to past practice. Additionally, to align with past practice, each KEIP Participant will receive a long-term award designed to mimic the economic structure of the LTRP grant they otherwise would have received in 2020, payable in 2023, which is consistent with the Debtors' longstanding compensation practices.  The target amount of these long-term awards includes a 50% concession as compared to the target 2020 LTRP grant that otherwise would have been granted. Given the uncertainty of the timing of emergence from these Chapter 11 Cases, the Compensation Committee determined that it was in the best interest of the Debtors and the post-emergence entities to not apply metrics to the long-term award for years subsequent to 2020.  The actual payouts will be based on the same Performance Metrics that apply to the KEIP Award that are described below and therefore will depend solely on the Company's performance in 2020. These long-term awards would **not** accelerate upon emergence from the Chapter 11 Cases but will accelerate upon a termination of

employment by the Debtors without cause.  The maximum aggregate amount of such payments is
$2,200,000.

17.    Each KEIP Participant will also be eligible to receive payment of LTRP amounts
due in 2022.  All LTRP payments due in 2022 (including those payable under the non-insider
KERP) will be subject to a 22% reduction to the payment due to the CEO and a 12% reduction
for other KEIP Participants.  I understand that, as with the LTRP payments due in 2021, the
Company calculated that such reductions, together with reductions to the 2022 LTRP payout
amounts of other participants as discussed below, are, in the aggregate, greater than the amount
of the 2022 LTRP payouts tied to pre-2018 performance.  So that the brunt of the 2022 LTRP
reductions would not be on non-insider employees, I understand that the Compensation
Committee determined that the reductions also be implemented for the KEIP Participants.  The
same Performance Metrics that apply to the KEIP Award will be applied to uncompleted
performance periods with respect to such LTRP, while completed performance periods will
remain subject to their existing performance scores.  Except as set forth above, such payments
will be paid under the existing LTRP terms but subject to acceleration in the event of a
termination of employment by the Debtors without cause. The aggregate target amount—and
maximum amount—of such payments is $3,700,000.

**B.    Performance Metrics.**

18.    The KEIP is purely incentive based. The KEIP Awards will be conditioned on the
KEIP Participants' ability to meet the Performance Metrics set out in the Scorecard, thus ensuring
that the KEIP Participants are properly incentivized to work toward a value-maximizing
restructuring of the Debtors' estates during this critical stage of these Chapter 11 Cases. In early
2020, the Compensation Committee, with guidance from Willis Towers Watson, identified and

approved certain Performance Metrics that could be applied to any incentive compensation
programs adopted by the Debtors. Payout of these awards is based on the achievement of corporate
performance objectives for the 2020 performance. At the time Performance Metrics were
originally established, further development of 2020 compensation programs was paused in
response to the uncertainty in the Debtors' business outlook stemming from the COVID-19
pandemic. However, when discussion of 2020 compensation programs resumed, the
Compensation Committee, with input from Willis Towers Watson, determined that the originally
developed Scorecard remained well-balanced to motivate the workforce and should continue to
apply to performance under the KEIP Awards. The KEIP Awards thus rely on the same three
strategic pillars historically applied to the AIP: (i) value creation (representing 40% of the Target
KEIP Award); (ii) innovation and efficiency (50% of the Target KEIP Award); and (iii) people
and culture (10% of the Target KEIP Award).

19.     The Scorecard's value creation metric is designed to measure and reward the long-
term success of the Debtors' business based on certain nonfinancial operational goals, such as
meeting certain deadlines with respect to its testing and development of overdose treatment
products and other non-opioid products. **Table 2** below sets forth certain key operational and
developmental goals that the Debtors have identified as critical to the long-term success of the
Debtors' business.

