**Hearing Date and Time: September 30, 2020, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: September 25, 2020, at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF HEARING ON MOTION OF THE DEBTORS FOR AN ORDER**
**(I) APPROVING SALE OF DEBTORS' COVENTRY FACILITY AND RELATED**
**ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND**
**ENCUMBRANCES, (II) APPROVING DEBTORS' ENTRY INTO A LONG-TERM API**
**SUPPLY AGREEMENT, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR**
**ASSIGNMENT, AS APPLICABLE, OF EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES AND (IV) GRANTING RELATED RELIEF**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Nayatt Cove Lifescience Inc. (4712), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**PLEASE TAKE NOTICE** that on September 14, 2020, the above-captioned debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Motion of the Debtors for Entry of an Order (I) Approving Sale of Debtors' Coventry Facility and Related Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving Debtors' Entry into a Long-Term API Supply Agreement, (III) Authorizing Assumption and Assignment or Assignment, as Applicable, of Executory Contracts and Unexpired Leases and (IV) Granting Related Relief* (the "**Motion**").  A hearing on the Motion will be held on **September 30, 2020** at **10:00 a.m.** (prevailing Eastern Time) (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing.  The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), the Hearing will be conducted telephonically.[2]  Parties wishing to appear at, or attend, the Hearing must refer to and comply

---

[2] A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/court-operations-under-exigent-circumstances-created-covid-19.

with the Bankruptcy Court's guidelines for telephonic appearances[3] and make arrangements with Court Solutions LLC by telephone at (917) 746-7476.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at http://www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [Docket No. 498], so as to be filed and received no later than **September 25, 2020** at **4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default; *provided* that objecting parties shall attend the Hearing telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if no Objection is timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the

---

[3] The Bankruptcy Court's procedures for telephonic appearances are available at: http://www.nysb.uscourts.gov/telephonic-appearances-white-plains.

Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion may be obtained free of charge on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:    September 14, 2020
          New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Eli J. Vonnegut*_____
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING SALE OF
DEBTORS' COVENTRY FACILITY AND RELATED ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) APPROVING DEBTORS'
ENTRY INTO A LONG-TERM API SUPPLY AGREEMENT, (III) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OR ASSIGNMENT, AS APPLICABLE, OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING
RELATED RELIEF**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PAGE

Relief Requested ........................................................................................................1

Jurisdiction and Venue................................................................................................2

General Background ....................................................................................................3

Proposed Transaction..................................................................................................3

    A.    The Coventry Facility ....................................................................3

    B.    The Debtors' Marketing Efforts.....................................................5

    C.    The Agreements ............................................................................8

    D.    The Transaction Is Value-Maximizing and in the Best Interests of the Debtors, and Should Be Approved ................................................8

Summary of the Agreements ....................................................................................10

    A.    The Asset Purchase Agreement .................................................10

    B.    The Supply Agreement and the Transition Services Agreement...........................13

Assumption and Assignment or Assignment, as Applicable, of the Assigned Contracts.............15

Basis for Relief Requested........................................................................................17

    A.    The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code and Should Be Approved ..................................17

        1.    The Proposed Sale of the Purchased Assets Is Justified by Good and Sound Business Reasons.............................17

        2.    A Private Sale Is Warranted and Maximizes the Value for the Debtors' Estates ......................................19

    B.    The Sale of the Purchased Assets Should Be Free and Clear of Claims and Interests ...........................................21

    C.    The Purchaser Should Be Granted the Full Protection of Section 363(m) of the Bankruptcy Code ............................................24

    D.    The Purchaser Protections Should Be Approved.................................25

    E.    Entry into the Supply Agreement Is Justified by Sound Business Reasons and Should Be Approved.............................28

i

F.       Assumption and Assignment or Assignment, as Applicable, of Contracts and
         Unexpired Leases Should Be Authorized and the Assumption and Assignment
         Procedures Should Be Approved ..........................................................................29

         1.       The Debtors Have Satisfied all Applicable Requirements of Section
                  365 of the Bankruptcy Code. ...................................................................29

         2.       Waiver of the Requirements of Bankruptcy Rule 6006(f)(6) Is
                  Appropriate. ..............................................................................................32

Debtors' Reservation of Rights.....................................................................................34

Waiver of Stay Under Bankruptcy Rules 6004(h) and 6006(d) ...................................34

Notice ..........................................................................................................................35

No Prior Request ........................................................................................................35

## TABLE OF AUTHORITIES

CASES

PAGE(S)

*In re 160 Royal Palm, LLC*,
  600 B.R. 119 (S.D. Fla.), *aff'd*, 785 F. App'x 829 (11th Cir. 2019) ................................ 19, 20

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986) ...................................................................................... 24

*Allstate Ins. Co. v. Hughes*,
  174 B.R. 884 (S.D.N.Y. 1994) .................................................................................. 24

*In re Bakalis*,
  220 B.R. 525 (Bankr. E.D.N.Y. 1998) ..................................................................... 20

*In re Beker Indus., Inc.*,
  63 B.R. 474 (Bankr. S.D.N.Y. 1986) ........................................................................ 22

*In re Bon Ton Rest. & Pastry Shop, Inc.*,
  53 B.R. 789 (Bankr. N.D. Ill. 1985) ......................................................................... 30

*In re Borders Group, Inc.*,
  453 B.R. 477 (Bankr. S.D.N.Y. 2011) ................................................................. 22, 23

*In re Boston Generating, LLC*,
  440 B.R. 302 (Bankr. S.D.N.Y. 2010) ...................................................................... 22

*In re Bygaph, Inc.*,
  56 B.R. 596 (Bankr. S.D.N.Y. 1986) ........................................................................ 30

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
  181 F.3d 527 (3d Cir. 1999) ...................................................................................... 27

*Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*,
  103 B.R. 524 (Bankr. D.N.J. 1988) ........................................................................... 29

*In re Chateaugay Corp.*,
  973 F.2d 141 (2d Cir. 1992) ...................................................................................... 28

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*,
  94 B.R. 343 (E.D. Pa. 1988) ..................................................................................... 22

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983) ............................................................................... 18, 28

*In re Dewey & Leboeuf LLP*,
  No. 12-12321 (MG), 2012 Bankr. LEXIS 5116 (Bankr. S.D.N.Y. Nov. 1, 2012) ................. 19

*In re Genco Shipping & Trading Ltd.*,
509 B.R. 455 (Bankr. S.D.N.Y. 2014) .................................................................. 26

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) .................................................................. 23

*In re Ionosphere Clubs, Inc.*,
100 B.R. 670 (Bankr. S.D.N.Y. 1989) .................................................................. 18

*Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),*
111 F.3d 269 (2d Cir. 1997) .................................................................. 25

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci),*
126 F.3d 380 (2d Cir. 1997) .................................................................. 24

*In re MF Global Inc.*,
467 B.R. 726 (Bankr. S.D.N.Y. 2012) .................................................................. 18

*In re MF Glob. Inc.*,
535 B.R. 596 (Bankr. S.D.N.Y. 2015) .............................................................. 19, 20

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.),*
25 F.3d 1132 (2d Cir. 1994) .................................................................. 20

*In re Natco Indus., Inc.*,
54 B.R. 436 (Bankr. S.D.N.Y. 1985) .................................................................. 29

*In re NEPSCO, Inc.*,
36 B.R. 25 (Bankr. D. Me. 1983) .................................................................. 20

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),*
78 F.3d 18 (2d Cir. 1996) .................................................................. 29

*Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.),*
147 B.R. 650 (S.D.N.Y. 1992) .................................................................. 25

*In re Old Carco LLC*,
406 B.R. 180 (Bankr. S.D.N.Y. 2009) .................................................................. 32

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
4 F.3d 1095 (2d Cir. 1993) .................................................................. 29

*In re Penn Traffic Co.*,
524 F.3d 373 (2d Cir. 2008) .................................................................. 29

*Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.),*
No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130 (S.D.N.Y. May 10, 1993) .................. 24

*In re The Great Atlantic & Pac. Tea Co., Inc.*,
544 B.R. 43 (Bankr. S.D.N.Y. 2016) .................................................................. 19

