**<u>Exhibit B</u>**

**APA, Disclosure Letter and Disclosure Schedules**

**APA**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**AMONG**

**RHODES TECHNOLOGIES,**

**NORAMCO COVENTRY LLC**

**AND**

**NORAMCO, LLC (SOLELY FOR PURPOSES OF SECTION 8.18)**

**DATED AS OF SEPTEMBER 14, 2020**

# TABLE OF CONTENTS

Page

Article I THE ACQUISITION ..................................................................2
    Section 1.1    Purchased Assets ........................................................2
    Section 1.2    Excluded Assets ..........................................................5
    Section 1.3    Assumed Liabilities ....................................................7
    Section 1.4    Excluded Liabilities ....................................................8
    Section 1.5    Assignment of Assigned Contracts .........................10
    Section 1.6    Purchase Price ..........................................................12
    Section 1.7    Inventory Credit .......................................................13
    Section 1.8    Treatment of Excluded Inventory ...........................16
    Section 1.9    Proration of Expenses ..............................................17
    Section 1.10    Withholding ..............................................................17
    Section 1.11    Purchase Price Allocation .......................................18

Article II THE CLOSING ......................................................................18
    Section 2.1    Closing ......................................................................18
    Section 2.2    Deliveries at the Closing .........................................19
    Section 2.3    Deliveries Post-Closing ...........................................21

Article III REPRESENTATIONS AND WARRANTIES OF THE SELLER ...........................21
    Section 3.1    Qualification, Organization......................................21
    Section 3.2    Authority of the Seller .............................................21
    Section 3.3    Consents and Approvals ..........................................22
    Section 3.4    No Violations ...........................................................22
    Section 3.5    Financial Information ...............................................22
    Section 3.6    Title to Property; Sufficiency of Assets...................23
    Section 3.7    Absence of Certain Changes ....................................24
    Section 3.8    Brokers or Finders ...................................................24
    Section 3.9    Litigation..................................................................24
    Section 3.10    Intellectual Property ................................................25
    Section 3.11    Real Property ............................................................26
    Section 3.12    Material Contracts ...................................................26
    Section 3.13    Compliance with Laws; Permits .............................28
    Section 3.14    Employee Benefit Matters .......................................29
    Section 3.15    Labor Matters...........................................................30
    Section 3.16    Environmental Matters .............................................31
    Section 3.17    Healthcare Regulatory Matters ................................32
    Section 3.18    Taxes........................................................................33
    Section 3.19    Insurance ..................................................................33
    Section 3.20    Material Customers; Material Suppliers ..................34
    Section 3.21    No Other Representations .........................................34

Article IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ....................34
    Section 4.1    Qualification; Organization ......................................34

Section 4.2     Authority of the Purchaser ...................................................35
Section 4.3     Consents and Approvals .......................................................35
Section 4.4     No Violations ......................................................................35
Section 4.5     Compliance with Laws ........................................................36
Section 4.6     Litigation.............................................................................36
Section 4.7     Brokers................................................................................36
Section 4.8     Financing .............................................................................36
Section 4.9     Healthcare Regulatory Matters ............................................36
Section 4.10    No Other Representations ....................................................37

Article V COVENANTS .......................................................................................38
Section 5.1     Conduct of Business Pending the Closing ............................38
Section 5.2     Access and Information .......................................................40
Section 5.3     Leaseback Transaction, and Sublease ..................................42
Section 5.4     Approvals and Consents; Cooperation; Notification.............42
Section 5.5     Further Assurances ..............................................................43
Section 5.6     Clarification and Oxycodone Notice Obligations ..................44
Section 5.7     Cure Costs ...........................................................................45
Section 5.8     Cooperation with Respect to Bankruptcy Court Approvals ....45
Section 5.9     Bankruptcy Court Filings.....................................................45
Section 5.10    Communications with Customers and Suppliers ...................45
Section 5.11    Employee Matters.................................................................45
Section 5.12    Payments Received..............................................................49
Section 5.13    Use of Names and Marks .....................................................49
Section 5.14    Business IP License .............................................................50
Section 5.15    Healthcare Regulatory Transfers and Required Authorizations ...............51
Section 5.16    Security Deposits Under Assigned Contracts ........................53
Section 5.17    Confidentiality.....................................................................53
Section 5.18    Exclusivity ..........................................................................53
Section 5.19    Title Insurance and Survey ..................................................54
Section 5.20    Quality Agreement ..............................................................55
Section 5.21    Transition to Other Facilities ...............................................55
Section 5.22    Non-Transferred NDAs .......................................................55
Section 5.23    Confirmation of Bankruptcy Plan ........................................55
Section 5.24    Intellectual Property. ...........................................................56

Article VI CONDITIONS PRECEDENT ..............................................................56
Section 6.1     Conditions Precedent to Obligation of the Seller and the Purchaser ........56
Section 6.2     Conditions Precedent to Obligation of the Seller....................57
Section 6.3     Conditions Precedent to Obligation of the Purchaser.............58
Section 6.4     Concurrent Delivery ............................................................59

Article VII TERMINATION .................................................................................59
Section 7.1     Termination..........................................................................59
Section 7.2     Effect of Termination ..........................................................61

Article VIII GENERAL PROVISIONS .................................................................62

Section 8.1    Tax Matters ......................................................................................62
Section 8.2    Bulk Sales ........................................................................................64
Section 8.3    Survival of Representations, Warranties and Covenants..........................64
Section 8.4    Public Announcements ......................................................................64
Section 8.5    Notices ............................................................................................64
Section 8.6    Descriptive Headings; Interpretative Provisions....................................66
Section 8.7    No Strict Construction ......................................................................66
Section 8.8    Entire Agreement; Assignment ..........................................................66
Section 8.9    Governing Law; Submission of Jurisdiction; Waiver of Jury Trial ..........67
Section 8.10   Expenses ..........................................................................................68
Section 8.11   Amendment......................................................................................68
Section 8.12   Waiver..............................................................................................68
Section 8.13   Counterparts; Effectiveness ...............................................................68
Section 8.14   Severability; Validity; Parties in Interest .............................................68
Section 8.15   Specific Performance.........................................................................68
Section 8.16   Time of the Essence...........................................................................69
Section 8.17   Releases ...........................................................................................69
Section 8.18   Purchaser Guarantee ........................................................................70

Article IX DEFINITIONS ..........................................................................................70

## **EXHIBITS**

Exhibit A        Real Property

Exhibit B        Deed

Exhibit C-1      R&D Building Lease Term Sheet

Exhibit C-2      Manufacturing Building and Warehouses Lease Term Sheet

Exhibit C-3      Upper Mill Building Sublease Term Sheet

Exhibit D        Form of Power of Attorney

Exhibit E        Form of Supply Agreement

Exhibit F        Transition Services Agreement Term Sheet

Exhibit G        Form of Sale Order

Exhibit H        Title Report

Exhibit I        Licensed Patents

Exhibit J        Licensed Copyrights

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated September 14, 2020 (this "Agreement"), is made among Rhodes Technologies, a Delaware general partnership (the "Seller"), Noramco Coventry LLC, a Delaware limited liability company (the "Purchaser") and, solely for purposes of Section 8.18 of this Agreement, Noramco, LLC, a Delaware limited liability company ("Noramco").  The Seller and the Purchaser are referred to individually herein as a "Party" and collectively as the "Parties."  Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in Article IX.

## RECITALS

**WHEREAS**, the Seller is engaged in the business of manufacturing, processing, storing, quality control testing, packaging, marketing, developing, selling and releasing certain active pharmaceutical ingredients, including the active pharmaceutical ingredients set forth on Schedule 1.01 (such business, as conducted by the Seller at the Real Property (as defined below) as of the date hereof, and during the twelve (12) months prior to the date hereof the "Business" and such active pharmaceutical ingredients, the "APIs");

**WHEREAS**, the Relevant Subsidiaries own the assets set forth on Schedule I;

**WHEREAS**, the Seller and certain of its Affiliates (including all of the Relevant Subsidiaries) filed voluntary petitions for relief commencing cases (collectively, the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 15, 2019;

**WHEREAS**, the Purchaser desires to purchase and accept, and the Seller desires to sell, convey, assign, transfer and deliver, and shall cause the applicable Relevant Subsidiaries to sell, convey, assign, transfer and deliver to the Purchaser, all of the Purchased Assets (as defined below), and the Purchaser is willing to assume, and the Seller desires to assign and delegate, and shall cause the applicable Relevant Subsidiaries to assign and delegate to the Purchaser, all of the Assumed Liabilities (as defined below), all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such sale and purchase of the Purchased Assets and such assignment and assumption of the Assumed Liabilities, the "Acquisition");

**WHEREAS**, the Parties acknowledge and agree that the purchase by the Purchaser of the Purchased Assets, and the assumption by the Purchaser of the Assumed Liabilities, are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller or its Affiliates;

**WHEREAS**, the execution and delivery of this Agreement and the Parties' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code; and

**WHEREAS**, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I
# THE ACQUISITION

Section 1.1    Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing (as defined below), the Seller shall sell, assign, transfer, convey and deliver, and shall cause the Relevant Subsidiaries (as applicable) to sell, assign, transfer, convey and deliver, to the Purchaser or one of its designated Affiliates (subject to Section 8.8), and the Purchaser (or, if applicable, one of its designated Affiliates) shall purchase and accept from the Seller and the Relevant Subsidiaries (as applicable), free and clear of all Encumbrances of any and every kind, nature and description, other than Permitted Post-Closing Encumbrances, all right, title and interest of the Seller and the Relevant Subsidiaries in, to or under all of the rights, properties and assets of the Seller and the Relevant Subsidiaries of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, or exclusively leased, licensed, used or held for use in, or exclusively relating to the Business, as the same shall exist on the Closing Date (as defined below), other than the Excluded Assets (as defined below) (collectively, the "Purchased Assets"), including all right, title and interest of the Seller or any of its Relevant Subsidiaries in, to and under the Purchased Assets that are listed or described below and including any such items that are not exclusive to the Business but listed below:

(a)    the fee-owned real properties owned by the Seller and the Relevant Subsidiaries, described on Exhibit A, which Exhibit A may be modified prior to the Closing by Purchaser following receipt of the Survey (as defined below) (individually and together, as context requires, the "Real Property") consisting of: (i) all buildings and improvements thereon; (ii) the rights appurtenant to the Real Property, if any, in the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Real Property, to the center line thereof; (iii) any rights of way, appendages, appurtenances, easements (including offsite easements), sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Real Property or any portion thereof and used in conjunction therewith; and (iv) all other rights, licenses, hereditaments and other privileges appurtenant to the Real Property;

(b)    all (i) API drug substance, except Oxycodone API drug substance, (ii) work in process, except Oxycodone work in process and (iii) raw materials, in each case (in respect of the foregoing (i)-(iii)), owned by the Seller (including such goods in transit to the Real Property) (collectively, "Inventory");

(c)    all machinery, office equipment, spare parts, furniture, tangible tools and tooling, computers, printers, scanners and all other equipment and similar devices owned by the

Seller or any of its Relevant Subsidiaries and physically located at the Real Property, including all machinery and equipment and other devices dedicated or otherwise used in research and development or Manufacturing;

(d)   all supplies physically located at the Real Property, including drums, packaging, liners and plastic bags;

(e)   the Executory Contracts that are listed, described or otherwise identified on Schedule 1.1(e), as such schedule may be amended from time to time pursuant to Section 1.5(e) (other than any Contracts listed or described on Schedule 1.2(r)) and the rights thereunder;

(f)   the Post-Petition Contracts set forth on Schedule 1.1(f) and the rights thereunder;

(g)   all assets related to information technology that are exclusively used or held for use at or for the Real Property and exclusively used or held for use in the operation of the Business, including any Contracts exclusively related to such information technology assets (including those that are set forth on Schedule 1.1(e)) (the "Purchased IT");

(h)   all Copyrights and Know-How (other than, for the avoidance of doubt, Oxycodone IP) owned by the Seller or any Relevant Subsidiary that is exclusively used or held for use to Manufacture the API (other than Oxycodone) at the Real Property, including all such Copyrights and Know-How in the drug master files, and batch records, for such API, and all Ancillary IP Rights with respect thereto (collectively, and together with the Intellectual Property covered in Sections 1.1(i) and 1.1(j), the "Purchased IP");

(i)   all Patents expressly set forth on Schedule 1.1(i), and all Ancillary IP Rights with respect thereto;

(j)   all Copyrights and Know-How (other than, for the avoidance of doubt, Oxycodone IP) owned by the Seller or any Relevant Subsidiary that is exclusively used or held for use in the Manufacture, or in development exclusively for use in the Manufacture, of the active pharmaceutical ingredients, including any in development, that are listed or described on Schedule 1.1(j) (such active pharmaceutical ingredients, the "Purchased Products"), and all Ancillary IP Rights with respect thereto;

(k)   all Permits and all pending applications therefor listed or described on Schedule 1.1(k);

(l)   all vehicles owned by the Seller and physically located at the Real Property, including those set forth on Schedule 1.1(l);

(m)   all Books and Records, other than Retained Books and Records; *provided* that the Seller may retain a copy of Books and Records that constitute Purchased Assets to the extent related to litigation (subject to the confidentiality obligations in Section 5.17);

3

(n)     all employment-related agreements with Transferred Employees including, non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Transferred Employees (the "Assigned Employment Agreements");

(o)     all rights, claims, rebates, refunds, Causes of Action (as defined below), actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent related to the Business, the Purchased Assets or the Assumed Liabilities (including any claims for past infringement or misappropriation) (without duplication of the rights, claims or Causes of Action of the Seller set forth in Sections 1.2(o), 1.2(p), 1.2(q), 1.2(r) and 1.2(s)), in each case to the extent such matters relate to the period after the Closing, except (x) as relates to rights retained by the Seller under the Environmental Remediation and Indemnity Agreement by and between Clariant Corporation and Rhodes Technologies, dated November 30, 2011 (the "Environmental Indemnity Agreement") solely and exclusively with respect to the Upper Mill Building and the real property located underneath it and to the Seller's period of ownership or use of the Real Property (under the terms of the Lease Agreement, dated as of November 29, 2011, by and between the Seller and Clariant Corporation), to the extent an Action is brought against the Seller, (y) for the right of the Purchaser to counterclaims based on such Causes of Action or other matters (which rights shall be Purchased Assets) and, (z) with respect to the Intellectual Property, all rights in clause (vi) of the definition of Intellectual Property to the extent with respect to Purchased IP, which rights are incorporated herein by reference;

(p)     all avoidance claims or Causes of Action available to the Seller under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "Avoidance Actions") against the Seller's vendors, suppliers, customers or trade creditors with whom the Purchaser continues to conduct business in regard to the Purchased Assets or the Business after the Closing and any of their Affiliates, and the Transferred Employees (collectively, the "Designated Parties"); *provided*, *however*, that it is understood and agreed by the Parties that the Purchaser will not pursue or cause its Subsidiaries to pursue any Avoidance Actions against any of the Designated Parties other than as a defense or counterclaim (to the extent permitted under applicable Law) against any claim or Cause of Action raised by such Designated Party;

(q)     the drug master files and batch records for the API and Purchased Products (other than Oxycodone); and

(r)     all goodwill associated with any of the foregoing.

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN ARTICLE III AND ANY ANCILLARY DOCUMENT (I) THE SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY,

FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLER MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE PURCHASED ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES AND THE EXCLUDED LIABILITIES, IN EACH CASE AS SET FORTH IN ARTICLE III AND IN ANY ANCILLARY DOCUMENT AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Section 1.2    Excluded Assets.  Notwithstanding anything contained in this Agreement to the contrary, the Purchased Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and marketable securities, and any bank accounts and lockbox arrangements of the Seller;

(b)    the Seller's leasehold interest in the Upper Mill Building, including without limitation, all of the Seller's right, title and interests under the Upper Mill Building Lease;

(c)    all (i) Oxycodone API drug substance and (ii) Oxycodone work in process;

(d)    all Drug Enforcement Administration ("DEA") quotas and DEA registrations for the import and Manufacture of the covered products;

(e)    all (i) Intellectual Property owned by, or with respect to which a license or other rights are granted to, the Seller or any of its Affiliates that relates to Oxycodone or Oxycodone Finished Product, including the development, manufacture, synthesis, regulation, or commercialization thereof and all drug master files and batch records relating thereto (and all Intellectual Property therein and with respect thereto, including the Supply IP (collectively, the "Oxycodone IP")) and (ii) all other Intellectual Property that is not Purchased IP (including (1) all Intellectual Property that relates to any finished dosage form of any pharmaceutical products and (2) Seller Marks);

(f)    all information technology other than Purchased IT;

(g)    all rights to products and active pharmaceutical ingredients in development other than rights to the Purchased Products;

(h)    all Permits and all pending applications therefor listed or described on Schedule 1.2(h);

(i)     all tangible personal property disposed of or consumed between the date of this Agreement and the Closing Date (i) in the ordinary course of the operation of the Business consistent with past practice or (ii) with the written consent of Purchaser;

(j)     the rights retained by the Seller under the Environmental Indemnity Agreement solely and exclusively with respect to the Upper Mill Building and the real property located underneath it and to the Seller's period of ownership or use of the Real Property (under the terms of the Lease Agreement, dated as of November 29, 2011, by and between the Seller and Clariant Corporation), to the extent an Action is brought against the Seller;

(k)     Retained Books and Records; *provided*, that copies of such books and records shall be made available to the Purchaser upon reasonable request to the extent (i) necessary to operate or own the Business or (ii) required and permitted under applicable Law;

(l)     all credits, refunds, and prepaid amounts of Seller with respect to Taxes paid by the Seller (or any of its Affiliates) and any deposits made by the Seller (or any of its Affiliates) with any Taxing Authority with respect to Taxes (in each case, net of any costs or expenses incurred by the Purchaser or its Affiliates in connection with obtaining, receiving or paying over any such credits, refunds, deposits, or prepaid amounts);

(m)     all insurance policies and claims under or rights to proceeds thereof relating to the Business or any Purchased Asset;

(n)     (i) any attorney-client privilege of the Seller or associated with the business and operations of the Seller pertaining to this Agreement and the Ancillary Documents and (ii) all emails, correspondence, invoices, recordings, and other documents or files, evidencing or reflecting communications between the Seller and Seller's counsel pertaining to the Seller or associated with the business and operations of the Seller which would be considered privileged attorney-client communications or otherwise be subject to an attorney-client or similar privilege;

(o)     (i) except those described in Section 1.1(p), all Avoidance Actions, (ii) any proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset or other Causes of Action of the Seller (other than Avoidance Actions) against any Person other than any Designated Party (it being understood that neither Purchaser nor the Business will be required to participate in or assist with any such settlement, claims, counterclaims, rights of offset or other Causes of Action), and (iii) all claims or Causes of Action of the Seller other than Avoidance Actions and those identified in Section 1.1(o), it being agreed that all proceeds from any Causes of Action that are Excluded Assets are also Excluded Assets.

(p)     all rights, claims or Causes of Action of the Seller arising under this Agreement, the Ancillary Documents or the Confidentiality Agreement;

(q)     all rights, claims or Causes of Action by or in the right of the Seller against any current or former director or officer of the Seller relating to the period prior to Closing or relating to any current or former director or officer of the Seller who is not a Transferred Employee for any time period (other than in respect of any Causes of Action related

to non-disclosure or confidentiality, non-compete, or non-solicitation agreements included in the Purchased Assets pursuant to clause (m) of Section 1.1);

(r)    all Contracts that are not Assigned Contracts, including the Contracts listed or described on Schedule 1.2(r), which Schedule may be modified in accordance with Section 1.5(e);

(s)    all receivables, claims or Causes of Action that relate primarily to any of the Excluded Assets or Excluded Liabilities (as defined below);

(t)    all Benefit Plans (collectively, the "Retained Benefit Plans") and any interests of the Seller in the assets of such Retained Benefit Plans;

(u)    all assets owned by Rhodes Pharmaceuticals L.P. and all other Affiliates of the Seller (other than the Purchased Assets owned by Seller or any of the Relevant Subsidiaries), including those located at the Real Property, and all assets set forth on Schedule 1.2(u); and

(v)    all accounts and notes receivable of the Seller whether or not current and whether or not related to the Business.

Section 1.3    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Purchased Assets to the Purchaser, the Purchaser shall assume from the Seller and agree to pay, perform and discharge, when due, in accordance with their respective terms all of the liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Seller with respect to, arising out of or relating to the following (collectively, the "Assumed Liabilities"):

(a)    the ownership, possession or use of the Purchased Assets and the operation of the Business, in each case solely and exclusively to the extent arising after, and relating only to, the period after the Closing;

(b)    all liabilities and obligations arising under the Assigned Contracts, to the extent arising at or after, and relating only to, the period after the Closing (other than, for the avoidance of doubt, the Cure Costs);

(c)    the Cure Costs (to the extent not paid and discharged by the Purchaser prior to or at the Closing);

(d)    all liabilities arising from the sale by Purchaser, Noramco and their respective Affiliates of APIs manufactured by Purchaser, Noramco or their respective Affiliates in the ordinary course of business pursuant to product warranties, product returns, and rebates, in each case solely and exclusively to the extent arising after, and relating only to, the period after the Closing and excluding, for the avoidance of doubt, any such liabilities with respect to APIs (including Oxycodone API) manufactured by the Seller or any of its Affiliates prior to the Closing;

(e)    all liabilities and obligations arising under the Assigned Employment Agreements, to the extent arising after, and relating to, the period after the Closing;

(f)    all liabilities and obligations relating to the employment and termination of service of the Transferred Employees to the extent arising after the Closing (other than with respect to any liabilities under any Retained Benefit Plan which shall be Excluded Liabilities, subject to Purchaser's obligations relating to severance pursuant to Section 5.11(c) and (e));

(g)    all liabilities or obligations (including any Actions seeking non-monetary relief) of the Business under Environmental Laws arising exclusively from the ownership, possession or use of the Purchased Assets, whether arising prior to, on or after the Closing Date, other than (i) any monetary fines or penalties for noncompliance with Environmental Laws that are imposed on the Seller prior to the Closing Date and (ii) any liabilities set forth on Schedule 1.3(g);

(h)    all Taxes imposed on or with respect to the Business, the Purchased Assets or the Assumed Liabilities, in each case, for Post-Closing Tax Periods; and

(i)    all liabilities, if any, set forth on Schedule 1.3(i).

The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or the Seller as compared to the rights and remedies that such third party would have had against the Seller absent the Chapter 11 Cases had the Purchaser not assumed such Assumed Liabilities.

Section 1.4    Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, neither the Purchaser nor any of its Affiliates shall assume, be obligated to assume, be deemed to have assumed, or be obliged to pay, perform or otherwise discharge, and the Seller shall be solely and exclusively liable with respect to, any liabilities or obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Seller and any Affiliate thereof other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the "Excluded Liabilities").  Without limiting the foregoing, the Purchaser does not (nor do any of its Affiliates) assume or agree to pay, perform or otherwise discharge the liabilities or obligations of the Seller or any of its Affiliates with respect to, arising out of or relating to, the following:

(a)    other than as specifically set forth in Section 1.3(c) and Section 1.3(f) and any liabilities or obligations with respect to Taxes governed by Section 1.4(e), all liabilities or obligations related to the ownership, possession or use of the Purchased Assets or the operation of the Business, in each case with respect to the period prior to the Closing;

(b)    all Indebtedness of the Seller or any of its Affiliates, whether arising prior to, on or after the Closing Date and whether or not related to the Business or the Purchased Assets;

(c)    all Actions pending (i) against the Seller or any of its Affiliates (except such Actions set forth on Schedule 1.3(g)) or (ii) to the extent against or giving rise to liabilities

8

or obligations of the Business, based on acts or omissions prior to the Closing Date even if instituted after the Closing Date;

(d)    all liabilities or obligations to the extent relating to the ownership, possession or use of the Excluded Assets;

(e)    all liabilities for or in respect of Excluded Taxes;

(f)    all liabilities and obligations relating to any of (i) the Retained Benefit Plans and any other employee benefit or compensation plan program or arrangement of any kind to which Seller or any of its ERISA Affiliates have any liabilities, obligations or potential liabilities (other than with respect to any liabilities under the Assigned Employment Agreements specifically assumed by Purchaser pursuant to Section 1.3(e), which shall be Assumed Liabilities) and (ii) the employment or termination of any current or former employee of the Seller or any of its Affiliates (including the employment of any Transferred Employees), and including with respect to any current, threatened or potential claims for compensation or benefits for any such Person(s) or any dependents or beneficiaries thereof to the extent, with respect to (ii), arising on or prior to the Closing Date;

(g)    to the extent due in connection with this transaction, any severance or termination payments or similar liabilities or obligations that are payable on the cessation of employment by the Seller or any of its Affiliates of any employee who declines the written offer of employment made by the Purchaser pursuant to Section 5.11(b);

(h)    all fees, charges, expenditures, expenses, costs and other payments incurred or otherwise payable by the Seller or any of its Affiliates, or for which the Seller or any of its Affiliates is liable, in connection with the administration of the Chapter 11 Cases or the negotiation, execution or consummation of the transactions contemplated by this Agreement or any Ancillary Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the fees and expenses of financial advisors, accountants, legal counsel, consultants, brokers and other advisors with respect thereto, and all transaction, change in control, retention or similar bonus arrangements, in each case whether incurred, accrued or payable on or prior to or after the date hereof or the Closing Date;

(i)    any liability relating to any API that is or has been manufactured, tested, distributed, held or marketed by or on behalf of the Seller or any of its Affiliates arising from any recall, withdrawal or suspension (whether voluntarily or otherwise) whether arising prior to, on or after the Closing Date (except to the extent any such liabilities are a result of Purchaser's performance under (or breach of its obligations under), the Supply Agreement after the Closing);

(j)    any liability relating to bonuses, commissions or similar incentive cash payments (including payroll taxes) for the year ending December 31, 2020 (whether or not the Closing occurs prior to December 31, 2020), whether or not incurred, accrued or payable on or prior to or after the date hereof or the Closing Date;

(k)        all accounts payable liabilities or obligations of the Seller or any of its Affiliates, whether or not related to the Business or the Purchased Assets, except for the Cure Costs; and

(l)        all liabilities set forth on Schedule 1.4(l).

Section 1.5        Assignment of Assigned Contracts.

(a)        Schedule 1.5(a) sets forth a list (the "Executory Contracts List") of all Contracts of the Seller and the Relevant Subsidiaries (if applicable) that are subject to assumption or rejection pursuant to Section 365 of the Bankruptcy Code, other than those Contracts set forth on Schedule 1.1(f) or Schedule 1.2(r) (each, an "Executory Contract"). The Executory Contracts List describes the Seller's good-faith estimate of the amount required to be paid with respect to each Executory Contract to cure all monetary defaults under such Contract to the extent required by Section 365(b) and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amount of such costs, as determined by the Bankruptcy Court, the "Cure Costs").

(b)        To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 1.5, on the Closing Date (or promptly upon the designation of an Executory Contract as an Assigned Contract pursuant to Section 1.5(e), if later) the Seller shall assign the Assigned Contracts to Purchaser pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by the Purchaser as may be required under Section 365 of the Bankruptcy Code and payment by the Purchaser of the Cure Costs in respect of the Assigned Contracts; provided that, to the extent such Cure Costs arose from the Seller's breach of an Assigned Contract during the period between the date hereof and the date that such Assigned Contract is assigned to the Purchaser pursuant hereto and/or to the extent the Cure Costs exceed two hundred eighty eight thousand five hundred thirty two dollars ($288,532) (the extent of any such excess, collectively, the "Excess Cure Amount"), such Excess Cure Amount shall be deducted from, offset against and shall result in a reduction of the Purchase Price (including, in the discretion of Purchaser, the amount payable at Closing pursuant to Section 1.6(a)(i)).

(c)        To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 1.5, the Seller shall assume and transfer and assign all of the Purchased Assets to the Purchaser and the Purchaser shall assume all of the Purchased Assets from the Seller, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code.  Notwithstanding any other provision of this Agreement or in any Ancillary Document to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a Governmental Entity or a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would constitute a breach or result in a default thereunder or such attempted assignment would be prohibited by applicable Law (such asset or right, a "Restricted Asset" or "Restricted Right" as applicable).

(d)        Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer,

10

assignment, conveyance or delivery to the Purchaser of any Restricted Asset or Restricted Rights is expressly prohibited by any applicable Law or requires any consent from any Governmental Entity or any other third party and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in Purchase Price (as defined below) without the sale, transfer, assignment, conveyance or delivery of such asset.  In the event that the transfer or assignment of any such Restricted Asset or Restricted Right does not occur at the Closing, then following the Closing, the Seller shall and shall cause the Relevant Subsidiaries to use its commercially reasonable efforts, and the Purchaser shall cooperate with the Seller, to obtain such consent, or seek to remove any applicable prohibition or restriction under applicable Law, as promptly as practicable following the Closing.  For so long as such Restricted Asset or Restricted Right, or the full benefits thereof, has not been sold, transferred, conveyed, delivered or assigned to Purchaser, the Parties shall, reasonably cooperate with each other to provide the Purchaser with all of the rights and benefits of such Restricted Asset or Restricted Right and Purchaser shall assume the related portion of any liabilities (solely to the extent such liabilities would be Assumed Liabilities) as if such Restricted Asset or Restricted Right had been transferred, conveyed or assigned to Purchaser on the Closing Date.  Once consent for the sale, transfer, assignment, conveyance or delivery of any such Restricted Asset or Restricted Right is obtained, or any restriction or prohibition under applicable Law no longer exists, the Seller shall or shall cause the Relevant Subsidiary to promptly transfer, assign, convey and deliver such Restricted Asset or Restricted Right to the Purchaser.  The Seller shall hold in trust for, and pay to the Purchaser, promptly upon receipt thereof, all income, proceeds and other monies received by the Seller derived from its use of any Restricted Asset or Restricted Right in connection with the arrangements under this Section 1.5(d).  The Purchaser shall be responsible for, and shall pay and discharge, and shall reimburse Seller with respect to, all liabilities and obligations which would have constituted Assumed Liabilities with respect to any Restricted Asset or Restricted Right in connection with the arrangements under this Section 1.5(d) (solely to the extent such liabilities would be Assumed Liabilities). The Parties agree to treat any Restricted Asset or Restricted Right the benefits of which are transferred pursuant to this Section 1.5(d) as having been sold to Purchaser for Tax purposes to the extent permitted by Law.  Each of the Seller and the Purchaser agrees to notify the other Parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Purchaser pursuant to this Section 1.5(d)) is not permitted for Tax purposes under applicable Law.

(e)     The Purchaser shall, two Business Days prior to the Closing Date, identify such Executory Contracts that Purchaser has decided will be "Assigned Contracts" to be assumed and assigned to Purchaser on the Closing Date by providing Seller with a final version of Schedule 1.1(e) as of such date. Up to the Designation Deadline, Purchaser may, in its sole discretion, remove an Executory Contract from Schedule 1.2(r) and add such Contract to Schedule 1.1(e); *provided*, that, notwithstanding anything to the contrary herein, the Executory Contracts designated by the Seller as "Non-Assignable Contracts" on Schedule 1.2(r) may not be designated as Assigned Contracts by the Purchaser. Upon any addition of an Executory Contract to Schedule 1.1(e) pursuant to this Section 1.5(e), Seller shall convey such Executory Contract to Purchaser, so long as (i) such Executory Contract is added to Schedule 1.1(e) prior to the entry of any Order of the Bankruptcy Court approving the rejection of such Executory Contract, (ii) the assumption and assignment has been or is approved by the Bankruptcy Court (including through

the Sale Order) and (iii) Purchaser or one of its Affiliates shall have paid any Cure Cost required for the assumption of such Executory Contract.

Section 1.6   Purchase Price.

(a)   In consideration for the Purchased Assets other than Inventory, the Purchaser shall, in addition to the assumption of the Assumed Liabilities by the Purchaser, pay to the Seller an amount up to ten million dollars ($10,000,000) in cash (the "Purchase Price"), which Purchase Price shall be paid to the Seller as follows:

(i)   one million dollars ($1,000,000) of the Purchase Price will be paid to the Seller at the Closing; and

(ii)   up to nine million dollars ($9,000,000) of the Purchase Price will be paid in the form of five (5) annual cash rebates of one million eight hundred thousand dollars ($1,800,000) (each, an "Additional Purchase Price Rebate") for each calendar year during the Rebate Period (as defined below) in which the Seller and/or its Affiliates have purchased and paid for seven thousand (7,000) or more kg of Oxycodone HCI under the Supply Agreement.  The (A) first Additional Purchase Price Rebate shall become payable following the end of the calendar year in which the earlier of the following occurs (1) the third anniversary of the Closing Date and (2) the date on which the Purchaser completes its total transition of the Business operations and Purchased Assets conducted or located at the Real Property to Purchaser's other facilities (the "Base Year") and the (B) four (4) remaining Additional Purchase Price Rebates shall become payable at the end of each subsequent calendar year after the Base Year (such five (5) year period, the "Rebate Period"); *provided*, that no Additional Purchase Price Rebate shall be paid or payable for any calendar year in which Seller and/or its Affiliates do not purchase and pay for at least five thousand two hundred fifty (5,250) kg of Oxycodone HCl under the Supply Agreement during such calendar year and in such case, the applicable Additional Purchase Price Rebate for such calendar year shall be forfeited (subject to Section 1.6(a)(iii)); *provided, further*, that if Seller and/or its Affiliates have purchased and paid for between five thousand two hundred fifty (5,250) and seven thousand (7,000) kg of Oxycodone HCI under the Supply Agreement in any such calendar year, then the Additional Purchase Price Rebate shall equal (x) one million eight hundred thousand dollars ($1,800,000), *multiplied by* (y) the number of kg of Oxycodone HCI purchased and paid for in such year divided by 7,000; *provided*, *further*, that if Seller and/or its Affiliates purchased and paid for less than seven thousand (7,000) kg of Oxycodone HCl under the Supply Agreement during any such calendar year, but more than seven thousand (7,000) kg of Oxycodone HCl during the immediately preceding calendar year, and such excess amount of Oxycodone HCl purchased and paid for above seven thousand (7,000) kg did not directly result in a Catch-Up Amount (as defined below) being paid in a prior year during the Rebate Period, such excess amount of Oxycodone HCl purchased and paid for above seven thousand (7,000) kg in the immediately preceding calendar year shall be included in the calculation of the Additional Purchase Price Rebate for such calendar year. For purposes of this Section 1.6(a)(ii), Affiliates of Seller will include any entity that is an Affiliate as of the date of this Agreement, even if no longer an Affiliate at the time of the relevant Oxycodone HCI purchase.  For the avoidance of doubt, Bard

Pharmaceuticals Limited shall not be considered an Affiliate of Seller for purposes of this Section 1.6(a)(ii).

(iii)     In addition to the Additional Purchase Price Rebate, in each of the four calendar years following the Base Year that Seller and/or its Affiliates purchases and pays for seven thousand and one (7,001) or more kg of Oxycodone HCl under the Supply Agreement (an "Excess Purchase Year"), the Seller shall be entitled to a catch-up amount (the "Catch-Up Amount") up to an amount equal to the difference between (A) the result of (x) one million eight hundred thousand dollars ($1,800,000), multiplied by (y) the number of prior calendar years elapsed during the Rebate Period, minus (B) the amount of the Additional Purchase Price Rebates actually paid to the Seller for such elapsed prior calendar years.  The Catch-Up Amount will be calculated by taking the amount of Oxycodone HCI purchased by the Seller or its Affiliates under the Supply Agreement during the Excess Purchase Year in excess of 7,000 kg (the "Excess Supply Amount") and adding such Excess Supply Amount to the amount of Oxycodone HCI actually purchased by the Seller under the Supply Agreement during the previously elapsed calendar year or years and recalculating the Additional Purchase Price Rebate for such elapsed calendar year or years taking into account the Excess Supply Amount (it being understood that (i) the Excess Supply Amount shall not increase the amount of Oxycodone HCI purchased in any prior year above 7,000 kg and (ii) the full Excess Supply Amount may be spread across multiple calendar years that have elapsed during the Rebate Period in order to maximize the Catch-Up Amount). For the avoidance of doubt, (x) in no event shall the aggregate Additional Purchase Price Rebates plus any Catch-Up Amounts payable for any calendar year(s) that have elapsed during the Rebate Period exceed one million eight hundred thousand dollars ($1,800,000) multiplied by the number of prior calendar years elapsed during the Rebate Period and (y) to the extent all or a portion of any Excess Supply Amount was used in a calculation that resulted in a Catch-Up Amount being paid, such Excess Supply Amount (or portion thereof) cannot be utilized in a calculation of an Additional Purchase Price Rebate in a subsequent year during the Rebate Period.  Schedule 1.6(a)(iii) includes a series of illustrative examples of the calculation of the Additional Purchase Price Rebates.

(iv)     Each Additional Purchase Price Rebate and Catch-Up Amount, if any, shall be paid to Seller within the first thirty (30) days of the end of the calendar year in which such Additional Purchase Price Rebate or Catch-Up Amount, as applicable, becomes due and payable.

(v)     Notwithstanding the foregoing, if Seller placed an order but did not complete a purchase and payment for Oxycodone HCI under the Supply Agreement during any of the calendar years relevant for this Section 1.6(a) due to a breach, shortfall or delay by the Manufacturer (as defined in the Supply Agreement) or a Force Majeure (as defined in the Supply Agreement), then Seller will get full credit to the extent caused by such breach, shortfall or delay for the kg ordered for purposes of determining the amount of the Additional Purchase Price Rebate and Catch-Up Amounts payable to the Seller.

Section 1.7     Inventory Credit.

13

(a)     In addition to the Purchase Price, the Purchaser will pay for Inventory on hand at Closing by providing a credit of up to fifteen million dollars ($15,000,000) (the "Credit"), on the timetable set forth in this Section 1.7, to the Seller to be used by the Seller, Purdue Pharma L.P. (including any Affiliate or successor of Purdue Pharma L.P. (including, without limitation, any successor to Purdue Pharma L.P. under a plan of reorganization under Bankruptcy Code), "Purdue") or their respective Affiliates, against amounts due for purchases made by such entities pursuant to the Supply Agreement (as defined below) in the immediately following calendar quarter. For the avoidance of doubt, any portion of the credit which is not used by the Seller during any calendar quarter shall carry over to the next quarter. The Credit shall be provided by the Purchaser in quarterly installments in accordance with Schedule 1.7(a) (each a "Quarterly Credit").

(b)     The total dollar amount of the Credit (the "Credit Amount") shall equal the value of the Inventory at Closing; *provided* that, in no event will the Credit Amount exceed fifteen million dollars ($15,000,000). For each component of Inventory, the value of the applicable component for purposes of determining the Credit Amount will be calculated as follows:

(i)     the value of API drug substance Inventory shall equal the agreed upon price for such API drug substance in the Supply Agreement (as set forth in Exhibit E);

(ii)     the value of work in process shall equal the costs as implemented on the first day of the month in which the Closing occurs, and shall be determined using the principles, estimation methodologies, procedures, and policies as used in the preparation of the unaudited balance sheet as of December 31, 2019, only to the extent it is consistent with GAAP.  For the avoidance of doubt, such work in process inventory shall be recorded as the lesser of cost or market value;

(iii)     the value of raw materials shall equal Seller's documented acquisition cost from third parties of such raw materials.

(c)     Within ten (10) Business Days after the Closing Date, the Seller shall deliver to Purchaser Seller's good faith calculation of the Credit Amount (such amount, the "Proposed Credit Amount"), together with reasonable supporting documentation.

(d)     During the sixty (60) day period following the Purchaser's receipt of the Proposed Credit Amount calculation, the Purchaser shall be permitted to review, and the Seller shall cooperate with the Purchaser's review of, Seller's relevant SAP reports, relevant batch records and any other relevant records and workpapers used to calculate the Proposed Credit Amount and if the Purchaser, in good faith, disagrees with the Proposed Credit Amount calculation prepared by the Seller, the Purchaser may dispute the Proposed Credit Amount (each such disagreement, a "Disputed Item") and send a written notice of dispute with regard to such Disputed Items (the "Notice of Objection") to the Seller, setting forth in reasonable detail the basis for its objection to each Disputed Item, and the Purchaser's proposal for any adjustment thereto.  If the Purchaser fails to provide a Notice of Objection within such sixty (60) day period, the Proposed Credit Amount shall be deemed the final Credit Amount and the Purchaser shall

14

provide the Seller with written confirmation of the corresponding Quarterly Credits resulting therefrom within two (2) Business Days thereafter.

(e)     If a timely Notice of Objection is delivered to the Seller, then (i) the Credit Amount shall become final and binding on the Seller and the Purchaser on the first to occur of (A) the date on which the Seller and the Purchaser resolve in writing any differences they have with respect to the matters specified in the Notice of Objection and (B) the date on which all Disputed Items are finally resolved in writing by the Independent Accountant (as defined below), in each case as provided below (the final amount of the Credit, following either such resolution is referred to as the "Final Credit Amount") and (ii) within two (2) Business Days of the determination of the Final Credit Amount, Purchaser shall provide the Seller with written confirmation of the corresponding Quarterly Credits resulting therefrom.  The Seller and the Purchaser shall seek in good faith to reach agreement as to any Disputed Item within ten (10) Business Days following delivery of the Notice of Objection.  If agreement is reached in writing within such 10-Business Day period as to all Disputed Items, the Seller and the Purchaser shall revise the Credit Amount accordingly and the Purchaser shall provide the Seller with written confirmation of the corresponding Quarterly Credits resulting therefrom within two (2) Business Days thereafter.  If the Seller and the Purchaser are unable to reach agreement within ten (10) Business Days following delivery of the Notice of Objection, then the Purchaser and Seller will engage (and, to the extent required, will execute a customary engagement agreement) an accounting firm of national reputation (excluding each of the Seller's and the Purchaser's respective regular outside accounting firms) as may be mutually acceptable to the Seller and the Purchaser (the "Independent Accountant") to review the Proposed Credit Amount and make a determination as to the resolution of any Disputed Item.  The determination of the Independent Accountant regarding the Proposed Credit Amount shall be delivered as soon as practicable following engagement of the Independent Accountant, but in no event more than thirty (30) days thereafter, and shall be final, conclusive and binding upon the Seller and the Purchaser and the Parties shall revise the Credit Amount accordingly, and the Purchaser shall provide the Seller with written confirmation of the corresponding Quarterly Credits resulting therefrom within two (2) Business Days of the delivery by the Independent Accountant of its final determination.  The scope of the disputes to be resolved by the Independent Accountant shall be limited to the unresolved Disputed Items and proposed adjustments set forth in the Notice of Objection, and the Independent Accountant shall not make any other determination.  The Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by one of the Parties, in the case of Seller, in the Proposed Credit Amount or in the case of the Purchaser, in the Notice of Objection.  Any determinations by the Independent Accountant and any work or analyses performed by the Independent Accountant in connection with its resolution of any dispute under this Section 1.7 shall not be admissible in evidence in any suit, action or proceeding between the Parties, other than to the extent necessary to enforce payment obligations under this Section 1.7.  The Seller and Purchaser shall each bear the cost of the Independent Accountant in inverse proportion as they may each prevail on matters resolved by the Independent Accountant, which proportionate allocations shall also be determined by the Independent Accountant at the time the determination of the Independent Accountant is rendered on the merits of the matters submitted.

15

(f)  Notwithstanding the foregoing, if prior to the determination of the Final Credit Amount pursuant to <u>Section 1.7(e)</u>, the Seller or its Affiliates or Purdue owe any amounts to the Purchaser pursuant to the Supply Agreement and there is a portion of the Credit Amount that is undisputed, then promptly (but no more than five (5) Business Days following the applicable entity's request), Purchaser shall deliver to the Seller a credit in an amount equal to the result of (i) the result of (x) the Proposed Credit Amount set forth in the calculation delivered by Seller pursuant to <u>Section 1.7(c)</u> minus (y) the amount of the Disputed Items (such difference, the "<u>Undisputed Credit Amount</u>"), divided by (ii) sixteen (16) (the "<u>Quarterly Undisputed Credit Amount</u>").  Within two (2) Business Days following delivery of the determination of the Final Credit Amount pursuant to <u>Section 1.7(e)</u>, (A) if the amount of the Final Credit Amount is greater than the Undisputed Credit Amount, then each Quarterly Credit following the final determination of the Final Credit Amount shall be increased by an amount equal to the amount of such difference divided by the number of quarters remaining in the sixteen (16) quarter period and (B) if the amount of the Final Credit Amount is the same as the Undisputed Credit Amount, then no further action shall be taken with respect to the Credit or the Quarterly Credit.

Section 1.8    <u>Treatment of Excluded Inventory</u>.

(a)  <u>Storage and Payment Obligations</u>. The Purchaser shall store Seller's Excluded Inventory (as defined below) in accordance with Seller's applicable storage procedures existing as of the Closing Date.  The Seller will reimburse the Purchaser for the reasonable, documented expenses incurred by the Purchaser for the storage of Seller's excluded inventory of Oxycodone API, consisting of  (i) Seller's Oxycodone API drug substance located at the Real Property as of the Closing Date ("<u>Excluded API Drug Substance</u>") and (ii) Seller's Oxycodone work in process located at the Real Property as of the Closing Date (the "<u>Excluded WIP</u>", and together with the Excluded API Drug Substance, the "<u>Excluded Inventory</u>") for the following time periods:  (A) in the case of Excluded API Drug Substance, for the period commencing as of the Closing Date and ending as of the date such particular Excluded API Drug Substance is shipped to Recipient (as defined in the Supply Agreement) in accordance with the Supply Agreement and (B) in the case of Excluded WIP, for the period commencing as of the Closing Date and ending as of the date such Excluded WIP has been transformed into Oxycodone API drug substance and is shipped to Recipient in accordance with the Supply Agreement.

(b)  <u>Manufacture, Delivery and Payment Obligations</u>.  The Purchaser will complete the manufacture of Seller's Excluded WIP and deliver to Recipient, in accordance with the terms of the Supply Agreement and a separate Product Addendum (which Product Addendum will relate only to the completion of Excluded WIP and the delivery of Excluded API Drug Substance and the Oxycodone API drug substance resulting from the completion of the manufacture of the Excluded WIP).  Notwithstanding the provisions set forth in <u>Section 4.1</u> of the Supply Agreement, the Recipient shall pay the Purchaser (i) any documented costs of delivery related to any Excluded API Drug Substance and (ii) an amount equal to the cost incurred by the Purchaser to complete the manufacture of Excluded WIP into Oxycodone API drug substance, which cost shall equal (i) the agreed upon price for Oxycodone API drug substance in the Supply Agreement (as set forth in <u>Exhibit E</u>) *minus* (ii) the cost of the Excluded WIP (as determined pursuant to <u>Section 1.7(b)(ii)(B)(1)</u>). The Parties will work together to

16

obtain any necessary regulatory approvals to allow Purchaser to complete the manufacture of the Excluded WIP.

(c)    Order of Priority. The Purchaser shall ship all Excluded API Drug Substance first, followed by any Oxycodone API drug substance manufactured using Excluded WIP, to Recipient prior to shipping any other Oxycodone API drug substance (including that manufactured by the Purchaser) to Recipient under the Supply Agreement.

Section 1.9    Proration of Expenses. All expenses described or listed on Schedule 1.9 relating to the Business, for any period commencing prior to the Closing Date and ending after the Closing Date, shall be prorated on a per diem basis between the Purchaser and the Seller as of the Closing Date and shall be treated as (i) an Assumed Liability, to the extent allocable to the period after the Closing, and (ii) as an Excluded Liability, to the extent allocable to the period prior to the Closing. Within one-hundred twenty (120) calendar days following the Closing Date, the Seller shall provide to the Purchaser a schedule setting forth the amount of expenses paid by the Seller and the portion of such expenses that shall be prorated to the Purchaser on a per diem basis pursuant to this Section 1.9 (the "Purchaser Expense Amount"). Within one-hundred twenty (120) calendar days following the Closing Date, the Purchaser will provide to the Seller a schedule setting forth the amount of expenses paid by the Purchaser and the portion of such expenses that shall be prorated to the Seller on a per diem basis pursuant to this Section 1.9 (the "Seller Expense Amount"). If the Purchaser Expense Amount is greater than the Seller Expense Amount, within thirty (30) calendar days following the later of (A) the delivery of the Seller Expense Amount if there is no dispute with respect thereto or (B) the resolution of any such dispute as provided in the final sentence of this Section 1.9, the Purchaser shall pay or cause to be paid to the Seller the amount by which the Purchaser Expense Amount exceeds the Seller Expense Amount by wire transfer of immediately available funds to an account or accounts designated by the Seller. If the Seller Expense Amount is greater than the Purchaser Expense Amount, within thirty (30) calendar days following the later of (x) receipt of the Seller Expense Amount if there is no dispute with respect thereto or (y) the resolution of any such dispute as provided in the final sentence of this Section 1.9, the Seller shall pay to the Purchaser the amount by which the Seller Expense Amount exceeds the Purchaser Expense Amount by wire transfer of immediately available funds to an account or accounts designated by the Purchaser. If the Parties dispute the Purchaser Expense Amount or the Seller Expense Amount, including the calculation thereof, the Parties shall apply, and comply with, the dispute resolution procedures set forth in Section 1.7(e), *mutatis mutandis*, with respect to any such dispute. Notwithstanding the foregoing, in the event an invoice, bill or assessment with respect to an expense described in this Section 1.9 is received after the Seller Expense Amount and Purchaser Expense Amount is finalized, the Seller or the Purchaser, as applicable, shall pay over to the other Party the amount that should have been paid by the Seller or the Purchaser, as applicable, pursuant to this Section 1.9 if such expenses were originally included in the calculation of the Seller Expense Amount or Purchaser Expense Amount, as applicable.

Section 1.10    Withholding. Purchaser and its Affiliates and their respective agents shall be entitled to deduct and withhold (or cause to be deducted and withheld) from any amounts payable pursuant to this Agreement or any Ancillary Documents, such amounts as are required to be deducted and withheld under the Code, or any applicable provision of U.S. federal, state or local or non-U.S. Law; provided, however, that other than to the extent the deduction or

withholding is attributable to Seller's failure to comply with <u>Section 2.2(a)(x)</u> of this Agreement or is with respect to any compensatory amounts, Purchaser shall take commercially reasonable efforts to provide Seller written notice of its intent to withhold from amounts payable to Seller at Closing pursuant to this Agreement and a description of the legal basis for such withholding at least ten (10) Business Days prior to Closing.  To the extent that amounts are so withheld, such amounts shall be timely paid over to the appropriate Taxing Authority and shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 1.11   <u>Purchase Price Allocation</u>.  The Parties agree to allocate for Tax purposes (and, as applicable, to cause their respective Affiliates to allocate for Tax purposes) the Purchase Price, the Credit and any other amounts treated as additional consideration for Tax purposes among the Purchased Assets in accordance with the following procedures and, to the extent applicable, in accordance with Section 1060 of the Code, the Treasury Regulations promulgated thereunder. Within ninety (90) days after the Closing Date, the Purchaser shall deliver to the Seller a proposed allocation of the Purchase Price, the Credit and any other amounts treated as additional consideration for Tax purposes as of the Closing Date (the "<u>Purchaser's Allocation</u>"). No later than thirty (30) days following the delivery of the Purchaser's Allocation, the Seller may deliver to the Purchaser a statement setting forth in reasonable detail any objections thereto, the basis for such objections, and the Seller's proposed allocation ("<u>Seller's Allocation Notice</u>").  If the Seller timely delivers to the Purchaser a Seller's Allocation Notice, the Seller and the Purchaser shall, during the twenty (20) days following such delivery, use commercially reasonable efforts to reach agreement on the disputed items or amounts.  The Purchaser's Allocation, if no Seller's Allocation Notice is timely delivered, or as adjusted pursuant to any agreement between the Seller and the Purchaser during the twenty (20)-day period following the timely delivery of Seller's Allocation Notice (the "<u>Allocation</u>") shall be final and binding on the Parties; *provided*, that if Seller's Allocation Notice is timely delivered and the Seller and the Purchaser are unable to reach agreement within such twenty (20)-day period, they shall not be required to reach agreement, and each Party shall file its respective Tax Returns in accordance with such allocation as it determines to be correct and consistent with applicable Law.  If an Allocation is determined pursuant to the foregoing provisions of this <u>Section 1.11</u>, each of the Parties (i) shall (and shall cause its Affiliates to) prepare and file all Tax Returns (and Internal Revenue Service Forms 8594) in a manner consistent with the Allocation and (ii) shall not (and shall cause its Affiliates not to) take any position on any Tax Return or in connection with any Tax proceeding inconsistent with the Allocation, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of applicable state, local or non-U.S. Law).

## ARTICLE II

## THE CLOSING

Section 2.1   <u>Closing</u>.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place remotely via the exchange of electronic documents by electronic mail at 10:00 a.m. local time as soon as possible (and in any event within two (2) Business Days) after the conditions set forth in <u>Article VI</u> shall have been satisfied or (if

permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver thereof at the Closing), or at such other time, date and place as the Parties hereto may mutually agree (the date of the Closing being herein referred to as the "Closing Date"); *provided* that, without the prior written consent of Purchaser and Seller, the Closing Date will be no sooner than January 1, 2021.  For financial, accounting and economic purposes, including risk of loss, and for all other purposes under this Agreement, upon the occurrence of the Closing, the Closing shall be deemed to have occurred at 12:01 a.m., New York City time, on the Closing Date.

Section 2.2    Deliveries at the Closing.

(a)    At the Closing, the Seller shall deliver or cause the applicable Relevant Subsidiaries or other Affiliate (to the extent named below) to deliver to the Purchaser or Purchaser's designated Affiliate:

(i)    a bill of sale transferring the Purchased Assets to the Purchaser in a form to be mutually agreed by the parties (the "Bill of Sale"), duly executed by the Seller and the Relevant Subsidiaries;

(ii)    a quitclaim deed for the Real Property, in the form attached hereto as Exhibit B, duly executed by the Seller.

(iii)    an assignment and assumption agreement to be entered into between the Seller and the Purchaser in a form to be mutually agreed by the parties (the "Assignment and Assumption Agreement"), duly executed by the Seller;

(iv)    the Supply Agreement, duly executed by Purdue (or an Affiliate or successor);

(v)    the Quality Agreement Amendment (as defined below), duly executed by Purdue;

(vi)    the Transition Services Agreement (as defined below), duly executed by Purdue;

(vii)    the R&D Building Lease (as defined below), duly executed by the Seller or an Affiliate of the Seller;

(viii)    the Manufacturing Building and Warehouses Lease (as defined below), duly executed by the Seller or an Affiliate of the Seller;

(ix)    the Upper Mill Building Sublease (as defined below), duly executed by the Seller;

(x)    a properly completed and duly executed IRS Form W-9 of the Seller and each Relevant Subsidiary; *provided* that, if any such entity is treated as disregarded as separate from its owner for U.S. federal income tax purposes, the Seller

shall provide, or cause to be provided, a properly completed and duly executed IRS Form W-9 of the regarded owner of such entity;

      (xi)     the certificates described in Section 6.3(c);

      (xii)    a copy of the Sale Order entered on the docket by the Bankruptcy Court;

      (xiii)   a list of all Cure Costs that are due and payable as of, or immediately following, the Closing to the applicable Assigned Contract counterparties;

      (xiv)   the Patent Assignment Agreement, duly executed by Seller; and

      (xv)    such other documents reasonably satisfactory to the Purchaser as the Purchaser may reasonably request in writing no later than three (3) Business Days prior to the Closing Date in order to give effect to the Acquisition.

      (b)     At the Closing, the Purchaser shall deliver to the Seller:

      (i)      the Purchase Price, by wire transfer of immediately available funds to an account or accounts designated by the Seller;

      (ii)     the Assignment and Assumption Agreement, duly executed by the Purchaser;

      (iii)    the Supply Agreement, duly executed by the Purchaser;

      (iv)    the Quality Agreement Amendment, duly executed by the Purchaser;

      (v)     the Transition Services Agreement, duly executed by the Purchaser;

      (vi)    the certificate described in Section 6.2(c);

      (vii)   the Bill of Sale, duly executed by the Purchaser;

      (viii)   the R&D Building Lease, duly executed by the Purchaser;

      (ix)    the Manufacturing Building and Warehouses Lease, duly executed by the Purchaser;

      (x)     the Upper Mill Building Sublease, duly executed by the Purchaser;

      (xi)    evidence of all DEA registrations and Permits required for the Purchaser to operate the Business, including satisfying its obligations under the Supply Agreement;

(xii)    the Patent Assignment Agreement, duly executed by the Purchaser; and

(xiii)    such other documents reasonably satisfactory to the Seller as the Seller may reasonably request in writing no later than three (3) Business Days prior to the Closing Date in order to give effect to the Acquisition.

Section 2.3    Deliveries Post-Closing.  Following the Closing, the Purchaser shall deliver to the Seller the Credit or Credits, as applicable, as finally determined pursuant to, and on the timetable set forth in, Section 1.7 hereof.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in the disclosure letter delivered by the Seller to the Purchaser immediately prior to the execution of this Agreement (the "Seller Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Seller Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article III for which it is reasonably apparent on the face of such disclosure that such disclosure is relevant to such other section), the Seller represents and warrants to the Purchaser as follows:

Section 3.1    Qualification, Organization.  The Seller is a legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of its jurisdiction of organization and has all requisite partnership or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.  The Seller is qualified to do business and is in good standing (with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Seller is not in violation of any of the provisions of its certificate of organization or partnership agreement (or equivalent organizational documents), in each case, except for violations that have not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All of the Relevant Subsidiaries are directly or indirectly wholly-owned and controlled by the Seller.

Section 3.2    Authority of the Seller.  The Seller has all requisite partnership power and authority to execute and deliver and, subject to the entry on the docket of the Sale Order, to perform its obligations under this Agreement and each of the Ancillary Documents to which the Seller is a party.  The execution, delivery and performance of this Agreement and such Ancillary Documents by the Seller and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite partnership action of the Seller, and no other proceedings (pursuant to the Seller's organizational documents, partnership agreement or otherwise) on the part of the Seller is necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.

Subject to the entry on the docket of the Sale Order, this Agreement and each such Ancillary Document have been duly and validly executed and delivered by the Seller, and, assuming the due authorization, execution and delivery of this Agreement and each such Ancillary Document by the Purchaser, as applicable, constitute a valid and binding agreement of the Seller, enforceable against each such Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect and to general equitable principles (collectively, the "Enforceability Limitations").

Section 3.3    Consents and Approvals.  Except as set forth on Section 3.3 of the Seller Disclosure Letter, no consent, approval, Permit or authorization of, or declaration, filing or registration with, any Governmental Entity is necessary or required to be made or obtained by the Seller or any Relevant Subsidiary in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents to which a Seller or any Relevant Subsidiary is a party and the consummation of the transactions contemplated hereby and thereby, except in connection with or compliance with any applicable requirements of the Bankruptcy Court, except for such consents, approvals, Permits, authorizations, declarations, filings or registrations, which, if not made or obtained, would not reasonably be expected to have a Material Adverse Effect.

Section 3.4    No Violations.  Except as described in Sections 3.3 and 4.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Seller, any Relevant Subsidiary of Seller nor the consummation by the Seller of the transactions contemplated hereby or thereby will (i) conflict with or result in any violation or breach of any provisions of the organizational documents of the Seller, any Relevant Subsidiary of Seller, (ii) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which the Seller, any Relevant Subsidiary of Seller is a party or by or to which any of its properties, rights or assets are bound or subject, (iii) result in the creation or imposition of any Encumbrance on any Purchased Asset other than (A) with respect to the execution and delivery of this Agreement, Permitted Pre-Closing Encumbrances and (B) with respect to the execution and delivery of the Ancillary Documents and with respect to the performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, the Permitted Post-Closing Encumbrances, in each case, on any properties, rights or assets of the Seller, any Relevant Subsidiary of Seller or (iv) conflict with or violate any Order or Law applicable to the Seller, any Relevant Subsidiary or its respective properties, rights or assets, except in the case of the foregoing clauses (ii) and (iii), for breaches, violations, defaults, rights, creations or impositions that (y) have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (z) are excused by or unenforceable as a result of the entry on the docket of the Sale Order.

Section 3.5    Financial Information.

(a)    The Seller has made available to the Purchaser copies of the following: (i) unaudited financial information for the Seller and its consolidated subsidiaries: for

each fiscal quarter beginning with the quarter ended March 31, 2018 and ending with the quarter ended June 30, 2020 (collectively, the "Quarterly Financial Information"): (x) balance sheet as of the last day of each fiscal quarter during such period, (y) statement of cash flows for the three months ended on the last day of each fiscal quarter during such period and (z) statement of profit (loss) for the three months ended on the last day of each fiscal quarter during such period, (ii) a statement of inventory by product line as of June 30, 2020 and (iii) a cost center budget summary for 2020 (collectively, the "Financial Information"). The Financial Information was prepared by the Seller in good faith in accordance with the Books and Records of the Seller and its consolidated subsidiaries and generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby (except as may be indicated in the notes to the financial statements and subject to year-end audit adjustments).

(b)      The Books and Records maintained with respect to the Seller and its consolidated subsidiaries and used in the preparation of the Financial Information accurately and fairly reflect, in all material respects, the transactions and the assets and liabilities of the Seller and its consolidated subsidiaries.

Section 3.6      Title to Property; Sufficiency of Assets.

(a)      The Seller and the applicable Relevant Subsidiaries have, as applicable, good and valid title to, a valid leasehold interest in or all rights to use, all of the Purchased Assets (other than the Real Property), subject to the Permitted Post-Closing Encumbrances. Notwithstanding the forgoing, no representation or warranty is made under the preceding sentence in this Section 3.6(a) in respect of any Intellectual Property matters, which are addressed with respect to such matters exclusively in Section 3.10 (as to which no representation or warranty with respect to such matters is made except as set forth in Section 3.10). Upon the entry and effectiveness of the Sale Order, the Seller and the applicable Relevant Subsidiaries will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser the Purchased Assets, and at the Closing, the Seller will sell, assign, transfer, convey and deliver, or cause the applicable Relevant Subsidiaries to sell, assign, transfer, convey and deliver to the Purchaser good title to, or, in the case of personal property leased by the Seller, a valid leasehold interest in, the Purchased Assets (other than the Real Property), free and clear of all Encumbrances other than Permitted Post-Closing Encumbrances. The Purchased Assets that are tangible personal property are in good working condition and repair, ordinary wear and tear excepted.

(b)      After giving effect to Section 1.5(c), Section 1.5(d) and except (x) as set forth in Section 3.6(b) of the Seller Disclosure Letter, (y) for the Excluded Assets specifically set forth in Sections 1.2(a)-(v) of this Agreement and (z) as would not be material to the Business, the Purchased Assets, together with the assets to be provided pursuant to the Supply Agreement, the services to be provided pursuant to the Transition Services Agreement and the Intellectual Property licensed, and other assets and rights provided to the Purchaser under the Supply Agreement, constitute (and with respect to the representation at the time of Closing, will constitute): (i) all properties, assets, rights and interests that relate exclusively to, are exclusively used or held exclusively for use in the Business during the twelve (12) months prior to the date hereof and as of the Closing (other than such properties, assets, rights and interests that have been disposed of in the ordinary course of business consistent with past practice prior to the

Closing in accordance with this Agreement), (ii) all of the properties, assets, rights and interests that were necessary and sufficient to own, operate and conduct the Business during the twelve (12) months prior to the date hereof in all material respects (other than such properties, assets, rights and interests that have been disposed of in the ordinary course of business consistent with past practice prior to the Closing and, if disposed of after the date hereof, in accordance with this Agreement) and (iii) all properties, assets, rights and interests of the Business listed on the Quarterly Financial Information for the most recent quarterly period  (other than such properties, assets, rights and interests that have been acquired, or have been disposed of in the ordinary course of business consistent with past practice, prior to the Closing in accordance with this Agreement).

(c)    The only Purchased Assets owned by the Relevant Subsidiaries are those described on Schedule 3.6(c).

Section 3.7    Absence of Certain Changes. Solely with respect to the Business, the Purchased Assets and the Assumed Liabilities, since July 1, 2020 until the date of this Agreement, (a) there has not occurred any Effect that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (b) the Seller has not settled, compromised or waived any Action which would impose any monetary obligation on the Purchaser or the Business which is not an Excluded Liability, (c) the Seller has not taken any action with respect to the Business, the Purchased Assets or the Assumed Liabilities which, if taken after the date hereof, would require the consent of the Purchaser pursuant to clause (ii) of Section 5.1(b)(vi), Section 5.1(b)(viii), Section 5.1(b)(x) and Section 5.1(b)(xi) and (c) except as would not be material to the Business taken as a whole, the Business has not suffered any material damage, destruction or loss, or any material interruption in use, of any material assets or properties (whether or not covered by insurance).

Section 3.8    Brokers or Finders.  Other than AlixPartners LLC and PJT Partners LP, the Seller has not employed or engaged any investment banker, broker or finder who is entitled to any fee or any commission in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby.

Section 3.9    Litigation.  Except as would not, individually or in the aggregate, have a Material Adverse Effect and except for the Chapter 11 Cases:

(a)    there are no Actions currently pending or, to the Knowledge of the Seller, currently threatened against the Seller, and there are no orders, judgments or decrees of or settlement agreements with, any Governmental Entity, in each case that relates to the Business or Purchased Assets; and

(b)    the Seller has not received written notice of, and to the Knowledge of the Seller, there are no, Orders of a court of competent jurisdiction outstanding against the Seller with respect to the Business or any of the Purchased Assets.

(c)    Notwithstanding the foregoing, no representation or warranty is made under this Section 3.9 in respect of any (i) Tax matters, which are addressed exclusively in Section 3.18 (as to which no representation or warranty is made except as set forth in

Section 3.18) and (ii) Intellectual Property matters, which are addressed exclusively in Section 3.10 (as to which no representation or warranty is made except as set forth in Section 3.10).

Section 3.10    Intellectual Property.

(a)    Section 3.10(a) of the Seller Disclosure Letter includes a list of all (i) issued, registered, or applied for Patents and Copyrights included in the Purchased Assets, and all such Patents and Copyrights are subsisting and in full force and effect.  The Seller exclusively owns all Intellectual Property expressly set forth in Section 3.10(a) of the Seller Disclosure Letter, and other Purchased IP, free and clear of all Encumbrances (other than Permitted Pre-Closing Encumbrances).  To the Knowledge of the Seller, as of the date hereof, the operation of the Business has not been in the past six (6) years and as currently conducted is not infringing, misappropriating or otherwise violating any Intellectual Property of any other Person, except as would not be material to the Business taken as a whole.   The Seller owns, or to the Knowledge of the Seller, is granted a valid and enforceable right pursuant to a written agreement to use, all Intellectual Property used in, or that are necessary for, the operation of the Business, including as currently conducted; *provided* that the foregoing is not a representation or warranty with respect to infringement, misappropriation, or other violation of Intellectual Property rights.

(b)    As of the date hereof, there are no material Actions pending or, to the Knowledge of the Seller, threatened in writing against the Seller alleging that the operation of the Business by the Seller is or was in the past three (3) years infringing, misappropriating or otherwise violating the Intellectual Property of any other Person in any material respect.

(c)    To the Knowledge of the Seller as of the date hereof, no Person is materially infringing, misappropriating, or otherwise violating any Purchased IP.

(d)    As of the date hereof, there are no Actions pending or threatened in writing against any Person by the Seller, alleging that such Person is infringing, misappropriating or otherwise violating any of the Purchased IP.

(e)    To the Knowledge of the Seller as of the date hereof, and except as would not, individually or in the aggregate, have a Material Adverse Effect, (i) the Seller in respect of the conduct of the Business is in compliance with applicable Law, as well as its own policies, relating to privacy, data protection, including with respect to the collection, storage, processing, transfer disposition, and use of personal information and other sensitive information collected, used, or held for use by the Seller or any of its Subsidiaries, and (ii) as of the date hereof, in respect of the conduct of the Business, no claims are or were in the past three (3) years, pending or threatened in writing against the Seller or any of its Subsidiaries alleging a violation of any Person's privacy rights or rights in personal information or any data protection or privacy Laws with respect thereto.

(f)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties contained in this Section 3.10 are the only representations and warranties being made by the Seller in this Agreement with respect to the validity of, the right to register, or the infringement, misappropriation, dilution or other violation of, Intellectual

Property rights, or the violation of any Laws or rights with respect to privacy, data protection or rights in personal information.

Section 3.11    Real Property.

(a)    The Seller and the Relevant Subsidiaries have good and insurable title to the Real Property, free and clear of all Encumbrances other than Permitted Pre-Closing Encumbrances. As of the date hereof, there are no pending condemnation or similar proceedings affecting the Real Property, and to the Knowledge of the Seller, no such action is or threatened in writing. Except as disclosed in Section 3.11(a) of the Seller Disclosure Letter, there are no written or oral leases, subleases, licenses, occupancy agreements or other Contracts granting to any Person (other than the Seller and its Affiliates) the right to use or occupy the Real Property and there is no Person (other than the Seller and its Affiliates) in possession of the Real Property.

Section 3.12    Material Contracts.

(a)    Section 3.12(a) of the Seller Disclosure Letter contains a complete and correct list, as of the date hereof, of each Contract described below in this Section 3.12(a) under which the Seller has any current or future rights, responsibilities, obligations or liabilities in connection with the Business (in each case, whether contingent or otherwise) or to which the Seller is a party or to which any of its properties or assets is subject relating to the Business, other than the Seller's Benefit Plans listed on Section 3.14(a) of the Seller Disclosure Letter (all Contracts of the type described in this Section 3.12(a), whether or not set forth on Section 3.12(a) of the Seller Disclosure Letter, being referred to herein as the "Material Contracts"):

(i)    requires expenditures by the Seller involving consideration in excess of two-hundred fifty thousand dollars ($250,000) relating to the Business in the next twelve (12)-month period;

(ii)    provides for payments to be received by the Seller in excess of two-hundred fifty thousand dollars ($250,000) relating to the Business in any twelve (12)-month period;

(iii)    by its express terms prohibits the Seller, or which would prohibit the Purchaser or any of its Affiliates from and after the Closing, from competing with other entities or marketing any product, or provides for "exclusivity" or sole source supplier, "most-favored nation" (solely with respect to contracts where the Business supplies a customer) or any similar requirement in favor of any Person other than the Seller, in each case as it relates to and affects the Business as it is presently conducted;

(iv)    with respect to material Purchased IP, (1) any license or covenant not to sue with respect to such Purchased IP granted pursuant to any Contract and (2) any Contracts restricting the Seller's or any of its Subsidiaries' ability to enforce, use, license, transfer or disclose any such Purchased IP, in each case (in respect of the foregoing (1) and (2)), other than (x) contracts to which the Purchaser is a party, (y) material transfer agreements, clinical trial agreements, nondisclosure agreements, services agreements and supply agreements, in each case, entered into in the ordinary course of business and in

26

which grants of rights to use Intellectual Property are non-exclusive, incidental to and not material to performance under the Contract and (z) Contracts for generally commercially available nonexclusively licensed software and other technology entered into in the ordinary course of business;

(v)     any material Contract that relates to the ongoing supply or Manufacturing at the Real Property;

(vi)     is a settlement, conciliation or similar agreement (x) with any Governmental Entity or (y) pursuant to which the Business will have any material outstanding obligation after the date of this Agreement (excluding for the avoidance of doubt contracts disclosed pursuant to clauses (i) – (v) or (vii) – (xiii));

(vii)     is for the employment or engagement of any Business Employees or independent contractors providing services primarily or exclusively to the Business at annual compensation in excess of one-hundred thousand dollars ($100,000) which is not terminable by the Seller at will without any severance obligations and (y) any Assigned Employment Agreements;

(viii)     each Contract under which the Seller or the Business is obligated to (A) sell, transfer, or otherwise dispose of any material assets of the Business (other than sales of Inventory or sales of obsolete assets in the ordinary course of business) or (B) purchase or acquire (by merger, consolidation, combination or otherwise) any Person or all or substantially all of the assets of any Person, in the case of each of clauses (A) and (B), having a value in excess of two-hundred fifty thousand dollars ($250,000);

(ix)     each Contract under which the Seller or the Business has (A) created, incurred, assumed or guaranteed any outstanding Indebtedness, (B) granted an Encumbrance on any of the material assets of the Business, whether tangible or intangible, to secure such Indebtedness or (C) extended credit to any Person in an amount in excess of one-hundred thousand dollars ($100,000) of committed credit, excluding extensions of credit pursuant to credit terms used in the ordinary course of business;

(x)     each Contract establishing any material joint venture, strategic alliance or other similar collaboration;

(xi)     any proxy or power of attorney;

(xii)     each Contract with a Material Supplier; and

(xiii)     each contract with a Material Customer.

(b)     Section 3.12(b) of the Seller Disclosure Letter sets forth each Contract between Seller and an Affiliate of the Seller relating to the Business (which shall be considered Material Contracts for purposes of this Agreement).

(c)     True and complete copies of each Material Contract in effect as of the date hereof have been made available to the Purchaser.  Excluding the effect of the Chapter 11 Cases,

27

the Seller is not in breach of or default under the terms of any Material Contract, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of the Seller, as of the date hereof, no other party to any Material Contract is in breach of or default under the terms of any Material Contract where such breach or default has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Material Contract is a valid, binding and enforceable obligation of the Seller party thereto and, to the Knowledge of the Seller, of each other party thereto, and is in full force and effect, subject to the Enforceability Limitations.

(d)     With respect to each Assigned Contract, assuming the due authorization, execution and delivery thereof by the other party or parties thereto, (i) each Assigned Contract is a valid and binding obligation of the Seller, to the Knowledge of the Seller, each other party or parties thereto, in accordance with its terms and is in full force and effect, subject to the Enforceability Limitations, (ii) the Seller is not, and, to the Knowledge of the Seller, no other party thereto is in default in the performance (including with respect to the due and proper payment required thereunder), observance or fulfillment of any obligation, covenant or condition contained in each of the Assigned Contracts and (iii) to the Knowledge of the Seller, as of the date of this Agreement, no event has occurred that would, with or without notice or lapse of time or both, result in any breach or violation of or constitute a default or give rise to any right of termination, acceleration, vesting, payment, exercise or revocation under any Assigned Contract, except, with respect to clauses (i), (ii) and (iii) above, where any of the foregoing would not, individually or in the aggregate, have a Material Adverse Effect.

(e)     Section 3.12(e) of the Seller Disclosure Letter sets forth the Seller's good faith calculation of the Cure Costs with respect to each Assigned Contract as of the date hereof.

(f)     Schedule 1.2(r) includes all Contracts described in clauses (i) through (xiii) of Section 3.12(a) that are between an Affiliate of Seller and a third party that relate to the Business.

Section 3.13   Compliance with Laws; Permits.

(a)     Each of the Seller and its Subsidiaries is, and has for the past twelve (12) months been, in compliance in all material respects with and is not in default under or in violation in any material respect of any Laws applicable to the Business. Notwithstanding the forgoing, no representation or warranty is made under this Section 3.13 in respect of any (i) Intellectual Property matters or violation of any Laws or rights with respect to privacy and data protection, which are addressed exclusively in Section 3.10 (as to which no representation or warranty is made except as set forth in Section 3.10), (ii) compliance with respect to employee benefits Laws, which are addressed by Section 3.14, (iii) compliance with respect to Environmental Laws, which are addressed by Section 3.16, (iv) compliance with respect to healthcare regulatory Laws addressed by Section 3.17 or (v) compliance with respect to Tax Laws, which are addressed by Section 3.18.

(b)     The Seller and the Relevant Subsidiaries are in possession of all franchises, grants, authorizations, business licenses, permits, easements, variances, exceptions, consents, certificates, approvals, registrations, clearances and orders of any Governmental Entity or pursuant to any applicable Law necessary for the Seller to own, lease and operate the Purchased Assets or conduct the Business (the "Permits"), except where the failure to have any of the Permits has not had and would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all Permits are in full force and effect, no default (with or without notice, lapse of time or both) has occurred under any such Permit.  The Seller and Relevant Subsidiaries have not received any written notice from any Governmental Entity threatening to suspend, revoke, withdraw or modify any such Permit.

Section 3.14   Employee Benefit Matters.

(a)     Section 3.14(a) of the Seller Disclosure Letter sets forth a complete and correct list of each material Benefit Plan.  The Seller has made available to the Purchaser copies of documents embodying each such material Benefit Plan.  The Seller has furnished the Purchaser with the most recent Internal Revenue Service determination or opinion letter issued with respect to each Benefit Plan subject to Section 401(a) of the Code and, to the Knowledge of the Seller, nothing has occurred since the issuance of each such letter that could reasonably be expected to cause the loss of the tax-qualified status of any such Benefit Plan.

(b)     (i) except as would not, individually or in the aggregate, result in a material liability to Purchaser or its Affiliates on or after the Closing Date, each Benefit Plan has been administered in all material respects in accordance with its terms and in compliance with applicable Law and no event has occurred and no condition exists with respect to each Benefit Plan that would reasonably be expected to subject, the Purchaser or any of its Affiliates to any material Tax, fine, lien, penalty or other liability imposed by ERISA, the Code or any other applicable Law, (ii) except as would not, individually or in the aggregate, have a Material Adverse Effect, none of the Benefit Plans promises or provides retiree medical or other retiree welfare benefits to any person except as required by applicable Law and (iii) except as would not, individually or in the aggregate, have a Material Adverse Effect, all contributions and payments required to be made by the Seller or any ERISA Affiliate to any Benefit Plan have been paid when due.

(c)     Neither the Seller nor any ERISA Affiliate has, within the three (3) year period prior to the date hereof, maintained, sponsored, participated in, contributed to, or been obligated to contribute to, or otherwise incurred any obligation or liability (including any contingent liability) under (i) any "multiemployer plan" (as defined in Section 3(37) of ERISA) or (ii) except as would not, individually or in the aggregate, have a Material Adverse Effect, any "pension plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA or Section 412 of the Code.  Neither the Seller nor any ERISA Affiliate has any actual or potential withdrawal liability for any complete or partial withdrawal (as defined in Sections 4203 and 4205 of ERISA) from any multiemployer plan.

(d)     Other than as provided for in, or as required by, this Agreement, the consummation of the Acquisition, whether alone or in combination with any other event, will not

(i) entitle any current or former employee of the Seller or any ERISA Affiliate to severance benefits or any other payment (including unemployment compensation, golden parachute, bonus or benefits) under any Benefit Plan; or (ii) accelerate the time of payment or vesting of any such benefits or increase the amount of compensation due any such current or former employee under any Benefit Plan.

Section 3.15    Labor Matters.

(a)    The Seller has made available to the Purchaser a true, complete, and correct list of (i) the name of all individuals actively employed by the Seller at the Real Property primarily or exclusively in connection with the Business (the "Business Employees") and individual independent contractors engaged by Seller primarily or exclusively in connection with the Business and the country and state in which the individual normally works, (ii) the employing entity for each such Person, (iii) the position, date of hire, current annual base salary or wage rate, current bonus entitlement, discretionary COVID-19 premium pay rate or commission rate, (iv) the exempt or non-exempt classification of such Person under the Fair Labor Standards Act, (v) whether each such Person is employed on a full-time or part-time basis, (vi) the leave status of each such Person (including whether such absence is excused or unexcused, the type of leave, the nature of any re-employment rights, and the anticipated return date if known) and (vii) the paid-time-off/vacation balance of each such person.

(b)    The Seller and the Business are not a party to, or bound by, any CBA.  In the three (3) years prior to the date of this Agreement, there has been no actual or, to the Knowledge of the Seller, threatened unfair labor practice charge, material labor grievance, Action, labor arbitration, labor strike, slowdown, lockout, handbilling, picketing, work stoppage, or other labor dispute involving the Seller or the Business Employees, which would, individually or in the aggregate, be material to the Business. In the three (3) years prior to the date of this Agreement, no labor union, works council, other labor organization, or group of Business Employees has made a demand for recognition or certification with respect to the Business, and there are no representation or certification proceedings presently pending or threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority with respect to the Business Employees. In the three (3) years prior to the date of this Agreement, there have been no labor organizing activities with respect to any Business Employees.

(c)    With respect to the Business Employees, the Seller is, and for the past three (3) years has been, in compliance with all applicable Laws relating to labor, employment, and employment practices including those relating to labor management relations, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), overtime, discrimination, sexual harassment, retaliation, civil rights, affirmative action, work authorization, immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), whistleblowing, disability rights or benefits, equal opportunity, plant closures and layoffs (including the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws ("WARN Act")), employee trainings and notices, workers' compensation, employee leave, COVID-19, unemployment insurance, safety and health and continuation coverage under group health plans,

except, in each case, for failures to comply that have not had and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)     To the Knowledge of the Seller, no findings or results of any drug screening or criminal background check performed on Business Employees has occurred that would reasonably be expected to bring the Seller, the Business, or the relevant Business Employee into material disrepute.

Section 3.16   Environmental Matters.

(a)     Except as disclosed in Section 3.16(a) of the Seller Disclosure Letter: (i) the Seller and the Relevant Subsidiaries, the Purchased Assets, and the Business are in compliance in all material respects with all applicable Environmental Laws, (ii) the Seller and the Relevant Subsidiaries possess all Permits and approvals required pursuant to any applicable Environmental Law or, as such relates to exposure to Hazardous Substances, to health and safety that are required to own, lease and operate the Purchased Assets or conduct the Business, and are in compliance in all material respects with all such Permits and approvals, (iii) none of the Seller, the Relevant Subsidiaries or the Business (or any Person for whom Seller, the Relevant Subsidiaries or the Business has liability or responsibility) has released, treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or exposed any Person to, any Hazardous Substances at any location (including at, on, from or under the Real Property) which, to the Knowledge of the Seller, is or has been contaminated by any substance, in a manner or condition that has resulted in or would reasonably be expected to result in a material liability (contingent or otherwise) of the Relevant Subsidiaries or the Business under any Environmental Laws, (iv) there is no Action currently pending or, to the Knowledge of the Seller, threatened alleging that a Seller, the Relevant Subsidiaries or the Business (or any Person for whom the Seller, Relevant Subsidiaries or the Business has liability or responsibility) is or may be in violation of or liable under, any Environmental Law and (v) none of the Seller, the Relevant Subsidiaries, or the Business have entered into or agreed to any consent decree or Order, and neither the Business or the Purchased Assets are subject to any Order, relating to compliance with or liabilities arising under Environmental Laws (including with respect to the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Substances).

(b)     With respect to the Environmental Indemnity Agreement, (i) the Seller is not in material breach of or default of such agreement; (ii) to the Knowledge of the Seller, as of the date hereof, no other party to any Material Contract is in material breach of or default under the terms of any Material Contract; and (iii) except as has not had and would not reasonably be expected to be material to the Business, such agreement is a valid, binding and enforceable obligation of the Seller party thereto and, to the Knowledge of the Seller, of each other party thereto, and is in full force and effect, subject to the Enforceability Limitations.

(c)     Seller and the Relevant Subsidiaries have made available to Purchaser copies of any material environmental audits, assessments and reports and all other documents materially bearing on environmental, health or safety liabilities relating to the past or current operations, properties or facilities of the Business (including without limitation the Real Property), in each case which are in its possession or under its reasonable control.

Section 3.17    Healthcare Regulatory Matters.

(a)    Section 3.17(a) of the Seller Disclosure Letter sets forth a true and complete list, as of the date hereof, and the Seller has made available to the Purchaser true and complete copies of, all Regulatory Authorizations from the FDA, the DEA, the EMA, Health Canada and all material Regulatory Authorizations from other applicable Regulatory Authorities held by the Seller relating to the Inventory or necessary to conduct the Business.  All such Regulatory Authorizations are (i) in full force and effect, and (ii) in good standing, valid and enforceable.

(b)    Since January 1, 2018, the Seller is in compliance with all applicable Health Laws that affect the Inventory and the Business, except where the failure to so comply would not, individually or in the aggregate, have a Material Adverse Effect.  As of the date hereof, (i) the Seller has not received any written notice from any Regulatory Authority (A) withdrawing any Regulatory Authorization relating to the Inventory or (B) alleging any violation of any Health Law related to the Business and (ii) there are no Governmental Entity investigations (except routine audits), suits, claims, actions or proceedings pending, or to the Knowledge of the Seller, threatened against the Seller with respect to the Inventory or the Business alleging a violation of any Health Law, except where the failure to so comply would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    Other than as set forth on Section 3.17(c) of the Seller Disclosure Letter, as of the date of this Agreement, neither the Seller nor, to the Knowledge of the Seller, any Person acting on the Seller's behalf has, with respect to the Business, (i) been subject to a Regulatory Authority shutdown or import or export prohibition or (ii) received any FDA Form 483, or other written Regulatory Authority notice of inspectional observations, "warning letters," "untitled letters" or demand to make any change to any API or any processes or procedures relating to the Business.

(d)    Neither the Seller nor, to the Knowledge of the Seller, any of its officers, employees, or agents, acting for the Seller has (i) made an untrue statement of a material fact or fraudulent statement to any Regulatory Authority or (ii) failed to disclose a material fact required to be disclosed to any Regulatory Authority.  To the Knowledge of the Seller, none of its respective officers, employees, agents is or has been convicted of any crime that has resulted in, or would reasonably be expected to result in, debarment from participation in any program related to pharmaceutical products pursuant to 21 U.S.C. Section 335a (a) or (b) or exclusion from participation in any federal health care program pursuant to 42 U.S.C. Section 1320a-7.

(e)    Except as disclosed in Section 3.17(e) of the Seller Disclosure Letter, since January 1, 2018, no API that is or has been manufactured, tested, distributed, held or marketed by or on behalf of the Seller in the Business has been recalled, withdrawn or suspended (whether voluntarily or otherwise) or, to the Knowledge of the Seller, has been adulterated or misbranded.  No Actions seeking the recall, withdrawal, suspension or seizure of any such API are pending or, to the Knowledge of the Seller, threatened against the Seller.

(f)     The representations and warranties set forth in this <u>Section 3.17</u> are the sole and exclusive representations and warranties of the Seller with respect to the healthcare regulatory matters.

Section 3.18    <u>Taxes</u>.

(a)     (i) All income and other material Tax Returns required to be filed on or before the Closing Date by or on behalf of the Seller or any Relevant Subsidiary with respect to the Business and the Purchased Assets have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and (ii) all income and other material Taxes due payable by or on behalf of the Seller or any Relevant Subsidiary on or before the Closing Date with respect to the Business and the Purchased Assets (whether or not shown on any Tax Returns) have been duly and timely paid.

(b)     As of the date of this Agreement, no audit or other proceeding with respect to any income or other material Taxes or material Tax Returns with respect to the Business or the Purchased Assets is currently in progress, or has been proposed or threatened in writing.

(c)     The Seller has not received written notice of any income or other material outstanding, proposed or assessed Tax deficiency that has not been paid, accrued for or been contested in good faith and in accordance with applicable Law, with respect to the Business or the Purchased Assets.

(d)     There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, income or other material Taxes due from Seller (solely as it relates to the Business or the Purchased Assets) for any taxable period and no request for any such waiver or extension is currently pending.

(e)     There are no liens for Taxes upon any of the Purchased Assets other than liens for Taxes that are Permitted Pre-Closing Encumbrances.

(f)     The Seller is not currently nor has been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treasury Regulations Section 1.6011-4(b)(2) (or similar provision of state, local or non-U.S. Law).

(g)     To the extent applicable and to the extent the Seller or a Relevant Subsidiary is disregarded as separate from its owner for U.S. federal state, local or other applicable income Tax purposes, references to such entity in this <u>Section 3.18</u> shall include references to such entity's regarded owner for U.S. federal, state, local or other applicable income Tax purposes; provided that any representation with respect to such entity's regarded owner in this <u>Section 3.18</u> shall be limited to the knowledge of such entity.

Section 3.19    <u>Insurance</u>.  <u>Section 3.19</u> of the Seller Disclosure Letter sets forth a complete and correct list, as of the Closing Date, of all material insurance policies and bonds

maintained by the Seller or any of its Affiliates with respect to the Business, the Purchased Assets or the Assumed Liabilities.

Section 3.20    Material Customers; Material Suppliers.  Section 3.20 of the Seller Disclosure Letter sets forth a true and complete list, as of the date hereof, of (a) the ten (10) largest customers of the Business (each a "Material Customer") and (b) the ten (10) largest suppliers of the Business (each a "Material Supplier"), in each case based on dollar volume of sales to such customers or the dollar volume of purchases from such suppliers, as the case may be, for the fiscal year 2019 (including the amount of such dollar volume sales or purchases during such period).  Since January 1, 2020, no Material Customer or Material Supplier has communicated to Seller or its Subsidiaries an intention to terminate or cancel its relationship with the Business or to materially reduce, or adversely modify in any material respect the pricing and volume terms of, its purchase or sale (as the case may be) of the goods or services of or to (as the case may be) the Business, whether then or in the future.

Section 3.21    No Other Representations.  Except for the representations and warranties contained in Article IV, the Seller acknowledges that it (i) has had an opportunity to conduct any and all due diligence with respect to the Purchaser and its Subsidiaries in connection with the transactions contemplated hereby, (ii) has relied solely upon its own independent review, investigation, or inspection of any documents in connection with the transactions contemplated hereby and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Purchaser or its Subsidiaries or with respect to any other information provided or made available to such Seller in connection with the transactions contemplated hereby (all of which have been and are disclaimed by Purchaser), or the completeness of any information provided in connection therewith.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Except as disclosed in the disclosure letter delivered by the Purchaser to the Seller immediately prior to the execution of this Agreement (the "Purchaser Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Purchaser Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article IV for which it is reasonably apparent on its face that such disclosure is relevant to such other section), the Purchaser represents and warrants to the Seller as follows:

Section 4.1    Qualification; Organization. The Purchaser is a legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, except where the failure to be so existing and in good standing or to have such power and authority would not, individually or in the aggregate, materially impair or materially delay its ability to perform its obligations under this Agreement.

The Purchaser is qualified to do business and is in good standing (with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing, would not, individually or in the aggregate, materially impair or materially delay its ability to perform its obligations under this Agreement.

Section 4.2    Authority of the Purchaser.  The Purchaser has all requisite corporate power and authority to execute and deliver and perform its obligations under this Agreement and each of the Ancillary Documents to which it is a party (subject to entry of the Sale Order).  The execution, delivery and performance of this Agreement and such Ancillary Documents by the Purchaser and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate action of the Purchaser, as applicable, and no other corporate proceedings (pursuant to any of the Purchaser's organizational documents or otherwise) on the part of the Purchaser is necessary to authorize the consummation of, and to consummate the transactions contemplated hereby and thereby.  This Agreement and each such Ancillary Document has been, or at or prior to Closing (as the case may be) will be, duly and validly executed and delivered by the Purchaser to the extent a party thereto, and, assuming the due authorization, execution and delivery of this Agreement by the Seller, constitute a valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the Enforceability Limitations.

Section 4.3    Consents and Approvals.  Except as set forth on Section 4.3 of the Purchaser Disclosure Letter, no consent, approval, permit or authorization of, or declaration, filing or registration with, any Governmental Entity is necessary or required to be made or obtained by the Purchaser or its Affiliates in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, permits, authorizations, declarations, filings or registrations that would not, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.4    No Violations.  Except as described in Sections 3.3 and 4.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Purchaser to the extent a party thereto nor the consummation by the Purchaser of the transactions contemplated hereby or thereby will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of the Purchaser, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which the Purchaser is a party or by or to which any of its properties, rights or assets are bound or subject or (c) conflict with or violate any Order or Law applicable to the Purchaser or its properties, rights or assets, except in the case of the preceding clauses (b) and (c), for breaches, violations, defaults, rights, creations or impositions that would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.5    Compliance with Laws.  The Purchaser is in compliance with and is not in default under or in violation of any Laws applicable to the Purchaser or any of its properties or assets, except where such non-compliance, default or violation has not and would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.6    Litigation.  Except as would not, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement or as set forth on Section 4.6 of the Purchaser Disclosure Letter:

(a)    There are no Actions currently pending or, to the Knowledge of the Purchaser, currently threatened, against the Purchaser, and there are no orders, judgments or decrees of or settlement agreements with, any Governmental Entity binding upon the Purchaser; and

(b)    the Purchaser has not received written notice of, and to the Knowledge of the Purchaser, there are no, Orders of a court of competent jurisdiction outstanding against the Purchaser.

Section 4.7    Brokers.  The Purchaser has not employed any investment banker, broker or finder in connection with the transactions contemplated hereby who might be entitled to any fee or any commission from the Seller in connection with this Agreement or upon consummation of the Acquisition or any of the other transactions contemplated hereby based upon arrangements made by the Purchaser.

Section 4.8    Financing.  On the Closing Date, the Purchaser will have, sufficient funds available to deliver the Purchase Price to the Seller and consummate the transactions contemplated by this Agreement and the Ancillary Documents which occur on the Closing Date.

Section 4.9    Healthcare Regulatory Matters.

(a)    Since January 1, 2018, the Purchaser is in compliance with, and has implemented appropriate internal controls that are reasonably designed to ensure it is in compliance with (i) all applicable Health Laws, except where the failure to so comply would not, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement or any of the Ancillary Documents.  As of the date hereof, the Purchaser has not received any written notice from any Regulatory Authority in any jurisdiction alleging noncompliance with or a violation of any Health Law and there are no Regulatory Authority investigations (except routine audits), suits, claims, actions or proceedings pending, or to the Knowledge of the Purchaser, threatened against the Purchaser alleging a violation of any Health Law.

(b)    Purchaser is not subject to any corporate integrity agreements, deferred prosecution agreements, monitoring agreements or consent decrees with or imposed by any Regulatory Authority and, to the knowledge of Purchaser, (i) the imposition of any such agreement or decree is not currently pending and (ii) Purchaser has not received written notice that the imposition of any such agreement or decree is currently contemplated or proposed.

(c)     Since January 1, 2018, no Purchaser facility at which Purchaser currently intends to, or could in the future, manufacture active pharmaceutical ingredients under the Supply Agreement has (i) been subject to a Regulatory Authority shutdown or import or export prohibition or (ii) received any FDA Form 483, or other written Regulatory Authority notice of inspectional observations, "warning letters," "untitled letters" or demand to make any change to any active pharmaceutical ingredient or any processes or procedures relevant to the manufacturing of active pharmaceutical ingredients.  All material Regulatory Authorizations held by the Purchaser relating to such facilities are (i) in full force and effect, and (ii) in good standing, valid and enforceable.

(d)     Since January 1, 2018, all material reports, documents, claims, registrations or notices required to be filed, maintained or furnished to FDA, DEA or any other Regulatory Authority in any jurisdiction have been so filed, maintained or furnished in a timely manner. All such reports, documents, claims, registration and notices were complete and accurate in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

(e)     Neither Purchaser nor, to the Knowledge of the Purchaser, any officers, employees, or agents, acting for the Purchaser has (i) made an untrue statement of a material fact or fraudulent statement to any Regulatory Authority or (ii) failed to disclose a material fact required to be disclosed to any Regulatory Authority.  Purchaser has complied in all material respects with data integrity requirements, including those set forth in FDA guidance documents, and no alleged failure to adhere to such requirements has resulted in the delayed manufacture, review, approval, or release of any finished drug product containing (or intended to contain) active pharmaceutical ingredients manufactured by Purchaser.

(f)     Neither Purchaser nor, to the Knowledge of the Purchaser, any of its officers, employees, agents is or has been convicted of any crime that has resulted in, or would reasonably be expected to result in, debarment from participation in any program related to pharmaceutical products pursuant to 21 U.S.C. Section 335a (a) or (b) or exclusion from participation in any federal health care program pursuant to 42 U.S.C. Section 1320a-7.

(g)     Since January 1, 2018, no active pharmaceutical ingredient manufactured or tested by Purchaser has been recalled, withdrawn or suspended (whether voluntarily or otherwise) or, to the knowledge of Purchaser, has been adulterated or misbranded.  No Actions seeking the recall, withdrawal, suspension or seizure of any such active pharmaceutical ingredient is pending or, to the Knowledge of the Purchaser, threatened against the Purchaser.

Section 4.10    No Other Representations. Except with respect to and without limiting Purchaser's reliance upon, the representations and warranties contained in Article III or in any Ancillary Document, the Purchaser acknowledges that it (i) has had an opportunity to conduct any and all due diligence with respect to the Seller and its Subsidiaries in connection with the transactions contemplated hereby, (ii) has relied solely upon its own independent review, investigation, or inspection of any documents in connection with the transactions contemplated hereby and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Seller or its Subsidiaries or with respect to any other information provided or made

available to such Seller in connection with the transactions contemplated hereby (all of which have been and are disclaimed by the Seller), or the completeness of any information provided in connection therewith.

## ARTICLE V
## COVENANTS

Section 5.1    Conduct of Business Pending the Closing.

(a)    From the date hereof through the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, except as set forth in Section 5.1(a) of the Seller Disclosure Letter, and except (i) as expressly contemplated by this Agreement or any Ancillary Document, (ii) as required by applicable Law (including the Bankruptcy Code), (iii) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed) or (iv) as required by the Chapter 11 Cases or otherwise required by any Order of the Bankruptcy Court, the Seller shall, and shall cause the Relevant Subsidiaries to, (x) conduct the Business in all material respects in the ordinary course of business consistent with past practice and (y) use its commercially reasonable efforts to preserve, maintain and protect the goodwill, material business relationships and the assets and properties of the Business in all material respects (ordinary wear and tear excepted).

(b)    From the date hereof through the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, except (i) as set forth in Section 5.1(b) of the Seller Disclosure Letter, (ii) as expressly contemplated by this Agreement or any Ancillary Document, (iii) as required by applicable Law (including the Bankruptcy Code), (iv) as consented to in writing by the Purchaser (such consent not to be unreasonably withheld, conditioned or delayed) or (v) as required by the Chapter 11 Cases or otherwise required by any Order of the Bankruptcy Court, the Seller shall not, and shall cause the Relevant Subsidiaries not to, with respect to the Business, the Purchased Assets or the Assumed Liabilities, directly or indirectly:

(i)    (v) other than in the ordinary course, acquire, (w) dispose of or sell (other than Inventory in the ordinary course), (x) transfer, lease, license, sublicense, (y) covenant not to assert, abandon, let lapse, pledge, subject to an Encumbrance (other than a Permitted Pre-Closing Encumbrance), in each case of (v), (w), (x) and (y) any asset that would otherwise be a Purchased Asset or (z) directly or indirectly, disclose or provide access to any Person any trade secrets or other material confidential information (including any personal information) that is included in the Purchased Assets (other than to an employee of Seller and third parties who are authorized to access such trade secrets and confidential information and is bound by customary confidentiality and non-disclosure provisions with respect to such trade secrets and other trade secrets and confidential information);

(ii)    create any Encumbrance or permit to exist any Encumbrance (in each case, other than Permitted Pre-Closing Encumbrances) on any Purchased Assets;

(iii)    (x) other than in the ordinary course of business, voluntarily terminate, amend in any material respect, waive any material rights under, any Material Contract included in the Purchased Assets or enter into any Contract that would have been a Material Contract if it had been entered into prior to the date hereof or amend or extend any Material Contract included in the Purchased Assets or (y) enter into any Contract involving the sale of any APIs or purchase of any narcotic raw materials which are included in the Purchased Assets;

(iv)    other than in the ordinary course of business, settle, compromise or waive any Action (x) materially affecting the value of the Business, the Purchased Assets or the Assumed Liabilities or (y) which would impose any monetary obligation on the Purchaser or the Business which is not an Excluded Liability;

(v)    fail to use commercially reasonable efforts to (i) maintain existing insurance policies included in the Purchased Assets or (ii) renew or replace existing insurance policies included in the Purchased Assets following their termination;

(vi)    with respect to Business Employees, (i) increase the compensation or benefits payable to such employees (including any increase in compensation due to COVID-19 or increasing the duration of any discretionary COVID-19-based increase in compensation past December 31, 2020) other than in the ordinary course of business; or (ii) grant any bonus, severance, retention or termination pay, other than in the ordinary course of business pursuant to any Benefit Plan in effect as of the date hereof;

(vii)    (i) hire or engage any employee or independent contractor to work for the Business other than in the ordinary course of business or to fill vacancies; (ii) reassign the duties of a Business Employee such that he or she is no longer a Business Employee; (iii) reassign the duties of any other employee of Seller such that he or she would be a Business Employee; or (iv) other than as a reasonable response to any Law, Order, directive, guideline or recommendation by any Governmental Entity in connection with or concerning COVID-19 or to any actual or reasonably anticipated material and sustained downturn in the Business due to COVID-19, furlough, layoff or terminate (other than for cause) any Business Employee;

(viii)    with respect to the Business Employees, enter into, modify, or extend a CBA or recognize or certify any labor union, labor organization, works council, or group of Business Employees as the bargaining representative for any Business Employees;

(ix)    other than as reasonably required in response to any Law, Order, directive, guideline or recommendation by any Governmental Entity in connection with or concerning COVID-19 or to any actual or reasonably anticipated material and sustained downturn in the Business due to COVID-19, implement any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs, salary or wage reductions, work schedule changes or other such actions that could implicate the WARN Act with respect to the Business Employees;

(x)     make any material change in its accounting or Tax reporting methods, principles or policies other than as required by Law or GAAP, except to the extent such changes do not materially affect the calculation of the financial statements;

(xi)     (A) make, change or rescind any material Tax election; (B) enter into any tax sharing agreement or closing agreement; (C) settle or compromise any claim, notice, audit report or assessment in respect of any Tax; (D) surrender any claim for a refund of any Taxes; (E) file any amended Tax Returns; (F) consent to any extension or waiver of the limitations period applicable to any claim or assessment or (G) file any Tax Return other than one prepared in accordance with past practice, in each case, except as otherwise could not reasonably be expected to adversely affect the Purchaser or its Affiliates;

(xii)     waive or release any noncompetition, nonsolicitation, nondisclosure, noninterference, nondisparagement, or other restrictive covenant obligation of any current or former Business Employee or independent contractor of the Business, in each case with respect to the Business;

(xiii)     other than in the ordinary course of business or as required to effectuate or prepare for the consummation of this Agreement or the Transition Services Agreement, surrender, terminate, withdraw, cancel, transfer or modify any Permit;

(xiv)     other than expenditures that in the aggregate would not cost more than $100,000 in excess of the ordinary course expenditures, commit to incur any capital expenditures, or any obligations or liabilities in connection therewith, or fail to make or delay any capital expenditures (including delaying or extending the timeline for any existing or in process capital expenditure projects);

(xv)     engage in any stockpiling, channel stuffing, excess purchasing or excessive sales or discounting activity with respect to inventory, supplies, raw materials or finished products;

(xvi)     fail to pay post-petition obligations as they become due and payable under the Assigned Contracts, unless such obligations are being contested in good faith; or

(xvii)     agree or authorize, in writing or otherwise, to take any of the foregoing actions.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) the Purchaser shall not directly have the right to control or direct the operations of the Seller, or the Business prior to the Closing and (ii) prior to the Closing, the Seller shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, control and supervision over the Business and its operations.

Section 5.2     <u>Access and Information</u>.

(a)    Subject to applicable Law, the Seller shall, and shall cause its Affiliates to, afford to the Purchaser and its Representatives reasonable access during normal business hours and upon reasonable advance notice to all of the Seller's properties, offices and Books and Records and, during such period, the Seller shall furnish as promptly as practicable to the Purchaser all information (financial, environmental or otherwise) the Purchaser may reasonably request, in each case, related to the Business, the Purchased Assets or the Assumed Liabilities, for any purpose related to the consummation of the transactions contemplated by this Agreement, preparing for the post-Closing operation of the Business or for the purpose of completing its environmental, health and safety due diligence; provided, however, that no invasive or intrusive environmental sampling or investigation shall be permitted during such period. Notwithstanding the foregoing, the Seller shall not be required by this <u>Section 5.2(a)</u> to provide the Purchaser or its Representatives with access to or to disclose information (i) that is prohibited from being disclosed pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) the disclosure of which would violate applicable Law or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege; *provided* that, in the event the Seller withholds access to any such information, the Seller will (x) inform the Purchaser that such information has been withheld and (y) use reasonable best efforts to provide such information in a manner which would not be prohibited or which would not violate applicable Law or cause the loss of any privilege.  For the avoidance of doubt, information obtained pursuant to this <u>Section 5.2(a)</u> shall be subject to the Confidentiality Agreement.  The Confidentiality Agreement shall automatically terminate and have no further force or effect from and after the Closing with respect to the Business, Purchased Assets or Assumed Liabilities but shall remain in effect with respect to any Excluded Assets or other information to the extent regarding Seller or its Affiliates and not the Business, Purchased Assets or Assumed Liabilities.

(b)    From and after the Closing for a period of six (6) years following the Closing Date (or, if later, the closing of the Chapter 11 Cases), the Purchaser will provide the Seller, any of the Seller's Affiliates, any trusts established under a Chapter 11 plan of the Seller or any other successors of the Seller, and any advisors thereto with reasonable access (for the purpose of examining and copying), during normal business hours, at Seller's (or the expense of any Affiliate or successor of the Seller) sole expense and upon reasonable advance notice, to the Books and Records and batch records relating to the Purchased Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing and reasonable access, during normal business hours (and without unreasonably disrupting the business of the Purchaser), at the Seller's sole expense and upon reasonable advance notice, to employees, officers, advisors, accountants, offices and properties (including for the purpose of better understanding such Books and Records) of the Purchaser, in each case, for purposes relating to the Chapter 11 Cases, or requests of any Regulatory Authority, actions to which the Seller is a party, insurance claims, tax payments, returns or audits or the functions of any trusts established under a Chapter 11 plan of the Seller. Notwithstanding the foregoing, the Purchaser shall not be required by this <u>Section 5.2(b)</u> to provide the Seller or its Representatives with access to or to disclose information (i) that is prohibited from being disclosed pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) the disclosure of which would violate applicable Law or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege; <u>provided</u> that, in the event the Purchaser withholds access to any such information, the Purchaser will (x) inform the Seller that

such information has been withheld and (y) use reasonable best efforts to provide such information in a manner which would not be prohibited or which would not violate applicable Law or cause the loss of any privilege. Unless otherwise consented to in writing by the Seller, the Purchaser will not, for a period of six (6) years following the Closing Date (or, if later, the closing of the Chapter 11 Cases), destroy or otherwise dispose of any of the material Books and Records and batch records (other than additional copies thereof) without first offering to surrender to the Seller, or any trusts established under a Chapter 11 plan of the Seller or any other successors of the Seller, such Books and Records or batch records or any portion thereof that the Purchaser may intend to destroy or dispose of.

(c)    In the event that either party is prohibited from disclosing information pursuant to Section 5.2(a)(i) or 5.2(b)(i), as the case may be, pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, such party shall use commercially reasonable efforts to obtain the required consent of the third party that is required in order to disclose such information or otherwise disclose such information in such manner as would not be prohibited.

(d)    Notwithstanding the foregoing, nothing herein will apply to or govern the maintenance of or access to drug master files, which will instead be addressed in the Supply Agreement.

Section 5.3    Leaseback Transaction, and Sublease.

(a)    At Closing, the Seller or one of its Affiliates and the Purchaser shall enter into (i) a leaseback agreement based on the term sheet attached hereto as Exhibit C-1 (the "R&D Building Lease"), pursuant to which the Purchaser will lease to the Seller or one of its Affiliates a portion of the R&D Building located on the Real Property, and (ii) a leaseback agreement based on the term sheet attached hereto as Exhibit C-2 (the "Manufacturing Building and Warehouses Lease"), pursuant to which the Purchaser will lease to the Seller or one of its Affiliates portions of the Manufacturing Building and Warehouses located on the Real Property.

(b)    Subject to the consent of the landlord of the Upper Mill Building, at Closing, the Seller or one of its Affiliates and the Purchaser shall enter into a sublease agreement based on the term sheet attached hereto as Exhibit C-3 (the "Upper Mill Building Sublease"), pursuant to which the Seller will sublease to the Purchaser or one of its Affiliates a portion of the Upper Mill Building.

Section 5.4    Approvals and Consents; Cooperation; Notification.

(a)    Subject to the terms and conditions of this Agreement, each Party hereto shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated hereby as soon as practicable after the date hereof, including (i) preparing and filing or otherwise providing, in consultation with the other Parties and as promptly as practicable and advisable after the date hereof, all documentation to effect all necessary applications, notices, petitions, filings, and other documents and to obtain as promptly as practicable all waiting period expirations or terminations, consents, clearances, waivers,

licenses, orders, registrations, approvals, permits, and authorizations necessary or advisable to be obtained from any third party or any Governmental Entity in order to consummate the transactions contemplated hereby, and (ii) taking all steps as may be necessary to obtain all such waiting period expirations or terminations, consents, clearances, waivers, licenses, registrations, permits, authorizations, orders and approvals.

(b)     In connection with and without limiting the foregoing, the Seller shall give any notices to third parties required under Assigned Contracts, and the Seller shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain third party consents to any Assigned Contracts that cannot be transferred or assigned effectively without the consent of such third parties (after giving effect to the Sale Order and the Bankruptcy Code).  Nothing in this Section 5.4(b) shall require the Seller or any Affiliate thereof to make any expenditure or incur any obligation on its own or on behalf of the Purchaser unless funds in the full amount thereof are advanced to the Seller in cash.

(c)     The Seller and the Purchaser shall give prompt notice to the other of the occurrence or failure to occur of an event that would, or with or without notice or lapse of time or both would, cause any condition to the consummation of the transactions contemplated hereby for the benefit of the other Parties hereto not to be satisfied.

(d)     Notwithstanding the foregoing, the obligations of the Parties hereto (i) to obtain any consent, approval or waiver from the Bankruptcy Court shall be governed exclusively by Section 5.8 and Section 5.9 and (ii) with respect to Regulatory Authorizations shall be governed exclusively by Section 5.15.

Section 5.5     Further Assurances.  In addition to the provisions of this Agreement, from time to time after the Closing Date, the Seller and the Purchaser shall use reasonable best efforts to execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Purchased Assets to the Purchaser and the assumption of the Assumed Liabilities by the Purchaser; *provided*, that nothing in this Section 5.5 shall (i) require the Seller or any of its Affiliates to make any non de minimis, out-of-pocket expenditure or incur any obligation on their own or on behalf of the Purchaser beyond those obligations contemplated hereby to be borne by them (unless funds in the full amount thereof are advanced to the Seller in cash) or (ii) prohibit the Seller or any of its Affiliates from ceasing operations or winding up its affairs following the Closing.  If, following the Closing, the Seller receives or becomes aware that it holds any asset, property or right which constitutes an Purchased Asset, then the Seller shall transfer such asset, property or right to the Purchaser or, as applicable, one or more designees of the Purchaser as promptly as practicable for no additional consideration.  If, following the Closing, the Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Purchaser shall transfer such asset, property or right to the Seller as promptly as practicable for no additional consideration.

Section 5.6      Clarification and Oxycodone Notice Obligations.

(a)      Each Party agrees that the only activities (including but not limited to sales) that are being expressly authorized under this Agreement or any Ancillary Document with respect to making, using, offering for sale, selling, importing or distributing by or on behalf of any Person of any Oxycodone Product or Oxycodone API, are the sales or supply of Oxycodone API to Seller, its Affiliates and Bard Pharmaceuticals Limited in accordance with and subject to the Supply Agreement, unless expressly authorized by a subsequent writing executed by both Parties and/or its Affiliate.  Each Party acknowledges that, except as otherwise expressly provided in the Supply Agreement, no Purdue Intellectual Property rights have been, or will be, terminated or exhausted based upon any activity by Purchaser or any of its Affiliates in respect of Oxycodone whatsoever and neither Purchaser nor any of its customers shall have any implied rights or rights by estoppel relating to the Purdue Intellectual Property in respect of Oxycodone. Except to the extent expressly set forth in this Agreement or any of the Ancillary Documents, no license or any other right in respect of any Purdue Intellectual Property shall be or has been granted, expressly or implicitly, to Purchaser or any of its Affiliates under this Agreement or the Ancillary Documents.  Seller, on behalf of itself and its Affiliates, expressly reserves all of its rights to assert claims of infringement, misappropriation or other violation for any unlicensed or unauthorized activities in respect of Oxycodone Products, any Oxycodone API, any other active pharmaceutical ingredients and any other products and to seek all remedies available at law or in equity with respect to any such claims. For clarity, (i) this Section 5.6 is not intended to, and shall not, (x) prohibit or restrict the Purchaser or any of its Affiliates from (1) using any Intellectual Property that it owns from and after the Closing in such manner as they determine in their sole discretion or (2) engaging in any particular activity or business, or (y) be a non-compete or similar restrictive covenant (provided that, for clarity, in respect of the foregoing (x) and (y) no rights, express or implied, with respect to any Purdue Intellectual Property are granted under this Section 5.6), and (ii) nothing in this Section 5.6 shall limit, modify, waive or amend the rights or obligations of either Party to the extent expressly set forth in this Agreement or in any Ancillary Document.

(b)      In furtherance of the foregoing, commencing as of Closing, with respect to any Oxycodone and any Oxycodone Finished Product (collectively, the "Oxycodone Products") Purchaser shall, and shall cause its Affiliates, to provide written notice to its and their customers that are recipients of Oxycodone and Oxycodone Finished Product as follows:

"You are hereby notified that in connection with transactions contemplated by an Asset Purchase Agreement, dated as of September 14, 2020 (the "APA"), including any related supply agreements, [Seller] has transferred ownership to [Purchaser] of its manufacturing facility at [Real Property] and that no license or covenant not to sue, express or implied, has been granted to [Purchaser] or any of its agents, representatives, API distributors, customers or end users under the APA for the using, offering to sell, selling, importing, exporting, distributing or making of active pharmaceutical ingredient or finished dosage form containing oxycodone or any modifications or derivatives (including any salts) thereof, including oxycodone hydrochloride and controlled-release oxycodone to any third parties.  The APA does not modify or supersede any other licenses or covenants not to sue between [Seller] and its affiliates, on the one hand, and [Purchaser] and its affiliates, on the other hand, in effect prior to the date of the APA."

This Section 5.6 shall, automatically and immediately, become ineffective and of no force or effect and cease to apply upon the expiration of that certain Settlement Agreement between the Parties dated December 21, 2012.

(c)     Purchaser agrees that it shall be a breach of this Agreement if it fails to comply with Section 5.6(a) or Section 5.6(b) unless such breach is cured by Purchaser within fifteen (15) Business Days after Purchaser's receipt of a written notice of such breach from Seller specifying such breach.

Section 5.7     Cure Costs.  The Seller shall deliver to the Purchaser a list of all Cure Costs that are due and payable as of, or immediately following, the Closing at least five (5) Business Days prior to the Closing Date. Subject to Section 1.5(e), at the Closing, the Purchaser shall pay or cause one of its Affiliates to pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, the Cure Costs.

Section 5.8     Cooperation with Respect to Bankruptcy Court Approvals. The Purchaser shall take such actions as are reasonably requested by the Seller to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (i) demonstrating that the Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (ii) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.9     Bankruptcy Court Filings.  On or before September 14, 2020, the Seller shall file, or cause to be filed, any motions, pleadings, notices or proposed Orders necessary or advisable in order to receive approval of the Sale Order by the Bankruptcy Court.  The Seller shall consult with the Purchaser concerning the Sale Order and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and, to the extent reasonably practicable, provide the Purchaser with copies of any material applications, pleadings, notices, proposed Orders and other documents to be filed by the Seller in the Chapter 11 Cases that relate to this Agreement, the Acquisition or the Purchaser at least two (2) Business Days prior to the making of any such filing or submission to the Bankruptcy Court.

Section 5.10     Communications with Customers and Suppliers.  Prior to the Closing, the Purchaser shall not, and shall cause its Affiliates and Representatives not to contact, or engage in any discussions or otherwise communicate with, the Seller's customers, suppliers, licensors, licensees and other Persons with which the Seller has commercial dealings without obtaining the prior written consent of the Seller (other than any such communication in the ordinary course of business of the Purchaser or its Affiliates without reference to the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement); *provided* that the Seller may not unreasonably withhold or delay consent for the Purchaser or its Affiliates to contact, or engage in any discussions or otherwise communicate with, Bard Pharmaceuticals Limited.

Section 5.11     Employee Matters.

(a)    Effective as of the Closing, each Transferred Employee shall cease participation in each Retained Benefit Plan and the Seller will retain all liabilities and obligations under the Retained Benefit Plans and no assets or liabilities of any Retained Benefit Plan will be transferred to the Purchaser or any benefit plan maintained by Purchaser and no Transferred Employee (as defined below) shall accrue any benefits under any Retained Benefit Plans in respect of service with Purchaser or any of its Affiliates after the Closing.

(b)    Effective as of and contingent upon the Closing Date, Purchaser or one of its Affiliates shall make offers of employment to (and Seller shall terminate the employment of) each of the Business Employees listed on a list mutually agreed by the Parties (the "Offer Employees") who are actively at work as of the Closing Date.  Such offers of employment shall be made by at least fifteen (15) days prior to the anticipated Closing Date, or within five (5) Business Days of the applicable date of hire with respect to any such Offer Employee hired by the Seller within the fifteen (15)-day period prior to the Closing Date.  Subject to the provisions of this Section 5.11(b), each offer of employment to an Offer Employee shall be to provide (i) the same or substantially similar position and title held by such Offer Employee as of immediately prior to the Closing, (ii) the same or substantially similar duties, authority and responsibilities performed by such Offer Employee as of immediately prior to the Closing, (iii) a primary work location at the Real Property, (iv) the same base salary or base wage rate and annual cash target bonus opportunities as provided to such Offer Employee by the Seller as of immediately prior to the Closing and (v) other employee benefits (but excluding equity or equity based compensation or incentive based compensation other than as set forth in clause (iv)) that are no less favorable in the aggregate than those provided to similarly situated employees of the Purchaser.  Effective immediately following the Closing, Purchaser or an Affiliate of Purchaser shall employ each Offer Employee who continues to be an employee of the Seller as of immediately prior to the Closing, and prior to the Closing executes an offer letter with Purchaser or an Affiliate of Purchaser in a form to be mutually agreed upon between Purchaser and Seller, which form shall contain Purchaser's standard employee confidentiality provisions (each such individual, a "Transferred Employee").  In the event any Offer Employee who is not actively at work as of the Closing Date becomes available for and able to return to active work within the ninety (90) days following the Closing Date, Purchaser or its Affiliate shall offer employment to (and Seller shall terminate) such Offer Employee effective upon the date such Offer Employee is available for and able to return to active work.  Such offer by Purchaser or its Affiliate shall be on the terms set forth in this Section 5.11.

(c)    For a period of one (1) year following the Closing Date (the "Continuation Period"), the Purchaser shall or shall cause one of its Affiliates to provide each Transferred Employee with (i) base salary or base wage rates and annual cash target bonus opportunities that are not less than those in effect for each such Transferred Employee immediately prior to the Closing and (ii) employee benefits (but excluding equity based compensation and incentive based compensation other than as set forth in clause (ii)) that are no less favorable than those provided to similarly situated employees of the Purchaser; provided, however, that in no event shall Purchaser or its Affiliates be required to provide any Transferred Employee any discretionary COVID-19 increase in base salary, base wages or other compensation for any period on or after January 1, 2021. With respect to each Transferred Employee who is terminated without cause by the Purchaser or one of its Affiliates during the Continuation Period, the Purchaser shall, or shall cause one of its Affiliates to, provide such Transferred Employee with

severance payments and benefits under the applicable Benefit Plan set forth on Schedule 5.11(c). On the Closing Date, for each Transferred Employee, the Purchaser shall, or shall cause its Affiliates to, assume all accrued and unused paid time off of each such Transferred Employee. Notwithstanding the foregoing, with respect to Offer Employees employed in the State of Rhode Island ("RI Employees"), Seller shall request each RI Employee to elect whether such RI Employee desires to have his or her accrued but unused paid time off paid out upon Closing by Seller or transferred to Purchaser or one of its Affiliates (the "PTO Elections"). Prior to the Closing Date (the "Election Deadline"), Seller will provide Purchaser with a list of all responses to the PTO Elections. For those RI Employees who (a) become Transferred Employees and (b) elect in writing for accrued but unused paid time off to be transferred to Purchaser or its Affiliates, Purchaser will assume such accrued but unused paid time off. Within the time frame required by applicable Law, Seller shall pay all accrued but unused paid time off to each RI Employee who either (i) does not become a Transferred Employee, (ii) elects in writing by the Election Deadline for such RI Employee's accrued but unused PTO to be paid out by Seller on the Closing Date, or (iii) fails to respond in writing to the PTO Election by the Election Deadline.

(d)    Purchaser and its Affiliates will have no obligations or other liabilities under this Agreement with respect to any Offer Employee who does not accept an offer of employment in compliance with Section 5.11(b) (any such employee, a "Non-Transferred Employee"). Seller shall be exclusively responsible for all liabilities arising from Seller's employment of any such Non-Transferred Employee or Seller's termination of such employment (including any severance and other similar costs), and all such liabilities will constitute Excluded Liabilities under this Agreement.

(e)    Purchaser shall, or shall cause one of its Affiliates to, provide to each Transferred Employee full credit for such Transferred Employee's service with the Seller prior to the Closing for purposes of eligibility to participate and vesting, and, with respect to paid time off and severance only determining the level of benefits (other than defined benefit pension accruals, long-term incentive plans or equity based compensation plans maintained by Purchaser or one of its Affiliates), under any benefit plan in which such Transferred Employee participates on or following the Closing (including severance as provided under Section 5.11(c)) to the same extent and for the same purpose such service was recognized by the Seller immediately prior to the Closing under the corresponding Retained Benefit Plan; *provided*, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits or coverage. The Purchaser shall, or shall cause one of its Affiliates to use commercially reasonable efforts to: (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements, and requirements to show evidence of good health under any applicable health and welfare plan of the Purchaser or any of its Affiliates to the extent such requirements were met or otherwise waived under a corresponding Retained Benefit Plan and (ii) credit each such Transferred Employee with all eligible payments, co-payments and co-insurance paid by such Transferred Employee under any Retained Benefit Plan prior to the Closing Date during the plan year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum under any corresponding benefit plan of the Purchaser or any Affiliate for such plan year.

(f)     As of or as soon as administratively practicable following the Closing Date, Purchaser shall allow  (or shall cause one of its Affiliates to cover) each Transferred Employee who is a participant in a Retained Benefit Plan that is a tax-qualified defined contribution plan  ("Seller 401(k) Plan") to participate under a tax-qualified defined contribution plan established or maintained by Purchaser or one of its Affiliates ("Purchaser 401(k) Plan"), in accordance with the terms of the Purchaser 401(k) Plan.  Effective not later than sixty (60) days following the Closing Date, the Purchaser shall (or shall cause one of its Affiliates to) the applicable Purchaser 401(k) Plan to accept eligible rollover distributions (as defined in Section 402(c)(4) of the Code) from Transferred Employees accounts under the Seller 401(k) Plan, to the extent permitted by the Purchaser 401(k) Plan, with respect to any account balances (including notes for plan loans) distributable in cash within an administratively reasonable time after the Closing Date.

(g)     With respect to any Transferred Employee who, as of the Closing Date, was a participant in the Seller's Key Employee Retention Plan (the "KERP"), subject to any approval of the Bankruptcy Court that may be required with respect to the KERP and such Transferred Employee's participation therein, Seller shall be responsible for and shall pay any amounts payable under the KERP to such Transferred Employee in accordance with the terms and conditions of the KERP.

(h)     Within five (5) Business Days immediately preceding the Closing Date, Seller will provide the Purchaser with a schedule setting forth the termination date (and if applicable, return date), work location and name of each Business Employee who has or will suffer an "employment loss" (including as a result of a furlough or reduction in hours) under the WARN Act during the ninety (90) day period prior to the Closing Date. For a period of ninety (90) days after the Closing Date, the Purchaser shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of employees of the Purchaser which, if aggregated with any such conduct on the part of the Seller prior to the Closing Date, would trigger the WARN Act.  The Parties agree that the covenants set forth in this Section 5.11 shall not apply to employees who are furloughed, terminated, temporarily laid off or subject to reduced hours or benefits as a result of COVID-19-related circumstances.

(i)     Nothing in this Section 5.11 shall constitute or be construed (i) as an amendment, termination or other modification of any employee benefit or compensation plan or arrangement, or a restriction or other limitation on the right of any Party hereto to amend, terminate or otherwise modify any such plans or arrangements, (ii) as a guarantee of employment for any period, or a restriction or other limitation on the right of any Party hereto to terminate the employment or the terms and conditions of employment of any individual at any time, or (iii) to create any third party rights in any Person other than the direct parties to this Agreement, including any current or former service provider of the Seller (or any beneficiaries or dependents thereof).

(j)     Schedule 5.11(j) sets forth the name and position of each Offer Employee that is a foreign national and who requires a visa in order to work in his or her current position. The Purchaser shall employ such Transferred Employees who are foreign nationals working in the United States in non-immigrant visa status (the "Foreign National Employees"), under terms and conditions such that Purchaser qualifies as a "successor-in-interest" under applicable United

States immigration laws effective as of the Closing Date.  The Purchaser agrees to assume all immigration-related liabilities and responsibilities under applicable United States immigration laws with respect to such Foreign National Employees. If any Transferred Employee requires a visa, work permit or pass or other approval for his or her employment with the Purchaser following the Closing Date, the Purchaser shall use its reasonable best efforts to see that any necessary applications are promptly made to secure the necessary visa, permit, pass or other approval and the Seller shall use good faith efforts to provide the Purchaser with information reasonably requested in connection with any such applications.

Section 5.12   Payments Received.  The Seller and the Purchaser each agree that after the Closing they will hold and will promptly transfer and deliver to the other, from time to time as and when received by them or their respective Affiliates, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other Parties hereto or its Affiliates and will account to the other for all such receipts.

Section 5.13   Use of Names and Marks.  Upon and following the Closing, Purchaser shall, and shall cause its Affiliates to, cease using any and all Seller Marks, except for during a period of six (6) months following the Closing (the "Phase Out Period"), Purchaser shall be permitted to use the Seller Marks solely in connection with the sale or exhaustion of any inventory and materials or other assets included in the Purchased Assets that depict such Seller Marks as of the Closing; provided that (a) such use is solely in the conduct of the Business as conducted immediately prior to the Closing and in the manner such Seller Marks were used by Seller immediately prior to the Closing and (b) during the Phase Out Period, Purchaser is diligent in its efforts to exhaust all such inventory and materials and other assets during such period.  If Purchaser has been diligent in its efforts to exhaust such inventory and materials and other assets during the Phase Out Period, but due to delays that are outside Purchaser's reasonable control and Purchaser is not able to overcome by exercising diligent efforts, then Purchaser shall have the right to request an extension of such period not to exceed an additional six (6) months and Seller shall not unreasonably withhold, condition or delay agreeing to such extension.  In furtherance of the foregoing, as soon as practicable but in no event later than the end of the Phase Out Period (or such extension, as applicable), Purchaser shall, and shall cause its Affiliates, to remove, strike over, or otherwise obliterate all Seller Marks from all assets, inventory and other materials included in the Purchased Assets.  Any use by the Purchaser of any of the Seller Marks as permitted in this Section is subject to its use of the Seller Marks in a form and manner of that, and with standards of quality no less than those, in effect for the Seller Marks as of the Closing Date. The Purchaser and its Affiliates shall not use the Seller Marks in a manner that reflects negatively, or would reasonably be expected to reflect negatively, on such Marks or on the Seller or its Affiliates (provided, that, no use of any Seller Mark in a manner used by Seller or any of its Affiliates prior to Closing shall be a breach of this sentence).  Seller shall have the right to terminate the rights granted under this Section, effective immediately upon notice to Purchaser, if Purchaser or any of its Affiliates fail to comply with the foregoing terms and conditions or otherwise fail to comply with any reasonable direction of the Seller in relation to the use of the Seller Marks, and Purchaser fails to cure such non-compliance within ten (10) days after receipt of notice of such non-compliance.  Each of the Parties acknowledges and agrees that any remedy at Law for any breach of the requirements of this Section would be inadequate and agrees and consents that without intending to limit any additional remedies that may be available, the Seller

and its Affiliates shall be entitled to a temporary or permanent injunction, without proof of actual damage or inadequacy of legal remedy, and without posting any bond or other undertaking, in any Action which may be brought to enforce any of the provisions of this Section. Notwithstanding anything to the contrary contained herein, nothing in this <u>Section 5.13</u> shall prohibit Purchaser or any of its Subsidiaries from using Seller Marks, in each case, for factual or historical references or otherwise in a manner that does not constitute trademark infringement or is required or otherwise permitted by applicable Law.

Section 5.14    <u>Business IP License</u>.

(a)    Subject to the terms and conditions of this Agreement, Seller hereby grants, and shall cause its Subsidiaries to grant, to Purchaser, effective as of the Closing, a worldwide, fully paid-up, royalty-free, irrevocable, perpetual, sublicensable (through multiple tiers), non-terminable, non-exclusive license under and to all Licensed Business IP to the extent Controlled as of the Closing by Seller or its applicable Subsidiary for use in the Manufacture or development for Manufacture of API or Purchased Products or otherwise in the conduct of the Business, and natural evolutions thereof; provided that the foregoing shall not include any license or other rights to make, use, sell, offer for sale, import, export or otherwise exploit Oxycodone or any Oxycodone Products. The license set forth in this <u>Section 5.14(a)</u> shall be transferable solely (i) to any successor by merger; or (ii) on an API-by-API or Purchased Product-by-Purchased Product basis, upon a sale or transfer of all or substantially all of Purchaser's assets, or the assets of that portion of Purchaser's pharmaceutical business related to such API or Purchased Product, involving such API or Purchased Product, to the purchaser of such assets (which purchaser may be an Affiliate) provided that, in each case (in respect of the foregoing (i) and (ii)), Seller is provided prior written notice of such transfer. For clarity, and notwithstanding anything to the contrary herein, (a) Purchaser is not granted a license under the Licensed Business IP to make, use, sell, offer for sale, import or export any finished drug product, and (b) the licenses set forth in Section 7.2 of the Supply Agreement, and terms and conditions regarding Intellectual Property (including as set forth in Article VII) of the Supply Agreement, (and not the license and other terms and conditions set forth in this <u>Section 5.14</u>) shall control with respect to supply of API to Seller and its Affiliates under the Supply Agreement and supply of Oxycodone to Bard Pharmaceuticals Limited under the Supply Agreement. Except to the extent expressly set forth in this Agreement or the Supply Agreement or any other written agreement between Purchaser or any of its Affiliates and Seller or any of its Affiliates, Seller reserves its and its Affiliates' rights in and to all Intellectual Property owned by, licensed to or otherwise subject to rights held by Seller and its Affiliates (other than, for clarity, the Purchased IP), and any rights granted herein by Seller do not, and shall not be construed to, confer any rights upon Purchaser or any other Person by implication, estoppel, exhaustion, implied license or otherwise. Without limiting the foregoing, except to the extent expressly within the scope of the licenses granted pursuant to this <u>Section 5.14(a)</u> or expressly licensed under the Supply Agreement or any other written agreement between Purchaser or any of its Affiliates and Seller or any of its Affiliates, any use by Purchaser following the Closing of any Licensed Business IP or any other Intellectual Property owned by, or exclusively licensed to, Seller or any of its Affiliates shall be deemed to be a material breach of this Agreement. Seller and its Affiliates expressly reserve all of their rights to assert claims of infringement, misappropriation or other violation for any unlicensed activities and to seek all remedies available to them at law or in equity with respect to such claims.

(b)    In the event that Purchaser, any of its Subsidiaries, or any sublicensees of the license set forth in Section 5.14(a), improves any Licensed Business IP, such improvements (collectively, the "Improvement Business IP") shall be the exclusive property of Purchaser, and Purchaser shall own all right, title and interest in and to such Improvement Business IP (and Purchaser shall cause its Subsidiaries and sublicensees to execute all documents necessary to effectuate such ownership as applicable).

(c)    Subject to the terms and conditions of this Agreement, Purchaser hereby grants, and shall cause its Subsidiaries to grant, to Seller, effective as of the Closing, a worldwide, fully paid-up, royalty-free, irrevocable, perpetual, fully transferable, sublicensable (through multiple tiers), non-terminable, non-exclusive license under and to all Improvement Business IP to the extent Controlled by Purchaser for any and all uses. Except to the extent expressly set forth in this Agreement or any other written agreement between Purchaser or any of its Affiliates and Seller or any of its Affiliates, Purchaser reserves its and its Affiliates' rights in and to all Intellectual Property owned by, licensed to, or with respect to which rights are otherwise granted to Purchaser and its Affiliates, and any rights granted herein by Purchaser do not, and shall not be construed to, confer any rights upon Seller or any other Person by implication, estoppel, exhaustion, implied license or otherwise. Without limiting the foregoing, except to the extent expressly within the scope of the licenses granted pursuant to this Section 5.14(c) or any other written agreement between Purchaser or any of its Affiliates and Seller or any of its Affiliates, any use by Seller following the Closing of any Improvement Business IP or any other Intellectual Property owned by, or exclusively licensed to, Purchaser or any of its Affiliates shall be deemed to be a material breach of this Agreement. Purchaser and its Affiliates expressly reserve all of their rights to assert claims of infringement, misappropriation or other violation for any unlicensed activities and to seek all remedies available to them at law or in equity with respect to such claims.

Section 5.15    Healthcare Regulatory Transfers and Required Authorizations.

(a)    Subject to the terms of the Transition Services Agreement (as defined below), the Purchaser shall use all commercially reasonable efforts to secure the DEA Regulatory Authorizations necessary to comply with the terms of this Agreement and the Supply Agreement, including all DEA registrations and quotas necessary for Purchaser to operate the Business.

(b)    Seller and the Purchaser shall file with the FDA, DEA and any other applicable Regulatory Authority the notices and information required by those Regulatory Authorities to transfer from the Seller to the Purchaser or for the Purchaser to obtain Regulatory Authorizations required to operate the Business, including satisfying the Purchaser's obligations under the Supply Agreement. The Parties also agree to use all commercially reasonable efforts to take any and all other actions required by the FDA, DEA and any other applicable Regulatory Authority to effect such transfers, to obtain such Regulatory Authorizations and to qualify Purchaser's APIs for use in finished products of customers who are Seller's Affiliates as soon as reasonably practicable (and before January 1, 2021, if reasonably practicable).

(c)    The Parties agree to confer jointly with the appropriate official(s) from DEA within five (5) Business Days of the execution of this Agreement to advise DEA of the

Agreement and to solicit DEA's guidance on the proper and expeditious implementation of Purchaser's obligation to promptly secure the requisite DEA Regulatory Authorizations and to clarify the Seller's intent to transfer or surrender its applicable DEA Regulatory Authorizations once Purchaser has secured its own Regulatory Authorizations. The Parties further agree to be guided by any material feedback DEA provides in response to the Parties' proposal.

(d)    Unless DEA advises the Parties to do otherwise, in furtherance and not in limitation of the foregoing, the Purchaser agrees to (x) submit the appropriate forms, requests, or applications to local and federal DEA offices, as required, to obtain the DEA Regulatory Authorizations required to operate the Business and satisfy the condition set forth in Section 6.1(g) as promptly as practicable, and in any event within ten (10) Business Days after the execution of this Agreement, and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested by the DEA and to take all other actions necessary to obtain the DEA Regulatory Authorizations required to operate the Business and satisfy the condition set forth in Section 6.1(g) as soon as practicable, and to (y) make all other necessary filings as promptly as practicable after the date hereof, and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested under any regulatory Law. The Purchaser shall have responsibility for the filing fees associated with any such filings.

(e)    Each of the Parties hereto shall, in connection with and without limiting the efforts referenced in Section 5.15(b) for the Purchaser to obtain the DEA Regulatory Authorizations required to operate the Business and satisfy the condition set forth in Section 6.1(g), (w) cooperate in all respects and consult with the other Party in connection with any filing or submission and, in connection with any investigation or other inquiry, have a reasonable opportunity to review in advance and comment on drafts of filings and submissions and reasonably consider in good faith comments of the other Party and provide the other Party with copies of filings and submissions, in each case regarding any of the transactions contemplated hereby, (x) promptly inform the other Party of any communication received by such Party from, or given by such Party to, the DEA, FDA or any other Regulatory Authority, by promptly providing copies to the other Party of any such written communications, and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and (y) permit the other Party to review in advance any communication that it gives to, and consult with each other in advance of any meeting, substantive telephone call or conference with, the DEA, FDA or any other Regulatory Authority, or, in connection with any proceeding by a private party, with any other Person, and to the extent permitted by the DEA, FDA or other applicable Regulatory Authority or other Person, give the other Party the opportunity to attend and participate in any in-person meetings, substantive telephone calls or conferences with the DEA, FDA or other Regulatory Authority or other Person, in each case regarding any of the transactions contemplated hereby; *provided*, that such materials referred to in the foregoing clauses (w)-(y) are not required to be provided to the extent prohibited by applicable Law.

(f)    In the event the Purchaser has not obtained the Regulatory Authorizations required to operate the Business, including satisfying the Purchaser's obligations under the Supply Agreement, prior to Closing, the Seller shall provide a power of attorney, pursuant to the Power of Attorney Agreement attached as Exhibit D hereto, that permits the Purchaser to operate

the Business under the Seller's DEA Regulatory Authorizations for no more than six months, which time period may be extended, only if necessary, by written agreement of the Parties. Purchaser and Seller shall comply with the terms of the Power of Attorney Agreement, including with respect to Purchaser's obligations while operating under the Power of Attorney, including providing the indemnification thereunder.

(g)    The Seller shall have rights to access the Real Property, and representatives of the Purchaser and the Seller shall meet regularly (on a schedule to be reasonably agreed upon by the Parties), during the period in which the power of attorney described in Section 5.15(f) applies, for purposes of assessing the Purchaser's compliance with regulatory Law and Good Manufacturing Practices and the Seller's risk under the power of attorney, and the Purchaser shall consider in good faith any requests made by Seller in connection therewith.

Section 5.16    Security Deposits Under Assigned Contracts.  At Closing, Purchaser will either (i) cause the security deposits described or listed on Schedule 5.16 (the "Security Deposits") to be replaced with Purchaser funds and return such Security Deposits to the Seller or (ii) reimburse the Seller for the amount of the Security Deposits and, if and when applicable under the Assigned Contracts to which the Security Deposits relate, direct the holder or holders of such Security Deposits to return the Security Deposits to the Purchaser; *provided* that Purchaser shall have no obligations in respect of any Security Deposits that are associated with Contracts which do not constitute Assigned Contracts as of the Closing.

Section 5.17    Confidentiality.  The Seller shall not, and shall cause its Subsidiaries and Representatives not to, at any time disclose or use any Confidential Information of which such Person is or becomes aware, whether or not such Confidential Information was or is developed by such Person. The foregoing shall not, however, prohibit disclosure by any Person of Confidential Information that (i) has been published in a form generally available to the public other than as a result of any Person's acts or omissions to act in violation hereof prior to the date such Person proposes to disclose such information or (ii) is required to be disclosed pursuant to any applicable Law or Order or is required or advisable (based on the advice of legal counsel) to be disclosed in or to the Bankruptcy Court.

Section 5.18    Exclusivity.  During the period from the date hereof until the earlier of the Closing Date or the valid termination of this Agreement pursuant to Article VIII, the Seller will not, nor will it authorize or permit any of its Subsidiaries or Representatives to, directly or indirectly: (i) solicit or knowingly encourage, facilitate or induce the making, submission or announcement of, or take any other action designed or reasonably likely to facilitate, any inquiry, expression of interest, proposal or offer concerning an Alternative Transaction from any Person other than Purchaser or its Affiliates or representatives, (ii) deliver or make available to any Person any nonpublic information with respect to the Purchased Assets, or the Business or afford access to the properties, books, records or representatives of the Purchased Assets or the Business to any Person (other than Purchaser or its Affiliates or representatives, or as required by applicable Law or is required or advisable (based on the advice of legal counsel) to be disclosed in or to the Bankruptcy Court) or (iii) negotiate, accept any proposals or offers from or respond (other than to inform the third party of Seller's obligations under this Agreement) to any inquiries relating to, or enter into any Contract with, any Person relating to or in connection with

any Alternative Transaction.  Seller will immediately cease, and direct its Subsidiaries and Representatives to cease, any and all existing activities, discussions or negotiations with any third parties conducted heretofore with respect to any Alternative Transaction and shall terminate such third parties access to any information or materials, including through any online or virtual data room, and shall instruct all such third parties to promptly return or destroy any such information accessed or obtained prior to the date hereof (subject to the terms of any applicable non-disclosure agreements). In the event that the Seller or any of its Affiliates or representatives receives an offer, proposal or inquiry with respect to an Alternative Transaction from any Person after the date hereof and prior to the Closing Date, Seller will provide Purchaser with notice of such event and a summary of the material terms thereof, including the identity of the party making such offer, proposal or inquiry.  Notwithstanding the foregoing, in response to a bona fide written Acquisition Proposal that the Seller determines in good faith (after consultation with its financial advisors and outside legal counsel) constitutes, or is reasonably expected to lead to, a Superior Proposal, and which Acquisition Proposal was not solicited, encouraged, facilitated or induced after the date hereof in breach of this Section 5.18, was made after the date hereof and did not otherwise result from a breach of this Section 5.18, the Seller may, after giving the Purchaser written notice of such determination, (A) furnish information with respect to the Seller to the Person making such Acquisition Proposal (and its Representatives) pursuant to a customary confidentiality agreement in form and substance consistent in all material respect with, and no less restrictive than, the Confidentiality Agreement; *provided*, that all such information has previously been provided to the Purchaser or is provided to the Purchaser prior to the time it is provided to such Person and (B) participate in discussions or negotiations with the Person making such Acquisition Proposal (and its Representatives) regarding such Acquisition Proposal. If the Seller intends to exercise its termination right pursuant to Section 7.2(b)(ix), it will provide written notice to the Purchaser at least three (3) Business Days in advance, together with a summary of the proposed terms, and if requested by the Purchaser, the Seller will negotiate in good faith with the Purchaser and its Representatives during such three (3) Business Day period regarding any revisions to this Agreement or the Supply Agreement proposed by the Purchaser, such that the Acquisition Proposal will no longer constitute a Superior Proposal.  If, after such three (3) Business Day period, the Seller determines in good faith (after consultation with its financial advisors and outside legal counsel) that the Acquisition Proposal continues to constitute a Superior Proposal (taking into account all proposed revisions to the terms of this Agreement and the Supply Agreement), the Seller may exercise its termination right pursuant to and in accordance with Section 7.2(b)(ix) subject to and contingent upon the payment of the Break-Up Fee and the Expense Reimbursement.

Section 5.19    Title Insurance and Survey. Seller shall use commercially reasonable efforts to assist the Purchaser in obtaining the Title Policies and Surveys in form and substance as set forth in this Section 5.19 of this Agreement, at or prior to Closing, including, without limitation, removing from title any liens or encumbrances which are not Permitted Post-Closing Encumbrances.  Seller shall provide the Title Company with any resolution, affidavit, indemnity or other assurances reasonably requested by the Title Company to issue the Title Policies.  The Purchaser shall obtain a title insurance policy from a title insurance company selected by the Purchaser (the "Title Company"), insuring Purchaser's fee simple title to the Real Property as of the Closing Date with gap coverage from the Seller through the date of recording, subject only to Permitted Post-Closing Encumbrances, and otherwise in form and substance reasonably acceptable to Purchaser (the "Title Policy").  Seller shall order and deliver to Purchaser a survey

54

for the Real Property, dated no earlier than the date of this Agreement in a form reasonably satisfactory to Purchaser and the Title Company (the "Survey"), which Survey shall not disclose any material encroachment from or onto any of the Real Property or any portion thereof (which is not the subject of a properly recorded easement or a license agreement), or any other material survey defect which has not been cured or, *provided* the title company will issue a further assurance endorsement with respect to such defect, insured over to the Purchaser's reasonable satisfaction.

Section 5.20   Quality Agreement.  Following the date hereof and prior to the Closing Date, the Purchaser and the Seller will mutually agree upon any amendments to the Quality Agreement (the "Quality Agreement Amendment") to reflect the acquisition of the Business and the Purchased Assets by Purchaser and as necessary to allow the Parties to perform their respective obligations under the Supply Agreement.

Section 5.21   Transition to Other Facilities. Purchaser shall use commercially reasonable efforts to complete the total transition of the Business operations and Purchased Assets conducted or located at the Real Property to Purchaser's other facilities as soon as reasonably practicable following Closing.  Seller shall, at Purchaser's request, use commercially reasonable efforts (at Purchaser's expense, except to the extent otherwise expressly set forth in the Supply Agreement, and subject to applicable law) to assist the Purchaser in its efforts to complete the total transition of the Business operations and Purchased Assets conducted or located at the Real Property to Purchaser's other facilities as soon as reasonably practicable, including providing Purchaser with such reasonable assistance as the Purchaser reasonably requests (at Purchaser's expense, except to the extent otherwise expressly set forth in the Supply Agreement, and subject to applicable law) prior to the Closing in order to facilitate and expedite such transition following the Closing.

Section 5.22   Non-Transferred NDAs.  Following the Closing, in the event (i) Purchaser provides written notice to Seller of an actual or threatened breach, or actions that would reasonably be expected to result in a breach, of a Non-Transferred NDA by the applicable third party counterparty with respect to the confidential information of the Business and (ii) Purchaser reasonably requests in such notice that Seller take action against such counterparty in order to protect Purchaser's interests in preserving the confidentiality of such confidential information of the Business under the applicable Non-Transferred NDA which interests would be harmed by such breach, Seller shall, at Purchaser's expense, promptly take all actions reasonably necessary to permit and authorize Purchaser to enforce or cause the enforcement of Seller's rights under the applicable Non-Transferred NDA on behalf and for the benefit of Purchaser or its applicable Subsidiary or Affiliate. Notwithstanding the foregoing, Seller may elect (at its sole option) to instead assign the applicable Non-Transferred NDA to Purchaser, so that Purchaser may take such actions itself.

Section 5.23   Confirmation of Bankruptcy Plan. The Seller will provide notice to Purchaser of its intent to enter into a Chapter 11 plan at least ten (10) Business Days prior to the effective date of such Chapter 11 plan of the Seller; provided that no notice shall be required under this Section 5.23 if the effective date of such Chapter 11 plan of the Seller is later than the date that is sixty (60) days after the Closing Date.

Section 5.24    Intellectual Property.

(a)    Prior to the Closing and during the twelve (12) month period immediately following the Closing Date, the Seller shall, at the Seller's expense, use commercially reasonable efforts to effect any necessary corrective change of ownership and recordation with all intellectual property offices and registrars and other similar authorities where any Patents included in the Purchased IP (i) are still recorded in the name of legal predecessors of the Seller or any Person other than the Seller or (ii) where, to the Knowledge of the Seller, the relevant recordation with of the intellectual property offices or registrars, and other similar authorities are materially incorrect for any other reason.

(b)    Prior to the Closing and during the twelve (12) month period immediately following the Closing Date, for any Patents included in the Purchased IP that are held by any of Persons that are affiliates of the Seller as of the Closing Date, the Seller shall use commercially reasonable efforts to cause such Persons to transfer all of their rights, title and interests (including Ancillary IP Rights) to and under such Patents to the Seller and following any such transfer, the Purchaser shall have the right to request, and reasonably following such request, the Seller shall provide the Purchaser with written documentation that effects and evidences such transfers.

(c)    Notwithstanding anything to the contrary herein, the Purchaser shall be responsible for preparing and filing all instruments and documents necessary to effect the assignment of the Patents included in the Purchased IP from the Seller to the Purchaser (other than delivery of the Patent Assignment Agreement by Seller pursuant to Section 2.2), including all costs and expenses of preparing and recording country-specific assignments and legalization of signatures (where required). The Seller shall reasonably cooperate with the foregoing as set forth in Section 5.5.

(d)    Notwithstanding anything to the contrary herein, the Seller's obligation to cooperate and perform the activities described in the foregoing Sections 5.24(a) through Section 5.24(c) shall expire twelve (12) months following the Closing Date (or, with respect to non-U.S. Intellectual Property, forty-eight (48) months following the Closing Date), unless, in the case of the Seller's obligations under Section 5.24(c), notwithstanding the good faith, diligent efforts of Purchaser, the Purchaser reasonably requires such cooperation from the Seller following expiration of such twelve (12) month period (or, with respect to non-U.S. Intellectual Property, forty-eight (48) months), in which event, the Purchaser shall have the right to request the Seller (and the Seller shall not unreasonably withhold its consent) to extend such cooperation for a reasonable period (not to exceed twelve (12) additional months, or, with respect to non-U.S. Intellectual Property, forty-eight (48) months) so long as the Purchaser continues to act diligently and in good faith with respect thereto.

## ARTICLE VI

## CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent to Obligation of the Seller and the Purchaser.  The respective obligations of each Party hereto to effect the transactions contemplated by this

Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)  *No Orders.*  No Governmental Entity of competent jurisdiction shall have enacted, enforced or entered any Law and no Order shall be in effect on the Closing Date that restrains, enjoins or otherwise prohibits the consummation of the Closing;

(b)  *Sale Order.*  The Bankruptcy Court shall have entered the Sale Order and such order shall not have been stayed, stayed pending appeal, reversed or vacated as of the Closing Date;

(c)  *Supply Agreement.*  The Purchaser and Purdue or an Affiliate of Purdue or any successor to Purdue under a plan of reorganization under Bankruptcy Code shall have entered into a long-term supply agreement (the "Supply Agreement") in the form attached hereto as Exhibit E;

(d)  *Quality Agreement.*  The Purchaser and Purdue shall have entered into the Quality Agreement Amendment to the Pharmaceutical Raw Material Quality Agreement by and between Noramco, Inc. and Noramco GmbH and Purdue Pharmaceuticals L.P. and Purdue Pharma Manufacturing L.P., dated as of March 7, 2019 (the "Quality Agreement"), which agreement, as amended, shall govern the obligations of the Purchaser in connection with the quality of the API supplied under the Supply Agreement;

(e)  *Transition Services Agreement.*  The Purchaser and Purdue, an Affiliate of Purdue consented to by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed) or any successor to Purdue under a plan of reorganization under Bankruptcy Code shall have entered into a transition services agreement (the "Transition Services Agreement") in a form mutually agreed by the Seller and the Purchaser, and in accordance with the term sheet attached hereto as Exhibit F;

(f)  *Lease Agreements.*  The Purchaser and the Seller or its Affiliates shall have entered into the R&D Building Lease and the Manufacturing Building and Warehouses Lease;

(g)  *Required Regulatory Authorizations and Registrations.*  The Purchaser shall have obtained all Regulatory Authorizations, including all DEA registrations, required to operate the Business, including satisfying the Purchaser's obligations under the Supply Agreement, or the Seller shall have provided the power of attorney described in Section 5.15(f).

Section 6.2    Conditions Precedent to Obligation of the Seller.  The obligation of the Seller to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Seller at or prior to the Closing of the following conditions:

(a)  *Representations and Warranties.*  (i) The Purchaser Fundamental Representations contained in this Agreement which are qualified by "material," "materiality," "Material Adverse Effect" or similar qualifying language are true and correct in all respects as of the Closing Date as if made at and as of such date (except to the extent such Purchaser Fundamental Representations speak as of another date, in which case such Purchaser

Fundamental Representations shall be true and correct as of such date); (ii) the Purchaser Fundamental Representations contained in this Agreement which are not qualified by "material," "materiality," "Material Adverse Effect" or similar qualifying language shall be true and correct in all material respects as of the Closing Date as if made at and as of such date (except to the extent such Purchaser Fundamental Representations speak as of another date, in which case such Purchaser Fundamental Representations shall be true and correct in all material respects as of such date); and (iii) all other representations and warranties of the Purchaser contained in this Agreement shall be true and correct as of the Closing Date as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such other representations and warranties to be so true and correct (disregarding any exception or qualification in such representations and warranties relating to "material," "materiality" or "Material Adverse Effect") has not and would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement or the Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby;

(b)      *Covenants*.  The covenants and obligations of the Purchaser to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects; and

(c)      *Officer's Certificate*.  The Purchaser shall have delivered to the Seller a certificate duly executed by an authorized officer of the Purchaser certifying to the effect that the conditions set forth in <u>Section 6.2(a)</u> and <u>Section 6.2(b)</u> have been satisfied.

Section 6.3      <u>Conditions Precedent to Obligation of the Purchaser</u>.  The obligation of the Purchaser to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Purchaser at or prior to the Closing of the following conditions:

(a)      *Representations and Warranties*.  (i) The Seller Fundamental Representations contained in this Agreement which are qualified by "material," "materiality," "Material Adverse Effect" or similar qualifying language are true and correct as of the Closing Date as if made at and as of such date (except to the extent such Seller Fundamental Representations speak as of another date, in which case such Seller Fundamental Representations shall be true and correct as of such date); (ii) the Seller Fundamental Representations contained in this Agreement which are not qualified by "material," "materiality," "Material Adverse Effect" or similar qualifying language shall be true and correct in all material respects as of the Closing Date as if made at and as of such date (except to the extent such Seller Fundamental Representations speak as of another date, in which case such Seller Fundamental Representations shall be true and correct in all material respects as of such date); (iii) the representation and warranty of the Seller contained in <u>Section 3.7(a)</u> shall be true and correct as of the Closing Date as if made at and as of such date; and (iv) all other representations and warranties contained in this Agreement shall be true and correct as of the Closing Date as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be so true and correct (disregarding any

exception or qualification in such representations and warranties relating to "material," "materiality" or "Material Adverse Effect") has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)      *Covenants*. The covenants and obligations of the Seller to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects;

(c)      *Officer's Certificates*.  The Seller shall have delivered to the Purchaser a certificate duly executed by an executive officer of the Seller certifying to the effect that the conditions set forth in <u>Section 6.3(a)</u> and <u>Section 6.3(b)</u> have been satisfied; and

(d)      *Material Adverse Effect*.  Since the date hereof, there shall not have occurred and be continuing any Material Adverse Effect.

Section 6.4      <u>Concurrent Delivery</u>. It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents, in each case, at Closing by any Party to another pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

## ARTICLE VII

## TERMINATION

Section 7.1      <u>Termination</u>.

(a)      This Agreement may be terminated by either the Purchaser or the Seller in the event that the Closing has not occurred on or before March 31, 2021, or such later date as may be mutually agreed in writing by the Parties in their sole discretion (the "<u>Outside Date</u>"); *provided*, that the right to terminate this Agreement pursuant to this <u>Section 7.1(a)</u> shall not be available to any Party if such Party has failed to materially perform any of its obligations under this Agreement required to be performed by it at or prior to the Closing and such failure to perform is the proximate cause for the Closing not occurring prior to the Outside Date.

(b)      This Agreement may also be terminated prior to the Closing:

(i)      at any time by the mutual written agreement of the Purchaser and the Seller;

(ii)      by the Purchaser, if (A) there shall have been a breach of or noncompliance with any of the covenants or agreements, or breach of or misrepresentation in any of the representations or warranties, set forth in this Agreement on the part of the Seller which breach or noncompliance, either individually or in the aggregate with other breaches by the Seller, would result in, if occurring or continuing on the Closing Date, the failure of either of the conditions set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u>, as the case may be, or (B) there has been any material breach by the Seller of the Sale Order, in each case which is not cured within ten (10) Business Days

following written notice to the Seller thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided*, that the Purchaser is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Purchaser in such a manner as would cause either of the conditions in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u> not to be satisfied);

(iii)    by the Seller, if (A) there shall have been a breach of or noncompliance with any of the covenants or agreements, or breach of or misrepresentation in any of the representations or warranties, set forth in this Agreement on the part of the Purchaser which breach or noncompliance, either individually or in the aggregate with other breaches by the Purchaser, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in either of <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>, as the case may be, or (B) there has been any material breach by the Purchaser of the Sale Order, in each case which is not cured within ten (10) Business Days following written notice to the Purchaser thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided*, that the Seller is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Seller in such a manner as would cause either of the conditions in <u>6.3(a)</u> or <u>6.3(b)</u> not to be satisfied);

(iv)    by the Purchaser, if (x) the Seller's Chapter 11 Cases are dismissed or converted to Chapter 7 cases under the Bankruptcy Code; (y) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Seller's Chapter 11 Cases; or (z) an examiner is appointed with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code in the Seller's Chapter 11 Cases;

(v)    by the Purchaser, if the Bankruptcy Court does not enter the Sale Order on or before October 5, 2020;

(vi)    by the Purchaser, if (i) the Seller withdraws or seeks authority to withdraw the Sale Motion at any time after the filing thereof, (ii) the Seller seeks approval from the Bankruptcy Court for an Alternative Transaction or (iii) the Seller, directly or indirectly, engages in any solicitation of an Alternative Transaction in breach of <u>Section 5.18</u>;

(vii)    by either the Seller or the Purchaser, if a Governmental Entity issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 7.1(b)(vii)</u> shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein is the proximate cause of such ruling or Order;

(viii)    by the Purchaser, if any creditor of the Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the stay to foreclose on any material portion of the Purchased Assets; or

60

(ix)     by the Seller at any time prior to Closing if (i) the Seller has received a Superior Proposal, (ii) the Seller enters into a definitive written agreement to consummate the acquisition transaction contemplated by that Superior Proposal, (iii) Seller has determined in good faith (after consultation with its financial advisors and outside legal counsel) that the failure to terminate this Agreement and consummate the Superior Proposal would be a breach of its fiduciary duties pursuant to applicable Law and (iv) concurrent with such termination, Seller pays the Break-Up Fee and Expense Reimbursement amount due to Purchaser in accordance with <u>Section 7.2(b)</u>.

Section 7.2     <u>Effect of Termination</u>.

(a)     Except as otherwise provided in this <u>Section 7.2</u>, in the event of termination of this Agreement by either Party hereto in accordance with <u>Section 7.1</u>, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Parties hereto, except for liability for fraud or willful breach of this Agreement prior to such termination.  The provisions of the final sentence of <u>Section 5.2(a)</u>, this <u>Section 7.2</u>, <u>Article VIII</u> (other than <u>Section 8.1</u> and <u>Section 8.16</u>) and, with respect to any defined terms used in the foregoing Sections or Article, and <u>Article IX</u> shall expressly survive the termination of this Agreement.

(b)     In the event that this Agreement is terminated by (i) Purchaser pursuant to <u>Section 7.1(b)(vi)</u>, (ii) by Seller pursuant to <u>Section 7.1(b)(ix)</u>, or (iii) by any Party pursuant to <u>Section 7.1(a)</u> at a time when this Agreement may be validly terminated by Purchaser pursuant to <u>Section 7.1(b)(vi)</u>, then (A) Purchaser shall be entitled to the reimbursement of, and Seller shall promptly, and in any event within thirty (30) days after such termination, reimburse Purchaser in immediately available funds for, all reasonable documented out-of-pocket fees and expenses (including reasonable professional's fees and expenses) incurred by Purchaser and its Affiliates in connection with their investigation (including due diligence), preparation, negotiation and attempted consummation of the transactions contemplated by this Agreement, up to a maximum reimbursement amount of one million five-hundred thousand dollars ($1,500,000) (the "<u>Expense Reimbursement</u>") and (B) in addition, Purchaser shall be immediately entitled to the payment of, and Seller shall within three (3) Business Days of such termination pay to the Purchaser, a break-up fee of three million dollars ($3,000,000) (the "<u>Break-Up Fee</u>").

(c)     In addition, in the event that this Agreement is terminated by any Party pursuant to <u>Section 7.1(a)</u> or by Purchaser pursuant to <u>Section 7.1(b)(ii)</u>, and the Seller consummates (or enters into an agreement to consummate) an Alternative Transaction within six (6) months following such termination, Purchaser shall be entitled to payment of the Break-Up Fee and Expense Reimbursement upon consummation of such Alternative Transaction.

(d)     The obligations of the Seller to pay the Break-Up Fee or Expense Reimbursement (i) shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the U.S. Bankruptcy Code and under an order to that effect issued by the Bankruptcy Court and shall be a superpriority administrative expense claim (*i.e.*, senior to all other administrative expense claims and payable out of Seller's cash or other collateral security under Seller's obligations to their senior secured lenders and prior to any recovery by such lenders) of Seller under Section 364(c)(1) of the U.S. Bankruptcy Code, or the inherent

jurisdiction of the Bankruptcy Court, (ii) shall not be subordinate to any other administrative expense claim against Seller or its Affiliates and (iii) shall survive the termination of this Agreement in accordance with this <u>Section 7.2</u>. The Seller shall seek the approval of the Break-Up Fee and Expense Reimbursement as set forth in this paragraph and this Agreement in the Sale Order.

**ARTICLE VIII**

**GENERAL PROVISIONS**

Section 8.1    <u>Tax Matters</u>.

(a)    All excise, transfer, documentary, stamp, value added, recordation, license, conveyance and other similar Taxes ("<u>Transfer Taxes</u>"), if any, imposed on or with respect to the Acquisition shall be borne by the Purchaser and shall be paid to the appropriate Taxing Authority promptly when due by the Person having the obligation to pay such Transfer Tax under applicable Law.  All sales, use and other similar Taxes ("<u>Sales and Use Taxes</u>"), if any, imposed on or with respect to the Acquisition shall be borne by the Seller and shall be paid to the appropriate Taxing Authority promptly when due by the Person having the obligation to pay such Sales and Use Taxes under applicable Law. The Party hereto responsible under applicable Law for filing a Tax Return with respect to any such Transfer Taxes or Sales and Use Taxes shall prepare and timely file such Tax Return and promptly provide a copy of such Tax Return to the other Parties.  The Purchaser and the Seller shall use reasonable efforts and cooperate in good faith to reduce or eliminate any Transfer Taxes or Sales and Use Taxes to the extent permitted by applicable Law.

(b)    For purposes of this Agreement, with respect to any Purchased Asset, the Seller and the Purchaser shall apportion the liability for real and personal property Taxes, ad valorem Taxes, and similar periodic Taxes ("<u>Periodic Taxes</u>") for Straddle Periods applicable to such Purchased Asset in accordance with this <u>Section 8.1(b)</u>.  The Periodic Taxes described in this <u>Section 8.1(b)</u> shall be apportioned between the Seller and the Purchaser as of the Closing Date, with the Purchaser liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period *multiplied by* a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period. The Seller shall be liable for that portion of the Periodic Taxes for a Straddle Period for which the Purchaser is not liable under the preceding sentence (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Pre-Closing Tax Period).  The Party hereto responsible under applicable Law for paying a Tax described in this <u>Section 8.1(b)</u> shall be responsible for administering the payment of such Tax and the preparation and filing of Tax Returns in respect of such Tax.  All apportionments hereunder shall be based on information that is available as of the Closing Date and there will be no re-apportionments of any Periodic Taxes regardless of whether information becomes available after the Closing Date that alters the amount of Taxes that would have been due with respect to the Straddle Period. To the extent the liability for Periodic Taxes for a certain Straddle Period is not determinable at the time of Closing or such Periodic Taxes are charged in arrears, such Periodic Taxes shall be prorated for

such Straddle Period, based on the most recent ascertainable full tax year without adjustment. For purposes of this <u>Section 8.1(b)</u>, the Straddle Period for ad valorem Taxes and real and personal property Taxes shall be the fiscal period for which such Taxes were assessed by the applicable Tax jurisdiction.

(c)    The Seller, on the one hand, or the Purchaser, on the other hand, as the case may be (the "<u>Reimbursing Party</u>"), shall provide reimbursement for any Tax paid by the other (the "<u>Paying Party</u>"), all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement (including this <u>Section 8.1</u>).  Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective liability therefor, although failure to do so shall not relieve the Reimbursing Party from its liability hereunder except to the extent the Reimbursing Party is actually prejudiced thereby. Notwithstanding the foregoing, (i) the Parties shall cooperate to determine, as promptly as practicable following the Closing, (x) the amount of Taxes for which Seller is responsible pursuant to <u>Section 8.1(b)</u> (the "<u>Seller Taxes Amount</u>"), (y) the amount of Taxes for which Purchaser is responsible pursuant to <u>Section 8.1(b)</u> (the "<u>Purchaser Taxes Amount</u>") and (z) the amount of Taxes allocated pursuant to <u>Section 8.1(b)</u> that have been paid by Seller prior to Closing (the "<u>Seller-Paid Taxes Amount</u>"), and (ii) following such determination, (x) if the Seller-Paid Taxes Amount exceeds the Seller Taxes Amount, the Purchaser shall promptly pay to the Seller the amount of such excess and (y) if the Seller Taxes Amount exceeds the Seller-Paid Taxes Amount, the Seller shall promptly pay to the Purchaser the amount of such excess.

(d)    The Parties shall cooperate in good faith with each other, and provide each other with such assistance as reasonably may be requested by any of them, and at the requesting party's expense, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials, in connection with (i) the preparation of any Tax Return with respect to the Business or Purchased Assets, (ii) the determination of any liability in respect of Taxes or the right to any refund, credit or prepayment in respect of Taxes or (iii) any audit or other examination by any Taxing Authority, or any judicial or administrative proceeding with respect to any Taxes, in each case, with respect to the Business or any Purchased Asset. The Parties (and their respective Affiliates) will not be required to provide each other with any information regarding Tax matters that, based on the good faith determination of the Party requested to provide such information, (x) includes information that does not relate solely to the Purchased Assets or the Business and (y) is confidential or could reasonably be expected to adversely affect such Party or any of its Affiliates.

(e)    Purchaser and Seller shall, upon request, use commercially reasonable efforts to obtain any certificate or other document from any Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the transactions contemplated hereby (including, but not limited to, any Taxes discussed in <u>Section 8.1(a)</u>).

(f)    Each Party shall treat payments made pursuant to this Agreement after the Closing as adjustments to the Purchase Price for Tax purposes to the extent permitted by applicable Law.

Section 8.2    Bulk Sales.  The parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Business and the Purchased Assets shall be free of any Encumbrances, including any liens arising pursuant to any bulk transfer laws, and the Parties shall take such steps as shall be necessary or appropriate to so provide in the Sale Order. Without limiting the foregoing and the Seller's obligations with respect to Excluded Liabilities, the Purchaser hereby waives compliance with the requirements and provisions of any "bulk-transfer" or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale, conveyance, assignment or transfer of any or all of the Purchased Assets to the Purchaser.

Section 8.3    Survival of Representations, Warranties and Covenants.

No representations or warranties in this Agreement shall survive the Closing.  No covenants in this Agreement or in any Ancillary Document shall survive the Closing except (i) to the extent the terms thereof expressly contemplate performance following the Closing and (ii) any covenants in Section 8.1 and Section 8.5.

Section 8.4    Public Announcements.  Unless otherwise required by applicable Law or by obligations of the Seller or the Purchaser or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or in order to enforce a Party's rights or remedies under this Agreement, the Seller, on the one hand, and the Purchaser, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed (it being agreed that any non-consent, conditional consent or delayed consent arising from the requirements of the Bankruptcy Court will not be deemed to be unreasonable)). Notwithstanding the foregoing, (a) the Purchaser and its Affiliates may provide general information about the subject matter of this Agreement in connection with their fund raising, marketing, informational or reporting activities, subject to customary confidentiality undertakings, (b) the Purchaser, its Affiliates and their respective Representatives may make customary disclosures as expressly contemplated by the financing documents and agreements of the Purchaser and its Affiliates, subject to the confidentiality undertakings set forth in such financing documents and agreements; *provided*, that the parties shall not release any information pursuant to this clause (b) without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed), (c) following the Closing, each of the parties may issue any press releases or any public statements or announcements regarding this Agreement and the transactions contemplated hereby which is not inconsistent in any material respect with any prior press release, public statement or public announcement previously jointly made by the parties and (d) nothing shall prevent the Seller and its Representatives and Affiliates from making statements in Bankruptcy Court proceedings in connection with the Chapter 11 Cases.

Section 8.5    Notices.  All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (i) at the time personally delivered if served by personal delivery upon the Party hereto for whom it is intended, (ii) at the time received if delivered by registered or certified mail (postage prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (iii) upon

confirmation if sent by email; in each case to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

(a)    if to the Purchaser, to:

c/o Noramco, LLC
500 Swedes Landing Rd
Wilmington, DE 19801
Email:        lkarras@noramco.com
Attention:    L. Lee Karras

with a copy (which shall not constitute notice) to:

c/o SK Capital Partners, LP
430 Park Avenue, 18th Floor
New York, NY 10022
Email:        adavenport@skcapitalpartners.com
Attention:    Aaron Davenport

and

Kirkland & Ellis LLP
300 N LaSalle
Chicago, IL 60654
Email:        jliss@kirkland.com; marenson@kirkland.com
Attention:    Jeremy S. Liss, P.C. and Matthew S. Arenson

and

(b)    if to the Seller, to:

Rhodes Technologies
498 Washington Street
Coventry, Rhode Island
Email:        David.Lundie@rhodestec.com
Attention:    David Lundie

with a copy (which shall not constitute notice) to:

Purdue Pharma L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901
Email:        marc.kesselman@pharma.com
Attention:    Marc L. Kesselman, Executive Vice President, General
Counsel and Secretary

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Email:         marie.gibson@skadden.com
Attention:     Marie Gibson

Section 8.6    <u>Descriptive Headings; Interpretative Provisions</u>.  The headings and words used for defined terms themselves (but not, for the avoidance of doubt, the express definitions thereof) contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  Whenever the last day for the exercise of any right or the discharge of any duty under this Agreement falls on other than a Business Day, the Party hereto having such right or duty shall have until the next Business Day to exercise such right or discharge such duty.  Unless otherwise indicated, the word "day" shall be interpreted as a calendar day. The term "ordinary course of business" shall mean in the ordinary course of the Seller's business with respect to the Business, consistent with past practices, including with respect to timing, frequency and magnitude and including any actions required or advisable (based on the advice of legal counsel) to be taken in connection with regulatory or bankruptcy matters.  The word "or" has the inclusive meaning represented by the phrase "and/or." References to "dollars" or "$" mean United States dollars, unless otherwise clearly indicated to the contrary.  No summary of this Agreement prepared by or on behalf of any Party hereto shall affect the meaning or interpretation of this Agreement.

Section 8.7    <u>No Strict Construction</u>.  The Seller, on the one hand, and the Purchaser, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Seller, the Purchaser, and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person with respect to this Agreement.

Section 8.8    <u>Entire Agreement; Assignment</u>.  This Agreement, the Ancillary Documents and the Confidentiality Agreement constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, among the Parties hereto or any of them, with respect to the subject matter hereof and thereof.  Neither this Agreement nor

any of the rights, interests or obligations under it may be directly or indirectly assigned, delegated, sublicensed or transferred by any of the Parties hereto, in whole or in part, to any other Person by operation of law or otherwise, without the prior written consent of the other Party, and any attempted or purported assignment in violation of this Section 8.7 will be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties hereto and their respective successors and permitted assigns and shall not be binding upon, inure to the benefit of, or be enforceable by, any other Person. Notwithstanding the foregoing, nothing in this Agreement shall or is intended to limit the ability of Purchaser or the Seller or their respective permitted assigns to assign its rights or delegate its responsibilities, liabilities or obligations under this Agreement, in whole or in part, without the consent of the Seller or the Purchaser, as applicable (a) to any Affiliate, (b) to lenders as security for borrowings, (c) to any subsequent purchaser of Purchaser or one of its Affiliates, the Business or any division thereof or any material portion of its assets, or to any subsequent purchaser of the Seller or any material portion of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger or otherwise) or (d) in the case of Seller, to any trusts established under a Chapter 11 plan of the Seller or any other successors of the Seller, at any time, whether prior to or following the Closing Date; provided, that, such assigning party shall not be released from its obligations hereunder.

Section 8.9    Governing Law; Submission of Jurisdiction; Waiver of Jury Trial.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breaches or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceedings; provided, however, that, if the Chapter 11 Cases are closed, each of the Parties irrevocably agrees that any such Actions or proceedings shall be heard and determined in a New York state court or a federal court sitting in New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action or proceeding arising out of or relating to this Agreement and the transaction contemplated hereby. The Parties each irrevocably waive, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of any such Action or proceeding.  Each of the Parties agrees not to commence any action, suit or proceeding relating thereto except in the courts described above in New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each Party hereto hereby consents to service of process in the manner and at the address set forth in Section 8.4.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.10    <u>Expenses</u>.  Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the Party hereto incurring such expenses.

Section 8.11    <u>Amendment</u>.  This Agreement may not be amended except by an instrument in writing signed on behalf of all the Parties hereto.

Section 8.12    <u>Waiver</u>.  At any time prior to or after the Closing, the Parties hereto may (i) extend the time for the performance of any of the obligations or other acts of the other Parties hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of a Party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

Section 8.13    <u>Counterparts; Effectiveness</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

Section 8.14    <u>Severability; Validity; Parties in Interest</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.  Except as expressly set forth herein, nothing in this Agreement is intended to confer upon any Person not a Party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 8.15    <u>Specific Performance</u>.

(a)    Each of the Parties recognize that if either Party breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for its injuries.  Each of the Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of this Agreement, without posting bond or other undertaking.  If any Action is brought by one of the Parties to enforce this Agreement, the other Party shall waive the defense that there is an adequate remedy at Law.

(b)    In the event of any breach, prior to the date on which the Bankruptcy Court issues the Sale Order, by the Seller of the Seller's agreements, covenants, representations or warranties contained herein or in the Sale Order, including any breach that is material or willful, the Purchaser's sole and exclusive remedy shall be to exercise the Purchaser's rights to terminate this Agreement pursuant to <u>Section 7.1(b)(ii)</u>, in accordance with the terms of such <u>Section 7.1(b)(ii)</u>, and the Purchaser shall not have any further Cause of Action for damages, specific performance or any other legal or equitable relief against the Seller or any of its former, current or future equity holders, directors, officers, Affiliates, agents or Representatives with respect thereto.

Section 8.16    Time of the Essence.  Subject to Bankruptcy Court requirements, time shall be of the essence of this Agreement.

Section 8.17    Releases.

(a)    Effective as of the Closing (but only if the Closing actually occurs), and other than with respect to any claims pursuant to, and subject to the terms, conditions and limitations of, this Agreement, the Ancillary Documents and the Confidentiality Agreement, Purchaser, on behalf of itself and each of its Affiliates, hereby releases the Seller and its Affiliates, and their current and former officers, directors, stockholders, employees, agents, Representatives, attorneys, investors, parents, predecessors, Subsidiaries, successors and assigns (collectively, the "Seller Released Parties") from any and all liabilities, actions, rights of action, contracts, Indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising at or prior to the Closing ("Causes of Action"), that such Purchaser or any of its Affiliates or any of its successors and assigns have or may have against any of the Seller Released Parties to the extent relating to the Purchased Assets or the Assumed Liabilities; *provided*, *however*, that this Section 8.17(a) shall not apply to any Causes of Action arising from the fraud or willful misconduct of the Seller Released Parties or brought to enforce rights under or any provision of this Agreement or any Ancillary Document; *provided, further,* that Purchaser shall not be deemed to have released any claim, defense, fact or circumstance, which Purchaser determines after the Closing is necessary or desirable to defend against any Action brought by any director, officer, employee, contractor, or agent or to prosecute any Action against any Transferred Employee relating to the work such individual performed for the Business prior to the Closing; *provided* further, that this Section 8.17(a) shall not apply to, and shall not operate as a release with respect to, any Causes of Action arising under any commercial agreement that is currently in effect on the date hereof between Seller (or any of its Affiliates), on the one hand and Purchaser (or any of its Affiliates), on the other hand.

(b)    Effective as of the Closing (but only if the Closing actually occurs), and other than with respect to any claims pursuant to, and subject to the terms, conditions and limitations of, this Agreement, the Ancillary Documents and the Confidentiality Agreement, the Seller, on behalf of itself and each of its controlled Affiliates, hereby releases the Purchaser and its Affiliates, and their current and former officers, directors, stockholders, employees, agents, Representatives, attorneys, investors, parents, predecessors, Subsidiaries, successors and assigns (collectively, the "Purchaser Released Parties") from any and all Causes of Action, that such Seller or any of its Affiliates or any of their respective successors and assigns, have or may have against any of the Purchaser Released Parties to the extent relating to the Excluded Assets or the Excluded Liabilities; *provided*, *however*, that this Section 8.17(b) shall not apply to any Causes of Action arising from the fraud or willful misconduct of the Purchaser Released Parties or brought to enforce rights under or any provision of this Agreement; *provided* further, that this Section 8.17(b) shall not apply to, and shall not operate as a release with respect to, any Causes of Action arising under any commercial agreement that is currently in effect on the date hereof between Seller (or any of its Affiliates), on the one hand and Purchaser (or any of its Affiliates), on the other hand.

Section 8.18    <u>Purchaser Guarantee</u>. To induce the Seller to enter into this Agreement, Noramco absolutely, unconditionally and irrevocably guarantees to the Seller the due, full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by the Purchaser or any of its Affiliates under this Agreement and any Ancillary Documents signed by the Purchaser or any of its Affiliates.  The obligations in this <u>Section 8.18</u> include a continuing guaranty of payment and not merely of collection.  Noramco represents and warrants to the Seller that: (i) it is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware; (ii) it has the requisite power and authority to execute and deliver this Agreement, this Agreement has been duly executed and delivered by it and constitutes a valid and binding obligation of Noramco, enforceable against it in accordance with its terms; (iii) the execution and performance of this Agreement does not (a) conflict with or constitute a violation of its organizational documents, (b) conflict with or constitute a violation of any Law applicable to it, or (c) conflict with, constitute a default under, result in a breach or acceleration of or require notice to or the consent of any third party under any contract, agreement, commitment, mortgage, note, license or other instrument or obligation to which Noramco is party or, except where such default, breach or acceleration, failure to give notice or obtain consent would not have a material adverse effect on the business or financial condition of Noramco; and (iv) no consent, approval, governmental authorization, declaration or filing with, or notice to, any Governmental Entity is required in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.  To the fullest extent permitted by Law, Noramco hereby expressly waives any and all rights or defenses arising by reason of any Law which would otherwise require any election of remedies by the Seller. Noramco waives promptness, diligence, notice of the acceptance, presentment, demand for payment, notice of non-performance, default, dishonor and protest, and all other notices of any kind (except for notices to be provided to Purchaser in accordance with this Agreement or the Ancillary Documents).

# ARTICLE IX
## DEFINITIONS

As used herein, the terms below shall have the following meanings:

"<u>Acquisition Proposal</u>" means any offer, proposal or indication of interest of an unaffiliated third party to engage in an Alternative Transaction.

"<u>Action</u>" means any action, claim, complaint, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

"<u>Affiliate</u>" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; *provided*, that, "Affiliate" excludes, in the case of the Seller, any Person that is not a debtor in possession in the Chapter 11 Cases.

"<u>Agreement</u>" has the meaning set forth in the Preamble and shall include the Exhibits and Schedules annexed hereto or referred to herein.

"<u>Alternative Transaction</u>" means any direct or indirect sale of all or substantially all of the assets of, the Seller, the Business or any material portion of the Purchased Assets (other than in the ordinary course of business) or similar extraordinary corporate transaction directly or indirectly involving the Seller, including any merger, reorganization, recapitalization or liquidation, which would have the effect of preventing or impeding the consummation of the transactions contemplated herein.

"<u>Ancillary Documents</u>" means the Bill of Sale, Assignment and Assumption Agreement, Supply Agreement, Quality Agreement, Transition Services Agreement, the R&D Building Lease, the Manufacturing Building and Warehouses Lease, the Upper Mill Building Sublease and each other agreement, document or instrument (other than this Agreement) executed and delivered by the Parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"<u>Assigned Contracts</u>" means (i) the Executory Contracts that are listed, described or otherwise identified on <u>Schedule 1.1(e)</u>, as such schedule may be amended from time to time pursuant to <u>Section 1.5(e)</u> (other than any Contracts listed or described on <u>Schedule 1.2(r)</u>) and (ii) the Post-Petition Contracts listed, described or otherwise identified on <u>Schedule 1.1(f)</u>.

"<u>Benefit Plan</u>" means any employee benefit or compensation plan, program, agreement, policy or other arrangement, including those providing for employment, compensation, retirement, deferred compensation, severance, separation, relocation, repatriation, expatriation, termination pay, performance awards, bonus, incentive, stock option, stock purchase, stock bonus, phantom stock, stock appreciation right, supplemental retirement or other pension or welfare benefits, whether written or unwritten, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA (regardless of whether covered by ERISA), (i) which is or has been sponsored, maintained, contributed to, or required to be contributed to by the Seller (or to which the Seller is a Party) or any of its ERISA Affiliates for the benefit of any Business Employee or (ii) with respect to which the Seller or any of its ERISA Affiliates could have any liability with respect to any Business Employee.

"<u>Books and Records</u>" means all documents of, or otherwise in the possession, custody or control of, or used by, the Seller to the extent exclusively related to the Purchased Assets and the Assumed Liabilities including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, Tax Returns that relate solely to the Purchased Assets or the Business, title policies, lists of past, present or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports (including environmental reports and assessments), plans, mailing lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, works of authorship, and related books, records and workpapers, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), in each case whether or not in electronic form. "Books and Records" shall also include, subject to applicable law, the following current employment and current personnel information with respect

to each Transferred Employee, in each case, to the extent permitted by applicable Law: salary, wage grade, job function, variable compensation targets and business and personal mailing addresses and telephone numbers, including as applicable, any employment-related agreements, Family and Medical Leave Act (or similar) records and Forms I-9 (Employment Eligibility Verification) related to such Business Employee; provided that Transferred Employees' records shall not include any medical records or performance documentation. For clarity, the acquisition of any Books and Records hereunder shall not include any Intellectual Property contained therein or with respect thereto.

"Business Day" means any day, other than a Saturday, Sunday and any day that is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by applicable Law or other governmental action to close.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act (including any changes in state or local law that are analogous to provisions of the CARES Act or adopted to conform to the CARES Act) and any legislative or regulatory guidance issued pursuant thereto.

"CBA" means any collective bargaining agreement or other Contract with any labor union, labor organization, or works council.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, which relates to the Business, including (i) trade secrets, Know-How, compilations of data and analyses, techniques, systems, formulae, algorithms, research, records, reports, manuals, documentation, models, source code, data and data bases relating thereto and (ii) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable).

"Confidentiality Agreement" means the Confidentiality Agreement, between Noramco and the Seller, dated April 30, 2020, as may be amended from time to time.

"Contract" means any agreement, contract, subcontract, settlement agreement, lease, sublease, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or instrument.

"Control" or "Controlled" means, with respect to the applicable Intellectual Property, that a Party has the legal right or authority (whether by ownership, license or otherwise, other than pursuant to a license or sublicense granted under this Agreement), at the applicable time, to grant to the other Party a license or a sublicense to such Intellectual Property as provided for herein without violating (i) the terms of any agreement or other arrangements with any Third Party or (ii) any Law applicable to such license or sublicense.

"COVID-19" means the novel coronavirus, SARS-CoV-2 or COVID-19 (and all related strains and sequences), including any intensification, resurgence, or evolutions or mutations thereof or related or associated epidemics, pandemics or disease outbreaks or public health emergencies.

"Deferring Payroll Tax Presidential Memorandum" means the presidential memorandum for the Secretary of the Treasury regarding "Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster" signed by the President of the United States on August 8, 2020.

"Designation Deadline" means the earlier of (i) 60 days after the Closing Date and (ii) the effective date of a Chapter 11 plan of the Seller.

"drug master files" means drug master files and any foreign equivalents, including Master Files and Certificates of Suitability.

"Effect" means any change, effect, development, circumstance, condition, fact, state of facts, event or occurrence.

"EMA" means the European Medicines Agency.

"Encumbrance" means any lien, pledge, hypothecation, mortgage, deed of trust, security interest, encumbrance, covenant, charge, claim, option, right of first refusal, easement, right of way, encroachment, occupancy right, preemptive right, community property interest or restriction of any nature, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether voluntarily incurred or arising by operation of Law.

"Environmental Laws" means any and all applicable Laws, Permits and Orders which (a) regulate or relate to the pollution, protection or clean-up of the environment, the use, treatment, storage, transportation, handling, disposal or release of Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, soil, sediment, wildlife, plants or other natural resources, or the health and safety of Persons or property, including protection of the health and safety of employees or the public, or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), or any other Law of similar effect.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Excluded Taxes" means any (i) Taxes imposed on or with respect to the Purchased Assets, the Assumed Liabilities or the Business for any Pre-Closing Tax Period, (ii) Taxes imposed on or with respect to the Excluded Assets or the Excluded Liabilities for any taxable

period, (iii) Periodic Taxes for which the Seller is responsible pursuant to Section 8.1(b) and (iv) Taxes deferred under CARES Act or the Deferring Payroll Tax Presidential Memorandum. For purposes of this Agreement, in the case of any Straddle Period, Periodic Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in the manner set forth in Section 8.1(b).

"FDA" means the U.S. Food and Drug Administration.

"Good Manufacturing Practices" means, with respect to the Seller, standards for the manufacture, processing, packaging, testing, transportation, handling and holding of drug products, as set forth in the FDCA and applicable regulations promulgated thereunder, as amended from time to time, and such standards of good manufacturing practices as are required by Regulatory Authorities in any other countries in which the APIs are sold or intended to be sold, including applicable regulations or guidelines from the International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, to the extent such standards are more stringent than those applicable in the United States.

"Governmental Entity" means (i) any supranational, national, federal, state, county, municipal, local, or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to government, (ii) any public international governmental organization or (iii) any agency, division, bureau, department, commission, board, arbitral or other tribunal (public or private), branch or other political subdivision of any government, entity or organization described in the foregoing clause (i) or (ii) of this definition (including patent and trademark offices and self-regulatory organizations).

"Hazardous Substance" means any pollutant and any toxic, hazardous, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical or chemical compound, and any other substance, material or waste, whether solid, liquid or gas, that may give rise to liability or standards of conduct pursuant to any Environmental Laws, including any petroleum product or byproduct, solvent, flammable or explosive material, radioactive material, asbestos, lead paint, polychlorinated biphenyls (or PCBs), dioxins, dibenzofurans, per- and poly-fluoroalkyl substances, heavy metals, or radon gas.

"Health Laws" means (i) the U.S. Food, Drug and Cosmetic Act, (ii) the Public Health Service Act, (iii) the Controlled Substances Act, (iv) all regulations promulgated pursuant to the aforementioned statutes, including Good Manufacturing Practices regulations; (v) state provincial licensing, disclosure and reporting requirements; and (vi) any comparable Law related to the manufacturing, processing, storing, quality control testing, packaging, releasing, importing, or exporting of active pharmaceutical ingredients or narcotic raw materials administered by any state or federal Governmental Entity or any Governmental Entity outside of the United States, each such clause (i) through (vi) as may be amended from time to time.

"Indebtedness" means, with respect to any Person, (i) all obligations for borrowed money, (ii) all obligations evidenced by bonds, debentures, notes or similar instruments, (iii) all Indebtedness of others secured by any Encumbrance on owned or acquired property of the reference Person, whether or not the Indebtedness secured thereby has been assumed, (iv) all guarantees (or any other arrangement having the economic effect of a guarantee) of Indebtedness

of others, (v) all obligations representing the deferred and unpaid purchase price of property (other than trade payables incurred in the ordinary course of business consistent with past practice), (vi) all obligations, contingent or otherwise, in respect of bankers' acceptances or letters of credit, (vii) any unpaid paid wages, salaries, wage premiums, bonuses, commissions, fees, severance or other compensation to the Business Employees and to all contractors or independent contractors performing services on behalf of the Business, (viii) net cash payment obligations of such Person under swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof (assuming they were terminated on the date of determination).

"Intellectual Property" shall mean, collectively, all intellectual property and industrial property throughout the world, including rights of the following types, under the laws of any jurisdiction in the world: (i) rights in works of authorship, including exclusive exploitation rights, copyrights and copyrightable subject matter, moral rights, software database rights and databases (collectively, but for clarity excluding Patents, "Copyrights"); (ii) trademarks, service marks, trade dress, logos, trade names and other source or origin identifiers (collectively, "Marks"), domain names and URLs and similar rights and any goodwill associated therewith; (iii) trade secrets, know-how, inventions, invention disclosures, methods, processes, protocols, specifications, techniques, data, results, plans, formulae, formulations, compositions, specifications, and other forms of technology (collectively, but excluding Patents, "Know-How"); (iv) patents and patent applications, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions and foreign counterparts thereof (collectively, "Patents"); and (v) rights of privacy and publicity, and (vi) along with respect to each of the foregoing (i) through (v), (1) all rights to prosecute and perfect the same through administrative prosecution, registration, recordation or other administrative proceeding, (2) all applications and registrations for the foregoing, and (3) all Causes of Action and rights to sue or seek other remedies arising from or relating to the foregoing (the foregoing subsections (vi)(1) and (vi)(2), collectively, "Ancillary IP Rights").

"Knowledge of the Purchaser" means the actual knowledge of the individuals set forth on Article IX of the Purchaser Disclosure Letter.

"Knowledge of the Seller" means the actual knowledge of the individuals set forth on Article IX of the Seller Disclosure Letter.

"Law" means any law (including common law), act, statute, requirement, code, rule, regulation, Order, ordinance decree, regulatory guidance or other pronouncement of any Governmental Entity.

"Licensed Business IP" means all (i) Patents expressly set forth on Exhibit I, (ii) the Copyright registrations and applications expressly set forth on Exhibit J; and (iii) all Copyrights that are not the subject of an application or registration and Know-How that are (a) owned as of the Closing by Seller or any of its Subsidiaries and (b) used or held for use in the Manufacture, or development for use in the Manufacture, of the APIs or Purchased Products, or otherwise in the conduct of the Business. Notwithstanding the foregoing, the Licensed Business IP shall not include any and all Intellectual Property that is primarily used or held for use with respect to Oxycodone or Oxycodone Products.

"Losses" means any and all damages, losses, liabilities, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs and expenses (including the reasonable costs and expenses of attorney incurred in the defense thereof) but excluding consequential damages, special damages, incidental damages, loss of profits, diminution in value, damages based on multiple of earnings, loss of business reputation, punitive and exemplary damages (other than such damages awarded to any third party against the Seller).

"made available" shall mean that the Seller or any of its Representatives has posted such materials to the virtual data room hosted at intralinks.com, but only if so posted prior to the date of this Agreement and which is available and accessible by the Purchaser and its Representatives on the Closing Date and for one (1) Business Day thereafter, or has directly delivered such materials to Purchaser or its counsel or financial advisor.

"Manufacture" and "Manufacturing" means the activities conducted or to be conducted at the Real Property to produce APIs, including the manufacturing, processing, storing, quality control testing, packaging and release of such APIs, and related operations.

"Manufacturing Building" means the manufacturing building located at 500 Washington Street, Coventry, Rhode Island, 02816 on Subdivision Lot 2, A.P. 56, Lot 113.2.

"Material Adverse Effect" means any Effect that, individually or in the aggregate, results in, or would reasonably be expected to (x) result in a material adverse effect on the Business (including the operation thereof), the Purchased Assets and the Assumed Liabilities, taken as a whole, excluding any Effects, either alone or in combination, resulting from, arising out of or relating to the Chapter 11 Cases (including the resolution of litigation and federal and state government matters by Affiliates of Seller), or (y) prevent, impede or delay the consummation of the transactions contemplated herein or the Ancillary Documents; *provided*, *however*, that, solely with respect to the foregoing clause (x), no Effects resulting or arising from the following shall be deemed to constitute a Material Adverse Effect or shall be taken into account when determining whether a Material Adverse Effect exists or has occurred:  (i) the Excluded Assets or the Excluded Liabilities, (ii) changes in general economic, financial or securities markets or geopolitical conditions, (iii) general changes or developments in business, regulatory or macroeconomic conditions or trends or the industries and markets in which the Business operates, (iv) the entry into this Agreement (provided that such exception shall not apply for purposes of the Material Adverse Effect qualification set forth in Section 3.4), the announcement of the Acquisition, the identity of the Purchaser or the consummation of the transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, licensors, licensees, partners or employees of the Business as a result thereof, (v) any actions expressly required to be taken or expressly required to be omitted by the Seller under this Agreement or any action or omission by the Purchaser which action or omission constitutes a material breach of this Agreement, (vi) any action which is expressly requested in writing by the Purchaser after the date hereof, (vii) changes in (or proposals to change) any applicable Laws or applicable accounting regulations or principles or the enforcement or interpretation thereof, in each case after the date hereof, (viii) any outbreak or escalation of hostilities or war or any act of terrorism or natural disaster or act of God, (ix) any epidemic, pandemic or other similar outbreak (including the COVID-19 virus) or material worsening of such matters existing as of the date

hereof and (x) any failure of the Business to meet any budgets, plans, projections or forecasts (internal or otherwise) (provided that the underlying cause of such failures may be taken into account); *provided* that, the Effects described in clauses (ii), (iii), (vii), (viii) and (ix), shall be taken into account to the extent that such Effects have a disproportionate impact on the Seller or the Business as compared to other persons engaged in the Business which operate in the same industry as the Seller.

"Non-Transferred NDA" means all non-disclosure and/or confidentiality agreements entered into between Seller (or its Affiliates) and (i) third parties other than Purchaser and its Affiliates that were entered into in connection with such third parties' review and consideration of an acquisition or business combination transaction with respect to the Business in the 12 months preceding the date hereof or between the date hereof and the Closing or (ii) former employees (x) who would have been Business Employees if such employees were still employed by Seller (or its Affiliates) and (y) whose employment with the Seller (or its Affiliates) was terminated within the two (2) year period immediately preceding the Closing Date.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Entity.

"Oxycodone" means oxycodone or any metabolite, salt, hydrate, solvate, enantiomer, free acid form, free base form, crystalline form, co-crystalline form, amorphous form, pro drug (including ester pro drug) form, racemate, polymorph, chelate, stereoisomer, tautomer, optically active form thereof or any other modification or derivative thereof, including any Oxycodone API.

"Oxycodone APIs" means those Oxycodone active pharmaceutical ingredients described in drug master files Nos. 16399 and 31377.

"Oxycodone Finished Product" means any pharmaceutical product, including all forms, presentations, doses and formulations, containing Oxycodone alone or in combination with other therapeutically active ingredients, including the product sold in the United States under the name OXYCONTIN as of the date hereof.

"Permitted Post-Closing Encumbrances" means any Encumbrance that is not extinguished by the Sale Order under applicable Law, it being understood that the Sale Order shall extinguish Encumbrances to the maximum extent permissible under applicable Law.

"Permitted Pre-Closing Encumbrances" means, prior to the Closing Date, (i) liens for Taxes and other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings, (ii) statutory liens and rights of set-off of carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, in each case, incurred in the ordinary course of business (A) for amounts not yet overdue, (B) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of sixty (60) days) are being contested in good faith, or (C) for amounts as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, (iii) liens securing rental payments under capitalized lease obligations, (iv) rights of setoff or banker's liens upon deposits of cash in favor of banks or other depositary institutions, (v) pledges or deposits under

worker's compensation, unemployment insurance and social security Laws to the extent required by applicable Law, (vi) rights of third parties pursuant to ground leases, leases, subleases, real property licenses, concessions or similar agreements, (vii) matters that would be disclosed by an accurate survey or inspection of the Real Property; (viii) local, county, state and federal ordinances, regulations, building codes or permits, now or hereafter in effect, relating to real property, (ix) restrictions or requirements set forth in any Permits relating to the Business, (x) violations, if any, arising out of the adoption, promulgation, repeal, modification or reinterpretation of any Order or Law which occurs subsequent to the date hereof, (xi) Encumbrances caused by or resulting from the acts or omissions of the Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (xii) Encumbrances arising by operation of Law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods, (xii) Encumbrances extinguished by the Sale Order, (xiii) licenses or other grants of rights to use or obligations with respect to Intellectual Property that are granted by Seller in the ordinary course of business, (xiv) liens and other matters disclosed on the Title Report, and (xv) Encumbrances set forth in Article IX of the Seller Disclosure Letter.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"Post-Petition Contracts" means Contracts of the Seller entered into by the Seller in the ordinary course of business or approved by the Bankruptcy Court, in either case after September 15, 2019 and, if entered into after the date hereof, in accordance with this Agreement.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on the end of the day of the Closing Date.

"Purchaser Fundamental Representations" means the representations and warranties set forth in Section 4.1, Section 4.2, clause (a) of Section 4.4 and Section 4.8.

"Purdue Intellectual Property" means Intellectual Property owned by, or with respect to which a license or other rights are granted to, Purdue or any of its Affiliates.

"R&D Building" means the research and development lab facility located at 500 Washington Street, Coventry, Rhode Island, 02816, at Subdivision Lot 24, A.P. 48, Lot 113.24.

"Regulatory Authority" means any national or supranational governmental authority, including the FDA, Health Canada or the EMA, with responsibility for granting any license, registrations or approvals with respect to the APIs.

"Regulatory Authorizations" means any approvals, clearances, authorizations, registrations, certifications, licenses and permits granted by any Regulatory Authority.

"Relevant Subsidiaries" means, collectively, all Subsidiaries of the Seller that have any right, title or interest in, to or under the Purchased Assets.

"Representatives" means, when used with respect to any Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers, financing sources and other agents, advisors and representatives of such Person and its Subsidiaries.

"Retained Books and Records" means (i) all books and records not exclusively related to the Purchased Assets or the Assumed Liabilities, (ii) confidential personnel and medical records pertaining to any employee of the Seller who is not a Transferred Employee, (iii) books and records that exclusively relate to any products (including API), (iv) standard operating procedures and validation reports, (v) Tax Returns and related records and workpapers, financial statements, and corporate or other entity filings, (vi) documents relating to proposals to acquire the Seller's business by persons other than the Purchaser, (vii) books and records that the Seller is required to retain under applicable Law and (viii) all books and records related to Oxycodone or Oxycodone Finished Product.

"Sale Motion" means a motion to be filed by the Seller in the Chapter 11 Cases seeking entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit G, with such changes as the Purchaser and the Seller find reasonably acceptable, that has not been stayed, vacated or stayed pending appeal, authorizing and approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Seller to consummate the transactions contemplated hereby pursuant to sections 105, 363 and 365 of the Bankruptcy Code and providing, among other things, substantially as follows: that (i) the Purchased Assets will be transferred to the Purchaser free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances) and claims, including, for the avoidance of doubt, any claims related to product liability claims; (ii) the Seller is authorized and empowered to assume and assign the Assigned Contracts to Purchaser; (iii) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iv) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; (v) the Purchaser is not a successor of the Seller or any of the Relevant Subsidiaries; and (vi) the Bankruptcy Court will retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof.

"Seller Fundamental Representations" means the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.3, clause (i) of Section 3.4, Section 3.6(b) and Section 3.8.

"Seller Marks" means (i) PURDUE, (ii) RHODES, and (iii) any and all Marks containing or comprising any of the foregoing (i) or (ii), including any Marks confusingly similar thereto or dilutive thereof.

"Straddle Period" means a taxable period that includes but does not end on the Closing Date.

"Subsidiary" means with respect to any Person, any corporation, limited liability company, partnership or other organization, whether incorporated or unincorporated, of which (a) at least a majority of the outstanding shares of capital stock of, or other equity interests, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation, limited liability company, partnership or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, or (b) with respect to a partnership, such Person or any other Subsidiary of such Person is a general partner of such partnership.

"Superior Proposal" means a bona fide written Acquisition Proposal for an Alternative Transaction that (i) is on terms that the Seller (or a committee thereof) has determined in good faith (after consultation with its financial advisor and outside legal counsel) is reasonably likely to be consummated in accordance with its terms, taking into account all legal, regulatory and financing aspects of the proposal (including certainty of closing) and the identity of the Person making the proposal and other aspects of the Acquisition Proposal that the Seller (or a committee thereof) deems relevant, if consummated, to be more favorable, from a financial point of view, to the Seller, its creditors and its bankruptcy estate than the transactions contemplated herein and provides for an aggregate purchase price (including, for the avoidance of doubt, the present value of any future credits expected to be provided to the Seller pursuant to the terms hereof) of at least $1,000,000 more than the aggregate purchase price provided for under this Agreement (taking into account any revisions to this Agreement made or proposed in writing by Purchaser prior to the time of such determination).

"Supply IP" has the meaning set forth in the Supply Agreement.

"Tax" or "Taxes" means (i) any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other charges and fees in the nature of a tax imposed by any Governmental Entity, whether or not disputed, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto, (ii) any liability for or in respect of the payment of any amount of a type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, unitary or other group for Tax purposes; and (iii) any liability for or in respect of the payment of any amount described in clauses (i) or (ii) of this definition as a transferee or successor, or by contract (other than commercial contracts entered into in the ordinary course of business, a principal purpose of which is not Taxes).

"Tax Return" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"Taxing Authority" means any federal, state, local or foreign Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

"Title Report" means the title report issued by Chicago Title attached hereto as Exhibit H, which Exhibit H may be modified prior to the Closing by Purchaser following receipt of the Survey and an updated title commitment.

"Upper Mill Building Lease" means that certain lease agreement, dated as of November 30, 2011, by and between Clariant Corporation, as landlord, and Rhodes Technologies, as tenant.

"Warehouses" mean (i) the warehouse building commonly known as "Building 7"; and (ii) the warehouse building commonly known as "Building 6," each located on "Parcel 1" described in the Title Report for the Real Property owned by the Seller.

Terms Defined Elsewhere.  The following terms are defined elsewhere in this Agreement, as indicated below:

| Term | Section |
|---|---|
| Acquisition | Recitals |
| Additional Purchase Price Rebate | Section 1.6(a)(ii) |
| Agreement | Preamble |
| Allocation | Section 1.11 |
| APIs | Recitals |
| Assigned Contracts | Section 1.5(e) |
| Assigned Employment Agreements | Section 1.1(n) |
| Assignment and Assumption Agreement | Section 2.2(a)(iii) |
| Assumed Liabilities | Section 1.3 |
| Avoidance Actions | Section 1.1(p) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Base Year | Section 1.6(a)(ii) |
| Bill of Sale | Section 2.2(a)(i) |
| Break-Up Fee | Section 7.2(b) |
| Business | Recitals |
| Business Employees | Section 3.15(a) |
| Catch-Up Amount | Section 1.6(a)(iii) |
| Causes of Action | Section 8.17(a) |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.1 |
| Closing Date | Section 2.1 |
| Continuation Period | Section 5.11(c) |
| Credit | Section 1.7(a) |
| Credit Amount | Section 1.7(b) |
| Cure Costs | Section 1.5(a) |
| DEA | Section 1.2(d) |
| Designated Parties | Section 1.1(p) |
| Disputed Item | Section 1.7(d) |
| Election Deadline | Section 5.11(c) |
| Enforceability Limitations | Section 3.2 |

Environmental Indemnity Agreement ..................................................................Section 1.1(o)
Excess Cure Amount ...........................................................................................Section 1.5(b)
Excess Purchase Year ..................................................................................... Section 1.6(a)(iii)
Excess Supply Amount .................................................................................. Section 1.6(a)(iii)
Excluded API Drug Substance .........................................................................Section 1.8(a)
Excluded Assets .................................................................................................. Section 1.2
Excluded Inventory ..........................................................................................Section 1.8(a)
Excluded Liabilities ............................................................................................ Section 1.4
Excluded WIP ...................................................................................................Section 1.8(a)
Executory Contract ...........................................................................................Section 1.5(a)
Executory Contracts List ..................................................................................Section 1.5(a)
Expense Reimbursement ...................................................................................Section 7.2(b)
Final Credit Amount .........................................................................................Section 1.7(e)
Financial Information ........................................................................................Section 3.5(a)
Foreign National Employees .............................................................................Section 5.11(j)
Improvement Business IP ..................................................................................Section 5.14(b)
Independent Accountant ...................................................................................Section 1.7(e)
Inventory...........................................................................................................Section 1.1(b)
KERP ................................................................................................................Section 5.11(g)
Manufacturing Building and Warehouses Lease ................................................Section 5.3(a)
Material Contracts.............................................................................................Section 3.12(a)
Material Customer............................................................................................. Section 3.20
Material Supplier .............................................................................................. Section 3.20
Non-Transferred Employee ...............................................................................Section 5.11(d)
Noramco ............................................................................................................Preamble
Notice of Objection ...........................................................................................Section 1.7(d)
Offer Employees ...............................................................................................Section 5.11(b)
Outside Date ..................................................................................................... Section 7.1(a)
Oxycodone IP ...................................................................................................Section 1.2(e)
Oxycodone Products .........................................................................................Section 5.6(b)
Parties ...............................................................................................................Preamble
Party ..................................................................................................................Preamble
Paying Party......................................................................................................Section 8.1(c)
Periodic Taxes...................................................................................................Section 8.1(b)
Permits ..............................................................................................................Section 3.13(b)
Phase Out Period ............................................................................................... Section 5.13
Proposed Credit Amount ...................................................................................Section 1.7(c)
PTO Elections ...................................................................................................Section 5.11(c)
Purchase Price...................................................................................................Section 1.6(a)
Purchased Assets ............................................................................................... Section 1.1
Purchased IP .....................................................................................................Section 1.1(h)
Purchased IT .....................................................................................................Section 1.1(g)
Purchased Products ...........................................................................................Section 1.1(j)
Purchaser ..........................................................................................................Preamble
Purchaser 401(k) Plan ...................................................................................... Section 5.11(f)
Purchaser Disclosure Letter...............................................................................Article IV

Purchaser Expense Amount ........................................................................... Section 1.9
Purchaser Released Parties ..................................................................... Section 8.17(b)
Purchaser Taxes Amount ........................................................................ Section 8.1(c)
Purchaser's Allocation ............................................................................. Section 1.11
Purdue ........................................................................................................ Section 1.7(a)
Quality Agreement .................................................................................. Section 6.1(d)
Quality Agreement Amendment ............................................................... Section 5.20
Quarterly Credit ...................................................................................... Section 1.7(a)
Quarterly Financial Information .............................................................. Section 3.5(a)
Quarterly Undisputed Credit Amount ...................................................... Section 1.7(f)
R&D Building Lease ................................................................................ Section 5.3(a)
Real Property ........................................................................................... Section 1.1(a)
Rebate Period ....................................................................................... Section 1.6(a)(ii)
Reimbursing Party ................................................................................... Section 8.1(c)
Restricted Asset ...................................................................................... Section 1.5(c)
Restricted Right ...................................................................................... Section 1.5(c)
Retained Benefit Plans ............................................................................ Section 1.2(t)
RI Employee ........................................................................................... Section 5.11(c)
Sales and Use Taxes ............................................................................... Section 8.1(a)
Security Deposits .................................................................................... Section 5.16
Seller ............................................................................................................ Preamble
Seller 401(k) Plan .................................................................................. Section 5.11(f)
Seller Disclosure Letter ................................................................................ Article III
Seller Expense Amount ............................................................................... Section 1.9
Seller Released Parties ........................................................................... Section 8.17(a)
Seller Taxes Amount ............................................................................... Section 8.1(c)
Seller's Allocation Notice ........................................................................ Section 1.11
Seller-Paid Taxes Amount ....................................................................... Section 8.1(c)
Supply Agreement ................................................................................... Section 6.1(c)
Survey ...................................................................................................... Section 5.19
Title Company ......................................................................................... Section 5.19
Title Policy .............................................................................................. Section 5.19
Transfer Taxes ........................................................................................ Section 8.1(a)
Transferred Employee ............................................................................ Section 5.11(b)
Transition Services Agreement .............................................................. Section 6.1(e)
Undisputed Credit Amount ..................................................................... Section 1.7(f)
Upper Mill Building Sublease ................................................................. Section 5.3(b)
WARN Act .............................................................................................. Section 3.15(c)

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed on their behalf as of the date first written above.

**SELLER:**

**Rhodes Technologies**

By: Purdue Pharma Inc., its managing general partner

By: _____
    Name: David Lundie
    Title:  Chief Technical Operations
           Officer

**PURCHASER:**

**Noramco Coventry LLC**

By: _____
    Name:
    Title:

**Noramco, LLC, solely for the purpose of Section 8.18**

By: _____
    Name:
    Title:

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed on their behalf as of the date first written above.

**SELLER:**

**Rhodes Technologies**

By: Purdue Pharma Inc., its managing general partner

By: _____
      Name:
      Title:

**PURCHASER:**

**Noramco Coventry LLC**

By: _____
      Name: L. Lee Karras
      Title:   Chief Executive Officer and President

**Noramco, LLC, solely for the purpose of Section 8.18**

By: _____
      Name: L. Lee Karras
      Title:   Chief Executive Officer and President

## Exhibit A

### Real Property[1]

<u>Button Land</u>

That certain tract or parcel of land with all the buildings and improvements thereon, situated on the southerly side of South Street in the Town of Coventry, County of Kent and State of Rhode Island being more particularly bounded and described as follows:

Beginning at a point on the southerly sideline of South Street, said point being the northwesterly corner of land now or formerly of Clariant AG, said point also being the northeasterly corner of herein described parcel;

Thence S 00"-32'-28" W for a distance of one hundred and 00/100 (100.00) feet to a point, said last course bounded easterly by land now or formerly of Clariant AG;

Thence S 89"-41'-16" W for a distance of eighty-seven and 00/100 (87.00) feet to a point, said last course bounded southerly by land now or formerly of Bernadette DiCarlo and land now or formerly of Clariant AG;

Thence N 00"-32'-28" E for a distance of one hundred and 00/100 (100.00) feet to a point on the southerly sideline of South Street, said last course is bounded westerly by land now or formerly of Clariant AG;

Thence N 89"-41'-16" E along the southerly sideline of said South Street for a distance of eighty-seven and 00/100 (87.00) feet to a point and place of beginning.

The above described parcel contains an area of 8,699 square feet of land more or less (0.20 +/- acres) and is shown on a plan entitled, "Boundary/Exisiting Conditions Survey Plat Map 56 Lots 106.1 & 106.2 #23 South Street, Coventry, Rhode Island, Dated October 10, 2008, Scale 1"=30' By: Crossman Engineering, Inc."

Said parcel is also described as follows:

That certain lot or parcel of land with all the bui8ldings and improvements thereon situated at the southerly side of Davis Street in the Village of Quidnick, in the Town of Coventry, County of Kent and State of Rhode Island and is laid out and designated as Lot No. 49 (forty-nine) on that plat entitled "Quidnick Mill Village, Coventry, R.I., Sept. 1927 by Albert Johnson" which said plat is on record in the Office of the Town Clerk of said Town of Coventry in Book No. 3 at Page 31.

Property Address:  23 South Street, Coventry, RI 02816
                   Plat: 56  Lot(s): 106.001

---

[1]   <u>Note to Draft</u>: Subject to update based on survey receipt.

## Quidnick Land

That certain tract or parcel of land with all the buildings and improvements thereon situated southerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island, being more particularly described as follows:

Beginning at the northeast corner of the herein described parcel, said point being marked by an iron pin, said point also being near the southerly end of South Street;

Thence S 00°-55'-01" W along a stone wall for a distance of two hundred ninety-one and 55/100 (291.55) feet to a point marked by a drill hole, said last course bounded easterly by land now or formerly of Muszynski, Henry M. & Stefanie Estate of;

Thence N 75°-15'-26" W partially along a stone wall for a distance of three hundred seventy-nine and 06/100 (379.06) feet to a point;

Thence N 00°-25'-54" W for a distance of one hundred ninety-three and 03/100 (193.03) feet to a point marked by an iron pipe, said last two courses bounded westerly and southerly by land now or formerly of Clariant AG;

Thence N 89°-41'-16" E for a distance of three hundred seventy-two and 71/100 (372.71) feet to the point and place of beginning, said last course bounded northerly by land now or formerly of Antonetta DiCarlo, land now or formerly of Clariant AG and South Street.

The above described parcel contains an area of 89,628 square feet of land more or less (2.06 +/- acres) and is shown on a plan entitled, "Boundary/Existing Conditions Survey Plat Map 56 Lots 106.1 & 106.2 #23 South Street, Coventry, Rhode Island, Dated October 10, 2008, Scale 1"=30' by Crossman Engineering, Inc."

Said parcel is also described as follows:

That certain lot or parcel of land with all the buildings and improvements thereon, situated at the southerly end of Davis Street in the Villa of Quidnick, in the Town of Coventry, County of Kent and State of Rhode Island and laid out and designated as Lot No. 63 (sixty-three) on that plat entitled, "Quidnick Mill Village, Coventry, R.I., September 1927 by Albert Johnson" which plat is recorded in the Office of the Town Clerk of said Town of Coventry in Book No. 3 at Page 31.

Property Address:  0 South Street, Coventry, RI 02816
                   Plat: 56  Lot(s): 106.002

## 500 Washington Street, 498 Washington Street and 6 South Street

Parcel 1

Parcel 'A':

That certain tract or parcel of land situated southerly of North Street, southwesterly of Pulaski Street and westerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'A' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South, Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared for: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 of 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS #1837." Said parcel is more particularly bounded and described as follows:

Beginning at the intersection of the southerly street line of North Street with the southwesterly street line of Pulaski Street;

thence proceeding S 41°-26'-57" E, by and with the said southwesterly street line of Pulaski Street a distance of 151.91' to its intersection with the northwesterly street line of South Street;

thence proceeding S 19°-22'-07" W, by and with the said northwesterly street line of South Street a distance of 90.87' to an angle point;

thence proceeding S 00°-38'-28" W and continuing by and with the said street line of South Street a distance of 19.17' to its intersection with the northerly street line of Paul Street;

thence proceeding N 89°-21'-54" W, partly along the said northerly street line of Paul Street and bounded southerly partly by Parcel 'B', hereafter described which is now or formerly of Hoechst Celanese Corporation a distance of 167.72' to a corner;

thence proceeding N 04°-10'-56" E a distance of 130.59' to a corner;

thence proceeding N 83°29'15" W a distance of 44.71' to an angle point;

thence proceeding S 89°-57'-45" W a distance of 135.63' to a corner;

thence proceeding N 29°-26'-53" W a distance of 47.00' to an angle point;

thence proceeding N 42°-48'-05" W a distance of 110.70' to the said southerly street line of North Street. The last five herein described courses are bounded westerly, southerly and southwesterly said Parcel 'B' of the Hoechst Celanese Corporation;

thence proceeding S 83°-41'-47" E along the said southerly street line of North Street a distance of 368.58' to the point and place of beginning.

Parcel 'B':

That certain tract or parcel of land situated southerly of North Street, southwesterly of Pulaski Street and westerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'B' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South, Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared For: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 of 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS

#1837." Said parcel is more particularly bounded and described as follows:

Beginning at the northwesterly corner of the premises herein described at the intersection of the southerly street line of the abandoned portion of North Street with the easterly street line of Quidnick Street, a private road;

thence proceeding S 83°-41'-47" E, by and with the said southerly street line of the abandoned portion of North Street a distance of 69.38' to the northeasterly corner of the parcel herein described and the northwesterly corner Parcel 'A' of the Hoechst Celanese Corporation;

thence proceeding S 42°-48'-05" E a distance of 110.70' to an angle point;

thence proceeding S 29°-26'-53" E a distance of 47.00' to a corner;

thence proceeding N 89°-57'-45" E a distance of 135.63' to an angle point;

thence proceeding S 83°-29'-15" E a distance of 44.71' to a corner;

thence proceeding S 04°-10'-56" W a distance of 130.59' to a corner;

thence proceeding S 89°-21'-54" E a distance of 17.27' to an iron pipe at the westerly terminus of Paul Street. The last six herein described courses are bounded northeasterly, northerly, easterly and northerly by said Parcel 'A' of the Hoechst Celanese Corporation;

thence proceeding S 00°-45'-54" W a distance-of 20.00' to a corner;

thence proceeding S 89°-14'-06" E a distance of 1.00' to a corner;

thence proceeding S 00°-45'-54" E a distance of 19.87' to an iron pipe at the northwesterly corner of land now or formerly of Joseph W. & Beatrice R. Chauvette. The last three herein described courses run by and with the said westerly terminus of Paul Street;

thence continuing S 00°-45'-54" E, bounded easterly by said Chauvette land a distance of 120.00' to the southwesterly corner of said Chauvette land and Parcel 'C' of the Hoechst Celanese Corporation;

thence proceeding N 89°-21'-54" W a distance of 193.01' to a corner;

thence proceeding S 01°-23'-54" E a distance of 29.17' to a corner;

thence proceeding S 88°-34'-12" W a distance of 162.74' to the said former easterly street line of Quidnick Street, a private road and the northwesterly corner of said Parcel 'C' of the Hoechst Celanese Corporation. The last three herein described courses are bounded southerly and easterly by said Parcel 'C' of the Hoechst Celanese Corporation;

thence proceeding N 00°-05'-56" W, by and with the said former easterly street line of Quidnick Street a distance of 141.00' to an angle point;

thence proceeding N 00°-11'-48 E and continuing by and with the said easterly street line of Quidnick Street a distance of 295.20' to the point and place of beginning.

Parcel 'C':

That certain tract or parcel of land situated southerly of North Street, southwesterly of Pulaski Street and westerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'C' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South, Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared For: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 of 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS #1837." Said parcel is more particularly bounded and described as follows:

Beginning at a point in the westerly street line of said South Street. Said point of beginning is also the southeasterly corner of land now or formerly of Joseph W. & Beatrice R. Chauvette and the northeasterly corner of the parcel herein described;

thence proceeding S 00°-38'-28" W. by and with the said westerly street line of South Street a distance of 113.33' to a corner;

thence proceeding S 89°-51'-09" Wand continuing partly by and with the said northerly street line of South Street and partly bounded southerly by a portion of said South Street which was abandoned and is now or formerly land of the Hoechst Celanese Corporation a distance of 503.31' to the former easterly street line of Quidnick Street a private road and the southwesterly corner of the parcel herein described;

thence proceeding N 00°-05'-56" W by and with the said former street line of Quidnick Street a distance of 85.19' to the northwesterly corner of the parcel herein described at the southwesterly corner of Parcel 'B' of the Hoechst Celanese Corporation;

thence proceeding N 88°-34'-12" E a distance of 162.74' to a corner;

thence proceeding N 01°-13'-54" W a distance of 29.17' to a corner. The last two herein described courses are bounded northerly and westerly by said Parcel 'B';

thence proceeding S 89°-21'-54" E, bounded northerly in part by said Parcel 'B' and in part by said Chauvette land a distance of 342.77' to the said westerly street line of South Street and the point and place of beginning.

Parcel 'F'

That certain tract or parcel of land situated southerly of North Street southwesterly of Pulaski Street and westerly of South Street in the Town or Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'F' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South. Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared For: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 or 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS #1837." Said parcel is more particularly bounded and described as follows:

Beginning at the intersection of the southwesterly street line of Pulaski Street and the easterly street line of South Street at the most northerly corner of the parcel herein described;

thence proceeding S 41°-26'-57" E. by and with the said southwesterly street line of Pulaski Street a distance of 164.40' to the most easterly corner of the parcel herein described at land now or formerly of Michael J. and Stasia A. Kennett;

thence proceeding S 50°-31'-03" W, bounded southeasterly by said Kennett land a distance of 90.00 to the most southerly corner of the parcel herein described at land now or former1y of Delores C. Del Mastro;

thence proceeding N 41°-26'-57" W. bounded southwesterly by said Del Mastro land a distance of 91.40' to the easterly street line of South Street;

thence proceeding N 00°-38'-28" E, by and with the said easterly street line of South Street a distance of 53.52' to an angle point;

thence proceeding N 19°-22'-07" E. by and with the said easterly street line of South Street a distance of 61.94' to the southwesterly street line of Pulaski Street and the point and place of beginning.

TOGETHER WITH the abandoned portions of Paul and Quidnick Streets abutting the premises.

TOGETHER WITH the rights conveyed in that Agreement and Deed recorded in Book 226 at page 183.

TOGETHER WITH the rights and easements set forth in Reciprocal Easement Agreement with Clariant Corp. recorded in Book 674 at Page 74.

498 Washington Street (also known as Map/Lot 0056-113.002 and 0056-103 by the Town of Coventry Tax Assessor as of December 31, 2019).

Parcel 2

Lots 1-12 (inclusive), 16, 24 and 25, as the same are depicted on the Administrative Subdivision Plan for Clariant Corporation, 500 Washington Street, Coventry, Rhode Island, prepared for Clariant Corporation in December 2009, prepared by John P. Caito Corporation, Civil Engineers - Land Planners, 141 James P. Murphy Highway, West Warwick, RI 02893-2382, dated December 17, 2009 and recorded on December 18, 2009 (the "Administrative Subdivision Plan") in the Town of Coventry Land Evidence Records, State of Rhode Island (the "Land Records"), as Map Number 1152 - 1160 and Instrument Number 8831, together with the improvements on such lots, including (i) the building on Lot 24 known as the " CTC Building;" (ii) the building on Lot 24 known as the "Security Building;" (iii) the buildings on Lot 25 known as the "HiRise Warehouse" and the support building known as the "HiRise Firewater Pump House;" and (iv) the building on Lot 16 known as the "Raw Material Warehouse"; and

Those lots depicted as Assessor' s Plat 5, Lots 248-251 (inclusive), alternatively depicted as "Old A.P. 5, Lots 248-251," alternatively depicted as " New A.P. 56, Lots 105 and 106.3," on Sheet 9 of the Administrative Subdivision Plan;

Said parcels also delineated on that plan set entitled "ALTA / ACSM Land Title Survey Plan, A.P. 48, Lots 113.1-113.10, 113.24, 113.25 and A.P. 56, Lots 105,113.11, 113.12 & 113.16 Washington Street, Quidnick Street, Pulaski Street, North Street & South Street, Coventry, Rhode Island November, 2011 by Waterman Engineering Co., Richard S. Lipsitz, P.L.S. No. 1837;

500 DD/EE/I/J/K/L/M/N/O/P/Q/R/S/T/W Washington Street (also known as Map/Lots 0048-113.024; 025; 0048-113.001 thru .010; 56-113.011; .012 and .016 by the Town of Coventry Tax Assessor as of December 31, 2019).

Parcel 3

Those three (3) lots of land with all buildings and improvements thereon, situated on the westerly side of South Street and on the southerly side of Paul Street in the Town of Coventry, County of Kent and State of Rhode Island, and laid out and designated as Lots numbered one (1), two (2) and three (3) on that plat entitled, "Plat of Napoleon Couture and Wife's Land Quidnick Village by Albert Johnson, 1930," which plat is recorded in the office of the Town Clerk in said Town of Coventry in Book 3 at Page 60.

6 South Street (also known as Map/Lot 0056-109.000 by the Town of Coventry Tax Assessor as of December 31, 2019).

**Exhibit B**

**Form of Quitclaim Deed**


**QUITCLAIM DEED**


[**RHODES TECHNOLOGIES**, a Delaware general partnership] *or* [**BUTTON LAND L.P.**, a Delaware Limited Partnership] *or* [**QUIDNICK LAND L.P.,** a Delaware Limited Partnership] [*Insert applicable Grantor*] with an address of 498 Washington Street, Coventry, Rhode Island ("Grantor"), for consideration paid in the amount of $[*Insert consideration*], grants to _____, a _____ with an address of _____, [*Insert name and address of Grantee*] ("Grantee") WITH QUITCLAIM COVENANTS,

> That certain lot or parcel of land, with all the buildings and improvements thereon, situated in the Town of Coventry, County of Kent, State of Rhode Island, more particularly described in Exhibit A attached hereto and made a part hereof.

Being the same premises conveyed to this Grantor by _____ Deed from _____ dated _____ and recorded in the Land Evidence Records of the Town of Coventry on _____ at _____ in Book _____ at Page _____. [*Insert parcel particulars*]

Being designated as Lot No. _____ on Assessor's Plat _____ of the Town of Coventry, as presently constituted. [*Insert parcel particulars*]

Subject to taxes assessed as of December 31, 202__.

Grantor represents that it has complied with the non-resident withholding provisions of R.I.G.L. Section 44-30-71.3 and that a discharge of lien is forthcoming from the R.I. Division of Taxation.

Grantor hereby certifies that the within transfer is exempt from the requirements of the Rhode Island Smoke and Carbon Monoxide Detector Law, R.I.G.L. 23.28.35-1 et seq. in

that the premises herein conveyed is not a residence and does not contain residential dwellings.

IN WITNESS WHEREOF, [**RHODES TECHNOLOGIES**] *or* [**BUTTON LAND L.P.**] *or* [**QUIDNICK LAND L.P.**] [*Insert applicable Grantor*] has caused these presents to be executed by its duly authorized _____ this ____ day of _____, 202__.

[**RHODES    TECHNOLOGIES**] *or* [**BUTTON    LAND    L.P.**] *or* [**QUIDNICK LAND L.P.**]

By: _____

Name: _____

Title: _____

STATE OF _____

COUNTY OF _____

In _____, in said County on the ____ day of _____, 202__ before    me    personally    appeared    _____, the _____ of [RHODES TECHNOLOGIES] *or* [BUTTON LAND L.P.] *or* [QUIDNICK LAND L.P.], to me known and known by me to be the party executing the foregoing instrument, and he/she acknowledged said instrument, by him/her executed, to be his/her free act and deed in said capacity and the free act and deed of [RHODES TECHNOLOGIES] *or* [BUTTON LAND L.P.] *or* [QUIDNICK LAND L.P.].

_____

Notary Public

Printed Name: _____

My Commission Expires: _____

**<u>Exhibit A</u>**

**<u>Legal Description</u>**

[*Insert applicable legal description*]

## Exhibit C-1

## Terms of Lease

R&D Facility (Coventry, RI)

| | |
|---|---|
| Lease: | Lease Agreement, dated as of [**Closing Date**], by and among [_____][1], as landlord, and Rhodes Pharmaceuticals L.P., as tenant. |
| Landlord: | [_____][2] |
| Tenant: | Rhodes Pharmaceuticals L.P. |
| Building: | The building on Lot 24 of the map attached hereto as **Exhibit A**, known as the "Research and Development Building" and "Buildings 13 and 14" based upon the site map attached hereto as **Exhibit A** and located on the former Rhodes Technologies Campus (the "Campus"). |
| Premises: | Tenant shall lease approximately 20,165 square feet of space on the 2nd floor of the Building located on 500 Washington Street, Coventry, Rhode Island. |
| | The "Premises" shall include Tenant's right to access and use all of the common areas and amenities of the Building, including without limitation, bathrooms for men and women (including handicapped accessible bathrooms), breakrooms, changing rooms, locker rooms and showers located in the Building (the "Amenities") which shall all be available for Tenant's employees and with respect to the bathrooms, Tenant's visitors.  During the Term, Landlord shall not remove any such Amenities existing in the Building as of the commencement date and shall maintain them in good repair and condition. |
| Furnishings: | Existing furniture, fixtures and equipment located in the Premises shall not be removed by Landlord and may be used by Tenant's during the Term. |

---

[1]    Note to Draft: Purchaser expects the landlord will be a newly-formed affiliate of Purchaser.

[2]    Note to Draft: Purchaser expects the landlord will be a newly-formed affiliate of Purchaser.

Term:                                From the Commencement Date to the Expiration Date.

Commencement Date:                   The Closing Date.

Expiration Date:                     December 31st, 2021

Extension / Renewal Options:         Commencing on the first quarter of 2022, Landlord will grant
                                     Tenant quarterly renewal options, but solely to the extent
                                     Landlord continues to operate the Campus or a portion
                                     thereof to produce APIs. At least 90 days prior to each
                                     quarter, (i) Landlord shall have the option to terminate the
                                     Lease by delivering to Tenant a written notice of non-renewal
                                     effective as of the day immediately preceding the beginning
                                     of such succeeding quarter and (ii) Tenant shall have the
                                     option to extend the Lease for such succeeding quarter by
                                     delivering to Landlord a written notice of renewal, but such
                                     notice of renewal will only be effective if Landlord has not
                                     properly delivered to Tenant a notice of non-renewal in
                                     accordance with clause (i). Failure of either Landlord or
                                     Tenant to give notice, will result in the term of the Lease to
                                     renew automatically for the succeeding quarter. The lease
                                     shall not be extendable beyond the earlier of (x) December
                                     31, 2022 or (y) the end of the last quarter in which product is
                                     manufactured at the Campus.

Annual Fixed Rent:                   $37.79  per square foot annually which is inclusive of
                                     Landlord's proportionate share of taxes, operating expenses
                                     and other amounts for the Building.

                                     $63,500 per month or $762,000 per annum.

Security Deposit:                    None.

Guarantor:                           None.

Permitted Use:                       Research and development, storage center, vault center, and
                                     ancillary uses thereto, including general, executive, office and
                                     administrative uses, and any other lawful use that is permitted
                                     by law.

Security:                            Landlord shall provide security services to Tenant and its
                                     employees and visitors, including, but not limited to: (i) at the
                                     entrances of the Building, (ii) the main security center
                                     services, (ii) Quidnick Street guard shack access (including

|  | any replacement thereof), and (iii) security card and badging with respect to the Premises. |
|---|---|
| Assignment / Subletting: | Tenant shall have the right to assign the lease or sublet the Premises or any part thereof without Landlord consent, so long as the use clause is not violated, to affiliates and corporate successors. In addition, Tenant shall have the right to assign the lease or sublet the Premises or any part thereof without Landlord consent in connection with any direct or indirect change of control of Tenant resulting from Tenant's emergence from bankruptcy.  All other assignments or subleases, including direct or indirect change of control of Tenant, shall require Landlord consent, such consent not to be unreasonably withheld, conditioned or delayed. |
| Parking Facility: | The parking lots, fixtures and other improvements and appurtenances now located or hereafter erected, located or placed directly adjacent to the Building, as further depicted in the Indicative Aerial View map attached hereto as **Exhibit B**. |
| Parking Allocation: | Tenant shall be allocated 1 reserved and designated parking spaces in the Parking Facility and 20 unreserved parking spaces.

Tenant shall also be allocated, at no additional cost, the use of the office trailer occupying approximately 3,600 square feet of the parking area located directly east of the "Research and Development Building". |
| Access: | Tenant, including Tenant's employees, vendors and visitors, shall have access to the Premises, the Amenities, the Building, the Parking Facilities and the Campus 24 hours a day, seven (7) days a week, 365 days a year. The Lease shall provide Tenant with the right to utilize Quidnick Street, North Street and South Street and related parking lots to gain access for foot traffic heading for the Upper Mill and R&D Buildings. |
| Services | Landlord shall provide cleaning, landscaping, snow removal, garbage and waste collection and disposal, heating and cooling of the interior of the Premises, fire safety, all utilities, security for the Building and the Premises. Minimum standards for each of the above, including minimum heating and cooling standards, shall be provided in the Lease. |

| | |
|---|---|
| Landlord's Work: | None. Premises to be delivered in its "as-is" condition. |
| Alterations: | Tenant shall not have any obligation to perform any alterations or improvements to the Premises. |
| | Tenant shall be permitted to perform such alterations that it requires in connection with its permitted use of the Premises without Landlord's consent or approval (but upon notice to Landlord and otherwise in compliance with all applicable requirements and the terms of the lease). |
| | Landlord shall not charge any supervisory or other fees for any initial or future alterations. |
| | Tenant shall not have any obligation to restore or remove any of its alterations at the end of the term of the lease but shall be permitted to remove its trade fixtures and personal property (collectively, "Tenant's Property") at the end of the term of the lease; it being agreed that any Tenant's Property remaining for more than thirty (30) days after the end of the term will be deemed abandoned. |
| Landlord's Maintenance Obligations | Landlord shall maintain, operate and repair (and replace as needed) the Building in good condition and repair (including, without limitation, all building systems, the Amenities, landscaping, windows, foundations, elevators (if any), the roof, the loading dock, exterior lighting, security systems, fences, gates and the parking area) in good order and condition, free of leaks, in compliance with all laws and ordinances. The Lease shall contain Landlord repair and maintenance covenants typical in leases of industrial properties. |
| Compliance With Law | During the Term, Landlord shall continue to cause the Building, the Amenities, the Campus and the Premises to be in compliance with all applicable laws and shall obtain and maintain all such permits and authorizations typical for the owner of a facility and a campus such as the Building and the Campus consistent with past practices. Tenant shall cause Tenant's operations within the Premises to be in compliance with all laws applicable to such operations and shall obtain and maintain all operational permits as operators of such facilities typically obtain and maintain. |

Ex. C-1-4

Tenant's Work Allowance:        None.

Tenant's Default; Termination   Fixed Rent: fourteen (14) days after notice.

Non-monetary: thirty (30) days, with due diligence extension.

Notice of Termination:  ten (10) days after expiration of notice periods above expiring without the default being cured within such ten (10) day period. If Landlord gives such notice of termination, the Lease shall terminate thirty (30) days after the giving of such notice to Tenant. Landlord shall not have the right to accelerate rental payments in the event of a termination of the lease and shall be required to use reasonable efforts to mitigate damages.

Self-help:                      Consistent with a customary commercial lease, Tenant shall not have self-help rights.

Insurance:[3]                   Landlord shall, during the entire Term, at Landlord's sole cost and expense, obtain and maintain in full force and effect, such insurance, as would a prudent owner, which insurance shall include the following, without limitation:

(i) All Risks (including flood and earthquake) insurance, in an amount of at least one hundred percent (100%) of the full replacement cost of the Building including, the leasehold improvements comprising a part thereof;

(ii) Broad Form Boiler and Machinery insurance, on a blanket repair and replacement basis, with limits for each accident in an amount of at least the replacement cost of the Building, Tenant's leasehold improvements, boilers, pressure vessels and miscellaneous electrical apparatus in or on the Premises; and

(iii) Comprehensive General Liability Insurance  with inclusive limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate.

Tenant shall be named as "additional insureds" with respect to all such insurance.

Tenant shall, during the entire Term, at Tenant's sole cost and expense, obtain and maintain in full force and effect, such

---

[3] Under review by Landlord's insurance team.

insurance in respect of the Premises, and the Tenant's trade fixtures, equipment and improvement thereon, as would a prudent tenant, which insurance coverage shall include the following without limitation:

(i) All Risks Tenant's property insurance for the replacement cost value of Tenant's owned furniture, fixtures and equipment, all alterations and installations, including loss of use thereof;

(ii) Comprehensive General Liability Insurance with inclusive limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate.

Landlord  shall be named as an "additional insured" with respect to all such insurance.

All insurance maintained by Landlord and Tenant with respect to the Building and the Premises shall include a "waiver of subrogation" clause.

| | |
|---|---|
| Casualty: | The Lease will include certain rights of landlord and Tenant to terminate in the event of a casualty, including the right to terminate if the estimated or actual restoration period exceeds the time periods set forth in the lease.  Rent shall be abated during the performance of restoration work. |
| | Tenant shall not have any obligation to deposit Tenant's insurance proceeds with Landlord or any other depository. |
| Condemnation: | Tenant shall have the right to terminate the lease if more than 15% of the Floor Area of the Premises or 10% or more of the parking area is taken.  The lease shall include customary provisions for the sharing of any condemnation award. |
| Signage | Tenant shall be permitted to retain all existing signage in the locations that exist as of the Commencement Date (and to replace the same). |
| Subordination and Non-Disturbance: | The Lease shall automatically be subordinate to Landlord's current and future financing.  Landlord shall use commercially reasonable efforts to obtain SNDA agreements from all existing and future mortgagees and superior lessors. All such SNDAs will be in a form reasonably acceptable to Landlord, Tenant and such third parties. |

Ex. C-1-6

**Exhibit A**

**Building Map**



# **Exhibit B**

## **Indicative Aerial View Map**



**Exhibit C-2**

**Terms of Lease**

Manufacturing Facility, Building 8 Warehouse and Building 6 Warehouse (Coventry, RI)

| | |
|---|---|
| Lease: | Lease Agreement, dated as of [**Closing Date**], by and among [_____][1] as landlord, and Rhodes Technologies and Rhodes Pharmaceuticals L.P., as tenants. |
| Landlord: | [_____][2] |
| Tenants: | Rhodes Technologies<br>Rhodes Pharmaceuticals L.P. |
| Buildings: | The buildings each located on the former Rhodes Technologies Campus (the "Campus") at 498 Washington Street, Coventry, Rhode Island, identified as follows:<br>• The building located on Lot 113.2 of the map attached hereto as Exhibit A, known as the Vault and Storage Building or Building 3<br>• The warehouse building located on Lot 113.2 of the map attached hereto as Exhibit A, known as "Building 8"; and<br>• The warehouse building located on Lot 113.2 of the map attached hereto as Exhibit A, known as "Building 6". |
| Premises: | Tenants shall lease the following:<br><br>• Approximately 42 square feet consisting of 3 pallet spaces in the main vault in Building 3;<br>• Approximately 84 square feet consisting of 6 pallet spaces in Building 8; and<br>• Approximately 168 square feet consisting of 12 pallet spaces in Building 6.<br><br>The "Premises" shall include Tenants' right to access and use all of the common areas of each Building, including without limitation, bathrooms for men and women (including handicapped accessible bathrooms) located on the floors in which the Premises is located in each Building. |

---

[1]    Note to Draft: Purchaser expects the landlord will be a newly-formed affiliate of Purchaser.

[2]    Note to Draft: Purchaser expects the landlord will be a newly-formed affiliate of Purchaser.

| | |
|---|---|
| Furnishings: | Existing furniture, fixtures and equipment located in the Premises shall not be removed by Landlord and may be used by Tenants during the Term. |
| Term: | From the Commencement Date to the Expiration Date. |
| Commencement Date: | The Closing Date. |
| Expiration Date: | December 31st, 2021 |
| Extension / Renewal Options: | Commencing on the first quarter of 2022, Landlord will grant Tenants quarterly renewal options, but solely to the extent Landlord continues to operate the Campus or a portion thereof to produce APIs. At least 90 days prior to each quarter, (i) Landlord shall have the option to terminate the Lease by delivering to Tenants a written notice of non-renewal effective as of the day immediately preceding the beginning of such succeeding quarter and (ii) Tenants shall have the option to extend the Lease for such succeeding quarter by delivering to Landlord a written notice of renewal, but such notice of renewal will only be effective if Landlord has not properly delivered to Tenants a notice of non-renewal in accordance with clause (i). Failure of either Landlord or Tenants to give notice, will result in the term of the Lease to renew automatically for the succeeding quarter. The lease shall not be extendable beyond the earlier of (x) December 31, 2022 or (y) the end of the last quarter in which product is manufactured at the Campus. |
| Annual Fixed Rent: | $40.76 per square foot annually, which is inclusive of Landlord's proportionate share of taxes, operating expenses and other amounts for the Building. |
| | Annual Fixed Rent shall be allocated to the Premises in each Building and follows: <br>• $143 per month for Building 3 (or $1,716 per annum); <br>• $286 per month for Building 8 (or $3,432 per annum); and <br>• $571 per month for Building 6 (or $6,852 per annum). |
| Security Deposit: | None. |

| | |
|---|---|
| Guarantor: | None. |
| Permitted Use: | Storage center, vault center, and ancillary uses thereto, including general, executive, office and administrative uses, and any other lawful use that is permitted by law. |
| Security: | Landlord shall provide security services to Tenants and its employees and visitors, including, but not limited to: (i) at the entrances of each Building, (ii) the main security center services, (ii) Quidnick Street guard shack access (including any replacement thereof), and (iii) security card and badging with respect to each Building. |
| Assignment / Subletting: | Tenant shall have the right to assign the lease or sublet the Premises or any part thereof without Landlord consent, so long as the use clause is not violated, to affiliates and corporate successors. In addition, Tenant shall have the right to assign the lease or sublet the Premises or any part thereof without Landlord consent in connection with any direct or indirect change of control of Tenant resulting from Tenant's emergence from bankruptcy.  All other assignments or subleases, including direct or indirect change of control of Tenant, shall require Landlord consent, such consent not to be unreasonably withheld, conditioned or delayed. |
| Access: | Tenants, including Tenants' employees, vendors and visitors, shall have access to the Premises, each Building, the Parking Facilities and the Campus 24 hours a day, seven (7) days a week, 365 days a year. The Lease shall provide Tenants with the right to utilize Quidnick Street, North Street and South Street and related parking lots to gain access for foot traffic heading for the Upper Mill and R&D Buildings. |
| Services | Landlord shall provide cleaning, landscaping, snow removal, garbage and waste collection and disposal, heating and cooling of the interior of the Premises, fire safety, all utilities, security  for each Building and the Premises. Minimum standards for each of the above, including minimum heating and cooling standards, shall be provided in the Lease. |
| Landlord's Work: | None. Premises to be delivered in its "as-is" condition.[3] |

---

[3]    Note: Pallet spaces in the Buildings may be separately partitioned from Landlord's retained premises.

| | |
|---|---|
| Alterations: | Tenants shall not have any obligation to perform any alterations or improvements to the Premises. |
| | Tenants shall be permitted to perform such alterations that it requires in connection with its permitted use of the Premises without Landlord's consent or approval (but upon notice to Landlord and otherwise in compliance with all applicable requirements and the terms of the lease). |
| | Landlord shall not charge any supervisory or other fees for any initial or future alterations. |
| | Tenants shall not have any obligation to restore or remove any of its alterations at the end of the term of the lease but shall be permitted to remove its trade fixtures and personal property (collectively, "Tenants' Property") at the end of the term of the lease; it being agreed that any Tenants' Property remaining for more than thirty (30) days after the end of the term will be deemed abandoned. |
| Landlord's Maintenance Obligations | Landlord shall maintain, operate and repair (and replace as needed) each Building in good condition and repair (including, without limitation, all building systems, landscaping, windows, foundations, elevators (if any), the roof, the loading dock, exterior lighting, security systems, fences, gates and the parking area) in good order and condition, free of leaks,  in compliance with all laws and ordinances. The Lease shall contain Landlord repair and maintenance covenants typical in leases of industrial properties. |
| Compliance With Law | During the Term, Landlord shall continue to cause each Building, the Campus and the Premises to be in compliance with all applicable laws and shall obtain and maintain all such permits and authorizations typical for the owner of a facility and a campus such as each Building and the Campus consistent with past practices. Tenants shall cause Tenants' operations within the Premises to be in compliance with all laws applicable to such operations and shall obtain and maintain all operational permits as operators of such facilities typically obtain and maintain. |
| Tenants' Work Allowance: | None. |

| | |
|---|---|
| Tenants Default; Termination | Fixed Rent: fourteen (14) days after notice. |

Non-monetary: thirty (30) days, with due diligence extension.

Notice of Termination: ten (10) days after expiration of notice periods above expiring without the default being cured within such ten (10) day period. If Landlord gives such notice of termination, the Lease shall terminate thirty (30) days after the giving of such notice to Tenants. Landlord shall not have the right to accelerate rental payments in the event of a termination of the lease and shall be required to use reasonable efforts to mitigate damages.

**Self-help:** Consistent with a customary commercial lease, Tenant shall not have self-help rights.

**Insurance:** Landlord shall, during the entire Term, at Landlord's sole cost and expense, obtain and maintain in full force and effect, such insurance, as would a prudent owner, which insurance shall include the following, without limitation:

(i) All Risks (including flood and earthquake) insurance, in an amount of at least one hundred percent (100%) of the full replacement cost of each Building including, the leasehold improvements comprising a part thereof;

(ii) Broad Form Boiler and Machinery insurance, on a blanket repair and replacement basis, with limits for each accident in an amount of at least the replacement cost of the Building, Tenants' leasehold improvements, boilers, pressure vessels and miscellaneous electrical apparatus in or on the Premises; and

(iii) Comprehensive General Liability Insurance with inclusive limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000) in the aggregate.

Tenants shall be named as "additional insureds" with respect to all such insurance.

Tenants shall, during the entire Term, at Tenants' sole cost and expense, obtain and maintain in full force and effect, such insurance in respect of the Premises, and the Tenants' trade fixtures, equipment and improvement thereon, as would a prudent tenant, which insurance coverage shall include the following without limitation:

(i) All Risks Tenants' property insurance for the replacement cost value of Tenants' owned equipment, all alterations and installations, including loss of use thereof;

(ii) Comprehensive General Liability Insurance with inclusive limits of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate.

Landlord  shall be named as an "additional insured" with respect to all such insurance.

All insurance maintained by Landlord and Tenants with respect to each Building and the Premises shall include a "waiver of subrogation" clause.

Casualty:

The Lease will include certain rights of landlord and Tenant to terminate in the event of a casualty, including the right to terminate if the estimated or actual restoration period exceeds the time periods set forth in the lease.  Rent shall be abated during the performance of restoration work.

Tenants shall not have any obligation to deposit Tenants' insurance proceeds with Landlord or any other depository.

Subordination and Non-Disturbance:

The Lease shall automatically be subordinate to Landlord's current and future financing.  Landlord shall use commercially reasonable efforts to obtain SNDA agreements from all existing and future mortgagees and superior lessors. All such SNDAs will be in a form reasonably acceptable to Landlord, Tenant and such third parties.

### Exhibit A

### Building Map



**Exhibit B**

**Indicative Aerial View Map**



**Exhibit C-3**

**Terms of Sublease**

Upper Mill Building (Coventry, RI)

| | |
|---|---|
| Existing Lease: | Lease Agreement, dated as of November 30, 2011, by and between Clariant Corporation, as landlord, and Rhodes Technologies, as tenant. |
| Sublease: | Sublease Agreement, dated as of [***Closing Date***], by and between Rhodes Technologies, as sublandlord, and Noramco Coventry LLC, as subtenant.[1] |
| Sublandlord: | Rhodes Technologies. |
| Subtenant: | Noramco Coventry LLC. |
| Building: | The administrative building on Lot 17 of the map attached hereto as **Exhibit A**, known as the Upper Mill Building located on 500 Washington Street, Coventry, Rhode Island, 02816, on the former Rhodes Technologies Campus (the "Campus"). |
| Premises: | Subtenant shall lease approximately 29,767 square feet of total square footage (5th Floor-16,640 square feet, 4th Floor-4,423, 3rd Floor-1,230 square feet, 2nd Floor-4,822 square feet, 1st Floor-2,652 square feet) of the Building. |
| Furnishings: | Sublandlord shall leave all furniture in place for Subtenant's use through the Term, as per a mutually agreed upon inventory. |
| Sublease Term: | From the Commencement Date to the Expiration Date. |
| Commencement Date: | The Closing Date. |
| Expiration Date: | December 31st, 2021 |

---

[1]    Note: Sublease will require consent of Clariant Corporation.

| | |
|---|---|
| Extension / Renewal Options: | Commencing on the first quarter of 2022, Sublandlord will grant Subtenant quarterly renewal options, but solely to the extent Subtenant continues to operate the Campus or a portion thereof to produce APIs. At least 90 days prior to each quarter, (i) Sublandlord shall have the option to terminate the Sublease by delivering to Subtenant a written notice of non-renewal effective as of the day immediately preceding the beginning of such succeeding quarter and (ii) Subtenant shall have the option to extend the Sublease for such succeeding quarter by delivering to Sublandlord a written notice of renewal, but such notice of renewal will only be effective if Sublandlord has not properly delivered to Subtenant a notice of non-renewal in accordance with clause (i). Failure of either Sublandlord or Subtenant to give notice, will result in the term of the Lease to renew automatically for the succeeding quarter. The Sublease shall not be extendable beyond the earlier of (x) December 31, 2022 or (y) the end of the last quarter in which product is manufactured at the Campus. |
| Annual Fixed Rent: | $26.00 per square foot annually, which is inclusive of Landlord's proportionate share of taxes, operating expenses (including utilities) and other amounts for the Building.<br><br>$64,500 per month or $774,000 per annum. |
| Security Deposit / Letter of Credit: | None. |
| Guarantor: | None |
| Permitted Use: | As permitted by the Existing Lease. |
| Assignment / Subletting: | An assignment of the Sublease, a further subletting of all or a portion of the Premises will not be permitted without Sublandlord consent, which consent may not be unreasonably withheld, conditioned, or delayed (subject to Landlord's approval per the Existing Lease); provided, however, customary affiliate transactions will be permitted without the consent of Sublandlord (provided Landlord consent is not required). |
| Parking Facility: | The parking lots, fixtures and other improvements and appurtenances now located or hereafter erected, located or placed directly adjacent to the Building, as further depicted in |

the Indicative Aerial View map attached hereto as **Exhibit B**. Landlord shall maintain the parking lots.

| | |
|---|---|
| Parking Allocation: | Subtenant shall be allocated parking areas in the vicinity of the Building identified as Lot 17 and Lot 18 pursuant to Section 4.11 of the Existing Lease. |
| Access[2]: | As provided by the Existing Lease. |
| Services: | The cost of utility services associated with Subtenant's use and occupancy of the Premises, including but not limited to: heating, electricity, water, sewer, telephone, internet, cable, alarm, and alarm monitoring shall be included in the Annual Fixed Rent.  Subtenant shall be responsible for providing security services for the Campus, including access control to the Upper Mill Building. |
| Sublandlord's Work: | None. Premises to be delivered in its "as-is" condition.[3] |
| Alterations: | Subtenant shall be permitted to construct improvements and make alterations to the Premises, subject to the requirements set forth in Article 4.5 of the Existing Lease. |
| Subtenant's      Obligations; Compliance With Law | Subtenant covenants and agrees that all obligations of Tenant under the Existing Lease shall be done or performed by Sublandlord with respect to the Premises, except as otherwise provided by the Sublease. |
| | During the Sublease Term, Subtenant shall cause Subtenant's operations within the Premises to be in compliance in all material respects with all laws applicable to such operations and shall obtain and maintain all operational permits as operators of such facilities typically obtain and maintain. |
| Subtenant's Work Allowance: | None. |

---

[2]    Note: Subtenant shall have access to the Premises, the Building, and the Parking Facilities 24 hours a day, seven (7) days a week, 365 days a year, pursuant to a separate Access Agreement, to be entered into between Sublandlord and Subtenant concurrently with the execution of the Sublease. The Access Agreement shall provide Subtenant with the right to utilize Quidnick Street, North Street and South Street and related parking lots to gain access for foot traffic heading for the Upper Mill Building.

[3]    Note: To the extent the 5th Floor of the Building needs to be shared between Subtenant and Sublandlord, the Premises will be separately partitioned.

| | |
|---|---|
| Subtenant Default; Termination: | The parties shall have customary termination rights (including applicable notice and cure periods) in connection with events of default, casualty and condemnation. |
| Holdover: | If Subtenant remains in occupancy after the Sublease Term, Subtenant will pay all Existing Lease obligations associated with the Premises to the extent actually paid by Sublandlord to prime landlord. |
| Signage: | As permitted under Section 4.9 of the Existing Lease. |
| Insurance: | As required under Section 3.1 of the Existing Lease. |
| | Sublandlord shall be named as "insureds" or "additional insureds" with respect to all such insurance. |

## Exhibit A

## Building Map



## Exhibit B

## Indicative Aerial View Map



**Exhibit D**

**Power of Attorney Agreement**

**THIS POWER OF ATTORNEY AGREEMENT** (this "Agreement") is entered into between Noramco Coventry LLC, a Delaware limited liability company ("Purchaser"), and Rhodes Technologies, a Delaware general partnership ("Seller") and is effective as of the date of execution of the attached Power of Attorney located at Exhibit 1 (the "Effective Date"). Each party may be referred to in the singular as "Party" or together as "Parties."

**WITNESSETH:**

**WHEREAS,** Seller and Purchaser entered into an Asset Purchase Agreement (the "Purchase Agreement"), dated as of September 14, 2020 which provides for, among other things, the acquisition of certain assets by Purchaser from Seller and certain of its Affiliates;

**WHEREAS,** Seller holds the Seller Drug Enforcement Administration ("DEA") controlled substance registrations listed on Exhibit 1 ("Seller DEA Registrations") necessary to operate the Business at the Real Property;

**WHEREAS,** to permit Purchaser to commence doing business at the Real Property, Purchaser is required to obtain DEA controlled substance registrations in its name (the "Purchaser DEA Registrations") as well as associated quotas;

**WHEREAS,** the Purchaser DEA Registrations have not been issued as of the Effective Date;

**NOW, THEREFORE,** in consideration of the promises, conditions and covenants contained herein and intending to be legally bound hereby, the Parties agree as follows:

1.    **Definitions**

Capitalized terms used herein and not defined shall have the meanings assigned to them in the Purchase Agreement.

2.    **Power of Attorney**

Purchaser and Seller agree to allow Purchaser to conduct activities for which DEA controlled substance registration is required under the Controlled Substances Act or regulations promulgated by DEA (collectively the "CSA" and such activities the "Controlled Substance Activities") at the Real Property under the Seller DEA Registrations, to the extent permitted by the applicable Regulatory Authorities and to the extent that Purchaser's Controlled Substance Activities fall within the scope of the Seller DEA Registrations. Accordingly, Seller hereby authorizes Purchaser to operate under the Seller DEA Registrations solely for the purpose

of conducting Controlled Substance Activities at the Real Property (the "Grant of Authority") pursuant to the Power of Attorney located at Exhibit 1 (the "Power of Attorney"), subject to the terms and conditions herein.

3.    **Seller's Grant of Authority.**

Seller hereby appoints Purchaser as its attorney-in-fact to operate under Seller's DEA Registrations only insofar as such authorization is necessary to enable Purchaser to conduct Controlled Substance Activities at the Real Property in compliance with the CSA, as set forth in the Power of Attorney, subject to Section 4 of this Agreement.  Seller acknowledges that, despite the Grant of Authority to Purchaser, because the Seller DEA Registrations will remain in Seller's name, DEA would hold Seller accountable for any violations of the CSA at the Real Property committed by Purchaser under the Seller DEA Registrations.  As such, Seller's Grant of Authority to Purchaser is expressly conditioned on Purchaser's representations in this Agreement, including but not limited to its agreements to comply in all respects with the CSA and other applicable Laws and to indemnify Seller as set forth in Section 5(a) of this Agreement.

4.    **Purchaser Obligations.**

Purchaser's obligations under the Grant of Authority:

(a)    Purchaser agrees to conduct the Controlled Substance Activities at the Real Property, pursuant to the Power of Attorney.  For the avoidance of doubt, Seller's Excluded Inventory shall be governed by Section 1.8 of the Purchase Agreement and the applicable provisions of the Supply Agreement.

(b)    Purchaser shall ensure that the Controlled Substance Activities conducted pursuant to the Power of Attorney are conducted in compliance with applicable Laws, including, without limitation, the CSA, and that the Controlled Substance Activities shall not exceed the scope of, or otherwise violate, the Seller DEA Registrations.

(c)    Purchaser shall ensure that the Controlled Substance Activities conducted pursuant to the Power of Attorney are conducted in compliance with policies, protocols, and procedures regarding compliance with the CSA that are no less rigorous than Seller's procedures, protocols, and policies regarding CSA compliance, which are listed in Addendum A hereto .

(d)    Purchaser shall maintain all records required to be maintained under the CSA or other applicable Law relating to Purchaser's Controlled Substance Activities that are conducted pursuant to the Power of Attorney. Purchaser shall maintain and retain all such records as required under the CSA or other applicable Law for a period of at least five (5) years or as otherwise required by the CSA or other applicable Law. Purchaser shall provide Seller with access to or copies of all such records, as may be reasonably requested by Seller. The

requirements of this Section 4(c) shall survive the termination of this Agreement and any other applicable agreement between the Parties to allow Seller to meet its responsibilities under the CSA and other applicable Law.

(e)        Subject to Section 5.14 of the Purchase Agreement, Purchaser agrees to diligently apply for all Purchaser DEA Registrations, including all quota and any other ancillary authority, required by Law to fulfill the terms of the Supply Agreement and to ensure that such Purchaser DEA Registrations are obtained as promptly as possible.

(f)        Purchaser agrees to promptly notify Seller of any material communications, both written and oral, with a Regulatory Authority that relates to or may otherwise impact the Seller DEA Registrations or the Controlled Substance Activities conducted pursuant to the Power of Attorney, but in no case later than two (2) business days after Purchaser's receipt of such Regulatory Authority communication and provide copies of the same. As the holder of the Seller DEA Registrations, Seller shall retain the right to be primarily responsible for communicating with the DEA or any other Regulatory Authority related to the Seller DEA Registrations or related to any Controlled Substance Activities conducted under the Seller DEA Registrations. Purchaser, however, shall provide all reasonably requested assistance and shall take all reasonably requested steps to assist Seller in such DEA or other Regulatory Authority communications, to the extent that the communications relate to Purchaser's Controlled Substance Activities conducted pursuant to the Power of Attorney.

(g)        Consistent with Section 5.14(g) of the Purchase Agreement, Purchaser shall give Seller and Seller's representatives rights to access the Real Property, and representatives of Purchaser and Seller shall meet regularly (on a schedule to be reasonably agreed upon by the Parties), during the period in which the Power of Attorney is in effect, for purposes of assessing the Purchaser's compliance with applicable Laws, including but not limited to the CSA and Good Manufacturing Practices, all requirements under this Agreement, and Seller's risk under the Power of Attorney.  Purchaser shall consider in good faith any requests made by Seller in connection therewith.

(h)        Purchaser shall give Seller or any Seller representative reasonable access to Purchaser records to the extent reasonably necessary to confirm that Purchaser is conducting the Controlled Substance Activities in accordance with applicable Laws and all requirements under this Agreement. Seller shall provide Purchaser with reasonable prior notice prior to any such audit or inspection and shall conduct no more than one audit or inspection in any twelve-month period, in each case, unless such audit or inspection is being conducted for cause.

(i)    Purchaser shall further promptly notify Seller of any departure from Purchaser's obligations under this Agreement. In the event that Seller finds, or Purchaser discovers, that Purchaser's Controlled Substance Activities conducted pursuant to the Power of Attorney are not in compliance with the terms of this Agreement, the CSA, or other applicable Law, Purchaser shall use commercially reasonably efforts to promptly implement any necessary corrective actions, which shall be subject to Seller's approval. Any material violation by Purchaser of the terms of this Agreement, the CSA, or other applicable Law  and failure by Purchaser to cure such material violation within thirty (30) days of receiving written notice of such violation by Seller shall be a basis for Seller's termination of this Agreement.

5.    **Indemnification.**

(a)    Purchaser hereby agrees to indemnify, defend, and hold Seller and its Affiliates, and their respective officers, directors, employees, and agents harmless from and against any and all claims, actions, suits, losses, demands, damages, costs, and expenses (including reasonable attorneys' fees) of every kind, nature, or description brought in connection with, arising out of, or related to claims with respect to Purchaser's Controlled Substance Activities at the Real Property pursuant to the Power of Attorney (each, a "Claim"), to the extent such Claim is the result of Purchaser's violation of applicable Laws, negligence, fraud, or breach of the terms of this Agreement, except that Purchaser shall not be responsible for any Claim resulting from a Purchaser violation of Law caused by the negligence, fraud, or breach of the terms of this Agreement by Seller. Any claim for indemnification made under this Section 5(a) shall be made in accordance with the procedures set forth in Section 5 of the Transition Services Agreement.

(b)    Seller shall indemnify, defend and hold harmless the Purchaser from and against any and all Losses incurred by the Purchaser or its Affiliates to the extent such Losses are incurred or sustained by, or arising out of, any Action brought by a Regulatory Authority or third party against the Purchaser or its Affiliates arising from Purchaser's Controlled Substance Activities at the Real Property, solely to the extent such Losses are the direct result of Seller's violation of Law, except that Seller shall not be responsible for any Losses caused by the negligence, fraud, or breach of the terms of the Purchase Agreement by Purchaser.

6.    **Termination.**

(a)    This Agreement shall terminate upon the earlier of (i) one hundred and eighty (180) days from the date of execution; (ii) with respect to each individual Seller DEA Registration, upon receipt by Purchaser of a corresponding valid Purchaser DEA Registration and any

applicable quota or other ancillary authority required by Law to fulfill the terms of the Supply Agreement ; or (iii) upon termination by Seller pursuant to Section 4(i) of this Agreement (the "<u>Termination Date</u>").

(b)     With respect to termination pursuant to Section 6(a)(i) of this Agreement, if Purchaser has not obtained all valid Purchaser DEA Registrations, any applicable quota, and any other ancillary authority required by Law to operate under the Purchaser DEA Registrations to fulfill the terms of the Supply Agreement by the Termination Date, then this Agreement and the Grant of Authority may be extended, only if necessary, by written agreement of the Parties, until such time as Purchaser has obtained all valid Purchaser DEA Registrations, any applicable quota, and any other ancillary authority required by Law to operate under the Purchaser DEA Registrations to fulfill the terms of the Supply Agreement, at which time this Agreement and the Grant of Authority shall terminate.

7.     **<u>Entire Agreement.</u>**

This Agreement, including all exhibits, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes any and all agreements which have existed between the Parties on the subject matter hereto. No amendments may be made to this Agreement unless made in writing and signed by both Parties.

8.     **<u>Counterparts.</u>**

This Agreement may be executed in counterparts, and both so executed will constitute one agreement, binding on both Parties, even though both Parties are not signatories to the original or same counterpart. Any counterpart of this Agreement will for all purposes be deemed to be a fully executed instrument.

9.     **<u>Notices.</u>**

All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the Party for whom it is intended, delivered by registered or certified mail, return receipt requested, or by a national overnight courier service, or sent by facsimile (provided, that notice by facsimile is confirmed by the sending facsimile machine), to the individual at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such individual (or by the Party that designated such individual):

If to Purchaser:

c/o Noramco, LLC
500 Swedes Landing Rd
Wilmington, DE 19801
Email: lkarras@noramco.com

Facsimile: (302) 761-2913
Attention: L. Lee Karras

with a copy (which shall not constitute notice) to:

c/o SK Capital Partners, LP
430 Park Avenue, 18th Floor
New York, NY 10022
Email: adavenport@skcapitalpartners.com
Facsimile: (646) 217-3691
Attention: Aaron Davenport

and

Kirkland & Ellis LLP
300 N LaSalle
Chicago, IL 60654
Email: jliss@kirkland.com; marenson@kirkland.com
Facsimile: (312) 862-2200
Attention: Jeremy S. Liss, P.C. and Matthew S. Arenson

and

*If to Seller:*

Rhodes Technologies
498 Washington Street
Coventry, Rhode Island
Email: David.Lundie@rhodestec.com
Facsimile: (203) 588-6026
Attention: David Lundie

with a copy (which shall not constitute notice) to:

Purdue Pharma L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901

Facsimile: (203) 588-6026
Email: Marc.kesselman@pharma.com
Attention: Marc L. Kesselman, Senior Vice President,
General Counsel and Secretary
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Facsimile: (212) 735-3000

Email: marie.gibson@skadden.com
Attention: Marie Gibson

All notices and other communications under this Agreement shall be deemed to have been received (i) when delivered by hand, if personally delivered, (ii) one (1) business day after being delivered to a national overnight courier service or (iii) one (1) business day after being sent, if sent by facsimile, with confirmation of receipt by the sending facsimile machine.

10.    **Assignment/Subcontracting.**

Purchaser shall not assign or otherwise subcontract its Controlled Substance Activities other than to the extent such activities are assigned or subcontracted out as of the Effective Date, without Seller's prior written consent.

11.    **Regulatory Approvals.**

In the event any Regulatory Authority with jurisdiction over the contents of this Agreement objects to any portion of this Agreement, the Parties shall negotiate in good faith to amend this Agreement to meet any such regulatory requirements consistent with the Parties' intent as reflected herein.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed on their behalf as of the date first written above.

**SELLER:**

**Rhodes Technologies**

By: Purdue Pharma Inc., its managing general partner

By: _____
     Name:
     Title:

**PURCHASER:**

**Noramco Coventry LLC**

By: _____
     Name:
     Title:

**Exhibit 1**

**Power of Attorney**

Seller
Address
DEA Registration Numbers:
Manufacturer: DEA Manufacturer License #RR0284632
Analytical:
Research: DEA Researcher (I) License #RK0290255; DEA Researcher (II-V) License #RR0279415
Export: DEA Exporter License #RR0322393
Import: DEA Importer License #RR0369593

        I, _____, the undersigned, am authorized to sign the current application for Drug Enforcement Administration ("DEA") registrations of the above-named registrant under the Controlled Substances Act and Controlled Substances Import and Export Act, 21 U.S.C. § 801, et seq., have made, constituted, and appointed, and by these presents, do make, constitute, and appoint _____, [Vice President] of [Purchaser], my true and lawful attorney for me in my name, place, and stead, to use the above-referenced DEA registration numbers for the purpose of continuing to handle and manufacture, and/or distribute controlled substances in schedules I-V at the DEA-registered facility located at _____, in accordance with all federal and state Laws.

        I hereby affirm that [Seller] is the above-named registrant and that, because the above-listed DEA registrations shall remain in Seller's name, DEA may consider Seller ultimately responsible for the lawful handling, manufacturing, and/or distributing of any and all controlled substances pursuant to the above-listed DEA registration numbers and the Power of Attorney Agreement. The authority granted herein shall expire upon the earlier of: (a) 180 days from the date of execution; (b) with respect to each individual above-referenced DEA registration, upon receipt by [Purchaser] of a corresponding valid DEA registration, and any applicable quota or other ancillary authority required by Law to fulfill the terms of the Supply Agreement; or (c) upon termination by Seller pursuant to Section 4(f) of the Power of Attorney Agreement. Notwithstanding the foregoing, except with respect to a valid termination pursuant to clause (b) or clause (c) of the foregoing sentence, if [Purchaser] has not obtained all corresponding valid DEA registrations and any applicable quota or other ancillary authority by the date that is 180 days from the date of execution, then the authority granted herein may be extended, only if necessary, by written agreement of the Parties until such time as [Purchaser] has obtained all such valid DEA registrations and any applicable quota required by Law to fulfill the terms of the Supply Agreement, at which time this grant of authority shall expire.

        I hereby ratify and affirm all that said attorney shall lawfully do or cause to be done by virtue hereof.

*[Signature Page Follows]*

## Addendum A

**Controlled Substance Policies**

[to come]

**Exhibit E**

**FORM OF MASTER MANUFACTURING AND SUPPLY AGREEMENT**

**BETWEEN**

**[●]**

**AND**

**NORAMCO, LLC**

**DATED AS OF [●], 2020**

# TABLE OF CONTENTS

ARTICLE I SUPPLY OF PRODUCT ................................................................................1

ARTICLE II START-UP ACTIVITIES AND MANUFACTURING PROCESS ........................4

ARTICLE III SUPPLY OF PRODUCT ............................................................................5

ARTICLE IV PRICE AND PAYMENT............................................................................11

ARTICLE V REGULATORY INFORMATION/DOCUMENTATION/INSPECTION ...........13

ARTICLE VI REPRESENTATIONS and WARRANTIES AND COVENANTS ....................15

ARTICLE VII ...........................................................................................................17

INTELLECTUAL PROPERTY ......................................................................................17

ARTICLE VIII INDEMNIFICATION; DISCLAIMER OF FURTHER WARRANTIES;
        LIMITATION ON LIABILITY .............................................................................18

ARTICLE IX TERM AND TERMINATION.....................................................................20

ARTICLE X CONFIDENTIALITY .................................................................................22

ARTICLE XI MISCELLANEOUS .................................................................................23

ARTICLE XII DEFINITIONS ......................................................................................28

Schedule A – Form of Product Addendum ............................................................A-1

Schedule B - Business Continuity Plan……………………………………………………..B-1

Schedule C - Licensed Patents................................................................................C-1

Schedule D – Technology Transfer .........................................................................D-1

## MASTER MANUFACTURING AND SUPPLY AGREEMENT[1]

**THIS MASTER MANUFACTURING AND SUPPLY AGREEMENT[2]** (this "<u>Agreement</u>") is effective [●] ("<u>Effective Date</u>") by and between Noramco, LLC, a Delaware limited liability company with a principal place of business at 500 Swedes Landing Road, Wilmington, Delaware 19801 ("<u>Manufacturer</u>"), and [●] with a principal place of business at [●] ("<u>Recipient</u>").  Recipient and/or Manufacturer will be referred to collectively as the "<u>Parties</u>" and singularly as a "<u>Party</u>."

### RECITALS

**WHEREAS**, Manufacturer and Rhodes Technologies have entered into that certain Asset Purchase Agreement, dated as of [●], 2020 ("<u>Asset Purchase Agreement</u>"), in connection with which the Parties have agreed to enter into this Agreement for the supply of the API (as defined below) by Manufacturer to Recipient;

**WHEREAS**, Manufacturer has agreed to manufacture, package, test, release, store and deliver to Recipient [REDACTED] for each API, in accordance with and subject to the terms of this Agreement; and

**WHEREAS**, Recipient has agreed to purchase such API from Manufacturer in accordance with and subject to the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

## SUPPLY OF PRODUCT

Section 1.1    <u>Agreement to Manufacture [REDACTED]</u>.

(a)    Subject to the terms and conditions of this Agreement, during the Term, Manufacturer shall Manufacture for Recipient and its Permitted Affiliates [REDACTED] in accordance with the Specifications, all applicable Laws (including all applicable current Good Manufacturing Practices), and the Quality Agreement.

---

[1]    <u>Note to Draft</u>: The terms of this Agreement are subject to the final determination of the Contracts that will be included in the Purchased Assets.

[2]    <u>Note to Draft</u>: The Agreement will be entered into by PPLP or an Affiliate or successor (including, without limitation, any successor to PPLP under a plan of reorganization under title 11 of the United States Code).

(b)     Subject to the terms and conditions of this Agreement, during the Term, Manufacturer shall Manufacture for Recipient and its Permitted Affiliates, and Recipient and its Permitted Affiliates [REDACTED] API set forth on the Product Addenda as of the Effective Date.

Section 1.2     Additional API.  During the Term, Recipient may request that Manufacturer Manufacture additional active pharmaceutical ingredients that are not specified on any Product Addendum as of the Effective Date (an "Additional API"), and following such request, the Parties shall negotiate in good faith regarding the terms of a separate Product Addendum for such Additional API.  In the event that the Parties agree on a Product Addendum for such Additional API, the Additional API shall automatically be deemed to be an API under this Agreement.  For clarity, except and only to the extent that the Parties expressly agree in writing, Recipient and its Affiliates shall not be required to purchase from Manufacturer, and Manufacturer shall not be required to Manufacture for Recipient and its Affiliates, any active pharmaceutical ingredients [REDACTED].

Section 1.3     Product Addendum.

(a)     The terms of this Agreement shall be deemed to be incorporated into each Product Addendum that may be executed by the Parties or in the case of Recipient, any of its Permitted Affiliates.  The Parties, or in the case of Recipient, any of its Permitted Affiliates, shall enter into a Product Addendum for each API.

(b)     In the event of a conflict between the terms of any Product Addendum and the terms of this Agreement, the terms of this Agreement shall prevail, except to the extent that the applicable Product Addendum expressly and specifically states an intent to supersede this Agreement on a specific matter.  Any amendment to the terms of this Agreement contained in a Product Addendum shall be effective solely with respect to the terms of this Agreement as incorporated in such Product Addendum, and not to the terms of this Agreement or the terms of any other Product Addendum.  Any amendment to the terms of this Agreement shall be effective for all Product Addenda, unless such amendment or Product Addendum specifies otherwise.

(c)     In the event that a Permitted Affiliate of Recipient executes any Product Addendum, all references in this Agreement as incorporated in such Product Addendum to Recipient shall be deemed to be to the applicable Permitted Affiliate designated therein as Recipient, which Permitted Affiliate shall be entitled to enforce this Agreement as incorporated in such Product Addendum in its own name and shall be solely liable to Manufacturer for any obligations and liabilities undertaken thereunder.

(d)     From time to time, Recipient may propose additional Affiliates for inclusion as Permitted Affiliates in respect of one (1) or more API by either (i) providing written notice to Manufacturer together with documentation evidencing that such proposed Affiliate is financially sound and has the ability to satisfy its obligations (including insurance and indemnification) hereunder and obtaining Manufacturer's prior written consent, not to be unreasonably withheld, conditioned or delayed, to add such proposed Affiliate or (ii) having

either Recipient or a Permitted Affiliate guarantee such proposed Affiliate's obligations to pay Manufacturer under the applicable Product Addendum, in which case Manufacturer's consent shall not be required.  If Manufacturer agrees to add any such Affiliate pursuant to clause (i) of the foregoing sentence, or Recipient provides Manufacturer with written documentation of the guarantee described in clause (ii) of the foregoing sentence, the Parties shall amend <u>Schedule F</u> (which the Parties acknowledge and agree sets forth Affiliates that are Permitted Affiliates in respect of the specific API as of the Effective Date) in accordance with Section 11.12 (Amendments).

Section 1.4   <u>Manufacturing Facility.</u>

(a)   Manufacturer shall perform all Manufacturing activities for each API under this Agreement at a Manufacturing Facility.  Manufacturer may use other facilities for the Manufacture of any API under any Product Addendum, and such Product Addendum shall be deemed to be amended accordingly (and such facility in such instance shall be deemed to be a Manufacturing Facility); *provided* that:

(i)  Manufacturer promptly, and as far in advance as reasonably practicable, notifies Recipient of its intent to use such alternate facilities;

(ii) such facilities have been approved in advance for such Manufacture by all applicable Governmental Entities;

(iii) such facilities are sufficient (including in respect of capacity) for Manufacturer to comply with its obligations hereunder (and, for clarity, Recipient shall have the right to conduct audits and inspections to make such determination); and

(iv) Manufacturer obtains the prior written consent of Recipient, not to be unreasonably withheld, conditioned or delayed.

(b)   In the event that Manufacturer transfers Manufacturing from any Manufacturing Facility to another facility or location in accordance with the terms hereof, Manufacturer shall be responsible for (i) all costs incurred by Manufacturer in connection with such transfer, (ii) [REDACTED] and (iii) any direct and documented Regulatory Authority filing fees incurred by Recipient and its Affiliates with respect to Recipient's drug product manufacturing facilities as a result of such transfer; and as between the Parties, Recipient and its Affiliates shall be responsible for any other costs or expenses incurred by Recipient and its Affiliates as a result of such transfer (including in respect of obtaining all relevant Consents from Governmental Entities with respect to Products).  Notwithstanding any of the foregoing, solely in the case of the initial technology transfer of API Manufacturing from the Coventry Facility to another Manufacturing Facility, Recipient and its Affiliates shall be solely responsible for the costs and expenses set forth in clauses (ii) and (iii) of the foregoing sentence.

(c)    Manufacturer shall be responsible for, to the extent necessary for or otherwise used in the Manufacture of API hereunder, (i) purchasing, installing and validating at the applicable Manufacturing Facility all equipment, dedicated change parts, and tooling; (ii) any and all modifications to existing equipment, dedicated change parts and tooling; and (iii) maintenance of all such equipment, dedicated change parts and tooling, and all costs and expenses associated therewith.  If pursuant to a Product Addendum, Recipient has agreed to pay for or reimburse any costs associated with any equipment, dedicated changes parts or tooling, then promptly following Recipient's request, Manufacturer shall return to Recipient all equipment, molds, dedicated change parts, tooling and operating supplies that were provided or paid for by Recipient; *provided* that Manufacturer shall have no liability for any breach of this Agreement resulting solely from no longer having access to any such equipment, molds, dedicated change parts, tooling and operating supplies returned to Recipient at Recipient's request.

Section 1.5    <u>Installed Capacity</u>.  Manufacturer shall at all times maintain the installed Manufacturing capacity at the applicable Manufacturing Facility sufficient to Manufacture, on an annual basis, [REDACTED] for each API as set forth in each Rolling Forecast, to accommodate concurrent production and supply of each API at such quantities on a standard production schedule.

Section 1.6    <u>Subcontracting</u>.  Manufacturer shall not be permitted to sublicense any of its rights or subcontract any of its obligations under this Agreement to any Person without Recipient's prior written consent, not to be unreasonably withheld, conditioned or delayed; *provided* that it shall be reasonable for Recipient to withhold such consent if (a) such rights or obligations relate to the Manufacture of API constituting or containing Oxycodone (as defined in the Asset Purchase Agreement) or (b) Recipient's legal counsel (which may be in-house counsel) has concerns related to (i) potential infringement of a Third Party's Intellectual Property or other proprietary rights by such proposed subcontractor, or (ii) infringement, misappropriation or other violations by such Person of, or that arises out of such Person being granted a sublicense or subcontract to, any Intellectual Property owned by, or with respect to which rights are granted to, Recipient or any of its Affiliates; *provided further*, that Recipient's consent is hereby given with respect to the subcontractors set forth on <u>Schedule E</u>.

Section 1.7    <u>Treatment of Excluded Inventory under the Asset Purchase Agreement</u>.  The terms and conditions of this Agreement shall apply to the Excluded Inventory (as defined in the Asset Purchase Agreement), except to the extent specifically set forth in Section 1.8 of the Asset Purchase Agreement.

# ARTICLE II

## START-UP ACTIVITIES AND MANUFACTURING PROCESS

Section 2.1    <u>Start-Up Activities</u>.[3]

(a)    With respect to each API, Manufacturer shall, at no additional cost to Recipient: (i) by the commencement date set forth in the applicable Product Addendum, comply with, and have completed to the reasonable satisfaction of Recipient, any and all Manufacturing start-up activities to fulfill its obligations under such Product Addendum with respect to such API, including stability testing, validation protocols, validation, writing of validation reports and Product Materials testing (including as and to the extent specified in Product Addendum), (ii) fulfill its obligations under and otherwise comply with the terms of the Transition Services Agreement, (iii) make all filings, submit all notices and obtain all Consents from Governmental Entities required to fulfill its obligations under this Agreement, including the filing of DMFs with all applicable Regulatory Authorities in accordance with Section 5.1, and using commercially reasonable efforts to obtain all relevant DEA quota authorizations, (iv) perform any and all other activities, preparations, supervision and training as is or becomes necessary to enable Manufacturer to Manufacture API for Recipient in accordance with the terms hereof, and (v) perform any and all other activities specified the applicable Product Addendum (the foregoing (i) through (v), collectively, the "<u>Start-Up Activities</u>").  For clarity, in accordance with Section 3.5(e), Manufacturer shall permit Recipient's Representatives, contractors and other designees to conduct audits and inspections to confirm that Manufacturer has fulfilled its obligations described in this Section 2.1(a).

(b)    Manufacturer shall permit Recipient's Representatives, contractors and other designees (at Recipient's option and at Recipient's sole cost, unless Manufacturer requests any such assistance or direction, in which case, if Recipient decides to provide any such assistance, Manufacturer shall be responsible, and shall reimburse Recipient, for its costs solely to the extent such costs have been pre-approved in writing by Manufacturer) to provide technical assistance and direction at the applicable Manufacturing Facility in connection with the Start-Up Activities; *provided, however*, such assistance and direction shall not reduce, limit or otherwise decrease Manufacturer's obligations hereunder.

Section 2.2    <u>Changes to the Specifications or Manufacturing</u>.  Either Party shall have the right to make changes to the Specifications or Manufacturing of any API, including changes to the Product Materials and the source of any Product Materials; *provided* that each Party shall be required to obtain the other Party's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) prior to making any such change, except where a change is required by or to comply with applicable Law.  In the event of any such change, (a) upon the either Party's request, such Party shall cooperate with the other Party with respect to any required notices to, and Consents from, any Governmental Entity with respect thereto and

---

[3]    <u>Note to Draft</u>: Certain provisions in this section and others are subject to revision depending on the ultimate transition plan between the parties for the Real Property and manufacturing capacity.

(b) if such changes are requested by Recipient, any increase or decrease in direct costs of implementation, or direct cost of goods, or if such change is requested by Manufacturer, any such decrease, shall be passed through to Recipient, either as a one-time fee or refund or as an increase or decrease to Price, as appropriate; *provided* that, in the case of any increase in costs, such costs are documented in writing.

## ARTICLE III

## SUPPLY OF PRODUCT

Section 3.1    Forecasts.  On the first day of each Calendar Quarter during the Term, Recipient shall provide Manufacturer with a written twelve (12) month rolling forecast estimating the API quantities that it plans to order from Manufacturer ("Rolling Forecast"), consistent with the standard pack size(s) set forth in the applicable Product Addenda.  The first six (6) months of each Rolling Forecast shall be binding on both the Recipient and the Manufacturer with respect to Rolling Forecasts provided by Recipient during the first twelve (12) months of the Term, and the first three (3) months of each Rolling Forecast shall be binding on both the Recipient and the Manufacturer with respect to Rolling Forecasts provided by Recipient thereafter (such binding portions, the "Firm Requirements"), and the remaining months of each Rolling Forecast is supplied for the convenience and information purposes of Manufacturer only and is not binding on either Party.

Section 3.2    Purchase Orders.

(a)    Recipient shall have the right to submit to Manufacturer written purchase orders, which purchase orders shall specify the API ordered, the quantity of API ordered (consistent with the standard pack size(s) set forth in the applicable Product Addendum), the Price therefor, the place of delivery and the required delivery date (each, a "Purchase Order").  Except for the Firm Requirements communicated via the Rolling Forecast and Purchase Orders, no verbal communications or other written or electronic communications shall be construed as a commitment by or on behalf of Recipient or any of its Permitted Affiliates to purchase under this Agreement.  The delivery date ("Delivery Date") for the API set forth in any Purchase Order shall be no less than thirty (30) days from the date of such Purchase Order; *provided* that Recipient may request to receive earlier delivery of any API and Manufacturer will use its best efforts to accommodate such request, subject to all applicable Laws (including any DEA quota).  Manufacturer shall supply Recipient with such quantities of each API as ordered by Recipient pursuant to each Purchase Order, [REDACTED] for the applicable Calendar Month; but in any case subject to the standard pack size(s) set forth in the applicable Product Addendum.  In the event that any Purchase Order specifies any quantities of API above [REDACTED] of the quantity set forth in the most recent Rolling Forecast for the applicable Calendar [REDACTED], Manufacturer shall use its commercially reasonable efforts to meet Recipient's requested delivery dates for such Excess Order Quantity and shall provide Recipient with written notice specifying whether it accepts the Purchase Order to the extent with respect to the Excess Order Quantity within five (5) Business Days of receipt of such Purchase Order; *provided* that if no such notice is provided within such five (5) Business Day period, the relevant

Purchase Order with respect to such Excess Order Quantity shall be deemed accepted by Manufacturer.

(b)     Notwithstanding anything to the contrary herein, Recipient may modify or cancel Purchase Orders any time as of or prior to thirty (30) days before the Delivery Date but, for clarity, such modification or cancellation shall not reduce the Firm Requirements and any modification shall be consistent with the standard pack size(s) set forth in the applicable Product Addendum. Any Purchase Order that is not modified or cancelled by Recipient as of or prior to such date will constitute a firm obligation for Manufacturer to supply such API to Recipient and Recipient to purchase such API from Manufacturer in accordance with and subject to the terms hereof.

(c)     Purchase Orders submitted by Recipient that accurately reflect [REDACTED] of the Firm Requirements and that are otherwise given in accordance with, and comply with, this Agreement (including the standard pack size(s) set forth in the applicable Product Addendum) will be accepted by Manufacturer. Manufacturer will provide written notice of acceptance or rejection of (i) each Purchase Order submitted by Recipient under Section 3.2(a) and (ii) any cancellation or modification of a Purchase Order submitted by Recipient under Section 3.2(b) within five (5) Business Days of receipt; *provided* that if no such acceptance or rejection is provided by Manufacturer within such five (5) Business Day period, the relevant Purchase Order, or cancellation or modification thereof, shall be deemed accepted by Manufacturer.

(d)     In the event that any term or condition contained in any Purchase Order or acknowledgement is inconsistent with this Agreement, then the term or condition set forth in the Purchase Order or acknowledgement shall not be binding unless the Party against whom enforcement is sought expressly agrees thereto in writing.

Section 3.3     Delivery; Risk of Loss.

(a)     [REDACTED].

(b)     Manufacturer shall ensure that all API supplied hereunder is packaged, labeled, transported, stored and otherwise Manufactured in accordance with the Specifications, the Quality Agreement, all applicable Laws and the applicable Product Addendum.

(c)     At the time of tender of delivery, API Manufactured for Recipient hereunder shall have a remaining shelf life of no less than seventy-five percent (75%) of the maximum allowable shelf life for such API (unless otherwise set forth in the applicable Product Addendum or with respect to which Recipient notifies Manufacturer from time to time that it will accept a lesser remaining shelf life; in which case, for the avoidance of doubt, the applicable API shall not be deemed Non-Conforming API by reason of having less than seventy-five percent (75%) remaining of the maximum allowable shelf life at the time of tender of delivery). For clarity, any API that does not have such shelf life at the time of delivery shall be deemed to be Non-Conforming API.

(d)    [REDACTED].

(e)    All shipments and deliveries of API by Manufacturer shall be accompanied by the following documentation: (a) the reference number of the relevant Purchase Order; (b) the API delivered, including their reference numbers, lot numbers (if applicable), retest date (if applicable) and batch numbers; (c) dates of manufacture and release; (d) the quantity of API delivered; (e) the date of dispatch from Manufacturer; (f) any material safety data sheets and labeling required by applicable Laws or otherwise requested by Recipient and (g) a Certificate of Compliance attesting that the API meets all applicable Specifications and complies with applicable Law, Certificate of Analysis, and any other documentation required to be delivered to Recipient in accordance with the Quality Agreement.

(f)    At Recipient's reasonable request from time to time, and subject to space availability in the applicable Manufacturing Facility, Manufacturer will store API prior to shipment at Recipient's risk.  Storage will be at no additional charge for the first ninety (90) days, and thereafter shall be charged to Recipient at a monthly rate (payable in advance and without pro ration) of five hundred dollars (US$500) per pallet.  The remaining shelf life requirement under Section 3.3(c) for any API stored by Manufacturer shall be reduced day-for-day by the period of storage.

Section 3.4    Product Materials.  Manufacturer shall obtain sufficient quantities of all Product Materials to enable Manufacturer to Manufacture API for Recipient in accordance with the terms hereof.  For clarity, the costs of all Product Materials shall be included in the Price for the API.  Recipient shall have no liability for excess or obsolete Product Materials purchased by Manufacturer unless the excess or obsolescence is caused by (a) a change to, or cancellation of, a firm Purchase Order (as described in Section 3.2(b)), (b) a change to the Specifications by Recipient, (c) Recipient's failure to place Purchase Orders for the Firm Requirements or (d) termination of this Agreement or any Product Addendum by Noramco in the event of a material breach by Recipient; in each case (in respect of the foregoing (a) through (c)) after such Product Materials have been purchased by Manufacturer following receipt of, and based upon, the most recent Rolling Forecast (as described in Section 3.1).  In any case where Recipient is responsible for the excess or obsolete Product Materials in accordance with this Section 3.4, Recipient's responsibility shall be limited to the reasonable out-of-pocket documented costs incurred by Manufacturer for any testing previously conducted as required by GMPs, the Quality Agreement or the applicable Specifications or as previously conducted at the request of or on behalf of Recipient on, and the destruction of, such excess Product Materials (which will be reimbursed by the Recipient).  The Manufacturer will, however, use commercially reasonable efforts to first use any such excess Product Materials for itself, its Affiliates, its other customers and Recipient.

Section 3.5    Shortages and Failure to Supply.

(a)    Allocation in the Event of Shortages.  If (i) Manufacturer's inventory of Product Materials will be insufficient to Manufacture for Recipient any amount of any API specified in any month of the Firm Requirements and such other quantities of API that Manufacturer is providing to itself, its Affiliates or any Third Party (each, a "Materials Shortfall"), (ii) Manufacturer's inventory of API will be insufficient to supply to Recipient any

amount of any API specified in any month of the Firm Requirements and such other quantities of API that Manufacturer is providing to itself, its Affiliates or any Third Party (each, an "API Shortfall", and together with any Materials Shortfall, a "Shortfall"), or (iii) any DEA quota received by Manufacturer will be insufficient to Manufacture for Recipient any amount of any API specified in any month of the Firm Requirements and such other quantities of API that Manufacturer is providing to itself, its Affiliates or any Third Party (each, a "DEA Quota Shortfall"), [REDACTED].

        (b)    Notice.  Each Party will promptly notify the other Party in writing of any Shortfall or DEA Quota Shortfall of which it becomes aware or that it reasonably believes will occur.

        (c)    Failure to Supply.

        (i)  If (A) either (1) Manufacturer does not deliver Conforming API in the total amount specified in any Purchase Order, which Purchase Order has been accepted by Manufacturer in accordance with Section 3.2(a) or Section 3.2(c) within ten (+/- 10) days of the Delivery Date (a "Failed Delivery"), or (2) a DEA Quota Shortfall occurs because Manufacturer either (x) failed to timely (under applicable Law) request from the DEA, and use commercially reasonable efforts to obtain, the necessary quota to Manufacture API in accordance with the applicable Rolling Forecast in effect when such request was made, or (y) breached its allocation obligations under Section 3.5(a) (a "Manufacturer-Caused DEA Quota Shortfall," and together with any Failed Delivery, a "Failure to Supply Event"),

and (B) Manufacturer does not cure the Failure to Supply Event within ten (10) days of Recipient's written request for the same (provided, that Manufacturer shall have no obligation to cure, and shall not be liable for, any DEA Quota Shortfall that is not a Manufacturer-Caused DEA Quota Shortfall); provided that Manufacturer shall not have the right to cure (i) if a 25 Day Failed Delivery shall have already occurred twice or more during any consecutive twelve (12) month period or (ii) any Failure to Supply Event (other than a 25 Day Failed Delivery) has occurred three (3) times or more during the Term,

then (C) Recipient may elect, without limiting its or its Affiliates' other rights or remedies, including its right to terminate under Section 9.2(a)(iv), (1) in the case of a Failed Delivery, to cancel the Purchase Order for the quantity of API not delivered; or in the case of a Manufacturer-Caused DEA Quota Shortfall, to cancel or not place, as applicable, a Purchase Order for the quantity of API specified in the applicable Firm Requirements for which there is insufficient DEA quota (such quantity, the "Failure to Supply Quantity") and (2) (x) Manufacture for itself, or (y) have Manufactured by the applicable Alternate Supplier, the Failure to Supply Quantity of API.

[REDACTED].

(ii) Manufacturer hereby grants, and shall cause its Affiliates and its subcontractors (as applicable) to grant, to Recipient a non-transferable (except as permitted by Section 11.3), sublicensable (solely to the applicable Alternate Manufacturer), royalty-free and fully paid-up, irrevocable, non-exclusive license during the Term to any and all Intellectual Property Controlled by such Person and that is used in the Manufacture of the applicable API for use solely for Manufacturing or having Manufactured such API in accordance with Section 3.5(c)(i)(C)(2).  From time to time during the Term, upon Recipient's reasonable request given no more frequently than once every six (6) months, Manufacturer shall provide Recipient with copies of any and all documents and materials that set forth any technology, information and knowledge used in the Manufacture of such APIs and that has not previously been provided to Recipient and is not included in the Purchased Assets.

(iii) [REDACTED].

(d)    [REDACTED].

(e)    <u>Continuity Plan</u>.  During the Term, Manufacturer shall maintain one or more written business continuity plans ("<u>Continuity Plans</u>") to help ensure Recipient's supply of each API by Manufacturer during the Term in accordance with the terms hereof.  A summary of the Continuity Plans in effect as of the Effective Date is attached hereto as <u>Schedule B</u>.  Manufacturer has provided true and complete copies of such Continuity Plans to Recipient, and Recipient hereby confirms the receipt and acceptability of such Continuity Plans.  Manufacturer shall be required to obtain Recipient's consent for any changes to any Continuity Plan that are reasonably likely to detrimentally impact supply (including any delay, interruption, or other shortage) of any API to Recipient or its designees.  For clarity, Recipient's rights to audit under Section 5.3 shall include rights to audit Manufacturer's compliance with the Continuity Plan then in effect and following any such audit, Recipient shall have the right to require reasonable updates or revisions to the then-current Continuity Plan.

(f)    <u>Audit Rights</u>.

(i)  At any time, during normal business hours and upon reasonable prior notice (which shall be no less than thirty (30) days or such shorter period if Recipient reasonably and good faith believes that the circumstances require such a shorter notice period), subject to the remainder of this Section, Recipient may send a reasonable number of its and its Affiliates' Representatives, consultants and contractors to inspect or audit Manufacturer's, its Affiliates' and respective facilities and review the records and operations related to the Manufacturer's exercise of its rights and performance of its obligations hereunder to ensure that Manufacturer is in compliance with Section 3.3(b) of this Agreement and that the applicable Manufacturing Facility complies with applicable Law (including GMP) (collectively, the "<u>Audited Obligations</u>"), and that Manufacturer can fulfill the Audited Obligations.  (1) Recipient shall be responsible for all costs associated with conducting any audit or inspection

pursuant to this Section 3.5(f)(i), and (2) audits or inspections shall be limited to once per Calendar Year, except, in respect of each of the foregoing (1) and (2), unless any prior audit or inspection by or on behalf of Recipient or any Regulatory Authority demonstrates, or any other facts, circumstances, or conditions exist as a result of which Recipient reasonably believes, that the Manufacturer, its Affiliates or any of its Product Materials suppliers have failed or are likely to fail to comply with any of the Audited Obligations (in which case, Recipient shall be permitted to conduct a reasonable number of additional for-cause audits or inspections, limited to the scope of the Audited Obligation in question, and Manufacturer shall be responsible for all such costs and expenses). Manufacturer shall, and shall cause its Affiliates and any Product Materials suppliers to, reasonably cooperate with any Representatives conducting any such audit (including by providing access to the relevant personnel). Notwithstanding anything to the contrary in this Section 3.5(f)(i), Manufacturer may require that, to the extent applicable, (i) the Representatives conducting an audit pursuant to this Section 3.5(f)(i) be accompanied by the Manufacturer's Representatives at all times during any such audit and (ii) all such audits are conducted in accordance with the obligations set forth in Article X.

(g)    Safety Stock. Manufacturer agrees to maintain throughout the Term a safety stock, subject to Recipient having sufficient DEA quota where applicable, of each API and all Product Materials. Unless otherwise set forth in the Product Addendum, the volume of such safety stock shall correspond to the Firm Requirements as set out in Recipient's then-most recent Rolling Forecast.

Section 3.6    Non-Conforming API.

(a)    Manufacturer shall not release any API for delivery that does not conform to the Specifications, all applicable Laws, the applicable Product Addendum, and the Quality Agreement (any such API, "Non-Conforming API"; and API that does conform to the Specifications, all applicable Laws, the applicable Product Addendum, and the Quality Agreement, "Conforming API"), without the prior written approval of Recipient.

(b)    Manufacturer shall quarantine and properly tag all Non-Conforming API. Manufacturer shall promptly submit to Recipient a report detailing the nature of any such Non-Conforming API, including the number of Batches affected, the investigation and testing done and Manufacturer's recommended disposition. Manufacturer also shall provide any additional information regarding such Non-Conforming API as may reasonably be requested by Recipient.

(c)    Recipient shall have the right to inspect, test, and evaluate any API delivered by Manufacturer hereunder, and to reject any Non-Conforming API by providing notice of such rejection to Manufacturer within ninety (90) days following receipt by Recipient of delivery of such API hereunder; *provided* that no such time restriction shall apply to Recipient's provision of such notice where latent defects have occurred or are present (*i.e.*, those defects in API that cannot be detected by Recipient through standard inspection and testing of a

Ex. E-13

sample or that affect only a portion of API delivered in a shipment (and not the sample that is tested) or that are discovered by customers purchasing API from Recipient); *provided* that notice of rejection because of latent defect must be provided (x) within thirty (30) days following discovery of such defect and (y) prior to the expiration of the API in question.  Notwithstanding anything to the contrary in this Agreement, use of the API in Product is solely Recipient's responsibility and API cannot and shall not be deemed Non-Conforming API after incorporation into Product, subject to the foregoing provisions regarding latent defects or to the extent such API is Non-Conforming as a result of Manufacturer's or its Affiliates' gross negligence, bad faith breach or willful misconduct.

(d)    At Recipient's option, Non-Conforming API will be disposed of by Recipient or will be returned to Manufacturer, in each case at Manufacturer's expense, and with respect to any API rejected in accordance with Section 3.6(c), Manufacturer shall (i) refund Recipient for the Price of such rejected API, (ii) provide Recipient with a credit for the Price of such rejected API, or (iii) use commercially reasonable efforts to promptly replace such rejected API at no cost to Recipient, in each case (in respect of the foregoing (i) through (iii)), within thirty (30) days of Recipient's election of any of the foregoing (i) through (iii).

(e)    If Manufacturer disputes Recipient's grounds for rejecting all or part of any shipment of the API as set forth above, and such dispute is not resolved by mutual agreement of the Parties within thirty (30) days of Recipient's notice of rejection, such dispute will be resolved by an independent, reputable testing organization mutually agreed upon by the Parties, which agreement shall not be unreasonably withheld, conditioned or delayed.  The determination of such testing organization with respect to whether all or part of any shipment is Non-Conforming API will be final and binding upon all Parties, but only as to reasons given by Recipient in rejecting the shipment or portion thereof and will have no effect on any matter for which such testing organization did not render a determination.  The fees and expenses of the testing organization will be paid by the Manufacturer if rejection is upheld by such testing organization, otherwise by Recipient.

(f)    The remedies described in this Section 3.6, together with Recipient's rights under Sections 3.5(a)-(c) and (f), right to indemnity under Section 8.1 and right to terminate in accordance with Section 9.2(a) (as applicable), shall be Manufacturer's sole liability and Recipient's sole remedy for any Non-Conforming API.

Section 3.7    <u>Quality Obligations.</u>

(a)    <u>Facility Compliance and Related Matters</u>.  Manufacturer shall maintain the Manufacturing Facilities in compliance with all applicable Laws, including the Federal Food, Drug and Cosmetic Act and the Controlled Substances Act and all Laws promulgated thereunder, and this Agreement, at all times during the Term.

(b)    <u>Quality Control Program</u>.  Manufacturer shall maintain a quality control program consistent with all applicable Laws, including GMP.

(c)     Segregation of Restricted Compounds.  Manufacturer shall not use any equipment, dedicated change parts, molds or tooling that are used to manufacture API to manufacture ingredients or products containing any of the following: androgens, estrogens, progestin, herbicides, pesticides, rodenticides, agrochemicals and cytotoxins, in each case without such controls and segregation with respect to these compounds as provided in the Quality Agreement and required by applicable Laws.  Manufacturer shall not manufacture penicillin, cephalosporins or beta lactams in any of the same buildings in which the API is Manufactured.

# ARTICLE IV

# PRICE AND PAYMENT

Section 4.1     Price.

(a)     The Price for each API will be as specified in the Product Addendum for such API, which Prices will be firm for the period commencing on the Effective Date and ending on the fifth (5th) anniversary thereof subject to Section 4.1(b), and automatically adjusted upon such fifth (5th) anniversary date and every two (2) years [REDACTED].

(b)     In the event that the applicable Product Addendum for an API specifies different Prices if such API is Manufactured at different Manufacturing Facilities, the following shall apply:  [REDACTED].

Section 4.2     Currency.  All sums payable hereunder shall be expressed in and payable in U.S. Dollars.

Section 4.3     Invoices.

(a)     Manufacturer shall submit invoices to Recipient for API Manufactured hereunder upon the earlier of (i) placement of such API into the possession of a common carrier for shipment under Section 3.3(a) or (ii) transfer of such API into storage under Section 3.3(f).  Manufacturer shall include the following information on all invoices: the applicable Purchase Order number and billing address, the type, description, part number (if any) and quantity of the API delivered or stored, the Delivery Date, the actual date of shipment or transfer into storage, the Price, and the ship-to destination.  Recipient shall be obligated to pay only for actual quantities of API delivered or stored.

(b)     If Recipient does not submit Purchase Orders for any portion of the Firm Requirements in any Calendar Month, then Manufacturer shall invoice Recipient for the difference between (i) the total amount Recipient would have paid to Manufacturer if the Firm Requirements had been fulfilled and (ii) the sum of all purchases of API from Manufacturer during such Calendar Month.

Section 4.4     Payment Terms.  Recipient shall pay all undisputed amounts due within thirty (30) calendar days from the date of receipt of the invoice by Recipient.  If Recipient

disputes all or any portion of an invoice in good faith, it shall be required to pay only the amount not in dispute, and in such event Recipient shall notify Manufacturer promptly, but in any event prior to the payment due date, of the amount and nature of the dispute.  Payment of disputed amounts shall be made within ten (10) Business Days of resolution of such dispute.  Payment by Recipient shall not result in a waiver of any of its rights under this Agreement.  Recipient may set off any amount Manufacturer owes Recipient against amounts payable under this or any other Ancillary Documents.  If payment of any undisputed amount is not received by Manufacturer by its due date, Manufacturer may, in addition to any other remedies available at equity or in law, (a) charge interest on the outstanding sum from the due date (both before and after any judgment) at two percent (2%) per month (or, if less, the maximum amount permitted by applicable Law) until paid in full or (b) provide written notice thereof to Recipient and cease all work hereunder until all undisputed Recipient accounts are brought current if Recipient does not cure such breach within ten (10) Business Days of such notice.

Section 4.5    Competitive Offer.  [REDACTED].

Section 4.6    Audits.

(a)    By Recipient.

(i)  Manufacturer shall, and shall cause its applicable Affiliates to, maintain complete and accurate records in accordance with GAAP and in sufficient detail for Recipient to confirm the accuracy of any payments made or required to be made and volume sold hereunder.  Upon written notice to Manufacturer, Recipient shall have the right, using an independent certified public accounting firm reasonably acceptable to the Manufacturer to audit the Manufacturer's and its Affiliates' books and records during normal business hours, no more than once per Calendar Year; *provided* that a reasonable number of additional audits per Calendar Year shall be permitted to the extent that Recipient has a reasonable, good faith belief, or a prior audit demonstrated, that Manufacturer failed to comply with any of its obligations under the first sentence of this Section 4.6(a), solely to verify the accuracy of any payments made or required to be made by Recipient and volume sold to Recipient hereunder.  Manufacturer shall, and shall cause its Affiliates to, reasonably cooperate with each such audit.  The independent certified public accounting firm shall prepare a report based on each such audit which shall be shared with both Parties, and such report shall contain the conclusions of such accounting firm with respect to whether the amounts paid and volumes sold were correct or, if incorrect, the amount of any underpayment or overpayment and the volumes not sold on an API by API basis.  The opinion of said independent accounting firm in connection therewith shall be binding on the Parties, other than in the case of manifest error.

(ii) Recipient shall be responsible for any and all fees and expenses it incurs in connection with any audit under this Section 4.6(a); *provided* that, in the event that such an audit reveals an overcharge by Manufacturer of more than five percent (5%) as to the period subject to such

audit, Manufacturer shall reimburse Recipient for its reasonable and documented out-of-pocket costs and expenses of such audit within thirty (30) days of the Recipient's invoice therefor.

(iii) If any audit conducted in accordance with this Section 4.6(a) establishes that Recipient overpaid any amounts due hereunder, Manufacturer shall, at Recipient's option, (A) refund the excess payments to Recipient within thirty (30) days of receipt of written notice thereof or (B) offset all such excess payments against any outstanding and future amounts owed by Recipient hereunder.

(iv) If any audit conducted in accordance with this Section 4.6(a) establishes that Recipient underpaid any amounts due hereunder, Recipient shall, at Manufacturer's option, (A) pay the unpaid amounts to Manufacturer within thirty (30) days of receipt of written notice thereof or (B) offset all such unpaid amounts against any outstanding and future amounts owed by Manufacturer hereunder.

(b)    [REDACTED].

(i)  [REDACTED].

(ii) [REDACTED].

(iii)[REDACTED].

(c)    [REDACTED].

Section 4.7    Taxes.

(a)    Manufacturer is responsible for the remittance to the appropriate Governmental Entity of all taxes, levies, duties, assessments and deductions of any nature required by applicable Law in connection with the supply of API (the "Taxes" or "Tax"), to the extent Manufacturer is required to pay such Taxes under applicable Law; *provided* that payment of any Value Added Tax ("VAT") shall be solely Recipient's responsibility and liability. Manufacturer will include and itemize all such Taxes in any applicable invoice for API to which the Taxes pertain.  Manufacturer will promptly forward to the appropriate Governmental Entity all Taxes collected from Recipient, as required by applicable Law (excluding VAT).  Upon Recipient's request Manufacturer agrees to provide adequate documentation to support any Tax charges.

(b)    Manufacturer agrees to reimburse Recipient and its Affiliates for any and all liability, fee, penalty, interest, deduction or cost or expense that may be assessed against or incurred by Recipient or any of its Affiliates as a result of Manufacturer's failure to remit Taxes collected by Manufacturer in accordance with this Section 4.7.  In addition, if Manufacturer fails to provide Recipient with timely notice of any audit that could result in an

Ex. E-17

increase in the amount of Taxes assessed, then Recipient and its Affiliates will not be required to pay any additional Taxes assessed as a result of that audit.

(c)     If Recipient or any of its Affiliates are required by applicable Law to withhold and pay on behalf of Manufacturer any withholding Tax imposed at source on any amount payable to Manufacturer under this Agreement, the amount of Recipient's or its Affiliate's (as applicable) payment will be credited toward any amounts paid or owed by Recipient to Manufacturer hereunder.  Upon request from Manufacturer, Recipient will make available to Manufacturer evidence of any payment to the applicable Governmental Entity related thereto.

(d)     Each Party is solely responsible for the payment of all other taxes incurred in connection with its business or this Agreement, including personal property taxes, franchise taxes, corporate excise or corporate privilege, property or license taxes, all taxes relating to its Personnel, and all taxes based on its net income or gross revenues or that have a similar effect.

(e)     The Parties will cooperate to enable each to more accurately determine its own Tax liabilities and to minimize Tax liabilities to the extent legally permissible.

## ARTICLE V

## REGULATORY INFORMATION/DOCUMENTATION/INSPECTION

Section 5.1     Drug Master Files.

(a)     Promptly following commencement of the Term (but within no more than ten (10) Business Days), Manufacturer, at its sole cost and expense, shall file the DMF included in the Purchased Assets as set forth on Schedule G with all applicable Regulatory Authorities (including the FDA) for each API other than Oxycodone (each, a "Post-Acquisition DMF").  Following such filing, Manufacturer, at its sole cost and expense, shall maintain throughout the Term a valid DMF covering each such API (the "Manufacturing DMFs") in accordance with all applicable Laws.  Following the transfer of each API to a Manufacturing Facility other than the Coventry Facility, Manufacturer may satisfy the foregoing obligation to maintain a Manufacturing DMF for such API by maintaining either the applicable Post-Acquisition DMF or a DMF for such API held by Manufacturer or any of its Affiliates prior to the commencement of the Term (each, a "Pre-Existing DMF"), except that Manufacturer shall provide Recipient ninety (90) days' notice before effectuating such a switch and shall clarify for Recipient the ways in which the Post-Acquisition DMF and Pre-Existing DMF differ, and cooperate with Recipient's effort to evaluate such differences, such that Recipient can properly assess what type of submission, if any, must be made with respect to the FDA approvals for the affected Products. For the avoidance of doubt, following the transfer of an API to a Manufacturing Facility, Manufacturer shall be required to hold only one (1) DMF for such API and, should Manufacturer elect to maintain a Pre-Existing DMF for such API, Manufacturer shall be entitled to withdraw the Post-Acquisition DMF for such API.  Subject to Section 1.4(b), as between the Parties, Recipient shall be solely responsible for any costs required to be incurred

by it and its Affiliates (including the cost of purchasing quantities of API necessary for qualification and validation activities) in connection with (i) the initial transition from API Manufactured under a DMF held by Recipient or any of its Affiliates to API Manufactured under a Post-Acquisition DMF, and (ii) the initial transition from API Manufactured under a Post-Acquisition DMF to API Manufactured under a Pre-Existing DMF.  For the avoidance of doubt, nothing herein shall be construed to require Manufacturer to withdraw any Pre-Existing DMF held by it or any of its Affiliates for Oxycodone.

(b)     Prior to submitting any Post-Acquisition DMF or making any changes to any Manufacturing DMF, Manufacturer shall provide Recipient with an opportunity to review such filing or change(s) and make comments thereto.  Each such submission shall require Recipient's prior written consent (which shall not be unreasonably withheld, conditioned or delayed), except for submissions effecting a change to a Manufacturing DMF required by or to comply with applicable Law.  In connection with proposed changes to a Manufacturing DMF (following the initial transitions referred to in Section 5.1(a)(i) and (ii)), upon Recipient's request, Manufacturer shall supply Recipient and its applicable Affiliates (in accordance with the delivery terms set forth in Section 3.3(a)), free of charge (other than for any taxes, shipping, insurance or similar charges that are the responsibility of Recipient or such Affiliate pursuant to the delivery terms set forth in Section 3.3(a)), API made in accordance with the proposed change(s) in such quantities as may be necessary to enable Recipient or such Affiliate to qualify the change(s) and evaluate whether any modification or update need be submitted to the FDA approvals for the affected Products as a result thereof.

(c)     During the Term, Recipient, at its sole cost and expense, shall maintain a valid DMF covering Oxycodone (the "Oxycodone DMF") in accordance with all applicable Laws.  Recipient shall notify Manufacturer of any changes to the Oxycodone DMF at least ninety (90) days prior to submitting such change to the applicable Regulatory Authority for purposes of allowing Manufacturer to make any changes to the applicable Manufacturing Facility, Product Materials or otherwise as necessary for fulfilling its obligations with respect to Manufacturing such Oxycodone for Recipient hereunder.  If the proposed change to the Oxycodone DMF results in an increase in Manufacturer's cost to Manufacture Oxycodone of five percent (5%) or more, Manufacturer shall be entitled to increase the Price of Oxycodone by an amount equal to such increase in Manufacturer's cost to Manufacture Oxycodone.

(d)     Recipient shall provide Manufacturer (or a designated Affiliate) with a Right of Reference to the Oxycodone DMF to the extent necessary for Manufacturer to Manufacture the APIs for Recipient hereunder, which Right of Reference shall be non-transferable, non-sublicensable, and solely for use by Manufacturer to Manufacture for Recipient and its Affiliates (and no other Person) with each API in accordance with and subject to the terms and conditions of this Agreement.  Manufacturer shall provide Recipient (including any Permitted Affiliate purchasing the applicable API) with a Right of Reference to the Manufacturing DMFs for purposes of manufacturing and commercializing the applicable Products, including for purposes of supporting the Regulatory Authorizations for such Products.

(e)     Subject only to Recipient's rights under Section 5.1(b), nothing in this Section 5.1 shall affect in any way Manufacturer's or its Affiliates' rights to file, maintain,

Ex. E-19

withdraw or otherwise handle or to exploit any DMF that is not a Post-Acquisition DMF, including any Pre-Existing DMF or DMF for active pharmaceutical ingredient that is not an API.

Section 5.2    Regulatory Information.  Each Party agrees to provide the other with all reasonable assistance and take all reasonable actions requested by the other that are necessary or desirable to enable the other Party to maintain such Party's DMFs, and in the case of Recipient, NDAs and ANDAs for Products, and comply with all applicable Laws applicable to the APIs, Product Materials, and the Products.  Such assistance and actions will include keeping the other Party informed of any Action by, or notification or other information which such Party or any of its Affiliates receives (directly or indirectly) from the FDA, DEA, or any other Governmental Entity which (a) raises any material concerns regarding the marketability of any API or Product, or (b) indicates or suggests a potential material liability for either Party or any of its Affiliates to any Third Party arising in connection with the API or a Product (such Action, notification or other information under the foregoing (a) or (b), a "Material Regulatory Inquiry"); *provided* that neither Party will be obliged to disclose information in breach of any contractual obligations or restrictions.

Section 5.3    Documentation.  Manufacturer will maintain true and complete documentation of (i) all data and information relating to the Manufacture of the API hereunder in accordance with all applicable Laws and (ii) all Material Regulatory Inquiries.

Section 5.4    Inspections.  If any Governmental Entity inspects a Manufacturing Facility, seizes any API or Product Materials used in Manufacture therefor, requests a recall of API or of Product, or notifies Manufacturer of any of the foregoing or any violation or potential violation of any applicable Law in connection with performance of its obligations hereunder or in respect of any of the Manufacturing Facilities, Manufacturer shall notify Recipient within two (2) Business Days and take such actions as may be required under this Agreement, the Quality Agreement or as otherwise instructed by Recipient.

Section 5.5    Recalls.  Except to the extent required by applicable Law and only with regard to APIs (and for clarity, not Products), Manufacturer shall not be permitted to initiate a recall of any API or Product but shall immediately notify Recipient if it learns that any API produced for Recipient or any of its Permitted Affiliates is or may be defective, adulterated or misbranded so that Recipient or any of its Affiliates may take any action it deems appropriate. Without limiting Recipient's or any of its Affiliates' rights or remedies, if a recall directly results from any breach by Manufacturer of this Agreement or Quality Agreement, Manufacturer shall reimburse Recipient for Recipient's and its Permitted Affiliates' direct and reasonable costs and expenses of recovering and destroying the API in question.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES AND COVENANTS

Section 6.1    By Manufacturer.  Manufacturer hereby represents and warrants to Recipient that prior to Manufacturer's first delivery of API to Recipient under this Agreement, Manufacturer will have received and will be in current compliance with, and will maintain

during the Term, all permits, licenses, registrations, and other forms of Consents from Governmental Entities (including from the DEA) required to be obtained and maintained by Manufacturer in order for Manufacturer to execute and deliver this Agreement and to perform its obligations hereunder in accordance with all applicable Laws; *provided* that the foregoing representation and warranty shall not be breached by, and Manufacturer shall not be liable for, any refusal or failure of the DEA to grant any DEA quota so long as Manufacturer timely (under applicable Law) requested from the DEA and used commercially reasonable efforts to obtain the necessary quota to Manufacture API in accordance with the Rolling Forecast.  During the period between Closing (as defined in the Asset Purchase Agreement) and issuance of new DEA site licenses to Manufacturer (or its applicable Affiliate) for the Coventry Facility, Recipient will provide Manufacturer (or such Affiliate) with appropriate and customary powers of attorney to operate the Coventry Facility under Recipient's DEA licenses; *provided* that Manufacturer shall not be liable under this Agreement for any insufficiency in or violation of applicable Law caused by the Recipient DEA licenses.

Section 6.2     By Recipient.  Recipient represents and warrants to Manufacturer that prior to Manufacturer's first delivery of API to Recipient under this Agreement, Recipient will have received and will be in current compliance with, and will maintain throughout the Term, all permits, licenses, registrations, and other forms of Consents from Governmental Entities (including from the DEA) required to be obtained and maintained by Recipient in order for Recipient to execute and deliver this Agreement and to perform its obligations hereunder in accordance with all applicable Laws.

Section 6.3     Quotas.  Each Party shall use its commercially reasonable efforts to timely obtain any and all DEA quotas necessary for the Manufacturing of sufficient quantities of APIs to fulfill the quantity of API forecasted [REDACTED] for each Calendar Year based on the most recent Rolling Forecast by Recipient prior to the date on which the applicable Party's quota request is due to the DEA under applicable Law.  If either Party does not have the necessary manufacturing quota or procurement quota, as applicable, or Consents from the DEA to fulfill its obligations hereunder, then such Party shall inform the other Party in writing as soon as reasonably practicable (but within no more than two (2) Business Days of becoming aware of such lack of quota).  Without limiting the other Party's rights or remedies hereunder, any outstanding Purchase Order shall nonetheless be deemed to be valid and may be fulfilled upon mutual agreement of Recipient and Manufacturer and upon receipt of necessary quotas and Consents from the DEA; and if any quota or Consent from the DEA is not received within six (6) months of the original Purchase Order date, the Purchase Order will be deemed to be revoked unless otherwise agreed upon by the Parties.  Any such revocation will relieve Recipient from its obligation to purchase the portion of the Firm Requirements applicable to such revoked Purchase Order, unless Recipient failed to timely (under applicable Law) request from the DEA and to use commercially reasonable efforts to obtain the necessary procurement quota to procure API in accordance with the Rolling Forecast, in which case Recipient shall not be so relieved from its obligations to purchase the Firm Requirements.

Section 6.4    Joint Supply Committee.

(a)    Formation.  No later than thirty (30) days after the Effective Date, the Parties shall establish a joint supply committee (the "JSC").  The JSC shall consist of at least two (2) employees from each of the Parties, each with the requisite experience and seniority to enable such person to fulfill the JSC's obligations hereunder.  From time to time, each Party may substitute one or more of its employees to the JSC on written notice to the other Party.  Recipient shall select from its JSC members the initial chairperson for the JSC, and every twelve (12) months thereafter the Party for which the then-current chairperson is not one of its JSC members shall select from its members the new chairperson for the JSC.

(b)    Responsibilities.  The JSC shall oversee the relationship between the Parties with respect to their rights and obligations under this Agreement, including:

(i)  discussing any proposals by Manufacturer to use any facilities other than the Manufacturing Facilities and any technology transfers;

(ii) discussing any issues regarding capacity, actual or potential Shortfalls or DEA Quota Shortfalls;

(iii) discussing any issues with respect to Manufacturer's compliance with its obligations hereunder or the Quality Agreement;

(iv) discussing any active pharmaceutical ingredients that Recipient or any of its Permitted Affiliates would like to be included as API hereunder; and

(v)  performing such other functions as the Parties may mutually agree in writing.

(c)    Meetings and Minutes.  The JSC shall meet once each Calendar Quarter (or more frequently as agreed by the Parties), with the location of such meetings alternating between locations designated by Recipient and locations designated by Manufacturer. JSC members may attend a meeting either in person or by telephone, video conference or similar means in which each participant can hear what is said by, and be heard by, the other participants. The chairperson of the JSC shall be responsible for calling meetings on no less than ten (10) Business Days' notice (unless the Parties otherwise agree to a shorter notice period).  Each Party shall make all proposals for agenda items and shall provide all appropriate information with respect to such proposed items at least five (5) Business Days in advance of the applicable meeting; *provided* that under exigent circumstances requiring input by the JSC, a Party may provide its agenda items to the other Party within a shorter period of time in advance of the meeting or may propose that there not be a specific agenda for a particular meeting, so long as the other Party consents to such later addition of such agenda items or the absence of a specific agenda for such meeting, such consent not to be unreasonably withheld, conditioned or delayed.

The chairperson of the JSC shall prepare and circulate for review and approval of the Parties minutes of each meeting within thirty (30) days after the meeting.  The Parties shall agree on the minutes of each meeting promptly, but in no event later than the next meeting of the JSC.

(d)  Decision-Making.  The JSC shall be for information purposes only and shall have no decision making authority.  Without limiting the foregoing, the JSC shall be permitted to make recommendations with respect to the matters within its purview, but such recommendations shall not be binding on either Party.

(e)  Authority.  The JSC shall have only the powers assigned expressly to it in this Article VI and elsewhere in this Agreement, and shall not have any power to amend, modify or waive compliance with this Agreement.  In furtherance thereof, each Party shall retain the rights, powers and discretion granted to it under this Agreement and no such rights, powers or discretion shall be delegated or vested in the JSC unless such delegation or vesting of rights is expressly provided for in this Agreement or the Parties expressly so agree in writing.

## ARTICLE VII

## INTELLECTUAL PROPERTY

Section 7.1  Background IP. As between the Parties, all Intellectual Property provided or licensed to Manufacturer by or on behalf of Recipient under this Agreement, and which was owned by, licensed to, or otherwise subject to rights held by Recipient or any of its Affiliates prior to being provided or licensed to Manufacturer hereunder (and, for clarity, was not included in the Purchased Assets), including any and all Supply IP, shall remain owned by, licensed to or otherwise subject to rights held solely by Recipient.  As between the Parties, all Intellectual Property that is owned by, licensed to or otherwise subject to rights held by Manufacturer on or prior to the Effective Date (including (a) all Intellectual Property included in the Purchased Assets and (b) all DMFs owned by Manufacturer prior to the consummation of the Asset Purchase Agreement, together with all Intellectual Property with respect thereto) or that is developed by or for Manufacturer outside the scope of this Agreement ("Manufacturer Background IP") shall remain owned by, licensed to or otherwise subject to rights held solely by Manufacturer.

Section 7.2  Manufacturing License.  During the Term, subject to the terms and conditions of this Agreement, Recipient hereby grants, and shall cause its Affiliates to grant, to Manufacturer a non-transferable (except as permitted by Section 11.3), non-sublicensable (except to Manufacturer's permitted subcontractors), irrevocable (during the Term), royalty-free and fully paid-up non-exclusive license under the Supply IP and the Improvement IP Controlled by Recipient solely to:

(a)  Manufacture Oxycodone in the United States solely for:

(i)  Recipient and its Affiliates; and

Ex. E-23

(ii) Bard Pharmaceuticals Limited ("Bard"); *provided* that such license shall be limited to Manufacturing Oxycodone API (as defined in the Asset Purchase Agreement), which API shall be solely for Bard to purchase for use solely outside of the United States.  Manufacturer shall use its commercially reasonable efforts to ensure that any API that is Manufactured under the license set forth in this clause (ii) is not used, re-sold or offered for re-sale within, or imported into, the United States, and that all such API is exported from the United States to any other country; and

(b)    Manufacture API (other than Oxycodone) solely for Recipient and its Affiliates.

For clarity, Manufacturer is not granted a license under the Supply IP and Improvement IP to make, use, sell, offer for sale, import or export any finished drug product.  The Parties acknowledge and agree that Manufacturer is granted a license to the Licensed Business IP (as defined in the Asset Purchase Agreement) under the Asset Purchase Agreement, and the Parties further acknowledge and agree that during the Term, the licenses set forth in this Section 7.2 and the other terms and conditions regarding Intellectual Property set forth herein (including with respect to ownership of improvements), shall control with respect to the supply of API to Recipient and its Affiliates hereunder and the supply of Oxycodone to Bard.

Section 7.3    <u>Reservation of Rights</u>.

(a)    Manufacturer acknowledges and agrees that no Supply IP or Improvement IP shall be deemed to have been terminated or exhausted based upon any Manufacturing activity by Manufacturer or any of its Affiliates (including in respect of Oxycodone) whatsoever and Manufacturer shall not have any implied rights or rights by estoppel to use any Supply IP or Improvement IP based on any such assertion.  Except to the extent expressly set forth in this Agreement or the Asset Purchase Agreement, Recipient reserves its and its Affiliates' rights in and to all Intellectual Property owned by, licensed to or otherwise subject to rights held by (other than pursuant to a license or sublicense granted under this Agreement or the Asset Purchase Agreement) Recipient and not included in the Purchased Assets that is not expressly licensed under this Agreement, and any rights granted herein by Recipient do not, and shall not be construed to, confer any rights upon Manufacturer or any other Person by implication, estoppel, exhaustion, implied license or otherwise.  Without limiting the foregoing, except to the extent expressly within the scope of the licenses granted pursuant to Section 7.2, any use by Manufacturer of any Supply IP, Improvement IP, or any other Intellectual Property owned by, licensed to or otherwise subject to rights held by (other than pursuant to a license or sublicense granted under this Agreement or the Asset Purchase Agreement) Recipient or any of its Affiliates and not included in the Purchased Assets (including, for clarity, any use in the Manufacture of API for itself, its Affiliates or any other Person and use in the Manufacture of other active pharmaceutical ingredients and products) shall be deemed to be a material breach of this Agreement.  Recipient and its Affiliates expressly reserve all of their rights to assert claims of infringement, misappropriation or other violation for any unlicensed activities and to seek all remedies available to them at law or in equity with respect to such claims.

(b)     Except to the extent expressly set forth in Section 3.5(c)(ii) and 9.3(d), Manufacturer reserves its and its Affiliates' rights in and to all Intellectual Property owned by, licensed to or otherwise subject to rights held by (other than pursuant to a license or sublicense granted under this Agreement or the Asset Purchase Agreement) Manufacturer, and nothing in this Agreement shall confer, or be construed to confer, any rights upon Recipient or any other Person by implication, estoppel, exhaustion, implied license or otherwise. Manufacturer and its Affiliates expressly reserve all of their rights to assert claims of infringement, misappropriation or other violation for any unlicensed activities and to seek all remedies available to them at law or in equity with respect to such claims.

Section 7.4    Improvements.  In the event that Manufacturer improves any Supply IP (including Supply IP for the Manufacture of Oxycodone hereunder), such improvements (collectively, the "Improvement IP") shall be the exclusive property of Recipient, and Recipient shall own all right, title and interest in and to such Improvement IP and all Intellectual Property with respect thereto.  Without any further consideration payable by or on behalf of Recipient or any of its Affiliates, Manufacturer hereby irrevocably transfers, assigns and conveys, and shall cause its Affiliates and its subcontractors (as applicable) to irrevocably transfer, assign and convey, any and all right, title and interest in and to any and all Improvement IP and Intellectual Property with respect thereto to Recipient free and clear of any encumbrances, and Manufacturer agrees to execute, and shall cause its subcontractors and its and their employees to execute, all documents necessary to do so or that are otherwise requested by Recipient or any of its Affiliates.

Section 7.5    Improvements to Manufacturer Background IP.  In the event that Manufacturer improves any Manufacturer Background IP (including Manufacturer Background IP relating to the manufacture of Oxycodone under Manufacturer's DMF), such improvements shall be the exclusive property of Manufacturer, and Manufacturer shall own all right, title and interest in and to such improvements and all Intellectual Property with respect thereto.

Section 7.6    Infringement Claims.  Without limiting any rights or remedies of any Recipient Indemnitees or Manufacturing Indemnitees hereunder, as to any Third Party claims of actual or alleged infringement, misappropriation or violation of any Third Party's Intellectual Property rights in respect of which Recipient or Manufacturer is responsible for indemnification hereunder, such indemnifying Party shall have the right (but not the obligation), at the indemnifying Party's cost, to (a) procure the relevant rights to use the applicable Intellectual Property, (b) subject to the indemnified Party's prior written agreement, change the relevant process or API with the intent of overcoming such allegation of infringement or (c) if the indemnifying Party is unable, after exercising commercially reasonable efforts to implement one of the options set forth in the foregoing (a) or (b), the Parties shall meet to discuss whether to terminate the Product Addendum applicable to the relevant API, which agreement shall not be unreasonably withheld, conditioned or delayed.

## ARTICLE VIII

## INDEMNIFICATION; DISCLAIMER OF FURTHER WARRANTIES; LIMITATION ON LIABILITY

Section 8.1    <u>Indemnification by Manufacturer</u>.  Manufacturer shall indemnify, defend and hold harmless Recipient, its Affiliates and its and their respective directors, officers, employees and agents, and each of their heirs, executors, successors and assigns (collectively, the "<u>Recipient Indemnitees</u>"), from and against any and all Losses arising in connection with any Claim or Action by a Third Party to the extent arising out of or resulting from any of the following (without duplication): (a) Manufacturer's or any of its Affiliate's breach of this Agreement, any Product Addendum or the Quality Agreement or of the Asset Purchase Agreement with respect to Manufacturer's obligations relating to Excluded Inventory; (b) any injury to or death of any Person occurring on the premises of Manufacturer; (c) Manufacturer's supply of API that is Non-Conforming API (for clarity, as described and determined under Section 3.6); (d) any grossly negligent or reckless act or omission or willful misconduct on the part of Manufacturer or any of its Affiliates or subcontractors (to the extent permitted), or its or their respective employees or agents; or (e) subject to Section 8.2(c), the actual or alleged infringement, misappropriation or violation of any Third Party's Intellectual Property rights to the extent arising from the Manufacturing of any API by or on behalf of Manufacturer, its Affiliates or its sublicensees (to the extent permitted hereunder) during the Term; except, in each case (in respect of the foregoing (a) through (e)), to the extent such Losses arise out of, or result from, the gross negligence, recklessness, willful misconduct or fraud of any Recipient Indemnitee or a material breach of this Agreement by any Recipient Indemnitee.

Section 8.2    <u>Indemnification by Recipient</u>. Recipient shall indemnify, defend and hold harmless Manufacturer, its Affiliates and its and their respective directors, officers, employees and agents, and each of their heirs, executors, successors and assigns (collectively, the "<u>Manufacturer Indemnitees</u>"), from and against any and all Losses arising in connection with any Claim or Action by a Third Party to the extent arising out of or resulting from any of the following (without duplication): (a) Recipient's or any of its Affiliate's breach of this Agreement, any Product Addendum or the Quality Agreement; (b) any grossly negligent or reckless act or omission or willful misconduct on the part of Recipient, any of its Affiliates, or its or their respective employees or agents; (c) the actual or alleged infringement, misappropriation or violation of any Third Party's Intellectual Property rights to the extent arising from (i) the Manufacturing of any API by or on behalf of Manufacturer, its Affiliates or its sublicensees (to the extent permitted hereunder) during the Term; *provided* that such Manufacturing is conducted in accordance with the process used by Recipient or its Affiliates immediately prior to Closing, (ii)  the use, in accordance with this Agreement, by Manufacturer or any of its Affiliates or sublicenses (to the extent permitted hereunder) of any Intellectual Property licensed to Manufacturer under Section 7.2, or (iii) Recipient's or its Affiliates' making, using, selling, offering for sale, importing or exporting any Product; or (d) the development, manufacture, sale, offer for sale, import, marketing, use, distribution or other exploitation of any Products; except, in each case (in respect of the foregoing (a) through (d)) to the extent such Losses arise out of, or

result from, the gross negligence, recklessness, willful misconduct or fraud of any Manufacturer Indemnitee or a material breach of this Agreement by any Manufacturer Indemnitee.

Section 8.3      Procedures for Indemnification.

(a)     If a Manufacturer Indemnitee or Recipient Indemnitee (each, an "Indemnitee") receives notice or otherwise learns of the assertion of any Claim or of the commencement of any Action with respect to which Recipient or Manufacturer, respectively, (each, an "Indemnifying Party") may be obligated to provide indemnification to an Indemnitee pursuant to Section 8.1 or Section 8.2 (collectively, a "Third-Party Claim"), such Indemnitee shall give such Indemnifying Party written notice thereof as promptly as practicable (and in any event within thirty (30) days) after becoming aware of such Third-Party Claim.  Any such notice shall describe the Third-Party Claim in reasonable detail.  Notwithstanding the foregoing, the failure of any Indemnitee or other Person to give notice as provided in this Section 8.3(a) shall not relieve the related Indemnifying Party of its obligations under this Article VIII, except to the extent, and only to the extent, that such Indemnifying Party is materially prejudiced by such failure to give notice.

(b)     An Indemnifying Party may elect (but shall not be required) to defend, at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, any Third-Party Claim; *provided* that the Indemnifying Party shall not be entitled to defend and shall pay the reasonable fees and expenses of one separate counsel for all Indemnitees if the claim for indemnification relates to or arises in connection with any criminal action, indictment or allegation.  Within thirty (30) days after the receipt of notice from an Indemnitee in accordance with Section 8.3(a) (or sooner, if the nature of such Third-Party Claim so requires), the Indemnifying Party shall notify the Indemnitee of its election whether the Indemnifying Party will assume responsibility for defending such Third-Party Claim, which election shall specify any reservations or exceptions to its defense.  After notice from an Indemnifying Party to an Indemnitee of its election to assume the defense of a Third-Party Claim, such Indemnitee shall have the right to employ separate counsel and to participate in (but not control) the defense, compromise, or settlement thereof, but the fees and expenses of such counsel shall be the expense of such Indemnitee; *provided, however*, in the event that the Indemnifying Party has elected to assume the defense of the Third-Party Claim but has specified, and continues to assert, any reservations or exceptions in such notice, then, in any such case, the reasonable fees and expenses of one separate counsel for all Indemnitees shall be borne by the Indemnifying Party.

(c)     If an Indemnifying Party elects not to assume responsibility for defending a Third-Party Claim, or fails to notify an Indemnitee of its election as provided in Section 8.3(b), such Indemnitee may defend such Third-Party Claim at the cost and expense of the Indemnifying Party.

(d)     Unless the Indemnifying Party has failed to assume the defense of the Third-Party Claim in accordance with the terms of this Agreement, no Indemnitee may settle or compromise any Third-Party Claim without the consent of the Indemnifying Party.  If an Indemnifying Party has failed to assume the defense of the Third-Party Claim within the time

Ex. E-27

period specified in clause (b) above, it shall not be a defense to any obligation to pay any amount in respect of such Third-Party Claim that the Indemnifying Party was not consulted in the defense thereof, that such Indemnifying Party's views or opinions as to the conduct of such defense were not accepted or adopted, that such Indemnifying Party does not approve of the quality or manner of the defense thereof or that such Third-Party Claim was incurred by reason of a settlement rather than by a judgment or other determination of liability.

(e)     In the case of a Third-Party Claim, no Indemnifying Party shall consent to entry of any judgment or enter into any settlement of the Third-Party Claim without the consent of the Indemnitee if the effect thereof is (i) to permit any injunction, declaratory judgment, other order or other non-monetary relief to be entered, directly or indirectly, against any Indemnitee or (ii) to require any Indemnitee to pay any monetary amounts not paid by the Indemnifying Party or (iii) to ascribe any fault on any Indemnitee in connection with such defense.

Section 8.4    DISCLAIMER OF FURTHER WARRANTIES.  EXCEPT AS AND TO THE EXTENT SPECIFICALLY AND EXPRESSLY SET FORTH IN THIS AGREEMENT, THE ASSET PURCHASE AGREEMENT AND THE OTHER ANCILLARY DOCUMENTS, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, NON-INFRINGEMENT, ENFORCEABILITY, OR ANY OTHER MATTER.

Section 8.5    LIMITATION OF LIABILITY.

(a)     NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT DAMAGES, INCLUDING PROSPECTIVE PROFITS, NOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES BASED UPON NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY IN TORT OR ANY OTHER CAUSE OF ACTION.

(b)     MANUFACTURER'S TOTAL LIABILITY UNDER THIS AGREEMENT FOR ANY AND ALL MATTERS RELATED TO OXYCODONE SHALL IN NO EVENT EXCEED THE GREATER OF (i) THE TOTAL AMOUNT OF FEES PAID BY RECIPIENT TO MANUFACTURER UNDER THIS AGREEMENT WITH RESPECT TO OXYCODONE OVER THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE DATE OF THE FIRST CLAIM MADE HEREUNDER WITH RESPECT TO OXYCODONE OR (ii) ONE MILLION DOLLARS (US$1,000,000).

(c)     MANUFACTURER'S TOTAL LIABILITY UNDER THIS AGREEMENT FOR ANY AND ALL MATTERS RELATED TO A GIVEN API SHALL IN NO EVENT EXCEED, ON AN API BY API BASIS (EXCLUDING OXYCODONE WHICH SHALL BE GOVERNED SOLELY BY SECTION 8.5(b)), THE GREATER OF (i) THE TOTAL AMOUNT OF FEES PAID BY RECIPIENT TO MANUFACTURER UNDER THIS AGREEMENT WITH RESPECT TO THE APPLICABLE API OVER THE TWELVE (12)

MONTHS IMMEDIATELY PRECEDING THE DATE OF THE FIRST CLAIM MADE HEREUNDER WITH RESPECT TO SUCH API OR (ii) ONE MILLION DOLLARS (US$1,000,000).

(d)  THE FOREGOING SECTIONS 8.5(a), 8.5(b) AND 8.5(c) SHALL NOT LIMIT (i) LOSSES ARISING FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (ii) LOSSES SUBJECT TO INDEMNITY UNDER SECTION 8.1 OR 8.2, (iii) LOSSES ARISING FROM A PARTY'S BREACH OF ARTICLE X (CONFIDENTIALITY) OR ARTICLE VII (INTELLECTUAL PROPERTY) (iv) LOSSES EXPRESSLY PERMITTED TO BE RECOVERED UNDER SECTION 3.5(b).

Section 8.6    Insurance.  Each Party shall, at its own expense, obtain and maintain throughout the Term of this Agreement and for two (2) years after the termination of the Agreement, (i) product liability insurance providing limits in the amount of at least Ten Million Dollars ($10,000,000) per occurrence and in the aggregate and (ii) commercial general liability insurance providing limits in the amount of at least Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate.  Each Party shall have the right to provide for such insurance through a captive insurance program.  Upon written request, each Party shall provide the other Party with written evidence of the required insurance.  The existence of such insurance shall in no way limit Recipient's or Manufacturer's liabilities or obligations hereunder.

## ARTICLE IX

## TERM AND TERMINATION

Section 9.1    Term.  This Agreement commences on the Effective Date, will continue through the seventh (7th) anniversary of the Effective Date ("Initial Term") and may be renewed at Recipient's option for two (2) consecutive two (2) year renewal terms (each such term, a "Renewal Term") (the Initial Term, together with any Renewal Terms, as applicable, the "Term") unless earlier terminated under the terms of this Agreement.

Section 9.2    Termination.

(a)  Prior to expiration of the Term set forth in Section 9.1, this Agreement or any or all Product Addendum executed hereunder may be terminated as follows:

(i)  by mutual written agreement of Recipient and Manufacturer at any time;

(ii) on a Product Addendum-by-Product Addendum basis, by either Recipient or Manufacturer, immediately upon written notice, if the other Party breaches such Product Addendum and such breach is not cured within sixty (60) days after receipt of written notice from the non-breaching Party specifying the nature of such breach;

Ex. E-29

(iii) on a Product Addendum-by-Product Addendum basis, by Recipient, immediately upon written notice, if the marketing approval for the final dosage form of the Product that contains the API subject to such Product Addendum is suspended indefinitely by any Regulatory Authority, cancelled or withdrawn;

(iv) by Recipient either on a Product Addendum-by-Product Addendum basis or with respect to the entire Agreement (as determined in its sole discretion), immediately upon written notice, if (a) a 25 Day Failed Delivery has occurred with respect to Oxycodone two (2) or more times during any consecutive twelve (12) month period or a (b) a Failure to Supply (other than a 25 Day Failed Delivery) has occurred with respect to Oxycodone three (3) or more times during the Term;

(v) by Recipient either on a Product Addendum-by-Addendum basis or with respect to the entire Agreement (as determined in its sole discretion), immediately upon written notice, if (a) a 25 Day Failed Delivery has occurred with respect to any API other than Oxycodone two (2) or more times during any consecutive twelve (12) month period or (b) a Failure to Supply (other than a 25 Day Failed Delivery) has occurred with respect to any API other than Oxycodone three (3) or more times during the Term (*provided* that, for the avoidance of doubt, each such 25 Day Failed Delivery or Failure to Supply in this Section 9.2(b)(v) may relate to any API or combination of APIs, other than Oxycodone, as applicable); or

(vi) by either Party as may be otherwise set forth in this Agreement.

(b)    Change of Control.

(i)  If, Manufacturer (1) enters into any agreement to sell, assign, transfer, mortgage, pledge or otherwise, directly or indirectly (whether by merger, consolidation, sale of assets and business or stock, operation of Law or otherwise), dispose of, or suffer the disposition of, more than 50% of its total assets or Capital Stock, (2) enters into any agreement that would otherwise result in a change of control of Manufacturer such that a corporation or other organization will control or own, directly or indirectly, more than 50% of the Capital Stock, or more than 50% of the voting power entitled to vote on the election of members of the board of directors or similar governing body of Manufacturer, or (3) enters into any agreement that would otherwise result in a Transfer Transaction, then Recipient may elect to terminate this Agreement by giving written notice to Manufacturer; *provided* that (A) such notice of termination must be given, if at all, within thirty (30) days after Recipient receives notice from Manufacturer of the consummation of the transaction triggering such termination right, (B) the effective date of any such termination shall be no less than twelve (12) months from the date of Recipient's termination notice, and (C)

the foregoing right of termination shall not apply and may not be exercised by Recipient if the Person acquiring or combining with Manufacturer (or its equity or assets, as applicable) in such Change of Control transaction is a Qualified Buyer. "Capital Stock" means (x) in the case of a corporation, corporate stock, (y) in the case of a partnership or limited liability company, partnership or membership interests or units (whether general or limited), and (z) any other interest or participation in a corporation, partnership or limited liability company that confers on a person the right to (a) receive directly in the recipient's capacity as a stockholder, partner or member, a share of the profits and losses of, or distribution of assets of, the issuing entity or (b) vote for the election of directors or managers of such entity.

(ii) Upon the consummation of any such Change of Control, if Recipient does not terminate this Agreement in accordance with Section 9.2(b)(i), the following shall apply:  Notwithstanding anything to the contrary in Section 3.5(f)(i) and Section 4.6(a), Recipient shall be permitted to conduct no more than two (2) audits or inspections per Calendar Year during the first two (2) years following a Change of Control, unless any prior audit or inspection by or on behalf of Recipient or any Regulatory Authority demonstrates, or any other facts, circumstances, or conditions exist as a result of which Recipient reasonably believes, that the Manufacturer, its Affiliates or any of its Product Materials suppliers have failed or may fail to comply with any obligations hereunder or under the Quality Agreement or under applicable Law (in which case, Recipient shall be permitted to conduct additional for-cause audits or inspections, and Manufacturer shall be responsible for all direct, out-of-pocket costs and expenses incurred by Recipient in connection with conducting such audit or inspection to the extent pre-approved in writing by Manufacturer).

(iii) During the Term, beginning as of and following consummation of a Change of Control, if Recipient does not terminate this Agreement in accordance with Section 9.2(b)(i), without limiting the other terms and provisions set forth in this Agreement, Manufacturer shall:

(1)    ensure that the members of Manufacturer's workforce with responsibilities related to this Agreement or the Quality Agreement (including in particular the applicable Manufacturing Facilities' plant manager, heads of technical operations, QC and site quality) have a similar level of experience and have similar qualifications as the individuals in such workforce on the date of consummation of the Change of Control;

(2)    conduct the business as it relates to Manufacturing the APIs in a manner that is consistent in all material respects with the nature, and is at least of the scope and magnitude (including in respect of the size of the workforce), as such business was conducted by the Manufacturer as of, and during the twelve (12) months prior to, the date of the consummation of the

Change of Control, subject to API volume changes and resulting workforce size adjustments; and

(3)    maintains a plant capital budget sufficient to perform Manufacturer's obligations hereunder.

Section 9.3    Effects of Termination.

(a)    Termination of this Agreement for whatever reason will not affect the accrued rights of the Parties arising in any way out of this Agreement as of the date of termination, and, in particular but without limitation, the right to recover damages against the other, and all provisions which are expressed to survive this Agreement will remain in full force and effect.

(b)    Without limiting the foregoing, upon termination of this Agreement, Recipient will take delivery of and pay for all undelivered API that was Manufactured (or that was in the process of being Manufactured, it being understood and agreed that Manufacturer shall complete any such work-in-process) under a Purchase Order at the Price in effect at the time the Purchase Order was placed.  For the avoidance of doubt, such API shall be subject to Section 3.6.  In addition, Section 3.4 shall apply with respect to Product Materials.

(c)    Upon expiration or termination (whether in part or in whole) of this Agreement, the Parties shall comply with the technology transfer provisions set forth on Schedule D[4].

(d)    [REDACTED].

(e)    Prior to expiration of this Agreement, upon either Party's request, the Parties shall meet to discuss in good faith to determine whether to agree upon any wind-down activities in connection with the upcoming expiration of this Agreement.

(f)    Survival.  Notwithstanding anything to the contrary contained in this Agreement, the provisions of Sections 3.6, 4.3 (with respect to any previously delivered API), 4.5, Articles V, VIII, X and XI [5]will survive any expiration or termination of this Agreement, as well as those provisions which by their nature are meant to survive termination.

## ARTICLE X

## CONFIDENTIALITY

Section 10.1    Disclosure of Confidential Information.  In connection with the performance of their respective obligations or exercising their rights under this Agreement, each

---

[4]  Note to Draft:  Noramco reserves comment until Schedule D is provided.

[5]  Note to Draft:  The Parties reserve comment until nearer to finalization.

Party (the "Disclosing Party") may disclose (or have disclosed) to the other Party (the "Receiving Party") certain Confidential Information of the Disclosing Party or any of its Affiliates.

Section 10.2    Use of Confidential Information.  In consideration of the contemplated disclosures of Disclosing Party Confidential Information, the Receiving Party agrees that any Confidential Information of the Disclosing Party will be kept confidential by the Receiving Party and not revealed to any Person other than the Receiving Party's Representatives and, in the case of Manufacturer, its permitted subcontractors, and then only to the extent necessary in order to fulfill the Receiving Party's obligations under this Agreement.  Further, the Receiving Party acknowledges the confidential nature of such Confidential Information, and shall protect the confidentiality and non-use of such Confidential Information with no less stringent measures as those used to protect Receiving Party's own Confidential Information of similar importance or value, and in any case, no less than with a reasonable standard of care. The Receiving Party will not, directly or indirectly, make any other use of or aid any Third Party to make any other use of such Confidential Information without the Disclosing Party's prior express written consent.

Section 10.3    Limitations.  The restrictions on disclosure and use set forth in Section 10.2 do not apply to Confidential Information that: (a) was in the Receiving Party's or any of its Representatives' possession and known to the Receiving Party or any of its Representatives, without any restrictions on its use or disclosure and through no breach of this Article X or any other provision herein or in the Quality Agreement by Receiving Party or its Representatives, at the time of the Disclosing Party's initial disclosure; (b) is now generally known to the public, or later becomes so by no breach of this Article X or any other provision herein or in the Quality Agreement by the Receiving Party or its Representatives; (c) is disclosed to the Receiving Party, without any restrictions on its use or disclosure, from a Third Party that did not receive it directly or indirectly from the Disclosing Party or its Representatives and that is not bound by any obligation of non-use or non-disclosure or otherwise prohibited from transmitting it to the Receiving Party; or (d) was developed independently, as evidenced by sufficient contemporaneous written evidence, by Receiving Party, without use of or reliance on the Confidential Information of Disclosing Party.

Section 10.4    Disclosure to Governmental Agencies.  Notwithstanding the foregoing and subject to the terms of this Section 10.4, the Receiving Party may disclose without violation of its confidentiality obligations under this Agreement such portions of the Disclosing Party's Confidential Information as are (i) required to be disclosed by Law or (ii) pursuant to legal process, including any bankruptcy or insolvency proceeding.  With respect to the disclosures permitted under this Section 10.4, the Receiving Party will, to the extent lawfully able to do so either prior to any such disclosure, if possible, or otherwise promptly thereafter, inform the Disclosing Party of such intended disclosure, use reasonable efforts to limit the disclosure and maintain the confidentiality of the disclosed Confidential Information to the extent reasonably possible, and provide the Disclosing Party with the opportunity to seek appropriate judicial or administrative relief to avoid, or obtain confidential treatment of, such disclosure at Disclosing Party's sole cost and expense.

Section 10.5    <u>Return of Confidential Information</u>.  Except as otherwise set forth in this Section 10.5, to the extent requested in writing by the Disclosing Party, the Receiving Party will, at the Disclosing Party's option, return to the Disclosing Party or destroy the Confidential Information of the Disclosing Party, including all copies, excerpts and summaries thereof contained on any media.  Notwithstanding the foregoing, (a) the Receiving Party may keep one archival copy as may be required by Law or its standard procedures, (b) the Receiving Party shall not be required to expunge any minutes or written consents of its board of directors (or equivalent governance body), and (c) to the extent that the Receiving Party's computer back-up or archiving procedures create copies of Confidential Information, the Receiving Party may retain such copies for the period it normally archives backed-up computer records, so long as such copies are not readily accessible and are not used or consulted for any purpose other than disaster recovery; each of which (the foregoing (a) through (c)) will remain subject to the obligations of confidentiality set forth in this Agreement.

Section 10.6    <u>Equitable Relief</u>.  The Receiving Party acknowledges and agrees that damages may not be an adequate remedy for any breach of the confidentiality obligations contained herein and that, in addition to any other remedy to which the Disclosing Party may be entitled at law or in equity, the Disclosing Party will be entitled to seek remedies of injunction and other equitable relief for any threatened or actual breach by the Receiving Party of such obligations, and the Parties waive the requirement of any bond being posted as security in any application for such relief.

Section 10.7    <u>Ownership</u>.  The Receiving Party agrees that, as between the Parties, all Confidential Information of the Disclosing Party is Disclosing Party's sole and exclusive property, and the permitted use thereof by the Receiving Party for the purposes of the Receiving Party's performance of its obligations under this Agreement will not be deemed a grant by the Disclosing Party to the Receiving Party of any license or other right under the Intellectual Property of the Disclosing Party to use such Confidential Information for any other purpose.  For the avoidance of doubt, (a) all Confidential Information included in the Purchased Assets shall be owned solely by Manufacturer, and Manufacturer shall be deemed the "Disclosing Party" with respect thereto, regardless (i) that Recipient or one of its Representatives may have initially provided such information to Manufacturer or its Representatives and (ii) of the provisions of Section 10.3; and (b) the Supply IP and the Improvement IP shall be the Confidential Information of Recipient hereunder.

# ARTICLE XI[6]

## MISCELLANEOUS

Section 11.1    <u>Notices</u>.  All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (a) at the time personally delivered if served by personal delivery upon the Party hereto for whom it is intended, (b) at the time received if delivered by registered or certified mail (postage

---

[6]    <u>Note to Draft</u>: To be conformed as necessary to the APA.

prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (c) upon confirmation if sent by facsimile or email; in each case to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

       if to Manufacturer, to:

           c/o Noramco, LLC
           500 Swedes Landing Rd
           Wilmington, Delaware 19801
           Email:      lkarras@noramco.com
           Attention:   L. Lee Karras

       with a copy (which shall not constitute notice) to:

           c/o SK Capital Partners, LP
           430 Park Avenue, 18th Floor
           New York, NY 10022
           Email:      adavenport@skcapitalpartners.com
           Attention:   Aaron Davenport

       and

           Kirkland & Ellis
           300 North LaSalle
           Chicago, IL 60654
           Email:      jliss@kirkland.com; marenson@kirkland.com
           Attention:   Jeremy S. Liss, P.C. and Matthew S. Arenson

if to Recipient, to:

[●]
[●]
[●]
Email:       [●]
Attention:    [●]

with a copy (which shall not constitute notice) to:

Purdue Pharma L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901
Facsimile:     203-588-6026
Email:        Marc.Kesselman@pharma.com
Attention:     Marc L. Kesselman, Executive Vice President, General
                     Counsel and Secretary

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, New York 10001
Facsimile:     (617) 573-4822
Email:        marie.gibson@skadden.com
Attention:     Marie Gibson

Section 11.2    Force Majeure.  Failure of any Party to perform its obligations under this Agreement will not subject such Party to any liability or place them in breach of any term or condition of this Agreement to the other Party if such failure is due to any cause beyond the control of such non-performing Party or any Person acting on its behalf ("Force Majeure"), unless conclusive evidence to the contrary is provided.  Causes of non-performance constituting Force Majeure shall include acts of God, storms, fires, explosions, earthquakes, floods, droughts, pandemics, riots, sabotage, embargo, fuel or energy shortage, civil commotion or civil unrest, strikes, lockouts or other labor difficulties, interference by civil or military authorities, acts of Governmental Entities (including bank closings and seizures and other governmental orders), acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure or interruption of networks or energy sources.  The Party affected shall within five (5) Business Days notify the other Party of the condition constituting Force Majeure as defined herein and shall exert reasonable commercial efforts to eliminate, cure and overcome any such causes and to resume performance of its obligations with all possible speed; *provided* that nothing herein shall obligate a Party to settle on terms unsatisfactory to such Party any strike, lockout or other labor difficulty, any investigation or other proceeding by any Governmental Entity or any litigation by any Third Party.  If a condition constituting Force Majeure as defined herein exists for more than one hundred twenty days (120) consecutive days, the non-affected Party will have the right to immediately terminate

Ex. E-36

upon written notice to the affected Party any Product Addendum the performance of which has been suspended due to such Force Majeure event.

Section 11.3   <u>Assignment</u>.  Except as provided otherwise in this Agreement, neither Party will assign or transfer this Agreement without the prior written consent of the other Party, which consent will not to be unreasonably withheld.  However, subject to Section 9.2(b), without such consent of the other Party, either Party may assign or transfer this Agreement, in its entirety: (a) to any of its Affiliates; (b) to any successor by merger; or (c) upon a sale or transfer of all or substantially all of its assets, or the assets of that portion of its pharmaceutical business, involving the API, to the purchaser of such assets (any such transaction as described in the foregoing (a) through (c), a "<u>Transfer Transaction</u>"). For clarity, assignment or transfer of this Agreement in part by Manufacturer (including upon the sale or transfer of assets of that portion of its business, involving some, but not all, of the API supplied hereunder) shall require Recipient's consent and shall not be a Transfer Transaction under this Agreement.  This Agreement will be binding upon and will inure to the benefit of the Parties and their successors and permitted assigns.

Section 11.4   <u>Descriptive Headings; Interpretative Provisions</u>.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Articles, Sections and Schedules are to Articles, Sections and Schedules of this Agreement unless otherwise specified.  All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  Whenever the last day for the exercise of any right or the discharge of any duty under this Agreement falls on other than a Business Day, the Party hereto having such right or duty shall have until the next Business Day to exercise such right or discharge such duty.  Unless otherwise indicated, the word "day" shall be interpreted as a calendar day.  References to "dollars" or "$" mean United States dollars, unless otherwise clearly indicated to the contrary.  No summary of this Agreement prepared by or on behalf of any Party hereto shall affect the meaning or interpretation of this Agreement.

Section 11.5   <u>No Strict Construction</u>.  The Recipient, on the one hand, and the Manufacturer, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Recipient and the Manufacturer, and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no

rule of strict construction construing ambiguities against the draftsperson shall be applied against any person with respect to this Agreement.

Section 11.6   Conflict between Agreements.  Unless expressly stated otherwise, in the event of a conflict between the terms of (i) the Quality Agreement and the terms of this Agreement, the terms of the Quality Agreement shall prevail with respect to quality activities and the terms of this Agreement shall prevail with respect to all other matters, and (ii) this Agreement and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall prevail.

Section 11.7   Negotiation, Arbitration.

(a)      In the event of any disputes, controversies or differences between the Parties, arising out of, in relation to, or in connection with this Agreement, including any alleged failure to perform, or breach, of this Agreement, or any issue relating to the validity, construction, interpretation, enforceability, breach, performance, application, or termination of this Agreement a ("Dispute"), then upon the written request of either Party, the Parties agree to meet and discuss in good faith an amicable resolution thereof, which good faith efforts include at least one in-person meeting between the executive officers of each Party.  If the Dispute is not resolved within thirty (30) days following the written request for amicable resolution, then either Party may then initiate arbitration under this Section 11.7(a).  Any Dispute that the Parties do not resolve through amicable resolution will be settled by final and binding arbitration administered by JAMS, Inc., the alternative dispute resolution company formerly known as Judicial Arbitration and Mediation Services, Inc., pursuant to its Comprehensive Arbitration Rules and Procedures then in effect, except as otherwise provided.  The number of the arbitrators will be one.  The arbitration will be conducted in New York, New York.  The language of the arbitration will be English.  Judgment on the award may be entered in any court having jurisdiction.  Except as may be required by applicable Law, neither Party may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both Parties.

(b)      Notwithstanding Section 11.7(a), any dispute, controversy or claim relating to the scope, validity, enforceability or infringement of any Patent or trademark rights covering the manufacture, use, importation, offer for sale or sale of API will be submitted to a court of competent jurisdiction in the country in which such Patent or trademark rights were granted or arose.

Section 11.8   Waiver.  Any delay or failure in enforcing a Party's rights under this Agreement or any waiver as to a particular default or other matter shall not constitute a waiver of such Party's rights to the future enforcement of its rights under this Agreement, nor operate to bar the exercise or enforcement thereof at any time or times thereafter, excepting only as to an express written and signed waiver as to a particular matter for a particular period of time.

Section 11.9   Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.

Nothing in this Agreement, express or implied, is intended to confer upon any Person not a Party to this Agreement (other than Indemnitees) any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 11.10  Parties' Relationship.  The relationship between Manufacturer and Recipient is that of independent contractors and nothing herein will be deemed to constitute or give rise to any employer-employee, agency, partnership or joint venture relationship among or between the Parties.  Neither Party will have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party.

Section 11.11  Expenses.  Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the Party incurring such expenses.

Section 11.12  Amendments.  This Agreement may not be amended except by an instrument in writing signed on behalf of all the Parties hereto.

Section 11.13  Successor and Assigns.  This Agreement will be binding upon and will inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 11.14  Further Assurances.  The Parties hereto agree that they will take all appropriate actions, including the execution or filing of any documents or instruments, which may be reasonably necessary or advisable to carry out the intent and accomplish the purposes of any of the provisions hereof.

Section 11.15  Publicity.  Except as may be required by applicable Law or by any Governmental Entity, under no circumstances may one Party use the name of the other Party, or any of its personnel, for promotional literature or advertising without the prior written permission and approval of the other Party.  Neither Party will make any press release or other public disclosure regarding this Agreement or the transactions contemplated hereby without the other Party's express prior written consent, except as required under applicable Law or by any Governmental Entity, in which case the Party required to make the press release or public disclosure shall use commercially reasonable efforts to obtain the approval of the other Party as to the form, nature and extent of the press release or public disclosure prior to issuing the press release or making the public disclosure.

Section 11.16  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

Section 11.17  Entire Agreement.  This Agreement, Asset Purchase Agreement, the Quality Agreement, and any other Ancillary Documents constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, among the Parties hereto or any of them, with respect to the subject matter hereof and thereof, including that

certain Master Supply Agreement, by and between Noramco Inc. and Purdue Pharma L.P., dated January 1, 2008, as amended, other than Sections [●], which, for clarity, are not superseded hereby.[7]

Section 11.18  <u>Venue and Jurisdiction.</u>  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction.  Each of the Parties hereto irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court.  Each Party hereto hereby consents to service of process in the manner and at the address set forth in Section 11.1.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

## ARTICLE XII

## DEFINITIONS[8]

Capitalized terms used in this Agreement shall have the meanings ascribed to such terms in this Agreement, including as specified in this Article XII.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

"<u>25 Day Failed Delivery</u>" means if Manufacturer does not deliver API in the total amount specified in any Purchase Order, which Purchase Order has been accepted by Manufacturer in accordance with Section 3.2(a) or Section 3.2(c), within ten (+/- 10) days of the Delivery Date, but does deliver such total amount of such API within twenty-five (+/- 25) days of the Delivery Date.

"<u>Action</u>" means any action, claim, complaint, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

"<u>Aesica Facility</u>" means the facility and buildings located at Aesica Pharmaceuticals Ltd., Windmill Industrial Estate, Shotton Lane, Cramlington NE23 3JL, United Kingdom.

"<u>Affiliate</u>" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with,

---

[7]  <u>Note to Draft</u>:  Subject to further review by the Parties.

[8]  <u>Note to Draft</u>: Definitions to be conformed to the APA as applicable.

such specified Person; *provided* that prior to the conclusion of the Chapter 11 Cases and the emergence of Seller from the bankruptcy proceeding "Affiliate" excludes, in the case of the Seller, any Person that is not a debtor in possession in the Chapter 11 Cases.

"API" means any active pharmaceutical ingredient specified in the applicable Product Addendum.

"Batch" means a specific quantity of API produced in a contiguous process or series of processes that is expected to be homogenous. The batch size will be defined as a fixed quantity and set forth in the applicable Product Addendum.

"Business Day" means any day, other than a Saturday, Sunday and any day that is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by applicable Law or other governmental action to close.

"Calendar Month" means each one (1) month period during each Calendar Year beginning on the first day of the applicable month and ending on the last day of such month.

"Calendar Quarter" means the respective periods of three consecutive calendar months ending on March 31, June 30, September 30 and December 31.

"Calendar Year" means the twelve (12) month period beginning on January 1 and ending on December 31.

"Certificate of Analysis" or "COA" means a summary report signed by the responsible Manufacturer quality official that includes, at a minimum, the following for each Batch: lot number, manufacture date, tests performed, including test specifications and results (*e.g.*, chemical, microbiological and bacteriological), Batch size (*e.g.*, kilos or number of finished packages), and a clear determination whether the test results fall within or outside of acceptable limits.

"Claims" means any claim, action, suit, demand or other legal assertion or proceeding brought by a Third Party against an Indemnitee.

"Confidential Information" means all confidential, non-public or proprietary information, in whatever form or manner presented.

"Consent" means any approval, consent, clearance, authorization, registration, certification, license, permit, declaration or other authorization.

"Control" or "Controlled" means, with respect to the applicable Intellectual Property, that a Party has the legal right or authority (whether by ownership, license or otherwise, other than pursuant to a license or sublicense granted under this Agreement), as of the Effective Date or during the Term, to grant to the other Party a license or a sublicense to such Intellectual Property as provided for herein without violating (i) the terms of any agreement or other arrangements with any Third Party or (ii) any Law applicable to such license or sublicense.

Ex. E-41

"Coventry Facility" means the facility and buildings located at 500 Washington Street, Coventry, Rhode Island, which is part of the Real Property transferred pursuant to the Asset Purchase Agreement.

"DEA" means the United States government agency known as the Drug Enforcement Agency, or any successor thereto.

"DMF" means a submission, and any amendment or supplements thereto, filed and maintained with a Regulatory Authority that provides confidential detailed information about facilities, processes, CMC data, or articles used in the manufacturing, processing, packaging, and storing of one or more APIs, and which allows a Person other than the holder of the submission to reference material in that submission in support of a regulatory approval or license to commercialize a drug product containing the applicable API(s).  This definition includes those submissions described in 21 CFR 314.420 and any foreign equivalents, including an Active Substance Master File, European Drug Master File, Canadian Master File or Certificate of Suitability (CEP).

"EMA" means the European Union government agency known as the European Medicines Agency, or any successor thereto.

"FDA" means the United States agency known as the Food and Drug Administration, or any successor thereto.

"Financial Buyer" means a private equity fund, hedge fund, family office, investment manager or similar investment vehicle that is primarily engaged in the business of investing in companies and businesses in order to generate a financial return.

"Good Manufacturing Practices" or "GMP" means all applicable Laws governing manufacturing practices related to the API (including ingredients, testing, storage, handling, intermediates, bulk and finished products), as the same may be updated, supplemented or amended from time to time, and includes ICH Q7.

"Governmental Entity" means (a) any supranational, national, federal, state, county, municipal, local, or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to government, (b) any public international governmental organization or (c) any agency, division, bureau, department, commission, board, arbitral or other tribunal, branch or other political subdivision of any government, entity or organization described in the foregoing clause (a) or (b) of this definition (including patent and trademark offices and self-regulatory organizations).  For clarity, Governmental Entities shall include all Regulatory Authorities.

"Health Canada" means the Canadian agency known as Health Canada, or any successor thereto.

"Intellectual Property" means, collectively, all intellectual property and industrial property throughout the world, including rights of the following types, under the Laws of any

jurisdiction in the world: (i) rights in works of authorship, including exclusive exploitation rights, copyrights and copyrightable subject matter, moral rights, software database rights and databases; (ii) trademarks, service marks, trade dress, logos, trade names and other source or origin identifiers, domain names and URLs and similar rights and any goodwill associated therewith; (iii) trade secrets, know-how, inventions, invention disclosures, methods, processes, protocols, specifications, techniques, data, results, plans, formulae, formulations, compositions, specifications, and other forms of technology (collectively, but excluding Patents, "Know-How"); (iv) patents and patent applications, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions and foreign counterparts thereof (collectively, "Patents"); and (v) rights of privacy and publicity, and (vi) along with respect to each of the foregoing (i) through (v), all rights to prosecute and perfect the same through administrative prosecution, registration, recordation or other administrative proceeding, all applications and registrations for the foregoing, and all causes of action and rights to sue or seek other remedies arising from or relating to the foregoing.

"Law" means any law (including common law), act, statute, requirement, code, rule, regulation, Order, ordinance decree, binding regulatory guidance or other binding pronouncement of any Governmental Entity.

"Losses" means any and all damages, losses, liabilities, obligations, penalties, judgments, settlements, claims, payments, fines, interest, costs and expenses (including the reasonable costs and expenses of attorneys incurred in the defense thereof), but excluding consequential damages, special damages, incidental damages, loss of profits, diminution in value, damages based on multiple of earnings, loss of business reputation, punitive and exemplary damages (other than such damages payable to any Third Party by an Indemnified Party).

"Manufacture" when used in connection with any API, shall refer to the manufacturing, processing, handling, packaging, storage, disposal, quality control testing (including in-process, release and stability testing) and supply of such API, and the handling, storage, disposal, and quality control testing (including in-process, release and stability testing) of Product Materials used in connection therewith.

"Manufacturing Facility" means, with respect to any API Manufactured hereunder, the Aesica Facility, Coventry Facility and/or Wilmington Facility, unless otherwise expressly set forth in the applicable Product Addendum in accordance with and subject to the terms hereof.

"MHRA" means the United Kingdom government agency known as the Medicines and Healthcare products Regulatory Agency, or any successor thereto.

"Permitted Affiliate" means those entities listed on Schedule F.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Price" means, for each API, the price as determined in accordance with Section 4.1.

"Product" means, with respect to each API, the pharmaceutical product(s) containing such API set forth on the applicable Product Addendum.

"Product Addendum" means a document executed by the Parties for an API to be Manufactured pursuant to the terms of this Agreement, which shall be substantially in the form of addendum attached to this Agreement as Schedule A.

"Product Materials" means, with respect to any API, all raw materials, packaging materials and other components needed for the Manufacturing of such API.

"Qualified Buyer" means [REDACTED].

"Regulatory Authority" means any national or supranational Governmental Entity, including the FDA, the EMA, the MHRA or the DEA, with responsibility for granting any license, registrations or approvals with respect to manufacturing, research, development, or commercialization of any APIs or Products.

"Representatives" means, when used with respect to any Person, the Affiliates of such Person and its and their respective directors, officers, employees, professional consultants, financial advisors, accountants, legal counsel, investment bankers, financing sources and agents.

[REDACTED].

"Right of Reference" shall have the meaning set forth in 21 C.F.R. § 314.3(b) or equivalents thereto under applicable Law in jurisdictions outside the United States.

"Specifications" means the specifications for the API set forth in the applicable Product Addendum, as such specifications may be amended or supplemented in accordance with the terms hereof.

"Strategic Buyer" means a Person with substantial experience manufacturing active pharmaceutical ingredients in the United States, including active pharmaceutical ingredients that are controlled substances (as defined under applicable Law in the United States), as reasonably determined by Recipient in good faith.

"Supply IP" means (a) the Patents expressly set forth on Schedule C and (b) Know-How to the extent necessary to Manufacture each API and Purchased Product and disclosed by or on behalf of Recipient or any of its Permitted Affiliates to Manufacturer for such Manufacture, in each case (in respect of the foregoing (a) and (b)), to the extent Controlled by Recipient as of the Effective Date and in the case of the foregoing (b), not included in the Purchased Assets.

"Third Party" means any Person other than the Parties or their respective Affiliates.

"United States" means the United States of America and its territories and possessions.

"Wilmington Facility" means Manufacturer's facility and buildings located at 500 Swedes Landing Road, Wilmington, Delaware 19801, USA.

In addition, the following terms are defined elsewhere in this Agreement, as indicated below:

| Term | Section |
|------|---------|
| Additional API | 1.2 |
| Agreement | Introduction |
| Alternate Supplier | 3.5(d) |
| API Shortfall | 3.5(a) |
| Asset Purchase Agreement | Recitals |
| Audited Obligations | 3.5(f) |
| Bard | 7.2(a)(ii) |
| Capital Stock | 9.2(b)(i) |
| Competitive Price | 4.5 |
| Conforming API | 3.6(a) |
| Continuity Plans | 3.5(e) |
| DEA Quota Shortfall | 3.5(a) |
| Delivery Date | 3.2(a) |
| Disclosing Party | 10.1 |
| Dispute | 11.7(a) |
| Effective Date | Introduction |
| Excess Order Quantity | 3.2(a) |
| Failed Delivery | 3.5(c)(i)(A) |
| Failure to Supply Event | 3.5(c)(i)(A) |
| Failure to Supply Quantity | 3.5(c)(i)(C) |
| Firm Requirements | 3.1 |
| Force Majeure | 11.2 |
| Highest Priced Facility | 4.1(b) |
| Improvement IP | 7.4 |
| Indemnifying Party | 8.3(a) |
| Indemnitee | 8.3(a) |
| Initial Term | 9.1 |
| JSC | 6.4(a) |
| Know-How | Intellectual Property definition |
| Lower Priced Facility | 4.1(b) |
| Manufacturer | Introduction |
| Manufacturer Background IP | 7.1 |
| Manufacturer-Caused DEA Quota Shortfall | 3.5(c)(i)(A) |

Manufacturer Indemnitees ...................................................................................................8.2
Manufacturing DMFs ...................................................................................................5.1(a)
Material Regulatory Inquiry ..............................................................................................5.2
Materials Shortfall .......................................................................................................3.5(a)
Non-Conforming API ..................................................................................................3.6(a)
Oxycodone ........................................................................................................................1.6
Oxycodone DMF .........................................................................................................5.1(c)
Party .......................................................................................................................Introduction
Patents ................................................................................ Intellectual Property definition
Pre-Existing DMF .......................................................................................................5.1(a)
Post-Acquisition DMF ................................................................................................5.1(a)
PPI Adjustment ............................................................................................................4.1(a)
Purchase Order ............................................................................................................3.2(a)
Receiving Party ............................................................................................................. 10.1
Recipient ..............................................................................................................Introduction
Recipient Indemnitees ......................................................................................................8.1
Renewal Term .................................................................................................................9.1
Rolling Forecast .............................................................................................................3.1
Shortfall ......................................................................................................................3.5(a)
Start-Up Activities .......................................................................................................2.1(a)
Tax(es) ........................................................................................................................4.7(a)
Term .................................................................................................................................9.1
Third-Party Claim ........................................................................................................8.3(a)
Transfer Transaction ........................................................................................................ 11.3
VAT ..............................................................................................................................4.7(a)

**IN WITNESS WHEREOF**, authorized Representatives of the Parties have executed this Agreement as of the Effective Date.

Accepted and Agreed:

**NORAMCO, LLC**

By: _____
     Name:
     Title:

Date:

**[●]**

By: _____
     Name:
     Title:

Date:

## Schedule A – Form of Product Addendum

This **PRODUCT ADDENDUM** ("Product Addendum") to the Master Manufacturing and Supply Agreement ("Agreement") dated [●] is entered into as of _____, 20__ (the "Product Addendum Effective Date") by and between Manufacturer and Recipient.  Capitalized terms that are not defined herein shall have the meaning set forth in the Agreement.

1.    Relevant Recipient Entity[9]

2.    API (Section 1.3(a))

    2.1    Name

    2.2    Related Product

    2.3    Countries where Recipient will sell Products

3.    Start-up Activities (Section 2.1)

    3.1    Manufacturing commencement date

    3.2    Additional start-up activities to be performed

4.    Manufacturing Facility[10] (Section 1.4)

5.    Price (Section 4.1)

6.    Specifications (Section 1.1(a))

7.    Maximum Shelf Life at Release (Section 3.3(c))

8.    Safety Stock Volume[11] (Section 3.5(f))

9.    Product Materials, including relevant suppliers (Section 2.1(a))

10.    Purchase Order/Invoicing Requirements (Section 3.2)

    10.1    Information to be contained in Purchase Order

---

[9]    Note to Draft: Only to be populated to the extent different than the Agreement.

[10]    Note to Draft: Only to be populated to the extent different than the Agreement.

[11]    Note to Draft: Only to be populated to the extent different than the Agreement.

10.2     Standard pack size:[12]

10.3     Invoices to be directed to:

11.     <u>Subcontractors</u>[13] (Section 1.6)

11.1     Approved subcontractors and scope of services to be provided by such subcontractors, if any

12.     <u>Additional Costs Assumed by Recipient</u> (to the extent not set forth in the Agreement), if any[14] (Section 1.4(c))

13.     <u>Other Terms and Conditions</u>

This Product Addendum shall be governed by and construed in accordance with the Laws of the State of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction.  Each of the Parties hereto irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court.  Each Party hereto hereby consents to service of process in the manner and at the address set forth in Section 11.1 of the Agreement. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

The Parties agree that the terms and conditions of the Agreement are incorporated herein as if fully set forth herein and further represent that this Product Addendum is executed by their duly authorized Representatives.

[MANUFACTURER]                              [RECIPIENT]


By:_____          By:_____

Name:_____          Name:_____

Title:_____          Title:_____

---

[12]  <u>Note to Draft</u>:  [REDACTED].

[13]  <u>Note to Draft</u>: Only to be populated to the extent Manufacturer is permitted to use contractors under this Agreement in addition to those specified in Schedule E to the Agreement.

[14]  <u>Note to Draft</u>: Only to be populated to the extent different than the Agreement.

Schedule A-2

Product Addenda to reflect the following pricing:

**Pricing for Rhodes Pharma**[15]

| Product | Price at Coventry Facility ($/kg) | Price at Other Manufacturing Facilities ($/kg) | Products Requiring Tech Transfer |
|---|---|---|---|
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |
| **[REDACTED]** | [REDACTED] | [REDACTED] | [REDACTED] |

---

[15]    <u>Note to Draft</u>: Pricing for Bard / Mundipharma to be agreed.

<u>Note to Draft</u>: Subject to ongoing review by Purdue.

Schedule A-3

**Schedule B - Business Continuity Plan[16]**



500 Swedes Landing Road
Wilmington, DE 19801

noramco.com

**Noramco Continuity Plan Executive Summary**

[REDACTED]

---

[16] Note to Draft: Subject to ongoing review by Purdue.

**Schedule C - Licensed Patents**

[REDACTED]

## Schedule D – Technology Transfer

[To be populated between signing and closing]

## Schedule E – Pre-Approved Subcontractors[17]

Recipient's prior written consent to the following subcontractors shall be deemed given under Section 1.6:

| Subcontractor | Location | Services |
|---|---|---|
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| Various laboratories as listed in DMFs held by Manufacturer or any of its Affiliates to the extent qualified by Manufacturer or any of its Affiliates | Refer to DMF | Analytical testing |

---

[17] Note to Draft:  Following signatory entity selection / prior to finalization, Noramco to confirm (must include all Affiliates who may be performing services).

## Schedule F – Permitted Affiliates

[To be provided by Purdue.  To include those Affiliates whose volumes are reflected in the API Volume Forecast – Revised July 2020.]

**Schedule G – DMFs Included in Purchased Assets**

[To be populated from APA]

**Exhibit F**

**Potential Rhodes Technologies / Noramco Transaction**
**Transition Services Agreement Term Sheet**

**SEPTEMBER 14, 2020**

**THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND GOVERNED**
**BY THE TERMS OF APPLICABLE CONFIDENTIALITY AGREEMENTS**

The following non-binding term sheet (the "**Transition Services Agreement Term Sheet**") sets forth the principal terms and conditions under which Purdue Pharma L.P. or an Affiliate or successor (including, without limitation, any successor to Purdue Pharma L.P. under a plan of reorganization under title 11 of the United States Code) (the "**Provider**") will provide certain transition services to Noramco Coventry LLC (the "**Purchaser**") on a transition basis for an agreed period following the sale (the "**Sale**") of Provider's manufacturing facility in Coventry, Rhode Island and substantially all of the assets related thereto to be consummated under section 363 of title 11 of the United States Code (the "**Bankruptcy Code**") in connection with the jointly-administered cases commenced on September 15, 2019 by the Provider and certain of its Affiliates under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

This Transition Services Agreement Term Sheet is an expression of interest only, shall not constitute an admission by any person or entity, and is not intended to and does not create any legal or equitable obligations on any party. The proposals contained herein are subject to, among other things, the completion of due diligence, legal documentation acceptable to the parties, board approval and in the case of Provider, Bankruptcy Court approval. Each party reserves the right at any time prior to the execution of definitive agreements to decline to enter into such definitive agreements should such party determine not to proceed with any proposed transaction. The parties agree that no liability will arise in the event of any such determination.

| | |
|---|---|
| **Parties:** | The "Parties" to the transition services agreement ("**TSA**") are Purdue Pharma L.P. or an Affiliate or successor (including, without limitation, any successor to Purdue Pharma L.P. under a plan of reorganization under title 11 of the United States Code) (the "**Provider**") and Noramco Coventry LLC (the "**Purchaser**"). |
| **Scope of Services:** | Subject to the terms and provisions of the TSA, Provider will, or will cause its Affiliates to, provide to the Purchaser or its Affiliates the services (the "**Services**") described in the attached **Schedule A**.<br><br>Services not agreed upon as of the date of the TSA but included in Rhodes Tech's operation of the Business prior to the closing |

| | |
|---|---|
| | of the Sale (the "**Closing**") and capable of being provided by or on behalf of the Provider following the Closing can be requested in writing within sixty (60) calendar days of the Closing by the Purchaser upon reasonable notice to the Provider.  The Provider shall promptly provide or cause to be provided to the Purchaser such additional services solely with respect to the Business for the remainder of the term of the TSA and the pricing related thereto shall be mutually agreed upon in good faith by the Parties within thirty (30) days after Purchaser's notice. Third party providers/subcontractors are limited to those providing the applicable services to Provider at Closing. |
| **Effective Date:** | The Closing date of the Sale. |
| **Term and Pricing:** | The Provider will provide the Services to the Purchaser for the term and fee for each Service as set forth in the attached **Schedule A**. |
| **Service Standards:** | The Provider shall provide, or cause to be provided, the Services with a level of care, scope, manner, content, skill and quality substantially equivalent to the level of quality such Services were provided for the benefit of the Business, in the ordinary course of business, for the 12-month period prior to the date of the TSA. |
| **Indemnification:** | The Provider shall indemnify, defend and hold harmless all Purchaser indemnified parties from and against any and all losses incurred by any Purchaser indemnified party to the extent such losses are incurred or sustained by, or arising out of, any third party claim arising from the Provider's material breach of the TSA, gross negligence, willful misconduct, infringement of third party intellectual property or violation of Provider's or its Affiliates' third party contracts.<br><br>The Purchaser shall indemnify, defend and hold harmless all Provider indemnified parties from and against any and all losses incurred by any Provider indemnified party to the extent such losses are incurred or sustained by, or arising out of, any third party claim arising from the Purchaser's material breach of the TSA, gross negligence, willful misconduct, infringement of third party intellectual property or violation of Purchaser's third party contracts (other than third party claims arising from the Provider's gross negligence, willful misconduct or material breach of the TSA or where Provider is otherwise to indemnify Purchaser). |

| | |
|---|---|
| | Each of Provider's and Purchaser's liability shall be capped at an amount equal to the aggregate amount of fees paid to it under the TSA for the first 12 months of the term, except in the case of damages subject to indemnity or Purchaser's or Provider's gross negligence or willful misconduct or damages resulting from Provider's breach of its confidentiality obligations under the TSA. |
| **Termination:** | With respect to any Service,<br><br>• the Purchaser may terminate such Service, in whole or in part with respect to such Service: (A) for any reason or no reason upon providing at least thirty (30) days' prior written notice to the Provider of such Service or (B) at any time upon prior written notice if the Provider has failed to perform any of their material obligations under the TSA with respect to such Service and such failure shall continue to exist thirty (30) days after receipt by the Provider of a written notice of such failure from the Purchaser; or (C) upon mutual agreement of the Parties.<br><br>• the Provider may terminate such Service, in whole or in part with respect to such Service: (A) at any time upon prior written notice if the Purchaser is in material breach of the TSA and such failure shall continue to exist thirty (30) days after receipt by the Purchaser of a written notice of such failure from the Provider or (B) immediately upon the Purchaser's receipt of written notice, if the continued performance of such Service would be a violation of any law. |
| **Governing Law:** | Except to the extent of the mandatory provisions of the Bankruptcy Code, the TSA shall in all respects be governed by, and construed in accordance with, the Laws of the State of New York without giving effect to any conflicts of law principles of such state that might refer the governance, construction or interpretation of such agreements to the Laws of another jurisdiction. |
| **Other Commercially Reasonably Terms:** | The TSA will include additional provisions addressing force majeure, confidentiality, assignability, payment terms, administrative and financial responsibility for consents and such other terms as the parties may mutually agree. |
| **Leases:** | In addition to the TSA, at Closing the Parties will enter into the leases on the terms set forth in the attached **Schedule B**. |

## Schedule A

## Services and Applicable Term

1.  Shared Services

    a.  Each Service as set forth below shall be provided for a term commencing on the date of Closing and ending by December 31, 2021. However, the Purchaser may elect to extend the term of a Service for up to an additional six (6) months on a month to month basis on the same terms and conditions provided below.

| | Service Name | Description of Service | Monthly Fees |
|---|---|---|---|
| 1. | Financial | **Shared Service Functions (provided from Stamford, CT)** | **$59,000** |
| | | • Order Entry<br>• Accounts Payable<br>• Treasury<br>• Credit & Collection<br>• Sales and use tax reporting<br>• Corporate GL Accounting and Bank Reconciliations<br>• Payroll<br>• Risk Management and Insurance<br>• Procurement | $7,000<br>$16,000<br>$1,000<br>$8,000<br>$5,000<br>$5,000<br>$8,000<br>$3,000<br>$6,000 |
| 2. | Financial | **Services Provided Onsite at Coventry, RI** | **$7,000** |
| | | • Monthly closes, annual budgets, invoice review and ad-hoc financial analysis. | |
| 3. | Information Technology | **Transitional Services from Existing Application and Infrastructure Environment** | **$115,000** |
| | | • Science Cloud Document Management System, Lorenz Docubridge Regulatory Submissions Software, Local deskside support (laptop, printers, cell phones etc.), SAP systems, HR systems, Procurement and expense management systems.<br>• Microsoft applications and O365 services (including licenses), remote access, internet, intranet, security, network and infrastructure services.<br>• Monthly fee includes all costs of Service Provider employees helping Purchaser support the site from an IT perspective and for an orderly transition of systems.<br>• Costs of data migration incurred by Service Provide to Purchaser (if needed or if any), would be separately invoiced with supporting documentation. | |
| 3. | Human Resources | **Support for Offer Employees during Transitional Period** | **$10,000** |
| | | • HR systems, existing compensation and benefit programs, employee files and other interim discussions to ensure orderly employee transition. | |

## Schedule B

## Lease Agreements

| Location | Landlord | Tenant | Commencement Date | End Date | Square Feet | Rate per SF | Annual Rent | Annual Rent To/(From) Noramco |
|---|---|---|---|---|---|---|---|---|
| R&D Facility | Noramco | Rhodes Pharmaceuticals LP | Closing | 12/31/2021 (Note 1) | 20,165 | 37.79 | $762,000 | $762,000 |
| Manufacturing Facility | Noramco | Rhodes Pharmaceuticals LP | Closing | 12/31/2021 (Note 1) | 294 | 40.76 | $12,000 | $12,000 |
| Upper Mill | Rhodes Technologies | Noramco | Closing | 12/31/2021 (Note 1) | 29,767 | 26.00 | $774,000 | ($774,000) |
| | | | | | | | Net Rent | $0 |

**<u>Exhibit G</u>**

**<u>Form of Sale Order</u>**

**<u>Exhibit H</u>**

**<u>Title Report</u>**

# ALTA COMMITMENT FOR TITLE INSURANCE

Issued By:

**CHICAGO TITLE INSURANCE COMPANY**

Commitment Number:

**20RI00282 (8664378)**

## NOTICE

**IMPORTANT - READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**Chicago Title Insurance Company**

By:

_____
President

Countersigned By:

_____
Authorized Officer or Agent

Attest:

_____
Secretary

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

**CHICAGO TITLE INSURANCE COMPANY**                     **COMMITMENT NO. 20RI00282 (8664378)**

**Order Number:  20RI00282 (8664378)**

## SCHEDULE A

1.  Commitment Date:  August 13, 2020 at 8:00am

2.  Policy to be issued:

    (a)  ALTA Owner's Policy 2006
    Proposed Insured:        Purchaser with contractual rights under a purchase agreement with the vested owner
    identified at Item 4 below
    Proposed Policy Amount:  $1,000.00

    (b)  ALTA Loan Policy 2006
    Proposed Insured:        Lender with a contractual obligation under a loan agreement with the Proposed
    Insured for an Owner's Policy, its successors and/or assigns as their respective
    interests may appear
    Proposed Policy Amount:  $0.00

3.  The estate or interest in the Land described or referred to in this Commitment is:

    Fee Simple

4.  Title to the Fee Simple estate or interest in the Land is at the Commitment Date, vested in:

    Rhodes Technologies a Delaware general partnership by virtue of a Warranty deed from Rhode Island Industrial
    Facilities Corp. dated March 9, 2007 and recorded March 21, 2007 in Book 1762 at page 879 in the Land
    Evidence Records of the Town of Coventry as to Parcel I

    Rhodes Technologies a Delaware general partnership by virtue of a Quitclaim deed from Clariant Corp. dated and
    recorded 2/9/2012 in Book 1912 at page 34 in the Land Evidence Records of the Town of Coventry as to Parcel 2.

    Rhodes Technologies a Delaware general partnership by virtue of a Quitclaim deed from Quidnick Land L.P. dated
    October 22, 2012 and recorded November 1, 2012 in Book 1937 at page 447 in the Land Evidence Records of the
    Town of Coventry as to Parcel 3.

5.  The Land is described as follows:

    SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Property Address:     498 Washington Street, Coventry, RI 02816
                      Plat: 0056  Lot(s): 113.002 and 103 - PARCEL 1
                      500 Washington Street, Coventry, RI 02816
                      Plat: 48  Lot(s): 113.024, 025, 113.001 thru .010.
                      Plat: 56  Lot(s): 113.011, .012 and .016 - PARCEL 2
                      6 South Street, Coventry, RI 02816
                      Plat: 56  Lot(s): 109.000 - PARCEL 3

### END OF SCHEDULE A

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as
of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
Legal Description

Parcel 1

Parcel 'A':

That certain tract or parcel of land situated southerly of North Street, southwesterly of Pulaski Street and westerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'A' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South, Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared for: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 of 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS #1837." Said parcel is more particularly bounded and described as follows:

Beginning at the intersection of the southerly street line of North Street with the southwesterly street line of Pulaski Street;

thence proceeding S 41°-26'-57" E, by and with the said southwesterly  street line of Pulaski Street a distance of 151.91' to its intersection with the northwesterly street line of South Street;

thence proceeding S 19°-22'-07" W, by and with the said northwesterly street line of South Street a distance of 90.87' to an angle point;

thence proceeding S 00°-38'-28" W and continuing by and with the said street line of South Street a distance of 19.17' to its intersection with the northerly street line of Paul Street;

thence proceeding N 89°-21'-54" W, partly along the said northerly street line of Paul Street and bounded southerly partly by Parcel 'B', hereafter described which is now or formerly of Hoechst Celanese Corporation a distance of 167.72' to a corner;

thence proceeding N 04°-10'-56" E a distance of 130.59' to a corner;

thence proceeding N 83°29'15" W a distance of 44.71' to an angle point;

thence proceeding S 89°-57'-45" W a distance of 135.63' to a corner;

thence proceeding N 29°-26'-53" W a distance of 47.00' to an angle point;

thence proceeding N 42°-48'-05" W a distance of 110.70' to the said southerly street line of North Street. The last five herein described courses are bounded westerly, southerly and southwesterly said Parcel 'B' of the Hoechst Celanese Corporation;

thence proceeding S 83°-41'-47" E along the said southerly street line of North Street a distance of 368.58' to the point and place of beginning.

Parcel 'B':

That certain tract or parcel of land situated southerly of North Street, southwesterly of Pulaski Street and westerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'B' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South, Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared For: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 of 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
Legal Description

#1837." Said parcel is more particularly bounded and described as follows:

Beginning at the northwesterly corner of the premises herein described at the intersection of the southerly street line of the abandoned portion of North Street with the easterly street line of Quidnick Street, a private road;

thence proceeding S 83°-41'-47" E, by and with the said southerly street line of the abandoned portion of North Street a distance of 69.38' to the northeasterly corner of the parcel herein described and the northwesterly corner Parcel 'A' of the Hoechst Celanese Corporation;

thence proceeding S 42°-48'-05" E a distance of 110.70' to an angle point;

thence proceeding S 29°-26'-53" E a distance of 47.00' to a corner;

thence proceeding N 89°-57'-45" E a distance of 135.63' to an angle point;

thence proceeding S 83°-29'-15" E a distance of 44.71' to a corner;

thence proceeding S 04°-10'-56" W a distance of 130.59' to a corner;

thence proceeding S 89°-21'-54" E a distance of 17.27' to an iron pipe at the westerly terminus of Paul Street. The last six herein described courses are bounded northeasterly, northerly, easterly and northerly by said Parcel 'A' of the Hoechst Celanese Corporation;

thence proceeding S 00°-45'-54" W a distance-of 20.00' to a corner;

thence proceeding S 89°-14'-06" E a distance of 1.00' to a corner;

thence proceeding S 00°-45'-54" E a distance of 19.87' to an iron pipe at the northwesterly corner of land now or formerly of Joseph W. & Beatrice R. Chauvette. The last three herein described courses run by and with the said westerly terminus of Paul Street;

thence continuing S 00°-45'-54" E, bounded easterly by said Chauvette land a distance of 120.00' to the southwesterly corner of said Chauvette land and Parcel 'C' of the Hoechst Celanese Corporation;

thence proceeding N 89°-21'-54" W a distance of 193.01' to a corner;

thence proceeding S 01°-23'-54" E a distance of 29.17' to a corner;

thence proceeding S 88°-34'-12" W a distance of 162.74' to the said former easterly street line of Quidnick Street, a private road and the northwesterly corner of said Parcel 'C' of the Hoechst Celanese Corporation. The last three herein described courses are bounded southerly and easterly by said Parcel 'C' of the Hoechst Celanese Corporation;

thence proceeding N 00°-05'-56" W, by and with the said former easterly street line of Quidnick Street a distance of 141.00' to an angle point;

thence proceeding N 00°-11'-48 E and continuing by and with the said easterly street line of Quidnick Street a distance of 295.20' to the point and place of beginning.

Parcel 'C':

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
Legal Description

That certain tract or parcel of land situated southerly of North Street, southwesterly of Pulaski Street and westerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'C' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South, Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared For: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 of 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS #1837." Said parcel is more particularly bounded and described as follows:

Beginning at a point in the westerly street line of said South Street. Said point of beginning is also the southeasterly corner of land now or formerly of Joseph W. & Beatrice R. Chauvette and the northeasterly corner of the parcel herein described;

thence proceeding S 00°-38'-28" W. by and with the said westerly street line of South Street a distance of 113.33' to a corner;

thence proceeding S 89°-51'-09" W and continuing partly by and with the said northerly street line of South Street and partly bounded southerly by a portion of said South Street which was abandoned and is now or formerly land of the Hoechst Celanese Corporation a distance of 503.31' to the former easterly street line of Quidnick Street a private road and the southwesterly corner of the parcel herein described;

thence proceeding N 00°-05'-56" W by and with the said former street line of Quidnick Street a distance of 85.19' to the northwesterly corner of the parcel herein described at the southwesterly corner of Parcel 'B' of the Hoechst Celanese Corporation;

thence proceeding N 88°-34'-12" E a distance of 162.74' to a corner;

thence proceeding N 01°-13'-54" W a distance of 29.17' to a corner. The last two herein described courses are bounded northerly and westerly by said Parcel 'B';

thence proceeding S 89º-21'-54" E, bounded northerly in part by said Parcel 'B' and in part by said Chauvette land a distance of 342.77' to the said westerly street line of South Street and the point and place of beginning.

Parcel 'F'

That certain tract or parcel of land situated southerly of North Street southwesterly of Pulaski Street and westerly of South Street in the Town or Coventry, County of Kent and State of Rhode Island and Providence Plantations delineated as Parcel 'F' on a plan entitled, "Administrative Subdivision Plan A.P. 56 - Lots 107, 108, 110, 111, 112, 113.1, 113.2 & 113.3 North, South. Pulaski, Paul & Quidnick Streets Coventry, Rhode Island Prepared For: Napp Coventry Scale: 1" = 40' Date: Oct. 28, 1997 Revised: 12/11/97 Sheet 1 or 1 prepared by Crossman Engineering, Inc. Warwick, R.I. Richard S. Lipsitz, PLS #1837." Said parcel is more particularly bounded and described as follows:

Beginning at the intersection of the southwesterly street line of Pulaski Street and the easterly street line of South Street at the most northerly corner of the parcel herein described;

thence proceeding S 41°-26'-57" E. by and with the said southwesterly street line of Pulaski Street a distance of 164.40' to the most easterly corner of the parcel herein described at land now or formerly of Michael J. and Stasia A. Kennett;

thence proceeding S 50°-31'-03" W, bounded southeasterly by said Kennett land a distance of 90.00 to the most southerly corner of the parcel herein described at land now or former1y of Delores C. Del Mastro;

thence proceeding N 41°-26'-57" W. bounded southwesterly by said Del Mastro land a distance of 91.40' to the easterly street line of South Street;

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
Legal Description

thence proceeding N 00°-38'-28" E, by and with the said easterly street line of South Street a distance of 53.52' to an angle point;

thence proceeding N 19°-22'-07" E. by and with the said easterly street line of South Street a distance of 61.94' to the southwesterly street line of Pulaski Street and the point and place of beginning.

TOGETHER WITH the abandoned portions of Paul and Quidnick Streets abutting the premises.

TOGETHER WITH the rights conveyed in that Agreement and Deed recorded in Book 226 at page 183.

TOGETHER WITH the rights and easements set forth in Reciprocal Easement Agreement with Clariant Corp. recorded in Book 674 at Page 74.

498 Washington Street (also known as Map/Lot 0056-113.002 and 0056-103 by the Town of Coventry Tax Assessor as of December 31, 2019).

Parcel 2

Lots 1-12 (inclusive), 16, 24 and 25, as the same are depicted on the Administrative Subdivision Plan for Clariant Corporation, 500 Washington Street, Coventry, Rhode Island, prepared for Clariant Corporation in December 2009, prepared by John P. Caito Corporation, Civil Engineers - Land Planners, 141 James P. Murphy Highway, West Warwick, RI 02893-2382, dated December 17, 2009 and recorded on December 18, 2009 (the "Administrative Subdivision Plan") in the Town of Coventry Land Evidence Records, State of Rhode Island (the "Land Records"), as Map Number 1152 - 1160 and Instrument Number 8831, together with the improvements on such lots, including (i) the building on Lot 24 known as the " CTC Building;" (ii) the building on Lot 24 known as the "Security Building;" (iii) the buildings on Lot 25 known as the "HiRise Warehouse" and the support building known as the "HiRise Firewater Pump House;" and (iv) the building on Lot 16 known as the "Raw Material Warehouse"; and

Those lots depicted as Assessor' s Plat 5, Lots 248-251 (inclusive), alternatively depicted as "Old A.P. 5, Lots 248-251," alternatively depicted as " New A.P. 56, Lots 105 and 106.3," on Sheet 9 of the Administrative Subdivision Plan;

Said parcels also delineated on that plan set entitled "ALTA / ACSM Land Title Survey Plan, A.P. 48, Lots 113.1-113.10, 113.24, 113.25 and A.P. 56, Lots 105,113.11, 113.12 & 113.16 Washington Street, Quidnick Street, Pulaski Street, North Street & South Street, Coventry, Rhode Island November, 2011 by Waterman Engineering Co., Richard S. Lipsitz, P.L.S. No. 1837;

500 DD/EE/I/J/K/L/M/N/O/P/Q/R/S/T/W Washington Street (also known as Map/Lots 0048-113.024; 025; 0048-113.001 thru .010; 56-113.011; .012 and .016 by the Town of Coventry Tax Assessor as of December 31, 2019).

Parcel 3

Those three (3) lots of land with all buildings and improvements thereon, situated on the westerly side of South Street and on the southerly side of Paul Street in the Town of Coventry, County of Kent and State of Rhode Island, and laid out and designated as Lots numbered one (1), two (2) and three (3) on that plat entitled, "Plat of Napoleon Couture and Wife's Land Quidnick Village by Albert Johnson, 1930," which plat is recorded in the office of the Town Clerk in said Town of Coventry in Book 3 at Page 60.
6 South Street (also known as Map/Lot 0056-109.000 by the Town of Coventry Tax Assessor as of December 31, 2019).

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
Legal Description

Property Address:  498 Washington Street, Coventry, RI 02816
Plat: 0056  Lot(s): 113.002 and 103 - PARCEL 1
500 Washington Street, Coventry, RI 02816
Plat: 48  Lot(s): 113.024, 025, 113.001 thru .010.
Plat: 56  Lot(s): 113.011, .012 and .016 - PARCEL 2
6 South Street, Coventry, RI 02816
Plat: 56  Lot(s): 109.000 - PARCEL 3

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

### SCHEDULE B, PART I
### REQUIREMENTS

All of the following Requirements must be met:

1.      The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land.  The Company may then make additional Requirements or Exceptions.

2.      Pay the agreed amount for the estate or interest to be insured.

3.      Pay the premiums, fees, and charges for the Policy to the Company.

4.      Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

      a.   Warranty Deed from Rhodes Technologies or Trustee in Bankrutptcy to Purchaser with contractual rights under a purchase agreement with the vested owner identified at Item 4 below

5.      Pay all unpaid real estate taxes, sewer installation charges, sewer use charges, water use charges, water installation charges, sidewalk, curbing, grading, fire and water district charges and all other municipal charges and assessments where applicable. The Company requires that a municipal lien certificate be obtained and recorded.

      NOTE: If the Land is located within the boundaries of the Downtown Providence District Management Authority, the Assessments by the Downtown Providence District Management Authority are liens on the Land. Satisfactory evidence to be provided to the Company that all outstanding quarterly assessments have been paid in full.

6.      Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

7.      Comply with the provisions of Rhode Island General Laws § 44-30-71.3 entitled "Sale of real property by nonresidents – Withholding requirements", and all regulations promulgated pursuant thereto. If applicable, this statute requires that a percentage of sellers' net proceeds be withheld and remitted to the Rhode Island Division of Taxation. An appropriate recitation of Rhode Island residency contained in the recorded deed discharges the lien

8.      If any mortgage set forth in Schedule B, Part I of this Commitment is an "open end" or equity line mortgage, a full satisfaction of same must be obtained and all credit cards and/or the balance of verified unused account checks must be sent to that mortgagee together with a written authorization and/or affidavit to that mortgagee to terminate/close the credit line account prior to or at the closing.

9.      The Company may make further requirements or exceptions upon review of the documents referred to in item 4 of Schedule B, Part I of this Commitment or after confirmation of the transaction details.

10.     The property address, tax assessor's plat and lot designation, and exact acreage or square footage of the Land will not be insured by the Policy to be issued pursuant to this Commitment.

11.     If any maps/plats are provided in the title abstract and/or with this Commitment, please note that said maps/plats are furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon. (Residential transactions only)

12. For each policy to be issued as identified in Schedule A, Item 2, the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. The Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

13. If A Usury Endorsement will be issued to the Proposed Insured Lender upon receipt by the Company of:

   a. evidence that the loan is not secured by a mortgage against the principal residence of any member of the borrower;

   b. the borrower has obtained a "pro forma methods analysis" satisfactory to the Company from a Rhode Island-licensed CPA indicating that the loan is capable of being repaid, and

   c. additional special risk premium of $TBD   per thousand dollars of policy liability.

14. As Seller, Rhodes Technology, is a partnership, the Company requires the following information and/or documents prior to closing;

   a. A copy of the executed partnership agreement and all amendments thereto for examination and approval;

   b. Certificate for Delaware Secretary of State indicating that the partnership has been registered and is in good standing; and

   c. Any and all consents required pursuant to the partnership in agreement in order to complete transactions to be insured.

15. Obtain and record discharges, terminations and/or releases for the following instruments

   a. Payoff Mortgage to Clariant Corp. in the amount of $1,700,000 dated and recorded with the Town of Coventry Land Evidence Records on February 9, 2012 in Book 1912 at page 55.

   b. Provide proper documentation of property release from Chapter 11 Bankruptcy proceedings filed in NY under case 19-23649 Purdue Pharma L.P and associated case 19-23668 Rhodes Technologies or Final non- appealable Order from Bankruptcy court authorizing the sale of the asset.

   If any mortgage set forth in Schedule B, Part I of this Commitment is a private mortgage, the Company requires the original discharge be obtained and held in escrow prior to the release of the payoff funds

   NOTE: All matters recited above as requiring recorded discharges, terminations and/or releases which are not as of the date of policy so discharged, terminated and/or released will appear as title exceptions in Schedule B-I of the Title Policy Issued hereunder.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

## SCHEDULE B, PART I
### REQUIREMENTS
(continued)

NOTE:    The Company may make other requirements or exceptions upon its review of the proposed documents creating the estate or interest to be insured or otherwise ascertaining details of the transaction.

**END OF SCHEDULE B, PART I**

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



ALTA Commitment for Title Insurance (MA ME NH RI VT) (08/01/2016)                    Printed:  08.17.20 @ 11:29 AM
RI-CTI-FCSD-02100.490208-SPS-1-20-20RI00282

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

## SCHEDULE B, PART II
## EXCEPTIONS

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the Effective Date hereof but prior to the date the Proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.    Rights or claims of parties in possession not shown by the public records.

3.    Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land and not shown by the Public Records.

4.    Any lien or right to a lien for services, labor or material not shown by the public records.

5.    Riparian rights of others in and to the waters of any stream and/or rivers lying along and/or crossing the Land, and any right, title and interest of others in and to any portion of the Land consisting of filled tidal lands.

6.    IF THE LAND IS A CONDOMINIUM UNIT:
Covenants, conditions, restrictions, reservations, rights of first refusal, easements, liens for assessments, options, powers of attorney and limitations on title created by the laws of the state where the Land is located (Rhode Island Condominium Act, R.I. Gen. Laws §34-36.1-1 et seq. and the Rhode Island Condominium Ownership Act, R.I. Gen. Laws §34-36-1 et seq., as amended and as applicable), or set forth in the Declaration of Condominium, Master Deed or Declaration of Trust and in the related By-Laws as duly recorded in the appropriate Public Records, as the same may have been amended, and in any instrument creating the estate or interest insured by the Policy.

7.    Taxes and municipal charges and any water and/or sewer charges and/or assessments coming due on or after the date of the Policy.

8.    Rights of parties in possession under unrecorded tenancies and/or leases.

9.    Leasehold in Book 1906 at page 259 as it relates to Upper Mill Building.

10.    Decision Recorded in Book 2063 at page 524.

11.    Decision recorded in Book 1859 at page 526.

12.    Easement recorded in Book 1859 at page 744 as amended in Book 1860 at page 826.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

## SCHEDULE B, PART II
### EXCEPTIONS
(continued)

13.    Memorandum of Agreement recorded in Book 1867 at page 426.

14.    Matters as Disclosed on a Survey Entitled, "ALTA/ACSM Land Title Survey Plan AP 48, Lots 113.1-113.10, 113.24, 113.25 and AP 56 Lots 105, 113.11,113.12, 113.16 Washington St., Quidnick Street, Pulaski Street, North & South Street, Coventry, Rhode Island; November 2011 for Rhodes Technologies, Inc. 498 Washington Street, Coventry RI 02816.

15.    DEM document recorded in Book 1872 at page 227.

16.    Easement recorded in Book 1881 at page 935.

17.    Soil Management Plan recorded in Book 1894 at page 501.

18.    DEM document recorded in Book 1896 at page 581.

19.    Amended Easement recorded in Book 1905 at page 541.

20.    Easement recorded in Book 1912 at page 38.

21.    Easement as set forth in Book 39 at Page 508.

22.    Rights reserved to The New York, New Haven and Hartford Railroad Company in deed recorded with said Land Evidence Records in Book 52 at Page 97.

23.    Easement to Narragansett Electric as set forth in Book 139 at page 1004.

24.    Notice of Approval by the Department of Environmental Management dated January 20, 1988 and recorded with said Land Evidence Records on January 28, 1988 in Book 211 at Page 283.

25.    As to appurtenant rights, easement as set forth in Book 226 at Page 183, with corrective acknowledgement recorded in Book 230 at Page 893.

26.    Notice of Approval by the Department of Environmental Management dated September 20, 1990 and recorded with said Land Evidence Records on October 2, 1990 in Book 268 at Page 769.

27.    Notice of Approval by the Department of Environmental management dated June 14, 1991 and recorded with said Land Evidence Records in Book 274 at Page 12.

28.    Notice of Approval by the Department of Environmental Management dated September 2, 1993 and recorded with the said land Evidence Records on September 17, 1993 in Book 409 at Page 214.

29.    Notice of Approval by the department of Environmental Management dated October 27, 1993 and recorded November 1, 1993 in the Coventry Land Evidence Records in Book 423 at page 137.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

30.    Notice of Approval by the Department of Environmental Management dated December 6, 1993 and recorded with said Land Evidence Records on December 16, 1993 in Book 432 at Page 239.

31.    Notice of Approval by the Department of Environmental Management dated December 3, 1993 and recorded with said Land Evidence Records on December 16, 1993 in Book 432 at Page 243.

32.    Notice of Approval by the Department of Environmental Management dated March 14, 1994 and recorded with said Land Evidence Records on March 25, 1994 in Book 451 at Page 26.

33.    Notice of Approval by the Department of Environmental Management dated May 11, 1994 and recorded with said Land Evidence Records on July 11, 1994 in Book 467 at Page 207.

34.    Reciprocal Easement Agreement by and between Clariant Corp. and NAPP COVENTRY dated February 4, 1998 and recorded in the Coventry Land Evidence Records in Book 674 at Page 74.

35.    Insignificat Alteration Permit from RIDEM to Clariant Corporation dated February 24, 1998 and recorded in the Coventry Land Evidence Records in Book 686 at page 118.

36.    Private rights of others in and to Quidneck Street, North Street and South Street.

37.    Terms, Conditions, and Provisions of Abandonment Decree relating to the abandonment of portions of Quidneck Street, North Street, and South Street entered by the Town of Coventry, dated November 11, 1974.

38.    Insignificant Alteration Permit from RIDEM to Clariant Corporation dated January 11, 2006 and recorded in the Coventry Land Evidence Records on January 20, 2006 in Book 1708 at Page 469.

39.    Order of Approval from RIDEM to Clariant Corporation dated October 10, 2006 and recorded in the Coventry Land Evidence Records on October 16, 2006 in Book 1743 at Page 661.

40.    Easement by and between Clariant Corporation and Verizon New England, Inc. (f/k/a New England Telephone and Telegraph) dated February 20, 2008 and recorded with the Coventry Land Evidence Records on March 7, 2008 in Book 1799 at Page 248.

41.    Insignificant Alteration Permit from RIDEM to Clariant Corporation dated May 7, 2008 and recorded in the Coventry Land Evidence Records on May 19, 2008 in Book 1805 at Page 968.

42.    Remedial Approval Letter from RIDEM to Clariant Corporation dated March 27, 2009 and recorded with the Coventry Land Evidence Records on April 2, 2009 in Book 1830 at Page 919.

43.    Order of Approval from RIDEM to Clariant Corporation dated March 30, 2009 and recorded with the Coventry Land Evidence Records on April 3, 2009 in Book 1830 at Page 993.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

44.     Easement Agreement between Town of Coventry and Clariant Corporation in Book 1856 at page 381.

45.     Decision of Administrative Subdivision in Book 1856 at page 537.

46.     Sewer Agreement in Book 1831 at page 961.

47.     Road Abandonment in Book 1919 at page 258 as affected by order in Book 1926 at page 308.

48.     Environmental Land Use Restrictions found in Book 1505 at page 146.

49.     Easement to Narragansett Electric and New England Telephone in Book 741 at page 306.

50.     Easement to Narragansett Electric and Verizon in Book 976 at page 90.

51.     Conditions as disclosed on Plat Book 14 at page 30 and 31.


## END OF SCHEDULE B, PART II

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

---

**1.  DEFINITIONS**

(a)  "Knowledge" or "Known":  Actual or imputed knowledge, but not constructive notice imparted by the Public Records.

(b)  "Land":  The land described in Schedule A and affixed improvements that by law constitute real property.  The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

(c)  "Mortgage":  A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.

(d)  "Policy":  Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

(e)  "Proposed Insured":  Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

(f)  "Proposed Policy Amount":  Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.

(g)  "Public Records":  Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.

(h)  "Title":  The estate or interest described in Schedule A.

**2.**  If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.**  The Company's liability and obligation is limited by and this Commitment is not valid without:

(a)  the Notice;

(b)  the Commitment to Issue Policy;

(c)  the Commitment Conditions;

(d)  Schedule A;

(e)  Schedule B, Part I-Requirements; and

(f)  Schedule B, Part II-Exceptions; and

(g)  a counter-signature by the Company or its issuing agent that may be in electronic form.

**4.  COMPANY'S RIGHT TO AMEND**

The Company may amend this Commitment at any time.  If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5.  The Company shall not be liable for any other amendment to this Commitment.

**5.  LIMITATIONS OF LIABILITY**

(a)  The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

(i)  comply with the Schedule B, Part I-Requirements;

(ii)  eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or

(iii)  acquire the Title or create the Mortgage covered by this Commitment.

(b)  The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

(c)  The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

(d)  The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.

(e)  The Company shall not be liable for the content of the Transaction Identification Data, if any.

(f)  In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.

(g)  In any event, the Company's liability is limited by the terms and provisions of the Policy.

**6.  LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**

(a)  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b)  Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c)  Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00282 (8664378)**

(continued)

(d)    The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)    Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)    When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7.    IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies.  The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8.    PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide.  A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9.    ARBITRATION (NOT APPLICABLE IN THE STATES OF MAINE, RHODE ISLAND AND VERMONT)**
The Policy contains an arbitration clause.  All arbitrable matters when the Proposed Policy Amount is Two Million And No/100 Dollars ($2,000,000.00) or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties.  A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

**END OF CONDITIONS**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**WIRE SAFE**™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*                              *Internet Crime Complaint Center:*
*http://www.fbi.gov*                                                      *http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

# ALTA COMMITMENT FOR TITLE INSURANCE

**CTIC-20900100 - 0 South Street
AP AP 56, Lot 106.002, Coventry, RI (Kent)**

Issued By:

## CHICAGO TITLE
## INSURANCE COMPANY
®

Commitment Number:

**20RI00252 (8664456)**

## NOTICE

**IMPORTANT - READ CAREFULLY:**   THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES.   ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE.   THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment.  This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**Chicago Title Insurance Company**

By:

_____
President

Countersigned By:

*Ann-Marie Widmann*
_____
Authorized Officer or Agent

Attest:

*Marjorie Nemzura*
_____
Secretary

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

**CHICAGO TITLE INSURANCE COMPANY**                              **COMMITMENT NO. 20RI00252 (8664456)**

**Order Number:  20RI00252 (8664456)**

## SCHEDULE A

1.  Commitment Date:  August 3, 2020 at 8:00am

2.  Policy to be issued:

    (a)  ALTA Owner's Policy 2006
         Proposed Insured:        Rhodes Technology
         Proposed Policy Amount:  $0.00

    (b)  ALTA Loan Policy 2006
         Proposed Insured:        Lender with a contractual obligation under a loan agreement with the Proposed
                                  Insured for an Owner's Policy, its successors and/or assigns as their respective
                                  interests may appear
         Proposed Policy Amount:  $0.00

3.  The estate or interest in the Land described or referred to in this Commitment is:

    Fee Simple

4.  Title to the Fee Simple estate or interest in the Land is at the Commitment Date, vested in:

    Quidnick Land L.P., a Delaware Limited Partnership by virtue of a Warranty Deed from Bernadette DiCarlo and
    Paul DiCarlo dated October 20, 2008 and recorded with the Town of Coventry Land Evidence Records on October
    20, 2008 in Book 1818 at Page 151.

5.  The Land is described as follows:

    SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Property Address:    0 South Street, Coventry, RI 02816
                     Plat: 56  Lot(s): 106.002

## END OF SCHEDULE A

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as
of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
Legal Description

That certain tract or parcel of land with all the buildings and improvements thereon situated southerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island, being more particularly described as follows:

Beginning at the northeast corner of the herein described parcel, said point being marked by an iron pin, said point also being near the southerly end of South Street;

Thence S 00°-55'-01" W along a stone wall for a distance of two hundred ninety-one and 55/100 (291.55) feet to a point marked by a drill hole, said last course bounded easterly by land now or formerly of Muszynski, Henry M. & Stefanie Estate of;

Thence N 75°-15'-26" W partially along a stone wall for a distance of three hundred seventy-nine and 06/100 (379.06) feet to a point;

Thence N 00°-25'-54" W for a distance of one hundred ninety-three and 03/100 (193.03) feet to a point marked by an iron pipe, said last two courses bounded westerly and southerly by land now or formerly of Clariant AG;

Thence N 89°-41'-16" E for a distance of three hundred seventy-two and 71/100 (372.71) feet to the point and place of beginning, said last course bounded northerly by land now or formerly of Antonetta DiCarlo, land now or formerly of Clariant AG and South Street.

The above described parcel contains an area of 89,628 square feet of land more or less (2.06 +/- acres) and is shown on a plan entitled, "Boundary/Existing Conditions Survey Plat Map 56 Lots 106.1 & 106.2 #23 South Street, Coventry, Rhode Island, Dated October 10, 2008, Scale 1"=30' by Crossman Engineering, Inc."

Said parcel is also described as follows:

That certain lot or parcel of land with all the buildings and improvements thereon, situated at the southerly end of Davis Street in the Villa of Quidnick, in the Town of Coventry, County of Kent and State of Rhode Island and laid out and designated as Lot No. 63 (sixty-three) on that plat entitled, "Quidnick Mill Village, Coventry, R.I., September 1927 by Albert Johnson" which plat is recorded in the Office of the Town Clerk of said Town of Coventry in Book No. 3 at Page 31.


Property Address:  0 South Street, Coventry, RI 02816
                   Plat: 56  Lot(s): 106.002

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00252 (8664456)**

## SCHEDULE B, PART I
## REQUIREMENTS

All of the following Requirements must be met:

1.     The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land.  The Company may then make additional Requirements or Exceptions.

2.     Pay the agreed amount for the estate or interest to be insured.

3.     Pay the premiums, fees, and charges for the Policy to the Company.

4.     Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

   a.  Warranty Deed from Quidnick Land L.P. to Rhodes Technology

   b.  Mortgage Deed from Rhodes Technology to Lender with a contractual obligation under a loan agreement with the Proposed Insured for an Owner's Policy

5.     Pay all unpaid real estate taxes, sewer installation charges, sewer use charges, water use charges, water installation charges, sidewalk, curbing, grading, fire and water district charges and all other municipal charges and assessments where applicable. The Company requires that a municipal lien certificate be obtained and recorded.

   NOTE: If the Land is located within the boundaries of the Downtown Providence District Management Authority, the Assessments by the Downtown Providence District Management Authority are liens on the Land. Satisfactory evidence to be provided to the Company that all outstanding quarterly assessments have been paid in full.

6.     Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

7.     Comply with the provisions of Rhode Island General Laws § 44-30-71.3 entitled "Sale of real property by nonresidents – Withholding requirements", and all regulations promulgated pursuant thereto. If applicable, this statute requires that a percentage of sellers' net proceeds be withheld and remitted to the Rhode Island Division of Taxation. An appropriate recitation of Rhode Island residency contained in the recorded deed discharges the lien

8.     If any mortgage set forth in Schedule B, Part I of this Commitment is an "open end" or equity line mortgage, a full satisfaction of same must be obtained and all credit cards and/or the balance of verified unused account checks must be sent to that mortgagee together with a written authorization and/or affidavit to that mortgagee to terminate/close the credit line account prior to or at the closing.

9.     The Company may make further requirements or exceptions upon review of the documents referred to in item 4 of Schedule B, Part I of this Commitment or after confirmation of the transaction details.

10.    The property address, tax assessor's plat and lot designation, and exact acreage or square footage of the Land will not be insured by the Policy to be issued pursuant to this Commitment.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00252 (8664456)**

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

11.  If any maps/plats are provided in the title abstract and/or with this Commitment, please note that said maps/plats are furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon. (Residential transactions only)

12.  For each policy to be issued as identified in Schedule A, Item 2, the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. The Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

13.  If A Usury Endorsement will be issued to the Proposed Insured Lender upon receipt by the Company of:

   a.  evidence that the loan is not secured by a mortgage against the principal residence of any member of the borrower;

   b.  the borrower has obtained a "pro forma methods analysis" satisfactory to the Company from a Rhode Island-licensed CPA indicating that the loan is capable of being repaid, and

   c.  additional special risk premium of $TBD  per thousand dollars of policy liability.

14.  As Buyer, Rhodes Technology, is a corporation, the Company requires the following information and/or documents prior to closing:

   a.  A Certificate of Good Standing from its State of incorporation;

   b.  A Certificate of Good Standing from the Rhode Island Division of Taxation if the title examination reveals the recording of a state tax lien against the buyer during the past six-year period; and

   c.  A Corporate resolution and certified vote authorizing the transaction to be insured;

15.  As Seller Quidnick Land L.P., is a limited partnership, the Company requires the following information and/or documents prior to closing:

   a.  A copy of the executed partnership agreement and all amendments thereto for examination and approval;

   b.  Certificate for Rhode Island Secretary of State indicating that the partnership has been registered and is in good standing; and

   c.  Any and all consents required pursuant to the limited partnership in agreement in order to complete transactions to be insured.

16.  Obtain and record discharges, terminations and/or releases for the following instruments

   a.  NO OPEN MORTGAGE OF RECORD. PLEASE VERIFY WITH CURRENT OWNER/SELLER.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



ALTA Commitment for Title Insurance (MA ME NH RI VT) (08/01/2016)                    Printed:  08.06.20 @ 01:42 PM
RI-CTI-FCSD-02100.490208-SPS-1-20-20RI00252

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00252 (8664456)**

**SCHEDULE B, PART I**
**REQUIREMENTS**
(continued)

If any mortgage set forth in Schedule B, Part I of this Commitment is an "Open End" or Equity Line Mortgage, a full satisfaction of same must be obtained and all credit cards and/or the balance of verified unused account checks must be sent to that mortgagee together with a written authorization and/or affidavit to that mortgagee to terminate/close the credit line account prior to or at the closing.

If any mortgage set forth in Schedule B, Part I of this Commitment is a private mortgage, the Company requires the original discharge be obtained and held in escrow prior to the release of the payoff funds

NOTE: All matters recited above as requiring recorded discharges, terminations and/or releases which are not as of the date of policy so discharged, terminated and/or released will appear as title exceptions in Schedule B-I of the Title Policy Issued hereunder.

NOTE:        The Company may make other requirements or exceptions upon its review of the proposed documents creating the estate or interest to be insured or otherwise ascertaining details of the transaction.

**END OF SCHEDULE B, PART I**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**          **COMMITMENT NO. 20RI00252 (8664456)**

## SCHEDULE B, PART II
## EXCEPTIONS

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the Effective Date hereof but prior to the date the Proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.    Rights or claims of parties in possession not shown by the public records.

3.    Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land and not shown by the Public Records.

4.    Any lien or right to a lien for services, labor or material not shown by the public records.

5.    Riparian rights of others in and to the waters of any stream and/or rivers lying along and/or crossing the Land, and any right, title and interest of others in and to any portion of the Land consisting of filled tidal lands.

6.    IF THE LAND IS A CONDOMINIUM UNIT:
      Covenants, conditions, restrictions, reservations, rights of first refusal, easements, liens for assessments, options, powers of attorney and limitations on title created by the laws of the state where the Land is located (Rhode Island Condominium Act, R.I. Gen. Laws §34-36.1-1 et seq. and the Rhode Island Condominium Ownership Act, R.I. Gen. Laws §34-36-1 et seq., as amended and as applicable), or set forth in the Declaration of Condominium, Master Deed or Declaration of Trust and in the related By-Laws as duly recorded in the appropriate Public Records, as the same may have been amended, and in any instrument creating the estate or interest insured by the Policy.

7.    Taxes and municipal charges and any water and/or sewer charges and/or assessments coming due on or after the date of the Policy.

### END OF SCHEDULE B, PART II

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00252 (8664456)**

---

**1.   DEFINITIONS**

(a)   "Knowledge" or "Known":  Actual or imputed knowledge, but not constructive notice imparted by the Public Records.

(b)   "Land":  The land described in Schedule A and affixed improvements that by law constitute real property.  The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

(c)   "Mortgage":  A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.

(d)   "Policy":  Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

(e)   "Proposed Insured":  Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

(f)   "Proposed Policy Amount":  Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.

(g)   "Public Records":  Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.

(h)   "Title":  The estate or interest described in Schedule A.

**2.**   If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.**   The Company's liability and obligation is limited by and this Commitment is not valid without:

(a)   the Notice;

(b)   the Commitment to Issue Policy;

(c)   the Commitment Conditions;

(d)   Schedule A;

(e)   Schedule B, Part I-Requirements; and

(f)   Schedule B, Part II-Exceptions; and

(g)   a counter-signature by the Company or its issuing agent that may be in electronic form.

**4.   COMPANY'S RIGHT TO AMEND**

The Company may amend this Commitment at any time.  If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5.  The Company shall not be liable for any other amendment to this Commitment.

**5.   LIMITATIONS OF LIABILITY**

(a)   The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

(i)   comply with the Schedule B, Part I-Requirements;

(ii)   eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or

(iii)   acquire the Title or create the Mortgage covered by this Commitment.

(b)   The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

(c)   The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

(d)   The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.

(e)   The Company shall not be liable for the content of the Transaction Identification Data, if any.

(f)   In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.

(g)   In any event, the Company's liability is limited by the terms and provisions of the Policy.

**6.   LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**

(a)   Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b)   Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c)   Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**  |  **COMMITMENT NO. 20RI00252 (8664456)**

(continued)

(d)  The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)  Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7.  IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies.  The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8.  PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide.  A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9.  ARBITRATION (NOT APPLICABLE IN THE STATES OF MAINE, RHODE ISLAND AND VERMONT)**
The Policy contains an arbitration clause.  All arbitrable matters when the Proposed Policy Amount is Two Million And No/100 Dollars ($2,000,000.00) or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties.  A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

**END OF CONDITIONS**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**WIRE SAFE** ™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification.  **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*                    *Internet Crime Complaint Center:*
*http://www.fbi.gov*                                          *http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

# ALTA COMMITMENT FOR TITLE INSURANCE

CTIC-20900099 0 South Street
AP AP 56, Lot 106.002, Coventry, RI (Kent)

Issued By:

**CHICAGO TITLE
INSURANCE COMPANY**
®

| Commitment Number: |
| --- |
| **20RI00251 (8664413)** |

## NOTICE

**IMPORTANT - READ CAREFULLY:**  THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES.  ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE.  THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment.  This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**Chicago Title Insurance Company**

By:

_____
President

Countersigned By:

*Ann-Marie Widmann*
_____
Authorized Officer or Agent

Attest:

_____
Secretary

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00251 (8664413)**

**Order Number:  20RI00251 (8664413)**

## SCHEDULE A

1.  Commitment Date:  August 3, 2020 at 8:00am

2.  Policy to be issued:

    (a)  ALTA Owner's Policy 2006
         Proposed Insured:        Rhodes Technology
         Proposed Policy Amount:  $0.00

    (b)  ALTA Loan Policy 2006
         Proposed Insured:        Lender with a contractual obligation under a loan agreement with the Proposed
                                  Insured for an Owner's Policy, its successors and/or assigns as their respective
                                  interests may appear
         Proposed Policy Amount:  $0.00

3.  The estate or interest in the Land described or referred to in this Commitment is:

    Fee Simple

4.  Title to the Fee Simple estate or interest in the Land is at the Commitment Date, vested in:

    Button Land L.P., a Delaware Limited Partnership by virtue of a Deed of Executrix from Bernadette DiCarlo the
    duly appointed Executrix of the Estate of Antoinette M. DiCarlo dated October 20, 2008 and recorded with the
    Town of Coventry Land Evidence Records on October 20, 2008 in Book 1818 at Page 148.

5.  The Land is described as follows:

    SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Property Address:     23 South Street, Coventry, RI 02816
                      Plat: 56  Lot(s): 106.001

### END OF SCHEDULE A

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as
of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



# EXHIBIT "A"
## Legal Description

That certain tract or parcel of land with all the buildings and improvements thereon, situated on the southerly side of South Street in the Town of Coventry, County of Kent and State of Rhode Island being more particularly bounded and described as follows:

Beginning at a point on the southerly sideline of South Street, said point being the northwesterly corner of land now or formerly of Clariant AG, said point also being the northeasterly corner of herein described parcel;

Thence S 00°-32'-28" W for a distance of one hundred and 00/100 (100.00) feet to a point, said last course bounded easterly by land now or formerly of Clariant AG;

Thence S 89°-41'-16" W for a distance of eighty-seven and 00/100 (87.00) feet to a point, said last course bounded southerly by land now or formerly of Bernadette DiCarlo and land now or formerly of Clariant AG;

Thence N 00°-32'-28" E for a distance of one hundred and 00/100 (100.00) feet to a point on the southerly sideline of South Street, said last course is bounded westerly by land now or formerly of Clariant AG;

Thence N 89°-41'-16" E along the southerly sideline of said South Street for a distance of eighty-seven and 00/100 (87.00) feet to a point and place of beginning.

The above described parcel contains an area of 8,699 square feet of land more or less (0.20 +/- acres) and is shown on a plan entitled, "Boundary/Exisiting Conditions Survey Plat Map 56 Lots 106.1 & 106.2 #23 South Street, Coventry, Rhode Island, Dated October 10, 2008, Scale 1"=30' By: Crossman Engineering, Inc."

Said parcel is also described as follows:

That certain lot or parcel of land with all the bui8ldings and improvements thereon situated at the southerly side of Davis Street in the Village of Quidnick, in the Town of Coventry, County of Kent and State of Rhode Island and is laid out and designated as Lot No. 49 (forty-nine) on that plat entitled "Quidnick Mill Village, Coventry, R.I., Sept. 1927 by Albert Johnson" which said plat is on record in the Office of the Town Clerk of said Town of Coventry in Book No. 3 at Page 31.

Property Address:  23 South Street, Coventry, RI 02816
                   Plat: 56  Lot(s): 106.001

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00251 (8664413)**

## SCHEDULE B, PART I
## REQUIREMENTS

All of the following Requirements must be met:

1.     The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land.  The Company may then make additional Requirements or Exceptions.

2.     Pay the agreed amount for the estate or interest to be insured.

3.     Pay the premiums, fees, and charges for the Policy to the Company.

4.     Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

       a.  Warranty Deed from Button Land L.P. to Rhodes Technology

       b.  Mortgage Deed from Rhodes Technology to Lender with a contractual obligation under a loan agreement with the Proposed Insured for an Owner's Policy

5.     Pay all unpaid real estate taxes, sewer installation charges, sewer use charges, water use charges, water installation charges, sidewalk, curbing, grading, fire and water district charges and all other municipal charges and assessments where applicable. The Company requires that a municipal lien certificate be obtained and recorded.

       NOTE: If the Land is located within the boundaries of the Downtown Providence District Management Authority, the Assessments by the Downtown Providence District Management Authority are liens on the Land. Satisfactory evidence to be provided to the Company that all outstanding quarterly assessments have been paid in full.

6.     Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

7.     Comply with the provisions of Rhode Island General Laws § 44-30-71.3 entitled "Sale of real property by nonresidents – Withholding requirements", and all regulations promulgated pursuant thereto. If applicable, this statute requires that a percentage of sellers' net proceeds be withheld and remitted to the Rhode Island Division of Taxation. An appropriate recitation of Rhode Island residency contained in the recorded deed discharges the lien

8.     If any mortgage set forth in Schedule B, Part I of this Commitment is an "open end" or equity line mortgage, a full satisfaction of same must be obtained and all credit cards and/or the balance of verified unused account checks must be sent to that mortgagee together with a written authorization and/or affidavit to that mortgagee to terminate/close the credit line account prior to or at the closing.

9.     The Company may make further requirements or exceptions upon review of the documents referred to in item 4 of Schedule B, Part I of this Commitment or after confirmation of the transaction details.

10.    The property address, tax assessor's plat and lot designation, and exact acreage or square footage of the Land will not be insured by the Policy to be issued pursuant to this Commitment.

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                          **COMMITMENT NO. 20RI00251 (8664413)**

---

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

11.     If any maps/plats are provided in the title abstract and/or with this Commitment, please note that said maps/plats are furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon. (Residential transactions only)

12.     For each policy to be issued as identified in Schedule A, Item 2, the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. The Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

13.     If A Usury Endorsement will be issued to the Proposed Insured Lender upon receipt by the Company of:

   a.     evidence that the loan is not secured by a mortgage against the principal residence of any member of the borrower;

   b.     the borrower has obtained a "pro forma methods analysis" satisfactory to the Company from a Rhode Island-licensed CPA indicating that the loan is capable of being repaid, and

   c.     additional special risk premium of $TBD   per thousand dollars of policy liability.

14.     As Seller, Button Land L.P. is a limited partnerships, the Company requires the following information and/or documents prior to closing;

   a.     A copy of the executed partnership agreement and all amendments thereto for examination and approval;

   b.     Certificate for Rhode Island Secretary of State indicating that the partnership has been registered and is in good standing; and

   c.     Any and all consents required pursuant to the limited partnership in agreement in order to complete transactions to be insured.

15.     As Buyer, Rhodes Technology, is a corporation, the Company requires the following information and/or documents prior to closing:

   a.     A Certificate of Good Standing from its State of incorporation;

   b.     A Certificate of Good Standing from the Rhode Island Division of Taxation if the title examination reveals the recording of a state tax lien against the buyer during the past six-year period; and

   c.     A Corporate resolution and certified vote authorizing the transaction to be insured;

16.     Obtain and record discharges, terminations and/or releases for the following instruments

   a.     NO OPEN MORTGAGE OF RECORD. PLEASE VERIFY WITH CURRENT OWNER/SELLER.

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 20RI00251 (8664413)**

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

If any mortgage set forth in Schedule B, Part I of this Commitment is an "Open End" or Equity Line Mortgage, a full satisfaction of same must be obtained and all credit cards and/or the balance of verified unused account checks must be sent to that mortgagee together with a written authorization and/or affidavit to that mortgagee to terminate/close the credit line account prior to or at the closing.

If any mortgage set forth in Schedule B, Part I of this Commitment is a private mortgage, the Company requires the original discharge be obtained and held in escrow prior to the release of the payoff funds

NOTE: All matters recited above as requiring recorded discharges, terminations and/or releases which are not as of the date of policy so discharged, terminated and/or released will appear as title exceptions in Schedule B-I of the Title Policy Issued hereunder.

NOTE:        The Company may make other requirements or exceptions upon its review of the proposed documents creating the estate or interest to be insured or otherwise ascertaining details of the transaction.

### END OF SCHEDULE B, PART I

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**                **COMMITMENT NO. 20RI00251 (8664413)**

## SCHEDULE B, PART II
## EXCEPTIONS

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1.    Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the Effective Date hereof but prior to the date the Proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.    Rights or claims of parties in possession not shown by the public records.

3.    Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land and not shown by the Public Records.

4.    Any lien or right to a lien for services, labor or material not shown by the public records.

5.    Riparian rights of others in and to the waters of any stream and/or rivers lying along and/or crossing the Land, and any right, title and interest of others in and to any portion of the Land consisting of filled tidal lands.

6.    IF THE LAND IS A CONDOMINIUM UNIT:
Covenants, conditions, restrictions, reservations, rights of first refusal, easements, liens for assessments, options, powers of attorney and limitations on title created by the laws of the state where the Land is located (Rhode Island Condominium Act, R.I. Gen. Laws §34-36.1-1 et seq. and the Rhode Island Condominium Ownership Act, R.I. Gen. Laws §34-36-1 et seq., as amended and as applicable), or set forth in the Declaration of Condominium, Master Deed or Declaration of Trust and in the related By-Laws as duly recorded in the appropriate Public Records, as the same may have been amended, and in any instrument creating the estate or interest insured by the Policy.

7.    Taxes and municipal charges and any water and/or sewer charges and/or assessments coming due on or after the date of the Policy.

### END OF SCHEDULE B, PART II

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.


AMERICAN
LAND TITLE
ASSOCIATION

**CHICAGO TITLE INSURANCE COMPANY**     **COMMITMENT NO. 20RI00251 (8664413)**

**1. DEFINITIONS**

(a) "Knowledge" or "Known":  Actual or imputed knowledge, but not constructive notice imparted by the Public Records.

(b) "Land":  The land described in Schedule A and affixed improvements that by law constitute real property.  The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

(c) "Mortgage":  A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.

(d) "Policy":  Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

(e) "Proposed Insured":  Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

(f) "Proposed Policy Amount":  Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.

(g) "Public Records":  Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.

(h) "Title":  The estate or interest described in Schedule A.

**2.** If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

**3.** The Company's liability and obligation is limited by and this Commitment is not valid without:

(a) the Notice;

(b) the Commitment to Issue Policy;

(c) the Commitment Conditions;

(d) Schedule A;

(e) Schedule B, Part I-Requirements; and

(f) Schedule B, Part II-Exceptions; and

(g) a counter-signature by the Company or its issuing agent that may be in electronic form.

**4. COMPANY'S RIGHT TO AMEND**

The Company may amend this Commitment at any time.  If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5.  The Company shall not be liable for any other amendment to this Commitment.

**5. LIMITATIONS OF LIABILITY**

(a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

(i) comply with the Schedule B, Part I-Requirements;

(ii) eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or

(iii) acquire the Title or create the Mortgage covered by this Commitment.

(b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

(c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

(d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.

(e) The Company shall not be liable for the content of the Transaction Identification Data, if any.

(f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.

(g) In any event, the Company's liability is limited by the terms and provisions of the Policy.

**6. LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**

(a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

(b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

(c) Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



**CHICAGO TITLE INSURANCE COMPANY**        **COMMITMENT NO. 20RI00251 (8664413)**

(continued)

(d)   The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)   Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)   When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7.   IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies.  The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8.   PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide.  A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9.   ARBITRATION (NOT APPLICABLE IN THE STATES OF MAINE, RHODE ISLAND AND VERMONT)**
The Policy contains an arbitration clause.  All arbitrable matters when the Proposed Policy Amount is Two Million And No/100 Dollars ($2,000,000.00) or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties.  A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

<strong>END OF CONDITIONS</strong>

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.



WIRE SAFE™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
|---|---|
| *http://www.fbi.gov* | *http://www.ic3.gov* |

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

<u>**Exhibit I**</u>

<u>**Licensed Patents**</u>

[REDACTED]

**<u>Exhibit J</u>**

**<u>Licensed Copyrights</u>**

None.

**Disclosure Letter**

**SELLER DISCLOSURE LETTER**

**TO**

**ASSET PURCHASE AGREEMENT**

dated as of September 14, 2020

among

**RHODES TECHNOLOGIES,**

**NORAMCO COVENTRY LLC**

**AND**

**NORAMCO, LLC (SOLELY FOR PURPOSES OF SECTION 8.18)**

**THIS SELLER DISCLOSURE LETTER** (this "Seller Disclosure Letter") is made and given pursuant to that certain Asset Purchase Agreement, dated as of September 14, 2020 (the "Purchase Agreement"), by and among RHODES TECHNOLOGIES, a Delaware general partnership ("the Seller"), NORAMCO COVENTRY LLC, a Delaware limited liability company (the "Purchaser") and, solely for purposes of Section 8.18 of the Purchase Agreement, NORAMCO, LLC, a Delaware limited liability company.

Capitalized terms used but not otherwise defined herein shall have the same meaning given to such terms in the Purchase Agreement. This Seller Disclosure Letter is incorporated and made a part of the Purchase Agreement and is an integral part of the Purchase Agreement. This Seller Disclosure Letter is qualified in its entirety by reference to specific provisions of the Purchase Agreement. This Seller Disclosure Letter and any documents attached to or delivered with this Seller Disclosure Letter are not intended to constitute, and shall not be construed as constituting, representations, warranties, covenants or agreements, except as and to the extent provided in the text of the Purchase Agreement. In no event shall the listing of any matter in this Seller Disclosure Letter be deemed or interpreted to broaden or expand in any way the representations, warranties, covenants and agreements contained in the Purchase Agreement.

This Seller Disclosure Letter may include items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts in this Seller Disclosure Letter, shall not be deemed to be an acknowledgment or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of the Purchase Agreement or otherwise.

This Seller Disclosure Letter is arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in the Agreement, and each such numbered and lettered section or subsection of this Seller Disclosure Letter shall only qualify the corresponding section or subsection of the Purchase Agreement to the extent of the disclosure set forth in such section or subsection of this Seller Disclosure Letter and any disclosure set forth in another section or subsection of this Seller Disclosure Letter that is specifically cross-referenced in such other section or subsection of this Seller Disclosure Letter or if, absent a specific cross-reference, the applicability of a disclosure set forth in any other numbered and lettered section or subsection of this Seller Disclosure Letter to such other section or subsection of this Seller Disclosure Letter is reasonably apparent on the face of such disclosure. The headings contained in this Seller Disclosure Letter are for reference purposes only and do not and are not intended to (i) modify the representations and warranties contained in the Purchase Agreement, (ii) limit the effect of the disclosures contained in this Seller Disclosure Letter or (iii) expand or limit the scope of the information required to be disclosed in this Seller Disclosure Letter. Unless otherwise indicated, any reference in this Seller Disclosure Letter to $ means U.S. dollars.

All references in this Seller Disclosure Letter to the enforceability of agreements with third parties, the existence or non-existence of third-party rights, the absence of breaches or defaults or similar matters or statements, are intended only to allocate rights and risks among the Parties and are not intended to be admissions against interests, give rise to any inference or proof of accuracy, be admissible against any party to the Purchase Agreement by any Person who is not a party to the Purchase Agreement, or give rise to any claim or benefit to any Person who is not a party to the Purchase Agreement. The disclosure of any allegation, threat, notice or other

2

communication shall not be deemed to include disclosure of the truth of the matter communicated.  In addition, the disclosure of any matter in the Seller Disclosure Letter shall not be deemed an admission that such matter actually constitutes noncompliance with, or a violation of, Law or Contract or other topic to which such disclosure is applicable.  In disclosing the information in this Seller Disclosure Letter, the Seller expressly does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any such information.

The information contained in this Seller Disclosure Letter is as of the date of the Purchase Agreement.  The Seller expressly disclaims, and does not undertake, any duty or obligation to update or modify information disclosed in this Seller Disclosure Letter, except as set forth in the Purchase Agreement.

The information contained herein is in all events subject to the terms of the Purchase Agreement and is subject to the terms and conditions of the Confidentiality Agreement.

## Section 3.3

## Consents and Approvals

1. Bankruptcy Court approval of the Sale Order.

2. All approvals required from the DEA and any other Regulatory Authority in connection with the transactions contemplated by the Purchase Agreement.

**Section 3.4**

**No Violations**

(ii)

1.  The sublease of the Upper Mill Building under the Lease Agreement, dated as of November 29, 2011, by and between Clariant Corporation and the Seller (the "Lease Agreement"), requires the consent of the landlord, Clariant Corporation.

2.  [REDACTED].

3.  Assignment of the Dronabinol Research Agreement, effective as of December 31, 2002, by and between the Seller and SVC Pharma LP, requires consent of SVC Pharma LP.

4.  [REDACTED].

## Section 3.6(b)

## Sufficiency of Assets

1. The assets and rights relating to the following services:

   i.    Order Entry

   ii.   Accounts Payable, Treasury and Vendor Master Maintenance

   iii.  Credit and Collections

   iv.   Tax

   v.    Accounting

   vi.   Procurement

   vii.  Payroll

   viii. Risk Management (Insurance)

   ix.   Human Resources

   x.    Legal

   xi.   Compliance Support

   xii.  Information Technology (to the extent shared with entities that are not the Seller)

2. The Contracts listed on Schedule 1.2(r).

3. The services purchased from vendors pursuant to purchase orders that are or will be completed prior to December 31, 2020, as set forth on Exhibit A attached hereto and will therefore be Excluded Assets.

4. The Seller has a number of outstanding purchase orders, which will be fully performed prior to December 31, 2020 and will therefore be Excluded Assets.

5. Business Employees that are not Offer Employees and Offer Employees who do not accept the offer of employment made by the Purchaser.

**Section 3.9**

**Litigation**

(a)

There are approximately 530 opioid claims pending against the Seller, broken down by multidistrict litigation and state litigation as follows:

1. Multidistrict litigation (465)
2. Utah (8)
3. South Carolina (41)
4. Pennsylvania (8)
5. Rhode Island (1)
6. Illinois (2)
7. Maryland (1)
8. West Virginia (2)
9. Puerto Rico (2)

The claims outlined above are Excluded Liabilities under the Agreement.

(b)

1. All items reflected in Section 3.16(a)(v) of this Seller Disclosure Letter are incorporated herein by reference.

**Section 3.10(a)**

**Patents and Copyrights**

1. The Patents listed on <u>Schedule 1.1(i)</u> of the Purchase Agreement are incorporated herein by reference.

**Section 3.11(a)**

**Real Property**

1. Rhodes Pharmaceuticals LP occupies portions of the Real Property without any formal lease (such portions of Real Property will be the subject of the leaseback transaction).

2. Permitted Pre-Closing Encumbrances of the type described in clauses (vii) or (xv) of the definition thereof in the Purchase Agreement.

**Section 3.12**

**Material Contracts**

For the avoidance of doubt, this Section 3.12(a) of the Seller Disclosure Letter includes Contracts that are not Assigned Contracts.

(a)

    (i)    See <u>Exhibit B</u> attached hereto.

    (ii)

        1.    Master Supply Agreement, effective as of August 9, 2019, between the Seller and Bard Pharmaceuticals Limited.

        2.    Purchase Orders with each of Purdue Pharma LP, Rhodes Pharmaceuticals LP and one third party unaffiliated entity that purchases from the Seller.

    (iii)

        1.    [REDACTED].

        2.    [REDACTED].

    (iv)

        1.    None.

    (v)

        1.    <u>Schedule 1.5(a)</u>, <u>Schedule 1.1(f)</u> and <u>Schedule 1.2(r)</u> of the Purchase Agreement are incorporated herein by reference.

    (vi)

        1.    Consent Agreement and Final Order, Docket No. RCRA-01-2011-0124, dated as of August 8, 2012, signed and agreed by the U.S. Environmental Protection Agency – Region I and Rhodes Technologies.

        2.    Declaration of Environmental Land Usage Restriction, made on October 9, 2003, by Rhodes Technologies and its successors and/or assigns.

    (vii)

        1.    None.

(viii)

    1.  None.

(ix)

    1.  Vendor equipment relating to the following Contracts:

        i.  [REDACTED].

        ii.  [REDACTED].

        iii.  Product Supply Agreement, dated as of April 18, 2001, by and between the Seller and Air Products and Chemicals, Inc.

            1.  Amendment 2 to the Product Supply Agreement, dated and effective as of October 1, 2013.

(x)

    1.  Joint Research Agreement, dated as of October 16, 2013, by and between the Seller and Purdue Pharma LP.

    2.  Joint Research Agreement, dated as of October 15, 2013, by and between the Seller and Rhodes Pharmaceuticals LP.

(xi)[1]

    1.  The Seller granted Samuel B. Abrams and Dechert LLP a power of attorney to prosecute Patent Application No. 13/711,520 and to transact all business in the United States Patent and Trademark Office in connection therewith.

    2.  The Seller has granted powers of attorney in connection with import and export of products, including the following:

        i.  Customs Power of Attorney, dated as of August 27, 2020, between the Seller, as grantor, and GEFCO Forwarding USA Inc., as grantee.

        ii.  Customs Power of Attorney, dated as of October 20, 2015, between the Seller, as grantor, and UPS Supply Chain Solutions, Inc., as grantee.

---

[1] This list does not include powers of attorney granted to ex-U.S. patent attorneys in connection with patent families that are not included in the Purchased Patents.

        iii.    Customs Power of Attorney, dated as of August 27, 2020, between the Seller, as grantor, and Geodis USA, Inc., as grantee.

3. The Seller has granted powers of attorney in respect of certain of the Purchased Patents to ex-U.S. law firms in the following countries: Belgium, Brazil, China, Colombia, India, Indonesia, Italy, Israel, Japan, Mexico, Philippines, Republic of Korea, South Africa, Spain, Switzerland and Taiwan.

(xii)

1. [REDACTED].

2. [REDACTED].

3. [REDACTED].

4. Commodity Master Agreement, effective as of April 8, 2016, by and among the Seller, Direct Energy Business, LLC and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business.

        i.    Amendment to the Commodity Master Agreement by and among the Seller, Direct Energy Business, LLC and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business, dated April 8, 2016.

        ii.    Amendment to the Commodity Master Agreement by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business, dated July 25, 2018, as affixed to the Transaction Confirmation, dated July 25, 2018, by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business (Utility Account Nos. 1784386019 and 4269090024).

        iii.    Amendment to the Commodity Master Agreement by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business, dated July 25, 2018, as affixed to the Transaction Confirmation, dated July 25, 2018, by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business (Utility Account Nos. 3981874009 and 5228153003).

5. Transaction Confirmation, dated August 18, 2017, by and between the Seller and Direct Energy Business, LLC.

6. Transaction Confirmation, dated August 21, 2017, by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business.

7. Transaction Confirmation, dated July 25, 2018, by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business (Utility Account Nos. 1784386019 and 4269090024).

8. Transaction Confirmation, dated July 25, 2018, by and between the Seller and Direct Energy Business Marketing, LLC d/b/a Direct Energy Business (Utility Account Nos. 3981874009 and 5228153003).

9. Purchase Order, dated February 24, 2020 titled "Electricity 498 Washington St. -bldg 3," by and between the Seller and Direct Energy Business.

10. Purchase Order, dated February 24, 2020 titled "Electricity 129 Quidnick St., UM," by and between the Seller and Direct Energy Business.

11. Purchase Order, dated February 25, 2020 titled "Electricity 500 Washington St. Storeroom-bldg 30," by and between the Seller and Direct Energy Business.

12. Master Waste Management Services agreement, effective as of July 26, 2019, by and between the Seller and Veolia ES Technical Solutions ("Veolia").

13. Product Purchase Agreement, dated as of November 18, 2019, by and between the Seller and Veolia.

14. Statement of Work #09012010-20, dated as of April 12, 2017, by and between the Seller and Veolia.

15. Statement of Work #07262019-1, dated as of August 29, 2019, by and between the Seller and Veolia.

16. Statement of Work #07262019-2, dated as of December 17, 2019, by and between the Seller and Veolia.

17. Statement of Work #07262019-3, dated as of December 23, 2019, by and between the Seller and Veolia.

18. Statement of Work #07262019-4, dated as of March 21, 2020, by and between the Seller and Veolia.

    i. Amendment #1 to Statement of Work #07262019-4, dated as of May 27, 2020.

19. Purchase Order, dated June 1, 2020 titled "2020 - 2022 Annual Periodic Lift Station Services," by and between the Seller and Veolia.

13

20. Master Services Agreement, effective as of January 1, 2014, by and between the Seller and Security Services of Connecticut, Inc. d/b/a SSC, Inc.

21. Master Customer License and Online Services Agreement, dated as of February 28, 2019, by and between the Seller and Dassault Systèmes Americas Corp. ("Dassault").

    i. Amendment to the Master Customer License and Online Services Agreement, effective as of June 12, 2019, in reference to Seller's order under Quote # PO_RUS0034492, Purdue Pharma LP's order under Quote # PO_RUS0034495, and Purdue Pharmaceuticals LP's order under Quote # PO_RUS0034493.

    ii. Amendment to the Master Customer License and Online Services Agreement, effective as of June 12, 2019, in reference to Seller's order under Quote # PO_RUS0034493, Purdue Pharma Manufacturing LP's order under Quote # PO_RUS0034492, and Purdue Pharma LP's order under Quote # PO_RUS0034495.

    iii. Amendment to the Master Customer License and Online Services Agreement, effective as of June 12, 2019, in reference to Seller's order under Quote # PO_RUS0034495, Purdue Pharma Manufacturing LP's order under Quote # PO_RUS0034492, and Purdue Pharmaceuticals LP's order under Quote # PO_RUS0034493.

    iv. Amendment to the Master Customer License and Online Services Agreement, effective as of June 12, 2019, in reference to Purdue Pharmaceuticals LP's order under Quote # PO_RUS0034493, Purdue Pharma Manufacturing LP's order under Quote # PO_RUS0034492, and Purdue Pharma LP's order under Quote # PO_RUS0034495.

22. Master Services Agreement, dated as of March 5, 2019, by and between the Seller and Dassault.

23. Statement of Work, dated as of March 5, 2019, by and between the Seller and Dassault.

24. Statement of Work, dated March 28, 2019, by and between the Seller and Dassault.

25. Statement of Work, dated April 2, 2020, by and between the Seller and Dassault.

26. Project Change Request, dated April 24, 2019, by and between the Seller and Dassault.

14

27. Purchase Order, dated March 31, 2020 titled "Hosting Services and Managed Services - March 2020 - March 2021," by and between the Seller and Dassault.

28. Sales Contract NA5028, effective as of August 1, 2013, by and between the Seller and Dow Chemical Company.

29. Purchase Contract, effective as of August 1, 2013, by and between the Seller and Union Carbide Corporation.

30. Contracting Services Agreement, effective as of May 24, 2013, by and between the Seller and A/Z Corporation.

  i.  Amendment #4 to the Contracting Services Agreement, effective as of December 11, 2013.

  ii.  Amendment #15 to the Contracting Services Agreement, effective as of March 30, 2015.

  iii.  Amendment #17 to the Contracting Services Agreement, effective as of September 16, 2015.

  iv.  Amendment #21 to the Contracting Services Agreement, effective as of March 4, 2016.

  v.  Amendment #40 to the Contracting Services Agreement, effective as of May 23, 2018.

  vi.  Amendment #46 to the Contracting Services Agreement, effective as of January 8, 2019.

  vii.  Amendment #52 to the Contracting Services Agreement, effective as of March 4, 2020.

  viii.  Amendment #53 to the Contracting Services Agreement, effective as of May 1, 2020.

(xiii)

1. Master Supply Agreement, effective as of August 9, 2019, between the Seller and Bard Pharmaceuticals Limited.

2. Purchase Orders with each of Purdue Pharma LP, Rhodes Pharmaceuticals LP and one third party unaffiliated entity that purchases from the Seller.

(b)

1.  The Bard Agreement.

2.  Purchase Orders with each of Purdue Pharma LP and Rhodes Pharmaceuticals LP.

3.  Dronabinol Research Agreement, effective as of December 31, 2002, by and between the Seller and SVC Pharma LP.

4.  [REDACTED].

5.  [REDACTED].

6.  Joint Research Agreement, dated as of October 16, 2013, by and between the Seller and Purdue Pharma LP.

7.  Joint Research Agreement, dated as of October 15, 2013, by and between the Seller and Rhodes Pharmaceuticals LP.

8.  Administrative Services Agreement, dated as of January 1, 2008, by and between the Seller and Purdue Pharma LP.

9.  Amended and Restated Quality Agreement, dated as of October 31, 2008, by and between the Seller and Purdue Pharma LP.

10. Master Services Agreement, dated as of October 23, 2009, by and between the Seller and Rhodes Pharmaceuticals LP.

    i.  Amendment No. 1 to Master Services Agreement, dated as of January 31, 2019.

11. Project Specification Order #1 to Master Services Agreement, dated as of October 23, 2009, by and between the Seller and Rhodes Pharmaceuticals LP.

    i.  Amendment No. 1 to Product Specification Order #1, dated as of January 1, 2010, by and between the Seller and Rhodes Pharmaceuticals LP.

16

12. Project Specification Order #10232009-2 to Master Services Agreement, dated as of November 1, 2012, by and between the Seller and Rhodes Pharmaceuticals LP.

13. Quality Agreement, dated as of October 23, 2009, by and between the Seller and Rhodes Pharmaceuticals LP.

14. Quality Agreement, dated as of August 15, 2013, by and between the Seller and Rhodes Pharmaceuticals LP.

     i. Amendment No. 1 to Quality Agreement, dated as of November 26, 2016.

(c)

Material Contracts pursuant to which the Seller has spent or received more than $[REDACTED] per during the year ending December 31, 2019 and/or through Aug 31, 2020 have been made available to the Purchaser, other than those listed below:

1. Items reflected in Sections 3.12(a)(ii)(2), 3.12(a)(xii)(3), (9-10) and (21-26).

2.

| [REDACTED]. | [REDACTED]. |
|---|---|
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |
| [REDACTED]. | [REDACTED]. |

Notwithstanding anything in the Purchase Agreement to the contrary, up to the Designation Deadline, Purchaser may, in its sole discretion, move any Post-Petition Contract from Schedule 1.1(f) to Schedule 1.2(r) if such Post-Petition Contract was not made available to the Purchaser prior to the date of the Purchase Agreement. For the avoidance of doubt, the Post-Petition Contracts listed on Schedule 1.1(f) of the Purchase Agreement under the heading "Post-Petition Contracts not made available to the Purchaser prior to the date of the Purchase Agreement" have not been made available to the Purchaser prior to the date of the Purchase Agreement.

The Seller is in default of Contracts with a corresponding cure cost, including those Material Contracts listed with a corresponding cure cost on Schedule 1.5(a) of the Purchase Agreement.

(d)(ii)

1.  Contracts with a corresponding cure cost, including those Assigned Contracts listed with a corresponding cure cost on Schedule 1.5(a) of the Purchase Agreement, are incorporated herein by reference.

(e)

1.  Contracts with corresponding cure cost on Schedule 1.5(a) that are Assigned Contracts are incorporated herein by reference.

## Section 3.13

## Compliance with Laws; Permits

(a)

    1.  All items reflected in Section 3.16(a) of this Seller Disclosure Letter are incorporated herein by reference.

**Section 3.14**

**Employee Matters**

(a)

1. Purdue Pharma L.P. Pension Plan.

2. Purdue Pharma L.P. and Participating Companies Retirement Savings 401(k) Plan.

3. Purdue Pharma L.P. and Participating Associated Companies Supplemental Savings Plan.

4. Long-Term Results Plan for Executives of Rhodes Technologies, Inc. and Rhodes Pharmaceuticals, L.P.

5. Purdue Separation Pay Plan 530.

6. Purdue Separation Pay Plan 529.

7. Purdue Separation Pay Plan for Vice Presidents and Above.

8. Health Insurance – Cigna.

9. Dental Insurance – Cigna.

10. Vision Insurance – UnitedHealthcare.

11. Retiree Medical.

12. Purdue Pharma L.P. Retiree Reimbursement Account.

13. Flexible Spending Account (Health Care and Dependent Care).

14. Short-Term Disability.

15. Long-Term Disability.

16. Life Insurance.

17. Travel Accident Insurance.

18. Personal Accident Insurance.

19. Supplemental Life Insurance (employee paid).

20

20. Dependent Life Insurance.

21. Automobile Allowance Program.

22. Relocation Program.

23. Tuition Assistance Program.

24. Adoption Assistance Program.

25. 529 College Savings Plan.

26. Health Advocate.

27. Back Up Child and Elder Care.

28. Employee Assistance Plan.

(b)

   (ii)

      1.  Retiree Medical.

      2.  Purdue Pharma L.P. Retiree Reimbursement Account.

(c)

   (ii)

      1.  Purdue Pharma L.P. Pension Plan.

## Section 3.16(a)

## Environmental Matters

(i)

1.  On March 23, 2011, the Seller was issued a Notice of Violation from the Office of Compliance & Inspection of the Rhode Island Department of Environmental Management ("RIDEM"), alleging violation of RIDEM's *Air Pollution Control Regulation No. 9 – Air Pollution Control Permits*. The Seller resolved the Notice of Violation by paying a $1,000 penalty.

2.  On January 21, 2014, the Seller was issued a Notice of Violation from the Office of Compliance & Inspection of RIDEM, alleging violation of Rhode Island's *Clean Air Act* and RIDEM's *Air Pollution Control (APC) Regulation No. 9 – Air Pollution Control Permits*. The Seller resolved the Notice of Violation by paying a $1,500 penalty.

3.  On April 17, 2018, the Seller was issued a Notice of Violation from the Town of West Warwick, Rhode Island, alleging violation of the Sewer Use Land Ordinance of the Town of West Warwick and the Significant Industrial User Wastewater Discharge Permit C-34 issued by the Town of West Warwick. The Seller resolved the Notice of Violation by conducting further analysis and submitting an investigation report.

4.  On July 16, 2020, the Seller was issued a Notice of Violation from the Town of West Warwick, Rhode Island, alleging violation of the Sewer Use Land Ordinance of the Town of West Warwick and the Significant Industrial User Wastewater Discharge Permit C-34 issued by the Town of West Warwick. The Seller resolved the Notice of Violation by conducting further analysis indicating compliance with the permit and submitting an investigation report.

5.  Complaint, Compliance Order and Notice of Opportunity for Hearing (the "Complaint"), as amended by the Amended Complaint and the Second Amended Complaint, Docket No. RCRA-01-2011-0124, issued by the U.S. Environmental Protection Agency on September 30, 2011. The Complaint was resolved pursuant to item (v)(2) of Section 3.16(a) of this Seller Disclosure Letter.

(v)

1.  Declaration of Environmental Land Usage Restriction, made on October 9, 2003, by Rhodes Technologies and its successors and/or assigns.

2.  Consent Agreement and Final Order, Docket No. RCRA-01-2011-0124, dated as of August 8, 2012, signed and agreed by the U.S. Environmental Protection Agency – Region I and Rhodes Technologies.

**Section 3.17(a)**

**Regulatory Authorizations**

<u>U.S. Food & Drug Administration (FDA)</u>

1. DMF #16399 for Oxycodone HCI.
2. DMF #31377 for Oxycodone HCI Process II.
3. DMF #19335 for Dronabinol, 10% in Sesame Oil.
4. DMF #23681 for Hydrocodone Bitartrate, USP.
5. DMF #27208 for Methylphenidate HCI, USP.
6. DMF #28226 for Naloxone HCI dihydrate, USP.
7. DMF #29885 for Buprenorphine HCI, USP.
8. DMF #30762 for Buprenorphine.
9. DMF #29317 for Morphine Sulfate, USP.
10. DMF #16351 for Hydromorphone HCI, USP.
11. DMF #31994 for Hydromorphone HCI, USP (Rhodes).
12. FDA Manufacturer (GDUFA Fee) License, FDA Establishment Number (FEI) 1211201.

<u>European Directorate for the Quality of Medicines (EDQM)</u>

1. CEP 2011-284 for Oxycodone HCI, Ph.Eur.
2. CEP 2017-263 for Oxycodone HCI, Ph.Eur. (Process II).
3. CEP 2014-125 for Naloxone HCI dihydrate, Ph.Eur.
4. CEP 2015-318 for Buprenorphine, Ph.Eur.

<u>Health Canada</u>

1. MF 2006-013 for Oxycodone HCI.
2. MF 2012-209 for Hydrocodone Bitartrate.
3. MF 2015-010 for Methylphenidate HCI.
4. MF 2016-039 for Naloxone HCI.

<u>Drug Enforcement Administration (DEA)</u>

1. [REDACTED].

<u>State Regulatory Authorizations</u>

1. Rhode Island Department of Health Manufacturer License #MNF00018.
2. Rhode Island Department of Health Researcher (I) License #CRF00036.
3. Rhode Island Department of Health Researcher (II-V) License #CRF00004.
4. Maryland Department of Health and Mental Hygiene Office of Controlled Substances Administration Distribute I – Controlled Dangerous Substances License #292203.

<u>Other Federal Licenses</u>

1.    Department of Transportation Hazardous Materials License #051519550080BD.

**Section 3.17(b)**

**Compliance with Health Laws**

1.    The Seller is confirming whether it is required to register as a controlled substance distributor under North Carolina law and, in the event such registration is required, will promptly apply for registration.

**Section 3.17(c)**

**Regulatory Authority Correspondence**

1.    The following FDA Form 483s and notices of inspectional observations, which have each been resolved, as applicable:

      1.    FDA Form 483, issued on May 1, 2003.

      2.    FDA Establishment Inspection Report, dated December 2, 2004.

      3.    FDA Establishment Inspection Report, dated April 5, 2007.

      4.    FDA Form 483, issued on May 5, 2010.

      5.    FDA Form 483, issued on March 21, 2012.

      6.    FDA Form 483, issued on August 15, 2014.

      7.    FDA Form 483, issued on July 27, 2016.

      8.    FDA Form 483, issued on January 23, 2020.

**Section 3.17(d)**

**Officers, Employees and Agents**

1.  [REDACTED].

**Section 3.17(e)**

**Recalls**

1.  In June 2018, one lot of Morphine Sulfate failed moisture testing at the Seller's facility in Wilson, North Carolina. The lot was returned to the Seller at the Real Property and was not used to manufacture any finished dosage product.

**Section 3.19**

**Insurance**

1.  See <u>Exhibit C</u> attached hereto.

**Section 3.20**

**Material Customers; Material Suppliers**

(a)

[REDACTED].

   1.  [REDACTED].

(b)

| Suppler Name | Total 2019 Purchases ($USD) |
|---|---|
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |
| Blue Cross Blue Shield | [REDACTED] |
| [REDACTED] | [REDACTED] |
| Direct Energy Business | [REDACTED] |
| Veolia Es Technical Solutions | [REDACTED] |
| Security Services Of Connecticut | [REDACTED] |
| Dassault Systèmes Americas Corp | [REDACTED] |
| Dow Chemical Company | [REDACTED] |
| A Z Corporation | [REDACTED] |

   2.  The Contract with [REDACTED] is due to expire December 31, 2020 and there are no discussions to renew.

30

## Section 5.1

## Conduct of the Business

For the avoidance of doubt, Section 5.1 does not restrict actions solely and exclusively with respect to Excluded Assets, including products in development.

(a)

   1.  [REDACTED].

   2.  [REDACTED].

(b)

    (i)

       1.  The Seller anticipates it will allow access to third parties to its regulatory filings in order for such third parties to qualify the Seller's APIs.

    (iii)

       1.  [REDACTED].

       2.  [REDACTED].

       3.  The Seller may enter into Contracts in the ordinary course of business to sell API, so long as the Seller delivers all API to be sold under such new Contracts prior to Closing with no post-Closing Obligations with respect thereto (it being understood that such Contracts shall not be Assigned Contracts unless designated as such by Purchaser).

       4.  The Seller may purchase narcotic raw materials, based on the Business' expectations of what raw materials will be needed in the ordinary course prior to March 31, 2021, consistent with any applicable quota limitations.

       5.  The Seller may extend the terms of the expiring agreements set forth on <u>Exhibit D</u> attached hereto.

    (vi)

31

1. The Seller may extend the duration of any discretionary COVID-19-based increase in compensation past the first week of January, 2021, if Closing has not occurred by such date.

(vii)

1. [REDACTED].

## Article IX

### Knowledge of the Seller; Encumbrances

Knowledge of the Seller:

1.    David Fogel.

2.    Jon Lowne.

3.    David Lundie.

4.    Randy Shamblen.

Encumbrances:

1.    Rhodes Technologies:

   a.    Financing Statement #20186043141 filed on August 31, 2018 by U.S. Bank Equipment Finance.

   b.    Financing Statement #20186662379 filed on September 26, 2018 by U.S. Bank Equipment Finance.

2.    [REDACTED].

## Exhibit A

**Purchase Order Expenditures**

[See attached]

| Exhibit A - Purchase Order Expenditures | | | |
| --- | --- | --- | --- |
| Company Name | 2018 | 2019 | 2020 |
| [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] |
| ILC DOVER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ASTRO CHEMICALS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| JOHNSON MATTHEY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| GENERAL CONTAINER CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| DAVOS CHEMICAL COPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| BRENNTAG NORTHEAST INC | [REDACTED] | [REDACTED] | [REDACTED] |
| AGNO PHARMA | [REDACTED] | [REDACTED] | [REDACTED] |
| STAUFFER MANUFACTURING CO | [REDACTED] | [REDACTED] | [REDACTED] |
| MAINTENANCE MANAGEMENT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MCMASTER CARR SUPPLY COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] |
| CHARLES SCHWAB 010291 | [REDACTED] | [REDACTED] | [REDACTED] |
| COVENTRY FIRE DISTRICT | [REDACTED] | [REDACTED] | [REDACTED] |
| ALLIED UNIVERSAL SECURITY SERVICES | [REDACTED] | [REDACTED] | [REDACTED] |
| GEFCO FORWARDING USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DANA TRANSPORTATION | [REDACTED] | [REDACTED] | [REDACTED] |
| ARNOLD & PORTER KAYE SCHOLER LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| FISHER SCIENTIFIC CO LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| RHEO ENGINEERING | [REDACTED] | [REDACTED] | [REDACTED] |
| PFAUDLER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| UNITED STATES PHARMACOPEIAL CONVENT | [REDACTED] | [REDACTED] | [REDACTED] |
| FOOD & DRUG ADMINISTRATION | [REDACTED] | [REDACTED] | [REDACTED] |
| OCCUPATIONAL HEALTH CONNECTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EXAMINETICS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PURDUE PHARMA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FIKE CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| KENT COUNTY WATER AUTHORITY | [REDACTED] | [REDACTED] | [REDACTED] |
| CHARLES SCHWAB 004969 | [REDACTED] | [REDACTED] | [REDACTED] |
| ATLANTIC PAPER & TWINE CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| PRESIDIO NETWORKED SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CRODA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| GEODIS USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MAROON GROUP LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| RPE SEPTIC SERVICES | [REDACTED] | [REDACTED] | [REDACTED] |
| DIVERSIFIED PUMPS | [REDACTED] | [REDACTED] | [REDACTED] |
| GRAINGER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| 3M PURIFICATION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CHARLES SCHWAB 022254 | [REDACTED] | [REDACTED] | [REDACTED] |
| SHI INTERNATIONAL CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| DEC-USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BUCHI CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| JOHNSON CONTROLS FIRE PROTECTION LP | [REDACTED] | [REDACTED] | [REDACTED] |
| FLOWSERVE US INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ALESSANDRA RYAN FOLZ | [REDACTED] | [REDACTED] | [REDACTED] |
| CHARLES SCHWAB 002634 | [REDACTED] | [REDACTED] | [REDACTED] |
| KRIEGER SPECIALITY PRDUCTS | [REDACTED] | [REDACTED] | [REDACTED] |
| TOWN OF WEST WARWICK REGIONAL | [REDACTED] | [REDACTED] | [REDACTED] |
| HAYES PUMP INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CHEMGLASS LIFE SCIENCES LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| IDEX/FITZPATRICK CO | [REDACTED] | [REDACTED] | [REDACTED] |
| STAPLES BUSINESS ADVANTAGE | [REDACTED] | [REDACTED] | [REDACTED] |
| RHODE ISLAND DIVN OF TAXATION | [REDACTED] | [REDACTED] | [REDACTED] |
| UNITED RENTALS (NORTH AMERICA) INC | [REDACTED] | [REDACTED] | [REDACTED] |
| US BANK NATIONAL ASSOCIATION | [REDACTED] | [REDACTED] | [REDACTED] |
| MOTION INDUSTRIES | [REDACTED] | [REDACTED] | [REDACTED] |
| INSIGHT DIRECT USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EUROFINS LANCASTER LABORATORIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CAMBRIDGE VALVE & FITTING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SERVOLIFT LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| SIGMA ALDRICH INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ANAQUA SERVICES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EZI DOCK SYSTEMS LIMITED | [REDACTED] | [REDACTED] | [REDACTED] |
| SALARS SPA | [REDACTED] | [REDACTED] | [REDACTED] |

| | | | |
|---|---|---|---|
| AAF INTERNATIONAL US | [REDACTED] | [REDACTED] | [REDACTED] |
| R & L CARRIERS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| GRAYBAR ELECTRIC COMPANY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| D&D FILTRATION CONSULTANTS | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| PALL TRINCOR | [REDACTED] | [REDACTED] | [REDACTED] |
| SKADDEN ARPS SLATE MEAGHER | [REDACTED] | [REDACTED] | [REDACTED] |
| BRAND NU LABORATORIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PRECISION COMPUTER SERVICES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| APPLIED MAINTENANCE | [REDACTED] | [REDACTED] | [REDACTED] |
| L K GOODWIN CO | [REDACTED] | [REDACTED] | [REDACTED] |
| FEDERAL EXPRESS CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| GLOBAL EQUIPMENT CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ROBERT E LOEWENSTEIN | [REDACTED] | [REDACTED] | [REDACTED] |
| MIURA AMERICA CO LTD | [REDACTED] | [REDACTED] | [REDACTED] |
| SKOLNIK INDUSTRIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DOYLE & ROTH MFG CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| INDUSTRIAL DYNAMICS CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| OSISOFT LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL FILTER MEDIA | [REDACTED] | [REDACTED] | [REDACTED] |
| READYREFRESH BY NESTLE | [REDACTED] | [REDACTED] | [REDACTED] |
| WATERMAN SURVEYING LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| FABOHIO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CETRULO LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| DWK LIFE SCIENCES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SIMPLY DEVINE LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| PHENOMENEX INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EAST COAST FILTER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SPARKLER FILTERS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BUREAU VERITAS NORTH AMERICA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EDQM HEALTHCARE EU DIR | [REDACTED] | [REDACTED] | [REDACTED] |
| ROBERTS ENERGY | [REDACTED] | [REDACTED] | [REDACTED] |
| NORAMCO LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| MCGILL HOSE & COUPLING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MCMASTER CARR SUPPLY COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| INERT CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| DELTA ELECTRO POWER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| TAX COLLECTOR | [REDACTED] | [REDACTED] | [REDACTED] |
| LOWENSTEIN SANDLER PC | [REDACTED] | [REDACTED] | [REDACTED] |
| ATLAS PALLET CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| PROCESS CONTROL SOLUTIONS | [REDACTED] | [REDACTED] | [REDACTED] |
| 3V TECH USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NEPONSET CONTROLS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MICRO MOTION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BRIGGS R BRUCE | [REDACTED] | [REDACTED] | [REDACTED] |
| NORTHEAST BATTERY & ALTERNATOR INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EXPO TECHNOLOGIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PRYOR CASHMAN LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| NEXUS PLASTICS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| KENT COUNTY WATER AUTHORITY | [REDACTED] | [REDACTED] | [REDACTED] |
| TRANTER PHE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SEACOAST SUPPLY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| REXEL USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ACETO CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| SIFTEX EQUIPMENT COMPANY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SEFAR AMERICA | [REDACTED] | [REDACTED] | [REDACTED] |
| COMMUNITY COLLEGE OF RHODE ISLAND | [REDACTED] | [REDACTED] | [REDACTED] |
| MSDS ONLINE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| WSP USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PRICE WATERHOUSE COOPERS LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| EMSL ANALYTICAL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ROTO DISC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MAIWALD PATENTANWALTS GMBH | [REDACTED] | [REDACTED] | [REDACTED] |
| PROTHERAGEN INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ONE STAMFORD REALTY LP | [REDACTED] | [REDACTED] | [REDACTED] |
| SD MYERS LLC | [REDACTED] | [REDACTED] | [REDACTED] |

| | | | |
|---|---|---|---|
| WATSON MARLOW INC | [REDACTED] | [REDACTED] | [REDACTED] |
| YANKEE FIBER CONTROL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| UNITED PARCEL SERVICE | [REDACTED] | [REDACTED] | [REDACTED] |
| DANNER ASSOICATES LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| LYNCH & PINE ATTORNEYS AT LAW LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| LACHMAN CONSULTANT SERVICES | [REDACTED] | [REDACTED] | [REDACTED] |
| IPRINT4COLOR INC | [REDACTED] | [REDACTED] | [REDACTED] |
| UNITED STATES PLASTIC CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| One-Time Vendor | [REDACTED] | [REDACTED] | [REDACTED] |
| PJB PROCESS EQUIPMENT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| VAC-U-MAX | [REDACTED] | [REDACTED] | [REDACTED] |
| APPLIED INDUSTRIAL TECHNOLOGIES | [REDACTED] | [REDACTED] | [REDACTED] |
| QUALITY CHEMICAL LABORATORIES | [REDACTED] | [REDACTED] | [REDACTED] |
| SPHERA SOLUTIONS CANADA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| GT SAFETY PRODUCTS | [REDACTED] | [REDACTED] | [REDACTED] |
| MEISSNER FILTRATION PRODUCTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TRUEFLOW TESTING & BALANCING LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| COLE PARMER INSTRUMENT CO | [REDACTED] | [REDACTED] | [REDACTED] |
| MIDDLESEX GASES & TECH INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SAFETY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ICON SCIENTIFIC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SENTROL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ABF FREIGHT SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| GIBSON ENGINEERING CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| KCTG HOLDINGS LP | [REDACTED] | [REDACTED] | [REDACTED] |
| BLUE CROSS BLUE SHIELD | [REDACTED] | [REDACTED] | [REDACTED] |
| TRANE US INC | [REDACTED] | [REDACTED] | [REDACTED] |
| COLONIAL INSTRUMENTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MSC FILTRATION TECHNOLOGIES | [REDACTED] | [REDACTED] | [REDACTED] |
| SHRED IT | [REDACTED] | [REDACTED] | [REDACTED] |
| AIRGAS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MINE SAFETY APPLIANCES CO LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| CPI CONTROLS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SENSITECH INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PILGRIM INSTRUMENT & CONTROLS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MID CITY STEEL CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| CROWN EQUIPMENT CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| CORP BROTHERS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CAROLYN HUDSON | [REDACTED] | [REDACTED] | [REDACTED] |
| SEVILLE CONTAINER FREIGHT | [REDACTED] | [REDACTED] | [REDACTED] |
| MO INDUSTRIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| AUTOMATION DIRECT.COM | [REDACTED] | [REDACTED] | [REDACTED] |
| COVENTRY GLASS CO | [REDACTED] | [REDACTED] | [REDACTED] |
| SETON IDENTIFICATION PRODUCTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EMROSE DATA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| INDUSTRIAL BURNER SERVICE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PTC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MCMASTER CARR SUPPLY COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| SHRED IT US JV LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| ACE GLASS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| VAISALA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BEN & JERRYS CATERING | [REDACTED] | [REDACTED] | [REDACTED] |
| AIR SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SPOTBUY | [REDACTED] | [REDACTED] | [REDACTED] |
| TIGER VAC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DITTMAN & GREER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ADVANTEC MFS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| HAYES INSTRUMENT SERVICE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NEUTRONICS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TINTOMETER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FLEXICON CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| GL FILTRATION LIMITED | [REDACTED] | [REDACTED] | [REDACTED] |
| APACHE STAINLESS EQUIPMENT CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| DAISY DATA DISPLAY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BURT PROCESS EQUIPMENT | [REDACTED] | [REDACTED] | [REDACTED] |
| | [REDACTED] | [REDACTED] | [REDACTED] |
| NEW PIG CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |

| | | | |
|---|---|---|---|
| WHEELS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SHIPMANS FIRE EQUIPMENT CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| READY REFRESH BY NESTLE | [REDACTED] | [REDACTED] | [REDACTED] |
| SENTINEL PROCESS SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| OAKWOOD PRODUCTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MYBINDING LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| MAGNATEX PUMPS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| RHODE ISLAND DEPT OF LABOR & TRNG | [REDACTED] | [REDACTED] | [REDACTED] |
| CONTROL COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| WHR GROUP | [REDACTED] | [REDACTED] | [REDACTED] |
| RI PACKING & INSULATION LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| FILTER SPECIALISTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| METO LIFT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EMLAB P&K LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| DHL EXPRESS USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| AIRGAS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| WB MASON CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DELAWARE DEPT OF LABOR | [REDACTED] | [REDACTED] | [REDACTED] |
| PC CONNECTION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| LINCOLN FINE INGREDIENTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| JOHNSON CONTROLS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| KELE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| | [REDACTED] | [REDACTED] | [REDACTED] |
| HAUG PARTNERS LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| HTS ENGINEERING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FREWITT USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MICHAEL J COLLINS | [REDACTED] | [REDACTED] | [REDACTED] |
| TRICORBRAUN INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NANOSCALE COMBINATORIAL SYNTHESIS | [REDACTED] | [REDACTED] | [REDACTED] |
| LOUIS DEBONE | [REDACTED] | [REDACTED] | [REDACTED] |
| CHARLES SCHWAB 005188 | [REDACTED] | [REDACTED] | [REDACTED] |
| AIR QUALITY INNOVATIVE SOL LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| ANDRITZ SEPARATION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EDUNEERING HOLDINGS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| METTLER TOLEDO AUTOCHEM INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NADEAU CORPORATION DEVELOPMENT | [REDACTED] | [REDACTED] | [REDACTED] |
| DE DIETRICH PROCESS SYSTEMS | [REDACTED] | [REDACTED] | [REDACTED] |
| TA INSTRUMENTS-WATERS LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| DOUGLAS CONSTRUCTION & SUPPLY CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| AMERICAN PLANT MAINTENANCE LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| TOYENCO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MELTZER PURTILL & STELLE LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| OC TANNER RECOGNITION COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| HOLBROOK BUGBEE | [REDACTED] | [REDACTED] | [REDACTED] |
| B&M CLAMBAKE CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DELL USA LP | [REDACTED] | [REDACTED] | [REDACTED] |
| METROHM USA | [REDACTED] | [REDACTED] | [REDACTED] |
| CLANCY MOVING SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SOCIETY OF CHEMICAL MANUFACTURERS | [REDACTED] | [REDACTED] | [REDACTED] |
| NS FILTRATION APS | [REDACTED] | [REDACTED] | [REDACTED] |
| CURVATURE LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| PROSYS SAMPLING SYSTEMS LTD | [REDACTED] | [REDACTED] | [REDACTED] |
| HAZARD EVALUATION LABORATORIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EDWARD FRENCH & SON INC | [REDACTED] | [REDACTED] | [REDACTED] |
| THIELSCH ENGINEERING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PEPPERL & FUCHS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CARL N GRAF | [REDACTED] | [REDACTED] | [REDACTED] |
| POND TECHNICAL SALES | [REDACTED] | [REDACTED] | [REDACTED] |
| CBRE, INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TORRINGTON SUPPLY CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CASCADE TEK SOLUTIONS LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| VEKTOR PHARMA TF GMBH | [REDACTED] | [REDACTED] | [REDACTED] |
| COLUMBIA WEATHER SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| AIP-BI HOLDINGS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| THOMAS & BETTS SOLUTIONS LLC | [REDACTED] | [REDACTED] | [REDACTED] |

| | | | |
|---|---|---|---|
| OVERHEAD DOOR COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| AQUA SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| HINCKLEY ALLEN AND SNYDER LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| IDEX MPT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| APEX BARCODING SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EF&G CONSTRUCTION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DATAWORKS DEVELOPMENT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| AMAZON.COM LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| HONEYWELL SAFETY PRODUCTS USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SITECON CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| SOUTHERN MECHANICAL LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| PEERLESS MILL SUPPLY COMP INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TEK STAINLESS PIPING PRODUCTS | [REDACTED] | [REDACTED] | [REDACTED] |
| THOMPSON HINE LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| MAGNA SAFE INTERNATIONAL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BOSTON ANALYTICAL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EXTREME BOLT & FASTENER LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| PROTECTOSEAL COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| FILTER SALES & SERVICE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BECKMAN COULTER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NORTHEAST AIR SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MUNDIPHARMA LABORATORIES GMBH | [REDACTED] | [REDACTED] | [REDACTED] |
| STONHARD | [REDACTED] | [REDACTED] | [REDACTED] |
| MBZ INDUSTRIAL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| VEGA AMERICAS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| R STAHL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ENERGY COUNCIL OF RHODE ISLAND | [REDACTED] | [REDACTED] | [REDACTED] |
| THERMAL TECHNOLOGIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ARROW GLOBAL ASSET DISPOSTION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DETECTOR ELECTRONICS CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| D L THURROTT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ROSEMOUNT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FIVE STAR LIMOUSINE SERVICE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NEW ENGLAND SALES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CARRIER CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| MITCHELL SCIENTIFIC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ROSEDALE PRODUCTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| WF INDUSTRIAL | [REDACTED] | [REDACTED] | [REDACTED] |
| THE MARLIN COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| STERLING INFOSYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| J M CANTY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL INSTITUTE OF STANDARDS | [REDACTED] | [REDACTED] | [REDACTED] |
| BRINKS HOFER GILSON & LIONE | [REDACTED] | [REDACTED] | [REDACTED] |
| RED WING BRANDS OF AMERICA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| RHODE ISLAND RENTALS | [REDACTED] | [REDACTED] | [REDACTED] |
| WALGREENS PHARMACY | [REDACTED] | [REDACTED] | [REDACTED] |
| CERTIFIED RESCUE COURSES | [REDACTED] | [REDACTED] | [REDACTED] |
| SECURE ACCESS DIGITAL SYSTEMS | [REDACTED] | [REDACTED] | [REDACTED] |
| ALLOY PRODUCTS CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| MARTINIS OIL CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MECHANICAL SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SAFETY KLEEN SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EAGLE FAR EAST | [REDACTED] | [REDACTED] | [REDACTED] |
| CORPORATION SERVICE COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| INNOVATIVE VACUUM SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| METTLER TOLEDO PROCESS ANALYTICS | [REDACTED] | [REDACTED] | [REDACTED] |
| JULABO USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| WALCO ELECTRIC COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| CORIS TINE INC | [REDACTED] | [REDACTED] | [REDACTED] |
| INSTRUMENT & VALVE SERVICES CO | [REDACTED] | [REDACTED] | [REDACTED] |
| HIGGINS OFFICE PRODUCTS | [REDACTED] | [REDACTED] | [REDACTED] |
| BOOKFACTORY LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| TOOMEY WATER SERVICES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| COX BUSINESS | [REDACTED] | [REDACTED] | [REDACTED] |
| CDW DIRECT LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| ULINE | [REDACTED] | [REDACTED] | [REDACTED] |
| COVENTRY SURVEY CO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| STERIS CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |

| | | | |
|---|---|---|---|
| TRANSCAT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NEWARK CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| MICRO MATIC USA LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| GALAXY FASTENERS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| THE PROTECTOSEAL COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| R & L TRUCKLOAD SERVICES LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| HURLEY CONSTRUCTION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BLUE THUNDER TECHNOLOGIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| AMERICAN LABELMARK COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| LION TECHNOLOGY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| READY REFRESH BY NESTLE | [REDACTED] | [REDACTED] | [REDACTED] |
| CROSSPOINT ENGINEERING | [REDACTED] | [REDACTED] | [REDACTED] |
| STATE OF RHODE ISLAND | [REDACTED] | [REDACTED] | [REDACTED] |
| GFS CHEMICALS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FOOD AND DRUG ADMINISTRATION | [REDACTED] | [REDACTED] | [REDACTED] |
| US ALARM AND DETECTION SUPPLY LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| RESTEK CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| JS FLEMING ASSOCIATES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| VWR FUNDING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| 4IMPRINT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NATIONAL GRID | [REDACTED] | [REDACTED] | [REDACTED] |
| CLIANTHA RESEARCH LIMITED | [REDACTED] | [REDACTED] | [REDACTED] |
| PITNEY BOWES PURCHASE POWER | [REDACTED] | [REDACTED] | [REDACTED] |
| ADVANCED LASER ENGRAVING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TOTAL TEMPERATURE | [REDACTED] | [REDACTED] | [REDACTED] |
| STERNE KESSLER GOLDSTEIN & FOX PLLC | [REDACTED] | [REDACTED] | [REDACTED] |
| FLOW ELEMENTS | [REDACTED] | [REDACTED] | [REDACTED] |
| WALKER INDUSTRIAL PRODUCTS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| ARC DOCUMENT SOLUTIONS LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| TECHNICAL TRAFFIC CONSULTANTS | [REDACTED] | [REDACTED] | [REDACTED] |
| HR DIRECT | [REDACTED] | [REDACTED] | [REDACTED] |
| UPS FREIGHT | [REDACTED] | [REDACTED] | [REDACTED] |
| TTE LABORATORIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NORTHEAST ENGINEERING INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FRONTIER COMMUNICATIONS | [REDACTED] | [REDACTED] | [REDACTED] |
| LEWA NIKKISO AMERICA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| STATE OF CONNECTICUT | [REDACTED] | [REDACTED] | [REDACTED] |
| LORENZ INTERNATIONAL LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| ACFM CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| AMERICAN AIR & WATER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| APEX ENGINEERING PRODUCTS CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| AVANTOR FLUID HANDLING LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| AXINE WATER TECHNOLOGIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BAKER COMPANY | [REDACTED] | [REDACTED] | [REDACTED] |
| BALTIMORE AIRCOIL CO | [REDACTED] | [REDACTED] | [REDACTED] |
| BARRY WEHMILLER DESIGN GROUP INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BASF CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| BEACH TECHNOLOGY SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BI TORQ VALVE AUTOMATION INC | [REDACTED] | [REDACTED] | [REDACTED] |
| BUCHIGLAS USA CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| CARBON FILTRATION SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CAYMAN CHEMICAL COMPANY INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CERTCO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CHARLES SCHWAB 012395 | [REDACTED] | [REDACTED] | [REDACTED] |
| CHIRAL TECHNOLOGIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CONTROL POINT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| CORROSION PRODUCTS & EQUIPT INC | [REDACTED] | [REDACTED] | [REDACTED] |
| COX COMMUNICATIONS | [REDACTED] | [REDACTED] | [REDACTED] |
| CTL CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| DATAPIPE USA LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| DENIOS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| DORSEY & WHITNEY LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| DR F PETER BOER | [REDACTED] | [REDACTED] | [REDACTED] |
| DRAIN NET TECHNOLOGIES | [REDACTED] | [REDACTED] | [REDACTED] |
| EDLON INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EDWARD MAHONY | [REDACTED] | [REDACTED] | [REDACTED] |
| EKATO CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |

| | | | |
|---|---|---|---|
| ENDICOTT COLLEGE | [REDACTED] | [REDACTED] | [REDACTED] |
| ENGRAVING MACHINES PLUSE CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| ESCO TECHNOLOGIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| EUROFINS PENLABS DISCOVERY SERVICES | [REDACTED] | [REDACTED] | [REDACTED] |
| FAUSKE AND ASSOCIATES LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| FINEMECH INC | [REDACTED] | [REDACTED] | [REDACTED] |
| FISHER SCIENTIFIC COMPANY LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| FLOW SCIENCES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| GE INSPECTION TECHNOLOGIES LP | [REDACTED] | [REDACTED] | [REDACTED] |
| HARRINGTON PURE | [REDACTED] | [REDACTED] | [REDACTED] |
| HEWLETT PACKARD FINANCIAL SERVICES | [REDACTED] | [REDACTED] | [REDACTED] |
| HIGHMARK & ANALYTICS | [REDACTED] | [REDACTED] | [REDACTED] |
| HOSOKAWA MICRON INTL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| IMS AG | [REDACTED] | [REDACTED] | [REDACTED] |
| INTELLIGEN INC | [REDACTED] | [REDACTED] | [REDACTED] |
| INTERNATIONAL SOC OF PHARMACEUTICAL | [REDACTED] | [REDACTED] | [REDACTED] |
| IQVIA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| JACKSON LEWIS PC | [REDACTED] | [REDACTED] | [REDACTED] |
| JOHNSON & WALES UNIVERSITY | [REDACTED] | [REDACTED] | [REDACTED] |
| JUCHHEIM LABORGERATE GMBH | [REDACTED] | [REDACTED] | [REDACTED] |
| LENOVO US INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MASY SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| MAYNARD COOPER & GALE | [REDACTED] | [REDACTED] | [REDACTED] |
| MESTRELAB RESEARCH S.L. | [REDACTED] | [REDACTED] | [REDACTED] |
| MINAKEM ASAS | [REDACTED] | [REDACTED] | [REDACTED] |
| MITSUBISHI ELECTRIC POWER | [REDACTED] | [REDACTED] | [REDACTED] |
| MOLECULAR APPLICATION TECH INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NERAC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NORTHEAST REPAIR CENTER INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NORTHERN ENERGY SERVICES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| NORTON ROSE FULBRIGHT US LLP | [REDACTED] | [REDACTED] | [REDACTED] |
| ODEH ENGINEERS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| PARKER HANNIFIN CORPORATION | [REDACTED] | [REDACTED] | [REDACTED] |
| PEMCO | [REDACTED] | [REDACTED] | [REDACTED] |
| PHILADELPHIA MIXING SOLUTIONS LTD | [REDACTED] | [REDACTED] | [REDACTED] |
| PIPING  SPECIALITIES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| POWER SOLUTIONS LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| PROVIDENCE CITY COLLECTOR | [REDACTED] | [REDACTED] | [REDACTED] |
| QACV CONSULTING LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| RAECO LIC LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| RAPIDTECH LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| READYREFRESH BY NESTLE | [REDACTED] | [REDACTED] | [REDACTED] |
| SCHNEIDER ELECTRIC IT USA INC | [REDACTED] | [REDACTED] | [REDACTED] |
| SPIRAX SARCO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| STAFFORD TECH INC | [REDACTED] | [REDACTED] | [REDACTED] |
| STATE OF RHODE ISLAND | [REDACTED] | [REDACTED] | [REDACTED] |
| STREM CHEMICALS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TBJ INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TCI AMERICA | [REDACTED] | [REDACTED] | [REDACTED] |
| TESTO INC | [REDACTED] | [REDACTED] | [REDACTED] |
| THERMON HEATING SYSTEMS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TOPSAFE SERVICES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| TSI INCORPORATED | [REDACTED] | [REDACTED] | [REDACTED] |
| UNIQUE METAL WORKS LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| UNITED STATES TREASURY | [REDACTED] | [REDACTED] | [REDACTED] |
| UPS SUPPLY CHAIN SOLUTIONS INC | [REDACTED] | [REDACTED] | [REDACTED] |
| US ELECTRICAL SERVICES INC | [REDACTED] | [REDACTED] | [REDACTED] |
| US ENVIRONMENTAL RENTAL CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| VANDEMARK CHEMICAL INC | [REDACTED] | [REDACTED] | [REDACTED] |
| VERDER SCIENTIFIC INC | [REDACTED] | [REDACTED] | [REDACTED] |
| XPRESSMYSELF.COM LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| YALE UNIVERSITY | [REDACTED] | [REDACTED] | [REDACTED] |
| CONSUMERS INTERSTATE CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| PACKINGS & INSULATIONS CORP | [REDACTED] | [REDACTED] | [REDACTED] |
| NEPTUNE BENSON LLC | [REDACTED] | [REDACTED] | [REDACTED] |
| EXSTAR INC | [REDACTED] | [REDACTED] | [REDACTED] |
| KENT COUNTY WATER AUTHORITY | [REDACTED] | [REDACTED] | [REDACTED] |
| KENT COUNTY WATER AUTHORITY | [REDACTED] | [REDACTED] | [REDACTED] |

| DANNER ASSOICATES LLC | [REDACTED] | [REDACTED] | [REDACTED] |

## Exhibit B

**Material Supply Contracts**

[See attached]

[REDACTED]

## **Exhibit C**

**Insurance Policies and Bonds**

[See attached]

Exhibit C - Insurance Policies
and Bonds

| Schedule of Commercial Insurance Policies | | | | |
|---|---|---|---|---|
| **Policy Type** | **Insurer** | **Period** | **Cash Collateralized LOC Provided** | **Limits** |
| General Liability  (Prem-Ops) | Old Republic | 10/1/19-10/1/20 | Primary General Liability: [REDACTED] LOC | [REDACTED]- Occurrence [REDACTED] SIR Excludes Products Liability |
| General Liability (Products) | Old Republic | 10/1/18-10/1/20 | Products collateral with Old Republic: [REDACTED] LOC [REDACTED]Trust | [REDACTED] - Occurrence |
| Workers Comp | Liberty | 10/1/19-10/1/20 | Casualty collateral with Liberty Mutual for the Auto policy and Workers Comp policy: [REDACTED] LOC | [REDACTED] Employers Liability Insurance Statutory Workers Compensation |
| Auto Liability | Liberty | 10/1/19-10/1/20 | Casualty collateral with Liberty Mutual for the Auto policy and Workers Comp policy: [REDACTED] LOC | [REDACTED] |
| Umbrella | Lloyd's of London (Apollo/Aegis) | 10/1/19-10/1/20 | | [REDACTED] xs [REDACTED] SIR each and every occurrence |
| Property US | Factory Mutual Insurance Company | 10/29/19-10/29/20 | | [REDACTED] |
| Marine Cargo | FM Global Transit | 10/29/19-10/29/20 | | [REDACTED] |
| Special Risk Corporate Protection Insurance - K&R | Great American Insurance Company (VOSCO) | 11/15/19-11/15/22 | | Limit of Liability : [REDACTED] |
| Cyber Liability Security and Privacy Protection | Steadfast Insurance Company - Zurich | 11/03/19-11/03/20 | | [REDACTED] Security & Privacy Liability |
| Crime | Axis Insurance Company | 12/12/19 - 12/12/20 | | A. Employee Theft [REDACTED] B. Client's Property [REDACTED] C.  Forgery of Alteration 1.  Checks Forgery [REDACTED] 2.  Credit, Debit or Charge Card Forgery [REDACTED] D.  On Premises [REDACTED] E.  In Transit [REDACTED] F.  Computer Fraud [REDACTED] G.  Funds Transfer Fraud [REDACTED] H.  Money Orders and Counterfeit Money [REDACTED] I. Electronic Data or Computer Programs Restoration Cost [REDACTED] J.  Investigative Expenses [REDACTED] K. Social Engineering Fraud [REDACTED] |
| Excess Crime | U.S. Specialty Insurance Company - HCC | 12/12/19- 12/12/20 | | Single Loss Limit of Liability: [REDACTED] excess of [REDACTED] underlying limits |

| Schedule of Captive Insurance | | | | |
|---|---|---|---|---|
| **Policy Type** | **Name** | **Cash Funding Amount** | **Policy Limits** | **Effective Dates** |
| **Employment Practices Liability  and Fiduciary Liability Insurance** | Wyndam Insurance Company | [REDACTED] | [REDACTED] | 2/11/2020 - 02/11/21<br><br>Continuity Date: 07/01/1997 |
| **General Liability (excluding Products Liability) [REDACTED] Products Completed Operations [REDACTED]** | Isosceles Insurance Ltd. | [REDACTED] | [REDACTED] Aggregate General Liability excluding products [REDACTED] Bodily injury and property damage liability  each occurrence | 10/1/19-10/1/20 Retro date October 1, 2019 general liability Retro date October 1, 2018 products liability |
| **Directors and Officers** | Isosceles Insurance Ltd. | [REDACTED] | [REDACTED] Aggregate Limit of Liability | 2/11/19-2/11/2022 Continuity Date: January 11, 2018 |

**<u>Exhibit D</u>**

**Expiring Contracts**

[See attached]

**Exhibit D - Expiring Contracts**

| Supplier | ContractName | ContractTypeName | Expiration Date |
|---|---|---|---|
| Agilent Technologies Inc. | Agilent Technologies_RT MSA 12-11-2020 (calibration, testing, repair, PM and other related services) | Master Service/Supply Agreements | 12/11/2020 |
| Alltech Associates Inc., A Wholly Owned Subsidiary of W.R. Grace & Co. - CONN | Alltech Associates Inc., A Wholly Owned Subsidiary of W.R. Grace & Co. - CONN MSA | Master Service/Supply Agreements | 2/14/2021 |
| AMD Lawn Care LLC | AMD Lawn Care LLC MSA | Master Service/Supply Agreements | 12/23/2020 |
| American Plant Maintenance, LLC (APM) | American Plant Maintenance, LLC (APM) MSA | Master Service/Supply Agreements | 11/30/2020 |
| AMRI SSCI, LLC (fka Aptuit) | AMRI SSCI, LLC (fka Aptuit) MSA | Master Service/Supply Agreements | 3/1/2021 |
| Aptuit, Inc. | Aptuit, Inc. MSA | Master Service/Supply Agreements | 8/31/2015 |
| Beamex Inc | Beamex Inc MSA | Master Service/Supply Agreements | 3/1/2021 |
| Bonn'sIndustrial Valve - see Frederick's Industrial Valve | Bonn'sIndustrial Valve - see Frederick's Industrial Valve MSA | Master Service/Supply Agreements | 3/1/2021 |
| Brinkmann Instruments dba Metrohm USA, Inc. | Brinkmann Instruments dba Metrohm USA, Inc. MSA | Master Service/Supply Agreements | 11/30/2020 |
| Bristow ElectricCo., Inc. | Bristow ElectricCo., Inc. MSA | Master Service/Supply Agreements | 3/10/2021 |
| Circuit Breaker Sales (fka ExStar) | ExStar MSA 9-20-20 | Master Service/Supply Agreements | 9/21/2020 |
| Dycem Limited | Dycem Limited MSA | Master Service/Supply Agreements | 3/31/2021 |
| Eagle Fence & Guardrail d/b/a EF&G Construction, Inc. | Eagle Fence & Guardrail d/b/a EF&G Construction, Inc. MSA | Master Service/Supply Agreements | 10/31/2020 |
| ExStar Inc. | ExStar Inc. MSA | Master Service/Supply Agreements | 9/30/2020 |
| Extrel CMS, LLC | Extrel CMS, LLC MSA | Master Service/Supply Agreements | 3/31/2021 |
| Glowaky, Raymond Ph.D. | Glowaky, Raymond_RT MSA 12-31-2020 (consulting on process chemistry and other related services) | Master Service/Supply Agreements | 12/31/2020 |
| Group Technology of Trumbull, Inc | Group Technology of Trumbull, Inc MSA | Master Service/Supply Agreements | 2/12/2021 |
| H. J. Astle Company | H. J. Astle Company MSA | Master Service/Supply Agreements | 3/31/2021 |
| Hach Company | Hach Company MSA | Master Service/Supply Agreements | 12/11/2020 |
| Heinkel Filtering Systems, Inc. USA | Heinkel Filtering Systems, Inc. USA MSA | Master Service/Supply Agreements | 1/31/2021 |
| I-Design Group | I-Design Group MSA | Master Service/Supply Agreements | 9/15/2020 |
| Leavitt's Tree Service, Inc. | Leavitt's Tree Service, Inc. MSA | Master Service/Supply Agreements | 12/31/2020 |
| Life Support Systems | Life Support Systems MSA | Master Service/Supply Agreements | 11/30/2020 |
| Little Rhody Machine Repair, Inc. | Little Rhody Machine Repair, Inc. MSA | Master Service/Supply Agreements | 3/31/2021 |
| Loewenstein, Robert | Loewenstein, Robert_RT MSA 12-31-2020 (consulting services for regulatory affairs) | Master Service/Supply Agreements | 12/31/2020 |
| Merrill Brink International Corporation | Merrill Brink International Corporation MSA | Master Service/Supply Agreements | 3/14/2021 |
| Mettler Toledo, Inc. | Mettler Toledo, Inc. MSA (exp 12-04-2020) | Master Service/Supply Agreements | 12/4/2020 |
| Mettler-Toledo Autochem Inc | Mettler-Toledo Autochem Inc MSA | Master Service/Supply Agreements | 9/30/2020 |
| Mystic Air Quality Consultants, Inc. | Mystic Air Quality Consultants, Inc. MSA | Master Service/Supply Agreements | 12/22/2020 |
| Novasep Incorporated | Novasep Incorporated MSA | Master Service/Supply Agreements | 11/30/2020 |
| NSF Health Sciences, LLC | NSF Health Sciences, LLC MSA | Master Service/Supply Agreements | 11/6/2020 |
| Organix, Inc. | Organix, Inc. MSA | Master Service/Supply Agreements | 3/7/2021 |
| PerkinElmer Health Sciences, Inc. | PerkinElmer Health Sciences, Inc. MSA | Master Service/Supply Agreements | 3/30/2021 |
| Polaris MEP | Polaris MEP MSA | Master Service/Supply Agreements | 3/1/2021 |
| RPKK, Inc. | RPKK, Inc. MSA | Master Service/Supply Agreements | 3/31/2021 |
| Safety-Kleen Systems, Inc. | Safety-Kleen Systems, Inc. MSA | Master Service/Supply Agreements | 2/26/2022 |
| Sage Environmental | Sage Environmental MSA | Master Service/Supply Agreements | 3/30/2021 |
| The Lock Shop, Inc. | The Lock Shop, Inc. MSA | Master Service/Supply Agreements | 1/31/2021 |
| Toomey Water Services, Inc. | Toomey Water Services, Inc. MSA | Master Service/Supply Agreements | 1/6/2021 |
| UL Kaplan EduNeering | UL Kaplan EduNeering MSA | Master Service/Supply Agreements | 9/30/2020 |

| Supplier | ContractName | Expiration Date |
|---|---|---|
| Agilent Technologies Inc | Agilent_RT SOW 12122019-1 12-31-2020 (2019-2020 QC instruments service plan) | 12/31/2020 |
| Agilent Technologies Inc | Agilent_RT SOW 12122019-1 12-31-2020 (Annual service plan for R&D instruments) | 12/31/2020 |
| Alert Scientific | Alert Scientific_RT SOW 01212010-20 11-30-2020 (Cascade Tek Vacuum Oven -PM) | 11/30/2020 |
| AZ Corporation | AZ Corp_RT Amt 52, Exhibit A-38 01-27-2021.pdf | 1/27/2021 |
| Beamex Inc | Beamex Inc SOW 02182010-7 | 2/16/2021 |
| Brodie Inc | Brodie_RT SOW 06172010-6 12-31-2020.pdf | 12/31/2020 |
| Burgess USA Training LLC | Burgess USA Training LLC SOW 07122013- 7 (2019 industrial and muni. emerg. response, OSHA training) 12-31-2020 | 12/31/2020 |
| Colden Corporation | Colden Corp_RT SOW 10022019-1 (as needed industrial hygiene/health and safety support) 12-31-2020 | 12/31/2020 |
| CrossPoint  Engineering | CrossPoint  Engineering SOW 02032010-8 | 12/31/2020 |
| EMD Millipore | Millipore (EMD)_RT SOW 03122008-17 | 12/30/2020 |
| EMD Millipore Corporation | Millipore Corporation_RT 06072019-2 01-01-2021 (Water Equipment (Milli-Q Integral 10 and RiOs Essential 5 Systems) Certification and PM | 1/1/2021 |
| Energy Machinery | Energy Machinery_RT SOW 10262014-3 12-31-2020 (2019-2020 compressor PM) | 12/31/2020 |
| Energy Machinery Inc | Energy Machinery_RT SOW 10262014-4 12-31-2020 (Turn around maintenance inspection) | 12/31/2020 |
| Eurofins Lancaster Laboratories Inc. | | 12/31/2020 |
| Evoqua  Water Technologies | Evoqua_RT MSA SOW 09012014-8 12-31-2020.pdf | 12/31/2020 |
| Group Technology of Trumbull, Inc | Group Technology of Trumbull, Inc SOW 02122014-7 12-31-2020 (IT Specialist) | 12/31/2020 |
| Hach Company | Hach Company_RT SOW 12112014-8 12-15-2020 (HACH Astro UV, CRS 5000 mg/l 2UV TOC analyzer) | 12/15/2020 |
| Hart Engineering Corporation | Hart Engineering_RT SOW Amendment 21, Ex A-16 12-31-2020 (Chiller CH7002 replacement) | 12/31/2020 |
| IQVIA Ltd. (IMS Health) | IQVIA Ltd_RT Services Agreement 12-31-2020 (four user subscriptions) | 12/31/2020 |
| Mar Cor Purification Inc | Mar Cor (Certco)_RT SOW 06122009-7 12-31-2020 (lab hood testing and evaluation - annual assessment and air flow testing) | 12/31/2020 |
| Mass Crane Hoist Services Inc. | Mass Crane_RT SOW 01012017-2  12-31-2021.pdf | 12/31/2020 |
| Mettler Toledo Autochem, Inc. | Mettler Toledo Autochem_RT SOW 10012010-15 (2 year iCare subscription) | 12/31/2020 |
| Mettler Toledo, Inc. | Mettler Toledo, Inc_RT SOW 12042012-33 (12-31-2020) (Burette and titrator - PM and calibration) | 12/31/2020 |
| Mettler Toledo, Inc. | Mettler Toledo, Inc. SOW 12042012-27 | 1/31/2021 |
| Mettler Toledo, Inc. | MT_RT SOW 12042012-37 02-27-2021.pdf | 2/27/2021 |
| Mettler-Toledo Autochem Inc | Mettler-Toledo Autochem Inc SOW 10012010-14 | 11/9/2020 |
| Mettler-Toledo Autochem Inc | Mettler-Toledo Autochem_RT 10012010-16 12-31-2020.pdf | 12/31/2020 |
| Miele Inc. | Miele Inc._RT SOW 07122010-28 09-26-2020 (PG8583CD glassware dishwasher PM) | 9/26/2020 |
| Miele Inc. | Miele_RT MSA SOW 07122010-29 09-26-2020 (Glassware Dishwasher PM) | 9/26/2020 |
| New England Controls | NEC_RT MSA SOW 10282013-6 12-31-2020 (DeltaV/AMS Major Software Upgrade) | 12/31/2020 |
| New England Controls | NEC_RT MSA SOW 10282013-9 (12-31-2020) (DeltaV and AMS major version software upgrade) | 12/31/2020 |
| New England Controls | NECI Inc_RT SOW 10282013-10  12-31-2020.pdf | 12/31/2020 |
| New England Controls, Inc. | New England Controls, Inc. SOW 10282013-6 | 12/31/2020 |
| New England Pest Control | New England Pest Control SOW 07022014-1 | 12/31/2020 |
| Occuhealth Inc. | Occuhealth Inc_RT SOW 01012012-9 (exp 12-31-2020) (2020 programs and training support) | 12/31/2020 |
| Power Products Systems LLC | Power Products Systems LLC SOW 08102014-2 | 12/31/2020 |
| S.D. Myers | S.D. Myers SOW 01212010-2 | 10/31/2020 |
| Security Services of CT, Inc. dba SSC, Inc. | SSCI_RT SOW 01012017 01-01-2021 (2020 security services) | 1/1/2021 |
| SimplexGrinnell LP | SimplexGrinnell LP SOW 07012014-2, A-1 | 10/31/2020 |
| Sullivan & McLaughlin | Sullivan & McLaughlin SOW 03012010-44 (12-31-2020) (2019 Fire Alarm Testing) | 12/31/2020 |
| Sullivan & McLaughlin | Sullivan & McLaughlin SOW 03012010-45 (12-31-2020) (fire pump testing and fire pump battery testing and inspection) | 12/31/2020 |
| Sullivan & McLaughlin | Sully Mac_RT SOW 03012010-48 02-14-2021.pdf | 2/14/2021 |
| Sullivan & McLaughlin | Sully Mac_RT SOW 03012010-49 02-14-2021.pdf | 2/14/2021 |
| Sully Mac | Sully Mac_RT SOW 03012010-46 12-31-2020 | 12/31/2020 |
| SVC - PII | SVC - PII SOW | 12/31/2020 |
| TA Instruments-Waters LLC | TA Instruments_RT SOW 07152011-10 exp 11-13-2020 (Advantage Support Contract) | 11/13/2020 |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-8 | 11/9/2020 |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-8 (A2) | 11/9/2020 |
| Thermal Technologies, Inc. | Thermal Technologie_RT SOW 08252014-3 09-19-2020.pdf | 9/19/2020 |
| Thermo Electron NA | Thermo Electron_RT MSA SOW 12172009-33 09-17-2020 (Thermo Nicolet iS10-FT-IR Spectrometer- Unity Essential Plan - 1 VALPRO Annual Cert.) | 9/17/2020 |
| TXP Services, Inc. | TXP Services_Coventry Technologies (12-31-2020) (DCG & T&E, Finance & Accounting Services, Payroll, Taxation, etc.) | 12/31/2020 |
| Veolia Environmental Services, LLC | Veolia Environmental Services_RT SOW 07262019-2 12-31-2020 (2020 On Site Services) | 12/31/2020 |
| Veolia Environmental Services, LLC | Veolia_RT SOW 07262019-3 01-01-2021.pdf | 1/1/2021 |
| Waters Corporation | Waters_RT SOW 01012008-36 10-29-2020 (19-20 NuGenesis Maintenance Renewal) | 10/29/2020 |
| Waters Technologies | Waters_RT SOW 01012008-38 12-31-2020.pdf | 12/31/2020 |
| Waters Technologies Corporation | Waters_RT SOW 01012008-39 12-31-2020 (2020 Empower Software Maintenance Power) | 12/31/2020 |
| Waters Technologies Corporation (no longer a d/b/a) | Waters Technologies Corp_RT SOW 01012008-38 12-31-2020 (2020 service plan for R&D & QC instruments) | 12/31/2020 |

| Supplier | ContractName |
|---|---|
| ABF FREIGHT SYSTEMS INC | Purchase Order |
| AGILENT TECHNOLOGIES INC | Purchase Order |
| AIRGAS EAST | Purchase Order |
| ALLSTATE SEALCOATING INC | Purchase Order |
| AMD LAWN CARE LLC | Purchase Order |
| ANCHOR INSULATION CO INC | Purchase Order |
| ATLANTIC PAPER & TWINE CO INC | Purchase Order |
| ATLANTIC SCALE COMPANY INC | Purchase Order |
| BECKMAN COULTER INC | Purchase Order |
| [REDACTED] | Purchase Order |
| [REDACTED] | Purchase Order |
| [REDACTED] | Purchase Order |
| BRIGGS R BRUCE | Purchase Order |
| BRISTOL FIRE PROTECTION INC | Purchase Order |
| BRODIE INC | Purchase Order |
| BRODIE INC | Purchase Order |
| BRODIE INC | Purchase Order |
| BURGESS USA TRAINING LLC | Purchase Order |
| CINTAS CORPORATION | Purchase Order |
| CIRCUIT BREAKER SALES NE INC | Purchase Order |
| CLEAN HARBORS INC | Purchase Order |
| CLEAN HARBORS INC | Purchase Order |
| CROSSPOINT ENGINEERING | Purchase Order |
| CROWN EQUIPMENT CORP | Purchase Order |
| DANA TRANSPORTATION | Purchase Order |
| DANOX ENVIRONMENTAL SERVICES INC | Purchase Order |
| DANOX ENVIRONMENTAL SERVICES INC | Purchase Order |
| DANOX ENVIRONMENTAL SERVICES INC | Purchase Order |
| DANOX ENVIRONMENTAL SERVICES INC | Purchase Order |
| DANOX ENVIRONMENTAL SERVICES INC | Purchase Order |
| DANOX ENVIRONMENTAL SERVICES INC | Purchase Order |
| DATAWORKS DEVELOPMENT INC | Purchase Order |
| DOW CHEMICAL COMPANY | Purchase Order |
| EMSL ANALYTICAL INC | Purchase Order |
| ENERGY MACHINERY INC | Purchase Order |
| ENERGY MACHINERY INC | Purchase Order |
| ERLAB INC | Purchase Order |
| EVOQUA WATER TECHNOLOGIES LLC | Purchase Order |
| EVOQUA WATER TECHNOLOGIES LLC | Purchase Order |
| FEDERAL EXPRESS CORP | Purchase Order |
| GEFCO FORWARDING USA INC | Purchase Order |
| GEODIS USA INC | Purchase Order |
| GEODIS USA INC | Purchase Order |
| GFS CHEMICALS INC | Purchase Order |
| HERITAGE ENVIRONMENTAL SERVICES | Purchase Order |
| HERITAGE ENVIRONMENTAL SERVICES | Purchase Order |

| | |
|---|---|
| HERITAGE ENVIRONMENTAL SERVICES | Purchase Order |
| HERITAGE ENVIRONMENTAL SERVICES | Purchase Order |
| HERITAGE ENVIRONMENTAL SERVICES | Purchase Order |
| HERITAGE ENVIRONMENTAL SERVICES | Purchase Order |
| INTERTEK USA INC | Purchase Order |
| IRON MOUNTAIN | Purchase Order |
| JOHNSON CONTROLS FIRE PROTECTION | Purchase Order |
| JOHNSON CONTROLS FIRE PROTECTION LP | Purchase Order |
| JOHNSON CONTROLS FIRE PROTECTION LP | Purchase Order |
| KENT COUNTY WATER AUTHORITY | Purchase Order |
| KENT COUNTY WATER AUTHORITY | Purchase Order |
| LAVOIE & SON INDUSTRIAL | Purchase Order |
| LOCK SHOP INC | Purchase Order |
| MAR COR PURIFICATION INC | Purchase Order |
| MATHESON TRI GAS INC | Purchase Order |
| MATHESON TRI GAS INC | Purchase Order |
| METTLER TOLEDO INC | Purchase Order |
| METTLER TOLEDO INC | Purchase Order |
| METTLER TOLEDO INC | Purchase Order |
| MICROCAD TRAINING & CONSULTING INC | Purchase Order |
| NALAS ENGINEERING SERVICES INC | Purchase Order |
| OCCUHEALTH INC | Purchase Order |
| OVERHEAD DOOR COMPANY | Purchase Order |
| OVERHEAD DOOR COMPANY | Purchase Order |
| POWER PRODUCTS SYSTEMS LLC | Purchase Order |
| R & L CARRIERS INC | Purchase Order |
| READYREFRESH BY NESTLE | Purchase Order |
| RI ANALYTICAL LABORATORIES INC | Purchase Order |
| RI ANALYTICAL LABORATORIES INC | Purchase Order |
| RICE LAKE WEIGHING SYSTEMS INC | Purchase Order |
| ROBERT E LOEWENSTEIN | Purchase Order |
| RPE SEPTIC SERVICES | Purchase Order |
| SAGE ENVIRONMENTAL INC | Purchase Order |
| SAGE ENVIRONMENTAL INC | Purchase Order |
| SCHNEIDER NATIONAL BULK CARRIERS IN | Purchase Order |
| SECURITY SERVICES OF CONNECTICUT | Purchase Order |
| SEVILLE CONTAINER FREIGHT | Purchase Order |
| SHRED IT US JV LLC | Purchase Order |
| SIEMENS INDUSTRY INC | Purchase Order |
| SIEMENS INDUSTRY INC | Purchase Order |
| SIEMENS INDUSTRY INC | Purchase Order |
| SIEMENS INDUSTRY INC | Purchase Order |
| SKURKA CONSTRUCTION INC | Purchase Order |
| SOCIETY OF CHEMICAL MANUFACTURERS | Purchase Order |
| SPECTRA AUTOMATION LTD | Purchase Order |
| STERLING INFOSYSTEMS INC | Purchase Order |
| SULLIVAN & MCLAUGHLIN COMPANIES INC | Purchase Order |

| | |
|---|---|
| SULLIVAN & MCLAUGHLIN COMPANIES INC | Purchase Order |
| TECH PAINTING CO INC AND | Purchase Order |
| TECH PAINTING CO INC AND | Purchase Order |
| UNITED PARCEL SERVICE | Purchase Order |
| UTILITY COMMUNICATIONS INC | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| VEOLIA ES TECHNICAL SOLUTIONS | Purchase Order |
| WATERS CORPORATION | Purchase Order |
| WATERS CORPORATION | Purchase Order |
| WATERS CORPORATION | Purchase Order |
| WOODARD & CURRAN INC | Purchase Order |

**Disclosure Schedules**

**Schedule 1.01**

**Active Pharmaceutical Ingredients**

<u>Under U.S. Food & Drug Administration (FDA) Approval</u>

1. Oxycodone HCI.
2. Oxycodone HCI Process II.
3. Dronabinol, 10% in Sesame Oil.
4. Hydrocodone Bitartrate, USP.
5. Methylphenidate HCI, USP.
6. Naloxone HCI dihydrate, USP.
7. Buprenorphine HCI, USP.
8. Buprenorphine.
9. Morphine Sulfate, USP.
10. Hydromorphone HCI, USP.
11. Hydromorphone HCI, USP (Rhodes).

<u>Under European Directorate for the Quality of Medicines (EDQM) Approval</u>

1. Oxycodone HCI, Ph.Eur.
2. Oxycodone HCI, Ph.Eur. (Process II).
3. Naloxone HCI dihydrate, Ph.Eur.
4. Buprenorphine, Ph.Eur.

<u>Under Health Canada Approval</u>
1. Oxycodone HCI.
2. Hydrocodone Bitartrate.
3. Methylphenidate HCI.
4. Naloxone HCI.

<u>Products in Development</u>
1. [REDACTED].
2. [REDACTED].
3. [REDACTED].

## Schedule I

### Relevant Subsidiaries' Assets

1. Button Land L.P. owns the following assets, which is subject to finalization based on receipt and review by Purchaser of the Survey for the Real Property:

That certain tract or parcel of land with all the buildings and improvements thereon, situated on the southerly side of South Street in the Town of Coventry, County of Kent and State of Rhode Island being more particularly bounded and described as follows:

Beginning at a point on the southerly sideline of South Street, said point being the northwesterly corner of land now or formerly of Clariant AG, said point also being the northeasterly corner of herein described parcel;

Thence S 00"-32'-28" W for a distance of one hundred and 00/100 (100.00) feet to a point, said last course bounded easterly by land now or formerly of Clariant AG;

Thence S 89"-41'-16" W for a distance of eighty-seven and 00/100 (87.00) feet to a point, said last course bounded southerly by land now or formerly of Bernadette DiCarlo and land now or formerly of Clariant AG;

Thence N 00"-32'-28" E for a distance of one hundred and 00/100 (100.00) feet to a point on the southerly sideline of South Street, said last course is bounded westerly by land now or formerly of Clariant AG;

Thence N 89"-41'-16" E along the southerly sideline of said South Street for a distance of eighty-seven and 00/100 (87.00) feet to a point and place of beginning.

The above described parcel contains an area of 8,699 square feet of land more or less (0.20 +/- acres) and is shown on a plan entitled, "Boundary/Exisiting Conditions Survey Plat Map 56 Lots 106.1 & 106.2 #23 South Street, Coventry, Rhode Island, Dated October 10, 2008, Scale 1"=30' By: Crossman Engineering, Inc."

Said parcel is also described as follows:

That certain lot or parcel of land with all the bui8ldings and improvements thereon situated at the southerly side of Davis Street in the Village of Quidnick, in the Town of Coventry, County of Kent and State of Rhode Island and is laid out and designated as Lot No. 49 (forty-nine) on that plat entitled "Quidnick Mill Village, Coventry, R.I., Sept. 1927 by Albert Johnson" which said plat is on record in the Office of the Town Clerk of said Town of Coventry in Book No. 3 at Page 31.

Property Address:  23 South Street, Coventry, RI 02816
                   Plat: 56  Lot(s): 106.001

2.  Quidnick Land L.P. owns the following assets, which is subject to finalization based on receipt and review by Purchaser of the Survey for the Real Property:

That certain tract or parcel of land with all the buildings and improvements thereon situated southerly of South Street in the Town of Coventry, County of Kent and State of Rhode Island, being more particularly described as follows:

Beginning at the northeast corner of the herein described parcel, said point being marked by an iron pin, said point also being near the southerly end of South Street;

Thence S 00°-55'-01" W along a stone wall for a distance of two hundred ninety-one and 55/100 (291.55) feet to a point marked by a drill hole, said last course bounded easterly by land now or formerly of Muszynski, Henry M. & Stefanie Estate of;

Thence N 75°-15'-26" W partially along a stone wall for a distance of three hundred seventy-nine and 06/100 (379.06) feet to a point;

Thence N 00°-25'-54" W for a distance of one hundred ninety-three and 03/100 (193.03) feet to a point marked by an iron pipe, said last two courses bounded westerly and southerly by land now or formerly of Clariant AG;

Thence N 89°-41'-16" E for a distance of three hundred seventy-two and 71/100 (372.71) feet to the point and place of beginning, said last course bounded northerly by land now or formerly of Antonetta DiCarlo, land now or formerly of Clariant AG and South Street.

The above described parcel contains an area of 89,628 square feet of land more or less (2.06 +/- acres) and is shown on a plan entitled, "Boundary/Existing Conditions Survey Plat Map 56 Lots 106.1 & 106.2 #23 South Street, Coventry, Rhode Island, Dated October 10, 2008, Scale 1"=30' by Crossman Engineering, Inc."

Said parcel is also described as follows:

That certain lot or parcel of land with all the buildings and improvements thereon, situated at the southerly end of Davis Street in the Villa of Quidnick, in the Town of Coventry, County of Kent and State of Rhode Island and laid out and designated as Lot No. 63 (sixty-three) on that plat entitled, "Quidnick Mill Village, Coventry, R.I., September 1927 by Albert Johnson" which plat is recorded in the Office of the Town Clerk of said Town of Coventry in Book No. 3 at Page 31.

Property Address:  0 South Street, Coventry, RI 02816
                   Plat: 56  Lot(s): 106.002

3

**Schedule 1.1(e)**

**Assigned Contracts**

1.  See <u>Exhibit A</u> attached hereto.

## Schedule 1.1(f)

## Post-Petition Contracts

Post-Petition Contracts made available to the Purchaser prior to the date of the Purchase Agreement:

| Counterparty | Type | Effective Date | Termination Date |
|---|---|---|---|
| Adamis Pharmaceuticals Corporation | MSA (supply) | 11/1/2019 | 11/1/2022 |
| Agilent Technologies | MSA | 12/12/2019 | 12/11/2020 |
| Agilent Technologies | SOW | 12/16/2019 | 12/31/2020 |
| Agilent Technologies | SOW | 12/16/2019 | 12/31/2020 |
| Air Products and Chemicals | Product Supply Agt | 12/10/2019 | 12/10/2022 |
| Alert Scientific | SOW | 10/17/2019 | 11/30/2020 |
| Alert Scientific | SOW | 6/13/2020 | 6/12/2023 |
| Alert Scientific | SOW | 10/1/2020 | 9/30/2021 |
| Alert Scientific | SOW | 10/17/2020 | 11/30/2021 |
| AZ Corporation | SOW | 3/4/2020 | 1/27/2021 |
| AZ Corporation | SOW | 5/1/2020 | 5/1/2021 |
| Biotage, Inc | SOW | 5/2/2020 | 5/1/2021 |
| Brinkmann Instruments | SOW | 10/16/2020 | 10/15/2021 |
| Brodie Inc | SOW | 3/10/2020 | 12/31/2020 |
| Burgess USA Training LLC | SOW | 10/30/2019 | 12/31/2020 |
| [REDACTED] | Manufacturing and Supply Agreement | 3/19/2020 | |
| [REDACTED] | SOW | 3/4/2020 | 2/28/2026 |
| Chilworth Technology Inc | MSA | 11/1/2019 | 11/1/2024 |
| Circuit Breaker Sales (fka ExStar) | SOW | 9/24/2019 | 11/30/2022 |
| Colden Corporation | MSA | 10/2/2019 | 10/1/2024 |
| Colden Corporation | SOW | 1/28/2020 | 12/31/2020 |

5

| | | | |
|---|---|---|---|
| Crown Equipment Corp (dba Crown Lift Trucks) | Agreement | 4/24/2020 | 4/24/2021 |
| Dow Chemical Company | Dow "IPA" Pre-Payment Agreement | | |
| Erlabs, Inc. | SOW | 7/24/2020 | 7/23/2021 |
| Evoqua Water Technologies | SOW | 6/1/2020 | 5/31/2022 |
| Evoqua Water Technologies | SOW | 2/13/2020 | 12/31/2020 |
| FW Webb Company | MSA | 10/25/2019 | 10/25/2024 |
| Hach Company | SOW | 10/3/2019 | 12/15/2020 |
| Hart Engineering Corporation | SOW | 12/23/2019 | 12/31/2020 |
| HP Services, Inc. | SOW | 1/3/2020 | 12/31/2021 |
| Kupper, Robert | SOW | 9/1/2020 | 8/31/2021 |
| Mass Crane Hoist Services Inc. | SOW | 10/17/2019 | 12/31/2021 |
| MMI, Inc. | SOW | 9/11/2019 | 7/31/2022 |
| Occupational Health Connections | MSA | 7/29/2020 | 7/29/2025 |
| Rudolph Research Analytical | SOW | 4/29/2020 | 4/29/2023 |
| Security Services of CT | SOW | 12/3/2019 | 1/1/2021 |
| Stonhard, Division of Stoncor Group Inc. | SOW | 7/14/2020 | 12/31/2021 |
| Sullivan Commercial Painting | MSA | 10/15/2019 | 9/11/2024 |
| Sullivan & McLaughlin | SOW | 2/14/2020 | 2/14/2021 |
| Sullivan & McLaughlin | SOW | 2/14/2020 | 2/14/2021 |
| Tech Painting | MSA | 6/15/2021 | 6/15/2022 |
| Thielsch Engineering Div. Rise Engineering | SOW | 7/1/2020 | 6/30/2021 |
| Veolia Environmental Services, LLC | SOW | 12/17/2019 | 12/31/2020 |
| Veolia Environmental Services, LLC | SOW | 12/23/2019 | 1/1/2021 |
| Veolia ES Technical Solutions | SOW | 3/21/2020 | 4/30/2022 |

6

| | | | |
|---|---|---|---|
| Direct Energy Business | PO - Electricity 129 Quidnick St., UM | 2/24/2020 | |
| Direct Energy Business | PO - Electricity 500 Washington St. Storeroom-bldg 30 | 2/25/2020 | |
| Direct Energy Services LLC | PO - Gas, 500 Washington St., Mfg, Storeroom-Bldg 30 | 2/24/2020 | |
| Direct Energy Services LLC | PO - Gas, 498 Washington St., Mfg, Bldg 6 | 2/24/2020 | |
| Dittman & Greer Inc | PO - Siemens software support 2020 | 2/28/2020 | |
| Mc Dean Inc | PO - ABB Site UPS maintenance and repairs | 4/6/2020 | 5/21/2023 |
| National Grid | PO - Gas - 498 Washington St. - Production - Commercial Mfg Order ID: 3110039621 | 2/24/2020 | |
| National Grid | PO - Gas - 498 Washington Street - Bldg 30 | 2/25/2020 | |
| National Grid | PO - Gas - 500 Washington St., CMC - RTC | 2/24/2020 | |
| National Grid | PO - Gas - 500 Washington St. - Upper Mill Boiler | 2/24/2020 | |
| New England Controls Inc | PO - Vibration Analysis 06/2020 - 05/2023 | 7/27/2020 | 6/30/2023 |
| Us Bank National Association | PO - Copiers - Rhodes Tech – Lincoln, Gloucester | 9/8/2020 | |

| | | | |
|---|---|---|---|
| Usherwood Business Equipment Inc | PO - Copiers - Rhodes Tech – S. Kingston, Foster, Bldg 30, Hope, Rockville, Woonsocket, N. Kingston | 3/31/2020 | 3/2/2025 |
| Usherwood Business Equipment Inc | PO - Copy Charges RT/RP | 2/26/2020 | 3/31/2025 |

Post-Petition Contracts not made available to the Purchaser prior to the date of the Purchase Agreement:

| Counterparty | Type | Effective Date | Termination Date |
|---|---|---|---|
| [REDACTED] | MSA | 3/4/2020 | 3/4/2025 |
| IES Engineers | SOW | 3/20/2020 | 4/20/2021 |
| Occuhealth Inc. | SOW | 10/17/2019 | 12/31/2020 |
| AMD Lawn Care LLC | PO - 2020 Site Wide Parking Lot Sand & Winter debris removal | 6/9/2020 | |
| Atlantic Scale Company Inc | PO - Certification of Calibration Weights | 5/5/2020 | |
| Briggs R Bruce | PO - 2020 Site Catch Basin Clean Out | 5/18/2020 | |
| Bristol Fire Protection Inc | PO - 2020 Upper Mill Fire Suppression System Drain valve Replacement | 6/24/2020 | |
| Circuit Breaker Sales Ne Inc | PO - 2020 Upper Mill & RTC PM Switchgear and Services | 6/16/2020 | |
| Crown Equipment Corp | PO - 2020 & 2021 Crown Forklift PM's | 7/13/2020 | 12/31/2021 |
| Dataworks Development Inc | PO - Freezerworks Maintenance and | 10/14/2019 | |

|  |  |  |  |
|---|---|---|---|
|  | Support Contract (2020) |  |  |
| Direct Energy Business | PO - Electricity 498 Washington St. - bldg 3 | 2/24/2020 |  |
| Direct Energy Services LLC | PO - Gas, 500 Washington St., MMF, UM | 2/24/2020 |  |
| Emsl Analytical Inc | PO - Routine Purified Water Samples Microbial Testing Sept/Oct 2020 | 8/26/2020 |  |
| Eurofins Lancaster Laboratories Inc | PO - 2019-2020 Misc. Compendial Raw Material Testing | 11/12/2019 |  |
| Evoqua Water Technologies LLC | PO - 2020 - 2022 Odor Control | 8/6/2020 | 5/21/2022 |
| Hach Company | PO - HACH Partnership Annual Renewal for astroTOC Analyzer - 2019-2020 to 2020 | 11/12/2019 |  |
| Hayes Instrument Service Inc | PO - June External Calibrations - 2020 | 6/22/2020 |  |
| Hp Services Inc | PO - 2020-2021 passivization services | 1/14/2020 | 12/31/2021 |
| Johnson Controls Fire Protection LP | PO - 2020-2023 Dry Chemical Integral Fire Extinguisher and Fire Extinguisher Insptection | 7/21/2020 | 6/30/2023 |
| JOHNSON CONTROLS FIRE PROTECTION LP | PO - 2020 HWSS fire suppression system cylinder Hydrostatic Testing | 6/16/2020 |  |

| | | | |
|---|---|---|---|
| LAVOIE & SON INDUSTRIAL | PO - 2020-2022 Commercial AND Construction Debris Removal and Disposal | 12/16/2019 | |
| MASS CRANE & HOIST SERVICES INC | PO - 2020 & 2021 Annual Hoist Inspections | 10/22/2019 | |
| Metrohm USA | PO - Metrohm Karl Fischer Titrator PM/Certification Service Contract (2020-2021) | 8/19/2020 | 10/14/2021 |
| Microcad Training & Consulting Inc | PO - 2020 AutoCAD & Vault Professional Annual Subscription | 12/10/2019 | |
| National Grid | PO - Electricity - 500 Washington St. Whse - B30 Electric Meter | 2/25/2020 | |
| National Grid | PO - Electricity - N. St., Pole Off-3 - Parking /Lights Pole off 3 | 2/24/2020 | |
| National Grid | PO - Gas - 500 Washington St., Emgen | 2/24/2020 | |
| National Grid | PO - Electricity - 498 Washington St. - Production - Commercial Mfg Order ID: 3110013773 | 2/24/2020 | |
| National Grid | PO - Electricity - 129 Quidnick - Clariant Main 23KV Feeder | 2/24/2020 | |
| National Grid | PO - Electricity - 42 Quidnick Pole 11 | 2/24/2020 | |

| | | | |
|---|---|---|---|
| New England Pest Control Co. | PO - Pest Control Program 2020 - 2023 | 2/3/2020 | 12/31/2023 |
| Rice Lake Weighing Systems Inc | PO - Rice Lake Weighiing Systems 07_09_2020 | 7/15/2020 | |
| Sage Environmental Inc | PO - 2020 Continued Environmental consulting for barcode project | 5/22/2020 | |
| Siemens Industry Inc | PO - 1 Year Service Contract_Siemens HVAC / PM_2019-2020 | 11/18/2019 | |
| Society Of Chemical Manufacturers | PO - SOCMA 2020 Membership Dues | 11/18/2019 | |
| Sterling Infosystems Inc | PO - 2020 Background/Drug Screen- Rhodes Tech. | 11/20/2019 | |
| Sullivan & Mclaughlin Companies Inc | PO - 2020 Weekly Fire Pump Testing and Monthly Fire Pump Battery Testing and Inspection | 2/24/2020 | 2/14/2021 |
| Sullivan & Mclaughlin Companies Inc | PO - 2020 Fire Alarm Testing | 2/24/2020 | 2/14/2021 |
| Sullivan & Mclaughlin Companies Inc | PO - 2020 - 2022 Plant Group & Spot Re-Lamping | 1/16/2020 | 12/31/2022 |
| Tech Painting Co Inc | PO - 2020 Tech Painting Misc. Painting | 9/1/2020 | |
| Toomey Water Services Inc | PO - 2020 CW Water Meter and Back-flow Preventer Testing | 9/1/2020 | |

| | | | |
|---|---|---|---|
| Veolia Es Technical Solutions | PO - 2020 - 2022 Annual Periodic Lift Station Services | 6/1/2020 | 4/30/2022 |
| Veolia Es Technical Solutions | PO - 2020 - 2022 Annual Periodic Lift Station Services | 6/1/2020 | 4/30/2022 |

**Schedule 1.1(i)**

**Purchased Patents**

1.  See <u>Exhibit B</u> attached hereto.

**Schedule 1.1(j)**

**Purchased Products**

1. [REDACTED].
2. [REDACTED].

**Schedule 1.1(k)**

**Permits and Pending Applications**

1. Rhode Island Department of Environmental Management ("RIDEM") Office of Air Resources Minor Source Permit Approval Nos. 1603, 1659-1665, 2084 and 2166.

2. RIDEM Air Permit No. 1414.

3. RIDEM Office of Air Resources General Permit No. GPEG-69.

4. RIDEM Division of Air and Hazardous Materials Permit Nos. 550, 551 and 1020.

5. Rhode Island Pollutant Discharge Elimination System ("RIPDES") Permit No. RI0023868.

6. Town of Coventry Building and Zoning Department Certificates of Occupancy Nos. 02-13C/O, 02-66C/O, 02-71C/O, C/O 14-44.

**Schedule 1.1(l)**

**Vehicles**

1.  2011 Ford F250, VIN#: 1FT7W2B64BEA15746.

2.  2012 Ford F250, VIN#: 1FTBF2B6XCEB86691.

**Schedule 1.2(h)**

**Excluded Permits**

1.   All FDA and DEA registrations.

2.   All DEA quotas.

3.   All state regulatory licenses.

4.   Town of West Warwick Industrial Wastewater Discharge Permit Nos. C-34 and C-35.

**Schedule 1.2(r)**

**Excluded Contracts**

1. See <u>Exhibit C</u> attached hereto.

**Schedule 1.2(u)**

**Other Excluded Assets**

1.  All shares of capital stock or other equity interests of the Seller, its direct and indirect Subsidiaries and any Affiliate thereof.

2.  Assets held by any of the Seller's Subsidiaries and any Affiliate of the Seller or any of its Subsidiaries, other than the Relevant Subsidiaries, including Dronabinol Inventory at Pii (owned by SVC Pharma L.P.) at the time of the Closing.

3.  Manufacturing samples, including all stability samples, retain samples and split tailgate samples.

4.  For the avoidance of doubt, all assets owned by Rhodes Pharmaceuticals L.P. set forth on Exhibit D.

5.  All information technology assets of the Seller to the extent not exclusively used by the Business.

6.  All machinery, equipment, spare parts, furniture, tangible tools and tooling and computers, printers, scanners, other office equipment and other personal property owned by the Seller that is (i) not (a) necessary to the operation of the Business or (b) physically located at the Real Property and (ii) not referenced specifically in a category of Purchased Assets in Section 1.1 of the Purchase Agreement.

7.  Historical books and records not necessary to operate the Business in the ordinary course; *provided* that such books and records will be made available to the Purchaser following the Closing if Purchaser requests access to any such books and records with specificity.

**Schedule 1.3(g)**

**Excluded Environmental Liabilities**

None.

**Schedule 1.3(i)**

**Other Assumed Liabilities**

None.

**Schedule 1.4(l)**

**Other Excluded Liabilities**

1. The approximately 530 opioid claims pending against the Seller, broken down by multidistrict litigation and state litigation as follows:

   a.  Multidistrict litigation (465)
   b.  Utah (8)
   c.  South Carolina (41)
   d.  Pennsylvania (8)
   e.  Rhode Island (1)
   f.  Illinois (2)
   g.  Maryland (1)
   h.  West Virginia (2)
   i.  Puerto Rico (2)

**Schedule 1.5(a)**

**Executory Contracts and Cure Costs**

1.  The Seller has a number of outstanding purchase orders, some of which are executory, which will be fully performed prior to December 31, 2020, none of which will be Assigned Contracts unless such purchase orders are assignable and specifically requested by Purchaser.

2.  See <u>Exhibit E</u> attached hereto.

**Schedule 1.6(a)(iii)**

**Calculation of Additional Purchase Price Rebate**

[REDACTED].

**Schedule 1.7(a)**

**Credit Installments**

| Number of Quarters Elapsed since Closing Date | Maximum Credit to be Issued at End of Quarter (based upon $15,000,000 Final Credit Amount)* |
|:---:|:---:|
| 1 | [REDACTED] |
| 2 | [REDACTED] |
| 3 | [REDACTED] |
| 4 | [REDACTED] |
| 5 | [REDACTED] |
| 6 | [REDACTED] |
| 7 | [REDACTED] |
| 8 | [REDACTED] |
| 9 | [REDACTED] |
| 10 | [REDACTED] |
| 11 | [REDACTED] |
| 12 | [REDACTED] |
| 13 | [REDACTED] |
| 14 | [REDACTED] |
| 15 | [REDACTED] |
| 16 | [REDACTED] |

25

**Schedule 1.9**

**Prorated Expenses**

1. Expenses relating to utilities and waste treatment at the Real Property.

2. Expenses under service and maintenance contracts.

3. Government Service Fees related to the Real Property.

4. Expenses under information technology service contracts and software that relate to the Purchased IT.

5. Expenses related to site vehicles transferred to the Purchaser.

6. Payments made to suppliers of materials in advance of final shipment to the Purchaser (this includes a $5,443,200 prepayment (with approximately $3,168,700 remaining as of June 30, 2020) under Purchase Order No. 4510008295, made pursuant to the Statement of Work 06062012-2, effective March 4, 2020, made pursuant to the Master Services Agreement between Rhodes Technologies and [REDACTED]).

7. Expenses under Equipment leases that are transferred to the Purchaser.

8. Subscriptions and fees to the extent relating to Purchased Assets or Assumed Liabilities.

9. Expenses paid by the Seller for factory and other supplies and materials received after Closing Date.

10. State licensing fees, to the extent such state licenses are assignable to the Purchaser.

11. Payroll liabilities with respect to the Transferred Employees for the payroll period during which Closing occurs.

**Schedule 3.6(c)**

**Purchased Assets Owned by the Relevant Subsidiaries**

1.  <u>Schedule I</u> of the Purchase Agreement is herein incorporated by reference.

**Schedule 5.11(c)**

**Severance Payments and Benefits for Transferred Employees**

[REDACTED].

## Schedule 5.11(j)

## Foreign National Employees

None.

**Schedule 5.16**

**Security Deposits**

1. [REDACTED].

## Exhibit A

**Assigned Contracts**

[See attached]

**Exhibit A - Assigned Contracts**

| Counterparty | ContractName | ContractTypeName |
|---|---|---|
| A.Z CORPORATION | Supplemental Maintenance Technician - 2020 | Purchase Order |
| Adamis Pharmaceuticals Corporation (San Diego, CA) | Adamis Pharmaceuticals Corp_RT API Supply Agreement 11-1-2022 (RT selling naloxone API to Adamis) | Master Service/Supply Agreements |
| Agilent Technologies Inc | Agilent_RT SOW 12122019-1 12-31-2020 (2019-2020 QC instruments service plan) | Statement of Work |
| Agilent Technologies Inc | Agilent_RT SOW 12122019-2 12-31-2020 (Annual service plan for R&D instruments) | Statement of Work |
| Agilent Technologies Inc. | Agilent Technologies_RT MSA 12-11-2020 (calibration, testing, repair, PM and other related services) | Master Service/Supply Agreements |
| Air Products | Air Products AGREEMENT | Master Service/Supply Agreements |
| Air Temp Mechanical Services Inc | Air Temp Mechanical_RT MSA 01-31-2024 (provide maintenance, service, repair, calibration, testing, certification and QA s | Master Service/Supply Agreements |
| Air Temp Mechanical Services Inc | Air Temp Mechanical_RT SOW 01312014-1 03-11-2022 (Chiller - Quality PM and Inspection Program) | Statement of Work |
| Alan Dunn - see GDI Consulting | Alan Dunn - see GDI Consulting MSA | Master Service/Supply Agreements |
| [REDACTED] | [REDACTED]_RT Supply Agreement 12-31-2021 (RT buyer Product from [REDACTED]) | Master Service/Supply Agreements |
| Alert Scientific | Alert Scientific_RT SOW 01212010-19 09-30-2020 (QC instruments - PM) | Statement of Work |
| Alert Scientific - | Alert_RT SOW 01212010-21 06-12-2023 | Statement of Work |
| Alert Scientific Incorporated | Alert Scientific_RT MSA 01-31-2024 (PM and calibration) | Master Service/Supply Agreements |
| Allstate Sealcoating Inc. | Allstate Sealcoating Inc. MSA | Master Service/Supply Agreements |
| Alltech Associates Inc., a Wholly Owned Subsidiary of W.R. Grace & Co. - CON | Alltech Associates Inc., a Wholly Owned Subsidiary of W.R. Grace & Co. - CONN MSA | Master Service/Supply Agreements |
| AMD Lawn Care LLC | AMD Lawn Care LLC MSA | Master Service/Supply Agreements |
| AMD Lawn Care LLC | AMD Lawn Care LLC SOW 12232015-1, A1, A2, A3 | Statement of Work |
| AMD Lawn Care LLC | AMD Lawn Care LLC SOW 12232015-3, A1 | Statement of Work |
| Americal Incorporated | Americal Incorporated MSA | Master Service/Supply Agreements |
| American Chemical Society | American Chemical Society | Agreement |
| American Labelmark Company | LabelMaster PO 3110037353 - Account 1299697 | Purchase Order |
| American Plant Maintenance, LLC (APM) | American Plant Maintenance, LLC (APM) MSA | Master Service/Supply Agreements |
| Analysis & Design Application Co, Ltd. d/b/a CD-Adapco | Analysis & Design Application Co, Ltd. d/b/a CD-Adapco | Agreement |
| Anchor Insulation | Anchor Insulation MSA | Master Service/Supply Agreements |
| Aptuit, Inc. | Aptuit, Inc. MSA | Master Service/Supply Agreements |
| Arden Engineering Constructors, LLC | Arden Engineering Constructors, LLC MSA | Master Service/Supply Agreements |
| Associated Electro-Mechanics Inc. | Associated Electro-Mechanics Inc. MSA (06-23-2024) (electrical, mechanical and machining services) | Master Service/Supply Agreements |
| Atlantic Coffee & Provision | Atlantic Coffee & Provision MSA | Master Service/Supply Agreements |
| Atlantic Scale Company, Inc. | Atlantic Scale Company, Inc. MSA | Master Service/Supply Agreements |
| Avantium Pharma BV | Avantium Pharma BV MSA | Master Service/Supply Agreements |
| Axine USA Inc. | Axine_RT Agreement_Executed_Exp. 09242021 | Master Service/Supply Agreements |
| Axine Water Technologies | Axine Water Technologies MSA | Master Service/Supply Agreements |
| AZ Corporation | AZ Corporation MSA | Master Service/Supply Agreements |
| AZ Corporation | AZ Contracting Agr 05-24-23, Amendment #4 | Statement of Work |
| AZ Corporation | AZ Amendment #15 (2015 pricing) | Statement of Work |
| AZ Corporation | AZ Amendment#17 (RP) | Statement of Work |
| AZ Corporation | AZ Amendment #21 (2016 pricing) | Statement of Work |
| AZ Corporation | AZ Contracting Agr 05-24-23, Amendment #40 | Statement of Work |
| AZ Corporation | AZ Corp_RT A-46 Executed | Statement of Work |
| B & P Littleford Day LLC | B & P Littleford Day LLC MSA | Master Service/Supply Agreements |
| Bard Pharmaceutical | Bard Pharmaceutical MSA | Master Service/Supply Agreements |
| Beach Technology | Beach Technology MSA | Master Service/Supply Agreements |
| Beamex Inc | Beamex Inc MSA | Master Service/Supply Agreements |
| Beamex Inc | Beamex Inc SOW 02182010-7 | Statement of Work |
| Beckman Coulter | Beckman Coulter Standard Service Terms and Conditions | T&Cs |
| Biotage, Inc | Biotage, Inc_RT MSA 05-30-2024 (repair and maintain lab tools and equipment) | Master Service/Supply Agreements |
| Biotage, Inc | Biotage_RT SOW 05302019-2 05-01-2021 | Statement of Work |
| Bonn'sIndustrial Valve - see Frederick's Industrial Valve | Bonn's Industrial Valve - see Frederick's Industrial Valve MSA | Master Service/Supply Agreements |
| Boston Analytical Inc. | Boston Analytical Inc. MSA | Master Service/Supply Agreements |
| Boston Analytical Inc. | Boston Analytical Inc. SOW | Statement of Work |
| Brinkmann Instruments dba Metrohm USA, Inc. | Brinkmann Instruments dba Metrohm USA, Inc. MSA | Master Service/Supply Agreements |
| Brinkmann Instruments dba Metrohm USA, Inc. | Brinkmann Instruments dba Metrohm USA, Inc. SOW 12022010-37 | Statement of Work |
| Brinton, Alan | Brinton, Alan MSA | Master Service/Supply Agreements |
| Bristol Fire Protection, Inc. | Bristol Fire Protection_RT MSA 11-12-2021 (maintenance, service, and repair services for sprinkler systems) | Master Service/Supply Agreements |
| Bristow ElectricCo., Inc. | Bristow ElectricCo., Inc. MSA | Master Service/Supply Agreements |
| BRODIE INC | 2019-2020 PIV Quarterly Inspections & Repairs | Purchase Order |
| Brodie, Inc. | Brodie_RT MSA 6-30-2025 | Master Service/Supply Agreements |
| Brodie, Inc. | Brodie_RT SOW 06172010-6 12-31-2020 | Statement of Work |
| Burgess USA Training LLC | Burgess USA Training LLC MSA | Master Service/Supply Agreements |
| Burgess USA Training LLC | Burgess USA Training LLC SOW | Statement of Work |
| Busch, LLC | Busch, LLC_RT MSA (limited standard service warranty) 11-30-2024 (repair services performed by Busch on any vacuum pu | Master Service/Supply Agreements |
| Buzzeo Associates, Ltd. | Buzzeo Associates, Ltd. MSA | Master Service/Supply Agreements |
| [REDACTED] | [REDACTED] MSA | Master Service/Supply Agreements |
| CambridgeSoft Corporation | CambridgeSoft Corporation MSA | Master Service/Supply Agreements |
| Carrier Corporation | Carrier Corporation MSA | Master Service/Supply Agreements |
| Catalent Micron Technologies, Inc. | Catalent Micron SOW/PO | Statement of Work/Purchase Order |
| CDI Business Solutions | CDI Business Solutions MSA | Master Service/Supply Agreements |
| Certified Rescue Courses, LLC | Certified Rescue Courses, LLC MSA | Master Service/Supply Agreements |
| Charles River Laboratories, Inc. | Charles River Laboratories, Inc. MSA | Master Service/Supply Agreements |
| Charles River Laboratories, Inc. | Charles River Laboratories, Inc. SOW 12062001-1 | Statement of Work |
| Circadian Technologies, Inc. | Circadian Technologies, Inc. MSA | Master Service/Supply Agreements |
| Circuit Breaker Sales (fka ExStar Inc.) | Circuit Breaker Sales (fka ExStar Inc.) MSA | Master Service/Supply Agreements |
| Circuit Breaker Sales NE, Inc (fka ExStar) | Circuit Breaker Sales_RT 09212010-8 11-30-2022 (switchgear PM) | Statement of Work |
| Clancy Moving Systems, Inc. | Clancy Moving Systems, Inc. MSA | Master Service/Supply Agreements |
| Clariant Corporation | Environmental Remediation and Indemnity Agreement* | Indemnity Agreement |
| Clariant Corporation (Lab Space) | Clariant Corporation (Lab Space) MSA | Master Service/Supply Agreements |
| Clariant Corporation (WareHouse) | Clariant Corporation (WareHouse) MSA | Master Service/Supply Agreements |
| Clariant Corporation | Letter Agreement re: Coventry Water Service | Letter Agreement |
| Clean Harbors Environmental Services, Inc. | Clean Harbors Environmental Services, Inc. MSA | Master Service/Supply Agreements |
| Clean6Sigma, LLC | Clean6Sigma, LLC MSA | Master Service/Supply Agreements |
| Comber | Heinkel Filtering System MSA | Master Service/Supply Agreements |
| Coris-Tine Inc. d/b/a Paul's Lock and Safe | Coris-Tine Inc. d/b/a Paul's Lock and Safe MSA | Agreement |
| Coventry Eye Care Associates | Coventry Eye Care Associates MSA 06-20-2024 (eye care services) | Master Service/Supply Agreements |
| Creative Office Environments | Creative Office Environments MSA | Master Service/Supply Agreements |
| CrossBay Staffing | CrossBay Staffing MSA | Master Service/Supply Agreements |
| CrossPoint  Engineering | CrossPoint  Engineering-RT MSA 01-31-2025 (engineering professional services and other related services) | Master Service/Supply Agreements |
| CrossPoint  Engineering | CrossPoint Engineering SOW 02032010-8 | Statement of Work |
| Danox Environmental Services, Inc. (DESI) | Danox Environmental Services, Inc._RT MSA (Waste Management Services) 12-31-2020 | Master Service/Supply Agreements |
| DeStefano Engineering, P.C. | DeStefano Engineering, P.C.-RT MSA 12-19-2023 (professional engineering services, and other related services) | Master Service/Supply Agreements |
| Direct Energy - CMA | Direct Energy - CMA AGREEMENT | CMA |
| Direct Energy (acct # 3981874009 and 5228153003) | Direct Energy (acct # 3981874009 and 5228153003) | Agreement |
| Direct Energy (acct #1784386019 and 4269090024) | Direct Energy (acct #1784386019 and 4269090024) | Agreement |
| Direct Energy Business | Direct Energy Transaction Confirmation 8-18-2017 | Agreement |
| Direct Energy Business | Direct Energy Transaction Confirmation  8-21-2017 | Agreement |

| Counterparty | ContractName | ContractTypeName |
|---|---|---|
| Direct Energy Services LLC | Direct Energy - Gas Service Agreement MSA | Master Service/Supply Agreements |
| DIRECT ENERGY SERVICES LLC | Gas, 498 Washington St., Mfg, Bldg 6 | Purchase Order |
| Douglas Construction | Douglas Construction MSA | Master Service/Supply Agreements |
| Dow Chemical Company, The | Dow Chemical Company, The MSA | Master Service/Supply Agreements |
| Dow Chemical Company, The - Union Carbide Corporation | Dow Chemical Company, The - Union Carbide Corporation MSA | Master Service/Supply Agreements |
| Dycem Limited | Dycem Limited MSA | Master Service/Supply Agreements |
| EAG, Inc. | EAG, Inc. MSA | Master Service/Supply Agreements |
| Eagle Fence & Guardrail d/b/a EF&G Construction, Inc. | Eagle Fence & Guardrail d/b/a EF&G Construction, Inc. MSA | Master Service/Supply Agreements |
| ECA Chemical Inc. | ECA Chemical Inc. MSA | Master Service/Supply Agreements |
| EMC Corporation | EMC Corporation Rhodes Tech MSA | Master Service/Supply Agreements |
| Emerson Process Management - Process Systems | SureService Guardian Support Renewal | Renewal |
| Energy Machinery | Energy Machinery MSA | Master Service/Supply Agreements |
| Energy Machinery | Energy Machinery_RT SOW 10262014-3 12-31-2020 (2019-2020 compressor PM) | Statement of Work |
| Energy Machinery Inc | Energy Machinery_RT SOW 10262014-4 12-31-2020 (Turn around maintenance inspection) | Statement of Work |
| Energy Management & Control Services, Inc. | Energy Management & Control Services, Inc. MSA | Master Service/Supply Agreements |
| Energy Management & Control Services, Inc. | EMC_RT SOW 05012011-8 06-30-2020 (three year metasys building management system preventative maintenance servic | Statement of Work |
| Energy Source, Inc. | Energy Source, Inc. MSA | Master Service/Supply Agreements |
| Erlabs, Inc. | Erlab, Inc._RT MSA 07-23-2023 (maintenance, service, repair, calibration, and testing services on lab fume hoods) | Master Service/Supply Agreements |
| Erlabs, Inc. | Erlab_RT 07232013-8 07-23-2021 | Statement of Work |
| Eurofins Lancaster Laboratories Inc. | Master Laboratory and Non-Clinical Services Agreement | Statement of Work |
| Evans Analytical Group, Inc. | Evans Analytical Group, Inc. | Agreement |
| Evoqua  Water Technologies | Evoqua  Water Technologies_RT MSA 09-01-2024 (PM services for water systems) | Master Service/Supply Agreements |
| Extrel CMS, LLC | Extrel CMS, LLC MSA | Master Service/Supply Agreements |
| Gardiner Associates, LLC | Gardiner Associates, LLC MSA | Master Service/Supply Agreements |
| GE Betz, Inc. | GE Betz, Inc. MSA 06-01-23 | Agreement |
| GE Inspection Technologies | GE Inspection_RT MSA (08-19-2023) (on-site RVI services) | Master Service/Supply Agreements |
| GFS CHEMICALS INC | Turbidity Standards for Calibrations, 2019 - 2020 | Purchase Order |
| Gordon R. Archibald | GRA, Inc. - Gordon R. Archibald MSA | Master Service/Supply Agreements |
| GRAINGER INC | Lumbar Support | Purchase Order |
| GRAYBAR ELECTRIC COMPANY INC | Material for wiring Bldg.5 emergency lights | Purchase Order |
| Group Technology of Trumbull, Inc | Group Technology of Trumbull, Inc MSA | Master Service/Supply Agreements |
| Group Technology of Trumbull, Inc | Group Technology of Trumbull, Inc SOW 02122014-7 12-31-2020 (IT Specialist) | Statement of Work |
| Guardmark | Guardmark MSA | Master Service/Supply Agreements |
| H. J. Astle Company | H. J. Astle Company MSA | Master Service/Supply Agreements |
| Hach Company | Hach Company MSA | Master Service/Supply Agreements |
| Hamilton Elevator Interiors, Inc. | Hamilton Elevator Interiors, Inc. MSA | Master Service/Supply Agreements |
| Hargrove and Associates, Inc. and its affiliates | Hargrove and Associates, Inc. and its affiliates MSA | Master Service/Supply Agreements |
| Harper Control Solutions, Inc. | Harper Control Solutions, Inc. MSA | Master Service/Supply Agreements |
| Harper Haines Fluid Controls, Inc. | Harper Haines Fluid Controls, Inc. MSA | Master Service/Supply Agreements |
| Hart Design | Hart Design MSA | Master Service/Supply Agreements |
| Hart Engineering Corporation | Hart Engineering Corporation MSA (10-18-23) | Master Service/Supply Agreements |
| Hart Engineering Corporation | Hart Engineering Corporation SOW A-15, Ex A-12 | Statement of Work |
| Hart Engineering Corporation | Hart Engineering Corporation SOW A-16, Ex A-13 | Statement of Work |
| Hart Engineering Corporation | Hart Engineering_RT A18, Exhibit A-14 (Axine Wastewater Project) | Statement of Work |
| Hazard Evaluation Lab | Hazard Evaluation Lab MSA | Master Service/Supply Agreements |
| Hazard Evaluation Lab (HEL) Inc. | Hazard Evaluation Lab SOW 03192010-5 05-21-2021 (E1064 & E988 PM plans) | Statement of Work |
| Health Training Education | Health Training Education MSA 11-30-25 | Master Service/Supply Agreements |
| Heinkel Filtering Systems, Inc. USA | Heinkel Filtering Systems, Inc. USA MSA | Master Service/Supply Agreements |
| HEL - see Hazard Evaluation Lab | HEL - see Hazard Evaluation Lab | Agreement |
| Heritage Environmental Services, LLC | Heritage Environmental Services, LLC MSA | Master Service/Supply Agreements |
| Heritage Environmental Services, LLC | Heritage_RT MSA Amendment #3 8-31-2025 | Master Service/Supply Agreements |
| Honeywell Safety Products | Honeywell_RT MSA 02-19-2024 (training, fall protection equipment inspections, etc.) | Master Service/Supply Agreements |
| Howorth Air Technology Limited | Howorth Air Technology Limited MSA | Master Service/Supply Agreements |
| HP Services, Inc. | HP Services, Inc._RT MSA 11-30-2021 (provide passivation and chemical cleaning services) | Master Service/Supply Agreements |
| HP Services, Inc. | HP Services, Inc._RT SOW 12012011-5 12-31-2021 (2020-2021 shop passivation services) | Statement of Work |
| Hunter Associates Laboratory d/b/a Hunterlab International Inc. | Hunter Associates Laboratory d/b/a Hunterlab International Inc. MSA | Master Service/Supply Agreements |
| Hurley Construction Inc. | Hurley Construction_RT MSA 07-24-2025 | Master Service/Supply Agreements |
| i-Design Group | i-Design Group MSA | Master Service/Supply Agreements |
| IES Engineers, Inc. | IES Engineers, Inc._RT MSA 01-30-2024 (toxicology assessments, SDS authoring and other health/safety related services) | Master Service/Supply Agreements |
| Imperatore Steel Erectors, Inc. | Imperatore_RT MSA Amendment #2 8-31-2025 | Master Service/Supply Agreements |
| Industrial Protection Products, Inc | Industrial Protection Products_RT MSA 12-31-2024 (supply safety shoes and associated services related to supply of Compa | Master Service/Supply Agreements |
| Intertek USA Inc. d/b/a QTI | Intertek USA Inc. d/b/a QTI MSA | Master Service/Supply Agreements |
| IoMosaic | IoMosaic AGREEMENT | Consulting Agreement |
| IPP | IPP AGREEMENT | Agreement |
| Iron Mountain | Iron Mountain AGREEMENT | Agreement |
| JOHNSON CONTROLS FIRE PROTECTION | Fire Extinguisher Purchases 2018 thru 2020 (Sitewide) from Simplex Grinnell | Purchase Order |
| Johnson Controls Fire Protection LP | Johnson Controls Fire Protection LP MSA (fka Simplex Grinnell) 07-01-2024 (provide fire alarm, fire extinguisher, suppressio | Master Service/Supply Agreements |
| Johnson Controls Fire Protection LP | Johnson Controls_RT SOW 07012014-3 | Statement of Work |
| Kaplan | Technology and Education Solution Agreement, as amended by Addendum I-IV | Agreement |
| Kenneth Industrial Products, Inc. | Kenneth Industrial Products, Inc. MSA | Master Service/Supply Agreements |
| Kepware, Inc. | Kepware, Inc. MSA | Master Service/Supply Agreements |
| Knorr Associates Inc. | DataPipe Program License Agreement | License Agreement |
| Knorr Associates Inc. | DataPipe Software Maintenance Agreement | Maintenance Agreement |
| Kupper, Robert | Kupper_RT MSA (Consultant) 08-31-2022 (research, process development, new product development, technical document | Master Service/Supply Agreements |
| LabelMaster Software | Rhodes Technologies 2019 Software Renewal | Renewal Quote |
| Leavitt's Tree Service, Inc. | Leavitt's Tree Service, Inc. MSA | Master Service/Supply Agreements |
| Life Support Systems | Life Support Systems MSA | Master Service/Supply Agreements |
| Little Rhody Machine Repair, Inc. | Little Rhody Machine Repair, Inc. MSA | Master Service/Supply Agreements |
| MAINTENANCE MANAGEMENT INC | Housekeeping and Janitorial Services 2022 | Purchase Order |
| Mar Cor Purification (fka as Stericycle, Inc.and fka Certco, Inc.) | Mar Cor Purification_RT MSA SOW 06122009-6 04-29-2021 (ductless fume hood testing and certification - 2019-2021) | Statement of Work |
| Mar Cor Purification Inc | Mar Cor (Certco)_RT SOW 06122009-7 12-31-2020 (lab hood testing and evaluation - annual assessment and air flow testin | Statement of Work |
| Marr Scaffolding | Marr Scaffolding MSA | Master Service/Supply Agreements |
| Mass Crane Hoist Services Inc. | Mass Crane Hoist Services Inc. MSA | Master Service/Supply Agreements |
| Mass Crane Hoist Services Inc. | Mass Crane Hoist Services Inc._RT SOW 01012017-2 12-31-2021 (annual inspection/PM on overhead cranes and hoists) | Statement of Work |
| Matcon | Matcon MSA | Master Service/Supply Agreements |
| Matheson Tri-Gas, Inc. | Matheson Tri-Gas, Inc. MSA | Master Service/Supply Agreements |
| MC Dean Inc (fka Thomas and Betts Power Solutions, a Member of the ABB G | MC Dean Inc (fka Thomas and Betts)_RT MSA 12-31-2023 (maintenance, service and repair of network critical power equip | Master Service/Supply Agreements |
| Meriden Cooper Corp. | Meriden Cooper Corp. MSA | Master Service/Supply Agreements |
| Merrill Brink International Corporation | Merrill Brink International Corporation MSA | Master Service/Supply Agreements |
| Metrohm USA | Brinkmann Metrohm MSA 11-30-2020 | Master Service/Supply Agreements |
| Mettler Toledo Autochem, Inc. | MT AutoChem_RT MSA 09-30-2025 | Master Service/Supply Agreements |
| Mettler Toledo Autochem, Inc. | Mettler Toledo Autochem_RT SOW 10012010-15 (2 year iCare subscription) | Statement of Work |
| Mettler-Toledo Autochem Inc | Mettler-Toledo Autochem Inc SOW 10012010-14 | Statement of Work |
| MicroCad Training & Consulting, Inc. | MicroCad Training & Consulting, Inc. MSA | Master Service/Supply Agreements |
| Midland Engineering Limited | Midland Engineering Limited MSA | Master Service/Supply Agreements |
| Mistras Group, Inc. | Mistras Group, Inc._RT MSA 06-27-2024 (non-destructive examination of process and utility equipment) | Master Service/Supply Agreements |
| MMI, Inc. | MMI, Inc. MSA | Master Service/Supply Agreements |

| Counterparty | ContractName | ContractTypeName |
|---|---|---|
| Molecular Application Technologies (MAT) | Molecular Application Technologies (MAT) MSA | Master Service/Supply Agreements |
| Mountain Air | Mountain Air MSA | Master Service/Supply Agreements |
| Mountain Air | Mountain Air  SOW 05292012-4 | Statement of Work |
| Mountain Air | Mountain Air  SOW 05292012-6 | Statement of Work |
| Mystic Air Quality Consultants, Inc. | Mystic Air Quality Consultants, Inc. MSA | Master Service/Supply Agreements |
| Nalas Engineering Services Inc. | Nalas Engineering Services_RT MSA 03-07-2024 (process development, chemical synthesis, sample analysis, safety-related | Master Service/Supply Agreements |
| National Grid | National Grid MSA | Master Service/Supply Agreements |
| NATIONAL GRID | Electricity - 42 Quidnick Poles 9 & 2 | Purchase Order |
| NATIONAL GRID | Electricity - 500 Washington St., Pole 19 | Purchase Order |
| Nestles Waters | Nestles Waters AGREEMENT | Master Service/Supply Agreements |
| New England Controls | New England Controls SOW 10282013-7 12-31-2020 (SureService DeltaV and AMS Service Plan) | Statement of Work |
| New England Controls | NEC_RT MSA SOW 10282013-6 12-31-2020 (DeltaV/AMS Major Software Upgrade) | Statement of Work |
| New England Controls | NEC_RT MSA SOW 10282013-9 (12-31-2020) (DeltaV and AMS major version software upgrade) | Statement of Work |
| New England Controls | New England Controls  Terms of Use AGREEMENT | Agreement |
| New England Controls (NEC) | NEC_RT SOW 10282013-8 12-03-2022 (3rd party factory support renewals) | Statement of Work |
| New England Controls Inc. | New England Controls Inc.  MSA | Master Service/Supply Agreements |
| New England Controls, Inc. | New England Controls, Inc. SOW 10282013-6 | Statement of Work |
| New England Pest Control | New England Pest Control_RT MSA 07-03-2024 (Pest Control / IPM program) | Master Service/Supply Agreements |
| New England Pest Control | New England Pest Control SOW 07022014-1 | Statement of Work |
| New England Pest Control d/b/a Big Blue Bug Solutions | NE Pest Control_RT SOW 07022014-2 01-01-2023 (3 year monthly pest control program) | Statement of Work |
| New Harbor Group | New Harbor Group MSA | Master Service/Supply Agreements |
| NEW HARBOR LLC | Government & Public Relations Services | Purchase Order |
| Northeast Electrical (Rockwell Automation) | Northeast Electrical (Rockwell Automation) | Software License & Service Agreement |
| Northern Energy Services Inc. | Northern Energy Services Inc. MSA | Master Service/Supply Agreements |
| Notch Welding & Mechanical Contractors, Inc. | Notch Welding & Mechanical Contractors, Inc. MSA | Master Service/Supply Agreements |
| Novasep Incorporated | Novasep Incorporated MSA | Master Service/Supply Agreements |
| NV5 (fka RDK Engineers) | NV5 (fka RDK Engineers) MSA | Master Service/Supply Agreements |
| Occuhealth Inc. | Occuhealth Inc. MSA | Master Service/Supply Agreements |
| Odeh Engineers, Inc. | Odeh Engineers, Inc. MSA | Master Service/Supply Agreements |
| OEM of Connecticut Inc. d/b/a OEM America L/C/F Inspection and Testing LL | OEM of Connecticut Inc. d/b/a OEM America L/C/F Inspection and Testing LLC | Agreement |
| ORCHSE Strategies, LLC | ORCHSE Strategies, LLC MSA | Master Service/Supply Agreements |
| Organix, Inc. | Organix, Inc. MSA | Master Service/Supply Agreements |
| OSIsoft, LLC | OSIsoft, LLC AGREEMENT | Software License & Service Agreement |
| OVERHEAD DOOR COMPANY | Overhead Door PMs 2018 - 2020 | Purchase Order |
| OVERHEAD DOOR COMPANY | 3 Year Overhead Door Annual Preventive Maintenance (2018-2020) | Purchase Order |
| Pare Corporation | Pare Corporation MSA 10-15-2025 | Master Service/Supply Agreements |
| Parsons Commercial Technology Group | Parsons Commercial Technology Group MSA | Master Service/Supply Agreements |
| Paul's Lock and Safe | Paul's Lock and Safe MSA | Master Service/Supply Agreements |
| PerkinElmer Informatics, Inc. | PerkinElmer Informatics, Inc. AGREEMENT | License Agreement |
| PFI Design | PFI Design MSA | Master Service/Supply Agreements |
| Pharmazeutisch Medizinisches Management (PMM) - See Wolfgang Fleischer | Pharmazeutisch Medizinisches Management (PMM) - See Wolfgang Fleischer, MD, PhD | Agreement |
| Pitney Bowes | Pitney Bowes CONTRACT | Lease |
| Power Products Systems LLC | Power Products Systems LLC MSA | Master Service/Supply Agreements |
| Power Products Systems LLC | Power Products Systems LLC SOW 08102014-2 | Statement of Work |
| POWER PRODUCTS SYSTEMS LLC | 2018 - 2020 Manufacturing Generator PMs & repairs | Purchase Order |
| Precise Instrument (Stephen Mendoza) | Precise Instrument (Stephen Mendoza) MSA | Master Service/Supply Agreements |
| Prolerized New England Company LLC | Prolerized New England Company LLC AGREEMENT | Sales Agreement |
| Prolerized New England Company LLC | Metal & Non Ferrous Scrap Metal Sales Agreement | Agreement |
| ProPharma Group Holdings, LLC | ProPharma Group Holdings, LLC MSA | Master Service/Supply Agreements |
| Proscape Landscaping | Proscape Landscaping MSA | Master Service/Supply Agreements |
| Quadient | Postage Meter Rental Agreement | Agreement |
| QUALITY CHEMICAL LABORATORIES | 2019 Testing services for L-Tartaric Acid, NF | Purchase Order |
| Regan Heating and Air Conditioning | Regan Heating and Air Conditioning MSA | Master Service/Supply Agreements |
| RI Analytical Laboratories | RI Analytical Laboratories MSA | Master Service/Supply Agreements |
| Rice Lake | Rice Lake MSA | Master Service/Supply Agreements |
| RPKK, Inc. | RPKK, Inc. MSA | Master Service/Supply Agreements |
| RPS ASA | RPS ASA | Agreement |
| Rudolph Research Analytical | Rudolph Research Analytical MSA | Master Service/Supply Agreements |
| Rudolph Research Analytical | Rudolph Research Analytical_RT SOW 08092010-7 04-29-2023 (Autopol V Polarimeters PM/IQ/PQ 3 year plan) | Statement of Work |
| Rudolph Research Analytical | Rudolph Research Analytical SOW 08092010-5 | Statement of Work |
| Rudolph Research Analytical | Rudolph Research_RT SOW 08092010-7 04-29-2023 | Statement of Work |
| S.A.L.A.R.S S.p.A. | S.A.L.A.R.S S.p.A. CONTRACT | Agreement |
| S.D. Myers | S.D. Myers SOW 01212010-2 | Statement of Work |
| SafeBridge Consultants, Inc. | SafeBridge Consultants, Inc. MSA | Master Service/Supply Agreements |
| Safety-Kleen Systems, Inc. | Safety-Kleen Systems, Inc. MSA | Master Service/Supply Agreements |
| Sage Environmental | Sage Environmental MSA | Master Service/Supply Agreements |
| Schneider | Schneider Electric Systems | Agreement |
| SCI Pharmtech Inc | SCI Pharmtech Inc MSA | Master Service/Supply Agreements |
| Security Services of CT | Security Services of CT MSA | Master Service/Supply Agreements |
| Security Services of CT | Security Services of CT SOW 01012014-7 | Statement of Work |
| Security Technologies, Inc. | Security Technologies, Inc. MSA | Master Service/Supply Agreements |
| Security Technologies, Inc. | Security Technologies, Inc. MSA | Master Service/Supply Agreements |
| ServPro of Providence | ServPro of Providence MSA | Master Service/Supply Agreements |
| Shawn Hartigan-Dakin D/B/A Mountain Air | Shawn Hartigan-Dakin D/B/A Mountain Air | Agreement |
| SHAWN T HARTIGAN | 4-Year PM Service Plan - 2 Lochinvar Condensing Boilers | Purchase Order |
| Shred-it USA LLC, a subsidiary of Stericycle, Inc. | Shred-it USA LLC, a subsidiary of Stericycle, Inc. AGREEMENT | Agreement |
| Shred-it USA LLC, a subsidiary of Stericycle, Inc. | Shred-it USA LLC, a subsidiary of Stericycle, Inc. AGREEMENT | Agreement |
| Siemens Industry, Inc. | Siemens Industry, Inc. MSA | Master Service/Supply Agreements |
| SimplexGrinnell LP | SimplexGrinnell LP SOW 07012014-2, A-1 | Statement of Work |
| Sitecon Corporation | Sitecon Corporation MSA | Master Service/Supply Agreements |
| SKURKA CONSTRUCTION INC | 2017-2020 Snow Plowing (Skurka) | Purchase Order |
| Skurka Construction Inc. | Skurka Construction Inc. MSA 04-20-2020 | Master Service/Supply Agreements |
| Skurka Construction Inc. | Skurka Construction Inc. SOW A-8 Ex-AS | Statement of Work |
| Spectra Automation Ltd | Spectra Automation Ltd_RT MSA 09-01-2024 (automation, implementation and testing services) | Master Service/Supply Agreements |
| Stonhard, Division of Stoncor Group, Inc. | Stonhard, Division of Stoncor Group, Inc._RT MSA 07-29-2024 (provide floor and wall systems) | Master Service/Supply Agreements |
| Suez WTS USA, Inc. | Suez WTS USA, Inc. MSA | Master Service/Supply Agreements |
| Sullivan & McLaughlin | Sullivan & McLaughlin_RT MSA 01-31-2025 (various electrical and technologies services) | Master Service/Supply Agreements |
| Sullivan & McLaughlin | Sullivan & McLaughlin_RT SOW 03012010-47 01-01-2022 (2020-2022 plant group and spot re-lamping) | Statement of Work |
| Sullivan & McLaughlin | Sullivan & McLaughlin SOW 03012010-44 (12-31-2020) (2019 Fire Alarm Testing) | Statement of Work |
| Sullivan & McLaughlin | Sullivan & McLaughlin_RT SOW 03012010-45 (12-31-2020) (fire pump testing and fire pump battery testing and inspection) | Statement of Work |
| Sullivan & McLaughlin | Sully Mac_RT SOW 03012010-46 12-31-2020 | Statement of Work |
| [REDACTED] | [REDACTED] AGREEMENT | License Agreement |
| [REDACTED] | [REDACTED]  Pty Ltd_RT Supply Agreement 12-31-2020 | Master Service/Supply Agreements |
| Surplus Solutions LLC | Surplus Solutions_RT Asset Purchase Agreement (one time) | Asset Purchase Agreement |
| Surplus Solutions, LLC | Surplus Solutions, LLC AGREEMENT | Sales Agreement |
| [REDACTED] | [REDACTED] | Commercial Supply Agreement |
| TECH PAINTING CO INC AND | 2020 Tech Painting Misc. Painting | Purchase Order |

| Counterparty | ContractName | ContractTypeName |
|---|---|---|
| Tech Painting Company Inc. | Tech Painting Company Inc. MSA | Master Service/Supply Agreements |
| The Lock Shop, Inc. | The Lock Shop, Inc. MSA | Master Service/Supply Agreements |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-8 | Statement of Work |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-9 | Statement of Work |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-8 (A2) | Statement of Work |
| Thermal Technologies, Inc. | Thermal Technologies, Inc._RT MSA 08-25-2024 (infrared thermography services for electrical equipment diagnostics, PM, | Master Service/Supply Agreements |
| Thermal Technologies, Inc. | Thermal Technologies, Inc._RT SOW 08252014-4 09-19-2021 | Statement of Work |
| Thielsch Engineering Div. Rise Engineering | Thielsch Engineering_RT MSA 09-01-2024 (engineering, laboratory, consulting, design, energy services and fabrication/rep | Master Service/Supply Agreements |
| Thomas & Betts Power Solutions, LLC, a member of the ABB Group | MC Dean (fka Thomas and Betts)_RT SOW 05152018-1 05-16-2023 (Network critical power equipment service plan) | Statement of Work |
| ThyssenKrupp Elevator Corporation | ThyssenKrupp Elevator Corporation MSA | Master Service/Supply Agreements |
| ThyssenKrupp Elevator Corporation | ThyssenKrupp Elevator Corporation SOW 08102016-1 | Statement of Work |
| TOOMEY WATER SERVICES INC | 2020 CW Water Meter and Back-flow Preventer Testing | Purchase Order |
| U.S. Bank Equipment Finanace (as assignee of Usherwood Office Technology) | Lease dated 8-7-18 | Lease |
| U.S. Bank Equipment Finanace (as assignee of Usherwood Office Technology) | Lease dated 4-23-19 | Lease |
| UL Kaplan EduNeering | UL Kaplan EduNeering MSA | Master Service/Supply Agreements |
| UL Kaplan EduNeering | UL Eduneering _RT Order 10398R  09-30-2020 | Statement of Work/Order |
| Unique Metal Works, LLC | Unique Metal Works, LLC MSA | Master Service/Supply Agreements |
| Univar USA Inc. | Univar Rhodes Beneficial Reuse Agr evergreen | Master Service/Supply Agreements |
| US BANK NATIONAL ASSOCIATION | Copiers - Rhodes Tech - Exeter, Westerly, Middleton, Cranston, Bridgewater, Quahog | Purchase Order |
| Usherwood Office Technology | Usherwood Office Technology Master Agreement | Master Service/Supply Agreements |
| Usherwood Office Technology | Usherwood Office Technology Service Agreement | Master Service/Supply Agreements |
| Usherwood Office Technology | Lease dated 3-3-20; related Maintenance Agreement | Lease |
| Usherwood Office Technology | Lease dated 4-2-19 | Lease |
| Utility Communications, Inc. | Utility Communications, Inc. MSA | Master Service/Supply Agreements |
| Veolia ES Technical Inc | Veolia ES Technical_RT Product Purchase Agreement 11-7-2020 (auto-renew) | Transfer Agreement |
| Veolia ES Technical Solutions LLC | Veolia_RT MSA (Waste) 07-26-2024 (waste disposal services, onsite management services, related support services, etc.) | Master Service/Supply Agreements |
| Vesta Partners, LLC | Vesta Partners, LLC MSA | Master Service/Supply Agreements |
| Walco Electric Company | Walco Electric Company_RT MSA 8-31-2025 | Master Service/Supply Agreements |
| Waterman Engineering Company | Waterman Engineering Company MSA | Master Service/Supply Agreements |
| Wechslet International, LLC | Wechslet International, LLC | Agreement |
| Wilner-Greene Associates, Inc. | Wilner-Greene Associates, Inc. MSA | Master Service/Supply Agreements |
| Woodard & Curran | Woodard & Curran MSA | Master Service/Supply Agreements |
| Working Words | Working Words MSA | Master Service/Supply Agreements |
| WSP USA Corp | WSP USA Corp MSA | Master Service/Supply Agreements |
| Xerox | Xerox CONTRACT | Lease |
| Xerox | Contract MX4-492537-Woonsocket | Lease |
| XEROX CORPORATION | Woonsocket – W7845PT Tandem, SN MX4-492537, IT –through 05/30/2021 | Purchase Order |
| Yankee Fiber Control | Yankee Fiber Control_RT Contracting Services Agreement 01-31-2025 | Master Service/Supply Agreements |

**<u>Exhibit B</u>**

**Purchased Patents**

[See attached]

**Exhibit B – Purchased Patents**

| COUNTRY | PATENT TITLE | APP. NO. | PATENT NO. | STATUS | FILING DATE | OWNER[1] |
|---|---|---|---|---|---|---|
| Australia | Process for N-dealkylation of tertiary amines | 2011263416 | 2011263416 | Granted | 2011-06-10 | Rhodes Technologies |
| Canada | Process for N-dealkylation of tertiary amines | 2802294 | 2802294 | Granted | 2011-06-10 | Rhodes Technologies |
| Switzerland | Process for N-dealkylation of tertiary amines | 11736153.5 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| Germany | Process for N-dealkylation of tertiary amines | 602011014031.0 | 602011014031.0 | Granted | 2011-06-10 | Rhodes Technologies |
| European Patent | Process for N-dealkylation of tertiary amines | 11736153.5 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| Spain | Process for N-dealkylation of tertiary amines | 11736153.5 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| France | Process for N-dealkylation of tertiary amines | 11736153.5 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| UK | Process for N-dealkylation of tertiary amines | 11736153.5 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| Israel | Process for N-dealkylation of tertiary amines | 223567 | 223567 | Granted | 2012-12-11 | Rhodes Technologies |
| Israel | Process for N-dealkylation of tertiary amines | 240503 | | Application | 2015-08-11 | Rhodes Technologies |
| Italy | Process for N-dealkylation of tertiary amines | 502015000016136 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| Netherlands | Process for N-dealkylation of tertiary amines | 117361535 | 2580218 | Granted | 2011-06-10 | Rhodes Technologies |
| PCT | Process for N-dealkylation of tertiary amines | PCT/IB2011/001328 | | Expired | 2011-06-10 | Rhodes Technologies |
| Taiwan | Process for N-dealkylation of tertiary amines | 100120389 | I471289 | Granted | 2011-06-10 | Rhodes Technologies |

[1] Note to Draft: The owners set forth in this schedule are the owners as reflected in the Seller's internal database. The Patents set forth in this Schedule as being owned by Rhodes Technologies may be owned by another Affiliate, or recorded in the name of an entity other than Seller. For clarity, Seller shall comply with Section 5.24 in respect of such Patents.

| USA | Process for N-dealkylation of tertiary amines | 13/711,288 | 8,921,556 | Granted | 2012-12-11 | Rhodes Technologies |
|---|---|---|---|---|---|---|
| USA | Process for N-dealkylation of tertiary amines | 14/558,513 | 9,309,258 | Granted | 2014-12-02 | Rhodes Technologies |
| Australia | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 2011263417 | 2011263417 | Granted | 2011-06-10 | Rhodes Technologies |
| Canada | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 2802295 | 2802295 | Granted | 2011-06-10 | Rhodes Technologies |
| Canada | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 2936749 | 2936749 | Granted | 2011-06-10 | Rhodes Technologies |
| Switzerland | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 11736154.3 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| Switzerland | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 15186900.5 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| Germany | Transition metal-catalyzed processes for preparing N-allyl compounds from tertiary amines | 602011040150.5 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| Germany | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 602011045493.5 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| European Patent | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 11736154.3 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| European Patent | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 15186900.5 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| Spain | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 2645725 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| Spain | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 15186900.5 | 2666404 | Granted | 2011-06-10 | Rhodes Technologies |
| France | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 11736154.3 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |

| | | | | | | |
|---|---|---|---|---|---|---|
| France | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 15186900.5 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| UK | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 11736154.3 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| UK | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 15186900.5 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| Israel | Transition metal-catalyzed processes for the preparation of n-allyl compounds | 223566 | 223566 | Granted | 2012-12-11 | Rhodes Technologies |
| Italy | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 502017000121407 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| Italy | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 502018000010275 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| Japan | Transition metal-catalyzed processes for preparing N-allyl compounds from tertiary amines | 2013-513776 | 5736040 | Granted | 2011-06-10 | Rhodes Technologies |
| Japan | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 2014-262237 | 6127040 | Granted | 2011-06-10 | Rhodes Technologies |
| Netherlands | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 11736154.3 | 2580201 | Granted | 2011-06-10 | Rhodes Technologies |
| Netherlands | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 15186900.5 | 2995614 | Granted | 2011-06-10 | Rhodes Technologies |
| PCT | Transition metal-catalyzed processes for preparing N-allyl compounds from tertiary amines | PCT/IB2011/001330 | | Expired | 2011-06-10 | Rhodes Technologies |
| Taiwan | Transition metal-catalyzed processes for preparing N-allyl compounds from tertiary amines | 100120387 | I478928 | Granted | 2011-06-10 | Rhodes Technologies |
| USA | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 13/711,520 | 9,127,014 | Granted | 2012-12-11 | Rhodes Technologies |

| | | | | | | |
|---|---|---|---|---|---|---|
| USA | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 14/818,199 | 9,593,124 | Granted | 2015-08-04 | Rhodes Technologies |
| USA | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 14/827,085 | 9,657,030 | Granted | 2015-08-14 | Rhodes Technologies |
| USA | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 14/827,104 | 9,624,232 | Granted | 2015-08-14 | Rhodes Technologies |
| USA | Transition metal-catalyzed processes for the preparation of N-allyl compounds and use thereof | 14/827,132 | 9,499,557 | Granted | 2015-08-14 | Rhodes Technologies |
| Australia | Low-temperature synthesis of methylphenidate hydrochloride | 2011342894 | 2011342894 | Granted | 2011-12-16 | Rhodes Technologies |
| Belgium | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies |
| Brazil | Low-temperature synthesis of methylphenidate hydrochloride | BR112013015072A | | Published | 2011-12-16 | Rhodes Technologies |
| Canada | Low-temperature synthesis of methylphenidate hydrochloride | 2822016 | 2822016 | Granted | 2011-12-16 | Rhodes Technologies |
| Switzerland | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies |
| China | Low-temperature synthesis of methylphenidate hydrochloride | 201180060441.5 | 103298785 | Granted | 2011-12-16 | Rhodes Technologies |
| Germany | Low-temperature synthesis of methylphenidate hydrochloride | 602011016004.4 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies; SCI Pharmtech, Inc. |
| European Patent | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies; SCI Pharmtech, Inc. |
| Spain | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies; SCI Pharmtech, Inc. |
| France | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies; SCI Pharmtech, Inc. |
| UK | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies; SCI Pharmtech, Inc. |
| Israel | Low-temperature synthesis of methylphenidate hydrochloride | 226597 | 226597 | Granted | 2011-12-16 | Rhodes Technologies |
| Italy | Low-temperature synthesis of methylphenidate hydrochloride | 502015000033214 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies |

| | | | | | | |
|---|---|---|---|---|---|---|
| Japan | Low-temperature synthesis of methylphenidate hydrochloride | 2013-543902 | 5886869 | Granted | 2011-12-16 | Rhodes Technologies |
| Korea | Low-temperature synthesis of methylphenidate hydrochloride | 10-2013-7018653 | 10-1561361 | Granted | 2011-12-16 | Rhodes Technologies |
| Mexico | Low-temperature synthesis of methylphenidate hydrochloride | MX/a/2013/007020 | 343653 | Granted | 2011-12-16 | Rhodes Technologies |
| Netherlands | Low-temperature synthesis of methylphenidate hydrochloride | 118111277 | 2651892 | Granted | 2011-12-16 | Rhodes Technologies |
| New Zealand | Low-temperature synthesis of methylphenidate hydrochloride | 612298 | 612298 | Granted | 2011-12-16 | Rhodes Technologies |
| PCT | Low-temperature synthesis of methylphenidate hydrochloride | PCT/IB2011/003140 | | Expired | 2011-12-16 | Rhodes Technologies |
| Philippines | Low-temperature synthesis of methylphenidate hydrochloride | 1-2013-501257 | 1-2013-501257 | Granted | 2011-12-16 | Rhodes Technologies |
| USA | Low-temperature synthesis of methylphenidate hydrochloride | 13/994,393 | 9,475,770 | Granted | 2013-10-28 | Rhodes Technologies |
| South Africa | Low-temperature synthesis of methylphenidate hydrochloride | 2013/5300 | 2013/5300 | Granted | 2011-12-16 | Rhodes Technologies |
| USA | 1,3-dioxanomorphides and 1,3-dioxanocodides | 13/975,747 | 9,315,514 | Granted | 2013-08-26 | Rhodes Technologies |
| Argentina | Methods for preparing buprenorphine | P160100641 | | Published | 2016-03-10 | Rhodes Technologies |
| Australia | Acetate salt of buprenorphine and methods for preparing buprenorphine | 2016230750 | 2016230750 | Granted | 2016-03-09 | Rhodes Technologies |
| Brazil | Acetate salt of buprenorphine and methods for preparing buprenorphine | BR112017019357 | | Published | 2016-03-09 | Rhodes Technologies |
| Canada | Acetate salt of buprenorphine and methods for preparing buprenorphine | 2977732 | | Application | 2016-03-09 | Rhodes Technologies |
| China | Acetate salt of buprenorphine and methods for preparing buprenorphine | 201680027202.2 | | Allowed | 2016-03-09 | Rhodes Technologies |
| Colombia | Acetate salt of buprenorphine and methods for preparing buprenorphine | NC2017/0009130 | | Published | 2016-03-09 | Rhodes Technologies |
| Eurasian Patent Convention | Acetate salt of buprenorphine and methods for preparing buprenorphine | 201792014 | | Application | 2016-03-09 | Rhodes Technologies |
| WIPO | Acetate salt of buprenorphine and methods for preparing buprenorphine | PCT 1479/2017 | | Expired | 2016-03-09 | Rhodes Technologies |
| European Patent | Acetate salt of buprenorphine and methods for preparing buprenorphine | 16709607.2 | | Published | 2016-03-09 | Rhodes Technologies |

| Indonesia | Acetate salt of buprenorphine and methods for preparing buprenorphine | P-00201706957 | IDP000066766 | Granted | 2016-03-09 | Rhodes Technologies |
|---|---|---|---|---|---|---|
| Israel | Acetate salt of buprenorphine and methods for preparing buprenorphine | 254384 | | Published | 2016-03-09 | Rhodes Technologies |
| India | Acetate salt of buprenorphine and methods for preparing buprenorphine | 201717031214 | | Published | 2017-09-04 | Rhodes Technologies |
| Japan | Acetate salt of buprenorphine and methods for preparing buprenorphine | 2017-547399 | 6660399 | Granted | 2016-03-09 | Rhodes Technologies |
| Japan | Acetate salt of buprenorphine and methods for preparing buprenorphine | 2019-186901 | | Published | 2016-03-09 | Rhodes Technologies |
| Korea | Acetate salt of buprenorphine and methods for preparing buprenorphine | 10-2017-7028535 | | Application | 2016-03-09 | Rhodes Technologies |
| Korea | Methods for preparing buprenorphine | 10-2020-7011729 | | Application | 2016-03-09 | Rhodes Technologies |
| Mexico | Acetate salt of buprenorphine and methods for preparing buprenorphine | MX/a/2017/011606 | | Published | 2016-03-09 | Rhodes Technologies |
| New Zealand | Acetate salt of buprenorphine and methods for preparing buprenorphine | 735736 | 735736 | Granted | 2016-03-09 | Rhodes Technologies |
| New Zealand | Acetate salt of buprenorphine and methods for preparing buprenorphine | 749978 | | Application | 2019-01-17 | Rhodes Technologies |
| Philippines | Acetate salt of buprenorphine and methods for preparing buprenorphine | 1-2017-501641 | | Application | 2017-09-08 | Rhodes Technologies |
| Singapore | Acetate salt of buprenorphine and methods for preparing buprenorphine | 20171107350T | | Published | 2016-03-09 | Rhodes Technologies |
| Taiwan | Methods for preparing buprenorphine | 20160107434 | | Allowed | 2016-03-10 | Rhodes Technologies |
| USA | Acetate salt of buprenorphine and methods for preparing buprenorphine | 15/507,453 | 10,406,152 | Granted | 2017-02-28 | Rhodes Technologies |
| USA | Acetate salt of buprenorphine and methods for preparing buprenorphine | 15/446,197 | 9,926,329 | Granted | 2017-03-01 | Rhodes Technologies |
| USA | Acetate salt of buprenorphine and methods for preparing buprenorphine | 15/894,520 | 10,278,967 | Granted | 2018-02-12 | Rhodes Technologies |
| USA | Acetate salt of buprenorphine and methods for preparing buprenorphine | 16/446,373 | | Allowed | 2019-06-19 | Rhodes Technologies |
| USA | Acetate salt of buprenorphine and methods for preparing buprenorphine | 16/446,397 | | Allowed | 2019-06-19 | Rhodes Technologies |
| PCT | Acetate salt of buprenorphine and methods for preparing buprenorphine | PCT/IB2016/051332 | | Expired | 2016-03-09 | Rhodes Technologies |
| South Africa | Acetate salt of buprenorphine and methods for preparing buprenorphine | 2017/05810 | 2017/05810 | Granted | 2016-03-09 | Rhodes Technologies |

## **Exhibit C**

**Excluded Contracts**

[See attached]

**Exhibit C - Excluded Contracts**

| Counterparty Name | Document Name | Type | Notes |
|---|---|---|---|
| Abbott | Abbott CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Adamis Pharmaceuticals Corporation | Adamis Pharmaceuticals Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Adtech Pharma | Adtech Pharma CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Adtech Pharma | Adtech Pharma_RT CDA 04-08-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Agilent | Agilent SOW 10012008-9 12-31-19 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| AGILENT TECHNOLOGIES INC | Agilent SOW 10012008-8 07-31-21 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| AGILENT TECHNOLOGIES INC | Master Services Agreement (PPLP) 10-1-2008 | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Agno Pharma | Agno Pharma CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Airgas, Inc. | Airgas, Inc. MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Albany Molecular Research, Inc. (AMRI) | AMRI_RT CDA 03-20-2022 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED] -RT CDA 04-09-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED]_RT CDA (theirs) 04-28-2030 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Alcami Corporation | Alcami Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Althaia S.A. Industria Farmaceutica - Lanza Pharma Ltda | Althaia S.A. Industria Farmaceutica - Lanza Pharma Ltda CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Amneal Pharmaceuticals LLC | Amneal Pharmaceuticals LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| AMRI SSCI, LLC (fka Aptuit) | AMRI SSCI, LLC (fka Aptuit) MSA | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Amyris, Inc. | Amyris, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Anatsigroup SAS, Axim Biotechnologies, Inc., Quay Pharma | Anatsigroup SAS, Axim Biotechnologies, Inc., Quay Pharmaceuticals, Xendo B.V. | Confidentiality Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| APC Workforce Solutions LLC d/b/a Zero Chaos | APC Workforce Solutions LLC d/b/a Zero Chaos Agreement | Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| APJeT, Inc. | APJeT, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Aquarius Ventures LLC | Aquarius Ventures LLC_RT CDA 02-25-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| ARC Document Solutions | ARC Document Solutions CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Arcadis U.S. Inc. | Arcadis U.S. Inc. Agreement | Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Arevipharma GmbH | Arevipharma GmbH CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Atmed Treatment Center | Atmed SOW 10012011-3 10-01-21 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Atmed Treatment Center | Atmed Treatment Center MSA | Master Service Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Atmed Treatment Center | Atmed Treatment Center SOW 10012011-2 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Aucta Pharmaceuticals, LLC | Aucta Pharmaceuticals, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| AustarPharma | AustarPharma CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Avanti-Tetra BioPharma-RT | Avanti-Tetra BioPharma-RT CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| AXIM Biotechnologies, Inc. | AXIM Biotechnologies, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Axim Biotechnologies, Inc., Anatsigroup SAS, Quay Pharma | Axim Biotechnologies, Inc., Anatsigroup SAS, Quay Pharmaceuticals, Xendo B.V. | Confidentiality Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| AZ Corporation-Leidos Engineering, LLC- National Grid | AZ Corporation-Leidos Engineering, LLC- National Grid CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| AZAD Pharma AG | AZAD Pharma AG CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Barry-Wehmiller Design Group Inc. | Barry-Wehmiller Design Group Inc. MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| BASF Corporation | BASF Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| BenefitFocus | BenefitFocus Client Services Agreement | Client Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Bespak Europe Limited | Bespak Europe Limited CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| BI Worldwide | BI Worldwide MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Bionorica Ethics GmbH | Bionorica Ethics GmbH CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| BioPharmaWorks, LLC | BioPharmaWorks, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Bloom Energy Corporation | Bloom Energy Corporation_RT CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| BlumShapiro | BlumShapiro CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Brand-Nu Laboratories | Brand-Nu Laboratories CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| BrandNu Laboratories | BrandNu Labs_RT CDA 06-12-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED]_RT CDA 04-18-2024 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| CambridgeSoft Corporation | CambridgeSoft Corporation MSA | Master Service/Supply Agreements | Non-Assignable Contract – contract is used by a non-Seller entity |
| CARON PRODUCTS & SERVICES INC | Amendment 2 to MSA | Amendment | Non-Assignable Contract – contract is with a non-Seller entity |
| CARON PRODUCTS & SERVICES INC | Caron Products & Services, Inc. SOW 01312016-8 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| CARON PRODUCTS & SERVICES INC | Caron Products_RT MSA 01-31-2025 | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| CARON PRODUCTS & SERVICES INC | Caron SOW 01312016-4 01-01-19 | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| CARON PRODUCTS & SERVICES INC | Caron SOW 01312016-5 07-10-19 | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| CARON PRODUCTS & SERVICES INC | Caron_RT SOW 01312016-6 (02-20-2020) (Light chamber and recirculator PM, c | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| Cat Rock Energy, LLC  Efficient Lighting Consultants | Cat Rock Energy-Efficient Lighting - RT 06-05-2024 (lighting, including lighting an | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED] | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| CBIZ Tofias | CBIZ Tofias  CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| CD-Adapco | CD-Adapco CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Ceridian Dayforce | Ceridian Dayforce Agreement 2012 | Service Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Ceridian Dayforce | Ceridian Dayforce Amendment 2019 | Amendment | Non-Assignable Contract – contract is with a non-Seller entity |
| Chang, Wei-Wei | Chang, Wei-Wei AGREEMENT | Research, Dev, License Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Chang, Wei-Wei - Gibralter, Richard - Sawyer, Kenneth | Chang, Wei-Wei - Gibralter, Richard - Sawyer, Kenneth ASSIGNMENT | Assignment | Non-Assignable Contract – contract is not exclusively related to the Business |
| Chemical Solutions Ltd. | Chemical Solutions Ltd. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Chemir | Chemir CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| China Meheco Corp. | China Meheco Corp CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Chiral Technologies, Inc. | Chiral Technologies, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Cintas | Standard Rental Services Agreement | Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| CINTAS CORPORATION | 2020 Rhodes Technologies Uniform Services | Purchase Order | Non-Assignable Contract – contract is used by a non-Seller entity |
| Cisco | Cisco EULA | End User License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Citrix Enterprise | Citrix enterprise-eula | End User License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| CJ Chemie Uetikon GMBH | Uetikon CDA 09-02-20 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| CLARIANT CORPORATION | Lease Agreement | Lease | Non-Assignable Contract – contract is with a non-Seller entity |
| Clinpak Technologies | Clinpak Technologies CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Convercent | Convercent- MSA (2018-12-14)_EXECUTED | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Cornerstone | Cornerstone Master Agreement | Master Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Coryn Pharmaceuticals | Coryn Pharmaceuticals_RT CDA 11-21-2024 (supply and manufacture of API) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Croda Inc. | Croda Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| CU Chemie Uetikon GMBH | CU Chemie Uetikon GMBH CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| DASSAULT SYSTEMES AMERICAS CORP | Hosting Services and Managed Services - March 2020 - March 2021 | Purchase Order | Non-Assignable Contract – contract is used by a non-Seller entity |
| Dassault Systèmes Americas Corp. | Dassault DS MSA USA 12.1 Rhodes Technologies_03-05-2019_fully executed | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Dassault Systèmes Americas Corp. | Dassault DS_RT Fixed Price SOW_Fully Executed | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| Dassault Systèmes Americas Corp. | Dassault DS_RT Time and Materials SOW_Fully Executed | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| Dassault Systèmes Americas Corp. | Dassault Master CLOSA (direct) - USA - V12.1(Rhodes Technologies) FINAL (EXEC | Customer License and Online Services Agree | Non-Assignable Contract – contract is with a non-Seller entity |
| Dassault Systèmes Americas Corp. | Dassault RT T&M SOW CornerstoneNYQUMAS 07-31-2020 | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| Dassault Systèmes Americas Corp. | Dassault_RT Project Change Request | Change Request | Non-Assignable Contract – contract is with a non-Seller entity |
| Databasics | Databasics Hosting Agreement | Software Hosting Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Davos & Reuter | Davos & Reuter CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Davos/Sai Advantium | Davos/Sai Advantium  CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Deloitte Consulting LLP | Deloitte Consulting LLP CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Dottikon Exclusive Synthesis AG | Dottikon Exclusive Synthesis AG CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Dow Chemical Company, The | Dow Chemical Company, The CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Duggan Associates | Duggan Associates CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Dunbar Global Logistics | Dunbar Global Logistics CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| EAG, Inc. | EAG, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Egencia | Egencia Master Agreement | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Elite Pharmaceutical Services Inc. | Elite Pharmaceutical Services Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| EMC Corporation | Basic Order Agreement | Order Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| EMC Corporation | Continuous Coverage Product Maintenance Agreement | Maintenance Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| EMC Corporation | EMC Corporation Purdue MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |

| Counterparty Name | Document Name | Type | Notes |
|---|---|---|---|
| EMD Millipore | Millipore (EMD)_RT SOW 03122008-17 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| EMD Millipore Corporation | EMD Millipore_RP MSA 06-07-2022 | Master Services Agreement | Non-Assignable Contract – contract is excluded under the APA |
| EMD Millipore Corporation | Millipore Corporation_RT 06072019-2 01-01-2021 (Water Equipment (Milli-Q In | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Enantia SL | Enantia SL CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Ernst & Young | Ernst & Young - Engagement Letter | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Ernst & Young | Ernst & Young - Letter | Letter of Intent | Non-Assignable Contract – contract is excluded under the APA |
| Ernst & Young | Ernst & Young - MSA | Master Services Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Ernst & Young | Ernst & Young - Statement of Work | Statement of Work | Non-Assignable Contract – contract is excluded under the APA |
| Eurofarma Laboratorios S.A. | Eurofarma Laboratorios S.A. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| EUROFINS LANCASTER LABORATORIES INC | Eurofins Lancaster_Purdue MLNCSA 03-31-2024 | er Laboratory and Non-Clinical Services Agree | Non-Assignable Contract – contract is with a non-Seller entity |
| EUROFINS LANCASTER LABORATORIES INC | Eurofins Lancaster_SOW 12-31-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Eurofins Panlabs, Inc. | Eurofins Panlabs, Inc._RT CDA 04-22-2024 (possible business collaboration) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Eurofins-Tetra-RT | Eurofins-Tetra-RT CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Euticals S.p.a. | Euticals S.p.a. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Euticals S.p.A. | Euticals S.p.A._RT CDA (certain business opportunities) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Experimur | Experimur CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Extranthis UG | Extranthis UG CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Eyenovia Inc. | Eyenovia Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Fluonic, Inc. | Fluonic, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Foss NIRSystems, Inc. | Foss Master Services Agreement (Purdue Pharma LP) | Master Services Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Frontage Laboratories and Tetra Biopharma | Frontage-Tetra-RT CDA 10-25-2024 (REDACTED) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Frontage Laboratories, Inc. | Frontage Master CRO Services Agreement | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Frontage Laboratories, Inc. | Frontage-Tetra-RT CDA 10-25-2024 | Confidentiality Disclosure Agreement | Non-Assignable Contract – contract is excluded under the APA |
| G&W Laboratories, Inc. | G&W Laboratories, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| G.C. Chemie Pharmie | G.C. Chemie Pharmie CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| GeneriCo Pharmaceuticals | GeneriCo Pharmaceuticals CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Generics international (US) Inc. dba Qualitest Pharmaceutic | Confidentiality Disclosure Agreement 5-7-17 | Confidentiality Disclosure Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Gensuite LLC | Gensuite_Purdue MSA 12-03-2021 | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Gensuite LLC | Gensuite_RT SOW 06-30-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Gibralter, Richard - Chang, Wei-Wei - Sawyer, Kenneth | Gibralter, Richard - Chang, Wei-Wei - Sawyer, Kenneth ASSIGNMENT | Assignment | Non-Assignable Contract – contract is not exclusively related to the Business |
| GlaxoSmithKline | GlaxoSmithKline CDA - RP | Confidentiality Disclosure Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Grunenthal GmbH | Grunenthal GmbH CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Harm Reduction Therapeutics | Harm Reduction Therapeutics (HRT)_Purdue CDA 11-09-2022 (HRT's naloxone p | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| HCL | HCL MSA _FINAL 4-27-2018 | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Huahai US, Inc. | Huahai US, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Human Pharm, Inc. | Human Pharm, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Hyasynth Bio, Inc. | Hyasynth Bio, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| IJS Global, Inc. | IJS Global, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| ILC Dover | ILC Dover CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Institut Químic de Sarria CETS Fundacio Privada | Institut Químic de Sarria CETS Fundacio Privada CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Interchem (ODO) | Interchem (ODO) CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Intrexon Corporation | Intrexon Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| IPPE | IPPE CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| IQVIA AG | IQVIA Ltd_RT Services Agreement (SOW) 12-31-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| IQVIA AG | IQVIA AG_RT Information Services Agreement 12-31-2020 | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Iron Mountain | Iron Mountain CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| ISPE | ISPE CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| IZUN Pharmaceuticals Corporation | IZUN Pharmaceuticals Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| JB Therapeutics | JB Therapeutics CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| JDA Software Group, Inc. | JDA Software Group, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Johnson Matthey | Johnson Matthey CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Kamal Pharmachem Inc | Kamal Pharmachem_RT CDA 02-24-2021 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Kofax | Kofax License Agreement | License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| KriSan Biotech, Co. Ltd. | KriSan Biotech, Co. Ltd. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Lanza Pharma Ltda | Lanza Pharma Ltda CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Lanza Pharma Ltda - Althaia S.A. Industria Farmaceutica | Lanza Pharma Ltda - Althaia S.A. Industria Farmaceutica CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Lanza Pharma Ltda - Uniao Química Farmaceutica Nacional | Lanza Pharma Ltda - Uniao Química Farmaceutica Nacional S/A CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Lee Pharmaceutical Holdings Limited | Lee Pharmaceutical Holdings Limited CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Leidos Engineering, LLC - National Grid - AZ Corporation | Leidos Engineering, LLC - National Grid - AZ Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Liaison Integration Services | Liaison Integration Services Master Agreement | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| LJB, Inc. | LJB, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Loewenstein, Robert | Loewenstein, Robert_RT MSA 12-31-2020 (consulting services for regulatory aff | Master Services Agreement | Non-Assignable Contract – contract is expiring and will not be renewed |
| Lorenz International LLC | Lorenz International LLC AGREEMENT | License Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Major Pharmaceuticals - SVC | Major Pharmaceuticals - SVC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Mallinckrodt LLC | Mallinckrodt LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Malvern Instruments | Malvern Instruments MSA (05-31-2020) (PM, service, repair, calibration, testing | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Malvern Instruments | Malvern Instruments MSA 05202010-11 06-01-2020 (diffraction product line - b | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Malvern Panalytical | Malvern Panalytical_RP SOW 05202010-13 05-16-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Malvern Panalytical | Malvern Panalytical_RT MSA SOW 05202010-14 06-01-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Malvern Panalytical | Malvern Panalytical_RT SOW 05202010-11 06-01-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mandala International | Mandala International CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| MedPharm Ltd | MedPharm CDA- 03-02-22 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| MedPharm Ltd | MedPharm Ltd MSA | Master Services Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| MedPharm Ltd | MedPharm SOW | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mercer Inc | Engagement Letter Agreement, evergreen | Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Merck KGaA (parent company of US subsidiary, MilliporeSi | Merck KGaA (MilliporeSigma)_RT CDA 05-17-2022 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Merck Sharp & Dohme Corp. | Merck Sharp & Dohme Corp. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| METTLER TOLEDO INC | PM/Calibrate MT Truck Tanker Scale 2018-2020 | Purchase Order | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mettler Toledo, Inc. | Mettler Toledo, Inc. MSA (exp 12-04-2020) | Master Service/Supply Agreements | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mettler Toledo, Inc. | MT_RT SOW 12042012-37 02-27-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mettler Toledo, Inc. | Rhodes Tech FOWN renewal quote 2020-100177755 | Quotation | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mettler Toledo, LLC | Mettler Toledo, Inc. SOW 12042012-27 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mettler Toledo, LLC | Mettler Toledo, Inc_RT SOW 12042012-33 (12-31-2020) (Burette and titrator - P | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Mettler Toledo, LLC | Mettler-Toldeo LLC MSA | Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Microsoft | Microsoft Business Agreement - 01.01.2002 | Business Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Midas Pharmaceuticals Inc. | Midas Generic CDA 07-26-18 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| MIELE INC | Miele Inc. MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| MIELE INC | Miele Inc. SOW 07122010-25 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| MIELE INC | Miele_RT MSA SOW 07122010-28 09-26-2020 | laster Services Agreement/Statement of Wor | Non-Assignable Contract – contract is used by a non-Seller entity |
| MIELE INC | Miele_RT MSA SOW 07122010-29 09-26-2020 | laster Services Agreement/Statement of Wor | Non-Assignable Contract – contract is used by a non-Seller entity |
| MIELE INC | Miele_RT MSA SOW 07122010-31 09-26-2021 | laster Services Agreement/Statement of Wor | Non-Assignable Contract – contract is used by a non-Seller entity |
| MIELE INC | Miele_RT MSA SOW 07122010-32 09-26-2021 | laster Services Agreement/Statement of Wor | Non-Assignable Contract – contract is used by a non-Seller entity |
| Millipore | Millipore SOW 03122008-13 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Millipore Corp | Millipore Corporation SOW 03122008-14 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Millipore Corp | Millipore_RP MSA 06-07-2022 | Master Services Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Millipore Corp | Millipore_RT SOW 06072019-1 01-31-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Millipore Corp | Millipore_RT SOW 06072019-2 01-01-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Millipore Corp | Millipore_RT SOW 06072019-3 04-30-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Minakem SAS | Minakem SAS CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Molecular Isotope Technologies | Molecular Isotope Technologies CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Mucodel Pharma | Mucodel Pharma CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Mundipharma Research Limited | Mundipharma Research Limited CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |

| Counterparty Name | Document Name | Type | Notes |
|---|---|---|---|
| Nalas Engineering Services, Inc. | Nalas_RT CDA 02-19-2024 (process development, safety-related activities, etc.) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| National Grid - AZ Corporation - Leidos Engineering, LLC | National Grid - AZ Corporation - Leidos Engineering, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Navinta LLC | Navinta LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| NEE | NEE  CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Nemus Bioscience | Nemus Bioscience CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Neurogen Corporation | Neurogen Corporation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| New England Electropolishing d/b/a NEE | New England Electropolishing d/b/a NEE CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| New Harbor Group-Photoflight-Reel Big Media 4 -way | New Harbor Group-Photoflight-Reel Big Media 4 -way CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Nissan | Nissan CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Norac Pharma | Norac Pharma CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Noramco, Inc. | Noramco, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Noramco, Inc. | Noramco, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| NorthStar Automation | NorthStar Automation - CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| NSF Health Sciences, LLC | NSF Health Sciences, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| NSF Health Sciences, LLC | NSF Health Sciences, LLC MSA | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| ODO Interchem | ODO Interchem CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| OnBase | OnBase End User License Agreement | End User License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Oracle | Oracle License and Services Agmt  (4 16 12) | License and Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Orexigen Therapeutics, Inc. + Rondaxe Pharma, LLC | Orexigen Therapeutics, Inc. + Rondaxe Pharma, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Organix, Inc. | Organix, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| OrganoPharma | OrganoPharma CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Oriel STAT-A-MATRIX | Oriel STAT-A-MATRIX CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Oza Enterprises | Oza Enterprises (summit synethics) CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Paracesus University | Paracesus University  CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Patagonia Pharmaceuticals LLC | Patagonia Pharmaceuticals LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| PerkinElmer Health Sciences, Inc. | PerkinElmer Health Sciences, Inc. MSA | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| PerkinElmer Informatics, Inc. (CambridgeSoft/ChemDraw - | PerkinElmer Informatics, Inc. AGREEMENT | License Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Pfizer, Inc. | Pfizer, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| PharmaBiosource Inc. | PharmaBiosource Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| PharmaCore | PharmaCore CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| PharmaCore | PharmaCore CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Pharmadax, Inc. | Pharmadax, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Pharmazeutisch Medizinisches Management (PMM) - See W | Pharmazeutisch Medizinisches Management (PMM) - See Wolfgang Fleischer, | Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| PhosphonicS Ltd | PhosphonicS Ltd CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Photoflight-New Harbor Group-Reel Big Media 4 -way | Photoflight-New Harbor Group-Reel Big Media 4 -way CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| PHT International, Inc. | PHT International, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Polaris Life Science - U-chem | Polaris Life Science - U-Chem CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Polaris MEP | Polaris MEP MSA | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Powdersize LLC | Powdersize (Lonza)_RT CDA_02-18-2022 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Powdersize LLC | Powdersize LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Prati, Donaduzzi & CIA Ltda | Prati, Donaduzzi & CIA Ltda CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Prodrug LLC | Prodrug LLC_RT CDA 10-4-2024 (ventures relating to prodrug technology) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED] | [REDACTED] | Non-Assignable Contract – contract is not exclusively related to the Business |
| Purdue Pharma L.P. | Purdue Pharma L.P. AGREEMENT | Joint Research Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Purdue Pharma L.P. | Purdue Pharma L.P. AGREEMENT | Master Service/Supply Agreements | Non-Assignable Contract – contract is not exclusively related to the Business |
| Purdue Pharma L.P. | Purdue Pharma L.P. AGREEMENT | Confidentiality Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Quay Pharmaceuticals, Anatsigroup SAS, Axim Biotechnolo | Quay Pharmaceuticals, Anatsigroup SAS, Axim Biotechnologies, Inc., Limited, , X | Services Quality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Rafa Laboratories | Rafa Laboratories CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| RAYMOND GLOWAKY | Glowaky_RT MSA (Consultant) 12-31-2020 | Master Services Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Reactive Intermediates | Reactive Intermediates_RT CDA 06-14-2024 (fine chemical manufacturing) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Reel Big Media -Photoflight-New Harbor Group- 4 -way | Reel Big Media -Photoflight-New Harbor Group- 4 -way CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| RespireRx Pharmaceuticals Inc. | RespireRx Pharmaceuticals Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| RespireRx Pharmaceuticals Inc. - Torreya Partners | RespireRx Pharmaceuticals Inc. - Torreya Partners  CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Rhodes Pharmaceuticals | Quality Agreement 10-23-2009 | Quality Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Rhodes Pharmaceuticals | Quality Agreement B-15-2013; Amendment 10-26-2016 | Quality Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Rhodes Pharmaceuticals | Rhodes Pharma AGREEMENT | Joint Research Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| Rhodes Pharmaceuticals | Rhodes Pharma MSA | Master Service/Supply Agreements | Non-Assignable Contract – contract is not exclusively related to the Business |
| RhodesPharmaceuticals | Rhodes Pharma PSO | PSO | Non-Assignable Contract – contract is not exclusively related to the Business |
| Ridgway's LLC | Ridgway's LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| River Stone Biotech ApS, CVR | River Stone Biotech_RT Mutual CDA 11-21-2020 (manufacture of API) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Road Scholar Transport | Road Scholar Transport_RT CDA 04-07-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Romeg Therapeutics, LLC | Romeg Therapeutics, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Rondaxe Pharma, LLC + Orexigen Therapeutics, Inc. | Rondaxe Pharma, LLC + Orexigen Therapeutics, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| RPS ASA | RPS ASA | Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| S&B Growth Inc. | S&B Growth Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| S&B Pharma Inc | S&B Pharma Inc CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Sai Advantium/Davos | Sai Advantium/Davos CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Saneca Pharmaceuticals a.s. | Saneca Pharmaceuticals a.s. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| SAP | SAP License Agreement | License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| SAP Ariba | SAP Ariba Cloud Supplemental Terms and Conditions v5 | Terms & Conditions | Non-Assignable Contract – contract is with a non-Seller entity |
| SAP Cloud Services | General Terms and Conditions for SAP Cloud Services | Terms & Conditions | Non-Assignable Contract – contract is with a non-Seller entity |
| Sawyer, Kenneth -Chang, Wei-Wei - Gibralter, Richard | Sawyer, Kenneth -Chang, Wei-Wei - Gibralter, Richard  ASSIGNMENT | Assignment | Non-Assignable Contract – contract is not exclusively related to the Business |
| Serina Therapeutics | Serina Therapeutics CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| SHIMADZU SCIENTIFIC | Shimadzu Scientific_RT SOW 05012009-12 01-08-2023 | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| SHIMADZU SCIENTIFIC | Shimadzu_PPLP MSA 04-30-2024 | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Shimadzu Scientific Instruments, Inc. | Shimadzu Scientific Instruments_Purdue MSA 04-03-2024 (installation, training, | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Shred-it USA LLC | Shred-it USA LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Siemens Product Lifecycle Management Software Inc. | Siemens Product Lifecycle Management Software Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Sigma-Aldrich, Inc. | Sigma-Aldrich, Inc. AGREEMENT | Pricing Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| SK Life Sciences | SK Life Sciences CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Skillsoft | Skillsoft Master License Agreement 06.01.15 - Executed | Master License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Smith, Kevin J. Ph.D. | Smith, Kevin J. Ph.D. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Snapdragon Chemistry, Inc. (Firefly) | Snapdragon Chemistry, Inc. (Firefly) CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Sovereign Pharmaceuticals, LLC | Sovereign Pharmaceuticals, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Sparta | Sparta - Purdue Trackwise License and Support Agreement exec 3-26-12 | License and Support Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Sparta Systems, Inc. | Sparta Systems, Inc. MSA | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Spartan Captial Securities | Spartan Captial Securities CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Spectra Automation | Spectra Automation CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| SPECTRA AUTOMATION LTD | 2020 PO for SPECTRA AUTOMATION LTD | Purchase Order | Non-Assignable Contract – contract is used by a non-Seller entity |
| Spectrum Laboratory Products, Inc. | Spectrum Lab Products_RT CDA 02-11-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Spectrum Laboratory Products, Inc. | Spectrum Laboratory Products, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| SSCI - see Aptuit | SSCI - see Aptuit CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Stelis Biopharma Private Limited | Stelis Biopharma Private Limited CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| STERLING INFOSYSTEMS INC | 2020 Background/Drug Screen- Rhodes Tech. | Purchase Order | Non-Assignable Contract – contract is used by a non-Seller entity |
| Sterling Pharmaceuticals Services LLC | Sterling Pharmaceuticals Services LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Sterling Pharmaceuticals Services LLC - Therapix Bioscience | Sterling Pharmaceuticals Services LLC - Therapix Biosciences Ltd CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Summit Biosciences, Inc. | Summit Biosciences, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Summit Biosciences, Inc. | Summit Biosciences, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED]_RT CDA 04-17-2024 (supply of API intermediates and raw materials | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED] CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED] CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Sundai Meditech Company, Ltd. | Sundai Meditech Company, Ltd. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |

| Counterparty Name | Document Name | Type | Notes |
|---|---|---|---|
| SVC - American Health Packaging | SVC - American Health Packaging CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| SVC - Major Pharmaceuticals | SVC - Major Pharmaceuticals CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| [REDACTED] | [REDACTED] Motor Carrier Services AGREEMENT | Services Agreement | Non-Assignable Contract – contract is excluded under the APA |
| TA Instruments | TA Instruments MSA | Master Service Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| TA Instruments-Waters LLC | TA Instruments_RP SOW 07152011-9 04-30-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| TA Instruments-Waters LLC | TA Instruments_RT SOW 07152011-10 exp 11-13-2020 (Advantage Support Con | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| TapeMark Co | TapeMark Co CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| TapeMark Co | TapeMark Co CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Tetra Bio-Pharma | Tetra Bio-Pharma CDA (purchase and sale of API) | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Tetra Bio-Pharma-Avanti-RT | Tetra Bio-Pharma-Avanti-RT CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Tetra Bio-Pharma-Eurofins-RT | Tetra Bio-Pharma-Eurofins-RT CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| The University of South Florida Board of Trustees | USF_RP Research Agreement 12-1-2019 | Research Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Therapix Biosciences Ltd | Therapix Biosciences Ltd CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Therapix Biosciences Ltd - Sterling Pharmaceuticals Services | Therapix Biosciences Ltd - Sterling Pharmaceuticals Services CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Thermaxx, LLC | Thermaxx, LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Thermo Electron | Thermo Electron_RT MSA SOW 12172009-34 10-27-2020 (ICS500 unity extended | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Electron NA | Thermo Electron_RT MSA SOW 12172009-33 09-17-2020 (Thermo Nicolet iS10-( | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Electron North America LLC | Thermo Electra NA_RT 12172009-32 09-30-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Electron North America LLC | Thermo Electron NA LLC_RT MSA 12-21-2024 (maintenance, service, repair, cali | Master Service/Supply Agreements | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Electron North America LLC | Thermo Electron NA_RT SOW 12172009-36 09-17-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Electron North America LLC | Thermo Electron NA_RT SOW 12172009-37 09-30-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Electron North America LLC | Thermo Electron NA_RT SOW 12172009-38 10-27-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| THERMO ELECTRON NORTH AMERICA LLC | Thermo Nicolet iS10 FT-IR Service Contract with Qual. 2020-2021 | Purchase Order | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Fisher Scientific (Asheville) | Thermo Fisher Scientific (Asheville) MSA | Master Service/Supply Agreements | Non-Assignable Contract – contract is used by a non-Seller entity |
| Thermo Fisher Scientific (Asheville) | ThermoFisher Asheville_RT SOW 06042010-14 07-28-2021 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| TLC Biopharmaceuticals, Inc. | TLC Biopharmaceuticals, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Torreya Partners - RespireRx Pharmaceuticals Inc. | Torreya Partners - RespireRx Pharmaceuticals Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| TXP Services Inc. | TXP Services Inc. Tax Services AGREEMENT | Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| TXP Services Inc. | TXP Services_Coventry Technologies (12-31-2020) (DCG & T&E, Finance & Accou | Statement of Work | Non-Assignable Contract – contract is with a non-Seller entity |
| UCB Pharma SA | UCB Pharma SA CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| U-Chem - Polaris Life Science | U-Chem - Polaris Life Science CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Uniao Quimica Farmaceutica Nacional S/A - Lanza Pharma | Uniao Quimica Farmaceutica Nacional S/A - Lanza Pharma Ltda  CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| United Services of America, Inc. | United Services of America, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Univar Solutions | Univar Solutions_RT CDA 04-14-2025 | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Univar USA Inc. | Univar USA Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| University of Huddersfield | University of Huddersfield CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| University of Huddersfield | UoH CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| University of New England | University of New England MSA | Master Service/Supply Agreements | Non-Assignable Contract – contract is not exclusively related to the Business |
| University of New England | University of New England SOW | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| University of RI Research Foundation | University of RI Research Foundation d/b/a Polaris MEP MSA 03-01-21 | Master Services Agreement | Non-Assignable Contract – contract is not exclusively related to the Business |
| UPM Pharmaceuticals | UPM Pharmaceuticals CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| US WorldMeds LLC | US WorldMeds LLC CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| USF | USF CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Veolia (Onyx) | Veolia (Onyx) MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Veolia Environmental Services, LLC | Veolia Environmental NJ- evergreen | Letter Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Veolia Environmental Services, LLC | Veolia Environmental Services, LLC MSA | Master Services Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Veolia Environmental Services, LLC | Veolia Environmental Services, LLC SOW 09022010-20 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Vertex License Agreement | Vertex License Agreement | License Agreement | Non-Assignable Contract – contract is with a non-Seller entity |
| Virginia Commonwealth University | VCU CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| VXL Life Sciences | VXL Life Sciences CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Water Technologies | Water Technologies  SOW 01012008-24 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters | Waters_RT SOW 01012008-35  12-31-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters | Waters_RT SOW 01012008-36 10-29-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters | Waters_RT SOW 01012008-39 12-31-2020 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters Corporation | Waters_RT SOW 01012008-30 (exp 10-29-2019) (18-19 NuGenesis Maintenance | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters Corporation | Waters_RT SOW 01012008-37 09-10-2020 (Empower 3 upgrade to FR4/FR5 and | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters Technologies | Waters Technologies - Amended & restated MSA | Master Services Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters Technologies | Waters Technologies SOW 01012008-25 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters Technologies | Waters Technologies SOW 01012008-29 | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Waters Technologies Corporation (no longer a d/b/a) | Waters Technologies Corp_RT SOW 01012008-38 12-31-2020 (2020 service plan | Statement of Work | Non-Assignable Contract – contract is used by a non-Seller entity |
| Wechslet International, LLC - cannot find | Wechslet International, LLC | Agreement | Non-Assignable Contract – contract is used by a non-Seller entity |
| Wei-Wei Chang | Wei-Wei Chang Assignment | Assignment | Non-Assignable Contract – contract is not exclusively related to the Business |
| West-Ward Pharmaceutical Corp. | West-Ward Pharmaceutical Corp. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Woodard & Curran - Paul B. Aldinger and Associates, Inc. | Woodard & Curran - Paul B. Aldinger and Associates, Inc. CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Xendo B.V., Amatisgroup SAS, Axim Biotechnologies, Inc., Q | Xendo B.V., Amatisgroup SAS, Axim Biotechnologies, Inc., Quay Pharmaceutica | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Yale University | Yale University CDA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Yankee Fiber Control, Inc. | Yankee Fiber Control, Inc. MSA | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |
| Z-Epsilon Holdings, LLC | Z-Epsilon Holdings, LLC | Confidentiality Agreement | Non-Assignable Contract – contract is excluded under the APA |

## **Exhibit D**

### **Rhodes Pharmaceuticals L.P. Assets**

[See attached]

| **Exhibit D - Excluded RP Assets** | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| **Rhodes Pharma Analytical Lab Equipment** | | | | | |
| RPAD # | Description | Model #/Catalog # | Serial # | Location | Qualification Contact Vendor | Comments |
| RPAD 004A | Waters e2695 Separation Module | e2695 | F10SM4478A | 208 | | |
| RPAD 004B | Waters 2998 Photodiode Array Detector | 2998 | F10998245A | 208 | | |
| RPAD 004C | Waters 2489 UV/Visible Detector | 2489 | F1087E475A | 208 | | |
| RPAD 005A | Waters e2695 Separation Module | e2695 | F10SM4445A | 208 | | |
| RPAD 005B | Waters 2489 UV/Visible Detector | 2489 | F1087E478A | 208 | | |
| RPAD 006A | Waters e2695 Separation Module | e2695 | F10SM4480A | 208 | | |
| RPAD 006B | Waters 2489 UV/Visible Detector | 2489 | F1087E484A | 208 | | |
| RPAD 006C | Refractometer | Differential Refractometer | K12214205M | 208 | | |
| RPAD 007A | Waters Acquity UPLC H Class Quaternary Solvent Manager | Acquity UPLC H Class | F10QSM022A | 208 | | |
| RPAD 007B | Waters Acquity UPLC H Class Sample Manager | Acquity UPLC H Class | F10SDI604N | 208 | | |
| RPAD 007C | Waters Acquity UPLC H Class Column Manager | Acquity UPLC H Class | J10CMP180N | 208 | | |
| RPAD 007D | Waters Acquity UPLC H Class Photodiode Array Detector | Acquity UPLC H Class | F10UPD876A | 208 | | |
| RPAD 008A | Waters e2695D XE Separation Module | e2695D XE | D10SD6020A | 208 | | |
| RPAD 008B | Waters 2489 UV/Visible Detector | 2489 | F1087E482A | 208 | | |
| RPAD 008C | Waters Transfer Module A | WTM | D09WTM609M | 208 | | |
| | Waters Transfer Module B | WTM | D09WTM609M | 208 | | |
| RPAD008D | Waters 2998 Photodiode Array Detector | 2998 | M13998664A | 208 | | |
| RPAD 009A | Flow Sciences Top Mounted Balance Encounter FS10300 | FS10300 | 07-U-01-04 | 207-208 | | |
| RPAD 009B | Flow Sciences Hepa-Filter C-1744 | C-1744 | 07-U15-07 | 207-208 | | |
| RPAD 010A | Flow Sciences Top Mounted Balance Encounter FS10400 | FS10400 | 07-U-01-01 | 207-208 | Flow Sciences | |
| RPAD 010B | Flow Sciences Hepa-Filter 18-X-36 | 18-X-36 | 06-28-10-03 | 207-208 | | |
| RPAD 011A | Flow Sciences Top Mounted Balance Encounter FS10400 | FS10400 | 06-U-21-01 | 207-208 | | |
| RPAD 011B | Flow Sciences Hepa-Filter 18-X-36 | 18-X-36 | 06-28-10-05 | 207-208 | | |
| RPAD 012 | METTLER TOLEDO Microbalance XP 56 | XP 56 | B021036384 | 207-208 | | |
| RPAD 013 | METTLER TOLEDO Analytical Balance XP205DR | XP205DR | B109033663 | 207-208 | | |
| RPAD 014 | METTLER TOLEDO Analytical Balance XP105DR | XP105DR | B015024447 | 207-208 | Mettler Toledo | |
| RPAD 015 | METTLER TOLEDO Top load Balance XP2002S | XP2002S | 1123453858 | 207-208 | | |
| RPAD 016 | Thermo Electron Sorvall Legend Micro 21 Centifuge | Micro 21 | 40907047 | 207/208 | N/A | |
| RPAD 017 | Thermo Scientific CL2 Centrifuge | CL-2 | 42620324 | 207/208 | N/A | |
| RPAD 018 | IKA Werke Shaker HS 501 Digital | HS 501 | 10.018693 | 207/208 | N/A | |
| RPAD 019 | Thermo Scientific Bath 3582 | 3582 | 1470100456404 | 207/208 | N/A | |
| RPAD 020 | Burrell Scientific Mechanical Shaker | Burrell Wrist Action Shaker | 183072236 | 207/208 | N/A | |
| RPAD 021 | Fisher Scientific ISOTEMP Freezer 95-925-1 | 95-925-1 | 119232001100619 | 208 | | |
| RPAD 022 | Fisher Scientific ISOTEMP Oven 6901 | 6901 | 221402-29 | 207 | Thermo Fisher | |
| RPAD 024 | Miele Professional Glassware Washer G7883CD | G7883CD | 74345940 | 208A | Miele | |
| RPAD 026 | Fisher Scientific ISOTEMP Stirring Hot Plate | SP135930-33 | C189210060506 | 207/208 | N/A | |
| RPAD 027 | Fisher Scientific ISOTEMP Stirring Hot Plate | SP135930-33 | C1886100606832 | 207/208 | N/A | |
| RPAD 028 | Thermo Fisher UV-Vis (Evolution 300 with VisionSecurity UV software) | Evolution 300 | EVON188002 | 208 | Thermo Scientific | |
| RPAD 030A | Millipore / Milli-Q Integral 10 | Integral 10 | FODA16319C | 208A | | |
| RPAD 030B | Millipore / Milli-Q Q-POD Remote Dispenser | Q-POD | FOEA12361O | 208A | Millipore | |
| RPAD 031 | Millipore / Milli-Q RiOs 16 | RiOs 16 | F9SN69988A | 208 | | |
| RPAD 033 | Thermo Forma Enviromental Chamber | 3940 | 317241-2706 | 208 | | |
| RPAD 034 | Thermo Forma Enviromental Chamber | 3940 | 317241-2707 | 208 | Thermo Fisher | |
| RPAD 035 | Thermo Forma Enviromental Chamber | 3940 | 317241-2708 | 208 | | |
| RPAD 038 | Distek Dissolution bath 2100 Series | 2100C | 2112595 | 207A | | |
| RPAD 039 | Distek Dissolution bath 2100 Series | 2100C | 2112594 | 207A | | |
| RPAD 040 | Distek Dissolution auto sampler Evolution 4300 | 4300 | 4301717 | 207A | | |
| RPAD 041 | METTLER TOLEDO Auto titrator-T50 | T50 | 5131180613 | 208 | | |
| RPAD 042 | METTLER TOLEDO KF titrator-V30 | V30 | 5131139116 | 208 | Mettler Toledo | |
| RPAD 043 | MT Weight Set (Cert. # MT0014430) | 1MG - 2KG | 6431230052 | 207/208 | Mettler Toledo | |
| RPAD 044 | MT Weight Set (Cert. # MT0014431) | | 6431230053 | | | |
| RPAD 045 | Vortex Mixer | Maxi Mix II | C1861110729002 | 207/208 | N/A | |
| RPAD 061A | Waters e2695 Separation Module | e2695 | B12SM4043A | 207 | Waters | |
| RPAD 061B | Waters 2998 Photodiode Array Detector | 2998 | L11998547A | | | |
| RPAD 061C | Waters 2489 UV/Visible Detector | 2489 | M1187E417A | | | |
| RPAD 062A | Agilent 7890A GC system | 7890A | CN12071047 | 208 | Agilent | |
| RPAD 062B | Agilent 7697A Headspace Sampler | 7697A | CN13280022 | | | |
| RPAD 064 | Sonicator, Branson | 5510R-DTH | RNC050025610E | 207/208 | N/A | |
| RPAD 065 | Photostability Chamber, Caron | 6540-1 | 043012-6540-1-28 | 207 | Caron | |
| RPAD 066 | Distek dissolution bath 7100 series | Symphony | 7101108 | 208 | Distek | |

# RP Analytical Lab

| RPAD # | Description | Model #/Catalog # | Serial # | Location | Qualification Contact Vendor | Comments |
|---|---|---|---|---|---|---|
| | **Rhodes Pharma Analytical Lab Equipment** | | | | | |
| RPAD 067 | Sotax Dissolution Unit | AT 7 smart | 1027 272 | 207 | Sotax | |
| RPAD 069 | Wrist Action™ Shaker, Burrell | 75 | 183072236 | 207/208 | N/A | |
| RPAD 070 | Thermo Forma Enviromental Chamber | 3940 | 111523-3020 | 208 | Thermo Fisher | |
| RPAD 071 | Distek Dissolution Medium Degasser & Dispenser | Ez-fill 4500 | 4501367 | 207/208 | Distek | |
| RPAD 072 | Reciprocating Holder Apparatus 7 (BIO-DIS) | Apparatus 7 | US1390964 | 207 | Agilent | |
| RPAD 073A | Infinity 1290 TCC | G1316C | DEBAC06203 | | | |
| RPAD 073B | Infinity 1290 Thermostat | G1330B | DEBAK13345 | | | |
| RPAD 073C | Infinity 1290 Bin Pump | G4220A | DEBAA03411 | 207 | | |
| RPAD 073D | Infinity 1290 DAD | G4212A | DEBAC06203 | | | |
| RPAD 073E | Infinity 1290 Sampler | G4226A | DEBAF02487 | | | |
| RPAD 074A | Infinity 1260 HiP ALS | G1367E | DEACO03448 | | Agilent | |
| RPAD 074B | Infinity 1260 Bin Pump | G1312B | DEACB05368 | | | |
| RPAD 074C | Infinity 1260 TCC | G1316A | DEACN20190 | 207 | | |
| RPAD 074D | Infinity 1260 DAD | G1315C | DEAA201732 | | | |
| RPAD 074E | Infinity 1290 Thermostat | G1330B | DEBAK13342 | | | |
| RPAD 074F | Infinity 1260 HiP Degasser | G4225A | JPAAA02208 | | | |
| RPAD 076 | Agilent 8000 Dissolution Sampling Station | 8000 | US1380926 | 207 | Agilent | |
| RPAD 077 | Distek Dissolution Medium Degasser & Dispenser | Ez-fill 4500 | 4501368 | 207A | Distek | |
| RPAD 078A | Fisher Scientific RTO PLATINUM THERMOMETER | Thermocouple | 122462623 | | Control Company | |
| RPAD 078B | Fisher Scientific Digi-thermo | Thermocouple | 130097834 | 207/208 | Control Company | |
| RPAD 078C | Fisher Scientific Digi-thermo | Thermocouple | 130097740 | | Control Company | |
| RPAD 078D | Fisher Scientific Digi-thermo | Thermocouple | 130097747 | | Control Company | |
| RPAD 079 | Mettler Toledo Toploading Balance | XP2002S | B322392930 | 207-208 | Mettler Toledo | |
| RPAD 080 | Waters Fractional Collector | Fraction Collector | D13WFC483J | 208 | Waters | |
| RPAD 081 | Burrell Scientific Mechanical Shaker | Burrell Wrist Action Shaker | 183072236 | 207/208 | N/A | |
| RPAD 083 | Eberbach Mechanical Shaker | Shaker | 31321 | 207/208 | N/A | |
| RPAD 084 | Agilent Dissolution Apparatus 7 | Dissolution Bath | MY13387001 | 207 | Agilent | |
| RPAD 085 | Agilent Sampling Station | Dissolution Station | US1336180 | 207 | Agilent | |
| RPAD 086 | Glas-Col Shaker (Digital Pulse Mixer) | 099A DPM12 | 11302061 | 207 | N/A | |
| RPAD 087 | METTLER TOLEDO Analytical Balance | XP205 | B402203348 | 207 | Mettler Toledo | |
| RPAD 088 | METTLER TOLEDO Toploading Balance | XP2002S | B350088998 | 207 | Mettler Toledo | |
| RPAD 089 | 4' Hybrid Isolator with Integrated Alarm | FSEHA 483024ABD | 10-X-10-06 | 207 | Flow Sciences | |
| RPAD 090 | Data Logger Smart Vue -40 ° C/+80 ° | SV203-100-LSB | 051750601964/9E000003C5AC8F28 | 208 | Thermo Fisher | |
| RPAD 091 | Data Logger Smart Vue -40 ° C/+80 ° | SV203-100-LSB | 051750601961/E2000003C59C8428 | 208 | Thermo Fisher | |
| RPAD 092 | Data Logger Smart Vue Temp/RH | SV207-100-LSB | 053350609CE | 208 | Thermo Fisher | |
| RPAD 093 | Data Logger Smart Vue Temp/RH | SV207-100-LSB | 053550601001/10001987 | 208 | Thermo Fisher | |
| RPAD 094 | Data Logger Smart Vue Temp/RH | SV207-100-LSB | 053550600FBE | 208 | Thermo Fisher | |
| RPAD 095 | Data Logger Smart Vue Temp/RH | SV207-100-LSB | 053550600FD2 | 208 | Thermo Fisher | |
| RPAD 096 | Quantos HPD Handheld Powder Dispensing | | B347031395 | 207 | Mettler Toledo | |
| RPAD 097 | Thermo Scientific Nicolet iS50 FT-IR | 912A0760 | AUP1300300 | 207 | Thermo Fisher | |
| RPAD 098 | Fisher Isotemp Vacuum Oven | Model 282A | 614063-379 | 207 | Thermo Fisher | |
| RPAD 099 | Data Logger Smart Vue Temp/RH | SV203-100-LSB | 053550600FBF/10001994 | 208 | Thermo Fisher | |
| RPAD 100A | Individual Weight 100 mg | | B404245986 | | | |
| RPAD 100B | Individual Weight 10 g | | B404245988 | | | |
| RPAD 100C | Individual Weight 100 g | | B404245989 | | | |
| RPAD 100D | Individual Weight 200 g | | B404245990 | 207/208 | Mettler Toledo | |
| RPAD 100E | Individual Weight 1000 g | | B404245991 | | | |
| RPAD 100F | Individual Weight 2000 g | | B404245992 | | | |
| RPAD 101A | MALS Detector | Wyatt/ miniDAWN TREOS | 786-TS | 207 | Wyatt | |
| RPAD 101B | Dynamic Light Scattering | Wyatt/WyattQELS | 825-WIQ | 207 | Wyatt | |
| RPAD 101C | Refractive Index Detector | Wyatt/Optilab TrEX | 801-TrEX | 207 | Wyatt | |
| RPAD 102 A | Waters Acquity UPLC H Class Quaternary Solvent Manager | 186015018 | C14QSM265A | 207 | | |
| RPAD 102 B | Waters Acquity UPLC H Class Sample Manager | 186015017 | A14SDI619G | 207 | | |
| RPAD 102 C | Waters Acquity UPLC H Class Column Manager | 186015043 | A14CMP991G | 207 | Waters | |
| RPAD 102 D | Waters Acquity UPLC H Class Photodiode Array Detector | 186015032 | C14UPD058A | 207 | | |
| RPAD 102 E | Acquity UPLC CH-30A | 186015045 | G13HLP696G | 207 | | |
| RPAD 103 | Acquity Qda Detector | 186006511 | KAB0417 | 207 | Waters | |
| RPAD 104A | Infinity 1260 ALS | G1329B | DEAAC26141 | 207 | | |
| RPAD 104B | Infinity 1260 Quat Pump | G1311B | DEAB710298 | 207 | | |
| RPAD 104C | Infinity 1260 TCC | G1316A | DEACN28256 | 207 | Agilent | |
| RPAD 104D | Infinity 1260 DAD | G4212B | DEEA307695 | 207 | | |
| RPAD 104E | Infinity 1290 Thermostat | G1330B | DEBAK18381 | 207 | | |
| RPAD 105 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | D14L32030W | 207 | Waters | Connected to RPAD004/005 |
| RPAD 106 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | D14L32032W | 207 | Waters | Connected to RPAD104 |
| RPAD 107 A | Orion Star A221 portable pH meter | K06345 | S/N K06345 | 207/208 | Thermo Scientific | |
| RPAD 107 B | pH probe | lot: | | 207/209 | Thermo Scientific | |
| RPAD 108 | Sotax Friability Tester | FT 2 | 2629.061 | 207 | Sotax | |
| RPAD 109 | Sotax Hardness Tester | HT 1 | O41.0043 | 207 | Sotax | |

# RP Analytical Lab

**Rhodes Pharma Analytical Lab Equipment**

| RPAD # | Description | Model #/Catalog # | Serial # | Location | Qualification Contact Vendor | Comments |
|---|---|---|---|---|---|---|
| RPAD 110 | MICRO-PIPETTE | 5 mL | L33959D | 207/208 | Eppendorf | |
| RPAD 111A | Fisher Scientific RTO PLATINUM THERMOMETER | 15-077-55 | 150024817 | 207/208 | Control Company | |
| RPAD 111B | Fisher Scientific RTO PLATINUM THERMOMETER | 15-077-55 | 150024816 | 207/208 | Control Company | |
| RPAD 111C | Fisher Scientific RTO PLATINUM THERMOMETER | 15-077-55 | 150024810 | 207/208 | Control Company | |
| RPAD 112 | Fisher Scientific ISOTEMP Stirring Hot Plate | | | 207/209 | Fisher Scientific | |
| RPAD 113 | Fisher Scientific ISOTEMP Stirring Hot Plate | | | 207/210 | Fisher Scientific | |
| RPAD 114 | Reciprocating Holder Apparatus 7 | G7972-64008 | MY15197801 | 207 | Agilent | |
| RPAD 115 | Dissolution Sampling Station | G7930-64000 | MY15130001 | 207 | Agilent | |
| RPAD 116A | Mastersizer 3000 Optical system | MAZ3000 | MAL1109409 | 208 | Malvern | |
| RPAD 116B | Mastersizer 3000 Hydro Accessory | MAZ3210 | MAL1109493 | 208 | Malvern | |
| RPAD 116C | Mastersizer 3000 Aero Accessory | MAZ3500 | MAL1108031 | 208 | Malvern | |
| RPAD 117 | Micropipette 20-200uL | Research plus | M23719D | 207/208 | Eppendorf | |
| RPAD 118 | Micropipette 100-1000 µL | Research plus | H35349E | 207/208 | Eppendorf | |
| RPAD 119 | Water Activity Meter | Series 4TEV | S40005313 | 207/208 | Decagon Devices | |
| RPAD 120 | Malvern Rheometer | Kinexus pro + | MAL1131495 | 203A | Malvern | |
| RPAD 121A | Waters e2695D XE Separation Module | e2695D XE | F14SD6100A | 208 | | |
| RPAD 121B | Waters 2489 UV/Visible Detector | 2489 | E1587E35A | 208 | | |
| RPAD 121C | Waters Transfer Module | 725271820 | K13WTM732M | 208 | Waters | |
| RPAD 121D | Waters 2998 Photodiode Array Detector | 2998 | C15998085A | 208 | | |
| RPAD 122 | Waters LAC/E 32 Acquistion Server Box | LAC/ E32 | H15L32119W | 208 | | Connected to RPAD121 |
| RPAD 123 | Distek Dissolution auto sampler Evolution 4300 | 4300 | 4302319 | 208 | Distek | |
| RPAD 124 | Distek Dissolution System Model 2500 | 2500 | 2501494 | 208 | Distek | |
| RPAD 125 | Distek Dissolution System Model 2500 | 2500 | 2501495 | 208 | Distek | |
| RPAD 126A | Viscometer | LVDV2T | 8692750 | 208 | Brookfield | |
| RPAD 126B | Circulating Bath | TC-550SD-115 | 2D1582196 | 208 | Brookfield | |
| RPAD 127 | UltraSonicator | CPX 8800H | BGS101559640B | 208 | Bransonic | |
| RPAD 128A | Infinity 1260 ALS | G1329B | DEAAC38419 | 208 | Agilent | |
| RPAD 128B | Infinity 1260 Quat Pump | G1311B | DEADO15519 | 208 | Agilent | |
| RPAD 128C | Infinity II 1260 TCC | G7116B | DEBA400661 | 208 | Agilent | |
| RPAD 128D | Infinity 1260 DAD | G4212B | DEAA311427 | 208 | Agilent | |
| RPAD 128E | Infinity 1290 Thermostat | G1330B | DEBAK26805 | 208 | Agilent | |
| RPAD 129A | Infinity 1260 ALS | G1329B | DEAAC38392 | 208 | Agilent | |
| RPAD 129B | Infinity 1260 Quat Pump | G1311B | DEADO15505 | 208 | Agilent | |
| RPAD 129C | Infinity II 1260 TCC | G7116B | DEBA400657 | 208 | Agilent | |
| RPAD 129D | Infinity 1260 DAD | G4212B | DEAA311311 | 208 | Agilent | |
| RPAD 129E | Infinity 1290 Thermostat | G1330B | DEBAK26793 | 208 | Agilent | |
| RPAD 130 | Waters LAC/E 32 Acquistion Server Box | LAC/ E32 | J15L32164W | 208 | Waters | Connected to RPAD006/007 |
| RPAD 131 | Waters LAC/E 32 Acquistion Server Box | LAC/ E32 | J15L3274W | 208 | Waters | Connected to RPAD008 |
| RPAD 132 | Hydrogen Generator | H2PEMPD-510-100 | 16PLD5009 | 208 | Parker Hannifin | |
| RPAD 133 | Zero Air Generator | HPZA-3500 | HPZA35000853A | 208 | Parker Hannifin | |
| RPAD 134 | Pipette 0.5-5mL | Research plus 0.5-5ml | H38331E | 207/208 | Eppendorf | |
| RPAD 135 | Pipette 1-10mL | Research plus 1-10ml | K17386E | 207/208 | Eppendorf | |
| RPAD 136 | Vibration Meter | Model 200 | 1512915 | 207/208 | Balmac | |
| RPAD 137 | Leica TCS SP8 | 158001104 | 8100001393 | 205 | Leica Microsysems | |
| RPAD 138 | DM 6 M | 11888779 | 416442 | 205 | Leica Microsysems | |
| RPAD 139 | Revco FMS High-Performance Lab Refrigerator | RFMS2305A | 0155391601160419 | 208 | Thermo Scientific | |
| RPAD 140 | Thermogravimetric Analysis (TGA) | Discovery | TGA1-0387 | 207 | TA Instruments | |
| RPAD 141 | Differential Scanning Calorimetry (DSC) | Discovery | DSC1-0405 | 207 | TA Instruments | |
| RPAD 142A | Millipore / Milli-Q Integral 10 | Integral 10 | F6DA41432C | 207A | Millipore | |
| RPAD 142B | Millipore / Milli-Q Q-POD Remote Dispenser | Q-POD | F6EA41897BF | 207A | | |
| RPAD 143A | HeightChek | N/A | 11227 | 207/208 | Distek | |
| RPAD 143B | HeightChek | N/A | 11432 | 207/208 | Distek | |
| RPAD 143C | HeightChek | N/A | 11453 | 207/208 | Distek | |
| RPAD 143D | HeightChek | N/A | 11565 | 207/208 | Distek | |
| RPAD 144A | Traceble Digital Calipers | 14-648-17, 11783217 | 161013733 | 207/208 | Fisher Scientific | |
| RPAD 144B | Traceble Digital Calipers | 14-648-17, 11783217 | 161013715 | 207/208 | Fisher Scientific | |
| RPAD 145A | SOTAX (Pharmatron) Automatic Disintegration Tester, DisiTest 50 Master Station | 14770-01 | 100.0281 | 208 | Sotax | |
| RPAD 145B | SOTAX (Pharmatron) Automatic Disintegration Tester DisiTest 50 Client Station | 14726-01 | 101.0084 | 208 | Sotax | |
| RPAD 146 | Precision SWB27 Shaker Bath | TSSWB27 | 300122135 | 207 | Thermo Scientific | |
| RPAD 147 | Mixer Mill | MM400 | 1216050809G | 207 | Thermo Scientific | |
| RPAD 148A | Sotax tablet processing workstation | Zymark TPW3 | TP1542N01055 | 207 | Sotax | |
| RPAD 148B | Sotax sample collection module | EasyFil | EF1536N1042 | 207 | Sotax | |
| RPAD 149 | BT Integra-Pack Package Tester | BT-IP-50 | IP-0252 | TBD | TM Electronics, Inc | |
| RPAD 150 | Texture Analyzer | CT34500 | 8708974 | 203A | Ametek Brookfield | |
| RPAD 151 | AR-1000 Adhesion/Relsease Tester | AR-1000 | 008783 | 203A | ChemInstruments | |
| RPAD 152 | 90° Peel Adhesion | PA-1000-90 | 008374 | 203A | ChemInstruments | |
| RPAD 153 | 180° Peel Adhesion | PA-1000-180 | 008793 | 203A | ChemInstruments | |
| RPAD 154 | High Speed Release Tester | HSR-1000 | 008628 | 203A | ChemInstruments | |
| RPAD 155 | Probe Tack Tester | PT-1000 | 008156 | 203A | ChemInstruments | |

RP Analytical Lab

| RPAD # | Description | Model #/Catalog # | Serial # | Location | Qualification Contact Vendor | Comments |
|---|---|---|---|---|---|---|
| | **Rhodes Pharma Analytical Lab Equipment** | | | | | |
| RPAD 156 | Shear Tester | SS-RT-10 | 008760 | 203A | ChemInstruments | |
| RPAD 157 | Cole-Parmer Ultrasonic Processor | CPX130 | 98190W-10-17 | 207 | Cole-Parmer | |
| RPAD 158 | Xevo G2-XS QTof | 176003484 | YEA578 | 207 | Waters | |
| RPAD 159A | Waters Acquity UPLC H Class Quaternary Solvent Manager | 186015018 | J16GSM920A | 207 | Waters | |
| RPAD 159B | Waters Acquity UPLC H Class Sample Manager | 186015017 | J16SDI524G | 207 | Waters | |
| RPAD 159C | Waters Acquity UPLC H Class Column Manager | 186015043 | J16CMP816G | 207 | Waters | |
| RPAD 159D | Waters Acquity UPLC H Class Photodiode Array Detector | 186015032 | H16UPD664A | 207 | Waters | |
| RPAD 159E | Acquity UPLC CH-30A | 186015011 | F16UPX794G | 207 | Waters | |
| RPAD160 | Thermoscientific Super-Nuova Multi-Place Stirrer/Hotplate | SP135935 | C1784111150180 | 207/208 | Thermo Scientific | |
| RPAD161 | Thermoscientific Stirrer/Hotplate | 1152016SH | C1928110832241 | 207/208 | Thermo Scientific | |
| RPAD162 | Thermoscientific Isotemp Stirrer/Hotplate | 11-100-100SH | C1886140940552 | 207/208 | Thermo Scientific | |
| RPAD163 | Thermoscientific Isotemp Stirrer/Hotplate | 11-100-100SH | | 207/208 | Thermo Scientific | |
| RPAD164 | Thermoscientific Maxi Mix III Vortex | M65825 | C1046110944783 | 207/208 | Thermo Scientific | |
| RPAD165 | Thermoscientific Isotemp Stirrer/Hotplate | SP135935 | C1784101141079 | 207/208 | Thermo Scientific | |
| RPAD166 | Thermoscientific Stirrer/Hotplate | 1152016SH | C1928120103325 | 207/208 | Thermo Scientific | |
| N/A | Timer | 06-662-46 | 170493424 | 207/208 | | |
| N/A | Timer | 06-662-46 | 170529619 | 207/208 | | |
| N/A | Timer | 06-662-46 | 170529600 | 207/208 | Fisher Scientific | |
| N/A | Timer | 06-662-46 | 170529632 | 207/208 | | |
| N/A | Timer | 06-662-46 | 170529609 | 207/208 | | |
| N/A | Timer | 06-662-46 | 170529604 | 207/208 | | |
| RPAD167 | Hook Weight Set | N/A | 87201 | 203A | Troemner | |
| RPAD168 | Fisher Scientific RTD Platinum Thermometer | 15-077-55 | 170913305 | 207/208 | Fisher Scientific | |
| RPAD169 | Fisher Scientific RTD Platinum Thermometer | 15-077-55 | 170913308 | 207/208 | Fisher Scientific | |
| RPAD170A | Eppendorf Micro-pipette | Research plus 0.10- 2.50 µl | G47538H | 207/208 | Eppendorf | |
| RPAD170B | Eppendorf Micro-pipette | Research plus 0.50-10.00 µl | M26017G | 207/208 | Eppendorf | |
| RPAD170C | Eppendorf Micro-pipette | Research plus 2.00-20.00 µl | P41847G | 207/208 | Eppendorf | |
| RPAD170D | Eppendorf Micro-pipette | Research plus 10.00-100.00 µl | L40927G | 207/208 | Eppendorf | |
| RPAD170E | Eppendorf Micro-pipette | Research plus 20.00-200.00 µl | K34192G | 207/208 | Eppendorf | |
| RPAD170F | Eppendorf Micro-pipette | Research plus 100.00-1000.00 µl | Q51360G | 207/208 | Eppendorf | |
| RPAD171 | Smart-Vue 915MHz Module/Sensor | SV304-500-LSB | 1.83552E+11 | 203A | Thermo Scientific | |
| RPAD 172A | Ametek Brookfield Individual weight 1000g | TA-CW-4500C | 5243 | 203A | Ametek Brookfield | |
| RPAD172B | Ametek Brookfield Individual weight 1000g | TA-CW-4500C | 5177 | 203A | Ametek Brookfield | |
| RPAD172C | Ametek Brookfield Individual weight 1000g | TA-CW-4500C | 5183 | 203A | Ametek Brookfield | |
| RPAD172D | Ametek Brookfield Individual weight 1000g | TA-CW-4500C | 5195 | 203A | Ametek Brookfield | |
| RPAD 172E | Ametek Brookfield Individual weight 500g | TA-CW-4500C | 5267 | 203A | Ametek Brookfield | |
| RPAD 173 | Waters LAC/ E32 Acquisition Server Box | | H18L32504W | 208 | Waters | |
| RPAD 174A | 1260 Infinity II Quarternary Pump | G7111B | DEAEW03565 | 207 | Agilent | |
| RPAD 174B | 1260 Infinity II Manual Injector | G1328C | DEABG05544 | 207 | Agilent | |
| RPAD 174C | 1260 Infinity II Multicolumn Thermostat | G7116A | DEAEM02825 | 207 | Agilent | |
| RPAD 174D | 1260 Infinity II Diode Array Detector HS | G7117C | ZDEAEK03621 | 207 | Agilent | |
| RPAD 174E | 1260 Infinity II Vial Sampler | G7129-64000 | DEAEQ26505 | 207 | Agilent | |
| RPAD 174F | Infinity Lab Sample Thermostat | G7167-60101 | DEBBP10641 | 207 | Agilent | |
| RPAD 175 | Orion Star A221 portable pH meter | STARA2210 | K13340 | 207/208 | Thermo Scientific | |
| RPAD 176 | Distek PrepEngine | PrepEngine | PREP-0087 | 207 | Distek | |
| RPAD 177 | Hot/Stir Plate | SP88850200 | C3020017041807853 | 207/208 | Thermo Scientific | |
| RPAD 178 | Hot/Stir Plate | SP88850200 | C3020017041807861 | 207/208 | Thermo Scientific | |
| RPAD 179 | Pressure/ Vacuum Gauge | 06-662-68 | 181808676 | 203A | Control Company | |
| RPAD 180 | Dry Vacuum Pump | 2042B-01 | 00001587 | 207 | Welch | |
| RPAD 181 | Distek 7100 Dissolution System | 7100 | 7101155 | 207A | Distek | |
| RPAD 182 | Centrifuge | Sorvall Legend X1 | 42450844 | 207 | Thermo Scientific | |
| RPAD 183 | Thermo Corona VEO RS Charged Aerosol Detector | 5081.002 | 8167258 | N/A | Thermo Scientific | |
| RPAD 184 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | D15L32069W | | Waters | Connected to RPAD128/129 |
| RPAD 185 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | E19L32042W | | Waters | Connected to RPAD061 |
| RPAD 186 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | E19L32068W | | Waters | Connected to RPAD073/074 |
| RPAD 187 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | F19L32448W | | Waters | Connected to RPAD062 |
| RPAD 188 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | D19L32070W | | Waters | Connected to RPAD102/103 |
| RPAD 189 | Waters LAC/ E32 Acquisition Server Box | LAC/ E32 | J14L32231W | 207 | Waters | Connected to RPAD174 |

## Rhodes Pharma Transdermal Lab Equipment

| Description | Model #/Catalog # |
|---|---|
| Fisher Isotemp Refrigerator/Freezer | |
| Thermo Sci TXS seriesFreezer TSX400A | 0160406601161219 |
| Thermo Sci 1300 series B2 Biohood | 170137727J |
| Hanson Vision Microette system W 3 auto fills/3 mixdrives6 | 1215-1667 |
| Milli Q integral 10 | F6JA64246A |
| Miele Professional Dishwasher | PG8583-CD |
| Henco Wak-In hood | |
| Branson Sonicator 8510 | RPC110157142E |
| Manual Dispensing Liquid Machine | |
| 2 Kewaunee Science Hoods | |
| Omni mixer Homogenizer  17-600-01 | MX11335 |
| Dragen Lab Mixer  OS20/S | MG177AE0000204 |
| Fisher Isotemp heat/stir plate | C3720425081643190 |
| Fisher Sci Vortex Analog | 161209046 |
| Mettler Toledo  PBK989-AB15 | E6514870883-7AU |
| Mettler Toledo  Display  IND 570 | 01770556HT |
| Mettler Toledo  XPE 205 | B650433684 |
| Mettler Toledo  XPE 56 | B650433678 |
| Esco Isolator | IS4201 |
| Tippmann | |
| Flo Science hood    4010 | 5091701 |
| Auto cutter BTRD-650 | 7228-1215-01 |
| Mathis Coater    KTF-S | 23316  3x480 |
| Cheminstruments Lab Laminator | |
| Lugris Press   Ma series 3 | 666286A |
| Stuart Bottle Roller   STR9D/120 | R109000039 |
| Sci Logex  MX-T6-S | VF19BAE001666 |
| Despatch Oven RFD | 188812 |
| Impulse Foot Sealer   AIE-450 FL | 50019 |
| Malvern Kinexus Rheometer  KNX2212 | mal1131495 |
| Cheminstruments Adhesion/Release AR-1000 | 008783 |
| Cheminstruments Probe Tack   PT-1000 | 008156 |
| Cheminstruments Shear-10   SS-RT-10 | 008760 |
| Leica Microscope   DM6M | 423137/424502 |
| Leica Microscope   TCS  SP8 | 414176 |
| Cheminstruments High Speed Release   HSR-1000 | 008628 |
| Cheminstruments 90 Peel Adhesion PA 1000-90 | 008374 |
| Cheminstruments 180 Peel Adhesion PA 1000-91 | 008793 |
| Brookfield Texture Analyzer  CT34500 | 8708974 |
| TM  Electronics BT Integra Pak BT-IP-50 | IP-0252 |
| Laminator  LC-100/008763 | |

## Rhodes Pharma Transdermal Lab Equipment

| Description | Model #/Catalog # |
|---|---|
| Mettler toledo XPR10002S | B832225262 |
| Mettler toledo XPR10002S | B833271031 |
| Mettler toledo XPE2050R | B829139240 |
| VPCC 2.0 Cutting  001 | |
| VPCC 2.0 Coating 001 | |
| Isolator ESCOWDCI | PC111390-1 |
| Ross Mixer  VMC-2 | 113284 |
| Dissolution Apparatus | |

**Rhodes Pharma Formulation Lab Equipment**

| Description | |
| :---: | :--- |

Sotax DT2 - Tablet Disintegrator Tester
Sotax TD 2 - Tap Density Tester
Sotax HT 1 - Tablet Hardness Tester
Milli-Q Integral 10
Fisher Sci Isotemp 60L Oven Gravty
Versapress
AIM System
Cone-mill
High Shear Granulator
V-Blender
LCI Multi Granulator MG-55
LCI Marumerizer QJ-230T
Fluid Bed
Pan Coater
Manual Tablet Compaction Machine (MTCM-1)
Hanson  Flodex 21-101-000
Vankel Friabilator 0800
Copley Friabimat SA-400
Silverson Lab mixer L5M-A
Orion Star A221 pH Meter
Cole-Palmer Masterflex pump 07522-30
Arrow  Air mixer   G
Ligthnin Labmaster Mixer  L1U10
Thermo Sci Heat/stir plate  SP135935
Fisher Sci Isotemp Heat/Stir plate 1130049SHP
HP LaserJet Pro M402dn
Epson Printer M188D
Fisher Sci Ultrasonic Bath 15337433
Fisher Sci Stereomaster II  SPT-1TH
Tiger-Vac 2D-25L (DT) MFS Hepa
Tiger-Vac EXP-20L (DT) RE Hepa
Mettler Toledo AG Balance AG245
Sartorious LE Balance LE1003S
Mettler Toledo Scale ML303E/03
Mettler Halogen Moisture Balance HR83
Mettler Floor Balance IND560X
Mettler Toledo TBrick15
Mettler Toledo TBrick15 EX
Gilson Gilsonic AutoSiever GA-6
Gilson Universal Spliter SP-33
Enercon Auto Jr Induction Cap Sealer ML0045-001-02
Dremel 4000

**<u>Exhibit E</u>**

**Executory Contracts and Cure Costs**

[See attached]

**Exhibit E - Executory Contracts**

| Counterparty | ContractName | ContractTypeName | Cure Costs |
|---|---|---|---|
| A Z CORPORATION | Supplemental Maintenance Technician - 2020 | Purchase Order | |
| Adamis Pharmaceuticals Corporation (San Diego, CA) | Adamis Pharmaceuticals Corp_RT API Supply Agreement 11-1-2022 (RT selling naloxone API to Adamis) | Master Service/Supply Agreements | |
| Agilent | Agilent SOW 10012008-9 12-31-19 | Statement of Work | |
| Agilent Technologies Inc | Agilent_RT SOW 12122019-1 12-31-2020 (2019-2020 QC instruments service plan) | Statement of Work | |
| Agilent Technologies Inc | Agilent_RT SOW 12122019-2 12-31-2020 (Annual service plan for R&D instruments) | Statement of Work | |
| Agilent Technologies Inc. | Agilent Technologies_RT MSA 12-11-2020 (calibration, testing, repair, PM and other related services) | Master Service/Supply Agreements | |
| Air Products | Air Products AGREEMENT | Master Service/Supply Agreements | |
| Air Temp Mechanical Services Inc | Air Temp Mechanical_RT MSA 01-31-2024 (provide maintenance, service, repair, calibration, testing, certification an | Master Service/Supply Agreements | |
| Air Temp Mechanical Services Inc | Air Temp Mechanical_RT SOW 01312014-1 03-11-2022 (Chiller - Quality PM and Inspection Program) | Statement of Work | |
| Alan Dunn - see GDI Consulting | Alan Dunn - see GDI Consulting MSA | Master Service/Supply Agreements | |
| [REDACTED] | [REDACTED]_RT Supply Agreement 12-31-2021 (RT buyer Product from [REDACTED]) | Master Service/Supply Agreements | |
| Alert Scientific | Alert Scientific_RT SOW 01212010-19 09-30-2020 (QC instruments - PM) | Statement of Work | |
| Alert Scientific | Alert_RT SOW 01212010-21 06-12-2023 | Statement of Work | |
| Alert Scientific Incorporated | Alert Scientific_RT MSA 01-31-2024 (PM and calibration) | Master Service/Supply Agreements | |
| Allstate Sealcoating Inc. | Allstate Sealcoating Inc. MSA | Master Service/Supply Agreements | |
| Alltech Associates Inc., A Wholly Owned Subsidiary of W.R. Grace & Co. - CONN | Alltech Associates Inc., A Wholly Owned Subsidiary of W.R. Grace & Co. - CONN MSA | Master Service/Supply Agreements | |
| AMD Lawn Care LLC | AMD Lawn Care LLC MSA | Master Service/Supply Agreements | 3966 |
| AMD Lawn Care LLC | AMD Lawn Care LLC SOW 12232015-1, A1, A2, A3 | Statement of Work | |
| AMD Lawn Care LLC | AMD Lawn Care LLC SOW 12232015-3, A1 | Statement of Work | |
| Americal Incorporated | Americal Incorporated MSA | Master Service/Supply Agreements | |
| American Chemical Society | American Chemical Society | Agreement | |
| American Labelmark Company | LabelMaster PO 3110037353 - Account 1299697 | Purchase Order | |
| American Plant Maintenance, LLC (APM) | American Plant Maintenance, LLC (APM) MSA | Master Service/Supply Agreements | 9,386 |
| AMRI SSCI, LLC (fka Aptuit) | AMRI SSCI, LLC (fka Aptuit) MSA | Master Service/Supply Agreements | |
| Analysis & Design Application Co, Ltd. d/b/a CD-Adapco | Analysis & Design Application Co, Ltd. d/b/a CD-Adapco | Agreement | |
| Anchor Insulation | Anchor Insulation MSA | Master Service/Supply Agreements | |
| APC Workforce Solutions LLC d/b/a Zero Chaos | APC Workforce Solutions LLC d/b/a Zero Chaos Agreement | Agreement | |
| Aptuit, Inc. | Aptuit, Inc. MSA | Master Service/Supply Agreements | |
| Arcadis U.S. Inc. | Arcadis U.S. Inc. Agreement | Agreement | |
| Arden Engineering Constructors, LLC | Arden Engineering Constructors, LLC MSA | Master Service/Supply Agreements | |
| Associated Electro-Mechanics Inc. | Associated Electro-Mechanics Inc. MSA (06-23-2024) (electrical, mechanical and machining services) | Master Service/Supply Agreements | |
| Atlantic Coffee & Provision | Atlantic Coffee & Provision MSA | Master Service/Supply Agreements | |
| Atlantic Scale Company, Inc. | Atlantic Scale Company, Inc. MSA | Master Service/Supply Agreements | |
| Avantium Pharma BV | Avantium Pharma BV MSA | Master Service/Supply Agreements | |
| Axine USA Inc. | Axine_RT Agreement_Executed_Exp. 09242021 | Master Service/Supply Agreements | |
| Axine Water Technologies | Axine Water Technologies MSA | Master Service/Supply Agreements | |
| AZ Corporation | AZ Corporation MSA | Master Service/Supply Agreements | |
| AZ Corporation | AZ Contracting Agr 05-24-23, Amendment #4 | Statement of Work | |
| AZ Corporation | AZ Amendment #15 (2015 pricing) | Statement of Work | |
| AZ Corporation | AZ Amendment#17 (RP) | Statement of Work | |
| AZ Corporation | AZ Amendment #21 (2016 pricing) | Statement of Work | |
| AZ Corporation | AZ Contracting Agr 05-24-23, Amendment #40 | Statement of Work | |
| AZ Corporation | AZ Corp_RT A-46 Executed | Statement of Work | |
| B & P Littleford Day LLC | B & P Littleford Day LLC MSA | Master Service/Supply Agreements | |
| Bard Pharmaceutical | Bard Pharmaceutical MSA | Master Service/Supply Agreements | |
| Barry-Wehmiller Design Group Inc. | Barry-Wehmiller Design Group Inc. MSA | Master Service/Supply Agreements | |
| Beach Technology | Beach Technology MSA | Master Service/Supply Agreements | |
| Beamex Inc | Beamex Inc MSA | Master Service/Supply Agreements | |
| Beamex Inc | Beamex Inc SOW 02182010-7 | Statement of Work | |
| Beckman Coulter | Beckman Coulter Standard Service Terms and Conditions | T&Cs | |
| Biotage, Inc | Biotage, Inc_RT MSA 05-30-2024 (repair and maintain lab tools and equipment) | Master Service/Supply Agreements | |
| Biotage, Inc | Biotage_RT SOW 05302019-2 05-01-2021 | Statement of Work | |
| Bonn'sIndustrial Valve - see Frederick's Industrial Valve | Bonn's Industrial Valve - see Frederick's Industrial Valve MSA | Master Service/Supply Agreements | |
| Boston Analytical Inc. | Boston Analytical Inc. MSA | Master Service/Supply Agreements | |
| Boston Analytical Inc. | Boston Analytical Inc. SOW | Statement of Work | |
| Brinkmann Instruments dba Metrohm USA, Inc. | Brinkmann Instruments dba Metrohm USA, Inc. MSA | Master Service/Supply Agreements | |
| Brinkmann Instruments dba Metrohm USA, Inc. | Brinkmann Instruments dba Metrohm USA, Inc. SOW 12022010-37 | Statement of Work | |
| Brinton, Alan | Brinton, Alan MSA | Master Service/Supply Agreements | |
| Bristol Fire Protection, Inc. | Bristol Fire Protection_RT MSA 11-12-2021 (maintenance, service, and repair services for sprinkler systems) | Master Service/Supply Agreements | |
| Bristow ElectricCo., Inc. | Bristow ElectricCo., Inc. MSA | Master Service/Supply Agreements | |
| BRODIE INC | 2019-2020 PIV Quarterly Inspections & Repairs | Purchase Order | |
| Brodie, Inc. | Brodie_RT MSA 6-30-2025 | Master Service/Supply Agreements | 3083 |
| Burgess USA Training LLC | Burgess USA Training LLC MSA | Master Service/Supply Agreements | |
| Burgess USA Training LLC | Burgess USA Training LLC SOW | Statement of Work | |
| Busch, LLC | Busch, LLC_RT MSA (limited standard service warranty) 11-30-2024 (repair services performed by Busch on any vacu | Master Service/Supply Agreements | |
| Buzzeo Associates, Ltd. | Buzzeo Associates, Ltd. MSA | Master Service/Supply Agreements | |
| [REDACTED] | [REDACTED] MSA | Master Service/Supply Agreements | |
| CambridgeSoft Corporation | CambridgeSoft Corporation MSA | Master Service/Supply Agreements | |
| Carrier Corporation | Carrier Corporation MSA | Master Service/Supply Agreements | |
| [REDACTED] | [REDACTED] SOW | Statement of Work | |

| Counterparty | ContractName | ContractTypeName | Cure Costs |
|---|---|---|---|
| CDI Business Solutions | CDI Business Solutions MSA | Master Service/Supply Agreements | |
| Certified Rescue Courses, LLC | Certified Rescue Courses, LLC MSA | Master Service/Supply Agreements | |
| Charles River Laboratories, Inc. | Charles River Laboratories, Inc. MSA | Master Service/Supply Agreements | |
| Charles River Laboratories, Inc. | Charles River Laboratories, Inc. SOW 12062001-1 | Statement of Work | |
| Circadian Technologies, Inc. | Circadian Technologies, Inc. MSA | Master Service/Supply Agreements | |
| Circuit Breaker Sales (fka ExStar Inc.) | Circuit Breaker Sales (fka ExStar Inc.) MSA | Master Service/Supply Agreements | |
| Circuit Breaker Sales NE, Inc (fka ExStar) | Circuit Breaker Sales _RT 09212010-8 11-30-2022 (switchgear PM) | Statement of Work | |
| Clancy Moving Systems, Inc. | Clancy Moving Systems, Inc. MSA | Master Service/Supply Agreements | |
| Clariant Corporation | Environmental Remediation and Indemnity Agreement* | Indemnity Agreement | |
| Clariant Corporation | Letter Agreement re: Coventry Water Service | Letter Agreement | |
| Clean Harbors Environmental Services, Inc. | Clean Harbors Environmental Services, Inc. MSA | Master Service/Supply Agreements | |
| Clean6Sigma, LLC | Clean6Sigma, LLC MSA | Master Service/Supply Agreements | |
| Comber | Heinkel Filtering System MSA | Master Service/Supply Agreements | |
| Coris-Tine Inc. d/b/a Paul's Lock and Safe | Coris-Tine Inc. d/b/a Paul's Lock and Safe MSA | Agreement | |
| Coventry Eye Care Associates | Coventry Eye Care Associates MSA 06-20-2024 (eye care services) | Master Service/Supply Agreements | |
| Creative Office Environments | Creative Office Environments MSA | Master Service/Supply Agreements | |
| CrossBay Staffing | CrossBay Staffing MSA | Master Service/Supply Agreements | |
| CrossPoint  Engineering | CrossPoint  Engineering-RT MSA 01-31-2025 (engineering professional services and other related services) | Master Service/Supply Agreements | |
| CrossPoint  Engineering | CrossPoint  Engineering SOW 02032010-8 | Statement of Work | |
| Danox Environmental Services, Inc. (DESI) | Danox Environmental Services, Inc._RT MSA (Waste Management Services) 12-31-2020 | Master Service/Supply Agreements | |
| DeStefano Engineering, P.C. | DeStefano Engineering, P.C.-RT MSA 12-19-2023 (professional engineering services, and other related services) | Master Service/Supply Agreements | |
| Direct Energy - CMA | Direct Energy - CMA AGREEMENT | CMA | 81810 |
| Direct Energy - Gas Service Agreement | Direct Energy - Gas Service Agreement MSA | Master Service/Supply Agreements | 8,328 |
| Direct Energy (acct # 3981874009 and 5228153003) | Direct Energy (acct # 3981874009 and 5228153003) | Agreement | |
| Direct Energy (acct #1784386019 and 4269090024) | Direct Energy (acct #1784386019 and 4269090024) | Agreement | |
| Direct Energy Business | Direct Energy Transaction Confirmation 8-18-2017 | Agreement | |
| Direct Energy Business | Direct Energy Transaction Confirmation  8-21-2017 | Agreement | |
| DIRECT ENERGY SERVICES LLC | Gas, 498 Washington St., Mfg, Bldg 6 | Purchase Order | |
| Douglas Construction | Douglas Construction MSA | Master Service/Supply Agreements | |
| DOW CHEMICAL COMPANY | Dow "IPA" Pre-Payment Agreement retainer | Pre-Payment Agreement | |
| Dow Chemical Company, The | Dow Chemical Company, The MSA | Master Service/Supply Agreements | 47,512 |
| Dow Chemical Company, The - Union Carbide Corporation | Dow Chemical Company, The - Union Carbide Corporation MSA | Master Service/Supply Agreements | |
| Dycem Limited | Dycem Limited MSA | Master Service/Supply Agreements | |
| EAG, Inc. | EAG, Inc. MSA | Master Service/Supply Agreements | |
| Eagle Fence & Guardrail d/b/a EF&G Construction, Inc. | Eagle Fence & Guardrail d/b/a EF&G Construction, Inc. MSA | Master Service/Supply Agreements | |
| ECA Chemical Inc. | ECA Chemical Inc. MSA | Master Service/Supply Agreements | |
| EMC Corporation | EMC Corporation Rhodes Tech MSA | Master Service/Supply Agreements | |
| Emerson Process Management - Process Systems | SureService Guardian Support Renewal | Renewal | |
| Energy Machinery | Energy Machinery MSA | Master Service/Supply Agreements | 2,429 |
| Energy Machinery | Energy Machinery_RT SOW 10262014-3 12-31-2020 (2019-2020 compressor PM) | Statement of Work | |
| Energy Machinery Inc | Energy Machinery_RT SOW 10262014-4 12-31-2020 (Turn around maintenance inspection) | Statement of Work | |
| Energy Management & Control Services, Inc. | Energy Management & Control Services, Inc. MSA | Master Service/Supply Agreements | |
| Energy Management &amp; Control Services, Inc. | EMC_RT SOW 05012011-8 06-30-2020 (three year metasys building management system preventative maintenance | Statement of Work | |
| Energy Source, Inc. | Energy Source, Inc. MSA | Master Service/Supply Agreements | |
| Erlabs, Inc. | Erlab, Inc_RT MSA 07-23-2023 (maintenance, service, repair, calibration, and testing services on lab fume hoods) | Master Service/Supply Agreements | 10,165 |
| Erlabs, Inc. | Erlab_RT 07232013-8 07-23-2021 | Statement of Work | |
| Evans Analytical Group, Inc. | Evans Analytical Group, Inc. | Agreement | |
| Evoqua  Water Technologies | Evoqua  Water Technologies_RT MSA 09-01-2024 (PM services for water systems) | Master Service/Supply Agreements | 262 |
| Extrel CMS, LLC | Extrel CMS, LLC MSA | Master Service/Supply Agreements | |
| Gardiner Associates, LLC | Gardiner Associates, LLC MSA | Master Service/Supply Agreements | |
| GE Betz, Inc. | GE Betz, Inc. MSA 06-01-23 | Agreement | |
| GE Inspection Technologies | GE Inspection_RT MSA (08-19-2023) (on-site RVI services) | Master Service/Supply Agreements | |
| GFS CHEMICALS INC | Turbidity Standards for Calibrations, 2019 - 2020 | Purchase Order | |
| Gordon R. Archibald | GRA, Inc. - Gordon R. Archibald MSA | Master Service/Supply Agreements | |
| GRAINGER INC | Lumbar Support | Purchase Order | |
| GRAYBAR ELECTRIC COMPANY INC | Material for wiring Bldg.5 emergency lights | Purchase Order | |
| Group Technology of Trumbull, Inc | Group Technology of Trumbull, Inc MSA | Master Service/Supply Agreements | 15080 |
| Group Technology of Trumbull, Inc | Group Technology of Trumbull, Inc SOW 02122014-7 12-31-2020 (IT Specialist) | Statement of Work | |
| Guardmark | Guardmark MSA | Master Service/Supply Agreements | |
| H. J. Astle Company | H. J. Astle Company MSA | Master Service/Supply Agreements | |
| Hach Company | Hach Company MSA | Master Service/Supply Agreements | |
| Hamilton Elevator Interiors, Inc. | Hamilton Elevator Interiors, Inc. MSA | Master Service/Supply Agreements | |
| Hargrove and Associates, Inc. and its affiliates | Hargrove and Associates, Inc. and its affiliates MSA | Master Service/Supply Agreements | |
| Harper Control Solutions, Inc. | Harper Control Solutions, Inc. MSA | Master Service/Supply Agreements | |
| Harper Haines Fluid Controls, Inc. | Harper Haines Fluid Controls, Inc. MSA | Master Service/Supply Agreements | |
| Hart Design | Hart Design MSA | Master Service/Supply Agreements | |
| Hart Engineering Corporation | Hart Engineering Corporation MSA (10-18-23) | Master Service/Supply Agreements | |
| Hart Engineering Corporation | Hart Engineering Corporation SOW A-15, Ex A-12 | Statement of Work | |
| Hart Engineering Corporation | Hart Engineering Corporation SOW A-16, Ex A-13 | Statement of Work | |
| Hart Engineering Corporation | Hart Engineering_RT A18, Exhibit A-14 (Axine Wastewater Project) | Statement of Work | |
| Hazard Evaluation Lab | Hazard Evaluation Lab MSA | Master Service/Supply Agreements | |
| Hazard Evaluation Lab (HEL) Inc. | Hazard Evaluation Lab SOW 03192010-5 05-21-2021 (E1064 & E988 PM plans) | Statement of Work | |
| Health Training Education | Health Training Education | Agreement | 401 |

| Counterparty | ContractName | ContractTypeName | Cure Costs |
|---|---|---|---|
| Heinkel Filtering Systems, Inc. USA | Heinkel Filtering Systems, Inc. USA MSA | Master Service/Supply Agreements | |
| HEL - see Hazard Evaluation Lab | HEL - see Hazard Evaluation Lab | Agreement | |
| Heritage Environmental Services, LLC | Heritage Environmental Services, LLC MSA | Master Service/Supply Agreements | |
| Heritage Environmental Services, LLC | Heritage_RT MSA Amendment #3 8-31-2025 | Master Service/Supply Agreements | |
| Honeywell Safety Products | Honeywell_RT MSA 02-19-2024 (training, fall protection equipment inspections, etc.) | Master Service/Supply Agreements | |
| Howorth Air Technology Limited | Howorth Air Technology Limited MSA | Master Service/Supply Agreements | |
| HP Services, Inc. | HP Services, Inc._RT MSA 11-30-2021 (provide passivation and chemical cleaning services) | Master Service/Supply Agreements | |
| Hunter Associates Laboratory d/b/a Hunterlab International Inc. | Hunter Associates Laboratory d/b/a Hunterlab International Inc. MSA | Master Service/Supply Agreements | |
| Hurley Construction Inc. | Hurley Construction_RT MSA 07-24-2025 | Master Service/Supply Agreements | |
| i-Design Group | i-Design Group MSA | Master Service/Supply Agreements | |
| IES Engineers, Inc. | IES Engineers_RT MSA 01-30-2024 (toxicology assessments, SDS authoring and other health/safety related services) | Master Service/Supply Agreements | |
| Imperatore Steel Erectors, Inc. | Imperatore Steel Erectors, Inc. MSA | Master Service/Supply Agreements | |
| Imperatore Steel Erectors, Inc. | Imperatore_RT MSA Amendment #2 8-31-2025 | Master Service/Supply Agreements | |
| Industrial Protection Products, Inc | Industrial Protection Products_RT MSA 12-31-2024 (supply safety shoes and associated services related to supply of | Master Service/Supply Agreements | |
| INSIGHT DIRECT USA INC | Cisco SMARTnet extended service agreement for Core Switches Coverage 05/01/2019 to 05/01/2020 | Purchase Order | |
| Intertek USA Inc. d/b/a QTI | Intertek USA Inc. d/b/a QTI MSA | Master Service/Supply Agreements | |
| IoMosaic | IoMosaic AGREEMENT | Consulting Agreement | |
| IPP | IPP AGREEMENT | Agreement | |
| Iron Mountain | Iron Mountain AGREEMENT | Agreement | 2981 |
| JOHNSON CONTROLS FIRE PROTECTION | Fire Extinguisher Purchases 2018 thru 2020 (Sitewide) from Simplex Grinnell | Purchase Order | |
| Johnson Controls Fire Protection LP | Johnson Controls Fire Protection LP MSA (fka Simplex Grinnell) 07-01-2024 (provide fire alarm, fire extinguisher, sup | Master Service/Supply Agreements | |
| Johnson Controls Fire Protection LP | Johnson Controls_RT SOW 07012014-3 | Statement of Work | |
| Kaplan | Technology and Education Solution Agreement, as amended by Addendum I-IV | Agreement | |
| Kenneth Industrial Products, Inc. | Kenneth Industrial Products, Inc. MSA | Master Service/Supply Agreements | |
| Kepware, Inc. | Kepware, Inc. MSA | Master Service/Supply Agreements | |
| Knorr Associates Inc. | DataPipe Program License Agreement | License Agreement | |
| Knorr Associates Inc. | DataPipe Software Maintenance Agreement | Maintenance Agreement | |
| Kupper, Robert | Kupper_RT MSA (Consultant) 08-31-2022 (research, process development, new product development, technical doc | Master Service/Supply Agreements | 2000 |
| LabelMaster Software | Rhodes Technologies 2019 Software Renewal | Renewal Quote | |
| Leavitt's Tree Service, Inc. | Leavitt's Tree Service, Inc. MSA | Master Service/Supply Agreements | |
| Life Support Systems | Life Support Systems MSA | Master Service/Supply Agreements | |
| Little Rhody Machine Repair, Inc. | Little Rhody Machine Repair, Inc. MSA | Master Service/Supply Agreements | |
| Loewenstein, Robert | Loewenstein, Robert_RT MSA 12-31-2020 (consulting services for regulatory affairs) | Master Service/Supply Agreements | |
| Lorenz International LLC | Lorenz International LLC AGREEMENT | License Agreement | |
| MAINTENANCE MANAGEMENT INC | Housekeeping and Janitorial Services 2022 | Purchase Order | |
| Mar Cor Purification (fka as Stericycle, Inc.and fka Certco, Inc.) | Mar Cor Purification_RT MSA SOW 06122009-6 04-29-2021 (ductless fume hood testing and certification - 2019-202 | Statement of Work | 6924 |
| Mar Cor Purification Inc | Mar Cor (Certco)_RT SOW 06122009-7 12-31-2020 (lab hood testing and evaluation - annual assessment and air flo | Statement of Work | |
| Marr Scaffolding | Marr Scaffolding MSA | Master Service/Supply Agreements | |
| Mass Crane Hoist Services Inc. | Mass Crane Hoist Services Inc. MSA | Master Service/Supply Agreements | |
| Mass Crane Hoist Services Inc. | Mass Crane Hoist Services Inc._RT SOW 01012017-2 12-31-2021 (annual inspection/PM on overhead cranes and hoi | Statement of Work | |
| Matcon | Matcon MSA | Master Service/Supply Agreements | |
| Matheson Tri-Gas, Inc. | Matheson Tri-Gas, Inc. MSA | Master Service/Supply Agreements | |
| MC Dean Inc (fka Thomas and Betts Power Solutions, a Member | MC Dean Inc (fka Thomas and Betts)_RT MSA 12-31-2023 (maintenance, service and repair of network critical powe | Master Service/Supply Agreements | |
| MedPharm Ltd | MedPharm Ltd MSA | Master Service/Supply Agreements | |
| MedPharm Ltd | MedPharm SOW | Statement of Work | |
| Mercer Inc. | Engagement Letter Agreement, evergreen | Agreement | |
| Meriden Cooper Corp. | Meriden Cooper Corp. MSA | Master Service/Supply Agreements | |
| Merrill Brink International Corporation | Merrill Brink International Corporation MSA | Master Service/Supply Agreements | |
| Metrohm USA | Brinkmann Metrohm MSA 11-30-2020 | Agreement | |
| Mettler Toledo Autochem, Inc. | Mettler Toledo Autochem_RT SOW 10012010-15 (2 year iCare subscription) | Statement of Work | |
| Mettler-Toledo Autochem Inc | Mettler-Toledo Autochem Inc MSA | Master Service/Supply Agreements | |
| Mettler-Toledo Autochem Inc | Mettler-Toledo Autochem Inc SOW 10012010-14 | Statement of Work | |
| MicroCad Training & Consulting, Inc. | MicroCad Training & Consulting, Inc. MSA | Master Service/Supply Agreements | |
| Midland Engineering Limited | Midland Engineering Limited MSA | Master Service/Supply Agreements | |
| Mistras Group, Inc. | Mistras Group, Inc._RT MSA 06-27-2024 (non-destructive examination of process and utility equipment) | Master Service/Supply Agreements | |
| MMI, Inc. | MMI, Inc. MSA | Master Service/Supply Agreements | |
| Molecular Application Technologies (MAT) | Molecular Application Technologies (MAT) MSA | Master Service/Supply Agreements | |
| Mountain Air | Mountain Air  MSA | Master Service/Supply Agreements | |
| Mountain Air | Mountain Air  SOW 05292012-4 | Statement of Work | |
| Mountain Air | Mountain Air  SOW 05292012-6 | Statement of Work | |
| Mystic Air Quality Consultants, Inc. | Mystic Air Quality Consultants, Inc. MSA | Master Service/Supply Agreements | |
| Nalas Engineering Services Inc. | Nalas Engineering Services_RT MSA 03-07-2024 (process development, chemical synthesis, sample analysis, safety-r | Master Service/Supply Agreements | |
| National Grid | National Grid MSA | Master Service/Supply Agreements | 8977 |
| NATIONAL GRID | Electricity - 42 Quidnick Poles 9 & 2 | Purchase Order | |
| NATIONAL GRID | Electricity - 500 Washington St., Pole 19 | Purchase Order | |
| Nestles Waters | Nestles Waters AGREEMENT | Master Service/Supply Agreements | |
| New England Controls | New England Controls SOW 10282013-7 12-31-2020 (SureService DeltaV and AMS Service Plan) | Statement of Work | |
| New England Controls | NEC_RT MSA SOW 10282013-6 12-31-2020 (DeltaV/AMS Major Software Upgrade) | Master Service/Supply Agreements | |
| New England Controls | NEC_RT MSA SOW 10282013-9 (12-31-2020) (DeltaV and AMS major version software upgrade) | Statement of Work | |
| New England Controls | New England Controls  Terms of Use AGREEMENT | Agreement | |
| New England Controls (NEC) | NEC_RT SOW 10282013-8 12-03-2022 (3rd party factory support renewals) | Statement of Work | |
| New England Controls Inc. | New England Controls Inc.  MSA | Master Service/Supply Agreements | |
| New England Controls, Inc. | New England Controls, Inc. SOW 10282013-6 | Statement of Work | |

| Counterparty | ContractName | ContractTypeName | Cure Costs |
|---|---|---|---|
| New England Pest Control | New England Pest Control_RT MSA 07-03-2024 (Pest Control / IPM program) | Master Service/Supply Agreements | 764 |
| New England Pest Control | New England Pest Control SOW 07022014-1 | Statement of Work | |
| New England Pest Control d/b/a Big Blue Bug Solutions | NE Pest Control_RT SOW 07022014-2 01-01-2023 (3 year monthly pest control program) | Statement of Work | |
| New Harbor Group | New Harbor Group MSA | Master Service/Supply Agreements | 500 |
| NEW HARBOR LLC | Government & Public Relations Services | Purchase Order | |
| Northeast Electrical (Rockwell Automation) | Northeast Electrical (Rockwell Automation) | Software License & Service Agreement | |
| Northern Energy Services Inc. | Northern Energy Services Inc. MSA | Master Service/Supply Agreements | |
| Notch Welding & Mechanical Contractors, Inc. | Notch Welding & Mechanical Contractors, Inc. MSA | Master Service/Supply Agreements | |
| Novasep Incorporated | Novasep Incorporated MSA | Master Service/Supply Agreements | |
| NSF Health Sciences, LLC | NSF Health Sciences, LLC MSA | Master Service/Supply Agreements | |
| NV5 (fka RDK Engineers) | NV5 (fka RDK Engineers) MSA | Master Service/Supply Agreements | 1489 |
| Occuhealth Inc. | Occuhealth Inc. MSA | Master Service/Supply Agreements | |
| Odeh Engineers, Inc. | Odeh Engineers, Inc. MSA | Master Service/Supply Agreements | |
| OEM of Connecticut Inc. d/b/a OEM America L/C/F Inspection and | OEM of Connecticut Inc. d/b/a OEM America L/C/F Inspection and Testing LLC | Agreement | |
| ORCHSE Strategies, LLC | ORCHSE Strategies, LLC MSA | Master Service/Supply Agreements | |
| Organix, Inc. | Organix, Inc. MSA | Master Service/Supply Agreements | |
| OSIsoft, LLC | OSIsoft, LLC AGREEMENT | Software License & Service Agreement | |
| OVERHEAD DOOR COMPANY | Overhead Door PMs 2018 - 2020 | Purchase Order | |
| OVERHEAD DOOR COMPANY | 3 Year Overhead Door Annual Preventive Maintenance (2018-2020) | Purchase Order | |
| Pare Corporation MSA 10-15-2025 | Pare Corporation MSA | Master Service/Supply Agreements | |
| Parsons Commercial Technology Group | Parsons Commercial Technology Group MSA | Master Service/Supply Agreements | |
| Paul's Lock and Safe | Paul's Lock and Safe MSA | Master Service/Supply Agreements | |
| PerkinElmer Health Sciences, Inc. | PerkinElmer Health Sciences, Inc. MSA | Master Service/Supply Agreements | |
| PerkinElmer Informatics, Inc. | PerkinElmer Informatics, Inc. AGREEMENT | License Agreement | |
| PFI Design | PFI Design MSA | Master Service/Supply Agreements | |
| Pharmazeutisch Medizinisches Management (PMM) - See Wolfga | Pharmazeutisch Medizinisches Management (PMM) - See Wolfgang Fleischer, MD, PhD | Agreement | |
| Pitney Bowes | Pitney Bowes CONTRACT | Lease | 50 |
| Polaris MEP | Polaris MEP MSA | Master Service/Supply Agreements | |
| Power Products Systems LLC | Power Products Systems LLC MSA | Master Service/Supply Agreements | |
| Power Products Systems LLC | Power Products Systems LLC SOW 08102014-2 | Statement of Work | |
| POWER PRODUCTS SYSTEMS LLC | 2018 - 2020 Manufacturing Generator PMs & repairs | Purchase Order | |
| Precise Instrument (Stephen Mendoza) | Precise Instrument (Stephen Mendoza) MSA | Master Service/Supply Agreements | |
| Prolerized New England Company LLC | Prolerized New England Company LLC AGREEMENT | Sales Agreement | |
| Prolerized New England Company LLC | Metal & Non Ferrous Scrap Metal Sales Agreement | Agreement | |
| ProPharma Group Holdings, LLC | ProPharma Group Holdings, LLC MSA | Master Service/Supply Agreements | |
| Proscape Landscaping | Proscape Landscaping MSA | Master Service/Supply Agreements | |
| Quadient | Postage Meter Rental Agreement | Agreement | |
| QUALITY CHEMICAL LABORATORIES | 2019 Testing services for L-Tartaric Acid, NF | Purchase Order | |
| Regan Heating and Air Conditioning | Regan Heating and Air Conditioning MSA | Master Service/Supply Agreements | |
| RI Analytical Laboratories | RI Analytical Laboratories MSA | Master Service/Supply Agreements | |
| Rice Lake | Rice Lake  MSA | Master Service/Supply Agreements | |
| RPKK, Inc. | RPKK, Inc. MSA | Master Service/Supply Agreements | |
| RPS ASA | RPS ASA | Agreement | |
| Rudolph Research Analytical | Rudolph Research Analytical MSA | Master Service/Supply Agreements | |
| Rudolph Research Analytical | Rudolph Research Analytical_RT SOW 08092010-7 04-29-2023 (Autopol V Polarimeters PM/IQ/PQ 3 year plan) | Statement of Work | |
| Rudolph Research Analytical | Rudolph Research Analytical SOW 08092010-5 | Statement of Work | |
| Rudolph Research Analytical | Rudolph Research_RT SOW 08092010-7 04-29-2023 | Statement of Work | |
| S.A.L.A.R.S S.p.A. | S.A.L.A.R.S S.p.A. CONTRACT | Agreement | |
| S.D. Myers | S.D. Myers SOW 01212010-2 | Statement of Work | |
| SafeBridge Consultants, Inc. | SafeBridge Consultants, Inc. MSA | Master Service/Supply Agreements | |
| Safety-Kleen Systems, Inc. | Safety-Kleen Systems, Inc. MSA | Master Service/Supply Agreements | |
| Sage Environmental | Sage Environmental MSA | Master Service/Supply Agreements | |
| Schneider | Schneider Electric Systems | Agreement | |
| SCI Pharmtech Inc | SCI Pharmtech Inc MSA | Master Service/Supply Agreements | |
| Security Services of CT | Security Services of CT MSA | Master Service/Supply Agreements | |
| Security Services of CT | Security Services of CT SOW 01012014-7 | Statement of Work | |
| Security Technologies, Inc. | Security Technologies, Inc. MSA | Master Service/Supply Agreements | |
| Security Technologies, Inc. | Security Technologies, Inc. MSA | Master Service/Supply Agreements | |
| ServPro of Providence | ServPro of Providence MSA | Master Service/Supply Agreements | |
| Shawn Hartigan-Dakin D/B/A Mountain Air | Shawn Hartigan-Dakin D/B/A Mountain Air | Agreement | |
| SHAWN T HARTIGAN | 4-Year PM Service Plan - 2 Lochinvar Condensing Boilers | Purchase Order | |
| Shred-it USA LLC, a subsidiary of Stericycle, Inc. | Shred-it USA LLC, a subsidiary of Stericycle, Inc. AGREEMENT | Agreement | |
| Shred-it USA LLC, a subsidiary of Stericycle, Inc. | Shred-it USA LLC, a subsidiary of Stericycle, Inc. AGREEMENT | Agreement | |
| Siemens Industry, Inc. | Siemens Industry, Inc. MSA | Master Service/Supply Agreements | 34177 |
| Sigma-Aldrich, Inc. | Sigma-Aldrich, Inc. AGREEMENT | Pricing Agreement | 10480 |
| SimplexGrinnell LP | SimplexGrinnell LP SOW 07012014-2, A-1 | Statement of Work | |
| Sitecon Corporation | Sitecon Corporation MSA | Master Service/Supply Agreements | 3540 |
| SKURKA CONSTRUCTION INC | 2017-2020 Snow Plowing (Skurka) | Purchase Order | |
| Skurka Construction Inc. | Skurka Construction Inc. MSA 04-20-2020 | Master Service/Supply Agreements | 12400 |
| Skurka Construction Inc. | Skurka Construction Inc. SOW A-8 Ex-A5 | Statement of Work | |
| Sparta Systems, Inc. | Sparta Systems, Inc. MSA | Master Service/Supply Agreements | |
| Spectra Automation Ltd | Spectra Automation Ltd_RT MSA 09-01-2024 (automation, implementation and testing services) | Master Service/Supply Agreements | |
| Stonhard, Division of Stoncor Group, Inc. | Stonhard, Division of Stoncor Group, Inc_RT MSA 07-29-2024 (provide floor and wall systems) | Master Service/Supply Agreements | |

| Counterparty | ContractName | ContractTypeName | Cure Costs |
|---|---|---|---|
| Suez WTS USA, Inc. | Suez WTS USA, Inc. MSA | Master Service/Supply Agreements | 16359 |
| Sullivan & McLaughlin | Sullivan & McLaughlin_RT MSA 01-31-2025 (various electrical and technologies services) | Master Service/Supply Agreements | |
| Sullivan & McLaughlin | Sullivan & McLaughlin_RT SOW 03012010-47 01-01-2022 (2020-2022 plant group and spot re-lamping) | Statement of Work | |
| Sullivan & McLaughlin | Sullivan & McLaughlin SOW 03012010-44 (12-31-2020) (2019 Fire Alarm Testing) | Statement of Work | |
| Sullivan & McLaughlin | Sullivan & McLaughlin SOW 03012010-45 (12-31-2020) (fire pump testing and fire pump battery testing and inspect | Statement of Work | |
| Sullivan & McLaughlin | Sully Mac_RT SOW 03012010-46 12-31-2020 | Statement of Work | |
| [REDACTED] | [REDACTED] AGREEMENT | License Agreement | |
| [REDACTED] | [REDACTED]_RT Supply Agreement 12-31-2020 | Master Service/Supply Agreements | |
| Surplus Solutions LLC | Surplus Solutions_RT Asset Purchase Agreement (one time) | Asset Purchase Agreement | |
| Surplus Solutions, LLC | Surplus Solutions, LLC AGREEMENT | Sales Agreement | |
| SVC Pharma LP (Delaware LP) | SVC_RT Dronabinol Supply Agreement Dec 2002 | Commercial Supply Agreement | |
| Tech Painting | Tech Painting MSA 06-15-22 | Master Service/Supply Agreements | |
| The Lock Shop, Inc. | The Lock Shop, Inc. MSA | Master Service/Supply Agreements | |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-8 | Statement of Work | |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-9 | Statement of Work | |
| The Lock Shop, Inc. | The Lock Shop, Inc. SOW 02012011-8 (A2) | Statement of Work | |
| Thermal Technologies, Inc. | Thermal Technologies, Inc._RT MSA 08-25-2024 (infrared thermography services for electrical equipment diagnostic | Master Service/Supply Agreements | |
| Thermal Technologies, Inc. | Thermal Technologies, Inc._RT SOW 08252014-4 09-19-2021 | Statement of Work | |
| Thermo Electron | Thermo Electron_RT MSA SOW 12172009-34 10-27-2020 (ICS500 unity extended warranty plan and vanquish unity | Statement of Work | |
| Thermo Electron NA | Thermo Electron_RT MSA SOW 12172009-33 09-17-2020 (Thermo Nicolet iS10-FT-IR Spectrometer- Unity Essential | Statement of Work | |
| Thermo Electron North America LLC | Thermo Electro NA_RT 12172009-32 09-30-2020 | Statement of Work | |
| Thermo Electron North America LLC | Thermo Electron NA LLC_RT MSA 12-21-2024 (maintenance, service, repair, calibration, testing, certification, and Q/ | Master Service/Supply Agreements | |
| Thermo Electron North America LLC | Thermo Electron NA_RT SOW 12172009-36 09-17-2021 | Statement of Work | |
| Thermo Fisher Scientific (Asheville) | Thermo Fisher Scientific (Asheville) MSA | Master Service/Supply Agreements | |
| Thermo Fisher Scientific (Asheville) | ThermoFisher Asheville_RT SOW 06042010-14 07-28-2021 | Statement of Work | |
| Thielsch Engineering Div. Rise Engineering | Thielsch Engineering_RT MSA 09-01-2024 (engineering, laboratory, consulting, design, energy services and fabricatio | Master Service/Supply Agreements | |
| Thomas & Betts Power Solutions, LLC, a member of the ABB Gro | MC Dean (fka Thomas and Betts)_RT SOW 05152018-1 05-16-2023 (Network critical equipment service plan) | Statement of Work | |
| ThyssenKrupp Elevator Corporation | ThyssenKrupp Elevator Corporation MSA | Master Service/Supply Agreements | 1772 |
| ThyssenKrupp Elevator Corporation | ThyssenKrupp Elevator Corporation SOW 08102016-1 | Statement of Work | |
| U.S. Bank Equipment Finanace (as assignee of Usherwood Office | Lease dated 8-7-18 | Lease | |
| U.S. Bank Equipment Finanace (as assignee of Usherwood Office | Lease dated 4-23-19 | Lease | |
| UL Kaplan EduNeering | UL Kaplan EduNeering MSA | Master Service/Supply Agreements | |
| UL Kaplan EduNeering | UL Eduneering_RT Order 10398R  09-30-2020 | Statement of Work/Order | |
| Unique Metal Works, LLC | Unique Metal Works, LLC MSA | Master Service/Supply Agreements | |
| Univar USA Inc. | Univar Rhodes Beneficial Reuse Agr evergreen | Master Service/Supply Agreements | |
| University of RI Research Foundation | University of RI Research Foundation d/b/a Polaris MEP MSA 03-01-21 | Master Service/Supply Agreements | |
| US BANK NATIONAL ASSOCIATION | Copiers - Rhodes Tech - Exeter, Westerly, Middleton, Cranston, Bridgewater, Quahog | Purchase Order | |
| Usherwood Office Technology | Usherwood Office Technology Master Agreement 08-07-23; Addendum to Master Agreement | Master Service/Supply Agreements | |
| Usherwood Office Technology | Usherwood Office Technology Service Agreement | Master Service/Supply Agreements | |
| Usherwood Office Technology | Lease dated 3-3-20; related Maintenance Agreement | Lease | |
| Usherwood Office Technology | Lease dated 4-2-19 | Lease | |
| Utility Communications, Inc. | Utility Communications, Inc. MSA | Master Service/Supply Agreements | 1085 |
| Veolia ES Technical Inc | Veolia ES Technical_RT Product Purchase Agreement 11-7-2020 (auto-renew) | Transfer Agreement | |
| Veolia ES Technical Solutions LLC | Veolia_RT MSA (Waste) 07-26-2024 (waste disposal services, onsite management services, related support services, | Master Service/Supply Agreements | |
| Vesta Partners, LLC | Vesta Partners, LLC MSA | Master Service/Supply Agreements | |
| Walco Electric Company | Walco Electric Company_RT MSA 8-31-2025 | Master Service/Supply Agreements | |
| Waterman Engineering Company | Waterman Engineering Company MSA | Master Service/Supply Agreements | |
| Wechslet International, LLC | Wechslet International, LLC | Agreement | |
| William Scotsman, Inc. | Lease Agreement (Office Trailers); two amendments dated 6-14-17 | Lease | |
| Wilner-Greene Associates, Inc. | Wilner-Greene Associates, Inc. MSA | Master Service/Supply Agreements | |
| Woodard & Curran | Woodard & Curran MSA | Master Service/Supply Agreements | |
| Working Words | Working Words MSA | Master Service/Supply Agreements | |
| WSP USA Corp | WSP USA Corp MSA | Master Service/Supply Agreements | |
| Xerox | Xerox CONTRACT | Lease | 2612 |
| Xerox | Contract MX4-492537-Woonsocket | Lease | |
| XEROX CORPORATION | Woonsocket – W7845PT Tandem, SN MX4-492537, IT –through 05/30/2021 | Purchase Order/Lease | |
| Yankee Fiber Control | Yankee Fiber Control_RT Contracting Services Agreement 01-31-2025 | Master Service/Supply Agreements | |