DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

**DECLARATION OF RAFAEL J. SCHNITZLER IN SUPPORT
OF MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING SALE OF
DEBTORS' COVENTRY FACILITY AND RELATED ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) APPROVING DEBTORS'
ENTRY INTO A LONG-TERM API SUPPLY AGREEMENT, (III) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OR ASSIGNMENT, AS APPLICABLE, OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING
<u>RELATED RELIEF</u>**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, Rafael Joseph Schnitzler, being fully sworn, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a director in the Strategic Advisory Group at PJT Partners LP ("**PJT**"), which serves as the investment banker for Purdue Pharma L.P. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**"). PJT is an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

2. I submit this declaration (this "**Declaration**") in support of the *Motion of the Debtors for Entry of an Order (I) Approving Sale of Debtors' Coventry Facility and Related Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving Debtors' Entry into a Long-Term API Supply Agreement, (III) Authorizing Assumption and Assignment or Assignment, as Applicable, of Executory Contracts and Unexpired Leases and (IV) Granting Related Relief* (the "**Motion**") filed herewith.[2]

3. I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by PJT employees working on this engagement or by members of the Debtors' management or their advisors, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

**Qualifications**

4.     PJT's Restructuring and Special Situations Group is one of the industry's leading advisors to companies and creditors in a variety of complex restructurings and bankruptcies. PJT was spun off from The Blackstone Group L.P. ("**Blackstone**") effective October 1, 2015. Upon the consummation of the spinoff, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. The former Blackstone restructuring professionals, in their capacity as PJT employees, have been conducting business and providing their clients with the same high-quality restructuring services that Blackstone had itself provided since the formation of its restructuring advisory practice 28 years ago. PJT professionals have extensive experience working with financially troubled companies in complex financial restructurings have assisted and advised debtors, creditors' committees and other constituencies in numerous chapter 11 cases.

5.     I have been an employee at PJT since the spinoff from Blackstone in October 2015 and, since that time, have focused primarily on mergers and acquisitions in the healthcare and telecommunications industries. Prior to joining PJT, I was a Vice President at Deutsche Bank Securities, Inc. where I worked in the investment bank division from 2011 to 2015.

6.     I hold a Bachelor of Arts degree in Economics from University of California Davis and a Master of Business Administration degree with a finance concentration from the Darden School of Business of the University of Virginia.

7.     I have over 9 years of mergers and acquisitions experience and have served as financial advisor in numerous transactions including asset sales and public and private company mergers and acquisitions. I have been an advisor to the following transactions, among others: the sale of Stemline Therapeutics to Menarini Group, ADMA Biologics' acquisition of Biotest's

3

Therapy Business Unit Assets, the sale of Yahoo's core operating business to Verizon, the sale of Global Tower Partners to American Tower Corporation and RigNet's acquisition of Inmarasat's Energy Broadband Business. In advising Purdue on this matter, I have conferred with my experienced PJT colleagues generally along the way, and specifically at each significant decision point.

8. To date, PJT has, among other things, engaged in extensive due diligence of the Debtors' business, including their operations, assets, corporate structure, and contractual arrangements to build a foundation for the Debtors' business plan and restructuring strategy. Moreover, PJT has performed diligence on the Debtors' cash flows and liquidity. PJT has played a critical role in arm's-length negotiations between the Debtors and their key stakeholders in furtherance of the Debtors' restructuring efforts. In addition, PJT has worked closely with the Debtors, Alix Partners and counsel with respect to the Transaction described in the Motion and this Declaration.

## The Coventry Facility

9. The Coventry Facility is an active pharmaceutical ingredient ("**API**") manufacturing facility located in Coventry, Rhode Island and is owned and operated by Rhodes Technologies ("**Rhodes Tech**"). The Coventry Facility manufactures the APIs used by Debtor Purdue Pharma L.P. ("**PPLP**") in the manufacturing of its branded finished products and used by Debtor Rhodes Pharmaceuticals L.P. ("**Rhodes Pharma**") in the manufacturing of certain of its generic finished products. In addition, APIs produced at the Coventry Facility are sold by Rhodes Tech to third parties.

10. While Rhodes Tech provides a reliable supply of critical APIs, operation of the Coventry Facility involves substantial fixed costs (with annual costs of approximately ▮▮▮▮▮▮)

4

associated with manufacturing and compliance with safety, health, environmental, Food and Drug Administration ("**FDA**"), Drug Enforcement Administration ("**DEA**") and other regulatory requirements. The Coventry Facility was originally built to provide a reliable and secure supply of oxycodone API for branded OxyContin. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ As a result, in connection with the development of their updated business plan, which was finalized in April 2020, the Debtors made the decision to explore strategic alternatives with respect to the Coventry Facility and outsource the Debtors' API supply needs. A transition away from the Coventry Facility would have the effect of unburdening the Debtors from the facility's annual fixed operating costs, creating a variable cost structure as volumes decrease while ensuring a reliable future supply of APIs. If the Debtors were to shut down the Coventry Facility and merely move supply to a third-party API supplier, they would expect to incur significant shut-down costs. Finding a secure and reliable strategic partner to take over the Coventry Facility and also supply APIs would avoid these shut-down costs.

