| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date: September 30, 2020<br>Hearing Time: 10:00 am |
| In re | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors. | Jointly Administered |

## OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION OF DEBTORS FOR ORDER AUTHORIZING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PLAN AND A KEY EMPLOYEE RETENTION PLAN

TO:     **THE HONORABLE ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this objection to the Debtors' Motion for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan (the "Bonus Motion"). ECF Doc. No. 1674. In support thereof, the United States Trustee respectfully states:

### PRELIMINARY STATEMENT

These Chapter 11 cases have been before this Court for only a year, yet this is the second time that authority to pay bonuses to both insiders and senior executives has been sought. When last before this Court seeking to pay bonuses to the Debtors' executives, authority was given to pay up to an aggregate of $38 Million dollars. Since that authorization was granted, not one victim has received any compensation, no creditors have received any distributions despite the Court's clear direction for the Debtors to work with its creditor constituents in order to expedite distributions to victims and creditors. Instead, the Debtors seek authority to make additional

payments of over $15 million to admitted insiders and seek to pay additional retention bonuses to other executives.

Aside from the question as to whether it is reasonable to pay yet more bonuses to insiders and senior executives at this time – considerable sums that would benefit those with significant illnesses, the payments of these bonuses are based upon metrics that (i) may have already been met and, therefore, do not incentivize future performance, (ii) may not represent difficult targets, and (iii) are so vaguely described that it is impossible to determine their terms and whether the insiders were compensated for the same tasks during the first round of bonuses. Accordingly, absent more information, it appears that the "incentive" awards are nothing more that retention payments awarding insiders for merely staying with the Debtors.

With respect to the Debtors' new KERP program, the Debtors seek authority to pay over $30,000,000 to 614 alleged non-insider employees. The cost of certain of these payments as a percentage of the Debtors' revenue is extremely high and over 90% market percentile. Additionally, the justification for the KERP payments appears to be virtually identical to the justification provided for in the previously approved KERP program including additional compensation for the alleged additional work these executives are performing in the chapter 11 cases. It is not reasonable for this chapter 11 Debtor to pay bonuses well above the market average or to continue to make bonuses available to executives while victims and creditors are asked to wait for future distributions.

Finally, the Debtors' employees were previously awarded bonuses in this case. Because the case commenced over a year ago, no plan has been filed, no payments have been distributed to creditors, it is unclear when creditors will receive a distribution, and it is also unclear if such distribution will even be meaningful, the facts and circumstances of this case do not justify the

requested bonus payments to insiders or the retention payments to non-insiders. The Bonus Motion should be denied.[1]

## BACKGROUND

General Background

1. The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 15, 2019 (the "Petition Date").

2. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. ECF Doc. No. 59.

4. The Debtors are pharmaceutical companies that manufacture, sell or distribute, among other products, extended-release, long-acting opioid pain medications. See Debtors' Information Brief ECF Doc. No. 17 at 1.

5. On September 27, 2019, the United States Trustee appointed an official committee of unsecured creditors (the "Official Committee"). ECF No. 131.

---

[1] The United States Trustee acknowledges the Bonus Motion seeks similar relief to the relief previously granted by the Court in the prior Benefits Motion, as defined herein. The United States Trustee is cognizant the Court overruled the United States Trustee's objections to the Benefits Motion. Yet, while the legal underpinings of the new motion may be similar to the past Benefits Motion, the facts and status of these cases are markedly different.

Prior Benefits Motion

6.  On the Petition Date, the Debtors filed a Motion for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers (the "Benefits Motion").  ECF Doc. No. 6.

7.  Pursuant to the Benefits Motion, the Debtors sought approval of, among other things, their (i) 2019 Annual Incentive Plan ("AIP"), (ii) Long Term Results Plan ("LTRP"), and (iii) Non-Executive Retention Plan.  Bonus Motion at ¶ 9.

8.  The United States Trustee objected to the Benefits Motion.  See ECF No. 134.

9.  At three separate hearings the United States Trustee asserted, among other things, because the metrics for the payment of bonuses are not difficult to reach, purported incentive payments were primarily for retentive purposes and violate Bankruptcy Code Section 503(c)(1).

10. Additionally, the United States Trustee asserted that because retention bonuses will be paid to officers who are "insiders" (as that term is defined in the Bankruptcy Code), retention payments to those individuals violate Section 503(c)(1).

