# Exhibit L

19-23649-shl Doc 1710-11 Filed 09/22/20 Entered 09/22/20 13:16:28 Index L Pg 2 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

T.C. Memo. 2011-208
United States Tax Court.

ESTATE OF Kenneth L. LAY,
Deceased, Linda P. Lay, Independent
Executrix and Linda P. Lay, Petitioners

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 15732–09.
|
Aug. 29, 2011.

**Synopsis**
**Background:** Taxpayer, on behalf of herself and as executrix of her husband's estate, petitioned for redetermination of $3,910,000 income tax deficiency related to purported income husband received from sale of two annuity contracts to corporation as part of agreement to stay on as corporation's chief executive officer (CEO).

**Holdings:** The Tax Court, Goeke, J., held that:

[1] taxpayers properly reported annuities transaction as sale, rather than as employee cash bonus;

[2] statute regarding taxation of property transferred in connection with performance of services did not apply to transaction; and

[3] purchase price in annuities transaction was within reasonable range of fair market value.

Decision for taxpayer.

West Headnotes (12)

[1] **Internal Revenue** Presumptions and Burden of Proof

Taxpayers generally bear the burden of proof to show that the determinations of the IRS commissioner in a deficiency notice are incorrect. Tax Court Rule 142(a)(1), 26 U.S.C.A. foll. § 7453.

[2] **Internal Revenue** Bonuses
**Internal Revenue** What are sales or dispositions resulting in gain or loss

Married taxpayers correctly reported annuities transaction on their federal income tax return as sale of two annuity contracts, for $5 million each, to corporation for which husband was chief executive officer (CEO), rather than as employee cash bonus, precluding taxpayers' liability for $3,910,000 federal income tax deficiency; benefits and risks of ownership of annuity contracts were transferred to corporation in transaction, as shown by corporation's use of contracts as consideration in retention agreement and taxpayers' compliance with all requirements to transfer annuity contracts pursuant to terms of those contracts.

[3] **Internal Revenue** Computation of gain or loss in general

Gross income includes gains from the sale of property, which is calculated as the amount realized from the sale less the adjusted basis in the property. 26 U.S.C.A. §§ 61(a)(3), 1001(a).

[4] **Internal Revenue** What are sales or dispositions resulting in gain or loss

Term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money.

[5] **Internal Revenue** Effect of State Laws and Judicial Decisions

State law determines the nature of property rights, and Federal law determines the appropriate tax treatment of those rights.

3 Cases that cite this headnote

19-23649-shl    Doc 1710-11    Filed 09/22/20    Entered 09/22/20 13:16:28    Index L
Pg 3 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

[6]  **Assignments**  Money due or to become due

Under Texas law, and pursuant to terms of annuity contracts, corporation's chief executive officer (CEO) and his wife were permitted to sell contracts to corporation; Texas law allowed assignment of any rights under annuity contract in accordance with its terms, and contract set forth conditions for sale to corporation and more generally allowed any owner to change interest in annuity by filing change order. V.A.T.S. Insurance Code, art. 21.22.

[7]  **Internal Revenue**  Persons Liable

Beneficial ownership, and not legal title, determines ownership for federal income tax purposes.

[8]  **Internal Revenue**  What are sales or dispositions resulting in gain or loss

Determination of whether the benefits and burdens of ownership have been transferred for purposes of federal income tax is one of fact and is based on the intention of the parties, evidenced by their written agreements and the surrounding facts and circumstances.

[9]  **Internal Revenue**  Medium of payment

Statute regarding taxation of property transferred in connection with performance of services did not apply to married taxpayers' deferred compensation arrangement with corporation for which husband was chief executive officer (CEO), and thus fair market value of annuity contracts that taxpayers sold to corporation as part of arrangement was not taxable to husband; agreement created nonqualified deferred compensation plan not taxed at its inception, as husband was granted right to earn back annuity contracts if he continued in his role as CEO for 4.25 more years, but contracts were not set aside from claims of corporation's creditors, and husband had no control over contracts during subject tax year and bore significant risk of forfeiture. 26 U.S.C.A. § 83; 26 C.F.R. §§ 1.83–3(c)(1), (d), 1.451–1(a), 1.451–2 1.446–1(c)(1)(i).

[10]  **Internal Revenue**  Time when earned or determinable

Mere promise to pay, not represented by notes or secured in any way, is not a receipt of income for a cash–method taxpayer. 26 C.F.R. §§ 1.451–1(a), 1.446–1(c)(1)(i).

[11]  **Internal Revenue**  Time when available to taxpayer

Income is constructively received in the taxable year in which it is credited to the taxpayer's account or set apart for the taxpayer so that he may draw upon it at any time. 26 C.F.R. §§ 1.451–1(a), 1.446–1(c)(1)(i).

[12]  **Internal Revenue**  Medium of payment
**Internal Revenue**  What are sales or dispositions resulting in gain or loss

Purchase price of $10 million, for which married taxpayers sold two annuity contracts to corporation as part of agreement by which husband stayed on as corporation's chief executive officer (CEO) rather than retiring, was within reasonable range of fair market value of those contracts, as required to show that corporation intended to purchase contracts so that any amount paid in excess of fair market value did not constitute additional compensation to husband for which taxpayers were liable to pay income tax; taxpayers' expert reasonably calculated that minimum values of two contracts were $5,109,117 and $4,432,456, or $9,541,573 total, so that purchase price was within five percent of that minimum value.

**Attorneys and Law Firms**

Charles H. Egerton and Jane Dunlap Callahan, for petitioners.

Stephen R. Takeuchi, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:

**\*1** This case involves a deficiency of $3,910,000 determined by respondent in the 2001 Federal income tax of Kenneth L. Lay and Linda P. Lay (the Lays). The deficiency is based upon respondent's determination that the Lays received income as a result of the sale of two annuity contracts to Enron Corp. (Enron). For the reasons stated herein, we find that they did not receive the income determined by respondent and are not liable for the deficiency.

FINDINGS OF FACT

Some of the facts have been stipulated and those facts are incorporated herein by this reference. Mrs. Lay resided in Texas and the estate of Mr. Lay was being administered in Texas at the time the petition was filed.

The Lays were married in 1982. Mr. Lay was chairman of the board of directors and chief executive officer of Houston Natural Gas Corp. when it merged in 1985 with InterNorth, Inc., forming what became known as Enron. Mr. Lay was chairman of the board of directors and chief executive officer of Enron from 1986 until February 2001. In 1990 Enron hired Jeffrey K. Skilling, who later succeeded Mr. Lay as chief executive officer in 2001. Enron grew very rapidly during the 1990s into a company with 16,000 employees and became the seventh largest company in the United States. In the late 1990s the board of directors of Enron comprised 13 individuals.[1] The board of directors of Enron also had committees that reported to the board of directors, including the Compensation and Management Development Committee (Compensation Committee). The Compensation Committee evaluated the compensation and made recommendations for the compensation paid to top-level officers.

The members of the Compensation Committee in 2001 were board of directors members Dr. Charles A. LeMaistre, Norman P. Blake, Jr., John H. Duncan, Dr. Robert K. Jaedicke, and Frank Savage. The members of the Compensation Committee were not employed by Enron and were not involved with companies in businesses similar to Enron's business. Dr. LeMaistre was the chairman of the Compensation Committee. Dr. LeMaistre also served on the executive committee of Enron because of his position as chairman of the Compensation Committee.

The compensation philosophy at Enron was to pay for and to reward an executive's performance that created long-term shareholder value. Before and during 2001 the Compensation Committee had developed a pay-for-performance system for the compensation of the senior officers of Enron. The compensation for senior officers had three elements: A base salary, an annual bonus, and a long-term incentive grant.

The Compensation Committee used the outside consulting firm Towers Perrin to provide compensation consulting services. At the request of the Compensation Committee, Towers Perrin provided a range of salaries for each position for which the Compensation Committee established the compensation, using comparable companies. Towers Perrin used 64 comparable companies to establish the compensation ranges.

**\*2** The Compensation Committee established a base salary for each position based on individual performance as measured against preestablished individual objectives, set at roughly the 50th percentile of the pay for that position at the comparable companies. The annual bonus was calculated on the after-tax net income of Enron, creating a pool for the annual bonus and payable to the senior officers on the basis of their individual performances as measured against preestablished individual objectives, such that the base salary and the annual bonus would be up to the 75th percentile of the pay for that position at the comparable companies. The long-term incentive grant had two components: Stock options and restricted stock. The restricted stock was paid out in 4–year trenches, and the 4–year period was used as the comparator.[2] The restricted stock was paid out only if Enron's productivity measured up to the plan developed at the beginning of each year; i.e., if Enron performed like the top 5 of 12 comparable companies in most years, or the top 3 in some years.

