# Exhibit M

 The Washington Post

# ROBINS CEO AT CENTER OF STORM

+ Add to list

By Morton Mintz
November 8, 1987

E. Claiborne Robins Jr. has become the focal point of the catastrophe caused by the Dalkon Shield and of the ensuing bankruptcy of A.H. Robins Co., his 121-year-old family-controlled company.

Lawyers and judges have been trying to pin down individual responsibility for critical decisions since the company halted U.S. sales of the intrauterine contraceptive device in 1974. Repeatedly, however, the testimony they got in depositions and courtrooms led them into swamps of buck-passing, memory losses and vagueness, say critics who have been trying to determine accountability.

Robins Jr., who began to work part-time at the company when he was 15, was a peripheral figure still on the executive ladder in the early 1970s -- the formative years of the Dalkon Shield disaster. In that era, the key decision-makers were his father, who was chairman, and William L. Zimmer III, his predecessor as president. Robins Jr. became president and chief executive officer in 1978, four years after the sales halt.

It was on his watch that the company filed for Chapter 11 bankruptcy court protection in August 1985, thereby assuring that his conduct would be rigorously examined by outsiders -- particularly the Dalkon Shield Claimants' Committee, representing tens of thousands of victims, and S. David Schiller, an assistant U.S. attorney who represents the Internal Revenue Service, a major creditor.

A few months ago, the committee began to home in mainly on Robins Jr., a handsome, well-groomed man of 44 who shuns the limelight.

The committee scored initial successes in its efforts to pinpoint accountability at a court hearing on Aug. 19 held by District Judge Robert R. Merhige Jr., who has been in charge of the bankruptcy proceeding from the start.

Merhige authorized the committee to sue Robins Jr. and two other directors -- his father and Zimmer -- for $2.4 billion for "gross negligence" and "misdeeds" in the IUD disaster (there are 214,000 notices of claims) and in the Chapter 11 proceeding.

Eight weeks later, Merhige ruled on a committee motion to hold Robins Jr. in both criminal and civil contempt. The committee alleged that the company had violated an order to file lawsuits, where necessary, to recoup unauthorized payments by the company while it was subject to court supervision, and emphasized that the judge had made Robins Jr. personally responsible for compliance. One of the principles governing Chapter 11 reorganizations is that to protect the rights of all creditors, a company may not make expenditures without court approval.

The judge held the corporation rather than its president in criminal contempt for "deliberate defiance" of the order. But he personalized the penalty by ordering Robins Jr. to pay a $10,000 fine himself. (In addition to compensation of $305,241 last year, his stock in the company is currently valued at more than $55 million.)

Last week, Merhige said he would change the criminal contempt finding to one of a civil contempt because of a recent Supreme Court ruling in a relevant case. Robins Jr. still had to pay the fine.

Robins Jr. did not respond to a request for an interview made through his attorney. But certain traits emerge from the public record, from sworn testimony and from former Robins employes and others who have had dealings with him.

He is a man who prizes privacy. He has a love of sports, particularly golf. Much on-the-record evidence is to the effect that he is dedicated and hard-working, and an executive who delegates authority so that he can set overall policy and avoid being swamped by the details of running a complex, diverse enterprise.

"I've got the opportunity to be a playboy if I want to," he told a Richmond reporter in 1974. "But work grows on you."

He told Chemical Week in 1978: "I cannot take a two-week vacation. After about the third or fourth day, I find myself thinking about going back to work. I guess in a way I never really relax at all."

Robins Jr. took personal responsibility last year for dismissing Penn Ayers Butler's San Francisco law firm as the company's first special bankruptcy counsel. Yet Butler, in a recent interview, said that from what he had seen, Robins "commands a tremendous personal loyalty from people in the company. The employes -- the rank and file -- hold him in very high regard."

But he has his critics among those who have had dealings with him. Their criticisms are nearly always off-the-record, undocumented and harsh. They paint him as frivolous -- a silver-spoon-in-the-mouth heir who isn't qualified to be, and doesn't want to be, a hands-on CEO.

"He had an absolute lack of concern for the company," one former official alleged. "He'd simply get up and walk out of meetings. Drifted from one department to the other."

Lawyers for the claimants' committee and the IRS have been frustrated by the public record of Robins Jr.'s knowledge concerning the Dalkon shield. For example, in 1984 the elder Robins testified that he was unable to recall ever having discussed the Dalkon Shield with his son, although the company and its insurer had paid out $179 million to dispose of claims by the end of 1983.

In the spring of 1986, assistant U.S. attorneys Schiller and Robert W. Jaspen took 46 depositions from company officers and employes, hoping to find out specifically who had approved about $8 million in unauthorized payments by the company, including $3 million in bonuses (since repaid) to past and present officers and directors.

