**Hearing Date and Time: October 28, 2020, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: October 14, 2020, at 11:59 p.m. (prevailing Eastern Time)**
**Reply Date and Time: October 25, 2020, at 11:59 p.m. (prevailing Eastern Time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION**
**TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS, OR**
**FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE,**
**CRIME FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

**PLEASE TAKE NOTICE** that on September 29, 2020, the Official Committee of

Unsecured Creditors of Purdue Pharma, L.P., *et al.* (the "**Official Committee**") filed the *Motion*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Privilege* (the "**Exceptions Motion**") and the declaration of Mitchell Hurley in support thereof and exhibits annexed thereto.

**PLEASE TAKE FURTHER NOTICE** that a telephonic hearing on the Exceptions Motion (the "**Hearing**") will be held on **October 28, 2020 at 10:00 a.m.** (prevailing Eastern Time) before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), 300 Quarropas Street, Courtroom No. 118, White Plains, New York 10601, or at such other time as the Court may determine.

**PLEASE TAKE FURTHER NOTICE** that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), the Hearing will be conducted telephonically.[2] Parties wishing to appear at, or attend, the Hearing must refer to and comply with the Court's guidelines for telephonic appearances[3] and make arrangements with Court Solutions LLC by telephone at (917) 746-7476.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.

**PLEASE TAKE FURTHER NOTICE** that in accordance with the *Agreed Order Regarding Discovery Deadlines and Briefing Scheduling in the Chapter 11 Cases* [ECF No. 1734] (the "**Stipulation**"), any responses or objections that may be filed in response to the Exceptions

---

[2] A copy of General Order M-543 can be obtained by visiting: http://www.nysb.uscourts.gov/news/courtoperationsunder- exigent-circumstances-created-covid-19.
[3] The Court's procedures for telephonic appearances are available at: http://www.nysb.uscourts.gov/telephonicappearances-white-plains.

Motion shall be received no later than **October 14, 2020 at 11:59 p.m.** (prevailing Eastern Time) and any reply in support of the Exceptions Motion shall be filed by **October 25, 2020 at 11:59 p.m.** (prevailing Eastern Time). Such responses and objections shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Court and served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures*, dated November 18, 2019 [ECF No. 498].

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default, *provided* that objecting parties shall attend the Hearing telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Court.

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Exceptions Motion, the Official Committee may, on or after the Objection Deadline, submit to the Court an order substantially in the form of the proposed order annexed to the Exceptions Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Exceptions Motion may be obtained free of charge by visiting the website of Prime Clerk LLC.[4] You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

[4] *See* https://restructuring.primeclerk.com/purduepharma.

New York, New York                          AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  September 29, 2020

By: /s/ *Mitchell P. Hurley*

Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
jsorkin@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma, L.P., et al.*

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION
TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS,
OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME FRAUD,
AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................ii

PRELIMINARY STATEMENT...............................................................................1

BACKGROUND ......................................................................................................7

    A.    Even the Limited and Incomplete Information Now Available Is
Compelling...................................................................................................7

    B.    Discovery Stipulations, Agreed Schedule, and Privilege Logs.............16

    C.    Critical Discovery from "IACs," Other II Way Entities, and NRF Remains.........18

ARGUMENT ...........................................................................................................23

    A.    The UCC is Entitled to the Fiduciary Documents Under the "Good Cause"
Exception to Privilege................................................................................23

        (1)    Purdue's Creditors Are the Debtors' *Only* Stakeholders............25

        (2)    The Estate Claims Under Investigation Are Colorable............26

        (3)    The UCC's Need for the Documents Is Manifest.....................31

        (4)    The Nature of the Documents Sought Also Counsels Disclosure.............33

    B.    The UCC Is Entitled to the Crime-Fraud Documents...........................33

        (1)    Probable Cause to Believe a Crime or Fraud Has Been Committed .........35

        (2)    Communications Reasonably Related to Fraud.......................37

    C.    The At-Issue Documents Should Also Be Produced..............................38

COMPLIANCE WITH RULES ..............................................................................41

NOTICE....................................................................................................................41

NO PRIOR REQUEST ...........................................................................................41

RESERVATION OF RIGHTS ...............................................................................41

CONCLUSION........................................................................................................41

## TABLE OF AUTHORITIES

**Federal Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns. Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) .................................................................... 26

*Amusement Indus. Inc. v. Stern*,
    293 F.R.D. 420 (S.D.N.Y. 2013) ................................................................ 34, 35, 37

*Arista Records LLC v. Lime Grp. LLC*,
    No. 06 CV 5936, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ...................... 39, 40

*In re Bairnco Corp. Sec. Litig.*,
    148 F.R.D. 91 (S.D.N.Y. 1993) ............................................................................. 24

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
    210 F.R.D. 506 (S.D.N.Y. 2002) ..................................................................... 39, 40

*Cendant Corp. v. Shelton*,
    246 F.R.D. 401 (D. Conn. 2007) ........................................................................... 36

*In re China Med. Techs., Inc.*,
    539 B.R. 643 (S.D.N.Y. 2015) .............................................................................. 23

*Clark v. United States*,
    289 U.S. 1 (1933) .................................................................................................. 34

*Cohen v. Uniroyal, Inc.*,
    80 F.R.D. 480 (E.D. Pa. 1978) .............................................................................. 26

*In re Dow Corning Corp.*,
    261 F.3d 280 (2d Cir. 2001) .................................................................................. 23

*Duttle v. Bandler & Kass*,
    127 F.R.D. 46 (S.D.N.Y. 1989) ............................................................................ 34

*Galaxy CSI, LLC v. Galaxy Comput. Servs., Inc. (In re: Galaxy Comput. Servs., Inc.)*,
    No. 1:04-CV-00007, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004) ................ 33, 35

*Garner v. Wolfinbarger*,
    430 F.2d 1093 (5th Cir. 1970) ........................................................................ *passim*

*Geissal v. Moore Med. Corp.*,
    192 F.R.D. 620 (E.D. Mo. 2000) .......................................................................... 24

*In re Grand Jury Proceedings,*
    219 F.3d 175 (2d Cir. 2000)........................................................................39

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,*
    731 F.2d 1032 (2d Cir. 1984)..........................................................34, 35, 37

*Hartford Fire Ins. Co. v. CMC Constr. Co., Inc.,*
    No. 3:06-CV-11, 2010 WL 11520219 (E.D. Tenn. Apr. 20, 2010)......................40

*In re Int'l Bus. Machines Corp. Sec. Litig.,*
    No. 92 C 9076, 1993 WL 760214 (S.D.N.Y. Nov. 30, 1993) ................................31

*Irving Tr. Co. v. Gomez,*
    100 F.R.D. 273 (S.D.N.Y. 1983) ......................................................................34

*In re McKesson Corp. Deriv. Litig.,*
    No. 17-cv-01850, 2018 WL 2197548 (N.D. Cal. May 14, 2018)..........................30

*Miller v. Schweickart,*
    405 F. Supp. 366 (S.D.N.Y. 1975) ...................................................................28

*Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman,*
    342 B.R. 416 (S.D.N.Y. 2006)..........................................................24, 25, 33

*Official Comm. of Unsecured Creditors v. Bay Harbour Mater Ltd. (In re BH S &
    B Holdings, LLC),*
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) ..........................................................27, 32

*In re Pfizer Inc. S'holder Deriv. Litig.,*
    722 F. Supp. 2d 453 (S.D.N.Y. 2010)...............................................................30

*In re Pfizer Inc. Sec Litig.,*
    No. 90 Civ. 1260, 1993 WL 561125 (S.D.N.Y. Dec. 23, 1993)............................25

*Quintel Corp., N.V. v. Citibank, N.A.,*
    567 F. Supp. 1357 (S.D.N.Y. 1983)...................................................................24

*In re Richard Roe, Inc.,*
    68 F.3d 38 (2d Cir. 1995)..................................................................................35

*RMED Int'l., Inc. v. Sloan's Supermarkets, Inc.,*
    94 CIV. 5587PKLRLE, 2003 WL 41996 (S.D.N.Y. Jan. 6, 2003) ........................31

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC,*
    319 F.R.D. 100 (S.D.N.Y. 2017) ..................................................................33, 35

*In re Tribune Co. Fraudulent Conv. Litig.,*
    No. 12 CV 2652 (DLC), 2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) ..............28, 37

*In re Tronox Inc.*,
   503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...........................................................27, 37

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ..........................................................................23

*United States v. Zolin*,
   491 U.S. 554 (1989) ........................................................................................34

*Univ. of Pa. v. Equal Emp't Opportunity Comm'n*,
   493 U.S. 182 (1990) ........................................................................................23

*In re W.R. Grace & Co.*,
   281 B.R. 852 (Bankr. D. Del. 2002) ...............................................................27

**State Cases**

*Boxer v. Husky Oil Co.*,
   429 A.2d 995 (Del. Ch. 1981) .........................................................................27

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999) .......................................................................28

*Grimes v. DSC Commc'ns Corp.*,
   724 A.2d 561 (Del. Ch. 1998) .........................................................................33

*Jones v. Mackey Price Thompson & Ostler*,
   469 P.3d 879 (Utah 2020) ..........................................................................27, 37

