

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   January 24, 2020

17                   10:29 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  SHEA

Page 2

1    HEARING re Motion to Extend Exclusivity Period for Filing a

2    Chapter 11 Plan and Disclosure Statement /Motion of Debtors

3    for Entry of an Order Extending the Exclusive Periods within

4    which to File a Chapter 11 Plan and Solicit Acceptances

5    Thereof

6

7    HEARING re Motion of Debtors for Entry of an Order

8    Authorizing (I) Debtors to (A) Pay Pre-Petition Wages,

9    Salaries, Employee Benefits and Other Compensation and (B)

10   Maintain Employee Benefits Programs and Pay Related

11   Administrative Obligations, (II) Employees and Retirees to

12   Proceed with Outstanding Workers' Compensation Claims and

13   (III) Financial Institutions to Honor and Process Related

14   Checks and Transfers (ECF 6)

15

16   HEARING re Objection of UST (ECF 134)

17

18   HEARING re Nevada Counties and Municipalities' Joinder to

19   the Objection of UST (ECF 190)

20

21   HEARING re The Commonwealth of Pennsylvania's Joinder to the

22   Objection of the UST (ECF 190)

23

24   HEARING re Joinder/Objection of the Ad Hoc Group of Non-

25   consenting States (ECF 197)

Page 3

1    HEARING re Joinder of the State of Arizona to the Objection

2    of the UST (ECF 201)

3

4    HEARING re Letter of Linda A. Lacewell, Superintendent of

5    New York State Department of Financial Service Re: Request

6    Payments to Purdue Pharma Employees (ECF 99)

7

8    HEARING re UST's Objection (related document(s)6) filed by

9    Paul Kenan Schwartzberg on behalf of United States Trustee

10   (ECF 134)

11

12   HEARING re Nevada Counties and Municipalities' Joinder to

13   (related document(s) 134) filed by Vadim J. Rubinstein on

14   behalf of Nevada Counties and Municipalities (ECF 190)

15

16   HEARING re Objection to Motion (related document(s)6) filed

17   by Melissa L. Van Eck on behalf of Commonwealth of

18   Pennsylvania (ECF 196)

19

20   HEARING re Joinder/Objection by the Ad Hoc Group of Non-

21   Consenting States (related document(s)6) filed by Andrew M.

22   Troop on behalf of Ad Hoc Group of Non-Consenting States

23   (ECF 197)

24

25

Page 4

1  HEARING re Joinder/Objection with the United States Trustee

2  (related document(s)6) filed by Seth Adam Meyer on behalf of

3  State of Arizona (ECF 201)

4

5  HEARING re Letter of Superintendent Linda A. Lacewell, Filed

6  by Nicolas G. Keller on behalf of New York State Department

7  of Financial Services (ECF 99)

8

9  HEARING re Response regarding severance for former Purdue

10 Pharma LP employees (related document(s)6, 62) filed by Dan

11 Colucci (ECF 103)

12

13 HEARING re Letter to Judge Drain from former employee and

14 unemployment benefits Filed by John Taormina (ECF 327)

15 STATEMENT OF THE AD HOC GROUP OF NON-CONSENTING STATES

16 MAINTAINING ITS OBJECTION TO PURDUES WAGE MOTION INSOFAR AS

17 IT RELATES TO PURDUE CEO CRAIG LANDAU (related document(s)6)

18 filed by Andrew M. Troop on behalf of Ad Hoc Group of Non-

19 Consenting States (ECF 557)

20

21 HEARING re Statement State of Maryland's Additional

22 Statement With Respect to the Payment of Bonuses Under

23 Debtors' Wage Motion to Any Recipient Who Participated in

24

25

1    HEARING re Debtors' Unlawful Conduct (related document(s)6)

2    filed by Brian Edmunds on behalf of State Of Maryland (ECF

3    559)

4

5    HEARING re Debtors' Motion for Entry of an Order (I)

6    Establishing Deadlines for Filing Proofs of Claim and

7    Procedures Relating Thereto, (II) Approving the Proof of

8    Claim Forms, and (III) Approving the Form and Manner of

9    Notice Thereof filed by James I. Mcclammy on behalf of

10   Purdue Pharma L.P. (ECF 717)

11

12   HEARING re Debtors' Memorandum of Law in Support of Motion

13   for Entry of an Order (I) Establishing Deadlines for Filing

14   Proofs of Claim and Procedures Relating Thereto, (II)

15   Approving the Proof of Claim Forms, and (III) Approving the

16   Form and Manner of Notice Thereof (related document(s)717)

17   filed by James I. McClammy on behalf of Purdue Pharma L.P.

18   (ECF 718)

19

20   HEARING re Objection to Motion Limited Objection and/or

21   Conditional Consent with Reservation of Rights of the NAS

22   Children AD HOC Committee to Motion of Debtors for Entry of

23   Order (i) Establishing Deadlines for Filing Proofs of Claim

24   and Procedures Relating Thereto, (ii) Approving Proof of

25   Claim Forms and (iii) Approving the Form and Manner Thereof

Page 6

1    (related document(s)717) (ECF 757)

2

3    HEARING re Statement and Reservation of Rights of the

4    Official Committee of Unsecured Creditors in Respect of the

5    Debtors' Motion for Entry of an Order (I) Establishing

6    Deadlines for Filing Proofs of Claim and Procedures Relating

7    Thereto, (II) Approving the Proof of Claim Forms, and (III)

8    Approving the Form and Manner of Notice Thereof (related

9    document(s)717) filed by Ira S. Dizengoff on behalf of The

10   Official Committee of Unsecured Creditors (ECF 763)

11

12   HEARING re Motion for Relief from Stay filed by George

13   Calhoun IV on behalf of Ironshore Specialty Insurance

14   Company (ECF 712)

15

16   HEARING re Debtors' Objection to TI G's Motion for Relief

17   from the Automatic Stay (ECF 753)

18

19   HEARING re Objection of the Official Committee of Unsecured

20   Creditors to the Motion of Ironshore Specialty Insurance

21   Company for Relief from Automatic Stay and Joinder to the

22   Debtor's Objection to Such Motion (related document(s)753,

23   712) filed by Ira S. Dizengoff on behalf of The Official

24   Committee of Unsecured Creditors (ECF 756)

25

1    HEARING re Ad Hoc Committees Statement in Support of Debtors

2    Objection to TIGs Motion for Relief From the Automatic Stay

3    (ECF 757)

4

5    HEARING re Limited Objection and/or Conditional Consent with

6    Reservation of Rights of the NAS Children AD HOC Committee

7    (ECF 754)

8

9    HEARING re Notice of Agenda / Agenda for January 24, 2020

10    Omnibus Hearing

11

12

13

14

15

16

17

18

19

20

21

22    Transcribed by:  Sonya Ledanski Hyde

23

24

25

1   A P P E A R A N C E S :

2

3   AKIN GUMP STRAUSS HAUER & FELD LLP

4       Attorneys for

5       One Bryant Park

6       New York, NY 10036

7

8   BY:  SARA L. BRAUNER

9       ANIK PREIS

10      MITCHELL HURLEY

11      JAMES SALWEN

12

13  CAPLIN & DRYSDALE

14      Attorneys for Multi-State Governmental Entities Group

15      One Thomas Circle, NW, Suite 1100

16      Washington, DC 20005

17

18  BY:  KEVIN C. MACLAY

19

20  PILLSBURY WINTHROP SHAW PITTMAN LLP

21      Attorneys for Ad Hoc Group of Non-Consenting States

22      31 West 52nd Street

23      New York, NY 10019

24

25  BY:  ANDREW M. TROOP

Page 9

```
 1    IFRAH LAW

 2         Attorneys for Ironshore Specialty Insurance Co. f/k/a

 3         TIG Specialty Insurance Company

 4         1717 Pennsylvania Avenue, NW, Suite 650

 5         Washington, DC 20006

 6

 7    BY:  GEORGE CALHOUN

 8

 9    MARTZELL, BICKFORD & CENTOLA

10         338 Lafayette Street

11         New Orleans, LA 70130

12

13    BY:  SCOTT R. BICKFORD

14

15    BROWN RUDNICK LLP

16         Attorneys for Ad Hoc Committee of Consenting

17         Governmental Entities

18         7 Times Square

19         New York, NY 10036

20

21    BY:  DAVID MOLTON

22

23

24

25
```

Page 10

```
 1   DAVIS POLK & WARDWELL LLP

 2        Attorneys for the Debtors

 3        450 Lexington Avenue

 4        New York, NY 10017

 5

 6   BY:  JAMES I. MCCLAMMY

 7        MARSHALL HUEBNER

 8

 9   KRAMER LEVIN NAFTALIS & FRANKEL LLP

10        Attorneys for Ad Hoc Committee of Consenting

11        Governmental Entities

12        1177 Avenue of the Americas

13        New York, NY 10036

14

15   BY:  KENNETH H. ECKSTEIN

16

17   MILBANK, TWEED, HADLEY & MCCLOY LLP

18        Attorneys for Raymond Sudder Family

19        28 Liberty Street

20        New York, NY 10005

21

22   BY:  GERARD UZZI

23

24

25
```

Page 11

1    DEBEVOISE & PLIMPTON LLP

2         Attorneys for Beacon Company

3         919 Third Avenue

4         New York, NY 10022

5

6    BY:  JASMINE BALL

7

8    GILBERT LLP

9         Attorneys for Consenting Government Entities

10        1100 New York Avenue, NW, Suite 700

11        Washington, DC 20005

12

13   BY:  KAMI E. QUINN

14

15   KELLER LENKNER

16        Attorneys for Arizona

17        150 N. Riverside Plaza, Suite 4270

18        Chicago, IL 60606

19

20   BY:  SETH A. MEYER

21

22

23

24

25

Page 12

1   COMMONWEALTH OF PENNSYLVANIA

2        Attorney for the Commonwealth of Pennsylvania

3        Financial Enforcement Section

4        Strawberry Square, 15th Floor

5        Harrisburg, PA 17120

6

7   BY:  MELISSA L. VAN ECK

8

9   STATE OF NEW YORK

10        Office of the Attorney General, Letitia James

11        Counsel for Opioids and Impact Litigation

12        Executive Division

13        28 Liberty Street

14        New York, NY 10005

15

16   BY:  DAVID E. NACHMAN

17

18   ALSO PRESENT TELEPHONICALLY:

19

20   JUSTIN ALBERTO

21   MICHAEL BAIRD

22   AGUSTINA BERRO

23   MICHELLE BURKART

24   ROBERT P. CHARBONNEAU

25   HEATHER M. CROCKETT

1    PETER C. D'APICE

2    WHITNEY FOGELBERG

3    CAROLINE F. GANGE

4    ERIC M. GOLD

5    TRICIA HERZFELD

6    JEREMY HILL

7    JEREMY C. KLEINMAN

8    MARK LIGHTNER

9    EDAN S. LISOVICZ

10   JOHN LONGMIRE

11   ERIC J. MALONEY

12   BRIAN MASUMOTO

13   ANNA MCDERMOTT

14   PATRICK MOHAN

15   GEOFF MULVIHILL

16   S. MICHAEL MURPHY

17   ROBERT P. PADJEN

18   DARREN L. PATRICK

19   MICHAEL PERA

20   CHRISTOPHER L. PERKINS

21   DANIEL PORAT

22   JEREMY W. RYAN

23   PAUL SCHWARTZBERG

24   CATRINA SHEA

25   ARTEM SKOROSTENSKY

Page 14

1    RYAN SLAUGH

2    TRUDY SMITH

3    CLAUDIA SPRINGER

4    ABIGAIL R. WOLF

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 15

1                  P R O C E E D I N G S

2           THE COURT:  Okay, good morning.  In re. Purdue

3      Pharma.

4           MR. HUEBNER:  Good morning, Your Honor.  For the

5      record, I am Marshall Huebner of Davis, Polk & Wardwell,

6      LLP, here on behalf of the Debtors.  Your Honor, let me

7      begin by wishing you a happy new year.  We have not seen you

8      since December.

9           THE COURT:  And happy Chinese New Year.

10          MR. HUEBNER:  And, you know, a few weeks have

11     passed; hopefully, everybody got a little bit of time off

12     with family and friends.

13          Your Honor, let me begin with what I hope is

14     another is another meaningful and positive progress report

15     with six or so, hopefully, very positive updates that I will

16     tick through very quickly.

17          Number one, as I think chambers knows because we

18     submitted it under a certificate of no objection -- praise

19     the Lord, the protective order appears to be done.  I won't

20     actually spend any more time describing the endless complex

21     multi-party conversations that went into it, except to note

22     that it now appears to have one universal claim, and it's an

23     important step.  Many parties have been operating as if it

24     were already in effect, knowing that its terms were largely

25     baked a while ago, but the devil -- quite a few devils were

Page 16

1    in the final details.  And unless the Court has concerns or

2    comments on it, hopefully, we can check the box on that

3    important document.

4              THE COURT:  So when do you expect to send that to

5    chambers?

6              MR. HUEBNER:  I believe we sent it earlier this

7    week, and it could have been entered as early as yesterday.

8    Now we're just waiting for the Court to enter it.  But yet,

9    the Court looks puzzled.

10             THE COURT:  Could you resend it?  I actually -- I

11   was in court most of the day yesterday, but I just didn't

12   register it coming in.

13             MR. HUEBNER:  Sure.

14             THE COURT:  You know, I would have I think because

15   it's an important step.

16             MR. HUEBNER:  We will do so forthwith.

17             THE COURT:  Okay, thank you.

18             MR. HUEBNER:  Two, Your Honor, I also have what I

19   hope is a very positive report on the monitor.  As, of

20   course, the Court knows because it was the Court's own idea

21   that having a monitor would be helpful, despite the fact

22   that the company stopped promoting opioids and has not

23   actually had a sales force and has, I think, a 15-page or so

24   single-spaced self-injunction, that nonetheless is yet an

25   additional step that the company would hire a monitor.

Page 17

1           The way the order entered on the injunction worked

2     was that the company would hire the monitor, but would

3     consult with the states and the creditors' committee as part

4     of doing so.  I think it's fair to say that we went way, way

5     beyond what the order required in terms of consulting.  We

6     actually considered candidates that were brought to us by

7     creditor constituencies, alongside candidates that we

8     identified ourselves.

9           Multiple creditor representatives actually fully

10    participated alongside us in the interviews of the monitors,

11    and it would be an understatement to say that we ultimately

12    took the views of the creditors very, very heavily into

13    account in making our selection, which happened yesterday.

14    We're not yet ready to announce the name because we now need

15    to talk about conflicts and contracts and structure and the

16    exact mechanics.  I am hopeful that the Court will find that

17    the august personage that we are very excited to have

18    alighted upon will be acceptable to everybody.

19           But that was also a long road; it's not the simple

20    thing.  And, you know, as your Court knows from other cases,

21    monitors can get very complex and grow far beyond the

22    original bounds and sometimes, frankly, you know, there are

23    non-trivial issues.  We very much hope that we will avoid

24    all that in part by having been, I think, unusually

25    thoughtful and open on the front end and pick someone of we

Page 18

1    think great reputation and integrity.

2         THE COURT:  Okay, thank you.

3         MR. HUEBNER:  Item three is the emergency relief

4    fund, which, candidly, for, you know, my personal liking

5    continues to move more slowly than I would like.  You know,

6    we had originally hoped, I think, to have the motion to

7    bring to the Court by January or February at the latest.  I

8    actually am hopeful that we're still on track for February;

9    let's have the motion.  This was a big week in the life of

10   the emergency relief fund because there are now robust

11   detailed fully articulated proposals that have now been

12   shared among the states, the UCC, and the Debtors.

13         There's definitely going to be more work to do on

14   kind of a reconciliation process to get down to something

15   that hopefully will work for those parties, but a lot of

16   work has been done and a structural step sort of was

17   achieved this week with proposals now in front of people.

18   And we hope to progress that because, as we note at every

19   hearing, you know, every day that goes by with all of our

20   cash sitting in the bank account and not saving lives is

21   another day that, you know, harm could have been avoided and

22   was not.

23         So we're cracking the whip, sort of as we know

24   how, but, obviously, there are a lot of parties.  It's very

25   complicated, it's a lot of money, it's unusual relief, you

Page 19

1    know, and it just -- it is not a simple thing, to say it

2    like that.

3              THE COURT:  Okay.

4              MR. HUEBNER:  Item number four is shareholder and

5    IAC diligence.  So just to report to the Court, as the Court

6    probably wouldn't remember because the Court probably has

7    about a thousand cases, we did a tripartite stipulation very

8    early in the case with the Debtors, the UCC, and the

9    shareholders that contemplated, and was later amended to add

10   more things, including a series of deliverables and

11   presentations in the month of January.  Those happened;

12   there were very large meetings that included representatives

13   from various parties, detailed presentations were made on

14   various topics, information was given; that also is sort of

15   ticking along.

16             Let me be very clear: that is not to remotely

17   suggest at all -- at all -- that the Debtors, the UCC, or

18   any of the stakeholders are anywhere near done.  In

19   connection with the diligence and information flow and

20   questions and analysis, there is a gargantuan amount still

21   in front of us before people, you know, would be comfortable

22   or make their final decisions on the ultimate disposition of

23   that side of this case.  But so far, we have not fallen off

24   track in terms of the things that we're required.

25             And to the family and shareholders' credit, you

1   know, a fair amount was delivered and presented; that, of

2   course, has led to many more things that were on the list

3   before and there are many requests pending and discovery

4   letters and things like that.  But, you know, it's -- it is

5   proceeding, and I thought that was worth mentioning as well.

6          Which segues to what is actually both the first

7   agenda item and the fifth, I guess, sort of piece of

8   positive news, which is exclusivity, which I hope to cover

9   in a grand total of 25 seconds.  Exclusivity is totally

10  uncontested.  There were neither formal nor informal

11  objections, and we ask that the relief that we requested be

12  granted.

13         Obviously, this is a case of extraordinary

14  complexity.  And I hope that if the Court sees, you know,

15  among the things that the Court sees are that we are working

16  day and night and night and day to build a consensus and try

17  to be good stewards for the estate to maximize its value and

18  help Purdue and the resources that will become available

19  through it do good in the world.

20         And I don't think I need to walk through the

21  motion.  It's a relatively standard motion; we ask for 180

22  days.  Seemingly, no one in the entire case objects, which I

23  actually take as a small point of pride, and we ask that the

24  order be entered.

25         THE COURT:  Okay.  And I'll take your introductory

Page 21

1    remarks as supplementing the record on exclusivity as well

2    on the request to extend it.  And before dealing with that

3    motion, I'm not inviting long or even any further

4    statements, but does anyone have anything further to say on

5    the introductory remarks that Mr. Huebner went through?

6           Okay.  I've reviewed the exclusivity extension

7    motion, which was timely filed.  As you say, it's unopposed.

8    And based on that, as well as my review and understanding

9    where the case stands, I'll grant the motion.  The Debtors

10   have clearly shown sufficient cause for the requested

11   extension, so you can email that order to chambers.

12          MR. HUEBNER:  Thank you, Your Honor.  Number six

13   is a similar, and this is why I will be turning the podium

14   over.  Number six is another, I think, just fantastic news

15   report, which is the second agenda item on the -- second

16   item on the agenda, which is the bar date.

17          Jim McClammy, my partner who will be up in here in

18   just a minute, Your Honor, you know, may actually end up

19   getting canonized for his work -- it's true, don't laugh,

20   it's actually literal truth -- for reconciling the endlessly

21   and often diametrically opposed views of an incredible

22   number of parties in this case, many of whom had a lot at

23   stake and extremely passionate views that often, frankly,

24   were just in direct contradiction of other peoples' views

25   that were equally strongly held.

Page 22

1          Somehow he has actually gone through the

2     labyrinth, and I believe that we are ready to present, you

3     know, what may end up being maybe even the, but let's just

4     say one of the most complex, intricate, and detailed

5     noticing and bar date motions and orders yet presented.  Let

6     me turn the podium to Mr. McClammy to explain what needs to

7     be done and, hopefully, get that order entered as well.

8               THE COURT:  Okay.

9               MR. MCCLAMMY:  Good morning, Your Honor.

10              THE COURT:  Good morning.

11              MR. MCCLAMMY:  Jim McClammy from Davis, Polk &

12     Wardwell on behalf of the Debtors.  Had not come here this

13     morning expecting to hear that I might be canonized.

14              THE COURT:  Well, I don't think that I know of any

15     saint whose first name is Jay, but that's okay.

16              MR. MCCLAMMY:  But, Your Honor, as mentioned, I'm

17     here to present on the bar date motion that we filed on

18     January 3rd.  With me in Court today from Davis, Polk are my

19     capable colleagues, Jacquelyn Knudson and Esther Towns, who

20     also worked tirelessly on this motion, as well as Shai

21     Waisman and Jeanne Finegan from Prime Clerk, our noticing

22     agent who will be running with this program going forward.

23              The relief that we're seeking today, Your Honor,

24     is the establishment of a bar date for the filing of proofs

25     of claims in these cases; that would be June 30th of 2020 as

Page 23

1    the general bar date.  Relief of proving the Debtors'

2    proposed proof of claim forms, including three proof of

3    claim forms specifically tied to people that would be filing

4    claims related to the opioid crisis.  There would be a form

5    proposed for personal injury claimants; a form proposed for

6    governmental entities; and then a general opioid claim form

7    for, you know, private individuals or companies that may

8    think that they have claims that are tied to opioid-related

9    issues, but not falling into the governmental or personal

10   injury group; and then a non -- just general claim form for

11   all other claims.

12          This process really, I think, is truly a testament

13   to the ability of the parties with divergent interests to

14   both advocate, but also to find common ground, and to work

15   in a way that produces an end result that was even better

16   than had been originally proposed.

17          So for that, the Debtors are very thankful for the

18   constructive involvement of the creditors' committee, the

19   multistate governmental entity group, the ad hoc committee

20   of governmental and other contingent litigation claimants,

21   the ad hoc for the non-consenting states, the ad hoc

22   committee of NAS babies, the ad hoc group of hospitals, and

23   also for the involvement of the Department of Justice in

24   connection with the negotiation and revisions to the order

25   that we will be presenting today.

Page 24

1          With all of that, Your Honor, there are

2     essentially no objections remaining to the entry of the

3     order today.  You will see that there have been some

4     reservations of rights that have been presented.  And I

5     think at this point in time, Your Honor, most of them are

6     tied to see how the program is working kind of going

7     forward.

8          And I think one of the reasons for that is what we

9     were working on as the Debtors going into this motion from

10    the very beginning is, this is an amazingly comprehensive

11    and expansive notice program.  As is set forth in the

12    papers, we're looking to reach, you know, 95 percent or more

13    of the entirety of the adult population in the United

14    States.

15         It required our agents, the noticing agent Prime

16    Clerk, to think about in developing this program where are

17    people, how can we reach them, how are people reachable in

18    this, you know, social media age?  Are there parts of the

19    country that have been more impacted by the opioid crisis

20    that may be more difficult to reach.  Do we have populations

21    that are not, you know, as accessible as you might find in

22    other situations.

23         So the sheer scope of the program, which I will

24    touch on briefly later, has been designed with all of that

25    in mind.

Page 25

1          Your Honor, before I proceed further, just one

2     thing for the evidentiary record.  I'd like to move into the

3     record the Declaration of Miss Jeanne Finegan, which was

4     Docket No. 719.  I believe chambers binder, Tab 2 at 3(b).

5     Miss Finegan is the vice president of notice and media

6     solutions at Prime Clerk and, as noted, she is present here

7     in the court today.

8          Miss Finegan and her team designed this notice

9     program, one of the largest ever deployed as I mentioned, to

10    reach over 95 percent of the adult population in the U.S.

11    And her declaration sets out the scope of the program, the

12    factors that went into the design of that program, and how

13    the program will be managed going forward.

14         Your Honor, I would ask that that declaration be

15    entered into evidence.

16         THE COURT:  Okay.  Does anyone wish to cross-

17    examine Miss Finegan on her declaration?  All right.  I have

18    reviewed it.  I don't think I need her to get on the stand.

19    I may have a couple of questions; in fact, I probably do.

20    But I think you'll probably be able to answer them; if not,

21    you could probably consult with her and give me a better

22    answer.  So having said that, I'll admit the declaration as

23    Miss Finegan's direct testimony.

24         MR. MCCLAMMY:  Thank you, Your Honor.  So as I

25    mentioned, Your Honor, the Debtors' notice program was

Page 26

1    designed with the assistance of Prime Clerk with the purpose

2    of effectively trying to reach and inform both known and

3    unknown claimants holding a variety of potential claims

4    against the Debtors about the deadlines and the process for

5    going about filing proofs of claim in these cases.

6         The notice program is going to give actual notice

7    to all of our known claimants.  We're going to be sending

8    out mailings to close to a million parties in these cases.

9    And we have, you know, anyone that has been involved in the

10   litigation already -- contact, counterparties, et cetera --

11   will be getting the actual mailing notice for these cases.

12        But we also understand that even with all of the

13   litigation that has been commenced to date that it's likely

14   that there are numbers of individuals out there, and at this

15   time, untold how expansive that may be, that may believe

16   that they have claims against these Debtors.  And,

17   therefore, we've worked very hard to design and implement a

18   notice program that is going to reach all of those -- all of

19   those potential claimants so that their claims can be

20   brought into this bankruptcy.

21        And I would say, Your Honor, we view this as a

22   very important stage in these cases.  It was noted in the ad

23   hoc committees' statement, submitted in connection with

24   this, that they would prefer to have an agreed resolution on

25   allocation in these cases, and that is completely consistent

Page 27

1    with where we are, Your Honor, as to next steps in these

2    cases.  But we do believe that starting this claims process

3    and having these claims brought into the Court is an

4    important part of making sure that that agreed allocation is

5    something that is defensible and can be, you know, supported

6    and approved by this Court and having that claims

7    information will be important to that.

8         But in addition to that, Your Honor, if for some

9    reason we're not able to reach resolution, we believe it's

10   important to have those claims in so that we can continue to

11   move forward in these cases in a timely manner.

12        So with respect to reaching those beyond claimants

13   that are already known, as I mentioned, it is a really --

14   it's really a multi-faceted process.  And here in the United

15   States, we are looking at not only doing the traditional

16   print media, placing things in newspapers, magazines and

17   things of that nature, but also moving beyond that and

18   using, you know, television, social media -- Facebook,

19   Instagram, things of that nature -- streaming radio,

20   terrestrial radio, certain niche medias in order to reach

21   people, looking at trade associations; certain things that

22   are designed to reach people in particular groups, whether

23   it be parents or, you know, NAS specific, pediatric groups;

24   certain things for the Native-American tribes.

25        We've looked at each aspect of who it is we're

Page 28

1    trying to reach and trying to find a way across various

2    media to reach them.  So the program essentially works and

3    kind of builds on itself with the hope that people will have

4    various touchpoints along the way such that, you know, you

5    may see it on TV.  And then you may go online and you'll run

6    a search and based on whatever search terms you are using,

7    you will see and be referred to, you know, the website for

8    the bankruptcy, and that website will then have information

9    about filing proofs of claim.

10          We'll give you the ability to file your proofs of

11   claim online.  There'll be frequently asked questions there

12   that will answer what we think will be the questions that

13   people will have as they're going through this process.  And

14   then you may see it, you know, videos, movie theaters and

15   areas where it's hard to reach people either through

16   television or the print media.  There'll be billboards,

17   there'll be things showing up on screens in movie theaters.

18          So all across the time from 21 days after the bar

19   date order is entered when the program comments through to

20   the end, we would expect to have, you know, six to eight

21   times, you know, touchpoints of hearing about the fact that

22   the Purdue bankruptcy, knowing that there's a bar date that

23   is June 30th, and pointing people to the website or a phone

24   number so they'll know exactly where to go for the filing of

25   their proofs of claim.

1          In addition to the scope of the notice program,

2     which indeed may be unprecedented in its scope and its

3     reach, given the need to reach individuals all across the

4     country, we thought it was also important to have tailored

5     proof of claim forms.  And those tailored proof of claim

6     forms, as we mention, were designed for both individuals,

7     governmental entities, and then a general opioid claim form

8     to get information that we think will be helpful not only to

9     understanding whether or not people have legitimate claims,

10    but also helpful to the discussions that will be ongoing

11    about allocation.

12          I will say, Your Honor, the forms as they were

13    originally filed and then as they've been modified and what

14    was submitted to the Court yesterday are the product of a

15    lot of negotiation with the various constituencies and

16    hearing from a lot of people about what the types of

17    questions are, can people really answer them, what the

18    concerns are with filling out the form.

19          And one of the things that you will see, as I

20    would like to walk you through some of the changes that

21    we're proposing in the order from when it was originally

22    filed, is there was concern for the individuals about

23    confidentiality of the forms, and not just about their own

24    personal information necessarily being out there, but

25    whether filing a claim tied to opioid use might be any way

Page 30

1    problematic if it's out there in the public.  You know, if

2    you are a caregiver for someone that you believe has NAS, is

3    mentioning that and putting names out there potentially

4    problematic because someone could see that and then perhaps

5    wonder who the mother was of that particular child, and that

6    could cause additional concerns.

7           So we've tried to mee everyone, as best we could,

8    to address all of those concerns, both about the nature of

9    the questions that were asked, protecting confidentiality,

10   and providing some alternatives into how claims are actually

11   filed in these cases.  And we thank the UCC, the states, the

12   multistate governmental entities group and the NAS group for

13   all of their input into that.

14          The UCC and the NAS group, the MSGE group and the

15   states will also be putting input into media program itself;

16   will be letting us know, you know, online forms that they

17   believe would be helpful to have our information go to.  And

18   they've done that already and we've incorporated that

19   information into an adjusted media program in that regard.

20          So that in general, Your Honor, is the

21   presentation I'd like to have for the Court.  I would be

22   happy to answer any questions before walking through the

23   changes in the order, which may also explain some of the

24   things that we're trying to accomplish.

25          THE COURT:  I have a blackline revised proposed

Page 31

```
 1    order that was provided when it was filed on the 23rd.  Is

 2    that the one you're going to be using?

 3              MR. MCCLAMMY:  Yes, Your Honor.  Docket 776?

 4              THE COURT:  Yes.

 5              MR. MCCLAMMY:  Yes.

 6              THE COURT:  Okay.  So if I have questions, they'll

 7    come up as we walk through this; if not, I'll raise them

 8    after we go through it.

 9              MR. MCCLAMMY:  That's perfect, Your Honor.  With

10    that, I'll walk through what I believe are the substantive

11    changes to the form of order starting at Page 3 -- Page 4 of

12    68 at the top for the revised proposed order in the

13    blackline.

14              In Paragraph 4(a), there was language included

15    here originally at the request of some of the states to just

16    further define the nature of the claims for the opioid claim

17    form to say, "Involving opioids or their production,

18    marketing and sale, including without limitation, the

19    Debtors' production at marketing," because I thought that

20    limiting it to only the production and marketing of the

21    Purdue opioids may have been too limiting, so we were fine

22    accommodating that.  We've made one correction just to --

23    just to the product that had been included in the generic

24    forms.  But other than that, I believe, at least on that

25    page, things are straightforward.
```

1           With respect to Page 4, this is in subsection (e).

2      We've included, for the avoidance of doubt, that holders

3      asserting the claims of any opioid proof of claim form and

4      the federal government are not required to file separate

5      proofs of claim form against each debtor, with respect to

6      which any such holder may or may have to specify, you know,

7      multiple debtors.  If you're filing an opioid proof of claim

8      form, we're going to have that filed in the lead case, and

9      it'll be treated as if it's filed in each of the cases.

10          THE COURT:  And the theory for that is all of the

11      debtors are putting up all of their assets, so there's no

12      intercompany issue.

13          MR. MCCLAMMY:  That's exactly right, Your Honor.

14          THE COURT:  Okay.

15          MR. MCCLAMMY:  And it would also be the case that

16      it may be hard to discern for some of the claimants whether

17      or not they had a Purdue product or Rhodes generic.

18          THE COURT:  Well, but I think just the fact that

19      each debtor is contributing its whole value gets over any

20      concerns about going on a debtor-by-debtor basis.

21          MR. MCCLAMMY:  On Page 5, Your Honor, we've

22      included a clarification in subsection (j), which just notes

23      that timely filed claims that satisfy the requirement of the

24      bankruptcy code, the bankruptcy rules and/or this order

25      should not be disallowed solely by reason of a lack of

Page 33

1    detail or specificity in response to questions asked in the

2    forms approved by this order.  And the reason for that was

3    there was some concern, including raised by the UCC and the

4    states, that their citizens wouldn't be able to -- or their

5    constituents wouldn't be able to provide, you know, some of

6    the detailed information because medical records may be

7    difficult to obtain.  For those that have lost loved ones,

8    it would be difficult to, you know, say exactly which

9    prescription medication it was or when, and we completely

10   understand that.

11          We think that the detail is helpful in

12   understanding what the legitimate claims are in these cases.

13   And to the extent people are reasonably able to answer, we

14   would ask that the Court approve the forms asking those

15   questions.  But we do understand, and think it would have

16   been the case anyway, that the mere failure to provide that

17   specificity is not going to be the basis for denying

18   someone's claim.

19          THE COURT:  Which is fine, although I think it's

20   also appropriate, and I believe the forms do this, for the

21   forms to state that you may be asked to provide more detail.

22          MR. MCCLAMMY:  That's exactly right.

23          THE COURT:  Which may be necessary before a claim

24   is allowed.

25          MR. MCCLAMMY:  That's exactly right, and the forms

Page 34

```
 1    do state that.  And that would our intention if we ever

 2    needed to go down that route.

 3              THE COURT:  Okay.  There's a change in Paragraph I

 4    just ahead of the paragraph we've been talking about, that

 5    says, "A claimant may also amend or supplement a claim after

 6    it is filed, including for the avoidance of doubt after the

 7    applicable bar date."  I think you should add there, "But

 8    not to allege a new claim," because that's the distinction

 9    that courts make.  You can supplement or amend, but you

10    can't make a new claim after the bar date.

11              MR. MCCLAMMY:  We will make that change, Your

12    Honor.

13              THE COURT:  Okay.

14              MR. MCCLAMMY:  Your Honor, in Paragraph 5, there

15    isn't any change noted in here.  But we did note just this

16    morning one thing that didn't carry over from some of the

17    changes in the protective order.  And the fact that some of

18    the information that is on the personal injury claimants'

19    form, some of that will be HIPAA protected information, some

20    of it may not be, so we are going to include in here a

21    provision that states that those forms will be treated as

22    confidential as information protected pursuant to HIPAA.

23    But also to the extent it's not protected by HIPAA, those

24    forms will be treated as professionals' eyes only under the

25    form of the protective order that will be entered.
```

Page 35

1              THE COURT:  Okay.  And on that score -- and I know

2      you're going to walk me through the forms themselves -- but

3      it's not the forms that are key here because, as you said,

4      there are many ways that the debtors will be contacting

5      people, either directly or indirectly, six to eight

6      hopefully touch points.

7              I think it's important in those, whether it's a

8      press release or a story you're giving to the press or a

9      summary, to make it clear that the PI claimants' forms are

10     subject to the confidentiality provision, so that they --

11     you know, someone who sees a blurb on YouTube will

12     understand that they're not -- that's going to be governing

13     the process, as opposed to just in the form itself.

14             MR. MCCLAMMY:  Will do, Your Honor.

15             THE COURT:  Okay.

16             MR. MCCLAMMY:  Your Honor, turning next to the

17     inclusion of Paragraph 7.

18             THE COURT:  Before we get to that --

19             MR. MCCLAMMY:  Sure.

20             THE COURT:  -- Prime Clerk is retained on two

21     different -- under two different orders in this case.  And

22     in one of those forms of orders for certain of its tasks,

23     it's acting as the claims agent for the Clerk of the Court,

24     so it's really an agent for the Clerk.  There are various

25     provisions in here that either indemnify or exculpate Prime

Page 36

1    Clerk.  I think you should drop a footnote the first time

2    you do that and say that whenever Prime Clerk is acting as

3    an agent of the Clerk of the Court, such exculpation or

4    indemnification will apply equally to the Clerk of the

5    Court.

6              MR. MCCLAMMY:  Will do, Your Honor.

7              THE COURT:  I mean, the Clerk is separately

8    protected by a number of separate presumptions and

9    protections, but I don't want there to be an implication

10   that somehow Prime Clerk is acting -- where Prime Clerk is

11   acting as an agent of the Clerk of the Court, only its

12   protected as opposed to the Clerk itself.

13             MR. MCCLAMMY:  Understood, Your Honor.  We'll make

14   that change as well.

15             THE COURT:  Okay.  I think that -- I'm raising

16   them now because I think the first time it comes up,

17   although maybe I'm wrong, is --

18             MR. MCCLAMMY:  -- is Paragraph 6?

19             THE COURT:  Yeah.

20             MR. MCCLAMMY:  I believe that's right.

21             THE COURT:  Yeah.

22             MR. MCCLAMMY:  So we will make that change.

23             THE COURT:  Okay.

24             MR. MCCLAMMY:  Your Honor, Paragraph 7, which

25   starts on Page 6 and carries over to Page 8, I will try to

Page 37

1    distill for Your Honor, rather than trying to read through

2    all of the words on the page.  The thing that is

3    accomplished by Paragraph 7 is mostly for administrative

4    convenience to allow certain of the ad hoc groups that know

5    that they will potentially have large numbers of claims

6    filings for their members, to allow their counsel to file

7    consolidated proofs of claim form.

8              The claims forms themselves, once filed, will be

9    treated still as though the individual members of these

10   groups or those that have granted authority to the counsel

11   or the agent to file the claim on their behalf will still be

12   treated as though they are a claim for that individual.

13   They'll still be using the form that applies to their

14   particular group.

15             So, for example, the states approached us and said

16   they would like the ability to perhaps file a consolidated

17   claim on behalf of all of the states.  And instead of having

18   someone that is, you know, there kind of uploading the forms

19   kind of like 50 times to say the same essential thing, we

20   said for administrative convenience, we can agree to that.

