Jasmine Ball
M. Natasha Labovitz
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836

*Attorneys for Beacon Company*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

## OBJECTION OF MORTIMER SACKLER INITIAL COVERED SACKLER PERSONS TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS OR FOR *IN CAMERA* REVIEW, BASED ON FAILURE OF THE SACKLERS AND THE DEBTORS TO DEMONSTRATE DOCUMENTS IDENTIFIED ON LOGS ARE PRIVILEGED

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

ARGUMENT .......................................................................................................................... 6

I.     ████████████████████████
████████████████████████ ....................... 6

II.     The UCC Has Shown No Basis to Intrude ██████████████████
█████████████████████████████
██████████████████ ............................................... 9

III.     The UCC Cannot Disturb the Attorney-Client Privilege Over Communications
Between Counsel and Communication Advisors With Respect to Litigation
Strategy ................................................................................................................. 12

IV.     The UCC's Attack on Privileged Communications Because They Include Other
Advisors Is Baseless ............................................................................................. 15

V.     There Is No Basis for *in Camera* Review of Privileged Communications from an
Advisor Who Had Both Legal and Non-Legal Roles Because the Law Is Clear
that Predominantly Legal Communications Are Nonetheless Privileged ......................... 21

VI.     There Is No Basis for the UCC to Bog Down the Chapter 11 Cases with an
Exceptionally Burdensome *in Camera* Review .............................................................. 23

CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**

*Alpex Computer Corp. v. Nintendo Co.*,
    No. 86 Civ. 1749 (KMW),
    1988 WL 87511 (S.D.N.Y. Aug. 16, 1988) ........................................................................11

*Apple Inc. v. Corellium, LLC*,
    No. 19-81160-CV,
    2020 WL 1986942 (S.D. Fla. Apr. 27, 2020) ...............................................................11, 23

*BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*,
    326 F.R.D. 176 (N.D. Ill. 2018) ........................................................................................16

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, New York*,
    171 F. Supp. 3d 136 (S.D.N.Y. 2016) ...............................................................................16

*E.E.O.C. v. Gear Petroleum, Inc.*,
    948 F.2d 1542 (10th Cir. 1991) ...........................................................................................8

*E.E.O.C. v. Karenkim, Inc.*,
    No. 5:08-CV-1019(NAM/DEP),
    2011 WL 13352967 (N.D.N.Y. Jan. 10, 2011) ....................................................................8

*ESPN, Inc. v. Office of Comm'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999) ...................................................................................8

*Gabaldoni v. Washington Cnty. Hosp. Ass'n*,
    250 F.3d 255 (4th Cir. 2001) .............................................................................................20

*Gabana Gulf Distribution v. Gap Int'l Sales, Inc.*,
    No. C-06-02584 CRB (EDL),
    2007 WL 2729863 (N.D. Cal. Sept. 19, 2007) ..................................................................19

*Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*,
    No. 02 CIV.7955 DLC,
    2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) ..................................................................14

*Highland Capital Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) .................................................................................8

*In re Cnty. of Erie*,
    473 F.3d 413 (2d Cir. 2007) ..........................................................................................22, 21

*In re Grand Jury Subpoenas Dated Mr. 24, 2003 Directed to (A) Grand Jury Witness
Firm & (B) Grand Jury Wintess*,
    265 F. Supp. 2d 321 (S.D.N.Y. 2003) .....................................................................13, 14, 15

*In re Omnicom Grp., Inc. Sec. Litig.*,
    233 F.R.D. 400 (S.D.N.Y. 2006) ....................................................................23

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    352 F. Supp. 3d 207 (E.D.N.Y. 2019) ...........................................................14

*In re Sept. 11 Litig.*,
    621 F. Supp. 2d 131 (S.D.N.Y. 2009)..............................................................9

*In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prod. Liab. Litig*,
    No. 1:17-MD-2775,
    2019 WL 2330863 (D. Md. May 31, 2019)....................................................20

*In re SunEdison, Inc.*,
    572 B.R. 482 (Bankr. S.D.N.Y. 2017)..........................................................6, 9

*Local 3, Int'l Bhd of Elec. Workers v. N.L.R.B.*,
    845 F.2d 1177 (2d Cir 1988)........................................................................21

*Ravenell v. Avis Budget Grp., Inc.*,
    No. 08-CV-2113 SLT,
    2012 WL 1150450 (E.D.N.Y. Apr. 5, 2012) .................................................14

*S.E.C. v. Wyly*,
    No. 10 Civ. 5760 SAS,
    2011 WL 3366491 (S.D.N.Y. July 27, 2011) ................................................17

*Sampedro v. Silver Point Capital, L.P.*,
    818 Fed. App'x 14 (2d Cir. 2020)................................................................16

*Schaeffler v. United States*,
    806 F.3d 34 (2d Cir. 2015)............................................................................9

