**Hearing Date: October 28, 2020 at 10:00 am (Prevailing Eastern Time)**
**Objection Deadline: October 25, 2020 at 11:59 pm (Prevailing Eastern Time)**
**Reply Deadline: October 27, 2020 at 12:00 pm (Prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy
Garrett L. Cardillo

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF HEARING ON DEBTORS' OMNIBUS OBJECTION TO THE OFFICIAL COMMITTEE'S MOTIONS TO COMPEL PRODUCTION OF THE DEBTORS' PRIVILEGED DOCUMENTS AND CROSS-MOTION FOR A PROTECTIVE ORDER**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**PLEASE TAKE NOTICE** that on October 14, 2020, the above-captioned debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Debtors' Omnibus Objection to the Official Committee's Motions to Compel Production of the Debtors' Privileged Documents and Cross-Motion for a Protective Order* (the "**Motion**") and the declaration of Benjamin S. Kaminetzky in support thereof and exhibits annexed thereto.

**PLEASE TAKE FURTHER NOTICE** a hearing on the Motion will be held on **October 28, 2020** at **10:00 a.m. (Prevailing Eastern Time)** (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

**PLEASE TAKE FURTHER NOTICE** that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), the Hearing will be conducted telephonically.[2] Parties wishing to appear at, or attend, the Hearing must refer to and comply with the Bankruptcy Court's guidelines for telephonic appearances[3] and make arrangements with Court Solutions LLC by telephone at (917) 746-7476.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing. The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

---

[2]    A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/courtoperations-under-exigent-circumstances-created-covid-19.

[3]    The Bankruptcy Court's procedures for telephonic appearances are available at: http://www.nysb.uscourts.gov/telephonic-appearances-white-plains.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **October 25, 2020** at **11:59 p.m. (Prevailing Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing and a failure to appear may result in relief being granted upon default; *provided* that objecting parties shall attend the Hearing telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of charge by visiting the website of Prime Clerk LLC at

https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings

by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with

the procedures and fees set forth therein.

Dated:    October 14, 2020
          New York, New York


By:  /s/ Benjamin S. Kaminetzky

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:     (212) 450-4000
Facsimile:     (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy
Garrett L. Cardillo


*Counsel to the Debtors
and Debtors in Possession*

**REDACTED**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy
Garrett L. Cardillo

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[4] | **(Jointly Administered)** |

**DEBTORS' OMNIBUS OBJECTION TO THE OFFICIAL COMMITTEE'S MOTIONS TO COMPEL PRODUCTION OF THE DEBTORS' PRIVILEGED DOCUMENTS AND CROSS-MOTION FOR A PROTECTIVE ORDER**

---

[4] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

REDACTED

## TABLE OF CONTENTS

P<small>AGE</small>(<small>S</small>)

Preliminary Statement .........................................................................................................1

Background .........................................................................................................................8

I.    The Court Has Established the Parameters of Appropriate Discovery ...............................8

II.   The UCC's Discovery Campaign Against the Debtors Is Inconsistent With the
Court's Parameters .............................................................................................................9

      A.    The UCC Has Received Substantial Information That Exceed Its Needs ............10

      B.    The UCC's Aggressive and Unfocused Approach to Discovery Has Come
at Significant Cost .............................................................................................13

      C.    The Privilege Motions Are Yet Another Unfortunate Example of the
UCC's Overbroad and Costly Approach to Discovery .........................................20

Argument ..........................................................................................................................22

I.    The Exceptions Motion Should Be Denied .....................................................................22

      A.    The UCC Has Failed to Establish "Good Cause" to Compel Waiver of the
Debtors' Privilege Under the So-Called Fiduciary Exception ..............................22

      B.    The UCC Has Failed to Establish Particularized Probable Cause Under the
Crime-Fraud Exception to Compel Disclosure ......................................................30

II.   The Privilege Log Motion Should Be Denied .................................................................34

      A.    The Debtors' Customary Privilege Logs Are More Than Adequate ....................35

      B.    The Debtors' Privilege Designations Are Adequately Supported and
Proper ..................................................................................................................39

      C.    The Debtors Have Appropriately Withheld Both Privileged Documents
and Presentations and Communications Provided to the DOJ .............................50

III.  The Court Should Enter a Protective Order to Protect the Reorganization Process
and Preserve Estate Resources ..........................................................................................55

Conclusion ........................................................................................................................57

i

REDACTED

## TABLE OF AUTHORITIES

### CASE(S)

PAGE(S)

*Alexander Interactive, Inc. v. Adorama, Inc.*,
No. 12 Civ. 6608 (PKC) (JCF), 2013 WL 6283511 (S.D.N.Y. Dec. 4, 2013).........................38

*Amusement Indus. v. Stern*,
293 F.R.D. 420, 427 (S.D.N.Y. 2013).....................................................................................34

*Aurora Loan Servs., Inc. v. Posner, Posner & Assoc., P.C.*,
499 F. Supp. 2d 475 (S.D.N.Y. 2007).....................................................................................36

*In re Banc of Cal. Sec. Litig.*,
No. SACV1700118AGDFMX, 2018 WL 6520418 (C.D. Cal. Dec. 7, 2018).........................45

*In re BCE West, L.P.*,
No. M-8-85, 2000 WL 1239117 (S.D.N.Y. Aug. 31, 2000) ...................................................45

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*,
171 F. Supp. 3d 136 (S.D.N.Y. 2016) .....................................................................................47

*Calvin Klein Trademark Tr. v. Wachner*,
198 F.R.D. 53 (S.D.N.Y. 2000)...............................................................................................47

*Cendant Corp. v. Shelton*,
246 F.R.D. 401 (D. Conn. 2007) .............................................................................................33

*Coan v. Dunne*,
No. 3:15-cv-00050 (JAM), 2019 WL 1513462 (D. Conn. Apr. 8, 2019) ...............................32

*Cohen v. Uniroyal, Inc.*,
80 F.R.D. 480 (E.D. Pa. 1978) ................................................................................................27

*Collens v. City of N.Y.*,
No. 03 Civ. 4477 JGKHBP, 2004 WL 1395228 (S.D.N.Y. June 22, 2004) ...........................38

*In re Copper Mkt. Antitrust Litig.*,
200 F.R.D. 213 (S.D.N.Y. 2001)........................................................................................46, 47

*Enslin v. Coca-Cola Co.*,
No. 2:14-CV-06476, 2016 WL 7013511 (E.D. Pa. June 24, 2016) ........................................37

*Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*,
232 F.R.D. 103 (S.D.N.Y. 2005)..............................................................................................47

*In re financialright GmbH*,
No. 17-MC-105, 2017 WL 2879696 (S.D.N.Y. June 22, 2017) .............................................53

REDACTED

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*,
   284 F.R.D. 132 (S.D.N.Y. 2012) ...............................................................43

*Garner v. Wolfinbarger*,
   430 F.2d 1093 (5th Cir. 1970) ...................................................................23

*In re Gen. Motors LLC Ignition Switch Litig.*,
   No. 14-MC-2543 (JMF), 2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015) ..........................31, 32

*Golden Trade, S.r.L. v. Lee Apparel Co.*,
   No. 90 Civ. 6291 (JMC), 90 Civ. 6292 (JMC), 92 Civ. 1667 (JMC), 1992 WL 367070
   (S.D.N.Y. Nov. 20, 1992) ...........................................................................37

*In re Grand Jury Investigation*,
   974 F.2d 1068 (9th Cir. 1992) ....................................................................37

*In re Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*,
   406 F. Supp. 381 (S.D.N.Y. 1975) ..............................................................43

*In re Grand Jury Subpoenas Dated Mar. 24, 2003*,
   265 F. Supp. 2d 321 (S.D.N.Y. 2003) .....................................................48, 49

*Gruss v. Zwirn*,
   No. 09 Civ. 6441 (PGG) (MHD), 2013 WL 3481350 (S.D.N.Y. July 10, 2013) ...................54

*Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*,
   No. 02 Civ. 7955, 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) ...........................47

*In re HH Liquidation, LLC*,
   571 B.R. 97 (Bankr. D. Del. 2017) ..............................................................25

*In re Initial Pub. Offering Sec. Litig.*,
   249 F.R.D. 457 (S.D.N.Y. 2008) ................................................................54

*In re Innkeepers USA Tr.*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) .........................................................21

*King v. Univ. Healthcare Sys. L.C.*,
   645 F.3d 713 (5th Cir. 2011) .....................................................................37

*In re Lozano*,
   392 B.R. 48 (Bankr. S.D.N.Y. 2008) ..........................................................56

*Maruzen Co. v. HSBC USA, Inc.*,
   No. 00 Civ. 1079 (RO), 00 Civ. 1512 (RO), 2002 WL 1628782
   (S.D.N.Y. July 23, 2002) ...........................................................................53

*In re Megan-Racine Assocs.*,
   189 B.R. 562 (Bankr. N.D.N.Y. 1995) ........................................................43

**REDACTED**

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  No. CV 06-6963-DOC, 2009 WL 10673943 (C.D. Cal. July 8, 2009) ............................44, 45

*Montesa v. Schwartz*,
  No. 12 Civ. 6057 (CS)(JCM), 2016 WL 3476431 (S.D.N.Y. June 20, 2016) .......................47

*Mui v. Union of Needletrades, Indus. and Textile Employees, AFL-CIO*,
  No. 97 Civ. 7270 HB KNF, 1998 WL 915901 (S.D.N.Y. Dec. 30, 1998)..............................24

*In re Musicland Holding Corp.*,
  424 B.R. 95 (Bankr. S.D.N.Y. 2010)...................................................................................56

*In re Nat. Gas Commodity Litig.*,
  No. 03 CIV. 6186VMAJP, 2005 WL 1457666 (S.D.N.Y. June 21, 2005), *aff'd*, 232
  F.R.D. 208 (S.D.N.Y. 2005)................................................................................................53

*Off. Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
  342 B.R. 416 (S.D.N.Y. 2006) ...................................................................................... *passim*

*In re Omnicom Grp. Inc., Sec. Litig.*,
  233 F.R.D. 400 (S.D.N.Y. 2006).........................................................................................31

*Otterson v. Nat'l R.R. Passenger Corp.*,
  228 F.R.D. 205 (S.D.N.Y. 2005).........................................................................................55

*Police & Fire Ret. Sys. of Detroit v. Safenet, Inc.*,
  No. 06 Civ. 5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) .......................................53, 54

*Ratliff v. Davis Polk & Wardwell*,
  354 F.3d 165 (2d Cir. 2003) ...............................................................................................54

*Ravenell v. Avis Budget Grp., Inc.*,
  No. 08-CV-2113 (SLT), 2012 WL 1150450 (E.D.N.Y. Apr. 5, 2012) ...................................47

*In re Residential Capital, LLC*,
  480 B.R. 529 (Bankr. S.D.N.Y. 2012)..................................................................................56

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
  352 F. Supp. 3d 207 (E.D.N.Y. 2019) ..................................................................................47

*In re Richard Roe, Inc.*,
  68 F.3d 38 (2d Cir. 1995) .............................................................................................. *passim*

*Rozell v. Ross-Holst*,
  No. 05 Civ. 2936, 2006 WL 163143 (S.D.N.Y. Jan. 20, 2006) ...........................................38

*In re Schick*,
  Nos. 96 B 42902, 96 B 43969, 96/9218A, 1997 WL 465217
  (Bankr. S.D.N.Y. Aug. 12, 1997) .....................................................................................36, 37

**REDACTED**

*Scott v. Chipotle Mexican Grill, Inc.*,
   94 F. Supp. 3d 585 (S.D.N.Y. 2015) ...................................................................36, 40

*SEC v. Roberts*,
   254 F.R.D. 371 (N.D. Cal. 2008) ...........................................................................45

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
   319 F.R.D. 100 (Bankr. S.D.N.Y. 2017) ................................................................33

*In re Signet Jewelers Ltd. Sec. Litig.*,
   332 F.R.D. 131 (S.D.N.Y. 2019) ............................................................................50

*Stardock Sys., Inc. v. Reiche*,
   No. 4:17-cv-07025-SBA (KAW), 2018 WL 6259536 (N.D. Cal. Nov. 30, 2018) .................49

*In re Steinhardt Partners, L.P.*,
   9 F.3d 230 (2d Cir. 1993) ......................................................................................52

*Summit, Ltd. v. Levy*,
   111 F.R.D. 40 (S.D.N.Y. 1986) .............................................................................47

*In re Teleglobe Commc'ns Corp.*,
   493 F.3d 345 (3d Cir. 2007) ..................................................................................25

*In re Teleglobe Commc'ns Corp.*,
   392 B.R. 561 (Bankr. D. Del. 2008) ......................................................................25

*Thai-Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*,
   945 F. Supp. 2d 431 (S.D.N.Y. 2013) ...................................................................50

*TVT Records v. Island Def Jam Music Grp.*,
   214 F.R.D. 143 (S.D.N.Y. 2003) ...........................................................................40

*United States v. Ackert*,
   169 F.3d 136 (2d Cir. 1999) ..................................................................................46

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) ................................................................................50

*United States v. Constr. Prods. Research, Inc.*,
   73 F.3d 464 (2d Cir. 1996) ....................................................................................36

*United States v. Jacobs*,
   117 F.3d 82 (2d Cir. 1997) ..........................................................................30, 31, 34

*United States v. Kovel*,
   296 F.2d 918 (2d Cir. 1961) .............................................................................47, 48

*United States v. Schwimmer*,
   892 F.2d 237 (2d Cir. 1989) ..................................................................................47

v

**REDACTED**

*Urban Box Off. Network, Inc. v. Interfase Managers, L.P.*,
    No. 01 Civ. 8854 (LTS)(THK), 2006 WL 1004472 (S.D.N.Y. Apr. 18, 2006) ....................41

*In re Velo Holdings, Inc.*,
    473 B.R. 509 (Bankr. S.D.N.Y. 2012) ..................................................................................43

*In re Weatherford Int'l Sec. Litig.*,
    No. 11CIV1646LAKJCF, 2013 WL 12185082 (S.D.N.Y. Nov. 19, 2013) ...........................54

*Women's InterArt Ctr., Inc. v. N.Y.C. Econ. Dev.*,
    223 F.R.D. 156 (S.D.N.Y. 2004) ........................................................................................41

STATUTES & RULES

Fed. R. Bankr. P. 9014(c) .....................................................................................................1

Fed. R. Civ. P. 26(b)(5)........................................................................................................35

Local Civil R. 26.2................................................................................................................36

S.D.N.Y. Local Bankr. R. 7034-1 ........................................................................................36

OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1103.03 (16th ed. 2018) ...........................................................27

8 Charles Alan Wright et al., FEDERAL PRAC. & PROC. § 2016.1 (3d ed. 2010) ...........................37

**REDACTED**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, "**Debtors**," "**Company**," or "**Purdue**") hereby submit this omnibus objection ("**Objection**") to the *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [Dkt. No. 1752] ("**Privilege Log Motion**" or "**Log Motion**") and the *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Waiver Exceptions to Claims of Privilege* [Dkt. No. 1753] ("**Exceptions Motion**") (collectively, "**Privilege Motions**").  In addition, pursuant to applicable rules, including Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, the Debtors hereby file this cross-motion ("**Cross-Motion**") for a protective order, substantially in the form attached hereto as **Exhibit A**.  In support of the Objection and Cross-Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.      For the last 13 months, out of the public eye, the Debtors have cooperated with the UCC's relentless and ever-expanding discovery demands—bending, compromising, facilitating and producing day after day, week after week, and month after month.  In doing so, the Debtors have never—not once—taken a public position seeking to limit any discovery that the UCC sought to take of any other party anywhere in the world, even when the Debtors privately disagreed, often strongly, with the cost/benefit calculus of various aspects of incremental discovery.  Indeed, the Debtors fully agree that extensive and thorough information sharing and discovery of multiple parties is not only appropriate, but absolutely required in a case of this magnitude and public import.  But there comes a point when too much is simply too much.

