Gerard Uzzi
Alexander B. Lees
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Gregory P. Joseph
Mara Leventhal
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Facsimile: (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>Debtors. [1] | Chapter 11<br>Case No. 19-23649 (RDD)<br>Jointly Administered |

**AMENDED RAYMOND SACKLER FAMILY'S OPPOSITION TO THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS' EXCEPTIONS MOTION**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. ("**PPI**") (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 6

I.    THE EVIDENCE UNIFORMLY DEMONSTRATES THAT
      DISTRIBUTIONS BETWEEN 2008 AND 2017 WERE MADE WITHOUT
      FRAUDULENT INTENT ............................................................................ 6

      A.    2007 Plea and Settlements ........................................................... 7

      B.    PPLP Was Solvent When Distributions Were Made................... 8

      C.    The Challenged Distributions ..................................................... 9

      D.    No Evidence That PPLP Or Family Members Anticipated The 2017
            Litigation Explosion ……………………………………………...10

            1.    There Was No Meaningful Litigation When Distributions Were
                  Made …………………………………………………………… 12

            2.    PPLP Had Huge Cash Reserves When Distributions Were
                  Made ...…………………………………………………………14

            3.    Board Documents Confirm That PPLP And The Board Did
                  Not Expect PPLP to Face Judgments PPLP Could Not Pay…...…14

            4.    Side B Was Intent on Keeping Money Invested in PPLP….……...16

            5.    Far From Being Stripped of Its Assets, PPLP Invested ███████
                  ███ Dollars in Research and Development after 2007 ……….…...18

            6.    The UCC Identifies No Evidence Even Suggesting That Family
                  Member Defendants Harbored Litigation Concerns ……………..19

                  a.    November 2006 Email From Jonathan Sackler…………...19

                  b.    May 2007 Email From David Sackler………………….....20

                  c.    May 2007 Email From Richard Sackler…………….…….21

                  d.    July 2007 Peter Boer Memorandum………………..….…21

                  e.    PPLP's Product Liability Insurance Status is Irrelevant ….23

II.   THE UCC'S CLAIM OF FRAUDULENT BREACH OF FIDUCIARY DUTY
      HAS NO EVIDENTIARY SUPPORT…………………………………………..25

      A.    The Board Reasonably Relied on Management and the OIG Monitor's
            Repeated Assurances That PPLP Was Operating in Compliance with
            Law……………………………………………………………………..26

      B.    The UCC's Crime-Fraud Motion Requires Proof That PPI's Board
            Intentionally Hurt PPLP—And No Proof Is Offered……………………..29

i

ARGUMENT ........................................................................................................ 29

I.    THERE IS NO BASIS FOR THE UCC'S ASSERTION OF THE  CRIME-FRAUD EXCEPTION TO ATTORNEY-CLIENT PRIVILEGE ....................... 29

A.    The Crime-Fraud Exception Is Narrow ..................................... 30

B.    The Requirement of Proving "Probable Cause" to Believe A Fraud Has Been Committed Is Unsatisfied—Let Alone That The Communications Furthered It ................................................. 31

C.    The UCC's Breach of Fiduciary Duty and Other Wrongdoing Theories of Crime-Fraud Fail Legally As Well As Factually .................................. 36

D.    The UCC Cannot Meet The "In Furtherance" Requirement By Showing That Documents Are "Reasonably Related To" A Crime Or Fraud ......... 37

E.    A Purdue Guilty Plea Would Not Bolster The UCC's Infirm Crime-Fraud Showing ........................................................... 41

II.   THERE IS NO BASIS FOR THE UCC'S ASSERTION OF AN AT-ISSUE WAIVER OF ATTORNEY-CLIENT PRIVILEGE ........................................... 42

A.    The At-Issue Waiver Doctrine Does Not Apply Because Side B Has Not Asserted Any Claims Or Defenses ...................................... 43

B.    Side B's December 2019 Presentation Identified All of Its Sources, None of Which Involved Privileged Legal Communications .................. 43

1.    Advocacy Based on Non-Privileged Documents Regarding PPLP's Compliance Program Did Not Waive Privilege ............ 44

2.    Arguments The Fraudulent Conveyance Claims Will Fail Do Not Waive Any Privilege ………………………………………46

C.    The UCC's At-issue Arguments Seek the Debtors' Privileged Information ........................................................... 48

CONCLUSION .................................................................................................... 49

REDACTED

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 650 Fifth Ave.*,
2013 WL 3863866 (S.D.N.Y. July 25, 2013) ..........................................................40

*Amusement Industry, Inc. v. Stern*,
293 F.R.D. 420 (S.D.N.Y. 2013) ...........................................................................37

*Arista Records LLC v. Lime Grp. LLC*,
2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)....................................................45, 46

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
210 F.R.D. 506 (S.D.N.Y. 2002) ............................................................................46

*Bernstein v. Village of Wesley Hills*,
95 F. Supp. 3d 547 (S.D.N.Y. 2015)........................................................................26

*Bodie v. Purdue Pharma Co.*,
236 F. App'x 511 (11th Cir. 2007) ..........................................................................13

*Boysaw v. Purdue Pharma*,
2008 WL 4452650 (W.D. Va. Sept. 30, 2008), *aff'd*, 320 F. App'x 178 (4th
Cir. 2009) .................................................................................................................13

*In re Braus*,
248 F. 55 (2d Cir. 1917).........................................................................................34

*Brennan v. 3250 Rawlins Ave. Partners, LLC*,
171 A.D. 3d 603 (1st Dep't 2019) ..........................................................................11

*Carlyle, LLC v. Quik Park 1633 Garage LLC*,
75 N.Y.S. 3d 139 (1st Dep't 2018) ..........................................................................11

*Cendant Corp. v. Shelton*,
246 F.R.D. 401 (D. Conn. 2007)........................................................................34, 35

*Clark v. United States*,
289 U.S. 1 (1933).....................................................................................................33

*In re County of Erie*,
546 F.3d 222 (2d Cir. 2008).......................................................................... *passim*

*Duttle v. Bandler & Kass*,
127 F.R.D. 46 (S.D.N.Y. 1989) ...............................................................................37

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
  2020 WL 3513670 (S.D.N.Y. June 27, 2020) .......................................................44

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
  392 F. Supp. 3d 244 (D.P.R. 2019)........................................................................34

*Foister v. Purdue Pharma, L.P.,*
  295 F. Supp. 2d 693 (E.D. Ky. 2003) .....................................................................13

*In re Fresh Del Monte Pineapple Antitrust Litig.,*
  2007 WL 64189 (S.D.N.Y. Jan. 4, 2007) ...............................................................34

*Galaxy CSI, LLC v. Galaxy Computer Services, Inc.,*
  2004 WL 3661433, (E.D. Va. Mar. 31, 2004) ..................................................35, 36

*In re Gen. Motors LLC Ignition Switch Litig.,*
  2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015) .............................................. *passim*

*In re Grand Jury Proceedings,*
  219 F.3d 175 (2d Cir. 2000)....................................................................................46

*In re Grand Jury Subpoena Duces Tecum,*
  731 F.2d 1032 (2d Cir. 1984)..................................................................................31

*Hartford Fire Ins. Co. v. CMC Constr. Co., Inc.,*
  2010 WL 11520219, (E.D. Tenn. Apr. 20, 2010)...................................................46

*Hickman v. Taylor,*
  329 U.S. 495 (1947)................................................................................................31

*Irving Tr. Co. v. Gomez,*
  100 F.R.D. 273 (S.D.N.Y. 1983) ......................................................................36, 37

*John Doe Co. v. United States,*
  350 F.3d 299 (2d Cir. 2003), *as amended* (Nov. 25, 2003)...............................5, 44

*Koenig v. Purdue Pharma Co.,*
  435 F. Supp. 2d 551 (N.D. Tex. 2006) ...................................................................13

*Labzda v. Purdue Pharma, L.P.,*
  292 F. Supp. 2d 1346 (S.D. Fla. 2003) ...................................................................13

*Marchand v. Barnhill,*
  212 A.3d 805 (Del. 2019) .......................................................................................42

*McCauley v. Purdue Pharma, L.P.,*
  331 F. Supp. 2d 449 (W.D. Va. 2004) ....................................................................13

*In re: National Prescription Opiate Litigation*,
  No. 19-MDL-2804, (N.D. Ohio Aug. 19, 2019), ECF No. 2483............................................26

*In re Omnicom Grp., Inc. Sec. Litig.*,
  233 F.R.D. 400 (S.D.N.Y 2006) ......................................................................................31

*Oxyn Telecommc'ns, Inc. v. Onse Telecom*,
  2003 WL 660848 (S.D.N.Y. Feb. 27, 2003)....................................................................48

*Parneros v. Barnes & Noble, Inc.*,
  332 F.R.D. 482 (S.D.N.Y. 2019) ...............................................................................47, 48

*In re Purdue Pharma L.P.*,
  No. 07-C-00740 (Ky. Cir. Ct. May 8, 2007) ...................................................................8

*In re Purdue Pharma L.P.*,
  No. 19-23649-rdd (Bankr. S.D.N.Y. Dec. 16, 2019), ECF No. 654-1 .................................9

*In re Richard Roe, Inc.*,
  168 F.3d 69 (2d Cir. 1999)......................................................................................31, 37, 39

*In re Richard Roe, Inc.*,
  68 F.3d 38 (2d Cir. 1995) ........................................................................................ *passim*

*RTN Networks, LLC v. Telco Grp. Inc.*,
  126 A.D. 3d 477 (1st Dep't 2015) ...................................................................................11

*SEC v. Webb*,
  2019 WL 1454532 (N.D. Ill. Apr. 2, 2019) ....................................................................41

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities*
  *LLC*, 319 F.R.D. 100 (S.D.N.Y. 2017) ......................................................................35, 36

*Standard Chartered Bank PLC v. Ayala Holdings (U.S.), Inc.*,
  111 F.R.D. 76 (S.D.N.Y. 1986) .....................................................................................48

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het*
  *Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
  327 F.3d 173 (2d Cir. 2003)............................................................................................41

*Tennessee v. Purdue Pharma L.P.*,
  2007 WL 2905352 (Ten. Cir. Ct. May 8, 2007) ...............................................................7

*Timmons v. Purdue Pharma Co.*,
  2006 WL 263602 (M.D. Fla. Feb. 2, 2006) ....................................................................13

*United States v. The Purdue Frederick Co.*,
  1:07-cr-00029 (W.D. Va. May 10, 2007), ECF No. 5-4....................................................7, 8

*United States v. The Purdue Frederick Co.*,
    1:07-cr-00029 (W.D. Va. May 10, 2007), ECF No. 6 ....................................................7, 8, 27

*United States v. The Purdue Frederick Co.*,
    1:07-cr-0029 (W.D. Va. May 10, 2007), ECF No. 5-5......................................................11, 27

*United States v. Purdue Frederick Co.*,
    495 F. Supp. 2d 569 (W.D. Va. 2007) .................................................................................13

*United States v. Stewart*,
    2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003) ....................................................................39

*United States v. White*,
    887 F.2d 267 (D.C. Cir. 1989) .............................................................................................38

*United States v. Zolin*,
    491 U.S. 554 (1989)........................................................................................................30, 41

## Rules & Statutes

Fed. R. Bankr. P. 9031 ..................................................................................................................5

Fed. R. Bankr. P. 9031, 1983 Advisory Committee Note ............................................................5

## PRELIMINARY STATEMENT[2]

On December 6, 2019, pursuant to ¶17(b) of the So-Ordered Amended and Restated Case Stipulation dated November 20, 2019 (ECF No. 518) ("**November Stipulation**"), counsel for the Sackler family provided "a thorough explanation and analysis of the defenses that the Shareholder Parties intend to make with regard to any and all causes of action that have been or may be … brought against them."  The presentation on behalf of members of the Raymond Sackler Family ("**Side B**")[3] was made orally and visually, with a 580-slide deck (the "**Presentation**") that set forth in detail overwhelming evidence that the allegations against the Raymond Sackler Family in the underlying litigation are factually unsupported, and the numerous reasons why the legal claims against them will fail.

