Gerard Uzzi
Alexander B. Lees
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Gregory P. Joseph
Mara Leventhal
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Facsimile: (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>Debtors. [1] | Chapter 11<br>Case No. 19-23649 (RDD)<br>Jointly Administered |

**AMENDED RAYMOND SACKLER FAMILY'S OPPOSITION TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS' GENERAL CHALLENGES MOTION**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND .............................................................................................. 5

ARGUMENT ................................................................................................... 7

I.     COMMUNICATIONS WITH PUBLIC RELATIONS ("PR") CONSULTANTS TO FACILITATE LEGAL ADVICE ARE PRIVILEGED AND PROTECTED BY THE WORK PRODUCT DOCTRINE ........................................... 7

     A.    Communications with ████ Are Protected by Attorney-Client Privilege ...................................................................................... 10

     B.    ████ Communications Are Protected Work Product .................... 17

     C.    Communications with ████ Are Privileged and Protected by Work Product ................................................................................. 19

II.    ████ COMMUNICATIONS WERE PROPERLY WITHHELD ...... 20

III.    THE CHALLENGED STUART BAKER COMMUNICATIONS ARE PRIVILEGED ................................................................................... 23

IV.    COMMUNICATIONS WITH PURDUE BOARD MEMBERS ON THE SPECIAL COMMITTEE ARE PRIVILEGED AND ENCOMPASSED WITHIN THE COMMON INTEREST DOCTRINE ............................ 25

V.    COMMUNICATIONS WITH OTHER PROFESSIONALS WERE PROPERLY WITHHELD ................................................................... 29

     A.    Communications with Accountants and Investment Advisors Are Protected by Attorney-Client Privilege Or Work Product Protection ...... 29

     B.    Communications with Other Professionals Were Properly Withheld ...... 30

VI.    COMMUNICATIONS WITH THE DEPARTMENT OF JUSTICE ARE NOT DISCOVERABLE ............................................................................. 33

     A.    ████ .................................................. 33

     B.    ████ ................................................. 36

     C.    ████ ............................... 38

VII.    THE UCC IS NOT ENTITLED TO *IN CAMERA* REVIEW ............... 38

CONCLUSION ................................................................................................ 40

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adkins v. Sogliuzzo*,
 2011 WL 4345439 (D.N.J. Sept. 15, 2011) ...........................................................37

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
 2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016)........................................................34

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
 2017 WL 280816 (S.D.N.Y. Jan. 20, 2017) ...........................................................34

*Alpex Computer Corp. v. Nintendo Co.*,
 1988 WL 87511 (S.D.N.Y. Aug. 16, 1988)............................................................24

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloombingburg*,
 171 F. Supp. 3d 136 (S.D.N.Y. 2016).....................................................................15

*Burns v. New York State Dep't of Corrections*,
 1989 WL 90803 (S.D.N.Y. Aug. 22, 1989).............................................................37

*In re Caesars Entm't Operating Co., Inc.*,
 2016 WL 7477566 (Bankr. N.D. Ill. Sept. 21, 2016) .............................................39

*Calvin Klein Trademark Trust v. Wachner*,
 124 F. Supp. 2d 207 (S.D.N.Y. 2000).....................................................................29

*Calvin Klein Trademark Trust v. Wachner*,
 198 F.R.D. 53 (S.D.N.Y. 2000) .........................................................................15, 18

*Champion Parts Rebuilders, Inc. v. Cormier Corp.*,
 1987 U.S. Dist. LEXIS 11849, 1987 WL 19149 (N.D. Ill. Oct. 26, 1987) ............33

*Chevron Corp. v. Salazar*,
 2011 WL 3880896 (S.D.N.Y. Sept. 1, 2011)..........................................................18

*In re Copper Mkt. Antitrust Litig.*,
 200 F.R.D. 213 (S.D.N.Y. 2001) ............................................................................21

*Crane Sec. Techs., Inc. v. Rolling Optics, AB*,
 230 F. Supp. 3d 10 (D. Mass 2017) ........................................................................29

*In re FiberMark, Inc.*,
 330 B.R. 480 (Bankr. D. Vt. 2005) .........................................................................30

*In re Grand Jury Investigation*,
   399 F.3d 527 (2d Cir. 2005)...........................................................................................21

*In re Grand Jury Subpoenas Dated Mar. 24, 2003*,
   265 F. Supp. 2d 321 (S.D.N.Y. 2003)..........................................................................9, 16

*Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC*,
   202 F.R.D. 418 (E.D. Pa. 2001)......................................................................................19

*Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co*,
   2014 WL 652308 (D. Conn. Feb. 19, 2014) ...................................................................36

*Haugh v. Schroder Inv. Mgmt. N.A. Inc.*,
   2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003)..........................................................15, 18

*HSH Nordbank AG NY Branch v. Swerdlow*,
   259 F.R.D. 64 (S.D.N.Y. 2009) ...................................................................................27, 28

*In re Int'l Oil Trading Co., LLC*,
   548 B.R. 825 (Bankr. S.D. Fla. 2016) ............................................................................32

*Kraus Indus. v. Moore*,
   2008 U.S. Dist. LEXIS 10065 (W.D. Pa. Feb. 11, 2008) ..............................................19

*Lamoureux v. Anazaohealth Corp.*,
   2009 WL 813977 (D. Conn. Mar. 26, 2009) ..................................................................35

*N.Y. Times Co. v. United States DOJ*,
   939 F.3d 479 (2d Cir. 2019)............................................................................................18

*Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enf't*,
   No. 16 CIV. 387 (PAE), 2020 WL 5518114 (S.D.N.Y. Sept. 14, 2020).........................25

*Primetime 24 Joint Venture v. EchoStar Commc'ns. Corp.*,
   2000 WL 97680 (S.D.N.Y. Jan. 28, 2000) .....................................................................35

*Ravenell v. Avis Budget Grp., Inc.*,
   2012 WL 1150450 (E.D.N.Y. Apr. 5, 2012) ...................................................................15

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   352 F. Supp. 3d 207 (E.D.N.Y. 2019) .............................................................................15

*In re Signet Jewelers*,
   332 F.R.D. 131 (S.D.N.Y. 2019), *aff'd*, 2019 WL 5558081 (S.D.N.Y. Oct. 23,
   2019) .....................................................................................................................18, 23, 31

*Stafford Trading, Inc. v. Lovely*,
   2007 U.S. Dist. LEXIS 13062 (N.D. Ill. Feb. 22, 2007) ................................................29

*Stardock Systems, Inc. v. Reiche*,
    2018 WL 6259536 (N.D. Cal. Nov. 30, 2018) ....................................................10, 11, 16, 17

*In re Tribune Co.*,
    2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ...................................................................27

*U.S. v. Kovel*,
    296 F.2d 918 (2d Cir. 1961)...................................................................................................32

*United States v. Adlman*,
    134 F.3d 1194 (2d Cir. 1998)................................................................................................17

*United States v. Alex. Brown & Sons, Inc.*,
    169 F.R.D. 532 (S.D.N.Y. 1996) ..........................................................................................33

*United States v. ASCAP*,
    1996 WL 157523 (S.D.N.Y. April 3, 1996) ..........................................................................36

*United States v. Construction Prods. Rsch, Inc.*,
    73 F.3d 464 (2d Cir. 1996)....................................................................................................25

*United States v. Glens Falls Newspapers, Inc.*,
    160 F.3d 853 (2d Cir. 1998)........................................................................................5, 35, 37

*United States v. Nobles*,
    422 U.S. 225 (1975)..............................................................................................................17

*United States v. Zolin*,
    491 U.S. 554 (1989)..............................................................................................................38

*Universal Standard, Inc. v. Target Corp.*,
    331 F.R.D. 80 (S.D.N.Y. 2019) ............................................................................................18

*In re WorldCom, Inc. Sec. Litig.*,
    2003 WL 22953645 (S.D.N.Y. Dec. 16, 2003) ................................................................5, 33

**Rules & Statutes**

Fed. R. Bankr. P. 2004.............................................................................................................35

Fed. R. Bankr. P. 9031..........................................................................................................5, 38

Fed. R. Civ. P. 26(b)(2)(D)(ii) ................................................................................................19

Fed. R. Evid. 503(b).................................................................................................................21

Local Bankruptcy Rule 7034-1 ...........................................................................................25, 27

The Raymond Sackler family ("**Side B**")[2] respectfully submits this memorandum of law in opposition to the Official Committee of Unsecured Creditors' (the "**UCC's**") Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged (the "**General Challenges Motion**").

