## Exhibit B

**Supplemental Willis Towers Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak
Dylan A. Consla
Kathryn S. Benedict

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**SUPPLEMENTAL DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PLAN AND KEY <u>EMPLOYEE RETENTION PLAN</u>**

I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

1.  I am a Director at Willis Towers Watson PLC ("**Willis Towers Watson**"). Willis Towers Watson has been engaged by Purdue Pharma L.P. and its above-captioned wholly owned direct and indirect subsidiaries (collectively, the "**Debtors**" or the "**Company**") to provide compensation consulting services and to serve as advisors to the Board's Compensation and Talent Committee (the "**Compensation Committee**"). I am familiar with the structure of the Debtors' pre- and post-petition compensation plans, including the Debtors' proposed Key Employee Incentive Plan (the **"KEIP"**).

2.  I submit this declaration (this "**Declaration**") on behalf of Willis Towers Watson in further support of the *Debtors' Supplemental Statement in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan*.[2] I am authorized to submit this Declaration on behalf of the Debtors.

3.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the KEIP, my team's and my research into compensation practices for companies in the pharmaceutical industry, as well as other companies that have recently filed for chapter 11 protection, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it remains my opinion that the KEIP is appropriate and reasonable. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1674] and the *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1674-3].

## QUALIFICATIONS AND BACKGROUND

4.   I received my Juris Doctor from University of San Diego School of Law in 1998, graduating Magna Cum Laude and Order of the Coif, and my Bachelor of Arts in international business from San Diego State University in 1994. After working at Gibson Dunn as an associate in the corporate practice, Pillsbury Winthrop as an associate in the executive compensation practice, and The Loftin Firm, P.C. where I was a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014. I joined Willis Towers Watson in 2016 where I have been continuously employed ever since.

5.   Willis Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. Willis Towers Watson designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. Willis Towers Watson focuses on four key business segments: corporate risk and brokering; human capital and benefits; exchange solutions; and investment, risk, and reinsurance.

6.   My responsibilities at Willis Towers Watson have primarily involved consulting to for-profit companies and not-for profit organizations, specifically regarding executive compensation. I routinely work with public and private companies in various industries regarding compensation philosophy, pay competitiveness, incentive plan design, and other compensation-related analyses and have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7.   I am highly experienced in executive, management, and employee compensation with over 20 years of experience in the field. During my tenure at Willis Towers Watson, I have

worked closely with a range of companies undergoing a financial restructuring in developing a variety of pre-petition and post-petition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees. Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including *Aegean Marine Petroleum Network Inc., et al.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re ATD Corporation, et al.*, Case No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores Inc., et al.*, Case No. 18-10584 (MFW) (Bankr. D. Del.); *In re Cloud Peak Energy Inc.*, Case No. 19-11047 (CSS) (Bankr. D. Del.); *In re FULLBEAUTY Brands Holdings Corp., et al.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Company, et al.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re PES Holdings, LLC*, Case No. 19-11626 (LSS) (Bankr. D. Del.); and *In re Westmoreland Coal Company, et al.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.).

## **KEY EMPLOYEE INCENTIVE PLAN**

**A.    Agreed Changes to the KEIP**

8.    I understand that two of the original KEIP Participants, the President of Imbrium Therapeutics and the Debtors' Senior Vice President, Intellectual Property Law & Public Health Initiatives, resigned to pursue other opportunities after the Motion was filed. In addition, I understand that the Debtors have agreed to adjourn the hearing on the KEIP with respect to the CEO and CFO to the omnibus hearing on November 17, 2020 at 10:00 a.m. (prevailing Eastern Time). I also understand that the Debtors have agreed with the UCC, NCSG, Ad Hoc Committee and MSGE to the following modifications to the KEIP with respect to KEIP Participants holding the following titles: (i) Executive Vice President, General Counsel and Corporate Secretary; (ii) Chief Technical Operations Officer; (iii) President, Rhodes Pharmaceuticals; and

(iv) President, Rhodes Technologies:

- the KEIP Award payments, LTRP payouts due in 2022 and long-term incentive compensation grant payable in 2023 will be reduced for each of the currently applicable KEIP Participants by a total of $395,382.00 as set forth in the table below:

| KEIP Participant | Agreed Reduction in Amount of: | | | |
|---|---|---|---|---|
| | KEIP Award | LTRP payouts due in 2022 | Long-term incentive compensation grant payable in 2023 | Total |
| Executive Vice President, General Counsel and Corporate Secretary | ($175,000.00) | ($40,963.00) | ($23,175.00) | ($239,138.00) |
| Chief Technical Operations Officer | ($54,753.00) | ($15,908.00) | ($9,000.00) | ($79,661.00) |
| President, Rhodes Pharmaceuticals | ($31,501.00) | ($4,573.00) | ($2,665.00) | ($38,739.00) |
| President, Rhodes Technologies | ($30,763.00) | ($4,474.00) | ($2,607.00) | ($37,844.00) |
| Total | ($292,017.00) | ($65,918.00) | ($37,447.00) | ($395,382.00) |

