AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
jsorkin@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.*, et al.

PILLSBURY WINTHROP SHAW PITTMAN LLP

Andrew M. Troop
Jason S. Sharp (admitted *pro hac vice*)
Andrew A. Alfano
31 West 52nd Street
New York, New York 10019
andrew.troop@pillsburylaw.com
jason.sharp@pillsburylaw.com
andrew.alfano@pillsburylaw.com

*Counsel to the Non-Consenting State Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
| Debtors.[1] | : | (Jointly Administered) |

**FURTHER STATEMENT REGARDING
NOTICE BY THE SACKLER FAMILIES OF SETTLEMENT WITH THE
UNITED STATES DEPARTMENT OF JUSTICE AND MOTION TO CONFIRM THAT
PAYMENT BY THE SACKLER FAMILIES UNDER SETTLEMENT WITH THE
<u>DEPARTMENT OF JUSTICE IS NOT PROHIBITED BY THIS COURT</u>**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

The Official Committee of Unsecured Creditors (the "Official Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") and the Ad Hoc Group of Non-Consenting States (the "NCSG"), by and through their respective undersigned counsel, hereby submit this further statement regarding the *Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion to Confirm that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by this Court* [ECF No. 1833] (the "Motion").[2]

## FURTHER STATEMENT

1. The Sacklers agreed not to dispose of their money in any way that would have the "material effect of frustrating enforcement of any potential judgment of this Court." Amended Stipulation[3] ¶ 13. In their Motion, the Sacklers contend that transferring $225 million to the Department of Justice to protect themselves from federal civil liability will not have such an effect. In addition, the Sacklers contend that the payment to the Department of Justice will be "a critical part" of a "global resolution" in these cases. Motion ¶ 17.

2. The Official Committee and the NCSG agree that the proposed transfer should be examined as "part" of a larger whole. In that regard, and bearing in mind the Court's statements at the October 28, 2020 hearing on the Motion, the Official Committee and the NCSG respectfully submit this Further Statement to request that two questions be answered concerning the proposed payment.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
[3] "Amended Stipulation" refers to the Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties [ECF No. 518].

**Federal Government Commitment To Use Funds For Abatement**

3. First, what commitment will the federal government make that it will dedicate the $225 million to abate the opioid epidemic (now or in the future) or use the funds for the type of programs advocated for by the Official Committee, the NCSG, or other parties in connection with discussions of an Emergency Relief Fund?[4] If the money transferred to the Department of Justice will *not* be deployed promptly to address needs for community recovery, peer support, prevention, treatment, and recovery relating to the opioid epidemic, then why is it necessary for the money to be secreted now as opposed to after there is either a more general settlement or path forward in the case?

4. As the mediators reported, the States, cities, counties, and other local governments participating in this case negotiated an agreement to dedicate their recovery to abatement: "the Non-Federal Public Claimants agreed among themselves that all value received by them through these chapter 11 cases would be exclusively dedicated to programs designed to abate the opioid crisis." Mediators' Report, ECF No. 1716 ¶ 3. Private sector parties (other than individual victims themselves) that participated in the mediation made extraordinary commitments to devote their recoveries to abatement as well. "The term sheets for the Hospitals, TPPs, and NAS Committee (with regard to abatement) require each private creditor group to use substantially all of their respective allocations to fund mutually agreeable programs designed to abate the opioid crisis (including treatments)." *Id.* at ¶ 7. These extraordinary commitments go far beyond how creditors are required to use their distributions in an ordinary case.

---

[4] Counsel to the Official Committee, and individual Official Committee members who have advocated for an ERF during this case, have contacted the DOJ and asked this question on three separate occasions since the hearing. While the DOJ has been perfectly polite in their responses, they have not provided an answer as of the time of filing this Statement.

3

5.      The law governing the Sackler settlement may allow the United States to commit the money to abatement. The settlement agreement recites that the Justice Department is resolving claims on behalf of agencies with substantial public health capabilities."[5] When the United States resolves claims under the False Claims Act for actual damages to federal agencies, the agencies are permitted to retain and use the settlement funds. For example, when the Justice Department settled false claims allegations against WorldCom and Sprint for overcharging many government agencies, the General Services Agency asked to put the money in a fund to be spent in ways that would address "government-wide telecommunications needs," and "lower future costs for all customer agencies."[6] The Justice Department Office of Legal Counsel approved that plan.[7] The WorldCom case involved $24.5 million and no national crisis. In this case, the federal government will receive $225 million, and the highest officials in the federal government have declared that the opioid epidemic constitutes a "public health emergency."[8] There must be ways for the federal government to spend this money that would be consistent with the abatement and emergency relief goals supported by the Official Committee, NCSG, and many other stakeholders in this case.

