Daniel R. Walfish
WALFISH & FISSELL PLLC
405 Lexington Ave., 8th Floor
New York, NY 10174
212-672-0521

Adam J. Levitin
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
202-662-9234

Jonathan C. Lipson
Temple University-Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
215-204-0608

*Counsel for* Amici Curiae *Bankruptcy Professors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | **This filing relates to: ECF 1828** |
| | : | |
| PURDUE PHARMA L.P., *et al.*, | : | Chapter 11 |
| | : | Case No. 19-23649 (RDD) |
| Debtors[1] | : | (Jointly Administered) |

**BRIEF OF BANKRUPTCY PROFESSORS AS *AMICI CURIAE* IN
OPPOSITION TO THE PROPOSED SETTLEMENT BETWEEN THE
UNITED STATES AND THE DEBTORS**

---

[1] The debtors in these cases, along with the last four digits of each debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). Collectively, these debtors are referred to as the "**Debtors**".

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... II

INTEREST OF AMICI ................................................................................ 1

INTRODUCTION ....................................................................................... 1

ARGUMENT .............................................................................................. 2

  I.   THE PURDUE SETTLEMENT IS PART OF A *SUB ROSA* PLAN AND
       CIRCUMVENTS THE PROCEDURAL PROTECTIONS OF THE
       BANKRUPTCY CODE .................................................................... 2

    A.  Transactions That Dictate Terms of a Future Reorganization Plan or
        Restrict Creditors' Right To Vote Are Sub Rosa Plans ................................. 3

    B.  The Purdue Settlement Is Part of a Sub Rosa Plan Because It Performs a
        Range of Functions Reserved for Plans .......................................................... 4

       i.   The Purdue Settlement Mandates a Particular Classification of Claims 6

       ii.   The Purdue Settlement Mandates a Particular Treatment of a Class .... 7

       iii.   The Purdue Settlement Mandates Treatment of Creditors That Are Not
           Party to the Settlement .............................................................................. 8

       iv.   The Purdue Settlement's Poison Pill Provision Effectively Mandates the
           Means of Implementing a Plan ................................................................ 10

       v.   The Purdue Settlement's Poison Pill Provision Deprives Creditors of a
           Meaningful Vote on Any Future Plan ..................................................... 12

       vi.   The Purdue Settlement Is Readily Distinguishable from Those Approved
           in Prior Decisions Because It Lacks a Business Purpose ....................... 12

    C.  Even if the Purdue Settlement Is Not Part of a *Sub Rosa* Plan, It Still May
        Not Be Approved Under *Jevic* Because It Violates the Procedural
        Safeguards of the Bankruptcy Code Without Providing Significant
        Offsetting Benefits for the Bankruptcy Process ........................................... 14

  II.  TAKEN TOGETHER, THE PURDUE AND SACKLER SETTLEMENTS
      FORCE CREDITORS TO PAY FOR THE SACKLER FAMILY'S ALLEGED
      WRONGDOING. ............................................................................ 16

  III.  THE PROPOSED SETTLEMENTS WILL FORECLOSE EFFORTS TO
       LEARN THE TRUTH ABOUT THE SACKLER FAMILY'S ROLE IN THE
       OPIOID CRISIS. ........................................................................... 20

CONCLUSION.......................................................................................... 23

APPENDIX A: LIST OF *AMICI CURIAE* BANKRUPTCY PROFESSORS ............. 25

# TABLE OF AUTHORITIES

**Cases**

*Czyzewski v. Jevic Holding Corp. (In re Jevic)*, 137 S. Ct. 973 (2017) .......... 3, 14 – 16

*Energy Future Holdings Corp. v. Del. Trust Co.*,
    648 Fed. Appx. 277 (3d Cir. 2016) ........................................................ 4

*In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) ................................ 4, 5, 11

*In re Chateaugay Corp.,* 89 F.3d 942 (2d Cir.1996) ................................... 7

*In re Delphi Corp.*, No. 05-44481RDD,
    2009 WL 2482146 (Bankr. S.D.N.Y. July 30, 2009) ............................... 7

*In re Delta Air Lines, Inc.*, 370 B.R. 537 (Bankr. S.D.N.Y. 2007) .............................. 6

*In re Jevic Holding Corp.*,
    787 F.3d 173 (3d Cir. 2015) ...................................................... 4

*In re LATAM Airlines Grp. S.A.*, 2020 Bankr. LEXIS 2405,
    2020 WL 5506407 (Bankr. S.D.N.Y. Sept. 10, 2020) ............................ 4

*In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) .................................. 5, 15

*In re Tower Auto, Inc.*, 342 B.R. 158, 164 (Bank. S.D.N.Y. 2006)................................ 4

*Matter of Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991),
    *on reh'g* (Feb. 27, 1992) ........................................................ 7

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating
    LLC)*, 478 F.3d 452 (2d Cir. 2007) ............................................ 3, 12, 13

*Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in
    Possession (In re Tower Auto. Inc.)*, 241 F.R.D. 162 (S.D.N.Y. 2006) .......... 3, 4, 12

**Statutes**

11 U.S.C. § 364................................................................................18

11 U.S.C. § 365................................................................................6

11 U.S.C. § 1122.................................................................................................18

11 U.S.C. § 1123.............................................................................................5, 11

11 U.S.C. § 1126.................................................................................................18

11 U.S.C. § 1129. ........................................................................................8, 11, 18

18 U.S.C. § 981 ...................................................................................................9

## Other Authorities

H.R. Doc. No. 93-137, pt. I (1973) ................................................................. 3

