PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
Andrew V. Alfano
31 West 52nd Street
New York, New York 10019
Email: andrew.troop@pillsburylaw.com
       andrew.alfano@pillsburylaw.com

Jason S. Sharp, admitted *pro hac vice*
1200 Seventeenth Street NW
Washington, DC 20036
Email: jason.sharp@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P., *et al.*,**[1] | Case No. 19-23649 (RDD) |
| **Debtors.** | (Jointly Administered) |

**OBJECTION OF THE AD HOC GROUP OF NON-CONSENTING STATES TO THE MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 105 AND FED. R. BANKR. P. 9019 AUTHORIZING AND APPROVING SETTLEMENTS BETWEEN THE DEBTORS AND THE UNITED STATES**

---

[1] The debtors in these chapter 11 cases along with the last four digits of their federal tax identification numbers, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' principal offices are at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 2

OBJECTION .................................................................................................................................. 4

    A.    The Proposed Settlements Constitute an Impermissible *Sub Rosa* Plan ....................... 4

        i.    The Circumstances of the Debtors' Chapter 11 Cases Do Not Justify Approval of the DOJ Resolution at This Time ............................................................................ 6

        ii.    The Proposed Settlements' Poison Pill Constitutes an Impermissible Sub Rosa Provision ................................................................................................................ 7

        iii.    The Motion Does Not Contain Adequate Information .......................................... 9

    B.    Approving the Proposed Settlements in Isolation Would Devalue the Mediation Process. ....................................................................................................................... 11

    C.    There Is No Rush; the Proposed Settlements Can Be Approved in Connection With Confirmation of the Debtors' Chapter 11 Plan. ......................................................... 13

CONCLUSION ............................................................................................................................ 15

i

## **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                                                          Page(s)

*In re Adelphia Commcs. Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005)..................................................................................8

*PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
    700 F.2d 935 (5th Cir.1983).................................................................................................5

*In re Chrysler LLC*,
    576 F.3d 108 (2d Cir. 2009)............................................................................................5, 6

*In re Combustion Eng'g*,
    391 F.3d 190 (3d Cir. 2004)..................................................................................................6

*In re Continental Air Lines, Inc.*,
    780 F.2d 1223 (5th Cir. 1986)..............................................................................................9

*In re Crowthers McCall Pattern, Inc.*,
    114 B.R. 877 (S.D.N.Y. Bankr. 1990)..................................................................................9

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)............................................................................................................6

*In re Def. Drug Stores, Inc.*,
    145 B.R. 312 (B.A.P. 9th Cir. 1992)..................................................................................10

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007)..................................................................................................5

*In re Latam Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2020 WL 5506407 (Bankr. S.D.N.Y. Sept. 10, 2020) ....................5, 7

*Law v. Siegel*,
    134 S. Ct. 1188 (2014)..........................................................................................................6

*In re Mcorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ................................................................................9

*In re Molycorp, Inc.*,
    Case No. 15-11357 (CSS), Docket No. 1050 (Bankr. D. Del. Jan. 8, 2016).......................9

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988)..............................................................................................................6

<u>Other Authorities</u>

Steve Miller, Opinion, *Litigation Won't Solve the Opioid Crisis*, Wall Street Journal
    (May 27, 2019, 4:32 PM).....................................................................................................3

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

The Ad Hoc Group of Non-Consenting States (the "Non-Consenting States")[2] submits this Objection (the "Objection") to the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [Docket No. 1828] (the "Motion")[3] filed by Purdue Pharma L.P. and its affiliated chapter 11 debtors (collectively, the "Debtors" or "Purdue").

The Court should grant the Motion, if at all, only in connection with confirmation of a plan of reorganization. The proposed settlements both predetermine, and coerce creditor support for, the post-confirmation continuation and structure of Purdue's OxyContin business and the rebranding of an OxyContin manufacturer as an organization of "public trust." These central issues should be negotiated, evaluated and approved or disapproved in the context of a (hopefully consensual) global resolution presented through a fulsome disclosure statement and plan of reorganization, subjected to voting and the other confirmation criteria contained in section 1129. They are not properly decided in the context of a stand-alone, preconfirmation Bankruptcy Rule 9019 motion implementing a bilateral agreement, that excluded a vast number of affected creditors from the process.

