WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
Tel:  (305) 371-2700
Fax: (305) 358-5744
Thomas E Lauria (admitted *pro hac vice*)
Laura L. Femino (*pro hac vice* pending)

1221 Avenue of the Americas
New York, New York 10020
Tel:  (212) 819-8200
Fax:  (212) 354-8113
J. Christopher Shore
Michele J. Meises
Alice Tsier
Sequoia Kaul

*Co-Counsel for Ad Hoc Group of Individual Victims*
*of Purdue Pharma L.P., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------
|  | : |  |
| In re: | : | Chapter 11 |
|  | : |  |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
|  | : |  |
| Debtors. [1] | : | (Jointly Administered) |
|  | : |  |
---------------------------------------------------------------

## LIMITED OBJECTION OF THE AD HOC GROUP OF INDIVIDUAL VICTIMS TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 105 AND FED. R. BANKR. P. 9019 AUTHORIZING AND APPROVING <u>SETTLEMENTS BETWEEN THE DEBTORS AND THE UNITED STATES</u>

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

FACTUAL BACKGROUND .................................................................. 3

      A.    The Mediation ................................................................. 3

      B.    The DOJ Claims ............................................................... 4

      C.    The DOJ Settles with the Debtors Outside of Mediation .......... 5

      D.    The Status of a Chapter 11 Plan ......................................... 6

OBJECTION ................................................................................... 7

    I.     The Court Should Adjourn Consideration of the DOJ Settlements to Plan Confirmation ................................................................. 7

      A.    By Their Own Terms, the DOJ Settlements Do Not Expressly Require Approval Prior to Plan Confirmation ..................................... 7

      B.    If Approved Outside a Plan, the DOJ Settlements Prejudice the Non-Settling Creditors and Jeopardize the Results of the Mediation ............... 9

      C.    Certain Aspects of the DOJ Settlements Amount to a Sub Rosa Plan and Should Be Addressed as Part of the Chapter 11 Process .......... 11

    II.   In the Alternative, the Court Should Not Approve the DOJ Settlements to the Extent They Contain Plan-Dictating Provisions ................................. 14

      A.    Certain Provisions of the DOJ Settlements May Violate the Priority Scheme of the Bankruptcy Code ............................................ 15

      B.    Other *Iridium* Factors Weigh against Approval of Any Plan-Dictating Provisions of the DOJ Settlements at This Early Stage .......... 20

          1.    The Debtors have offered no evidence to show that approval of plan-dictating provisions at this time is necessary, or that any costs whatsoever attend delaying settlement approval until plan confirmation ................................................................. 21

          2.    Approval of the plan-dictating terms of the DOJ Settlements is not in the paramount interest of creditors at this time .......... 22

CONCLUSION .................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Bertrand-Chaffee Hosp.*, Nos. 07-00470K, 07-00472K, 2009 Bankr. LEXIS
1840 (Bankr. W.D.N.Y. May 21, 2009) ...................................................................18

*In re Biolitec, Inc.*, 528 B.R. 261 (Bankr. D.N.J. 2014) .....................................9, 11, 14

*In re Chapman*, 264 B.R. 565 (B.A.P. 9th Cir. 2001) ....................................................17

*In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010) ......................................20

*In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) .............14

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ............................................13

*In re DBSD N. Am., Inc.*, 634 F.3d 79 (2d Cir. 2010).....................................17, 18, 19

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) ...........................15, 17, 19, 20, 22, 23

*In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2020 Bankr. LEXIS 2405 (Bankr.
S.D.N.Y. Sept. 10, 2020) ........................................................................................13

*In re Lyondell Chem. Co.*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014) ...............................20

*In re Miami Metals I, Inc.*, 603 B.R. 531 (Bankr. S.D.N.Y. 2019) ....................9, 11, 15

*In re Motors Liquidation Co.*, 555 B.R. 355 (Bankr. S.D.N.Y. 2016) .........................23

*In re N.Y. Med. Grp., P.C.*, 265 B.R. 408 (Bankr. S.D.N.Y. 2001)..............................18

*In re NII Holdings, Inc.*, 536 B.R. 61 (Bankr. S.D.N.Y. 2015) ..............................15, 23

*In re Nutritional Sourcing Corp.*, 398 B.R. 816 (Bankr. D. Del. 2008)......................23

*In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003) ...........................15

*In re Sabine Oil & Gas Corp.*, 555 B.R. 180 (Bankr. S.D.N.Y. 2016) ........................21

*In re SunEdison, Inc.*, 575 B.R. 220 (Bankr. S.D.N.Y. 2017) ......................................19

*In re Tower Auto. Inc.*, 241 F.R.D. 162 (S.D.N.Y. 2006).............................................14

*In re Tower Auto., Inc.*, 342 B.R. 158 (Bankr. S.D.N.Y. 2006) ...................................11

*United States v. Egan*, No. 10 Cr. 191, 2015 U.S. Dist. LEXIS 106769 (S.D.N.Y.
Aug. 13, 2015) ........................................................................................................16

*United States v. Gotti*, 155 F.3d 144 (2d Cir. 1998) ........................................................16

## STATUTES AND RULES

11 U.S.C. § 105 ...............................................................................................................1

11 U.S.C. § 726 .........................................................................................................17, 18

11 U.S.C. § 1122 ............................................................................................................18

11 U.S.C. §§ 1123 ..........................................................................................................19

11 U.S.C. § 1129 .........................................................................................13, 17, 18, 19

21 U.S.C. § 853 ..............................................................................................................16

Fed. R. Bankr. P. 9019 ............................................................................................ passim

Fed. R. of Crim. P. 11 .......................................................................................................7

The Ad Hoc Group of Individual Victims (the "**Ad Hoc Group**") of Purdue Pharma L.P.,

*et al.* (collectively, the "**Debtors**" or "**Purdue**"), by and through its undersigned counsel, submits

this objection (the "**Objection**") to the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed.*

*R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United*

*States* (the "**Motion**") [ECF No. 1828].[2]  In support of the Objection, the Ad Hoc Group

respectfully states as follows.

