

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

86 Chambers Street
New York, New York 10007

November 13, 2020

**By ECF**
The Honorable Robert D. Drain
United States Bankruptcy Judge
United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4140

    Re:    *In re Purdue Pharma L.P., et al.*, No. 19-23649 (RDD)

Dear Judge Drain:

    This Office represents the United States in connection with the above-captioned bankruptcy proceedings. We write to address more fully a question posed by the Court at the October 28, 2020 hearing, specifically how the Government intends to use the $225 million that would be paid to the United States in its settlement agreement with the Sackler family (the "Sackler Settlement Agreement"), and whether those funds would be used to abate the opioid crisis. *See* Oct. 28, 2020 Hr'g Tr. 60:2-5 ("Is there any understanding or agreement or commitment by the United States, regarding how the $225 million would be spent? *I.e.*, in particular, is there any commitment by the United States that it would be spent on abatement?"). As explained below, the Government intends to use nearly all of the settlement proceeds to replenish funding for federal healthcare programs that will advance public health objectives, including, but not limited to, abatement.

    The Sackler Settlement Agreement resolves the Government's allegations that the Named Sacklers (as defined in the Sackler Settlement Agreement) violated the False Claims Act, 31 U.S.C. § 3729 *et seq*. As set forth in more detail in Addendum A to the Sackler Settlement Agreement, the Government alleges that, from 2013 to 2018, the Named Sackers caused false and/or fraudulent claims for OxyContin to be submitted to federal healthcare programs, including Medicare; Medicaid; TRICARE; the Federal Employees Health Benefits Program; and programs operated by the Indian Health Service (collectively, the "Federal Healthcare Programs").

    Pursuant to the "refund exception" to the Miscellaneous Receipts Act (the "MRA"), *see* 31 U.S.C. § 3302(b), damaged agencies in False Claims Act settlements are generally entitled to recover their damages caused by the false claims.[1] In this matter, the Federal Healthcare Programs

---

[1] *See generally* Apportionment of False Claims Act Recoveries to Agencies, 28 Op. O.L.C. 25 (Mar. 12, 2004), at https://www.justice.gov/file/18886/download. The Office of Legal Counsel ("OLC") opinion cited by the Unsecured Creditors Committee and the Non-Consenting State Group, *see* Dkt. No. 1893 at 4, is not to the contrary, and it does not support the proposition for which it is cited. There, the General Services Administration ("GSA") asked whether actual

sustained damages as a result of the False Claims Act violations alleged by the Government against the Named Sacklers. Based on the damages sustained by the Federal Healthcare Programs as a result of those violations, the United States anticipates that more than 85% of distributable proceeds from the Sackler Settlement Agreement will be returned to the Medicare Trust Fund and to the United States Department of Health and Human Services ("HHS") to replenish the federal government's contribution to Medicaid, with lesser amounts going to the appropriate federal agencies for the damages sustained by the other Federal Healthcare Programs.[2]

Thus, the vast majority of the distributable proceeds will go towards Medicare and Medicaid, the two largest governmental healthcare programs. Although HHS, the agency responsible for overseeing the Medicare Trust Fund, is not permitted to segregate these funds and apply them exclusively towards opioid abatement purposes, settlement proceeds directed to Medicare will help fund existing healthcare programs, including the extensive abatement efforts under Medicare. Among other treatment programs administered by Medicare, as of January 1, 2020, Medicare Part B provided a new Opioid Treatment Programs benefit for the treatment of Opioid Use Disorder ("OUD"). This includes coverage of FDA-approved opioid agonist and antagonist Medication-Assisted Treatment ("MAT") medications; the dispensing and administration of MAT medications; substance use counseling; individual and group therapy; toxicology testing; intake activities; and periodic assessments.[3]

Similarly, although the funds returned to Medicaid cannot be earmarked specifically for opioid abatement, those funds will be directed towards a broad array of healthcare needs through the states' Medicaid programs, including opioid abatement. Because a substantial percentage of nonelderly adults with OUD are covered by Medicaid,[4] Medicaid plays a substantial role in

---

damages from a False Claims Act settlement could be returned to the agency's Information Technology Fund, a "revolving fund" established by Congress to finance GSA's provision of "information technology resources to federal agencies," or whether the damages were required to be returned to the general Treasury. The OLC opined that such damages could be returned to GSA's Information Technology Fund, under the refund exception to the MRA. *See* Application of Miscellaneous Receipts Act to Settlement of False Claims Act Suits, 30 Op. O.L.C. 53 (Jan. 10, 2006), at https://www.justice.gov/sites/default/files/olc/opinions/attachments/2015/10/19/op-olc-v030-p0053.pdf. For the reasons stated *infra*, the same is true here.

[2] In accordance with 28 U.S.C. § 527, three percent of the amount collected in this matter will be deposited in the Department of Justice's Working Capital Fund.

[3] In addition to people over the age of 65, Medicare is available to individuals who have received Social Security benefits for 24 months. *See* Who is eligible for Medicare?, https://www.hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index.html. The HHS Office of Inspector General has identified this population of beneficiaries under the age of 65 as particularly at risk for opioid misuse or overdose. *See* Opioid Use in Medicare Part D Remains Concerning (June 2018), https://oig.hhs.gov/oei/reports/oei-02-18-00220.pdf.

[4] A 2019 report from the Kaiser Family Foundation found that, of the nearly two million nonelderly adults suffering from OUD in 2017, nearly 4 in 10 were covered by Medicaid (for reference, the share of the population of nonelderly adults covered by Medicaid was only 16%). *See* The Opioid Epidemic and Medicaid's Role in Facilitating Access to Treatment,

helping to abate the opioid crisis. For Medicaid beneficiaries who have OUD, state-managed Medicaid programs facilitate access to inpatient and outpatient treatment services—including detoxification, psychotherapy, peer support, supported employment, intensive outpatient treatment, and partial hospitalization—as well as medications and therapy prescribed as part of medication-assisted treatment.

Further, individuals with OUD with Medicaid are significantly more likely to receive treatment than those with private coverage.[5] The 2019 Kaiser Family Foundation Report anticipated that Medicaid would finance 28% of all substance use disorder treatment services in the country as of 2020. In short, Medicaid is a crucial part of the nation's fight against the opioid crisis, and the settlement proceeds from the Sackler Settlement Agreement will thus help support Medicaid's key role in that effort.

In sum, the Government's recoveries from the Sackler Settlement Agreement will benefit the public health concerns that the Federal Healthcare Programs are tasked by Congress to meet, including those programs' important role in abating the opioid crisis.

We thank the Court for its consideration of this matter.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York

By:    */s/ Lawrence H. Fogelman*
LAWRENCE H. FOGELMAN
PETER ARONOFF
DANIELLE LEVINE
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2800
Facsimile: (212) 637-2686
Lawrence.Fogelman@usdoj.gov
Danielle.Levine@usdoj.gov
Peter.Aronoff@usdoj.gov

cc: All Counsel of Record (by ECF)

---

https://www.kff.org/medicaid/issue-brief/the-opioid-epidemic-and-medicaids-role-in-facilitating-access-to-treatment/.

[5] *See id.*