UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:, <br><br> **PURDUE PHARMA L.P.,** *et al.*, <br><br> Debtor,[1] | Chapter 11 <br><br> Case No. 19-23649 (RDD) <br><br> (Jointly Administered) |

## THIRD MONITOR REPORT

Comes now, Thomas J. Vilsack, as duly contracted Monitor for Purdue Pharma L.P. to report to the Court as follows:

## EXECUTIVE SUMMARY

This Third Monitor Report will include a description of steps taken since the Second Monitor Report: to determine compliance with the conditions of the Voluntary Injunction, to review documents and materials relied upon, to retain subject matter experts, to provide an update on the implementation of recommendations from the Initial and Second Monitor Reports, to outline additional information relating to a variety of topics germane to the Voluntary Injunction including the ban on promotions, use of remunerations, suspicious order monitoring, lobbying, memberships, and Initial Covered Sackler Persons, and to make recommendations for continued compliance with the terms and conditions of the Voluntary Injunction. Officials at Purdue

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

Pharma L.P. continue to be responsive and cooperative notwithstanding the Covid 19 crisis in furnishing information and providing access to key personnel. Based on what has been reviewed to date and subject to the continued adherence to recommendations contained in previous Monitor Reports and recommendations contained herein, Purdue Pharma L.P. and the Initial Covered Sackler Persons appear to be making a good faith effort to comply with the terms and conditions of the Voluntary Injunction.

## INTRODUCTION – STEPS TAKEN SINCE SECOND REPORT

1. Since the filing of the Second Report, the undersigned Monitor has continued to request, receive and review a variety of reports and documents that contain lobbying, financial, marketing, production and manufacturing quotas, chargeback reports, suspicious order monitoring information, and several consultant surveys assessing the fair market value range for certain fees and credits paid in the industry to wholesalers, distributors, pharmacy benefit managers and managed care operations for Purdue Pharma L.P. and its related entities (Purdue). In addition, the undersigned Monitor has reviewed reports submitted to the Drug Enforcement Agency (DEA) by Purdue. Also reviewed were filings with this Court concerning changes in the employee and senior management bonus and compensation structure proposed to be implemented at Purdue.

2. Since the filing of the Second Report, the undersigned Monitor has continued to retain the expert services, with Court approval, of Jodi Avergun, former DEA Chief of Staff, who has been instrumental in assisting with the review of the suspicious order monitoring and reporting efforts at Purdue, leading to a series of recommendations contained in the Second Report and the implementation of said recommendations.

3. Since the filing of the Second Report, the undersigned Monitor has retained the expert services of HealthPlan Data Solutions Inc. to better understand how remunerations, rebates

and other financial tools are being used at Purdue in the relationship with wholesalers, managed care organizations, group purchasing operations, and governmental entities.

## FIRST REPORT RECOMMENDATIONS

4. In the Initial Report filed by the undersigned Monitor a series of recommendations were made and agreed upon by Purdue. Included in those agreed upon recommendations was the requirement that the third party sales force personnel hired by Purdue to market non-opioid products certify they have read the Preliminary Voluntary Injunction dated November 6, 2019 (Injunction)[2], they have provided a list of any health care provider or customer called upon that inquired about opioids or opioid products, and that they acknowledge they have directed any such inquiry by the health care provider or customer to the Medical Affairs Department of Purdue (Paragraph 48 of the Initial Report). The undersigned Monitor received and reviewed the certifications prior to the filing of the Second Report and is scheduled to receive the next set of certifications at the end of the calendar year.

5. Included in those agreed upon recommendations was the requirement that in the event data from studies identified in detail in the Initial Report (Paragraphs 49-55 of the Initial Report) was published in a scientific journal and that data was linked to a website controlled by Purdue, the company would accompany the publication of the data with a disclaimer drawing attention to the risks of misuse, abuse and overdose of opioids and opioid products (Paragraph 55 of the Initial Report). The undersigned Monitor has been advised that no such publication of data nor linkage has yet taken place.

---

[2] On November 6, 2019, the Bankruptcy Court entered a Preliminary Injunction as part of this Bankruptcy Proceeding. The Preliminary Injunction Order included, as Appendix A, a Voluntary Injunction (Injunction). The Injunction has been entered numerous times and remains unchanged from the version entered on November 6, 2019.

