DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut
Marc J. Tobak
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649 (RDD)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF THE MOTION OF DEBTORS
PURSUANT TO 11 U.S.C. § 105 AND FED. R. BANKR. P. 9019
AUTHORIZING AND APPROVING SETTLEMENTS BETWEEN
THE DEBTORS AND THE UNITED STATES**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................5

    I.    The DOJ Resolution Should Be Approved Because It is in the Best
Interests of the Estates and is Necessary to Advancing These Chapter 11
Cases Toward a Successful Resolution ....................................................................5

        A.    The DOJ Resolution is in the Best Interests of the Estates .........................5

        B.    The DOJ Resolution Should be Approved Now ........................................12

    II.    The DOJ Resolution Is Not a *Sub Rosa* Plan of Reorganization ..........................14

        A.    Settlements Are Strongly Favored in Bankruptcy Proceedings and
Will Only Be Rejected as *Sub Rosa* Plans in Narrow, Extreme
Circumstances Not Present Here ...............................................................14

        B.    The DOJ Resolution Is Worlds Away from a *Sub Rosa* Plan ...................18

        C.    The Remaining DOJ Resolution Terms Challenged by the
Objectors Do Not Render the DOJ Resolution a *Sub Rosa* Plan ..............25

    III.    The Remaining Objections Are Unavailing ...........................................................30

        A.    The Clarity Provided by the DOJ Resolution Will Assist in
Mediation and the Resolution of These Chapter 11 Cases ........................30

        B.    The DOJ Does Not Have Discretion to Use Forfeiture Judgment
Claim Funds for Abatement under Federal Law ........................................31

        C.    The Document Repository Described in the DOJ Resolution is a
Floor Not a Ceiling ...................................................................................32

CONCLUSION ...................................................................................................................33

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re Adelphia Commc'ns Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ............................................................ 8, 9, 10, 12, 23

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co.* (*In re Ionosphere Clubs, Inc.*),
    156 B.R. 414 (S.D.N.Y. 1993) ................................................................................................. 11

*ASSF IV AIV B Holdings III L.P. v. Empire Generating Co., LLC* (*In re Empire Generating Co., LLC*),
    Lead Case 19-CV-5721 (CS), Consol. Action 19-CV-5744, 2020 WL 1330285
    (S.D.N.Y. Mar. 23, 2020) ......................................................................... 17, 18, 23

*In re Binder & Binder – The National Social Security Disability Advocates (NY), LLC*,
    No. 14-23728 (RDD), 2014 WL 7403456 (Bankr. S.D.N.Y. Dec. 24, 2014) ....................... 27

*In re Chrysler LLC*,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009) ............................................................................... 17, 18

*In re Crowthers McCall Pattern, Inc.*,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ......................................................... 16, 17, 18, 28, 29

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) ............................................................................................................. 18

*In re Dreier LLP*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) ................................................................................... 8

*Gowan v. Patriot Grp., LLC* (*In re Dreier LLP*),
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ................................................................................... 7

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) ........................................................................... 5, 6, 11, 13, 15

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................................. 25

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254 (JLG), 2020 WL 5506407 (Bankr. S.D.N.Y. Sept. 10, 2020) ............. 23, 24, 26

*In re Lion Capital Grp.*,
    49 B.R. 163 (Bankr. S.D.N.Y. 1985) ................................................................... 17, 18, 26, 28

*Matter of Cajun Elec. Power Coop., Inc.*,
    119 F.3d 349 (5th Cir. 1997) ...................................................... 15, 18

*In re Miami Metals I, Inc.*,
    603 B.R. 531 (Bankr. S.D.N.Y. 2019) ............................................... 24

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016) ............................................... 15

*In re MPM Silicones, LLC*,
    No. 14-22503 (RDD), 2014 WL 4637175 (Bankr. S.D.N.Y. Sept. 17, 2014),
    *aff'd*, 596 B.R. 416 (2019) ......................................................... 22

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (Bankr. D. Del. 2014) ............................................. 15, 18

*Off. Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession*
(*In re Tower Auto. Inc.*),
    241 F.R.D. 162 (S.D.N.Y. 2006) ................................................ 26, 27

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010) ..................................................... 15, 17

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
    700 F.2d 935 (5th Cir. 1983) .................................................... 15, 16

*In re Tower Auto., Inc.*,
    342 B.R. 158 (Bankr. S.D.N.Y. 2006) ...................................... 15, 16, 18

*United States v. Banco Cafetero Pan.*,
    797 F.2d 1154 (2d Cir. 1986) ......................................................... 8

*United States v. Walsh*,
    712 F.3d 119 (2d Cir. 2013) .......................................................... 8

*In re WorldCom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .......... 25

STATUTES & RULES

11 U.S.C. § 105 ......................................................................... 1, 33
11 U.S.C. § 362(b)(4) ..................................................................... 8
11 U.S.C. § 726(a)(4) .................................................................... 10
11 U.S.C. § 1129(a)(7) ................................................................... 10
18 U.S.C. § 982 ........................................................................ 6, 8
18 U.S.C. § 3571(d) ....................................................................... 6

18 U.S.C. § 3613(e) ................................................................................................. 9

18 U.S.C. § 3663 ..................................................................................................... 6

18 U.S.C. § 3663A .................................................................................................. 6

21 U.S.C. § 853 ....................................................................................................... 8

28 U.S.C. § 524(c)(4) ............................................................................................ 32

28 U.S.C. § 2461(c) ................................................................................................ 8

Fed. R. Bankr. P. 9019 ..................................................................................... *passim*

OTHER AUTHORITIES

8 Collier on Bankr. P. 1141.05 (16th ed. 2020) .......................................................... 10

U.S. Dep't of Justice, 1-12.100 - Coordination of Corporate Resolution Penalties in
Parallel and/or Joint Investigations and Proceedings Arising from the Same Misconduct,
Justice Manual (new May 2018),
    https://www.justice.gov/jm/jm-1-12000-coordination-parallel-criminal-civil-
    regulatory-and-administrative-proceedings ........................................................... 25

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession

in these proceedings (collectively, "**Debtors**," "**Company**," or "**Purdue**") hereby submit this

reply ("**Reply**") in further support of their Motion Authorizing and Approving Settlements

between the Debtors and the United States [Dkt. No. 1828] ("**Motion**")[2] and in response to

objections and a statement filed in response thereto.[3]  The Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The proposed settlement with the Department of Justice ("**DOJ Resolution**")

should be approved because it fully resolves the United States' criminal and civil investigations

of the Debtors in a manner that is fair, equitable, and in the best interests of the estates.  This

milestone settlement should be approved now—not delayed, deferred, or risked.  If approved, the

DOJ Resolution will preserve <u>billions</u> of dollars of value for creditors other than the federal

government and will maximize the value available to address the opioid crisis.  It favorably

settles the risk of forfeiture or loss of all, or substantially all, of the Debtors' value flowing from

---

[2] Except where otherwise indicated, capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Motion.

[3] The Reply responds to the *Ad Hoc Committee on Accountability's Objection to Purdue's Motion to Authorize and Approve Settlements Between Purdue and The United States* [Dkt. No. 1911] ("**AHCA Objection**" or "**AHCA Obj.**"), the *Objection of the Ad Hoc Group of Non-Consenting States to the Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [Dkt. No. 1914] ("**NCSG Objection**" or "**NCSG Obj.**"), the *Limited Objection of the Ad Hoc Group of Individual Victims to Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [Dkt. No. 1916] ("**PI Objection**" or "**PI Obj.**"), and *the Official Committee of Unsecured Creditors' Statement Regarding Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States and Request for Certain Modifications in the Proposed Form of Order Approving the Same* [Dkt. No. 1920] ("**UCC Statement**" or "**UCC Stat.**").  The Reply does not separately address the *Brief of Bankruptcy Professors as* Amici Curiae *in Opposition to the Proposed Settlement between the United States and the Debtors* [Dkt. No. 1913-1] because the Court has not granted leave to file that brief and the arguments advanced therein are either duplicative of those made by other parties or are entirely irrelevant to the resolution of the Motion.

the potential for criminal and civil forfeitures, fines, and penalties totaling billions of dollars, many of which are also alleged to be non-dischargeable.  It also eliminates the prospect of extraordinarily expensive and value-destructive criminal prosecution and litigation by the federal government against the Debtors.  Conversely, failure to approve the settlement now will throw all of these crucial matters into question, replacing stability with massive risk and uncertainty that will hinder and could cripple the Debtors' efforts to confirm a plan.  When measured against the standards of Federal Rule of Bankruptcy Procedure 9019, under which settlements are favored and should be approved so long as they do not "fall below the lowest point in the range of reasonableness," the DOJ Resolution should unquestionably be approved.

