PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
Andrew V. Alfano
31 West 52nd Street
New York, New York 10019

Jason S. Sharp, admitted *pro hac vice*
1200 Seventeenth Street NW
Washington, DC 20036

*Counsel to the Ad Hoc Group of Non-Consenting States*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **In re:** | ) ) | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*,[1] | ) ) ) | Case No. 19-23649 (RDD) |
| **Debtors.** | ) ) ) | (Jointly Administered) |

**THE AD HOC GROUP OF NON-CONSENTING STATES'**
**STATEMENT IN SUPPORT OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS' MOTIONS TO COMPEL PRODUCTION**
**OF PURPORTEDLY PRIVILEGED DOCUMENTS OR FOR *IN CAMERA REVIEW***

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of their federal tax identification numbers, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' principal offices are at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# **TABLE OF CONTENTS**

                                                                                                                        **Page**

PRELIMINARY STATEMENT ........................................................................................ 1
BACKGROUND ................................................................................................................ 1
MORE EVIDENCE OF CRIMES AND FRAUD............................................................. 4
CONCLUSION................................................................................................................. 11

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Commonwealth of Massachusetts v. Purdue Pharma LP*,
    No. 1884-CV-01808 (Mass. Sup. Ct. 2019). ...................................................................3, 11

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
    319 F.R.D. 100 (S.D.N.Y. 2017) ......................................................................................2, 12

Statutes and Codes

Massachusetts General Laws
    Chapter 93A, Section 6(6) ......................................................................................................5

Other Authorities

*CDC Guidelines for Prescribing Opioids for Chronic Pain*, *available at*
    https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf ....................................10

*FDA Reconsiders Painkiller Training Requirements for Doctors*, NBC News
    (May 2, 2016, 9:10 AM), *available at*
    https://www.nbcnews.com/health/health-news/fda-reconsiders-painkiller-
    training-requirements-doctors-n565866 .................................................................................5

*Overdose Death Rates*, Nat'l Institutes of Health, *available at*
    https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates..................6, 11

*Purdue Pharma L.P. Selected Investigation Documents Part I, Committee on
    Oversight and Reform U.S. House of Representatives*, at 35, *available at*
    https://oversight.house.gov/sites/democrats.oversight.house.gov/files/102720
    %20Purdue%20Documents%20Part%20I.pdf........................................................................7

*Standardizing and Evaluating Risk Evaluation and Mitigation Strategies (REMS)*
    (Sept. 2014), *available at*
    https://www.fda.gov/files/about%20fda/published/Standardizing-and-
    Evaluating-Risk-Evaluation-and-Mitigation-Strategies-(REMS).pdf .....................................4

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

The Ad Hoc Group of Non-Consenting States (the "Non-Consenting States")[2] submits this statement in support of the motions filed by the Official Committee of Unsecured Creditors seeking production of documents inappropriately withheld as privileged ("Privilege Motions") [Docket. Nos. 1752, 1753] and states as follows:

## PRELIMINARY STATEMENT

1. The Non-Consenting States submit this Statement in accordance with the agreed briefing schedule entered by the Court. The Non-Consenting States likewise remain fully committed to engaging in the mediation to strive to reach consensual resolutions in these cases.

## BACKGROUND

2. The Official Committee and the Non-Consenting States are investigating Purdue and the Sacklers' role in the opioid crisis, their related liability, and whether transfers of billions of dollars out of Purdue at the Sacklers' direction (together with others), and for the direct or indirect benefit of the Sacklers or their enterprises, were intentionally or constructively fraudulent. This work is critical to the States' determination whether to support a chapter 11 plan that releases non-debtor third parties, including members of the Sackler family, the Debtors' current or former directors and officers, or other third parties.

3. As set forth in the Privilege Motions, Sackler family members withheld documents relevant to that inquiry based on incorrect assertions of privilege, and the Sacklers' Objections to the motions are unavailing.

