REDACTED

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Elizabeth Scott (*admitted pro hac vice*)
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY IN SUPPORT OF**
**ITS MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED**
**DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME**
**FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................................................. ii

PRELIMINARY STATEMENT...........................................................................1

DISCOVERY STATUS.....................................................................................5

ARGUMENT....................................................................................................9

I.      THE CRIME FRAUD EXCEPTION JUSTIFIES FURTHER DISCLOSURE......9

        A.      Breach of Fiduciary Duty:  Substantial Reason Exists to Believe the
                Sacklers and Other Purdue Board Members Breached Their Fiduciary
                Duties .............................................................................................10

                1.      The Sacklers' close involvement in the details of Purdue's affairs
                        supports an inference that they breached their fiduciary duties.....12

                2.      The Sacklers were directly involved or implicated in conduct
                        Purdue has admitted was criminal or that allegedly underpins DOJ
                        claims. .......................................................................................18

        C.      Intentional Fraudulent Transfer:  Probable Cause Exists to Believe that the
                Sacklers, in Control of Purdue, Sought to Hinder or Delay Creditors.......24

                1.      The Sacklers' own words and actions reveal their motivations.....25

                2.      Purdue faced massive actual or threatened litigation and vast
                        liability at all relevant times—and the Sacklers knew it...............27

                3.      ████████████████████████████████████████████████34

                4.      ██████████████████████████████. ...................35

                5.      Other Sackler contentions are equally unpersuasive. ...................37

        D.      The Crime-Fraud Documents Should Be Produced or Reviewed *In
                Camera*...................................................................................................41

II.     THE AT ISSUE EXCEPTION JUSTIFIES FURTHER DISCLOSURE.............44

CONCLUSION................................................................................................47

i

## TABLE OF AUTHORITIES

**Federal Cases**

*Amusement Indus., Inc. v. Stern*,
    293 F.R.D. 420 (S.D.N.Y. 2013) ................................................................9, 10, 40, 43

*Arista Records LLC v. Lime Grp. LLC*,
    No. 06 CV 5936(KMW), 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ........44, 45, 46

*In re Brocade Commc'ns Sys., Inc. Derivative Litig.*,
    615 F. Supp. 2d 1018 (N.D. Cal. 2009) ....................................................................12

*Brown v. Barnes and Noble, Inc.*,
    No. 1:16-cv-07333(RA)(KHP), 2019 WL 7168146 (S.D.N.Y. Dec. 12, 2019) ..........45

*Cendant Corp. v. Shelton*,
    246 F.R.D. 401 (D. Conn. 2007).........................................................................24, 41

*In re Cnty. of Erie*,
    546 F.3d 222 (2d Cir. 2008).................................................................................44, 46

*Drummond Company, Inc. v. Conrad & Scherer, LLP*,
    885 F.3d 1324 (11th Cir. 2018) ................................................................................43

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012)......................................................................................40

*Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*,
    No. 1:04-CV-00007-LMB, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004)...................9

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
    731 F.2d 1032 (2d Cir. 1984)......................................................................................9

*Irving Trust Company v. Gomez*,
    100 F.R.D. 273 (S.D.N.Y. 1983) ...............................................................................10

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997)......................................................................................17

*Moore v. Bay*,
    284 U.S. 4 (1931).....................................................................................................38

*In re Oxycotin Antitrust Litig.*,
    No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008).....................................................33

*In re Richard Roe, Inc.*,
    168 F.3d 69 (2d Cir. 1999)........................................................................................42

*Rosebud Sioux Tribe v. A & P Steel, Inc.*,
   733 F.2d 509 (8th Cir. 1984) ...................................................................17

*Scott v. Chipotle Mexican Grill, Inc.*,
   67 F. Supp. 3d 607 (S.D.N.Y. 2014)........................................................45

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
   319 F.R.D. 100 (Bankr. S.D.N.Y. 2017) ...............................................9, 24

*In re Tronox, Inc.*,
   503 B.R. 239 (Bankr. S.D.N.Y. 2013).....................................38, 39, 40, 41

*United States v. Travisano*,
   724 F.2d 341 (2d Cir. 1983)......................................................................10

*United States v. Zolin*,
   491 U.S. 554 (1989)..................................................................................43

*In re W.R. Grace & Co.*,
   281 B.R. 852 (Bankr. D. Del. 2002) .........................................................40

**State Cases**

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
   911 A.2d 362 (Del. 2006) .........................................................................12

*Dohmen v. Goodman*,
   234 A.3d 1161 (Del. 2020) .......................................................................12

*Jones v. Mackey Price Thompson & Ostler*,
   469 P.3d 879 (Utah 2020) .........................................................................40

*Lebanon Cnty. Employees' Ret. Fund v. AmerisourceBergen Corp.*,
   No. 2019-0527-JTL, 2020 WL 132752 (Del. Ch. Jan. 13, 2020)...................11, 12, 23

*N.J. Dep't of Env't Prot. v. Caldeira*,
   794 A.2d 156 (N.J. 2002)..........................................................................39

*In re N.Y.C. Asbestos Litig.*,
   109 A.D.3d 7 (N.Y. App. Div. 2013) ........................................................9

*Pritchard v. Pritchard*,
   No. FA950319316S, 2004 WL 1052680 (Conn. Super. Ct. Apr. 26, 2004) ..............39

*Purdue Pharma L.P. v. Hon. Steven D. Combs*,
   No. 2013-CA-001941-OA (Ky. Ct. App. dated Feb. 4, 2014) ....................................30

*State v. Lombardo Bros. Mason Contractors, Inc.*,
   54 A.3d 1005 (Conn. 2012) .......................................................................39

**Federal Statutes**

11 U.S.C. § 544(b) .................................................................................................38

**State Statutes**

Haw. Rev. Stat. § 657-1.5 .....................................................................................39

N.J.S.A. 2A:14-1.2(a) ...........................................................................................39

**Rules**

Bankruptcy Rule 9031 .......................................................................................1, 43

**Constitutional Provisions**

Fifth Amendment ...........................................................................................5, 17, 23

## PRELIMINARY STATEMENT

1.      If ever there were circumstances justifying application of the crime-fraud and at issue doctrines—two vital, universally recognized exceptions to the attorney-client privilege—they are present here.  The extensive record marshalled by the UCC[2] provides ample "probable cause" to believe the Sacklers engaged in widespread breaches of fiduciary duty and fraudulently transferred billions of dollars out of Purdue to their putative spendthrift trusts and foreign affiliates with the intention of hindering and depriving creditors.  This is precisely the kind of wrongdoing that justifies application of the crime fraud exception.[3]

2.      Purdue has now confessed to being a serial federal offender, admitting to crimes committed over a period totaling at least 15 years, and spanning three decades, all while under the exclusive ownership and control of the Sacklers.  Purdue admits that its most recent period of law breaking began *the same month*—May 2007—that Purdue previously confessed to marketing and selling opioids in violation of federal law, and that Purdue engaged in a sustained program to defraud the United States government.  Based on those crimes, and on related civil wrongdoing, Purdue soon will have paid close to $1 billion in damages, fines, penalties and forfeitures to the federal government, and will have admitted to liability of approximately $8 billion.

3.      Until recently, the Sacklers dominated and controlled Purdue and all of its affairs, with a particularly keen focus on the sale and marketing of OxyContin, the drug responsible for

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. The UCC withdraws its alternative request for appointment of a special master in light of Bankruptcy Rule 9031. Evidence supporting the Motion and cited below was attached to the Declaration of Mitchell Hurley dated September 29, 2020 [ECF 1754] (the "**Hurley Decl.**"), concluding with exhibit number 109.  The UCC has identified substantial additional evidence in support of the Motion since it filed its opening papers.  For ease of reference, such new evidence will be attached to the Declaration of Arik Preis dated November 18, 2020 (the "**Preis Decl.**") beginning with exhibit number 110.

[3] For the avoidance of doubt, and as set forth in the *Stipulation of Settlement and Agreed Order Regarding Official Committee's Motion to Compel and Debtors' Motion for a Protective Order* [ECF No. 1955], the UCC and the Debtors have resolved the portions of the Motion pertaining to documents withheld by the Debtors; and, as such, the UCC seeks no further relief from the Debtors in respect of the Motion.

most of the Sacklers' extravagant wealth. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

4.      But the Sacklers were far more than just dominating directors. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ When it came to increasing

opioid sales through aggressive marketing tactics—the conduct underpinning Purdue's recent plea

and settlement with the DOJ—████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████    ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ That approach,

which the Sacklers specifically and enthusiastically endorsed, is at the heart of the conduct Purdue

now admits was criminal.

5.      Directors breach their fiduciary duties when they knowingly permit the company

to engage in conduct that violates the law.  In these cases, the evidence of the Sacklers' complete

dominion over Purdue's affairs, and meticulous attention to and control over the details of Purdue's

marketing, is overwhelming.  That evidence permits—indeed, all but requires—an inference that

if Purdue was continuously engaged in criminal conduct in the marketing and sale of OxyContin

for at least ten years (on top of the five years of crimes Purdue admitted to in 2007), the Sacklers

had to know about it.  And even if the Sacklers' conduct with respect to Purdue's crimes somehow could be described merely as negligent, they still would be liable for breaches of fiduciary duty, since Purdue did not purport to eliminate the Board's fiduciary duty of care until 2018.

6.      Probable cause also exists to believe that the Sacklers transferred billions of dollars out of Purdue in a deliberate attempt to hinder or delay opioid creditors, another basis for applying the crime-fraud exception.  The Sacklers claim that the massive value transfers Purdue made to their trusts in the wake of the 2007 plea could not have been intended to evade Purdue creditors, because prior to 2017 no one could have predicted that Purdue would face ███████████████ But dozens of contemporaneous emails, memos and other documents demonstrate just the opposite.  Key members of the Sackler family unmistakably were shaken by Purdue's 2007 guilty plea, and deeply concerned that opioid-related litigation and its threat to the family's wealth would persist and grow.

7.      ████████████████████████████████████████
████████████████████████████████████████
████████████████     ████████████████████
████████████████████     The transfers upon which the Sacklers then embarked were unprecedented, both in absolute terms and as a percentage of Purdue's net sales, resulting in at least $12 billion in cash and property moving offshore and to family trusts from 2008 and after.  These facts are sufficient for a "reasonably prudent person" to conclude that the Sacklers may have engaged in fraudulent transfers and to apply the crime fraud exception.

