REDACTED

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF ARIK PREIS DATED NOVEMBER 18, 2020

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

REDACTED

Under 28 U.S.C. § 1746, I, Arik Preis,[2] declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.       This declaration ("**Declaration**") is submitted in support of the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al.'s Motions (defined below) and two reply briefs filed contemporaneously with this Declaration entitled (1) Official Committee of Unsecured Creditors' Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege (the "**Exceptions Reply**")[3]; and (2) Official Committee of Unsecured Creditors' Reply in Support of Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Failure of the Sacklers to Demonstrate Documents Identified on Logs are Privileged (the "**General Challenges Reply,**"[4] and, together with the Exceptions Reply, the "**Replies**").[5]

2.       I am an attorney in good standing admitted to practice in the State of New York, and I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**").  I was admitted to the New York State Bar in 2001 and have been practicing law in the area of bankruptcy and financial restructuring since that time.  I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as counsel to the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al (the "**UCC**").

---

[2] My legal name is Erik Preis but for my entire life I have utilized the name Arik and not Erik.

[3] For the sake of clarity, the Exceptions Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753] (the "**Exceptions Motion**").

[4] For the sake of clarity, the Challenges Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs are Privileged* [ECF No. 1752] (the "**General Challenges Motion**").  The Exceptions Motion and General Challenges Motion are collectively referred to herein as the "**Motions**."

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Replies, which the UCC has endeavored to use consistently with definitions used in the Motions.

REDACTED

3.       The UCC files its Replies in accordance with the briefing schedule provided in the

*Stipulation and Agreed Order Regarding Amended Briefing Schedule in the Chapter 11 Cases*,

executed by the Debtors, the Sacklers, the NCSG, the AHC, and the UCC, which was filed and so

ordered by the Court on October 26, 2020 [ECF No. 1848].  After filing its Motions, the UCC has

continued to meet and confer with counsel for the Side A and Side B Sacklers (collectively, the

"**Sacklers**") and the Debtors (collectively with the Sacklers, the "**Withholding Parties**") in a good

faith effort to resolve by agreement the issues raised by the Motions without the intervention of

the Court.  While the parties informally resolved some of the UCC's challenges, they could not

resolve all the issues as described in the Replies.

4.       This Declaration attaches and describes documents and testimony relied upon in

the Replies.  Certain exhibits attached hereto have been designated as Confidential, Highly

Confidential, Professional's Eyes Only, or Outside Professional's Eyes Only, by one or more

parties to this proceeding and are redacted pursuant to the *Third Amended Protective Order* entered

in these proceedings [ECF No. 1935].  The UCC also files certain correspondence with the

Withholding Parties under seal in an abundance of caution in order to accommodate certain

Withholding Parties' prior positions concerning the confidentiality of email address and other

information that may be contained therein.  By filing in this way, the UCC does not intend to

suggest that it agrees the information is or ought to be confidential.

5.       Attached hereto as **Exhibit A** is a true and correct copy of an excel workbook

containing the entries on Side A's privilege log that the UCC is challenging in the Motions and

Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the

Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the

Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the

3

REDACTED

categories of privileged documents the UCC seeks to compel. This Exhibit A is intended to supersede the Exhibit A attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

6.      Attached hereto as **Exhibit B** is a true and correct copy of an excel workbook containing the entries on Side B's privilege log that the UCC is challenging in the Motions and Replies, separated by category based on the tabbed worksheets in the excel workbook. For the Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the categories of privileged documents the UCC seeks to compel. This Exhibit B is intended to supersede the Exhibit B attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

7.      Attached hereto as **Exhibit C** is a list of document control numbers corresponding to certain Privilege Log entries for which the UCC requests *in camera* review. The list is organized categorically and by Withholding Party. The document control numbers in Exhibit C are presented as a limited sampling of materials that the UCC believes would enable the Court to make a reasoned determination whether further *in camera* review or other relief is appropriate respecting categories of documents identified in the General Challenges Reply.

8.      Attached hereto as **Exhibit 110** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated September 25, 2020.

9.      Attached hereto as **Exhibit 111** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated October 12, 2020.

10.      Attached hereto as **Exhibit 112** is a true and correct copy of a letter from Mitchell Hurley to Jasmine Ball, dated October 14, 2020.

REDACTED

11.     Attached hereto as **Exhibit 113** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 20, 2020.

12.     Attached hereto as **Exhibit 114** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 23, 2020.

13.     Attached hereto as **Exhibit 115** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 29, 2020.

14.     Attached hereto as **Exhibit 116** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated September 28, 2020.

15.     Attached hereto as **Exhibit 117** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated October 19, 2020.

16.     **Exhibit 118** to this Declaration has been intentionally omitted.

17.     **Exhibit 119** to this Declaration has been intentionally omitted.

18.     **Exhibit 120** to this Declaration has been intentionally omitted.

19.     **Exhibit 121** to this Declaration has been intentionally omitted.

20.     Attached hereto as **Exhibit 122** is a true and correct copy of an email from Stuart Baker dated November 1, 2018, which was produced to the UCC under the Bates number MSF00470861.

21.     Attached hereto as **Exhibit 123** is a true and correct copy of an email exchange between Mortimer Sackler and Antony Mattessich, dated April 24, 2017, which was produced to the UCC under the Bates number MSF00575712.

22.     Attached hereto as **Exhibit 124** is a true and correct copy of an email from Stuart Baker to Richard Sackler, dated November 22, 2013, which was produced to the UCC under the Bates number RSF_OLK00070002.

5

REDACTED

23.    Attached hereto as **Exhibit 125** is a true and correct copy of a July 27, 2011 email from Cecil Pickett forwarding a Stuart Baker email with attachment titled "Proposed 2012 Calendar of Meetings and Board Calls," which was produced to the UCC under the Bates numbers PPLPUCC9002657293-94.

24.    Attached hereto as **Exhibit 126** is a true and correct copy of an email chain dated June 21, 2019, which was produced to the UCC under the Bates number MSF00997606.

25.    Attached hereto as **Exhibit 127** is a true and correct copy of an excel spreadsheet containing text messages including Dame Theresa Sackler and others, which was produced to the UCC under the Bates number MSF90089695.

26.    Attached hereto as **Exhibit 128** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002663187.

27.    Attached hereto as **Exhibit 129** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002664919.

28.    Attached hereto as **Exhibit 130** is a true and correct copy of an email from Mortimer Sackler dated May 21, 2019, which was produced to the UCC under the Bates number PPLPUCC002662986.

29.    **Exhibit 131** to this Declaration has been intentionally omitted.

30.    Attached hereto as **Exhibit 132** is a true and correct copy of an email from David Lundie to John Donovan, dated February 8, 2012, which was produced to the UCC under the Bates number PPLPC036000177151.

REDACTED

31.    Attached hereto as **Exhibit 133** is a true and correct copy of a September 2010 email chain which was produced to the UCC under the Bates number PPLPUCC002449097.

32.    Attached hereto as **Exhibit 134** is a true and correct copy of an email from Michael Friedman dated March 5, 2006, which was produced to the UCC under the Bates number PPLPUCC002603602.

33.    Attached hereto as **Exhibit 135** is a true and correct copy of a February 15, 2011 email from Jonathan Sackler attaching Purdue board and management discussion materials, which was produced to the UCC under the Bates number PPLPUCC9003800123.

34.    Attached hereto as **Exhibit 136** is a true and correct copy of excerpts from the minutes of a March 4, 2003 meeting of the board of directors of Purdue Pharma Inc., which was produced to the UCC under the Bates number PPLPUCC500647319.

35.    Attached hereto as **Exhibit 137** is a true and correct copy of a May 5, 2017 email from Craig Landau attaching a Purdue diagnostic and forward plan, which was produced to the UCC under the Bates number PWG004670879.

36.    Attached hereto as **Exhibit 138** is a true and correct copy of a February 2007 email chain which was produced to the UCC under the Bates number PPLPC061000013858.

37.    Attached hereto as **Exhibit 139** is a true and correct copy of a March 2008 email chain which was produced to the UCC under the Bates number PPLPC012000174476.

38.    Attached hereto as **Exhibit 140** is a true and correct copy of an February 2012 email chain which was produced to the UCC under the Bates number PPLPUCC9002981007.

39.    Attached hereto as **Exhibit 141** is a true and correct copy of a November 2013 email chain which was produced to the UCC under the Bates number SideA00429689.

REDACTED

40.     Attached hereto as **Exhibit 142** is a true and correct copy of a June 2015 email chain which was produced to the UCC under the Bates number PPLPUCC9004448656.

41.     Attached hereto as **Exhibit 143** is a true and correct copy of excerpts from a February 11, 2010 letter from Amy D'Agostino to Cecil Pickett attaching executed Director Agreements, which was produced to the UCC under the Bates number CP0000001.

42.     Attached hereto as **Exhibit 144** is a true and correct copy of Executive Committee Meeting Notes & Actions, dated September 21, 2011, which was produced to the UCC under the Bates number RSF_OLK00035017.

43.     Attached hereto as **Exhibit 145** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number PPLPC012000372585.

44.     Attached hereto as **Exhibit 146** is a true and correct copy of a September 11, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number PPLPC012000441614.

45.     Attached hereto as **Exhibit 147** is a true and correct copy of an August 15, 2013 email from Richard Sackler, which was produced to the UCC under the Bates number PPLPUCC9002391802.

46.     Attached hereto as **Exhibit 148** is a true and correct copy of an email from Stuart Baker dated August 21, 2013, which was produced to the UCC under the Bates number PPLPC045000016165.

47.     Attached hereto as **Exhibit 149** is a true and correct copy of an April 6, 2014 email from Edward Mahony, which was produced to the UCC under the Bates number PPLPC012000471641.

REDACTED

48.     Attached hereto as **Exhibit 150** is a true and correct copy of excerpts from a presentation titled: Changes in prescriptions of OxyContin and OPANA ER after introduction of tamper resistant formulations among potentially problematic and comparator prescribers, which was produced to the UCC under the Bates number PPLPC019000826509.

49.     Attached hereto as **Exhibit 151** is a true and correct copy of a May 21, 2007 email and attached May 2007 calendar printout, which was produced to the UCC under the Bates numbers PPLPUCC001531749-50.

50.     Attached hereto as **Exhibit 152** is a true and correct copy of excerpts from an August 2013 email from Donna Condon attaching an August 8, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number MDSF00986947.

51.     Attached hereto as **Exhibit 153** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

52.     Attached hereto as **Exhibit 154** is a true and correct copy of excerpts from a Purdue OxyContin Annual Marketing Plan, dated October 6, 2013, which was produced to the UCC under the Bates number PAK000062549.

53.     Attached hereto as **Exhibit 155** is a true and correct copy of excerpts from an August 15, 2013 Purdue board meeting agenda and attached August 8, 2013 memorandum from McKinsey which was produced to the UCC under the Bates number PPLP004409890.

54.     Attached hereto as **Exhibit 156** is a true and correct copy of an October 8, 2011 Google news alert, which was produced to the UCC under the Bates number RSF00683542.

55.     Attached hereto as **Exhibit 157** is a true and correct copy of a November 1, 2013 Google news alert, which was produced to the UCC under the Bates number RSF_OLK00008429.

REDACTED

56.     Attached hereto as **Exhibit 158** is a true and correct copy of an April 18, 2015 Google news alert, which was produced to the UCC under the Bates number MDSF00514742.

57.     Attached hereto as **Exhibit 159** is a true and correct copy of a July 2016 email chain, which was produced to the UCC under the Bates number PWG004484978.

58.     Attached hereto as **Exhibit 160** is a true and correct copy of a January-February 2008 email chain, which was produced to the UCC under the Bates number SideA00391976.

59.     Attached hereto as **Exhibit 161** is a true and correct copy of a February 2008 email chain, which was produced to the UCC under the Bates number PPLPC042000011810.

60.     Attached hereto as **Exhibit 162** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC000335135.

61.     Attached hereto as **Exhibit 163** is a true and correct copy of document titled "CEO Considerations," which was produced to the UCC under the Bates number PPLPUCC001662356.

62.     Attached hereto as **Exhibit 164** is a true and correct copy of excerpts from a Dec. 6, 2019 "Presentation of Defenses ('Side A')," which was provided to the UCC by counsel for Side A.

63.     Attached hereto as **Exhibit 165** is a true and correct copy of excerpts from an October 8, 2010 Purdue news summary, which was produced to the UCC under the Bates number PPLPC061000060749.

64.     Attached hereto as **Exhibit 166** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001112.

65.     Attached hereto as **Exhibit 167** is a true and correct copy of a May 11, 2012 email and attached presentation and timeline, which was produced to the UCC under the Bates number MARSH-PURDUE-001768.

REDACTED

66.    Attached hereto as **Exhibit 168** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001777.

67.    Attached hereto as **Exhibit 169** is a true and correct copy of a July 2015 email chain, which was produced to the UCC under the Bates number MDSF00450185.

68.    Attached hereto as **Exhibit 170** is a true and correct copy of a June 2016 email chain, which was produced to the UCC under the Bates number MDSF00010697.

69.    Attached hereto as **Exhibit 171** is a true and correct copy of excerpts from a February 29, 2012 Purdue news summary, which was produced to the UCC under the Bates number IACS_ESI_0000490680.

70.    Attached hereto as **Exhibit 172** is a true and correct copy of an March 30, 2016 letter from Moody's Investor Services, which was produced to the UCC under the Bates number PPLPUCC003938943.

71.    Attached hereto as **Exhibit 173** is a true and correct copy of an April 7, 2016 letter from Standard & Poor's Ratings Services, which was produced to the UCC under the Bates number PPLPUCC500143127.

72.    Attached hereto as **Exhibit 174** is a true and correct copy of a document titled "Proposal Regarding Board Practices," which was produced to the UCC under the Bates number MSF00144650.

73.    Attached hereto as **Exhibit 175** is a true and correct copy of a July 16, 2017 email from Mortimer Sackler which was produced to the UCC under the Bates number SideA00229177.

74.    Attached hereto as **Exhibit 176** is a true and correct copy of a March 10, 2008 email from Richard Sackler which was produced to the UCC under the Bates number PPLPC023000164605.

REDACTED

75.    Attached hereto as **Exhibit 177** is a true and correct copy of an April-May 2011 email chain which was produced to the UCC under the Bates number PPLPUCC9000363533.

76.    Attached hereto as **Exhibit 178** is a true and correct copy of *Purdue's Written Responses to 30(b)(6) Topics*, served in connection with *In re: National Prescription Opiate Litigation*, MDL No. 2804, in the United States District Court, Northern District of Ohio, which was produced to the UCC under the Bates number POK003735973.

77.    Attached hereto as **Exhibit 179** is a true and correct copy of a June 18, 2014 Purdue news summary, which was produced to the UCC under the Bates number POK003746339.

78.    Attached hereto as **Exhibit 180** is a true and correct copy of an April 12, 2012 OxyContin Market Events presentation, which was produced to the UCC under the Bates number PPLPC012000372437.

79.    Attached hereto as **Exhibit 181** is a true and correct copy of excerpts from an August 13, 2014 presentation from JP Morgan, which was produced to the UCC under the Bates number PPLPUCC000281516.

80.    Attached hereto as **Exhibit 182** is a true and correct copy of the Purdue plea agreement with the United States dated October 20, 2020 and filed in these proceedings at EFC No. 1828-2.

81.    Attached hereto as **Exhibit 183** is a true and correct copy of excerpts from a notification of patent decision in *In re Oxycotin Antitrust Litig.*, No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008), which was produced to the UCC under the Bates number PURCHI-000834581.

82.    Attached hereto as **Exhibit 184** is a true and correct copy of an August 17, 2020 letter to Mitchell Hurley.

REDACTED

83.    Attached hereto as **Exhibit 185** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2007 and 2006, which was produced to the UCC under the Bates number PPLPUCC500056846.

84.    Attached hereto as **Exhibit 186** is a true and correct copy of a May 1999 email chain, which was produced to the UCC under the Bates number PPLPUCC000004987.

85.    Attached hereto as **Exhibit 187** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC004057767.

86.    Attached hereto as **Exhibit 188a** is a true and correct copy of privilege slip sheet, which was produced to the UCC under the Bates number PPLPC051000035807, and is identified in metadata as the parent document of PPLPC051000035808 (Ex. 188b to this Declaration).

87.    Attached hereto as **Exhibit 188b** is a true and correct copy of a 2006 Comment published in Northwestern University Law Review titled: "West Virginia's Painful Settlement: How the OxyContin Phenomenon and Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for Black Markets," which was produced to the UCC under the Bates number PPLPC051000035808.

88.    Attached hereto as **Exhibit 189** is a true and correct copy of a Purdue News Summary circulated on June 20, 2014, which was produced to the UCC under the Bates number PAZ000115626.

89.    Attached hereto as **Exhibit 190** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

90.    Attached hereto as **Exhibit 191** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2008 and 2007, which was produced to the UCC under the Bates number PPLPUCC500056885.

REDACTED

91.     Attached hereto as **Exhibit 192** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001863.

92.     Attached hereto as **Exhibit 193** is a true and correct copy of a April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001114.

93.     Attached hereto as **Exhibit 194** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001804.

94.     Attached hereto as **Exhibit 195** is a true and correct copy of excerpts from a privilege log dated March 5, 2019, produced by the Debtors in connection with MDL litigation, and provided to the UCC in connection with these proceedings.

95.     Attached hereto as **Exhibit 196** is a true and correct copy of a November 2020 email chain between counsel for Norton Rose Fulbright, the UCC, and the Debtors, among others.

96.     Attached hereto as **Exhibit 197** is a true and correct copy of a November 8, 2020 email from Katherine Porter to counsel for the Debtors concerning deposition scheduling.

97.     Attached hereto as **Exhibit 198** is a true and correct copy of a November 15, 2020 email from Katherine Porter attaching the current deposition schedule in these proceedings.

98.     Attached hereto as **Exhibit 199** of State Settlement Agreement and Release dated July 17, 2007, and entered into by the State of Washington and The Purdue Frederick Company, Inc. and Purdue Pharma L.P., which was produced to the UCC under the Bates number PPLPC030000403213.

99.     Attached hereto as **Exhibit 200** is a true and correct copy of the online curriculum vitae of Norton Rose Fulbright attorney Donald Strauber, which was obtained on November 17, 2020, at https://www.nortonrosefulbright.com/en-us/people/1016474.

REDACTED

100.    Attached hereto as **Exhibit 201** is a true and correct copy of the affidavit of Edward B. Mahony, dated February 4, 2014, and submitted in connection with the lawsuit styled *Purdue Pharma L.P. v. Combs*, Case No. 2013-CA-001941, in the Commonwealth of Kentucky Court of Appeals.

101.    Attached hereto as **Exhibit 202** is a true and correct copy of the following journal article: Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194 (2011).

102.    Attached hereto as **Exhibit 203** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2009 and 2008, which was produced to the UCC under the Bates number PPLPUCC500056924.

103.    Attached hereto as **Exhibit 204** is a true and correct copy of a December 24, 2010 email to Richard Sackler titled "What's new for 'oxycontin' in PubMed," which was produced to the UCC under the Bates number RSF_OLK00055037.

104.    Attached hereto as **Exhibit 205** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2010 and 2009, which was produced to the UCC under the Bates number PPLPUCC500056963.

105.    Attached hereto as **Exhibit 206** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017072.

106.    Attached hereto as **Exhibit 207** is a true and correct copy of an email from Howard Udel forwarding a March 10, 2008 article titled: "Anatomy Of A Patent Dispute: Purdue Pharma's OxyContin Battle," which was produced to the UCC under the Bates number MSF01116645.

107.    Attached hereto as **Exhibit 208** is a true and correct copy of an excerpt from a distributions summary spreadsheet provided by Side A to the UCC.

REDACTED

108.    Attached hereto as **Exhibit 209** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC9004824942.

109.    Attached hereto as **Exhibit 210** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated May 6, 2009, which was produced to the UCC under the Bates number PNY000127987.

110.    Attached hereto as **Exhibit 211** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated April 1, 2010, which was produced to the UCC under the Bates number PPLP004250164.

111.    Attached hereto as **Exhibit 212** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 28, 2011, which was produced to the UCC under the Bates number PPLPUCC001877705.

112.    Attached hereto as **Exhibit 213** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated March 8, 2012, which was produced to the UCC under the Bates number PPLPUCC001884369.

113.    Attached hereto as **Exhibit 214** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 24, 2013, which was produced to the UCC under the Bates number PPLP004427723.

REDACTED

114.    Attached hereto as **Exhibit 215** is a true and correct copy of an August 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC9004797180.

115.    Attached hereto as **Exhibit 216** is a true and correct copy of the September 3, 2019 Amendment to the Shareholders' Agreement executed between Purdue Pharma Inc. and certain PPI Shareholders, which was provided to the UCC by the Debtors.

116.    Attached hereto as **Exhibit 217** is a true and correct copy of hearing transcript excerpts from the Nov. 19, 2019 hearing in this matter.

117.    Attached hereto as **Exhibit 218** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Cecil Pickett, Ph.D.

118.    Attached hereto as **Exhibit 219** is a true and correct copy of deposition transcript excerpts from the November 4, 2020 deposition of Stuart Baker.

119.    Attached hereto as **Exhibit 220** is a true and correct copy of deposition transcript excerpts from the September 22, 2020 deposition of Stephen Ives.

120.    Attached hereto as **Exhibit 221** is a true and correct copy of deposition transcript excerpts from the August 28, 2020 deposition of David Sackler.

121.    Attached hereto as **Exhibit 222** is a true and correct copy of deposition transcript excerpts from the September 2, 2020 deposition of Marianna Sackler.

122.    Attached hereto as **Exhibit 223** is a true and correct copy of deposition transcript excerpts from the November 5, 2020 deposition of Kathe Sackler.

123.    Attached hereto as **Exhibit 224** is a true and correct copy of deposition transcript excerpts from the October 27, 2020 deposition of John Stewart.

124.    Attached hereto as **Exhibit 225** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Mark Timney.

REDACTED

125.    Attached hereto as **Exhibit 226** is a true and correct copy of deposition transcript excerpts from the November 10, 2020 deposition of Mortimer D.A. Sackler.

126.    Attached hereto as **Exhibit 227** is a true and correct copy of deposition transcript excerpts from the September 24, 2020 deposition of Theresa Sackler.

127.    Attached hereto as **Exhibit 228** is a true and correct copy of deposition transcript excerpts from the November 16, 2020 deposition of Peter Boer.


Executed on: November 18, 2020


*/s/ Arik Preis*
Arik Preis

REDACTED

# EXHIBITS A – B

## (redacted)

REDACTED

# EXHIBIT C

## Exhibit C – Privilege Log Control Numbers For *In Camera* Review

| Side A's Privilege Control Numbers for *In Camera* Review | |
|---|---|
| **Category** | **Privilege Control Numbers** |
| **Baker and White**[1] | 5003; 10836; 11432; 11443; 12661; 10448; 10618; 12878; 11057; 13315; 14760; 14926; 30931; 15869 |
| **Special Committee**[2] | 24493; 24600; 25417; 25802; 25829; 25839; 25840; 25841; 32804 |
| **Public Relations**[3] | 14655; 14670; 14965; 15259; 15397; 15444; 16709; 30687; 34105 |
| **Accountants and Investment Advisors**[4] | 2651; 3287; 4247; 4292; 10751; 31970; 33741; 32131 |
| **Intent to Seek Legal Advice**[5] | 16458; 17150; 18355; 24690; 26175 |
| **Exceptions Categories Crime Fraud and At Issue (listed together)**[6] | 1929; 1958; 2017; 2122; 2153; 2497; 2633; 2634; 2650; 2651; 6746; 6902; 7173; 7966; 10686; 11622; 12146; 12147; 13844; 14382; 14385; 14399; 14569; 15869; 16737; 17283; 21664; 24599; 29289; 31566; 31834; 32438; 33220 |

---

[1] Full privilege log entries highlighted at Preis Decl., Ex. A, Tab 1.

[2] Full privilege log entries highlighted at Preis Decl., Ex. A, Tab 3.

[3] Full privilege log entries highlighted at Preis Decl., Ex. A, Tab 4.

[4] Full privilege log entries highlighted at Preis Decl., Ex. A, Tab 5.

[5] Full privilege log entries highlighted at Preis Decl., Ex. A, Tab 6.

[6] Full privilege log entries highlighted at Preis Decl., Ex. A, Tab 7.

1

| Side B's Privilege Control Numbers for *In Camera* Review | |
|---|---|
| **Category** | **Privilege Control Numbers** |
| **Baker and White**[7] | JS-067698; PS-00049272; PS-01043242; PS-01072058; PS-01099447; RS0189895; RS0218610; RS0291493; RS0724510; RSNY12063465; RSNY15084261 |
| **Accountant Stephen Ives**[8] | PS-00106015; PS-01245109; PS-01303703; PS-01307172; PS-01358002; PS-01365941; PS-01412107; PS-01418271; PS-01462062; PS-01520296; PS-01553863; PS-01917947; PS-01979837; RSNY12436974 |
| **Special Committee**[9] | PS-01149009; PS-01157154; PS-01158413; RSM-267318 |
| **Public Relations**[10] | PS-00101960; PS-00004258; PS-00130626; PS-00107354; PS-00129785; PS-00129492; PS-00004930 |
| **Accountants and Investment Advisors**[11] | JS-067618; JS-069025 JS-069039 MB1083823 RS0463956 RSNY12347195 |
| **Exceptions Categories Crime Fraud and At Issue (listed together)**[12] | MB1086385; PS-00000564; PS-00000697; PS-00054790; PS-00054791; PS-00107323; PS-00156535; PS-00156536; PS-00596782; PS-01003436; PS-01015104; PS-01024217; PS-01042976; PS-01043921; PS-01055206; PS-01062548; PS-01139119; PS-01280423; PS-01287223; PS-01315425; PS-01325516; PS-01329508; PS-01365941; PS-01366319; PS-01369596; PS-01371784; PS-01371976; PS-01372042; PS-01422314; PS-01430097; PS-01431673; PS-01445699; PS-01808871; PS-02007313; RS0674611; RS0831598; RS0883988; RSNY12416940 |

---

[7] Full privilege log entries highlighted at Preis Decl., Ex. B, Tab 1.

[8] Full privilege log entries highlighted at Preis Decl., Ex. B, Tab 2.

[9] Full privilege log entries highlighted at Preis Decl., Ex. B, Tab 3.

[10] Full privilege log entries highlighted at Preis Decl., Ex. B, Tab 4.

[11] Full privilege log entries highlighted at Preis Decl., Ex. B, Tab 5.

[12] Full privilege log entries highlighted at Preis Decl., Ex. B, Tab 6.

REDACTED

# EXHIBITS 110 – 181
# (redacted)

REDACTED

# EXHIBIT 182

# Exhibit B

## Plea Agreement

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

| | |
|---|---|
| *970 Broad Street, 7th floor* | 973-645-2700 |
| *Newark, New Jersey 07102* | |

JSF/SMS/PL AGR
2018R00192

October 20, 2020

Patrick Fitzgerald, Esq.
Jennifer L. Bragg, Esq.
Maya P. Florence, Esq.
William E. Ridgway, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606

Jeffrey S. Bucholtz, Esq.
King & Spalding LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006

   Re:  Plea Agreement with Purdue Pharma L.P.

Dear Mr. Fitzgerald:

  This letter sets forth the plea agreement between the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the United States Department of Justice, Civil Division, Consumer Protection Branch (collectively, the "United States") and your client, Purdue Pharma L.P. ("Purdue"). This agreement is contingent upon Purdue's compliance with its cooperation obligations detailed below.

Charge

  Conditioned on the understandings specified below, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States will accept guilty pleas from Purdue to a three-count Information, to be filed in the U.S. District Court for the District of New Jersey (the "Court"), which charges Purdue with: in Count One, a dual-object conspiracy to defraud the United States, contrary to Title 18, United States Code, Section 371, and to violate the Food, Drug, and Cosmetic Act, contrary to Title 21, United States Code, Sections

REDACTED

2

331, 333(a)(1), and 353, all in violation of Title 18, United States Code, Section 371; in Count Two, a conspiracy to violate the Federal Anti-Kickback Statute related to Purdue's payments to health care providers, contrary to Title 42, United States Code, Section 1320a-7b(b), in violation of Title 18, United States Code, Section 371; and in Count Three, a conspiracy to violate the Federal Anti-Kickback Statute related to Purdue's payments to Practice Fusion, a cloud-based electronic health records platform, contrary to Title 42, United States Code, Section 1320a-7b(b), in violation of Title 18, United States Code, Section 371.

If Purdue enters guilty pleas and a judgment of conviction is entered that is consistent with the terms of the agreed disposition included in this plea agreement, and if Purdue otherwise fully complies with all of the terms of this agreement, the United States will not initiate any further criminal charges against Purdue, Purdue Pharma Inc., or their present or former companies, affiliates (including certain independent associated companies[1]), divisions, or subsidiaries, or their predecessors, successors, or assigns with respect to the production, sale, marketing or distribution of opioid products, or the reporting of (or obligation to report) information regarding such products and activities to federal government agencies, between May 2007 and the present. However, in the event that guilty pleas in this matter are not entered for any reason or the judgment of conviction entered as a result does not remain in full force and effect, Purdue agrees that any dismissed charges and any other charges that are not time-barred by the applicable statute of limitations (and any tolling agreements relating to the statute of limitations executed by Purdue on 08/16/2018, 07/16/2019, and 07/01/2020) on the date this agreement is signed by Purdue may be commenced against Purdue, notwithstanding the expiration of the limitations period after Purdue signs the agreement.

The United States expressly reserves the right to prosecute any individual, including but not limited to present and former owners, officers, directors, employees, and agents of Purdue, in connection with the conduct encompassed by this plea agreement or known to the United States.

<u>Sentencing</u>

The violations of Title 18, United States Code, Section 371 to which Purdue agrees to plead guilty each carry a maximum term of probation of five years and a statutory maximum fine equal to the greatest of (1) $500,000, or (2) twice the gross amount of any pecuniary gain that any persons derived from the offense, or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense. Fines imposed by the sentencing judge may be subject to the payment of interest.

---

[1] The list of independent associated companies is contained in **Exhibit A**.

1:19-cr-03549-hdd Doc 2015-28 Filed 11/09/21/20 Entered 11/09/21/20 54:580:31 Main Document
REDACTED
Plea Agreement Pg 28 of 178 Pg 4 of 97

3

Further, in addition to imposing any other penalty on Purdue, the sentencing judge: (1) will order Purdue to pay an assessment of $400 per count pursuant to Title 18, United States Code, Section 3013, which assessment must be paid by the date of sentencing; and (2) may order Purdue to pay restitution pursuant to Title 18, United States Code, Section 3663.

The parties agree that the fine contemplated by this agreement is consistent with the United States Sentencing Guidelines ("U.S.S.G.") and takes into account Purdue's conduct under Title 18, United States Code, Sections 3553 and 3572. The United States calculates the Sentencing Guidelines as follows:

(1) The parties agree that the base Guideline fine calculation is $2,000,000,000 in that such amount was the reasonably estimated pecuniary loss from the offenses, see U.S.S.G. §§ 8C2.3, 8C2.4(a)(3);

(2) Pursuant to U.S.S.G. § 8C2.5, the culpability score is nine (9), which is determined as follows:

(i) Base culpability score of five (5) pursuant to U.S.S.G. § 8C2.5(a);

(ii) Add four (4) points pursuant to U.S.S.G. § 8C2.5(b)(2);

(iii) Add two (2) points pursuant to U.S.S.G. § 8C2.5(c); and

(iii) Deduct two (2) points pursuant to U.S.S.G. § 8C2.5(g)(2).

(3) Pursuant to U.S.S.G. § 8C2.6, the appropriate multiplier range associated with a culpability score of nine (9) is 1.80 to 3.60; and

(4) Therefore, the advisory Guidelines Fine Range is $3,600,000,000 to $7,200,000,000.

The parties agree that U.S.S.G. §§ 8C2.5(c) and 8C2.5(g)(2) apply. It is the position of Purdue that U.S.S.G. § 8C2.5(b)(2) does not apply. Purdue stipulates, however, that the advisory Guidelines Fine Range is $3,600,000,000 to $7,200,000,000.

Agreed Disposition

The United States and Purdue agree that, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the appropriate disposition of this case is as follows (the "Agreed Disposition"):

(1) FINE: The sentence imposed shall order a criminal fine in the amount of $3,544,000,000;

(2) FORFEITURE: Purdue consents to the entry of a forfeiture judgment in the amount of $2,000,000,000;

(3) RESTITUTION: No restitution shall be entered because restitution to other persons is not administratively feasible in this case, and attempting to fashion an order to provide restitution to any such possible persons would result in complication and prolongation of the sentencing process that would outweigh the need to provide restitution to any such possible persons under 18 U.S.C. § 3663(a)(1)(B)(ii); and

(4) PROBATION: Purdue shall not be subject to a term of probation.

The Agreed Disposition takes into account, among other things, Purdue's status as a debtor in *In re Purdue Pharma L.P., et al.*, No. 19-bk-23649 (RDD) (the "Purdue Bankruptcy"), and Purdue's agreement to a claim in the amount of $2,800,000,000 to resolve its civil liability arising from the Department of Justice's civil investigation relating to similar conduct (attached as **Exhibit B**). Purdue understands that the United States takes no position as to the proper tax treatment of any other payments made by Purdue pursuant to this plea agreement, any civil settlement agreement, or any agreement with the Department of Health and Human Services or any other federal government agency.

The parties agree that Purdue will file a motion in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") pursuant to Federal Rule of Bankruptcy Procedure 9019 that seeks the Bankruptcy Court's approval for the disposition of assets described in this plea agreement, including the criminal fine and forfeiture amounts described below (the "9019 Motion"). If the Bankruptcy Court denies the 9019 Motion, this agreement shall not be effective. If the Bankruptcy Court grants the 9019 Motion, the parties agree to request a plea hearing before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure that will occur within seven days of the Bankruptcy Court's grant of the 9019 Motion.

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States and Purdue agree that the Agreed Disposition is the appropriate disposition of this case. The parties agree to request that the Court's acceptance of the plea agreement, pursuant to Rule 11(c)(3)(A), be deferred until the date of the sentencing hearing (the "Sentencing Hearing Date"). The parties further agree to request that the Sentencing Hearing Date take place no earlier than seventy-five days following the date of confirmation of the chapter 11 plan of reorganization in the Purdue Bankruptcy (the "Plan of Reorganization") under 11 U.S.C. § 1129, but in any event 7 days prior to such Plan of Reorganization becoming effective. In the event the Purdue Bankruptcy is converted from a chapter 11 case to a chapter 7 case, or the Purdue Bankruptcy is dismissed, the parties agree to request that the Sentencing Hearing Date take place within fourteen days of such event.

Pursuant to Rule 11(c)(1)(C), if the Court accepts this plea agreement on the Sentencing Hearing Date, the Court will be bound to impose a sentence consistent with the Agreed Disposition. If, however, the sentencing judge rejects this plea agreement and the Agreed Disposition, Purdue has the opportunity, pursuant to Rule 11(c)(5), to withdraw its pleas of guilty, and the United States may also withdraw from the plea agreement. Additionally, prior to the Sentencing Hearing Date, Purdue may withdraw its pleas of guilty if one of the following events occurs (a "Plea Withdrawal Triggering Event"): (1) the Bankruptcy Court rejects, or otherwise declines to confirm, a Plan of Reorganization proposed by Purdue in the Purdue Bankruptcy that provides for the emergence from the Purdue Bankruptcy of a public benefit company (or entity with a similar mission), or (2) the Department of Health and Human Services Office of Inspector General exercises, or states an intent to exercise, any available authority to exclude Purdue's successor public benefit company (or entity with a similar mission) from participation in Federal health care programs. If a Plea Withdrawal Triggering Event occurs, Purdue shall determine whether to withdraw its pleas of guilty, and shall notify the United States of its decision, within 14 days. If Purdue elects not to withdraw its pleas of guilty within 14 days of a Plea Withdrawal Triggering Event, Purdue will have waived its right to withdraw its pleas based on that Plea Withdrawal Triggering Event, except under the circumstances set forth in Rule 11(c)(5).Purdue's decision not to withdraw its pleas based on a Plea Withdrawal Triggering Event does not waive its right to withdraw its pleas based on another Plea Withdrawal Triggering Event. If a Plea Withdrawal Triggering Event does not occur, Purdue shall not be permitted to withdraw its pleas of guilty, except under the circumstances set forth in Rule 11(c)(5).

In the event that Purdue withdraws its guilty pleas or the judgment of conviction entered as a result does not remain in full force and effect, the waiver of indictment filed at the time of the plea hearing will remain in full force and effect. Additionally, in the event that Purdue withdraws its guilty pleas, Purdue agrees that it will not demand a speedy trial pursuant to 18 U.S.C. § 3161, or any other statute or authority, in connection with the charges in the Information. Purdue further agrees that if it withdraws its guilty pleas, the Government should be provided as much time as it believes is reasonably necessary to prepare for trial, and Purdue will not object to any such reasonable request by the Government. The waiver of indictment applies to each count of the three counts of the Information and may be asserted and enforced by the United States in any judicial district, including the District of New Jersey and the District of Vermont. Purdue further agrees that, if it withdraws its guilty pleas or the judgment of conviction entered as a result does not remain in full force and effect, the criminal Information that will be filed in the District of New Jersey on the date of its plea hearing shall remain pending, and that the United States may, in its sole discretion, elect to transfer Count Three of the Information to the District of Vermont for further proceedings.

19-23649-shdd Doc 2018-28 Filed 11/02/21 Entered 11/02/21 04:58:31 Main Document
Plea Agreement Page 31 of 178 Pg 7 of 97

6

REDACTED

Rights of the United States Regarding Sentencing

Except as otherwise provided in this agreement, the United States reserves its right to take any position with respect to the appropriate sentence to be imposed on Purdue by the sentencing judge, to correct any misstatements relating to the sentencing proceedings, and to provide the sentencing judge and the United States Probation Office all law and information relevant to sentencing, favorable or otherwise. In addition, the United States may inform the sentencing judge and the United States Probation Office of: (1) this agreement; and (2) the full nature and extent of Purdue's activities and relevant conduct with respect to this case.

