

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13              United States Bankruptcy Court

14              300 Quarropas Street, Room 248

15              White Plains, NY 10601

16

17              October 28, 2020

18              11:19 AM

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

Page 2

1    HEARING re Notice of Agenda / Agenda for October 28, 2020

2    Hearing

3

4    HEARING re Motion to Authorize / Motion of Debtors for Entry

5    of an Order Authorizing Implementation of a Key Employee

6    Incentive Plan and a Key Employee Retention Plan (ECF #1674)

7

8    HEARING re Objection to Motion For Order Authorizing

9    Implementation of a Key Employee Incentive Plan and a Key

10   Employee Retention Plan (related document(s)1674) filed by

11   Paul Kenan Schwartzberg on behalf of United States Trustee

12   (ECF #1708)

13

14   HEARING re Objection to Motion (related document(s)1674)

15   filed by Paul A. Rachmuth on behalf of Ad Hoc Committee on

16   Accountability (ECF #1709)

17

18   HEARING re Memorandum of Law In Support of Ad Hoc Committee

19   on Accountability's Objection to Debtors' Motion to Pay

20   Bonuses (related document(s)1674) filed by Paul A. Rachmuth

21   on behalf of Ad Hoc Committee on Accountability (ECF #1710)

22

23

24

25

Page 3

1   HEARING re Debtors' Omnibus Reply in Support of Motion of

2   Debtors for Entry of an Order Authorizing Implementation of

3   a Key Employee Incentive Plan and a Key Employee Retention

4   Plan (related document(s)1674) filed by Eli J. Vonnegut on

5   behalf of Purdue Pharma L.P. (ECF #1742)

6

7   HEARING re Motion to Shorten Notice with Respect to Motion

8   to Confirm that Payment by the Sackler Families under

9   Settlement with the United States Department of Justice is

10  not Prohibited by This Court filed by Gerard Uzzi on behalf

11  of The Raymond Sackler Family (ECF #1832)

12

13  HEARING re Motion to Confirm that Payment by the Sackler

14  Families under Settlement with the United States Department

15  of Justice is not Prohibited by this Court filed by Gerard

16  Uzzi on behalf of The Raymond Sackler Family (ECF #1883)

17

18  HEARING re Statement Regarding and Limited Objection to

19  Notice by the Sackler Families of Settlement with the United

20  States Department of Justice and Motion to Confirm that

21  Payment by the Sackler Families Under Settlement with the

22  Department of Justice is not Prohibited by this Court

23  (related  document(s)1833) filed by Ira S. Dizengoff on

24  behalf of The Official Committee of Unsecured Creditors of

25  Purdue Pharma L.P., et al. (ECF #1856)

1   HEARING re Motion to File Proof of Claim After Claims Bar

2   Date (Backup document was not filed/Personal Injury Proof of

3   Claim filed by James Harry Rand (ECF #1664)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 5

```
 1   A P P E A R A N C E S :

 2

 3   DAVIS POLK & WARDWELL LLP

 4        Attorneys for the Debtor

 5        450 Lexington Avenue

 6        New York, NY 10017

 7

 8   BY:  MARSHALL HUEBNER (TELEPHONICALLY)

 9        JAMES MCCLAMMY (TELEPHONICALLY)

10        CHRISTOPHER ROBERTSON (TELEPHONICALLY)

11

12   PILLSBURY WINTHROP SHAW PITTMAN LLP

13        Attorneys for Ad Hoc Non-Consenting States

14        31 West 52nd Street

15        New York, NY 10019

16

17   BY:  ANDREW TROOP (TELEPHONICALLY)

18

19   EISENBERG & BAUM, LLP

20        Attorneys for Ad Hoc Committee on Accountability

21        24 Union Square East

22        New York, NY 10003

23

24   BY:  MICHAEL QUINN (TELEPHONICALLY)

25
```

Page 6

```
 1    MILBANK

 2          Attorney for Sackler Family

 3          55 Hudson Yards

 4          New York, NY 10001

 5

 6    BY:  GERARD UZZI

 7

 8    U.S. DEPARTMENT OF JUSTICE

 9          Attorney for the U.S. Trustee

10          86 Chambers Street

11          New York, NY, 10007

12

13    BY:  LAWRENCE FOGELMAN

14

15    ALSO PRESENT TELEPHONICALLY:

16

17    DANIELLE GENTIN-STOCK

18    JOSEPHINE GARTRELL

19    LOWELL FINSON

20    SHEILA BRINBAUM

21    SARA BRAUNER

22    HAYDEN COLEMAN

23    SETH MEYER

24    CHRISTOHPER ROBERTSON

25    SARA ROITMAN
```

Page 7

```
 1   ALEX DRAVILLAS

 2   JASMINE BALL

 3   JEFFREY ROSEN

 4   NATASHA LABOVITZ

 5   EMILY F. MACKAY

 6   MAURA MONAGHAN

 7   DANIEL E. STROIK

 8   HAROLD WILLIFORD

 9   ADAM HABERKOM

10   MARC SKAPOF

11   CHRISTOPHER PERKINS

12   PETER ARONOFF

13   MARC HIRSCHFEILD

14   BROOKS BARKER

15   MITCHELL P. HURLEY

16   ANN LANGLEY

17   KEVIN MACLAY

18   ARIK PREIS

19   CHRISTOPHER SHORE

20   MICHELE MEISES

21   CYRUS MEHRI

22   HUNTER BLAIN

23   GREGORY JOSEPH

24   BENJAMIN KAMINETZKY

25   NICHOLAS PRETY
```

Page 8

1    HARRISON CULLEN

2    KENNETH H. ECKSTEIN

3    JEREMY KLEINMAN

4    RAMON NAGUIAT

5    M. VIOLA SO

6    KATIE STADLER

7    JAMES STEMPLEL

8    BARBARA VAN ROOYAN

9    ANNE WALLICE

10   CATRINA SHEA

11   DENNIS CHU

12   MARIA CHUTCHIAN

13   MEGAN KAPLER

14   MARA LEVENTHAL

15   PAUL ROTHSTEIN

16   DONALD CREADORE

17   CYNTHIA MUNGER

18   STEVEN SKALTE

19   KELSEY MCELVEEN

20   JAKE HOLDREIGHT

21   AISHA RICH

22   OREN LANGER

23   RONALD BASS

24   JOSHUA KARSH

25   SCOTT BICKFORD

Page 9

1 ARTEM SKOROSTENSKY

2 DIETRICH KNAUTH

3 JEFFREY GARFINKLE

4 BRANDAN MONTMINY

5 SHARA CORNELL

6 PAUL SCHWARTZBERG

7 HAYLEY THEISEN

8 SCOTT FLAHERTY

9 NANCY GOLDIN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2              THE COURT:  Good morning.  This is Judge Drain.

3    We're here today exclusively on In Re Purdue Pharma L.P. et

4    al.  This is a completely telephonic hearing.  You should

5    identify yourself, therefore, the first time you speak and

6    if you're lawyer, you should identify your client.  It's

7    probably a good idea to do so thereafter just to make sure

8    that the court reporter can put together your voice with

9    your name.

10             Because this is a telephonic hearing, you should

11   keep yourself on mute unless you're speaking at the time, of

12   course, you should unmute yourself.  There's one authorized

13   recording of these hearings.  It's being taken by Court

14   Solutions.  They provide a copy to our clerk's office on a

15   daily basis.  If you want to order a transcript, you should

16   contact the clerk's office to arrange for the preparation of

17   one.

18             So with that introduction, I'm happy to go down

19   the agenda for today's hearing which actually now is an

20   amended agenda that added a couple of matters.  So why don't

21   proceed in that fashion?

22             MR. HUEBNER:  Sure.  Good morning, Your Honor.

23   For the record this is Marshall Huebner of Davis Polk and

24   Wardwell on behalf of the Debtors.  Can the Court and others

25   hear me clearly?

Page 11

1          THE COURT:  Yes.

2          MR. HUEBNER:  Terrific.  Good Morning, Your Honor.

3          So before we get to the agenda letter, I have

4   given the Court and the parties updates on material

5   developments and I think every omnibus hearing that sort of

6   stay with the case, it's pretty typical in mega Chapter 11

7   cases.  And there has, of course, been a very material

8   development in these cases since we last were before Your

9   Honor, which is the company's civil and criminal resolution

10  with the DOJ.

11         This motion is on for approval on November 17th,

12  so I will, of course, in no way, shape or form advocate for

13  the deal today.  Today is not that day, but I think it is

14  appropriate to say just a small number of things by way of

15  update, especially because this is obviously a case of great

16  public interest and many media outlets have hopefully

17  inadvertently misdescribed the settlement reached and the

18  articles range, frankly, to extremes on both ends.

19         At one point the banner lead headline on CNN said,

20  the settlement will "close the company," and there are other

21  articles at the other end saying that it's a mirage of a

22  deal with no consequences for Purdue.  So I'm just going to

23  lay out --

24         MR. TROOP:  Your Honor.  Your Honor.  I'm sorry,

25  Mr. Huebner.  Your Honor, this is Andrew Troop from the Non-

Page 12

1    Consenting States at Pillsbury Winthrop.

2           I think where Mr. Huebner started, which is that

3    he's updated the Court with regard to a material event in

4    this case, is perfectly fair, but to respond to public

5    statements made outside of the courtroom with respect to the

6    mistakes that had been reported in those -- and you didn't

7    see my air quotes, Your Honor -- mistakes that have been

8    reported in those media outlets is by definition, we all

9    would understand it, an effort to set the stage for a

10   hearing on a motion that's not on today.

11          And at least I for one have not considered at all

12   that that kind of detail would be reported at this hearing.

13   Nor, Your Honor -- and therefore I'm not prepared to respond

14   to it.  And I don't think that that's an appropriate

15   posture.

16          I also don't think it's necessary, Your Honor,

17   between now and the time of the hearing on the 17th

18   objections, if any, will be filed, replies will be filed,

19   and the table will be set for you in connection with that

20   particular motion.

21          So rather than take time to do that today, I would

22   ask Mr. Huebner to rest on where he is, and that is he

23   believes that public reports are inaccurate, I think

24   implicit in that is that he is telling the public and the

25   press go read what's on file, and that we move on to the

1    substance of today's hearing.

2            MR. HUEBNER:  Okay.  Your Honor.

3            MR. TROOP:  I apologize for the interruption.

4            THE COURT:  Well, it always is -- let me just

5    break in.  It always is good to read what's on file, but I

6    think really, Mr. Huebner, I think that the record's clear

7    that that motion is on file for November 17th.  If there are

8    other events in the case that you need to update us on

9    that's fine, but I'm not sure anything more needs to be said

10   on the DOJ Purdue Settlement which was announced last week

11   and where the Debtor's have made the motion for approval

12   that's on for the 17th.

13           MR. HUEBNER:  Your Honor, the truth is, my remarks

14   actually were briefer than Mr. Troop's interruption, and I

15   actually was going to be extraordinarily careful to merely

16   lay out a few facts that I think are of great importance to

17   the public.  And I certainly was not going to refer to

18   either any statement of any other party or any statements to

19   the media or anything like that.  That was merely explaining

20   why in a case of great public interest I thought that saying

21   six facts about the settlement and then moving directly on

22   to the hearing was important.

23           That said, obviously, it all actually is in the

24   motion, I think more or less, just there, you know, because

25   the case has so much public interest and it's on the front

Page 14

```
 1   page of the paper so frequently because people are getting

 2   things just wrong wrong and it's affecting public discourse,

 3   we thought a few facts would be useful, but obviously I'm

 4   happy to take the Court's direction.

 5            I do want the Court to understand though, because,

 6   you know, it is always integrity above all else, that

 7   nothing that -- I have one page or so of notes I would be

 8   going through or will go through based on the Court's

 9   pleasure is any advocacy at all.  It is literally 1, 2, 3,

10   4, 5, 6, just facts, now I'll let us move on.

11            So according to you just, Your Honor, tell me what

12   you would prefer.  I'm delighted to stick to that very

13   tightly and carefully thought out sort of set of things that

14   I think would be useful or I'm happy to move on.

15            THE COURT:  Okay.  Well, I would prefer, I guess,

16   Mr. Huebner, that reporters that are following this story I

17   assume will do their job, and if they want to verify what

18   they previously reported or want to report on this further

19   they'll go to the source which is the underlying

20   documentation.  And we have to rely on them to do that.  So,

21   you know, the ones that do that, I assume people will read

22   more of than the ones don't at least eventually.  And why

23   don't we leave it at that?

24            MR. HUEBNER:  Sure.  Happy to do so, Your Honor.

25   So then let me move on to the first motion on for today,
```

Page 15

1    which is the key employee incentive motion.

2              As Your Honor, of course, remembers, the vast

3    majority of this motion has been consensually resolved at

4    the prior hearing, and we adjourned the motion with respect

5    to the insiders.  I think our filing of a few days ago makes

6    clear we are in a very good place for today on those.

7              The original motion sought approval as to the

8    insiders for a KEIP, a key employee retention program that

9    was actually was going to replace both of the historical AIP

10   and the historical LTIP programs that constituted, in fact,

11   decades' long, annual incentive programs for any of the

12   insiders.

13             Between the filing of that motion and this

14   hearing, two of those eight insiders actually resigned from

15   the company, getting us down to six.  Of the remaining six,

16   the Debtors are still in dialog with the creditor

17   constituencies as to the CEO and CFO, but have reached

18   agreement, which is up for today, on the other four.

19             With respect to the other four, one quick

20   housekeeping point, which will sound very familiar because

21   we did a similar thing at the last hearing, we've confirmed

22   with the creditor stakeholders that the Debtor's three

23   supporting declarations, one from John Lowne, and two from

24   Josephine Gartrell, one of which was filed on Monday and the

25   prior one was admitted into evidence at the last hearing on

Page 16

1   September 30th, will be likewise admitted into evidence or I

2   guess this may be a continuation of a hearing, so maybe the

3   last two already are in evidence and then only the new one

4   needs to come in, and so I would like to move those

5   admissions, but then, just like last time, it is completely

6   understood and agreed that while nobody obviously has any

7   interest in cross-examining the witnesses today, and today

8   it's fully consensual, the admission and having those

9   declarations serve as evidence for today's order is without

10  any prejudice of any kind to any objector's rights to cross-

11  examine them or otherwise should we have a contested hearing

12  on the two remaining insiders next month.

13          So, Your Honor, I think that was agreed to

14  everybody and I hope and trust that since it's the same

15  thing we did at the last hearing, that that is acceptable to

16  the Court.

17          THE COURT:  Okay.  Yes, it is acceptable, and I

18  have read Ms. Gartrell's October 26th, 2020 supplemental

19  declaration and don't have questions for her on it.  So I

20  will have it admitted as a supplement to her prior

21  declaration and as part of her direct testimony in

22  connection with the remaining portion of the Debtor's

23  KEIP/KERP motion.

24          MR. HUEBNER:  Terrific.  Thank you, Your Honor.

25  With respect to the resolution that was reached, as we laid

Page 17

1    out in our supplemental statement, although the original

2    proposal (indiscernible) the KEIP motion already reflected a

3    reduction to the amount that would have been paid under the

4    AIP and LTIPs, further reductions were agreed to as set

5    forth in the supplemental statement of both financial

6    reductions, date changes and the like that were requested by

7    and negotiated successfully with the creditors.

8            As I hope the Court and all parties know well by

9    now, we try to listen to the views of all parties and to

10   adjust and respond and resolve.  But candidly, we listen to

11   the views of the Court even a little bit more than we listen

12   to the views of everyone else.

13           So as Your Honor noted at the last hearing you,

14   "wanted to know about the industry standard," "whether the

15   incentives are properly targeted," and noted that it would,

16   "benefit from the focus on the market of the Debtor's

17   competitors."

