**Exhibit 1**

REDACTED

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Elizabeth Scott (*admitted pro hac vice*)
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY IN SUPPORT OF
ITS MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED
DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME
FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

here, that are based on disloyalty and bad faith. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006) (observing that a statutory safe harbor "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty"). The Sacklers' knowledge of Purdue's criminal misconduct can be inferred from their hands-on management of Purdue—especially its efforts to drive sales of OxyContin—and vitiates any claim that they acted negligently, but in good faith.

28. Indeed, and by design, Purdue's Board—and thus the Sacklers—expressly retained control over all major decisions, and "guided" management. ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████ Preis Decl., Ex. 136 at PPLPUCC500647349 [PEO/HC].

29. █████████████████████████████████████████████████

██████████████████████████████████████ *See generally* Preis Decl., Ex. 134 [PEO/HC]. ████████████████████████████████

███████████████████████████████████████████████████████████████

*Id.* at PPLPUCC002603603. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

REDACTED



*Id.* at PPLPUCC002603602.

30.

*E.g.,* Preis Decl., Ex. 137 [C].

Preis Decl., Ex. 133 at PPLPUCC002449097 [PEO/HC].

Preis Decl., Ex. 135 at PPLPUCC9003800125 [HC].

31.

Preis Decl., Ex. 142 at PPLPUCC9004448656 [HC].

Preis Decl., Ex. 218 (Pickett Dep. 144:19-145:20; 150:25-151:17).

Preis Decl., Ex. 137 at PWG004670879-80



[C].

Preis Decl., Ex. 223 (Kathe Sackler Dep. 272:3-10).

32.

*See* Preis Decl., Ex. 218 (Pickett Dep. 88:16-91:2); Preis Decl., Ex. 143 (CP0000015

[C].

Pries Decl., Ex. 218 (Pickett Dep. 91:8-92:3).

*Id.* at 92:7-10.

*Id.* at 140:18-22.

,[14]

[15]

,[16]

33.

Preis Decl., Ex.

135 at PPLPUCC9003800125 n.1 [HC].

[14] *See* Preis Decl., Ex. 174 at MSF00144656-58 [OPEO].
[15] *See id.* at MSF00144650 [OPEO].
[16] *See* Preis Decl., Ex. 125 ( PPLPUCC9002657294 [HC] ).

███████████████████████████████████████████████████

██████████████████████████████████████.17  ████████████████

███████████████████████████████████████████████████

████████████████████ *See* Preis Decl., Ex. 132 at PPLPC036000177151 [C].  ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Preis Decl., Ex. 186 at PPLPUCC0004987 [HC].

34. The ardor of Richard and Mortimer Jr. for growing OxyContin sales never wavered, nor did their interventions with Purdue's nominal executive team to drive increased sales:

- ███████████████████████████████████████████████████ Preis Decl., Ex. 138 at PPLPC061000013859-64 [C].

- ███████████████████████████████████████████████████.18

- ███████████████████████████████████████████████████ Preis Decl., Ex. 139 at PPLPC012000174476-77 [C].

- ███████████████████████████████████████████████████

---

17 *See* Preis Decl., Ex. 175 at SideA00229177-78 [PEO/C] ████████████████████
████████████████████████████).

18 Preis Decl., Ex. 138 at PPLPC061000013858-59 [C].



Preis Decl., Ex. 176 at PPLPC023000164605 [C].

- ████████████████████████████████████████████ [19]

- ████████████████████████████████████████████ [20]

- ████████████████████████████████████████████ Preis Decl., Ex. 140 at PPPLPUCC9002981008 [HC].

- ████████████████████████████████████████████ Preis Decl., Ex. 141 at SideA00429689 [PEO/C].

- ████████████████████████████████████████████

35.     The Court also would be within its discretion to draw adverse inferences against the Sacklers based on the refusal of Purdue's CEOs to answer questions at their depositions.  *See, e.g.*, *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (adverse inference may be drawn against party based on non-party invocation of Fifth Amendment privilege); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 523 (8th Cir. 1984) (reversing district court failure to permit plaintiff to call non-party witness to stand to invoke Fifth Amendment where non-party allegedly conspired with defendant).  Among other things, the Court can infer that had the CEOs testified, they would have confirmed what the documents already strongly evidence:  the Sacklers controlled

[19] Preis Decl., Ex. 176 at PPLPC023000164608-09 [C].
[20] *See, e.g.*, Preis Decl., Ex. 177 at PPLPUCC9000363533 [HC].

management and micromanaged Purdue.  *See, e.g.*, Preis Decl., Ex. 224 (Stewart Dep. 151:4-12); *id.* Ex. 225 (Timney Dep. 42:3-5, 52:18-53:11, 107:2-108:5).

