Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                  United States Bankruptcy Court

14                  300 Quarropas Street, Room 248

15                  White Plains, NY 10601

16

17                  November 17, 2020

18                  10:09 a.m.

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  UNKNOWN

Page 2

1    HEARING re Notice of Agenda / Agenda for November 17, 2020

2    Hearing

3

4    HEARING re Motion to Authorize / Motion of Debtors for Entry

5    of an Order Authorizing Implementation of a Key Employee

6    Incentive Plan and a Key Employee Retention Plan (ECF #1674)

7

8    HEARING re Objection to Motion For Order Authorizing

9    Implementation of a Key Employee Incentive Plan and a Key

10   Employee Retention Plan (related document(s)1674) filed by

11   Paul Kenan Schwartzberg on behalf of United States Trustee

12   (ECF #1708)

13

14   HEARING re Objection to Motion (related document(s)1674)

15   filed by Paul A. Rachmuth on behalf of Ad Hoc Committee on

16   Accountability (ECF #1709)

17

18   HEARING re Memorandum of Law In Support of Ad Hoc Committee

19   on Accountability's Objection to Debtors' Motion to Pay

20   Bonuses (related document(s)1674) filed by Paul A. Rachmuth

21   on behalf of Ad Hoc Committee on Accountability (ECF #1710)

22

23

24

25

Page 3

1    HEARING re Debtors' Omnibus Reply in Support of Motion of

2    Debtors for Entry of an Order Authorizing Implementation of

3    a Key Employee Incentive Plan and a Key Employee Retention

4    Plan (related document(s)1674) filed by Eli J. Vonnegut on

5    behalf of Purdue Pharma L.P. (ECF #1742)

6

7    Debtors Supplemental Reply in Support of Motion of Debtors

8    for Entry of an Order Authorizing Implementation of a Key

9    Employee Incentive Plan and a Key Employee Retention Plan

10   (related document(s)1674) filed by Eli J. Vonnegut on behalf

11   of Purdue Pharma L.P. (ECF #1960)

12

13   Debtors Supplemental Statement in Support of Motion of

14   Debtors for Entry of an Order Authorizing Implementation of

15   A Key Employee Incentive Plan and A Key Employee Retention

16   Plan (related document(s)1674) filed by Eli J. Vonnegut on

17   behalf of Purdue Pharma L.P. (ECF #1847)

18

19   Statement / Debtors Statement Regarding Motion to Confirm

20   that Payment by the Sackler Families under Settlement with

21   the United States Department of Justice is not Prohibited by

22   this Court (related document(s)1833)

23

24

25

Page 4

1   Statement Regarding and Limited Objection to Notice by the

2   Sackler Families of Settlement with the United States

3   Department of Justice and Motion to Confirm that Payment by

4   the Sackler Families Under Settlement with the Department of

5   Justice is not Prohibited by this Court (related

6   document(s)1833) filed by Ira S. Dizengoff on behalf of The

7   Official Committee of Unsecured Creditors of Purdue Pharma

8   L.P., et al. (ECF #1856)

9

10   Objection to Motion (related document(s)1833) filed by Paul

11   A. Rachmuth on behalf of Ad Hoc Committee on Accountability

12   (ECF #1891)

13

14   Further Statement Regarding Notice by the Sackler Families

15   of Settlement with the United States Department of Justice

16   and Motion to Confirm that Payment by the Sackler Families

17   under Settlement with the Department of Justice Is Not

18   Prohibited by this Court (related document(s)1856, 1833)

19   filed by Ira S. Dizengoff on behalf of Ad Hoc Group of Non-

20   Consenting States, The Official Committee of Unsecured

21   Creditors of Purdue Pharma L.P., et al. (ECF #1893)

22

23

24

25

Page 5

1    Omnibus Reply in Further Support of Motion to Confirm That

2    Payment by The Sackler Families Under Settlement With The

3    United States Department of Justice is Not Prohibited by

4    This Court ([related documents 1833, 1891, 1893]) filed by

5    Gerard Uzzi on behalf of The Raymond Sackler Family (ECF

6    #1951)

7

8    Debtors' Statement Regarding Motion to Confirm that Payment

9    by the Sackler Families under Settlement with the United

10   States Department of Justice is not Prohibited by this Court

11   (related document(s)1833) filed by Marshall Scott Huebner on

12   behalf of Purdue Pharma L.P. (ECF #1909)

13

14   Letter regarding how the Government intends to use the $225

15   million that would be paid to the United States in its

16   settlement agreement with the Sackler family Filed by

17   Lawrence Fogelman on behalf of United States of America (ECF

18   #1942)

19

20   Motion to Approve Compromise / Motion of Debtors Pursuant to

21   11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and

22   Approving Settlements Between the Debtors and the United

23   States filed by Marshall Scott Huebner on behalf of Purdue

24   Pharma L.P. (ECF #1828)

25

Page 6

1    Objection to Debtors' Motion to Approve Settlement with the

2    United States (related document(s)1828) filed by Paul A.

3    Rachmuth on behalf of Ad Hoc Committee on Accountability

4    (ECF #1911)

5

6    Opposition to Debtors' Motion to Approve Settlement with

7    United States (related document(s)1828) filed by Daniel

8    Walfish on behalf of Bankruptcy Professors as Amici Curiae

9    (ECF #1913)

10

11   OBJECTION OF THE AD HOC GROUP OF NON-CONSENTING STATES TO

12   THE MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 105 AND FED.

13   R. BANKR. P. 9019 AUTHORIZING AND APPROVING SETTLEMENTS

14   BETWEEN THE DEBTORS AND THE UNITED STATES (related

15   document(s)1828) filed by Andrew M. Troop on behalf of Ad

16   Hoc Group of Non-Consenting States (ECF #1914)

17

18   Limited Objection of the Ad Hoc Group of Individual Victims

19   to Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R.

20   Bankr. P. 9019 Authorizing and Approving Settlements Between

21   the Debtors and the United States (related document(s)1828)

22   filed by J. Christopher Shore on behalf of Ad Hoc Group of

23   Individual Victims of Purdue Pharma L.P. (ECF #1916)

24

25

Page 7

1    Debtors' Omnibus Reply in Support of the Motion of the

2    Debtors' Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P.

3    9019 Authorizing and Approving Settlements between the

4    Debtors and the United States (related document(s)1828)

5    filed by Marshall Scott Huebner on behalf of Purdue Pharma

6    L.P. (ECF #1962)

7

8    The Official Committee of Unsecured Creditors' Statement

9    Regarding Motion of Debtors Pursuant to 11 U.S.C. § 105 and

10   Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements

11   Between the Debtors and the United States and Requests for

12   Certain Clarifications in the Proposed Form of Order

13   Approving the Same (related document(s)1828) filed by Ira S.

14   Dizengoff on behalf of The Official Committee of Unsecured

15   Creditors of Purdue Pharma L.P., et al. (ECF #1920)

16

17   Letter to Judge Drain received by e-mail on 11-11-20, re: Ad

18   Hoc on Accountability's Objection to Purdue's

19

20   Motion to Authorize and Approve settlements between Purdue

21   and The United States (filed by Mr. Dan Schneider, "The

22   Pharmacist", President, Tunnel of Hope) (ECF #1934)

23

24

25

Page 8

1    Debtors' Motion for Leave to Exceed the Page Limit in Filing

2    Omnibus Reply in Support of Motion Pursuant to 11 U.S.C. §

3    105 and Fed. R. Bankr. P. 9019 Authorizing and Approving

4    Settlements Between the Debtors and the United States

5    (related document(s)1962) filed by Marshall Scott Huebner on

6    behalf of Purdue Pharma L.P. (ECF #1963)

7

8    Notice of Filing of Revised Proposed Order Regarding the

9    Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R.

10   Bankr. P. 9019 Authorizing and Approving Settlements Between

11   the Debtors and the United States (related document(s)1828)

12   filed by Marshall Scott Huebner on behalf of Purdue Pharma

13   L.P. (ECF #1966)

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 9

```
 1   A P P E A R A N C E S :

 2

 3   DAVIS POLK & WARDWELL LLP

 4        Attorneys for the Debtor

 5        450 Lexington Avenue

 6        New York, NY 10017

 7

 8   BY:  MARSHALL HUEBNER (TELEPHONICALLY)

 9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11        Attorneys for the Creditors Committee

12        399 Park Avenue

13        New York, NY 10022

14

15   BY:  ARIK PREIS

16

17   PILLSBURY WINTHROP SHAW PITTMAN LLP

18        Attorneys for Ad Hoc Non-Consenting States

19        31 West 52nd Street

20        New York, NY 10019

21

22   BY:  ANDREW TROOP (TELEPHONICALLY)

23

24

25
```

Page 10

1              P R O C E E D I N G S

2              THE COURT:  Good morning.  This is Judge

3    Drain.  We are here today in In re Purdue Pharma L.P., et

4    al.  This is a completely telephonic hearing.  You should

5    identify yourself and your client the first time you speak.

6    It's a good idea to do that thereafter also so that the

7    court reporter can be clear about your name relating to your

8    voice.

9              There is one authorized recording of the matters

10   on the calendar today.  It's taken by Court Solutions.

11   Court Solutions provides a copy to our clerk's office on a

12   daily basis.  If you want to have a transcript of today's

13   hearing, you should contact the clerk's office to arrange

14   for the production of one.  Because this is a telephonic

15   hearing, you should keep your phone on mute unless of course

16   you are speaking.

17             So with that introduction, I have the agenda for

18   today's hearings.  There are three matters on the agenda,

19   the remaining portion of the key employee incentive plan

20   motion, the adjourned hearing on the motion by the Sackler

21   family to confirm that their payment under their settlement

22   with the Department of Justice is not prohibited by the

23   Court's preliminary injunction order, and finally, the

24   Debtor's motion to approve the Debtor's settlement with The

25   United States.  So I'm happy to go down the agenda in that

Page 11

1     order.

2              MR. HUEBNER:  Thank you, Your Honor.  Can the

3     Court hear me clearly?

4              THE COURT:  Yes.  Fine, thanks.

5              MR. HUEBNER:  Good morning, Your Honor, and good

6     morning to everyone who is on the line in these obviously

7     continuously complicated times.  For the record, I am

8     Marshall Huebner of Davis Polk & Wardwell LLP on behalf of

9     Purdue Pharma and its 22 subsidiaries, the Debtors in these

10    Chapter 11 cases.

11             Your Honor, before we turn to the agenda and the

12    three items that are on it, two very quick key updates, as

13    is traditional in large cases, including this one.

14             First, the monitor's third report was filed

15    yesterday, but in the flurry of paper, it may not have

16    reached the Court's or others' attention.  We are pleased

17    that Secretary Vilsack again found no instance of non-

18    compliance with any of the terms of the voluntary self-

19    injunction, including the broad self-imposed ban on

20    promotion.  Secretary Vilsack again noted that the Debtors

21    have been cooperative throughout his review process.

22             The monitor's third report sets forth the

23    extensive and successful steps that the company has taken to

24    comply with all of the recommendations made in his first and

25    second reports as well as the company's continued compliance

Page 12

1    with the recommendations made in his first and second

2    reports.

3           In his third report, Secretary Vilsack made

4    additional thoughtful recommendations that relate to the

5    company's suspicious order monitoring program.  The company

6    has agreed to implement all of his recommendations.  As it

7    has done over the past nine months, the company will

8    continue to provide full cooperation to the monitor and

9    assist him fully with his ongoing work.

10          So, Your Honor, as you surely remember, because in

11   fact it was your idea, it wasn't even relief that anybody

12   asked for, this has now been in place really almost for the

13   full length of these cases.  And it's certainly the Debtor's

14   hope, trust, and expectation that exactly as the Court

15   envisioned, having a personage of impeccable credentials and

16   broad experience deeply involved and watching all that is

17   going on at the Debtors with respect to the ambit of the

18   self-injunction, it is important and critical for many

19   public policy and other reasons.  Candidly, I wonder

20   personally if all opioids shouldn't be sold with something

21   along these lines.

22          Number two, Your Honor, as presaged to you a few

23   days ago in a written submission, the Debtors have fully

24   resolved the UCC and non-consenting states' motions.

25   Actually, I think they were technically the UCC's motions to

Page 13

1    compel the production of privileged documents for the

2    Debtors as well as the Debtor's cross-motion for a

3    protective order seeking to set clear and distinctive

4    parameters over any remaining diligence and discovery as to

5    the Debtors.

6           The settlement is reflected in the stipulation we

7    filed on the docket on Sunday and is another important

8    milestone in this case for at least two reasons.  First,

9    because the stipulation provides for the production of

10   thousands of documents to the UCC on a common-interest basis

11   of privileged documents that go to the very core of the

12   diligence exercise, including both privileged documents

13   relating to transfers of value from the Debtors to the

14   Sacklers over many years and literally thousands of

15   privileged communications on a broad array of topics that

16   were sent to or from Purdue and its affiliates to the

17   Sacklers on a wide variety of topics.  This resolution was

18   agreed to to provide mediation parties with further

19   confidence that they are negotiating with the relevant facts

20   in hand.

21          Your Honor, let me be very clear.  The Debtors

22   believed and continue to believe that their prior approach

23   with respect to privileged documents was and continues to be

24   entirely proper, and we absolutely also understand and agree

25   that others had a different view and wanted access to

Page 14

1    privileged documents.  And it's critical that we're not

2    actually waiving privilege, we're just settling all these

3    issues.

4         Why are we doing it?  Because we think it's in the

5    best interest of the case.  Not because, like the Committee

6    and UCC, we were not very comfortable with having our day in

7    court in front of you.  In fact, we were quite comfortable.

8    But the real issue is how do we move these cases forward.

9    And it was our view that providing these thousands of

10   privileged documents on very core topics would significantly

11   facilitate and accelerate the Sackler-focused mediation.

12        The second important element in the stipulation,

13   Your Honor, is that it brings us to the endpoint of

14   discovery against the Debtors.  Your Honor has made clear at

15   virtually every hearing your view on the diligent type of

16   exercise that we have been engaging in, and we are all aware

17   of the cost to the estate on all sides.

18        Whatever their differences in view might have

19   been, the Debtors, the UCC, and the non-consenting states

20   have now fully agreed to the remaining scope of discovery as

21   to the Debtors.  The Sackler issues are still outstanding,

22   and the Debtors, as the Court knows, have never once

23   interposed themselves in between other parties seeking

24   discovery or the Sacklers and the Sacklers.  The conclusion

25   of the Debtors (indiscernible) discovery, its conclusion is

Page 15

1    now on the very near-term horizon.

2            So, once again, as is always the case in all mega

3    cases, let alone one of incredibly complexity and social

4    import, most of the work goes on below the water line.  And

5    things are proceeding literally every single day, and most

6    cases I think quite productively.

7            Your Honor, that brings us to Item 1 on the agenda

8    with --

9            THE COURT:  I'm sorry, Mr. Huebner.  Can I

10   interrupt you on just the last point about the stipulation?

11           What is the schedule for releasing those

12   documents?

13           MR. HUEBNER:  So it's already been done, Your

14   Honor.  My understanding -- I'm not sure if Mr. Kaminetzky

15   is on the live line.  I might be misspeaking, but I think we

16   have already released a big slug of them.  Or if not,

17   they're, like, literally waiting to go.  I would ask if

18   there is a team member -- because I actually don't do

19   document production.

20           MR. PREIS:  Can I...

21           MR. HUEBNER:  Mr. Price, please.

22           MR. PREIS:  Sorry.  Your Honor, this is Arik Preis

23   from Akin Gump Strauss Hauer & Feld.  Can I be heard on the

24   question you just asked?

25           THE COURT:  Sure.

1           MR. PREIS:  So under the stipulation, this was an

2     important point, which is the timing.  We negotiated that

3     the first batch would be produced no later than Sunday,

4     November 15th.  And then all the remaining batches by

5     November -- by Sunday, November 22nd.  And obviously to the

6     extent there is any further document review that the Debtors

7     do, they would continue to supplement.

8           Indeed, as Mr. Huebner pointed out, we did receive

9     the first batch of a couple thousand documents on Sunday.

10    And we -- the next deadline and the final deadline is next

11    Sunday.

12          THE COURT:  Okay.  So part has already been

13    released, and the rest is imminent.

14          MR. HUEBNER:   Yes.  And, Your Honor, for what

15    it's worth, my team actually advises me -- I just got an

16    email -- that we actually made the first production on

17    Saturday.  So we are moving, and maybe even ahead of

18    schedule.  But whether it was Saturday or Sunday, it's very

19    fast and a lot, and we're moving heaven and earth to get it

20    all out.  Again, to accelerate mediation and give people

21    documents that they believe are very important to see,

22    notwithstanding their, in our view, privilege.  So hopefully

23    that's a very good thing for everybody.

24          THE COURT:  Okay.  And you noted that this is now

25    clearly under a stated joint interest agreement.  So I'm

Page 17

```
 1    assuming that most if not all of these documents pertain to

 2    issues about avoidable transfers.

 3            MR. HUEBNER:  So, Your Honor, interestingly

 4    enough, they're much broader than that.  You know, one are

 5    that I think there was substantial agreement on is avoidable

 6    transfers.  But, frankly, we sort of went big and we said

 7    why don't we just give you essentially every privileged

 8    document exchanged with the Sacklers on a wide variety of

 9    topics and actually went beyond the core topics.  Because,

10    again, the goal is to dispel uncertainty, suspicion,

11    concern.  And so there are some topics like individual

12    employee issues or IT issues that we all agreed people don't

13    need to see because, frankly, this is already pretty unusual

14    and far afield.  But it actually is much broader than just

15    transfers.

16            And just so the Court understands -- again, I'm

17    getting emails of course as we speak -- we've produced 3,024

18    documents already.  Again, all privileged documents.  And

19    the next production will be the big one.  Obviously we're

20    dancing as fast as we can.  And as Mr. Preis said, the next

21    set is coming quite soon.

22            THE COURT:  Okay.  All right.  Thank you.

23            MR. HUEBNER:  So, Your Honor, that --

24            MR. PREIS:  Your Honor --

25            MR. HUEBNER:  Oh, I'm sorry.  Please.
```

Page 18

1              MR. PREIS:  I was unaware that Mr. Huebner was

2       going to speak about the resolution today.  And I had -- if

3       Your Honor will indulge, I'd just like to make three points

4       about the stipulation.  Is that okay?

5              THE COURT:  Okay.

6              MR. PREIS:  Mr. Huebner did point out that we do

7       have potentially differences of opinion about whether or not

8       -- excuse me, how to address discovery in these cases. But I

9       think we both agree, first, that resolution of the issue is

10      another important step toward moving the cases forward and

11      will assist all the parties in mediation.

12             The second point is that the stipulation -- I do

13      want to point out that it allows us to meet and confer with

14      the Debtors about using the documents in depositions and

15      filings and that we must agree with the Debtors prior to

16      such use.  Given that we and the Debtors have the ultimate

17      same goal, it should go without saying that we should be

18      aligned on such use if it comes to that.  We found this

19      provision particularly helpful given the upcoming privileges

20      hearing with regard to the Sackler documents withheld for

21      privilege.  And we'll see, obviously, if any of the

22      documents produced will be helpful there.

23             Finally, I just want to clarify something Mr.

24      Huebner said.  He said something about the fact that this

25      ends any and all discovery that the Committee and the non-

Page 19

```
1    consenting states will serve on the Debtors in these cases.

2    And if I misheard that, I apologize.  That's not exactly

3    true.  It does put an end to the discovery we will be

4    serving on the Debtors as it relates to the items and the

5    issues that are at play on the estate causes of action.

6    Obviously if there are other issues in the case, like plan

7    confirmation or something else that has nothing to do with

8    the topics that we have already sought discovery from the

9    Debtors, that's obviously fair game, and the Debtors

10   understand that, and that's in the stipulation.  I just

11   didn't want there to be any confusion about that.

12          THE COURT:  Right.  No, that's clear to me.

13          MR. PREIS:  And the other point related to that is

14   although it's not specifically stated in the stipulation,

15   obviously the stipulation only applies to the parties to it.

16   In other words, the non-consenting states, the Creditors'

17   Committee, and the Debtors, and that those limitations don't

18   apply to any party who is not a party to the stipulation.  I

19   assume that's obvious, but someone who had looked at it

20   asked me to make sure that was clear.  That's it.

21          THE COURT:  Okay, very well.

22          MR. HURLEY:  Your Honor, this is Mitch Hurley.

23   Can I make just one other point of clarification?  There is

24   some work ongoing by the Debtors with respect to Norton Rose

25   documents.  And I'm sure Mr. Huebner didn't intend to
```

Page 20

1    suggest, and maybe didn't, that that's coming to an end.

2    But that work is not affected to my understanding from the

3    stipulation.  And I just want to make that clear as well for

4    the record.

5                THE COURT:  Okay.

6                MR. HUEBNER:  So, look, I think -- and I

7    apologize, I meant to give a very general overview.  There's

8    actually a lot of really cool stuff in the stip that I also

9    didn't lay out.  But I don't think I disagree with the

10   things that were said, and I think the document is clear.  I

11   certainly don't disagree with anything Mr. Preis said.  I'm

12   assuming Mr. Hurley, who I find to be right almost all the

13   time as well, is correct.  And so with that, I think we're

14   good.  It's a great stipulation.  Hopefully it will be very

15   helpful.  And we are, as I said, moving heaven and earth and

16   ahead of schedule to produce everything within a very short

17   time period.

18               THE COURT:  Okay.

19               MR. HUEBNER:  So, Your Honor, if we're good on

20   that, I guess we can now turn to the agenda.

21               Item One, as Your Honor noted, is the KEIP/KERP

22   motion.  And so I'll take this one if that is okay with the

23   Court.

24               Your Honor, as the Court knows from the docket and

25   from our prior hearings of late, the Debtors originally

1   filed their motion to authorize a KEIP and a KERP over two

2   months ago, on September 9, 2020.  After two hearings and

3   extensive adjournments, the only remaining issue before the

4   Court today is whether the Debtor may provide negotiated

5   further reduced 2020 incentive compensation as agreed to by

6   the UCC, the ad hoc committee, the non-consenting states,

7   and the MSGE, and they're no longer objected to by the ad

8   hoc committee on accountability.  These payments relate only

9   to the Debtor's CEO and CFO.  Everyone else is done.  As the

10  Court surely remembers, two of our insiders actually

11  resigned between the time of the filing and the first

12  hearing.  The other four were addressed successfully after a

13  negotiated resolution at the last hearing with no

14  objections.

15          And now we're left with these two where the U.S.

16  Trustee is, despite the settlements and accommodations and

17  reductions and date changes and the like reached for so many

18  other parties over a multi-month period, is pressing its

19  original filed objection.

20          Your Honor, as requested int eh motion, the KEIP,

21  as we laid out, already included material concessions

22  relative to historical practice under these very

23  longstanding AIP and LTRP for these two individuals.

24          The KEIP award, which is calculated as the sum of

25  the annual incentive plan award that such individual would

Page 22

1   have received plus the LTRP payments due in 2021 was

2   originally filed with the following reductions.  A 47

3   percent reduction to the CEO's LTRP payment in 2021, a 25

4   percent reduction to the CFO's LTRP payable in 2021, capping

5   payouts at a hundred percent of target, even though our

6   annual incentive program, like many others, historically

7   pays in excess of target if the company exceeds its

8   performance goals.  I think in our situation if my memory is

9   right, the cap was 150 percent.  But we capped it at 100

10  irrespective of performance.

11          Second, Your Honor, in the initial motion, LTRP

12  payouts for 2022 are reduced by 22 percent for the CEO and

13  12 percent for the CFO.  And the long-term award payable in

14  2023 was reduced by 50 percent for both the CEO and CFO

15  relative to the LTRP program that would normally be made

16  this year.

17          As I said, we adjourned it and had extensive

18  negotiation and reached a deal with the UCC, the AHC, the

19  non-consenting states, the MSGE and filed a negotiated and

20  fully-agreed order implementing, if the Court agrees with

21  us, implementing that settlement.

22          At the last hearing, as I'm sure all parties

23  remember, we presented the settlement reached with the same

24  creditor constituencies for the other four insiders.  For

25  three of the four of them, they were moved to the midpoint

Page 23

1    of the 50th and 75th percentiles of the Willis Towers Watson

2    companies and market data for annual TDC.  The general

3    counsel was treated separately as a special situation.  And

4    the payouts to those insiders, besides a variety of other

5    date changes to make things more attentive and achieve

6    certain other goals requested by the creditors also reduced

7    their 2022 and 2023 payouts by an additional 4.5 percent.

8         The settlement before the Court today, Your Honor,

9    on our last two executives is even more concessionary.  The

10   CEO's proposed KEIP award is being reduced by an additional

11   $593,000, which results in TDC below the midpoint of the

12   50th and 75th percentiles.  Specifically much closer to 50

13   than 75.  It's nine percent above 50 and 24 percent below

14   75.

15        The CFO's 2020 TDC was already below the midpoint

16   of the 50th and 75th percentiles.  Even taking into account

17   his proposed KEIP award, it was 15 percent above and 17

18   percent below 75.  So no further reduction was required on

19   the analytical framework that was used.

20        In addition, they've agreed to the same 4.5

21   percent reduction to the 2022 and 2023 payouts agreed to

22   with respect to the other key participants.  The aggregate

23   reduction for the two individuals are approximately

24   $711,000.

25        As this Court previously recognized -- and of

Page 24

1    course we did this at several hearings last year, stretching

2    into January if my memory is right, as well as two hearings

3    this year -- the AIP and the LTRP were standard components

4    of employees' compensation.  And the Court's phrase was,

5    quote, "This seems a lot more like salary than a bonus plan

6    even though it's referred to as a bonus plan."  That's at

7    Page 104 of the transcript from December 4, 2019.

8         Accordingly, as you went on to say on the next

9    page, "They're just going to get what makes them in the

10   middle, makes them competitive.  To me, that's not a bonus."

11   Page 105, Lines 2 to 3.

12        Your Honor, we want to be very clear because, once

13   again, I think people outside the bankruptcy case have

14   either just misunderstood or mischaracterized.  And so it's

15   just important that the record is clear.  These are not

16   bankruptcy bonuses.  They are not retention bonuses.  They

17   are not pay-to-stay bonuses.  They are not special one-time,

18   thanks-so-much bonuses.  The KEIP is a continuation of

19   annual programs that are 20 to 30 years old that provide

20   annual compensation of the type that most, probably even the

21   overwhelming majority, of large companies provide.  There is

22   nothing extraordinary about these programs.  They are not

23   tied to the bankruptcy cases.  They were not put in place

24   for the bankruptcy cases.  This is the same type of

25   compensation that is and would be available to executives at

Page 25

1    non-distressed pharma companies, and really by most

2    companies in any industry, which is how one sets the market

3    for compensation.

4           Moreover, these employees, all of our employees,

5    actually, face downsize and limitation that employees at

6    non-distressed pure companies and pure pharmaceutical

7    companies generally do not face.  They have very little

8    visibility into their long-term employment prospects.  Many

9    have severance rights capped by the Bankruptcy Code, and

10   none have any equity or other similar upside.

11          In addition, they must manage all the complexities

12   of a uniquely challenging Chapter 11 process over and above

13   the significant responsibilities of their regular role and

14   actually run and lead an operating pharmaceutical company

15   during a global pandemic.

16          Thus, even stating that these employees are now,

17   quote, slightly above the 50th percentile of TDC for 2020

18   actually overstates things because of all the many things

19   that pure pharma executives would have.

20          Let me talk for a minute about performance

21   metrics, Your Honor.  Because that was one of the issues

22   raised many months ago by the U.S. Trustee.

23          As an initial matter, this is actually déjà vu all

24   over again.  This Court was clear at the very fist hearing

25   on this motion, on September 30th that, quote, "Fighting

Page 26

1    over other things relating to KEIPs really does not lead to

2    much of a change, if anything.  But it does lead to more

3    cost."  And you asked the parties to focus on the market for

4    the Debtor's competitors.  The Debtors and others have

5    already taken this to heart, and took it further to heart,

6    negotiating their changes to the KEIP based on their

7    assessments and the market for compensation of executives at

8    non-distressed pharmaceutical companies in a highly-

9    constructive manner.

10          And the U.S. Trustee, by contrast, continues to

11   press the types of issues that were addressed directly last

12   year, including with respect to the similar objection

13   pressed.

14          The U.S. Trustee first takes issue with the fact

15   that some of the performance metrics include target dates to

16   achieve milestones that fall before the end of the year, so

17   some deadlines have passed or were close to passing when the

18   motion was filed.  This is unavoidable in a bankruptcy where

19   you just can't move based on the timing of the case early

20   enough a lot of the time.

21          As courts have noted, the difficulty of achieving

22   performance metrics is properly measured from when they were

23   set, see In re Aralez Pharm. US Inc., 2018 WL 6060356, at *4

24   (Bankr. S.D.N.Y. Nov. 19, 2018).  As that court noted, which

25   is directly on point and quite similar to what this Court

Page 27

1    ruled last year, "The Court is unpersuaded that the targets

2    are not sufficiently challenging because some of those

3    targets now appear achievable in hindsight...  The Court

4    sees no issue with reviewing a KEIP that was designed to

5    incentivize work that is already partially performed."  This

6    is exactly what this Court did last year.

7              Moreover, Your Honor, when this motion was filed,

8    the CFO testified in unrebutted, sworn testimony that, "It

9    currently appears that some of the 2020 performance metrics

10   may be achieved.  Others still require extensive work to be

11   achieved, and it is a virtual certainty that others will not

12   be achieved."  Lowne Declaration, Paragraph 22.

13             This only reinforces the CFO's other unrebutted

14   sworn testimony that the performance metrics are,

15   "Ambitious, having threshold targets that are difficult to

16   achieve, both individually and when considered in

17   combination, and were required to keep participants'

18   diligent and committed efforts."

19             And, by the way, we know that Mr. Lowne is telling

20   the truth, because in fact as of this morning, the plan is

21   not going to hit target.  It's at something like 91 percent.

22   And so in fact leaving aside that the testimony was

23   absolutely truthful when given, it also appears to have been

24   a prognostication of perfect accuracy.

25             Despite this unrebutted testimony and the U.S.

Page 28

1      Trustee's gracious agreement that it did not need to cross-

2      examine the witness and that the declarations could now be

3      admitted for the third time for all purposes, including

4      these, the U.S. Trustee nonetheless argues that there is not

5      sufficient information to determine that the performance

6      metrics are truly stretch goals.

7              This ignores the fact that this Court questioned

8      Mr. Lowne extensively last year about this very issue and

9      whether the process the company used to develop the

10     performance metrics, which are actually based on the same

11     budget that the Debtors used to run their business, was

12     sufficient to ensure that the metrics in fact represented

13     stretch goals.

14             On December 4th, 2019, which I think was the

15     second of our compensation hearings last year, at Pages 72

16     to 75, we had exchanges like, "So are there times when you

17     asked them for more results than proposed," said the Court.

18             Mr. Lowne, "Significantly more."

19             As Mr. Lowne testified in his sworn declaration,

20     this year's performance metrics are, "Consistent with and

21     are a continuation of past practice."  See Paragraph 28.

22     There is no reason whatsoever that similar metrics set

23     through a similar process do not get approved this year as

24     they were last year.

25             One subpoint, Your Honor.  The U.S. Trustee takes

Page 29

1   issue with the fact that ten percent of the performance

2   metrics consist of a score on a "people and culture" metric.

3   However, many answers.  One, the same ten percent rating,

4   which is of course only ten percent of this more subjective

5   factor of people and culture, was approved by this Court

6   last year.  Second, timely implementing organizational

7   education to occur in the first three quarters of 2020

8   involving a transition plan for the fourth quarter are very

9   important strategic priorities for the company, as Mr. Lowne

10  testified at Paragraph 26. Contrary to the U.S. Trustee's

11  assertion that this is an entirely typical metric for senior

12  managers of the company, which at the end of the day counted

13  people as among its most important attributes for so many

14  reasons.  The company and the compensation committee of the

15  board of directors and their advisors respectfully disagree.

16        Last year the Court extensively questions our

17  declarants, the same two declarants that testify in support

18  of this motion, and found their answers satisfactory to

19  essentially the same programs.  And we are, frankly,

20  surprised to have to revisit these issues yet again a year

21  later.

22        Two final issues, Your Honor.  I'm pretty much

23  done on the compensation motion.

24        Number one, the Court already rejected the U.S.

25  Trustee's argument that the KERP participants' regular

Page 30

1   annual compensation programs shouldn't be renewed because of

2   a purported lack of progress in the Chapter 11 cases.  With

3   respect to the emergency fund issue, the Court specifically

4   noted that, "Even the decisionmakers here for the company

5   are not responsible for there not being an emergency fund."

6   Transcript, 112, Lines 19 to 20, September 30, 2020.

7           Paragraphs 17 to 28 of our KERP reply, Your Honor,

8   describes the very substantial progress the Debtors have

9   made towards confirmation, which is in no small part the

10  result of the efforts of many people, but assuredly

11  including the key participants.  As to the ERF, the Court

12  understands quite well why that ultimately did not happen.

13  It certainly was not for lack of an unbelievable amount of

14  passionate effort by the Debtors.

15          In fact, the Debtors believe that enormous

16  progress has in fact been made in this case, as hopefully

17  will be evidenced by the agenda later this morning.

18          One final point, Your Honor.  It should be noted,

19  and I want to say loud and clearly, no compensation order

20  entered in these cases nor one penny of compensation paid to

21  any employee during these cases prejudices or determines or

22  really has any relevance whatsoever to whether plan releases

23  will be granted to any individuals or impede any plan issues

24  at all.  The orders of course don't address that.  They

25  never have, they never will.

Page 31

1          Moreover, the 2019 clawback language that we all

2     agreed to, and I think actually the Court also kind of

3     negotiated with us -- I think it was kind of a big round

4     robin -- is of course also included in this order, as it has

5     been in every one of our proposed and entered compensation

6     orders.  And to say it simply, plan issues await the plan.

7     This is only about 2020 compensation where our last two

8     executives and the Debtors are actually taking reductions

9     and agreeing to reductions with virtually every creditor

10    group on this case that bring then I think frankly

11    comfortably within the range if not below similar market

12    compensation.

13          The Debtors therefore respectfully submit that the

14    KEIP for the CEO and the CFO, subject to the agreed

15    reductions negotiated with the major creditor

16    constituencies, the reservation of future issues for the

17    future and the clawback language and the other language yet

18    again found in the order we propose be approved.

19          That, Your Honor, is what I have to say on item

20    one of the agenda.

21          THE COURT:  Okay.  Thanks.  I have one question on

22    the modifications to the key employee incentive plan, and

23    then I want to address Mr. Lowne's testimony and Ms.

24    Gartrell's testimony.

25          As far as the agreed modifications, if you go to

Page 32

1   Page 3 of the Debtor's supplemental reply, which lays out

2   those modifications, I believe I understand the monetary

3   ones and the timing ones.  But if you look at the last three

4   bullet points in Paragraph 4, the first one says, "The KEIP

5   award payments will be subject to a clawback if the

6   remaining KEIP participant resigns or is terminated for any

7   reason other than by the Debtors without cause prior to June

8   30, 2021."  And then it says, "Accepted such clawback will

9   expire upon emergence should it occur earlier."  So it's

10  clear there that the clawback is if the remaining KEIP

11  participant resigns or is terminated for any reason other

12  than by the Debtors without cause.

13           The next two bullet points refer to the LTRP or

14  LTRP payouts due in 2022.  And it says that that will be

15  subject to a clawback, but it doesn't say what that clawback

16  is triggered by.  Similarly, the last bullet point says

17  subject to a clawback, which deals with the long term

18  incentive compensation payable in 2023.

19           Should I take it that the clawback referred to in

20  those two paragraphs is the same clawback referred to in the

21  KEIP award payments, i.e. if the remaining KEIP participant

22  resigns or is terminated for any reason other than without

23  cause?

24           MR. HUEBNER:  Yes, Your Honor.  The way it works -

25  - it actually kind of has a funny origin.  Normally debtors

Page 33

1   want things paid more quickly, and creditors want it paid

2   more slowly for retention purposes.

3            THE COURT:  Right.

4            MR. HUEBNER:  Here it was actually the creditors

5   who asked that the LTRP payments otherwise due in 2022 and

6   2023 be paid on emergence because they just didn't want the

7   successor entity to have any payment obligations left --

8            THE COURT:  Right.

9            MR. HUEBNER:  -- with respect to the pre-emergence

10  period.

11           THE COURT:  No, I understand.  We went over the

12  timing point at the last hearing and I became comfortable

13  with that.  But I'm just focusing again on what is it that

14  triggers the clawback, and is it combination with --

15           MR. HUEBNER:  Yeah, I was --

16           THE COURT:  Okay.

17           MR. HUEBNER:  Yeah.  I was literally -- that was

18  the next clause, which was in order to ensure that we didn't

19  lose the retentive aspect of this, if, before what would

20  otherwise have been the applicable payment dates in 2022 or

21  2023, the employee, exactly as you point out, resigns

22  without good reason or is terminated for cause, then the

23  money has to be paid back.  So if you're there through 2022

24  past the payment date and then you resign without good

25  reason, obviously only the 2023 payment gets clawed back.

Page 34

1    So there is a temporal aspect as well.  But the standard is

2    the same.  And apologies, we didn't re-layer it into every

3    provision.  But, yes, there is no arbitrage between the

4    clawback statement and the clawback standards for the

5    different things that are paid prior to what the Debtors

6    want to be the sort of hold period with respect to

7    (indiscernible).

