Gerard Uzzi
Alexander B. Lees
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Gregory P. Joseph
Mara Leventhal
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Facsimile: (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>Debtors. [1] | Chapter 11<br>Case No. 19-23649 (RDD)<br>Jointly Administered |

**THE RAYMOND SACKLER FAMILY'S SURREPLY IN FURTHER SUPPORT OF ITS
OPPOSITION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
EXCEPTIONS MOTION**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. ("**PPI**") (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................... iii

PRELIMINARY STATEMENT ...................................................1

I.   THERE IS NO EVIDENCE THAT ANY CHALLENGED COMMUNICATION
     WAS MADE IN FURTHERANCE OF A CRIME OR FRAUD .................................5

II.  PPLP'S PLEA DOES NOT CURE THE UCC'S FAILURE TO ESTABLISH
     PROBABLE CAUSE OF A CRIME OR A FRAUD BY ANY SACKLER FAMILY MEMBER ......7

     A.   There Is No Evidence Linking The Sacklers To PPLP's ADD Misconduct ........8

     B.   Board Knowledge Of Purdue's Pled-To Misconduct Cannot Be Inferred
          From Generalized Allegations Of "Micromanagement" ...................................11

     C.   Invocation Of The Fifth Amendment By Purdue Executives—On Whom The
          Board Relied—Does Not Support An Adverse Inference Against The Board...14

III. THE ADDENDUM A ALLEGATIONS, EVEN IF CREDITED, DO NOT ESTABLISH
     PROBABLE CAUSE OF A CRIME OR FRAUD BY THE FORMER DIRECTORS ...................15

     A.   Purdue Addendum A vs. Sackler Addendum A .................................15

     B.   No Evidence The Board Knew Or Should Have Known Of The Crimes ..........17

          1.   The Board Understood Purdue Was Addressing Abuse And Diversion
               Through Rigorous Compliance And Launching ADF OxyContin ............17

          2.   The Directors Understood That McKinsey's Advice And
               Purdue's Marketing Were Directed At The Legitimate Market ...............19

          3.   The UCC And NCSG Present No Evidence That Purdue's Marketing
               Was Deceptive ..........................................................22

          4.   The E2E Program Shows No Wrongdoing By The Directors ..................22

               a.   E2E Was A Management Project .....................................22

               b.   The Board's Limited E2E Guidance Included An Instruction
                    Not Just To Increase Sales But To Help HCPs And Patients ...........23

               c.   The Board Understood that E2E Built In Compliance ....................24

i

5.    The UCC And NCSG's Other Arguments About E2E Are Meritless .......24

6.    The Board Was Statutorily Entitled To Rely On McKinsey's And
Management's Advice ...............................................................................28

IV.    NEITHER THE ADDENDA NOR THE UCC'S BELATED ADDITIONAL EXHIBITS
ESTABLISH PROBABLE CAUSE OF INTENTIONAL FRAUDULENT TRANSFERS .................28

A.    The Undisputed Evidence Shows There Was No Significant Litigation
Between 2008 And 2017 And That None Was Expected...................................29

B.    The Sacklers' Words And Actions Confirm They Had No Fraudulent Intent ...29

C.    The Evidence Shows That The Sacklers Had No Reason To Anticipate
Significant Litigation When The Distributions Were Approved.......................33

V.    THE NCSG'S NEW ARGUMENTS HAVE NOTHING TO DO WITH THE CRIME-FRAUD
ISSUES PRESENTED ON THIS MOTION ........................................................................39

VI.    THERE IS NO BASIS TO BURDEN THE COURT WITH AN *IN CAMERA* REVIEW...............40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amusement Indus., Inc. v. Stern*,
   293 F.R.D. 420 (S.D.N.Y. 2013) .............................................................................7 n.13

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ...........................................................................................40 n.97

*Cendant Corp. v. Shelton*,
   246 F.R.D. 401 (D. Conn. 2007) .........................................................................6 n.12

*Commonwealth v. Purdue Pharma LP*,
   2019 WL 5617817 (Mass. Super. Ct. Oct. 8, 2019) ..................................................39 n.95

*Drummond Co. v. Conrad & Scherer, LLP*,
   885 F.3d 1324 (11th Cir. 2018) ...........................................................................7 n.13

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996)...................................................... 3 & n.9, 4 & n.10

*In re Gen. Motors LLC Ignition Switch Litig.*,
   2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015) ....................................................................7

*In re Handy & Harman Ref. Grp., Inc.*,
   266 B.R. 32 (Bankr. D. Conn. 2001) ............................................................ 14 nn.27-28

*In re infoUSA, Inc. S'holders Litig.*,
   953 A.2d 963 (Del. Ch. 2007)...........................................................................11 n.25

*In re N.Y.C. Asbestos Litig.*,
   109 A.D.3d 7 (1st Dep't 2013) ............................................................................6 n.11

*In re Richard Roe, Inc.*,
   68 F.3d 38 (2d Cir. 1995).....................................................................1 n.3, 5, 6 n.12, 7

*In re SAIC Inc. Derivative Litig.*,
   948 F.Supp.2d 366 (S.D.N.Y.2013),
   *aff'd sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014)........................4 n.10

*In re WorldCom, Inc.*,
   377 B.R. 77 (Bankr. S.D.N.Y. 2007) ......................................................................14 n.28

*Lazar v. Mauney*,
    192 F.R.D. 324 (N.D. Ga. 2000)................................................................ 41-42

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997)............................................................ 14 nn.27-28

*MacNamara v. City of New York*,
    2008 WL 186181 (S.D.N.Y. Jan. 18, 2008) .................................................7 n.13

*Marchand v. Barnhill*,
    212 A.3d 805 (Del. 2019) .......................................................................4

*Mercier v. Inter-Tel (Del.), Inc.*,
    929 A.2d 786 (Del. Ch. 2007)...............................................................16 n.32

*Mindspirit, LLC v. Evalueserve Ltd.*,
    2020 WL 3640235 (S.D.N.Y. July 4, 2020) .................................................3 n.7

*Rosebud Sioux Tribe v. A&P Steel, Inc.*,
    733 F.2d 509 (8th Cir. 1984) ...............................................................14 n.28

*Samaritan Inns v. District of Columbia*,
    1995 WL 405710 (D.D.C. June 30, 1995) ..................................................16 n.32

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011).........................................................................27 n.61

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997),
    *abrogated in part on other grounds by*
    *Loughrin v. United States*, 134 S. Ct. 2384 (2014)........................................1 n.2, 5, 6 n.12

*United States v. Stewart*,
    2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003) .............................................6 n.12

*United States v. White*,
    887 F.2d 267 (D.C. Cir. 1989) ..............................................................6 n.12

*United States v. Zolin*,
    491 U.S. 554 (1989)..........................................................................41

## Rules & Statutes

Fed. R. Evid. 408 ..................................................................................2

N.Y. Bus. Corp. Law § 717(a) ...................................................................28

iv

## PRELIMINARY STATEMENT[1]

Despite introducing a thousand pages of new exhibits, the UCC does not even attempt to cure a fundamental defect in its crime-fraud argument—it points to no evidence that any of the challenged attorney-client "communications … actually have been made with an intent to further an unlawful act."[2]  That, alone, compels denial of this motion.

Nor has the UCC satisfied its burden to establish "probable cause to believe that a crime or fraud has been attempted or committed" by the Sacklers.[3]  The UCC points to Purdue's recent guilty plea ("**2020 Plea**"), distorts what Purdue actually admitted, and ignores that the former Board is not implicated in any admitted misconduct.

Purdue both pled guilty to crimes and entered into a civil settlement.  Purdue's civil settlement, like the Sacklers', included an Addendum A—a list of allegations that Purdue denied, except to the extent that Purdue admitted certain facts in connection with its guilty plea.[4]  The only facts that Purdue admitted are contained in Schedule A to its guilty plea.[5]  These admissions are quite limited and do not involve the former Directors.  Purdue admitted to:

- Fraud on the Drug Enforcement Agency ("**DEA**") and aiding and abetting prescribers in dispensing prescription drugs without a legitimate medical purpose (Count One).  Preis Ex. 182 at 15-17.

---

[1]    This Surreply uses the abbreviations used in Side B's Opposition ("**Side B Opp.**") to the UCC's Exceptions Motion.  "**RX**" refers to the exhibits to the accompanying Declaration of Mara Leventhal.  "**UCC Reply**" and "**Preis Ex.**" refer to the UCC's Reply in Support of its Exceptions Motion and the exhibits annexed to the accompanying Arik Preis Declaration.  "**NCSG Reply**" and "**Feiner Ex.**" refer to the NCSG's Statement in support of the UCC's Exceptions Motion and the accompanying exhibits.  Emphasis is added to and internal quotation and citations are omitted from quoted material in this brief, unless otherwise indicated.

[2]    *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated in part on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014).

[3]    *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("***Roe I***").

[4]    Preis Ex. 182A; *see id.* at Recital II(K).

[5]    Preis Ex. 182 at 15-18.

- Payments to two healthcare providers ("**HCPs**") in violation of the Anti-Kickback Statute (Count Two).  *Id.* at 17.

- Payments to Practice Fusion in violation of the Anti-Kickback Statute (Count Three). *Id*. at 17-18.

None of this misconduct is alleged against the former Directors in Sackler Addendum A (RX 68).  The DEA and Practice Fusion are unmentioned in Sackler Addendum A.  So, too, are the Key Opinion Leader, speaker program and all of the other kickback allegations involving HCPs that are contained both in Purdue Schedule A (Preis Ex. 182 at 15, 17) and in Purdue Addendum A (Preis Ex. 182B at Addendum A ¶¶6-9, 176, 182, 187, 191, 212).  Nothing in Purdue Schedule A, Purdue Addendum A or Sackler Addendum A even suggests that the former Directors were aware of the misconduct Purdue pled to.

The UCC relies on denied allegations in Sackler Addendum A, which are inadmissible under Fed. R. Evid. 408 because the UCC offers them "to prove ... the validity ... of a disputed claim."  But even if considered, the fundamental premise of Sackler Addendum A is provably false.  Sackler Addendum A ¶3 alleges that, "[a]lthough the Named Sacklers knew that the legitimate market for Purdue's opioids had contracted, the Named Sacklers nevertheless requested that Purdue executives recapture lost sales and increase Purdue's share of the opioid market."  (RX 68).  The theory is that the Board was thus encouraging management to pursue sales in the illegitimate market.  (*Id*. ¶4).  That is clearly false.  As shown at pp. 19-21, *infra*, the Board relied on extensive data showing there was a huge, multibillion-dollar legitimate market occupied by competitors that Purdue was pursuing.  The Board's focus on increasing sales of FDA-approved products at the expense of competitors—on the understanding it was being done in compliance with law—was perfectly appropriate.

