# Exhibit 68

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS); the Defense Health Agency (DHA), acting on behalf of the TRICARE program; the Office of Personnel Management (OPM), which administers the Federal Employees Health Benefits Program (FEHBP); and the Indian Health Service (IHS) (collectively, the "United States"), and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler (collectively, the "Named Sacklers" and, with the United States, "the Parties"), through their authorized representatives.[1]

## RECITALS

A.  The Named Sacklers are beneficiaries of trusts that indirectly own Purdue Pharma, L.P. ("Purdue").

B.  Purdue is a Delaware Limited Partnership that is headquartered in Stamford, Connecticut.

C.  At all relevant times, Purdue, directly or through its subsidiaries, manufactured, marketed, and sold pharmaceutical products in the United States, including OxyContin. OxyContin is a branded, extended-release oxycodone tablet.  Oxycodone is an opioid agonist 1.5 times more powerful than morphine with a high potential for addiction, abuse, and misuse. OxyContin is approved by HHS's Food and Drug Administration (FDA) for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which

---

[1] To the extent the term 'Named Sacklers' appears in Recital A, Recital E, and the second sentence of Recital F, in those instances the term includes Jonathan Sackler, rather than the Estate of Jonathan Sackler.

alternative treatment options are inadequate. It is classified as a Schedule II narcotic under the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

      D.      On September 15 and 16, 2019, Purdue and approximately twenty-three related and affiliated entities each filed voluntary petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Debtors"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. On September 18, 2019, the Bankruptcy Court entered an order authorizing the joint administration and procedural consolidation of the Debtors' chapter 11 cases (the "Chapter 11 Cases")[2] pursuant to Rule 1015(b) for the Federal Rules of Bankruptcy Procedure under the case caption *In re Purdue Pharma L.P., et al.*, No. 19-23649 (Bankr. S.D.N.Y.) (Jointly Administered).

      E.      The United States contends that the Named Sacklers caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); the TRICARE Program, 10 U.S.C. §§ 1071-1110b ("TRICARE"); and the FEHBP, 5 U.S.C. §§ 8901-8914; and caused purchases of OxyContin by the IHS on behalf of its federally operated programs, *i.e.*, programs not operated by a tribal health program or an Urban

---

[2] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).

Indian organization, as those terms are defined in the Indian Health Care Improvement Act, 25 U.S.C. § 1603(25), (29) (collectively, the "Federal Healthcare Programs").

F.     The United States contends that it has certain civil claims against the Named Sacklers as specified in Paragraph 4 below, for engaging in the conduct set forth in Addendum A (hereinafter, the Covered Conduct).  As a result of the conduct set forth in Addendum A, the United States alleges that, from 2013 to 2018, the Named Sacklers knowingly caused false and/or fraudulent claims for OxyContin to be submitted to the Federal Healthcare Programs.

G.     This Agreement is neither an admission of liability by the Named Sacklers nor a concession by the United States that the claims of the United States are not well founded.  The Named Sacklers expressly deny the allegations regarding the Covered Conduct.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.     The Named Sacklers shall pay or cause to be paid to the United States two-hundred twenty-five million ($225,000,000) plus interest on the Settlement Amount at the rate of 0.75% from November 5, 2020 ("Settlement Amount"), by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the Department of Justice, on the later of (i) fifteen (15) days after the Effective Date of this Agreement; or (ii) three (3) business days after the date on which the Bankruptcy Court grants a Motion to Confirm (as defined in Paragraph 2).

2.     No later than two business days after the Effective Date, the Named Sacklers will file in the Chapter 11 Cases a Notice of Settlement with the United States Department of Justice and Motion to Confirm That Payment Thereunder Is Not Prohibited ("Motion to Confirm").  To

the extent that any funds transferred to the United States in payment of the Named Sacklers'

obligations in Paragraph 1 derive directly or indirectly from transfers from the Debtors, the

Named Sacklers will expressly disclose these facts to the Bankruptcy Court and obtain an order

from the Bankruptcy Court confirming in advance of paying the Settlement Amount that

payment is not prohibited.  If the Bankruptcy Court denies the Motion to Confirm, the Motion to

Confirm is not granted in full, or the relief or Bankruptcy Court's Order is not consistent with the

terms and conditions of this Agreement, the United States may, in its sole discretion, rescind the

Agreement.

3.       The entirety of the Settlement Amount is not tax-deductible.  Neither the Sacklers

nor the Released Parties as defined in Paragraph 4 will treat any portion of the Settlement

Amount as, or represent that any portion of the Settlement Amount is, tax deductible.

4.       Subject to the exceptions in Paragraph 8 (concerning excluded claims) below, and

conditioned upon the full payment of the Settlement Amount, the United States releases the

Named Sacklers, their family members and the family trusts, current and former trustees and

protectors (solely in their capacity as trustees and protectors), all as identified in Addendum B

and the Purdue parent entities and the independent associated companies, all as identified in

Addendum C (collectively the "Released Family Members, Trust Parties and Entities") from any

civil or administrative monetary claim, whether *in rem* or *in personam*, that the United States has

based on the Covered Conduct or that seeks to recover funds distributed as part of the Covered

Conduct by Purdue, under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Food, Drug and

Cosmetic Act, 21 U.S.C. § 301 *et seq.*; the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*;

the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies

Act, 31 U.S.C. §§ 3801-3812; the Federal Debt Collection Procedures Act, 28 U.S.C. §§

3304(a)(1), (b)(1)(A), and (b)(1)(B); Civil Forfeiture, 18 U.S.C. § 981(a)(1)(C); any statutory

provision creating a cause of action for civil damages or civil penalties which the Civil Division of the Department of Justice has actual or present authority to assert and compromise pursuant to 28 C.F.R. Pt. 0.45(d) and 0.45(j); or the common law theories of payment by mistake, unjust enrichment, disgorgement, fraud, and, if applicable, breach of contract.  In addition, subject to the exceptions in Paragraph 8 (concerning excluded claims) below, and conditioned upon the full payment of the Settlement Amount, the United States releases the transferees of funds originally distributed by Purdue (collectively, the "Released Transferees") from any civil or administrative monetary claim, whether in rem or in personam, that the United States has that seeks to recover funds distributed as part of the Covered Conduct by Purdue under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3304(a)(1), (b)(1)(A), and (b)(1)(B) or Civil Forfeiture, 18 U.S.C. § 981(a)(1)(C).  The Released Family Members, Trust Parties and Entities and the Released Transferees are hereinafter referred to, collectively, as the "Released Parties."  Nothing in this Agreement releases any claims the Debtors' estates have the ability to bring, including but not limited to fraudulent transfer claims and any claims that could be brought by the Debtors' estates by standing in the shoes of any creditors in the Chapter 11 Cases against any individuals or non-debtor entities, including without limitation, the Debtors' current or former owners, shareholders, or members of their Boards of Directors.

5.     OIG-HHS expressly reserves all rights to institute, direct, or maintain any administrative action seeking exclusion against the Named Sacklers and any of the Released Parties from Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) under 42 U.S.C. § 1320a-7(a) (mandatory exclusion), or 42 U.S.C. § 1320a-7(b) or 42 U.S.C. § 1320a-7a (permissive exclusion).

6.      DHA expressly reserves all rights to institute, direct, or maintain any administrative action seeking exclusion against the Named Sacklers and any of the Released Parties from TRICARE  under 32 C.F.R. § 199.9(f) (mandatory and permissive exclusions).

7.      OPM expressly reserves all rights to institute, direct, or maintain any administrative action seeking debarment against the Named Sacklers and any of the Released Parties from the FEHBP under 5 U.S.C. § 8902a(b) (mandatory debarment), or (c) and (d) (permissive debarment).

8.      Notwithstanding the release given in Paragraph 4 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

> a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);
>
> b.      Any criminal liability;
>
> c.      Except as explicitly stated in this Agreement, any administrative liability, including mandatory or permissive exclusion from Federal health care programs;
>
> d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;
>
> e.      Any liability based upon obligations created by this Agreement;
>
> f.      Any liability of individuals or entities other than the Released Parties;
>
> g.      Any liability for personal injury or property damage (or for consequential damages arising therefrom);
>
> h.      Any liability for claims of the states or Indian tribes in the Chapter 11 Cases or otherwise, and no setoff related to amounts paid under this

Agreement shall be applied to any recovery in connection with any claim, action, or recovery by the states or Indian tribes;

i.   For avoidance of doubt, the United States, except as expressly contemplated by this settlement, retains all rights to recover, pursuant to 42 U.S.C. 1396b(d), the federal share of funds that have been or could be recovered by other entities; and

j.   Any liability for the following actions:

1.   *United States ex rel. Manchester v. Purdue Pharma, L.P., et al.*, No. 1:16-cv-10947 (D. Mass.); and

2.   *United States ex rel. [Sealed] v. [Sealed] (D. Vt.).*

No setoff related to amounts paid under this Agreement shall be applied to a recovery, if any, in connection with these actions.

9.     The Released Parties agree that no amounts paid under this Agreement will be applied to reduce amounts paid or to be paid by the Released Parties or on their behalf to the Debtors or creditors in the Chapter 11 Cases, including pursuant to the Summary Term Sheet filed with Bankruptcy Court, Dkt. No. 257.

10.     The Released Parties waive and shall not assert any defenses they may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

11.     The Released Parties fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and

expenses of every kind and however denominated) that the Released Parties asserted, could have asserted, or may assert in the future against the United States, and its agencies, officers, agents, employees, and servants related to the Covered Conduct and the United States' investigation and prosecution.

12.     The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier), TRICARE, FEHB, or any state payer, related to the Covered Conduct; and the Released Parties agree not to resubmit to any Medicare contractor, TRICARE, FEHB, or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

13.     The Released Parties agree to the following:

a.     <u>Unallowable Costs Defined</u>:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll-1 and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of the Released Parties in connection with:

(1)     the matters covered by this Agreement;

(2)     the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement;

(3)     the Released Parties' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

(4)    the negotiation and performance of this Agreement; and

(5)    the payment the Released Parties make to the United States pursuant to this Agreement

are unallowable costs for government contracting purposes and under the Federal Healthcare Programs (hereinafter referred to as Unallowable Costs).

b.    <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for by the Released Parties, and the Released Parties shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by the Released Parties or any of its subsidiaries or affiliates to the Federal Healthcare Programs.

c.    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>:  The Released Parties further agree that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by the Released Parties or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  The Released Parties agree that the United States, at a minimum, shall be entitled to recoup from the Released Parties any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by the Released Parties or any of their owned or controlled entities of the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on the Released Parties or any of their owned or controlled entities' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine the Released Parties' or their owned or controlled entities' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

14.      This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 4 (Released Parties) and Paragraph 15 (waiver for beneficiaries paragraph), below.

