Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836

*Attorneys for Beacon Company*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**SUR-REPLY MEMORANDUM OF OBJECTION OF MORTIMER SACKLER
INITIAL COVERED SACKLER PERSONS TO THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS' MOTION TO COMPEL PRODUCTION OF
PURPORTEDLY PRIVILEGED DOCUMENTS, OR FOR *IN CAMERA* REVIEW,
BASED ON GOOD CAUSE, CRIME FRAUD, AND AT ISSUE EXCEPTIONS TO
CLAIMS OF PRIVILEGE**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's registration
number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue
Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma
Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P.
(8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas
Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio
Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience
Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes
Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes
Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma
LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at
One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

STATEMENT OF FACTS ................................................................................................... 5

I.     The UCC's Reply Does Not Show Probable Cause with Respect to the Elements of the "Crime Fraud" Exception ......................................................................... 5

     A.     The UCC's Intentional Fraudulent Transfer Allegations Still Do Not Show Any Side A ICSP Acting to Interfere, Hinder, or Delay Creditors...................... 5

          1.     The UCC Reply Does Not Come Forward With Evidence Showing Probable Cause That Each, Let Alone All, Side A ICSPs Participated in Fraudulent Transfers ........................................... 6

          2.     An Extensive Record Disproves the UCC's Claim that Any Side A ICSP Knew that Purdue Faced a "Massive" Litigation Threat and "Vast Liability" ......................................................................... 9

          3.     The UCC Has No Answer to Cash Management Practices That Ensured That Purdue's Needs Were Met Before Distributions Were Approved ......................................................................... 11

          4.     Side A Distributions Were Transferred to Trusts for Conventional Wealth Management Purpose—Not to Hide It from Creditors ............... 13

     B.     The UCC's Fiduciary Duty Allegations Do Not Show Any Side A ICSP Engaging in a Crime or Fraud ................................................................... 14

          1.     No Side A ICSP Engaged in Management Functions .............................. 15

          2.     No Side A ICSP Engaged in Crimes or Frauds ........................................ 16

     C.     The UCC Reply Does Not Contain Any Allegations About the Role of Counsel in Facilitating Any Supposed Crime or Fraud ........................................ 21

II.    The NCSG Memorandum Does Not Show Probable Cause with Respect to the Elements of the "Crime Fraud" Exception ....................................................... 22

ARGUMENT ................................................................................................................... 27

I.     The UCC and the NCSG Have Not Come Forward with Evidence of Probable Cause That Any Side A ICSP Engaged in a Crime or Fraud............................................ 27

     A.     The UCC and the NCSG's Intentional Fraudulent Transfer Allegations Do Not Show Any Side A ICSP Engaging in a Crime or Fraud ................................ 27

B.    The UCC's Fiduciary Duty Allegations Do Not Show Any ICSP Engaging
in a Crime or Fraud ............................................................................................. 30

C.    The NCSG's Allegations Do Not Show Any ICSP Engaging in a Crime or
Fraud .................................................................................................................... 33

II.    The UCC and the NCSG Have Not Shown Probable Cause That Side A ICSP
Communications with Counsel Facilitated Any Alleged Crime or Fraud ....................... 34

III.    The Court Should Not Order an *In Camera* Review Because the UCC and the
NCSG Have Offered No Basis to Conclude That the "Crime Fraud" Exception
Applies ............................................................................................................................ 37

CONCLUSION ............................................................................................................................ 38

# TABLE OF AUTHORITIES

CASES

*Amusement Indus.Inc. v. Stern*, 293 F.R.D. 420 (S.D.N.Y. 2013)................................36

*Bialek v. Racal-Milgo, Inc.*, 545 F. Supp. 25 (S.D.N.Y. 1982) ...................................26

*Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007)........................................28

*Coquina Invs. v. Rothstein,* No. 10-60786-Civ-COOKE/BANDSTRA, 2011 WL
    13096509 (S.D. Fla. Oct. 19, 2011)......................................................32

*Cotton v. City of Eureka*, No. C-08-04386 SBA (EDL), 2010 WL 2889498 (N.D. Cal.
    July 22, 2010) ..................................................................32

*Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F. 3d 1324 (11th Cir. 2018) ......35, 36

*Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200 (D. Colo. 2006)........................32

*Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-00007-LMB, 2004 WL
    3661433 (E.D. Va. Mar. 31, 2004) ...........................................30, 31

*In re AHT Corp.*, 292 B.R. 734 (S.D.N.Y. 2003) ........................................26

*In re N.Y.C. Asbestos Litig.*, 109 A.D.3d 7 (N.Y. App. Div. 2013) (UCC Reply ¶ 20) ...............30

*In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) ............................29, 30

*In re Platinum and Palladium Commodities Litigation*, 828 F. Supp. 2d 588 (S.D.N.Y.
    2011) .........................................................................17

*In re Richard Roe, Inc.*, 168 F.3d 69 (2d. Cir. 1999) ("*Roe II*")..................27, 30, 34, 35

*In re Richard Roe Inc.*, 68 F.3d 38 (2d Cir. 1995)........................................27

*Kertesz v. Gen. Video Corp.*, No. 09-cv-1648 (GBD), 2010 WL 11506390 (S.D.N.Y.
    2010) .........................................................................10

*LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) .......................................31, 32, 33

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) .........................17

*Loughrin v. United States*, 573 U.S. 351 (2014)...........................................3

*MacNamara v. City of New York*, No. 04 Civ. 9216(RJS)(JCF), 2008 WL 186181
    (S.D.N.Y. Jan. 18, 2008)...................................................3, 34

*Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 846–48 (S.D.N.Y. 2017)......................10

*Progressive Cas. Ins. Co. v. Monaco*, No. 16-cv-823 (VAB), 2017 WL 2873051 (D. Conn. July 5, 2017).............................................................................................32

*Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir. 1984) ....................................33

*S.E.C. v. Citigroup Global Markets, Inc.*, 827 F. Supp. 2d 328 (S.D.N.Y. 2011), *vacated* ..........17

*Sackler v. Utah Div. of Consumer Protection,* No. 190905862 (Utah Dist. Ct. Oct. 10, 2019) ...................................................................................................................................... 27

*Securities Investor Protection Corp. v. Bernard Madoff Investment Securities LLC*, 319 F.R.D. 100 (S.D.N.Y. 2017) ....................................................................................................28

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) .....................................................................3

*United States v. Zolin*, 491 U.S. 554 (1989) ................................................................................37

STATUTES

N.Y. Bus. Corp. Law § 717 ...........................................................................................................31

Pursuant to the *Notice of Agreement between Debtors and UCC re: Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers*: [Dkt. No. 1908], the Side A ICSPs[2] submit this sur-reply memorandum in further opposition to the UCC's Exceptions Motion and the Ad Hoc Group of Non-Consenting States' memorandum submitted on November 18, 2020 [Dkt. No. 2012] (the "NCSG Reply").

