Eisenberg & Baum, LLP
Michael S. Quinn
24 Union Square East, Fourth Floor
New York, New York 10003
(212) 353-8700

*Counsel to the Ad Hoc Committee on Accountability*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.* [1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**THE AD HOC COMMITTEE ON ACCOUNTABILITY'S
STATEMENT IN SUPPORT OF THE MOTION OF DEBTORS FOR
ENTRY OF A THIRD ORDER EXTENDING THE EXCLUSIVE PERIODS
WITHIN WHICH TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES**

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

The Ad Hoc Committee on Accountability, by its undersigned counsel, respectfully submits this statement in support of the Debtors' Motion to Extend the Exclusive Periods to File a Chapter 11 Plan and Solicit (ECF No. 2045, the "**Motion**").

The Committee on Accountability respectfully states as follows:

**The Motion Should be Granted**

---

[1] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

1

The Motion contends that an extension of Purdue's deadlines is justified to allow work on "two remaining key issues, the resolution of which are critical to the formulation of a plan: (1) the resolution of potential claims or causes of action that may be asserted by the Debtors and others against the Sackler family and related parties, and (2) the precise contours of the structure and governance of the successor entity to which the Debtors' assets will be transferred upon effectiveness of the Chapter 11 Plan."[2]

The Committee on Accountability agrees. Purdue seeks 67 days.[3] In that time, Purdue aims to resolve the liability of the Sackler family for the national opioid crisis and to decide the future of Purdue's infamous OxyContin business. The difficulty of those problems provides good cause for the Motion to be granted.[4]

**The Sacklers**

The Sacklers' liability should be established through trials in the communities that they decimated. The reason the Sacklers have not faced these trials is because they are billionaires. They are rich enough that half of the States in the country have agreed not to sue them, and the other half were blocked by this Court. To see the difference big money makes, compare the Sacklers to Insys, another criminal opioid Company. In Insys, the Government tried and convicted John Kapoor, the Chairman of the Board, along with his CEO, Vice President of Sales, National Director of Sales, two Regional Sales Directors, and the Vice President of Managed Markets. They were all sentenced to prison. While Kapoor and the others await jail

---

[2] Motion at 2.
[3] Motion ¶ 1.
[4] The Debtors refer to "difficult issues." Motion ¶ 26. They are right.

2

time, the Sacklers, no doubt, are settling into their winter residences.[5]

Money, even a lot of it, should not stand in the way of justice. Regular Americans already pay trillions of dollars in taxes to fund our government. We do not have to sell immunity to wealthy lawbreakers in order to pay for a fraction of the services needed to address this epidemic.[6] When billionaires break the law, they should not be allowed to buy their way out of trials by dangling money in front of public officials. We elect Attorneys General to be law enforcement officers, not toll collectors. The Committee on Accountability hopes that the Court will grant the 67 days and that the parties will use the time to consider how to bring the Sacklers to justice.

**Purdue**

Planning a "successor entity" to Purdue is difficult because keeping any part of Purdue in business goes against the law that protects our health care system by excluding criminals from it.

In 1977, Congress enacted a law requiring that doctors who commit health care crimes must be excluded from participating in Medicare and Medicaid.[7] In 1981, Congress expanded the law to exclude from government health care programs both individuals *and corporations* that commit health care crimes.[8] On the government's website today is a list of 3,158

---

[5] Katherine Clarke, *A Real Estate Empire Tied to Purdue Pharma,* Wall St. J., Nov. 12, 2020, *available at* https://www.wsj.com/articles/a-real-estate-empire-tied-to-purdue-pharma-11605206747.

[6] The aggregate proof of claims of all the States totals $2.156 trillion. Proof of Claim No. 150563.

[7] Pub. L. 95-142, Medicare-Medicaid Anti-Fraud and Abuse Amendments, described at https://oig.hhs.gov/exclusions/effects_of_exclusion.asp.

[8] Pub. L. 97-35, Civil Monetary Penalties Law (CMPL), described at, https://oig.hhs.gov/exclusions/effects_of_exclusion.asp.

corporations that are excluded from doing business with federal health care programs. That list is attached as Exhibit A.

In addition to federal law, many states also exclude from government health care programs individuals and companies that are convicted of health care crimes.[9] If they are enforced, these laws should impose a real threat to deter companies from committing crimes, and they should protect the government and the public from continuing to do business with criminals.

The laws excluding criminals from health care business are enforced sometimes. The federal government reports that, if an individual pharmacist is convicted of a crime and excluded from federal health care programs, he will remain excluded even if he goes to medical school and tries to re-enter the practice of health care as a doctor.[10] The government has stated that, "in many instances, the practical effect" on individuals who are convicted of crimes and excluded from government health care programs "is to preclude employment" in much of the health care field.[11]

But there is one famous example where "the practical effect" of excluding a convicted criminal from health care was engineered by powerful players to be *no effect at all*. On the list of 3,158 excluded corporations, entry #2,402 is the "Purdue Frederick Company, Inc." of Stamford, Connecticut.[12] When Purdue was convicted of a felony in 2007, the company's

---

[9] Cal. Welf. & Inst. Code § 14043.61; 130 Mass. Code Regs. 450.224; Miss. Code Ann. § 43-13-121(7); N.Y. Comp. Codes R. & Regs. Tit. 18, §§ 504.5, 504.7; 55 Pa. Code § 1101.76; Ohio Admin. Code § 5160-1-17.6(F); S.C. Code Ann. Regs. 126-400; 1 Tex. Admin. Code § 371.1705(a); Wash. Admin. Code 182-502-0030.