**TABLE 2**

| 2020 Value Creation Performance Metrics | 2020 Performance Target | % of Value Creation | % of Target KEIP Award |
|---|---|---|---|
| *Public Health Initiatives*[3] | | | |

---

[3] All medications referred to in this section are potential treatments for opioid overdose.

| | | | |
|---|---|---|---|
| ➤ **Intranasal Naloxone**: Formalize agreement(s) and provide support for the non-profit development of intranasal naloxone with HRT to allow first patient in Phase 1 | End of Q3 2020 | | |
| ➤ **Nalmefene**: ANDA Filed by Vial with Competitive Generic Therapy (CGT) Designation | End of Q4 2020 | 45.0% | 18.0% |
| ➤ **Nalmefene**: Complete Engineering Batches for Nalmefene Prefilled Syringe | End of Q4 2020 | | |
| ➤ **Nalmefene**: Complete Nalmefene Autoinjector Formulation Development Work | End of Q4 2020 | | |
| *Research & Development*[4] | | | |
| ➤ **OAG**: Complete Last Patient Randomized in Proof-of-Concept Phase 2 Trial OAG2002<br>➤ **OAG**: Complete In Life Portion for Chronic Toxicology Studies, 6M rat and 9M dog | End of Q4 2020<br><br>Q3 2020 and Q4 2020, respectively | 15.0% | 6.0% |
| ➤ **Tinostamustine**: Advancement of Clinical Program | Q3 2020 | 15.0% | 6.0% |
| *Rhodes* | | | |
| ➤ **Generic Medication-Assisted Treatment Product**: Launch | Q4 2020 | 2.5% | 1.0% |
| ➤ **Generic Migraine and COPD Medications**: Submit DHE ANDA | End Q4 2020 | 6.25% | 2.5% |
| ➤ **Generic ADHD Treatment**: ANDA Submission | Q2 2020 | 6.25% | 2.5% |
| ➤ **Generic Treatment for Intestinal Parasites**: ANDA Submission | Q3/Q4 2020 | 5.0% | 2.0% |
| ➤ **Generic Nausea Prevention Medication**: Manufacture Exhibit Batches and Close the BE Study | Q4 2020 | 5.0% | 2.0% |
| **Total** | | **100%** | **40%** |

---

[4] OAG refers to a potential treatment for insomnia associated with alcohol cessation. Tinostamustine refers to a potential cancer treatment.

20.    The Scorecard's innovation and efficiency metric is designed to capture key financial and operational goals, including important business metrics such as operating profits, net sales and operating losses.  **Table 3** below sets forth certain key financial and operational goals that the Debtors have identified as critical to the long-term success of the Debtors' business.

**TABLE 3**

| 2020 Innovation and Efficiency Performance Metric[5] | 2020 Performance Target | % of Innovation and Efficiency | % of Target KEIP Award |
|---|---|---|---|
| Purdue Branded Business Operating Profit | $115M | 20% | 10% |
| Adhansia XR Net Sales | $18M | 10% | 5% |
| Adhansia XR Operating Loss[6] | ($44M) | 15% | 7.5% |
| Avrio Net Sales | $85M | 10% | 5% |
| Avrio Operating Profit | $8.6M | 15% | 7.5% |
| Rhodes (RALP) Operating Loss | ($35M) | 30% | 15% |
| **Total** | | **100%** | **50%** |

21.    As I understand it, the People and Culture metric includes:

- Organizational education
- Development of a transition plan
- A review to determine whether the Debtors' estates have been properly positioned for transition to their post-emergence roles

**C.    Evaluation of the KEIP.**

22.    In assessing the appropriateness and reasonableness of the KEIP, I worked with my

---

[5] Adhansia XR is a Central Nervous System (CNS) stimulant prescription medicine used for the treatment of ADHD in people six years of age and older. Avrio Health L.P. is a wholly owned subsidiary of the Debtors which produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

[6] The operating loss metric relates to Adhansia, which was recently launched and still in the growth phase.

team to analyze competitive target/max total direct compensation, a standard benchmark that includes base salary, short term incentives, and long-term incentives "**Total Direct Compensation**"), for all KEIP Participants.

23.    As my primary reference point for the competitiveness of Total Direct Compensation of all KEIP Participants, my team and I analyzed the compensation opportunities of executives at relevant market comparators in the pharmaceutical industry. Specifically, my team and I matched the KEIP Participants to survey benchmarks at companies in Willis Towers Watson's 2019 CDB Pharmaceutical and Health Sciences Executive Compensation Survey Report, based on our understanding of each KEIP Participant's job duties and responsibilities within the Debtors' organization. For each survey benchmark, my team and I developed, where possible, revenue-adjusted survey data for Total Direct Compensation.