*U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prof. & Indem. Ass'n* (In re U.S. Lines, Inc.),
   197 F.3d 631 (2d Cir. 1999) .................................................................................................... 20

*William v. Kivitz*,
   764 F.2d 1019 (4th Cir. 1985) ............................................................................................... 24

<u>Statutes & Rules</u>

11 U.S.C. § 105(a) ....................................................................................................... 1, 20

11 U.S.C. § 363 ............................................................................................................ 1, 17

11 U.S.C. § 363(b) ......................................................................................................... 19, 24

11 U.S.C. § 363(b)(1) ............................................................................................. 17, 28, 29

11 U.S.C. § 363(f) ............................................................................................................ 22, 23

11 U.S.C. § 363(f)(2) ....................................................................................................... 23

11 U.S.C. § 363(f)(3) ....................................................................................................... 22

11 U.S.C. § 363(m) .................................................................................................... 24, 25

11 U.S.C. § 365 ............................................................................................... 1, 29, 32, 34

11 U.S.C. § 365(a) ........................................................................................................... 29

11 U.S.C. § 365(b) ........................................................................................................... 15

11 U.S.C. § 365(f) ............................................................................................................ 32

11 U.S.C. § 365(f)(1) ....................................................................................................... 32

11 U.S.C. § 365(f)(3) ....................................................................................................... 32

11 U.S.C. § 1107(a) ........................................................................................................... 3

11 U.S.C. § 1108 ................................................................................................................ 3

28 U.S.C. § 157 .................................................................................................................. 2

28 U.S.C. § 157(b)(2) ........................................................................................................ 2

28 U.S.C. § 1334 ............................................................................................................... 2

28 U.S.C. § 1408 ............................................................................................................... 3

28 U.S.C. § 1409 ............................................................................................................... 3

Fed. R. Bankr. P. 2002 ..................................................................................................... 1

Fed. R. Bankr. P. 6004 ................................................................................................................... 1

Fed. R. Bankr. P. 6004(f)(1) ......................................................................................................... 19

Fed. R. Bankr. P. 6004(h) ............................................................................................................. 34

Fed. R. Bankr. P. 6006 .............................................................................................................. 1, 32

Fed. R. Bankr. P. 6006(d) ............................................................................................................. 34

Fed. R. Bankr. P. 6006(f)(2) ..........................................................................................................33

Fed. R. Bankr. P. 6006(f)(6) .................................................................................................... 32, 33

Fed. R. Bankr. P. 7008 .................................................................................................................... 2

Fed. R. Bankr. P. 9007 .................................................................................................................... 1

Fed. R. Bankr. P. 9014.................................................................................................................... 1

Local Bankr. R. 6004-1 ................................................................................................................... 1

Local Bankr. R. 6006-1 ................................................................................................................... 1

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")

hereby file this *Motion of the Debtors for Entry of an Order (I) Approving Sale of Debtors'*

*Coventry Facility and Related Assets Free and Clear of Liens, Claims, Interests and*

*Encumbrances, (II) Approving Debtors' Entry into a Long-Term API Supply Agreement,*

*(III) Authorizing Assumption and Assignment or Assignment, As Applicable, of Executory*

*Contracts and Unexpired Leases and (IV) Granting Related Relief* (this "**Motion**").  In support

of this Motion, the Debtors respectfully state as follows:

<u>**Relief Requested**</u>

1.      By this Motion, and pursuant to sections 105(a), 363 and 365 of the United States

Code, 11 U.S.C. § 101, *et seq.* (as amended or modified, the "**Bankruptcy Code**"), Rules 2002,

6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy**

**Rules**"), Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the Southern District of

New York (the "**Local Bankruptcy Rules**") and the *Amended Guidelines for the Conduct of*

*Asset Sales, General Order M-383 of the Court* (the "**Sale Guidelines**"), the Debtors seek entry

of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Sale Order**"):

- approving the private sale (the "**Sale**") of certain assets (as more specifically set forth in Section 1.1 of the APA (as defined below), the "**Purchased Assets**") of Debtor Rhodes Technologies ("**Rhodes Tech**" or the "**Seller**") to Noramco Coventry LLC (the "**Purchaser**") pursuant to that certain Asset Purchase Agreement, dated as of September 14, 2020 (attached hereto as <u>Exhibit B</u>, and as amended from time to time, including all schedules and exhibits, the "**APA**"),[2] free and clear of all liens, claims, encumbrances and other interests ("**Claims and Interests**") to the fullest extent permitted by law and except where the Debtors have agreed to transfer, and the Purchaser has expressly agreed to permit or assume, certain encumbrances and certain liabilities of the Debtors (as set forth and defined in the APA, the "**Permitted Post-Closing Encumbrances**" and the "**Assumed Liabilities**");

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the APA.

- authorizing the assumption and assignment to the Purchaser of certain Executory Contracts of the Debtors as set forth in Schedule 1.1(e) of the APA, as such schedule may be amended from time to time pursuant to Section 1.5(e) of the APA, and the assignment to the Purchaser of certain Post-Petition Contracts as set forth on Schedule 1.1(f) of the APA (collectively, as more fully set forth in the APA, the "**Assigned Contracts**" and the non-Debtor counterparties to such Assigned Contracts, the "**Contract Counterparties**");

- authorizing the Debtors to enter into and perform under a long-term supply agreement in the form attached to the APA as Exhibit E (the "**Supply Agreement**" and, together with the APA and all other Ancillary Documents, including without limitation a transition services agreement (the "**TSA**") in a form mutually agreed by the Seller and the Purchaser and in accordance with the term sheet attached as Exhibit F to the APA, the "**Agreements**"); and

- granting certain related relief.

2.      In support of this Motion, the Debtors rely on and incorporate the *Declaration of Rafael J. Schnitzler in Support of the Motion of the Debtors for Entry of an Order (I) Approving Sale of Debtors' Coventry Facility and Related Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving Debtors' Entry into a Long-Term API Supply Agreement, (III) Authorizing Assumption and Assignment or Assignment, as Applicable, of Executory Contracts and Unexpired Leases and (IV) Granting Related Relief* (the "**Schnitzler Declaration**"), filed contemporaneously herewith.

## **Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and, pursuant to Bankruptcy Rule 7008, the Debtors consent to entry of a final order by the Court in connection with this Motion to the

extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

4.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## General Background

5.     On September 15, 2019 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 27, 2019, the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner has been appointed in these Chapter 11 Cases.

6.     Information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed on September 16, 2019 [Docket No. 17].

7.     The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 59] entered by the Court on September 18, 2019 in each of the Chapter 11 Cases.

## Proposed Transaction

**A.     The Coventry Facility**

8.     Rhodes Tech owns and operates an active pharmaceutical ingredient ("**API**") manufacturing facility located in Coventry, Rhode Island (the "**Coventry Facility**"), which manufactures the APIs used by Debtor Purdue Pharma L.P. ("**PPLP**") in the manufacturing of its branded finished products and Debtor Rhodes Pharmaceuticals L.P. ("**Rhodes Pharma**") in the

manufacturing of certain of its generic finished products.  In addition, Rhodes Tech sells APIs produced at the Coventry Facility to third parties.

9.      While Rhodes Tech provides a reliable supply of critical APIs, operation of the Coventry Facility involves substantial fixed costs (with annual costs of approximately ███ █████ ) associated with manufacturing and compliance with safety, health, environmental, Food and Drug Administration ("**FDA**"), Drug Enforcement Administration ("**DEA**") and other regulatory requirements.  Schnitzler Declaration ¶ 10.  The Coventry Facility was originally built to provide a reliable and secure supply of oxycodone API for branded OxyContin.  *Id*. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████  In connection with the development of their updated business plan, which was finalized in April 2020, the Debtors made the decision to explore strategic alternatives with respect to the Coventry Facility and outsource the Debtors' API supply needs.  *Id*.  A transition away from the Coventry Facility would have the effect of unburdening the Debtors from the facility's annual fixed operating costs, creating a variable cost structure as volumes decrease while ensuring a reliable future supply of APIs.  *Id*.  If the Debtors were to shut down the Coventry Facility and merely move supply to a third-party API supplier, they would expect to incur significant shutdown costs. Finding a secure and reliable strategic partner to take over the Coventry Facility and also supply APIs would avoid these shut-down costs.  *Id*.  The Debtors have conducted an extensive marketing and negotiation process in furtherance of this alternative.  *Id*.