11. In April 2020, PJT, as investment banker to the Debtors, began working with the Debtors' management team and co-advisors to explore strategic alternatives for the Coventry Facility and identify a suitable alternative supply of APIs, including by conducting the extensive marketing and negotiation process described in more detail below.

5

**Sale Process**

12.     Two fundamental factors informed the decision to conduct a private process, as opposed to a court-supervised auction, to sell the Coventry Facility and source an alternative supply of APIs.  First, there are a limited number of companies that are in the business of manufacturing low ABUK oxycodone and the other APIs produced at the Coventry Facility, and a financial buyer of the Coventry Facility would likely not be able to offer competitive supply terms given the financial profile of the Rhodes Tech business.  Second, the Debtors could not risk any interruption in the supply of high-quality APIs in both the short and long term.  Accordingly, each interested party was evaluated not only as a potential purchaser of the Coventry Facility, but also on its ability to execute a seamless transition of the API supply from Rhodes Tech to the purchaser and to function as a long-term commercial partner.  Because the universe of potential interested parties is small, and because nonfinancial considerations such as reputation and experience in the API manufacturing industry, compliance and good standing with all regulatory bodies, continuity of supply and execution risk would be such important factors in evaluating any competing proposals, a court-supervised auction process would involve increased expense and delay and would be unlikely to produce additional value for the Debtors' estates.

13.     With these factors in mind, beginning in April 2020, the Debtors contacted 12 entities regarding potential strategic alternatives for Rhodes Tech's API manufacturing business. As expected, preliminary feedback received in this initial outreach indicated that only a select group of parties was interested in exploring an API supply agreement with the Debtors and a potential partnership or acquisition of the Coventry Facility.

14.     In May 2020, the Debtors communicated to these parties the intent to launch a formal process for the solicitation of bids for a transaction.  Based on these communications, four

parties, including Noramco LLC ("**Noramco**"), expressed interest in participating. In mid-June 2020, PJT distributed first round process letters, and the Debtors granted the four interested parties access to confidential information regarding Rhodes Tech's API manufacturing business and the Coventry Facility. Thereafter, PJT, along with the Debtors and their other advisors, engaged in an extensive process to provide diligence and guidance to these parties, including by coordinating numerous diligence calls and responding to diligence questions.

15.     By July 15, 2020, all four interested parties submitted round-one proposals or letters of intent. Noramco submitted a proposal and detailed markup of the term sheets for both a long-term API supply agreement and the purchase by the Purchaser, a newly-formed affiliate of Noramco, of the Coventry Facility. The three competing proposals offered materially less value, taking into account API pricing terms and the terms of the sale of the Coventry Facility, and materially more complexity with regard to the Debtors' short- and long-term supply of APIs. In addition, Noramco's long track record in the industry, financial credibility, and proven access to resources were important to the Debtors' assessment of Noramco's proposal.

16.     The Debtors, in consultation with PJT, believed that two proposals (including the Purchaser's) offered favorable economic terms and that the other proposals involved unacceptably high execution risk and/or risk regarding continuity of supply. The parties that submitted these two proposals were invited to submit round-two proposals. A third party was encouraged to resubmit a more formal proposal by July 31, 2020. On July 22, 2020, the Debtors and their advisors provided access to additional confidential information not provided to first-round interested parties, and on July 30, 2020, the Debtors distributed drafts of long-form transaction documents.

17. On August 24, 2020, final bids, including final transaction documents, were received by the Debtors from the Purchaser and one other round-two bidder. Both bidders improved their offers between rounds one and two. As compared with its first-round proposal, the Purchaser's second-round proposal provided for increased consideration in the form of a higher initial purchase price for the Purchased Assets at closing, contingent installment payments to be paid over time based upon API purchase thresholds for Oxycodone HCl under the Supply Agreement, increased consideration for Rhodes Tech inventory and improved API pricing terms. The Debtors and their advisors determined that this proposal offered materially better certainty of supply and materially greater value than the other round-two bidder's final proposal, which, among other things, would have required millions of dollars' worth of incremental costs and would have involved increased timing and execution risk as it would have required clinical testing to transfer the Rhodes Tech API manufacturing business.