11. The Court overruled the objections of the United States Trustee and granted the Debtors' requests.

The Bonus Motion

*The KEIP*

12. On September 9, 2020, the Debtors filed the Bonus Motion.

13. According to the Bonus Motion the Debtors seek approval of a Key Employee Incentive Plan (the "KEIP") for eight insiders: the (i) Chief Executive Office; (ii) Executive Vice President, Chief Financial Officer; (iii) General Counsel; (iv) Senior Vice President, Intellectual Property Law & Public Health Initiatives; (v) Chief Technical Operations Officer; (vi) President, Imbrium Therapeutics; (vii) President, Rhodes Pharmaceuticals; and (viii) President, Rhodes Technologies. Bonus Motion at ¶ 19.

14. KEIP Participant will receive (i) an award ("KEIP Award") contingent upon performance metrics with a target value, (ii) partial payment of prepetition Long Term Results Plan ("LTRP") grants that are payable in 2022 and (iii) a long-term incentive compensation grant payable in 2023. Id. at ¶ 21.

14. KEIP Awards aggregate between $7,400,000 (threshold) to $9,866,000 (target) by achieving performance metrics. Id. at ¶ 21 & 22.

15. KEIP Award will be paid as follows: (i) 50% paid in October 2020 and (ii) the remaining 50% paid in January 2021. Id. at ¶ 24.

16. Each KEIP Participant will also be eligible to receive a long-term award designed to mimic the economic structure of the LTRP grant they otherwise would have received in 2020, payable in 2023. Id at ¶ 25. The same performance metrics that apply to the KEIP Award will apply to this award. Id. The maximum amount of such payments is approximately $2,200,000. Id.

17. Each KEIP Participant will also be eligible to receive payment of LTRP amounts due in 2022. Id. at ¶ 26. The same performance metrics that apply to the KEIP Award will be applied to uncompleted performance periods with respect to such LTRP, while completed performance periods will remain subject to their existing performance scores. Id. The aggregate

target amount—and maximum amount—of such payments is approximately $3,700,000. Id.

18. As more fully set forth in the Bonus Motion and below, the metrics for the awards to the KEIP participants are as follows: value creation (representing 40% of the Target KEIP Award), innovation and efficiency (50% of the Target KEIP Award) and people and culture (10% of the Target KEIP Award). Id. at ¶ 27.

*The KERP*

19. The Debtors also seek authorization to implement a Key Employee Retention Plan (the "KERP") for approximately 614 employees, of which 17 would be Vice President or higher and 597 will be middle management and professional employees such as scientific researchers, as well as regulatory and compliance personnel. Id. at ¶ 39.

20. KERP Participant will receive (i) an award ("KERP Award") comprised of an amount equal to the KERP Participants' target 2020 annual incentive plan and LTRP payout due in 2021, (ii) a long-term incentive compensation grant payable in 2023, and (iii) partial payment of prepetition LTRP grants that are payable in 2022 and full payment of the prepetition grants that are payable in 2023. Id. at ¶ 41. Certain KERP Participants will also receive additional targeted retention payments. Id.

20. The total aggregate target (and maximum) payment under the KERP Award comprised of an amount equal to the KERP Participants' target 2020 annual incentive plan and LTRP payout due in 2021is approximately $21,600,000. Id. at ¶ 44.

21. The KERP Award will be paid as follows: (i) 50% paid in October 2020 and (ii) the remaining 50% paid in January 2021. Id.

22. In addition, the Debtors seek to provide additional Targeted Retention Awards to an identified group of key employees on a similar basis in an aggregate amount of up to

$8,100,000. Id. at ¶ 45. These Targeted Retention Awards will be payable 50% in January 2021, and 50% in April 2021. Id.

23. KERP participants will also be entitled to payment in 2022 and 2023 on account of prepetition LTRP awards at target value. Id. at ¶46. The aggregate total of target LTRP payouts in 2022 and 2023 for all KERP Participants is approximately $10,100,000 and $1,150,000, respectively. Id.

24. Finally, KERP Participants will receive a long-term award designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the KERP Participant in 2020 under Purdue's longstanding compensation practices. Id. at ¶ 47. The amount of such grant will be equal to the target LTRP grants that otherwise would have been granted to the KERP Participant in 2020. Id. The aggregate total of these long-term awards for all KERP Participants is approximately 10,200,000. Id.

25. According to Willis Towers Watson PLC, the Debtors' compensation expert, the cost of the $21,600,000 KERP Award as a percentage of revenue (without taking into consideration any of the other KERP bonuses for which the Debtors seek authorization to pay) is above the 90% market percentile. See Declaration of Josephine Gartrell at ¶ 52, annexed to Bonus Motion as Exhibit C.

26. Similarly, the cost of the Targeted Retention Awards alone, as a percentage of revenue, is almost at the 90% market percentile. Id. at ¶ 53.