The Compensation Committee set the compensation for Mr. Lay as chief executive officer and chairman of the board each year, using the Enron pay-for-performance methodology for setting compensation. The Compensation Committee

reviewed Mr. Lay's salary, bonuses, and long-term incentives over a period of years together with Mr. Lay's performance as compared with the plan of operation adopted for the year and the comparators for CEOs and chairmen of the board.

In the mid–1990s Mr. Lay was planning his retirement from the position of CEO of Enron. Initially, the Compensation Committee and the board of directors considered Rich Kinder, the chief operating officer (COO) of Enron, as the successor to Mr. Lay as CEO of Enron. The Compensation Committee determined that Mr. Kinder was well qualified to run the company on the basis of his experience as COO but asked Mr. Kinder whether the Compensation Committee could continue to review his performance for another year to evaluate his potential as the CEO for Enron. Mr. Kinder agreed to the additional year of review with the understanding that he would be able to leave Enron with certain benefits if he was not elected to the position of CEO at the end of the 1–year period, and the board of directors approved the arrangement, following the Compensation Committee's recommendation.

At the end of the year the board of directors decided to continue the arrangement for 1 more year, with Mr. Lay as CEO/chairman of the board and Mr. Kinder as COO. In accordance with the prior agreement, Mr. Kinder exercised his option and left Enron in 1996 in order to become CEO of another company. After Mr. Kinder resigned from his position as COO, the board of directors elected Mr. Skilling as president and COO of Enron in December of 1996. As COO of Enron, Mr. Skilling reported directly to Mr. Lay, the CEO of Enron. Enron had hired Mr. Skilling in 1990, and he had been the director of an innovative, highly successful venture of Enron. The management of Enron identified Mr. Skilling as the future successor CEO. Mr. Lay thereafter recommended that Mr. Skilling become the new CEO of Enron. The Compensation Committee and the board of directors supported Mr. Lay's recommendation of Mr. Skilling for the CEO position.

 **\*3**  In February 2001 Mr. Lay stepped down as CEO and Mr. Skilling became CEO of Enron. Mr. Lay remained chairman of the board of directors of Enron. After Enron announced that Mr. Skilling was taking over as CEO, Mr. Lay received offers from other companies to take other positions.

In February 2001 stock prices were in general decline, including the price of Enron stock. Technology stocks in particular had fallen in the summer of 2000, and stock prices consequently fell throughout the market. The Compensation Committee requested a stress test of Enron's financial condition because of concern over the falling stock prices. The results of the stress test in May 2001 indicated that Enron was financially sound even though Enron stock prices had fallen. Mr. Lay was in final contract negotiations regarding a position with another company when Mr. Skilling suddenly resigned from Enron on August 14, 2001.

Upon the unexpected resignation of Mr. Skilling, the board of directors of Enron immediately and proactively worked to persuade Mr. Lay to take the CEO position again at Enron. The board of directors determined that no other senior officer at Enron was sufficiently trained and ready to step into the CEO position.

The board of directors of Enron wished to rehire Mr. Lay as CEO and to retain Mr. Lay for a long period in order to stabilize the company. Enron negotiated for Mr. Lay to serve as CEO of Enron and to remain in the CEO position for a period of years.

Although Mr. Lay had wished to retire as CEO of Enron, he agreed to return. Mr. Lay held a very large position in Enron stock because of the long-term incentives earned over the years, and he had a major requirement for liquidity. Enron and its advisers developed proposals with incentives to entice Mr. Lay to reassume his position as CEO and to retain him for a period of years. The Compensation Committee was interested in an agreement to retain Mr. Lay for a period of years. The subsequent sudden collapse of Enron was unanticipated by the Compensation Committee during the negotiations with Mr. Lay in August 2001. The instruments that Enron would normally use for retention, stock options and restricted stock, both were problematic.

First, because Mr. Lay was over age 55 and had served for more than 5 years, if he voluntarily retired all of his restricted stock would immediately vest. Second, Enron's stock plan documents limited the number of shares, options, or restricted shares that could be granted in 1 year in accordance with a shareholder-approved plan, and there was not time to hold a shareholder meeting to approve a modification to the plan. Accordingly, alternatives for retention were considered. At the request of the Compensation Committee, Towers Perrin prepared alternatives for the Compensation Committee to offer to Mr. Lay for consideration. The alternatives prepared by Towers Perrin were based on two annuity contracts owned by Mr. Lay and Mrs. Lay—the contracts which underlie the dispute in the present case.

*4 Mr. Lay purchased annuity No. 002105676 from the Manufacturers Life Insurance Co. of North America (ManuLife) on September 30, 1999 (Kenneth L. Lay Annuity). Mr. Lay paid premiums in the aggregate amount of $5 million to ManuLife for the Kenneth L. Lay Annuity as follows:

| Date of Payment | Premium Payment |
| --- | --- |
| Sept. 30, 1999 | $2,500,000 |
| May 10, 2000 | 1,125,000 |
| June 19, 2000 | *1,375,000* |
| Total | 5,000,000 |

Annuity No. 002155712 issued by ManuLife was purchased for Mrs. Lay on February 8, 2000 (Linda P. Lay Annuity). Premiums in the aggregate amount of $5 million were paid to ManuLife for the Linda P. Lay Annuity as follows:

| Date of Payment | Premium Payment |
| --- | --- |
| Feb. 8, 2000 | $2,500,000 |
| May 10, 2000 | 1,125,000 |
| June 19, 2000 | *1,375,000* |
| Total | 5,000,000 |

The annuity contracts were titled "Flexible Purchase Payment Deferred Combination Fixed and Variable Annuity Contract Non–Participating". The owner of each annuity contract could elect to step up the value of the annuity contract to the market value of the selected investments of the annuity contract. The annuity contracts also had a Guaranteed Retirement Income Program feature, referred to as the "GRIP", that guaranteed a 6–percent annual increase on the amounts invested in the annuity.

The owner of the annuity contract could request that the annuity payments start 7 years after purchase (or, if made, 7 years after an election to step up the value of the annuity to market value) using the greater of actual market value of the investments in the account or the GRIP amount. The GRIP amount, as calculated over time with the 6–percent annual increase to the amount paid for the policy, was referred to as the "Income Base".

Mr. Lay elected to step up the value of his annuity contract on September 30, 2000. The income base of the Kenneth L. Lay Annuity on September 21, 2001, was $5,854,272.65, and the owner of the Kenneth L. Lay Annuity on the seventh anniversary of Mr. Lay's election to step up the policy value (September 30, 2007) was entitled to annuitize the guaranteed Income Base of $8,303,072 pursuant to the terms of the Kenneth L. Lay Annuity.

The income base of the Linda P. Lay Annuity on September 21, 2001, was $5,453,004.77, and the owner of the Linda P. Lay Annuity on the seventh anniversary of the issuance of the policy (February 8, 2007) was entitled to annuitize the guaranteed income base in the approximate amount of $7,512,482 (the current income base reflected on the January 1 to March 31, 2007, John Hancock Statement for the Linda P. Lay Annuity) pursuant to the terms of the Linda P. Lay Annuity.

The owner of the annuity contract could make withdrawals from the amounts invested in the contract and could change the investment elections. The annuity contracts were issued in Texas and provide that the governing law is Texas law. The annuity contracts state that "each owner may change the Owner, Annuitant, or Beneficiary of his or her interest in the Contract by written request in a form acceptable to us and which is received at our Annuity Service Office ." The annuity contracts provide:

**\*5** An Owner may assign his interest in this Contract at any time prior to the Maturity Date. No assignment will be binding on us unless it is written in a form acceptable to us and received at our Annuity Service Office. We will not be liable for any payments made or actions we take before the assignment is accepted by us * * *. We will not be responsible for validity of any assignment.

Mary K. Joyce was vice president of compensation of Enron in 2001. As vice president, Mrs. Joyce worked closely with the Compensation Committee. The Compensation Committee set pay philosophy, particularly regarding executive compensation, oversaw compensation plans, selected consultants to provide advice regarding compensation, and oversaw employee benefit plans. Mrs. Joyce acted at the direction of the Compensation Committee. Mrs. Joyce prepared the agenda and materials that were presented at each meeting of the Compensation Committee, working directly with Dr. LeMaistre and other members of the committee. Mrs. Joyce also obtained any reports that the Compensation Committee requested in connection with compensation and benefits.