Robins Jr.'s 113-page transcript is larded with answers such as, "I don't recall," "all that would have been handled at a lower level" and "I was not aware of it at the time."

One example is an exchange concerning a Kansas jury's award of $7.5 million in punitive damages to a Dalkon Shield victim. "Do you recall if that was a punitive damages judgment?" he was asked. "I don't remember," he replied.

Schiller's frustration with his attempts to identify who had told whom to do what in the 46 depositions led him to coin the word "Robinspeak" in June 1986, when Merhige held the company in civil contempt for "knowingly violating court orders" and for actions "prohibited by both the spirit and letter of the law."

He defined Robinspeak this way: "I don't know," "I don't recall," "I have no present recollection," "We had no definitive discussion," "I probably said," "I would have said."

The following is a partial sequence of events concerning Robins Jr. and the Dalkon Shield:

1972: Robins Jr. joined the board after getting a bachelor's degree in business administration at the University of Richmond.

1974: Under government pressure, the company halted domestic Dalkon Shield sales (while continuing foreign sales for at least nine months.) The trigger was an outbreak of life-threatening pelvic inflammatory disease, or PID, in pregnant users; a near-epidemic of PID in nonpregnant users developed later. PID often impairs or destroys the ability to bear a child.

The suspect component was the tail string, which ran from the IUD in the germ-free uterus to the germ-laden vagina. The shield string was unique in two vital respects: it consisted of hundreds of tiny filaments encased in a sheath, and it was made entirely of nylon, which rots on prolonged exposure to body fluids.

The evidence is massive that deterioration of the sheath led to rips and tears through which bacteria penetrated the spaces between the filaments. From there, capillary

action "wicked" the germs into the uterus, where they caused PID.

All other IUD strings are monofilaments. The shield string looked like one, and the company never told physicians that it was made of nylon.

1976: Chairman Robins and President Zimmer said that "the shield, when properly used, is a safe and effective IUD." They and Robins Jr. have never explained how a woman could improperly use the device, nor have they retracted the claim.

1977: A Richmond Times-Dispatch story reported that, in talking with members of the investment community outside Richmond, Robins Jr. said the three favorite subjects for discussion are "his own dedication to the company, the lingering exposure to {product-liability lawsuits} involving the Dalkon Shield ... and the outlook for sales, earnings and new products."

1981: By Dec. 31, according to the company's annual report for 1981, it "had disposed of approximately 4,200 cases and claims alleging injuries arising from use of the Dalkon Shield." The cumulative payout by the insurer and the company was listed as $98 million.

1982: Robins Jr. was asked at a deposition: "When did you first become aware that there might be problems with the tail string of the Dalkon Shield?" He replied: "I'm not familiar with the fact that there is a problem with the Dalkon Shield."

1983: A year later, he testified that wicking "has been brought to my attention over the last 13 years {since 1970}," although he "didn't know what it meant."

1984: In testimony given by Ernest L. Bender Jr., senior vice president for corporate planning who reported to Robins Jr., "I've had no conversations with him about the Dalkon Shield," Bender said.

It was in 1984 that the issue of individual accountability first captured national attention.

In connection with some pending Dalkon Shield cases, Miles W. Lord, then chief U.S. district judge for Minnesota, asked Robins Jr. and two other senior officers to trace the women still wearing Dalkon Shields and to recall the IUDs.

While the executives stood mute and Dalkon Shield victims in the courtroom wept, Lord said: "Please, in the name of humanity, lift your eyes above the bottom line. You, the men in charge, must surely have hearts and souls and consciences." He pleaded with the executives "to seek new horizons in corporate consciousness and a new sense of personal responsibility.

"If one poor young man were, by some act of his -- without authority or consent -- to inflict such damage upon one woman, he would be jailed for a good portion of the rest of his life," Lord told them in a speech that an appeals court later struck from the record.

Eight months later -- without reference to Lord's plea -- the company launched a recall campaign.

This history was on Schiller's mind last July, and again on Oct. 16, after Rorer Group proposed to merge with the company. On both occasions, he objected to Robins' disclosure for its proposed financial reorganization, partly because none of the persons who had been responsible for the Dalkon Shield was named. He said in the July filing:

"To leave in management those who would knowingly sell unsafe and ineffective drugs or medical devices, who would actively deceive regulatory governmental agencies, or who would hide 'ostrich-like', head in the sand, from bad news and do nothing to prevent further injuries and death, would do violence to public policy and the public interest."

A lawyer for A.H. Robins Co. last week accused Schiller of "a grandstand play of the lowest order."

The lawyer, James S. Crockett Jr., said Schiller's argument was a claim "that no individual should be permitted to serve as an officer or director of the reorganized

company unless that person comes forth and proves that his 'wife beating' has stopped by demonstrating his innocence of any allegations of misdeeds relating to the Dalkon shield."

0 Comments