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
   930 A.2d 92 (Del. 2007) .................................................................................24

*Ret. Fund v. AmerisourceBergen Corp.*,
   C.A. No. 2019-05470, 2020 WL 132752 (Del. Ch. Jan. 13 2020) .............30, 31, 37

**Federal Statutes**

11 U.S.C. § 541 ......................................................................................................27

11 U.S.C. § 548(b) .................................................................................................28

18 U.S.C. § 371 ......................................................................................................31

21 U.S.C. §§ 331, 333, 352, 353 ...........................................................................31

42 U.S.C. § 1320a-7b(b) ........................................................................................31

**State Statutes**

Del. Code Ann. § 17-1101(d) ........................................................................................28

**Rules**

Fed. R. Bankr. P.  9014(c) ..............................................................................................1

Fed. R. Bankr. P. 9017 ..................................................................................................23

Fed. R. Evid. 501 ..........................................................................................................23

Local Bankruptcy Rule 9013-1(a) ...............................................................................41

**Other Authorities**

https://www.latimes.com/nation/la-xpm-2011-sep-17-la-me-drugs-epidemic-
    20110918-story.html ...............................................................................................15

Pursuant to applicable rules, including Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, and the Amended Stipulation and Agreed Order Regarding Discovery Deadlines and Briefing Scheduling in the Chapter 11 Cases [ECF No. 1730] (the "**Scheduling Stipulation**"), the Official Committee of Unsecured Creditors (the "**UCC**") of Purdue Pharma, L.P. ("**PPLP**") and its affiliated debtors and debtors-in-possession (collectively, "**Purdue**" or the "**Debtors**") files this Motion Based On Good Cause, Crime-Fraud, and At-Issue Exceptions to the Attorney-Client Privilege (the "**Motion**") seeking an order, substantially in the form submitted herewith, requiring each of the Debtors and the CSPs[2] (collectively the "**Withholding Parties**") to (i) produce documents that have been or may be withheld on purported privilege grounds within categories identified below (the "**Challenged Documents**") or (ii) provide the Challenged Documents to the Court, or to a special master appointed by the Court (a "**Special Master**"), for review *in camera* and production to the UCC to the extent deemed appropriate.[3]  The Ad Hoc Group of Non-Consenting States ("**NCSG**") supports the relief requested in this Motion.

### PRELIMINARY STATEMENT

1.      On May 10, 2007, Purdue and three of its key executives pled guilty to criminal conduct relating to their sale and marketing of OxyContin.  At the same time, an entity affiliated with Purdue, the source of most of the Sackler family's wealth, agreed to make a $634 million settlement payment to the U.S. government.

2.      ████████████████████████████████████████████████

---

[2] As defined in the Scheduling Stipulation, the CSPs include the Raymond Side (or "**Side B**") Initial Covered Sackler Persons and Additional Custodians, and the Mortimer Side (or "**Side A**") Covered Parties.  The CSPs are sometimes referred to herein simply as the "**Sacklers**" or, as applicable, the "**Side A Sacklers**" and the "**Side B Sacklers**."  Terms defined in the Scheduling Stipulation shall have the meanings ascribed to them there to the extent used but not defined in the Motion.

[3] The UCC has met and conferred with the Withholding Parties in a good faith effort to resolve by agreement the issues raised in this Motion without the intervention of the Court but the parties were unable to do so. *See* Hurley Decl. ¶ 3.



3.    A few months later, Peter Boer, ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████    In April of 2008, the Sacklers installed Mr. Boer on Purdue's board, where he remains.  Thereafter, and continuing through 2016, Purdue distributed unprecedented sums to and for the benefit of the Sacklers, hoping then and now that these sums would be beyond the reach of Purdue's creditors.

4.    Between 2008 and 2012 alone, for example, Purdue transferred nearly $7 billion in cash to or for the benefit of family trusts and foreign-based companies.  Through 2016, the total cash distributions amounted to more than $10 billion,[5] along with at least another $1 billion in other property (the "**Non-Cash Transfers**").  Virtually all of that vast wealth was moved into so-called "spendthrift" trusts, many located in the Channel Islands, as well as to foreign "Independent Associated Companies," or "IACs."  Remarkably, the Sacklers now actually tout the "defensive measures" they took as having successfully placed their assets beyond the reach of Purdue's creditors.

5.    The UCC is investigating valuable estate claims with the support and encouragement of all of Purdue's creditors, and consistent with the cooperation stipulation agreed

---

[4] Hurley Decl., Ex. 57.

[5] A portion of the distributions was used to pay taxes owed by the Sacklers and their trusts.

to by the parties on July 17, 2020 and so ordered by the Court on July 31, 2020.  *See* Amended Stipulation and Agreed Order Among the Official Committee and Other Parties in Interest Regarding Discovery and the Sharing of Information in the Chapter 11 Cases [ECF No. 1543]. That investigation includes (i) whether Purdue's massive transfers of wealth to the Sacklers were the product of intentional or constructive fraud, and (ii) whether the Sacklers and other board members breached their fiduciary duties to Purdue in connection with such transfers and otherwise.

6.       Evidence of the knowledge, beliefs, and motivations of Purdue and the Sacklers in connection with the opioid crisis, the liability risk it posed, and the steps the Sacklers took to transfer value away from Purdue's creditors and to themselves are questions of obvious importance to these claims.  Review of documents that the Debtors, the Sacklers and the so-called IACs and Other II Way Entities[6] have thus far agreed to produce is still underway, and will not be complete for some weeks.  But already, strong evidence in support of the estate claims has emerged, as discussed in the Background section below, and the UCC expects more will be discovered.

7.       The Debtors and the Sacklers, however, are withholding nearly 400,000 documents responsive to the UCC's requests on grounds of alleged privilege.  It is virtually certain that much of the most probative evidence of Purdue's and the Sacklers' knowledge and motivations— "what they knew and when they knew it"—will be found among these materials to which only the Debtors and the Sacklers have access or familiarity.[7]  As demonstrated in the other privilege motion the UCC filed today, many of these documents simply are not privileged in the first place, and suggest a troubling desire by the Debtors and the Sacklers to hold back great swaths of information

[6] "**Other II Way Entities**" are "all entities jointly owned or controlled, directly or indirectly, by the two sides of the Sackler family that are not IACs."  [ECF No. 1340] ¶ 2.

[7] The UCC brings this Motion now based on the Court's direction at the July 23, 2020 omnibus hearing to surface privilege disputes promptly, and anticipates renewing aspects of the Motion as documents and logs continue to be produced.  For instance, at this time, neither the IACs nor the Other II Way Entities have yet delivered privilege logs, and their productions are weeks away from scheduled completion.

that is by definition responsive to requests propounded by the UCC and others.

8.    The information asymmetry ████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████ █████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

9.    The Court can end this informational asymmetry and enhance and likely expedite

the UCC's investigation by enforcing three established exceptions to privilege:

> (i) the *good cause exception* provides stakeholder beneficiaries with access to privileged communications initially procured by their fiduciaries;

> (ii) the *crime-fraud exception* recognizes that communications made in furtherance of a fraudulent objective cannot properly be withheld from disclosure as privileged; and

> (iii) the *at-issue exception* prevents parties from making factual claims, the truth of which only can be assessed by examination of privileged communications.

10.    All three exceptions are operative here.  The UCC is the only fiduciary in these

proceedings whose sole job is to maximize value for unsecured creditors—Purdue's only

stakeholders—and has an overwhelming interest in gaining access to privileged communications

that could conclusively establish key elements of the estates' claims.  Denying that access, in

contrast, benefits only the Sacklers ████████████████████████████

██████████████████████████████████████████████████████████

Good cause therefore exists to provide Purdue's creditors with access to the Debtors' otherwise

---

█ █████████████████████████████████████████████████████

privileged material.

11.     Regarding the crime-fraud exception, more than sufficient evidence already has been adduced to make the necessary showing of "probable cause," both in connection with Purdue's extraordinary post-2007 transfers to the Sacklers, the trusts and the "IACs," and the board's alleged breaches of fiduciary duty. Privileged communications "reasonably related" to that conduct must be produced. And by putting their alleged good faith and knowledge directly at issue—including by denying that they could have known Purdue might face "meaningful litigation" before 2017—the Sacklers must now disclose privileged communications that may further demonstrate the falsity of that assertion.