21             The hospitals approached us similarly and said

22   there's upwards of, you know, 400 or 500, you know,

23   hospitals in our group; can we find some way to avoid having

24   to do that?  Similar for the multistate governmental

25   entities group, which has over a thousand members.  And then

Page 38

1      also for the ad hoc committee, which includes those

2      representing other contingent claimants beyond just the --

3      beyond just the states; cities, county municipalities, and

4      tribes.  They have the ability to also file a consolidated

5      claim on those that have authorized them to do so.

6              We wanted to make clear, though, that this is not

7      us saying that we believe that class proofs of claim can be

8      filed in this case or that it would be appropriate to do so.

9      And in each case, the member or the person whose claim is

10     being filed will be known, and they will have given express

11     authorization for the counsel or the agent to file that

12     claim on their behalf on a consolidated basis.

13             THE COURT:  So let me -- this is a long paragraph

14     and it's an important one.  I just want to make sure.  In

15     the middle of it, it permits the filing on behalf of

16     consenting claimants of a consolidated claim.  And then it

17     says, "Using the appropriate opioid proof of claim form,

18     comma, on behalf of each and every member of the applicable

19     group or a subgroup thereof."

20             And I think what that means, but I just want to

21     make sure it's clear, is, let's say -- just pick an example

22     -- the hospital group, okay.  Does this mean that there will

23     be one filer, which is the ad hoc hospital group, but that

24     attached to that consolidated form will be, you know,

25     conceivably 450 separate attachments of the form, the

Page 39

1    appropriate form that lays out their particular damages and

2    why?

3              MR. MCCLAMMY:  It would be something along those

4    lines, or it would be one form for the group and it will

5    have, for example, a spreadsheet attached to it that will

6    provide answers to those questions.

7              THE COURT:  Well, okay.  The point I want to make

8    sure because the key reason for this relief is for the

9    debtors and the other parties-in-interest in the case to

10   have a means to analyze who has what claims.  And so, I'm

11   perfectly fine with having a consolidated claim, so you

12   don't have to have 450 filings, but that claim should attach

13   specific information as to each claim within that

14   consolidated claim, and I'm not sure that leaps out of this

15   paragraph.

16             MR. MCCLAMMY:  Okay.

17             THE COURT:  The easiest way is to attach 450

18   individual claim forms.  I guess you could say or, you know,

19   a spreadsheet that contains that information for each

20   claimant.  Because otherwise, it's really not -- it's not --

21   you won't have anything more than what people are filing

22   already as far as describing who they represent.  And it's

23   quite likely that hospital X in county Y will have different

24   claims than, you know, hospital A in county B, and we need

25   to know that.  I'm not just singling out hospitals; this

Page 40

1    would apply to all sorts of claimants, you know, so I think

2    that needs to be made clear.

3            MR. MCCLAMMY:  Absolutely, Your Honor.

4            THE COURT:  This is fine to file as long as the --

5    either the form for each claimant is attached or the

6    information is summarized in a way, maybe that you've

7    checked with in advance to confirm is sufficiently

8    particularly with the debtor.

9            MR. MCCLAMMY:  We can work on that, Your Honor.  I

10   understand, and I think that's completely applicable as it

11   applies to, you know, the hospitals and perhaps even others

12   in the ad hoc groups.  My understanding as to the states is

13   they will file, or at least are considering filing a proof

14   of claim form that may have an aggregate damages number

15   across their forms.

16           THE COURT:  Well, if they're prepared to take the

17   same recovery.  I mean, I just -- I'm not sure that works.

18   I mean, I don't know.  I mean, it may well be.  I agree with

19   you that the -- I think the preferred results here will be

20   an agreed allocation among claimants and in all likelihood

21   categories of claimants.  But we don't know that for sure.

22           So one of the functions of a bar date is to give

23   you the fallback if you can't reached an agreed.  And if --

24   again, I'm just picking a state -- if West Virginia says it

25   has claims worth X-hundred million and Massachusetts says we

Page 41

1    have claims worth Y-hundred million, just having a form that

2    says all the states have claims, you know, 50 times some

3    number; it just doesn't -- you're not able to determine what

4    the claims are.

5          I think they probably all have the same theories,

6    so that I -- I mean, that can be taken off by what we just

7    talk about, you know, or, you know, a spreadsheet.  But I

8    think as far as amount, you got to lay out your best shot at

9    what you think it is because, otherwise, you won't be able

10   to have that base.

11          MR. MCCLAMMY:  Yes, Your Honor.  I think we

12   understand we have to work out that language with the

13   states.  But, yes, we're in complete agreement on that.

14          THE COURT:  I mean, they're not going to have

15   personal injury claims because states don't have personal

16   injuries, so they don't have to fill out that form.

17          MR. MCCLAMMY:  Exactly.

18          THE COURT:  But they would have to, I think, in a

19   consolidated -- it's not like an indenture trustee's claim.

20   I mean, there, it's based on one document and you have that

21   claim so the bondholders don't have to file individual

22   claims.  The theories here may well be the same, although

23   you may need to have them run it by your first so you're

24   comfortable that that's okay, as you talked about earlier.

25          MR. MCCLAMMY:  Exactly.

Page 42

1           THE COURT:  You don't file the individual claim

2     for them.  But I think as far as amount is concerned, you

3     know, I don't see how we could get away with not having that

4     stated.

5           MR. MCCLAMMY:  Understood, Your Honor.

6           THE COURT:  There may be an unliquidated amount.

7     I don't know, but I think you need to know.

8           MR. MCCLAMMY:  Thank you, Your Honor.

9           THE COURT:  Does anyone have anything to say on

10    that?

11          MR. TROOP:  Your Honor, if I may.

12          THE COURT:  Sure.

13          MR. TROOP:  Your Honor, there are certain kinds of

14    claims that transcend the boundaries of the states, and that

15    the allocation of those claims as amongst the states may or

16    may not be driven by specific facts with respect to that

17    specific state in the way that you are thinking about

18    assessing the claim.

19          And so, one of the things that we were trying to

20    do was to not have a fight over whether to have a bar date

21    at all now in light of the cost and expense, not only to the

22    estate, but to each claimant in putting together an

23    individualized claim that -- you know, pick Oklahoma, Your

24    Honor.  I forget how long that trial went and how many pages

25    of documents and how much went in, but it was a really huge

Page 43

1    effort.  But also to provide the ability for reasonable and

2    rational amounts for common claims.

3                THE COURT:  Well, on that score --

4                MR. TROOP:  And if there are differences, Your

5    Honor, we'll work our way through.  But --

6                THE COURT:  Can I just interrupt you on that

7    point?

8                MR. TROOP:  You wear the robe, Your Honor.

9                THE COURT:  On common claims, if you say we have a

10   common claim, that fixes the nature of that claim.  You

11   know, I don't have any problem with that.  And if you say we

12   have an unliquidated claim because we can't liquidate now, I

13   guess I don't have a problem with that.  I mean, that's

14   subject to the objection process and the like.

15               But where you know you have a specific claim

16   that's not necessarily a common claim, I think you need to

17   flag that because you said it may or may not.

18               MR. TROOP:  And we're thinking about it that way,

19   Your Honor.  I just wanted to be very clear about the

20   limitations, the issues.

21               THE COURT:  That's fine.  It's a good point, but

22   it's all funneled through the claim process.  So if the

23   states agree they have certain common claims and that claim

24   is going to be the same for Rhode Island as it is for Texas,

25   then you could say that and that's fine.  That's what, you

Page 44

1    know, that's what it is.

2            MR. TROOP:  And we were also trying to think of

3    ways, Your Honor, to minimize the likelihood that you would

4    get 50 claim forms and at the bottom simply said

5    unliquidated, right?

6            THE COURT:  Well --

7            MR. TROOP:  So those are --

8            THE COURT:  But I think there is some -- I mean,

9    if you actually can give -- I mean, I don't -- it would seem

10   to me to be helpful to give a rough estimate at least of

11   what you think is at stake here because it's going to play

12   into the negotiations.

13           MR. TROOP:  And, Your Honor, I think it will play

14   into the negotiations regardless of whether a proof of claim

15   form is filed or not.

16           THE COURT:  Well, I don't know.

17           MR. TROOP:  But that --

18           THE COURT:  I think filing a proof of claim is an

19   important event in a case.  And, you know, the other folks

20   who are going to be arguing that they should get specific

21   recoveries, whatever -- you know, a hospital.  I was told

22   that basically the hospitals claims are basically a hundred

23   percent of a year's GNP in the U.S. a few hearings ago, for

24   example.  So, you know --

25           MR. TROOP:  Our claims are bigger than that, Your

1    Honor.

2              THE COURT:  They may want to see what yours say.

3    I mean, I -- so I appreciate that at some level, this is

4    just a first step.  But I don't want it to be completely

5    meaningless, so I think there should be some level of detail

6    in it.

7              MR. TROOP:  And, Your Honor, all I'm trying to

8    alert the Court to is that these are issues that we all

9    considered in the process, including whether to make a big

10   deal about having a bar date now or not.

11             THE COURT:  Right.

12             MR. TROOP:  Before we know what this case is going

13   to look like at the end where this work may actually turn

14   out to be less helpful than more helpful at significant

15   expense.

16             THE COURT:  Okay.

17             MR. TROOP:  So, Your Honor, I'm saying we've made

18   that balance.  I'm not arguing that point.

19             THE COURT:  Right.

20             MR. TROOP:  This was an integral part of that

21   balance, consistent with I think my articulation of our

22   understanding of what a consolidated claim could look like.

23             THE COURT:  Okay.

24             MR. TROOP:  Which was slightly different than,

25   though I don't think intentionally so, than the colloquy

Page 46

1    that was going back and forth.

2         THE COURT:  Well, there are different entities

3    covered by this paragraph, which is one of the reasons I

4    wanted to discuss it.  States, largely by definition, cover

5    everyone within the state, to the extent that states have

6    that ability to do that.

7         MR. TROOP:  Right.

8         THE COURT:  And the hos- -- you know, the

9    hospitals or the NAS babies, that's different; those are

10   individual claimants.  This paragraph covers both.  So I

11   think -- I just want -- as far as entities other than the

12   states are concerned, I think what we said before goes.  As

13   far as the states are concerned, I suppose the language we

14   talked about or a summary, as opposed to an individual form,

15   you know, reasonably acceptable to the debtors may be

16   sufficient.  Because I think you all know, as I think I do,

17   what is going to be elicited here.

18        But I didn't want just something that said we have

19   a claim and leave it at that.  I think you need to have

20   something more than that.

21        MR. TROOP:  We understand, Your Honor.  And, look,

22   I'm not -- I have no more of an idea of where this case will

23   end up than anyone else does in the courtroom right now.

24   But I think that it's relatively well-known that in

25   connection with the litigation involving opioids around the

Page 47

1   country right now, states are constantly working on their

2   own allocation, looking at recoveries in the hall in and out

3   of these.

4           THE COURT:  Well, and as far as a bar date is

5   concerned in this case.  To me, it's probably more

6   meaningful that it would come to the states, as opposed to

7   the other claimants, individual claimants that can file a

8   group claim, although not a class claim under this

9   provision.

10          To know that states' theories of liability, as

11  opposed to amounts, because their ultimate argument is going

12  to be, under these theories, we're really covering

13  everybody, and then we will have a negotiation both among

14  yourselves and the people that say no you're not.

15          So the theories, as far as the states'

16  consolidated claim is concerned, are really important.  And

17  if you have a difference in theory between Maryland and

18  Rhode Island, say, that should be flagged.  If everyone has

19  the same theory, then that's easy.  So maybe that's -- to

20  me, that's the -- as far as the summary is concerned, that's

21  more important as far as the states are concerned than

22  specific amounts.

23          MR. TROOP:  Understood, Your Honor.  Thank you

24  very much for your time.  And as long as I'm here and

25  because I can't help myself, earlier you suggested some

Page 48

1   language that said you can file a claim after the bar date,

2   but not a new claim.

3           THE COURT:  You can amend the claim, a supplement,

4   yeah.

5           MR. TROOP:  Amend, but not a new claim.  Just

6   something popped in my head, which is I think you mean

7   without leave of court, right?

8           THE COURT:  Yeah, sure.

9           MR. TROOP:  If someone came to you and said --

10   right, that's all.

11          THE COURT:  But this order authorizes it so it

12   gives you leave of court.

13          MR. TROOP:  Yeah.  Understood, Your Honor.  I was

14   just making sure I understood that.

15          THE COURT:  Okay.

16          MR. TROOP:  Thanks.

17          MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

18   Eckstein of Kramer Levin on behalf of the ad hoc committee.

19          THE COURT:  Good morning.

20          MR. ECKSTEIN:  Let me just supplement a few

21   comments that Mr. Troop made in the colloquy.  I think

22   generally, I'm comfortable with the direction, but I think a

23   little clarification may be useful.  The goal was, and as

24   Mr. Troop said, I think the feeling we all had in the case

25   was to try to work with the idea of a bar date because you

Page 49

1    don't know ultimately where the case comes out.  And I think

2    at the end of the day, the feeling is it is useful to have

3    the bar date in place.

4            And ideally, the plan is to work through an RSA

5    and a plan in advance of the bar date and, hopefully, that

6    will provide a framework for an agreed-upon allocation,

7    which should make the bar date, I don't think irrelevant,

8    but much less necessary and the allocation should ultimately

9    supersede.  If we don't get to an allocation, an agreed-upon

10   allocation, then obviously the bar date data will become

11   more important and we'll have to figure out mechanisms to

12   work through claim allowance allocation and the Court, you

13   know, overseeing proceeding.

14           That said, we're hoping to make the bar date

15   process as smooth as possible.  And I think the concept, at

16   least for the governmental entities was as to the states,

17   there is a reservation for the states to file essentially a

18   collective claim.  As Mr. Troop said, a lot of work has been

19   done by the states, not just in this case but more broadly

20   over a long period of time.

21           And I think that, to the extent an aggregate claim

22   is filed, it will reflect both consensus on the theories --

23   and I would certainly expect that the theories for the

24   claims will be set forth in the aggregate claim -- but it

25   will reflect essentially, at least among the states, a

Page 50

1    collective view on how the states would allocate amongst

2    themselves.  I think we all recognize that the claims that

3    are asserted are going to exceed whatever the ultimate

4    assets are that are going to be the basis for the plan by

5    many, many, many multiples and so, allocation is really

6    quite important.

7            And so, at least as far as the governmental

8    entities are concerned on the state side, the hope is that

9    there will, in fact, be -- and I think there essentially is

10   already -- an agreement among the states as to how they

11   would allocate so that you eliminate that fight.

12           The other issue that we've anticipated that is a

13   little different from Mr. Troop's consideration, is we have

14   both states and non-state governmental entities on our ad

15   hoc committee.  And even if there is a consensus among the

16   states as to how each of the states would allocate, Your

17   Honor could appreciate there are issues between the states

18   and the non-states as to how the municipalities within each

19   state will essentially participate in the distributions that

20   will come out from the plan in respect to both damages and,

21   probably more importantly, the abatement side of the plan

22   process, how we're going to actually address the -- cure the

23   problem going forward.

24           Similarly, we also have on our committee a

25   representative of the Indian tribes, and we have a separate

Page 51

1    issue similar to the municipalities as to how you would

2    provide within the governmental entities for the Indian

3    tribes.  So I'm hoping that the claim forms, while it's not

4    certain, will either be done in the aggregate or

5    individually; and if there is not consensus, then the

6    individual -- then the states will file individual claims.

7              But I think it's in the interest of the estate, to

8    the extent there is the more consensus that the governmental

9    entities have, the -- I think the better -- the more

10   advanced the case will be.  And I think having the

11   flexibility to file the claims for each of these groups in

12   some aggregate sense is useful because it will streamline.

13             It doesn't eliminate the need to ultimately reach

14   an agreement between the governmental entities and the

15   private claimants on exactly how we will allocate between

16   those two larger quadrants, and that obviously is maybe the

17   most challenging part of the allocation issue in the case,

18   although I don't want to minimize the importance of dealing

19   with the allocation on the state and the municipality and

20   for our side as well.

21             So we've tried to take all these issues into

22   account in the claim forms.  And I think that it certainly

23   makes sense to articulate theories; it certainly makes sense

24   to articulate, as best as possible -- and I think best as

25   possible is important -- the amounts of the claims, and to

Page 52

1   try to give as much specificity as we can so that the claims

2   actually will have value if they're needed.  That's been the

3   approach.

4           And I'm hoping -- it may make sense in that

5   Paragraph 8 to separate out the governmental entities and

6   tribes from the private claimants so that there's less

7   complication, and maybe we can work with the debtor and the

8   creditors' committee to make sure that this form picks up

9   these theories, and at the same time it works.

10          THE COURT:  Right.  I think that makes sense.  I

11  mean, as far as the first point you made, when someone files

12  a proof of claim, it's their claim.  So if they want to

13  limit it in a specific way through an allocation, that's

14  fine.  I just didn't want there to be an implication that

15  you could do that and then change your mind in this

16  paragraph.

17          MR. ECKSTEIN:  I appreciate that point, Your

18  Honor.

19          THE COURT:  So if the group, whatever it is, can

20  agree on that and agree what the claim will be among

21  themselves and as far as the estate is concerned, that's

22  fine.  That's just like saying I'll limit my claim to

23  $100,000.  On the other hand, I don't want this paragraph to

24  imply that, well, you can change your mind later and say,

25  well, actually my claim is not $100,000, it's 150,000 or

Page 53

```
 1    whatever, you know, whatever the difference is.

 2              MR. ECKSTEIN:  I understand that, and I think

 3    we'll make sure that each of the government entities

 4    understand that point as well.

 5              THE COURT:  Okay.

 6              MR. ECKSTEIN:  Thank you, Your Honor.

 7              THE COURT:  Okay.  You have someone behind you.

 8              MS. MANOUKIAN:  Your Honor, Kristine Manoukian,

 9    Schulte Roth & Zabel on behalf of the ad hoc group of

10    hospitals.  Just very briefly to comment on the comments

11    that were made in the beginning.  I think the idea, at least

12    our idea, behind the inclusion of this language and then

13    working through it with the Debtors was that there would be,

14    as Mr. Eckstein suggested, there'd be one aggregate claim

15    that would be filed by the 550 plus hospitals, in terms of

16    the proof of claim form by the hospitals in our group.

17              I think what we were envisioning is we would have

18    some sort of an attachment spreadsheet that identified all

19    of those hospitals.  They all largely have the common

20    theories, as you noted, and so that would be described in

21    the addendum.  But then there'd be a spreadsheet that to the

22    extent the hospitals want to break out their separate

23    amounts of claims, they will do so in that spreadsheet.

24              THE COURT:  They can't not break it out.  They

25    have to break it out.
```

Page 54

1          MS. MANOUKIAN:  Understood, Your Honor.  But the

2    idea would be there to be one, you know, single consolidated

3    claim that would have the aggregate amount.

4          THE COURT:  If the spreadsheet in essence gives

5    the debtors the same type of information that individual

6    claim forms would, that's fine.

7          MS. MANOUKIAN:  Understood, Your Honor.  Thanks.

8          THE COURT:  And, you know, this is not just for

9    claims' purposes.  If there are five hospitals in Texas, for

10   example, an allocation may well have a second step, which

11   is, you know, so much money will go to the State of Texas

12   and then the State of Texas will look at the claimants

13   within the State of Texas and they can use these proofs of

14   claim forms to say, all right, under the plan, this is how

15   that money will be allocated.  So there's a real use to this

16   in particularizing it when you go to individual claimants.

17         THE COURT:  Understood, Your Honor.  Thank you.

18         THE COURT:  All right.

19         MR. MCCLAMMY:  Thank you, Your Honor.

20         THE COURT:  Okay.  This was by far the biggest set

21   of questions I had, so I think the rest of this may be a

22   little easier.

23         MR. MCCLAMMY:  I have a sense that that paragraph

24   might be the one.

25         THE COURT:  Okay.

Page 55

1          MR. MCCLAMMY:  I think with that we'll be able to

2    work through with the comments from Your Honor on the record

3    and any other statements from counsel, the language that

4    will need to be included to revise there.

5          THE COURT:  Okay.

6          MR. MCCLAMMY:  Your Honor, Paragraph 8 of the

7    order was revised to address some questions that had been

8    raised by the Department of Justice with respect to the

9    claim that may be filed by the federal government.  They

10   were concerned that certain questions that appeared on even

11   the general opioid claim form, as opposed to the government

12   entity claim form, didn't necessarily apply to the federal

13   government and all of its agencies, including potentially,

14   you know, with the regulatory agencies and others that may

15   have claims.

16          So they still intend to file a claim or claims

17   that will set out their theories for recovery, just as

18   anyone else would, but would like to use the more standard

19   form, which is titled here, the non-opioid claim form for

20   purposes of this specific case.  But for the government, for

21   the federal government, we did want to make it clear that

22   just because they're using a claim form that may be labeled

23   non-opioid claim form, to the extent that they have claims

24   tied to the opioid crisis that they believe Purdue was

25   responsible for, they can set those out on that claim form

Page 56

1    as well.

2              THE COURT:  That's fine.

3              MR. MCCLAMMY:  And, Your Honor, I did want to just

4    note for the record, and counsel for the government did ask

5    us to state, that nothing in the U.S. government's, you

6    know, negotiation of the terms of the order or their

7    eventual filing of the proof of claim shall determine the

8    ultimate treatment of that claim or any such claims as well.

9              THE COURT:  Of course, that applies to everybody.

10             MR. MCCLAMMY:  And I thought that made sense and

11   was easy to do.  Thank you, Your Honor.

12             THE COURT:  Okay.

13             MR. MCCLAMMY:  Your Honor, I believe the next

14   substantive change is at Paragraph 13, subsection (j).

15             THE COURT:  Right.

16             MR. MCCLAMMY:  And this Your Honor may have

17   noticed in our original filing the exclusion from the need

18   to file a proof of claim with respect to indemnification or

19   contribution claims was limited to just former -- current or

20   former employees of the debtors.  At the time, we were in

21   negotiations with the UCC seeking to have that extended to

22   the current or former officers and directors of the debtors,

23   and have since been able to reach agreement; that, to the

24   extent the current or former officer has not actually been

25   named in any of the pending litigation, that they have no

Page 57

1    need to file a proof of claim here.

2             THE COURT:  Okay.

3             MR. MCCLAMMY:  The next substantive change, I

4    believe, is in Paragraph 16, Pages 12 to 13 of the

5    blackline.

6             THE COURT:  Right.

7             MR. MCCLAMMY:  And this is consistent with what

8    I've talked about earlier, Your Honor, which is we've had a

9    number of conversations leading into this process, both

10   about the substance of the order, but also about how the

11   notice program is going to be conducted going forward.  And

12   the creditors committee would like to continue to have that

13   input kind of going forward and wanted to memorialize that

14   here in the terms of this order.

15            So we've included language here that will require

16   Prime Clerk to provide weekly reports to the debtors and the

17   creditors committee regarding the supplemental program which

18   outlines, you know, where we are placing media, our plans

19   for going forward, to the extent that, you know, people are

20   going to websites, getting the numbers of people that are

21   visiting sites or seeing the social media posts and things

22   of that nature, so that people can, on a regular and real

23   time basis, have a sense of, you know, what's working and

24   not working.

25            Prime Clerk had already been, you know, planning

Page 58

1    that as part of their process.  They will monitor it, you

2    know, minute by minute, day by day.  So to the extent they

3    see that something is trending, they will be able to adjust;

4    to the extent that they see that something is not, they'll

5    be able to adjust and move some of, you know, the resources

6    that way, so we were happy to do that.

7            THE COURT:  Okay.  I mean, I think this is fine

8    that they'll be providing weekly reports, which implicit in

9    that is that they'll be monitoring.  I think you and the

10   committee were wise not to spell out what happens after

11   that.  I mean, it's really I think very fact driven.

12           MR. MCCLAMMY:  I think that's exactly right, Your

13   Honor.

14           THE COURT:  And, you know, if it appears there's a

15   problem or just disagreement over how to allocate the

16   resources that they can't be resolved, I guess it comes back

17   to me, but hopefully it's something that can be adjusted as

18   you're going on.

19           MR. MCCLAMMY:  I think that's right.  And in

20   connection with our agreements with the committee, I did

21   want to just state for the record, Your Honor, that debtors

22   and Prime Clerk are committed to working constructively and

23   collaboratively with the creditors' committee, you know, on

24   the supplemental notice plan.  And we will, of course,

25   regularly consult with and seek input from the creditors'

Page 59

1   committee and its advisors on substantially all matters that

2   are related to that notice program, including among other

3   things, the implementation of that plan, the scripts that

4   we'll be using for the radio and the TV ads, the rollout

5   schedules and the placement of notices.

6         We'll also make ourselves reasonably available to

7   answer questions from the creditors' committee throughout

8   this process.  And in addition, you know, the debtors and

9   Prime Clerk will keep the creditors' committee, you know,

10  reasonably informed about the progress of the notice program

11  as we've outlined here in the bar date order.

12        And I also did want to note for the record, and

13  consistent with the committee's statement that they filed

14  earlier this week.  The debtors have agreed to engage, for a

15  reasonable fee, a PR and/or media consultants that will be

16  working directly with Prime Clerk at the request of the

17  creditors' committee to assist with that supplemental notice

18  plan.

19        It's all subsumed within the budget that we've

20  already presented in Miss Finegan's declaration.  And we

21  believe that, you know, the expertise that this individual

22  brings to the table and the discussions that we've had with

23  that individual already have proven very constructive and

24  will only help the process kind of going forward.

25        THE COURT:  Okay.

Page 60

1          MR. MCCLAMMY:  The last thing of substance, Your

2    Honor, I believe is Paragraph 19.  The language that we

3    included here was designed to really allow the debtors some

4    flexibility in reaching out to get to everyone that we think

5    has the potential for filing a claim.  It's going to require

6    us to make statements, you know, on the radio, you know, if

7    you think you may have a claim.

8          And we don't want any of those suggestions to be

9    taken as an admission of liability at this stage in these

10   cases or as to the validity of any particular claim or type

11   of claimant or class of claimant that we may be reaching out

12   to.  So we've included this provision in here for the

13   avoidance of any doubt.

14         THE COURT:  That's fine.

15         MR. MCCLAMMY:  Unless Your Honor has any further

16   questions on the order, I can turn to a couple of things in

17   the proofs of claim forms.

18         THE COURT:  No.  Why don't we turn to the forms.

19         MR. MCCLAMMY:  So, Your Honor, as a result of some

20   of the negotiations between the parties, we've made a few

21   changes to the proofs of claim form.  But as a general

22   matter --

23         THE COURT:  But those are in my --

24         MR. MCCLAMMY:  Those are all in your binder.

25         THE COURT:  They're in my binder.

Page 61

1          MR. MCCLAMMY:  I don't think any of them change

2     anything substantively.  A lot of it was --

3          THE COURT:  Yeah, no.  I really didn't -- I mean,

4     I think these changes are consistent with the order.  I

5     didn't really see anything that created an issue, with one

6     exception.  The form itself doesn't reference, as far as I

7     can see, the confidentiality provisions of the order.

8          MR. MCCLAMMY:  We did for the personal injury

9     claimant form.

10          THE COURT:  Where is that, because I went through

11     it a couple of times, I couldn't find it.  There's an

12     instruction in the instructions not to give personally

13     identifying information, but I didn't see anything in the

14     form itself.

15          MR. MCCLAMMY:  Yes.  It's in the -- and if we need

16     to, if Your Honor has missed it, maybe we need to put that

17     in bold so that others see it as well.

18          THE COURT:  But where is it?

19          MR. MCCLAMMY:  But if you're in the -- right under

20     the part that has the website link, and it says read these

21     instructions, read the instructions at the end of this

22     document.

23          THE COURT:  Please read these instructions.

24          MR. MCCLAMMY:  The fifth paragraph down.

25          THE COURT:  You mean the one that says you must

Page 62

1    leave that or redact?

2              MR. MCCLAMMY:  It says personal injury claimant

3    proof of claim forms, any supporting documentation submitted

4    with the form shall remain confidential and shall not be

5    made available to the public.

6              THE COURT:  I'm sorry.  Where is that?

7              MR. MCCLAMMY:  In the fifth paragraph down.  I'm

8    looking at Page 41 of 68 in the exhibits for the personal

9    injury claimant proof of form.

10             THE COURT:  I was looking at the wrong form.

11             MR. MCCLAMMY:  Proof of claim form, the blackline

12   version.  It's right on top of the bolded paragraph that

13   says fill in the information about the claim as of September

14   15, 2019, the petition date.

15             THE COURT:  So just underline highly confidential.

16             MR. MCCLAMMY:  Will do.

17             THE COURT:  Okay, that's fine.

18             MR. MCCLAMMY:  Okay.  We will make that change

19   then, Your Honor.

20             THE COURT:  Okay.

21             MR. MCCLAMMY:  Unless Your Honor has any further

22   questions for --

23             THE COURT:  Well, I had a few other points.

24   First, this is obviously expensive.

25             MR. MCCLAMMY:  It is, Your Honor.

Page 63

1           THE COURT:  It's $23 plus million dollars

2     estimated.  But I agree with all the parties, including

3     those who thought about it and had reservations about it,

4     which I did to some extent too, that you really -- it would

5     be highly unusual not to have a bar date in a case, you

6     know, under the bankruptcy code even where you could make

7     the argument that there is a set of claimants who would

8     cover everybody.

9           Secondly, I believe there are, separate and apart

10    from having a bar date so that people who miss it are out of

11    luck on individual claims, it's important to get individual

12    claims so that one can negotiate a plan and a distribution

13    mechanism.

14          That being said, this is a, for want of a better

15    word, a public health case.  Are you -- are you getting,

16    like, special rates or free treatment from the media on

17    this?  I mean, I don't see why not?  I mean, you know, they

18    make public service announcements all the time.  I would

19    think that there should be some break here on this.

20          MR. MCCLAMMY:  I think Your Honor's statements on

21    that --

22          THE COURT:  Starting with the "Wall Street

23    Journal" and the "New York Times," you know.

24          MR. MCCLAMMY:  I think Your Honor's statements on

25    that can only help in that regard.  But, yes, we are -- we

Page 64

1   are looking at every possible opportunity to make sure we

2   are managing the costs, and Prime Clerk has been on top of

3   that and I'm sure we will take that --

4           THE COURT:  Okay.  And maybe the states could be

5   helpful there.  I mean, I'm not saying to strongarm people,

6   but just to make the point that this really is a public

7   service type of announcement.

8           The second point is tied into one of the

9   rationales here for having a bar date, which is perhaps more

10  important in this case than some other cases, which is to

11  know, you know, who individuals are who say they have a

12  material claim.

13          A big part of this program is not the form itself;

14  it's stories in the media, which obviously create far more

15  attention than, you know, a placement of an ad on one page

16  in a newspaper.  It's summaries put online.  I think it's

17  important in each of those -- and we don't have copies of

18  those; I'm leaving that up to your discretion as monitored

19  by the committee and others to get right -- that it be clear

20  that this is not an invitation to people who generally have

21  claims because of opioids.  People should understand, this

22  is claims against these debtors.

23          Now, it may be that that's a lot of people, but

24  it's not an invitation just for anyone who has an opioid

25  problem but has never taken any product by these debtors to

1    file a claim.  It's not that type of public health issue.

2    It is centered on these debtors.  And I fully agree with

3    what you've agreed to with the committee and others that it

4    may be that people don't have their prescription

5    information.

6          But I think it needs to be made clear when you

7    make a press release, when you provide a canned story to the

8    media, when you do a summary that the focus here is on

9    claims against these debtors, not just a general feeling

10   that the opioid crisis has hurt me somehow, because that's

11   not helpful.  It's not what a proof of claim should be;

12   that's too tactical an explanation.  It's not helpful to the

13   process; it's a total waste of everyone's time and shouldn't

14   be done.

15         So I don't know if you were considering that for

16   your press releases and canned stories and whatever you call

17   them, banners for YouTube, but that's important; these

18   particular debtors, not the opioid crisis generally.

19         MR. MCCLAMMY:  Absolutely, Your Honor, understood.

20   That has been part of our considerations and part of how

21   we're working with the creditors' committee to get that

22   message out in the right way, things that can get peoples'

23   attention.

24         THE COURT:  Right.

25         MR. MCCLAMMY:  And to understand perhaps who

Page 66

```
 1    exactly Purdue and the Purdue debtors are so they can make

 2    some of those determinations as to whether they have a

 3    claim.

 4              THE COURT:  Okay.  And then my last point is, and

 5    I think this is a very important thing you're doing.  You

 6    are reaching out to prescribers.

 7              MR. MCCLAMMY:  Yes, Your Honor.

 8              THE COURT:  And obviously, that's the point of

 9    contact for, I would think, other than NAS babies, people

10    who really do have individual claims for being harmed by the

11    debtors' products.  They will -- their doct- -- you know,

12    they have -- I believe they have an absolute obligation to

13    notify people; nevertheless, human nature being what it is,

14    they may be reluctant to doing so.  Is their confidentiality

15    protected through the claim form?  I mean, are they -- are

16    you going to tell them anything other than just, you know,

17    here's the notice?

18              MR. MCCLAMMY:  For the prescribers?

19              THE COURT:  Yeah.

20              MR. MCCLAMMY:  We're working on developing

21    something that could go in there so that they can pass that

22    information on as well and not just be, here's the standard,

23    you know, notice of claim form.

24              THE COURT:  I mean, they may -- I mean, again, I

25    think everyone's hope is that there would be an agreed
```

 1    allocation.  I mean, conceivably if you're objecting to a

 2    claim, they might be a witness because they will say, yeah,

 3    I prescribed X whatever to somebody.  So it's not complete

 4    confidentiality, but I just -- I don't know if thoughts been

 5    given to how to encourage these people.  And maybe, maybe

 6    you don't encourage them other than to say, you know, you

 7    really as a professional have a duty to notify.

 8               MR. MCCLAMMY:  Exactly.

 9               THE COURT:  Maybe that's it, right?  I just want

10    to make sure that you and the committee have been thinking

11    about --

12               MR. MCCLAMMY:  Absolutely.

13               THE COURT:  -- how to encourage them to do it in

14    the right way.

15               MR. MCCLAMMY:  Absolutely.

16               THE COURT:  All right.  Does anyone have anything

17    further to say on the bar date motion?

18               MR. BICKFORD:  Good morning, Your Honor.  I'm

19    Scott Bickford.  I'm from New Orleans, where actually we

20    have a lot of Saints.  None in the Super Bowl.

21               So, Your Honor, I'm here on behalf of the -- I'll

22    say NAS children, because -- and I'm here with Scott

23    Markowitz, who is representing the Committee as well.

24               The -- I say NAS children, because as the Court is

25    aware from previous filings, there are some 500,000 of these

Page 68

1    kids out there, many of which don't have a statute of

2    limitation running against them because they are minors, who

3    have been born since 2000 and who may have potential claims

4    in this case.  A third of those children have profound

5    disabilities in terms of learning, developmental, and some

6    teratogenic issues as well.  However, the Court does -- and

7    I want to address something very quickly that the Court

8    brought up, is this idea of giving information to

9    prescribers to pass on to potential mothers who had NAS

10   children.  There involves issues of the doctor's own

11   liability, whether the doctors are in fact witnesses,

12   whether they will pass the information along.  And I think

13   even the Debtor recognizes that this type of notice is a

14   pretty precarious way to notice the children.

15           You know, we have had a number of discussions with

16   the UCC, with the Debtors, with the hospitals, with the

17   noticing consultant, and other claimants in this case.  And

18   I think that one of the biggest concerns that we have is

19   this whole idea of confidentiality.  Because if we're

20   looking at birth mothers -- okay?  So in the NAS world we

21   have birth mothers, we have foster parents, we have adoptive

22   parents, we have grandmothers and grandfathers, we have

23   aunts and uncles and other distant relatives.  We have a

24   population of children that has been moved, is mobile, is

25   disparate.  And we're trying to reach all those kids.

1          But with regard to a birth mother -- and this has

2     already been raised when we've been talking about the ERF

3     issues.  This has all been raised by people on the UCC

4     committee and other people, that mothers won't come forward

5     either because they perceive, rightly or wrongly, that a

6     state is going to take their child away if in fact they are

7     still addicted to opiates and caring for the child, or that

8     because they were addicted to opiates at the time the child

9     was born dependent on opiates, that in fact that child

10    would, again, be taken by social services.  They are

11    concerned that social services will in fact subpoena records

12    and that various states' attorney generals will come after

13    and subpoena records from whatever institution is in fact

14    collecting data and information on this.

15          Now, understanding that the person that is the

16    recipient of this is the child, who is innocent.  But

17    because we interpose a guardian with the child, there

18    becomes a problem that the guardian, fearing for their own

19    self or fearing that their child is going to be taken away

20    from them, creates a great impediment on confidentiality.

21    And this is a very big issue going forward with regard to

22    the notice, which is why we're reserving our rights

23    regarding this, to see how many actually apply.  And I don't

24    know how we can test how many birth mothers are going to be

25    reluctant to file claims on behalf of their children.  There

Page 70

1   becomes further complications of course down the line, which

2   we haven't even gotten to, is if --

3          THE COURT:  Again, the form, as far as they're

4   concerned, is confidential.  I was focusing on the

5   prescribers.  I mean, it is confidential as far as the

6   claimant is concerned, which would include the guardian or

7   the mother that's filing the claim for her child.

8          MR. BICKFORD:  Okay.  Well, in that regard, I

9   really think that it ought to be then stamped confidential

10  in terms of the proof of claim in big, bold letters.

11         THE COURT:  Well, it is confidential.

12         MR. BICKFORD:  Understood that.  But I'm just

13  telling you that there is a great perception out there of

14  birth mothers, very fearful of the --

15         THE COURT:  Well, again, I mean, the forms say

16  what they say, and I'm comfortable having underlined it now,

17  that they're clear.  The order says what it says.  As far as

18  the PR campaign, you know, that can be made clear as well as

19  the -- I think I said it would be made clear.  That was my

20  first point in today's hearing, that when you do the summary

21  of the notice and the banners for YouTube and the like, the

22  fact that the form is confidential is one of the things

23  that's highlighted, to be highlighted, as well as that this

24  is a claim against the data.  You have to show that it's

25  against the data as opposed to just generally because of the

Page 71

1    opioid crisis.