*Stardock Sys., Inc. v. Reiche*,
    No.417CV07025SBAKAW,
    2018 WL 6259536 (N.D. Cal. Nov. 30, 2018) .............................................16

*The Sols. Team, Inc. v. Oak St. Health, MSO, LLC*,
    No. 17 cv 1879,
    2020 WL 30602 (N.D. Ill. Jan. 2, 2020) ......................................................19

*United States v. Kovel*,
    296 F.2d 918 (2d Cir 1961)......................................................................13, 16

*United States v. Krug*,
    868 F.3d 82 (2d Cir. 2017).............................................................................9

*United States v. Schwimmer*,
   892 F.2d 237 (2d Cir. 1989).................................................................................9

*Universal Standard Inc. v. Target Corp.*,
   331 F.R.D. 80 (S.D.N.Y. 2019) ........................................................................16

STATUTES

Fed. R. Bankr. P. 2004.......................................................................................6, 7, 8, 9

Fed. R. Evid. 408 ..........................................................................................2, 6, 7, 8, 9

Fed. R. Evid. 801 ...................................................................................................9

The Mortimer Sackler Initial Covered Sackler Persons ("Mortimer Sackler ICSPs")[2] respectfully submit this Objection to the Official Committee of Unsecured Creditors' ("UCC") Motion to Compel Production of Purportedly Privileged Documents or for *In Camera* Review Based On Failure Of The Sacklers and The Debtors to Demonstrate Documents Identified on Logs are Privileged (the "General Challenges Motion" or "Br."). For the reasons set out below, the UCC's motion should be denied in its entirety.[3]

## PRELIMINARY STATEMENT

1.    The General Challenges Motion is a baseless attempt to deprive twelve Side A custodians of the protection of the attorney-client privilege over entire categories of communications. The General Challenges Motion offers scant rationale to justify the sought-after intrusion on the attorney-client relationships and challenges the privilege of myriad documents with little, if any, relevance to the UCC's diligence of the proposed settlement.

2.    As this Court has made clear, the parties "have rights including basic rights in respect to privilege and the like and I don't require them to waive privilege." Sept. 30, 2020 Hr'g Tr at 82:18–20. The UCC's document requests are incredibly broad and go back decades, requiring the production of more than a million pages of documents from Side A custodians alone on topics like their "financial status" and encompass legal issues like tax planning, estate planning, and ordinary course business disputes having nothing to do with Purdue. Given the sheer breadth of the UCC's Subpoena, it is hardly surprising that thousands of documents

---

[2]    The Mortimer Sackler ICSPs include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts for their benefit and the trustees of those trusts**.** Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties dated Nov. 20, 2019,¶ 1 [D.N. 518]

[3]    The Mortimer Sackler ICSPs preserve, and do not waive, all defenses, including without limitation defenses based on lack of personal jurisdiction.

concerning a broad variety of privileged communications from many different attorneys would need to be withheld or redacted.

3.      The UCC mounts a blunderbuss attack on five categories of documents properly withheld as privileged or confidential.  All of these documents were appropriately designated in keeping with well-established law and this indiscriminate effort by the UCC should be rejected.

4.      *First*, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ *See* Aug. 26, 2020 Hr'g Tr. 25:17-21 ("And I just think it's important for the bankruptcy lawyers to keep an eye on the litigators and make sure that they understand the difference between doing due diligence and an examination and taking discovery for purposes of a trial."). ██████████

████████████████████████████████████████████████

████████████████████████████████████

5.      *Second*, the UCC asks the Court to reject on a wholesale basis ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

a███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████    The Second Circuit, the Southern District of New York and this Bankruptcy

Court have all recognized ███████████████████████████████████████

███████████████████.

6.     *Third*, the UCC asserts that all communications involving communications

advisors are not privileged.  Not so.  Courts recognize that when communications, or public

relations, advisors are retained by law firms in order to assist with litigation strategy, they are

within the privileged circle.  That is exactly the circumstance here.

7.     *Fourth*, the UCC broadens its attack to argue that any time any sort of third-party

advisor is included on a communication, that communication loses its privileged status.  That is

simply not the law.  The UCC's contention that only communications with counsel and not

communications among parties about seeking legal advice are entitled to privilege similarly

reflects an insupportably cramped interpretation of attorney-client privilege.

8.     *Fifth*, the UCC argues that communications between clients and counsel who may

also provide business advice are automatically not subject to privilege.  The law, however, is

clear:  a communication with a lawyer who is predominantly providing legal advice is privileged,

even if that lawyer in the same communication or on other communications also provides

business advice.  Side A recognized the need to distinguish between business and legal advice,

disclosing communications in whole where the communication was about business advice,

redacting privileged portions of mixed communications and withholding documents where the

predominant purpose of the communication was seeking or receiving legal advice.