1

REDACTED

2.      Now, after more than a year of almost around the clock work by dozens of lawyers, over 90 million pages of materials produced and tens of millions of dollars—the Debtors at last have no choice but to seek the Court's intervention.  Because no matter how much material the UCC has and gets, the UCC continues to take the view that mediation, negotiation, and resolution of the remaining issues in these chapter 11 cases cannot happen unless and until no document is left un-reviewed, no deposition is left untaken, and no privilege is left respected. Compounding the need for judicial intervention is the fact that huge swaths of the discovery that the UCC has and continues to seek are about primary liability, a topic that the Court early and frequently stated should not be the focus of discovery or expenditure in light of the fact that even before these cases were filed, the Debtors had already offered 100% of their value to creditors without any need to litigate liability.  The UCC has simply sidestepped—for over a year—the Court's clear guidance.  And there are real consequences—every dollar of needless discovery is an unjustifiable drain on the assets of the estate, and every week added to the process brings further costs and risks and delays in getting the material resources of the estates into communities where it can be put to use addressing the opioid crisis.

3.      The Court's directives regarding the scope of discovery have not been ambiguous. It has repeatedly admonished the parties that discovery and diligence in these chapter 11 cases needs to be tailored and proportional to the objectives of this bankruptcy.  As the Court emphasized, "what we're talking about here is not a litigation for a trial, but rather discovery to support negotiations over a potential settlement."  (July 23, 2020 Omnibus Hr'g Tr. 37:13-22.) In other words, the objective is "to perform due diligence" (June 23, 2020 Omnibus Hr'g Tr. 38:5-19), not "establish[] liability at a time when substantial amounts of value have already been offered."  (Mar. 18, 2020 Omnibus Hr'g Tr. 93:6-21.)   Because discovery of any significant

2

**REDACTED**

scope is inevitably "a very expensive process," the Court has repeatedly urged "the bankruptcy

lawyers to keep an eye on the litigators and make sure that they understand the difference

between doing due diligence and an examination and taking discovery for purposes of a

trial." (Aug. 26, 2020 Hr'g Tr. 25:14-21.)  And all for good reason—to ensure "that money

that's going to creditors doesn't get eaten up in preparing for a perfect litigation." (May 1, 2020

Hr'g Tr. 49:3-24.)

4.    The UCC has consistently disregarded the Court's admonitions to ensure costs are

appropriately managed and discovery efforts are reasonably measured.  It has propounded

dozens of overbroad requests to the Debtors (and many others) for documents, depositions, or

other diligence materials that reflect little or no tailoring to the issues central to resolving these

cases or any fair ultimate objective.  The UCC's staffing of this matter on the litigation side has

been commensurate with its approach to discovery.  As of late, the UCC has been sending

anywhere between nine and twelve professionals to <u>each</u> of the depositions of members of the

Sackler families.  Twenty-nine UCC litigation partners and senior litigation counsel billed time

to these cases in July 2020, and that is just senior litigators.

5.    The Privilege Motions are consistent with the manner in which the UCC has

approached discovery from the Debtors and others in these chapter 11 cases, and they are a

bridge too far.  By these motions, the UCC seeks production and/or *in camera* review of broad

portions of the Debtors' privileged information.  The UCC asserts, without any support, that "[i]t

is virtually certain that much of the most probative evidence of Purdue's and the Sacklers'

knowledge and motivations—'what they knew and when they knew it'—will be found among

these [privileged] materials." (Exceptions Mot. ¶ 7.)  The UCC ignores the Debtors' and the

Special Committee of the Debtors' Board of Directors' ("**Special Committee**") role as a

3

REDACTED

fiduciary in these cases and maligns their motives in withholding privileged materials, going so far as to suggest that the Debtors' routine assertion and protection of privilege somehow amounts to a "troubling desire" to hide information.  (*Id.*)  The UCC concedes that there would be "painstaking" and "very arduous"—read extraordinarily costly, time-consuming, and distracting—work ahead for the Court and the parties were it to prevail.  (*Id.* ¶ 13; Log Mot. ¶ 7.)  And the UCC goes further and makes a not-so-thinly-veiled threat:  Order the production of the Debtors' privileged information, or the UCC (and the Non-Consenting States) will not participate in good faith in court-ordered mediation and negotiations with the Sacklers. (Exceptions Mot. ¶ 8 ("The UCC and the NCSG cannot adequately evaluate the settlement framework favored by the Debtors and the Sacklers, or prepare for and participate in negotiations that could lead to unprecedented third-party releases, without first gaining access to these critical documents."); Exceptions Mot. ¶ 70 ("[T]he UCC cannot fully assess the value of the claims that the Debtors propose to release pursuant to the [s]ettlement [f]ramework without access to the Fiduciary Documents."); Log Mot. ¶ 7 ("Without receiving the inappropriately Withheld Documents, [the UCC's] investigation will be far from complete.").)  The UCC's claim that it finds itself stymied by some sort of "informational asymmetry" is not credible.  Every day, all across America, parties negotiate and resolve disputes, virtually always without recourse to another party's privileged material and with exponentially less information than the mountains of information that the UCC currently has in its possession.

6.        The UCC's attempt to both further delay and also seemingly hold a successful resolution of these chapter 11 cases hostage to a favorable ruling on its Privilege Motions, and unending discovery, is in direct violation of this Court's direction and the policies underlying the reorganization process.  The Debtors have recognized the importance of the UCC as a fiduciary

**REDACTED**

in these cases from day one and have gone out of their way to be solicitous and accommodate its

wide-ranging, unduly burdensome, and onerous information requests.  Although one would not

know it from reading the UCC's nearly 70 pages of briefing, the Debtors have produced

staggering amounts of information to the UCC over the past year.  This information includes:

- the entirety of the MDL and non-MDL civil litigation productions, which total over 70 million pages (comprising over 10 million documents);

- A 356-page report from the Debtors' Special Committee detailing all cash transfers to or for the benefit of the Sacklers from January 1, 2008 onward;

- A follow-up, 401-page report by the Debtors' Special Committee detailing, among other things, non-cash transfers to or for the benefit of the Sacklers since January 1, 2008;

- Over 3.7 million pages (comprising over 600,000 documents) in response to the UCC's request that the Debtors collect from over ███ custodians, in most cases for time periods going back twenty-five years, based on an expansive set of over ███ search terms;

- Over 13.5 million pages (comprising over 2.5 million documents) that were previously produced to the U.S. Department of Justice ("**DOJ**") in connection with its ongoing investigation of the Debtors; and

- Hundreds of thousands of pages of diligence materials ██████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████ that required hundreds of lawyer and company employee hours to compile and produce.

7.    These productions surely eclipse those made in some of the largest civil litigations

now proceeding in the United States.  Moreover, not included in the foregoing is analysis and

work product the Debtors' Special Committee has shared with the UCC on a confidential and

common interest basis concerning possible estate claims.  Since February 2020, in fact, the

Debtors' Special Committee team has had five lengthy meetings with UCC professionals during

which they had direct access to Debtors' experts on matters concerning potential estate claims.

The Debtors have also provided substantial additional materials related to transfer analyses and

**REDACTED**

methodology, as well as work product and additional targeted and relevant materials before

depositions.  The Debtors' Special Committee, as the UCC well knows, has access to the

Debtors' privileged materials and is evaluating that information in connection with its analysis of

estate claims.  Nowhere does the UCC explain why the Special Committee and its counsel would

abdicate their responsibility in these chapter 11 cases and support a low-ball settlement of estate

claims in the event they locate the proverbial smoking gun that the UCC apparently believes is

lurking in the Debtors' privileged files.

8.       The UCC's Privilege Motions also fail entirely on their own terms.  First, the

UCC's claim that the so-called "good cause" or "fiduciary" exception should permit it to invade

the Debtors' privilege is without merit.  Among many other reasons, the UCC has failed to

demonstrate a need for the privileged documents that it seeks or explain, aside from rank

speculation, why the over 90 million pages it already has are insufficient to allow it to engage in

productive negotiations.  Indeed, it is hornbook law that even a statutory committee that has

actually obtained standing to pursue claims on behalf of the estate—*a fortiori* the UCC here—

does not as a rule accede to the Debtors' privileged documents.  The primary case upon which

the UCC relies, and the only case in the United States of which the Debtors are aware where a

court has permitted an invasion of the privilege by a creditors' committee under this exception,

*G-I Holdings*, *Off. Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416,

424 (S.D.N.Y. 2006), is inapposite.  Likewise, with respect to the crime/fraud exception, the

UCC has abandoned any pretense of establishing that the "particular communication[s] with

counsel or attorney work product was intended in some way to facilitate or to conceal the

criminal activity," *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (emphasis added),

devoting a mere three sentences to this dispositive issue.

9.      The UCC's Privilege Log Motion fares no better.  The UCC's objections, in large measure, are speculative, conclusory, and categorical attacks on the Debtors' detailed, document-by-document privilege logs.  The Debtors' privilege logs are more than sufficient to carry the Debtors' burden.  Moreover, and perhaps most importantly, the UCC does not even attempt to tell the Court how its broad-based privilege challenges—which include, for example, challenges to withholding communications involving public relations firms—are likely to materially advance the UCC's analysis of estate claims.

10.      The Court need not, however, even wrestle with the Privilege Motions.  The demands contained therein and the resulting document reviews (both by the Court and the parties) that the UCC calls for are wildly disproportionate to and incongruous with the needs of the case and the scope of the diligence exercise that the Court has reminded the parties time and again that they are engaged in.  Indeed, that the UCC has seen fit to set in motion a costly privilege fight vis-à-vis the Debtors—quintessential litigation about litigation—in the context of these chapter 11 cases and during critical mediation efforts, only demonstrates the need for a protective order here.  For these reasons, the Debtors request that the Court enter a protective order providing two forms of relief.  First, the Court should deny the Privilege Motions as inconsistent with the needs of the case.  Second, the Debtors request that the Court limit any further discovery from the Debtors to the voluminous discovery that the Debtors have already agreed to provide: i.e., non-privileged materials directly relevant to potential estate claims and third-party releases.  The Debtors respectfully submit that such relief is required for the many reasons set forth below.

REDACTED

## Background

### I.    The Court Has Established the Parameters of Appropriate Discovery

11.    As set forth above, this Court has made clear to the parties in these chapter 11 cases that discovery needs to be tailored and proportional to the objectives of this bankruptcy, which "is not a litigation for a trial, but rather discovery to support negotiations over a potential settlement," (July 23, 2020 Omnibus Hr'g Tr. 37:13-22), and not to "establish[] liability at a time when substantial amounts of value have already been offered" (Mar. 18, 2020 Omnibus Hr'g Tr. 93:6-21). No doubt concerned with escalating costs, the Court has reminded the parties—especially their litigators—of this proportionality principle at virtually every hearing over the last five months:

- May: "[Litigators] have one task, which is to get ready for trial and get as much information as they can to do that, particularly when the bankruptcy lawyers are in charge of . . . the bankruptcy case and settlements. But that's not ultimately how bankruptcy needs to work. The bankruptcy lawyers need to stay on top of this so that the money that's going to go to creditors doesn't get eaten up in preparing for a perfect litigation." (May 1, 2020 Discovery Hr'g Tr. 49:3-24);

- June: "I am going to remind everyone, although I think the litigators here on all sides are familiar with the bankruptcy process, that this is bankruptcy discovery. It's not in the context of an adversary proceeding or contested matter. This is to perform due diligence. It's very important due diligence, but it's to perform due diligence. So those who practice [in] the bankruptcy area should know the difference . . . ." (June 23, 2020 Omnibus Hr'g Tr. 38:5-19);

- July: "[W]hat we're talking about here is not a litigation for a trial, but rather discovery to support negotiations over a potential settlement." (July 23, 2020 Omnibus Hr'g Tr. 37:13-22); and

- August: "[I]t's important for the bankruptcy lawyers to keep an eye on the litigators and make sure that they understand the difference between doing due diligence and an examination and taking discovery for the purposes of a trial." (Aug. 26, 2020 Omnibus Hr'g Tr. 25:14-21).