So compelling was the Presentation that, before it ended, a member of the Ad Hoc Group of Non-Consenting States ("**NCSG**") asked to be heard and said: "Listening to his presentation … you would think that my office … filed a complaint based on legally unsustainable theories, many legally unsustainable theories, cherry picked the facts, distorted the documents, and committed various other sins bordering on—if not incompetence then malpractice and something akin to Rule 11 violations."  Ex. 96 (Tr. 107:16–25).  But, far from identifying any facts that the Presentation did not accurately set forth, the NCSG-member demurred, stating, "I don't intend here to walk through and try in the few minutes that I've asked for to address the multiple []

---

[2]     "**Ex.**" refers to exhibits of the accompanying Declaration of Mara Leventhal.  "**Exceptions Motion**" refers to the brief in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege*, and "**Hurley Ex.**" refers to exhibits to the Declaration of Mitchell Hurley submitted with the Exceptions Motion.   "**PPLP**," "**PPI**," and "**Debtors,**" sometimes referred to as "**Purdue,**" have the meaning set forth in n.1, *supra*.

[3]     The Raymond Sackler Family includes Richard Sackler, David Sackler, and the estates of the late Jonathan Sackler and Beverly Sackler.

legal [and] factual assertions that have been advanced today." Ex. 96 (Tr. 108:1–4).  Instead, he

left.

Side B furnished all of the supporting documents for the Presentation, all of which were

drawn from Purdue's productions in the pre-petition litigation or from the public domain.  In the

more than 10 months since, the UCC has engaged in a scorched-earth discovery onslaught to try,

in vain, to find a shred of evidence to refute the uncontradicted record that the members of the

Raymond Sackler Family did not engage in any of the wrongful conduct alleged against them in

the underlying litigation.  In particular, the UCC has not identified any evidence that any

distributions by the Debtors—which stopped in 2017, the same year that new opioid litigation

filings against PPLP erupted from just 2 the year before to 330—were made with the intent to

hinder, delay or defraud any creditors.  There is no such evidence, as the UCC's Exceptions

Motion makes all too clear.

In its Exceptions Motion, the UCC assumes a significant burden—to show that it has

developed such a compelling record of evidence against Side B that the long-standing

protections for the attorney-client privilege should be set aside pursuant to the crime-fraud

exception or because Side B placed advice of counsel at issue.  The UCC has utterly failed to

meet that burden.  What the UCC's motion actually shows is the utter lack of evidence to

substantiate the UCC's professed "probable cause" showing of fraudulent conveyance, breach of

fiduciary duty, or waiver by Side B.  The evidence is all to the contrary.  And all of the

supposedly at-issue communications (i) were not communications from counsel and (ii) have

been produced.

**Crime-Fraud.**  The UCC contends that Side B's privilege should be set aside on the

theory that there is probable cause to believe that Side B family members committed a fraud:

either by approving fraudulent transfers from PPLP or by breaching fiduciary duties.  To invoke

the crime-fraud exception, the UCC must demonstrate "probable cause to believe that a crime or

fraud has been attempted or committed" and that the requested communications "were in

furtherance thereof." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("***Roe I***").  The

UCC's arguments fail on both grounds.

*First*, the UCC's motion focuses on distributions that PPLP made between 2008 and 2017

(the "**Distributions**"), which it contends were fraudulent transfers or were approved by PPI

Board members in breach of their fiduciary duties.  The UCC has identified no evidence of fraud,

much less sufficient evidence to establish probable cause and breach the privilege.  The actual

record—detailed below—conclusively establishes that no significant litigation had been filed or

was anticipated when any of the Distributions was made, and all Distributions immediately

stopped when the wave of litigation hit.  When the Distributions were made:

- PPLP faced no threatening opioid litigation.  The few governmental claims and investigations it faced were settled for manageable amounts.  For example, in 2015, PPLP settled an investigation by the New York Attorney General's Office for just $75,000 and settled a long-running lawsuit by Kentucky for $24 million to be paid over 8 years.  Products liability cases were dismissed, settled or dormant.

- PPLP was generating ▮▮▮▮ of dollars in sales revenue every year.

- The Board left immense amounts of unrestricted cash in PPLP at year end, over a ▮▮▮▮ dollars a year—every year—from 2014 on.

- Side B wanted to keep even _more_ money in PPLP    and was even willing to lend money to PPLP.

- PPLP had no funded debt and no meaningful obligations of any kind.

- Over two-thirds of the Distributions were made when the federal monitor was in place (2008-2012), and the Board was advised each year that the federal monitor confirmed PPLP's compliance with its Corporate Integrity Agreement ("**CIA**").

- Far from being stripped of its assets, PPLP invested over ▮▮▮▮ in Research and Development and developed new FDA-approved medicines.

The paltry evidence the UCC points to consists of a handful of communications about

litigation risk in 2007—some before and some just after The Purdue Frederick Company, Inc.

("**Purdue Frederick**") entered into a plea agreement with the U.S. Department of Justice

3

("**DOJ**").  The Purdue entities ended up settling not only with the federal government in but also,

within the next two months, 49 states and the District of Columbia *resolving those risks*.

Alternatively, the UCC purports to premise fraud on notices PPLP provided to its insurers



.  The evidence starkly refutes that.  For example,

Ex. 73 at –570.  More than 50 million pages of documents have been produced in this case.  The

UCC cannot find anything in those documents, or in any of the depositions to date, to establish

probable cause for either fraudulent transfer or fiduciary breach.  Nor can the UCC satisfy its

obligation to proffer evidence of intentional fraud—which is required to justify application of the

crime-fraud exception, (*see* Argument § I)—because there is none.

Second, the UCC has completely failed to show that any of "the [requested]

communications were in furtherance" of a fraud.  *Roe I*, 68 F.3d at 40.  Instead, the UCC has

used a blunderbuss approach asking this Court to set aside the privilege for a huge number of

documents, or review them *in camera*, in the hope that they *might* contain evidence of

wrongdoing.  That is insufficient.  *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 2015

WL 7574460, at *6 (S.D.N.Y. Nov. 25, 2015) ("Plaintiffs' bid falls short ... with respect to the

second prong of the crime-fraud test [because they] do not provide a factual basis for a good

faith belief that the communications and work product they seek—let alone any *particular*

communications or work product they seek—were made with the intent to further a crime or

fraud." (emphasis in original)).

Further, to the extent the UCC suggests that the Court might appoint a special master,

4

that is legally groundless.  Special masters are not permitted in bankruptcy matters.  *See* Fed. R.

Bankr. Pro. 9031 ("Rule 53 F.R.Civ.P. does not apply in cases under the Code."), 1983 Advisory

Committee Note ("This rule precludes the appointment of masters in cases and proceedings

under the Code").

**At-Issue Waiver.**  The UCC vainly argues that the Presentation—which demonstrated

that plaintiffs in the underlying litigation cannot show that any members of Side B breached any

legal obligations—waived privilege on an at-issue basis.  This argument fails for three reasons.

*First*, the Presentation advanced arguments based on <u>non-privileged documents produced</u>

<u>by the Debtors in pre-petition litigation or available in the public domain</u>.  Every document was

cited by Bates number or URL.  None of these reflected a privileged communication.

*Second*, at-issue waiver applies only in litigation, when a party relies on advice of counsel

in a claim or defense it has asserted.  *See In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008).

Arguments by one set of counsel to another do not effect an at-issue waiver.  *See John Doe Co.*

*v. United States*, 350 F.3d 299, 301, 306 (2d Cir. 2003), *as amended* (Nov. 25, 2003) (rejecting

argument that letter by counsel to government asserting company's "good faith belief that its

actions … were in conformity with law" effectuated at-issue waiver).  Here, the UCC is

investigating potential claims and, pursuant to ¶17(b) of the November Stipulation, Side B was

explaining "the defenses that the Shareholder Parties intend to make."  The UCC's other infirm

contention, that at-issue waiver occurs whenever counsel asserts their client's good faith—even

where the argument does not depend on reliance on legal advice—contravenes binding Second

Circuit precedent.  *Cnty. of Erie*, 546 F.3d at 229.

*Third*, the UCC's at-issue waiver arguments are aimed at the wrong party.  The privileged

information that the UCC seeks is ***the Debtors'***.  The Debtors produced the documents on which

Side B relied.  None was privileged, but if it had been, the privilege belonged to the Debtors.

The UCC's discovery program has led to the production of a vast number of documents at great expense.  After sifting through those documents, the UCC has turned up no evidence of intentional wrongdoing by the members of the Sackler family who served on PPI's Board.[4] Now, the UCC asks for permission to rifle through privileged documents in the hope that it will come across something, anything, to support the distorted media furor about the Sackler family.  But the UCC's paltry showing on this motion reflects the futility of its colossally expensive discovery operation.  The Exceptions Motion is groundless and should be denied.

## BACKGROUND

### I.    THE EVIDENCE UNIFORMLY DEMONSTRATES THAT DISTRIBUTIONS BETWEEN 2008 AND 2017 WERE MADE WITHOUT FRAUDULENT INTENT

The UCC does not even argue, much less offer evidence to prove, that any of the claims against PPLP in the underlying litigation can be established.  It assumes PPLP's underlying liability—which has never been substantiated by any judgment and has been hotly contested[5]— and then argues that Distributions between 2008 and 2016 were fraudulent transfers because they were made with knowledge that PPLP was likely to face "████████████."  *See* Exceptions Motion ¶11, *et seq*.  This is a threshold failure that vitiates the UCC's attempt to establish that

---

[4]    The only document produced by Side B in the Exceptions Motion is Hurley Ex. 83—which the UCC seems to have attached only to avoid the embarrassment of citing no documents.  It is a 2012 email from David Sackler—before he became a PPI Board member or had any other role at Purdue—to his father, Richard Sackler, forwarding a publicly available letter from two Senators to Purdue's then-CEO.  *Id.*; *see also* https://www.finance.senate.gov/imo/media/doc/Purdue_May_8.pdf.  The only text in the email says, "█████████" The UCC cites this email only to prove the existence of the publicly available letter.  Exceptions Motion ¶34.  The email proves nothing, other than that the UCC has no evidence to substantiate its claims.

[5]    When the Debtors commenced these proceedings, not a single judgment had been entered against Purdue, and two had been entered in its favor.  Debtors commenced these proceedings because of the "sheer number and scale" of the more than 2,600 lawsuits against Purdue, not because they had any merit.  *See* Debtors' Informational Brief at 37, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Sept. 9, 2019) (ECF No. 17) ("**Debtors' Informational Brief**").

any of the Distributions were fraudulent.  Without showing Purdue's underlying liability in

connection with its marketing and sale of opioids, the UCC cannot show that Purdue was

insolvent at any time in the past, that Purdue had any tort claimants that it could have intended to

defraud, or that there is a "triggering creditor" for purposes of section 544(b), which is the

provision on which the estate must rely to recover nearly all the Distributions, since they

occurred more than two years before the petition date.

Overwhelming evidence establishes that PPLP was and remained solvent and adequately

capitalized on the date of each Distribution, that neither PPLP nor the family member defendants

believed PPLP would incur debts beyond its ability to pay, and that PPLP did not intend to harm

future tort claimants.

### A.  2007 Plea and Settlements

In 2007, before the Distributions at issue were made, Purdue Frederick entered into a plea

agreement with the U.S. Department of Justice and paid in excess of $600 million to settle claims

brought by the federal government and 49 states,[6] and an additional $19.5 million in connection

with the Consent Judgment it entered into with 26 states and the District of Columbia.[7]  As a

result of these settlements, the federal government and every state had by July 2007 released

---

[6]    *See* Plea Agreement, *United States v. The Purdue Frederick Co.*, 1:07-cr-00029 (W.D. Va.
May 10, 2007) (ECF No. 6) ("**Plea Agreement**"); Information, Attachment D, *United States v.
The Purdue Frederick Co.*, 1:07-cr-00029 (W.D. Va. May 10, 2007) (ECF No. 5-4) ("**Civil
Settlement Agreement**").