## PRELIMINARY STATEMENT[3]

The UCC has spent more than a year conducting a sweeping investigation into the affairs of the Debtors, the Sackler families, and their related entities and trusts. From Side B alone, it demanded documents covering at least 120 different topics dating back 25 years before the petition date from a long list of custodians, most of whom had no meaningful role at Purdue. The scope has been literally preposterous.[4] But Side B has acceded to virtually every discovery demand made of it by the UCC. This is why, as the Court recently observed, it has not had to make any rulings—beyond giving guidance—on any discovery dispute.[5] But as the Court also

---

[2]    The Raymond Sackler Family includes Richard Sackler, David Sackler, and the estates of the late Jonathan Sackler and Beverly Sackler.

[3]    "**Ex.**" refers to exhibits to the accompanying Declaration of ▮▮▮▮▮▮ "▮▮▮▮ **Ex.**" refer to the exhibits to the accompanying Declaration of ▮▮▮▮▮▮ ("▮▮▮▮ **Decl.**"). "**Hurley Ex.**" refers to exhibits to the Declaration of Mitchell Hurley ("**Hurley Decl.**") accompanying the General Challenges Motion.

[4]    The UCC has required Side B to collect documents from such far-ranging and irrelevant sources as college email boxes and social media accounts established in the name of deceased pets, minor children, and business ventures having nothing to do with Purdue or pharmaceuticals. It was not only the collection itself that was overbroad; so, too, was the eventual review and production. The UCC demanded that Side B apply extremely broad search terms (*e.g.*, "verbal," "arm's length") that were not reasonably targeted to return relevant documents and then insisted that every document returned by its search terms be deemed "presumptively responsive" to the subpoena, regardless of its relevance to the issues.

[5]    *See* Sept. 30, 2020, Hr'g Tr. at 82:13-15.

1

noted, the transparency demanded by this case does not require Sackler family members to give up discovery privileges.[6]

The UCC's General Challenges Motion challenges 11,739 entries on Side B's privilege logs. Of these, 9,143—over 77%—involve communications among Side B, its counsel, and public relations professionals hired by counsel in late 2018 to help redress the unbalanced and inaccurate media onslaught threatening Side B's ability to get a fair hearing on the merits (the "**PR Communications**"). The UCC's attack on the PR Communications and the remainder of its General Challenges Motion are meritless for seven reasons:

*First*, the PR Communications are both privileged and protected as work product. The public relations professionals were hired by counsel specifically for the purpose of helping to redress the massive number of vicious, inaccurate and one-sided media attacks on Sackler family members that undermine counsel's ability to find an unbiased jury pool and other fact-finders, and obtain a fair hearing on the merits for the family. In extraordinary circumstances like these, communications with public relations professionals to help mitigate the taint of saturating, biasing media influence, for the purpose of ensuring the fairness of litigation, fall within the attorney-client privilege. Almost all of the PR Communications (8598 of 9143) are also protected as work product, and the UCC has made no showing sufficient to pierce that qualified privilege.

*Second*, the UCC seeks production of 2,200 documents involving ███████████ These documents are both privileged and protected as work product. ███████ is an advisor who provides accounting and other financial services to Side B family members; an officer of various

---

[6]    *See id.* at 82:18-20.

Side B family entities; a current or former trustee of several Side B trusts; an officer of trustee

companies for Side B trusts; and an advisor to Side B on a wide variety of financial matters.[7]

The UCC argues that ████████ is an accountant, and the communications with him could only be

within the scope of attorney-client privilege if he were performing necessary translation services

of accounting matters to an attorney.  But ████████ is far more than an accountant.  Because of

his multiple roles, he himself falls within the definition of "Initial Covered Sackler Person" in ¶1

of the November 20, 2019 Amended and Restated Case Stipulation [ECF No. 518].  ████████ is a

quintessential representative, employee, and agent of Side B and therefore falls within the scope

of Side B attorney-client privilege.  In addition, ████████ has been privy to work product, and the

UCC has made no showing to overcome work product protection with respect to any document

on Side B's privilege logs involving ████████.

    ***Third***, the UCC has no basis to challenge privilege assertions over the few dozen Side B

documents involving Stuart Baker that the UCC seeks.  Mr. Baker is a lawyer and has served as

longtime counsel to the Debtors, the IACs, Sackler family members, and their related entities and

trusts.  The UCC correctly observes that Mr. Baker held various non-legal roles at the Debtors

and related parties, and Side B has produced tens of thousands of documents involving Mr.

Baker that did not involve confidential communications seeking or rendering legal advice.  The

relevant entries on Side B's privilege logs make it clear that, in the documents at issue, Mr.

Baker was providing or being solicited for legal advice.  The UCC offers not one shred of

evidence to show that Mr. Baker was acting in a non-legal capacity in respect of the challenged

entries.

---

[7]    *See, e.g.*, Ex. 94 at 31, 59, 60 (Nov. 22, 2019 Raymond Side Informational Presentation) (noting current and former trustee positions).

3

REDACTED

*Fourth*, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

*Fifth*, the UCC challenges Side B's privilege log entries involving a variety of
accountants, investment advisors, joint venture partners, and other professionals.  These
documents are protected from disclosure because they are work product.  The UCC has made no
showing that sharing work product with these professionals increased the likelihood that the
materials would come into the hands of a litigation adversary.

*Sixth*, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

4



The UCC has so far charged the estate over $40 million for its investigation.  It has all of the underlying documents.  It can do its own analysis.

*Seventh*, the UCC is not entitled to its alternative requested relief of *in camera* review of the nearly 12,000 documents it challenges on Side B's privilege logs.  Mere suspicions of counsel, unsubstantiated by facts, are insufficient to justify this relief.  Moreover, the UCC's request would place monumental burdens on the Court, as the UCC acknowledges in its brief.  And it is *the Court* that the UCC would be imposing upon.  Although the UCC suggests appointing a special master, it overlooks that masters are not permitted in bankruptcy cases, as Rule 9031 makes unmistakably clear.

## BACKGROUND

The substantial size of Side B's privilege logs is the by-product of the UCC's immense discovery program.  Side B counsel reviewed millions of pages sourced from at least 84 personal and professional email boxes, social media accounts, and other communication platforms, as well as 53 personal devices, cellular phones, and computers; the resulting data collected and processed reached 7.657 terabytes in size.[8]  It is no surprise that a review process of this

---

[8]    Four terabytes—about half of this volume—has been estimated to fill 16 Sears Towers.  *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22953645, at *3 (S.D.N.Y. Dec. 16, 2003).  As we

magnitude resulted in privilege logs with thousands of entries.  Each entry now at issue has been considered and reconsidered.

Through the meet-and-confer process, Side B undertook multiple good faith re-reviews of privilege designations as the UCC identified discrete categories of challenged documents, and Side B produced approximately 100 documents as a result.[9]  Side B also undertook certain re-reviews, on its own initiative, to confirm the accuracy of its privilege logs, and produced an additional approximately 550 documents, including 401 that were included on Exhibit B to the Hurley Declaration accompanying the UCC's motions.[10]  Side B also provided the UCC with significant additional information about the documents and individuals at issue in this motion, to provide more support and explanation for its privilege and work product assertions.[11]

Over 75% of the log entries at issue include litigation and bankruptcy counsel and are dated 2018 or later, *after* Side B directors left the Purdue Pharma Inc. ("**PPI**") board, *after* Purdue Pharma L.P. ("**PPLP**") had ceased marketing opioid products, and *after* the litigation against Sackler family members had commenced—in other words, communications overwhelmingly likely to relate to litigation strategy, and correspondingly unlikely to reflect

---

have noted before, the 7.6 terabytes actually collected here by Side B counsel equates to more than half the total volume of the Library of Congress.  *See* Leslie Johnston, *A "Library of Congress" Worth of Data: It's All In How You Define It*, THE SIGNAL (Apr. 25, 2012), https://blogs.loc.gov/thesignal/2012/04/a-library-of-congress-worth-of-data-its-all-in-how-you-define-it/ (citing sources estimating that "[a]ll the data in the American Library of Congress amounts to 15 TB") (quoting *Optimism Shines through Experts' View of the Future*, THE SYDNEY MORNING HERALD (Mar. 24, 2012, 3:00 AM), https://www.smh.com.au/national/optimism-shines-through-experts-view-of-the-future-20120323-1vpas.html).

[9]    *See* Exs. 102, 104, 110, 111, 118, 119.

[10]    Attached hereto as Ex. 121  is a revised version of Hurley Ex. B that reflects the documents that the UCC seeks to compel which have already been produced in full.