- the KEIP Award will be paid (x) 50% on or about November 1, 2020 rather than in October 2020 and (y) 50% on or about March 31, 2021 rather than in January 2021;[3]

- the KEIP Award payments will be subject to a clawback if the KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to June 30, 2021 rather than March 15, 2021, except that such clawback will expire upon emergence should it occur earlier;

- the LTRP payouts due in 2022 will be accelerated upon emergence, subject to a clawback through the date that such payments would otherwise have been made absent emergence; and

---

[3] All payment dates referenced herein are approximate. Payments will be made on the closest scheduled payroll date.

- the long-term incentive compensation grant payable in 2023 will be accelerated upon emergence, subject to a clawback through the date that such payments would otherwise have been made absent emergence.

**B.    Non-Debtor Pharmaceutical Industry Benchmarking**

9.      I have considered the Court's comments at the September 30, 2020 hearing noting that the Court is particularly interested in understanding the "industry standard" with respect to compensation of executives like the KEIP Participants.[4] For the reasons described below, I believe that the comparison of the compensation of the KEIP Participants to comparable executives at similarly-sized organizations in the pharmaceutical industry included in my prior declaration (the "**First Willis Towers Declaration**" or "**First Willis Towers Decl.**")[5]—and used as an important tool in the development of the KEIP—provides the relevant industry information to which the Court referred.

10.     In the First Willis Towers Declaration, I compared the compensation of the KEIP Participants to compensation at similar pharmaceutical companies that participated in Willis Towers Watson's 2019 CDB Pharmaceutical and Health Sciences Executive Compensation Survey Report (the "**Survey**"). First Willis Towers Decl. ¶ 23. This Survey aggregated data from approximately 87 comparable non-debtor companies in the pharmaceutical industry for purposes of benchmarking the KEIP. Indeed, Willis Towers Watson's standard methodology for comparing proposed compensation programs for executives of distressed companies (in and out of chapter 11) is to compare their compensation programs to those of non-distressed companies on a revenue-adjusted basis. As this Court noted, this approach focuses on the Debtors' competitors for

---

[4] Hr'g Tr., 143:17-19, Sept. 30, 2020.

[5] *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1674-3].

6

executive talent, which is an important reason that Willis Towers Watson utilized the Survey (in conformance with Willis Towers Watson's standard methodology) in setting appropriate total compensation levels under the KEIP. It is my opinion that the Survey is highly relevant and the most appropriate set of data to compare the KEIP Participants' compensation to Debtors' market for talent, even in the chapter 11 context.[6]

C.   **Updated Total Direct Compensation Analysis**

11.   In the First Willis Towers Declaration, I included an analysis of competitive target total direct compensation ("**Total Direct Compensation**") for all KEIP Participants, a standard benchmark that includes base salary, short term incentives, and long-term incentives. It is important to note that the KEIP Participants have no ability to earn above-target compensation, meaning that no matter how much above target performance KEIP Participants perform, they are not eligible for any "upside" in compensation—the "maximum" opportunity is equal to the target opportunity. My team and I analyzed the compensation opportunities of executives at relevant market comparators in the pharmaceutical industry by matching the KEIP Participants to benchmarks from the Survey based on our understanding of each KEIP Participant's job duties and responsibilities within the Debtors' organization. For each benchmark in the Survey, my team and I developed, where possible, revenue-adjusted survey data for Total Direct Compensation. The results of this analysis were included in paragraphs 24 through 28 of the First Willis Towers Declaration.

12.   My team and I updated this analysis to account for the agreed reductions to payments under the KEIP with respect to the four KEIP Participants currently in question. The

---

[6] Hr'g Tr., 143:7-10, Sept. 30, 2020 (stating that "I would benefit from . . . a focus on the market of the Debtors' competitors" with respect to analyses from the compensation consultant regarding the appropriateness of the KEIP).