6.      If the Motion is granted, the federal government would be the first party to be paid by the Sacklers since this Court began overseeing these cases. While all other plaintiffs were and continue to be enjoined from litigation against the Sacklers (or have voluntarily stood down from such litigation), the Department of Justice will become the first plaintiff since the bankruptcy filing

---

[5] ECF No. 1833, at 18, 20 (("the Department of Health and Human Services (HHS); the Defense Health Agency (DHA), acting on behalf of the TRICARE program; the Office of Personnel Management (OPM), which administers the Federal Employees Health Benefits Program (FEHBP); and the Indian Health Service (IHS)"), for claims that "the Named Sacklers knowingly caused false and/or fraudulent claims for OxyContin to be submitted to the Federal Healthcare Programs").

[6] Application of Miscellaneous Receipts Act to Settlement of False Claims Act Suits, 30 Op. O.L.C. 53 (Jan. 10, 2006), at https://www.justice.gov/opinion/file/786171/download.

[7] *Id.*

[8] https://www.cms.gov/About-CMS/Agency-Information/Emergency/EPRO/Current-Emergencies/Ongoing-emergencies

4

to resolve its claims. The example set by the United States and the practical impact of $225 million are both important. Before the Motion is decided, and before any Sackler funds are secreted, the Official Committee and the NCSG would respectfully request that the federal government explain in a Court filing what commitment it is making to dedicate the $225 million it receives from the Sacklers to provide emergency relief or generally abate the opioid epidemic.

**Sackler Assets Remaining For Other Creditors**

7.     Second, after the $225 million is transferred, how much Sackler wealth will remain available for both (a) prompt and (b) overall, payment, to other creditors? The Sacklers have not introduced evidence on this point. At the October 28 hearing, the Court noted that no "financial disclosure" had been presented to the Court to provide evidence regarding the material effect of the proposed payment. Oct. 28, 2020 Hearing at 100:14-15. While counsel commented on press coverage of the settlement, the Court stated, "I don't really have any evidence," regarding the material effects of the payment in the context of the Sacklers' wealth. Oct. 28, 2020 Hearing at 87:10.

8.     The appropriate way to determine the material effect of the proposed payment is with evidence. The Sacklers should present evidence (through an affidavit or other declaration) to the Court showing how much other money is available for both prompt and overall payment to other creditors,[9] so the Court can assess whether the proposal violates the anti-secretion provision.

## CONCLUSION

9.     The Official Committee and the NCSG respectfully request that the Department of Justice and the Sacklers answer the questions raised regarding the Motion. The Official Committee

---

[9] To this end, it would be instructive to have the Sacklers provide specifics as to from where the funds to make these payments are being taken. Counsel to the "B" Side of the Sacklers has already discussed these specifics with counsel to the Official Committee and the NCSG, and therefore the Official Committee and NCSG would hope that providing an affidavit to this effect should not be problematic for the "B" Side.

and the NCSG reserve all rights with respect to the Motion, including the right to amend or supplement this Statement, submit additional briefing, participate in any discovery and be heard at any hearing related to the Motion.

Dated: New York, New York
       November 3, 2020

AKIN GUMP STRAUSS HAUER & FELD LLP

By: /s/ Arik Preis
    Ira S. Dizengoff
    Arik Preis
    Mitchell P. Hurley
    Joseph L. Sorkin
    Sara L. Brauner
    One Bryant Park
    New York, New York 10036
    Tel: (212) 872-1000
    Fax: (212) 872-1002
    idizengoff@akingump.com
    apreis@akingump.com
    mhurley@akingump.com
    jsorkin@akingump.com
    sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P.*, et al.

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ Andrew M. Troop
    Andrew M. Troop
    Jason S. Sharp (admitted *pro hac vice*)
    Andrew A. Alfano
    31 West 52nd Street
    New York, NY 10019
    Telephone: (212) 858-1000
    andrew.troop@pillsburylaw.com
    jason.sharp@pillsburylaw.com
    andrew.alfano@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*