Jonathan C. Lipson, *The Secret Life of Priority: Corporate Reorganization After
Jevic*, 93 WASH. L. REV. 631 (2018) ............................................................ 14

Tim McLaughlin, *Insys founder Kapoor sentenced to 66 Months in Prison for Opioid
Scheme*, REUTERS (Jan. 23, 2020, 7:42 AM), https://reut.rs/3k9uf4I ........................ 13

## INTEREST OF AMICI[1]

The professors whose names and affiliations are set forth on Appendix A (the **"<u>Bankruptcy Professors</u>"**) are law professors at nine law schools throughout the United States, where they teach courses in bankruptcy and financial restructuring. They have collectively authored numerous treatises, textbooks, and articles on bankruptcy law. They have also all been active in bankruptcy policy reform efforts, and are interested in the maintenance of bankruptcy law as an effective public policy tool for addressing mass torts.

The Bankruptcy Professors are concerned that the proposed settlements misuse the reorganization system to abet and ultimately exculpate non-debtors credibly accused of materially contributing to one of the nation's deadliest public health crises.

## INTRODUCTION

The Court should decline to approve the proposed settlement between the United States Department of Justice ("**<u>DOJ</u>**" or the "**<u>United States</u>**") and the Debtors (the "**<u>Purdue Settlement</u>**") because the Purdue Settlement, in combination with the separate settlement between DOJ and certain members of the Sackler family (the "**<u>Sackler Family</u>**" and the "**<u>Sackler Settlement</u>**") and the Debtor's criminal plea agreement with DOJ (collectively, the "**<u>Proposed Settlements</u>**"): (1) constitutes a

---

[1] No one other than *amici* or their counsel has funded the preparation and submission of this brief. To the best of their knowledge, *amici* and their counsel have no financial interest in the any aspect of the Debtors' bankruptcies.

plan *sub rosa* with a coercive "poison pill" that circumvents the procedural protections of the Bankruptcy Code; (2) forces creditors of the Debtors to absorb costs that should more properly be paid by the Debtors' owners, the Sackler Family; and (3) significantly reduces the likelihood that the truth about the role of the Sackler Family in the opioid crisis will ever be known.

The Proposed Settlements purport to resolve a limited set of liabilities between the Debtors and Sackler Family and the DOJ. If approved, however, the Purdue Settlement will present the Court and creditors with a *fait accompli* regarding the shape and effect of the Debtors' restructuring and will preclude a full airing of the responsibility of the Sackler Family for the opioid crisis. The Court should adhere to the procedural protections of the Bankruptcy Code and not approve any settlement that predetermines the outcome of these cases or allows the bankruptcy system to be used to whitewash the behavior of non-debtors credibly accused of playing a key role in the opioid crisis and creating the Debtors' massive liabilities.

## ARGUMENT

## I. THE PURDUE SETTLEMENT IS PART OF A *SUB ROSA* PLAN AND CIRCUMVENTS THE PROCEDURAL PROTECTIONS OF THE <u>BANKRUPTCY CODE</u>

The Purdue Settlement is part of a *sub rosa* plan of reorganization and circumvents key procedural safeguards that protect transparency and accountability in the bankruptcy process. The Court may not approve such a settlement, irrespective

of its supposed substantive merits. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). Even if, against the great weight of the evidence, the Court determines that the Purdue Settlement is not part of a plan *sub rosa*, it still should not be approved because it circumvents procedural protections necessary to preserve the balance "in the bargaining power of different classes of creditors" and to prevent "collusion" that might derive from "'the ability of a few insiders. . . to use the reorganization process to gain an unfair advantage.'" *Czyzewski v. Jevic Holding Corp. (In re Jevic),* 137 S. Ct. 973, 986, 987 (2017) (quoting H.R. Doc. No. 93–137, pt. I, p. 255 (1973)).[2]

### A. TRANSACTIONS THAT DICTATE TERMS OF A FUTURE REORGANIZATION PLAN OR RESTRICT CREDITORS' RIGHT TO VOTE ARE *SUB ROSA* PLANS

The Bankruptcy Code does not define what constitutes a "*sub rosa* plan." Historically, courts have identified transactions as constituting a *sub rosa* plan if they "dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization, or dictate the terms of a plan of reorganization." *Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In*

---

[2] Although the Purdue and Sackler Settlements go to pains to appear separate, they must be understood as mutually reinforcing steps that will lead inevitably to a plan of reorganization that embodies and implements the term sheet filed at the commencement of these cases [ECF 247] ("**Term Sheet**"). Indeed, the motion in support of the Sackler Settlement [ECF 1833] ("**Sackler Settlement Motion**") boasts that that settlement is a key step toward implementing the larger "Settlement Framework" embodied in the Term Sheet. *See* ECF 1833 ¶ 2 & n.2.

re Tower Auto. Inc.*), 241 F.R.D. 162, 169 (S.D.N.Y. 2006) (quoting *In re Tower Auto.,*

*Inc.*, 342 B.R. 158, 164 (Bankr. S.D.N.Y. 2006)). As the Third Circuit has explained:

> When a transaction or settlement in bankruptcy has the effect of
> "dictating some of the terms of any future reorganization plan," a court
> deems the transaction impermissible because it "short circuits the
> requirements of Chapter 11 . . . by establishing the terms of the plan *sub
> rosa* in connection with a sale of assets."