Furthermore, requiring the Motion to be considered at confirmation will not deprive these estates of any benefits of the proposed settlements. The Debtors' obligation was to seek approval

---

[2] California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

[3] Capitalized terms used in this Objection that are not otherwise defined have the meanings ascribed to them in the Motion. Also, unless otherwise noted, references to a "section" are references to a section of title 11 of the United States Code (the "Bankruptcy Code"); and references to a Bankruptcy Rule are references to a rule contained in the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

1

of the settlements by filing a motion, which they have done. The settlements are not contingent on their approval at any time prior to confirmation.

In further support of this Objection, the Non-Consenting States respectfully state as follows:

## PRELIMINARY STATEMENT

1.     By the Motion, Purdue seeks to approve proposed settlements of civil and criminal claims for pervasive misconduct in its opioid business (the "Proposed Settlements"). The Proposed Settlements provide for, among other things, (i) a $2 billion criminal asset judgment satisfied by a $225 million upfront super priority administrative expense payment; (ii) general unsecured claims for criminal and civil penalties of $3.544 billion and $2.8 billion, respectively; and (iii) the admission of guilt to three felony counts for conspiracy to defraud the United States and to violate the Federal Anti-Kickback Statute. The Proposed Settlements also mandate that Purdue's OxyContin business emerge from chapter 11 as a public benefit company ("PBC") or some other entity with a "similar purpose," notwithstanding, among other things, the significant public policy objections of the attorneys general of twenty four States and the District of Columbia[4] and the lack of detail on how the PBC will be structured and governed, what its mission or purpose is, and what an entity with a "similar purpose" might be. In addition, the Proposed Settlements allow the United States a $2 billion super-priority administrative expense claim, exceeding the entire value of Purdue's operating assets, if there is no OxyContin PBC. The PBC requirement, coupled with this coercive "poison pill," is the focus of this Objection.

2.     The Proposed Settlements are not simply an agreement pursuant to which Purdue will resolve its civil and criminal liability with the federal government. By mandating the post-

---

[4] *See* https://www.mass.gov/doc/october-14-2020-letter-to-attorney-general-barr/download.

2

emergence continuation and structure of Purdue's opioid business in a bipartite agreement, they set all other creditors on a pre-determined path. If approved now, the Proposed Settlements would straitjacket the parties just as they are addressing the complex questions surrounding the future of Purdue, and it would allow Purdue and the Sacklers to rebrand Purdue as an agent of "public trust," a narrative they have advocated from well before these chapter 11 cases commenced.[5]

3. Since March 2020, non-federal public and private creditors have been engaged in a multiphase, complex and (so far) highly productive mediation. This summer, these creditors took the unprecedented step of agreeing that substantially all recoveries other than payments to personal injury claimants will be dedicated to abating the opioid crisis.[6] Under the Proposed Settlements, if the non-federal public and private creditors do not agree to the OxyContin PBC or some similar structure or other terms of the Proposed Settlements, non-federal public and private creditors risk losing any recovery and their agreed-upon abatement program.[7] A resolution with the federal government acceptable to the non-federal public claimants is a condition to three of the four agreements reached with private claimants in the first phase of mediation.[8]

4. The PBC mandate, among other parts of the Proposed Settlements, yields an improper *sub rosa* plan that pre-wires material plan terms. Indeed, the Motion at paragraph 1

---

[5] Steve Miller, Opinion, *Litigation Won't Solve the Opioid Crisis*, Wall Street Journal (May 27, 2019, 4:32 PM), https://www.wsj.com/articles/litigation-wont-solve-the-opioid-crisis-11558989157. The PBC narrative has been perfectly coordinated as among Purdue, its independent board chair, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These cited materials contain information designated as "Confidential" under the protective order entered in these chapter 11 cases. Copies of these documents and an unredacted version of this document will be provided via e-mail to the Court.

[6] Although the federal government was kept informed, it has chosen not to engage actively in the mediation process.

[7] The ability for the emergence structure to be a PBC or "other similar entity" does not mitigate the issues surrounding a PBC or the Proposed Settlements' insistence on a PBC on the mediation process. As discussed in paragraph [16] below, neither the Motion nor the Proposed Settlements define what a similar entity is or might be or what its purpose or mission might be. This vague, ambiguous, undefined and elastic reference is no answer to the disruption the PBC requirement will have on mediation.