## PRELIMINARY STATEMENT

1.      The Ad Hoc Group represents the interests of more than 60,000 individual victims

of Purdue opioid products, approximately one half of all individual victims who filed claims in

these cases.  For the past several months, the Ad Hoc Group, along with the Debtors' other major

creditor constituencies, has participated in a Court-directed mediation process in an effort to

negotiate a consensual allocation of the distributable value of the Debtors' estates to various

creditor bodies while avoiding inter-creditor litigation over the flashpoint issues of claim

allowance and claim subordination.  The mediation parties have endeavored to do so in the hope

that they can bypass time and value-consuming disputes undertaken at the expense of the estates

and the entire creditor body.  As the Court is aware, those mediation efforts have resulted in a

number of term sheet settlements, including one reached with the Ad Hoc Group, that will form

the backbone of any plan of reorganization in these cases.

2.      While the Debtors have indicated that they are supportive of the settlements reached

in the mediation, they have not yet signed on to those settlements or sought this Court's approval

---

[2]    Capitalized terms used but not defined herein shall have the same meaning as such terms in the Motion, the Plea
Agreement, the Civil Settlement Agreement, or the Mediators' Report, as applicable.

to do so.  Nor have they circulated a plan of reorganization that would effectuate the mediation settlements.  In light of the filing of the Motion, which seeks to resolve on a final basis issues of claim allowance and claim subordination for just one of the Debtors' myriad creditor constituencies, the Ad Hoc Group is concerned that this premature settlement could actually undermine the critical plan processes ahead.

3.    The Ad Hoc Group is not opposed in principle to the substance of the proposed settlements with the United States.  The Ad Hoc Group is opposed, however, to the timing of the settlements, which provide for claim allowance and distribution independently of, and well in advance of, the plan process, which has not yet even begun.  The Ad Hoc Group is particularly concerned with the pre-plan allowance of a $2 billion superpriority administrative expense claim, which would have the pre-plan effect of giving the federal government DIP lender-like status in these Chapter 11 Cases without its ever having contributed funds to the reorganization—even if a plan is never confirmed.   In the event a plan is not confirmed in the near term for reasons having nothing to do with the Debtors' ongoing business or the actions of its creditors, allowance of the federal government's $2 billion superpriority claim could leave the Debtors with an extremely limited set of options for its restructuring.  In turn, non-estate fiduciaries (such as the Sackler families or the public-side creditors who have seemingly vowed to reject any settlement with the Sackler families) could take advantage of this limited optionality to advance their own parochial interests at the expense of the Debtors' estates.

4.    The Ad Hoc Group believes that its concerns—all of which stem from the timing of the Motion—can be easily resolved by postponing approval of the settlements until plan confirmation.  Nothing in the proposed DOJ settlements indicates that the United States has required settlement prior to a plan, or that it might retract these settlement terms if asked to

consummate them in the near future as part of a plan of reorganization.  Simply put, there is no

ticking clock on this deal that would justify approval of plan-dictating terms absent a plan.

Accordingly, the Ad Hoc Group respectfully requests that the Court adjourn the Motion at least

until any hearing on the Debtors' motion to approve a disclosure statement.  In the alternative, if

the Court is inclined to address the Motion outside the context of a plan, the Ad Hoc Group submits

that the Motion should be denied without prejudice to refiling a settlement that does not

impermissibly dictate the terms of a plan which has yet to be filed.

## FACTUAL BACKGROUND

### A.    The Mediation

5.    From March 4, 2020, the Ad Hoc Group and other major creditors in these Chapter

11 Cases have engaged in an intensive mediation process in an effort to move these Chapter 11

Cases to a consensual resolution at great expense borne solely by the Ad Hoc Group.[3]  Mediators'

Report ¶¶ 1-2.  The mediation process, which lasted almost seven months, resulted in each of the

Personal Injury Claimants, the Hospitals, counsel to certain of the TPPs, and the NAS Committee

reaching settlements with the Non-Federal Public Claimants, and the Debtors and the Insurance

Purchasers reaching a separate settlement agreement (together, the "**Mediation Settlements**").  *Id.*

¶ 5.

6.    All of the Mediation Settlements are, however, conditioned on the Court's

confirmation of a plan of reorganization that includes participation by the Sackler families.  *Id.*

---

[3]    The parties to the mediation (the "**Mediation Parties**") are listed in the *Order Appointing Mediators* [ECF No.
895] (the "**Mediation Order**") ¶ 2.  The mediation process also included numerous participants who were not
officially Mediation Parties, including the United States of America, Native American Tribes, representatives of
a putative class of independent school districts,  proposed representatives of a putative class of children born with
NAS in the State of West Virginia, the NAACP and a group of victim advocates which refer to themselves as the
"Ad Hoc Committee on Accountability."  *See* Mediators' Report [ECF No. 1716] ¶ 1.

¶ 12.  The Sackler families did not participate in the mediation and are not bound by the Mediation

Settlements.  *Id.* ¶ 2.

      7.    The federal government did not participate in the mediation, although all parties

were aware that its claims would require resolution and conditioned their Mediation Settlements

on that resolution.  *See Debtors' Motion for Entry of An Order Appointing Mediators* [ECF No.

855] ¶ 9.  The Court provided the federal government an opportunity to "send representatives to

observe mediation sessions," and to meet and confer with the mediators regarding the mediation

procedures.  Mediation Order ¶ 6.  However, the federal government was not required, and chose

not, to address its claims through the mediation process.  Mediators' Report ¶ 1.

### B.    The DOJ Claims

      8.    On July 30, 2020, the federal government, through the Department of Justice

("**DOJ**"), filed two proofs of claim against the Debtors.  The first proof of claim, No. 137848,

alleged unsecured civil claims (including punitive claims) in excess of $8.4 billion (the "**DOJ Civil**

**Claim**").[4]  The second proof of claim, No. 137798 (the "**DOJ Criminal Claim**" and, together with

the DOJ Civil Claim, the "**DOJ Claims**"), asserted unsecured claims for (i) a criminal fine of

approximately $6.2 billion or in excess thereof (the "**DOJ Criminal Fine Claim**") and (ii) criminal

forfeiture of approximately $3.5 billion or in excess thereof (the "**DOJ Criminal Forfeiture**

**Claim**").[5]

---

[4]   *See Addendum to Proof of Claim of the United States of America (Proof of Claim No. 137848)* (the "**DOJ Civil POC**") ¶ 5, https://restructuring.primeclerk.com/purduepharma/Home-ClaimInfo (asserting "single damages in the amount of $2.8 billion or in excess thereof, plus treble damages and penalties.").