6. Included in the agreed upon recommendations was the requirement that Purdue insert the same cautionary language contained in the Purdue Pharma L.P. website on the Rhodes Pharmaceuticals L.P. website (Paragraph 58 of the Initial Report). This recommendation continues to be followed.

7. Included in the agreed upon recommendations was the requirement that Purdue update its LinkedIn account to reflect the correct number of employees and to alert followers to the existing bankruptcy proceeding (Paragraphs 63 of the Initial Report). This recommendation continues to be followed.

8. Included in the agreed upon recommendations was the requirement that Purdue certify that for the corporate performance element in the Market Access Incentive Compensation Plan neither top-line opioid product sales, nor volume specifically would be used as a factor in calculating salaries or bonus (Paragraph 101 of the Initial Report). Purdue did decide to propose changes to the compensation, bonus and/or retention payments for its non-market access field based employees. The undersigned Monitor has received a copy of the filing. Following receipt of the filing the undersigned Monitor asked if the proposed changes in any way altered the formula for calculating such payments with respect to providing an incentive or payment for the marketing, promotion and sale of opioids and opioid products. The undersigned received assurances from Purdue that the formula or method of awarding or calculating payments was not changed in any way that would promote or incentivized the promotion, marketing or sale of opioids or opioid products or incentivize compensation based on top-line opioid sales and volumes. As a result, Purdue continues to be in compliance with the Part II, Section B, Paragraph 1 of the Injunction.

9. Included in the agreed upon recommendations was the requirement that lobbyists working at the federal and state levels have contracts that spell out in detail the prohibitions on

4

lobbying and an agreement to abide by those prohibitions (Paragraphs 156, 169 of the Initial Report), a requirement that lobbyists provide a list of all issues and matters worked on and positions taken with respect to each such issue or matter (Paragraphs 159, 170 of the Initial Report) and a requirement that lobbyists certify compliance with those prohibitions (Paragraphs 159,171 of the Initial Report). The undersigned Monitor has received the reports and certifications requested.

10. Included in the agreed upon recommendations was the requirement that Purdue would provide written notice to the undersigned Monitor before any effort to lobby against any opioid tax (not including lobbying with respect to how a tax might be structured or administered) (Paragraph 173 of the Initial Report). To date no such written notice has been provided, indicating no such effort has been undertaken.

## SECOND REPORT RECOMMENDATIONS

11. In the Second Report filed by the undersigned Monitor a series of recommendations were made and agreed upon by Purdue. Included in those agreed upon recommendations was the hiring of expert services to review the system of rebate, service fees, price protections, and other financial remunerations used by Purdue with wholesalers, group purchasing organizations, managed care operations, and governmental entities (Paragraph 31 of the Second Report). The review was designed to determine whether or not payments, credits and discounts provided by Purdue were reasonable or unreasonable and consistent or inconsistent with normal business practices and industry ranges for similar payments, credits and discounts. A request was made and Court approval was obtained to retain the services of HealthPlan Data Solutions Inc. (HDS) located in Ohio. HDS provides analysis for hospitals about the reasonableness and fairness of rebates and other remunerations being made available to their clients.

5

12. Included in the agreed upon recommendations contained in the Second Report was the agreement to review the threshold system used at Purdue (Paragraph 70 of the Second Report). The Undersigned Monitor has been informed that Purdue has contracted with an affiliate of the third party vendor used to produce the algorithm based suspicious order monitoring system (SOM). The consultant has experience in providing direction on the development of an effective suspicious order monitoring system and due diligence compliance program. The consultant has been tasked with evaluating, analyzing, and advising on key DEA requirements and providing recommendations for improvements and modifications to the SOM system, the use of a threshold, the SOM Standard Operating Procedures (SOPs), customer onboarding, and pended order analysis, evaluation and investigation of all pended orders flagged by SOM. Already the consultant has made several recommendations to enhance Purdue's due diligence efforts connected to a periodic review of data and to pended orders. **A recommendation is made to provide the undersigned Monitor the full results of the consultant's review, the implementation plan for any recommendations accepted by Purdue, and a detailed description of any other changes proposed to the SOM program, the use of thresholds, revisions and updates to SOPs, customer onboarding, and the handling of pended orders. Purdue agrees to this recommendation.**