2.      None of the three objections or the one statement regarding the DOJ Resolution (together, "**Objections**" filed by the "**Objectors**")[4] disputes that the DOJ Resolution is favorable to creditors.  For its part, the Official Committee of Unsecured Creditors ("**UCC**") appropriately lauds the "favorable financial terms of the Proposed DOJ Resolution," which in its view will "ameliorate the threat of dilution posed by a staggering DOJ claim" and "result in significant value being available to distribute to the Debtors' other creditors and abate the opioid crisis." (UCC Stat. ¶ 2.)  None of the Objectors dispute that the Debtors could face enormous and potentially catastrophic risks of litigation, prosecution, or exclusion from federal healthcare programs if they fail to reach a consensual settlement with the United States.  At most, the Objectors dispute whether the federal government would be <u>certain</u> to secure the worst-case scenario that would devastate the recovery of all other creditors and quite possibly necessitate liquidation.  That limited disagreement only underscores why the DOJ Resolution is in the best

---

[4] Although the UCC did not object and filed only a statement, the Debtors will refer to the UCC, the Ad Hoc Committee on Accountability, the Ad Hoc Group of Individual Victims ("**PI Group**"), and the Ad Hoc Group of Non-Consenting States ("**NCSG**") collectively as the "Objectors" for ease of reference.

interests of the estates.  Under *Iridium*, the question is not close:  all seven *Iridium* factors overwhelmingly favor approval of the DOJ Resolution under Rule 9019.

3.      Certain objections to the DOJ Resolution spring from a mistaken belief that the DOJ Resolution cements a $2 billion superpriority administrative expense claim in these cases ("**Forfeiture Judgment Claim**") for the DOJ immediately upon approval of the settlement.  This is incorrect.  The Forfeiture Judgment Claim and the Criminal Fine Claim will not become allowed claims until the later of (i) entry of the judgment of conviction in accordance with the Plea Agreement by the United States District Court for the District of New Jersey and (ii) confirmation of the Debtors' plan.  In an effort to resolve or limit certain of the Objections, the Debtors are revising the proposed form of Order to clarify when and how the Forfeiture Judgment Claim and Civil Fine Claim become allowed claims.[5]  Should the DOJ Resolution be approved, the parties will continue plan negotiations with full knowledge of the circumstances that would trigger allowance of the Forfeiture Judgment Claim, as well as what circumstances would preserve or eliminate the $1.775 billion credit against that judgment, and under which the DOJ or the Debtors would have the right to terminate the DOJ Resolution and return the parties to the *status quo ante*.

4.      While substantially conceding the benefits of the DOJ Resolution, the Objectors ask the Court to delay its approval.  But a delay in the approval of the DOJ Resolution carries extensive and unacceptable risks and costs.  The Debtors as fiduciaries of the estates cannot risk continued uncertainty with respect to the immense benefits of the DOJ Resolution—benefits that the Objectors do not dispute and the UCC lauds.  Delaying approval of the Motion will also only serve to further jeopardize these cases and the ultimate transfer of billions of dollars of estate

---

[5] The Debtors will be filing a revised proposed form of Order and a comparison of the revised form of Order against the version filed with the Motion in advance of the hearing.

value as part of a plan for purposes of abating the opioid crisis—delay that may well be costing a

million dollars a day in lost abatement funds.

5.    The DOJ Resolution is not, as some Objectors allege, an impermissible *sub rosa*

plan.  A settlement may be rejected as a *sub rosa* plan of reorganization only in limited and

"extreme circumstances," in which the settlement dictates the terms of, and is therefore

tantamount to, a plan.  The DOJ Resolution is not even close, as it does not bind the Debtors, this

Court, or other creditors to any particular treatment of the unsecured claims awarded to the

United States or of the claims of other parties, let alone a full specific plan structure.  It is true

that under the terms of the DOJ Resolution confirmation of a plan that provides for emergence of

a public benefit company or entity with a similar mission preserves the $1.775 billion Forfeiture

Judgment Credit and that failure to confirm a plan with such features would also trigger a right

by the Debtors to withdraw the plea under the Plea Agreement or rescind the Civil Settlement

Agreement and by the Department of Justice ("**DOJ**") to rescind the Civil Settlement

Agreement.  Yet, to say these provisions "dictate" a particular plan structure is exactly

backwards—they presume and indeed permit a variety of plan structures, simply tying

realization of the full benefits of the DOJ Resolution to the confirmation of a plan that provides

for certain limited (and salutary) terms related to emergence.  That is commonplace in

bankruptcy settlements, which routinely provide for contingencies or termination rights

depending on the terms of a plan.  That creditors have an <u>incentive</u> to support a plan structure

that provides the maximum benefits available under the DOJ Resolution does not mean the DOJ

Resolution <u>mandates</u> that structure or constitutes a *sub rosa* plan.  It is simply a consequence of

the DOJ's rights outside of bankruptcy—and the overwhelming downside risks that led the

Debtors to pursue the DOJ Resolution in the first place.

4

6.      The fact is that the DOJ Resolution resolves the entirety of the Debtors' potential civil and criminal liability to the United States while preserving <u>billions</u> of dollars in value for non-federal creditors.  Approval is undoubtedly in the best interests of the estates and should be granted.

## **ARGUMENT**

I.      **The DOJ Resolution Should Be Approved Because It is in the Best Interests of the Estates and is Necessary to Advancing These Chapter 11 Cases Toward a Successful Resolution**

A.      **The DOJ Resolution is in the Best Interests of the Estates**

7.      The Debtors' Motion presents a single issue for resolution:  whether the Debtors' settlement with the DOJ should be approved under Rule 9019.  The Objectors do not contest that the proper inquiry under Rule 9019 is whether the settlement is "fair and equitable and in the best interests of the estate."  (Mot. ¶ 31 (collecting cases).)  They do not dispute that the Debtors' burden on a Rule 9019 motion is to demonstrate <u>only</u> "that the settlement does not 'fall below the lowest point in the range of reasonableness,'" and that Debtors need not show that the settlement is the best possible compromise.  (Mot. ¶ 31 (citation omitted).)  There is no disagreement that in analyzing the reasonableness of a settlement under this standard, bankruptcy courts look principally to the seven interrelated factors set forth in *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) ("***Iridium***").[6]  (*See* Mot. ¶ 32.)  And under these well-settled

---

[6] The *Iridium* factors are:  (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay; (3) the paramount interests of the creditors; (4) whether other parties in interest support the proposed settlement; (5) the nature and breadth of releases to be obtained by officers and directors; (6) whether the competency and experience of counsel support the settlement; and (7) the extent to which the settlement is the product of arm's-length bargaining.  *See In re Iridium*, 478 F.3d at 462.

standards and factors, there can be no serious dispute that the DOJ Resolution is in the best interests of the estates.

8.      As the Debtors established in their opening papers, the first three *Iridium* factors—the balance between the litigation's possibility of success and the settlement's future benefits, the likelihood of complex and protracted litigation, and the paramount interests of the creditors—weigh decisively in favor of approving the DOJ Resolution.  Purdue faces enormous and potentially catastrophic litigation, prosecution, and exclusion risk from the federal government should it fail to resolve the United States' claims.  No one meaningfully contests this.  Nor could they.  The DOJ claims that the Debtors' prior conduct gives rise to criminal liability under numerous federal statutes.  (*See* Mot. ¶ 35 (citing DOJ Criminal Proof of Claim ¶ 1).)  If the United States were to prevail in a criminal prosecution of the Debtors, the Debtors could face: (1) a $6.2 billion or more non-dischargeable criminal fine pursuant to 18 U.S.C. § 3571(d); (2) an order of restitution pursuant to 18 U.S.C. §§ 3663, 3663A; and/or (3) a criminal forfeiture judgment in the amount of $3.5 billion or more pursuant to 18 U.S.C. § 982(a).  (Mot. ¶ 36 (citing DOJ Criminal Proof of Claim ¶¶ 2-4).)  In addition, the DOJ asserts an extraordinarily large claim for <u>civil</u> liability totaling $2.8 billion or more in damages, to be trebled, plus penalties, as well as claims for civil forfeiture (Mot. ¶ 38 (citing DOJ Civil Proof of Claim ¶¶ 5, 54-57).)  Moreover, the conduct that underlies the DOJ's claims is essentially the same as that which underlies the claims of nearly all creditors, which has led to over $100 trillion of asserted claims.

9.      The DOJ's claims have the potential to wipe out all of the value of the Debtors' estates.  (Mot. ¶ 37.)  The DOJ wields unique and powerful civil and criminal forfeiture authority.  For example, under the "relation back" doctrine in particular, the DOJ could seek to

divest the estates of property in satisfaction of a forfeiture judgment as though that property had

never been part of the estates in the first place, potentially depriving non-federal public and

private creditors of <u>billions</u> of dollars of distributable value.  (*See* Mot. at ¶ 36 (describing the

relation-back doctrine's operation on title to property)); *see also Gowan v. Patriot Grp., LLC (In

re Dreier LLP)*, 452 B.R. 391, 411 (Bankr. S.D.N.Y. 2011) (holding forfeiture orders can "divest

a bankruptcy estate of its property even though the estate was created <u>before</u> the forfeiture order

was entered," since forfeiture relates back to the time of the wrongdoing and such assets are not

property of the debtor) (emphasis in original).  The Objectors' only response, mustered by the PI

Group, is that the DOJ <u>might</u> not prevail in divesting the full value of a criminal forfeiture

judgment because target assets <u>might</u> not be "traceable" such that the relation back doctrine

<u>might</u> not apply.  (PI Obj. ¶¶ 36-38 (asserting that there is no relation-back for "substitute assets"

and arguing consequently that "it is not at all clear that the DOJ would be entitled to all or

substantially all of the Debtors' value absent settlement").)  But that is no answer at all, for three

reasons.