---

[2] California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

1

4. As the Official Committee noted in its Privilege Motions, a party seeking discovery under the crime-fraud exception must establish: (1) that "there is probable cause to believe that a crime or fraud has been attempted or committed"; and (2) "that the communications were in furtherance thereof." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 319 F.R.D. 100, 107 (S.D.N.Y. 2017) (*quoting In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)). Courts also articulate this standard as requiring "substantial reason" to believe that the party engaged in or attempted fraud and used communications with an attorney to do so. *Id*.

5. The Official Committee's Privilege Motions forcefully demonstrate, with evidence, that there is "probable cause" and "substantial reason" to conclude that the Sacklers repeatedly engaged in fraud and committed crimes in operating Purdue and secreting its assets and have withheld communications with attorneys that furthered the fraud and crimes.[3]

6. In response, the Sacklers retreat to their claim that the entire nationwide litigation against them is a mistake. They say they have secret "overwhelming evidence" that, though it has never been revealed publicly, shows "the allegations against the Raymond Sackler Family in the underlying litigation are factually unsupported."[4]

7. Contrary to the Sacklers' unsupported declarations of innocence, the evidence shows pervasive fraud and crime. In 2019, a Massachusetts Superior Court reviewed scores of documents supplied by the Sacklers, at the Sacklers' request, and concluded:

> This Court has nevertheless examined the documents – including Board minutes – relating to these allegations and is satisfied that the Commonwealth has met its burden of producing evidence showing that each of the named defendants participated in making or approving false representations knowingly sent into

---

[3] *See Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for in Camera Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege* ¶¶ 16-35, 72-81, Docket No. 1753.

[4] *Amended Raymond Sackler Family's Opposition to the Official Committee of Unsecured Creditors' Exceptions Motion* at 1, Docket No. 1815 ("RSF Opp.").

2

Massachusetts with the intent that Massachusetts residents rely on those misrepresentations, resulting in injury to them.[5]

Because that Court was deciding personal jurisdiction arguments on a motion to dismiss, it did not make a fact finding about the falsity of representations; but it did assess the "evidence showing that each of the named defendants participated in making or approving" Purdue's marketing scheme.[6] Richard Sackler, David Sackler, Theresa Sackler, Mortimer Sackler, Ilene Sackler Lefcourt, and Kathe Sackler – as well as current CEO Craig Landau, current board members Peter Boer and Cecil Pickett, and others – all participated in making or approving the representations.

8. Regarding the prerequisites of the crime-fraud exception, the Sacklers say: "The UCC does not even argue, much less offer evidence to prove, that any of the claims against PPLP in the underlying litigation can be established. It assumes PPLP's underlying liability—which has never been substantiated by any judgment and has been hotly contested."[7] But that is false.

9. Last month, Purdue agreed to plead guilty to multiple felonies, including a decade-long conspiracy to encourage unnecessary, illegal, and dangerous prescriptions of Purdue opioids: "Beginning in or about May 2007 and continuing until in or about March 2017 … Purdue knowingly and intentionally conspired and agreed with others to aid and abet HCPs' dispensing, without a legitimate medical purpose and outside the usual course of professional practice."[8] The DOJ's summaries of facts included in both the Purdue and Sackler settlement agreements illustrate how Purdue's misconduct was not a rogue act by a low-level employee, but instead was directed from the top of the company by the Sacklers and the executives they oversaw.[9]

---

[5] *Commonwealth of Massachusetts v. Purdue Pharma LP*, No. 1884-CV-01808, 36 Mass. L. Rptr. 111, at *6 (Mass. Sup. Ct. Oct. 8, 2019).
[6] *See id.* at *5-6.
[7] RSF Opp. at 6.
[8] *Plea Agreement*, Docket No. 1828, Ex. B at 17 ("Plea Agreement").
[9] *See* Addendum A to Purdue Settlement Agreement ¶¶ 1-216, Docket No. 1828-2 ("Purdue Addendum A"); Addendum to A to Sackler Settlement ¶¶ 1-170, Docket No. 1833 ("Sackler Addendum A").