8.      The Sacklers also put "at issue" their good faith, and their alleged belief that litigation was not a serious threat at the time of the transfers, both in their defense presentations and again in opposition to the Motion.  The mere fact that estate claims have not yet been

commenced against the Sacklers should not prevent application of the at issue doctrine, as the Sacklers contend.  To more accurately evaluate and bolster the strength of estate claims, creditors should be given access to the same information that would be available to them if they reject the Settlement Framework and proceed to litigation with the Sacklers, including documents that could contradict (or support) the central arguments the Sacklers intend to make in defense of such claims.

9.    The Sacklers argue the Motion should be denied because the UCC seeks disclosure of documents by category.  But substantial precedent exists for granting exceptions motions based on documents identified by group, and the categories selected by the UCC here are reasonably calculated to include documents likely to be in furtherance of or closely related to the Sacklers breaches of duty and the claims of good faith.  And, the UCC had no choice but to proceed as it did.  Given the sheer size of the Sacklers' logs, and the generic document descriptions they feature, neither the UCC nor anyone other than the Sacklers themselves can say with confidence which of the specific documents they withheld come within the applicable categories.  To the extent the Court elects to review any documents *in camera*, the UCC submits that a reasonable and less burdensome starting point would be with a small sample of documents within each of the categories, and suggests below a sampling of approximately 71 such documents.

10.    The UCC will continue to engage in good faith in the current mediation process with the mediators, the Sacklers, the NCSG, the AHC, the Debtors, and others in an effort to reach resolution of the claims against the Sacklers.  Indeed, the UCC is hopeful that discovery it already has marshalled, and that is underway, will be enough to elicit reasonable settlement terms from the Sacklers, perhaps even before the scheduled hearing date (December 15, 2020).  Barring a settlement, however, disclosure of the material subject to the Motion will remain critical.  Notably, (i) key witnesses, including Purdue's CEOs from 2007 to 2017 (John Stewart and Mark Timney)

REDACTED

have refused to answer the UCC's questions on Fifth Amendment grounds, (ii) several years or more have elapsed since many of the transfers and other events at issue occurred, (iii) witness memories appear to have faded, and (iv) a number of important witnesses are not available at all.[4] Contemporaneous documents therefore have been and will remain critical to developing the facts that support the estates' claims, and absent settlement by December 15, the Motion should be granted.

## DISCOVERY STATUS

11.    Parties to these cases, including in opposition to the Motions, have criticized the manner in which the UCC has conducted discovery in these cases.  The UCC believes these attacks are unfair, and provides a brief update on the status of discovery and reminder of how we arrived here.

12.    First, the UCC has not engaged in "relentless" or "ever expanding" discovery demands in these cases, as has been suggested.  On the contrary, the UCC last served a new document request on the Sacklers on March 31, 2020, and on the Debtors on May 1, 2020.  Nearly all of the documents produced in response to those requests were the subject of so-ordered stipulations entered into by the parties last summer, were identified using agreed ESI search criteria that the parties' negotiated over periods of many weeks, and expressly were based on "hit reports" disclosing the number of documents that would be subject to review before the parties executed the stipulations.[5]  The stipulations also required rolling privilege logs, and the current Motions

---

[4] Raymond, Mortimer Sr., Jonathan, and Beverly Sackler are no longer living.  Peter Boer, author of the July 2007 memo recommending the Sacklers take "defensive measures," provided about 45 minutes of deposition testimony on November 16, 2020 but did not return from the morning break.  Mr. Boer will not be made available to complete his examination, apparently based on a medical condition.

[5] *Stipulation and Agreed Order Among the Official Committee, the Non-Consenting States Group and the Debtors Regarding Discovery in the Chapter 11 Cases* [ECF No. 1623]; *Stipulation and Agreed Order Among the Official Committee and the Raymond Side Covered Parties Regarding Discovery Deadlines in the Chapter 11 Cases* [ECF No. 1348]; *Stipulation and Agreed Order Among the Official Committee and the Mortimer Side Covered Parties Regarding Discovery Deadlines in the Chapter 11 Cases* [ECF No. 1347].

were the subject of a later stipulation with the Debtors dated August 25, 2020, that was amended and joined in part by the Sacklers on September 28, 2020.  In other words, discovery has proceeded as the disclosing parties agreed.

13.     The UCC also was provided with documents produced by the Debtors and others pre-petition in the MDL.  While vast, these productions already had been gathered in response to requests made by other parties, and producing them to the UCC did not impose a material additional burden on the Debtors or other disclosing parties.  For its part, the UCC never intended to review every one of these documents, and did not to do so.  Rather, the UCC employed search terms, machine-learning, and predictive coding to identify much smaller, targeted groups of documents for review, a process that has unearthed much information of critical relevance to these cases, but without the cost of a document-by-document review.

14.     Criticism leveled at the UCC for using Cole Schotz lawyers, including partners, in connection with document review also is misguided.  The average billing rate for a Cole Schotz partner, or "member," is less than that of a first-year associate at a large, New York-based firm. *Compare* [ECF No. 1924] at Ex. A (disclosing average Cole Schotz partner member rate of $619), *with* [ECF No. 1864] at Ex. B (identifying Davis Polk & Wardwell first year associate rate of $690.00).   In document review, these experienced Cole Schotz lawyers play a crucial role, receiving documents from contract attorneys after "first level" review, and helping identify those of greater potential significance and then distributing them to team members for use in depositions, pleadings and otherwise.  This is precisely the kind of task that Cole Schotz was retained to carry out, at rates lower than any appropriate alternative.[6]  Nor has Akin Gump overstaffed these cases

---

[6] *See also* Preis Decl., Ex. 217 (Nov. 19, 2019 Hr'g Tr. at 23:12-16 (J. Drain: "I actually welcome the notion that the committee decided to hire [Cole Schotz] not as a conflicts counsel, but as an efficiency counsel, which is, I think, a nice way of saying a less expensive counsel for matters that are appropriate.")).

at a senior level or otherwise. Most partner and senior counsel hours through August have been

billed by just six Akin Gump lawyers, while other subject-matter experts have been utilized

periodically as necessary and appropriate, and have billed comparatively few hours.[7]

15.    The document discovery phase of the UCC's investigation is nearing completion.

The UCC understands that the Sacklers and the Debtors have finished producing documents

pursuant to last summer's stipulations, except for documents subject to the Motions. The Debtors,

the Sacklers, and related current and former clients ("**NRF Clients**") of Norton Rose Fulbright

("**NRF**" or "**Norton Rose**") have committed to completing by the end of November their

production of ESI responsive to the UCC's requests previously served on the NRF Clients that are

in NRF's immediate possession. Preis Decl., Ex. 196 (November 9, 2020 Simpson Thacher email).

The so-called IACs also are engaged in producing documents pursuant to separate stipulations,

which the UCC hopes will be completed without further Court intervention.

16.    The UCC has taken far fewer depositions than the opposition suggests, and soon

will be finished. On July 23, 2020, the Court instructed the UCC to start depositions before the

conclusion of document discovery.[8]    The UCC promptly sent letters to the Debtors and to the

Sacklers asking that they provide notice to identified witnesses that the UCC was considering

deposing. The UCC made clear repeatedly that it had no intention of deposing all of the witnesses

---

[7] For instance, in July, a white-collar partner billed 16.2 hours, an appellate partner billed 9.4 hours, and an insurance partner billed 15.7 hours. In addition, although Akin Gump believes the fees it has incurred are appropriate and compensable, it routinely writes off substantial sums in recognition of the great expense of these cases generally and with the expectation that any estate savings will benefit victims of the opioid crisis. *See, e.g*., Eleventh *Monthly Fee Statement of Akin Gump Strauss Hauer & Feld LLP for the Period of August 1, 2020 through August 31, 2020* [ECF No. 1870] at 2 n.2 (reflecting a voluntary fee reduction of more than $2 million); *see also Twelfth Monthly Fee Statement* [ECF No. 1923] at 2 n.2 ($911,767.00 reduction); *Tenth Monthly Fee Statement* [ECF No. 1696] at 2 n.2 ($612,473.50 reduction); *Ninth Monthly Fee Statement* [ECF No. 1559] at 2 n.2 ($310,958.00 reduction); *Eighth Monthly Fee Statement* [ECF No. 1382] at 3 n.3 ($375,945 reduction); *Seventh Monthly Fee Statement* [ECF No. 1276] at 2 n.2 ($242,846.00 reduction).

[8] Document productions remain underway, and the UCC reserves its right to bring to the Court's attention in connection with the Motions information not cited here or in its opening brief to the extent identified by the UCC's ongoing review in advance of the hearing.

identified in its letters, and merely sought to ensure their availability on the schedule preferred by the Court. In an August 25, 2020 letter, the UCC advised the Court that it and the NCSG together planned to take approximately 25 depositions, not 40 as suggested by some.[9] To date, the UCC has scheduled a total of 21 witnesses, and sought diligently to complete all of those examinations by the end of November. Due to witness schedules and/or preferences, the UCC has scheduled 5 depositions in early December.[10]

17.      Certain parties have suggested that it was unnecessary or imprudent for the UCC to take discovery in these cases because Purdue provided substantial disclosures pre-petition in the opioid MDL. But none of the pre-petition discovery was directed at claims for fraudulent transfer, breach of fiduciary duty or any of the other claims that belong to the estates. Moreover, critical custodians escaped discovery entirely in the MDL, including most members of the Sackler family and all non-Sackler members of Purdue's Board of Directors. And as its submissions on these Motions demonstrate, the UCC's discovery has greatly strengthened and increased the value of the estates' claims against the Sacklers.

18.      The Motions themselves also have been productive. In exchange for the UCC's agreement to withdraw its challenges, the Debtors will provide (and have already provided) thousands of privileged documents to the UCC on a common interest basis concerning distributions, communications with the Sacklers, and probative documents identified by the Debtors' own investigation. The UCC is aware of no other debtor agreeing to supply privileged documents to its creditors, certainly not on this scale. In addition, after the UCC challenged the disclosing parties' Privilege Logs, they agreed to produce previously withheld information from

---

[9] *Mitchell Hurley Letter to the Court*, dated August 25, 2020 [ECF No. 1613].
[10] Preis Decl., Ex. 197 (November 8, 2020 K. Porter email); *see also id*. Ex. 198 (November 15, 2020 K. Porter email attaching current deposition schedule).

more than 12,000 documents, including 5,535 by Side A (15% of the total originally logged) and 3,158 by Side B (14% of the total originally logged).

## ARGUMENT

19.     More than sufficient "probable cause" exists to believe that the Sacklers breached their fiduciary duties and made intentional fraudulent transfers, and to justify application of the crime-fraud exception.  The Sacklers also have put "at issue" their claims of good faith, and that they had no idea before 2017 that Purdue might face meaningful opioid-related litigation.