Stipulations

The United States and Purdue stipulate and agree to the statements set forth in the attached Schedule A, which hereby are made a part of this plea agreement. This stipulation does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate to a particular fact or legal conclusion, each reserves the right to argue the existence of and the effect of any such fact or conclusion upon the sentence. Moreover, this agreement to stipulate on the part of the United States is based on the information and evidence that the United States possesses as of the date of this agreement. Thus, if the United States obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, the United States shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either the United States or Purdue from any other portion of this agreement, including any other stipulation. If the sentencing court rejects a stipulation, both parties reserve the right to argue on appeal or at post-sentencing proceedings that the sentencing court was within its discretion and authority to do so. These stipulations do not restrict the United States' right to respond to questions from the Court and to correct misinformation that may be provided to the Court.

Agreement Not to Prosecute

Except as provided herein, the United States agrees that, other than the charges in the Information in this case, it will not bring any other criminal charges or forfeiture action against Purdue, Purdue Pharma Inc., or their present and former companies, affiliates (including the independent associated companies identified above), divisions, or subsidiaries, or their predecessors, successors, or assigns, for conduct which (1) falls within the scope of the investigations conducted by the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the Consumer Protection Branch of the Department of Justice relating to

REDACTED

Purdue, or (2) was known to the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, the United States Attorney's Office for the Southern District of New York, or the Consumer Protection Branch of the Department of Justice as of the date of the execution of this plea agreement, and which concerned Purdue in the United States. The non-prosecution provisions of this paragraph are binding on the Office of the United States Attorney for the District of New Jersey, the Office of the United States Attorney for the District of Vermont, the Consumer Protection Branch, Civil Division, of the Department of Justice, and the United States Attorney's Offices for each of the other 92 judicial districts of the United States. The non-prosecution provisions in this paragraph are also binding on the Criminal Division of the United States Department of Justice, with the exception that this paragraph does not prohibit the Fraud Section of the Criminal Division and/or the United States Attorney's Office for the District of New Jersey from investigating allegations that a Purdue affiliate or affiliates may have violated the Foreign Corrupt Practices Act and related statutes in connection with the sale and marketing of Purdue's products, nor does it prohibit the United States from bringing charges against any culpable individual or entity as a result of such investigation. This investigation and these prosecutions, if any, are specifically excluded from the release in this paragraph. Attached as **Exhibit C** to this agreement is a copy of the letter to Rachael A. Honig, Attorney for the United States, from Acting Assistant Attorney General Jeffrey Bossert Clark, Civil Division, Department of Justice, authorizing this agreement.

Purdue understands that this plea agreement does not bind any other government agency, or any component of the Department of Justice, except as specified in this agreement.

<u>Waiver of Appeal and Post-Sentencing Rights</u>

The United States and Purdue agree that, provided the District Court imposes a sentence in accordance with this Rule 11(c)(1)(C) plea agreement, neither party will appeal that sentence. Purdue further agrees that, in exchange for the concessions the United States made in entering into this Rule 11(c)(1)(C) plea agreement, it will not challenge its conviction for any reason by any means, other than ineffective assistance of counsel, and it will not challenge or seek to modify any component of its sentence for any reason by any means, other than ineffective assistance of counsel. The term "any means" includes, but is not limited to, a direct appeal under 18 U.S.C. § 3742 or 28 U.S.C. § 1291, a motion to vacate the sentence under 28 U.S.C. § 2255, or any other motion, however captioned, that seeks to attack or modify any component of the judgment of conviction or sentence. Lastly, the parties have stipulated to certain facts in the Schedule A to this plea agreement. Accordingly, the parties agree that they will

19-23649-shdd Doco2015281Filed FilEd 11/0/21/2Enterde td/19/20/2054:580:31air ExhiZitinBent
REDACTED
Plea AgrePage3Be of 1178g 9 of 97
8

not challenge at any time, using any means, the District Court's acceptance of those stipulated facts.

Criminal Fine

Purdue agrees that the fine imposed by the Court as part of the Agreed Disposition shall be treated as an allowed, unsubordinated, general unsecured claim in the Purdue Bankruptcy.

Forfeiture

As part of its acceptance of responsibility, and (i) pursuant to 18 U.S.C. § 982(a)(7), Purdue agrees to forfeit to the United States all of its right, title, and interest in all property Purdue obtained that constituted and was derived, directly and indirectly, from gross proceeds traceable to its conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, contrary to 21 U.S.C. §§ 331, 333(a)(1), and 353(b)(1)(B); and (ii) pursuant to 21 U.S.C. § 334 and 28 U.S.C. § 2461(c), Purdue agrees to forfeit to the United States all of its right, title, and interest in the value of any and all Purdue drugs that were misbranded after such drugs were held for sale after shipment in interstate commerce contrary to 21 U.S.C. § 331(k). Purdue further agrees that the aggregate value of such property was $2,000,000,000; that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists; that the United States is therefore entitled to forfeit substitute assets in an amount not to exceed $2,000,000,000 (the "Forfeiture Judgment"); that the Forfeiture Judgment shall be deemed to have the status of an allowed superpriority administrative expense claim in the Purdue Bankruptcy with priority over any and all claims and administrative expenses of any kind, including but not limited to those specified in 11 U.S.C. §§ 364(c)(1), 503(b)(1), or 507(b); and that Purdue shall not grant to any other party any superpriority claim that is senior to or on parity with the Forfeiture Judgment. Notwithstanding the provisions of Rule 11(c)(1)(C), Purdue agrees that the Court may enter a preliminary order of forfeiture at the time the plea is entered, and that such Order will be final upon entry of the judgment of conviction, pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, and may be satisfied in whole or in part with substitute assets.

Purdue agrees that it shall tender to the United States Marshals a $225 million payment in partial satisfaction of the Forfeiture Judgment within three business days following entry of the judgment of conviction. If this $225 million payment is not paid by close of business of the third day following the entry of the judgment of conviction: (1) interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date; and (2) the United States shall be authorized to conduct any discovery needed to identify, locate, or dispose of property sufficient to pay the Forfeiture Judgment in full or in connection with any petitions filed with regard to proceeds or substitute assets, including depositions, interrogatories, and requests for production of documents, and the issuance of subpoenas. In the event that the Bankruptcy Court does not confirm

19-23649-shdd Doc 2018-28 Filed 11/02/21 Entered 11/02/21 05:40:31 Main Document
Plea Agreement Pg 34 of 178 Pg 10 of 97

9

REDACTED

a plan of reorganization in the Purdue Bankruptcy, Purdue is not entitled to credit against the Forfeiture Judgment (as set forth in more detail below in the Coordination of Corporate Resolution Penalties section) and any additional payments necessary to satisfy the Forfeiture Judgment shall also be due by close of business on the third business day following the entry of the judgment of conviction.

Purdue shall include in the 9019 Motion a request that the Bankruptcy Court approve the transfer of $225 million to the United States Marshals Service in partial satisfaction of the Forfeiture Judgment.

Purdue shall not file, or cause any other person or entity to file, or assist any other person or entity in filing, any claim to the Forfeiture Judgment, or in any other way interfere with or delay the forfeiture of the Forfeiture Judgment. Purdue further agrees that it will not file a claim or a petition for remission or mitigation in any proceeding involving the Forfeiture Judgment and will not cause or assist anyone else in doing so. Failing to execute any documents necessary to pass clear title to the Forfeiture Judgment to the United States will be considered a material breach of this Agreement.

Upon reasonable request from the United States, Purdue agrees to reasonably cooperate with the United States in connection with responding to any claims asserted against the Forfeiture Judgment.

Purdue waives the requirements of Rules 32.2 and 43(a) of the Federal Rules of Criminal Procedure regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Purdue understands that criminal forfeiture is part of the sentence that may be imposed in this case and waives any failure by the court to advise it of this pursuant to Rule 11(b)(1)(J) of the Federal Rules of Criminal Procedure when the plea is entered. Purdue waives any and all constitutional, statutory, and other challenges to the forfeiture on any and all grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment. It is further understood that any forfeiture of Purdue's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the court may impose upon Purdue in addition to forfeiture.

Coordination of Corporate Resolution Penalties

In order to avoid the unnecessary imposition of duplicative fines, penalties, and/or forfeiture for the same or similar misconduct, the United States agrees to credit against the $2 billion Forfeiture Judgment $1.775 billion of the value distributed or otherwise conferred in settlement of claims asserted by state, tribal, or local government entities under the Plan of Reorganization (the "Forfeiture Judgment Credit"). If less than $1.775 billion in value is distributed

or otherwise conferred in settlement of such claims under the Plan of Reorganization, the amount of the Forfeiture Judgment Credit will be equal to such lesser amount of value. If the $225 million payment and the Forfeiture Judgment Credit combine to total $2 billion, they will be deemed to permanently and finally satisfy the Forfeiture Judgment.

In the event that the Bankruptcy Court does not confirm a plan of reorganization in the Purdue Bankruptcy that provides for the emergence from the Purdue Bankruptcy of a public benefit company (or entity with a similar mission), then (i) Purdue shall not be entitled to the Forfeiture Judgment Credit, and (ii) the United States shall retain the full amount of the Forfeiture Judgment as an allowed superpriority administrative expense claim.

<u>Cooperation</u>

Purdue shall cooperate with the United States' ongoing investigations and any resulting prosecutions pertaining to the investigations by the District of New Jersey, the District of Vermont, and the Consumer Protection Branch of the Department of Justice relating to Purdue. Purdue's ongoing cooperation is a condition of this agreement and failure to comply with this term shall be deemed a material breach of this agreement. As reflected in the Justice Manual, Purdue's cooperation will include: (1) making disclosures of all relevant facts about any individuals who were involved in the misconduct; (2) to the extent possible, making witnesses available for interviews and providing the United States relevant documentary evidence; and (3) voluntary disclosure of other wrongdoing identified by Purdue. The United States will determine in its sole discretion whether information it seeks from Purdue as part of Purdue's cooperation is relevant to the United States' investigations.

Notwithstanding any provision of this agreement, (1) Purdue is not required to request its current or former officers, agents, or employees that they forgo seeking the advice of an attorney or that they act contrary to that advice; (2) Purdue is not required to take any action against its officers, agents, or employees for following their attorney's advice; and (3) Purdue is not required to waive any privilege or claim of work product protection.

<u>Document Repository</u>

Once the order confirming the chapter 11 plan of reorganization in the Purdue Bankruptcy has become final and non-appealable, and the plan of reorganization has become effective, Purdue will create and host a public and permanent document repository containing non-privileged documents in Purdue's possession, custody, or control which it has produced to the Department and that the Department identifies as relating to the charges asserted in the information and the alleged civil violations. Purdue's document

repository shall be publicly available at an easily identifiable and accessible website. Purdue and its successors shall maintain the document repository for no less than five (5) years.

The Department acknowledges that the identified documents may require redaction based on privilege, HIPAA, and other privacy interests before they may be made public. The Department further acknowledges that the process of reviewing and preparing documents for publication in the repository may require time, but Purdue shall make reasonable efforts to publish the documents within a reasonable time period. The Department may supplement the list of documents to be included in the repository at any time, up to the date the repository is published. The Department's determination that documents relate to the underlying crimes and alleged civil violations shall be final; however, should Purdue believe in good faith that a document does not relate to the underlying conduct, Purdue may advise the Department, which shall reasonably consider Purdue's request.

Other Provisions

No provision of this agreement shall preclude Purdue from pursuing in an appropriate forum, when permitted by law, an appeal, collateral attack, writ, or motion claiming that Purdue received constitutionally ineffective assistance of counsel.

Corporate Authorization

Purdue agrees that it is authorized to enter into this agreement, that it has authorized the undersigned corporate representative, Robert S. Miller, to take this action, and that all corporate formalities for such authorization have been observed.

Purdue has provided to the United States a certified copy of a resolution of the governing body of Purdue, affirming that it has authority to enter into this agreement and has (1) reviewed this plea agreement in this case; (2) consulted with outside legal counsel in this matter; (3) authorized execution of this agreement; (4) authorized Purdue to enter a conditional plea of guilty if authorized in the Purdue Bankruptcy; and (5) authorized Robert S. Miller to execute this agreement and all other documents necessary to carry out the provisions of this agreement. A copy of this resolution attached hereto as **Exhibit D**.

<u>No Other Promises</u>

This agreement and the Exhibits hereto constitute the plea agreement between Purdue and the United States and together their terms supersede any previous agreements between them. No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.

Very truly yours,

RACHAEL A. HONIG
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

J. Stephen Ferketic
Sean M. Sherman
Nicholas P. Grippo
Melissa M. Wangenheim
Assistant U.S. Attorneys
District of New Jersey


CHRISTINA E. NOLAN
*United States Attorney*

Owen C.J. Foster
Assistant U.S. Attorney
United States Attorney's Office
District of Vermont

GUSTAV W. EYLER
Director

Gabriel H. Scannapieco
Kara M. Traster
Maryann N. McGuire
Rachel E. Baron
Michael L. Collyer
Hilary K. Perkins
Trial Attorneys
Consumer Protection Branch
Civil Division
Department of Justice

19-23649-shl Doc 2015-28 Filed 11/02/21 Entered 11/02/21 05:40:30 Main Document
Plea Agreement Pg 38 of 178 Page 14 of 97

REDACTED

13

## COMPANY REPRESENTATIVE'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Purdue Pharma L.P. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Outside counsel and I discussed all of the Agreement's provisions, including those addressing the charges, sentencing, stipulations, forfeiture and waiver, as well as the impact Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure has upon this agreement. Counsel fully advised me of the rights of the Company, of possible defenses, of the provisions of the U.S. Sentencing Guidelines, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chairman of the Board of Directors of Purdue Pharma Inc., the general partner of the Company and that I have been duly authorized by the Board of Directors of the general partner of the Company to execute this Agreement on behalf of the Company.

Date: October 20, 2020                         Purdue Pharma L.P.


By: _____
Robert S. Miller

19-23649-shld Doc 2018-28 Filed 11/01/21 Entered 11/01/21 05:40:30 Main Document
REDACTED
Plea Agreement Page 39 of 178 Pg 15 of 97

14

# CERTIFICATE OF COUNSEL

I am counsel for Purdue Pharma L.P. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined the relevant Company documents and have discussed the terms of this Agreement, including those addressing the charges, sentencing, stipulations, forfeiture and waiver, as well as the impact Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure has upon this Agreement, with the Company's Board of Directors. Based on our review of the foregoing materials and discussion, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of the Agreement with the Board of Directors, the Chief Executive Officer, and the Chairman of the Board of Directors of Purdue Pharma Inc., the general partner of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the provisions of the U.S. Sentencing Guidelines, and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: October 20, 2020                    Purdue Pharma L.P.

By: _____

Patrick J. Fitzgerald
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Counsel for Purdue Pharma L.P.

19-23649-shld Doc 2018-28 Filed 11/02/21/20 Entered 11/02/10/2021 05:40:30 Main Exhibit B Document
Plea Agreement 176 Page 40 of 176 16 of 97

REDACTED

15

## Schedule A

1. The United States and Purdue Pharma L.P. agree to stipulate to the following facts:

## Count One

a. Purdue Pharma L.P. ("Purdue") is a privately held Delaware limited partnership headquartered in Stamford, Connecticut. Purdue has manufactured, sold, and distributed its branded opioid products since at least 2007, including OxyContin®, an extended release opioid medication ("ERO") that is a Schedule II controlled substance. During this time, Purdue or its manufacturing subsidiaries annually applied for and received registrations from the U.S. Drug Enforcement Administration (DEA) as a manufacturer and distributor of controlled substances. Accordingly, Purdue was subject to the obligations imposed by the Controlled Substances Act and its implementing regulations, including the requirement that it maintain effective controls against diversion.

b. From at least 2007 through February 2018, Purdue employed sales representatives to establish and maintain relationships with Health Care Providers ("HCPs") who prescribed opioids. Purdue's sales representatives called on or "detailed" HCP offices with a goal of promoting its opioid products to those HCPs. Purdue instructed its sales representatives to provide HCPs with prescription savings cards to defray the cost to patients to fill prescriptions for Purdue opioid products. From as early as August 2010, Purdue implemented speaker programs in which Purdue recruited and paid HCPs to educate other HCPs about Purdue opioid products.

c. In an effort to identify HCPs potentially engaged in abuse and diversion, Purdue implemented Standard Operating Procedure 1.7.1—later rebranded as the "Abuse and Diversion Detection Program" ("ADD Program")—in 2002. Through the ADD Program, Purdue required every member of its field organization, including sales representatives, to report to Purdue upon learning of circumstances or making observations that may suggest potential abuse or diversion of opioids. Purdue called these "Reports of Concern" or "ADD Reports." Circumstances requiring the submission of an ADD Report included, but were not limited to: an HCP engaging in an atypical pattern of prescribing techniques; information from a highly credible source or multiple sources (*e.g.*, pharmacists, law enforcement, or others) that an HCP, or patients of the HCP, were engaging in diversion; unlicensed individuals signing or dispensing prescriptions; a large number of patients traveling considerable distance for visits to the practice; long lines of patients waiting for prescriptions from an HCP; an HCP's waiting room being filled to capacity; exceedingly brief or non-existent contact between a patient and an HCP; and credible allegations that an HCP is under active

investigation related to diversion or substance abuse by any law enforcement or regulatory authority.

d. Senior-level Purdue employees reviewed ADD Reports, as well as additional information related to the HCP (including sales representatives' notes from calling on the HCP, the HCP's prescription history, the status of the HCP's state and DEA licenses, and sales force observations) and determined whether Purdue should no longer promote its opioid products to that individual or practice. These determinations resulted in decisions to "continue calling" or "cease calling" on an HCP. Purdue referred to the list of HCPs that it determined it should cease calling upon as having been placed in "Region Zero." The ADD Program provided that Purdue could take such further steps as appropriate, including "providing notice of such potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities."

e. The DEA regulates the total quantity of schedule I and II controlled substances that can be manufactured in a given year through a quota system. The quota system provides for the estimated medical, scientific, research, and industrial needs of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks, while avoiding overproduction, shortages, and diversion. To determine the annual legitimate need and set appropriate quotas, the DEA relies upon several sources of data, including data from manufacturers concerning the quantity of legitimate prescriptions written for controlled substances on an annual basis. To support its requested quota allocation, Purdue provided the DEA with data concerning the quantity and sales volume of prescriptions for Purdue Schedule II controlled substances. Purdue presented these data as constituting the annual medically-related sales of its opioid products, but failed to inform the DEA of over 1.4 million OxyContin prescriptions written by Region Zero HCPs.

f. Beginning in or about May 2007 and continuing until in or about March 2017, in the District of New Jersey and elsewhere, Purdue knowingly and intentionally conspired and agreed with others to defraud the DEA by impeding its lawful governmental functions and rights by: failing to maintain effective controls against diversion in that, with respect to more than one hundred HCPs, including ten of the HCPs the United States has identified for Purdue in the course of plea negotiations, Purdue, *inter alia*, failed to: (1) report and provide complete and accurate information to DEA about HCPs after the HCPs were flagged by internal anti-diversion programs, in situations in which the Company possessed sufficient information that should have led to a report; and (2) cease detailing HCPs after receiving information suggesting that those HCPs were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice, in situations in which Purdue possessed sufficient information that a decision should have been made to cease detailing. Moreover, Purdue knowingly and intentionally conspired and agreed with others to impede the lawful function of the DEA by failing to account for

19-23549-shdd Doc 2018-28 Filed 11/021/20 Entered 11/021/20 10:54:08 Main Document
REDACTED
Plea Agreement 176, 18 of 97
Page 42 of 178

17

potential downstream diversion of its products in reporting sales numbers to DEA as part of its quota requests.

g. Beginning in or about May 2007 and continuing until in or about March 2017, in the District of New Jersey and elsewhere, Purdue knowingly and intentionally conspired and agreed with others to aid and abet HCPs' dispensing, without a legitimate medical purpose and outside the usual course of professional practice (and thus without a valid prescription), prescription drugs held for sale after shipment in interstate commerce, thereby rendering the dispensed drugs misbranded in violation of the Federal Food, Drug, and Cosmetic Act.

## Count Two

h. Beginning in or about June 2009 and continuing until in or about March 2017, in the District of New Jersey and elsewhere, Purdue Pharma L.P. knowingly and intentionally conspired and agreed with others to commit an offense against the United States, that is, to knowingly and willfully offer payments in the form of speakers fees and other payments (*e.g.*, travel, lodging, consulting fees) to two HCPs with at least one purpose to induce those HCPs to write more prescriptions of Purdue opioid products, for which payment was made in whole or in part under a Federal healthcare program.

## Count Three

i. During the relevant time period, Practice Fusion was a Delaware corporation with headquarters in San Francisco, California. Practice Fusion was a cloud-based electronic health records ("eHR") platform that generally provided services to healthcare providers without charge.

j. Prior to and during the summer of 2015, Practice Fusion marketed to Purdue the potential use of a Clinical Decision Support ("CDS") program that would be placed on the Practice Fusion eHR platform in order to alert healthcare providers to conduct pain assessments and document pain treatment plans for patients. As part of marketing the CDS program to Purdue, Practice Fusion represented to Purdue that the CDS program could be a means to increase the number of prescriptions written for Purdue's ERO medications.

k. In the fall of 2015, following the Practice Fusion presentations and marketing efforts, a manager-level marketing employee proposed that the Practice Fusion CDS be included as a marketing "tactic" for Purdue in 2016. The employee completed internal marketing department forms regarding the Practice Fusion CDS program that identified the "objective" of the program as "[g]row[ing] ERO prescriptions within the Practice Fusion eHR" and estimated a "return on investment" based on an increase in Purdue's ERO medications. Purdue paid for the Practice Fusion CDS with marketing funds that were allocated by each of its three ERO brands.

1:19-cr-00949-hdd Doc 2018-28 Filed 11/01/21 Entered 11/01/21 05:40:30 Main Document
Plea Agreement Page 43 of 178 Page 19 of 97

18

REDACTED

l. Based in part on the Practice Fusion presentation and the internal Purdue analysis of the proposed CDS program, Purdue agreed to pursue the project and entered into a one year "Statement of Work" contract with Practice Fusion, effective as of March 1, 2016. Purdue paid Practice Fusion $959,700 for the specified services, including the CDS program.

m. At the time Purdue entered into this contractual Statement of Work with Practice Fusion, one purpose of Purdue's investment was to provide remuneration in return for Practice Fusion running the CDS program on the Practice Fusion eHR platform, which arranged for healthcare providers who opted to use the eHR platform to order Purdue EROs that may have been paid for under a Federal health care program.

n. Purdue agreed to have the Practice Fusion CDS program run for a one-year period, from July 2016 to June 2017, and be provided to healthcare providers on the Practice Fusion eHR platform. Purdue made payments to Practice Fusion from April 22, 2016, through December 23, 2016.

o. The remuneration paid by Purdue to Practice Fusion was done in return for Practice Fusion including in its eHR platform a CDS with one of its purposes to increase Purdue's ERO sales, portions of which were paid for by federal health care programs, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(B) & (2)(B).

p. Purdue and Practice Fusion's agreement was a conspiracy to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371.

REDACTED

# Exhibit A

REDACTED

Exhibit A
# ACTIVE OPERATIONAL IAC's

| COMPANY | Jurisdiction |
|---|---|
| Mundipharma Pharmaceuticals Argentina S.r.l. | Argentina |
| Mundipharma Pty Limited | Australia |
| Mundipharma Healthcare Pty. Limited | Australia |
| Mundipharma Oncology Pty. Limited | Australia |
| Mundipharma GesmbH | Austria |
| Mundipharma BV | Belgium |
| Mundipharma Pharmaceuticals Belgium BV | Belgium |
| Mundipharma Brasil Productos Médicos e Farmacêuticos Ltd. | Brazil |
| Elvium Life Sciences GP Inc. | Canada |
| Elvium Life Sciences Limited Partnership | Canada |
| Purdue Pharma | Canada |
| Purdue Pharma Inc. | Canada |
| Beijing Mundipharma Pharmaceutical Company Limited | China |
| Mundipharma (Shanghai) International Trade Company Limited | China |
| Mundipharma (Colombia) S.A.S. | Colombia |
| Mundipharma A/S | Denmark |
| Mundipharma Middle East FZ-LLC | UAE/Dubai |
| Mundipharma Egypt LLC | Egypt |
| Mundipharma Oy | Finland |
| Mundipharma Management S.ar.l. | France |
| Mundipharma SAS | France |
| Mundipharma (Hong Kong) Limited | Hong Kong |
| PT. Mundipharma Healthcare Indonesia | Indonesia |
| Mundipharma Kabushiki Kaishe | Japan |
| Mundipharma Korea Limited | Korea |
| Euro-Celtique S.A. | Luxembourg |
| Mundipharma Pharmaceuticals Sdn. Bhd. | Malaysia |
| Mundipharma de Mexico, S. de R.L. de C.V. | Mexico |
| Mundipharma (Myanmar) Co., Limited | Myanmar |
| Mundipharma DC B.V. | Netherlands |
| Mundipharma Pharmaceuticals B.V. | Netherlands |
| Mundipharma New Zealand Limited | New Zealand |
| Mundipharma A.S. | Norway |
| Mundipharma Healthcare Pte. Limited | Singapore |
| Mundipharma IT Services Pte. Limited | Singapore |
| Mundipharma Manufacturing Pte. Limited | Singapore |
| Mundipharma Pharmaceuticals Private Limited | Singapore |
| Mundipharma Pte Limited | Singapore |
| Mundipharma Singapore Holding Pte. Limited | Singapore |
| Mundipharma (Proprietary) Limited | South Africa |
| Mundipharma Biologics S.L. | Spain |
| Mundipharma Pharmaceuticals S.L. | Spain |
| Mundipharma AB | Sweden |

REDACTED

| | |
|---|---|
| Mundipharma AG | Switzerland |
| Mundipharma Distribution GmbH | Switzerland |
| Mundipharma International Services GmbH | Switzerland |
| Mundipharma IT GmbH | Switzerland |
| Mundipharma IT Services GmbH | Switzerland |
| Mundipharma Laboratories GmbH | Switzerland |
| Mundipharma LATAM GmbH | Switzerland |
| Mundipharma MEA GmbH | Switzerland |
| Mundipharma Near East GmbH | Switzerland |
| Taiwan Mundipharma Pharmaceuticals Limited | Taiwan |
| Mundipharma (Thailand) Limited | Thailand |
| Mundipharma Pharmaceuticals Industry and Trade Limited | Turkey |
| Bard Pharmaceuticals Limited | England |
| Clinical Designs Limited | England |
| Mundibiopharma Limited | England |
| Mundipharma International Limited | England |
| Mundipharma International Technical Operations Limited | England |
| Mundipharma IT Services Limited | England |
| Mundipharma Medical Company Limited | England |
| Mundipharma Research Limited | England |
| Napp Laboratories Limited | England |
| Napp Pharmaceutical Holdings Limited | England |
| Napp Pharmaceutical Group Ltd. | England |
| Napp Pharmaceuticals Limited | England |
| Qdem Pharmaceuticals Limited | England |
| Mundipharma Healthcare Corporation | United States (DE) |
| Mundipharma Healthcare LLC | United States (WA) |
| Mundipharma IT Services Inc. | United States (DE) |
| Mundipharma Pharmaceuticals Inc. | United States (NY) |
| Mundipharma International Corporation Limited | Bermuda |
| Mundipharma International Limited | Bermuda |
| Mundipharma Ophthalmology Products Limited | Bermuda |
| Mundipharma Laboratories Limited | Bermuda |
| Mundipharma Limited | Bermuda |
| Mundipharma Medical Company | Bermuda |
| LP Clover Limited | Bermuda |
| Mundipharma Corporation (Ireland) Limited | Ireland |
| MN Consulting LLC | Bermuda |
| Mundipharma Internatioanl Services S.ar.l. | Luxembourg |
| Mundipharma Deutschland GmbH & Co. KG | Germany |
| Mundipharma GmbH | Germany |
| Krugmann GmbH | Germany |
| Mundipharma Verwaltungsgesellschaft mbH | Germany |
| Mundipharma Pharmaceuticals Limited | Ireland |
| Mundipharma Pharmaceuticals S.r.l. | Italy |
| Mundipharma TK | Japan |
| Ladenburg B.V. | Netherlands |

REDACTED

| | |
|---|---|
| Mundipharma Bradenton B.V. | Netherlands |
| Bradenton Products B.V. | Netherlands |
| Mundipharma B.V. | Netherlands |
| Mundipharma Polska SP. Z.O.O. | Poland |
| Mundipharma Farmaceutical LDA. | Portugal |
| Mundipharma Distribution Limited | Korea |
| Mundipharma Medical GmbH | Switzerland |

REDACTED

# Exhibit B

# SETTLEMENT AGREEMENT

## I. PARTIES

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS); the Defense Health Agency (DHA), acting on behalf of the TRICARE Program; the Office of Personnel Management (OPM), which administers the Federal Employees Health Benefits Program (FEHBP); and the Indian Health Service (IHS) (collectively, the "United States"); and Purdue Pharma L.P. ("Purdue" and, with the United States, "the Parties"), through their authorized representatives.

## II. RECITALS

A.      Purdue is a Delaware limited partnership that is headquartered in Stamford, Connecticut.

B.      At all relevant times, Purdue, directly or through its subsidiaries, manufactured, marketed, and sold pharmaceutical products in the United States, including OxyContin, Butrans, and Hysingla.

C.      OxyContin is a branded, extended-release oxycodone tablet that was reformulated with abuse-deterrent properties in 2010. Oxycodone is an opioid agonist 1.5 times more powerful than morphine with a high potential for addiction, abuse, and misuse. OxyContin is approved by HHS's Food and Drug Administration (FDA) for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate. It is classified as a Schedule II narcotic under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

D.      Hysingla is a branded, extended-release hydrocodone tablet that is formulated with abuse-deterrent properties.  Hydrocodone is an opioid agonist as powerful as morphine that exposes users to the risks of addiction, abuse, and misuse.  Hysingla is FDA approved for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.  It is classified as a Schedule II narcotic under the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

E.      Butrans is a branded buprenorphine patch.  Buprenorphine is an opioid partial agonist 12.6 times more powerful than morphine that exposes users to the risks of addiction, abuse, and misuse.  Butrans is FDA approved for the management of moderate to severe chronic pain in patients requiring a continuous, around-the-clock opioid analgesic for an extended period of time.  It is classified as a Schedule III narcotic under the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

F.      On September 15 and 16, 2019, Purdue and twenty-two affiliated entities (collectively, the "Debtors") each filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  On September 18, 2019, the Bankruptcy Court entered an order authorizing the joint administration and procedural consolidation of the Debtors' chapter 11 cases (the "Chapter 11 Cases") pursuant to Rule 1015(b) for the Federal Rules of Bankruptcy Procedure under the case captioned *In re Purdue Pharma L.P., et al.*, No. 19-23649 (Bankr. S.D.N.Y.) (Jointly Administered).[1]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal

19-23649-shld Doc 2018-28 Filed 11/19/21 Entered 11/19/21 20:54:08 Main Document
Plea Agreement Pg 51 of 176 Page 27 of 97

REDACTED

G.     On July 30, 2020, the United States Department of Justice submitted claim 137848 in the bankruptcy of Purdue on behalf of HHS, DHA, and OPM alleging that, from 2010 to 2018, Purdue knowingly caused false, medically unnecessary claims to be submitted to federal health care programs for Purdue's opioid drugs; from 2008 to 2018, Purdue transferred billions of dollars in distributions and assets to its owners, the Sackler family and their holding companies and trusts, some of which is recoverable as fraudulent transfers; and Purdue's misconduct gives rise to criminal liability and forfeiture of proceeds traceable to Purdue's crimes.

H.     On such date as may be determined by the U.S. District Court for the District of New Jersey, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, Purdue will plead guilty to a three-count Information to be filed by the United States in *United States v. Purdue Pharma L.P.*, Criminal Action No. [to be determined] (D.N.J.) that will allege violations of 18 U.S.C. § 371 for: (1) a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, 353; (2) a conspiracy to violate the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), related to Purdue's payments to health care providers; and (3) a conspiracy to violate the AKS related to Purdue's payments to Practice Fusion, a cloud-based electronic health records platform (hereinafter the "Criminal Action").

I.     The United States contends that Purdue, directly or through its subsidiaries, caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"); the Medicaid Program, 42 U.S.C.

---

Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).

§§ 1396-1396w-5 ("Medicaid"); the TRICARE Program, 10 U.S.C. §§ 1071-1110b

("TRICARE"); and the FEHBP, 5 U.S.C. §§ 8901-8914; and caused purchases of OxyContin by

the IHS on behalf of its federally operated programs, *i.e.*, programs not operated by a tribal

health program or an Urban Indian organization, as those terms are defined in the Indian Health

Care Improvement Act, 25 U.S.C. § 1603(25), (29) (collectively, the "Federal Healthcare

Programs").

J.       The United States contends that it has certain civil claims against the Debtors, as

specified in Paragraph III.3 below, for engaging in the conduct set forth in Addendum A from

2010 to 2018.  As a result of the conduct set forth in Addendum A, the United States alleges that

Debtors knowingly caused false and/or fraudulent claims for OxyContin, Butrans, and Hysingla

to be submitted to the Federal Healthcare Programs (hereinafter the "Covered Conduct").

K.       This Agreement is neither an admission of liability by Purdue nor a concession by

the United States that its claims are not well founded.  Purdue denies that it engaged in the

Covered Conduct, with the exception of such admissions that are made in connection with any

guilty plea by Purdue in connection with the Criminal Action.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the

above claims, and in consideration of the mutual promises and obligations of this Settlement

Agreement, the Parties agree and covenant as follows:

### III.  TERMS AND CONDITIONS

1.       The Debtors agree that the United States shall have an allowed, unsubordinated,

general unsecured claim in the Chapter 11 Cases in the amount of Two Billion Eight Hundred

Million Dollars ($2,800,000,000) (the "Settlement Claim").  Payment on account of the

Settlement Claim shall be made as provided for in a Plan of Reorganization as defined in

Paragraph 2, or, in the event of liquidation, in accordance with any order of liquidation approved

4

by the Bankruptcy Court.  In either event, only the amount actually paid to the United States

shall constitute restitution under this Agreement.

2.        Debtors shall propose and obtain confirmation of a plan that (i) provides for a

cash distribution on account of the Settlement Claim as soon as reasonably practicable after the

effective date of the Plan of Reorganization; (ii) does not provide the United States with an

equity stake in the reorganized company or any other structure that emerges from the

bankruptcy; (iii) provides that payment shall be made into accounts set forth in the instructions

provided to Debtors by the Civil Division of the Department of Justice; (iv) places the Settlement

Claim in its own class under the Plan of Reorganization; and (v) provides fair and equitable

treatment to the United States and does not unfairly discriminate against the United States ("Plan

of Reorganization").

3.        Subject to the exceptions in Paragraph III.7 (concerning excluded claims) below,

and conditioned on Paragraphs III.1, 2 and 8 (concerning treatment of claims in the Chapter 11

Cases) below, the United States releases the Debtors from any civil or administrative monetary

claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C.

§§ 3729-3733; the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq.; the Controlled

Substances Act, 21 U.S.C. § 801 et seq.; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-

7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law

theories of payment by mistake, unjust enrichment, fraud, nuisance, or negligent entrustment.

For the avoidance of doubt, this Paragraph III.3 does not release any claims the United States

may have against any individual, including without limitation, the Debtors' current or former

owners, shareholders or members of their Boards of Directors.  Nothing in this Agreement

releases any claims the Debtors' estates have the ability to bring against any individuals or non-

debtor entities, including without limitation, the Debtors' current or former owners, shareholders

5

or members of their Boards of Directors, including without limitation fraudulent transfer claims and any other claims that could be brought by the Debtors' estates standing in the shoes of any creditors in the Chapter 11 Cases.

4.      Purdue understands and acknowledges that as a result of the guilty plea described in Paragraph H of the Preamble above, it will be excluded pursuant to 42 U.S.C. 1320a-7(a)(1) from Medicare, Medicaid, and all other Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f).  Such exclusion shall have national effect and, pursuant to 42 U.S.C. § 1320a-7(i), shall be effective after a judgment of conviction has been entered or a guilty plea has been accepted by a Federal, state, or local court.  After Purdue is excluded, Federal health care programs shall not pay anyone for items or services, including administrative and management services, furnished, ordered, or prescribed by Purdue in any capacity.

5.      DHA expressly reserves all rights to institute, direct, or maintain any administrative action seeking exclusion against the Debtors from TRICARE under 32 C.F.R. § 199.9(f) (mandatory and permissive exclusions).

6.      OPM expressly reserves all rights to institute, direct, or maintain any administrative action seeking debarment against the Debtors from the FEHBP under 5 U.S.C. § 8902a(b) (mandatory debarment), or (c) and (d) (permissive debarment).