18           Of course it was not lost on Your Honor I'm sure,

19   that just a couple of paragraphs later in the supplemental

20   statement, you'll see that in essence the deal, at least

21   with the UCC the Ad Hoc Committee, the Non-Consenting States

22   and the MSGE and to which the U.S. Trustee and the Ad Hoc

23   Committee on Accountability, agreed not to press their

24   objection further moves the annual compensation for the four

25   relevant insiders for today to the midpoint of the 50th and

1    75th percentiles of the Willis Towers Watson Company and

2    Market Data for (TVC?), except for the general counsel who

3    has frankly been acknowledged by everybody to be a special

4    situation given Purdue's circumstances.

5            So this was laid out in paragraphs 10 and 11 of

6    our supplemental statement, which was previewed and actually

7    edited by both the UCC and the Non-Consenting State Group

8    before we filed it.

9            It also aligns with the sworn evidence and

10   testimony presented both last year and this year and, of

11   course, with the original approach in our motion and

12   declarations.  And again, to be clear with Your Honor's

13   September 30th request, we think we had already, in fact,

14   taken that exact approach and the original sort of comps and

15   the like were, you know, the Debtor's competitors and

16   looking at the Pharma market to the best of Willis Powers'

17   expert ability, but we sort of double downed on that in the

18   final lap and in the resolution.

19           So given that that is uncontested, I don't want to

20   burden the docket or the expense of this case with anything

21   more about it.  We are grateful because we know that these

22   are not simple issues, and that many parties with widely

23   divergent views on a variety of topics worked very

24   productively with us to get this done.  And we will continue

25   to work to hopefully resolve or at least substantially

Page 19

1    narrow the very few remaining issues on 2020 compensation in

2    advance of the November 17th hearing where anything that is

3    left will be addressed.

4              So unless the Court has any questions, it's a

5    fully consensual order negotiated both at the form and

6    substance and we ask that it be entered.

7              THE COURT:  Okay.  Does anyone have anything

8    further to say on this matter as currently sought by the

9    Debtors on agreement with the former objectors and those who

10   had reserved their rights?

11             Okay.  I had previously granted a portion of the

12   Debtor's motion with respect to the KERP and KEIP proposed

13   by them and heard last month .  What was reserved was the

14   portion of the motion that sought approval of a KEIP, K-E-I-

15   P for eight senior executives under Section 503(c) of the

16   Bankruptcy Code and 363(b) to the extent that it is

17   incorporated in Section 503(c)(3).

18             The motion is currently unopposed as to the four

19   executives who are covered in respect of the release sought

20   by the Debtors today.  Two of the executives who had

21   originally been reserved on have since resigned their

22   positions, and two are still under discussion and will be

23   heard -- or the motions for request for relief will be heard

24   at a future date.

25             The law in this area is relatively clear.  The

Page 20

1    Congress, in Section 503(c)(1), effectively barred transfers

2    to or obligations incurred for the benefit of an insider of

3    the Debtor for the purpose of inducing such person to remain

4    with the Debtor's business.

5              The courts have long recognized that all

6    compensation, to some extent, causes a person to remain in

7    their employment.  Obviously, if you're not compensated at

8    all or if you're undercompensated, you tend to want to look

9    for other employment that will compensate you or will

10   compensate you at market or at least consider it.

11             So courts have placed a qualifier, which isn't

12   specifically in the statute, although it could be certainly

13   implicit in the word "purpose" of primary, see In Re Global

14   Home Products, LLC; In Re: Nellson Nutraceutical, Inc. 369

15   B.R. 787, (Bankr. D.Del. 2007).  I'm sorry, citing In Re

16   Nellson v. Nutraceutical, Inc.

17             The court also rec --, I mean, the Bankruptcy Code

18   also recognizes in Section 503(c)(3) that other transfers or

19   obligations that are outside the ordinary course of business

20   will not be approved if they are not justified by the facts

21   and circumstances of the case.

22             The courts have generally, including in the Second

23   Circuit, said that the "justified by the facts and

24   circumstances of the case" language from the statute sets a

25   standard really no different than the standard under Section

Page 21

1   363(b) of the Bankruptcy Code, i.e. is the proposed

2   compensation program a proper exercise of business judgment

3   in light of the facts and circumstances of the case.  See In

4   Re Velo Holdings, Inc. 472 B.R. 201-212, (Bankr. S.D.N.Y.

5   2012) and In Re Dana Corp 358 B.R. 567, 576-77 (Bankr.

6   S.D.N.Y 2006).

7           This is not the corporate law business judgment

8   standard where the court is deferential to the Board's

9   judgment unless a conflict of interest or lack of due care

10  is shown.  Rather ultimately, it's the bankruptcy court's

11  judgment informed by the position taken by the Debtor and

12  any objections.

13          In the absence of objections, after due notice,

14  one assumes though that the parties having been properly

15  informed agree with the Debtor's business judgment and the

16  court's review, although not eliminated, takes that into

17  account.

18          In the Dana case that I've cited, Judge Lifland

19  observed that there were a number of factors the court

20  should consider in evaluating the business judgment of

21  making such a decision.  Namely is there a reasonable

22  relationship between the plan proposed and the results be

23  obtained by either the plan calculated to achieve the

24  desired performance, is the cost of the plan reasonable in

25  the context of Debtor's assets, liabilities and earning

Page 22

1    potential?  Is the scope of a plan fair and reasonable, i.e.

2    who does it apply to and does it unfairly discriminate?

3    This often comes up in the context of cases where a plan is

4    proposed at the same time that the Debtor is either cutting

5    jobs or cutting compensation or seeking to modify collective

6    bargaining agreements, which isn't the case here.

7            Another factor is, is the plan or proposal

8    consistent with industry standards.  Related to that is what

9    were the due diligent efforts of the Debtor in investigating

10   a need for a plan, and what is generally applicable in the

11   particular industry, and when did the Debtor received

12   independent counsel in performing that due diligence, and in

13   creating and authorizing the compensation program?

14           Often these cases focus on the incentive element

15   of the plan and whether the incentives proposed are, in

16   fact, truly difficult to reach, or at least incentivize

17   employees to work more than beyond the normal job that they

18   would be expected to do, but it's important to note that

19   Congress did not limit Section 503(c)(3) compensation to

20   incentive plans.

21           And I believe that it is important to focus as

22   much, if not more, on whether the plan is consistent with,

23   subject to the circumstances of the particular case,

24   industry specific standards as opposed to bankruptcy case

25   specific standards.

Page 23

1           And I did have questions about that in connection

2     with the original proposal.  And I think the parties have

3     addressed those questions as well as performing their own

4     due diligence on how the proposed compensation fits in the

5     context of this particular case.

6           Having reviewed the declarations by Ms. Gartrell,

7     including the supplemental declaration, it appears to me

8     that the revised proposal does place these executives in the

9     middle of industry compensation for people performing jobs

10    like theirs, with one exception, which I'll come back to.

11          What had not been addressed previously, and I

12    think was important to address here, is that often in non-

13    bankrupt companies, a significant portion of executive's

14    compensation comes in the form of stock, which has both its

15    risks and its rewards.  Stock can appreciate considerably in

16    value and also can turn out to diminish in value or even be

17    worthless.

18          In bankruptcy cases because the stock itself often

19    is not appreciating at all or may, in fact, be worthless,

20    compensation is adjusted to be in the form of cash.  That

21    provides a certain recovery, but also limits the upside

22    beyond the certain recovery which industry-wide stock awards

23    provide.

24          I think Ms. Gartrell addresses this dynamic

25    appropriately in her supplemental declaration.  I'm noting

Page 24

1    that, of course, there's no upside here, but also reflecting

2    that the discounts agreed to are taking into account the

3    added value of having a certain return in the form of cash.

4    Where the truly incentive nature of the compensation is

5    harder to peg, i.e., there's a dispute over whether the

6    targets are hard to reach or not.  I think that type of

7    analysis is very important in these types of motions, trying

8    to put the program in the context of industry standards,

9    taking into account the fact that the form of consideration,

10   which is cash, is different than is usually a significant

11   element of the consideration in the industry as a whole,

12   which is stock.

13          I think the Debtors and the other parties have

14   done that here, and therefore, I find that the motion

15   satisfies 503(c)(3) with regard to the three executives who

16   are at the midpoint or roughly at the midpoint as detailed

17   by Ms. Gartrell's supplemental declaration.

18          With regard to the Debtor's general counsel that

19   person was brought on fairly late in the day to help the

20   Debtors manage the enormous amount of litigation pending

21   against them pre-bankruptcy as well as now in the bankruptcy

22   case.  That person's job description it appears clear to me

23   is not comparable to other general counsel in this industry,

24   requires more expertise and more work, frankly, and I think

25   the parties in interest have recognized that as well in not

Page 25

1   objecting to the general counsel's proposed compensation

2   package as set forth in the agreed revisions here which is

3   over market for general counsels generally in this industry,

4   but reflects the added duties and expertise that a general

5   counsel has.

6           So I will grant the motion as it applies to these

7   four people.  You can email the agreed form of order to the

8   Court as noted in the prior hearing.  That agreed form of

9   order has a disgorgement provision in it beyond the normal

10  disgorgement provision for leaving other than being

11  terminated without cause in the periods prescribed which

12  covers the possibility of the employee being later found

13  liable for criminal or other conduct as laid out in the

14  order which is appropriate to highlight here.

15          So Mr. Huebner, you can email that order to

16  chambers.

17          MR. HUEBNER:  Thank you, Your Honor.  And, Your

18  Honor, thank you in particular for the last point, which I

19  probably should have affirmatively noted.  Any compensation

20  order that we serve up to this Court is going to have that

21  language in it.  That language, as the Court surely

22  remembers, was negotiated extensively last year with the

23  core parties.  I think the Court itself had some reflections

24  on it.  It was based off of language that had been agreed to

25  and we think it is entirely appropriate.  And obviously if

1    that standard is triggered the consequences is provided in

2    the order for behavior to rise to that level will have the

3    consequences that they do.  So thank you.

4           Your Honor, as to the Debtors I would note that,

5    yet again, we have brought you an uncontested hearing,

6    despite the extreme complexity to say the least of this

7    case.  The other matter of the Debtors on for today is that

8    of Mr. Rand, who Court may remember from the prior hearing

9    who patiently listened to all of us drone on forever until

10   he finally got a chance to speak.

11          Let me turn that over to Mr. McClammy and then

12   I'll take the podium back for just a minute, and then I

13   think turn it over, I think, to Mr. Uzzi, since the only

14   other motion on for today is going to be his.

15          THE COURT:  Okay.  Very well.  And just for the --

16   again, for the record what we're going to deal with now then

17   is the motion by James Rand to toll or toll his deadline to

18   file a proof of claim in this case beyond the extended

19   filing deadline of July 30, 2020.  He had asked to appear

20   even though he's incarcerated, and that creates some

21   difficulty.  He was going to arrange for him to appear.  Mr.

22   Rand are you on the phone?

23          Okay.  I don't see him on the hearing dashboard.

24   I know that we alerted him and Court Solutions last week and

25   this week and yesterday about the number to call and to hook

Page 27

1    him in, but I don't see him here.  But the agenda says that

2    this motion is uncontested, and there has been no objection,

3    so why don't I hear from Debtor's counsel?

4              MR. MCCLAMMY:  Thank you, Your Honor.  Good

5    morning.  This is Jim McClammy for the Debtors.

6              We have been in touch with the UCC and others

7    regarding this motion and it was agreed to reach out to to

8    Mr. Rand to see if we could, you know, enter a stipulation

9    essentially resolving the motion by allowing for the filing

10   late, but reserving all other rights with respect to the

11   claim.

12             We've made a number of attempts to contact Mr.

13   Rand and his counselor, but, as Your Honor notes, there are

14   some difficulties given his incarceration and have not been

15   able to reach him directly.

16             With Your Honor's permission, I think perhaps the

17   best way to proceed is we've sent the proposed stipulation

18   to Mr. Rand and his counselor.  We hope that they will be

19   able to review that and sign off, hopefully in short order

20   at which point, if the Court is amenable, we could this

21   perhaps by notice of presentment and have it resolved that

22   way.

23             THE COURT:  Well, can I ask you a couple of

24   questions first?  Has he filed a proof of claim?

25             MR. MCCLAMMY:  Yes, so there is a proof of claim

Page 28

```
 1    that has been filed.

 2           THE COURT:  Okay.  I thought he was proceeding pro

 3    se.  Certainly, what he filed was pro se; does he have a

 4    lawyer?

 5           MR. MCCLAMMY:  We're not aware of an attorney.  I

 6    believe he may have mentioned an attorney on his -- on the

 7    call, but he has a counselor at the penitentiary who also, I

 8    guess, assists with getting information to him.

 9           THE COURT:  Well, I mean, look, if the Debtors,s

10    having consulted with the committee and others, and there

11    being no objection to the motion, maybe the better way to

12    deal with this is just for you to submit an order granting

13    the motion, deeming the claim timely filed, but reserving

14    all other potential defenses or objections to the claim.

15           MR. MCCLAMMY:  We can do that, Your Honor.

16           THE COURT:  Okay.  And then you can just mail that

17    to him.  I mean, the rationale for that is that, unlike I'm

18    assuming the vast majority of people and editors that filed

19    claims in this case, Mr. Rand states that he was

20    incarcerated and unable to meet the filing deadline because

21    of quarantine in his prison.

22           MR. MCCLAMMY:  That's exactly right.

23           THE COURT:  Rather than spend the money to further

24    investigate that and to have an evidentiary hearing on

25    whether he would have been able to mail a claim in on a
```

1    timely basis, the Debtor's in consultation with the

2    committee are prepared to deem it timely filed.  Subject, of

3    course, to all other potential objections, which is, I

4    believe a reasonable resolution here.

5             Although it shouldn't be taken as a open door to

6    other claimants that they will have their motions to be in a

7    claim timely filed, notwithstanding it was filed after the

8    bar date to be granted or agreed to.

9             So I'll look for that order and you can copy him

10   on the -- I think he has access to a computer at some point.

11   You can copy him on the email.

12            MR. MCCLAMMY:  We'll do, Your Honor.  Thank you

13   very much.

14            THE COURT:  Okay.  Thank you.

15            MR. MCCLAMMY:  With that, I'm turning it back over

16   to Mr. Huebner.

17            THE COURT:  Okay.

18            MR. HUEBNER:  So Your Honor the other issue, you

19   know, originally, we were headed for two, you know,

20   potentially non-trivial disagreements of today's hearing on

21   the Debtors side.  One obviously is the KEIP, which we just

22   finished discussing was resolved.  The other are the

23   committee's motions with respect to privileged or, as they

24   say, purportedly privileged documents and our motion for a

25   protective order.

Page 30

```
 1              As Your Honor knows, that has now been determined

 2      at the committee's request pursuant to a form of stipulation

 3      that various parties have agreed to, and so, you know, just

 4      so the Court knows and the parties know, like on all issues,

 5      we are working on a potential resolution for that.  I don't

 6      know if we'll get there.  I won't say more than that, but we

 7      certainly understand leaving (indiscernible) to merits of

 8      either motion, we do understand that the views and the

 9      merits of various parties and their requests and desires to

10      see documents.

11              In that regard, Your Honor, there is one small

12      thing I do want to say, which is nothing about that fight

13      has any connection of any kind to the representation and

14      commitments and promises that the Debtor's have repeatedly

15      made to a post-emergence repository of documents.  And I

16      just, I do want everyone to understand that and

17      (indiscernible).  We made those promises.  I actually went

18      back and checked late last night, on October 11, 2019,

19      November 6th, 2019, June 3rd, 2020, and July 23rd, 2020, and

20      I do it again today.  There will be a large, meaningful,

21      fully public repository of documents in this case when it is

22      over as these companies emerge.  So none of that is on for

23      today, but I don't want there to be confusion that that goal

24      that we have promised the world and this Court for over a

25      year is in anyway affected by the Committee's motions or the
```

Page 31

1    Debtor's cross motion for a protective order.

2         With that, Your Honor, let me turn the podium to

3    Mr. Uzzi, since the only contested motion is his.

4         THE COURT:  Well, let me say one more thing on

5    this.  I think, I mean, I sent the stipulation in that

6    resolved the adjournment of the motion.  I assume it's been

7    entered.  And importantly that stipulation provided that the

8    discovery is still ongoing.  There's no adjournment of the

9    discovery itself just of the motion with respect to the

10   privilege issues.