2. ***The Sacklers were directly involved or implicated in conduct Purdue has admitted was criminal or that allegedly underpins DOJ claims.***

36. The evidence also connects the Sacklers to specific predicates underlying the Purdue Plea Agreement and the Purdue and Sackler settlements with the DOJ.  Under the Purdue Plea Agreement, Purdue admits to a three count felony information charging Purdue with (i) a dual object conspiracy to defraud the United Sates and to violate the FDCA, including by continuing to market opioids to health care providers ("**HCPs**") despite having information the HCPs were prescribing opioids without a legitimate medical purpose, (ii) conspiracy to violate the Federal Anti-Kickback Statute through improper payments to HCPs, and (iii) conspiracy to violate the Federal Anti-Kickback Statute related to Purdue's payments to Practice Fusion, a cloud based electronic health records organization ("**ERO**").[21]  Purdue stipulated to certain agreed facts in Schedule A to the plea agreement spanning a period from May 2007 through 2017 (the "**Plea SOF**").[22]  The Purdue Plea Agreement attaches as Exhibit C a civil settlement between Purdue and the DOJ which in turn includes an Addendum A ("**AA**") detailing misconduct alleged by the DOJ, but not agreed to by Purdue.[23]

37. The criminal plea is predicated in part on Purdue's failure to inform the DEA that so-called "Region Zero" doctors were responsible for over one million OxyContin prescriptions. Under Purdue's Abuse Diversion and Detection ("**ADD**") program, sales representatives were required to file reports concerning HCPs engaged in practices suggesting potential abuse or

---

[21] *Notice of Hearing on Motion of Debtors Pursuant to 11 U.S.C § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and The United States*, [ECF No. 1828] (hereinafter "**2020 Purdue-DOJ Settlement Agreement**") Ex. B at 2-3.

[22] *Id.*, Ex. B at Schedule A.

[23] *Id.* at Ex. C.  Addendum A begins on page 24.

diversion of opioids, such as "engaging in an atypical pattern of prescribing techniques." 2020 Purdue-DOJ Settlement Agreement, 2020 DOJ Settlement Agreement Ex. B at Schedule A at 16 (Plea SOF ¶ c). "Senior-level Purdue employees" would review the reports and determine whether to put the HCP on a do-not-call list that Purdue referred to as "Region Zero." *Id.* (Plea SOF ¶ d). While Purdue usually stopped "detailing"—calling on—Region Zero HCPs, Purdue and the Sacklers knew that Region Zero HCPs continued to drive revenue by disproportionally writing OxyContin prescriptions. *Id.* Ex. C at 53-54 (AA ¶¶ 27-32).

38.



*E.g.* Preis Decl., Ex. 150 at Slide 8 [C].

*See id.* at 61 (AA ¶ 69). But Purdue did not disclose that information to the DEA, a choice that was or should have been known to the Sacklers, and that Purdue now admits was criminal. *See* 2020 Purdue-DOJ Settlement Agreement, Ex. B at Schedule A (Plea SOF ¶ e).

39. Purdue also tracked average monthly prescriptions by HCPs, which it ranked by "deciles," with the HCPs who wrote the most OxyContin prescriptions in decile ten, and the HCPs who wrote the fewest such prescriptions in decile one. In 2010, Purdue introduced a new "tamper resistant" version of OxyContin that was more difficult to abuse by snorting or injection, though Purdue knew it remained subject to abuse by oral ingestion. *See* 2020 Purdue-DOJ Settlement Agreement, Ex. C (AA ¶ 66). Purdue swiftly saw a substantial and sustained drop in OxyContin

REDACTED

sales.[24] ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Preis Decl., Ex. 144 at RSF_OLK00035020 [HC].

40.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████  Preis Decl., Ex. 145 at PPLPC012000372585 [C]. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Preis Decl., Ex. 226 (Mortimer Sackler Dep. 310:16-25).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  *Id.*

41.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  Preis Decl., Ex. 152 at MDSF00986949 [PEO]. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



---

[24] ████████████████████████████████████████████
████████████  *See* Preis Decl. Ex. 178 at
POK003735985 [C].