8            THE COURT:  Right.  And then of course we have the

9    separate clawback language in paragraph 9 of the proposed

10   order, which is also the order that's in effect for the

11   other employees if it's found that any of the covered

12   parties knowingly participated in any criminal misconduct in

13   connection with his or her employment or was aware of the

14   public sources of such conduct.  So --

15           MR. HUEBNER:  Yes.

16           THE COURT:  That's a separate clawback.  I was

17   just referring to this one on Page 3.

18           MR. HUEBNER:  Yes.

19           THE COURT:  But I think the record is clear now on

20   that point.

21           MR. HUEBNER:  Yes.  And apologies if I was too

22   oblique when I was referencing at the end sort of the

23   clawback provision that we all negotiated last year.  I was

24   talking about what I guess we could call the misconduct

25   clawback, the clawback provision which of course is here yet

Page 35

1    again, as it was and will be in every compensation-related

2    order that we seek authority to have entered.

3         THE COURT:  Right.  So in support of this motion,

4    which now only has one remaining part to it, my having

5    entered orders on the rest of the motions request for relief

6    already, the Debtors submitted a declaration by Mr. Lowne

7    dated September 9, 2020.  The Debtors have also submitted

8    three declarations by Ms. Gartrell.  The ones that I think

9    are relevant here are the September 9, 2020 declaration just

10   to set the context for how the currently requested relief

11   has been modified from what was originally sought.  And then

12   we have her second supplemental declaration that deals with

13   the current request, which is dated November 16th, 2020.

14        I, as you all know, normally take direct testimony

15   by declaration or affidavit.  I see Mr. Lowne on the hearing

16   dashboard and understand that the main issue that the U.S.

17   Trustee is raising pertains to the incentive metrics, which

18   is what is covered in his declaration as opposed to Ms.

19   Gartrell's primarily.

20        So, Mr. Lowne, let me ask you.  Your declaration,

21   again, was attached to the original motion.  It's dated

22   September 9th, 2020.  Other than the update that Mr. Huebner

23   just recited as to not meeting certain of the targets as of

24   yesterday, is there anything else in your declaration that

25   you would wish to change?

Page 36

1             MR. LOWNE:  No.  There is nothing in my

2     declaration I wish to change.  And Mr. Huebner's update is

3     data that I provided to him which reflects our latest

4     estimates of how we're performing on the metrics.  So that's

5     the only update to my previous declaration.

6             THE COURT:  Okay.  All right.  So I understand,

7     again, from the agenda as well as Mr. Huebner's remarks,

8     that the only remaining objection to this aspect of the

9     motion is by the U.S. Trustee.  Does the U.S. Trustee wish

10     to question Mr. Lowne on his declaration?

11             MR. SCHWARTZBERG:  No, Your Honor.  Paul

12     Schwartzberg for the U.S. Trustee's office.

13             THE COURT:  Okay.  All right.  So I will admit it.

14     I've reviewed it carefully and I don't have any questions on

15     it that I didn't ask at the hearing in connection with the

16     2019 KEIP/KERP motion.  But I'm happy to hear then the U.S.

17     Trustee if you have any oral argument to add to the

18     objection.

19             MR. HUEBNER:  Your Honor -- Mr. Schwartzberg, just

20     one second.

21             Your Honor, apologies.  Just to be very technical,

22     could we also move the three Gartrell declarations formally

23     into evidence with respect to this hearing --

24             THE COURT:  Okay, that's fine.  Ms. Gartrell's

25     most recent one -- I think we may actually have done that

Page 37

1   with regard to the first two.  But her most recent one is

2   dated November 16th.  I don't know if -- Ms. Gartrell, are

3   you on the phone?

4          MS. GARTRELL:  Yes, Your Honor.  I am on the

5   phone.

6          THE COURT:  Okay.  Knowing what you know today and

7   knowing that your declarations would be your direct

8   testimony in this motion, except as modified by the two

9   updates, is there anything in the declarations, and in

10  particular of this November 16th one, that you would wish to

11  change?

12         MS. GARTRELL:  No, Your Honor.

13         THE COURT:  Okay, thank you.  And, Mr.

14  Schwartzberg, do you have any question for Ms. Gartrell?

15         MR. SCHWARTZBERG:  No, Your Honor.

16         THE COURT:  Okay, very well.  So I'll admit those

17  declarations for purposes of this hearing.

18         So, again, Mr. Schwartzberg, I don't know if you

19  have oral argument or you just want to rest on the

20  objection.

21         MR. SCHWARTZBERG:  Your Honor, I have two brief --

22         THE COURT:  If you have oral argument, I'm happy

23  to hear it.

24         MR. SCHWARTZBERG:  Yeah.  I have two brief issues

25  that the U.S. Trustee, my office and I have with the motion,

Page 38

1      Your Honor, that we wanted to raise.

2            The first, Your Honor, 503(c)(1) we believe does

3      not permit a transfer to an insider for retention purposes

4      other than certain facts and findings that are not relevant

5      here.  And it speaks of transfer.  It doesn't talk about

6      bankruptcy bonus or the like.  It just uses the word

7      transfer.  And the Debtor asserts that these are not

8      transfers for retention purposes.  But I do note the burden

9      is on the Debtor to prove that the metrics they set are

10     incentives and in fact they call them inventive plans and

11     are not merely pay-to-stay level.

12           The Debtor has three categories of metrics; the

13     innovation and efficiency metric, the people and culture

14     metric, and the value creation metric.

15           The innovation and efficiency metric sets

16     financial targets that need to be met in 2020 in order for

17     awards to be paid.  We do not believe that they actually

18     provided enough information to allow a reviewer of the

19     pleadings to determine whether those are actually

20     incentivizing enough.

21           For example, I believe the largest percentage of

22     that innovation and efficiency metric is the Rhodes

23     operating loss.  They listed I believe on Paragraph 29 of

24     the motion as a $35 million loss of the performance target.

25     But the don't list what the actual loss was in 2019, 2018.

1    So we believe that those financial -- that financial

2    information would be relevant in helping to determine

3    whether this is a true incentivizing target or not.

4              The other metric they have is the people and

5    culture metric.  I know Mr. Huebner talked about this

6    briefly.  But to my reviewing of it, it's a very vague

7    metric and so it would be reviewed holistically.  It's not

8    even clear what that means.  So I believe it's hard to make

9    that as a standard to determine whether someone -- to

10   determine whether someone has actually reached that metric

11   or not.  As indicated before, I believe it's the Debtor's

12   burden on this.

13             And finally, Your Honor, the value creation

14   metric, as we noted in the motion, which was originally

15   going to be heard on September 30th, at that date all of

16   those tasks would have been completed.  And so it's hard to

17   say that it's looking forward when it appears to be looking

18   backward.

19             Now, I know there's caselaw that indicates it's

20   when it's done that the metric is created, but this is a

21   2020 program and the motion was filed I believe in August or

22   early September.  It's the Debtor who controls the timing of

23   it, and it's their burden as well to prove that it's

24   incentivizing.

25             And finally, Your Honor, the last issue I want to

Page 40

1    raise -- and I do realize I did raise this exact same issue

2    at the retention portion of this hearing and Your Honor

3    overruled it, but I wanted to raise it again.  And that's

4    the additional compensation going to the insiders while yet

5    no payments have been made to victims in this case.

6              The CEO and the CFO are going to receive

7    respectively I believe between $2 million and $3 million for

8    the CEO, and the CFO between $750,000 and $1 million in KEIP

9    payments.  And this is on top of the additional compensation

10   they received in 2019.  These are the two highest-paying

11   officers, insiders.  And we believe that because the victims

12   have not received anything yet and it's not clear when,

13   although I do understand we are getting close to that point,

14   we don't believe that this scenario justifies it under the

15   facts and circumstances the award of the additional

16   compensation at this point.  And that's all I have, Your

17   Honor.

18             THE COURT:  Okay.  Mr. Huebner, on the last -- or

19   maybe Mr. Lowne can answer this.  On the ten percent

20   category dealing with personnel, who awards -- who actually

21   makes the determination to award the bonus there?

22             MR. LOWNE:  So we have a compensation committee

23   which is comprised of members of our board. And when the

24   bonus recommendation is made by each of the categories,

25   there will be a presentation to the compensation committee

Page 41

1    on each of the categories of the bonus awards.  And the

2    compensation committee ultimately determines the payout

3    percentages.

4            THE COURT:  Okay.  All right.  Thank you.

5            Okay, anything else?

6            MR. HUEBNER:  Your Honor, unless the Court has any

7    questions, I actually think that I addressed each of these

8    points in our reply.  And I know we have quite a full

9    agenda.

10           THE COURT:  Right.

11           MR. HUEBNER:  And so if the Court has questions, I

12   will answer them.  But I actually believe that each of the

13   points in fact was addressed at some length and

14   definitively, both by the declaration and by our reply.  The

15   Court's prior concern of last year and in many years of

16   practice before you, I know that senior executives never be

17   able to set their own compensation.  And that is assuredly

18   not the case here, as you've just heard.  You know, this is

19   the board of directors and an operating compensation

20   committee that reviews the performance of executives and

21   makes decisions.  And as I said a little while ago, we're

22   tracking below plan, which is pretty big proof that these

23   are not layouts that were set recently to make sure people

24   got a hundred percent.  That's just not true at all.  They

25   were set a long time ago, and the proof is in the pudding.

Page 42

1   And we would rest on our papers unless the Court has

2   questions.

3            THE COURT:  Okay, fair enough.  Thank you.  All

4   right.

5            I have before me, as I noted --

6            MR. PREIS:  Your Honor?

7            THE COURT:  Ye?

8            MR. PREIS:  I'm sorry, this is Arik.  I used the

9   hand-raising thing on the --

10           THE COURT:  Oh, okay.  There are just too many

11  hands on the screen, so I didn't notice it.  I'm sorry.

12           MR. PREIS:  That's okay.  I just wanted to make a

13  few points on behalf of the Committee, the ad hoc group, and

14  non-consenting states and the multi-state group.

15           THE COURT:  Okay.

16           MR. PREIS:  And it won't take more than a minute.

17           As the Debtors noted, the four groups -- the UCC,

18  the ad hoc group, the non-consenting states, and the multi-

19  state group -- worked together to resolve our collective

20  issues on the KEIP.  I think it's a great example of how the

21  constituents in this case can work together constructively

22  and cooperatively in a way that we were able to streamline

23  the discussions on the KEIP and the KERP in ways, frankly,

24  that we were not able to do one year ago.

25           And I do want to point out that a lot of the

1    credit goes to the states and their advisors.  We think the

2    resolution -- I speak for all of us.  I think the resolution

3    reached makes sense for the case and struck the right

4    balance given all the facts and circumstances.

5            That being said, I just want to note two things.

6    First, the Debtors filed a reply yesterday on the KEIP.

7    Although we reached resolution on the KEIP, I believe I

8    speak for all of us again when is say that for the record,

9    we don't necessarily agree with some of the statements made

10   in that reply, although we do join in the relief requested.

11           The second thing is, as Mr. Huebner pointed out --

12   and this was very important to the resolution -- none of the

13   resolutions reached today or previously on the KERP or the

14   KEIP reflect any agreement about the propriety or scope of

15   releases to be granted under the plan.  And the four groups

16   I mentioned all reserve our rights to address that issue at

17   the appropriate time.

18           That's it, Your Honor.  Thank you.

19           THE COURT:  Okay.

20           MR. HUEBNER:  Your Honor, let me say one last

21   thing, which is I actually would like to pause for just 20

22   seconds and say thank you as well.  The Debtors are not

23   unaware that executive compensation is a complicated and

24   charged topic in every case.  Here as well, and maybe here

25   as many or more than most hard cases.  And in fact, the

Page 44

1    creditor groups were quite constructive and extremely

2    thoughtful.  And we actually -- once we were able to get

3    past a lot of the other issues and we did them in just the

4    right order, which is working up from the bottom to protect

5    the sort of less well-compensated and less senior parts of

6    the workforce, we actually moved pretty swiftly and very

7    productively towards reaching agreement here.  Even if

8    someone is below market comp, it doesn't change the fact

9    that, you know, a million dollar bonus or more to an

10   executive is difficult to understand in many complicated

11   ways.  And we are very grateful that the core players worked

12   with us so productively to put this behind us.

13          And, as I said, the revised form of order is

14   completely agreed.  And unless the Court has questions, we

15   would ask that it be entered.

16          THE COURT:  Okay.  Very well, thanks.  All right.

17   I have before me the remaining portion of the Debtor's

18   motion for approval of a key employee incentive plan under

19   Section 503(c)(3) of the Bankruptcy Code for 2020 as well as

20   resolved consensually by the party-in-interest objectors

21   other than the U.S. Trustee dealing with portions of the

22   incentive program for future years.

23          The remaining portion of the motion pertains to

24   the Debtor's CEO and CFO.  Again, the Court having granted

25   on a largely consensual basis the other portions of the

1    motion.

2         The Bankruptcy Code, in Section 503(c)(1)

3    effectively prohibits a transfer by a Debtor or an

4    obligation incurred by a Debtor to an insider of the Debtor

5    for the purposes of inducing such person to remain with the

6    Debtor's business.  I say effectively because the provision

7    lays out certain conditions that if met would permit such a

8    stay payment or obligation.  But as a practical matter,

9    those conditions would not be met here, not would they be

10   met in almost any bankruptcy case.

11        It's acknowledged that the CEO and CFO are

12   insiders as that term is defined for purposes of 503(c)(1)

13   and 101(31) of the Bankruptcy Code.  Therefore, if the

14   proposed key employee incentive plan is for the purpose of

15   inducing those two people to remain with the Debtor's

16   business, i.e. to stay employed, then I would deny the

17   motion.

18        Section 503(c)(3), however, provides that for any

19   other transfer to an employee, the Court -- and that is

20   outside the ordinary course of business, it would be

21   prohibited if it is not justified by the facts and

22   circumstances of the case.

23        The objections by various parties with an economic

24   stake in these cases, including the official unsecured

25   creditors' committee, the non-consenting state group, and

Page 46

1    the ad hoc committee on accountability and others have been

2    resolved by changes to the proposed KEIP for these two

3    individuals, which based on my review, including my review

4    of Ms. Gartrell's second supplemental declaration, clearly

5    put their treatment at market for similar pharmaceutical

6    companies even though Purdue obviously is in a bankruptcy

7    case with substantial additional tasks to be performed by

8    these two people.

9            In light of those changes, all of the objections

10   were withdrawn except the objection by the United States

11   Trustee.  That objection raised two points.  The first is

12   that -- well, actually, it raised three points.

13           The first is that in essence the Court already

14   approved a KEIP for these two people with respect to 2019,

15   so why should it do so in 2020.

16           The second is that these cases have not resulted

17   in a Chapter 11 plan yet or an interim distribution to

18   creditors, and therefore no KEIP should be awarded.

19           Lastly, the objection states that payments under

20   the proposed KEIP are based upon metrics that, quote, may

21   have already been met and therefore do not incentivize

22   future performance, may not represent difficult targets, and

23   are vaguely described so that it cannot be determined

24   whether either they were difficult to achieve or were not

25   already compensated for in the first round in 2019.

Page 47

1          It is clear here that the Debtors have the burden

2     with respect to their motion.  However, they have submitted

3     a declaration by John Lowne that describes the metrics here

4     and further asserts that the metrics were in fact -- or at

5     the time that they were adopted were expected to be

6     difficult to achieve and, as stated in the declaration,

7     would require significant work well above the day-to-day

8     work that is part of the normal job description for these

9     employees.

10          Moreover, it is clear from Ms. Gartrell's

11    declaration that without the prospect of earning these

12    incentive payments, the two executives would be seriously

13    undercompensated, i.e. it is an important part of their

14    market-based compensation, albeit that if they do not

15    perform at the high levels described in the Lowne

16    declaration, they would not earn the incentive payments.

17          The courts have recognized that all forms of

18    compensation to some extent incentivize a party to stay at

19    work.  Obviously if you're not paid, you're inclined to

20    leave.  Or if you're not paid at market, you're inclined to

21    leave.  So the courts have put a I believe reasonable gloss

22    on Section 503(c)(1), which is that the payment or

23    obligation does not have the primary purpose of being for

24    the employees -- inducing the employee, rather, to continue

25    to remain employed by the Debtor.  See for example Aralez

1   Pharmaceuticals US Inc., 2018 Bankr. LEXIS 3649, 7-8 (Bankr.

2   S.D.N.Y. November 19, 2018) and the cases cited therein, as

3   well as In re Nellson Nutraceutical, Inc., 369 B.R.

4   787 (Bankr. D. Del. 2007), and In re Global Home Products,

5   LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007), in which the

6   court stated, "The entire analysis changes if the bonus plan

7   is not primarily motivated to attain personnel or is not in

8   the nature of severance."

9           Courts have found that a compensation plan is

10  primarily incentivizing when it properly incentivizes

11  management to produce an increased value of the estate and

12  is designed to motivate the employees to achieve performance

13  goals that are difficult to achieve and are not simply part

14  of doing their own job in the ordinary course, i.e. merely

15  reporting to work, or benefitting from the occurrence of an

16  event such as confirmation of a plan or the debtor's sale of

17  substantially all of its assets.  See generally In re Dana

18  Corp., 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006), In re

19  Borders Group, Inc., 453 B.R. 459,

20  471 (Bankr. S.D.N.Y. 2011), In re Residential Capital, LLC,

21  478 B.R. 154, 170, and In re Hawker Beechcraft, Inc. 479

22  B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  There, summing up

23  much of the caselaw, Judge Bernstein stated that the metrics

24  for an incentive program require management to stretch to

25  meet performance goals.

 1              Here, the metrics for the incentive compensation

 2    are not challenged and have already been approved by me with

 3    respect to the 2019 KEIP, namely value creation, which

 4    accounts for 40 percent of the determination of the award,

 5    which has metrics tied to implementing specific targets for

 6    delivering opioid overdose medications and drugs and the

 7    research and development for other medications and drugs

 8    such as for treating insomnia, cancer treatments, treatment

 9    of ADHD, nausea, and the like.

10              The second metric is with respect to innovation

11    and efficiency, which is a 50 percent portion.  This sets

12    various income or minimizing of loss targets for various

13    business segments of the Debtors.

14              And then the final ten percent of the metrics

15    relates to managing people, which is obviously a major

16    component of any senior executive's job, particularly in a

17    Chapter 11 case where, as this incentive program provides,

18    dealing with transition plans or programs.  I will note that

19    two of the KEIP participants have resigned, which clearly

20    reflects the need for these senior executives to dal with

21    high level as well as personal issues running through the

22    entire organization caused in part by the bankruptcy cases

23    themselves.

24              As I noted, Mr. Lowne has testified that these

25    metrics are difficult to achieve, and indeed, that some of

Page 50

1    them will not be achieved.  Moreover, the objectors, who

2    have withdrawn their objections, are well-informed, well-

3    represented, and good stewards of their clients' positions

4    and in evaluating this program, including the triggers for

5    bonus awards within these three metrics, have concluded that

6    the KEIP for 2020 as revised is not objectionable.  There

7    was no attempt to cross-examine Mr. Lowne or Ms. Gartrell.

8         And in light of all of that, I conclude that the

9    Debtor has carried its burden to show that in fact under the

10   standard enunciated by the courts for motions like this

11   pertaining to Section 503(c)(3), this KEIP as modified is in

12   fact appropriate.  The courts have noted that the general

13   business judgement standard as applied in bankruptcy cases

14   applies to the "justified by the facts and circumstances of

15   the case" language of Section 503(c)(3).  But, given the

16   specific issues raised by incentive plans for senior

17   management have noted that courts can be guided in

18   exercising their review of the program and whether it passes

19   muster as showing an exercise of sound business judgement if

20   they consider the following.

21        Is there a reasonable relationship between the

22   plan proposed and the results to be obtained, i.e. is the

23   plan calculated to achieve the desired performance?  Is the

24   cost of the plan reasonable in the context of debtor's

25   assets, liabilities, and earning potential?  Is the scope of

Page 51

1    the plan fair and reasonable?  Does it apply to all

2    employees?  Does it discriminate unfairly?  Is the plan and

3    proposal consistent with industry standards?  What will be

4    due diligence efforts of the debtor investigating the need

5    for a plan, analyzing which key employees need to be

6    incentivized, what is available, what is generally

7    applicable in a particular industry?  And lastly, did the

8    Debtor receive independent counsel in performing due

9    diligence and in creating and authorizing the incentive

10   compensation.  Again, see In re Dana Corp., 358 B.R. 576,

11   577 as well as well as In re Aralez Pharmaceuticals US, Inc.

12   2018 Bankr. LEXIS 3649 (Page 9).

13          Here, clearly the Debtors have independent counsel

14   and advice.  Ms. Gartrell's supplemental declaration shows

15   that the proposal is consistent with industry standards,

16   specifically within the pharmaceutical industry.  And

17   there's no suggestion that this plan is not reasonable in

18   the context of those assets, liabilities, or earning

19   potential.  And based on Ms. Gartrell's testimony, it

20   appears to me that the plan does not discriminate unfairly

21   and that it awards market compensation.

22          And finally, as I already noted, it is properly

23   incentivizing and the Debtors have carried their burden of

24   proof in that regard.

25          As to the remaining objections, I'll take them in

Page 52

1    no particular order.

2            As I noted during the first hearing on this when

3    the objection was raised with regard to other employees of

4    the debtors, the fact that the Debtor's plan has not been

5    confirmed or that there has not been a substantial interim

6    distribution to creditors in this case to date is completely

7    and utterly irrelevant to the motion before me.  Indeed, to

8    impose such a standard would undercut the foregoing caselaw.

9    As Judge Glenn held in the Residential Capital case that I

10   cited, one should not measure a right to a bonus award based

11   on the occurrence of an event like a sale or confirmation of

12   a plan.  I repeat, should not measure it that way.  This is

13   not simply another bonus.  This is part of annual

14   compensation.  The U.S. Trustee knows that.  And any

15   insinuation of the contrary is really just simply misguided.

16           Secondly, the fact that a debtor needs to obtain

17   court approval with proper vetting by third parties before

18   that approval, i.e. on notice and a hearing, routinely means

19   that when these plans are set, there is a gap where

20   employees are performing with the hope that they will

21   actually be compensated according to those plans before the

22   court actually considers the motion.  It doesn't take much

23   common sense to understand that if one adopted a rule that

24   said that we now know whether these performance goals are

25   met or not and therefore they can't be incentivizing makes

Page 53

1    no sense.  That's not the way to run a business.  And that's

2    not what the court approval process is about.  The court

3    approval process is to determine whether when the goals were

4    set they were within properly the reach of Section

5    503(c)(3).  It's hard to imagine that such an argument

6    would even be made, but it has been made in the past and

7    actually dealt with as I've dealt with it now.  See In re

8    Aralez Pharmaceuticals U.S., Inc., 2018 Bankr. LEXIS 3649

9    (13-14).

10          The only way this argument could be made is if the

11   fact that the targets were achieved shows that they were

12   really easily achieved with no work.  And that is a

13   difficult showing to make.  But to simply say that with the

14   lapse of time we don't need it anymore just is backwards.

15   So I hope we will not see this argument in the future.

16          So I will grant the Debtor's motion with regard to

17   these two employees.  And I've seen the revised order which

18   is proper and consistent with the prior orders that I've

19   entered in this motion.  So you could email that to

20   chambers, Mr. Huebner.

21          MR. HUEBNER:  Thank you very much, Your Honor.

22          Now, the second item on today's agenda is actually

23   not the Debtor's motion.  It's in relation -- the hearing

24   that we had at the last omnibus hearing about the Sackler

25   family sort of comfort order with respect to the injunction.

Page 54

1    I assume Mr. Uzzi will take the podium.  I should have

2    checked with him advance.  But Mr. Uzzi, is it correct that

3    you are the person to whom I turn over the podium?

4            MR. UZZI:  Yes, I am here.  Can you hear me?

5            THE COURT:  Yes, I can hear you fine.

6            MR. UZZI:  Thank you, Your Honor.  Before the

7    Court is the Sackler Family's motion to confirm that payment

8    under a settlement agreement with the DOJ is not prohibited

9    by this Court.  That motion is Docket 1833.

10           Your Honor, I should have stated for the record,

11   Gerard Uzzi.  I represent the Raymond Sackler family.

12   Debevoise represents the Mortimer Sacker family.  This is a

13   joint motion by both families.  As with our prior

14   conference, I will take the lead in presenting the motion,

15   but my colleagues from Debevoise may seek to supplement my

16   remarks.

17           Your Honor, in connection with the request to

18   shorten time in respect of this motion now that's before the

19   Court, the Court heard substantial argument actually on this

20   motion at the October 28th hearing.  At that hearing, the

21   Court instructed us to set this motion for disposition at

22   today's hearing and to file a notice both setting an

23   objection deadline for November 3rd as well as notifying

24   parties to refer to the transcript of the October 28th

25   hearing for further direction regarding the nature of

Page 55

1     today's hearing.  We did that, Your Honor.  We filed the

2     notice on October 29th, and that is Docket Number 1867.

3            Now, on October 28th, we discussed that we had

4     already made substantial argument with respect to the motion

5     and that the Court was not expecting a lengthy hearing today

6     where we would reargue the motion.  Instead, the Court had

7     suggested that today would be more of an update and to

8     address of course any new objections filed and also to

9     discuss the potential revisions to the proposed order.

10           A limited number of filings were made since the

11    October 28th conference, Your Honor.  Those are set forth in

12    the Debtor's agenda.  We did file a brief reply.  That is

13    Docket Number 1951.  Importantly, attached to our reply is a

14    further revised proposed order.

15           Your Honor, in light of the remarks at the October

16    28th hearing regarding the nature of today's hearing, I

17    won't present, or re-present argument, I should say.  I'll

18    just say for the completeness of this transcript to frame

19    the relief, the motion that we're seeking is a request for

20    very narrow relief.  The Sackler families have entered into

21    a settlement agreement with the DOJ that requires the

22    Sacklers to pay $225 million in the aggregate.  The motion

23    seeks only to confirm that the payment is not prohibited by

24    this Court, specifically that the payment does not run afoul

25    of what we have referred to as the anti-secretion language

Page 56

1    contained in the Court's injunction.  This motion does not

2    seek to have this Court approve the merits of the settlement

3    as being -- or the merits of the settlement at all, but

4    specifically as being good or bad or fair or unfair for the

5    Sacklers or the DOJ.  The settlement agreement is also

6    completely independent of the Debtor's agreements with the

7    DOJ.  All of that was discussed on October 28th.  And unless

8    the Court has any further questions regarding what we

9    discussed, I won't readdress the issues now.

10            As far --

11            THE COURT:  Okay.

12            MR. UZZI:  Pardon me.  Were you going to say

13   something, Your Honor?

14            THE COURT:  No, I just said that's fine.

15            MR. UZZI:  Okay.  Thank you, Your Honor.  As far

16   as an update goes, I believe the principal reason why we

17   continued the hearing today was to see if mediation was to

18   progress and whether any progression would impact today's --

19   the need for today's relief.

20            And I can say, Your Honor, that we are progressing

21   in medication, but mediation is not completed or there is

22   not anything that I think I can say that impacts the

23   disposition of this motion today.

24            The Court also did raise the prospect of what I'll

25   call an easy disposition of the motion, being the DOJ

Page 57

1    committing that the settlement payments will be used for

2    abatement.  That was also -- that concept was also the

3    subject of the UCC and non-consenting states' further

4    statement in respect to the motion.  The DOJ did file a

5    letter and deliver a letter to Your Honor that does address

6    that issue.  I'm sure the Court has reviewed that letter.

7    The letter speaks for itself, and the DOJ is here today so I

8    certainly don't want to speak for the DOJ.  I will note that

9    the letter does state in a number of different ways that the

10   funds will be used to advance public health initiatives

11   including abatement.

12           Your Honor, I'm not sure whether that is

13   sufficient to satisfy the Court.  Even if it's not

14   completely sufficient, I hope it does go a long way in the

15   Court's consideration of the motion.

16           As far as a presentation for today, we filed our

17   reply brief, Your Honor.  I won't restate what we've already

18   said in there.  I just will outline the high-level issues

19   just to make a few points.

20           First, as the Court I believe likely remembers,

21   prior to our October 28th conference, we did file an initial

22   revised proposed order intended to respond to and hopefully

23   address the objection filed by the UCC and non-consenting

24   states in their original objection that they filed prior to

25   the October 28th hearing.

Page 58

1           At that conference, Your Honor, you had suggested

2    some further revisions to the order.  We've attempted to

3    address that.  We've attached the order to our -- a further

4    revised order to our reply.  We are hopeful that we did

5    address the Court's concerns.  We believe we've addressed,

6    as we discussed at the prior hearing, the committee and the

7    non-consenting states' objection.  I am happy to discuss the

8    revisions to the order if Your Honor has further questions.

9           Also, on October 28th there was some discussion on

10   the intent of the anti-secretion language.  That is the

11   anti-secretion language, in our view, is not intended to

12   prohibit the payments that we seek to make to the DOJ under

13   the settlement agreement.  Instead, it was intended to

14   prohibit what I've referred to as the nefarious secretion of

15   assets in a manner that would move the assets away from this

16   Court's jurisdiction.

17          The Court correctly noted that we did not offer

18   any transcript citations.  So to complete the record, Your

19   Honor, we did put that in our reply brief.

20          But as I said at the October 28th hearing, my

21   views and the views of other counsel, whether it be Mr.

22   Huebner, Mr. Preis, Mr. Troop, with respect to the intent of

23   that language is secondary to, frankly, the Court's own

24   views.  It's the Court's order.  And I don't anticipate that

25   the Court, as I explained on October 28th, would have had

Page 59

1    today's facts and circumstances in mind when that court was

2    -- when the order was entered, I should say.  But it is I

3    think ultimately the Court's views that is most important

4    here, including with respect to not only what that language

5    was intended to mean when entered, but also the fact that we

6    have asked for alternative relief today in the event the

7    Court would conclude that that language did in fact prohibit

8    the payments that we are seeking to make.

9            Finally, Your Honor, the UCC and the non-

10   consenting states have filed a further statement where they

11   now suggest that the Sacklers should be required to

12   introduce evidence of the Sackler wealth.

13           Your Honor, we state in our reply that, notably,

14   neither the UCC nor the non-consenting states -- well, let

15   me first say, I'm sorry, that they already have a

16   substantial amount of wealth -- excuse me, Your Honor.  They

17   already information regarding the Sackler's wealth, and they

18   don't suggest that based upon their own knowledge that the

19   submission of the evidence they request would in fact defeat

20   the motion.

21           Your Honor, I submit their request here is similar

22   to the original objection where they were seeking admission

23   from us not for the purpose of this specific motion, but in

24   fact to leverage this opportunity for some other purposes.

25           As we stated in our reply, Your Honor, the

Page 60

1    evidence requested is not necessary for this motion.  We

2    submit that the correct analysis is to recognize that the

3    DOJ is in fact in competition with all other creditors for

4    the Sackler's assets, but that the DOJ also has potentially

5    superior enforcement remedies to all other creditors.

6            Now, I addressed this again at the October 28th

7    hearing, Your Honor.  We have stated that we disagree with

8    the assertions that have been made against the Sacklers.

9    But to the extent that the creditors of the Debtors believe

10   that they have strong claims, they need to recognize that

11   the DOJ's claims then are similarly as strong.  And they

12   need to also take into consideration the DOJ's superior

13   enforcement remedies.  And when you do that, Your Honor, I

14   think it's pretty easy to conclude that our settlement with

15   the DOJ does not frustrate the ability of this Court to

16   enforce any potential future judgement.  In fact, it likely

17   enhances it.  Again, I made the argument on the 28th.  It's

18   also in our reply brief, so I won't further burden the

19   record here.

20           I will note, Your Honor, though that in their

21   further statement at Paragraph 9, what is essentially their

22   prayer for relief is that they respectfully request that the

23   Department of Justice and the Sacklers answer the questions

24   raised regarding the motion.

25           As it relates to the Sacklers, Your Honor, we've

Page 61

1    already answered those questions to them directly.  They

2    have the information, forcing us to put in evidence is not

3    going to further inform their views as to the

4    appropriateness of this relief.

5            Your Honor, I will close simply in saying that

6    this is an important step in these cases.  Resolution with

7    the DOJ is a gating item regardless of the ultimate

8    disposition of these cases.  If we don't take the

9    opportunity to lock this in now, there can be no assurances

10   that we'll be able to do it again in the future.

11           Your Honor, in light of the Court's remarks

12   regarding the nature of this hearing, I don't have any

13   further argument, but I am of course happy to address any

14   questions the Court has of me.

15           THE COURT:  Okay.  Why don't I hear the other

16   parties first and then I'll -- I do have a couple questions,

17   but why don't I hear the other parties first.

18           MR. UZZI:  Yes, Your Honor.

19           MR. HUEBNER:  Your Honor, this is Marshall

20   Huebner.  I guess as someone who is not opposed to the

21   relief for specific reasons, it might make sense for me to

22   go next, although I think I actually will be extremely

23   brief.

24           Your Honor, may I be heard and can I be heard?

25           THE COURT:  Yes, sure.

Page 62

1           MR. HUEBNER:  Okay, terrific.  So, Your Honor,

2    from the estate's perspective, which is the perspective we

3    bring, obviously it's sort of governance and sort of what's

4    best for the country and the like, the point from our

5    perspective is does this likely increase or decrease the

6    likely recoveries of and via the estate.  And one of the

7    issues that parties had from the beginning of the case,

8    which was, as we'll talk about a little later on Item Number

9    3, is how much dilution will there be by the DOJ.  And that

10   has been reflected first and foremost in the term sheet that

11   the Debtors filed over a year ago with respect to the

12   framework agreement.  And I think we were all waiting to

13   see.

14           Unless I misunderstand it, and I'm pretty sure

15   that I don't, the Department of Justice/The United States of

16   America has actually required that its $225 million civil

17   settlement with the Sacklers be incremental and in no way,

18   shape, or form dilute or reduce the $3 billion-plus

19   settlement that forms the basis of the framework agreement.

20   From the estate's perspective, that's a very big deal

21   because that dilution, you know, if it had been sort of, you

22   know, the $3 billion-plus structure all in, as many feared

23   and thought that it might be, and the question is, you know,

24   now the estates are maybe only getting 2.775 plus upside.

25   That would be a very different deal and the Debtors,

Page 63

1  frankly, might have a different view.  But it's not, because

2  The United States insisted that the 225 the Sacklers are

3  paying them directly in no way, shape, or form take away

4  from the monies already agreed to in the framework

5  agreement.

6           The second thing I would not -- and this is going

7  to relate to the next hearing, so I'll say it quickly and be

8  done -- is that this is really of a piece with the DOJ

9  settlement with respect to the Debtors as well where the DOJ

10  is essentially taking a fixed sum for itself and allowing,

11  you know, all remaining recoveries including any and all

12  upside and to further negotiate it with a resolution with

13  the shareholders to stay with the estate and essentially go

14  to other creditors.  And so these two things fit together.

15  You know, the Debtors don't really take a view on other

16  aspects of the settlement.

17           As I discussed with the Court last time, the order

18  is fairly heavily blacklined.  In fact, it's extremely

19  heavily blacklined from the version already filed.  Many of

20  those changes actually came from us.  Because with the lens

21  of the estate on, it was actually quite important.  While

22  for sure -- for sure -- and I want to be very clear about

23  this, the UCC and the non-consenting states raised the

24  issues to us in the first instance and sort of, you know,

25  brought us into this, we were, frankly, moving night and day

Page 64

1   on other things.  And they filed the pleading and they

2   flagged issues for the Court's consideration.  You know,

3   once we're in, we're in.  And so we then sort of joined the

4   party and sent riders and paragraphs and additional

5   provisions.  And the order in its current form, which is

6   potentially three times the length of the one that was

7   filed, the Debtors have no objection to it.

8           As Mr. Uzzi noted, the propriety of the

9   settlement, the wisdom of the settlement, all that, not our

10  issue at all.  That's just not Purdue's function for any

11  number of reasons.  But with respect to the economics of the

12  estate, the Debtors have no objection to this order being

13  entered with the protection that we and the UCC and the non-

14  consenting states negotiated.

15          THE COURT:  Okay.  I'll ask you because you're a

16  little bit more neutral than Mr. Uzzi.  At the hearing that

17  we held last month, it wasn't entirely clear to me whether

18  approving or granting this motion would have any positive or

19  negative effect on the mediation of the Sackler issues

20  that's ongoing.  Given that there is no deadline in the

21  agreement for court approval, and given that the  motion was

22  made on -- the request was made on short notice and I did

23  have a couple of questions about the order as well as a

24  question on how The United States was going to be using the

25  $225 million, I put the hearing on for today.

Page 65

1          I'm not asking you to comment on anything specific

2     about the mediation that's ongoing, but do you believe that

3     inaction and further adjournment would facilitate the

4     mediation, or to the contrary, do you believe that approval

5     would facilitate the mediation?

6          MR. HUEBNER:  Well, I sure with you'd ask someone

7     else instead of me.

8          So, Your Honor, let me answer you hopefully both

9     carefully and to the best of my ability.  This is a topic on

10    which I think different people could have different views.

11    And I think that depending on where one is sitting, one

12    could have different views.