Notably, the allegations in Sackler Addendum A reject the UCC's thesis that the Sacklers were involved in Purdue marketing misconduct between 2007 and 2012.  While Purdue's

2

Addendum A alleges that Purdue engaged in marketing misconduct from 2010-18 (Preis Ex.

182B at Addendum A ¶¶4, 9, 25, 40-41, 45), Sackler Addendum A's marketing allegations

against the former Directors are limited to the period 2013-18 (RX 68 at Addendum A ¶¶4, 5,

23).  This tacitly acknowledges that (i) in the period from 2007-12, the Board was entitled to rely

on assurances from the OIG of HHS, and from management, that Purdue was operating in

compliance with law;[6] (ii) the marketing allegations against the former Directors are limited to

their crediting the advice of "a leading management consulting firm,"[7] McKinsey & Co.

("**McKinsey**"), which resulted in the Evolve to Excellence ("**E2E**") program;[8] and (iii) nothing

in Sackler Addendum A credits any of the theories of deceptive marketing advanced by the

States in the pre-petition litigation.

Nor does the 2020 Plea evidence any breach of fiduciary duty, let alone a breach

sufficient to support a crime-fraud motion.  The *Caremark* theory of recovery relied on by the

UCC "is possibly the most difficult theory in corporation law upon which a plaintiff might hope

to win a judgment."[9]  It is a breach of the duty of loyalty.  The UCC—conflating the duty of care

and the duty of loyalty—characterizes its fiduciary duty claim as a form of negligence.  UCC

---

[6]      The Board was told each year that the OIG confirmed that PPLP was operating in compliance with its Corporate Integrity Agreement (Side B Opp. 28-30 & nn.81-91).  The UCC points to fine print in OIG letters to Purdue stating that the OIG did not confirm the effectiveness of Purdue's compliance program.  *See* UCC Reply ¶24 & n.12.  But OIG's job was to confirm Purdue's compliance with the CIA, and it did that every year, in every letter to Purdue.  Board members received management's unqualified confirmation of CIA compliance by the OIG (Side B Opp. 28-30 & nn. 81-91).

[7]      *Mindspirit, LLC v. Evalueserve Ltd.*, 2020 WL 3640235, at *2 (S.D.N.Y. July 4, 2020).

[8]      The McKinsey/E2E allegations are infirm for the reasons stated in pp. 19-28, *infra*.

[9]      *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  We assume, for purposes of this brief only, that PPI's Board owed a *Caremark* duty of care to PPLP.

Reply ¶¶5, 26.  That is not enough to state a *Caremark* claim.  "Even a showing of gross negligence by a majority of the Board will not suffice."[10]

Under the Delaware Supreme Court's decision in *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019), to establish a board's breach of the *Caremark* duty, it is not sufficient to show that the company committed a crime.  "[E]ven when illegal or harmful company activities escaped detection," a party asserting such a breach must show that "the board failed to make the required good faith effort to put a reasonable compliance and reporting system in place."  *Id.* at 821.  The UCC must therefore show a "sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists."  *Caremark*, 698 A.2d at 971.  It has not.  Side B's extensive proof that the Board reasonably relied on (i) management to conscientiously implement the ADD Program and Purdue's other anti-diversion efforts and (ii) management's regular, repeated and documented assurances that Purdue was operating in compliance with law remains unrebutted.  *See* Side B Opp. 26-30; *infra* at pp. 8-11.  This vitiates any claim of fraudulent intent.

The UCC relies on misleading quotations from exhibits—almost all dating to 2006 to 2008—as supposed evidence of the Sackler family's belief that Purdue faced massive liability between 2008 and 2017.  The contemporaneous evidence previously submitted proves the opposite.  From 2008 to 2017, there was no indication that Purdue faced the prospect of massive, unmanageable litigation.  The Board was repeatedly assured that the opposite was true.  And far from trying to strip Purdue of its assets, Side B was interested in investing in Purdue.  The Board authorized Purdue to keep vast amounts of cash in its coffers every year—including more than ▮▮▮▮▮ each year from 2014 on.

---

[10]    *In re SAIC Inc. Derivative Litig.*, 948 F.Supp.2d 366, 381 (S.D.N.Y.2013) (dismissing *Caremark* claim), *aff'd sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014).

The UCC ultimately relies on the fact that Purdue made distributions itself as evidence that the distributions must have been fraudulent.  But the distributions, without more, are not probative of wrongdoing: paying out profits is what for-profit companies do.  The UCC has presented no evidence that there was a need to keep the distributions in Purdue.  It has identified no missed opportunities, no ways in which Purdue should have reinvested the money.  On the UCC's theory, Purdue should have had ███████ in cash sitting in its accounts, just in case it faced future liability.

The NCSG Reply does not advance any argument that bears on the instant motion and appears to be little more than press fodder.  The hodge-podge of documents comprising the NCSG's exhibits have nothing to do with any crime or fraud.

Without any pretense of an evidentiary showing, the UCC now claims that privileged documents prepared by Side B's current counsel in 2017—after distributions ceased and the avalanche of litigation had materialized—were in furtherance of a fraudulent scheme.  Arguing that opposing counsel's work product was in furtherance of a fraud that had occurred years earlier is a non sequitur.  Making such accusations sullies the accuser.

It is the UCC's burden to demonstrate both (1) "probable cause to believe that a crime or fraud has been attempted or committed" by the Sacklers and (2) that the communications "were in furtherance thereof."  *Roe I*, 68 F.3d at 40.  The UCC has failed to make either showing.

## I.    THERE IS NO EVIDENCE THAT ANY CHALLENGED COMMUNICATION WAS MADE IN FURTHERANCE OF A CRIME OR FRAUD

The Second Circuit has warned that, "[w]ith strong emphasis on intent, the crime-fraud exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal [or fraudulent] activity."  *Jacobs*, 117 F.3d at 88.  The UCC and the NCSG present no evidence whatsoever that

any of the challenged communications was made in furtherance of a crime or fraud. The crime-fraud motion therefore must be rejected on this ground alone.

The UCC asks this Court to permit it to shirk its burden of proof. First, it claims that "the evidence provides probable cause to conclude that the Board may have violated its duty of care, a negligence standard" (UCC Reply ¶26). No case supports this argument because it makes no sense. The UCC alleges an omission—a failure to exercise care—but cannot explain how any legal advice intentionally furthered such a breach.[11]

Second, the UCC contends that it need not show the documents were "in furtherance of" wrongdoing if they were "likely to be … closely related" to wrongdoing. UCC Reply ¶9. Closely-related is not the standard in the Second Circuit (even if it were, the UCC has not met it). In this Circuit, "a simple finding of relevance does not demonstrate a criminal or fraudulent purpose" and "does not trigger the exception."[12]

Third, the UCC argues that it may dispense with its burden to identify specific communications in furtherance of a crime because it does not have access to the privileged

---

[11]    UCC Reply (¶20) cites *In re N.Y.C. Asbestos Litig.*, 109 A.D.3d 7, 10 (1st Dep't 2013). This case did not involve a fiduciary breach and does not suggest that the exception could apply to an omission. It was a fraud case which ordered *in camera* review of communications with in-house counsel who was "intimately involved in supposedly objective scientific studies" about the cancer-causing effect of asbestos, where the defendant "den[ied] such participation." *Id.* at *8.

[12]    *Roe I*, 68 F.3d at 40-41; *Jacobs*, 117 F.3d at 88; *see also United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (Ruth Bader Ginsburg, J.) ("It does not suffice that the communications may be related to a crime."); *United States v. Stewart*, 2003 WL 23024461, at *2 (S.D.N.Y. Dec. 29, 2003) ("confidential communications must be in furtherance of the criminal or fraudulent conduct for the crime-fraud exception to apply. If the law were otherwise, every defendant accused of a crime ... would lose the protection of the attorney-client privilege with respect to prior statements to his lawyer concerning the same subject matter."). The UCC's reliance (UCC Reply ¶75) on *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), to argue that merely relevant communications are subject to the crime-fraud exception is misplaced. *Shelton* recognized the Second Circuit's holding "that the crime-fraud exception cannot be invoked simply because attorney-client communications have the potential to be relevant," and granted the motion because the "evidence ... suggests the *communications themselves* were intended in some way to facilitate or conceal fraudulent activity." *Id.* at 406-07.

communications.  UCC Reply ¶76.  This is always true when a movant seeks to compel

production under the crime-fraud exception.  It does not relieve the UCC of its burden to show

that the "particular communication" was "intended … to facilitate or to conceal" the crime or

fraud.  *Roe I*, 68 F.3d at 40-41.  The UCC Reply (¶76) does not explain what "significant date

range" or "other" information it deems suspect, or why, and its unsubstantiated assertions that

there may have been wrongdoing around the time of the challenged communications are

inadequate.[13]  As in *In re General Motors LLC Ignition Switch Litigation*:

> Plaintiffs' bid falls short ... with respect to the second prong of the crime-fraud
> test.  Put simply, Plaintiffs do not provide a factual basis for a good faith belief
> that the communications ... they seek—let alone any *particular* communications
> or work product they seek—were made with the intent to further a crime or fraud.

2015 WL 7574460, at *6 (S.D.N.Y. Nov. 25, 2015) (emphasis in original).

## II.    PPLP's Plea Does Not Cure The UCC's Failure To Establish Probable Cause Of A Crime Or A Fraud By Any Sackler Family Member

Purdue's 2020 Plea does not establish probable cause of crime or fraud—or even

fiduciary breach—by any Sackler family member.

**Practice Fusion.**  There is no evidence, or even any Addendum A allegation, that

Purdue's relationship with Practice Fusion (Count Three) was ever brought to the attention of the

Board.  Preis Ex. 182 at 17-18.

---

[13]    *MacNamara v. City of New York*, 2008 WL 186181, at *4 (S.D.N.Y. Jan. 18, 2008) (the "exception requires a showing of probable cause to believe that *each of the particular attorney-client communications* at issue was used in furtherance of [a] crime or fraud").  None of the cases relied on by the UCC support its categorical approach.  In the Eleventh Circuit case, *Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1333 (11th Cir. 2018) (UCC Reply ¶77), the movant sought very targeted documents that the Court held were "sufficiently related to the allegations of fraud on the court, witness bribery, and suborning perjury," such as communications with "the Colombian attorney who served as the intermediary for payments" from the law firm to the witness.  In *Amusement Industries, Inc. v. Stern*, 293 F.R.D. 420, 440 (S.D.N.Y. 2013) (UCC Reply ¶77), the Court ordered production "[b]ecause we have found the transactions on which these attorneys worked to each constitute illegal schemes devised by Stern."  The UCC has made no similar showing.