15.      The Released Parties agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

16.      In exchange for valuable consideration provided in this Agreement, the Named Sacklers acknowledge the following:

a.      The Named Sacklers have reviewed their respective financial situations and warrant that they are solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I) and shall remain solvent following payment to the United States of the Settlement Amount.

b.      In evaluating whether to execute this Agreement, the Parties and the

Released Parties intend that the mutual promises, covenants, and obligations set forth herein

constitute a contemporaneous exchange for new value given to the Named Sacklers, within the

meaning of 11 U.S.C. § 547(c)(1), and the Parties conclude that these mutual promises,

covenants, and obligations do, in fact, constitute such a contemporaneous exchange.

c.       The mutual promises, covenants, and obligations set forth herein are

intended by the Parties to, and do in fact, constitute a reasonably equivalent exchange of value.

d.      The Parties do not intend to hinder, delay, or defraud any entity to which

the Named Sacklers were or became indebted to on or after the date of any transfer contemplated

in this Agreement, within the meaning of 11 U.S.C. § 548(a)(1).

e.      If the Named Sacklers' obligations under this Agreement are avoided or

rescinded for any reason (including, but not limited to, (i) through the exercise of a trustee's

avoidance powers under the Bankruptcy Code or (ii) by the United States pursuant to Paragraph

2 (Motion to Confirm)); if the United States is required to return, disgorge, or otherwise remit

any of the Settlement Amount; or if, before the Settlement Amount is paid in full, any of the

Named Sacklers or a third party commences a case, proceeding, or other action under any law

relating to bankruptcy, insolvency, reorganization, or relief of debtors seeking any order for

relief of the Named Sacklers' debts, or to adjudicate the Named Sacklers as bankrupt or

insolvent, or seeking appointment of a receiver, trustee, custodian, or other similar official for the

Named Sacklers or for all or any substantial part of the Named Sacklers' assets, the United States

may elect, in its sole discretion:

(a) to rescind the releases in this Agreement and bring any civil and/or

administrative claim, action, or proceeding against the Released Parties for the claims that

would otherwise be covered by the releases provided in Paragraph 4 above; or

(b) in the event of bankruptcy, to have an undisputed, noncontingent, and liquidated allowed claim against the Named Sacklers for at least the Settlement Amount, less any payments received pursuant to this Agreement that are not otherwise avoided and recovered from the United States.

f.      The Named Sacklers agree that any civil and/or administrative claim, action, or proceeding brought by the United States under Paragraph 16(e) is not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) because it would be an exercise of the United States' police and regulatory power.  The Named Sacklers shall not argue or otherwise contend that the United States' claim, action, or proceeding is subject to an automatic stay and, to the extent necessary, consents to relief from the automatic stay for cause under 11 U.S.C. § 362(d)(1).

17.      In the event that this Agreement is nullified or rescinded for any reason or in the event the Named Sacklers' obligations under this Agreement are avoided for any reason, the Released Parties will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings that are brought by the United States within 180 calendar days of written notification to the Released Parties that the releases have been rescinded, except to the extent such defenses were available on January 15, 2020.

18.      Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

19.      Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

20.      This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District

Court for the District of New Jersey.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

21.    This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.

22.    The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

23.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

24.    This Agreement is binding on the Released Parties' successors, transferees, heirs, and assigns.

25.    All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

26.    This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement").  Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

<u>THE UNITED STATES OF AMERICA</u>

DATED: **10/21/20**    BY: _____

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
*Civil Division*
Jamie Ann Yavelberg
Director
Natalie A. Waites
Kristen M. Murphy
Claire L. Norsetter
Attorneys
*Commercial Litigation Branch*
*Civil Division*
*United States Department of Justice*


DATED: _____    BY: _____

RACHAEL HONIG
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515
Nicole F. Mastropieri
Marihug P. Cedeño
Assistant United States Attorneys
*District of New Jersey*

DATED: _10/21/2020_        BY: _~Lisa M. Re~_____
                              LISA M. RE
                              Assistant Inspector General for Legal Affairs
                              Office of Counsel to the Inspector General
                              Office of Inspector General
                              *United States Department of Health and Human Services*



DATED: _____        BY: _____
                              SALVATORE M. MAIDA
                              General Counsel
                              Defense Health Agency
                              *United States Department of Defense*



DATED: _____        BY: _____
                              EDWARD M. DEHARDE
                              Assistant Director of Federal Employee
                              Insurance Operations
                                 Healthcare and Insurance
                              *United States Office of Personnel Management*

DATED: _____    BY: _____

                                  LISA M. RE
                                  Assistant Inspector General for Legal Affairs
                                  Office of Counsel to the Inspector General
                                  Office of Inspector General
                                  *United States Department of Health and Human Services*

BLEY.PAUL.NICHO  Digitally signed by
LAS.1099873821  BLEY.PAUL.NICHOLAS.1099873821
                  Date: 2020.10.21 09:40:17 -04'00'

DATED: _10/21/2020__    BY: /s/ Salvatore M. Maida
                                  SALVATORE M. MAIDA
        for     General Counsel
                                  Defense Health Agency
                                  *United States Department of Defense*

DATED: _____    BY: _____

                                  EDWARD M. DEHARDE
                                  Assistant Director of Federal Employee
                                  Insurance Operations
                                    Healthcare and Insurance
                                  *United States Office of Personnel Management*

DATED: _____   BY: _____
                              LISA M. RE
                              Assistant Inspector General for Legal Affairs
                              Office of Counsel to the Inspector General
                              Office of Inspector General
                              *United States Department of Health and Human Services*

DATED: _____   BY: _____
                              SALVATORE M. MAIDA
                              General Counsel
                              Defense Health Agency
                              *United States Department of Defense*

DATED: 10/21/2020   BY: _____
                          EDWARD M. DEHARDE
                          Assistant Director of Federal Employee
                          Insurance Operations
                            Healthcare and Insurance
                          *United States Office of Personnel Management*

**NAMED SACKLERS**

DATED: 10/21/2020   BY: _____
_____
Dr. Richard Sackler

DATED: _____   BY: _____
_____
David Sackler

DATED: _____   BY: _____
_____
GARRETT LYNAM, ESQ.
On Behalf of the Estate of Jonathan Sackler

DATED: _____   BY: _____
_____
THEODORE V. WELLS, JR.
MICHELE HIRSHMAN
ROBERTO FINZI
Paul, Weiss, Rifkind, Wharton & Garrison LLP
Counsel for Dr. Richard Sackler, David Sackler,
and the Estate of Jonathan Sackler

DATED: _____   BY: _____
_____
Mortimer D.A. Sackler

DATED: _____   BY: _____
_____
Kathe Sackler

DATED: _____   BY: _____
_____
MARY JO WHITE
JEFFREY J. ROSEN
MAURA K. MONAGHAN
Debevoise & Plimpton LLP
Counsel for Mortimer D.A. Sackler and
Kathe Sackler

## NAMED SACKLERS

DATED: _____        BY: _____
                            Dr. Richard Sackler

DATED: 10/21/2020      BY: _D 15_____
                            David Sackler

DATED: _____        BY: _____
                            GARRETT LYNAM, ESQ.
                            On Behalf of the Estate of Jonathan Sackler

DATED: _____        BY: _____
                            THEODORE V. WELLS, JR.
                            MICHELE HIRSHMAN
                            ROBERTO FINZI
                            Paul, Weiss, Rifkind, Wharton & Garrison LLP
                            Counsel for Dr. Richard Sackler, David Sackler,
                            and the Estate of Jonathan Sackler

DATED: _____        BY: _____
                            Mortimer D.A. Sackler

DATED: _____        BY: _____
                            Kathe Sackler

DATED: _____        BY: _____
                            MARY JO WHITE
                            JEFFREY J. ROSEN
                            MAURA K. MONAGHAN
                            Debevoise & Plimpton LLP
                            Counsel for Mortimer D.A. Sackler and
                            Kathe Sackler

## NAMED SACKLERS

DATED: _____     BY: _____
                          Dr. Richard Sackler


DATED: _____     BY: _____
                          David Sackler


DATED: _October 21, 2020_   BY: _~~B-H~~_____
                          GARRETT LYNAM, ESQ.
                          On Behalf of the Estate of Jonathan Sackler


DATED: _____     BY: _____
                          THEODORE V. WELLS, JR.
                          MICHELE HIRSHMAN
                          ROBERTO FINZI
                          Paul, Weiss, Rifkind, Wharton & Garrison LLP
                          Counsel for Dr. Richard Sackler, David Sackler,
                          and the Estate of Jonathan Sackler


DATED: _____     BY: _____
                          Mortimer D.A. Sackler


DATED: _____     BY: _____
                          Kathe Sackler


DATED: _____     BY: _____
                          MARY JO WHITE
                          JEFFREY J. ROSEN
                          MAURA K. MONAGHAN
                          Debevoise & Plimpton LLP
                          Counsel for Mortimer D.A. Sackler and
                          Kathe Sackler

## NAMED SACKLERS

DATED: _____     BY: _____
                          Dr. Richard Sackler


DATED: _____     BY: _____
                          David Sackler


DATED: _____     BY: _____
                          GARRETT LYNAM, ESQ.
                          On Behalf of the Estate of Jonathan Sackler


DATED: 10/21/2020     BY: *Theodore V. Wells, Jr.*
                          THEODORE V. WELLS, JR.
                          MICHELE HIRSHMAN
                          ROBERTO FINZI
                          Paul, Weiss, Rifkind, Wharton & Garrison LLP
                          Counsel for Dr. Richard Sackler, David Sackler,
                          and the Estate of Jonathan Sackler


DATED: _____     BY: _____
                          Mortimer D.A. Sackler


DATED: _____     BY: _____
                          Kathe Sackler


DATED: _____     BY: _____
                          MARY JO WHITE
                          JEFFREY J. ROSEN
                          MAURA K. MONAGHAN
                          Debevoise & Plimpton LLP
                          Counsel for Mortimer D.A. Sackler and
                          Kathe Sackler

**NAMED SACKLERS**

DATED: _____   BY: _____

Dr. Richard Sackler


DATED: _____   BY: _____

David Sackler


DATED: _____   BY: _____

GARRETT LYNAM, ESQ.
On Behalf of the Estate of Jonathan Sackler


DATED: _____   BY: _____

THEODORE V. WELLS, JR.
MICHELE HIRSHMAN
ROBERTO FINZI
Paul, Weiss, Rifkind, Wharton & Garrison LLP
Counsel for Dr. Richard Sackler, David Sackler,
and the Estate of Jonathan Sackler


DATED: October 21, 2020   BY: _____

Mortimer D.A. Sackler


DATED: _____   BY: _____

Kathe Sackler


DATED: _____   BY: _____

MARY JO WHITE
JEFFREY J. ROSEN
MAURA K. MONAGHAN
Debevoise & Plimpton LLP
Counsel for Mortimer D.A. Sackler and
Kathe Sackler

**NAMED SACKLERS**

DATED: _____      BY: _____
                           Dr. Richard Sackler


DATED: _____      BY: _____
                           David Sackler


DATED: _____      BY: _____
                           GARRETT LYNAM, ESQ.
                           On Behalf of the Estate of Jonathan Sackler


DATED: _____      BY: _____
                           THEODORE V. WELLS, JR.
                           MICHELE HIRSHMAN
                           ROBERTO FINZI
                           Paul, Weiss, Rifkind, Wharton & Garrison LLP
                           Counsel for Dr. Richard Sackler, David Sackler,
                           and the Estate of Jonathan Sackler


DATED: _____      BY: _____
                           Mortimer D.A. Sackler


DATED: _10/21/2020_    BY: _____
                           Kathe Sackler


DATED: _10/21/2020_    BY: _____
                           MARY JO WHITE
                           JEFFREY J. ROSEN
                           MAURA K. MONAGHAN
                           Debevoise & Plimpton LLP
                           Counsel for Mortimer D.A. Sackler and
                           Kathe Sackler

**Addendum A**

## ADDENDUM A TO SETTLEMENT AGREEMENT[1]

### I.    Introduction

1.      Purdue Pharma L.P. and its affiliates (collectively, "Purdue") is owned by trusts for the benefit of the Sackler family.  Members of the Sackler family previously served as members of the board of directors of Purdue's general partner, including, Dr. Richard Sackler, Mortimer D. A. Sackler, Jonathan Sackler, Kathe Sackler, and David Sackler (the "Named Sacklers").