1.      The UCC's reply memorandum in support of its Exceptions Motion (the "UCC Reply") and the NCSG Memorandum only confirm that the Court should not invoke the extraordinary remedy of requiring the Side A ICSPs to produce privileged documents.  As set forth below, none of the UCC or the NCSG allegations come remotely close to meeting the burden necessary to justify this extraordinary remedy for two separate and independent reasons. First, neither the UCC nor the NCSG comes forward with any evidence that any Side A ICSP, much less all of them, engaged in a crime or fraud.  Second, neither the UCC nor the NCSG makes any attempt to satisfy a core prerequisite of the application:  coming forward with **evidence** that the communications with counsel they seek facilitated any of the crimes or frauds that they allege.  The Department of Justice ("DOJ") allegations upon which the UCC and NCSG largely rely were expressly denied by the members of the Sackler families that are parties to the DOJ civil settlement (the "Named Sacklers")—something the DOJ frequently does not permit defendants to do—and the full record demonstrates that the Side A ICSPs acted entirely lawfully. The Motion should therefore be denied.

2.      This Court has already recognized that the parties should now have "sufficient information" to reach a negotiated settlement.  Hr'g Tr. November 17, 2020 at 251:2–3 [Dkt. No.

---

2       All terms used herein shall have the same meaning as set forth in the Side A ICSPs' Objection to the UCC's Exceptions Motion (the "Side A Obj.") [Dkt. No. 1804].  The Side A ICSPs preserve, and do not waive, all defenses, including without limitation defenses based on lack of personal jurisdiction.

2073].  Indeed, the UCC already has over 90 million pages of documents from the Debtors, Side A, and Side B, and has taken more than a dozen depositions.  The UCC has so many documents that they conceded that even billing at a rate of several million dollars per month, they cannot cast human eyes over all of them.  UCC Reply ¶ 13.  The UCC nonetheless claims it should receive even more documents.  Not only does the UCC have no basis to apply the "crime fraud" exception, but its proposal to either (i) have someone sort through documents to determine which ones fit within its seven general categories or (ii) have this Court conduct an *in camera* review would only further distract the parties from reaching a settlement.

* * *

3.      The UCC concedes that it is not pursuing a constructive fraudulent conveyance theory and that its "crime-fraud arguments are based on the Sacklers' intentionally fraudulent transfers and breaches of fiduciary duties."  UCC Reply ¶ 73 [Dkt. No. 2014].  The NCSG makes allegations about a disjointed set of crime or fraud allegations.  Neither the UCC nor the NCSG meets the burden of coming forward with evidence to support a finding of probable cause that would justify the Court ordering the production of privileged communications.

4.      **Intentional fraudulent conveyance**:  Notwithstanding its new allegations, the UCC has not come forward with a shred of actual evidence—much less probable cause—that any Side A ICSP authorized any transfer with the intent of hindering, interfering with or delaying any creditor.  Indeed, there are no specific intentional fraudulent conveyance allegations for virtually all of the Side A ICSPs.  In any event, the UCC does not identify a single document showing that any Side A ICSP was concerned that litigation threatened Purdue's solvency, much less than any Side A ICSP sought to move assets to avoid hypothetical creditors.

2

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    To state the obvious,

wishing to sell or merge a business is no indication of fraud.  Indeed, in this year alone,

notwithstanding the pandemic, there have been at least nine strategic transactions involving

healthcare companies with a value of more than $1 billion.[3]

5.    The UCC also fails to meet its burden of evidence that **"each of the particular
attorney-client communications at issue was used 'in furtherance of [a] crime or fraud'**
**. . . ."** *MacNamara v. City of New York*, No. 04 Civ. 9216(RJS)(JCF), 2008 WL 186181, at *4

(S.D.N.Y. Jan. 18, 2008) (alterations in original) (quoting *United States v. Jacobs*, 117 F.3d 82,

87 (2d Cir. 1997), abrogated on other grounds by *Loughrin v. United States*, 573 U.S. 351

(2014)).  In fact, the UCC makes few isolated allegations about any communications with

counsel, none of which involve Side A ICSPs.  The UCC does not allege that any of those

communications with counsel—or any others—facilitated any supposed intentional fraudulent

conveyance by any Side A ICSP.

6.    The UCC Reply doubles down on the UCC's meritless position that it can satisfy

that burden through its use of seven highly generalized categories of documents that simply

rephrase its allegations, *e.g.*, "Whether, and/or how, opioid litigants could collect, or be

prevented from collecting, a potential judgment against the Sacklers, their trusts and other

affiliates and assets (even if the Sacklers' motive to obscure assets was unbeknownst to the

lawyer providing the advice)."  Hurley Decl., Ex. 101, at 2 [Dkt. No. 1754].  These categories

---

[3]    Michael Gibney, *Largest Healthcare Deals of 2020 Break Through COVID-19 M&A
Drought*, S&P GLOBAL (Aug. 18, 2020),
https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-
headlines/largest-healthcare-deals-of-2020-break-through-covid-19-m-a-drought-59894540.

provide no objective indicia regarding (i) what counsel is rendering the advice; (ii) the circumstances under which such advice is rendered; and (iii) how such advice facilitated an alleged crime or fraud.

7.      The UCC is similarly incorrect that its chart of privilege log entries identifies communications with counsel that facilitated any alleged Side A ICSPs' intentional fraudulent transfers.  Many of the entries appear to have been selected simply because they contained the word "███."  The UCC, however, has not come forward with any evidence showing that legal advice regarding ███ was in furtherance of efforts by Side A ICSPs to defraud creditors.  To the contrary, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

8.      **Fiduciary duty**:  The UCC's fiduciary duty claims do not give rise to application of the "crime fraud" exception for multiple reasons.

9.      First, none of the UCC's fiduciary duty allegations show any Side A ICSP engaging in a crime or fraud.  Instead, the UCC's claims are either predicated on conduct by Purdue's management or unproven allegations borrowed from the DOJ that are disproven by the record.  The UCC, for example, parrots the DOJ's allegations that the Named Sacklers approved a management initiative called E2E that supposedly resulted in medically unnecessary prescriptions being written.  UCC Reply ¶¶ 44–45.  ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

10.    <u>Second</u>, the UCC's allegations of breach of fiduciary duty could not possibly

justify an order stripping documents of privilege.  The UCC makes no attempt to show how

communications between Side A ICSPs and counsel facilitated any of the supposed conduct

associated with alleged fiduciary duty breaches related to Purdue marketing activities.