[10] Pub. L. 95-142, Medicare-Medicaid Anti-Fraud and Abuse Amendments, Footnote 3 of U.S. Dep't of Health and Human Services O.I.G., *The Effect of Exclusion From Participation in Federal Health Care Programs – Special Advisory Bulletin* (Sept. 1999), https://oig.hhs.gov/exclusions/effects_of_exclusion.asp.

[11] *Id.*

[12] Exhibit A at 42.

lawyers and the Justice Department arranged things so that the Purdue Frederick Company would be excluded, but Purdue Pharma L.P. would carry on. The same executives and the same employees kept selling drugs. And, we know now, they kept committing crimes while many thousands of Americans died.

There is no dispute that Purdue's 2020 convictions, just like the 2007 convictions, meet the legal standard for mandatory exclusion from government healthcare programs.[13] The open question is whether that exclusion will be meaningful or a charade. At the last hearing in this case, an attorney emphasized: "The DOJ deal requires that Purdue Pharma L.P. itself, not a subsidiary, not an affiliate, itself plead guilty to multiple serious crimes and be excluded from participation in Federal healthcare programs."[14] For the members of the Committee on Accountability whose children were killed before 2007, and who heard authorities boast about shutting down Purdue Frederick, and who saw the same perpetrators continue the same misconduct under a different corporate name for another decade – for them, that attorney's claims rings hollow.

The Committee on Accountability does not want to put a new label on Purdue and send it into the future to continue its business. The exclusion law was enacted so that employees of health care companies would have a compelling reason *not to allow* their company to commit crimes. Breaking the law might increase profits or help someone collect a bonus in the short term, but, if the company were convicted, then everyone's job would be at risk.

---

[13] Nov. 21, 2020 Purdue Plea Agreement, Settlement Agreement, Terms and Conditions, pg. 6, ¶ 4.

> [Purdue] will be excluded pursuant to 42 U.S.C. 1320a-7(a)(1) from Medicare, Medicaid, and all other Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f). Such exclusion shall have national effect and, pursuant to 42 U.S.C. § 1320a-7(i), shall be effective after a judgment of conviction has been entered or a guilty plea has been accepted by a Federal, state, or local court. After Purdue is excluded, Federal health care programs shall not pay anyone for items or services, including administrative and management services, furnished, ordered, or prescribed by Purdue in any capacity.

[14] Hr'g Tr. 95-96 (Nov. 17, 2020).

To make that deterrent work, exclusion must have real consequences for real people. Purdue's recent compensation motion sought to pay bonuses to 622 employees, including those who have been at Purdue for decades.[15] Of course those employees and their "triple blue chip" professionals[16] want Purdue preserved as a "public benefit company." If they pull off that trick, they will keep their jobs, just as they did in 2007. If, instead, Purdue's assets are sold off to other drug companies, then many of the people who committed the crimes and drove Purdue into this bankruptcy will need to find a new line of work. That explains why Purdue came into this bankruptcy determined to survive as a "public benefit company," no matter what the laws on health care crimes say.

The Committee on Accountability hopes that the Court will grant the 67 days and that the parties will use the opportunity to arrange the sale of Purdue's assets to other pharmaceutical companies and ensure that criminals are excluded from the health care business this time.

**Conclusion**

WHEREFORE, the Committee on Accountability respectfully submits that the Motion should be granted.

| | |
|---|---|
| Dated: December 10, 2020<br>New York, NY | Respectfully Submitted,<br>Eisenberg & Baum, LLP<br><br>By:    /s/ Michael S. Quinn<br>         Michael S. Quinn (mq-1640) |

---

[15] Debtors' Notice of Hr'g on Mot. for Entry of Order Authorizing Implementation of Key Employee Incentive Plan and Key Employee Retention Plan, Sept. 9, 2020, ECF No. 1674 at 10, ¶ 19; 23, ¶ 39.

[16] Hr'g Tr. 218:6 (Nov. 17, 2020) ("That's what the new blue chip, triple blue-chip structure is for; which is to figure out those questions.") The Committee on Accountability associates "blue chip" and "triple blue chip" with McKinsey-esque decision making and business practices. *See* Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdose*, N.Y. Times, Dec. 1, 2020, *available at* https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

24 Union Square East, Fourth Floor
New York, New York  10003
(212) 353-8700
mquinn@eandblaw.com
prachmuth@eandblaw.com
ebaum@eandblaw.com

*Counsel to Ad Hoc Committee on Accountability*