24.    If the Debtors do not receive approval from the Court to implement the KEIP, Total Direct Compensation (currently representing <u>only</u> adjusted base salaries) for the KEIP Participants, in aggregate, would fall 16% <u>below the market 25th percentile</u> of Total Direct Compensation (excluding general counsel role) and 39% <u>below the market median</u> (excluding general counsel role). In other words, the KEIP Participants would be materially undercompensated versus comparable executives at similarly-sized organizations in the pharmaceutical industry. These circumstances could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives. It is also my experience that it would be highly uncommon for a distressed entity comparable to the Debtors' size and scope to fail to provide short- and long-term, cash-based incentive opportunities. The KEIP is, in part, designed to address some of this shortfall.

25.    My team and I then compared to market the KEIP Participants' Total Direct

Compensation, both excluding and including the annualized values of certain prepetition retention awards (the "**Existing Non-Executive Retention Plan**"). Excluding Existing Non-Executive Retention Plan, the KEIP Participants' Total Direct Compensation, in aggregate, would fall 25% above the market median (excluding general counsel role) of the pharmaceutical industry and 12% below the market 75th percentile of the pharmaceutical industry (excluding general counsel role). Including the Existing Non-Executive Retention Plan, the KEIP Participants, in aggregate, would fall 18% above the market 75th percentile of the pharmaceutical industry (excluding general counsel role).

26.     It is my understanding based on conversations with the Debtors and their other outside advisors that the CEO joined the Company in a non-executive position in 1999 and has served as CEO since June 2017.  It is also my understanding that continuity in the CEO role is critical to the Debtors' success in these Chapter 11 Cases. Further, I understand that the Debtors, under the CEO's leadership, voluntarily stopped promoting opioid pain medications to prescribers through sales representatives and via other channels, such as in medical journals, and eliminated its opioid medication sales force. Last, the CEO has been instrumental in advancing the development of several opioid overdose reversal and addiction treatment medications.

27.     Absent the KEIP, the CEO would be compensated significantly below market and the KEIP is designed to compensate for this shortfall. Specifically, the CEO's base pay falls 25% below the market 25th percentile of Total Direct Compensation and 48% below the market median of Total Direct Compensation.  Adding incentives by way of the KEIP helps address the shortfall in competitive positioning compared to the market Total Direct Compensation.

28.     Including the KEIP, the Debtors' CEO would fall between market median (+21%) and market 75th percentile (-16%) of Total Direct Compensation. This variance from the median

14

is justified based on my understanding of the CEO's extensive experience and expertise with the

Debtors' business, and his stewardship through these Chapter 11 Cases.  Moreover, the CEO's

proposed KEIP award should be considered in the context of the substantial concessions he made

with respect to 2019 compensation—when averaging the 2019 variance in compensation,

including court-approved reductions, the CEO's compensation is positioned 8% above the 50th

percentile, and 25% below the 75th percentile of Total Direct Compensation.

29.    Similarly, I understand from discussions with the Debtors and their other outside

advisors that the General Counsel is critical to the Debtors' operations and the success of these

Chapter 11 Cases. Although the General Counsel's compensation is high compared to the market,

his compensation—including the KEIP—is reasonable in light of my understanding of the

importance of his role to the Debtors' successful operation during these Chapter 11 Cases and

through emergence therefrom, as well as the Debtors' need of a highly credentialed and qualified

general counsel in light of their present circumstances. I also understand that, in addition to the

General Counsel's leadership prior to these immensely litigious and highly public Chapter 11

Cases, the Debtors' General Counsel faces the additional challenge of ensuring the future success

of the Debtors' estates and the successful emergence from these Chapter 11 Cases. Moreover, I

am informed that when the General Counsel accepted the role with the Debtors, he forewent similar

opportunities at other companies offering notably higher compensation packages. Accordingly,

the General Counsel's compensation—including the KEIP—is reasonable in light of the

aforementioned facts and circumstances as I understand them to be; again and particularly, the

immense challenges he faces in his role with the Debtors and his significant  experience and

expertise.

30.    Based on the results of these benchmarking analyses, and my experience with other

15

incentive compensation arrangements implemented in Chapter 11 cases, I believe the KEIP and the KEIP Participants' potential Total Direct Compensation levels are appropriate in light of competitive market practice for companies like the Debtors that operate in the pharmaceutical industry, and reasonable in light of the Debtors' current circumstances. Critically, the absence of both short- and long-term incentive opportunities for the KEIP Participants significantly undermines the current competitiveness of the Debtors' compensation structure, which in turn could negatively impact the Debtors' ability to motivate current management to achieve desired business objectives.