**B.    The Debtors' Marketing Efforts**

10.    Two fundamental factors informed the Debtors' decision to conduct a private process, as opposed to a court-supervised auction, to sell the Coventry Facility and source an alternative supply of APIs.    First, there are a limited number of companies that are in the business of manufacturing low ABUK oxycodone and the other APIs produced at the Coventry Facility, and a financial buyer of the Coventry Facility would likely not be able to offer competitive supply terms given the financial profile of the Rhodes Tech business.    Schnitzler Declaration ¶ 12.    As such, the universe of potential parties that were expected to show interest in the Coventry Facility was quite limited.    Second, the Debtors could not risk any interruption in the supply of high-quality APIs in both the short and long term.    *Id*.    Accordingly, each interested party was evaluated not only as a potential purchaser of the Coventry Facility, but also on its ability to execute a seamless transition of the API supply from Rhodes Tech to the purchaser and to function as a long-term commercial partner.    *Id*.    Because the universe of potential interested parties is small, and because non-financial considerations such as reputation and experience in the API manufacturing industry, compliance and good standing with all regulatory bodies, continuity of supply and execution risk would be such important factors in evaluating any competing proposals, the Debtors, in consultation with their legal and financial advisors, determined that a court-supervised auction process would involve increased expense and delay and would be unlikely to produce additional value for the Debtors' estates.    *Id*.

11.    With these factors in mind, beginning in April 2020, the Debtors contacted twelve entities regarding potential strategic alternatives for Rhodes Tech's API manufacturing business.    Schnitzler Declaration ¶ 13.    As expected, preliminary feedback received by the Debtors and their advisors in this initial outreach indicated that only a select group of parties was interested in

exploring an API supply agreement with the Debtors and a potential partnership or acquisition of the Coventry Facility. *Id*.

12.    In May 2020, the Debtors communicated to these parties the intent to launch a formal process for the solicitation of bids for a transaction. Schnitlzer Declaration ¶ 14. Based on these communications, four parties, including Normaco LLC ("**Noramco**"), expressed interest in participating. *Id*. In mid-June 2020, the Debtors and their advisors distributed first round process letters and granted the four interested parties access to confidential information regarding Rhodes Tech's API manufacturing business and the Coventry Facility. *Id*. Thereafter, the Debtors and their advisors engaged in an extensive process to provide diligence and guidance to these parties, including by conducting numerous diligence calls and responding to diligence questions. *Id*.

13.    By July 15, 2020, the Debtors received round-one proposals and letters of intent from all four interested parties. Schnitzler Declaration ¶ 15. Noramco submitted a proposal and detailed markup of the term sheets for both a long-term API supply agreement and the purchase of the Coventry Facility by the Purchaser, a newly formed affiliate of Noramco. *Id*. The three competing proposals offered materially less value, taking into account API pricing terms and the terms of the sale of the Coventry Facility, and materially more complexity with regards to the Debtors' short-term and long-term supply of APIs. *Id*. In addition, Noramco's long track record in the industry, financial credibility and proven access to resources were important to the Debtors' assessment of Noramco's proposal. Schnitzler Declaration ¶ 29.

14.    The Debtors, in consultation with their advisors, believed that two proposals (including the Purchaser's) offered favorable economic terms and that other proposals involved unacceptably high execution risk and/or risk regarding continuity of supply. Schnitlzer

6

Declaration ¶ 16.  The parties that submitted these two proposals were invited to submit round-two proposals.  *Id*.  A third party was encouraged to resubmit a more formal proposal by July 31, 2020.  *Id*.  On July 22, 2020, the Debtors and their advisors provided access to additional confidential information not provided to first-round interested parties, and on July 30, 2020, the Debtors distributed drafts of long-form transaction documents.  *Id*.

15.    On August 24, 2020, final bids, including final transaction documents, were received by the Debtors from the Purchaser and one other round-two bidder.  Schnitzler Declaration ¶ 17.  Both bidders improved their offers between the first and second rounds.  *Id*.  As compared with its first-round proposal, the Purchaser's second-round proposal provided for increased consideration in the form of a higher initial purchase price for the Purchased Assets at closing, contingent installment payments to be paid over time based upon API purchase thresholds for Oxycodone HCl under the Supply Agreement, increased consideration for Rhodes Tech inventory and improved API pricing terms.  *Id*.  The Debtors and their advisors determined that this proposal offered materially better certainty of supply and materially greater value than the other round-two bidder's final proposal, which, among other things, would have required millions of dollars' worth of incremental costs and would have involved increased timing and execution risk as it would have required clinical testing to transfer the Rhodes Tech API manufacturing business.  *Id*.

16.    As a result, the Debtors and their advisors concluded that the overall structure offered by the Purchaser's proposal represented the best option available to the Debtors and would substantially benefit the Debtors' estates by enabling the Debtors to (a) procure a supply of APIs necessary to operate the Debtors' ongoing finished products business, at a cost substantially lower than presently incurred by manufacturing such APIs "in house," from an

experienced API manufacturer with the capability to ensure high-quality supply and with whom the Debtors can build a strong long-term commercial relationship and (b) unburden their estates from the high fixed, unabsorbed annual costs associated with the ownership and operation or potential closure of the Coventry Facility.  Schnitzler Declaration ¶ 18.

C.    **The Agreements**

17.    After extensive arm's-length negotiations and good-faith efforts by all parties, on September 14, Rhodes Tech, the Purchaser and Noramco, as guarantor of Purchaser's obligations, executed the APA in contemplation of a private sale pursuant to which the Purchaser has agreed to acquire the Coventry Facility and other related Purchased Assets, as well as assume the Assigned Contracts and pay the Cure Costs related thereto.  Schnitzler Declaration ¶ 19.  As a condition to Closing, PPLP (or an affiliate thereof) and Noramco will enter into the Supply Agreement, which will have a minimum term of seven years, with two two-year renewals at the Debtors' option.  The parties (or their affiliates) will also enter into additional Ancillary Documents, including a transition services agreement, consistent with the term sheet attached to the APA, to effectuate the transfer of the Coventry Facility operations from the Debtors to the Purchaser.

D.    **The Transaction Is Value-Maximizing and in the Best Interests of the Debtors, and Should Be Approved**

18.    In light of the foregoing, including the good-faith and arm's-length negotiation process, the price received for the Purchased Assets, the avoidance of potential substantial shutdown costs for the Coventry Facility in the absence of a sale and the favorable economic and non-economic terms of the Supply Agreement, the Debtors believe that the transaction contemplated by the APA, the Supply Agreement and the other Ancillary Documents (collectively, the "**Transaction**") represents fair value and the highest or otherwise best

transaction involving the Purchased Assets available to the Debtors and their estates, as it provides a greater value than would likely be available under any other alternative (including the avoidance of substantial fixed annual operating costs associated with the Debtors' continued operation of the Coventry Facility and the potential cost of shutting down the Coventry Facility, which would be necessary in the event the Debtors sourced their API needs from third parties without selling the Coventry Facility).  Schnitzler Declaration ¶ 30.  While the APA and the Supply Agreement are separate agreements, they are components of an integrated transaction. *Id*.  *See also, e.g.*, APA, § 8.9.  The Debtors respectfully submit that the integrated nature of the Transaction requires the Court to consider the benefits to the Debtors holistically.  Indeed, the entry into the Supply Agreement is a closing condition under the APA.  Moreover, the Debtors could not enter into the APA and sell the Coventry Facility without obtaining an alternative supply of APIs, nor would they enter into the Supply Agreement without having either a plan to sell the Coventry Facility or to achieve substantially significant savings to outweigh the costs of shutting down the Coventry Facility.  Schnitzler Declaration ¶ 30.

19.    Accordingly, the Debtors believe that the Transaction is in the best interest of the Debtors, their estates and all parties in interest and seek the Court's authorization to enter into and perform under the Agreements and consummate the Transaction.  Moreover, for the reasons discussed above and in the Schnitzler Declaration, the Debtors further believe that any further marketing process, including a court-supervised auction process, would only harm the Debtors' estates by creating considerable unnecessary risk, delay and additional expense with no commensurate benefit, given the Debtors' belief, after consultation with their advisors, that no other transaction counterparty would likely come forward with better terms than the Purchaser

and Noramco.  Schnitzler Declaration ¶ 31.  The Transaction has been approved by the Debtors'

board of directors.  Schnitzler Declaration ¶ 32.