18. As a result, the overall structure offered by the Purchaser's proposal represented the best option available to the Debtors and would substantially benefit the Debtors' estates by enabling the Debtors to (a) procure a supply of APIs necessary to operate the Debtors' ongoing finished products business, at a cost substantially lower than presently incurred by manufacturing such APIs "in house," from an experienced API manufacturer with the capability to ensure high-quality supply and with whom the Debtors can build a strong long-term commercial relationship and (b) unburden their estates from the high fixed, unabsorbed annual costs associated with the ownership and operation or potential closure of the Coventry Facility.

**The Transaction**

19. After extensive arm's-length negotiations and good-faith efforts by all parties, on September 14, Rhodes Tech, the Purchaser and Noramco, as guarantor of Purchaser's obligations,

executed the APA in contemplation of a private sale pursuant to which the Purchaser has agreed to acquire the Coventry Facility and other related Purchased Assets, as well as assume the Assigned Contracts and pay the Cure Costs related thereto. As a condition to Closing (as defined in the APA), PPLP (or an affiliate thereof) and Noramco will enter into the Supply Agreement, which will have a minimum term of seven years, with two two-year renewals at the Debtors' option. The parties (or their affiliates) will also enter into additional Ancillary Documents, including a transition services agreement, consistent with the term sheet attached to the APA, to effectuate the transfer of the Coventry Facility operations from the Debtors to the Purchaser.

20. The Transaction will provide value to the Debtors in four primary ways. First, Noramco has proven ability to supply low ABUK material over a number of years, enabling the Debtors to achieve savings from this early transfer to the Purchaser. Second, under the attractive terms of the Supply Agreement, the Debtors ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ anticipate estimated net savings of approximately ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Third, the Debtors expect to realize up to $10 million from the Purchase Price ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Fourth, the Debtors expect to realize ▓▓▓▓▓▓▓▓ of inventory credit ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Finally, the Debtors would avoid approximately ▓▓▓▓▓▓▓▓ in anticipated shut-down costs that would have been incurred if the Debtors sourced their API requirements without selling the Coventry Facility and subsequently closed the Coventry Facility. The Debtors anticipate realizing total value from the Transaction of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

9

21. I believe that the Transaction contemplated under the APA and the Supply Agreement represents the best and most viable option for the sale of the Coventry Facility and the highest offer received during the marketing process.

### The Reasonableness of the Purchaser Protections

22. The APA provides for a Break-Up Fee of $3 million and Expense Reimbursement of up to $1.5 million for the Purchaser in the event that the APA is terminated under certain conditions specified in Section 7.2 thereof. In addition, the APA provides that, until the earlier of the Closing Date or the valid termination of the APA, the Debtors agree not to solicit or take certain other actions with respect to an Alternative Transaction (the "**No-Shop**" and, together with the Break-Up Fee and the Expense Reimbursement, the "**Purchaser Protections**"). However, the Debtors are permitted to respond under certain circumstances to a bona fide written Acquisition Proposal that the Debtors determine in good faith (after consultation with their financial advisors and outside legal counsel) constitutes, or is reasonably expected to lead to, a Superior Proposal. The APA defines a "Superior Proposal" for this purpose in part as one offering at least $1 million more in value than the Transaction.

23. The Purchaser Protections are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Purchaser. The Break-Up Fee and Expense Reimbursement represent approximately ▮▮▮▮ and ▮▮▮▮, respectively, of the ▮▮▮▮ total value of the Transaction. Moreover, my understanding is that the Purchaser would not have entered into the Transaction without the Purchaser Protections, and therefore the Purchaser Protections are necessary to preserve the value of the Debtors' estates. The Purchaser Protections were negotiated in good faith and were necessary to secure the Purchaser's commitment to close subject to the risk that the Debtors receive an unsolicited

10

Superior Proposal. Moreover, the payment of the Break-Up Fee and Expense Reimbursement will not diminish the Debtors' estates. The Debtors do not intend to terminate the APA—if doing so would incur an obligation to pay the Break-Up Fee and Expense Reimbursement—unless the Debtors accept a Superior Proposal that provides for consideration in excess of that offered by the Purchaser plus the Break-Up Fee and Expense Reimbursement.

24.    In light of these circumstances, the Purchaser Protections are (a) commensurate with the real and substantial benefits conferred upon the Debtors' estates by the Purchaser, (b) reasonable and appropriate in light of the size and nature of the Transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Purchaser, and (c) necessary to induce the Purchaser to enter into and continue to be bound by the APA. Further, the APA provisions relating to the Purchaser Protections (along with other provisions of the APA) were (x) scrutinized by the Debtors' professionals and (y) approved by the Debtors' board of directors.