## ARGUMENT

### A.   The Governing Law

**Section 503(c)**

Section 503(c) of the Bankruptcy Code provides, in relevant part, that:

Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1)   a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that

   (A)   the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

   (B)   the services provided by the person are essential to the survival of the business; and

   (C)   either –

      (i)   the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

      (ii)   if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before
      the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c).

As an initial matter, Section 503(c) must be applied to any contemplated transfer that is being made for the benefit of an insider of a debtor. Once it is determined that the individual who will receive the transfer is an insider, no transfer can be made where the transfer is being made for the purpose of inducing the person to remain with the debtor's business, unless the factors set forth in Sections 503(c)(1)(A) and (B) are met and either one of the mathematical formulas set forth in (C)(i) or (C)(ii) has been satisfied.

Congress added Section 503(c) in 2005 to curtail payments of retention incentives to insiders to "'eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process.'" In re Residential Capital LLC, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012) ("Rescap") (quoting In re Global Home Prods., LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007); accord In re Hawker Beechcraft, Inc., 479 B.R. 308, 312-13 (Bankr. S.D.N.Y. 2012); In re Velo Holdings, Inc., 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012). In addition, Congress intended to limit the scope of key employee retention plans and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor. Rescap, 478 B.R. at 169. Congress intended to put into place "a set of challenging standards" for debtors to overcome before retention bonuses could be paid. Global Home, 369 B.R. at 784. The proponent of a bonus plan has the burden of showing that the plan is not a retention plan governed by Section 503(c)(1). Hawker Beechcraft, 479 B.R. at 313; Rescap, 478 B.R. at 170.

Where Section 503(c) applies, the transfer cannot be justified solely on the debtor's business judgment. See In re Borders Group., Inc., 453 B.R. 459, 470-71 (Bankr. S.D.N.Y. 2011). If a proposed transfer falls within Section 503(c)(1), then the business judgment rule does

9

not apply, regardless of whether a sound business purpose may actually exist. In re Dana Corp., 351 B.R. 96, 101 (Bankr. S.D.N.Y. 2006) ("Dana I").

Further, a debtor's label of a plan as incentivizing to avoid the strictures of Section 503(c)(1) must be viewed with skepticism; rather, the circumstances under which the proposal is made and the structure of the compensation package control. Velo Holdings, 472 B.R. at 209 ("Attempts to characterize what are essentially prohibited retention programs as 'incentive' programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages"); see also Hawker Beechcraft, 479 B.R. at 313 ("The concern ... is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding 'facts and circumstances' standard in ... §503(c)(3)."); Dana I, 351 B.R. at 102 n.3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

Finally, not only must bonus plans comply with Section 503(c), but as administrative expenses they must also be "actual, necessary costs and expenses of preserving the estate," as required by Section 503(b). 11 U.S.C. §503(b); In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr. D. Del. 2001) (administrative expenses may not be allowed unless they are actual and necessary to preserve the estate); In re Regensteiner Printing Co., 122 B.R. 323 (N.D. Ill. 1990) (reversing approval of severance agreements for key employees, because debtors presented no evidence that severance payments were necessary to preserve bankruptcy estate).

**B.  The Debtors Have Failed to Satisfy Their Evidentiary
Burden to Demonstrate the KEIP is an Incentive Plan**

The law is clear that the burden is on the Debtors to either show that the proposed bonus plan complies with the requirements of section 503(c)(1) or that it is not a disguised retention plan.  See Dana I, 351 B.R. at 100; Mesa Air Group, 2010 WL 3810899, at *2 (citing Global Home Prods., 369 B.R. at 785).

Retention plans usually are intended "to encourage certain crucial employees to remain with the company through a critical, transitional time period when the exact future of the company is unclear and when those employees would be most likely to search for other employment."  Brooklyn Hosp., 341 B.R. 405, 413 (Bankr. E.D.N.Y. 2006).  Although the Debtors style the KEIP as incentive plans, they fail to satisfy the stringent criteria that it is not merely retentive.  It is the substance of how and why the proposed payments are made, not the label put on the plan, that is determinative.  Mesa Air Group, Inc., 2010 WL 3810899, at *4 (incentive plans are designed to motivate employees to achieve performance goals).