When Enron was developing proposals to attract Mr. Lay to return as CEO, Dr. LeMaistre instructed Mrs. Joyce to request proposals from Towers Perrin for use by the Compensation Committee that would provide liquidity and a retention device. Accordingly, Mrs. Joyce requested that Towers Perrin prepare proposals to attract Mr. Lay by providing liquidity and to retain Mr. Lay for a period of years by structuring a retention device.

The alternatives proposed by Towers Perrin were: (1) To lend funds to Mr. Lay with the annuity contracts as collateral; (2) to purchase the annuity contracts for fair market value; or (3) to purchase the annuity contracts for fair market value and then use the annuity contracts as a retention device by awarding the acquired contracts to Mr. Lay with a "cliff vesting" schedule. The term "cliff vesting" means that the award vests in its entirety at the end of the vesting period, rather than vesting ratably over the vesting period.

The Compensation Committee considered the alternatives and chose the third alternative to purchase the annuity contracts, both to provide immediate liquidity to Mr. Lay and to use the annuity contracts as a retention device by providing Mr. Lay with the opportunity to have the annuity contracts transferred back to him if he met certain contractually specified requirements and subject to a cliff-vesting schedule. The Compensation Committee rejected the first two options proposed by Towers Perrin because, although they met Mr. Lay's requirement for liquidity, the options did not provide a retention device as required by the board of directors of Enron. Towers Perrin proposed a 4.25–year commitment from Mr. Lay.

Enron's outside counsel, Vinson & Elkins, assisted in structuring the annuities transaction. At Dr. LeMaistre's request, Mrs. Joyce presented the proposed annuities transaction to the Compensation Committee at its meeting on September 14, 2001. Mrs. Joyce used two spreadsheets, headed "Scenario 1" and "Scenario 2", in making her presentation of the Towers Perrin proposal to the Compensation Committee and to illustrate the differences of using the annuity contracts as compared to Enron stock to accomplish the board's retention objective.

**\*6** The spreadsheets showed that the Lays had paid a total of $10 million for the annuity contracts ($5 million for each policy), that the Lays would receive a total of $4,691,567 if they were to liquidate the contracts at that time, and that the value of the annuity contracts at that time was $11,240,685. [3]

The only difference between the two spreadsheets presented at the meeting was the amount that would be paid for the annuity contracts, $10 million as shown on Scenario 1 and $4,691,567 on Scenario 2. Because the purchase price reflected on Scenario 2 was the amount that the Lays would receive if they cashed in their annuity contracts, the Compensation Committee concluded that it would not provide any incentive for Mr. Lay to return to Enron as its CEO, a requirement for the transaction.

The spreadsheets showed the benefits to Enron and to Mr. Lay of using the annuities transaction instead of using Enron stock for the transaction, especially the fact that the annuities transaction would not dilute Enron stock and would provide Mr. Lay with immediate liquidity. The Compensation Committee determined on the basis of the information provided by Towers Perrin that the current fair market value

of the annuity contracts at the time of the transaction was $11,240,685.

Following the discussion of the issues at its meeting on September 14, 2001, the Compensation Committee approved "Scenario 1 of the Ken Lay Insurance Swap Analysis". The scenario approved by the Compensation Committee was to acquire the annuity contracts for $5 million each, $10 million total, and also to provide Mr. Lay the opportunity to earn back the annuities at the end of a 4.25–year cliff-vesting period (or upon certain terminations outside Mr. Lay's control). The Compensation Committee, therefore, authorized Enron to pay $10 million for two annuity contracts worth $11,240,685.

The Compensation Committee authorized the officers of Enron to execute and deliver all documents necessary or appropriate to carry into effect the approved annuities transaction. The board of directors of Enron approved the transaction at its meeting on October 8, 2001. The Compensation Committee concluded that the proposed purchase of the annuity contracts would provide Mr. Lay with liquidity and was a good investment for Enron.

The plan approved by the Compensation Committee had two distinct elements. First, as part of the package of inducements offered to Mr. Lay in exchange for abandoning his plans to retire and agreeing to reassume the responsibilities of CEO of Enron, Enron agreed to purchase both of the annuity contracts from Mr. and Mrs. Lay for $10 million. Second, as a retention device, Enron agreed that if Mr. Lay neither resigned without consent nor was removed for certain specified reasons as chairman of the board and CEO of Enron before the expiration of a 4.25–year term, it would reconvey the annuity contracts to Mr. Lay upon completion of his service commitment.

 *7  The Lays accepted the offer to sell their annuity contracts for $5 million each, $10 million total, and Mr. Lay accepted the offer to earn back the annuity contracts as a long-term incentive award if he remained with Enron for the 4.25–year term (or left the employment of Enron for certain reasons outside his control). Following Mr. Skilling's resignation, the board of directors of Enron elected Mr. Lay to the position of CEO of Enron. Enron prepared a Purchase, Sale, and Reconveyance Agreement (agreement) to memorialize the terms of the agreement that Enron negotiated with Mr. Lay. The Enron legal staff worked with its outside counsel, Vinson & Elkins, to prepare the agreement.

Mr. Lay, Mrs. Lay, and Enron entered into the agreement on September 21, 2001. Mrs. Joyce executed the agreement on September 21, 2001, on behalf of Enron in her capacity as a vice president of Enron. The Lays executed and delivered the agreement to Enron on September 21, 2001. The agreement required Enron to deliver $10 million by certified check or wire transfer to the Lays at the closing of the purchase of the annuity contracts.

The agreement also required the Lays, before or simultaneously with the tender of the purchase price to them, to: (i) Complete fully and accurately the Personal Information Change Form (change form) for each of the contracts directing a change in ownership of that contract to Enron and designating Enron as sole and primary beneficiary to receive any death proceeds paid under the contracts; (ii) execute and submit the change forms to Enron, and (iii) transfer the originals and all copies of the Contracts in their possession to Enron.

The change forms attached to the agreement to be used to transfer the annuity contracts to Enron are the forms provided by ManuLife for this purpose. The change form required the signature of the current owner. The change form also required the signature of the new owner if the change form was being used to change the owner. The change form states: "Please complete this Personal Information Changes form with appropriate signatures and mail to Manulife North America's Product Administration Department."

In order to transfer the Kenneth L. Lay Annuity to Enron, Mr. Lay executed the change form to change the owner and beneficiary of the Kenneth L. Lay Annuity to Enron. Mr. Lay delivered the executed, original change form with the original annuity policy contract No. 002105676 to Enron on September 21, 2001. Mrs. Joyce executed the change form for the transfer of the Kenneth L. Lay Annuity to Enron, on behalf of Enron as the new owner of the Kenneth L. Lay Annuity, on September 21, 2001.

In order to transfer the Linda P. Lay Annuity to Enron, Mrs. Lay executed the change form provided by ManuLife to change the owner and beneficiary of the Linda P. Lay Annuity to Enron. Mrs. Lay delivered the executed, original change form with the original annuity policy contract No. 002155712 to Enron on September 21, 2001. Mrs. Joyce executed the change form for the transfer of the Linda P. Lay Annuity to Enron, on behalf of Enron as the new owner of the Linda P. Lay Annuity, on September 21, 2001. Mrs. Joyce received the

original annuity contracts that the Lays delivered to Enron on September 21, 2001.

**\*8** Enron transferred $10 million to the bank account of the Lays by wire transfer on September 21, 2001, in exchange for the two annuity contracts.

There is an issue regarding the date that the change forms were submitted by Enron to ManuLife and whether the originals or copies were transmitted. Mrs. Joyce delegated the responsibility for submitting the change forms to ManuLife on behalf of Enron to Aaron Brown, the director of compensation for Enron. Mrs. Joyce and Mr. Brown both believed that the original change forms had been submitted to ManuLife on or shortly after September 21, 2001. Mr. Brown stated to a ManuLife employee that he had provided the original change forms to ManuLife at the time of the annuities transaction.

After September 21, 2001, Enron representatives asked ManuLife why it had not yet processed the change of ownership of the annuity contracts in accordance with the change forms. Mr. Brown transmitted the fully executed change forms from Enron to ManuLife by facsimile on January 12, 2002. The facsimile cover sheet was addressed by Mr. Brown to Gretchen Swanz of ManuLife, and contained the following instructions to ManuLife: "Gretchen, please facilitate the transfer of ownership/beneficiary of these policies to Enron." Ms. Swanz then sent an email to Mr. Brown, on February 19, 2002, requesting that he send the original change forms. Mr. Brown responded by email dated February 19, 2002, that certified copies of the originals would be provided. ManuLife corresponded with Enron regarding the change forms. ManuLife did not contact Mr. or Mrs. Lay regarding the change forms.