12.     The privilege logs the Debtors and the Sacklers have produced to date do not provide sufficient information concerning the withheld documents to permit the UCC, or any other reader, to identify with certainty all the documents that should be produced pursuant to this Motion on an entry-by-entry basis. The UCC therefore asks the Court to order production, or *in camera* review by the Court or a Special Master, of documents from January 1, 2006 forward that come within the categories identified in detail in Exhibit 101 to the accompanying Declaration of Mitchell Hurley dated September 29, 2020 ("**Hurley Decl.**"), and summarized below:

1.   **Good Cause Exception (Privilege Claims Belonging to the Debtors)**. Privileged documents concerning (a) the Debtors' financial condition or awareness of same, (b) knowledge of actual or potential opioid claims, investigations or damages, (c) Purdue's attempts to insure opioid related claims, (d) whether or not to make cash or non-cash transfers to or for the Sacklers, (e) litigation risk after the 2007 settlement, (f) value received for non-cash transfers, (g) whistleblower activity relating to opioids, and (h) the liability risks of various types of transfers (as more fully defined on page 1 of Exhibit 101 to the Hurley Decl., the "**Fiduciary Documents**");

2.   **Crime Fraud Exception (Privilege Claims Belonging to the Sacklers or the Debtors)**. Documents concerning (a) asset protection or estate planning measures relating to the Sacklers' or Purdue's liability, (b) fraudulent transfer risk relating to transfers, (c) ability of litigants to collect on judgments against Purdue, the Sacklers, their trusts and other affiliates, (d) exposure to liability

5

for breaches of fiduciary duty and other misconduct, and any efforts to conceal such misconduct or breaches of duty, (e) formation and administration of the Sacklers' trusts, (f) steps to avoid liability relating to distributions, or (g) non-cash transfers to or for the benefit of the Sacklers (as more fully defined on page 2 of Exhibit 101 to the Hurley Decl., the "**Crime Fraud Documents**"); and

3. **At Issue Exception (Privilege Claims Belonging to the Sacklers)**. Documents concerning (a) the Sacklers' claim that the board had a "good faith" belief that Purdue's opioid practices were legally compliant, (b) the claim that no one feared Purdue could "face meaningful litigation until 2017," and (c) any claimed good faith belief or reliance on counsel concerning propriety of cash and non-cash transfers (as more fully defined on page 3 of Exhibit 101 to the Hurley Decl., the "**At Issue Documents**").[9]

13.    Given the sheer number of documents the Debtors and the Sacklers have withheld to date, ensuring that all responsive documents subject to these exceptions are made available to the creditors and the Court will be painstaking work. From the perspective of the UCC and the creditor parties whose interests it represents, however, that effort is not only justified, it is essential.

14.    Of equal importance, these cases present unique issues of public health, equity, and justice, and it is no exaggeration to say that the eyes of the nation are watching.



---

[9] In addition to defining the categories, the UCC has sought to identify non-exhaustive, illustrative lists of Challenged Documents that it believes may fit within these categories. Hurley Decl., Ex. A (Excel Tabs L-M), Ex. B (Excel Tabs J-K), Ex. C (Excel Tabs N-O). As noted, however, the UCC cannot identify those documents with certainty, and must rely on the withholding parties to supply the associated documents for production, or *in camera* review, as the Court may order. The UCC reserves the right to seek documents in additional or different categories, including based on information that may be produced as a result of the Motion.

## BACKGROUND

15.     As discussed below, document discovery from the Debtors and the Sacklers is proceeding on the schedule and in the manner that those parties specifically agreed last summer, pursuant to stipulations so-ordered by the Court.  That discovery is not yet complete, however, and critical discovery from so-called "IACs," Other II Way Entities, and Norton Rose Fulbright ("**NRF**") is far from complete.  Nevertheless, the UCC already has uncovered information that supports both key estate claims and the relief sought by this Motion.

A.     **Even the Limited and Incomplete Information Now Available Is Compelling**

16.     While much discovery remains, strong evidence already has begun to emerge that supports the estates' fraudulent conveyance, breach of fiduciary duty, and other claims, and militates in favor of requiring the Debtors and the Sacklers to produce documents currently concealed from Purdue's creditors on privilege grounds.[10]



17.     ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████     Hurley Decl., Ex. 58 (Dec. 6, 2019 presentation by Joseph Hage Aaronson LLC, on behalf of the Side B - Raymond-side Sacklers entitled "*In Re: Purdue Pharma L.P., et al.*: Presentation of Defenses: Pursuant to November 5, 2019 Amended Stipulation ¶ 17(b) (ECF No. 431) at 488.  The actual evidence contradicts the Sacklers' defense, however.

18.     The board certainly knew "meaningful litigation" was likely when ████████ ████████████████████████████████████ ████████████████████████████████████

---

[10] The facts set forth herein should not be read as the complete set of facts upon which a complaint would be based; rather, they are set forth herein *solely* for purposes of establishing the predicate necessary to grant this Motion.



Hurley Decl., Ex. 59 at 875, 877.

*Id.* at 875-76.

Hurley Decl., Ex. 60 at 2.[11]

19.    But even more direct evidence rebuts the Sacklers' denial that they feared litigation risk prior to 2017.

*e.g.*, Hurley Decl., Ex. 61 at 3,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

20.    The Sacklers' concerns about liability related to the opioid crisis did not abate after

the settlement was filed in the Western District of Virginia on May 10, 2007.  ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

21.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████

*Id.* (emphasis added).  At his deposition, David ███████████████████████████████

█████████████████████████████████████████████████████  Hurley

Decl., Ex. 43 (David Sackler Dep. Aug. 28, 2020, 188).  █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  *Id.* at 188-

---

[12] Hurley Decl., Ex. 62 (2006-11-20 email from Jonathan Sackler).

[13] Hurley Decl., Ex. 63 (2007-05-13 email from Richard Sackler).



22.

Hurley
Decl., Ex. 66.

Hurley Decl., Ex. 67.

23.

Hurley Decl., Ex. 68 at PWG004474000.

Hurley Decl., Ex. 69 at PPLPUCC9000491386.

24.

---

14

Hurley Decl., Ex. 65.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* Hurley Decl., Ex. 61 at

PPLPC012000372436-37 ████████████████████████

      25.    In April 2008, the Sacklers made Mr. Boer a member of Purdue's board. ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Hurley Decl., Ex. 70 at 1

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Purdue then embarked on a series of transfers ████████████████████████████

████████████████████████

      26.    The post-settlement cash transfers to and for the Sacklers' trusts and entities abroad represented an exponential increase from prior year distributions, in absolute terms, and as a percentage of Purdue's annual revenue, as illustrated in the chart below:



27. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████.

28.    Side B may argue that it opposed making large distributions from Purdue to the family trusts, at least in later years. ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ *See* Hurley Decl., Ex.

106 ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Hurley Decl., Ex. 107 at PPLPUCC500647328 ██████



Hurley Decl., Ex. 43 (D. Sackler Dep. 379:6-380:3).

29.     Notably, the lion's share of the cash distributions made to hinder, delay, or defraud creditors—nearly ████—occurred between 2008 and 2012.  *See* AlixPartners Cash Report [ECF No. 654-1] at 11.  ███████

Hurley Decl., Ex. 71 at PPLPC042000011919.

*Id.* at PPLPC042000011916.

*Id.* at PPLPC042000011911.

30.     The Sacklers appear to have explored sale transactions in vain for some period, and did not agree on a leveraged recapitalization.  Instead, they proceeded to simply distribute the value of Purdue to themselves and away from Purdue's creditors in astonishing and unprecedented sums.  ████████████  the transfers were accomplished using a network of Sackler-owned companies and more than 100 trusts, many of which are based overseas.

31.    Incredibly, in these cases, the Sacklers actually tout that structure—████████████

████████ —as a "significant obstacle" to recovery by Purdue's creditors. ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████ Hurley Decl., Ex. 72 (December 6, 2019 presentation by Debevoise & Plimpton,

on behalf of the Side A - Mortimer-side Sacklers entitled "Presentation of Defenses ('Side A'):

Pursuant to November 5, 2019 Amended Stipulation ¶ 17(b) (ECF No. 431)) at 71.  According to

the Sacklers, █████████████████████████████████████████, their wealth

is largely beyond the "reach" of "creditors" of Purdue and the individual Sackler beneficiaries due

to their network of trusts.  *Id*. at 72.

32.    To be sure, the Sacklers appeared to be more careful about putting their concerns

about opioid liability in writing as the years went on, ████████████████████████████

████████████████████████████████████████████████████████████████████

*See, e.g.*, Hurley Decl., Ex. 73 ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Hurley

Decl., Ex. 74 ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ Hurley  Decl.,  Ex.  108 ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Hurley Decl., Ex. 76 ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Hurley Decl., Ex. 77 ███████████████████

████████████████████████████████████████████████████████████

██████████

33.    But there can be no doubt the Sacklers remained aware of the litigation threat

throughout the period the transfers were being made to hinder and delay creditors.  As discussed

above, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████    *See, e.g.*, Hurley Decl., Ex. 78 at PWG004497897; Hurley Decl., Ex. 59 at

PPLPC012000259875, 877; Hurley Decl., Ex. 79 at PWG004463777-78; Hurley Decl., Ex. 60;

Hurley Decl., Exs. 80-82.  The drumbeat of reporting on the opioid crisis also continued throughout

the period, including the vast financial harm it inflicted.  *See, e.g.*, Sept. 17, 2011, *LA Times*, "Drug

deaths now outnumber traffic fatalities in U.S., data show," https://www.latimes.com/nation/la-

xpm-2011-sep-17-la-me-drugs-epidemic-20110918-story.html.

34.    In May 2012, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Hurley Decl., Ex. 83 at RSF00679318-23. ██

████████████████████████████████████████████████████████████



Hurley Decl., Ex. 84 at PPLPUCC001456443.