2          So I don't think that's -- I mean, I don't know

3    what more we could say on that at this point.

4          MR. BICKFORD:  Right.  I only raise it because

5    this is one of the reasons, the principal reasons we're

6    reserving rights in this case, to see how -- in fact if --

7          THE COURT:  That's fine.  But again, that's just a

8    reservation.  We have to see the facts and who is

9    responsible for what and the like.  But that's fine.  I

10   understand that.  But your input on how to deal with the

11   prescribers is useful.  You don't need to go through it now,

12   but I think it raised an issue in my mind.  I mean, maybe

13   they're just damned if they do and damned if they don't,

14   because they do have professional responsibilities.  But I

15   would like to encourage them to reach out to people.

16         MR. BICKFORD:  Yeah.  And the fact of the matter

17   is even if you reach a prescriber and even if that

18   prescriber is willing to send out notices to a former birth

19   mother, the former birth mother may not actually in a lot of

20   cases even have custody or control of the child.  So that's

21   --

22         THE COURT:  Well, okay.  That's fair.  Okay.

23         MR. BICKFORD:  And with regard -- we would just

24   thank the Court for allowing perhaps us to file one claim

25   with spreadsheets with all the information that is required

Page 72

1    on the proof of claim form on behalf of multiple children in

2    this case to save time and money.

3              THE COURT:  As long as each claimant's claim is

4    sufficiently particularized, whether it's on a form or a

5    spreadsheet, is fine with me.

6              MR. BICKFORD:  Okay.  Thank you.

7              THE COURT:  Okay.

8              You can stay there if you want.  You don't have to

9    --

10             MR. PREIS:  I can't see, but -- Your Honor, I know

11   there are other items on the agenda that we need to get to,

12   so I'll be brief.  But I did want to make sure I said just a

13   few things.  For the record, Your Honor, Arik Preis from

14   Akin Gump on behalf of the Creditor's Committee.

15             The Debtors did a nice job of explaining the

16   process, how we got here.  They also correctly read into the

17   record the agreement we have about our participation going

18   forward.  Just four things I want to mention.  And, again,

19   I'll try to be brief.

20             First, why we've taken such a large interest here,

21   something that hasn't been touched on today.  Second, the

22   discussion around the actual forms themselves.  Third is the

23   deadline to file the proofs of claims, and then fourth, the

24   supplemental notice program.

25             On the first point, why we've taken such a large

1    interest.  Putting aside I think what everyone recognizes,

2    which is we need to make sure we give everyone the chance

3    and the notice to file a proof of claim if they believe they

4    have a claim against the Debtors.  And it's been my own

5    personal experience from talking to people involved, talking

6    to individuals, and many people believe that there is some

7    sort of settlement that is already kind of baked and done in

8    this case that gives all the money to the states.  And

9    therefore, there are a lot of individuals out there who may

10   be thinking to themselves there's no reason for me to file a

11   proof of claim, because I'm not going to see anything.

12   That's one of the main reasons we've been so involved in

13   making sure that not just the proof of claim forms are easy

14   to fill out, but the supplemental notice program that I'm

15   going to get to in a second.

16         The second thing was on the proof of claim forms

17   themselves.  I do want to -- I think Mr. McClammy has done

18   an unbelievable job putting together everyone's comments.

19   The purpose of most of the comments were twofold.  One, to

20   get rid of a lot of the questions, but secondly, to make

21   them really easy.  And I think that's been accomplished.  We

22   won't know until the bar date if it actually worked.  But as

23   of right now I think everyone sitting in the room thinks

24   that they're fair.

25         The third thing, the deadline to file proofs of

1   claim.  Again, we think the choice of the bar date makes

2   sense.  But as we've put in our statement, we don't know.

3   And we'll see how this goes.  And we may be back here, as

4   you said, in a few months saying, okay, have we done it this

5   way or this way, now we've learned from our mistakes, we may

6   need another month.  We don't want to repeat --

7              THE COURT:  Well, hopefully that won't happen.

8   Mullane on down doesn't require perfection.  So --

9              MR. PREIS:  Right.

10             THE COURT:  But I understand your point.

11             MR. PREIS:  But we've seen what happened in PG&E,

12   and I think that was referenced in a number --

13             THE COURT:  Well, those were specific people

14   though.  I think -- anyway, enough said on that.

15             MR. PREIS:  Okay.  On the fourth thing, on the

16   supplemental notice program.  Again, it's impossible to know

17   if $23 million, or $20 million, or whatever it is, is going

18   to be the right number.  But I think part of this has been,

19   well, we want to make sure we do everything we can.  And so

20   one thing that Mr. McClammy hit on is all the different

21   places that all the messages are going to be.  And I think

22   he said the idea is to target each individual six to eight

23   times.  But we've also been equally focused on what the

24   message is.  And that's one of the reasons we urged the

25   Debtors to hire a consultant, why we also have been focus on

Page 75

1   the scripts for TV commercials, why we've been focused on

2   perhaps who the spokesperson would be.

3          Your point about hoping someone would do this for

4   free, you know, public service messages.  One of the great

5   things about earned media is that it is for free.  And so

6   we've been trying to, you know, talk to earned media.

7   Again, one of the great things about the consultant that the

8   Debtors have agreed to bring on.  So, again, we don't know

9   if it's a perfect process, but it's as good as we've been

10  able to come up with.

11         So, again, I just want to thank again the Debtors

12  for everything they've done.  And hopefully we're not going

13  to be back here asking you for relief at some point in the

14  future.  But this is kind of uncharted territory for I think

15  everyone in the room.  Thank you, Your Honor.

16         THE COURT:  Apropos your first point and your

17  earned media point.  This has been a theme that I raised in

18  the first hearing in this case, and it's worth repeating.

19         Even if there ultimately is an allocation here --

20  and there's not a deal now, obviously, at this point on a

21  plan.  But if there is an allocation that leaves a

22  substantial amount of the Debtor's value to the states and

23  territories, one of the primary benefits of a bankruptcy

24  case is that the plan can lock in, perhaps only in general

25  ways, but perhaps more in specific ways, how the states use

Page 76

1    that money so that people will know that it's not going to

2    be used five years from now when these attorneys general

3    have moved on to something else, these attorneys general

4    being highly motivated to deal with the opioid crisis.  But

5    five years from now maybe they won't.  And maybe the state

6    will just say, all right, I want to apply it to taxes.

7    Well, a plan can require how it's to be used.  And the bar

8    date where individual claimants say they've been hurt can

9    guide the states through a plan on how to use the money.

10   And that's really important.

11            So if you could get that message out to the press

12   so they understand that, you know, if a plan here ultimately

13   results in the states getting a lot of value and it's not

14   just for general purposes to alleviate, you know, a subway

15   deficit, all to the good.

16            MR. PREIS:  I appreciate that, you know.  And

17   we'll make sure that when the Debtors are talking to media,

18   we'll make that point.  I'm going to take for the fact that

19   you said if the states get most of the money.

20            THE COURT:  Sure.

21            MR. PREIS:  We haven't --

22            THE COURT:  I understand.  But as far as filling

23   out proofs of claims are concerned, it's an important step

24   no matter who gets the money.

25            MR. PREIS:  Thank you, Your Honor.

Page 77

1         THE COURT:  Okay.  So I will grant the Debtor's

2    motion to set a bar date.  I think we do need to change the

3    order, as we've discussed, with regard to the consolidated

4    claim provision and a couple other minor changes.  My

5    directions from the bench about what should be in summaries

6    and press releases and the like, they don't have to be --

7    that's just part of reference to the record of the hearing.

8    You don't have to add that to the order.

9         MR. MCCLAMMY:  Right, Your Honor.

10        THE COURT:  Okay?

11        MR. MCCLAMMY:  We will make those changes and get

12   that resubmitted to chambers.

13        THE COURT:  Great.  And since we're talking about

14   June 30th, it's not something you have to do by Monday, but

15   I would like to have it by the end of next week.

16        MR. MCCLAMMY:  We will try to get it as quickly as

17   possible.  We have a deadline obviously to start everything,

18   those 21 days from the date that the order is entered.  But

19   rest assured, we will not be waiting.  The processes that

20   need to be put in place for all of this to start and get

21   underway have already been well in the works and will

22   continue unabated.

23        THE COURT:  Okay.

24        MR. MCCLAMMY:  Thank you, Your Honor.

25        MR. HUEBNER:  Your Honor, that brings us to the

Page 78

1    next item on the agenda, which is what I call the limited

2    continuation to hopefully finish up our wages motion.  We

3    have I think one half of one issue left to be resolved.

4          So, Your Honor, I am frankly surprised and

5    saddened to find myself up here.  It was certainly not for

6    lack of trying on any number of occasions between the

7    December 4th hearing and today to put this issue behind us.

8    And it just was not possible.

9          So, Your Honor, to quickly set the stage, what

10   we're here seeking approval for is the very last element of

11   our 2019 incentive-related programs and other related items

12   that were adjourned several times from earlier hearings

13   until December 4th.  What is left is the Court's

14   consideration of a deeply concessionary settlement reached

15   with the UCC after weeks of negotiation of the 2019

16   incentive compensation for the Debtor's CEO.  The sole

17   objectors in the case are the dissenting states, including

18   Pennsylvania, which tucked itself in underneath the most

19   recent filing, and they are one of the dissenting states.

20          That's a very brief recap, Your Honor.  Prior to

21   the December 4th hearing when this was settled with the UCC,

22   Dr. Landau, as part of a complex agreement reached with the

23   UCC covering all employees, had agreed to cuts and changes

24   far deeper than those covering any other employee of Purdue.

25          Four fundamental provisions that I'll cover very

1    quickly.  One, a clawback provision with language that was

2    thereafter agreed to by all parties, including the

3    objectors, used in the December 9th order that preserves the

4    rights to seek discouragement of the AIP amounts, that Dr.

5    Landau has found either to have knowingly participated in

6    criminal conduct or even failed to report fraudulent or

7    criminal conduct of others.  We took the Court's direction

8    (indiscernible) and Insys.  We actually I think even bolted

9    up more from that there, and with that received agreement as

10   to everyone else.

11          Two, an anti-secretion provision applicable to no

12   other employee, and only to Dr. Landau, that he agreed to in

13   advance of the prior hearing that prohibits him from taking

14   any action as a material effect of frustrating enforcement

15   of any potential judgement with respect to the IP payments.

16          Three, the latest payment terms of any employee.

17   As Your Honor may remember, this is normally paid in March

18   of the next year, as annual plans often are.  Dr. Landau

19   agreed to take 50 percent only on June 1st and the next 50

20   percent on September 1st, taking this greatly-reduced amount

21   and de facto turning it into a 2020 retention plan kind of

22   for free for the Debtor's perspective.

23          And then four, the numbers matter, as we'll be

24   talking about quite a bit I think in the next while.  A 63

25   percent reduction in his 2019 incentive compensation.

Page 80

1    Actually, I believe Dr. Landau alone took the brunt of

2    almost 25 percent of the $10 million in overall savings that

3    the deal with the UCC reflected.

4           Quite frankly, it's really very unfortunate to be

5    up here given that we've ben talking about this stuff since

6    September and that we have bent over backwards multiple

7    times to reach peace, especially on what in the grand scheme

8    of things, while material from a compensation perspective,

9    is not really material from the Debtor's perspective.

10          Even more so, Your Honor, because after the

11   hearing in addition to providing copious information to the

12   dissenting states, itself a lot of process and a lot of

13   interaction, Dr. Landau made one more very material

14   concession that was in addition to all of the UCC

15   concessions, which is that the latter half of the $6 million

16   we'll be talking about in a few minutes that Dr. Landau got

17   in March 2018 that was to vest in 37 days on March 1st, Dr.

18   Landau agreed to extend the vesting date of that by ten

19   months, to December 31, 2020.  This actually has several

20   effects we'll be talking about in a few minutes, because it

21   obviously decreases his attributable 2019 compensation

22   substantially.  It almost resets and turns it into a brand-

23   new retention because now it's a cliff and he actually has

24   to write us a check for $3 million if he leaves in the next

25   11 months, which he otherwise would be free to keep the

Page 81

1    money forever potentially as of March 1st.

2            And so this is the one issue that is left.  In

3    terms of the hearing, again, because the Court has such a

4    heavy docket, I don't want to take things for granted.  As a

5    quick reminder, the only evidence of the December 4th

6    hearing was the Debtor's.  There were two very-detailed

7    declarations, both by John Lowne, the Debtor's CFO, which I

8    think was something like 35 very dense pages about these

9    plans, and Josephine Gartrell, a director of Willis Towers

10   Watson, one of the country's preeminent compensation

11   consulting firms.  I would also remind the Court that they

12   both spent a long time on the witness stand.  This was a

13   very extended hearing, and that Mr. Troop and others had a

14   full opportunity to cross-examine both of those witnesses.

15   And I think their testimony about the plans and their

16   structure and their efficacy and their need and their

17   industry nature, including questions that were asked about

18   some of the topics we'll be discussing today, we're very

19   comfortable with the factual record.  No one else had any

20   witnesses or any evidence of any kind.

21           So now let's talk about Dana II, which is I think

22   sort of based on Your Honor's ruling and our colloquies and

23   the briefing, we're going to sort of treat as the de facto

24   governing standard.

25           So first -- and I say this quickly, because

Page 82

1    obviously I'm going to be addressing the merits in just a

2    moment.  Under the express ruling of Dana II, this is the

3    ordinary course of business and does not need court

4    approval.  What actually happened in Dana II, as Judge

5    Liftland said -- and I'll be quoting it in a minute -- the

6    AIP at issue in Dana II was, quote, "refined" prepetition,

7    but was still, quote, "similar" to previous programs.  He

8    then ruled, and I quote, as to their annual AIP.  "Does not

9    differ significantly from Dana's prepetition practice.

10   Accordingly, it is within the ordinary course of the

11   Debtor's business."  So there where the plan actually was

12   changed, I think among other things.  It made the payment

13   semiannual and accelerated things and tweaked other things.

14   He still found that because those were just refinements and

15   it was, quote, "similar", that it was nonetheless ordinary

16   course.

17          Here, again, as a reminder, the uncontroverted

18   oral and written testimony of John Lowne was that for 30

19   years this plan has not changed, including for 2019.

20   Obviously this plan was put in place well before the

21   petition date.  I think it was designed in March or so.  And

22   obviously we filed in September.

23          That said, I just want to give the Court, as I

24   always try to do, multiple ways to hopefully see things our

25   way.  I'm not going to be addressing what we addressed in

Page 83

1    our pleadings, which are the we think procedural impropriety

2    of the joinders to the joinders to the joinders in the late

3    pleadings.  We'll leave that for the papers.  I don't want

4    to make an issue of that today.  But I think on top of those

5    issues, they are ordinary course issues as well.

6              But now let's talk about the factors.  Because

7    we're just as comfortable on the factors as we are with the

8    procedural propriety and potentially the obviation of the

9    need for this hearing at all.

10             So the factors that Dana II sets forth, and there

11   are six of them, is whether the business judgment standard

12   under 503(c)(3) has been met.  And we'll be coming back to

13   that later as well, which is this is a business judgement

14   standard that is tested in specific context.

15             As a reminder again, and forgive me for using that

16   word a few times, the Court has already concluded with a

17   rather detailed ruling that the Debtor's AIP, which is

18   carefully structured and was described at great length in

19   the submitted evidentiary records, meets this standard with

20   respect to all the other employees.  And Dr. Landau's

21   proposed payment is of course under the exact same plan with

22   the exact same metrics that was ruled on in December, and we

23   believe that it satisfies the standards very comfortably as

24   well.  I will --

25             THE COURT:  For this point and for the ordinary

Page 84

1    course point, the only issue that I believe still exists

2    following the December hearing is whether the revised terms,

3    including as most recently revised, are appropriate taking

4    into account the March 2018 agreement.

5              MR. HUEBNER:  Yeah.  I agree, Your Honor.

6              THE COURT:  And that's what I reserved on, because

7    there really wasn't a lot of information until the very last

8    minute in the objections about that arrangement.

9              MR. HUEBNER:  Correct, Your Honor.

10             THE COURT:  That's really what I think we should

11   be focusing on.  It's not just the AIP in isolation in other

12   words.

13             MR. HUEBNER:  Agree, agree, and agree, Your Honor,

14   which is why, as I was literally about to say, the first

15   four of the six factors I will address with extreme brevity

16   and then turn to what I think is really the issue, which is

17   the compensation package in light of and including the

18   retention paid in March 2018.

19             THE COURT:  Or agreed to be paid.

20             MR. HUEBNER:  No, it was paid.  It was paid in

21   March of 2018.  It was a prepaid retention.  And I'll be

22   talking about that again.  I'll --

23             THE COURT:  Well, except it's now -- the vesting

24   point has now changed.

25             MR. HUEBNER:  Correct, yeah.  I'm only talking

Page 85

1    about when it was paid.

2              THE COURT:  Okay.

3              MR. HUEBNER:  I'm going to get to vesting in a few

4    minutes.

5              THE COURT:  Okay.

6              MR. HUEBNER:  So let me actually then move to warp

7    speed on the factors that I think are far less relevant.

8    Because it does bear mentioning that there are six factors,

9    and we actually think that there isn't even much to discuss

10   at all on almost all of them.

11             Whether the plan is calculated to achieve desired

12   performance, I'll just skip it.  There was extensive

13   testimony.  The Court ruled on this issue.  There was the

14   35-page Lowne declaration.  You know, the Debtors have made

15   clear that they and the board of directors believe that Dr.

16   Landau is the right person to read this company during this

17   challenging time, and that this payment is needed to

18   incentivize and compensate him.  And so the first factor

19   does actually matter, because the Board's decision, despite

20   the fact that we are aware of the material sums and the

21   material pay package are at issue, actually matter on

22   whether the plan is actually calculated to achieve

23   performance and support the Debtors and their states.

24             Factor three, whether the scope of the plan is

25   fair and reasonable or discriminates unfairly.  Also,

1    candidly, Your Honor, nothing to discuss here, and it's not

2    contested.  The plan applies to all employees.  So it

3    tautologically does not discriminate among employees because

4    they are all covered, unlike many plans cover only a select

5    few.  And as Your Honor I think appreciated, and the

6    Committee gets credit for pushing us in the negotiations to

7    do this, the changes negotiated with the UCC were massively

8    progressive and not regressive.  The more senior you were,

9    the more and more got taken away.  And in Dr. Landau's case,

10   more and more by a very wide margin, the most got taken

11   away.  And so, you know, it's sort of -- I don't want to say

12   it's anti-discriminatory, but it's highly progressive and

13   not regressive with respect to the UCC's changes, which, as

14   Your Honor knows, were quite material.

15           Factor five and six, whether the Debtors performed

16   due diligence in investigating the need for the plan and

17   whether the Debtors received independent counsel in

18   performing due diligence in authorizing the plan.

19           Your Honor, this factor -- these factors I know

20   are close to your heart, because in multiple hearings you've

21   often asked the question, which is not the way the cases

22   necessarily phrase it, you know, do they control their own

23   pay, do they do this themselves, were they able to pull

24   themselves up by their own bootstraps.  And of course Your

25   Honor knows, because we had extensive testimony and Your

Page 87

1    Honor actually ruled at some length on this, this is the

2    opposite of that.  There was extensive professional

3    involvement, extensive diligence.  And then as Your Honor

4    noted -- and I'll just read Your Honor's quote, because it's

5    better and faster than anything else.  I have to say -- it's

6    just a reminder, we can move on -- in ruling very heavily in

7    the Debtor's favor on this point against the U.S. Trustee,

8    you know, disguised retention plans, Your Honor said among

9    many other things, quote, "In addition to the Debtor's

10   process of analyzing the AIP, which involved independent

11   counsel, the Compensation Committee of the Board, and Willis

12   Towers, the plans were subject to substantial diligence by

13   the UCC and other parties that have a substantial stake in

14   these cases."  Things like Willis Towers you actually said

15   the comp. consultant, so there were a couple of brackets in

16   my citation, but you can take it as a matter of integrity

17   that the citation is correct but for bracketed proper nouns.

18   And then of course there has been way more diligence since

19   then.

20           So, just like Dana II, by the way, where I also

21   note the court also took great comfort in the fact that this

22   was their, quote, second try, because the court actually

23   turned the plans down the first time, unlike our case.  But

24   then there were extensive negotiations with the UCC.  We

25   obviously have that here in spades.  And obviously the UCC

Page 88

1   had multiple professionals working on this.  And so the idea

2   of thorough diligence, independent counsel, essentially a

3   very carefully considered board decision validated by others

4   after a lot of work is present in spades here.  I would

5   shudder to think how much the estate has actually now spent

6   with everybody looking at and analyzing and attacking and

7   changing these plans.  But as to Dr. Landau in particular,

8   no one can say it hasn't been thought about in depth.

9        Now let's talk about the last two factors, which

10  is where we really need to spend our time this morning,

11  whether the cost of the plan is reasonable in the context of

12  the Debtor's assets and liabilities, and whether the

13  payments to Dr. Landau is consistent with industry

14  standards.  And I will absolutely discuss those, Your Honor,

15  against the background of the retention payment, as Your

16  Honor asked.  And it's all in here, so you can be sure that

17  that's what I was planning to do ab initio.

18        So, first, the cost of the payment and is it

19  reasonable in the context of the Debtor's assets and

20  liabilities.  In other words, it is a very large,

21  complicated case.  Numbers are different, jobs are

22  different, roles are different, experience is different, and

23  the like.  So as to the cost of payments, Your Honor, as a

24  reminder, we are talking about a grand total after the 63

25  percent reduction with the UCC of $1.3 million to be made in

Page 89

1   two payments later this year.  This is for a company with

2   well over a billion dollars in cash, multiple products and

3   product lines, zero dollars in funded debt, hundreds of

4   billions of dollars, or as Your Honor noted, probably the

5   GNP of the entire planet by the time we are finished and

6   liabilities of great complexity, and almost a billion

7   dollars in annual revenue.  Thus, in the specific context of

8   the Debtor's assets and asserted liabilities, we think that

9   the greatly-reduced $1.3 million payments are reasonable.

10        So now let's go to the last factor, which is

11   industry standards and what I'll just call general

12   reasonableness, taking lots of other things into account as

13   the objectors would have us do.

14        In an attempt to evade the clear factual record of

15   these proceedings, the objectors urged this Court to

16   categorize Dr. Landau's compensation in a way that is

17   unsupported by the record, including the directly on point

18   expert testimony  But as you will see in a few minutes, even

19   if I adopt every single judgement that they ask us to make

20   and all of their flawed assumptions about how to look at

21   compensation and how to do industry comparisons, you will

22   see that the numbers prove beyond peradventure that the

23   compensation, even taking into account the retention, is

24   well inside the bounds of industry practice.

25        Because what the objectors try to do is they take

1    total direct comp, which the unrebutted, clear testimony of

2    our expert is that when you do apples-to-apples comparisons,

3    you include LTIP, annual, and short-term incentive plans and

4    base salary, because everything else just varies way too

5    much in companies, that in fact Dr. Landau's TDC for 2019

6    will in fact be well below the 50th percentile.

7             As a reminder, and Ms. Gartrell expressly

8    testified at the hearing that retention payments and

9    benefits are distinct from and are not analyzed as part of

10   TDC.  She could not have been clearer.  As she said, quote,

11   "Total direct compensation does not include executive

12   benefits and prerequisites."  And two, we would not, quote,

13   "We would not include retention payments in the TDC

14   analysis."

15            The evidence adduced demonstrates that it would

16   not only be improper, but impossible to compare what the

17   objectors improperly try to present as his, quote, "TDC",

18   which is just the arithmetic total of virtually every dollar

19   he got for virtually any purpose, with only a couple of

20   exceptions against actual TDC.

21            Even though the expert testimony, which makes

22   perfect sense if you take a step back and think about it, is

23   that TDC includes those three things -- base salary, annual

24   incentives, and long-term incentives, they argue that for

25   benchmark purposes, his total comp. should be deemed to

Page 91

1   include things like the retention -- which I'll talk about

2   in a few minutes, and I will show you the numbers to the

3   penny -- and benefits, including things like U.S. housing

4   and U.S. car allowance while living separate from his

5   family, to count that as salary that he's sort of got and

6   kept.

7          This is improper for many reasons as, among other

8   reasons, there is of course endless variability in the

9   benefits and reimbursements and perks of senior employees at

10  large companies.

11         It also bears to mention that in this case in

12  particular, many of these expenses are designed to cover the

13  unusual incremental costs to Dr. Landau and his family by

14  relocating to Canada and then back down to the United States

15  while his family stayed in Canada.  So a commuting expense

16  when you're ripped away from your family who you previously

17  relocated at the request of the shareholders to be counted

18  as sort of salary and bonus and a comp against executives,

19  where for the other executives the only thing that is

20  counted is salary and bonus, is just not right.

21         But here's the simple bottom line fact.  And now

22  we're going to go to the numbers.  Dr. Landau's actual 2019

23  TDC is $3,932,038.  It's comprised of $2,618,788 in base

24  salary and $1,313,250 in the AIP payments if Your Honor

25  grants the relief.  That number, and I'm going to build from

Page 92

1     there, is barely above the 25th percentile and is way, way

2     below the 50th percentile of $5.015 million.  And by the

3     way, that doesn't even account for the fact that the 2019

4     AIP payments which are now being paid near the end of this

5     year aren't really only 2019 comp anymore.  Right?  All the

6     other people that are being comped to don't have further

7     strings attached and don't have to work two years sort of

8     for one to get their AIP payments for the prior year.

9          But now let's do the math.  Because even if for

10    the sake of argument you include a hundred percent of the

11    retention payments allocable to 2019 and the calculation of

12    2019, here's what happens. $2,618,788 in base salary, the

13    proposed AIP payments if Your Honor grants the relief

14    requested of $1,313,250 -- hold on, there's going to be a

15    chart coming with all the numbers -- and retention of

16    $1,863,636.  That's the allocable retention to 2019 with the

17    stretch-out.

18         So what that means is that his TDC for 2019, even

19    if I added in all the allocable retention from the $6

20    million March 2019 payment that stretches over almost three

21    years now, would be $5,795,674, which is below the midpoint

22    of the 50th and the 75th percentile.

23         As a reminder, Ms. Gartrell was asked what is

24    competitive industry pay.  And she said that it is between

25    the 50th and 75th percentile.  So even if we ignore the fact

Page 93

1    that he has to work for most or all of 2020 to get the 2019

2    reduced AIP payments and we ignore the fact, as we'll talk

3    about in a few minutes, that if he leaves during 2020, he

4    has to actually write Purdue a check for $3 million and get

5    zero retention for either 2019 or 2020 and we just pretend

6    that he gets to keep forever the $1.8 million allocable of

7    the $6 million retention to 2019, it's still market comp.

8    No question about it, as testified to by Willis Towers.

9             But let's go even further.  Because there's no

10   fact pattern more or less that I won't cognize.  And let's

11   make another improper argument, a leap.  And we still

12   satisfy this factor candidly.  Because, Your Honor, if you

13   turn to Page 7 of their brief and you look at their chart

14   where they try to say, like, OMG, this is just an obscene

15   amount of money, the number that you get to by adding in

16   expense reimbursements and travel stuff, the U.S. housing,

17   the car, everything, everything, everything, everything, and

18   you just sort of pretend that he got all of it, including

19   the allocated retention irrevocably on December 31st and

20   that was all 2019 comp -- so again, if you take a step back,

21   for everyone else in the entire industry benchmark, nothing

22   gets counted except base salary, LTIP, and AIP.  But for Dr.

23   Landau, we're going to count virtually every penny he got

24   and almost $2 million of allocated severance, the grand

25   total is $6.446 million for 2019, which still falls within

Page 94

1    the competitive range and is well below the 75th percentile

2    of $7.165 million.  In fact, it's almost $700,000 below the

3    75th percentile.

4              So, no matter how many breaks I give them in

5    trying to see it their way and how many things I let them

6    improperly load in so that one person is sort of carrying

7    like 50 packages, but the whole rest of the industry is

8    carrying three packages, it still is the case that his 2019

9    comp, taking into account the attributed retention payment,

10   is well under the 75th percentile.

11             So now let's just talk about what might happen

12   during 2020.  Because from the Board of Directors and the

13   Debtor's perspective, talking about the value to the

14   enterprise and stability and avoiding risk and cost and

15   spending money wisely, we're not unaware that these are

16   material sums.  And as the Court correctly noted at the last

17   hearing, there's sort of very little that's less pleasant to

18   have to talk about at a podium and address from the bench in

19   a bankruptcy case as executive compensation.  It's just a

20   complicated topic.  But the test is still the Dana factors

21   and is this in the best interest of the estate.

22             So here's where we are now.  Dr. Landau now has to

23   stay through virtually all of 2020 to get either or both of

24   this 2019 greatly-reduced AIP payments and to keep not only

25   the $1.8 of the retention that is allocable to 2019, but

Page 95

1    actually a full $3 million.  Because if he leaves, assuming

2    that Your Honor enters the order as requested with the final

3    massive post-hearing concession, if he leaves before

4    December 31, he not only doesn't get the AIP, which we'll

5    talk about in a second, but he has to write a check to

6    Purdue for $3 million for the latter half of the money he

7    got two years ago in March 2018.

8           So let's just do the math for a minute.  Because,

9    again, there's money at issue here, and the Court and the

10   parties deserve to know the accurate numbers.  And we'll

11   talk in a few minutes just for a minute or two about 2018.

12          If the relief we are requesting is granted, if Dr.

13   Landau leaves before June 1, 2020, he forfeits 100 percent

14   of his 2019 AIP, because he left before either of the two

15   payment dates, and he has to be there on the payment date.

16   And he has to write Purdue a check for $3 million.  That

17   means his base salary for 2019 of $2.6 million ends up being

18   the totality of his earnings, which is way below the 25th

19   percentile, and he has to write a check to the company for

20   $3 million.  And if he resigns after June 1st, 2020 but

21   before September 1st, 2020, he gets the first of his two AIP

22   payments.  So he gets 650 of the 1.3.  So his overall 2019

23   compensation turns out to be $3.775 million, the base salary

24   amount plus 650.  But then he has to write Purdue a check

25   for $3 million.  So whether you call it that he made $3.7 or

Page 96

1    that he made $700,000, I don't need to resolve.  Remember

2    that the 50th percentile of TDC is $5.015 million.  So he's

3    still way below the 50th percentile, even not taking into

4    account the $3 million refund he owes Purdue, which means he

5    got no retention at all for March 1, 2019 and on.  And even

6    if he stays past the September 1 payment but resigns before

7    the December 31 payment, he still forfeits a hundred percent

8    of the unvested $3 million that he has agreed to defer and

9    has to write us a check for $3 million.

10          That means that his total compensation for 2019

11   would be $4.4 million, which is the base salary of $2.6 and

12   the AIP.  But, again, I leave to others whether they want to

13   see it as $4.4 or $1.4, because he's writing us a check for

14   $3 million.  In any event, the 50th percentile is $5.015.

15   So, again, any way you slice it, his actual TDC is well

16   below the 05th percentile.

17          Now, it's a virtual certainty, Your Honor -- and

18   this is very important, because the goal is always what's

19   good for the estate and is this the right use of money --

20   that this $1.3 million, payable half in June, half in

21   September, is a very, very small fraction of the many soft

22   and hard costs that Purdue would have to incur if it had to

23   replace the CEO should Dr. Landau decline to work for base

24   salary only.  Because obviously if the relief were denied

25   and he were told that it's nothing other than the base

Page 97

1    salary he already got, which, as we already discussed, is

2    way below the 25th percentile -- you know, hopefully this

3    would never happen for any number of reasons.  But these are

4    the kinds of things the board and the company and presumably

5    the UCC, which agreed to a greatly-reduced package in its

6    business judgement, mirroring the ultimate determination of

7    the Debtors, was there.

8            And Paragraph 8, Your Honor, of the John Lowne

9    Declaration contains some sworn evidence on not Dr. Landau

10   in particular, but the extreme costs and dislocation to

11   Purdue from replacing people, including senior people.  As

12   you might imagine, we don't exactly have people lining up to

13   come work at the company.

14           Just because -- although it came up, whether or

15   not properly, sort of at the very end of a multi-hearing

16   cycle on these issues, I actually want to spend just a

17   minute on the $6 million payment itself.  Because as I said

18   at the last hearing, the Court always deserves comfort as to

19   all parties that we are all doing our level best to steward

20   this thing appropriately.

21           Surprisingly to me, the objectors' pleading

22   contains an incomplete and in fact misleading

23   characterization of the restructuring that took place in

24   June 2018.  I will quote it in full, and then I will tell

25   you what actually happened.

1           On Page 5 in their filing, in Paragraph 6B, the

2    objectors state, and I quote in full Section 6B, "On March

3    23, 2018, Purdue prepaid Landau a $6 million retention

4    payment (the prepaid retention).  As originally

5    contemplated, the prepaid retention was to vest 50 percent

6    by March 2020 and a hundred percent by March 1, 2022.  A few

7    months later, in June 2018, Purdue accelerated the vesting

8    schedule so that Landau would be fully vested in the prepaid

9    retention by March 1, 2020."  Closed quote, end of

10   paragraph.

11          But of course that's not what happened, and they

12   know that.  Because they knew it before the hearing even

13   happened in December, because it was in some of their

14   complaints and it was in the MDL stuff.  They knew it beyond

15   (indiscernible).  We discussed it about 30 times after the

16   hearing.  And they knew it because we described it

17   accurately and in detail in our brief.  But they chose to

18   misdescribe it.

19          What actually happened was they cited only one of

20   the three changes that happened in June 2018, leaving out

21   the two very substantial, arguably massive concessions by

22   Dr. Landau as part of the changing of the vesting schedule.

23   What actually happened was that there were three changes.

24   One was the one they quoted to you.  The others, which they

25   omitted, were, one, his total severance package was reduced

1    from $14.5 million, which it could have been at the high

2    end, to a total of no more than $7 million to $8 million

3    because we took out of it all of the future retention

4    payments that hadn't been paid yet, greatly dropping his

5    severance at a time where it was by no means certain where

6    and when and hither and yon this company was going to go.

7            The second thing that happened was the future

8    retention payments that were already contractually promised

9    were dropped by $2 million.  So what actually happened in

10   the June restructure was three things, one of them which was

11   the acceleration of the vesting schedule, which was in Dr.

12   Landau's favor.  Two, which were very material, which were

13   take-aways and concessions by Dr. Landau.  I should also

14   note that Dr. Landau's most recent concession actually

15   largely reverses the one benefit he got from the accelerated

16   vesting schedule, because that was deaccelerated and it's

17   been pushed out to the end of 2020, adding almost an entire

18   year to it.  So, you know, it's sort of -- now we're down to

19   he got half a thing and he gave up two very big things.

20           And while we're on the subject of voluntary give-

21   ups by Dr. Landau, something we mentioned in our pleading,

22   but because of the way they draft it there is I think worth

23   mentioning.  During 2019 as the company's situation got more

24   complicated, Dr. Landau decided to voluntarily and

25   irrevocably give up, just give back for no consideration,

Page 100

1    not as part of any trade, several of the benefits that he

2    was entitled to, including the private air travel that they

3    call out in Section 9C of their pleading, and the income

4    loss make whole that they call out in Section 9D of their

5    pleading.

6            So in fact the very types of benefits that at a

7    minimum are potentially more complicated as a company

8    becomes troubled, Dr. Landau did the right thing well before

9    the petition date and gave them back, saving the company

10   over $250,000 a year and coming off of the numbers in the

11   charts that obviously try and take a picture of just sort

12   of, you know, more and more and more.  In fact, it's

13   becoming less and less with the various concessions.  So

14   that's that.

15           So then, you know, look.  What I think is going on

16   is really twofold.  One is, you know, people seemingly

17   wanting to understand the 2018 retention payment better.

18   Although as I note when we actually went back and read their

19   pre-filing state law complaints -- and by the way, only two

20   -- and this is -- you know, we'll talk about that in a

21   minute, too.  Only two of the 48 complaints filed by states

22   named Dr. Landau.  There are some interesting language

23   choices in their objection that seem to suggest multiple

24   complains.  It's two, right?  One of those two actually goes

25   into extraordinary detail, almost like a blow-by-blow.  So

Page 101

1    none of this was really news to anybody.

2            So what do I think is really kind of going on?

3    Look, it's always dangerous, but I'll just make a little bit

4    of a thought at least as to some of the objectors.  But

5    what's really going on is that 2018 in general, which is the

6    year of high compensation, you know, higher than 2019 and

7    almost surely higher than 2020 is going to be.  And I'm

8    happy to take that on also.  Because, Your Honor, even if

9    you want to say I don't only want to talk about this

10   retention payment, I want to look at that whole chart on

11   Page 7, and he made a lot of money in 2018.  And, you know,

12   it always has to seem right and feel right and not just be

13   right.  And even though this is only the last of the Dana

14   factors, here's the story.  His actual TDC for 2018 is

15   $6.088 million, which is, once again, well below the 75th

16   percentile of $7.165 million.  So even if you look at the

17   highest year and you say it's even relevant, that's where

18   you end up.

19           Let me give you six thoughts on 2018, and then let

20   me bring this to a close.  One, I actually don't think his

21   overall 2018 compensation actually is relevant.  I don't

22   know of any caselaw that says you do a multi-year lookback

23   where the annual compensation component is being brought to

24   the court for that year.  They certainly didn't cite any law

25   that says that, and I certainly don't see anything in the

1   cases that I read, and I read quite a few of them, that says

2   that.

3           Two, even if you were to look at the reduced $1.3

4   million remaining stretched out 2019 AIP in connection with

5   2018 compensation, if you add the TDC for 2018 and you add

6   the 2019 TDC, they're less than two times the Willis Towers

7   2018 TDC 50th percentile.  So in fact even if you just say

8   his TDC was very high in 2018, it actually went down

9   substantially in 2019, and the two numbers together are

10  below 5.015 times two, which is the 50th percentile.  So

11  even if you want to do like a rolling lookback, that

12  actually still I think gets you to the same place.