9.    In an implicit acknowledgement that its efforts to compel the wholesale disclosure of privileged materials will fail, the UCC falls back on an argument that the documents should be subject to *in camera* review instead.  But there is no need for *in camera review* of thousands of documents here and the process would bog down this already staggeringly expensive discovery process at a time when both the Debtors and the Court have urged that the cases should be moving quickly toward the development and confirmation of a Plan of Reorganization.

## BACKGROUND

10.    On March 31st, 2020, the UCC served its Requests seeking 88 categories of documents.  The relevant time period for the UCC Requests was defined as January 1, 1996, to September 15, 2019 for the Initial Covered Sackler Persons and January 1, 2006 to September 15, 2019 for the Additional Covered Sackler Persons.  The Requests sought documents relating to a wide variety of topics, many of which were untethered to the Debtors, much less the substance of the litigation claims that led to the chapter 11 filing.  *See, e.g.*, Request No. 9 ("All Documents Concerning or constituting asset planning or estate planning or asset protection advice made or provided to the Covered Sackler Persons or the Trusts . . . ."); Request No. 13 ("All Documents and Communications Concerning . . . any subsequent Transfers or reinvestment of [any funds transferred from Purdue] . . . ."[4]); Request No. 19 ("All Documents and Communications Concerning the financial status of the Covered Sackler Persons . . . ."); Request No. 82 ("All Documents and Communications Concerning tax strategies to avoid or reduce tax liability."); Request No. 84 ("Documents sufficient to Identify all charitable donations, gifts or contributions

---

[4]    The scope of Request No. 13 was immense because the UCC defined "Transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property, or an interest in property" without any materiality threshold.  As written, the Request included, for example, any document that hit on one of the UCC's search terms that reflected any payment any Mortimer Sackler ICSP made between 1996 and 2019 and any document concerning any past or present investment relationship by any ICSP that included, in part, funds potentially traceable to Purdue.

by or on behalf of any Covered Sackler Persons from 2007 to the present.").  The Subpoena also included numerous requests on topics that clearly concern legal advice.  *See, e.g.*, Request No. 25 ("All Documents and Communications related to the proposed settlement framework and Summary Term Sheet or any other proposed or potential compromise of claims related to these cases . . . ."); Request No. 26 ("[A]ll Documents and Communications Concerning all opioid-related litigation"); Request No. 28 ("All Documents Concerning any Communications to which any Covered Sackler Person was a party Concerning actual or potential Claims against or liability of Purdue or any of its owners or other affiliates arising out of or relating to the sale or marketing of opioids.").

11.    The Mortimer Sackler ICSPs served comprehensive responses and objections, which included agreement to produce large swaths of relevant documents and objections to plainly irrelevant aspects of the document requests.  During the meet-and-confer process, the UCC requested that the Mortimer Sackler and Raymond Sackler ICSPs defer their relevance and burden objections to the extent that electronic documents had hit on one or more of the UCC's search terms, and both agreed to do so to expedite discovery in this matter.  As a result, the Mortimer Sackler ICSPs alone have produced approximately ███ documents from their review of approximately ███ documents.  The Privilege Log included less than ██ of the documents deemed responsive in the course of the Mortimer Sackler ICSPs' review and contained ███ documents.  Of these documents, ███ were withheld in full and ███ were produced with redactions.  This number of privileged documents is clearly proportional to the scale of the document production, particularly in light of the fact that the UCC's Subpoena included many requests that focus on legal issues, equally related to underlying mass tort litigation.

12.    Following the production of the Privilege Log, the Mortimer Sackler ICSPs

agreed, at the UCC's request, to re-review and potentially de-designate entries on the Privilege

Log.  This process has been successful in resolving numerous privilege disputes.  The Mortimer

Sackler ICSPs have also identified ███████████ documents (still only a fraction of the

extensive Privilege Log) that they determined should not have been included in the Privilege Log,

which is hardly surprising given the scale and pace of the discovery in these cases, that are being

de-designated.  Further, and notwithstanding the UCC's aggressive motion, the Mortimer Sackler

ICSPs' review of Privilege Log entries, based on correspondence with the UCC remains ongoing

and we anticipate that we will continue to resolve additional privilege disputes in good faith.

## **ARGUMENT**

**I.**  ████████████████████████████████████
████████████████████████

13.    ███████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████

14.    ███████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

15.    ███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ ██████████████████

16.    █████████████████████████████████████████████

███████████████████████████████████████████████

---

[5] ████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████    *See* Aug. 26 Tr. ("And I just think it's important for

the bankruptcy lawyers to keep an eye on the litigators and make sure that they understand the

difference between doing due diligence and an examination and taking discovery for purposes of

a trial.").

      17.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ ██ ████ ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

18.     Unable to provide substantive justification for its demand, the UCC falls back to the general principle that the scope of Rule 2004 discovery is "broad."  But, as *SunEdison* underscores, "broad" does not mean limitless.  Here, the UCC's request should be rejected as beyond the limits of what is necessary or appropriate to conduct its diligence of the proposed settlement.