12.    The Debtors have long acknowledged the importance of robust information sharing and have agreed with the Court that due diligence in these cases was always "going to be

REDACTED

of an unusually high level in order to achieve consensus." (July 23, 2020 Omnibus Hr'g Tr. 68:9-12.)  But the fact is that the discovery here has been "extraordinary for a bankruptcy case" (July 23, 2020 Omnibus Hr'g Tr. 68:18-19)—and extraordinarily expensive.  The estates have already incurred tens of millions of dollars of costs attributable to discovery.  Over the past five months, in fact, the estates have incurred on average approximately $25 million <u>a month</u> in fees, a substantial portion of which is attributable **<u>solely</u>** to discovery-related work.  Moreover, the Debtors estimate that the estates will incur on average more than $30 million a month (a run rate that would annualize to $360 million) in professional fees in August, September, and October 2020, again attributable in substantial part to discovery.  Every additional million dollars spent on delay and discovery is another million dollars that cannot be put to addressing the opioid crisis.  Excessive discovery is also certain to extend these cases for potentially months, causing the estates to incur even greater costs—possibly in excess of $100 million—to the detriment of stakeholders.  Therefore, as the Court has stated, every effort must be made to be judicious in such pursuits and to preserve estate resources wherever possible.

## II.      The UCC's Discovery Campaign Against the Debtors Is Inconsistent With the Court's Parameters

13.      As noted above, the Debtors have recognized from the outset the importance of the UCC as a fiduciary in these cases.  They have thus endeavored to work as closely and cooperatively as possible with the UCC to steer these cases toward a successful and consensual resolution.  In that same vein, the Debtors have gone to extraordinary lengths to be solicitous and accommodating to the UCC's many, many information requests and demands—sometimes several a day—and have provided the UCC with millions of documents and other information. The UCC's approach to discovery is neither proportional to the needs of these cases nor consistent with the Court's repeated directives that parties confine themselves to conducting

broad, deep and expansive—but also balanced and **<u>necessary</u>**—due diligence.  The UCC

continues to propound overbroad requests to the Debtors for documents, depositions, or other

diligence material that reflect little to no tailoring to critical issues, which has no doubt cost the

beneficiaries of these estates dearly.   After 13 months, the Debtors require the Court's

intervention.

        **A.**    **The UCC Has Received Substantial Information That Exceed Its Needs**

        14.      The UCC's Privilege Motions are devoid of critical context—specifically, that the

Debtors have already provided the UCC with an <u>immense</u> volume of information and discovery,

and certainly far more material than is sufficient to conduct the due diligence exercise warranted

under the circumstances and contemplated by the Court.

        15.      The Debtors began providing materials and information to the UCC almost from

the inception of these chapter 11 cases.  In October 2019, for example, the Debtors provided

counsel to the UCC (and the Non-Consenting States) a 356-page report on all cash distributions

and other payments made by the Debtors to or for the benefit of members of the Sackler Families

during the period of January 1, 2008 to September 15, 2019, which was prepared at the direction

of the Special Committee.[5]  This report provided detailed information on, for example, cash

distributions to or for the benefit of the Debtors' shareholders and affiliated entities, including

the independent associated companies ("**IACs**") and compensation paid to or for the benefit of

Sackler family members, among other things.  The Debtors followed up in May 2020 with a 401-

page report by the Debtors' Special Committee detailing, among other things, significant non-

cash transfers and intercompany arrangements, among Purdue, its parent, Pharmaceutical

Research Associates L.P., the IACs, and the Rhodes entities between January 1, 2008 and

---

[5] This report was later filed on the docket in redacted form.  *See* Notice of Filing of Report of the
Special Committee (Dec. 16, 2019), Dkt. No. 654.

**REDACTED**

September 15, 2019.[6]  These reports were the product of thousands of hours of professional time after review of enormous amounts of transactional and other data and go to the heart of the estate claims being investigated by the Debtors and the UCC.  (Declaration of Benjamin S. Kaminetzky, dated October 14, 2020 ("**Kaminetzky Decl.**") Ex. 1 ¶ 10.).  Indeed, there may be no stronger testament to the usefulness and value of these reports than the UCC's own repeated reliance on them in the Privilege Motions.  (*See, e.g.*, Exceptions Mot. ¶¶ 27, 29, 44, 57.)

16.     In October 2019, the Debtors also provided the UCC with the documents produced in the Ohio MDL, which totaled over 50 million pages.  (Kaminetzky Decl. Ex. 2 ¶ 6.) And over the next months, the Debtors produced tens of millions more pages from other civil litigations.  ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████  By early 2020, the Debtors had also produced numerous deposition transcripts and related exhibits for current and former Purdue employees who were deposed in civil litigations, including Richard Sackler and Kathe Sackler.  (Kaminetzky Decl. Exs. 4-5.)

17.     The Debtors did not, however, stop with that.  Cognizant of the UCC's role in these chapter 11 cases, the Debtors agreed to provide extensive amounts of <u>supplemental</u> material in response to the UCC's requests.  First, the Debtors agreed to undertake new collections of electronically stored information and documents ("**ESI**") from over ██ custodians, including from additional Sackler family custodians and directors, in most cases for time periods going back 25 years, based on an expansive set of over ████ search terms provided by the UCC

---

[6] This report was also filed on the docket in redacted form.  *See* Notice of Filing of Report of Special Committee (May 29, 2020), Dkt. No. 1194.

REDACTED

("**Supplemental ESI Productions**").[7]  The Debtors began rolling productions of Supplemental

ESI Productions in May 2020, and following weeks of negotiations required as a result of

excessive demands (Kaminetzky Decl. Exs. 6-24), substantially completed these productions in

early September 2020.  To date, Debtors have produced over 3.7 million pages comprising over

600,000 such documents.   Second, the Debtors agreed to provide the UCC with non-privileged

documents previously produced to the DOJ in connection with its ongoing investigation of the

Debtors ("**DOJ Productions**").  The Debtors to date have produced over 13.5 million pages

comprising over 2.5 million such documents.

18.     In addition to these supplemental productions of ESI and DOJ materials, the

Debtors engaged in a parallel effort to provide hundreds of thousands of pages of diligence

materials (comprising both original analyses and historical documents) to the UCC in response to

dozens of requests. These include materials comprising original analyses and reams of historical

documents on a wide variety of topics. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ required hundreds of lawyer and company employee hours to compile and produce.

(*See, e.g.*, Kaminetzky Decl. Exs. 30-39)  And this is all in addition to the substantial amount of

analyses and work product pertaining to possible estate claims provided on a common interest

basis by the Debtors' Special Committee team—information sharing that, at present, has not

been meaningfully reciprocated by the UCC.

---

[7] The Debtors' agreement to make these productions is memorialized in the *Stipulation and
Agreed Order Among the Official Committee, the Non-Consenting States Group and the Debtors
Regarding Discovery in the Chapter 11 Cases* (Aug. 26, 2020) [Dkt. No. 1623] ("**ESI
Stipulation**").

**REDACTED**

19.    The universe of information available to the UCC has hardly been confined to that obtained from the Debtors.  The UCC and the Debtors have also—entirely appropriately—received significant discovery from the Sacklers.  To date, the Sackler Families and their financial institutions have produced over 450,000 documents (totaling over 2.5 million pages).  The Sacklers' independent associated companies ("**IACs**") have also recently made productions totaling over 85,000 documents and over 1.5 million pages; and depositions, including of Sackler family members, began on August 28, 2020.  Five depositions have been taken thus far, with many scheduled in the coming weeks.

### B.    The UCC's Aggressive and Unfocused Approach to Discovery Has Come at Significant Cost

20.    The manner in which the UCC has pursued the veritable mountain of information that the Debtors have provided, however, has not been tailored, proportional, or cost-efficient.  Take, for example, the manner in which the UCC approached what later became known as the Supplemental ESI Productions.  In October 2019, the UCC submitted a 12-page set of supplementary information requests pursuant to the UCC Stipulation[8] that included ▮ separately enumerated items, many seeking documents and information dating back to January 1, 1996 (the "**Schedule A Requests**").  The Debtors began making productions pursuant to the Schedule A Requests shortly after receiving them.  And for months thereafter, the Debtors labored to provide complete and responsive information by making rolling productions usually every week (*See, e.g.*, Kaminetzky Decl. Exs. 26, 27, 28, 29, 42, 48, 51), notwithstanding multiple requests for information that had already been produced.  The Debtors therefore assumed, and reasonably

---

[8] *See* Case Stip. Among the Debtors, the Official Comm. of Unsecured Creditors & Certain Related Parties ¶¶ 7, 17 (Oct. 11, 2019), Dkt. No. 291 ("**UCC Stipulation**").

**REDACTED**

expected, that when the UCC requested the productions of supplemental ESI from additional

custodians in early 2020, its requests would be targeted to fill informational gaps.

21.    The Debtors' expectations proved to be misplaced.  In February 2020, the UCC

requested that the Debtors run a set of search terms across ███████ custodians over a nearly 25-

year time period ("**February ESI Requests**"), with no meaningful explanation as to why such

sweeping collections were justified under the circumstances.[9]  (Kaminetzky Decl. Ex. 6, 52.)

Based on hit reports the Debtors prepared, one portion of the February ESI Requests would have

yielded a staggering **7 million documents**, on top of the tens of millions of pages the UCC

already had to review.  (Kaminetzky Decl. Ex. 53.)  It took many more months for the UCC to

negotiate down these search terms and custodians to a set that even remotely began to approach

the outer bounds of what would be reasonable or proportional.  (Kaminetzky Decl. Exs. 6-24.)

And to what end?  As these chapter 11 cases have developed, it has become apparent that the

fruits of these efforts likely did not justify the costs.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[9] Additional correspondence underscores that the opening salvo in the UCC's requests for
supplemental collections was not tailored:  In correspondence dated January 2, 2020, ████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████  Notably, the
UCC's January 2 letter also requested that the Debtors begin collecting information pursuant to
██ extensive topics.  (*Id.* at 12-16.)  Many of the January 2 requests were entirely duplicative
of—or otherwise wholly encompassed within—the ██ requests in the Schedule A Requests, to
which the Debtors had been endeavoring to respond.  Many others pertained directly to issues of
underlying liability, reflecting little to no consideration of the massive amount of liability-related
documents provided by the Debtors months before.

**REDACTED**

████████. Likewise, a large amount of the evidence upon which the Privilege Motions are predicated was provided to the UCC well in advance of these supplemental collection efforts.

22.    The UCC's approach to depositions has been no more measured.  As important context, dozens of depositions of company witnesses were taken prior to the Debtors' bankruptcy, and provided to the UCC.   Again, in recognition of the important role the UCC plays in these cases, the Debtors acceded to the UCC's request to take additional depositions pertaining to estate claims.  (*See* Stip. & Agreed Order Among the Official Committee, the Non-Consenting States, the Ad Hoc Committee & the Debtors Regarding Discovery Deadlines & Briefing Scheduling in the Chapter 11 Cases ¶¶ 3-6 (Aug. 25, 2020), Dkt. No. 1609; *see also* Am. Stip. & Agreed Order Regarding Discovery Deadlines & Briefing Scheduling in the Chapter 11 Cases ¶¶ 3-6 (Sept. 28, 2020), Dkt. No. 1734 ("**Amended Discovery Stipulation**").)  But, again, the UCC opened discussions by propounding a list of ██ possible company deponents that reflected little, if any, thought or consideration of who might actually have material information that would move these cases forward.  (Kaminetzky Decl. Ex. 54.)  The UCC's initial list, for example, included Howard Udell, a former general counsel of Purdue who passed away seven years ago.  (*Id.* at 2.)  That fact was readily ascertainable from numerous documents that the Debtors produced to the UCC in June (or from publicly available information). ███████

████████████████████████████████████████████████████

███████████████████████ (*Id.*)  The Debtors had to explain that many of the persons they requested were persons not likely to have relevant knowledge. (*See, e.g.*, Kaminetzky Decl. Ex. 55.)

23.    ████████████████████████████████████

████████████████████████████████████████████████████

15

**REDACTED**

24.     And just last week, the UCC sent a letter to counsel for a former senior lawyer at Purdue and identified a number of topics that the UCC plans to address in that lawyer's deposition.  Very few of the topics identified in the letter bear any seeming relation to possible estate claims.  To the contrary, nearly all of the topics appear to be focused on establishing the Debtors' underlying civil liability, including the capture-it-all-category: "[t]he sales and marketing of opioids."  (Kaminetzky Decl. Ex. 75.)

25.     These examples—and there are many others—underscore that the UCC has approached discovery from the Debtors in these cases in a manner that has long been untethered to the ultimate objectives and directly contrary to the Court's repeated directions.  Until now, the

REDACTED

Debtors have labored to meet the UCC's overly broad and ever-increasing demands without involving the Court.  But they can no longer.  Discovery has been a significant driver of the costs the estates have been incurring in recent months.  The UCC's last-filed monthly fee statements, for example, catalogued over $7 million in fees and expenses incurred for the month of July alone, including time billed by __29__ litigation partners/members and senior litigation counsel.[10]  Over 86% of the total hours billed by lawyers appear to be attributable to discovery- and estate claim-related tasks.  This does not even count the millions of dollars that the Debtors have been forced to expend responding to dozens of UCC letters and e-mails, sometimes multiple ones in a single day, meeting and conferring, and collecting and reviewing information responsive to overbroad demands.

26.    To be clear, the Debtors are not seeking to curtail appropriate discovery that is focused on estate claims and third-party release issues.  That said, the Debtors remain skeptical that the substantial discovery that the UCC continues to aggressively pursue[11] will justify the price tag that will be associated with it.  For example, the UCC has indicated that it intends to depose ▮ witnesses and has reserved the right to depose more.[12]  (Kaminetzky Decl. Exs. 58-65.)  Somewhere between nine and twelve professionals have appeared on behalf of the UCC

---

[10] This includes Akin Gump and efficiency counsel, Cole Schotz.  (*See, e.g.*, Tenth Monthly Fee Statement of Akin Gump Strauss Hauer & Feld LLP for Professional Servs. Rendered & Disbursements Incurred as Counsel to the Official Comm. of Unsecured Creditors for the Period of July 1, 2020 Through July 31, 2020 (Sept. 16, 2020), Dkt. No. 1696; Fifth Monthly Fee Statement of Cole Schotz P.C. for Compensation for Servs. Rendered and Reimbursement of Expenses as Co-Counsel to the Official Comm. of Unsecured Creditors for the Period from July 1, 2020 Through July 31, 2020 (Sept. 16, 2020), Dkt. No. 1697.)