[7]    *See, e.g.*, Agreed Final Judgment, *Tennessee v. Purdue Pharma L.P.*, 2007 WL 2905352,
at *6 (Ten. Cir. Ct. May 8, 2007).  Purdue had previously settled other lawsuits and investigations
brought by state governments.  In 2002, an investigation by the State of Florida resulted in a
payment of $500,000; in 2004, an action brought by the Attorney General of West Virginia was
settled for $10 million; and in 2006, an investigation by the State of Mississippi was settled for
$250,000.  *See* Debtors' Informational Brief, *supra* note 5, at 34; Ex. 1 (Settlement Agreement &
Release).

claims against PPLP and the Sackler family based on PPLP's marketing of OxyContin for all periods preceding the releases.[8]

### B. PPLP Was Solvent When Distributions Were Made

At the time of the Distributions, PPLP was demonstrably solvent.  Among other facts detailed below, many of which are addressed in the Presentation but are conveniently omitted from the excerpts submitted with Hurley Ex. 58 at Slides 470, 488, 493):[9]

- PPLP's ███████ far exceeded its distributions,[10] and the Board left enormous amounts of ████ in PPLP *after* distributions—over ███████████, every year from 2014 on.[11]

- PPLP had no funded debt.[12]

- PPLP did not face meaningful opioid litigation.  PPLP faced none of the suits that ultimately precipitated its bankruptcy filing until 2014, when 2 were filed, and only 3 more followed in 2015-16.[13]

- When the wave of litigation hit in 2017, the Board immediately ceased distributions.[14]

- Contemporaneous PPLP documents, including ████████████████ and numerous other submissions to the Board, demonstrate that PPLP did not in fact perceive a threat from opioid—or any other—litigation from 2008 through 2016. *See infra* § I.D.3.

- The same evidence establishes that, as late as 2016, PPLP thought  and advised the Board  that its ████████████████. *See id.*

---

[8]    *See, e.g.*, Civil Settlement Agreement, *supra* note 6, at ¶2; Plea Agreement, *supra* note 6, at ¶11; Consent Judgment at ¶35, *In re Purdue Pharma L.P.*, No. 07-C-00740 (Ky. Cir. Ct. May 8, 2007).

[9]    A complete copy of the "Fraudulent Transfer Claims" part of the Side B Presentation is provided for context. *See* Ex. 94.

[10]    Ex. 94 at Slide 496 (Side B Fraudulent Transfer Slides).

[11]    § I.D.2, *infra*.

[12]    Debtors' Informational Brief, *supra* note 5, at 1.

[13]    *See* § I.D.1, *infra*.

[14]    *Id.*

- Over two-thirds of all distributions were made in 2008-2012, while the federal monitor was in place and was confirming, every year, that PPLP was operating in compliance with the CIA, and thus in compliance with federal law. *See id.*

- JPMorgan, Moody's and S&P all evaluated PPLP in 2014-2016 and concluded it was ███████████████████.[15]

- Other opioid manufacturers, which have been sued alongside PPLP for causing the opioid crisis, were not viewed by market participants as being insolvent based on the threat of future litigation and judgments. They continued to access the capital markets and repeatedly raised debt financing throughout the period when Distributions were made. Their bond prices did not materially decline in value until after the Distributions ceased, and credit rating agencies did not perceive substantial risk for these companies until then.[16]

### C. The Challenged Distributions

During the period from 2008 to 2017, PPLP cash distributions[17] amounted to $10.346 billion.[18] These distributions fall into three categories:

(1)    $4.1 billion in **"US Partner Distributions,"** which were transfers to the limited partner of PPLP and ultimately to trusts of which certain Sackler family members are beneficiaries. The AlixPartners Cash Transfers of Value Analysis Report shows

---

[15]    Ex. 95 at Slides 511-13 (Side B Fraudulent Transfer Slides).

[16]    Ex. 95 at Slides 514-28 (Side B Fraudulent Transfer Slides).

[17]    The UCC also challenges certain non-cash transfers from Purdue to the IACs and PRA, (Exceptions Motion ¶44)—which it estimates (without support) are worth ███████████ (*id.*, ¶45).

[18]    *See* AlixPartners Cash Transfers of Value Analysis Report at Slides 11, 25, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Dec. 16, 2019), ECF No. 654-1. PPLP is a Delaware limited partnership. PPLP's general partner is PPI. PPLP is wholly owned by Pharmaceutical Research Associates L.P. (**"PRA"**), a Delaware limited partnership. PRA is ultimately 99.5% owned by two entities in equal part, Beacon Company (**"Beacon"**), a Side A Delaware general partnership, and Rosebay Medical Company L.P. (**"Rosebay"**), a Side B Delaware limited partnership. ████████████████████. The remaining equity interest in PRA (about 0.5%) is owned in approximately equal parts by PLP Associates Holdings Inc. (**"PLP"**), a New York corporation, and PPI. ████████████████. PPI is owned 50% by Side A and 50% by Side B. ████████████████. *See generally* Ex. 95 at Slides 4, 23-29, 77, 79, 81 (Nov. 22, 2019 Raymond-side Informational Presentation); Debtors' Informational Brief, *supra* note 5, at 8, 16 & Appendix A.

that these largely stopped in 2016, with a small distribution made in 2017.

(2)  $1.6 billion in "**Ex-US Distributions**," which are amounts ultimately reinvested in the IACs (Independent Affiliated Companies).  The last of these distributions was made in 2016.

(3)  $4.7 billion in "**Tax Distributions**," which PPLP (a pass-through entity for tax purposes) calculated by estimating the taxes associated with its income, and then distributed.

All cash distributions from 2008 through 2017 are reflected in this AlixPartners chart:[19]



### D. No Evidence That PPLP Or Family Members Anticipated The 2017 Litigation Explosion

The UCC's theory of intentional fraud is that the Sackler families began, as early as 2008, to siphon profits because they wanted "to transfer value out of Purdue and away from creditors as a result of the 'uncapped nature' of Purdue's potential opioid liability."  Exceptions Motion ¶59.  But actual intent cannot be determined with hindsight.  The current flood of opioid cases did not begin until 2017, at which point the distributions immediately ceased.  At the time the distributions were made, in 2008-2016, the evidence establishes that PPLP did not in fact

---

[19]    AlixPartners Cash Transfers of Value Analysis Report, *id.*, at Slide 25.

perceive a threat from opioid—or any other—litigation and repeatedly so advised the Board. The massive discovery record proves that as late as 2016, PPLP believed—and advised the Board—that its ████████████████████████████.[20]

Critically, over two-thirds of the Distributions were made in 2008-2012, when PPLP was under a federal monitorship, as required by PPLP's Corporate Integrity Agreement.[21] Each year, the federal monitor—the Office of Inspector General of the Department of Health and Human Services—confirmed to PPLP and to the Board that PPLP was operating in compliance with the CIA, which was designed to ensure compliance with federal healthcare law.[22] Neither PPLP nor the Board had any reason to expect overwhelming litigation—and judgments in amounts PPLP could not satisfy—from operations being conducted in full compliance with law.

Further, the evidence establishes that every quarter from 2007 to 2018, when the last Side B director left the PPI Board, management certified to the Board—and documented in detailed compliance reports—that PPLP was operating in compliance with law.[23] On that understanding, Side B directors had no reason to anticipate significant future litigation—let alone the avalanche that descended in 2017—at the time the distributions were approved.

---

[20]    *See Carlyle, LLC v. Quik Park 1633 Garage LLC*, 75 N.Y.S. 3d 139, 140 (1st Dep't 2018) ("the timing of the allegedly fraudulent transfers—beginning [] years before the judgment debtors incurred the subject debts—undermines the claim of fraudulent intent."); *RTN Networks, LLC v. Telco Grp. Inc.*, 126 A.D. 3d 477, 478 (1st Dep't 2015) (affirming dismissal when "it [wa]s clear from the complaint that the judgment had not yet been obtained at the time of the transaction at issue"); *Brennan v. 3250 Rawlins Ave. Partners, LLC*, 171 A.D. 3d 603, 605 (1st Dep't 2019) (no DCL § 276 liability when plaintiff did not allege that defendants "had notice of plaintiff's claims before any of the transfers were made or were unable to pay them").

[21]    Information, Attachment E, at 6-16 and Appendix B, § I, *United States v. The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007), ECF No. 5-5 (CIA).

[22]    *See* Hurley Ex. 58 at Slide 33 and the cited documents referenced at n.83, *infra*.

[23]    *See* Hurley Ex. 58 at Slide 35 and the cited documents referenced at n.23, *infra*.

### 1.    There Was No Meaningful Litigation When Distributions Were Made

None of the 2,600+ opioid cases that precipitated Purdue's bankruptcy filing (the "**Chapter 11-Triggering Opioid Cases**")[24] was commenced until 2014, when two were filed. One more was commenced in 2015; two in 2016; and the avalanche began only in 2017:



In the pre-2017 period, governmental claims and investigations were resolved for reasonable amounts. In 2015, PPLP settled an investigation by the New York Attorney General with a payment of just $75,000.[25] In 2015 it settled a longstanding litigation brought by the Attorney General of Kentucky for $24 million to be paid over 8 years. The amount of this settlement was inflated because PPLP had been judicially determined to have admitted liability by failing to respond to requests for admission. *See* Ex. 70 (PPLPUCC000701839). Even this

---

[24]    Debtors' Informational Brief, *supra* note 5, at 1; Complaint for Injunctive Relief at 1, *Purdue v. Commonwealth of Massachusetts*, Adv. Proc. 19-08289-rdd (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 1; *id*. at ECF No. 1-3 (Ex. C - list of pending opioid cases) (excluding non-US cases).

[25]    *See* Assurance of Discontinuance, *In the Matter of Purdue Pharma L.P.*, Assurance No. 15-151 (N.Y. Aug. 19, 2015).

inflated amount, multiplied by 50 states, would be a fraction of a single year's sales revenue for PPLP.

Products liability suits were never a threat to Purdue. It won many suits brought by individuals claiming harm from OxyContin.[26] Thousands more such claims were settled on extremely manageable terms.[27]  By 2008, management advised the Board that ████████████ ████████████████████████████████████████████████,[28] less than ███████ of that year's revenue. By 2010-11, there were ████████████████████████ ████████████████████████████████████.[29]  The number of products suits declined after that, and all were dormant by 2014-15.[30]

---

[26]  *See, e.g., Boysaw v. Purdue Pharma*, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008), *aff'd*, 320 F. App'x 178 (4th Cir. 2009) (affirming dismissal OxyContin products liability claim); *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. 2007) (same); *Timmons v. Purdue Pharma Co.*, 2006 WL 263602 (M.D. Fla. Feb. 2, 2006) (dismissing OxyContin product liability claims); *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003) (same); *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346 (S.D. Fla. 2003) (same); *Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551 (N.D. Tex. 2006) (same); *McCauley v. Purdue Pharma, L.P.*, 331 F. Supp. 2d 449 (W.D. Va. 2004) (same); *see also United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007) (accepting guilty plea; recognizing that "Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries.").

[27]  *See, e.g.*, Ex. 3 (PPLPC044000010048 at –49, –51) (████████████████ ████ ██████████████████████████████████).

[28]  *See, e.g.*, Ex. 6 (1/11/08 Board Agenda Book) (PPLP004400663 at –677) ("████ ████████████████████████").

[29]  *See* Ex. 40 (2010-11 Financial Statements) (PPLPMDL0040000537 at –574).

[30]  *See* Ex. 47 (2011-12 Financial Statements) (PPLPC029000544177 at –208) (████ ████████████████████████), Ex. 62 (2013-14 Financial Statements) (POK003285615 at –655) (████████████████████); Ex. 74 (2014-15 Financial Statements) (PPLPC011000090527 at –570) (████████████████████████████); Ex. 77 (2015-16 Financial Statements) (PPLPC021000890262 at –304) (████████████████).

### 2.    PPLP Had Huge Cash Reserves When Distributions Were Made

At the time each distribution was made, PPLP maintained a massive cash reserve.  As the chart below reflects, from 2009 to 2015, PPLP's unrestricted cash at year end grew every year, from ███████████ in 2009 to ███████████ in 2015.[31]  In 2016, the last year a significant distribution was made, PPLP held over ███████████ in unrestricted cash at year end.[32]



### 3.    Board Documents Confirm That PPLP And The Board Did Not Expect PPLP to Face Judgments PPLP Could Not Pay

The voluminous evidence produced by PPLP and family members resoundingly confirms that the onslaught of opioid litigation that emerged in 2017 was not expected when the Distributions were made:

- In materials presented to the Board on January 11, 2008, management advised the Board that it believed that all OxyContin litigation could be "███████████

---

[31]    Ex. 5 (PPLPC031001244649, at *10) (providing unrestricted cash from 2008 to 2012); Ex. 71 (PPLPC051000265076 at –084) (providing unrestricted cash for 2013 and 2014); Ex. 123 (2016-06-08 Mid-year update) (PPLPC045000018249 at –384) (providing unrestricted cash for 2015).