[11]    *See* Exs. 99, 100, 101, 103, 105, 107,108, 110, 111, 118, 119.

historical conduct giving rise to alleged liability.[12]

## **ARGUMENT**

**I.      COMMUNICATIONS WITH PUBLIC RELATIONS ("PR") CONSULTANTS TO FACILITATE LEGAL ADVICE ARE PRIVILEGED AND PROTECTED BY THE WORK PRODUCT DOCTRINE**

This is not a typical case.  It is being tried in the media, not the courtroom.  This clip

from NBC's affiliate in Boston—which aired on the day the family's motion to dismiss the

Massachusetts AG's complaint was heard—exemplifies the prejudicial coverage of the family:

http://mms.tveyes.com/MediaCenterPlayer.aspx?u=aHR0cDovL21lZGlhY2VudGVyLnR2
2ZXllcy5jb20vZG93bmxvYWRnYXRld2F5LmFzcHg%2FVXNlcklEPTcyNzUxOSZNR
ElEPTEyMDY2MTg4Jk1EU2VlZD03NjM2JlR5cGU9TWVkaWE%3D

NBC10 Boston, TVEYES (Aug. 2, 2019).  This clip shows the Massachusetts AG joining

protestors bearing placards of huge photos of deceased loved ones outside the courthouse.  *Id.* at

0:30-0:38.  The reporter repeats all of Massachusetts' claims and shows highlights from the

AG's courthouse press conference, in which she declares:  "It's a classic example of profits over

people."  *Id.* at 0:44-0:46.  A voiceover reports:  "Attorneys for the company's top leaders said

they can't be held personally liable for the problem on the ground. . . . But for families in the

state who today stood on these steps, that doesn't matter."  *Id.* at 1:16-1:41.  That is followed by

statements of protesters:  "We want them held accountable."  *Id.* at 1:41-1:42.

The use of the media to drown out the merits—and to obscure the lack of factual or legal

support for claims against the Sackler family—is a deliberate strategy that counsel for the

plaintiffs in the opioid litigation announced years ago.  For example:

- *Bloomberg* (2017):  "This litigation will vilify them.  It won't make the companies look like they're legitimate businesspeople.  It'll make them look like they took advantage and made billions of dollars on lots of people who died from their

---

[12]      *See* Ex. 119 at 2-3.

products."[13]

- *60 Minutes* (2018):  Plaintiff's counsel: "A case in court is a case in court, and that's fine.  But there's also the court of public opinion.  And the court of public opinion is sometimes the most powerful court."[14]

As this Court has observed, "shaming has become a litigation tool."  May 1, 2020 Hr'g Tr. at 40:8-9.  The Sackler family is now reviled because the media has decided that they created and profited from the opioid epidemic, despite the fact that none of this is true.  The UCC has itself brought press coverage into these proceedings, its counsel quoting a prejudicial headline—"The Sacklers Could Get Away With It"—and then arguing from that premise.  July 23, 2020 Hr'g Tr. at 44:22-45:2.

The plaintiffs' use of media as a litigation tool compelled counsel for Side B to retain its PR advisors.  The November 12, 2018 engagement letter between Side B litigation counsel Joseph Hage Aaronson LLC ("**JHA**") and ███████████████ makes this clear:



---

[13]    Esmé E Deprez & Paul Barrett, *The Lawyer Who Beat Big Tobacco Takes On the Opioid Industry*, BLOOMBERG BUSINESSWEEK (Oct. 5, 2017), https://www.bloomberg.com/news/features/2017-10-05/the-lawyer-who-beat-big-tobacco-takes-on-the-opioid-industry?sref=WTioBDaU (quoting Mike Moore, Plaintiff's Attorney).

[14]    *60 Minutes*: *Opioid Crisis: The lawsuits that could bankrupt manufacturers and distributors*, CBS NEWS (Dec. 16, 2018), https://www.cbsnews.com/video/opioid-crisis-attorney-mike-moore-takes-on-manufacturers-and-distributors-at-the-center-of-the-epidemic-60-minutes/ (subscription required).

██████████████ .[15]

Against this background, the UCC seeks to compel the production of 9,147 documents

described in the Side B Logs because they involve (i) ██████ ; (ii) ████████████████

████████████████████ , a non-testifying data-analysis expert that JHA engaged (██

██████ is not a public relations firm, as Side B has repeatedly informed the UCC[16]); or (iii) PR

professionals engaged by other parties with whom Side B shares common legal interests.[17] *See*

General Challenges Motion ¶50 n.41 & Hurley Ex. B (Tab B). The UCC argues that disclosure

to a PR firm like ██████ "waives privilege." General Challenges Motion ¶45. But in

extraordinary circumstances like those enveloping Side B, the privilege "extends to otherwise

privileged communications that involve persons assisting the lawyer in the rendition of legal

services[,]" including public relations "consultants used by lawyers to assist in performing tasks

that go beyond advising a client as to the law." *In re Grand Jury Subpoenas Dated Mar. 24,*

*2003*, 265 F. Supp. 2d 321, 325-26 (S.D.N.Y. 2003).

---

[15]    *See* ██████ Ex. A ¶ 2 (emphasis added).

[16]    *See* Ex. 89 ; Ex. 108 at 4 ; Ex. 118 at 2; and § I.C, below.

[17]    Disputes about 36 communications with PR professionals ████████ and ████████
are moot because those documents have been produced. *See* Ex. 121 at Tab B. The other PR
professionals at issue were—as Side B's logs and letters to the UCC reflect—retained by Purdue,
the IACs, or Side A, with whom Side B shares a common interest. *See infra* § V.B. They are:
████████████████████████████████████████████ *See* Ex. 122 ; Ex. 108 at 4; Ex. 110 at 1 ;
Ex. 111 at 1 ; Ex. 118 ; and § V.A, below. Side B respectfully refers the Court to contemporaneous
opposition briefs filed by the Debtor and Side A addressing those PR professionals. Side B
respectfully requests that the UCC's challenge to the IAC's assertion of privilege for its PR expert,
████████████████ —first raised on by the UCC September 22, but never explained (*see* Ex.
116 ; Ex. 117 —should await a motion, if any, by the UCC directed to the IACs. *See* the UCC's
contemporaneous Exceptions Motion, ECF No. 1753, ¶¶40, 48 (anticipating possible motion
practice concerning IAC privilege).

### A.    __Communications with ███████ Are Protected by Attorney-Client Privilege__

This is the paradigmatic case for application of Judge Kaplan's reasoning in *In re Grand Jury*.  Like this case, *In re Grand Jury* involved a "high profile matter" that was the subject of "intense press interest and extensive coverage . . . ."  265 F. Supp. 2d at 323.  Lawyers for the target retained a PR firm "out of a concern that 'unbalanced and often inaccurate press reports about Target created a clear risk that the prosecutors and regulators conducting the various investigations would feel public pressure to bring some kind of charge against' her."  *Id.*  The firm's "primary responsibility was . . . to communicate with the media in a way that would help restore balance and accuracy to the press coverage" with the "objective [of] neutraliz[ing] the environment in a way that would enable prosecutors and regulators to make their decisions and exercise their discretion without undue influence from the negative press coverage."  *Id.*

Judge Kaplan recognized that "the ability of lawyers to perform some of their most fundamental client functions . . . would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants."  *Id.* at 330.  Judge Kaplan held that, in appropriate circumstances, the "policies that inform the attorney-client privilege" are furthered by "encouraging frank communication among client, lawyers, and public relations consultants," *id.* at 330, and this "warrants extension of the privilege to confidential communications between and among the client, the lawyer, and any public relations consultant the lawyer may engage to advise on the performance of that function."  *Id.* at 329.

Similarly, in *Stardock Systems, Inc. v. Reiche*, 2018 WL 6259536 (N.D. Cal. Nov. 30, 2018), the plaintiffs had disseminated "false and negative statements" in a "public relations . . . war" aimed at "sway[ing] public opinion in favor of [plaintiff] while casting a

shadow over [defendants], thereby forcing them to settle this case . . . ." *Id.* at *2.  Counsel for

defendants retained a public relations firm to "provide[] input on legal strategy, including

regarding initial pleadings and communications about the case to counteract . . . [plaintiffs'] false

and negative statements."  The Court held that the attorney-client privilege applied "because

Defendants' counsel (and not Defendants themselves) hired the PR firm . . . to provide PR

counseling specifically for the purposes of litigation strategy in the current action[.]"  *Id.* at *6.

      Extension of the privilege to ███████ is warranted under *In re Grand Jury* and *Stardock.*

JHA retained ███████ to combat the massive number of highly prejudicial, publicly disseminated

falsehoods about the Sacklers that jeopardize their right to receive fair hearing.  Examples of

incendiary media appearing before counsel hired ██████ include:

- "**The Sackler dynasty's ruthless marketing of painkillers has generated billions of dollars—and millions of addicts.**"  Patrick Keefe, *The Family That Built An Empire Of Pain*, THE NEW YORKER (Oct. 23, 2017)  https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.