7

aggregate market positioning of these KEIP Participants both before and after the agreed reductions is shown in the table below:

|  | Variance to Market TDC | | | | | |
|---|---|---|---|---|---|---|
|  | Purdue Base + Proposed 2020 KEIP | | | Purdue Base + Proposed 2020 KEIP Subject to Agreed Reductions | | |
|  | P25 | P50 | P75 | P25 | P50 | P75 |
| EVP, General Counsel | 358% | 229% | 136% | 341% | 217% | 127% |
| Chief Technical Operations Officer | 43% | 17% | -4% | 37% | 13% | -7% |
| President, Rhodes Pharmaceuticals | 37% | 7% | -15% | 32% | 3% | -18% |
| President, Rhodes Technologies | 62% | 27% | 0% | 56% | 23% | -3% |
| **Average (excl. General Counsel)** | **47%** | **17%** | **-6%** | **42%** | **13%** | **-10%** |

13. In addition, my team and I expanded the analysis to show any variance when considering the long-term incentive compensation grant payable in 2023 instead of the portion of the KEIP that replaces the LTRP payout in 2021 as the applicable component to include in the measure of Total Direct Compensation, which is set forth in the table below:

8

|  | Variance to Market TDC | | | | | |
|---|---|---|---|---|---|---|
|  | **Purdue Base + Proposed 2020 KEIP Subject to Agreed Reductions** | | | **Considering the long-term incentive compensation grant payable in 2023 instead of the portion of the KEIP that replaces the LTRP payout in 2021** | | |
|  | **P25** | **P50** | **P75** | **P25** | **P50** | **P75** |
| EVP, General Counsel | 341% | 217% | 127% | 336% | 213% | 124% |
| Chief Technical Operations Officer | 37% | 13% | -7% | 40% | 16% | -5% |
| President, Rhodes Pharmaceuticals | 32% | 3% | -18% | 32% | 4% | -18% |
| President, Rhodes Technologies | 56% | 23% | -3% | 57% | 23% | -3% |
| **Average (excl. General Counsel)** | **42%** | **13%** | **-10%** | **43%** | **14%** | **-9%** |

### D. Considerations With Respect to Long-Term Incentive Compensation

14. At the September 30, 2020 hearing, the Court also noted that it may be helpful to address the "distinction between equity and cash" where Purdue provides cash-based long-term incentive awards while many of its peer pharmaceutical companies are primarily public or pre-IPO companies that frequently offer equity-based long-term incentive compensation.[7] It is true that equity is riskier than cash due to potential market fluctuations. Purdue's incentive compensation programs in prior years, which have consistently been cash-based rather than equity-based, typically allowed participants to earn up to 150% or more of target compensation in the event of above-target performance on the applicable performance metrics, which partially

---

[7] Hr'g Tr., 143:14-17, Sept. 30, 2020.

9

replicated the greater variation and upside associated with equity-based long-term incentive programs. This practice was discontinued under the KEIP (and under the AIP last year as part of the changes agreed to with creditor constituencies), so the current incentive opportunity is limited to a maximum of 100% of target under the KEIP. Particularly in this context, where the KEIP provides for downside but not upside, I believe that it would not be appropriate to discount the cash incentive opportunities under the KEIP for benchmarking purposes on account of the risks associated with equity that in many cases comprise elements of the incentive programs offered by comparable non-debtor pharmaceutical companies in the Survey.

15. In addition, the long-term incentive opportunities under the KEIP were modified to be measured against 2020 performance only, whereas long-term incentives, including the Debtor's pre-petition LTRPs, are typically measured based on multi-year performance periods. I understand that this adjustment was necessary because the Company hopes to emerge in early 2021 and establishing performance goals for beyond 2020 was essentially impossible given the significant anticipated changes to the Debtors upon emergence. On balance, the shorter performance period provides the KEIP Participants with greater visibility of achievement and thereby decreases the level of risk as compared to a multi-year performance period. To account for the decreased risk associated with measuring performance against 2020 only and in an effort to facilitate reaching agreement with key creditor constituencies, the Debtors previously applied a 50% reduction to the long-term incentive grants payable in 2023 relative to the amount of the LTRP grant that otherwise would have been granted to the KEIP Participants under the Debtors' past practices. While Willis Towers Watson has not quantified the precise discount that would be appropriate to account for the decreased risk associated with the shorter performance period for long-term incentive opportunities under the KEIP, I believe, based on my team's assessment of

10

the proposed discount, that the 50% reduction was more than sufficient to reasonably account for the decreased risk associated with the shorter performance period for long-term incentive opportunities under the KEIP.

16. For all the reasons described above, it remains my opinion that the KEIP is appropriate and reasonable as modified by the agreement with certain creditor constituencies.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 26, 2020

                                                           /s/ *Josephine Gartrell*
                                                          Josephine Gartrell
                                                          Director
                                                          Willis Towers Watson PLC