*Energy Future Holdings Corp. v. Del. Trust Co.*, 648 Fed. Appx. 277, 284-85 (3d Cir.

2016) (quoting *In re Jevic Holding Corp.*, 787 F.3d 173, 187 (3d Cir. 2015) (Scirica, J.,

concurring in part and dissenting in part) (quoting in turn *In re Braniff Airways, Inc.*,

700 F.2d 935, 940 (5th Cir. 1983)).

While courts have permitted settlements that fix the treatment of some but

not all classes of claims, they will not permit settlements to "run[] roughshod over the

rights of the remaining claimants, and the Code's plan confirmation procedures." *In*

*re LATAM Airlines Grp. S.A.*, 2020 Bankr. LEXIS 2405, *214, 2020 WL 5506407

(Bankr. S.D.N.Y. Sept. 10, 2020) (citing *Official Comm. of Unsecured Creditors of*

*Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.*), 241 F.R.D.

162, 169 (S.D.N.Y. 2006)).

### B. THE PURDUE SETTLEMENT IS PART OF A *SUB ROSA* PLAN BECAUSE IT PERFORMS A RANGE OF FUNCTIONS RESERVED FOR PLANS

The Bankruptcy Code does not define the term "plan," but it does prescribe

several things that a plan *must* do: classify claims, specify the treatment of claims,

provide adequate means for the plan's implementation, including "amendment of the

debtor's charter" or "issuance of securities of the debtor," and provide for certain corporate governance structures. 11 U.S.C. §§ 1123(a)(1), (3), (5)(I)-(J), (6), (7). Moreover, a plan cannot be implemented without an informed vote of affected creditors.

We may, therefore, evaluate whether a transaction is functionally a plan based on whether it undertakes the steps required of a plan. Notably, under existing *sub rosa* plan jurisprudence, a transaction does not need to constitute a complete or formal plan in order to offend the *sub rosa* rule. Instead, it need merely predetermine key plan features and the procedural protections meant to insure their integrity. *See, e.g.*, *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (the transaction "had the practical effect of dictating *some* of the terms of any future reorganization plan.") (emphasis added); *In re Lionel Corp.*, 722 F.2d 1063, 1065 (2d Cir. 1983) (reversing a Bankruptcy Court's approval of the sale of an asset that represented 34% of the debtors' consolidated assets).

The Purdue Settlement is offensive for precisely these reasons. It does not merely settle a dispute about the allowance of the United States' claim. ECF 1828-3 ("**Purdue Settlement Agreement**") at ¶ III.1. It also requires particular classification and treatment of the United States' claim under a plan. *Id.* ¶ III.2. It effectively dictates the character of the distribution that all creditors would receive. And, as a practical matter, the Proposed Settlements will choke the flow of information critical to enable creditors to make an informed decision whether to vote

for or against any formal plan that must bear the burden of these settlements. This Court, however, has made clear that these are the sorts of things settlements may not do. *See, e.g.*, *In re Delta Air Lines, Inc.*, 370 B.R. 537, 551 (Bankr. S.D.N.Y. 2007) (permitting a settlement under 11 U.S.C. § 365(g) because it did not "invok[e] *the classification and voting procedures* applicable in the plan approval process.") (emphasis added.)).

### i.    *The Purdue Settlement Mandates a Particular Classification of Claims*

The Purdue Settlement requires that the United States have an allowed unsecured claim of about $6.344 billion, comprised of a $3.544 billion criminal fine and a $2.8 billion civil claim. ECF 1828-1 ("**Proposed Order**") at ¶¶ 5-6. The Purdue Settlement further provides that this claim shall be separately classified from all other claims, Purdue Settlement Agreement at ¶ III.2, even though the United States' claim is a general unsecured claim for which there is otherwise no clear basis for separate classification from the general unsecured claims of state and local governments.

This provision wrongfully arrogates to the settlement the question of classification, which should be reserved to a plan. It also does more than merely ensure a certain payout to the United States. It gives the United States a veto over any consensual plan confirmation. Awarding a veto right over a confirmation is inconsistent with the procedural protections of the Bankruptcy Code. Moreover, by mandating separate classification, the Purdue Settlement would also necessarily

determine the classification of *other* creditors—they must be in separate classes from the United States.

By mandating separate classification of the United States, the Purdue Settlement also undercuts the Bankruptcy Code's procedural protections for a representative creditor electorate. Section 1122 gives plan proponents discretion in classifying claims, permitting separate voting classifications where justified by legitimate business reasons. *See, e.g., In re Chateaugay Corp.,* 89 F.3d 942, 949 (2d Cir. 1996) ("to warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof."). *See also In re Delphi Corp.*, No. 05-44481RDD, 2009 WL 2482146, at *12 (Bankr. S.D.N.Y. July 30, 2009) (Drain, B.J.). But no plan may classify claims merely to gerrymander an affirmative vote. *See Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991), *on reh'g* (Feb. 27, 1992) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

By giving the United States a claim in its own class, this is exactly what the Purdue Settlement does. It all but guarantees the Debtors the existence of an impaired, accepting class for the cramdown confirmation of a plan that implements the other requirements of the Purdue Settlement.