[8] *See Mediators' Report* at ¶ 12, Docket No. 1716.

3

threatens every creditor except the federal government with no recovery if they choose a different outcome, notwithstanding Purdue's repeated refrain throughout this case that it is turning itself over to its creditors. *See, e.g.*, Oct. 11, 2019 Hr'g. Tr. 84:12-16 ("Your Honor appreciates this is … turning over the assets of Purdue to the claimants for the benefit of the citizenry of the country…."); Sept. 17, 2019 Hr'g Tr. 137:2-4 ("[T]his is a highly unusual case, in that the debtors have determined to turn over their businesses to their claimants…."); Sept. 17, 2019 Hr'g Tr. 137:19-20 (Claimants are "future owners of the business and beneficiaries of all of that value….").

5. Approval of the Proposed Settlements also effectively forecloses ongoing efforts to advance a private buyer alternative for Purdue's businesses with the Debtors, the Unsecured Creditors' Committee and others. Purdue's fate should be determined by its stakeholders through the collective negotiation process and confirmation of a plan of reorganization. Neither Purdue nor the federal government should be permitted to impose that result without full and fair negotiations, disclosures and a reorganization plan, and the exploration of private sale alternatives.

6. The Debtors cannot short-circuit fundamental chapter 11 protections by establishing the terms of a plan *sub rosa* through approval of a settlement. Nor can the Court's equitable powers be used to sidestep these requirements. For these reasons, the Court should require that the Motion be considered with and as part of a plan of reorganization, to allow the parties to negotiate a widely accepted resolution.

**OBJECTION**

**A.    The Proposed Settlements Constitute an Impermissible *Sub Rosa* Plan**

7. By the Motion, the Debtors seek not only to resolve one creditor's claims against Purdue, but also to:

> a. Mandate that the Debtors confirm a plan of reorganization that provides for all the Debtors' assets to be transferred to a "public benefit company or "entity with a similar mission" (Mot. ¶ 3);

    b. Require separate classification of the federal government's Allowed Claims (Mot., Ex. A. ¶ 7);

    c. Restrict the form of payment on those Allowed Claims (Mot., Ex. A. ¶ 7);

    d. Prohibit the issuance of equity in Purdue or any other structure to the United States (Mot., Ex. A. ¶ 7);

    e. Prevent the Debtors from proposing "a Plan of Reorganization or liquidation that is inconsistent with [the Civil Settlement] Agreement." (Civil Settlement Agreement ¶ 8.e.); and

    f. Bind all of the Debtors' creditors and parties in interest to the Proposed Settlements, while giving the Debtors or the Department of Justice the option to rescind if the Court does not confirm a plan that, among other things, provides for Purdue's emergence from chapter 11 as a public benefit company or entity with a similar mission (Civil Settlement Agreement ¶ 10) (collectively, the "*Sub Rosa* Provisions").

8. By pre-determining several material terms of a chapter 11 plan, including requiring that the Debtors' operating assets be transferred to a PBC, without the safeguards inherent in the chapter 11 confirmation process, the Proposed Settlements constitute a *sub rosa* plan. For this reason, the Court should deny the Motion. *See In re Chrysler LLC*, 576 F.3d 108, 117 n.9 (2d Cir. 2009) (distinguishing between a section 363 sale that will practically determine the treatment of creditors and an impermissible *sub rosa* plan because the former "does not specifically 'dictate,' or 'arrange' *ex ante*, by contract, the terms of any subsequent plan"), *cert. granted, judgment vacated sub nom. Indiana State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009), and *vacated sub nom. In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010); *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) ("The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'" (quoting *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir.1983)).

5

9. Although *sub rosa* objections often arise in asset sales under Bankruptcy Code section 363, *sub rosa* objections "are germane to any transaction by a debtor that adversely impacts on interested parties' rights to participate in the restructuring process." *In re Latam Airlines Grp. S.A.*, No. 20-11254 (JLG), 2020 WL 5506407, at *54 (Bankr. S.D.N.Y. Sept. 10, 2020). Likewise, Bankruptcy Code section 105(a) cannot be used to create substantive rights not otherwise available under applicable law or circumvent chapter 11's plan requirements. *In re Combustion Eng'g*, 391 F.3d 190, 236 (3d Cir. 2004).