[5]   *See Addendum to Proof of Claim of the United States of America (Proof of Claim No. 137798)* (the "**DOJ Criminal POC**") ¶¶ 2-3, https://restructuring.primeclerk.com/purduepharma/Home-ClaimInfo.

## C.    The DOJ Settles with the Debtors Outside of Mediation

9.      On October 21, 2020, the Debtors filed the Motion announcing that, while most of

the creditor constituencies in these Chapter 11 Cases were engaged in mediation, the Debtors

reached two proposed settlement agreements with the DOJ on account of the DOJ Claims (the

"**DOJ Settlements**"):[6]

> a.  A proposed plea agreement between Purdue Pharma L.P. ("**PPLP**") and the
> United States, acting through the NJ USAO, the VT USAO, and DOJ Consumer
> Protection (the "**Plea Agreement**"), attached to the Motion as Exhibit B,
> pursuant to which PPLP will plead guilty to certain violations of criminal law,
> namely (1) to conspiracy to defraud the United States by, among other things,
> misrepresenting that it maintained an effective anti-diversion program and
> facilitating the dispensing of its opioid products without legal medical purpose;
> and (2) to conspiracy to violate the Federal Anti-Kickback Statute by making
> payments to (a) two doctors to induce them to write more prescriptions of
> PPLP's opioid products and (b) an electronic health records company in
> exchange for referring, recommending and arranging for the ordering of PPLP's
> extended release opioid products.  Mot. ¶ 19; Plea Agreement 1.
>
> b.  A proposed civil settlement agreement between PPLP and the United States,
> acting through DOJ Commercial Litigation, NJ USAO, and VT USAO and on
> behalf of HHS-OIG, TRICARE, and the Office of Personnel Management (the
> "**Civil Settlement Agreement**"), attached to the Motion as Exhibit C, to resolve
> allegations that the Debtors knowingly caused false and/or fraudulent claims
> for PPLP's extended release opioid products, OxyContin, Butrans, and
> Hysingla, to be submitted to federal healthcare programs.  The proposed
> settlement agreement does not constitute an admission of liability by PPLP,
> and, in it, PPLP denies that it engaged in the alleged conduct except to the extent
> it makes admissions in connection with the Plea Agreement.  *See* Civil
> Settlement Agreement ¶ K; Mot. ¶¶ 18, 23-26.

10.     The DOJ Settlements address the DOJ Claims as follows:

> a.  To settle the $3.5 billion DOJ Criminal Forfeiture Claim, Purdue agrees to the
> entry of a criminal forfeiture judgment in the amount of $2 billion (the "**DOJ
> Forfeiture Judgment**"), which would be deemed to have the status of an
> allowed superiority administrative expense claim against PPLP.  Mot. ¶ 3.
> Pursuant to the Plea Agreement, the Forfeiture Judgment would be satisfied by
> (i) an upfront payment of $225 million (the "**Forfeiture Payment**"), to be

---

[6]    The DOJ Settlements do not resolve all federal claims, including Proof of Claim Nos. 137406, 138509, 137782,
138522, and 137798 filed by the DOJ, HHS, and the U.S. Department of Veterans Affairs. Mot. ¶ 39 n.7; Civil
Settlement Agreement ¶ 7(l).

made within 3 business days following the entry of a judgment of conviction pursuant to the Plea Agreement, and (ii) application of a $1.775 billion "credit" against the DOJ Forfeiture Judgment for value distributed under the plan in respect of claims asserted by state, tribal, or local government entities (collectively, the "**SMTs**"), so long as the confirmed plan provides that the Debtors will emerge from bankruptcy as a public benefit company (the "**Forfeiture Judgment Credit**"). The proposed order approving the Motion additionally provides that PPLP shall not grant any other party any superpriority claim that is senior to or on parity with the $2 billion DOJ Forfeiture Judgment. Proposed Order ¶ 3.

    b.   To resolve the DOJ Criminal Fine Claim of $6.2 billion, Purdue agrees to plead guilty to three criminal counts and accept a criminal fine in the amount of $3.544 billion as an allowed unsecured claim against PPLP (the "**Allowed DOJ Criminal Fine Claim**"), which cannot be subordinated by the chapter 11 plan. *Id.*

    c.   To resolve the $8.4 billion DOJ Civil Claim, Purdue agrees that the DOJ shall have an allowed unsecured claim against the Debtors in the amount of $2.8 billion (the "**Allowed DOJ Civil Claim**"), which claim cannot be subordinated by the chapter 11 plan. Plea Agreement 3-4, 8-9; Civil Settlement Agreement ¶ 1.

11.    The DOJ Settlements mandate confirmation of a plan of reorganization that is consistent with certain terms contained in the DOJ Settlements. Plea Agreement 5; Civil Settlement Agreement ¶¶ 8, 10. The consequences of a failure to confirm a plan conforming to the DOJ Settlements are discussed in detail below.

12.    As noted in the Motion, the Debtors "do not yet know the position of other creditors" regarding the DOJ Settlements because they did not solicit those views before filing the Motion. Mot. ¶ 42.

**D.    The Status of a Chapter 11 Plan**

13.    At the hearing before this Court on July 23, 2020, Debtors' counsel represented that "a plan should go . . . on file in these cases well before the end of 2020, and my personal view is that October or early November seems like the right target, and hopefully achievable." July 23, 2020 Hr'g Tr. 31:22-25. While the Debtors have indicated that they are supportive of the

Mediation Settlements, they have not explained how the DOJ Settlements will affect the recoveries

of other creditors.  To date, the Ad Hoc Group has not seen a draft plan, much less a proposed term

sheet, and has no visibility into how, or when, the plan process will unfold.  Indeed, one of the key

concerns here is that the plan negotiation process will actually take longer than it would if the DOJ

Settlements were part of a filed plan.

## OBJECTION

**I.     The Court Should Adjourn Consideration of the DOJ Settlements to Plan Confirmation**

**A.     By Their Own Terms, the DOJ Settlements Do Not Expressly Require Approval Prior to Plan Confirmation**

14.    Although the DOJ Settlements require the ultimate approval of this Court, they do

not require approval at any date certain.  Similarly, neither the Plea Agreement nor the Civil

Settlement Agreement is conditioned on approval by any date certain.