13. As to the threshold and its use in the SOM process the in-house SOM team at Purdue has worked with the consultant to determine if use of a threshold should continue. The recommendation is that there are rational reasons to continue having a threshold, but additional review is required to determine in what ways its use could be improved. In addition, the consultant is working on a Standard Operating Procedure, outlining how the threshold is to be calculated, used and maintained. **A recommendation is made that the undersigned Monitor be provided the SOP when completed. An additional recommendation is made that the**

6

**undersigned Monitor be informed of what, if any, other changes are being proposed in the use of the threshold or the method by which it is calculated before any changes are implemented and a method agreed upon. In addition, it is recommended that the sole use of the threshold should never be the only step taken to approve a pended order for reporting or shipping and that due diligence require further investigation as to the cause or causes of an order being pended before a decision is made to release or reject and report an order. Purdue agrees to these recommendations.**

14. Included in the agreed upon recommendations contained in the Second Report was the agreement to hire additional staff to bolster review of orders pended or flagged by a set of algorithms embedded in the SOM program conducted by Purdue (Paragraph 77 of the Second Report) and to better document decisions to fill the pended orders being reported to the DEA (Paragraph 71 of the Second Report). Purdue increased staffing on the SOM team by temporarily assigning an analyst to the team to assist with data analytics while the search for a Manager candidate to support SOM operations is conducted. Additionally, a full-time employee with significant DEA experience has been reassigned within Purdue and now has management responsibility for the SOM team, reporting to the VP, Ethics & Compliance.

15. Purdue has also developed a check list for pended orders that establishes the reason for the order being flagged, the threshold analysis, documentation of the customer contact, the decision made and a comment section where an explanation of the action taken can be recorded. In 2019, the percentage of pended orders flagged by the SOM system was approximately 15% of all orders. Through the first 10 months of 2020 the percentage of pended orders flagged by the SOM system was approximately 13%.

16. Included in the agreed upon recommendations contained in the Second Report was an agreement to report for a period of 90 days commencing October 1, 2020 all pended or

flagged orders, (except for those that are based on a jurisdictional requirement and automatically pended for second review (e.g., Ohio)) , to the DEA. Purdue began reporting those pended or flagged orders to the DEA on a weekly basis each Thursday for the previous Sunday to Saturday period during the first week of October after a trial run of reporting prior to October 1, 2020. Over 300 orders were reported from October 1 through 31. Prior to the institution of this recommended reporting system a total of 15 orders were reported to the DEA from January through September. To date no barriers to the more expansive reporting have been identified . This reporting recommendation is to be reviewed at the end of the calendar year at which time additional recommendations related to its continuation, expiration or modification may be made.

17. The DEA recently filed a Notice of Proposed Rule Making relating to suspicious order monitoring and seeking to clarify procedures that are to be followed for orders received under suspicious circumstances. The rule is being filed by the DEA in an effort to comply with the Drug Diversion Act of 2018. In the proposed rule, DEA outlines a two-step framework for the handling of orders received under suspicious circumstances. A registrant receiving such an order that is pended, flagged or identified as a suspicious order can either report the order to the DEA and refuse to fill the order, or the registrant can within 7 days of the receipt of the order conduct a due diligence investigation to determine if the order is indeed suspicious and decide within 7 days to report and not fill the order or not report and complete the order. In the proposed order the DEA seeks to provide more definition to the concept of a due diligence investigation. The investigation must be more than a check the box investigation. The proposed rule sets forth that a due diligence investigation linked to the reporting duty and the shipping responsibility must dispel all red flags indicative of a suspicious order and must be adequately documented. The documentation required under the proposed rule would require the record to include how the registrant handled the order, the reason or reasons for the order to be flagged as suspicious, the

8

steps taken to investigate, the information obtained, and the basis for the decision to report or to ship. **A recommendation is that Purdue request the consultant discussed in paragraph 12 above be asked to review if the current documentation provided in the current SOM system would satisfy the requirements of the proposed rule and what, if any, modifications or suggestions the consultant would make to the current documentation effort. Purdue agrees to this recommendation.**

18.    Included in the agreed upon recommendations contained in the Second Report were a number of steps to be taken in connection with the reporting and review of chargebacks. Purdue agreed to begin reviewing chargebacks on a monthly basis instead of quarterly (Paragraph 76 of the Second Report). That monthly review began in September of 2020.