10.     First, the PI Group's narrow focus on paragraph 8 of the Plea Agreement is

misguided.  (*See* PI Obj. ¶ 36.)  If the issue had to be litigated, there may be a chance that the

Debtors could demonstrate that PPLP no longer possesses "property constituting, or derived

from, any proceeds . . . obtained, directly or indirectly, as the result of" the <u>specific violations</u>

that are the subject of the Plea Agreement.  *See* 21 U.S.C. § 853(a)(1).  However, success on that

argument would be far from guaranteed.[7]  In the event that PPLP does not possess "tainted"

---

[7] As the Debtors establish in their Motion, and as the Objectors fail to contest, the DOJ has a
variety of "accounting choices" at its disposal to trace "tainted" funds held in the Debtors'
accounts to the proceeds of the alleged underlying offenses, even where they may have been co-
mingled with other "untainted" funds.  (Mot. ¶ 36); *see also United States v. Walsh*, 712 F.3d
119, 124 (2d Cir. 2013); *United States v. Banco Cafetero Pan.*, 797 F.2d 1154, 1160 (2d Cir.

property in an amount necessary to satisfy the forfeiture judgment, the United States could seek

forfeiture of "substitute assets" unrelated to the crime.  *See* 18 U.S.C. § 982; 21 U.S.C. § 853(p).

The Debtors might then be able to further demonstrate that the "relation back" doctrine does not

apply to "substitute assets."  Of course, the Debtors could not do any of this without litigating a

criminal case for months or years while these chapter 11 cases are delayed, professional fees pile

up at an extraordinary rate, and the Debtors attempt to operate their businesses under the cloud of

a high-profile criminal trial.  (*See* Mot. ¶ 38 (noting that the United States would argue its

litigation can proceed during the pendency of these bankruptcy cases under the exception to the

automatic stay of Section 362(b)(4)).)  A criminal trial would no doubt be expensive, protracted,

and extraordinarily challenging for the Debtors.  *See In re Adelphia Commc'ns Corp.*, 327 B.R.

143, 164 (Bankr. S.D.N.Y. 2005) ("Any litigation with the Government necessarily will be

complex.").

        11.     Second, and relatedly, the PI Group ignores the fact that, absent a settlement, the

United States could choose to bring additional claims and charges against the Debtors under

other legal and factual theories that could give rise to additional arguments regarding whether the

Debtors' assets are "tainted" property.  In other words, the Debtors entered the DOJ Resolution

---

1986) (discussing various tracing approaches and noting that "[w]hich approach reflects reality
in any particular case will depend on the precise circumstances").  For example, the United
States, at its option, could argue that if the Debtors' accounts contained, at some point, the net
results of transactions that include a deposit of tainted funds, "there is a plausible argument to be
made either that the account contains the 'traceable proceeds' of the tainted deposit (so long as
the balance has not fallen below the amount of the tainted deposit) or that any withdrawal (in
excess of the tainted deposit) contains the 'traceable proceeds' of such a deposit."  *Banco
Cafetero Pan.*, 797 F.2d at 1159-60 (emphasis omitted).  If the assets are in fact traceable, under
the relation-back doctrine, the United States' right, title, and interest in proceeds traceable to the
commission of an offence subject to forfeiture "vest[ed] in the United States upon the
commission of the act giving rise to forfeiture," 21 U.S.C. § 853(c) (incorporated by 18 U.S.C.
§ 982(b) and 28 U.S.C. § 2461(c)), giving the United States a valid priority claim.  *See In re
Dreier LLP*, 429 B.R. 112, 127 (Bankr. S.D.N.Y. 2010).

to manage the <u>risk</u> of the DOJ pursuing a criminal judgment greater than the entire value of the estates under any number of theories, only certain of which are expressly addressed by the Plea Agreement.  That risk is not disputed and must be taken into account when assessing the settlement under Rule 9019.  The Debtors, as fiduciaries of the estates, are not willing to gamble with billions of dollars of value that could otherwise be productively employed to abate the opioid crisis—and, as discussed further below, the reality is that most of Objectors are not either.

12.    Third, even assuming the PI Group is right that some quantum of assets would not be deemed "tainted" property under any theory of criminal liability that the United States might assert absent a settlement, this provides cold comfort to the Debtors.  Indeed, the Debtors would still face a host of <u>other</u> claims and remedies that have the potential to destroy billions of dollars of estate value.  For example, a $6.2 billion non-dischargeable criminal fine alone would entitle the United States to much or all of the value of the Debtors' estates upon emergence and likely end all prospects of a reorganization.  *See* 18 U.S.C. § 3613(e) ("No discharge of debts in a proceeding pursuant to any chapter of title 11, United States Code, shall discharge liability to pay a fine pursuant to this section . . . .").  A "debtor <u>must</u> pay a non-dischargeable claim, even after plan confirmation."  8 Collier on Bankr. P. 1141.05, at 6 (16th ed. 2020).[8]  The unique and

---

[8] The PI Group asserts that "in a liquidation scenario . . . all of the DOJ's punitive claims . . . would be subject to subordination," and that, under the "best interests" test under 11 U.S.C. § 1129(a)(7), these claims would also be "subject to subordination in a chapter 11 plan" context. (PI Obj. ¶ 39.)  This argument is irrelevant.  First, the Debtors are not in a "liquidation scenario."  These are chapter 11 cases.  Second, while the 11 U.S.C. § 726(a)(4) status of any forfeiture claims might be relevant to a creditor that raises a "best interests" objection in connection with plan confirmation, "it is also true that [a hypothetical 'best interests' objection] would turn on a host of other factors incapable of prediction at this time—most notably the degree of acceptances of a reorganization plan by creditors, and the value to be distributed under any chapter 11 plan." *In re Adelphia Commc'ns Corp.*, 327 B.R. at 170.  As the *Adelphia* court observed, "in chapter 11, the failure to satisfy the [best interests] rule would merely result in the inability to confirm a plan—not subordination or disallowance of the claim in question in the chapter 11 case." *Id.* Whether the Debtors can confirm a plan is not the question before the Court.

amplified risks posed by the DOJ's claims more than outweigh any possible benefits that might

be secured through litigation.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 327 B.R. at 160

(finding that "eliminating a 'real risk' of a criminal indictment . . . that would have disastrous

consequences to [the] reorganization," including potential fines and forfeiture, strongly

supported approving settlement with the SEC under first *Iridium* factor).

13.    Importantly, the Objectors acknowledge, either explicitly or implicitly, that the

DOJ Resolution is economically favorable to the Debtors' non-DOJ creditors.  In addition to

lauding the "favorable financial terms of the Proposed DOJ Resolution"—which in its view "will

result in significant value being available to distribute to the Debtors' other creditors and abate

the opioid crisis" (UCC Stat. ¶ 2)—the UCC further observes, correctly, that "resolution of the

United States' claims is a vital step toward the Debtors' ultimate restructuring, given that the

proposed settlement . . . ameliorate[s] the threat of dilution posed by a staggering DOJ claim."

(UCC Stat. ¶ 2.)  For its part, the PI Group is "opposed . . . to the timing of the settlements,"

though the Debtors believe that these concerns are based on a misunderstanding of the DOJ

Resolution that will be further clarified in the revised form of Order.  In any event, the PI Group

"is not opposed in principle to the substance of the proposed settlements with the United States."

(PI Obj. ¶ 3.)  And although the NCSG takes issue with how the Forfeiture Judgment Claim and

Forfeiture Judgment Credit operate together and potentially incentivize certain post-emergence

structures for the Debtors, the NCSG stops well short of critiquing the economics of the deal.

That is because the DOJ Resolution is indisputably in the paramount interests of the creditors

(the states most of all), *see In re Iridium*, 478 F.3d at 462, notwithstanding that some of those

creditors would have preferred that a DOJ Resolution could have been reached that, in their

view, would have been even more favorable to them.  However, the case law is crystal clear that

the Court must consider the whole agreement as presented by the Debtors, and may not "blue

pencil" the agreement to tailor it to the deal that the Objectors <u>wish</u> the Debtors had struck.  *See*

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156

B.R. 414, 430 (S.D.N.Y. 1993) ("Since the Settlement Agreement is a global settlement of all the

claims, it is not possible to vacate only the portions which affect [certain debtors' abilities to

pay].  The appropriate inquiry is whether the Settlement Agreement <u>in it[s] entirety</u> is

appropriate for the . . . estate." (emphasis added)).