10. The Sacklers say: "Critically, over two-thirds of the Distributions were made in 2008-2012, when PPLP was under a federal monitorship, as required by PPLP's Corporate Integrity Agreement."[10] Though PPLP was under a federal monitorship, what is significant about the 2008-2012 period is that it did not deter Purdue's criminal activity under the leadership of the Sacklers. Purdue has admitted that it intentionally engaged in a criminal conspiracy to aid the dispensing of opioids without a legitimate medical purpose throughout that time – beginning "in or about May 2007," within weeks of its first criminal conviction, and continuing until 2017.[11] The timing, therefore, does not support the Sacklers' argument in the way that they wish it would. Instead, it shows that the Sacklers extracted billions from Purdue as Purdue was *violating* a Corporate Integrity Agreement and committing intentional fraudulent and criminal acts.

### MORE EVIDENCE OF CRIMES AND FRAUD

11. Much more evidence confirms that the Sacklers led the dangerous conduct at Purdue. Some of that evidence is cited in the Official Committee Privilege Motions and its response filed in further supports of the Privilege Motions (the "Response"). Some more of that evidence, from the States' investigations, is described below.

12. In the fallout from Purdue's first criminal conviction in 2007, Congress enacted a law granting FDA the authority to require Risk Evaluation and Mitigation Strategies ("REMS") for certain prescription drugs to ensure that the benefits of these drugs outweigh their risks.[12] In October 2008, FDA notified Purdue that it was required to submit a REMS plan that would add ground-breaking restrictions on the use of OxyContin, including a requirement that OxyContin

---

[10] RSF Opp. at 11.

[11] Plea Agreement at 16.

[12] *See Standardizing and Evaluating Risk Evaluation and Mitigation Strategies (REMS)* (Sept. 2014), *available at* https://www.fda.gov/files/about%20fda/published/Standardizing-and-Evaluating-Risk-Evaluation-and-Mitigation-Strategies-(REMS).pdf.

could be prescribed <u>only</u> by doctors who completed mandatory specialized training.[13] The Sacklers recognized this public health initiative as a grave threat to their profit. Purdue directors Jonathan Sackler and Peter Boer instructed Craig Landau to find a way to deflect the FDA in order to "save the business."[14] (Boer is a Sackler family loyalist who remains on the Board of Purdue even today, and Landau is now the CEO.) Richard Sackler's daughter Marianna worked with Landau and a team of McKinsey consultants to block requirements that would reduce sales.[15] The team implemented a plan to "band together" with other opioid sellers to avoid restrictions that could cause a "significant" loss of revenue.[16] They succeeded. Even to this day, the FDA has never required specialized training for OxyContin prescribers.[17]

13. Preparing for an FDA meeting in 2009, the team reviewed the "hardest questions" that the FDA might ask.[18] For the question, "Why should we trust you?," the Answer Book said: "We acknowledge mistakes made in the past. We have x, y and z measures in place that did not exist before."[19] For the question, "Who at Purdue takes personal responsibility for all these deaths?," the Answer Book said: "We all feel responsible." Purdue has now admitted that it

---

[13] Ex. B, Oct. 4, 2008 Email from Rob Rosiello, MCK-MAAG-0119373, attaching letters from Bob Rappaport, Director, Division of Anesthesia, Analgesia and Rheumatology Products, Office of Drug Evaluation II, CDER, MCK-MAAG-0119375 and MCK-MAAG-0119381. As set forth in the Declaration of Gillian Feiner (Ex. A), Exhibits B-T, each bearing prefix MCK-MAAG, were produced by McKinsey & Company pursuant to Massachusetts General Laws chapter 93A § 6(6) and are filed pursuant to that section ("such material or information may be disclosed by the attorney general in court pleadings or other papers filed in court").

[14] Ex. C, Oct. 24, 2008 Email from Maria Gordian, MCK-MAAG-0117875. Peter Boer remains on the Board of Directors of Purdue today.

[15] *See* Ex. D, Jan. 20, 2009 Email from Rob Rosiello, MCK-MAAG-0118819.

[16] Ex. E, Oct. 16, 2008 Email from Loren Griffith, MCK-MAAG-0128552, and attachment, MCK-MAAG-0128553 at slides 0-1.