## I.     THE CRIME FRAUD EXCEPTION JUSTIFIES FURTHER DISCLOSURE

20.     Communications and "advice in furtherance of a fraudulent or unlawful goal" are not privileged.  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).  The claims to which the exception applies include intentional fraudulent transfer and breach of fiduciary duty, among others.  *See id*. at 1041 (applying crime-fraud exception to communications in furtherance of transfers to hinder or delay creditor); *In re N.Y.C. Asbestos Litig.*, 109 A.D.3d 7, 10 (N.Y. App. Div. 2013) ("The crime-fraud exception encompasses a fraudulent scheme, an alleged breach of fiduciary duty, or an accusation of some other wrongful conduct."); *Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-00007-LMB, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004) (noting crime/fraud exception has been applied to "fraudulent transfers in the bankruptcy context and breaches of fiduciary duty") (citation omitted).

21.     Courts in this Circuit do not, as the Sacklers contend, require moving parties to "establish fraud in the traditional sense of deceit or trickery."  *See* Side B Amended Exceptions Objections [ECF No. 1815] (hereinafter "**BXO**") at 34 (citing a Northern District of Illinois decision).  Rather, evidence of "intentional actions to hinder, delay or defraud" is sufficient.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 319 F.R.D. 100, 109 (Bankr. S.D.N.Y.

2017); *see Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 425 (S.D.N.Y. 2013) (exception reaches "conduct beyond the technical definitions of crimes or frauds to include other wrongful conduct"). The Sacklers argue *Irving Trust Company v. Gomez*, 100 F.R.D. 273 (S.D.N.Y. 1983), requires a showing of "actual fraud" to invoke the exception, but that case says just the opposite: "unlawful conduct" suffices "regardless of whether such conduct constitutes a fraud or any other intentional tort." *Id.* at 277; *compare* BXO at 37-38. In any event, Purdue admittedly defrauded the U.S. government while under the Sacklers' control.

22.     Nor is the UCC required to "demonstrate" that the estates will prevail on their claims. *E.g.*, BXO at 32; *see also* Side A Exceptions Objections [ECF No. 1804] ¶ 57 (hereinafter "**AXO**"). "Obviously, there need not be a 'definitive[]' showing" of wrongful conduct to invoke the crime-fraud exception; "rather, 'there need only be presented a reasonable basis for believing' that conduct triggering the exception has occurred. *Amusement Indus., Inc.*, 293 F.R.D. at 426 ("The probable cause standard cannot imply 'more probable than not.'") (quoting *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983)). The relevant threshold sometimes is called a "probable cause" or "substantial reason" standard, but however labeled, "is 'not an overly demanding standard.'" *Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107 (quoting *Amusement Indus.*, 293 F.R.D. at 427). That standard is readily met here, particularly in light of Purdue's recent admission that it committed federal crimes for at least a ten-year period under the stewardship of the Sacklers.

    **A.     Breach of Fiduciary Duty:  Substantial Reason Exists to Believe the Sacklers and Other Purdue Board Members Breached Their Fiduciary Duties**

23.     Directors who knowingly fail to prevent violations of positive law breach their fiduciary duty of loyalty. *Lebanon Cnty. Employees' Ret. Fund v. AmerisourceBergen Corp.*, No. 2019-0527-JTL, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020).[11] On May 10, 2007, Purdue

---

[11] *See* October 20, 2020 plea agreement (the "**Plea Agreement**," or "**2020 Plea Agreement**") Preis Decl., Ex. 182.

REDACTED

admitted to federal crimes in connection with its sale and marketing of opioids between 1996 and 2001, and agreed to pay a $600 million fine. Purdue now admits that it embarked on further criminal conduct that very same month—May of 2007—this time lasting through at least 2017. Purdue also has conceded liability for fines, penalties and damages amounting to about $8 billion.

24.     According to the Sacklers, the "record proves the reasonableness, good faith and conscientiousness" of the Sackler Board members. BXO at 27. But it does nothing of the sort. In their October 15 opposition, the Sacklers tout "federal oversight of PPLP's marketing and its compliance with federal health care law" as a basis for believing that Purdue's conduct under their watch was above board. *Id.* at 27. The Sacklers claim that during the period of the CIA, "each year" the Office of Inspector General of HHS confirmed that PPLP was "in compliance with federal law." *Id.* ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[12] And just days after the Sacklers filed their oppositions, Purdue admitted it "knowingly and intentionally conspired and agreed with others to defraud" the federal government. *Compare* BXO at 27 *with* Preis Decl., Ex. 182 (2020 Plea Agreement) at 16.

25.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ *See* Preis Decl., Ex. 132 at PPLPC036000177151 [C] (████████████████

████████████████████████████████████████). But discovery has revealed the Sacklers' fingerprints on all important Purdue decisions, especially decisions

---

[12] Preis Decl., Ex. 210 [C] (██████████████████████); *id.* Ex. 211 [C] (█████████████████████); *id.* Ex. 212 [C] (██████████████████); *id.* Ex. 213 [C] (████████████████████); *id.* Ex. 214 [C] (████████████████████).

concerning sales, marketing and other practices impacting OxyContin revenues, and including much of the conduct forming the predicate for Purdue's recent guilty plea.

26.     That evidence more than justifies a "reasonable belief" that the Sacklers actually knew about Purdue's criminal conduct, or at least failed adequately to monitor that conduct, and thus violated their fiduciary duties of good faith and loyalty. *See AmerisourceBergen Corp.*, 2020 WL 132752, at *22 (observing that board members and officers "breach[] their fiduciary duty of loyalty by," among other things, "consciously permitting the company to violate positive law," or "consciously failing to monitor … regulatory risk").  Certainly, the evidence provides probable cause to conclude that the Board may have violated its duty of care, a negligence standard that Purdue's partnership agreement did not purport to eliminate until 2018.[13]  *See In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1046 (N.D. Cal. 2009) ("To plead a violation of the duty of care [under Delaware law], a plaintiff need not allege that a defendant knowingly breached or even consciously disregarded his fiduciary duty to the company; gross negligence is sufficient.") (citation omitted).

### 1.     The Sacklers' close involvement in the details of Purdue's affairs supports an inference that they breached their fiduciary duties.

27.     The Sacklers argue that as mere Board members, they reasonably relied on management reports that Purdue was in compliance with applicable laws and regulations, and have no responsibility for the fact that Purdue actually was carrying out multiple felonies over a period of many years. *E.g.*, BXO at 26-28.  But directors only can take refuge in statutory safe harbors if they act in good faith, and then only for breaches of the duty of care, not claims, like some included

---

[13] Absent such contractual exculpation, "a general partner's duties to limited partners and the partnership parallel those exercised by directors of Delaware corporations," who "owe duties of care and loyalty" to the enterprise. *Dohmen v. Goodman*, 234 A.3d 1161, 1167-68 (Del. 2020).  Most of the identified breaches of duty occurred before the 2018 amendment to the PPLP partnership agreement, and that amendment may be avoidable in any case. *See* Exceptions Motion n.21.

here, that are based on disloyalty and bad faith. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006) (observing that a statutory safe harbor "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty"). The Sacklers' knowledge of Purdue's criminal misconduct can be inferred from their hands-on management of Purdue—especially its efforts to drive sales of OxyContin—and vitiates any claim that they acted negligently, but in good faith.

28.    Indeed, and by design, Purdue's Board—and thus the Sacklers—expressly retained control over all major decisions, and "guided" management. ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ Preis Decl., Ex. 136 at PPLPUCC500647349 [PEO/HC].

29.    ███████████████████████████████████████████████████

████████████████████████████████████████ *See generally* Preis Decl., Ex. 134 [PEO/HC]. ████████████████████████████████████████

████████████████████████████████████████████████████████

*Id.* at PPLPUCC002603603. ██████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

REDACTED

█████████████████ *Id.* at PPLPUCC002603602.

30.    █████████████████████████████████████████████████

████████████████████████████████████████████████ *E.g.,* Preis Decl.,

Ex. 137 [C]. █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Preis Decl., Ex. 133 at

PPLPUCC002449097 [PEO/HC]. ████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████ Preis Decl., Ex. 135 at PPLPUCC9003800125 [HC].

31.    █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████    ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████ Preis Decl., Ex. 142 at PPLPUCC9004448656 [HC]. ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████ Preis Decl., Ex. 218 (Pickett Dep. 144:19-145:20; 150:25-151:17). ████████

██████████████████████████████████████████████████████████████

█████████████████████████████ Preis Decl., Ex. 137 at PWG004670879-80

[C]. ████████████████████████████████████████████

████████████████████████████████ Preis Decl., Ex. 223 (Kathe Sackler Dep.

272:3-10).

32.    ██████████████████████████████████████

████████████████████████████████████████████████

████████████    ██████████████████████████████████

████████████████████████████████████████████████

██████    *See* Preis Decl., Ex. 218 (Pickett Dep. 88:16-91:2); Preis Decl., Ex. 143 (CP0000015

[C]). ████████████████████████████████████████

██████████████████    Pries Decl., Ex. 218 (Pickett Dep. 91:8-92:3). ████████

████████████████████████████████████████████████

██████████████    *Id.* at 92:7-10. ████████████████

████████████████████████████████████████████████

████████████████████████████████████    *Id.* at 140:18-22. ████████

████████████████████████████████████████████████

███████████████████████████████████████████████,[14]

█████████████████████████████████[15] ████████████████

████████████████████████████████,[16]

33.    ██████████████████████████████████████

████████████████████████████████████████    Preis Decl., Ex.

135 at PPLPUCC9003800125 n.1 [HC]. ████████████████

---

[14] *See* Preis Decl., Ex. 174 at MSF00144656-58 [OPEO].
[15] *See id.* at MSF00144650 [OPEO].
[16] *See* Preis Decl., Ex. 125 (████████████████████ PPLPUCC9002657294 [HC] ████
████████████████████████████).

REDACTED

[REDACTED] .17 [REDACTED]

[REDACTED]

[REDACTED] *See* Preis Decl., Ex. 132 at PPLPC036000177151 [C]. █

[REDACTED]

[REDACTED]

[REDACTED] Preis Decl., Ex. 186 at PPLPUCC0004987 [HC].

34.    The ardor of Richard and Mortimer Jr. for growing OxyContin sales never wavered, nor did their interventions with Purdue's nominal executive team to drive increased sales:

- [REDACTED] Preis Decl., Ex. 138 at PPLPC061000013859-64 [C].