7.      Notwithstanding the release given in Paragraph III.3 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.      Any criminal liability;

c.      Except as explicitly stated in this Agreement, any administrative liability, including mandatory or permissive exclusion from Federal health care programs;

d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.    Any liability based upon obligations created by this Agreement;

f.    Any liability of any individuals, including but not limited to, present and former owners, shareholders, officers, directors, employees, trustees, and agents of Debtors;

g.    Any liability of any entities other than the Debtors, including consultants, contractors, and Sackler family trusts, trustees, trust protectors, and affiliated entities;

h.    Any liability of non-Debtor individuals, assets, or entities for any claims that could have been or may be brought by, or on behalf of, the Debtors to recover funds or assets transferred from the Debtors;

i.    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

j.    Any liability for failure to deliver goods or services due;

k.    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

l.    Any liability for claims 137406, 138509, 137782, 138522, and 137798 filed in the Chapter 11 Cases by the U.S. Department of Justice, U.S. Department of Health and Human Services and the U.S. Department of Veterans Affairs, and no setoff related to amounts paid under this Agreement shall be applied to any claim, action, or recovery in connection with such claims;

m.    Any liability for claims of the states or Indian tribes, and no setoff related to amounts paid under this Agreement to the United States shall be applied to any

7

recovery in connection with any claim, action, or recovery by the states or Indian tribes;

n.     For avoidance of doubt, the United States, except as expressly contemplated by this settlement, retains all rights to recover, pursuant to 42 U.S.C. 1396b(d), the federal share of funds that have been or could be recovered by other entities; and

o.     Any liability for the claims or conduct alleged in the following actions:

1. *United States ex rel. Manchester v. Purdue Pharma, L.P., et al.*, No. 1:16-cv-10947 (D. Mass.); and

2. *United States ex rel. [SEALED] v. [SEALED]* (D. Vt.).

No setoff related to amounts paid under this Agreement shall be applied to a recovery, if any, in connection with these actions.

8.     In connection with the Chapter 11 Cases, the United States and Debtors agree:

a.     The Debtors shall file a motion under Federal Rule of Bankruptcy Procedure 9019 (the "9019 Motion") no later than 7 business days from the date this Agreement is executed, seeking approval of this Agreement.  Before filing such motion and proposed order, Debtors shall obtain the United States' consent as to form, and the United States and the Debtors acknowledge that this time period may be extended by mutual agreement.

b.     The proposed order in respect of the 9019 Motion shall provide that the Settlement Claim shall not be subordinated, disallowed,  or reconsidered in these Chapter 11 Cases,  including based on 11 U.S.C. §§ 510, 726(a)(4) or for any other reason.

c.     The Debtors will not seek releases or exculpation regarding any claims belonging to and currently controlled by the United States against any individuals or non-debtor entities.

8

d.      This Agreement shall not preclude, impair, waive or affect the United States' right to receive, in respect of the Settlement Claim or any other claims filed in the Chapter 11 Cases, its appropriate share under the Plan of Reorganization of any recovery resulting from any actions by the estates in these Chapter 11 Cases or on behalf of the estates that seek to recover assets for the estates, including but not limited to any fraudulent transfer action pursued by the Debtors, or any trustee, person or entity on behalf of the Debtors, against the Debtors' former or current owners, shareholders or any other person, asset or entity.

e.      The Debtors will not propose a Plan of Reorganization or liquidation that is inconsistent with this Agreement.

f.      If the Bankruptcy Court does not confirm a Plan of Reorganization in the Chapter 11 Cases that provides for the emergence from the Chapter 11 Cases of a public benefit company (or entity with a similar mission), Purdue and the United States each have the option to rescind this Agreement.

g.      The United States reserves the right to object to any proposed Plan of Reorganization for any reason not covered by this Agreement.

9.      Nothing in this Agreement exempts the United States from or otherwise grants any relief under the bar date order, to the extent applicable, entered in the Chapter 11 Cases on February 3, 2020 and amended on June 3, 2020 with respect to the Debtors.

10.     If Purdue defaults on any material obligation under this Agreement; if a Plan of Reorganization consistent with the terms of this Agreement is not confirmed; in the event of dismissal or conversion of the Chapter 11 Cases, voluntary or otherwise; or in the event Debtors' obligations under this Agreement are voided for any reason, the United States may elect, in its sole discretion: (a) to rescind the releases in this Agreement and bring any civil and/or

9

administrative claim, action, or proceeding against Debtors for the claims that would otherwise be covered by the release provided in Paragraph III.3 above or (b) to have an undisputed, noncontingent, and liquidated, allowed unsecured claim against Debtors for the full amount of the United States' claim 137848 filed in the Chapter 11 Cases. With respect to (a) and (b) in this Paragraph, the United States fully reserves any and all setoff and recoupment rights, claims, and defenses as to the Debtors that the United States may have, and the United States may pursue its claims in the Chapter 11 Cases as well as in any other case, action, or proceeding.

11.     If Purdue exercises the option of rescission pursuant to Paragraphs III.8.g of this Agreement or the United States exercises the option of rescission pursuant to any Paragraph of this Agreement, the Agreement will be rescinded except for Paragraphs III.8, 10, 11, 12, 14, and 23. If this Agreement is rescinded for any reason, Debtors will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings that are brought by the United States within 180 calendar days of written notification that the releases have been rescinded, except to the extent such defenses were available on July 18, 2018.

12.     In the event of a default by Debtors of any material obligation under this Agreement or rescission of this Agreement, Purdue will agree and stipulate that the automatic stay under 11 U.S.C. § 362(a) does not apply to the United States' claims, actions, or proceedings in connection with the Covered Conduct and, to the extent necessary, will consent to relief from the automatic stay for cause under 11 U.S.C. § 362(d)(1). Purdue further agrees that it will not seek to enjoin the United States' claims, actions, or proceedings pursuant to 11 U.S.C. § 105 or any other bankruptcy authority.

13.     The agreed treatment of the Settlement Claim set forth in this Agreement represents the amount the United States is willing to accept in compromise of its civil claims

arising from the Covered Conduct (pursuant to and as set forth more expressly in the terms of this Agreement) due solely to the Debtors' financial condition.

14.     The Debtors waive and shall not assert any defenses they may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

15.     The Debtors fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that the Debtors have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution.

16.     The Settlement Claim shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Federal Healthcare Program or any state payer related to the Covered Conduct; and Purdue agrees not to resubmit to any Federal Healthcare Program or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

17.     The Debtors agree to the following:

a.     <u>Unallowable Costs Defined</u>:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official program

11

directives promulgated thereunder) incurred by or on behalf of the Debtors, their present or former officers, directors, employees, shareholders, and agents in connection with:

    (1)    the matters covered by this Agreement and any related plea agreement;

    (2)    the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement;

    (3)    the Debtors' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

    (4)    the negotiation and performance of this Agreement; and

    (5)    the payment the Debtors make to the United States pursuant to this Agreement or the Plan of Reorganization.

are unallowable costs for government contracting purposes and under the Federal Healthcare Programs (hereinafter referred to as Unallowable Costs).

    b.    <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for by the Debtors, and the Debtors shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by the Debtors or any of its subsidiaries or affiliates to the Federal Healthcare Programs.

    c.    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: The Debtors further agree that within 90 days of the Effective Date of this Agreement they shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph)

included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by the Debtors or any of their current subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. The Debtors agree that the United States, at a minimum, shall be entitled to recoup from the Debtors any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by the Debtors or any of their current subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on the Debtors or any of their current subsidiaries or affiliates' cost reports, cost statements, or information reports.

d. Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine the Debtors' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

18. The Debtors agree to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, the Debtors shall encourage, and agree not to impair, the cooperation of their directors, officers, and employees, and shall use their best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. The Debtors further agree to furnish to the United

13

19-23649-shl d Doc 2015-28 Filed 11/20/21 Entered 11/20/21 05:40:30 Main Document
REDACTED
Plea Agreement Pg 62 of 176 38 of 97

States, upon reasonable request, complete, and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in their possession, custody, or control concerning any investigation of the Covered Conduct that they have undertaken, or that has been performed by another on their behalf.  For the avoidance of doubt, the Debtors' cooperation is a material condition of this Agreement. The United States will determine in its sole discretion whether information it seeks from the Debtors as part of the Debtors' cooperation is relevant to the United States' investigations.  Notwithstanding any provision of this Agreement, (1) the Debtors are not required to request of their current or former officers, agents, or employees that they forgo seeking the advice of an attorney or that they act contrary to that advice; (2) the Debtors are not required to take any action against their officers, agents, or employees for following their attorney's advice; and (3) the Debtors are not required to waive or furnish to the United States any materials subject to any privilege or claim of work product protection, except to the extent stated in an agreement between Purdue and the United States dated June 18, 2019, to the extent such content is privileged, if at all, or to the extent any other waiver, voluntary or otherwise, occurred prior to the date of this Agreement.

19.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph III.20 (waiver for beneficiaries paragraph), below.

20.     The Debtors agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals,  or third party payors based upon the claims defined as Covered Conduct.

21.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

14

22. Each Party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

23. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of New Jersey, provided that disputes regarding the implementation of those provisions of this Agreement related to the Chapter 11 Cases may also be heard by the Bankruptcy Court. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

24. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

25. The undersigned counsel for the United States represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below. The undersigned representative of Purdue certifies that he is the Chairman of the Board of Directors of Purdue Pharma Inc., the general partner of Purdue, and that he has been duly authorized by the Board of Directors of the general partner of Purdue to execute this Agreement on behalf of Purdue.

26. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

27. This Agreement is binding on Purdue's successors, transferees, heirs, and assigns, including any reorganized debtor, in any and all forms, or trustee appointed in these Chapter 11 Cases or under a confirmed plan.

28. Purdue consents to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

15

29.     This Agreement is effective on the date that the Bankruptcy Court approves the

9019 Motion (Effective Date).  Facsimiles and electronic transmissions of signatures shall

constitute acceptable, binding signatures for purposes of this Agreement.

## THE UNITED STATES OF AMERICA

DATED: 10/21/20      BY: _____
JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
*Civil Division*
Jamie Ann Yavelberg
Director
Natalie A. Waites
Edward Crooke
Alicia J. Bentley
Kelley Hauser
Christelle Klovers
Albert P. Mayer
Kristen M. Murphy
Claire L. Norsetter
Attorneys
*Commercial Litigation Branch*
*Civil Division*
*United States Department of Justice*


DATED: _____      BY: _____
RACHAEL HONIG
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515
Nicole F. Mastropieri
Marihug P. Cedeño
Assistant United States Attorneys
*District of New Jersey*


DATED: _____      BY: _____
CHRISTINA E. NOLAN
United States Attorney
Owen C.J. Foster
Assistant United States Attorney
*District of Vermont*

17

## THE UNITED STATES OF AMERICA

DATED: _____    BY: _____
JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
*Civil Division*
Jamie Ann Yavelberg
Director
Natalie A. Waites
Edward Crooke
Alicia J. Bentley
Kelley Hauser
Christelle Klovers
Albert P. Mayer
Kristen M. Murphy
Claire L. Norsetter
Attorneys
*Commercial Litigation Branch*
*Civil Division*
*United States Department of Justice*

DATED: _____    BY: _____
RACHAEL HONIG
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515
Nicole F. Mastropieri
Marihug P. Cedeño
Assistant United States Attorneys
*District of New Jersey*

DATED: 10/21/20    BY: Christina E. Nolan (KJD)
CHRISTINA E. NOLAN
United States Attorney
Owen C.J. Foster
Assistant United States Attorney
*District of Vermont*

17

DATED: 10/21/2020    BY: _____
                          LISA M. RE
                          Assistant Inspector General for Legal Affairs
                          Office of Counsel to the Inspector General
                          Office of Inspector General
                          United States Department of Health and Human Services


DATED: _____    BY: _____
                          SALVATORE M. MAIDA
                          General Counsel
                          Defense Health Agency
                          United States Department of Defense


DATED: _____    BY: _____
                          EDWARD M. DEHARDE
                          Assistant Director of Federal Employee
                              Insurance Operations
                          Healthcare and Insurance
                          United States Office of Personnel Management

1:19-cr-33549-hidd Doc 2018-28 Filed 11/01/20 Entered 11/01/20 15:40:30 Main Document
Plea Agreement Page 68 of 176, 44 of 97
REDACTED

DATED: _____      BY: _____
                            LISA M. RE
                            Assistant Inspector General for Legal Affairs
                            Office of Counsel to the Inspector General
                            Office of Inspector General
                            United States Department of Health and Human Services

                            BLEY.PAUL.NICHO   Digitally signed by
                            LAS.1099873821    BLEY.PAUL.NICHOLAS.1099873821
                                              Date: 2020.10.21 09:33:31 -04'00'

DATED: 10/21/2020    BY: /s/ Salvatore M. Maida _____
                            SALVATORE M. MAIDA
                     for    General Counsel
                            Defense Health Agency
                            United States Department of Defense

DATED: _____      BY: _____
                            EDWARD M. DEHARDE
                            Assistant Director of Federal Employee
                                Insurance Operations
                            Healthcare and Insurance
                            United States Office of Personnel Management

18

DATED: _____ BY: _____
LISA M. RE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services


DATED: _____ BY: _____
SALVATORE M. MAIDA
General Counsel
Defense Health Agency
United States Department of Defense


DATED: 10/21/2020 BY: _____
EDWARD M. DEHARDE
Assistant Director of Federal Employee
    Insurance Operations
Healthcare and Insurance
United States Office of Personnel Management

**Purdue Pharma L.P.**

DATED: 10/20/2020     BY: _____

Robert S. Miller
Chairman of the Board of Directors
Purdue Pharma Inc., general partner of
Purdue Pharma L.P.

DATED: 10/20/2020     BY: _____

Patrick Fitzgerald
Jennifer L. Bragg
Maya P. Florence
William E. Ridgway
Skadden, Arps, Slate, Meagher & Flom LLP
Counsel for Purdue Pharma L.P.

DATED: 10/20/2020     BY: _____

Jeffrey S. Bucholtz
King & Spalding LLP
Counsel for Purdue Pharma L.P.

19

# Addendum A

## ADDENDUM A TO SETTLEMENT AGREEMENT

**I.** **Introduction**

1.      Purdue Pharma L.P.'s ("Purdue") profits declined precipitously in 2010 after the introduction of its Reformulated OxyContin, which was intended to be more difficult (though not impossible) to crush or manipulate for purposes of abuse and misuse.

2.      Purdue attributed the majority of the decline to two trends: (i) individuals abusing opioids moving from OxyContin to opioids that were easier to abuse through insufflation or injection and (ii) increased scrutiny of prescribers, pharmacists, and other actors in the opioid distribution chain.

3.      Purdue sought to recapture lost sales and increase Purdue's share of the opioid market.

4.      As a result, from 2010 through approximately February 2018, Purdue developed and implemented several strategies to ensure that the revenues generated from its opioid prescriptions, including those that Purdue knew or should have known were not medically necessary, would continue to flow to Purdue.

5.      At the center of these strategies was Purdue's aggressive marketing program that focused on detailing over 100,000 doctors and nurse practitioners nationwide each year, including thousands of prescribers that Purdue knew or should have known were prescribing opioids for uses many of which were not for a medically accepted indication, were unsafe, ineffective, and medically unnecessary, and/or were diverted for uses that lacked a legitimate medical purpose.   By 2013, Purdue intensified its detailing of the very highest-volume prescribers, *i.e.*, those writing "25 times as many OxyContin scripts" as their similarly situated peers, because it knew that its detailing was highly effective in causing these prescribers to write

more prescriptions for Purdue's opioids.  This strategy was referred to as the "Evolve to Excellence" or "E2E" program.

6.    Purdue also rewarded and induced prescriptions from some of its most lucrative prescribers by paying kickbacks through its Key Opinion Leader corporate advisor and speaker programs.  Indeed, some of the prescribers whom Purdue paid through these programs were poor speakers, showed indicia of abuse and diversion, or, in at least one case, requested an express *quid pro quo* from Purdue employees.

7.    Increasingly concerned that pharmacies would not fill OxyContin prescriptions as pharmacies and regulators increased safeguards against the filling of medically unnecessary prescriptions, Purdue developed and implemented a strategy to detail the pharmacies of its highest volume prescribers, including those that Purdue knew were writing medically unnecessary prescriptions, to ensure that Purdue opioids would be dispensed.  Further, after Purdue determined that a large number of its prescriptions were still being rejected, Purdue considered an "alternative distribution strategy" and later developed a program focused on Hysingla through which it paid kickbacks to three specialty pharmacies to dispense prescriptions for Purdue's opioids that traditional pharmacies refused to fill.

8.    Finally, from April 2016 through December 2016, Purdue paid kickbacks to Practice Fusion, an electronic health records company ("EHR"), to induce it to recommend and arrange for prescriptions of opioids by creating alerts that would appear within Practice Fusion's software while providers were seeing patients.  Purdue did so with the intent that these alerts would cause more prescriptions for extended release opioids like those manufactured and sold by Purdue.

REDACTED

9.      Through its marketing and kickbacks, from 2010 through 2018, Purdue
knowingly caused the submission of false and fraudulent claims to Federal healthcare programs
for its opioid drugs that were: (1) prescribed for uses that were not for a medically accepted
indication, were unsafe, ineffective, and medically unnecessary, and that were often diverted for
uses that lacked a legitimate medical purpose; or (2) tainted by illegal kickbacks.

## II.     Prior Resolution

10.      In 2007, The Purdue Frederick Company, Inc. ("Purdue Frederick"), an affiliate
of Purdue, pled guilty to misbranding OxyContin by falsely marketing it as less addictive, less
subject to abuse and diversion, and less likely to cause dependence and withdrawal than other
pain medications.  Purdue and Purdue Frederick also agreed to pay more than $600 million, of
which over $100 million was paid to settle civil False Claims Act liability for knowingly causing
the submission of false claims to Federal healthcare programs for OxyContin.  In conjunction
with the resolution, Purdue entered into a five-year Corporate Integrity Agreement with the
Department of Health and Human Services, Office of Inspector General (OIG-HHS).  OIG-HHS
closed the corporate integrity agreement in January 2013.

## III.    Organization of Purdue Pharma

11.      Purdue Pharma L.P. carries on operations, including distributing and selling the
extended-release opioid drugs OxyContin, Butrans, and Hysingla.  Prior to February 2018, it
employed a sales force of, at times, over five hundred representatives to market its opioid drugs.

12.      Purdue was owned (through trusts) and controlled by members of the Sackler
family.  Several members of the Sackler family served on the Board of Directors of Purdue

Pharma Inc., which oversaw Purdue and certain related companies during the relevant time period.[1]

13. The Sacklers, as members of the Purdue Board, exercised substantial oversight over management's operations of Purdue. For instance, in February of 2011, a memorandum observed: "There seems to be a consensus that the role of the board and that of the management is blurred compared with the distinctions made by other major corporations," and, historically, certain members of Sackler family functioned as "executives, management, board, and shareholders all-in-one [and] worked collaboratively with other managers on a daily basis."

14. As late as 2017, a high-level Purdue executive commented: "Three distinct business types (branded Rx [including Purdue]/biosimilars, consumer/OTC, generics) are being run through four separate regions (five if Rhodes is included), with the Board of Directors serving as the 'de-facto' CEO."

## IV. The Opioid Drugs Purdue Manufactured, Marketed, Promoted, and Sold

### A. *OxyContin*

15. Oxycodone is an opioid agonist with a morphine milligram equivalent ("MME") of 1.5 and a high potential for abuse similar to other opioids including fentanyl, hydromorphone, methadone, morphine, and oxymorphone.

16. It is classified as a Schedule II narcotic under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* ("CSA").

---

[1] The following reflects the tenures of the Sackler family members on the Purdue Pharma Inc. Board of Directors: Richard S. Sackler (10/2/1990 – 7/24/2018); Jonathan D. Sackler (10/2/1990 – 12/8/2018); David A. Sackler (7/19/2012 – 8/14/2018); Kathe A. Sackler (10/2/1990 – 9/27/2018); Mortimer D.A. Sackler (1/15/1993 – 1/16/2019); Theresa E. Sackler (1/15/1993 – 9/7/2018); Ilene Sackler Lefcourt (10/2/1990 2/4/2005; 5/16/2008 – 10/9/2018); and Beverly Sackler (approximately 1993 –10/2017).

REDACTED

19-23649-shld Doc 2018-28 Filed 11/01/21 Entered 11/02/20 15:40:30 Main Document
Plea Agreement Page 76 of 178 Pg 52 of 97

17.     Purdue manufactured, marketed, promoted, sold, and distributed OxyContin, an extended-release oxycodone tablet, nationwide, including by sending sales representatives to prescribers' offices and pharmacies, to persuade healthcare providers to prescribe and pharmacists to dispense OxyContin.

18.     In April 2010, Purdue received FDA approval to market a reformulated version of OxyContin.

19.     Reformulated OxyContin was more difficult to crush or dissolve, but FDA cautioned that Reformulated OxyContin "is not completely tamper-resistant and those intent on abusing this new formulation will likely find a means to do so.  In addition, the product can still be misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."

20.     In August 2010, Purdue discontinued the original version of OxyContin.

**B.     *Butrans***

21.     Buprenorphine is an opioid partial agonist with an MME of 12.6 that exposes users to the risks of addiction, abuse, and misuse.  It is classified as a Schedule III narcotic under the CSA.

22.     In June 2010, Purdue received FDA approval to market Butrans, a buprenorphine patch, and began manufacturing, marketing, promoting, and selling Butrans nationwide.

**C.     *Hysingla***

23.     Hydrocodone is an opioid agonist with an MME of 1.0 that exposes users to the risks of addiction, abuse, and misuse.  It is classified as a Schedule II narcotic under the CSA.

24. In November 2014, Purdue received FDA approval to market Hysingla, an extended-release hydrocodone tablet, which is formulated with abuse-deterrent properties, and began manufacturing, marketing, promoting, and selling Hysingla nationwide.

## V. Purdue Knowingly Caused Medically Unnecessary Prescriptions to be Submitted to Federal Healthcare Programs

25. From 2010 to February 2018, Purdue engaged in strategies that resulted in prescriptions of its drugs for uses that were not for a medically accepted indication, were unsafe, ineffective, and medically unnecessary, and that were diverted for uses that lacked a legitimate medical purpose. Such prescriptions are not reimbursable by Federal healthcare programs.

26. The paragraphs below describe the fraudulent scheme to cause extreme high-volume prescribers to write medically unnecessary OxyContin prescriptions for Federal healthcare program beneficiaries.

### A. *"Calling On" and "Detailing" Prescribers Causes Them to Write More Prescriptions*

27. Until it stopped marketing opioids in February 2018, Purdue sought to increase and maintain opioid sales by sending sales representatives to prescribers' offices and pharmacies to meet with prescribers in person; deliver company-developed messaging; give the prescribers meals (such as coffee, breakfast, and lunch) and marketing materials (such as articles, brochures, posters, and other media); and provide information about pharmacies stocking Purdue opioids and prescription coverage, including coverage under Federal healthcare benefit programs.

28. This practice is known in the pharmaceutical industry as "calling on" or "detailing" healthcare providers and pharmacies.

29. Purdue knew that calling on or detailing healthcare providers and pharmacies caused them to prescribe and dispense, respectively, more of Purdue's opioid drugs.

30. In September 2010, at a presentation to Purdue's sales supervisors, a Purdue executive explained: "As I have stated several times, we know increases in the prescriber call average will have the single largest impact of anything you can do to increase prescriptions of Purdue products with our core and super core prescribers."

31. Additionally, presentations related to E2E recognized: "Increased calls have a significant impact on OxyContin TRx."

32. Likewise, Purdue prepared return-on-investment analyses comparing the cost of detailing as compared to the OxyContin prescriptions that would not have been written but for Purdue's in-person marketing, as well as "sensitivity" analyses showing the impact of Purdue's detailing on OxyContin prescribing.

### B. *The Sales Revenue Purdue Calculated from Federal Healthcare Programs*

33. Purdue knew that Federal healthcare programs paid claims for Purdue's opioid drugs, including OxyContin, and those payments accounted for a significant percentage of Purdue's revenue.

34. For example, an April 11, 2012, budget presentation to Purdue's Board of Directors showed that certain Federal healthcare programs accounted for over 30% of Purdue's revenue from sales of OxyContin.

35. Additionally, Purdue developed messaging and marketing materials associated with prescription coverage for OxyContin, including Federal healthcare program coverage, to induce prescribers to write OxyContin prescriptions for Federal healthcare program beneficiaries.

36. Purdue knew that it was reasonably foreseeable that its promotional activities for its drugs were a substantial factor in claims being submitted to Federal healthcare programs.

REDACTED

### C. *Purdue's Marketing of OxyContin After Reformulation*.

37.     Shortly after the introduction of Reformulated OxyContin, Purdue's profits declined, in large part, because some individuals who abused OxyContin moved to more easily manipulated opioids.

38.     Purdue executives closely analyzed Purdue's internal data, including data purchased from vendors, in order to target high-volume prescribers and monitor their prescriptions.

39.     Purdue ranked the prescribers based on their aggregate opioid prescriptions in deciles from numbers 1 through 10, with 10 being the highest.

40.     From 2010 to 2013, Purdue instructed its sales force to primarily focus on the top three deciles of prescribers.

41.     The purpose of focusing the sales force on these highest deciles of prescribers was to cause an even higher volume of prescriptions to be written by them.

42.     Purdue knew, at that time, that the three highest deciles of prescribers combined accounted for only 1.5% of all opioid prescribers nationwide, but wrote 80% of all OxyContin prescriptions nationwide.  Purdue also knew that these prescribers were the most responsive to Purdue's detailing.

43.     Specifically, in June 2010, Purdue executives discussed instructing sales representatives to "build their target list with a focus on the highest prescribers across all three categories (Tier 1), and then fill in target list with the next highest potential and keep in front of OER [opioid extended release] high prescribers."  They estimated that "the top three deciles drive closer to 80% of all Rxs."

44. An October 6, 2013 update to Purdue's 2013 annual marketing plan included a graphic, showing the breakdowns of the deciles.

- **Prescribers**

In 2012: 209,066 healthcare providers (HCP) wrote at least one prescription for OxyContin.
For the first 6 months of 2013: 165,137 HCPs wrote at least one prescription for OxyContin.

**January – July 2013 Prescribers**

| TRx Decile | # Physicians | % Physicians | # Rx | Mean Rx / Physician/Month |
|---|---|---|---|---|
| 10 | 358 | 0.2% | 617,887 | 246.6 |
| 9 | 778 | 0.5% | 617,624 | 113.4 |
| 8 | 1,500 | 0.8% | 617,149 | 67.8 |
| 7 | 2,182 | 1.4% | 617,248 | 40.4 |
| 6 | 3,613 | 2.3% | 617,056 | 24.4 |
| 5 | 5,668 | 3.5% | 617,075 | 15.6 |
| 4 | 8,668 | 5.4% | 617,056 | 10.2 |
| 3 | 13,636 | 8.5% | 617,048 | 6.5 |
| 2 | 24,399 | 15.2% | 617,331 | 3.6 |
| 1 | 99,825 | 62.2% | 620,667 | 0.9 |

45. While the targeting strategies and terminology differed over time, from 2010 through 2013, sales representatives were instructed to develop call plans around these high volume prescribers and detail them with the most frequency. In turn, sales representatives were rewarded with incentive compensation tied to the volume of OxyContin prescriptions generated from the health care providers they had detailed and faced corrective action plans, such as performance improvement plans, when they did not meet their sales goals.

46. A July 2012 Purdue PowerPoint, "OxyContin Marketing Mix Modeling Result," depicts the high degree of responsiveness to detailing by extreme high-volume prescribers (deciles 7 and above) – with deciles 9 and 10 (the very highest of the high volume prescribers) demonstrating the greatest responsiveness to Purdue's marketing.

- 9 -



47.     Purdue also found that, if it stopped detailing those extreme high-volume prescribers, the number of Purdue prescriptions written by them would not just have stayed stagnant – it would have declined.  For example, on September 16, 2011, a Purdue executive stated that high-volume prescribers' OxyContin prescriptions decreased between 23 to 28% without detailing.

48.     Approximately a year later, on July 13, 2012, a Purdue executive advised others that "OxyContin base sales will most likely erode with time when marketing programs are removed" and that incremental prescription lift was 32% after detailing by Purdue sales representatives.

**D.      *Declining Sales and Higher Sales Goals***

49.     From 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin.

50.     On January 25, 2010, Richard Sackler emailed other members of Purdue's Board: "By way of background, the most important driver of our sales growth or decline is the performance of all the oxycodone extended release forms in the market (called OER); this is comprised of OxyContin® tablets plus all the generics in the space."

51.     By virtue of OxyContin's importance, certain of the Sacklers placed pressure on executives to meet OxyContin sales goals set by the Board and participated in decision-making regarding Purdue's sales strategies for OxyContin, at times overruling the targets set by Purdue's executives.

52.     For example, in January 2010, Purdue executives and certain of the Sacklers engaged in an exchange regarding the executives' proposed 2010 budget.

53.     The executives proposed that OxyContin growth should be pegged at 3%. Richard Sackler thought this target was too low and would "lead to an OxyContin[] tablets forecast that is almost the same as our sales in 2009."  A Purdue executive informed Richard Sackler that "in looking at the recent [oxycodone extended release] prescription growth trends and knowing the overall dynamics of the market OxyContin competes in – I just can't see a way of the prescription growth tracking to a level substantially higher than the 3% on which this budget is based" and that the higher target suggested by Richard Sackler would "be interpreted as an imposition as opposed to an action that will stimulate the type of business building behaviors we want to encourage."

54.     In response, Richard Sackler, who believed that Purdue's OxyContin growth target should be much higher, told a Purdue executive "… I'm disappointed and don't agree with you.  This is a matter that the Board will have to take up and give you a settled direction."

55.     Later that month, on January 25, 2010, Richard Sackler emailed the Board and informed them that he had "engaged management on this subject," referring to the proposed 2010 budget, and explained his view that management's number was "unduly conservative."

56.     On the same day, Mortimer D.A. Sackler followed up with Theresa Sackler regarding Richard's proposal, stating "we should push management to agree to a higher target."

- 11 -

57.     After the release of Reformulated OxyContin in August 2010, OxyContin sales immediately began to decline.

58.     Purdue management presented information regarding the slipping demand for Purdue's OxyContin to Purdue's Board in December 2010, showing that the total weekly kilograms dispensed of branded OxyContin declined from August to November 2010.

59.     This downward trend continued the following year.  On or about June 15, 2011, a Purdue executive prepared a memorandum to a Purdue executive, among others, identifying an expected budget shortfall of over $1 billion.  The memorandum stated that "Kilograms dispensed have declined since the transition to the reformulated, primarily due to fewer 40mg and 80mg tablets being dispensed."

60.     In or around June 20, 2011, a Purdue executive shared this information with the Board in a presentation stating, "Since the transition, 40 and 80mg tablet prescriptions have decreased significantly.  The 10mg and 20mg tablet prescriptions initially increased, but given their lower value not enough to offset the higher strength decline."  The presentation went on to revise the forecast of projected OxyContin sales from $3.9 billion to $2.8 billion.

61.     Sales continued to trend downward in 2012.

62.     On April 15, 2012, Richard Sackler emailed a Purdue executive, stating, "We should . . . discuss the sudden decline in [OxyContin] sales in the past year or two.  What are we doing to identify corrective actions?"  The following day, a Purdue executive forwarded Richard Sackler's email to another Purdue executive, among others, stating, "I am surprised that Dr. Richard is asking this.  . . .  Since the decline is related to reformulation I'm not sure how to proceed with him."

63. On July 17, 2012, Mortimer D.A. Sackler emailed fellow Purdue Board members stating that Purdue should "start a search asap for a new CEO" and consider "replacing the head of sales and marketing."

64. In November 2012, looking back at the time period since Reformulated OxyContin replaced original OxyContin, a Purdue executive reported to Purdue's Board of Directors that there was a "Decline in OxyContin [Prescriptions] From Late 2010 Through 2011." The executive added that 2012 gross sales of OxyContin were "3.7%[] below budget" and 2012 net sales of OxyContin were "4.3% below budget due to lower prescription demand, , lower trade inventory, and higher returns than budgeted."

65. In October 2013, Mortimer D.A. Sackler inquired directly with Purdue's leadership to request additional data concerning the downward trend in sales by dosage, requesting a chart to "show the breakdown of the OxyContin market share by strength against competitors. I would like to understand more the recent dynamics of the market and where the patients are shifting to that we are losing." Later that same day, responses to Mortimer's questions explained that the loss of sales was due to "the recent dynamics of the market," the pressures of increased government regulation, and that there were "fewer patients titrating to the higher strengths from the lower ones."

E. **Post-Reformulation Decline Attributed, in Large Part, to Medically Unnecessary Prescriptions**

66. Purdue studied the drivers of the post-reformulation OxyContin sales decline, and it attributed the decline, in large part, to a reduction in prescriptions written for individuals who abused OxyContin through insufflation or injection and increases in safeguards intended to hinder medically unnecessary prescribing.

67.     Purdue also conducted a number of post-marketing studies of Reformulated OxyContin.

68.     Purdue's studies and analyses showed that the decline in overall OxyContin prescriptions was most pronounced among both extreme high-volume opioid prescribers and its highest dosage tablets, the 40 mg and 80 mg tablets.

69.     Purdue also attributed approximately 40% of the decline in OxyContin prescriptions in 2010 to 2011 to "Region Zero" prescribers.  Region Zero prescribers were prescribers that Purdue instructed sales representatives not to call on because, based on information maintained by its Abuse and Diversion Detection ("ADD") Program, Purdue determined that "there is a concern about potential abuse or diversion related activities" by them.  Purdue had detailed information (down to the number of prescriptions written, product, and dosage) of Purdue products prescribed by all prescribers, including Region Zero doctors from which it could determine that Purdue had been making substantial profits from these prescriptions.

70.     Purdue knew that the remainder of prescribers who experienced a significant drop in sales post-reformulation were not on Purdue's Region Zero do-not-call list, meaning representatives could continue detailing them.

71.     At the December 2010 Board briefing, a Purdue executive discussed a chart stating that "Region 0 Accounts For Much Of The TRx Decline At The Regional Level."

72.     In April 2011, Purdue prepared an excel sheet showing prescribers who experienced significant drops in prescriptions post-reformulation.  Among the 134 prescribers listed in the prescription change analysis, Purdue was continuing to detail about one-third of

them.  The spreadsheet specifically identified substantial declines in prescriptions for 80 mg tablets.

73.    On October 25, 2011, Purdue's Board received a copy of Purdue's September Executive Committee Meeting Notes & Actions, which provided Board members with information regarding the impact of Reformulated OxyContin on abuse.

74.    Among the Board materials was a presentation stating that there was a "[d]ecline in 80 mg prescriptions, esp[ecially] among 'Do not Call' prescribers," and a "[s]hift in routes of abuse, especially injecting and snorting."

75.    The study, which surveyed individuals being treated for opioid use disorder who reported abusing OxyContin through any route, also found that while the overall rate of OxyContin abuse decreased, some users continued to abuse Reformulated OxyContin through insufflation or injection—albeit with more difficulty—and that the percentage of users who reported abusing OxyContin through oral ingestion increased from 54% to 76% following the introduction of Reformulated OxyContin.

76.    The materials provided to the Board in October 2011 also included a study, "Changes in Prescribing Patterns Following Introduction of Reformulated OxyContin:  A Window into Diversion."  The study examined a two-year period, August 2009 to July 2011, and found that data for Region Zero prescribers showed an 86% decline in their OxyContin prescriptions after Purdue's introduction of its reformulated version, and especially at the highest dosages, 40 and 80 mg tablets.  The study found that prescribers suspected of abuse and diversion also prescribed the highest dose (80 mg) of OxyContin more frequently than other prescribers.

77. The study also found that Region Zero prescribers accounted for only 38.4% of the overall decline in sales post-reformulation, which Purdue attributed to reduced abuse of OxyContin. The remaining 61.6% of the decline was among other prescribers that were not on Purdue's Region Zero lists, meaning that sales representatives either were continuing to call on these prescribers or were permitted to do so.

78. Figures in the presentation further showed that immediate-release oxycodone prescribing increased at a similar rate (an approximately 32% increase) to the decline in 80 mg and 40 mg tablets of Reformulated OxyContin prescriptions (which experienced a 24% decrease and 26% decrease, respectively) among the non-Region Zero comparator prescribers, indicating that patients who had been abusing OxyContin may have been shifted to a non-reformulated oxycodone product that they could continue to misuse.

79. Versions of the presentation, including at least one provided to Richard Sackler in August 2013, repeated key findings, including: "Greater declines for doctors that were potentially problematic prescribers"; "Greater declines for high versus low dosage strengths"; "A small number of prescribers contribute to a large proportion of potential diversion of opioids from legal to illegal channels"; and "there were doctors in the [Purdue's] database who were prescribing painkillers 'for what appears to be the wrong reasons.'"

80. In sum, Purdue knew that, after the release of its Reformulated OxyContin, the product continued to be abused, but the method of abuse shifted to abuse through oral ingestion. Furthermore, Purdue knew that abuse and diversion appeared concentrated among a cohort of

high-volume prescribers. As described below, certain of Purdue's marketing efforts were

concentrated on extreme high-volume prescribers.

   **F.**  ***Decline in OxyContin Revenue Also Attributed to Safeguards Intended to Curb Abuse and Diversion.***

   81.  At the same time, Purdue also attributed declines in OxyContin prescription

revenue post-reformulation to safeguards intended to reduce medically unnecessary opioid sales,

including increased scrutiny of opioid prescribing by law enforcement, wholesalers, distributors,

and retail pharmacies.

   82.  For example, a Business Condition Report from a May 2-3, 2013 Board of

Directors Meeting described sales as being "$144mm behind Q12013 budget" with "$36mm

attributed to lower Rx demand" and stated that "[p]ossible causes of fewer tabs/Rx in the

market" include "Increased State Regulations"; "Anti-opioid environment"; and "Increased

DEA/law enforcement scrutiny of physicians, pharmacies and wholesalers."

   83.  A consulting company that worked for Purdue since approximately the mid-2000s

similarly attributed the decline in sales, in large part, to both the reformulation and safeguards

against medically unnecessary prescriptions.

   84.  In 2013, the consulting company informed Purdue and its Board, that "[t]he retail

channel, both pharmacies and distributors, is under intense scrutiny and direct risk."