11        And the parties have also represented to me, and I

12   fully believe them of course having dealt with them for over

13   a year, that alongside of that process they're also fully

14   committed to the ongoing mediation.  And those were really

15   the conditions I think that are important conditions to the

16   adjournment.  And I do hope that the parties continue to

17   discuss the issues raised by the motion, but if not fully

18   resolved, of course we'll hear it on the adjourn date.

19        So why don't we then turn to the last matter on

20   today's calendar which is really a matter in two parts.  The

21   first is the motion by the -- well, I'll just refer to it

22   generically as the Sackler's, for an order granting

23   shortened notice of the consideration of the second part,

24   which is the Sackler's motion "to confirm the payment by the

25   Sackler family under their settlement with the DOJ or with

Page 32

1    the United States Department of Justice is not prohibited by

2    this Court's prior orders."

3              MR. UZZI:  Yes, Your Honor.  Oh, sorry.

4              THE COURT:  I'm sorry.  I'm not sure who's

5    speaking for the Sacklers, but you can go ahead with those.

6              MR. UZZI:  Yes, Your Honor.  It's Gerard Uzzi of

7    Milbank.  Can you hear me okay?

8              THE COURT:  Yes, I can hear you fine.  Thank you.

9              Mr. UZZI:  All right.  Thank you, Your Honor.  As

10   you know, we represent the Raymond Sackler family, also

11   known as the Side B.  Debevoise represents the Mortimer

12   Sackler family also known as Side A.  I'm going to speak

13   first, Your Honor.  Together the two sides of the family, we

14   refer to them as the Sackler families for the purpose of the

15   motion, you know, I will present the motion, Your Honor, on

16   behalf of both Sackler families.  And so my remarks will be

17   made in that context unless I, you know, state otherwise.

18              I'd first like to thank Your Honor for granting us

19   the opportunity to present the motion to shorten.  To put it

20   in its proper context, I would like to address at least

21   preliminarily some of what we're trying to address in the

22   underlying motion that is seeking this Court's confirmation

23   that we are allowed to make the payments as stated to the

24   DOJ.  And to do so I think I need to not only address what

25   the motion is asking for, but what it's not asking for.

Page 33

1           I start, Your Honor, with why we are even here

2    today.  And we're here today because of what we believe is

3    good news, at least good news in the context of moving these

4    cases forward and moving these cases forward is something

5    that all major parties in interest have expressed a desire

6    to do.

7           One of the issues that not only the Sacklers have

8    identified as a gaiting issue in these cases, but all the

9    material parties have identified as a gaiting issue in these

10   cases is, you know, where do things stand with the DOJ?

11   Well, the Sackler families have been able to reach an

12   agreement with the DOJ.  That agreement was made public by

13   the DOJ and it's otherwise attached to our underlying

14   motion, which is Docket Number 1833.

15          Pursuant to that agreement the Sackler families

16   are required to make a payment in the aggregate of $225

17   million to the DOJ.

18          So what we are here today, Your Honor, on is a

19   very narrow request of this Court to confirm that no prior

20   order of this Court prohibits that payment.  What we're not

21   asking to do, Your Honor, is we're not asking this Court to

22   approve the terms of the settlement with the DOJ or to say

23   from the Sackler's perspective that this is a good or a fair

24   settlement, this is not a 9019 motion.

25          We are mindful, however, Your Honor, of this

Page 34

1     Court's injunction, comments that the court has made and

2     others with respect to the injunction and, most importantly,

3     what we refer to as the anti-secretion language that has

4     been incorporated in the injunction.  And that anti-

5     secretion language provides in pertinent part that during

6     the injunction and for a brief period afterwards

7     (indiscernible) that the Sacklers will not take any action

8     with respect to any material amount of their property that

9     would have the material affect of frustrating enforcement of

10    any potential judgment of this Court.

11          So again, and I'll be a little bit of a broken

12    record on this, Your Honor, we're here on that narrow issue

13    of just simply whether that anti-secretion language

14    prohibits our payment to the DOJ.  We're not asking for a

15    broader interpretation of that language, just simply whether

16    the payments are prohibited.  And on the chance that the

17    Court does believe that the payments are prohibited by that

18    language, then we ask the Court to grant us relief from that

19    language.

20          We filed our motion to shorten and the underlying

21    motion at about 1:30 a.m. on October 22nd.  In accordance

22    with the case management order, prior to filing the motion

23    to shorten we sought consent of the Debtor's and the UCC.

24    And after the motion to shorten was filed, we sought the

25    consent of the Consenting Ad Hoc Group and and the Non-

Page 35

1    Consenting Ad Hoc Group.  The Debtors, the UCC and the

2    Consenting Ad Hoc Group have consented to the motion being

3    heard on short notice.  The Non-Consenting Group has taken

4    no position on the motion to shorten.

5         We have received one objection to the motion to

6    shorten and that's from the Ad Hoc Committee on

7    Accountability and that's Docket Number 1852.

8         As far as the motion to shorten goes, Your Honor,

9    first I think it's fairly indisputable that this is a

10   significant moment in these cases.  And we therefore thought

11   it appropriate to bring this settlement agreement or to

12   bring this fact, I should say, before the Court as soon as

13   we could.  And in normal cases, perhaps that wouldn't be as

14   necessary as we felt it was here, but we are mindful that

15   this is not a normal case, and we are mindful, Your Honor,

16   of the statements that are made outside of this Court that

17   do impact the positions that are taken in this Court.  And

18   we're particularly mindful of the statements regarding the

19   Sackler's efforts, motivations, and culpability with respect

20   to anything that they do.

21        And we were concerned that if we simply filed this

22   and let our motion linger to the next omnibus hearing, which

23   isn't until November 17th, without any commentary from us to

24   you, Your Honor, and your potential response, if you have

25   any, that that lingering could be counterproductive and

1    harmful to the process.  So we filed it first just simply as

2    a notice and the opportunity to have a conversation with

3    Your Honor.

4            But as far as the merits of shortening notice,

5    Your Honor, we are in mediation and going into the

6    mediation, the Court is well aware of the conversations we

7    had as to whether it makes sense to start now.  And one of

8    the debates that people have had is, well, we need to know

9    where the DOJ is and even the DOJ's observance of mediation,

10   you know, was a subject of discussion.

11           And so what we do -- and by we, I mean, what the

12   Sackler families do with the DOJ -- is a significant point

13   in the mediation, that's beyond dispute.  If it turns out

14   that we're not allowed to make this payment because of the

15   anti-secretion language, we should all know that sooner

16   rather than later.

17           And, you know, as far as conduct in the mediation

18   and I won't -- I will not comment, of course, Your Honor, on

19   where the mediation stands, but one thing we're mindful of

20   too, is positioning in mediation for other purposes.  That

21   is, you know, holding up our ability to consummate this if

22   leverage was sought or determined to provide leverage.  I

23   want to be clear, nobody has done that, Your Honor.  But we

24   didn't know whether that would be a possibility before we

25   filed the motion to shorten and we don't know if that could

1      possibly happen if we don't have this determined today.

2              I think it's important, Your Honor with respect to

3      the motion to shorten, that the substantive relief, the

4      request, while of upmost importance, and I'm not going to

5      diminish the importance, is actually very narrow.  And so

6      therefore, we believe that this something that can properly

7      be considered on shortened notice.

8              Finally, Your Honor we do note that the next

9      omnibus hearing is quite a crowded docket, therefore, for

10     efficiency purposes, we think it also makes sense to hear

11     the motion today.  Only the Ad Hoc Committee for

12     Accountability objects to the motion to shorten.  Their

13     objection, as we read it, is mostly an attack on the

14     Sacklers and it's and attack on the settlement.  And it

15     doesn't really address why more time is needed to consider

16     whether the preliminary injunction prevents the payment.

17             And, Your Honor, we're not surprised by the

18     attacks, we've heard them before, and I'm sure we'll hear

19     them again.  But if you look at the attacks, what they seem

20     to be saying is that this isn't a good settlement because it

21     doesn't punish the Sacklers enough or say it another away,

22     the Sacklers should be paying even more.

23             Well, I understand that emotional position, Your

24     Honor, but if we look at this in the context of what we're

25     trying to accomplish in this case, that is actually counter

Page 38

1    to the interest of the unsecured creditors.  It's not in the

2    best interest for the unsecured creditors here to the extent

3    they have valid claims to say, well, the DOJ should take

4    even more so that there's less available ultimately to the

5    unsecured creditors.

6           As far as the actual objection to shorten notice,

7    they state that we have shown no cause, but Your Honor, I

8    submit we have.  The mediation here is material, and I don't

9    think that can be on dispute.  And they actually don't say

10   we're wrong about that.  They just say, "that doesn't seem

11   right," and that's on page 10 of their brief.

12          Well, if we've established cause, as we submit we

13   have, their mere speculation to the contrary is not enough

14   to overcome that cause.  I think most instructively, Your

15   Honor, however, is that no other party has objected to the

16   shortening of notice, including those parties who have been

17   working very hard in the mediation, in the discovery and,

18   you know, trying to move this case forward.

19          Your Honor, I do have quite a bit more to say on

20   the underlying motion if we get to it, but that's all I have

21   with respect to the motion to shorten.  I'm, of course,

22   happy to answer any questions you may have.

23          THE COURT:  Okay.  I think most of my questions go

24   to the merits as opposed to the timing.  So I'm happy to

25   hear from the -- I'm assuming it's Mr. Quinn on behalf of

Page 39

1    the objectives.

2            MR. QUINN:  Good morning, Your Honor.  It's

3    Michael Quinn of Eisenberg and Baum for the Ad Hoc Committee

4    of Accountability.

5            The committee on accountability objects to the

6    motion to shorten notice.  As you know, Your Honor, the

7    presumptive practice in this district requires 14-days

8    notice prior to action on a matter.  While that period can

9    be shortened for cause, that cause must be good.  Here, the

10   cause the Sacklers offer is not sufficient and the reasons

11   to follow the regular rules are stronger.

12           It sounds like the Sackler's main argument for

13   expedited treatment seems to be that it will assist the

14   mediation.  That argument is not so compelling because

15   Purdue's motion and their DOJ settlements will be heard on a

16   regular schedule.  The mediation can accommodate hearing the

17   Sackler's motion on the regular schedule as well.

18           What's even more important here are the reasons to

19   apply the regular rule.  This case matters to a lot of

20   people.  There are significant questions about the Sackler's

21   motion, including questions about their finances, their

22   criminal liability, and how this motion fits into the larger

23   plan.  It would be wise to allow for the regular period to

24   address these issues.

25           Your Honor, I just have one last point.  News of

Page 40

```
 1    the settlement broke last week and it hit a lot of people

 2    very hard.  Over the weekend, my client, Barbara, messaged

 3    me, "Had a dream about Patrick last night for the first time

 4    in a very long time.  In the dream he was 12 years old.

 5    Bizarre, but what's been happening with Purdue and the

 6    Sacklers is so bizarre that I'm not so surprised.  Don't

 7    like dreaming about him as I always wake up feeling sad even

 8    if the dream was happy."

 9              Your Honor, we ask the Court follow the regular

10    rules regarding this motion.  Thank you.

11              THE COURT:  Okay.  Well, the objection, as you

12    noted Mr. Quinn, does raise or asked questions related to

13    the DOJ settlements.  I think we should answer a couple as

14    part of this first part of the hearing.

15              The first is, it appears quite clear to me from

16    the settlement itself, a copy of which is attached to the

17    underlying motion and is before the signature page is -- I'm

18    sorry -- let me just turn to it -- is 13 pages long, double

19    spaced -- that -- as stated in paragraph 8, "The following

20    claims of the United States are specifically reserved and

21    not relieved and among those claims is any criminal

22    liability," that's a quote.

23              So I think that question is actually answered by

24    the side of settlement and probably easily answered within

25    the five days of notice of this underlying motion.
```

1              I also think it is clear, although maybe not as

2    clear as that point, that the motion before me, the

3    underlying motion, is not a motion for approval of the DOJ

4    settlement.  That is a determination that the Department of

5    Justice acting on behalf of the United States made on behalf

6    of the United States and the Sacklers made between and among

7    themselves to resolve the claims of the United States

8    against them for civil liability as set forth in the

9    settlement.

10             So again, I am not being asked, nor could I, to

11   approve in an order that settlement.  It's just simply

12   outside the scope of my jurisdiction or what I am empowered

13   to do.

14             MR. QUINN:  Your Honor, I appreciate that.

15             THE COURT:  So -- well, I'm trying to -- this is

16   one of the problems with the telephonic hearing.  You can't

17   see that I'm just laying this out.  I'm not saying this to

18   criticize you.  I'm pointing out, in the context of this

19   motion to shorten, that I think those two points, which

20   might well be points that one would raise in respect to a

21   motion to shorten, are actually quite clear and therefore

22   don't need more time to elucidate.

23             There are other issues that I want to turn to now

24   that I've considered as to whether there needs to be more

25   time to be developed or for development so that those issues

Page 42

1    with respect to the underlying motion could be properly

2    addressed or whether they could be addressed today.

3           And I think that goes back to what the underlying

4    motion seeks.  And at the risk of repeating of what Mr. Uzzi

5    stated, I will say that it appears to me clear that the

6    motion, particularly as clarified by the proposed

7    modifications to the order, seeks either a determination

8    that paragraph 13 of the amended and restated case

9    stipulation among the official committee of unsecured

10   creditors and certain related parties, which people have

11   referred as to the K stipulation, which I so ordered on

12   November 20, 2019 largely in the context of a requested

13   further extension of the preliminary injunction, applies to

14   preclude the settlement payment to the DOJ by the Sackler

15   family.

16          Paragraph 13 says, prior to the date, that is 30

17   days after the expiration of the stay period, i.e. the

18   preliminary injunction, no covered party shall take any

19   action with respect to any material amount of his, her, or

20   its property that is located inside or outside of the United

21   States with the intent or material effect of frustrating

22   enforcement of any potential judgment of this Court and

23   these Chapter 11 cases or any other actions pending against

24   them in any other court or jurisdiction.

25          That paragraph, as well as the rest of the case

Page 43

1    stipulation, is incorporated into the preliminary

2    injunction, so I so ordered the case stipulation.  I also

3    have incorporated it into the preliminary injunction.  So

4    that's an order and the Sackler family are seeking a

5    determination as to whether either their proposed payment

6    violates that order or for relief from that provision of the

7    order paragraph 13 to make the payment.

8         The concerns that that raises are primarily

9    concerns addressed by that paragraph which, Mr. Quinn, you

10   have raised also in your objection, which is whether the

11   purpose of that paragraph is contravened by the proposed

12   payment.

13        The purpose of that paragraph is primarily, if not

14   exclusively, to protect the Debtor's estates and, to the

15   extent they have claims against the Sacklers, third-parties,

16   from dissipation of the Sackler's assets before or, you

17   know, during this period of the injunction, before any

18   judgment against them is obtained and can be enforced, i.e.,

19   to protect potential creditors of the Sacklers from the

20   effects of the delay of litigation and enforcement, and

21   their transfer during that period of assets that would

22   otherwise go to pay a judgment.

23        There's a lot subsumed in that, which this

24   provision simply sidesteps by saying they won't do it.

25   Although it does use, importantly, some qualifying terms

Page 44

1    either intent or material effect of frustrating enforcement.

2         What that provision sidesteps is whether and when

3    there would be judgments against the Sacklers and if so,

4    would the proposed transfer actually materially affect the

5    collectability of such a judgment.

6         Now, the parties in interest in this case, who

7    were very well represented and well-funded, namely creditors

8    committee and the Ad Hoc group of Supporting Parties and the

9    Non-Consenting Group, as part of that same case stipulation

10   obtained the covered parties, which would include the

11   Sackler family's commitment to cooperate in good faith, to

12   among other things, provide financial information. not only

13   about their past finances, which would be related to

14   potential avoidance actions, but current finances.