*Id.* at MDSF00986953.

42.

*See* Preis Decl., Ex. 150 at Slide 8 [C].

Preis Decl., Ex. 154 at PAK000062565 [C].

Preis Decl., Ex. 226 (Mortimer Sackler Dep. 335:5-336:22, 338:3-16).

Preis Decl., Ex. 154 at PAK000062570 [C].

43.

Preis Decl., Ex. 146 at PPLPC012000441614 [C].

REDACTED

███████████████████████  Preis Decl., Ex. 155 at PPLP004409892-93 [C].  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

44.  ████████████████████████████████████

████████████████  Preis Decl., Ex. 147 [HC].  ████████████

████████████████████████████████████  Preis

Decl., Ex. 148 [C].  According to emails available to the DOJ but not the UCC, at the August 23

meeting with McKinsey, "the room was filled with only family including … the elder statesman

Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs … they were

extremely supporting of the findings and our recommendations … and wanted to strongly endorse

getting going on our recommendations."  2020 Purdue-DOJ Settlement Agreement, Ex. C (AA ¶¶

103-104).  Purdue proceeded to adopt the McKinsey plan, which it called "Evolve to Excellence"

(or "**E2E**").  *Id.* (AA ¶ 90).

45.  This Sackler-endorsed program, which "focused on intensifying marketing to the

very highest-volume prescribers in the country," underpins the DOJ's claim that Purdue

"knowingly caused [the submission of] false and or fraudulent claims," and may also have

contributed to a predicate for Purdue's guilty plea, including by aiding and abetting the dispensing

of medically unnecessary prescription drugs, and by continuing to detail HCPs "in situations in

which Purdue possessed sufficient information that a decision should have been made to cease

detailing."  *Id.* (AA ¶ 108); *id.*, Ex. B at Schedule A (Plea SOF ¶ f) (failure to maintain effective

controls and thus defraud the DEA included detailing HCPs).  ████████████████

████████████████████████████████████████████████████

REDACTED

███████████████████  Preis Decl., Ex. 149 at PPLPC012000471642 [C].

46.     The Sacklers' direct involvement in conduct identified in, or related to, the Plea

Agreement and Civil Settlement with the DOJ, can also be inferred from the refusal of Purdue's

CEOs during the key period to answer the UCC's questions on Fifth Amendment grounds.  The

following is a sample of related questions the CEOs refused to answer:

- From at least 2010 to the end of your time as CEO of Purdue, did Purdue engage in strategies that resulted in prescriptions that were not medically indicated, were unsafe, ineffective and/or medically unnecessary[?] … Those prescriptions were then sometimes diverted for uses that lacked a legitimate medical purpose, correct?  Preis Decl., Ex. 224 (Stewart Dep. 144:3-145:7).

- A strategy that Purdue employed that furthered the opioid crisis included targeting prescribers most likely to prescribe opioids, correct[?] … The expected increase in sales from such targeting was over $100 million annually, correct? … And the Board of Directors of Purdue approved that targeting prescriber program, correct?  *Id.* Ex. 224 (Stewart Dep. 145:8-146:11).

- Yet another strategy that Purdue employed that furthered the opioid crisis included speaker programs where Purdue paid certain prescribers to speak to other prescribers about why they should prescribe OxyContin and other Purdue opioids, correct? … Purdue knew that speaker programs had a high risk of creating high risk of creating off-label abuse of opioids, correct? … The riskiness of such programs were reported to the board, including the Sackler members of the board correct?  *Id.* Ex. 224 (Stewart Dep. 146:23-149:7).

- You and the Board Members of Purdue knew that more prescriptions of ADF OxyContin translated into more abuse, correct? … [D]espite that knowledge, the company and the Board pushed to increase prescriptions, to increase profits, to increase distributions to the Sacklers, correct?  *Id.* Ex. 225 (Timney Dep. 69:15-70:5).

- The Sacklers exercised substantial oversight and control over management's operations of Purdue, correct? … While you were CEO, the Sacklers received regular detailed reports from you and other members of management about sales trends, correct? … The Sacklers had direct communications with you and other Purdue executives, including sales and marketing executives concerning forecasts and marketing strategies and tactics, correct? … The Sacklers directed management to use sales tactics that would cause more higher dose opioid prescriptions to be written, correct?  *Id.* Ex. 225 (Timney Dep. 107:2-108:5).