13         The Debtor's view is that this actually is

14    salutary towards accelerating the case for -- I think at the

15    end of the day -- and again, I'm extemporizing here -- the

16    following fundamental reason.  The Sacklers have a net worth

17    of X.  And that net worth is known.  And between the DOJ

18    settlement and the estate settlement, if we're able to reach

19    a settlement that would otherwise (indiscernible), at the

20    end of the day, they will pay Y.  And either Y will be

21    agreed to or it will not.  And if it's not, we'll have to

22    figure out something very different than what we've been

23    talking about for 13 months.

24         I just don't think it can be argued with that if

25    the DOJ, for example, demanded and the Sacklers have agreed

Page 66

1    to multiples of the 225 -- let's say for example a huge

2    portion of their net worth, which I know what it is,

3    assuming their presentations were accurate, which I trust

4    that they were, I just think it's just simple reality that

5    that just needs a lot less elasticity in how much they would

6    be willing to pay the estate.

7           For example, if the DOJ took all of their net

8    worth minus $3 billion, then they couldn't even do the deal

9    at hand because they wouldn't have the money left.

10          Obviously one could have a different view.  And I

11   don't want to suggest, god forbid -- as everyone in this

12   case knows very well, I most assuredly have no monopoly on

13   wisdom.  But one could take the view that if the DOJ took

14   ten times this, it would set the tone that we're coming

15   after X, Y, or Z, and maybe that would make them more likely

16   to settle at a higher number.  And I think reasonable minds

17   could differ.

18          At the end of the day I think the Debtor's view --

19   and it's pretty strongly held -- that this will facilitate

20   resolution.  That, frankly, leaving -- and again, I can't

21   disclose their wealth, but leaving very material assets both

22   to ensure that we negotiate both the existing deal to get to

23   fruition, and presumably a different deal from the estate

24   side if we are to get on board the creditors who have sworn

25   a blood oath that they will never sign on to the existing

Page 67

1    deal.  We think that that actually is the way -- that is the

2    way that we are looking at it.

3              And so from the estate's perspective, as I said,

4    the lack of dilution to the estate in both this deal and,

5    frankly, the Debtor DOJ deal and the fact that if you

6    believe the media reports and the Sacklers have X billion

7    dollars, then it leaves them with plenty of money to do a

8    deal with the estate.  And since under our deal, the DOJ is

9    in fact allowing virtually all of what would have been its

10   property to go to the estate, I kind of feel like that's

11   where the action is and that getting this done and turning

12   to the single hardest issue in these proceedings, which is

13   is a price going to be reached that both the Sacklers and

14   the critical mass of the Debtor's creditors, you know,

15   enough to support confirmation, you know, we'll agree to

16   proceed on a global settlement path, or is that just simply

17   not possible?  And after, you know, a year and a gazillion

18   dollars, we need to throw in the towel and go in a different

19   direction.  We're nowhere near that crossroads right now.

20   And we think this one, frankly, makes it less likely that we

21   reach it.

22              THE COURT:  Okay.  Thanks.  All right.  I guess

23   before I hear from the objectors, I did receive the letter

24   from Mr. Fogelman writing on behalf of the U.S. Attorney for

25   the Southern District, Ms. Strauss, laying out The United

Page 68

1    States' understanding of where the $225 million would go or

2    how it would be used.

3            I don't know, Mr. Fogelman, if you have anything

4    more to say in respect to the settlement -- or this motion

5    that is.

6            MR. FOGELMAN:  No, Your Honor.  This is Larry

7    Fogelman on behalf of the U.S. Attorney's Office.  We are

8    prepared to answer any questions that the Court has.

9            THE COURT:  Okay.  All right.  Thank you.  All

10   right.

11           Well, again, I think Mr. Uzzi correctly laid out

12   the framework for this hearing.  I don't really need to hear

13   a lot a recap of what people argued last month, but I am

14   happy to hear from the objectors.

15           MR. TROOP:  Thank you, Your Honor.  This is Andrew

16   Troop from Pillsbury Winthrop Shaw Pittman on behalf of the

17   non-consenting states.  I am hopeful that my comments will

18   cover the UCC's concerns, the Creditors' Committee's

19   concerns as well.  Mr. Preis will confirm that when I

20   conclude.

21           Your Honor, I will be brief.  We listened hard at

22   the last hearing, and so let me address really just four

23   points.

24           The first is with respect to the revised form of

25   order.  If the Court is inclined to grant the motion, then

Page 69

1    we agree that the order addresses the specific issues and

2    concerns that were raised at last month's hearing.  And so

3    we don't have comments on the order.

4           With respect to the Department of Justice and The

5    United States, we appreciate the letter.  But I think it

6    goes without saying that we are disappointed that The United

7    States cannot or will not make the same commitment that the

8    non-federal public claimants had made with regard to

9    dedicating funds to abate the opioid crisis.  After all,

10   that's why we're here and that's why there is this

11   resolution with the Sacklers.

12          Finally, Your Honor, with regard to the issues on

13   evidence and ability to pay.  Your Honor, we understood the

14   last hearing to require some presentation, evidentiary

15   presentation with regard to the impact of the payment on

16   those assets of the Sacklers that are available to pay

17   judgements that might be entered by this Court or any other

18   court against them.

19          And I start with a truism, Your Honor, grounded in

20   the fact that I have no reason to believe that the

21   presentations that have been made about the Sackler's wealth

22   is inaccurate or are inaccurate.  But that's very different

23   than satisfying a burden to demonstrate that the provisions

24   of the preliminary injunction with regard to a material

25   payment had been satisfied on the record.

Page 70

1           Secondly, Your Honor --

2           THE COURT:  Can I parse that through?  I want to

3    make sure I understand you.  Are you saying that -- I think

4    what you're saying is that there is a difference between a

5    presentation that's made, albeit with a great deal of

6    seriousness behind it, to the committee, the states, et

7    cetera and evidence under oath.  Isn't that the point you're

8    making?

9           MR. TROOP:  That's the point, Your Honor.  And to

10   just follow that up for a minute.  And I want to be very

11   careful because I do not want to step over the line of

12   disclosing anything that we've agreed we will keep

13   confidential.  But -- and I don't think that this will do

14   this -- this will do that.

15          There is a difference between saying that the

16   Sacklers have X and that X of what they have they believe

17   are committing to being available to satisfy judgements.

18   And so there is a distinction there that drives, is driven

19   by defenses that might in fact be raised with regard to

20   collection under judgements.  And because there is no detail

21   provided with regard to this payment, where it's coming

22   from, is it being financed -- I think there was a lot in the

23   press and a lot of statements made about a prior settlement

24   where there was difficulty by the Sacklers in obtaining the

25   requisite credit support to be able to make a payment --

Page 71

1    that demonstrates that evidence is appropriate and required.

2           After all, Your Honor, they are seeking relief

3    from your order.  They are -- I believe my memory, Your

4    Honor -- and I admit, I don't have the transcript in front

5    of me.  But I don't believe that you -- let me put it

6    differently.  I don't believe that the provision was

7    intended, nor clearly does it say that it is effective only

8    in connection with the nefarious secretion of assets.  There

9    is more to that provision than that.  And our reference to

10   it as an anti-secretion provision shouldn't be given a life

11   of its own.

12          And so, Your Honor, it really isn't an evidence

13   issue.  But that really does fall into the fourth point,

14   which is something that Mr. Uzzi addressed in part and Mr.

15   Huebner addressed in part, and you raised by your question,

16   I believe.  And that is, is your approval of this relief now

17   necessary, helpful, or hurtful with regard to the

18   negotiation process?

19          And I start with the first, which is necessary,

20   which we discussed last time, that there is nothing that

21   requires the approval of this resolution now, nor is there

22   anything that says it has a risk of going away with the

23   passage of time.

24          Secondly, Your Honor, the impact of approval,

25   particularly in light of the lack of evidentiary basis, but

1   disputes that I can't because of the mediation privilege and

2   other provision of the protective order get into, could -- I

3   won't say make it impossible to reach a conclusion, but I

4   can say that it will make it more difficult.  It is,

5   frankly, as Mr. Huebner said -- and I'm trying not to get

6   into the argument about the next matter on the agenda.  But

7   Mr. Huebner I believe acknowledged that it and the DOJ

8   settlement are intended to drive a particular conclusion in

9   this case, drive towards a conclusion in this case, and a

10  particular conclusion in this case.

11          And as I said at the last hearing, unlike the

12  federal government, which was not constrained in its

13  investigation, was not constrained in its ability to pursue

14  its police power actions, every other creditor was

15  constrained on the former, and every state was constrained

16  on the latter.  And they were restrained for the purpose of

17  advancing negotiated resolution in this case.  And I think,

18  as I said last time, Your Honor, effectively not permitting

19  the Sackler resolution to be consummated now without any

20  evidence that doing so actually poses a risk advances that

21  negotiation goal.

22          And, you know, I think that we are often -- we

23  being the non-consenting states -- described as the one -- I

24  think in some presentation, you know, people were described

25  as having a blood oath against certain things.  And I'm not

1    sure where that blood oath is viewed, since we're fully

2    engaged on the Sackler issue, on the future of Purdue issue.

3    And that's not going to end.

4           So I do think, Your Honor, that not granting this

5    motion now facilitates, fosters that negotiation process for

6    all the parties that are involved.  Us, the Sacklers, the

7    Debtors, the Creditors' Committee, the ad hoc committee of

8    states, the MSGE.  And we would ask you to underscore your

9    previous orders intended to do just that by not approving

10   the motion at this time.  Thank you.

11          THE COURT:  Okay.  And I appreciate you're

12   constrained because you're in the middle of negotiations,

13   plus you've received the information that you received in

14   confidence regarding the Sackler's finances.

15          But it appears pretty clear to me that even though

16   this sum, this amount of money is that -- it's money, it's

17   cash and therefore obviously the highest form of

18   collectability, in the important area of the amount of the

19   payment, it's a relatively low amount.  I would understand

20   the argument much better if the amount was much higher.

21   Then I would understand what I think you've been saying to

22   me.  But it's hard for me to see that this amount somehow

23   skews a negotiation which in fact it would appear to me

24   gives the states the ability to say, you know, not only do

25   we want more, but you have more to pay.

Page 74

1            MR. TROOP:  Your Honor, have you paused because

2    you want me to respond?

3            THE COURT:  Yes.

4            MR. TROOP:  Your Honor, I think that is surely

5    something that may be advanced in the context of

6    negotiations and discussions.  But let's take a different

7    example.  Let's say the Sacklers have ten dollars.

8            THE COURT:  Well, but they don't.

9            MR. TROOP:  No, no, I know.  But hang on.  Just --

10           THE COURT:  Okay.  You're using a hypothetical.

11   Okay.

12           MR. TROOP:  I'm using a hypothetical, Your Honor.

13   Okay?

14           THE COURT:  Got it.

15           MR. TROOP:  But let's say the Sacklers have ten

16   dollars.  And then let's say that they say $9.75 of that $10

17   is beyond your reach.  And we have 25 cents that is not

18   beyond anyone's reach.  And they're talking the 25 cents and

19   paying that to the Department of Justice.  That does have an

20   impact potentially, and a material impact on the ability to

21   collect -- I'm sorry, I don't know who is in the background.

22           THE COURT:  Someone should put their phone on

23   mute.  We are hearing some background noise.

24           I understand your point.

25           MR. TROOP:  And, Your Honor, again -- and so I

Page 75

1    don't need to say anything else, Your Honor.  Thank you.

2              THE COURT:  Okay, all right.  Thank you.

3              MR. UZZI:  Your Honor, it's Gerard Uzzi.  May I

4    U.S. --

5              THE COURT:  I'd like to hear from the objectors

6    first and then you can respond, Mr. Uzzi.

7              MR. UZZI:  Fair enough, Your Honor.

8              THE COURT:  If there's anyone else.  I know Mr.

9    Troop said he was -- he hoped he was going to make the

10   Creditors' Committee's point too, but if there are any other

11   objectors that wand to add to what Mr. Troop said, you can

12   go ahead.

13             MR. QUINN:  Good morning, Your Honor.  It's

14   Michael Quinn of Eisenberg & Baum for the ad hoc committee

15   on accountability.  Is it all right if I speak?

16             THE COURT:  Sure.

17             MR. QUINN:  Thank you.  Your Honor, like the

18   parties before me have said, and specifically for us, you've

19   already heard our objections to this.  All we suggest is

20   that it would be better for the Court to see and approve all

21   the pieces of the plan together.  And that's all we have for

22   you on this motion, Your Honor.

23             THE COURT:  Okay, thank you.

24             Okay, I think that does leave you, Mr. Uzzi, then.

25             MR. UZZI:  All right.  Thank you, Your Honor.

Page 76

1    Just two -- I think you made some of the points I was going

2    to make in response to Mr. Troop's argument.  So I just want

3    to make two other brief points.

4         The idea that there's no risk in delay is just

5    false.  As I discussed at the October 28th hearing, the

6    settlement agreement does give The United States a recission

7    right.  Now, we could all debate in the abstract the breadth

8    of that, but we bear the risk of the ultimate outcome and

9    the potential exercise of recission rights.  So this isn't

10   without risk.  And I just want to make that point.

11        The second point that I wanted to make was as it

12   relates to collectability, we had discussions with Mr. Troop

13   and the UCC regarding those issues prior to the October 28th

14   hearing, and we made several revisions to the order to

15   address that issue.  Because, as I said at the October 28th

16   hearing, and I think as the Court acknowledged, we weren't

17   seeking and we are not seeking to gain any sort of

18   litigation or tactical advantage here with the manner in

19   which we made these payments.  And so we put in a catchall

20   provision of Paragraph 6 of the odder that allows this

21   Court, to the extent that the manner in which we made the

22   payments are later determined as somehow prejudiced, Mr.

23   Troop's clients or any other party in interest, that this

24   Court can order a reallocation.  So I think we've addressed

25   that issue already, and many other issues in the way that we

Page 77

1    had revised the order prior to October 28th and how we

2    further revised it as a -- in response to the October 28th

3    conference.

4         Your Honor, unless you have questions for me,

5    that's all I wanted to add to the argument.

6         THE COURT:  Okay.  All right.  Anyone else?

7         MR. TROOP:  Your Honor, just to be clear -- and I

8    believe I'm quoting from the motion here, the Sackler's

9    motion -- the only way that The United States can rescind

10   the agreement is if you deny the motion to confirm, if you

11   don't grant it in full, or if the relief you grant is

12   inconsistent with the terms and conditions of the agreement.

13   Deferring ruling would not trigger any of those requirements

14   or give right to rescind.  And we are stuck with the

15   document that we have that we didn't negotiate or a part of.

16   But it is what it is.  Just so that's in front of you, Your

17   Honor, as you think about this.

18        THE COURT:  Okay.  Well, that raises two points.

19   And I guess they're questions for Mr. Fogelman.

20        First, the order that was proposed as part of the

21   motion has been changed to address certain objections to the

22   motion and points that I had raised.  Is there anything in

23   the proposed order that would cause The United States to

24   exercise a revocation right?  It's not exactly the relief

25   that was sought, in other words.

1            MR. FOGELMAN:  Your Honor, this is Larry Fogelman

2    on behalf of the United States Attorney's Office.  We have

3    reviewed the proposed order and we are fine with that order,

4    Your Honor.

5            THE COURT:  Okay.  All right.  The other question

6    will put you more on the spot.  Obviously there is a strong

7    incentive for The United States to abide by agreements that

8    it enters into, even if those agreements are subject to

9    subsequent court approval.  But ultimately DOJ acts on

10   behalf of the government.  Governments can change their

11   minds.  Is there an ability on the United States' part if

12   this delays, say, into January after the new administration

13   to review this agreement if it's not been approved already?

14           MR. FOGELMAN:  Your Honor, the Government would

15   simply have to reserve all rights that it has under this

16   agreement.  I think Mr. Uzzi pointed out that at the end of

17   Paragraph 2 there is a sentence that deals with recission.

18   I'm not prepared today to opine on its meaning or contours.

19   I am prepared to say that we reserve all rights that we have

20   under Paragraph 2 and the rest of the agreement.

21           THE COURT:  Okay.

22           MR. UZZI:  Your Honor, Gerard Uzzi again.  If I

23   could just make one or two additional points regarding

24   mediation, Your Honor.

25           At least from our standpoint -- and I hope this is

1    understandable on its face -- our ability to progress.  I

2    mean, the Sackler family's ability to make determinations in

3    the mediation is impacted by this or impaired to the extent

4    this relief is not granted.  I think it's very easy for

5    others to say, oh, well, no, we can just let this kind of

6    hang out there and we'll see.  And no harm, no foul.  That's

7    not our position, Your Honor.  And I don't know any other

8    way to demonstrate that than to ask everybody who is making

9    that argument to just put themselves in my shoes and

10   advising my clients and the decisions they have to make with

11   respect to having what Mr. Troop himself has said on

12   multiple occasions, resolution of a 900-pound gorilla issue.

13   That was Mr. Troop at the chambers conference in relation to

14   whether mediation should go forward, that we shouldn't move

15   mediation forward because we didn't know where the DOJ was.

16   Well, we know where the DOJ is now.  And I just think there

17   is an extreme inconsistency in those positions.

18           The second thing.  Again, nobody wants to move

19   this case along faster than the Sackler families.  And to

20   the extent that it would move mediation along, you know,

21   maybe, just maybe it would be okay.  But the relief before

22   the Court is really a very simple request.  It's a very

23   narrow request.  And the request, again, is simply whether

24   or not this Court has prohibited us from making this

25   payment.  And of course, in the alternative, if it has, to

Page 80

1    let us make this payment.

2              And I would just ask the court to permit us to

3    make this payment.  We don't believe we're -- or, frankly,

4    Your Honor, just to confirm that we're not prohibited to

5    make this payment, I do think it will have a materially

6    negative impact on mediation.  We are all speculating on

7    that point.  But it's not a risk worth taking I submit, Your

8    Honor.

9              THE COURT:  Okay.

10             MR. HUEBNER:  Your Honor, if I may.  I was very

11   brief before.  Let me just say one last thing which I think

12   is also relevant.  Because I don't think -- the cul-de-sacs

13   I think it's not helpful to get into.  But obviously, you

14   know, it goes without saying I was there drafting the

15   Debtor's order on this injunction.  And it was very clear to

16   everybody -- in fact, we said it multiple times and the

17   document is clear on its face that the injunction just did

18   not apply at all to the DOJ or to any DOJ-related matters

19   either against the Debtors or against others.

20             The DOJ itself could have taken any number of

21   actions during this case.  I don't want to speak to what

22   their powers are.  Freezing, seizing, grabbing, whatever of

23   either the Debtors or the Sacklers.  And I think there's no

24   question in the world that nobody could have stopped them in

25   the bankruptcy system if they were compliant with applicable

Page 81

1    law.

2         In general I think sort of the lesser is included

3    in the greater.  And so since the injunction didn't apply to

4    the DOJ at all -- and frankly, I think that the transcript

5    and many other cites that parties have provided does show

6    from the parties who negotiated what they at least believe

7    it was for, it seems to me that the DOJ settling and

8    agreeing to take 225 instead of taking 225 or 2.25 or 5.5 or

9    8.5 just doesn't seem inconsistent to me with the spirit of

10   what people agreed to.  And obviously as Your Honor knows,

11   the dissenting states ultimately agreed to voluntarily be

12   bound to the terms of the injunction as opposed to being

13   bound.  But everyone understood -- and I think the order has

14   now been amended like 17 times -- it was never applied to

15   the Department of Justice, not for one minute.  And the

16   notion that now an anti-secretion clause from 14 months ago

17   would bar a fully publicly-disclosed, technicolor, every

18   document attached to press releases settlement with The

19   United States of America seems to us, separate from, you

20   know, the prudential questions which we also agree that

21   sooner is much safer and better for the estate than later,

22   it just seems to stretch a bankruptcy court order, frankly,

23   far beyond its snapping point in terms of intent and,

24   frankly, possibly in terms of jurisdiction.

25         So I don't want to unduly put my thumb on the

Page 82

1    scale.  I was hoping not to talk at all.  But I do think

2    that from the estate's perspective, the proponent of this

3    order and the entity that frankly hopes to receive billions

4    of dollars from the Sacklers, ideally pursuant to a fully-

5    consensual deal, yes, I think this is an extremely important

6    milestone to lock down and then climb on to the next level

7    from.

8            THE COURT:  Okay.  On the order before me, I did

9    have one change that I want to run by you.  If, Mr. Uzzi,

10   you have it there?

11           MR. UZZI:  Yes.

12           THE COURT:  All right.  It's in Paragraph 3.  And

13   I would change it to read as follows just so there's

14   absolutely no confusion.  I would just have it begin with a

15   Roman I, "In entering this order, the Court is not approving

16   the settlement agreement, nor is it making any findings of

17   fact or conclusions of law with respect to the settlement

18   agreement with the exception of the Court's declaration in

19   Paragraph 2 hereof."  And then it would continue on with the

20   rest of the paragraph.

21           The way it reads now with the exception at the

22   beginning, there is a suggestion I'm approving the

23   settlement agreement somehow, which I'm not.

24           MR. UZZI:  Yes.

25           THE COURT:  So I would just make that change just

Page 83

1    --

2            MR. UZZI:  Yeah, that's fine, Your Honor.  We can

3    make that change.

4            THE COURT:  All right.  So let me go then to the

5    ruling on the motion.

6            I have before me a motion by the Sackler families

7    as defined in the motion that payment by them of $225

8    million under their settlement with United States Department

9    of Just on behalf of The United States is not prohibited by

10   this Court.  And more specifically, is not prohibited by

11   Paragraph 13 of the amended stipulation entered early in

12   this case among the Debtors, the Official Committee of

13   Unsecured Creditors, and certainly related parties,

14   including the Sacklers, which was then incorporated and

15   continues to be incorporated in the preliminary injunction

16   order that I've entered in this case.

17           The relevant language in the amended stipulation

18   is as follows, and it pertains to the Sackler's agreement

19   under that stipulation.  Prior to the ate that is 30 days

20   after the expiration of the stay period, i.e. the expiration

21   of the preliminary injunction, no covered party -- and

22   that's a defined term in the stipulation, but it includes

23   the movants here, the Sackler family -- shall take any

24   action with respect to any material amount of his, her, or

25   its property that is located inside or outside of The United

Page 84

1    States with the intent or material effect of frustrating

2    enforcement of any potential judgement of this Court in

3    these Chapter 11 cases or any other actions pending against

4    them in any other court or jurisdiction.

5           The motion argues and the supplemental pleadings

6    filed in support of the motion argue that this provision,

7    which was indeed repeatedly referred to by the parties when

8    they were explaining the amended stipulation to me in court

9    and thereafter as the anti-secretion provision wouldn't

10   apply at all to a $225 million payment to The United States

11   under the DOJ settlement because this is a public payment on

12   notice to parties in interest and is not a case where the

13   Sacklers are hiding or secreting assets to take them out of

14   the reach of the parties in interest in this case or in this

15   court or any other court of competent jurisdiction in

16   respect of claims by parties in interest in this case

17   against the Sackler family members.

18          It does appear to me when reviewing the relevant

19   transcripts that most of the discussion is as the movants

20   have previously asserted and continue to assert, that this

21   provision was really intended to prevent the Sacklers from

22   hiding their assets or putting them out of the reach of

23   judgement creditors.

24          On the other hand, not all of the references are

25   to that effect.  And, indeed, the language as written in the

Page 85

1    stipulation states, "with the intent or material effect of

2    frustrating enforcement" would suggest that it covers more

3    than simply improper hiding of assets.

4            That doesn't mean that the motion should be

5    denied, however, because the entire provision needs to be

6    construed and applied to the particular facts with regard to

7    this $225 million payment in the context of this case.

8            Again, it prohibits any action with respect to any

9    material amount of the covered parties' property.  So there

10   is a materiality element there.  And then it also says that

11   that transfer cannot be with the intent or material effect

12   of frustrating enforcement of any potential judgement.

13           As I noted, one way to resolve the motion would be

14   to show that the $225 million is not a material amount in

15   the context of this paragraph.  Obviously on its face, $225

16   million is a lot of money, and to I think anyone, even Bill

17   Gates or Warren Buffett, it is a material amount.  On the

18   other hand, it appears clear to me that the Sacklers'

19   financial condition has been sufficiently vetted to show

20   that they have materially more assets than the $225 million.

21           I believe the only concern or at least the

22   addressed concern by the objectors on this point, i.e. this

23   materiality point, is twofold.  One, the presentations have

24   not been made under oath before a judge, so they could be

25   wrong.  But of course the objectors have substantial

Page 86

1    resources to check up on the presentations.

2            And also it may well be the case that $225 million

3    in cash is proportionally more material when one takes into

4    account the issue of collectability on the other assets

5    which I'm presuming or assuming, and I believe I can do so

6    reasonably in large measure would need to be converted to

7    cash to be collectable.

8            Another way to resolve the motion -- and I know

9    that at the hearing and it was clear from the objector's

10   response that they agreed -- is if we could be reasonably

11   confident that most if not all of the $225 million would be

12   applied promptly to help abate the opioid crisis, which is

13   something that the parties bound by the preliminary

14   injunction order have agreed in their mediation to date as

15   reported by the mediators.

16           Since the prior hearing on October 28th, I've

17   received a letter on behalf of the U.S. Department of

18   Justice through the U.S. Attorney for the Southern District

19   of New York explaining the constraints on the Government in

20   how they would apply the settlement funds, but noting that

21   with the exception of three percent which would be deposited

22   into the Department of Justice's working capital fund, which

23   I assume goes to general purposes for the DOJ, the remaining

24   portion of the $225 million would go, under federal law, to

25   federal healthcare programs.

Page 87

1          Mr. Fogelman, who sent the letter on behalf of the

2     DOJ, is careful to note that those programs are not

3     exclusively devoted to opioid abatement, but that they

4     include material opioid abatement programs, initiatives, and

5     efforts.

6          One also notes I guess that money for healthcare

7     is somewhat fungible.  If you have more money for healthcare

8     X, that may free up money for abatement, healthcare Y.

9          I agree with Mr. Troop that this letter is

10    appreciated and helpful, but not dispositive.  Although it

11    appears to me that it could not be dispositive given the

12    state of the restrictions that is imposed by the law on the

13    federal government on how the settlement proceeds can be

14    used.  But I think it is an important point.  It's not going

15    for federal buildings or to build a wall, for example, or

16    anything else.  It's going to healthcare.  Except for the

17    three percent that I mentioned.

18         I will trust that those who review those budgets

19    in Congress, having expressed their strong desire to abate

20    the opioid crisis, would make sure that to the extent they

21    can this money can be used as a fungible matter at least to

22    enable more funds, the bulk of the funds, the fund to go to

23    opioid programs.

24         That leaves then the last way that the motion

25    could be granted, which is whether this payment is made with

Page 88

1    the intent or material effect of frustrating enforcement of

2    any potential judgment.

3            It is clear to me it's not made with the intent of

4    frustrating enforcement.  I agree with Mr. Uzzi that the

5    U.S. Government is a potentially superior competing creditor

6    to the other creditors in this case, including vis-à-vis

7    their claims against the Sacklers.

8            It comes down to whether this has a material

9    effect of frustrating enforcement of any potential

10   judgement.  From everything I know on the record in this

11   case generally and in connection with this motion, the $225

12   million settlement, to the contrary, would facilitate the

13   rights of others, starting with the Debtor itself, to pursue

14   their claims against the Sacklers, either, again from the

15   Debtor's side under Chapter 5 of the Bankruptcy Code or

16   direct claims against the Sacklers that various parties in

17   interest might have, including the objecting states.

18           It is clear to me that the aggregate amount here

19   leaves much greater value available for the debtors and

20   third party creditors to obtain, either by negotiation, or

21   if negotiations fail, if and when judgements are obtained,

22   by collecting on a judgement.

23           Mathematically, any payment would have the effect

24   of frustrating enforcement to the extent of that payment.

25   But what is important here is that it appears clear that the

Page 89

1    Department of Justice, knowing the status of this case,

2    being an observer in the mediation, has negotiated an

3    agreement that other than this amount leaves the negotiation

4    and/or enforcement of claims against the Sacklers in the

5    hands of the other parties in interest in this case.  And it

6    is further clear to me that this amount leaves much more

7    available to those parties in interest.  One could well

8    argue then that rather than frustrating enforcement, this

9    settlement actually enhances the ability of the other

10   parties in interest in the case to collect on judgements or

11   settlement from the Sackler family members.

12         Clearly, cash is the most liquid form of an asset,

13   and therefore the most collectible form of a judgement.  But

14   to me that's overshadowed by what I believe to be the case

15   here and that has clearly not been argued by anyone to the

16   contrary, which is that the Sacklers have magnitudes of

17   value now available to other parties in interest, starting,

18   first and foremost, with the Debtors for their creditors

19   because of this settlement.

20         It's also argued that the Department of Justice,

21   in addition to being a competing creditor who has settled

22   for a relatively modest amount in light of the overall

23   picture of the Sackler's assets, is a potentially superior

24   creditor, i.e. has superior rights.  Of course this

25   settlement is not a settlement of criminal liability.  I

Page 90

1    have not spent a lot of time analyzing whether the DOJ, if

2    this settlement was not approved -- I mean, if this payment

3    was not approved, excuse me -- would have the ability to

4    step ahead on civil claims of the other parties in interest

5    in these cases.

6            But it is clear to me that from the commencement

7    of these cases, indeed, from before the commencement of the

8    case with regard to the so-called consenting state and

9    governmental groups, a successful to those parties and to

10   the debtors resolution of The United States' claims was

11   always an important condition and was always outside of the

12   process applicable to the other parties in interest, which

13   suggests that, indeed, the DOJ does have potentially

14   superior rights.

15           In light of the record before me and my sense of

16   the importance of granting this motion, I've also taken into

17   account the effect that it would have on the ongoing

18   mediation of the remaining key issue in this case, which is

19   whether there will be an agreement that would enable a

20   Chapter 11 plan to be confirmed between the key creditors

21   and the Sacklers.  Again, that mediation is ongoing.  I have

22   no reason to doubt that the parties are engaging in it in

23   good faith, that they are, again, well represented, and that

24   the mediators are remarkably talented.

25           The last thing I would want to do is approve this

1    motion if it would cause that mediation to be adversely

2    affected.  Based on everything I've heard, and my sense of

3    the dynamics in a mediation of this sort generally, I

4    conclude that permitting this payment would not materially

5    impair the mediation, and indeed by setting this bar for the

6    Sackler's liability to the government facilitate the

7    resolution as between the remaining parties in interest in

8    the case, vis-à-vis the Sacklers.

9            They have it in their power know knowing what the

10   result is to negotiate for the rest as much as they believe

11   they can obtain and decide whether they've gotten enough in

12   light of the defenses and the cost of pursuing litigation.

13   I don't believe a payment of $225 million will retard that

14   process.  I do believe there is a good chance that it will

15   improve it and facilitate it.

16   I will note further that the agreement itself contemplates

17   the possibility that a payment to the Government, the U.S.

18   Government, might be disgorgeable under Section 550 of the

19   Bankruptcy Code when the United States is an immediate or

20   mediate transferee or initial transferee.  Of course you

21   have (indiscernible) the deepest pocket in the world.

22           So it appears to me that if in fact I'm wrong and

23   this payment is somehow improperly frustrating enforcement,

24   550 would at least facilitate recovery under Section (a)(2)

25   of that section if it can be established that it was

Page 92

1    received with knowledge of the voidability of the transfer

2    avoided, i.e. the fraudulent transfer to the Sacklers in the

3    first place.

4                     If clearly there's consideration for the

5    transfer, the transfer itself to the government would not be

6    a fraudulent transfer, although, of course, there could be a

7    preference.

8              So I believe that the motion should be granted on

9    the basis that it does not have a material affect of

10   frustrating enforcement of any potential judgment of this

11   Court or any other Court against the Sackler family members

12   who were parties to the settlement and would be making the

13   payment given the size of the payment and what I believe to

14   be the size or the value of the Sacklers other assets.

15             So, Mr. Uzzi, you could email the revised order,

16   revises we discussed about half an hour ago with regard to

17   Paragraph 3 to chambers for entry.

18             MR. UZZI:  Yes, Your Honor.

19             THE COURT:  And you should just cc the objector's

20   counsel and Mr. --

21             MR. UZZI:  Yes, Your Honor.

22             THE COURT:  -- do that.  Again, I want to make

23   crystal clear, and I think I did so even more with regard to

24   my comment on Paragraph 3, I am not approving the settlement

25   agreements here.  I don't have jurisdiction to do so.  It's

1    not before me, and my entry of this order does not lock in

2    any result in this Chapter 11 case.  This request, this

3    motion was really limited to the specific applicability of

4    the language that I quoted to these particular facts and

5    this particular payment.

6            So why don't we move then to the last matter on

7    the agenda.

8            MR. HUSNICK:  Thank you, Your Honor.  Actually,

9    Your Honor, just to do a sound check since this one

10   obviously will be pretty extensive.  Am I coming through

11   loud and clear for the Court and others?

12           THE COURT:  Yes, and I hope I was when I was

13   giving that ruling.

14           MR. HUSNICK:  Yeah, you sounded great.

15           THE COURT:  Okay.

16           MR. HUSNICK:  Okay.  So, Your Honor, that brings

17   us to the third item on the agenda.  And actually in looking

18   at the agenda letter, I realize there's one micro-thing in

19   advance, which is I guess we did ask to file -- I didn't

20   even know this, to be candid, think that's embarrassing --

21   that we had to file a motion for leave to exceed the page

22   submit in our omnibus reply brief.  I think that that motion

23   sets forth the basis for the relief.

24           We're obviously responding to multiple parties

25   raising multiple issues on a very serious, ultimately, you

Page 94

```
 1    know, multi-multi-billion-dollar suit and a case of national

 2    import.  I don't believe there were any objections filed to

 3    that motion for a few extra pages in our reply brief, and I

 4    guess I would ask to the extent that it needs to be granted,

 5    that it be granted.

 6              THE COURT:  All right.  Given the length of the --

 7    the cumulative length of the objection which the reply brief

 8    replied to, I'll grant that motion.

 9              MR. HUSNICK:  Thank you very much, Your Honor.  So

10    onto the main motion for today.

11              Your Honor, today is, in fact, a monumental day

12    for these estates.  While we'll, of course, address the

13    objections, it simply cannot be gained to say that the

14    settlement with the Department of Justice is a milestone.  I

15    believe that's critical and I'm positive that the allocation

16    agreements announced in the mediator's reports on September

17    23rd, 2020.

18              Today's hearing is underlain by one tectonic

19    indisputable and undisputed fact: The United States of

20    America has claims, rights, powers, and abilities that no

21    other party in this case has, and it alone could take

22    actions and, if successful, could very well result in all

23    other creditors in these cases receiving little to no

24    recovery, quite possibly even zero, rather than the billions

25    of dollars they are currently on track to receive.
```

Page 95

1           Had the DOJ decisionmakers landed in a different

2     place, today would have been a very dark day for this case

3     and its creditors.

4           Moreover, the DOJ settlement before you is

5     undeniably aligned to a truly extraordinary degree with the

6     vision of this case that this Court and virtually all of the

7     Debtors' other stakeholders have laid out at hearing after

8     hearing over 14 months.

9           What are the primary elements of that vision and

10    how are they addressed by this settlement?

11          One, Purdue should admit responsibility for

12    unlawful conduct and be held accountable for what so many

13    governmental and private parties have accused it of; that is

14    accomplished.

15          The era of, quote, "Purdue has never admitted

16    liability or been found liable for unlawful conduct since

17    2007," closed quote, can end today.  And the relief that we

18    seek includes Purdue moving swiftly to plead guilty to

19    multiple serious felonies, and no individuals are receiving

20    releases under this settlement.

21          Two, Purdue should not emerge from Chapter 11,

22    something very important to certain of our creditors,

23    ironically, quite possibly, the objectors most of all;

24    accomplished.

25          The DOJ deal requires that Purdue Pharma L.P.

Page 96

1    itself, not a subsidiary, not an affiliate, itself plead

2    guilty to multiple serious crimes and be excluded from

3    participation in Federal healthcare programs.  On the

4    effective date, Purdue Pharma will not be emerging, and its

5    assets will be transferred to a clean new entity.

6              Three, a public document repository; accomplished.

7    Today marks the sixth hearing before this Court stretching

8    back to the very first month of the case.  I was actually

9    the first one to raise it, if my memory is right, at which I

10   had represented that there will be a public document

11   repository on emergence.

12             When a lawyer represents something to a Federal

13   Court on behalf of a client, that is a bankable promise.  It

14   is now also a binding obligation, assuming that the Court

15   enters the order today, under the DOJ deal.  And to the

16   avoidance of doubt and let me say this with crystal clarity

17   loud and clear to the many people listening: The public

18   repository obligations required by the DOJ settlement are

19   the minimum; they are not the maximum.  We stand ready when

20   the time is right to negotiate the contours of what will go

21   live soon or after the effective date -- on or soon after

22   the effective date, which will surely include tens of

23   millions of pages and will be available to the public for

24   years.

25             Goal number four, that the DOJ not derail a

Page 97

1   potential global settlement by taking so much estate value

2   for itself or otherwise destroying distributable value that

3   the rest of the deals just don't work.  We actually already

4   talked about this, Your Honor, with agenda item number two.

5   Accomplished.  I will have much more to say about this in a

6   few minutes.  But suffice it to say that the DOJ settlement

7   reflects an extraordinary wise and public policy-oriented

8   outcome that is unquestionably in the best interest of all

9   creditors and the American people despite ability to have

10  taken off of the top and independent of the bankruptcy

11  system, billions of dollars of value for the Federal

12  Treasury or to take other acts that would destroy billions

13  of dollars of stakeholder value.