**Kickbacks to Two HCPs.**  There is no evidence, or even any Addendum A allegation, that Purdue's improper payment of speaker fees and other payments to two HCPs (Count Two) was ever brought to the attention of the Board.  Preis Ex. 182 at 17.  The Board understood that Purdue had policies barring the payment of any fee to any HCP "██████████████████████████
██████████████████████████████████████████"[14] and the Board was repeatedly informed that ████████████████████████████████████████
████████████████████████████████████████████████████████
██████████"[15]

**Fraud on the DEA.**  There is no evidence, or even any Addendum A allegation, that the Board was involved in Purdue's fraud on the DEA (Count One).  Preis Ex. 182 at 16-17.  The UCC argues that Purdue's failure to disclose information to the DEA was "a choice that was or should have been known to the Sacklers."  UCC Reply ¶38.  But the only support cited for the UCC's assertion is the same 2020 Plea that <u>never mentions the Sacklers</u>.  *Id.*

Critically, <u>none</u> of the UCC's categories of so-called crime-fraud documents has anything to do with the ADD Program, the DEA, Practice Fusion or payments to HCPs.  Exceptions Motion ¶12(2).

**A.    <u>There Is No Evidence Linking The Sacklers To PPLP's ADD Misconduct</u>**

Purdue's plea to deceiving the DEA (Count One) involves Purdue's ADD Program (Preis Ex. 182 at 15-16 (¶¶(c)-(d)) and its failure to "cease detailing HCPs after receiving information suggesting that those HCPs were prescribing opioid products without a legitimate medical

---

[14]    RX 23 (Purdue SOP Num. GC-SOP-0001.04) (PPLP003364388).  *See also* RX 29 (Purdue Healthcare Law Compliance Policies) (PCA000008931, at -953) ("█ ██ ████
██████████████████████████████████████████████████████
█████████████").

[15]    Ex 67 at PPLP004412155 (italics in original).  *See also* Ex. 54 at PPLP004410801, -808; Ex. 37 at PPLP004407563.

purpose ... in situations in which Purdue possessed sufficient information that a decision should have been made to cease detailing" (*id*. at 16 (¶(f)(2))).  The Board was not involved in implementing the ADD Program.  It was not informed about specific HCPs under review and had no role in deciding whether to cease detailing.  Sackler Addendum A affirmatively acknowledges that.

The ADD Program was overseen by Purdue's Law Department until mid-2016 and by both the Law and Compliance Departments after that.[16]  An ADD review team investigated each report of a suspicious prescriber to determine whether to place the prescriber on Purdue's No Call list ("**Region Zero**").[17]  If that was done, sales reps were prohibited from calling on that prescriber and did not earn any sales incentive bonus based on prescriptions that prescriber wrote.[18]  Sackler Addendum A acknowledges that "[t]he Named Sacklers did not sit on the ADD review team."  RX 68 (Addendum A ¶123).

Although the Board was not involved in implementing the ADD Program, it attentively monitored the Program.  It was regularly advised that:

- Purdue was vigorously implementing and monitoring the ADD Program.[19]

---

[16]    RX 4 (6/15/07 ADD SOP 1.7.1) (PPLP003429997); RX 56 (9/2015 ADD SOP 1.7.1) (PPLP004035073); RX 61 (8/2017 ADD SOP 1.7.1) (PPLPC016000316429); Ex. 75 (8/25/16 Ethics and Compliance Quarterly Report to the Board) at PPLP004413388, and RX 63 (1/25/18 ADD Program Working Practices Document (PPLPC023000971903)).

[17]    *See* RX 20 (Internal Inquiries: Procedures) (PPLPC019000213919).

[18]    *See* RX 4 (6/15/07 ADD SOP 1.7.1) (PPLP003429997); RX 56 (9/2015 ADD SOP 1.7.1) (PPLP004035073); RX 61 (8/2017 ADD SOP 1.7.1) (PPLPC016000316429).

[19]    *See, e.g.*, Ex. 23 at PPLP004404114-15 (1Q 2010 Quarterly Compliance Report) (PPLP004404102) (Compliance Dept. resolution of ████████████████); Ex. 24 at PPLP004404566-67 (2Q 2010 Quarterly Compliance Report) (PPLP004404551) (Compliance Dept. resolution of ██████████████); Ex. 27 at PPLP004405718-19 (4Q 2010 Quarterly Compliance Report) (PPLP004405709) (Compliance Dept. resolution of █ ████████████████); Ex. 29 at PPLP004406041-42 (1Q 2011 Quarterly Compliance Report) (PPLP004406032) (Compliance Dept. resolution of ████████████████); Ex. 31 at

9

- All employees were trained on the ADD Program.[20]

- [21]

- [22]

---

PPLP004406480-81 (2Q 2011 Quarterly Compliance Report) (PPLP004406466) (Compliance Dept. resolution of ████████████); *id.* at -486-90 (████████████ ████████████); RX 30 at 2-4, 11-13, 18 (PPLPC042000024694) (defining diversion, Region 0 prescribers and the ADD Program, and ████████████ ████████████); Ex. 37 at PPLP004407567-68 (4Q 2011 Quarterly Compliance Report) (PPLP004407554) (Compliance Dept. resolution of ████████████ █████); Ex. 42 at PPLP004408063-64 (2Q 2012 Quarterly Compliance Report) (PPLP004408046) (Compliance Dept. resolution of ████████████); Ex. 46 at PPLP004409363-66 (4Q 2012 Quarterly Compliance Report) (PPLP004409357) (Compliance Dept. resolution of ████████████); Ex. 78 at PPLP004413919-20 (3/17 Ethics & Compliance Report) (PPLP004413913) (████████████ █████); Ex. 79 at PPLP004414248 (6/17 Ethics & Compliance Update) (PPLP004414244) (████████████).

[20]    *See, e.g.*, Ex. 26 at PPLP004405470-74 (3Q 2010 Quarterly Compliance Report) (PPLP004405460) (extensive discussion of training on Purdue's Healthcare Law Compliance Policies); Ex. 42 at PPLP004408055 (2Q 2012 Quarterly Compliance Report) (PLP004408046) ("████████████.").

[21]    *See, e.g.*, Ex. 23 at PPLP004404106 (1Q 2010 Quarterly Compliance Report) (PPLP004404102); RX 24 at PPLP004434750-51 (8/30/10 Period 3 IRO Report on Additional Promotional and Product Services Systems Assessment) (PPLP004434741); Ex. 42 at PPLP004408050, -061 (2Q 2012 Compliance Report) (PPLP004408047); RX 36 at PPLP003430131 (1/2/13 Sales Force SOP) (PPLP003430093); RX 58 at PPLP003578717 (1/16 Sales Force SOP Manual) (PPLP003578668).

[22]    *See, e.g.*, Ex. 23 at PPLP004404106 (1Q 2010 Quarterly Compliance Report) (PPLP004404102); Ex. 24 at PPLP004404554 (2Q 2010 Quarterly Compliance Report) (PPLP004404551); Ex. 26 at PPLP004405480-82 (3Q 2010 Quarterly Compliance Report) (PPLP004405460); Ex. 27 at PPLP004405713 (4Q 2010 Quarterly Compliance Report) (PPLP004405709); Ex. 29 at PPLP004406034, -036 (1Q 2011 Quarterly Compliance Report) (PPLP004406032); Ex. 31 at PPLP004406469, -483-84 (2Q 2011 Quarterly Compliance Report) PPLP004406466); Ex. 49 at PPLP004409696-97 (1Q 2013 Quarterly Compliance Report) (PPLP004409694); Ex. 53 at PPLP004410512 (3Q 2013 Quarterly Compliance Report)

Pursuant to Purdue's settlement with the New York Attorney General ("**NYAG**"), <u>every</u>
<u>decision to place an HCP in Region Zero after 2015</u> was reviewed by an outside auditor
approved by NYAG.  His 2016 report concluded that " 
"[23]  He made similar findings in each subsequent
year, until Purdue stopped marketing OxyContin.[24]

The UCC and NCSG offer no reason why the Board's reliance on the extensive
information it received documenting Purdue's adherence to ADD Program requirements was not
reasonable.

### B.    Board Knowledge Of Purdue's Pled-To Misconduct Cannot Be Inferred From Generalized Allegations Of "Micromanagement"

The UCC asks this Court to infer the former Directors' "knowledge of Purdue's criminal
misconduct … from their hands-on management of Purdue."  *See* UCC Reply ¶27.  This is a
spurious argument because there is no evidence of supposed "micromanagement" relating to the
ADD Program or Practice Fusion or payments to HCPs.  Allegations unrelated to the alleged
misconduct are insufficient to establish a breach of fiduciary duty.[25]

The UCC's contention that the Board, rather than management, ran Purdue is
unsupported.  Central to the UCC's argument is a sentence from a Craig Landau memorandum

---

(PPLP004410506); Ex. 55 at PPLP004411173 (1Q 2014 Quarterly Compliance Report)
(PPLP004411166).

[23]    RX 59 at PPLP004473668 (10/7/16 Auditor's First Report on Purdue Pharma's ADD
Program) (PPLP004473667).

[24]    RX 62 at PPLP004473710-11 (10/20/17 Auditor's Second Report on Purdue Pharma's
ADD Program) (PPLP004473709); RX 64 at PPLP004473740 (10/19/18 Auditor's Third and
Final Report on Purdue Pharma's ADD Program) (PPLP004473738).

[25]    *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 983-84 (Del. Ch. 2007).

(written when he was President of Purdue Canada) that concerned MNP Consulting Limited

("**MNP**"), not PPLP or PPI, and noted that "███████████████████████████████████

█████"[26] The MNP board advised the independent associated companies ("**IACs**") in 49

countries outside the U.S. but not PPLP or PPI.  Landau's memo does not address PPLP or PPI.

The UCC's Reply is a pastiche of distortion and omission:

- The UCC argues that "████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████████████████████."  UCC Reply ¶31
  (citing Preis Ex. 142).  But—as Mortimer Sackler's email in the exhibit makes
  clear —the draft resolution was drafted by the **MNP** board, ████████████████
  ████████████████████████████████.

- The UCC points to a sentence in a 2011 memorandum written by Peter Boer that
  noted "██████████████████████████████████████████
  ███████████████████████████████."  UCC Reply ¶30 (quoting
  Preis Ex. 135).  But the "board" Mr. Boer referenced was the **MNP** board.  The
  memorandum references considering "████████████████████████████
  ████████████████████████████████████████
  █████████████████████████"

The UCC Reply deceptively quotes from the testimony of Cecil Pickett—a Side A

director of PPI and a former director of Biogen Idec and other large pharmaceutical companies—

to paint the PPI Board as "███████████████████████████████████████"  UCC

Reply ¶31.  Mr. Pickett actually said that, while some Board members, himself included, "███

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████" (RX 69 (10/30/20 Pickett Tr. 143:18-144:14)).