2.      Purdue's profits declined in 2010 after the introduction of its Reformulated OxyContin, which was intended to be more difficult (though not impossible) to crush or manipulate for purposes of abuse and misuse.  The Named Sacklers and Purdue executives tracked Purdue's lost sales closely and regularly scrutinized sales reports and related data.  They attributed the majority of the decline to two trends: (i) individuals abusing opioids moving from OxyContin to opioids that were easier to abuse through insufflation and injection and (ii) increased scrutiny of prescribers, pharmacists, and other actors in the opioid distribution chain.

3.      Although the Named Sacklers knew that the legitimate market for Purdue's opioids had contracted, the Named Sacklers nevertheless requested that Purdue executives recapture lost sales and increase Purdue's share of the opioid market.

4.      As a result, of these requests, from at least 2013 through 2018, Purdue developed an aggressive marketing program that focused on detailing over 100,000 doctors and nurse practitioners nationwide each year, including thousands of prescribers that the Named Sacklers knew or should have known were prescribing opioids that were not always for a medically accepted indication; were sometimes unsafe, ineffective, and medically unnecessary; and that

---

[1] All of the events, circumstances, and conduct described in this addendum constitute the "Covered Conduct" as that term is used in the Settlement Agreement.

were sometimes diverted for uses that lacked a legitimate medical purpose.   By 2013, Purdue

intensified its detailing of the very highest-volume prescribers, *i.e.*, those writing "25 times as

many OxyContin scripts" as their similarly situated peers, because Purdue and the Named

Sacklers knew that Purdue's detailing was highly effective in causing these prescribers to write

more prescriptions for Purdue's opioids.  This strategy, referred to as the "Evolve to Excellence"

or "E2E" program, was approved by the Named Sacklers.

5.      Through their approval of the E2E program, from 2013 to 2018, the Named

Sacklers knowingly caused the submission of false and fraudulent claims to federal health care

benefit programs for Purdue's opioid drugs that were prescribed for uses that were unsafe,

ineffective, and medically unnecessary, and that were often diverted for uses that lacked a

legitimate medical purpose.

6.      Around the same time, from approximately 2008 to 2018, at the Named Sacklers'

request, billions of dollars were transferred out of Purdue as cash distributions of profits and

transfers of assets into Sackler family holding companies and trusts.  Certain of these

distributions and transfers were made with the intent to hinder future creditors and/or were

otherwise voidable as fraudulent transfers.

## II.      <u>Organization of Purdue Pharma</u>

7.      Purdue carries on operations, including distributing and selling the extended-

release opioid drugs OxyContin, Butrans, and Hysingla.  Prior to February 2018, it employed a

sales force of, at times, over five hundred representatives to market its opioid drugs.

8.      Purdue was owned (through trusts) and controlled by the Sackler Family.  From at

least 1996 through 2018, members of the Sackler family served at various points as directors,

officers, consultants and employees of Purdue.  In these roles, members of the Sackler family

- 2 -

directed and oversaw Purdue's development, manufacture, marketing, promotion, sales, and

distribution of opioids, including OxyContin and interactions with the Drug Enforcement

Administration and the Food and Drug Administration, the Centers for Medicare & Medicaid

Services, and the Department of Health and Human Services.[2]

9.      As Board members, the Named Sacklers were not merely passive recipients of

information.

10.     Richard Sackler, Jonathan Sackler, and Kathe Sackler at times maintained offices

at Purdue's headquarters.

11.     Richard Sackler, Jonathan Sackler, Kathe Sackler, and Mortimer D.A. Sackler all

had direct communications with Purdue executives, including Sales and Marketing executives,

concerning forecasts and strategies.  At times, Richard Sackler also directly communicated with

lower level employees.  In addition, Richard Sackler, Mortimer D.A. Sackler, and Kathe Sackler

were involved in employment decisions regarding the CEO and Sales and Marketing leadership

positions.

12.     The Named Sacklers, as members of the Purdue Board, exercised substantial

oversight over management's operations of Purdue.  In February of 2011, a memorandum

observed:  "There seems to be a consensus that the role of the board and that of the management

is blurred compared with the distinctions made by other major corporations."  He further

observed that certain members of the Sackler family functioned as "executives, management,

---

[2] The following reflects the tenures of the Sackler family members on the Purdue Pharma Inc.
Board of Directors: Richard S. Sackler (10/2/1990 – 7/24/2018); Jonathan D. Sackler (10/2/1990
– 12/8/2018); David A. Sackler (7/19/2012 – 8/14/2018); Kathe A. Sackler (10/2/1990 –
9/27/2018); Mortimer D.A. Sackler (1/15/1993 – 1/16/2019); Theresa E. Sackler (1/15/1993 –
9/7/2018); Ilene Sackler Lefcourt (10/2/1990 – 2/4/2005; 5/16/2008 – 10/9/2018); and Beverly
Sackler (approximately 1993 –10/2017).

board, and shareholders all in one [and] worked collaboratively with other managers on a daily

basis."  As late as 2017, a high-level Purdue executive commented:  "Three distinct business

types (branded Rx [including Purdue]/biosimilars, consumer/OTC, generics) are being run

through four separate regions (five if Rhodes is included), with the Board of Directors serving as

the 'de-facto' CEO."

### III.      The Opioid Drugs Purdue Manufactured, Marketed, Promoted, and Sold

#### A.      *OxyContin*

13.      Oxycodone is an opioid agonist with a morphine milligram equivalent ("MME")

of 1.5 and a high potential for abuse similar to other opioids including fentanyl, hydromorphone,

methadone, morphine, and oxymorphone.

14.      It is classified as a Schedule II narcotic under the Controlled Substances Act, 21

U.S.C. § 801, *et seq.* ("CSA").

15.      Purdue manufactured, marketed, promoted, sold, and distributed OxyContin, a

branded extended-release oxycodone tablet, nationwide, including by sending sales

representatives to prescribers' offices and pharmacies, to persuade healthcare providers to

prescribe and pharmacists to dispense OxyContin.

16.      In April 2010, Purdue received FDA approval to market a reformulated version of

OxyContin ("Reformulated OxyContin").

17.      Reformulated OxyContin was more difficult to crush or dissolve, but FDA

cautioned that Reformulated OxyContin "is not completely tamper-resistant and those intent on

abusing this new formulation will likely find a means to do so.  In addition, the product can still

be misused or abused and result in overdose by simply administering or ingesting larger than

recommended oral doses."

18. In August 2010, Purdue discontinued the original version of OxyContin.

**B.** *Butrans*

19. Buprenorphine is an opioid partial agonist with an MME of 12.6 that exposes users to the risks of addiction, abuse, and misuse. It is classified as a Schedule III narcotic under the CSA.

20. In June 2010, Purdue received FDA approval to market Butrans, a branded buprenorphine patch, and began manufacturing, marketing, promoting, and selling Butrans nationwide.

**C.** *Hysingla*

21. Hydrocodone is an opioid agonist with an MME of 1.0 that exposes users to the risks of addiction, abuse, and misuse. It is classified as a Schedule II narcotic under the CSA.

22. In November 2014, Purdue received FDA approval to market Hysingla, a branded hydrocodone tablet, and began manufacturing, marketing, promoting, and selling Hysingla nationwide.

**IV.** **The Named Sacklers Knowingly Caused Medically Unnecessary Prescriptions to be Submitted to Federal Healthcare Programs**

23. From 2013 to 2018, the Named Sacklers approved an initiative that intensified marketing to high-volume prescribers and resulted in prescriptions of OxyContin that were unsafe, ineffective, and medically unnecessary, and that were diverted for uses that lacked a legitimate medical purpose. Such prescriptions are not reimbursable by Federal healthcare programs.

24. The paragraphs below describe Purdue and the Named Sacklers' scheme to cause high-volume prescribers to write medically unnecessary OxyContin prescriptions for Federal healthcare program beneficiaries.

- 5 -

A.    *"Calling On" and "Detailing" Prescribers Causes Them to Write More Prescriptions*

25.    The Named Sacklers knew or should have known that one of Purdue's most effective tools to increase and maintain opioid sales was to send sales representatives to prescribers' offices to meet with prescribers in person; deliver company-developed messaging; give the prescribers meals (such as coffee, breakfast, and lunch) and marketing materials (such as articles, brochures, posters, and other media); and provide information about pharmacies stocking Purdue opioids and prescription coverage, including coverage under Federal healthcare benefit programs.

26.    This practice is known in the pharmaceutical industry as "calling on" or "detailing" healthcare providers.

27.    The Named Sacklers – through their many years in the pharmaceutical industry and the data analyses and management reports to the Board that they received – knew that calling on or detailing healthcare providers causes them to prescribe more of Purdue's opioid drugs.

28.    For example, the Named Sacklers received return-on-investment analyses comparing the cost of detailing as compared to the OxyContin prescriptions that would not have been written but for Purdue's in-person marketing, as well as "sensitivity" analyses showing the impact of Purdue's detailing on OxyContin prescribing.

29.    In sum, the Named Sacklers knew that detailing was one of the most effective means for growing OxyContin sales and, for this reason, they took a particular interest in this facet of Purdue's marketing, requested regular briefings, and provided input on various strategies.  Indeed, Richard Sackler even went on a ride-along with at least one Purdue sales representative to experience Purdue's detailing in-person.

**B.      *The Sales Revenue Purdue Calculated from Federal Healthcare Programs***

30.      The Named Sacklers knew that Federal healthcare programs paid claims for Purdue's opioid drugs, including OxyContin, and were informed by Purdue management reports to the Board that those payments accounted for a significant percentage of Purdue's revenue.

31.      For example, an April 11, 2012, budget presentation to Purdue's Board of Directors showed that certain Federal healthcare benefit programs accounted for over 30% of Purdue's revenue from sales of OxyContin.

32.      Additionally, Purdue developed messaging and marketing materials associated with insurance coverage for OxyContin, including Federal healthcare program coverage, to induce prescribers to write OxyContin prescriptions for Federal healthcare program beneficiaries.

33.      In sum, the Named Sacklers knew, or should have known, that Purdue's promotional activities for its drugs were a substantial factor in claims being submitted to Federal healthcare programs.

**C.      *Purdue's Marketing of OxyContin After Reformulation*.**

34.      Throughout the relevant time period, the Named Sacklers received regular briefings from Purdue executives and employees concerning prescription trends and data, and, through at least January 2014, Richard Sackler received weekly analyses of opioid prescribing data.

35.      Shortly after the introduction of Reformulated OxyContin in 2010, the Named Sacklers received data and briefings showing that Purdue's profits declined as some individuals who abused OxyContin moved to more easily manipulated opioids.

36.     The Named Sacklers were also informed by Purdue management that during this
time period Purdue closely analyzed internal data not just with regard to overall sales trends, but
also to target high-volume prescribers and monitor their opioid prescriptions.