11.    **<u>NCSG allegations</u>**:  The NCSG does not show any Side A ICSP engaged in any

crime or fraud, relying either on DOJ allegations that are inadequate for the reasons described

above or allegations of conduct that do not involve Side A ICSPs.  And the NCSG does not even

bother to try to show that any alleged conduct was facilitated by communications with counsel.

## <u>STATEMENT OF FACTS</u>

I.    **The UCC's Reply Does Not Show Probable Cause with Respect to the Elements of the "Crime Fraud" Exception**

A.    **The UCC's Intentional Fraudulent Transfer Allegations Still Do Not Show Any Side A ICSP Acting to Interfere, Hinder, or Delay Creditors**

12.    Despite extensive discovery, including access to far more documents than any

earlier plaintiffs (including the state of Oklahoma and two Ohio municipalities, all three of

whom were ready to go to trial), the UCC has introduced no evidence that any Side A ICSP was

"worried about Purdue['s] litigation risk," UCC Reply ¶ 59, or approved any transfer of funds to

evade litigation creditors.  Indeed, the UCC cannot deny the irrefutable evidence to the contrary:

at the same time that the alleged project to defraud creditors was supposedly in full swing,

████████████████████████████████████████████████████████████

████████████████████████████████

    1.      The UCC Reply Does Not Come Forward With Evidence Showing Probable Cause That Each, Let Alone All, Side A ICSPs Participated in Fraudulent Transfers

13.     The UCC Reply makes many allegations regarding "the Sacklers" that have nothing to do with any Side A ICSP,[4] and the UCC does <u>not</u> make any specific intentional fraudulent conveyance allegations with respect to virtually all of the Side A former directors.

14.     The UCC makes no intentional fraudulent conveyance allegations regarding Ilene Sackler Lefcourt.

15.     The UCC makes no intentional fraudulent conveyance allegations regarding Kathe Sackler, but the UCC notes that she occasionally *received* a small number of news summaries that included stories about opioid diversion and abuse. *Id.* ¶ 57.

16.     The UCC makes no intentional fraudulent conveyance allegations regarding Theresa Sackler, but the UCC notes that she occasionally *received* a small number of news summaries that included stories about opioid diversion and abuse. *Id.*

17.     The UCC makes no intentional fraudulent conveyance allegations regarding the Side A outside directors.

18.     ███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

---

[4]    Allegations concerning members of the Raymond Sackler family are rebutted in their Opposition to the Exceptions Motion and their sur-reply.

19. ██████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████

20. ██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████

21. 

22.

23.

---
5    The UCC claims that there were "questionable" redactions on this email, but the UCC has the version of this email that the Side A ICSPs attach here, with nearly all the redactions removed.

6 



      2.      An Extensive Record Disproves the UCC's Claim that Any Side A ICSP
Knew that Purdue Faced a "Massive" Litigation Threat and "Vast
Liability"

24.      The UCC's claim that "the Sacklers" knew that Purdue faced a supposedly

massive litigation risk is disproven by Purdue's lengthy history—which the UCC ignores—of

prevailing in individual product liability suits or settling them for relatively modest amounts.[7]

25.      The UCC speculates that "the Sacklers" knew about Purdue's supposed litigation

exposure based on a small number of lawsuits, articles theorizing about future litigation, and the

identity of a lawyer retained by Purdue—but none of this shows that any Side A ICSP knew or

believed that Purdue faced litigation liability that Purdue could not afford to resolve:

---

[7]

- A comment in a 2006 law review article—which the UCC concedes was circulated only to members of management and not Side A ICSPs—speculated that Purdue's 2004 settlement with West Virginia could result in more litigation.  UCC Reply ¶ 54.  This settlement, however, was only for $10 million.  Preis Decl., Ex. 188b at PPLPC051000035809.

- Purdue was sued by Kentucky in 2007, but the suit was resolved in 2015 for $24 million over eight years, an amount that was inflated by Purdue facing a procedural bar that could have prevented it from contesting liability.  Side A. Obj. ¶ 23.  The UCC's claim that this case "still implied Purdue liability of at least [$1.6 billion] (sic) on a morphine milligram basis," UCC Reply ¶ 56 n.32, rests solely on the UCC's speculation and certainly does not reflect the state of mind of any Side A ICSP.

- 

- Purdue was sued by several municipalities in 2014, and there was speculation in the media about additional litigation.  UCC Reply ¶ 56.  B

- Purdue was represented in connection with the 2007 plea and other OxyContin litigation by Don Strauber, an attorney who previously had defended the tobacco industry.  UCC Reply ¶ 55.  The UCC provides no evidence that any Side A ICSP was aware of this fact.  Regardless, any suggestion that any Side A ICSP must have known that Purdue faced litigation risk that threatened its solvency because of the resume of a Purdue outside lawyer is farcical.

- Articles at various times discussed the harm allegedly caused by OxyContin and other prescription opioids and Purdue's supposed damages.  *Id.*  ¶¶ 56–57.  When individual

---

[8]    In any event, the UCC's allegation regarding this document rests on the mistaken assumption that the only reason Purdue would not indemnify a director is insolvency— there are numerous cases involving solvent companies that declined to satisfy their indemnification obligations.  *See, e.g., Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 846–48 (S.D.N.Y. 2017) (apparently solvent company refused to indemnify former director, despite acknowledging obligation to do so); *Kertesz v. Gen. Video Corp.*, No. 09-cv-1648 (GBD), 2010 WL 11506390 (S.D.N.Y. 2010) (former officer and director raised disputed issues of fact as to whether company complied with its indemnification obligations).

claims were litigated in court—not in the press—the result was invariably that Purdue
prevailed or settled the cases for relatively modest amounts.  Side A Obj. ¶¶ 17–18.

- 

        3.       The UCC Has No Answer to Cash Management Practices That Ensured
                  That Purdue's Needs Were Met <u>Before</u> Distributions Were Approved

26.



27.     The UCC's claim that outside directors blindly followed instructions from

members of the Sackler families, UCC Reply ¶¶ 67–68,

---

9



28.





4.    Side A Distributions Were Transferred to Trusts for Conventional Wealth
Management Purpose—Not to Hide It from Creditors

████████████████████████████████████████████████████████
████████████████████████████████████████

████████████████████

**B.    The UCC's Fiduciary Duty Allegations Do Not Show Any Side A ICSP Engaging in a Crime or Fraud**

32.    The UCC's claim that the "crime fraud" exception should be applied because Side A ICSPs supposedly breached their fiduciary duties largely rests on allegations regarding Purdue's management.  The UCC seeks to connect that alleged conduct to "the Sacklers" through a combination of (i) certain documents that reflect generalized annoyance with certain members of Purdue's Board, UCC Reply ¶¶ 25, 29, 31, 34; and (ii) a small number of documents regarding information received by Purdue's Board and the summary of a meeting prepared by an outside consultant that made <u>no reference</u> to any Side A ICSP, *id.* ¶¶ 38–44.  None of these documents shows any Side A ICSPs overstepping their bounds as directors or engaging in criminal or fraudulent conduct.