31.    To assess the appropriateness and reasonableness of the design of the KEIP, I analyzed 20 comparable examples (general industry) of key employee incentive plans approved since 2016 with company revenues between $500 million and $5 billion. These companies include: Appyion, Inc.; Avaya, Inc.; Bristow Group Inc.; Ciber, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Cumulus Media Inc.; Ditech Holding Corporation; Ezra Holdings Limited; FirstEnergy Solutions Corp.; FTD Companies, Inc.; Gander Mountain Company Inc.; GenOn Energy; hhgregg, Inc.; Marsh Supermarkets; Payless Inc.; PHI, Inc.; Real Industry, Inc.; Velocity Holdings Company, Inc.; and Westinghouse Electric Company LLC.

32.    In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of incentive plans generally at other companies.

33.    To assess the appropriateness and reasonableness of the cost of the Target KEIP Award, my team and I reviewed the proposed target and maximum cost (Target = Maximum for Target KEIP Award) of the KEIP expressed in the following two ways:  (i) as an aggregate amount, and (ii) as a percentage of the Debtors' revenue. This comparison can be observed in the table below:

| Aggregate KEIP Cost vs Market | Purdue Target/Max Performance and Payout | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| $000s | $9,866 | $5,000 | $6,700 | $10,300 | $12,300 | $13,300 | $26,300 |
| Percentage of Revenue | 0.77% | 0.47% | 0.56% | 0.73% | 0.97% | 1.11% | 2.26% |

## D.    Appropriateness of the KEIP.

34.    For the aforementioned reasons and based on my experience with incentive-based compensation programs employed by companies in Chapter 11, I believe the design, structure, cost and individual opportunities available under the Debtors' KEIP is appropriate and consistent with market practice.

## E.    Reasonableness of the KEIP

35.    The KEIP Participants are managing the Debtors during a challenging time for the Debtors, in which they navigate difficult terrain as they seek to emerge from bankruptcy. It is my understanding that the Debtors and KEIP Participants face immense challenges that go beyond those  typically faced by companies in Chapter 11.

36.    Moreover, Target KEIP Awards are substantially similar to the KEIP Participants' historical annual AIP award and LTRP payouts. While the total cost of the proposed KEIP Awards is higher than the 2019 AIP and LTRP payouts made in 2020, this difference is driven chiefly by (i) the CEO's agreement to a substantial one-time reduction in compensation otherwise due to him in 2020 as a show of good faith to the Debtors' stakeholders and as part of an overall agreement to speed approval of incentive compensation program for the rest of the workforce and (ii) the fact that the General Counsel, hired in 2018, was not entitled to an LTRP payout in 2020 but would be for the first time in 2021.

17

37.     It is my understanding that the challenges faced by the CEO, the General Counsel

and the other KEIP Participants have been significantly increased during these Chapter 11 Cases

due to the extremely complex and highly litigious nature of the bankruptcy case. The Debtors

have determined that it is appropriate to continue to compensate the CEO in line with his historic

compensation (which is in line with market rates) and not to insist upon continuation of his

extraordinary concessions relating to 2019 compensation given the increased responsibilities

imposed on him in the course of these Chapter 11 Cases as well as the additional challenging

task of ensuring the future success of the Debtors' estates and facilitating a successful

restructuring. The Debtors have similarly determined that it is appropriate to compensate the

General Counsel to account for his extraordinary stewardship during these litigious Chapter 11

Cases and incentivize him to continue to lead the Debtors towards a successful restructuring. I

understand that the Debtors require a General Counsel with the highest level of expertise, and

resilience; a true strategic advisor to the CEO.  It is also my understanding that the incumbent

General Counsel was an external hire who was identified as one of the only candidates who

could fill the role under the circumstances at the time of hire and currently.  Accordingly, the

Debtors' incentive-based compensation programs for the CEO, General Counsel, and other KEIP

Participants are appropriate in light of the circumstances faced by the Debtors in this

restructuring.

38.     For these reasons and based on my experience with incentive-based compensation

programs employed by companies in Chapter 11, as well as the environment in which the Debtors

are operating, I believe the design, structure, cost and individual opportunities available under the

Debtors' KEIP are reasonable.