## Summary of the Agreements

### A.    The Asset Purchase Agreement

20.    A summary of the material terms of the APA are set forth in the table below.[3]

| Term | Summary Description |
|---|---|
| **Purchase Price** APA, § 1.6 | Up to $10 million in cash, with $1 million to be paid at closing ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |
| **Purchased Assets** APA, § 1.1 | All properties and assets of the Seller and the Relevant Subsidiaries relating to the Business, other than certain excluded assets, including: (a) the Real Property; (b) inventory (other than inventory relating to Oxycodone); (c) machinery and equipment at the Real Property; (d) supplies at the Real Property; (e) the Assigned Contracts and the rights thereunder; (f) information technology assets used at the Real Property in the operation of the Business; (g) Copyrights and Know-How (other than Oxycodone IP) for the manufacture of APIs at the Real Property; (h) certain Patents; (i) Copyrights and Know-How for the manufacture of certain APIs in development; (j) certain Permits and pending applications therefor; (k) all vehicles at the Real Property; (l) all Books and Records (other than Retained Books and Records); (m) all employment-related agreements with Transferred Employees; (n) all causes of action related to the Business, the Purchased Assets or the Assumed Liabilities (other than certain retained causes of action); (o) all avoidance actions against trade creditors with whom the Purchaser continues to conduct business or Transferred Employees; (p) the drug master files and batch records for the API and Purchased Products; and (q) all goodwill associated with any of the foregoing. |
| **Assumed/Excluded Liabilities** | On the terms and subject to the conditions of the APA, at the Closing, the Purchaser shall assume from the Seller and agree to pay, perform and discharge, when due (a) liabilities |

---

[3] Any summaries contained herein are provided for the convenience of the Court and parties in interest. To the extent that there is any conflict between this Motion and the Agreements, the Agreements shall govern in all respects.  Capitalized terms used but not otherwise defined in this paragraph have the meanings ascribed to such terms in the Agreements.

| | |
|---|---|
| APA, §§ 1.3 & 1.4 | arising after and relating to the period after the Closing with respect to (i) the ownership, possession or use of the Purchased Assets, (ii) the operation of the Business, (iii) the Assigned Contracts, (iv) the sale by the Purchaser (or its affiliates) of APIs manufactured by the Purchaser (or its affiliates) in the ordinary course of business, (v) the Assigned Employment Agreements and (vi) the employment and termination of service of the Transferred Employees, (b) the amounts required to be paid with respect to each Assigned Contract to cure all monetary defaults under such Contract to the extent required by section 365(b) and otherwise satisfy all requirements imposed by section 365(d) of the Bankruptcy Code (the "**Cure Costs**"), (c) all liabilities of the Business under Environmental Laws arising from the ownership, possession or use of the Purchased Assets, whether arising prior to, at or after the Closing, other than certain excluded liabilities, (d) all Taxes for Post-Closing Tax Periods and (e) all liabilities set forth on Schedule 1.3(i) to the APA. <br><br>The Purchaser will not assume any liabilities of Rhodes Tech (or its Affiliates) other than the Assumed Liabilities in connection with the Sale. |
| **Termination** <br> APA, § 7.1 | The APA may be terminated: (a) by either the Purchaser or the Seller in the event that the Closing has not occurred by March 31, 2021; (b) by mutual written agreement of the Purchaser and the Seller; (c) by the Purchaser or the Seller, a breach of the APA that would cause of a failure of the closing conditions to be satisfied or a material breach of the Sale Order in either case by the other party and that remains uncured after 10 business days' notice or is not capable of cure in such time (provided such termination right may only be exercised by the non-breaching party); (d) by the Purchaser, if (i) the Seller's Chapter 11 Cases are dismissed or converted to Chapter 7 cases, (ii) a chapter 11 trustee is appointed in the Seller's Chapter 11 Cases, (iii) an examiner is appointed with expanded powers in the Seller's Chapter 11 Cases, (iv) the Sale Order is not entered on or before October 5, 2020, (v) the Seller withdraws or seeks authority to withdraw the Sale Motion, (vi) the Seller seeks court approval for an Alternative Transaction, (vii) the Seller solicits an Alternative Transaction in breach of Section 5.17 of the APA, or (viii) the Bankruptcy Court enters a final order lifting the automatic stay to permit a creditor of the Seller to foreclose on any material portion of the Purchased Assets; (e) by either the Seller or the Purchaser, if a Governmental Entity issues a final, non-appealable ruling or order permanently prohibiting the transactions contemplated by the APA; (f) by the Seller, if the Seller (i) has received a Superior Proposal, (ii) enters into a definitive written agreement to consummate such Superior Proposal, (iii) has determined in good faith that the failure to terminate the APA and consummate the Superior Proposal would be a breach of its fiduciary duties and (iv) concurrent with such termination, the Seller pays the Break-Up Fee and Expense Reimbursement due to the Purchaser in accordance with Section 7.2(b) of the APA. |
| **Purchaser Protections** <br> APA §§ 5.17, 7.2 | The APA provides that, in the event that the APA is terminated under certain circumstances (and, with respect to terminations under certain provisions thereof, the Seller consummates or enters into an agreement to consummate an Alternative Transaction within the twelve (12) months following such termination), then the Seller shall pay the Purchaser (a) a break-up fee in the amount of $3 million (the "**Break-Up Fee**") and (b) the amount of the reasonable and documented out-of-pocket fees and expenses incurred by the Purchaser in connection with the Sale transactions up to an aggregate amount of $1.5 million (the "**Expense Reimbursement**").  In addition, the APA provides that, until the earlier of the Closing Date or the valid termination of the APA, the Debtors agree not to solicit or take certain other actions with respect to an Alternative Transaction (the  "**No-Shop**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Purchaser Protections**").  However, the Debtors are permitted to respond under certain circumstances to a bona fide written Acquisition Proposal that the Debtors determine in good faith (after consultation with their financial advisors and outside legal counsel) constitutes, or is reasonably expected to lead to, a |

| | Superior Proposal. The APA defines a "Superior Proposal" for this purpose in part as one offering at least $1 million more in value than the Transaction. |

21.    In accordance with the Sale Guidelines, a summary of the Extraordinary Provisions (as defined in the Sale Guidelines) of the APA is set forth in the table below.

| Provision | Summary Description |
|---|---|
| **Sale to Insider**<br>Guideline I.D.1 | The Purchaser is not an "insider," as such term is defined in section 101(31) of the Bankruptcy Code, of any of the Debtors. |
| **Agreements with Management**<br>Guideline I.D.2 | The provisions regarding offers of employment to Offer Employees do not include management or key employees under the Sale Guidelines. |
| **Private Sale/No Competitive Bidding**<br>Guideline I.D.3 | The Debtors seek to consummate the Sale as a private sale without an auction or further bidding process. As described herein and in the Schnitzler Declaration, the Debtors have already conducted a thorough marketing process, and due to the unique characteristics of the Transaction and the integrated nature of the Agreements, the Debtors believe that there are few, if any, parties that would be able to enter into similar arrangements and that the Transaction provides the best opportunity to maximize value. |
| **Deadlines**<br>Guideline I.D.4 | The Closing shall occur no later than March 31, 2021, otherwise the APA may be terminated by the Purchaser or the Seller. *See* APA, § 7.1(a).<br><br>The APA may be terminated by the Purchaser if the Bankruptcy Court does not enter the Sale Order on or before October 5, 2020. |
| **Good-Faith Deposit**<br>Guideline I.D.5 | Due to the structure and timing of payment of the purchase price for the Purchased Assets, the Purchaser is not required to provide a good-faith deposit under the APA. |
| **Interim Arrangements with Proposed Buyer**<br>Guideline I.D.6 | As noted above, the TSA will set forth the obligations of the Debtors and the Purchaser in connection with operations at the Coventry Facility for a limited period of time following Closing. The TSA will be consistent with the terms set forth on Exhibit F to the APA. |
| **Use of Proceeds**<br>Guideline I.D.7 | Due to the structure and timing of payment of the purchase price for the Purchased Assets, no specific use of proceeds is contemplated. |
| **Tax Exemption**<br>Guideline I.D.8 | The Debtors do not seek to have the Sale of the Purchased Assets declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention**<br>Guideline I.D.9 | After the Closing Date, the Seller shall retain (a) all books and records not exclusively related to the Purchased Assets or the Assumed Liabilities, (b) confidential personnel and medical records pertaining to any employee of the Seller, (c) books and records that exclusively relate to any products (including API), (d) standard operating procedures and validation reports, (e) other books and records that the Seller is required by law to retain or that the Seller determines are necessary or advisable to retain, including tax returns, financial statements, and corporate or other entity filings, (f) documents relating to proposals to acquire the Seller's business by persons other than the Purchaser and (g) books and records that the Seller is required to retain under applicable Law. *See* APA, § 1.2(k) & art. IX (def'n of "Retained Books and Records"). |
| **Sale of Avoidance** | The Purchased Assets include Avoidance Actions against vendors, suppliers, customers |