## No Successor Liability

25.    My understanding is that, with the sole exception of the Assumed Liabilities and the Permitted Post-Closing Encumbrances, as expressly set forth in the APA, the Purchaser is not expressly or impliedly agreeing under the terms and conditions of the APA to assume any of the debts or obligations of the Debtors.

## Sale Free and Clear Required by the Purchaser

26.    In connection with the APA, the Purchaser expressly negotiated for the protection of obtaining the Purchased Assets free and clear of all Liens and Claims (including, without limitation, any potential successor liability claims). My understanding is that the Purchaser would have paid substantially less consideration for, or not purchased, the Purchased Assets if the

Purchasers were not buying such assets free and clear of any Liens and Claims, specifically including any successor liability claims.

**Assumption and Assignment or Assignment, as Applicable of the Assigned Contracts Under the APA**

27. Pursuant to the APA, among the Purchased Assets to be transferred to the Purchaser are the Assigned Contracts on Schedules 1.1(e) and 1.1(f) to the APA, as such schedule may be supplemented, modified or amended in accordance with the APA.

28. Assumption and assignment or assignment, as applicable, of the Assigned Contracts to the Purchaser is integral to the APA and the transaction contemplated therein, and, accordingly, their assumption and assignment or assignment, as applicable, are reasonable and an enhancement to the value of the Debtors' estates in my judgment. It is my belief that the assumption and assignment or assignment, as applicable, to the Purchaser of the Assigned Contracts in connection with the consummation of the sale of the Purchased Assets is supported by sound business judgment and is in the best interests of the Debtors' estates.

29. PJT reviewed the Purchaser's financial wherewithal and determined that the Purchaser is well positioned to perform its obligations under the Assigned Contracts. Noramco is a leading specialty API development and manufacturing company with a long track record in the industry, financial credibility, sufficient working capital, and both the intent and proven access to resources to satisfy all future obligations required under the Assigned Contracts. Noramco was acquired by SK Capital Partners from Johnson & Johnson in July 2016. SK Capital Partners is a private investment firm with over $5 billion in assets under management, with a portfolio employing over 10,000 employees and generating over $9 billion of annual sales globally. Noramco's business under SK Capital Partners' ownership generates over $180 million in annual revenue.

**Conclusion**

30. In light of the foregoing, including the good faith and arm's-length negotiation process, the price received for the Purchased Assets, the avoidance of potential substantial shutdown costs for the Coventry Facility in the absence of a sale and the favorable economic and non-economic terms of the Supply Agreement, I and the Debtors' management believe that the Transaction contemplated by the APA, the Supply Agreement and the other Ancillary Documents represents fair value and the highest or otherwise best transaction involving the Purchased Assets currently available to the Debtors and their estates, as it provides a greater value than would likely be available under any other alternative (including the avoidance of substantial fixed annual operating costs associated with the Debtors' continued operation of the Coventry Facility and the potential cost of shutting down the Coventry Facility, which would be necessary in the event that the Debtors sourced their API needs from third parties without selling the Coventry Facility). While the APA and the Supply Agreement are separate agreements, together they constitute components of an integrated transaction. Indeed, the entry into the Supply Agreement is a closing condition under the APA. Moreover, the Debtors could not enter into the APA and sell the Coventry Facility without obtaining an alternative supply of APIs, nor would they enter into the Supply Agreement without having either a plan to sell the Coventry Facility or to achieve substantially significant savings to outweigh the costs of shutting down the Coventry Facility. Due to the integrated nature of the Transaction, the benefits to the Debtors must be viewed holistically. For these reasons, consummation of each agreement is contingent upon the consummation of the other as a business matter.

31. Accordingly, I and the Debtors' management believe that the Transaction is in the best interest of the Debtors, their estates and all parties in interest and seek the Court's

authorization to enter into and perform under the Agreements and consummate the Transaction. It is also my belief that any further marketing process, including a public sale or bidding process, would only harm the Debtors' estates by creating considerable delay and additional expense with no commensurate benefit, given that no other transaction counterparty would likely come forward with better terms than the Purchaser and Noramco. Importantly, however, the Debtors negotiated for and obtained inclusion in the APA of the "fiduciary out" described above. For the reasons discussed above, a court-supervised auction process would likely create unnecessary cost and delay, potentially jeopardize the Purchaser's willingness to participate and not produce improved deal terms.

32. On September 8, 2020, the Debtors' board of directors approved entry into the Transaction.

33. Upon the careful consideration of the Transaction, including the benefits and risks attendant thereto, I believe that the relief requested in the Motion is in the best interests of all stakeholders in these Chapter 11 Cases.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 14, 2020
       New York, New York

By: */s/ Rafael J. Schnitzler*
Name: Rafael J. Schnitzler
Title: Director, PJT Partners LP