*The Debtors Do Not Demonstrate that the Metrics are Difficult*

The Debtors do not demonstrate that the metrics for the bonuses associated with the KEIP awards present difficult targets that will incentivize future performance.  The Value Creation performance metrics are as follows:

| 2020 Value Creation Performance Metrics | 2020 Performance Target | % of Value Creation | % of Target KEIP Award |
|---|---|---|---|
| *Public Health Initiatives[9]* | | | |
| ➢ **Intranasal Naloxone**: Formalize agreement(s) and provide support for the non-profit development of intranasal naloxone with HRT to allow | End of Q3 2020 | | |

11

| | | | |
|---|---|---|---|
| • first patient in Phase 1<br>➢ **Nalmefene**: ANDA Filed by Vial with Competitive Generic Therapy (CGT) Designation<br>➢ **Nalmefene**: Complete Engineering Batches for Nalmefene Prefilled Syringe<br>➢ **Nalmefene**: Complete Nalmefene Autoinjector Formulation Development Work | End of Q4 2020<br><br>End of Q4 2020<br><br>End of Q4 2020 | 45.0% | 18.0% |
| *Research & Development*[10] | | | |
| ➢ **OAG**: Complete Last Patient Randomized in Proof-of-Concept Phase 2 Trial OAG2002<br>➢ **OAG**: Complete In Life Portion for Chronic Toxicology Studies, 6M rat and 9M dog | End of Q4 2020<br><br>Q3 2020 and Q4 2020, respectively | 15.0% | 6.0% |
| ➢ **Tinostamustine**: Advancement of Clinical Program | Q3 2020 | 15.0% | 6.0% |
| *Rhodes* | | | |
| ➢ **Generic Medication-Assisted Treatment Product**: Launch | Q4 2020 | 2.5% | 1.0% |
| ➢ **Generic Migraine and COPD Medications**: Submit DHE ANDA | End Q4 2020 | 6.25% | 2.5% |
| ➢ **Generic ADHD Treatment**: ANDA Submission | Q2 2020 | 6.25% | 2.5% |
| ➢ **Generic Treatment for Intestinal Parasites**: ANDA Submission | Q3/Q4 2020 | 5.0% | 2.0% |
| ➢ **Generic Nausea Prevention Medication**: Manufacture Exhibit Batches and Close the BE Study | Q4 2020 | 5.0% | 2.0% |
| **Total** | | **100%** | **40%** |

Bonus Motion at ¶28.

The time period for one of the metrics (Generic ADHD Treatment) already passed prior to the filing of the Bonus Motion. The time periods for many of the other metrics end the date of the hearing on the Bonus Motion. Because metrics that have already been completed do not incentive future performance, it is unclear why the Debtors did not file the Bonus Motion in January or February of this year (prior to the onset the Covid-19 pandemic) rather than after many of the metrics may have already been obtained.[2] Accordingly, these metrics appear to be for retentive, not incentive, purposes[3].

The innovation and efficiency metrics are as follows:

| 2020 Innovation and Efficiency Performance Metric[11] | 2020 Performance Target | % of Innovation and Efficiency | % of Target KEIP Award |
|---|---|---|---|
| Purdue Branded Business Operating Profit | $115M | 20% | 10% |
| Adhansia XR Net Sales | $18M | 10% | 5% |
| Adhansia XR Operating Loss[12] | ($44M) | 15% | 7.5% |
| Avrio Net Sales | $85M | 10% | 5% |
| Avrio Operating Profit | $8.6M | 15% | 7.5% |
| Rhodes (RALP) Operating Loss | ($35M) | 30% | 15% |
| **Total** | | **100%** | **50%** |

Bonus Motion at ¶ 29.

No information, including historical financial information, regarding these metrics is provided to allow creditors, the Court and the US Trustee to compare the current targets with

---

[2] The Debtors developed the metrics early this year, prior to the Covid-19 Pandemic. See Declaration of John Lowne at ¶¶ 22 & 23 annexed to Bonus Motion at Exhibit B.

[3] This concern applies to all of the metrics.

13

past results. Without such information it is impossible to determine if these are truly difficult targets or rather "lay-ups" rewarding participants for merely staying with the Debtor.

Finally, the Debtors describe the people and culture metric is as follows:

> Finally, nurturing of the Debtors' human resources and organizational culture will be critical to keep the Debtors on the path to emergence and beyond. Such steps include organizational education to occur in the first three quarters of 2020 and the development of a transition plan by the end of the fourth quarter of 2020. This metric will be reviewed holistically to determine whether the Debtors have been properly positioned for their post-emergence roles and will represent 10% of the KEIP.

Bonus Motion at ¶ 30.

This description is at best vague and it is difficult to objectively determine if it has been achieved. Therefore, it is impossible to ascertain if this metric represents a difficult target or is merely retentive in nature.