In 2004 ManuLife acquired and merged with John Hancock Life Insurance Co. (John Hancock). John Hancock became the wholly owned subsidiary of ManuLife and succeeded to all of the U.S. operations of ManuLife and the former John Hancock Life Insurance Co. John Hancock, therefore, is the insurance company that is currently the party to the annuity contracts and has the records regarding the annuity contracts. John Hancock has copies of the fully executed agreement and the fully executed change forms in its files.

The Lays reported the annuities transaction on their 2001 tax return on Schedule D, Capital Gains and Losses, as a sale of each annuity contract for $5 million. Mr. Lay and Mrs. Lay each had an adjusted basis of $5 million in the annuity contract sold by him or her to Enron pursuant to the agreement. The Lays reported zero gain or loss on the sale of the annuity contracts, on the basis of a sale price of $5 million for and an adjusted basis of $5 million in each of the annuity contracts sold to Enron pursuant to the agreement. Enron issued a Form W–2, Wage and Tax Statement, to Mr. Lay for the 2001 calendar year to report the compensation it paid him; that Form W–2 did not include in Mr. Lay's compensation any part of the $10 million that Enron paid for the annuity contracts. However, in 2004 pursuant to an agreement with the Internal Revenue Service (IRS), Enron issued an amended Form W–2 to Mr. Lay for 2001 reporting the $10 million as compensation.

**\*9** On January 23, 2002, the board of directors requested that Mr. Lay resign, and he resigned as chairman of the board of directors and CEO of Enron with the consent of the board of directors in February 2002.

Enron filed a petition for chapter 11 bankruptcy on December 2, 2001, in the U.S. Bankruptcy Court for the Southern District of New York, in a case styled In re Enron, Debtor, chapter 11, Case No. 01–16034, Jointly Administered (bankruptcy case). Enron listed the annuity contracts purchased from the Lays as assets on Schedule B, Personal Property, of its Statement of Financial Affairs (initial and amended) filed in the bankruptcy case. The Official Committee of Unsecured Creditors of Enron filed a complaint (and an amended complaint) in the bankruptcy case, to avoid the annuities transaction. The complaint, as amended, has been consolidated with the remaining insolvency proceedings in the bankruptcy case and remains pending. On July 15, 2004, Enron's fifth amended plan was confirmed in the bankruptcy case. Pursuant to the fifth amended plan, the Enron Creditors Recovery Corporation was formed as the successor to Enron. John Hancock filed a motion to intervene and file its interpleader complaint in the adversary proceeding on October 20, 2010, alleging that the ownership of the annuity contracts is disputed between Enron and Mrs. Lay and requesting that the bankruptcy court determine the ownership of the annuity contracts.

Because the IRS took the position that the Lays owned the annuity contracts after the annuities transaction, in order to test the status of the ownership of the annuities Mrs. Lay requested a partial withdrawal of $50,000 from the Linda P. Lay Annuity that she had transferred previously to Enron, in a withdrawal request form submitted to John Hancock on

19-23649-shl Doc 1710-11 Filed 09/22/20 Entered 09/22/20 13:16:28 Index L Pg 10 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

February 8, 2006. The annuity contracts allow withdrawals from the contract value. In response to Mrs. Lay's request, John Hancock did not pay the requested withdrawal and instead responded with a letter to Mrs. Lay describing issues regarding the ownership of the Linda P. Lay Annuity. In its letter dated February 15, 2006, John Hancock described the agreement, quoting portions regarding the transfer to Enron and the reconveyance obligation, the change form submitted to ManuLife, and the fact that Mr. Lay had ceased serving as CEO and chairman, then concluding it was unable to determine whether Mr. Lay or Mrs. Lay had an ownership interest.

On July 5, 2006, Mr. Lay died suddenly. Mrs. Lay is the Independent Executrix of the Estate of Kenneth L. Lay. The Form 706, United States Estate (and Generation–Skipping Transfer) Estate Tax Return, filed for Mr. Lay's estate listed the claim against Enron for the annuity contracts as a claim on Schedule C, Mortgages, Notes, and Cash, and listed the claim of Enron for the annuity contracts on Schedule K, Debts of the Decedent, as a contested claim. Neither of the annuity contracts had been conveyed to Mrs. Lay, or to the Estate of Kenneth L. Lay, as of the trial date in this case. Neither Mr. Lay (or his estate) nor Mrs. Lay ever received any distributions from either ManuLife or John Hancock with respect to either of the annuity contracts. No death benefit has been paid pursuant to the annuity contracts on account of Mr. Lay's death.

**\*10** The Lays timely filed their joint Federal tax return for tax year 2001. On April 2, 2009, respondent issued a statutory notice of deficiency to petitioners in which respondent determined a deficiency in income tax for the year ended December 31, 2001, of $3,910,000. Petitioners timely filed a petition in this Court on June 23, 2009.

## OPINION

### I. *Burden of Proof*

**[1]** Petitioners would generally bear the burden of proof in this case. See Rule 142(a)(1); [4] *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). The burden of proof on factual issues that affect a taxpayer's liability for tax may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue."

Sec. 7491(a)(1). On the record before us, we do not need to reference the burden of proof to resolve this case as the facts are adequately presented. Therefore, we need not determine whether section 7491(a)(1) is applicable.

### II. *Sale of Annuity Contracts*

**[2]** Respondent argues that the Lays did not sell the annuity contracts and that the $10 million they received was an employee cash bonus includable in income for the 2001 taxable year. The issue, therefore, is whether the Lays sold their annuity contracts to Enron in September 2001, in accordance with the agreement. There is no question the agreement was executed and that the Lays acted in accordance with the agreement. As we understand respondent's position, respondent maintains the agreement was not made in good faith and that Enron and the Lays never intended to transfer the annuity contracts, but rather Enron simply paid Mr. Lay $10 million.

**[3]** Gross income includes gains from the sale of property. Secs. 61(a)(3), 1001(a). The gain from the sale of property is calculated as the amount realized from the sale less the adjusted basis in the property. Sec. 1001(a). The basis is ordinarily the cost of the property. Sec. 1012(a). This calculation of gain allows the taxpayer's investment in the property to be recovered tax free before any requirement to report a taxable gain on the sale. Sec. 1011(a).

Pursuant to the agreement, the Lays sold each of the annuity contracts to Enron for $5 million, for a total of $10 million. The amount realized on the sale of each annuity contract, therefore, was $5 million. The Lays had paid $5 million for each annuity contract and had not withdrawn any amount or received any distributions with respect to either of the annuity contracts. Accordingly, the Lays had an adjusted basis in each annuity contract of $5 million. The Lays, therefore, reported zero gain upon the sale of the annuity contracts in 2001.

### A. *State Law*

**[4] [5]** "The term 'sale' is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money."

*Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237, 1981 WL 11305 (1981) (citing *Commissioner v. Brown,* 380 U.S. 563, 570–571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965)). State law determines the nature of property rights, and Federal law determines the appropriate tax treatment of

19-23649-shl    Doc 1710-11    Filed 09/22/20    Entered 09/22/20 13:16:28    Index L
Pg 11 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

those rights. [Aquilino v. United States,](javascript) 363 U.S. 509, 513 (1960).

**\*11** **[6]** The agreement memorializes a contractual understanding of the Lays with Enron. The agreement sets forth the sale of the annuity contracts to Enron. Enron then used the annuity contracts it purchased as the long-term incentive for Mr. Lay also provided in the agreement.

The agreement also provides that Enron agrees to make a future conveyance of the annuity contracts to Mr. Lay should he remain employed by Enron for 4.25 years or upon certain earlier terminations of employment outside his control. Only the sale evidenced by the agreement is directly at issue in this case; i.e., whether the Lays sold their annuity contracts to Enron in 2001. [5]

The agreement and the annuity contracts all provide that Texas law governs. The rights and interests of the parties to the annuity contracts, therefore, must be determined by applying Texas law. Texas law allows the assignment of any rights under an annuity contract in accordance with the terms of the contract. Tex. Ins.Code Ann. art. 21.22–4, sec. 4 (West 1997). State law permitted the Lays, the owners of the annuity contracts, to assign the annuity contracts to Enron in accordance with the terms of the annuity contracts.