*E.g.*, Hurley Decl., Ex. 85 at PPLP004411166–176

Hurley Decl., Ex. 86 at

PPLP004412071–075                                            As

discussed in the Argument section below, these facts are more than sufficient to establish the "probable cause" necessary to justify disclosure of related privileged documents based on the crime-fraud exceptions, and support the UCC's "at-issue" waiver argument as well.

35.    Breach of fiduciary duty allegations also can justify application of the crime-fraud exception. Purdue's "primary liability" for its conduct in connection with the opioid crisis is relevant to the estates' breach of fiduciary duty and other claims and, as discussed below, the UCC has been limited in its attempts in these cases to take new primary liability discovery. Nevertheless, a more than credible basis exists to believe that the board may have breached its fiduciary duties, including based on claims made and evidence adduced pre-petition in the MDL, as discussed in more detail in the Argument section below. The categories of documents sought pursuant to the Motion are summarized in the Preliminary Statement, and detailed in Exhibit 101 to the Hurley Declaration.

**B.    Discovery Stipulations, Agreed Schedule, and Privilege Logs**

36.    During recent hearings and Court conferences, the Debtors and the Sacklers have expressed substantial discontent at the scope of discovery the UCC is undertaking. Discovery already has illuminated important facts previously unknown to creditors, however, and the UCC

submits its completion is critical.   Moreover, the overwhelming majority of the document disclosures currently underway by the Sacklers and the Debtors were specifically agreed to by those parties in stipulations that they negotiated over the course of weeks, and that were submitted to and "so-ordered" by the Court.   *See, e.g.*, ECF No. 1295 (June 22, 2020 notice attaching stipulations among UCC, Sacklers, and IACs); ECF No. 1623 (stipulation among Debtors, UCC, and NCSG regarding document discovery).   When the Sacklers and the Debtors signed the stipulations, they knew the precise number of documents that they were agreeing to review for most custodians based on search terms they negotiated with the UCC and "hit reports" identifying the number of documents returned by the agreed search criteria.[15]

37.      The current schedule for completion of document discovery by the Sacklers and the Debtors is also consistent with the stipulations they entered over the summer, and that the Debtors recently reaffirmed.   *See Amended Stipulation and Agreed Order Regarding Discovery Deadlines and Briefing Scheduling in the Chapter 11 Cases* [ECF No. 1734].   At the Court's urging, the UCC and other creditors have sought to accelerate depositions (and this Motion) in an effort to complete discovery as expeditiously as is reasonably possible under the circumstances.[16]

38.      Regarding this Motion, the UCC has long foreshadowed its view that privilege challenges could be among the most important litigated issues in these cases.   In the stipulations, the UCC carefully bargained for privilege logs to be produced on a rolling basis so that the disclosing parties could not wait until all document discovery was finished before identifying

---

[15] The Sacklers "ACSP" custodians were the exception; the Sacklers had not yet run hit reports for those custodians, so the stipulations provided an agreed upper limit on the number of documents subject to production without further Court intervention.   In each case, however, the UCC's search terms actually returned substantially *fewer* ACSP documents than the upper limit in the Stipulations.

[16] ██████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████

allegedly privileged documents (the Sacklers' preferred approach).  The UCC anticipated that the

Debtors, the Sacklers, and others might produce lengthy and complex privilege logs, and was

determined to ensure the parties and the Court had enough time to process those logs and address

appropriate challenges.

39.     The UCC's forecast turned out to be accurate.  The final Sackler log is not due until

October 22, 2020, but between the Sacklers and the Debtors, just under 250,000 documents have

already been identified that were returned by search terms agreed under the stipulations, but not

produced to the UCC based on a claim of privilege.  Additionally, the Debtors withheld another

135,000 documents from their productions in pre-petition litigation.  Final logs from the IACs and

others are not due to be produced until October.[17]

## C.   **Critical Discovery from "IACs," Other II Way Entities, and NRF Remains**

40.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████      Among other things, based on

facts it has learned in the course of its investigation, the UCC believes discovery from the "IACs,"

so-called Other II Way Entities, and NRF is essential.  Although this brief does not seek relief

regarding the items set forth in this section, it is important for the Court to understand both that

much more needs to be done, and how the UCC may need to come back before the Court with

additional privilege arguments regarding the IACs.

41.     First, the record now indicates that *Purdue itself is an IAC*.  The separation between

Purdue and the "Mundipharma" IACs identified in these cases appears to be artificial.  *See, e.g.*,

---

[17] As noted elsewhere, the UCC may need to return to the Court for additional relief after additional logs are produced by the disclosing parties and reviewed and considered by the UCC, and does not currently challenge entries on the pre-petitions logs, but reserves its right to do so in the future.

ECF No. 518 at 3, 20 (amended stipulation defining IACs as "ex-U.S. pharmaceutical entities …

owned or controlled by any Shareholder Party").  Indeed, documents ranging from 1991 all the

way up to 2017 describe Purdue as an IAC.  *E.g.* Hurley Decl., Ex. 102 (June 22, 2017 press release

describing Purdue as "a  privately held pharmaceutical company [that] is part of a global network

of independent associated companies"); Hurley Decl., Ex. 88 at PPLP004417344 ████████

████████████████████████████████████████████████ Hurley  Decl.,

Ex. 87 ██████████████████████████████████████████████

████████████████████████████

42.    Until 2019, an entity called MNP Consulting ("**MNP**") was the advisory board for

the IACs. █████████████████████████████████████████

██████████████████ Hurley Decl., Ex. 109. ████████████████

███████████████████████████ *Compare* Hurley Decl., Ex. 50 (PPI), *with*

Hurley Decl., Ex. 109 (MNP Consulting Limited). ████████████████████

██████████████████████████████████████████ *See, e.g.,*

Hurley Decl., Ex. 99 ██████████████████████████████████

████████████████████████████████████████████████

Hurley Decl., Ex. 100 ████████████████████████████████

To date, the UCC has deposed three current and/or former MNP directors, ███████

████████████████████████████████████████████████

████████████████████████████ *See* Hurley Decl., Ex. 47 (Theresa

Sackler Dep. Sept. 23, 2020, 63:25–65:16);  Hurley Decl., Ex. 43 (D. Sackler Dep. 86:20–87:10);

Hurley Decl., Ex. 46 (Ilene Sackler Dep. Sept. 18, 2020, 91:18–92:7). ████████████

████████████████████████████████████████████████

 *See, e.g.*, Hurley Decl., Ex. 89

43.     Ongoing IAC discovery therefore is necessary to understand how and why decisions were made concerning Purdue's affairs, including its cash distributions to the Sacklers, and the degree to which the IACs and their value can (or should) be separated from Purdue in these cases.   In addition, ex-U.S. IACs and Other II Way Entities were the subject, or recipients, of Purdue non-cash transfers in exchange for what appears to be less than reasonably equivalent value.   The UCC has been seeking discovery for months from those entities in an effort to investigate the circumstances of suspicious transactions between Purdue and other Sackler-owned entities.

44.     While the UCC's review of such transactions is ongoing (and has indeed been stymied time after time in these cases), it has identified the following problematic non-cash transfers, among others:

a.





45.    Collectively, these non-cash transfers (the "**Non-Cash Transfers**") represent at least another ███████ in value transferred by Purdue for the benefit of the Sacklers during the period 2008 to 2019.

46.    On July 22, 2020, the UCC and certain of the IACs entered into a discovery stipulation, outlining deadlines for the production from the IACs of documents responsive to the UCC's subpoena. *Second Stipulation and Agreed Order Among the Official Committee and the Stipulating IACS Regarding Discovery Deadlines in the Chapter 11 Cases* [ECF No. 1490, 1518] ("**IAC Discovery Stipulation**").  Per the IAC Discovery Stipulation, and subsequent negotiations between the parties to this stipulation, productions were or are due between September 18 and October 19, 2020, with privilege logs due within 15 calendar days of each production. *Id.*  The IACs have produced to date approximately 85,000 documents, which were identified from manual searches, as well as searches of email and other electronically stored data.  However, counsel for the IACs recently informed the UCC that documents responsive to certain of the UCC's priority requests—including notably, those related to the cash and Non-Cash Transfers to the IACs—are largely, if not solely, in the custody of NRF.  *See* Hurley Decl., Ex. 41 (September 16, 2020 Ltr.

from M. Hirschfield).

47.    For example, counsel for the IACs recently advised the UCC that NRF appears to have been largely, and perhaps solely, responsible for developing the terms of the agreements concerning many of the Non-Cash Transfers. ████████████████████████

████████████████████████████████████████████

████████████████████████    The UCC has been advised that the IACs, and potentially also the Debtors, have few or no records pertaining to these subjects, which are maintained by NRF.    Hurley Decl., Ex. 41, Ex. 91 (email correspondence between Marc Hirschfield and Ashley Crawford).    While the UCC has received some assurances from counsel for the IACs that collection of these documents, which are critical to the UCC's investigation, is *now* underway, it remains unclear whether they will be produced by the deadlines called for in the IAC Discovery Stipulation.[18]    In addition, the IACs are still in the process of collecting data for one custodian.    Other discovery from NRF is also crucially important, and not yet completed.