13          Three, all of these things were taken into account

14  by the Debtors and the UCC in reaching a settlement.  This

15  was not the Debtor's initial proposal that we're up here

16  still discussing, Your Honor.  We worked for weeks with the

17  UCC and other parties.  And Dr. Landau took a set of massive

18  cuts on -- and everyone knew the facts and the numbers as

19  part of doing that.  And we have one objector group, which

20  is one half of one constituency in the case, saying they

21  feel differently.  I just don't think that, frankly, should

22  be weighted the way they would like it to be weighted.

23          Five, retention payments -- and let's talk about

24  the $6 million straight up.  It's a material sum of money.

25  There's no question about it.  It's now stretched over three

Page 103

1    -- just under three years.  Yeah, three years minus two

2    months.  So we'll call it three years for rounding purposes,

3    which now equates to about $2 million a year on average for

4    retention.  It's there, it's a fact, it's in the numbers.

5    As I've tried to show the Court, even if I load it into TDC

6    and I load it into salary, he's still very comfortably

7    within the percentages that our expert testified are

8    industry standard, which actually is the last Dana prong.

9    In other words to me, Your Honor, that was the core issue,

10   which is Your Honor specifically said, you know, this $6

11   million payment from 2018 is coming up a little late in the

12   day for me.  I'd like you all to go off and talk about it,

13   and I want a better understanding of how it fits into the

14   numbers.  So that's what I did 15 or so minutes ago, which

15   is showing you even if I load in not only the allocated

16   retention, but every single one of the expenses that the

17   objectors ask us to, almost every wire transfer he got for

18   any purpose with the exception of a couple of categories,

19   it's still below all of the industry metrics that the

20   experts provide to the Court and are uncontested.

21          Six, and this is the last point on this.  Without

22   the greatly-reduced 2019 AIP being granted, Dr. Landau's

23   actual 2019 TDC would be below the 25th percentile, or sort

24   of off the charts to the left.  And there's nothing in the

25   caselaw that says that an employee should be penalized and

Page 104

1    paid far, far below market because in prior year a subset of

2    creditors alleges that he or she was paid above market,

3    which it turns out is not even true.  But even if it were

4    true, it's just not the law that you sort of make it right

5    several years later by asking somebody to work for a small

6    fraction or a fraction of market pay.

7              And so at the end of the day, Your Honor, any way

8    you look at it, no matter how much they want to load in, the

9    2019 compensation with the greatly reduced deal struck by

10   the UCC with the Debtors after weeks of work we think is

11   appropriate and in the estate's best interest.

12             What I did do, because I know -- you know, I spent

13   a long time thinking about these numbers.  May I approach?

14             THE COURT:  I've gone through them.

15             MR. HUEBNER:  Okay.  It's really pretty though.

16   (indiscernible).

17             THE COURT:  They're in the papers.

18             MR. HUEBNER:  So, Your Honor, I want to just turn

19   then for one last second to the Insys thing.  In other

20   words, my view is that this is closed.  Their brief,

21   whatever one wants to call it, their statement in support of

22   their joinder to their joinder, began on Page 3 by saying

23   Your Honor has already ruled on this point.  But then had a

24   little mini section with two paragraphs at the end saying

25   actually, no, we want to reopen this.

 1             I have a bunch of things to say about that

 2      attempt.  But if Your Honor's view as you began before I

 3      spoke is that that issue is done and we're only here to

 4      discuss the numbers and the $6 million, then I will spare

 5      you 2.4 pages of oral argument on the Insys and the clawback

 6      issues.

 7             THE COURT:  I don't think I need oral argument.  I

 8      think the parties have addressed it in their pleadings.

 9             MR. HUEBNER:  Okay.  So, Your Honor, as I said, we

10      tried awfully hard to settle this.  We're not unaware of the

11      cost and the burden on everybody for doing this.  But,

12      candidly, there was no deal to be had at all of any kind,

13      which was very unfortunate.  Dr. Landau, to his credit, I

14      think did the right thing yet again, which is although

15      moving the vesting date ten months was a very big

16      concession, because he's literally a month away from this

17      thing vesting, was supposed to be a trade for can we just,

18      you know, call it a day and move on.  And the answer was no,

19      there is no deal to be done here.  He nonetheless said you

20      know what, it's the right thing to do, and I intend to stay

21      here through 2020 to see this case to the end, and I'm happy

22      to put not only the $1.3 million of last year's pay on the

23      chopping block if I resign without cause, I'm happy to have

24      the Court be told that I'm putting the $3 million that's

25      just about to vest on the block also.  It should have been

1   enough.  It's extremely, extremely unfortunate that after

2   the four changes with the UCC, the big fifth change was not.

3            THE COURT:  Okay.

4            MR. TROOP:  Good afternoon, Your Honor.  I am

5   going to try to move at trans-warp speed.

6            Your Honor, I start with the following.  It is not

7   inappropriate for state attorney generals to say we can't

8   consent to the payment of an AIP based upon as a matter of

9   principle --

10            THE COURT:  You don't need to --

11            MR. TROOP:  Okay.  Your Honor, second,

12   notwithstanding that, this process has provided benefit to

13   the estate.  Benefit described by the Debtors in the

14   pleadings and --

15            THE COURT:  Okay.  That's fine, too.

16            MR. TROOP:  Okay. And uncovered $660,000 that has

17   to be repaid.

18            MR. HUEBNER:  So just to be clear, that was done

19   last July.  No one uncovered anything.  It's just not right.

20            MR. TROOP:  I'm sorry, disclosed for the first

21   time to us the fact that there was a discrepancy in the

22   payments.

23            MR. HUEBNER:  That's correct.

24            MR. TROOP:  Okay.  Your Honor, notwithstanding the

25   many questions and back and forth.  But from us, Your Honor,

Page 107

```
 1    the issue that still remains on the one point is that we
 2    understood you to ask for the following.  We understood you
 3    to ask for an apples-to-apples comparison.  Tell me why when
 4    you look at a CEO's compensation and you include TDC,
 5    retention, whatever other perks they're getting, that those
 6    parts all match up against the market?  And Mr. Huebner's
 7    presentation studiously says, well, let's take those things
 8    and put it into the analysis and just compare it against
 9    TDC, which may or may not give an accurate description of
10    how this compensation plays out.  It surely doesn't account
11    for example, notwithstanding the other concessions in March
12    of 2018, what it means to pay someone in cash the entire
13    amount of a retention payment that was supposed to keep them
14    around until 2022.  Right?  Well beyond December of this
15    year.
16            It is -- if we're going to focus on those
17    particular issues, we still think that the presentation and
18    the facts are insufficient.  But I don't need to get into
19    the numbers, Your Honor.  The numbers are there.  We can
20    move them, we can manipulate them.  These were the things
21    with which we struggled.  And I will represent to you
22    notwithstanding (indiscernible) that didn't need to get into
23    the first part.  There's not a single fact and not a single
24    proposal, not a single piece of data that was shared with us
25    by the Debtors that wasn't analyzed and the subject of
```

Page 108

1    discussion.  We just couldn't get there, Your Honor, on the

2    settlement.  And I otherwise rest on the papers, Your Honor.

3            THE COURT:  Okay, very well.  Anyone else?  All

4    right.

5            I held a hearing in early December on the Debtor's

6    motion for approval of various compensation-related programs

7    for 2019.  And having heard testimony by the Debtor's

8    compensation expert, Ms. Gartrell, and reviewed the factual

9    record, I overruled the objections that were remaining to

10   the modified relief that the Debtors were seeking, with one

11   exception, which was the 2019 compensation proposal as

12   modified again for the Debtor's CEO, Dr. Landau.

13           The reason I did that was that the focus or the

14   primary focus of the objection of the ad hoc non-consenting

15   state group to that aspect of the motion only became clear

16   to me basically at the hearing, and, frankly, at the tail

17   end of the hearing.  And in the response that was filed

18   shortly before the hearing by the ad hoc group in which a

19   pre-bankruptcy -- that is March 2018, so considerably pre-

20   bankruptcy -- restructuring of Dr. Landau's compensation

21   package, including his severance package was agreed.  I

22   believe that at that point I didn't have a sufficient level

23   of information where ruling would be appropriate.  That was

24   in part because the focus of the hearing really wasn't on

25   that transaction and how it related to the relief that the

Page 109

1    Debtors were currently seeking.  In part it was because I

2    had the impression that the Debtors and the ad hoc state

3    group might be looking at the same 2018 agreement

4    differently just in terms of the facts of the agreement and

5    that there should be further discussion as to what its terms

6    actually were.  So I adjourned the hearing as far as that

7    limited request for relief was concerned.

8              The whole subject of in particular executive

9    compensation in bankruptcy cases, as was remarked on by Mr.

10   Huebner in today's hearing, is a difficult one for courts,

11   and in particular for the public to fully understand.

12   Generally speaking, when we get to senior executive levels,

13   we are talking about substantial sums of money,

14   substantially above the amounts that the ordinary everyday

15   person makes, and frankly substantially above the amount

16   that bankruptcy judges make.  I'm reminded of Babe Ruth's

17   remark when he was told that he made four times the salary

18   of President Hoover.  He said, well, I had a better year

19   than he had.  I'm not sure how President Hoover reacted to

20   that, but the ordinary person in the street naturally finds

21   it hard to believe that people make the amount of money that

22   expert testimony shows they make for these types of jobs.

23             But the important point to keep in mind I believe

24   is that if you cannot get capable people to perform this

25   type of work without paying them that amount of money or

Page 110

1    more, or alternatively the replacement cost is greater than

2    what is being proposed, it's really not in the interest of

3    the creditors and not appropriate to say, well, nevertheless

4    they should take a haircut because it seems like a lot of

5    money.  In other words, market compensation underlies

6    ultimately the decision that courts make on motions for

7    approval of executive incentive plans where the court has

8    already made, as I have made here, a determination that the

9    plan is primarily incentivizing as opposed to

10   (indiscernible).

11          You can't leave a company without a chief

12   executive officer.  And the universe of replacements,

13   particularly in a situation like this in a complicated,

14   difficult bankruptcy that raises unique issues that requires

15   more than a fair amount of not only general business

16   expertise, but knowledge about the industry and the like,

17   you need someone to run the company.  And people don't work,

18   generally speaking, for less than market, whether they're

19   paid $30,000 a year, or $200,000 a year, or several million

20   dollars a year.

21          Here the specific request before me was for

22   approval of the 2019 AIP, or annual incentive plan, which as

23   compromised by Dr. Landau covers only 50 percent of what

24   that plan would otherwise be up to, well, $1,313,250.  He

25   had agreed prior to the December hearing to make that

Page 111

1    reduction from a hundred percent to 50 percent, to delay a

2    portion of the payment of that AIP and to forego his long-

3    term retention plan for 2019, which was another $1.530

4    million.

5              The Debtors wish me to evaluate the motion simply

6    by looking at that 2019 aggregate of his base compensation

7    plus the 2019 now-reduced annual incentive plan.  And it is

8    quite clear from the record that that total compensation or

9    total base compensation is well below the median.  In fact,

10   at about the 25 percent range.

11             The states contend that I should also take into

12   account the $6 million retention payment agreed to in March

13   of 2018, again, well before the September 2019 petition date

14   here.  I'm not aware either of any case that looks back that

15   far to a prepetition compensation change for a senior

16   executive in a bankruptcy case.  But there were suggestions

17   that at least as of that date the Debtors were contemplating

18   a potential bankruptcy case.  And the closer one gets to

19   bankruptcy where there might be pre-bankruptcy increases in

20   compensation that are not well-explained by market or

21   factual data, the more a court should pay attention to them.

22             I am satisfied, however, based on the record that

23   was already developed, including the negotiations with the

24   Creditor's Committee when Dr. Landau made significant

25   concessions, as well as his additional concession with

Page 112

1    regard to the vesting of the remaining portion for 2019 of

2    that $6 million, as well as the further explication which I

3    now accept by the Debtors of the components of his March 23,

4    2018 agreement.  And finally, the mathematical comparisons

5    of market data as developed by Ms. Gartrell, even taking

6    into account the $6 million retention payment, which there

7    are substantial legal issues as to whether it should be

8    taken into account, that to me show that all things

9    considered, again, even fully taking into account that

10   payment as now discounted, Dr. Landau's compensation is at a

11   market rate.

12           If you take into account his cost reimbursements,

13   which I fully believe would not be appropriate since they

14   seem to be legitimate cost reimbursements, it would be

15   slightly above the median.  If you don't take them into

16   account, it would be somewhat below the median.  But again,

17   that's assuming you take the full March $6 million into

18   account, notwithstanding the fact that it was well before

19   the petition date, notwithstanding further that it was in

20   the context of further provisions in the agreement whereby

21   he reduced his severance amount by in essence a like amount

22   of dollars and the circumstances under which the company I

23   believe was operating at that time.

24           I also, again, believe that as of today, given the

25   material concessions that Dr. Landau has made, there is no

Page 113

1    question that his compensation on a base level is well below

2    the median, and even taking into account the March 23

3    agreement is at the median or slightly below it.

4           The Debtors have raised a couple of procedural

5    points which are worth addressing.  It is true that the ad

6    hoc group's objection and the State of Maryland's objection

7    are really joinders in an objection that is not at this

8    point being pursued by the U.S. Trustee.  There are

9    consequences in simply filing a joinder.  Most importantly,

10   they go to rights of appeal.  I don't believe that a joinder

11   gives rise to a right to settle a matter or to appeal it.  I

12   do believe, however, that it was appropriate to adjourn the

13   hearing to consider on a more complete record the issues, if

14   for no other reason, to lay out the court's rational

15   ultimately now in approving this remaining aspect of the

16   motion.

17          I, frankly, did not want there to be a question

18   mark hanging over Dr. Landau's head as to whether he was

19   being given a sweetheart deal or an overly-generous

20   compensation package.

21          I don't believe that question mark exists today.

22   On the other hand, I didn't want there to be an unresolved

23   question that he was receiving too much.  And again, the

24   record reflects that that's not the case.

25          Lastly, I did already address, I believe, since

Page 114

1    the U.S. Trustee raised it also, the concern that has been

2    raised in the ad hoc group's more recent filing as well,

3    that because Dr. Landau had an important position as chief

4    medical officer for this set of Debtors for several years,

5    and then came back in mid-2017 to become the Debtor's CEO,

6    that he should not receive any portion of his compensation

7    other than his base salary, because there are undeveloped

8    concerns as to whether he individually has criminal or other

9    liability for the Debtor's misconduct.

10           Dr. Landau has been named in some of the

11   complaints filed against the Debtors, including two of the

12   states' complaints.  I have reviewed the attachments to the

13   states', the ad hoc group, that is, opposition to this

14   portion of the motion, which include a ruling denying the

15   motion by, among others, Dr. Landau to dismiss one of the

16   states' complaints.

17           It appears to me that while that motion was

18   dismissed, it was a motion couched on the types of argument

19   that can be made when a motion to dismiss is filed, and not

20   on an analysis of the facts, since when you make a motion to

21   dismiss, or decide a motion to dismiss, the Court is bound

22   to accept the facts as pled as being true, simple facts that

23   are contradicted by documents in the record.

24           It is conceivable to me that Dr. Landau could, as

25   alleged in those complaints, have some liability.  It is

Page 115

1  equally conceivable to me, perhaps more so, given the

2  current nature of the board, and the active role of the

3  creditors' committee that he does not.  Given the claw back

4  provisions and non-secreting agreement that he has agreed to

5  abide by in connection with this motion, I believe there's

6  already been struck an appropriate balance coupled with the

7  so-called N.C. features of the order that I've already

8  entered in December, to address such concerns.

9           I believe it would be wholly inappropriate to in

10  essence, send a Debtor into material risk of not having a

11  chief executive officer merely because a complaint has been

12  filed against him or her that has survived a motion for

13  summary judgment, largely made of jurisdictional grounds.

14  And rather that under these facts, the estates should be

15  protected by what Dr. Landau has agreed to, and what's in

16  the order.

17           So I will grant the remaining portion of the

18  motion, and the Debtors can submit a, I guess you'd call it

19  a supplemental order on that, granting that relief.

20           MR. HUEBNER:  Thank you, Your Honor.  On the

21  subject of orders, just so the Chambers knows, at 10:44 this

22  morning, Ms. Benedict sent to chambers the protective order

23  again.

24           THE COURT:  Okay.

25           MR. HUEBNER:  So hopefully (indiscernible) she can

Page 116

1    sit here and transmit what's requested as it's being asked

2    for.

3              THE COURT:  Okay.

4              MR. HUEBNER:  So hopefully you'll have those both

5    by end of day.

6              THE COURT:  Very well.

7              MR. HUEBNER:  I do think we have one more proposed

8    order, attach the motion of -- with respect to Dr. Landau,

9    we'll separately resubmit it in whatever magical way we do

10   that, so that you have it separately.

11             THE COURT:  Right, okay, that's fine.

12             MR. HUEBNER:  Your Honor, that brings us to the

13   last agenda item, which is the motion to lift the stay,

14   which obviously (indiscernible) is no longer ours.

15             THE COURT:  Okay.  I -- people who want to leave

16   because they're not absorbed by this motion, notwithstanding

17   that it's important, are free to do so.  Okay.  And that

18   goes for people who are on the phone as well.

19             MR. CALHOUN:  May have found the only thing that's

20   more scintillating than executive compensation to talk

21   about, Your Honor, which is insurance coverage and lift stay

22   motions.  George Calhoun, of Ifrah, PLLC, on behalf of

23   Ironshore Specialty Insurance Company, formerly known as TIG

24   Specialty Insurance Company.

25             Your Honor, I'm not going to belabor all the

1    materials that were submitted by the -- my client and the

2    objectors in the various papers.  I do want to highlight a

3    couple of issues for Your Honor.  TIG did issue a policy,

4    insurance policy to Purdue Frederick, which is a non-Debtor

5    in 2000.  Several of the Debtors are insured under that

6    policy.  TIG initiated an arbitration in 2018, pre-petition

7    with respect to some -- a number of coverage issues.

8            THE COURT:  Can I ask you a question on that?  The

9    arbitration clause said any party to this dispute may, once

10   a claim or demand on his part has been denied or remains

11   unsatisfied for a period of 20 calendar days by any other --

12   through the notification process initiative the arbitration.

13           The Debtors say there's been -- there was

14   something that happened in 2001, a notice.  But the Debtors

15   said they have not made any claim on the insurance.  So how

16   does this fit into a claim or demand?  I appreciate the

17   parties invoke -- I mean, they, it doesn't appear that they

18   ever raised this issue, and the arbitration panel has been

19   formed.  But where there's been no claim on the insurance?

20           MR. CALHOUN:  So Your Honor, the issue of whether

21   there's been a claim on insurance is a specialized issue in

22   insurance law.

23           THE COURT:  Okay.

24           MR. CALHOUN:  And if the claim was reasonably

25   foreseeable, then coverage litigation is appropriate.

Page 118

1              THE COURT:  Well, but has it been denied?  Or

2      remains unsatisfied?

3              MR. CALHOUN:  So Your Honor, there is not a -- so,

4      two issues with respect to that, Your Honor.  No, there is

5      not a claim that -- we have, by invoking the coverage

6      defenses, said that we're not covering this type of claim,

7      so --

8              THE COURT:  So that would constitute a claim?

9              MR. CALHOUN:  Yes, to the extent their claims that

10     they've given us notice of, we said those aren't covered,

11     and we've instituted an arbitration to say, arbitrable panel

12     confirmed that these types of claims that they've provided

13     us notice with are not covered.

14             THE COURT:  And the Debtors -- so you sent the

15     Debtors a claim saying this, we denied coverage?

16             MR. CALHOUN:  Not in that -- Your Honor, we

17     instituted the arbitration, and we've had --

18             THE COURT:  No, but there's this -- I appreciated

19     -- maybe his is all waived by the Debtors, I don't know if

20     they've waived that right.  But I mean, it does say, once a

21     claim or demand on his part has been denied or remains

22     unsatisfied, and then you go on to the notice period.

23             So I mean, there's a claim or demand, and then

24     there's a denial or remaining unsatisfied.  And I'm just

25     not, I don't, it doesn't leap out to me that any of those --

Page 119

1    it's two of one or two of the other, any of those two things

2    happened.

3             MR. CALHOUN:  Your Honor, thankfully, I don't

4    think you have to resolve that.  That's an issue for the

5    arbitrable panel.

6             THE COURT:  Okay, why?  I mean, you're saying it

7    has to be arbitrated.  Even under the arbitration decisions,

8    one of the four things to consider is whether it's really

9    covered by the arbitration agreement.

10            MR. CALHOUN:  You're right, and that issue, the

11   issue of whether this is ripe, which is what you're going to

12   --

13            THE COURT:  I'm not talking about ripe.  I'm

14   talking about whether this contract actually applies, at

15   this point.  It may apply in the future, but I'm just, int

16   his point, does it really apply?

17            MR. CALHOUN:  Your Honor, absolutely, we believe

18   that it does.

19            THE COURT:  But why?

20            MR. CALHOUN:  Your Honor, because they have given

21   us notice of claims, which is --

22            THE COURT:  That's from 2001, right?

23            MR. CALHOUN:  And 2005, and then through their

24   later conduct.

25            THE COURT:  They started in 2001, right.

Page 120

1           MR. CALHOUN:  Yep.  And being on notice of those

2    claims, we determined that they, under our, my clients

3    believe, that they're not covered.  Other words, is denied -

4    -

5           THE COURT:  Well, was it denied?  Was the notice

6    of claims, is that the type of thing that can be denied?

7           MR. CALHOUN:  If an insurer denies coverage, yes.

8           THE COURT:  Did that happen?

9           MR. CALHOUN:  I don't know if there was a formal

10   denial, or whether it was in the form of a reservation of

11   rights.

12          THE COURT:  Well, it doesn't say reserve rights.

13   It says denied or remains unsatisfied.  It wouldn't be

14   unsatisfied, because it's just a notice of claim, it's not a

15   demand.

16          MR. CALHOUN:  Correct.

17          THE COURT:  So it would have to be a notice of

18   claim, as opposed to a claim.  And you're telling me under

19   insurance law, it's the same thing.  And then that's denied.

20   But is a denial something less than saying, we deny

21   coverage?  I mean, there are consequences for denying

22   coverage.

23          MR. CALHOUN:  That's correct, Your Honor.

24          THE COURT:  I mean, there are serious consequences

25   for insurers.  So if that hasn't happened, I would think

Page 121

1    under the language of this agreement, that's not a \denial.

2         MR. CALHOUN:  Well, that's all set forth in the

3    arbitration.  And I think that issue of whether or not

4    there's been a sufficient denial of that is arbitrable.  It

5    stars with any dispute under this.  You'll be -- shall be,

6    final and fully determined (indiscernible) pursuant to the

7    English Arbitration Act.  I mean --

8         THE COURT:  No, but it says you start the

9    arbitration once a claim or demand on his part has been

10   denied, or remains unsatisfied.  So you don't get into the

11   arbitration unless that's happened.  I mean, this -- I'm,

12   put it differently, I appreciate that the arbitrators may

13   have an issue as to whether the denial is proper, or even

14   whether it's occurred.  That's an issue.  But there's a

15   separate issue, which is whether this contract actually sets

16   up the arbitration by this provision, whether this provision

17   has been triggered yet.

18        MR. CALHOUN:  Well, certainly, Your Honor, there

19   is an arbitration.  I mean, there already is an arbitration.

20        THE COURT:  Well, I appreciate that, and that's

21   why I raised the waiver issue.  But on the other hand, the

22   way I read this provision to work is that it kind of just

23   gets started on its own, once the notice is given.  And to

24   me, that still leaves open the issue as to whether the right

25   to give the notice was -- exists, and whether this is

Page 122

1    actually covered, this dispute is covered by this provision.

2              MR. CALHOUN:  Your Honor, obviously we believe

3    that it is, and that's why we filed the arbitration.

4              THE COURT:  Well, I know you do, but you haven't

5    told me yet why.  I mean, was there a denial of coverage?

6              MR. CALHOUN:  Implicitly in the filing of the

7    arbitration, yes, Your Honor.  If he wants to supplement --

8              THE COURT:  Has there been an actual written

9    denial, saying we deny coverage?

10             MR. CALHOUN:  I have personally not seen that,

11   Your Honor.

12             THE COURT:  Okay.

13             MR. CALHOUN:  So the reason I am reluctant to say

14   it is I'm not the coverage counsel.

15             THE COURT:  Right.

16             MR. CALHOUN:  And I was not counsel when this was

17   filed, so I just don't personally know the answer to that.

18             THE COURT:  Okay, and look, I'm not an insurance

19   lawyer, but I've done enough insurance cases to know that an

20   actual denial of coverage is a big deal, and sometimes

21   insurers try to get around it by saying, well, there are

22   issues.  And it's not the same thing, and they know it.

23             And so I think when they use the phrase denied in

24   an agreement like this, its's more than just saying there

25   are issues.  We want to find out before we deny, in other

Page 123

1    words.  I mean, if the arbitration is just to see a

2    determination whether we have a right to deny or not, I

3    don't know if it is.  I mean, this is just -- but if it is,

4    it would seem to me that this contract doesn't cover it.

5    because that's not what the contract says.  It says there

6    has to be a denial.

7         MR. CALHOUN:  Well, implicitly, then, Your Honor,

8    there -- the arbitration has been filed.  And that issue is

9    before the arbitrators, whether -- the issue of

10   arbitrability is one --

11        THE COURT:   Have they said, has --

12        MR. CALHOUN:   The Debtor has not --

13        THE COURT:  Has Iron, what's the new name?

14   Ironshore Specialty, has Ironshore Specialty made a denial?

15        MR. CALHOUN:  I don't know, Your Honor.  I just

16   don't -- can supplement whether or not it's been a denial or

17   it was a reservation, but --

18        THE COURT:  I wanted to get that out at the

19   beginning, because you're going through the factual record.

20   It just wasn't clear to me.  It still isn't, really.

21        MR. CALHOUN:  I appreciate that, Your Honor.

22        THE COURT:  Okay.

23        MR. CALHOUN:  I do think that issue is one that's

24   for the arbitration.  The Debtor in the arbitration, as I

25   understand it, has raised the issue of whether it was right.

Page 124

1    I don't believe they've raised the issue of arbitrability.

2    So I don't believe that that is a dispute.

3              THE COURT:  Okay.

4              MR. CALHOUN:  I do believe they've argued that we

5    haven't made a demand yet, therefore it's not right.

6              MR. CALHOUN:  Well, let me just ask.  Have you, is

7    that -- the Debtors think that issue's waived as to whether

8    this provision applies?

9              MR. MCCLAMMY:  No, no, Your Honor, we don't think

10   that issue's waived.  My understanding is that the issue of

11   arbitrability has actually been raised in the arbitration

12   proceeding.  So, and we note that in our --

13             THE COURT:  Well, that could be a lot of different

14   things.  It could be ripeness, for example.  Which is -- but

15   ripeness can be a lot of things too.  Is it right under the

16   contract, or is it ripe under the facts?

17             MR. MCCLAMMY:  Exactly.

18             THE COURT:  Okay, so we don't really know today.

19             MR. MCCLAMMY:  Not in detail.

20             THE COURT:  All right.

21             MR. MCCLAMMY:  My understanding is that all those

22   issues have been preserved in the proceeding.  But at the

23   end of the day, as far as the ultimate determination on this

24   case, I'm not so sure on the merits.

25             THE COURT:  Okay, do you know whether there's been

1      an actual denial of coverage?

2              MR. MCCLAMMY:  There have been notices filed, and

3      my understanding is that there have been denials of the

4      applicability of the coverage.  I don't believe that that

5      necessarily covers the answer to that question, which is,

6      has there been the actual denial of coverage as it would

7      pertain here?

8              THE COURT:  Yep, and what was the response to the

9      notice, saying no, you have -- you do cover us?

10             MR. MCCLAMMY:  Right, right.

11             THE COURT:  Has that been sent back by the

12     Debtors?

13             MR. MCCLAMMY:  That, I'm not sure if there's been

14     correspondence back on that, Your Honor.

15             THE COURT:  Okay.

16             MR. MCCLAMMY:  Your Honor, so my understanding

17     form coverage counsel is that the denial did not come until

18     after the arbitration.  The issue with respect to that is

19     that we have, in fact, raised those issues in the

20     arbitration.  We have not contested the arbitration, but we

21     are raising those issues, raising those issues there.

22             THE COURT:  Okay, okay.

23             MR. CALHOUN:  So Your Honor, as you know, we are

24     seeking relief, and for two bases.  One of them is the

25     contention that because this is arbitrable, which I

Page 126

1    understand Your Honor's point, that alone is cause for

2    relief from stay under some of the authority in this

3    district.

4           And the responses really go into disputes under

5    the Sonnax factors, which I will address briefly.  Where

6    there has been -- where there's a prepetition arbitration,

7    Your Honor, we think you'd be forced to abstain if this --

8    if they attempted to bring this into the Court, because it's

9    a prepetition matter based on state law, be timely resolved,

10   because it's a pre-petition matter based on state law, be

11   timely resolved, if a timely motion was brought.

12          THE COURT:  But they say -- they say they're not

13   looking to bring it into this court at this point.

14          MR. CALHOUN:   No, they're saying they don't want

15   it -- they don't want it resolved at all.

16          THE COURT:  Well, at least not for now.

17          MR. CALHOUN:  Right.

18          THE COURT:  At some point they may have to

19   resolve.  But not for now.

20          MR. CALHOUN:  The point is, Your Honor, they don't

21   -- they're not in complete control of that. We are, in this

22   case, we're the plaintiff.

23          THE COURT:  Well, can I -- you analogized this to

24   abstention, and it really is very close.  I mean, it's

25   basically -- FAA is a federal abstention statute.  So if you

Page 127

1    abstain, you're abstaining from something, and you send it

2    off to where it was before.  What am I abstaining from at

3    this point?  Nothing, right?  There's nothing in front of

4    me.

5              MR. CALHOUN:  Abstention is an analogy, Your

6    Honor.

7              THE COURT:  But it's the same -- isn't it the same

8    thing here?  I mean, the FAA says where something should eb

9    decided, but it doesn't say that it has to be decided now,

10   notwithstanding the automatic stay.

11             MR. CALHOUN:  Correct, Your Honor.  I agree with

12   you on that.

13             THE COURT:  Okay.

14             MR. CALHOUN:  I think we all agree on that.

15             THE COURT:  All right.

16             MR. CALHOUN:  I don't think there's a dispute.

17   But a number of --

18             THE COURT:  Well, but there is a dispute as to

19   whether the Sonnax factors apply or not, and it seems to me

20   that the better argument, based on the very close analogy

21   with abstention is they wouldn't apply, if the Debtors are

22   looking to do something here or in some other form, other

23   than arbitration.

24             But if they're not, then they do apply, because

25   it's really just a question of whether you let litigation go

Page 128

1    forward that the Debtors aren't pursuing at this point.

2           MR. CALHOUN:  Fair enough, Your Honor.  And you

3    know, we've cited on papers the cases that talk about this

4    Court's limited discretion to allow arbitration to go

5    forward.  But I think it's -- because of Your Honor's

6    observation and the way things are, I think it's just

7    appropriate to address the Sonnax factors, and why we think

8    it should go forward now.

9           THE COURT:  Okay, all right.

10          MR. CALHOUN:  Unfortunately, the Sonnax test is a

11   12-factor test, and I think we can all agree that judges can

12   read it just about any way they want, one way or another.

13   But I want to focus on the points that the objectors said

14   heavily weigh in their favor.  Because we disagree with

15   them.  The first one is that they contend that this will

16   lead to unnecessary costs that the estate will incur.

17          This was the same argument that the objectors made

18   in the Quigley matter, that we don't want to deal with this

19   now, we'll deal with it later, and other parties will bear

20   the cost.  That's not a factor here.  A hundred percent of

21   the Debtor's assets are going forward into whatever post-

22   petition entity comes out of this.  Those costs, it's a half

23   dozen of one, six of the other.  Those costs are going to be

24   borne at some point in time regardless.

25          THE COURT:  Although Quigley involved the

Page 129

1    Wellington agreement, so everyone was going to be involved,

2    right?

3                MR. CALHOUN:  It's true that more parties were

4    involved in that, Your Honor.  I don't think that cuts

5    against us here.  One of the other factors is obviously

6    whether or not this will distract from the Debtor's

7    reorganization.  In Quigley, there was a question of whether

8    or not that plan was feasible, even, because of the

9    availability of insurance coverage.  That plan very much

10   depended on insurance coverage.  This case does not turn on

11   insurance coverage.

12               THE COURT:  But I guess I read Quigley a little

13   differently.  It seemed to me that Judge Bernstein in that

14   case was really focusing heavily on the -- what I usually

15   focus on, which is the efficient use of judicial, or

16   arbitrable resources, what you get out of the lawsuit.

17               And in Quigley, the issues were very nicely

18   focused among all the insurers, or substantially all of

19   them, in this one setting.  And they were pretty much ready

20   to be decided.  And because most of the parties were parties

21   do their arbitration provision, they were going to have to

22   be decided at some point in the arbitration, as long as it

23   was structured properly.

24               And in Quigley, he actually dealt with, you know,

25   he says I suggested that a resolution of the coverage issue

Page 130

```
 1   through arbitration might prompt a resolution of the entire

 2   coverage dispute.  At a minimum, it was most of the dollars

 3   in dispute.  According to the stay release we'll have a

 4   greater chance of encouraging a compete resolution of the

 5   issues, and will promote the interests of judicial economy.

 6            Whereas here, we don't even have the claims in

 7   yet.  We don't even know what these types of claims are that

 8   are going to be the subject of the arbitration.

 9            MR. CALHOUN:  I disagree with that, Your Honor.

10            THE COURT:  Okay.

11            MR. CALHOUN:  A, I brought that motion in Quigley,

12   and so I'm very familiar with it.  And certainly that would

13   -- the efficiency was a factor there, but that was in a

14   little bit of a different context, because the insurers had

15   brought an adversary proceeding.  We moved to stay that in

16   favor of this arbitration, because there were a number of

17   parties that were factors there.

18            But as in Quigley, as in here, ultimately the

19   plan didn't depend on, I think, those insurance dollars,

20   although there was a feasibility issue working in the

21   background of Quigley that is not working in the background

22   here.  It's a different case.

23            THE COURT:  But I will not -- I mean, whether a

24   plan depends on something or not doesn't really control

25   Sonnax.  I mean, I will very often deny a lift stay motion
```

Page 131

1    to continue pre-petition litigation, because I'll say to the

2    claimant, you're going to spend all this money, you may

3    lose, in which case you'll have no claim, or you'll win, and

4    you have no idea what you're going to get.  Because you'll

5    get anywhere from no cents on the dollar, because unsecured

6    creditors will be out of the money, to a hundred cents.

7             We have no idea yet.  There's no bar date, there's

8    no claim.  Doesn't have anything to do with the plan.  It's

9    just the efficient use of the forum to solve the particular

10   issue at stake.

11            MR. CALHOUN:  Well, I think -- and that's what we

12   think will happen here, Your Honor.  The issues that we're

13   raising, the coverage issues in large part go to, are these

14   types of claims covered?  We do know the types of claims,

15   Your Honor, because there have been complaints, and notices

16   given to us about the types of claims that they're

17   (indiscernible).

18            For example, claims by the state AGs.  We contend

19   those types of claims are not covered for exactly the reason

20   Your Honor noted today, states don't have personal injuries.

21   They've given us notice of those claims under our insurance

22   policies.  We say that type of claim was not covered.  That

23   will be decided --

24            THE COURT:  We'll actually have the claims at the

25   end of June.  I don't understand why we wouldn't wait until

Page 132

1    then to decide how to structure this.  I mean, we'll have

2    the claims.  They're under, you know, most of these

3    complaints, if they've gone anywhere have gone to -- I'm

4    sorry, most of the complaints that have gone anywhere have

5    just gone to a motion to dismiss stage.  That's different

6    than having to set out your claim in a bar date notice.

7           And it may well be that when this is all -- that

8    claims come in, you'll see that the true PI claims are X

9    hundred million or billion, or whatever.  And the -- you'll

10   actually have the claim at that point, from the States.  I

11   don't -- I don't know why we're doing this now.  Plus of

12   which, it's only one of how many insurers?

13           MR. CALHOUN:  A bunch, Your Honor.  But that's --

14   but it's the only one that chose to file an arbitration pre-

15   petition.

16           THE COURT:  Well, okay.  That, maybe it doesn't

17   say that -- but I don't want to -- I will say this in a way

18   that won't cast dispersions.  But I'll suggest that maybe

19   the majority is thinking more efficiently than the minority?

20           MR. CALHOUN:  I'm not going to speak to whether or

21   not it's -- what their trial strategy is.

22           THE COURT:  I mean, insurers definitely know how

23   to spend their litigation dollars.  And out of how many are

24   there?  There's at least 25, or is it 75?  I forget.

25           MR. CALHOUN:  I know there are at least 19 other,

Page 133

1      based on their filing.

2              THE COURT:  Around 20.

3              MR. CALHOUN:  Yeah.

4              THE COURT:  So --

5              MR. CALHOUN:  The point is, Your Honor, is that we

6      believe that it actually -- resolving this issue early is --

7      will be beneficial to the estate.  I mean, what, none of the

8      objections that you received said we wanted to -- this is

9      asking you to decide a really, they want to decide a really

10     important point about the allowance, and allocation, and all

11     these issues that aren't involved in the arbitration, which

12     was a little bit telling, in my mind --

13             THE COURT:  I under -- I'm just looking at whether

14     this is the right time to do it.  And I'm concerned about

15     three things.  First, I'm concerned that we don't really

16     have the claims.  So if it's an arbitration about whether

17     claims are covered or not, and you don't have the claims,

18     then it seems like it's premature.

19             Secondly, I'm concerned that only one out of the

20     at least 20 insurers have chosen this route.  And the

21     Debtors have not chosen this route.  So you're -- the vast

22     majority of the people who are trying to spend their

23     litigation dollars efficiently have said, this isn't what we

24     should do.

25             Now, maybe that's just because insurers want to

1    put off the day when they pay.  That's certainly

2    understandable.  But okay, there may well be a reason for

3    that.  they will know better when the claims come in that

4    the -- where to go with determining the issues.  I mean,

5    maybe it can be part of a settlement.  I mean, frankly they

6    get protection under 524 equivalents, for example.