**II.    The UCC Has Shown No Basis to Intrude** ████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████

19.     Nor is the UCC entitled to communications reflecting privileged advice ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████     *See United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (the joint defense privilege "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy" has been undertaken); *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) ("[P]rivilege is not waived by disclosure of communications to a party that is engaged in a 'common legal enterprise' with the holder of the privilege."); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (the common interest rule is "an extension of the attorney client privilege" that serves the "need to protect the free flow

of information from client to attorney . . . whenever multiple clients share a common interest about a legal matter"). ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

20.    ████████████████████████████████████ the Court has already recognized that held that the mass tort litigation against the former directors was closely related to the litigation against Purdue.  *See* Oct. 11. 2019 Tr. at 261:10-22 (holding that extension of injunction to litigation against third parties was appropriate in light of the "identity of factual interest" with litigation against the Debtors).  The claims against the former directors cannot succeed unless those plaintiffs first prove wrongful conduct by the Debtors. ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

21.    The UCC fails to explain how any specific communication on the Privilege Log is ████████████████████. Instead, the UCC relies on ████████████████

███████████████████████████████████████████████

████████████████████ (Br. ¶42).  In light of t████████████████████

████████████████████████████████, it is not enough for the UCC to assert *ipse dixit* that it "is troubled" ███████████████████████(¶ 41),

"question" ██████████████████████████████████(¶ 42), and

suggest █████████████████████████████████████████████████████

███████ (¶ 42).  None of these vague complaints justifies wholesale de-designation or *in

camera* review of documents ████████████████████████████████.  *See, e.g.*,

*Apple Inc. v. Corellium, LLC*, No. 19-81160-CV, 2020 WL 1986942, at *3–4 (S.D. Fla. Apr. 27,

2020) ("Absent probative direct or circumstantial evidence supporting claims that opposing

counsel are improperly withholding documents or engaging in other discovery misconduct, the

Court will not rely on counsel's suspicions."); *Alpex Computer Corp. v. Nintendo Co.*, No. 86

Civ. 1749 (KMW), 1988 WL 87511, at *3 (S.D.N.Y. Aug. 16, 1988) ("[S]uspicions of counsel

are not a basis for shifting the responsibility for discovery from counsel to the court.").

22.    The UCC also makes a generic challenge to common interest communications

present on Side A's Privilege Log on the grounds that they are not specifically identified as such.

Side A has already provided the UCC with a detailed Appendix to its Privilege Log describing

the role of every individual who appears in one or more entries on the Privilege Log, including

third parties who share a common interest with one or members of Side A.  This information is

sufficient to evaluate the privilege claims, particularly where the common interest arises out of

matters irrelevant to the global settlement.  Discovery in these chapter 11 cases has attained an

extraordinary scale and, due to the breadth and timeframe of the discovery requests, has swept in

numerous documents that, while technically responsive, are of little or no relevance to the core

diligence issues.  It would not be a worthwhile use of the parties' limited resources to annotate

numerous privilege log entries simply to spell out where the common interest doctrine is plainly

applicable based on the information already provided.

23.    The UCC's argument that claims of common interest must be "based on

competent evidence" (Br. ¶ 40) puts the cart before the horse.  The common interest doctrine is

not an independent basis for withholding documents; it is a doctrine that protects the privilege

from waiver.  To the extent there are specific communications potentially relevant to the

diligence necessary to achieve a global resolution, Side A remains willing to meet-and-confer,

re-review prior privilege designations, and provide further information in response to specific

inquiries from the UCC.

### III.    The UCC Cannot Disturb the Attorney-Client Privilege Over Communications Between Counsel and Communication Advisors With Respect to Litigation Strategy

24.    The communication, and public relations, advisors who appear on the Privilege

Log conducted work that is inextricably intertwined with litigation strategy and therefore

protected under the law of this Circuit.[6]  As the Court is doubtless aware, the civil litigation that

preceded these Chapter 11 cases was heavily covered by the news media, talk shows, and others.

Indeed, Massachusetts and other state attorneys general have routinely issued press releases

announcing the filing of complaints and case developments and frequently called attention to

opioid litigation on Twitter and other social media platforms.[7]  Almost all of the documents

relating to public relations advisors on the privilege log are from 2017 to the present.[8]  (Br.

¶¶ 45-54.)