[11] (Exceptions Mot. ¶¶ 7 n.7 ("The UCC . . . anticipates renewing aspects of the Motion as documents and logs continue to be produced."), 12 n.9 ("The UCC reserves the right to seek documents in additional or different categories, including based on information that may be produced as a result of the Motion.").)

[12] The Debtors understand that ▮ depositions are currently scheduled.

17

**REDACTED**

at each deposition.  (*See, e.g.*, Kaminetzky Decl. Ex. 66 at 3-4; 76-80.)  It simply cannot be

"necessary" to have a dozen professionals from a single constituency attending depositions—at a

cost to these estates possibly into the six figures, just for the day of the deposition itself.

      27.    Moreover, while the Debtors do not dispute that depositions of Sackler family

members are generally appropriate, the Debtors would expect that the content and scope would

be appropriately tailored.  ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████  That is not appropriate in ordinary civil litigation, and it

serves no productive purpose in the context of the due diligence exercise in which the parties are

engaged here and where these estates are bearing the costs of multiple parties and constituencies.

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████  This

deposition (which the UCC reserved the right to reopen at a later date) was attended by 12 UCC

professionals. (Kaminetzky Decl. Ex. 66 at 3-4.)

28.    Nor does it appear that the UCC will conclude its depositions or the incredible amounts of additional discovery that it is seeking in a manner that does not materially impede the progress of these cases.  Under the operative Amended Discovery Stipulation, while the depositions are intended to run "only" through November 2020 (Am. Discovery Stip. ¶ 4), the UCC has insisted that continued productions of documents (including those discussed below) may require the UCC to resume depositions of certain individuals at later times.

29.    Finally, the UCC claims that "critical" discovery from the IACs must still be done ███████████████████████████████████████████ (Exceptions Mot. ¶ 40.)  The UCC even goes so far as to assert that it may need to return to this Court with "additional" privilege arguments "regarding the IACs." (*Id*.)  While the Debtors agree that tailored discovery is appropriate, Debtors disagree that "much more needs to be done." (*Id*.)  As the Court has noted, the purpose of discovery in these cases is so the parties can engage in good faith settlement discussions, not litigation.  The UCC, however, appears intent on leaving no pebble unturned.  To illustrate, the Debtors understand that ESI collections and productions from the IACs have been expansive, ███████████████████████. Moreover, in a recent email, the UCC requested that counsel for the IACs produce the "formation and governance" documents for a list of no fewer than ██ IACs in numerous countries and languages—a list that had apparently been <u>narrowed</u> from a much larger list.  (Kaminetzky Decl. Ex. 74.)  The Debtors also understand that the UCC is continuing to seek extensive corporate designee deposition testimony from the IACs.

30.    While the UCC asserts that ongoing IAC discovery is "necessary" to "investigate the circumstances of suspicious transfers" (Exceptions Mot. ¶ 43), the Debtors have already provided two multi-hundred-page reports to the UCC with extraordinary detail, as well as

19

**REDACTED**

substantial additional work product and analysis on a common interest basis concerning these

very issues, including numerous oral briefings and written responses to many questions.  Indeed,

for each of the "problematic" transfers that the UCC claims "it" has identified, the UCC cites the

**Debtors' report**.  (*Id.* ¶ 44.) █████████████████████████████

███████████████████████████████████████████████████████

███████████████████.  Since February 2020, the Debtors' Special Committee team has had five

lengthy meetings with UCC professionals during which they had direct access to Debtors'

experts on these issues and the Debtors provided substantial additional materials related to

transfer analyses and methodology.

### C.    The Privilege Motions Are Yet Another Unfortunate Example of the UCC's Overbroad and Costly Approach to Discovery

31.    Through the Privilege Motions, the UCC seeks the production of 15 "categories"

of documents (*see* Hurley Decl. Ex. 101), some quite broad, and the production of many

thousands of documents identified on the Debtors privilege logs.  These motions further reflect a

UCC that has lost sight of the critical objectives of these chapter 11 cases and the appropriate

scope of the diligence exercise in which the parties are engaged.  Fully aware that succeeding on

their motions and requests for *in camera* review of the thousands of documents at issue would

impose immense burdens on the parties and the Court, the UCC repeatedly asserts that it has a

"critical need" to obtain the Debtors' privileged information.  Indeed, the UCC claims that "[i]t

is virtually certain that much of the most probative evidence of Purdue's and the Sacklers'

knowledge and motivations—'what they knew and when they knew it'—will be found among

these materials to which only the Debtors and the Sacklers have access or familiarity."

(Exceptions Mot. ¶ 7.) ████████████████████████████████

REDACTED

████████████████████████████████████████████████

██████████████████████████

32.       These assertions are, to say the least, troubling.  The UCC provides no support for its belief that smoking guns abound among the Debtors' privileged material, and provides no reason why, if they did, the Special Committee (along with its counsel) would abdicate its responsibility as a fiduciary in these chapter 11 cases and support an inappropriately low settlement of estate claims in the face of such evidence.  *In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) ("[I]t is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate . . . ").  The UCC does not tell the Court why the tens of millions of pages of materials and other information that it has already demanded and received from the Debtors and other parties is insufficient to permit it to analyze the potential value of estate claims and effectively negotiate with the Sacklers.  The UCC fails to explain why parties in mega-chapter 11 cases and other similar litigations almost always assess and resolve high stakes disputes with far less information and without access to privileged material, but the UCC somehow cannot.  Under any view, the document review process and discovery sought by the Privilege Motions far exceeds any reasonable bounds.

\*        \*        \*

33.       As established in Sections I and II, *infra*, the Privilege Motions should be denied on their own merits (or lack thereof).  But they should also be denied for a more fundamental reason, namely that they call for a document review process and productions that are unnecessary, unduly burdensome, inconsistent with the due diligence process directed by the Court, and an inefficient and wasteful use of estate (as well as judicial) resources.  (*See* Section

**REDACTED**

III, *infra*.)  In this Court's own words:  "[A]t some point the information process needs to stop, because you're going to reach the point of diminishing returns in terms of the cost versus the value."  (May 1, 2020 Discovery Hr'g Tr. 103:17-104:7).  The Debtors have remained silent and compromised for months, but can do so no longer.  The point of diminishing returns was long ago passed.

<u>**Argument**</u>

**I.**     <u>**The Exceptions Motion Should Be Denied**</u>

34.     In addition to being antithetical to the parameters the Court has set forth for appropriate diligence (*see* Background, *supra*, & Section III, *infra*), the Exceptions Motion also fails because the UCC has not met its burden to compel the production of the material it seeks.[13]

   **A.     The UCC Has Failed to Establish "Good Cause" to Compel Waiver of the Debtors' Privilege Under the So-Called Fiduciary Exception**

35.     The Exceptions Motion seeks the production of eight categories of the Debtors' privileged documents under the so-called "good cause" or "fiduciary" exception.  (*See* Hurley Decl. Ex. 101, at 1.)  The "categories" identified by the UCC are both sweeping and amorphous, and include, for example, **<u>all</u>** documents from 2006 to present concerning "knowledge of actual or potential opioid claims . . . and other opioid-related risks" or the "Debtors' financial condition" (*Id.*)  These categories capture significant amounts of the Debtors' privileged information and would likely require the re-review of thousands if not tens of thousands of the Debtors' privileged documents just to determine which documents might reasonably fall within them.  ██████████████████████████████████████████████

---

[13] The Debtors note that paragraphs 82 to 88 of the Exceptions Motion concerning the at-issue waiver doctrine are directed solely to the Sackler families.

REDACTED

████████████████████████████████████████████████

Notwithstanding that such overbroad demands are disproportionate to the needs of the case, the UCC also fails to establish that any of these documents should be disclosed under the fiduciary exception, which is simply inapplicable here.

36.    The paradigmatic context in which the fiduciary exception arises is shareholder derivative litigation.  For example in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), shareholders brought a derivative suit alleging that the corporation's officers and directors violated federal securities laws.  During discovery, corporate counsel declined to turn over documents concerning the challenged stock sale based on the corporation's attorney-client privilege.  *Id.* at 1096.  Recognizing that the attorney-client privilege is essential to a corporation's management, the court declined to create an absolute exception for shareholders, but instead held that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance."  *Id.* at 1103-04.  In other words, the exception is designed to provide a limited safety valve to the attorney-client privilege in circumstances where a producing party has duties that run to the benefit of others but the producing party's judgment is questioned.  Courts in the Southern District that have applied *Garner* have considered various factors in determining good cause.[15]

---

[14] The UCC itself has acknowledged that the scope of materials it seeks under the exceptions would be "substantial."  (Exceptions Mot. ¶ 13.)

[15] *G-I Holdings*, 342 B.R. at 424, summed up the factors under four broad headings:  "(1) the discovering party's stake in the fiduciary relationship; (2) the apparent merit of the claim; (3) the need of the discovering party for the information; and (4) the nature of the communication itself."   Other courts have listed the nine factors enumerated in *Garner*: "(1) [T]he number of shareholders and the percentage of stock they represent; (2) The bona fides of the shareholders;

**REDACTED**

37.     The UCC's effort to twist these circumstances into a *Garner*-like fiduciary exception fails.  The only case cited by the UCC (and the only case of which the Debtors are aware) where a committee was granted access to a debtor's privileged communications under the fiduciary exception is *G-I Holdings*.  A cursory review of that case, however, makes clear that it is wholly inapposite.  There, the debtor's owner spun off to himself what was the debtor's only viable business line via a stock transaction shortly after a critical settlement of asbestos liability was rejected by the Third Circuit, before the debtor filed for bankruptcy.  *Id.* at 420.  Key members of the management team—including the general counsel—went to work for the spun off entity but were still acting as management of the Debtors under a management agreement. *Id.*  The UCC, which was granted standing by the bankruptcy court to prosecute estate claims in that case, filed suit seeking to recover the transfer of stock to the owner and moved to compel the production of approximately 350 privileged documents in the debtor's possession related to fraudulent transfers claims.  *Id.* at 419.  The District Court ultimately found good cause to compel such limited disclosure because the UCC had been granted standing to pursue fraudulent transfer litigation that had survived a motion to dismiss, the UCC had demonstrated a "substantial need" to discover the material, and that the "information sought [was] available from no other sources." *Id.* at 423-25.  Moreover, the Court found that the UCC's litigation claims created an "obvious and irreconcilable conflict" with the debtor, particularly where senior

---

(3) The nature of the shareholders' claim and whether it is obviously colorable; (4) The apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; (5) Whether, if the shareholders claim is of wrongful action by the corporation, it is of action criminal or illegal or not criminal but of doubtful legality; (6) Whether the communications relate to past or prospective actions; (7) Whether the communications are of advice concerning the litigation itself; (8) The extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (9) The risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons." *Mui v. Union of Needletrades, Indus. & Textile Employees, AFL-CIO*, No. 97 Civ. 7270-HB (KNF), 1998 WL 915901, at *2 (S.D.N.Y. Dec. 30, 1998).

**REDACTED**

officers of the debtor, including the general counsel, were employed by the owner's newly spun-off entity—the defendant—and simultaneously provided services to the debtor—the plaintiff—under a management agreement, and the target of the fraudulent transfer action was the control person of the debtor.  *Id.* at 425.  The instant facts could scarcely be farther afield.[16]

38.    The UCC argues that the four factors cited by the Court in *G-I Holdings* in determining whether to allow the UCC's invasion of the privilege weigh in favor of permitting the UCC to invade the Debtors' privilege here.  (Exceptions Mot. ¶¶ 52-71.)  They do not.  No matter how one slices it, there is simply no "good cause" for discovery the UCC seeks, and the application of the *Garner* doctrine in this context would be unprecedented.[17]

---

[16] The UCC also cites a number of cases applying the good cause exception in a "wide variety" of other contexts (Exceptions Mot. ¶ 52), although, as the UCC seemingly concedes, not one is analogous here.  *See In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 98-99 (S.D.N.Y. 1993) (in securities class action, applying *Garner* to compel production of 11 documents); *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 625 (E.D. Mo. 2000) (applying fiduciary exception to one category of testimony concerning decision to terminate plaintiff's ERISA plan); *Quintel Corp., N.V. v. Citibank, N.A.*, 567 F Supp 1357, 1364 (S.D.N.Y. 1983) (in securities fraud action, finding good cause where testimony of one individual was "important to [plaintiff]'s case" and "its only source").

[17] The UCC's attempted reliance on the fiduciary exception falters on an additional issue.  Although the UCC has emphasized that creditors take the place of shareholders when a corporate entity is insolvent (Exceptions Mot. ¶ 52), it has not even tried to establish if and when Purdue became insolvent.  That, however, is fatal, because courts have held that committees of unsecured creditors must prove insolvency at the time the communications they seek were made to avail themselves of the fiduciary exception.  *In re HH Liquidation, LLC*, 571 B.R. 97, 104 (Bankr. D. Del. 2017) ("It is unclear when Debtors became insolvent, and the [c]ourt finds that insolvency is the key."); *see In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 384 (3d Cir. 2007) (observing the *Garner* exception to the privilege only exists if debtor is insolvent); *In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 598 (Bankr. D. Del. 2008) (holding, on remand, that to satisfy the requirements of *Garner*, "Plaintiffs must establish that they were insolvent at the time of the communications in question").

**REDACTED**

> i. *The UCC Fails to Demonstrate a "Need" to Discover the Debtors' Privileged Documents*

39.     The UCC concedes, as it must, that "necessity of the information is the most important factor in the good cause analysis." (Exceptions Mot. ¶ 67.) As set forth above, in the context of these actions and the staggering amount of information the UCC and others have already received, there is no need whatsoever to obtain further information from the Debtors, let alone privileged information in potentially broad and indeterminate categories. Beyond conclusory and unsupported assertions ███████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ and that it is "virtually certain that much of the most probative evidence of Purdue's and the Sacklers' knowledge and motivations" will be found among the Debtors' privileged materials (*Id.* ¶ 7), the UCC makes no effort to explain why the millions of documents it already has are insufficient to engage in diligence of the Settlement Structure and productive negotiations with members of the Sackler families. Indeed, the UCC does not even acknowledge the millions of documents now in its possession.