[32]    Ex. 79 (17-07-25 EC Meeting) (PPLPC032000398822, at –846).

14

███████████████[33]

- A November 3, 2009 Board Agenda shows that ██████████████████████
  ████████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████████
  █████████████████████.[34]

- PPLP's ████████ presented to the Board on June 21, 2011 budgeted ████████
  ████████████ for the years 2011 to 2017,[35] showing clearly that no
  significant opioid litigation was anticipated.

- The updated ████████ presented to the Board in May 2013 again budgeted ████
  ████████████.[36] These projections also showed the Board that PPLP expected
  that its fees spent on Product Liability and Government Related Litigation would
  fall from ████████ in 2013 to under ██ in 2022.[37]

- The Board had every reason to believe that PPLP's projections were reliable.
  Between the 2011 and 2013 ████████████, PPLP's annual budget reports reflect
  that the amounts budgeted for ████ legal fees were in line with the 10-year projections.
  At the end of 2011, the budget report informed the Board that ████████████
  ████████████████████████████. Similarly, at the end of 2012, the budget report informed
  the Board that ██████████████████████████████████████████████████.[39]

- PPLP's Annual Budgets for 2013 and 2015 also ████████████████████████
  ████████████, showing no expected surge in litigation.[40] PPLP's annual budget
  report for 2016 showed that PPLP's legal fees in 2013 (██████████████) and 2014
  (████████████) had been in line with the 2011 projections (██████████████

---

[33]     Ex. 6 (1/11/2008 Board Agenda Book) (PPLP004400663 at 677).

[34]     Ex. 19 (11/3/2009 Board Agenda Book) (PPLPUCC9002964468 at 495).

[35]     Ex. 30 (6/21/2011 Purdue 10-Year Plan) (PPLPC042000023782 at 888)).

[36]     Ex. 50 (5/9/2013 10-Year Plan) (PPLPC063000003469 at 584)).

[37]     Id.

[38]     Ex. 34 (2012 Budget Submission) (POR172144 at 628-29)).

[39]     Ex. 43(2013 Budget Submission) (PPLPC063000017048 at –131)).

[40]     Ex. 43 (2013 Budget Submission) (PPLPC063000017048 at –607); Ex. 56 (2015 Budget
Executive Summary) (PPLP004411368 at –463).

██████, respectively), and that PPLP's projected legal fees for 2015 (██████████)
were substantially lower than the fees projected in 2011 (██████████).[41]

- PPLP's annual budget for 2016 (██████████) showed that PPLP projected to
  spend about ████ less than it had projected in 2011 (██████████).[42]  PPLP's
  Financial Statement for 2016 shows that the actual total spent on legal fees in 2016
  (██████████) was almost exactly what was budgeted.[43]

Management's reports to the Board paint a compelling and consistent picture of the low

litigation risk PPLP faced before 2016 that is accurately summed up by materials for the January

15, 2016 Board meeting.  "

"[44]

### 4.    Side B Was Intent on Keeping Money Invested in PPLP

In the millions of pages that have been produced in this proceeding, the record is devoid

of any documents showing that any Board member anticipated a material opioid litigation risk or

the massive wave of litigation that erupted in 2017.  In fact, the record shows just the opposite.

The documents show that Board members frequently discussed the future of PPLP; that Side A

and Side B had different investment philosophies, but neither Side A nor Side B expressed any

concern over future litigation; and that the Side B offered ██████████

██████████, exposing it to all risks PPLP faced.

In November 2014, Jonathan Sackler informed the Board that Side B opposed further

distributions that year and explained that ██████████

---

[41]    *Compare* Ex. 67 (2016 Annual Budget Report) (PPLPC063000003207 at –373) *with* Ex.
29 (2011 Annual Budget Report) (PPLPC042000023782 at –888).

[42]    *Compare* Ex. 67 (2016 Annual Budget Report) (PPLPC063000003207 at –373) *with* Ex.
29 (2011 Annual Budget Report) (PPLPC042000023782 at –888).

[43]    Ex. 67 (2016 Annual Budget Report) (PPLPC063000003207 at –373); Ex. 29 (EC Meeting
Slides from 2017) (PPLPC032000398822 at –855).

[44]    Ex. 71 (1/15/2016 Board Agenda Book) (PPLP004412586 at   631)).



.",[46]

",[47] Litigation risk was not an issue for either side of the family.

A June 2015 email again reflects                                    .[48] It reflects that,                                    , Side B urged that "                                    " and expressed Side B's desire to have "                                    ",[49]

Also in 2015, Side B made a                                    ,                                    . Side B proposed

.",[50] In August 2015, Side B drafted terms for its                    offer.[51]

Side B's offer in 2015 to                              of PPLP—which would have exposed

---

[45]    Ex. 57 at –31 (November 15, 2014 email from J. Sackler).

[46]    *Id*. at –29.

[47]    *Id*. at –28.

[48]    Ex. 63 (June 28, 2015 email from          ).

[49]    *Id*. at –05, –06.

[50]    *Id*. at –06.

[51]    Ex. 65 (August 13, 2015 email from D. Sackler); *see also* Ex. 64, 60.

17

Side B to all the risks PPLP faced—provides incontrovertible evidence that it did not anticipate the wave of litigation that led to PPLP's bankruptcy.

     5.     **Far From Being Stripped of Its Assets, PPLP Invested ▮▮▮▮▮<br>Dollars in Research and Development after 2007**

The UCC's attempt to establish that members of the Sackler families stripped PPLP of all of its assets is also belied by the vast sums that PPLP spent on research and development at the same time as the challenged Distributions. From 2008 to 2017, the Board authorized, and PPLP spent, nearly ▮▮▮▮▮▮▮ on research and development. The Board substantially *increased* PPLP's research and development budget every year from 2008 (▮▮▮▮▮▮) to 2013 (▮▮▮▮▮)[52]—and this six-year period is when more than 75% of the Distributions were made. A 2011 report informed the Board that PPLP had '▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[53] A 2013 report informed the Board that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[54] Purdue's substantial investments in long-term projects reflects a business being run for long-term success, not a scheme to strip it of its assets.

---

[52]     Ex. 6 (2008 Budget Approval at PPLP004416699 700 (▮▮▮▮▮▮▮▮▮▮)); Ex. 76 (2009 Budget Approval at PPLP004416757 58 (▮▮▮▮▮▮▮▮)); Ex. 13 (2010 Budget Approval at PPLP004416983 84 (▮▮▮▮▮▮▮▮)); Ex. 20 (2011 Budget Approval at PPLP004417106 07 (▮▮▮▮▮▮▮▮▮); Ex. 35 (2012 Budget Approval at PPLP004417228 29 (▮▮▮▮▮▮▮)); Ex. 35 (2013 Budget Approval at PPLP004417299 300 (▮▮▮▮▮)).

[53]     Ex. 32 (2012 Budget Presentation at PPLPUCC003392194).

[54]     Ex. 49 (1Q 2013 Board Report at PPLP004367581).

6.    **The UCC Identifies No Evidence Even Suggesting That Family Member Defendants Harbored Litigation Concerns**

From its analysis of over 50 million pages of discovery, the UCC has identified only a handful of documents in an effort to counter the overwhelming evidence proving that the unprecedented opioid litigation now facing Purdue and the family was not anticipated before 2017. It also discusses PPLP's products liability insurance, which it misapprehends, and ignores PPLP's actual products liability experience, which was never threatening. These scant documents and the out-of-context quotes that the UCC relies on wither under analysis.

a.    **November 2006 Email From Jonathan Sackler**

The UCC points to a November 2006 email — that is, an email <u>preceding</u> all of the 2007 settlements and releases — from Jonathan Sackler to his brother about ███████ " as supposed evidence that board members knew PPLP would face massive litigation a decade later. Exceptions Motion ¶ 19; Hurley Ex. 62. The UCC claims that the email is ████████ ████████████████████████████ because in this pre-settlement email, Jonathan ████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████



██████████████████████████████ " [55]

But the UCC not only ignores the 2006 date of the email, it also deliberately mischaracterizes every single aspect about the email, including:

- Jonathan's observation that █████████████████████ was ████████████████████████████ " [56]

---

[55]    Hurley Ex. 62 at PPLPC057000003694.
[56]    *Id.*

- Jonathan's remark about ███████████████████████████████████████████████ ." 57

- The " ███████████████ " he references were <u>all resolved</u> several months later by the 2007 settlements between Purdue and virtually every state — many of them twice. 58

- Jonathan discussed a " ██████████████ ." That means Purdue's " ████████ " and is the opposite of a suggestion to strip Purdue of assets, as the UCC intimates. 59 And, as discussed in Background, § I.D.2, above, the Board did that. It made sure that PPLP had free cash — from hundreds of millions to over a billion dollars in unrestricted cash on hand every year, after Distributions.

- The email otherwise reflects that Jonathan considered the " ██████████████ ██████████████████ " and says nothing about opioid litigation. 60

Jonathan's recognition, before the 2007 settlements and releases, that PPLP had litigation risks does not show that he believed that PPLP faced litigations that it would one day be unable to pay. And the next document cited by the UCC shows definitively that he did not.

### b. May 2007 Email From David Sackler

The UCC also points to an email from May 17, 2007, one week after Purdue's 2007 guilty plea and federal settlement and two months before it entered into the settlements with all of the states. Exceptions Motion ¶21; Hurley Ex. 64. In this email, David Sackler writes to his father and uncle, " ████████████ " 61 At the time, David was 27 years old and working at a hedge fund. He had no position at Purdue and had never held more than a high school internship at Purdue. 62 He did not join the PPI Board until 2012, five years later. As David testified:

---

57    *Id.*

58    *Id.* at –3699; *see supra* § I.A. [references to 2007 settlements].

59    *Id.*

60    *Id.*

61    Hurley Ex. 64.

62    Ex. 109 (8/28/20 D. Sackler Tr. 62:5-7; 63:17-22).



Ex. 109 (8/28/20 D. Sackler Tr. 188:17-189:8).

The UCC conspicuously ignores the response to David's email from his uncle, Jonathan Sackler, who had served on the PPI Board since 1990 and who very much did know what was happening at Purdue.  Jonathan responded: ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮"[63]

c.    **May 2007 Email from Richard Sackler**

The UCC also cites a May 13, 2007 email from Richard Sackler to a friend three days after Purdue's guilty plea   and two months before its settlements with all of the states   stating:



"▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[64]  There is no reference to litigation, as opposed to ▮▮▮▮▮▮, and the same email chain contains ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[65]

d.    **July 2007 Peter Boer Memorandum**

The UCC also relies on a memorandum written by Peter Boer in July 2007 about ▮

▮▮▮▮▮▮▮▮▮▮.  *See* Exceptions Motion ¶¶23-24.  Boer was not then a member of the PPI Board or affiliated with Purdue.  In the memo, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[63]    Hurley Ex. 64.

[64]    Exceptions Motion ¶20; Hurley Ex. 63.

[65]    Hurley Ex. 63.

███████████████████████████████████████████████████████████████████

████████████████ .[66]    ██████████████████████████████████████████████

███████████████████████████████ ”[67]    which it did as the products liability cases were

dismissed and settled, as discussed in § I.D.1, above.  He also hypothesized that: ‘████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████ ”[68]

     The UCC has seized on Boer's generic reference to ███████████████████████

█████████████████████████████████████████████████████████████████ .

Exceptions Motion ¶¶3, 24.  But that memorandum does not remotely show anything of the sort.

Boer was an outsider who had no actual knowledge, and ████████████████████████████

███████████████████████████████    years before OxyContin was introduced.[69]

     Nor does the UCC point to any evidence that Side B took any '████████████████' in

response to Mr. Boer's memorandum.  The UCC has over 50 million documents, including

everything remotely relevant relating to B-side trusts, their formation and their structure.  They

have <u>nothing</u> to point to.

---

[66]    Hurley Ex. 69.

[67]    *Id.* at  389.

[68]    Id.