- "**The Sacklers have made a fortune from OxyContin, the painkiller blamed for sparking the deadly opioid crisis.**"  Allen Frances, *The Sackler Family's Drug Money Disgraces Museums Around the World*, THE GUARDIAN (Feb. 16, 2018) https://www.theguardian.com/commentisfree/2018/feb/16/sackler-family-blood-money-disgrace-museums.

- "**What about deaths caused by Purdue's drug OxyContin, reportedly the world's top-selling opioid painkiller?**"  David Cohen, *The Opioid Timebomb: The Sackler Family and How Their Painkiller Fortune Helps Bankroll London Arts*, THE EVENING STANDARD (March 19, 2018)  https://www.standard.co.uk/news/health/the-opioid-timebomb-the-sackler-family-and-how-their-painkiller-fortune-helps-bankroll-london-arts-a3793651.html.[18]

The vitriol aimed at the Sacklers includes anti-Semitic tropes and death threats.  One

---

[18]    *See also* Harriet Ryan, *et al.*, "*You want a description of hell?*" *OxyContin's 12-hour Problem*, LOS ANGELES TIMES (May 5, 2016) https://www.latimes. com/projects/oxycontin-part1/; Barry Meier, *Pain Killer: America's Opioid Crisis Uncovered*, CNBC (May 31, 2018) https://www.cnbc.com/video/2018/05/31/pain-killer-americas-opioid-crisis-uncovered.html.

noxious blog published a series of posts tarring "**the New York Jews known as the Sackler family**" as "**the demons who deliberately crafted, planned, and inseminated the White Plague**," and purporting to tell "**the tale of the Sacklers' rise to power, of the Jewish perversion of the pharmaceutical industry**," which "**provides us with an incredible glimpse into the Jewish coup of the twentieth century, into the Jewish corrosion of every single one of our institutions**."[19] Tweets urge that the "**first public Rose Garden executions, by help of Saudi's bone cutters, will be the Sackler family**."[20] There are countless more like this.[21]

▓▓▓▓ has tracked legions of similarly false and incendiary statements disseminated globally. ▓▓▓▓ has helped obtain corrections from more than fifty major media outlets, including ABC News, CBS News, CNN, Fox News, MSNBC, NBC News, The New York Times, NPR, The Wall Street Journal, and The Washington Post, and ▓▓▓▓ has succeeded in

---

[19]    Giles Corey, *The White Plague, Part I, An Empire of Death: The Rise of the House of Sackler*, OCCIDENTAL OBSERVER (July 22, 2020) https://www.theoccidentalobserver.net/2020/07/22/the-white-plague-part-i-an-empire-of-death-the-rise-of-the-house-of-sackler/.

[20]    (@ReporterPhoenix), TWITTER https://twitter.com/ReporterPhoenix/status/1096473344705265664.

[21]    *See, e.g.,* (@alexhudginsbush), TWITTER https://twitter.com/alexhudginsbush/status/1213213313737248768?s=11 ("**All i [sic] said was 'the entire sackler family deserves to be shot and their bodies put on display'**"); (@shewz), TWITTER https://twitter.com/shewz/status/1182488112871530496 ("**the Sackler family would be killed in a public execution** ... I would go even if it would mean I lost my job"); Ex. 88 (copy of: (@ArtbyKGH), TWITTER https://twitter.com/ArtbyKGH/status/1097251776166850560 ("**If we're gonna execute drug dealers, we can start with the Sackler family**") (subsequently removed for violation of policy)); (@shewz), TWITTER https://twitter.com/shewz/status/1108125939366412288 ("**If you want to get the root cause start by feeding the Sackler family to hungry dogs**"); (@tsawruk), Twitter https://twitter.com/tsawruk/status/1225397648892493825 ("**The Sackler family should be killed by lethal injection of their own product**"); (@naninizhoni), TWITTER https://twitter.com/naninizhoni/status/1293238951239651342 ("**I wish the Sackler family could get the guillotine**.").

getting inflammatory social media posts taken down.[22]

Many of the statements ▮▮▮▮ worked to correct were based on false allegations

emanating from the opioid litigation.  For example:

- The New York Times corrected its false statement—based on a "filing in a Massachusetts lawsuit"—in a January 15, 2019 article that the "Sacklers Directed Efforts to Mislead Public About OxyContin, <u>New Documents Indicate,</u>" to say "<u>Court Filing Claims</u>."[23]

- NBC corrected its accusation on December 29, 2019 that the Sacklers "tried to hide ill-gotten billions overseas" to reflect that it was "<u>[a]ccording to the New York state attorney general</u>," and the "<u>Sacklers has [sic] disputed the AG's findings.</u>"[24]

- The New York Times corrected misstatements in a July 22, 2020 op-ed, *The Sacklers Could Get Away With It* (original material stricken; new language in bold and underscored): "So far, the bankruptcy court has granted injunctions stopping proceedings in several hundred lawsuits charging that Sackler family members directed the aggressive marketing campaign ~~that led to~~ **for OxyContin; it and other opioids have been implicated in the addictions of** millions of ~~addicted~~ patients and the deaths of several hundred thousand."  The correction added that "**it is unclear what proportion**" of addiction and opioid deaths "**OxyContin is responsible for**."[25]

---

[22]    *See* the accompanying ▮▮▮▮ Declaration at ¶¶6-12.

[23]    *Compare* original (▮▮▮ Ex. B) *with* corrected version, Barry Meier, *Sacklers Directed Efforts to Mislead Public About OxyContin, Court Filing Claims*, THE NEW YORK TIMES (Jan. 15, 2019), https://www.nytimes.com/2019/01/15/health/sacklers-purdue-oxycontin-opioids.html. ABC News made a similar correction to its January 16, 2019 article about the Massachusetts litigation, "Family behind OxyContin knowingly deceived public about safety of the opioid drugs, **court documents allege**." *Compare* original (▮▮▮ Ex. C) *with* corrected version, Aaron Katersky and Anthony Rivas, *Family Behind OxyContin Knowingly Deceived Public About Safety of the Opioid Drugs, Court Documents Allege*, ABCNEWS (Jan. 16, 2019, 7:29 PM), https://abcnews.go.com/US/Health/family-oxycontin-knowingly-deceived-public-safety-opioid-drugs/story?id=60428693.

[24]    *Compare* original (▮▮▮Ex. D) *with* corrected version, Zachary Siegel, *Opioids, Pot and Criminal Justice Reform Helped Undermine this Decade's War on Drugs*, NBCNEWS.COM (Dec. 29, 2019, 4:30 AM), https://www.nbcnews.com/think/opinion/opioids-pot-criminal-justice-reform-helped-undermine-decade-s-war-ncna1108231.

[25]    *Compare* original (▮▮▮ Ex. E) *with* corrected version, Gerald Posner and Ralph Brubaker, *The Sacklers Could Get Away With It*, THE NEW YORK TIMES (July 22, 2020),

The ███████ Declaration reflects enormous efforts, under the supervision of counsel, to ameliorate the media carnage.  As in *Grand Jury Subpoenas*, "public advocacy" coordinated by counsel on behalf of the Sacklers plainly rose to the level of a "professional legal service" and it warrants "extension of the privilege to confidential communications between and among" the Sacklers, their counsel, and the public relations consultants JHA "engage[d] to advise on the performance of that function."  265 F. Supp. 2d at 329.

The engagement letter contemplates that JHA, its co-counsel, PPLP, or members of the Sackler family will ████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████  ██████ Ex. A  at ¶¶3(b)-(e).

The UCC offers no sound basis for invading the privilege. ███████████████████

█████████████████████████████████████████████████  General Challenges Motion

¶52.  But that is not the issue.  Side B has produced thousands of communications with ██████ reflecting "monitoring" of news stories.[26]  That is not what has been withheld as privileged.

The UCC contends that *In re Grand Jury* is limited to "its particular context" and that communications with PR experts may privileged only "if they constitute efforts to influence prosecutors' and regulators' decisions whether to indict in a high-profile grand jury investigation."  General Challenges Motion ¶¶47-48.  But a fair hearing is a fair hearing, whether before prosecutors, a court, or a jury.  Even on the UCC's squibbed reading, the present proceeding involves state AGs and local DAs with prosecutorial powers who follow the media.

---

https://www.nytimes.com/2020/07/22/opinion/sacklers-opioid-epidemic.html?action=click&module=Opinion&pgtype=Homepage.