### ii.   *The Purdue Settlement Mandates a Particular Treatment of a Class*

The Purdue Settlement requires that the United States' claim be paid in cash "as soon as reasonably practicable after the effective date" of the plan and prohibits

payment in the form of an equity stake in any reorganized company. This is nothing

less than specification of treatment under a plan, which is again something reserved

for a plan.[3]

### iii.    The Purdue Settlement Mandates Treatment of Creditors That Are Not Party to the Settlement

The Purdue Settlement envisions a restructuring of the Debtors into a public

benefit corporation or the like. Purdue Settlement Agreement, at ¶ III.8.f. *See also*

ECF 1828-2 (Purdue Plea Agreement) at ECF pages 6, 11. While the Purdue

Settlement does not formally require such an outcome, it all but guarantees it if

approved because it contains a "poison pill." The poison pill makes any attempt to

steer the case in any other direction costly and unattractive to general unsecured

creditors like opioid victims, such that they are unlikely to risk triggering the poison

pill.

Specifically, the Purdue Settlement provides that the "Debtors will not propose

a Plan of Reorganization or liquidation that is inconsistent with this Agreement,"

Purdue Settlement Agreement at ¶ III.8.e, and if a Plan of Reorganization is not

confirmed that "provides for the emergence from the Chapter 11 Cases of a public

benefit company (or entity with a similar mission), Purdue and the United States

---

[3] Similarly, the Purdue Settlement requires "fair and equitable treatment" and prohibits "unfair discrimination" under any plan. Purdue Settlement Agreement at ¶ III.2. These are terms with statutory significance, as they are requirements for a "cramdown" confirmation under section 1129(b). No such requirements exist, however, for a "consensual" confirmation under section 1129(a). The Purdue Settlement is thus adding additional requirements for the treatment of the United States' claim, which is again an issue reserved for a plan.

each have the option to rescind this Agreement." *Id.* ¶ III.8.f. If the United States rescinds, it may reinstate all of its claims, including a $2 billion dollar administrative priority claim based on its criminal forfeiture powers, an $8.4 billion dollar unsecured claim, and the right to assert civil forfeiture powers.[4] Purdue Settlement Agreement at ¶¶ III.10 & III.8.f.

The poison pill structure thus locks in the Debtors' emergence as a public benefit corporation under a future plan of reorganization. Our point here is not to debate the wisdom of the public benefit corporation structure as the goal for a reorganization, but instead to point out that effectively mandating it in the Purdue Settlement has the effect of determining the treatment of creditors beside the United States who may for various reasons find it undesirable. However wise and socially beneficial a public benefit corporation structure might be, it cannot overcome the procedural protections of the Bankruptcy Code.

To wit, if the Debtors emerge as a public benefit corporation under a plan, the plan will have to distribute the equity of such public benefit corporation in some way. The Purdue Settlement, however, specifically forbids a distribution of equity to the United States, so this equity must be distributed to some other entity or to *other* classes under a plan. *See* Proposed Order, at ¶ 7 ("The Debtors' Plan will (i) provide

---

[4] In Claim 137848, the United States claims up to $8.4 billion in treble damages claims, while also reserving the right of civil forfeiture, which would render assets traceable to the alleged wrongdoing forfeit to the government as of the time of the wrongdoing, 18 U.S.C. § 981(f), and therefore not property of the Debtors' bankruptcy estates.

for a cash distribution on account of the Allowed Claims as soon as reasonably practicable after the effective date of the Plan; (ii) not provide the United States with an equity stake in the reorganized company or any other structure that emerges from the bankruptcy").

This means that the Purdue Settlement not only dictates treatment for other creditors, but also that such other creditors must receive treatment that is different from, and potentially worse than, that of the United States because many creditors may not want payment in the form of interests (even derivatively) in of a company that makes and sells the very opioids that created and contributed to the current crisis in the first place. It is more than plausible that, to many creditors, a reorganized Purdue would be not a public benefit, but a public *burden. Amici* take no exception to the Debtors cramming such a plan down on creditors—those are the rules of the game—but do take sharp issue with it being accomplished through a poison pill in a settlement.

### iv.   *The Purdue Settlement's Poison Pill Provision Effectively Mandates the Means of Implementing a Plan*

The poison pill feature means that if the Purdue Settlement is approved, the Debtors' corporate structure upon emergence is pre-determined: the Debtors will have no real choice but to restructure as a public benefit corporation. *See* Purdue Settlement Motion [ECF 1828] at ¶ 2 (noting that the DOJ's "criminal forfeiture judgment alone"—which would snap back into place if the poison pill were triggered— "could leave the Debtors with no viable alternative to liquidation").

10

By pre-determining the shape of the Debtors' corporate governance under a plan, the Purdue Settlement intrudes upon the proper province of a plan. A plan must provide for adequate means for its implementation, including amendment of the debtor's corporate charter and/or issuance of new securities of the debtor. 11 U.S.C. § 1123(a)(5)(I)-(J). Additionally, because a plan must provide for certain corporate governance provisions, 11 U.S.C §§ 1123(a)(6)-(7), 1129(a)(5), a debtor's post-emergence corporate governance is also a matter reserved for a plan. Both a charter amendment (or a whole new charter) and the issuance of new securities would be necessary for the Debtors to emerge as a public benefit corporation.