10. The *Sub Rosa* Provisions go far beyond a section 363 asset sale that practically determines the treatment of creditors; they *"specifically 'dictate,' or 'arrange' ex ante*, by contract, the terms of any subsequent plan." *In re Chrysler LLC*, 576 F.3d at 117 n.9. As such, the Proposed Settlements constitute an impermissible *sub rosa* plan and cannot be approved, if at all, other than in connection with confirmation of a plan of reorganization.

> *i. The Circumstances of the Debtors' Chapter 11 Cases Do Not Justify Approval of the DOJ Resolution at This Time*

11. Courts have refused to allow chapter 11 debtors to enter into transactions that "circumvent the [Bankruptcy] Code's procedural safeguards." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017). In *Jevic*, the Supreme Court emphasized that circumvention of the Bankruptcy Code's procedural safeguards is not permissible even in 'rare cases,' and courts "cannot 'alter the balance struck by the statute.'" *Id.* at 987 (quoting *Law v. Siegel*, 134 S. Ct. 1188, 1198 (2014)).

12. Nothing about these cases justifies a shortcut that circumvents the Bankruptcy Code's protections by mandating that only a plan that provides for a reorganized debtor as a PBC is permissible. This includes the threat of criminal forfeiture, even if the Court calculates that creditors would be better off if the Motion is approved. *See Jevic*, 137 S. Ct. at 987 (citing *Norwest*

6

*Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) and "explaining that courts cannot deviate from the procedures 'specified by the Code,' even when they sincerely 'believ[e] that ... creditors would be better off.'"). Instead, creditors, many of whom hold claims individually or as a mediation party exponentially larger than the federal government's asserted claims,[9] are entitled to the protections of the process provided in the Bankruptcy Code.

> ii. The Proposed Settlements' Poison Pill Constitutes an Impermissible Sub Rosa Provision

13. The Proposed Settlements provide that the United States will be granted a $2 billion super-priority criminal asset forfeiture claim. *See* Proposed Order ¶ 3. If the Debtors emerge as a PBC, then the United States will recover only $225 million of the Forfeiture Judgment and the remaining $1.775 billion will be credited against the value distributed or otherwise conferred in settlement of claims asserted by state, tribal, or local governments. Plea Agreement at 9. If a court-approved PBC structure is not obtained, the "poison pill" provision provides that the Forfeiture Judgment Credit will not apply and the United States will have a super-priority administrative claim of $2 billion, which will essentially consume the value of the Debtors' operating assets and businesses.[10]

14. The Proposed Settlements' poison pill is an overt and impermissible limitation on the rights of creditors to vote on an eventual chapter 11 plan similar to the poison pill recently rejected in *In re Latam Airlines Grp. S.A. See* 2020 WL 5506407, at *58. In *Latam*, the Court (Garrity, J.) denied the debtors' financing motion because "it indirectly impacts creditor rights of

---

[9] See, for example, the aggregate proof of claim filed by all States in the amount of approximately $2.156 trillion, exclusive of State forfeiture claims which are asserted in an unliquidated amount. Proof of Claim No. 150563.

[10] "In the event that the Bankruptcy Court does not confirm a plan of reorganization in the Purdue Bankruptcy that provides for the emergence from the Purdue Bankruptcy of a public benefit company (or entity with a similar mission), then (i) Purdue shall not be entitled to the Forfeiture Judgment Credit, and (ii) the United States shall retain the full amount of the Forfeiture Judgment as an allowed superpriority administrative expense claim." Plea Agreement at 10.

7

franchise by mandating that only a [specific type of chapter 11 plan] may be confirmed," despite concluding that the debtors had demonstrated a proper business justification for the proposed debtor-in-possession financing. *Id.* The DOJ Settlements would similarly limit the rights of every creditor except the federal government by presenting them with an illusory choice: vote for the plan mandated by the Proposed Settlements and take a structure they do not want, or vote against that plan and, in the words of the Debtors, "leave the Debtors with no viable alternative to liquidation, and satisfaction of such a judgment would leave little to no recovery for other creditors." Mot. ¶ 2.