15.    The Plea Agreement lays out a series of steps for implementation.  Nothing in the

Plea Agreement prevents these steps from occurring in connection with confirmation of a chapter

11 plan.  Specifically:

> a.  The Plea Agreement requires that the Debtors seek this Court's approval of the settlement by filing a motion under Federal Rule of Bankruptcy Procedure 9019, but does not mandate the timing for filing such motion.  Plea Agreement 4.  The Plea Agreement specifies that it will become effective on the date the Court approves the 9019 Motion, but does not specify a deadline by which that approval must occur. *See id*. ("If the Bankruptcy Court denies the 9019 Motion, this agreement shall not be effective. If the Bankruptcy Court grants the 9019 Motion, the parties agree to request a plea hearing before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure that will occur within seven days of the Bankruptcy Court's grant of the 9019 Motion.").
>
> b.  Upon the Court's grant of the 9019 Motion, the Debtors and the DOJ will request a plea hearing before the U.S. District Court for the District of New Jersey (the "**NJ District Court**"), to be held within seven days of the Bankruptcy Court's grant of the 9019 Motion.  Plea Agreement 4.  Such a hearing will be held "[o]n such date as may be determined by the [NJ District Court]."  Civil Settlement Agreement ¶ H.

    c.  At the plea hearing, Purdue will plead guilty to three counts. *Id.* The parties agree that the NJ District Court "may enter a preliminary order of forfeiture at the time the plea is entered, and that such Order will be final upon the entry of the judgment of conviction . . . ." Plea Agreement 8. Within three business days following the entry of the judgment of conviction, Purdue will pay $225 million in partial satisfaction of the DOJ Forfeiture Judgment. *Id.* The Plea Agreement does not require the NJ District Court to enter the preliminary order at the time Purdue's plea is entered, and in fact requests that the New Jersey District Court's approval of the Plea Agreement (including its provisions as to forfeiture) be deferred until the date of the sentencing hearing. *Id.*

    d.  Finally, Plea Agreement provides that the sentencing hearing take place no earlier than 75 days after the confirmation of chapter 11 plan, but no later than 7 days prior to such a plan becoming effective. Plea Agreement 4.

16.    Similarly, the Civil Settlement Agreement contains no imminent milestones that would necessitate approval outside the context of a plan confirmation process. Specifically:

    a.  The Civil Settlement Agreement provides that within 7 days of its execution, the Debtors will file the 9019 Motion seeking the Court's approval of the settlement. However, the Civil Settlement Agreement specifically contemplates that "this time period may be extended by mutual agreement." Civil Settlement Agreement ¶ 8(a).

    b.  Like the Plea Agreement, the Civil Settlement Agreement specifies that it will not become effective until the Court's grant of the Motion, and does not set a deadline by which the Court must grant approval or by which the Civil Settlement Agreement must become effective. *Id.* ¶ 29 ("This Agreement is effective on the date that the Bankruptcy Court approves the 9019 Motion . . . .").

    c.  The Civil Settlement Agreement does not set any additional milestones for its implementation, providing only that "[p]ayment on account of the Settlement Claim shall be made as provided for in a Plan of Reorganization . . . or . . . in accordance with any order of liquidation approved by the Bankruptcy Court," *id.* ¶ 1, and that the plan will provide for "a cash distribution on account of the [s]ettlement [c]laim as soon as reasonably practicable after the effective date of the Plan of Reorganization." *Id.* ¶ 2.

17.    In sum, nothing in the DOJ Settlements requires the Court to approve the allowance of the DOJ Claims months ahead of the plan confirmation process. Nor have the Debtors or DOJ indicated that either would retract this long-fought deal if asked to execute the DOJ Settlements in the near future rather than today. As set forth in the following section, fairness to other creditor

constituencies, particularly the Mediation Parties, requires the Court to adjourn consideration of the DOJ Settlements until that time.

**B.    If Approved Outside a Plan, the DOJ Settlements Prejudice the Non-Settling Creditors and Jeopardize the Results of the Mediation**

18.    As this Court recently acknowledged, "the Second Circuit has explicitly instructed 'that when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties.'" *In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019).  In *Miami Metals*, certain creditors objected to a 9019 motion for approval of a settlement between the debtors, the senior lenders, and the unsecured creditors committee.  In denying the motion, the Court relied on the reasoning in *In re Biolitec, Inc.*, 528 B.R. 261 (Bankr. D.N.J. 2014), which cautioned against approval of "an outcome-determinative settlement" that would have the effect of a plan without the protections inherent in the plan process.  Applying those principles, this Court found that (i) the funds set aside by the settlement for the objecting creditors' claims may not have been sufficient to address those claims; and (ii) the timing and sequence of the settlement disadvantaged the objecting creditors. *See In re Miami Metals I, Inc.*, 603 B.R. at 537.  As to the timing issue, the Court expressed "concern[] about the timing of the benefits under the [s]ettlement," particularly that "certain features of the [s]ettlement automatically come into effect on the [s]ettlement [d]ate, whereas others are triggered if and only if the [p]lan, as set forth under the [PSA], is confirmed." *Id*.  The Court was "troubled by such sequencing," which "ensure[d] that the [s]enior [l]enders [would] reap the full benefit of the [s]ettlement on the [s]ettlement [e]ffective [d]ate, regardless of whether or when the [p]lan [was] confirmed," while the debtors' estates would "suffer if the [p]lan fail[ed] because their benefits are conditioned on the [p]lan becoming effective." *Id*.

19.     The Motion implicates the same concerns that animated the Court's decision in *Miami Metals*.  Approval of the Debtors' Motion at this stage risks significant prejudice to the Ad Hoc Group and other creditors in the event that a plan is not confirmed, having nothing to do with the ongoing business of the Debtors or any actions taken (or not taken) by creditors during the Mediation.  The DOJ Settlements include provisions specifying that, in the event a plan complying with the terms of the DOJ Settlements is not confirmed, the DOJ's claims would still be allowed, given priority in part, and protected from subordination.  *See* Proposed Order ¶ 7; Civil Settlement Agreement ¶ 10.[7]  Worse, if the Debtor defaults under the Civil Agreement, the DOJ Settlements provide that the automatic stay *will automatically be lifted* as to the United States only, allowing the government to seize the Debtor's property outside the supervision of this Court and while all other creditors remain bound by the stay.  Proposed Order ¶ 8.