19.    Included in the agreed upon recommendations contained in the Second Report were a number of steps to be taken in connection with the reporting and reviewing of chargebacks. Purdue agreed to examine the method and process by which certain chargebacks were selected for a more in-depth review (Paragraph 76 of the Second Report). Commencing in September Purdue began to document their review of chargebacks by preparing a report of "outliers" based on large number of chargebacks. The report outlines research conducted by Purdue to determine if there is a reason, such as volume of doctor offices and hospitals, that might explain the large number of chargebacks. Purdue contracted with the aforementioned consultant identified in paragraph 12 above to conduct a review of the current system of review and to make recommendations for any changes and modifications to that system improving its capacity to identify possible diversion or misuse of opioid products. The third-party vendor has developed a tool to automate the process used in analyzing chargebacks and Purdue is reviewing other ways in which the review process can be improved. **A recommendation is made that the results of the review and of the use of the tool be made available to the undersigned**

9

**Monitor and to provide the undersigned Monitor notice of any changes being made to the chargeback review process before said changes are implemented. Purdue agrees to this recommendation.**

20. Included in the agreed upon recommendations contained in the Second Report was a recommendation involving membership organizations to which Purdue or its management team management belong. Purdue and its management team required that the company member or individual key staff member recuse the company and/a senior management team member from participating or supporting any decision by the membership organization that would be considered promotion of opioid products and to provide a certification of compliance to the undersigned Monitor (Paragraph 90 of the Second Report). The undersigned Monitor prior to this filing received a duly executed and timely certification of compliance with this recommendation.

## BAN ON PROMOTION

21. Based on the information received and documents reviewed the undersigned Monitor finds that Purdue continues to sell its branded opioid products without the use of a sales force.

22. The undersigned Monitor examined information detailing DEA established procurement and manufacturing quotas granted to Rhodes Technologies for active pharmaceutical ingredients and manufacturing quotas granted to Purdue Pharmaceuticals L.P. for finished dosage forms of opioids and opioid products for sale covering the years 2018, 2019, and 2020. The records, recently updated from those provided for the Second Report continue to reflect quotas that either have remained relatively steady or declined over that three-year period.

23. The undersigned Monitor examined the most recent Purdue financial reports. These financial records represented that the current dollar sales of Purdue's branded opioid

products for 2020 remain in line with 2019 sales and significantly reduced from 2018 and 2017 sales.

24. The lack of a dedicated sales force for branded opioid products, steady or declining sales figures from prior years, and the static or declining product quotas all support the conclusion that Purdue remains in compliance with the ban on promotion of opioids and opioid products contained with Part II, Section A (1, 3 and 5) of the Injunction.

### **REMUNERATION: REBATES, CREDITS, DISCOUNTS, CHARGEBACKS, ADMINISTRATIVE FEES AND DATA PURCHASES**

25. Under Part II, Section B (2) of the Injunction, Purdue agreed not to offer any remuneration directly or through a Third Party to any person in return for the sale, use or distribution of opioid products. This agreement expressly did not prohibit the use of rebates and/or chargebacks. However, the terms "remuneration," "person," "rebates" and "chargebacks" were not defined in the Part I of the Injunction.

26. Purdue sells opioid products to a variety of entities including to wholesalers, distributors, government agencies, states, group purchasing operations, pharmacy benefit managers, and hospitals.

27. Purdue sells opioid products by virtue of a variety of negotiated contracts and agreements and/or pursuant to a number of government programs operated by federal or state agencies.

28. With the wholesale distributors, they earn a fee for the services they perform for Purdue which are issued as a credit against the purchase of branded opioid products. There are a number of credits given or earned by the authorized wholesalers and distributors that are credited against the purchase price of branded opioid products that include the following:

    a.     a credit for maintaining a certain level of inventory,

11

      b.      a credit for maintaining a certain level of service quality,

      c.      a credit for limiting excess inventory

      d.      a credit for an administrative fee for distributing product through a centralized location,

      e.      a credit for the difference between the wholesaler acquisition cost (WAC) from Purdue (prior to prompt pay and fee credits) and the price that the wholesaler and distributor sells to Purdue's end contract customer, which can be lower (referred to as a "chargeback"), and

      f.      a credit for providing data on inventory levels and sales to end customers.

29.    In addition to the foregoing credits earned and given, Purdue also purchases general commercial prescription data and trade market access data from its wholesalers and third-party vendors that is allocated as an expense against branded opioid products. The data purchased includes national sales and inventory data from a variety of sources which is used by Purdue to track and/or forecast products and markets, plan production/manufacturing, to assess distributor performance, and to document formulary performance.