14.     The remaining four *Iridium* factors are all virtually uncontested.  The fifth

factor—the nature and breadth of releases to be obtained by officers and directors—favors

settlement because the DOJ Resolution will not include criminal or civil releases for any non-

Debtor.  (Mot. ¶ 43.)  The sixth and seventh factors—whether the competency and experience of

counsel support the settlement and the extent to which the settlement is the product of arm's-

length bargaining—also support approving the DOJ Resolution because it was the subject of

more than a year and a half of extensive, good faith, arm's-length negotiations by competent and

experienced counsel.  (Mot. ¶ 44.)  Indeed, the PI Group readily agrees that the DOJ Resolution

is a "comprehensive, hard-fought deal."  (PI Obj. ¶ 45.)  And, of course, with respect to the

fourth Iridium factor—whether other parties in interest support the proposed settlement—most of

the Debtors' hundreds of thousands of creditors have not objected at all.  This factor therefore

weighs in the Debtors' favor or, at worst, is neutral.  *See In re Adelphia Commc'ns Corp.*, 327

B.R. at 165 (assigning creditor opposition minimal weight because "approval of a settlement

cannot be regarded as a counting exercise" but must instead focus on "more fundamental factors"

such as benefits and "downside risk" particularly where the Debtors are "fiduciar[ies] for all

11

parties in interest, who naturally have competing interests with respect to limited assets that are insufficient to satisfy everyone's needs and concerns").

15.     Simply put, the DOJ Resolution is highly favorable to the estates and its creditors and certainly well within the bounds of reasonableness. The Debtors respectfully submit that, taken together, the *Iridium* factors not only support but also compel approval of the DOJ Resolution here.

### B.     The DOJ Resolution Should be Approved Now

16.     Unable to advance a credible objection to the DOJ Resolution under the well-settled legal standard, the Objectors claim that the Court should delay consideration of the Motion until plan confirmation and that there is no harm in doing so. (*See* NCSG Obj. ¶¶ 28-31 (asserting that there is "no rush" to approve the DOJ Resolution); PI Obj. ¶¶ 14-17, 45-46 (arguing that the Court should delay consideration of the Motion because the terms of the DOJ Motion do not expressly require approval by a certain date).) The Objectors are wrong, and, moreover, the Debtors are not willing to gamble the entirety of the estate, billions of dollars, and the recovery of all creditors on the Objectors' hope that delay will not be harmful. Locking in the DOJ Resolution ensures that these cases continue apace toward a successful resolution and is in the best interests of the Debtors and their estates.

17.     As an initial matter, resolution of the United States' claims is integral to moving these cases forward toward a plan of reorganization. The Debtors and estate stakeholders have understood this from the very inception of these chapter 11 cases,[9] and, as stated in the

---

[9]*See, e.g.*, Summary Term Sheet with Ad Hoc Committee ¶ 10 (Oct. 8, 2019), Dkt. No. 257 ("As a condition to the Settlement, Purdue, the Shareholder Parties, and their respective related parties shall have resolved with the U.S. Department of Justice on terms satisfactory to them and approved by the Bankruptcy Court on appropriate notice, all potential federal liability arising from or related to opioid-related activities. If the economic terms of any such resolution are materially inconsistent with this Settlement or otherwise materially adverse to the Debtors, the

Mediators' Report of September 2020, three of the four term sheets memorializing agreements among the non-federal public claimants and private claimants "are conditioned on resolution of the United States' claims on terms reasonably acceptable to the Non-Federal Public Claimants, and email correspondence with respect to the fourth term sheet addresses this issue as well." (*See* Mediators' Report ¶ 12 (Sept. 23, 2020), Dkt. No. 1716.)  Approving the DOJ Resolution now will provide certainty with respect to its terms, and assurances that there will be significant distributable value for non-federal claimants.  That will, in turn, provide a firm foundation upon which all parties in interest may continue in earnest the final phases of these cases:  *i.e.*, negotiation and confirmation of a plan of reorganization.  That the DOJ Resolution "clear[s] the way for implementation of a reorganization plan," *In re Iridium*, 478 F.3d at 467, is reason enough for this Court to join issue on the Debtors' Motion now.  Continued uncertainty would only serve as an obstacle to crafting a plan of reorganization.

18.    Just as importantly, the Objectors' position on timing ignores the inherent risks and costs associated with delay.  The Debtors cannot jeopardize the immense benefits that the current compromise affords the estates—benefits that the Objectors do not dispute.  The DOJ Resolution reflects a hard-fought and complex compromise as between the Debtors and the United States, involving numerous federal agencies and components within the DOJ.  The complexity of the DOJ Resolution heightens the risk that would be posed by uncertainty regarding whether or when this Court will approve it.

---

Ad Hoc Committee shall have the right . . . to terminate the Settlement."); *see also* Amended UCC Stipulation ¶ 5 (Nov. 5, 2019), Dkt. No. 431-2 (excluding a settlement with the DOJ from an otherwise all-encompassing prohibition on the Debtors seeking to file a motion to approve a settlement in these cases without UCC approval during the initial 180 days of the preliminary injunction).

19.     Moreover, delay in approving the DOJ Resolution will only protract these chapter 11 cases, which are currently costing the estates approximately $30 million a month in professional fees—value that could otherwise be devoted to ameliorating and addressing the opioid crisis and saving lives.  As the Debtors have maintained from the outset, the hard-won gains that the parties have achieved incrementally should be locked in to the extent they can be at each critical juncture, so that the next phase of the case can proceed efficiently and expeditiously and, ultimately, these cases can be brought to a successful conclusion.  That is precisely what the Motion proposes to do.

20.     Time is of the essence.  To protect the benefits received from the DOJ Resolution, ensure that the greatest value possible is distributed to the Debtors' creditors to be put to work abating the opioid crisis, and keep these chapter 11 cases progressing toward emergence, the DOJ Resolution must be approved now.

## II.     The DOJ Resolution Is Not a *Sub Rosa* Plan of Reorganization

### A.     Settlements Are Strongly Favored in Bankruptcy Proceedings and Will Only Be Rejected as *Sub Rosa* Plans in Narrow, Extreme Circumstances Not Present Here

21.     Because the Objectors do not and cannot gain traction under Rule 9019, they instead devote the lion's share of their papers to arguing that the DOJ Resolution somehow constitutes a so-called *sub rosa* plan of reorganization.  The Objectors are mistaken.

22.     As set forth above, settlements are strongly favored in bankruptcy proceedings. They "help clear a path for the efficient administration of the bankrupt estate, including any eventual plan of reorganization."  *In re Iridium*, 478 F.3d at 455; *see also In re Motors Liquidation Co.*, 555 B.R. 355, 364-65 (Bankr. S.D.N.Y. 2016) (settlements "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy case"). A settlement that—like the DOJ Resolution—passes muster under Rule 9019 may be rejected as

14

a *sub rosa* plan of reorganization only in limited, "extreme circumstances," *In re Tower Auto.,*

*Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006), where the settlement will "in effect, 'short

circuit the requirements of [c]hapter 11 for confirmation of a reorganization plan.'" *In re*

*Iridium*, 478 F.3d at 466 (quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re*

*Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).

23.     Importantly, that a settlement or other transaction will have an impact on the

eventual terms of a plan, or make some plan structures more desirable to creditors than others,

does not transmute a bona fide and beneficial settlement into an impermissible *sub rosa* plan of

reorganization.  *See Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R.

65, 84 (S.D.N.Y. 2010) (holding that although the transaction had an "inevitable and enormous

influence on any eventual plan of reorganization or liquidation," it was not a *sub rosa* plan).

Any material settlement will have <u>some</u> impact on the contours of a plan.  *Id.*  A settlement

agreement is a *sub rosa* plan <u>only</u> when the settlement is tantamount to a plan itself.  For

example, settlements that "dispose of all claims against the estate, restrict creditors' right to vote

as they see fit on a proposed [c]hapter 11 plan, or dispose of substantially all of the debtor's

assets have been found to constitute improper *sub rosa* plans."  *See, e.g.*, *In re Nortel Networks,*

*Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014); *see also Matter of Cajun Elec. Power Co-op.,*

*Inc.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re Tower Auto.*, 342 B.R. at 164.  The DOJ Resolution

does not one of these things.

24.     The leading cases on the subject bear this out.  In *In re Braniff Airways, Inc.*, for

example, the Fifth Circuit considered whether a transaction entered into by an airline debtor

constituted an impermissible *sub rosa* plan.  700 F.2d at 940.  Among other things, the relevant

agreements (i) mandated that "[t]he reorganization plan would have to allocate the [transaction

consideration] according to the terms of the . . . agreement or forfeit a valuable asset,"

(ii) "required [secured creditors] to vote a portion of their deficiency claim in favor of any future

reorganization plan approved by a majority of the unsecured creditors' committee," and

(iii) "provided for the release of claims by all parties against [the debtor], its secured creditors

and its officers and directors."  *Id.*  The Fifth Circuit determined that "[w]ere this transaction

approved, and considering the proposed properties to be transferred, little would remain save

fixed base equipment and little prospect or occasion for further reorganization."  *Id.*  In other

words, the transaction was "in fact a reorganization," and the Fifth Circuit thus rejected it.  *Id.*;

*see also In re Tower Auto.*, 342 B.R. at 164 (noting that a settlement that "restructure[s] the

[d]ebtors' business or finances generally" is a *sub rosa* plan).