[17] *See FDA Reconsiders Painkiller Training Requirements for Doctors*, NBC News (May 2, 2016, 9:10 AM), *available at* https://www.nbcnews.com/health/health-news/fda-reconsiders-painkiller-training-requirements-doctors-n565866 ("The FDA's initial ideas to improve safety included mandatory certification for doctors … But industry pushed back … The FDA's final plans were ultimately much milder than its initial proposals.").

[18] Ex. F, Sept. 24, 2009, FDA Advisory Committee on Reformulated OxyContin: Question & Answer Book, MCK-MAAG-0152135 (excerpted; includes slides 0,1, 2, 11, and 12 of slide deck numbered 0-121).

[19] *Id.* at slide 11.

committed felonies to encourage medically unnecessary opioid prescriptions at the very same time as that FDA meeting.[20] And, since that meeting, many more thousands of Americans have been harmed by Purdue's opioids, overdosed, and died.[21]

14.  The Sacklers' intervention to block the OxyContin REMS fits a pattern of Sacklers controlling the action at Purdue. In October 2008, the same month as the FDA's letter, a consultant who interviewed Purdue staff recorded that "the Board gets involved in too many decisions that it shouldn't" and "[t]he Board makes almost all the important decisions."[22] The consultant elaborated: "[t]he brothers who started the company viewed all employees like the guys who 'trim the hedges' – employees should do exactly what's asked of them and not say too much."[23] Five days later, a Purdue executive wrote to a different consultant from his personal email account to warn them that Purdue CEO John Stewart "may be at a 'tipping point' with Purdue Board" because of the "FDA threat to Oxy."[24] The next day, a consultant reported on an interview with senior Purdue attorney Phil Strassburger: "Decision-making at Purdue is an 'utter failure' … There are two primary reasons for the inadequate decision-making … The first is interference by the Board … the Board is involved in all levels of decision-making on a weekly basis … Dr. Richard in particular is highly involved."[25] Another consultant on the OxyContin projects described her role

---

[20] *Id.* at slide 12.

[21] *See* United HealthCare Services, Inc.'s Proof of Claim No. 135053, Attachment at 2, *available at* https://restructuring.primeclerk.com/purduepharma/Home-ClaimDetails?id=MzE5MTYyOQ== ("between January 1, 2008 and December 31, 2019, United paid healthcare benefits and reimbursement for hundreds of thousands members who were diagnosed with OUD after receiving a prescription for an opioid manufactured and marketed by Debtors"); *Overdose Death Rates*, Nat'l Institutes of Health, *available at* https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates.

[22] Ex. G, Oct. 16, 2008 Email from Jonathan Cain, MCK-MAAG-1071727; *see also* Sackler Addendum A ¶ 12 ("the role of the board and that of the management is blurred … executives, management, board, and shareholders all in one [and] worked collaboratively with other managers on a daily basis … with the Board of Directors serving as the 'de-facto' CEO").

[23] Ex. G, Oct. 16, 2008 Email from Jonathan Cain, MCK-MAAG-1071727.

[24] Ex. H, Oct. 21, 2008 Email from William Mallin, MCK-MAAG-1072780.

[25] Ex. I, Oct. 22, 2008 Email from Jonathan Cain, MCK-MAAG-0201523.

as "counselor to Richard Sackler" and "look[ed] forward to deepening our relationships with the Sackler family and serving them."[26]

15. In 2013, the Sacklers learned that efforts by pharmacies to comply with the law and protect public health threatened to reduce their profit. A memo sent to the Sacklers explained that "Walgreens implemented a nationwide requirement that its pharmacists rigorously review and evaluate the appropriateness of Class 2 prescriptions," including Purdue opioids.[27] Purdue CFO Ed Mahony warned: "similar efforts are in various stages at other pharmacies. The result of this effort may increasingly depress future prescriptions. The Purdue management team will report on this and other environmental factors at the July 25, 2013 Board meeting."[28]

16. As documents released by the U.S. House Oversight Committee show, Purdue hired McKinsey to address the factors limiting OxyContin sales and "oversee the execution of a plan to pursue the greatest opportunities for boosting growth."[29] On August 15, 2013, Sackler directors and other board members met with the CEO and Sales VP about OxyContin sales tactics.[30] A week later, Richard Sackler arranged a face-to-face meeting with McKinsey to review tactics to "Turbocharge the Sales Engine."[31]

---

[26] Ex. J, Mar. 26, 2009 Memo from Maria Gordian, MCK-MAAG-0118669.