- [REDACTED] .18

- [REDACTED] Preis Decl., Ex. 139 at PPLPC012000174476-77 [C].

- [REDACTED]

---

17*See* Preis Decl., Ex. 175 at SideA00229177-78 [PEO/C] [REDACTED] ).

18 Preis Decl., Ex. 138 at PPLPC061000013858-59 [C].

 Preis Decl., Ex. 176 at PPLPC023000164605 [C].

35. The Court also would be within its discretion to draw adverse inferences against the Sacklers based on the refusal of Purdue's CEOs to answer questions at their depositions. *See, e.g.*, *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (adverse inference may be drawn against party based on non-party invocation of Fifth Amendment privilege); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 523 (8th Cir. 1984) (reversing district court failure to permit plaintiff to call non-party witness to stand to invoke Fifth Amendment where non-party allegedly conspired with defendant). Among other things, the Court can infer that had the CEOs testified, they would have confirmed what the documents already strongly evidence: the Sacklers controlled

---

[19] Preis Decl., Ex. 176 at PPLPC023000164608-09 [C].
[20]*See, e.g.*, Preis Decl., Ex. 177 at PPLPUCC9000363533 [HC].

management and micromanaged Purdue.  *See, e.g.*, Preis Decl., Ex. 224 (Stewart Dep. 151:4-12); *id.* Ex. 225 (Timney Dep. 42:3-5, 52:18-53:11, 107:2-108:5).

### 2.    *The Sacklers were directly involved or implicated in conduct Purdue has admitted was criminal or that allegedly underpins DOJ claims.*

36.    The evidence also connects the Sacklers to specific predicates underlying the Purdue Plea Agreement and the Purdue and Sackler settlements with the DOJ.  Under the Purdue Plea Agreement, Purdue admits to a three count felony information charging Purdue with (i) a dual object conspiracy to defraud the United Sates and to violate the FDCA, including by continuing to market opioids to health care providers ("**HCPs**") despite having information the HCPs were prescribing opioids without a legitimate medical purpose, (ii) conspiracy to violate the Federal Anti-Kickback Statute through improper payments to HCPs, and (iii) conspiracy to violate the Federal Anti-Kickback Statute related to Purdue's payments to Practice Fusion, a cloud based electronic health records organization ("**ERO**").[21]  Purdue stipulated to certain agreed facts in Schedule A to the plea agreement spanning a period from May 2007 through 2017 (the "**Plea SOF**").[22]  The Purdue Plea Agreement attaches as Exhibit C a civil settlement between Purdue and the DOJ which in turn includes an Addendum A ("**AA**") detailing misconduct alleged by the DOJ, but not agreed to by Purdue.[23]

37.    The criminal plea is predicated in part on Purdue's failure to inform the DEA that so-called "Region Zero" doctors were responsible for over one million OxyContin prescriptions. Under Purdue's Abuse Diversion and Detection ("**ADD**") program, sales representatives were required to file reports concerning HCPs engaged in practices suggesting potential abuse or

---

[21] *Notice of Hearing on Motion of Debtors Pursuant to 11 U.S.C § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and The United States*, [ECF No. 1828] (hereinafter "**2020 Purdue-DOJ Settlement Agreement**") Ex. B at 2-3.

[22] *Id.*, Ex. B at Schedule A.

[23] *Id.* at Ex. C.  Addendum A begins on page 24.

diversion of opioids, such as "engaging in an atypical pattern of prescribing techniques."  2020 Purdue-DOJ Settlement Agreement, 2020 DOJ Settlement Agreement Ex. B at Schedule A at 16 (Plea SOF ¶ c).  "Senior-level Purdue employees" would review the reports and determine whether to put the HCP on a do-not-call list that Purdue referred to as "Region Zero." *Id.* (Plea SOF ¶ d). While Purdue usually stopped "detailing"—calling on—Region Zero HCPs, Purdue and the Sacklers knew that Region Zero HCPs continued to drive revenue by disproportionally writing OxyContin prescriptions.  *Id.* Ex. C at 53-54 (AA ¶¶ 27-32).

38.



*E.g.* Preis Decl., Ex. 150 at Slide 8 [C].

*See id.* at 61 (AA ¶ 69).  But Purdue did not disclose that information to the DEA, a choice that was or should have been known to the Sacklers, and that Purdue now admits was criminal.  *See* 2020 Purdue-DOJ Settlement Agreement, Ex. B at Schedule A (Plea SOF ¶ e).

39.    Purdue also tracked average monthly prescriptions by HCPs, which it ranked by "deciles," with the HCPs who wrote the most OxyContin prescriptions in decile ten, and the HCPs who wrote the fewest such prescriptions in decile one.  In 2010, Purdue introduced a new "tamper resistant" version of OxyContin that was more difficult to abuse by snorting or injection, though Purdue knew it remained subject to abuse by oral ingestion.  *See* 2020 Purdue-DOJ Settlement Agreement, Ex. C (AA ¶ 66).  Purdue swiftly saw a substantial and sustained drop in OxyContin

REDACTED

sales.[24] █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ Preis Decl., Ex. 144 at RSF_OLK00035020 [HC].

40.    ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ Preis Decl., Ex. 145 at PPLPC012000372585 [C]. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ Preis Decl., Ex. 226 (Mortimer Sackler Dep. 310:16-25).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ *Id.*

41.    ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ Preis Decl., Ex. 152 at MDSF00986949 [PEO]. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[24] ████████████████████████████████████████████████████████████
██████████████████████████████████████ *See* Preis Decl. Ex. 178 at
POK003735985 [C].

REDACTED

███████████████████████████████████ *Id.* at MDSF00986953.

42. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ *See* Preis Decl., Ex. 150 at Slide 8 [C]. █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████ Preis Decl., Ex. 154 at PAK000062565 [C].

██████████ Preis Decl., Ex. 226 (Mortimer Sackler Dep. 335:5-336:22, 338:3-16). ██

████████████████████████████████████████████

████████████████████████████████████████████ Preis
Decl., Ex. 154 at PAK000062570 [C].

43. ████████████████████████████████████

████████████████████████████████████████████

█████████ Preis Decl., Ex. 146 at PPLPC012000441614 [C]. █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

21

████████████████████    Preis Decl., Ex. 155 at PPLP004409892-93 [C].    ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

44.    ██████████████████████████████████████████████████████

██████████████████    Preis Decl., Ex. 147 [HC].    ██████████████████████████

████████████████████████████████████████████████████████    Preis

Decl., Ex. 148 [C].  According to emails available to the DOJ but not the UCC, at the August 23

meeting with McKinsey, "the room was filled with only family including … the elder statesman

Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs … they were

extremely supporting of the findings and our recommendations … and wanted to strongly endorse

getting going on our recommendations."  2020 Purdue-DOJ Settlement Agreement, Ex. C (AA ¶¶

103-104).  Purdue proceeded to adopt the McKinsey plan, which it called "Evolve to Excellence"

(or "**E2E**").  *Id.* (AA ¶ 90).

45.    This Sackler-endorsed program, which "focused on intensifying marketing to the

very highest-volume prescribers in the country," underpins the DOJ's claim that Purdue

"knowingly caused [the submission of] false and or fraudulent claims," and may also have

contributed to a predicate for Purdue's guilty plea, including by aiding and abetting the dispensing

of medically unnecessary prescription drugs, and by continuing to detail HCPs "in situations in

which Purdue possessed sufficient information that a decision should have been made to cease

detailing."  *Id.* (AA ¶ 108); *id.*, Ex. B at Schedule A (Plea SOF ¶ f) (failure to maintain effective

controls and thus defraud the DEA included detailing HCPs).  ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ Preis Decl., Ex. 149 at PPLPC012000471642 [C].

46.    The Sacklers' direct involvement in conduct identified in, or related to, the Plea

Agreement and Civil Settlement with the DOJ, can also be inferred from the refusal of Purdue's

CEOs during the key period to answer the UCC's questions on Fifth Amendment grounds.  The

following is a sample of related questions the CEOs refused to answer:

- From at least 2010 to the end of your time as CEO of Purdue, did Purdue engage in strategies that resulted in prescriptions that were not medically indicated, were unsafe, ineffective and/or medically unnecessary[?] … Those prescriptions were then sometimes diverted for uses that lacked a legitimate medical purpose, correct?  Preis Decl., Ex. 224 (Stewart Dep. 144:3-145:7).

- A strategy that Purdue employed that furthered the opioid crisis included targeting prescribers most likely to prescribe opioids, correct[?] … The expected increase in sales from such targeting was over $100 million annually, correct? … And the Board of Directors of Purdue approved that targeting prescriber program, correct?  *Id.* Ex. 224 (Stewart Dep. 145:8-146:11).

- Yet another strategy that Purdue employed that furthered the opioid crisis included speaker programs where Purdue paid certain prescribers to speak to other prescribers about why they should prescribe OxyContin and other Purdue opioids, correct? … Purdue knew that speaker programs had a high risk of creating high risk of creating off-label abuse of opioids, correct? … The riskiness of such programs were reported to the board, including the Sackler members of the board correct?  *Id.* Ex. 224 (Stewart Dep. 146:23-149:7).

- You and the Board Members of Purdue knew that more prescriptions of ADF OxyContin translated into more abuse, correct? … [D]espite that knowledge, the company and the Board pushed to increase prescriptions, to increase profits, to increase distributions to the Sacklers, correct?  *Id.* Ex. 225 (Timney Dep. 69:15-70:5).

- The Sacklers exercised substantial oversight and control over management's operations of Purdue, correct? … While you were CEO, the Sacklers received regular detailed reports from you and other members of management about sales trends, correct? … The Sacklers had direct communications with you and other Purdue executives, including sales and marketing executives concerning forecasts and marketing strategies and tactics, correct? … The Sacklers directed management to use sales tactics that would cause more higher dose opioid prescriptions to be written, correct?  *Id.* Ex. 225 (Timney Dep. 107:2-108:5).

In short, there is more than sufficient reason to believe that the Sacklers breached their fiduciary

duties to Purdue by "consciously permitting the company to violate positive law," failing

adequately to monitor Purdue or, with gross negligence, causing or allowing Purdue to engage in

criminal conduct.  *See AmerisourceBergen Corp.*, 2020 WL 132752, at *22.