   85.  More specifically, the consulting company explained "[t]here are reports of

wholesalers stopping shipments entirely to an increasing number of pharmacies," "[m]any

wholesalers are also imposing hard quantity limits on orders based on prior purchase levels," and

"[p]harmacy chains are implementing guidelines for which patients can fill opioid prescriptions."

1:19-2358494-hdd Doc 2018528 Filed Filed 19/2/21/20 Entered 11/9/21/20 2 54 080:31 ain Exhibit B nt
REDACTED
Plea Agre Page 89 nf 178 65 of 97

86.     Later, Purdue's 2014 budget presentation to the Board listed these safeguards – intended to prevent medically unnecessary prescriptions of opioids, including OxyContin – among the "challenges" to achieving revenue goals.

**G.      *Re-catalyzing Medically Unnecessary Prescriptions: Turbocharging Sales through E2E.***

87.     On May 25, 2013 Richard Sackler had a call with a senior executive from the consulting company to discuss various business opportunities, including opportunities related to OxyContin.

88.     On May 28, 2013, Purdue entered into a contract with the consulting company to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin revenue and develop plans to capture priority opportunities."

89.     Between July 18 and August 8, 2013, the consulting company provided several reports to a Purdue executive, at least two of which were provided to the Board, including the Sacklers.

90.     The consulting company proposed that Purdue adopt what was later referred to as the "Evolve to Excellence" initiative, or "E2E."

91.     The reports concluded that there existed a "significant opportunity to improve sales through better targeting."

92.     "Better targeting" meant focusing sales calls on extreme high-volume opioid prescribers and removing sales representative discretion with respect to call plans.

93.     Purdue and the consulting company analyzed Purdue prescription data and other Purdue data sources broken down by deciles based on, primarily, their opioid prescribing. According to Purdue and the consulting company's deciling calculations, the prescribers writing

"25 times as many OxyContin prescriptions as" other providers – those within the top five deciles – comprised less than seven percent of all prescribers nationwide, but wrote approximately as many opioid prescriptions as the remaining 93 percent of prescribers combined.

94.     The consulting company contended that, in contrast to the decile ranking undertaken by Purdue from 2010 to 2012, its rankings focused on "value deciles," which purported to be qualitatively different.  In practice, the value decile ranking only enhanced Purdue's marketing focus on extreme high-volume prescribers and ensured a focus on Federal healthcare program beneficiaries.

95.     The "value decile" analysis purported to use the following metrics:  (1) overall opioid prescriptions, including number of branded versus generic prescriptions; (2) whether the prescriber had rules in place prohibiting sales representatives from calling on them; (3) managed care access, including access to Federal healthcare program beneficiaries; and (4) the number of the prescriber's new to brand prescriptions (including new opioid patients and switches from other opioid products).

96.     The consulting company reports showed that the highest-volume prescribers were the most susceptible to marketing:  detailing resulted in a 53% increase in prescriptions compared to only 33% for the middle decile prescribers.  They also showed that, in the absence of detailing, high-volume prescribers' Purdue prescriptions would decline considerably.

97.     The consulting company told Purdue and its Board that its proposed marketing plan would slow or reverse that decline and recapture those sales.

98.     The memoranda asked Purdue to "make a clear go or no go decision on Turbocharging the Sales Engine," meaning implementing E2E.

99.    On August 15, 2013, two Purdue executives discussed the consulting company's progress on evaluating growth opportunities for OxyContin with the Board.  Their presentation noted that the analysis would include an examination of "relatively more sudden declines in tablets per prescriptions and prescriptions for 40 mg and 80 mg strengths" and "prescriber segmentation and targeting."

100.    Later that same day, Richard Sackler emailed Mortimer D. A. Sackler: "The 'discoveries' of [the consulting company] are astonishing."

101.    Richard Sackler subsequently arranged for a face-to-face meeting for the Board with the consulting company outside of the presence of Purdue executives.

102.    On August 23, 2013, certain Sackler family members met with the consulting company and examined its "unvarnished" findings and recommendations.

103.    Following the meeting, one of the consulting company partners that led the meeting with the Sacklers memorialized in an email: "[T]he room was filled with only family, including the elder statesman Dr. Raymond [Sackler]. . . .  We went through exhibit by exhibit for about 2 hrs. . . .  They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

104.    Another consulting company partner further remarked in the email correspondence that their "findings were crystal clear to" the Sacklers "and [the Sacklers] gave a ringing endorsement of 'moving forward fast.'"

105.    After the "ringing endorsement" by the Sacklers, Purdue, in collaboration with the consulting company, implemented many of the consulting company's recommendations.

106.    The Board received a presentation on E2E's implementation at the September 2013 Board meeting.

107.     In September 2013, Richard Sackler emailed an advisor asking when Purdue could reach out to a newly-hired Purdue executive to brief him on E2E.

108.     E2E took a multifaceted approach to increasing OxyContin prescribing and Purdue's profits.  The consulting company recommended, among other strategies, refreshing Purdue's marketing messaging – particularly around titration to higher, more lucrative dosages -- and undertaking strategies to ensure prescriptions would be filled.  At its core, however, E2E focused on intensifying marketing to the very highest-volume prescribers in the country by targeting them with increased frequency and minimizing sales representative discretion in identifying prescribers to target.  The E2E call plans targeted the highest-volume prescribers in the country, and the program demanded stricter adherence with call plans than had existed in years past.

109.     In late 2013, the Board received a 2014 Budget presentation again reviewing E2E's implementation.  Board notes show the Board discussed ensuring E2E's funding at that meeting.

110.     In sum, Purdue understood E2E's core strategies, namely, that it relied on generating prescriptions from extreme high-volume prescribers, and implemented it anyway.

**H.**     *E2E's Aggressive OxyContin Sales and Marketing Strategies.*

111.     E2E was overseen by the consulting company and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO").

- 21 -

i.  ***Increasing the Frequency of Calls on Extreme High-Volume
Prescribers***

112.   Based on a study showing that providers in deciles 7-10 were most responsive to

sales calls and were the most prolific writers, the E2E call plans instructed sales representatives

to call on the very highest deciles of high-volume prescribers with the most frequency.

113.   Specifically, Purdue instructed its sales representatives to call on the highest

volume OxyContin prescribers (*i.e.*, those in so-called "deciles" 7 through 10) at least 24 times a

year and "heavily favor" promoting OxyContin over other Purdue opioids in their messaging.

114.   Purdue executives also emphasized the focus of E2E at national sales meetings:

"The single core objective of E2E…is to make sure that we're making calls on the highest

potential customers with the right frequency to maximize prescribing potential."

115.   An email between two Purdue executives dated October 23, 2013, entitled "S&P

Final Version" attached Board presentations, a 2014 Budget Presentation to the Board on

OxyContin Tablets, which reflected that the extreme high-volume prescribers that E2E targeted

were most sensitive to Purdue's marketing:



116.   Speaker notes to this presentation discussed focusing on these top tier prescribers

because "Increased calls with decile 8-10 prescribers have a significant impact on OxyContin®

TRx growth" – an over 39% increase as compared to a decline of approximately 17% among prescribers receiving fewer calls.

### ii. *Messaging to Cause High Volume Prescribers to Get More Patients on OxyContin and Titrate Patients to Higher Dosages*

117.    Purdue's sales and marketing departments prepared scripts, visual aids, brochures, and messaging for representatives to use with the providers they called on.  A large part of this marketing was intended to cause the highest volume prescribers in the nation to "commit" to writing more OxyContin prescriptions.

118.    At the same time, Purdue also refined its marketing message through the S.T.A.R.T. (Supplement, Titrate, Adjust, Reassess, Tailor) initiative by focusing sales conversations with prescribers on titrating patients to dosages.

119.    The goal of the program was to discourage patient discontinuation of OxyContin due to perceived lack of pain relief by encouraging providers to increase the OxyContin dosage, or "titrate up."

120.    For example, a 2011 script stated:  "We discussed the discontinuation rate of extended-release opioids by day 35.  One of the potential reasons for discontinuation is the lack of efficacy perhaps as a result of lack of titration."  E2E created a refreshed 2014 version of the script that stated:  "According to an analysis … 57% of patients initiated on some commonly prescribed extended-release opioids are no longer on those products by day 35," "Assuming a patient discontinues therapy by day 35 due to their perceived lack of pain relief, what is the impact on your patient, you and your staff? (pause for effect)," and then "Doctor, working with you and your staff, I can provide support to you when initiating and titrating dosages on my products."

121.    In addition, representatives were trained to "[o]vercome . . . objection[s]" raised by providers and get physicians to "commit" to prescribe more Purdue products. Specifically, representatives were trained to pivot from legitimate physician concerns about addiction to statements about "dependence" and opioid "tolerance."  When asked about the safety of high dosages, representatives were instructed to respond that OxyContin "does not have a ceiling dose."

122.    The Board received information concerning "OxyContin strength Rx history as well as statistical projections" that attributed the decline in sales of the high dosage tablets to "DEA pressures and 'good faith dispensing policies' at large chain pharmacies, *fewer patients switching into the ERO market from other products*, and there are *fewer patients titrating to the higher strengths from the lower ones*" (emphasis in original).

123.    At the November 2013 meeting concerning Purdue's 2014 budget, a Purdue executive discussed with the Board the company's plan to "refine the message" of the company's titration up marketing campaign and specifically referenced the "Individualize the Dose" campaign, a Conversion & Titration Guide, and the S.T.A.R.T. principles to "highlight important elements of titration throughout the course of treatment."

124.    Briefings to the Board also showed that the E2E marketing pushed by sales representatives in these calls specifically discussed titrating to higher dosages, initiating opioid naïve patients on opioid therapy, and switching patients from immediate release opioids to Reformulated OxyContin.

125.    In December 2013 correspondence, a Purdue executive told the Board that "[t]he E2E sales force focus/effectiveness initiatives [that] are being implemented starting October 2013 through April 2014 are already showing positive results."

- 24 -

REDACTED

19-23649-shdd Doc 2028-1 Filed 11/02/21 Entered 11/02/21 05:40:30 Main Document
Plea Agreement 176 Page 96 of 178 Page 72 of 97

I.    *Purdue's Internal Systems Confirm that E2E Caused Medically Unnecessary Prescribing*

126.    Purdue's Abuse and Diversion Detection ("ADD") program and Region Zero list contain examples of high-volume prescribers detailed during E2E that Purdue's own employees suspected were writing medically unnecessary prescriptions.

127.    At all relevant times, Purdue maintained an ADD program, through which Purdue had the means and ability to identify prescribers suspected of engaging in abuse and diversion.

128.    The ADD program began in or around 2002 and ended in or around February 2018.  It was governed during most of that time period by Standard Operating Procedure ("SOP") 1.7.1.

129.    SOP 1.7.1 instructed Purdue employees to refer prescribers who displayed indicia of abuse and diversion to ADD.  Employees referred these prescribers to ADD by issuing a Report of Concern ("ROC").

130.    The indicia of abuse and diversion in SOP 1.7.1 were amended over time and included, among other things, excessive numbers of patients; brief or nonexistent contact with patients; high numbers of cash pay patients; information that a prescriber or his or her patients may be diverting opioids; allegations of patient overdoses; allegations of unauthorized individuals signing prescriptions; large numbers of patients traveling long distances; and allegations that a prescriber is under investigation.

131.    After prescribers were referred to ADD, Purdue reviewed information concerning the prescribers to determine whether Purdue should continue to market its opioids to them.

132.    If Purdue determined a sales representative should not continue to call on a prescriber, the prescriber was placed on the Region Zero list.

1:19-cr-00349-shidd Doc 2018-28 Filed 11/09/21/20 Entered 11/09/20 21 05:40:30 Main Document
REDACTED
Plea Agreement 176 Page 97 of 97 73 of 97

133.   Purdue was aware that Region Zero providers were responsible for a major drop in sales after Reformulated OxyContin was released, and that there were also declines among prescribers that were not on Region Zero that Purdue sales representatives could continue to detail.

134.   Purdue sales representatives were trained to report prescribers suspected of abuse and diversion to ADD, and some sales representatives did so.

135.   However, high-volume prescribers were often not reported and, even if they were, they were sometimes not added to Region Zero until they lost the ability to prescribe through legal or medical board action.  In addition, certain Purdue policies resulted in high-volume prescribers not being reported to ADD, and thus not being added to Region Zero.  For example, Purdue trained its sales representatives to only report clear instances of abuse and diversion, and sales representatives were instructed to discuss the reports with their district managers prior to filing.  In addition, although Purdue's policy stated that it required timely reporting, Purdue had few, if any, effective compliance measures to address an employee's failure to report, and very few sales representatives were penalized for failing to timely report.

136.   Purdue's Sales and Marketing Department tracked prescribing of opioids by all health care providers, including providers included in ADD and Region Zero, placing them into deciles as described above.  ADD contained a field that reflected whether a health care provider was a high-volume prescriber.  When the sales force petitioned for a prescriber to be removed from Region Zero so that detailing of him or her could resume, and when ADD reviewed such petitions, both the sales force and ADD were aware of the volume of sales generated by that prescriber.

137.    From 2002 through the end of 2012, Purdue conducted various data analyses to identify prescribers with red flags for abuse and diversion. The red flags included prescribers with high numbers of prescriptions for 80mg tablets; prescribers with large numbers of patients that used multiple prescribers or pharmacies; and prescribers with large numbers of cash paying patients.

138.    Purdue also evaluated prescribers whose prescriptions declined sharply following reformulation.

139.    Although the analyses identified many red flag prescribers, only a fraction were reviewed as part of the ADD program and Purdue knowingly continued detailing others without any further scrutiny.

140.    Further, even for those prescribers who were placed on Region Zero, Purdue engaged in other practices to increase those prescribers' opioid prescriptions.

      a.    Purdue permitted sales representatives to continue calling on other members of the exact same practice, although doing so could increase the prescriptions of the Region Zero prescriber;

      b.    Purdue detailed its highest-volume prescribers' pharmacies in order to increase the likelihood that Region Zero prescriptions would be filled; and

      c.    Purdue permitted sales representatives and managers to petition to have Region Zero status reversed so they could resume calling on Region Zero prescribers.  These petitions were sometimes granted.

141.    For example, in 2012, Purdue employees petitioned for over 180 mid to high-decile Region Zero providers to be reinstated.

142.    Purdue also failed to maintain updated and complete Region Zero lists.

143.     Purdue knowingly continued detailing prescribers suspected of abuse and
diversion, including at times after a ROC was filed with ADD.

### *Doctor-1*

144.     From January 2010 through May 2018, Purdue representatives detailed Doctor-1
at least 300 times, although calls after February 2018 did not promote opioid products.  During
this time, the doctor caused the submission of a high number of OxyContin claims to Medicare.

145.     Purdue knew that Doctor-1 was prescribing medically unnecessary opioids.  From
2009 through 2011, Purdue received at least three different ROCs about Doctor-1.

146.     In October 2009, a Purdue sales representative reported:  "Pharmacist . . . says
they've had all kinds of problems with abuse and diversion of Oxycontin . . . [Pharmacist] said
[he] and [other doctor] are too lose [sic] when writing prescriptions of Oxycontin. He says of the
patients he thinks are selling their prescriptions, he has notified the doctors, but nothing has
changed."

147.     In June 2010, the sales representative further reported:  "the pharmacy manager,
says [the doctor] is known as the "Candyman" . . .  because she will immediately put every
patient on the highest dose of narcotics she can, whether it's Oxycontin or another product.  He
says when he goes to local pharmacist meetings, when her name comes up everyone in the room
cringes and moans because of her practices.  He says she is doing all kinds of wacky dosing and
tablet strengths.  He says he feels like she is not doing what she should be doing with
medications.  On occasion he has refused to fill prescriptions from her office . . . . He said he's
been seeing some crazy dosing of Oxycontin coming in, especially from [Doctor-1]."

148.     In July 2010, a Purdue sales representative reported:  Another physician "said he
had a patient . . . from [the doctor] who was on 80 mg 5 times per day. He thought this was over

- 28 -

the top and asked me today what the maximum dose was. He felt this patient was definitely exceeding it. I told him since it was a single entity opioid, there is no ceiling dose. It is only limited by side effects. He said he would not continue this type of dose."

149.     The same representative "became concerned on March 18, 2010, when she realized that patients were being treated by . . . a registered nurse without prescribing privileges, in [the doctor's] absence. According to [the representative], this 'was not an isolated incident.'"

150.     The representatives' call notes showed other instances where Doctor-1 was absent during business hours, including a February 2010 incident when the doctor left in the middle of the day to get a tattoo.

151.     The ADD program placed Doctor-1 on Region Zero and instructed sales representatives to cease calling on the doctor in August 2010.

152.     However, in October 2011, Purdue informed sales representatives that they may resume calling on Doctor-1, and the sales representatives did so until the spring of 2018.

153.     Purdue's detailing caused Doctor-1 to write medically unnecessary prescriptions for OxyContin, claims for which were submitted to Federal healthcare programs.

### *Doctor-2*

154.     From January 2010 to May 2018, Purdue representatives detailed Doctor-2 at least 260 times, although calls after February 2018 did not promote opioid products.

155.     During this time, Doctor-2 caused Medicare claims for OxyContin, the overwhelming majority of which were for OxyContin 80mg tablets.

156.     On September 23, 2003, a Purdue employee flagged Doctor-2 for ADD review stating, "Have you looked at the doctor with [the doctor's ME number]? This person is in specialty decile 7 and has about twice the volume as anyone else in that decile."

- 29 -

157.     Purdue performed an ADD review in July 2004 after reviewing information showing the doctor had abnormally high opioid volume and a high percentage of cash-paying patients, and receiving reports that the doctor was under investigation for his opioid prescribing. The ADD team did not place Doctor-2 on the Region Zero list at that time.

158.     Doctor-2's name came up again in 2008 and 2009 in connection with Purdue's internal investigation of a diverting pharmacy.  The investigation revealed, in part, the following red flags regarding the pharmacy, including:  it was a high traffic pharmacy; cars observed at the pharmacy had out of state plates; it had pharmacy clients loitering outside; it had pharmacy clients entering and exiting vehicles not their own; and it had pharmacy clients exchanging prescription drugs.  As part of the investigation, Purdue identified Doctor-2 as one of the "Three (3) Main Doctors who prescribe for [pharmacy]," but undertook no further review of the doctor after this event.

159.     Purdue sales representatives' call notes also identified ongoing concerns regarding abuse by the doctor's patients.  For example, a 2010 call note stated: "Had a patient that died this week that was taking OxyContin (2 tablets of 80mg at Q12h).  She was 45-48 years old and had been seen by [the doctor] for 10 years.  The patient had complained previously (was reported) that the reformulation made her sick and tried to get a refund for the reformulation (the pharmacy refused).  She did find generic OxyContin.  Patient was found dead sitting at the kitchen table with a syringe beside her.  It has been ruled as an accidental death by the police."

160.     Following the reformulation of OxyContin, Doctor-2 was flagged for review by a December 2010 data analysis due to the doctor's drop in Reformulated OxyContin prescription rates.  Months after the analysis, on August 1, 2011, Purdue completed an ADD review, deciding

REDACTED

19-23649-shld Doc 2018-528 Filed 14/19/21/20 Entered 14/19/21/20 15:40:30 Main Exhibit Ent
Plea Agreement Page 102 of 178 87 of 97

to take no action based on Doctor-2's explanation for why he stopped prescribing Reformulated
OxyContin

161.    In early 2013, the state Board of Medical Examiners filed a complaint against
Doctor-2 outlining his practice of prescribing OxyContin and other opioids outside the course of
legitimate medical practice, which detailed the excessive amounts of OxyContin he prescribed to
certain patients.

162.    On February 27, 2013, a Purdue sales representative filed a ROC that Doctor-2
was subject to disciplinary action by the Board of Medical Examiners.  On April 5, 2013,
Doctor-2 was placed on the Region Zero list. Purdue representatives had detailed Doctor-3 146
times between 2007 and his addition to Region Zero in April 2013.

163.    Although under ADD review since February 27, 2013, Purdue sales
representatives called on Doctor-2 several more times until April 5, 2013.

164.    Four months later, on August 26, 2013, a Purdue sales representative requested to
resume calling on the doctor.  In response, the ADD program wondered if it was "[t]oo soon to
put him back on the list."  It initially recommended a "resume call" status due to a "lack of
progress on the resolution of the board's complaint and the doctor's continuation in practice,"
but, after further discussion, kept him on Region Zero.

165.    In February 2015, the same Purdue sales representative again requested that the
doctor be removed from the Region Zero list.  The doctor was removed from the list on March
2015 after an "Expedited Review" of requests to resume calling on several high-volume doctors.
Purdue sales representatives detailed Doctor-2 an additional 117 times between March 2015 and
spring 2018, although calls after February 2018 did not promote opioid medications.

166.    In sum, Purdue's detailing caused Doctor-2 to write medically unnecessary prescriptions for OxyContin, claims for which were submitted to Federal healthcare programs.

### *Doctor-3*

167.    From January 2010 through March 2013, Purdue sales representatives detailed Doctor-3, who was, at one time, the highest volume Medicare prescriber of opioids in the nation, over 100 times.  The majority of Doctor-3's prescriptions were for 80 mg tablets.

168.    Doctor-3 surrendered his medical and DEA licenses in 2013.  In October 2016, Doctor-3 pled guilty to distribution of a controlled substance and healthcare fraud.

169.    Over the course of a little over a year, Purdue's ADD program received at least five ROCs concerning Doctor-3.  Additionally, Doctor-3's practice had numerous, easily identifiable indicia of abuse and diversion, including large numbers of high dosage patients, long lines of patients waiting outside his clinic, brief or nonexistent patient examinations, and drug transactions in the parking lot.  Yet, Doctor-3 was not placed on Region Zero during this time period and sales representatives were directed to continue calling on him.

170.    In fact, Doctor-3 was not placed on Region Zero at all until he lost his medical license and could no longer prescribe Purdue's opioids.

171.    Purdue's detailing caused Doctor-3 to write medically unnecessary prescriptions for OxyContin, claims for which were submitted to Federal healthcare programs.

**J.    *Purdue Detailed the Pharmacies of Region Zero Prescribers to Cause More Medically Unnecessary Prescriptions to be Filled***

172.    From 2010 through 2012, Purdue trained its sales force to call on pharmacies that dispensed a "high volume of opioid scripts" and were near a "[l]arge pain practice."

173.    In 2013, the same consulting company that developed E2E identified pharmacist scrutiny as a hurdle to sales and told the Board:  "Access to OxyContin for some patients has

become quite challenging in specific local markets. This is due to a combination of factors
including: regulations, DEA initiatives, [Physicians for Responsible Opioid Prescribing],
wholesaler initiatives and local pharmacist perceptions. . . While the wholesaler issues are quite
visible and real, we believe the daily decisions being made at local pharmacies, while less
publicly visible, are in fact creating far greater access issues."

174.    On November 18, 2013, Purdue received a presentation from a vendor that
identified the top twenty OxyContin prescribers whose OxyContin prescriptions declined as a
result of a pharmacy's "good faith dispensing" policy designed to hinder the dispensing of
medically unnecessary prescriptions.

175.    In 2014, a Purdue regional manager similarly wrote that "[t]he retail pharmacist is
an integral part of our business.  As the old adage in pharmaceutical sales goes, 'The pharmacist
isn't likely to generate business, but they sure can kill it.'"

176.    To ensure that prescriptions from extreme high-volume prescribers would be
filled, Purdue engaged in certain strategies, including instructing its sales representatives to detail
pharmacies and paying kickbacks to specialty pharmacies to fill red flag prescriptions, which is
discussed further below.

177.    Purdue also sought to encourage the pharmacists to "reach out to a Prescriber to
recommend that a patient be switched from immediate release oxycodone to OxyContin."  In
other words, Purdue's pharmacy calls both functioned to assuage pharmacists' concerns about
filling prescriptions for OxyContin and at times served as a proxy or indirect call on the very
Region Zero prescribers Purdue allegedly precluded the sales force from directly contacting.

178.    At the same time, Purdue had the means and ability to detect suspicious
pharmacies through its Order Monitoring System (OMS).  Like Purdue's ADD team (and

- 33 -

comprised of many of the same personnel), the OMS Committee was empowered to flag suspicious pharmacies, instruct distributors to pause or cancel orders to those pharmacies, and instruct sales representatives not to call on the pharmacies.

179.    In addition to identifying suspicious pharmacies through referrals and data analyses, the OMS team also had the ability to see which pharmacies were filling prescriptions from Region Zero prescribers.  Despite having this data, Purdue continued knowingly marketing to the pharmacies that filled the prescriptions of Region Zero and other red flag providers, which led those prescribers' medically unnecessary Purdue prescriptions to be filled.

180.    For example, in or around 2010, Purdue's OMS Committee reviewed a Florida pharmacy based on a report from a district manager that the pharmacy was "filling primarily from 1.7.1 physicians," referring to prescribers reported to ADD for displaying indicia of abuse and diversion.  The report stated that the Florida pharmacy's "parking lot is filled with cars with license plates from other states including Kentucky.  They are ordering and filling prescriptions for primarily OxyContin 80mg. . . . [They are also filling prescriptions] from 1.7.1 physicians. He asked the pharmacist if he had any concerns about filling prescriptions from these physicians, and the Pharmacist (owner) stated that he was not going to question what a physician writes for his/her patient."

181.    Despite Purdue's knowledge of the red flags indicating the pharmacy was engaged in abuse and diversion, the OMS Committee voted to "continue to monitor" the pharmacy, and allowed the sales representatives to continue to call on the pharmacy for the next five years through 2015.

## VI.     Kickbacks to Doctors to Induce and Reward Prescriptions

182.     As an additional means to induce doctors to prescribe Purdue's opioid drugs, from 2010 through at least March 2018, Purdue paid kickbacks to certain prescribers in the form of speaker programs, advisory board memberships, research programs and honoraria.

183.     Purdue allowed its sales and marketing personnel, who had data on each doctor's prescribing of Purdue's drugs and whose compensation depended on increasing their assigned doctors' prescribing of Purdue's drugs, to select speakers instead of Purdue's medical education staff.

184.     Purdue also allowed its sales representatives to relay and endorse doctors' requests to be retained, and the doctors could be selected even if they had not been identified by the consulting company Purdue had retained for this purpose.  Within Purdue, these were known as "unsolicited requests."

185.     Purdue vested final authority to select doctors in Purdue's Marketing department, which had data on each doctor's Purdue prescriptions.

186.     Purdue's list of speakers included providers that Purdue knew or should have known were writing prescriptions that were not for a medically accepted indication; for uses that were unsafe, ineffective, and medically unnecessary; and/or that were diverted for uses that lacked a legitimate medical purpose.

187.     Under the processes described above, Purdue knowingly and willfully selected doctors to retain as paid corporate advisors and speakers specifically to induce them to prescribe and reward them for prescribing Purdue's drugs in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS).

188.     For example:

- 35 -

a.  Purdue paid the highest-volume OxyContin prescriber in the United States
over $160,000 between 2013 and May 2018 because he was, in the words of
Purdue's employees, "the biggest prescriber in CT," "the #3 prescriber of
opioids nationally," and "very important to our success," even after he
indicated that if he stopped receiving speaking assignments from Purdue, "the
love may be lost."

b.  Purdue paid the highest-volume OxyContin prescriber in Medicare
approximately $475,000 between 2013 and January 2017 to deliver speeches
and advice even though Purdue observed he was "not a strong speaker or
presenter" and "attendees couldn't follow him," he engaged in "heavy
prescribing, particularly in large doses for long periods of time," and was
excluded by Florida Medicaid.

c.  Purdue paid more than $110,000 to a high-volume prescriber who demanded
speaking assignments or else he would "re-evaluate the use of [Purdue's]
products."

**VII.     Kickbacks to an Electronic Health Records Vendor for Prescriptions**

189.  Practice Fusion, Inc. ("Practice Fusion") is a company that provides EHR services
to medical providers.  Practice Fusion provided EHR services to tens of thousands of healthcare
providers in the United States, which were used during millions of patient visits each month.

190.  Practice Fusion's EHR system included the capability to prompt prescribers
during a patient visit to take certain clinical actions based on particular personal health
information and circumstances relayed by the patient. These prompts were known as clinical

REDACTED

19-23649-shld Doc 2018-28 Filed 11/01/21 Entered 11/01/21 05:40:30 Main Document
Plea Agreement Pg 108 of 178 Page 184 of 97

decision support ("CDS") alerts and were meant to aid the prescriber in making treatment decisions by providing unbiased information consistent with medical practice guidelines.

191.    On January 27, 2020, Practice Fusion entered into a deferred prosecution agreement with the United States and admitted that it solicited and received kickbacks from an unnamed pharmaceutical company—Purdue – in exchange for using CDS alerts within its EHR software to influence the prescribing of opioid pain medications.

192.    Beginning in or around spring 2014, Purdue discussed paying Practice Fusion to create a CDS alert ("Pain CDS") to prompt providers using Practice Fusion's EHR to take certain clinical actions that Purdue believed would increase prescriptions for Purdue's extended release opioid products ("EROs"), which included OxyContin, Butrans, and Hysingla.

193.    From the beginning, the primary purpose of the program was to increase Purdue's ERO prescriptions.

194.    On May 4, 2014, a Purdue executive wrote regarding a potential deal with Practice Fusion that "[t]he key is understanding how it grows or protects [prescriptions]."

195.    On March 23, 2015, a Practice Fusion employee emailed colleagues in preparation for an upcoming meeting at Purdue and described the opportunity to sell a CDS program to Purdue.  The Practice Fusion employee explained that Purdue "has communicated that the average dosage of OxyContin is declining," and that "[p]roviders are hesitant about using high dosages to combat pain."   The Practice Fusion employee further explained that, "[a]s a result, Purdue is toying with the idea of using Pain Assessment tools with the provider at every visit and before every [prescription]."

196.    In a September 2015 presentation to Purdue's marketing personnel, Practice Fusion touted that the Pain CDS would increase Purdue's prescriptions of OxyContin, Butrans,

- 37 -

1:19-cr-36349-mdd Doc 2015-28 Filed 11/21/20 Entered 11/20/20 05:40:30 Main Document
Plea Agreement Page 109 of 178 85 of 97
REDACTED

and Hysingla by delivering "clinical patient-centric provider messages" targeted at healthcare providers with "opioid naive patients with chronic pain," and with patients currently receiving immediate release oxycodone and hydrocodone.

197.     Practice Fusion and Purdue determined the amount of payment – nearly $1 million – by considering Purdue's anticipated return on investment, rather than on the fair market value of the services.  Purdue's last payment to Practice Fusion occurred in December 2016.

198.     In March 2016, Practice Fusion's recap of the kickoff of the Pain CDS project with Purdue began with the statement, "Primary goal of the project is to increase Rx for Purdue's medications."

199.     In May 2016, Practice Fusion again heard that the CDS alert program was not for research purposes, and that "I keep hearing the client revert back to 'Rx lift' as the primary objective of the program, this came up in the kickoff meeting and again during last week's meeting when we were talking about the objectives of the prospective and retrospective analyses."

**B.**     ***Purdue Designed the Pain CDS to Increase Its ERO Sales***

200.     Purdue participated in the design of the Pain CDS alert.  It approved the types of patients the Pain CDS would target and what guidance the alert would provide healthcare providers.

201.     The Pain CDS was presented to providers as a neutral medical standard.  However, Purdue's primary objective in designing of the CDS alert was to increase its ERO sales, and the Pain CDS deviated from medically accepted standards, CDC guidelines, and FDA-approved labels for Purdue's EROs.

202.    In creating a list of treatment plan options for addressing pain, Purdue employees pulled from a list of alternatives treatments to opioids in a New England Medical Journal article on opioid abuse in chronic pain.  That article described several concerns about opioid use, including " concerns about overdosing and abuse by patients" and " [f]actors associated with the risk of opioid overdose or addiction."  Despite this, Purdue employees added opioids to the list within the CDS of potential therapies for chronic pain.

203.    Although the written contract between Purdue and Practice Fusion expired in mid-2017, the Pain CDS alert was live on Practice Fusion's EHR platform from on or about July 6, 2016 to the spring of 2019.  The Pain CDS alerted more than approximately 230 million times during this period.

204.    Purdue knew that Federal healthcare programs paid for EROs marketed by it and other pharmaceutical companies, and that the CDS alert was designed to prompt providers (including those who treated patients whose drug prescriptions were paid by government healthcare programs) to focus on patients' pain and create care plans.  Purdue further knew that the CDS Pain alert was designed to increase prescriptions of EROs.

### VIII.    <u>Alternative Distribution Strategy</u>

205.     As an additional means to circumvent safeguards intended to prevent the filling of suspicious prescriptions, from October 2015 through 2018, Purdue and certain of the Sacklers sought to find a pharmacy mechanism to fill OxyContin prescriptions that other traditional pharmacies had rejected.

### A.    *Purdue Caused Specialty Pharmacies to Dispense Medically Unnecessary Prescriptions.*

206.    As noted above, in July 2013, as part of the E2E program, the consulting company relayed to Purdue and the Board that OxyContin revenues were down because, among

other things, "entire pharmacies [are] being shut off by distributors, pharmacies themselves imposing tablet limits, decreases in channel inventory leading to greater stockouts, and pharmacies choosing to not stock OxyContin." The consulting company proposed creating an "alternative model for how patients receive OxyContin. This model would bypass retail, likely through a third party vendor who would provide adjudication and direct distribution to patients."

207. On August 16, 2013, one day after the Board briefing on E2E discussed above, Mortimer D. A. Sackler emailed a Purdue executive and others asking what ideas management had for creating a new distribution system "to help relieve this problem of product access for legitimate chronic pain patients," which would use "an independent service to verify the legitimacy of [the patients'] prescriptions." Two days later, Mortimer D.A. Sackler reiterated, "I do think there may be an opportunity here for us to set up a complimentary business to handle this for Purdue as well as other controlled drug manufacturers. Do we have a team who could explore this possibility?"

208. On August 18, 2013, Richard Sackler responded that he had the same idea and expressed it to a Purdue executive after a Board meeting. That Purdue executive responded three days later confirming Mortimer D.A. Sackler's interest in exploring an "alternative distribution process for all or essentially all opioid formulations." Mortimer D.A. Sackler responded on the same day, "To be clear, I was thinking about selling to pharmacies."

209. Shortly thereafter, the Sacklers approved E2E, and the E2E program went on to develop "multiple tactics to address these issues," including "alternative supply channels." In 2015, the Company entered agreements with three specialty pharmacies.

210. Some of the prescriptions that were filled by the specialty pharmacies had been rejected by traditional retail pharmacies and displayed indicia that the prescriptions were not for

REDACTED

a medically accepted indication; for uses that were unsafe, ineffective, and medically unnecessary; and that were often diverted for uses that lacked a legitimate medical purpose.

211.    Purdue's ADD program data further confirms that some of these prescriptions lacked medical necessity.  From mid-2015 through 2018, the specialty pharmacies filled Medicare prescriptions for Purdue opioids written by approximately 100 prescribers.  Nearly one-fourth of those prescribers were referred to ADD on suspicion of engaging in abuse and diversion.

**B.    *Purdue Paid Kickbacks to Specialty Pharmacies.***

212.    From October 2015 through 2018, Purdue paid the specialty pharmacies over $100,000 in kickbacks to fill prescriptions that other traditional pharmacies had rejected.

213.    By October 2013 and in connection with Purdue's alternative distribution model strategies, Purdue had approached six potential partners, but all six rejected Purdue's offer because they were "not comfortable with mail fulfillment" and were concerned with the "risk associated with dispensing OxyContin" under that model.  Purdue updated the Sacklers on status at the Board meeting that month:  "What is Purdue Considering? Includes exploring opportunity to distribute directly; exploring existing channels (Specialty pharmacies, independent pharmacy networks)."

214.    In May 2015, Purdue hired a vendor to assist with this project.  A presentation by the vendor stated that Purdue could expect a "100% fill rate" and was structured so that the pharmacy was paid a fee each time it dispensed a prescription for Hysingla.

215.    The agreements Purdue ultimately entered into with three specialty pharmacies made payments at above fair market value that were tied to the volume of Hysingla the pharmacy dispensed.

REDACTED

19-23649-shld Doc 2018-28-4 Filed 11/01/21/20 Entered 11/01/20 21 05:40 08:31 Main Exhibit Document
Plea Agreement Page 113 of 178 89 of 97

216.    Purdue's sales representatives and Medical Affairs department employees referred prescribers and patients that were having difficulty filling prescriptions for any Purdue opioids, including OxyContin, to the specialty pharmacies.

REDACTED

# Exhibit C

19-23649-shldd Doc 2018-28-2led-File11/1901/20/1/20 ntered 1/09/10/02/105/405/830:31 ain Exhibit Bent
REDACTED
Plea Agreement of 178891 of 97



# U.S. Department of Justice
Civil Division

Assistant Attorney General

October 13, 2020

Honorable Christina E. Nolan
United States Attorney
District of Vermont
U.S. Federal Courthouse and
Federal Building
11 Elmwood Avenue, 3rd Floor
Burlington, VT 05402-0570

Gustav W. Eyler
Director, Consumer Protection Branch
Civil Division, Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Rachael A. Honig
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515
District of New Jersey
970 Broad Street, 7th Floor
Newark, New Jersey 07102

      Attention:    J. Stephen Ferketic
                    Assistant United States Attorney, District of New Jersey

Re: Global Plea Agreement for Purdue Pharma L.P.

Dear Ms. Nolan, Mr. Eyler, and Ms. Honig:

     This is in response to your request for authorization to enter into a global agreement with Purdue Pharma L.P. (Purdue).

I hereby approve the terms of the Plea Agreement with Purdue, including the provisions on pages 6-7, through which the United States agrees not to initiate further criminal proceedings against Purdue for the conduct at issue, with the exceptions and conditions noted within those paragraphs and elsewhere within the Plea Agreement.

You are authorized to make this approval a matter of record in this proceeding.