15        So it would appear to me, because I've not heard

16   complaints about this aspect of the stipulation not being

17   complied with, that there are key parties in interest who

18   have a pretty good idea at least as to whether in the light

19   of this case a $225 million payment really would run

20   contrary to the intent of that paragraph 13.

21        They have chosen not to address the timing here,

22   although the ad hoc group of non-consenting states has

23   raised a limited objection to the underlying motion.  I'm

24   assuming that's because they believe due diligence now so

25   that the delay to November doesn't really help that process

Page 45

1   further to resolve the issue before me on the underlying

2   motion.

3            So, I think that is the main issue here as to

4   timing.  And frankly, my view is that I would like to

5   reserve decision on the motion to shorten until I at least

6   hear the underlying motion and decide whether I need more

7   facts or not, and whether other parties would need to weigh

8   in at that point; in which case, I'd adjourn it and that

9   would certainly provide parties sufficient time under the

10   bankruptcy rules, beyond five days, that they would have for

11   today.

12            I think that there is some benefit as the Movant,

13   the Sacklers, have argued, to the mediation, for me to rule

14   today.  On the other hand, I may be wrong about that.  And

15   all things considered, that would argue for adjourning it,

16   to get more information.

17            I also should note that, unlike most judges, I

18   don't consider these types of motions to shorten, or motions

19   to shorten, generally, on an ex parte basis or without a

20   hearing.  If I believe there is a reasonable argument to be

21   made, that I should hear it on shortened notice, I will tell

22   the Movant to schedule the motion to hear on shortened

23   notice, to be heard immediately before it, in conjunction

24   with the underlying motion.  At least that gives parties,

25   like your clients, the opportunity to say, "You're doing

1    this too fast."

2          Originally, when I got this motion, I was

3    disinclined even to do that, as the Debtors and the State

4    and the Committee know.  But it was made clear to me that

5    all of those parties were prepared to have this be heard --

6    the underlying motion, that is -- today.  They pointed out

7    that it was not specifically linked to the Debtors'

8    settlement motion; which will be heard next month.  And so,

9    I put it on the calendar.

10          And I appreciate your objection and I'm just,

11   simply, going to keep it open and hear the merits, and then

12   decide whether we need more information or not.  But I think

13   there's at least enough support, or showing of cause, for me

14   to consider the merits, and then decide whether we need more

15   time or not.

16          So, why don't we move to the hearing on the

17   merits, which again, Mr. Uzzi gave a preview of, and which I

18   think I gave a preview of.  And then we'll see whether we

19   need more time or not, in that context.

20          MR. UZZI:  Yes, Your Honor, Gerard Uzzi again, on

21   behalf of the Sackler families.  Your Honor, you laid out

22   precisely the relief that we're seeking, so I won't burden

23   the record with repeating that.  I do think that where I'd

24   like to start is just to reflect, for a moment, on why the

25   anti-secretion language was put in both the stipulation and

Page 47

1    then incorporated into the preliminary injunction in the

2    first place.

3              As you may recall, Your Honor, at that time, there

4    was a significant amount of noise about the Sacklers

5    attempting to secrete assets, and some concerns expressed

6    that the injunction would give us the opportunity to further

7    secrete our assets, and that would be, obviously, improper.

8    And Your Honor, we weren't trying -- the Sackler families

9    weren't trying to secrete their assets; they weren't going

10   to try to secrete their assets.

11             So, it was fairly sleeves off the vest for us to

12   be able to say, fine, we'll just agree, somehow, in language

13   that we're not going to secrete our assets.  Hence, the

14   moniker that we've come up with and we've referred to this

15   language as the anti-secretion language.  And the language

16   that is in the stipulation and is in the orders, of course,

17   as Your Honor has represented, and perhaps in reflection,

18   the language just should have said, "Thou shall not secrete

19   your assets."

20             But we do have that language there.  I do believe,

21   Your Honor, that at that time, the intention of that

22   language was to not prevent the Sacklers from using their

23   assets for legitimate purposes, but was rather intended to

24   prevent nefarious acts.  There was some discussion about

25   that at the preliminary injunction hearing, Your Honor.  And

Page 48

1    as I stated, there was no intention, there is no intention,

2    to engage in nefarious acts.  So, it was an easy give on our

3    part.

4              I do, though, understand, Your Honor, that if I'm

5    confident of my position that this was not to prevent this -

6    - and I am confident -- it does beg the question somewhat,

7    of why are we here?  Well, first, we are talking about $225

8    million, and that is a material sum of money.  And as Your

9    Honor referenced, in reading the anti-secretion language,

10   there are various qualifiers.  There's more than one

11   material qualifier, and one of the material qualifiers is as

12   it relates to a material amount of their assets.  And I'm

13   certainly not going to argue in this context, that $225

14   million is not a material amount of money.

15             Now, that said, in the context of whether there's

16   any prejudice to the estate, I think the materiality of this

17   payment does come into play.  But as to whether this sum of

18   money triggers us to think about the anti-secretion

19   prevision, I'm certainly not going to suggest that it's not

20   material.

21             And while I believe that the payment to the DOJ is

22   unquestionably a legitimate purpose, it does involve the

23   payment with respect to litigation or threatened litigation.

24   And obviously, litigation and threatened litigation, even

25   though the DOJ is not subject to the injunction, is a

Page 49

1    subject of the injunction.  And so, I think, as any good

2    bankruptcy lawyer, as Your Honor knows, when we're dealing

3    with these types of issues in similar respects, of the

4    automatic stay, it is always prudent to seek the Court's

5    views and to confirm that we are doing the right thing.

6            And so, we're here in that spirit.  It's worth

7    nothing also, Your Honor, we did agree contractually with

8    the DOJ to seek this confirmation.  We further agreed with

9    the DOJ, that to the extent that the source of funds that

10   we're using to make the payments were direct or indirect

11   transfers from Purdue, that we would disclose that fact to

12   the Court, and the parties in interest.  And we have, in

13   fact, disclosed that fact in our papers, and are disclosing

14   it now.  I think that that is probably the bone of

15   contention we have with respect to the merits, Your Honor.

16           There is one objection that we received, to the

17   underlying motion.  And that was a joint objection filed by

18   the UCC and the Non-Consenting States.  That's docket number

19   1856.

20           Now, Your Honor, we're not surprised, we're

21   disappointed.  We're not surprised that they'd take shots at

22   the Sacklers.  They do say quite a few things that I'm not

23   going to respond to, other than to make clear for the record

24   that we disagree, particularly with respect to the

25   characterization of what discovery is purporting to

Page 50

1    demonstrate.

2            We, obviously, have significantly different views

3    in that regard, but that's not relevant for today.

4            I do think one thing that is relevant, though, is

5    that they do take issue with the fact that the Sacklers deny

6    liability.  The Sacklers deny liability.  They have been

7    consistent on that point, and that's not something that has

8    changed.  And that's maybe something that's easy to take a

9    shot at.  How dare they deny liability?

10           But what's not easy to take a shot at, and what's

11   not referenced, is the other point that the Sackler families

12   have been consistent on.  And that is, that the Sackler

13   families, notwithstanding that they deny liability, prefer

14   to try to settle this litigation.  And not just settle it,

15   but settle it in a manner that will fund an abatement plan

16   and provide resources to at-risk communities and parties in

17   need.  That's what we're trying to do here.

18           And that's a goal that, at least all the parties

19   have stated, that they desire as well.  And I think it's a

20   laudable goal.  And that's why, when we say we believe this

21   is -- we're coming to the Court with good news, it's good

22   news because the settlement with the DOJ is a milestone on

23   that path.  And hopefully, if it's confirmed that we can

24   make this payment, it clears the way for us to get to the

25   ultimate here sooner -- excuse me, Your Honor -- the end

Page 51

1       sooner rather than later.

2               Your Honor, in some respects, I think my remarks,

3       whatever I will make and whatever the remarks of other

4       counsel will make, is somewhat secondary to the Court's just

5       inherent views.  And this comes down to, or could come down

6       to, just simply, what was the Court expecting of us, the

7       Sacklers, when it issued he injunction?  And I fully

8       recognize when I make that statement, Your Honor, that it's

9       unlikely that the Court had this set of facts in mind.  That

10      is, a settlement with the DOJ in this manner at this time,

11      in mind, when it issued the injunction.

12              But I do think there is the broader context of,

13      what were we trying to establish with the anti-secretion

14      language?  That is, was it designed to do what I believe in

15      my heart it was designed to do, as one of the draftsmen of

16      it, was simply to prevent us from engaging in nefarious

17      conduct, trying to secrete our assets and put them outside

18      the reach of the Court.

19              But Your Honor, when I look at the principal

20      objection to the payments being made -- and that is the

21      objection of the UCC and the Non-Consenting States, and

22      even, to some extent, the Ad Hoc Committee on Accountability

23      -- I think there is an underlying thematic concern of

24      somehow there being some sort of prejudice to the estate.

25              And I think, if that's the concern, we can address

Page 52

1    that issue.  And we have attempted to address that issue,

2    Your Honor.

3           I think the first concern that was raised was that

4    we were asking this Court to somehow bless the terms of the

5    settlement.  I think Your Honor has already addressed that

6    issue.  And as Your Honor noted, I failed to, in my opening

7    remarks, I believe I might have failed to reference the fact

8    that we filed a revised form of order with a blackline last

9    night.  That is docket number 1858.  We addressed that, and

10   we have accepted language addressing that, from the UCC, the

11   Debtors and the Non-Consenting States.  So, I believe that

12   issue is resolved in paragraph three of the revised order.

13   Obviously, if I have that wrong, Mr. Preis or Mr. Troop will

14   correct me.

15          There was also some concern about some language

16   between the Sackler's family settlement and the company's

17   own settlements with the DOJ.  I think the Court has also

18   addressed that, Your Honor.  And that is reflected in

19   paragraph four of the revised order.  And again, if that's

20   not resolved, Mr. Preis and Mr. Troop will correct me.

21          The last issue relates to the source of the

22   payment.  And I'd like to say upfront, Your Honor, when we

23   were determining where to make these payments from, there

24   was no attempt to try and make the payments in a way that

25   would give us some sort of strategic litigation advantage in

Page 53

1    the future.  And I don't think anybody is suggesting that,

2    but I thought it was worth just saying that, because I think

3    it puts into context our attempts to resolve this.

4             What we are managing, principally, is efficient

5    availability of liquidity in the short term.  And Your

6    Honor, that goes to the fact that, yes, we have made

7    substantial disclosures to the parties and interests of

8    family wealth.

9             As the parties know, wealth does not equate to

10   liquidity.  And there are those assets that are more liquid

11   than others, and $225 million is a material sum of money.

12   And so, we're principally driven by that concern.

13            The UCC and the Non-Consenting States, if I

14   understand their objection, believe that they would be

15   prejudiced if we used sources that are proceeds, or at least

16   arguably proceeds of Purdue distributions.  And I think that

17   their arguments are that they have better causes of action

18   or better claims to proceeds than not.  And, Your Honor, as

19   a bankruptcy lawyer, I understand that argument.  And

20   they've asked us, though, to make a representation and

21   warranty that is ordered by this Court that we would use

22   funds that are not, at least indirect distributions from

23   Purdue, or transfers from Purdue.

24            And Your Honor, that is just simply easier said

25   than done.  You know, as I said, Your Honor, we're not

1      running away from the fact that we did, in fact, receive

2      substantial distributions from Purdue, but that doesn't mean

3      that all the distributions are from Purdue.  But that also

4      doesn't mean that all -- rather not all the distributions,

5      all the wealth -- is from Purdue.  But that also doesn't

6      mean that all of the wealth is liquid.  And we're simply

7      dealing, trying to deal with that in the most efficient way

8      we can.

9              But even if that were not an issue, Your Honor, we

10     have a much broader issue with how the Committee and the

11     Non-Consenting States are asking us to resolve this.  And I

12     don't think it will come as a surprise, Your Honor, to say

13     that there is a substantial disagreement over what an

14     indirect transfer from Purdue may mean.  And it's one thing

15     for us in the context of litigation, and the context of

16     advocacy, with respect to, and for the purposes of future

17     litigation, to say that something is or -- you know, for us

18     to say it's not an indirect distribution, or an indirect

19     proceeds of distribution, or them to say it is. It's quite

20     another thing for us to agree in the context of an order to

21     prejudge that, and to know what the consequences of being

22     wrong on that would be.

23             And so, we are very uncomfortable with being able

24     to address the Committee's concerns the way they would like

25     them addressed, with the representations and warranties that

Page 55

1       they would like us to make.

2               But as I said, Your Honor, we don't believe that

3       the anti-secretion language even applies to this payment.

4       However, we do want to address the committees and the Non-

5       Consenting States' concerns as it relates to any potential

6       prejudice.  We do think we've done that in the form of order

7       that we submitted to Your Honor overnight.

8               And if I understand again, the Committee's

9       concerns, I think their first concern is that, to the extent

10      that one of the covered parties -- and that's a defined term

11      that is borrowed from the injunction, that's borrowed from

12      the settlement, that's in the anti-secretion language --

13      were to have both assets that are not indirect proceeds, or

14      direct or indirect proceeds, and have assets that are

15      indirect proceeds, that by using the assets that are

16      indirect or direct proceeds, they would somehow be

17      prejudice; well, we've agreed that to deem, to the extent

18      that that those facts exist; deem any amounts that we pay to

19      be from amounts that are not direct or indirect proceeds

20      from Purdue, transfers from Purdue.  And that's reflected in

21      the order in paragraph five.

22              Second, and Your Honor, we borrowed this from,

23      frankly, prior art, when we deal with what I'll call

24      enterprise-style settlements.  And I think Your Honor will

25      know what I'm talking about when we say, okay, on behalf of

Page 56

1    the enterprise, we're going to make this settlement.  We

2    don't really know how we should allocate this now.

3             And it may be relevant in the future.  It may turn

4    out that it's never relevant in the future.  So, if it ever

5    becomes relevant in the future, we'll address it at that

6    time.  And so, we've put a provision in to reflect that,

7    that if we ever get to the point that we don't settle this

8    litigation -- and that the Committee or representatives of

9    the estates or other parties and interests, bring these

10   claims, and they're successful on their claims, so that

11   we're getting down to the last $225 million, or the portion

12   that the covered Sackler party paid into this settlement,

13   and it's not there, and had it been there, there would have

14   been additional recovery -- would give this court the power

15   to fix that equitably through some reallocation in the

16   future.

17            Now, Your Honor, we think that it's highly

18   unlikely we ever get there.  But we want to address the

19   concerns that have been raised by the Committee and the Non-

20   Consenting States.  And we've added that type of provision

21   that gives this Court the ability to make it right, so to

22   speak, in the future.  And that's paragraph five.

23            Lastly, we understand there was a concern that we

24   might take the position that if we could establish that

25   these amounts were, in fact, paid from proceeds, indirect

Page 57

1   transfers from Purdue, that we would be able to say,

2   essentially, Your Honor, "Ah-ha, you can't get it now, we've

3   already given it away to the DOJ."  And that's not our

4   intent, Your Honor.  It was never our intent.  And so, we

5   added language that clarifies that even if these are

6   proceeds of direct or indirect transfers from Purdue, we

7   won't use that as an argument to say any other claims that

8   somebody may have against us, should be reduced to offset

9   because of that.

10          And Your Honor, we believe that should adequately

11   address the concerns.  And we're, Your Honor, to the extent

12   that that's not sufficient, you know, what else we could

13   possibly do.  We're open.  But we're not sure what else

14   would actually help.

15          Your Honor, but again, I think that this, in the

16   context of the whole, really needs to be considered.  And we

17   should not lose sight of what we're trying to accomplish

18   here.  The Sackers are trying to move these cases along.

19   And we have achieved a significant milestone by settling

20   with the DOJ.  But not just the settlement, the mere fact of

21   the settlement, but in a manner that is beneficial to the

22   creditors.  And this is where, I referenced earlier, Your

23   Honor, I wouldn't say $250 million is not a material sum of

24   money, because obviously, it is.  But I do think it needs to

25   be put into the context of now the prejudice.