In short, there is more than sufficient reason to believe that the Sacklers breached their fiduciary

duties to Purdue by "consciously permitting the company to violate positive law," failing

adequately to monitor Purdue or, with gross negligence, causing or allowing Purdue to engage in

criminal conduct.  *See AmerisourceBergen Corp.*, 2020 WL 132752, at *22.

    **C.**    **Intentional Fraudulent Transfer:  Probable Cause Exists to Believe that the Sacklers, in Control of Purdue, Sought to Hinder or Delay Creditors**

    47.    Probable cause for application of the crime fraud exception may be found where a transferor is subject to, or has reason to fear, litigation or other unliquidated liabilities, and makes transfers to allegedly creditor-remote vehicles like trusts.  *See, e.g.*, *Cendant Corp.*, 246 F.R.D. at 405-06 (holding that the "most logical inference" from defendant's decision to transfer assets to trust while subject to litigation was that transferor sought to "hinder, delay or defraud" litigation creditors); *Sec. Inv'r Prot. Corp.*, 319 F.R.D. at 108 (noting that "temporal proximity" between transferor's decision to buy house solely in spouse's name and her knowledge that Ponzi scheme was about to unravel were relevant to probable cause for crime fraud exception). ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████  *See* Hurley Decl.

[ECF No. 1754], Ex. 58 at 488;[25] BXO at 15; AXO ¶¶ 54-55 (purporting to distinguish *Cendant*).

In fact, ████████████████ not only could have been predicted dating back to 2007, the evidence shows that the Sacklers perceived and feared that threat when they made the challenged transfers.

---

[25] The UCC's citation to aspects of the Sacklers' defense presentations in these cases is entirely appropriate.  Side B actually tried to file its presentation publicly, and raises no objection to its use here.  Side A does object, but without any basis.  Side A's presentation expressly was prepared pursuant to the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518], and presented to the UCC in part to induce it to forbear from taking its own discovery for the first several months of the cases.  After discovery began, Side A argued it should be limited because its presentation "preview[ed] for the UCC" defenses "that would have been developed through expert discovery in the civil litigation that is now stayed by this Court's injunction" and is "highly relevant to the UCC's weighing of the strengths and weaknesses of the litigation claims."  *Compare* AXO ¶ 58 *with Letter from J. Ball to Court*, dated April 29, 2020 [ECF No. 1113] at 3-4 n.6.  The Sacklers never intended to maintain as confidential the positions in their presentations; on the contrary, the Sacklers advised expressly that they would be the centerpieces of their defense if the claims do not settle.

### 1. *The Sacklers' own words and actions reveal their motivations.*

48.    None of the Sacklers' attempts to explain away their contemporaneous expressions of concern about opioid related liability are remotely convincing. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ BXO at 19 (underscore in original, alteration added). █

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████ Hurley Decl. [ECF No. 1754], Ex. 62. ████████████

██████████████████████████████████ *Id.* at PPLPC057000003699. █

██████████████████████████████████████████████████████████

████████████████ BXO at 20 (underscore added by the Sacklers). ████████

████████████████████████ Hurley Decl. [ECF No. 175█ Ex. 62 (emphasis added).

49.    It is clear that the Sacklers remained deeply concerned about future liabilities despite the DOJ agreement. *Compare* BXO at 4 (claiming 2007 settlements "resolv[ed] those risks"). ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████ Preis Decl., Ex. 187 at PPLPUCC004057767 [PEO]. ████████████

██████████████████████████████████████████████████████████

████████████████████████ Preis Decl., Ex. 209 at PPLPUCC9004824942 [HC]. ████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████ *Id.*

50.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Hurley Decl. [ECF No. 1754], Ex. 64 [HC].  To be sure, as the Sacklers

note, David was not then on Purdue's Board, and was 27 years old. ████████████████████████

████████████████████████████████████, Preis Decl., Ex. 226 (Mortimer D.A. Sackler

Dep. 245:22-246:25), ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ *See* Hurley Decl. [ECF No. 1754], Ex. 65 [PEO]. ████████████████

████████████████████████████████████████████████████

████████████████████████████████ Preis Decl., Ex. 221 (David Sackler Dep. 121:9-18);

*see also* Hurley Decl., Ex. 57 [C]. ████████████████████████████████████████

████████████████████████████████████████████████████

████████



Hurley Decl. [ECF No. 1754], Ex. 64 at PPLPUCC002683256 [HC].