14          The United States in America is, in essence,

15  agreeing to take only $225 million from the Debtors for

16  itself on account of its forfeiture rights and what are

17  expected to be modest general unsecured claim recoveries in

18  the complex of these cases, as long as what, as long as

19  $1.775 billion it is otherwise owed is instead rerouted to

20  where every single stakeholder in this case, presumably the

21  states most of all, wanted to go to state-centered abatement

22  of the opioid epidemic.

23          And for its two general unsecured claims, which

24  will undoubtedly be a very small fraction of the unthinkably

25  large claims pool I will describe later, the United States

Page 98

1    has agreed to take treatment in line and no better than

2    varices by the Debtors hundreds and thousands of other

3    general unsecured creditors, all claims the DOJ has, to

4    priority, to non-dischargeability and to access to the

5    Debtors' assets notwithstanding 541 are, in essence, waived.

6           This DOJ deal, in fact, Your Honor, makes

7    everything else possible.  The Debtors stand firmly and

8    immovably behind the private side cash-out deals announced

9    without full detail on September 23rd.  Almost immeasurable

10   efforts went into making those deals happen.  The non-

11   Federal governmental entities, including AHC, NCSG and the

12   NSG spent months negotiating with the five private side

13   groups and other entities and reached appropriate cash-out

14   deals with all five private side groups.

15          The Debtors and the UCC spent thousands of hours

16   assisting and the estate spent tens of millions of dollars

17   to facilitate and help bring this to fruition.  These

18   private side cash-out deals, which include the hospitals,

19   NAS Children, TPPs, ratepayers and, of course, personal

20   injury claimants will provide these parties in material cash

21   distributions, most of whom have agreed to direct-to-

22   abatement, while still allowing the substantial majority of

23   the distributable proceeds in these Chapter 11 cases,

24   including the funds to be received under any deal from the

25   shareholders, to be channeled via state and local

Page 99

1    governmental entities directly and exclusively to abate the

2    opioid crisis and nowhere else.

3          Unless something happens, Your Honor, that I

4    cannot foresee, the Debtors are not budging from these

5    private side deals, not today, not tomorrow, not ever.  More

6    on that a bit later.

7          Primary goal number five: abatement, abatement,

8    abatement.  This is the grand answer to the why of the

9    transactions before you today.  There are more than 330

10   million Americans, and while there's only one of each of us,

11   we are all represented by many governmental officials in

12   this case.  To take myself as an example, I may well have

13   had claims filed on my behalf by each of my school district,

14   my city, my county, my state, federal government, but there

15   is still only one of me.

16         We certainly would not purport to speak for the

17   federal government; they are, of course, more than capable

18   of speaking for themselves.  But our understanding of the

19   DOJ's approach arises out of its, quote, "no piling on"

20   closed quote, policy, which formally holds that as long as

21   other governmental entities are themselves receiving money

22   in respect of similar allegations, the DOJ may choose to

23   step back -- way back -- and not take the money for itself.

24   In other words, the distributable value must go towards

25   claims on behalf of the same 330 million Americans, but it

Page 100

1    does not need to go through the federal first.

2           This power fee is laid out in the Department of

3    Justice manual where the DOJ states its policy that, and

4    quote, "We will coordinate with and consider the amount of

5    fines, penalties and/or forfeiture paid to other federal,

6    state, local or foreign enforcement authorities that are

7    seeking to resolve a case with a company for the same

8    misconduct," closed quote.  Section 1-12.100.

9           Consistent with that policy, the DOJ filed a

10   statement of interest in the (indiscernible) in early 2018,

11   specifically noting that its goal in the broader opioid

12   litigation would be to, and I quote, "Assist parties in

13   carefully crafting non-monetary remedies that'll effectively

14   combat the opioid crisis on a nationwide basis in accordance

15   with appliable law," closed quote.  U.S. memorandum in

16   support of motion to participate in settlement discussions

17   and as friends of the court, as per the docket site, it's

18   212-1.  There's more detail, and I can provide it later if

19   it's needed.

20          And this, Your Honor, is exactly what they have

21   done.  Your Honor doesn't forget much, so I'm not going to

22   read you and belabor the record with the quotes from the

23   bench and actually the states at many hearings, including

24   October 10, 2019, October 11, 2019, November 6, 2019,

25   January 24, 2020, June 23, 2020, September 30, 2020, and

Page 101

1    October 28, 2020, again and again emphasizing that a state-

2    centered, abatement-centered outcome where most of the

3    Debtors value goes exclusively to address the opioid crisis

4    is the prime directive of these cases.  And today, Your

5    Honor, we step massively and monumentally closer to that

6    goal.

7              Before moving to the substance of the objections,

8    I think it makes sense to briefly describe the timeline of

9    what I've had with the DOJ, since there has been both

10   misunderstood and mischaracterized in some of the few

11   objections that were filed.

12             What we are seeking today is authority to enter

13   into the civil agreement and the plea agreement, which

14   together make up our comprehensive DOJ resolution.  If that

15   authority as granted, we will immediately enter into the

16   civil settlement agreement.  The DOJ will then request the

17   hearings to be scheduled within seven days before the

18   Federal District Court in New Jersey where Purdue Pharma

19   L.P., not a subsidiary and not an affiliate, will itself

20   plead guilty to the three felonies laid out in the criminal

21   settlement documents in accordance with the plea agreement.

22             The next step is the confirmation hearing which,

23   as sad as it is for me to say, is still months away.  Then

24   Purdue and the federal government will request a sentencing

25   hearing to be held at least 75 days after confirmation, at

Page 102

1    which the parties will together request that the plea

2    agreement be accepted, the agreed sentence be imposed upon

3    Purdue, and a judgment of conviction entered against it.

4         As the papers laid out, the agreed-upon sentence

5    consists of a $2 billion forfeiture claim -- more on that in

6    a minute -- and allowed unsecured claims on the criminal

7    side totaling $3.544 billion.  However, as the papers make

8    clear, the federal government is agreeing to take only $225

9    million in cash; on the forfeiture claim filed in the amount

10   of $3.5 billion and settled in the amount of $2 billion as

11   long as a small number of entirely reasonably, though

12   admittedly not universally supported, conditions are

13   satisfied.

14        And as the structure I've just described

15   anticipates and our amended 1999 order makes clear, the

16   allowed criminal claims, including the forfeiture claim,

17   both come only after confirmation.  What the DOJ will

18   receive immediately is the allowed unsecured, unsubordinated

19   civil claim of $2.8 billion, which none of the objectors

20   really take issue with, independent of objecting to the deal

21   generally.

22        So, Your Honor, one very good news update, which

23   is while the hearing was going on, as is often the case, you

24   know, some of us were double testing and triple testing.

25   And I'm delighted to report that the claim -- the objection

Page 103

1    filed by the White & Case firm on behalf of the personal

2    injury claimants is now fully resolved.  We have been

3    filing, that the Court surely noticed, amended orders, you

4    know, maybe too many.  Maybe we should have skipped the one

5    this morning, but we were working as fast as we can and,

6    frankly, it hit the docket, you know, as things were still a

7    little bit midstream.  There's, I think, one more word

8    that's changing; it's not very material and we're in the

9    process of getting that filed.

10            So the good news is, one objection is down and we

11   will soon file a cumulative blackline showing the

12   incremental edit that, as you might imagine since White &

13   Case negotiated from the perspective of a major player

14   group, that sort of, you know, in favor of the estate as it

15   were.  It's certainly not a give-back or a degradation of

16   the deal from the estate's perspective.

17            The objectors, at least some of them,

18   misunderstood when the DOJ would be receiving it's allowed

19   forfeiture claim, and from Davis Polk's perspective when

20   several count and experienced lawyers call us and raise the

21   same question or confusion, we assume that we did something

22   that needs improvement.  So we jumped into the form of order

23   and worked with the DOJ to have it far more clearly provide

24   exactly when the DOJ's criminal forfeiture claim and fines

25   are allowed, and also to clear up other potential

Page 104

1     misunderstandings or ambiguities that either re-noticed on a

2     post-filing lead or others brought to our attention.

3              With respect to the blacklined order filed, Your

4     Honor, which I think is on the docket, let me just quickly

5     walk the world through it and then keep going.

6              Paragraph 3, as I already described, now clarifies

7     that the $2 billion forfeiture judgment claim is not allowed

8     until both later of the entry of judgment of conviction in

9     accordance with the plea agreement -- that's the thing

10    that's supposed to happen 75 days after confirmation, so

11    it's the later of that hearing -- and the entry of the

12    confirmation order.  More on that later because it's a

13    critical and important feature of the DOJ resolution.

14             Paragraphs 4 and 5 are essentially the same.  Note

15    again it just further clarifies, so there's no possible

16    doubt on anyone's part, that the criminal fine claim would

17    not be allowed if Your Honor entered the order we are

18    seeking today or tomorrow.

19             Paragraph 7 contains two clarifications that I

20    think are actually quite important.  First, the order as

21    originally drafted required that the plan provide for

22    various things, including separate classification of the

23    DOJs claims.  That was a non-trivial drafting mistake for

24    which, as the ultimate senior member of the Davis Polk team,

25    I'm happy to take responsibility for and, I guess, admit or

Page 105

1    apologize.  We just drafted the order wrong in a fashion not

2    ideal.

3            The deal, which the order now says, is that the

4    DOJ can rescind the civil settlement agreement if the plan

5    fails to provide for certain treatment.  This is not only

6    what the civil agreement says, but we actually think, in

7    fact, is the complete answer to the sub rosa issues raised

8    in the objections that I'll talk about when I get to the

9    objection.

10           The second changes that the DOJ requested that the

11   order clarify that they can rescind the plea agreement if

12   the Debtors materially breach it, which again was always the

13   deal.  You know, it's basic contract law and I'm sure it's

14   federal criminal law that if we breach our agreement,

15   they're not bound.

16           The changes to Paragraph 8 merely clarify what the

17   law actually says.  The stay waiver does not allow them to

18   come or drive up with a truck and take value and assets on

19   account of their unsecured claims.  It allows them to do

20   what arguably they could probably do anyway, which is

21   continue the investigation and litigation of their civil

22   claims up to the point of monetary judgment, but not the

23   execution or collection.  And again, I remind the Court and

24   all parties, the DOJ is not bound by our current injunction,

25   so this is not a carveout.  I think it's just the way the

1   world works.

2          Finally, there's Paragraph 9, which says two

3   things: one, it confirms for, like, the fourth time that the

4   criminal and forfeiture claims are not allowed until the

5   later of the judgment and conviction and confirmation of the

6   plan; and clause (b), which we actually Mr. Shore and White

7   & Case a vote of thanks for.  He caught the fact that if the

8   claims are not allowed until after confirmation, which

9   everyone should love for any number of reasons, but they

10  actually need to vote.  So we actually provided so for the

11  essentially temporary voting allowance in the new section in

12  Paragraph 9.

13         So, Your Honor, in the face of this extraordinary

14  deal, why --

15         THE COURT:  Can I interrupt you for -- I'm sorry,

16  Mr. Husnick.  Can I interrupt you for a second?

17         MR. HUSNICK:  Of course.

18         THE COURT:  Mr. Fogelman, is this -- all this

19  language in the revised proposed order acceptable to the

20  DOJ?

21         MR. FOGELMAN:  It is, Your Honor.

22         THE COURT:  Okay, very well.  So, you can go

23  ahead, Mr. Husnick.

24         MR. HUSNICK:  It would have been a pretty bad day

25  if I got the wrong answer.

Page 107

1            So, Your Honor, the last thing I guess I should

2    say is that the late breaking changes that actually happened

3    while the other matters were being argued actually are

4    changes in reflect of -- in respect of, excuse me, the

5    paragraph that relates to what happens essentially if the

6    plan is not confirmed, and it makes the standard I think a

7    little bit tougher by adding a materiality qualifier.  I'm

8    trying to get that order up on my screen, so I don't get it

9    wrong.

10           But as I said, we'll be filing a blackline in a

11   couple of minutes that will show -- I think it's actually

12   only a one word change from the order entered this morning,

13   so it is obviously another pro-estate change that was

14   negotiated.  And again, I think I can firmly represent to

15   you since there were emails flying around all through the

16   hearing that the changes are acceptable to the DOJ.

17           They're found in Paragraph 6, Your Honor -- I now

18   have successfully managed to call it up on my screen --

19   where there's a proviso in the first sentence of Paragraph 6

20   that, again, against the originally filed version, I'll help

21   explain the changes.  It used to say provide that PPLP

22   defaults on any material obligation, it said under this

23   agreement; that was just a typo because this is the order

24   and not an agreement, so it needed to say the civil

25   settlement agreement.  And then the two word changes are

Page 108

1   both adjectives coming up.  It used to say if a plan

2   consistent with the terms of the civil settlement agreement

3   is not confirmed, we added the word materially before

4   consistent, which again makes it better for the Debtors.

5          And then the next provision, which is the last

6   change, is it used to provide for that right in the event of

7   a dismissal or a conversion, voluntary or otherwise; that's

8   now being changed to in the event of a voluntary dismissal

9   or conversion; that if the Debtors take specific action, as

10  opposed to something surprisingly happening to them, that's

11  what triggers the sort of enhanced right.

12         All, frankly I think, thoughtful and good changes

13  and we are grateful to the DOJ.  We are not unaware, as

14  we'll talk about in another context in a few minutes, of the

15  unthinkable complexity of multiple separate U.S. attorneys'

16  offices and different divisions of main justice and the

17  S.D.N.Y. itself through tele-counsel, all needing to keep

18  huddling and coming back to work on changes to an order that

19  obviously has received attention, you know, rather quite a

20  lot of it, and we're very grateful that they moved, frankly,

21  with the swiftness of the private party.

22         So, Your Honor, back to sort of the next section,

23  which is the objections.  So in the face of what sounds, at

24  least as I've represented it, as a pretty extraordinary

25  incredible deal, why have any limited objections been filed,

Page 109

1    even if only a very, very small number of them.  And I do

2    want to stress the word limited because even where it's not

3    in the title, there's no question that that's what they are.

4    No one is actually objecting to virtually any of the major

5    elements of the deal, which are undeniably remarkable and in

6    the best interest of the estate.

7            As the UCC, for example, noted in its statement,

8    the proposed DOJ resolution, with the parenthetical noting

9    assuming that it's consummated essentially, is a monumental

10   step in both these Chapter 11 cases and the broader opioid

11   world.  And again, assuming that it doesn't cause other harm

12   in the case, which I'll talk about in a few minutes, quote,

13   "Resolution of the United States claims is a vital step

14   towards the Debtors ultimate restructuring, given that the

15   proposed settlement will... ameliorate the threat of

16   dilution posed by a staggering DOJ claim."

17           The committee raises in total in its statement

18   which is not an objection, five very possible points that we

19   sort of largely agree with.  A couple of them I think we've

20   already hopefully brought home, a couple I'll describe sort

21   of, you know, what we think about them and how we did the

22   best we could.

23           But while they don't say it, the rest of the

24   objectors, I think it goes without saying that the guilty

25   pleas by the company, the lack of individual releases, the

Page 110

1    certainty that this provides, the self-contraction and

2    extremely modest expected economic recovery of the United

3    States of America, and its major focus on the shared goal of

4    state-centered abatement, I have to believe that everyone

5    likes those parts and those are the main parts.  It's just

6    that a very few parties out of the 613,000 claimants in this

7    case have just a few things they wish were even better.

8              But it should be noted, Your Honor, that no party

9    contests the deferential governing and legal standard here,

10   nor do I think that anyone has even challenged that we

11   actually go seven for seven on the Second Circuit's Iridium

12   factors.

13             In the end, some of the objections spring from a

14   fundamental misunderstanding of the settlement; some express

15   issues just not before the court at all on our motion, which

16   is why they're not, for example, the shareholders should be

17   criminally prosecuted.  Other objections raised parochial

18   concerns on which they would simply prefer that the United

19   States not have a view or a preference or a policy.  But as

20   far as I know, telling the United States of America that it

21   should not or is not allowed to have a view, an opinion or a

22   preference, especially on an issue where you have one

23   yourself, is not a legally cognizable objection.

24             Every claimant in this case and every single one

25   of the few objectors to this motion who cuts a deal or

Page 111

1    reaches an agreement with the Debtors or with other

2    creditors in this case is allowed to and, in fact, every one

3    of them has made those deals condition on things that they

4    feel they must have.  Conditions precedent are as old as law

5    itself and as old as contract and fit both well and

6    literally every single day within the contours of the

7    Bankruptcy Code.

8              So let me now turn to the substance of the

9    objections and address each topic in turn.

10             Your Honor, our reply brief is filled quite

11   extensively with legal authority.  We cited dozens of cases

12   for everything we say.  I'm not going to burden the record

13   by providing pincites and reading case quotes for almost all

14   of them because, you know, I don't think that would actually

15   help anybody.

16             Objection number one:  The $225 million being paid

17   to the DOJ is not itself going to abatement.

18             Four responses: one, this is not a legal

19   objection.  No one has the right to demand that the United

20   States do specific things with the recoveries to which it is

21   entitles or for which it negotiates in a Chapter 11 case.

22             Two, the DOJ settlement taken as a whole is

23   unquestionably in the best interest of the estate and its

24   creditors.  Objectors are not allowed to cherry-pick at

25   provisions they wish were different.  The law is crystal

Page 112

1    clear and it is black letter that the court must consider

2    the agreement cum onere and may not blue pencil an agreement

3    or tailor it to the deal that objectors or, frankly, the

4    debtors for that matter, wish was just a little bit better.

5          Three, I had by advised -- not my area of practice

6    obviously, but assume that I'm right -- that the

7    Comprehensive Crime Control Act of 1984, 28 U.S.C. Section

8    524(c) and other aspects of federal law simply do not allow

9    governmental officials to designate the use of forfeited

10   funds for specified projects or purposes no matter how

11   worthy.  Just like the money in the last hearing had to go

12   to certain pathways because that's how the law works --

13   we're obviously a government of laws, not of people -- the

14   money is required by law when it's a forfeiture to go into

15   the DOJ asset forfeiture fund.

16         But finally, fourth and most importantly, this

17   objection misses the forest for the trees to a truly

18   remarkable extent.  The federal government is taking, quote,

19   "only" closed quote, 225 into the Federal Treasury and its

20   modest recoveries, most likely, on its unsecured claims.

21   It's not taking 2 billion or 4 billion or 5 billion or 6

22   billion, which it could well have sought.  Instead, the very

23   worth of the settlement and almost every one of its fibers

24   evidences that the federal government's prime directive is

25   helping to ensure that the billions of dollars we are

Page 113

1   desperately trying to put to work as soon as we can from the

2   opioid crisis, are indeed going to state-centered abatement.

3   With only 225 million, hopefully under 3 percent of the

4   estate going to the Federal Treasury.

5           Objection number two:  The DOJ settlement is an

6   unlawful sub rosa plan because the DOJ has the right to

7   rescind the settlement or withdraw credit it is not

8   obligated to provide if a small number of quite reasonable

9   things important to it are not in a plan of reorganization

10  confirmed by this Court.

11          First off, Your Honor, let's spend a few minutes

12  talking about consistency, because, of course, as we all

13  learned from childhood, what is good for the goose must be

14  good for the gander.

15          The objectors themselves have agreed to multiple

16  private side deals in which they have inserted multiple

17  conditions precedent.  This is all in the mediator report

18  and, obviously, much more detail behind it.  When they those

19  to make the private side deals conditioned on an eventual

20  DOJ deal, I don't think that they were breaking the law and

21  signing an unlawful sub rosa plan of reorganization.

22          Similarly, when they chose to make their private

23  side agreements conditioned on a shareholder agreement, I

24  don't imagine that they thought or would today represent to

25  you that they believe they were agreeing to an illegal sub

Page 114

1    rosa plan.  Rather, as we all know, settlements almost all

2    the time, in fact, have conditions precedent.

3            Unsurprisingly, this and other S.D.N.Y. courts,

4    and courts in every jurisdiction probably in the country,

5    have dozens or hundreds of times approved agreements of this

6    nature, including even more specifically in the Adelphia

7    case, where the Court approved an agreement that, as here,

8    distributed hundreds of millions of dollars to the federal

9    government -- in that case, $715 million, almost three times

10   what is at issue here -- and gave a different treatment

11   depending on the structure of the post-emergent entities.

12           Another of the very few examples I will provide

13   orally, which is quite a fortiori to the case at bar, is In

14   re. Lion Capital Group, where the Bankruptcy Court

15   specifically held that a settlement agreement that allocated

16   funds generated in a liquidation specifically provided for a

17   certain allowed claim and required parties to vote in favor

18   of the plan containing the terms of the settlement.  Even

19   that was not a sub rosa plan because its ultimate affect was

20   to, quote, "free up assets for the estate and permit the

21   formulation of a plan of arrangement," closed quote.

22           Our deal obviously does not have anywhere near

23   these type of attributes for, one, Your Honor, as probably

24   everyone or almost everyone on the phone knows is wide,

25   deep, consistent and clear.  Debtors are absolutely allowed

Page 115

1   to reach settlement with counterparties under which

2   counterparties have rescission or termination rights if the

3   eventual plan is not one that they like or expect.

4          RSAs, PSAs, 9019 settlements, cash collateral

5   orders, DIP orders, and many other categories of agreements

6   approved by branch of courts around the country every single

7   week contain termination rights providing that the eventual

8   plan is not a, quote, "conforming plan," a, quote,

9   "accepting plan," a, quote, "approved plan," parties can

10  undo the agreement.

11         Creditors are surely limited and certainly to some

12  extent has a right to dictate the settlement terms of the

13  plan, but they absolutely have the right under a wide

14  variety of circumstances to agree to remain bound to a

15  settlement only if they get what they bargained for.

16         This is so obvious and so ubiquitous in bankruptcy

17  law that I will provide only a small number of examples; our

18  brief has many more.

19         In front of this Court, there is Empire

20  Generating, 19-23007 from June 2019, where you approved an

21  RSA three months before the plan.

22         In Global A&T Electronics in 2017 near the end of

23  the year, you approved the agreement that provided its very

24  termination rights to each party, including providing

25  contending no (sound glitch) of a termination right if the

Page 116

1    debtors or any equity party, quote, "files, supports, or

2    fails to timely object to any plan of reorganization,

3    liquidation, scheme, sale..." blah, blah, blah "... or other

4    transaction other than the restructuring sets forth herein."

5             In Ultra Petrol, you know, also in 2017, you

6    approved an RSA.  It provided varying termination rights to

7    each party, including yet again, providing the debtor and

8    every single counterparty the right to terminate if the

9    Bankruptcy Courts enters an order denying confirmation of

10   the specifically identified plan of reorganization five

11   months before a plan.

12            MPN Silicones, you did this in 2014 -- I have

13   docket cites for every one of these -- four months before

14   the plan.  TBS Shipping, 2012, one month before the plan.

15   And your brothers and sister on the bench, Your Honor, do it

16   just as frequently; that's an RSA or a PSA or a DIP order or

17   a cash collateral order or a 9019 invariably has and they

18   virtually always pursued plans.  In Avia, it was three

19   months before the plan.  In Eagle Boat Shipping, it was one

20   and a half months before the plan.  In Jenco, it was two

21   months before the plan.  Et cetera, et cetera, et cetera, et

22   cetera.

23            Objection 2(a):  The fact that the DOJ forfeiture

24   claim might end up being 2 billion instead of 225 million is

25   somehow inherently illegal.  It's also, I guess, kind of

Page 117

1    like horrible with a straight jacket, it's a poison pill,

2    it's a sub rosa plan.  It's just not, not at all.  And in

3    the interest of time, I'm going to limit myself to five

4    answers to this legally and factually unsupportable claim on

5    which no one has a single case.

6         First, the Debtors could have agreed to a flat $2

7    billion forfeiture claim with the United States of America

8    in exchange for all that they are getting and all that they

9    are avoiding under this agreement.  Would have stood up if

10   that was in the best interest of the estate and very

11   comfortably defended that deal.

12        Such an agreement would have, of course, been far,

13   far worse for creditors; in fact, at least $1.775 billion

14   worth and probably more than the deal that we actually cut,

15   but it still would have passed muster comfortably under

16   9019.  Since that settlement would have been lawful, this

17   one, which will very, very likely end up almost $2 billion

18   than that one for our other creditors, most assuredly is.

19        Two, while the word irony is often used

20   erroneously, the irony of the dissenting states alleging

21   that the United States is not entitled to a $2 billion

22   forfeiture claim and that that's improper is almost too much

23   to bear.  The 48 states and five territories active in these

24   cases have filed a claim for $2.156 trillion arising out of

25   essentially the same conduct against essentially the same

Page 118

1    citizens as the federal government; the difference being the

2    federal government represents 100 percent of the American

3    people and these states represent maybe something percent of

4    that population.

5           So let it not be lost on anyone that the states

6    filed claims, again, arising out of essentially the same

7    conduct against a smaller, albeit material sets of a

8    populous, are alleged to be 1,000 times the size of the $2

9    billion forfeiture agreement and nearly 10,000 times the

10   recovery that the DOJ, our super-creditor, that unlike

11   everyone else has asserted credible forfeiture non-

12   dischargeable rights, is likely to receive.

13          If you just do a quick total and give the estate

14   the benefit of the doubt, the DOJ's claims amount to at

15   least $18.1 billion, including a non-dischargeable criminal

16   fine that they allege is a minimum of $6.2 billion, $2.8

17   billion in civil damages which they allege should be trebled

18   to 8.4 billion plus penalties, all of which the DOJ asserts

19   is non-dischargeable and has zealously had us extend the

20   deadline to non-dischargeability.

21          Three, a criminal forfeiture claim filed in the

22   amount of $3.5 billion or more, which in its claims, the DOJ

23   expressly asserts, is based on the relation backed doctrine.

24          Four, an order of restitution, quote, "In an

25   amount equal to the losses suffered by any victims of the

Page 119

1    debtors' offenses," closed quote, the exact amount which

2    would be determined by a sentencing court and could, if we

3    take the states at face value, be in the trillions of

4    dollars; and five, contingent unliquidated claims arising

5    from its fraudulent transfer and civil forfeiture claims.

6              Answer number three:  That neither for the

7    forfeiture claim nor the criminal fine claim of the federal

8    government is, in fact, being allowed today.  They're not

9    actually being allowed in advance of confirmation.  That is

10   a complete and total answer.  The law is completely clear: a

11   settlement can't be a sub rosa plan when claims are not

12   allowed until at or after the confirmation hearing.  In this

13   case, 75 days after upon acceptance of the plea agreement

14   and sentencing by a Federal Court in accordance with the

15   plea agreement, and only if the Debtors have chosen to go

16   forward with the plan that conforms to the expectations of

17   the federal government.

18             There's a lot of law in our reply brief on this

19   where subsequent confirmation of a plan is a condition to

20   consummation of the settlement, that settlement cannot be a

21   sub rosa plan.  And we have (indiscernible) including the

22   affirmance of this court in Empire Generating, where the

23   District Court made that exact point in affirming.

24             Response number four:  There rescission right of

25   the federal government under our amended order to unwind the

Page 120

1    deal or just not provide the $1.775 billion they are

2    otherwise not obligated to provide does not render the

3    settlement a sub rosa plan.  It's kind of ironic because the

4    objectors all love In re. Crowthers McCall, some of them

5    actually cited their leadoff case.

6         Well, let's see what it says, and I quote, "Where

7    the motion seeks only authority for a company entering into

8    an agreement providing a basis for a plan and to merge with

9    another entity only if certain conditions, including entry

10   of an order of confirmation reflecting the agreement, are

11   satisfied," closed quote.  It is a not a sub rosa plan.

12   Read their own case, the lead case at Page 886.

13        The rescission rights in this settlement and the

14   modification rights, which are kind of a mini version or

15   we're not going to rescind the whole thing, we'd just amend

16   it, are no different than the rights included every day in

17   PSAs, RSAs, cash collateral and other orders.

18        And we know this best of all because you were just

19   affirmed on this issue, that issue dead on.  In Empire

20   Generating, you approved an RSA three months before plan

21   confirmation that exactly as here was conditioned on the

22   plan of reorganization having certain attributes.  The

23   objectors, exactly as here, wrongly alleged that that made

24   the agreement a sub rosa plan.  They lost before this Court,

25   and on March 23rd, 2020, they lost on appeal.  2020 WL

Page 121

1    1330285 at star 2, star 9, pretty much star everything.  The

2    whole decision is just down the line exactly an accurate

3    attestment and explanation of the law.

4            Moreover, Your Honor, as I noted before, before I

5    got to objection 2(a), the DOJ's rescission rights in its

6    agreement are analytically identical to the rescission

7    rights contained in the non-federal public claimant five

8    terms sheets with the private claimants, each of which, as

9    is expressly noted in the September 23rd mediator's report,

10   and I quote, "Conditioned on the Court's confirmation of a

11   plan of reorganization that includes participation by the

12   Sackler family in the plan of reorganization."  And three of

13   the deals are, and I quote, "Conditioned on resolution of

14   the United States claims on terms reasonably acceptable to

15   the non-federal public claims."

16           Here, Your Honor, exactly as the objecting states

17   have in their own term sheets on issues that were important

18   to them, the Debtors and the DOJ each simply have a right to

19   return to the pre-agreement world if the terms in the

20   confirmed plan are not as anticipated.

21           Sixth and finally on objection 2(a).  The

22   agreement to provide cash distributions to federal

23   government for its extraordinary rights and powers does not

24   in any way, shape or form convert the claims settlement into

25   a sub rosa plan.  Once again, let's talk about goose and

1   gander.  Every one of the key creditor constituencies at

2   today's hearing is party to other settlements in this case

3   that provide material fixed cash distributions that

4   aggregate to multiples of $225 million to the private side

5   creditors in this case.

6          And those mediated settlements, which took about

7   six months to get done, were appropriately touted and louted

8   by all of us, every one of us as incredible accomplishments

9   in these cases, not as unlawful sub rosa plans, and the case

10  law is just as clear.  See, for example, Adelphia at 27 B.R.

11  143 at Page 157 and 160, approving the settlement agreement

12  where the government agreed to different financial terms

13  depending on the structure of the post-emergence entity.  I

14  won't give you the details.  I'm quite confident the Court

15  is familiar with the case.

16         THE COURT:  Can I go back to the earlier point you

17  made, that the $2 billion front claim, forfeiture claim, is

18  subject to a plan being confirmed?

19         MR. HUSNICK:  Yes, Your Honor.

20         THE COURT:  Page 8 of the criminal settlement says

21  that the forfeiture judgment, which is the $2 billion, shall

22  be deemed to have the status of an allowed super-priority

23  administrative expense claim in the Purdue bankruptcy with

24  priority over any and all claims and administrative

25  expenses.

Page 123

1          So when you say it's not effective until the plan

2     is confirmed, any plan to be confirmed would have to have

3     that in it, right?

4          MR. HUSNICK:  Again, Your Honor, their rescission

5     right -- let me first pause for a second.  That is exactly

6     the ambiguity that, frankly, others point out as well; that

7     in one place, it seemed to say shall have, whereas in many,

8     many other places, it was clear that it was only upon the

9     acceptance of a plea agreement at the sentencing hearing.

10          THE COURT:  Right.

11          MR. HUSNICK:  Which is why I took some time to

12     read through the changes to the order.  Apparently, the

13     majority of them actually just obliterate any ambiguity

14     about this point.  For example, Paragraph 5 of the proposed

15     order now says if the District Court accepts the plea

16     agreement at the sentencing hearing, which is the thing that

17     happens after confirmation, the United States shall, as of

18     the latter of the entry of the judgment of conviction and,

19     two, the confirmation of the Debtor's plan.

20          THE COURT:  All right.

21          MR. HUSNICK:  And then Paragraph 9 contains a

22     mega-override so that there's no possible question at all,

23     that says notwithstanding anything else in this order or the

24     plea agreement to the contrary -- that gives you the

25     override that you're looking for -- a forfeiture judgment,

Page 124

1    forfeiture payment and criminal fine shall not be allowed

2    claims until the latter of, one, entry of judgment which

3    succeeds confirmation and, two, confirmation of the Debtors'

4    plan.

5              THE COURT:  Okay.

6              MR. HUSNICK:  So it's, like, kryptonite wrapped in

7    titanium now and there's no possible question left.

8              THE COURT:  Okay.  Anyway, I interrupted you.  You

9    can go on.

10             MR. HUSNICK:  No, no, that's exactly what people

11   called and were, like, and the UCC to their credit actually

12   put in their pleading, like, we're a little confused but we

13   sure hope it's the second way and not the first way.  And

14   since it was definitely the second way, we just said it five

15   times in the order so that nobody had to think about the

16   issue every again.

17             Objection number five, which is not really an

18   objection as the UCC in its statement candidly admits, it's

19   a concern and it's a legitimate concern.  It arises out of

20   the fact that the settlements reached between the non-

21   federal governmental claimants and the private side

22   claimants in mediation have a condition in them that the

23   non-federal government be satisfied, reasonably satisfied

24   actually -- excuse me, that word is very important -- with

25   the terms of the DOJ deal.

Page 125

1         So what happens if a subset, for example, of the

2    non-federal claimants allege that this unbelievably pro-

3    estate gives them kind of almost all the money, triggers

4    their reasonable satisfaction termination right.  First of

5    all, I'm not sure what happens if only some of them or a few

6    of them say it because the documents are briefed, leave it

7    at that.

8         That said, Your Honor, I have a lot to say about

9    this risk because it is a risk that needs to be discussed

10   and addressed head on.  I'm going to tell you exactly how

11   the Debtors think about it.  First of all, these reasonable

12   termination right provisions look an awful lot like the ones

13   that the Debtors and the AHC negotiated 13 months ago in the

14   October 8th, 2019 framework term sheet, which provides, and

15   I quote, "As condition to the settlement, Purdue, the

16   shareholder parties and their respective relates parties

17   shall have resolved with the U.S. Department of Justice on

18   terms satisfactory to them... all potential federal

19   liability arising from or related to opioid-related

20   activities."  That's Paragraph 10.

21        So I'm going to put forth and I stand by the

22   following view.  These reasonable termination provisions, or

23   reasonable as the word of the provisions -- I'm not opining

24   on the reasonableness of the provision -- were designed to

25   give the states and the NSG an out if the federal government

Page 126

1    took intolerably much value for itself or took other action

2    and so grievously diminished the value of the estate that

3    the states could not longer stomach the private side deals

4    that they come after six months of mediation.

5          From the Debtor's perspective, this is a question

6    of choosing among and managing risks, which is exactly what

7    Rule 9019 and Section 363 and Iridium and TNT Trailer not

8    only allow but require the Debtor to do.  And respectfully,

9    the choice that the Debtors made on this issue is at the

10   apogee of reasonableness and nowhere near its nadir which is

11   the requirement under law.

12         On the one hand, the risk we face is not reaching

13   a deal with the federal government and likely being

14   indicted, prosecuted, likely in more than one jurisdiction

15   by multiple U.S. Attorney's offices.  This scenario comes

16   with no ability to manage the risk that the new entity would

17   be excluded from federal programs, which destroys the

18   business, or that in the meantime while litigating, Purdue

19   Pharma could lose its state and federal licenses and quotas,

20   which also essentially puts new debtors out of business.

21         And then even if we were still around after

22   multiple federal litigation, turning to then address more

23   than $18 billion in federal claims or the subset of them

24   that was civil or that survived a criminal prosecution or

25   the like, all allegedly both non-dischargeable and giving

Page 127

1    rise to forfeiture as alleged by the federal government.  As

2    we see it, Your Honor, under this scenario, distributions

3    would likely approach or be zero for every single creditor

4    in this case, even if Purdue ultimately prevailed.  And

5    ironically, I don't think there's a single objector or

6    anyone in this case on the creditor's side that hopes Purdue

7    prevails, because obviously the conduct is the same conduct

8    underlying the claims of every other party in this case.

9             The alternative risk that we had to choose in

10   choosing which of the risks was in the best interest of the

11   estate to mitigate as best it could, is that this wise and

12   fair and generous to the states most of all deal is seen as

13   so inseparable to some of the states that they attempt --

14   and I stress the word attempt -- to press the nuclear

15   button, argue that it is not reasonably acceptable to them

16   and send all of us, themselves most of all, to the ground

17   zero of no deals on allocation, a ground zero that will set

18   this case back a year, hundreds of millions of dollars in

19   professional fees, and that amount or much, much more in

20   lost value.

21            Because what exactly would cancelling the private

22   side deal mean for the states?  Not that I'm remotely

23   conceiving that the Debtors and the private side and many

24   others would passively sit by and allow such an outcome to

25   reap.  As this Court, I and many others have repeatedly

Page 128

1    noted and warned, in the absence of the private side

2    allocation settlements, we could literally spend the next 20

3    years and every single penny this estate would ever have or

4    get its hands on in professional fees resolving the claims

5    in this case.

6            There are currently 613,000 claims on our docket,

7    totaling approximately $140 trillion.  So the record is

8    clear, the number is trillion, not billion.  But the

9    aggregate asserted number is actually much, much higher than

10   just $140 trillion because 90 percent of the claims were

11   filed in an unliquidated amount without numbers.  The 140

12   trillion comes from only about 10 percent of the filed

13   claims.  Plus, if we really had to decide who gest what on a

14   claimant-by-claimant basis without the private side deals,

15   there could be $500 trillion of claims or maybe even a

16   quadrillion dollars of claims across more than 600,000

17   individual claimants, each seeking material sums with all in

18   the millions, billions or trillions.  These numbers are, in

19   fact, unfathomable.