The UCC argues that the Court should infer knowledge of wrongdoing from the number

of meetings that the PPI Board had or the amount of time that directors spent on their Board

duties.  UCC Reply ¶32.  This argument is baffling.  The UCC has thousands of documents that

---

[26]    Preis Ex. 137; RX 71 (11/24/20 Landau Tr. 329:19-330:4).

specify what was considered at these meetings and has deposed multiple attendees.  It cites no
evidence of knowledge of any of the misconduct admitted by Purdue.  The only inference to
draw from the UCC's inability to point to any evidence is that the Board had no knowledge, or
reason to know, of wrongdoing.

The UCC Reply contends that Richard Sackler "interven[ed] with Purdue's nominal
executive team to drive increased sales" (UCC Reply ¶34) by plucking snippets from old emails
that predate the allegations in Sackler Addendum A and are wholly unrelated to any alleged
Purdue misconduct or any coherent theory of misconduct (UCC Reply ¶34):

- A 2007 email exchange in which Richard ███████████████████████
  █████████████████████████. Preis Ex. 138.

- A 2008 email about an executive's discussion with Richard concerning Purdue's
  ███████████. Preis Ex. 139.

- A 2008 email in which Richard used data analysis to check the accuracy of
  management's ███████████. Preis Ex. 176.

- A 2006 email exchange in which Michael Friedman told Richard that ███████████
  ████████████████████████████████████████████
  ███████████████████████. Preis Ex. 134.

- ███████████████████████ did in 2011 in connection with the launch of
  Butrans—a Schedule III opioid patch ███████████████ that has never
  been tied to the opioid epidemic.  Preis Ex. 177.

As Richard's late brother Jon complained, Richard "███████████████████████████"
(Preis Ex. 142 at -656) and he clearly annoyed them, but there is no evidence anyone paid
significant attention to the ideas Richard presented or that any of those ideas was improper, let
alone part of a crime or fraud.

The UCC points to a 1999 email to argue that Richard Sackler was inappropriately
focused on OxyContin as a Board member.  UCC Reply ¶33; Preis Ex. 186.  In 1999, Richard
was also an officer—a Senior Vice President.  Reliance on this and the other old documents the

UCC cites betrays its lack of evidence of Board involvement in the misconduct admitted in the

2020 Plea.

### C.    Invocation Of The Fifth Amendment By Purdue Executives—On Whom The Board Relied—Does Not Support An Adverse Inference Against The Board

The UCC urges the Court to draw an adverse inference against the Board from the

invocation of the Fifth Amendment by two former Purdue CEOs.  UCC Reply ¶¶35, 46.  It

should not.  Four factors guide the Court in deciding whether to draw an adverse inference

against a party based upon a third-party witness's invocation of the Fifth Amendment:

> (1) the nature of the relevant relationships, (2) the degree of control of the party over the non-party witness, (3) the compatibility of the interests of the party and the non-party witness, and (4) the role of the non-party witness in the litigation.... [T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for truth.[27]

None of these factors favors an adverse inference against the Side B former Directors, who have

no control over Purdue's former CEOs.  No evidence has been offered to show any ongoing

relationship between Side B and the former CEOs.[28]  Their interests in these proceedings are

---

[27]    *In re Handy & Harman Refining Grp., Inc.*, 266 B.R. 32, 35 (Bankr. D. Conn. 2001) (quoting *LiButti v. United States*, 107 F.3d 110, 123–24 (2d Cir. 1997) (citations omitted)).

[28]    *See Handy & Harman*, 266 B.R. at 35 (declining to draw adverse inference from non-party's invocation of Fifth Amendment where there was "no basis for a finding that there is presently any relationship between the witness and the debtor"); *In re WorldCom, Inc.*, 377 B.R. 77, 110 (Bankr. S.D.N.Y. 2007) (declining to draw adverse inference "[w]ithout further evidence of the ties among the non-parties").  The cases cited by the UCC are not to the contrary.  In *LiButti*, the Second Circuit set the standard and remanded for a determination whether a negative inference should be drawn against a daughter (who allegedly was a front for her father) from her father's invocation of the Fifth Amendment.  *See* 107 F.3d at 123–24.  In *Rosebud Sioux Tribe v. A&P Steel, Inc.*, 733 F.2d 509, 522 (8th Cir. 1984), the defendant had already introduced favorable deposition testimony of the non-party witness, who then refused to testify at trial on Fifth Amendment grounds.  The Eighth Circuit held that in such a circumstance, the witness should be called and the inferences might be allowed (if the Fifth Amendment were invoked) that the earlier testimony was perjured.  *Id.*  The Side B former Directors are not attempting to use Mr. Timney's or Mr. Stewart's testimony.

very different.  To the extent that there was wrongdoing at Purdue, the Side B directors were

unaware of it, uninvolved in it, and relied on management, including the former CEOs.[29]

Only a handful of the unanswered questions the UCC wants to rely on even mention "the

Sacklers" or "the Board."  UCC Reply ¶46.  Most are extremely vague, such as "The Sacklers

exercised substantial oversight and control over management's operations of Purdue, correct?"

*Id*.  None of them connects the Board to any of the misconduct admitted in PPLP's 2020 Plea or

supports the UCC's claims of intentionally fraudulent transfers or fiduciary breaches.

### III.    THE ADDENDUM A ALLEGATIONS, EVEN IF CONSIDERED, DO NOT ESTABLISH PROBABLE CAUSE OF A CRIME OR FRAUD BY THE FORMER DIRECTORS

In a vain attempt to proffer evidence of probable cause of a crime or fraud by the

Sacklers, the UCC and NCSG coopt the allegations in the Addenda A to each of the Purdue and

Sackler civil settlements,[30] ignoring both their inadmissibility and their material differences.

#### A.    Purdue Addendum A vs. Sackler Addendum A

Purdue Addendum A alleges that Purdue paid kickbacks through its Key Opinion Leader

and speaker programs and Practice Fusion.[31]  These allegations do not suggest any misconduct

by the former Directors and are not alleged in Sackler Addendum A.  Purdue Addendum A also

alleges that Purdue engaged in "several strategies to ensure that the revenues generated from its

opioid prescriptions, including those that Purdue knew or should have known were not medically

necessary, would continue to flow" from 2010-18 (Preis Ex. 182B at Addendum A ¶¶4, 9, 25,

40-41, 45).  One of the allegedly improper strategies alleged in Purdue Addendum A was based

on the E2E marketing program recommended to Purdue in 2013 by McKinsey ("a consulting

---

[29]    Hurley Ex. 58 at slides 30-50.

[30]    UCC Reply ¶¶36, 45; NCSG Reply ¶¶9 & n.9, 19-22, 25.

[31]    Preis Ex. 182B, Addendum A ¶¶6-9, 126-171, 176, 182-204, 212.

company"), which has long been regarded as "an internationally respected consulting firm."[32]

McKinsey had been engaged by Purdue management, and E2E was implemented by Purdue

management (*id.* ¶¶83, 84, 88-90, 99, 109, 111, 114-15, 125).  With the exception of the limited

allegations admitted in its 2020 Plea (Schedule A (Preis Ex. 182 at 15-18)), Purdue <u>expressly</u>

<u>denied</u> every allegation in Purdue Addendum A (Preis Ex. 182B, Recital II(K)).

The allegations in Sackler Addendum A (RX 68) are narrower and different.  Sackler

Addendum A does not contain any allegations about Key Opinion Leaders, Purdue's speaker

program, Practice Fusion, the DEA or Purdue's quota requests.  Its marketing allegations are

limited to the period <u>2013</u>-18, the period after the OIG monitorship ended.  Nothing in Sackler

Addendum A even suggests Board awareness of the misconduct to which PPLP pled.  The

Named Sacklers "expressly den[ied]" all of the allegations.  RX 68, Recital G.

The differences between the allegations in the Purdue and Sackler Addenda are

paramount.  The limited time frame for the Sackler allegations implicitly acknowledges that the

Board properly relied on assurances from the OIG and management that Purdue was operating in

compliance with law between 2007 and 2012.  The alleged liability of the former Directors

depends entirely on its failure to question McKinsey's advice and the resulting E2E strategy.

The allegations in Sackler Addendum A bear no resemblance to the pre-petition claims of the

States or the product liability claims that the UCC grandiosely argues, without support and

contrary to all evidence (*see* Side B Opp. pp. 14, 24-26 and *infra* at pp. 36-38), motivated the

distributions.

---

[32]    *Samaritan Inns v. District of Columbia*, 1995 WL 405710 (D.D.C. June 30, 1995); *see also, e.g.*, *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 799 (Del. Ch. 2007) ("the respected firm of McKinsey & Co").

It bears repeating that (i) the UCC has failed to show the use of any challenged privileged communications were made "in furtherance" of any these allegations, and (ii) the categories of crime-fraud documents the UCC purports to challenge do not even mention McKinsey or E2E (Exceptions Brief ¶12(2)).  *See* Preis Ex. B, Tab 6.  But the allegations are also wholly unsound.

### B.    No Evidence The Board Knew Or Should Have Known Of The Crimes

The UCC and NCSG Replies do not adduce any evidence to show that, from 2013 to 2018, the directors understood that either McKinsey's advice to management or the E2E program involved or would lead to soliciting improper prescriptions or cause the submission of false claims for Purdue opioids.  On the contrary, as discussed below, McKinsey told the Board it was recommending that Purdue adopt best industry practices, and management showed the Board that there was a huge legitimate market for Purdue to pursue because its competitors occupied over 75% of a $12 billion prescription analgesic market in which Purdue's market share was shrinking.  The Court is thus left with the UCC's apparent suggestion that Purdue should have ignored a distinguished consulting firm's advice and done nothing to compete with competitors while its market share was declining.  If the Board had done as the UCC now suggests and interfered with management's work with McKinsey, it would face allegations that it had negligently overseen management's failure to take responsible action to respond to competition.