37.     Purdue ranked the prescribers based on their aggregate opioid prescriptions in
deciles from numbers 1 through 10, with 10 being the highest.

**D.      *Declining Sales and Higher Sales Goals***

38.     From 2010 to 2018, Purdue's profits were almost entirely driven by its success in
selling OxyContin.

39.     The Named Sacklers understood the importance of OxyContin's sales' success to
Purdue's bottom line.

40.     On January 25, 2010, Richard Sackler emailed other members of Purdue's Board:
"By way of background, the most important driver of our sales growth or decline is the
performance of all the oxycodone extended release forms in the market (called OER); this is
comprised of OxyContin® tablets plus all the generics in the space."

41.     By virtue of OxyContin's importance, the Named Sacklers were personally made
aware of sales targets, and at times challenged the targets set by Purdue executives.

42.     In January 2010, Purdue executives and certain of the Named Sacklers engaged in
an exchange regarding the executives and other employees' proposed 2010 budget.

43.     Purdue executives and other employees proposed that OxyContin growth should
be pegged at 3%.  Richard Sackler thought this target was too low and would "lead to an
OxyContin[] tablets forecast that is almost the same as our sales in 2009."  In response,  Purdue's
CEO informed Richard Sackler that "in looking at the recent [oxycodone extended release]
prescription growth trends and knowing the overall dynamics of the market OxyContin competes

- 8 -

in – I just can't see a way of the prescription growth tracking to a level substantially higher than the 3% on which this budget is based" and that the higher target suggested by Richard Sackler would "be interpreted as an imposition as opposed to an action that will stimulate the type of business building behaviors we want to encourage."

44.    In response, Richard Sackler, who believed that Purdue's OxyContin growth target should be much higher, told Purdue's CEO "… I'm disappointed and don't agree with you.  This is a matter that the Board will have to take up and give you a settled direction."

45.    Later that month, on January 25, 2010, Richard Sackler emailed the Board and informed them that he had "engaged management on this subject," referring to the proposed 2010 budget, and explained his view that management's number was "unduly conservative."

46.    On the same day, Mortimer D.A. Sackler followed up with Theresa Sackler regarding Richard's proposal, stating "we should push management to agree to a higher target."

47.    After the release of Reformulated OxyContin in August 2010, OxyContin sales immediately began to decline.

48.    Purdue management presented information regarding the slipping demand for Purdue's OxyContin to Purdue's Board in December 2010, showing that the total weekly kilograms dispensed of branded OxyContin declined from August to November 2010.

49.    This downward trend continued the following year.  On or about June 15, 2011, Purdue's Associate Director of Forecasting Analytics prepared a memorandum to Purdue's CEO, among others, identifying an expected budget shortfall of over $1 billion.  The memorandum stated that "Kilograms dispensed have declined since the transition to the reformulated, primarily due to fewer 40mg and 80mg tablets [,Purdue's highest dosage tablets,] being dispensed."

50.     In or around June 20, 2011, Purdue's CFO shared this information with the Board in a presentation stating, "Since the transition, 40 and 80mg tablet prescriptions have decreased significantly. The 10mg and 20mg tablet prescriptions initially increased, but given their lower value not enough to offset the higher strength decline." The presentation went on to revise the forecast of projected OxyContin sales from $3.9 billion to $2.8 billion.

51.     Sales continued to trend downward in 2012.

52.     On April 15, 2012, Richard Sackler emailed Purdue's Vice President of Sales, stating, "We should . . . discuss the sudden decline in [OxyContin] sales in the past year or two. What are we doing to identify corrective actions?" The following day, the Vice President of Sales forwarded Richard Sackler's email to Purdue's CEO, among others, stating, "I am surprised that Dr. Richard is asking this. . . . Since the decline is related to reformulation I'm not sure how to proceed with him."

53.     On July 17, 2012, Mortimer D.A. Sackler emailed fellow Purdue Board members stating that Purdue should "start a search asap for a new CEO" and consider "replacing the head of sales and marketing."

54.     In November 2012, looking back at the time period since Reformulated OxyContin replaced original OxyContin, Purdue's CEO reported to Purdue's Board of Directors that there was a "Decline in OxyContin [Prescriptions] From Late 2010 Through 2011." The CEO added that "2012 gross sales [of OxyContin] were 3.7% below budget [and] 2012 net sales [of OxyContin] were 4.3% below budget due to lower prescription demand."

55.     In October 2013, Mortimer D.A. Sackler asked Purdue's management for additional data concerning the downward trend in sales by dosage, requesting a chart to "show the breakdown of the OxyContin market share by strength against competitors. I would like to

understand more the recent dynamics of the market and where the patients are shifting to that we

are losing." Later that same day, responses to Mortimer's questions explained that the loss of

sales was due to "the recent dynamics of the market," the pressures of increased government

regulation, and that there were "fewer patients titrating to the higher strengths from the lower

ones."

  **E.**   ***Post-Reformulation Decline Attributed to Medically Unnecessary Prescriptions***

  56.  Purdue studied the drivers of the post-reformulation OxyContin sales decline, and

it attributed most of the decline to a reduction in medically unnecessary prescriptions, many of

which were written for abuse through insufflation or injection, and increases in safeguards

intended to hinder medically unnecessary prescribing.

  57.  Purdue also conducted a number of post-marketing studies of Reformulated

OxyContin.

  58.  Purdue's studies and analyses showed that the decline in overall OxyContin

prescriptions was most pronounced among high-volume "Region Zero" prescribers and the

highest dosage tablets, the 40 mg and 80 mg tablets.

  59.  Purdue also attributed approximately 40% of the decline in OxyContin

prescriptions in 2010 and 2011 to "Region Zero" prescribers. Region Zero prescribers were

prescribers that Purdue instructed sales representatives not to call on because, based on

information maintained by its Abuse and Diversion Detection ("ADD") Program, Purdue

determined that "there is a concern about potential abuse or diversion related activities" by them.

Purdue had detailed information (down to the number of prescriptions written, product, and

dosage) of Purdue products prescribed by Region Zero doctors and knew that Purdue had been

making a considerable profit from these prescriptions.

- 11 -

60.     Purdue knew that the remainder of prescribers who experienced a significant drop in sales post-reformulation were not on Purdue's Region Zero do-not-call list, meaning representatives could continue detailing them.

61.     In or around August 2010, the Named Sacklers, received a Board package that included Region Zero sales data, including the names of Region Zero prescribers.

62.     By December 1, 2010, the Named Sacklers were made aware of Purdue's findings concerning the drop in sales post-reformulation. Specifically, at a December Board briefing, Purdue's CEO discussed a chart stating that "Region 0 Accounts For Much Of The TRx Decline At The Regional Level."

63.     In April 2011, Purdue prepared an excel sheet showing prescribers who experienced significant drops in prescriptions post-reformulation.  Among the 134 prescribers listed in the prescription change analysis, Purdue was continuing to detail about one-third of them.  The spreadsheet specifically identified substantial declines in prescriptions for 80 mg tablets.

64.     On October 25, 2011, Purdue's Board received a copy of Purdue's September Executive Committee Meeting Notes & Actions, which provided Board members with information regarding the impact of Reformulated OxyContin on abuse.

65.     Among the Board materials was a presentation stating that there was a "[d]ecline in 80 mg prescriptions, esp[ecially] among 'Do not Call' prescribers," and a "[s]hift in routes of abuse, especially injecting and snorting."

66.     The study also found that some users continued to abuse Reformulated OxyContin through insufflation or injection – albeit fewer of them.  Among the remaining

- 12 -

individuals who reported abusing OxyContin, the percentage reporting abuse through oral ingestion rose from 52% to 75%.

67.     The materials provided to the Board in October 2011 also included a study, "Changes in Prescribing Patterns Following Introduction of Reformulated OxyContin: A Window into Diversion." The study examined a two-year period, August 2009 to July 2011, and found that data for Region Zero prescribers showed an 86% decline in their OxyContin prescriptions after Purdue's introduction of its reformulated version, and especially at the highest dosages, 40 and 80 mg tablets. The study found that prescribers suspected of abuse and diversion also prescribed the highest dose (80 mg) of OxyContin more frequently than other prescribers.

68.     The study also found that Region Zero prescribers accounted for only 38.4% of the overall decline in sales post-reformulation, which Purdue attributed to reduced abuse of OxyContin. The remaining 61.6% of the decline was among other prescribers that were not on Purdue's Region Zero lists, meaning that sales representatives either were continuing to call on these prescribers or were permitted to do so.

69.     Figures in the presentation further showed that prescribing of immediate-release oxycodone increased at a similar rate (an approximately 32% increase) to the decline in 80 mg and 40 mg tablets of Reformulated OxyContin prescriptions (which experienced a 24% decrease and 26% decrease, respectively) among the non-Region Zero comparator prescribers, indicating that patients who had been abusing OxyContin may have been shifted to a non-reformulated oxycodone product that they could continue to misuse.

70.     Versions of the presentation, including at least one provided to Richard Sackler in August 2013 at his request, repeated key findings, including: "Greater declines for doctors that

- 13 -

were potentially problematic prescribers"; "Greater declines for high versus low dosage strengths"; "A small number of prescribers contribute to a large proportion of potential diversion of opioids from legal to illegal channels"; and "there were doctors in the [Purdue's] database who were prescribing painkillers 'for what appears to be the wrong reasons.'"

71.    In sum, the Named Sacklers knew, or should have known, that, after the release of its Reformulated OxyContin, the product continued to be abused, but the primary method of abuse shifted to abuse through oral ingestion.  Furthermore, the Named Sacklers knew, or should have known, that abuse and diversion appeared concentrated among a cohort of high-volume prescribers.  The Named Sacklers nevertheless endorsed a marketing effort beginning in 2013 focused on high-volume prescribers.

**F.    *Decline in OxyContin Revenue Also Attributed to Safeguards Intended to Curb Abuse and Diversion.***

72.     At the same time, Purdue also attributed declines in OxyContin prescription revenue post-reformulation to safeguards intended to reduce medically unnecessary opioid sales, including increased scrutiny of opioid prescribing by law enforcement, wholesalers, distributors, and retail pharmacies.

73.    For example, a Business Condition Report from a May 2-3, 2013 Board of Directors Meeting described sales as being "$144mm behind Q12013 budget" and stated that "[p]ossible causes of fewer tabs/Rx include increased state regulations, anti-opioid environment, and increased DEA/law enforcement scrutiny of physicians, pharmacies and wholesalers."

74.    A consulting company that worked for Purdue since approximately the mid-2000s similarly attributed the decline in sales, in large part, to both the reformulation and safeguards against medically unnecessary prescriptions.

- 14 -

75.     In 2013, the consulting company informed Purdue and its Board, that "[t]he retail channel, both pharmacies and distributors, is under intense scrutiny and direct risk."

76.     More specifically, the consulting company explained to Purdue and its Board "[t]here are reports of wholesalers stopping shipments entirely to an increasing number of pharmacies," "[m]any wholesalers are also imposing hard quantity limits on orders based on prior purchase levels," and "[p]harmacy chains are implementing guidelines for which patients can fill opioid prescriptions."

77.     Later, Purdue's 2014 budget presentation to the Board listed these safeguards – intended to prevent medically unnecessary prescriptions of opioids, including OxyContin – among the "challenges" to achieving revenue goals.