33.    Purdue's directors were not its management.  ████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████

34.    Finally, the UCC argues that Board participation in management activities can be inferred by the frequency with which the Board met, UCC Reply ¶ 32—but frequency of meetings does not turn directors into managers.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████

      1.      No Side A ICSP Engaged in Management Functions

35.     The UCC does not point to a single instance of any Side A ICSP participating in Purdue's prescription opioid marketing activities or other management functions.

36.     The UCC makes <u>no</u> specific allegations about Ilene Sackler Lefcourt being involved in management activities.

37.     The UCC makes <u>no</u> specific allegations about Kathe Sackler being involved in management activities.

38.     The UCC makes <u>no</u> specific allegations about Theresa Sackler being involved in management activities.

39.     The UCC includes a few allegations about Mortimer D.A. Sackler, ██████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

- ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████ *see also, e.g.*, David A. Katz, *Advice for Boards in CEO Selection and Succession Planning*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (JUNE 11, 2012) ("Selecting the chief executive officer and planning for CEO succession are among the most important responsibilities of a company's board of directors."), at https://corpgov.law.harvard.edu/2012/06/11/advice-for-boards-in-ceo-selection-and-succession-planning/; Richard Summerfield, *The Role of the Board in M&A*, FINANCIER WORLDWIDE (June 2019) ("[I]t is essential that board members play their part and provide input on whether an acquisition is in the best interests of the company and its

shareholders . . . Whether to pursue a deal is one of the more momentous–and scrutinized–decisions a board will make, particularly if it is deciding whether to sell the company which may crystalise the value of the stockholders' investment."), at https://www.financierworldwide.com/the-role-of-the-board-in-ma.

- 

2. No Side A ICSP Engaged in Crimes or Frauds

40.    Purdue's 2020 plea, upon which the UCC relies, makes <u>zero</u> reference to Purdue's Board or members of the Sackler families.[12] Preis Decl., Ex. 182.  It contains not a single reference suggesting any of them had any role in the crimes at issue.  The UCC nevertheless claims that the Board is responsible for medically unnecessary prescriptions because it supposedly endorsed management's E2E initiative.  However, E2E is <u>not</u> mentioned in Purdue's plea at all.  It is merely referenced in a denied allegation in Purdue's civil DOJ settlement.  E2E is also referenced in the Named Sacklers' civil settlement agreement with the DOJ as a set of

---

[12]    The UCC attempts to connect Purdue's plea to Purdue's Board by making the bald assertion that Purdue's decision not to inform the Drug Enforcement Agency ("DEA") that "Region Zero" doctors (on a no-call list) were continuing to prescribe OxyContin was "a choice that was or should have been known to the Sacklers."  UCC Reply ¶ 38.  The UCC, however, provides no evidence that the Board had any knowledge about what prescriber data Purdue was or was not giving to the DEA.

explicitly denied allegations.  Allegations that have been denied are of no evidentiary weight

whatsoever.  *See, e.g.*, *S.E.C. v. Citigroup Global Markets, Inc.*, 827 F. Supp. 2d 328, 333

(S.D.N.Y. 2011), *vacated and remanded on other grounds by* 752 F.3d 285 (2d Cir. 2014) ("As a

matter of law, an allegation that is neither admitted nor denied is simply that, an allegation.  It

has no evidentiary value."); *In re Platinum and Palladium Commodities Litigation*, 828 F. Supp.

2d 588, 593–94 (S.D.N.Y. 2011) (striking allegations based on an order enforcing a settlement

with the Commodities Futures Trading Commission because the order "was the product of a

settlement between the CFTC and the Respondents, not an adjudication of the underlying issues

in the CFTC proceeding," so the plaintiffs were "prohibited from relying on the [order] to plead

the 'underlying facts of liability.'").[13]  They are entirely inadequate to establish the stringent

showing necessary to apply the "crime fraud" exception to attorney-client privilege.  As

described below, these claims are refuted by an extensive record showing that ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

    41.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[13]    *See also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding
that "a consent judgment between a federal agency and a private corporation which is not
the result of an actual adjudication of any of the issues . . . can not be used as evidence in
subsequent litigation between that corporation and another party").

[14]    The following discussion of McKinsey and E2E applies with equal force to the NCSG's
allegations regarding these initiatives.



42.

43.

---

15    *FDA Actions on OxyContin Products, 4/16/2013,* at
      https://www.fda.gov/drugs/information-drug-class/fda-actions-oxycontin-products-
      4162013#:~:text=FDA%20has%20determined%20that%20the,abuse%20via%20the%20intr
      anasal%20route.

44.    Purdue's Board never adopted McKinsey's recommendations or told management to do so.  Purdue's Board, like all boards, acts through votes, and the UCC does not identify a single Board vote relating to McKinsey or E2E.  Further, the internal McKinsey email regarding the August 23, 2013 meeting with the Purdue Board makes no reference to any Side A ICSP being present, much less saying anything during the meeting.  To the contrary, the McKinsey email confirms that whatever directors were present at the meeting were <u>not</u> deeply engaged on McKinsey's work:  "**Board had not engaged on our work…Dr. Richard had not read our memo**."  NCSG Reply**,** Ex. O.

45.



46.

[REDACTED]

---

16    *See, e.g.*, *Just the Facts: Prescription Drug Utilization Management*, Am. Cancer Soc'y (Feb. 25, 2014) ("Health plans often specify a limit on the total quantity of a given prescription drug that can be dispensed at one time. For example, plans may limit patients to a 30-day supply of a particular medication per month. This type of limit is not usually a significant barrier for patient access. More frequently, these limits are used to ensure that a patient is not prescribed a quantity of medication that exceeds best practices or medical guidelines."), at https://www.fightcancer.org/policy-resources/just-facts-prescription-drug-utilization-management; *Pharmacy Practice in Managed Care*, Academy of Managed Care Pharmacy (Dec. 2015) (listing "cost containment strategies" including "[f]ormulary management" and "[u]tilization management"), at

48.     At its core, the UCC's claim that the Board believed Purdue was seeking to
encourage medically unnecessary prescriptions through E2E is illogical:  it would have made no
sense for Purdue to emphasize OxyContin's abuse-deterrent properties if the objective was to
encourage sales from "pill mill" doctors whose "patients" sought to abuse OxyContin for non-
medical purposes.  Indeed, it is difficult to understand why such "pill mills" would have had <u>any</u>
interest in a high-priced, branded drug with abuse-deterrent features when lower cost generic
products without such features were readily available.  ███████████████████████████
████████████████████████████████████████████████████████████████
███████████████████

**C.     The UCC Reply Does Not Contain Any Allegations About the Role of
Counsel in Facilitating Any Supposed Crime or Fraud**

49.     Although styled as a brief advocating for certain exceptions to the attorney-client
privilege, the UCC Reply has very few allegations about the role of counsel.  Communications
by or with attorneys are mentioned only a few times.  *See* ¶¶ 51, 54, 55, 59.[17]  The UCC does not
even argue that any of these communications were in furtherance of a crime or fraud.