18

## KEY EMPLOYEE RETENTION PLAN AND TARGETED RETENTION PLAN

### A. Overview of the KERP.

39.     The KERP Participants consist of approximately 612 incentive-eligible employees,

of which 17 hold a position of Vice President or higher and 595 will be middle management and

professional employees. None of the KEIP Participants are eligible to participate in the KERP, and

no KERP Participant is an insider. Each KERP Participant will receive (i) an award (a "**KERP**

**Award**") comprised of replacement of the KERP Participants' 2020 AIP and LTRP payouts due

in 2021, (ii) a long-term incentive compensation grant payable in 2023, (iii) partial payment of

prepetition LTRP grants that are payable in 2022 (reduced as discussed below) and full payment

of the prepetition LTRP grants that are payable in 2023. Certain KERP Participants will also

receive additional targeted retention payments.

40.     Each KERP Participant's KERP Award is equal to the sum of the target amount of

the AIP award they otherwise would have been eligible to receive for 2020 and the LTRP payout

they would otherwise have expected to be paid in 2021 subject to a 21% reduction for KERP

Participants with a title of Vice President or higher at the time of the grant and 11% for KERP

Participants with a title less senior than Vice President at the time of the grant.   As noted above, I

understand that the Company calculated that aggregate 2021 LTRP payments (considering both

KEIP and KERP Participants) will be reduced in an amount greater than the amount of the 2021

LTRP payouts tied to pre-2018 performance.

41.     As with the KEIP, the KERP Award <u>replaces</u> the 2020 AIP award and LTRP

payouts that would ordinarily be due in 2021 and is <u>not</u> new or additive to past practice.

42.     The KERP Award is not subject to additional performance criteria to provide the

KERP Participants with greater compensation certainty. This is intended to help retain KERP

Participants under the present challenging and uncertain conditions.

43.    KERP Awards will be paid as follows: (i) 50% paid in October 2020 and (ii) the remaining 50% paid in January 2021. Other than for hourly employees, KERP Award payments are subject to a clawback if the KERP Participant resigns or is terminated for any reason other than by the Debtors without cause before the earlier of March 15, 2021 or emergence. Payments under the KERP Awards will be subject to each KERP Participant's continued employment through the applicable payment date, with acceleration in the event of a termination of the KERP Participant's employment by the Debtors other than for cause. In the event the Debtors emerge from bankruptcy any time prior to a payment date, the remaining full amount of the KERP Awards would accelerate and be payable. The total aggregate maximum payment under the KERP Awards is $21,600,000.

44.    In addition, the Debtors believe that the Existing Non-Executive Retention Plan was particularly critical to preserving and maximizing the value of the Debtors' estates.  The Debtors therefore seek to provide additional targeted retention awards to an identified group of key employees on a similar basis in an aggregate amount of up to $8,100,000 (the "**Targeted Retention Awards**").  The Targeted Retention Awards will be payable 50% in January 2021, and 50% in April 2021. Other than for hourly employees, Targeted Retention Award payments are subject to a clawback if, before end of day June 30, 2021, a Retention Eligible Employee resigns or is terminated for any reason other than by the Debtors for cause. Payments under Targeted Retention Awards will be subject to a Retention Eligible Employee's continued employment through the applicable payment date, with acceleration in the event of a termination of a Retention Eligible Employee's employment by the Debtors other than for cause. In the event the Debtors emerge from bankruptcy any time prior to a payment date or the expiration of the clawback, the remaining amount of the Targeted Retention Payment would accelerate and be payable and the

clawback would no longer apply.

45.     Prior to the commencement of these Chapter 11 Cases, certain of the KERP Participants were granted LTRP awards that are payable in 2022 and 2023. Each such KERP Participant[7] will be entitled to payment in 2022 and 2023 on account of such prepetition LTRP awards at target value (or, with respect to completed performance periods, the amount previously set based on achievement during such period).  As noted above, I understand that the Company calculated that the aggregate LTRP payments (considering both KEIP and KERP Participants) with respect to such years will be reduced by an amount greater than the amount of the LTRP payouts tied to pre-2018 performance.  These reductions for KERP Participants will consist of a 9% reduction for KERP Participants with a title of Vice President or higher and a 5% reduction for KERP Participants with a title less senior than Vice President with respect to payouts in 2022 and no reduction with respect to payouts in 2023.  Except as provided above, such payments will be paid under the existing LTRP terms but subject to acceleration in the event of a termination of employment by the Debtors without cause. The aggregate total of target LTRP payouts in 2022 and 2023 for all KERP Participants is $10,100,000 and $1,150,000, respectively.