| | |
|---|---|
| **Actions**<br>Guideline I.D.11 | or trade creditors with whom the Purchaser continues to conduct business in regard to the Purchased Assets after the Closing and any of their Affiliates. *See* APA, § 1.1(n). |
| **Requested Findings as to Successor Liability**<br>Guideline I.D.12 | The Debtors seek a finding that (a) the Purchaser is not a "successor" to, a mere continuation of, or alter ego of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Purchaser and the Debtors; (b) the Purchaser is not holding itself out to the public as a successor to or a continuation of the Debtors or their estates; (c) the Purchaser is not a successor to any of the Debtors or their estates by reason of any theory of law or equity, and the Transaction (including the Sale) does not amount to a consolidation, succession, merger, or de facto merger of Purchaser and the Debtors; (d) immediately prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Purchaser; and (e) the transfer of the Purchased Assets to the Purchaser, and the assumption of the Assumed Liabilities by the Purchaser, except as otherwise explicitly set forth in the APA, does not, and will not, subject the Purchaser to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability or law, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise. *See* Proposed Sale Order ¶¶ L & 39. |
| **Future Conduct**<br>Guideline I.D.13 | N/A |
| **Requested Findings as to Fraudulent Conveyance**<br>Guideline I.D.14 | The Debtors request findings that (a) the consideration provided for the Purchased Assets constitutes reasonably equivalent value and fair consideration and (b) the Agreements were not entered into, and the Debtors and the Purchaser have not entered into the Agreements or proposed to consummate the Transaction, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors or otherwise fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims. *See* Proposed Sale Order ¶¶ N, 12 & 43. |
| **Sale Free and Clear of Unexpired Leases**<br>Guideline I.D.15 | The Debtors seek to sell the Transferred Assets to the Purchaser free and clear of all Claims and Interests (other than any Permitted Post-Closing Encumbrances and Assumed Liabilities). *See* APA, § 1.1; Proposed Sale Order ¶ 10. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Guideline I.D.16 | The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). *See* Proposed Sale Order ¶¶ X & 46. |

## B.    The Supply Agreement and the Transition Services Agreement

22.    The Supply Agreement will ensure the supply of the APIs necessary to operate the Debtors' ongoing finished products business, at a cost substantially lower than presently incurred by manufacturing such APIs "in house," from Noramco, an experienced API

manufacturer with the capability to ensure high-quality supply and with whom the Debtors can build a strong long-term commercial relationship.

23.     The Supply Agreement provides for the provision of APIs to the Debtors for a minimum of seven years, with two two-year renewal options.   API prices under the Supply Agreement are fixed for the first five years and are automatically adjusted thereafter ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ The Debtors are confident this arrangement will ensure access to sufficient supply of APIs at all times during the term of the Supply Agreement.   Due to the favorable pricing in the Supply Agreement relative to the Debtors' current costs of production, the Debtors anticipate estimated net savings of approximately ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.  Schnitzler Declaration ¶ 20.  In the event Noramco fails to comply with these terms, the Debtors will have the ability to terminate the Supply Agreement and seek APIs from another source.

24.     The TSA will require the Debtors to provide certain services necessary to effectuate a smooth transfer of the Coventry Facility operations to the Purchaser.  Services to be provided under the TSA will include financial, IT and human resources support services, in each

case related to the operation of the Coventry Facility.  As contemplated in the term sheet attached to the APA as Exhibit F, the Debtors' indemnification obligations under the TSA will be capped at the amount equal to the aggregate amount of fees paid to the Debtors under the TSA for the first twelve months of the term, except in the case of damages subject to indemnity or the Debtors' gross negligence or willful misconduct or damages resulting from the Debtors' breach of their confidentiality obligations under the TSA.

**<u>Assumption and Assignment or Assignment, as Applicable, of the Assigned Contracts</u>**

25.     In connection with the Transaction, the Debtors seek authorization to assume and assign or assign, as applicable, to the Purchaser (or its designated assignee(s)) the Assigned Contracts pursuant to section 365(b) of the Bankruptcy Code and the following procedures (the "**Assumption and Assignment Procedures**").

- Counterparties to all Executory Contracts and Post-Petition Contracts (collectively, "**Eligible Contracts**") that may potentially be assumed and assigned or assigned, as applicable, to the Purchaser as Assigned Contracts pursuant to the APA are being served with notice of this Motion, including the notice attached hereto as <u>Exhibit C</u> (the "**Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs**"), and have the opportunity to file an objection (an "**Assumption and Assignment Objection**") prior to **September 27, 2020** at **4:00 p.m.** (prevailing Eastern Time) (the "**Assumption and Assignment Objection Deadline**") to the Debtors' ability to assume and assign or assign, as applicable, the applicable Eligible Contract, the ability of the Purchaser to provide adequate assurance of future performance of such Eligible Contract and/or the proposed Cure Cost to be paid in connection with the assumption and assignment or assignment, as applicable, of such Eligible Contract if such Eligible Contract is designated as an Assigned Contract pursuant to the APA.

- In the event that an Executory Contract is omitted from the Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs, and the Purchaser desires to designate such Executory Contract as an Assigned Contract in accordance with the terms of the APA, the Debtors shall promptly (i) serve a supplemental assumption and assignment notice (each, a "**Supplemental Assumption**

15

**and Assignment Notice**") by first class mail or electronic mail on the applicable Contract Counterparties setting forth the Debtors' intention to assume and assign such Executory Contracts to the Purchaser (which notice shall include the applicable proposed Cure Costs) and (ii) file the Supplemental Assumption and Assignment Notice with the Court.  Any Contract Counterparty to an Executory Contract listed on a Supplemental Assumption and Assignment Notice shall have an opportunity to file an objection (a "**Supplemental Assumption and Assignment Objection**") no later than fourteen (14) days from the date of service of such Supplemental Assumption and Assignment Notice (the "**Supplemental Assumption and Assignment Objection Deadline**") to the Debtors' ability to assume and assign such Executory Contract, the ability of the Purchaser to provide adequate assurance of future performance of such Executory Contract and the proposed Cure Cost for such Executory Contract.

- All Assumption and Assignment Objections and Supplemental Assumption and Assignment Objections must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (iii) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Contract Counterparty believes are required to cure defaults under the relevant potential Assigned Contract and supporting materials evidencing the same, (iv) be filed by no later than the Assumption and Assignment Objection Deadline or Supplemental Assumption and Assignment Deadline, as applicable, and (v) be served on (A) counsel for the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, New York 10017, Attn: Eli J. Vonnegut and Christopher S. Robertson, (B) counsel to the Purchaser, Kirkland & Ellis LLP, 601 Lexington Ave., New York, New York 10022, Attn: James A. Stempel, (C) counsel to the Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP, Bank of America Tower, One Bryant Park, New York, New York 10036, Attn: Arik Preis and Sara L. Brauner, and (D) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Paul K. Schwartzberg (collectively, the "**Assumption and Assignment Objection Notice Parties**").