Absent further explanation, the KEIP awards that are tied to the foregoing metrics do not represent difficult targets to reach. See Hawker Beechcraft 479 B.R. at 314 (denying bonus motion where (i) sale price target was not "much of a challenge" and (ii) cash flow targets would be met if debtors do not encounter any "whoopsies").

### *Debtors Do Not Adequately Address Section 503(c)(1)(C)*

The Debtors fail to establish that, among other things, any of the insiders have a bona fide job offer with other companies at the same or greater rates or that either (a) the new proposed payments are less than ten times the mean of similar payments made to non-management employees during the calendar year, or (b) the proposed payments are less than 25 percent of the amount of any similar payments made to the Senior Managers in the prior year. 11 U.S.C. § 503(c)(1). Accordingly, the Court should conclude that the Debtors have failed to satisfy their burden under section 503(c)(1) and the "incentive" awards should not be approved at this time.

### C. The KERP Must Be Rejected Because the Awards are too Costly and KERP Participants May Receive $8.1 Million of Targeted Retention Awards Not Tied to Any Metric That Would Allow the Court to Determine Whether Such Payments Are Appropriate

In order for the bonus plan to pass muster under Section 503(c)(3) of the Bankruptcy Code, the movant must show that it is warranted by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3); In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006)("Dana II"). To meet their burden under Section 503(c)(3), the Debtors must show that there is "sound business judgment" for the compensation plan in question. See id. at 576-77.

As noted above, the cost of the $21,600,000 KERP Award as a percentage of revenue is above the 90% market percentile. Similarly, the cost of the Targeted Retention Awards as a percentage of revenue is almost at the 90% market percentile. The payment of large bonuses well in excess of market average is not justified by the facts and circumstances of this case (especially in light of the fact that it is unclear when and what distribution creditors will receive).

Furthermore, as set forth above, KERP Participants may receive Targeted Retention Awards in an aggregate amount of up to $8,100,000. Bonus Motion at ¶ 45. The Bonus Motion does not provide how these payments are to be determined.

The Debtors offer no standard or metric that would enable the Court to determine whether these payment are reasonable under the "business judgment" or any other standard. Given that there is no way to determine the basis for bestowing such cash awards on the KERP Participants, and due to the cost of the KERP bonuses, the Bonus Motion offers the Court no way to conclude that the KERP passes muster under the "business judgment" or "facts and circumstances of the case" test that applies to such motions. Accordingly, the Court should decline to approve the KERP.

**D. The KEIP and KERP Are Not Justified By the Facts and Circumstances of This Case**

If the Court finds that section 503(c)(1) does not apply, the Court may also consider whether the payments are permissible under section 503(c)(3). Dana II, 358 B.R. at 576. Section 503(c)(3) authorizes judicial discretion with respect to bonus plans motivated primarily by reasons other than retention. Id. Should the Court find that Section 503(c)(1) does not apply, to grant the awards the Court must find that it passes the test of Section 503(c)(3) – that it is necessary to preserve the value of the Debtor's estate, and is "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3); In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr. D. Del. 2001) (administrative expenses may not be allowed unless they are actual and necessary to preserve the estate); see also In re Regensteiner Printing Co., 122 B.R. 323 (N.D. Ill. 1990) (reversing approval of severance agreements for key employees, because debtors presented no evidence that severance payments were necessary to preserve bankruptcy estate).[4]

The Debtors have not established that the requested bonuses are justified by the facts and circumstances of this case. As set forth above, the Debtors were previously awarded authority to pay employees bonuses under the Benefits Motion. After over a year, however, no plan of reorganization has been filed. Creditors have not received a distribution. Moreover, it is unclear when creditors will be paid and if such payment will even be meaningful. Accordingly, in-light of the foregoing, the facts and circumstances do not justify the payment of additional bonuses to the Debtors' employees.

---

[4] Although some courts in this district have determined that the standard under Section 503(c)(3) is not different from the business judgment test under Section 363(b), see In re Residential Capital, LLC, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013) (additional citations omitted), these courts and others continue to apply the factors listed by Judge Lifland in Dana II, when determining if the structure of a compensation proposal and the process for its development meet with the standard under Section 503(c)(3).

16

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the approval of the portions of the Bonus Motion as set forth herein and grant such other relief as the Court deems fair and just.

Dated: New York, New York
September 22, 2020

                                                  Respectfully submitted,

                                                  WILLIAM K. HARRINGTON
                                                  UNITED STATES TRUSTEE, Region 2

                                                  By: */s/ Paul K. Schwartzberg*
                                                  Paul K. Schwartzberg
                                                  Trial Attorneys
                                                  201 Varick Street, Room 1006
                                                  New York, New York 10014
                                                  Tel. (212) 510-0500