The terms of the annuity contracts permitted the transfers of the annuity contracts. The annuity contracts provide:

> An Owner may assign his interest in this Contract at any time prior to the Maturity Date. No assignment will be binding on us unless it is written in a form acceptable to us and received at our Annuity Service Office * * * We will not be responsible for validity of any assignment.

The annuity contracts further provide that "each Owner may change the Owner, Annuitant, or Beneficiary of his or her interest in the Contract by written request in a form acceptable to us and which is received at our Annuity Service Office." Accordingly, the terms of the annuity contracts permitted the Lays to sell the annuity contracts to Enron and the sale was allowed pursuant to Texas law.

B. *Enron*

Enron and the Lays entered into a contract for the purchase and sale of the annuity contracts on September 21, 2001. Enron agreed in the agreement to purchase the annuity contracts for $5 million per contract. The agreement evidencing the annuities transaction was authorized by the Compensation Committee. The Compensation Committee of the board of directors, made up of independent directors, structured, reviewed, and approved the annuities transaction, and the Committee's actions were thereafter reported to Enron's full board of directors.

Enron developed and proposed the annuities transaction after the unexpected resignation of Mr. Skilling and the determination by the board of directors that no one other than Mr. Lay was ready to step into the CEO position at that time. The board of directors immediately worked to attract Mr. Lay to return to the CEO position at Enron. The Compensation Committee requested that Towers Perrin, Enron's compensation consultant, develop proposals to persuade Mr. Lay to reassume the CEO position and to remain at Enron for a period of years.

**\*12** The Compensation Committee instructed Towers Perrin that the proposals should address Mr. Lay's need for liquidity and the board of directors' requirement to include a method for retaining Mr. Lay in the CEO position for a period of years. Because Mr. Lay was over age 55 and had served for more than 5 years, any restricted stock Enron gave him would immediately vest if he retired and restricted stock was not an acceptable means for retention from Mr. Lay's perspective.

Towers Perrin valued the annuity contracts at $11,240,685 in September 2001. Towers Perrin proposed the following alternatives for consideration by the Compensation Committee: (1) To lend funds to Mr. Lay with the annuity contracts as collateral; (2) to purchase the annuity contracts; or (3) to purchase the annuity contracts and then use the annuity contracts as a retention device as an award to Mr. Lay with a cliff-vesting schedule. The Compensation Committee considered the recommendations by Towers Perrin and chose the third alternative, because it accomplished both of the requirements established by the Compensation Committee. First, the purchase of the annuity contracts met the requirement to provide liquidity to Mr. Lay as an inducement to reassume the CEO position. Second, the use of the annuity contracts as a retention device for Mr. Lay met the requirement for a retention device. The Compensation

19-23649-shl    Doc 1710-11    Filed 09/22/20    Entered 09/22/20 13:16:28    Index L
Pg 12 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

Committee and the board of directors as a whole approved the annuities transaction in good faith after careful consideration. These facts are supported by the agreement and the credible testimony at trial.

### C. *Annuity Contract Requirements*

In order to transfer the annuity contracts to Enron, the Lays executed the change forms provided by ManuLife and delivered the executed change forms with the original annuity contracts to Enron at the closing conference with Mrs. Joyce on September 21, 2001. Mrs. Joyce also executed the change forms on behalf of Enron on September 21, 2001.

The Lays executed the change forms provided by ManuLife and made the assignment in a "written request in a form acceptable to" ManuLife as required by the terms of the annuity contracts. Each of the Lays executed a change form to transfer his or her annuity contract to Enron on September 21, 2001, and delivered the change form to Enron. As required by the change forms for a change in ownership of an annuity contract, Mrs. Joyce executed the change forms on September 21, 2001, on behalf of Enron. Enron thereafter delivered the change forms to ManuLife. Whether the delivery conformed to ManuLife's requirements to transfer the ownership of the annuity contracts is disputed, but we find no effort to abort the transfer in the actions taken by Enron's employees; and we also find the Lays acted in accord with the agreement to fulfil their contractual obligations to transfer the annuity contracts. In summary, on September 21, 2001, the Lays met all the requirements of the agreement to transfer the annuity contracts, and Enron paid the consideration.

### D. *Manulife*

**\*13** In connection with the annuities transaction, it is not clear whether Enron sent the original change forms to ManuLife. Mrs. Joyce and Mr. Brown both believed the originals were sent to ManuLife on or shortly after September 21, 2001. Enron did in fact send the change forms to ManuLife by facsimile transmission. ManuLife, however, did not change the ownership of the annuity contracts on its books. ManuLife stated that the reason it did not transfer title on its books is that it did not receive the originals of the fully executed change forms.

The change forms state that the forms should be mailed to ManuLife, which perhaps could be construed as a request for the original, but the annuity contracts do not include this requirement. The annuity contracts require "a written request in a form acceptable to us". Enron had all of the legal documents necessary to perfect its title in the annuity contracts. Moreover, Enron conducted itself as if it had acquired the annuity contracts. Mr. Brown of Enron inquired of ManuLife why the annuity contracts had not been transferred on its books to Enron. He informed ManuLife that he had submitted the original change forms. Mr. Brown then transmitted the fully executed change forms to ManuLife by facsimile. Enron was the beneficial owner of the annuity contracts in accordance with the agreement even though ManuLife failed to note the transfer of title on its books.

**[7]** The status of the legal title to the annuity contracts does not control in determining whether a sale occurred. Beneficial ownership, and not legal title, determines ownership for Federal income tax purposes. *Ragghianti v. Commissioner,* 71 T.C. 346, 1978 WL 3361 (1978), affd. without published opinion 652 F.2d 65 (9th Cir.1981); *Pac. Coast Music Jobbers, Inc. v. Commissioner,* 55 T.C. 866, 874, 1971 WL 2529 (1971), affd. 457 F.2d 1165 (5th Cir.1972). The Federal income tax consequences of property ownership generally depend upon beneficial ownership, rather than possession of mere legal title. *Speca v. Commissioner,* 630 F.2d 554, 556–557 (7th Cir.1980), affg. T.C. Memo.1979–120; *Beirne v. Commissioner,* 61 T.C. 268, 277, 1973 WL 2566 (1973). " '[C]ommand over property or enjoyment of its economic benefits' * * *, which is the mark of true ownership, is a question of fact to be determined from all of the attendant facts and circumstances." *Monahan v. Commissioner,* 109 T.C. 235, 240, 1997 WL 658776 (1997) (quoting *Hang v. Commissioner,* 95 T.C. 74, 80, 1990 WL 98703 (1990)).

**[8]** This Court has stated that "a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under State law." *Houchins v. Commissioner,* 79 T.C. 570, 590, 1982 WL 11155 (1982). The determination of whether the benefits and burdens of ownership have been transferred is one of fact and is based on the intention of the parties, evidenced by their written agreements and the surrounding facts and circumstances. *Paccar, Inc. & Subs. v. Commissioner,* 85 T.C. 754, 777, 1985 WL 15411 (1985), affd. 849 F.2d 393 (9th Cir.1988); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. at 1237; *Ragghianti v. Commissioner, supra* at 349. Beneficial ownership is marked by command over property or enjoyment of its economic benefits. *Yelencsics v. Commissioner,* 74 T.C. 1513, 1527, 1980 WL 4612 (1980) (stock was sold in accordance with

an agreement for the sale, even though the title to the stock was not transferred, in accordance with the agreement of the parties).

**\*14** For example, in *Pac. Coast Music Jobbers, Inc. v. Commissioner, supra* at 874, this Court considered whether the individual taxpayer (Hansen) purchased the stock of the corporate taxpayer (Pacific Coast Music Jobbers) from three other shareholders in 1962 pursuant to agreements executed in 1962. Taxpayer Hansen negotiated to acquire all of the stock of Pacific Coast Music Jobbers and entered into two agreements with the shareholders whereby the sellers received payments over a 5–year period during which the stock was held in escrow. The issues in *Pac. Coast Music Jobbers, Inc.* were whether Hansen acquired the stock upon execution of the agreements and thus became a shareholder required to consent to the corporation's Selection, and, if Hansen became a shareholder, whether the amounts paid out to the selling shareholders were constructive dividends to Hansen. This Court stated:

> For purposes of Federal income taxation the determination of whether a sale has occurred centers more on the question of which party, as a result of the transaction, has command or domination over the property, rather than on the refinements of title.* * * A court must consider not only when the bare legal title passed but also when the benefits and burdens of the property, or the incidents of ownership, were acquired or disposed of in a closed transaction.* * * In deciding the question, the court looks to that party to the transaction who has the greatest number of the attributes of ownership. * * * A court should look to practicalities, disregarding merely formal and not useful rights and attributes. * * * If it is found from all the facts and surrounding circumstances that the parties intended an agreement to result in the sale of property, and the agreement transfers substantially all the accouterments of ownership, the transaction will be treated as a sale even though the parties intended the legal title should not pass until later.