48.    Since July 31, 2020, the Simpson Thacher law firm has been authorized by Stuart Baker, the Debtors, the Sacklers, and their other affiliates, to coordinate NRF's production of documents responsive to requests served on those parties that are in NRF's immediate possession. Simpson recently advised the UCC, however, that NRF has retained its own counsel—the Cleary Gottlieb law firm—in connection with these matters.    The UCC is working diligently to obtain necessary discovery from NRF voluntarily, but may return to the Court for additional relief, including after logs of IAC and NRF documents are produced.    NRF, IAC, and other productions likely will require resolution of additional privilege issues when completed.

---

[18] Notably, the documents the IACs now claim are in the possession of NRF, and that NRF has apparently just begin to collect, fall within the categories of documents the UCC sought from the Sacklers and NRF directly in November and December 2019, respectively. *See* Hurley Decl., Ex. 91.

## ARGUMENT

**A.**    **The UCC is Entitled to the Fiduciary Documents Under the "Good Cause"**
**Exception to Privilege**

49.    The Debtors, including Purdue Pharma Inc. ("**PPI**"), the general partner of PPLP,

have withheld from production to the UCC hundreds of thousands of documents that are

responsive to the UCC's requests in these cases. ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ As the sole remaining

beneficiaries of the board's fiduciary duties, the UCC's constituents should be given access to the

Fiduciary Documents.

50.    The attorney-client privilege serves important purposes, but it is not absolute.

Indeed, as "an obstacle to the investigation of the truth," the privilege "ought to be strictly confined

within the narrowest possible limits." *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100-01 (5th Cir.

1970) (internal quotations and citation omitted).   In appropriate cases, where the policies

underlying the privilege are outweighed by more important ones, disclosure may be required. *See*

*Univ. of Pa. v. Equal Emp't Opportunity Comm'n*, 493 U.S. 182, 189 (1990); *United States v.*

*Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).  The "good cause" or "fiduciary" exception is one

such ground for requiring production of otherwise privileged documents. *In re Dow Corning*

*Corp.*, 261 F.3d 280, 286 (2d Cir. 2001).[19]

51.    In *Garner*, the stockholders of a corporation alleged that corporate directors and

officers had engaged in securities fraud and other misconduct in connection with certain

transactions.   *Id.* at 1095.    The corporation refused on privilege grounds to provide

communications relating to the transactions, and the stockholders moved to compel. *Id.* at 1096.

---

[19] Privilege determinations in bankruptcy cases in a non-adversarial posture are governed by federal law. *See* Fed. R. Bankr. P. 9017; Fed. R. Evid. 501; *see, e.g.*, *In re China Med. Techs., Inc.*, 539 B.R. 643, 648 (S.D.N.Y. 2015).

The Fifth Circuit held that where fiduciaries are alleged to have acted "inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public" mean the privilege must be subject to the stockholder's right to "show cause why it should not be invoked." *Id.* at 1103-04.  As the *Garner* court held, it is "difficult to rationally defend the assertion of the privilege if all, or substantially all, [stakeholders] desire to inquire into the attorney's communications with corporate representatives."  *Id.* at 1101.

52.    When corporate entities like PPI become insolvent, creditors replace equity holders as the residual beneficiaries of the fiduciaries' duties, and succeed to the stockholder's right to show cause why the fiduciaries should not be permitted to invoke privilege under the circumstances.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007) (when corporation is insolvent, "its creditors take the place of the shareholders as the residual beneficiaries"); *Garner*, 430 F.2d at 1103-04.  And the good cause exception has been applied in bankruptcy cases, *e.g.*, *Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*, 342 B.R. 416, 424 (S.D.N.Y. 2006) (hereinafter "*G-I Holdings*") and in a wide variety of other contexts as well.  *See In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 97-99 (S.D.N.Y. 1993) (good cause exception applied in stock purchaser suit regarding litigation liability related to "90,000 asbestos-related cases"); *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 624 (E.D. Mo. 2000) (ERISA administrators and beneficiaries); *Quintel Corp., N.V. v. Citibank, N.A.*, 567 F. Supp. 1357, 1360-63 (S.D.N.Y. 1983) (bank acting as fiduciary in real estate transaction).

53.    The decision in *G-I Holdings* is apposite.  There, the debtor filed for chapter 11 voluntary reorganization "in the face of massive asbestos liabilities."  342 B.R. at 418.  A committee of asbestos tort creditors was appointed to pursue fraudulent conveyance and other claims relating to G-I's prepetition distribution of its most valuable asset to or for the benefit of

G-I's then equity owners through a spin-off transaction. *Id.* Applying the good cause exception, the SDNY bankruptcy court ordered G-I to produce categories of privileged documents identified by the creditors committee, including so that the creditors committee could evaluate claims that G-I carried out the challenged transaction "in good faith," and because the creditors committee represented G-I's "entire bankruptcy estate" in its effort to "set[] aside the transfers," and "because it is the beneficiary of the fiduciary duties owed by G-I's management." *Id.* at 424-425.

54.     "For simplicity of analysis," *G-I Holdings* followed the lead of a district court decision in grouping "the *Garner* factors into four broad categories:  (1) the discovering party's stake in the fiduciary relationship; (2) the apparent merits of the claim; (3) the need of the discovering party for the information; and (4) the nature of the communication itself." *Id.* at 424 (quoting *In re Pfizer Inc. Sec Litig.,* No. 90 Civ. 1260, 1993 WL 561125, at *13 (S.D.N.Y. Dec. 23, 1993)).  As discussed below, all of the factors referenced in *G-I Holdings* weigh in favor of disclosure here.

**(1)     Purdue's Creditors Are the Debtors' *Only* Stakeholders**

55.     The Debtors had no funded debt when they filed for bankruptcy, and the unsecured creditors whose interests the UCC represents therefore are the Debtors' sole stakeholders.  As in *Garner*, the estate claims the UCC is investigating through discovery would benefit all of those stakeholders equally, and would not be brought "on behalf of individual shareholders or claimants," a factor that causes courts to "bring a lesser degree of scrutiny to bear in determining whether good cause exists."  *See G-I Holdings*, 342 B.R. at 424-25.  Indeed, one court observed that where, as here, "unanimity or substantial unanimity exists … the [*Garner*] court suggested that the attorney-client privilege would be immediately overcome without further inquiry into

other elements of good cause." *Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480, 484, n.4 (E.D. Pa. 1978).[20]

(2)    **The Estate Claims Under Investigation Are Colorable**

56.    The standard for presenting a "colorable" claim is a "relatively easy one to make," and is satisfied where the proposed litigation will not be a "hopeless fling." *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns. Corp.)*, 330 B.R. 364, 376, 386 (Bankr. S.D.N.Y. 2005). ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ The UCC also has identified substantial evidence and information in support of key estates' claims, as briefly discussed below.

57.    ***Constructive fraudulent conveyance***.  The estates have the right to claw back the value of any transfers the Debtors made (i) in exchange for less than reasonably equivalent value (ii) while the Debtors were insolvent or that rendered the Debtors insolvent. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

58.    Regarding insolvency, the Debtors have resisted providing the UCC with the full additional "primary liability" discovery it sought.  However, the value of claims asserted against the Debtors are historically vast.  The States alone claim damages against the Debtors amounting to $630 billion dating from 2007-2019.  That sum does not count the damages alleged by all other public and private plaintiffs, and by itself would render the Debtors deeply insolvent even if

_____

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

discounted dramatically for litigation risk and the passage of time. *See In re W.R. Grace & Co.*, 281 B.R. 852, 869 (Bankr. D. Del. 2002) (assessing the debtor's solvency at the time of the fraudulent transfer and including future asbestos-related personal injury or property damage claims that had not yet been asserted against the debtor at the time of transfer). When other claims are included, the Debtors' total alleged liability is measured in the *trillions of dollars*. These facts easily meet the low standard necessary to show the estates' constructive fraud claims are colorable.

59.    ***Intentional fraudulent conveyance***. Transfers made with actual intent to hinder, delay, or defraud creditors are recoverable by the estates as fraudulent. It is unnecessary to prove that defrauding creditors was the *sole* motivation of the transferor; rather, a transfer is intentionally fraudulent if "at least one of the [transferor's] motives was an impermissible one." *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 n.8 (Utah 2020) (collecting cases); *In re Tronox Inc*., 503 B.R. 239, 278-79 (Bankr. S.D.N.Y. 2013) (collecting cases). As discussed above, evidence adduced by the UCC even through its incomplete investigation to date strongly suggests that the Sacklers' actions were motivated by the desire to transfer value out of Purdue and away from creditors as a result of the "uncapped nature" of Purdue's potential opioid liability.