7            And then lastly, I did have the issue about the --

8    whether, I mean, like Judge Bernstein in Quigley, if I were

9    to lift the stay, I would want to know that this was a

10   comprehensive solution, not just that one insurer could get

11   a victory that would be collateral estoppel on the Debtors,

12   but if it lost, it wouldn't necessarily be collateral

13   estoppel on the other insurers.  And if the other ones had

14   not invoked arbitration, and maybe that's because the

15   contract actually doesn't provide for it at this point, it's

16   not going to be comprehensive, it's just going to be

17   piecemeal.

18           So it's dragged -- in essence, it would be

19   dragging them into something that maybe doesn't even apply,

20   but even if it did, they don't want to do it yet.  They

21   haven't sent out the notice.

22           MR. CALHOUN:  I don't think we can -- I'm not

23   taking the position whether or not we can drag other

24   insurers into our arbitration.  This is not -- Wellington

25   was different because it was a group agreement.  These are

Page 135

1    our one-off, individual agreements.

2            THE COURT:  Right, right.  So it seems to me that

3    this is -- it may ultimately be, and the Debtors have chosen

4    not really to brief the core issue on arbitrability.  It may

5    be that it has to go to an arbitration, at some point.  It

6    just seems to me that it doesn't seem to be very efficient,

7    to be doing it now.

8            MR. CALHOUN:  It certainly resolves all of my

9    client's 1issues, and --

10           THE COURT:  Well, okay, that's fine.

11           MR. CALHOUN:  And I think it would be instructive,

12   at least, to the Debtors and to the other parties to the

13   extent the Debtors share the outcome -- to the extent that

14   there's issues of, are these types of claims covered?  They

15   might want to know that sooner rather than later.

16           THE COURT:  Well the other, I guess the other

17   point -- this has been pending since 2001, these issues?

18   Why now?  Why is it more important now than back in, from

19   between 2001 and 2018?

20           MR. CALHOUN:  I think, Your Honor, the answer to

21   that is simply by looking at what the states have been

22   doing, and the profile of this issue just became so much

23   larger and more significant, and the costs that were being

24   alleged became, such that it became.

25           THE COURT:  But you all aren't paying anything

Page 136

1   yet.  There's been no claim --

2              MR. CALHOUN:  There's been a claim, Your Honor,

3   there hasn't been a demand.

4              THE COURT:  Demand, I'm sorry, there's been no

5   demand to pay.  I'm using the wrong terminology, yeah.  So I

6   guess you do have to make some sort of reserve, but there's

7   a fair amount of discretion in that, right?

8              MR. CALHOUN:  (indiscernible) totally --

9              THE COURT:  That's a separate thing.

10             MR. CALHOUN:  Separate and somewhat taboo things.

11             THE COURT:  So even as far as the balancing the

12  harms goes, it would be nice for the insurer to get a

13  ruling.  But you could do most of that analysis separately.

14  You've dealt with these types of issues, you've briefed

15  them.  You could analyze them.  There's separate reserve

16  issues for them.  I don't even see why it's that -- I don't

17  see why we don't get the actual claims in and then look at

18  it.

19             MR. CALHOUN:  Well, Your Honor, if it's as simple

20  as us analyzing the issues, then people like Ms. Quinn

21  wouldn't have a job to come -- to tell insurers that we're

22  wrong.  So the fact that we can analyze this, and it doesn't

23  appear that there's coverage for any state or municipality

24  claims under these policies because they don't allege

25  personal injuries, if it were that simple, the Debtors

Page 137

1   wouldn't have given us notice of these claims, and said that

2   we think we might be liable for these.  It's not that

3   simple.

4           THE COURT:  No, I appreciate it's not simple.  It

5   just seems to me that having one insurer under one policy,

6   have an arbitration wouldn't necessarily be binding on the

7   other insurers, because it's not efficient --

8           MR. CALHOUN:  It wouldn't necessarily be binding.

9   It might be instructive.

10          THE COURT:  That's the same point you were just

11  making, that you can instruct people in a negotiation.

12          MR. CALHOUN:  It is kind of ironic, Your Honor,

13  because they (indiscernible) the argument that there'd be a

14  flood of claims, if you let us go forward, and

15  (indiscernible) --

16          THE COURT:  Well, I'm not sure that's the case,

17  but I think that it would be efficient to have it all done

18  at once.  But I'm not sure there would be a flood of -- A, I

19  don't believe that anyone -- I mean, no one has chimed in

20  and say yeah, we want that too.  No insurer has filed a

21  pleading said, we want that also.

22          MR. CALHOUN:  No, but (indiscernible).

23          THE COURT:  Well, probably like, why are you doing

24  this?  No, it may have been that we're interested in wanting

25  to do it.  Not pejoratively.  But I just, I really think

Page 138

1    it's premature.

2              MR. CALHOUN:  I hear Your Honor.  So I don't have

3    anything else to add that's not in our papers.  So if you

4    have any other questions, I'll sit and listen to you.

5              THE COURT: I mean, I could torture out all by

6    asking of further briefing on arbitrability under the

7    agreement, and whether this is a core proceeding or not.

8    But I don't -- I think that's premature, too.  Because no

9    one is -- no one except for, well, I'll say TIG or Ironshore

10   is interested in this, at this point, in pursuing it.  So I

11   think it's premature.

12             Since it's really a collective insurer policy type

13   of issue, it may well materialize, at which point

14   arbitration may well be compelled.  But even, I mean, one of

15   the reasons I'm not asking for briefing on the core issue is

16   that I don't know what the facts will be then.  It may well

17   be that this is a matter that must be arbitrated.  But

18   conceivably, there may be facts like U.S. Lines which would

19   say it shouldn't be.  I'm skeptical of that, but it might

20   be, and we just don't know at this point.

21             MR. CALHOUN:  Yeah, we can have that conversation

22   about U.S. Lines, actually we don't think it's --

23             THE COURT:  Well, I'm not one to tell the Second

24   Circuit that, particularly since I helped win that one.

25             MR. CALHOUN:  Well, no, I think you can get --

Page 139

1   look, although I think it's wrong, and I think there's

2   reasons you can say it's wrong, you don't have to get there.

3   This case is just so much different, because U.S. Lines

4   (indiscernible) of claims.

5           THE COURT:  Well, I don't know, because we don't

6   really have the claims in yet.  I don't know how it fits

7   into the plan process.  I mean, since I represented the

8   Debtors in U.S. Lines, U.S. Lines, the asbestos claims were

9   important in U.S. Lines, but they -- it wasn't the whole

10  case by any means.  So it's -- I don't know.  It's largely

11  because I think you need to see how the claims come in, and

12  how the insurance ties in to the case.

13          MR. CALHOUN:  Your Honor, (indiscernible) --

14          THE COURT:  That will help determine how, whether

15  this is core or not, that I'm not going to ask for briefing

16  on that issue now.  And I think that's the reason why this

17  is not required abstention, because it's not an issue in the

18  case yet.  It's -- and that's why we don't have the facts.

19  It's not really an issue in the case yet, so you can't make

20  the determination under (indiscernible) galleries, and the

21  cases where there is an issue that comes up hot and heavy,

22  and both sides want to have the answer.

23          Only one side wants the answer today, and it's not

24  the Debtor.  So to me, you actually do have to look at the

25  Sonnax factors, because there's nothing to abstain from, and

Page 140

1   you can't do the core, non-core, and if it's core, is it

2   truly important analysis, based on today's facts?  Because

3   it's just not there.  And you shouldn't have to do it,

4   because it's premature.

5           MR. CALHOUN:  I hear Your Honor.  And though we

6   don't agree with you, would it make sense for us to withdraw

7   the motion without prejudice until after the bar date?

8           THE COURT:  Yeah, yes.  Or you can adjourn it to a

9   date in July, if you want.  That's fine, then you don't have

10  to refile it.

11          MR. CALHOUN:  I think that makes more sense.  Then

12  we can talk to the Debtor and see --

13          THE COURT:  I'm happy to have it be schedule to an

14  omnibus date in July.

15          MR. CALHOUN:  I think that would be probably more

16  efficient than continuing --

17          THE COURT:  And then we'll see where it is at that

18  point.  Okay, thank you.

19          MR. MCCLAMMY:  Thank you, Your Honor.  That will

20  work for us as well.

21          THE COURT:  Okay.

22          MR. CALHOUN:  Your Honor, we have nothing further.

23          THE COURT:  You have nothing further, okay, so --

24          MR. CALHOUN:  Except you should be comfortable,

25  plenty of other people will torture us in your absence, if

Page 141

1    the past is a predictor of the future.  Have a wonderful

2    weekend.

3                  THE COURT:  All right, and see you in February.

4                  (Whereupon these proceedings were concluded at

5    1:36 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3                              RULINGS

4                                           Page        Line

5

6    Exclusivity Extension Motion Granted        21          9

7

8    Bar Date Motion Granted                     77          1

9

10   Dr. Landau Motion Granted in Part          115         17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 143

1                    C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski         Digitally signed by Sonya Ledanski Hyde
                            DN: cn=Sonya Ledanski Hyde, o, ou,
                            email=digital@veritext.com, c=US
7    Hyde                   Date: 2020.01.29 16:32:17 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 29, 2020

[& - 503]                                                                                           Page 1

**&**

**&**  8:3,13 9:9 10:1
10:9,17 11:1 15:5
22:11 53:9

**0**

**05th**  96:16

**1**

**1**  95:13 96:5,6
98:6,9 142:8
**1,313,250**  91:24
92:14 110:24
**1,863,636**  92:16
**1.3**  88:25 89:9
96:20 102:3
105:22
**1.3.**  95:22
**1.4**  96:13
**1.530**  111:3
**1.8**  93:6 94:25
**10**  80:2
**100**  95:13
**100,000**  52:23,25
**10005**  10:20 12:14
**10017**  10:4
**10019**  8:23
**10022**  11:4
**10036**  8:6 9:19
10:13
**103**  4:11
**10601**  1:14
**10:29**  1:17
**10:44**  115:21
**11**  2:2,4 80:25
**1100**  8:15 11:10
**115**  142:10
**11501**  143:23
**1177**  10:12
**12**  57:4 128:11
**13**  56:14 57:4
**134**  2:16 3:10,13
**14.5**  99:1

**15**  16:23 62:14
103:14
**150**  11:17
**150,000**  52:25
**15th**  12:4
**16**  57:4
**17**  142:10
**17120**  12:5
**1717**  9:4
**180**  20:21
**19**  60:2 132:25
**19-23649**  1:3
**190**  2:19,22 3:14
**196**  3:18
**197**  2:25 3:23
**1:36**  141:5
**1issues**  135:9
**1st**  79:19,20 80:17
81:1 95:20,21

**2**

**2**  25:4 93:24 99:9
103:3
**2,618,788**  91:23
92:12
**2.4**  105:5
**2.6**  95:17 96:11
**20**  74:17 117:11
133:2,20
**200,000**  110:19
**2000**  68:3 117:5
**20005**  8:16 11:11
**20006**  9:5
**2001**  117:14
119:22,25 135:17
135:19
**2005**  119:23
**201**  3:2 4:3
**2017**  114:5
**2018**  80:17 84:4
84:18,21 95:7,11
97:24 98:3,7,20
100:17 101:5,11
101:14,19,21

102:5,5,7,8
103:11 107:12
108:19 109:3
111:13 112:4
117:6 135:19
**2019**  62:14 78:11
78:15 79:25 80:21
82:19 90:5 91:22
92:3,5,11,12,16
92:18,20 93:1,5,7
93:20,25 94:8,24
94:25 95:14,17,22
96:5,10 99:23
101:6 102:4,6,9
103:22,23 104:9
108:7,11 110:22
111:3,6,7,13
112:1
**2020**  1:16 7:9
22:25 79:21 80:19
93:1,3,5 94:12,23
95:13,20,21 98:6
98:9 99:17 101:7
105:21 143:25
**2022**  98:6 107:14
**21**  28:18 77:18
142:6
**23**  63:1 74:17 98:3
112:3 113:2
**23rd**  31:1
**24**  1:16 7:9
**248**  1:13
**25**  20:9 80:2
111:10 132:24
**250,000**  100:10
**25th**  92:1 95:18
97:2 103:23
**28**  10:19 12:13
**29**  143:25

**3**

**3**  25:4 31:11 80:24
83:12 93:4 95:1,6
95:16,20,25 96:4

96:8,9,14 104:22
105:24
**3,932,038**  91:23
**3.7**  95:25
**3.775**  95:23
**30**  82:18 98:15
**30,000**  110:19
**300**  1:13 143:22
**30th**  22:25 28:23
77:14
**31**  8:22 80:19 95:4
96:7
**31st**  93:19
**327**  4:14
**330**  143:21
**338**  9:10
**35**  81:8 85:14
**37**  80:17
**3rd**  22:18

**4**

**4**  31:11,14 32:1
**4.4**  96:11,13
**400**  37:22
**41**  62:8
**4270**  11:17
**450**  10:3 38:25
39:12,17
**48**  100:21
**4th**  78:7,13,21
81:5

**5**

**5**  32:21 34:14 98:1
**5,795,674**  92:21
**5.015**  92:2 96:2
102:10
**5.015.**  96:14
**50**  37:19 41:2 44:4
79:19,19 94:7
98:5 110:23 111:1
**500**  37:22
**500,000**  67:25
**503**  83:12

**50th**  90:6 92:2,22
  92:25 96:2,3,14
  102:7,10
**524**  134:6
**52nd**  8:22
**550**  53:15
**557**  4:19
**559**  5:3

**6**

**6**  2:14 3:8,16,21
  4:2,10,17 5:1
  36:18,25 80:15
  92:19 93:7 97:17
  98:3 102:24
  103:10 105:4
  111:12 112:2,6,17
**6.088**  101:15
**6.446**  93:25
**60606**  11:18
**62**  4:10
**63**  79:24 88:24
**650**  9:4 95:22,24
**660,000**  106:16
**68**  31:12 62:8
**6b**  98:1,2

**7**

**7**  9:18 35:17 36:24
  37:3 93:13 99:2
  101:11
**7.165**  94:2 101:16
**700**  11:10
**700,000**  94:2 96:1
**70130**  9:11
**712**  6:14,23
**717**  5:10,16 6:1,9
**718**  5:18
**719**  25:4
**75**  132:24
**753**  6:17,22
**754**  7:7
**756**  6:24
**757**  6:1 7:3

**75th**  92:22,25
  94:1,3,10 101:15
**763**  6:10
**77**  142:8
**776**  31:3

**8**

**8**  36:25 52:5 55:6
  97:8 99:2

**9**

**9**  142:6
**919**  11:3
**95**  24:12 25:10
**99**  3:6 4:7
**9c**  100:3
**9d**  100:4
**9th**  79:3

**a**

**ab**  88:17
**abatement**  50:21
**abide**  115:5
**abigail**  14:4
**ability**  23:13
  28:10 37:16 38:4
  43:1 46:6
**able**  25:20 27:9
  33:4,5,13 41:3,9
  55:1 56:23 58:3,5
  75:10 86:23
**absence**  140:25
**absolute**  66:12
**absolutely**  40:3
  65:19 67:12,15
  88:14 119:17
**absorbed**  116:16
**abstain**  126:7
  127:1 139:25
**abstaining**  127:1
  127:2
**abstention**  126:24
  126:25 127:5,21
  139:17

**accelerated**  82:13
  98:7 99:15
**acceleration**
  99:11
**accept**  112:3
  114:22
**acceptable**  17:18
  46:15
**acceptances**  2:4
**accessible**  24:21
**accommodating**
  31:22
**accomplish**  30:24
**accomplished**
  37:3 73:21
**account**  17:13
  18:20 51:22 84:4
  89:12,23 92:3
  94:9 96:4 102:13
  107:10 111:12
  112:6,8,9,12,16
  112:18 113:2
**accurate**  95:10
  107:9 143:4
**accurately**  98:17
**achieve**  85:11,22
**achieved**  18:17
**act**  121:7
**acting**  35:23 36:2
  36:10,11
**action**  79:14
**active**  115:2
**actual**  26:6,11
  72:22 90:20 91:22
  96:15 101:14
  103:23 122:8,20
  125:1,6 136:17
**ad**  2:24 3:20,22
  4:15,18 5:22 7:1,6
  8:21 9:16 10:10
  23:19,21,21,22
  26:22 37:4 38:1
  38:23 40:12 48:18

**50**:14 53:9 64:15
  108:14,18 109:2
  113:5 114:2,13
**adam**  4:2
**add**  19:9 34:7
  77:8 102:5,5
  138:3
**added**  92:19
**addendum**  53:21
**addicted**  69:7,8
**adding**  93:15
  99:17
**addition**  27:8 29:1
  59:8 80:11,14
  87:9
**additional**  4:21
  16:25 30:6 111:25
**address**  30:8
  50:22 55:7 68:7
  84:15 94:18
  113:25 115:8
  126:5 128:7
**addressed**  82:25
  105:8
**addressing**  82:1
  82:25 113:5
**adduced**  90:15
**adjourn**  113:12
  140:8
**adjourned**  78:12
  109:6
**adjust**  58:3,5
**adjusted**  30:19
  58:17
**administrative**
  2:11 37:3,20
**admission**  60:9
**admit**  25:22
**adopt**  89:19
**adoptive**  68:21
**ads**  59:4
**adult**  24:13 25:10

[advance - approach]                                                Page 3

advance   40:7 49:5
  79:13
advanced   51:10
adversary   130:15
advisors   59:1
advocate   23:14
afternoon   106:4
age   24:18
agencies   55:13,14
agenda   7:9,9 20:7
  21:15,16 72:11
  78:1 116:13
agent   22:22 24:15
  35:23,24 36:3,11
  37:11 38:11
agents   24:15
aggregate   40:14
  49:21,24 51:4,12
  53:14 54:3 111:6
ago   15:25 44:23
  95:7 103:14
agree   37:20 40:18
  43:23 52:20,20
  63:2 65:2 84:5,13
  84:13,13 127:11
  127:14 128:11
  140:6
agreed   26:24 27:4
  40:20,23 49:6,9
  59:14 65:3 66:25
  75:8 78:23 79:2
  79:12,19 80:18
  84:19 96:8 97:5
  108:21 110:25
  111:12 115:4,15
agreement   41:13
  50:10 51:14 56:23
  72:17 78:22 79:9
  84:4 109:3,4
  112:4,20 113:3
  115:4 119:9 121:1
  122:24 129:1
  134:25 138:7

agreements   58:20
  135:1
ags   131:18
agustina   12:22
ahead   34:4
aip   79:4 82:6,8
  83:17 84:11 87:10
  91:24 92:4,8,13
  93:2,22 94:24
  95:4,14,21 96:12
  102:4 103:22
  106:8 110:22
  111:2
air   100:2
akin   8:3 72:14
alberto   12:20
alert   45:8
alighted   17:18
allege   34:8 136:24
alleged   114:25
  135:24
alleges   104:2
alleviate   76:14
allocable   92:11,16
  92:19 93:6 94:25
allocate   50:1,11
  50:16 51:15 58:15
allocated   54:15
  93:19,24 103:15
allocation   26:25
  27:4 29:11 40:20
  42:15 47:2 49:6,8
  49:9,10,12 50:5
  51:17,19 52:13
  54:10 67:1 75:19
  75:21 133:10
allow   37:4,6 60:3
  128:4
allowance   49:12
  91:4 133:10
allowed   33:24
allowing   71:24

alongside   17:7,10
alternatively
  110:1
alternatives   30:10
amazingly   24:10
amend   34:5,9
  48:3,5
amended   19:9
american   27:24
americas   10:12
amount   19:20
  20:1 41:8 42:2,6
  54:3 75:22 79:20
  93:15 95:24
  107:13 109:15,21
  109:25 110:15
  112:21,21 136:7
amounts   43:2
  47:11,22 51:25
  53:23 79:4 109:14
analogized   126:23
analogy   127:5,20
analysis   19:20
  90:14 107:8
  114:20 136:13
  140:2
analyze   39:10
  136:15,22
analyzed   90:9
  107:25
analyzing   87:10
  88:6 136:20
andrew   3:21 4:18
  8:25
anik   8:9
anna   13:13
announce   17:14
announcement
  64:7
announcements
  63:18
annual   79:18 82:8
  89:7 90:3,23

101:23 110:22
  111:7
answer   25:20,22
  28:12 29:17 30:22
  33:13 59:7 105:18
  122:17 125:5
  135:20 139:22,23
answers   39:6
anti   79:11 86:12
anticipated   50:12
anybody   101:1
anymore   92:5
anyway   33:16
  74:14
apart   63:9
appeal   113:10,11
appear   117:17
  136:23
appeared   55:10
appears   15:19,22
  58:14 114:17
apples   90:2,2
  107:3,3
applicability
  125:4
applicable   34:7
  38:18 40:10 79:11
applies   37:13
  40:11 56:9 86:2
  119:14 124:8
apply   36:4 40:1
  55:12 69:23 76:6
  119:15,16 127:19
  127:21,24 134:19
appreciate   45:3
  50:17 52:17 76:16
  117:16 121:12,20
  123:21 137:4
appreciated   86:5
  118:18
approach   52:3
  104:13

**approached** 37:15
37:21
**appropriate**
33:20 38:8,17
39:1 84:3 104:11
108:23 110:3
112:13 113:12
115:6 117:25
128:7
**appropriately**
97:20
**approval** 78:10
82:4 108:6 110:7
110:22
**approve** 33:14
**approved** 27:6
33:2
**approving** 5:7,8
5:15,15,24,25 6:7
6:8 113:15
**apropos** 75:16
**arbitrability**
123:10 124:1,11
135:4 138:6
**arbitrable** 118:11
119:5 121:4
125:25 129:16
**arbitrated** 119:7
138:17
**arbitration** 117:6
117:9,12,18
118:11,17 119:7,9
121:3,7,9,11,16
121:19,19 122:3,7
123:1,8,24,24
124:11 125:18,20
125:20 126:6
127:23 128:4
129:21,22 130:1,8
130:16 132:14
133:11,16 134:14
134:24 135:5
137:6 138:14

**arbitrators**
121:12 123:9
**areas** 28:15
**aren't** 118:10
128:1 133:11
135:25
**arguably** 98:21
**argue** 90:24
**argued** 124:4
**arguing** 44:20
45:18
**argument** 47:11
63:7 92:10 93:11
105:5,7 114:18
127:20 128:17
137:13
**arik** 72:13
**arithmetic** 90:18
**arizona** 3:1 4:3
11:16
**arrangement** 84:8
**artem** 13:25
**articulate** 51:23
51:24
**articulated** 18:11
**articulation** 45:21
**asbestos** 139:8
**aside** 73:1
**asked** 28:11 30:9
33:1,21 81:17
86:21 88:16 92:23
116:1
**asking** 33:14
75:13 104:5 133:9
138:6,15
**aspect** 27:25
108:15 113:15
**asserted** 50:3 89:8
**asserting** 32:3
**assessing** 42:18
**assets** 32:11 50:4
88:12,19 89:8
128:21

**assist** 59:17
**assistance** 26:1
**associations** 27:21
**assuming** 95:1
112:17
**assumptions**
89:20
**assured** 77:19
**attach** 39:12,17
116:8
**attached** 38:24
39:5 40:5 92:7
**attachment** 53:18
**attachments**
38:25 114:12
**attacking** 88:6
**attempt** 89:14
105:2
**attempted** 126:8
**attention** 64:15
65:23 111:21
**attorney** 12:2,10
69:12 106:7
**attorneys** 8:4,14
8:21 9:2,16 10:2
10:10,18 11:2,9
11:16 76:2,3
**attributable**
80:21
**attributed** 94:9
**august** 17:17
**aunts** 68:23
**authority** 37:10
126:2
**authorization**
38:11
**authorized** 38:5
**authorizes** 48:11
**authorizing** 2:8
86:18
**automatic** 6:17,21
7:2 127:10

**availability** 129:9
**available** 20:18
59:6 62:5
**avenue** 9:4 10:3
10:12 11:3,10
**average** 103:3
**avoid** 17:23 37:23
**avoidance** 32:2
34:6 60:13
**avoided** 18:21
**avoiding** 94:14
**aware** 67:25
85:20 111:14
**aways** 99:13
**awfully** 105:10

**b**

**b** 1:21 2:9 25:4
39:24
**babe** 109:16
**babies** 23:22 46:9
66:9
**back** 46:1 58:16
74:3 75:13 83:12
90:22 91:14 93:20
99:25 100:9,18
106:25 111:14
114:5 115:3
125:11,14 135:18
**background**
88:15 130:21,21
**backwards** 80:6
**baird** 12:21
**baked** 15:25 73:7
**balance** 45:18,21
115:6
**balancing** 136:11
**ball** 11:6
**bank** 18:20
**bankruptcy** 1:1
1:12,23 26:20
28:8,22 32:24,24
63:6 75:23 94:19
108:19,20 109:9

109:16 110:14
111:16,18,19,19
**banners** 65:17
70:21
**bar** 21:16 22:5,17
22:24 23:1 28:18
28:22 34:7,10
40:22 42:20 45:10
47:4 48:1,25 49:3
49:5,7,10,14
59:11 63:5,10
64:9 67:17 73:22
74:1 76:7 77:2
131:7 132:6 140:7
142:8
**barely** 92:1
**base** 41:10 90:4
90:23 91:23 92:12
93:22 95:17,23
96:11,23,25 111:6
111:9 113:1 114:7
**based** 21:8 28:6
41:20 81:22 106:8
111:22 126:9,10
127:20 133:1
140:2
**bases** 125:24
**basically** 44:22,22
108:16 126:25
**basis** 32:20 33:17
38:12 50:4 57:23
**beacon** 11:2
**bear** 85:8 128:19
**bears** 91:11
**becoming** 100:13
**began** 104:22
105:2
**beginning** 24:10
53:11 123:19
**behalf** 3:9,14,17
3:22 4:2,6,18 5:2
5:9,17 6:9,13,23
15:6 22:12 37:11

37:17 38:12,15,18
48:18 53:9 67:21
69:25 72:1,14
116:22
**belabor** 116:25
**believe** 16:6 22:2
25:4 26:15 27:2,9
30:2,17 31:10,24
33:20 36:20 38:7
55:24 56:13 57:4
59:21 60:2 63:9
66:12 73:3,6 80:1
83:23 84:1 85:15
108:22 109:21,23
112:13,23,24
113:10,12,21,25
115:5,9 119:17
120:3 122:2 124:1
124:2,4 125:4
133:6 137:19
**ben** 80:5
**bench** 77:5 94:18
**benchmark** 90:25
93:21
**benedict** 115:22
**beneficial** 133:7
**benefit** 99:15
106:12,13
**benefits** 2:9,10
4:14 75:23 90:9
90:12 91:3,9
100:1,6
**bent** 80:6
**bernstein** 129:13
134:8
**berro** 12:22
**best** 30:7 41:8
51:24,24 94:21
97:19 104:11
**better** 23:15 25:21
51:9 63:14 87:5
100:17 103:13
109:18 127:20

134:3
**beyond** 17:5,21
27:12,17 38:2,3
89:22 98:14
107:14
**bickford** 9:9,13
67:18,19 70:8,12
71:4,16,23 72:6
**big** 18:9 45:9
64:13 69:21 70:10
99:19 105:15
106:2 122:20
**bigger** 44:25
**biggest** 54:20
68:18
**billboards** 28:16
**billion** 89:2,6
132:9
**billions** 89:4
**binder** 25:4 60:24
60:25
**binding** 137:6,8
**birth** 68:20,21
69:1,24 70:14
71:18,19
**bit** 15:11 79:24
101:3 130:14
133:12
**blackline** 30:25
31:13 57:5 62:11
**block** 105:23,25
**blow** 100:25,25
**blurb** 35:11
**board** 85:15 87:11
88:3 94:12 97:4
115:2
**board's** 85:19
**bold** 61:17 70:10
**bolded** 62:12
**bolted** 79:8
**bondholders**
41:21

**bonus** 91:18,20
**bonuses** 4:22
**bootstraps** 86:24
**born** 68:3 69:9
**borne** 128:24
**bottom** 44:4 91:21
**bound** 114:21
**boundaries** 42:14
**bounds** 17:22
89:24
**bowl** 67:20
**box** 16:2
**bracketed** 87:17
**brackets** 87:15
**brand** 80:22
**brauner** 8:8
**break** 53:22,24,25
63:19
**breaks** 94:4
**brevity** 84:15
**brian** 5:2 13:12
**brief** 72:12,19
78:20 93:13 98:17
104:20 135:4
**briefed** 136:14
**briefing** 81:23
138:6,15 139:15
**briefly** 24:24
53:10 126:5
**bring** 18:7 75:8
101:20 126:8,13
**brings** 59:22
77:25 116:12
**broadly** 49:19
**brought** 17:6
26:20 27:3 68:8
101:23 126:11
130:11,15
**brown** 9:15
**brunt** 80:1
**bryant** 8:5
**budget** 59:19

**build** 20:16 91:25
**builds** 28:3
**bunch** 105:1
  132:13
**burden** 105:11
**burkart** 12:23
**business** 82:3,11
  83:11,13 97:6
  110:15

**c**

**c** 8:1,18 13:1,7
  15:1 83:12 143:1
  143:1
**calculated** 85:11
  85:22
**calculation** 92:11
**calendar** 117:11
**calhoun** 6:13 9:7
  116:19,22 117:20
  117:24 118:3,9,16
  119:3,10,17,20,23
  120:1,7,9,16,23
  121:2,18 122:2,6
  122:10,13,16
  123:7,12,15,21,23
  124:4,6 125:23
  126:14,17,20
  127:5,11,14,16
  128:2,10 129:3
  130:9,11 131:11
  132:13,20,25
  133:3,5 134:22
  135:8,11,20 136:2
  136:8,10,19 137:8
  137:12,22 138:2
  138:21,25 139:13
  140:5,11,15,22,24
**call** 65:16 78:1
  89:11 95:25 100:3
  100:4 103:2
  104:21 105:18
  115:18

**called** 115:7
**campaign** 70:18
**canada** 91:14,15
**candidates** 17:6,7
**candidly** 18:4
  86:1 93:12 105:12
**canned** 65:7,16
**canonized** 21:19
  22:13
**capable** 22:19
  109:24
**caplin** 8:13
**car** 91:4 93:17
**carefully** 83:18
  88:3
**caregiver** 30:2
**caring** 69:7
**caroline** 13:3
**carries** 36:25
**carry** 34:16
**carrying** 94:6,8
**case** 1:3 19:8,23
  20:13,22 21:9,22
  32:8,15 33:16
  35:21 38:8,9 39:9
  44:19 45:12 46:22
  47:5 48:24 49:1
  49:19 51:10,17
  55:20 63:5,15
  64:10 68:4,17
  71:6 72:2 73:8
  75:18,24 78:17
  86:9 87:23 88:21
  91:11 94:8,19
  102:20 105:21
  111:14,16,18
  113:24 124:24
  126:22 129:10,14
  130:22 131:3
  137:16 139:3,10
  139:12,18,19
**caselaw** 101:22
  103:25

**cases** 17:20 19:7
  22:25 26:5,8,11
  26:22,25 27:2,11
  30:11 32:9 33:12
  60:10 64:10 71:20
  86:21 87:14 102:1
  109:9 122:19
  128:3 139:21
**cash** 18:20 89:2
  107:12
**cast** 132:18
**categories** 40:21
  103:18
**categorize** 89:16
**catrina** 13:24
**cause** 21:10 30:6
  105:23 126:1
**centered** 65:2
**centola** 9:9
**cents** 131:5,6
**ceo** 4:17 78:16
  96:23 108:12
  114:5
**ceo's** 107:4
**certain** 27:20,21
  27:24 35:22 37:4
  42:13 43:23 51:4
  55:10 99:5
**certainly** 49:23
  51:22,23 78:5
  101:24,25 121:18
  130:12 134:1
  135:8
**certainty** 96:17
**certificate** 15:18
**certified** 143:3
**cetera** 26:10
**cfo** 81:7
**challenging** 51:17
  85:17
**chambers** 15:17
  16:5 21:11 25:4
  77:12 115:21,22

**chance** 73:2 130:4
**change** 34:3,11,15
  36:14,22 52:15,24
  56:14 57:3 61:1
  62:18 77:2 106:2
  111:15
**changed** 82:12,19
  84:24
**changes** 29:20
  30:23 31:11 34:17
  60:21 61:4 77:4
  77:11 78:23 86:7
  86:13 98:20,23
  106:2
**changing** 88:7
  98:22
**chapter** 2:2,4
**characterization**
  97:23
**charbonneau**
  12:24
**chart** 92:15 93:13
  101:10
**charts** 100:11
  103:24
**check** 16:2 80:24
  93:4 95:5,16,19
  95:24 96:9,13
**checked** 40:7
**checks** 2:14
**chicago** 11:18
**chief** 110:11 114:3
  115:11
**child** 30:5 69:6,7
  69:8,9,16,17,19
  70:7 71:20
**children** 5:22 7:6
  67:22,24 68:4,10
  68:14,24 69:25
  72:1
**chimed** 137:19
**chinese** 15:9

**choice**  74:1
**choices**  100:23
**chopping**  105:23
**chose**  98:17
  132:14
**chosen**  133:20,21
  135:3
**christopher**  13:20
**circle**  8:15
**circuit**  138:24
**circumstances**
  112:22
**citation**  87:16,17
**cite**  101:24
**cited**  98:19 128:3
**cities**  38:3
**citizens**  33:4
**claim**  5:6,8,14,15
  5:23,25 6:6,7
  15:22 23:2,3,6,10
  26:5 28:9,11,25
  29:5,5,7,25 31:16
  32:3,5,7 33:18,23
  34:5,8,10 37:7,11
  37:12,17 38:5,7,9
  38:12,16,17 39:11
  39:12,13,14,18
  40:14 41:19,21
  42:1,18,23 43:10
  43:10,12,15,16,22
  43:23 44:4,14,18
  45:22 46:19 47:8
  47:8,16 48:1,2,3,5
  49:12,18,21,24
  51:3,22 52:12,12
  52:20,22,25 53:14
  53:16 54:3,6,14
  55:9,11,12,16,19
  55:22,23,25 56:7
  56:8,18 57:1 60:5
  60:7,10,17,21
  62:3,11,13 64:12
  65:1,11 66:3,15

66:23 67:2 70:7
70:10,24 71:24
72:1,3 73:3,4,11
73:13,16 74:1
77:4 117:10,15,16
117:19,21,24
118:5,6,8,15,21
118:23 120:14,18
120:18 121:9
131:3,8,22 132:6
132:10 136:1,2
**claimant**  34:5
  39:20 40:5 42:22
  60:11,11 61:9
  62:2,9 70:6 131:2
**claimant's**  72:3
**claimants**  23:5,20
  26:3,7,19 27:12
  32:16 34:18 35:9
  38:2,16 40:1,20
  40:21 46:10 47:7
  47:7 51:15 52:6
  54:12,16 63:7
  68:17 76:8
**claims**  2:12 22:25
  23:4,8,11 26:3,16
  26:19 27:2,3,6,10
  29:9 30:10 31:16
  32:3,23 33:12
  35:23 37:5,8
  39:10,24 40:25
  41:1,2,4,15,22
  42:14,15 43:2,9
  43:23 44:22,25
  49:24 50:2 51:6
  51:11,25 52:1
  53:23 54:9 55:15
  55:16,23 56:8,19
  63:11,12 64:21,22
  65:9 66:10 68:3
  69:25 72:23 76:23
  118:9,12 119:21
  120:2,6 130:6,7

131:14,14,16,18
131:19,21,24
132:2,8,8 133:16
133:17,17 134:3
135:14 136:17,24
137:1,14 139:4,6
139:8,11
**clarification**
  32:22 48:23
**class**  38:7 47:8
  60:11
**claudia**  14:3
**clause**  117:9
**claw**  115:3
**clawback**  79:1
  105:5
**clear**  19:16 35:9
  38:6,21 40:2
  43:19 55:21 64:19
  65:6 70:17,18,19
  85:15 89:14 90:1
  106:18 108:15
  111:8 123:20
**clearer**  90:10
**clearly**  21:10
**clerk**  22:21 24:16
  25:6 26:1 35:20
  35:23,24 36:1,2,3
  36:4,7,10,10,11
  36:12 57:16,25
  58:22 59:9,16
  64:2
**client**  117:1
**client's**  135:9
**clients**  120:2
**cliff**  80:23
**close**  26:8 86:20
  101:20 126:24
  127:20
**closed**  98:9
  104:20
**closer**  111:18

**code**  32:24 63:6
**cognize**  93:10
**collaboratively**
  58:23
**collateral**  134:11
  134:12
**colleagues**  22:19
**collecting**  69:14
**collective**  49:18
  50:1 138:12
**colloquies**  81:22
**colloquy**  45:25
  48:21
**colucci**  4:11
**come**  22:12 31:7
  47:6 50:20 69:4
  69:12 75:10 97:13
  125:17 132:8
  134:3 136:21
  139:11
**comes**  36:16 49:1
  58:16 128:22
  139:21
**comfort**  87:21
  97:18
**comfortable**
  19:21 41:24 48:22
  70:16 81:19 83:7
  140:24
**comfortably**
  83:23 103:6
**coming**  16:12
  83:12 92:15
  100:10 103:11
**comma**  38:18
**commenced**  26:13
**comment**  53:10
**comments**  16:2
  28:19 48:21 53:10
  55:2 73:18,19
**commercials**  75:1
**committed**  58:22

**committee** 5:22
6:4,10,19,24 7:6
9:16 10:10 17:3
23:18,19,22 38:1
48:18 50:15,24
52:8 57:12,17
58:10,20,23 59:1
59:7,9,17 64:19
65:3,21 67:10,23
69:4 72:14 86:6
87:11 111:24
115:3
**committee's** 59:13
**committees** 7:1
26:23
**common** 23:14
43:2,9,10,16,23
53:19
**commonwealth**
2:21 3:17 12:1,2
**commuting** 91:15
**comp** 87:15 90:1
90:25 91:18 92:5
93:7,20 94:9
**companies** 23:7
90:5 91:10
**company** 6:14,21
9:3 11:2 16:22,25
17:2 85:16 89:1
95:19 97:4,13
99:6 100:7,9
110:11,17 112:22
116:23,24
**company's** 99:23
**compare** 90:16
107:8
**comparison** 107:3
**comparisons**
89:21 90:2 112:4
**comped** 92:6
**compelled** 138:14
**compensate** 85:18