25.    As a threshold matter, this privilege dispute again reflects the UCC's failure to

focus discovery on diligence of the proposed settlement.  Exchanges between counsel and

---

[6]    Side A has already produced at least █████ of the public relations documents challenged by the UCC via Hurley Decl., Ex. A (Excel Tab D), and intends to make an additional disclosure of approximately █ documents in short order. ███████████████████████████████████████████████ ██████████████████

[7]    *See, e.g.*, @MassAGO, Twitter (Oct. 4, 2019, 2:05 PM), https://twitter.com/MassAGO/status/1180198426895667200; @NewYorkStateAG, Instagram (Aug. 5, 2019), https://www.instagram.com/p/B0ydD-NhIIK/?igshid=563a1uore3dv; @AGBecerra, Twitter (Oct. 3, 2019, 1:51 PM), https://twitter.com/AGBecerra/status/1179831379816677376; Attorney General Josh Shapiro, Facebook (May 16, 2019), https://www.facebook.com/PaAttorneyGen/videos/601256267027080/?vh=e&extid=0).

[8]    Only █ documents of the documents the UCC has challenged pre-date 2017.

communications advisors concerning the media aspects of litigation strategy are of little, if any, relevance to the UCC's diligence because (*i*) there were no distributions to the Side A Family Members after 2016, (*ii*) the allegations in litigation creditors' complaints primarily relate to marketing many years prior to 2017, and (*iii*) Purdue stopped marketing altogether in early 2018. Further attempts by the UCC to intrude on communications concerning media strategy during the mass tort litigation will not meaningfully advance these chapter 11 cases. The UCC's persistent demands for these documents appears to be little more than an attempt to obtain counsel's confidential strategy for the mass tort litigation at the expense of focusing on the evaluation of the proposed settlement.

26.     The Second Circuit has long recognized that communications with third-party advisors may be privileged. *See United States v. Kovel,* 296 F.2d 918, 922 (2d Cir 1961). In *In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness*, Judge Kaplan explained how this principle specifically applies to the retention of communications advisors: "(1) confidential communications (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing with the media in cases such as this (4) that are made for the purpose of giving or receiving advice (5) directed at handling the client's legal problems are protected by the attorney-client privilege." 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003) (attorney-client privilege protected communications with public relations advisor concerning high-profile grand jury investigation).

27.     ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

13

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████ (Hurley Decl. Ex. 16 (Aug.

23, 2020 J. Ball Ltr. at 2))

28.     The public relations documents on the privilege log confirm that counsel found it

necessary to rely on the expertise of public relations professionals.  For example:

- Entry No. ███████ ██████████████████████████████████████████████████

████████████████████████████████████ *In re Grand Jury Subpoenas*
clearly recognized the need for coordination and discussion between counsel and
communications advisors on many strategic considerations at the intersection of
public relations and legal analysis.  *See* 265 F. Supp. 2d at 330 ("Questions such
as whether the client should speak to the media at all, whether to do so directly or
through representatives, whether and to what extent to comment on specific
allegations, and a host of others can be decided without careful legal input only at
the client's extreme peril.").

- Entry No. ███████ T████████████████████████████████████████████████████
██████████████████████████████████ Including communications
advisors in these discussions is essential for counsel to effectively represent the
clients' best interests in statements concerning pending litigation.  *See In re
Grand Jury Subpoenas*, 265 F. Supp. 2d at 330 ("For example, lawyers may need
skilled advice as to whether and how possible statements to the press—ranging
from 'no comment' to detailed factual presentations—likely would be reported in
order to advise a client as to whether the making of particular statements would be
in the client's legal interest.").

29.     Contrary to the UCC's contention, no court has questioned the validity of Judge

Kaplan's decision in *In re Grand Jury Subpoenas* or limited the decision to its particular facts.[9]

---

[9]    Contrary to the parenthetical in the Motion, *Haugh* did not "suggest[] there is an open question whether *In re
Grand Jury 2003* was correctly decided"; the *Haugh* court simply stated: there was no need to address whether
the then-recent opinion was correctly decided because it did not assist the party invoking it.  *Haugh v. Schroder
Inv. Mgmt. N. Am. Inc.*, No. 02 CIV.7955 DLC, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003).  The
validity of *In re Grand Jury Subpoenas* was also not at issue in *In re Restasis* or *Ravenell* because it did not
apply to the facts of those cases.  *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F.
Supp. 3d 207, 212 (E.D.N.Y. 2019) ("In re Grand Jury does not apply to the situation here—the routine hiring
of consultants to help a company improve its regulatory position."); *Ravenell v. Avis Budget Grp., Inc.*, No. 08-

*See* Motion ¶ 49 (suggesting that attorney-client privilege only covers public relations documents

that "constitute or relate to efforts to influence prosecutors").  While the UCC identifies

decisions declining to apply *In re Grand Jury Subpoenas* based on the specific facts presented in

those cases,[10]  such

that "attorney efforts to influence public opinion in order to advance the clients legal position[s]"

were necessary to "achieve a fair and just result" of the legal matter.[11]  *In re Grand Jury* at 326,

330.