40.     The UCC instead doubles down on its claim that ████████████████ ████████████████████████████████████████ ██████████ But that is not how the American legal system works. There is nothing untoward or improper about the Debtors acting to protect their privileged material. If the so-called "information asymmetry" about which the UCC complains were sufficient to compel disclosure of privileged documents or thwart successful negotiations, one of two things would be true: the production of privileged material would be ubiquitous—but it is of course exceedingly rare—or disputes would never settle—which they do every single day.

26

ii. *The UCC's Stake in the Fiduciary Relationship Does Not Warrant Invasion of the Privilege*

41.     The Debtors do not dispute that the UCC is a statutory fiduciary that represents the interests of unsecured creditors.  But the UCC's stake in this relationship in the context of this case does not support a finding of good cause.

42.     As an initial matter, it is not the case—as the UCC seemingly suggests—that the UCC can "immediately overcome [the Debtors' privilege] without further inquiry into elements of good cause."  (Exceptions Mot. ¶ 55 (quoting *Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480, 484, n.4 (E.D. Pa. 1978)).)  To the contrary, it is hornbook law that even where a committee actually obtains standing to assert a claim on behalf of the Debtors—something the UCC has not received—it is not entitled to the Debtors' attorney-client privileged information.  *See* 7 Collier on Bankruptcy ¶ 1103.03 (16th 2018) ("[A] committee is not entitled to attorney-client privileged information from the debtor or the estate just because the committee is asserting a cause of action that is property of the estate.").  The UCC's principal authority, *G-I Holdings*, itself confirms this.  *See G-I Holdings*, 342 B.R. at 422.  If the UCC's argument were correct, UCCs would almost always gain access to the Debtors' privileged documents.  In fact, this virtually never happens, as well-demonstrated by the UCC's only one—literally one—case, which is also inapposite.

43.     Finally, and more fundamentally, the UCC has not come close to demonstrating the same type of "irreconcilable conflict" between the UCC and Debtors that animated the court's finding of good cause in *G-I Holdings*.  As the UCC concedes, it is conducting diligence to evaluate the propriety of a settlement in bankruptcy.  (Exceptions Mot. ¶ 40.).  To be sure, this includes an assessment of potential estate claims, but that is entirely distinct from the scenario in *G-I Holdings*, where the UCC had been granted standing to prosecute, and was in fact

27

**REDACTED**

prosecuting, estate claims under circumstances where the debtor had a "demonstrated conflict of interest" with the senior executives at the plaintiff and the defendant. *G-I Holdings*, 342 B.R. at 425. Here, there is no reason to question the Debtors' judgment. There is nothing to suggest that the Debtors are acting "inimically" toward their creditors or that the Debtors are otherwise not acting fully consistent with their fiduciary duties to creditors in stewarding this process. Quite the contrary. As the Court has recognized time and time again, the Debtors are providing immense amounts of disclosure and other information to their creditors to enable them to evaluate the Settlement Structure. (*See* Nov. 6, 2019 Second Prelim. Inj. Hr'g Tr. 89:19-20 (noting debtors were "working to ensure appropriate financial disclosure"); Mar. 18, 2020 Omnibus Hr'g Tr. 94:12-14 ("[P]roper transparency is taking place in this case as far as the due diligence that I've already described."); May 1, 2020 Discovery Hr'g Tr. 103:17-18 ("I actually believe a lot of information has been provided."); Sept. 30, 2020 Omnibus Hr'g Tr. 82:4-17 ("It is clear to me that an immense amount of disclosure has occurred - - over 5 million pages, hundreds of thousands of documents, depositions, et cetera, and it will continue to occur."); *see also* June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. 95:6-7) ("The Debtors themselves, as far as I can see in this case, have been acting as good appropriate fiduciaries.").

44.    Moreover, the Debtors' blue-chip Special Committee has been overseeing the Debtors' own exhaustive review of possible estate claims. (Debtors' Informational Br., at 14-15 (Sept. 16, 2019), Dkt. No. 17).) The Special Committee has full and irrevocably delegated authority to analyze the settlement framework and all Sackler claims, and is comprised of three top-flight directors with over one hundred collective years of bankruptcy and restructuring experience, and a senior pharmaceutical industry expert, all with no prior relationship to the Sacklers. (Information Br. at 14-15.) This work is being appropriately and zealously carried out

28

**REDACTED**

by the Debtors.  The UCC does not claim otherwise.  The situation here could not possibly be

further afield from that before the Court in *G-I Holdings*, where no such committee or

investigation existed and G-I's president and general counsel were employees controlled by the

defendant and who were merely providing services to the debtor under a management agreement.

> ### iii.   The UCC Is Not Asserting a Claim, but Pursuing Settlement Discovery

45.    The UCC next asserts that because the "[e]state [c]laims [u]nder [i]nvestigation

[a]re [c]olorable," this supports finding good cause.  (Exceptions Mot. at 26.)  To be clear, the

Debtors—through the Special Committee—have been hard at work for over a year investigating

possible estate claims themselves, and it would not be appropriate for the Debtors to take a

position with respect to the specific evidence cited by the UCC in its motion at this time.  But

just because a litigation claim may be colorable does not mean that the UCC has good cause to

invade the Debtors' privilege.  In the wholly inapposite *G-I Holdings*, for example, the Court

found one factor supporting good cause was that, **in the context of litigation of estate claims**

(that the UCC had been granted standing to prosecute), the fact that the claims had survived a

motion to dismiss weighed in favor of finding good cause to give the UCC access to those

documents in that litigation.  But here there is no litigation.  Nor has the UCC been granted

standing to prosecute any estate claims (those estate claims belong to the Debtors).  Instead, as

discussed above and as the Court has often stated, the discovery that the parties are now engaged

in is for purposes of analyzing the Settlement Structure.  The UCC does not cite a single

authority suggesting that it would be proper to grant it access to the Debtors' privileged

documents in this context.

> ### iv.   The UCC's Categories Are Overbroad and Unduly Burdensome

46.    The UCC asserts that its "categories" are consistent with *Garner* and *G-I*

*Holdings*, that it "has defined its categories carefully," and therefore the "[n]ature of the

29

REDACTED

[d]ocuments [s]ought" also supports a finding of good cause.  (Exceptions Mot. ¶ 71 (citing *G-I Holdings*).)  Not so.  As an initial matter, the court in *G-I Holdings* did not reach this factor because the parties did not directly address it.  The *G-I Holdings* court noted that the "meet and confer process with respect to the submitted privilege logs has not been completed.  When it has, perhaps specific objections can be presented."  *G-I Holdings*, 342 B.R. at 425.  Likewise, here, the meet and confer process regarding privilege logs is also still underway.  The Debtors produced their last privilege log on October 14, 2020.  And despite the UCC's attempts in correspondence to unilaterally end the parties' meet and confer process, the Debtors have repeatedly made clear, including in their last letter before this motion was filed, that they remained willing to "consider any particularized requests [by the UCC] to withdraw a privilege assertion." (Kaminetzky Decl. Ex. 68 at 2.)  But, as the Debtors also explained, forcing the Debtors to review and produce thousands or tens of thousands of privileged documents without articulating more than speculation that material information in these documents is likely to be found, is simply not a proportionate or efficient use of estate resources.  (*See* Section I, *supra*.)  Nor are the UCC's proposed categories—such as documents reflecting "knowledge of actual or potential opioid claims" and "the Debtors' financial condition" from 2006 to present—anywhere near as tailored as those that formed the basis for relief in *G-I Holdings*, 342 B.R. at 425 (ordering disclosure as to only a limited set of 341 documents and allowing possibility for more meeting and conferring and "specific objections").  Consequently, this factor does not support a finding of good cause.

**B.    The UCC Has Failed to Establish Particularized Probable Cause Under the Crime-Fraud Exception to Compel Disclosure**

47.    In the Second Circuit, the "crime-fraud exception has a narrow and precise application," *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1994), and may be invoked only if

30

**REDACTED**

the movant meets two requirements: the movant must establish that: (1) "there is probable cause to believe that a crime or fraud has been attempted or committed"; and (2) "the communications were in furtherance thereof." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). This burden cannot be satisfied simply by showing that the material in question "might provide evidence of a crime or fraud." *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 404–05 (S.D.N.Y. 2006) (citing *Jacobs*). The movant must instead make a particularized showing that a communication was in furtherance of a fraud and was intended to facilitate the fraud. *Id.*; *Jacobs*, 117 F.3d at 88.

48. Under this exception, the UCC seeks disclosure of seven "categories" of documents (13 including subparts). (Exceptions Mot. ¶ 81 (citing Hurley Decl. Ex. 101).) The UCC also purports to identify ███ "illustrative" privilege log entries that it believes relate to these categories and that "may" come within the exceptions. The UCC, however, does not even attempt to make the particularized showing necessary to invade the privilege under this exception or to demand *in camera* review of any documents.

49. As a threshold matter, the UCC's suggestion that there is a low bar with respect to the quantum of evidence or level of particularity required under this exception (Exceptions Mot. ¶¶ 74, 81) is misleading. As the Second Circuit has observed, the "exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." *In re Richard Roe,* 68 F.3d at 40. If that were the case, of course, "the privilege would be virtually worthless." *Id.* The exception can apply only where the movant demonstrates that the "client communication . . . was **itself** in furtherance of the crime or fraud." *Id.* (emphasis in original). And this means that there must be probable cause to believe that "the <u>particular</u> communication with counsel or attorney work product was intended in some way to

facilitate or to conceal the criminal activity." *Id.* (emphasis added); *see also In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2015 WL 7574460, at *4 (S.D.N.Y. Nov. 25, 2015).

50.     The Exception Motion falls well short of this standard.  With respect to the first prong of the test—the "probable" cause prong—the Debtors' own investigation is continuing, and it would not be appropriate for the Debtors to take a position with respect to the specific evidence cited by the UCC in its motion.  But the UCC surely fails the second prong.  Notwithstanding that it seeks disclosure and/or *in camera* review of hundreds of documents, the UCC does not articulate a connection between any allegedly wrongful conduct and any particular communication or set of communications.  For example, the UCC does not identify in its brief any specific transfers, any specific time periods, any specific custodians, or any specific lawyers involved in those transactions.  Without such basic information, it is not clear how the Debtors or the Court could even begin to respond to or adjudicate the basis for their assertions.  For that reason alone, the UCC's motion must fail.  *See, e.g.*, *Coan v. Dunne*, 2019 WL 1513462, at *4 (D. Conn. Apr. 8, 2019) (denying motion to compel where movant "ha[d] not made the particularized showing to justify the crime/fraud exception for the vast range of otherwise privileged documents he seeks"); *In re: Gen. Motors*, 2015 WL 7574460, at *4 ("[T]he Government must provide particularized evidence that each challenged communication was made in furtherance of the crime or fraud. . . .  Mere relevance or temporal proximity does not suffice.") (emphasis and quotation omitted).

51.     In response, the UCC offers only speculation:  The UCC declares that it "suspects" communications are related to fraudulent schemes and that, apparently, this should suffice.  (Exceptions Mot. ¶ 81.)  But, of course, "[m]ere suspicion . . . is not enough to warrant

**REDACTED**

invading the attorney-client privilege" under this exception, as the UCC's own authorities make

crystal clear.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 108

(S.D.N.Y. 2017); (Exceptions Mot. ¶¶ 72, 74).  The Second Circuit has in fact categorically

rejected the notion that the exception might apply based on "a finding that these documents, read

collectively, have the real potential of being relevant evidence of activity in furtherance of a

crime."  *In re Richard Roe*, 68 F.3d at 40 (quotations omitted).

52.     The UCC also claims it was unable to offer the specifics required because it was

"greatly limited by the vague nature of many of the descriptions on the logs."  (Exceptions Mot.

¶ 81.)  That does not stand to scrutiny either.  Those privilege logs provide ample dating,

attorney, custodian information, and descriptions to orient the UCC, and the UCC has millions of

pages of other non-privileged information to provide context.

53.     Finally, the UCC's principle authority, *Cendant Corp. v. Shelton*, 246 F.R.D. 401,

405 (D. Conn. 2007), does not support its position.  Putting aside that this case concerned a

request for deposition testimony of an attorney, not document requests, the Court's analysis

actually underscores the UCC's utter lack of particularity in its approach here.  Indeed, there, the

District Court found probable cause to compel limited testimony from two attorneys under the

crime-fraud exception to attorney-client privilege only after a thorough review of the evidentiary

record regarding the specific transactions.  *Id.* at 405-08.  Moreover, the Court found that the

movant had produced evidence demonstrating the assistance of each of the two attorneys had

been sought in furtherance of the fraud.  *Id.* at 406.  Only then did the Court order depositions to

proceed as to the "specifically identified areas."  *Id*. at 407.  By contrast, the UCC, has not even

attempted to make a specified showing with respect to any—and certainly not with respect to the

many thousands—of documents it demands here.[18]  Accordingly, it has failed to meet its burden

on this exception.[19]

## II.      The Privilege Log Motion Should Be Denied

54.      The UCC's Privilege Log Motion is no more availing.  The essentially categorical

challenges that the UCC levies are entirely insufficient to justify the production or "very

arduous" *in camera* review that the UCC demands.  (Log Mot. ¶ 7.)

55.      At the outset, it is important to provide context for the number of documents

withheld for privilege cited in the UCC's submission.  (*Id.* ¶ 10.)  The withheld documents fall

into three broad categories:  First, there are approximately 136,000 documents that were

withheld from the huge amount of pre-petition (e.g., MDL) productions (productions that totaled

over 10 million documents and over 70 million pages) that the Debtors made available to the

UCC early on in these cases.  The UCC does not currently seek relief with respect to these pre-

petition privilege logs (*Id*. ¶ 11), and the Debtors have made clear to the UCC that they are not

going to squander estate resources revisiting privilege calls made in pre-petition litigation.