[69]    *See* Ex. 94 (Nov. 22, 2019 Raymond-side Informational Presentation, at Slides 4, 23-29.)
The UCC's reference to an April 2008 memo in which Richard Sackler and Peter Boer purportedly
‘██████████████ is also highly misleading.  Exceptions Motion ¶25; Hurley Ex. 70.  The risk at issue in
the memo was the anticipated end of '████████████████████████████████ ,” which was
then expected to take place in 2013.  Hurley Ex. 70.  To the extent it mentioned other risks—like
potential '██████████████████████████████████████████ ” *Id.*



### e.    PPLP's Product Liability Insurance Status Is Irrelevant

The UCC strains to suggest that family directors knew for at least a decade that the 2017 litigation wave was coming because "██████████████████████████████████████ ██████████████████████████████████" Exceptions Motion ¶18.  The UCC cites no documents to show that Board members were apprised of the substance of those notices. Further, the notices are irrelevant for two reasons.  *First*, the UCC cannot cite any evidence that products liability litigation was ever threatening to PPLP in the following decade and a half.  *See generally supra* § I.B.  For example, in ████████████████████████████████████ ███████████████████████████████████████████[73]

Products liability litigation was hardly an existential threat to PPLP.

*Second*, as discussed *supra* § I.B, PPLP management consistently projected ██████ ████████████████████ in contemporaneous submissions to the Board.  Further, the fact that resolution of the products and governmental cases was achieved at levels PPLP could easily afford proves that Board members had no reason to believe that future product liability litigation

---

[70]    *See* Exceptions Motion ¶31.

[71]    *See* Ex. 94 (Nov. 22, 2019 Raymond-side Informational Presentation at Slides 4, 23-29).

[72]    *Id.*

[73]    Ex. 74 at 42 (PPLPC011000090527).

might pose a threat to PPLP's solvency.

Alternatively, the UCC has suggested fraudulent knowledge before 2017 because, <u>after Distributions ended</u>, "████████████████████████████████ ████████████████████" Exceptions Motion ¶18. That is a classic example of impermissible fraud by hindsight. The evidence establishes that PPLP management did not anticipate the 2017 wave of litigation and repeatedly advised the Board that no significant litigation was anticipated. PPLP was targeted by the plaintiffs' bar. It was the "sheer number and scale" of the more than 2,600 lawsuits against PPLP—and not their dubious merit—that precipitated the Debtors' commencement of these proceedings.[74]

The UCC points to management reports to the Board "████████████████████ ████████" that PPLP "██████████████████████████████████" Exceptions Motion ¶18. ████████████████████████████████████████████



████[75] ███████████████████████████

████.[76] There is no evidence that any of the ███████████████████ were coupled with reports that anticipated products liability litigation ever posed a threat to PPLP, and the evidence establishes that no threat was perceived. Quite the reverse, PPLP's management

---

[74]    Debtors' Informational Brief, *supra* note 5, at 37.

[75]    *See* Ex. 87 at 2 (September 7, 2018 US Products Liability Insurance Update (9/13/2018 Board Material) (PURDUE-COR-00009574) ("████████████████████████████████████ ████████████████████████").

[76]    *Id.*

repeatedly found " 

[redacted]"[77]

Moreover, [redacted]

heavily undercut the UCC's theory of fraudulent transfer.  <u>PPLP's own counterparties were</u>
<u>willing to do business with—and extend credit to—PPLP on the basis of</u> [redacted]

[redacted]  These real-time market participants clearly did not perceive a risk that PPLP would be

inundated with lawsuits and suffer judgments in excess of this amount.

Further, all of this discussion of products liability insurance misses the point.  The vast

majority of the claims at issue in the pending litigation that overwhelmed PPLP are based on

novel applications of consumer protection statutes and public nuisance—not products liability.

## II.    THE UCC'S CLAIM OF FRAUDULENT BREACH OF FIDUCIARY DUTY HAS NO EVIDENTIARY SUPPORT

The gist of the UCC's breach of fiduciary duty argument seems to be that, because

plaintiffs have asserted claims against Purdue, that must be a sign of mismanagement by

Purdue's fiduciaries.  The UCC maintains that this supports an application of the crime-fraud

exception to the attorney-client privilege.  This is legally spurious, for the reasons discussed in

*supra* § I.  It is also entirely unsubstantiated as a factual matter.

The UCC argues that " 

[redacted]" citing only a brief filed by plaintiffs in an action against Purdue

(but not any family members) in the MDL.  *See* Exceptions Motion ¶63 (citing Hurley Ex. 92).

---

[77]    Ex. 59 at Slide 49 ([redacted]
(PPLPC032000394439).

That motion was opposed by the Debtors and <u>denied</u> by the MDL court.[78] The evidentiary value

of a rejected argument made by plaintiffs in another case against other persons is zero.

On the apparent theory that allegations are evidence, the UCC asserts that "



. *See* Exceptions Motion ¶65 n.22  (citing Hurley Ex. 95).  It also

argues that ████████████████████████████████████████

Exceptions Motion ¶58.[79]  These are not "facts" in any probative sense.  "[I]t

is hornbook law that unproven, non-adjudicated allegations are not evidence."[80]  *See supra* § I.

Unproved allegations do not supply the requisite "reasonable basis" that the UCC must establish,

as held in numerous cases discussed in *supra* § I.B.

The UCC's reliance on unproved allegations rather than any of the 50 million pages of

documents it has analyzed or depositions it has taken is telling and dispositive.

### A.    The Board Reasonably Relied on Management and the OIG Monitor's Repeated Assurances That PPLP Was Operating in Compliance with Law

Under New York law, each PPI director was "entitled to rely on information, opinions,

---

[78]    *See In re: National Prescription Opiate Litigation*, No. 19-MDL-2804, Opinion and Order Regarding Plaintiffs' Summary Judgment Motions Addressing the Controlled Substances Act at 26-27 (N.D. Ohio Aug. 19, 2019), ECF No. 2483 (denying the plaintiffs' motion for a summary determination that Purdue had breached its duty of care with regard to specific order, noting that plaintiffs' factual allegations were disputed, and concluding that "[t]hese issues also require an in-depth review of factual evidence by a jury.").

[79]    The UCC also cites David Sackler's testimony that he did not know what ████████████ *see* Hurley Ex. 43 (D. Sackler Tr. 156:5-157:21)—for no apparent purpose, since David Sackler's inability to identify someone else's titles is probative of exactly nothing.  Exceptions Motion ¶62.

[80]    *Bernstein v. Village of Wesley Hills*, 95 F. Supp. 3d 547, 569 (S.D.N.Y. 2015) (quoting *Tucker v. Am. Int'l Group, Inc.*, 2012 WL 685461, at *4 (D. Conn. Mar. 2, 2012)).

reports or statements . . . prepared or presented by . . . officers or employees . . . whom the director believes to be reliable and competent in the matters presented."  N.Y. B.C.L. § 717(a)(1).  The directors were also entitled to rely on "other persons as to matters which the director believes to be within such person's professional or expert competence."  *Id.* § 717(a)(2).

The uncontradicted record proves the reasonableness, good faith and conscientiousness of the Board.  The evidence the UCC conspicuously omits includes that:

- From 2007 through 2018 (when the last Side B Director left the Board), management certified to the Board in quarterly compliance reports that PPLP was operating in compliance with law, and documented its certifications with detailed compliance reports.[81]

- There was federal oversight of PPLP's marketing and its compliance with federal health care law and FDA requirements for 5 years, from 2007-2012, under the Corporate Integrity Agreement put in place in 2007.[82]

- During this 5-year period, the Board received confirmation each year from the Office of Inspector General of HHS that PPLP was operating in compliance with the Corporate Integrity Agreement and thus in compliance with federal law.[83]

- In July 2012, as the end of the federal oversight period was approaching, the Board

---

[81]    *See* Exs. 4, 8, 9, 11,  12, 15, 16, 17, 18, 20, 23, 24, 26, 27, 29, 31, 33, 37, 41, 42, 44, 46, 49, 52, 53, 54, 55, 56, 60, 63, 67, 69,  73, 75, 76, 78, 79, 81, 82, 83, 84, and 86.  *See also* Hurley Ex. 58, Slide 35.

[82]    Information, Attachment E to Plea Agreement, at § II(A) and Appendix B §§ II-III, *United States v. The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007), ECF No. 5-5 (Corporate Integrity Agreement).

[83]    *See* Ex. 10 at PPLP004367324 (July 15, 2008 Quarterly Board Report, p. 28) (PPLP004367297); Ex. 17 at PPLPC012000236645 (Q2 2009 Quarterly Compliance Report, p. 6) (PPLPC012000236639);  Ex. 22 at PPLP004317559 (April 21, 2010 Quarterly Report to Board, p. 12) (PPLP004317547); Ex. 28 at PPLPC012000322448 (May 2, 2011 Quarterly Report to Board, p. 23) (PPLPC012000322426); Ex. 39 (Mar. 8, 2012 OIG Letter to Purdue) (PPLP004428603); Ex. 38 at PPLPC012000362899 (Feb. 3, 2012 Quarterly Report to the Board, p. 31) (PPLPC012000362899); Ex. 49 at PPLP004409695 (Q1 2013 Quarterly Compliance Report, p. 2) (PPLP004409694); *see also* Hurley Ex. 58 at Slide 33.

was informed that PPLP was maintaining and enhancing its compliance program,[84] including by █████████████████████████████ .

- The Board was informed that employees were extensively trained on compliance.[85]

- The Board was advised that PPLP audited potential areas of risk, and the Board received the results of many of the audits.[86]

- Management informed the Board that management was continually monitoring for compliance violations.[87] In particular, the Board was informed how the speakers' program was monitored to ensure compliance.[88]

- The Board was also informed that all compliance issues were reported and remediated.[89] They were told that most compliance issues identified were minor,[90]

---

[84]    See Ex. 42 at PPLP004408048-55 (2Q 2012 Quarterly Compliance Report) [2012.07.19 – Post-CIA Compliance Program Report] (PPLP004408046); *id.* at PPLP004408061; Ex. 41 at PPLP004407951 (1Q 2012 Quarterly Compliance Report [2012.04.27]) (PPLP00440795)
("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ); *see also* Hurley Ex. 58 at Slide 34.

[85]    See Ex. 26 at PPLP004405470 (3Q 2010 Quarterly Compliance Report, p. U.S. 44) (PPLP004405460).

[86]    See Ex. 54 at PPLP004410807 (4Q 2013 Quarterly Compliance Report, p. U.S. 116) (PPLP004410797); Ex. 67 at PPLP004412161 (2Q 2015 Quarterly Compliance Report) (PPLP004412152); *see also* Hurley Ex. 58 at Slides 41, 50.

[87]    See Ex. 53 at PPLP004410510 (3Q 2013 Quarterly Compliance Report, p. 7) (PPLP004410506); *see also* Hurley Ex. 58 at Slide 47.

[88]    See Ex. 37 at PPLP004407563 (4Q 2011 Quarterly Compliance Report) (PPLP004407554); Ex. 54 (4Q 2013 Quarterly Compliance Report) (PPLP004410797); *see also* Hurley Ex. 58 at Slides 48-49.

[89]    See Ex. 20 at PPLP004403710-11 (4Q 2009 Quarterly Compliance Report, p. 4-5) (PPLP004403707); *see also* Hurley Ex. 58 at Slide 42.

[90]    See Ex. 35 at PPLP004366896 (November 2011 Quarterly Report, p. 25) (PPLP004366871); Ex. 44 at PPLP004366860 (November 2012 Quarterly Report, p. 45) (PPLP004366816); Ex. 51 at PPLPC012000433436 (July 2013 Quarterly Report, p. 49) (PPLPC012000433388); *see also* Hurley Ex. 58 at Slide 43.

and that serious violations resulted in termination.[91]

The evidence proves that the Board was fully engaged on compliance and had good reason to believe that Purdue conducted its marketing and sales activities in compliance with law.

The UCC offers no evidence to the contrary.

### B. The UCC's Crime-Fraud Motion Requires Proof That PPI's Board Intentionally Hurt PPLP—And No Proof Is Offered

The UCC's crime-fraud motion cannot succeed based on the argument that there was a breach of fiduciary duty, unless this breach was sufficient to trigger the crime-fraud exception to privilege. That requires a showing that the breach constituted a deliberate and intentional attempt to harm PPLP and that the directors received and used legal advice in support of that breach. The UCC has offered no proof in support of this argument, and none exists.