[26]    *See, e.g.*, Exs. 90, 91, 92.

None of the cases the UCC cites parallels the extraordinary media circumstances presented here,[27] and two of them recognize the validity of *In re Grand Jury* in circumstances like these.[28]

The UCC ignores the descriptions for withheld communications with ███ (*see* General Challenges Motion ¶53), which explain that the documents are "█████████████████████ █████████████████████████████████████████████████████████████ █████████████████" Hurley Ex. B (Tab B).  The UCC nowhere mentions the copious additional "Subject line" and "file name" metadata for the documents in the Side B privilege logs.  That data confirms the communications represent efforts by ███ to advance Side B's legal defense

---

[27]    *See Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 54-55 (S.D.N.Y. 2000) (PR firm represented as retained by counsel for litigation "was already working directly for the [client] pursuant to an agreement dated" over a year earlier; log reflected "ordinary public relations advice" where the "work and advice simply serves to assist counsel in assessing the probable public reaction to various strategic alternatives"); *Haugh v. Schroder Inv. Mgmt. N.A. Inc.*, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) (plaintiff "has not identified any legal advice that required the assistance of a public relations consultant" such as a "nexus between the consultant's work and the attorney's role in preparing … [the] case for court"); *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloombingburg*, 171 F. Supp. 3d 136, 139-40, (S.D.N.Y. 2016) (rejecting counsel's "rather brazen" request that the "Court ... rely on their broad representation that the attorney-client and work-product privileges apply to communications with an outside public relations consultant" engaged pursuant to a contract with the client, not counsel, notwithstanding conceded failure to "collect[], review[] or log[] the communications at issue").

[28]    *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 212 (E.D.N.Y. 2019) (recognizing *In re Grand Jury*'s "precedential value" in the "unique context" of a "high profile criminal investigation where lawyers are attempting to counteract the broad power of the government," as distinguished from "the routine hiring of consultants to help a company improve its regulatory position"); *Ravenell v. Avis Budget Grp., Inc.*, 2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) (recognizing that *In re Grand Jury* found privilege in "situations where an agent performs a role beyond the expertise of counsel but nevertheless crucial to providing competent legal advice," there, a "high profile grand jury investigation," where counsel hired PR consultants "to assist them dealing with the media in cases such as this").

19-23649-shl    Doc 1816    Filed 10/16/20    Entered 10/16/20 16:12:42    Main Document
Pg 21 of 45
REDACTED

by identifying and correcting misinformation related to the opioid litigation;[29] responding to

false statements by AGs and other plaintiffs to the press;[30] and developing strategies and analysis

to help correct the public record about facts at issue in the litigation.[31]

     In a hostile media environment that includes stories in, for example, The New Yorker

entitled "*The Family That Built an Empire of Pain*," and major newspapers and networks issuing

corrections of misstatements about the family, these Side B privilege log entries fairly reflect

██████ assistance in working to create an environment in which the merits can be heard.  *In re*

*Grand Jury Subpoenas* recognizes this as one of a lawyer's "most fundamental client functions."

265 F. Supp. 2d at 330.  *Stardock* upheld privilege log entries like Side B's—regarding the

"response to initial press inquiry;" "potential reporters and publications requested by counsel;"

"claims;" "draft press release;" "settlement negotiations;" "public posts;" "services;" and

"potential future strategy"—because they "relate to . . . counsel's litigation strategy in dealing

with the present suit," "legal advice in responding to the lawsuit filed by Plaintiff" and

---

[29]   *E.g.*, Hurley Ex. B (Tab B), lines 428, 691-95, 1660-62, 3915-16, 3918, 3921-22 (referencing ██████); 85, 87, 92, 118, 121, 319 ("████████████████████"); 5215-17 ("████████████"); 5269-76 ("████████████?");

[30]   *E.g.*, Hurley Ex. B (Tab B) lines 374 ("████████████"); 683 (describing ████ ████); 1545 ("████████████████████"); 4400 ("████████████████████"); 4837 ("████████████████████"); 5622 ("████████████████████").

[31]   *E.g.*, Hurley Ex. B (Tab B) lines 4624-38, 4640-41, 4654-57, 8000-16 ("████████"); 5224 ("████████████"); 5250 ("████████████████████"); 877, 881, 893, 895, 902 ("████████████████"); 8788-90, 8959 ("████████████"); 9144 ("████████████████"); 9129 ("████████████"); 882-86 ("████████████████"); 1007-08, 1022 ("████████████"); 1229-31 ("████████████"); 3878-79 ("████████████████"); 3885 ("████████"); 4116-17 ("████████████"); 4356 ("████████████").

16

"launching a public or social media based campaign that will most favor Defendants in terms of their perception in the current legal action."  2018 WL 6259536 at *6.

## B.    ███████ **Communications Are Protected Work Product**

The communications involving ██████ also are protected by the work product doctrine, which is "distinct from and broader than the attorney-client privilege."  *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975).[32]  "Where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3)."  *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998).

The work product privilege protects documents prepared by an attorney's agent, including public relations consultants.

> [T]the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Nobles*, 422 U.S. at 238-39.  This applies to public relations consultants.  *See Stardock*, 2018 WL 6259536 at *3 ("In the context of Rule 26, PR firms may fall within the category of an attorney's consultant or at the very least their agent.").

The waiver rules regarding the work product doctrine differ from those regarding the attorney-client privilege in two ways.  *First*, "[u]nlike the attorney-client privilege, the work-product privilege is not necessarily waived by disclosure to any third party; rather, the courts

---

[32]    Side B withheld approximately 8598 of the 9143 PR documents on work product grounds, some (not all) in addition to a privilege designation.  *See* Hurley Ex. B (Tab B).

generally find a waiver of the work product privilege <u>only if the disclosure substantially</u>

<u>increases the opportunity for potential adversaries to obtain the information</u>."[33] Even in

circumstances in which the public relations advice itself is found to "fall[] outside the ambit of

protection of the 'work product' doctrine embodied in Rule 26(b)(3):"

> It does not follow . . . that an otherwise valid assertion of work-product protection is waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence . . . .  This is especially so if, as plaintiffs here assert, the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing . . . .

*Calvin Klein Trademark*, 198 F.R.D. at 55.[34]

The UCC argues that  (General Challenges Motion ¶54), but does not even attempt to

explain how Side B's log falls short of that burden.  Even cases on which the UCC relies

acknowledge that work product protects materials, like ▮▮▮▮, prepared "to aid counsel in

preparing for litigation."[35]

---

[33]    *In re Signet Jewelers*, 332 F.R.D. at 138 (emphasis added); *see also N.Y. Times Co. v. United States DOJ*, 939 F.3d 479, 494 (2d Cir. 2019) ("A party waives the work product protection by taking actions inconsistent with this [sic] its purpose, such as disclosing work product to its adversary, or by placing privileged documents 'at issue' in a litigation") (citations omitted).

[34]    *See also Haugh v. Schroder Inv. Mgmt. N.A. Inc.*, 2003 WL 21998674, at *1 (S.D.N.Y. Aug. 25, 2003) (letters from counsel to public relations consultant entitled to work product protection even though not entitled to attorney-client privilege).

[35]    *Universal Standard, Inc. v. Target Corp.*, 331 F.R.D. 80, 93 (S.D.N.Y. 2019); *see also Calvin Klein Trademark*, 198 F.R.D. at 55 ("It does not follow ... that an otherwise valid assertion of work-product protection is waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence... This is especially so if ... the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself"); *Chevron Corp. v. Salazar*, 2011 WL 3880896, at

*Second*, the burden of proving waiver of work product protection falls on the UCC as the party seeking the work product.[36]  The UCC has not carried its burden.  Communicating with ███ did not increase the likelihood that adversaries would obtain the material communicated. This motion is proof of that.

### C.    Communications with ███████ Are Privileged and Protected by Work Product

As set forth in its retainer letter with JHA, ████████ was engaged "███████████ ████████████████████████████████████████████████ ██████████████████████████████████████." Ex. 89  ¶1.  Side B has repeatedly informed the UCC that ██████████ is *not* a PR firm,[37] and all 14 ████████ emails on the log include litigation counsel and reference a "███████."[38]  The UCC maintains its "PR consultant" challenge to ██████████ because it believes that ██████████ services "are intended to assist counsel in influencing media coverage."  General Challenges Motion at 27 n.43.  The UCC is apparently referencing portions of the engagement letter reflecting that ███████████████████████████████████████████████ ██████████████████████████████████████." Ex. 89  ¶2.  That is a patent misreading of the engagement letter.  Just as the engagement letter contemplates, as Side B told the UCC, and as the challenged privilege log entries reflect, ██████████ performed

---

*1-2 (S.D.N.Y. Sept. 1, 2011) (communication with PR consultant not protected because it was unrelated to "strategizing about the conduct of the litigation itself").