A similar conditional settlement provision was forbidden by the Fifth Circuit in the seminal *sub rosa* plan case of *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983). In *Braniff*, the transaction at issue gave the debtor scrip that could be used for travel on another air carrier, but required that the scrip be used solely in a future reorganization and that it be issued only to certain types of creditors. As the Fifth Circuit noted, "The reorganization plan would have to allocate the scrip according to the terms of the PSA agreement or forfeit a valuable asset." *Id.* at 940.

Here, the Debtors must either confirm a plan that reorganizes the Debtors into a public benefit corporation or face possible criminal and civil asset forfeiture. This sort of forced choice misappropriates plan decisions for a settlement process that lacks the procedural protections of plan confirmation.

> **v.      The Purdue Settlement's Poison Pill Provision Deprives Creditors
> of a Meaningful Vote on Any Future Plan**

The Purdue Settlement's poison pill also deprives creditors of a meaningful
exercise of their franchise and their right to propose a plan after the Debtors'
exclusivity period has lapsed, as it will in just a few months. The poison pill changes
the calculus for a creditor that wishes to vote against a public benefit company plan
and instead to promote an alternative restructuring (such as an asset sale) or a
liquidation. This sort of "death trap" provision that precludes creditors' free exercise
of their vote is the very essence of a *sub rosa* plan. As the District Court for the
Southern District of New York has noted, a *sub rosa* plan "restrict[s] creditors' rights
to vote as they deem[ed] fit on a plan of reorganization." *Official Comm. of Unsecured
Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.)*,
241 F.R.D. 162, 169 (S.D.N.Y. 2006).

While any of these features individually is overreach for a settlement, taken
collectively they represent an unquestionable intrusion on plan prerogatives. The
Purdue Settlement should not be approved outside of the plan confirmation process.

> **vi.     The Purdue Settlement Is Readily Distinguishable from Those
> Approved in Prior Decisions Because It Lacks a Business Purpose**

The Purdue Settlement may be readily distinguished from settlements
approved in other cases in the face of claims that they are in fact *sub rosa* plans. In
*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating
LLC)*, 478 F.3d 452 (2d Cir. 2007), for example, the Second Circuit permitted a pre-
plan settlement that freed up cash over which creditors had claimed a lien, enabling

12

the funding of a litigation trust for creditors. Absent the settlement, the estate would
have lacked the means to propose and implement any plan of reorganization.
Accordingly, the Second Circuit found "a proper business justification for the
Settlement." *Id* at 467.

In contrast, no *business* (as distinct from criminal-law) justification supports
the Purdue Settlement. To be sure, the DOJ could potentially shut the Debtors down
in the absence of a settlement. But, as explained below, this simply reflects the fact
that the Debtors' estates are paying for alleged wrongdoing by the Sacklers—the
Debtors' "de-facto CEO," according to the DOJ's allegations. If, instead, the DOJ
charged the Sacklers for their alleged actions—as it did with the CEO of Insys, until
recently the only other opioid crisis Chapter 11 case[5]—the Debtors could emerge free
of the burdens created by the Sacklers' alleged misconduct.

The Purdue Settlement is not necessary in general for a reorganization of the
Debtors, or even for the particular reorganization the Debtors envision. Nor would
the Debtors' settlement with DOJ pave the way for a resolution of estate claims
against the Sacklers, as they may argue. Even if the Purdue Settlement were
somehow an essential "building block" for a reorganization, its offensive terms in
particular are not necessary or essential for a reorganization; Purdue could have

---

[5] Insys CEO and founder, John Kapoor, was convicted by a federal jury for paying kickbacks
to drive sales of opioids and sentenced to sixty-six months in prison. *See* Tim McLaughlin,
*Insys Founder Kapoor Sentenced to 66 Months in Prison for Opioid Scheme*, REUTERS (Jan.
23, 2020, 7:42 AM), https://reut.rs/3k9uf4I.

settled the DOJ's claims against it without a poison pill that locks in a public benefit
corporation structure. Likewise, even if the settlement is a "building block," nothing
requires it to be approved *now* prior to a plan. The settlement could be part of a plan,
so approval would involve the full disclosure statement process, rather than motion
practice that does not provide information to passive creditors who are not actively
engaged in the case. Moreover, postponing approval of the settlement until a plan
process would likely enhance the Debtors' litigation leverage vis-à-vis the Sacklers.

The Purdue Settlement has the practical effect of dictating key terms of a
prospective Chapter 11 plan: classification, treatment, and the form of the debtor
upon emergence. As such it cannot be approved outside a plan.

### C. EVEN IF THE PURDUE SETTLEMENT IS NOT PART OF A *SUB ROSA* PLAN, IT STILL MAY NOT BE APPROVED UNDER *JEVIC* BECAUSE IT VIOLATES THE PROCEDURAL SAFEGUARDS OF THE BANKRUPTCY CODE WITHOUT PROVIDING SIGNIFICANT OFFSETTING BENEFITS FOR THE BANKRUPTCY PROCESS

Existing jurisprudence on what constitutes a *sub rosa* plan pre-dates the
Supreme Court's recent decision in *Czyzewski v. Jevic Holding Corp. (In re Jevic)*, 137
S. Ct. 973 (2017). *Jevic* teaches that there is a broader stricture against transactions
that end-run the Bankruptcy Code's procedural requirements than indicated by prior
jurisprudence on *sub rosa* plans. *Jevic* is "a reminder that bankruptcy judges must
police the integrity of the reorganization process, even as they seek to maximize its
payouts." Jonathan C. Lipson, *The Secret Life of Priority: Corporate Reorganization
After Jevic*, 93 WASH. L. REV. 631, 638 (2018).