15. Although settlement agreements between the federal government and debtors have permitted different forms of consideration depending on whether the debtor is reorganized or sold, those settlements have not required a specific outcome or provided materially different terms depending on the outcome. For example, in *Adelphia*, the debtors' settlement agreement with the federal government provided that the debtors would contribute $715 million in value to a restitution fund established for the debtors' victims, but provided for a different mix of consideration depending on whether Adelphia reorganized or was sold. If Adelphia emerged from bankruptcy as a standalone entity, the $715 million would be comprised of: (i) $600 million of common stock of the reorganized Adelphia, and (ii) $115 million of an interest in a litigation trust. In a sale of Adelphia or substantially all its assets, the same $715 million would be comprised of: (i) $400 million of the purchaser's common stock, (ii) $115 million of an interest in a litigation trust, and (iii) $200 million in cash (conditioned on a sale price of at least $10 billion). *See In re Adelphia Commcs. Corp.*, 327 B.R. 143, 157 (Bankr. S.D.N.Y. 2005).

16. In contrast, here, the Proposed Settlements not only restrict the forms of consideration that may be used to satisfy the DOJ's claim, they also provide for a $1.775 billion

8

penalty on other creditors if Purdue does not emerge as a PBC (or entity with a similar mission). Thus, by conditioning the availability of the $1.775 billion Forfeiture Judgment Credit to support abatement on Purdue's emergence from bankruptcy as a PBC, the Proposed Settlements go far beyond merely resolving claims and are an impermissible *sub rosa* plan.

17. Furthermore, given the impact of the Proposed Settlements on the treatment of other creditors, they and their poison pill do not even satisfy those limited circumstances where courts have approved for solicitation plans of reorganization that contain so-called "death traps." A typical "death trap" presents holders of claims *within* a creditor class under a plan with receiving one treatment if they vote against a plan and another (often enhanced) treatment if they vote in favor of a plan. The Proposed Settlements' poison pill provision – which reallocates estate value to the federal government and away from every other creditor class if there is no OxyContin PBC – fails this limited acceptance of "death traps." Courts have only approved for solicitation plans of reorganization that contain so-called "death traps" when they do not impact the treatment of other classes of claims under the plan of reorganization. *See In re Molycorp, Inc.*, Case No. 15-11357 (CSS), Docket No. 1050 (Bankr. D. Del. Jan. 8, 2016) (finding death trap provision triggered by plan objection from official committee impermissible); *see also In re Mcorp Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) (finding death trap provision triggered by other class's vote to reject plan impermissible).

### iii.    The Motion Does Not Contain Adequate Information

18. Bankruptcy Code sections 1121-1129 are the cornerstones of the chapter 11 process. They provide for rigorous disclosures through a court-approved disclosure statement and exacting requirements for plan confirmation. Even if the Proposed Settlements could be approved without the full franchise protections required by the plan process, the disclosure provided by the Motion is insufficient. *See In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 883 (S.D.N.Y.

Bankr. 1990) ("[A] debtor in a Chapter 11 case cannot use section 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization," for to do so allow would render "creditor's rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7) and 1129(b)(2), meaningless." (citation omitted)); *see also In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11. *See, e.g.*, 11 U.S.C. § 1125 (disclosure requirements); *id*. § 1126 (voting); *id*. § 1129(a)(7) (best interest of creditors test); *id*. § 1129(b)(2)(B) (absolute priority rule)." (quotation marks omitted)). Courts have required proponents of transactions that have the effect of dictating plan terms to provide creditors, at a minimum, the disclosure protections they would have received in the plan confirmation process. *See In re Def. Drug Stores, Inc.*, 145 B.R. 312, 318 (B.A.P. 9th Cir. 1992).

19. For example, the Motion does not contain any information concerning the PBC requirement. It does not describe the PBC structure or its duration; it does not describe the PBC's governance; it does not describe the PBC's post-emergence operations; it does not describe the direct or indirect interests of creditors in the PBC; it does not provide any disclosure as to how the PBC will provide value to creditors. The Motion contains none of the disclosure necessary for creditors to assess the intended post-confirmation structure required by the settlement and its impact. The language in the settlements themselves requiring future Purdue to be used as a "public benefit company (or some other entity with a similar purpose)" is no more clear. Neither the "purpose" nor the "similar purpose" is described or defined.