20.     This means that, in a liquidation, the DOJ's $2 billion superpriority claim would drain the estates of value (particularly absent a Sackler contribution) and leave nothing for remaining creditors.  This is particularly troubling at present because, just as in *Miami Metals*, there is no plan on file and, indeed, none on the near horizon.

21.     In that regard, while the Mediation parties have spent considerable time and resources working towards a consensual resolution, that work is far from over.  Over the next few months, the creditors and the Debtors must work together to incorporate the Mediation Settlements and the DOJ Settlements into a plan of reorganization that works for all.[8]  Approval of the DOJ

---

[7]    *See also* Civil Settlement Agreement ¶ 6 (allowing, in the event that no conforming plan is confirmed, the full amount of the claim filed in the DOJ Civil POC).  As previously noted, the full amount of the DOJ Civil Claim alone would be in excess $8.4 Billion, but it is not clear how much in excess as the amounts arising from the DOJ fraudulent transfer and civil forfeiture claims are contingent/unliquidated.  *See* DOJ Civil POC ¶¶ 61, 62.

[8]    The Ad Hoc Group does not doubt that the Debtors are in fact supportive of the Mediation Settlements.  However, if the DOJ Settlements are approved prior to a plan, then there is no guarantee that enough value remains in the estate to satisfy both the DOJ Claims and the recoveries contemplated by the Mediation Settlements.

Settlements prior to a plan could materially disrupt the negotiation process by putting one creditor—the DOJ—at a significant advantage to other creditors, all of which were directed by this Court to mediate over allocation and allowance.

22.    Other provisions in the DOJ Settlements raise similar concerns.    The DOJ Settlements dictate separate classification for the DOJ Claims, and prevent the Debtors from proposing any plan inconsistent with the DOJ Settlements.

### C.    Certain Aspects of the DOJ Settlements Amount to a Sub Rosa Plan and Should Be Addressed as Part of the Chapter 11 Process

23.    The Motion should not be considered at this time because approving certain aspects of the DOJ Settlements would dictate the terms of a future chapter 11 plan and circumvent the protections inherent in the confirmation process, including the opportunity to vote.    The DOJ Settlements constitute the kind of "extreme circumstances" that courts have found to be impermissible sub rosa plans—i.e., settlements that dictate the terms of a plan and the rights of non-settling parties "without the benefit of a confirmed plan or court-approved disclosure statement and without an adequate business justification."    *In re Tower Auto., Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006).

24.    As discussed above, this Court in *Miami Metals* relied on the reasoning in *In re Biolitec, Inc.*, 528 B.R. 261 (Bankr. D. N.J. 2014), which cautioned against approval of "an outcome-determinative settlement that would have the same effect as a sub rosa plan."    603 B.R. at 536.    The *Biolitec* court observed that "parties other than those to the settlement did not receive disclosures or the opportunity to negotiate or vote on the settlement's provisions.    In this respect, [the settlement] resembles an impermissible sub rosa plan.    It is well established that courts may not approve settlements that have the effect of a sub rosa plan and accomplish an end run around

the protection granted creditors in Chapter 11 of the Bankruptcy Code.'" *Id.* (quoting *Biolitec*,

528 B.R. at 271-72).

25.    The DOJ Settlements dictate terms related to claim allowance, claim classification,

treatment of claims, and distributions under a plan.  While such terms would not be inherently

problematic in the context of plan confirmation, approval of the DOJ Settlements prior to a plan

threatens to circumvent critical bankruptcy protections and thus risks prejudice to the Ad Hoc

Group and other creditors.

26.    As to claim <u>allowance</u> and treatment, the DOJ Settlements provide:[9]

- The United States shall have its contingent DOJ Forfeiture Judgment allowed as a superpriority administrative expense claim against PPLP in the amount of $2.0 billion, with priority over any and all claims and administrative expenses of any kind.  Proposed Order ¶ 3.  The United States agrees to gift $1.775 billion of this amount to the SMTs.  Mot. ¶ 3.

- PPLP shall not grant any other claim superpriority status senior to or *pari passu* with the United States' superpriority claim.  Proposed Order ¶ 3.

- The DOJ Criminal Fine Claim shall be allowed in the amount of $3.544 billion, which claim shall be unsubordinated, undisputed, noncontingent, liquidated and unsecured.  *Id*. ¶ 5.

- The DOJ Civil Claim shall be allowed in the amount of $2.8 billion, which claim shall be unsubordinated, undisputed, noncontingent, liquidated unsecured claim against Purdue in the amount of $2.8 billion on account of civil claims. *Id*. ¶ 6.

- Neither the Allowed DOJ Criminal Fine Claim nor the Allowed DOJ Civil Claim shall not be subject to subordination, and their allowance shall not be subject to reconsideration.  Proposed Order ¶ 7.

27.    As to claim <u>classification</u>, the DOJ Settlements provide that the Allowed DOJ

Criminal Fine Claim and the Allowed DOJ Civil Claim shall be placed in a "separate class from

other creditors" under a plan.  Proposed Order ¶ 7.

---

[9]    Provided that the Plea Agreement is accepted by the criminal court.  Plea Agreement 5.

28.    As to claim <u>distribution</u>, the DOJ Settlements provide:

- The United States agrees to "gift" up to $1.775 billion of its $2 billion DOJ Forfeiture Judgment to the SMTs "under the Debtors' chapter 11 plan." Mot. ¶ 3.

- The Debtors shall pay $225 million of the DOJ Forfeiture Judgment in cash within three business days after entry of a judgment or conviction in accordance with the Plea Agreement. Proposed Order ¶ 4.

- The Debtors' plan will (i) provide for a cash distribution on account of the Allowed DOJ Criminal Fine Claim and the Allowed DOJ Civil Claim "as soon as reasonably practicable after the effective date of the Plan" and (ii) "not provide the United States with an equity stake in the reorganized company or any other structure that emerges from the bankruptcy." Proposed Order ¶ 7.

29.    The DOJ Settlements also require that the plan provide for the emergence of a public benefit company, Mot. ¶¶ 3, 6, and prohibit the Debtors from proposing a plan of reorganization or liquidation inconsistent with the Settlements. Plea Agreement 5; Civil Settlement ¶ 8(e).