30.    With Pharmacy Benefit Managers, Managed Care Entities and Group Purchasing Organizations there are a number of credits negotiated in part to maintain formulary status or retain exclusivity for the use of Purdue opioid products within the various plans offered by Managers, Entities and Organizations including:

      a.      rebates,

   b. price protection payments to restrict the impact of price increases that occur from time to time, and

   c. administrative fees.

31. With federal and state programs, rebates and discounts are fixed by law, by regulation or by negotiated agreement to ensure that prices paid for opioids and other pharmaceutical drugs remain low.

32. The rebates, credits, discounts, chargebacks, price protection payments, and data purchase amounts vary from customer to customer and from month to month. The payments, credits and discounts that are negotiated are approved by a multi-disciplinary committee of Purdue executives that includes representatives from the finance, law, ethics and compliance, commercial and pricing functions while excluding sales and marketing representatives. The systems used to evaluate the extent of payments, credits and discounts and as well as the amounts of each are considered to be proprietary by Purdue and other pharmaceutical manufacturers that offer similar incentives.

33. The varied and proprietary nature of payments, credits and discounts make it difficult to determine if any payment, credit, discount or data purchase is outside a normal range that might suggest non-compliance with the prohibitions of Part II, Section B (2) of the Injunction.

34. Purdue maintains a list of some but not all of the current fee percentages paid to wholesalers, distributors, and group purchasing operations by Rhodes Pharmaceuticals. The list reflects a variety of percentages for fees that reflect the complexity of arrangements Rhodes Pharmaceuticals has with its customers and the differences that arise between arrangements with

customers for generic products and the limited number of branded products sold by Rhodes Pharmaceuticals. Different fees are also assessed based on the following:

    a.    the fact that customers not only purchase product but also distribute product, the fact that customers pass through the costs of bookkeeping, invoicing and billing,

    b.    the fact that the customer may have special arrangements with their own larger retail customer or and operate as if for that customer they are a group purchasing organization,

    c.    the fact that hospitals may purchase product by the unit as opposed to a bottle or box, and

    d.    the volume of purchases.

35.    Purdue Pharma L.P. maintains a scorecard for its major wholesalers that documents the amount and percentage of fees paid or credited to a customer on a quarterly basis.

36.    Purdue Pharma L.P. commissioned a survey to establish a fair market value range of services paid to wholesalers for a variety of services provided to Purdue Pharma L.P. by the wholesalers. The third- party vendor performing the survey used a variety of methods to calculate an acceptable range for the fees as a percentage of gross sales using WAC which is the list price for each branded opioid product available to all authorized distributors that purchase directly from Purdue. The survey found the fair market range to be between 3.47% to 9.9% of the WAC sales.

37.    A similar survey was concluded by the same vendor for the administrative fees paid to pharmacy benefit managers and managed care organizations. The ranges established by the study depended in part on the extent of data provided by the pharmacy benefit manager or the

14

managed care organization. The fair market range for base data arrangements was 2.29% to 5.28% of the WAC while the range for more enhanced data arrangements was 2.75% to 6.3% of the WAC.

38. The range of administrative fees reflected by Purdue in the list referred in paragraph 34 above to group purchasing organizations is recorded as a percentage of the WAC. Most, but not all, of the fees are within the range determined by the aforementioned surveys. A principal reason that some fee percentages appear high is that the fees relate to generic products sold by Rhodes Pharmaceuticals which are established, without negotiation, as a "take or leave" condition of doing business with the customer.

39. In an effort to more fully understand the payments, credits, discounts and other remunerations used by Purdue and whether they have been used in amounts that would unreasonably promote the sale and use of opioids and opioid products in contravention of the terms and conditions of the Injunction, the undersigned Monitor hired HDS to conduct a review. HDS was charged with determining the reasonableness and appropriateness of the payments, credits, fees and discounts offered by Purdue and whether such payments, credits, fees and discounts fell outside the bounds of normal and customary business practice.

40. HDS requested and received a series of spreadsheets outlining information identifying Purdue's customers, products purchased, quantities purchased, pricing information, and credited payments, credits, fees and discounts. In addition, HDS also reviewed the studies commissioned by Purdue referred in Paragraphs 36 and 37 above.

41. HDS conducted an analysis of spreadsheets as described in the Paragraph 40 above for Purdue's wholesale customers, pharmacy benefit manager customers, group purchasing operation customers, managed care organization customers, and federal and state program or agency customer.