25.    Conversely, where a settlement "free[s] assets for distribution" or is "a necessary

step toward, or building block of, a plan of reorganization," it is not a *sub rosa* plan.  *In re*

*Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990).  In *In re Crowthers*,

the court held that an agreement that contained a "provision terminating the [a]greement if (i) the

closing does not occur within forty-five days after entry of the order of confirmation or July 31,

1990 . . . (ii) the case is dismissed or converted to a chapter 7 case, or (iii) [the debtor] shall

consummate a competing transaction" was not a *sub rosa* plan because the "motion seeks only

authority for [a company] to enter into an agreement providing a basis for a plan and to merge

with another entity only if certain conditions, including entry of an order of confirmation

reflecting the agreement, are satisfied."  *Id.* at 800, 886, 890; *see also In re Lion Capital Grp.*, 49

B.R. 163, 174-77 (Bankr. S.D.N.Y. 1985) (holding that the settlement agreement, which

(i) allocated funds generated by liquidation of assets, (ii) provided for certain allowed general

unsecured claims, and (iii) required parties to the settlement to vote in favor of a plan containing

the terms of the settlement was not a *sub rosa* plan because the ultimate effect was to "free up

assets for [the] estate and permit the formation of a plan of arrangement").

26.      In a similar vein, courts have also held that a transaction that "merely brings in

value" in which "[c]reditors will thereafter share . . . pursuant to a chapter 11 plan subject to

confirmation by the [c]ourt" is not a *sub rosa* plan.  *In re Motors Liquidation Co.*, 430 B.R. at

84-85; *see also In re Chrysler LLC*, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009) (noting that "[a]

debtor may sell substantially all of its assets as a going concern and later submit a plan of

liquidation providing for the distribution of the proceeds of the sale").  Notably, *sub rosa*

concerns regarding settlements or other transactions fall away where "there will be no

distribution or allocation of any estate assets or sale proceeds to any creditors; and . . . those

assets . . . will be allocated and distributed only at a future date pursuant to a negotiated chapter

11 plan."  *In re Motors Liquidation Co.*, 430 B.R. at 85; *see also In re Chrysler LLC*, 405 B.R. at

98 ("[T]he [d]ebtors will seek to confirm a plan that will provide the distribution of assets in the

[d]ebtors' estates.  Thus, the classification of claims is independent of the sale process and the

[d]ebtors are not attempting to evade the plan confirmation procedures.").

27.      In light of the nature of the *sub rosa* plan doctrine and the indisputably high bar

for implicating it, it is hardly surprising that *sub rosa* objections like those asserted by the

Objectors are routinely rejected by the courts.  *See, e.g.*, *ASSF IV AIV B Holdings III L.P. v.*

*Empire Generating Co, LLC (In re Empire Generating Co., LLC)*, Lead Case 19-CV-5721 (CS),

Consolidated Action 19-CV-5744, 2020 WL 1330285 at *2, *9 (S.D.N.Y. Mar. 23, 2020)

(affirming this Court's ruling approving RSA and denying *sub rosa* objection); *In re Nortel*

*Networks*, 522 B.R. at 509; *Matter of Cajun Elec. Power Co-op., Inc.*, 119 F.3d at 355; *In re*

17

*Chrysler LLC*, 405 B.R. at 97; *In re Tower Auto., Inc.*, 342 B.R. at 163; *In re Crowthers*, 114

B.R. at 890; *In re Lion Capital Grp.*, 49 B.R. at 177.[10]

28.    As is evident from the foregoing and as more fully discussed below, the

Objectors' reliance on the *sub rosa* plan doctrine is entirely misplaced.  The DOJ Resolution is

not a *sub rosa* plan of reorganization.  Far from it.  It is instead a crucial stepping stone and

necessary building block toward achieving a successful reorganization in these chapter 11

cases—one that makes billions of dollars of value available for distribution to the estates' other

creditors.

**B.    The DOJ Resolution Is Worlds Away from a *Sub Rosa* Plan**

29.    The gravamen of the Objectors' *sub rosa* argument is that the Forfeiture Judgment

Claim, the Forfeiture Judgment Credit, rescission rights provided to the Debtors and DOJ, and

the benefit that the DOJ Resolution confers upon the non-federal claimants in the event that a

certain type of post-emergence structure is approved operate together to make the DOJ

Resolution a *sub rosa* plan of reorganization.  In the Objectors' telling, the DOJ Resolution

impermissibly grants an immediate pre-plan allowance of a $2 billion superpriority

administrative expense claim (i.e., the Forfeiture Judgment Claim), conditions a $1.775 billion

credit in favor of the claimants against the Forfeiture Judgment Claim on the confirmation of a

plan that provides for the emergence of a public benefit company or entity with a similar

mission, and thus actually or functionally "requir[es] that the Debtors' operating assets be

---

[10] The NCSG cites *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), in support of its
assertion that approval of the DOJ Resolution would "circumvent[] . . . the Bankruptcy Code's
procedural safeguards."  (NCSG Obj. ¶ 11 (internal quotation marks omitted).)  The NCSG is
wrong, for two reasons.  First, its argument presumes that the DOJ Resolution is a *sub rosa* plan
and circumvents the Bankruptcy Code.  It is not and does not.  Second, *Jevic* is entirely
inapposite and considered the appropriateness of priority-violating distributions as part of a
structured dismissal—a circumstance not present here.  *Jevic*, 137 S. Ct. at 985.

transferred to a PBC, without the safeguards inherent in the chapter 11 confirmation process."

(NCSG Obj. ¶ 8.)  The Objectors further claim that the foregoing terms are a so-called "poison

pill."  (*See* NCSG Obj. ¶¶ 13-17; UCC Stmt. ¶¶ 4-7.)  The Objectors' arguments, however, rest

on a fundamental misapprehension of both the DOJ Resolution and the *sub rosa* plan doctrine.

They should be rejected.

> i. The Forfeiture Judgment Claim and Forfeiture Judgment Credit Only Come
> Into Existence After a Plan of Reorganization Is Confirmed, and the Debtors'
> Post-Emergence Structure Will Be Determined at Confirmation

30.    A seeming predicate of some of the Objectors' complaints with respect to the

DOJ Resolution is that approval of the Motion will result in an immediate, pre-plan allowance of

a $2 billion dollar superpriority administrative expense claim (i.e., the Forfeiture Judgment

Claim) and that the DOJ Resolution mandates or requires a post-emergence public benefit

company structure without the safeguards of confirmation of a chapter 11 plan.  Neither premise

is accurate.  The Forfeiture Judgment Claim will not be allowed and thus the Forfeiture

Judgment Credit will not come into effect until **after confirmation of a plan of reorganization**.

Likewise, approval of the DOJ Resolution does not "mandate" or "require" the confirmation of a

plan that provides for a post-emergence public benefit company or entity with a similar mission,

it just attaches certain consequences should that not occur.  The key terms of the DOJ Resolution

operate as follows:

> (a)    First, this Court will either grant or deny the Motion.  (Plea Agreement at
> 4.)

> (b)    If this Court grants the Motion, Purdue and the DOJ will request that a
> plea hearing before the United States District Court for the District of New
> Jersey occur within seven days of this Court's grant of the Motion.  (*Id.*)
> In addition, the DOJ will receive "an allowed, unsubordinated, undisputed,

non-contingent, liquidated unsecured claim against PPLP in the amount of $2.8 billion"—i.e., the Civil Claim.  (Proposed Order ¶ 6.)[11]

(c)    Purdue and the DOJ have agreed to request that the District Court's acceptance of the Plea Agreement be deferred until the sentencing hearing, and that the sentencing hearing take place **no earlier than seventy-five days following the date of confirmation** of the chapter 11 plan of reorganization (but in any event 7 days before the plan of reorganization becomes effective).  (Plea Agreement at 4.)

(d)    If the District Court accepts the Plea Agreement and enters a judgment of conviction and the confirmation order has been entered, the United States shall have an allowed superpriority administrative expense claim against PPLP in the amount of $2 billion (i.e., the Forfeiture Judgment Claim). (Proposed Order ¶ 3.)

(e)    If the District Court accepts the Plea Agreement and enters a judgment of conviction and the confirmation order has been entered, the Debtors will tender to the United States Marshals a $225 million forfeiture payment within three business days after entry of the judgment of conviction. (Proposed Order ¶ 4.)

(f)    It is necessarily at this time that the $1.775 billion Forfeiture Judgment Credit is either applied or not applied, depending on whether this Court has approved a plan of reorganization that includes a public benefit company or entity with a similar mission.  (Plea Agreement at 10.)