[27] Ex. K, Jul. 16, 2013 Email from Ed Mahony to the Board, MCK-MAAG-0117520, attaching June 2013 Financial Statement Cover Memo at MCK-MAAG-0117521.

[28] *Id.*

[29] *Purdue Pharma L.P. Selected Investigation Documents Part I, Committee on Oversight and Reform U.S. House of Representatives*, at 35, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/102720%20Purdue%20Documents%20Part%20I.pdf.

[30] Ex. L, Aug. 15, 2013 Email from Arnab Ghatak, MCK-MAAG-0112710 (attaching slides titled "Identifying OxyContin Growth Opportunities"); *see also* Sackler Addendum A ¶ 91 ("On August 15, 2013, Purdue's CEO and a Purdue executive discussed the consulting company's progress on evaluating growth opportunities for OxyContin with the Board, including the Named Sacklers. Their presentation noted that the analysis would include an examination of 'relatively more sudden declines in tablets per prescriptions and prescriptions for 40 mg and 80 mg strengths' and 'prescriber segmentation and targeting.'").

[31] *Purdue Pharma L.P. Selected Investigation Documents Part I*, Committee on Oversight and Reform U.S. House of Representatives, at 38, 45, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/102720%20Purdue%20Documents%20Part

17. Even Purdue's own Vice President of Sales & Marketing was skeptical about turbocharging the sales engine. He warned: "I have some real concerns with the thought that our issues center on a need to turbocharge sales."[32] He noted that "a majority of this year's sales loss is in less tabs and continued drop in higher strengths … the tides against using opioids long term, in higher doses are all under fire."[33] But another long-time Purdue executive, David Lundie, observed that a proposal to "turbocharge" sales "will catch the attention of the shareholders" – *i.e.*, the Sacklers.[34]

18. Lundie was right. After meeting with the Sacklers, McKinsey partner Arnab Ghatak reported: "The board mtg today went very well – the room was filled with only family … We went through exhibit by exhibit for about 2 hrs. They were extremely supportive of the findings and our recommendations … and wanted to strongly endorse getting going on our recommendations."[35] Ghatak's colleague Martin Elling agreed: "the findings were crystal clear to everyone and they gave a ringing endorsement of 'moving forward fast.'"[36]

19. As the Department of Justice has described, the plan that the Sacklers endorsed involved "focusing sales calls on extremely high-volume opioid prescribers and removing sales representative discretion with respect to call plans" and targeting doctors who wrote "25 times as many OxyContin prescriptions as other providers."[37] The DOJ found that: "Purdue's Abuse and Diversion Detection ('ADD') program and Region Zero list, of which the Named Sacklers were

---

%20I.pdf; *see also* Sackler Addendum A ¶ 93 ("Richard Sackler subsequently arranged for a face-to-face meeting for the Board with the consulting company outside of the presence of Purdue executives.").

[32] Ex. M, Aug. 14, 2013 Email from Russell Gasdia, MCK-MAAG-0119733.

[33] *Id.*

[34] Ex. N, Aug. 23, 2013 Email from David Lundie, MCK-MAAG-0117328.

[35] Ex. O, Aug. 23, 2013 Email from Arnab Ghatak, MCK-MAAG-0112331; *see also* Sackler Addendum A ¶ 95 ("strongly endorse getting going on our Recommendations").

[36] Ex. O, Aug. 24, 2013 Email from Martin Elling, MCK-MAAG-0112331; *see also* Sackler Addendum A ¶ 96 ("ringing endorsement of 'moving forward fast'").

[37] Sackler Addendum A ¶¶ 84-85.