      C.      **Intentional Fraudulent Transfer:  Probable Cause Exists to Believe that the Sacklers, in Control of Purdue, Sought to Hinder or Delay Creditors**

      47.      Probable cause for application of the crime fraud exception may be found where a transferor is subject to, or has reason to fear, litigation or other unliquidated liabilities, and makes transfers to allegedly creditor-remote vehicles like trusts.  *See, e.g.*, *Cendant Corp.*, 246 F.R.D. at 405-06 (holding that the "most logical inference" from defendant's decision to transfer assets to trust while subject to litigation was that transferor sought to "hinder, delay or defraud" litigation creditors); *Sec. Inv'r Prot. Corp.*, 319 F.R.D. at 108 (noting that "temporal proximity" between transferor's decision to buy house solely in spouse's name and her knowledge that Ponzi scheme was about to unravel were relevant to probable cause for crime fraud exception). ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  *See* Hurley Decl.

[ECF No. 1754], Ex. 58 at 488;[25] BXO at 15; AXO ¶¶ 54-55 (purporting to distinguish *Cendant*).

In fact, ██████████████ not only could have been predicted dating back to 2007, the evidence shows that the Sacklers perceived and feared that threat when they made the challenged transfers.

---

[25] The UCC's citation to aspects of the Sacklers' defense presentations in these cases is entirely appropriate.  Side B actually tried to file its presentation publicly, and raises no objection to its use here.  Side A does object, but without any basis.  Side A's presentation expressly was prepared pursuant to the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518], and presented to the UCC in part to induce it to forbear from taking its own discovery for the first several months of the cases.  After discovery began, Side A argued it should be limited because its presentation "preview[ed] for the UCC" defenses "that would have been developed through expert discovery in the civil litigation that is now stayed by this Court's injunction" and is "highly relevant to the UCC's weighing of the strengths and weaknesses of the litigation claims."  *Compare* AXO ¶ 58 *with Letter from J. Ball to Court*, dated April 29, 2020 [ECF No. 1113] at 3-4 n.6.  The Sacklers never intended to maintain as confidential the positions in their presentations; on the contrary, the Sacklers advised expressly that they would be the centerpieces of their defense if the claims do not settle.

### 1.    The Sacklers' own words and actions reveal their motivations.

48.    None of the Sacklers' attempts to explain away their contemporaneous expressions

of concern about opioid related liability are remotely convincing. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ BXO at 19 (underscore in original, alteration added). ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ Hurley Decl. [ECF No. 1754], Ex. 62. ████████████████████

██████████████████████████████████████ Id. at PPLPC057000003699. ██

████████████████████████████████████████████████████████████████

██████████████████████████ BXO at 20 (underscore added by the Sacklers). ██████

██████████████████████████████████ Hurley Decl. [ECF No. 175█ Ex. 62 (emphasis

added).

49.    It is clear that the Sacklers remained deeply concerned about future liabilities

despite the DOJ agreement. *Compare* BXO at 4 (claiming 2007 settlements "resolv[ed] those

risks"). ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Preis Decl., Ex. 187 at PPLPUCC004057767 [PEO]. ██████████████████

████████████████████████████████████████████████████████████████

███████████████████ Preis Decl., Ex. 209 at PPLPUCC9004824942 [HC]. ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



████████████████████████████ *Id.*

50.   ██████████████████████████████████████

██████████████████████████████████████

██████████████████ Hurley Decl. [ECF No. 1754], Ex. 64 [HC].  To be sure, as the Sacklers

note, David was not then on Purdue's Board, and was 27 years old. ███████████████

████████████████████████████, Preis Decl., Ex. 226 (Mortimer D.A. Sackler

Dep. 245:22-246:25), ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ *See* Hurley Decl. [ECF No. 1754], Ex. 65 [PEO]. █████████████

████████████████████████████████████████

██████████████████████████ Preis Decl., Ex. 221 (David Sackler Dep. 121:9-18);

*see also* Hurley Decl., Ex. 57 [C]. ████████████████████████████

████████████████████████████████████████

████████

Hurley Decl. [ECF No. 1754], Ex. 64 at PPLPUCC002683256 [HC].

51.   ██████████████████████████████████████

████████████████████████████████████████

██████████████ Preis  Decl.  Ex.  151  at  PPLPUCC001531750  [HC/PEO]. █████████

████████████████████████████████████████

████████████████████████████████████████



███████. Preis Decl., Ex. 219 (Baker Dep. 359:10-21).

*Id.* at 359:22-360:6.

52.   ████████████████████████████████████████

████████████████████ Hurley Decl. [ECF No. 1754], Ex. 69.[26]

████████████████████████████████ Preis Decl, Ex. 228 (Boer Dep. 38:10-

40:8 [HC]).

███████████████████████████ Preis Decl., Ex. 164 (

███████████████████████████) [FRE 408/PEO]

at 72.

> **2.    Purdue faced massive actual or threatened litigation and vast liability at all relevant times—and the Sacklers knew it.**

---

[26] The Sacklers argue that by June 10, 2007 settlements with the DOJ and certain states had been entered **"resolving those risks**." Side B Amd. Exceptions Obj. at 4 (bolding and italics in original). ████████████████████████████████████████ ████ Preis Decl., Ex. 199 ¶¶ 2-3 (Washington State settlement and release); Hurley Decl. [ECF No.1754], Ex. 61 at PPLPC01200372436-37.  And the evidence leaves no room for doubt that the Sacklers believed they and Purdue remained at risk to opioid creditors.

53.    According to the Sacklers, (i) "from 2008-2016" Purdue only "faced occasional litigation risk" akin to that of "any company," (ii) Purdue had buttoned up all litigation by the spring of 2007, and (iii) an "immense wave" of litigation was "simply unfathomable."  AXO ¶ 6. The evidence tells a different story. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████    Hurley Decl. [ECF No. 1754], Ex. 61 at slide 3.  Nor did Purdue face only "occasional litigation risk" akin to that of "any company." ████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████[29]  The Sacklers argue that products liability actions were not an existential threat, and note that many began to settle in 2011 and 2012.  By that time, however, the Sacklers already had transferred close to $7 billion in cash to themselves or for their benefit.  *See Cash Transfers of Value Analysis*, dated December 16, 2019 [ECF No. 654] at slide 11. [30]

54.    Moreover, the Sacklers had no assurance in the 2008-2012 time period that litigation would be limited to products liability cases.  Kentucky already had initiated a *parens patriae* action, and additional state lawsuits were far from "unfathomable."  *Compare* AXO ¶ 6.

████████████████████████████████████████████

---

[27] Preis Decl., Ex 185 at PPLPUCC500056874 [PEO].
[28] *Id*., Ex. 191 at PPLPUCC500056916 [PEO].
[29] *Id*., Ex. 203 at PPLPUCC500056955 [PEO]; *id.*, Ex. 205 at PPLPUCC500056996 [PEO/HC].
[30]
████████████████████████████████████████  *Declaration of Mara Leventhal dated October 14, 2020* [ECF No. 1812], Ex. 19 at PPLPUCC9002964495 [HC].
████████████████████████████████████

**REDACTED**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Preis  Decl.,  Ex.  188b  at

PPLPC051000035809, PPLPC051000035818-19.[31]

55.     At the time, Mr. Baker was a partner at Chadbourne & Parke, long-time counsel to

the Brown & Williamson tobacco company, one of four "original participating manufacturers"

that settled with states attorneys' general in the late-1990s for more than $200 billion.  ████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Pries Decl., Ex 219 (Baker Dep. 365:6-18).  Indeed,

according to his web bio, Strauber continues to "represent[] The Purdue companies in the defense

of the OxyContin litigation" to this day.  Preis Decl., Ex. 200 (web bio).  It would have bordered

on malpractice for Strauber not to have shared with Purdue the fact that tobacco companies also

fended off product liability cases for a period of time, but eventually were forced into one of the

largest civil settlements in U.S. history.

56.     The Sacklers certainly were paying attention when, in 2014, the City of Chicago

and two California counties filed separate actions against Purdue using tactics similar to those

deployed against tobacco companies.  ████████████████████████████

---

[31] A cover email forwarding this article that was withheld as privileged shows that the article was shared with Howard
Udell, Purdue's then-General Counsel, among others.  *See* Preis Decl., Ex. 188a; *id.* Ex. 195 (excerpt of Mar. 5, 2019
MDL privilege log [C]).

REDACTED



Preis Decl., Ex. 153 at PPLPC045000017006 [C].

Preis Decl., Ex. 189 at PAZ000115628-29.

*Id.* at PAZ000115629.

Preis Decl., Ex. 190 at PPLPC045000017005 [C].

57.

*See, e.g.*, Preis Decl., Ex. 165 at PPLPC061000060750 [C]

---

[32] The Sacklers cite their settlement of the Kentucky action as evidence that Purdue had no reason to believe state-led opioid litigation could be a serious threat during the 2008 to 2017 time period. But the Kentucky settlement was not reached until December 18, 2015, and by that time (i) the Sacklers already had caused Purdue to make most of the transfers subject to challenge, and (ii) other public entities had commenced lawsuits of their own, including Chicago and the California counties. To be sure, at $24 million, the Kentucky settlement was smaller than the Oklahoma settlement that would follow, but still implied Purdue liability of at least [$1.6 billion] on a morphine milligram equivalent basis, and Purdue itself claimed that even $1 billion in opioid-related liabilities "would have an immediate, crippling, and irreparable effect on Purdue." Preis Decl., Ex. 201 (*Affidavit of Edward B. Mahony* ¶¶ 4, 6, *Purdue Pharma L.P. v. Hon. Steven D. Combs*, No. 2013-CA-001941-OA (Ky. Ct. App. dated Feb. 4, 2014)).



); *id.* Ex. 156 at RSF00683542 [C] (

); *id.* Ex. 171 at IACS_ESI_0000490681-82 [C] (

);

*id.* Ex. 157 at RSF_OLK00008429 [C] (

); *id.* Ex. 179 at

POK003746339 [C] (

); *id.* Ex. 158 at MDSF00514742 [PEO/C] (

); *id.* Ex. 159 at PWG004484978 [C] (

).