Sincerely,

Jeffrey B. Clark
Acting Assistant Attorney General

REDACTED

Exhibit D

**PURDUE PHARMA L.P.**

**SECRETARY'S CERTIFICATE**

October 20, 2020

I, Marc L. Kesselman, the Secretary of Purdue Pharma Inc. ("PPI"), the general partner of Purdue Pharma L.P. ("PPLP"), and of PPLP, hereby certify, in my capacity as the Secretary of PPI and PPLP, and not individually, that (i) the resolutions attached hereto as <u>Annex A</u> were duly approved by the Board of Directors of Purdue Pharma Inc. (in its capacity as general partner of Purdue Pharma L.P.) on October 20, 2020, have not been amended, modified, revoked or rescinded as of the date hereof, and are in full force and effect.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned, solely in his capacity as the Secretary of PPI and PPLP, and not individually, has executed this Secretary's Certificate as of the date first written above.

**PURDUE PHARMA L.P.**

**By: Purdue Pharma Inc., its general partner**

By: _____

     Name:  Marc L. Kesselman

     Title:    Executive Vice President,
                General Counsel and Secretary

<u>Annex A</u>

## EXCERPT OF THE RESOLUTIONS OF PURDUE PHARMA INC. (THE "CORPORATION"), DATED OCTOBER 20, 2020

WHEREAS, Purdue Pharma L.P. (the "**Partnership**"), through its legal counsel, has been engaged in discussions with the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the United States Department of Justice, Civil Division, Consumer Protection Branch (collectively, the "**United States**") in connection with their investigation into potential criminal violations related to the Partnership's or its affiliates' marketing, manufacturing, sale and distribution of opioids (the "**Criminal Investigation**");

WHEREAS, each of the Partnership's management and outside legal counsel have reported to the Board the terms and conditions of a proposed resolution of the Criminal Investigation;

WHEREAS, the Board of Directors (the "**Board**") of Purdue Pharma Inc. (the "**Corporation**") has reviewed, with its outside legal counsel, the Plea Agreement (including the Company Officer's Certificate, the Certificate of Counsel and Schedule A forming a part thereof) between the United States and the Partnership related to the Criminal Investigation (the "**Plea Agreement**");

WHEREAS, the Board has determined in consultation with its outside legal counsel that it is in the best interest of the Corporation and the Partnership (in the Corporation's capacity as general partner of the Partnership) for the Board to authorize the Partnership to enter into the Plea Agreement and to carry out the Partnership's obligations thereunder, including entering the guilty plea set forth therein subject to the conditions set forth in the Plea Agreement; and

WHEREAS, the Board acknowledges that the Plea Agreement sets forth the Partnership's agreement with the United States fully, and that no additional promises or representations have been made to the Partnership by any officials of the United States in connection with the disposition of this matter, other than those set forth in the Plea Agreement.

NOW, THEREFORE, IT IS:

RESOLVED, that the Partnership's negotiation, execution, delivery and performance of the Plea Agreement, including entering the guilty plea set forth therein subject to the conditions set forth in the Plea Agreement, be and hereby are approved in all respects;

RESOLVED, FURTHER, that, Robert S. Miller, Chairman of the Board ("Mr. Miller"), and each of the officers of the Corporation and the Partnership (the "**Proper Officers**") is hereby authorized, in the name of and on behalf of the Corporation (in its own capacity and as the general partner of the Partnership) and the Partnership, to speak on behalf of the Corporation and the Partnership in any proceeding necessary or appropriate in connection with the Plea Agreement, including for the purpose of entering the guilty plea set forth therein in court on behalf of the Partnership;

RESOLVED, FURTHER, that Mr. Miller, and each of the Proper Officers is hereby authorized, in the name of and on behalf of the Corporation (in its own capacity and as the general partner of the Partnership) and the Partnership, (x) to execute and deliver the Plea Agreement, with such changes as Mr. Miller or such Proper Officer executing the same may approve, such approval to be conclusively evidenced by the execution and delivery thereof by Mr. Miller or such Proper Officer, and all agreements or documentation required in connection with the Plea Agreement, (y) to take all actions and execute and deliver all documents as Mr. Miller or any such Proper Officer shall deem necessary or appropriate in connection with the Plea Agreement and any transactions or actions contemplated thereby, including entering the guilty plea subject to the conditions set forth therein, and (z) to take all actions, make all filings and execute all documents (or request any applicable third parties to take any applicable action, make any applicable filing and execute any applicable document) as Mr. Miller or any such Proper Officer shall deem necessary or appropriate in connection with the Plea Agreement becoming effective and to effect the transactions contemplated thereby;

RESOLVED, FURTHER, that Mr. Miller, and each of the Proper Officers is hereby authorized, in the name of and on behalf of the Corporation (in its own capacity and as the general partner of the Partnership) and the Partnership, to cause such pleadings or other documents to be filed with the United States Bankruptcy Court for the Southern District of New York as may be necessary or appropriate for the Plea Agreement to become effective and to effect the transactions contemplated thereby; and

RESOLVED, FURTHER, that legal counsel for the Corporation and the Partnership is authorized, empowered and directed, on behalf of the Corporation (in its own capacity and as the general partner of the Partnership) and the Partnership (x) to execute and deliver the Certificate of Counsel forming part of the Plea Agreement and all other documentation required to be executed by legal counsel in connection with the Plea Agreement and (y) to take all actions and execute and deliver all other documents as Mr. Miller or any Proper Officer shall deem necessary or appropriate in connection with the Plea Agreement and any transactions or actions contemplated thereby, including entering the guilty plea set forth therein subject to the conditions set forth therein; and

RESOLVED, FURTHER, that Mr. Miller, and each of the Proper Officers is hereby authorized on behalf of the Corporation and the Partnership to take any and all actions, make any and all filings, execute and deliver any and all documents, agreements, authorizations, consents, certificates and other documents and instruments and to take any and all other steps deemed by any such officer to be necessary or desirable to carry out the purpose and intent of the foregoing resolutions; and

RESOLVED, FURTHER, that all actions heretofore taken by the Corporation, the Partnership, Mr. Miller and/or the Proper Officers in connection with any matter referred to in any of the foregoing resolutions are hereby approved, ratified and confirmed in all respects as fully as if such actions had been presented to this Board for its approval prior to such actions being taken.

# EXHIBIT 183 – 188a (redacted)

REDACTED

# EXHIBIT 188b

REDACTED

Westlaw.

100 NWULR 1409                                                                                      Page 1
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

Northwestern University Law Review
Spring 2006

**Comment**

**\*1409** WEST VIRGINIA'S PAINFUL SETTLEMENT: HOW THE **OXYCONTIN** PHENOMENON AND
UNCONVENTIONAL THEORIES OF TORT LIABILITY MAY MAKE PHARMACEUTICAL COMPANIES
LIABLE FOR BLACK MARKETS

Joseph B. Prater [FNa1]

Copyright © 2006 Northwestern University School of Law, Northwestern

University Law Review; Joseph B. Prater

I.      Introduction ................................................... 1409

II.     Background ..................................................... 1412

        A. OxyContin: A Prescription Narcotic Backed by Deep Pockets ..... 1412

        B. Illicit Diversion of OxyContin ............................... 1414

III.    Injured Abuser as Plaintiff: The Difficulty of Establishing

        Liability ..................................................... 1417

        A. Drug Abusers as the Primary Source of OxyContin Injuries ...... 1417

        B. Suits Brought by Patients and Abusers ........................ 1418

IV.     Public Entity as Claimant: When Drug Abuse Harms the Broader

        Community ..................................................... 1420

        A. Unconventional Tort Theories and Public Entities Generally .... 1420

        B. West Virginia's Public Entity Suit Against Purdue ............. 1424

        C. West Virginia's Negligent Marketing Claims Conflated

PPLPC051000035808

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
REDACTED
Pg 125 of 178
100 NWULR 1409                                                                                        Page 2
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

        Promotionwith Distribution ....................................... 1430

V.      Potential Impact of West Virginia's Settlement ................... 1433

        A. Understanding the Settlement: Why It Happened, and Why It

        Increases the Threat of Future Legal Action Against Drug

        Manufacturers .................................................... 1433

        B. Culture: Making Manufacturers Liable for the Failures of

        Communities ...................................................... 1435

        C. Chilling Effects on the Treatment of Chronic Pain ............. 1436

VI.     Conclusion ....................................................... 1437

## I. Introduction

Since the discovery of a veritable goldmine in the now-notorious waves of tobacco and asbestos litigation, many plaintiffs' attorneys have been searching relentlessly for the "next big thing" [FN1] in products liability litigation: a new source of tort claims capable of providing a massive supply *1410 of legal fees. [FN2] Unfortunately for defendants and for the public, the hunt for mass torts seems often to focus less on the merits and more on the "mass," either by eschewing well-established yet conventional tort doctrines in favor of less conventional yet more flexible ones, [FN3] or by simply attempting to draw questionable analogies to past plaintiff-side success stories. [FN4]

This Comment focuses on the potential policy pitfalls posed by unbounded application of the first strategy--that which seeks to establish liability through "unconventional" tort theories--in the context of the harms caused by the use and abuse of prescription narcotics. The controversy concerning the abuse of, and addiction to, the prescription painkiller OxyContin and the ensuing public entity litigation [FN5] present a unique opportunity to explore the threats that overly liberal application of "unconventional" tort liability to manufacturers of prescription narcotics may have on pain sufferers. [FN6] Specifically, this Comment focuses on the recent settlement of a suit levied against Purdue Pharma ("Purdue"), the manufacturer of OxyContin, by the state of West Virginia. That suit asserted causes of action including, inter alia, negligent marketing and public nuisance, [FN7] and ultimately settled in November 2004, with Purdue agreeing to pay $10 million to the state of West Virginia. [FN8]

Purdue's settlement with West Virginia is notable primarily because of the tenuous chain of causation between the design and marketing of OxyContin and the harms associated with its use. In the simplest tort action, A *1411 negligently or intentionally causes harm to B. With the presence of an intervening force, the direct chain of causation from A to B is broken. An actor or action, C, has facilitated the transaction and thus becomes a necessary force in the chain of causation and, arguably, the source most directly responsible for the harm caused. Such an extended chain of causation poses a challenge to plaintiffs, and often frustrates their ability to demonstrate liability. Thus, it is more difficult to hold a manufacturer liable when another party or action has more directly caused the harm.

This Comment focuses only on litigation concerning the most salient harms associated with OxyContin, caused by those who deliberately misuse the drug, as opposed to the more minor threats presented by those who hold prescriptions and administer the drug with legitimate intentions. Proving liability for these indirect harms necessarily involves an extended chain of causation. Users are not patients prescribed OxyContin but instead individuals who came upon the drug through illicit means. Yet even with these barriers to demonstrating causation and liability, West Virginia prevailed. In effectuating its $10 million settlement with Purdue, West Virginia was able to recover for social harms caused by drug abusers who illegally obtained OxyContin via black markets and knowingly misused the drug for recreation.

Part I of this Comment discusses the history of the drug OxyContin and its sole active ingredient, oxycodone. Contrary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl   Doc 2015   Filed 11/19/20   Entered 11/19/20 02:54:56   Main Document
Pg 126 of 178
REDACTED
100 NWULR 1409                                                                                      Page 3
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

to popular misunderstanding, OxyContin is not a revolutionary drug at the chemical level but, rather, a new means of administering a decades-old painkiller.  Part I goes on to discuss the means by which OxyContin users and dealers fuel black markets via drug diversion and takes note of the marked geographic concentration of illegal OxyContin trade and abuse.

Part II argues that the harms caused by OxyContin stem primarily from deliberate misuse of the drug, rather than its proper use by "legitimate" patients.  Legitimate patients are defined as those who hold valid prescriptions and administer the drug with legitimate intentions, i.e., use as directed.  By contrast, abusers are defined as those who have obtained OxyContin on the black market or through an illegal prescription and seek to use the drug for recreation.  Part II argues that the active role that OxyContin abusers play in harming themselves is precisely the reason that they have been so unsuccessful as plaintiffs.

However, one OxyContin suit has met with success--that brought by West Virginia.  Part IV discusses the unique role that public entities can play as plaintiffs in litigating cases with extended causation complications.  Specifically, it notes that public entities are in a unique position, insofar as they can assert liability for the harms that a product's marketing and distribution bring to bear on an entire community.  Part IV briefly sketches the jurisprudential history of negligent marketing and public nuisance, two *1412 theories that public entities have applied in novel ways through asbestos, [FN9] tobacco, [FN10] and, especially, firearms litigation. [FN11]  First, Part IV argues that, by effectively ignoring the buffering role that physicians play in the marketing of controlled substances and by failing to differentiate between the harms caused by the "legitimate" use of prescription narcotics and their intentional abuse, West Virginia's negligent marketing and public nuisance claims against Purdue effectively sought to establish liability where there should have been none. [FN12]  Second, Part IV argues that this circumstance is driven as much by the need for public revenues [FN13] as it is by the temptation to use tort law as a surrogate where proper legislative regulation is lacking. [FN14]

Part V concludes by stressing that it is precisely in the context of a public entity suit that such "questionable" claims have real force.  Economic incentives--such as the avoidance of legal fees and, of particular relevance in the public entity context, negative media coverage--may lead even the most aggressively defensive companies to fold early in litigation, and thus implicitly consent to bear some degree of liability for regulatory failure. [FN15]  The ultimate result is that litigation may have a chilling effect on the treatment of chronic pain, insofar as it makes pharmaceutical companies liable for black markets that they may neither condone nor control.

## II. Background

A. OxyContin: A Prescription Narcotic Backed by Deep Pockets

OxyContin is a brand-name, time-release formulation of oxycodone hydrochloride  ("oxycodone"), first launched in 1996 by Purdue. [FN16]  Pharmacologically, oxycodone is an opiate agonist produced synthetically and is capable of producing effects similar to heroin if abused. [FN17]  Because of its *1413 "high potential for abuse," which "may lead to severe psychological or physical dependence," OxyContin is categorized as a Schedule II narcotic, the most restrictive schedule available for legal pharmaceuticals. [FN18]

For Purdue--a privately held company [FN19]--OxyContin has provided an enormous financial success.  OxyContin generated over $1.5 billion in sales in 2002 alone, accounting for more than seventy-five percent of Purdue's total annual revenues. [FN20]  That year, OxyContin was the "number-one prescribed Schedule II narcotic in the United States," according to the U.S. Department of Justice ("DOJ"). [FN21]  Despite its revolutionary financial success, OxyContin is not an especially revolutionary drug at the chemical level. [FN22]  Indeed, the drug's sole active ingredient, oxycodone, was first synthesized in 1916 [FN23] and has been widely prescribed for decades under brand names including Percocet [FN24] and Percodan. [FN25]  These older formulations, however, contain smaller doses of oxycodone in immediate-release formulations and, as a result, provide pain relief of relatively short duration. [FN26]  OxyContin is unique in that its time-release mechanism allows for a single pill to slowly release a large amount of oxycodone over time, eliminating the need for repeated dosing.  Whereas most oxycodone formulations typically provide only four to six hours of pain relief, OxyContin is effective for up to twelve hours, [FN27] providing not only a convenience to pain patients but, far more importantly, a reduced risk of experiencing pain between doses. [FN28]

As a result, a single dose of OxyContin contains far more oxycodone than immediate-release formulations, and this feature has facilitated its abuse. Swallowing OxyContin pills whole, as directed, allows for a steady release of oxycodone

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

over time.  Crushing pills prior to ingestion, however, defeats that time-release mechanism and causes all of the active ingredient *1414 to become immediately available for absorption.  A tablet so ingested produces a heroin-like high and, although some regular abusers do swallow the pills whole, most abusers (and, in particular, the most hard-core abusers) simply crush the tablets in order to defeat the time-release mechanism. [FN29]  Most abusers crush the tablets and either swallow the resulting powder or, for a more intense effect, snort it like powdered cocaine. [FN30]  The ultimate result is that--once crushed--an OxyContin tablet is nothing more than a large dose of oxycodone.  As such, one commentator has described OxyContin as "old wine in a new bottle." [FN31]  More bluntly, one "long time drug user and dealer" is said to have described it as "the same old shit."  [FN32]   Thus, OxyContin is not exactly a "new" phenomenon, and this mischaracterization has served to unnecessarily increase media overreaction to the abuse situation and, in turn, serves to muddy the issue of the potential harms that OxyContin use and abuse may have caused. [FN33]

B. Illicit Diversion of OxyContin

OxyContin abuse has been sufficiently concentrated both geographically and socioeconomically that it is now commonly referred to as "Hillbilly heroin" [FN34] and "poor man's heroin." [FN35]  It was relatively poor, rural areas such as Appalachia and rural New England that were hit first and hit hardest by OxyContin abuse and related crimes. [FN36]  However, OxyContin abuse and addiction is not categorically limited to rural, impoverished areas: more recently, OxyContin abuse has spread to urban areas, [FN37] and even some of the wealthiest members of society have experienced addiction to the drug, as the recent high-profile scandal involving political commentator Rush Limbaugh *1415 illustrates. [FN38]  The most important factor, perhaps, in the spread of OxyContin abuse is that it was available in every American community well before potential abusers were even aware of its existence. Thus, every town and city effectively harbored a preexisting supply of OxyContin ready for the black market; so long as there was a user or dealer sufficiently clever and motivated to "divert" the drug, a black market was one dubious prescription away. [FN39]

"Drug diversion" refers to all of the processes by which legal prescription drugs are ultimately placed in the hands of those for whom the drug has not been legitimately prescribed, whether directly by the end user or through a black-market stream of commerce. [FN40]  Drug diversion is fueled both by physicians who knowingly or unknowingly prescribe scheduled drugs to persons who do not actually need them, and by legitimate patients who forgo one or more doses in order to later sell or simply share with friends.  The Department of Justice identifies a number of primary sources for the diversion of OxyContin, which are by no means peculiar to this drug, specifically: "doctor shopping," "improper prescribing practices," and "pharmacy diversion." [FN41]

First, the Department of Justice notes that "[t]he most widely used diversion technique at the street level is doctor shopping," the practice of visiting large numbers of physicians and convincing them that there is a legitimate need for a prescription. [FN42]  This technique is not only effective at the level of the individual abuser, but is also available to black market dealers seeking to obtain large amounts of narcotics.  Indeed, such charades are often conducted on a large scale, with some drug seekers going so far as to visit doctors in multiple states. [FN43]

Second, illegal prescribing practices have facilitated significant drug diversion. [FN44]  Unscrupulous physicians--who are fully aware that the "patient" has no legitimate need for prescription narcotics--may nonetheless prescribe controlled substances on demand, in order to reap a profit. [FN45]  Sometimes these activities encompass a doctor's entire practice, rendering it nothing more than a vehicle for generating revenues from sales of illicit *1416 prescriptions.  Such operations are often referred to as "pill mills" [FN46] and are quite common in areas where OxyContin abuse is high.

Finally, "pharmacy diversion" occurs where workers or thieves divert OxyContin by removing the physician from the picture altogether.  Pharmacy diversion may be effectuated either by forging prescriptions or by simply stealing drugs from the pharmacy's shelves. [FN47]  Demand for OxyContin has surged so much that a number of pharmacies "have stopped carrying the drug for fear of break-ins." [FN48]  Additionally, foreign pharmacies located in countries with relatively lax or ineffective controls on the sale of prescription narcotics have long fueled "pharmacy diversion," supplying U.S. black markets with ample quantities of prescription pharmaceuticals--and OxyContin is no exception. [FN49]  One commentator on the underground trade in prescription pharmaceuticals generally has noted that "[t]here are approximately ten times as many pharmacies in Tijuana" as in San Diego, though both are "cities of roughly equal population." [FN50]  This imbalance is common among Mexican cities along the U.S. border, due to a robust cross-border trade in prescription drugs for both personal use and illicit resale. [FN51]  While much of this trade is attributable to nonrecreational prescription drug users [FN52] seeking a cheaper alternative to the domestic market, [FN53] the cross-border pharmaceutical trade has become a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PPLPC051000035811

100 NWULR 1409                                                                                            Page 5
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

boon for illicit suppliers of scheduled narcotics. [FN54]  In 1998, two years after OxyContin's launch, only about 5000 grams of OxyContin were shipped to Mexico. [FN55]  This number, however, increased to approximately 26,500 grams in 1999 and a staggering 89,000 grams in 2000. [FN56]

*1417 III. Injured Abuser as Plaintiff: The Difficulty of Establishing Liability

A. Drug Abusers as the Primary Source of OxyContin Injuries

The media storm created by the abuse of OxyContin has resulted in increased scrutiny of "legitimate" uses of the drug, including increased fear of accidental patient overdoses as well as "iatrogenic" addiction, a term that describes addiction resulting from legitimate use of a drug to combat pain. [FN57]  Distinguishing between the harms caused by legitimate use of OxyContin and those caused by its intentional abuse is crucial.  By confounding the harms caused by "well-intentioned" OxyContin over-prescription with those caused by deliberate diversion and abuse of OxyContin, we confuse the harms that can and cannot be caused by aggressively marketing narcotics to physicians.

Some commentators have accused OxyContin of presenting serious risks to pain patients, and, in turn, there have been a large number of (mostly "conventional") lawsuits against Purdue alleging, inter alia, negligence [FN58] and design defect. [FN59]  For instance, some patients allege harm or addiction to OxyContin resulting from use of the drug as prescribed, where those prescriptions were well within the confines of uses clearly approved by the FDA. [FN60]  These suits, however, have been unsuccessful, perhaps in part because of increasing agreement that the drug's benefits outweigh its risks when it is appropriately prescribed.

More commentators are showing concern that the drug is not as dangerous to legitimate patients as some would urge, and fears that many OxyContin addicts started out as legitimate patients using the drug as prescribed have largely subsided. [FN61]  Recent data suggest that most OxyContin addiction does not result from indiscriminate, "off-label" overprescribing of the drug but, rather, existing drug abusers who were simply trying out a new product. [FN62]  Additionally, regarding the risk of fatal overdose, a recent study showed that, of all deaths involving oxycodone (and not necessarily OxyContin, specifically), most involved the concomitant use of illicit drugs, other prescription narcotics, alcohol, or a combination of these substances. [FN63] *1418 That study found that, although "[a] total of 919 deaths were classified as either being induced by or related to drug abuse [,] . . . only 30 deaths were identified that solely involved abuse of oxycodone" and, of those, only "12 deaths could be identified involving the specific drug product OxyContin." [FN64]  However, even on the assumption that OxyContin is acceptably safe when used within FDA guidelines, the drug nonetheless presents some degree of substantial risk to "legitimate" pain patients.  As a Schedule II narcotic, it should not surprise reasonable observers that the drug poses inherent risks, including at least some risk of iatrogenic addiction.

Regardless of whether harm through prescription use is prevalent, liability may be reasonable for harms caused to patients prescribed OxyContin by doctors who were confused or misled by Purdue's aggressive marketing.  Those patients might have potential claims against Purdue in a direct sense, such as for negligent marketing to physicians.  Liability does not seem justified for harms that have befallen those who purchased OxyContin from drug dealers or those who deceived well-meaning physicians into writing a prescription.  For them, it was neither Purdue's marketing nor the design of the pills that caused drug abusers harm but rather their own decisions to intentionally misuse the pills for recreational purposes.  Thus, drug abuse as the source of injury appears to be a losing case.  However, as the West Virginia suit demonstrates, room for litigation may still exist for harm resulting from this second category of use.  While the former group of plaintiffs is more characteristic of those bringing conventional tort suits, the West Virginia suit demonstrates that the indirect harms caused to the community by the latter category of users allow for a unique sort of plaintiff: the public entity.

B. Suits Brought by Patients and Abusers

By late 2003, OxyContin was the source of nearly 300 state and federal lawsuits against Purdue, including a number of class-action complaints. [FN65]  Plaintiffs have asserted claims against Purdue under a number of "traditional" tort theories, including negligence, defective design, and failure to warn, [FN66] as well as under theories relating to Purdue's marketing and promotion of OxyContin. [FN67]  In response, Purdue has taken an aggressive stance in *1419 order to avoid "pay[ing] a dime to a plaintiff" in these cases, and has so far incurred tens of millions of dollars in legal fees. [FN68]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
REDACTED
Pg 129 of 178
100 NWULR 1409                                                                                    Page 6
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

Design defect claims against Purdue are founded on the notion that OxyContin's time-release mechanism did not work as it should, and thus resulted in overdose or addiction. [FN69] In some of these design defect cases, plaintiffs have alleged that the design of the OxyContin tablets increased the risk of overdose, but these suits have not been successful. [FN70] And, where plaintiffs were illegal users, who often intentionally defeated the time-release mechanism, the extent of their deliberate misuse tended to render any sort of claim impracticable. [FN71]

Courts have been reluctant to find causation not only in "conventional" tort claims alleging defective design of OxyContin tablets but also in other doctrinal contexts. The common thread between courts' rejection of nearly all of these claims is the difficulty in establishing causation and duty between conduct and injury. [FN72] First, courts in most jurisdictions will distinguish between the mere negligent misuse and the intentional misuse of prescription drugs. Foreseeably negligent misuse of a drug does not bar a finding of proximate causation in such jurisdictions, but a court will apply the doctrine of "sole proximate cause" where a drug user "intentionally misuses a product to his detriment." [FN73] For example, in a wrongful death action brought against Purdue by an OxyContin abuser, a district court granted summary judgment for Purdue on the ground that "intentional misuse of an intoxicating product is the sole proximate cause of the [plaintiff's] injury" due to the fact that he had "intentionally . . . misused the product by crushing and inhaling it." [FN74] Second, courts have not been receptive to plaintiffs' contentions that drug manufacturers have an "affirmative duty to police their product in the stream of commerce." [FN75] Those courts have referred not only to applicable law specific to the jurisdiction, but to the broader common law concepts espoused by the Restatement (Second) of Torts in rejecting the existence of such a duty. [FN76]

*1420 In addition, it is noteworthy that a court's consideration of causation in a case involving drug abuse can often carry moral overtones. In some jurisdictions, the fact that the abuser committed an illegal and ostensibly immoral act in helping to bring about her injury can influence a court's decision of whether to apply a contributory negligence doctrine in lieu of a comparative fault doctrine. [FN77] Generally speaking, the application of a contributory negligence doctrine serves to bar a plaintiff's claim altogether, whereas the application of a comparative fault doctrine serves only to mitigate damages. [FN78] As a result, courts have held illegal abuse of a drug to bar recovery in many jurisdictions, including Kentucky, [FN79] Michigan, [FN80] and, interestingly, West Virginia. [FN81]

Courts' considerations in cases brought by drug abusers should apply to suits brought by public entities suing on behalf of drug abusers, to the extent that these entities seek compensation for the havoc that intentional abusers have wrought on the community. [FN82] Seemingly, claims of mere negligence or a design defect in the time-release mechanism brought by drug abusers have been rejected because of the drug user's own intervening illegal act. This basis for harm still exists even for communities indirectly affected by the drug abuse. Just as intentional abuse of a prescription narcotic eviscerates the causal link between that drug and an abuser's injury in a conventional suit, abuse frustrates causation in a claim based on the aggregate harm caused by a great many intentional abusers.

IV. Public Entity as Claimant: When Drug Abuse Harms the Broader Community

A. Unconventional Tort Theories and Public Entities Generally

Causation problems make it difficult for drug addicts--and especially those drug addicts who have intentionally misused a product for recreation--to assert liability against a prescription narcotics manufacturer. Public entity suits provide a unique method to circumvent these causation problems by alleging that a pharmaceuticals manufacturer has harmed the community as a whole through its product marketing, distribution practices, or both. To illustrate, note the difference between an OxyContin abuser alleging *1421 that Purdue's marketing practices caused her harms and the state alleging that those same practices negligently facilitated her rampant drug abuse, which, in turn, caused harms to the public.

In spite of courts' reluctance to accept the novel doctrines advanced during the recent surge of public entity suits against gun manufacturers, [FN83] these suits nonetheless provide a means of pursuing revenue. [FN84] Even a few plaintiffs' success stories may render these doctrines increasingly attractive to public entities in need of revenues and, though unpredictable and prone to dismissal, such suits remain tempting sources of income. [FN85] As West Virginia's $10 million settlement demonstrates, such strategies may sometimes prove lucrative. [FN86]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
REDACTED
Pg 130 of 178
100 NWULR 1409                                                                              Page 7
100 Nw. U. L. Rev. 1409
**(Cite as: 100 Nw. U. L. Rev. 1409)**

Public entities have filed high-profile lawsuits not only against gun manufacturers, [FN87] but also against tobacco companies and manufacturers of lead paint products. [FN88]  While a city has yet to file suit against a pharmaceutical manufacturer, the state of West Virginia has already pursued such "'social issue' tort litigation" [FN89] successfully in the context of OxyContin.  States face similar revenue problems as cities and are likewise incentivized to file suit in pursuit of revenue. [FN90]  Additionally, other states that have faced the highest rates of OxyContin abuse are, for the most part, similarly situated. [FN91]  Therefore, it is unsurprising that West Virginia chose this route when the opportunity arose.  In return, West Virginia generated a substantial amount of revenue from its $10 million settlement with Purdue. [FN92]

In its suit, West Virginia relied upon two basic types of novel product liability theories: negligent marketing [FN93] and public nuisance. [FN94]  This section provides a brief sketch of the characteristics and history of these "unconventional" tort doctrines and discusses the crucial role that public entities have played--as plaintiffs--in spawning these unconventional doctrinal vehicles.

**\*1422** 1. Negligent Marketing. --Negligent marketing is a relatively new theory of liability, first conceived in the context of the sale and manufacture of firearms and first recognized by a court in the 1999 case Hamilton v. Accu-Tek. [FN95]  This theory "assumes that [manufacturers and sellers] have a duty to market their products in a manner that will not affirmatively increase a product's inherent risk to consumers and third parties." [FN96]  Support for negligent marketing gained momentum when a later California court recognized the theory in Merrill v. Navegar, Inc. [FN97]  In both cases, however, the theory was rejected on appeal, [FN98] leading one noted commentator on negligent marketing, Professor Richard Ausness, to opine that "the status of negligent marketing claims remains very much in doubt." [FN99]  Nonetheless, West Virginia's settlement suggests that negligent marketing claims (and product public nuisance claims) nonetheless pose a real threat.

Professor Ausness delineates three broad categories of negligent marketing claims: first, claims based on a product's design; second, claims based on advertising and promotional activities; and, finally, claims based on negligent distribution practices. [FN100]  As West Virginia's suit highlights, negligence claims based on promotional and distributional practices are of particular interest to pharmaceutical manufacturers. [FN101]  Specifically, Ausness notes that liability may arise from pharmaceutical companies' efforts to "pressure or bribe doctors to prescribe [drugs] . . . in excessive dosages or to persons who do not really need them." [FN102]  Ausness terms such activity "overpromotion," and opines that "[r]ecent experience involving the painkiller OxyContin illustrates the potential applicability of [the overpromotion] form of negligent marketing to prescription drug sellers," because of Purdue's alleged attempts to promote the drug for inappropriate uses. [FN103]

Distribution-centered strains of negligent marketing stem not from the advertising or promotion of a product per se but, rather, on the actual distribution of the product. [FN104]  Professor Ausness explicitly defines negligent distribution claims as a "form of negligent marketing" that focus on the notion that a product's distribution may allow inappropriate users to "more easily obtain access to it at the retail level." [FN105]  In its OxyContin suit, West Virginia **\*1423** relied on this type of a claim in its allegation that Purdue's practice of supplying Mexican pharmacies "facilitate[ed] the inappropriate use of OxyContin" simply because "members of the public [could] obtain OxyContin from these pharmacies without a prescription." [FN106]  Ausness notes that this charge "resembles one of the negligent marketing claims brought against handgun manufacturers in Hamilton v. Accu-Tek," in that it comprises a negligent failure to supervise retailers claim. [FN107]

2. Public Nuisance in the Products Arena. --An additional (yet still emerging and uncertain) vehicle has grown from the more traditional theory of public nuisance, and similarly poses a threat to pharmaceutical manufacturers. [FN108]  Public nuisance is an unconventional avenue in the context of products liability litigation. [FN109]  The Restatement (Second) of Torts identifies public nuisance as "an unreasonable interference with a right common to the general public," [FN110] and the doctrine has roots extending far back into the English common law. [FN111]  More recently, plaintiffs have attempted to stretch its boundaries to cover product liability for the manufacture, marketing, and sale of asbestos, [FN112] firearms, [FN113] tobacco, [FN114] and--most recently with West Virginia's suit--OxyContin. [FN115]

At first glance, stretching public nuisance into the products realm may not seem entirely unreasonable.  The Restatement speaks of "interference with a public right" [FN116] and looks to whether the "actor knows or has reason to know" that her actions "ha[ve] a significant effect upon the public right." [FN117]  As such, the doctrine can be so extended by simply framing the negative societal impacts of dangerous products in terms of interference with a "public right." [FN118]  Expansion of the doctrine, however, has engendered much academic criticism, [FN119] and attempts to extend the doctrine to **\*1424** cover products liability in the context of asbestos have failed outright. [FN120]  Similarly, expansion in the context

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of firearms has achieved mixed results in convincing courts to allow such claims to go to trial. [FN121]  As time wears on, however, courts have been increasingly reluctant to recognize the merits of public nuisance claims in the context of public entity firearms litigation. [FN122]

In a recent decision, the Supreme Court of Illinois granted a defendant-firearms manufacturer's motion to dismiss a public nuisance claim levied by the city of Chicago. [FN123]  There, the court penned a fifty-page opinion criticizing the plaintiff's proposed extension of public nuisance doctrine, specifically noting that firearms are "product[s] that may be possessed legally by some persons, in some parts of the state." [FN124]  The court's dismissal was based on two primary considerations.  First, the court took issue with the plaintiff's attempts to establish causation, noting that "the alleged public nuisance is not so foreseeable to the dealer defendants that their conduct can be deemed the legal cause of a nuisance that is the result of the aggregate of the criminal acts of many individuals over whom they have no control." [FN125]  Second, the court stressed its "reluctance to expand nuisance liability in an area highly regulated by both state and federal law" in such a way as to "creat[e] an entirely new species of public nuisance liability." [FN126]  Such drastic action, it concluded, "must be the work of the legislature, brought about by the political process." [FN127]

B. West Virginia's Public Entity Suit Against Purdue

The success of Purdue's aggressive litigation strategy established that more traditional avenues of tort liability would not be effective in targeting the real source of the OxyContin problem--its abuse. [FN128]  In 2001, the Attorney General of West Virginia, Darrell McGraw, Jr., filed suit against Purdue in an attempt to establish liability on the basis of Purdue's production, promotion, marketing, and distribution of OxyContin. [FN129]  In total, the complaint *1425 set forth seven causes of action: violation of the West Virginia Consumer Credit Protection Act, continuing public nuisance, unjust enrichment/restitution, indemnity, negligence, medical monitoring, and, finally, violation of West Virginia's antitrust statutes. [FN130]  Despite Purdue's otherwise aggressive, "no-settle" stance taken in other litigation [FN131]--which has cost it approximately $250 million to sustain for three long years [FN132]--it finally settled with West Virginia for the sum of $10 million, money which "will finance doctor continuing-education programs, law enforcement drug-prevention programs and community drug-rehabilitation programs." [FN133]

West Virginia alleged that its state agencies incurred some $30.5 million in OxyContin related expenditures between 1996 and 2003. [FN134]  Its complaint struggled to tie Purdue's aggressive marketing of OxyContin to the costs that the state had borne out because of OxyContin abuse, alleging that Purdue's marketing led to "excessive, inappropriate [sic] and unnecessary prescriptions of OxyContin" and, thus, that "citizens and consumers of West Virginia, who have legitimately and legally paid for OxyContin, have incurred actual damages and excessive costs." [FN135]  Thus, West Virginia sought, inter alia, "restitution and reimbursement sufficient to cover all costs expended for health care services and programs associated with the diagnosis and treatment of adverse health consequences of OxyContin use, including but not limited to addiction due to defendants' wrongful conduct," as well as "restitution and reimbursement sufficient to cover all prescription costs the State has incurred related to OxyContin due to defendants' wrongful conduct." [FN136]  The "wrongful conduct" presumably relates to Purdue's marketing and distribution practices.

1. West Virginia Effectively Sought to Recover for Harms Caused by OxyContin Abuse. --

On its face, the complaint simply sought to gain reimbursement for costs to the state caused by the unnecessary prescription of OxyContin: first, the direct costs associated with the state payment for patients' prescriptions and, second, for the indirect expenses related to overprescribing, such as state efforts to treat iatrogenic addiction. [FN137]  Tellingly, however, the *1426 complaint alleged that "ten of the 55 counties in West Virginia, all in the southern part of the state, accounted for approximately 48% of the total prescriptions paid for by" the West Virginia Department of Health and Human Resources. [FN138]  This disparity in the geographic source of claims betrays the real nature of West Virginia's suit, exposing it as a vehicle by which to conflate the harms caused by the legitimate--albeit potentially medically unnecessary-- use of OxyContin with the harms caused by blatant abusers who obtained the drug via purposeful diversion and related black markets.

Although it is conceivable that a higher number of pain patients would be concentrated in these areas, or that doctors working in these areas would be less informed and, thus, more susceptible to Purdue's marketing claims, these factors do not offer a persuasive explanation for the geographical disparity. This inconsistency can be better explained by considering that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
REDACTED
Pg 132 of 178

100 NWULR 1409                                                                                   Page 9
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

the more concentrated locations are the very areas of West Virginia where black markets for OxyContin were most flourishing. [FN139] The harm is more likely to have resulted from increased doctor shopping and the operation of so-called pill mills, i.e., criminal activity perpetrated by drug seekers and often intentionally aided by physicians, as opposed to random chance. This notion is supported by two distinct propositions.