1              And simply put, if the claims of the creditors are

2     as strong as they claim they are, as the creditors claim

3     they are, well then, let's face it, the DOJ has equally

4     strong claims.  But what the DOJ also has is enforcement

5     remedies that are not available to other creditors; that are

6     available only to the DOJ.  And those claims, what those

7     enforcement remedies risk significantly impairing what would

8     be left available to the creditors, and available to the

9     abatement goals that we all so desire.

10             Now, I say that, Your Honor, and I cannot

11    emphasize more, that we do contest that liability.  So, I'm

12    not acknowledging the liability.  I acknowledge, though, the

13    risks here.  And in absence of any settlement, we'll fight,

14    because we'll have no choice.  We're hoping not to do that.

15    We prefer to settle it.  But in the arguments that the

16    creditors make, they can't really have it both ways.  They

17    can't credibly assert that they have a material prejudice on

18    the basis of a presumptive strength of claims, but ignore

19    the benefits that are created, actually, by this settlement,

20    using those presumptive strengths of the claims.  Because we

21    clear away the DOJ; even if we don't get to the global

22    settlement, we clear away the DOJ.

23             Or, say it from, look at it from the other

24    standpoint:  They can't ignore the risks of blowing up the

25    DOJ settlement, because there's risk, not just to us, the

Page 59

1    Sacklers, there's risks to the estates.

2         So, I think when we look at some of the issues,

3    Your Honor, that I think you were getting at, as it relates

4    to, you know, is this somehow prejudicial?  I don't think it

5    is at all.  I don't think, even if we didn't put in the

6    additional language, it would be prejudicial at all.  But we

7    put that additional language in, that I think solves it all.

8         Your Honor, I'd just like to say one more thing,

9    and then I'll pause.  And that's to come back to a more, I

10   think, optimistic note.  And that this settlement here is

11   intended to be progress toward the abatement plan, that

12   everyone has claimed they would like to see achieved.  And I

13   fully acknowledge, there's a lot of open issues, including

14   open issues with respect to what abatement even means, or

15   how it should be done; which is not something that the

16   Sacklers are involved in, and that's up to those parties who

17   will be providing those abatement services.  But that is the

18   goal here.  And this needs to be viewed, or I'd submit, Your

19   Honor, at least, that this be viewed in that context, and

20   that point not be lost in the noise.

21        Your Honor, that's all I have on the merits.  I'm

22   happy to answer any questions you may have, otherwise, I'll

23   cede the podium.

24        THE COURT:  Okay.  I have a question that's

25   related to the last point that you made.  And you could

Page 60

1    answer this, or counsel for the United States can answer it.

2    Is there any understanding or agreement or commitment by the

3    United States, regarding how the $225 million would be

4    spent? I.e., in particular, is there any commitment by the

5    United States that it would be spent on abatement?

6            MR. UZZI:  Your Honor, the United States is on the

7    line, so I actually think it's best that I let them answer

8    that question.

9            MR. FOGELMAN:  Good morning, Your Honor.  This is

10   Larry Fogelman from the United States Attorney's Office on

11   behalf of the United States.  Your Honor, the plain terms of

12   the settlement don't address how the funds would be used.  I

13   think, typically, in a false claims act settlement, moneys

14   go towards those agencies that were harmed by the false

15   claims.  So, the moneys would not be used -- I understand

16   the states have worked out, or are working towards an

17   abatement plan -- those funds would not be used for the

18   states' abatement plan.

19           THE COURT:  I'm not talking about the states'

20   abatement plan, but how the United States has used the

21   money.  And I'm not trying to put any parameters on that.  I

22   just am curious as to whether they would go into general

23   funds; whether they would go to, on the other hand, to

24   Health and Human Services, for example, specifically, for

25   their various programs for addiction treatment, or if

Page 61

1   there's been any thought given to that, at this point.

2           MR. FOGELMAN:  Your Honor, I can't say with any

3   specificity, whether the agencies that would be receiving

4   the funds have determined how those funds would be used.

5   What I can say is, in a typical False Claims Act case, where

6   the agencies are harmed by virtue of the false claims that

7   have been submitted to the government, that the moneys

8   recovered from the FDA, at least to the extent of single

9   damages, would go towards those agencies, to make them whole

10  for the amounts lost through the false claims that were

11  made.  But again, with regard to this specific case, I

12  cannot -- I'm not aware of any deliberations by the agencies

13  of how to use those funds.

14          THE COURT:  Okay.  All right.  Okay, so, I have

15  looked at the proposed amended order, and there is an

16  obvious dispute between what the order provides in paragraph

17  five and proposed language by the Committee and the Non-

18  Consenting State group, in their paragraph five, that latter

19  order seeks to -- would provide that each covered party

20  agrees to pay its obligations under the settlement from a

21  source that contains funds that are not directly or

22  indirectly proceeds or distributions from the Debtors.  And

23  Mr. Uzzi has been candid, as was the motion, in paragraph

24  11, in saying, well, depending on your definition of

25  'indirectly,' that's impossible to do.

1 So, I'll leave that dispute to decide for the

2 moment.  It does appear to me that the revised proposed

3 order does make it clear -- although it was implicit in the

4 motion -- that, as stated in paragraph three, "In entering

5 this order the Court is not approving the settlement

6 agreement with the DOJ, or making any findings of fact or

7 conclusions of law with respect to this settlement

8 agreement."  And then, in paragraph four, "Entry of this

9 order shall have no effect on the disposition of the

10 Debtors' motion to approve their settlement agreement with

11 the DOJ, or be construed as making any findings of fact or

12 conclusions of law …," related in that order, motion, to

13 this order.  I.e., the two motions are completely unlinked

14 Paragraph six does have the ability to reallocate,

15 although it is limited to the Debtors' estates' ability;

16 whereas paragraph 13 applies not just to the estates, but to

17 other parties' judgments as well.

18 Paragraph seven has the no offset language.  A lot

19 in the objection can be subsumed in the proposed language

20 from the objector's order, that would say you just are not

21 making the payments from -- indirectly or directly --

22 proceeds of distributions from the Debtors.  I don't know

23 whether the Committee and the objecting, or Non-Consenting

24 States, have considered leaving that language aside; whether

25 there are any other changes to the order, assuming that

1   language might not survive the motion; that would address

2   their concerns, that they have also raised in the objection.

3           For example, I had considered, in paragraph three,

4   adding at the end of that paragraph:  Comma, including,

5   without limitation, as a settlement agreement, might be

6   asserted as a defense.  And in the avoidance … and any

7   future -- I'm sorry -- in any future proceeding, under

8   Article Five of the Bankruptcy Code, or to the effect of the

9   automatic stay, that any future case under the Bankruptcy

10  Code; which would, I think, make it crystal clear that I

11  would not be making any findings, and a future Court would

12  not be bound as to defenses to reeling in a recovery on an

13  avoidance claim in a future Sackler family member

14  bankruptcy.

15          Similarly, I would think maybe paragraph six

16  should be expanded beyond prejudicial to the estates'

17  ability, and be intended to also include other parties

18  protected by paragraph 13 of the case stipulation.

19          But with that answer, I'm happy to hear from

20  either Mr. Preis or Mr. Troop, or whoever is speaking for

21  the objects.

22          MR. TROOP:  Thank you, Your Honor.  This is Andrew

23  Troop from Pillsbury on behalf of the Non-Consenting States.

24  If it is all right with Your Honor, Mr. Preis and I have

25  split up the presentation to you today.

Page 64

1          THE COURT:  Okay.

2          MR. TROOP:  And to preview, just a little bit,

3     Your Honor, it's because events over the last day have, in

4     part, led us to think that there might be different and

5     appropriate resolutions with respect to the underlying

6     motion, at this time.

7          First, Your Honor, I want to underscore what was

8     implicit, I think, in Mr. Uzzi's presentation, which is that

9     we have worked, and worked hard, over the last days to see

10    which issues we could eliminate from dispute, and which we

11    could not.  And that but for, I think, the issues that

12    you've raised and that we've been thinking about, we have

13    resolved two of the three issues.  But the one that remains

14    the sticking point is this issue of where is this payment

15    coming from?

16         Your Honor, first, I want to address a few other

17    things that Mr. Uzzi stated.  The first is that there are,

18    undoubtedly, mediation benefits, or benefits to the

19    mediation, from knowing the Department of Justice's

20    position, both with respect to the Debtors and with respect

21    to the Sacklers; whether knowing those positions translates

22    into consummating settlements now, is a very different

23    question.

24         Your Honor, since, effectively the beginning of

25    this case, states, in particular, have been voluntarily, or

Page 65

1    involuntarily restrained in pursuing their claims against

2    the Sacklers.  And while the United States was not similarly

3    voluntarily or involuntarily restrained, I think that the

4    intent of your preliminary injunctions, and our colloquies,

5    was to create an environment in which parties would

6    negotiate in a collective way, to determine whether or not

7    there is a consensual plan of reorganization that can be

8    reached.

9           And, you know, as I've said in chambers

10   conferences and in public hearings, one of the challenges to

11   that process has been consistently that DOJ, vis-à-vis both

12   Purdue and the Sacklers, were sitting on the sideline, given

13   the sequence in which the mediation was laid out.

14          We are now in the midst of mediating,

15   particularly, the Sackler issues.  And together with that,

16   because it is not really easy to divorce the issues, the

17   question about the future of Purdue post-reorganization.

18   Both the settlements have significant impact on those

19   discussions on the go-forward basis.

20          So, Your Honor, the State actually is set --

21          THE COURT:  Can I interrupt you on that?  I don't

22   see how the DOJ one does, frankly, because it's just the

23   payment of money by the Sacklers, who aren't involved in

24   Purdue anyway.  But --

25          MR. TROOP:  Let me get to that, Your Honor.  So,

Page 66

1    Your Honor, the issue here comes down to the -- from a case

2    dynamic perspective, we -- the states and others -- had been

3    restrained from doing exactly the same thing with the

4    Department of Justice; pursuing claims, having the threat of

5    those claims.

6              THE COURT:  I understand that point.

7              MR. TROOP:  And so, Your Honor, what happens is

8    that we now have a settlement where I think everyone agrees

9    $225 million is a material amount of money.  And the

10   question becomes -- and this is what became very clear to me

11   yesterday, Your Honor -- is, as I think Mr. Uzzi said

12   yesterday and repeated today, we don't even know whether

13   this $225 million will be relevant in the future, if there

14   is a settlement or if there's not a settlement.  And

15   accordingly, we're left with having to ensure that we take

16   positions now that the $225, which is a material amount of

17   money, will not be material to the outcome of the

18   negotiations that are ongoing.

19             And Your Honor, there's no -- Mr. Uzzi talked a

20   lot about the benefits to the states, or the lack of

21   prejudice for moving forward right now.  I would note, Your

22   Honor -- I've read this settlement agreement again and again

23   over the last few days -- there is no requirement in the

24   settlement that you approve it now.  There's no deadline by

25   which it needs to be approved.

Page 67

1          THE COURT:  I agree with that.  I mean, Mr. Uzzi,

2     if you disagree, you can tell me.  But I agree with that, in

3     reading paragraph two.

4          MR. TROOP:  And then, Your Honor, admittedly, the

5     Sacklers didn't even raise the interest component as

6     potential prejudice from delay, or in support of the

7     shortened notice.  But if my math is correct, we're talking

8     about $4,600 a day after November 5th, a trivial sum, in the

9     scheme of things.

10          So, the Sacklers and the estates -- it's Sacklers,

11     and the purported benefits to states and other creditors --

12     can and will be maintained.  There is no out if you just

13     simply choose not to rule now, and to defer ruling until the

14     mediation is concluded.  And, as noted, the cost of doing so

15     is trivia.

16          The last point, Your Honor, is with respect to the

17     proposed resolutions set forth in the revised order,

18     submitted by the Sacklers.  And I think that Mr. Preis will

19     address this some more.  But I wanted to highlight, Your

20     Honor, that the resolutions are, in my opinion, they're

21     illusory if, in fact, there is not $225 million in proceeds

22     or wealth, not directly or indirectly derived from proceeds

23     received from Purdue distributions.

24          THE COURT:  I don't understand.  Maybe I'm just

25     missing that point.  I don't understand at that point.

1              MR. TROOP:  Your Honor, Mr. Uzzi, I believe,

2      acknowledges that there is, at the very least, an argument

3      that all of the Sacklers' wealth derives, directly or

4      indirectly, from distributions they receive from Purdue.

5      And in fact, Your Honor, requests for the Sacklers to

6      identify $225 million in wealth where that would not be true

7      unequivocally, have been answered by the statement that Mr.

8      Uzzi said today; which is that this is a liquidity issue,

9      and that it's not as easy as anyone might imagine, to be

10     able to identify that source of funds.  Which is a long way,

11     Your Honor, of coming back to the main point that I want to

12     make; which is that if it turns out that there is a global

13     resolution in this case, which makes this resolution, this

14     payment, irrelevant, simply irrelevant, the risk of doing

15     something now, which might make it relevant, are not

16     outweighed by the process that we're engaged in to achieve a

17     collective resolution.

18             THE COURT:  Now I understand what you were saying.

19     I thought you said the opposite, which is that making the

20     payment now would be irrelevant.  I know completely

21     understand what you said.

22             MR. TROOP:  Sorry, Your Honor, I apologize for

23     having not been clear.

24             THE COURT:  It was probably me.  Let's blame it on

25     telephonic hearings where we can't see each other.  So, Your

1    Honor, when we look at this, we say, let the process that

2    we're engaged in play itself out.  There's simply not enough

3    of a reason to approve this settlement now, period.  That

4    does not mean that I'm asking you to deny the relief that's

5    been requested.  I do understand the denial of the relief

6    that's been requested might lead to a result that is

7    unpredictable, because we don't know how the DOJ will

8    respond.  So, there is a balance that you can strike today

9    that maintains the balance in the case.  We're all spending

10   hours and hours a day and a week, and each month, trying to

11   determine, trying to figure out a way to get to the end of.

12           So, with that, Your Honor, unless you have any

13   other questions for me, I'll turn it over to Mr. Preis.

14           THE COURT:  Okay, thank you.

15           MR. TROOP:  Thank you, Your Honor.

16           MR. PREIS:  Good afternoon, Your Honor.  It's Arik

17   Preis from Akin Gump Hauer & Feld, on behalf of the Official

18   Committee.  First of all, can you hear me?

19           THE COURT:  Yeah, loud and clear.

20           MR. PREIS:  Okay.  Now that Mr. Uzzi and Mr. Troop

21   have both spoken, I'm going to try to cut what I was going

22   to say quite substantially.

23           I want to subdivide my presentation just into

24   three parts.  The first is, the first part will be to

25   address the injunction in the anti-secretion provision,

1    because there's been a number of things said about those two

2    things that I want to correct.  The second is to talk about

3    the order itself, and some potential resolutions with regard

4    to the order, and what legally is the issue at stake.  And

5    then, third, is kind of where do we go from here, given

6    everything you've heard.

7            The first part, with regard to the case

8    stipulation and the anti-secretion provision, I just want to

9    remind Your Honor and the Court that when we agreed to the

10   injunction 13 months ago, we made it clear that there were

11   two reasons we were supportive:  The first was to ensure

12   that creditors were not racing to the courthouse to obtain

13   judgements against the Sacklers, that would put them at the

14   front of the line.  And the second, was that as part of the

15   quid pro quo, we negotiated for the anti-secretion

16   provision.

17           The point of the anti-secretion provision as

18   obvious, and it's been talked about.  And the idea was that

19   we would focus on the proposed settlement framework and

20   investigation of it.  And the Sacklers would have to agree

21   not to secrete assets out of the reach of creditors.

22           What Mr. Uzzi said, and he kept referring to -- he

23   knows what the purpose was, and he kept saying, well, the

24   idea was that that the Sacklers would not take actions,

25   intentionally, to harm creditors.  Understood, but that's

1   actually not the only provision in the anti-secretion

2   provision.  It doesn't rest on intent.  It says intent or

3   material effect.  And so, it doesn't really matter if the

4   intent of the payment may or may not be to harm creditors;

5   it's also, or whether the effect is.