51.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Preis  Decl.  Ex.  151  at  PPLPUCC001531750 [HC/PEO]. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████. Preis Decl., Ex. 219 (Baker Dep. 359:10-21). ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Id.* at 359:22-360:6.

    52.  ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Hurley Decl. [ECF No. 1754], Ex. 69.[26] █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Preis Decl, Ex. 228 (Boer Dep. 38:10-

40:8 [HC]). ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Preis Decl., Ex. 164 (

████████████████████████████████████) [FRE 408/PEO]

at 72.

    **2.**    ***Purdue faced massive actual or threatened litigation and vast liability at all relevant times—and the Sacklers knew it.***

---

[26] The Sacklers argue that by June 10, 2007 settlements with the DOJ and certain states had been entered ***"resolving those risks*.*"** Side B Amd. Exceptions Obj. at 4 (bolding and italics in original). ██████████████

████ Preis Decl., Ex. 199 ¶¶ 2-3 (Washington State settlement and release); Hurley Decl. [ECF No.1754], Ex. 61 at PPLPC01200372436-37. And the evidence leaves no room for doubt that the Sacklers believed they and Purdue remained at risk to opioid creditors.

53.     According to the Sacklers, (i) "from 2008-2016" Purdue only "faced occasional litigation risk" akin to that of "any company," (ii) Purdue had buttoned up all litigation by the spring of 2007, and (iii) an "immense wave" of litigation was "simply unfathomable."  AXO ¶ 6. The evidence tells a different story.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████  Hurley Decl. [ECF No. 1754], Ex. 61 at slide 3.  Nor did Purdue face only "occasional litigation risk" akin to that of "any company."  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████[29]  The Sacklers argue that products liability actions were not an existential threat, and note that many began to settle in 2011 and 2012.  By that time, however, the Sacklers already had transferred close to $7 billion in cash to themselves or for their benefit.  *See Cash Transfers of Value Analysis*, dated December 16, 2019 [ECF No. 654] at slide 11. [30]

54.     Moreover, the Sacklers had no assurance in the 2008-2012 time period that litigation would be limited to products liability cases.  Kentucky already had initiated a *parens patriae* action, and additional state lawsuits were far from "unfathomable."  *Compare* AXO ¶ 6.

████████████████████████████████████████████████████

---

[27] Preis Decl., Ex 185 at PPLPUCC500056874 [PEO].
[28] *Id.*, Ex. 191 at PPLPUCC500056916 [PEO].
[29] *Id.*, Ex. 203 at PPLPUCC500056955 [PEO]; *id.*, Ex. 205 at PPLPUCC500056996 [PEO/HC].
[30] ████████████████████████████████████████████  *Declaration of Mara Leventhal dated October 14, 2020* [ECF No. 1812], Ex. 19 at PPLPUCC9002964495 [HC].
████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Preis Decl., Ex. 188b at PPLPC051000035809, PPLPC051000035818-19.[31]

55.     At the time, Mr. Baker was a partner at Chadbourne & Parke, long-time counsel to the Brown & Williamson tobacco company, one of four "original participating manufacturers" that settled with states attorneys' general in the late-1990s for more than $200 billion. [REDACTED]

[REDACTED]

[REDACTED] Pries Decl., Ex 219 (Baker Dep. 365:6-18).  Indeed, according to his web bio, Strauber continues to "represent[] The Purdue companies in the defense of the OxyContin litigation" to this day.  Preis Decl., Ex. 200 (web bio).  It would have bordered on malpractice for Strauber not to have shared with Purdue the fact that tobacco companies also fended off product liability cases for a period of time, but eventually were forced into one of the largest civil settlements in U.S. history.

56.     The Sacklers certainly were paying attention when, in 2014, the City of Chicago and two California counties filed separate actions against Purdue using tactics similar to those deployed against tobacco companies.  [REDACTED]

---

[31] A cover email forwarding this article that was withheld as privileged shows that the article was shared with Howard Udell, Purdue's then-General Counsel, among others.  *See* Preis Decl., Ex. 188a; *id.* Ex. 195 (excerpt of Mar. 5, 2019 MDL privilege log [C]).