20           The states, and this is why and probably everybody

21   might well be looking at net zero recovery if we went back

22   to square one even without the DOJ recovering.  But I have

23   faith that we won't, Your Honor, which is why we chose the

24   way, way smaller of the two risks, in part, because only the

25   dissident states and not the ad hoc or the NSG are objecting

Page 129

1   today.  But much more importantly and because I will not let

2   go of my faith that all of our goals are actually the same,

3   to get the most value to a state-centered abatement model to

4   save lives as soon as we reasonably can, and also because

5   the $225 million going to the DOJ exactly basically, Your

6   Honor, just ruled half an hour ago on the prior motion, is

7   actually mathematically just a fraction of the material

8   dollars already allocated to the private side and a tiny and

9   unbelievably reasonable fraction of the billions of dollars

10  expected to be distributed on account of the state and local

11  government for abatement.

12          Let me use hypothetical numbers just for a minute.

13  Even if its whole distributable value in this case is only

14  $7 billion, let's do that case -- cash, insurance, assets,

15  revenues, Sackler payments -- I'm assuming for this purpose

16  a flat $3 billion contribution and no more because it only

17  gets better -- the DOJ's $225 million represents about 3

18  percent of that total, leaving 97 percent of the estate to

19  the other creditors, mostly to non-federal governments.

20          I've been doing this for a pretty long time, Your

21  Honor, and I have genuinely never seen anything like it.  A

22  creditor that credibly alleges that it has $20 billion or

23  more in super-priority forfeiture non-dischargeable fines

24  and claims and unthinkable rights to do things to the

25  company if it thought it was in the government's best

1    interesting, agreeing to take less than 2 cents on the

2    dollar and leave 97 percent of the estate for general

3    unsecured creditors.

4              And again, regressing out the DOJ and focusing

5    just on the private side claimants for a minute.  We had to

6    choose a risk, Your Honor, and we just don't believe that

7    the states, in fact, are sanguine -- the Debtors most

8    assuredly are not -- that they would end up with anything

9    remotely close to the same quite large percentage of the

10   radically tragically smaller pie that would remain if and

11   when a long brutal ugly war reignited between the private

12   and governmental claimants someday drew to a conclusion.

13             The private claimants have made it very, very

14   clear to the Debtors that they are prepared for war against

15   the governmental claimants if their hard-fought settlements

16   are not consummated.

17             So, Your Honor, the Debtors chose between these

18   two risks, weighing both their probability and their

19   amplitude and stand by the choice they made, a choice that

20   as a matter of law is entitled to substantial deference.

21   Candidly, it wasn't a very hard choice.

22             And then there's sort of objection number six,

23   which brings me near the end of my presentation.  It's not

24   really an objection at all; it's kind of like the one you

25   just finished overruling, which is a request that the

Page 131

1    judgment of a very small number of objectors actually

2    override the judgment of the Debtors at the importance of

3    proceeding today, as opposed to at some future date.

4         This last -- it's really not an objection -- I

5    guess, request, which of course has no legal support because

6    it can't, is a request that the Court adjourn today's

7    hearing because, as they would have you believe, there

8    really is no risk or cost in doing so.  And if we only had a

9    few more weeks, other open issues might fall into place and

10   make the deal today resolution utterly unobjectionable and

11   delightful to these very few objectors.

12        At very first blush, Your Honor, this siren song

13   has a bit of a lure.  Who wouldn't want to adjourn a

14   contested matter if it could be heard a few weeks later and

15   maybe be way less contested or uncontested?  But as this

16   Court well knows, that is what the Debtors have done at

17   every single possible opportunity in this case and in other

18   cases that we have had before you for decades.  We adjourn

19   matters once, twice, even three times wherever we possibly

20   can to narrow and frequently fully resolve issues that

21   originally drew discomfort or unhappiness from stakeholders.

22        Your Honor, if this were such a case and

23   adjourning this hearing were not terrifyingly risky and

24   imprudent, you know we would be the first to suggest it, as

25   we have done at so many junctures in this case and prior

1    cases.  Here, Your Honor, the siren song of just adjourn is

2    exactly, literally and technically, a siren's song because

3    the request understates and completely misapprehends the

4    serious unjustified and unjustifiable risks that the Debtors

5    in these estates would be taking if the 9019 agreement is

6    not approved today, and the amplitude is in the billions.

7            The whole case and all that some of us have been

8    working towards for almost three years could be the price

9    tag.  Just like how we settle, when a debtor settles is a

10   business judgment question and one that, as a matter of law,

11   it can have substantial deference under the Bankruptcy Code

12   and Bankruptcy Rules.

13           We have very good reason to be absolutely

14   unwilling to take the risk of this hearing being adjourned,

15   and that judgment deserves both respect and deference.  It

16   is not surprising that no one has brought forth, or I think

17   could bring forth, a single case citation to this Court

18   where a court has ruled that a debtor must, as a matter of

19   law, adjourn a mission critical case saving settlement

20   because a small group of creditors in their subjective

21   judgment and for their own strategic reason would rather

22   have it heard anon.  And as Judge Gerber actually said

23   eerily on point in Adelphia, and I quote, "I am not in a

24   position to condemn the Adelphia board or this settlement

25   based on what is in essence speculation as to what the DOJ

Page 133

1    would have done.  That is what settlements are all about,"

2    closed quote, Page 19.

3            It also bears mentioning, Your Honor, that many

4    stakeholders in this case seem to share the Debtor's view

5    about the wisdom, propriety, and legality of resolution.

6    There are five primary private side groups, as this Court

7    well knows.  Of the five, one chose to object, and it was a

8    serious objection, a long objection; it is resolved.  Now,

9    none of the private side groups are objecting.

10           There's the United States of America.  I don't

11    really need to belabor that one.  Obviously, they are not

12    objecting; they are the counterparty.

13           No objections from the tribes, no objections from

14    the AHC, no objection from the NSG.  The UCC, which is very

15    careful with its words, chose not to object, but instead to

16    file a statement raising a handful of thoughtful and

17    understandable concerns that we share, goals that we either

18    achieved or tried to achieve or on issues that we have now

19    clarified and should be put in the resolved class.

20           The statement reflects the unavoidable fact that

21    we all live with every day in our personal lives and

22    professional lives: we can't get everything we want.  It

23    would have been great if this unbelievably terrific deal

24    were even better, but that comes nowhere close to making it

25    not good enough under Rule 9019.

Page 134

1          Your Honor, procedurally, the filing of the

2     professors, I think is not yet sort of before the Court.  It

3     is so replete with error and so permeated by

4     misunderstanding of these cases, with the Court's

5     permission, I actually won't address at all right now.  And

6     if it is necessary, I am delighted to argue later because I

7     just think while they're brilliant and wonderful, amazing

8     professors and I read a lot of their work and I love a lot

9     of their work, they just get this one very wrong.

10          So let me instead hit one final topic and then I

11    am done with my opening.

12          Your Honor, I've already -- and then I'll reply in

13    extraordinary detail, thoroughly address that the, quote,

14    "PBC" issue certainly does not give rise to a legally

15    supportable objection.  The simplest answer is that

16    settlements, just like every settlement of every one of the

17    objectors in this case is allowed to be conditional and is

18    allowed to have a change in terms or a rescission right if

19    the deal that people are basing their settlement on doesn't

20    happen at the confirmation hearing.

21          But because it looms large in several of the

22    objections, and maybe more importantly because so many

23    parties pretty much who are not actually involved in this

24    case either misunderstand or mischaracterize the provision

25    in the DOJ settlement that is premised on this Court

Page 135

1   approving a plan under which Purdue will not emerge from

2   Chapter 11, but its assets will instead be transferred on

3   emergence to a public benefit company or entity with a

4   similar mission, and others seem to even suggest or demand

5   that the assets be sold now no matter how devastating the

6   value loss, a few words need to be said, but only a very few

7   words.

8            First of all, if today's release is granted,

9   Purdue will, hopefully before Thanksgiving, be pleading

10  guilty to multiple serious felonies on the federal level.

11  And if the plea agreement is accepted and Purdue is

12  convicted, Purdue Pharma will never emerge from Chapter 11,

13  ever.  This is a goal that I believe is shared by all of our

14  creditors, maybe most of all by the objectors.

15           That, of course, though gives rise to a question

16  that has to be answered.  What do we do with the Debtor's

17  material and complicated assets in the near term to best

18  achieve the many goals of these cases, maximize abatement

19  value, and save and improve as many lives as we possibly

20  can?

21           I can assure you, Your Honor, that the Debtors,

22  like other people, have very strong views on the topic.  If

23  I'm left with no choice but to get through an extended

24  discussion of the merits of the PBC this morning, I am

25  prepared to do so in extraordinary detail with numerical

Page 136

1    examples of exactly why we're doing what we're doing.  If

2    other creditors want to talk to you about whether an

3    immediate sale should happen, I have plenty to say about

4    that as well.

5         But today is not actually the time or place for

6    it.  It is a 9019 hearing about an almost unprecedentedly

7    favorable settlement, not a referendum or an open mic

8    session on the future of Purdue; rather, we will continue to

9    have these conversations where they belong in the context of

10   mediation.

11        The DOJ condition precedent provides only that all

12   aspects of the deal, including transfer to the states by the

13   federal government of almost $2 billion, will remain in

14   place, and I quote, "Public benefit company or other similar

15   entity."  There is much flexibility in the offing.

16        My last three minutes, Your Honor, I will just

17   dispel some of the most -- the largest misunderstandings.  A

18   public benefit company is nothing more than a regular

19   private company created under state law, with one tweak:

20   it's one whose governing documents provide that it is

21   allowed to take social good and the betterment of society

22   into account alongside its profit motives.  The structure

23   has stayed available under the laws of 36 states and

24   territories so that officers and directors can't be sued if

25   they do societal good or for profit in order to do things to

Page 137

1    make our world a better place by donating profits to opioid

2    abatement.

3           For the avoidance of doubt, a PBC is not -- I

4    repeat not -- a government or quasi-governmental

5    corporation.  Newco would not in any way, shape or form on

6    any level and not even for a pico-second, be free from state

7    or federal regulations, laws or prosecution.  The exact

8    corporate and trust structure of Newco and the distribution

9    vehicle, the identity of trustees, directors and management,

10   the terms of the government documents and dozens of other

11   issues are ripe and are undergoing towards their resolution

12   and compromise.  No creditor will have to take any role,

13   function, post, ownership, security that they don't want to.

14          Your Honor, a few months ago, I had hoped that

15   this November hearing would be the hearing in which we were

16   presenting three term sheets on all the remaining case

17   issues.  While it is not a shortcut, I do remain hopeful,

18   maybe foolishly so, that we might be able to do that when we

19   are before you in December or very soon thereafter.

20          But for today, we are poised to take a monumental

21   gargantuan leap forward in these cases for accountability,

22   for transparency, for abatement, for value maximization, and

23   for the value going to the American people via the non-

24   federal governmental claimants who at last stand poised to

25   receive the very material majority of these estate assets,

Page 138

1    which they have already pledged to dedicate 100 percent to

2    the opioid crisis, exactly as I told you was our goal at the

3    first day hearing 427 days ago and with which you and many

4    others, including these same objectors, have agreed again

5    and again.

6            I respectfully suggest that the Debtors have far,

7    far more than satisfied their burden of demonstrating that

8    the settlement, both for what it accomplishes and what it

9    sends is in the best interest of these estates.

10           THE COURT:  Okay.

11           MR. HUSNICK:  Your Honor, with respect to order of

12   operations, if it makes sense since I'm pretty confident the

13   DOJ is in full support of the motion, and I know that the

14   Court always wants to hear from supporters first and then,

15   you know, the order may get complicated after that, you

16   know, given that, you know, there's an objector.  If it

17   makes sense, we thought it might make sense for the DOJ to

18   go next.  But obviously, again, as the old saying, I'm just

19   a guy and you're the Court, so whatever, of course, is the

20   Court's preference.

21           THE COURT:  No, that's fine.  I'm happy to hear

22   from Mr. Fogelman, although he's already confirmed that the

23   order as proposed is acceptable, even though it modifies

24   arguably the terms of the agreement.  I have a logistical

25   issue too.  This hearing's gone longer than I anticipated,

Page 139

1    and there's a technical issue with CourtSolutions that we

2    have to reset if it's on for more than four hours.  So at

3    some point in the next 10 minutes or so, we're going to have

4    to do something to that end, but I could hear from Mr.

5    Fogelman in the meantime.

6              MR. FOGELMAN:  Thank you, Your Honor.  This is

7    Larry Fogelman on behalf of the United States.  Can Your

8    Honor hear me clearly?

9              THE COURT:  Yeah, I can hear you fine.

10             MR. FOGELMAN:  Great.  May it please the Court, in

11   the face of the national public health emergency stemming

12   from opioids, the United States has deployed extensive

13   resources to combat this crisis, which claims tens of

14   thousands of Americans lives each year.  The broad efforts

15   of the United States include the use of criminal and civil

16   tools under federal law to hold actors accountable for their

17   unlawful actions, including manufacturers, distributors,

18   pharmacies, and physicians.

19             We are here today because the United States has

20   reached a milestone event in its nationwide effort to

21   address the opioid epidemic, the global resolution of our

22   criminal and civil law enforcement investigations into

23   Purdue, arguably the most significant manufacturer of

24   opioids in the country.  Given the unique task of the United

25   States to enforce federal law and to ensure public health,

Page 140

1    the resolution has twin aims: to hold wrongdoers accountable

2    and to facilitate resources for treatment and care of those

3    affected by opioid use disorder.

4          The government's criminal and civil resolutions

5    with Purdue hold Purdue accountable for its conduct and are

6    structured to ensure that remedial actions are taken towards

7    combatting the opioid crisis on a nationwide basis.

8    Debtors' 9019 motion should be approved as it is not only in

9    the best interest of the estate, it is in the best interest

10   of the public in fighting this national health emergency.

11         First, the global resolution holds Purdue

12   accountable to the public for its misconduct.  Most

13   significantly, the global resolution requires Purdue Pharma,

14   L.P. to plead guilty to three felony counts for defrauding

15   the United States and violating the anti-kickback statute

16   from 2009 to 2017.

17         The resolution also requires Purdue to admit

18   publicly to the facts underlying its criminal misconduct,

19   and it brings to light the government's factual conclusions

20   from its civil investigation.  Further, the United States

21   requires that Purdue will host a document repository

22   available to the public relating to the criminal charges and

23   civil violations.

24         Second, the global resolution is a critical step

25   in remediating this nationwide crisis.  Of the government's

Page 141

1    $2 billion criminal forfeiture claim, $1.775 billion will be

2    credited to the states, local governments and tribal

3    authorities for their critical work in abating this

4    epidemic.  The government's $3.544 billion criminal fine and

5    $2.8 billion civil damages will be treated as general

6    unsecured claims.

7           Your Honor, we have a cleareyed view that in a

8    case with trillions of dollars of claims and a company with

9    assets worth a tiny fraction of the dollar value of those

10   claims, the recovery on unsecured claims might well be less

11   than one cent on the dollar.  Essentially then, we are

12   applying the vast bulk of the government's recovery as a

13   credit to the abatement plan.

14          The UCC has commented on the, quote, "favorable

15   financial terms of the proposed DOJ resolution," unquote,

16   which in its view, quote, "will result in significant value

17   being available to distribute to the Debtors other creditors

18   and abate the opioid crisis," unquote.  The UCC further

19   observes that, quote, "resolution of the United States claim

20   is a vital step toward the Debtors' ultimate restructuring

21   given the proposed settlement... ameliorates the threat of

22   dilution posed by a staggering DOJ claim," unquote.

23          In reaching this resolution, the United States

24   felt it was incredibly important that the credits of the

25   estate, which include the states, thousands of local

Page 142

1    governments, trial authorities, and victims of opioid use

2    disorder, receive the vast majority of the United States'

3    potential recoveries in this case to permit those entities

4    to put those funds towards the important and critical work

5    of abatement of this crisis.

6         This global resolution achieves that goal as 88.75

7    percent or 1.775 of the $2 billion of funds in our criminal

8    asset forfeiture deal goes towards abatement.

9         Based on our criminal investigation, the U.S.

10   would be within its rights to assert at least a $3.5 billion

11   forfeiture claim, as reflected in our proof of claim, and at

12   least a $6.2 billion penalty.  But instead of aggressively

13   pressing these claims through a prosecution, the government

14   believes that these funds would be better used if put

15   towards the abatement objectives of federal, state and

16   tribal governments that they had achieved in the mediation.

17        MR. HUSNICK:  Mr. Fogelman, can you take a breath

18   for just one second.  Your Honor, I'm getting messages that

19   the dial-in line for people who are --

20        THE COURT:  Yeah, this is what I was addressing

21   earlier.  I apologize for this.  You're all going to have to

22   hang up and redial in again.  CourtSolutions can only go for

23   four hours at a time and then, I guess, it poops out, so

24   this is probably a good time for people to stretch their

25   legs too.  Why don't you redial in so that you're redialed

Page 143

1    in by 2:00 p.m.  Okay?

2              MR. HUSNICK:  Thank you, Your Honor.

3              THE COURT:  All right, I'm going to hang up at

4    this point.  Mr. Fogelman, you can pick up at that point.

5              MR. FOGELMAN:  Thank you, Your Honor.

6         (Recess)

7              THE COURT:  Hello, everyone.  This is Judge Drain.

8    Were back on the record in in re Purdue Pharma, L.P.  I

9    apologize for having to take the break.  Technology is like

10   certain people.  They can't take more than four hours of

11   court time in one stretch.  So, again, I just want to remind

12   you all to keep your phones on mute unless you're speaking,

13   and I think we broke when Mr. Fogelman was still speaking on

14   behalf of the U.S. and the DOJ.  So, Mr. Fogelman, if you're

15   back on the line, you can keep going.

16             MR. FOGELMAN:  Thank you, Your Honor.  For the

17   record, this is Larry Fogelman on behalf of the United

18   States.  Just prior to the break, I'd been making the point

19   that, instead of aggressively pressing our criminal

20   prosecution, the government believes that the funds at issue

21   would be better used by putting them towards the abatement

22   plan at state and local governments and tribal authorities.

23   And I want to make two points about how this credit fits

24   into DOJ's previously stated policy interests.

25             First, it's worth understanding our resolution in

Page 144

1    the context of DOJ's written anti piling on policy about

2    coordinating corporate resolutions in parallel proceedings

3    arising from the same misconduct.  Under that policy, which

4    we published in 2018, we endeavor, as appropriate, to

5    coordinate with and consider the amounts paid to state and

6    local authorities that are seeking to resolve a case with a

7    company for the same misconduct.  The goal of the policy is

8    achieving an equitable result.

9             That policy applies across DOJ's enforcement

10   actions, including this one, where many state and local

11   authorities have proceedings against the Debtor arising from

12   its opioid marketing and distribution practices.  That's why

13   here, in this case, and through this settlement, we are

14   prepared to see the vast bulk or our asset forfeiture

15   recovery go towards this critically important abatement plan

16   advanced by the states, local governments, and tribal

17   authorities.

18            Second, and more specific to the opioid context,

19   this resolution is very much consistent with DOJ's filings

20   more than two years ago in the multi-district federal

21   litigation over opioids.  For example, in April 2018, when

22   we filed a motion to participate in settlement discussions,

23   and as a friend of the court, we explain that the United

24   States has a significant stake in combatting the opioid

25   epidemic, which has implications for the proper allocation

1    of any monetary settlements of claims.  It's that same stake

2    in combatting the opioid epidemic that we are endeavoring to

3    address through this settlement.

4            We recognize that the goal of nearly every

5    interested party in this case, including the court, is for

6    nearly all the proceeds of the bankruptcy to go to opioid

7    abatement programs, and the United States is a strong

8    advocate and partner in achieving that goal.  Indeed, we

9    made the decision to permit a credit against our forfeiture

10   claim because of our beliefs in the extraordinary value

11   those funds will have if they are used towards abatement.

12   Similarly, with those interests in mind, we wanted to ensure

13   that the future company's mission benefits the American

14   people.  Thus, it was incredibly important to the United

15   States that the future company would be a public benefit

16   company, or a structure with a similar mission.

17           We say this against the backdrop of the United

18   States' recognition that Oxycontin has benefits when used

19   appropriately.  This PBC structure can ensure that Oxycontin

20   is distributed in a manner as safe as possible without

21   diversion.  Equally important, the PBC structure will enable

22   the future company to have the fiduciary flexibility to use

23   the proceeds in a manner that go towards further abating the

24   opioid crisis and taking into account long-term public

25   health interests.  Critically, we wanted to ensure that the

Page 146

1    new company is not required to maximize profits over lives;

2    that the new company has a robust charter and mission; and

3    that the proceeds will be used for the benefits of those

4    individuals and communities suffering from the opioid

5    crisis.

6            Again, while the aforementioned mission is

7    critical to the United States, given our unique role in

8    addressing this crisis, we wanted to ensure that Purdue's

9    other important governmental constituencies, the states,

10   local governments, and tribal authorities, have the

11   necessary flexibility to achieve the goal that we all share.

12   That's why we use the term "PBC or entity with a similar

13   mission" in our settlement papers.  We look forward to

14   working cooperatively with the Debtor and other creditor

15   groups to come up with the most effective structure for

16   post-emergent Purdue.

17           With regard to timing, Your Honor, we did include

18   in our papers the requirement that the 9019 motion be

19   brought within 7 days.  And it's also a requirement of our

20   papers that, within 7 days after the court approves the

21   9019, the parties will seek to have the plea heard in

22   District Court in New Jersey.  Thus, built into this

23   agreement was our desire to get this deal to the finish

24   line.  We want Purdue to allocate to the three felonies that

25   are the subject of the plea agreement, and we want that to

Page 147

1    happen as soon as possible.  We would be prejudiced if this

2    doesn't go forward.  The U.S. would have lost months of time

3    that could have been used prosecuting and liquidating its

4    claims.  We shouldn't be penalized for opting to potentially

5    negotiate our claims and submit them to the court.

6            In sum, Your Honor, the United States' role on

7    this case is far greater than its role as a creditor of the

8    bankruptcy entity.  Rather, we are tasked with serving the

9    broader public health interest, and we take that role

10   incredibly seriously.  As part of that broader role, we

11   wanted to ensure that our resolution with the company

12   achieved the goals of the United States, while affording

13   every interested party in this case the ability to work

14   towards solving this crisis.  We believe our deal does that.

15   Our deal is both in the best interest of the Estate as well

16   as the best interest of the public, and we ask that the

17   court approve this 9019 motion.  Thank you, Your Honor.

18           THE COURT:  Okay, thank you.  I guess I will take

19   Mr. Huebner up.  If anyone else wants to speak in favor of

20   the settlement, they can.  Of course, I know who has

21   objected.  I'm assuming that those who have not objected are

22   prepared to let the settlement be approved, but if anyone

23   wants to speak, briefly, in support of the settlement, they

24   should feel free to.

25           MR. ECKSTEIN:  Your Honor, this is Kenneth

Page 148

1    Eckstein of Kramer Levin.  Would it be appropriate for me to

2    make some brief comments at this point?

3              THE COURT:  Sure.

4              MR. ECKSTEIN:  Thank you very much, Your Honor.  I

5    hope you can hear me through the phone.

6              This is Kenneth Eckstein of Kramer Levin speaking

7    on behalf of the Ad Hoc Committee of Governmental Claimants.

8    Your Honor, I'm speaking briefly to advise the court that

9    the Ad Hoc Committee supports approval of the DOJ settlement

10   today.  We share in the view that the DOJ settlement

11   represents an essential building block to a plan of

12   reorganization in this case, and was an important step

13   recognized by the consenting states and the Debtor in

14   connection with the negotiation of the term sheet at the

15   outset of this case.

16             As Your Honor has heard in great detail, as

17   structured, the settlement contemplates a $225 billion-

18   dollar payment ultimately being provided to the DOJ in an

19   allowed claim of $3.544 million dollars.  This, if

20   implemented, represents a remarkable step, which should pave

21   the way for the overwhelming portion of this Estate,

22   including proceeds of a Sackler settlement being dedicated

23   to fund abatement of state and local governments and to fund

24   the settlements with the private claimant groups, most of

25   which also have agreed to dedicate their recoveries to

1    abatement.

2         We share the view that this settlement is not a

3    sub rosa plan and we take great comfort from the remarks

4    made both by Mr. Huebner and by Mr. Fogelman in describing

5    exactly how they expect to implement the condition that was

6    built into the settlement regarding a "public benefit

7    corporation or other entity with a similar mission" being

8    embodied in a plan of reorganization.  And in particular,

9    the flexibility that Mr. Fogelman pointed to and the desire

10   to continue to work closely and cooperatively with all of

11   the parties in this case to put into place a workable form

12   of governance and a workable emergent structure is something

13   that is very important to us, and we have every reason to

14   expect that that is going to be successful.  Having this

15   settlement in place provides us greater confidence that

16   we're going to be able to achieve that very important goal.

17        Your Honor, while we appreciate the concerns

18   raised by the Creditors' Committee, as well as some of the

19   concerns that have been raised by the non-consenting state

20   group, we ultimately share the view that, given the

21   challenges that we all face in this case - and they are many

22   - that it is most constructive to start putting fundamental

23   components in place that are going to allow us to get to a

24   plan.  We believe this is one of those components, and

25   therefore, the Ad Hoc Committee is supportive of the Court

Page 150

1    entering an order approving the DOJ settlement.  I'm happy

2    to respond to any questions.  Thank you, Your Honor.

3            THE COURT:  Okay, thank you.  All right, I don't

4    know what order the objectors have agreed on, if any, but

5    I'm happy to hear from them, at this point.

6            MR. SHORE:  Your Honor, this is Chris Shore from

7    White & Case.  We're kind of caught in the middle, now.

8    We're neither supportive (indiscernible) --

9            THE COURT:  That's true.  I should hear from you,

10   you're right.  I should hear from you first.

11           MR. SHORE:  Okay.  Well, thank you very much, Your

12   Honor.  Chris Shore from White & Case on behalf of the Ad

13   Hoc Group of Personal Injury Victims, which represent about

14   60,000 of the about 130,000 personal injury claims filed.

15   And the Ad Hoc group has been a mediation participant.

16           I'd like to address, first, a little bit about the

17   objection, then go to the resolution of the objection that

18   we've reached, provide a little more color than Mr. Huebner

19   did on that, and then maybe a little bit at the end, focus

20   on this point about where we go from here.

21           First, with respect to the objection, we were

22   really -- you know, when we got the Debtor's motion, which

23   was a surprise, I think to all the creditors as to what it

24   was, and how it was going to play out.  We had two concerns:

25   one was a global concern, and one was a parochial concern.

Page 151

1      The global concern focused on the fact that, as Your Honor

2      knows, for months, a number of creditors, at great expense

3      and spending a lot of time, worked in a mediation to address

4      allocation of a state distributable value.

5            And the reason we focused on allocation, because

6      allowance was such a flashpoint.  It kind of didn't matter

7      the size of your claims or the priority of the claims, as

8      long as we just agreed to how the distributable value would

9      be allocated.  And ultimately, we all agreed, as reported by

10     the mediators, on allocation percentages and/or amounts.

11     But all of it is premised on there being global peace

12     embodied in a plan.  None of these settlements can be

13     effectuated outside the context of the plan.

14            And to that end, we are taking comfort from Mr.

15     Huebner's comments that the Debtors are committed to

16     honoring those settlements when they ultimately get around

17     to a plan process.  But while that was playing out, the

18     Debtors were focused on allowance, and allowing claims, even

19     if parties like the Ad Hoc groups objected to the amounts of

20     the claims.  And not only that, the Debtors weighed in on

21     priority, agreeing to a $2+ billion-dollar superpriority

22     claim.  Now, I don't know whether it's ambiguous or we were

23     just misreading it wrong, but the proposed order that went

24     with the original motion, I thought, was pretty clear about

25     what the Debtors were giving up and when they were giving it

1    up, in the context of the plan.

2         And the reason the superpriority admin claim

3    matters so much is, of course, there are no secured pre- or

4    post-petition claims, so the allowance of that claim would,

5    in effect, be an allocation of distributable value in the

6    case.  It's -- that's just the way it would work.  We'd all

7    be saddled, whether in a plan process, or something else,

8    with dealing with the payment of that claim and the raising

9    of cash to pay that claim, in the context of a plan.

10        So, as to this global piece, we felt that there

11   was something unfair about the Debtors having sent the

12   creditors out to mediate over allocation and leave aside

13   issues of allowance and priority, while at the same time,

14   one creditor was getting a giant guaranteed recovery.  Now,

15   it is an (indiscernible) important stakeholder, but it is

16   only one stakeholder.  And we formed a view, as a group, the

17   global piece would best occur if it all occurred at the same

18   time.

19        Now, for the parochial point, I'm trying not to be

20   provocative, here, and we've discussed this with the DOJ,

21   but it's not hard to imagine that the individuals most

22   affected by Purdue's role in the opioid epidemic, the people

23   who develop medical conditions and, in some heartbreaking

24   cases, their heirs, have very strong views about whether the

25   Federal Government played a role in the process, whether it

Page 153

1    did its job properly, and whether it protected citizens from

2    known harms.  It's also not hard to imagine that the same

3    individuals would not agree, outside some form of global

4    peace, that the Federal Government would not only get a

5    claim, but that claim would include what might be

6    subordinatable penalties and fines.  So, whether viewed from

7    the perspective of all creditors or just the individuals, we

8    had very strong views about the possibility that any of this

9    could be done outside a plan.

10            To that end, we, as Mr. Huebner laid out, we have

11   engaged with the Debtors over the past week, and directly

12   with the DOJ, and whether it's titanium and Kryptonite or

13   not, we've restructured the order to embody, really, four

14   concepts.

15            First, with respect to the superpriority claim, as

16   Mr. Huebner pointed out, it only arises in a ladder of an

17   acceptance of the plea, or the confirmation of a plan.  So,

18   there is no partial peace, here.  It's going to be global

19   peace before that superpriority or, as global as we can get,

20   the superpriority claim takes effect.  And importantly, the

21   provision with respect to that overrides everything.  It is

22   a notwithstanding anything in the plea agreement, or the

23   order to the contrary, that it can't -- it can't rise to the

24   status of an allowed claim.  And one clarification, there,

25   because I've mentioned to the Debtors' plan: as we

Page 154

1     understand it, it's not a plan that is proposed by the

2     Debtor, such that they have some hold on exclusivity, here,

3     but rather, it is a plan which deals with each of the

4     Debtors.

5              The second point, same with the criminal fine.

6     The criminal fine is going to be treated like the

7     superpriority claim.  It -- the provision which deals with

8     it is notwithstanding anything else to the contrary.  It

9     only arises, or rises to the level of an allowed non-

10    subordinatable claim if we get to a confirmed plan.  The

11    civil claim is dealt with a little differently.  The civil

12    claim -- the Court is, at this point, allowing a $2.8

13    billion-dollar general, unsecured claim outside the plan.

14    That is what I would consider a garden variety 9019

15    settlement.  And because, as Mr. Huebner pointed out, the

16    size of the creditor pool, $2.8 billion-dollar allowance

17    isn't going to tie the hands of us, in the context of a

18    plan, particularly when the Government even acknowledges

19    that that might result in a distribution to their claim

20    classified separately in the pennies of dollars.

21             Finally, we've clarified with respect to the lift

22    stay.  The lift stay originally would have provided, whether

23    it was ambiguous or not, would have provided the Government

24    the right, if it had obtained a judgment from another court,

25    to execute on that, and we've clarified that the only thing

Page 155

1    that can happen without the government -- Federal Government

2    coming back to the Court, is a liquidation of the claim and

3    the continuation of the investigation.  So, with those

4    modifications, and subject to what I just clarified there,

5    the Ad Hoc Group is not objecting to the 9019, at this

6    point.

7           But I do want to make clear that we have some firm

8    views about where we need to go.  To date, there has been

9    lots of talk about the plan process, and discussion of lots

10   of money for abatement and distributions to victims.  But to

11   date, there is no draft plan, there's no term sheet, there's

12   no timeline, there's no commitment, and we're just stuck in

13   a world in which the admin burn continues.  Money that could

14   go to compensation and abatement isn't being spent on

15   compensation and abatement, and we had hoped that this

16   milestone would create an opportunity to structure a plan,

17   to get something out there so that the parties could come

18   forward.  We have a deal with the DOJ now, we have the

19   mediated allocation settlements, all pieces are in place.

20          So, the issue is, do you either take the

21   opportunity, as I think the UCC is proposing, that we not

22   approve the settlement at this time, and deal with some --

23   one piece, which I'm going to get to, which is the

24   reasonably acceptable issue; or do we let this go with the

25   understanding and continued commitment by the Debtors that

Page 156

1   they're going to drive this process forward and that we're

2   going to be able to hold the deal together?  This is kind of

3   where we came out on it: as has been noted in the papers and

4   already some discussion in court today, there is an out, as

5   noted in the mediator's report for the public side to walk

6   away from allocation deals if the plan -- or if the

7   resolution with the DOJ is not reasonably acceptable.

8           And now, to boil down to its basic economics, the

9   only thing that's happening here is $225 million dollars

10  will go out the door to the government.  That's immaterial,

11  in the context of total distributable value.  There's going

12  to be a $2.8 billion-dollar allowed general unsecured claim,

13  which, again, in the context of this claim pool, is

14  immaterial, and I believe, if pressed, Mr. Troop would have

15  to concede that those are acceptable.  It comes down to this

16  public benefit company concept, and the option - it's a very

17  specific option that's given to the Government to void the

18  entire deal if a certain exit structure is not used.

19          Now, my, kind of, view on this is that when we're

20  dealing with, for plan purposes, the Court and the

21  creditors, including the Federal Government, are going to be

22  focusing on distributable value - maximizing distributable

23  value - whether that's through a sale, as it seems like some

24  of the Non-Consenting States want, or through stock in a

25  reorganized entity, it's all going to abatement.  And it's -

Page 157

1    - everybody should be interested in dealing with, or

2    increasing, the amount of money that's available for

3    distribution.

4          So, our view is, if it's a sale, and it's

5    determined, as it should be in the context of a plan, that a

6    sale actually maximizes the value of monies to distribute to

7    abatement victims, over some other form, I can't believe the

8    Federal Government is going to blow up the plan in favor of

9    a structure that provides less abatement money.  On the

10   flipside, if it's a reorganization, and it's determined that

11   putting it in this structure, the public benefit company,

12   maximizes value, I can't believe that the Non-Consenting

13   States are going to blow up the settlement and return us all

14   to the status quo, if a plan is confirmed with that kind of

15   structure.

16         So, our view is, rather than hold up the

17   settlement at this point while that issue is resolved - and

18   I do think it can get resolved - I think that the -- whether

19   the Court indicates or the parties just take it upon

20   themselves, we need to get into a virtual room, we need to

21   start drafting the plan, we need to start understanding

22   those issues.  And obviously, the form of structure coming

23   out is going to be important, and Mr. Huebner can convince

24   everybody that his view maximizes value and other people

25   will have views.  But it's the exchange of those views that

Page 158

1    makes a plan process work, and we just waited too long to

2    get there.

3           So, we've come to the conclusion that the scenario

4    in which we're all thrown back into chaos because either the

5    public Non-Consenting States blow up a deal over one

6    structure or another, or the Federal Government wants to

7    blow up a deal over one structure or another, can probably

8    be mitigated in the near term, but again, would implore

9    everybody to focus on the fact that this case isn't getting

10   better with age - no case does - and that money needs to get

11   out both for abatement and compensation, rather than the

12   lack of momentum that exists at this time.  So, unless Your

13   Honor has any questions, I've got nothing further.

14           THE COURT:  Okay, thank you.

15           MR. TROOP:  Your Honor, this is Andrew Troop from

16   Pillsbury on behalf of the Non-Consenting States.  Unless

17   someone would like to go before me, I'm happy to go now.

18           THE COURT:  Why don't you go ahead?

19           MR. TROOP:  Thank you, Your Honor.  Your Honor, to

20   put this just. little bit in context, many months before,

21   and I would venture, even longer than that, Purdue set

22   itself on a course to emerge from its troubles as a public

23   benefit company dedicated to providing opioids in a

24   responsible way, and other public benefits.  I think, from

25   pretty close to about that same time, the Debtors got a

1    reaction from at least -- from the states representing about

2    53 percent of the country, that that structure was not

3    acceptable - the public benefit structure.  And the Debtors

4    have not wavered from their position that that is the

5    structure that they are advocating.

6            And we move forward now to a settlement agreement

7    with the Department of Justice that is focused on achieving

8    that exact result.  Everyone, everyone, has talked about how

9    good the settlement is, how it satisfies the Iridium

10   factors, how it's in the best interest of creditors, the

11   economics of it.  But they've ignored, frankly, the

12   prescription of the Supreme Court in Jevic, and frankly,

13   adopted by Judge Garrity in the LATAM case, that that's not

14   the test to be applied now.  Here, the question is whether

15   the settlement intends, is structured, to drive people to a

16   result that, it effectively impacts their franchise --

17           THE COURT:  Can I interrupt you on that?

18           MR. TROOP:  -- in the Chapter 11 case --

19           THE COURT:  The Second Circuit has made it clear,

20   as Iridium said and as Judge Garrity said in LATAM, that you

21   can sell the entire company for a good business reason.  To

22   me, that certainly drives people to a particular structure.

23   It drives them to a sale, as opposed to a reorg.  And yet,

24   it has been clear since the 70s that you can do that, and

25   reiterated in the very case you've cited to me.  So, what

Page 160

1    are you talking about?  The structure has to actually be in

2    the plan, not narrow people's options towards a plan.