### 1.    The Board Understood Purdue Was Addressing Abuse And Diversion Through Rigorous Compliance And Launching ADF OxyContin

Purdue developed ADF OxyContin to ███████████████████████████████

████████████████████████████[33]  The Board understood that its abuse-deterrent

---

[33]    RX 32 at PPLPC057000011194, slide 7  (6/12/12 Email attaching ███████████████
████████████    ████████████    █████    █    ████████████    ████████████    ████████)
(PPLPC057000011188).

technology served an important public policy goal and was lauded by the FDA,[34] the DEA,[35] and

42 State Attorneys General[36] as a step towards reducing the abuse of opioids.

When Purdue launched ADF OxyContin, the FDA-approved label did not describe its

abuse deterrent properties.  The FDA asked Purdue to conduct further studies.  Those studies,

which were reported to the Board, showed that abuse and diversion fell substantially after

OxyContin's reformulation.  For example, a June 18, 2012 presentation to the Board reported a

███████████████████████████████████████████████████████████████████.[37]

A March 21, 2013 presentation to the Board reported similar results.[38]  Studies showed that

██████████████████████████████████████.[39]  The Board considered all of this a major

success—proof that ADF OxyContin was accomplishing its goals.[40]  The FDA approved a

revised label in April 2013 stating that the ADF formulation "has physicochemical properties

---

[34]     https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/abuse-deterrent-opioid-analgesics.

[35]     RX 47 (9/17/13 J. Rannazzisi Tr., DEA (Presidential Initiative Current Issues In Drug Abuse Panel)) (PPLPC018000884102).

[36]     RX 52 (12/16/13 Letter from Nat'l Ass'n of Attorneys Gen. FDA) (PPLPC046000057423).

[37]     *See* RX 32 at PPLPC05700001194, slide 9 (6/12/12 Email attaching ███████████████ ████████████    ████████    ██    ███████████    ██████████    █████████ ) (PPLPC05700001188).

[38]     RX 37 at PPLPC0440000418961 (3/21/13 Abuse Deterrent Strategy Presentation) (PPLPC044000041897) (████████████████████████████████████████████████████████████ ), −964 (███████████████████████████████████████████████████ ).

[39]     *See, e.g.*, RX 32 (6/18/12 Presentation to Board) (PPLPC057000011188); RX 30 (Attachment to Exec. Comm. Notes Sent to Board on 10/25/11) (PPLPC042000024694); RX 37 (3/21/13 Presentation to Board) (PPLPC044000041964).

[40]     *See, e.g.*, RX 37 at PPLPC044000041961, -962, -968 (3/21/13 Presentation to Board) (PPLPC044000041897); RX 42 at PPLP004409860 (7/25/13 Presentation to Board) (PPLP004409781).

expected to make abuse via injection difficult" and "to reduce abuse via the intranasal route,"

although abuse "by the oral route is still possible."  RX 39 (4/16/13 label).

In November 2012, management told the Board that ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████.[41]  Once the new label recognizing

OxyContin's abuse deterrent properties was approved, Purdue started to market OxyContin

based on that label.  Management hired McKinsey in conjunction with this effort.



**2.      The Directors Understood That McKinsey's Advice And
Purdue's Marketing Were Directed At The Legitimate Market**

Neither the UCC nor the NCSG offers any evidence that the Board was pursuing

improper prescriptions.  Both rely only on the disputed allegations in Sackler Addendum A.  The

Addendum alleges that "the Named Sacklers knew that the legitimate market for Purdue's

opioids had contracted" because the number of OxyContin prescriptions shrank following the

launch of ADF OxyContin.  RX 68 at Addendum A ¶¶3, 56-71.  From this, Sackler Addendum A

leaps to the conclusion that efforts to expand the number of OxyContin prescriptions necessarily

required prescriptions that were not medically appropriate.  *Id.* ¶¶4, 78.  This is demonstrably

untrue.

The allegation that the Named Sacklers "knew that the legitimate market for Purdue's

opioids had contracted" (*id.* at ¶3) is false.  It is true, as discussed below, that the market for

Extended Release Opioids ("**EROs**") was shrinking, but management presented extensive data to

---

[41]      *See, e.g.*, RX 34 at 13 (11/2012 Sales & Mktg. Presentation to Board)
(PPLPC012000396109) (████████ █ ████████ ███████████
█████████ █ ████████ ████); *id.* at 25 (████████ ████████████
████████████████████ ).

the Board showing that there was an enormous legitimate market for Purdue's prescription opioids currently occupied by competitors and told the Board that Purdue's marketing was aimed at persuading HCPs to prescribe Purdue opioids over competitors' medications.

In November 2012, for example, the Board received a presentation showing that ██ ████████████████████████████████████████████████.[42] Purdue's opioid sales were approximately ███████ at that time. *Id.* at 3. This left a prescription analgesic market of more than ███████ that Purdue could expand into by taking market share from competitors.

Directors also received reports showing that ████████████████████ ████████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████.[43] The Board was informed that ███████████████ ████████████████████████████████████████ ████████████████████████.[44]

---

[42]    RX 34 at 8 (11/2012 Sales & Mktg. Presentation to Board) (PPLPC012000396109).

[43]    RX 50 at PPLPUCC9008739120-21 (9/13/13: ████████████████████████) (PPLPUCC9008739108) (████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████); RX 51 at PPLP004401004-08 (11/2013 Year-End Budget Book) (PPLP004409973) (████████████████████████ ██████████████████). The UCC ignores these reports and (UCC Reply ¶40) cites only a defensive comment in an email that did not go to the Board for the proposition that the decline was "████████████████████." Preis Ex. 145. The author of that email elsewhere acknowledged that there were multiple reasons for the sales decline (none of which he attributes to the reformulation). *See, e.g.*, Feiner Ex. J at MCK-MAAG-0119733.

[44]    RX 55 at PPLP004411408, -409, -412, -413 (11/2014 Budget Proposal for 2015) (PPLP004411368).

During the period 2013 to 2018, the Board thus understood that Purdue's opioids were serving a small portion of a very large market.[45]  The Board was advised that McKinsey and E2E

███████████████████████████████████████████████████████

███████████████████████. All of the Purdue marketing material presented to the Board reflected this, including all of the marketing material identified in Sackler Addendum A (RX 68) ¶113.[46]

McKinsey and E2E stressed that ██████████████████████████

████████████████████████████████████████████████████████████.[47]

The UCC and NCSG present no evidence that the Board had, or should have had, any reason to believe that a physician who prescribed ADF OxyContin rather than another prescription analgesic after being detailed by Purdue's sales representatives was writing a prescription that was not for legitimate medical purposes.

---

[45]     In just the ERO market, management advised the Board that ███████████████████

████████    RX 34 at PPLPC012000396110 (PPLPC012000396109).    In 2015, management advised the Board that █████████████████████████████████████████████████

████████████████████    RX 57 at PPLPC063000003353 (PPLPC063000003207).  *See also* Preis Ex. 137 at PWG004670882 ("████████████████████████████████████████████

████████████████.").

[46]     *See* RX 51 at PPLP004410059, -0060, -0063 (OxyContin 2014 Budget Proposal) (PPLP004409973); *see also* RX 44 at PAZ000046442, -446, -448 (Individualize the Dose brochure) (PAZ000046439); RX 35 at PAK000971879, -881, -883, -884, -885, -891 (Conversion and Titration Guide) (PAK000971874); RX 33 at PAK000971391, -392, -397 (Patient Profiles brochure) (PAK000971389); RX 66 (8/28/20 D. Sackler Deposition Tr. 338:17-339:16).

[47]     *See* RX 46 at PPLPC063000002009 (9/12/13 Presentation to Board) (PPLPC063000002005); RX 55 at PPLP004411408 (11/2014 Budget Proposal for 2015) (PPLP004411368); RX 51 at PPLP004410068 PPLP (Nov. 2013 Budget Proposal for 2014).

3. **The UCC And NCSG Present No Evidence That Purdue's Marketing Was Deceptive**

In the pre-petition litigation against Purdue, the NCSG claimed that Purdue's marketing was deceptive and inconsistent with the FDA-approved label. It speaks volumes that there are no allegations in Purdue Addendum A or Sackler Addendum A that Purdue's marketing, including through the E2E program, was deceptive or inconsistent with the FDA-approved label. Neither the UCC nor the NCSG have submitted any evidence to suggest that Purdue's marketing was deceptive.

4. **The E2E Program Shows No Wrongdoing By The Directors**

a. **E2E Was A Management Project**

The NCSG's counterfactual effort to portray E2E as a project driven by the Sacklers (NCSG Reply ¶¶16-22) distorts and omits the relevant evidence. E2E was a project commenced by Purdue's management, who made the decision to engage McKinsey around April 2013.[48] The Board was not informed about this decision until June 2013.[49]

The NCSG and UCC focus on a meeting in August 2013 at which McKinsey consultants met with some directors. *See* Feiner Ex. O at MCK-MAAG-0112331. After the meeting, McKinsey consultants remarked on the Board's lack of knowledge about McKinsey's advice:

- "Board had not engaged on our work…. Dr. Richard had not read memo…"

- "We took them through both memos – some had read it, some had not. We went through exhibit by exhibit for about 2 hrs. They all clearly learned a lot and many asked good questions."

*Id.* (ellipses in original). This was not a Board-driven project.

---

[48]    *See* RX 38 (PPLPC012000417566); RX 40 (PPLPC012000424137).

[49]    RX 41 at PPLPC057000014145 (6/2013 cover email to a Board report noting: "███████████████████████████████████████████████████████████ ████████████████████████████████.") (PPLPC057000014144).

Most of the other documents cited by the NCSG as supposed evidence of the Board's involvement with E2E reflect interactions between Purdue management and McKinsey that the Board was not privy to.[50]   The NCSG quotes, for example, one email from McKinsey (NCSG Reply ¶10, quoting Feiner Ex. P) that says: "Don't take foot off pedal. Must deliver E2E. Critical for credibility with Board."  It is a summary of a meeting between Purdue's then-CEO, Mark Timney and various McKinsey consultants—and no directors.

It makes sense that the McKinsey project was management driven.  Its scope was comparatively modest.  McKinsey said its advice presented an ██████████████████ ██████████"[51]  At the time, PPLP's sales exceeded ████████ annually.[52]

> ### b.    The Board's Limited E2E Guidance Included An Instruction Not Just To Increase Sales But To Help HCPs And Patients

When the E2E project was discussed by the Board, directors emphasized that they did not want to approve a project aimed only at increasing prescriptions without regard to the public good.  Notes from one October 2013 Board meeting reflect the Board's ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████"[53] not simply the desire to increase prescriptions for Purdue:

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

RX 49 (PPLPC012000452389 at −392).

---

[50]    *See* Feiner Exs. K, L, M, S.

[51]    *See* Preis Ex. 155 at PPLP004409892 (8/15/13 Board Agenda).

[52]    *See* RX 51 at PPLP004409988; Ex. 71 at PPLPC051000265076.

[53]    RX 48 (PPLPC012000449535).

### c.      The Board Understood That E2E Built In Compliance

The November 2013 budget presentation to the Board showed the team structure for

managing E2E.  RX 51 at PPLP004410022 (Nov. 2013 Budget Pres., PPLP004409973).  It

showed that E2E would be ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████.[54]  This built compliance into E2E.  There was no reason for the

Board to suspect that E2E would target illegitimate prescriptions.