78.     Nevertheless, the Named Sacklers continued to press the company to recapture lost sales and implement strategies, including the E2E program discussed below, to improve profits without regard to whether those sales were tethered to or could be achieved based solely on medically necessary prescriptions.

**G.      *Re-catalyzing Medically Unnecessary Prescriptions: Turbocharging Sales through E2E.***

79.     On May 28, 2013, Purdue executives executed a contract with a consulting company to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin revenue and develop plans to capture priority opportunities."

80.     Richard Sackler had direct communications with the consulting company shortly before the contract was executed, which continued as the consulting company worked with Purdue to develop and implement E2E.

- 15 -

81.     Between July 18 and August 8, 2013, the consulting company provided several reports to Purdue's CEO, at least two of which were provided to the Board, including the Named Sacklers.

82.     The consulting company proposed that Purdue adopt what was later referred to as the "Evolve to Excellence" initiative, or "E2E."

83.     The reports concluded that there existed a "significant opportunity to improve sales through better targeting."

84.     "Better targeting" primarily meant focusing sales calls on extremely high-volume opioid prescribers and removing sales representative discretion with respect to call plans.

85.     Purdue and the consulting company analyzed Purdue prescription data and other Purdue data sources broken down by deciles based on, primarily, providers' opioid prescribing. According to Purdue and the consulting company's deciling calculations, the prescribers writing "25 times as many OxyContin prescriptions as" other providers – those within the top five deciles – comprised less than seven percent of all prescribers nationwide, but wrote approximately as many opioid prescriptions as the remaining 93 percent of prescribers combined.

86.     The consulting company contended that, in contrast to the decile ranking undertaken by Purdue from 2010 to 2012, its rankings focused on "value deciles," which purported to be qualitatively different.  In practice, the value decile ranking only enhanced Purdue's marketing focus on extremely high volume prescribers and ensured a focus on federal health care benefit program beneficiaries.

87.     The "value decile" analysis purported to use the following metrics:  (1) overall opioid prescriptions, including number of branded versus generic prescriptions; (2) whether the

prescriber had rules in place prohibiting sales representatives from calling on them; (3) managed care access, including access to Federal healthcare benefit program beneficiaries; and (4) the number of the prescriber's new to brand prescriptions (including new opioid patients and switches from other opioid products).

88.     The consulting company reports showed that the highest-volume prescribers were the most susceptible to marketing:  detailing resulted in a 53% increase in prescriptions compared to only 33% for the middle decile prescribers.  They also showed that, in the absence of detailing, high-volume prescribers' Purdue prescriptions would decline considerably.

89.     The consulting company told Purdue and its Board that its proposed marketing plan would slow or reverse that decline.

90.     The memoranda asked Purdue to "make a clear go or no go decision on Turbocharging the Sales Engine," meaning implementing E2E.

91.     On August 15, 2013, Purdue's CEO and a Purdue executive discussed the consulting company's progress on evaluating growth opportunities for OxyContin with the Board, including the Named Sacklers.  Their presentation noted that the analysis would include an examination of "relatively more sudden declines in tablets per prescriptions and prescriptions for 40 mg and 80 mg strengths" and "prescriber segmentation and targeting."

92.     Later that same day, Richard Sackler emailed Mortimer D. A. Sackler:  "The 'discoveries' of [the consulting company] are astonishing."

93.     Richard Sackler subsequently arranged for a face-to-face meeting for the Board with the consulting company outside of the presence of Purdue executives.

94.     On August 23, 2013, certain of the Named Sacklers met with the consulting company and examined its "unvarnished" findings and recommendations.

95.     Following the meeting, one of the consulting company partners that led the meeting that included certain of the Named Sacklers memorialized in an email: "[T]he room was filled with only family, including the elder statesman Dr. Raymond [Sackler]. . . .  We went through exhibit by exhibit for about 2 hrs. . . .  They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

96.     Another consulting company partner further remarked in that email correspondence that their "findings were crystal clear to" the Sacklers "and [the Sacklers] gave a ringing endorsement of 'moving forward fast.'"

97.     After the "ringing endorsement", Purdue, in collaboration with the consulting company, implemented many of the consulting company's recommendations.

98.     The Named Sacklers approved the E2E program to recapture lost sales and to improve profits.

99.     The Board received a presentation on E2E's implementation at the September 2013 Board meeting.

100.     In September 2013, Richard Sackler emailed an advisor asking when Purdue could reach out to its newly-hired CEO to brief him on E2E.

101.     E2E took a multifaceted approach to increasing OxyContin prescribing and Purdue's profits.  The consulting company recommended, among other strategies, refreshing the marketing messaging and undertaking strategies to ensure prescriptions would be filled.  At its core, however, E2E focused on intensifying marketing to the very highest-volume prescribers in the country by targeting them with increased frequency and minimizing sales representative discretion in identifying prescribers to target.

- 18 -

102.    In late 2013, the Board received a 2014 Budget presentation again reviewing E2E's implementation.  Board notes show the Board discussed ensuring E2E's funding at that meeting.

103.    In sum, the Named Sacklers knew, or should have known, that E2E's core strategies relied on generating prescriptions from extremely high-volume prescribers and ensured that it was implemented to increase OxyContin profits.

### H.    *E2E's Aggressive OxyContin Sales and Marketing Strategies.*

104.    E2E was overseen by the consulting company and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO").

### i.    *Increasing the frequency of calls on Extreme High-Volume Prescribers*

105.    Based on a study showing that providers in deciles 7-10 were most responsive to sales calls and were the most prolific writers, the E2E call plans instructed sales representatives to call on the very highest deciles of high-volume prescribers with the most frequency.

106.    Specifically, Purdue instructed its sales representatives to call on the highest volume OxyContin prescribers (*i.e.*, those in so-called "deciles" 7 through 10) at least 24 times a year and "heavily favor" promoting OxyContin over other Purdue opioids in their messaging.

107.    Purdue executives also emphasized the focus of E2E at national sales meetings: "The single core objective of E2E…is to make sure that we're making calls on the highest potential customers with the right frequency to maximize prescribing potential."

108.    An email between two Purdue executives dated October 23, 2013, entitled "S&P Final Versions" attached Board presentations, including a 2014 Budget Presentation on

OxyContin Tablets, which reflected that the extreme high-volume prescribers that E2E targeted were most sensitive to Purdue's marketing:



109.    Speaker notes to this presentation discussed focusing on these top tier prescribers because "Increased calls with decile 8-10 prescribers have a significant impact on OxyContin® TRx growth" – an over 39% increase as compared to a decline of approximately 17% among prescribers receiving fewer calls.

### ii.    *Messaging to Cause High Volume Prescribers to Get More Patients on OxyContin and Titrate Dosages*

110.    Purdue's sales and marketing departments prepared scripts, visual aids, brochures, and messaging for representatives to use with the providers they called on.  A large part of this marketing was intended to cause the highest volume prescribers in the nation to "commit" to writing more OxyContin prescriptions.

111.    At the same time, Purdue also refined its marketing message through the S.T.A.R.T. (Supplement, Titrate, Adjust, Reassess, Tailor) initiative by focusing sales conversations with prescribers on titrating patients to dosages.

- 20 -

112.    The goal of the program was to discourage patient discontinuation of OxyContin due to perceived lack of pain relief by encouraging providers to increase the OxyContin dosage, or "titrate up."

113.    At the November 2013 meeting concerning Purdue's 2014 budget, a Purdue executive discussed with the Board the company's plans to "refine the message" of the company's titration up marketing campaign and specifically referenced the "Individualize the Dose" campaign, a Conversion & Titration Guide, and the S.T.A.R.T. principles to "highlight important elements of titration throughout the course of treatment."

114.    Briefings to the Board also showed that the E2E marketing pushed by sales representatives in these calls specifically discussed titrating to higher dosages, initiating opioid naïve patients on opioid therapy, and switching patients from immediate release opioids to Reformulated OxyContin.

115.    As such, the Named Sacklers knew, or should have known, that the program they requested and approved would not only cause more prescriptions by high-volume prescribers, but was also intended to increase the dosage of those prescriptions.

116.    In December 2013 correspondence, Purdue's CFO told the Board that "[t]he E2E sales force focus/effectiveness initiatives [that] are being implemented starting October 2013 through April 2014 are already showing positive results."

**I.      *Purdue's Internal Systems Confirm that E2E Caused Medically Unnecessary Prescribing***

117.    Purdue's Abuse and Diversion Detection ("ADD") program and Region Zero list, of which the Named Sacklers were aware, contain examples of high-volume prescribers detailed during E2E that Purdue's own employees suspected were writing medically unnecessary prescriptions.

- 21 -

118.    At all relevant times, Purdue maintained an ADD program, through which Purdue had the means and ability to identify prescribers suspected of engaging in abuse and diversion.

119.    The Named Sacklers were aware of the ADD program and Region Zero based on briefings received through their membership in the Board, interactions with Purdue employees, and news articles, including articles published by the *Los Angeles Times*.

120.    The ADD program operated from approximately 2002 through February 2018 and was governed during most of that time period by Standard Operating Procedure ("SOP") 1.7.1.

121.    SOP 1.7.1 instructed Purdue employees to refer prescribers who displayed indicia of abuse and diversion to ADD.  Employees referred these prescribers to ADD by issuing a Report of Concern ("ROC").

122.    The indicia of abuse and diversion in SOP 1.7.1 were amended over time and included, among other things, excessive numbers of patients; brief or nonexistent contact with patients; high numbers of cash pay patients; information that a prescriber or his or her patients may be diverting opioids; allegations of patient overdoses; allegations of unauthorized individuals signing prescriptions; large numbers of patients traveling long distances; and allegations that a prescriber is under investigation.

123.    After prescribers were referred to ADD, an ADD review team comprised of Purdue employees reviewed information concerning the prescribers to determine whether Purdue should continue to market its opioids to them.  The Named Sacklers did not sit on the ADD review team.

124.    If Purdue's ADD review team determined a sales representative should not continue to call on a prescriber, the prescriber was placed on the Region Zero list.

- 22 -

125.     The Board, including the Named Sacklers were made aware by Purdue management reports to the Board that Region Zero providers were responsible for a major drop in sales after Reformulated OxyContin was released, and that there were similar declines among prescribers who were not on Region Zero that Purdue sales representatives could continue to detail.

126.     Purdue sales representatives were trained to report prescribers suspected of abuse and diversion to ADD, and some sales representatives did so. However, many high-volume prescribers, despite having indicia of abuse and diversion, were not reported.  Further, even after they were reported to ADD, Purdue continued to detail and generate prescriptions from high-volume prescribers that were prescribing opioids that were not for a medically accepted indication; were unsafe, ineffective, and medically unnecessary; and that were often diverted for uses that lacked a legitimate medical purpose.   The following are two examples of high-volume prescribers that Purdue detailed during E2E.

### *Doctor-1*

127.     From January 2010 through May 2018, Purdue representatives detailed Doctor-1 at least 290 times, although calls after February 2018 did not promote opioid medications. During this time, the doctor caused the submission of a high number of OxyContin claims to Medicare.

128.     Purdue knew that Doctor-1 was prescribing medically unnecessary opioids.  From 2009 through 2011, Purdue received at least three different ROCs about Doctor-2.