---

https://www.amcp.org/sites/default/files/2019-
03/Pharmacy%20Practice%20in%20Managed%20Care%20-%20Dec%202015-1.pptx.

[17]     The UCC Reply quotes an email from Stuart Baker in paragraph 30, but that communication
did not pertain to legal advice.

- 

- In paragraph 55, the UCC notes that Don Strauber, a partner at Chadbourne & Parke, has represented Purdue.  UCC Reply ¶ 55.  The UCC does not allege that Mr. Strauber provided any advice that furthered a crime or fraud.  Instead, the UCC takes the extraordinary position that the Court should infer that Mr. Strauber advised Purdue that litigation might render it insolvent simply because Mr. Strauber represented tobacco companies in connection with the 1998 Tobacco Master Settlement Agreement.  Not only is this argument nonsensical, but the proposition that the experience of an attorney's clients should be imputed to his other clients would make the practice of law unsustainable.

- 

- Finally, the NCSG Memorandum is wholly devoid of any contention that counsel played a role in any of its allegations.

50.    None of these allegations show any counsel facilitating any supposed intentional fraudulent transfer or facilitating any alleged breach of fiduciary duty related to Purdue's conduct.

## II.    The NCSG Memorandum Does Not Show Probable Cause with Respect to the Elements of the "Crime Fraud" Exception

51.    The disjointed allegations in the NCSG Memorandum similarly do not show any Side A ICSP engaging in criminal or fraudulent conduct.  The NCSG does not even attempt to show that any alleged conduct was facilitated by advice of counsel.

52.    The NCSG claims that there was "a pattern of Sacklers" controlling the actions at Purdue, NCSG Reply ¶ 14, but not a single document that the NCSG cites in support of its allegations makes any specific reference to a Side A ICSP or was ever received by a Side A ICSP.  These documents consist of nothing more than (i) several internal McKinsey emails

which contained notes of meetings in which two Purdue executives reportedly expressed concern about Purdue's board at large, NCSG Reply, Exs. G, I; (ii) one email from a Purdue executive to McKinsey stating that the Board was dissatisfied with CEO John Stewart, *id.*, Ex. H; and (iii) a self-evaluation by a McKinsey employee in which she boasted, among other things, about her relationship with unspecified members of the Sackler Family, and efforts in "[t]ackling the challenges of malaria." *Id.*, Ex. J. These emails do not show any Side A ICSP doing anything, much less committing a crime or fraud.

53.    The NCSG's allegation that Purdue improperly opposed the FDA's 2008 proposal that OxyContin should be prescribed only by doctors who completed certain training does not specify involvement by any Side A ICSP. Regardless, the risk management procedures for OxyContin and other Schedule II opioids are set forth in a Risk Evaluation and Mitigation Strategies ("REMS") program for all opioids that the FDA adopted in 2012 and updated numerous times since then.[18] The NCSG simply has no basis to second guess the policy choices made over a decade ago by the FDA, the nation's prescription drug regulator. And even if they could, that second-guessing offers no basis for canceling the privilege over any Side A communications.

54.    The NCSG quotes the DOJ's allegation that "Purdue's Abuse Diversion Detection Program and Region Zero list, of which the Named Sacklers were aware, contains examples of high-volume prescribers during [the project] that Purdue's own employees suspected were writing medically unnecessary prescriptions." NCSG Reply ¶ 19. ████████████████

████████████████████████████████████████

---

[18]    *Approved Risk Evaluation and Mitigation Strategy (REMS)*, U.S. Food & Drug Admin., last updated Nov. 14, 2019, at https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=17



55.

56.    The NCSG references a 2013 memorandum from a Purdue executive to Purdue's Board that explained that demand for OxyContin might be reduced because of a requirement imposed by Walgreens that its pharmacists review and evaluate the appropriateness of prescriptions for Schedule II medications.  The NCSG, however, does not and cannot specify anything—let alone anything unlawful—that any Side A ICSP did in response.

57.    The NCSG discusses statements made in certain slides that were provided by McKinsey to Purdue's management in 2017.  The NCSG does not cite to any document showing that these slides were ever shown to the Board.  To the contrary, the transmittal email from McKinsey makes clear that these slides reflected only a proposal:  "Here are a few summary pages **if helpful** for your Board Update."  As far as the Side A ICSPs are aware, this proposal was never provided to the Board**.**

58.    The NCSG makes just one intentional fraudulent transfer claim regarding a Side A ICSP—a brief reference in a footnote to a supposed statement by Mortimer D.A. Sackler about a "death spiral."  NCSG Reply ¶ 20 n.42.  But Mortimer never said he believed that Purdue was in a "death spiral," much less that it was caused by litigation exposure.  ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████

59.     Finally, grasping at straws for support, the NCSG relies on a decision of a

Massachusetts trial court denying a motion to dismiss filed by Sackler Former Directors.  NCSG

¶ 7.  A denial of a motion to dismiss has no evidentiary value.  *See, e.g.*, *In re AHT Corp.*, 292

B.R. 734, 746 (S.D.N.Y. 2003) ("But a decision denying a motion to dismiss does not mean that

a claim has merit and will ultimately succeed. If it did, we could simply enter judgment for the

plaintiff at the same time we denied the motion to dismiss for failure to state a claim and spare

ourselves a lot of unnecessary aggravation."); *Bialek v. Racal-Milgo, Inc.*, 545 F. Supp. 25, 36

(S.D.N.Y. 1982) (denial of 12(b)(2) motion to dismiss "does not, of course, alleviate plaintiff's

burden of proving the requisite jurisdictional facts at trial by a preponderance of the evidence;

nor does it prejudice defendant's right to move, at the conclusion either of plaintiff's case or of

the presentation of all the evidence, for a Rule 12(b)(2) dismissal on the ground that the plaintiff

failed to sustain this burden of proof").