46.     Consistent with past practice, certain KERP Participants will receive a long-term award designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the KERP Participant in 2020 under Purdue's longstanding compensation practices. The amount of such grant will be equal to the target LTRP grants that otherwise would have been granted to the KERP Participant in 2020. The grant will not be subject to performance metrics. The aggregate total of these long-term awards for all KERP Participants is $10,200,000.

---

[7] KERP Participants include post-petition retirees for this purpose.

47.    In assessing the appropriateness and reasonableness of the KERP, I worked with my team to analyze 17 comparable examples (general industry) of approved programs that capture all or a portion of pre-restructuring incentive plans since 2016 with company revenues between $500 million - $5 billion; these programs may take the form of incentive or retention programs depending on the company. These companies include: Appvion, Inc.; Arch Coal, Inc.; ATD Corporation; Basic Energy Services; Breitburn Energy Partners LP; Bristow Group Inc.; Cenveo, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Cumulus Media Inc.; Energy XXI Ltd.; FirstEnergy Solutions Corp.; Hexion Holdings LLC; Real Industry, Inc.; Verso Corporation; and Westmoreland Coal Company.

48.    My team and I then compared the aggregate of KERP Participants' Total Direct Compensation both excluding and including the annualized values of the Existing Non-Executive Retention Plan, for both non-insider executives and middle management and professionals.

49.    The aggregate market positioning is shown in the table below:

| Employee Group | N | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 58 | 28% | 0% | -23% | 55% | 22% | -5% | -24% | -40% | -53% |
| Non-Insider (Middle Management & Professional Survey) | 402 | 25% | 7% | -8% | 30% | 11% | -4% | 5% | -10% | -22% |

| Employee Group | N | Variance to Market TDC (Purdue Base + Proposal) | | | Variance to Market TDC (Purdue Base + Proposal + Retention) | | |
|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 58 | 12% | -12% | -32% | 40% | 10% | -15% |
| Non-Insider (Middle Management & Professional Survey) | 402 | 23% | 5% | -10% | 28% | 9% | -6% |

22

50.    Based on the results of these benchmarking analyses, my experience in other incentive compensation arrangements implemented in Chapter 11 cases, and my understanding of the Debtors' challenges as represented by Debtors and their other outside advisors such as the environment in which the Debtors are operating, and the rate at which the Debtors are affected by employee attrition, I believe the KERP and the KERP Participants' aggregate Total Direct Compensation levels are appropriate and reasonable .

51.    In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of retention plans.

52.    To assess the appropriateness and reasonableness of the cost of the KERP, my team and I reviewed the proposed cost of the KERP expressed in the following two ways:  (i) as an aggregate amount, (ii) as a percentage of the Debtors' revenue. This comparison can be observed in the table below:

| Aggregate KERP Cost vs Market | Purdue Target/Max Performance and Payout (without retention) | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $21,600 | $10,800 | $14,000 | $24,600 |
| Percentage of Revenue | 1.68% | 0.61% | 1.02% | 1.63% |

53.    To assess the appropriateness and reasonableness of the cost of the Targeted Retention Awards, my team and I reviewed the proposed cost expressed in the following two ways:  (i) as an aggregate amount, (ii) as a percentage of the Debtors' revenue. This comparison can be observed in the table below:

23

| Aggregate Cost vs Market | Purdue | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| **$000s** | $8,100 | $2,574 | $3,725 | $8,073 |
| **Percentage of Revenue** | 0.63% | 0.20% | 0.38% | 0.71% |

Also, in my experience, and the data shows, programs such as the Debtors' proposed KERP and Targeted Retention Awards are regularly utilized by similarly-situated companies to retain personnel such as the KERP Participants.

### Appropriateness and Reasonableness of the KERP and Targeted Retention Awards

54.    Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, cost, and award opportunities available under the KERP and Targeted Retention Awards are appropriate and reasonable given the facts and circumstances of these Chapter 11 Cases as I understand them.

*[Remainder of page intentionally left blank]*

24

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 9, 2020

  /s/ *Josephine Gartrell*
Josephine Gartrell
Director
Willis Towers Watson PLC