- The Debtors and the Purchaser intend to cooperate with the Contract Counterparties in an attempt to reconcile any difference in Cure Costs.  If no objection to a proposed Cure Cost set forth on the Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs or a Supplemental Assumption and Assignment Notice is timely filed by the Assumption and Assignment Objection Deadline or the applicable Supplemental Assumption and Assignment Objection Deadline with respect to an Eligible Contract, then the Debtors respectfully request that such proposed Cure Cost be binding upon the Contract Counterparty to such Eligible Contract and constitute the final

determination of the total Cure Costs required to be paid in connection
with the assumption and assignment to the Purchaser of such Eligible
Contract if such Eligible Contract is designated as an Assigned Contract
pursuant to the APA.  If an objection to a Cure Cost set forth in the Notice
of Potential Assumption and Assignment or Assignment, as Applicable, of
Contracts and Proposed Cure Costs or a Supplemental Assumption and
Assignment Notice is timely filed with respect to an Eligible Contract, and
such objection is not otherwise resolved by the parties, such objection
shall be resolved by the Court (i) in the case of a Cure Cost set forth in the
Notice of Potential Assumption and Assignment, as Applicable, of
Contracts and Proposed Cure Costs, at the Sale Hearing or
such later date as agreed by the Debtors and the applicable Contract
Counterparty and (ii) in the case of a Cure Cost set forth in a Supplemental
Assumption and Assignment Notice, at a date to be determined by the
Court, which if reasonably practicable shall be no later than the applicable
Assignment Date.

26.    Pursuant to the APA, the Purchaser is permitted to designate certain Executory

Contracts not assigned to Purchaser on the Closing Date as Assigned Contracts up to the

Designation Deadline, which is the earlier of (i) sixty (60) days after the Closing Date and (ii) the

effective date of a chapter 11 plan of the Seller.  Under the Proposed Sale Order, the Debtors

shall file (x) a notice listing the contracts that are Assigned Contracts as of the Closing Date and

(y) an additional notice listing the additional contracts that are Assigned Contracts as of the

Designation Deadline, in each case within five (5) Business Days after such date, and serve such

notice on the counterparties to such Assigned Contracts.

**Basis for Relief Requested**

**A.    The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy
Code and Should Be Approved**

***1.    The Proposed Sale of the Purchased Assets Is Justified by Good and Sound
Business Reasons***

27.    Section 363(b)(1) of the Bankruptcy Code empowers the Court to authorize a

debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."

To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the

17

Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

28.     The Debtors have demonstrated that the Sale is supported by good and sound business reasons.  The Debtors' ongoing operations are dependent on continued access to a supply of the APIs manufactured at the Coventry Facility.  However, Rhodes Tech's continued operation of the Coventry Facility burdens its estate with substantial fixed costs because of █ ███████████████████████████████████████████████████████████████████████ ███. The Transaction will enable the Debtors to secure a reliable supply of APIs, while unburdening their estates of the substantial fixed costs associated with operating the Coventry Facility and avoiding the substantial shut-down costs that would be associated with moving supply to a third-party API supplier without selling the Coventry Facility, thereby maximizing the value of the Debtors' enterprise.  *See* Schnitzler Declaration ¶ 10.  Furthermore, the proposed Transaction does not benefit any insider, nor does it unfairly favor any creditor or other party in interest.

### 2.    *A Private Sale Is Warranted and Maximizes the Value for the Debtors' Estates*

29.    Bankruptcy Rule 6004(f)(l) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1).  Courts often allow chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code and is based on sound business judgment.  *See, e.g.*, *In re Waypoint Leasing Holdings LTD*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. Jan 8, 2019) (approving private sale of helicopter pursuant to section 363(b)); *In re China Fishery Group Limited (Cayman)*, Case No. 16-11895 (JLG) (Bankr. S.D.N.Y. Nov 15, 2016) (approving private sale of golf club membership pursuant to section 363(b)); *In re 160 Royal Palm, LLC*, 600 B.R. 119, 127 (S.D. Fla.), *aff'd*, 785 F. App'x 829 (11th Cir. 2019) ("private sales are not unheard of in bankruptcy proceedings, and are in fact expressly contemplated by the bankruptcy rules"); *In re Dewey & Leboeuf LLP*, No. 12-12321 (MG), 2012 Bankr. LEXIS 5116, at *17 (Bankr. S.D.N.Y. Nov. 1, 2012) (holding that "the Debtor has established a good business reason," pursuant to section 363(b), to sell its artwork through a private auction to save costs, reduce delay, and maximize the sale price); *In re MF Glob. Inc.*, 535 B.R. 596, 605–06, 608 (Bankr. S.D.N.Y. 2015) (approving the private sale to a buyer already familiar with the debtors' assets as an exercise of "sound business judgment" under section 363(b)); *In re Eastman Kodak Company*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. January 18, 2013) (ECF No. 2893) (approving private sale of a technology center and industrial complex pursuant to section 363(b)). *C.f. In re The Great Atlantic & Pac. Tea Co., Inc.*, 544 B.R. 43, 49 (Bankr. S.D.N.Y. 2016) (noting that "there is no rule that a debtor's decision to reject a lease be subject to a formal auction: even asset sales are not conditioned on such a requirement, which does not appear in the Bankruptcy Code or Bankruptcy Rules" and pointing out that the Sale Guidelines "specifically recognizes the

propriety of private sales" and provide that, "subject to certain disclosure requirements, the Court

does not 'express a preference for public sales over private sales as a means to maximize the sale

price'").

30.    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a), orders are appropriate where they

are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's

creditors. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prof. & Indem. Ass'n (In re U.S. Lines,*

*Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re*

*Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy

courts are courts of equity, empowered to invoke equitable principles to achieve fairness and

justice in the reorganization process.").

31.    A court should defer to a debtor's business judgment regarding the manner in

which an asset sale is conducted, including whether structured as a public or private sale. *See In*

*re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (recognizing that a trustee has "ample

discretion to administer the estate, including authority to conduct public or private sales of estate

property"); *In re MF Glob. Inc.*, 535 B.R. at 605–06, 608 (noting that "[t]he business judgment

of a trustee is entitled to great deference," and approving the sale of property pursuant to a

private sale after consideration of the trustee's articulated justifications for the appropriateness of

a private sale). *See also In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the

thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the

trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the

estate."); *160 Royal Palm,* 600 B.R. at 127 ("The use of a private sale, to take advantage of the

offer made by [the proposed purchaser], was within the Debtor's business judgment, and the Court sees no reason to supplant its judgment for the business judgment determination of the Debtor.").

32.    The Debtors' decision to pursue a private sale is supported by the unique characteristics of this transaction.  The Coventry Facility and its API manufacturing business is an asset with a small and highly specialized universe of potential buyers, and it is essential that the Debtors have a long-term commercial relationship with any buyer.  Of the limited number of interested parties, the Purchaser has offered the most advantageous economic terms and is also the most attractive interested counterparty from the perspective of minimizing execution risk and obtaining a reliable source of all necessary future APIs.  Given these unique circumstances, the Debtors believe that a public sale or bidding process and/or further private marketing efforts would result in a considerable delay and additional expense with no commensurate benefit to the Debtors' estates.

33.    Therefore, for the reasons set forth above, the Debtors respectfully submit that the Transaction provides a more robust recovery for the Debtors' estates, creditors and all parties in interest than can be achieved by any other realistically available alternative use or sale of the Coventry Facility, including a court-supervised auction.  Thus, the Debtors' determination to enter into the APA and to sell the Purchased Assets to the Purchaser in a private sale in the context of the overall Transaction is a valid and sound exercise of the Debtors' business judgment.

**B.    The Sale of the Purchased Assets Should Be Free and Clear of Claims and Interests**

34.    The Debtors propose to sell the Purchased Assets to the Purchaser free and clear of all Claims and Interests, except for Assumed Liabilities and Permitted Post-Closing

Encumbrances.  The sale of estate property free and clear of any interest therein is governed by

section 363(f) of the Bankruptcy Code, which provides, in relevant part:

> The trustee may sell property under [section 363(b) or (c)] free and clear of any interest in such property of any entity other than the estate, only if—
>
> (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

35.    Because section 363(f) of the Bankruptcy Code is written in the disjunctive, the

sale may be free and clear of interests if any of the five conditions are met.  *Citicorp*

*Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Borders*

*Group, Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).