*Id.*

In *Pac. Coast Music Jobbers, Inc.* the Court held that Hansen acquired the stock upon execution of the agreements and not 5 years later when the payments were complete and the stock was transferred from the escrow. This Court concluded that the total of the payments that Hansen was required to make to the sellers established the purchase price and that Hansen acquired the stock by means of a bootstrap purchase using the profits from the corporate operations to acquire the business. The escrow arrangement supported the conclusion that a sale had occurred because the sellers had nothing further to do but collect the sale price, and Hansen was getting the benefit of the corporate dividends.

This Court noted that the sellers gave up significant rights to alter or end the business of the corporation by their agreement to continue the corporate business, and the sellers also lost substantial domination and control because they gave Hansen their irrevocable proxies. Although the sellers' attorney in *Pac. Coast Music Jobbers, Inc. v. Commissioner, supra* at 877, retained the stock in escrow, it was reasoned that "the important fact is not when the parties intended title to change hands but when they intended the accouterments of ownership to be transferred."

**\*15** The Lays gave up all rights to alter or terminate the annuity contracts and lost domination and control over them. After selling the annuity contracts to Enron, the Lays could not sell them, nor could they liquidate them or borrow against them. They also could not alter the investment options for the annuity contracts or make any other elections or decisions regarding them.

The Lays had delivered the transfer documents and received the consideration for the sale, and there was nothing else for them to do in connection with the transfer of the annuity contracts to Enron. Enron, on the other hand, was able to use the annuity contracts for the retention agreement. Enron also could make cash withdrawals and alter the investment options in the annuity contracts. Enron, therefore, had dominion and control over the annuity contracts.

Unlike the situation in *Pac. Coast Music Jobbers, Inc.,* the entire purchase price was paid at the closing of the

annuities transaction, on September 21, 2001. In addition, whereas the sellers in *Pac. Coast Music Jobbers, Inc.* placed the stock at issue in escrow held by their own attorney, the Lays transferred the annuity contracts with the fully executed change forms to Enron on September 21, 2001, with no restrictions on the transfer of legal title. Enron was in control over completing the transfer of legal title on the books of ManuLife. This is not a situation where the seller has retained control over the legal title to the property, with the resulting issue of whether the seller's retention of title prevented a sale from occurring. See *Yelencsics v. Commissioner, supra* at 1527 (taxpayers purchased stock pursuant to an agreement with the selling shareholder that gave the taxpayers unqualified voting proxies, control of the corporation, and entitlement to all profits and dividends, even though the selling shareholder remained the owner of record); *Ragghianti v. Commissioner,* 71 T.C. 346, 1978 WL 3361 (1978) (shareholder acquired stock upon posting a bond required by State law to ensure payment of purchase price, even though the selling shareholders continued to hold the stock).

Enron also used the annuity contracts purchased from Mrs. Lay for the retention agreement with Mr. Lay. The use of the annuity contracts as consideration for this agreement, therefore, confirms that Enron was the beneficial owner of the annuity contracts. Even after Enron entered into the agreement with Mr. Lay to reconvey the annuity contracts after his service commitment, Enron remained the beneficial owner of the annuity contracts. Enron possessed the annuity contracts and had the right to possess the annuity contracts and fully received the benefits of ownership. As the owner of the annuity contracts, Enron also bore the risk of any loss in connection with owning the annuity contracts.

The Lays reported the transaction as a sale of the annuity contracts on their 2001 tax return. Enron did not include the purchase price on Mr. Lay's original Form W–2 for 2001. After purchasing the annuity contracts, Enron filed for bankruptcy on December 2, 2001, and listed the annuity contracts as assets. Enron's position, therefore, was that it had purchased the annuity contracts.

*\*16* John Hancock confirmed that it did not consider Mrs. Lay to be the owner, notwithstanding the legal title on its books.

Enron issued amended Forms W–2c, Corrected Wage and Tax Statement, to Mr. Lay in 2004 in connection with Enron's settlement of an employment tax audit with the IRS Appeals Office. We do not find this after-the-fact event relevant to the case before us.

The District Courts in Texas have concluded that the execution of agreements controls in situations where formal filings have not been accomplished. *Keller v. United States,* 104 AFTR 2d 2009–6015, 2009–2 USTC par. 60,579 (S.D.Tex.2009); *Church v. United States,* 85 AFTR 2d 2000–804, 2000–1 USTC par. 60,369 (W.D.Tex.2000), affd. per curiam 268 F.3d 1063 (5th Cir.2001). In *Church* such a partnership agreement executed by the parties governed, even though a certificate of limited partnership had not been filed with the State before the death of one of the parties to the partnership agreement. The court held that the written partnership agreement was an enforceable contract and governed the rights of the parties. *Church v. United States, supra.* The execution of the partnership agreement in *Church* also accomplished the transfer of the beneficial interest in securities held in the decedent's Paine Webber account to the partnership under Texas and Federal law, with no execution or submission of a change form to Paine Webber. The court in *Keller v. United States, supra,* followed *Church* and held that the execution of a partnership agreement reflecting certain bonds as assets of the partnership before the transferor's death accomplished the transfer of the bonds to the partnership, even though no request for a change was submitted to Vanguard, the company holding the bonds.

The Lays agreed to sell the annuity contracts to Enron and executed and delivered all documents required to effect the transfer of legal title to the annuity contracts to Enron, in accordance with the agreement. The transferor in each of the *Church* and *Keller* cases had not even executed a transfer form to transfer the ownership of the securities at issue to the partnership before the transferor's death, whereas the Lays had fully executed and delivered the change forms to Enron and Enron had transmitted the change forms to ManuLife. The reasoning of *Church* and *Keller,* therefore, supports a finding that the Lays sold the annuity contracts.

### E. *Conclusion*

The Lays sold the Annuity contracts to Enron on September 21, 2001. In doing so, they complied with the requirements of the agreement and took the steps required to transfer the annuity contracts to Enron. The benefits and risks of ownership of the annuity contracts were transferred to Enron in the annuities transaction. The Lays, therefore, properly

reported the transaction on their Federal income tax return as a sale of the two annuity contracts.

example, in a trust or escrow account.
* * *

### III. Section 83

**[9]** Respondent's first alternative position is that the agreement provided for the transfer of the annuity contracts by Enron to the Lays on September 21, 2001, in connection with the performance of services by Mr. Lay and, therefore, caused the fair market value of the property to be taxable to Mr. Lay pursuant to section 83.

**\*17** Section 83(a) provides, in pertinent part, that if property is transferred to a taxpayer in connection with the performance of services, the excess of the fair market value of the property over the amount, if any, paid for the property shall be included in the taxpayer's gross income in the first taxable year in which the taxpayer's rights in the property are not subject to a substantial risk of forfeiture. See *Tanner v. Commissioner,* 117 T.C. 237, 242, 2001 WL 1568376 (2001), affd. 65 Fed. Appx. 508 (5th Cir.2003); sec. 1.83–7(a), Income Tax Regs.[6]

Consequently, taxability pursuant to section 83 would result only if the provision in the agreement that granted Mr. Lay the opportunity to earn back the Annuity contracts if he remained with Enron for a period of 4.25 years (or an earlier date if Mr. Lay's employment terminated for certain specified reasons beyond Mr. Lay's control) constituted (1) property that (2) was transferred to Mr. Lay in 2001(3) in connection with his performance of services and (4) the property was transferable by Mr. Lay or not subject to a substantial risk of forfeiture in 2001. See sec. 83(a).

The term "property" for purposes of section 83 includes:

> real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future. The term also includes a beneficial interest in assets (including money) which are transferred or set aside from the claims of creditors of the transferor, for

Sec. 1.83–3(e), Income Tax Regs. Property is "transferred" for purposes of section 83 when a person acquires a beneficial ownership interest in such property. Sec. 1.83–3(a)(1), Income Tax Regs. Unfunded and unsecured promises to transfer property in the future are excepted from the definition of "property" for purposes of section 83. Sec. 1.83–3(e), Income Tax Regs.