60.    ***Breach of fiduciary duty***. The estate's breach of fiduciary duty claims are likewise colorable. Officers and directors of a corporate general partner like PPI owe fiduciary duties to the partnership, and PPLP's claims for breach of those duties belong to the estates. *Official Comm. of Unsecured Creditors v. Bay Harbour Mater Ltd. (In re BH S & B Holdings, LLC)*, 420 B.R. 112, 152 (Bankr. S.D.N.Y. 2009) ("The claim for breach of fiduciary duty is derivative under Delaware law, and constitutes property of the estate under 11 U.S.C. § 541."); *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997-98 (Del. Ch. 1981) (finding that "the fiduciary duty of fair dealing by a general partner to a limited partner is no less than that owed by a corporate director to a shareholder")

27

(quoting *Miller v. Schweickart*, 405 F. Supp. 366, 369 (S.D.N.Y. 1975)); *see also Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180-1181 (Del. Ch. 1999) (limited partners in partnership asserted direct claims against corporate general partner and its directors). Delaware law permits a partnership to limit the fiduciary duties of its general partner, but PPLP apparently did not do so until 2018. 6 Del. Code Ann. § 17-1101(d). ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

61.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Hurley Decl., Ex 90. As alleged above, Purdue likely was insolvent when the transfers were made, which by itself would subject those transfers to "entire fairness" review. *Cf. In re Tribune Co. Fraudulent Conv. Litig.*, No. 12 CV 2652 (DLC), 2019 WL 294807, at *12, *17 (S.D.N.Y. Jan. 23, 2019) ("[A] director of an insolvent corporation is interested in a transaction if he or she receives a personal benefit not shared by all of the insolvent corporation's creditors."). The Debtors' disclosure of additional merits documents responsive to the UCC's requests has been limited, as noted elsewhere, and 2004 discovery is still far from complete.

62.    Among other things, the UCC has not yet deposed any Debtor witnesses.

---

[21] ███████████████████████████████████████████████████████
███████████████████████████████ Among other things, much of the misconduct occurred while the 1997 LPA was still in effect, and no consideration was provided for the amendments in the 2018 LPA, which was executed when Purdue was almost certainly insolvent. *See* 11 U.S.C. § 548(b).

Moreover, some of the Sackler witnesses that have been deposed have exhibited an extraordinary lack of knowledge concerning basic facts relating to the family's enterprise. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Hurley Decl., 46 (I. Sackler Dep. 78:7-12). ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ Hurley Decl., Ex. 40, Ex. 43 (D. Sackler Dep. 156:5-157:21), Ex. 52; *see also* Official Committee of Unsecured Creditors' Mot. to Compel Prod. of Purportedly Privileged Docs., or for *In Camera* Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Docs. Identified on Logs are Privileged at 14-16 (detailing Baker roles).

63.    Nevertheless, credible allegations of mismanagement by Purdue's fiduciaries have been made, including in connection with their alleged failure to adequately monitor Purdue's compliance with the law in connection with its sale and marketing of opioids. The MDL plaintiffs specifically allege that Purdue's suspicious order monitoring ("**SOM**") system was not reasonably designed to detect suspicious orders and was "wholly inadequate to guard against diversion" because, among other things, it was controlled by sales and finance personnel and focused on financial considerations rather than the prevention of diversion. Hurley Decl., Ex. 92 at 37-40.

64.    The MDL plaintiffs also allege that Purdue had information in its possession that would have enabled it to prevent diversion—in the form of chargeback data from wholesalers and various types of prescriber-level information from internal and external sources—but that it failed to use this information to adequately identify, halt, and report suspicious orders.  Hurley Decl., Ex.

92 at 39-40, Ex. 93 at 31-32. These allegations and additional deficiencies in Purdue's SOM compliance are reflected in the MDL plaintiffs' expert report, which concluded that "Purdue Pharma did not maintain effective controls to prevent diversion, and did not maintain an adequate SOM program and failed to take reasonable steps to prevent its products from being diverted" Hurley Decl., Ex. 94 at 168.

65.    Such allegations support colorable claims for breach of fiduciary duty. *See Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, C.A. No. 2019-05470, 2020 WL 132752, at *9 (Del. Ch. Jan. 13 2020) (allegations that distributor's board failed adequately to monitor opioid sales and permitted corporation to violate law sufficient for "credible basis" showing); *In re McKesson Corp. Deriv. Litig.*, No. 17-cv-01850, 2018 WL 2197548, at *1 (N.D. Cal. May 14, 2018) (denying motion to dismiss complaint because plaintiffs alleged that directors and officers of a pharmaceutical distributor failed to implement either an effective suspicious order monitoring system or controls sufficient to alert them to the failures of their order monitoring system); *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 462-63 (S.D.N.Y. 2010) (denying motion to dismiss breach of fiduciary duty claims because plaintiffs alleged that directors and officers of a pharmaceutical manufacturer knew or should have known about but consciously failed to address misconduct relating to the promotion of its drugs).[22]

66.    In addition to civil claims, the United States is asserting very substantial liability for alleged criminal conduct that Purdue's fiduciaries failed to monitor or prevent. In its criminal

---

[22] Colorable claims of board misconduct are also amply demonstrated by the massive proofs of claim filed by the federal government in these cases. As reflected in its civil proof of claim, the United States is asserting civil claims against Purdue for single damages in the amount of $2.8 billion or in excess thereof, plus treble damages and penalties, for conduct occurring from 2010 through 2018. Hurley Decl., Ex. 95 (DOJ Civil Proof of Claim) at 3-4. These claims arise under the False Claims Act, among other causes of action, and relate to allegations that Purdue knowingly or recklessly caused the federal government to pay for prescriptions that were medically unnecessary and/or resulted from various types of unlawful kickbacks paid to physicians, specialty pharmacies, and an electronic health records vendor. *Id.* at 4-7.

proof of claim, the United States alleges conduct that it claims could result in a criminal fine of $6.2 billion or more, forfeiture of $3.5 billion or more, and an order of restitution for losses suffered by victims of such criminal conduct.  Hurley Decl., Ex. 96 (DOJ Criminal Proof of Claim) at 1-2. According to the government, the conduct in question potentially implicates a number of federal criminal laws, including the "anti-kickback violations (42 U.S.C. § 1320a-7b(b)), misbranding in violation of the Food, Drug, and Cosmetic Act (21 U.S.C. §§ 331, 333, 352, 353), conspiracy (18 U.S.C. § 371), and others." *Id.*  Such conduct also supports breach of fiduciary duty claims.  *See AmerisourceBergen*, 2020 WL 132752, at *21 (internal quotations and citations omitted) ("[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.").

### (3)    The UCC's Need for the Documents Is Manifest

67.    The UCC has a substantial and urgent need for the ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    *See, e.g.*, *RMED Int'l., Inc. v. Sloan's Supermarkets, Inc.*, 94 CIV. 5587PKLRLE, 2003 WL 41996, at *5 (S.D.N.Y. Jan. 6, 2003) ("The apparent necessity of the information and its availability from other sources is considered the most important factor and is stressed by courts when undertaking the Garner analysis."); *In re Int'l Bus. Machines Corp. Sec. Litig.*, No. 92 C 9076, 1993 WL 760214, at *5 (S.D.N.Y. Nov. 30, 1993) ("The fourth *Garner* factor, the necessity or desirability of plaintiffs having the information and its availability from other sources, is significant.").

68.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

69.    It is thus possible that the Sacklers *still* have copies of key privileged documents.

And of course, the Sacklers were Purdue board members until recently and therefore had access

to those documents at one time and likely were the authors or recipients of many of them.  ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

70.    ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████    In the latter scenario, a litigation trustee almost certainly

would have access to Purdue's privileged communications, including the Fiduciary Documents.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

### (4)    The Nature of the Documents Sought Also Counsels Disclosure

71.    The categories of documents the UCC seeks are consistent with the teachings of *Garner*. The UCC seeks documents "related to past" not "prospective actions," does not seek restructuring-related privileged documents, and has defined its categories carefully to encompass documents that are likely to be the most relevant to the estate claims the UCC is investigating. *See Garner*, 430 F.2d at 1104. Unfortunately, the UCC cannot identify with certainty all of the documents that fall within or outside of the defined categories, as the logs simply do not provide sufficient detail for that determination.[23] The UCC's reliance on categories—and ultimately on the Debtors, who have access to the contents of the withheld documents—is appropriate under the circumstances. *See, e.g.*, *Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*, No. 01 Civ 8539(RWS), 2006 WL 2883255, at *1 (explaining on rehearing that documents subject to motion "fell into five subject matter categories" identified by tort committee as important to claims); *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 569 (Del. Ch. 1998) (ordering production of categories of privileged documents based on good cause exception).

## B.    The UCC Is Entitled to the Crime-Fraud Documents

72.    The crime-fraud doctrine extinguishes any privilege or work product protection as to communications made in furtherance of a fraud or breach of fiduciary duty. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 319 F.R.D. 100, 109 (S.D.N.Y. 2017); *Galaxy CSI, LLC v. Galaxy Comput. Servs., Inc. (In re: Galaxy Comput. Servs., Inc.)*, No. 1:04-CV-00007, 2004 WL

---

[23] The UCC has done its best to identify specific documents by control number that the UCC believes may be within the identified categories. *See, e.g.*, Hurley Decl., Ex. 101. But given the limits of the logs, the UCC cannot be certain of those designations, and includes them solely for purposes of illustration and as an aid for the Court.