**compensation** 2:9
2:12 78:16 79:25
80:8,21 81:10
84:17 87:11 89:16
89:21,23 90:11
94:19 95:23 96:10
101:6,21,23 102:5
104:9 107:4,10
108:6,8,11,20
109:9 110:5 111:6
111:8,9,15,20
112:10 113:1,20
114:6 116:20
**compete** 130:4
**competitive** 92:24
94:1
**complains** 100:24
**complaint** 115:11
**complaints** 98:14
100:19,21 114:11
114:12,16,25
131:15 132:3,4
**complete** 41:13
67:3 113:13
126:21
**completely** 26:25
33:9 40:10 45:4
**complex** 15:20
17:21 22:4 78:22
**complexity** 20:14
89:6
**complicated**
18:25 88:21 94:20
99:24 100:7
110:13
**complication** 52:7
**complications**
70:1
**component**
101:23
**components** 112:3
**comprehensive**
24:10 134:10,16

**comprised** 91:23
**compromised**
110:23
**conceivable**
114:24 115:1
**conceivably** 38:25
67:1 138:18
**concept** 49:15
**concern** 29:22
33:3 114:1
**concerned** 42:2
46:12,13 47:5,16
47:20,21 50:8
52:21 55:10 69:11
70:4,6 76:23
109:7 133:14,15
133:19
**concerns** 16:1
29:18 30:6,8
32:20 68:18 114:8
115:8
**concession** 80:14
95:3 99:14 105:16
111:25
**concessionary**
78:14
**concessions** 80:15
98:21 99:13
100:13 107:11
111:25 112:25
**concluded** 83:16
141:4
**conditional** 5:21
7:5
**conduct** 5:1 79:6
79:7 119:24
**conducted** 57:11
**confidential** 34:22
62:4,15 70:4,5,9
70:11,22
**confidentiality**
29:23 30:9 35:10
61:7 66:14 67:4

68:19 69:20
**confirm** 40:7
**confirmed** 118:12
**conflicts** 17:15
**connection** 19:19
23:24 26:23 46:25
58:20 102:4 115:5
**consensus** 20:16
49:22 50:15 51:5
51:8
**consent** 5:21 7:5
106:8
**consenting** 2:25
3:21,22 4:15,19
8:21 9:16 10:10
11:9 23:21 38:10
108:14
**consequences**
113:9 120:21,24
**consider** 113:13
119:8
**considerably**
108:19
**consideration**
50:13 78:14 99:25
**considerations**
65:20
**considered** 17:6
45:9 88:3 112:9
**considering** 40:13
65:15
**consistent** 26:25
45:21 57:7 59:13
61:4 88:13
**consolidated** 37:7
37:16 38:4,12,16
38:24 39:11,14
41:19 45:22 47:16
54:2 77:3
**constantly** 47:1
**constituencies**
17:7 29:15

**constituency**
102:20
**constituents** 33:5
**constitute** 118:8
**constructive**
23:18 59:23
**constructively**
58:22
**consult** 17:3 25:21
58:25
**consultant** 68:17
74:25 75:7 87:15
**consultants** 59:15
**consulting** 17:5
81:11
**contact** 26:10
66:9
**contacting** 35:4
**contains** 39:19
97:9,22
**contemplated**
19:9 98:5
**contemplating**
111:17
**contend** 111:11
128:15 131:18
**contention** 125:25
**contested** 86:2
125:20
**context** 83:14
88:11,19 89:7
112:20 130:14
**contingent** 23:20
38:2
**continuation** 78:2
**continue** 27:10
57:12 77:22 131:1
**continues** 18:5
**continuing** 140:16
**contract** 119:14
121:15 123:4,5
124:16 134:15

**contracts** 17:15
**contractually**
99:8
**contradicted**
114:23
**contradiction**
21:24
**contributing**
32:19
**contribution**
56:19
**control** 71:20
86:22 126:21
130:24
**convenience** 37:4
37:20
**conversation**
138:21
**conversations**
15:21 57:9
**copies** 64:17
**copious** 80:11
**core** 103:9 135:4
138:7,15 139:15
140:1,1,1
**correct** 84:9,25
87:17 106:23
120:16,23 127:11
**correction** 31:22
**correctly** 72:16
94:16
**correspondence**
125:14
**cost** 42:21 88:11
88:18,23 94:14
105:11 110:1
112:12,14 128:20
**costs** 64:2 91:13
96:22 97:10
128:16,22,23
135:23
**couched** 114:18

**counsel** 12:11
37:6,10 38:11
55:3 56:4 86:17
87:11 88:2 122:14
122:16 125:17
**count** 91:5 93:23
**counted** 91:17,20
93:22
**counterparties**
26:10
**counties** 2:18 3:12
3:14
**country** 24:19
29:4 47:1 143:21
**country's** 81:10
**county** 38:3 39:23
39:24
**couple** 25:19
60:16 61:11 77:4
87:15 90:19
103:18 113:4
117:3
**coupled** 115:6
**course** 16:20 20:2
56:9 58:24 70:1
82:3,10,16 83:5
83:21 84:1 86:24
87:18 91:8 98:11
**court** 1:1,12 15:2
15:9 16:1,4,8,9,10
16:11,14,17,20
17:16,20 18:2,7
19:3,5,5,6 20:14
20:15,25 22:8,10
22:14,18 25:7,16
27:3,6 29:14
30:21,25 31:4,6
32:10,14,18 33:14
33:19,23 34:3,13
35:1,15,18,20,23
36:3,5,7,11,15,19
36:21,23 38:13
39:7,17 40:4,16

41:14,18 42:1,6,9
42:12 43:3,6,9,21
44:6,8,16,18 45:2
45:8,11,16,19,23
46:2,8 47:4 48:3,7
48:8,11,12,15,19
49:12 52:10,19
53:5,7,24 54:4,8
54:17,18,20,25
55:5 56:2,9,12,15
57:2,6 58:7,14
59:25 60:14,18,23
60:25 61:3,10,18
61:23,25 62:6,10
62:15,17,20,23
63:1,22 64:4
65:24 66:4,8,19
66:24 67:9,13,16
67:24 68:6,7 70:3
70:11,15 71:7,22
71:24 72:3,7 74:7
74:10,13 75:16
76:20,22 77:1,10
77:13,23 81:3,11
82:3,23 83:16,25
84:6,10,19,23
85:2,5,13 87:21
87:22 89:15 94:16
95:9 97:18 101:24
103:5,20 104:14
104:17 105:7,24
106:3,10,15 108:3
110:7 111:21
114:21 115:24
116:3,6,11,15
117:8,23 118:1,8
118:14,18 119:6
119:13,19,22,25
120:5,8,12,17,24
121:8,20 122:4,8
122:12,15,18
123:11,13,18,22
124:3,13,18,20,25

125:8,11,15,22
126:8,12,13,16,18
126:23 127:7,13
127:15,18 128:9
128:25 129:12
130:10,23 131:24
132:16,22 133:2,4
133:13 135:2,10
135:16,25 136:4,9
136:11 137:4,10
137:16,23 138:5
138:23 139:5,14
140:8,13,17,21,23
141:3
**court's** 16:20
78:13 79:7 113:14
128:4
**courtroom** 46:23
**courts** 34:9
109:10 110:6
**cover** 20:8 46:4
63:8 78:25 86:4
91:12 123:4 125:9
**coverage** 116:21
117:7,25 118:5,15
120:7,21,22 122:5
122:9,14,20 125:1
125:4,6,17 129:9
129:10,11,25
130:2 131:13
136:23
**covered** 46:3 86:4
118:10,13 119:9
120:3 122:1,1
131:14,19,22
133:17 135:14
**covering** 47:12
78:23,24 118:6
**covers** 46:10
110:23 125:5
**cracking** 18:23
**craig** 4:17

**create** 64:14
**created** 61:5
**creates** 69:20
**credit** 19:25 86:6
105:13
**creditor** 17:7,9
**creditor's** 72:14
111:24
**creditors** 6:4,10
6:20,24 17:3,12
23:18 52:8 57:12
57:17 58:23,25
59:7,9,17 65:21
104:2 110:3 115:3
131:6
**criminal** 79:6,7
114:8
**crisis** 23:4 24:19
55:24 65:10,18
71:1 76:4
**crockett** 12:25
**cross** 25:16 81:14
**cure** 50:22
**current** 56:19,22
56:24 115:2
**currently** 109:1
**custody** 71:20
**cuts** 78:23 102:18
129:4
**cycle** 97:16

**d**

**d** 1:22 15:1 142:1
**damages** 39:1
40:14 50:20
**damned** 71:13,13
**dan** 4:10
**dana** 81:21 82:2,4
82:6 83:10 87:20
94:20 101:13
103:8
**dana's** 82:9
**dangerous** 101:3

**daniel** 13:21
**darren** 13:18
**data** 49:10 69:14
70:24,25 107:24
111:21 112:5
**date** 21:16 22:5
22:17,24 23:1
26:13 28:19,22
34:7,10 40:22
42:20 45:10 47:4
48:1,25 49:3,5,7
49:10,14 59:11
62:14 63:5,10
64:9 67:17 73:22
74:1 76:8 77:2,18
80:18 82:21 95:15
100:9 105:15
111:13,17 112:19
131:7 132:6 140:7
140:9,14 142:8
143:25
**dates** 95:15
**david** 9:21 12:16
**davis** 10:1 15:5
22:11,18
**day** 16:11 18:19
18:21 20:16,16
49:2 58:2,2
103:12 104:7
105:18 116:5
124:23 134:1
**days** 20:22 28:18
77:18 80:17
117:11
**dc** 8:16 9:5 11:11
**de** 79:21 81:23
**deaccelerated**
99:16
**deadline** 72:23
73:25 77:17
**deadlines** 5:6,13
5:23 6:6 26:4

**deal** 45:10 71:10
75:20 76:4 80:3
104:9 105:12,19
113:19 122:20
128:18,19
**dealing** 21:2
51:18
**dealt** 129:24
136:14
**debevoise** 11:1
**debt** 89:3
**debtor** 1:9 32:5
32:19,20,20 40:8
52:7 68:13 115:10
117:4 123:12,24
139:24 140:12
**debtor's** 6:22
75:22 77:1 78:16
79:22 80:9 81:6,7
82:11 83:17 87:7
87:9 88:12,19
89:8 94:13 102:15
108:5,7,12 114:5
114:9 128:21
129:6
**debtors** 2:2,7,8
4:23 5:1,5,12,22
6:5,16 7:1 10:2
15:6 18:12 19:8
19:17 21:9 22:12
23:1,17 24:9
25:25 26:4,16
31:19 32:7,11
35:4 39:9 46:15
53:13 54:5 56:20
56:22 57:16 58:21
59:8,14 60:3
64:22,25 65:2,9
65:18 66:1,11
68:16 72:15 73:4
74:25 75:8,11
76:17 85:14,23
86:15,17 97:7

102:14 104:10
106:13 107:25
108:10 109:1,2
111:5,17 112:3
113:4 114:4,11
115:18 117:5,13
117:14 118:14,15
118:19 124:7
125:12 127:21
128:1 133:21
134:11 135:3,12
135:13 136:25
139:8
**december** 15:8
78:7,13,21 79:3
80:19 81:5 83:22
84:2 93:19 95:4
96:7 98:13 107:14
108:5 110:25
115:8
**decide** 114:21
132:1 133:9,9
**decided** 99:24
127:9,9 129:20,22
131:23
**decision** 85:19
88:3 110:6
**decisions** 19:22
119:7
**declaration** 25:3
25:11,14,17,22
59:20 85:14 97:9
**declarations** 81:7
**decline** 96:23
**decreases** 80:21
**deemed** 90:25
**deeper** 78:24
**deeply** 78:14
**defenses** 118:6
**defensible** 27:5
**defer** 96:8
**deficit** 76:15

**define** 31:16
**definitely** 18:13
132:22
**definition** 46:4
**delay** 111:1
**deliverables**
19:10
**delivered** 20:1
**demand** 117:10
117:16 118:21,23
120:15 121:9
124:5 136:3,4,5
**demonstrates**
90:15
**denial** 118:24
120:10,20 121:1,4
121:13 122:5,9,20
123:6,14,16 125:1
125:6,17
**denials** 125:3
**denied** 96:24
117:10 118:1,15
118:21 120:3,5,6
120:13,19 121:10
122:23
**denies** 120:7
**dense** 81:8
**deny** 120:20 122:9
122:25 123:2
130:25
**denying** 33:17
114:14 120:21
**department** 3:5
4:6 23:23 55:8
**depend** 130:19
**depended** 129:10
**dependent** 69:9
**depends** 130:24
**deployed** 25:9
**depth** 88:8
**described** 53:20
83:18 98:16
106:13

**describing** 15:20
39:22
**description** 107:9
**deserve** 95:10
**deserves** 97:18
**design** 25:12
26:17
**designed** 24:24
25:8 26:1 27:22
29:6 60:3 82:21
91:12
**desired** 85:11
**despite** 16:21
85:19
**detail** 33:1,11,21
45:5 98:17 100:25
124:19
**detailed** 18:11
19:13 22:4 33:6
81:6 83:17
**details** 16:1
**determination**
97:6 110:8 123:2
124:23 139:20
**determinations**
66:2
**determine** 41:3
56:7 139:14
**determined** 120:2
121:6
**determining**
134:4
**developed** 111:23
112:5
**developing** 24:16
66:20
**developmental**
68:5
**devil** 15:25
**devils** 15:25
**diametrically**
21:21

**differ** 82:9
**difference** 47:17
53:1
**differences** 43:4
**different** 35:21,21
39:23 45:24 46:2
46:9 50:13 74:20
88:21,22,22,22
124:13 130:14,22
132:5 134:25
139:3
**differently** 102:21
109:4 121:12
129:13
**difficult** 24:20
33:7,8 109:10
110:14
**diligence** 19:5,19
86:16,18 87:3,12
87:18 88:2
**direct** 21:24 25:23
90:1,11
**direction** 48:22
79:7
**directions** 77:5
**directly** 35:5
59:16 89:17
**director** 81:9
**directors** 56:22
85:15 94:12
**disabilities** 68:5
**disagree** 128:14
130:9
**disagreement**
58:15
**disallowed** 32:25
**discern** 32:16
**disclosed** 106:20
**disclosure** 2:2
**discounted**
112:10
**discouragement**
79:4

discovery 20:3
discrepancy 106:21
discretion 64:18 128:4 136:7
discriminate 86:3
discriminates 85:25
discriminatory 86:12
discuss 46:4 85:9 86:1 88:14 105:4
discussed 77:3 97:1 98:15
discussing 81:18 102:16
discussion 72:22 108:1 109:5
discussions 29:10 59:22 68:15
disguised 87:8
dislocation 97:10
dismiss 114:15,19 114:21,21 132:5
dismissed 114:18
disparate 68:25
dispersions 132:18
disposition 19:22
dispute 117:9 121:5 122:1 124:2 127:16,18 130:2,3
disputes 126:4
dissenting 78:17 78:19 80:12
distant 68:23
distill 37:1
distinct 90:9
distinction 34:8
distract 129:6
distribution 63:12
distributions 50:19

district 1:2 126:3
divergent 23:13
division 12:12
dizengoff 6:9,23
docket 25:4 31:3 81:4
doct 66:11
doctor's 68:10
doctors 68:11
document 3:8,13 3:16,21 4:2,10,17 5:1,16 6:1,9,22 16:3 41:20 61:22
documentation 62:3
documents 42:25 114:23
doesn't 117:17 118:25 136:22
doing 17:4 27:15 66:5,14 97:19 102:19 105:11 132:11 135:7,22 137:23
dollar 90:18 131:5
dollars 63:1 89:2 89:3,4,7 110:20 112:22 130:2,19 132:23 133:23
don't 113:21 118:25 121:10 122:17 123:16 124:1,2,9,18 125:4 126:14,15 126:20 128:18 130:6,7 131:20,25 132:11,17 133:15 133:17 134:20 136:16,16,17,24 137:19 138:2,8,20 138:22 139:2,5,18 140:6,9

doubt 32:2 34:6 60:13
dozen 128:23
dr 78:22 79:4,12 79:18 80:1,13,16 80:17 83:20 85:15 86:9 88:7,13 89:16 90:5 91:13 91:22 93:22 94:22 95:12 96:23 97:9 98:22 99:11,13,14 99:21,24 100:8,22 102:17 103:22 105:13 108:12,20 110:23 111:24 112:10,25 113:18 114:3,10,15,24 115:15 116:8 142:10
draft 99:22
drag 134:23
dragged 134:18
dragging 134:19
drain 1:22 4:13
driven 42:16 58:11
drop 36:1
dropped 99:9
dropping 99:4
drysdale 8:13
due 86:16,18
duty 67:7
d'apice 13:1

e

e 1:21,21 8:1,1 11:13 12:16 15:1 15:1 32:1 142:1 143:1
earlier 16:6 41:24 47:25 57:8 59:14 78:12
early 16:7 19:8 108:5 133:6

earned 75:5,6,17
earnings 95:18
easier 54:22
easiest 39:17
easy 47:19 56:11 73:13,21
eb 127:8
ecf 2:14,16,19,22 2:25 3:2,6,10,14 3:18,23 4:3,7,11 4:14,19 5:2,10,18 6:1,10,14,17,24 7:3,7
eck 3:17 12:7
eckstein 10:15 48:17,18,20 52:17 53:2,6,14
economy 130:5
ecro 1:25
edan 13:9
edmunds 5:2
effect 15:24 79:14
effectively 26:2
effects 80:20
efficacy 81:16
efficiency 130:13
efficient 129:15 131:9 135:6 137:7 137:17 140:16
efficiently 132:19 133:23
effort 43:1
eight 28:20 35:5 74:22
either 28:15 35:5 35:25 40:5 51:4 69:5 79:5 93:5 94:23 95:14 111:14
element 78:10
elicited 46:17
eliminate 50:11 51:13

email 21:11
emergency 18:3
  18:10
employee 2:9,10
  4:13 78:24 79:12
  79:16 103:25
employees 2:11
  3:6 4:10 56:20
  78:23 83:20 86:2
  86:3 91:9
encourage 67:5,6
  67:13 71:15
encouraging
  130:4
endless 15:20 91:8
endlessly 21:20
ends 95:17
enforcement 12:3
  79:14
engage 59:14
english 121:7
enter 16:8
entered 16:7 17:1
  20:24 22:7 25:15
  28:19 34:25 77:18
  115:8
enterprise 94:14
enters 95:2
entire 20:22 89:5
  93:21 99:17
  107:12 130:1
entirety 24:13
entities 8:14 9:17
  10:11 11:9 23:6
  29:7 30:12 37:25
  46:2,11 49:16
  50:8,14 51:2,9,14
  52:5 53:3
entitled 100:2
entity 23:19 55:12
  128:22
entry 2:3,7 5:5,13
  5:22 6:5 24:2

envisioning 53:17
equally 21:25
  36:4 74:23 115:1
equates 103:3
equivalents 134:6
erf 69:2
eric 13:4,11
especially 80:7
essence 54:4
  112:21 115:10
  134:18
essential 37:19
essentially 24:2
  28:2 49:17,25
  50:9,19 88:2
establishing 5:6
  5:13,23 6:5
establishment
  22:24
estate 20:17 42:22
  51:7 52:21 88:5
  94:21 96:19
  106:13 128:16
  133:7
estate's 104:11
estates 115:14
esther 22:19
estimate 44:10
estimated 63:2
estoppel 134:11
  134:13
et 26:10
evade 89:14
evaluate 111:5
event 44:19 96:14
eventual 56:7
everybody 15:11
  17:18 47:13 56:9
  63:8 88:6 105:11
everyday 109:14
everyone's 65:13
  66:25 73:18

evidence 25:15
  81:5,20 90:15
  97:9
evidentiary 25:2
  83:19
exact 17:16 83:21
  83:22
exactly 28:24
  32:13 33:8,22,25
  41:17,25 51:15
  58:12 66:1 67:8
  97:12 124:17
  131:19
examine 25:17
  81:14
example 37:15
  38:21 39:5 44:24
  54:10 107:11
  124:14 131:18
  134:6
exceed 50:3
exception 61:6
  103:18 108:11
exceptions 90:20
excited 17:17
exclusion 56:17
exclusive 2:3
exclusivity 2:1
  20:8,9 21:1,6
  142:6
exculpate 35:25
exculpation 36:3
executive 12:12
  90:11 94:19 109:8
  109:12 110:7,12
  111:16 115:11
  116:20
executives 91:18
  91:19
exhibits 62:8
exists 84:1 113:21
  121:25

expansive 24:11
  26:15
expect 16:4 28:20
  49:23
expecting 22:13
expense 42:21
  45:15 91:15 93:16
expenses 91:12
  103:16
expensive 62:24
experience 73:5
  88:22
expert 89:18 90:2
  90:21 103:7 108:8
  109:22
expertise 59:21
  110:16
experts 103:20
explain 22:6
  30:23
explained 111:20
explaining 72:15
explanation 65:12
explication 112:2
express 38:10
  82:2
expressly 90:7
extend 2:1 21:2
  80:18
extended 56:21
  81:13
extending 2:3
extension 21:6,11
  142:6
extensive 85:12
  86:25 87:2,3,24
extent 33:13
  34:23 46:5 49:21
  51:8 53:22 55:23
  56:24 57:19 58:2
  58:4 63:4 118:9
  135:13,13

**extraordinary**
  20:13 100:25
**extreme**  84:15
  97:10
**extremely**  21:23
  106:1,1
**eyes**  34:24

**f**

**f**  1:21 9:2 13:3
  143:1
**faa**  126:25 127:8
**facebook**  27:18
**faceted**  27:14
**fact**  16:21 25:19
  28:21 32:18 34:17
  50:9 58:11 68:11
  69:6,9,11,13
  70:22 71:6,16
  76:18 85:20 87:21
  90:5,6 91:21 92:3
  92:25 93:2,10
  94:2 97:22 100:6
  100:12 102:7
  103:4 106:21
  107:23 111:9
  112:18 125:19
  136:22
**facto**  79:21 81:23
**factor**  85:18,24
  86:15,19 89:10
  93:12 128:11,20
  130:13
**factors**  25:12 83:6
  83:7,10 84:15
  85:7,8 86:19 88:9
  94:20 101:14
  126:5 127:19
  128:7 129:5
  130:17 139:25
**facts**  42:16 71:8
  102:18 107:18
  109:4 114:20,22
  114:22 115:14

124:16 138:16,18
  139:18 140:2
**factual**  81:19
  89:14 108:8
  111:21 123:19
**failed**  79:6
**failure**  33:16
**fair**  17:4 20:1
  71:22 73:24 85:25
  110:15 128:2
  136:7
**fallback**  40:23
**fallen**  19:23
**falling**  23:9
**falls**  93:25
**familiar**  130:12
**family**  10:18
  15:12 19:25 91:5
  91:13,15,16
**fantastic**  21:14
**far**  17:21 19:23
  39:22 41:8 42:2
  46:11,13 47:4,15
  47:20,21 50:7
  52:11,21 54:20
  61:6 64:14 70:3,5
  70:17 76:22 78:24
  85:7 104:1,1
  109:6 111:15
  124:23 136:11
**faster**  87:5
**favor**  87:7 99:12
  128:14 130:16
**fearful**  70:14
**fearing**  69:18,19
**feasibility**  130:20
**feasible**  129:8
**features**  115:7
**february**  18:7,8
  141:3
**federal**  32:4 55:9
  55:12,21 126:25

**fee**  59:15
**feel**  101:12 102:21
**feeling**  48:24 49:2
  65:9
**feld**  8:3
**fifth**  20:7 61:24
  62:7 106:2
**fight**  42:20 50:11
**figure**  49:11
**file**  2:4 28:10 32:4
  37:6,11,16 38:4
  38:11 40:4,13
  41:21 42:1 47:7
  48:1 49:17 51:6
  51:11 55:16 56:18
  57:1 65:1 69:25
  71:24 72:23 73:3
  73:10,25 132:14
**filed**  3:8,13,16,21
  4:2,5,10,14,18 5:2
  5:9,17 6:9,12,23
  21:7 22:17 29:13
  29:22 30:11 31:1
  32:8,9,23 34:6
  37:8 38:8,10
  44:15 49:22 53:15
  55:9 59:13 82:22
  100:21 108:17
  114:11,19 115:12
  122:3,17 123:8
  125:2 137:20
**filer**  38:23
**files**  52:11
**filing**  2:1 5:6,13
  5:23 6:6 22:24
  23:3 26:5 28:9,24
  29:25 32:7 38:15
  39:21 40:13 44:18
  56:7,17 60:5 70:7
  78:19 98:1 100:19
  113:9 114:2 122:6
  133:1

**filings**  37:6 39:12
  67:25
**fill**  41:16 62:13
  73:14
**filling**  29:18 76:22
**final**  16:1 19:22
  95:2 121:6
**finally**  112:4
**financial**  2:13 3:5
  4:7 12:3
**find**  17:16 23:14
  24:21 28:1 37:23
  61:11 78:5 122:25
**finds**  109:20
**fine**  31:21 33:3
  39:11 40:4 43:21
  43:25 52:14,22
  54:6 56:2 58:7
  60:14 62:17 71:7
  71:9 72:5 106:15
  116:11 135:10
  140:9
**finegan**  22:21
  25:3,5,8,17
**finegan's**  25:23
  59:20
**finish**  78:2
**finished**  89:5
**firms**  81:11
**first**  20:6 22:15
  36:1,16 41:23
  45:4 52:11 62:24
  70:20 72:20,25
  75:16,18 81:25
  84:14 85:18 87:23
  88:18 95:21
  106:20 107:23
  128:15 133:15
**fit**  117:16
**fits**  103:13 139:6
**five**  54:9 76:2,5
  86:15 102:23

fixes   43:10
flag   43:17
flagged   47:18
flawed   89:20
flexibility   51:11
    60:4
flood   137:14,18
floor   12:4
flow   19:19
focus   65:8 74:25
    107:16 108:13,14
    108:24 128:13
    129:15
focused   74:23
    75:1 129:18
focusing   70:4
    84:11 129:14
fogelberg   13:2
folks   44:19
following   84:2
    106:6 107:2
footnote   36:1
force   16:23
forced   126:7
forego   111:2
foregoing   143:3
foreseeable
    117:25
forever   81:1 93:6
forfeits   95:13 96:7
forget   42:24
    132:24
forgive   83:15
form   5:8,16,25
    6:8 23:4,5,6,10
    29:7,18 31:11,17
    32:3,5,8 34:19,25
    35:13 37:7,13
    38:17,24,25 39:1
    39:4 40:5,14 41:1
    41:16 44:15 46:14
    52:8 53:16 55:11
    55:12,19,19,22,23

55:25 60:21 61:6
    61:9,14 62:4,9,10
    62:11 64:13 66:15
    66:23 70:3,22
    72:1,4 120:10
    125:17 127:22
formal   20:10
    120:9
formed   117:19
former   4:9,13
    56:19,20,22,24
    71:18,19
formerly   116:23
forms   5:8,15,25
    6:7 23:2,3 29:5,6
    29:12,23 30:16
    31:24 33:2,14,20
    33:21,25 34:21,24
    35:2,3,9,22 37:8
    37:18 39:18 40:15
    44:4 51:3,22 54:6
    54:14 60:17,18
    62:3 70:15 72:22
    73:13,16
forth   24:11 46:1
    49:24 83:10
    106:25 121:2
forthwith   16:16
forum   131:9
forward   22:22
    24:7 25:13 27:11
    50:23 57:11,13,19
    59:24 69:4,21
    72:18 128:1,5,8
    128:21 137:14
foster   68:21
found   79:5 82:14
    116:19
four   19:4 72:18
    78:25 79:23 84:15
    106:2 109:17
    119:8

fourth   72:23
    74:15
fraction   96:21
    104:6,6
framework   49:6
frankel   10:9
frankly   17:22
    21:23 78:4 80:4
    102:21 108:16
    109:15 113:17
    134:5
fraudulent   79:6
frederick   117:4
free   63:16 75:4,5
    79:22 80:25
    116:17
frequently   28:11
friends   15:12
front   17:25 18:17
    19:21 127:3
frustrating   79:14
full   81:14 95:1
    97:24 98:2 112:17
fully   17:9 18:11
    65:2 98:8 109:11
    112:9,13 121:6
functions   40:22
fund   18:4,10
fundamental
    78:25
funded   89:3
funneled   43:22
further   21:3,4
    25:1 31:16 60:15
    62:21 67:17 70:1
    92:6 93:9 109:5
    112:2,19,20 138:6
    140:22,23
future   75:14 99:3
    99:7 119:15 141:1

g

g   4:6 15:1
g's   6:16
galleries   139:20
gange   13:3
gargantuan   19:20
gartrell   81:9 90:7
    92:23 108:8 112:5
general   12:10
    23:1,6,10 29:7
    30:20 55:11 60:21
    65:9 75:24 76:2,3
    76:14 89:11 101:5
    110:15
generally   48:22
    64:20 65:18 70:25
    109:12 110:18
generals   69:12
    106:7
generic   31:23
    32:17
generous   113:19
geoff   13:15
george   6:12 9:7
    116:22
gerard   10:22
getting   21:19
    26:11 57:20 63:15
    76:13 107:5
gilbert   11:8
give   25:21 26:6
    28:10 40:22 44:9
    44:10 52:1 61:12
    73:2 82:23 94:4
    99:20,25,25
    101:19 107:9
    121:25
given   19:14 29:3
    38:10 67:5 80:5
    112:24 113:19
    115:1,3 118:10
    119:20 121:23
    131:16,21 137:1

**gives** 48:12 54:4
73:8 113:11
**giving** 35:8 68:8
**gnp** 44:23 89:5
**go** 28:5,24 30:17
31:8 34:2 54:11
54:16 66:21 71:11
89:10 91:22 93:9
99:6 103:12
113:10 118:22
126:4 127:25
128:4,8 131:13
134:4 135:5
137:14
**goal** 48:23 96:18
**goes** 18:19 46:12
74:3 100:24
116:18 136:12
**going** 18:13 22:22
24:6,9 25:13 26:5
26:6,7,18 28:13
31:2 32:8,20
33:17 34:20 35:2
35:12 41:14 43:24
44:11,20 45:12
46:1,17 47:11
50:3,4,22,23
57:11,11,13,19,20
58:18 59:24 60:5
66:16 69:6,19,21
69:24 72:17 73:11
73:15 74:17,21
75:12 76:1,18
81:23 82:1,25
85:3 91:22,25
92:14 93:23 99:6
100:15 101:2,5,7
106:5 107:16
116:25 119:11
123:19 128:21,23
129:1,21 130:8
131:2,4 132:20
134:16,16 139:15

**gold** 13:4
**good** 15:2,4 20:17
20:19 22:9,10
43:21 48:17,19
67:18 75:9 76:15
96:19 106:4
**gotten** 70:2
**governing** 35:12
81:24
**government** 11:9
32:4 53:3 55:9,11
55:13,20,21 56:4
**government's**
56:5
**governmental**
8:14 9:17 10:11
23:6,9,19,20 29:7
30:12 37:24 49:16
50:7,14 51:2,8,14
52:5
**grand** 20:9 80:7
88:24 93:24
**grandfathers**
68:22
**grandmothers**
68:22
**grant** 21:9 77:1
115:17
**granted** 20:12
37:10 81:4 95:12
103:22 142:6,8,10
**granting** 115:19
**grants** 91:25
92:13
**great** 18:1 69:20
70:13 75:4,7
77:13 83:18 87:21
89:6
**greater** 110:1
130:4
**greatly** 79:20 89:9
94:24 97:5 99:4
103:22 104:9

**ground** 23:14
**grounds** 115:13
**group** 2:24 3:20
3:22 4:15,18 8:14
8:21 23:10,19,22
30:12,12,14,14
37:14,23,25 38:19
38:22,23 39:4
47:8 52:19 53:9
53:16 102:19
108:15,18 109:3
114:13 134:25
**group's** 113:6
114:2
**groups** 27:22,23
37:4,10 40:12
51:11
**grow** 17:21
**guardian** 69:17
69:18 70:6
**guess** 20:7 39:18
43:13 58:16
115:18 129:12
135:16 136:6
**guide** 76:9
**gump** 8:3 72:14

**h**

**h** 10:15
**hadley** 10:17
**haircut** 110:4
**half** 78:3 80:15
95:6 96:20,20
99:19 102:20
128:22
**hall** 47:2
**hand** 52:23
113:22 121:21
**hanging** 113:18
**happen** 74:7
94:11 97:3 120:8
131:12
**happened** 17:13
19:11 74:11 82:4

97:25 98:11,13,19
98:20,23 99:7,9
117:14 119:2
120:25 121:11
**happens** 58:10
92:12
**happy** 15:7,9
30:22 58:6 101:8
105:21,23 140:13
**hard** 26:17 28:15
32:16 96:22
105:10 109:21
**harm** 18:21
**harmed** 66:10
**harms** 136:12
**harrisburg** 12:5
**hasn't** 120:25
136:3
**hauer** 8:3
**head** 48:6 113:18
**health** 63:15 65:1
**hear** 22:13 138:2
140:5
**heard** 108:7
**hearing** 2:1,7,16
2:18,21,24 3:1,4,8
3:12,16,20 4:1,5,9
4:13,21 5:1,5,12
5:20 6:3,12,16,19
7:1,5,9,10 18:19
28:21 29:16 70:20
75:18 77:7 78:7
78:21 79:13 80:11
81:3,6,13 83:9
84:2 90:8 94:17
95:3 97:15,18
98:12,16 108:5,16
108:17,18,24
109:6,10 110:25
113:13
**hearings** 44:23
78:12 86:20

heart 86:20
heather 12:25
heavily 17:12 87:6
128:14 129:14
heavy 81:4 139:21
held 21:25 108:5
help 20:18 47:25
59:24 63:25
139:14
helped 138:24
helpful 16:21 29:8
29:10 30:17 33:11
44:10 45:14,14
64:5 65:11,12
herzfeld 13:5
high 99:1 101:6
102:8
higher 101:6,7
highest 101:17
highlight 117:2
highlighted 70:23
70:23
highly 62:15 63:5
76:4 86:12
hill 13:6
hipaa 34:19,22,23
hire 16:25 17:2
74:25
hit 74:20
hither 99:6
hoc 2:24 3:20,22
4:15,18 5:22 7:1,6
8:21 9:16 10:10
23:19,21,21,22
26:23 37:4 38:1
38:23 40:12 48:18
50:15 53:9 108:14
108:18 109:2
113:6 114:2,13
hold 92:14
holder 32:6
holders 32:2

holding 26:3
hon 1:22
honor 2:13 15:4,6
15:13 16:18 21:12
21:18 22:9,16,23
24:1,5 25:1,14,24
25:25 26:21 27:1
27:8 29:12 30:20
31:3,9 32:13,21
34:12,14 35:14,16
36:6,13,24 37:1
40:3,9 41:11 42:5
42:8,11,13,24
43:5,8,19 44:3,13
45:1,7,17 46:21
47:23 48:13,17
50:17 52:18 53:6
53:8 54:1,7,17,19
55:2,6 56:3,11,13
56:16 57:8 58:13
58:21 60:2,15,19
61:16 62:19,21,25
65:19 66:7 67:18
67:21 72:10,13
75:15 76:25 77:9
77:24,25 78:4,9
78:20 79:17 80:10
84:5,9,13 86:1,5
86:14,19,25 87:1
87:3,8 88:14,16
88:23 89:4 91:24
92:13 93:12 95:2
96:17 97:8 101:8
102:16 103:9,10
104:7,18,23 105:9
106:4,6,11,24,25
107:19 108:1,2
115:20 116:12,21
116:25 117:3,20
118:3,4,16 119:3
119:17,20 120:23
121:18 122:2,7,11
123:7,15,21 124:9

125:14,16,23
126:7,20 127:6,11
128:2 129:4 130:9
131:12,15,20
132:13 133:5
135:20 136:2,19
137:12 138:2
139:13 140:5,19
140:22
honor's 63:20,24
81:22 87:4 105:2
126:1 128:5
hoover 109:18,19
hope 15:13 16:19
17:23 18:18 20:8
20:14 28:3 50:8
66:25
hoped 18:6
hopeful 17:16
18:8
hopefully 15:11
15:15 16:2 18:15
22:7 35:6 49:5
58:17 74:7 75:12
78:2 82:24 97:2
115:25 116:4
hoping 49:14 51:3
52:4 75:3
hos 46:8
hospital 38:22,23
39:23,24 44:21
hospitals 23:22
37:21,23 39:25
40:11 44:22 46:9
53:10,15,16,19,22
54:9 68:16
hot 139:21
housing 91:3
93:16
huebner 10:7 15:4
15:5,10 16:6,13
16:16,18 18:3
19:4 21:5,12

77:25 84:5,9,13
84:20,25 85:3,6
104:15,18 105:9
106:18,23 109:10
115:20,25 116:4,7
116:12
huebner's 107:6
huge 42:25
human 66:13
hundred 40:25
41:1 44:22 92:10
96:7 98:6 111:1
128:20 131:6
132:9
hundreds 89:3
hurley 8:10
hurt 65:10 76:8
hyde 7:22 143:3,8

### i

iac 19:5
idea 16:20 46:22
48:25 53:11,12
54:2 68:8,19
74:22 88:1 131:4
131:7
ideally 49:4
identified 17:8
53:18
identifying 61:13
ifrah 9:1 116:22
ignore 92:25 93:2
ii 2:11 5:7,14,24
6:7 81:21 82:2,4,6
83:10 87:20
iii 2:13 5:8,15,25
6:7
il 11:18
imagine 97:12
impact 12:11
impacted 24:19
impediment 69:20
implement 26:17

implementation 59:3
implication 36:9 52:14
implicit 58:8
implicitly 122:6 123:7
imply 52:24
importance 51:18
important 15:23 16:3,15 26:22 27:4,7,10 29:4 35:7 38:14 44:19 47:16,21 49:11 50:6 51:25 63:11 64:10,17 65:17 66:5 76:10,23 96:18 109:23 114:3 116:17 133:10 135:18 139:9 140:2
importantly 50:21 113:9
impossible 74:16 90:16
impression 109:2
improper 90:16 91:7 93:11
improperly 90:17 94:6
impropriety 83:1
inappropriate 106:7 115:9
incentive 78:11,16 79:25 90:3 110:7 110:22 111:7
incentives 90:24 90:24
incentivize 85:18
incentivizing 110:9
include 34:20 70:6 90:3,11,13