### IV.    The UCC's Attack on Privileged Communications Because They Include Other Advisors Is Baseless

30.    The Court should reject the UCC's claim that numerous privileged

communications lose that status simply because other advisors to the attorney's client were privy

to the communication..[12]  (Br. ¶¶ 55-58).  The attorney-client privilege is simply not so narrow

---

CV-2113 SLT, 2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) ("Defendants in this case have failed to demonstrate that the involvement of OCI or its corporate successor was necessary for effective communication between counsel and client.").

[10]    These essential elements are missing from the cases the UCC cites to support its request for the categorical waiver of privilege.  For example, it is inappropriate to compare the minor and inessential role played by the public relations consultant in *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, New York*, 171 F. Supp. 3d 136,146–47 ("Mr. Holland's declaration asserts that he used West End to distill complex facts into digestible pieces and conduct records research that facilitated municipal officials' ability to accurately explain the Lamm case to the public.").  Further, the cases in which the UCC relies are all easily distinguishable.  Several of these cases concern public relations personnel retained for business purposes whereas here the public relations personnel have been providing advice concerning high-profile litigation against the clients.  *See, e.g., Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 92 (S.D.N.Y. 2019) ("The public relations consultant here was hired not by the attorney but by Universal Standard and was hired for business purposes.").

[11]    *Stardock Sys., Inc. v. Reiche*, No.417CV07025SBAKAW, 2018 WL 6259536, at *6 (N.D. Cal. Nov. 30, 2018) ("Because Defendants' counsel (and not Defendants themselves) hired the PR firm of Singer to provide PR counseling specifically for the purposes of litigation strategy in the current action, just like the services the PR firm in the In re Grand Jury Subpoenas case rendered, the attorney-client privilege extends to the withheld communications between Singer and Defendants' counsel.").

[12]    At the request of the UCC, Debevoise has re-reviewed the privilege log and has already produced over ▉ documents involving third-party advisors that were originally withheld.  For most of these documents, it was

that the attorney and client cannot even consult in confidence with the client's non-legal advisors.

The Second Circuit recently reaffirmed that communications involving third-party advisors may

be protected by the attorney client privilege:

> When a communication is "made in confidence for the purpose of
> obtaining legal advice from the lawyer," the inclusion of a third party on
> that communication does not necessarily destroy the attorney-client
> privilege, so long as the inclusion "is necessary, or at least highly useful,
> for the effective consultation between the client and the lawyer."
> "[C]ommunications by the client to his counsel and a third party
> reasonably related to [the] purpose of having the third-party interpret [the
> communications] so that the lawyer may better give legal advice" remain
> protected.

*Sampedro v. Silver Point Capital, L.P.*, 818 Fed. App'x 14, 19 (2d Cir. 2020), at *3 (2d Cir. June

4, 2020) (citation omitted), as amended (June 5, 2020) (quoting *United States v. Kovel*, 296 F.2d

918, 922 (2d Cir. 1961)) (holding that consultant was essential for analyzing data relevant to

legal analysis).  As the communications on the Privilege Log demonstrate, third-party advisors

may prove "highly useful" to the attorney's consultation of her client in diverse circumstances,

from insurance claims to landlord-tenant issues.

31.    To assert otherwise and seek a categorical waiver of privilege, as the UCC has

done, overlooks that "[a]nalysis of attorney-client privilege claims requires then a discerning

analysis, not merely a demonstration that a financial analyst or consultant may have been a

recipient of a questioned document. . . .  Determining the application of the attorney-client

privilege requires a careful analysis, not the invocation of a rule of easy and automatic

application."  *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 176, 185

(N.D. Ill. 2018) (documents containing "comments, suggestions, and/or questions between

---

determined on review not that the third-party advisors broke privilege but rather that the legal advice did not
predominate over the investment advice.  As the review is ongoing, Side A anticipates that it may produce
additional documents involving third-party advisors.

financial advisor and attorneys pertaining to the drafting of the agreements" were privileged).  In

other words, the fundamental principle of attorney-client privilege as it applies to

communications including advisors must be considered on a document-by-document basis.  The

UCC also ignores the fundamental common law principle that communications between a party's

agent or representative and counsel fall within the attorney-client communication.  *See, e.g.*,

*S.E.C. v. Wyly*, No. 10 Civ. 5760 SAS, 2011 WL 3366491, at *8 (S.D.N.Y. July 27, 2011) ("The

email and attachments are privileged because they are communications between a necessary

agent and a lawyer on a confidential legal matter."), *modified on reconsideration sub nom. S.E.C.,

Inc. v. Wyly*, No. 10 Civ. 5760 SAS, 2011 WL 3841591 (S.D.N.Y. Aug. 18, 2011), *and modified

on reconsideration sub nom. S.E.C., Inc. v. Wyly*, No. 10 Civ. 5760 SAS, 2011 WL 4055408

(S.D.N.Y. Aug. 19, 2011).

32.    As the following examples illustrate, the UCC's request for categorical

de-designation of documents including third parties is unfounded.