Second, there are approximately 100,000[20] documents that the Debtors have not produced to the

---

[18] For the same reason, *Amusement Indus. v. Stern*, 293 F.R.D. 420, 427 (S.D.N.Y. 2013)
(Exceptions Mot ¶ 81), is distinguishable.  There, after demonstrating probable cause to believe
the producing party engaged in four specific fraudulent transactions, the movant provided
specific evidence establishing that producing party "frequently communicated with or
transmitted documents to other parties to these transactions exclusively through his attorneys."
*Amusement Indus.*, 293 F.R.D. at 439.

[19] The Debtors also submit that, for the same reasons, *in camera* review would be inappropriate
and a waste of the Court's resources.  *Jacobs*, 117 F.3d at 87 (emphasizing trial-court discretion
both as to whether to conduct *in camera* review and in "determin[ing] whether the facts are such
that the exception applies").

[20] The Debtors have learned that a portion of the documents on the privilege logs identified by
the UCC were produced in certain underlying litigations whose productions have been produced
to the UCC.  Amended logs will be provided to the UCC in due course.

UCC because, among other reasons, they are privileged documents that the Debtors produced to the DOJ in cooperation with its ongoing investigation ███████████████████████ ███████████████████████████████████████████. These withheld documents are a small portion of the 2.5 million documents produced to the DOJ that the Debtors have made available to the UCC, and are treated separately below.  Finally, there are 120,000 documents that the Debtors have logged to date from the search term and custodian process resulting from the UCC's overbroad document requests, of the over 600,000 documents the Debtors have produced from that process, totaling over 3.7 million pages.[21] Certain subsets of these materials are the focus of the Privilege Log Motion and are treated below first.  In all events, the number of documents that the Debtors have withheld is small when compared with the vast amount of material provided to the UCC in these chapter 11 cases.

### A.    The Debtors' Customary Privilege Logs Are More Than Adequate

56.    Permeating the UCC's Privilege Log Motion is a consistent refrain:  Debtors' "vague and conclusory log entries simply are not sufficient to carry the Withholding Parties' burden of demonstrating the communications" falling within certain broad categories are privileged.  (*See, e.g.*, *id.* ¶ 32.)  The Debtors' customary privilege logs, however, are more than sufficient to carry the Debtors' burden.

57.    Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure provides that a party withholding otherwise discoverable documents on the basis of privilege must "expressly make the claim . . . and describe the nature of the documents, communications or tangible things not produced or disclosed—and do so in a manner that, <u>without revealing information itself</u>

---

[21] As part of the Debtors' ongoing review of documents, the Debtors provided the UCC with amended logs on October 3, 2020 and October 14, 2020.

**REDACTED**

privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 25(b)(5)(A)

(emphasis added). In fact, under this District's local rules, "[e]fficient means of providing

information regarding claims of privilege are encouraged" and categorical privilege logs are

"presumptively proper." *See* S.D.N.Y. & E.D.N.Y. Civ. R. 26.2(c).

58.    At the UCC's insistence, the Debtors went far beyond this, electing to provide a

detailed document-by-document privilege log of tens of thousands of documents—at material

cost to these estates. The Debtors' privilege logs include, among other information, all parties to

the communication, the date and subject of the communication, any basis for withholding, and a

detailed privilege description. There is no doubt that this level of detail is more than sufficient to

meet the requirements of the Local Rules and applicable case law, and is common among

document productions in civil litigations. *See* S.D.N.Y. & E.D.N.Y. Civ. R. 26.2(a)(2)(A);

Bankr. S.D.N.Y. R. 7034-1(c); *Scott v. Chipotle Mexican Grill, Inc*., 94 F. Supp. 3d 585, 600-01

(S.D.N.Y. 2015) (holding that log entries including descriptions such as "[d]iscussion of legal

advice regarding Chipotle's Labor Management Guide" and "[d]iscussion of meeting with John

Shunk and legal advice concerning classification of Chipotle's apprentice position" are

sufficient).[22]

---

[22] The cases cited by the UCC concerning inadequate privilege logs (Log Mot. ¶ 17) are not to
the contrary. In *U.S. v. Constr. Prods. Research, Inc.*, for example, the logs were deemed
deficient because they contained as little as two-, three-, or four-word inscrutable descriptions
such as: (a) "'Fax Re: DOL Findings' with comment 'cover sheet'; (b) 'Fax: Whistleblower
article' with comment 'Self-explanatory'; (c) 'Letter Re: Customer Orders' with comment 'Re:
Five Star Products'; (d) 'Summary of Enclosures' with comment 'Self-explanatory'; etc." 73 F.
3d 464, 473-74 (2d Cir. 1996). In *Aurora Loan Servs., Inc. v. Posner, Posner & Assoc., P.C.*,
the logs were found inadequate because they "d[id] not identify which privilege [was] being
asserted (attorney-client or work product) and often d[id] not identify the parties to the
communication." 499 F. Supp. 2d 475, 479 (S.D.N.Y. 2007). *In re Schick*, Nos. 96 B 42902, 96
B 43969 (SMB), 96/9218A (SMB), 1997 WL 465217, at *4 (Bankr. S.D.N.Y. Aug. 12, 1997), is
entirely inapposite. There, the bankruptcy court found that the trustee and her counsel had

REDACTED

59.     It is well-established that where (as here) large quantities of disputed documents are at issue, the "court has broad discretion as to how to proceed" in resolving privilege disputes on a motion to compel, including by "rel[ying] on sufficiently detailed privilege logs" in lieu of an "affidavit or declaration addressing each document at issue." *Golden Trade, S.r.L. v. Lee Apparel Co.*, Nos. 90 Civ. 6291(JMC), 90 Civ. 6292(JMC), and 92 Civ. 1667(JMC), 1992 WL 367070, at *5 (S.D.N.Y. Nov. 20, 1992) (citing *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) ("In essence, the party asserting the privilege must make a *prima facie* showing that the privilege protects the information the party intends to withhold.  We have previously recognized a number of means of sufficiently establishing the privilege, one of which is the privilege log approach.")); *see also* 8 Charles Alan Wright et al., FEDERAL PRAC. & PROC. § 2016.1 (3d ed. 2010) (noting that a privilege log itself functions "like a prima facie showing that the identified materials were properly withheld on privilege grounds").  "Once the producing party has made this initial showing, the requesting party cannot require the producing party—or the court—to make a detailed, document-by-document evaluation of each privilege claim simply by speculating that the documents listed on the privilege log are being inappropriately withheld."  *Enslin v. Coca-Cola Co.*, No. 2:14-CV-06476, 2016 WL 7013511, at *1 n.3 (E.D. Pa. June 24, 2016) (citing *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 721 (5th Cir. 2011) ("district court did not err in declining to engage in a full *in camera* review" of withheld documents on nothing more than the requesting party's speculation that the documents listed on the privilege log were improperly withheld "because they were made for a purpose other than obtaining legal advice")).

---

waived privilege with respect to five documents containing her notes because they failed to provide any privilege log.  *In re Schick*, 1997 WL 465217, at *1, 3, 5-6.

**REDACTED**

60.    This approach makes good sense.  As the UCC knows, "[i]t is well-settled that *in camera* review of documents by the [c]ourt is the exception and not the rule because of the enormous strain it places on the resources of federal trial courts."  *Collens v. City of N.Y.*, No. 03 Civ. 4477 JGKHBP, 2004 WL 1395228, at *2 (S.D.N.Y. June 22, 2004) (*in camera* review to resolve privilege disputes "is ordinarily utilized only when necessary").  (*See* Log. Mot. ¶ 7 ("The UCC is very aware that the relief it is seeking could result in very arduous work by the Court or a Special Master.").  In fact, courts decline to review documents on a privilege log merely to "ensure that they are, indeed, protected by disclosure."  *Alexander Interactive, Inc. v. Adorama, Inc.*, 12 Civ. 6608 (PKC) (JCF), 2013 WL 6283511, at *7 (S.D.N.Y. Dec. 4, 2013); *cf. Rozell v. Ross-Holst*, No. 05 Civ. 2936 (PKC) (JCF), 2006 WL 163143, at *4 (S.D.N.Y. Jan. 20, 2006) (in rejecting relevancy challenge, observing that "[d]iscovery in our adversarial system is based on a good faith response to demands for production by an attorney constrained by the Federal Rules and by ethical obligations").  As discussed further below, the UCC cannot compel production or *in camera* review of large categories of documents by speculating, in the most generalized terms, that those documents might not be subject to the stated privilege, particularly in the middle of ongoing privilege reviews.  (*See, e.g.*, Log Mot. ¶¶ 33, 35 (speculating that certain entries "do not demonstrate that the ***predominate purpose*** of the communication was legal" because they involve counsel whose "legal or business capacity . . . may not be easily discerned") (emphasis in original); 51 (███████████████████████████ █████████████████████████); 60 (questioning the privilege because "many more circumstances 'could' exist that *do not* permit a privilege assertion with . . .  third parties").

61.    The Debtors have also demonstrated a willingness to undertake re-reviews as appropriate, recognizing that in a complex proceeding such as this, where the Debtors have

38

**REDACTED**

reviewed hundreds of thousands of documents and logged tens of thousands of others under

incredibly tight time frames, it is inevitable that there may be documents that were incorrectly

logged.  The Debtors have undertaken significant re-reviews of privilege log entries that the

UCC has identified in its various letters and the present Log Motion, and are continuing to

conduct quality control reviews.  (*See* Kaminetzky Decl. Ex. 68.)  In a show of good faith, the

Debtors commit to re-review documents identified on Exhibit C to the UCC's motion by October

28, 2020, and will de-designate documents if the Debtors determine they are not privileged.

> **B.    The Debtors' Privilege Designations Are Adequately Supported and Proper**
>
> > *i.   Baker ███████ Documents*

62.    The UCC first seeks *in camera* review of ████████ documents and

communications withheld by the Debtors on which Stuart Baker and ██████████ are the only

lawyers copied ("**Baker ██████ Withheld Documents**").[23]  The UCC, however, offers nothing

beyond pure speculation to justify such an *in camera* review.  There is no dispute that Baker ███

████ are attorneys who are likely to be party to privileged communications.  (Log Mot. ¶ 36

("To be sure, Messrs. Baker ███████ were lawyers, and the UCC acknowledges that they

likely were party to some communications that are in fact privileged.").)  Nor do the Debtors

dispute that Baker ████████ served in non-legal roles such that communications involving them

may not be privileged.  The UCC's argument instead is that the information in the privilege logs

fails to show that the "predominate purpose" of ███████ communications is legal.  (*Id.* ¶ 35.)

But this is nothing but a blanket, non-specific attempt by the UCC to force the Debtors to further

---

[23] The UCC misleadingly combines entries in the Debtors' and the Sackler Families' privilege
logs in their assertion that over 3,000 documents and communications that involve only Stuart
Baker ████████████████ (and no other attorneys) should be subject to an *in camera* review.
Only 1,155 documents in this category appear on the Debtors' privilege logs.

**REDACTED**

establish a privilege that is properly supported by the Debtors' privilege log and the information

provided to the UCC.

63.    The assertion that the ███████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████ 2003)).)  In fact, the Debtors have actually produced

over 78,000 communications that include Stuart Baker ████████████████.  That the Debtors

have produced tens of thousands of Baker ████████ communications confirms that the Debtors

are asserting privilege on a document-by-document basis, including with respect to the dual roles

these persons had at the Debtors.

64.    What remains of the UCC's argument essentially boils down to generalized

criticisms that the privilege log entries with respect to the Baker ████████ Withheld Documents are

"vague," "conclusory" or "opaque," or "insufficient" to show that the "predominate" purpose is

legal.  (*Id.* ¶¶ 32, 34.)  These sorts of generalized allegations, however, are insufficient to trigger

*in camera* review, as set forth in Part III.A, *supra*.  Indeed, the only description the UCC

purports to identify as somehow problematic—"legal advice regarding general corporate advice"

(*Id.* ¶¶ 28-34)—explicitly concerns legal advice.  That is more than adequate.  *See Scott*, 94 F.

Supp. 3d at 600-01 (holding that logs "identify[ing] that the documents are discussing legal

advice on a particular topic" based on descriptions such as "Legal advice regarding Chipotle's

Labor Management Guide" are sufficient).  Nor has the UCC even attempted to combat the

*prima facie* sufficiency of the logs by demonstrating that the "surrounding circumstances" call

for additional details.  (Log Mot. ¶ 35 (quoting *Urban Box Office Network, Inc. v. Interfase

Managers, L.P.*, No. 01 Civ. 8854 (LTS) (THK), 2006 WL 1004472, at *6 (S.D.N.Y. Apr. 18,

2006)).)  In *Urban Network*, the court's *in camera* review appears to have been precipitated by

**REDACTED**

the fact that "[v]irtually all of the documents" on the plaintiffs' privilege log related to one business transaction with the defendants that was the subject matter of the action. 2006 WL 1004472, at *6. By contrast, the entries here (not surprisingly given the UCC's broad request), relate to a variety of different subject matters (Hurley Decl., Ex. C, Tab A (██████████ ██████ ██████████)), negating any notion that the Debtors took a blanket privilege approach with respect to certain communications merely because they involve ██████ or Baker.[24]  The UCC has not come close to establishing that these documents must be reviewed by a special master or the Court.

### ii.  The Common Interest Assertions Are Adequately Supported

65.    The UCC next claims that the Debtors' "common interest assertions are insufficient" (Log Mot. ¶ 19) for two reasons, neither of which is persuasive.

66.    First, the UCC criticizes the Debtors' efforts to delineate for the UCC the entries in their privilege logs to which the common interest applies ████████████████. ████████████████████████████ This is incorrect.