## ARGUMENT

### I. THERE IS NO BASIS FOR THE UCC'S ASSERTION OF THE CRIME-FRAUD EXCEPTION TO ATTORNEY-CLIENT PRIVILEGE

Under the guise of the crime-fraud exception, the UCC seeks access to huge swaths of privileged communications and work product related to representation of the Sackler family spanning more than a decade, including:

> (a) "The Sacklers' asset protection and estate planning measures"; (b) "Whether cash or non-cash transfers to the Sacklers were, or were not, at risk of being deemed fraudulent transfers"; (c) "Whether, and/or how, opioid litigants could collect, or be prevented from collecting, a potential judgment against the Sacklers, their trusts and other affiliates and assets"; (d) "Purdue's potential liability, or the Sacklers' . . . related to breaches of fiduciary duty and other misconduct, and any efforts to conceal such conduct or breaches of duty"; (e) "The formation, governance and management of the Sacklers' trusts, including whether trusts were created or modified, or transfers made among trusts, for the purpose of delaying or hindering creditors, and whether purportedly discretionary trusts are operated in a manner consistent with that claimed status"; (f) "The appropriate amount, and mechanics for, distributions to the Sacklers to avoid tracing or liability (including fraudulent

---

[91]    *See* Ex. 15 at PPLP004402212 (4Q 2008 Quarterly Compliance Report, p. 8) (PPLP004402205); *see also* Hurley Ex. 58 at Slide 44.

transfer liability)"; and (g) "Non-cash transfers to entities the Sacklers controlled for less than reasonably equivalent value to Purdue" (Hurley Ex. 101 at 2).

On its face, this flouts Second Circuit precedent, which requires a "narrow and precise application" of the crime-fraud exception.[92]  To invoke the crime-fraud exception, the UCC must demonstrate both "that [i] there is probable cause to believe that a crime or fraud has been attempted or committed and [ii] that the [requested] communications were in furtherance thereof."[93]  The UCC has utterly failed to meet its burden of proving either prong.

### A.   The Crime-Fraud Exception Is Narrow

"The attorney-client privilege is the 'oldest of the privileges for confidential communications known to the common law[,]'"[94] and "is designed to promote unfettered communication between attorneys and their clients so that the attorney may give fully informed legal advice."[95]  "The protection given to attorney work product serves a similar purpose: 'to avoid chilling attorneys in developing materials to aid them in giving legal advice and in preparing a case for trial.'"[96]

"Given that the attorney-client privilege and work product immunity play a critical role in our judicial system," the Second Circuit has cautioned that the "limited" crime-fraud exception

---

[92]   *See United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated in part on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014).

[93]   *Roe I*, 68 F.3d at 40.

[94]   *Id.* at 39 (quoting *Upjohn Co. v. United States*, 499 U.S. 383, 389 (1981)).

[95]   *Id.*; *accord United States v. Zolin*, 491 U.S. 554, 562 (1989) (the "central concern" of the privilege is "'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" (quoting *Upjohn Co.*, 499 U.S. at 389)).

[96]   *Roe I*, 68 F.3d at 39 (quoting *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982)); *accord Hickman v. Taylor*, 329 U.S. 495, 510 (1947) ("[I]t is essential that a lawyer work within a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel").

"should not be framed so broadly as to vitiate much of the protection they afford."[97]  On the

contrary, the Second Circuit holds that:

> [T]he crime-fraud exception has a narrow and precise application:

>> It applies only when the communications between the client and his lawyer further a crime, fraud or other misconduct.  It does not suffice that the communications may be related to a crime.  To subject the attorney-client communications to disclosure, *they must actually have been made with an intent to further an unlawful act*.[98]

The UCC offers no evidence to satisfy this prerequisite to the relief it seeks.  Its motion should be

denied for this reason alone.

### B. The Requirement of Proving "Probable Cause" to Believe A Fraud Has Been Committed Is Unsatisfied—Let Alone That The Communications Furthered It

"Probable cause" requires "that a prudent person have a reasonable basis to suspect the

perpetration or attempted perpetration of a crime or fraud, and that the communications were in

furtherance thereof."[99]  In applying these standards, the trial court exercises considerable

discretion "to determine whether the facts are such that the exception applies."[100]

The UCC spends the bulk of its crime-fraud discussion positing that the crime-fraud

exception applies because of supposed fraudulent transfers from PPLP to the Sacklers and

purported breaches of fiduciary duty arising from those transfers.  The UCC asserts that the

Distributions were intended to siphon funds out of PPLP to the Sacklers, and out of the reach of

---

[97]    *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) ("***Roe II***") (citations omitted).

[98]    *Jacobs*, 117 F.3d at 88 (first emphasis added) (quoting *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (Ginsburg, J.)).

[99]    *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984) (citation omitted); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 405 (S.D.N.Y 2006) ("As for the meaning of the term 'probable cause' in this context, the Second Circuit has described it as equivalent to 'a reasonable basis for believing that the objective was fraudulent.'" (quoting 731 F.2d at 1039)).

[100]    *Jacobs*, 117 F.3d at 87.

future plaintiffs.  The UCC fails to meet its burden to make a sufficient showing of any of this.

*First*, the UCC has entirely failed to demonstrate that the Distributions constitute fraudulent transfers.  The UCC has not even tried to meet the prerequisite of any fraudulent transfer claim—establishing PPLP's underlying liability to at least one claimant.  Having failed to satisfy this threshold requirement, the UCC cannot show that (i) PPLP was insolvent, undercapitalized, or believed that it could not pay its debts as they matured; (ii) PPLP even had any creditors that it could have intended to hinder, delay, or defraud; or (iii) there was a triggering creditor as of the petition date with the right to avoid PPLP's transfers preceding the bankruptcy by more than two years (which is essentially all the Distributions).

The UCC points to a proof of claim filed by the U.S. Government in these bankruptcy cases.  Exceptions Motion ¶66.  The proof of claim contains no evidence.  It merely recites a series of allegations—bare, unproven, and conclusory.  Citation to a proof of claim does not satisfy the UCC's burden.  *See, e.g.*, *In Caesars Entm't Operating Co., Inc.*, 2016 WL 7477566, at *2 (Bankr. N.D. Ill. Sept. 21, 2016) (rejecting invocation of crime-fraud exception where official committee relied on adversary proceeding complaint: "A complaint is in any event simply a set of allegations; it establishes no facts."); *see also Official Comm. of Asbestos Claimants of G-I Holding, Inc.*, 342 B.R. 416, 427 (Bankr. S.D.N.Y. 2006) ("The sufficiency of the FAC from a pleading perspective 'does not equate with an affirmative showing of a prima facie case for purposes of defeating the attorney-client privilege.'" (quoting *In re Taxable Mun. Bonds Litig.*, 1993 WL 390145, at *1 (E.D.La. Sept. 24, 1993))); *Clark v. United States*, 289 U.S. 1, 15 (1933) (Cardozo, J.) ("It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud." (internal quotation marks and citation omitted)).

Further, even if the UCC had made some showing of the Debtors' underlying liability—

instead of defaulting on this critical issue—there is no evidence that PPLP or any of the director defendants foresaw the current wave of litigation at the time any Distribution was made, much less harbored any intent to prevent PPLP from being able to satisfy its liabilities.  On the contrary, overwhelming and uncontradicted evidence (discussed at § I.D.1), shows that, at the time of the Distributions, (i) very few of the Chapter 11-Triggering Opioid Cases had been filed against PPLP; (ii) PPLP management in fact did not foresee significant future litigation and repeatedly advised the Board that the risk of future litigation was low and declining; and (iii) opioid litigation—public and private—was declining, sparse or dormant.

Nor was there any reason to think that PPLP would be unable to satisfy its obligations as they came due.  It had no funded debt or significant third-party obligations, it was earning ██████████ of annual revenue, and it was keeping immense ██████████ every year.  Nor is there any evidence of any fraudulent intent.  The record proves the reverse— that the directors were informed that PPLP's litigation risk was ██████████, that they were repeatedly advised PPLP was operating in compliance with law, and that the Side B directors offered to ██████████.  The record also reflects without contradiction that PPLP was investing ██████ in new products and in research and development during the years in which Distributions were made.

*Second*, absent proof of actual fraudulent intent, the crime-fraud exception is not triggered.  An intent to "hinder" or "delay" would not suffice to invoke the crime-fraud exception, even if the UCC had offered some proof of either (it has not).  The UCC must—but has failed to—establish fraud in the traditional sense of deceit or trickery.  *See Caesars*, 2016 WL 7477566, at *3 (committee failed to establish *prima facie* application of crime-fraud exception where avoidance claims were based on allegations of an intent to "hinder" or "delay" creditors:  "'[F]raudulent transfer' is an umbrella term for a variety of claims, some of which

33

involve fraud in the usual sense and some of which do not."); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 392 F. Supp. 3d 244, 258 (D.P.R. 2019) (crime-fraud exception did not apply in the context of alleged fraudulent transfers where there had been no "prima face showing of criminal or deceptive activity"); *In re Braus*, 248 F. 55, 64 (2d Cir. 1917) ("[t]he intent to defraud is something distinct from the mere intent to delay or hinder" (internal quotations and citation omitted)).[101] Allegations that PPLP engaged in constructive fraudulent transfers—which, by definition, involve no actual fraud—do not suffice.

While the UCC has identified certain decisions applying the crime-fraud exception in the fraudulent conveyance context, the cases all involved intentionally deceptive conduct in furtherance of the fraudulent transfer. In *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), (Exceptions Motion ¶78), the relevant trust was created after "the fraudulent accounting . . . had been[] uncovered, resulting in huge losses to Cendant shareholders, and [the transferor] had been named as a defendant in shareholder actions in which the damages sought exceeded the value of his assets." The *Cendant* Court concluded that the parties seeking to pierce the privilege had made a showing that the relevant trust might have been formed as a "vehicle[] for carrying out the fraud" that harmed the shareholders. *Id.* at 406. Here, the ████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████.

Similarly, in *Galaxy CSI, LLC v. Galaxy Computer Services, Inc.* (*In re Galaxy Computer Services, In*c.), 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004), (Exceptions Motion ¶76), the corporate debtor demonstrated that its officers schemed to hide information in an "extensively

---

[101]    *See also In re Fresh Del Monte Pineapple Antitrust Litig.*, 2007 WL 64189, at *14 (S.D.N.Y. Jan. 4, 2007) ("It seems clear that the intent element, so critical to the application of the crime-fraud exception to the attorney client privilege, requires intent to induce detrimental reliance.").

planned course of dealing to collude with a competitor and clandestinely transfer assets." The *Galaxy* Court found that the crime-fraud exception applied because the debtor made a *prima facie* showing that defendants "took steps to hide the foreclosure from the two independent proxy board members." *Id.* at *4. Here, there is no allegation that the family board members hid Distributions from anyone. *Forbes* reported them.[102]

Likewise, in *Securities Investor Protection Corp. v. Bernard L. Madoff Inv. Securities LLC*, 319 F.R.D. 100, 108 (S.D.N.Y. 2017) ("***Madoff***"), the Madoff trustee sought documents pertaining to a real estate transaction in which an employee of Bernard L. Madoff Investment Securities LLC sought to purchase a "house solely in [her partner's] name, rather than jointly as originally planned." In *Madoff*, it was undisputed that the defendant had "knowledge that BLMIS's financial position was poor," and the transaction in question happened "only a few months before Madoff's Ponzi scheme was exposed." *Id.* By contrast, here, there was no fraudulent accounting by PPLP, the Distributions spanned a decade and stopped two years before PPLP's bankruptcy filing, and PPLP's financial condition was sound—and it was left flush with cash—when each Distribution was made.

Further, the *Madoff* decision confirms that "[m]ere suspicion" of fraud—which is all that the UCC offers—"is not enough to warrant invading the attorney-client privilege," *id.* (citation omitted); rather, there must be "substantial reason to believe that [the client] engaged in or attempted to commit a fraud and used communications with [the] attorney to do so," *id.* at 107 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 2007 WL 2376170, at *11 (S.D.N.Y. Aug. 10, 2007) (internal quotations omitted)).