[36]     *See, e.g.*, *Kraus Indus. v. Moore*, 2008 U.S. Dist. LEXIS 10065, at *13 (W.D. Pa. Feb. 11, 2008); *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 418, 423 (E.D. Pa. 2001).

[37]     *See* Ex. 89; Ex. 108; Ex. 118; and § V.B, below.

[38]     *See* Hurley Ex. B (Tab B) (lines 1075, 1078, 1166-69, 1730, 4175-76, 4180-83, 6061).

analyses relevant to pending and anticipated litigation.

████████████ is a non-testifying expert engaged by counsel for litigation purposes, and the UCC has not shown the exceptional circumstances required—under Fed. R. Civ. P. 26(b)(2)(D)(ii)—to obtain access to obtain the ████████ communications it seeks.

**II.    ██████████ COMMUNICATIONS WERE PROPERLY WITHHELD**

The UCC seeks to compel production of approximately 2,200 communications[39] involving ████████—whom the UCC includes among "accountants and investment advisors"—arguing that Side B's descriptions of these communications "████████ ████████████████████████████████████████ ████████████." General Challenges Motion ¶58; *id.* Ex. B (Tab C). The UCC's characterization of privilege principles as they relate to accountants in general is not accurate— the privilege applies when attorneys rely on any other professionals to render legal advice (*see infra* § V.A)—but as to ████████, it is largely irrelevant. As the UCC is well aware, ████ is not simply an accountant.

During ████████ deposition, the UCC elicited extensive testimony regarding his various roles in respect of the Raymond Sackler family.[40] Side B's supplement to its privilege log likewise identified for the UCC the multiple roles ████████ served.[41] In light of the extensive

---

[39]    This includes a handful of communications involving employees that work for ████████ and were communicating at ████████ direction.

[40]    Ex. 115 at 40:21-23 (████████████████████████████████████); 53:16-68:18, 215:16-216:8 ████████████████████████████████████████████████████████████ ; 110:2-112:6, 147:5-151:10, 179:15-190:20 ( ████████████████████████████████████); 199:13-202:21 ( ████████████████████████████████); 277:23-279:12 ( ████████████████████ ).

[41]    Ex. 118 at 7-13.

information provided to the UCC regarding the breadth of ███████ roles with Side B, the

UCC's argument that ██████ could only be within the scope of privilege if he were providing

translation-like services on accounting matters is incongruous and off-point.

    As a long-time employee of the Sackler family, the manager of the Sackler family

offices, an advisor on a wide range of financial and accounting matters, trustee of several Side B

trusts, and officer of Side B family entities, ██████ is the consummate representative and agent

of the Raymond Sackler family members.  He is also an Initial Covered Sackler Person.  ███

██████ presence on privileged communications where he was acting in these capacities—which is

the case for all the documents at issue on Side B's privilege logs—does not waive the attorney-

client privilege.

    The Second Circuit looks to the Supreme Court's Proposed Rule of Evidence 503 for the

controlling principles of federal common law regarding privilege.  *See In re Grand Jury

Investigation*, 399 F.3d 527, 532 (2d Cir. 2005) ("While Proposed Rule 503 was not adopted by

Congress, courts and commentators have treated it as a source of general guidance regarding

federal common law principles.").[42]  Proposed Rule 503 reflects the common law principle that

privileged communications encompass those "between [a client] *or his representative* and his

lawyer or his lawyer's representative."  *See* Proposed Fed. R. Evid. 503(b), 56 F.R.D. 183, 236

(1972) ("A client has a privilege to refuse to disclose and to prevent any other person from

disclosing confidential communications made for the purpose of facilitating the rendition of

professional legal services to the client, (1) between himself *or his representative* and his lawyer

---

[42]    *See also In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 217 (S.D.N.Y. 2001)
("Proposed Rule of Evidence 503 . . . establishes a benchmark for determining the scope of the
attorney-client privilege under the federal common law . . . .").

or his lawyer's representative, or . . . or (4) *between representatives of the client* or between the client *and a representative of the client*." (emphasis added)).

The case law addressing employees of family offices affirms this principle.  In *In re Lululemon Athletica Inc.220 Litig.*, the plaintiffs sought to compel production of an email exchange involving (i) Lululemon personnel; (ii) Dennis Wilson, Lululemon's founder and Chairman of the Board; (iii) Mr. Wilson's personal attorney; and (iv) Tina Swinton, "the CFO of Wilson's 'Family Office,' which operated as his personal investment company."  No. CV 9039-VCP, 2015 WL 1957196, at *1-2 (Del. Ch. Apr. 30, 2015).  The plaintiffs argued that Lululemon waived the attorney-client privilege by including Swinton on the email exchange.  *Id.* at *4.  The Court disagreed: "Because Wilson and Lululemon had a common legal interest, any disclosure of the communication to Swinton would not be a waiver of privilege because *Swinton was Wilson's representative*."  *Id.* at *9 (emphasis added).

Similarly, in *Securities and Exchange Commission v. Wyly*, the Special Master—who is also the Reporter to the Advisory Committee on the Federal Rule of Evidence—concluded that communications involving family office employees are presumptively privileged.  No. 10 CIV. 5760(SAS), 2011 WL 3366491, at *8 (S.D.N.Y. July 27, 2011), *modified in other respects on reconsideration*, 2011 WL 3841591 (S.D.N.Y. Aug. 18, 2011), *and* 2011 WL 4055408 (S.D.N.Y. Aug. 19, 2011).  He found that that communications between "Keeley Hennington, the CFO, who oversaw the 'family office'" and a lawyer for the family were "clearly within the privilege, as they involve confidential communication on legal matters between a lawyer for the [family] and an agent necessary to the representation," and therefore did not need to be disclosed except to the extent that the privilege had been waived.  *Id.* at *2, *8.  *See also* 2011 WL

3841591, at *1 (first reconsideration decision finding a different document created by the same family office CFO privileged).

 role as an agent and representative of members of the Raymond Sackler family—as well as officer of family entities and trustee of family trusts—belies the UCC's arguments that ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████ General Challenges Motion ¶57. These issues fell squarely within ███████ role as an agent, employee, and representative of the family members and their trusts. His presence on communications involving these issues, where legal advice was sought or provided, does not vitiate the attorney-client privilege. *Lululemon*, 2015 WL 1957196, at *9; *Wyly*, 2011 WL 3366491, at *8.

Nor can the UCC establish waiver of the work product protection attaching to challenged communications involving ███████. Work-product protection is not waived by disclosure to a third-party, unless that disclosure increases the likelihood that potential adversaries will gain access to it. *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 138 (S.D.N.Y. 2019), *aff'd*, 2019 WL 5558081 (S.D.N.Y. Oct. 23, 2019) (McMahon, C.J.); *supra* §I.B. As a close advisor and employee of Side B, the disclosure of work product material to ███████ did nothing of the sort.

## III.    THE CHALLENGED STUART BAKER COMMUNICATIONS ARE PRIVILEGED

The UCC contends that 56 documents involving Stuart Baker are not privileged because the communications are not legal in nature. Side B has re-reviewed these 56 documents and determined that 26 could be produced in full and an additional 14 could be produced with

23

redactions rather than be withheld in full; it completed that production on October 14, 2020.[43]

Therefore, only 30 documents involving Mr. Baker are at issue (including the 14 that were

recently re-produced with redactions).

The UCC offers two justifications to overcome the privilege assertions with respect to

these documents, and neither is persuasive.  *First*, the UCC asserts that Mr. Baker held both legal

and non-legal roles.  True, but the fact that Mr. Baker acted in a non-legal capacity in some

instances does not mean that he did not act as a lawyer in others.  The UCC surmises, without

any evidence, that Side B improperly withheld as privileged the few communications involving

Mr. Baker that remain at issue.  But mere "suspicions of counsel are not a basis for shifting the

responsibility for discovery from counsel to court" by triggering judicial second-guessing of

privilege determinations.  *Alpex Computer Corp. v. Nintendo Co.*, 1988 WL 87511, at *3

(S.D.N.Y. Aug. 16, 1988) (denying *in camera* review).  And the UCC's contention here is

undercut by the discovery record.  Far from attempting to assert a "blanket privilege" over

communications involving Mr. Baker, as suggested in General Challenges Motion ¶32 (quoting

*TVT Records v. Island Def Jam Music Grp.*, 214 F.R.D. 143, 145 (S.D.N.Y. 2003)), Side B has

produced *tens of thousands* of documents involving Mr. Baker *subject to no claim of privilege*.