14

*Jevic* clarifies that there is not simply a prohibition on *sub rosa* plans, but on all transactions that "circumvent the Code's procedural safeguards." 137 S. Ct. at 986 (citing *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1069 (2d Cir. 1983) (reversing a Bankruptcy Court's approval of an asset sale after holding that § 363 does not "grant[] the bankruptcy judge *carte blanche*" or "swallow[] up Chapter 11's safeguards")). The touchstone for the Supreme Court in *Jevic* was not whether a settlement (in that case, a "structured dismissal") was a plan *sub rosa*, but whether the Code's procedural protections generally were respected. Thus, under *Jevic*, even if a transaction is not a *sub rosa* plan (because it does not rise to the level of a "plan"), it is still forbidden if it would end-run the Code's procedural safeguards. The lesson from *Jevic* is that parties cannot "hack" the bankruptcy process to get a result they desire, even if they claim it is "efficient."

While *Jevic* expressed a willingness to countenance limited violations of procedural safeguards if there was a "significant offsetting bankruptcy-related justification," 137 S. Ct. at 986, no such justification exists here. The Purdue Settlement does not "'make even the disfavored creditors better off'" as with critical vendor orders, nor do they "'maximiz[e] the value of the bankruptcy estate'" (*id*. at 985). Instead, they enable the Sackler Family to shift liability for the Debtors' misconduct to creditors, and make it less likely that a record of the Sackler Family's responsibility for the opioid crisis will ever be established.

15

Nor does the Court's reasoning in *Jevic* permit special pleading in "rare cases." *Id.* at 987. The Bankruptcy Code's procedural protections apply in all cases without exception. The animating idea in *Jevic* is that if a transaction walks like a plan and talks like a plan—if it in fact leads directly and ineluctably to a final and predetermined outcome—it must go through the plan confirmation process, which includes critical disclosure and consent protections demonstrably absent from the Proposed Settlements.

Amici submit that the Proposed Settlements are a *sub rosa* plan, but even if the Court disagrees and finds that they do not predetermine a plan, the Purdue Settlement still should not be confirmed because it circumvents the procedural protections of the Bankruptcy Code in contravention of *Jevic*. As explained above, it specifies the treatment of classes of claims, provides for the means of a plan's implementation, and unduly coerces creditors' voting. None of that is consistent with the procedural protections of the Bankruptcy Code. Given that there are no offsetting benefits for the bankruptcy process (much less "significant" benefits), the Purdue Settlement cannot be approved under *Jevic*.

## II.    TAKEN TOGETHER, THE PURDUE AND SACKLER SETTLEMENTS FORCE CREDITORS TO PAY FOR THE SACKLER FAMILY'S ALLEGED WRONGDOING.

Addenda to both the Sackler Settlement Agreement and the Purdue Settlement Agreement make a damning case against the Sackler Family, in their role

as "de-facto CEO" of Purdue at all times relevant to the criminal charges for which

Purdue is paying. *See* Sackler Settlement Motion, Ex. A, Addendum A ("**Sackler**

**Addendum**") at 4, ¶ 12; Purdue Settlement Motion [ECF 1828], Ex. C, Addendum A

("**Purdue Addendum**"), at 4, ¶ 14.

According to the Sackler Addendum, from 2013 to 2018 certain members of the

Sackler Family:

> knowingly caused the submission of false and fraudulent claims to
> federal health care benefit programs for Purdue's opioid drugs that were
> prescribed for uses that were unsafe, ineffective, and medically
> unnecessary, and that were often diverted for uses that lacked a
> legitimate medical purpose.

Sackler Addendum at 2, ¶ 5. Although they "knew that the legitimate market for

Purdue's opioids had contracted, the Named Sacklers nevertheless requested that

Purdue executives recapture lost sales and increase Purdue's share of the opioid

market." *Id*. at 1, ¶ 3.

In exchange for the Sackler Family's payment of $225 million, DOJ would

"release[] the Named Sacklers . . . from any and all civil or administrative monetary

claims." Sackler Settlement Motion, Ex. A, at ¶ 4.[6] Although the Sackler Family

denies the allegations in their Settlement Agreement, the fact remains that at all

relevant times, the Sackler Family indirectly owned all of the Debtors' voting equity

---

[6] The DOJ would not at this time release claims against the Sackler Family for criminal
liability. Sackler Settlement Motion, Ex. A (Settlement Agreement), at ¶ 8(b).

and populated the Debtors' board.[7] They were, according to the DOJ's allegations, the

Debtors' "de-facto CEO." *See* Sackler Addendum at 4, ¶12; Purdue Addendum at 4,

¶ 14.