20. These disclosure deficiencies are particularly concerning, where, as here, the federal government has significant latitude to withdraw from the agreement, or declare a plan non-conforming, if the post-confirmation structure is not the PBC or "other entity with a similar

10

purpose" it or Purdue wants. As described above, the effect would be that value would go to the federal government and not be available for personal injury claimants and abatement.

21.     Finally, the impact of the allowed federal government unsecured claims in the approximate amount of $6.3 billion and the requirements for their treatment in the Proposed Settlements are not sufficiently described or explained, nor can they be at this time. Too much remains unresolved in this case and the ability to describe this impact adequately will become clear only with the passage of time. Moreover, this impact (indeed the entirety of the Proposed Settlements) could result in the negotiated agreements in principle between the non-federal public claimants and several of the private claimant groups in the first phase of the mediation to unravel, as those agreements are contingent on a resolution with the United States reasonably acceptable to the non-federal public claimants.

**B.     Approving the Proposed Settlements in Isolation Would Devalue the Mediation Process.**

22.     Whether or not States should have been required to stop their police power actions against Purdue and the Sacklers in favor of the chapter 11 negotiation process, they either have been compelled to do so or they have agreed to do so. The Debtors and the Sacklers asked for this restraint, and the Court endorsed it, so that the parties could engage in good faith negotiations. *See* Oct. 11, 2019 Hr'g Tr. 149:7-10 ("'The parties need to have a clear shot at negotiating an overall settlement of what amounts to a three-cornered battle.' And I appreciate that's what the purpose of this injunction is….").

23.     In response, and for nearly eight months, the parties in these cases have engaged in a multi-phased, all-consuming mediation process coupled with discovery to evaluate the strength of estate and third-party claims. *See Decl. of Benjamin S. Kaminetzky in Support of Debtors'*

11

*Motion to Extend the Preliminary Injunction*, *Purdue Pharma L.P. v. Mass. (In re: Purdue Pharma L.P.)*, Adv. Pro. No. 19-08289 (RDD), Docket No. 199 ¶¶ 4-5, (Bankr. S.D.N.Y. Sept. 16, 2020).

24. In the mediation, the non-federal claimants negotiated not only how estate value would be distributed, but also how those dollars would be used: for abatement of the opioid crisis. Other than to review the abatement plan negotiated by the non-federal public claimants, the United States did not engage with mediation parties.

25. Now, through the Proposed Settlements, the Debtors go much further. In addition to resolving the amount and priority of claims, the Proposed Settlements attempt to guarantee a future for Purdue that is not the product of a negotiated outcome among the ultimate stakeholders, by dictating the continued operation of Purdue's opioid business through a PBC where the residual value ultimately will be held directly or indirectly by the non-federal public claimants and *not* DOJ. *See e.g.,* Mot., Ex. A. ¶ 7. Forcing parties to accept an OxyContin PBC through a Bankruptcy Rule 9019 motion is not just an inappropriate *sub rosa* plan, but it also runs the risk of upsetting the current dynamic in the mediation.

26. Through the Proposed Settlements, the Debtors and the United States gathered to themselves issues that are of great significance to the non-federal public claimants. The Proposed Settlements dictate the continued operation of Purdue's opioid business through an entity dressed up as a "public trust" that requires the States to directly or indirectly hold the residual interest in those operations over an unspecified and potentially lengthy period. They insulate the federal government from a similarly conflicted position, for example, by being both a residual interest holder and a regulator of the same entity, by prohibiting the issuance to it of anything but cash when a plan of organization for Purdue becomes effective. They also preclude efforts to consummate a transaction with an acceptable private buyer and allow the federal government

12

general unsecured claims that could cause agreements between the non-federal public claimants and private claimants to fall apart.

27. The Court should support the negotiation process the Bankruptcy Code intends and the Court has ordered. The benefits of doing so are potentially boundless. Not only might issues regarding the post-emergence structure and operations of Purdue be resolved through negotiation among the non-federal public claimants, but other issues might be resolved consensually as well, as parties receive clarity on whether the federal government will commit any of the $225 million proposed payment by the Sackler family[11] and any of the $225 million and additional distributions contemplated to be made to it based on an allowed approximately $6.3 billion unsecured claim from the Purdue estate, to abate the opioid epidemic. As the Court knows, despite collectively confronting hundreds of billions of dollars in deficits due to the COVID-19 epidemic, all non-federal public claimants maintain their extraordinary commitment to use their recoveries in these cases for abatement of the opioid crisis, and abatement also is the cornerstone provision of the mediation agreements in principle adopted by the non-personal injury private claimants.