30.    The foregoing terms work together to dictate the terms of the Debtors' future chapter 11 plan in significant ways, without affording creditors the key procedural protections of the plan process, such as creditor voting and the requirements of section 1129(a) of the Bankruptcy Code. *See generally* 11 U.S.C. § 1129(a). As this Court very recently aptly stated:

> A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a chapter 11 plan of reorganization. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)). . . . *Concerns about sub rosa plans . . . are germane to any transaction by a debtor that adversely impacts on interested parties' rights to participate in the restructuring process*. "The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect 'short circuit the requirements of Chapter 11 for confirmation of a reorganization

plan.'"  *Iridium*, 478 F.3d at 466 (quoting *In re Braniff Airways, Inc.*, 700 F.2d at 940).

*In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2020 Bankr. LEXIS 2405, at *197-98 (Bankr. S.D.N.Y. Sept. 10, 2020) (emphasis added); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017) (noting that debtors may not enter into transactions that "circumvent the Code's procedural safeguards"); *In re Biolitec*, 528 B.R. at 271 (rejecting 9019 settlement because, among other things, it "seeks to alter parties' rights without their consent and lacks many of the Code's most important safeguards"); *In re Tower Auto. Inc.*, 241 F.R.D. 162, 168 (S.D.N.Y. 2006) ("A settlement which has the effect of dictating the terms of the debtor's plan of reorganization prior to the confirmation process cannot not be approved."); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").  Instead, the Court should adjourn this Motion to ensure that all creditors have a meaningful opportunity to vote on these terms in the context of plan confirmation.

*          *          *          *

31.    For all these reasons, the Motion should be adjourned and heard in connection with plan confirmation.

## II.    In the Alternative, the Court Should Not Approve the DOJ Settlements to the Extent They Contain Plan-Dictating Provisions

32.    If, and only if, the Court denies the Ad Hoc Group's request and considers the Motion at this time, then the Court should not approve any provision of the DOJ Settlements that would dictate the terms a future plan or reorganization.  This includes provisions that could violate the absolute priority rule or unfairly discriminate, such as provisions allowing certain DOJ Claims on a superpriority basis at this time.  The Ad Hoc Group is certainly aware that courts generally do not approve portions of a settlement and reject other portions.  But at this time and on this record, it is unclear the extent to which the plan-dictating provisions of the DOJ Settlements must

be approved now, or if the Debtors have attempted to negotiate deferred approval of those provisions only upon consideration of a plan.

33.    Bankruptcy Rule 9019 requires Court approval of a compromise or settlement outside of a plan. Fed. R. Bankr. P. 9019(a). In approving a settlement, the Court must ensure that the settlement is "fair and equitable and is in the best interests of the estate." *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). The Debtors bear the burden of persuasion in demonstrating that a settlement satisfies these standards. *See In re Remsen Partners, Ltd.*, 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (proponent has the "burden of establishing that the proposed settlement is in the range of reasonableness and in the best interest of the estate and creditors"). The analysis requires "an independent, full and fair assessment" of a proposed settlement; the Court "may not simply rubber stamp the recommendation" of a debtor. *Id.* (internal citations and quotation marks omitted); *see also In re Miami Metals I*, 603 B.R. at 535 ("[T]he court must make an informed and independent judgment as to whether a proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" (quoting *TMT Trailer Ferry*, 390 U.S. at 424)).

34.    For the reasons discussed below, the plan-dictating provisions of the DOJ Settlements do not satisfy these standards at this time.

**A.    Certain Provisions of the DOJ Settlements May Violate the Priority Scheme of the Bankruptcy Code**

35.    As the Second Circuit held in *Iridium*, "in the Chapter 11 context, whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under

Bankruptcy Rule 9019. In most cases, it will be dispositive." 478 F.3d at 455. The Court should decline to approve the plan-dictating provisions of the DOJ Settlements because, *absent a plan*, they risk effecting distributions that would violate absolute priority and/or discriminate unfairly among classes of unsecured creditors.

36.    As discussed above, the DOJ Settlements purport to give priority status to $2 billion of punitive DOJ forfeiture claims on the ground that these claims "could entitle [the DOJ] to substantially all of the Debtors' distributable value if upheld." Mot. ¶ 1. The Debtors add that the Federal Government "could seek forfeiture" of the Debtors' property and note that the "relation-back" doctrine might apply to divest the estates of the Debtors' property by attaching "'substitute assets' unrelated to the crime." *Id.* ¶ 36; Plea Agreement 8 ("the United States is . . . entitled to forfeit substitute assets in an amount not to exceed $2,000,000,000"); *see* 21 U.S.C. § 853 (on criminal forfeiture); *id.* § 853(c) (on the "relation-back" doctrine). The Debtors assert that "[i]f the United States were successful, it could thus be entitled to obtain substantially all of the value of the Debtors' estates through its forfeiture claims, which would render a successful, and possibly any, reorganization impossible." Mot. ¶ 37.

37.    This cursory review of applicable forfeiture law assumes too much, however. courts in the Second Circuit have held that the relation-back *does not* apply to substitute assets. *See, e.g.*, *United States v. Egan*, No. 10 Cr. 191, 2015 U.S. Dist. LEXIS 106769, at * 11 (S.D.N.Y. Aug. 13, 2015) (noting that "there is no explicit relation-back provision for substitute assets" in the criminal forfeiture statute, and observing that *United States v. Gotti*, 155 F.3d 144 (2d Cir. 1998), in which the Second Circuit held that pretrial restraints of substitute assets were improper in the context of the analogous RICO forfeiture statute, has been read by "[s]ome courts in this circuit . . . as foreclosing the relation-back of the Government's interest in substitute assets to the

time of the crime" (collecting cases)). Absent application of the relation-back doctrine, the DOJ cannot lay claim to substitute assets of the Debtors; it merely holds unsecured forfeiture claims against property of the estate. *See In re Chapman*, 264 B.R. 565, 572 (B.A.P. 9th Cir. 2001) (noting that where relation back does not apply, forfeiture claims are merely claims against property of the estate); *see also* 11 U.S.C. § 726(a)(4) (subordinating forfeiture claims against the estate in a liquidation). Accordingly, contrary to the assertions in the Motion, it is not at all clear that the DOJ would be entitled to all or substantially all of the Debtors' value absent settlement.