15

42. HDS' analysis is ongoing and will be provided in a supplement to this Third Report or included in the undersigned Monitor's Fourth Report.

## SUSPICIOUS ORDER MONITORING

43. A detailed explanation of the system used at Purdue under its Suspicious Order System was outlined in Second Monitor Report (Paragraphs 32 - 45) filed by the undersigned Monitor.

44. As discussed in Paragraphs 12 through 19 above Purdue is currently reporting to the DEA all flagged or pended orders under its algorithm-based system except those flagged solely for the purpose of conducting a second required review, is reviewing the use of the threshold, and is developing a more robust system for identifying chargebacks that merit additional review. **The recommendations contained in Paragraphs 12, 13, 17 and 19 above are reiterated here and additional information will be provided in the next Monitor's Report as to each recommendation.**

45. Part of the process for monitoring suspicious orders is to review chargebacks for any potential irregularities. During the course of the review a number of retailers would appear to have chargebacks in higher numbers than other similarly situated pharmacies. **A recommendation would be to conduct a review, based on the recommendations made by the consultant consulting on the chargeback review, of recent chargeback reports to identify pharmacies operated by certain retailers that have higher chargebacks on a repeat basis, to determine the reason or reasons that explain why, and to document the findings of the review. Purdue agrees to this recommendation.**

## LOBBYING

46. Under Part II, Section D, Paragraphs 1, 2, and 3 of the Injunction Purdue agreed to certain restrictions on its lobbying activities at both the federal and state level. A review of

lobbying reports for over 20 states and for the federal government involving Purdue and its lobbyists and consultants reinforced and supported the representation made in the certifications received from Purdue officials and their lobbyists and consultants that Purdue is in direct compliance with Part II, Section D, Paragraph 1, 2, and 3 the Injunction.

47. Under Part II, Section C Paragraph 5 of the Injunction no officer of Purdue may concurrently serve as a director of an entity that engages in the promotion of opioid products or opioids. Purdue continues to certify that all executives have been asked about memberships and that none currently serves as a director, board member, employee, agent or officer of any entities that engages in promotion relating to opioids or opioid products.

48. In the Second Report filed by the undersigned Monitor in Paragraphs 80 thorough 89 raised an issue involving membership organizations such the Association for Accessible Medicine and Healthcare Distribution Alliance that engage in lobbying. The recommendation was made and accepted that any employee of Purdue who serves as a board member of such organizations shall recuse themselves from any vote of the board to proceed to lobby on an issue that would be contrary to the lobbying prohibitions of the Injunction. In addition, employees of Purdue shall be prohibited from serving on any working group of such organizations that engage in lobbying on any issue that would violate the provisions of the Injunction. Purdue has certified that all of its employees have complied with the recommendation.

## INITIAL COVERED SACKLER PERSONS

49. Under Part II, Section I of the Injunction the Initial Covered Sackler Pearson's were not to be actively engaged in the opioid business in the United States or interfere with compliance with the Injunction. Since the filing of the Initial Report one of the Initial Covered Sackler Persons, Jonathan D. Sackler, has died. Under Part II, Section I of the Injunction the

17

Estate of Jonathan D. Sackler will be substituted for Jonathan D. Sackler as an Initial Covered Sackler Person.

50.   The undersigned Monitor received signed certifications from all the named Initial Covered Sackler Persons or their representatives certifying that none of the named Initial Covered Sackler Persons actively engaged in the opioid business in the United States and that each one has taken no action to interfere with compliance of the provisions of the Injunction.

**MISCELLANEOUS**

51.   As the calendar year comes to an end before the next Report is due a request will be made to provide 2019 and 2020 Spend Report outlining any expenditure made by Purdue to health care providers and others to check compliance with the Injunction's prohibitions against payments made to promote the use or sale of opioids and opioid products. Purdue agrees to provide to the Monitor the available Spend Reports.

52.   In the Second Report Purdue (Paragraphs 93 and 94) agreed to provide a list of political contributions that fell within agreement reached with creditors and other interested parties in the Bankruptcy matter. Purdue certified that no political contributions covered by said agreement have been made since the filing of the Second Report.

Wherefore, the undersigned Monitor respectfully submits this Third Report with the recommendations and requests contained therein in paragraphs 12, 13, 17, 19, 44 and 45.

_____

Thomas J. Vilsack Monitor