(g)    If the District Court accepts the Plea Agreement and enters a judgment of conviction and the confirmation order has been entered, the United States shall have an allowed, unsubordinated, undisputed, non-contingent, liquidated unsecured claim against PPLP in the amount of $3.544 billion (i.e., the Criminal Fine Claim) (Proposed Order ¶ 5);

(h)    Purdue may withdraw its guilty plea if this Court rejects, or otherwise declines to confirm, a plan of reorganization proposed by Purdue that provides for the emergence of a public benefit company or other entity with a similar mission.  (Plea Agreement at 5.)[12]

---

[11] No Objector takes individual issue with the allowance of the Civil Claim outside of the context of a larger objection to the overall DOJ Resolution, which will be addressed in Part II.B.ii *infra*. (*See* NCSG Obj. ¶ 21 (concern that the impact of the allowed claims in the larger context of the DOJ Resolution is unclear); PI Obj. ¶ 26 (addressing allowance generally under the DOJ Resolution, including with respect to the Civil Claim).)

[12] Purdue's Civil Settlement Agreement with the DOJ contains a rescission right for both Purdue and the DOJ in the event that the plan of reorganization does not provide for the emergence of a

As the NCSG has observed, "[t]he predicate acts to effectuate the [DOJ Resolution] . . . are all keyed to and dependent on confirmation of a chapter 11 plan."  (NCSG Obj. ¶ 29.)  The revised form of Order that the Debtors will file in advance of the hearing will make all of this yet more clear.

31.     The foregoing demonstrates that the Forfeiture Judgment Claim—and with it the Forfeiture Judgment Credit—should come into effect at least seventy-five days after confirmation, when the District Court accepts the Plea Agreement.  And neither the Forfeiture Judgment Claim nor the Criminal Fine Claim will be allowed claims unless and until the confirmation order has also been entered.  In addition, the DOJ Resolution does not mandate or conclusively set the Debtors' post-emergence structure at all.  As the NCSG seemingly acknowledges, the term concerning the emergence of a "public benefit company" or "other entity with a similar mission" is actually quite flexible and broad.  (NCSG Obj. ¶ 19.)  Among other things, it does not describe any particular corporate structure or duration; it does not describe governance; it does not describe post-emergence operations; and it does not describe how interests in the entity may or may not be held.[13]  (NCSG Obj. ¶ 19.)  Moreover, the DOJ Resolution does not legally <u>mandate</u> or <u>guarantee</u> that a public benefit company or other similar entity emerges.  That question will be decided, one way or the other, at confirmation.

ii.     <u>The DOJ Resolution Does Not Dictate the Plan or Constitute a "Poison Pill"</u>

32.     Perhaps recognizing this, the Objectors claim, in essence, that the DOJ Resolution makes the emergence of a public benefit company or other entity with a similar mission so

---

public benefit company or other entity with a similar mission.  (*See* Civil Settlement Agreement ¶ 8(f).)

[13] Emergence as a public benefit company or entity with a similar mission would not foreclose a future sale of Debtors' assets, as deemed appropriate by the governing body of the post-emergence entity.

attractive to the non-federal claimants that those claimants are likely to choose such a structure over other structures.  (*See, e.g.*, NCSG Obj. ¶¶ 13-17; PI Obj. ¶¶ 26, 29; AHCA Obj. 2-5; *see also* UCC Stat. ¶¶ 4-7.)  Maybe so.  But that the DOJ Resolution provides certain benefits to the non-federal claimants in the event that a public benefit company or entity with a similar mission emerges, and certain rights and consequences attach if it does not, does not convert the DOJ Resolution into an impermissible *sub rosa* plan or constitute some type of "poison pill."[14] During the plan process, creditors can—with full information—weigh the relative costs and benefits of various plan structures and act accordingly.  If the confirmed plan provides for emergence as a public benefit company or entity with a similar mission, the non-federal claimants will receive the benefit of the $1.775 billion Forfeiture Judgement Credit.  If the plan that is confirmed does not provide for a public benefit company or entity with a similar mission, the non-federal claimants either will not obtain the benefit of the Forfeiture Judgment Credit[15] or the DOJ Resolution will be rescinded, in which case the DOJ and the Debtors will be returned to

---

[14] The NCSG's argument that the terms of the Forfeiture Judgment Credit amount to an impermissible "death trap" is entirely misplaced.  The Forfeiture Judgment Credit is not a "death trap."  As the NCSG admits, a "death trap" is a plan feature that provides for more favorable treatment to creditors that vote in favor of a plan.  *See, e.g. In re MPM Silicones, LLC*, No. 14-22503 (RDD), 2014 WL 4637175, at *3 (Bankr. S.D.N.Y. Sept. 17, 2014), *aff'd* 596 B.R. 416 (2019); (NCSG Obj. ¶ 17.).  The Forfeiture Judgment Credit plainly does not condition any creditor's recovery on how that creditor votes on a plan.  If the conditions for the Forfeiture Judgment Credit are satisfied, creditors will benefit from the reduction of the federal government's recovery on account of the Forfeiture Judgment Claim without regard to how they voted on the plan.  And if the conditions for the Forfeiture Judgment Credit are not satisfied, the reduction in value allocable to creditors flows not from any provision altering creditor treatment under a plan, but from the arithmetical consequences of the $2 billion Forfeiture Judgment Claim.

[15] Indeed, the scenario in which in which the Forfeiture Judgment Claim would exist in these cases without the corresponding Forfeiture Judgment Credit is a narrow and unlikely one:  (1) a plan providing for a public benefit company is rejected; (2) Purdue nonetheless does not withdraw its plea; (3) a plan is confirmed that will not satisfy the Forfeiture Judgment Credit; and (4) the District Court accepts the Plea Agreement after confirmation.  (Plea Agreement at 10.)

their respective *ex ante* positions.  This optionality, and the opportunity for all creditors to

consider, review, analyze, and object to any proposed plan of reorganization at a confirmation

hearing, entirely vitiates the Objectors' arguments that the DOJ Resolution constitutes a *sub rosa*

plan.  *See, e.g.*, *In re Empire Generating Co., LLC*, 2020 WL 1330285, at *9 (affirming this

Court's ruling approving RSA and denying *sub rosa* objection on the basis that the RSA was "an

agreement about supporting things, . . . not an approval of the [363] sale," and "[a]ll plan terms

remained subject to confirmation of the plan" where "the RSA left open the possibility that an

offer" other than that set forth in the RSA "could be made and accepted," thus demonstrating that

the RSA did "not cement a reorganization" (internal quotations omitted)); *In re Adelphia

Commc'ns Corp.*, 327 B.R. at 157 (approving settlement wherein federal government agreed to

accept different financial terms depending on the structure of the post-emergence entity—in

particular, accepting stock if the company reorganized but requiring certain amounts in cash if

the company was sold—thereby treating part of its consideration for the settlement agreement as

consummation of its preferred form of emergence structure).

33.     The DOJ Resolution bears no resemblance to the agreements at issue in the cases

upon which the Objectors rely where the agreements or transactions were held to contravene the

*sub rosa* plan doctrine.  For example, the bankruptcy court in *In re LATAM Airlines Group S.A.*

held that a credit agreement between the debtors and certain DIP lenders was an improper *sub

rosa* plan because the contract "lock[ed] into place [a] 20% discount to plan value on stock to be

issued" by the debtors to certain lenders if the debtors elected to distribute stock in lieu of cash in

satisfaction of the DIP loan.  No. 20-11254 (JLG), 2020 WL 5506407, at *58 (Bankr. S.D.N.Y.

Sept. 10, 2020).  The bankruptcy court specifically called out the fact that, "[i]f approved,"

"neither the [d]ebtors' decision to make that election, nor the 20% discount, will be subject to

creditor comment or Court review." *Id.* In other words, the bankruptcy court held that the agreement <u>was</u>, in effect, a plan of reorganization because it bound the debtors' other creditors without any opportunity for further review at plan confirmation, rather than merely adjusting the costs or benefits of certain outcomes that other creditors would then have the option to weigh. So, too, for *In re Miami Metals I, Inc.*, 603 B.R. 531 (Bankr. S.D.N.Y. 2019). There, the bankruptcy court rejected a settlement that came into effect <u>prior</u> to plan confirmation and which set a cap on the recovery of certain creditors who were not parties to the settlement without permitting those capped creditors any opportunity to object at confirmation. *Id.* at 536-37.

34.    The Objectors may very well wish that the DOJ Resolution was even more favorable to their constituencies, and that it did not contain the contingencies to which they object. The bargain that was struck, however, was the product of over a year's worth of intensive, arm's-length discussions. The particular mix of terms reflected in the DOJ Resolution is the one that secured an agreement—one that is indisputably in the best interests of the estates in light of all of the circumstances. (*See supra* Part I.) Importantly, the conditioning of the Forfeiture Judgment Credit on the emergence of a public benefit company or entity with a similar mission is consistent with the DOJ's long-standing interest in abatement and "assist[ing] parties in carefully crafting non-monetary remedies that will effectively combat the opioid crisis on a nationwide basis . . . in accordance with applicable law." United States' Memorandum in Support of its Motion to Participate in Settlement Discussions and as Friends of the Court at 2, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-02804 (DAP) (N.D. Ohio Apr. 2, 2018), Dkt. No. 212-1. It also provides an objective benchmark against which the United States can ensure that value will be "distributed or otherwise conferred in settlement of claims asserted by state, tribal, or local governmental entities" as required to secure the Forfeiture Judgment Credit (Plea

Agreement at 9), and avoids the need for a subjective determination of whether that condition

has been met.[16]   The balance reflected in the DOJ Resolution provides benefits to the Debtors

and the DOJ and inures to the resounding benefit of the estates and their stakeholders.  It is not a

*sub rosa* plan.