8

aware, contain examples of high-volume prescribers detailed during [the project] that Purdue's own employees suspected were writing medically unnecessary prescriptions."[38] Indeed, "even after they were reported to ADD, Purdue continued to detail and generate prescriptions from high-volume prescribers that were prescribing opioids that were not for a medically accepted indication; were unsafe, ineffective, and medically unnecessary; and that were often diverted for uses that lacked a legitimate medical purpose."[39]

20. For Purdue, we now know that generating unsafe and medically unnecessary prescriptions was a corporate felony. Purdue has admitted that not-yet-named individuals "knowingly and intentionally conspired and agreed with others to aid and abet HCPs' dispensing, without a legitimate medical purpose."[40] The Sacklers have not admitted to anything. But the evidence of who made the decisions at Purdue is clear. And the DOJ's conclusion about the Sacklers is clear too — they knowingly committed fraud:

> [T]he Named Sacklers knowingly caused the submission of false and fraudulent claims to federal health care benefit programs for Purdue's opioid drugs that were prescribed for uses that were unsafe, ineffective, and medically unnecessary, and that were often diverted for uses that lacked a legitimate medical purpose.[41]

Why did the Sacklers do it? For the money. The DOJ reviewed Sackler emails, showing what David, Richard, Jonathan, and Mortimer Sackler wrote in their own words,[42] and reached this conclusion about the Sacklers' fraud:

> [A]t the Named Sacklers' request, billions of dollars were transferred out of Purdue as cash distributions of profits and transfers of assets into Sackler family holding companies and trusts. Certain of these distributions and transfers were made with

---

[38] Sackler Addendum A ¶ 117.
[39] Sackler Addendum A ¶ 126.
[40] Plea Agreement at 17.
[41] Sackler Addendum A ¶ 5.
[42] *See, e.g.*, Sackler Addendum A ¶ 161 (David: "We're rich? For how long? Until which suits get through to the family?"); ¶ 162 (Richard: "distribute more free cash"); ¶ 163 (Mortimer: Purdue in a "death spiral" ); ¶ 164 (Jonathan: "we've taken a fantastic amount of money out of the business").

9

the intent to hinder future creditors and/or were otherwise voidable as fraudulent transfers.[43]

21. In 2014, consultants reported that the Sacklers continued to drive Purdue's turbocharge scheme, known by the euphemism "E2E."[44] A consultant recorded in his "raw notes" for Ghatak and others: "Don't take foot off pedal. Must deliver E2E. Critical for credibility with Board. Accelerate …."[45]

22. The national opioid crisis accelerated too. By November 2017, staff prepared to brief the Sacklers on ways to salvage business with health insurance companies by paying a rebate to the insurers for each patient who overdosed or developed opioid use disorder.[46] Their analysis showed that paying a rebate could be an "attractive option" for Purdue if the payment was in the range of $6,000 to $14,000 for each patient who was harmed.[47] The money would not go to the patient, but it would encourage the insurance company to keep paying for Purdue drugs. The same analysis showed that the *majority* of OxyContin prescriptions exceeded the guidelines for opioid doses set by the Centers for Disease Control; the CDC warned doctors to avoid increasing doses to 90 morphine milligram equivalents ("MME"), but 51% of Purdue's OxyContin patients exceeded that guideline, and Purdue's average was 113 MME.[48]

23. Eventually, the people who were closest to the Sacklers realized they had gone down the wrong path. Even though Craig Landau led Purdue's effort to block required training for opioid prescribers, Landau admitted that the opioid crisis was caused by "Too many Rxs being

---

[43] Sackler Addendum A ¶ 6.
[44] *See* Sackler Addendum A ¶ 82 ("the 'Evolve to Excellence' initiative, or 'E2E'").
[45] Ex. P, Mar. 13, 2014 Email from John Goldie, MCK-MAAG-0119088.
[46] Ex. Q, Nov. 28, 2017 Email from Anna Draganova, MCK-MAAG-1001200, and attachment, MCK-MAAG-1001201 at slide 8.
[47] Ex. R, Dec. 20, 2017 Email from Christen Tingley, MCK-MAAG-0201384, and attachment, MCK-MAAG-0201388 (excerpted; includes slides 1-41) at slide 20 ("more attractive options"), slide 40 (rebate amounts).
[48] *Id.* at slide 23 (dose data for Purdue prescriptions); *CDC Guidelines for Prescribing Opioids for Chronic Pain, available at* https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf.