58.    The scale of harm associated with the abuse and diversion of OxyContin and other opioids was also well known to Purdue.  Purdue regularly tracked and reviewed reports and information concerning the economic consequences of the opioid crisis.  In fact, Purdue commissioned a study of its own that was released in 2008.  *See* Preis Decl., Ex. 202 (Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194, 199 (2011)).  According to its own study, in the year 2006 alone OxyContin caused

1,553 deaths and $7.2 billion in damages.  *Id.*  ████████████████████████████

████████████████████████████████████████  Preis Decl., Ex. 204

[C].  Purdue also calculated how much of its own revenue was derived from the abuse of

OxyContin, concluding in 2006 that up to 18.1%—or $1.8 billion—of its sales for the prior 10

years were based on diversion and abuse.[33]

     59.     Side A implies that while the UCC has identified substantial evidence that Side B

was worried about Purdue's litigation risk, similar proof does not exist regarding Side A.  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  Exceptions

Motion ¶ 22.  ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████  Preis Decl., Ex. 160 at SideA00391976-77 [PEO/C].  ██████████████

████████████████████████████████████████████████████████

██████████  *Id.* at Side A00391978.  ██████████████████████████

████████████████████████████████████████████████████████

██████████  *Id.* (emphasis added).  ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  *Id.* at Side A00391976.  ████████

---

[33] The Sacklers argue they believed the risk of damages associated with their sale of opioids was small because Purdue "settled" with New York state in 2015 for just $75,000, referring to an Assurance of Discontinuance ("**AOD**") that Purdue entered into with the New York State Attorney General's Office ("**NYAG**").  AXO ¶ 22.  But the AOD was not a "settlement" in any material sense.  Among other things, the NYAG did not release any claims against Purdue in connection with the AOD.  If it had, New York would not now be suing Purdue for billions of dollars based on conduct dating back to 2007 and before.  Under the AOD, Purdue agreed to undertake additional obligations aimed at reducing abuse and diversion of OxyContin.  In other words, the AOD proves nothing except that Purdue managed to deceive the State of New York just as Purdue has now admitted to deceiving the federal government with respect to Purdue's abuse, diversion and deterrence efforts.

REDACTED

███████████████████████████████████████████████

███████████████████████████████████████████████

*Id.*

    60.   ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████  Hurley Decl. [ECF No. 1754], Ex. 67

(PPLPUCC000177443). ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ █ ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  *Id.* at PPLPUCC000177445.

    61.   ███████████████████████████████████████

███████████████████████████████████████████████

████  Preis Decl., Ex. 161 at PPLPC042000011810, PPLPC042000011812 [HC].  ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[34] ████

████████████████████████████████████  *See, e.g.*, Preis Decl.,
Ex. 180 at PPLPC012000372437 at slides 4, 6 [C] ████████████████████████████████

████████████████████████████████████████  ); *id.* Ex. 207 at
MSF01116645 [OPEO]; *id.* Ex. 183 at PURCHI-000834581 [C] (████████████████████

█████████████████████



*Id.*

*Id.*

Preis Decl., Ex. 162 at PPLPUCC000335136

[PEO/HC] (                              ).[35]

        **3.**

62.

[35] The Sacklers boast in their opposition that there had not yet been any "finding of liability against the Defendant Debtors or Related Parties" despite a large number of "Pending Actions." AXO ¶ 27. Just days after writing those words, of course, the Sacklers announced that they plan to pay $225 million to settle civil claims alleged against the family by the DOJ, and the Debtors disclosed that they soon will plead guilty to multiple federal crimes for the second time since 2007. *See generally* Sackler-DOJ Settlement Agreement; *Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion to Confirm that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by This Court* [ECF No. 1833] (hereinafter the "**Sackler-DOJ Settlement Agreement**"). The Sacklers also fail to note Purdue's many litigation failures, including (a) denials of motions to dismiss claims against Debtors in at least fourteen cases (including in thirteen different states and in the federal MDL); (b) a settlement by Debtors for $270 million in Oklahoma to avoid trial; (c) Johnson & Johnson losing at trial in the same Oklahoma case Debtors settled with a judgment against it of over $400 million; (d) Debtors losing the only summary judgment motion that has been filed in the various cases against it, and (e) Debtors having now pled guilty to committing crimes over many years and agreeing to an $8.3 billion settlement.

REDACTED



Preis Decl., Ex. 166 at MARSH-PURDUE-001113 [HC] (

).

Preis Decl., Ex. 167 at MARSH-PURDUE-001768-70 [HC].

Preis Decl., Ex. 168 at

MARSH-PURDUE-001777 [HC] (emphasis added).

63.

Preis Decl.,

Ex. 192 at MARSH-PURDUE-001863.

Preis Decl., Ex. 193 at MARSH-PURDUE-001114.

Preis Decl., Ex. 194 at MARSH-PURDUE-001804

[HC].

**4.**

64.

BXO at 16-17; *see also id.* at 3 (                                                              ).

██████████████████████████████████

65.    ████████████████████████████████████████

████████████████████████████    *See, e.g.*, BXO at 41-42 (████████████████████████

██████████████████████████████████).    ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████    Preis Decl.,

Ex. 163 at PPLPUCC001662356 [PEO/HC].    ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

66.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████    Preis Decl., Ex. 206 at PPLPC045000017072-73 [C].    ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████    Preis Decl., Ex. 215

REDACTED

at PPLPUCC9004797180 [HC]). ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████

### *5.*      *Other Sackler contentions are equally unpersuasive.*

67.      Side A claims that Purdue had "outside directors" with "impeccable credentials," implying that they would have acted as a check on any fraudulent conduct regarding distributions. AXO ¶ 15. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ Preis Decl., Ex. 169 at MDSF00450185 [C] (capitalization in original). Nor do the Sacklers offer any evidence that any "outside director" was meaningfully independent from the side of the family by which he or she was hand-picked.

68.      That is probably because the evidence demonstrates the exact opposite. ██

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████ Preis Decl., Ex. 162 at PPLPUCC000335137 (███████████████). ██

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████ Preis Decl., Ex. 170 at MDSF00010698 [PEOC] (emphasis

added).[36]

69.    ████████████████████████████████████████████████

████████████████████████████████████████████. *E.g.*, BXO at 22;

AXO ¶¶ 29-30.  But to the extent that the Sacklers transferred value out of Purdue at least in part

based on fear of Purdue's ███████████████ it makes no difference whether the recipient of

those transfers was a trust created in 2008, 2004 or 1974.[37]  Nor is it significant that Purdue was

owned by trusts since before OxyContin was introduced.  It was the transfers of cash and other

property out of Purdue to the trusts themselves (and to overseas affiliates) that were designed to

frustrate creditors.

70.    Next, the Sacklers argue that transfers "preceding the bankruptcy by more than two

years" cannot be avoided, apparently relying a time limitation provided in Section 548(a).  *See*

BXO at 32.  Under Section 544, however, state or other non-bankruptcy law determines the

limitations periods, if any, to which the estates' claims are subject, and an estate representative can

avoid transfers on behalf of all creditors as long as at least one triggering creditor has a valid claim

at the time of the transfer.  *See* 11 U.S.C. § 544(b); *Moore v. Bay*, 284 U.S. 4, 5 (1931) (holding

entirety of a fraudulent transfer can be avoided by estate as long as at least one triggering creditor

is present even if that creditor's claims make up a fraction of the amount avoided); *In re Tronox,*

*Inc.*, 503 B.R. 239, 266 n.31 (Bankr. S.D.N.Y. 2013) ("[T]here is no question that the drafters of

the Bankruptcy Code adopted the rule of *Moore v. Bay* …. and that a debtor such as Tronox can

---

[36] ██████████████████████████████████████████████████
████████████████████████████████████████ *Id.*
[37] ██████████████████████████████████████████████████
███████████████████████████. *See, e.g.*, Preis Decl., Ex. 184 (Aug. 17, 2020 Letter to M.
Hurley); *id.* Ex. 208 [PEO] (███████████████████████████████████).

avoid the transaction on behalf of the estate and all of its creditors.").

71.     While the UCC need not prove that a triggering creditor exists to prevail on this Motion, there can be no serious doubt that such creditors are present here.  For example, the Pension Benefit Guaranty Corporation, a United States government agency, is afforded a six-year limitations period under the Fair Debt Collection Practices Act.  *See In re Tronox Inc.*, 503 B.R. at 273-75.[38]  The state of New Jersey is subject to a ten-year statute of limitations, N.J.S.A. 2A:14-1.2(a); *N.J. Dep't of Env't Prot. v. Caldeira*, 794 A.2d 156, 163-65 (N.J. 2002),[39] while the states of Hawaii[40] and Connecticut[41] are not subject to any statute of limitations for fraudulent conveyance claims.  In addition, much of the evidence of intentional fraud cited in connection with the Motion became available for the first time in discovery in these cases, and therefore the two-year period to bring intentional fraudulent conveyance claims under the so-called "discovery rule" has not yet even begun to run with respect to any of the challenged transfers.  Finally, the statutes of limitation applicable to the fraudulent transfer claims (or other claims) may be subject to equitable tolling, or extended pursuant to the discovery rule or the "continuing wrong" doctrine or on other grounds.

72.     The Sacklers point to the substantial evidence marshalled by the UCC that they

---

[38] *See* Proofs of Claim filed by the PBGC,  Claim Nos. 42481, 42497, 42499, 82985, 87644, and 91430 available at: https://restructuring.primeclerk.com/purduepharma/Home-ClaimInfo (last accessed Nov. 17, 2020).

[39] Specifically, New Jersey law provides that, "Except where a limitations provision expressly and specifically applies to actions commenced by the State or where a longer limitations period would otherwise apply, and subject to any statutory provisions or common law rules extending limitations periods, any civil action commenced by the State shall be commenced within ten years after the cause of action shall have accrued."  N.J.S.A. 2A:14-1.2(a).

[40] *See* Haw. Rev. Stat. § 657-1.5 ("No limitation of actions provided for under this or any other chapter shall apply to bar the institution or maintenance of any action by or on behalf of the State and its agencies, unless the State is specifically designated in such a statute as subject to the limitation period contained therein.  No defense to any action brought by the State or any of its agencies shall be predicated upon the lapse of time.").

[41] *State v. Lombardo Bros. Mason Contractors, Inc.*, 54 A.3d 1005, 1015 (Conn. 2012) (noting that "this and other courts of this state expressly have recognized [the rule of *nullum tempus*] as part of this state's common law since the second half of the nineteenth century," and holding that statutes of limitations or repose for tort actions, product liability actions, and negligence actions do not apply to the state itself); *see also Pritchard v. Pritchard*, No. FA950319316S, 2004 WL 1052680, at *2 (Conn. Super. Ct. Apr. 26, 2004).

REDACTED

were motivated by the litigation threat against Purdue to transfer Purdue's assets to trusts and overseas, and argue that it is possible to place an innocent gloss on the identified communications if looked at in the light most favorable to the Sacklers. Even if such a reading were plausible—which the UCC disputes—it would not defeat the UCC's showing of probable cause. As the Second Circuit has held, "the fact than an innocent explanation may be consistent with the facts alleged does not negate probable cause." *Amusement Indus., Inc.*, 293 F.R.D. at 427 (quoting *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012)). Moreover, as the UCC pointed out in its opening papers—and the Sacklers do not deny—fraud need not be the transferor's sole motivation; a transfer is intentionally fraudulent if "at least one of the [transferor's] motives was an impermissible one." *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 & n.8 (Utah 2020) (collecting cases); *In re Tronox Inc.*, 503 B.R. at 278-79 (same).