First, to be blunt, doctors are not stupid. As this Comment has already stressed, OxyContin contains but one active ingredient, oxycodone, which has been in common use for longer than the vast majority of physicians have been alive. [FN140] Moreover, OxyContin is a Schedule II drug, and all physicians prescribing it are acutely aware of that fact and its implications. [FN141] Indeed, OxyContin received the most restrictive classification available for a prescription drug due to its "high potential for abuse." [FN142] While it is true that OxyContin's marketing may have increased well-intentioned prescriptions of the drug, a marketing strategy that would have equal impact in all markets is unlikely to explain the geographical disparities in the prescribing volume of the drug. This geographic concentration of addiction speaks more of a culture of abusers seeking the drug for recreational purposes. Cultural and educational disparities, among other factors, could account for some increase in iatrogenic addiction from region to region. [FN143] Such factors *1427 cannot account for all of the regional variances, however, given the degree to which the concentration of OxyContin abuse varies between socioeconomically comparable states. [FN144]

Second, West Virginia alleged that Purdue's practice of supplying Mexican pharmacies "facilitate[ed] the inappropriate use of OxyContin," because Purdue was "aware that members of the public [could] obtain OxyContin from these pharmacies without a prescription." [FN145] This allegation clearly sought to establish liability for OxyContin abuse resulting not from innocent albeit unnecessary prescriptions but, rather, from the illicit diversion of OxyContin. The claim evidences the weak causal link between Purdue's actions and West Virginia's harms because it underscores the important causal role played by drug abusers and addicts who were purchasing the drug through black markets.

2. The Primary Basis of West Virginia's Suit: Purdue's Controversial Marketing. --

Although Purdue has never engaged in direct-to-consumer marketing of OxyContin, it does promote the drug to physicians, a ubiquitous practice in which virtually all prescription drug companies engage. [FN146] Purdue has utilized several methods of promoting OxyContin to physicians, including print advertising in medical journals, [FN147] "promotional giveaways" such as stuffed animals and compact discs, [FN148] as well as "seminars on pain management in resort locations like Arizona, California, and Florida." [FN149] Internal documents disclosed during a Florida investigation of Purdue's marketing described a "communication objective[] [to] . . . convince health care professionals . . . to aggressively treat both non-cancer pain and cancer pain" *1428 with OxyContin, stressing that "[t]he positive use of opioids, and OxyContin tablets in particular, will be emphasized." [FN150]

Purdue's marketing first caught the attention of the Food and Drug Administration ("FDA") in 2000, when the FDA sent a warning letter to Purdue "regarding a journal advertisement that appeared in the New England Journal of Medicine that promoted OxyContin in a manner that was false or misleading." [FN151] This letter charged that
    the advertisement implied OxyContin had been studied in all types of arthritis and can be used as first-line therapy for the treatment of osteoarthritis, failed to include important limitations to claims presented from an osteoarthritis study; and promoted OxyContin in a selected class of patients without presenting risk information especially applicable to that selected class of patients. [FN152] Ultimately, Purdue ceased dissemination of the advertisement. [FN153]

In January 2003, the FDA issued another warning letter to Purdue's Executive Vice President and Chief Operating Officer, Michael Friedman, regarding two other advertisements for OxyContin that Purdue had published in respected medical journals, such as the Journal of the American Medical Association ("JAMA"). [FN154] In it, the FDA charged that Purdue's "advertisements omit [ted] and minimize[d] the serious safety risks associated with OxyContin, and promote[d] it for uses beyond which [sic] have been proven safe and effective." [FN155] In response to the FDA warning, Purdue discontinued the ads permanently. [FN156] It would appear that both of these print advertisements were similarly aimed at furthering Purdue's objective of "convinc[ing] health care professionals . . . to aggressively treat both non-cancer pain and cancer pain." [FN157] The FDA certainly thought so, including an entire section in its warning letter entitled "Overbroadening of Indication," *1429 [FN158] which asserted that by "portray[ing] a seemingly healthy, unimpaired man out fishing and taking care of a child, rather than . . . a more typical person with persistent, moderate to severe pain," Purdue was suggesting the use of OxyContin "for pain relief in a much broader range of patients than indicated." [FN159] Ultimately, the FDA concluded that the advertisements were "misleading because they ma[de] prominent claims of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

effectiveness for pain relief, but omit[ted] from the body of the advertisements crucial facts related to the serious, potentially fatal safety risks associated with the use of OxyContin, the potential for OxyContin to be abused, and the limitations on its appropriate indicated use." [FN160]  Thus, the FDA concluded that both ads were in violation of print advertising regulations, and demanded that Purdue pull the ads immediately. [FN161]

3. Purdue's Efforts to Combat OxyContin Abuse and Black Markets. -- Purdue has undertaken at least some response measures to rein in OxyContin black markets.  Purdue's actions may very well make financial sense for the company: despite increased revenues from narcotic abuse and addiction, this is not a situation that a drug manufacturer wants to confront.  Although diversion necessarily bolsters sales, black markets produce substantial costs in the form of bad publicity, [FN162] as well as the costs incurred in defending tort actions [FN163] and coping with increased regulatory pressures. [FN164] Notably, one of Purdue's most outspoken critics has opined that "[t]here is no reason to believe that Purdue executives ever foresaw the catastrophe that OxyContin would create," and that "[s]imilar disasters have befallen other drugmakers and every pharmaceutical company lives with the dread that it might be next." [FN165]

First, Purdue has spent a considerable sum on researching means by which abuse of OxyContin may be thwarted.  As of October 2003, it had spent roughly $200 million on preventing abuse of the drug, the bulk of which went toward "the development of an 'antagonistic' substance that would make it difficult for users to get the heroin-like rush if [abusers] crushed and then snorted or injected the tablet." [FN166]  Approximately $50 million *1430 of those expenditures has gone toward "educating the public and medical community about the dangers of prescription drug abuse, as well as security efforts to combat thefts and illegal trafficking of OxyContin." [FN167]

Additionally, Purdue has certainly not ignored foreign distribution problems entirely.  In direct response to concerns about illicit diversion, Purdue initially "restrict[ed] shipments of certain dosage strengths" to Mexico and "change[d] the indicium on tablets destined for the Mexican market" in order "to help identify tablets seized in the United States that are diverted from Mexico." [FN168]  Ultimately, Purdue ceased all shipments to Mexico following an armed robbery in December of 2001, in which nine thieves stole over 30,000 bottles of the drug from a Mexico City distributor. [FN169] Such precautions establish that Purdue was, at the very least, taking substantial action to mitigate the diversion of OxyContin.

C. West Virginia's Negligent Marketing Claims Conflated Promotion with Distribution

There are two distinct aspects to West Virginia's negligent marketing and public nuisance claims: one that inheres in Purdue's promotional activities, and one that inheres in its distribution practices.  It is crucial to distinguish between "direct-to-consumer" marketing of prescription pharmaceuticals and marketing that is directed at the prescribing physician. Pharmaceutical companies' use of direct-to-consumer marketing has surged in recent years, [FN170] and--as a number of commentators have noted--such marketing may ultimately serve to expose drug manufacturers to increased liability. [FN171] However, there is no reason to think that direct-to-consumer marketing has played a substantial role in Purdue's marketing of OxyContin, generally. [FN172]  Rather, most charges that Purdue negligently marketed *1431 OxyContin have primarily focused instead on its promotion of "off-label" uses of the drug to physicians [FN173] to prescribe the drug as a "first-line" treatment against a broad range of pain. [FN174]

"Overpromotion" is an apt descriptor of the theoretical basis of claims alleging that a physician inappropriately prescribed OxyContin to a plaintiff as a result of overly aggressive or even wholly off-label marketing. [FN175]  In considering the close relation between distribution and marketing, however, it is important to note that there is a distinction between negligent advertising and negligent distribution. [FN176]  This is most clearly illustrated by contrasting allegations that Purdue was acting negligently simply because it supplied OxyContin to Mexican distributors with allegations that its aggressive advertising to physicians led to overprescribing.  West Virginia's complaint contains both types of allegations. [FN177]

Under Ausness's framework, both the simple distribution to Mexican pharmacies and the alleged "overpromotion" may constitute negligent marketing, albeit for different reasons. [FN178]  There is, however, an important distinction between "overpromotion" that leads physicians to simply prescribe OxyContin to the wrong patients and distribution practices that have the ancillary effect of facilitating diversion.  But, there is also a connection between the two: by increasing the total number of prescriptions, "overpromotion" may facilitate diversion.  The more often the drug is prescribed, the greater the total production and, in turn, more pills are available for diversion.  An increase in the total number of prescriptions facilitates illicit diversion and, in so doing, fuels black markets.  It is error, however, to categorize such impact as the result of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"marketing," at least for legal purposes. Admittedly, it is conceivable that marketing the drug to physicians increased its black-market availability. This, however, would be true of any marketing of a prescription narcotic, negligent or otherwise. In other words, the more of the drug there is in the stream of legitimate commerce, the more easily criminals can divert it into the black market.

**\*1432** One critic of Purdue's marketing notes that, "[i]nstead of limiting the drug's promotion to doctors who specialize in treatment of patients with severe and chronic pain and who regularly monitor those patients, OxyContin was promoted to general practitioners who would not closely monitor the effects of the drug on their patients." [FN179] Interestingly, this observation goes not to the question of availability to black-market users but simply to the overprescribing of the drug for seemingly legitimate patients. It is important to stress again that, for purposes of liability, Purdue's marketing practices were only relevant to the extent that they lead to iatrogenic addiction and "legitimate" patient overdose or to the extent that they increased the availability of black-market OxyContin. In evaluating a claim that focuses on the harms caused by black-market sales and abuse of a drug, marketing to physicians is only relevant to the extent that it bolsters distribution of the drug. As egregious as such marketing may seem in the context of increasing prescriptions, it is clear that the causal connection between such marketing and black markets is far less direct and, indeed, even tenuous.

Tellingly, this inherently weak causal link between the sale of a legal product and the establishment of black markets has already led a number of jurisdictions to refuse to apply unconventional tort theories in the firearms context. Those courts have held that the causal connection between the supply of a legal product to the general population and the social harms created by firearms crime was simply too tenuous to establish liability. [FN180]

Most notable is City of Chicago v. Beretta U.S.A. Corp., a case in which the Supreme Court of Illinois vigorously rejected a public entity's attempt to render a gun manufacturer liable for the "alleged fostering of an underground handgun market." [FN181] Because the legal strategy effectively translates into an attempt to establish liability on the grounds that the legal sale of a legal product was ultimately feeding a black market, Beretta is especially relevant to analysis of the merits of West Virginia's claim. [FN182] Moreover, the Beretta court cited the opinions of numerous jurisdictions in reaching its conclusions, indicating that the causal weaknesses inherent in negligent marketing and distribution claims largely transcend jurisdictional peculiarities. [FN183]

Second, notwithstanding problems of causation, the Beretta court was especially reluctant to allow "judicial intervention" in an area where there is comprehensive regulatory legislation, stressing that "[l]itigation should not be used to achieve legislative goals." [FN184] Academic commentators have expressed **\*1433** this same concern, [FN185] a concern which ultimately led the court to conclude that "[a]ny change of this magnitude in the law affecting a highly regulated industry must be the work of the legislature, . . . not the work of the courts." [FN186] To say that the manufacture and sale of OxyContin is at least as heavily regulated as the manufacture and sale of firearms is truly an understatement. As a Schedule II narcotic, [FN187] OxyContin is heavily regulated even among controlled substances with a high potential for abuse. As such, the Beretta court's reasoning, here, is readily applicable to unconventional tort theories in the context of OxyContin, as well as in the context of firearms.

V. Potential Impact of West Virginia's Settlement

A. Understanding the Settlement: Why It Happened, and Why It Increases the Threat of Future Legal Action Against Drug Manufacturers

It is important to note that, among the literally hundreds of lawsuits filed against Purdue, this is the only case to date that has not been either dismissed or withdrawn. [FN188] Although Purdue officially admitted no wrongdoing, the settlement was undoubtedly a blow to its corporate ego, in that it was the first OxyContin lawsuit that Purdue had settled, and the company was known to "boast[] that it had never settled or lost a case." [FN189] This record certainly provided not only a source of institutional pride but also helped buttress Purdue's claims that its marketing practices were not negligent. Thus, the question is presented: Why did Purdue settle this case?

There are a number of plausible explanations for Purdue's decision to settle this case wholly unrelated to the merits of its underlying claims. First, West Virginia's suit was "one of the earliest [OxyContin] suits" against Purdue, filed in 2001. [FN190] As time wore on, Purdue may have had an increasing incentive to end the suit, so as to cut losses and avoid the uncertainties associated with a jury trial. Second, the unconventional nature of the action may have led Purdue to reason that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
REDACTED
Pg 135 of 178
100 NWULR 1409                                                                      Page 12
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

a settlement in this particular context would not necessarily signal a willingness to settle the hundreds of other suits pending against it. [FN191]  Settlement of the West Virginia case would free up resources to pursue further dismissals in those cases. Although a settlement might risk emboldening other public entities to follow suit, Purdue may have been willing to take that risk so as to focus its resources on fighting the gales of lawsuits filed by individual citizens. Finally, the OxyContin *1434 phenomenon had drawn much attention in the media, and a long, high-profile trial would only have drawn further negative exposure.  [FN192]  This exposure could have severely harmed Purdue's reputation and perhaps even encouraged more individual citizens to either file suit themselves, participate in class actions, or both. [FN193]  A plaintiff's perceived stature and motivations are likely to influence public perception of the merits of that plaintiff's suit.  Thus, the public is likely to perceive a legal battle with private citizens--many drug addicted, no less-- very differently than it would perceive a legal battle with a public entity. Regardless of the actual merits, the general public is skeptical of trial lawyers generally and tort claims in particular. [FN194]  This is especially true where the plaintiff appears to be at least partially at fault. [FN195] On the other hand, a public entity suit is not likely to be viewed as skeptically by the public.  There is an enormous difference between an action initiated by a private litigator and one initiated by a duly appointed state attorney general.  As a result, the public is far less likely to discount West Virginia's suit as trivial, incentivizing Purdue to keep the whole matter as far away from the public spotlight as possible.

With respect to the potential impact of West Virginia's suit, it is worth noting that the amount of the settlement--$10 million--is a substantial sum. It thus presents a credible threat not only to Purdue but to all similarly situated manufacturers of scheduled prescription drugs.  This sum is just under one third of the amount that West Virginia health care agencies had spent on OxyContin between 1996 and 2003, $30.5 million. [FN196]  Moreover, such a high-profile case is likely to generate even more suits, including large class actions, [FN197] as well as generate even more bad press for narcotic painkillers generally. [FN198]

Finally, should the promise of revenues encourage additional public entities to follow West Virginia's lead, by suing Purdue, other manufacturers of scheduled narcotics, or both, the degree of negative fallout from the settlement would multiply greatly.  Although it is too early to know for certain whether other public entities will indeed follow, OxyContin opponents in some states are already urging their attorneys general to consider pursuing similar claims. [FN199]  More troubling, the rapid succession of public entity *1435 suits against firearms manufacturers suggests the possibility of a similar phenomenon in the context of scheduled narcotics. [FN200]

B. Culture: Making Manufacturers Liable for the Failures of Communities

The ultimate settlement of West Virginia's case against Purdue presents the risk of making pharmaceutical manufacturers absolutely liable for prescription narcotic black markets, markets which have existed as long as there have been recreational drug users demanding the high that these narcotics can offer.  The problem with West Virginia's claims--and any other claims that may be levied by any sort of "public entity" [FN201]--is that the harms caused by OxyContin do not appear to have resulted from well-intentioned overprescription to legitimate, honest patients but, rather, from the black markets created by crafty suppliers and buyers who were not legitimately prescribed the drug. [FN202]  Thus, the causal connection between Purdue's marketing, even if it were indeed negligent in some sense, and these black markets is indirect, and reveals the tenuous relation between Purdue's marketing practices and the black-market use of drugs.

In making Purdue so liable, the West Virginia settlement raises the specter of drug manufacturer responsibility for the regulatory and law-enforcement failures at all levels of government, which have allowed these black markets to flourish. [FN203]  Indeed, Purdue executives noted a possible connection between the cultural and socioeconomic conditions of those regions hit hardest by the OxyContin phenomenon and prescription drug abuse, generally. [FN204] Many of these regions have "high unemployment rates and a long history of using narcotic painkillers to treat injuries caused by regional occupations like farming, mining, and logging," [FN205] as well as a history of prescription narcotic black markets long predating the release of OxyContin. [FN206]

Were there a greater connection between Purdue's marketing--which was aggressive nationally, and not limited to regional promotions--and black markets, one would certainly expect to see a less pronounced concentration of OxyContin diversion and abuse.  Rather, despite the fact that OxyContin abuse has spread to more urban areas, [FN207] its abuse has nonetheless*1436 remained highly concentrated geographically. [FN208]  Moreover, these are the regions where public entities are most incentivized to file suit due to the same fiscal shortcomings that allow black markets to flourish in the first place. [FN209]  Thus, in attempting to hold Purdue (or similarly situated pharmaceutical companies, for that matter) liable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
REDACTED
Pg 136 of 178
100 NWULR 1409                                                                                    Page 13
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

for this extreme abuse, plaintiffs are effectively making them liable for the failures not only of an imperfect system of narcotics control on a national level but, more disconcertingly, for the failures of a community to police physician prescribing and to keep local black markets in check.

C. Chilling Effects on the Treatment of Chronic Pain

Increased litigation could serve to further chill pharmaceutical companies' development and promotion of narcotic painkillers and, in turn, further the "chronic undertreatment of pain." [FN210] Morphine consumption rose by seventy-five percent between 1990 and 1994 as a result of the so-called pain management movement, a trend which promoted the use of prescription narcotics to combat chronic pain and fight what many saw as the widespread failure of physicians to use strong, narcotic painkillers often enough and in sufficient dosages. [FN211] In 1994, the Department of Health and Human Services updated its clinical guidelines to more aggressively encourage the use of opioids for treatment of cancer pain. [FN212] Clearly, these events were taken by many supporters of the pain management movement as significant advancements in fighting what some perceive as the chronic undertreatment of pain. [FN213] However, a trend toward holding pharmaceutical manufacturers liable for black markets could lead to a retrenchment of hard-won gains on the pain management front. [FN214] Prior to its settlement, Purdue's attorneys threatened in a memorandum that such a negative outcome might lead it to discontinue sales of OxyContin in West Virginia altogether. [FN215]

Moreover, overreaction to the OxyContin phenomenon has already led some state legislators to propose a bill banning OxyContin and, possibly, all oxycodone-containing drugs. [FN216] Purdue's settlement could very well add to the hysteria, influencing the prescribing practices of the most scrupulous pain management physicians and contributing to doctors' general fear of *1437 litigation and criminal liability associated with the use of opiate painkillers. Indeed, the vigorous criminal prosecution of doctors (often in questionably criminal circumstances) has already been decried as creating a "chilling effect" on the "willingness of doctors to prescribe powerful prescription narcotics, which many [pain management physicians] think is the only way to relieve chronic pain." [FN217]

VI. Conclusion

West Virginia's success, even if limited, is an instance of a questionable claim surviving long enough to induce settlement and, in so doing, an attempt to regulate a broad social problem through the courts--here, the black-market trade in prescription narcotics. However, regulation of social problems is a task better suited to a legislature, a conclusion that courts have reached in the context of other highly regulated yet legal products. The causal link between Purdue's advertising and deliberate OxyContin abuse is limited simply to the fueling of drug diversion via an increase in the total amount of pills available to divert; this link is, at best, weak. Such a theory of liability thus offers a very slender reed on which to rest a new chapter in the law of products liability, particularly when the well-being of so many patients in need of effective treatment for chronic pain hangs in the balance.

[FNa1]. J.D., Northwestern University School of Law, 2006; B.A., University of Kentucky, 2002.

[FN1]. Huhnsik Chang, Legal--Litigation--Getting to the Point, Reinsurance, Oct. 1, 2003, at 43.

[FN2]. Scott A. Smith, Turning Lead into Asbestos and Tobacco: Litigation Alchemy Gone Wrong, 71 Def. Couns. J. 119 (2004).

[FN3]. See, e.g., Richard C. Ausness, Tort Liability for the Sale of Non-Defective Products: An Analysis and Critique of the Concept of Negligent Marketing, 53 S.C. L. Rev. 907 (2002) [hereinafter Ausness, Non-Defective Products]; Richard C. Ausness, Will More Aggressive Marketing Practices Lead to Greater Tort Liability for Prescription Drug Manufacturers?, 37 Wake Forest L. Rev. 97, 123-26 (2002) [hereinafter Ausness, Aggressive Marketing] (describing the "relatively new legal theory of 'negligent marketing,'" which does not require that a plaintiff "prove that the product in question is defective"); see also Doug Morgan, Comment, What in the Wide, Wide World of Torts Is Going on? First Tobacco, Now Guns: An Examination of Hamilton v. Accu-Tek and the Cities' Lawsuits Against the Gun Industry, 69 Miss. L.J. 521 (1999) (discussing claims levied against tobacco companies and gun manufacturers under negligent marketing and negligent distribution theories).

[FN4]. See, e.g., Smith, supra note 2, at 120 ("More than one observer has referred to litigation against former manufacturers of lead pigment and lead paint as 'the next tobacco' or 'the next asbestos.'").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REDACTED
100 NWULR 1409                                                                    Page 14
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

[FN5]. Tim O'Brien, OxyContin Suits Coming up Empty: Purdue Pharma's Litigation Strategy Costly, but Effective, Conn. L. Trib., Oct. 27, 2003, at 3.

[FN6]. See Beth Packman Weinman, Freedom from Pain: Establishing a Constitutional Right to Pain Relief, 24 J. Legal Med. 495 (2003) (discussing abuse of prescription narcotics generally, and OxyContin in particular, in relation to the "chronic undertreatment of pain").

[FN7]. See Complaint at 16-19, 23-26, West Virginia ex rel. McGraw v. Purdue Pharma L.P. (W. Va. Cir. Ct. filed June 21, 2001) (No. 01-C-137-S), available at http://www.cmht.com/pdfs/oxycontin-cmpl.pdf [hereinafter West Virginia Complaint].

[FN8]. OxyContin Lawsuit Is Settled: Purdue Pharma to Pay State $10 Million, Charleston Gazette, Nov. 6, 2004, at 1A [hereinafter OxyContin Lawsuit Is Settled].

[FN9]. See Joseph W. Cleary, Comment, Municipalities Versus Gun Manufacturers: Why Public Nuisance Claims Just Do Not Work, 31 U. Balt. L. Rev. 273, 280-88 (2002).

[FN10]. Id. at 282 & n.109.

[FN11]. See, e.g., Ausness, Non-Defective Products, supra note 3, at 917-36; Morgan, supra note 3.

[FN12]. See West Virginia Complaint, supra note 7.

[FN13]. See, e.g., Cleary, supra note 9, at 273; Laura L. Gavioli, Comment,  Who Should Pay: Obstacles to Cities in Using Affirmative Litigation as a Source of Revenue, 78 Tul. L. Rev. 941 (2004).

[FN14]. See Michael I. Krauss, Regulation Masquerading as Judgment: Chaos Masquerading as Tort Law, 71 Miss. L.J. 631 (2001); Philip C. Patterson & Jennifer M. Philpott, Note, In Search of a Smoking Gun: A Comparison of Public Entity Tobacco and Gun Litigation, 66 Brook. L. Rev. 549 (2000).

[FN15]. Patterson and Philpott discuss the role that "public entity" suits against tobacco and firearms manufacturers have played in acting as an effective surrogate for litigation, despite the weaknesses of the underlying claims. See Patterson & Philpott, supra note 14, at 551 ("Despite the questionable merits of the public entity tobacco lawsuits, the tobacco companies agreed to settle without trying a single case to verdict." (citation omitted)).

[FN16]. Domestic Strategic Intelligence Unit, U.S. Dep't of Justice, OxyContin: Pharmaceutical Diversion (2002), available at http:// www.avitarinc.com/pdf/Drug-Intelligence-Brief-Oxycotine-Facts.pdf [hereinafter DOJ Intelligence Brief].

[FN17]. Id.

[FN18]. 21 U.S.C. § 812(b)(2)(A), (C) (2000).  Schedule I, the most restrictive schedule available for any substance, is reserved for "drug[s] or other substance[s]" that have "no currently accepted medical use in treatment in the United States" and, thus, includes only drugs that are outlawed entirely. Id. § 812 (b)(1)(A), (B).

[FN19]. See Press Release, Purdue Pharma, Purdue Pharma Supports Task Force Recommendations (Feb. 12, 2004), available at http:// www.purdue.ca/about/purdue_pharma_press_release_021204.pdf.

[FN20]. Cf. O'Brien, supra note 5.

[FN21]. DOJ Intelligence Brief, supra note 16, at 2.

[FN22]. Cf. id. at 1-2.

[FN23]. Paul Tough, The Alchemy of OxyContin: From Pain Relief to Drug, N.Y. Times, July 29, 2001, § 6 (Magazine), at 32.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PPLPC051000035821

[FN24]. See Prescription Drug Information for Consumers and Professionals: Percocet, http://www.drugs.com/percocet.html (last visited Feb. 1, 2006). Unlike OxyContin, Percocet is a "dual entity" drug, containing both oxycodone and acetaminophen. Id.

[FN25]. See Prescription Drug Information for Consumers and Professionals: Percodan, http://www.drugs.com/percodan.html (last visited Feb. 1, 2006). Percodan, like Percocet, is a "dual entity" drug, containing a mixture of oxycodone and aspirin. Id.

[FN26]. DOJ Intelligence Brief, supra note 16, at 1.

[FN27]. Id.

[FN28]. Barry Meier, Pain Killer 84 (2003).

[FN29]. See Kevin Irwin & Mark Kinzly, Oxy-mania: Still Going Strong, Harm Reduction Comm., Winter 2003, http://www.harmreduction.org/pubs/news/winter03/win03KinzlyIrwin.htm; see also Meier, supra note 28, at 13 (noting that it doesn't "take long for even novice drug abusers" to learn how to crush an OxyContin tablet, thus "releasing its oversized narcotic trove for their immediate pleasure").

[FN30]. See Meier, supra note 28, at 15; Irwin & Kinzly, supra note 29, at 13.

[FN31]. Meier, supra note 28, at 81. Notwithstanding this characterization of OxyContin, Meier is--to say the least--highly critical of OxyContin itself as well as Purdue's marketing of the drug and its response to early reports of abuse. See id. at 311-13.

[FN32]. Irwin & Kinzly, supra note 29. Although this characterization of OxyContin is humorous, it is also quite illuminating: it reveals that at least some users and dealers are perfectly aware of the fact that OxyContin is little more than a decades-old standby among drugs of abuse.

[FN33]. For a highly critical view of the media coverage of OxyContin abuse, see id. (describing the public reaction to OxyContin abuse as "Oxy-Mania").

[FN34]. See Office of Nat'l Drug Control Policy, Street Terms: Drugs and the Drug Trade, http://www.whitehousedrugpolicy.gov/streetterms/ByType.asp? intTypeID=58 (last visited Feb. 1, 2006); see also Meier, supra note 28, at 46 (noting that "[s]ome newspaper writers had started calling [OxyContin] 'hillbilly heroin'").

[FN35]. Nat'l Drug Intelligence Ctr., Dep't of Justice, OxyContin Diversion and Abuse 3 (2001) [hereinafter DOJ Bulletin].

[FN36]. Id. at 2.

[FN37]. Ausness, Non-Defective Products, supra note 3, at 915-16.

[FN38]. Mark Whitaker, Top of the Week; The Editor's Desk, Newsweek, Oct. 20, 2003, at 4 ("Limbaugh admitted to his 20 million listeners that he was 'addicted to prescription pain medication' and would check into a 30-day rehab program. The announcement came a week after Limbaugh's former housekeeper disclosed that she had illegally purchased thousands of OxyContin pills for him over a four-year period, and was cooperating in an official probe.").

[FN39]. See id. at 4-5.

[FN40]. Id. at 4.

[FN41]. Id.

[FN42]. Id.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REDACTED

100 NWULR 1409
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

[FN43]. Id.

[FN44]. Tough, supra note 23.

[FN45]. See, e.g., Meier, supra note 28, at 298-303.

[FN46]. Id. at 302.

[FN47]. Id. at 298-302.

[FN48]. O'Brien, supra note 5, at 3.

[FN49]. See Donald E. deKieffer, The Mexican Drug Connection: How Trade in Pharmaceuticals Has Wrecked the FDA, 9 Sw. J.L. & Trade Am. 321 (2003).

[FN50]. Id. at 322.

[FN51]. Id. at 323.

[FN52]. This group includes both "legitimate" users of scheduled drugs, as well as those seeking drugs with no potential for abuse (such as antibiotics).

[FN53]. For a brief discussion of the economic factors that result in lower prescription drug prices in many foreign markets, such as Mexico, see deKieffer, supra note 49, at 325-27 (attributing these price differentials to less rigorous regulatory schemes, less stringent patent protection and, in turn, drug counterfeiting).

[FN54]. DOJ Intelligence Brief, supra note 16, at 7-8.

[FN55]. Id. at 7.

[FN56]. Id.

[FN57]. The term "iatrogenic" means, literally, "physician-induced."  See What Does the Word "Iatrogenic" Mean?, Am. Iatrogenic Ass'n, http:// www.iatrogenic.org/define.html (last visited Jan. 21, 2006).

[FN58]. See, e.g., Labzda v. Purdue Pharma L.P., 292 F. Supp. 2d. 1346, 1356 (S.D. Fla. 2003).

[FN59]. See Cornelius v. Cain, No. CACE 01-020213(02), 2004 WL 48102  (Fla. Cir. Ct. Jan. 5, 2004).

[FN60]. See, e.g., Howland v. Purdue Pharma, L.P., 2003 Prod. Liab. Rep.  (CCH) P 16,694 (Ohio Ct. App. July 14, 2003).

[FN61]. See, e.g., Sally Satel, Painful Correction: OxyContin's Bad Rap, Forbes, Sept. 6, 2004, at 48.

[FN62]. Edward J. Cone et al., Oxycodone Involvement in Drug Abuse Deaths: A DAWN-Based Classification Scheme Applied to an Oxycodone Postmortem Database Containing over 1,000 Cases, 27 J. Analytical Toxicology 57, 64-66 (2003).

[FN63]. Id. at 66.

[FN64]. Id.

[FN65]. See O'Brien, supra note 5.

[FN66]. See, e.g., Howland v. Purdue Pharma, L.P., [2003] Prod. Liab. Rep. (CCH) P 16,694 (Ohio Ct. App. July 14, 2003), available at 2003 WL 21637968; Ohler v. Purdue Pharma, L.P., No. 01-3061, 2002 WL 88945 (E.D. La. Jan. 22, 2002).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
Pg 140 of 178

REDACTED
100 NWULR 1409                                                                    Page 17
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

[FN67]. See, e.g., McCauley v. Purdue Pharma L.P., 331 F. Supp. 2d 449 (W.D. Va. 2004) (granting defendant Purdue Pharma's motion for summary judgment on claim that "Purdue marketed the drug to the plaintiffs' physicians by falsely representing in written promotional materials and in oral claims made by its sales representatives that OxyContin was safer, less addictive, and less prone to abuse than other oxycodone-based pain medications").

[FN68]. O'Brien, supra note 5, at 3. For cases in which Purdue challenged the class certification instead of settling, see, e.g., Howland, [2003] Prod. Liab. Rep. (CCH) P 16,694; Ohler, 2002 WL 88945.

[FN69]. See, e.g., Wethington v. Purdue Pharma L.P., 218 F.R.D. 577, 586- 87 (S.D. Ohio 2003) (denying class certification to a group of plaintiffs arguing, inter alia, that Purdue was "liable for manufacturing a defective, highly addictive product that lacks an antagonist agent to prevent its euphoric effects when crushed and ingested").

[FN70]. See Cornelius v. Cain, No. CACE 01-020213(02), 2004 WL 48102 (Fla. Cir. Ct. Jan. 5, 2004).

[FN71]. See, e.g., Labzda v. Purdue Pharma L.P., 292 F. Supp. 2d 1346, 1355-56 (S.D. Fla. 2003).

[FN72]. See generally Ausness, Non-Defective Products, supra note 3.

[FN73]. Labzda, 292 F. Supp. 2d at 1356 (applying Florida law).

[FN74]. Id. (emphasis added).

[FN75]. Id. at 1353. See also infra Part IV.A.1 for a more detailed discussion of negligent marketing generally, as well as the alleged "duty" to supervise distribution of potentially harmful products specifically.

[FN76]. Labzda, 292 F. Supp 2d at 1353-55 ("There is not now, nor has there ever been, any common law duty for either a private person or a governmental entity to enforce the law for the benefit of an individual or a specific group of individuals." (quoting Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468 So. 2d 912, 918 (Fla. 1985) (citing Restatement (Second) of Torts § 315 (1965) in applying Florida law))).

[FN77]. See, e.g., Labzda, 292 F. Supp. 2d at 1355-56.

[FN78]. See also id. Compare Restatement (Second) of Torts § 465 cmt. b, with id. § 433A.

[FN79]. Foister, 295 F. Supp. 2d at 704-05 (discussing such a bar in the context of "public policy").

[FN80]. Orzel v. Scott Drug Co., 537 N.W.2d 208, 212-15 (Mich. 1995).

[FN81]. Mark A. Ford, Note, Another Use of OxyContin: The Case for Enhancing Liability for Off-Label Drug Marketing, 83 B.U. L. Rev. 429, 437 (2003) (citing West Virginia Judge Dismisses OxyContin Case Against Purdue Pharma, Drug Wk., Oct. 4, 2002, at 30).

[FN82]. See generally West Virginia Complaint, supra note 7.

[FN83]. See, e.g., Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055 (N.Y. 2001).

[FN84]. See, e.g., Cleary, supra note 9; Gavioli, supra note 13; cf. Patterson & Philpott, supra note 14.

[FN85]. Cleary, supra note 9; Gavioli, supra note 13.

[FN86]. OxyContin Lawsuit Is Settled, supra note 8.

[FN87]. See, e.g., City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099 (Ill. 2004).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REDACTED

[FN88]. Gavioli, supra note 13, at 946-51.

[FN89]. Id. at 951.

[FN90]. It is notable that the states that have been hit the hardest by the OxyContin epidemic are largely poor and rural, such as West Virginia and the contiguous "Appalachian" states.  As such, West Virginia's settlement may motivate similarly situated states to respond to the lawsuit in kind.

[FN91]. Id.

[FN92]. OxyContin Lawsuit Is Settled, supra note 8.

[FN93]. See West Virginia Complaint, supra note 7, at 16-19, 23-26.  Note that West Virginia was asserting negligent marketing claims based on both the promotion and distribution of OxyContin.

[FN94]. See id.

[FN95]. 62 F. Supp. 2d 802 (E.D.N.Y 1999); see Ausness, Non-Defective Products, supra note 3, at 909.

[FN96]. Ausness, Non-Defective Products, supra note 3, at 908-09.

[FN97]. 89 Cal. Rptr. 2d 146 (Ct. App. 1999); see Ausness, Non-Defective Products, supra note 3, at 909.

[FN98]. Merrill v. Navegar, Inc., 28 P.3d 116 (Cal. 2001), rev'g 89 Cal. Rptr. 2d 146; Hamilton v. Beretta U.S.A. Corp, 750 N.E.2d 1055 (N.Y. 2001) (rejecting negligent marketing as a viable theory under New York law on a certification of the issue from Second Circuit Court of Appeals).

[FN99]. Ausness, Non-Defective Products, supra note 3, at 909.

[FN100]. Id. at 912-17.

[FN101]. Ausness, Aggressive Marketing Practices, supra note 3, at 133-35.

[FN102]. Id. at 133.

[FN103]. Id.

[FN104]. Ausness, Non-Defective Products, supra note 3, at 915.

[FN105]. Id.

[FN106]. West Virginia Complaint, supra note 7, at 9; see Ausness, Non-Defective Products, supra note 3, at 915-16.

[FN107]. Ausness, Aggressive Marketing Practices, supra note 3, at 135  (discussing Hamilton v. Accu-Tek, 62 F. Supp. 2d 802 (E.D.N.Y 1999)).

[FN108]. West Virginia Complaint, supra note 7, at 16-19.

[FN109]. See Cleary, supra note 9, at 278-88.

[FN110]. Restatement (Second) of Torts §  821B (1965).

[FN111]. See Cleary, supra note 9, at 276-78.

[FN112]. See id. at 280-82 (discussing the failures of numerous attempts to establish liability for the production and sale of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl    Doc 2015    Filed 11/19/20    Entered 11/19/20 02:54:56    Main Document
Pg 142 of 178
REDACTED
100 NWULR 1409                                                                    Page 19
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

asbestos under a public nuisance theory).

[FN113]. See, e.g., Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055 (N.Y. 2001); see also Cleary, supra note 9, at 282-88; Morgan, supra note 3, at 521.

[FN114]. See Patterson & Philpott, supra note 14, at 549.

[FN115]. See West Virginia Complaint, supra note 7, at 16-19.

[FN116]. Restatement (Second) of Torts § 821B(2) (1965).

[FN117]. Id. § 821B(2)(c).

[FN118]. See, e.g., Cleary, supra note 9, at 280.

[FN119]. Id.

[FN120]. Id. at 280-82.

[FN121]. Id. at 282-88.

[FN122]. See, e.g., id. at 280.

[FN123]. City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099 (Ill. 2004).

[FN124]. Id. at 1121.

[FN125]. Id. at 1138.

[FN126]. Id. at 1148.

[FN127]. Id.

[FN128]. See Tim O'Brien, Suits Abound by Users Claiming Addiction to Painkiller OxyContin, N.J.L.J., Oct. 21, 2003, at 1, available at http:// www.law.com/jsp/article.jsp?id=1066605407030.