6          And frankly, Your Honor, this is important

7   because, as you know, we believe the Sacklers were

8   intentionally moving assets out of the reach of creditors,

9   since the first DOJ settlement in 2007.

10         Fast forward now to last week.  On Wednesday at

11  noon, we saw for the first time this proposed settlement.

12  We had been told confidentially the amount of the

13  settlement.  But on Wednesday, we received the actual

14  settlement, including the addendum.  As we mentioned in our

15  papers, and as Mr. Uzzi pointed out, the settlement has some

16  issues, that we had with it.  And as a result, we negotiated

17  some modifications to the order that you, not only have you

18  pointed out, but you suggested some revisions to, which we

19  appreciate.

20         We also were somewhat satisfied with the addendum,

21  because the DOJ makes assertions there in support of many of

22  the items we've been investigating for the better part of

23  ten months.  But that's, obviously, not for today.

24         Now I move to the second portion of my

25  presentation, which is to talk about the order.

Page 72

1           THE COURT:  Can we, on the first portion, I tend

2    to agree with you that paragraph 13 of the case stipulation

3    isn't just limited to intent, or nefarious acts.  But, as

4    you say, it says, "Or have the material effect of

5    frustrating enforcement of any potential judgment."

6           One of the points Mr. Uzzi makes, though, is that

7    really, permitting this settlement payment to be made

8    promptly, doesn't have a material affect because it's

9    actually -- leaves more for the states, consistent with the

10   mediation that's already been -- the mediation is part one,

11   which is left to them, to negotiate with the Sacklers, to

12   then have allocated to abatement programs.  I guess that's

13   point one.

14          Point two is, since the focus there, as opposed to

15   intent -- and it's hard to say there's an intent here, since

16   it's clearly disclosed and it's to the government; it's not

17   secreting in that sense.  The intent behind the other

18   language, not to materially affect or frustrate judgment, is

19   recovery of a potentially-avoidable transfer.

20          On that score, particularly with the revisions to

21   the order, there's no deeper pocket than the United States

22   if you can't recover whatever you want to recover from the

23   Sacklers, that's ultimately negotiated.  I guess one could

24   argue, under 550, you could recover it from the United

25   States; although Mr. Troop made the tracing argument.  But

Page 73

1   you would have that anyway at this point.

2          So, I'm not sure that simply pointing out that

3   paragraph 13 is broader than Mr. Uzzi says it is, ultimately

4   addresses what's really at issue here; which is, does, in

5   fact, a payment like this -- particularly with the right

6   language in the order -- have the material effect of

7   frustrating enforcement?

8          Now, I understand Mr. Troop's argument, which I

9   think you're going to move to, which is the timing point,

10  but I guess, I didn't want to let your first argument pass

11  without observing those two points.

12         MR. PREIS:  I appreciate you mentioning, you

13  raising this, because this is exactly what I was going to

14  get to in my discussion of the order.  But to be very

15  pointed about it, I am focused on the words, "Frustrating

16  enforcement of any potential judgment of this Court."

17         THE COURT:  Right.

18         MR. PREIS:  Because the effect of the payment, in

19  the way is being made, has that effect, which I'm about to

20  explain.

21         THE COURT:  All right, although I'm not -- well,

22  okay.  But let me -- particularly, since we're on the phone,

23  I'm going to say this:  Under 550(a), one can recover from

24  any immediate or mediate transferee of such initial

25  transferee, provided that that transferee took, without

1    knowledge of the voidability of the transfer avoided.

2          So, you know, the record -- there's certainly

3    plenty of references, including in Addendum A to the

4    settlement agreement that we're talking about, that refers

5    to the DOJ's belief that the Sacklers received avoidable

6    transfers.

7          I agree, you have a tracing issue, but you have a

8    tracing issue today on that point.  And I just wanted to

9    note that.

10          MR. PREIS:  Agreed.  Again, Your Honor, which I'm

11   about to address, which is exactly that point.

12          THE COURT:  I'll stop interrupting you then.

13          MR. PREIS:  No, no, it's not -- I appreciate,

14   because I want to make sure I'm going to hit the points that

15   are front and center in your mind.

16          THE COURT:  Okay.

17          MR. PREIS:  In moving to the settlement agreement,

18   paragraph two, which is the paragraph that has caused all

19   these problems, states that, apparently, the Sacklers need

20   to state that they'll disclose the fact that they actually

21   obtained an order from the Court, confirming in advance that

22   payment is not prohibited and they have to disclose whether

23   or not payments have been directly or indirectly from

24   transfers from the debtors.

25          So they don't have to use proceeds of direct or

Page 75

1    indirect transfer from Purdue, but for some reason, the DOJ

2    just wanted them to confirm whether or not they were going

3    to do so, which again, I assume was -- someone put in there

4    to make sure that they wouldn't run afoul of the anti-

5    secretion.  I'll call these proceeds transfer proceeds.  We

6    raised this issue with the Sacklers over the weekend and we

7    had calls with them and based on that, our position would be

8    as follows, and we hope that this -- you know, and this is

9    not in the order because the order -- the proposed form

10   order we ultimately put out reflects after a number of

11   discussions.

12          But the way we would propose, right, if we could

13   have it in a perfect world -- the Sacklers should tell us if

14   they have sufficient assets that are not transfer proceeds

15   to make the settlement payment.  If they have such assets,

16   they should use them first and clearly delineate them in the

17   order, and hopefully they have $225 million to do that.  If

18   they don't have sufficient assets that are not transfer

19   proceeds to make the settlement payment or if all of their

20   wealth is indeed transfer proceeds, then they should tell us

21   that, too.  They have not wanted to do that.  And they

22   should use the assets to make the payment after exhausting

23   all the assets that are not transfer proceeds and clearly

24   represent in the order how much is transfer proceeds and how

25   much is not so we can rely on that.

1    Third, if they can't distinguish between assets

2    which are transfer proceeds and not transfer proceeds,

3    that's fine, too.  Make the settlement payment to the DOJ

4    and state in the order that the Sacklers comingled their

5    assets in an attempt to hinder, defraud, or delay creditors

6    and then make the payment to the DOJ for those assets.  We

7    discussed this with the Sacklers over the weekend and

8    various permutations since then.  The response wasn't that

9    they don't want to any of this.  It's that they tried to

10   solve for a different issue which you've pointed out and

11   which they've pointed out -- which is a start -- I will

12   admit to you it's a start -- but it doesn't answer the

13   question.  The question -- the key point -- is that they

14   don't want to represent and warrant anything about whether

15   statement payments comes from transfer proceeds for obvious

16   reasons.

17            THE COURT:  But Mr. Price --

18            MR. PREIS:  Right.

19            THE COURT:  -- have you laid out a definition of

20   what indirectly in this context means?  I mean, I think to

21   be fair to both sides, unless you have a clear definition of

22   the phrase in paragraph 13 of -- I'm sorry -- of direct or

23   indirect in paragraph 5, then it would just be an invitation

24   to future litigation.

25            MR. PREIS:  Completely agree with you which is

Page 77

1    why, as I'm going to get to, we came back to the problem

2    that they don't want to admit one thing because it would put

3    them in a box, and as a result, they tried to solve for

4    something else which, in their solution, has the effect of

5    frustrating enforcement of a potential judgment that we will

6    have in the future.

7            So what we come back to --

8            THE COURT:  But why do you need them to admit that

9    all proceeds paid to them by the debtors within the statute

10   of limitations for an avoidance action were paid to them

11   with the intent to avoid -- you know, for avoidance

12   purposes?  I don't -- is that what you're asking them to

13   admit or am I missing something?

14           MR. PREIS:  No, I don't need them to admit one or

15   the other.  I need them to take a position on it because

16   otherwise, our view is they violate the anti-secretion

17   provision.

18           THE COURT:  But let me -- what is it you're asking

19   them to admit to as far as to whether they've engaged in a

20   fraudulent transfer?  That's what I don't understand.

21           MR. PREIS:  No.  All they have to do is tell us

22   whether the proceeds are what I call -- whether the payments

23   are transfer proceeds or not transfer proceeds.

24           THE COURT:  But you can't do that without defining

25   the word indirect.

Page 78

1              MR. PREIS:  Agree with you which is why -- which

2       is where I'm going to get to which is, if we can't come to a

3       resolution of what that means as Mr. Uzzi pointed out

4       earlier, then I fall back on what Mr. Troop pointed out

5       which is, again, we're not trying to undo the settlement.

6       We don't object on the grounds of the actual settlement and

7       the Sacklers aren't seeking approval of the settlement.  So

8       all we're asking is if the settlement doesn't have to be

9       approved today -- sorry -- if the payment doesn't have to

10      made today, as Mr. Troop pointed out, and we can allow the

11      parties in mediation -- in phase two of the mediation -- to

12      work out the -- hopefully, a resolution of the Sackler

13      issues and as part of that, then permit the payment to be

14      made without saying that the settlement is not approved,

15      then it puts everyone on the same ground as they are now

16      with regard to the amount of --

17             THE COURT:  I understand that point.  I'm just

18      saying that I think that -- that's fine.  And you're going

19      to get to that point, but as far as protecting the estate

20      and the other parties and clearly paragraph 13 was not just

21      limited to the estate, one could reasonably do that, setting

22      aside the timing issues.  I think one could reasonably do

23      that without requiring the Sacklers to make a representation

24      which, unless you define indirectly, would subject them to

25      arguably have made -- making a false representation --

Page 79

1    arguably -- or alternatively, having them represent

2    something that I don't think, again, they should be required

3    to make as part of protecting the parties and the estates

4    which is that somehow they are making an intentional

5    fraudulent transfer or have done so.

6         It would seem to me that the protection would be

7    the notice that the United States is under that some part of

8    even as much as all of the 225 million might be -- might be

9    -- the proceeds of an avoidable transfer and therefore,

10   could be recoverable under 550(a) and (d).  I don't think

11   you need any representation from the Sacklers to enhance

12   that.  You may need some tinkering with the order to make it

13   crystal clear, but -- anyway.

14        If you're moving on to the timing point, I think

15   Mr. Troop made that point pretty clearly.

16        MR. PREIS:  Understood and I'm not going to

17   reiterate it.  I hope that you can see that's how we get to

18   the same ultimate answer.

19        THE COURT:  Yeah.  No, I do -- I mean, if everyone

20   can agree then you have an agreement -- then the objection

21   goes away.  I understand that and I also understand -- I'm

22   not trying to facetious there -- that in this context, this

23   has been set up -- this case and now with the mediation part

24   two -- in the hope and with a process for everyone to reach

25   agreement.  So I understand that.

1           I had one other point -- one other question to ask

2    you and in part, it's simply -- in part, it's driven by the,

3    perhaps, completely by chance connection between the amount

4    here -- 225 million -- and the amount that we had earlier

5    been discussing this case as an emergency relief fund.  If

6    we knew that the federal government was going to apply this

7    $225 million to legitimate abatement programs or to

8    legitimate abatement, even so much as like staffing people -

9    - law enforcement and first responders in the hardest hit

10   communities and then spreading out to (indiscernible)

11   surplus with means to immediately address overdoses, would

12   this even be an issue or would this money go out today?

13           MR. PREIS:  Are you addressing that question to me

14   or to somebody else?  I just didn't want to --

15           THE COURT:  To you.  I'm putting you on the spot

16   and you can just say I don't know, but it would seem to me

17   that it would go -- it would seem to me this issue could go

18   away if the federal government could actually say that.

19           MR. PREIS:  So it's a -- I will admit to you I had

20   not thought of the question because it was made clear to me

21   that the federal government gets to decide what they want to

22   do with the money however they want it -- that the money

23   goes into the federal treasury.  I heard Mr. Fogelman --

24           THE COURT:  Right.

25           MR. PREIS:  -- earlier.  That being said, I would

Page 81

1   just point out that it's my understanding that the federal

2   government actually has already -- and I'm going to use the

3   wrong verb -- mandated or require -- or however -- through

4   their various agencies hundreds and millions of dollars to

5   fight the opioid crisis that apparently has not been used.

6   And so -- because of whether it be red tape or the fact that

7   it's still in discussion as to how it's going to use it, et

8   cetera, and so while what you say is -- would be a

9   phenomenal thing if immediately 225 million could be used in

10  the way we had wanted to use it at the -- 13 months ago

11  through an emergency relief fund, I don't think the federal

12  government actually is capable of doing it that way.  But

13  that's --

14          THE COURT:  Well, look, I'm probably going beyond

15  where I should go.  I don't -- look, I want to be clear.

16  I'm telling the federal government how to use this money if

17  it ever gets it.  But I do think and I don't want to put

18  words in your mouth, but if they actually would commit to

19  use it promptly for abatement, that might be another way to

20  resolve this motion.  But I don't think -- I apologize for

21  even going this far on it.  I don't think there's anything

22  more to be said on it at this point, but I am making that

23  statement and I don't think people would disagree that if it

24  actually was going to be used for abatement promptly, I

25  think everyone would say, spend the money.  But leave that

1    aside.

2            Is there anything more that you want to add to

3    what you've already said and what Mr. Troop said?

4            MR. PREIS:  No thank you, Your Honor.  I

5    appreciate.

6            THE COURT:  Okay.

7            MR. HUEBNER:  Your Honor, this is Marshall Huebner

8    for the debtors.  I think probably this is the right order.

9    Mr. Price asked me to wait until they were done, but the

10   debtors have definitely have (indiscernible).

11           THE COURT:  All right.  Well, let me -- Mr. Quinn

12   objected to --

13           MR. HUEBNER:  Oh, I'm sorry.  I apologize --

14           THE COURT:  -- the court.  Do you have anything,

15   Mr. Quinn, to add to what counsel for the non-consenting

16   states and the committee have said?  No.  Okay.  All right.

17   so I think you can go ahead, Mr. Huebner.

18           MR. HUEBNER:  Sure.  Your Honor, I think that

19   there are, you know -- during parts of this hearing I have

20   to confess my head was spinning about exactly what the

21   (indiscernible) conditions were --

22           MR. QUINN:  Your Honor.  I'm sorry.

23           MR. HUEBNER:  Oh, Mr. Quinn, please.

24           MR. QUINN:  Mr. Huebner, I apologize.  Apparently,

25   I was unmuted on Court Solutions but not on my iPhone so I

Page 83

1    apologize.

2            THE COURT:  Okay.  That's fine.

3            MR. QUINN:  Your Honor, I just wanted to get back

4    to a quick point that you had made earlier in the hearing.

5    I wanted to refer to case stipulation paragraph 17 that says

6    that the stipulation relies on the term sheet.  I think the

7    issue I was making concerning criminal liability is that the

8    term sheet specifically denounces that the Sacklers need to

9    receive a release from all potential federal liability not

10   just civil liability.

11           This point is important to this issue just

12   because, does this settlement really -- approving it today

13   versus next month -- truly advance the cases.  If we're not

14   in compliance with the requests in the term sheet, then I

15   can't quite understand how we are at this very moment

16   advancing cases.

17           THE COURT:  Well, because you're resolving the

18   civil liability claim.

19           MR. QUINN:  Right, definitely.  But the term sheet

20   calls for all potential federal liability, not just civil

21   liability and maybe the Sacklers' counsel can clarify what

22   they mean by all potential federal liability.

23           THE COURT:  But the term sheet isn't before me.

24   That's not -- I mean, you know, sufficient unto the day is

25   the evil thereof.  I decide what's before me.  I'm not

Page 84

1    deciding anything else.

2          MR. QUINN:  But what is before you is whether, you

3    know, shortening this notice today -- their argument is that

4    it advances the mediation and I'm saying it may not advance

5    the mediations because hearing it today doesn't necessarily

6    accomplish this.  And the last thing I'd say, Your Honor, is

7    I do appreciate what you're saying regarding abatement and

8    for the federal funds to be used specifically for abatement.

9    So I just want to point out the ad hoc committee on

10   accountability truly does believe that the DOJ settlement

11   funds should be used for that particular purpose rather than

12   just to go into the general treasury funds.