Preis Decl., Ex. 153 at PPLPC045000017006 [C].

Preis Decl., Ex. 189 at PAZ000115628-29.

*Id.* at PAZ000115629.

Preis Decl., Ex. 190 at
PPLPC045000017005 [C].

57.

*See, e.g.*, Preis Decl., Ex. 165 at PPLPC061000060750 [C]

---

[32] The Sacklers cite their settlement of the Kentucky action as evidence that Purdue had no reason to believe state-led opioid litigation could be a serious threat during the 2008 to 2017 time period.  But the Kentucky settlement was not reached until December 18, 2015, and by that time (i) the Sacklers already had caused Purdue to make most of the transfers subject to challenge, and (ii) other public entities had commenced lawsuits of their own, including Chicago and the California counties.  To be sure, at $24 million, the Kentucky settlement was smaller than the Oklahoma settlement that would follow, but still implied Purdue liability of at least [$1.6 billion] on a morphine milligram equivalent basis, and Purdue itself claimed that even $1 billion in opioid-related liabilities "would have an immediate, crippling, and irreparable effect on Purdue."  Preis Decl., Ex. 201 (*Affidavit of Edward B. Mahony* ¶¶ 4, 6, *Purdue Pharma L.P. v. Hon. Steven D. Combs*, No. 2013-CA-001941-OA (Ky. Ct. App. dated Feb. 4, 2014)).

(█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████); *id.* Ex. 156 at RSF00683542 [C] (████████████████████████████

██████████████████████████████████████████████████████████████

████████); *id.* Ex. 171 at IACS_ESI_0000490681-82 [C] (███████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████);

*id.* Ex. 157 at RSF_OLK00008429 [C] (████████████████████████████████

██████████████████████████████████████████████████); *id.* Ex. 179 at

POK003746339 [C] (████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████); *id.* Ex. 158 at MDSF00514742 [PEO/C] (███████████

██████████████████████████████████████████████████████████████

████████████████████████); *id.* Ex. 159 at PWG004484978 [C] (████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████).

58. The scale of harm associated with the abuse and diversion of OxyContin and other opioids was also well known to Purdue. Purdue regularly tracked and reviewed reports and information concerning the economic consequences of the opioid crisis. In fact, Purdue commissioned a study of its own that was released in 2008. *See* Preis Decl., Ex. 202 (Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194, 199 (2011)). According to its own study, in the year 2006 alone OxyContin caused

1,553 deaths and $7.2 billion in damages.  *Id.* ████████████████████████████

████████████████████████████████████████████████  Preis Decl., Ex. 204

[C].  Purdue also calculated how much of its own revenue was derived from the abuse of OxyContin, concluding in 2006 that up to 18.1%—or $1.8 billion—of its sales for the prior 10 years were based on diversion and abuse.[33]

      59.     Side A implies that while the UCC has identified substantial evidence that Side B was worried about Purdue's litigation risk, similar proof does not exist regarding Side A.  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Exceptions

Motion ¶ 22. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████  Preis Decl., Ex. 160 at SideA00391976-77 [PEO/C].  ██████████████

████████████████████████████████████████████████████████████████████

██████████████  *Id.* at Side A00391978.  ████████████████████████████

████████████████████████████████████████████████████████████████████

██████████  *Id.* (emphasis added).  ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* at Side A00391976.  ████████

---

[33] The Sacklers argue they believed the risk of damages associated with their sale of opioids was small because Purdue "settled" with New York state in 2015 for just $75,000, referring to an Assurance of Discontinuance ("**AOD**") that Purdue entered into with the New York State Attorney General's Office ("**NYAG**").  AXO ¶ 22.  But the AOD was not a "settlement" in any material sense.  Among other things, the NYAG did not release any claims against Purdue in connection with the AOD.  If it had, New York would not now be suing Purdue for billions of dollars based on conduct dating back to 2007 and before.  Under the AOD, Purdue agreed to undertake additional obligations aimed at reducing abuse and diversion of OxyContin.  In other words, the AOD proves nothing except that Purdue managed to deceive the State of New York just as Purdue has now admitted to deceiving the federal government with respect to Purdue's abuse, diversion and deterrence efforts.