3    Right?  Otherwise, we wouldn't be able to have § 363(b)

4    sales.

5                MR. TROOP:  Well, actually, Your Honor, I do think

6    that's true.  I think you can have 363 -- because --

7                THE COURT:  Really?  You think Judge Garrity

8    didn't say that in LATAM, or Iridium say it?  It's one thing

9    to restrict options or leverage, which is perfectly

10   permissible.  It's another thing to dictate the terms of a

11   plan treatment, contrary to the Code.  So, let's go back to

12   the PBC point.  How does that dictate plan treatments if

13   it's contingent on a plan being accepted and negotiated?

14               MR. TROOP:  So, Your Honor, let me move forward,

15   because -- and if I understood Mr. Shore's clarifications

16   correctly, then what this settlement does is it gives people

17   the opportunity to vote for a plan they don't want or

18   against a plan where they give up all value.  Because the

19   definition of Debtor's plan, which is in the revised order,

20   which appears nowhere, but as Mr. Shore made clear, and

21   assuming that was accurate, relates to a plan of

22   reorganization for the Debtors and -- for all of the

23   Debtors, regardless of the proponent.  Then, a -- then the

24   confirmation of a plan of reorganization will result in a

25   forfeiture claim that has a superpriority administrative

Page 161

1   expense.  And that does more than simply change the contours

2   of the negotiations.  That drives the result in terms of

3   structure of the plan --

4           THE COURT:  So does a sale of substantially all of

5   the assets.

6           MR. TROOP:  -- structure -- structure -- structure

7   of the emergent entity.

8           THE COURT:  Mr. Troop, so does a sale of

9   substantially all the assets under § 363(b), if it's Lionel,

10  as long as it's not because of undue pressure, and there's a

11  valid business reason for it, it can be done.

12          MR. TROOP:  But Your Honor, this isn't trying to -

13  - this isn't -- this isn't --

14          THE COURT:  So, I have to evaluate whether -- so,

15  I have to evaluate whether it's a good business reason to

16  put that choice to people.  And I think Mr. Shore addressed

17  it, and he addressed it in a way that is thoughtful, and one

18  needs to think about it that way, as opposed to simply

19  saying, it can't be done, because the case law is to the

20  contrary.

21          MR. TROOP:  Your Honor, I -- not I believe.  We

22  disagree on the case law and its limitations.

23          THE COURT:  Well...

24          MR. TROOP:  And Your Honor, it -- I believe,

25  firmly, that the limitations imposed with regard to the

Page 162

1    ability to proceed with a sub rosa plan are not eviscerated

2    by the fact that you can sell all of the Debtors' assets in

3    a Chapter 11 case.  Chrysler, in fact, found that a sub rosa

4    plan did not exist because the issues with regard to

5    treatment and outcome were still subject to negotiation.

6    And here, the issue is whether the combination is intended

7    to stack the deck so, in response to, an agreement and a

8    series of agreements which, notwithstanding the amendments

9    that are being made to the order, results in the same

10   outcome.  And that is, if there is not --

11              THE COURT:  Is that because of -- is that because

12   of the public benefit or similar outcome revocation option,

13   or is there something else besides that?

14              MR. TROOP:  That's the focus, Your Honor.

15              THE COURT:  All right, so, let's focus on that for

16   a moment.  I have read the objection carefully.  The --

17   either your objection or one of the other ones attaches the

18   letter or release that your clients made in respect of the

19   public benefit corporation issue, and certain senators'

20   statements regarding it.  And I want to make sure I

21   understand, notwithstanding Mr. Huebner's desire not to

22   discuss this issue, the reasons why they are adamant on this

23   point.  Let me start with a couple of questions.  I'm

24   assuming - maybe I'm wrong - but I'm assuming that, first of

25   all, the states that you represent continue to desire to

Page 163

1    have as much value as possible go to abating the opioid

2    crisis that would come out of this Chapter 11 case, right?

3            MR. TROOP:  Balanced against the potential risk

4    associated with states effectively owning a company,

5    directly or indirectly --

6            THE COURT:  Okay, so -- all right.

7            MR. TROOP:  -- that it's supposed to regulate, and

8    so Your Honor --

9            THE COURT:  All right, so, I understand -- I --

10   let me stop there, okay?  I understand, then.  My second

11   question was that, assuming that the goal is still to

12   maximize value, the states are concerned about a potential

13   conflict of interest and/or, I suppose, liability, although

14   I find that to be a much more remote prospect.  But they're

15   concerned about a conflict of interest, right?  Because they

16   would be the beneficiaries of an entity that,

17   notwithstanding all of the best intentions, might once again

18   violate federal and state regulation in the sale of opioids.

19   Am I right about that?

20           MR. TROOP:  And Your Honor -- yes, Your Honor, but

21   you can't discount the potential of liability as if that's

22   going to --

23           THE COURT:  Well, we can get to that in a moment.

24   We can get to that in a moment, okay?

25           MR. TROOP:  Yes, Your Honor.

Page 164

1           THE COURT:  But it would seem to me that a trust

2     structure, there are beneficiaries in the sense that they

3     would be receiving value, which then they would allocate as

4     they saw fit to remediating or dealing with the opioid

5     crisis.  It would seem to me that if the asset were sold,

6     the business were sold, that it was taxed, they would have a

7     conflict of interest.  In fact, they probably have a bigger

8     one because they want it to make more money so they could

9     have more taxes.  And if it were sold, then you have no

10    charter to focus on the public interest, and a shareholder

11    obligation, to maximize profits, which leads to the

12    potential for more abuse in the future, notwithstanding the

13    existence of government regulation.

14          MR. TROOP:  Your Honor --

15          THE COURT:  This has led thoughtful people,

16    including the author of, I believe, the most comprehensive

17    and up-to-date history on this issue, David Herzberg, to

18    suggest that really, you should have some structure that

19    actually nationalizes a company like this.  David Herzberg

20    of White Market Drugs: Big Pharma and the Hidden History of

21    Addiction in America, University of Chicago Press, 2020.

22          So, it seems to me there are hard choices wherever

23    you go on this.  The benefit, as Mr. Fogelman explained, of

24    a public benefit corporation is at least that you build into

25    the charter that maximization of profits, which Mr. Herzberg

Page 165

1    points out with countless case studies, over 100 years of

2    history, has led regulated drugs where the government has

3    recognized that they have a valid purpose but can be abused,

4    to be abused because of human greed.  We can't get rid of

5    human greed, but you can minimize it, and one way to

6    minimize it is by having a charter that says greed doesn't

7    come first.  You don't get your bonus because of high

8    profits.  You get your bonus if you maximize the public

9    interest.

10            So, it does seem to me that when one talks about a

11   conflict of interest, one cannot be blithe about it.  There

12   are conflicts of interest inherent in a sale to a third

13   party, in a taxation model, or in a PBC model, or in a

14   trust.  So, then you have the issue of potential liability.

15   Maybe you could discuss that for a moment.  It seems odd to

16   me that a plan that sets up a public benefit company that is

17   run not by the states but by a board charged with this task,

18   that is independent, or some other structure that isolates

19   the states from making the decisions, given the law in all

20   50 states on piercing the corporate veil, I'm having a hard

21   time seeing a realistic risk of liability.

22            MR. TROOP:  So, Your Honor, let me back up and

23   reset for just a second.  As the Non-Consenting States have

24   told every party in interest who's asked in this case, we

25   are committed to going down two paths simultaneously.  That

Page 166

1   is, is there an opportunity to sell the business to a third

2   party and what those requirements and restrictions would be,

3   and alternatively, is there a way to address what we

4   understand to be the fundamental concerns inherent in the

5   desire, at least by the Federal Government, to have a

6   continuing-to-operate Purdue, which is a source of supply,

7   that does not require a public benefit company, or some

8   undefined term of an entity with a similar mission.

9         We are not so absolute, in anything in this case,

10  about the realities that we all face in trying to deal with

11  this company and its assets.  And the issue here is whether

12  the agreement entered into directs a particular result that

13  is not subject to, or significantly not subject to, the

14  normal give and take of a negotiated effort in a Chapter 11

15  case.  The issue about the future of Purdue, its -- what it

16  would look like, what the options are, are currently being

17  explored and negotiated, both of the options that we've

18  discussed -- that I've identified, the dual paths.  The

19  issue of resolving with the Sacklers is moving forward.  It

20  is doing it in the construct of a negotiation where a

21  particular result or a particular party is not given the

22  opportunity -- is not being given the opportunity simply to

23  say, no you have to do it my way because if you don't, I get

24  the value.

25        And I think that you can't look at this settlement

Page 167

1    agreement, these combination of settlement agreements,

2    assuming as, again, that I do, that the definition of

3    Debtors' plan in the revised order is any plan for the

4    Debtors, the allowance of a civil forfeiture claim and the

5    plea agreement, which we quoted - I believe it's on Page 10

6    of the plea agreement - which sets out the results if a plan

7    is confirmed that does not have a PBC or acceptable entity -

8    - or an entity of similar purpose, result obtains.  And that

9    is a very different change in dynamic than a sale of assets

10   which monetizes all the value of the Debtors.

11              THE COURT:  But a sale is the alternative --

12              MR. TROOP:  Isn't it?  Isn't it?

13              THE COURT:  A sale is the very alternative you

14   suggested.  I think you just contradicted yourself.

15              MR. TROOP:  No, I didn't, Your Honor, because I

16   said --

17              THE COURT:  How can it be a different dynamic than

18   a sale?

19              MR. TROOP:  Because there --

20              THE COURT:  Because you stated there are two

21   alternatives here: a sale, and a surviving entity that is

22   dedicated to alleviating the opioid crisis.

23              MR. TROOP:  Well, in both cases, the proceeds will

24   be used to alleviate the opioid crisis.

25              THE COURT:  And so would the sale proceeds.

Page 168

1    Right.

2             MR. TROOP:  So --

3             THE COURT:  Both would.

4             MR. TROOP:  -- so the question is, right, this

5    settlement would seem to, or does, push down one track and

6    not the other.

7             THE COURT:  Right, but what I'm saying is --

8             MR. TROOP:  Doesn't it?

9             THE COURT:  -- is that if the Debtors proposed

10   today, if they had a buyer today, all right, that would

11   spend enough money to give the creditors in this case, and

12   the Debtors -- enough so the Debtors would recommend that

13   sale, and the DOJ came in and said no, we want a public

14   benefit corporation, the response would be, it's a good

15   business decision to sell the company, and we're not going

16   to put off those options.  We're making a decision now.  It

17   doesn't decide the terms of the plan.  It just decides

18   whether we go one route or another.  And what you just told

19   me is, we want to keep both options open.  But that's not a

20   sub rosa plan, just like a sale is not a sub rosa plan.

21             So, I have to weigh whether the option that the

22   Debtor is choosing, which is not a plan but actually, just

23   creates negotiating leverage for a particular plan, is a

24   good business decision.  And I go back to, I'm having a hard

25   time seeing, except in the scenario where Mr. Shore posits

Page 169

1    that a sale actually does maximize recoveries so that that

2    money can, at the maximum amount, can be used to alleviate

3    the opioid crisis, how this would actually come up in real

4    life.  And if a sale maximizes recoveries, I tend to agree

5    with him, it's going to be hard for the government, at that

6    point, the Federal Government to say, oh, no, no, we want to

7    scuttle that whole process.

8           So, you know, perhaps the structure you're

9    negotiating, and I think this plan certainly puts room in

10   it, has a public component which includes a potential sale

11   that maximizes total recoveries.  Even though that sale will

12   go to a third party who is only regulated, and who,

13   therefore, may, in the future, do exactly what the

14   government has gotten Purdue to plea to, today, i.e.,

15   because of human greed and the requirement that, for their

16   shareholders corporations maximize profits, again, cuts

17   corners around regulations and abuses the law.  That's the

18   risk of a sale.  No choice here is really clean that way.

19           MR. TROOP:  So, Your Honor, with regard to the

20   sale option, I note only that, in the sale of the

21   (indiscernible) business in (indiscernible), a continuing

22   injunction was imposed on the buyer with regard to all of

23   the very issues that you've identified, and that there are

24   ways to construct a sale to maximize the unlikely result,

25   right, or the likely result -- the likelihood of the result

Page 170

```
1    that you've identified, one.  Two, the -- if I understood

2    you correctly, and Mr. Shore correctly, we should accept

3    that, notwithstanding an approved agreement that would

4    provide the Federal Government with a $2 billion-dollar --

5    whatever the hell a superpriority administrative expense

6    claim is, in this context, that they will -- that it would -

7    - that we should trust it will, nonetheless, choose to

8    proceed with the state-driven abatement program, even though

9    it may be forced to take a third-party buyer over its

10   objection.

11            And Your Honor, that is the issue that mitigates

12   against the argument that this is not directing the outcome

13   of this case.  It's also, Your Honor, interesting that the

14   only way you get out of the result of this agreement is if

15   the Debtors rescind it or if the Federal Government rescinds

16   it, once you approve it.  And the Debtors, who have spent a

17   long time today touting the benefits of the settlement, all

18   of it, including its downside, I think it would be hard to

19   imagine that they will conclude they should rescind their

20   part of the agreement.

21            THE COURT:  No, but Mr. Troop --

22            MR. TROOP:  Right?  I mean...

23            THE COURT:  -- Mr. Troop, the way the order has

24   been revised, the forfeiture claim and the civil fraud claim

25   will not be allowed claims if a plan is not confirmed.  So,
```

Page 171

1    if your clients decide that, truly, a public benefit company

2    or similar --

3              MR. TROOP:  Entity with a similar mission.

4              THE COURT:  -- a structure that has a similar role

5    or function, is just completely unpalatable to them, then,

6    in fact, the agreement -- this part of the agreement won't

7    go into effect anyway.  It won't go into effect.  There's no

8    rescission.  It's contingent on a plan being confirmed.

9              MR. TROOP:  But Your Honor, that presumes we

10   couldn't confirm a plan that doesn't have a PBC, right?

11             THE COURT:  Yes, you could confirm that.  That's

12   right.

13             MR. TROOP:  So, isn't that the improper effect of

14   this settlement, that it says, you might be able to confirm

15   a plan that doesn't have a PBC --

16             THE COURT:  Right.

17             MR. TROOP:  -- but if you do, we can proceed with

18   the plea agreement, take the $2 billion-dollar forfeiture

19   claim, and take all the value of the estate.  Isn't that the

20   way this agreement comes together?  If anything, Your Honor,

21   the changes highlight the fact that the circumstance that I

22   just described is a fair reading of how the settlement

23   agreement -- settlement agreements -- the plea agreement and

24   the settlement agreement, would work in tandem.  And it

25   would work that way for each of the claims because they have

Page 172

1    the same triggers.  It cuts off the ability to pursue a plan

2    of reorganization, by definition, would be cutting off your

3    nose to spite your face.  That's not -- and Your Honor, that

4    is not what the negotiation process was intended to do,

5    either generally in a Chapter 11; which is why there is a

6    prohibition on sub rosa plans.

7            THE COURT:  It's the same -- I come back to the

8    same point, which is never addressed:  It's the same thing

9    as a sale.  Because I think the plan that you are

10   contemplating would be a sale plan, and that is the same

11   thing.  You could do it now without a plan.  And that's the

12   alternative you're focusing on.  And it's the flip side of

13   the coin.  So, again, I have to evaluate whether people in

14   government will act reasonably and rationally when all of

15   the choices are put before them.

16           And, frankly, I'm still having a hard time

17   understanding why, assuming that you can build some

18   flexibility into the governance structure to pursue a sale

19   that might make sense, with the types of protections that

20   were built into Insys's, for example; not to have it as one

21   that uses the value for the public benefit.

22           After all, that's what people are talking about

23   here: not making a profit, except for the public benefit.

24   And again, there are conflicts of interest in any one of

25   these scenarios.

Page 173

1          You have not yet answered my question.  I don't

2     see a reasonable likelihood that if they are merely

3     shareholders of a public benefit company; just as if they

4     were beneficiaries of a trust, that somehow they could be

5     liable, through piercing the corporate veil or some other

6     theory.  You need to explain that rationale to me, because I

7     just don't see it.

8          MR. TROOP:  So, Your Honor, when you asked the

9     question, "Are they concerned about liability?" and I

10    answered yes --

11         THE COURT:  Right.

12         MR. TROOP:  I was not saying that they are

13    concerned that they could personally, the estate could be

14    personally liable.

15         THE COURT:  Right.

16         MR. TROOP:  Right?  But what I am saying is,

17    frankly, the same thing that we discussed on October 11 in

18    the context of the preliminary injunction; when I said that

19    it is a significant problem for the settlement to be based

20    on continued value being received from foreign entities, who

21    may also be improperly promoting or advancing the use of

22    opioids.  Because it doesn't matter whether the states can

23    get tagged with a dollar number; it gets ...what matters is

24    the reality that a statement that X states Purdue --

25    Purdue's, or X state's PBCs, opioids, killed someone.

Page 174

1            There are layers of complexity here and --

2            THE COURT:  Well, can we stop on that point for a

3    --

4            MR. TROOP:  -- and challenges …

5            THE COURT:  Can we stop for a moment on that

6    point?  I am assuming that the following at least is true:

7    which is that, the answer to that statement, which I guess

8    would be in the press -- because it wouldn't be in the

9    courts, because the Plaintiff would know they would lose in

10   the courts -- but in the press is, we approved, in the

11   bankruptcy case, a charter that said this company should be

12   run X ways, to prevent that from happening.  And we put all

13   sorts of people in place; the equivalent of former Governor

14   Vilsack, to ensure that.  And notwithstanding that,

15   unfortunately, this happened.

16            Now, you would equally have a statement in the

17   press that said that state X pushed really hard to sell this

18   business to company Y; which, you know, is located outside

19   of the United States in country X.  And guess what?  Now

20   country X is letting it sell opioids in America, and they've

21   killed people.  Is that press story any worse?  I doubt it.

22            MR. TROOP:  Your Honor, I don't think --

23            THE COURT:  Because there, you could say they let

24   it be sold to company X.

25            MR. TROOP:  Your Honor?

Page 175

```
 1              THE COURT:  So, let's get real about this, all

 2     right?  It's nice to send letters, but let's focus on the

 3     actual conflicts and how to eliminate them, or at least

 4     reduce them.

 5              MR. TROOP:  So, Your Honor, that is the next

 6     point, which is that there is so much unknown about how

 7     these issues play out.  And as I said to you, we're fully

 8     engaged, because we're not unrealistic about the potential -

 9     -

10              THE COURT:  But --

11              MR. TROOP:  But Your Honor, about the potential --

12              THE COURT:  But as I read the settlement -- look,

13     as I read this settlement, which I have jurisdiction over,

14     the language on this point is very broad and very flexible.

15     So, you can do all that within this settlement.  And, all

16     things considered, if you still can't see your way to find

17     something that either you or the government can agree on,

18     the federal government can agree on -- now under a new

19     administration, of course, a Democratic administration --

20     the worst you have is a claim that is substantially less

21     than the forfeiture claim they've asserted.

22              But the main point is the language is flexible.

23     And you can deal with those types of things in your

24     negotiations.

25              MR. TROOP:  Your Honor, at the end of the day, I
```

Page 176

1    firmly believe that the most balanced result in this case

2    will obtain if parties are able to negotiate these issues

3    without this settlement approved.  Everyone understands what

4    the downside is.  No one is saying it can't come later.  But

5    everyone is saying that this very issue, about flexibility,

6    is not a bipartite agreement; it's a multi-party issue.

7            And I would hope that the reality of unstacked

8    negotiations on these very issues would enhance the

9    likelihood of a negotiated result.  But any way it comes

10   out, Your Honor, I've already told you, the nonconsenting

11   states are committed to pushing down two tracks.  And it

12   would be appropriate -- without trying to reopen a whole can

13   of worms, Your Honor -- but appropriate given the, at the

14   very least, spirit of those cases which acknowledge that

15   even very good results should be subjected to process.  And

16   that process is ultimately confirmation, and the process to

17   get to it, would prevail here.

18            THE COURT:  Which cases are you talking about?

19            MR. TROOP:  I don't ...Jevic does that.

20            THE COURT:  Jevic didn't even deal with a plan.

21   It was a --

22            MR. TROOP:  No, but --

23            THE COURT:  It was either a chapter seven or a

24   dismissal.  And it was a priority-skipping order that said,

25   "You shall make this payment."  It wasn't a decision that

Page 177

1     would affect people's negotiating leverage going forward.

2             MR. TROOP:  Actually, it kicked the whole case

3     out, right, Your Honor?  The point from Jevic is that it

4     says, even if the decision makes perfect business sense,

5     even if the Court is convinced it's the right thing to do,

6     there are times you say no because there's a process, and

7     that process is the negotiating process that goes through to

8     a chapter 11 plan of reorganization.  So, Your Honor, I --

9             THE COURT:  -- to have you read it, but that's not

10    what the Supreme Court said.  It was a specific priority-

11    skipping payment that was directed by the Court.  I

12    understand the Court found that that was a good thing,

13    because no one would get any money otherwise.  And this way

14    there would at least be some money to some people.  But it

15    was a specific payment.  There's no specific payment here.

16    This just changes leverage, although frankly, as Judge

17    Kaplan, Lew Kaplan said, or Judge Sweet said, and numerous

18    bankruptcy judges have said:  you have leverage that's part

19    of a settlement, and you have to deal with it.  And the

20    federal government has leverage here.

21            So, what, besides Jevic, are you relying on?

22            MR. TROOP:  Your Honor, I'll stop.

23            THE COURT:  Okay, because I don't get it --

24            MR. TROOP:  I think there comes a point where it's

25    clear that the candle isn't worth the wick.  And Your Honor

Page 178

```
 1    --

 2              THE COURT:  If I'm misreading these cases, you

 3    should tell me.  I really want to ...I mean --

 4              MR. TROOP:  I'm sorry, Your Honor.  I'm sorry.  I

 5    don't think ...as much as ...you know, I've actually

 6    practiced longer than Marshall, okay?  And there's no one on

 7    this hearing who respects this process, you or what

 8    bankruptcy judges do more.  But part of that calculus is to

 9    be able to say, I've made the points I would like to make

10    and I'm not sure that there's any benefit to going on

11    further.

12              THE COURT:  Okay.  That's fine.  All right.  Do

13    you have other people who want to speak?

14              MR. PREIS:  Your Honor, this is Arik Preis from

15    Akin Gump on behalf of the Official Committee of Unsecured

16    Creditors.  I was emailing with Mr. Huebner.  Is it okay if

17    I speak now?

18              THE COURT:  Sure.

19              MR. PREIS:  Okay.  Good afternoon.  Again, for the

20    record. Arik Preis from Akin Gump Strauss Hauer & Feld on

21    behalf of the Official Committee of Unsecured Creditors.

22              Your Honor, we filed a statement with regard to

23    the motion at Docket No. 19-20 last week.  That statement

24    was, as a number of people have said, intentionally

25    cautious.  I'm going to move away you were just speaking to
```

Page 179

1    Mr. Troop about, but then I'm going to come back to it at

2    the end of my statements, which are not very long.

3           So, with regard to specific issue that's in front

4    of you, we come at this from a different perspective than

5    you've heard this morning, and this afternoon.

6           From our perspective, resolution here comes down

7    to one of the seven iridium factors; which is whether other

8    parties and interests support it.  And I think the debtors

9    generally have it right.  Pretty much, almost no creditor in

10   their right mind would not support the economics of the DOJ

11   settlement.  If it's $225 million in cash, and an unsecured

12   claim of $6 billion or so, that is a small fraction of the

13   public side claims.  And, therefore, when it shares in the

14   public side distribution pool, it receives a small fraction

15   of that pool.  And for its part, the non-consenting group,

16   as you've just heard, would also like a reference to the BBC

17   removed.

18          If those three things were clear, and that was the

19   deal, then we would be done, and I don't think we'd be

20   having this hearing.  But there are conditions.  And while

21   it's certainly normal to have conditions, the problem is,

22   that PBC condition, is what's causing the heartache here.

23   You've heard Mr. Huebner mention, and we've put it in our

24   papers and you saw the mediator's report, that the private

25   side term sheets agreed after six months of phase one of the

Page 180

1     mediation, have a condition; requires the termination that

2     the public side, which is inartfully defined, that a

3     reasonable resolution with the DOJ is reached.  There's no

4     parameters around what that means.

5              We believe, as do the Debtors, and Mr. Huebner

6     said that the provision was intended to ensure that the

7     claims held by the public claimants; which are the residual

8     owners of the Debtor's estates and, therefore, bear the

9     entire risk of dilution by any claim asserted by the United

10    States, would not be so diluted as to negate the economic

11    terms of mediated settlements.

12             But in an effort to ensure that there's no

13    confusion, and the case can continue building on each

14    previous rung, as Mr. Huebner and others have said -- you

15    know, we build block by block.  We asked the public, does

16    the DOJ settlement, as it currently stands, satisfy the

17    condition?  And the answer was, as we reported in our

18    statement, it is premature.

19             They didn't put specifics around the word

20    'premature.'  But we know, at least now for the non-

21    consenting group, why they say it is premature.  And while

22    we could debate with the public side creditors whether

23    that's an inappropriate response or in bad faith, or

24    politically motivated, or otherwise, it doesn't matter.

25             And to be clear, we do take a lot of the comments

Page 181

1    Mr. Huebner said, to heart, regarding what those words in

2    the settlement should mean, and why it would be an awful

3    result, everyone on this call knows, for the public-private

4    deals to unravel.

5            I would further note, incidentally, that Mr.

6    Eckstein, in his very brief comments in support of approval

7    of DOJ settlement today, and with full knowledge of the

8    issue, didn't change the state's response.  But more

9    importantly, that answer, it is premature; is not an answer

10   that we're comfortable with.

11           So, we ask the Debtors, if the public side thinks

12   it's premature to answer the question, and we know the

13   public sides are asking for more time to work out the future

14   of Purdue in phase two of the mediation -- and they've told

15   us, and you, and now they've told you now publicly, that

16   they're evaluating all alternatives, can we adjourn the

17   hearing for a month.

18           And the Debtors' response was -- it's

19   understandable -- no, because we don't want to take the risk

20   that the DOJ walks away from the settlement.  And the

21   Debtors, understandably, like many creditors, would like the

22   case to move forward.  And they believe each block builds

23   upon the previous block.

24           But, of course, the DOJ settlement doesn't allow

25   the DOJ to walk away from the settlement, or terminate it,

Page 182

1    if not approved prior to December 15.  And we asked the

2    Debtors, and Mr. Huebner was clear about this:  Aren't you

3    taking the risk that the deals were reach in phase one could

4    unravel?  And their answer was, "No, we don't think it's

5    likely to happen.  It could, but we don't think it's

6    likely."  And Mr. Huebner said that earlier as well.  And

7    others have said to us, "No, we don't think it'll happen,

8    but if it does happen, we'll just litigate about it."

9            We simply don't share the confidence, or other

10   parties' acceptance we just need to litigate it if it can be

11   avoided.  So, where does that leave us?

12           If a DOJ settlement, as it currently stands, is

13   approved, the public-private side term sheets are at some

14   level of risk; some people think little to no risk.  We

15   don't know.  If the DOJ settlement, as it currently stands,

16   is not approved, the DOJ settlement is at some level of

17   risk.  Neither of those outcomes are acceptable.

18           So, contrary to what Mr. Huebner mentioned, it

19   kind of feels like any decision on this issue, potentially,

20   should be adjourned for a short period of time so parties

21   can resolve the issues.  And we fully trust and expect that

22   the public-side creditors are not seeking to modify the

23   public-private side term sheet once their issues with the

24   DOJ get resolved.

25           But we are not just thinking that an adjournment

Page 183

1    is necessary without specifics.  Rather, and this is where I

2    want to get to the colloquy you just had with Mr. Troop,

3    there needs to be some direction about what issues they

4    should be discussing.

5           My feeling is that a lot of what you just

6    discussed with Mr. Troop, as Mr. Troop was saying, needs to

7    be negotiated directly with the DOJ.  So, first, what do the

8    words 'public benefit company' or 'entity with a similar

9    mission,' mean exactly?  We've heard different variations of

10   it.  The non-consenting student group raised this in their

11   papers.  We'd like to understand exactly what everyone

12   thinks as well.

13          We all know what it means in the abstract.  But

14   all parties should get with the DOJ and understand this

15   before we start litigating whether there is an issue with

16   the DOJ settlement or not.  Maybe there's no issue at all,

17   and then the public-side creditors can give us the

18   confirmation that we need, but we don't know yet.

19          Second, do the words 'public benefit company' or

20   'entity,' with a similar mission, mean that the future

21   economic indirect beneficiaries of Purdue need to be the

22   public-side creditors.  You and Mr. Troop just had a

23   colloquy about this.  Could someone else own Purdue?  Could

24   it be a third party?  Does that raise a conflict?  What is

25   the DOJ going to say about that?

Page 184

1           And you said, I think, that you trust that if

2    there was some third party that came along, that offered

3    maximum value, that agreed to sell the -- to operate the

4    company, in a morally, socially and ethically responsible

5    way, and continues to supply oxycontin to the American

6    public as necessary, that would be acceptable to them.  We

7    don't know that.  That's not in the agreement.  And until

8    people talk about that and have comfort that, as Mr. Troop

9    said, we can go down both alternatives at the same time,

10   without needing to be locked into one -- which again, we

11   don't take a position on, but we only take a position on it

12   as it affects the previous six months of the case.

13          We can think of other issues, but these are the

14   main ones.  And again, none of this means that we think the

15   DOJ settlement, if it sticks to the economics as laid out

16   above -- sorry -- as I mentioned, is anything but a

17   monumental achievement in this case.  We've put that in our

18   papers and we mean it.  But there doesn't seem to be a

19   reason it needs to be approved today.

20          We've found that in this case, in previous

21   hearings, when Your Honor set the deadlines and mediation,

22   and gives people clear direction.  Things happen, so in

23   thinking about all the various ramifications of what we've

24   heard today, and what people have and have refused to

25   confirm, we'd ask that you do the same here.

Page 185

```
1              Thank you, Your Honor.

2              THE COURT:  Thank you.

3              MR. HUEBNER:  Your Honor, there may be another

4    objector or two, who would like to speak --

5              THE COURT:  Why don't I just give them a chance to

6    speak -- Mr. Quinn are you --?

7              MR. QUINN:  I am.  This has been a long open mic,

8    Your Honor.

9              THE COURT:  You can go ahead.

10             MR. QUINN:  And I forgot my guitar, so I

11   apologize.  It's Michael Quinn of Eisenberg and Baum for the

12   Ad Hoc Committee on Accountability.  Your Honor, I really

13   don't want to duplicate what's been discussed, both with the

14   sub rosa, you know, the legal sub rosa issues, as well as

15   some of the topics covered regarding the public benefits

16   company.  However, my points do focus solely on the Public

17   Benefits Corporation contingency, and my client's deep-

18   seated fear of it.

19             First, I want to talk about how the DOJ settlement

20   process was wrong.  Second, I'll touch very briefly about

21   how the results of that settlement process was wrong, but I

22   don't want to waste anybody's time.  And third, I'll give

23   you my suggestion as to what the Court can do today about

24   it.

25             First, the process that led to the DOJ settlement
```

Page 186

1    is deficient, because the parties who negotiated the deal

2    didn't get input from the people whose input is required.

3    My clients and other victims of Purdue, made repeated

4    attempts this past year to meet with the DOJ about Purdue's

5    crimes.

6            The Crimes Victims Rights Act, 18 USC Section

7    3771, grants victims the reasonable right to confer with an

8    attorney from the government in the case.  The DOJ ignored

9    these victims' requests to meet.

10           Your Honor, I think it's very important for

11   criminal and even civil prosecutors within prosecutorial

12   offices, to meet with victims.  I see it in New York City

13   with normal crimes that are committed, and I think it should

14   apply equally here.

15           The influence of having a victim speak to a

16   prosecutor is a significant part of any criminal and civil

17   case.  Instead, according to Purdue's legal bills, filed in

18   the bankruptcy, and Purdue's reply filed yesterday, the DOJ

19   got to meet with Purdue and Sackler attorneys under a joint

20   defense agreement for over a year and a half.

21           These closed-door meetings resulted in the

22   peculiar mandate now before the Court being argued so

23   vigorously.  They want to transform Purdue into either, as

24   I've been told, a Newman's Own-like company, or a

25   government-sponsored oxycontin business.

Page 187

1          The negotiation between these two parties, the DOJ

2     and Purdue-slash-the Sacklers alone, is not sufficient to

3     make this kind of policy decision.

4          The federal government often solicits public

5     comments on DOJ settlement terms that affect public health

6     before settlements are finalized.  There's little doubt in

7     anyone's mind, including the 80-plus lawyers here today, the

8     decisions made today and in the future in this bankruptcy,

9     will severely impact public health.

10          It's not good enough for DOJ prosecutors and

11     Purdue's sharp lawyers to think about these concepts in

12     private, sign a deal and file this motion.  The DOJ neither

13     invited input from Purdue's victims, nor the public, nor,

14     apparently, any members of the House and Senate; who, as you

15     mentioned Your Honor, objected to this formation of a

16     government-sponsored business; or, as I've been told, a

17     Newman's Own, or like a Patagonia company.

18          Turning to the second point, Your Honor, and I'll

19     just touch on it briefly, I had some prepared thoughts about

20     it, but I really don't want to go down that rabbit hole

21     again.

22          My clients and other Purdue victims don't want the

23     government involved in the business of selling oxycontin or

24     being the beneficiaries of a business involved in selling

25     oxycontin.

Page 188

1           My clients, in 2007 -- there were three of them --

2    as I attached in an exhibit, begged the Court, after the

3    last DOJ settlement with Purdue, to have accountability, and

4    to sort out something that would save lives.  My other

5    clients, after my first set of clients begged the Court

6    during last Purdue settlement, had the consequence -- you

7    know, suffered the consequences of a failed DOJ settlement.

8           You can understand, Your Honor, why we stand here

9    today trembling before you, concerned that some conversation

10   between a couple of lawyers and the DOJ's lawyers, and a

11   number of hours spent hashing out a negotiation, scares the

12   pants out of us.

13          Your Honor, what I've heard today regarding the

14   public benefits company, is that vague answers -- I've heard

15   vague answers to what's going to happen with Purdue moving

16   forward.  And I know the Debtor has minimized this point;

17   that there's a really great deal here, that the federal

18   government was so beneficent that they only charged Purdue

19   with a small fine; that the federal government was so

20   amazing that they can charge Purdue, the carcass of a

21   company, with three felonies; that, how wonderful this was,

22   because the other creditors are going to be able to maximize

23   a payout for abatement.

24          But Your Honor, we think there's a huge mistake

25   here.  We think the process that the DOJ went through was

Page 189

1    wrong.  We think that the results, which are completely

2    vague and baffling to me and my clients, is wrong.  You

3    know, we're just kind of sitting here in shock, Your Honor.

4    And I know it may sound -- go ahead.

5             THE COURT:  Could I ask you this?  What exit

6    vehicle would your clients prefer?  Or do they just want to

7    be involved in determining the exit vehicle?

8             MR. QUINN:  I think it's time that they be

9    involved in determining the exit vehicle.  Your Honor,

10   they've testified at FDA hearings they were turned down.

11   They've showed up to Court; they were turned down.  You

12   know, they try everything to get involved in the

13   conversation.  And Your Honor, the only reason we didn't go

14   under the tent and sign like some kind of confidentiality

15   agreement, was because, you know, my clients are outsiders;

16   but they really want a chance to be heard.

17            If the mother of a murder victim wasn't able to

18   speak to a prosecutor, to spill tears in front of the

19   prosecutor before the prosecutor reached a deal with the

20   murderer, the entire city or country or the world, would be

21   in shock.  And that's -- you know ...okay, go ahead.

22            THE COURT:  But again, my job is to decide whether

23   the settlement is fair and reasonable from the perspective

24   of the Debtor, is the state and the parties in interest; not

25   from what the DOJ --

Page 190

1          MR. QUINN:  I don't think it's fair and

2    reasonable.

3          THE COURT:  Let me finish.  Not from what the DOJ

4    should have done -- so, really what I'm asking -- and you

5    don't have to have an answer on this, I mean not a specific

6    answer.  But I do want to know, is there a specific exit

7    structure that your client support?  Or just that they want

8    to be involved in that --

9          MR. QUINN:  Both, Your Honor.

10         THE COURT:  I'm sorry, I didn't hear that because

11   there was some paper rattling.

12         MR. QUINN:  Sorry.  It's not paper, I'm sitting on

13   a very old chair.

14         THE COURT:  Okay.  Well, maybe you should stand up

15   so it doesn't break.  But which?  Is it both or is it one or

16   the other?  I just would like to know that.

17         MR. QUINN:  Your Honor, first of all, my clients

18   recognize that the process was fishy, to say the least.  You

19   know, they or the other 140,000 victims -- you know, even

20   like creating a group of them to speak with the DOJ, would

21   have been fine.  But those requests went unanswered by the

22   DOJ.

23         Secondly, when it comes to matters of public

24   health, we believe that the DOJ has a responsibility to

25   reach out to victims of crimes so that future issues aren't

Page 191

1    repeated.  They didn't do that.  They were so nice in 2007

2    to invite some of my clients to testify at a --

3                    THE COURT:  Mr. Quinn, I don't ...I can't tell the

4    DOJ what to do.  And in fact --

5                    MR. QUINN:  I understand.

6                    THE COURT:  -- my role is not to evaluate this

7    settlement from the DOJ's perspective.  I'm focusing on,

8    again, from the Debtor --

9                    MR. QUINN:  Is it fair and reasonable?

10                   THE COURT:  -- the Creditors' perspective, what is

11   it that your clients would like?  Is it simply involvement?