### 5.      The UCC And NCSG's Other Arguments About E2E Are Meritless

The UCC and NCSG have advanced a number of attacks on E2E in an effort to create an

appearance of impropriety.  All are devoid of merit.

*First*, the UCC argues that the Board should have concluded Purdue's marketing to high-

decile prescribers was improper on the theory that ███████████████████████████████

████████████████████████████████████████████████████ following the

introduction of OxyContin ADF.  UCC Reply ¶41.  The UCC bases this contention on its

doctored quotation of an August 2013 report by McKinsey as saying that ██████████████

███████████████████████████████████████████████████████████████████████████

*Id.*.  The report actually said that: ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████  Preis Ex. 152 at MDSF00986949 (emphasis added).  The report thus shows

---

[54]      *See also* RX 53 at slides 24-25, 35-40 (Presentation to E2E Executive Oversight Team
addressing "████████████████████████████████████████) (PPLPC014000232245).

precisely the opposite of what the UCC is trying to argue—and reflects the robustness of the

ADD Program.[55]

*Second*, the UCC asserts that, instead of continuing to market OxyContin, the Board

should have ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████ UCC Reply

¶41.  Conducting an analysis of suspicious prescribers based on their prescribing practices is not

a Board function—it is a management function.  The ADD Program reviewed prescribers for

suspicious prescribing practices.  The Board was continually advised that management was

vigorously implementing the ADD Program—and it was specifically advised that management

performed precisely the analysis the UCC says should have been performed.

In a September 2010 Board Report, the Board was informed that Purdue's Law

Department was, with the Epidemiology Department, ███████████████████████████

███████████████████████████████████"[56]  In 2011

and 2012, Purdue conducted an epidemiological study of ██████████████████████

███████████████████████████████████████████████.[57]

Based on an analysis of prescribing practices following the reformulation of OxyContin,

Purdue's Law Department referred ████████████████████████"[58]

---

[55]    The referenced prescribers Purdue was <u>not</u> calling on were in Region Zero.  That most of
the decline in OxyContin prescriptions was attributed to Region Zero prescribers attests to the
strength of the ADD Program, which had evidently detected most of the prescribers associated
with diversion.

[56]    RX 25 at PWG004349936 (9/23/10 Board Report) (PWG004349878).

[57]    RX 31 (████████████████████████████████████████████████████████
███████ ████ ███████████ █████ █ █████ ██████ █████████ ██████████ )
(PWA001433067).

[58]    RX 43 (PPLPC031001086873); *see also* RX 27 at PPLPC053000051170 (████████████
██████ ██ ██ ███████████ █ █ ██ ██████ ) (PPLPC053000051168); RX  28

The UCC's attempt to fault the Board for failing to conduct an analysis that Purdue actually did reflects a remarkable indifference to, or ignorance of, the evidence produced to the UCC, which has spent scores of millions of dollars ostensibly reviewing and investigating.

*Third*, the NCSG and UCC argue that it was improper for Purdue to follow McKinsey's recommendations and to market to high decile prescribers. They cite no evidence in support of this claim. The Board properly heeded McKinsey's advice because McKinsey—then regarded as one of the world's leading management consulting firms—repeatedly advised t that its recommendations were simply bringing to Purdue "██████████████████."[59]

Marketing to physicians by decile was, to all intents and purposes, a reasonable way of achieving a lawful goal. Purdue's marketing was aimed at persuading prescribers to switch appropriate patients from Purdue's competitors' products to Purdue opioids.[60] There is nothing improper about using commercially-available past prescribing information to identify prescribers who treat pain patients. To the contrary, the Supreme Court has held that doing so is protected by the First Amendment, striking down a Vermont law aimed at preventing pharmaceutical



(PWA001487465)  (████████████████████████████
██████████████████).

[59]      *See, e.g.*, Preis Ex. 155 at PPLP004409892 (8/2013 McKinsey Report); *see also* RX 42 at PPLP004409877, -879, -887 (7/2013 Report from McKinsey: "████████████████
████████████████████████    ████████████████████
██████████    ████████████████████████████████")
(PPLP004409781).

[60]      *See, e.g.*, RX 55 at PPLP004411409 (11/2014 Budget Presentation to Board) (██████
██████████████████████████) (PPLP004411368); *id.* at –413
(████████████████████████████████████
██████████████████████████████); RX 50 at PPLPUCC9008739157
(████████████████████████████████████
████████████████████████████████████
████████████████████████) (PPLPUCC9008739108).

companies from using commercially available prescribing information to tailor their message to prescribers.[61]

*Fourth*, the NCSG suggests that something (it is not clear what) was improper because an analysis showed that 51% of Purdue's OxyContin patients were receiving doses above the 90 MME dose recommended by the CDC.  NCSG Reply ¶22.  This argument is baseless.  The CDC Guidelines "provide[] recommendations for the prescribing of opioid pain medication by primary care clinicians for chronic pain … in outpatient settings."[62]  They expressly do not address "active cancer treatment, palliative care, and end-of-life care."  *Id.*  Nor do the CDC Guidelines set a ceiling for opioid prescribing at 90 MME/day.  The Guidelines instead advise that clinicians can "carefully justify" such doses.  The FDA has expressly rejected a maximum dose for opioids because it is not supported by scientific evidence.[63]

*Fifth*, both the UCC and NCSG assert—without evidence—that the Board should have been suspicious because high-decile HCPs prescribed more OxyContin than low-decile prescribers.  UCC Reply ¶¶42-43; NCSG Reply ¶19.  There is nothing surprising about the fact that some medical practitioners, in specialties that involve patients with significant pain, prescribe many more opioids than others, who see fewer such patients.[64]  Neither the UCC nor the NCSG has presented any evidence to show that anyone familiar with the industry would consider this suspicious.  More importantly, this argument fundamentally misapprehends the role

---

[61]  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011).

[62]  *See*
https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fmmwr%2Fvolumes%2F65%2Frr%2Frr6501e1er.htm.

[63]  RX 45 at 11-14 (███████████████████████████████████
████████████████).

[64]  *See* RX 50 at PPLPUCC9008739124 (███████████████████████████
████████████) (PPLPUCC9008739108).

27

of a board of directors.  The Board relied on management, on a world-class consulting firm, and

on the fact that PPLP had in place an ADD program that the Board understood was monitoring

suspicious prescribing.

*Sixth*, the NCSG cites an email chain suggesting that some McKinsey employees

destroyed evidence to hide their interactions with Purdue.  Feiner Ex. T.  That behavior, however

deplorable, has nothing to do with the former Directors.

### 6.    The Board Was Statutorily Entitled To Rely On McKinsey's And Management's Advice

Under New York Business Corporation Law § 717(a), a director of a New York

corporation like PPI is

> entitled to rely on information, opinions, reports or statements … prepared or
> presented by: (1) one or more officers or employees of the corporation … whom
> the director believes to be reliable and competent in the matters presented, [and]
> (2) ... other persons as to matters which the director believes to be within such
> person's professional or expert competence.

A director "who so performs his [or her] duties shall have no liability by reason of being or

having been a director of the corporation."  *Id.*

The UCC's and NCSG's arguments second-guessing the wisdom of the E2E program and

the judgment calls made by Purdue's Compliance Department thus miss the mark.  The Board

was entitled to rely on (i) McKinsey's and management's reasoned advice about the proposed

marketing program, and (ii) management's documented presentations that Purdue's marketing

was in compliance with all applicable laws.

### IV.    NEITHER THE ADDENDA NOR THE UCC'S BELATED ADDITIONAL EXHIBITS ESTABLISH PROBABLE CAUSE OF INTENTIONAL FRAUDULENT TRANSFERS

The UCC's opening brief in support of the Exceptions Motion argued that members of

Side B made fraudulent transfers.  For the reasons set forth in our Opposition, the UCC failed to

establish probable cause that any transfers were made with an intent to defraud.  Side B Opp. 32-

36.  Nor did the UCC offer probable cause to show that any of the challenged legal communications were in furtherance of such a scheme.  *Id.* at 38-40.  In its Reply, the UCC asserts numerous new arguments in support of its fraudulent conveyance theory.  None establishes probable cause that Side B approved distributions with fraudulent intent.  And none even attempts to show that particular legal communications were in furtherance of intentional fraudulent transfers.

### A.    The Undisputed Evidence Shows There Was No Significant Litigation Between 2008 And 2017 And That None Was Expected

The UCC offers no evidence to dispute the voluminous evidence presented in our Opposition showing that the 2017 explosion of cases that triggered Purdue's bankruptcy was not expected by Purdue or any of the Sackler Board members.  The UCC Reply studiously ignores the evidence—from 2008, when management told the Board that all OxyContin litigation could be ████████████████████████    ████████[65] through 2016, when management reiterated to the Board that the ████████████████████[66]  No one anticipated that Purdue would face an existential opioid litigation threat when any of the challenged distributions were made.  *See* Side B Opp. 4, 10-17.

### B.    The Sacklers' Words And Actions Confirm They Had No Fraudulent Intent

Faced with these uncontroverted facts, the UCC strains to rewrite history.  The UCC attempts to manufacture supposedly "contemporaneous expressions of concern about opioid related liability" by the Sacker directors for the period from 2008 and 2017, but it features only a handful of comments cherry-picked from documents in 2006 and 2007.  *See* UCC Reply ¶¶48-52 (citing Hurley Ex. 62 (2006); Preis Ex. 187 (2007); Preis Ex. 209 (2007); Hurley Ex. 64 (2007);

---

[65]    Ex. 6 at PPLP004400677 (1/11/08 Board Agenda Book) (PPLP004400663).

[66]    RX 72 at PPLP004412631 (1/15/16 Board Agenda Book) (PPLP004412586).

Preis Ex. 151 (2007); Hurley Ex. 69 (2007)).  None of the documents cited, nor any other evidence, supports the UCC's fiction.  Nor can the UCC explain why there is <u>no</u> such document expressing concern for a decade before 2017.  The UCC has every email, every document, every encrypted communication from Side B.  It can find nothing.

**Documents Predating May-August 2007 Settlements.**  The UCC's evidence of supposedly "contemporaneous expressions of concern about opioid related liability" (UCC Reply ¶48) features documents that antedate Purdue's May 2007 guilty plea and civil settlement with the federal government; its entry into consent judgments with 26 states and the District of Columbia in mid-2007; and its May-August 2007 settlements with 48 states and the District of Columbia of all Medicaid claims based on OxyContin marketing.  Pre-settlement concerns were allayed in those settlements.  The federal and state governments released Purdue and its officers, directors, employees and owners from virtually all civil and criminal liability through mid-2007 arising out of Purdue's marketing of OxyContin.[67]  These broad liability releases also explain why the UCC identifies no evidence that any Sackler Board member expressed any concerns that opioid litigation threatened the viability of Purdue when they approved distributions from 2008-16.