129.     In October 2009, a Purdue sales representative reported:  "Pharmacist . . .  says they've had all kinds of problems with abuse and diversion of Oxycontin . . . [Pharmacist] said [he] and [other doctor] are too lose [sic] when writing prescriptions of Oxycontin. He says of the

- 23 -

patients he thinks are selling their prescriptions, he has notified the doctors, but nothing has changed."

130.    In June 2010, the sales representative further reported:  "the pharmacy manager, says [the doctor] is known as the "Candyman" . . .  because she will immediately put every patient on the highest dose of narcotics she can, whether it's Oxycontin or another product.  He says when he goes to local pharmacist meetings, when her name comes up everyone in the room cringes and moans because of her practices.  He says she is doing all kinds of wacky dosing and tablet strengths.  He says he feels like she is not doing what she should be doing with medications.  On occasion he has refused to fill prescriptions from her office . . . . He said he's been seeing some crazy dosing of Oxycontin coming in, especially from [Doctor-1]."

131.    In July 2010, a Purdue sales representative reported:  Another physician "said he had a patient . . . from [the doctor] who was on 80 mg 5 times per day. He thought this was over the top and asked me today what the maximum dose was.  He felt this patient was definitely exceeding it.  I told him since it was a single entity opioid, there is no ceiling dose.  It is only limited by side effects.  He said he would not continue this type of dose."

132.    The same representative "became concerned on March 18, 2010, when she realized that patients were being treated by . . . a registered nurse without prescribing privileges, in [the doctor's] absence.  According to [the representative], this 'was not an isolated incident.'"

133.    The representatives' call notes showed other instances where Doctor-1 was absent during business hours, including a February 2010 incident when the doctor left in the middle of the day to get a tattoo.

134.    The ADD program placed Doctor-1 on Region Zero and instructed sales representatives to cease calling on the doctor in August 2010.

- 24 -

135.    However, in October 2011, Purdue instructed sales representatives to resume calling on Doctor-1 and the sales representatives did so until May 2018.

136.    Purdue's detailing caused Doctor-1 to write medically unnecessary prescriptions for OxyContin, claims for which were submitted to Federal healthcare programs.

### *Doctor-2*

137.    From January 2010 to May 2018, Purdue representatives detailed Doctor-2 at least 130 times, although calls after February 2018 did not promote opioid medications.

138.    During this time, Doctor-2 caused Medicare claims for OxyContin, the overwhelming majority of which were for OxyContin 80mg tablets.

139.    On September 23, 2003, a Purdue employee flagged Doctor-2 for ADD review stating, "Have you looked at the doctor with [the doctor's ME number]?  This person is in specialty decile 7 and has about twice the volume as anyone else in that decile."

140.    Purdue performed an ADD review in July 2004 after reviewing information showing the doctor had abnormally high opioid volume and a high percentage of cash-paying patients, and receiving reports that the doctor was under investigation for his opioid prescribing. The ADD team did not place Doctor-2 on the Region Zero list at that time.

141.    Doctor-2's name came up again in 2008 and 2009 in connection with Purdue's internal investigation of a diverting pharmacy.  The investigation revealed, in part, the following red flags regarding the pharmacy, including:  it was a high traffic pharmacy; cars observed at the pharmacy had out of state plates; it had pharmacy clients loitering outside; it had pharmacy clients entering and exiting vehicles not their own; and it had pharmacy clients exchanging prescription drugs.  As part of the investigation, Purdue identified Doctor-2 as one of the "Three

(3) Main Doctors who prescribe for [pharmacy]," but undertook no further review of the doctor after this event.

142.    Purdue sales representatives' call notes also identified ongoing concerns regarding abuse by the doctor's patients.  For example, a 2010 call note stated: "Had a patient that died this week that was taking OxyContin (2 tablets of 80mg at Q12h).  She was 45-48 years old and had been seen by [the doctor] for 10 years.  The patient had complained previously (was reported) that the reformulation made her sick and tried to get a refund for the reformulation (the pharmacy refused).  She did find generic OxyContin.  Patient was found dead sitting at the kitchen table with a syringe beside her.  It has been ruled as an accidental death by the police."

143.    Following the reformulation of OxyContin, Doctor-2 was flagged for review by a December 2010 data analysis due to the doctor's drop in Reformulated OxyContin prescription rates.  Months after the analysis, on August 1, 2011, Purdue completed an ADD review, deciding to take no action based on Doctor-2's explanation for why he stopped prescribing Reformulated OxyContin

144.    In early 2013, the state Board of Medical Examiners filed a complaint against Doctor-3 outlining his practice of prescribing OxyContin and other opioids outside the course of legitimate medical practice, which detailed the excessive amounts of OxyContin he prescribed to certain patients.

145.    On February 27, 2013, a Purdue sales representative filed a ROC that Doctor-2 was subject to disciplinary action by the Board of Medical Examiners.  On April 5, 2013, Doctor-2 was placed on the Region Zero list. Purdue representatives had detailed Doctor-2 146 times between 2007 and his addition to Region Zero in April 2013.

146.     Although under ADD review since February 27, 2013, Purdue sales representatives called on Doctor-2 several more times until April 5, 2013.

147.     Four months later, on August 26, 2013, a Purdue sales representative requested to resume calling on the doctor.  In response, the ADD program wondered if it was "[t]oo soon to put him back on the list."  It initially recommended a "resume call" status due to a "lack of progress on the resolution of the board's complaint and the doctor's continuation in practice," but, after further discussion, kept him on Region Zero.

148.     In February 2015, the same Purdue sales representative again requested that the doctor be removed from the Region Zero list.  The doctor was removed from the list on March 2015 after an "Expedited Review" of requests to resume calling on several high-prescribing doctors.  Purdue sales representatives detailed Doctor-2 an additional 117 times between March 2015 and May 2018.

149.     In sum, Purdue's detailing caused Doctor-2 to write medically unnecessary prescriptions for OxyContin, claims for which were submitted to Federal healthcare programs.

**V.       Alternative Distribution Model**

150.     As an additional means to circumvent safeguards intended to prevent the filling of suspicious prescriptions, from October 2015 through 2018, Purdue and certain of the Named Sacklers sought to find a pharmacy mechanism to fill OxyContin prescriptions for patients that other traditional pharmacies had rejected.

151.     As noted above, in July 2013, as part of the E2E program, the consulting company relayed to Purdue management and, through briefings, the Board that OxyContin revenues were down because, among other things, "entire pharmacies [are] being shut off by distributors, pharmacies themselves imposing tablet limits, decreases in channel inventory

leading to greater stockouts, and pharmacies choosing to not stock OxyContin."  The consulting company proposed creating an "alternative model for how patients receive OxyContin.  This model would bypass retail, likely through a third party vendor who would provide adjudication and direct distribution to patients."

152.    On August 16, 2013, one day after the Board briefing on E2E discussed above, Mortimer D. A. Sackler emailed Purdue's CEO and others asking what ideas management had for creating a new distribution system "to help relieve this problem of product access for legitimate chronic pain patients," which would use "an independent service to verify the legitimacy of [the patients'] prescriptions."  Two days later, Mortimer D.A. Sackler reiterated, "I do think there may be an opportunity here for us to set up a complimentary business to handle this for Purdue as well as other controlled drug manufacturers.  Do we have a team who could explore this possibility?"

153.    On August 18, 2013, Richard Sackler responded that he had the same idea and expressed it to Purdue's CEO after a Board meeting.  Purdue's CEO responded three days later confirming Mortimer D.A. Sackler's interest in exploring an "alternative distribution process for all or essentially all opioid formulations."  Mortimer D.A. Sackler responded on the same day, "To be clear, I was thinking about selling to pharmacies."

154.    Shortly thereafter, the Named Sacklers approved E2E, and the E2E program went on to develop "multiple tactics to address these issues," including "alternative supply channels."  In 2015, the company entered agreements with three specialty pharmacies for Hysingla.

155.    Some of the prescriptions that were filled by the specialty pharmacies, which included other Purdue opioids, had been rejected by traditional retail pharmacies and displayed indicia that the prescriptions were not for a medically accepted indication; for uses that were

- 28 -

unsafe, ineffective, and medically unnecessary; and that were often diverted for uses that lacked a legitimate medical purpose.

156.    Purdue's ADD program data further confirms that some of these prescriptions lacked medical necessity.  From mid-2015 through 2018, the specialty pharmacies filled Medicare prescriptions for Purdue opioids written by approximately 100 prescribers.  Nearly one-fourth of those prescribers were referred to ADD on suspicion of engaging in abuse and diversion.

157.    In sum, certain of the Named Sacklers suggested that Purdue find an alternative distribution strategy to fill prescriptions that were rejected because of safeguards against medically unnecessary prescribing.  In doing so, they knew, or should have known, that the alternative distribution model could cause the submission of false claims for Purdue opioids.

## VI.      The Fraudulent Transfer of Assets from Purdue

158.    Beginning in 2007, the Named Sacklers discussed a strategy to remove assets from Purdue, making the assets more difficult for future plaintiffs or creditors to reach.

159.    From 2007 to at least 2017, the Named Sacklers used their control of Purdue to remove cash and other assets from Purdue and transfer these assets to other entities controlled by the Sackler family.

160.    On May 17, 2007 (one week after a criminal plea entered by a Purdue entity and agreement to pay over $600 million), Jonathan Sackler emailed David Sackler, Richard Sackler, and a long-time financial advisor, stating that an investment banker once told him, "your family is already rich, the one thing you don't want to do is to become poor."

161.    The same day, David Sackler replied-all by email:

[W]hat do you think is going on in all of these courtrooms right now? We're rich?  For how long?  Until which suits get through to the family?  I

think [the investment banker's] advice was just violated in a Virginia
courtroom.

My thought is to lever up where we can, and try to generate some
additional income.  We may well need it. . . .  Even if we have to keep it in
cash, it's better to have the leverage now while we can get it than thinking
it will be there for us when we get sued.

162.    In or about April 2008, Richard Sackler wrote a memorandum to Kathe Sackler,

Ilene Sackler, David Sackler, Jonathan Sackler, and Mortimer D. A. Sackler in which he

discussed limiting the Sackler family's risk in the ownership of Purdue:  "[T]he most certain way

for the owners to diversify their risk is to distribute more free cash flow so they can purchase

diversifying assets."

163.    On September 8, 2014, Mortimer D. A. Sackler emailed Jonathan Sackler, stating

that there had been "a huge depreciation in [Purdue's] bottom line and more importantly

shareholder value over the past 5+ years" and that Purdue was in a "death spiral."

164.    The same day, Jonathan Sackler responded to Mortimer D. A. Sackler that "when

the business has more cash flow than is required, I've supported distributions, and we've taken a

fantastic amount of money out of the business."

165.    About a month later, on October 12, 2014, Jonathan Sackler emailed Richard

Sackler, David Sackler, and others:  "I think we can continue to make money in it [opioid

analgesics] for decades to come, particularly if we are smart and diligent around emerging

markets, formulation, generics, and APIs, but in the aggregate, it's more of a smart milking

program than a growth program."

166.    From 1997 through 2007, Purdue distributed a total of $126 million in cash to

members of the Sackler family and their holding companies and trusts.

- 30 -

167.    In the next decade, from 2008 to 2018, the Purdue Board approved billions in transfers of funds out of Purdue as cash distributions of profits into Sackler family holding companies and trusts.

168.    Certain of these distributions and transfers were made with the intent to hinder future creditors and/or were otherwise avoidable as fraudulent transfers.