60.     The NCSG also disregards the fact that the only decision regarding a Side A ICSP

that was subject to appellate review resulted in a dismissal of the case.  In Utah, after an

administrative tribunal found that Kathe Sackler (the only Side A ICSP named in the litigation)

was subject to jurisdiction in Utah, a Utah District Court exercised its discretion to issue an

extraordinary writ—a rare remedy used only to correct egregious errors, as its name applies—

dismissing the claims against Kathe because she did not participate in Purdue's alleged activities

in Utah.  Side A Obj. ¶ 26 (citing *Sackler v. Utah Div. of Consumer Protection,* No. 190905862

(Utah Dist. Ct. Oct. 10, 2019)).

## ARGUMENT

61.     There is no dispute that according to the Second Circuit, the "crime fraud"

exception can only be applied in the narrow circumstance in which a "party seeking to invoke the

crime-fraud exception must at least demonstrate that there is probable cause to believe that a

crime or fraud has been attempted or committed <u>and</u> that the communications were in

furtherance thereof." *In re Richard Roe, Inc.*, 168 F.3d 69, 70 (2d. Cir. 1999) ("*Roe II*").

Further, there must be "(i) a determination that 'the client communication or attorney work

product in question was *itself* in furtherance of the crime or fraud' and (ii) 'probable cause to

believe that **the particular communication** with counsel or attorney work product was *intended*

in some way to facilitate or to conceal the criminal activity.'" *Id.* at 71 (quoting *In re Richard*

*Roe Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)) (emphasis added only as to "the particular

communication"); UCC Reply ¶ 75.  The UCC and the NCSG have failed to come forward with

evidence to meet their burden with respect to either of these elements.  They have not shown that

any Side A ICSP engaged in a crime or fraud.  Equally fundamentally, they have not identified

"particular communications" with counsel that facilitated criminal or fraudulent activity.

I.     **The UCC and the NCSG Have Not Come Forward with Evidence of Probable Cause
       That Any Side A ICSP Engaged in a Crime or Fraud**

       A.     **The UCC and the NCSG's Intentional Fraudulent Transfer Allegations Do
              Not Show Any Side A ICSP Engaging in a Crime or Fraud**

62.     The UCC and the NCSG's meager allegations against Side A ICSPs could not be

more different from the fact patterns in the cases they cite in which courts applied the "crime

fraud" exception.  The UCC cites *Securities Investor Protection Corp. v. Bernard Madoff*

*Investment Securities LLC*, 319 F.R.D. 100, 108 (S.D.N.Y. 2017), in which the court found a

"'temporal proximity' between transferor's decision to buy a house solely in spouse's name and

her knowledge <u>that Ponzi scheme was about to unravel</u>."  UCC Reply ¶ 47 (emphasis added).

Similarly, in *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), the court found that at the time the defendant created a trust, an accounting fraud had been uncovered and the defendant "had been named as a defendant in shareholder actions in which the damages sought exceeded the value of his assets." *See* UCC Reply ¶ 47.

63.    The UCC plainly cannot show probable cause with respect to each of the Side A ICSPs for which it makes no substantive allegations.  Regardless, the UCC and the NCSG cannot come forward with evidence that is comparable to the fact patterns in the cases they cite.  The UCC and the NCSG failed to show that any Side A ICSP believed that Purdue faced a realistic risk of litigation that could render it insolvent notwithstanding its large cash reserves.  And they certainly do not show anyone acting to hide money from creditors.  Indeed, all available evidence is to the contrary.

64.    H██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

65.    ██████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

66.     Courts have rejected intentional fraudulent conveyance claims in cases that are

similar to the present matter.  In *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010),

the court rejected intentional fraudulent conveyance claims that were "implausible" in light of

the defendant's conduct:  "Daimler's own actions do not support an inference of fraudulent

intent" as "[i]t is implausible that an affiliate of Daimler would make a $1.5 billion credit facility

available to CarCo or that Daimler would make a direct $920 million repayment to CarCo of

intercompany debt if Daimler were intentionally stripping assets from CarCo and expected

CarCo to fail." *Id.* at 194.  The UCC and the NCSG similarly cannot explain why Purdue's

Board, which supposedly was acting to defraud creditors, did just the opposite by allowing

Purdue to build a huge stockpile of cash that could be pursued by hypothetical litigation creditors

(should they ever materialize).  *See also* Side A Obj. ¶¶ 15–27.

### B.   The UCC's Fiduciary Duty Allegations Do Not Show Any ICSP Engaging in a Crime or Fraud[19]

67.   The UCC cannot circumvent its inability to show that any Side A ICSP engaged in a crime or fraud (as discussed in Section I.A., above) by arguing that an allegation of breach of fiduciary duty, without more, could be a sufficient basis to apply the "crime fraud" exception. That argument has been rejected by the Second Circuit, which expressly requires "probable cause to believe that a crime or fraud has been attempted or committed."  *Roe II*, 168 F.3d at 70. Similarly, a case cited by the UCC, *In re N.Y.C. Asbestos Litig.*, 109 A.D.3d 7, 10 (N.Y. App. Div. 2013) (UCC Reply ¶ 20), mentions breaches of fiduciary duty but then goes on to state that a party seeking "to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a <u>fraud or crime has been committed</u> and that the communications in question were in furtherance of the fraud or crime" (emphasis added).[20]   Indeed, absent a requirement of proving a crime or fraud, dockets would be flooded with "crime fraud" motions accompanying every breach of fiduciary suit.

68.   The UCC cannot bolster its fiduciary duty allegations  by drawing adverse inferences against the Board members from the refusal of two ex-CEOs (John Stewart and Mark

---

[19]   The Side A ICSPs dispute that the UCC has any basis to bring fiduciary duty claims against them (including with respect to any insolvency arguments that the UCC is no longer asserting in connection with the Exceptions Motion).  The Side A ICSPs reserve the right to litigate such claims if the UCC ever asserts them.

[20]   While the court in *Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-00007-LMB, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004), recognized that there might be unspecified circumstances in which a breach of fiduciary duty could give rise to an application of the "crime fraud" exception, it held that under the facts of the case there was extensive evidence of fraud:  "an extensively planned course of dealing to collude with a competitor and clandestinely transfer assets from the parent company, through transactions structured with the advice of counsel."  To the extent *Galaxy* or any of the UCC's other cases are read to allow application of the "crime fraud" exception without proof of a crime or fraud, any such case is contrary to binding Second Circuit authority.