36.    The Debtors submit that the Sale of the Purchased Assets free and clear of Claims

and Interests satisfies one or more of the requirements under section 363(f) of the Bankruptcy

Code.  To the extent a party objects to the proposed Sale on the basis that it holds a prepetition

Claim or Interest in the Purchased Assets, where the purchase price for a debtor's assets is the

best available purchase price under the circumstances, a court may authorize the sale free and

clear of interests pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price

is less than the face amount of such interests. *See In re Boston Generating, LLC*, 440 B.R. 302,

332 (Bankr. S.D.N.Y. 2010); *In re Beker Indus., Inc.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y.

1986).  The Debtors believe that, particularly in light of the costs associated with the Purchased Assets, the consideration provided by the proposed Transaction represents the fair value of such assets.

37.      Furthermore, if a party does not object to the proposed Sale, then such failure to object may be deemed consent under section 363(f)(2) of the Bankruptcy Code.  Accordingly, the Debtors request that, unless a party asserting a prepetition Claim or Interest with respect to any of the Purchased Assets (other than with respect to Assumed Liabilities and Permitted Post-Closing Encumbrances) timely objects to this Motion, such party shall be deemed to have consented to the Sale.  *See Borders Group*, 453 B.R. at 483 ("Under section 363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear of liens."); *In re GSC, Inc.*, 453 B.R. 132, 183 (Bankr. S.D.N.Y. 2011).

38.      The sale of the Purchased Assets free and clear of Claims and Interests is required to maximize the value of any transaction involving Rhodes Tech's API manufacturing business. If the Purchased Assets are not sold free and clear of all Claims and Interests, or if the Purchaser or its assets (including the Purchased Assets) would, or in the future could, be liable for or attach to any such Claim or Interest (other than Assumed Liabilities and Post-Closing Encumbrances), the Purchaser would not be willing to enter into the APA or consummate the Sale.  Indeed, it is unlikely that any potential buyer would be willing to purchase the Purchased Assets without a "free and clear" sale.  Therefore, the Sale free and clear of all Claims and Interests is in the best interest of the Debtors' estates and valid and justified under section 363(f) of the Bankruptcy Code.

C.    **The Purchaser Should Be Granted the Full Protection of Section 363(m) of the Bankruptcy Code**

39.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor in the event the approval of the sale under section 363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

40.    Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely."  *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)).  *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

41.    While the Bankruptcy Code does not define "good faith," most courts have adopted a traditional equitable definition, applying it to a buyer who "purchases the assets for value, in good-faith and without notice of adverse claims."  *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 389 (2d Cir. 1997) (quoting *William v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985)).  Good faith of a purchaser is demonstrated by "the integrity of his conduct during the course of the sale proceedings."  *Id.* at 390.  Courts in the Second Circuit have held

that misconduct that would typically destroy a purchaser's good-faith status involves fraud, collusion or an attempt to control the sale price or take unfair advantage of other bidders. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

42.    The negotiations over the Transaction were conducted in good faith and at arm's length, and to the best of the Debtors' knowledge, information and belief, no party has engaged in any misconduct, fraud or collusion.    Therefore, the Debtors submit that the Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections as such as set forth therein.

**D.    The Purchaser Protections Should Be Approved**

43.    The APA provides for certain Purchaser Protections to compensate the Purchaser in the event that the Transaction does not close after the entry of the order approving the Sale. The Purchaser required the Purchaser Protections to ensure that the Purchaser would be compensated for the time and resources dedicated in the APA and the Supply Agreement in the event the Debtors terminate the APA prior to the Closing, which is anticipated to occur on or around January 1, 2021.

44.    The use of purchaser protections is an established practice in chapter 11 asset sales involving the sale of significant assets.    The appropriateness of such purchaser protections is determined under a business judgment standard. *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bid protections, including break-up fee arrangements that have been negotiated by a debtor, are to be reviewed according to the "business judgment" standard, under which such procedures and arrangements are "presumptively valid").    Under this standard, a debtor's decision to provide for a termination fee is proper so long as the following conditions are

satisfied: (a) the relationship of the parties who negotiated a termination fee is not tainted by self-dealing or manipulation; (b) the fee does not hamper bidding and (c) the amount of the fee is not unreasonable relative to the proposed purchase price. *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).   With respect to the first two *Genco* factors, the Purchaser Protections were negotiated in the context of an arm's-length commercial agreement, and they did not hamper the bidding process.  Indeed, the Purchaser Protections were not even in place during the competitive private marketing process.

45.    With respect to the third *Genco* factor, a termination fee should be a fair and reasonable percentage of the proposed purchase price and should be reasonably related to the prospective purchaser's risk, effort and expenses. *Id.* at 662.  Courts in this district have evaluated purchaser protections that include break-up fees and the reimbursement of reasonable expenses by reference to the overall transaction value. *See, e.g.*, *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Oct. 30, 2019) (ECF No. 491) (approving break-up fee, work fee and expense reimbursement of up to 3% in the aggregate); *In re Waypoint*, Case No. 18-13648 (authorizing a 3% break-up fee and approximately 0.5% of expense reimbursement); *In re Hooper Holmes, Inc. d/b/a Provant Health*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) (ECF No. 119) (authorizing a 3% break-up fee and approximately 1% of expense reimbursement); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (ECF No. 223) (authorizing a 3% break-up fee and 0.375% of expense reimbursement); *In re Eastman Kodak Company, et al.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. July 5, 2012) (ECF No. 1590) (authorizing "such bid protections . . . as the Debtors determine would benefit their estates").

46.    Here, the Break-Up Fee and Expense Reimbursement must be measured against the value of the Transaction as a whole, which the Debtors believe is approximately ███ ███. Schnitzler Declaration ¶ 25. The Break-Up Fee and Expense Reimbursement therefore represent approximately ███ and ███, respectively, of the total transaction value. *Id.* These amounts are reasonable and appropriate in light of the size and nature of the Transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Purchaser, and commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Purchaser. *Id* ¶ 26. Moreover, inclusion of the Break-Up Fee and Expense Reimbursement were necessary to induce the Purchaser to enter into and continue to be bound by the APA. *Id*.

47.    Courts in other circuits have held that purchaser protections must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets. *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding that the business judgment rule may not be used as an alternative to the administrative expenses section of the Bankruptcy Code as a basis for approving certain bidding protections). The Purchaser Protections would also meet this standard, were it to be applied. The Purchaser Protections are necessary to induce the Purchaser to enter into the Transaction and bear the risk that a third party presents superior transaction between the entry of the order approving the Sale and the Closing Date. The Purchaser Protections are therefore necessary to allow the Debtors to realize the value Transaction, while also giving the Debtors the opportunity for increased returns if a materially more valuable proposal is made—a clear benefit to the Debtors' estates. Moreover, the Purchaser Protections will not diminish the Debtors' estates. The Debtors do not intend to terminate the APA, if doing so would incur an

obligation to pay the Break-Up Fee and Expense Reimbursement, unless the Debtors accept a Superior Proposal that provides for consideration that is greater than the consideration offered by the Purchaser by an amount sufficient to pay the Break-Up Fee and Expense Reimbursement.

48.     Accordingly, the Debtors submit that the Purchaser Protections have a sound business purpose, are fair and are appropriate under the circumstances, and therefore should be approved.

### E.    Entry into the Supply Agreement Is Justified by Sound Business Reasons and Should Be Approved

49.     As described above and in the Schnitzler Declaration, PPLP (or an affiliate thereof) will enter into the Supply Agreement as an integral part of the Transaction. Indeed, the fundamental purpose of the Transaction is to reduce the Debtors' cost of obtaining necessary APIs, and the Debtors anticipate estimated net savings of approximately ███████████

████████████████████████████████████████████████████████████████

████████████████. *See* Schnitzler Declaration ¶¶ 20, 30. Critically, as discussed above, the Debtors believe that Noramco offers a high degree of certainty of close and stability of supply.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

50.     As set forth above, authorization to use, sell or lease property of the estate pursuant to section 363(b)(1) requires a demonstration that the decision to enter into the proposed transaction is a sound exercise of the debtor's business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

51.     Accordingly, the Debtors submit that entry into the Supply Agreement is supported by good and sound business reasons, is in the best interest of their estates and should be approved by the Court.