The provisions of the agreement that granted Mr. Lay the right to earn back the annuity contracts if he continued to render services for 4.25 years create an unfunded and unsecured promise to transfer property in the future. Enron agreed to transfer the annuity contracts to Mr. Lay in the future upon his completion of 4.25 years of service. The annuity contracts were not transferred or set aside from the claims of creditors of the transferor; in fact, Enron listed the annuity contracts as assets upon filing for bankruptcy. Mr. Lay was required to perform services before his right to receive the annuity contracts ripened, and he could not assign his retention agreement. The promise in the agreement to reconvey the annuities to Mr. Lay after 4.25 years of service, therefore, is not "property" within the meaning of section 83. Consequently, the threshold requirement for application of section 83 (that "property" be transferred to the service provider) is not met. This arrangement between Enron and Mr. Lay, for Enron to transfer property to Mr. Lay if he provided services for a period of years, is a nonqualified deferred compensation plan not taxed at inception because the property was not set aside or protected from the creditors of Enron. See sec. 83; sec. 1.83–3(e), Income Tax Regs.

**\*18** **[10]** **[11]** Deferred compensation for services is included in gross income in the taxable year in which it is actually or constructively received. Sec. 1.451–1(a), Income Tax Regs. (income is included in income for the taxable year in which actually or constructively received by the taxpayer); sec. 1.446–1(c)(1)(i), Income Tax Regs. (under the cash method of accounting, gross income is included for the taxable year in which actually or constructively received); Rev. Rul. 60–31, 1960–1 C.B. 174. A mere promise to pay, not represented by notes or secured in any way, is not a receipt of income for a cash

19-23649-shl Doc 1710-11 Filed 09/22/20 Entered 09/22/20 13:16:28 Index L Pg 16 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

method taxpayer. Rev. Rul. 60–31, 1960–1 C.B. at 177. Income is constructively received in the taxable year in which it is credited to the taxpayer's account or set apart for the taxpayer so that he may draw upon it at any time. *Sproull v. Commissioner,* 16 T.C. 244, 1951 WL 302 (1951), affg. 194 F.2d 541 (6th Cir.1952); sec. 1.451–2, Income Tax Regs. "However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." Sec. 1.451–2(a), Income Tax Regs.

Mr. Lay had no control over the annuity contracts in 2001. Enron's listing the annuity contracts as assets when it filed for bankruptcy confirms that the annuity contracts were not set aside for Mr. Lay. Mr. Lay would constructively receive the annuity contracts only after the 4.25 years of service or upon an earlier termination that triggered the conveyance of the annuity contracts to Mr. Lay under the terms of the agreement, none of which occurred in 2001. Section 83 requires inclusion of the fair market value of the property in income when the property is first either transferable or not subject to a substantial risk of forfeiture. Rights of a person in property are "transferable" if the person may transfer any interest in the property to any person other than the transferor, but only if the property is not subject to a substantial risk of forfeiture. Sec. 1.83–3(d), Income Tax Regs.

Property is not considered to be transferable merely because the person performing the services may designate a beneficiary to receive the property in the event of his or her death. Sec. 1.83–3(d), Income Tax Regs. A substantial risk of forfeiture exists where the right to property is conditioned on the future performance of substantial services or the occurrence of a condition related to a purpose of the transfer, and the possibility of the forfeiture is substantial if such condition is not satisfied. Sec. 83(c); sec. 1.83–3(c)(1), Income Tax Regs. Forfeiture of property upon termination of employment before retirement at a specified age or time, death, or disability generally constitutes a substantial risk of forfeiture. Sec. 1.83–3(c)(4), *Example* (1), Income Tax Regs.

Under the terms of the agreement, Mr. Lay would forfeit the annuity contracts upon termination of his employment before the end of the 4.25–year service period unless his employment was terminated because of: (a) Retirement with the consent of the board; (b) disability; (c) an involuntary termination (other than termination for cause); or (d) a termination for "Good Reason" (meaning a substantial change in Mr. Lay's duties or position with Enron or a substantial decrease in his salary, without his consent).

**\*19** Forfeiture of the annuity contracts if Mr. Lay voluntarily terminated his employment before the 4.25 years constitutes a substantial risk of forfeiture. See *id.*

The board would have had to take a specific action to trigger Mr. Lay's right to the annuity contracts upon other terminations by consenting to Mr. Lay's retirement, or by substantially decreasing Mr. Lay's salary or position without his consent. The requirement for the board to take an action to trigger Mr. Lay's right to the annuity contracts is consistent with a substantial risk of forfeiture. Because Mr. Lay had to work 4.25 years for Enron in order to receive the annuity contracts and could terminate his employment before those 4.25 years only under specific circumstances outside his control without forfeiting the annuity contracts, there was a "substantial risk of forfeiture" in 2001. The events in 2002 regarding Mr. Lay's resignation are not before us.

In conclusion, section 83 does not apply to the deferred compensation arrangement at issue.

IV. *Price of Annuity Contracts*

Respondent's second alternative position is that the $10 million purchase price Enron paid for the annuity contracts was in excess of their fair market value as of September 21, 2001, and that the excess represented additional compensation to Mr. Lay.

This Court has considered whether an amount paid by an employer to an employee for property was actually in part a payment for property and in part compensation. In *Azar Nut Co. v. Commissioner,* 94 T.C. 455, 1990 WL 28788 (1990), affd. 931 F.2d 314 (5th Cir.1991), an employer purchased the personal residence of an employee pursuant to an employment contract for a price equal to the residence's appraised fair market value of $285,000. The employer immediately attempted to resell the house and sold the house 2 years later for $200,000 (at a loss of $111,366 on the transaction). As its initial argument, the employer claimed an ordinary and necessary business expense in an amount equal to the loss, on the theory that this amount represented compensation deductible under section 162(a). *Id.* at 459. This Court rejected this argument, stating:

19-23649-shl    Doc 1710-11    Filed 09/22/20    Entered 09/22/20 13:16:28    Index L
Pg 17 of 19

Estate of Lay v. C.I.R., T.C. Memo. 2011-208 (2011)
102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

> There is nothing in the record before us to indicate that any portion of the purchase money * * * [the employer] paid to * * * [the employee] represented a premium or additional amount in excess of the fair market value of the house that would otherwise constitute "compensation." * * *

*Id.*

Similarly, there is nothing in the record to indicate that any portion of the $10 million that Enron paid the Lays for the annuity contracts represented a premium or additional amount in excess of the fair market value of the annuity contracts that would otherwise constitute compensation. As in *Azar Nut Co.,* Enron relied upon a valuation report that indicated that the value of the annuity contracts was $11.2 million at the time of the transaction. The Compensation Committee was aware that the Lays had paid $10 million for the annuity contracts less than 2 years before the Compensation Committee began its deliberation. In addition, we note that whereas in *Azar Nut Co.* the employer suffered a loss with respect to the asset that it purchased, there is no indication that Enron suffered any loss with respect to its purchase of the annuity contracts. The income base of the Kenneth L. Lay Annuity contract on September 21, 2001, was $5,854,272.65 when Enron paid $5 million for that contract, and the owner of the Kenneth L. Lay Annuity on September 30, 2007, was entitled to annuitize the guaranteed income base of $7,375,160 pursuant to the terms of the Kenneth L. Lay Annuity.

**\*20** The Commissioner has argued in other cases that sales were in fact dividend distributions after concluding that the sale prices exceeded the fair market value of the assets sold. E.g., *Commissioner v. Brown,* 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); *Palmer v. Commissioner,* 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937). In these cases, the Court looked to the intent of the contracting parties to pay a fair market value price for the assets. See also Rev. Rul. 67–246, 1967–2 C.B. 104 (donor must prove that purchase price exceeded value of property purchased; intention to make a gift by paying in excess of value highly relevant to determining whether donor made gift).

In *Commissioner v. Brown, supra,* shareholders sold their stock to a third-party buyer for $1.3 million, and the purchase price was payable by the buyer over time from the corporate earnings. The Commissioner argued that the purchase price was excessive and, therefore, was a device by the sellers to collect future earnings of the corporation at capital gains rates. This Court had found that the sale price was arrived at in an arm's—length transaction, was the result of real negotiating and was "within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets." *Brown v. Commissioner,* 37 T.C. 461, 486, 1961 WL 1360 (1961), affd. 325 F.2d 313 (9th Cir.1963), affd. 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). Even though the sellers did not receive the full purchase price, this Court held that the transaction was a sale, partly on the basis of the finding that the purchase price was within a reasonable range. In this case, as in *Brown,* there has been no showing that the transaction's purpose was other than a sale (i.e., to pay compensation to Mr. Lay).