3661433, at *2 (E.D. Va. Mar. 31, 2004). The exception applies equally to claims of attorney-client privilege and work product immunity, and is designed to ensure that the "seal of secrecy" in otherwise privileged communications does not extend to communications made in furtherance of a fraudulent objective. *See United States v. Zolin*, 491 U.S. 554, 563 (1989); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) ("[A]dvice in furtherance of a fraudulent or unlawful goal . . . . is socially perverse, and the client's communications seeking such advice are not worthy of protection.") (citation omitted). Thus, "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933).

73.    The crime-fraud exception can be invoked in connection with claims for fraudulent transfer and breach of fiduciary duty, and applies to any communications "sought or rendered in furtherance of what is known or reasonably should be known to be unlawful conduct." *Irving Tr. Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983). The central focus in crime-fraud cases is whether a document or communication furthered a fraudulent objective. Thus, the crime-fraud exception may apply regardless of innocence of the participants—attorney or client. *Amusement Indus. Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) (crime-fraud exception applies "even if the attorney has no inkling that the matter he or she is working on involves any improper conduct"); *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 56 (S.D.N.Y. 1989) ("[L]egal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice."). Accordingly, while the UCC's crime-fraud arguments primarily concern a scheme by the Sacklers and non-Sackler Directors, they apply equally to any document custodian—including the Debtors. *See Duttle*, 127 F.R.D. at 56 ("[T]he ultimate perpetrator cannot insulate attorney-client

communications used to further his fraud by keeping other participants in ignorance.").

74.     A party seeking discovery under the crime-fraud exception must establish: (1) that "there is probable cause to believe that a crime or fraud has been attempted or committed"; and (2) "that the communications were in furtherance thereof." *Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107 (quoting *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)).  In civil actions, some courts articulate this standard as requiring "*substantial reason* to believe that [the party at issue] engaged in or attempted to commit a fraud and used communications with [her] attorney to do so." *See Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107 (emphasis in original).  In either case, however, it is "not an overly demanding standard." *Id.* (quoting *Amusement Indus.*, 293 F.R.D. at 427).

### (1)     Probable Cause to Believe a Crime or Fraud Has Been Committed

75.     "Probable cause" does not require the discovering party to actually prove a fraudulent objective, or even that a fraudulent objective is "more probable than not." *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039; *see also Amusement Indus.*, 293 F.R.D. at 426 ("Obviously, there need not be a 'definitive[]' showing of the fraudulent nature of the client's objective.") (citation omitted).  "[T]here need only be presented a reasonable basis for believing that the objective was fraudulent." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039.  Importantly, "[t]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause." *Amusement Indus.*, 293 F.R.D. at 427.

76.     The crime-fraud exception is properly invoked where communications relate to apparent fraudulent transfers and breaches of fiduciary duty. *See, e.g.*, *Sec. Investor Prot. Corp.*, 319 F.R.D. at 109 ("As the Trustee accurately observes, these intentional actions to hinder, delay, or defraud BLMIS's creditors arguably constitute fraudulent transfers under the Bankruptcy Code . . . which are themselves sufficient to trigger the crime-fraud exception.") (citation omitted); *In re Galaxy Comput. Servs.*, 2004 WL 3661433, at *2 ("The crime/fraud exception has been applied to

reach both fraudulent transfers in the bankruptcy context and breaches of fiduciary duty.")
(citations omitted).

77.    As noted elsewhere, the UCC accelerated the filing of this Motion based on the
Court's admonition at the July 23, 2020 conference to surface privilege disputes promptly.
Discovery is still far from complete, and the UCC suspects that Fiduciary Documents may provide
further evidence suggesting a fraud has been committed.  But even at this early stage, the UCC
adduced evidence that it believes in good faith meets the probable cause standard with respect to
both intentional fraudulent conveyance and breach of fiduciary duty.

78.    In *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), for example,
the district court found "probable cause" in connection with an intentional fraudulent conveyance
claim where the alleged privilege holder created and funded a trust "with actual intent to hinder,
delay, or defraud creditors."  In support of its finding, the *Shelton* court noted that the trust was
created when the privilege holder's companies were facing huge losses following exposure of a
fraudulent accounting scheme.  *Id.*  Over the course of several years, the privilege holder managed
to transfer $7.5 million worth of assets to the trust he created.  *Id.*  During that time, the privilege
holder also managed to go from holding his assets in a manner "totally exposed to claims of his
creditors" to having them almost completely shielded from creditors.  *Id.* at 405-06.  The court
ruled that these suspicious, albeit circumstantial facts (some of which were only before the court
by judicial notice), were enough to warrant application of the crime-fraud exception.  *Id.* at 406.

79.    As detailed above, the circumstances around the billions the Sacklers caused to
transfer to their trusts and foreign affiliates are substantially more compelling than those in *Shelton*,
and support a finding of probable cause.  This is particularly so because the UCC is not required
at this state of the proceedings to "prove" fraud, or even show that the validity of its claims is

"more likely than not." *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039.  Nor

must the UCC show that hindering or delaying Purdue's creditors was the *only* motive for the

transfers. *E.g. Jones,* 469 P.3d at 890, n.8.  The evidence here is more than sufficient to form a

"reasonable belief" that "at least one of the [Sackler's] motives was an impermissible one." *Id*;

*see also In re Tronox*, 503 B.R. at 278-79.

80.     The same evidence supports a breach of fiduciary duty claim against Purdue's

directors.  To the extent Purdue was insolvent at the time of any of the identified transfers, those

transactions would be materially self-interested, and sufficient by themselves to plead a breach of

the duty of loyalty. *In re Tribune*, 2019 WL 294807, at *17.  The board's management also resulted

in more than *$2 trillion* of claims being asserted against the Debtors, a fact which by itself supplies

a "reasonable basis for believing" the board failed to discharge its fiduciary duties. *See supra*, ¶¶

63-66; *AmerisourceBergen Corp.*, 2020 WL 132752, at *11, *19 (holding plaintiffs were entitled

to investigate whether company's fiduciaries breached their duties by consciously failing "to

establish and monitor the necessary information and reporting systems" which led to "a significant

corporate trauma, as evidenced by its recent offer . . . to pay $10 billion to settle with the state

attorneys general"); *see also* Section A(2), *supra* (describing additional allegations relating to

breach of fiduciary duty claims).

### (2)     Communications Reasonably Related to Fraud

81.     To be considered "in furtherance" of the fraud, an allegedly privileged

communication need only share a "purposeful nexus" with or be "reasonably relate[d]" to the

fraudulent conduct. *Amusement Indus.*, 293 F.R.D. at 427 (internal quotations omitted).  The UCC

has identified the categories of documents that the UCC suspects have been withheld and are

reasonably related to the fraudulent schemes. *See* Hurley Decl., Ex. 101.  The UCC also has

identified certain illustrative log entries that the believes may come within the identified

categories, but its ability to do so was greatly limited by the vague nature of many of the descriptions on the logs.[24]

## C.    The At-Issue Documents Should Also Be Produced

82.    As referenced above, on November 25, 2019, the two sides of the Sackler family provided written and oral presentations ("Presentations") in which they identified "the defenses that [they] intend to make with regard to any and all causes of action that have been or may be asserted against them."  *See* Hurley Decl., Ex. 72 (Side A presentation), Ex. 58 (Side B presentation); *see also* Motion to Allow/Motion to Make Publicly Available the Raymond Sackler Family's Presentation of Dec. 6, 2019 [ECF No. 685] (withdrawn).  The Presentations included assertions putting "at issue" communications with counsel.

83.    The Sacklers made clear in their presentations that their own alleged "good faith," knowledge and state of mind will be central to their defenses in these cases.  ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ Hurley Decl., Ex. 58 at 488. ███████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ Hurley Decl., Ex. 72 at 67-68; *see also*

Hurley Decl., Ex. 58 at 470 ███████████████████████████████████████

██████████████████████████████████████████

84.    Regarding primary liability, the Sacklers claim the board acted at all times in the

---

[24] The UCC of course lacks access to the withheld documents themselves, so only the withholding parties ultimately can ensure that they produce or make available for inspection the correct universe of documents that are within the identified categories.

[25] The Sacklers base their argument on a misinterpretation of the law of New York, which does not apply to the estates' fraudulent conveyance claims, but the UCC must nevertheless prepare to meet that argument head-on.

good faith belief that they were doing nothing wrong. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Hurley Decl., Ex. 58 at 29-50.

85.    Having put at issue their knowledge and states of mind concerning questions of liability and other matters, the Sacklers must disclose related communications that might otherwise have been deemed privileged.  "[A] party may not assert that it believed its conduct was lawful, and simultaneously claim privilege to block inquiry into the basis for the party's state of mind or belief." *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936, 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011).    As such, a party waives privilege when he puts privileged communications "at issue" by asserting a claim or defense "that in fairness requires examination of protected communications."  *Id.*  Whether fairness requires disclosure is decided on a case-by-case basis.  *In re Grand Jury Proceedings*, 219 F.3d 175, 182-83 (2d Cir. 2000).  The "at issue" doctrine applies to both attorney-client privileged and attorney work product documents.  *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 511 (S.D.N.Y. 2002).