91:1 92:10 107:4 114:14
included 19:12 31:14,23 32:2,22 55:4 57:15 60:3 60:12
includes 38:1 90:23
including 19:10 23:2 31:18 33:3 34:6 45:9 55:13 59:2 63:2 78:17 79:2 81:17 82:19 84:3,17 89:11 91:3 93:18 97:1 100:2 108:21 111:23 114:11
inclusion 35:17 53:12
income 100:3
incomplete 97:22
incorporated 30:18
increases 111:19
incredible 21:21
incremental 91:13
incur 96:22 128:16
indemnification 36:4 56:18
indemnify 35:25
indenture 41:19
independent 86:17 87:10 88:2
indian 50:25 51:2
indirectly 35:5
indiscernible 79:8 98:15 104:16 107:22 110:10 115:25 116:14 121:6 131:17 136:8 137:13,15 137:22 139:4,13

139:20
individual 37:9,12 39:18 41:21 42:1 46:10,14 47:7 51:6,6 54:5,16 59:21,23 63:11,11 66:10 74:22 76:8 135:1
individualized 42:23
individually 51:5 114:8
individuals 23:7 26:14 29:3,6,22 64:11 73:6,9
industry 81:17 88:13 89:11,21,24 92:24 93:21 94:7 103:8,19 110:16
inform 26:2
informal 20:10
information 19:14 19:19 27:7 28:8 29:8,24 30:17,19 33:6 34:18,19,22 39:13,19 40:6 54:5 61:13 62:13 65:5 66:22 68:8 68:12 69:14 71:25 80:11 84:7 108:23
informed 59:10
initial 102:15
initiated 117:6
initiative 117:12
initio 88:17
injunction 16:24 17:1
injuries 41:16 131:20 136:25
injury 23:5,10 34:18 41:15 61:8 62:2,9

innocent 69:16
input 30:13,15 57:13 58:25 71:10
inside 89:24
insofar 4:16
instagram 27:19
instituted 118:11 118:17
institution 69:13
institutions 2:13
instruct 137:11
instruction 61:12
instructions 61:12 61:21,21,23
instructive 135:11 137:9
insufficient 107:18
insurance 6:13,20 9:2,3 116:21,23 116:24 117:4,15 117:19,21,22 120:19 122:18,19 129:9,10,11 130:19 131:21 139:12
insured 117:5
insurer 120:7 134:10 136:12 137:5,20 138:12
insurers 120:25 122:21 129:18 130:14 132:12,22 133:20,25 134:13 134:24 136:21 137:7
insys 79:8 104:19 105:5
int 119:15
integral 45:20
integrity 18:1 87:16

intend 55:16 105:20
intention 34:1
intentionally 45:25
interaction 80:13
intercompany 32:12
interest 39:9 51:7 72:20 73:1 94:21 104:11 110:2
interested 137:24 138:10
interesting 100:22
interests 23:13 130:5
interpose 69:17
interrupt 43:6
interviews 17:10
intricate 22:4
introductory 20:25 21:5
investigating 86:16
invitation 64:20 64:24
inviting 21:3
invoke 117:17
invoked 134:14
invoking 118:5
involved 26:9 73:5,12 87:10 128:25 129:1,4 133:11
involvement 23:18,23 87:3
involves 68:10
involving 31:17 46:25
ip 79:15
ira 6:9,23
iron 123:13

ironic 137:12
ironshore 6:13,20 9:2 116:23 123:14 123:14 138:9
irrelevant 49:7
irrevocably 93:19 99:25
island 43:24 47:18
isolation 84:11
issue 32:12 50:12 51:1,17 61:5 65:1 69:21 71:12 78:3 78:7 81:2 82:6 83:4 84:1,16 85:13,21 95:9 103:9 105:3 107:1 117:3,18,20,21 119:4,10,11 121:3 121:13,14,15,21 121:24 123:8,9,23 123:25 124:1,10 125:18 129:25 130:20 131:10 133:6 134:7 135:4 135:22 138:13,15 139:16,17,19,21
issue's 124:7,10
issues 17:23 23:9 43:20 45:8 50:17 51:21 68:6,10 69:3 83:5,5 97:16 105:6 107:17 110:14 112:7 113:13 117:3,7 118:4 122:22,25 124:22 125:19,21 125:21 129:17 130:5 131:12,13 133:11 134:4 135:14,17 136:14 136:16,20
it'll 32:9

item 18:3 19:4 20:7 21:15,16 78:1 116:13
items 72:11 78:11
its's 122:24
iv 6:13

**j**

j 3:13 13:11 32:22 56:14
jacquelyn 22:19
james 5:9,17 8:11 10:6 12:10
january 1:16 7:9 18:7 19:11 22:18 143:25
jasmine 11:6
jay 22:15
jeanne 22:21 25:3
jeremy 13:6,7,22
jim 21:17 22:11
job 72:15 73:18 136:21
jobs 88:21 109:22
john 4:14 13:10 81:7 82:18 97:8
joinder 2:18,21 2:24 3:1,12,20 4:1 6:21 104:22,22 113:9,10
joinders 83:2,2,2 113:7
josephine 81:9
journal 63:23
judge 1:23 4:13 82:4 129:13 134:8
judgement 79:15 83:13 89:19 97:6
judges 109:16 128:11
judgment 83:11 115:13
judicial 129:15 130:5

july 106:19 140:9 140:14
june 22:25 28:23 77:14 79:19 95:13 95:20 96:20 97:24 98:7,20 99:10 131:25
jurisdictional 115:13
justice 23:23 55:8
justin 12:20

**k**

k 9:2
kami 11:13
keep 59:9 80:25 93:6 94:24 107:13 109:23
keller 4:6 11:15
kenan 3:9
kenneth 10:15 48:17
kept 91:6
kevin 8:18
key 35:3 39:8
kids 68:1,25
kind 18:14 24:6 28:3 37:18,19 57:13 59:24 73:7 75:14 79:21 81:20 101:2 105:12 121:22 137:12
kinds 42:13 97:4
kleinman 13:7
knew 98:12,14,16 102:18
know 15:10 16:14 17:20,22 18:4,5 18:19,21,23 19:1 19:21 20:1,4,14 21:18 22:3,14 23:7 24:12,18,21 26:9 27:5,18,23 28:4,7,14,20,21

28:24 30:1,16,16
32:6 33:5,8 35:1
35:11 37:4,18,22
37:22 38:24 39:18
39:24,25 40:1,11
40:18,21 41:2,7,7
42:3,7,7,23 43:11
43:15 44:1,16,19
44:21,24 45:12
46:8,15,16 47:10
49:1,13 53:1 54:2
54:8,11 55:14
56:6 57:18,19,23
57:25 58:2,5,14
58:23 59:8,9,21
60:6,6 63:6,17,23
64:11,11,15 65:15
66:11,16,23 67:4
67:6 68:15 69:24
70:18 71:2 72:10
73:22 74:2,16
75:4,6,8 76:1,12
76:14,16 85:14
86:11,19,22 87:8
95:10 97:2 98:12
99:18 100:12,15
100:16,20 101:6
101:11,22 103:10
104:12,12 105:18
105:20 118:19
120:9 122:4,17,19
122:22 123:3,15
124:18,25 125:23
128:3 129:24
130:7 131:14
132:2,11,22,25
134:3,9 135:15
138:16,20 139:5,6
139:10
**knowing** 15:24
28:22
**knowingly** 79:5

**knowledge** 110:16
**known** 26:2,7
27:13 38:10 46:24
116:23
**knows** 15:17
16:20 17:20 86:14
86:25 115:21
**knudson** 22:19
**kramer** 10:9
48:18
**kristine** 53:8

**l**

**l** 3:17 8:8 12:7
13:18,20
**l.p.** 1:7 5:10,17
**la** 9:11
**labeled** 55:22
**labyrinth** 22:2
**lacewell** 3:4 4:5
**lack** 32:25 78:6
**lafayette** 9:10
**landau** 4:17 78:22
79:5,12,18 80:1
80:13,16,18 85:16
88:7,13 91:13
93:23 94:22 95:13
96:23 97:9 98:3,8
98:22 99:13,21,24
100:8,22 102:17
105:13 108:12
110:23 111:24
112:25 114:3,10
114:15,24 115:15
116:8 142:10
**landau's** 83:20
86:9 89:16 90:5
91:22 99:12,14
103:22 108:20
112:10 113:18
**language** 31:14
41:12 46:13 48:1
53:12 55:3 57:15
60:2 79:1 100:22

121:1
**large** 19:12 37:5
72:20,25 88:20
91:10 131:13
**largely** 15:24 46:4
53:19 99:15
115:13 139:10
**larger** 51:16
135:23
**largest** 25:9
**lastly** 113:25
134:7
**late** 83:2 103:11
**latest** 18:7 79:16
**laugh** 21:19
**law** 5:12 9:1
100:19 101:24
104:4 117:22
120:19 126:9,10
**lawsuit** 129:16
**lawyer** 122:19
**lay** 41:8 113:14
**lays** 39:1
**lead** 32:8 128:16
**leading** 57:9
**leap** 93:11 118:25
**leaps** 39:14
**learned** 74:5
**learning** 68:5
**leave** 46:19 48:7
48:12 62:1 83:3
96:12 110:11
116:15
**leaves** 75:21 80:24
93:3 95:1,3,13
121:24
**leaving** 64:18
98:20
**led** 20:2
**ledanski** 7:22
143:3,8
**left** 78:3,13 81:2
95:14 103:24

**legal** 112:7 143:20
**legitimate** 29:9
33:12 112:14
**length** 83:18 87:1
**lenkner** 11:15
**letitia** 12:10
**letter** 3:4 4:5,13
**letters** 20:4 70:10
**letting** 30:16
**level** 45:3,5 97:19
108:22 113:1
**levels** 109:12
**levin** 10:9 48:18
**lexington** 10:3
**liabilities** 88:12
88:20 89:6,8
**liability** 47:10
60:9 68:11 114:9
114:25
**liable** 137:2
**liberty** 10:19
12:13
**life** 18:9
**lift** 116:13,21
130:25 134:9
**liftland** 82:5
**light** 42:21 84:17
**lightner** 13:8
**likelihood** 40:20
44:3
**liking** 18:4
**limit** 52:13,22
**limitation** 31:18
68:2
**limitations** 43:20
**limited** 5:20 7:5
56:19 78:1 109:7
128:4
**limiting** 31:20,21
**linda** 3:4 4:5
**line** 70:1 91:21
142:4

**lines** 39:4 89:3 138:18,22 139:3,8 139:8,9
**lining** 97:12
**link** 61:20
**liquidate** 43:12
**lisovicz** 13:9
**list** 20:2
**listen** 138:4
**literal** 21:20
**literally** 84:14 105:16
**litigation** 12:11 23:20 26:10,13 46:25 56:25 117:25 127:25 131:1 132:23 133:23
**little** 15:11 48:23 50:13 54:22 94:17 101:3 103:11 104:24 129:12 130:14 133:12
**lives** 18:20
**living** 91:4
**llp** 8:3,20 9:15 10:1,9,17 11:1,8 15:6
**load** 94:6 103:5,6 103:15 104:8
**lock** 75:24
**long** 17:19 21:3 38:13 40:4 42:24 47:24 49:20 72:3 81:12 90:24 104:13 111:2 129:22
**longer** 116:14
**longmire** 13:10
**look** 45:13,22 46:21 54:12 89:20 93:13 100:15 101:3,10,16 102:3

104:8 107:4 122:18 136:17 139:1,24
**lookback** 101:22 102:11
**looked** 27:25
**looking** 24:12 27:15,21 47:2 62:8,10 64:1 68:20 88:6 109:3 111:6 126:13 127:22 133:13 135:21
**looks** 16:9 111:14
**lord** 15:19
**lose** 131:3
**loss** 100:4
**lost** 33:7 134:12
**lot** 18:15,24,25 21:22 29:15,16 49:18 61:2 64:23 67:20 71:19 73:9 73:20 76:13 80:12 80:12 84:7 88:4 101:11 110:4 124:13,15
**lots** 89:12
**loved** 33:7
**lowne** 81:7 82:18 85:14 97:8
**lp** 4:10
**ltip** 90:3 93:22
**luck** 63:11

**m**

**m** 3:21 4:18 8:25 12:25 13:4
**maclay** 8:18
**magazines** 27:16
**magical** 116:9
**mailing** 26:11
**mailings** 26:8
**main** 73:12

**maintain** 2:10
**maintaining** 4:16
**majority** 132:19 133:22
**making** 17:13 27:4 48:14 73:13 137:11
**maloney** 13:11
**managed** 25:13
**managing** 64:2
**manipulate** 107:20
**manner** 5:8,16,25 6:8 27:11
**manoukian** 53:8,8 54:1,7
**march** 79:17 80:17,17 81:1 82:21 84:4,18,21 92:20 95:7 96:5 98:2,6,6,9 107:11 108:19 111:12 112:3,17 113:2
**margin** 86:10
**mark** 13:8 113:18 113:21
**market** 93:7 104:1,2,6 107:6 110:5,18 111:20 112:5,11
**marketing** 31:18 31:19,20
**markowitz** 67:23
**marshall** 10:7 15:5
**martzell** 9:9
**maryland** 5:2 47:17
**maryland's** 4:21 113:6
**massachusetts** 40:25

**massive** 95:3 98:21 102:17
**massively** 86:7
**masumoto** 13:12
**match** 107:6
**material** 64:12 79:14 80:8,9,13 85:20,21 86:14 94:16 99:12 102:24 112:25 115:10
**materialize** 138:13
**materials** 117:1
**math** 92:9 95:8
**mathematical** 112:4
**matter** 1:5 60:22 71:16 76:24 79:23 85:19,21 87:16 94:4 104:8 106:8 113:11 126:9,10 128:18 138:17
**matters** 59:1
**maximize** 20:17
**mcclammy** 5:9,17 10:6 21:17 22:6,9 22:11,11,16 25:24 31:3,5,9 32:13,15 32:21 33:22,25 34:11,14 35:14,16 35:19 36:6,13,18 36:20,22,24 39:3 39:16 40:3,9 41:11,17,25 42:5 42:8 54:19,23 55:1,6 56:3,10,13 56:16 57:3,7 58:12,19 60:1,15 60:19,24 61:1,8 61:15,19,24 62:2 62:7,11,16,18,21 62:25 63:20,24

[mcclammy - motion]                                                      Page 22

65:19,25 66:7,18
66:20 67:8,12,15
73:17 74:20 77:9
77:11,16,24 124:9
124:17,19,21
125:2,10,13,16
140:19
**mccloy** 10:17
**mcdermott** 13:13
**mdl** 98:14
**mean** 36:7 38:22
40:17,18,18 41:6
41:14,20 43:13
44:8,9 45:3 48:6
52:11 58:7,11
61:3,25 63:17,17
64:5 66:15,24,24
67:1 70:5,15 71:2
71:12 117:17
118:20,23 119:6
120:21,24 121:7
121:11,19 122:5
123:1,3 126:24
127:8 130:23,25
132:1,22 133:7
134:4,5,8 137:19
138:5,14 139:7
**meaningful** 15:14
47:6
**meaningless** 45:5
**means** 38:20
39:10 92:18 95:17
96:4,10 99:5
107:12 139:10
**mechanics** 17:16
**mechanism** 63:13
**mechanisms**
49:11
**media** 24:18 25:5
27:16,18 28:2,16
30:15,19 57:18,21
59:15 63:16 64:14
65:8 75:5,6,17

76:17
**median** 111:9
112:15,16 113:2,3
**medias** 27:20
**medical** 33:6
114:4
**medication** 33:9
**mee** 30:7
**meetings** 19:12
**meets** 83:19
**melissa** 3:17 12:7
**member** 38:9,18
**members** 37:6,9
37:25
**memorandum**
5:12
**memorialize**
57:13
**mention** 29:6
72:18 91:11
**mentioned** 22:16
25:9,25 27:13
99:21
**mentioning** 20:5
30:3 85:8 99:23
**mere** 33:16
**merely** 115:11
**merits** 82:1
124:24
**message** 65:22
74:24 76:11
**messages** 74:21
75:4
**met** 83:12
**metrics** 83:22
103:19
**meyer** 4:2 11:20
**michael** 12:21
13:16,19
**michelle** 12:23
**mid** 114:5
**middle** 38:15

**midpoint** 92:21
**milbank** 10:17
**million** 26:8 40:25
41:1 63:1 74:17
74:17 80:2,15,24
88:25 89:9 92:2
92:20 93:4,6,7,24
93:25 94:2 95:1,6
95:16,17,20,23,25
96:2,4,8,9,11,14
96:20 97:17 98:3
99:1,2,2,9 101:15
101:16 102:4,24
103:3,11 105:4,22
105:24 110:19
111:4,12 112:2,6
112:17 132:9
**mind** 24:25 52:15
52:24 71:12
109:23 133:12
**mineola** 143:23
**mini** 104:24
**minimize** 44:3
51:18
**minimum** 100:7
130:2
**minor** 77:4
**minority** 132:19
**minors** 68:2
**minus** 103:1
**minute** 21:18 58:2
58:2 82:5 84:8
95:8,11 97:17
100:21
**minutes** 80:16,20
85:4 89:18 91:2
93:3 95:11 103:14
**mirroring** 97:6
**misconduct** 114:9
**misdescribe** 98:18
**misleading** 97:22
**missed** 61:16

**mistakes** 74:5
**mitchell** 8:10
**mobile** 68:24
**modified** 29:13
108:10,12
**mohan** 13:14
**molton** 9:21
**moment** 82:2
**monday** 77:14
**money** 18:25
54:11,15 72:2
73:8 76:1,9,19,24
81:1 93:15 94:15
95:6,9 96:19
101:11 102:24
109:13,21,25
110:5 131:2,6
**monitor** 16:19,21
16:25 17:2 58:1
**monitored** 64:18
**monitoring** 58:9
**monitors** 17:10,21
**month** 19:11 74:6
105:16
**months** 74:4
80:19,25 98:7
103:2 105:15
**morning** 15:2,4
22:9,10,13 34:16
48:17,19 67:18
88:10 115:22
**mother** 30:5 69:1
70:7 71:19,19
**mothers** 68:9,20
68:21 69:4,24
70:14
**motion** 2:1,2,7
3:16 4:16,23 5:5
5:12,20,22 6:5,12
6:16,20,22 7:2
18:6,9 20:21,21
21:3,7,9 22:17,20
24:9 67:17 77:2

78:2 108:6,15
111:5 113:16
114:14,15,17,18
114:19,20,21
115:5,12,18 116:8
116:13,16 126:11
130:11,25 132:5
140:7 142:6,8,10
**motions** 22:5
110:6 116:22
**motivated** 76:4
**move** 18:5 25:2
27:11 58:5 85:6
87:6 105:18 106:5
107:20
**moved** 68:24 76:3
130:15
**movie** 28:14,17
**moving** 27:17
105:15
**msge** 30:14
**mullane** 74:8
**multi** 8:14 15:21
27:14 97:15
101:22
**multiple** 17:9 32:7
72:1 80:6 82:24
86:20 88:1 89:2
100:23
**multiples** 50:5
**multistate** 23:19
30:12 37:24
**mulvihill** 13:15
**municipalities**
2:18 3:12,14 38:3
50:18 51:1
**municipality**
51:19 136:23
**murphy** 13:16

**n**

**n** 8:1 11:17 15:1
142:1 143:1

**n.c.** 115:7
**nachman** 12:16
**naftalis** 10:9
**name** 17:14 22:15
123:13
**named** 56:25
100:22 114:10
**names** 30:3
**nas** 5:21 7:6 23:22
27:23 30:2,12,14
46:9 66:9 67:22
67:24 68:9,20
**native** 27:24
**naturally** 109:20
**nature** 27:17,19
30:8 31:16 43:10
57:22 66:13 81:17
115:2
**near** 19:18 92:4
**necessarily** 29:24
43:16 55:12 86:22
125:5 134:12
137:6,8
**necessary** 33:23
49:8
**need** 17:14 20:20
25:18 29:3 39:24
41:23 42:7 43:16
46:19 51:13 55:4
56:17 57:1 61:15
61:16 71:11 72:11
73:2 74:6 77:2,20
81:16 82:3 83:9
86:16 88:10 96:1
105:7 106:10
107:18,22 110:17
139:11
**needed** 34:2 52:2
85:17
**needs** 22:6 40:2
65:6
**negotiate** 63:12

**negotiated** 86:7
**negotiation** 23:24
29:15 47:13 56:6
78:15 137:11
**negotiations**
44:12,14 56:21
60:20 86:6 87:24
111:23
**neither** 20:10
**nevada** 2:18 3:12
3:14
**never** 64:25 97:3
**nevertheless**
66:13 110:3
**new** 1:2 3:5 4:6
8:6,23 9:11,19
10:4,13,20 11:4
11:10 12:9,14
15:7,9 34:8,10
48:2,5 63:23
67:19 80:23
123:13
**news** 20:8 21:14
101:1
**newspaper** 64:16
**newspapers** 27:16
**nice** 72:15 136:12
**nicely** 129:17
**niche** 27:20
**nicolas** 4:6
**night** 20:16,16
**non** 2:24 3:20,22
4:15,18 8:21
17:23 23:10,21
50:14,18 55:19,23
108:14 115:4
117:4 140:1
**normally** 79:17
**note** 15:21 18:18
34:15 56:4 59:12
87:21 99:14
100:18 124:12

**noted** 25:6 26:22
34:15 53:20 87:4
89:4 94:16 131:20
**notes** 32:22
**notice** 5:9,16 6:8
7:9 24:11 25:5,8
25:25 26:6,6,11
26:18 29:1 57:11
58:24 59:2,10,17
66:17,23 68:13,14
69:22 70:21 72:24
73:3,14 74:16
117:14 118:10,13
118:22 119:21
120:1,5,14,17
121:23,25 125:9
131:21 132:6
134:21 137:1
**noticed** 56:17
**notices** 59:5 71:18
125:2 131:15
**noticing** 22:5,21
24:15 68:17
**notification**
117:12
**notify** 66:13 67:7
**notwithstanding**
106:12,24 107:11
107:22 112:18,19
116:16 127:10
**nouns** 87:17
**number** 15:17
19:4 21:12,14,22
28:24 36:8 40:14
41:3 57:9 68:15
74:12,18 78:6
91:25 93:15 97:3
117:7 127:17
130:16
**numbers** 26:14
37:5 57:20 79:23
88:21 89:22 91:2
91:22 92:15 95:10

100:10 102:9,18
103:4,14 104:13
105:4 107:19,19
**nw** 8:15 9:4 11:10
**ny** 1:14 8:6,23
9:19 10:4,13,20
11:4 12:14 143:23

**o**

**o** 1:21 15:1 143:1
**objecting** 67:1
**objection** 2:16,19
2:22,24 3:1,8,16
3:20 4:1,16 5:20
5:20 6:16,19,22
7:2,5 15:18 43:14
100:23 108:14
113:6,6,7
**objections** 20:11
24:2 84:8 108:9
133:8
**objector** 102:19
**objectors** 78:17
79:3 89:13,15,25
90:17 97:21 98:2
101:4 103:17
117:2 128:13,17
**objects** 20:22
**obligation** 66:12
**obligations** 2:11
**obscene** 93:14
**observation** 128:6
**obtain** 33:7
**obviation** 83:8
**obviously** 18:24
20:13 49:10 51:16
62:24 64:14 66:8
75:20 77:17 80:21
82:1,20,22 87:25
87:25 96:24
100:11 116:14
122:2 129:5
**occasions** 78:6

**occurred** 121:14
**office** 12:10
**officer** 56:24
110:12 114:4
115:11
**officers** 56:22
**official** 6:4,10,19
6:23
**okay** 15:2 16:17
18:2 19:3 20:25
21:6 22:8,15
25:16 31:6 32:14
34:3,13 35:1,15
36:15,23 38:22
39:7,16 41:24
45:16,23 48:15
53:5,7 54:20,25
55:5 56:12 57:2
58:7 59:25 62:17
62:18,20 64:4
66:4 68:20 70:8
71:22,22 72:6,7
74:4,15 77:1,10
77:23 85:2,5
104:15 105:9
106:3,11,15,16,24
108:3 115:24
116:3,11,15,17
117:23 119:6
122:12,18 123:22
124:3,18,25
125:15,22,22
127:13 128:9
130:10 132:16
134:2 135:10
140:18,21,23
**oklahoma** 42:23
**old** 143:21
**omg** 93:14
**omitted** 98:25
**omnibus** 7:10
140:14

**once** 37:8 101:15
117:9 118:20
121:9,23 137:18
**ones** 33:7 134:13
**ongoing** 29:10
**online** 28:5,11
30:16 64:16
**open** 17:25 121:24
**operating** 15:23
112:23
**opiates** 69:7,8,9
**opioid** 23:4,6,8
24:19 29:7,25
31:16 32:3,7
38:17 55:11,19,23
55:24 64:24 65:10
65:18 71:1 76:4
**opioids** 12:11
16:22 31:17,21
46:25 64:21
**opportunity** 64:1
81:14
**opposed** 21:21
35:13 36:12 46:14
47:6,11 55:11
70:25 110:9
120:18
**opposite** 87:2
**opposition** 114:13
**oral** 82:18 105:5,7
**order** 2:3,7 5:5,13
5:23 6:5 15:19
17:1,5 20:24
21:11 22:7 23:24
24:3 27:20 28:19
29:21 30:23 31:1
31:11,12 32:24
33:2 34:17,25
48:11 55:7 56:6
57:10,14 59:11
60:16 61:4,7
70:17 77:3,8,18
79:3 95:2 115:7

115:16,19,22
116:8
**orders** 22:5 35:21
35:22 115:21
**ordinary** 82:3,10
82:15 83:5,25
109:14,20
**original** 17:22
56:17
**originally** 18:6
23:16 29:13,21
31:15 98:4
**orleans** 9:11
67:19
**ought** 70:9
**outcome** 135:13
**outlined** 59:11
**outlines** 57:18
**outstanding** 2:12
**overall** 80:2 95:22
101:21
**overly** 113:19
**overruled** 108:9
**overseeing** 49:13
**owes** 96:4

**p**

**p** 8:1,1 12:24
13:17 15:1
**pa** 12:5
**package** 84:17
85:21 97:5 98:25
108:21,21 113:20
**packages** 94:7,8
**padjen** 13:17
**page** 16:23 31:11
31:11,25 32:1,21
36:25,25 37:2
62:8 64:15 85:14
93:13 98:1 101:11
104:22 142:4
**pages** 42:24 57:4
81:8 105:5

**paid** 79:17 84:18
84:19,20,20 85:1
92:4 99:4 104:1,2
110:19
**panel** 117:18
118:11 119:5
**papers** 24:12 83:3
104:17 108:2
117:2 128:3 138:3
**paragraph** 31:14
34:3,4,14 35:17
36:18,24 37:3
38:13 39:15 46:3
46:10 52:5,16,23
54:23 55:6 56:14
57:4 60:2 61:24
62:7,12 97:8 98:1
98:10
**paragraphs**
104:24
**parents** 27:23
68:21,22
**park** 8:5
**part** 17:3,24 27:4
45:20 51:17 58:1
61:20 64:13 65:20
65:20 74:18 77:7
78:22 90:9 98:22
100:1 102:19
107:23 108:24
109:1 117:10
118:21 121:9
131:13 134:5
142:10
**participate** 50:19
**participated** 4:23
17:10 79:5
**participation**
72:17
**particular** 27:22
30:5 37:14 39:1
60:10 65:18 88:7
91:12 97:10

107:17 109:8,11
131:9
**particularized**
72:4
**particularizing**
54:16
**particularly** 40:8
110:13 138:24
**parties** 15:23
18:15,24 19:13
21:22 23:13 26:8
39:9 60:20 63:2
79:2 87:13 95:10
97:19 102:17
105:8 117:17
128:19 129:3,20
129:20 130:17
135:12
**partner** 21:17
**parts** 24:18 107:6
**party** 15:21 117:9
**pass** 66:21 68:9
68:12
**passed** 15:11
**passionate** 21:23
**patrick** 13:14,18
**pattern** 93:10
**paul** 3:9 13:23
**pay** 2:8,10 85:21
86:23 92:24 104:6
105:22 107:12
111:21 134:1
136:5
**payable** 96:20
**paying** 109:25
135:25
**payment** 4:22
79:16 82:12 83:21
85:17 88:15,18
92:20 94:9 95:15
95:15 96:6,7
97:17 98:4 100:17
101:10 103:11

106:8 107:13
111:2,12 112:6,10
**payments** 3:6
79:15 88:13,23
89:1,9 90:8,13
91:24 92:4,8,11
92:13 93:2 94:24
95:22 99:4,8
102:23 106:22
**peace** 80:7
**pediatric** 27:23
**pejoratively**
137:25
**penalized** 103:25
**pending** 20:3
56:25 135:17
**pennsylvania**
3:18 9:4 12:1,2
78:18
**pennsylvania's**
2:21
**penny** 91:3 93:23
**people** 18:17
19:21 23:3 24:17
24:17 27:21,22
28:3,13,15,23
29:9,16,17 33:13
35:5 39:21 47:14
57:19,20,22 63:10
64:5,20,21,23
65:4 66:9,13 67:5
69:3,4 71:15 73:5
73:6 74:13 76:1
92:6 97:11,11,12
100:16 109:21,24
110:17 116:15,18
133:22 136:20
137:11 140:25
**peoples** 21:24
65:22
**pera** 13:19
**peradventure**
89:22

**perceive** 69:5
**percent** 24:12
25:10 44:23 79:19
79:20,25 80:2
88:25 92:10 95:13
96:7 98:5,6
110:23 111:1,1,10
128:20
**percentages** 103:7
**percentile** 90:6
92:1,2,22,25 94:1
94:3,10 95:19
96:2,3,14,16 97:2
101:16 102:7,10
103:23
**perception** 70:13
**perfect** 31:9 75:9
90:22
**perfection** 74:8
**perfectly** 39:11
**perform** 109:24
**performance**
85:12,23
**performed** 86:15
**performing** 86:18
**period** 2:1 49:20
117:11 118:22
**periods** 2:3
**perkins** 13:20
**perks** 91:9 107:5
**permits** 38:15
**person** 38:9 69:15
85:16 94:6 109:15
109:20
**personage** 17:17
**personal** 18:4
23:5,9 29:24
34:18 41:15,15
61:8 62:2,8 73:5
131:20 136:25
**personally** 61:12
122:10,17

**perspective** 79:22 80:8,9 94:13
**pertain** 125:7
**peter** 13:1
**petition** 2:8 62:14 82:21 100:9 111:13 112:19 117:6 126:10 128:22 131:1 132:15
**pg&e** 74:11
**pharma** 1:7 3:6 4:10 5:10,17 15:3
**phone** 28:23 116:18
**phrase** 86:22 122:23
**pi** 35:9 132:8
**pick** 17:25 38:21 42:23
**picking** 40:24
**picks** 52:8
**picture** 100:11
**piece** 20:7 107:24
**piecemeal** 134:17
**pillsbury** 8:20
**pittman** 8:20
**place** 49:3 77:20 82:20 97:23 102:12
**placement** 59:5 64:15
**places** 74:21
**placing** 27:16 57:18
**plains** 1:14
**plaintiff** 126:22
**plan** 2:2,4 49:4,5 50:4,20,21 54:14 58:24 59:3,18 63:12 75:21,24 76:7,9,12 79:21 82:11,19,20 83:21

85:11,22,24 86:2 86:16,18 88:11 110:9,22,24 111:3 111:7 129:8,9 130:19,24 131:8 139:7
**planet** 89:5
**planning** 57:25 88:17
**plans** 57:18 79:18 81:9,15 86:4 87:8 87:12,23 88:7 90:3 110:7
**play** 44:11,13
**plays** 107:10
**plaza** 11:17
**pleading** 97:21 99:21 100:3,5 137:21
**pleadings** 83:1,3 105:8 106:14
**pleasant** 94:17
**please** 61:23
**pled** 114:22
**plenty** 140:25
**plimpton** 11:1
**pllc** 116:22
**plus** 53:15 63:1 95:24 111:7 132:11
**pm** 141:5
**podium** 21:13 22:6 94:18
**point** 20:23 24:5 39:7 43:7,21 45:18 52:11,17 53:4 64:6,8 66:4,8 70:20 71:3 72:25 74:10 75:3,13,16 75:17,20 76:18 83:25 84:1,24 87:7 89:17 103:21 104:23 107:1

108:22 109:23 113:8 119:15,16 126:1,13,18,20 127:3 128:1,24 129:22 132:10 133:5,10 134:15 135:5,17 137:10 138:10,13,20 140:18
**pointing** 28:23
**points** 35:6 62:23 113:5 128:13
**policies** 131:22 136:24
**policy** 117:3,4,6 137:5 138:12
**polk** 10:1 15:5 22:11,18
**popped** 48:6
**population** 24:13 25:10 68:24
**populations** 24:20
**porat** 13:21
**portion** 111:2 112:1 114:6,14 115:17
**position** 114:3 134:23
**positive** 15:14,15 16:19 20:8
**possible** 49:15 51:24,25 64:1 77:17 78:8
**post** 95:3 128:21
**posts** 57:21
**potential** 26:3,19 60:5 68:3,9 79:15 111:18
**potentially** 30:3 37:5 55:13 81:1 83:8 100:7
**pr** 59:15 70:18

**practice** 82:9 89:24
**praise** 15:18
**pre** 2:8 100:19 108:19,19 111:19 117:6 126:10 131:1 132:14
**precarious** 68:14
**predictor** 141:1
**preeminent** 81:10
**prefer** 26:24
**preferred** 40:19
**preis** 8:9 72:10,13 74:9,11,15 76:16 76:21,25
**prejudice** 140:7
**premature** 133:18 138:1,8,11 140:4
**prepaid** 84:21 98:3,4,5,8
**prepared** 40:16
**prepetition** 82:6,9 111:15 126:6,9
**prerequisites** 90:12
**prescribed** 67:3
**prescriber** 71:17 71:18
**prescribers** 66:6 66:18 68:9 70:5 71:11
**prescription** 33:9 65:4
**present** 12:18 22:2,17 25:6 88:4 90:17
**presentation** 30:21 107:7,17
**presentations** 19:11,13
**presented** 20:1 22:5 24:4 59:20

presenting 23:25
preserved 124:22
preserves 79:3
president 25:5
109:18,19
press 35:8,8 65:7
65:16 76:11 77:6
presumably 97:4
presumptions
36:8
pretend 93:5,18
pretty 68:14
104:15 129:19
previous 67:25
82:7
previously 91:16
pride 20:23
primarily 110:9
primary 75:23
108:14
prime 22:21 24:15
25:6 26:1 35:20
35:25 36:2,10,10
57:16,25 58:22
59:9,16 64:2
principal 71:5
principle 106:9
print 27:16 28:16
prior 78:20 79:13
92:8 104:1 110:25
137:23 140:15
private 23:7 51:15
52:6 100:2
probably 19:6,6
25:19,20,21 41:5
47:5 50:21 89:4
137:23 140:15
problem 43:11,13
50:23 58:15 64:25
69:18
problematic 30:1
30:4
procedural 83:1,8
113:4

procedures 5:7,14
5:24 6:6
proceed 2:12 25:1
proceeding 20:5
49:13 124:12,22
130:15 138:7
proceedings
89:15 141:4 143:4
process 2:13
18:14 23:12 26:4
27:2,14 28:13
35:13 43:14,22
45:9 49:15 50:22
57:9 58:1 59:8,24
65:13 72:16 75:9
80:12 87:10
106:12 117:12
139:7
processes 77:19
produces 23:15
product 29:14
31:23 32:17 64:25
89:3
production 31:17
31:19,20
products 66:11
89:2
professional 67:7
71:14 87:2
professionals
34:24 88:1
profile 135:22
profound 68:4
program 22:22
24:6,11,16,23
25:9,11,12,13,25
26:6,18 28:2,19
29:1 30:15,19
57:11,17 59:2,10
64:13 72:24 73:14
74:16
programs 2:10
78:11 82:7 108:6

progress 15:14
18:18 59:10
progressive 86:8
86:12
prohibits 79:13
promised 99:8
promote 130:5
promoting 16:22
prompt 130:1
prong 103:8
proof 5:7,15,24
6:7 23:2,2 29:5,5
32:3,7 38:17
40:13 44:14,18
52:12 53:16 56:7
56:18 57:1 62:3,9
62:11 65:11 70:10
72:1 73:3,11,13
73:16
proofs 5:6,14,23
6:6 22:24 26:5
28:9,10,25 32:5
37:7 38:7 54:13
60:17,21 72:23
73:25 76:23
proper 87:17
121:13
properly 97:15
129:23
proposal 102:15
107:24 108:11
proposals 18:11
18:17
proposed 23:2,5,5
23:16 30:25 31:12
83:21 92:13 110:2
116:7
proposing 29:21
propriety 83:8
protected 34:19
34:22,23 36:8,12
66:15 115:15

protecting 30:9
protection 134:6
protections 36:9
protective 15:19
34:17,25 115:22
prove 89:22
proven 59:23
provide 33:5,16
33:21 39:6 43:1
49:6 51:2 57:16
65:7 103:20
134:15
provided 31:1
106:12 118:12
providing 30:10
58:8 80:11
proving 23:1
provision 34:21
35:10 47:9 60:12
77:4 79:1,11
121:16,16,22
122:1 124:8
129:21
provisions 35:25
61:7 78:25 112:20
115:4
public 30:1 62:5
63:15,18 64:6
65:1 75:4 109:11
pull 86:23
purdue 1:7 3:6
4:9,17 5:10,17
15:2 20:18 28:22
31:21 32:17 55:24
66:1,1 78:24 93:4
95:6,16,24 96:4
96:22 97:11 98:3
98:7 117:4
purdues 4:16
purpose 26:1
73:19 90:19
103:18