33.    ***Accountants:*** Communications involving accountants who were necessary for the

provision of legal advice were properly withheld as privileged.[13]  *See, e.g.*, *Indianapolis Airport

Auth. v. Travelers Prop*. Cas. Co. of Am., No. 1:13-CV-01316-JMS, 2015 WL 4715202, at *7

(S.D. Ind. Aug. 7, 2015) ("As agents of IAA, communications containing legal advice between

IAA's accountants at BKD and IAA's counsel are privileged.").  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[13]    The UCC's discussion of cases that do not recognize an accountant-client privilege are beside the point as Side
A did not withhold documents based on the accountant-client privilege.  *See* Br. ¶ 55.

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

34.    ***Insurance Brokers:*** Similarly, communications including insurance brokers, as
an agent, may be party to a privileged communication and were properly withheld.[14]  F█

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████[15]  Not only is this communication

privileged, it is also irrelevant to the diligence in this case.

35.    ***Consultants:*** Consultants can function as an agent within the circle of attorney-
client privilege for the same reasons.[16]  For example, the UCC challenges the privilege

designation of attorney-client communications t█████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[14]    Of the ██ documents related to the presence of insurance brokers that the UCC has challenged, Side A has
produced ██ documents, and will produce an additional tranche in short order.

[15]    ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████.

[16]    Of the ██ number of documents related to the presence of professional consultants that the UCC has
challenged, Side A has produced ███ documents, and will produce approximately ███ in short order.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Again, not only are these attorney-client communications ████████████████

privileged, but they are also in no way relevant to the resolution of the chapter 11 cases.

36.    The UCC's complaint that Side A has improperly withheld communications that

do not include a lawyer and described on the privilege log as "reflecting an intent to seek legal

advice" is similarly misplaced.[17]  (UCC Brief at paras. 43-44.)  First, contrary to the UCC's

contention, this is a perfectly valid basis for the assertion of attorney-client privilege.  *See, e.g.*,

*The Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, No. 17 cv 1879, 2020 WL 30602, at *1 (N.D.

Ill. Jan. 2, 2020) (certain documents that reflected communication for the purpose of receiving

legal advice were considered privileged); *Gabana Gulf Distribution v. Gap Int'l Sales, Inc.*, No.

C-06-02584 CRB (EDL), 2007 WL 2729863, at *1 (N.D. Cal. Sept. 19, 2007)

("[C]ommunications between non-lawyers regarding an intent to seek legal advice may be

privileged.").  Many of the communications the UCC challenges on this ground concern content

originating with or communicated to lawyers and, in fact, lawyers are the authors or recipients in

a number of cases.

- Entry No. ██████ This document i███████████████████████

  (Ball Decl. Exhibit 22)

---

- Entry No ███████ This document is t ███████████████████

. (Ball Decl. Exhibit 23).

37.   ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████[18] These

communications are both attorney-client communications and work product because they were

made for the purpose of ███████████████████████████.[19]

38.   The General Challenges Motion's refrain that the Mortimer Sackler ICSPs have

failed to provide sufficient information to justify their privilege designations accurately is

unfounded.  Throughout the General Challenges Motion, the UCC often focuses on one field of

the Privilege Log – a brief explanation of the privilege basis – and ignores the other information

supporting the privilege designations, including the subject line of withheld communications, the

context provided by unredacted content of partially redacted documents, and the Appendix

providing supplemental information about every individual who appears on the Privilege Log.

The Mortimer Sackler ICSPs stand ready to provide additional information on privileged

communications that are potentially relevant to the dispute, as they have throughout the

---

[18] Privilege Log Entry No.'s ███████████████████████████████
█████████████████.

[19] Some of the documents at issue were incorrectly described on the log as "reflecting an intent to seek legal advice" when they were in fact redacted for spousal privilege.  For example, Privilege Log Entry No. 2503 was produced with only spousal communications redacted.  The privilege log description has been accordingly revised to reflect that this document is being produced in redacted form pursuant to the spousal privilege.

discovery process. However, it is neither a necessary nor reasonable use of the parties' resources to revisit thousands of entries that have no relation to the substance of the settlement concerning which the UCC is supposed to be conducting diligence.

**V.    There Is No Basis for *in Camera* Review of Privileged Communications from an Advisor Who Had Both Legal and Non-Legal Roles Because the Law Is Clear that Predominantly Legal Communications Are Nonetheless Privileged**

39.    The UCC's request for *in camera* review of all communications for which Side A's Privilege Log reflects that ███████████ or Stuart Baker acted as counsel is both unnecessary and unreasonable. The documents relating to Stuart Baker challenged by the UCC on this basis have already been removed from the privilege log or will be removed shortly, and the UCC will receive any such documents. The Court should not be burdened with an *in camera* review of the entries where ███████████ provided legal advice simply because ███████████ acted as a non-legal advisor at other times and therefore the UCC distrusts the privilege designations. *See Local 3, Int'l Bhd of Elec. Workers v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir 1988) ("*In camera* review is considered the exception, not the rule" and acknowledging that the "inspection of disputed documents places very burdensome demands on federal trial courts."). It is common for attorneys to act as business advisors and these determinations must be made on a document-by-document basis. *See County of Erie*, 473 F.3d at 420 ("[t]he predominant purpose of a communication cannot be ascertained by quantification or classification of one passage or another; it should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer.").