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

██ But the UCC does not cite a single authority in support of the notion that the Debtors were

---

[24] For the same reason, *Women's InterArt Ctr.*, 223 F.R.D. 156, 161 (S.D.N.Y. 2004) is distinguishable. There, the Court held that defendants failed to demonstrate attorney-client privilege over an in-house attorney's handwritten notes because the notes appeared to relate to business information, "no explanatory supplements" were provided, and the defendants were "unable to declare with any certainty who received the[] notes." *Id.*

**REDACTED**

required to provide that type of granular information to support its common interest assertions.

Moreover, these questions would have required the Debtors to expend significant resources

piecing together a complex history predating Davis Polk's representation of the Debtors for

seemingly no purpose.  The Debtors did not "refuse" [] to answer the UCC's questions.  Instead,

the Debtors have repeatedly offered to evaluate any particular questions as to specific

documents.

67.    Further, the Debtors' privilege log entries include detailed privilege descriptions

that provide more than sufficient justification for withholding documents pursuant to the

common interest doctrine, many of which are self-evident.  These include, but are not limited to:

- o  "Document compiled by or at the direction of counsel in anticipation of litigation relating to compliance with regulatory or other legal requirements and prepared in connection with the same, in common interest with related parties" (*see, e.g.*, Hurley Decl. Ex. C, Tab C, at PL-00074535);

- o   "Email correspondence compiled by or at the direction of counsel in anticipation of litigation relating to patent litigation affecting the Company and prepared in connection with the same, in common interest with related parties" (*see, e.g.*, Hurley Decl. Ex. C, Tab M, at PL-00036842);

- o  "Email correspondence compiled by or at the direction of counsel in anticipation of litigation relating to opioid-related government investigations and enforcement actions affecting the Company and prepared in connection with the same, in common interest with related parties" (*see, e.g.*, Hurley Decl. Ex. C, Tab C, at PL-00074536); and

- o  "Email correspondence compiled by or at the direction of counsel in anticipation of litigation relating to issues relating to an actual or potential restructuring and prepared in connection with the same, in common interest with related parties" (*see, e.g.*, Hurley Decl. Ex. C, Tab N, at PL-00016500).

68.    In addition to a general challenge to the sufficiency of the Debtors' assertions, the

UCC also challenges ■ of the documents on the Debtors' privilege logs because it seems to

believe that there cannot be a common interest between members of the Debtors' Special

**REDACTED**

Committee and the Sackler Families.[25]  (Log Mot. ¶ 41.)  But that the UCC would be "troubled"

by this is, frankly, perplexing.  "Parties asserting a common interest need only share a common

interest about a legal matter."  *In re Velo Holdings Inc.*, 473 B.R. 509, 515 (Bankr. S.D.N.Y.

2012).  The doctrine exists "to protect the free flow of information from client to attorney . . .

whenever multiple clients share a common interest about a legal matter."  *Fireman's Fund Ins.*

*Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 139 (S.D.N.Y. 2012).  At the same time,

courts are crystal clear that the "the interests of the parties asserting a common interest need not

be universally congruent."  *In re Velo Holdings*, 473 B.R. at 515; *see also In re Grand Jury*

*Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381, 392 (S.D.N.Y. 1975) ("a joint

defense may be made by somewhat unsteady bedfellows"); *In re Megan-Racine Assocs., Inc.*,

189 B.R. 562, 572 (Bankr. N.D.N.Y. 1995) ("[E]ven where a later law-suit is foreseeable

between the co-defendants that does not prevent them from sharing confidential information for

the purpose of a common interest.").

        69.    The Debtors, acting through their board of directors ("**Board**"), shared a common

interest with members of the Sackler Families on a number of issues,



. The UCC appears to understand that four

independent "at-large directors" serve on the Debtors' Special Committee, a committee of the

Board that is delegated exclusive authority to oversee investigations and analyze distributions

---

[25] ██████████████████████████████████████████████, only ███ of these
communications are on the Debtors' privilege logs.  Notably, only 28 of those documents
actually purport to relate to a common interest.

**REDACTED**

and any other dealings between the Debtors and the Sackler Families and their affiliates. (Log. Mot. ¶ 41.)  But the UCC erroneously conflates the Special Committee members' specific Sackler-related delegated duties and authorities with their broader responsibilities as members of Purdue's plenary Board.  The at-large Board members who also serve on the Special Committee may be included on communications that implicate Purdue's privilege on issues about which Purdue shares a common legal interest with members of the Sackler Families—███████

████████████████████████████████████████████████████████████

██████.  This is also true of communications between Special Committee Board members and Board members appointed by the Sackler Families.  (*Id.* ¶ 42 n. 36.)  In other words, the participation of the at-large Board members on the Special Committee does not in any way preclude them from participating fully in the functions of the plenary Board—or erase any privileges when they do so.

70.    Finally, the UCC's authorities (*Id.* ¶ 42) are inapposite.  They address a scenario where a special committee is charged with investigating <u>current</u> members of a plenary board and/or management and involved communications concerning the investigation itself.  *See, e.g.*, *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6963-DOC (RNBx), 2009 WL 10673943, at *4 & n.6 (C.D. Cal. July 8, 2009) (no common interest where special committee was charged with conducting internal investigation of board members regarding potential securities laws violations, and communications between the Special Committee and its counsel were shared with the board); *S.E.C. v. Roberts*, 254 F.R.D. 371, 378 (N.D. Cal. 2008) (counsel for Special Committee making presentations on investigation to the Board and others).[26]  The

---

[26] Moreover, the viability of *S.E.C. v. Roberts*' (and, by extension, *Middlesex Ret. Sys'*) reasoning is unsettled in California district courts, let alone those within this Circuit.  *See, e.g.*, *In re Banc of California Sec. Litig.*, No. SACV1700118-AG (DFMx), 2018 WL 6520418, at *2

**REDACTED**

scenario here is markedly different.  Indeed, no Sackler Family member sits on the Board—nor

have they since before the Special Committee's formation.  (Debtors' Informational Br., at 14-

15.)  And the fact that certain plenary Board members were appointed by the Sacklers does not

eviscerate the privilege with respect to them.  Such a finding would upend the entire governance

structure of the Debtors—of which the UCC was well aware since the inception of these cases

(*Id*.)—at this critical juncture in the bankruptcy.

### iii.  *Third Parties*

71.    The UCC next seeks disclosure or *in camera* review of ▮▮▮▮▮▮▮▮▮▮

communications or documents withheld by the Debtors involving parties that, according to the

UCC, break the Debtors' privilege.  (Log Mot. ¶¶ 45-60.)  The scope of the relief the UCC seeks

is exceptionally broad.  The UCC challenges communications involving third parties of nearly

every conceivable ilk present on the Debtors' privilege logs, including public relations firms,

accountants, bankers, lobbyists, consultants, real estate firms, insurance brokers, non-debtor

counsel, non-affiliates of the Debtors, and others (*see, e.g.*, *id.* ¶ 60) (collectively, the "**Third**

**Parties**" and, the communications on which the Third Parties appear, the "**Third-Party**

**Communications**").  The Court should decline the UCC's request to undertake an *in camera*

review of the Third-Party Communications or otherwise order their disclosure—particularly in

light of the Debtors continued ongoing review of these materials.

72.    Perhaps more than anything, this portion of the UCC's Privilege Log Motion

confirms the extent to which the UCC has lost sight of the scope of appropriate discovery in

---

(C.D. Cal. Dec. 7, 2018) (discussing *S.E.C. v. Roberts* and noting that "other courts have
recognized that the privilege remains intact and is not destroyed as to certain communications
between the special committee's counsel and company management") (citing *In re BCE West,
L.P.*, No. M-8-85, 2000 WL 1239117, at *2 (S.D.N.Y. Aug. 31, 2000) (finding that
communications between board of directors and special committee's counsel did not waive
attorney-client privilege))).

**REDACTED**

these chapter 11 cases.  Missing from the UCC's papers is any explanation of what it reasonably

expects to find in these materials that would materially bear on estate claims—particularly in

view of the millions of documents the UCC already has in its possession and is presumably

analyzing.  Despite repeated invitations to do so, it has made no effort to tailor its privilege

challenges and to focus on documents that actually matter to these chapter 11 cases.  And the

UCC's expansive approach to privilege challenges and concomitant refusal to hone its requests

has already led to substantial costs for the estate.  If the UCC prevails, there will assuredly be

further substantial costs and diversion of resources, not just of the parties but also the Court—all

to no apparent end.  These reasons alone justify the denial of the UCC's motion.  *See* Part I,

*supra*.

73.    The UCC's broad challenge to the Debtors' privilege assertions involving third

parties notwithstanding, the UCC seemingly concedes, as it must, that the presence of third

parties does not categorically destroy the Debtors' privilege.  For good reason.  It is well

established that a third party's presence does not vitiate privilege under appropriate

circumstances.  *See, e.g*, *United States v. Ackert*, 169 F.3d 136, 140 (2d Cir. 1999) (recognizing

that "inclusion of a third party in attorney-client communications does not destroy the privilege if

the purpose of the third party's participation is to improve the comprehension of the

communications between attorney and client"); *In re Copper Market Antitrust Litig.*, 200 F.R.D.

213, 216 (S.D.N.Y. 2001) (finding privilege was preserved where third party was "functional

equivalent" of employee of the company).[27]  Courts in this district have routinely upheld claims

---

[27] The UCC's own authorities acknowledge that the privilege expands to third parties under
certain circumstances.  (Log. Mot. ¶ 45, 55-56, 60).  *See Haugh v. Schroder Inv. Mgmt. N. Am.
Inc.*, No. 02 Civ. 7955 (DLC), 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("Where the
communications from the client to a consultant are made in confidence and 'for the purpose of
obtaining legal advice' from the attorney, the communication is privileged." (quoting *United*

**REDACTED**

of privilege over communications involving public relations firms, accountants, other

consultants, professionals, and investigators on those bases.  *See e.g., In re Copper Market

Antitrust Litig.*, 200 F.R.D. at 219, 221; *United States v. Schwimmer*, 892 F.2d 237, 243-44 (2d

Cir. 1989); *Montesa v. Schwartz*, No. 12 Civ. 6057 (CS) (JCM), 2016 WL 3476431, at *7

(S.D.N.Y. June 20, 2016).[28]  These authorities also make clear that whether a third party's

participation in an otherwise privileged communication breaks privilege entails an inherently a

case- and fact-specific analysis.  *See Kovel*, 296 F.2d at 922.

74.    Consistent with the foregoing, the Debtors have applied a document-by-document

approach to their assertions of privilege.  Take, for example, the ▮▮public relations firms that the

---

*States v. Kovel,* 296 F.2d 918, 922 (2d Cir. 1961))); *Calvin Klein Trademark Tr. v. Wachner*, 198
F.R.D. 53, 54-55 (S.D.N.Y. 2000) (acknowledging the protection of the attorney-client privilege
where a third party serves a "translator" function); *Bloomingburg Jewish Educ. Ctr. v. Vill. of
Bloomingburg, N. Y.*, 171 F. Supp. 3d 136, 140 (S.D.N.Y. 2016) ("Under certain circumstances .
. . the privilege for communication with attorneys can extend to shield communications to others
when the purpose of the communication is to assist the attorney in rendering advice to the
client."); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d
207, 212 (E.D.N.Y. 2019) (analyzing whether the privilege applied to a public relations firm and
noting that "the privilege extends to a communication disclosed to a third party . . . if the purpose
of the third party's participation is to improve the comprehension of the communications
between attorney and client") (quotations omitted); *Ravenell v. Avis Budget Grp., Inc.*, No. 08-
cv-2113, 2012 WL 1150450, at *2 (E.D.N.Y. Apr. 5, 2012) ("Courts have carved out an
exception to the waiver rule . . . that applies where disclosures to a third party are necessary to
facilitate communication between attorney and client."); *Summit Ltd. v. Levy*, 111 F.R.D. 40, 41
(S.D.N.Y. 1986) ("Although no privilege attaches specifically to an accountant/client
communication, such matters may be withheld if they meet the traditional requirements of the
attorney/client privilege."); *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232
F.R.D. 103, 113 (S.D.N.Y. 2005) (discussing two "doctrines" with respect to privilege over
communications involving financial advisors, where the third party acts as an "interpreter" or is
"the functional equivalent of an employee").

[28] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In connection
with an amended privilege log served by the Debtors on October 3, 2020, the Debtors provided
an appendix identifying many (if not all) parties on the amended privilege log that were
identified by the UCC in the Hurley Decl., Exhibit C, Tab M.  (*See* Kaminetzky Decl. Ex. 69-1)

**REDACTED**

UCC challenges on Debtors' privilege logs.  (Log Mot. ¶¶ 50-51.)[29]  The Debtors have actually

produced over 3,600 communications involving those same firms to the UCC.  Likewise, the

UCC identifies ███ communications redacted or withheld as privileged involving accountants or

investment advisors.  (Hurley Decl. Ex. C., Tab D.)  But again, the Debtors have produced the

vast majority of documents that involve accountants and investment advisors—totaling over

36,000 documents, and have not categorically withheld documents involving the Third Parties

identified by the UCC.

75.    The closest the UCC comes to lodging a non-conclusory and speculative

challenge to communications with Third Parties involves public relations firms—a subject to

which it devotes the majority of its briefing.  Although the UCC acknowledges that the court in

*In re Grand Jury Subpoena Dated March 24, 2003*, 265 F. Supp. 2d 321, 323-24, 330 (S.D.N.Y.

2003), extended protection to communications involving public relations professionals, it states

that "many district courts have declined to extend that decision beyond its particular context."

(Log Mot. ¶ 48.)