---

[102]    Alex Morrell, *The OxyContin Clan: The $14 Billion Newcomer to Forbes 2015 List of Richest U.S. Families*, Forbes (July 1, 2015, 10:17 AM EDT), https://www.forbes.com/sites/alexmorrell/2015/07/01/the-oxycontin-clan-the-14-billion-newcomer-to-forbes-2015-list-of-richest-u-s-families/#13b2fa4475e0.

## C.  The UCC's Breach of Fiduciary Duty and Other Wrongdoing Theories of Crime-Fraud Fail Legally As Well As Factually

The UCC's threadbare assertion that the crime-fraud exception extends to all breach of fiduciary duty claims, (Exceptions Motion ¶¶72-73, 76), is erroneous.  In support of its argument, the UCC cites three cases:  *Madoff*, 319 F.R.D. at 109, and *Galaxy*, 2004 WL 3661433, at *2—both of which involved actual fraud—and *Irving Tr. Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983) ("***Irving Trust***"), which did not even involve a fiduciary duty claim (nor did *Madoff*).  The breach of fiduciary duty in *Galaxy* was that the directors committed *fraud* in making misrepresentations about the company.  *Galaxy*, 2004 WL 3661433, at *2.  None of these cases supports the UCC's position here.  Even if the UCC could establish probable cause that any former director breached a fiduciary duty—it cannot—the UCC has come forward with no evidence that the alleged breach constituted a fraud, which is a prerequisite to triggering the exception.

But the UCC's overreach does not stop there.  It also contends that the crime-fraud exception should expansively be applied to unidentified "unlawful conduct" in general, not just to crimes or frauds.  *See, e.g.*, Exceptions Motion ¶73.  The UCC's fact-free reliance on an inapposite district court case, *Irving Trust*, 100 F.R.D. at 277 (Exceptions Motion ¶73), is telling. *Irving Trust* involved an underlying fraud—a credit scam perpetrated by an employee of Irving Trust "pursuant to which Irving Trust's records were caused to reflect deposits in certain accounts not in fact received in such accounts," and "[w]ithdrawals were then permitted or bank checks issued on the strength of the fictitious deposits."  *Id.* at 275.  At Irving Trust's urging, Chase froze funds of one of its customers, a third party who had done business with victims of the fraud, notwithstanding Chase's knowledge that its customer had no knowledge of the underlying fraud.  This caused the Chase customer severe harm.  *Id.* at 275-77.  The *Irving Trust*

36

Court concluded that Chase intentionally "deprived [its customer] of the rightful use of his funds although it knew of no grounds to do so." *Id.* at 277.  It held that in-house counsel's "communications, in furtherance of Chase's tortious conduct, are not protected by the attorney-client privilege." *Id.*  By its terms, *Irving Trust* has no application to this case.  The UCC has not remotely established intentional tortious conduct.[103]

Nor can the UCC's expansive invocation of the crime-fraud exception be reconciled with the Second Circuit's post-*Irving Trust* jurisprudence—specifically that, "[g]iven that the attorney-client and work product immunity play a critical role in our judicial system, the *limited exceptions* to them should not be framed so broadly as to vitiate much of the protection they afford." *Roe II*, 168 F.3d at 71 (emphasis added) (citations omitted); *see also In re Cnty. of Erie*, 546 F.3d 222, 228 (2d Cir. 2008) ("[R]ules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution.").

## D. The UCC Cannot Meet The "In Furtherance" Requirement By Showing That Documents Are "Reasonably Related To" A Crime Or Fraud

Not only has the UCC failed to come forward with any evidence that PPLP engaged in a crime or fraud, but it also has failed to satisfy its burden of showing that any legal advice reflected on Side B's privilege log was given for the purpose of "concealing or facilitating" a crime or fraud.  As the Second Circuit noted in *Roe I*, "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud," for "[i]f it did, the privilege would be virtually worthless because a client could not

---

[103]    The UCC's reliance on *Amusement Industry, Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013), (Exceptions Motion ¶¶73, 75), is similarly misplaced.  *Stern* involved application of the crime-fraud exception to attorney communications that enabled the defendant to fraudulently obtain financing from various financial institutions.  *Id.* at 440.  It therefore does not support the application of the crime-fraud exception to cases without any fraud.  Likewise, in *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 56 (S.D.N.Y. 1989), (Exceptions Motion ¶73), the communications were tied to a fraudulent investment scheme.

freely give, or an attorney request, evidence that might support a finding of culpability." 68 F.3d at 40. "Instead, <u>the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud</u>." *Id*. (italics emphasis in original). There must be probable cause to believe that "the <u>particular</u> communication with counsel or attorney work product was <u>intended</u> in some way to facilitate or to conceal the criminal activity." *Id.* (emphasis added); *see Jacobs*, 117 F.3d at 88 ("With strong emphasis on intent, the crime-fraud exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal [or fraudulent] activity.") (internal quotations and citation omitted). The UCC has made no such showing.

"[T]o subject privileged communications or attorney work product to disclosure, a party must show a 'purposeful nexus' that the communications were '*made with an intent to further*' the crime or fraud." *See In re Gen. Motors*, 2015 WL 7574460, at *4 (emphasis in original) (quoting *Roe I*, 68 F.3d at 40; *Jacobs*, 117 F.3d at 88). "Mere relevance or temporal proximity does not suffice." *Id.*; *see also United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (R.B. Ginsburg, J.) ("It does not suffice that the communications may be related to a crime. . . . [The communications] must actually have been made with an intent to further an unlawful act."). "Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose," that same finding of relevance "does not trigger the exception." *Roe I*, 68 F.3d at 40-41. As the court put it in *United States v. Stewart*, 2003 WL 23024461, at *2 (S.D.N.Y. Dec. 29, 2003), "confidential communications must be in furtherance of the criminal or fraudulent conduct for the crime-fraud exception to apply. . . . If the law were otherwise, every defendant accused of a crime . . . would lose the protection of the attorney-client privilege with respect to prior statements to his lawyer concerning the same subject matter."

38

Ignoring this black-letter law, the UCC asks the Court to vitiate the privilege as to any

documents it deems "reasonably related" to the purported fraudulent transfers, including, *e.g.*,

asset protection and estate planning measures; legal analysis of Distributions; legal analysis of

future litigation exposure and potential liability; formation, governance, and management of the

Sacklers' trusts.  Exceptions Motion ¶81; Hurley Ex. 101.  The UCC purports to identify

"illustrative log entries," (Exceptions Motion ¶81; Hurley Ex. B), but offers no explanation

demonstrating how the log entries are even related to—much less reflect communications

intended to facilitate or conceal—alleged criminal or fraudulent activity.

The UCC thus fails to identify—much less meet the probable cause standard to show

that—any "particular communication" that "was intended in some way to facilitate or to conceal

the criminal activity," as the Second Circuit requires.  *See Roe I*, 68 F.3d at 40.  The UCC cannot

satisfy the exception by pointing to countless documents that they speculate <u>might</u> provide

evidence of a crime or fraud.  *See Roe II*, 168 F.3d at 71; *accord In re Gen. Motors*, 2015 WL

7574460, at *6.

The UCC has utterly failed to meet its burden of "<u>provid[ing] particularized evidence that

each challenged communication was made in furtherance of the crime or fraud</u>," which alone is

fatal to their motion.  *See In re 650 Fifth Ave.*, 2013 WL 3863866, at *2 (S.D.N.Y. July 25,

2013) (crime-fraud exception inapplicable because government failed to "demonstrate that every

challenged communication by counsel . . . —taken one-by-one—was 'in furtherance of' the

crime or fraud"); *In re Gen. Motors*, 2015 WL 7574460, at *7 ("[T]he Second Circuit has

'strong[ly] emphasi[zed]' that evidence of a crime or fraud alone is not enough to vitiate the

attorney-client privilege and work product doctrine, and that the moving party must *also* show

'that the particular communication with counsel or attorney work product was intended in some

way to facilitate or to conceal the criminal activity.'" (alteration in original) (citations omitted)).

Indeed, a cursory review of the UCC's list of the communications it claims are subject to the crime-fraud exception shows that the UCC has made no effort to show that each was in furtherance of a crime.  *See* Exceptions Motion Ex. B at Tab J.  For example, the UCC claims that the crime-fraud exception applies to documents from 2019—years after the challenged distributions ended and the Side B family directors had all stepped down—including documents about legal advice regarding litigation.

The UCC tries to escape the consequences of its failure to show that the crime-fraud exception applies to specific documents by suggesting that this Court might conduct an *in camera* review (putting aside its legally fatuous request for a special master).  *In camera* review of thousands of pages in the speculation that they might have been in furtherance of a crime, as the UCC suggests, would impose an unmanageable burden on this Court.  As *In re Outlaw Labs, L.P.*, put it

> The ... request for *in camera* review appears to be an attempt to have the Court do the work not only of finding the evidence in the record [the party] has failed to submit to justify *in camera* review ... but also review thousands of pages of documents to determine if the documents are subject to the crime-fraud exception.

2020 WL 5500220, at *7 (S.D. Cal. Sept. 11, 2020); *accord, e.g.*, *Caesars Entm't*, 2016 WL 7477566, at *4 (N.D. Ill. Sept. 21, 2016) (declining *in camera* review because volume was enormous and would absorb too much court time).  The UCC cannot foist its failure to show that privileged communications were used in furtherance of a fraud onto the Court.  *See United States v. Zolin*, 491 U.S. 554, 571 (1989) ("There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents.").  There is no reason to impose that weighty burden on this court.

### E. A Purdue Guilty Plea Would Not Bolster The UCC's Infirm Crime-Fraud Showing

If rumors in the press are true, Purdue may negotiate a guilty plea with the DOJ in the near future. *See, e.g.*, Reuters, Purdue Pharma Nears Guilty Plea Agreement Over Alleged Role in Opioids Crisis, THE GUARDIAN (Oct. 7, 2020), [https://www.theguardian.com/us-news/2020/oct/07/purdue-pharma-sackler-family-guilty-agreement](https://www.theguardian.com/us-news/2020/oct/07/purdue-pharma-sackler-family-guilty-agreement). Even if that were to materialize, it would not support any of the UCC's crime-fraud arguments.

First, a guilty plea by Purdue would not be binding on non-parties, such as the former directors, who were not in privity with, and had no control over, Purdue at the time the plea was entered. *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 184, 186 (2d Cir. 2003) ("Collateral estoppel applies only against a party to a previous adjudication and that party's 'privies;'" held, corporation not bound by conviction of former CEO because they were not in privity "at the time of [his] trial."); *SEC v. Webb*, 2019 WL 1454532, at *4 (N.D. Ill. Apr. 2, 2019) (similar).

Second, a guilty plea by Purdue would not establish any reason to believe that the legal communications the UCC is challenging (Hurley Ex. B, Tab J) were used to further a crime or fraud. *Jacobs*, 117 F.3d at 88 ("'To subject the attorney-client communications to disclosure, they must actually *have been made with an intent to further an unlawful act.*'" (emphasis in original)); *accord In re Gen. Motors*, 2015 WL 7574460, at *6.

Third, a guilty plea *by Purdue* could not establish probable cause to believe that any Distributions were made with a fraudulent intent *by Side B*, and it is fraud on the part of Side B that the UCC must establish to prevail on its crime-fraud theory. A guilty plea—entered years after the challenged Distributions and entered into as part of an effort to resolve the claims that have overwhelmed Purdue—would not undermine the overwhelming evidence showing that *at*

*the time of the Distributions* Side B wanted to keep money invested in Purdue and there was no suggestion that cash-flush Purdue would be unable to pay creditors.

Whatever Purdue may plead to in 2020, its management consistently assured the directors—in detailed oral and written compliance reports every quarter from 2007 through 2018—that Purdue was operating in compliance with law. *See supra* § I.D. This vitiates any claim of fraudulent intent. Indeed, a criminal violation by a corporation does not, without more, even suggest a due care breach by its directors, much less a crime or fraud. *See, e.g.*, *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019) ("[O]ur case law gives deference to boards and has dismissed *Caremark* [inadequate Board supervision] cases even when illegal or harmful company activities escaped detection....").