Side B has meticulously distinguished between communications in which Mr. Baker was acting

as lawyer and those in which he was acting in a business capacity.

---

[43]    *See* Ex. 121 at Tab A . Side B is also hereby revising its privilege log entries for RS0848556
and RS0810047 to add, in addition to attorney-client privilege, a claim of work product over these
two documents. The UCC cannot demonstrate that any of the parties to these communications
waives a claim of work product protection for the reasons discussed *supra* §I.B.

*Second*, the UCC argues that Side B's privilege assertions are "vague and conclusory" and "insufficient" to establish that the withheld communications are legal in nature.  But the communications at issue are among Stuart Baker, PPI Board members and executives, and IAC advisory board members and executives—hence, between lawyer and client (including representatives of the client).[44]  The communications are fairly described as "██████████ ███████████████████████████████████████████████," and the entries provide sender and recipient information for each document, the basis for withholding the document, as well as other information required by Local Bankruptcy Rule 7034-1, such as date and type of document.  The privilege log also contains additional information—which is not required by the Local Bankruptcy Rules but which was provided to give the UCC even more detail about the nature of Side B's privilege assertions—such as the subject line of each email and file name of documents.  This is sufficient to ascertain that Mr. Baker was acting as a lawyer on the challenged communications.[45]

## IV.    COMMUNICATIONS WITH PURDUE BOARD MEMBERS ON THE SPECIAL COMMITTEE ARE PRIVILEGED AND ENCOMPASSED WITHIN THE COMMON INTEREST DOCTRINE

The UCC seeks production of 200 documents on Side B's privilege logs involving Messrs. Buckfire, Miller, and Cola, who are Purdue Board members that also serve on PPI's

---

[44]    *See* Hurley Ex. B at Tab A; Exs. 93, 113, 122.

[45]    The detail provided by Side B stands in stark contrast to that provided in the cases cited by the UCC.  *See Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enf't*, No. 16 CIV. 387 (PAE), 2020 WL 5518114, at *8-9 (S.D.N.Y. Sept. 14, 2020) (privilege log descriptions lacked author and recipient information and characterized documents as "talking points," "meeting agenda," "Frequently Asked Questions," and the like); *United States v. Construction Prods. Rsch. Inc.*, 73 F.3d 464, 473-74 (2d Cir. 1996) (privilege entries were: "(a) 'Fax Re: DOL Findings' with comment 'cover sheet;' (b) 'Fax: Whistleblower article' with comment 'Self-explanatory;' (c) 'Letter Re: Customer Orders' with comment 'Re: Five Star Products;' and (d) 'Summary of Enclosures' with comment 'Self-explanatory'" (internal citations omitted)).

Special Committee. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ That

is temporally wrong as to most of the documents, and legally wrong as to all of them.

*First*, 144 of the 200 challenged communications on Tab I are dated ***before*** the formation

of the Special Committee.  As the UCC notes, ████████████████████████████

████████████████████████████████████████████████

████.[46]  The email messages themselves, however, each bear the date of the communication

on the face of the document.  In response to the UCC's motion, Side B manually re-reviewed the

144 documents with unreliable metadata and confirmed that each one is dated before May 2019,

when the UCC states the Special Committee was formed.  General Challenges Motion ¶41.  The

latest of these 144 messages was dated April 29, 2019.  These 144 documents, therefore, are not

within the scope of the UCC's motion, which is predicated on an asserted adversity between the

Special Committee and the Sackler families.[47]

*Second*, all 200 of the challenged communications were properly withheld ████████████

████████████████████████████████████████████████

---

[46]     These 144 documents are email messages with an ".olk15message" file extension, which
is a file type associated with an old version of Microsoft Office for Mac.  Side B has explained to
the UCC that these file types cannot be processed correctly using currently available forensic
document collection and processing tools, and as such there are a variety issues with these
documents, including that the metadata, including the "date" field that was used to populate the
privilege log, is unreliable. *See* Ex. 98 at 2.  That the metadata is unreliable, however, does not
preclude manual review of the documents to determine the date, where the text is legible.

[47]     *See* Ex. 121 at Tab I  (reflecting dates of the 144 OLK files that have been manually
populated).

REDACTED



Further, ███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████.  The common interest doctrine "applies even where

the parties' interests are adverse in substantial respects.  The privilege applies even where a

lawsuit is foreseeable in the future between co-defendants."  *In re Tribune Co.*, 2011 WL

386827, at *4 (Bankr. D. Del. Feb. 3, 2011).  To the extent that Purdue may be adverse to Side B

---

[48]    *See* Ex. 85.  Although a written common interest agreement exists in this instance, courts
are clear that a common interest relationship need not be memorialized in writing in order to be
effective. *See HSH Nordbank AG NY Branch v. Swerdlow*, 259 F.R.D. 64, 72 n.12 (S.D.N.Y.
2009).

in respect of some matters, this does not mean that privileged communications regarding other

matters as to which they have an identical legal interest are discoverable.[49]

Messrs. Buckfire, Cola, and Miller are copied on these communications in their capacity as

Purdue Board members, and not in their capacity as Special Committee members.  This is

demonstrated by the fact that *other* Purdue Board members, who are not on the Special

Committee, were included on the same communications.  *Compare* Hurley Ex. B at Tab I, cell

L201 *with* Informational Br. [ECF 17] at 14-15.  Side B has repeatedly informed the UCC, and

hereby represents to the Court as well, that it did not withhold on privilege grounds responsive

communications involving Side B, on one hand, and members of the Special Committee *acting*

*as such*, on the other.

---

[49]    The UCC also criticizes Side B for not writing the words "common interest" next to each
entry on its privilege logs where parties are alleged to have had such a relationship.  General
Challenges Motion ¶¶37-40.  A detailed response to this argument is not necessary because the
UCC evidently does not seek specific relief based on this criticism, and instead focuses its
challenges to common interest assertions only on documents involving Purdue.  For the avoidance
of doubt, however, Side B disputes the UCC's assertion.  Side B's "burden" with respect to a
privilege log is to comply with Local Bankruptcy Rule 7034-1, which it did, including by
describing the "nature of the privilege being claimed" (*e.g.*, attorney-client privilege).  Common
interest is not "an independent source of privilege," but rather an "an exception to the general rule
that voluntary disclosure of confidential, privileged material to a third party waives any applicable
privilege." *HSH Nordbank*, 259 F.R.D. at 71.  It is, therefore, not a privilege required to be logged
under Rule 7034-1.  Even if it were, Side B did in fact provide to the UCC, as addenda to its
privilege logs, a description of the individuals or entities appearing on the logs, Ex. 93, 113, 122,
████████████████████████████████████████, Ex. 118.  The UCC never disputed that
Side B had a common interest with any other party listed ██████████, except Purdue.

28

## V.    COMMUNICATIONS WITH OTHER PROFESSIONALS WERE PROPERLY WITHHELD

### A.    Communications with Accountants and Investment Advisors Are Protected by Attorney-Client Privilege Or Work Product Protection

Of the 2,267 privilege log entries challenged as involving accountants and investment advisors, 2,200 relate to ██████ and have previously been addressed.  *See supra* §I.A.  Of the 67 documents that do not relate to ██████: (i) 17 were withheld subject to a claim of work product protection, which the UCC has not rebutted; and (ii) two involve ████████████████ ██████, who—as Side B has informed the UCC—are trustees as well as investment advisors.[50] That they were acting in their capacity as trustees in the communications at issue is apparent from the subject line of the emails: "████████████████."  There can be no legitimate dispute that these are privileged and protected by work product.

That leaves just 48 documents that are subject only to a claim of attorney-client privilege. As to those documents, courts recognize that "in today's market place, attorneys need to be able to have confidential communications with investment bankers to render adequate legal advice." *Stafford Trading, Inc. v. Lovely*, 2007 U.S. Dist. LEXIS 13062, at *19-20 (N.D. Ill. Feb. 22, 2007); *see id.* at *21 (attorney communications with client's investment banker in connection with merger privileged because "the purpose . . . [was] obtaining or providing legal advice" for the client); *accord Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 24 (D. Mass 2017) (attorney communications with investment banker in connection with deal structure privileged because purpose was to "craft[] legal advice"); *Calvin Klein Trademark Trust v. Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (Rakoff, D.J.) (attorney communications with client's investment banker privileged where banker was providing counsel with "expert

---

[50]    Ex. 108 at 3.

advice as to what a reasonable business person would consider 'material' . . . from a business

person's perspective" and so was serving "an interpretive function" for attorney).