What no one denies is that the Debtors—and not the Sacklers—are paying the

great bulk of the price for whatever wrongs were committed here—nearly 98% of the

total. If the Purdue Settlement is approved, the United States will receive a $2 billion

"superpriority administrative expense claim" (Proposed Order at ¶ 3),[8] $1.75 billion

of which DOJ will "gift" to certain state, tribal or local government entities, and the

---

[7] According to the "Informational Brief" filed by the Debtors at commencement of these cases, "shareholder entities ultimately owned by the descendants of Mortimer Sackler have the right to appoint up to two 'Class A Directors,' and shareholder entities ultimately owned by the descendants of Raymond Sackler have the right to appoint up to two 'Class B Directors.' Finally, the shareholders jointly appoint a Board chair and additional 'At-Large Directors.' Debtors' Informational Brief at 14 [ECF 17]. The Sackler Addendum indicates the tenures of the Sackler family members on the board of directors of Purdue Pharma, Inc., the corporate general partner of Purdue Pharma L.P., the main debtor in these cases:

- Richard S. Sackler (10/2/1990 – 7/24/2018);
- Jonathan D. Sackler (10/2/1990– 12/8/2018);
- David A. Sackler (7/19/2012 – 8/14/2018);
- Kathe A. Sackler (10/2/1990 –9/27/2018);
- Mortimer D.A. Sackler (1/15/1993 – 1/16/2019);
- Theresa E. Sackler (1/15/1993 –9/7/2018);
- Ilene Sackler Lefcourt (10/2/1990 – 2/4/2005; 5/16/2008 – 10/9/2018); and
- Beverly Sackler (approximately 1993 –10/2017).

*See* Sackler Addendum at 3 n. 2.

[8] It is unclear what a "superpriority administrative expense claim" means. Administrative expenses are not "claims," and thus not classified under 11 U.S.C. § 1122, entitled to vote under 11 U.S.C. § 1126, to count as an impaired class under 11 U.S.C. § 1129, or entitled to various other protections under 11 U.S.C. § 1129. Moreover, administrative expenses merely have "priority," not "superpriority," which is reserved for financings under 11 U.S.C. § 364(c)(1). At the very least, the Proposed Settlements should clarify if they are awarding a "claim" or an "administrative expense."

$6.3 billion unsecured claim noted above. As a practical matter, this means both that the claims of the United States will likely dwarf those of other creditors (without any meaningful opportunity to challenge them), and that they will therefore significantly dilute recoveries of general unsecured creditors. Because the Purdue Settlement dictates that the United States shall not be paid in equity of the reorganized debtors, it will further constrict the type and value of consideration that can be paid to general unsecured creditors.

It is no answer to say that the Sackler Family may yet be charged criminally, because the Proposed Settlements do not address the Sackler Family's potential criminal liability and there is, currently, no indication that DOJ intends to pursue the Sacklers criminally.

Likewise, it is no answer to say, as the Debtors might, that the Purdue Settlement reduces the DOJ's civil demands on the Sacklers, which in turn facilitates a greater recovery for the Debtors from fraudulent transfer or other estate claims against the Sacklers (which can then potentially be redirected to opioid abatement rather than to the U.S. Treasury's general fund as a recovery by DOJ would be). It is purely speculative whether there will in fact be a greater recovery. Thus creditors are being asked to shoulder a cost now in the hopes that the Sacklers will simply reallocate funds that they might otherwise have had to pay the United States to the Debtors' claims. It is equally plausible, however, that the Sacklers' willingness to pay claims of the Debtors will not budge; they will simply bank the $225 million implied

reduction in their potential liability to the United States. Indeed, the timing of the settlement is also problematic in this regard. There is no urgency to approve the settlement, and there is every reason to believe that deferring approval of a settlement and considering it as part of a plan confirmation process would increase pressure on the Sacklers and result in a greater recovery for the Debtors.

Even if the Court disagrees with *amici*'s contention that the Purdue Settlement dictates the terms of a plan, the Purdue Settlement will still force the estate and thus creditors to absorb the costs of the Sackler Family's alleged misconduct based on a speculative hope that it will result in a greater recovery in fraudulent transfer litigation with the Sacklers.

## III. THE PROPOSED SETTLEMENTS WILL FORECLOSE EFFORTS TO LEARN THE TRUTH ABOUT THE SACKLER FAMILY'S ROLE IN THE OPIOID CRISIS.

If approved by this Court in their current procedural posture, the Proposed Settlements will also make it virtually impossible for creditors and the Court to resist confirming a plan of reorganization for the Debtors that deviates from the Term Sheet. Any plan that implements the Term Sheet will, as a practical matter, release the Sackler Family from all liability for the opioid crisis, and do so with little meaningful scrutiny of their role in that crisis. This is because the Term Sheet—and any plan that implements it—will grant the Sackler Family broad releases "from all claims and causes of action of any nature." *See* Term Sheet [ECF 257], at ¶ 5; s*ee also*

*id*. ¶ 6 (providing that Sackler Family's contributions will be "[i]n exchange for comprehensive releases in the form and manner to be agreed upon by the parties."). The net effect would be that the Sackler Family will, for all practical purposes, be fully immune from any further litigation, liability or scrutiny of their role in the opioid crisis.

This is perhaps the ultimate problem with the Proposed Settlements and the Sackler Family's ultimate goal in seeking them. It is well known that the Sackler Family has aggressively resisted discovery about their role in the opioid crisis. They did so in the thousands of lawsuits commenced prior to these Chapter 11 cases, and they are doing so in this case. Although the Addenda to the Proposed Settlements tell a shocking tale about the Sackler Family, much of the information underlying those allegations—which the Sackler Family disputes—is unlikely to be made a public part of the record of this reorganization process, even though those allegations are the very reason for the Debtors' bankruptcy.