C. **There Is No Rush; the Proposed Settlements Can Be Approved in Connection With Confirmation of the Debtors' Chapter 11 Plan.**

28. The Proposed Settlements do not require the Motion to be approved on November 17 or anytime thereafter and effectuation of the Proposed Settlements is dependent only on plan confirmation. The Civil Settlement Agreement requires the Debtors to file the Motion within seven business days after execution. Civil Settlement Agreement ¶ 8.a. The Debtors have satisfied that obligation.

---

[11] *See Further Statement Regarding Notice by the Sackler Families Under Settlement With the Department of Justice Is Not Prohibited by This Court* [Docket No. 1893].

13

29. The predicate acts to effectuate the Proposed Settlements, including (i) Purdue's guilty plea (and its accompanying exclusion from federal health care plans) on the Sentencing Hearing Date,[12] (ii) payment of the $225 million Forfeiture Payment within three business days following entry of the judgment of conviction[13] and (iii) payment of the cash distribution on the Settlement Claim "as soon as reasonably practicable after the effective date,"[14] are all keyed to and dependent on confirmation of a chapter 11 plan. Neither the Debtors or their estates (assuming the proposed resolution is in the best interest of those estates) nor the United States, therefore, will be prejudiced by considering the Motion with plan confirmation.

30. Moreover, as explained above, there are significant deficiencies in the information disclosed in the Motion and Proposed Settlements. All these information deficiencies will be resolved in connection with solicitation of a chapter 11 plan through the disclosure statement approval process. Parties in interest will, if they believe it warranted, object to the adequacy of the disclosure statement, and the Court will only approve it once it is satisfied that disclosure is adequate. 11 U.S.C. § 1125.

31. Considering that the Proposed Settlements do not require Court approval on any set timeframe before confirmation of a chapter 11 plan and because there is a need for more disclosure about terms in the Proposed Settlements and their impact on creditors, there is no reason to approve

---

[12] Plea Agreement at 4 ("The parties further agree to request that the Sentencing Hearing Date take place no earlier than seventy-five days following the date of confirmation of the chapter 11 plan of reorganization in the Purdue Bankruptcy (the "Plan of Reorganization") under 11 U.S.C. § 1129, but in any event 7 days prior to such Plan of Reorganization becoming effective.").

[13] Plea Agreement at 8 ("Purdue agrees that it shall tender to the United States Marshals a $225 million payment in partial satisfaction of the Forfeiture Judgment within three business days following entry of the judgment of conviction."). The entry of the judgment of conviction is dependent on the occurrence of the Sentencing Hearing Date. The Sentencing Hearing Date is to occur within 75 days after confirmation of a plan of reorganization. Plea Agreement at 4.

[14] Civil Settlement Agreement ¶ 2 ("Debtors shall propose and obtain confirmation of a plan that (i) provides for a cash distribution on account of the Settlement Claim as soon a reasonably practicable after the effective date of the Plan of Reorganization. . . . .").

14

the Motion now, while mediation is ongoing. Indeed, approving the Motion before mediation has concluded could impair the likelihood of a successful mediation and a consensual plan. In contrast, the effort and good faith in which parties have approached mediation to date suggests that deferring decision on the Motion will enhance the likelihood of a successful mediation by letting parties find a common outcome together.

## **CONCLUSION**

For these reasons, the Court should decline ruling on the Motion at this time.

Dated: November 10, 2020
       New York, New York

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:    */s/ Andrew M. Troop*
       Andrew M. Troop
       Andrew V. Alfano
       31 West 52nd Street
       New York, NY 10019
       Telephone: (212) 858-1000
       Email: andrew.troop@pillsburylaw.com
              andrew.alfano@pillsburylaw.com

       Jason S. Sharp, admitted *pro hac vice*
       1200 17th Street NW
       Washington, D.C. 20036
       Telephone: (202) 663-8019
       Email: jason.sharp@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*

**CERTIFICATE OF SERVICE**

       I, Andrew V. Alfano, hereby certify that, on November 10, 2020, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

                                            /s/ *Andrew V. Alfano*
                                            Andrew V. Alfano