38. Where a creditor's secured or priority claims to estate property are suspect, it is not appropriate to grant those suspect claims value in a settlement as if they had already been held valid. *See Iridium*, 478 F.3d at 461 (finding that proposed settlement violated absolute priority where settlement purported to pay value to first lien lenders on account of their disputed first liens, noting that those liens remained "contested" outside the settlement). Even if the forfeiture claims were valid, Purdue's assets—including the "substitute assets" the government seeks to claim—remain estate property until the automatic stay has been lifted to permit the government to proceed. *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 98 (2d Cir. 2010) (noting that even where the secured lenders' liens were undisputed, the property remained property of the estate until the automatic stay was lifted and thus was not the secured creditors' to do with as they pleased).

39. Additionally, in a liquidation scenario—which the Debtors state would occur absent the Settlement, Mot. ¶ 1, all of the DOJ's punitive claims (including forfeiture, criminal fines, and civil penalties) would be subject to subordination. *See* 11 U.S.C. § 726(a)(4) (providing that any "fine, penalty, or forfeiture" is subordinated to all other classes of claims, except claims for interest accruing during the case). The Ad Hoc Group believes that, because of the application of the "best interests test" under section 1129(a)(7) of the Bankruptcy Code, these claims would

*also* be subject to subordination in a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(7) (providing that

each dissenting holder of claims in an impaired class "will receive or retain under the plan on

account of such claim . . . property of a value . . . that is not less than the amount that such holder

would so receive or retain if the debtor were liquidated under chapter 7"); *see also In re N.Y. Med.*

*Grp., P.C.*, 265 B.R. 408, 416 n.5 (Bankr. S.D.N.Y. 2001) (noting that because "punitive damage

claims are subordinated to general unsecured claims in a chapter 7 liquidation [under section]

726(a)(4), and hence, fare differently under the 'best interest of creditors' test [under section

1129(a)(7)], [t]his difference may justify . . . their subordination to the payment of the unsecured

claims"); *In re Bertrand-Chaffee Hosp.*, Nos. 07-00470K, 07-00472K, 2009 Bankr. LEXIS 1840,

at *2 (Bankr. W.D.N.Y. May 21, 2009) ("The Court holds that 11 U.S.C. §§ 726, 1122, and 1129,

are unequivocal and dispositive" in requiring the subordination of penalties "to the claims of all

other creditors.").

40.    Notably, the SMT claims, which the DOJ Settlements purport to prefer over the

claims of all other creditors through impermissible "gifting" by the DOJ,[10] are similarly subject to

subordination to the extent punitive in nature. Even if the DOJ *were* entitled to all of Purdue's

value due to forfeiture claims—and the Ad Hoc Group firmly contests that it is—the DOJ would

still not be permitted to gift that value to one favored class of unsecured creditors and leave

disfavored classes of unsecured creditors behind. *See In re DBSD*, 634 F.3d at 87 (rejecting plan

in which senior creditors gifted a portion of their recovery to another class in violation of the

---

[10]    Paragraph 6 of the Motion explains that "the United States has agreed to provide offset credit for value conferred
upon the non-federal government creditors up to $1.775 billion out of a $2 billion DOJ Forfeiture Judgment,
provided that the Debtors: (i) confirm a plan of reorganization that provides that all of the Debtors' assets are
transferred to a public benefit company (or entity with a similar mission); and (ii) distribute at least $1.775 billion
of value to state, tribal, and local governments in satisfaction of their claims." Mot. ¶ 6.

Code's priority scheme, *even where* "there is no doubt as to [the secured lenders'] secured creditor

status . . . and where the complaining creditor would get no more if the gift had not been made."

(emphasis added) (internal quotations omitted)).

41.   For all these reasons, the DOJ Settlements contemplate a distribution that, absent a

plan allocating sufficient value to other unsecured creditors, may violate section 1129(b) of the

Bankruptcy Code by making distributions to subordinated punitive claims before general

unsecured claims of higher priority have been paid in full.  *See* 11 U.S.C. § 1129(b)(2)(B); *In re*

*DBSD*, 634 F.3d at 97 ("[T]he statutory language and the legislative history of § 1129(b) clearly

bar any expansion of any exception to the absolute priority rule beyond that recognized in our

cases at the time Congress enacted the 1978 Bankruptcy Code.").  Even if the DOJ Claims and

SMT claims were not subordinated, the DOJ Settlements may *still* violate the Bankruptcy Code's

priority scheme by discriminating unfairly, i.e., by providing a substantially higher distribution to

certain classes of unsecured claimants (i.e., the United States and the SMTs) than to others (all

other general unsecured claimants, including those in the Ad Hoc Group).[11]  *See* 11 U.S.C. §§

1123(a)(4), 1129(b)(1); *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017) ("[T]he

unfair discrimination test assures fair treatment among classes of the same priority level while the

fair and equitable requirement ensures fair treatment among classes of different priority levels.").

In the Second Circuit, a 9019 settlement may not violate the Bankruptcy Code's priority scheme

without justification.  *Iridium*, 478 F.3d at 466 (overruling a bankruptcy court order approving a

9019 settlement that violated absolute priority without justification).

---

[11]   And it may very well not—until a plan is on file to document the recoveries to be received by the general
unsecured creditors on their claims, there is no way of knowing whether or not the distribution enacted by the
DOJ Settlement complies with either horizontal or vertical fairness under 11 U.S.C. §1129(b)(1).

42.    There is no such justification here.  Because the plan-dictating terms of the DOJ

Settlements, if permitted, risk violating the priority scheme of the Bankruptcy Code, those

provisions cannot be approved at this time.  *See Iridium*, 478 F.3d at 464 ("[A] bankruptcy court

"must be certain that parties to a settlement have not employed a settlement as a means to avoid

the priority strictures of the Bankruptcy Code."); *In re Lyondell Chem. Co.*, 503 B.R. 348, 369

(Bankr. S.D.N.Y. 2014) ("[T]he absolute priority rule has importance even outside of decisions as

to whether to confirm reorganization plans. It is the 'most important factor' that must be considered

in any settlement where absolute priority rule considerations appear." (internal citation omitted));

*In re Chemtura Corp.*, 439 B.R. 561, 595 n.148 (Bankr. S.D.N.Y. 2010) ("In the Chapter 11

context, whether a settlement's distribution plan complies with the Bankruptcy Code's priority

scheme will often be the dispositive factor.").