C.      **The Remaining DOJ Resolution Terms Challenged by the Objectors Do Not Render the DOJ Resolution a *Sub Rosa* Plan**

35.     Although the Objectors' arguments are largely devoted to the Forfeiture Judgment

Claim, the Forfeiture Judgment Credit, and the potential emergence of a public benefit company

or entity with a similar mission, the Objectors also take issue with certain other terms that they

suggest render the DOJ Resolution a *sub rosa* plan.  None does.

---

[16] In a single paragraph towards the end of its objection, the PI Group argues that the Forfeiture Judgment Credit is an impermissible "gift" from the DOJ to the non-federal public claimants. (PI Obj. ¶ 40.)  This argument fails.  The Forfeiture Judgment Credit is not a "gift" because it does not augment any amount that the non-federal public claimants are currently entitled to receive.  Instead, the Forfeiture Judgment Credit is precisely what its name suggests—a credit. Put another way, every dollar of value given to the non-federal public claimants counts twice— once as a dollar to decrease the $2 billion Forfeiture Judgment Claim held by the DOJ, and once as a dollar to the non-federal public claimants' claims for the purposes of abatement—without any change in the actual value that may be provided to the non-federal public claimants.  By contrast, a "gift" occurs where one creditor provides its bankruptcy proceeds to another creditor, thereby augmenting the recipient's take over and above what it would otherwise have received. *See, e.g.*, *In re Journal Register Co.*, 407 B.R. 520, 529-34 (Bankr. S.D.N.Y. 2009) (affirming "gift" in a plan where secured lenders provided value to another class over the dissent of a class with priority over the recipient class); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *61 (Bankr. S.D.N.Y. Oct. 31, 2003) (affirming "gift" in a plan where trade claimants received greater value as a result of contributions from priority class claimants). Moreover, the Forfeiture Judgment Credit is consistent with the "Coordination of Corporate Resolution Penalties in Parallel and/or Joint Investigations and Proceedings Arising from the Same Misconduct" policy set forth in Section 1-12.100 of the Justice Manual.  That policy provides that the "Department [of Justice] should . . . endeavor, as appropriate, to coordinate with and consider the amount of fines, penalties, and/or forfeiture paid to other federal, state, local, or foreign enforcement authorities that are seeking to resolve a case with a company for the same misconduct." U.S. Dep't of Justice, 1-12.100 - Coordination of Corporate Resolution Penalties in Parallel and/or Joint Investigations and Proceedings Arising from the Same Misconduct, Justice Manual (new May 2018) https://www.justice.gov/jm/jm-1-12000- coordination-parallel-criminal-civil-regulatory-and-administrative-proceedings.

25

36.     For example, the NCSG and PI Group object to the allowance, treatment,

payment, and classification of the Criminal Fine Claim (*see* Proposed Order ¶ 5) and Civil Claim

(*see* Proposed Order at ¶ 6) as *sub rosa* provisions.  (NCSG Obj. ¶¶ 7(b)-(c); PI Obj. ¶¶ 25-27.)

Settlements, however, often provide for specified treatment of the agreed allowed claims, and

courts have determined that doing so does not run afoul of the prohibition on *sub rosa* plans.

*See, e.g.*, *In re Lion Capital Grp.*, 49 B.R. at 174 (holding that a settlement that "provide[d] for

the allowance of . . . claim[s] against the estate as . . . general unsecured claim[s] for

$45,834,953.31" and "approximately $40,800,000.00" was not a *sub rosa* plan); *Off. Comm. of*

*Unsecured Creditors of Tower Auto. Inc. v. Debtors & Debtors in Possession (In re Tower Auto.*

*Inc.)*, 241 F.R.D. 162, 169-69 (S.D.N.Y. 2006) (holding that a "guaranteed recovery" under the

settlement "of at least 20 percent on [a] significant claim . . . represent[ed] a substantial portion

of [the debtor's] unencumbered estate," but was not a *sub rosa* plan because it did not dispose of

all of the debtors' assets, dispose of or release claims of general unsecured creditors, or restrict

creditors' rights to vote on an eventual plan of reorganization); *see also In re LATAM Airlines*

*Grp. S.A.*, 2020 WL 5506407, at *58 ("[T]here are cases in which courts have rejected sub rosa

plan arguments and approved settlements which effectively fix the treatment of some, but not all,

classes of claims in yet to be filed reorganization plans, but do so without running roughshod

over the rights of the remaining claimants, and the Code's plan confirmation procedures." (citing

*In re Tower Auto. Inc.*)).  Additionally, terms establishing allowance and priority are typical in

pre-confirmation agreements in bankruptcy cases.  *See, e.g.*, Final Order (I) Authorizing Debtors

to (A) Obtain Postpetition Financing & (B) Use Cash Collateral, (II) Granting Liens & Providing

Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to

the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, & (V) Granting Related

26

Relief at Section 7.01(s), *In re Speedcast Int'l Ltd.*, No. 20-32243 (Bankr. S.D. Tex. May 20,

2020), Dkt. No. 239 (providing for superpriority administrative expense claims); Interim Order

(I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Liens, Security Interests

& Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate

Protection; (V) Scheduling A Final Hearing; & (VI) Modifying the Automatic Stay at Section 9,

*In re Binder & Binder – The National Social Security Disability Advocates (NY), LLC*, No. 14-

23728 (RDD), 2014 WL 7403456, at *11 (Bankr. S.D.N.Y. Dec. 24, 2014) (providing for

superpriority administrative expense claims).  The revised Proposed Order will further dispel any

potential concern that these provisions "dictate" the terms of a plan.  The DOJ will have the right

to rescind the DOJ Resolution should the plan fail to provide for the agreed classification and

treatment of the Criminal Fine Claim and Civil Claim.  (Proposed Order ¶ 7.)  Finally, and

perhaps most importantly, the NCSG and PI Group themselves reached an agreement that

provided for a large fixed cash distribution for the unsecured claims of the personal injury

claimants.  (*See* Mediators' Report ¶¶ 5-6, 9.)  And the NCSG reached similar agreements with

several other private claimant constituencies, as appropriately lauded in the Mediators' Report to

this Court.  (*Id.* ¶¶ 5, 7, 9.)  They now cannot possibly be heard to allege that such a structure—

their own—is unlawful.

37.     The NCSG and PI Group also challenge standard anti-circumvention language

prohibiting the Debtors from proposing a plan inconsistent with the DOJ Resolution.  (NCSG

Obj. ¶ 7(e); PI Obj. ¶ 20.)  Such language, of course, is necessary to ensure the parties receive

the benefit of their bargain, and accordingly courts have found that such terms do not convert a

pre-confirmation settlement into an impermissible *sub rosa* plan.  *See e.g.*, *In re Lion Capital

Grp.*, 49 B.R. at 176-77 (noting that "a contractual provision in a settlement agreement that

requires a . . . creditor to vote for a plan consistent with the settlement [does] not change" the

settlement into a *sub rosa* plan); *In re Crowthers*, 114 B.R. at 885 (noting that the provision in *In*

*re Lion Capital Group* was not a *de facto* plan because "it simply prevented any party to the

settlement from reneging in future plan consideration").  Here, too, the revised Proposed Order

will make crystal-clear that authorizing entry into the DOJ Resolution will not fix plan terms,

but, instead, provide the DOJ with a right to rescind the DOJ Resolution if the plan does not

provide the DOJ the benefits of its bargain.  (Proposed Order ¶ 7.)  Such anti-circumvention

provisions are routinely incorporated into restructuring support agreements.  *See, e.g.,*

Restructuring Support Agreement at Section 11.01(d), *In re Neiman Marcus Grp. Ltd LLC*, No.

20-32519 (DRJ) (Bankr. S.D. Tex. May 7, 2020), Dkt. No. 86; Restructuring Support Agreement

at Section 3(b)(ii), *In re PG&E Corp. & Pacific Gas and Electric Co.*, 19-30088 (DM) (Bankr.

N.D. Cal. Dec. 9, 2019), Dkt. No. 5038-1; Restructuring Support Agreement at Section

5(a)(xxiii), *In re Empire Generating Co, LLC*, No. 19-23007 (RDD) (Bankr. S.D.N.Y. June 10,

2019), Dkt. Nos. 5-1 & 98; Global Settlement, Forbearance, and Restructuring Support

Agreement at Sections 5(a)(iv)(B), 6(iii)(B), *In re Glob. A&T Electronics Ltd.*, No. 17-23931

(RDD) (Bankr. S.D.N.Y. Dec. 22, 2017), Dkt. No. 62-1; Restructuring Support Agreement

Relating to the Offshore Business at Section 2(e), *In re Ultrapetrol (Bahamas) Ltd.*, 17-22168

(RDD) (Bankr. S.D.N.Y. Mar. 17, 2017), Dkt. No. 148-1; Support and Settlement Agreement at

Section 5.2(b)(ii), *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. May 14, 2013), Dkt.