written, Too high a dose, For too long, For conditions that often don't require them, By doctors who lack the requisite training in how to use them appropriately."[49] When Purdue hired McKinsey to disassemble the sales engine that it had previously been paid to "turbocharge," the consultants quoted Landau: "this is the changes [sic] we should have done 5 years ago."[50] In those five years, tens of thousands of Americans overdosed and died.[51]

24.     The next summer, when news broke that a state attorney general had sued the Sacklers and other directors and executives, McKinsey consultant Martin Elling, who had met with the Sackler family to plan to turbocharge the sales engine, wrote to Arnab Ghatak, who also attended that meeting: "It probably makes sense to have a quick conversation with the risk committee to see if we should be doing anything other than eliminating all our documents and emails."[52] Ghatak replied: "Will do."[53] Whatever documents and emails they wanted to eliminate, the evidence that survives tells the story of the Sacklers' role in crimes and fraud.

## CONCLUSION

25.     The time for wondering whether crimes and fraud were committed at Purdue is past.  We know that not-yet-named individuals at Purdue committed fraud and crimes over and over.  We know that their crimes continued for more than a decade, even after Purdue's first criminal conviction, while the Sacklers controlled the company and reaped for themselves billions

---

[49] *Commonwealth of Massachusetts v. Purdue Pharma L.P., et. al.*, No. 1884-CV-01808 (Mass. Sup. Ct. Jan. 31, 2019), Compl. ¶ 832 (citing Sept. 18, 2017 Email from Craig Landau, PPLPC021000904935), *available at* https://www.mass.gov/files/documents/2019/07/11/43_01%20First%20Amended%20Complaint%20filed%2001-31-2019_0.pdf.

[50] Ex. S, Dec. 6, 2017 Email from Amir Golan, MCK-MAAG-0089955 ("Craig understands that Purdue has to go through significant change ('this is the changes we should have done 5 year ago'), given the expected significant decline in sales….").

[51] *See Overdose Death Rates*, Nat'l Institutes of Health, *available at* https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates.

[52] Ex. T, Jul. 4, 2018 Email from Martin Elling, MCK-MAAG-1056712.

[53] *Id.*

of dollars in profits the whole time. And, for each of the fraudulent schemes that has been laid out in detail in Schedule A of the Plea Agreement,[54] Addendum A to Purdue's Settlement Agreement,[55] Addendum A to the Sacklers' Settlement Agreement,[56] the Official Committee's Privilege Motions and Response, and this Statement, there is more than sufficient "probable cause" to demonstrate that the Sacklers participated in the fraud and are improperly withholding communications with attorneys that were in furtherance thereof. *Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107.

26.  The Court should grant the Privilege Motions, and the Sacklers should turn over the withheld evidence.

Dated: November 18, 2020  
      New York, New York

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:  *Andrew M. Troop*  
     Andrew M. Troop  
     Andrew V. Alfano  
     31 West 52nd Street  
     New York, NY 10019  
     (212) 858-1000  
     andrew.troop@pillsburylaw.com  
     andrew.alfano@pillsburylaw.com

     Jason S. Sharp, admitted *pro hac vice*  
     1200 17th Street NW  
     Washington, D.C. 20036  
     (202) 663-8019  
     jason.sharp@pillsburylaw.com

*Counsel to the Ad Hoc Group of Non-Consenting States*

---

[54] *See* Plea Agreement, Schedule A.  
[55] *See* Purdue Addendum A.  
[56] *See* Sackler Addendum A.

**CERTIFICATE OF SERVICE**

   I, Andrew V. Alfano, hereby certify that, on November 18, 2020, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

                    /s/ Andrew V. Alfano
                    Andrew V. Alfano