73.    The Sacklers contend that "allegations that PPLP engaged in constructive fraudulent transfers … do not suffice" to invoke the crime-fraud exception. But the UCC's crime-fraud arguments are based on the Sacklers' intentionally fraudulent transfers and breaches of fiduciary duties. To be sure, Purdue was insolvent dating back to the 2008 transfers, including based on massive-opioid-related claims that had accrued but not yet been filed. *See, e.g., In re W.R. Grace & Co.*, 281 B.R. 852, 859-65 (Bankr. D. Del. 2002) (holding that un-asserted mass tort claims should be considered in solvency analysis even if unknown at the time of the challenged transactions).[42] The UCC briefly discussed its constructive fraud claims in its opening papers in connection with the *Garner* argument directed to the Debtors. *See* Exceptions Motion ¶¶ 57-58. Since that branch of its Motion has been settled, the UCC will not address insolvency in detail

---

[42]    ████████████████████████████████████████████████████████████████ Preis Decl., Ex. 228 (Boer Dep. 45:20-46:18 [HC]).

here.[43]

74.    Finally, the Sacklers argue that the billions of dollars in transfers they made to their trusts and offshore affiliates in an attempt to hinder or delay creditors were made openly, and therefore cannot be considered fraudulent, because "*Forbes* reported them."  BXO at 35.[44]  But *Forbes* simply reported the family's wealth as the "combined value of [the Sacklers'] drug operations as well as accumulated dividends over the years."[45]  *Forbes* gave no hint as to how much of that wealth remained in the company and how much had been secreted offshore in an attempt to defraud creditors.  Nor did *Forbes* describe the unprecedented value transfer program the Sacklers launched after Purdue confessed to criminal conduct in 2007, nor cite evidence that the family was motivated at least in part out of fear of Purdue's ████████████  Neither *Forbes* nor anyone else outside of Purdue could have known any of these facts until they were unearthed in connection with discovery, since Purdue was closely held and because, as *Forbes* put it, the Sacklers made a practice of "fl[ying] under the radar."[46]

###    D.    The Crime-Fraud Documents Should Be Produced or Reviewed *In Camera*

75.    "Communications that otherwise would be protected by the attorney-client



---

<sup>43</sup>

*Compare* BXO at 9.

Preis Decl., Ex. 181 at PPLPUCC000281516, PPLPUCC000281524 [PEO-HC] (JP Morgan); *id.* Ex. 172 at PPLPUCC003938943 [PEO-HC] (Moody's); *id.* Ex. 173 at PPLPUCC500143127 [PEO-HC] (S&P).  Third, even if any of them had tried to assess Purdue's opioid-related liability—and they did not—the standards applicable under GAAP fundamentally differ from the legal standards for determining the impact of potential tort liability in an insolvency analysis.  *See, e.g., In re Tronox Inc.*, 503 B.R. at 302 (stressing that "GAAP itself only requires reporting a limited subclass of environmental and tort liabilities," and that "the way GAAP looks at [such liabilities] is different than the determination of a [fraudulent transfer] claim") (citations omitted).

<sup>44</sup> Alex Morrell, The OxyContin Clan: The $14 Billion Newcomer to Forbes 2015 List of Richest U.S. Families, FORBES (July 1, 2015, 10:17 AM EDT), https://www.forbes.com/sites/alexmorrell/2015/07/01/the-oxycontin-clan-the-14-billion-newcomer-to-forbes-2015-list-of-richest-u-s-families/#13b2fa4475e0.

<sup>45</sup> *Id.*

<sup>46</sup> In any case, and as discussed elsewhere, evidence that the Sacklers transferred value from Purdue to themselves or for their benefit at least in part to hinder or delay creditors is sufficient to invoke the crime fraud exception, without also requiring evidence of fraud in the "sense of deceit or trickery."

privilege 'are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct,'" *see, e.g.*, *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007) (quoting *In re Grand Jury*, 731 F.3d at 1038) or if "intended in some way to facilitate or conceal" such wrongful conduct.  *See* AXO ¶ 41 (citing *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999)).  The UCC has identified categories of withheld documents that it believes satisfy the crime fraud exception here, including documents concerning (i) the Sacklers' asset protection and estate planning measures relating to the transfer of funds to family trusts and away from Purdue's creditors, (ii) whether Purdue transfers were or could be deemed fraudulent transfers, (iii) how opioid plaintiffs might collect, or be prevented from collecting, on any judgments against Purdue, the Sacklers or any of the Sacklers' other affiliates, (iv) the amount and mechanics for distributions to and for the benefit of the Sacklers, (v) Purdue's potential liability as it relates to breaches of fiduciary duty or other misconduct, (vi) non-cash transfers to or for the benefit of the Sacklers, and (vii) concealment by the Sacklers of any misconduct.[47]

76.     The Sacklers argue that the UCC cannot rely on categories in support of its motion, and instead was required to identify "each of the particular attorney-client communications [that] was used in furtherance of a crime or fraud."  AXO ¶ 41.  But it would literally be impossible for the UCC to do as the Sacklers demand given the vague nature of the descriptions they employed on their Privilege Logs.  The UCC nevertheless did its best to decode the Privilege Logs by reference to significant date ranges, subject fields (though often sparse and cryptic) and other available information, attaching lists of log entries identified by control number that the UCC believes might be within the categories.[48]  Unfortunately, because only the Withholding Parties

---

[47] *See* Hurley Decl., Ex. 101 at 2.
[48] *See* Preis Decl., Ex. A (Excel Tab 7) and Ex. B (Excel Tab 6) for a sample list of Privilege Log entries the UCC believes might be within the crime-fraud and/or at-issue categories.  The UCC has further narrowed the list to 60 entries that the UCC suggests for *in camera* review.  The control numbers of the Privilege Log entries submitted for

have access to the contents of the documents, only they can confidently identify which come within the categories and which do not.[49]  *See, e.g.*, AXO ¶ 43 (arguing that certain documents withheld by Side A do not come within the categories identified by the UCC).

77.    Ample precedent supports a categorical approach to privilege-challenge motions, including based on the crime-fraud exception.  For example, the Eleventh Circuit upheld a district court's decision to review documents within nine broad categories of documents for application of the crime-fraud exception in furtherance of a crime or fraud "in lieu of a document-by-document analysis."  *Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1333 (11th Cir. 2018); *see also Amusement Indus., Inc.*, 293 F.R.D. at 440-41 (ordering production of categories of communications between the defendant and the defendant's attorneys based on the crime-fraud exception without reference to specific documents).  The standard for triggering *in camera* review requires only "a factual basis adequate to support a good faith belief by a reasonable person … that *in camera* review … may reveal evidence to establish the claim that the crime-fraud exception applies."  *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotation omitted).  The UCC respectfully submits that it has established a more than adequate factual basis to justify *in camera* review of documents in the identified categories.[50]

78.    The burden associated with *in camera* review has been greatly reduced as a result of the UCC's settlement with the Debtors.  Nevertheless, the burden associated with the requested

---

*in camera* review are listed in Exhibit C to the Preis Declaration.  These entries, as they appear on the Privilege Logs, are also highlighted in yellow on Exhibits A-B of the Pries Declaration.

[49] In a September 25, 2020 letter to Side B, the UCC offered to drop its General Challenges Motion with respect to entries not within any of the categories identified in connection with this Motion.  *See* Preis Decl., Ex. 110 (Sept. 25, 2020 Letter from M. Hurley).  On September 28, 2020 Side B agreed, and provided a list of control numbers that are *not* within any of those categories.  *See* Preis Decl., Ex. 116 (Sept. 28, 20209 Letter from A. Lees).  The UCC made the same offer to Side A on October 14, 2020, but has not received any response.  *See* Preis Decl., Ex. 112 (Oct. 14, 2020 Letter from M. Hurley).

[50] As noted, the UCC withdraws its alternative request for appointment of a special master in light of Federal Rule of Bankruptcy Procedure 9031.

*in camera* review remains substantial.  In its discretion, the Court can certainly begin its review with a subset of the identified categories, or a fractional, random sample of some or all of the identified categories, or employ another method to limit the scale of the initial review and determine whether an examination of additional documents *in camera* is warranted.  As an option, and in an effort to further reduce the burden on the Court, the UCC has selected a total of sixty entries, thirty from Side A and thirty from Side B, that it suggests for *in camera* review related to the "crime fraud" and "at issue" exceptions.[51]  The UCC is available to provide any support the Court may request in connection with crafting a practical solution to the problem created by the extraordinary size of the Privilege Logs in these cases, and the correspondingly large number of challenges pursued by the UCC.[52]

## II.    THE AT ISSUE EXCEPTION JUSTIFIES FURTHER DISCLOSURE

79.    In their oppositions and defense presentations,[53] the Sacklers claim that in "good faith" (i) they believed Purdue's opioid sales and marketing practices were at all times compliant with applicable laws and regulations and (ii) prior to 2017, they believed that Purdue did not face significant litigation risk related to opioids.  The Sacklers' decision to put their alleged good faith at issue justifies disclosure of attorney-client communications that "may well demonstrate the falsity of [their] claim[s]." *Arista Records LLC v. Lime Grp. LLC,* No. 06 CV 5936(KMW), 2011 WL 1642434, at *3 (S.D.N.Y. Apr. 20, 2011) (quotation omitted).

---

[51] *See* Preis Decl., Ex. C listing the control numbers for suggested *in camera* review for crime fraud and at issue categories.  The UCC has also highlighted the privilege log entries for suggested *in camera* review for Side A and Side B in the crime fraud and at issue categories in Preis Decl. Ex. A (Excel Tab. 7) and Preis Decl. Ex. B (Excel Tab 6).

[52] The Sacklers argue that communications from 2013 to 2017 should be immune from the crime fraud exception because the "lion's share" of fraudulent distributions were made between 2008 and 2012.  AXO ¶ 43.  But the Sacklers' fraud continued after 2012, though the family "only" transferred about $2.4 billion in cash during the later years.[52] And communications that occurred after the Sacklers stopped secreting funds from Purdue in 2017 also may be subject to the crime fraud exception, which applies *both* to communications in furtherance of a crime or fraud *and* to communications relating to later attempts to conceal that the crime or fraud occurred.