[FN129]. West Virginia Complaint, supra note 7, at 1. Specifically, the complaint named as defendants Purdue Pharma, L.P., Purdue Pharma, Inc., Purdue Frederick Company, Inc., Abbott Laboratories, and Abbott Laboratories, Inc. Id. Purdue has an agreement with Abbott Laboratories making in a "co-promoter" of OxyContin, and "Purdue allegedly agreed to indemnify Abbott Laboratories for all liabilities ... in relation to OxyContin." 1st Imp: Defense Costs Not Damages in Policy, Conn. L. Trib., Sept. 27, 2004, at 219.

[FN130]. West Virginia Complaint, supra note 7, at 12-30.

[FN131]. See, e.g., Heather Smith, The Pain Continues, Am. Law., Jan. 2004, at 29.

[FN132]. 1st Imp: Defense Costs Not Damages in Policy, supra note 129. This figure includes all legal defense fees for both Purdue and its codefendant Abbott Laboratories, which it contracted to help promote OxyContin. Id.

[FN133]. OxyContin Lawsuit Is Settled, supra note 8.

[FN134]. Id.

[FN135]. West Virginia Complaint, supra note 7, at 12.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REDACTED

100 NWULR 1409                                                                          Page 20
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

[FN136]. Id. at 18.

[FN137]. Although West Virginia never specified the amount sought to compensate it for the costs of treating addiction, it specifically sought $30.5 million for costs associated with the overprescription of OxyContin. Associated Press, West Virginia, OxyContin Manufacturer Settle Suit, Nat'l L.J., Nov. 15, 2004, at 10.

[FN138]. Id. at 11.

[FN139]. See DOJ Intelligence Brief, supra note 16, at 2-3; DOJ Bulletin, supra note 35, at 1-2.  Southern West Virginia borders on Kentucky and Virginia, and is near the geographical center of Appalachian OxyContin black markets.

[FN140]. Tough, supra note 23, at 34.

[FN141]. Moreover, OxyContin's status as a Schedule II drug is not only mentioned but displayed prominently in its ads. See, e.g., November 2002 OxyContin Advertisement, http://www.fda.gov/cder/warn/2003/JamaAdNov02.pdf (last visited Feb. 1, 2006).

[FN142]. 21 U.S.C. § 812(b)(2)(A) (2000).

[FN143]. See DOJ Intelligence Brief, supra note 16, at 2-3; DOJ Bulletin, supra note 35, at 1-2.

[FN144]. See, e.g., DOJ Bulletin, supra note 35, at 1-2.

[FN145]. West Virginia Complaint, supra note 7, at 9.

[FN146]. OxyContin Ads Pulled, Am. Med. News, Mar. 10, 2003, at 1, available at http://www.ama-assn.org/amednews/2004/02/16/prsa0216.htm. But see Ohler v. Purdue Pharma, L.P., No. Civ. A 02-3061, 2002 WL 88945, at *2 (E.D. La. Jan. 22, 2002) (involving plaintiffs' allegations that Purdue promoted and marketed "OxyContin directly to consumers utilizing multimedia and the internet and otherwise facilitat[ed] the inappropriate unsafe use of the drug to increase its market").

[FN147]. OxyContin Ads Pulled, supra note 146.

[FN148]. Meier, supra note 28, at 33.

[FN149]. Id. at 96-97.  Regarding these seminars, Meier argues:
    Officials of the drugmaker always insisted when asked by reporters that the talks were generic in nature, intended only to raise medical awareness about the inadequacy of pain treatment rather than to market OxyContin.  But any program promoting the use of long-acting narcotics also promoted OxyContin. The reason: the number of competing products could be counted on a few fingers.
    Id. at 97.
    In all fairness to Purdue, however, it is worth mentioning that Meier--who is cited rather extensively in this Comment--is one of Purdue's most outspoken critics, penning not only Pain Killer but also a large number of newspaper articles on OxyContin.  See Trevor Butterworth, The Great OxyContin Correction Controversy: Did Slate Correct Its Way into Error?, STATS, Apr. 27, 2004, at 2- 3, available at http://www.stats.org/files/upld-news469pdf?.pdf.

[FN150]. Meier, supra note 28, at 97-98.

[FN151]. OxyContin: Balancing Risks and Benefits: Hearing of the S. Comm. on Health, Education, Labor, and Pensions, 107th Cong. 18 (2002) (statement by John K. Jenkins, M.D., Director, Office of New Drugs, Food and Drug Administration) [hereinafter OxyContin Hearing].

[FN152]. Id.

[FN153]. Id.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19-23649-shl   Doc 2015   Filed 11/19/20   Entered 11/19/20 02:54:56   Main Document
REDACTED
Pg 144 of 178
100 NWULR 1409                                                              Page 21
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

[FN154]. Warning Letter from Thomas W. Abrams, Food & Drug Admin., to Michael Friedman, Executive Vice President and Chief Operating Officer, Purdue Pharma L.P. (Jan. 17, 2003), available at http://www.fda.gov/foi/warning_letters/g3797d.htm [hereinafter FDA Warning Letter]. Both the October ad and the November ad are available on the FDA's website. October 2002 OxyContin Advertisement, http://www.fda.gov/cder/warn/2003/JamaAdOct02.jpg (last visited Feb. 1, 2006); November 2002 OxyContin Advertisement, http:// www.fda.gov/cder/warn/2003/JamaAdNov02.pdf (last visited Feb. 1, 2006). Interestingly, the November ad included the following text, which the earlier October ad did not: "Purdue is firmly committed to maintaining the highest standards of marketing practices in the industry while continuing to advance the proper treatment of pain in America. If Purdue's marketing and sales practices fail to meet this standard, we urge you to contact us at 1-888-690- 9211." Id.

[FN155]. FDA Warning Letter, supra note 154, at 1.

[FN156]. OxyContin Ads Pulled, supra note 146.

[FN157]. Meier, supra note 28, at 97-98.

[FN158]. Translated into plain English, "overbroadening of indication" simply refers to an unjustifiable increase in the number of situations in which a drug is thought to be sufficiently safe and effective to warrant its use.

[FN159]. FDA Warning Letter, supra note 154, at 5.

[FN160]. Id. at 3.

[FN161]. Id. at 4-6.

[FN162]. See, e.g., id.

[FN163]. O'Brien, supra note 5, at 3.

[FN164]. See Associated Press, Lawmakers: OxyContin Maker Failing to Curb Abuse, USA Today, Dec. 20, 2001, http:// www.usatoday.com/news/health/addiction/2001-12-12-oxycontin.htm.

[FN165]. Meier, supra note 28, at 293.

[FN166]. O'Brien, supra note 5, at 3. Because OxyContin abusers must crush the tablets in order to thwart the time-release mechanism, it is conceivable that an opioid antagonist--a compound which would effectively negate the effects of the drug's active ingredient, oxycodone--could be incorporated such that crushing the tablet would activate or release the antagonist. Thus, the antagonist would not be of concern to "legitimate" oxycodone users, but would render the tablets wholly ineffective once crushed or otherwise altered so as to facilitate abuse. Meier, supra note 28, at 303-06 (discussing Purdue's inquiries into the possibility of incorporating naloxone--an opiate antagonist--into OxyContin tablets).

[FN167]. O'Brien, supra note 5, at 3.

[FN168]. DOJ Intelligence Brief, supra note 16, at 7.

[FN169]. Id. at 7-8.

[FN170]. Linda C. Fentiman, Internet Pharmacies and the Need for a New Federalism: Protecting Consumers While Increasing Access to Prescription Drugs, 56 Rutgers L. Rev. 119, 135-36 (2003).

[FN171]. See, e.g., Ausness, Aggressive Marketing, supra note 3, at 97; Fentiman, supra note 170, at 135-36.

[FN172]. But see, e.g., Ohler v. Purdue Pharma L.P., No. Civ. A 01-3061, 2002 WL 88945, at *2 (E.D. La. Jan. 22, 2002) (granting motion to remand to state court). Plaintiffs alleged that Purdue was, inter alia, "marketing/promoting OxyContin

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REDACTED

100 NWULR 1409                                                                    Page 22
100 Nw. U. L. Rev. 1409
**(Cite as: 100 Nw. U. L. Rev. 1409)**

directly to consumers utilizing multimedia and the internet and otherwise facilitating the inappropriate unsafe use of the drug to increase its market." Id.

The accusations in this incarnation of Ohler--that OxyContin had been marketed directly to consumers--were based on information contained on the website "Partners Against Pain," which offered information about chronic pain and its treatments to the general public.  In such cases, the Partners Against Pain website was itself named as a defendant.  Id. at *1-2; see, e.g., Little v. Purdue Pharma, L.P., 227 F. Supp. 2d 838, 839, 842 (S.D. Ohio 2002) (sustaining grant of plaintiffs' motion to remand to state court in class action against, inter alia, Purdue Pharma, L.P. and Partners against Pain). Because of the relatively minor role of this alleged marketing, and the tenuous connection that it would bear to a public entity suit such as West Virginia's, this Comment operates under the assumption that OxyContin has never been marketed to consumers. Indeed, the most salient criticisms of Purdue's marketing strategies have focused on its marketing to physicians through the use of journal advertisements, seminars, and the like, marketing which was unquestionably undertaken on a large scale and conceivably could have had a large impact on the volume of OxyContin prescriptions.

[FN173]. See Ford, supra note 81, at 431-32, 445.

[FN174]. OxyContin Hearing, supra note 151.

[FN175]. Ausness, Non-Defective Products, supra note 3, at 913-14.

[FN176]. Id. at 913-16.

[FN177]. West Virginia Complaint, supra note 7, at 23-26.

[FN178]. Ausness, Non-Defective Products, supra note 3, at 915-16.

[FN179]. Ford, supra note 81, at 447.

[FN180]. See, e.g., City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099 (Ill. 2004); Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1056 (N.Y. 2001).

[FN181]. City of Chicago, 821 N.E.2d at 1122.

[FN182]. Id.

[FN183]. Id. at 1119-20.

[FN184]. Id. at 1123.

[FN185]. See, e.g., Cleary, supra note 9, at 280.

[FN186]. City of Chicago, 821 N.E.2d at 1148.

[FN187]. DOJ Intelligence Brief, supra note 16, at 1-2.

[FN188]. Court Downgrades OxyContin Suit, Lexington Herald-Leader, Dec. 16, 2004, at B3.

[FN189]. Id.

[FN190]. Id.

[FN191]. O'Brien, supra note 5, at 3.

[FN192]. See generally Meier, supra note 28.

[FN193]. See, e.g., DaWalt v. Purdue Pharma L.P., 397 F.3d 392 (6th Cir. 2005) (involving a class of plaintiffs alleging

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REDACTED
100 NWULR 1409                                                                 Page 23
100 Nw. U. L. Rev. 1409
(Cite as: 100 Nw. U. L. Rev. 1409)

personal injuries caused by use of OxyContin).

[FN194]. Robert A. Clifford, Popular Media Paints Unrealistic Portrait of Lawyers (... and What We Can Do About It), Chi. B. Ass'n Rec., Jan. 2005, at 44, 45.

[FN195]. Id.

[FN196]. Associated Press, supra note 137.

[FN197]. See, e.g., DaWalt, 397 F.3d at 392.

[FN198]. See generally Meier, supra note 28.

[FN199]. See, e.g., Shamus McGillicuddy, A Loud Voice of OxyContin Concern, Patriot Ledger (Quincy, Mass.), Feb. 17, 2005, at 16.

[FN200]. Cf. Patterson & Philpott, supra note 14, at 549.

[FN201]. Id. at 549-50 (citation omitted).

[FN202]. See, e.g., Satel, supra note 61.

[FN203]. Cf. Patterson & Philpott, supra note 14, at 551 ("The most likely result in the public entity gun litigation is ... a settlement, thus achieving the type of industry-wide reform through litigation that has not been achieved through legislation." (citation omitted)).

[FN204]. Meier, supra note 28, at 47.

[FN205]. Id.

[FN206]. See, e.g., Irwin & Kinzly, supra note 29; cf. Satel, supra note 61.

[FN207]. Ausness, Non-Defective Products, supra note 3, at 915-16.

[FN208]. See DOJ Bulletin, supra note 35, at 1-2.

[FN209]. See, e.g., Cleary, supra note 9, at 273; Gavioli, supra note 13, at 941-46.

[FN210]. Weinman, supra note 6, at 496.

[FN211]. Tough, supra note 23, at 36.

[FN212]. Id.

[FN213]. See, e.g., Weinman, supra note 6, at 495-96.

[FN214]. See, e.g., Kent Durning, Note, No Pain No Gain?!: Who Will Make the Greatest Sacrifices in Curbing Opioid Analgesic Diversion and Abuse?, 93 Ky. L.J. 199, 234-35 (2004).

[FN215]. Tobey Coleman, OxyContin Marketing Tactics Go on Trial Today, Charleston Gazette, Nov. 1, 2004, at 1A.

[FN216]. West Virginia Bill Sought to Ban OxyContin, http:// www.pharmacist.com/articles/d_dn_0009.cfm (last visited Feb. 1, 2006).

[FN217]. Jerry Markon, Drug Trial of Former Pain Doctor Opens Today, Wash. Post, Nov. 4, 2004, at B8.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

100 NWULR 1409
100 Nw. U. L. Rev. 1409
**(Cite as: 100 Nw. U. L. Rev. 1409)**

Page 24

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PPLPC051000035831

# EXHIBIT 189 – 199 (redacted)

# EXHIBIT 200

NORTON ROSE FULBRIGHT

# Donald Strauber

**Of Counsel**
Norton Rose Fulbright US LLP

don.strauber@nortonrosefulbright.com

**New York**
**T:** +1 212 408 5205



Donald Strauber has more than 50 years of experience in complex commercial litigation and heads up matters in courts throughout the United States. He has worked primarily in three areas: health-related litigation, federal securities litigation and large commercial disputes.  He is in charge of Jim Beam's defense of alcohol-health cases and litigation relating to the marketing of beverage alcohol. He was co-national counsel for the Purdue defendants in the OxyContin® litigation and advises Purdue on matters relating to OxyContin.

## Professional experience

Collapse all

### — Education

LL.B, *cum laude*, Harvard Law School, 1960
BA, University of Pennsylvania, 1957

### — Admissions

• New York State Bar

### — Representative experience

• Representing The Purdue companies in the defense of the OxyContin® litigation.

• Represented Jim Beam in connection with *Thorp v. Beam* relating to the issue of whether a distiller is responsible for a child's alleged "fetal alcohol syndrome." The successful defense of this case before a jury in Seattle resulted in the voluntary dismissal of similar cases around the country and put an end to the feared onslaught of litigation on that issue.

• Represented Jim Beam in purported class actions throughout the United States dealing with the labeling of products as "All Natural."

• Represented Rockwell Automation, Inc. (formerly Rockwell International Corporation) in connection with *Broad v. Rockwell*, a securities class action on behalf of holders of Collins convertible debentures, arising out of the Rockwell-Collins merger, which was successfully tried to a jury in Dallas and affirmed *en banc* by the Fifth Circuit Court of Appeals.

### — Rankings and recognitions

• Legal 500 Leading lawyer, Litigation - Product Liability and mass tort defense: Consumer products:  The Legal 500 has described him as "the dean of the US beverage alcohol product liability bar" (2010) -- "His signal quality is the maturity of his judgement and he has a record of outstanding success on product liability matters brought to verdict." (2009)  In 2017 he continued to be named as a "leading lawyer" in products liability and was named to the Legal 500 Hall of Fame which recognizes individuals designated by the Legal 500 as "elite lawyers" for at least six consecutive years.

• Acritas Star, *Acritas*, 2018-2020

- New York Metro Super Lawyer, *Thomson Reuters, 2013*

## Publications

- "Products Liability," Chapter 77, *Successful Partnering Between Inside and Outside Counsel*, (Robert L. Haig), *Thomson Reuters/West*, 2012

## Memberships and activities

- Member, Association of the Bar of the City of New York

- Member, American Bar Association

- Member, Board of Directors, Mobilization for Justice, New York City

# EXHIBIT 201

COMMONWEALTH OF KENTUCKY
COURT OF APPEALS

CASE NO. 2013-CA-001941-OA

PURDUE PHARMA L.P.,
PURDUE PHARMA INC.,
THE PURDUE FREDERICK COMPANY, INC. d/b/a
THE PURDUE FREDERICK COMPANY,
PURDUE PHARMACEUTICALS, L.P., and
THE P.F. LABORATORIES, INC.                              PETITIONERS

v.

HON. STEVEN D. COMBS,
Pike Circuit Court, Division II                          RESPONDENT

COMMONWEALTH OF KENTUCKY, *ex rel.*          REAL PARTY IN INTEREST
JACK CONWAY, ATTORNEY GENERAL           Plaintiff in Civil Action No. 07-CI-01303

## AFFIDAVIT OF EDWARD B. MAHONY

Edward B. Mahony, being duly sworn, states and attests as follows:

1.      My name is Edward B. Mahony. I am over 21 years of age and am competent in all respects to testify to the matters stated herein.

2.      A copy of my current CV is attached to this affidavit.

3.      I am Executive Vice President, Chief Financial Officer and Treasurer of Purdue Pharma L.P. I have held this position since 2000, including at all times relevant to the testimony contained herein. In this capacity, I am knowledgeable about the current and projected financial condition of the Purdue petitioners in the above-captioned matter ("Purdue"); the historical impact of various contingencies, including adverse court findings, on the business operations of Purdue; and the potential impact of future contingencies on the ongoing business operations of Purdue. I provide this testimony based on my personal knowledge and information from records maintained by Purdue in the ordinary course of business.

1

4.      I have been asked to offer my opinions on the impact on Purdue's ongoing business operations of a trial court judgment of or exceeding $1 billion in the above-captioned matter ("Adverse Judgment").  More specifically, I have been asked to describe the adverse effects of an Adverse Judgment during the pendency of an appeal and the impact such a judgment would have on the company should it be upheld on appeal.  I offer these opinions to a reasonable degree of certainty within the fields of finance and accounting and based upon my education, training, experience, and personal knowledge of the company gained from my many years of experience as Purdue's Chief Financial Officer.

5.      As an initial matter, Purdue is a small to midsize pharmaceutical manufacturer.  In 2012, it had sales revenues of approximately $2.2 billion.  As a point of comparison, Merck & Co., Inc., which is one of the 10 largest pharmaceutical companies in the world, reported over $47 billion of sales in 2012.  (Merck & Co., Inc., 2012 Annual Report (Form 10-K), at 40 (Feb. 28, 2013), *available at* http://www.merck.com/investors/financials/annual-reports/home.html (last visited Feb. 4, 2014).)

**Impact of an Adverse Judgment if Affirmed on Appeal**

6.      If the Adverse Judgment ultimately were upheld on appeal, it would have an immediate, crippling, and irreparable effect on Purdue.

7.      Even with the measures that would have to be put into place to prepare for the contingency of having to pay the Adverse Judgment (described below), the immediate payout of a billion dollar judgment would:

a.   Result in the layoff of hundreds of employees;

b.   Force the sale of important capital assets;

2

    c.  Dramatically restrict Purdue's research and development function, including ongoing research on abuse deterrent formulations of opioids;

    d.  Severely limit Purdue's capacity to invest in new technologies to bring new drugs to market;

    e.  Trigger serious collateral impacts under existing agreements with creditors, licensees, and other third parties which would increase Purdue's costs, further inflate the overall loss associated with the Adverse Judgment, and impair Purdue's ability to issue letters of credit otherwise essential to its business; and

    f.  Force Purdue to attempt to sublease at below market rates the office space vacated by the laid off employees.

8.    In short, if upheld on appeal, an Adverse Judgment would have a crippling effect on Purdue's operations and jeopardize Purdue's long-term viability.

## Impact of an Adverse Judgment During the Pendency of An Appeal

9.    Without question, the mere issuance of the Adverse Judgment by the trial court would have immediate, irreparable and long-lasting adverse impacts on Purdue during the pendency of an appeal, even if the Adverse Judgment ultimately is reversed on appeal.

10.    Even if Purdue is likely to prevail on appeal of the Adverse Judgment, Purdue would have to take reasonable and responsible steps to prepare for the possibility, however remote, that the Adverse Judgment is upheld.

11.    For example, Purdue would have to post enormous collateral sufficient to obtain a supersedeas bond to secure the Adverse Judgment pending appeal. *See* CR 73.04; KRS 411.187. In addition, Purdue would have to set at least a several hundred million dollar reserve to prepare for the contingency that the Adverse Judgment would be upheld. That money would have to

come from material cuts in Purdue's expenses, including cuts in personnel and research and development. It also would have to forego certain opportunities to license or otherwise acquire promising new drugs and drug technology. Posting the bond and setting the reserve also would trigger covenants in various agreements Purdue has with third parties, further increasing Purdue's costs, reducing the funds available for investment, and harming Purdue's credit rating.

12.    These cuts and other impacts to Purdue's business that would occur during the pendency of the appeal would be material and irreversible. The human capital and research and development opportunities lost would never be able to be regained even if the Adverse Judgment ultimately is overturned on appeal.

13.    These predictions of the lasting impact of an Adverse Judgment on Purdue, even if ultimately reversed on appeal, are not speculative. Purdue's past experience, under different circumstances, has shown that such events can have a material adverse impact on Purdue and inform my view of the impact that an Adverse Judgment in this case would have on Purdue and its business.

14.    In 2004, the United States District Court for the Southern District of New York issued an order and judgment invalidating certain patents for OxyContin® Tablets ("OxyContin") and temporarily permitting generic companies to sell generic versions of OxyContin. Although that judgment ultimately was vacated in its entirety by the United States Court of Appeals for the Federal Circuit, it nonetheless had a dramatic and lasting adverse impact on Purdue during the pendency of the appeal. Among other things, the judgment forced Purdue to lay off approximately two-thirds of its employees, including 75% of the members of its research and development departments before the judgment was vacated two years later. The impact of the

4

erroneous judgment on both Purdue and more than a thousand employees was permanent and

irreparable, even though the decision ultimately was vacated on appeal.

REDACTED

This ___4th___ day of February, 2014.

_____

EDWARD B. MAHONY

STATE OF _Connecticut_

COUNTY OF _Fairfield_

Sworn to and subscribed before me
this _4th_ day of February, 2014.

_____
Notary Public
My Commission Expires:    **My Commission Expires
October 31, 2014**

_____

6

# EDWARD B. MAHONY, CPA

271 Shady Hill Road
Fairfield, CT 06430

Home: (203) 259-7366
Office: (203) 588-7060

**SUMMARY**

Senior financial and business executive with pharmaceutical, consumer product and international experience. An innovative contributor to top and bottom line. A strategic partner who anticipates and capitalizes on change to build for the future.

**EXPERIENCE**
**1993 – Present**

**PURDUE PHARMA L.P. - Stamford, CT**

**Executive Vice President, Chief Financial Officer**                **2000 – Present**
**And Treasurer**
**Vice President, Chief Financial Officer**                                **1993 – 2000**
Senior financial officer responsible for accounting, financial planning and analysis, budgeting, controls, systems, treasury operations (cash flow, credit and real estate), fleet, risk management, customer service, procurement, and information technology for this rapidly growing pharmaceutical company. Reporting to the President and CEO.

- As part of the senior leadership team grew sales from $200 million in 1993 to over $2 billion in 2010.
- As part of risk management responsibility:
  - Placed insurance programs and collected well in excess of $100 million in claims on those policies.
  - Established contingency plans which allowed the company to immediately respond to unexpected events.
  - Completed more than ten financings, ensured compliance with all covenants during the life of the loans even in the face of significant business challenges, and in certain cases, negotiated early repayment at a discount to par.
  - Negotiated and closed more than fifteen major real estate transactions including purchases, sales, leases, subleases, credit enhancements from tenants and more.
  - Initiated and encouraged a cost savings and efficiency environment, which results in tens of millions of dollars of savings each year.
  - As part of the Purdue team, negotiated and closed more than fifty product licenses or acquisitions, litigation settlement agreements and other commercial agreements.
  - As part of the Purdue team, managed venture investments with a personal focus on financing and in certain cases the workout phase.
  - Chair of Purdue's Capital Committee, Pension Investment Committee and Executive Audit Committee.
  - Member of Executive Operations Committee, Executive Committee, Commercial Operations Committee and Strategy Committee.

**1978 – 1993**          **BRISTOL-MYERS SQUIBB – New York, NY**

**Vice President, Products Division Controller**          **1991 – 1993**
Member of Operating and Strategic Planning Committee for a $600 million consumer products/health care company. Business unit financial officer responsible for accounting, financial planning, controls, systems and key treasury operations (cash flow, credit and real estate). Reporting to the President.

- Helped deliver 2-year cumulative 40% profit increase on 5% sales growth.

- As part of the Strategic Planning Committee, mapped out a new direction and future for the division.

- Through benchmarking of competitors' cost, launched cost cutting in promotion, market research, advertising, production and working capital, adding 10% profit to the bottom line.

- Focused the financial process and organization to maximize existing portfolio profitability while strategically investing in future growth.

- Negotiated an early exit from a 137,000 sq. ft. long-term office lease.

**Director, Financial Integration – Pharmaceutical Group**          **1990 – 1991**
Responsible for cost-effective, post-merger integration of the former Bristol and Squibb operations. Reporting to the Vice President, Controller of this $6 billion business.

- Conceived of and led a team responsible for ensuring a rapid, smooth combination of Bristol and Squibb's financial and customer service operations at 40 overseas locations, saving $60 million.

- Introduced rigorous business and financial controls through a multi-faceted cultural change program which included audit bulletins, action alerts, risk assessment, organizational initiatives and extensive personal visits.

- Initiated reengineering of domestic accounts payable based on the Ford Motor Company "no invoice" model, allowing for a 50% staff reduction.

- Member of Real Estate Committee whose activities included site evaluation, selection and final approval of the construction of a 600,000 sq. ft. office.

**Assistant Controller, International Group**                1985 – 1989
Responsible for financial reporting, consolidation, cost accounting and
performance analysis of 120 overseas units for this $1.5 billion business.
Responsible for key international treasury activities (foreign currency risk
management, working capital management and transfer pricing).
Financial officer of a $200 million export operation.

- Created a paperless consolidation and international financial reporting
  system using telecommunications and computerized edit routines to
  reduce reporting time by three weeks, data by 20% and error rate by
  90%.

- Implemented a step-by-step program in partnership with overseas
  management, reducing working capital by $100 million.

- Upgraded staff, improved systems and simplified work, saving $2
  million.

- Created numerous staff learning opportunities, such as lunch and
  learns, peer instruction, job rotation, targeted programs with Columbia
  University and a focused MBO system.

**Assistant Controller, Unitek Corp. (subsidiary of B-MS)**    1983 – 1985
CFO International for Unitek, a $100 million dental equipment subsidiary
in Monrovia, California.

- Turned around the financial discipline by recruiting talented, local
  financial executives and creating cash flow and financing plans for
  each operation.

- Developed and implemented funding plans for overseas operations,
  which included local borrowing and working capital controls.

- Evaluated two potential acquisition candidates.

**Manager, Headquarters Finance, International Group**    1981 – 1983
Controller of a $100 million headquarters and common services budget.
Responsible for traditional financial activities, including accounts payable,
payroll, collections, budgeting and reporting.

**Senior Accountant, International Group**                1978 – 1981
Rotated through several accounting and supervisory positions, such as
general accounting, accounts receivable and budgeting.

| 1976 – 1978 | **TOUCHE ROSS & COMPANY – Senior Auditor** |
| | Responsible for publishing, leasing, factory equipment and non-profit audits. |

| 1975 – 1976 | **PRICE WATERHOUSE – Auditor** |

| **EDUCATION** | MBA, Finance, New York University, 1983 |
| | Certified Public Accountant, New York, 1977 |
| | BS, Accounting, Manhattan College, 1975 |

Past Board/Community Affiliations include:
- Lauralton Hall, Milford, CT – Board of Directors
- UCONN School of Business Advisory Board
- Sound Waters, Stamford, CT – Board of Directors

Current Board Affiliations include:
- Rhodes Technologies, LP - Coventry, RI – Bulk manufacturer of active ingredient used in certain medicines.
- Rhodes Pharmaceuticals, LP - Coventry, RI – A start-up stage generic pharmaceutical company.
  (Both Rhodes Technologies, LP and Rhodes Pharmaceuticals, LP are beneficially owned by the owners of Purdue Pharma LP.)
- Norwalk Hospital Board of Directors Member (2010 to Present) – Norwalk Hospital is a not-for-profit, acute care teaching hospital that has more than 500 physicians on its active medical staff and is a national leader in health care quality and patient safety.

REDACTED

# EXHIBIT 202

ORIGINAL ARTICLE

# Economic Costs of Nonmedical Use of Prescription Opioids

*Ryan N. Hansen, PharmD,\* Gerry Oster, PhD,† John Edelsberg, MD,† George E. Woody, MD,‡ and Sean D. Sullivan, PhD\**

**Objectives:** Although the economic costs of substance misuse have been extensively examined in the published literature, information on the costs of nonmedical use of prescription opioids is much more limited, despite being a significant and rapidly growing problem in the United States.

**Methods:** We estimated the current economic burden of nonmedical use of prescription opioids in the United States in terms of direct substance abuse treatment, medical complications, productivity loss, and criminal justice. We distributed our broad cost estimates among the various drugs of misuse, including prescription opioids, down to the individual drug level.

**Results:** In 2006, the estimated total cost in the United States of nonmedical use of prescription opioids was $53.4 billion, of which $42 billion (79%) was attributable to lost productivity, $8.2 billion (15%) to criminal justice costs, $2.2 billion (4%) to drug abuse treatment, and $944 million to medical complications (2%). Five drugs—OxyContin, oxycodone, hydrocodone, propoxyphene, and methadone—accounted for two-thirds of the total economic burden.

**Discussion:** The economic cost of nonmedical use of prescription opioids in the United States totals more than $50 billion annually; lost productivity and crime account for the vast majority (94%) of these costs.

**Key Words:** prescription opioid misuse, nonmedical opioid use, abuse, opiates, oxycodone

(*Clin J Pain* 2011;27:194–202)

Although the economic costs of substance misuse have been extensively examined in the published literature, information on the costs of nonmedical use of prescription opioids is much more limited, despite the fact that it is a significant and rapidly growing problem in the United States.[1] Between the years 1999 and 2006, the number of deaths in the United States related to poisoning increased by 85% (from 20,000 to 37,000 annual deaths), with the largest increase attributable to opioid analgesics.[2] The National Survey of Drug Use and Health (NSDUH)

Received for publication April 1, 2010; revised August 13, 2010; accepted August 18, 2010.
From the \*Department of Pharmacy, Pharmaceutical Outcomes Research and Policy Program, University of Washington, Seattle, Washington; †Policy Analysis Inc., Brookline, Massachusetts; and ‡Department of Psychiatry and Treatment Research Institute, University of Pennsylvania, Philadelphia, Pennsylvania.
Supported by an unrestricted grant from Purdue Pharma, LP.
Reprints: Ryan N. Hansen, PharmD, Department of Pharmacy, Pharmaceutical Outcomes Research and Policy Program, University of Washington, Seattle, WA (e-mail: rhansen@u.washington.edu).
Supplemental Digital Content is available for this article. Direct URL citations appear in the printed text and are provided in the HTML and PDF versions of this article on the journal's website, www.clinicalpain.com.
Copyright © 2011 by Lippincott Williams & Wilkins

(formerly, the National Household Survey on Drug Abuse) estimated that, between 2001 and 2006, the number of persons using prescription pain relievers (in almost all instances opioids) for nonmedical purposes increased from 3.5 million to 5.2 million.[3] The numbers of patients seen in emergency rooms, admitted to hospital for the treatment of misuse of opioid analgesics, and dying from unintentional overdose of these agents correspondingly increased over this period.[3]

The most recent study in this area presented estimates of the cost of misuse of prescription opioid analgesics in the United States in 2001.[4] However, this study did not present cost estimates specific to individual prescription opioids. Furthermore, the data from this study are almost a decade old, and the prevalence of nonmedical use of prescription opioids and adverse outcomes related to such use has increased substantially since then.

The objective of this study was to estimate the economic burden in the United States resulting from nonmedical use of prescription opioids, using recent data from NSDUH to attribute estimates of national costs to individual drugs of misuse.

## METHODS

To characterize the economic burden of the nonmedical use of prescription opioids in the United States, we used techniques of prevalence-based cost-of-illness ascertainment.[4] As is customary in such studies, economic burden was assumed to consist of both direct (medical and nonmedical) and indirect costs. Estimates of direct economic burden are intended to reflect the opportunity cost of "resources used" in the treatment of opioid misuse and its sequelae (and therefore not available for other uses). Estimates of indirect economic burden are intended to reflect the value of "lost resources" (ie, forgone productivity) as a result of opioid misuse and their sequelae. In tallying direct and indirect economic burden, both societal and healthcare systems perspectives were used.

We examined the economic burden associated with the nonmedical use of prescription opioids in terms of 4 major categories: substance abuse treatment, medical complications, productivity loss, and criminal justice. Figure 1 details our analytic approach. Within each subcategory of costs, the proportion attributable to individual prescription opioids was identified using category-specific estimates or proportions derived from NSDUH. The description that follows summarizes our efforts, however a detailed technical appendix (Supplemental Digital Content 1, http://links.lww.com/CJP/A18) is available, which presents NSDUH variables used in the analysis.

NSDUH captures data on 60,000 to 70,000 persons annually (or about 0.022% to 0.023% of the total US population). Thus, for many questions of interest, the expected number of usable responses—and hence the precision of any

PPLPC018000486056

*Clin J Pain* • Volume 27, Number 3, March/April 2011    *Costs of Nonmedical Use of Prescription Opioids*



**FIGURE 1.** Schematic of analytic approach.

resulting estimates—is quite low. Accordingly, to increase precision, we used data from 3 years of the survey (2004 to 2006).[5–7] Response proportions for each year were weighted (using the survey year's sample size) and combined to calculate an overall proportion.

As NSDUH is a complex probability sample, analytic approaches used with data from simple random samples usually are not appropriate. Ignoring the complex design can lead to biased estimates and overstated significance levels. Sample weights and the stratification and clustering of the design must be incorporated into an analysis to obtain unbiased estimates and associated standard errors. Accordingly, to estimate sampling errors, we used the Taylor series (linearization) method within the SAS procsurvey command, using the analysis weights, stratum, and cluster design variables provided within the NSDUH dataset.

## Substance Abuse Treatment

To estimate total US expenditures for treatment related to abuse of prescription opioids, we began with published estimates from a report of the Substance Abuse and Mental Health Services Administration of the US Department of Health and Human Services, entitled "National Expenditures for Mental Health Services and Substance Abuse Treatment, 1993-2003."[8] National Expenditures for Mental Health Services and Substance Abuse Treatment provided expenditure estimates for healthcare services related to the diagnosis and treatment of mental health and substance abuse disorders. Estimates for 2003 were inflated to 2006 price levels using the medical care component of the Consumer Price Index (CPI).[9] Data from the pooled 2004 to 2006 NSDUH were then used to apportion expenditure estimates into those attributable to the nonmedical use of prescription opioids versus all other drugs of misuse and, for the former, among various prescription opioids.

## Medical Complications

Medical complications associated with nonmedical use of prescription opioids were assumed to consist of HIV/AIDS, chronic hepatitis C, and neonatal care. Costing of these complications is described below.

## HIV/AIDS

Our estimate of the direct costs of HIV/AIDS among persons who misuse prescription opioids was based on the most recent analysis of annual direct expenditures for HIV-infected persons in the United States.[10] Bozzette's 1996 cost

estimate was adjusted to 2006 price levels, using the medical care component of the CPI.[9] As the number of persons in the United States infected with HIV has increased substantially during the past decade, the 1996 price-adjusted estimate was further adjusted upward to account for the estimated increase in the number of persons receiving care for HIV infection. This increase was assumed to be proportional to the reported increase in the population of HIV-infected persons (diagnosed and undiagnosed) between 1996 and 2003, with further adjustment for the period 2003 to 2006, assuming a constant rate of increase over the entire period 1996 to 2006.[10,11]

The indirect costs of HIV/AIDS were estimated solely on the basis of HIV/AIDS mortality. Foregone earnings for persons dying of HIV/AIDS in 2006 due to nonmedical use of prescription opioids were estimated based on the age and sex distribution of all persons dying of HIV/AIDS.[12] Discounted future earnings were calculated based on average earnings and mean life expectancy for persons with this age and sex distribution.[13]

To estimate the total percentage of HIV/AIDS cases attributable to intravenous (i.v.) drug abuse, we began with the percentages of persons living with HIV/AIDS in 2006 whose disease was attributable to injection drug use, or male-to-male sexual contact and injection drug use. To this, we added an estimate of the percentage of HIV/AIDS cases attributable to high-risk heterosexual contact with an injecting drug user. This estimate was based on the percentage of heterosexually transmitted cases in 2001 (among all cases with specified subcategory of risk) attributed to sex with an injecting drug user. We further assumed that the overall percentage of HIV/AIDS cases attributable to i.v. drug abuse reflects the proportion of the direct and indirect costs of HIV/AIDS attributable to i.v. drug abuse.

## Chronic Hepatitis C

Our estimate of US total costs for chronic hepatitis C in 2006 was based on a published cost estimate reported for 1997.[14] Cost estimates were based on the data collected by the National Center for Health Statistics, the Health Care Financing Administration (now, the Centers for Medicare and Medicaid Service), the Centers for Disease Control and Prevention, the National Institute of Drug Abuse, the Agency for Healthcare Research and Quality, US Bureau of Labor Statistics, and the National Hospital Discharge Survey. The cost of chronic liver disease associated with chronic hepatitis C was considered separately from the cost

© 2011 Lippincott Williams & Wilkins

PPLPC018000486057

*Hansen et al*                                                    *Clin J Pain • Volume 27, Number 3, March/April 2011*

of chronic hepatitis C–associated primary liver cancer. As the number of persons with chronic hepatitis C in the United States is believed to have increased substantially between 1997 and 2006, we inflated Leigh's 1997 estimate to account for the increase in the prevalence of chronic hepatitis C.[15] We also updated Leigh's cost estimates to 2006 dollars, using the medical care component of the CPI.[8]

As is the case for HIV/AIDS, i.v. drug abuse is responsible for a large proportion of all chronic hepatitis C infections. However, in the case of chronic hepatitis C, almost all cases are attributable to direct spread through contaminated drug paraphernalia; sexual spread is unusual. The Centers for Disease Control (CDC) estimates the proportion of chronic hepatitis C infections attributable to i.v. drug abuse (any drug) to be 54.3%.[16] We assumed that this reflects the proportion of the total costs of chronic hepatitis C attributable to i.v. drug abuse. Then, to apportion the total costs of chronic hepatitis C attributable to all i.v. drug abuse into the components attributable to nonmedical i.v. use of prescription opioids versus other drugs of misuse, and among the former, among specific prescription opioids, we used the same methodology as described earlier.