13         THE COURT:  Okay.  Thanks.  All right.

14         MR. QUINN:  Back to Marshall.

15         THE COURT:  Mr. Huebner.

16         MR. HUEBNER:  Okay.  Thank you, Your Honor.  So

17   Your Honor I have to confess that, you know, as the

18   colloquys were going on, I was having a little trouble

19   following myself and so I'm going to come at it maybe from a

20   little bit of a different angle.  Question number one to me

21   is, does the order apply at all.  In other words, is this a

22   comfort order or this actual release?  And I guess the way I

23   think about it is as follows:  I went back and checked every

24   one of the relevant transcripts and what I said on October

25   10th and 11th about this provision, what Mr. Price said, and

Page 85

1    what Mr. Uzzi said.  I think it's fair to say that the --

2    you know, the focus of everyone at the time was now

3    secretion which was understandable because among other

4    things, many of the Sacklers, you know, live overseas and

5    it's very complicated and there were quite a few of them and

6    they were getting the benefit of the injunction.  That's

7    what we were talking about.  You know, it is absolutely

8    correct without any question that it says, or the material

9    effect of frustrating enforcement.

10           You know, candidly, I don't think it was in my

11   head that the Sacklers wouldn't be allowed to settle any

12   litigations and I think it was originally our order and

13   certainly whether anyone said that has relevance -- no one

14   did say it, right.  So then you get to the question of,

15   well, let's just do it in the plain meaning world, which is

16   going to be, I think, pretty (indiscernible) for all of us

17   for a while now.  And the question is, is taking their --

18   you know, $225 million of their assets and settling

19   potentially massive civil claims by the United States of

20   America likely to have a material effect on the frustrating

21   enforcement.  Because in fact, the estate owns all these

22   claims that we're talking and they're actually our causes of

23   action and so these are things that we think a lot about.

24   Even more, when very thoughtful smart people like Mr. Price

25   and Mr. Troop bring further nuances to our attention.

Page 86

1          I didn't actually see the Sackler DOJ settlement

2     until Mr. Price sent it to me.  I was not involved in any

3     way, shape, or form with its creation and I literally got it

4     from Arik after it was done and announced.  And the

5     conclusion, certainly, I reached is that, we think that the

6     Sacklers getting out from under all of the civil things that

7     the DOJ could do against them and bring against them for

8     $225 million which -- you know, I obviously know the

9     Sacklers' net worth because of course as this Court alluded

10    and I actually had it pulled this morning at 9:56 and read

11    that also -- the October 11th case stipulation amended on

12    November 20th required extremely detailed presentations of

13    the assets and balance sheets and the like of every single

14    covered Sackler person and attestations with respect to

15    same.  And so those of us who are in the inner cone of

16    ultimate confidentiality have a strong sense of things --

17    what I would say which is public is that the debtors'

18    forensic reports that many have cited and on some levels

19    some others have credit for, even the work was ours, show

20    over $10 billion in transfers going out.  There's a second

21    (indiscernible) report that shows transactions, some of

22    which are potential undervalue transactions, and, you know,

23    it doesn't -- and there are all the public reports about $13

24    billion and the like and media articles saying this is 2

25    percent of their wealth.  And so, you know -- again, I'm not

Page 87

1    going to disclose anything at all except to say that the

2    estate carefully considered whether -- even you viewed the

3    order applying at all, whether the Sacklers paying 225 to

4    fully resolve the DOJ would have a, quote, material effect

5    of frustrating enforcement of a potential future fraudulent

6    transfer judgment and we think it doesn't.

7              And we think it doesn't at least --

8              THE COURT:  Can I just stop you there?  That may

9    well be the case and no one really is arguing that it isn't,

10   but at the same time, I don't really have any evidence to

11   say it is.

12             MR. HUEBNER:  No and Your Honor, keep going.

13   There's a -- I'm going to explain why I think one can reach

14   that conclusion pretty comfortably, frankly, on the basis of

15   what I'm about to say.  And maybe I'm wrong but --

16             THE COURT:  Okay.

17             MR. HUEBNER:  -- let me -- that's where I'm going

18   next, right.  So obviously as those pointed out, if we reach

19   a settlement, this is not relevant.  If there's no

20   settlement and there's a litigation and the estate claims a

21   loan otherwise would have taken every single penny of the

22   Sacklers and we leave them literally penniless and we're

23   still owed more money, as you pointed out, we go after -- I

24   think although it sounds kind of crazy but there it is in

25   this extreme fact pattern -- the DOJ.  If our causes of

Page 88

1    action are less than the Sacklers' net worth, then we can

2    recover on them and this payment did not have the material

3    effect.

4           Whether or not the payment to the DOJ has its

5    origin in funds that are directly or indirectly traceable to

6    Purdue, I actually think is a red herring because what

7    happens in a fraudulent transfer judgment under 550 and 551,

8    especially when it's cash that was transferred since the

9    estate has the option of either getting the economic value

10   plus pre-judgment and post-judgment interest or getting the

11   property back.  Since this is largely cash transfers, we get

12   the value so if someday a court finds that we get -- you

13   know, the Sacklers have to return X billion dollars, we just

14   have a judgment against them and we can recover against all

15   of their assets, you know, wherever located irrespective of

16   whether they are traceable as being Purdue transfers because

17   we're not trying to get the exact physical dollars back.  It

18   was all, obviously, electronic.  We're simply recovering on

19   our judgment and so I don't know that it's actually

20   analytically relevant in terms of recoverability whether

21   these funds that were used, even in the extreme fact pattern

22   where we need every single penny they possibly have to

23   satisfy the judgment, that in fact the origin of these funds

24   is particularly relevant, frankly, analytically, obviously.

25           Now let's turn to how we got protected from this.

1            THE COURT:  The transferees that the committee is

2    focusing is not the Sacklers.  It's the government.

3            MR. HUEBNER:  Correct.  And that's my point, Your

4    Honor.

5            THE COURT:  I took it that that's why this direct

6    or indirect is relevant is because if it's not direct or

7    indirect then the government hasn't gotten anything that

8    could be recovered from it.  And so they don't have to worry

9    about the payment.

10           MR. HUEBNER:  And that is -- Your Honor, that's

11   why I was not readdressing the recoverability from the

12   federal government point.  My goal --

13           THE COURT:  Okay.

14           MR. HUEBNER:  -- was -- and, you know, candidly,

15   when you look at the Sacklers' blackline order which has a

16   lot stuff -- new stuff -- in it -- it probably more than

17   doubled the (indiscernible) -- a lot of that -- I don't

18   think it tells out of school -- came from me because I

19   wanted to tie down many different ways that the estate was

20   not going to put at risk of losing recoveries because of

21   this payment even in that extreme fact pattern where the DOJ

22   payment is not a good thing it's a bad thing.  We failed to

23   reach agreement with the Sacklers.  We sue them.  We get a

24   $100 billion judgment that exceeds their net worth and

25   somehow we can't get it back from the federal government and

Page 90

1    so we're left 225 shy, all of which by the way is obviously

2    a fact pattern that I think is completely unrealistic.  But

3    we get paid to draft for every eventuality and risk we can

4    think no matter no remote.

5            So if you work up from the bottom you start with

6    the new paragraph 7 which says that no Sackler is allowed to

7    ever argue that they can reduce or offset any damages

8    because this 225 is like -- that would have been something

9    you could have recovered but now we paid to the federal

10   government.  Sorry.  You know, the rest of the money we have

11   is clean.  Again, that argument is analytically in fact

12   without any possible merit because what we would have

13   against them is a cash judgment and it wouldn't matter where

14   their then extant assets came from, but just to protect us

15   fully, they're barred by a court order that would become

16   essentially an affirmative injunction from ever seeking to

17   reduce or offset any damages awarded whether or not this 225

18   ultimately is proven someday by someone to be direct or

19   indirect.

20           Paragraph 6 cauterizes the risk a different way.

21   In other words, everything we could think of we threw in

22   which is why there is all this new language.  Paragraph 6

23   says there's like an automatic reallocation.  In other

24   words, it's essentially like an -- and forgive the pun, Your

25   Honor, it's absolutely not intended -- it's an anti-

Page 91

1    marshaling provision that actually essentially means the

2    court and the Sacklers agree -- they're the ones seeking

3    this order -- will deem the 225 as having been paid from

4    non-transferred funds.  So even if we actually had to

5    recover specifically transferred funds as opposed to merely

6    recovering on a money judgment, this is deemed to be non-

7    transferred.  So we get access to the full corpus of

8    anything that's left up to the amount of transfers, again,

9    if that were the law works which in fact it doesn't, so it's

10   kind of, you know, suspenders on suspenders.

11          Then you go to paragraph 5, right, which expressly

12   says it's deemed to have the (indiscernible) so it's even

13   like an equitable reallocation suspenders on suspenders.

14   Paragraph 5 is the actual suspenders which is that the

15   amounts are actually being deemed to be made from funds that

16   are not proceed.  And then you go to paragraphs 3 and 4

17   which are not contested.  That's language we all agreed on

18   and buffed up that the two settlements are utterly

19   interdependent.

20          So you might say, and it would be a fair question,

21   you know, why are the debtors weighing in on this, right, if

22   they had no role in the Sackler DOJ settlement.  And the

23   answer is because our job, as always, is to push forward

24   things that we believe are in the best interests of the

25   estate, and, you know, Mr. Troop and -- he may rue the day

Page 92

1   because actually I was going to say few factual things I

2   thought would be extremely helpful for several people to

3   hear but whatever.  All good.  You know, we believe very

4   strongly that it is in the best interest of the estate,

5   including with respect to the phase two mediation, that this

6   payment which I think it's fair to say in the context of

7   their overall reported wealth is a small percentage, be made

8   and that this be another plank in the case that we've talked

9   all along.  It's been 13 months, Your Honor.  I've never

10   varied -- intercreditor allocation, DOJ, final Sackler deal

11   with the estate.  And this is the huge --

12          THE COURT:  Well, can I stop you at this point?  I

13   mean, the agreement is agreed and I'm not being asked to say

14   that the payment can't be made.  I'm just being asked to

15   defer a ruling, having given parties a couple of indications

16   on how I might ultimately rule, so that the parties can

17   continue on with the mediation.

18          MR. HUEBNER:  Understood, Your Honor.

19          THE COURT:  I'm not being asked to undo this

20   agreement.  And I think -- I agree with you.  I think -- it

21   appears to me, although again I don't have anything close to

22   all the facts, but it appears to me in the context of part

23   two of the mediation that -- and my review of this agreement

24   and the agreement between the DOJ and Purdue which leaves a

25   substantial amount of the value to the states that as far as

Page 93

1    the case is concerned this is a constructive step.  I'm not

2    sure why making the payment at this point is -- makes it an

3    even more constructive step since the parties on both sides

4    are committed to it.

5            MR. HUEBNER:  Yeah.  So, Your Honor, I would say

6    this.  These are difficult issues for me to say much more

7    about both because I'm talking about someone else's very

8    serious settlement with the United States of America and

9    because we are dealing with mediation privilege, but let me

10   just say two things and there's more that, frankly, I think

11   would be helpful but I really cannot say.

12           Number one, under colloquy before about abatement,

13   there is one thing that I think just simply has to be said

14   about the November 17th and I will leave it at one fact

15   which is, the DOJ's $2 billion forfeiture claim as

16   contemplated under the debtor DOJ settlement -- almost 90

17   percent of it -- 1.775 billion -- is not being taken by the

18   federal government but instead is being deemed paid and

19   satisfied in full only if it goes on account of the claims

20   of state, tribal, and local governments in the abatement

21   framework that we have already worked out.  And so Your

22   Honor's question --

23           THE COURT:  Right.

24           MR. HUEBNER:  -- fundamentally was, is the DOJ

25   letting most of what it could have taken go to abatement.

Page 94

1    You have to zoom out and I apologize.  I know it's not on

2    for today but the question simply cannot be thought about

3    unless you actually look at the much larger settlement

4    coming next month because the overwhelming -- overwhelming -

5    - majority of what the federal government could have taken

6    from both the company and the Sacklers is deemed less for

7    two purposes.

8             One, it's being directly directed to abatement in

9    the form of the $1.775 billion credit, and two, as Mr. Uzzi

10   pointed out, by taking what, again according media reports

11   in a relatively or quite or tiny -- whatever adjective you

12   want to use -- portion of the Sacklers' wealth, the big

13   negotiation that lies ahead remains the Sacker, slash,

14   estate, hyphen, creditors negotiation and so that -- you

15   know, there are two different ways in which we think the DOJ

16   settlement, to us and to them, is absolutely and most of all

17   in the public interest of the states and the American

18   people.

19            As to why today and not in a month -- again, Your

20   Honor, if they were debtors before the Court and you had

21   jurisdiction over their assets and they were seeking 9019

22   relief and you said, you know, with respect to your business

23   judgment the settlement should go first -- I've heard good

24   arguments in all directions.  I'm totally convinced about

25   the order.  But they're actually not debtors under your

Page 95

1   jurisdiction and we wouldn't be here at all, frankly, except

2   that the order happened to have some extra language in it

3   that says, or has the material effect of frustrating

4   enforcement.  Because when you look at all the

5   (indiscernible) where we actually -- we're all talking about

6   was secretion especially because a lot of the A side was

7   overseas and in fact Your Honor lauded the injunction and

8   the secretion language at great length, noting, quite

9   sharply at time to parties, that we actually got for the

10  estate far more than we might ever get in years of civil

11  litigation and discovery because we'd have to do letters of

12  rogatory and the Hague Convention and international

13  discovery and the like and that really was the animated

14  concern.

15          And so when I think you look at sort of what it --

16  what hurdle is it that the Court has to, you know, agree

17  either that is doesn't apply or it is satisfied, this is not

18  a 9019.  This is, just does this injunction bar this payment

19  and respectfully, I don't think there's a reference anywhere

20  in any transcript at any hearing about this that even

21  contemplated that it would bar public, you know, settlement

22  and judgments, let alone with the United States of America,

23  which everybody acknowledged was an unstayed party.  And

24  even more so, Your Honor, one last point that no one has

25  told you yet which also weighted heavily into the debtors'

Page 96

1    the special committee's calculus is that what the term sheet

2    from last October does talk about is that the non-federal

3    governmental claimant have to be satisfied with the amount

4    of dilution on the, quote, $3 billion minimum deal with the

5    Sacklers from the federal government.

6             The federal government deal demands that that

7    dilution be zero because they have required that the 225

8    that we're talking about be incremental to the 3 billion

9    which is another reason that --

10            THE COURT:  No, I understand that.  I -- look.

11   Let me go back to the timing point for a second, Mr.

12   Huebner.  This is as much a question for Mr. Fogelman.  Can

13   either side to this settlement agreement between the Sackler

14   families on the one side and the DOJ on the other -- can

15   either side -- does either side other than a breach of

16   course have the ability to get out of this agreement if I

17   adjourn this to November 17th?

18            MR. UZZI:  Your Honor, it's Gerard Uzzi.

19            COUNSEL:  Your Honor, this is -- oh, go ahead,

20   Gerry.

21            MR. UZZI:  Your Honor, Gerard Uzzi again.  You

22   know, that -- at the risk of speaking against my own

23   interests, the last sentence of paragraph 2 of the

24   settlement agreement provides that if the bankruptcy court

25   denies the motion to confirm, the motion to confirm is not

Page 97

1    granted in full, or the relief or the bankruptcy court's

2    order is not consistent with the terms and conditions of

3    this agreement, the United States may, in its sole

4    discretion, rescind this agreement.

5            Now my counterparty is the United States of

6    America and the -- now I know what I believe that's supposed

7    to mean.  But the question, is, you know, who's going to

8    interpret this and who's going to enforce this if the United

9    States were for whatever reason exercise or claim it has a

10   right to rescind.  I mean, we've already been through the

11   discussion that it's not this Court, that this Court isn't

12   taking jurisdiction over this agreement and we completely

13   understand that.  But, you know, it's easy for, I think, you

14   know, parties to say, oh, just push this off and there's no

15   risk.  I think there's risk in delay, Your Honor.  There is.