REDACTED

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Id.*

60. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ Hurley Decl. [ECF No. 1754], Ex. 67

(PPLPUCC000177443). ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ █ ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.* at PPLPUCC000177445.

61. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███ Preis Decl., Ex. 161 at PPLPC042000011810, PPLPC042000011812 [HC]. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[34] ████████████████████████████████████████████████████████ *See, e.g.*, Preis Decl.,
Ex. 180 at PPLPC012000372437 at slides 4, 6 [C]
████████████████████████████████████████████████████████
); *id.* Ex. 207 at
MSF01116645 [OPEO]; *id.* Ex. 183 at PURCHI-000834581 [C] (
████████████████████████████████████

**REDACTED**



*Id.*

*Id.*

Preis Decl., Ex. 162 at PPLPUCC000335136
[PEO/HC] (                    ).[35]

**3.**

62.

---

[35] The Sacklers boast in their opposition that there had not yet been any "finding of liability against the Defendant Debtors or Related Parties" despite a large number of "Pending Actions." AXO ¶ 27. Just days after writing those words, of course, the Sacklers announced that they plan to pay $225 million to settle civil claims alleged against the family by the DOJ, and the Debtors disclosed that they soon will plead guilty to multiple federal crimes for the second time since 2007. *See generally* Sackler-DOJ Settlement Agreement; *Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion to Confirm that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by This Court* [ECF No. 1833] (hereinafter the "**Sackler-DOJ Settlement Agreement**"). The Sacklers also fail to note Purdue's many litigation failures, including (a) denials of motions to dismiss claims against Debtors in at least fourteen cases (including in thirteen different states and in the federal MDL); (b) a settlement by Debtors for $270 million in Oklahoma to avoid trial; (c) Johnson & Johnson losing at trial in the same Oklahoma case Debtors settled with a judgment against it of over $400 million; (d) Debtors losing the only summary judgment motion that has been filed in the various cases against it, and (e) Debtors having now pled guilty to committing crimes over many years and agreeing to an $8.3 billion settlement.

REDACTED

███████████ Preis Decl., Ex. 166 at MARSH-PURDUE-001113 [HC] (██████

██████████). ████████████████████████████

████████████████████████████████

██████ Preis Decl., Ex. 167 at MARSH-PURDUE-001768-70 [HC]. ██████████

████████████████████████████████

██████████████████████████ Preis Decl., Ex. 168 at

MARSH-PURDUE-001777 [HC] (emphasis added).

63.  ██████████████████████████████

██████████████████████████████ Preis Decl.,

Ex. 192 at MARSH-PURDUE-001863. ████████████████

████████████████████████████████

██████████████████ Preis Decl., Ex. 193 at MARSH-PURDUE-001114. █

████████████████████████████████

████████████████████████████████

██████████████ Preis Decl., Ex. 194 at MARSH-PURDUE-001804

[HC]. ██████████████████████████████

████████████

**4.**  ████████████████████

64.  ██████████████████████████████

████████████████████████████████

BXO at 16-17; *see also id.* at 3 (████████████████████████).

████████████████████████████████

████████████████████████████████

████████████████████████████████

65. ███████████████████████████████████████████

████████████████████████ *See, e.g.*, BXO at 41-42 (███████████████

████████████████████████). ██████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████ Preis Decl.,

Ex. 163 at PPLPUCC001662356 [PEO/HC]. █████████████████

█████████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████

66. ███████████████████████████████████████

█████████████████████████████████████████████████

██████ Preis Decl., Ex. 206 at PPLPC045000017072-73 [C]. ███████

█████████████████████████████████████████████████

███████████████████████████████████████ Preis Decl., Ex. 215

at PPLPUCC9004797180 [HC]). ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████

### 5.  *Other Sackler contentions are equally unpersuasive.*

67.     Side A claims that Purdue had "outside directors" with "impeccable credentials," implying that they would have acted as a check on any fraudulent conduct regarding distributions. AXO ¶ 15. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ Preis Decl., Ex. 169 at MDSF00450185 [C] (capitalization in original). Nor do the Sacklers offer any evidence that any "outside director" was meaningfully independent from the side of the family by which he or she was hand-picked.

68.     That is probably because the evidence demonstrates the exact opposite. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████ Preis Decl., Ex. 162 at PPLPUCC000335137 (█████████████████████). ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ Preis Decl., Ex. 170 at MDSF00010698 [PEOC] (emphasis