12   Or do they have a specific view yet?  Or you know, that's

13   all --

14                   MR. QUINN:  Both.

15                   THE COURT:  They would like involvement to discuss

16   this condition, specifically.  They're not -- you know, they

17   go way beyond -- pecuniary interests are not their only

18   interests.  If it was, they would be represented by White &

19   Case.

20                   Secondly, they believe that there are other

21   options besides turning this into a vague public benefits

22   company, that could maximize creditors, you know, what the

23   creditors get, and preserve the health and safety of

24   individuals and families in this country moving forward.  I

25   understand that we're looking to write creditors and

Page 192

1    individuals, governments, cities, towns, who were wronged.

2            But Your Honor, my clients are like the Ghost of

3    Christmas Past; they're here to tell you, in 2007, they saw

4    there was a problem; the problem got worse and this is our

5    moment, their moment, to tell you we got to make sure that

6    the future is safer.

7            Their position, even though we haven't spent a ton

8    of time with it, is that this carcass of a company should be

9    sold off to private hands.  The reason they believe -- go

10   ahead --

11           THE COURT:  No, go ahead.

12           MR. QUINN:  The reason they believe that this

13   carcass of a company should be sold off to private hands, is

14   so that there is less influence or opportunity for problems,

15   with the government being involved in this company.  And

16   also, whoever buys this company is walking in, in 2020,

17   2021; they're not walking in, in 2007.  They're not walking

18   in with a fleet of lobbyists, with really good relationships

19   with Congresspeople.  They're not walking in with, you know,

20   the social capital and political capital that the prior

21   owners had.

22           We believe that a private owner can come in, with

23   very strict modifications, come in, buy the company, and

24   operate it because, like you said, Your Honor, there are

25   very few beneficial uses for oxycontin.  It is a company

Page 193

1   that can generate money, but we do not want it to be a

2   company to maximize making money.

3            THE COURT:  Well, but a private buyer, buys it to

4   make money.

5            MR. QUINN:  Yeah, but a private buyer can -- look,

6   Your Honor, a private buyer can always make more money by

7   doing nefarious things that, like Purdue did for the past 20

8   years.  They don't have to.  I think somewhere along the

9   line, we've forgotten that like not every company, just

10  because it's not, quote, unquote, has a term in its bylaws

11  that says it's going to do good, can still act within the

12  bounds of the law.

13           Most companies actually do.  I mean, probably the

14  companies you see more often than not maybe don't.  But most

15  companies in this country do act within the bounds of the

16  law.  They respect government rules and regulations; they

17  want to make a profit, but it doesn't mean that they're

18  willing to jump over that line and do illegal things.

19           THE COURT:  I guess you're not involved in the

20  multi-state NDL against the drugstore companies and the

21  like.

22           MR. QUINN:  No.  No, Your Honor, I'm not.  I can

23  only do so much.

24           THE COURT:  The Plaintiffs in that case might

25  disagree.

Page 194

1          MR. QUINN:  Well, Your Honor, Johnson & Johnson

2    got out of the opioid selling business.  Like, plenty of

3    them have moved on.  Insys didn't go so well, but --

4          THE COURT:  I agree with that.  But someone that's

5    going to be buying it, isn't.  They haven't.  They haven't

6    moved on.  Anyway, I think this --

7          MR. QUINN:  Look, I don't think being able to put

8    -- I don't think this whole thing should be hung up on being

9    able to put in a, you know, allow Purdue to reach beyond

10   what it should be doing and put in a term in a bylaw that

11   says, "We're going to do good," like they did in Paul

12   Newman's salad dressing company.  You know, I'm not even

13   sold on the -- you know, and my clients don't understand how

14   this fix is going to really change anything.

15         There's nothing wrong with making money, Your

16   Honor.  I think everybody here agrees with that.  There is

17   something wrong about making money by breaking the law.  And

18   you know, if the government can stay on one side, and the

19   business can stay on the other side, and the government will

20   watch the business and the business will know that the

21   government's watching the business; that the business has

22   already had a conversation with the government, and the

23   government's saying, "You better not break the law," and

24   that relationship continues, Your Honor, I think we're going

25   to be moving into a better situation.

Page 195

1              THE COURT:  Okay.  Well, all right.  Thank you

2              MR. QUINN:  You're welcome.

3              THE COURT:  One would think that that was the

4    message that went out in 2007.  And, of course, the Sacklers

5    would not have anything to do with this company in the

6    future.  But I understand the point about vagueness, and the

7    desire to have some more structure around it.

8    Alternatively, there's a point that says that it's

9    deliberately flexible and deliberately vague, so that the

10   parties can put the structure around it.  And I guess that's

11   what I have to evaluate.

12             MR. HUEBNER:  Your Honor, let me, of course, first

13   ask, are there any other people on the Objector's side

14   before, I think, respond to (indiscernible) the last couple

15   of hours.

16             THE COURT:  Well, I said that I would entertain

17   the Professor's request to file an amicus brief after I

18   heard from all of the Objectors.  And I think I've heard

19   from all of the Objectors.  Professor Lipson is on the

20   phone.

21             Professor Lipson, I don't know whether having

22   heard them and the argument today, there's anything that you

23   believe can be added that isn't duplicative?

24             MR. LIPSON:  Your Honor, this is Jonathan Lipson

25   for Temple University on behalf of the proposed amici.  Can

Page 196

1    you hear me okay?

2            THE COURT:  Yeah, I can hear you fine.

3            MR. LIPSON:  Thanks very much.  We really only

4    have two other very brief points to make that I don't think

5    have been addressed by anyone who has objected to this

6    point, or that we have found in any of the other objections

7    or statements submitted.

8            And so, I guess if you'd like, what I'd like to do

9    is just take a moment to argue our motion for acceptance of

10   our brief, and in the process, to explain those two things

11   that we think are important, but that may not have been

12   addressed by others, if that's acceptable to you.

13           THE COURT:  Why don't you address the two things?

14           MR. LIPSON:  Sure.  I think that ...as we read the

15   Debtors' proposed settlement, it creates a proposed

16   repository, a public repository, of documents that would be

17   produced by the Debtors to DOJ, in connection with its

18   investigation.  That is, you know, obviously a laudable

19   thing to do.  But as we say in our brief, the timing and the

20   scope are potentially problematic.

21           As we read paragraph ten of the, I think it was

22   the third revised, proposed order that we circulated later

23   this morning; information produced by the Debtors to DOJ

24   won't be released to the public unless and until three

25   conditions are met:  Number one, an order confirming a plan

Page 197

1    is final and non-appealable; number two, DOJ has approved a

2    release of the documents, and number three, the documents

3    are found to be non-privileged.

4           What we're concerned about is that much of this

5    same information, in those same documents, may also be vital

6    to any disclosure statements that the Debtors would present

7    in support of a plan of reorganization.

8           Our concern is that Debtors will not be able to

9    disclose this information because this order seems to say

10   that it can't be released until those conditions are

11   satisfied.

12          THE COURT:  That's not true, right?  Mr. Huebner,

13   you're going to have to disclose whatever you need to

14   disclose as part of a disclosure statement, right?

15          MR. HUEBNER:  Your Honor, it's not true at all,

16   and --

17          THE COURT:  That's fine.  It can't be.  So, let's

18   move off of that point.  That's not the meaning of that

19   paragraph of the order.  It doesn't give the Debtors a free

20   pass to just file a disclosure statement that, unlike this

21   hearing, for example, which has now gone on for about four

22   hours, on just this motion, doesn't adequately inform the

23   parties and the Court of the basis for a confirmation of a

24   plan.

25          MR. LIPSON:  If Mr. Huebner is clarifying that the

Page 198

1    --

2            THE COURT:  It's done.  It's clarified.  There's

3    no issue about that.

4            MR. LIPSON:  Then I think ...that's our underlying

5    concern about both this case and the effect that this case

6    will have on future mass tort debtors, because we ultimately

7    worry that, you know, there will be third party releases in

8    this case, and there has to be adequate information in a

9    plan in order to make it possible for creditors to vote for

10   or against that plan, including with respect to the

11   shareholders of the Debtor.

12           If the proposed structure of the public repository

13   doesn't restrict that, that's very helpful.  We obviously

14   share the other concerns that others raise, but we don't

15   want to -- me too, that's our only sort of systemic point,

16   were concerns about the flow of information in this case,

17   and what that would portend, both for this case and for

18   those in the future.  And I'll stop there, Your Honor.

19   Thank you.

20           THE COURT:  Okay.  I want to be clear, by saying

21   what I said, it doesn't mean that the Debtors have to

22   disclose everything that they revealed to the Department of

23   Justice in some future pleading in the case.  It's tied to

24   what is necessary and appropriate for whatever pleading that

25   they have filed to sustain the burden of proof.  I think

Page 199

1    that law professors would understand that.

2              MR. LIPSON:  Thank you for the clarification, Your

3    Honor, and thank you, Mr. Huebner.

4              THE COURT:  Okay, very well.  All right.

5              MR. HUEBNER:  So, Your Honor, I guess I'm going to

6    try to be pretty brief.  We actually are moving towards the

7    sixth hour of this hearing, but I think there are some

8    things to be said.  Because we ended up sort of having the

9    open mic session that I feared.

10             And frankly, as important as this hearing and this

11   settlement is, obviously, there are equally important things

12   still ahead of us.  And leaving here, even with a complete

13   victory in terms of the order, but with, will be some

14   clarification from the Debtors' perspective, so that

15   everyone who is listening understands what we're thinking

16   and why we're thinking, and a little bit better, I think

17   would be useful.

18             But let me first talk about the parts of the last

19   hour and a half or two hours that were actually objections.

20             First of all, just positionally, I do want to note

21   -- I'm not sure I've ever seen Mr. Shore in the middle

22   before, as opposed to one of the ends of a dispute.  So,

23   that, actually, sort of makes this a remarkable day in its

24   own, and I do want to thank him again, formally and

25   publicly, for their very constructive engagement.  We agree

Page 200

1      with many of the points they made.

2              One clarification, because this is actually quite

3      important to us:  There is no question under the documents,

4      and it was absolutely understood and agreed by both the

5      Debtors and the DOJ from the beginning, that the criminal

6      claim and the forfeiture claim, could not be allowed until

7      well after the confirmation hearing.  What the documents

8      originally said was, that that happened after the sentencing

9      hearing, and the sentencing hearing happened 75 days after

10     the confirmation hearing.

11             And so, to be clear, this was not a change; it was

12     always the case, which is one of the 83 things that makes

13     this not a sub rosa plan, under directly governing law; that

14     things are conditioned on confirmation.  They just can't be

15     -- one of the cohorts, it may have been Empire, said sub

16     rosa, by the way, is completely the wrong Latin term, and

17     it's actually confusing.  The right term --

18             THE COURT:  Mr. Huebner, you said you were going

19     to be brief.

20             MR. HUEBNER:  Okay, never mind, keep rolling.

21     Let's talk for a minute about the law, because there were

22     three cases discussed and I'm going to hit each of them for

23     about a minute.  And I think that will make at least the

24     Debtors' views very clear.

25             Number one, bizarrely, Mr. Troop tried cited

Page 201

1    Chrysler.  Chrysler was a priority-skipping plan.  It wasn't

2    just a sale.  Because in your colloquy, you clearly

3    understood and noted and told everyone, a sale of all the

4    assets itself is way more sub rosa than this.  That one went

5    far beyond that.  It was the subject of incredible scholarly

6    and professional discussion afterwards, because it gave the

7    union benefit funds, a direct recovery in the new entity;

8    which moved over all of Chrysler's asserts, basically, lock,

9    stock and barrel, while not paying secured creditors, who

10   were senior to them.

11           Whether or not Chrysler would pass muster under

12   Jevic, I don't know.  But there's no question in the world

13   that the fact pattern in Chrysler is way, way, way beyond

14   what we're doing here.

15           Now, let's talk about Jevic, which is great.  And

16   it's great for us, because what Jevic actually held, exactly

17   as Your Honor pointed out, is that they granted cert to

18   decide the specific question of whether a ...where a

19   carefully constructed dismissal of a case that mandated

20   distribution of proceeds in a matter directly inconsistent

21   with the Bankruptcy Code, was to be allowed, even though it

22   was kind of Pareto efficient; because the people who are

23   being skipped over and getting nothing in the structured

24   dismissal, were also getting nothing in a regular chapter

25   11, because of absolute priority.

1          What the Supreme Court held was that a priority-

2    skipping structured dismissal that, if it were a plan, would

3    be insanely illegal, is beyond the powers of a bankruptcy

4    court.  And, buy the way, it actually also said, in part,

5    that's because, and I quote, "...the priority-violating

6    distribution is attached to a final disposition; it does not

7    preserve the debtor as a going concern; it does not make the

8    disfavored creditors better off; it does not promote the

9    possibility of a confirmable plan; it does not help to

10   restore the status quo ante; and it does not protect

11   reliance interests.  In short, we cannot find that the

12   violation of ordinary priority rules that occurred here has

13   any significant offsetting bankruptcy related

14   justification."  That's at page 11.

15          THE COURT:  And of course, it also said that

16   Iridium is probably still good law.

17          MR. HUEBNER:  Yes, in actually the same paragraph,

18   Your Honor, on page 11, I actually read you the bottom of

19   it, but it actually begins with citing Iridium at the top of

20   it, and goes onto site Cybergenic and K-Mart and RadLAX.

21          So, I'm delighted to discuss Jevic all day long,

22   because I think it affirms this situation in spades, as does

23   the more recent affirmance of Your Honor, in Empire; where

24   the Court actually dealt with the JEVIC argument in the

25   context of an RSA that, again, did lots of things we are not

Page 203

1    doing, like demanding mandatory third-party releases and

2    lots of other things.  And exactly as Your Honor ruled -- I

3    mean, I hate to do it, but just what it says -- "As Judge

4    Drain observed at the hearing, the RSA is in agreement about

5    supporting things, not in approval of the sale.  All plan

6    terms remain subject to confirmation of the plan.  And the

7    RSA left open the possibility that an offer better than the

8    stalking horse, could be made and accepted.  The RSA simply

9    did not, as Appellant argues, settle the precise outcome of

10   the organization."  That's on page seven.

11          And then, on page eight, "The Court describes

12   Jevic in detail and says that it is totally inapposite

13   because this is an RSA assumption order, not a sale or plan

14   order, that has priority skipping, to which Appellant did

15   not consent."

16          So, those are the three cases you were told about.

17   We have about 80 more of them in our brief.  The law is just

18   completely clear.

19          So, now, let's talk though, about things that may

20   be as important.  And again, Your Honor, I am trying to be

21   quick.  I've crossed out a lot of stuff.  But on some level,

22   we aren't -- maybe today is setting the stage for the whole

23   rest of the case, and many of our most, candidly, beloved

24   and important stakeholders are listening, and it matters.

25          Number one, the statement that Creditors are being

Page 204

1    asked to go to give up all value unless they accept a plan

2    that they don't want, it's just not true.  This Debtor right

3    now, has $3 billion at a minimum, expected to come in from

4    this Sacklers; over $1 billion of cash on the balance sheet,

5    which has gone up since the filing date, despite the

6    horrifying expenses of this case; billions of dollars in

7    operating assets, and hundreds of millions of dollars in

8    insurance policies.

9         The fact that, if the DOJ believes that the

10   emergence does not meet the requirements of the justice

11   manual, and longstanding policy of piling on abating the

12   opioid crisis, would allow them, if we were to decide to

13   proceed with a plan.  And if enough of our creditors were to

14   support it, and if the Court were to find that confirmation

15   standards were satisfied, there would still be billions left

16   for everyone else, as opposed to not having a DOJ deal, and

17   being indicted and excluded from federal programs, and

18   possibly losing our state and federal licenses, and then

19   facing unsettled $18.1 billion plus of alleged

20   (indiscernible) claims.

21        We're doing this for the other stakeholders.

22   Frankly, as much or more than we're doing it for the DOJ.

23   We're doing it because it's in the best interests.

24        Your Honor, I officially beg, I am begging

25   creditors and stakeholders not to dig in on their vision of

Page 205

1    what is or is not a PBC.  We've come a long way since the

2    beginning of this case, and we have listened and adjusted

3    and listened and adjusted.

4           Purdue is pleading guilty to multiple felonies.

5    Purdue is not emerging from chapter 11.  Its assets are

6    being ripped away on the effective date and put into either

7    -- we'll talk about a magic sale in a minute -- or a triple

8    blue chip, brand new, clean saferoom, to sell opioids in the

9    safest possible way.

10          We deeply, deeply respect the policy concerns --

11   not only of the dissenting states, but of the consenting

12   states.  There are groups, including me and corporate

13   lawyers and trust lawyers and tax lawyers, from many law

14   firms, meeting every day to attenuate and balance the

15   concerns that everyone is talking about.  We don't want to

16   own it.  We're not going to own it.  We're not even going to

17   own it for tax purposes.  We're not going to control it.

18   We're not going to be on the board.  We're not going to be

19   trustees.

20          It's that get it.  Of course, we get it.  And the

21   goal is to design something that just balances all of these

22   concerns.  Winning today's hearing is not the goal; it's one

23   goal.  This settlement could be -- without it happening --

24   the (indiscernible) demise of billions of dollars in value.

25   But we still need to get the rest of the way there.

Page 206

1          So, Your Honor, let me express a couple of quick

2     things on that point.

3          Number one, as you basically kind of connect for

4     (indiscernible) some of the objectors in your colloquy, what

5     they're saying is, because the DOJ's condition to the credit

6     is something we don't like, it's not okay.  But if it was

7     something we did like, it would be okay.  Just like in our

8     own deals, we have things we do like.  And of course, we

9     didn't insert conditions, precedents, that we don't like.

10         That's kind of a checkmate, because, basically,

11    it's an admission, that as long as they like the conditions

12    they'd be just fine; but because they don't, it doesn't make

13    them unlawful, it just allows the DOJ to have a view of

14    their own, just like some of today's objectors have views of

15    their own.

16         Let's talk for a minute about this thing of 'we

17    have no choice,' because it's not true.  I can think of

18    three choices in about ten seconds.

19         Let's assume, for a minute, that the world is

20    completely backwards, and the worst fears, as articulated by

21    Mr. Troop, comes to pass; which is, somehow, even though the

22    Debtors are the ones who have consistently modified what it

23    means, but believe in a PBC, we somehow go forward with a

24    no-PBC plan.  In other words, we propose a non-PBC plan.

25    There aren't no options, Your Honor.  There are a minimum of

Page 207

1    three options, and actually more.

2         Option one, accept that the DOJ is going to get $2

3    billion and take the other four, five, six, seven, whatever

4    number it is, billion dollars, for the rest of the

5    creditors.

6         Option two, which I think is by far the most

7    likely, is since we're only going to do things that are in

8    the public interest, and the best interests of America, the

9    play in the system, and the flexibility, result in the DOJ

10   and all the states, and the Debtors, having a conversation

11   and figuring it out, and working out something that meets

12   shared policy goals, to do the best for the American people,

13   and save as many lives as they want, as we possibly can.

14        Option three is oppose confirmation.  If you think

15   the plan is unlawful, because it gives the DOJ a $2 billion

16   forfeiture claim, and that it doesn't meet the confirmation

17   standards, vote against it.  This isn't a priority skipping

18   structured dismissal, where once this order is entered, I

19   paid you your creditors and skip senior creditors.  These

20   claims don't go into effect, and they never did, until the

21   confirmation order is entered, pursuant to the dictate of

22   the Bankruptcy Code.

23        Your Honor, we all want the same thing, we really

24   do:  continuity of supply, safety in the provision of the

25   medication, maximization of value, development of important

Page 208

```
 1   medications.  The DOJ is allowed to have a view about how

 2   they think that is best effectuated.

 3              To tick down some final issues, Your Honor, with

 4   respect to risk of liability, I think it's behind us

 5   already.  But just to be clear, we have like --

 6              THE COURT:  I think it's behind us.  We can move

 7   off of that one.

 8              MR. HUEBNER:  Okay, done.  Your Honor, Mr. Preis,

 9   exactly as I feared, sort of semi-hypnotically, you know,

10   brought to you the siren song of there are no walkaway

11   rights for the DOJ, can't you just adjourn?

12              Again, this is a question, as I think I spoke

13   about at some length, about balancing risks and business

14   judgment.  We do not share the view -- do not share the view

15   -- that there is not material risk to the Debtors of a

16   devastating change of direction of these cases if this is

17   not entered.  It's just -- it's our view, and it is an

18   informed view.  We chose among risks, and risk we --

19              THE COURT:  What is it informed by, Mr. Huebner?

20   Because the agreement itself doesn't preclude me from

21   adjourning it.

22              MR. HUEBNER:  That's true, Your Honor.  And for

23   reasons relating to admission (indiscernible) interest,

24   because if this happens, there may well be disagreements

25   over it.  Suffice it to day, and I would prefer not to say
```

Page 209

1    more, that the criminal jurisdiction of the Department of

2    Justice, is very likely not constrained by the agreements

3    that were signed with respect to its ability to move in

4    different directions with respect to indictment and

5    prosecution.

6              And in particular, or even more so, because,

7    obviously, this Court, you've said a thousand times, has no

8    jurisdiction over the criminal authority of the United

9    States of America.  And there are also multiple US

10   attorneys' offices involved, as I think this Court knows.

11             Suffice it to say that we are not at all sanguine,

12   as I said in my opening that, you know, essentially, there

13   could be a free extension here, because we don't think that

14   at all.  And that's why we have chosen to move forward

15   today, because we think it is not even a question as to

16   whether the risk of the potential parade of horribles, of

17   frankly, the expressions of unhappiness of the objectors,

18   versus not having a new deal in hand, is not even close,

19   Your Honor.  With respect to --

20             THE COURT:  Mr. Fogelman,  again, I'm going to put

21   you on the spot, but the criminal side of this deal -- so,

22   it's a signed agreement, so I'm referring to it as a deal --

23   the criminal side is something that the DOJ could -- or an

24   attorney general -- I'm sorry, Assistant US Attorney in, I

25   don't know, in New Jersey or in Vermont, could change or

Page 210

1    renege on?

2            MR. FOGELMAN:  Your Honor, first let me just state

3    that we have no present intention to back out of the plea

4    agreement.  That said, I cannot tie the hands or make any

5    promises or commitments on behalf of the multiple criminal

6    teams of prosecutors from the District of New Jersey, the

7    District of Vermont, and the Consumer Protection Bureau of

8    DOJ.  We don't know what's going to happen in a week, two

9    weeks, three weeks, a month from now, two months from now,

10   three months from now.

11           With regard to Your Honor's question about the

12   law, my general understanding is that the government can

13   withdraw a plea after it's accepted by the defendants, but

14   before it's accepted by the Court, so long as there is no

15   detrimental reliance by the defendant.  And that's United

16   States versus Kuchinski, 469 F.3d 853.

17           And I'll admit, I am not a criminal lawyer, Your

18   Honor.  I wanted to try to familiarize myself with this area

19   before today.  So, that is really based on a cursory

20   understanding.

21           But that said, the Debtor as well has the right to

22   pull out of a plea under Rule 11 of the Criminal Rules of

23   Procedure.  And the United States very much wants this to go

24   forward.  We want -- you know, under the agreement, we've

25   arranged for there to be a request to the District of New

Page 211

1   Jersey to have a plea hearing within a week after approval

2   of this order.  We want that to go forward, Your Honor.  We

3   want Purdue to plead guilty for the three felonies that have

4   been charged, that are in the plea.

5           We have no heard why this should be deferred.

6   Thank you, Your Honor.

7           THE COURT:  Okay thanks.  Mr. Huebner, I'm sorry I

8   interrupted you, but you can go ahead.

9           MR. HUEBNER:  No, that's okay.  And as you might

10  imagine, Your Honor, we have quite a few federal prosecutors

11  and criminal lawyers, former, on our team.  And our view

12  that there is risk to the estate, I can assure you, is well

13  founded.

14          With respect to Mr. Quinn, let me be relatively

15  brief, because he said quite a few things about his

16  understanding of the DOJ deal.  I just think, respectfully,

17  to Mr. Quinn, who actually pled quite a lot, many of them

18  are just wrong wronged.  And it's not right that the record

19  should be left with those things (indiscernible) someone's

20  statement of fact.

21          Number one, I don't believe there's a joint

22  defense agreement between the United States of America and

23  Purdue.  They are the prosecutor; we are the defendants --

24          THE COURT:  No, I think what he said is that there

25  was a joint defense agreement between the Sacklers and

Page 212

1    Purdue.

2              MR. HUEBNER:  No, he actually said between Purdue

3    and the --

4              MR. QUINN:  No. Sorry, Marshall, I meant between

5    the Sacklers and Purdue there was a common defense

6    agreement.

7              MR. HUEBNER:  Okay, understood.  I don't think

8    it's what you said, but it's fine.  Number two --

9              MR. QUINN:  I'm not a great lawyer, but I would

10   recognize there's not a joint defense agreement between the

11   government and a private entity.  I can't think of one

12   anyway.

13             MR. HUEBNER:  Number two, Your Honor, Mr. Quinn,

14   many times, used the phrase 'Purdue-slash-the Sacklers.'

15   Again, so that the record is clear, the Sacklers have left

16   the building about two years ago; are not on the board, have

17   no rights and no powers over this company, have no executive

18   functions, receive no remuneration, receive no

19   reimbursement, etc.

20             This is a debtor-in-possession, a chapter 11

21   estate, with a sworn duty to maximize value and do the best

22   it can for its creditors.

23             The kind of suggestion that Purdue and the

24   Sacklers are in this together is really completely false.

25   And frankly, really not helpful.  Purdue and the Sacklers

Page 213

1    largely parted ways a while ago.  And as this Court and all

2    people know well, the Debtors are actually the Plaintiffs,

3    and owners of billions of dollars of potential claims

4    against the Sacklers.  The special committee and others have

5    been at work on that for well over a year and a half.

6             And, you know, Alix Partners, we have a special

7    committee that's published 1,000 pages of reports, etc.,

8    etc.

9             So, this insinuation, which still appears in the

10   press, of Purdue, quote, "...which is controlled by the

11   Sacklers …," it's deeply wrong and deeply, deeply unhelpful.

12   They are the descendants.  They are not the shareholders

13   anymore, from our perspective.

14            Your Honor, other things like a couple of lawyers

15   (indiscernible) a couple of hours, this is fishy, to say the

16   least.  I won't even pause on those.  This is a multi-year

17   investigation with hundreds of -- thousands, probably -- of

18   hours, from multiple prosecutorial offices all around the

19   country.  And it's just -- it's not fair to say things like

20   that when they're not true.

21            With respect to potential involvement in the

22   design of the PBC -- I do say this very respectfully:  I

23   don't believe I have ever once, once minimized or

24   denigrated, God forbid, the pain or the loss or the

25   suffering of any victim or person impacted by this or other

Page 214

1   products.

2           So, the end of the day, Mr. Quinn represents five

3   individuals.  And candidly, I call him a lot, and I offer to

4   talk to him a lot.  You know, any time he files an objection

5   I make time for him and he's very gracious; I say sorry, 11

6   o'clock at night is the only time I can talk.  The notion

7   that he's sort of frozen out -- I actually have also offered

8   twice to meet with his clients directly.

9           And I would say one thing, which is, he referenced

10  several things -- frankly, twisted -- that were in our

11  settlement conversations over this motion, including me

12  trying to explain to him what the PBC is and how we're

13  thinking about it and why.  Suffice it to say that we sort

14  of view it a little bit differently.

15          Your Honor, the assets of this company are not a

16  carcass -- another word that Mr. Quinn tossed out quite a

17  few times.  As I noted before, there is billions of dollars

18  of value here.  And this is something that we actually all,

19  including, I believe, Mr. Quinn and his clients, care very

20  much about; which is, what is the best way, balancing other

21  concerns, like the state's understandable, extreme antipathy

22  for owning or controlling these assets post emergence, to

23  get the most value, to the American people.

24          It's not a carcass, it's billions of dollars.  And

25  actually, exactly, to get it as right as we can, is actually

Page 215

1    extremely important.

2          With respect to that, there were some bizarre

3    moments in colloquy where I thought I heard someone saying,

4    you know, I trust a private, profit-seeking owner, whose

5    only goal really is to make money, you know, maybe more over

6    a structure I don't even know about  Like, we are

7    contemplating a triple blue chip structure that has a brand

8    new co, with new management and new directors, with a top co

9    on top of it, with new trustees, and an abatement trust on

10   top of that, with the same overlapping trustees, all

11   selected in blazing sunshine, with extraordinary records --

12   exactly as this Court pointed out, just like Secretary

13   Vilsack; people of impeccable finance and public health,

14   DEA, etc., experience.  And the flexibility that's built

15   into the structure to let the major parties in this case

16   figure that out together, is what we're talking about.

17         Let me say one last thing, because it's also

18   important to say -- actually, I apologize, two last things,

19   and then I will be done.  But this is really just so

20   important.

21         Number one, there's a fact I wish I could change,

22   but I can't, which is:  Even though Purdue makes quite a few

23   other products that get lost in the shuffle of oxycontin --

24   famous products, like Betadine and Colace and Senokot, and a

25   lot of generic drugs, the reality is that as of now, the

Page 216

1    substantial amount of Purdue's value and revenues come from

2    oxycontin.  It's not a fact I can change.  No one can change

3    it.  Just like tobacco companies get the cash from tobacco,

4    we get a lot of our cash from oxycontin.

5              And so, you know, people talk about, "I don't want

6    tainted money," or 'blood money' or 'oxy money,' but you

7    can't regress that out of the equation; it's not possible.

8    Whether the assets of these debtors are sold next week, next

9    month or in five years, it is an immutable fact that

10   stakeholders will be getting a substantial majority of their

11   value from oxycontin.  That's either the cash from past

12   sales, the revenues from future sales, or the proceeds of

13   the sale of those revenues.

14             If people don't like that, they should withdraw

15   their proofs of claim, and not seek distributions under the

16   plan, and leave these proceedings, because we have no other

17   way to create value to abate the opioid crisis, and redress

18   the wrongs that Purdue's criminal plea and lack of emergence

19   from chapter 11 represent.

20             Finally, there's the question of the sale.  So,

21   let me be clear on this as well.  We understand

22   conversations go on four, five, six, eight hours a day,

23   about the best way forward.  And frankly, we have some

24   pretty different views, that a minority of predators in this

25   case -- and I think an awful lot of people have our view.

1   And that's okay, it's not over yet, and the conversations

2   are still continuing.

3           If a magic purchaser appears on a unicorn, and

4   offers us full value for the assets, or close enough to full

5   value, that we and many, many involved creditors in this

6   case, believe that the value loss is tolerable, even though

7   it comes right out of abatement, to side step completely the

8   structuring that has to be done for the attenuation of the

9   fact that governments --

10           By the way, to be clear, they're not going to own

11   it, and they don't have to be the residual beneficiaries.

12   There's technology for every one of these issues that, in

13   fact, we're discussing in the background.

14           But if such a purchaser does actually arrive, it

15   may make sense.  And if that purchaser agrees to run it,

16   essentially as a PBC, and agrees to have the self-injunction

17   and agrees to be, as we envisioned NewCo being, the safest,

18   most restricted seller of class two narcotics in the

19   country, and wants to give abatement money to us up front,

20   in a huge slug -- obviously, it's our job to do that.

21           The problem is, from everything we have seen so

22   far, that is not remotely likely to happen.  And I'm going

23   to give only one example -- which Your Honor, the reason I'm

24   doing it in part, and I'm very close to done -- is because

25   you did it in part.  And I actually think that it's helpful

Page 218

```
 1   for people to understand why we think it is so unlikely that
 2   it's going to make sense; not that it may not make sense to
 3   sell some or all of these assets; maybe even very swiftly
 4   post emergence; maybe some in six months, some in 18 months,
 5   some in 36 months.
 6            That's what the new blue chip, triple blue-chip
 7   structure is for; which is to figure out those questions
 8   without a fee burn that's approaching $1 million a day, and
 9   the damage to the business that goes on every day we stay in
10   chapter 11, and our fate is not known, and many other
11   things.
12            So, let me just do the math, because I actually
13   think that it's helpful.  Your Honor alluded to it.  I'm not
14   talking, by the way, about the conflicts of interest.  The
15   governments get a bunch of money either way, whether it's
16   the capital gains of the purchaser, the due on sale, NOL,
17   operating revenues at the entity that are taxable in the
18   hands of a new purchaser; there are many, many ways that
19   some states might actually have a much more direct economic
20   stake in the income generation capacity of this company,
21   than they would with their tiny fractionated ownership
22   rights of the opioid abatement trust, that has to go to
23   thousands of local governments and tribes and states.
24            Again, there's buffer and buffers that we're
25   thinking about; not because we don't understand, but because
```

Page 219

1    we do understand.

2            But let me do the dummy math, because this is so

3    important for people to hear, and then I'm done.

4            Assume, for a minute that the nominal value of the

5    product cash flows and the residual value of the assets over

6    the next nine years is $9 billion.  Right, there's cash

7    income generation, and then there's residual value.

8            At some point we just put a term and a value on

9    things.

10           In a NewCo structure, all $2 billion of cash flow

11   and residual asset value we believe can go right to

12   abatement because we think we can structure it as a tax-free

13   entity, even without any governmental ownership of any type.

14           But now -- again lawyer dummy math -- let's talk

15   about the sale alternative.  So let me put myself in the

16   mind of a third party.  Purdue's investment manager comes to

17   me and says, hey, hedge fund guy, I'd like to sell you this

18   $2 billion of cash flow and residual (indiscernible).  So

19   what do I do?

20           I open Excel and I say, well, first of all, I'm a

21   taxpayer.  Let's pretend that Georgia goes Republican and

22   Biden can't raise the corporate tax rate to 32 percent, and

23   I get the benefit of the current tax rate.  So that's a

24   state and local tax burden every year on my net income of 25

25   percent.

Page 220

1          So the first thing I do on a PV basis is say about

2     $300 million comes off because I don't get the 2 billion; I

3     get 1.7.  And I'm not even assuming a tax burden on the

4     sales from 2029.  I'm only assuming a tax burden on the cash

5     flow.  And then he says, okay, but I'm an investor, I'm a

6     capitalist.  I'm the person who's talking about investing

7     hundreds of millions of dollars in a complicated asset.  So

8     you know what?  I'm going to treat it like a regular asset,

9     like a pretzel factory, and I'm going to see I need a 20

10    percent return on equity capital.

11         The way the math works, Your Honor, to generate a

12    20 percent return for nine years and be a tax-paying entity

13    means you only pay five to six hundred million dollars up

14    front for the pre-tax cash flow and residual value that in

15    the hands of NewCo are $2 billion.

16         So issue number one for us, Your Honor -- and

17    there are many, many more, but I just beg, beg, beg people

18    to listen to it with an open mind, because we want what you

19    want -- is that we lose possibly three-quarters of the value

20    of the company to the profit-making need and the tax burden

21    of a prospective purchaser.

22         And Your Honor, I treated it like a pretzel, not

23    like (indiscernible) --

24         MR. PREIS:  Your Honor --

25         MR. HUEBNER:  -- (indiscernible) products.

Page 221

```
 1              MR. PREIS:  Your Honor --

 2              MR. HUEBNER:  It has --

 3              MR. PREIS:  I'm sorry --

 4              MR. HUEBNER:  Sorry.  I --

 5              MR. PREIS:  I don't know where this is going, and

 6    I -- but -- sorry, this is -- a number of people are

 7    listening to this and all asking the same question.  I'm

 8    sorry --

 9              MR. HUEBNER:  Yeah, so it's a --

10              MR. PREIS:  (indiscernible) but --

11              MR. HUEBNER:  Yeah.  (indiscernible)  So let me

12    say this, Your Honor.  As I said, I was kind of done.  So

13    I'm going to be done now.  I urged in my opening that people

14    not make this an open mic on PBC versus sale.  And that

15    request was rejected.  And several of the objectors went

16    into speeches about what their position has been from the

17    beginning on this versus that, and why this is

18    (indiscernible) to them.  That has nothing to do with the

19    case law or the 9019 in front of us.  So I will accept Mr.

20    Preis' good advice, although I actually could say things to

21    show you why the price on a risk-adjusted basis and a --

22              THE COURT:  You should accept his advice.

23              MR. HUEBNER:  Okay.  I'm accepting it.  So, let me

24    wrap up in 10 seconds.  At the end of the day, the case law

25    is absolute and absolutely in favor of approving the 9019.
```

Page 222

1    The Debtors are allowed to choose what they believe is in

2    their best interests, the timing of what they believe is in

3    their best interests, and the content of it.

4           Like every other creditor in the case, the United

5    States is allowed to have preferences for the conditions

6    that (indiscernible).  This is no different than the

7    hundreds, maybe thousands, of PSAs, RSAs, 9019s, cash

8    collateral orders, DIP orders, that legions of cases, like

9    (indiscernible) and Delphi and Empire and (indiscernible)

10   and Chrysler have found legal.

11          I don't want to be distracted from where I

12   started.  This is a monumentally positive day for these

13   estates and for the goal that we all share.  And we very

14   deeply and profoundly ask that the relief be granted.