The UCC strains to downplay the significance of the federal settlement in allaying pre-May 2007 concerns about opioid related litigation because there was an ███████████

███████████" to settle the federal government's claims reflected in a letter dated October 25, 2006 (UCC Reply ¶48).  An agreement in principle is not binding or enforceable, and there are many slips between notional and final agreements.  Moreover, the states were not parties to the agreement in principle. ██████████████████████████████████

---

[67]   *See* Side B Opp. 7 & nn.6-7.

██████████████████████████████████.[68]  The 48-state plus D.C. Medicaid settlements

were not all reached until August 2007.[69]  There was good reason to harbor concerns before all

of these settlements were executed and binding releases issued.

**May 22, 2007 Smolinsky Meeting.**  The UCC speculates that ████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ (UCC Reply ¶51; Preis Ex. 151).  Nor does the UCC identify any action taken as a result of

that meeting.  The UCC concedes that Stuart Baker testified that, in May 2007, ██████████████

████████████████████████████████████████████████████████████

████████████████████████ (UCC Reply ¶51; Preis Ex. 219 (Baker Dep.

359:10-21)).  Richard Sackler's deposition testimony confirms that neither Purdue nor he were

considering bankruptcy in May 2007.  He testified that to the best of his recollection the meeting

concerned the risk ████████████████████████████[70]

████████████████████.  The UCC Reply cites exactly one email between Sackler family

members between 2008 and 2017 that actually references anticipated litigation, and it confirms

---

[68]    *See* RX 2 (326/07 Decision to ██████████████████████████████
████████████████████) (PPLPC053000019063).

[69]    *See* RX 16 at ¶18 and PPLPC051000087083 (8/30/07 Settlement Agreement with
Alabama); RX 6 at ¶18 and 10 (8/7/07 Settlement Agreement with California); RX 15 at ¶18 and
PPLPC018000164839 (8/23/07 Settlement Agreement with Connecticut); RX 5 at ¶18 and
PPLPC018000164861 (8/3/07 Settlement Agreement with D.C.); RX 13 at ¶18 and
PPLPC018000164850 (8/17/07 Settlement Agreement with Delaware); RX 7 at ¶18 and p. 11
(8/12/07 Settlement Agreement with Kansas); RX 8 at ¶18 and p. 10 (8/13/07 Settlement
Agreement with Massachusetts); RX 10 at ¶18 and p. 10 (8/15/07 Settlement Agreement with
Michigan); RX 11 at ¶18 and p. 11 (8/15/07 Settlement Agreement with Montana); RX 12 at ¶18
and p. 11 (8/15/07 Settlement Agreement with Nebraska); RX 14 at ¶18 and p. 11 (8/21/07
Settlement Agreement with New Hampshire); RX 9 at ¶18 and PPLPC030000403211 (8/13/07
Settlement Agreement with Virginia).

[70]    RX 70 (R. Sackler Dep. 353:20-25; 355:23-24).

that the only litigation risk anticipated was *de minimis* and promptly resolved. The email, an exchange between Richard and Mortimer Sackler in early 2008, discusses ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ."[71] The UCC highlights Richard's observation that ████████████████████████████████████ ███████████████████████."[72] but conspicuously ignores Richard's express reference to the ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ [73] The UCC also ignores that the "██████████" was an individual action threatened in early 2008, filed in December 2008, settled 10 months later for ██████████, and dismissed with prejudice—with no "admission by any Defendant"—pursuant to a stipulation that ordered Mr. Jeffrey "to have no direct contact with Richard S. Sackler, MD, or any members of his family."[74] The UCC also never mentions that ████████████████████████████████████████████████████████████ ████████████████████████.[75]

---

[71]    UCC Reply ¶59 (Preis Ex. 160). *See also* RX 1 (12/28/04 Suspense Account Agreement) (PPLPUCC003011761).

[72]    UCC Reply ¶59 (citing Preis Ex. 160).

[73]    Preis Ex. 60 at SideA00391978.

[74]    RX 18 (2/14/08 email from R. Jeffrey) (PPLPUCC90004351030); RX 21 at 5 (8/2009 Settlement Agreement) (PKY183121983); RX 22 at ¶¶2-5 (9/30/09 Stipulation Dismissing Case).

[75]    RX 19 (5/15/08 Decision document) (PPLPUCC000496396). The Board's reliance on Purdue to indemnify litigation thereafter (*e.g.*, UCC Reply ¶56) is further evidence that the Sacklers did not expect that litigation to subject Purdue to bankruptcy.

**C.    The Evidence Shows That The Sacklers Had No Reason To Anticipate
Significant Litigation When The Distributions Were Approved**

The UCC's intentional fraud thesis also founders on irrefutable evidence proving that the

Sacklers had no reason to expect significant litigation when they approved the distributions.  We

will not revisit the voluminous evidence discussed in Side B Opp. at 10-25— evidence that the

UCC cannot address—and will limit this discussion to the UCC's flimsy attempts to dodge a bit

of that evidence.

Struggling to reconcile the contemporaneous evidence that Side B wanted to reinvest its

distributions in Purdue with the UCC's unsupported theory that Side B was intentionally

stripping Purdue of its assets, the UCC argues that Side B's desire to leave money in PPLP *after*

*2014* proves they had fraudulently transferred money out of PPLP *before 2014* (UCC Reply

¶64).  That makes no sense.  The evidence shows that, by 2014, Purdue sales were declining, the

OxyContin patent's expiration was looming, and the need to reinvest was ascendant.  The UCC's

lame contention that Side B "████████████████████" (*id.* (italics deleted)) is equally

specious.  It proves only that distributions were made—not an improper motive for doing so.

The UCC Reply (¶65) cites a 2008 memo by Peter Boer and Richard Sackler entitled

████████████████████████████████████████[76]  But the

memo—which concerns ████████ and never mentions opioid litigation—identifies the risk:

"████████████████████████████████"[77]  The

memo thus stresses that: ████████████████████████

████████████████████████████████

---

[76]    Hurley Ex. 70 & Preis Ex. 163 (duplicates) at PPLPUCC001662356.

[77]    *Id.* at PPLPUCC001662358.



██████████████████████████████████."[78]  The memo emphasized that ██████████

███████████████████████████████████████████"[79] showing the

importance of compliance to the directors.

The UCC misleadingly states that the ████████ referenced in another 2008 email

exchange ████████████████████████████████████████████████

████████████████████████████████████. UCC Reply ¶60 (citing Hurley

Ex. 67). But the UCC knows—or certainly should know—that less redacted versions of the

document in the Debtors' production show that ████████████████████████████

██████████ As Mortimer Sackler explains in the email exchange, ███████████████

█████████████████████████████████████████████████████████

███████████"[80]

The UCC complains that the Sacklers █████████████████████████████

██████████████████████ based on a single chart presented to the Board in 2014 showing

that ██████████████████████████████████████. *See* UCC Reply at ¶65. If

true, that would not prove that any distribution was approved to hinder creditors. But the

argument is yet another half-truth. The UCC omits the other charts in the slide deck showing

that ███████████████████████████████████████████████████,[81]

a strategy that would make no sense if the Sacklers were simultaneously trying to remove

Purdue's assets from the reach of future judgment creditors.

---

[78]    *Id.* at PPLPUCC001662359.

[79]    *Id*. at PPLPUCC001662358.

[80]    RX 17 at PPLPUCC9004227986 (2/13/08 Email from M. Sackler to R. Sackler) (PPLPUCC9004227984).

[81]    *See* RX 54 at PPLPUCC003118166 (5/14/14 Board Agenda); *id.* at PPLPUCC003118165 *ff*. ("████████████████████████████████████████████████").

And the same Board Package contains another chart illustrating projected <u>declines</u> in

Purdue's legal expenses, which conclusively shows that no significant litigation was expected:[82]



The UCC's contention that Purdue's R&D program was "███████" (UCC Reply ¶66) is

pure rhetoric.  The UCC cannot refute that the Board authorized, and PPLP spent, nearly

███████ dollars on research and development from 2008 to 2017 and ██████████████

PPLP's R&D budget every year from 2008 to 2013—when more than ████ of the distributions

were made.  Side B Opp. 19.  The UCC simply cherry picks a phrase out of context—Jonathan

Sackler's statement that Purdue's strategy was "████████████████████████████████

████████"[83]—from a 2014 email that says nothing about opioid litigation but does show that he

and others were focused on a strategic plan for Purdue's future.[84]  The UCC's snippet

conveniently excludes Jonathan's optimistic prediction in the same sentence that the UCC

quotes: "████████████████████████████████████████████████████████████

---

[82]     *Id*. at PPLPUCC003118157.

[83]     Preis Ex. 206 at PPLPC045000017073.

[84]     *Id*. at -076, -073 ("████████████████████████████████████████████
████████████████████████████████████████").

███████████████████████████████████████████████████████████

███████████████████████████████████"[85]

The UCC also cites a document updating the Board on a setback in its active efforts to hire a new Business Development executive as evidence that the Board was not sufficiently committed to business development (Preis Ex. 215). The document proves just the opposite—all directors sought to reverse the setback—and says nothing about a threat of opioid litigation.

The UCC points to a host of third-party documents—never produced to the Sacklers, despite our request to the UCC (*see* RX 67)—to argue that the Sacklers knew for at least a decade that a wave of litigation was coming.[86] None of these emails went to any member of the Sackler family, and none reflects anything other than the Board's sensible directive that management try to get product liability insurance. *Id.* Putting aside that product liability claims were never a threat to Purdue (Side B Opp. 14, 24-26), the UCC acknowledges that Purdue at all times had "█████████████████████████████████ (UCC Reply at 28 n. 30). That, coupled with ████████████████████ the Board maintained in PPLP at year end (Side B Opp. 15)—provided protection far in excess of the ████ million cost of the prior product liability settlements.[87]

The UCC's remaining attempts to show that ███████████████████████ ████████████████████████ (UCC Reply ¶27, italics deleted) are no stronger:

•    The UCC points to the number of product liability suits reported in Purdue's financial statements—virtually all of which it concedes were resolved before 2012 (UCC Reply

---

[85]    *Id.* at -073.

[86]    *See* UCC Reply ¶¶62-63 (citing Preis Exs. 166-68, 192-94).

[87]    *See* RX 60 at slide 7 (PPLPC002000250049).