169.    Purdue did not fully document certain of these transfers and did not conduct full valuations of the transferred assets.

170.    Purdue did not receive reasonably equivalent value for certain of these transfers.

**Addendum B**

## ADDENDUM B:  RELEASED FAMILY MEMBERS AND TRUST PARTIES

### Individual Family Members

1.   David Sackler
2.   Estate of Beverly Sackler, including executors thereof
3.   Estate of Jonathan Sackler, including executors thereof
4.   Ilene Sackler Lefcourt
5.   Kathe Sackler
6.   Marissa Sackler
7.   Michael Sackler
8.   Mortimer D.A. Sackler
9.   Richard Sackler
10.  Samantha Hunt
11.  Theresa Sackler
12.  Sophie Dalrymple
13.  The spouses, children and grandchildren of the above, as enumerated on (i) a list transmitted to the Department of Justice by Debevoise & Plimpton LLP on October 21, 2020 and (ii) a list transmitted to the Department of Justice by Paul, Weiss, Rifkind, Wharton & Garrison LLP on October 21, 2020.

### Trusts, Trustees and Protectors

1.   1959 Irrevocable Trust
2.   1969 Irrevocable Trust
3.   1974 Irrevocable Trust fbo BS and JDS
4.   1974 Irrevocable Trust fbo BS and RSS
5.   1974 Revocable Trust
6.   533 Canal Trust
7.   AJ Irrevocable Trust
8.   Alexa Saunders
9.   Angonoka Trust
10.  Anthony Roncalli
11.  AR Irrevocable Trust
12.  Beacon Trust
13.  Beacon Trust Company Ltd.
14.  Beth B. Sackler Trust
15.  Beverly Sackler 2012 Revocable Pourover Trust
16.  Beverly Sackler Trust 1 f/b/o Clare Elizabeth Sackler 12/27/1989
17.  Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989
18.  Beverly Sackler Trust 1 f/b/o Madeleine Sackler 12/26/1989
19.  Beverly Sackler Trust 1 f/b/o Marianna Rose Sackler 12/21/1989
20.  Beverly Sackler Trust 1 f/b/o Miles Raymond Sackler 12/29/1989

21.   Beverly Sackler Trust 1 f/b/o Rebecca Kate Sackler 12/22/1989
22.   Beverly Sackler Trust 2 f/b/o Clare Elizabeth Sackler 12/27/1989
23.   Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989
24.   Beverly Sackler Trust 2 f/b/o Madeleine Sackler 12/26/1989
25.   Beverly Sackler Trust 2 f/b/o Marianna Rose Sackler 12/21/1989
26.   Beverly Sackler Trust 2 f/b/o Miles Raymond Sackler 12/30/1989
27.   Beverly Sackler Trust 2 f/b/o Rebecca Kate Sackler 12/22/1989
28.   Beverly Sackler Trust 3 f/b/o Clare Elizabeth Sackler 12/27/1989
29.   Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989
30.   Beverly Sackler Trust 3 f/b/o Madeleine Sackler 12/26/1989
31.   Beverly Sackler Trust 3 f/b/o Marianna Rose Sackler 12/21/1989
32.   Beverly Sackler Trust 3 f/b/o Miles Raymond Sackler 12/28/1989
33.   Beverly Sackler Trust 3 f/b/o Rebecca Kate Sackler 12/22/1989
34.   BJSS 2010 Trust
35.   BJSS 2013 Trust
36.   BJSS and JHSS 2012 K Trust
37.   Bowland Company Ltd.
38.   BRJ Fiduciary Management LLC
39.   BSS Trust 98
40.   Canadian Partnership Trust
41.   Cedar Cliff Fiduciary Management Inc.
42.   Cedar Cliff Trust
43.   Charles G. Lubar
44.   Chelsea Trust Company Ltd.
45.   Christopher B. Mitchell
46.   Christopher M. Reimer
47.   Clare E. Sackler 2012 Trust
48.   Clover Trust
49.   Cobo Bay Trust
50.   Codan Trust Company Ltd.
51.   Cornice Fiduciary Management LLC
52.   Cornice Trust
53.   Crystal Fiduciary Company LLC
54.   Crystal Trust
55.   DABB Trust
56.   Data LLC
57.   Data Trust
58.   David A. Sackler 2012 Trust
59.   Diagonal Blue Trust
60.   Elizabeth A. Whalen
61.   Estera Services (Bermuda) Ltd.
62.   Fidinc Trust
63.   Flat Creek Fiduciary Management LLC

64. Flat Creek Purpose Trust
65. FTA Trust
66. Gorey Trust
67. Hagen Trust Company Ltd.
68. Halm Trust
69. Heatheridge Trust Company Ltd.
70. Hercules Trust
71. Hermance Schaepman
72. Hillside Trust Company Ltd.
73. Hudson Trust
74. Ian McClatchey
75. Ilene S. Lefcourt Trust 88
76. Ilene S. Lefcourt Trust 96
77. Ilene Sackler Lefcourt Revocable Trust
78. Indian Wells Hill Trust
79. Inholmes Trust
80. Irrevocable Trust under Declaration dated as of April 25, 1991
81. Irrevocable Trust under Declaration dated as of August 25, 1992
82. Irrevocable Trust under Declaration dated as of December 29, 1992
83. Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler
84. Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler
85. ISL 2010 Family Trust
86. ISL 2011 Family Trust
87. ISL JML OSHA Trust
88. ISL LT Children's Trust
89. Jackson River Trust
90. JDS 1992 Insurance Trust
91. JDS 2/2/98 Trust
92. JDS Fiduciary Management Trust
93. JDS Pourover Trust
94. JDS Revocable Pourover Trust
95. Jeffrey A. Robins
96. JHSS 2010 Trust
97. JHSS 2013 Trust
98. JML 2010 Family Trust
99. JML 2011 Family Trust
100. JML Investment Trust
101. JML OSHA Trust
102. JML Pour-Over Trust
103. Joerg Fischer
104. John Wilcox

3

105.    Jonathan D. Sackler Life Insurance Trust
106.    Jonathan D. Sackler Trust f/b/o Clare Elizabeth Sackler 4/11/90
107.    Jonathan D. Sackler Trust f/b/o Madeleine Sackler 4/11/90
108.    Jonathan D. Sackler Trust f/b/o Miles Raymond Corson Sackler 4/11/90
109.    Jonathan D. Sackler Trust U/A 9/30/04
110.    Jonathan White
111.    JSS Trust 98
112.    Karen Lefcourt Trust
113.    KAS 2010 Family Trust
114.    KAS 2011 Family Trust
115.    Kathe A. Sackler 2001 Trust
116.    Kathe A. Sackler Trust 88
117.    Kathe A. Sackler Trust 96
118.    Kerry J. Sulkowicz
119.    KLT 2010 Family Trust
120.    KLT 2011 Family Trust
121.    KLT Pour-Over Trust
122.    La Coupe Trust
123.    Lauren Kelly
124.    Leslie J. Schreyer
125.    LSRR Family Trust
126.    Lune River Trust
127.    Madeleine Sackler 2012 Trust
128.    Marianna R. Sackler 2012 Trust
129.    Marianna R. Sackler Captain Trust
130.    Mary Corson Trust
131.    May Trust
132.    Maydean Trust Company Ltd.
133.    MCM Fiduciary Management LLC
134.    MCM Fiduciary Management Trust
135.    MDAS 2010 Family Trust
136.    MDAS 2011 Family Trust
137.    MDAS Children's Trust 2012
138.    MDAS Investment Trust
139.    MDS 1992 Trust
140.    MDS 2002 Trust
141.    MDS 2006 Trust
142.    MDS Beacon 2010 Trust
143.    MDS Beacon 2011 Trust
144.    MDS Beacon 2012 Trust
145.    MDS Beacon 2013 Trust
146.    MDS Family Trust 2010
147.    Medichem Trust

4

148. Meerkat Trust
149. Memphis Pharma Trust
150. MIL Trust
151. Miles R.C. Sackler 2012 Trust
152. Millborne Trust Company
153. Millennium Trust
154. Milton Trust
155. Mondai Trust
156. Mordas Consolidated Purpose Trust
157. Mortimer DA Sackler Trust 1996
158. Mortimer DA Sackler Trust 2002
159. Morvetta Trust
160. MTS 2002 Trust
161. MTS 2006 Trust
162. MTS 2013 Family Trust
163. MTS 2016 Trust
164. MTS Bare Trust
165. MTS Beacon 2013 Trust
166. MTS Beacon 2014 Trust
167. MTS Beacon 2015 Trust
168. MTS Beacon Trust 2010
169. MTS Beacon Trust 2011
170. MTS Beacon Trust 2012
171. MTS Family Trust 2010
172. MTS Trust 2006
173. Mundi Lab Trust
174. Nixie Trust
175. North Bay Trust Company Inc.
176. PALP Trust
177. Perelle Bay Trust
178. Peter Ward
179. Pickering Trust
180. Racine Trust
181. Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012
182. Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012
183. Raymond R. Sackler Marital Trust u/a 3/29/2012
184. Raymond R. Sackler Trust 1 dtd 12/23/89
185. Raymond R. Sackler Trust 1B dtd 12/23/89
186. Raymond R. Sackler Trust 2 dtd 12/23/89
187. Raymond R. Sackler Trust 2B dtd 12/23/89
188. Rebecca K. Sackler 2012 Trust
189. Rebecca K. Sackler Captain Trust
190. Reserve Trust

191.    Richard S. Sackler Life Insurance Trust
192.    Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90
193.    Richard S. Sackler Trust f/b/o Marianna R. Sackler 3/8/90
194.    Richard S. Sackler Trust f/b/o Rebecca K. Sackler 3/8/90
195.    Richard S. Sackler Trust U/A 9/30/04
196.    Romas Trust 2002
197.    RSS 1992 Insurance Trust
198.    RSS 2/2/98 Trust
199.    RSS Fiduciary Management Trust
200.    RSS Pourover Trust
201.    RSS Revocable Pourover Trust
202.    Sandiway Trust Company Ltd.
203.    SASS 2010 Trust
204.    SASS 2013 Trust
205.    SDS 1992 Trust
206.    SDS 2002 Trust
207.    SDS 2006 Trust
208.    SDS Bare Trust
209.    SDS Beacon 2011 Trust
210.    SDS Beacon 2012 Trust
211.    SDS Beacon 2014 Trust
212.    SDS Family Trust 2010
213.    Sheffield Trust
214.    Silver Trust
215.    Soft River Fiduciary Management LLC
216.    Soft River Purpose Trust
217.    SS Tanager Trust
218.    SSH 2013 Family Trust
219.    SSSH Beacon 2013 Trust
220.    SSSH Trust 1996
221.    SSSH Trust 2002
222.    Stephen A. Ives
223.    Taddeo Fiduciary Management Inc.
224.    Taddeo Purpose Trust
225.    Taddeo Trust
226.    Tayleigh Trust Company Ltd.
227.    Tenzin Trust Company Ltd.
228.    TES Bare Trust
229.    TES Beacon 2012 Trust
230.    TES Beacon 2013 Trust
231.    TES Beacon 2014 Trust
232.    The 1974 Irrevocable Investment Trust
233.    The Jonathan D. Sackler Revocable Pourover Trust dated September 30, 2004