Timney) to testify.  The UCC's argument makes no sense because the UCC overlooks that the

Board is entitled to rely on reports from management.  *See* N.Y. Bus. Corp. Law § 717.  If the

adverse inference the UCC seeks to draw is that the ex-CEOs engaged in misconduct (*see* UCC

Reply ¶ 46), that could potentially mean that the CEOs were misleading the Board as well.  In

any event, the UCC offers no basis to infer that the Side A ICSPs had any reason to disbelieve

communications from the CEOs, much less other members of Purdue's management.  In

particular, the Side A ICSPs had no reason to doubt ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

69.      Regardless, the UCC's argument is refuted by Second Circuit case law that

provides that a non-party's refusal to testify can lead to adverse inferences drawn against a party

only in limited circumstances that are not applicable here.  In *LiButti v. United States*, 107 F.3d

110 (2d Cir. 1997), a case the UCC cites, the Second Circuit outlined four factors to consider in

evaluating whether adverse inferences should be drawn:  (1) the nature of the relevant

relationships (which will "invariably be the most significant circumstance"); (2) the degree of

control of the party over the nonparty witness; (3) the compatibility of the interests of the party

and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness

in the litigation.  *Id.* at 123.  These factors point strongly against adverse inferences here:

- There is no relationship between any Side A ICSP and the former CEOs, as Mr. Stewart was fired by the Board in 2013 and Mr. Timney resigned due to differences of opinion with the Board in 2017.

- No Side A ICSP has any control over either former CEO.

- The interests of the Side A ICSPs and the former CEOs are not closely aligned because liability for management and the Board are assessed separately. Side A ICSPs have repeatedly taken the position that they did not participate in, and are not responsible for, management's alleged conduct.

- The role of the former CEOs is relatively minor in this litigation. The UCC has numerous other sources of information that it is using to conduct diligence, including tens of millions of pages of documents and testimony from more than a dozen witnesses including Purdue's current CEO.

70.    Courts have frequently declined to apply adverse inferences in analogous circumstances where, among other things, the witness who refused to testify and the party against which the inference was sought did not have a close relationship. *See, e.g. Coquina Invs. v. Rothstein,* No. 10-60786-Civ-COOKE/BANDSTRA, 2011 WL 13096509, at *1 (S.D. Fla. Oct. 19, 2011) (declining to find adverse inference against TD Bank because a former employee who declined to testify had been fired and TD Bank and the former employee "did not have a close relationship," the former employee "had little, if any loyalty, to TD Bank," and TD Bank did not exert control over the employee).[21]

71.    The two cases the UCC cites are inapposite. In *LiButti*, the Second Circuit remanded to the district court to determine whether adverse inferences should be drawn in a tax

---

[21]  *See also, e.g., Progressive Cas. Ins. Co. v. Monaco*, No. 16-cv-823 (VAB), 2017 WL 2873051, at *11 (D. Conn. July 5, 2017) (declining to apply adverse inference where defendant had reported the non-party witness for theft and where defendant did not have significant degree of control over non-party witness); *Cotton v. City of Eureka*, No. C-08-04386 SBA (EDL), 2010 WL 2889490, at *4 (N.D. Cal. July 22, 2010) (declining to apply adverse inference where there was "no evidence of any close or special relationship" between the party against whom the inference was sought and the non-party witness, and there was "no showing that [the party] ha[d] any degree of control over" the non-party witness); *Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200, 1213 (D. Colo. 2006) (declining to apply adverse inference where non-party witness was a "tangential figure," and "no longer work[ed] for or with" the defendants, and where the adverse inference sought was "massive in scope," and the non-party was not "the only source of the answer" with regard to several of the questions plaintiff posed).

proceeding where the non-party taxpayer (a father) did not answer questions regarding whether he owned or controlled a business or a horse purportedly owned by the party (his daughter) because of the "strength of their relationship" and shared interest. The relationship between the Side A ICSPs and two long-departed CEOs are very different from a father and daughter. In *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 514 (8th Cir. 1984), a non-party gave deposition testimony that was harmful to the plaintiff and stated he would invoke the Fifth Amendment if called to testify at trial. The trial court determined that the witness was unavailable and allowed the defendant to introduce the deposition testimony at trial. *Id.* The Eighth Circuit reversed because the use of deposition testimony under these circumstances was fundamentally unfair, holding that the trial court should have allowed plaintiff to call the non-party as a witness. *Id.* at 522. This case is irrelevant because the Side A ICSPs do not plan to use the deposition testimony of either former CEO.

### C. The NCSG's Allegations Do Not Show Any ICSP Engaging in a Crime or Fraud

72.    The NCSG says barely anything at all about any Side A ICSP, much less that shows any of them engaged in a crime or fraud. The NCSG says nothing about Ilene Sackler Lefcourt, Kathe Sackler, or Theresa Sackler (except to include their names in a list of directors). Mortimer D.A. Sackler appears just once — in a footnote stating nothing more than: "Mortimer: Purdue in a 'death spiral.'" NCSG Reply ¶ 20 n.42. As discussed above, Mortimer did not say that Purdue was in a death spiral, nor did he say anything about litigation risk. *See supra* ¶ 58.

█████████████████████████████████████████████

73.    The NCSG's generalized allegations regarding Purdue's Board are no different. The documents the NCSG cites at most show that certain Purdue executives were dissatisfied with unspecified members of Purdue's Board. And the NCSG's allegations regarding McKinsey

and E2E are simply a rehash of the UCC's arguments, which do not show any Side A ICSP

engaging in criminal or fraudulent conduct for the reasons described above.

## II.    The UCC and the NCSG Have Not Shown Probable Cause That Side A ICSP Communications with Counsel Facilitated Any Alleged Crime or Fraud

74.    The UCC and the NCSG have failed to satisfy the iron-clad requirement that they

come forward with "probable cause to believe that **the particular communication** with counsel

or attorney work product was intended in some way to facilitate or to conceal the criminal

activity." *Roe II*, 168 F.3d at 70.  Instead, they "rest merely upon the movant's presentation of a

'theory' regarding widespread fraud" — something they are not permitted to do.  *MacNamara v.

City of N.Y.*, No. 04 Civ. 9216 (RJS), 2008 WL 186181, at *4 (S.D.N.Y. Jan. 17, 2008).  Courts

routinely deny "crime fraud" motions for failure to satisfy these requirements.  *See, e.g.*, *id.*; *Roe

II*, 168 F.3d 69.

75.    <u>Intentional fraudulent conveyances</u>:  The UCC neither specifies which counsel, if

any, facilitated intentional fraudulent conveyances by Side A ICSPs, nor the circumstances in

which counsel facilitated such conveyances.  *See* Side A Obj. ¶¶ 35–37.  The UCC instead seeks

to cover its inability to identify any link between actual communications with counsel and its

crime/fraud allegations by citing instead to (i) seven broad categories unrelated to any specific

communications with counsel, which do little more than restate the UCC's allegations, and (ii)

various entries selected from the Side A ICSP privilege log.  *See* Hurley Decl., Ex. 101, at 2;

Hurley Decl., Ex. A.  Neither enables the UCC to satisfy its burden.

76.    The UCC's seven categories are facially insufficient to satisfy the Second

Circuit's requirement that a movant must come forward with "probable cause to believe that **the

particular communication** with counsel or attorney work product was intended in some way to

facilitate or to conceal the criminal activity." *Roe II*, 168 F.3d at 70.  Categories such as the

following are at most restatements of the UCC's theories of the case:

- "The Sacklers' asset protection and estate planning measures to transfer funds to trusts and other assets with "limited transparency" and/or "jurisdictional shielding" from creditors relating to the Sacklers' and Purdue's liability;"

- "Whether, and/or how, opioid litigants could collect, or be prevented from collecting, a potential judgment against the Sacklers, their trusts and other affiliates and assets (even if the Sacklers' motive to obscure assets was unbeknownst to the lawyer providing the advice);" and

- "The appropriate amount, and mechanics for, distributions to the Sacklers to avoid tracing or liability (including fraudulent transfer liability)."

Hurley Decl., Ex. 101, at 2.  None of the UCC's categories contain objective criteria that could

be used to identify particular communications with counsel that facilitated any allegedly criminal

or fraudulent conduct.

77.     The two cases cited by the UCC illustrate exactly what the UCC is unable to do:

specify which counsel facilitated alleged frauds and the particular circumstances in which such

counsel did so.  In *Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F. 3d 1324, 1333

(11th Cir. 2018), for example, the district court determined that there was an adequate showing

that <u>counsel</u> committed a fraud (fraud on the court and witness bribery) and found that specific

communications between that counsel about discrete topics were in furtherance of that

crime/fraud, *e.g.*, counsel's "withholding and redaction of documents produced to Drummond in

the defamation case showing payments to [two witnesses]," and counsel's email stating that two

witnesses "would receive ongoing monthly payments."[22]  Similarly, in *Amusement Indus.Inc. v.*

---

[22]    Contrary to the UCC's claim, the Eleventh Circuit did not "uph[o]ld a district court's decision to review documents within nine broad categories."  UCC Reply ¶ 77.  The court expressly explained that its opinion addressed only a "pure legal issue" of whether work product protection can be invoked in circumstances in which counsel, but not their clients, engaged in a crime or fraud. *Drummond Co., Inc.*, 885 F. 3d at 1339.

*Stern*, 293 F.R.D. 420, 440–41 (S.D.N.Y. 2013), the court "found the transactions on which these attorneys worked to each constitute illegal schemes devised by" the defendant, and on that basis required the disclosure of communications between the defendant and "Buchanan Ingersoll & Rooney, P.C.; Herrick, Feinstein LLP; or Hoffinger Ste[rn] and Ross, LLP concerning (1) Ste[rn]'s efforts to obtain financing from J.P. Morgan; (2) Ste[rn]'s efforts to obtain financing from Citigroup; (3) Ste[rn]'s acquisition and use of Amusement's $13 million; or (4) Ste[rn]'s efforts to obtain financing from Petra at the time." The UCC's categories, by contrast, contain none of these types of specific and objective factual parameters.

78.     The UCC's list of privilege log entries is similarly insufficient because the UCC fails to connect any of the entries to any allegedly intentional fraudulent conveyance. The UCC does not explain how it compiled the list of entries related to its Exceptions Motion. Hundreds of entries on the UCC's chart seem to have been selected because they contain the word "████" The UCC does not specify how any and all legal advice related to ████ facilitated intentional fraudulent transfers. Nor could it, as the use of ████ is an entirely appropriate means of inter-generational wealth planning and there is no evidence that any transfers to Side A trusts were made to defraud creditors.

79.     <u>Fiduciary duties</u>. The UCC does not even attempt to explain how (if at all) its fiduciary duty allegations regarding Side A ICSPs are related to communications with counsel. Under the rubric of "fiduciary duty" allegations, the UCC dwells at length on the alleged conduct of Purdue's management. The UCC does not and cannot explain how any communications between Side A and counsel that it is challenging facilitated any activities by management, much less conduct that was criminal or fraudulent.

80.     The inability of the UCC to connect its fraudulent conveyance allegations to communications is further confirmed by the one UCC "category" that even mentions fiduciary duties:  "Purdue's potential liability, or the Sacklers' (or any of their advisors') potential liability, related to breaches of fiduciary duty and other misconduct, and any efforts to conceal such conduct or breaches of duty."  *See* Hurley Decl., Ex. 101, at 2.  This catalog of allegations leaves unanswered what conduct falls within it, much less which particular communications between Side A ICSPs and counsel facilitated it.

81.     The NCSG's allegations:  The NCSG brief says nothing about the role of counsel with respect to its allegations.

## III.    The Court Should Not Order an *In Camera* Review Because the UCC and the NCSG Have Offered No Basis to Conclude That the "Crime Fraud" Exception Applies

82.     Recognizing that its use of categories that merely restate its theories does not work, the UCC falls back on an *in camera* review of each communication as an alternative.  An *in camera* review is unwarranted here.  The UCC correctly recognizes that an *in camera* review is appropriate only where a party presents "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review . . . may reveal evidence to establish that the crime-fraud exception applies."  UCC Reply ¶ 77 (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989)).  The UCC and the NCSG, however, have not made such a showing for the reasons described above.  Their attempt to use an *in camera* review as a court-sanctioned "fishing expedition" to determine if they may have a basis to apply the crime fraud exception puts the cart before the horse and has no basis in law.  An *in camera* review of an unknown number of documents would only further prolong this dispute and potentially pose even more burdensome demands on the parties at a time when their focus should be settlement negotiations.

## CONCLUSION

83.     The UCC's and the NCSG's meritless efforts to convince the Court to order the production of privileged documents have already proven an unnecessary distraction from the Court's directive to pursue a global negotiated resolution that would put an end to wasteful litigation that is draining the Debtors' Estate by tens of millions of dollars each month and would allow significant abatement resources to begin flowing to hard-hit communities across the country.  The UCC and the NCSG already have access to a massive volume of documents, and they have not come close to meeting the burden of showing that they meet the narrow circumstances in which a Court should apply the extraordinary remedy of ordering the production of privileged documents.  The Court should deny the Exceptions Motion.

Dated:   December 9, 2020
             New York, New York

                                            By:      /s/ Jasmine Ball_____
                                                       Jasmine Ball
                                                       Maura Kathleen Monaghan
                                                       Jeffrey J. Rosen
                                                       DEBEVOISE & PLIMPTON LLP
                                                       919 Third Avenue
                                                       New York, New York 10022
                                                       Telephone:  (212) 909-6000
                                                       Facsimile:  (212) 909-6836
                                                       Email: jball@debevoise.com
                                                                 mkmonaghan@debevoise.com
                                                                 jrosen@debevoise.com

                                                       *Attorneys for Beacon Company*