**F.    Assumption and Assignment or Assignment, as Applicable, of Contracts and Unexpired Leases Should Be Authorized and the Assumption and Assignment Procedures Should Be Approved**

*1.     The Debtors Have Satisfied all Applicable Requirements of Section 365 of the Bankruptcy Code.*

52.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008).

53.     Furthermore, section 365 of the Bankruptcy Code authorizes the assumption and assignment of contracts, provided that any outstanding defaults under the contracts to be assumed are cured (or adequate assurance that such defaults will be promptly cured is provided) and adequate assurance of future performance is provided.   11 U.S.C. § 363(b)(1) and (f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean an absolute assurance that

debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803

(Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the

required assurance will fall considerably short of an absolute guarantee of performance").

Among other things, adequate assurance may be provided by evidencing the assignee's financial

health and experience in managing the type of enterprise or property assigned. *See In re Bygaph,*

*Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is

present when the prospective assignee of a lease has financial resources and has expressed

willingness to devote sufficient funding to the business to give it a strong likelihood of

succeeding).

54.    The assumption and assignment or assignment, as applicable, of the Assigned

Contracts satisfies the requirements of the Bankruptcy Code, and is supported by the Debtors'

sound business judgment.   The assumption and assignment or assignment, as applicable, of

Assigned Contracts is required under the APA, which is a necessary element of the Transaction.

Given that consummation of the Transaction is important to the Debtors' efforts to maximize

value for their estates and stakeholders, the Debtors' assignment of Assigned Contracts is an

exercise of sound business judgment and, therefore, should be approved.

55.    The Contract Counterparties can be assured of future performance by the

Purchaser.   Noramco is a leading specialty API development and manufacturing company.   The

Purchaser has a long track record in the industry, financial credibility, sufficient working capital,

and both the intent and proven access to resources to satisfy all future obligations required under

the Assigned Contracts.   *See* Schnitzel Declaration ¶ 29.   Moreover, pursuant to the APA, the

Purchaser has agreed to pay the Cure Costs associated with the Assigned Contracts, and the

assumption and assignment or assignment, as applicable, of the Assigned Contracts will be effective only upon payment by the Purchaser of the Cure Costs.

56.    Pursuant to the Assumption and Assignment Procedures described above, Contract Counterparties to all Eligible Contracts that may potentially be assumed and assigned or assigned, as applicable, to the Purchaser as Assigned Contracts pursuant to the APA are being served with notice of this Motion, including the Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs.  The Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs sets forth the Debtors' good-faith calculations of Cure Costs with respect to each Eligible Contract listed.  In addition, such notice will provide Contract Counterparties with notice of the Assumption and Assignment Objection Deadline, and an opportunity to be heard.  Furthermore, in the event that an Executory Contract is omitted from the Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs, and the Purchaser desires to designate such Executory Contract as an Assigned Contract in accordance with the terms of the APA, the Contract Counterparty to such Executory Contract will be served with a Supplemental Assumption and Assignment Notice, including the Debtors' good-faith calculations of Cure Costs with respect thereto and notice of the Supplemental Assumption and Assignment Objection Deadline.  Therefore, Contract Counterparties to Eligible Contracts will have a meaningful opportunity to raise any objections to the proposed assumption and assignment or assignment, as applicable, of their respective Eligible Contracts, the ability of the Purchaser to provide adequate assurance of future performance of such Eligible Contracts if they are designated as Assigned Contracts pursuant to the APA and the proposed Cure Cost to be paid

in connection with the assumption and assignment or assignment, as applicable, of such Assigned Contracts.

57.    Based on the foregoing, the Debtors submit that the assumption and assignment or assignment, as applicable, to the Purchaser of the Assigned Contracts satisfies the requirements under the Bankruptcy Code, and should be authorized and approved, and the Assumption and Assignment Procedures should be approved.

58.    In addition, to facilitate the assumption and assignment or assignment, as applicable, of Assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assigned Contracts, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[5]

### 2.    *Waiver of the Requirements of Bankruptcy Rule 6006(f)(6) Is Appropriate.*

59.    Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to assume or reject multiple unexpired leases "be limited to no more than 100 executory contracts or unexpired leases."  Fed R. Bankr. P. 6006.  However, the 2007 Advisory Committee Note to Rule 6006 states that "[a]n omnibus motion to assume, assign, or reject multiple executory contracts and unexpired leases must comply with the procedural requirements set forth in subdivision (f) of the rule, unless the court orders otherwise."  Fed. R. Bankr. P. 6006 advisory committee note.  Thus, courts will waive the requirements of Bankruptcy Rule 6006(f)(6) for cause.  *See, e.g.*, *In re Old*

---

[5] Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1). Section 365(f)(3) of the Bankruptcy Code further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

*Carco LLC*, 406 B.R. 180, 207 (Bankr. S.D.N.Y. 2009) (citing the advisory committee notes and permitting more than 100 agreements to be rejected through one motion when (i) the rejected agreements were substantially similar, (ii) all of the rejected agreements were subject to a single comprehensive analysis by the debtors, and (iii) all of the agreements were being rejected and not assigned to the reorganized entity). As the court noted in *Old Carco*, counterparties to the rejected agreements could easily find their names on the list of counterparties, and "it would not have advanced the process by requiring the Debtors to file eight separate motions requesting the same relief." *Id*. at 210.

60.     The Debtors respectfully submit that cause exists here to waive the requirements of Bankruptcy Rule 6006(f)(6) and that, for several reasons, the 100 contract limitation imposed by Bankruptcy Rule 6006(f)(6) should not apply to this Motion. The Debtors' rationale for assuming the Assigned Contracts, and the legal and factual support for these determinations, are uniform. Also, consistent with Bankruptcy Rule 6006(f)(2), the Contract Counterparties to the potential Assigned Contracts are listed on the Notice of Potential Assumption and Assignment or Assignment, as Applicable, of Contracts and Proposed Cure Costs attached hereto as Exhibit C in alphabetical order, making the list easy to navigate without the need to file multiple concurrent motions. Finally, the Debtors submit that it would be wasteful, confusing, and inefficient if the Debtors were required to file multiple separate pleadings requesting the same relief. Under these circumstances, the Debtors submit that including all of the contracts that may be designated as Assigned Contracts in a single motion is the most efficient and otherwise appropriate course for the benefit not only of the Debtors, but also of the Court and the counterparties to these leases. *See* Fed. R. Bankr. P. 6006 advisory committee's note (stating the drafting committee's intent that a court may order exceptions to Fed. R. Bankr. P. 6006(f) for an omnibus motion).

**Debtors' Reservation of Rights**

61.     Expect as expressly set forth herein, nothing contained herein or any action taken pursuant to such relief is intended or shall be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder or any other party; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Waiver of Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

62.     The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).[6]  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to maximize the value of their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), as the nature of the relief sought herein justifies immediate relief.

---

[6] Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under §365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

## Notice

63.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [Docket No. 498] and available on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma); (b) all counterparties to each Eligible Contract that may or will be an Assigned Contract; (c) the Internal Revenue Service; (d) the Department of Justice; (e) the Food and Drug Administration; (f) the Department of Health and Human Services; (g) any other local, state and federal agencies that have issued licenses or permits to the Seller with respect to the operation and use of the Purchased Assets; (h) all entities known to have expressed an interest to the Debtors in a transaction involving any material portion of the Purchased Assets during the past six (6) months; and (i) any person or entity with a particularized interest in the subject matter of this Motion (collectively, the "**Notice Parties**").  In addition, as soon as reasonably practicable after filing this Motion, the Debtors will (i) publish notice of the Sale Motion in the national edition of the *Wall Street Journal* and (ii) serve notice of the Sale Motion via email (or, in instances where no email address is available, via first class mail) on each party that filed a proof of claim against the Seller in these Chapter 11 Cases, in each case in the form in the form attached hereto as Exhibit D.  The Debtors respectfully submit that no further notice is required.

## No Prior Request

64.     The Debtors have not previously sought the relief requested herein from the Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Sale

Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein

and such other relief as the Court deems appropriate under the circumstances.

Dated:    September 14, 2020
          New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*