The board of directors of Enron wished for Mr. Lay to return to Enron as CEO. In order to persuade Mr. Lay to return as CEO, the Compensation Committee asked the compensation consultant Towers Perrin for proposals and selected the proposal that satisfied the requirements of the board of directors. Towers Perrin proposed that Enron purchase the annuity contracts for $10 million and provided analyses to the Compensation Committee, showing that the value of the annuity contracts was $11.2 million. With this information, the Compensation Committee concluded that the value of the annuity contracts was $11.2 million. The Compensation Committee concluded that the purchase of the annuity contracts was a good investment for Enron. In addition, the parties to the agreement specifically agreed that Enron was paying $5 million for each annuity contract.

The record demonstrates that Enron intended to pay $10 million as fair market value for the annuity contracts, and there is no excess to include in gross income. Intent of the parties is important in determining whether a purchase price should be recharacterized. Enron's Compensation Committee approved the purchase of the annuity contracts for $10 million.[7] Accordingly, the board approved a purchase price of $10 million for an asset valued at $11.2 million. The Lays had paid $10 million for the annuity contracts; and even though the Towers Perrin report indicated a value of $11.2 million, they would have received only $4.691 million if they

had liquidated the annuity contracts at that time. Nevertheless, the Compensation Committee reasonably found that $10 million was a fair price for the annuity contracts.

**\*21** **[12]** The issue is not whether the value of the annuity contracts was, in fact, $10 million. The issue is whether the $10 million that Enron paid to the Lays was intended for the purchase of the annuity contracts. In determining whether the annuities transaction was in fact a sale, the Court considers whether the purchase price was within a reasonable range. See [Commissioner v. Brown, 380 U.S. at 572](#).

In order to demonstrate that the purchase price was in fact within a reasonable range, petitioners introduced expert witness testimony of the value of the annuity contracts on the sale date, September 21, 2001, when the income base was $5,854,272.65 for the Kenneth L. Lay Annuity and $5,453,004.77 for the Linda P. Lay Annuity. Petitioners' expert witness, Lawrence Katzenstein, prepared a report with an appraisal of the annuity contracts at the time of the annuities transaction. Mr. Katzenstein has special expertise in valuing annuity contracts.

Mr. Katzenstein used a discount rate provided by petitioners' other expert witness, Robert Buchanan, an experienced appraiser and accredited senior appraiser (business valuation). In order to determine the discount rate to use to value the annuity contracts, Mr. Buchanan used evidence of open market transactions in interests similar to the annuity contracts. Mr. Buchanan noted that the discount rate would be used to calculate the value of the annuity contracts as the present value of the future stream of guaranteed payments based on the guaranteed income rider. Mr. Buchanan based the discount rate on two methodologies. The first method was based on the Actuarial Guideline for Variable Annuities from the National Association of Insurance Commissioners for purchasing an annuity with a guaranteed minimum income benefit and produced a discount rate of 4.49 percent as of September 21, 2001. The second method was based on the Standard Valuation Law from the National Association of Insurance Commissioners for the standard valuation interest rates for types of annuities such as the annuity contracts and resulted in a discount rate of 4.50 percent.

Mr. Buchanan weighted all indications equally and concluded that the appropriate discount rate applicable to the valuation analysis of the annuity contracts as of September 21, 2001, was 4.67 percent. Mr. Katzenstein then used this fair market discount rate to determine the fair market value of each of the annuity contracts on September 21, 2001. [8] Mr. Katzenstein used the information provided by John Hancock regarding the monthly annuity benefits payable starting on the first date the annuity option could have been exercised pursuant to each of the annuity contracts in order to calculate the values of the annuity contracts. Mr. Katzenstein then performed an actuarial analysis to determine the value of each of the annuity contracts, using the discount rate provided by Mr. Buchanan. Mr. Katzenstein determined that the minimum value of the Kenneth L. Lay Annuity was $5,109,117, and that the minimum value of the Linda P. Lay Annuity was $4,432,456, as of September 21, 2001, totaling $9,541,573. Mr. Katzenstein testified that these values were minimum values and that the annuity contracts could have had higher values as of September 21, 2001.

**\*22** The purchase price in this case, therefore, was within 5 percent of the values that Mr. Katzenstein calculated as the minimum values of the annuity contracts. That purchase price was within a reasonable range of values supports the conclusion that the annuities transaction was in fact a sale. In other words, even if the $10 million price for the annuity contracts exceeded the actual values somewhat, the price was within a reasonable range of values, showing that the parties intended for the annuities transaction to be a sale transaction for the annuity contracts.

Respondent offered no evidence with respect to the values of the annuity contracts as of September 21, 2001. Moreover, in the event that the sale price is treated as less than $10 million with the excess treated as taxable, this excess amount also would be a loss to the Lays. Mr. Lay and Mrs. Lay paid a total of $10 million for the annuity contracts, and their cost basis in the annuity contracts is $10 million. Accordingly, if the Lays had sold the annuity contracts for less than $10 million, then they might have reasonably reported an ordinary loss on the sale equal to the amount realized less their adjusted basis. See [sec. 1001](#); [Rev. Rul. 61–201, 1961–2 C.B. 46](#) (ordinary loss allowed on a taxpayer's surrender of a single premium refund annuity contract for cash consideration).

In summary, Enron paid Mr. and Mrs. Lay $10 million in exchange for the annuity contracts. Enron intended for the full amount of its payment to be consideration for the annuity contracts. The annuities transaction is well documented, and all actions of the parties to the transaction reflect that Enron purchased the annuity contracts for $10 million. The Lays

properly reported the transaction on their 2001 tax return as a sale of their annuity contracts.

To reflect the foregoing,

*Decision will be entered for petitioners.*

**All Citations**

T.C. Memo. 2011-208, 2011 WL 3805988, 102 T.C.M. (CCH) 202, T.C.M. (RIA) 2011-208, 2011 RIA TC Memo 2011-208

## Footnotes

| | |
|---|---|
| 1 | The members of the board of directors of Enron were: Kenneth L. Lay of Enron; Robert A. Belfer of Belfer Oil & Gas; Norman P. Blake, Jr., of General Electric; John H. Duncan of Gulf & Western Corp.; Herbert S. Winokur of Capricorn; Dr. John Mendelson of MD Anderson Cancer Center; Dr. Charles A. LeMaistre, former chancellor of the University of Texas system and past president of MD Anderson Cancer Center in Houston; Dr. Wendy L. Gramm, economist and professor of economics at Texas A & M University; Dr. Robert K. Jaedicke, former dean of Stanford Law School;, Lord John Wakeham, a member of the British Parliament; Ronnie Chan, a resident of Hong Kong; Paulo V. Ferraz Pereira, an industrialist from Argentina; and Frank Savage, an industrialist from the east coast of the United States. The board of directors of Enron represented the shareholders interests and oversaw the activities of the company. |
| 2 | A tranche is a number of related securities that are part of a larger securities transaction. A comparator is a device for comparing something with a similar thing or with a standard measure. |
| 3 | The spreadsheets also showed that the current floor value was $11,240,685 and that the value in 4.25 years would be $14,399,344. |
| 4 | All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code. |
| 5 | Mr. Lay remained employed by Enron through the end of 2001, and therefore there is no issue of whether the annuity contracts were reconveyed to Mr. Lay in 2001 in accordance with the agreement.<br>The issue of whether Mr. Lay is entitled to the reconveyance of the annuity contracts arises in 2002 upon the termination of Mr. Lay's employment with Enron and is at issue in the Enron bankruptcy case, in which Enron listed the annuity contracts as assets and John Hancock has filed a request for the bankruptcy court to resolve the issue. |
| 6 | Respondent has not alleged that Enron retransferred the annuity contracts to either Mr. Lay or Mrs. Lay in 2001. |
| 7 | See IRS Publication 561 (for purposes of determining a charitable contribution deduction "The value of an annuity contract or a life insurance policy issued by a company regularly engaged in the sale of such contracts or policies is the amount that company would charge for a comparable contract."). For gift tax purposes, therefore, it appears that the value of the Annuity contracts would have been $10 million. *United States v. Parker,* 376 F.2d 402, 408 (5th Cir.1967); *Anselmo v. Commissioner,* 80 T.C. 872, 1983 WL 14829 (1983) (the valuation test for estate and gift tax purposes is generally the same as that used for charitable contribution deduction purposes), affd. 757 F.2d 1208 (11th Cir.1985). |
| 8 | Mr. Katzenstein reviewed the annuity contracts and took note of both the guaranteed minimum income benefit payable on amounts paid for the contract and the special feature that if the annuity investment account performed sufficiently well, the payments could be higher. |

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.