86.    In *Arista Records*, a copyright infringement damages proceeding, the defendant claimed his decision to transfer assets from his corporation into family limited partnerships was not intended "to avoid any potential legal exposure from being sued" for infringement.  2011 WL 1642434, at *1.  He went on to claim that "he did not believe that [his company] … would be sued for copyright infringement" at the time of the transfers, and that the transfers therefore could not have been motivated by fraud.  *Id.*  The court held that the defendant could not argue that he "acted in good faith and without an improper motive," and at the same time deny "access to the advice

given by counsel," even though defendant did not expressly invoke reliance on counsel." *Id.* at *2.

87.    Indeed, where a party puts at issue its "state of mind, such as [its] good faith belief in the lawfulness of his conduct," the party must disclose related communications with counsel regardless of whether the party explicitly relied on an advice of counsel defense because such communications "may well demonstrate the falsity of its claim." *Id.* at *3 (citation and internal quotation omitted). Even if the party did not rely on counsel at all, the discovering party "still would be entitled to know if [the withholding party] ignored his counsel's advice." *Id.*; *see also Bank Brussels Lambert*, 210 F.R.D. at 510 ("Under this standard, a party does not have to expressly state that it relied on any advice from his attorney.").

88.    As discussed above, the Sacklers have put their communications with counsel at issue by explicitly and implicitly putting their knowledge and good faith at issue. Though unnecessary to trigger waiver, Side B actually references legal advice expressly in connection with its good faith defense. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████. Hurley Decl., Ex. 58 at 37-38. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████    Hurley Decl., Ex. 58 at 493; *see also* Hurley Decl., Ex. 72 at 67-68. Related communications with counsel must therefore be produced. *See, e.g., Hartford Fire Ins. Co. v. CMC Constr. Co., Inc.*, No. 3:06-CV-11, 2010 WL 11520219, at *4 (E.D. Tenn. Apr. 20, 2010) (defendant implicitly waived attorney-client privilege by asserting "she simply followed [counsel's] advice when she made the transfers at issue" and therefore could not have had "actual

intent to hinder, delay, or defraud").

## COMPLIANCE WITH RULES

89.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. The UCC submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## NOTICE

90.    Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion.  The UCC respectfully submits that no further notice is required.

## NO PRIOR REQUEST

91.    No prior request for the relief sought in this Motion has been made.

## RESERVATION OF RIGHTS

92.    The UCC and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Motion, to seek additional discovery, add additional parties, or to raise additional grounds for granting this Motion during any reply briefing or hearing on the Motion.

## CONCLUSION

93.    For the foregoing reasons the UCC respectfully asks the Court to grant the Motion in full, and to order the Debtors and the Sacklers to (i) produce the Challenged Documents and/or (ii) provide the Challenged Documents to the Court or a Special Master for *in camera* review.  The NCSG supports the relief requested herein.

REDACTED

New York, New York                          AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  September 29, 2020

By: /s/ *Mitchell P. Hurley*                        

    Ira S. Dizengoff
    Arik Preis
    Mitchell P. Hurley
    Joseph L. Sorkin
    Sara L. Brauner
    One Bryant Park
    New York, New York 10036
    Telephone: (212) 872-1000
    Facsimile: (212) 872-1002
    idizengoff@akingump.com
    apreis@akingump.com
    mhurley@akingump.com
    jsorkin@akingump.com
    sbrauner@akingump.com

    *Counsel to the Official Committee of Unsecured
    Creditors of Purdue Pharma, L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER GRANTING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED
DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME
FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

Upon the Motion to Compel Production of Purportedly Privileged Documents, or for

*In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Privilege,

dated September 29, 2020 (the "**Motion**"), of the Official Committee of Unsecured Creditors

(the "**UCC**") of Purdue Pharma L.P. and its affiliated debtors and debtors in possession

(collectively, the "**Debtors**"); and upon all papers filed in connection with the Motion; and

upon the record of the hearing held by the Court on October 28, 2020, and all objections to

the Motion having been withdrawn or overruled; and the Court having jurisdiction over the

Motion pursuant to 28 U.S.C. § 1334(a); and the venue of these chapter 11 cases and the

Motion being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Motion

being a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having authority to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

enter a final order with respect to the Motion; and no additional notice being required except

as provided herein; and, after due deliberation and good and sufficient cause appearing; now,

therefore,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED.

2.    The Sacklers (as defined in the Motion) and the Debtors are hereby ORDERED to

produce, or in the alternative provide for *in camera* review, all documents that have been

withheld, or may be withheld, within the Challenged Document categories.

3.    Specifically, the Sacklers and the Debtors are ORDERED to produce, or in the

alternative provide for *in camera* review, all Challenged Documents that have been withheld, or

may be withheld, on the basis of the privileges abrogated by this order in the following categories:

    a.  <u>Challenged Documents subject to the Good Cause Exception for Privilege Claims
Belonging to the Debtors include documents from January 1, 2006 to the present
concerning:</u>

       i.  The Debtors' financial condition, including as a result of actual or
potential opioid-related liability due to improper sales and marketing of
opioids or otherwise, and Debtors and/or the Sacklers awareness of the
same;

      ii.  Knowledge of actual or potential opioid claims, investigations, damages,
litigation, and other opioid related risks;

     iii.  The Debtors' failed attempts to procure products insurance and director
and officer insurance;

     iv.  The propriety, or not, of causing Purdue to make cash and non-cash
transfers to or for the direct or indirect benefit of the Sacklers, and any
related discussion or analysis concerning fiduciary duties, solvency,
fraudulent conveyance, illegal dividends, and other liability or other legal
risks actually or potentially attendant to such transfers;

      v.  The degree to which liability risks would or might persist notwithstanding
the 2007 settlements with the United States Department of Justice and
certain states;

     vi.  Whether Purdue received adequate value in exchange for non-cash
transfers it made to the IACs  and otherwise for the direct or indirect
benefit of the Sacklers, including under the OxyContin license agreements

with the IACs and Purdue's transfer of Lucien to the Sacklers in 2010;

    vii.  Any whistleblower or similar activity concerning Purdue's sale and marketing of opioids; and

    viii.  Liability risks associated with cash transfers versus risks associated with non-cash transfers, and liability risks associated with transfers directly to or for the benefit of the Sacklers' trusts versus risks associated with transfers to or for the benefit of IACs or other entities directly or indirectly owned by the Sacklers.

  b.  <u>Challenged Documents subject to the Crime-Fraud Exception for Privilege Claims Belonging to the Sacklers or the Debtors include documents from January 1, 2006 to the present concerning:</u>

    i.  The Sacklers' asset protection and estate planning measures to transfer funds to trusts and other assets with "limited transparency" and/or "jurisdictional shielding" from creditors relating to the Sacklers' and Purdue's liability;

    ii.  Whether cash or non-cash transfers to the Sacklers were, or were not, at risk of being deemed fraudulent transfers;

    iii.  Whether, and/or how, opioid litigants could collect, or be prevented from collecting, a potential judgment against the Sacklers, their trusts and other affiliates and assets (even if the Sacklers' motive to obscure assets was unbeknownst to the lawyer providing the advice);

    iv.  Purdue's potential liability, or the Sacklers' (or any of their advisors') potential liability, related to breaches of fiduciary duty and other misconduct, and any efforts to conceal such conduct or breaches of duty;

    v.  The formation, governance and management of the Sacklers' trusts, including whether trusts were created or modified, or transfers made among trusts, for the purpose of delaying or hindering creditors, and whether purportedly discretionary trusts are operated in a manner consistent with that claimed status;

    vi.  The appropriate amount, and mechanics for, distributions to the Sacklers to avoid tracing or liability (including fraudulent transfer liability); and

    vii.  Non-cash transfers to entities the Sacklers controlled for less than reasonably equivalent value to Purdue, including but not limited to:

        1.  Royalties from international sales of OxyContin by the IACs,
        2.  Transfer of non-ADF OxyContin IP rights from PPLP to PRA LP,
        3.  Transfer of PPLP's equity interest in Infinity Pharmaceuticals Inc. to PRA LP,
        4.  Transfer of PPLP's equity interest in Lucien Holdings Sarl to PRA LP,
        5.  PPLP's transfer of equity interest in New Suffolk Holdings LLP to PRA LP, or

3

     6.  PPLP transfer of equity interests in Millsaw Realty L.P. to PRA LP.

c.  <u>Challenged Documents subject to the At-Issue Exception for Privilege Claims Belonging to the Sacklers include documents from January 1, 2006 to the present concerning:</u>

    i.  The Sacklers' claim of the board(s)' alleged "good faith" belief that Purdue's marketing and sales practices with respect to opioids were compliant with applicable laws and regulations;

    ii.  The Sacklers' claim of an alleged "good faith" belief that Purdue did not face significant litigation risk related to opioids prior to 2017, including attempts by the Debtors to procure products insurance and director and officer insurance;

    iii.  The Sacklers' alleged "good faith" belief and/or reliance on counsel with respect to the propriety of cash and non-cash distributions or transfers to the Sacklers and whether such transfers or distributions presented a risk of being deemed fraudulent transfers.

White Plains, New York

Dated: _____       _____
                          THE HONORABLE ROBERT D. DRAIN
                          UNITED STATES BANKRUPTCY JUDGE