**purposes** 54:9
55:20 76:14 90:25
103:2
**pursuant** 34:22
121:6
**pursued** 113:8
**pursuing** 128:1
138:10
**pushed** 99:17
**pushing** 86:6
**put** 61:16 64:16
74:2 77:20 78:7
82:20 105:22
107:8 121:12
134:1
**putting** 30:3,15
32:11 42:22 73:1
73:18 105:24
**puzzled** 16:9

**q**

**quadrants** 51:16
**quarropas** 1:13
**question** 86:21
93:8 102:25 113:1
113:17,21,23
117:8 125:5
127:25 129:7
**questions** 19:20
25:19 28:11,12
29:17 30:9,22
31:6 33:1,15 39:6
54:21 55:7,10
59:7 60:16 62:22
73:20 81:17
106:25 138:4
**quick** 81:5
**quickly** 15:16
68:7 77:16 78:9
79:1 81:25
**quigley** 128:18,25
129:7,12,17,24
130:11,18,21
134:8

**quinn** 11:13
136:20
**quite** 15:25 39:23
50:6 79:24 80:4
86:14 102:1 111:8
**quote** 82:6,7,8,15
87:4,9,22 90:10
90:12,17 97:24
98:2,9
**quoted** 98:24
**quoting** 82:5

**r**

**r** 1:21 8:1 9:13
14:4 15:1 143:1
**radio** 27:19,20
59:4 60:6
**raise** 31:7 71:4
**raised** 33:3 55:8
69:2,3 71:12
75:17 113:4 114:1
114:2 117:18
121:21 123:25
124:1,11 125:19
**raises** 110:14
**raising** 36:15
125:21,21 131:13
**range** 94:1 111:10
**rate** 112:11
**rates** 63:16
**rational** 43:2
113:14
**rationales** 64:9
**raymond** 10:18
**rdd** 1:3
**reach** 24:12,17,20
25:10 26:2,18
27:9,20,22 28:1,2
28:15 29:3,3
51:13 56:23 68:25
71:15,17 80:7
**reachable** 24:17
**reached** 40:23
78:14,22

**reaching** 27:12
60:4,11 66:6
102:14
**reacted** 109:19
**read** 37:1 61:20
61:21,23 72:16
85:16 87:4 100:18
102:1,1 121:22
128:12 129:12
**ready** 17:14 22:2
129:19
**real** 54:15 57:22
**really** 23:12 27:13
27:14 29:17 35:24
39:20 42:25 47:12
47:16 50:5 58:11
60:3 61:3,5 63:4
64:6 66:10 67:7
70:9 73:21 76:10
80:4,9 84:7,10,16
88:10 92:5 100:16
101:1,2,5 104:15
108:24 110:2
113:7 119:8,16
123:20 124:18
126:4,24 127:25
129:14 130:24
133:9,9,15 135:4
137:25 138:12
139:6,19
**reason** 27:9 32:25
33:2 39:8 73:10
108:13 113:14
122:13 131:19
134:2 139:16
**reasonable** 43:1
59:15 85:25 88:11
88:19 89:9
**reasonableness**
89:12
**reasonably** 33:13
46:15 59:6,10
117:24

**reasons** 24:8 46:3
71:5,5 73:12
74:24 91:7,8 97:3
138:15 139:2
**recap** 78:20
**receive** 114:6
**received** 79:9
86:17 133:8
**receiving** 113:23
**recipient** 4:23
69:16
**recognize** 50:2
**recognizes** 68:13
73:1
**reconciliation**
18:14
**reconciling** 21:20
**record** 15:5 21:1
25:2,3 55:2 56:4
58:21 59:12 72:13
72:17 77:7 81:19
89:14,17 108:9
111:8,22 113:13
113:24 114:23
123:19 143:4
**records** 33:6
69:11,13 83:19
**recoveries** 44:21
47:2
**recovery** 40:17
55:17
**redact** 62:1
**reduced** 79:20
89:9 93:2 94:24
97:5 98:25 102:3
103:22 104:9
111:7 112:21
**reduction** 79:25
88:25 111:1
**reference** 61:6
77:7
**referenced** 74:12

referred  28:7
refile  140:10
refined  82:6
refinements  82:14
reflect  49:22,25
reflected  80:3
reflects  113:24
refund  96:4
regard  30:19
  63:25 69:1,21
  70:8 71:23 77:3
  112:1
regarding  4:9
  57:17 69:23
regardless  44:14
  128:24
register  16:12
regressive  86:8,13
regular  57:22
regularly  58:25
regulatory  55:14
reimbursements
  91:9 93:16 112:12
  112:14
related  2:10,13
  3:8,13,16,21 4:2
  4:10,17 5:1,16 6:1
  6:8,22 23:4,8 59:2
  78:11,11 108:6,25
relates  4:17
relating  5:7,14,24
  6:6
relatively  20:21
  46:24
relatives  68:23
release  35:8 65:7
  130:3
releases  65:16
  77:6
relevant  85:7
  101:17,21
relief  6:12,16,21
  7:2 18:3,10,25

20:11 22:23 23:1
  39:8 75:13 91:25
  92:13 95:12 96:24
  108:10,25 109:7
  115:19 125:24
  126:2
relocated  91:17
relocating  91:14
reluctant  66:14
  69:25 122:13
remain  62:4
remaining  24:2
  102:4 108:9 112:1
  113:15 115:17
  118:24
remains  107:1
  117:10 118:2,21
  120:13 121:10
remark  109:17
remarked  109:9
remarks  21:1,5
remember  19:6
  79:17 96:1
remind  81:11
reminded  109:16
reminder  81:5
  82:17 83:15 87:6
  88:24 90:7 92:23
remotely  19:16
reopen  104:25
reorganization
  129:7
repaid  106:17
repeat  74:6
repeating  75:18
replace  96:23
replacement
  110:1
replacements
  110:12
replacing  97:11
report  15:14
  16:19 19:5 21:15

79:6
reports  57:16
  58:8
represent  39:22
  107:21
representative
  50:25
representatives
  17:9 19:12
represented  139:7
representing  38:2
  67:23
reputation  18:1
request  3:5 21:2
  31:15 59:16 91:17
  109:7 110:21
requested  20:11
  21:10 92:14 95:2
  116:1
requesting  95:12
requests  20:3
require  57:15
  60:5 74:8 76:7
required  17:5
  19:24 24:15 32:4
  71:25 139:17
requirement
  32:23
requires  110:14
resend  16:10
reservation  5:21
  6:3 7:6 49:17 71:8
  120:10 123:17
reservations  24:4
  63:3
reserve  120:12
  136:6,15
reserved  84:6
reserving  69:22
  71:6
resets  80:22
resign  105:23

resigns  95:20 96:6
resolution  26:24
  27:9 129:25 130:1
  130:4
resolve  96:1 119:4
  126:19
resolved  58:16
  78:3 126:9,11,15
resolves  135:8
resolving  133:6
resources  20:18
  58:5,16 129:16
respect  4:22 6:4
  27:12 32:1,5
  42:16 50:20 55:8
  56:18 79:15 83:20
  86:13 116:8 117:7
  118:4 125:18
response  4:9 33:1
  108:17 125:8
responses  126:4
responsibilities
  71:14
responsible  55:25
  71:9
rest  54:21 77:19
  94:7 108:2
restructure  99:10
restructuring
  97:23 108:20
resubmit  116:9
resubmitted
  77:12
result  23:15 60:19
results  40:19
  76:13
retained  35:20
retention  79:21
  80:23 84:18,21
  87:8 88:15 89:23
  90:8,13 91:1
  92:11,15,16,19
  93:5,7,19 94:9,25

96:5 98:3,4,5,9
99:3,8 100:17
101:10 102:23
103:4,16 107:5,13
111:3,12 112:6
**retirees** 2:11
**revenue** 89:7
**reverses** 99:15
**review** 21:8
**reviewed** 21:6
25:18 108:8
114:12
**revise** 55:4
**revised** 30:25
31:12 55:7 84:2,3
**revisions** 23:24
**rhode** 43:24 47:18
**rhodes** 32:17
**rid** 73:20
**right** 25:17 32:13
33:22,25 36:20
44:5 45:11,19
46:7,23 47:1 48:7
48:10 52:10 54:14
54:18 56:15 57:6
58:12,19 61:19
62:12 64:19 65:22
65:24 67:9,14,16
71:4 73:23 74:9
74:18 76:6 77:9
85:16 91:20 92:5
96:19 100:8,24
101:12,12,13
104:4 105:14,20
106:19 107:14
108:4 113:11
116:11 118:20
119:10,22,25
121:24 122:15
123:2,25 124:5,15
124:20 125:10,10
126:17 127:3,15
128:9 129:2

133:14 135:2,2
136:7 141:3
**rightly** 69:5
**rights** 5:21 6:3 7:6
24:4 69:22 71:6
79:4 113:10
120:11,12
**ripe** 119:11,13
124:16
**ripeness** 124:14
124:15
**ripped** 91:16
**rise** 113:11
**risk** 94:14 115:10
**riverside** 11:17
**road** 17:19 143:21
**robe** 43:8
**robert** 1:22 12:24
13:17
**robust** 18:10
**role** 115:2
**roles** 88:22
**rolling** 102:11
**rollout** 59:4
**room** 1:13 73:23
75:15
**roth** 53:9
**rough** 44:10
**rounding** 103:2
**route** 34:2 133:20
133:21
**rsa** 49:4
**rubinstein** 3:13
**rudnick** 9:15
**ruled** 82:8 83:22
85:13 87:1 104:23
**rules** 32:24
**ruling** 81:22 82:2
83:17 87:6 108:23
114:14 136:13
**rulings** 142:3
**run** 28:5 41:23
110:17

**running** 22:22
68:2
**ruth's** 109:16
**ryan** 13:22 14:1

**s**

**s** 3:8,13,16,21 4:2
4:10,17 5:1,16 6:1
6:9,9,22,23 8:1
13:9,16 15:1
**saddened** 78:5
**saint** 22:15
**saints** 67:20
**sake** 92:10
**salaries** 2:9
**salary** 90:4,23
91:5,18,20,24
92:12 93:22 95:17
95:23 96:11,24
97:1 103:6 109:17
114:7
**sale** 31:18
**sales** 16:23
**salwen** 8:11
**sara** 8:8
**satisfied** 111:22
**satisfies** 83:23
**satisfy** 32:23
93:12
**save** 72:2
**saving** 18:20
100:9
**savings** 80:2
**saying** 38:7 45:17
52:22 64:5 74:4
102:20 104:22,24
118:15 119:6
120:20 122:9,21
122:24 125:9
126:14
**says** 34:5 38:17
40:24,25 41:2
61:20,25 62:2,13
70:17,17 101:22

101:25 102:1
103:25 107:7
120:13 121:8
123:5,5 127:8
129:25
**schedule** 98:8,22
99:11,16 140:13
**schedules** 59:5
**scheme** 80:7
**schulte** 53:9
**schwartzberg** 3:9
13:23
**scintillating**
116:20
**scope** 24:23 25:11
29:1,2 85:24
**score** 35:1 43:3
**scott** 9:13 67:19
67:22
**screens** 28:17
**scripts** 59:3 75:1
**search** 28:6,6
**second** 21:15,15
54:10 64:8 72:21
73:15,16 87:22
95:5 99:7 104:19
106:11 138:23
**secondly** 63:9
73:20 133:19
**seconds** 20:9
**secreting** 115:4
**secretion** 79:11
**section** 12:3 98:2
100:3,4 104:24
**see** 24:3,6 28:5,7
28:14 29:19 30:4
42:3 45:2 58:3,4
61:5,7,13,17
63:17 69:23 71:6
71:8 72:10 73:11
74:3 82:24 89:18
89:22 94:5 96:13
101:25 105:21

123:1 132:8
136:16,17 139:11
140:12,17 141:3
**seeing** 57:21
**seek** 58:25 79:4
**seeking** 22:23
56:21 78:10
108:10 109:1
125:24
**seemingly** 20:22
100:16
**seen** 15:7 74:11
122:10
**sees** 20:14,15
35:11
**segues** 20:6
**select** 86:4
**selection** 17:13
**self** 16:24 69:19
**semiannual** 82:13
**send** 16:4 71:18
115:10 127:1
**sending** 26:7
**senior** 86:8 91:9
97:11 109:12
111:15
**sense** 51:12,23,23
52:4,10 54:23
56:10 57:23 74:2
90:22 140:6,11
**sent** 16:6 115:22
118:14 125:11
134:21
**separate** 32:4
36:8 38:25 50:25
52:5 53:22 63:9
91:4 121:15 136:9
136:10,15
**separately** 36:7
116:9,10 136:13
**september** 62:13
79:20 80:6 82:22
95:21 96:6,21

111:13
**series** 19:10
**serious** 120:24
**service** 3:5 63:18
64:7 75:4
**services** 4:7 69:10
69:11
**set** 24:11 49:24
54:20 55:17,25
63:7 77:2 78:9
102:17 114:4
121:2 132:6
**seth** 4:2 11:20
**sets** 25:11 83:10
121:15
**setting** 129:19
**settle** 105:10
113:11
**settled** 78:21
**settlement** 73:7
78:14 102:14
108:2 134:5
**severance** 4:9
93:24 98:25 99:5
108:21 112:21
**shai** 22:20
**share** 135:13
**shared** 18:12
107:24
**shareholder** 19:4
**shareholders** 19:9
19:25 91:17
**shaw** 8:20
**shea** 1:25 13:24
**sheer** 24:23
**short** 90:3
**shortly** 108:18
**shot** 41:8
**show** 70:24 91:2
103:5 112:8
**showing** 28:17
103:15

**shown** 21:10
**shows** 109:22
**shudder** 88:5
**side** 19:23 50:8,21
51:20 139:23
**sides** 139:22
**significant** 45:14
111:24 135:23
**significantly** 82:9
**similar** 21:13
37:24 51:1 82:7
82:15
**similarly** 37:21
50:24
**simple** 17:19 19:1
91:21 114:22
136:19,25 137:3,4
**simply** 44:4 111:5
113:9 135:21
**single** 16:24 54:2
89:19 103:16
107:23,23,24
**singling** 39:25
**sit** 116:1 138:4
**sites** 57:21
**sitting** 18:20
73:23
**situation** 99:23
110:13
**situations** 24:22
**six** 15:15 21:12,14
28:20 35:5 74:22
83:11 84:15 85:8
86:15 101:19
103:21 128:23
**skeptical** 138:19
**skip** 85:12
**skorostensky**
13:25
**slaugh** 14:1
**slice** 96:15
**slightly** 45:24
112:15 113:3

**slowly** 18:5
**small** 20:23 96:21
104:5
**smith** 14:2
**smooth** 49:15
**social** 24:18 27:18
57:21 69:10,11
**soft** 96:21
**sole** 78:16
**solely** 32:25
**solicit** 2:4
**solution** 134:10
**solutions** 25:6
143:20
**solve** 131:9
**somebody** 67:3
104:5
**someone's** 33:18
**somewhat** 112:16
136:10
**sonnax** 126:5
127:19 128:7,10
130:25 139:25
**sonya** 7:22 143:3
143:8
**sooner** 135:15
**sorry** 62:6 106:20
132:4 136:4
**sort** 18:16,23
19:14 20:7 53:18
73:7 81:22,23
86:11 91:5,18
92:7 93:18 94:6
94:17 97:15 99:18
100:11 103:23
104:4 136:6
**sorts** 40:1
**southern** 1:2
**spaced** 16:24
**spades** 87:25 88:4
**spare** 105:4
**speak** 132:20

speaking 109:12
110:18
special 63:16
specialized
117:21
specialty 6:13,20
9:2,3 116:23,24
123:14,14
specific 27:23
39:13 42:16,17
43:15 44:20 47:22
52:13 55:20 74:13
75:25 83:14 89:7
110:21
specifically 23:3
103:10
specificity 33:1,17
52:1
specify 32:6
speed 85:7 106:5
spell 58:10
spend 15:20 88:10
97:16 131:2
132:23 133:22
spending 94:15
spent 81:12 88:5
104:12
spoke 105:3
spokesperson
75:2
spreadsheet 39:5
39:19 41:7 53:18
53:21,23 54:4
72:5
spreadsheets
71:25
springer 14:3
square 9:18 12:4
stability 94:14
stage 26:22 60:9
78:9 132:5
stake 21:23 44:11
87:13 131:10

stakeholders
19:18
stamped 70:9
stand 25:18 81:12
standard 20:21
55:18 66:22 81:24
83:11,14,19 103:8
standards 83:23
88:14 89:11
stands 21:9
stars 121:5
start 77:17,20
106:6 121:8
started 119:25
121:23
starting 27:2
31:11 63:22
starts 36:25
state 3:1,5 4:3,6
4:21 5:2 8:14 12:9
33:21 34:1 40:24
42:17 46:5 50:8
50:14,19 51:19
54:11,12,13 56:5
58:21 69:6 76:5
98:2 100:19 106:7
108:15 109:2
113:6 126:9,10
131:18 136:23
stated 42:4
statement 2:2
4:15,21,22 6:3 7:1
26:23 59:13 74:2
104:21
statements 21:4
55:3 60:6 63:20
63:24
states 1:1,12 2:25
3:9,21,22 4:1,15
4:19 8:21 17:3
18:12 23:21 24:14
27:15 30:11,15
31:15 33:4 34:21

37:15,17 38:3
40:12 41:2,13,15
42:14,15 43:23
46:4,5,12,13 47:1
47:6,10,15,21
49:16,17,19,25
50:1,10,14,16,16
50:17,18 51:6
64:4 69:12 73:8
75:22,25 76:9,13
76:19 78:17,19
80:12 85:23 91:14
100:21 111:11
114:12,13,16
131:20 132:10
135:21
statute 68:1
126:25
stay 6:12,17,21
7:2 72:8 94:23
105:20 116:13,21
126:2 127:10
130:3,15,25 134:9
stayed 91:15
stays 96:6
step 15:23 16:15
16:25 18:16 45:4
54:10 76:23 90:22
93:20
steps 27:1
steward 97:19
stewards 20:17
stipulation 19:7
stopped 16:22
stories 64:14
65:16
story 35:8 65:7
101:14
straight 102:24
straightforward
31:25
strategy 132:21

strauss 8:3
strawberry 12:4
streaming 27:19
streamline 51:12
street 1:13 8:22
9:10 10:19 12:13
63:22 109:20
stretch 92:17
stretched 102:4
102:25
stretches 92:20
strings 92:7
strongarm 64:5
strongly 21:25
struck 104:9
115:6
structural 18:16
structure 17:15
81:16 132:1
structured 83:18
129:23
struggled 107:21
studiously 107:7
stuff 80:5 93:16
98:14
subgroup 38:19
subject 35:10
43:14 87:12 99:20
107:25 109:8
115:21 130:8
submit 115:18
submitted 15:18
26:23 29:14 62:3
83:19 117:1
subpoena 69:11
69:13
subsection 32:1
32:22 56:14
subset 104:1
substance 57:10
60:1
substantial 75:22
87:12,13 98:21

109:13 112:7
**substantially** 59:1
  80:22 102:9
  109:14,15 129:18
**substantive** 31:10
  56:14 57:3
**substantively**
  61:2
**subsumed** 59:19
**subway** 76:14
**sudder** 10:18
**sufficient** 21:10
  46:16 108:22
  121:4
**sufficiently** 40:7
  72:4
**suggest** 19:17
  100:23 132:18
**suggested** 47:25
  53:14 129:25
**suggestions** 60:8
  111:16
**suite** 8:15 9:4
  11:10,17 143:22
**sum** 102:24
**summaries** 64:16
  77:5
**summarized** 40:6
**summary** 35:9
  46:14 47:20 65:8
  70:20 115:13
**sums** 85:20 94:16
  109:13
**super** 67:20
**superintendent**
  3:4 4:5
**supersede** 49:9
**supplement** 34:5
  34:9 48:3,20
  122:7 123:16
**supplemental**
  57:17 58:24 59:17
  72:24 73:14 74:16

115:19
**supplementing**
  21:1
**support** 5:12 7:1
  85:23 104:21
**supported** 27:5
**supporting** 62:3
**suppose** 46:13
**supposed** 105:17
  107:13
**sure** 16:13 27:4
  35:19 38:14,21
  39:8,14 40:17,21
  42:12 48:8,14
  52:8 53:3 64:1,3
  67:10 72:12 73:2
  73:13 74:19 76:17
  76:20 88:16
  109:19 124:24
  125:13 137:16,18
**surely** 101:7
  107:10
**surprised** 78:4
**surprisingly**
  97:21
**survived** 115:12
**sweetheart**
  113:19
**sworn** 97:9

**t**

**t** 143:1,1
**tab** 25:4
**table** 59:22
**taboo** 136:10
**tactical** 65:12
**tail** 108:16
**tailored** 29:4,5
**take** 20:23,25
  40:16 51:21 64:3
  69:6 76:18 79:19
  81:4 87:16 89:25
  90:22 93:20 99:13
  100:11 101:8

107:7 110:4
  111:11 112:12,15
  112:17
**taken** 41:6 60:9
  64:25 69:10,19
  72:20,25 86:9,10
  102:13 112:8
**talk** 17:15 41:7
  75:6 81:21 83:6
  88:9 91:1 93:2
  94:11,18 95:5,11
  100:20 101:9
  102:23 103:12
  116:20 128:3
  140:12
**talked** 41:24
  46:14 57:8
**talking** 34:4 69:2
  73:5,5 76:17
  77:13 79:24 80:5
  80:16,20 84:22,25
  88:24 94:13
  109:13 119:13,14
**taormina** 4:14
**target** 74:22
**tasks** 35:22
**tautologically**
  86:3
**taxes** 76:6
**tdc** 90:5,10,13,17
  90:20,23 91:23
  92:18 96:2,15
  101:14 102:5,6,7
  102:8 103:5,23
  107:4,9
**team** 25:8
**telephonically**
  12:18
**television** 27:18
  28:16
**tell** 66:16 97:24
  107:3 136:21
  138:23

**telling** 70:13
  120:18 133:12
**ten** 80:18 105:15
**teratogenic** 68:6
**term** 90:3,24
  111:3
**terminology**
  136:5
**terms** 15:24 17:5
  19:24 28:6 53:15
  56:6 57:14 68:5
  70:10 79:16 81:3
  84:2 109:4,5
**terrestrial** 27:20
**territories** 75:23
**territory** 75:14
**test** 69:24 94:20
  128:10,11
**testament** 23:12
**tested** 83:14
**testified** 90:8 93:8
  103:7
**testimony** 25:23
  81:15 82:18 85:13
  86:25 89:18 90:1
  90:21 108:7
  109:22
**texas** 43:24 54:9
  54:11,12,13
**thank** 16:17 18:2
  21:12 25:24 30:11
  42:8 47:23 53:6
  54:17,19 56:11
  71:24 72:6 75:11
  75:15 76:25 77:24
  115:20 140:18,19
**thankful** 23:17
**thankfully** 119:3
**thanks** 48:16 54:7
**theaters** 28:14,17
**theme** 75:17
**theories** 41:5,22
  47:10,12,15 49:22

49:23 51:23 52:9
53:20 55:17
**theory**   32:10
47:17,19
**thereof**   2:5 5:9,16
5:25 6:8 38:19
**thereto**   5:7,14,24
6:7
**they've**   132:3
**thing**   17:20 19:1
25:2 34:16 37:2
37:19 60:1 66:5
73:16,25 74:15,20
91:19 97:20 99:7
99:19 100:8
104:19 105:14,17
105:20 116:19
120:6,19 122:22
127:8 136:9
**things**   19:10,24
20:2,4,15 27:16
27:17,19,21,24
28:17 29:19 30:24
31:25 42:19 57:21
59:3 60:16 65:22
70:22 72:13,18
75:5,7 80:8 81:4
82:12,13,13,24
87:9,14 89:12
90:23 91:1,3 94:5
97:4 99:10,19
102:13 105:1
107:7,20 112:8
119:1,8 124:14,15
128:6 133:15
136:10
**think**   15:17 16:14
16:23 17:4,24
18:1,6 20:20
21:14 22:14 23:8
23:12 24:5,8,16
25:18,20 28:12
29:8 32:18 33:11

33:15,19 34:7
35:7 36:1,15,16
38:20 40:1,10,19
41:5,8,9,11,18
42:2,7 43:16 44:2
44:8,11,13,18
45:5,21,25 46:11
46:12,16,16,19,24
48:6,21,22,24
49:1,7,15,21 50:2
50:9 51:7,9,10,22
51:24 52:10 53:2
53:11,17 54:21
55:1 58:7,9,11,12
58:19 60:4,7 61:1
61:4 63:19,20,24
64:16 65:6 66:5,9
66:25 68:12,18
70:9,19 71:2,12
73:1,17,21,23
74:1,12,14,18,21
75:14 77:2 78:3
79:8,24 81:8,15
81:21 82:12,21
83:1,4 84:10,16
85:7,9 86:5 88:5
89:8 90:22 99:22
100:15 101:2,20
102:12,21 104:10
105:7,8,14 107:17
116:7 119:4
120:25 121:3
122:23 123:23
124:7,9 126:7
127:14,16 128:5,6
128:7,11 129:4
130:19 131:11,12
134:22 135:11,20
137:2,17,25 138:8
138:11,22,25
139:1,1,11,16
140:11,15

**thinking**   42:17
43:18 67:10 73:10
104:13 132:19
**thinks**   73:23
**third**   11:3 68:4
72:22 73:25
**thomas**   8:15
**thorough**   88:2
**thought**   20:5 29:4
31:19 56:10 63:3
88:8 101:4
**thoughtful**   17:25
**thoughts**   67:4
101:19
**thousand**   19:7
37:25
**three**   18:3 23:2
79:16 85:24 90:23
92:20 94:8 98:20
98:23 99:10
102:13,25 103:1,1
103:2 133:15
**ti**   6:16
**tick**   15:16
**ticking**   19:15
**tied**   23:3,8 24:6
29:25 55:24 64:8
**ties**   139:12
**tig**   9:3 116:23
117:3,6 138:9
**tigs**   7:2
**time**   15:11,20
24:5 26:15 28:18
36:1,16 47:24
49:20 52:9 56:20
57:23 63:18 65:13
69:8 72:2 81:12
85:17 87:23 88:10
89:5 99:5 104:13
106:21 112:23
128:24 133:14
**timely**   21:7 27:11
32:23 126:9,11,11

**times**   9:18 28:21
37:19 41:2 61:11
63:23 74:23 78:12
80:7 83:16 98:15
102:6,10 109:17
**tirelessly**   22:20
**titled**   55:19
**today**   22:18,23
23:25 24:3 25:7
72:21 78:7 81:18
83:4 112:24
113:21 124:18
131:20 139:23
**today's**   70:20
109:10 140:2
**told**   44:21 96:25
105:24 109:17
122:5
**top**   31:12 62:12
64:2 83:4
**topic**   94:20
**topics**   19:14 81:18
**torture**   138:5
140:25
**total**   20:9 65:13
88:24 90:1,11,18
90:25 93:25 96:10
98:25 99:2 111:8
111:9
**totality**   95:18
**totally**   20:9 136:8
**touch**   24:24 35:6
**touched**   72:21
**touchpoints**   28:4
28:21
**towers**   81:9 87:12
87:14 93:8 102:6
**towns**   22:19
**track**   18:8 19:24
**trade**   27:21 100:1
105:17
**traditional**   27:15

trans  106:5
transaction
  108:25
transcend  42:14
transcribed  7:22
transcript  143:4
transfer  103:17
transfers  2:14
transmit  116:1
travel  93:16 100:2
treat  81:23
treated  32:9 34:21
  34:24 37:9,12
treatment  56:8
  63:16
trending  58:3
trial  42:24 132:21
tribes  27:24 38:4
  50:25 51:3 52:6
tricia  13:5
tried  30:7 51:21
  103:5 105:10
triggered  121:17
tripartite  19:7
trivial  17:23
troop  3:22 4:18
  8:25 42:11,13
  43:4,8,18 44:2,7
  44:13,17,25 45:7
  45:12,17,20,24
  46:7,21 47:23
  48:5,9,13,16,21
  48:24 49:18 81:13
  106:4,11,16,20,24
troop's  50:13
troubled  100:8
trudy  14:2
true  21:19 104:3,4
  113:5 114:22
  129:3 132:8 143:4
truly  23:12 140:2
trustee  3:9 4:1
  87:7 113:8 114:1

trustee's  41:19
truth  21:20
try  20:16 36:25
  48:25 52:1 72:19
  77:16 82:24 87:22
  89:25 90:17 93:14
  100:11 106:5
  122:21
trying  26:2 28:1,1
  30:24 37:1 42:19
  44:2 45:7 68:25
  75:6 78:6 94:5
  133:22
tucked  78:18
turn  22:6 45:13
  60:16,18 84:16
  93:13 104:18
  129:10
turned  87:23
turning  21:13
  35:16 79:21
turns  80:22 95:23
  104:3
tv  28:5 59:4 75:1
tweaked  82:13
tweed  10:17
two  16:18 35:20
  35:21 51:16 79:11
  81:6 88:9 89:1
  90:12 92:7 95:7
  95:11,14,21 98:21
  99:12,19 100:19
  100:21,24,24
  102:3,6,9,10
  103:1 104:24
  114:11 118:4
  119:1,1,1 125:24
twofold  73:19
  100:16
type  54:5 60:10
  64:7 65:1 68:13
  109:25 118:6
  120:6 131:22

138:12
types  29:16 100:6
  109:22 114:18
  118:12 130:7
  131:14,14,16,19
  135:14 136:14

## u

u.s.  1:23 25:10
  44:23 56:5 87:7
  91:3,4 93:16
  113:8 114:1
  138:18,22 139:3,8
  139:8,9
ucc  18:12 19:8,17
  30:11,14 33:3
  56:21 68:16 69:3
  78:15,21,23 80:3
  80:14 86:7 87:13
  87:24,25 88:25
  97:5 102:14,17
  104:10 106:2
ucc's  86:13
ultimate  19:22
  47:11 50:3 56:8
  97:6 124:23
ultimately  17:11
  49:1,8 51:13
  75:19 76:12 110:6
  113:15 130:18
  135:3
unabated  77:22
unaware  94:15
  105:10
unbelievable
  73:18
uncharted  75:14
uncles  68:23
uncontested
  20:10 103:20
uncontroverted
  82:17
uncovered  106:16
  106:19

underlies  110:5
underline  62:15
underlined  70:16
underneath  78:18
understand  26:12
  33:10,15 35:12
  40:10 41:12 46:21
  53:2,4 64:21
  65:25 71:10 74:10
  76:12,22 100:17
  109:11 123:25
  126:1 131:25
understandable
  134:2
understanding
  21:8 29:9 33:12
  40:12 45:22 69:15
  103:13 124:10,21
  125:3,16
understatement
  17:11
understood  36:13
  42:5 47:23 48:13
  48:14 54:1,7,17
  65:19 70:12 107:2
  107:2
underway  77:21
undeveloped
  114:7
unemployment
  4:14
unfairly  85:25
unfortunate  80:4
  105:13 106:1
unfortunately
  128:10
unique  110:14
united  1:1,12 3:9
  4:1 24:13 27:14
  91:14
universal  15:22
universe  110:12

**unknown**  26:3
**unlawful**  5:1
**unliquidated**  42:6
  43:12 44:5
**unnecessary**
  128:16
**unopposed**  21:7
**unprecedented**
  29:2
**unrebutted**  90:1
**unresolved**
  113:22
**unsatisfied**
  117:11 118:2,22
  118:24 120:13,14
  121:10
**unsecured**  6:4,10
  6:19,24 131:5
**unsupported**
  89:17
**untold**  26:15
**unusual**  18:25
  63:5 91:13
**unusually**  17:24
**unvested**  96:8
**updates**  15:15
**uploading**  37:18
**ups**  99:21
**upwards**  37:22
**urged**  74:24 89:15
**use**  29:25 54:13
  54:15 55:18 75:25
  76:9 96:19 122:23
  129:15 131:9
**useful**  48:23 49:2
  51:12 71:11
**ust**  2:16,19,22 3:2
**ust's**  3:8
**usually**  129:14
**uzzi**  10:22

**v**

**vadim**  3:13
**validated**  88:3
**validity**  60:10
**value**  20:17 32:19
  52:2 75:22 76:13
  94:13
**van**  3:17 12:7
**variability**  91:8
**varies**  90:4
**variety**  26:3
**various**  19:13,14
  28:1,4 29:15
  35:24 69:12
  100:13 108:6
  117:2
**vast**  133:21
**veritext**  143:20
**version**  62:12
**vest**  80:17 98:5
  105:25
**vested**  98:8
**vesting**  80:18
  84:23 85:3 98:7
  98:22 99:11,16
  105:15,17 112:1
**vice**  25:5
**victory**  134:11
**videos**  28:14
**view**  26:21 50:1
  104:20 105:2
**views**  17:12 21:21
  21:23,24
**virginia**  40:24
**virtual**  96:17
**virtually**  90:18,19
  93:23 94:23
**visiting**  57:21
**voluntarily**  99:24
**voluntary**  99:20

**w**

**w**  13:22
**wage**  4:16,23
**wages**  2:8 78:2
**waisman**  22:21
**wait**  131:25
**waiting**  16:8
  77:19
**waived**  118:19,20
  124:7,10
**waiver**  121:21
**walk**  20:20 29:20
  31:7,10 35:2
**walking**  30:22
**wall**  63:22
**want**  36:9 38:14
  38:20 39:7 45:2,4
  46:11,18 51:18
  52:12,14,23 53:22
  55:21 56:3 58:21
  59:12 60:8 63:14
  67:9 68:7 72:8,12
  72:18 73:17 74:6
  74:19 75:11 76:6
  81:4 82:23 83:3
  86:11 96:12 97:16
  101:9,9,10 102:11
  103:13 104:8,18
  104:25 113:17,22
  116:15 117:2
  122:25 126:14,15
  128:12,13,18
  132:17 133:9,25
  134:9,20 135:15
  137:20,21 139:22
  140:9
**wanted**  38:6
  43:19 46:4 57:13
  123:18 133:8
**wanting**  100:17
  137:24
**wants**  104:21
  122:7 139:23

**wardwell**  10:1
  15:5 22:12
**warp**  85:6 106:5
**washington**  8:16
  9:5 11:11
**wasn't**  139:9
**waste**  65:13
**watson**  81:10
**way**  17:1,4,4
  23:15 28:1,4
  29:25 37:23 39:17
  40:6 42:17 43:5
  43:18 52:13 58:6
  65:22 67:14 68:14
  74:5,5 82:25
  86:21 87:18,20
  89:16 90:4 92:1,1
  92:3 94:5 95:18
  96:3,15 97:2
  99:22 100:19
  102:22 104:7
  116:9 121:22
  128:6,12,12
  132:17
**ways**  35:4 44:3
  75:25,25 82:24
**we've**  26:17 27:25
  30:7,18 31:22
  32:2,21 34:4
  45:17 50:12 51:21
  57:8,15 59:11,19
  59:22 60:12,20
  69:2 72:20,25
  73:12 74:2,5,11
  74:23 75:1,6,9
  77:3 80:5 118:11
  118:17 128:3
**wear**  43:8
**website**  28:7,8,23
  61:20
**websites**  57:20
**week**  16:7 18:9,17
  59:14 77:15

weekend  141:2
weekly  57:16 58:8
weeks  15:10 78:15
  102:16 104:10
weigh  128:14
weighted  102:22
  102:22
wellington  129:1
  134:24
went  15:21 17:4
  21:5 25:12 42:24
  42:25 61:10
  100:18 102:8
west  8:22 40:24
whip  18:23
white  1:14
whitney  13:2
wholly  115:9
wide  86:10
willing  71:18
willis  81:9 87:11
  87:14 93:8 102:6
win  131:3 138:24
winthrop  8:20
wire  103:17
wise  58:10
wisely  94:15
wish  25:16 111:5
wishing  15:7
withdraw  140:6
witness  67:2
  81:12
witnesses  68:11
  81:14,20
wolf  14:4
wonder  30:5
wonderful  141:1
word  63:15 83:16
words  37:2 84:12
  88:20 103:9
  104:20 110:5
  120:3 123:1

work  18:13,15,16
  21:19 23:14 40:9
  41:12 43:5 45:13
  48:25 49:4,12,18
  52:7 55:2 88:4
  92:7 93:1 96:23
  97:13 104:5,10
  109:25 110:17
  121:22 140:20
worked  17:1
  22:20 26:17 73:22
  102:16
workers  2:12
working  20:15
  24:6,9 47:1 53:13
  57:23,24 58:22
  59:16 65:21 66:20
  88:1 130:20,21
works  28:2 40:17
  52:9 77:21
world  20:19 68:20
worth  20:5 40:25
  41:1 75:18 99:22
  113:5
wouldn't  120:13
  137:8
write  80:24 93:4
  95:5,16,19,24
  96:9
writing  96:13
written  82:18
  122:8
wrong  36:17
  62:10 136:5,22
  139:1,2
wrongly  69:5

**x**

x  1:4,10 39:23
  40:25 67:3 132:8
  142:1

**y**

y  39:23 41:1
yeah  36:19,21
  48:4,8,13 61:3
  66:19 67:2 71:16
  84:5,25 103:1
  133:3 136:5
  137:20 138:21
  140:8
year  15:7,9 79:18
  89:1 92:5,8 99:18
  100:10 101:6,17
  101:22,24 103:3
  104:1 107:15
  109:18 110:19,19
  110:20
year's  44:23
  105:22
years  76:2,5 82:19
  92:7,21 95:7
  103:1,1,2 104:5
  114:4
yep  120:1 125:8
yesterday  16:7,11
  17:13 29:14
yon  99:6
york  1:2 3:5 4:6
  8:6,23 9:19 10:4
  10:13,20 11:4,10
  12:9,14 63:23
youtube  35:11
  65:17 70:21
you've  136:14

**z**

zabel  53:9
zero  89:3 93:5