40.    An attorney also acting as a business adviser is entirely common and does not—without more—necessitate a burdensome *in camera* review; if this were the rule, courts would be overwhelmed by requests that every communication regarding in-house counsel be reviewed *in*

21

*camera*.  Instead, joint business and legal communications remain protected so long as the "predominant purpose" of the communication was legal advice.  *See In re Cty. of Erie*, 473 F.3d 413, 420 (2d Cir. 2007) (holding that a communication containing both legal and business advice is privileged where its "predominant purpose" was to render or solicit legal advice).  Where ████████ provided solely business advice, materials were produced.  Indeed, the Mortimer Sackler ICSPs have produced many communications with ████████ that are not privileged.  Based on review during the meet-and-confer process, the set of documents where privilege is asserted based on ████████'s role as counsel has been further narrowed.[20]

41.    As the following examples illustrate, the purpose of the withheld and redacted communications from ████████ was "predominantly" legal in nature (including many when he worked at the law firm ████) and therefore protected by privilege:



- Entry No. ████ This document is ████████████████████████████████████████

- Entry No. ████ This email relates to ████████████████████

- Entry No. ████ This is an email ████████████████

- Entry No. ████ This email ████████████████

---

[20]    Of the ██ documents that the UCC challenged with respect to Mr. Baker and ████████ counsel has now removed ██ from the privilege log and anticipates producing over ██ additional documents shortly.

██████████████████████████████████████████████
████████████████

- Entry No. ███ This email from ██████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████

42.    The UCC's blanket argument that all ███████ communications were for

business purposes is insufficient and untrue.  (*See* Br. ¶¶ 28-34.)**.**  The foregoing examples

demonstrate that ███████ provided legal advice for purposes other than business, *e.g.*, estate

planning, while joint business and legal communications remain protected so long as the

"predominant purpose" of the communication was legal advice.  Further, it is clear from the

Privilege Log that the communications in question have nothing to do with the UCC's diligence

of the settlement and simply do not warrant *in camera* inspection by the Court.

**VI.    There Is No Basis for the UCC to Bog Down the Chapter 11 Cases with an
Exceptionally Burdensome *in Camera* Review**

43.    Throughout the General Objections Motion, the UCC requests *in camera* review

of <u>all</u> of the challenged documents to the extent not immediately produced.  The UCC does not

and cannot justify this request.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400,

409 (S.D.N.Y. 2006) (denying *in camera* review despite detailed evidentiary submission that

nonetheless had not "demonstrated an adequate basis for setting aside the privilege").  The

UCC's proposal that these documents be provided for *in camera* review would also lead to an

unnecessary waste of resources.  *See Apple Inc.*, 2020 WL 1986942, at *3–4 ("*in camera* review

of Apple's withheld documents . . . would be a waste of scarce judicial resources.  This Court,

like all of society, is in the midst of dealing with the serious and far-reaching effects of the novel

coronavirus pandemic. . . .  The instant Motion, premised primarily upon the distrust and

suspicion of the good faith of opposing counsel, is not a motion that warrants *in camera* review

or further consideration"). For example, Entry No. 4892, a partially redacted document

challenged by the UCC, contains – as is clear from the unredacted portions – ███████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Ball

Decl. Exhibit 24) (████████████████████████████████████████████████

███████████████████████████████). The mere fact that this document was

deemed responsive to the UCC's broad subpoena does not mean that it merits further discussion,

much less analysis by the Court.

## **CONCLUSION**

44.    The Mortimer Sackler ICSPs respectfully request that the Court enter an Order

denying the UCC's motion to compel production of purportedly privileged documents, or for *in*

*camera* review.



Dated:    October 14, 2020
          New York, New York


                                    By:    */s/ Jasmine Ball*_____
                                           Jasmine Ball
                                           M. Natasha Labovitz
                                           Maura Kathleen Monaghan
                                           Jeffrey J. Rosen
                                           DEBEVOISE & PLIMPTON LLP
                                           919 Third Avenue
                                           New York, New York 10022
                                           Telephone:  (212) 909-6000
                                           Facsimile:  (212) 909-6836
                                           Email: jball@debevoise.com
                                                   nlabovitz@debevoise.com
                                                   mkmonaghan@debevoise.com
                                                   jrosen@debevoise.com

                                           *Attorneys for Beacon Company*