76.    The UCC, however, largely ignores the striking similarities between *In re Grand

Jury Subpoena* and the situation in which the Debtors (as well as the Related Parties) found

themselves.  In *In re Grand Jury Subpoena*, a public relations firm was retained to

"communicate with the media in a way that would help restore balance and accuracy to the press

coverage" and "affect[] the media-conveyed message that reached the prosecutors and regulators

responsible for charging decisions in the investigations" concerning a high-profile target (later

identified as Martha Stewart).  *In re Grand Jury Subpoena*, 265 F. Supp. 2d at 323-24.  The

---

[29] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

public relations firm advised the target and the lawyers and also "conveyed to members of the media information that the [t]arget['s] defense team wished to have disseminated." *Id.* at 324. The "ultimate issue," in the court's view, was "whether attorney efforts to influence public opinion in order to advance the client's legal position . . . are services, the rendition of which also should be facilitated by applying the privilege to relevant communications which have this as their object." *Id.* at 326. The court ultimately found that they were and authorized the withholding of communications between the public relations firm, the lawyers, and the target (or combinations thereof). *Id.* at 331. Here, as in *In re Grand Jury Subpoena*, the Debtors and Related Parties are high profile and faced a highly adverse press environment (to put it mildly). Unlike in *In re Grand Jury Subpoena*, where the target was "only" facing inquiries from federal prosecutors and unidentified regulators, the Debtors and Related Parties were the subject of an extraordinary number of lawsuits and investigations by dozens of federal, state, and other governmental actors. Under these circumstances, the assertion of protection over certain communications involving public relations firms is more than justifiable and was, in fact, critical to mounting any serious defense to the onslaught of government action. *Id.* at 330-31; *Stardock Sys., Inc. v. Reiche*, No. 4:17-cv-07025-SBA (KAW), 2018 WL 6259536, at *6 (N.D. Cal. Nov. 30, 2018) (according protection to communications between law firm and public relations consultant).

77.    The UCC also, for the most part, disregards that a significant portion of the Third Party Communications it challenges—over a third or three quarters in some categories—involves work product. *See, e.g.*, Hurley Decl. Ex. C, Tabs A, C, D, F, H, I, K, M, N, O ("Basis for Withholding or Redacting" column). It is black letter law that a third party's presence on an otherwise privileged communication or document generally renders waiver <u>less</u> likely when the

49

**REDACTED**

work product doctrine is applicable.  *See, e.g.*, *U.S. v. Adlman*, 134 F.3d 1194, 1204 (2d Cir.

1998) (holding that "highly persuasive showing" is needed to overcome work product doctrine);

*In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 138 (S.D.N.Y. 2019) ("[C]ourts generally

find a waiver of the work product privilege only if the [third party] disclosure substantially

increases the opportunity for potential adversaries to obtain the information.") (quotations

omitted); *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*,

945 F. Supp. 2d 431, 437 (S.D.N.Y. 2013) (same). ███████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████  ████████████████████████████

████████████████████████

78.     As set forth above, the Debtors take seriously their obligation to make

productions in good faith and have, in connection with the UCC's letters and now its motion,

undertaken to re-review, at substantial expense, all of the documents cited on Exhibit C.  If, in

connection with that review, the Debtors determine that documents should be de-designated and

produced, they will be.  In fact, the Debtors believe that some de-designations are likely,

particularly given the extraordinary time pressure in which Debtors were given to review and

produce hundreds of thousands of documents and create privilege logs with respect to tens of

thousands more.

### C.     The Debtors Have Appropriately Withheld Both Privileged Documents and Presentations and Communications Provided to the DOJ

79.     Finally, the UCC demands that the Debtors produce (1) privileged documents that

the Debtors produced to the DOJ ██████████████████████████ ("**DOJ Privileged**

**Documents**"); and (2) any written presentations to and/or communications with the DOJ

**REDACTED**

concerning opioid-related claims against them ("**DOJ Presentations and Communications**").
(Log Mot. ¶ 18.)  The Court should deny the UCC's motion to compel both categories of
material.

80.     Like nearly every other aspect of its Privilege Motions, the UCC's demands lack
critical context.  Notwithstanding that the Debtors had already commenced productions of
documents pursuant the UCC's requested search terms and custodians, the UCC also demanded
that the Debtors produce all documents previously provided to the DOJ during the DOJ's
investigation of the Debtors ("**DOJ Productions**")—which totaled over 13.5 million pages.  At
the time, the Debtors explained that "the DOJ productions are likely significantly over-broad in
that they covered a substantial number of custodians and very broad and numerous search terms
and the documents were produced, in the interest of time, without conducting a responsiveness
review."  (Kaminetzky Decl. Ex. 70.)  For this reason, the Debtors expressed the view that
"[t]urning over again large numbers of documents that are likely to include a meaningful amount
of irrelevant material as well as privileged material to be reviewed by parties that are, or perhaps
will be, paid by the Debtors' estates is not the best use of estate resources."  (*Id*.)  The Debtors,
however, reassured the UCC that to the extent a non-privileged document fell within the scope of
the supplemental ESI collection, the Debtors would not withhold such a document because it had
been produced to the DOJ.  (*Id*.)  But the UCC persisted, and the Debtors (again) relented.
Ultimately, the Debtors agreed to produce all non-privileged documents in the DOJ Productions
(including after undertaking a substantial effort to conduct a privilege review over approximately
300,000 documents). (*See* ESI Stipulation at ¶ 9.)  To date, the Debtors have produced 2.5
million such documents.  To be clear, though, consistent with the governing stipulation, the

REDACTED

Debtors did not agree to produce <u>privileged</u> documents in the DOJ Productions (and instead agreed only to produce a log of documents withheld).

81.    ███████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███    The UCC, of course, does not say what it hopes or expects to find in these privileged materials, or what would justify the estates bearing the costs of the UCC's review.  The UCC's request should be denied on this ground alone.  *See* Part I, *infra*.

82.    The UCC's assertion that the Debtors' waived privilege over the DOJ Privileged Documents by producing them to the DOJ is also wrong.  Far from it being "axiomatic" that disclosure to an investigator categorically waives privilege (Log Mot. ¶ 21), the Second Circuit has expressly declined to adopt such a *per se* rule.  *See In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993).  It has instead held that such disclosure should be evaluated on a "case-by-case" basis and may not result in waiver, including in "situations in which the [investigator] and the disclosing party have entered into an explicit agreement that the [investigator] will maintain the confidentiality of the disclosed materials."  *Id.*  Numerous courts in the Southern District, following *Steinhardt*, have held that voluntary disclosure to government agencies pursuant to a confidentiality agreement does not waive the attorney-client privilege or work product doctrine.  *See In re financialright GmbH*, No. 17-mc-105 (DAB), 2017 WL 2879696, at *7 (S.D.N.Y. June 22, 2017); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, No. 06 Civ. 5797 (PAC), 2010 WL 935317, at *2 (S.D.N.Y. Mar. 12, 2010); *In re Nat. Gas Commodity Litig.*, No. 03 Civ. 6186VMAJP, 2005 WL 1457666, at *8 (S.D.N.Y. June 21, 2005), *aff'd*, 232 F.R.D. 208, 211-12 (S.D.N.Y. 2005) (citing cases); *Maruzen Co. v. HSBC USA, Inc.*, No. 00

52

REDACTED

CIV. 1079 (RO), 00 CIV. 1512 (RO), 2002 WL 1628782, at *2 (S.D.N.Y. July 23, 2002).  There

is good reason for these holdings.  As one court in this District has observed, "[t]here is a strong

public interest in encouraging disclosure and cooperation with law enforcement agencies;

violating a cooperating party's confidentiality expectations jeopardizes this public interest."

*Police & Fire Ret. Sys.*, 2010 WL 935317, at *2.

83.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████.  *See Maruzen Co.*, 2002 WL 1628782, at *1 (declining to find waiver where agreement

stated "[USAO] would maintain the [m]aterial in confidence and not disclose it to any third

parties . . . ."); *In re financialright GmbH*, 2017 WL 2879696, at *6 (same where agreement

stated "[disclosing party] does not intend to waive the protection of the attorney work product

doctrine, attorney-client privilege, or any other privilege.").  ████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████.  As a separate matter, courts

have also considered in this context whether the party seeking the materials has established a

**REDACTED**

"pressing need" for them.  *Police & Fire Ret. Sys.*, 2010 WL 935317, at *2.  Here, the UCC has

failed to demonstrate any need, let alone a pressing need, for access to these specific materials.

For all of these reasons, the UCC's motion to compel the production of these documents should

be denied.

84.    The authority cited by the UCC is not to the contrary.  Some of the cases cited

have no bearing because in those cases no confidentiality agreement was in place before the

relevant disclosure was made.  *See In re Weatherford Intl. Sec. Litig.*, No. 11 Civ. 1646 (LAK)

(JCF), 2013 WL 12185082, at *6 n.4 (S.D.N.Y. Nov. 19, 2013) (observing that "there is no

confidentiality agreement between the Audit Committee and the SEC"); *Ratliff v. Davis Polk &*

*Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003) (ordering disclosure, but no indication

confidentiality agreement was in place with the SEC prior to disclosure and where the materials

themselves did not contain privileged statements).  Others are entirely factually inapposite.  *See*

*Gruss v. Zwirn*, No. 09 Civ.. 6441 (PGG) (MHD), 2013 WL 3481350, at *8 & n.2 (S.D.N.Y.

July 10, 2013) (finding withholding party actually produced the materials it supplied and used

during its presentations to the SEC to the parties in the later litigation but then attempted to keep

only the related attorney notes and summaries of witness interviews confidential);  *In re Initial*

*Pub. Offering Sec. Litig.,* 249 F.R.D. 457, 466 (S.D.N.Y. 2008) (ordering disclosure despite

agreement where the disclosing party had made repeated voluntary disclosures to multiple

adversarial parties).

85.    With respect to presentations provided to and communications exchanged with

the DOJ, the UCC has failed to demonstrate why discovery of such material is reasonable or

appropriate, particularly in light of the fact that the UCC has nearly all of the materials that the

Debtors produced to the DOJ (and has presumably reviewed them).  In addition, while the UCC

REDACTED

is correct that invoking the investigatory privilege is the province of DOJ, the policy rationale

that underlies the privilege applies with equal force here.  *See Otterson v. Nat'l R.R. Passenger*

*Corp.*, 228 F.R.D. 205, 207, 210 (S.D.N.Y. 2005) ("The law enforcement or investigatory

privilege exists to prevent disclosure of law enforcement techniques and procedures, to preserve

the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the

privacy of individuals involved in an investigation, and otherwise to prevent interference with an

investigation.") (quotations omitted).  The DOJ Presentations and Communications that the UCC

demands were provided to the DOJ in the course of an ongoing investigation and settlement

negotiations pursuant to Federal Rules of Evidence 408 and 410.  The same public interest in

encouraging disclosure and cooperation with law enforcement agencies that the court

emphasized in *Police & Fire Retirement System* applies equally in this instance; requiring the

Debtors to produce presentations made to DOJ to aid its investigative efforts and

communications exchanged with DOJ in the course of settlement negotiations will inhibit parties

from sharing such materials with  investigative agencies in the future for fear that they will

become discoverable.

## III.      The Court Should Enter a Protective Order to Protect the Reorganization Process and Preserve Estate Resources

86.      It is axiomatic that courts may "limit or forbid unduly burdensome discovery."  *In*

*re Residential Capital, LLC*, 480 B.R. 529, 542 (Bankr. S.D.N.Y. 2012); *see also In re Lozano*,

392 B.R. 48, 59 (Bankr. S.D.N.Y. 2008).  The touchstone of the analysis is proportionality.

"Even when the party seeking discovery establishes its relevance, a court may limit the discovery

if the burden or expense of the proposed discovery outweighs its likely benefit."  *In re Musicland*

*Holding Corp.*, 424 B.R. 95, 100 (Bankr. S.D.N.Y. 2010) (quotations omitted).  Counsel for the

UCC has acknowledged as much.  (July 23, 2020 Omnibus Hr'g Tr. 44:12-20) (observing that

**REDACTED**

the relevant question is whether "the burden is undue under the circumstances" and whether it is

"proportional to the needs of the case").  The UCC's latest efforts to obtain incremental

information from the Debtors—efforts, it bears repeating, that the Debtors have cooperated with

for over a year, day after day, week after week, month after month—now far exceed any

reasonable sense of proportionality and measure, and have done so for some time.  For this

reason, the Debtors request that the Court enter a protective order, in substantially the form

attached hereto, providing two forms of relief.

87.     First, while the Privilege Motions should be denied on their own terms, they

should be denied on the separate basis that they are wholly inconsistent with the needs of the

cases and the Court's clear instructions on the scope of due diligence discovery efforts.  As set

forth above, the UCC fails to explain why the tens of millions of pages of materials and other

information that it has already received from the Debtors and other parties is insufficient to

permit it to analyze the potential value of estate claims and effectively negotiate with the

Sacklers.  Parties almost always assess and resolve their disputes with far less information, and

the UCC has not shown why it should be treated differently here.

88.     Second, and for substantially the same reasons, the Debtors request that the Court

enforce its stated parameters on discovery and limit any further discovery of the Debtors to that

which the Debtors have already agreed and focused on estate claims and third-party

releases.  The parties have been engaged in discovery for over a year, and an "immense" amount

of disclosure—over 90 million pages—has occurred.  (Sept. 30, 2020 Omnibus Hr'g Tr. 82:4-

17.)  To date, the UCC has received tens of millions of historical documents, tens of thousands of

pages of company diligence material, and hundreds of pages of original analysis produced by the

Debtors in the course of their own investigations that are directly pertinent to the UCC's estate

REDACTED

claims investigation.  The UCC has taken five depositions and has noticed many others.  It is pursuing completing discovery from the IACs and Norton Rose.  In this Court's own words: "At some point the information process needs to stop, because you're going to reach the point of diminishing returns in terms of the cost versus the value."  (May 1, 2020 Discovery Hr'g Tr. 103:17-104:7).  As set forth above, we have certainly now reached, if not exceeded, that point.

### No Prior Request

89.     No previous request for the relief sought herein has been made by the Debtors to this Court or any other court.

### Notice

90.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [Dkt. No. 498] and available on the Debtors' restructuring case website at https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion. The Debtors respectfully submit that no further notice is required.

### Conclusion

91.     For all of the foregoing reasons, the Debtors respectfully request that this Court deny the UCC's Privilege Motions and grant Debtors' motion for a protective order.

**REDACTED**

Dated:   October 14, 2020
             New York, New York

By: /s/ Benjamin S. Kaminetzky

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:     (212) 450-4000
Facsimile:      (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy
Garrett L. Cardillo

*Counsel to the Debtors*
*and Debtors in Possession*