## II.    THERE IS NO BASIS FOR THE UCC'S ASSERTION OF AN AT-ISSUE WAIVER OF ATTORNEY-CLIENT PRIVILEGE

The standard for at-issue waiver is set forth by the Second Circuit in *In re County of Erie*—a case that the Exceptions Motion conspicuously fails to address. 546 F.3d 222 (2d Cir. 2008). *County of Erie* holds that: "The key to a finding of implied waiver… is some showing by the party arguing for a waiver that the opposing party *relies* on the privileged communication as a claim or defense or as an element of a claim or defense." 546 F.3d at 228 (emphasis in original). The Court emphasized that "a party must *rely* on privileged advice from his counsel to make his claim or defense." *Id.* at 229 (emphasis in original). The UCC has not made, and cannot make, such a showing: the former directors have not asserted any claims or defenses in these proceedings, and never relied on advice of counsel in any of the pre-petition litigation.

*County of Erie* also held that the defendants' mere assertion of lawful behavior on its part does not place underlying advice of counsel as to lawfulness at issue. *Id.* ("They [the defendants] maintain only that their actions were lawful. . . . [A]ny legal advice rendered by the

County Attorney's Office is irrelevant to any defense so far raised by Petitioners."). *County of Erie* thus adopted a narrow interpretation of the at-issue waiver doctrine. *See id.* (concluding that the test for at-issue waiver applied by the district court "cuts too broadly" because it found waiver without the essential element of "reliance on privileged advice in the assertion of the claim or defense"). The doctrine does not apply here for the following reasons.

A. **The At-Issue Waiver Doctrine Does Not Apply Because Side B Has Not Asserted Any Claims Or Defenses**

The at-issue waiver doctrine is a rule for litigation, to prevent unfair litigation practices—using privilege as both a sword and a shield. It applies only where one "party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion." *Id.* As this Court has reminded the UCC, the parties are not preparing for trial—they are doing due diligence. Tr. of Aug. 26, 2020 Hearing at 25:17-21 (emphasizing "the difference between doing due diligence and an examination and taking discovery for purposes of a trial."). *County of Erie* teaches that for at-issue waiver to apply, "a party must *rely* on privileged advice from his counsel to make his claim or defense." 546 F.3d at 229 (emphasis in original). Because at this stage there are only potential claims and Side B has yet to assert defenses in these cases, the at-issue waiver doctrine does not apply.

B. **Side B's December 2019 Presentation Identified All of Its Sources, None of Which Involved Privileged Legal Communications**

The UCC's at-issue waiver argument focuses on the Presentation that Side B gave on December 6, 2019. Hurley Ex. 58. The Presentation provided a "thorough explanation and analysis of the defenses that the Shareholder Parties intend[ed] to make with regard" to claims that might be asserted against Side B. *See* November Stipulation ¶17(b).

The UCC's motion therefore rests on the unsound premise that argument about defenses in a Presentation made to other lawyers—not argument to the court or another decisionmaker—

43

can effect a privilege waiver.[104]  The UCC offers no case law supporting this proposition.  To the

contrary, the Second Circuit held in *John Doe Co. v. United States*, that statements by one

counsel to another <u>cannot</u> support at-issue waiver, since the receiving counsel can simply

discount the statements if they believe that they need access to privileged documents to check

them.  350 F.3d 299, 306 (2d Cir. 2003), *as amended* (Nov. 25, 2003).  The Court explained that

there was no waiver where one party (Doe) "has made its assertions only to its adversary, which

is free to ignore them and cannot have its position compromised by virtue of the fact that Doe

has made the assertions without relinquishing its privilege." *Id.*[105]  That holding governs here.

Further, none of the statements identified in the Motion remotely effected a waiver:

### 1.    Advocacy Based on Non-Privileged Documents Regarding PPLP's Compliance Program Did Not Waive Privilege

The UCC relies on a portion of the Presentation given by Side B under the heading

"Good Faith and Reasonableness."  This portion of the Presentation was based entirely on non-

privileged documents produced by the Debtors in the pre-petition litigation.  These include:

- The non-privileged Corporate Integrity Agreement.  Hurley Ex. 58 at Slides 31-32.

- Non-privileged documents repeatedly reporting to the Board that PPLP was operating in compliance with the Corporate Integrity Agreement, (*id.* at Slide 33), and that its compliance program was equally strict after the CIA ended.  *Id.* at Slide 34.

- Non-privileged documents reflecting the fact that PPLP's management was informed in regular quarterly reports that PPLP's marketing was in compliance with law.  *Id.* at Slide 35-36.

- Non-privileged documents showing that the PPI Board was advised that multiple, strict

---

[104]    The UCC notes Side B's withdrawn motion to make the Presentation public.  That motion was withdrawn, following comments from the Court.  The Presentation did not seek any relief from the Court.

[105]    *See, e.g.*, *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 3513670, at *2 (S.D.N.Y. June 27, 2020) ("The Second Circuit requires that a party must rely on privileged advice from his counsel to make his claim or defense.... Simply because privileged information is relevant to a claim or defense in the case does not give rise to an implied waiver." (citations and internal punctuation omitted)).

procedures—including legal review—were in place and enforced to ensure that PPLP was operating in compliance with law.  *Id.* at Slides 37-50.

Neither the Presentation nor any of the cited documents produced by PPLP revealed communications of counsel or made claims concerning the legal advice received by the PPI Directors.  Debtors' counsel was present at the Presentation and did not object to any of the slides as revealing privilege or express any concern that the arguments waived the Debtors' privilege.  The UCC Exceptions Motion (at ¶88) emphasizes the Presentation's observation that under PPLP's internal procedures: "███████████████████████████████" and that all marketing material was reviewed by PPLP's Legal Department.  Hurley Ex. 58 at Slides 37-38.  These observations are about the procedures PPLP used to review its marketing materials; not legal advice received by the Board.  The attorney-client privilege protects communications.  No communications were mentioned or relied on.

The Motion relies heavily on *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011), (Exceptions Motion ¶86), in an attempt to suggest that privilege is automatically waived whenever defendants dispute allegations that they acted with wrongful intent.  The UCC argues that because Side B used the phrase "good faith," it has therefore put privileged documents "at issue."  Unsurprisingly, *Arista Records* does not stand for this proposition.  In *Arista Records*, the defendants sought to affirmatively testify—in the damages phase of a trial—that they had a "good faith belief that their conduct … was lawful" even though they had objected to discovery into the basis for that belief— the legal advice they received. *Arista Records*, 2011 WL 1642434, at *1.  *Arista Records* merely holds that parties cannot affirmatively testify as to their subjective understanding of the law, while simultaneously

objecting to discovery regarding basis for that belief.[106]  Side B has done nothing of the sort.

The UCC ultimately grounds its Motion on the claim that it has a right to fair access to documents.  But Side B provided the UCC with all of the extensive source material referenced in its presentation in December 2019.[107]  Moreover, the UCC has conducted its own gargantuan discovery program, at the cost to the estates of tens of millions of dollars, into all aspects of PPLP operations, including compliance.  The UCC therefore does not need discovery into PPLP's privileged communications to test the veracity of the statements made in the Side B Presentation.  The UCC's blind hope that privileged documents will turn up some evidence of wrongdoing—which is not supported by the millions of other documents it now has—is not a basis for finding waiver.

### 2. Arguments That Fraudulent Conveyance Claims Will Fail Do Not Waive Any Privilege

The UCC argues that



"  Exceptions Motion

¶83; Hurley Ex. 58 at Slide 470.  There is no reference to advice of counsel.  This statement was

---

[106]    None of the other cases cited in the UCC's at waiver argument help the UCC.  First, *In re Grand Jury Proceedings*, 219 F.3d 175, 189, 191-92 (2d Cir. 2000) (Exceptions Motion ¶85), declined to find that there was at issue waiver and in fact teaches that corporate officers cannot waive their company's privilege unless they are acting pursuant to a plan by the corporation.  This in fact undermines the UCC's arguments that Side B waived privilege as to Purdue's documents here.  Second, *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 510 (S.D.N.Y. 2002) (Exceptions Motion ¶85), held only that the privilege holder waived the privilege by bringing a lawsuit against its former law firm, putting its reliance on counsel at issue.  Side B has no claims against counsel here.  Last, *Hartford Fire Ins. Co. v. CMC Constr. Co., Inc.*, 2010 WL 11520219, at *4 (E.D. Tenn. Apr. 20, 2010), (Exceptions Motion ¶88), found waiver where a defendant asserted that "she simply followed [counsel's] advice."  The Side B defendants have made no such assertion.

[107]    *See* Ex. 95.

part of a section in the Presentation demonstrating that no plaintiff would be able to succeed in

bringing a fraudulent transfer claim against Side B based on actual fraudulent intent because the

plaintiff would not be able to show actual intent.  Ex. 95at Slide 493; *see also* Slide 488.   This

argument was based numerous objective facts, including that:

- PPLP was under a federal monitorship from 2008 to 2012, during which it faced almost no opioid litigation.  Ex. 95 at Slide 490.

- PPLP did not face meaningful litigation at any point through 2016.  Ex. 94 at Slides 488-92.

- PPLP resolved investigations and litigation for reasonable amounts before 2017, including settling an investigation by New York for a mere $75,000 and a law suit by Kentucky for $24 million over eight years.  Ex. 95 at Slides 488, 491.

- Only two new opioid lawsuits were filed against PPLP in 2016.  Ex. 95 at Slide 492.

- PPLP stopped making distributions when the wave of litigation hit in 2017.  Ex. 95 at Slide 488.

- PPLP regularly made distributions over a course of years, which is the opposite of a suspicious strategy to evade an anticipated debt.  Ex. 95 at Slide 494.

- PPLP's distributions were always a fraction of PPLP's sales revenue.  Ex. 95 at Slide 496.

Argument by counsel, based on non-privileged information, that plaintiffs would be

unable to show any fraudulent intent by PPLP does not put at issue privileged communications.

*See County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008) (argument of good faith "through defense

counsel and the examination of witnesses" would not waive the privilege); *Parneros v. Barnes &*

*Noble, Inc.*, 332 F.R.D. 482, 502–03 (S.D.N.Y. 2019) (defendant's denial of allegations by

plaintiff that defendant acted with wrongful state of mind did not waive the privilege); *Standard*

*Chartered Bank PLC v. Ayala Holdings (U.S.), Inc.*, 111 F.R.D. 76, 82 (S.D.N.Y. 1986) (the

position that privileged is waived whenever a party's state of mind is at issue in a case, would

render the attorney-client privilege "a nullity in all the vast commercial litigation in which fraud

or reliance is an issue.").

If the UCC's argument to the contrary were accepted, it would mean that whenever someone asserts a claim of fraudulent conveyance, the defendant must either admit that they acted with an intent to defraud or waive their privilege. That is preposterous. *Oxyn Telecommc'ns, Inc. v. Onse Telecom*, 2003 WL 660848, at *6 (S.D.N.Y. Feb. 27, 2003) (rejecting argument that defendant put its privileged communications at issue by denying allegations of fraud and bad faith: "A party cannot, through its own allegations of fraud or bad faith, waive its adversary's privilege."). The Second Circuit has made it clear that "[a] mere indication of a claim or defense certainly is insufficient to place legal advice at issue." *Cnty. of Erie*, 546 F.3d at 229.

### C. The UCC's At-issue Arguments Seek the Debtors' Privileged Information

The documents that the UCC want are *the Debtors'* privileged documents—documents not referenced in the Presentation (because they were privileged) communicating legal advice to the Board concerning the operation of PPLP's compliance program and litigation. The UCC has articulated no basis for this relief.

## **CONCLUSION**

The UCC's Exceptions Motion should be denied.


Dated:  October 14, 2020 (amended        _/s/ Gerard Uzzi_____
          October 16, 2020)                  Gerard Uzzi
          New York, New York            Alexander B. Lees
                                         **MILBANK LLP**
                                         55 Hudson Yards
                                         New York, NY 10001
                                         Telephone: (212) 530-5000

                                         _/s/ Gregory P. Joseph_____
                                         Gregory P. Joseph
                                         Mara Leventhal
                                         **JOSEPH HAGE AARONSON LLC**
                                         485 Lexington Avenue, 30th Floor
                                         New York, New York 10017
                                         Telephone: (212) 407-1200


                                         _Counsel for the Raymond Sackler Family_