The presence of non-legal professionals on a communication does not "negate[]

eligibility for protection from disclosure" where the communication is with a financial advisor

and intended to "facilitate the provision of legal service by the attorney to the client." *In re*

*FiberMark, Inc.*, 330 B.R. 480, 499 (Bankr. D. Vt. 2005) (communications "between Akin

Gump and the [Unsecured Creditors] Committee includ[ing] the Committee's financial advisor"

were privileged because it was "demonstrated that the communication was intended to facilitate

the provision of legal service by the attorney to the client").

As part of the meet-and-confer process, Side B re-reviewed the communications on its

privilege log involving ████████████████████████████████████████████

████████████████████████ in response to the UCC's inquires.  As a result of that re-review, it

produced non-privileged communications and confirmed that the withheld communications

involving these investment advisors are within the scope of privilege for this reason.  *See* Exs.

108 at 3, 110 at 2.  The remaining, challenged communications with those professionals are

privileged because they were necessary to the provision of legal advice.  With respect to

████████████████████████████, those professionals are associated with Side A (as the

UCC has been advised, *see* Ex. 108 at 2) and Side B respectfully refers the Court to

contemporaneous briefs filed by Side A addressing those professionals.

### B.    Communications with Other Professionals Were Properly Withheld

The UCC also challenges 32 entries on the ground that they reflect communications

involving "consultants," "co-investors," "bankers," "real estate firms," or "other third parties."

General Challenges Motion ¶59.  Most of these documents—23 of 32—contain material

protected by the work product doctrine, and the UCC has not argued that there has been a waiver

of work product protection. That would require a showing—not even attempted here—that

sharing with these professionals increased the likelihood that an adversary would gain access.

*See In re Signet Jewelers*, 332 F.R.D. at 138; *supra* § I.B. Having failed to carry that burden,

the UCC is not entitled to production of these documents.

With respect to all 32 documents, the UCC has offered no basis to question Side B

counsel's determinations as to privilege.

**Consultants.** The five documents identified by the UCC as involving "consultants" are

actually a single parent email between ████████ and three lawyers (████████████, Stuart

Baker and ████████████)[51] and its four attachments,[52] which were prepared by counsel.

Communications between the client's representative, ████████ and the client's counsel are

privileged. The UCC has not explained in its motion—or in prior meet and confers—why it

believes there is a "consultant" present on this communication.

**Co-Investors.** The document involving "co-investors"[53] includes a party to a joint

venture sharing a common interest,[54] and the UCC cites no authority for the proposition that joint

venturers do not share a common interest in respect of legal matters concerning their shared

business endeavor. Moreover, the entry is subject to a claim of work product protection, and the

UCC again fails to explain how including a joint venture partner on a communication vitiates

---

[51]     PS-01996634.

[52]     PS-01996635, PS-01996636, PS-01996637, and PS-01996638.

[53]     MB1099577.

[54]     *See* Ex. 93 at 3 ████████████████████████████████████████
████████████.

that protection by making an adversary more likely to gain access.  *See supra* § I.B.

**Bankers.**  The UCC challenges seven documents as involving "bankers."  Three documents[55] were withheld on the basis of the attorney-client privilege because the bankers were acting as agents and were included on these emails because they were necessary for the provision of legal advice.  *See, e.g.*, *U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (addressing when agents are within the scope of privilege); *In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 834 (Bankr. S.D. Fla. 2016) (holding that a broad interpretation of the agency exception is "more consistent with the purpose for the exception" and finding a litigation funder within the scope of the attorney-client privilege).  The other four emails with bankers constitute work product,[56] for which the UCC offers no ground for disclosure.  Those emails each relate to ███████████ ███████████████████████████████████████████ that has no relevance to the issues the UCC purports to be investigating.

**Real Estate.**  Every document the UCC cites as involving "███████"[57] is also protected by the work product doctrine and relates to the same irrelevant ████████ litigation.  Again, the UCC makes no effort to carry its burden of establishing waiver of work product protection.

**Other Third-Parties.**  Four of the seven documents cited by the UCC as involving "other third parties" include material protected by the work product doctrine,[58] which the UCC again has not even attempted to overcome with any evidence or arguments.  The remaining three are redacted documents that the UCC is apparently challenging due to the involvement of ██

---

[55]    *See* Hurley Ex. B at Tab F (PS-01867474, PS-01867486, and MB1096980).

[56]    *See* Hurley Ex. B at Tab F (PS-01282562, PS-01282568, PS-01603949, and PS-01603955).

[57]    *See* Hurley Ex. B at Tab G.

[58]    *See* Hurley Ex. B at Tab H (PS-01892026, PS-01892030, PS-01892035, PS-01900103).

██████ ,[59] who Side B has repeatedly informed the UCC is an agent of Side A.[60]  Side B has

determined that one of these documents can be produced without redactions.[61]  The privilege log

entries for the remaining two entries demonstrate that the communications were regarding the

IACs,[62] with respect to which Sides A and B have identical legal interests as shareholders,[63] and

as such Mr. O'Connor (as agent of Side A) does not break privilege.

## VI.    COMMUNICATIONS WITH THE DEPARTMENT OF JUSTICE ARE NOT DISCOVERABLE

The General Challenges Motion seeks to compel production from the Raymond Sackler

family of its



---

[59]    *See* Hurley Ex. B at Tab H (PS-01620292, PS-01635483 and PS-01996808).

[60]    Ex. 93; Ex. 118 at 12.

[61]    PS-01996808.  This document has not yet been produced but will be promptly.

[62]    *See* Hurley Ex. B at Tab H, lines 5 and 6 (referencing Mundipharma)

[63]    *See* Ex. 118 at 12.

REDACTED





General Challenges Motion

¶19.  Ferreting around for impeachment material is contrary to this Court's repeated admonitions that this Rule 2004 discovery process is not intended to be trial preparation.  May 1, 2020 Hr'g Tr. at 49:3-13, August 26, 2020 Hr'g Tr. at 25:9-13.

REDACTED

**B.**



REDACTED



<span style="color:red">REDACTED</span>



## VII.    THE UCC IS NOT ENTITLED TO *IN CAMERA* REVIEW

As an alternative to its request for production of the 11,739 documents identified on the

Side B privilege logs, the UCC requests *in camera* review.  Its failure to come forward with

credible arguments casting doubt on Side B's privilege assertions precludes this relief.  Before *in*

*camera* review is ordered, "the judge should require a showing of a factual basis adequate to

support a good faith belief by a reasonable person . . . that *in camera* review of the materials may

reveal evidence" that a privilege has been vitiated.  *United States v. Zolin*, 491 U.S. 554, 572

(1989) (internal quotation marks omitted).  The UCC has not satisfied this burden.  Moreover,
"the decision whether to engage in *in camera* review rests in the sound discretion of the district
court," including by considering the volume of materials at issue and their relevance to the case.
*Id.*

It would be a waste of judicial resources for the Court to perform a review of 12,000
documents withheld by Side B—and tens of thousands more withheld by other parties.   The
UCC suggests appointment of a Special Master, but it overlooks Bankruptcy Rule 9031, which
states that Federal Rule of Civil Procedure 53 (providing for the appointment of masters in civil
cases) "does not apply in cases under the Code."  As the Advisory Committee Note to Rule 9031
states clear, Rule 9031 "precludes the appointment of masters in cases and proceedings under the
Code."   It is thus *the Court* on which the UCC would place the extreme burden of reviewing
these voluminous materials.  The Court should exercise its discretion to deny *in camera* review.
*See In re Caesars Entm't Operating Co., Inc.*, 2016 WL 7477566, at *4 (Bankr. N.D. Ill. Sept.
21, 2016) (declining *in camera* review as a matter of discretion because the volume was
enormous and would consume too much court time to accomplish).

39

REDACTED

## **CONCLUSION**

For these reasons, Side B respectfully requests that the Court deny the UCC's General

Challenges Motion.

Dated:  October 14, 2020 (amended              */s/ Gerard Uzzi*_____
        October 16, 2020)                     Gerard Uzzi
         New York, New York                   Alexander B. Lees
                                              **MILBANK LLP**
                                              55 Hudson Yards
                                              New York, NY 10001
                                              Telephone: (212) 530-5000

                                              */s/ Gregory P. Joseph*_____
                                              Gregory P. Joseph
                                              Mara Leventhal
                                              **JOSEPH HAGE AARONSON LLC**
                                              485 Lexington Avenue, 30th Floor
                                              New York, New York 10017
                                              Telephone: (212) 407-1200

                                              *Counsel for the Raymond Sackler Family*