The Debtors may respond by arguing that, under the Proposed Settlements, they would create and host a "public document repository containing non-privileged documents in their possession, custody, or control that they have produced to the United States and that the United States identifies as relating to the charges asserted" against the Debtors. Purdue Settlement Motion [ECF 1828] at 4, ¶ 3. However, that repository will contain only the *Debtors'* documents. To the extent that (as seems likely) important conduct occurred at *non-Debtor* entities under the Sackler

Family's control, those documents are unlikely to come to light. In addition, the repository will not be available until *after* a plan is confirmed. That means that creditors will be asked to vote on a plan that is likely to include releases for the Sacklers (and non-debtor entities under their control) without potentially crucial information about what the Sacklers actually knew and did and therefore whether those releases are warranted and permissible.

Rather than providing transparency, the Proposed Settlements thus threaten both to prevent and to delay release of potentially critical information about the family alleged to be at the center of the opioid crisis. If so, this would be a perversion of the Chapter 11 system, and an invitation to all successful tortfeasors—that is, those who have made billions of dollars—to use the system to limit their liability.

It is no answer to say that the Official Committee of Unsecured Creditors has received all relevant information and can therefore be relied on as a proxy for disclosure. If the Purdue Settlement is approved, the Committee, too, would be subject to the same poison pill. It is perhaps no coincidence that the DOJ took the extraordinary step in these cases of siding with the Sackler Family in their efforts to withhold documents from the Committee. *See* Letter from Audrey Strauss, Acting United States Attorney for the Southern District of New York, to the Honorable Robert D. Drain (Oct. 19, 2020) [ECF 1821].

## CONCLUSION

The Debtors' cases involve the single most important public policy issue in bankruptcy today: whether the bankruptcy system can be used as a tool for addressing not just financial harms, but also creditors' dignitary interests. Many creditors in these cases want not only—or even—the modest payout that a plan could produce under the best plausible outcome. Rather, they want transparency and accountability. They want to know whether allegations, such as those made by DOJ, are true and, if so, whether the Sacklers are entitled to the releases that they will surely seek. If approved by this Court, the Purdue Settlement will make it virtually impossible to provide credible answers to these questions at the time of a creditor vote, and will ensure that a plan can still be confirmed via cramdown by setting up the United States in a class by itself as an impaired, accepting creditor.

The Proposed Settlements function as a *sub rosa* plan which, if approved, will use a poison pill provision to force creditors to accept a particular form of a restructuring that may be morally repugnant to them both in terms of forcing creditors to take ownership of an opioid manufacturer and in avoiding a full airing of the role of the Debtors and the Sackler Family in the opioid crisis. The Court should not approve the Purdue Settlement. If the Debtors wish to settle the United States' claim, they should do so, subject to court approval, but any such settlement should be limited to fixing the allowed claim of the United States and nothing more.

23

Dated: November 10, 2020

Respectfully submitted,


___/s/ Daniel R. Walfish___
Daniel R. Walfish
WALFISH & FISSELL PLLC
405 Lexington Ave., 8th Floor
New York, NY 10174
212-672-0521

Adam J. Levitin
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
202-662-9234

Jonathan C. Lipson
Temple University-Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
215-204-0608


*Counsel for* Amici Curiae *Bankruptcy Professors*

## APPENDIX A: LIST OF *AMICI CURIAE* BANKRUPTCY PROFESSORS

**Jared A. Ellias** holds the Bion M. Gregory Chair in Business Law and is Professor of Law**,** University of California, Hastings College of the Law.

**Pamela Foohey** is Professor of Law**,** Indiana University Maurer School of Law.

**Edward J. Janger** is the David M. Barse Professor of Law and Associate Dean for Research and Scholarship at Brooklyn Law School. Professor Janger has served as Anne Urowsky and Maurice Greenberg Visiting Professor at Yale Law School, and the Bruce W. Nichols Visiting Professor at Harvard Law School. He has served as the American Bankruptcy Institute Scholar in Residence, and is the co-author (with Jeffrey Ferriell) of the treatise *Understanding Bankruptcy* (4th ed. 2019).

**Adam J. Levitin** is the Agnes N. Williams Research Professor & Professor of Law at Georgetown University Law Center. He has previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School and as the American Bankruptcy Institute's Scholar in Residence. His publications include *Business Bankruptcy: Financial Restructuring and Modern Commercial Markets* (2d ed. Wolters Kluwer 2018).

**Jonathan C. Lipson** holds the Harold E. Kohn Chair and is Professor of Law at Temple University—Beasley School of Law. He was previously the Foley & Lardner Professor of Law at the University of Wisconsin Law School, and has been a Visiting

Professor at the University of Pennsylvania. He was Counsel of Record to Amici Curiae Law Professors in *Czyzewski v. Jevic Holding Corp.* (*In re Jevic)*, 137 S. Ct. 973 (2017).

**Nathalie Martin** is the Associate Dean for Faculty Development and Professor of Law and holds the Frederick M. Hart Chair in Consumer and Clinical Law at the University of New Mexico.

**Juliet M. Moringiello** is Associate Dean for Research and Faculty Development, Widener University Commonwealth Law School.

**Chrystin Ondersma is** Professor of Law at Rutgers Law School.

**Robert K. Rasmussen** holds the J. Thomas McCarthy Trustee Chair in Law and Political Science, and was formerly the dean of, the University of Southern California Gould School of Law.

**William Woodward** is Professor of Law Emeritus at Temple University and a Senior Fellow at Santa Clara University School of Law.