**B.    Other *Iridium* Factors Weigh against Approval of Any Plan-Dictating Provisions of
the DOJ Settlements at This Early Stage**

43.    To determine whether a proposed settlement is fair, equitable, and in the best

interests of the estate, courts in this Circuit apply the factors set forth in *In re Iridium Operating*

*LLC*, 478 F.3d 452 (2d Cir. 2007), namely: (1) the balance between the litigation's possibility of

success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation,

with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the

judgment; (3) the paramount interests of the creditors, including each affected class's relative

benefits and the degree to which creditors either do not object to or affirmatively support the

proposed settlement; (4) whether other parties in interest support the settlement; (5) the

competency and experience of counsel supporting, and the experience and knowledge of the

bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be

obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's

length bargaining.  *Id.* at 464.

44.    Here, without a proposed plan in place, neither the creditors nor the Court have

sufficient information from which to determine whether the DOJ Settlements are fair and equitable

and in the best interests of the Debtors' estates.   To the contrary, in light of the threat (discussed

above) that the DOJ Settlements pose to the Mediation Settlements and to the Debtors' major

creditor constituencies, the *Iridium* factors weigh against approval at this time of provisions in the

DOJ Settlements that dictate the terms of a future plan.

> 1.    *The Debtors have offered no evidence to show that approval of plan-dictating*
> *provisions at this time is necessary, or that any costs whatsoever attend*
> *delaying settlement approval until plan confirmation*

45.    As discussed above, nothing in the DOJ Settlements imposes a deadline on approval

of these settlement terms.   Neither the Debtors nor the DOJ have indicated that they might retract

the terms of this proposal if asked to consummate it in the near future as part of a plan; nor is there

is any reason to think that either party would do so.   According to the Debtors, the DOJ settlements

"are the product of years of investigation and extensive arm's length negotiations."  Mot. ¶ 4.

There  is  no  record  proffered  to  support  a  conclusion  from  the  Court  that  delaying  this

comprehensive, hard-fought deal for several months (according to the Debtors' timeline[12]) would

take its terms off the table.

46.    Courts  should  not  approve  settlement  terms  absent  a  cost-benefit  analysis

adequately showing that the benefits of settlement approval outweigh the costs of rejection (or, in

this case, delay).  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 296 (Bankr. S.D.N.Y. 2016)

---

[12]    *See* July 23, 2020 Hr'g Tr. 31:22-25 (Debtors' counsel anticipating that "a plan should go . . . on file in these
cases well before the end of 2020").

(finding that the debtors met their burden in showing that the benefits outweighed costs of failing to settle only after "a diligent investigation into the merits of each claim" and "risk-adjusted" analysis of the claim amounts "reflecting the Debtors' view of their chance of success with respect to each claim" if those claims were not settled).

47.    Additionally, if approved in advance of a chapter 11 plan, the DOJ Settlements threaten to destroy the costly fruits of mediation labor.  Without a proposed plan, neither the Court nor creditors can evaluate whether a plan conforming to the DOJ Settlements would leave enough distributable value in the Debtors' estates to allow them to honor the terms of the Mediation Settlements.  If the DOJ Settlements do not leave sufficient value, then approval of the Motion will simply trade one set of litigations (between the Debtors and the United States) for another (multi-party litigation among the Mediation Parties themselves, as well as between Mediation Parties and Debtors).

2.    *Approval of the plan-dictating terms of the DOJ Settlements is not in the paramount interest of creditors at this time*

48.    Under the third and fourth *Iridium* factors, the Court must consider whether a proposed settlement is in the paramount interest of creditors, and the extent to which it has the support of affected creditors.  *Iridium*, 478 F.3d at 462.  As discussed above, the Ad Hoc Group believes that early approval of the plan-dictating features of the DOJ Settlements may in fact *slow* plan negotiations by reducing plan urgency and giving undo leverage to parties who have expressed a preference for political interests over economic ones.

49.    Notably, the DOJ Settlements were negotiated without any involvement from other constituencies.  While this was perhaps unavoidable, Mot. ¶ 42 ("Because the DOJ investigations were required to be kept confidential, it was not possible to solicit the views of other creditors before this motion was made."), that does little to address the *consequences* of this closed-door

negotiation for the creditors who stood outside it.[13] *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 835-36 (Bankr. D. Del. 2008) (finding settlement not in the best interests of creditors who were "not at the negotiating table and who were not adequately represented in their absence"); *Iridium*, 478 F.3d at 461 (The "clear purpose" of Rule 9019 is "to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court." (internal citation omitted)). Perhaps accordingly, the Debtors do not claim any non-settling creditor support for the Motion.

50.    The adverse consequences to non-settling creditors of premature approval are exacerbated by the fact that, if the Motion is approved now, the Debtors' major creditor constituencies will not have the opportunity to challenge the DOJ Settlements should they ultimately function to upend the negotiated Mediation Settlements. The Court should not approve the plan-dictating terms of the DOJ Settlements without reference to the substance of the Mediation, without ever seeing a plan, and without any indication that a plan consistent with the DOJ Settlements can or will respect the Mediation Settlements.

---

[13]    This situation is critically different from that in which courts have found a non-settling party's interests to have been adequately represented in the negotiation process such that the proposed settlement could be deemed in the paramount interest of creditors. *See, e.g., In re Motors Liquidation Co.*, 555 B.R. 355, 369 (Bankr. S.D.N.Y. 2016) (emphasizing "the fact that the Committee, which is charged with guarding the paramount interests of the creditors, itself negotiated the Settlement supports the view that the Settlement is in the best interests of unsecured creditors"); *In re NII Holdings*, 536 B.R. at 130 (noting that even where objecting creditors did not participate directly in negotiations, the negotiating parties included the Committee and Independent Manager, who could adequately represent the interests of those creditors).

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Ad Hoc Group of Individual Victims respectfully requests that the Court (i) adjourn consideration of the Motion, (ii) in the alternative, decline to approve the plan-dictating provisions of the DOJ Settlements, and (iii) grant such other and further relief as is just and proper.

Dated:  November 10, 2020
New York, New York

WHITE & CASE LLP

By:  _/J. Christopher Shore_

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel:  (212) 819-8200
Fax:  (212) 354-8113
Michele J. Meises
Alice Tsier
Sequoia Kaul

Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
Tel:  (305) 371-2700
Fax: (305) 358-5744
Thomas E Lauria (admitted _pro hac vice_)
Laura L. Femino (_pro hac vice_ pending)

_Co-Counsel for Ad Hoc Group of Individual
Victims of Purdue Pharma L.P., et al._