No. 8154-1; Plan Support Agreement at Sections 7(l), 7(p), *In re TBS Shipping Servs., Inc.*, No.

12- 22224 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012), Dkt. Nos. 54-2 & 80.

       38.    Finally, the NCSG seemingly takes issue with the rights of the parties to rescind

the Civil Settlement Agreement, and of Purdue to withdraw its guilty plea under the Plea

Agreement, in the event that the Court does not confirm a plan providing for the emergence of a

public benefit company or other entity with a similar mission.  (NCSG Obj. ¶ 7(f).)  The

rescission rights in the DOJ Resolution merely return the parties to the *status quo ante* were the

confirmed plan to differ from that described in the Plea Agreement and Civil Settlement

Agreement, consistent with standard practice.  (*See* Plea Agreement at 5; Civil Settlement

Agreement ¶ 8(f).)[17]  No Objector has cited authority suggesting that a rescission right in a

settlement renders it a *sub rosa* plan.  Nor could they, for parties routinely—and probably

increasingly—incorporate contingencies in settlements and other agreements that serve as the

building blocks of a plan of reorganization, and courts do not find these provisions to run afoul

of the prohibition on *sub rosa* plans.  *See, e.g.*, *In re Crowthers*, 114 B.R. at 880, 886 (holding

that agreement which contained a "provision terminating the [a]greement if (i) the closing does

not occur within forty-five days after entry of the order of confirmation or July 31, 1990 . . .

(ii) the case is dismissed or converted to a chapter 7 case, or a trustee is appointed in the

[c]hapter 11 case, or (iii) [the debtor] shall consummate a competing transaction" was not a *sub

rosa* plan because the "motion seeks only authority for [the debtor] to enter into an agreement

providing a basis for a plan and to merge with another entity only if certain conditions, including

entry of an order of confirmation reflecting the agreement, are satisfied").  In particular, the right

to terminate upon the filing of a plan inconsistent with the agreement reached is a standard term

in restructuring support agreements approved almost every week by this Court and many others.

---

[17] The rescission rights in the DOJ Resolution are almost identical to the rescission rights
contained in the non-federal public claimants' term sheets with private claimants in these cases,
each of which is "conditioned on the Court's confirmation of a plan of reorganization that
includes participation by the Sackler famil[ies] in the plan of reorganization" and three of which
are "conditioned on resolution of the United States' claims on terms reasonably acceptable to
the" non-federal public claimants.  (*See* Mediators' Report ¶ 12.)  Here, as the non-federal public
claimants have in those term sheets, the Debtors and DOJ each simply have a right to return the
parties to a pre-agreement world if the terms of a confirmed plan are not as anticipated.

*See, e.g.*, Restructuring Support Agreement at Section 5(a)(xxiii), *In re Empire Generating Co, LLC*, No. 19-23007 (RDD) (Bankr. S.D.N.Y. June 10, 2019), Dkt. Nos. 5-1 & 98; Restructuring Support Agreement at Section 8(a)(ii), *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019), Dkt. No. 291; Global Settlement, Forbearance, and Restructuring Support Agreement at Section 8(b)(v), *In re Glob. A&T Electronics Ltd.*, 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 22, 2017), Dkt. No. 62-1; Plan Support Agreement at Section 6(d)(xi), *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Aug. 25, 2017), Dkt. Nos. 902 & 1029; Restructuring Support Agreement Relating to the Offshore Business at Section 14(b)(iii), 14(c)(iii), 14(d)(i), *In re Ultrapetrol (Bahamas) Ltd.*, 17-22168 (RDD) (Bankr. S.D.N.Y. Mar. 17, 2017), Dkt. No. 148-1; Restructuring Support Agreement at Section 7(i), *In re Eagle Bulk Shipping Inc.*, No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 18, 2014), Dkt. Nos. 63 & 95; Restructuring Support Agreement at Section 2.1.(q), *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014), Dkt. Nos. 147 & 507; Restructuring Support Agreement Section 11(c)(iii), *In re Genco Shipping & Trading Limited*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. April 25, 2014), Dkt. Nos. 13 & 47; Plan Support Agreement at Section 7(l), 7(p), *In re TBS Shipping Servs., Inc.*, No. 12-22224 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2012), Dkt. Nos. 54-2 & 80.

39.    The *sub rosa* objections to these typical, standard provisions are wholly without merit.

### III.    The Remaining Objections Are Unavailing

#### A.    The Clarity Provided by the DOJ Resolution Will Assist in Mediation and the Resolution of These Chapter 11 Cases

40.    The NCSG also contends that the DOJ Resolution somehow "devalue[s] the [m]ediation [p]rocess." (NCSG Obj. ¶¶ 22-27.) This unusual, untrue, and unsupported argument

30

is predicated, in large measure, upon the mistaken premise that the DOJ Resolution "dictates" the future of Purdue. As set forth in Part II.B, *supra*, it does not. Far from devaluing any mediation process, the DOJ Resolution represents a massive step forward for the Debtors' chapter 11 cases by resolving the Debtors' criminal and civil exposure to the United States in a manner that provides and preserves immense value to the estates and their claimants, including the non-federal public claimants. This, as the Debtors and estate stakeholders have long known, is a necessary step on the way to confirmation. *See* Part I, *supra*. The irony should not be lost on anyone—the DOJ Resolution provides a mechanism, the Forfeiture Judgment Credit, to satisfy the majority of the DOJ's recovery through value distributed to the very states now complaining. In light of the foregoing, the Debtors hope that the non-federal public claimants will, as requested by the UCC, represent to the parties and the Court that the condition contained in the mediation term sheets regarding the "resolution of the United States' claims on terms reasonably acceptable to the [n]on-[f]ederal [p]ublic [c]laimants" (*see* Mediators' Report ¶ 12) has been fully satisfied and remove any lingering uncertainty regarding the success of the first stage of mediation. The Debtors remain fully committed to the mediation process and strongly believe that approval of the Motion should give all parties in interest added momentum toward fully resolving the open issues.

**B.    The DOJ Does Not Have Discretion to Use Forfeiture Judgment Claim Funds for Abatement under Federal Law**

41.    The Ad Hoc Committee on Accountability and the UCC each ask whether the DOJ can "provide assurance" that the $225 million payment that the DOJ will receive as the only part of the Forfeiture Judgment Claim not subject to the Forfeiture Judgment Credit "will be used promptly" for abatement purposes "or otherwise explain how such funds will be expended." (UCC Stmt. ¶ 17; *see also* AHCA Obj. at 5-6.) Although the Debtors defer to the DOJ regarding

31

the potential use of forfeiture funds, the Debtors understand that the DOJ does not have discretion to decide, cause, or direct that the forfeited funds will be used for abatement pursuant to the Comprehensive Crime Control Act of 1984 and other federal statutes.  *See* 28 U.S.C. § 524(c)(4) ("There shall be deposited in the [Department of Justice Asset Forfeiture] Fund . . . all amounts from the forfeiture of property under any law enforced or administered by the Department of Justice . . . .").  This, however, is not grounds for not approving the DOJ Resolution, both because it is not legally cognizable and also because the overall structure of the DOJ Resolution is extremely pro-abatement.  Indeed, it is the inability of the federal government to guarantee that its recoveries will be used for opioid-related abatement, combined with its willingness to offset its own recoveries in favor of state and local governments who can and will use their recoveries for abatement, that makes the Debtors' settlement with the DOJ so essential.

> **C.    The Document Repository Described in the DOJ Resolution is a Floor Not a Ceiling**

42.    The UCC's final concern regarding the scope of the document repository described in the DOJ Resolution (UCC Stmt. ¶¶ 18-19), which the UCC emphasizes has the support of all creditors and the Court, has an easy answer that the Debtors are happy to provide—the language sets a floor, not a ceiling.  The Debtors intend that the document repository—promised by the Debtors at no fewer than five hearings (*see* Oct. 11, 2019 Prelim. Inj. Hr'g Tr. 66:17-18; *id.* at 67:5-20; Nov. 6, 2019 Prelim. Inj. Hr'g Tr. 30:19-31:19; June 3, 2020 Bar Date Ext. Hr'g Tr. 20:18-21:8; July 23, 2020 Omnibus Hr'g Tr. 48:12-18; Oct. 28, 2020 Omnibus Hr'g Tr. 30:20-22)—that will exist upon emergence will go beyond the repository described in the DOJ Resolution.  (*See* Plea Agreement at 10-11.)  The Debtors' agreement with the DOJ regarding the minimum context of a document repository is but one more stepping stone on the road to emergence.

32

## **CONCLUSION**

43.     For all of the foregoing reasons, the Debtors respectfully request that this Court

grant the Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. 9019 Authorizing

and Approving Settlements Between the Debtors and the United States.

Dated:   November 16, 2020
             New York, New York

By: /s/ *Marshall S. Huebner*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:      (212) 450-4000
Facsimile:      (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut
Marc J. Tobak
Christopher S. Robertson


*Counsel to the Debtors
and Debtors in Possession*