[53] The UCC's citation to the Sacklers' presentations is appropriate and consistent with the parties' reasonable expectations.  *See* n. 24 *supra*.

80.     Fairness, the touchstone of the exception, comes into play when parties put their state of mind at issue.  *See In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("Underlying any determination that a privilege should be forfeited is the notion of unfairness."); *Brown v. Barnes and Noble, Inc.*, No. 1:16-cv-07333(RA)(KHP), 2019 WL 7168146, at *7 (S.D.N.Y. Dec. 12, 2019) (at-issue waiver applies "where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim or defense") (internal quotation and citation omitted).  The doctrine applies regardless of whether the party expressly relies on advice of counsel, as long as an examination of privileged communications is necessary to fairly examine the claim of good faith.  *See Scott v. Chipotle Mexican Grill, Inc*., 67 F. Supp. 3d 607, 614-16 (S.D.N.Y. 2014) (in case alleging that salaried apprentices were misclassified and entitled to overtime pay, defendant claimed good faith defense of reliance on applicable regulations; court recognized that legal advice might demonstrate falsity of good faith defense).

81.     In *Arista Records*, the court held that the at-issue waiver doctrine applied to privileged communications where the client alleged certain transfers were not intended "to avoid any potential legal exposure" and that "he did not believe that [his company] … would be sued" at the time of the transfers—even though the client did not expressly invoke reliance on counsel. No. 06 CV 5936(KMW), 2011 WL 1642434, at *1-3 (S.D.N.Y. Apr. 20, 2011).  The Sacklers attempt to distinguish *Arista Records* because it involved testimony, but nothing in the decision suggests the court would have arrived at a different conclusion if the privilege had instead been asserted over documents.  *See* BXO at 45-46.  Indeed, the court in *Arista Records* rejected defendants' argument that plaintiff's motion in limine was "a disguised and untimely motion to compel," because the court did not view the distinction as material.  *See* 2011 WL 1642434, at *2 (discovering parties can seek relief in the form of a motion to compel or motion in limine, but "a

motion to compel is not a prerequisite to invoking the [at-issue] rule").[54]

82.    The Sacklers argue that at-issue waiver is inapplicable because the UCC currently

asserts no "claims."   The Sacklers concede, however, that their presentations describe "the

defenses that the Shareholder Parties intend to make" if there is no settlement and claims are

litigated.  To gauge the value of those claims, the UCC must have access to the same documents

that would be available to creditors were the Sacklers to invoke their good faith arguments in a

litigation setting.  The fact that litigation is not actually pending now should not by itself bar the

relief the UCC seeks, considering the nature of the exercise in which the parties are engaged.

83.    Nor is this case analogous to *John Doe Co. v. United States*, where the subject of a

grand jury investigation shared its "good faith" defense solely in an effort to influence the decision

making of its adversary—a prosecutor—who would not be prejudiced regardless of whether it

accepted or rejected the contentions.  350 F.3d 299, 301, 306 (2d Cir. 2003).  Here, in contrast, the

Sacklers hoped their presentations would influence many potential "decisionmakers" concerning

the Settlement Framework they support, including the consenting and non-consenting states, the

Debtors, a host of other creditor groups in addition to the UCC, and for Side B at least, the Court

itself.  *See Motion to Allow/Motion to Make Publicly Available the Raymond Sackler Family's

Presentation of Dec. 6, 2019* [ECF No. 685] (withdrawn); BXO at 8, 11, 27-29.

84.    Finally, the Sacklers argue that "if the UCC's argument were accepted … whenever

someone asserts a claim of fraudulent conveyance, the defendant must either admit that they acted

with an intent to defraud or waive the privilege."  BXO at 48.  But the Sacklers do not merely deny

they acted with fraudulent intent.  They deny that prior to 2017 they could have had any reason to

---

[54] *Arista Records* is entirely consistent with the Second Circuit's decision in *Erie*, where application of the doctrine
was rejected precisely because the "petitioners d[id] not claim a good faith or state of mind defense."  546 F.3d at 229;
*compare* BXO at 43.

REDACTED

believe Purdue might face ████████████████ and they do so specifically to undermine any inference that they transferred vast sums out of Purdue to and for the benefit of Sackler family trusts in order to evade litigation creditors.  The Sacklers likewise claim they genuinely believed that Purdue was complying with all laws and regulations, despite the fact that Purdue has now pleaded guilty twice to engaging in criminal conduct in the sale of opioids over a period spanning three decades while controlled by the Sackler family.  If privileged documents exist rebutting the Sacklers assertions of good faith, fairness demands they be supplied to Purdue's creditors as they consider whether to release valuable estate claims.

## **CONCLUSION**

85.     For the foregoing reasons the UCC respectfully asks the Court to grant the Motion in full, and enter the proposed order submitted with the Reply, requiring the Sacklers to (i) produce the Challenged Documents and/or (ii) provide the Challenged Documents to the Court for *in camera* review.  The NCSG supports the relief requested herein.

REDACTED

New York, New York                          AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  November 18, 2020


                                  By: /s/ *Mitchell P. Hurley*                    

                                  Ira S. Dizengoff
                                  Arik Preis
                                  Mitchell P. Hurley
                                  Joseph L. Sorkin
                                  Elizabeth Scott (*admitted pro hac vice*)
                                  Sara L. Brauner
                                  One Bryant Park
                                  New York, New York 10036
                                  Telephone: (212) 872-1000
                                  Facsimile: (212) 872-1002
                                  idizengoff@akingump.com
                                  apreis@akingump.com
                                  mhurley@akingump.com
                                  jsorkin@akingump.com
                                  edscott@akingump.com
                                  sbrauner@akingump.com

                                  *Counsel to the Official Committee of Unsecured
                                  Creditors of Purdue Pharma, L.P.,* et al.

## **Exhibit A**

## **Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER GRANTING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED
DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME
FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

Upon the Motion to Compel Production of Purportedly Privileged Documents, or for

*In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Privilege,

dated September 30, 2020 [ECF No. 1753] (the "**Motion**"), of the Official Committee of

Unsecured Creditors (the "**UCC**") of Purdue Pharma L.P. and its affiliated debtors and debtors

in possession (collectively, the "**Debtors**"); and upon all papers filed in connection with the

Motion; and upon the record of the hearing held by the Court on December 15, 2020, and all

objections to the Motion having been withdrawn or overruled; and the Court having

jurisdiction over the Motion pursuant to 28 U.S.C. § 1334(a); and the venue of these chapter

11 cases and the Motion being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409;

and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable
jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal
Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium
Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp.
(4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue
Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805),
Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes
Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC
Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard,
Stamford, CT 06901.

authority to enter a final order with respect to the Motion; and no additional notice being required except as provided herein; and, after due deliberation and good and sufficient cause appearing; now, therefore,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.       Pursuant to the *Stipulation of Settlement and Agreed Order Regarding Official Committee's Motions to Compel and Debtors' Motion for Protective Order* [ECF No. 1955-1], the UCC and the Debtors have resolved the portions of the Motion directed at documents withheld by the Debtors, and the UCC seeks no further relief as to those portions of the Motion.  For these reasons, the Motion is DENIED AS MOOT as to the relief sought against the Debtors.

2.       The Motion is GRANTED in full as to the Sacklers (as defined in the Motion).

3.       The Sacklers are hereby ORDERED to produce, or in the alternative provide for *in camera* review, the documents that have been withheld, or may be withheld, within the Challenged Document categories.

4.       Specifically, the Sacklers are ORDERED to produce, or in the alternative provide for *in camera* review, the Challenged Documents that have been withheld, or may be withheld, on the basis of the privileges abrogated by this order in the following categories:

    a.  <u>Challenged Documents subject to the Crime-Fraud Exception for Privilege Claims Belonging to the Sacklers include documents from January 1, 2006 to the present concerning:</u>

        i.  The Sacklers' asset protection and estate planning measures to transfer funds to trusts and other assets with "limited transparency" and/or "jurisdictional shielding" from creditors relating to the Sacklers' and Purdue's liability;

        ii.  Whether cash or non-cash transfers to the Sacklers were, or were not, at risk of being deemed fraudulent transfers;

        iii.  Whether, and/or how, opioid litigants could collect, or be prevented from collecting, a potential judgment against the Sacklers, their trusts and other affiliates and assets (even if the Sacklers' motive to obscure assets was unbeknownst to the lawyer providing the advice);

2

   iv.  Purdue's potential liability, or the Sacklers' (or any of their advisors') potential liability, related to breaches of fiduciary duty and other misconduct, and any efforts to conceal such conduct or breaches of duty;

   v.  The formation, governance and management of the Sacklers' trusts, including whether trusts were created or modified, or transfers made among trusts, for the purpose of delaying or hindering creditors, and whether purportedly discretionary trusts are operated in a manner consistent with that claimed status;

   vi.  The appropriate amount, and mechanics for, distributions to the Sacklers to avoid tracing or liability (including fraudulent transfer liability); and

   vii.  Non-cash transfers to entities the Sacklers controlled for less than reasonably equivalent value to Purdue, including but not limited to:

1. Royalties from international sales of OxyContin by the IACs,
2. Transfer of non-ADF OxyContin IP rights from PPLP to PRA LP,
3. Transfer of PPLP's equity interest in Infinity Pharmaceuticals Inc. to PRA LP,
4. Transfer of PPLP's equity interest in Lucien Holdings Sarl to PRA LP,
5. PPLP's transfer of equity interest in New Suffolk Holdings LLP to PRA LP, or
6. PPLP transfer of equity interests in Millsaw Realty L.P. to PRA LP.

b.  <u>Challenged Documents subject to the At-Issue Exception for Privilege Claims Belonging to the Sacklers include documents from January 1, 2006 to the present concerning:</u>

   i.  The Sacklers' claim of the board(s)' alleged "good faith" belief that Purdue's marketing and sales practices with respect to opioids were compliant with applicable laws and regulations;

   ii.  The Sacklers' claim of an alleged "good faith" belief that Purdue did not face significant litigation risk related to opioids prior to 2017, including attempts by the Debtors to procure products insurance and director and officer insurance;

   iii.  The Sacklers' alleged "good faith" belief and/or reliance on counsel with respect to the propriety of cash and non-cash distributions or transfers to the Sacklers and whether such transfers or distributions presented a risk of being deemed fraudulent transfers.

White Plains, New York

Dated: _____      _____
                                   THE HONORABLE ROBERT D. DRAIN
                                   UNITED STATES BANKRUPTCY JUDGE