## Neonatal Care

Pregnant women who misuse prescription opioids on a nonmedical basis may give birth to opioid-dependent infants who require prolonged neonatal in-hospital care for opioid withdrawal syndrome. We estimated the total US cost of opioid withdrawal syndrome among newborns in 2006 using data from the Healthcare Cost and Utilization Project Kids' Inpatient Database (HCUP KID).[17] The HCUP KID database is a unique all-payer inpatient care database for children in the United States.

Using data from the 2006 HCUP KID, we estimated the total cost of hospitalization for newborns with any listed diagnosis of drug withdrawal syndrome in infants, opioid type (ICD-9-CM code 779.5). HCUP KID reports the total charges associated with hospitalizations. We assumed a cost-to-charge ratio of 66% to convert the charges reported in HCUP KID to their approximate costs. To disaggregate these expenditures into components attributable to mothers who used prescription opioids nonmedically versus heroin, we used the methodology described earlier to examine the principal opioid of misuse among problem users in NSDUH. We assumed that affirmative responses to question concerning current pregnancy are within the gestational timeframe, as NSDUH does not determine the length of the current pregnancy.

## Productivity Loss

To estimate the economic burden of lost productivity associated with nonmedical use of prescription opioids, we focused attention on mortality from poisoning, unemployment and subemployment, and work loss resulting from incarceration. The economic burden represented by premature death was estimated using the discounted present value of expected future earnings of persons who died in 2005 as a result of nonmedical prescription opioid use. Productivity loss due to unemployment and subemployment was estimated based on the loss of potential productivity due to drug disorders and institutionalization/hospitalization. Finally, productivity loss due to incarceration were also estimated.[18]

## Mortality From Unintentional Poisoning

The CDC National Vital Statistics System provides detailed information (including stratification by age and sex) on deaths due to poisoning by narcotics and psychodysleptics for the years 1999 to 2005, the year of the dataset that we used.[19] Paulozzi et al[20,21] have used this dataset for years before 2003 to report deaths due to prescription opioids. As death certificates occasionally list more than 1 narcotic/psychodysleptic, we calculated the percentage of all drug listings in the narcotic and psychodysleptic category that were prescription opioids and multiplied this percentage by the total number of deaths due to poisoning by narcotics and psychodysleptics in 2005 (18,347) to estimate the total number of poisoning deaths due to prescription opioids. This total number was apportioned among the 3 major categories of prescription opioids ("other opioid type," "methadone," and "other synthetic opioids") in proportion to the number of times these categories were listed.

We apportioned deaths among the individual prescription opioids in the other opioid type and other synthetic narcotic categories in a manner similar to that used to apportion the costs of misuse treatment, using the misuse treatment questions. Lost future earnings of persons who died as a result of prescription opioid poisoning in 2005 were estimated based on the age and sex distribution of those who died and the mean present value of expected future earnings among persons of the same age and sex.[13] A 3% discount rate was used to discount expected future earnings back to year of death.[21]

## Unemployment and Subemployment

We based our estimates of total US costs of unemployment and subemployment in 2006 on 1998 data reported by the Office of National Drug Control Policy (ONDCP), in a document entitled "The Economic Costs of Drug Abuse in the United States, 1992 to 1998."[22] To calculate productivity losses due to unemployment and subemployment, we updated ONDCP cost estimates for drug disorders and institutionalization/hospitalization. Lost productivity due to institutionalization/hospitalization (ie, unable to work due to drug treatment) was estimated based on the number of patients using inpatient hospital or residential treatment services. Adjustment for wage inflation was based on the 2006 Bureau of Labor Statistics' Hourly Compensation Index.[23]

Apportionment of the costs of unemployment and subemployment was based on the data from NSDUH using work loss specific questions. Lost earnings were apportioned between prescription opioids and other drugs of abuse, and among the former, among specific opioid products, using an n-way tabulation of the above NSDUH question with the "ever used" question, as described earlier.

## Incarceration

Estimation of productivity loss represented by the incarceration of persons for drug-related offenses used methods similar to those used in the ONDCP 2001 report. The number of persons incarcerated in local jails and in state and federal prisons was estimated using 2006 data reported by the Bureau of Justice Statistics.[24] For persons in local jails, distribution by primary offense has been reported by the Bureau of Justice Statistics, most recently for 2002.[25] For persons in federal and state prisons, distribution by offense was reported for 2006.[24] For each

© 2011 Lippincott Williams & Wilkins

PPLPC018000486058

*Clin J Pain* • Volume 27, Number 3, March/April 2011

type of crime, the percentage of each primary offense that is attributable to drug abuse was based on an analysis reported by Harwood et al[26] in their 1998 study (ie, 30% of burglaries are attributable to drug abuse). Lost earnings of persons incarcerated for drug-related crimes were estimated based on the age and sex distribution of those incarcerated and the average annual earnings of persons by age and sex.[13]

## Criminal Justice

We estimated US total costs of police services, the legal system, and incarceration in 2006 based on a 2003 report of the Bureau of Justice Statistics.[27] Direct expenditures were tallied in terms of "direct current expenditures" (salaries, wages, fees, and commissions and purchases of supplies, materials, and contractual services) and "capital outlays" (construction and purchase of equipment, land, and existing structures). We updated 2003 cost estimates to 2006 using the CPI.[9]

Total estimated expenditures for police services, the legal system, and incarceration were stratified into expenditures for drug law violations versus all other crimes based on corresponding percentages of all arrests, as reported by the Federal Bureau of Investigation's Uniform Crime Statistics.[28,29] Expenditures for drug law violations were apportioned among various prescription opioids on the basis of their relative percentages of all drug seizures, as reported by the National Forensic Laboratory Information System.

## Costs to Crime Victims

Our estimate of total US costs to crime victims was based on a published estimate of the total cost of drug-involved crimes in the United States in 1999.[30] For each type of crime, the cost to victims was estimated as the product of the number of crime victims times the percentage with drug involvement times the average cost per victim. Summation of these products across all types of crime yielded an estimate of the total cost of drug-involved crime to victims. Cost estimates were adjusted to 2006 price levels using the overall CPI.[5]

## RESULTS

### Substance Abuse Treatment

Expenditures for the direct treatment of all drug abuse were estimated to total $11.5 billion in 2006. Nonmedical

use of prescription opioids accounted for 19.3% of this total ($2.2 billion), apportioned as follows: (1) general hospital, inpatient—$411 million; (2) general hospital, outpatient—$325 million; (3) physician and other profession services—$363 million; and (4) substance misuse facilities—$1.12 billion. Table 1 reports the total abuse treatment costs apportioned among the opioids of interest.

### Medical Complications

The estimated economic burden of medical complications stemming from all drug abuse (HIV/AIDS, chronic hepatitis C, neonatal care) was $14.7 billion in 2006. The proportion of this burden attributable to nonmedical use of prescription opioids was 6.40% ($944 million).

### Mortality From Unintentional Poisoning

The estimated cost of lost productivity due to mortality from prescription opioid poisoning was $12.4 billion in 2005. On the basis of the data from the CDC National Vital Statistics System, we estimated that 11,806 persons died due to poisoning from "other opioids," "methadone," and "other synthetic narcotics." Table 2 reports estimated mortality costs for various categories of prescription opioids based on NSDUH data. Mortality costs were also apportioned on the basis of sales data for 5 prescription opioids. Calculations were based on the correlation of drug sales (in morphine equivalents) with poisoning deaths, as described in Table 3.

### Unemployment and Subemployment

The total value of lost productivity due to unemployment and subemployment arising from abuse of all drugs was $30.8 billion in 2006. Costs of unemployment and subemployment related to drug disorders were $28.6 billion, and costs of institutionalization/hospitalization totaled $2.2 billion. The percentage of these costs attributable to nonmedical prescription opioid use was 47.8% ($14.7 billion).

### Incarceration

The estimated cost of lost productivity due to incarceration for drug offenses was $74 billion in 2006. The total number of persons incarcerated due to drug violations was as follows: (1) federal prisons—116,534 persons; (2) state prisons—806,154 persons; and (3) local jails—367,404 persons. The percentage of these costs

TABLE 1. Abuse Treatment Costs Apportioned Among the Prescription Opioids (in $Millions)

| Opioid | Percentage of all Drug Use (NSDUH) (%) | Inpatient | Outpatient | Physician and Other Professionals | Substance Abuse Facility | Total |
|---|---|---|---|---|---|---|
| OxyContin | 3.71 | $79.08 | $62.57 | $69.75 | $215.61 | $427.01 |
| Propoxyphene | 2.92 | $62.22 | $49.22 | $54.88 | $169.62 | $335.94 |
| Oxycodone | 2.21 | $47.12 | $37.28 | $41.56 | $128.46 | $254.41 |
| Hydrocodone | 4.59 | $97.82 | $77.39 | $86.28 | $266.69 | $528.18 |
| Codeine | 1.69 | $35.99 | $28.47 | $31.74 | $98.12 | $194.33 |
| Meperidine | 0.76 | $16.20 | $12.81 | $14.29 | $44.15 | $87.45 |
| Hydromorphone | 0.48 | $10.15 | $8.03 | $8.95 | $27.67 | $54.80 |
| Methadone | 0.86 | $18.24 | $14.43 | $16.09 | $49.74 | $98.50 |
| Morphine | 0.94 | $19.98 | $15.81 | $17.62 | $54.46 | $107.87 |
| Fentanyl | 0.01 | $0.16 | $0.13 | $0.14 | $0.44 | $0.87 |
| Other | 1.13 | $24.16 | $19.12 | $21.31 | $65.88 | $130.47 |
| Total | 19.30 | $411.11 | $325.26 | $362.62 | $1,120.83 | $2,219.82 |

NSDUH indicates National Survey of Drug Use and Health.

© 2011 Lippincott Williams & Wilkins

PPLPC018000486059

*Hansen et al*                                                                      *Clin J Pain* • Volume 27, Number 3, March/April 2011

**TABLE 2.** Mortality Costs Apportioned Among the Prescription Opioids (in $Millions) of Interest (in $Millions)

| Proportion | No. Deaths (CDC/NSDUH) | Mortality |
|---|---|---|
| OxyContin | 1553 | $1,631.94 |
| Oxycodone | 925 | $972.32 |
| Hydrocodone | 1921 | $2,018.60 |
| Codeine | 707 | $742.68 |
| Hydromorphone | 199 | $209.43 |
| Morphine | 392 | $412.24 |
| Methadone | 4392 | $4,614.78 |
| Propoxyphene | 1359 | $1,428.24 |
| Meperidine | 354 | $371.79 |
| Fentanyl | 4 | $3.68 |
| Total | 11806 | $12,405.70 |

CDC/NSDUH indicates centers for disease control/National Survey of Drug Use and Health.

attributable to nonmedical prescription opioid use was 20.10% ($14.8 billion).

## Criminal Justice

Total expenditures for criminal justice attributable to all drug abuse were $40.9 billion in 2006. The percentage attributable to nonmedical prescription opioid use was 21.5% ($8,775 million).

## Policing/Legal/Incarceration

Total US expenditures for police services, the legal system, and incarceration related to drug abuse violations in 2006 were as follows: (1) policing—$16.9 billion; (2) legal—$8.4 billion; and (3) incarceration—$12.4 billion. Drug law violations accounted for 18.6% of all crimes. The percentage attributable to nonmedical prescription opioid use was estimated to be 20.1%, apportioned as follows: (1) policing—$3.4 billion; (2) legal $1.7 billion; and (3) incarceration—$2.5 billion.

## Cost to Crime Victims

The cost to crime victims for all alcohol-involved and drug-involved crimes in the United States in 2006 totaled $23.2 billion, of which 13.3% ($3.1 billion) can be attributed to drugs only.[27] Total costs can be broken down into the following categories: (1) medical costs—$207 million; (2) work loss—$2.06 billion; and (3) property damage—$803 million. The percentage of these costs attributable to nonmedical prescription opioid use was 20.1% ($618 million).

## Total Costs

The estimated total cost of nonmedical use of prescription opioids was $53.4 billion in 2006, of which $42 billion (79%) was attributable to lost productivity, $8.2 billion (15%) to criminal justice costs, $2.2 billion (4%) to misuse treatment, and $944 million to medical complications (2%). For the prescription opioids of interest, estimated associated total costs were as follows: (1) OxyContin, $7.3 billion (13.6%); (2) propoxyphene, $8.7 billion (16.3%); (3) oxycodone, $6.0 billion (11.3%); (4) hydrocodone, $12.7 billion (23.8%); (5) codeine, $4.2 billion (8.0%); (6) meperidine, $2.0 billion (3.8%); (7) hydromorphone, $1.2 billion (2.2%); (8) methadone, $6.2 billion (11.6%); (9) morphine, $2.6 billion (4.8%); (10) fentanyl, $0.03 billion (0.06%); and (11) other, $2.4 billion (4.6%). Table 4 reports the total costs of nonmedical use of prescription opioids.

## DISCUSSION

We estimate that the total cost of nonmedical use of prescription opioids in 2006 was $53.4 billion, of which $42 billion (79%) was attributable to lost productivity, $8.2 billion (15%) to criminal justice costs, $2.2 billion (4%) to substance abuse treatment, and $0.9 billion to medical complications (2%). To put this estimate in the context of other diseases, obesity was estimated to annually cost $139 billion annually in 2005,[31] the burden of smoking was estimated at $193 billion in 2004,[32] and the Department of Health and Human Services estimated the total cost of Alcohol Abuse to be $184.6 billion in 1998.[33] The ONDCP estimated the total cost of all drug abuse in the United States to be $143.4 billion in 1998, with a projected increase of $8.65 billion annually to $160.7 billion in 2000.[22] The percentage attributable to lost productivity was 69%, and the percentage due to criminal justice was approximately 18%. Conservatively assuming that the ONDCP-estimated rate of increase would have continued until 2006, the ONDCP estimate for 2006 would have been $212.6 billion, of which our estimate of $53 billion for prescription opioid abuse would constitute about 25% of the total.

Although our estimates appear compatible with those of the ONDCP, they are much greater than those of the only previous study to focus exclusively on the costs of nonmedical use of prescription opioids.[4] In that study, the total cost of prescription opioid misuse in 2001 was estimated to be only $8.6 billion, despite the fact that similar items of cost were included in both that study and ours. In part, the discrepancy between the 2 estimates is attributable to inflation and the considerable increase in the prevalence of nonmedical use of prescription opioids during

**TABLE 3.** Mortality Costs Among "Other Opioids" Based on Sales Data (in $Millions)*

| Agent | Sales (Millions of Grams) | Percentage of All Sales† | No. Deaths (CDC) | Total Costs |
|---|---|---|---|---|
| Codeine | 2.8 | 3.60 | 206 | $209.87 |
| Oxycodone | 30.6 | 39.60 | 2256 | $2,309.45 |
| Hydrocodone | 25.7 | 33.20 | 1892 | $1,936.20 |
| Morphine | 15 | 19.40 | 1105 | $1,131.39 |
| Hydromorphone | 3.2 | 4.20 | 239 | $244.94 |
| Total | 77.3 | 100.00 | 5698 | $5,831.85 |

*Five thousand six hundred ninety-nine deaths, using ICD-10 code "other opioids" (T40.2).
†Calculations based on oral morphine equivalents.
CDC indicates centers for disease control; ICD, International Classification of Disease.

PPLPC018000486060

**TABLE 4.** Overall Costs of Opioid Abuse (in $Millions)

| | OxyContin | Propoxyphene | Oxycodone | Hydrocodone | Codeine | Meperidine | Hydromorphone | Methadone | Morphine | Fentanyl | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abuse treatment | $427.01 (19.24%) | $335.94 (15.13%) | $254.41 (11.46%) | $528.18 (23.79%) | $194.33 (8.75%) | $87.45 (3.94%) | $54.80 (2.47%) | $98.50 (4.44%) | $107.87 (4.86%) | $0.87 (0.04%) | $130.57 (5.88%) | $2,219.82 (100%) |
| General hospital, inpatient | $79.08 | $62.22 | $47.12 | $97.82 | $35.99 | $16.20 | $10.15 | $18.24 | $19.98 | $0.16 | $24.16 | $411.11 |
| General hospital, outpatient | $62.57 | $49.22 | $37.28 | $77.39 | $28.47 | $12.81 | $8.03 | $14.43 | $15.81 | $0.13 | $19.12 | $325.26 |
| Physicians and other professionals | $69.75 | $54.88 | $41.56 | $86.28 | $31.74 | $14.29 | $8.95 | $16.09 | $17.62 | $0.14 | $21.31 | $362.62 |
| Substance abuse facilities | $215.61 | $169.62 | $128.46 | $266.69 | $98.12 | $44.15 | $27.67 | $49.74 | $54.46 | $0.44 | $65.88 | $1,120.83 |
| Medical complications | $166.46 (22.14%) | $0.92 (0.12%) | $26.06 (3.47%) | $1.40 (0.19%) | $0.35 (0.05%) | $54.01 (7.18%) | $197.51 (26.26%) | $30.21 (4.02%) | $273.33 (36.35%) | $1.52 (0.20%) | $0.26 (0.03%) | $752.04 (100%) |
| HIV/AIDS | $105.83 | N/A | $16.29 | N/A | N/A | $34.38 | $126.04 | $19.22 | $174.40 | $0.97 | N/A | $477.14 |
| Chronic hepatitis C | $59.98 | N/A | $9.23 | N/A | N/A | $19.49 | $71.44 | $10.90 | $98.85 | $0.55 | N/A | $270.45 |
| Neonatal problems | $0.65 | $0.92 | $0.54 | $1.40 | $0.35 | $0.14 | $0.02 | $0.09 | $0.08 | N/A | $0.26 | $4.45 |
| Productivity loss | $5,812.23 (13.83%) | $6,689.96 (15.92%) | $4,625.47 (11.01%) | $9,811.13 (23.34%) | $3,319.65 (7.90%) | $1,541.75 (3.67%) | $750.69 (1.79%) | $5,820.45 (13.85%) | $1,790.52 (4.26%) | $20.83 (0.05%) | $1,846.57 (4.39%) | $42,029.23 (100%) |
| Mortality | $1,631.94 | $1,428.24 | $972.32 | $2,018.60 | $742.68 | $371.79 | $209.43 | $4,614.78 | $412.24 | $3.68 | N/A | $12,405.70 |
| Unemployment/subemployment | $2,666.65 | $2,241.23 | $1,607.26 | $3,458.50 | $1,250.88 | $601.58 | $295.76 | $789.80 | $800.39 | $5.77 | $1,013.82 | $14,731.64 |
| Incarceration | $1,513.64 (10.16%) | $3,020.49 (20.88%) | $2,045.89 (13.74%) | $4,334.03 (29.10%) | $1,326.09 (8.90%) | $568.38 (3.82%) | $245.49 (1.65%) | $415.87 (2.79%) | $577.89 (3.88%) | $11.37 (0.08%) | $832.75 (5.59%) | $14,891.89 (100%) |
| Criminal justice | $835.43 | $1,667.12 | $1,129.21 | $2,392.12 | $731.92 | $313.71 | $135.50 | $229.53 | $318.96 | $6.28 | $459.63 | $8,219.41 |
| Policing | $346.06 | $690.57 | $467.75 | $990.88 | $303.18 | $129.95 | $56.13 | $95.08 | $132.12 | $2.60 | $190.39 | $3,404.70 |
| Legal | $173.03 | $345.29 | $233.88 | $495.45 | $151.59 | $64.97 | $28.06 | $47.54 | $66.06 | $1.30 | $95.20 | $1,702.37 |
| Incarceration | $253.46 | $505.78 | $342.58 | $725.73 | $222.05 | $95.17 | $41.11 | $69.64 | $96.77 | $1.90 | $139.44 | $2,493.63 |
| Cost to crime victims | $62.89 | $125.49 | $85.00 | $180.07 | $55.10 | $23.61 | $10.20 | $17.28 | $24.01 | $0.47 | $34.60 | $618.71 |
| Total | $7,241.13 (13.61%) | $8,693.94 (16.34%) | $6,035.15 (11.34%) | $12,732.83 (23.92%) | $4,246.25 (7.98%) | $1,996.92 (3.75%) | $1,138.49 (2.14%) | $6,178.70 (11.61%) | $2,490.67 (4.68%) | $29.49 (0.06%) | $2,436.93 (4.58%) | $53,221.50 (100%) |

N/A indicates not applicable.

© 2011 Lippincott Williams & Wilkins

PPLPC018000486061

*Hansen et al*                                                                                      *Clin J Pain* • Volume 27, Number 3, March/April 2011

the period 2001 to 2006. Differences in methodology, however, also probably account for some of the discrepancy. For example, Birnbaum et al estimated prescription opioid deaths using the data from the Drug Abuse Warning Network, which is not nationally representative, but rather is based on the reports from medical examiners in selected metropolitan areas. Although Birnbaum et al did not report the actual number of prescription-opioid deaths that they estimated from Drug Abuse Warning Network, it is likely to have been much lower than the number we would have estimated using national data from the CDC Compressed Mortality Dataset. In addition, Birnbaum et al used a 6% discount rate to estimate foregone future earnings, whereas we used a more standard rate of 3%[34] (note: the present value of estimated future costs is inversely related to the discount rate). Taking into account these differences in methodology, and the two-fold increase in the number of deaths attributable to prescription opioid misuse in the period 2001 to 2006 (according to CDC Compressed Mortality Dataset), it is not surprising to find that their estimate ($865 million) is much lower than ours ($12.4 billion).

Our study has a number of significant limitations. First, we relied more on data from NSDUH, which—as its name indicates—is a household survey, and therefore does not include incarcerated persons and the homeless. Both of these omitted groups contain substantial numbers of persons who are misusing drugs. To the extent that patterns of nonmedical use of prescription opioids in these groups differ from those in NSDUH, our results may yield a biased representation of overall nonmedical use of prescription opioids in the United States.

Second, although we based our study on the best available sources, for a variety of reasons—especially the age of some of the cost estimates we used—the accuracy of many of our estimates is uncertain. For example, our estimate of the total direct costs of HIV/AIDS is from 1996, the first year in which highly active antiretroviral therapy was widely used. Although we updated this estimate to account for inflation and the increase in the prevalence of HIV/AIDS, greater use of highly active antiretroviral therapy and other expensive therapies in 2006 (vs. 1996) may impart a conservative bias to our estimates.

Third, our estimates of the proportion of costs attributable to prescription opioids versus other drugs of abuse, and our estimates of costs attributable to individual prescription opioids, assumes that costs are independent of the particular drug of abuse and that polydrug abuse does not impact these costs. In other words, i.v. abusers of heroin are assumed to have the same risk of contracting HIV/AIDS—and the same costs if they do so—as i.v. abusers of prescription opioids. No studies have yet tested this assumption, but it may be reasonably close to what is actually happening. For example, injecting use was found in over 40% of opioid-addicted youth who were using heroin and prescription opioids in 2 recent studies.[35,36] In 1 study where patients' average age was 19.1 years, average years addicted was 1.5, and slightly less than 75% were Caucasian, 18% tested positive for hepatitis C at baseline, and 4 of 83 who were negative at baseline and retested 12 weeks later became positive (thus showing a significant amount of HIV risk behavior).[35] It is clear that persons who misuse prescription opioids only by the oral route are at low risk of acquiring or spreading HIV, but some have been known to transition to injecting heroin as it often costs

less. Conversely, those using heroin only by inhalation have levels of HIV risk that are comparable with those using only prescription opioids by the oral route.

Another result of this assumption of independence is that various crimes are considered to be equally likely to be committed by abusers of street drugs (eg, heroin, crack cocaine, methamphetamine) and abusers of prescription opioids. The validity of this assumption of independence is unknown. However, a recent cost-effectiveness study of opioid-addicted youth who were treated in the aforementioned study by Woody et al found that approximately 50% engaged in criminal activity for the past 30 days at the baseline assessment, and that social costs due to crime were substantial.[37] In assessing the distribution of social costs due to crimes, it is important to bear in mind that they involve costs to victims and to the criminal justice system, that use of prescription opioids without a prescription is as illegal as use of heroin, and that persons who use 1 class of opioids often use drugs from another class, depending on availability, cost, and changing preferences.

A final significant limitation concerns the method we used to apportion costs among prescription opioids. In most cases, the NSDUH questions used for apportionment could not be directly linked to cost items of interest. For example, NSDUH does not contain information on the principal drug of misuse or the drug for which treatment was received. Thus, we were limited to the number of mentions of ever having used the different prescription opioids as the principal means of apportionment of treatment costs. Whether there is a direct correlation between the frequency with which different drugs were ever used and the costs of treatment associated with abuse of these drugs is unknown. In one instance, however, we were able to compare the results of our NSDUH-based indirect apportionment with another means of apportionment. Specifically, poisoning deaths were apportioned among "other opioids" (ie, codeine, oxycodone, hydrocodone, morphine, and hydromorphone), based on both pharmaceutical sales data and NSDUH "ever used" data. The number of deaths attributed to oxycodone (oxycodone and OxyContin combined), hydrocodone, and hydromorphone was similar with both methods of apportionment: (1) oxycodone—2478 (NSDUH) versus 2256 (sales data); (2) hydrocodone—1921 (NSDUH) versus 1892 (sales data); and (3) hydromorphone—199 (NSDUH) versus 239 (sales data). Results for codeine and morphine were substantially different using the 2 methodologies, however: (1) codeine—707 (NSDUH) versus 206 (sales) and (2) morphine—392 (NSDUH) versus 1105 (sales).

In conclusion, our study suggests that the costs of nonmedical use of prescription opioids in the United States are substantial. The great majority of these costs (94%) are accounted for by lost productivity and crime. Our estimates are consistent with prior estimates for all drug misuse reported by ONDCP, but much higher than a prior published estimate specific to prescription opioids. In our analysis of costs by specific prescription opioids, 5 drugs (OxyContin, oxycodone, hydrocodone, propoxyphene, and methadone) accounted for two-thirds of the total economic burden of the nonmedical use of prescription opioids. Given the limitations and uncertainties of our methods and sources, our results should be interpreted with caution and regarded as approximations only.

These data do not address clinical issues related to balancing the benefits of pain treatment with opioids

© 2011 Lippincott Williams & Wilkins

PPLPC018000486062

*Clin J Pain* • Volume 27, Number 3, March/April 2011

against the risks of nonmedical use and diversion. On the one hand, treating everyone as if they are at high risk and requiring frequent visits and urine tests can be burdensome and unnecessarily expensive; on the other, treating everyone as if they are at low risk can produce other problems. Emerging work on prescription-monitoring programs is likely to introduce new tools that can assist medical providers in identifying persons who are likely to misuse or divert prescription opioids, provided they are available to prescribers and "user friendly." However, even with the help of such programs, decisions about the risks, benefits, and specifics of pain treatment with opioids always will require clinical judgment that is informed by treatment guidelines.

## REFERENCES

1. Compton W, Volkow N. Major increases in opioid analgesic abuse in the United States: concerns and strategies. *Drug Alcohol Depend.* 2006;81:103–107.
2. Warner M, Chen LH, Makuc DM. Increase in fatal poisonings involving opioid analgesics in the United States, 1999–2006. NCHS data brief, no. 22. Hyattsville, MD: National Center for Health Statistics; 2009. Available at www.cdc.gov/nchs/data/databriefs/db22.pdf. [Accessed August 5, 2010].
3. Substance Abuse and Mental Health Services Administration, Office of Applied Studies. Results from the 2006 National Survey on Drug Use and Health. 2007. National Findings (Office of Applied Studies), NSDUH Series: H-32, DHHS Publication No. (SMA) 07-4293. Rockville, MD, 2007.
4. Birnbaum HG, White AG, Reynolds JL, et al. Estimated costs of prescription opioid analgesic abuse in the United States in 2001: a societal perspective. *Clin J Pain.* 2006;22:667–676.
5. United States Department of Health and Human Services. Substance Abuse and Mental Health Services Administration. Office of Applied Studies. National Survey on Drug Use and Health, 2004 [Computer file]. ICPSR04373-v1. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2006-05-12.
6. United States Department of Health and Human Services. Substance Abuse and Mental Health Services Administration. Office of Applied Studies. National Survey on Drug Use and Health, 2005 [Computer file]. ICPSR04596-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2009-08-12.
7. United States Department of Health and Human Services. Substance Abuse and Mental Health Services Administration. Office of Applied Studies. National Survey on Drug Use and Health, 2006 [Computer file]. ICPSR21240-v4. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2009-08-12.
8. Mark TL, Levit KR, Coffey RM, et al. *National Expenditures for Mental Health Services and Substance Abuse Treatment, 1993–2003.* Rockville, MD: Substance Abuse and Mental Health Services Administration, SAMHSA Publication No. (SMA) 07-4227; 2007.
9. Department of Labor. Bureau of Labor Statistics. 2008. Available at: http://www.bls.gov. [Accessed August 5, 2010].
10. Bozzette SA, Berry SH, Duan N, et al. The care of HIV-infected adults in the United States. *New Engl J Med.* 1998;339: 1897–1904.
11. Glynn M, Rhodes P. Estimated HIV prevalence in the United States at the end of 2003. National HIV Prevention Conference. 2005. Available at: http://www.aegis.com/conferences/NHIVPC/2005/T1-B1101.html. [Accessed August 5, 2010].
12. Centers for Disease Control (CDC) and Prevention. HIV/AIDS Surveillance Report, 2006. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention website. 2008. Available at: http://www.cdc.gov/hiv/topics/surveillance/resources/reports. [Accessed August 5, 2010].
13. Census Bureau. The 2008 Statistical Abstract: The National Databook. Table 120 Deaths—Life years lost and mortality costs by age, sex, and cause. 2008. Available at: http://www.census.gov/compendia/statab/cats/births_deaths_marriages_divorces.html. [Accessed August 5, 2010].
14. Leigh JP, Bowlus CL, Leistikow BN, et al. Costs of hepatitis C. *Arch Int Med.* 2001;161:2231–2237.
15. Armstrong GL, Wasley A, Simard EP, et al. The prevalence of hepatitis C virus infection in the United States, 1999 through 2002. *Ann Int Med.* 2006;144:705–714.
16. Wasley A, Grytdal S, Gallagher K. Surveillance for acute viral hepatitis—United States, 2006. Centers for Disease Control (CDC) and Prevention website. 2008. Available at: http://www.cdc.gov/mmwr/preview/mmwrhtml/ss5702a1.htm. [Accessed August 5, 2010].
17. HCUP Kids' Inpatient Database (KID). Healthcare Cost and Utilization Project (HCUP). 2000 and 2003. Agency for Healthcare Research and Quality, Rockville, MD. http://www.hcup-us.ahrq.gov/kidoverview.jsp.
18. Haddix AC, Teutsch SM, Corso PS. (eds). *Prevention Effectiveness: A Guide to Decision Analysis and Economic Evaluation.* US: Oxford University Press; 2002.
19. Centers for Disease Control (CDC) and Prevention. Wonder online database: Mortality—underlying cause of death. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention website. 2005. Available at: http://wonder.cdc.gov/. [Accessed June 16, 2008].
20. Paulozzi LJ, Budnitz DS, Xi Y. Increasing deaths from opioid analgesics in the United States. *Pharmacoepidemiol Drug Safety.* 2006;15:618–627.
21. Paulozzi LJ, Ryan G. Opioid analgesics and rates of fatal drug poisoning in the United States. *Am J Prevent Med.* 2006;31: 506–511.
22. Office of National Drug Control Policy. *The Economic Costs of Drug Abuse in the United States: 1992–1998.* Washington, DC: Executive Office of the President (Publication No. NCJ-190636); 2001.
23. Department of Labor. Bureau of Labor Statistics. Annual indexes of productivity, hourly compensation, unit costs, and prices. 2007. Available at: http://www.bls.gov/news.release/prod2.t14.htm. [Accessed August 5, 2010].
24. Department of Justice. Office of Justice Programs, Bureau of Justice Statistics. Prison and jail inmates at midyear 2006. 2007. Available at: http://bjs.ojp.usdoj.gov/index.cfm?ty = pb-detail&iid = 1006. [Accessed August 5, 2010].
25. Department of Justice. Office of Justice Programs, Bureau of Justice Statistics. Profile of jail inmates, 2002. 2004. Available at: http://bjs.ojp.usdoj.gov/index.cfm?ty = pbdetail&iid = 1118. [Accessed August 5, 2010].
26. Harwood H, Fountain D, Livermore G. *The Economic Costs of Alcohol and Drug Abuse in the United States 1992.* Rockville, MD: National Institutes on Drug Abuse; 1998.
27. Department of Justice. Office of Justice Programs, Bureau of Justice Statistics. Prisoners in 2006. 2007. Available at: http://bjs.ojp.usdoj.gov/index.cfm?ty = pbdetail&iid = 908. [Accessed August 5, 2010].
28. Department of Justice. Office of Justice Programs, Bureau of Justice Statistics. Justice expenditure and employment in the United States, 2003. 2006. Available at: http://bjs.ojp.usdoj.gov/index.cfm?ty = pbdetail&iid = 1017. [Accessed August 5, 2010].
29. Department of Justice. Federal Bureau of Investigation. Uniform crime statistics—Estimated number of arrests. 2006. Available at: http://www.fbi.gov/ucr/cius2006/data/table_29.html. [Accessed August 5, 2010].
30. Miller TR, Levy DT, Cohen MA, et al. Costs of alcohol and drug-involved crime. *Prev Sci.* 2006;7:333–342.
31. Cawley J. The cost-effectiveness of programs to prevent or reduce obesity the state of the literature and a future research agenda. *Arch Pediatr Adolesc Med.* 2007;161:611–614.

PPLPC018000486063

REDACTED

*Hansen et al*                                          *Clin J Pain* • Volume 27, Number 3, March/April 2011

32. Smoking and tobacco use: MMWRs: 2002: Annual smoking-attributable mortality, years of potential life lost, and economic costs: Office on smoking and health (OSH): CDC [homepage on the Internet]. [cited 9/29/2009]. Available at: http://www.cdc.gov/tobacco/data_statistics/mmwrs/byyear/2002/mm5114a2/highlights.htm.

33. Tenth Special Report to Congress on Alcohol and Health from The Secretary of Health and Human Services. DHHS Publication. June 2000;No. 00-1583.

34. Gold MR, Siegel JE, Russell LB, et al. *Cost-effectiveness in Health and Medicine*. New York, NY: Oxford University Press; 1996.

35. Woody GE, Poole S, Subramaniam G, et al. Extended versus short-term buprenorphine-naloxone for treatment of opioid addicted youth: a randomized trial. *J Am Med Assoc.* 2008;300:2002–2011.

36. Subramaniam GA, Stitzer ML, Woody G, et al. Clinical characteristics of treatment-seeking adolescents with opioid versus cannabis/alcohol use disorders. *Drug Alcohol Depend.* 2009;99:141–149.

37. Polsky D, Glick HA, Yang J, et al. Cost-effectiveness of extended buprenorphine-naloxone treatment for opioid-addicted youth. *Data from a Randomized Trial.* 2010;105:1616–1624.

      © 2011 Lippincott Williams & Wilkins

PPLPC018000486064

REDACTED

# EXHIBIT 203 – 216

# (redacted)

REDACTED

# EXHIBIT 217

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5

6    PURDUE PHARMA L.P., ET AL.        Case No. 19-23649-rdd

7

8              Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12                    U.S. Bankruptcy Court

13                    300 Quarropas Street

14                    White Plains, New York 10601

15

16                    November 19, 2019

17                    10:31 AM

18

19

20

21

22    B E F O R E :

23    HON ROBERT D. DRAIN

24    U.S. BANKRUPTCY JUDGE

25    ECRO:  NAROTAM RAI

REDACTED

Page 23

1   I can tell you I have -- I appreciate -- and these are the

2   uncontested ones.

3            MR. CONSLA:  The uncontested ones.  Correct.  The

4   contested ones are later in the agenda.

5            THE COURT:  Right.

6            I really only have two -- one question and one

7   issue.

8            MR. CONSLA:  Uh-huh.

9            THE COURT:  Let's put it that way.  On the law

10  firms which include Dechert, King & Spalding for the

11  debtors, and Akin Gump and Bayard for the committee, I only

12  had one question, which is -- which I'll preface by saying I

13  actually welcome the notion that the committee decided to

14  hire Bayard not as a conflicts counsel, but as an efficiency

15  counsel, which is, I think, a nice way of saying a less

16  expensive counsel for matters that are appropriate.

17           But as far as the services that Bayard is

18  rendering, and I appreciate that they acknowledge that

19  they'll be doing the best they can not to duplicate efforts,

20  some are listed as being requested by Akin Gump and the

21  committee, some are listed as assisting Akin Gump and the

22  committee, and some are listed as working in conjunction

23  with Akin Gump and the committee.

24           And I'm just not sure what -- is there any real

25  distinction there?  I mean, how are they getting their

Page 178

C E R T I F I C A T I O N

We, Sherri L. Breach & Penny Skaw, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

Sherri L. Breach, Approved Transcriptionist

_____

Penny Skaw, Approved Transcriptionist

Date:  November 22, 2019

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

REDACTED

# EXHIBIT 218 – 228

# (redacted)