16           THE COURT:  Well, all right.  So no -- certainly

17   the Sacklers can't get out of it.  Right?

18           MR. UZZI:  Correct.

19           THE COURT:  Okay.  So Mr. Fogelman, if I adjourn

20   this to November 17th -- I'm not denying it and -- I'm just

21   not ruling on it until the 17th -- does the United States

22   have the right to rescind the agreement?

23           MR. FOGELMAN:  Your Honor, if I can answer that.

24   This is Larry Fogelman from the U.S. Attorney's Office.  To

25   address Your Honor's question I'd first like to backtrack

Page 98

1    for a moment just to look at the broader context of

2    paragraph 2.  The United States in entering into this

3    agreement did insist that we include this language about

4    expressly disclosing the facts that the settlement funds

5    here may come directly or indirectly from transfers from the

6    debtors.  We understand that the Court is going to be

7    addressing fraudulent transfer issues through this case and

8    it's very important to us that this fact was and has been

9    disclosed to the Court.

10           You know, with regard to the question about

11   timing.  Well, I'm not prepared to formally waive any rights

12   we may or may not have under paragraph 2 in terms of the

13   last sentence.  We certainly have no present intention of

14   voiding the settlement agreements if Your Honor chose to

15   wait until November to rule on this.  We are -- again, in

16   the light of wanting to bring this issue to the Court's

17   attention, we're similarly deferential to the Court in terms

18   of how it wants to address the timing on this issue.  Thank

19   you.

20           THE COURT:  Okay.  I mean, I haven't even granted

21   the motion to shorten yet.  Technically, this isn't even

22   being heard except as a preliminary conference.  Let me ask

23   a more pointed question.  Does -- we obviously have

24   something that will happen between today and November 17th,

25   namely, a presidential election.  Does a new attorney

Page 99

1    general -- well, of course it wouldn't be a new attorney

2    general then.  It would be -- the 17th is not before the new

3    administration if there is a new administration would come

4    in.  So that wouldn't play into it at all.  Correct?

5                 MR. FOGELMAN:  Your Honor --

6                 THE COURT:  This is still the DOJ before or after

7    the election.  Right?

8                 MR. FOGELMAN:  Your Honor, I think that's

9    accurate.  I think the administration remains in place no

10   matter who wins the election until they're --

11                THE COURT:  I think we can agree on that.  Okay.

12   So --

13                MR. UZZI:  But, Your Honor -- it's Gerard Uzzi.

14   If I can just be heard just for one moment more on the

15   timing, Your Honor.  You know, we -- it seems to me that the

16   issue that we're talking about here is the issue relating to

17   the indirect proceeds of transfers or transfers -- well,

18   should I say of rather, proceeds of indirect transfers from

19   Purdue and whether or not if we use those proceeds it

20   wouldn't violate the anti-secretion language.  Now I found

21   that argument to be somewhat puzzling, and again, I'm going

22   to speak a little bit against my own interest because I

23   don't believe the anti-secretion language is limited to

24   proceeds from Purdue.  I mean, we've agreed to the anti-

25   secretion language with respect to all of our assets whether

1    or not --

2             THE COURT:  I agree.  I think the proceeds point

3    only goes to the 550 point as far as immediate or

4    intermediate transferees.  You don't need to -- this

5    language prohibits any transfer that's material.

6             MR. UZZI:  Well, I agree with that, Your Honor.

7    And -- well, it prohibits a transfer that would be -- that

8    would materially frustrate this Court's ability to enter or

9    exercise a judgment.

10            THE COURT:  Right.

11            MR. UZZI:  Right, which I believe that were

12   outside of this language for that purpose.  But more

13   importantly, Your Honor, I mean, what we --

14            THE COURT:  Why?  Is it because of the financial

15   disclosure that I haven't seen and the assessment of the

16   case?  I mean, I -- you -- it may well be true.  I mean --

17   and I don't have people jumping up and down and telling me

18   that, you know, this is going to deplete our recovery.  In

19   fact, my sense is just the opposite.  But I really don't

20   have that record today.  I'm not suggesting that people need

21   to put it in front of me necessarily but I don't have it

22   today.

23            MR. UZZI:  But even if that's the case -- I don't

24   believe it's applicable because I don't believe that that

25   was ultimately the intent of this language, putting aside

Page 101

1   the facts and needing to take into consideration --

2           THE COURT:  Well, I don't have that before me

3   either. I have the language in front of me and the language

4   says what it says.  In fact, no one has quoted to me any of

5   the transcripts.  They're just telling me what they believe

6   was said.  So enough of that.  I have the language that's in

7   front of me.

8           MR. UZZI:  Fair enough, Your Honor.  What we've

9   heard here today, though, is really an attempt to try and

10  use the -- a delay in a determination here to get me to make

11  some sort of admission that is against my interest that is

12  irrelevant, really, to whether this relief should be

13  granted.

14          THE COURT:  I agree with you on -- I think I was

15  pretty clear with Mr. Price.  I don't see why that is at all

16  appropriate.  I agree with you on that point.

17          MR. UZZI:  And so therefore, Your Honor, and very

18  respectfully, Your Honor, I question why we would -- what

19  else do we need to address at this point that we will

20  address on November 17th that we haven't already addressed

21  today.  And certainly your comments on the order, Your Honor

22  -- we have no issues with your additional comments on the

23  order.  Again, we're not trying here today to play any sort

24  of litigation tactic games in trying to get it -- some sort

25  of advantage.  We just would like to advance this.  We think

Page 102

1    that it's beneficial, Your Honor.  That's all I have to say.

2            THE COURT:  Okay.  And I -- that's fine.  I don't

3    think you are trying to get any sort of advantage.  On the

4    other hand, I don't really see a disadvantage in letting the

5    mediation proceed for another three weeks to see where we

6    are at that point.  I just -- you know, it, to me -- I think

7    as far as the mediation and the negotiations between the

8    Sacklers and the states are concerned, it appears to me that

9    this settlement is a positive development not a negative

10   development.  On the other hand, I'm not a party to those

11   negotiations and having seen it, I don't see a risk to the

12   settlement of granting -- of adjourning the motion or in

13   fact even saying that we'll hear this motion on regular

14   notice with any other objections to come in on the 3rd of

15   November.

16           I don't think there will be any other objections

17   that aren't already encompassed by the thoughtful objection

18   raised by the committee and the non-consenting states.  I

19   mean, I think the record is clear.  I'm not approving this

20   settlement.  This is the United States judgment as to

21   whether they want to enter into this or not -- you know, the

22   DOJ on behalf of the United States and the agencies.  I'm

23   certainly not approving from the Sacklers' perspective.  I'm

24   just dealing with one provision in an order which, to me, I

25   think I will need to say to make it clear -- and this is

1   consistent with the order -- I mean, I'm sorry, with the

2   paragraph 2 of the settlement -- this order is deemed not to

3   violate paragraph 13 or any other order of the court.

4          And to the extent it would, the covered parties

5   are relieved from paragraph 13 to make the payment but then

6   with the other protective language we've discussed and

7   ultimately, the only issue then is whether in fact a payment

8   of $225 million to the federal government contravenes the

9   purpose -- I think it probably contravenes the language --

10  but contravenes the purpose of paragraph 13.  It probably

11  doesn't but it would appear to me it's probably better to

12  have the mediation play out at least over the next two-and-

13  a-half weeks to see whether we even to make that ruling.

14          MR. UZZI:  Understood, Your Honor.  If --

15          THE COURT:  You know, I just -- I think I can't

16  really say any more than that with the one caveat.  If the

17  Department of Justice or their boss can say, this money is

18  going as soon as we can deliver it to abatement and -- you

19  know, then I don't think anyone would object to this.  And

20  frankly, I think they'd get a medal.  But that's just me

21  talking.  That's the other way to resolve this and it's a

22  way that would make a lot of people happy.  So I'd like to

23  see whether one of two things can happen.

24          I think the first of those two things would make a

25  lot of people happy, too, which is an overall agreement

Page 104

1    here.  If it doesn't happen, you know, maybe the second

2    would moot everything and make a lot of people happy.  If

3    neither of those things happen, I think you have a sense of

4    where I'm going to come out on this, perhaps with a little

5    more evidence to support it and a clear order.  But that's

6    really where I'm coming out, frankly.

7               MR. UZZI:  Your Honor, if I may ask.  The November

8    17th calendar is crowded.  We've -- you've already heard

9    substantial argument on this.

10              THE COURT:  I agree.  I'm not thinking of a lot

11   more here.  I'm not really thinking of this as, you know,

12   another two hours of argument.  You know, unless someone

13   makes a brand-new point that they want to make an objection

14   that isn't easily addressed, I think that we probably just

15   need an update and probably a revised order.

16              MR. HUEBNER:  Your Honor, one small point -- this

17   is Marshall Huebner -- from my end.  I actually did not want

18   to burden the Court and the parties before.  I actually have

19   all six citations from the transcripts right in front of me

20   on my screen.  I didn't read them because I thought it would

21   be a burden.  It sounded that maybe the Court was a little

22   frustrated that you didn't hear how parties described this

23   provision so if that's helpful now --

24              THE COURT:  Well, I can hear on the -- I can hear

25   it on the 17th or you could submit that.  I mean, that's

Page 105

1    just you, right?

2              MR. HUEBNER:  I just didn't -- I didn't want the

3    Court to think that we were unprepared to address concerns

4    that might have come up and --

5              THE COURT:  No.  No, that's fine.

6              MR. HUEBNER:  -- I made a decision to say, let me

7    go through them.  I have them right here.  But, you know, we

8    actually do have them fully collated and are happy to make

9    them, obviously, available to people.

10             THE COURT:  Okay.

11             MR. ECKSTEIN:  Your Honor, if I may.  This is Mr.

12   Eckstein.  Can I just -- can I make one brief comment if --

13   I know that the hour's late.

14             THE COURT:  Sure.

15             MR. ECKSTEIN:  I appreciate Your Honor has

16   indicated your ruling and hearing this on the 17th.  We'll

17   abide by that.  I did want to make the point, Your Honor,

18   that we thought that today's motion was narrow.  We actually

19   believe that the points raised by the UCC and the non-

20   consenting states were very well taken and we actually shard

21   in those points and we thought that the resolution --

22   resolutions that were proposed in a modified order and as

23   further clarified by Your Honor were very helpful and we

24   thought actually protected the estate against any potential

25   risk that the payment if it's ultimately made to the

Page 106

1    Sacklers could be used adversely against the estate.  And so

2    we felt the actions were appropriate.  The solution was

3    appropriate and we actually thought that this matter has

4    been effectively resolved.

5             Nonetheless, I gather Your Honor is inclined to

6    defer this to the 17th.  I will say from a personal

7    standpoint, Your Honor, I think particularly in this case

8    were there are very, very sort of big picture macro issues,

9    we tend to believe that certainty is advantageous to the

10   estate and on balance I would prefer that we lock down as

11   much as can and to the extent this is put into place, we

12   think that would be advantageous.  If it's going to wait

13   until the 17th, we can abide that.  But I hope that there's

14   no implication taken that if the mediation can be delayed

15   further, that that somehow will further delay locking this

16   down.  So we just wanted to make that point clear that we

17   are looking to try to create as much certainty as possible

18   so we can button down open issues in the case including the

19   DOJ.

20             THE COURT:  Right.  Well, I -- that's well taken.

21   On the other hand, I do have a contract here and I don't

22   think either side could really get out of it, frankly, in

23   this context based on carrying the hearing to the 17th.

24   I'll reiterate that I think about 98 percent of the record

25   is before me already.  I would like to see the revised

Page 107

1    order.  I think it is clear that I don't believe, although

2    it was a nice try, that one can reasonably back the Sacklers

3    into saying that this payment will be made from funds that

4    aren't indirectly proceeds of distributions unless you

5    define it in a way that they could actually make that

6    statement which I don't people want to do.  So the focus is

7    really on protecting judgment creditors and the estate under

8    550 or the equivalent and I think you can do that.  I'd like

9    to see the order.

10        But I'd also like to have the parties move ahead

11   in the light of this agreement which again, I think,

12   although I'm not involved in the mediation, obviously, is a

13   very constructive step in the case.  Or alternatively, for

14   the federal government to say the money's going was -- said

15   I hope it will go.  Either of those things, I think, will

16   bring a prompt resolution to this and, yes, I'm not looking

17   to adjourn this any -- or carry it any longer than mid-

18   November.

19        So I'll trust the parties are all focused on

20   resolving these issues with the Sacklers, not just this

21   issue that was today's hearing but the overall issues.  I

22   think it is a very positive step that the federal government

23   has worked out its civil issues with the Sacklers to the

24   extent set forth in the settlement and its issues with the

25   debtors in the way that it has.  And I think that should

Page 108

1  foster movement in the mediation.  So enough said on that.

2  I will carry the hearing.  I will not take any more

3  objections to this motion beyond November 3 and I don't

4  contemplate having a lengthy hearing at that time but more

5  of an update.

6          MR. HUEBNER:  Your Honor, one tiny process

7  question.  This is Marshall Huebner.  Since the objectors

8  and obviously a deeply involved party including the debtors

9  are the ad hoc committee on accountability, the non-

10 consenting states, and the UCC, and since in fact I think

11 that when we all sit down and look at the transcript Your

12 Honor may have actually given enough guidance to get

13 everything squared away with an order -- I just don't know

14 yet -- if the parties are able to agree on an order -- those

15 four parties and obviously the Unites States of America as

16 well -- maybe submit it (indiscernible) of counsel or do you

17 prefer that even it's agreed to and the parties would like

18 it submitted, that we're sort of not allowed to and have to

19 wait and add it to the docket of the 17th?

20         THE COURT:  No.  You could submit it.  I think

21 you'd probably want to wait until the 3rd, but I think you

22 could submit it.  I mean, I know you could submit it.

23         MR. HUEBNER:  Absolutely.  Okay.  Forget I --

24 maybe I'm too --

25         THE COURT:  But I referred you to -- if you can

1    resolve it I think you -- look, Mr. Uzzi did say something

2    at the beginning and frankly, Mr. Fogelman said something,

3    both of which are important.  This issue it was important to

4    flag.  Now the fact that this payment was going to be -- was

5    contemplated and that there was an issue as to whether it

6    would be coming from -- directly or indirectly -- proceeds

7    of distributions from Purdue.  The government was absolutely

8    right to want that flagged publicly.  That was important.

9          Mr. Uzzi was right in saying it was important to

10   get this in front of the Court promptly to get direction as

11   to whether I believed on notice to parties and interests

12   that this payment would violate my order and if so, whether

13   they could get relief from it.  So I don't -- but we've now

14   had that hearing.  I think you know where I'm coming out.  I

15   doubt there will be any new points raised so I think you

16   have a fair amount of guidance on how to deal with it.

17          MR. HUEBNER:  Yep.  And we will try to push it

18   forward.

19          THE COURT:  So unless there's anything more to be

20   said, I think that will conclude today's calendar on Purdue.

21   Am I right (indiscernible)?

22          MR. UZZI:  Your Honor, just one administrative

23   question.  Again, Gerard Uzzi.  Would you like us to file a

24   notice with respect to the objection and the continuation or

25   is this record sufficient?

Page 110

1              THE COURT:  I think you should file a notice.

2              MR. UZZI:  Okay.  Thank you, Your Honor.

3              THE COURT:  Okay.  Thank you.  And you can put in

4    the notice the parties should refer to the transcript of the

5    hearing if they -- for further direction on the nature of

6    the hearing on the 17th if there is to (indiscernible).

7              MR. UZZI:  Thank you.  Yes, Your Honor.

8              THE COURT:  Okay.  Great.  Thank you.  Thanks

9    everyone.

10             MR. UZZI:  Thank you.

11             MR. FOGELMAN:  Thank you, Your Honor.

12             MR. QUINN:  Thank you, Your Honor.

13             (Whereupon these proceedings were concluded at

14   3:12 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 111

1                    C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 30, 2020