15          THE COURT:  Okay.  All right.  Okay, I --

16          MR. TROOP:  Your Honor, it's Andrew Troop.  Drew.

17   I just have one request, that Mr. Huebner and the Debtors be

18   as open-minded with regard to alternatives as they have

19   asked us to be in connection --

20          THE COURT:  That's a totally fair request.  I

21   understand that.  And I'm assuming it'll be the case.  I'll

22   have --

23          MR. TROOP:  Great.

24          THE COURT:  -- some words about -- in my ruling on

25   negotiations going forward.

1          MR. TROOP:  Thank you, Your Honor.  And if

2     necessary, to have more discussions about the issues that

3     Mr. Huebner raised and in recognition of his request that he

4     -- which I think, frankly, everyone did honor --

5          THE COURT:  Right.

6          MR. TROOP:  - not to --

7          THE COURT:  If anyone didn't honor it, it was me.

8     But I think that's because I needed to understand what the

9     concerns were about the recission right --

10          MR. TROOP:  But all I'll say, Your Honor, is we're

11     happy to talk with you about that in chambers with whoever

12     wants to participate, if they'd like.  Thank you.

13          THE COURT:  Well, okay.  Very well.  All right.  I

14     have before me the Debtors' motion for approval of a

15     settlement with the United States that's actually embodied

16     in two separate agreements attached to the motion, the first

17     being a plea agreement with Purdue Pharma LP, and the

18     second, which is an exhibit, being a settlement agreement

19     regarding the United States civil claims against the

20     Debtors.

21          Certain provisions of those agreements have been

22     clarified in the proposed form of order, and the record

23     reflects that the United States is in agreement that, as

24     modified by the order, the settlements are currently in

25     place and that the order reflects the agreements with the

Page 224

1    United States.

2         Settlements and compromises are a normal part of

3    the process of reorganization and are strongly favored over

4    litigation in the bankruptcy context.  See Protective

5    Committee for Independent Stockholders of TMT Trailer Ferry,

6    F-E-R-R-Y, Inc. v. Anderson, 290 U.S. 414, 424 (1968).  See

7    also In Re Motors Liquidation Company, 554 B.R. 355, 364,

8    365 (Bank. S.D.N.Y. 2016).

9         It's also well established that a bankruptcy court

10   is required to make an informed and independent judgment in

11   determining whether a settlement is fair and equitable and

12   should be approved.  Again, see the TNT Trailer Ferry case,

13   390 U.S. 428.

14        Based on the framework announced by the Supreme

15   Court in TMT Trailer Ferry and the analysis that the Court

16   undertook, courts in this circuit have concluded that a

17   settlement to warrant approval by the court must first be on

18   notice on the opportunity for a hearing, that it must be

19   fair and equitable, and in the best interests of the estate.

20        Further, because a settlement, of this nature at

21   least, is an action out of the ordinary course, and the use

22   of the Debtors' property out of the ordinary course, it also

23   has to be a valid and good business decision.

24        It is also established in this court that because

25   of the role that settlements play in the bankruptcy process,

Page 225

1    a bankruptcy court's approval of a settlement is reviewed

2    "extremely deferentially", because a bankruptcy court is in

3    the best -- and this is a quote -- "A bankruptcy court is in

4    the best position as the ongoing supervisory court for the

5    bankruptcy case to determine whether a compromise is in the

6    best interests of the estate and is fair and equitable."

7    See In Re Liu, L-I-U, 1998 U.S. App. LEXIS 31698, 2 (2d Cir.

8    December 18, 1998); DeBenedictis v. Truesdale (In Re Global

9    Vision Products) 2009 U.S. Dist. LEXIS 64213, 6-7 (S.D.N.Y.

10   July 14, 2009); and In Re Purified Down Products Corp., 150

11   B.R. 519, 522 (S.D.N.Y. 1993).

12          Given the foregoing, courts, in reviewing proposed

13   settlements, are guided by the following factors.  As laid

14   out in In Re Iridium Operating LLC, 478 F.3d 452, 462 (2d

15   Cir. 2007).  See also Global Vision Products v. Truesdale,

16   2009 U.S. Dist. LEXIS 64213, 13.  They are, one, the

17   probability of success should be issues that are being

18   settled, being litigated, versus the present and future

19   benefits of the settlement, without the delay and expense

20   and risk of litigation and subsequent appeals.

21          The likelihood of complex and protracted

22   litigation if a settlement is not approved with its

23   attendant expense, inconvenience and delay, including the

24   difficulty in collecting on a judgment.  Three, the interest

25   of creditors, including the degree to which creditors

Page 226

1    support the proposed settlement.  Four, whether other

2    interested parties support the settlement.  Five, the

3    competency and experience of counsel supporting and the

4    experience and knowledge of the Court in reviewing the

5    settlement.  Six, the nature and breadth of the releases to

6    be obtained by officers and directors, if any.  And last,

7    seven, the extent to which the settlement is the product of

8    arms-length bargaining.

9         In bankruptcy cases, certain settlements, as is

10   the one before me, don't involve litigation whereby a debtor

11   is looking to recover on a judgment, but rather, is looking

12   to minimize liability or the adverse effect of a claim on

13   its estate creditors and reorganization prospect.

14        There are further limitations on settlements,

15   beyond consideration of the following seven factors, and the

16   ultimate determination as to whether the settlement is fair

17   and equitable and in the best interest of the estate and the

18   proper exercise of business judgment.  Namely, whether a

19   particular settlement's distribution scheme complies with

20   the Bankruptcy Code's priority scheme must be the most

21   important factor for the Bankruptcy Court to consider.  In

22   Re Iridium Operating LLC, 478 F.3d, 464.

23        In addition, in rare and extreme circumstances, a

24   settlement may cross the bounds of settling the issues to

25   fixing the terms, or at least certain key terms, of a

Page 227

1    Chapter 11 plan without the benefits of a Chapter 11 plan

2    process with a disclosure statement, subject to notice and

3    approval by the Court, voting, and ultimately a confirmation

4    hearing.  However, as noted by the case law, those

5    circumstances are generally extreme and rare.  See In Re

6    Tower Auto Inc., 342 B.R. 158 (Bankr. S.D.N.Y. 2006), aff'd

7    2006, U.S. Dist. LEXIS 91958 (S.D.N.Y. Dec. 1, 2006), aff'd

8    648 Fed. App'x 277, 284-85.

9             Here, most of the TMT Trailer factors are

10   uncontroverted and support the settlement.  Generally

11   speaking, the settlement is favorable to the Debtors in that

12   it substantially compromises the criminal rights or criminal

13   claims of the United States, and further compromises the

14   United States' civil claims.

15            The settlement would reduce and fix the criminal

16   claims, as asserted in the United States' proofs of claim to

17   a $2 million forfeiture claim from a potentially greater

18   amount asserted, and that is a $3.5 million forfeiture

19   claim, and a $3.544 billion civil fraud claim compromised

20   from a $6.2 billion civil fraud claim.

21            Similarly, settlement would fix the civil claims

22   of the United States at a substantial reduction to $2.85

23   billion from the remaining amount, roughly $8.3 billion --

24   excuse me -- yes, $8.3 billion remaining amount of the

25   portion of the United States claim in this case for such

Page 228

1    liability.

2            It is clear from the record before me today that

3    the settlement amounts, both on the civil side and on the

4    criminal side, facilitate the Debtors' reorganization and

5    enable the Debtors to move ahead with a plan generally

6    consistent with the allocation agreements previously

7    negotiated in the Phase 1 portion of the mediation, and the

8    agreement in principle with the so-called consenting states

9    and governmental entities group.  And I will address that

10   further in my ruling later.

11           The settlement provides that the $2 billion civil

12   forfeiture claim, if a plan is confirmed consistent with the

13   terms of the settlement, would be modified by a credit to

14   the public claimants of most of that to billion dollar

15   amount, namely $1.725 billion worth, which would they be

16   free, or freed up from payment to the United States, to

17   instead be allocated as per the Phase 1 mediation to the

18   states and non-federal government entities.

19           Only $225 million of cash would be required to be

20   paid to the United States as part of that portion of the

21   settlement.  This is a relatively low amount in regards to

22   the overall estate value, and again, facilitates a plan on

23   behalf of the other parties in interest in the case.

24           That result is not the only possible result under

25   the settlement.  The settlement also provides that both the

Page 229

1   Debtors and the federal government have the right to rescind

2   the settlement if a plan is not confirmed that provides for

3   the reorganization of the Debtors' estate in a public

4   benefit corporation or similar structure, which the record

5   has made clear is, I believe, deliberately vague, but with

6   the ultimate goal of maximizing the value of the Debtors'

7   estate to abate the opioid crisis.

8           If such a plan is not confirmed in addition and

9   another plan is confirmed that does not provide for such

10  treatment, the United States also has the right, if it

11  doesn't rescind, to have that $2 billion claim paid as a

12  superpriority administrative expense.

13          The settlement has been completely clarified,

14  however, to make it clear that the allowance, including, as

15  I just described it, of the criminal claims of the United

16  States is not to occur and is conditioned upon confirmation

17  of a Chapter 11 plan in this case.  As a practical matter,

18  that's how the revised order works.

19          The claims that are being settled, again, fall

20  into two baskets, criminal and civil.  And the criminal

21  basket includes a criminal forfeiture claim.  There is a, I

22  believe, clear precedence, that is, for the proposition that

23  a civil forfeiture claim sought for the direct assets at

24  issue would not be treated as property of the Debtors'

25  estate, even if the judgment in respect of that claim was

Page 230

1    entered, as would be the case here, after the commencement

2    of the Chapter 11 case, as discussed in, among other cases,

3    the Drier decision by Judge Bernstein, D-R-I-E-R, discussed

4    in the Debtors' motion papers.

5            The courts are divided over whether a forfeiture

6    claim with respect to substitute assets has that level of

7    status, at least in the Second Circuit, and there's a

8    division in the case law throughout the country.  And the

9    Second Circuit has specifically not addressed that issue, as

10   noted in United States v. Egan, 654 Fed. App'x 520 n.1 (2d

11   Cir. July 8, 2016).

12           Of course, in determining a settlement, the

13   bankruptcy judge doesn't have to know the answer to a

14   question like that where there are substantial grounds for

15   dispute.  The judge really needs to understand the issue and

16   decide whether the settlement is fair in the light of the

17   issue.  See, for example, the discussion in Ad Hoc Adelphia

18   Trade Claims Committee v. Adelphia Communications Corp., 337

19   B.R. 475, 477, 378 (S.D.N.Y. 2006), aff'd, 224 Fed. App'x 14

20   (2d Cir. 2006), where the Court was discussing an open issue

21   regarding the possible treatment of a government claim and

22   noted the government's negotiating leverage.  See also, for

23   example, In Re Residential Capital, LLC, 497 B.R. 720, 752

24   (Bankr. S.D.N.Y. 2013).

25           In addition to having a forfeiture claim that's

Page 231

1    being settled for substantially less than base amount of the

2    claim, the Federal Government also has substantial rights

3    inherent in its criminal enforcement power, including

4    precluding all of the debtors from continuing in business,

5    or effectively continuing in business, by cutting off access

6    to Medicare and Medicaid reimbursement, and the like.

7            So on the merits of the claims and the dispute

8    with respect to them, it appears clear to me that the

9    settlement satisfies the first and second Iridium factors.

10   Clearly the counsel that negotiated this settlement is

11   highly experienced in this area.  And the settlement also

12   appears to me to be the product of arms-length bargaining.

13   And that has not been challenged in a meaningful way.

14           It has been suggested -- and I have no reason to

15   doubt it -- by one of the objectors that the DOJ did not

16   meet with individual victims, or at least the objector

17   individual victims of the alleged misconduct while

18   negotiating a settlement.  But as I noted during oral

19   argument, my review is not one of the DOJ's conduct, but

20   rather the fairness and reasonableness and equitable nature

21   of the settlement from the perspective of the Debtors, their

22   estates, and other parties in interest in these cases.

23           As far as the factor of the interest of creditors

24   is concerned, clearly, not all parties in interest support

25   this settlement.  There are currently two objections to the

Page 232

1   settlement by parties in interest in the case.  First, an

2   objection by the so-called non-consenting states, and that

3   is obviously a significant group of 25 states representing a

4   substantial portion of the U.S. population, as well as a

5   relatively small group, but nevertheless an objecting group,

6   of individual claimants.

7          One objection to the settlement has been resolved,

8   and importantly resolved by clarifying language in the order

9   that I've already mentioned, that resolves that objector's

10  concerns.  And they were somewhat legitimate concerns over

11  whether the settlement, as drafted, either improperly

12  treated the Federal Government's claims as allowed claims or

13  did so in a way that precluded the confirmation of a plan

14  that would provide for different treatment.

15         As I noted, at this time it's crystal clear, and

16  as provided for in the order, that although the settlement

17  agreement provides for an allowed superpriority claim for

18  the forfeiture claim, that claim is not allowed until after

19  a plan is confirmed in the case.

20         Secondly, the order makes it crystal clear that if

21  the settlement is rescinded, the right to not have the stay

22  in the bankruptcy case apply is confined essentially to

23  Section 362(b)(4).  It does not apply to monetary

24  enforcement, for example, but simply to liquidating a

25  judgment, consistent with 362(b)(4).

Page 233

1          The objecting parties are not objecting as to the

2     amount of the agreed upon claim, but rather assert that the

3     settlement's provision that provides that the government has

4     the option to rescind the agreement if a plan is confirmed

5     that does not include a public benefit company structure, or

6     similar structure in it, or alternatively, the risk that if

7     it doesn't rescind the settlement it will then have a $2

8     billion superpriority claim, warrants the denial of the

9     settlement.

10          The Unsecured Creditors' Committee has argued that

11     rather than denying the settlement, the hearing should be

12     adjourned until the parties can better negotiate the terms

13     of what that provision means, i.e., what an acceptable

14     public benefit corporation or similar exit structure would

15     be before the issue is further joined.  Of course, the non-

16     consenting states recommend such an adjournment too, but

17     state that if there is no such adjournment, the motion

18     should be denied, which the Creditors' Committee does not

19     assert.

20          The argument for denial of the motion is really

21     twofold.  First, the objectors argue that this term, which I

22     have described, turns this settlement into the rare and

23     extraordinary instance where the settlement is not just a

24     settlement, but is also a so-called sub rosa plan, or it has

25     sufficient features of a plan that it should not be approved

Page 234

1    without going to the plan confirmation process.

2           I have also considered whether the rights of

3    either the Federal Government, on the one hand, to rescind

4    the settlement, or the rights of the non-consenting states

5    in their Phase 1 mediation settlements with the non-public

6    entities to rescind those agreements regarding allocation,

7    in the event that the treatment of the Federal Government's

8    claims in this case are not reasonably satisfactory, also

9    would argue under the business judgment standard that the

10   settlement should not be approved, i.e., that the settlement

11   would create such uncertainty regarding those important

12   issues in the case that the merits of the settlement are

13   outweighed by the additional uncertainty created on the

14   settlement.

15          I considered both of those possible arguments to

16   deny the motion carefully.  Let me deal first with the so-

17   called sub rosa plan argument.

18          The sub rosa doctrine is one that is case law-

19   driven ultimately, recognizing the differences between a

20   Chapter 11 plan on the one hand, and an action taken out of

21   the ordinary course, including a settlement, on the other.

22   And again, as noted by Bankruptcy Judge Gropper and then

23   affirmed by Judge Berman, and then ultimately by the Second

24   Circuit, "In extreme circumstances, courts have refused to

25   approve settlements or other transactions by a debtor, such

Page 235

1   as the sale of all or substantially all assets, without the

2   benefit of a confirmed plan or court-approved disclosure

3   statement and without an adequate business justification."

4   That's at Page 163 of 342 B.R. 158.

5           Judge Gropper then goes on to say at Page 164, "On

6   the other hand, courts have approved even large and

7   important settlements prior to confirmation of the plan,

8   notwithstanding a sub rosa plan objection, where the

9   settlement did not dispose of all of the debtor's assets,

10  restrict creditors' rights to vote as they deemed it on a

11  plan of reorganization, or dictate the terms of a plan of

12  reorganization."

13          In that case, although the Court approved a

14  settlement that allocated value to a certain set of

15  creditors at a certain priority level, which therefore

16  reduced other parties' rights to recover in a Chapter 11

17  case, the Court found that the transaction was not a sub

18  rosa plan, and indeed, even though the debtor would be

19  funding a replacement via the health insurance plan, it was

20  a proper exercise of business judgment because, as Judge

21  Gropper put it, and it was picked up on by the District

22  Court affirmant, the debtor was actually getting rid of a

23  white elephant, i.e., dealing with an important business

24  problem in a reasonable and fair way that did not reflect

25  the terms of a Chapter 11 plan.

Page 236

1          The cases where a sub rosa plan argument has

2     succeeded are actually quite limited, as opposed to courts

3     having to consider whether those cases or that doctrine

4     applies to the facts before them.  It was raised and applied

5     recently in two cases by my colleagues, which I believe are

6     quite distinguishable.

7          First in In Re Miami Metals I, Inc., 603 B.R. 531

8     (Bankr. S.D.N.Y. 2019), actually, Judge Lane found that a

9     proposed settlement that would dictate how sale proceeds

10    would be allocated, including going so far as to potentially

11    use non-estate property to pay estate claims, ran afoul of

12    the sub rosa plan rule, and obviously, that's the

13    appropriate result.  The non-estate claimants were simply

14    not at the table and the settlement was being negotiated on

15    their backs.

16         The settlement also required a specific vote.  I'm

17    sorry.  The settlement, although contemplated a subsequent

18    plan, locked in the burdens of the settlement before that

19    confirmation.  So the benefits only came thereafter.  Again,

20    not an issue here, particularly as clarified by the proposed

21    order.

22         Next, Judge Garrity, in In Re Latam, L-A-T-A-M,

23    Airlines Group S.A., 2020 Bankr. LEXIS 2405 (Bankr. S.D.N.Y.

24    Sept. 10, 2020), refused to approve a debtor-in-possession

25    financing, again because, among other things, it violated

Page 237

1    the sub rosa plan rule or principle, noting that the

2    absolute priority policy of Section 1129 of the Bankruptcy

3    Code, which governs confirmation of plans, was implicated by

4    the proposed transaction of allocating upfront an option by

5    the debtor, which was controlled by the party to the other

6    side of the transaction, to provide shares in the

7    reorganized company at a 20 percent discount to plan value

8    to the DIP lenders.  Again, a clear plan-like term.

9          In addition, unlike here, that term was built in,

10   as there was a finding requested that that 20 percent

11   discount was fair and fixed.  Therefore, the Court was

12   precluded from reviewing it in the context of a confirmation

13   request, which, as noted, was months away, at least, if not

14   longer.  So, therefore, the facts could easily change.

15         And finally, that transaction provided that only

16   the debtor plan had that option, and the failure to have

17   that option in such plan would constitute an event of

18   default under the DIP loan.

19         Whether all of those provisions added up to a sub

20   rosa plan or only some of them is not entirely clear from

21   the opinion.  But it is clear that that insider transaction

22   raised serious concerns in the Court's mind as to whether it

23   crossed the line to actually fixing the terms of a Chapter

24   11 plan in stone.

25         I will also note that the Miami Metals case

Page 238

1    considered a related plan support agreement to the

2    settlement, where the terms of the proposed plan appeared to

3    Judge Lane to raise important confirmation issues.  And he

4    did not view that problem in the context of a sub rosa plan

5    argument, but rather in the context of a business judgment

6    benefit of the estate argument, i.e., if the benefits of the

7    settlement were only obtainable upon plan confirmation of a

8    plan that on its face did not appear to be necessarily or

9    easily confirmable, he was not going to approve it.

10          The Braniff Airlines case, In Re Braniff Airways,

11    Inc., 700 F.2d 935 (5th Cir. 1983), also is one of few

12    occasions where a court denied a proposed transaction on the

13    sub rosa plan theory.  But again, under those facts, the

14    plan -- I'm sorry -- the proposed sale transaction did far

15    more than sell substantially all of the assets of the

16    business.  It also dictated how the sale proceeds would be

17    divided among the creditors and required a specific vote by

18    secured creditors on their deficiency claim.

19          In contrast, in addition to the Tower Auto case

20    that I've already cited, numerous courts have approved

21    transactions or settlements that had a major effect on

22    reducing the options available to creditors with regard to

23    what type of reorganization they would have.  And as noted

24    by Judge Garrity in Latam Airlines Group case, it's well-

25    established in this circuit, since the Lionel decision, that

Page 239

1   if there is a good business reason to sell an asset that

2   comprises substantially debtor's estate, it can be done.

3   That is not a sub rosa plan.  Although it does curtail the

4   options available, because at that point, one is talking

5   about allocating cash or other sale consideration, as

6   opposed to stock in a reorganized entity.

7          More on point even that that here -- and I'll say

8   that's on point, because one of the -- in fact, the only sub

9   rosa plan argument that the objectors make is that the

10  settlement may preclude -- or not even preclude -- it

11  doesn't actually mandate, but it may effectively lead

12  parties to negotiate a plan that contemplates a standalone

13  public benefit, or similar type of immanent vehicle, as

14  opposed to a sale -- a flip side of Lionel and its progeny -

15  - but again, restricting that type of choice, as determined

16  by the Second Circuit, as noted by multiple cases going back

17  to Lionel and discussed specifically in Tower Auto and in

18  Latam, is not approving a sub rosa plan.

19         In addition, there are at least two cases that

20  have addressed the sub rosa plan issue in detail, flowing

21  from the Southern District of New York, where there were

22  government claims settled, where the proceeds were allocated

23  one way under one set of potential future transactions or

24  another way under other potential future transactions, and

25  where the government settlement would be going to a

Page 240

1    restitution fund to equity holders as a credit, and the

2    Court nevertheless found that that settlement was not a sub

3    rosa plan.  The first being In Re Adelphia Communications

4    Corp., which I've already cited, culminating in the

5    affirmance of 224 Fed. App'x 14 (2d Cir. 2006), but

6    beginning with 327 B.R. 143 (Bankr. S.D.N.Y. 2005) and the

7    affirmance at 337 B.R. 475, and with the discussion at 477-

8    78.

9         In addition, Judge Cote addressed the sub rosa

10   plan argument in DeBenedictis v. Truesdale, In Re Global

11   Vision Products, 209 U.S. Dist. LEXIS 64213.  In that

12   settlement, the Chapter 11 trustee agreed to a settlement,

13   which was a settlement with a class holding false

14   advertising claims.  The settlement barred the debtor's

15   future sale of concededly viable products, as found

16   previously by an examiner that I appointed, in deference to

17   the claimant's views that although the examiner found that

18   those products, if properly marketed, would not violate

19   applicable law or regulation.  There was too much risk of

20   future improper selling to warrant ongoing sales.

21        The settlement also set up a mechanism for

22   pursuing futuristic claims whereby the claims were assigned

23   to the settlement class, which in turn agreed to subordinate

24   50 percent of its recovery to non-insider creditors under a

25   sharing formula thereafter.

Page 241

1          At the trial level, I considered, and Judge Cote

2     considered at the appellate level, an objection that said

3     that that structure violated the sub rosa plan rule, citing,

4     among other cases, In Re Lionel Corp., 722 F.2d 1063, 1071

5     (2d Cir. 1993), and noting that the settlement effectively

6     put in motion the terms of a liquidation, as opposed to a

7     going concern reorganization that was centered around future

8     litigation.

9          The Court held, "The Court finds no similarity

10    between the sub rosa plan in Braniff and the settlement

11    agreement.  The settlement agreement does not dictate the

12    terms of a future plan.  Rather, it provides for an

13    undertaking by the trustee to propose a type of plan.

14    Moreover, the settlement agreement does not prevent

15    creditors from proposing their own plans, as the objectant

16    has done.  In addition, the settlement agreement does not

17    restrict any rights afforded to creditors under the

18    Bankruptcy Code, such as the right to vote on a proposed

19    plan.  It binds only the parties to the agreement."

20         And again, lastly, it does not mandate the

21    subordination provided for in the agreement, which, as is

22    the case here, with regard to the allowance of the claims,

23    only comes into play when a plan providing for such

24    subordination is confirmed.  That distinction is made, as

25    the Debtors point out in numerous cases, both in the Second

Page 242

1    Circuit and elsewhere, including in the District Court

2    opinion in Empire Generating cited in the parties' briefs.

3           It's just simply not the case that a major

4    resolution in the case which limits people's options going

5    forward, but does not (indiscernible) their rights after the

6    vote on a plan constitutes a sub rosa plan.  See also In Re

7    Nortel Networks, Inc., 522 B.R. 491, 408-09 (Bankr. D. Del.

8    2014), and in the underlying decision in Iridium that I

9    previously cited.

10          So it is clear to me that this settlement is not a

11   sub rosa plan, at least as arguably modified, or at least

12   clarified in the proposed confirmation order.  That does

13   raise finally, again, or lead to the other potential basis

14   for the objection and the basis for the Creditors'

15   Committee's request to adjourn the hearing for further

16   clarification and negotiation among the parties regarding

17   the meaning of the settlement's reference to a public

18   benefit corporation, or other similar structure.

19          Obviously, if a settlement settling one set of

20   problems opens up a set of other problems that outweighs the

21   terms of the settlement, it shouldn't be approved.  That was

22   really what was going on in In Re Miami Metals I, Inc., 603

23   B.R. 531 (Bankr. S.D.N.Y. 2019).

24          This settlement does not resolve all potential

25   related concerns that it raises, even as modified in the

Page 243

1    proposed agreed form of order.  It still leaves open the

2    issue as to whether on the one hand, the Federal Government

3    really would exercise its rescission right and revive the

4    settlement of the claims that would be resolved by the

5    settlement, which I think all parties agree is a settlement

6    that is very much in the estate's and their favor, if a plan

7    with a public benefit corporation or similar goal or

8    structure is not confirmed.

9           Or alternatively, there is an open issue as to

10   whether, A, the non-consenting states would exercise their

11   right under the agreements that they had negotiated as part

12   of Phase 1 mediation to rescind those agreements, if the

13   treatment of the Federal Government's claims in this case is

14   not reasonably satisfactory to them.

15          And there is a second level issue as to whether in

16   litigation over such a potential rescission, it would be a

17   reasonable action under the terms of the allocation

18   settlements to take such a position.

19          I recognize that the use of the phrase "public

20   benefit corporation", or similar structure, is vague.  The

21   tales of such an exit structure are not articulated in the

22   settlement and have not been articulated at the hearing

23   today.  On the other hand, it is also clear to me that there

24   is some benefit to that vagueness in that it creates a fair

25   amount of flexibility on the parties' part to negotiate an

Page 244

1    exit structure, as that would be reasonably acceptable to

2    all parties, and not create the issues that I've just

3    described.

4              Ideally, a court would want the parties to

5    negotiate that issue in advance before such a settlement is

6    approved.  And I take seriously the non-consenting states'

7    statement that they are prepared to do that, and that they

8    have an open mind as to structures that might fit within

9    that vague several word concept in the DOJ settlement

10   agreement.

11             I actually had some concern whether they did have

12   an open mind, which is why I engaged in a lengthy colloquy

13   with Mr. Troop, their counsel, during oral argument.  It

14   appears to me that they do, and I believe that that is

15   appropriate, given the fact that, as Mr. Huebner so well put

16   it, there is no way, given that most of the revenue and

17   value of these Debtors comes from OxyContin, that one can

18   divorce payment in one form or another by these Debtors to

19   alleviate, remediate and abate the opioid crisis without

20   using that value in one form or another.

21             As noted in the recent history that I quoted

22   during oral argument, David Herzberg, " White Market Drugs:

23   Big Pharma and the Hidden History of Addiction in America",

24   University of Chicago Press, 2020, there has always been a

25   tension in how United States treated legal drugs, i.e.,

Page 245

1    drugs that, if used properly, have a beneficial effect on

2    people, but if used improperly, cause great harm.

3           Generally speaking, we have followed a regulation

4    model, but there are problems with that model.  There are

5    conflicts, however one determines to realize value from

6    these Debtors, or potential conflicts, that is, to abate the

7    opioid crisis.  If one sells the business, there is a

8    potential for the buyer who wants to, obviously, make money

9    out of that process to abuse the existing regulations.

10          There is a potential for conflict of interest if

11   you simply tax the profits, because of course, you want

12   higher taxes and, therefore, higher profits, and therefore,

13   greed enters into the picture, and potentially leads to

14   misuse, just as greed potentially and has historically led

15   to misuse with regard to white market drugs throughout

16   history in the United States.

17          And there is a potential conflict that even when

18   one is merely the beneficiary of a trust, or a not-for-

19   profit corporation, or a public interest corporation, that

20   one could be accused in the press of being somehow

21   responsible for some future misuse, albeit that one has done

22   as much as one can in setting up a structure that ensures

23   beyond regulation that such misuse will not occur.

24          So, I'm glad there's an open mind and I believe

25   there should be, given that none of the alternatives is in

Page 246

1    any way perfect.

2         Should I defer so that the matter can be discussed

3    further as to how a structure can be set up that minimizes

4    the conflicts and the risks of misuse going forward?  There

5    is a countervailing consideration beyond the important

6    consideration of continuing momentum towards a confirmable

7    plan in this case, and that is a concern that with regard to

8    the criminal aspect of the claims asserted by the

9    government, unlike the civil claims, the government

10   apparently has discretion to change its mind and seek a far

11   higher or different criminal remedy.  That would be a big

12   problem in this case.

13        I don't think the government will do that, but the

14   risk to the Debtors' estates, even if that probability is

15   low, is nevertheless very high, given the benefits of this

16   settlement, which frankly, again, results in both guilty

17   pleas and agreed facts, and almost 90 percent of the

18   forfeiture amount going as a credit to the non-federal

19   public entities to directly abate the opioid crisis under

20   the government's wonderfully titled "No Piling-On" doctrine.

21        I'm not prepared to take that risk.  I also say

22   that because I believe that the risk of either the non-

23   consenting states exercising their rescission right that

24   I've already discussed, or the government acting contrary to

25   a reasonable proposal that would have the so-called non-

Page 247

1    consenting states' support for an exit structure, I believe

2    is far lower, since both entities, which after all have the

3    public interest as their guiding imperative, share an

4    interest in resolving the opioid crisis, and using the

5    Debtors' resources to the maximum to do that.

6           I trust, therefore, that they will act reasonably

7    and actually go forward and negotiate a plan that has an

8    appropriate exit structure, that puts the value of these

9    Debtors' to maximum use for abatement purposes, with proper

10   review and oversight, not by the states as owners, but by

11   people who can be trusted to do so with proper corporate and

12   trust governance procedures to ensure that they and their

13   successors do so, and with suitable flexibility if a

14   transaction that also furthers and actually improves upon

15   devoting the Debtors' resources to abating the opiate crisis

16   seems worth pursuing.

17          And weighing the perspective risks, it appears to

18   me to be the case that knowing what would be reasonable

19   behavior here argues that this settlement should be approved

20   now, knowing that the parties will, in fact, negotiate in

21   good faith going forward, as to not only the exit structure,

22   but also the remaining issue, fundamental issue in this

23   case, which is any settlement with the Sackler family

24   members.  I guess I will close by focusing on that point.

25          I view as an extremely important development in

Page 248

1   this case not only Purdue's guilty plea to the felonies

2   outlined in the settlement agreement, but also Purdue's

3   agreement to the stated facts attached as the addendum to

4   the agreement.

5          In addition, although as I've noted earlier today

6   the separate DOJ Sackler family settlement is not one that I

7   have jurisdiction over to approve under Rule 9019 of the

8   Bankruptcy Code and the case law that I've already

9   described, that settlement too has an extremely important

10  addendum of agreed facts.

11         With those two documents, it would seem to me that

12  as far as potential liabilities issues are concerned, the

13  parties have enough to negotiate the third-party release

14  claims now.  I also believe, based on the agreement that was

15  announced today, at the beginning of this very long day,

16  that the Debtors and the Committee and non-consenting states

17  have resolved the remaining privilege issues asserted by the

18  Debtors, that the settlement of the estate claims against

19  the Sacklers can be resolved now or in the imminent future.

20         There is every reason for the parties to focus

21  over the next months on both sets of issues pertaining to

22  the Sacklers and the emergent structure issues and reach an

23  agreement.  You have it at your command and you can do it,

24  and you need to do it.  If you are not able to do it with

25  the help of some of the best, two the best mediators in the

Page 249

1    country, then you'll never do it, and I will move on to

2    considering other alternatives in this case.

3              I agree with, I believe, all the parties here,

4    certainly the Creditors' Committee and the Debtors and the

5    roughly 60,000 personal injury claimants, but I think all of

6    the 48 states governmental entities have this view, that the

7    DOJ settlement is a critical building block in this case.

8    It has enough flexibility in it so you can negotiate the

9    remaining open issue as to the exit structure.

10             And I know now that you will not do that on a

11   simplistic basis, but take into account the fact that there

12   is no completely conflict-free resolution here with any exit

13   approach.  Anyone who thinks contrary either isn't thinking

14   straight or is just engaging in rhetoric, and this is not

15   the time for that, if there ever is such a time.  And I know

16   now that that's not how the non-consenting states are

17   thinking.  They appreciate these issues.  They told me that.

18   So please, get it done.

19             The mediators have not asked me to impose a

20   deadline, nor has anyone else except Mr. Shore.  But again,

21   it's my view -- and this is consistent with what we've been

22   discussing throughout the last several months -- that these

23   three issues can and should all be resolved over the next 30

24   days.  We'll discuss it at the next omnibus hearing.  Of

25   course, I'm not privy to your mediations, but again, now is

Page 250

```
 1    the time, as the jazz song says, to please go and do it.

 2              So, I will ask Mr. Huebner to email the final

 3    revised proposed order granting the motion to chambers.  You

 4    should cc anyone who filed a pleading on this motion with a

 5    copy, as well as the U.S. Trustee and the so-called

 6    consenting and multigovernmental entity group's counsel.

 7              MR. UZZI:  Your Honor, it's Gerard Uzzi.  May I

 8    just be heard, just for a moment?

 9              THE COURT:  Okay.

10              MR. UZZI:  Your Honor, you just said something in

11    your ruling which we appreciate a great deal, and obviously,

12    are listening very carefully.  But I just want to make sure

13    there's no confusion in the record.  I think you said that

14    in connection with the Sackler family's settlement with the

15    DOJ there was an agreed statement of facts.  That is not the

16    case.  Those are allegations that are disputed much like

17    factual allegations in a complaint.  I just don't want the

18    record to be confused on that point, Your Honor.

19              THE COURT:  Okay.  That is fair.  I got that

20    wrong.  But you do have --

21              MR. UZZI:  Thank you, Your Honor.

22              THE COURT:  -- a very clear statement of facts by

23    Purdue, and you have very clear allegations from the Federal

24    Government, after a lengthy investigation that resulted in a

25    settlement.  To me, it's enough to negotiate a settlement of
```

1    the non-estate claims.  I trust, at this point, or certainly

2    in the very  near future, there will be sufficient

3    information to negotiate the estate claims too during the

4    time period that I'd referenced.

5              MR. UZZI:  Thank you, Your Honor.

6              THE COURT:  Okay.  All right.

7              MR. TROOP:  Your Honor, as long as we're clearing

8    things up, and I could be wrong, but on the Purdue

9    settlement, I actually think that there are two documents

10   that are attached.  One includes certain admitted facts, and

11   others include only alleged facts.

12             THE COURT:  Right.  I'm just focusing on the

13   admitted addendum --

14             MR. TROOP:  Thank you, Your Honor.

15             THE COURT:  -- of the admitted facts.  And again -

16   -

17             MR. HUEBNER:  Your Honor --

18             THE COURT.  I mean, I don't know what else you

19   need.  I really don't.

20             MR. HUEBNER:  Your Honor, on behalf of the

21   Debtors, let me say thank you, and thank you to everybody

22   for the patience of staying on for seven and a half hours.

23   We will get the order sent out exactly as the Court noticed.

24   It will be in the form of Word that was filed earlier today.

25   I think the parties already have it because it's on the

Page 252

1    docket.  But for the avoidance of doubt, we'll re-attach it

2    when we send it to chambers.  I'm sure that Mr. Brooks -- my

3    copy of "White Market Drugs" is already on the way.  I'm

4    guessing others have ordered it as well.  And we will try to

5    be guided by all the wisdom, open-mindedness, flexibility

6    and creativity that I think we can possibly muster.  Because

7    at the end of the day -- I'll say it one last time -- I

8    genuinely, deeply believe we all have the exact same goals,

9    every party in this case.  And the question is just how can

10   we figure out how to best and most expeditiously achieve

11   them.

12            THE COURT:  Okay.  All right.  I want to be clear.

13   I'm not endorsing everything the author of that book says.

14   But it's interesting.  I mean, he actually says the

15   government should own these companies.  I guess --

16            MR. HUEBNER:  Well, then Mr. Troop will probably

17   be buying a copy of that.

18            THE COURT:  Yes.  But, of course, the government

19   is in the healthcare business to some extent and it can't

20   get away from it.  So --

21            MR. HUEBNER:  Yep, understand.  And again, thank

22   you one last time, Your Honor (indiscernible).

23            THE COURT:  Okay.

24            MR. TROOP:  Mr. Troop always likes a good read.

25   My real question is whether Mr. Eckstein's hand is tire from

Page 253

1    having been up for the last five hours.

2               MR. HUEBNER:  Fair enough.

3               MR. ECKSTEIN:  Just electronically.

4               THE COURT:  All right.  Thank you, all, very much.

5    ALL:  Thank you.

6

7               (Whereupon these proceedings were concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 254

1          C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  November 19, 2020