¶53).  The UCC does not dispute that Purdue won or settled on favorable terms all of those suits

by 2012, leaving just a few that remained dormant, as the same financial statements confirm.[88]

- The UCC points to the Kentucky case that settled for $24 million in 2015 as proof

that "state lawsuits were far from 'unfathomable.'"  UCC Reply ¶54.  It is not clear what the

UCC thinks was fathomable.  The Kentucky case asserted Medicaid claims and was commenced

in October 2007,[89] shortly after 48 other states and the District of Columbia settled their

Medicaid claims for $59.3 million.[90]  And even if multiplied by 50 states, the Kentucky

settlement amount was less than Purdue maintained in one-year's cash reserves.

- The UCC argues that the $24 million Kentucky settlement "implied Purdue

liability of at least [$1.6 billion] on a morphine milligram equivalent basis."  The UCC's liability

estimate assumes, incorrectly, that the other 49 states had not already settled their parallel claims.

The UCC also ignores that (i) the $24 million settlement figure was inflated by a procedural error

(failure to deny state court request for admission following removal) that put Purdue at risk of

admitting liability,[91] and (ii) even if the strained MME-equivalent methodology for calculating

---

[88]     Preis  Ex.  185  at  PPLPUCC500056874  (" ███████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████.").  *See
also* Preis Ex. 191 at PPLPUCC500056916 (same); Preis Ex. 203 at PPLPUCC500056955
(similar); Preis Ex. 205 at PPLPUCC500056996 (similar).

[89]     *Commonwealth of Kentucky et al v. Purdue Pharma, L.P. et al*, No. 7:07-cv-00222, Dkt.
No. 1-2 (E.D. Ky. Oct. 29, 2007) ¶¶5, 77-92 (October 4, 2007 Kentucky Complaint).

[90]     *See* Side B Opp. 7 & nn.6-7.  The only state other than Kentucky that did not settle its
Medicaid claims in 2007 was West Virginia, which had settled "all claims of whatsoever kind or
nature relating to OxyContin Tablets" for $10 million in 2004.  Ex. 1 (December 15, 2004 West
Virginia Settlement) (VF 00932234).

[91]     *See* Side B Opp. 13, Opinion and Order Denying Petition for Writ of Prohibition, *Purdue
Pharma L.P. v. Commonwealth ex rel. Conway*, No. 2013-CA-001941 (Ky. Ct. App. Feb. 28,
2014).  That procedural error was the reason a Purdue executive submitted an affidavit (Preis Ex.
201) about the adverse consequences of a judgment if Purdue could not contest liability.  That

exposure were meaningful, Purdue had over ██████████ in unrestricted free cash in 2015 and almost ██████████ in sales.

- The UCC cites a November 2006 "law journal article" warning that the West Virginia lawsuit settled in 2004 prompted "OxyContin opponents in some states [to urge] their attorneys' general to consider pursuing similar claims."[92]  The UCC does not claim that any members of the Sackler family saw the article.  By the time this article was published, 27 attorneys general had already pursued claims similar to those asserted by West Virginia, and those claims were all settled for $19.5 million by consent judgments in May 2007.[93]

- The UCC points out that some of the Sacklers were on email chains circulating news articles about opioids (*see* UCC Reply ¶57 (citing Preis Exs. 156-59, 165, 171, 179)), or that mentioned three cases filed in 2014—one in Chicago and 2 in California (UCC Reply ¶56).  That is a far cry from proof that anyone was concerned that a wave of litigation would ensue in 2017.

- The UCC points to an automated email that Richard Sackler received in 2010 forwarding ████████████████████████████████████████████ ██████████████████████████████████.  UCC Reply ¶58 (citing Preis Ex. 204).  Richard Sackler testified that he had set up a ████████████████████████████████████████████

---

affidavit did not indicate that Purdue—or the Sacklers—believed, or should have believed, the Purdue would face a billion-dollar judgment <u>if it could contest liability</u>.

[92]    UCC Reply ¶54 (citing Preis Ex. 188B).

[93]    *See* RX 3 ¶25 (Consent Judgment, *In re Purdue Pharma L.P.*, No. 07-C-00740 (Ky. Cir. Ct. May 8, 2007)).  The UCC's speculation about what advice a Chadbourne partner who represented Purdue in the 2007 plea deal, and who also represented a tobacco company in the late-1990s, did or did not "share[] with Purdue" about the tobacco companies defense of their own product liability cases (UCC Reply ¶55) is not evidence that any Sackler Board member was concerned about product liability litigation between 2008 and 2017.

████████████████[94]   There is no evidence that he ever received the actual article, which post-

dates the email conveying the abstract.  *See* Preis Ex. 202.

## V.   THE NCSG'S NEW ARGUMENTS HAVE NOTHING TO DO WITH THE CRIME-FRAUD ISSUES PRESENTED ON THIS MOTION

The NCSG makes irrelevant arguments that do not advance any issues raised by the

UCC's motion to compel.

The NCSG invokes the denial of a motion to dismiss by a Massachusetts trial court as

supposed evidence of wrongdoing.  The decision "assume[d] that the allegations in the

Complaint are true and view[ed] those allegations in the light most favorable to the

Commonwealth."[95]  An actual review of the documents cited in the Complaint filed by the

Massachusetts Attorney General shows that they contain no evidence of wrongdoing and were

grossly mischaracterized by the Complaint, as Side B demonstrated as part of its defense

presentation to the creditors on December 6, 2019 (RX 65 at slides 58-96, 163-256).

In the section of its brief entitled "More Evidence of Crimes and Fraud," the NCSG

insinuates that members of the Board instructed Purdue "to find a way to deflect the FDA" in an

effort to prevent "ground-breaking restrictions on the use of OxyContin."  *See* NCSG Reply

¶12.[96]  There is no substance to the NCSG's insinuation.  The NCSG does not point to any

---

[94]   RX 70 (11/19/20 R. Sackler Dep. Tr. 151:2-20).

[95]   *Commonwealth v. Purdue Pharma LP*, 2019 WL 5617817, at *2 (Mass. Super. Ct. Oct. 8, 2019).

[96]   In advancing this argument, the NCSG mischaracterizes the documents it cites.  For example, the NCSG asserts that Jonathan Sackler and Peter Boer asked Craig Landau to "do whatever he thinks is necessary to save the business" in connection with the FDA's REMS proposal.  NCSG Reply ¶12 (quoting Feiner Ex. C).  But in the quoted email, the referenced conversation transpires under the heading "Broader Strategy work," which does not talk about REMS.  Feiner Ex. C.  Rather, the "focus [of this broader strategy work] is on OTR and OxyContin."  *Id.*  OTR stands for Oxycodone or OxyContin Tamper Resistant (later known as ADF OxyContin).

39

evidence even suggesting that Purdue committed a crime or a fraud on the FDA, let alone that any member of the Sackler family did so.  The NCSG's argument seems to be little more than a complaint that the FDA—the regulatory authority charged with these decisions—determined that specialized training for OxyContin prescribers is not necessary.[97]

The NCSG cites a handful of documents as supposed evidence of Richard Sackler's micromanagement.  NCSG Reply ¶15.  None of these documents tie Dr. Sackler to any crime or fraud (or even any allegation in Sackler Addendum A), much less suggest that any legal communication sought by the UCC was made in furtherance of a crime or fraud.  Importantly, however, these documents undercut the UCC's argument that Side B was making fraudulent distributions because the documents reflect, again, that Side B was interested in investing in Purdue's business.  *See* Feiner Exs. I and J.

The NCSG cites a McKinsey presentation as evidence that McKinsey proposed paying rebates to insurance companies when patients suffered from overdoses or addiction (opioid use disorder).  NCSG Reply ¶22.  There is, however, no evidence that any member of Side B saw or endorsed a rebate program, or that Purdue adopted one.

## VI.    THERE IS NO BASIS TO BURDEN THE COURT WITH AN *IN CAMERA* REVIEW

Acknowledging that it has failed to identify specific documents that were used in furtherance of a fraudulent scheme, the UCC asks the Court to do its work for it by reviewing *in camera* 30 Side B communications in the hope that they are in furtherance of a fraudulent scheme.  *In camera* review "require[s] a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to

---

[97] The NCSG's complaint is doubly irrelevant because a claim of fraud on the FDA can only be brought by the federal government.  *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) ("state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law").

establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554,

572 (1989).  The Supreme Court has cautioned that *in camera* review should not be lightly

undertaken, or else courts will be enlisted as "unwitting (and perhaps unwilling) agents" "in

groundless fishing expeditions." *Id.* at 571.

The UCC has failed to present any evidence giving cause to believe that any of the 30

Side B communications that it proposes for *in camera* review was made to further, facilitate or

conceal a fraud or crime.

The UCC's position is that, without offering evidence that any communication was made

in furtherance of a crime or fraud, it can assert that fellow members of the bar were furthering a

fraudulent scheme, and that the Court should therefore undertake *in camera* review.  For

example, among the 30 documents that the UCC has flagged for *in camera* review are two copies

of a July 11, 2017 email—after all distributions had ceased—from Side B's current counsel,

Gregory P. Joseph, to the Side B directors attaching privileged work product.  Copied on the

email was former Bankruptcy Judge Robert E. Gerber.  These mid-2017 documents were

withheld as "███████████████████████████████████████████

███████████████████████████████"  *See* Preis Ex. B, Tab 6, PS-00156535, PS-

00156536, PS-00054790, and PS-00054791; Pries Ex. C at 2.  The UCC offers not even a

specific argument as to how an email and memo sent after distributions ceased could have been

intended to facilitate or conceal any fraudulent activity.  These legal communications were not

challenged in the UCC's opening brief.  *See* Hurley Ex. B, Tab. J.  The UCC now contends,

without any factual basis, that all sorts of communications from the post-2017, post-distribution

period involving Side B's current counsel were in furtherance of a fraudulent scheme.  *See* Preis

Ex. B, Tab 6.  This argument raises serious questions for UCC counsel.  *See Lazar v. Mauney*,

192 F.R.D. 324, 328–29 (N.D. Ga. 2000) (rejecting crime-fraud argument by parties who "have

not attempted to submit any evidence whatsoever" to make the requisite "prima facie showing"

as unfounded and in violation of Rule 11 and the Georgia ethical rules).

The UCC's failure to make the requisite showing that an *in camera* inspection of the

documents it has selected is warranted forms the ground of this opposition.  It should not be

construed as suggesting that *in camera* review would do anything but unreservedly confirm that

the crime-fraud exception does not apply to any of documents for which review is sought or

which are otherwise at issue on this motion.

Respectfully submitted.

Dated:  December 9, 2020
     New York, New York

*/s/ Gerard Uzzi*
Gerard Uzzi
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000

*/s/ Gregory P. Joseph*
Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200

*Counsel for the Raymond Sackler Family*