6

234. The Jonathan D. Sackler Revocable Pourover Trust dated December 12, 2010
235. The Richard S. Sackler Revocable Pourover Trust
236. The RSS 2012 Family Trust
237. Themar Consolidated Purpose Trust
238. Themar Trust Company Ltd.
239. Theresa E. Sackler 1988 Trust
240. Theresa E. Sackler 2008 Trust
241. Thomas A. Russo
242. Tom & Kelly Trust
243. Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler
244. Trust Agreement dated August 29, 2003 f/b/o Mary Corson and Issue of Jonathan D. Sackler
245. Trust B U/A 11/5/74 fbo Beverly Sackler
246. Trust U/A 11/5/74 fbo Beverly Sackler
247. Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler
248. Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler
249. Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler
250. Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler
251. Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler
252. Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler
253. Trust under Agreement dated the 11th day of May 2005
254. Trust under Agreement dated the 13th day of March 2009
255. Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler
256. Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler
257. Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler
258. Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler
259. Trust Under Declaration of Trust No. 1 dated November 25, 1996
260. Trust Under Declaration of Trust No. 2 dated November 25, 1996
261. Trust Under Declaration of Trust No. 2 dated November 25, 1996
262. Varus Trust

7

# Addendum C

**ADDENDUM C:**
**RELEASED PURDUE PARENT ENTITIES AND**
**INDEPENDENT ASSOCIATED COMPANIES**

**Purdue Parent Entities**

1.  Banela Corporation
2.  Beacon Company
3.  BR Holdings Associates Inc.
4.  BR Holdings Associates L.P.
5.  BRJ Fiduciary Management LLC, as Trustee of Trust B (U/A 11/4/74 fbo Beverly Sackler) ("74B Trust")
6.  Cedar Cliff Fiduciary Management Inc., as Trustee of Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust")
7.  Cornice Fiduciary Management LLC, as Trustee of AJ Irrevocable Trust
8.  Cornice Fiduciary Management LLC, as Trustee of Raymond R. Sackler Trust 2 dtd 12/23/89 ("JDS 1989 Captain Trust A")
9.  Cornice Fiduciary Management LLC, as Trustee of Raymond R. Sackler Trust 2B dtd 12/23/89 ("JDS 1989 Captain Trust B")
10. Crystal Fiduciary Company LLC, as Trustee of 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust")
11. Crystal Fiduciary Company LLC, as Trustee of AR Irrevocable Trust
12. Data LLC, as Trustee of Raymond R. Sackler Trust 1 dtd 12/23/89 ("RSS 1989 Captain Trust A")
13. Data LLC, as Trustee of Raymond R. Sackler Trust 1B dtd 12/23/89 ("RSS 1989 Captain Trust B")
14. Heatheridge Trust Company Limited, as Trustee under Settlement dated 31 December 1993 F.B.O. the issue of Mortimer D. Sackler M.D., Theresa E. Sackler and certain charitable objects
15. Linarite Holdings LLC
16. MCM Fiduciary Management LLC, as Trustee of 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust")
17. Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust dated 2 March 1999 F.B.O. Theresa E. Sackler, the issue of Mortimer D. Sackler, M.D. and certain charitable objects
18. Moonstone Holdings LLC
19. North Bay Trust Company Inc., as Trustee of The 1974 Irrevocable Investment Trust ("Investment Trust")
20. Perthlite Holdings LLC
21. Pharmaceutical Research Associates L.P. (formerly Purdue Holdings L.P.)
22. PLP Associates Holdings Inc.
23. PLP Associates Holdings L.P.
24. Purdue Pharma Inc.
25. Rosebay Medical Company L.P.

26.  Rosebay Medical Company, Inc.
27.  Roselite Holdings LLC
28.  Stanhope Gate Corp.

**Independent Associated Companies**

1.  Accardi B.V.
2.  Accardi S.àr.l.
3.  Alfa Generics B.V.
4.  Arsago B.V.
5.  Bard Pharmaceuticals (1990) Inc.
6.  Bard Pharmaceuticals Limited
7.  Bermag Limited
8.  Boetti Corporation
9.  Boldini Corporation
10.  Bradenton Products B.V.
11.  Bulla S.àr.l.
12.  Clinical Designs Limited
13.  Clovio Corporation
14.  E.R.G. Realty, Inc.
15.  Elvium Life Sciences GP Inc.
16.  Elvium Life Sciences Limited Partnership
17.  Elvium ULC
18.  Euro-Celtique S.A.
19.  Evening Star Services Limited
20.  Filti S.àr.l.
21.  Flira S.àr.l.
22.  Hayez Corporation
23.  Ind S.àr.l.
24.  Irey S.àr.l.
25.  Krugmann GmbH
26.  Ladenburg B.V.
27.  Lake Claire Investments Limited
28.  L.P. Clover Limited
29.  Lucien Holdings S.àr.l.
30.  Lymit Holdings S.àr.l.
31.  Maltus Corporation
32.  Marnine Holdings Pte. Limited
33.  Martone Holdings Pte. Limited

2

34.     Mexcus Corporation
35.     MN Consulting LLC
36.     MNP Consulting Limited
37.     Modi – Mundipharma Beauty Products Private Ltd
38.     Modi – Mundipharma Healthcare Private Ltd
39.     Modi – Mundipharma Private Ltd
40.     Mundibiopharma Limited
41.     Mundichemie GmbH
42.     Mundipharma (Argentina) S.r.l.
43.     Mundipharma (China) Pharmaceutical Company Limited
44.     Mundipharma (Colombia) S.A.S.
45.     Mundipharma (Hong Kong) Limited
46.     Mundipharma (Myanmar) Co., Limited
47.     Mundipharma (Proprietary) Limited
48.     Mundipharma (Shanghai) International Trade Company Limited
49.     Mundipharma (Thailand) Limited
50.     Mundipharma A.S.
51.     Mundipharma A/S
52.     Mundipharma AB
53.     Mundipharma AG
54.     Mundipharma B.V.
55.     Mundipharma Biologics GmbH
56.     Mundipharma Biologics Inc.
57.     Mundipharma Bradenton B.V.
58.     Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda.
59.     Mundipharma BV
60.     Mundipharma Company
61.     Mundipharma Corporation (Ireland) Limited
62.     Mundipharma Corporation Limited
63.     Mundipharma DC B.V.
64.     Mundipharma de Mexico, S. de R.L. de C.V.
65.     Mundipharma Deutschland GmbH & Co. KG
66.     Mundipharma Development Pte. Limited
67.     Mundipharma Distribution GmbH
68.     Mundipharma Distribution Limited
69.     Mundipharma EDO GmbH
70.     Mundipharma Egypt LLC
71.     Mundipharma Farmaceutica LDA.

3

72.    Mundipharma FZ-LLC
73.    Mundipharma GesmbH
74.    Mundipharma GmbH
75.    Mundipharma Healthcare Corporation
76.    Mundipharma Healthcare LLC
77.    Mundipharma Healthcare Pte. Limited
78.    Mundipharma Healthcare Pty. Limited
79.    Mundipharma Holding AG
80.    Mundipharma International Services GmbH
81.    Mundipharma International Services Limited
82.    Mundipharma International Services S.ar.l.
83.    Mundipharma International Corporation Limited
84.    Mundipharma International Holdings Limited
85.    Mundipharma International Limited
86.    Mundipharma International Services GmbH
87.    Mundipharma International Services Limited
88.    Mundipharma International Services S.àr.l.
89.    Mundipharma International Technical Operations Limited
90.    Mundipharma IT GmbH
91.    Mundipharma IT Services GmbH
92.    Mundipharma IT Services Inc.
93.    Mundipharma IT Services Limited
94.    Mundipharma IT Services Pte. Limited
95.    Mundipharma Kabushiki Kaishe
96.    Mundipharma Korea Limited
97.    Mundipharma Laboratories GmbH
98.    Mundipharma Laboratories Limited
99.    Mundipharma LATAM GmbH
100.    Mundipharma Limited
101.    Mundipharma Ltd.
102.    Mundipharma Management S.ar.l.
103.    Mundipharma Manufacturing Pte. Limited
104.    Mundipharma MEA GmbH
105.    Mundipharma Medical CEE GmbH
106.    Mundipharma Medical Company
107.    Mundipharma Medical Company Limited
108.    Mundipharma Medical GmbH
109.    Mundipharma Medical S.ar.l.

4

110.  Mundipharma Middle East FZ-LLC
111.  Mundipharma Near East GmbH
112.  Mundipharma New Zealand Limited
113.  Mundipharma Oncology Pty. Limited
114.  Mundipharma Ophthalmology Corporation Limited
115.  Mundipharma Ophthalmology Products Limited
116.  Mundipharma Oy
117.  Mundipharma Pharmaceutical Company
118.  Mundipharma Pharmaceuticals (Chile) Limitada
119.  Mundipharma Pharmaceuticals Argentina S.r.l.
120.  Mundipharma Pharmaceuticals B.V.
121.  Mundipharma Pharmaceuticals Belgium BV
122.  Mundipharma Pharmaceuticals Inc.
123.  Mundipharma Pharmaceuticals Industry and Trade Limited
124.  Mundipharma Pharmaceuticals Limited
125.  Mundipharma Pharmaceuticals Private Limited
126.  Mundipharma Pharmaceuticals S.L.
127.  Mundipharma Pharmaceuticals S.r.l.
128.  Mundipharma Pharmaceuticals Sdn. Bhd.
129.  Mundipharma Polska SP. Z.O.O.
130.  Mundipharma Pte Limited
131.  Mundipharma Pty Limited
132.  Mundipharma Research Company Limited
133.  Mundipharma Research GmbH & Co. KG
134.  Mundipharma Research Limited
135.  Mundipharma Research Verwaltungs GmbH
136.  Mundipharma SAS
137.  Scientific Office of Mundipharma MEA GmbH
138.  Mundipharma Singapore Holding Pte. Limited
139.  Mundipharma TK
140.  Mundipharma Verwaltungsgesellschaft mbH
141.  Napp Laboratories Limited
142.  Napp Pension Trustees Limited
143.  Napp Pharmaceutical Group Limited
144.  Napp Pharmaceutical Holdings Limited
145.  Napp Pharmaceuticals Limited
146.  Napp Research Centre Limited
147.  Nitid S.àr.l.

148. Nontag S.àr.l.
149. One Stamford Realty L.P.
150. Paineurope Limited
151. Par-La-Ville Properties Limited
152. Porthos S.àr.l.
153. PT. Mundipharma Healthcare Indonesia
154. Purdue BioPharma Inc.
155. Purdue BioPharma L.P.
156. Purdue Frederick Inc.
157. Purdue Pharma Inc. (Canadian Company)
158. Purdue Pharma Technologies Inc.
159. Purdue Pharma Pty. Ltd.
160. Purdue Pharma ULC
161. Qdem Pharmaceuticals Limited
162. Rafa Laboratories Ltd.
163. Sofy S.àr.l.
164. Songol S.àr.l.
165. Sonti S.àr.l.
166. Tacca B.V.
167. Taiwan Mundipharma Pharmaceuticals Limited
168. Technical Scientific Office of Mundipharma Near East GmbH
169. Tenna B.V.
170. The Napp Educational Foundation
171. The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City
172. Vaccaro B.V.
173. Venusti B.V.
174. Win – Healthcare Private Ltd.
175. Win – Medicare Private Ltd.
176. Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd.