**University at Buffalo**
The State University of New York

**College of Arts and Sciences**
Department of History

December 12, 2020

Honorable Robert Drain
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601-4140

Re: Purdue Pharma L.P., et al, Case No. 19-23649 (RDD)

Dear Judge Drain:

Purdue Pharma has requested an extension of the deadline for submission of a bankruptcy plan in Doc. No. 2045 (Motion of Debtors for Entry of a Third Order Extending the Exclusive Periods within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof). At a previous hearing the Court instructed the parties to "negotiate a plan that has an appropriate exit strategy" and that "resolving the opioid crisis" and "the public interest" should be the guiding principles of such a plan. We respectfully submit this letter regarding the development of this plan.

We are both historians who have written extensively on the pharmaceutical industry, drug addiction, and related topics. David Herzberg is Associate Professor at the University at Buffalo-State University of New York. Joseph M. Gabriel is Associate Professor at the Florida State University College of Medicine. Our scholarship has won national awards and has been widely recognized as both deeply researched and innovative. Between us we have published four books and more than twenty-five scholarly articles and book chapters on the history of pharmaceuticals and related topics. The Court recently referred to Herzberg's book *White Market Drugs* as "the most comprehensive and up-to-date history on this issue."[1]

We are honored that the Court has consulted the work of pharmaceutical historians, and we agree that greed in the pharmaceutical industry has been the primary cause of a long series of public health crises. As noted by the Court, our scholarship has led us to believe that nationalization or other far-reaching

---

[1] David Herzberg, *White Market Drugs: Big Pharma and the Hidden History of Addiction in America* (University of Chicago Press, 2020). See also David Herzberg, *Happy Pills in America: From Miltown to Prozac* (The Johns Hopkins University Press, 2010); Matthew Crawford and Joseph M. Gabriel, eds., *Drugs on the Page: Pharmacopeias and Healing in the Early Modern Atlantic World* (University of Pittsburgh Press, 2019); Joseph M. Gabriel, *Medical Monopoly: Intellectual Property Rights and the Origins of the Modern Pharmaceutical Industry* (University of Chicago Press, 2014).

reforms should be considered as ways to minimize the malign effects of this greed. We do not, however, believe that turning Purdue Pharma into a public benefit corporation will be effective in mitigating the opioid crisis or promoting the public interest.

History suggests that the proposed transformation of Purdue will not advance the public interest for two main reasons:

- First, historical precedent suggests that the new Purdue is unlikely to thrive and produce the desired revenue. Systemic changes in pharmaceutical markets over the past century have made it unlikely that a declining company remade into a public benefit corporation will survive.
- Second, transforming one relatively small company will not address the systemic problems in the pharmaceutical industry that enabled—or even encouraged—Purdue's bad behavior. History makes clear that Purdue is not an outlier; its practices have been all too common among other companies. Transforming Purdue will not meaningfully address these broader problems.

In this letter we provide evidence and reasoning for these two propositions. In the interest of being constructive, we also respectfully submit for the Court's consideration several historically-informed ways that Purdue's assets might be directed towards strategies that will promote the public interest in abating the opioid crisis—and preventing the next one.

**PURDUE'S MISDEEDS, AND THE OPIOID CRISIS MORE GENERALLY, ARE A CONSEQUENCE OF PHARMACEUTICAL COMPANIES' INCREASING PRIORITIZATION OF PROFIT OVER THE COURSE OF THE 20TH CENTURY**

<u>Reputable pharmaceutical companies have not always risked public health in pursuit of profit</u>. The origins of today's pharmaceutical industry lie in the 19th century with a small group of drug companies who defined themselves by their commitment to the AMA's Code of Medical Ethics. Historians refer to these companies as "ethical" drug manufacturers. Following the Code, these companies sold only known, proven, unpatented drugs and did not advertise to the public. This ethical restraint restricted their share of a drug market dominated by hyper-advertised "patent" medicines, and thus limited their profits, but it deepened their connection to professional medicine and scientific research undertaken for public benefit.[2]

<u>Over the course of the 20th century, "ethical" pharmaceutical companies increasingly prioritized profits and drug marketing became a core business strategy</u>. In the 20th century, "ethical" pharmaceutical manufacturing developed into a highly competitive and regulated market in which success depended on developing new products likely to return high profits. This raised the value of "me-too" drugs that were not always well-matched with a social need and which often did not bring significant new clinical benefit. Indeed, sometimes "innovative" products were substantially *worse* than similar products already on the market.[3] Unable to produce a steady stream of miracles, the industry invested in the next best thing: a

---

[2] Joseph M. Gabriel, *Medical Monopoly: Intellectual Property Rights and the Origins of the Modern Pharmaceutical Industry* (University of Chicago Press, 2014).

[3] Jonathan J. Darrow and Aaron S. Kesselheim, "Nearly One-Third of New Drugs are No Better than Older Drugs, and Some are Worse" *Health Affairs* (Oct. 6, 2016); Milton M. Silverman and Philip R. Lee, *Pills, Politics, and*

deluge of marketing. Most of this marketing targeted physicians and other clinicians through "detailing," direct mail advertising, sponsorship of conferences, and other means. Some of it has also been directed at the general public.[4] Over the course of the 20th century, the imperatives of marketing have crept ever earlier in the research and development process, shaping medicines' trajectory from the first moments of interaction between scientists and molecules.[5]

<u>Drug marketing increases drug risks</u>. The ancient Greek word "pharmakon" can be translated as both "remedy" and "poison." Even useful medicines can be dangerous and expose patients (and in the case of opioids, their friends and families) to significant risk. Marketing intensifies those risks: evidence suggests that the more a drug is advertised the greater the iatrogenic (medically-caused) harm.[6] This has been borne out by a series of preventable public health crises linked to drug marketing over the course of the 20th century, both in the United States and across the world. One infamous example is the sale of the tranquilizer/anti-nausea drug thalidomide in the late 1950s and early 1960s, which led to the deaths of about 2,000 children and serious birth defects in more than 10,000 children worldwide (the drug was only prevented from entering the US market due to the heroic efforts of FDA employee Frances Kelsey).[7] Thanks in part to continued expansion of pharmaceutical marketing, harms related to use of prescription drugs are a major public health problem in the U.S. today.[8]

---

*Profits* (University of California Press, 1974). For the early twentieth-century, see Gabriel, *Medical Monopoly*, esp. Chapt. 6.

[4] Jeremy A. Greene and David Herzberg, "Hidden in Plain Sight: Marketing Prescription Drugs to Consumers in the Twentieth Century" *American Journal of Public Health* 100 (2010), 793-803.

[5] Bennett Harvey Holman, *The Fundamental Antagonism: Science and Commerce in Medical Epistemology* (Ph.D. dissertation, University of California, Irvine, 2015); Jean-Paul Gaudilière and Ulrike Thomas (eds.), *The Development of Scientific Marketing in the Twentieth Century: Research for Sales in the Pharmaceutical Industry* (New York: Routledge, 2016); Jean-Paul Gaudilière, "From *Propaganda* to Scientific Marketing: Schering, Cortisone, and the Construction of Drug Markets," *History and Technology* 29 (2013): 188-209; Jeremy Greene, *Prescribing by Numbers: Drugs and the Definition of Disease* (Baltimore: The Johns Hopkins University Press, 2006).

[6] Howard Brody and Donald Light, "The Inverse Benefit Law: How Drug Marketing Undermines Patient Safety and Public Health," *American Journal of Public Health* 101 (2011): 399-404.

[7] Carpenter, *Reputation and Power*, Chapter Four. Another example is the early broad spectrum antibiotic chloramphenicol in the 1950s, which caused severe and fatal aplastic anemia in some patients. Scott Podolsky, *The Antibiotic Era: Reform, Resistance, and the Pursuit of a Rational Therapeutics* (Johns Hopkins University Press, 2015). More recent examples include the Fen-phen (fenfluramine/phentermine) tragedy of the 1990s and the Vioxx (rofecoxib) tragedy of the early 2000s. See Harlan M. Krumholz, Joseph S. Ross, Amos H. Presler, and David S. Egilman, "What Have We Learned from Vioxx?" *BMJ* 324 (2007), 120 - 123; Tom Nesi, *Poison Pills: The Untold Story of the Vioxx Drug Scandal* (St. Martin's Press, 2008); Alicia Mundy, *Dispensing with the Truth: The Victims, the Drug Companies, and the Dramatic Story Behind the Battle Over Fen-Phen* (St. Martin's Press, 2001).

[8] Some studies suggest that just the medically-approved use of prescription drugs (i.e., not including un-approved use such as opioid pills used by friends or family of the person to whom they were prescribed) is between the fourth and sixth leading cause of death in America; see Brian Chen, John Restaino, and Elizabeth Tippett, "Key Elements in Adverse Drug Reactions Safety Signals: Application of Legal Strategies" *Cancer Policy: Pharmaceutical Safety* (Springer, 2019); Donald Light, Joel Lexchin, and Jonathan J. Darrow, "Institutional Corruption and the Myth of Safe and Effective Drugs," *Journal of Law, Medicine, & Ethics* 41 (2013): 590-600; J. Lazarou, B.H. Pomeranz, and P. N. Corey, "Incidence of Adverse Drug Reactions in Hospitalized Patients: A Meta-Analysis of Prospective Studies" *JAMA* 279:15 (1998), 1200-5.

Addiction has long been one of the risks tied to drug marketing. This has been the case with addictive drugs over the course of the twentieth-century. As Herzberg documents in *White Market Drugs*, the U.S. has suffered three major waves of marketing-driven addiction crises. The first involved pharmaceutical opioids and cocaine from the late 19th century to the early 20th century; the second involved pharmaceutical sedatives (barbiturates, benzodiazepine tranquilizers) and stimulants (amphetamine) from the 1930s to the 1970s; and the third involved pharmaceutical sedatives, stimulants, and opioids in the late 20th and early 21st centuries. In all three waves, aggressive marketing spurred dangerous overuse of addictive medicines with catastrophic consequences. As we describe below, unethical and illegal forms of marketing have also been a significant part of this broader process. The Sackler family has been a pioneer of all kinds of pharmaceutical marketing since the end of World War II, but they did not invent it and nor were they its sole practitioners.

## UNETHICAL DRUG MARKETING HAS ALSO INCREASED DURING THE 20th CENTURY AND HAS HARMED THE PUBLIC INTEREST

Pharmaceutical companies increasingly engaged in unethical or fraudulent marketing practices over the course of the 20th century. As "ethical" pharmaceutical companies intensified their marketing campaigns, they increasingly engaged in unethical and sometimes illegal forms of drug promotion.[9] The Sackler family has been a leader in this trend, pushing the boundary on acceptable marketing practices and helping to ignite not only the current opioid crisis but also an earlier crisis of tranquilizer addiction and overdose in the 1960s and 1970s (a period during which Valium was the leading cause of drug-related ER visits and fatal overdose).[10] However, the Sacklers did not stand alone. Rather, they were unusually successful examples of broader problematic developments, as evidenced (for example) by the large number of criminal and civil complaints against pharmaceutical companies over the past thirty years.[11]

Unethical and illegal tactics for promoting medicines have corrupted medical knowledge and practice. Numerous physicians, scholars, investigative journalists, and other researchers have described how pharmaceutical manufacturers bend clinical decision making to their own ends through aggressive efforts to promote their goods, sometimes by corrupting the scientific process.[12] Not all of these efforts are illegal, or even necessarily unethical, but many are. These activities can be grouped into the following three broad categories: illegal marketing and other illegal behaviors; ethically dubious but not necessarily illegal marketing; and legal but unethical manipulation of scientific practice and publishing (Appendix

---

[9] Joseph M. Gabriel and Bennett Holman, "Clinical Trials and the Origins of Pharmaceutical Fraud: Parke, Davis & Company, Virtue Epistemology, and the History of the Fundamental Antagonism" *History of Science* (2020)

[10] Patrick Radden Keefe, "The Family that Built an Empire of Pain," *New Yorker*, October 23, 2017; David Herzberg, *Happy Pills in America: From Miltown to Prozac* (Johns Hopkins University Press, 2009), Chapter Four.

[11] According to Public Citizen, between 1991 and 2017 alone drug makers entered into more than 400 federal and state settlements resulting in criminal and civil penalties totaling $38.6 billion. A large portion of these settlements were related to illegal forms of marketing and promotion. Sammy Almashat, Ryan Lang, Sidney M. Wolf, and Michael Carome, *Twenty-Seven Years of Pharmaceutical Industry Criminal and Civil Penalties: 1991 Through 2017* (Public Citizen, 2018)

[12] There is an extensive literature documenting this. Two excellent overviews are Ben Goldacre, *Bad Pharma: How Drug Companies Mislead Doctors and Harm Patients* (New York: Farrar, Straus and Giroux, 2013) and Carl Elliot, *White Coat Black Hat: Adventures on the Dark Side of Medicine* (Boston: Beacon Press, 2010)

provides a list for each category). Commenting on the deleterious effect of these activities, in 2009 a former editor-in-chief of the *New England Journal of Medicine* lamented that "it is no longer possible to believe much of the clinical research that is published, or to rely on the judgment of trusted physicians or authoritative guidelines."[13]

<u>There is abundant evidence that illegal and ethically dubious forms of drug promotion harms patients</u>.[14] Off-label drug use and adverse drug reactions are correlated, for example, raising concerns about illegal advertising intended to increase off-label prescriptions.[15] The manipulation of the scientific process, including the publication of misleading ghostwritten articles, undermines the reliability of the clinical literature and also harms patients. One recent independent re-analysis of the raw data from a clinical trial of antidepressants in adolescents concluded that neither of two major drugs (paroxetine and imipramine) were more effective than placebo, and that both increased harms. The original ghostwritten publication discussing SmithKline Beecham's now-infamous Study 329 said the exact opposite. This deceptive article has been cited at least 796 times and has not been retracted.[16]

## HISTORY SUGGESTS TURNING PURDUE INTO A PUBLIC BENEFIT CORPORATION WILL NOT ADDRESS THESE PROBLEMS

<u>Because Purdue's greatest misdeed was to pioneer the use of these unethical and illegal activities in the promotion of a powerful opioid, true abatement requires correcting these corrupt practices, not just changing Purdue's behavior</u>. Purdue's main innovation was the application of unethical and/or illegal marketing strategies to promote a powerful opioid. The company infamously deployed deceptive advertising, cultivated KOLs, manipulated professional practice guidelines, and otherwise bent scientific medicine to its own ends.[17] As Purdue racked up profits, other opioid manufacturers quickly joined in, following the same playbook. In other words, Purdue did not just sell dangerous products; it also sold a way of selling dangerous products. Abating the opioid crisis means addressing both of Purdue's misdeeds: abating the harms from the over-promotion of opioids, and abating the corrupt practices involved in over-promoting opioids. We do not think transforming Purdue into a public benefit corporation will accomplish these goals, for four reasons:

---

[13] Marcia Angell, "Drug Companies & Doctors: A Story of Corruption" *New York Review of Books* (Jan. 15, 2009)

[14] Donald Light, Joel Lexchin, and Jonathan J. Darrow, "Institutional Corruption and the Myth of Safe and Effective Drugs," *Journal of Law, Medicine, & Ethics* 41 (2013): 590-600; Donald W. Light, ed., *The Risks of Prescription Drugs* (Columbia University Press, 2010).

[15] Antle Neubert, Harald Dormann, Jutta Weiss, Tobias Egger, Manfred Criegee-Rieck, Wolfgang Rascher, Kay Brune, and Burkhard Hinz, "The Impact of Unlicensed and Off-Label Drug Use on Adverse Drug Reactions in Paediatric Patients" *Drug Safety* 27 (2004), 1059-1067.

[16] Joanna Le Noury, John M. Nardo, David Healy, Jon Jueidini, Melissa Raven, Catalin Tufaru, and Elia Abi-Jaoude, "Restoring Study 329: Efficacy and Harms of Paroxetine and Imipramine in Treatment of Major Depression in Adolescence" *BMJ* 351 (2015), h4320. The original results were published as MArk B. Keller, et. al., "Efficacy of Paroxetine in the Treatment of Adolescent Major Depression: A Randomized, Controlled Trial" *Journal of the American Academy of Child & Adolescent Psychiatry* 40:7 (2001), 762-772. See also Leemon B. McHenry and Jon N. Jureidini, "Industry-Sponsored Ghostwriting in Clinical Trial Reporting: A Case Study" *Accountability in Research* 15:3 (2008), 152-67.

[17] Sergio Sismondo, *Ghost-Managed Medicine: Big Pharma's Invisible Hands* (Mattering Press, 2018), 1-39.

<u>First, Purdue is no longer an influential force in opioid markets. Transforming the company into a public benefit corporation will have little impact on the market or on the behavior of other opioid manufacturers</u>. Purdue's days of being an influential industry leader are almost certainly over. It is a relatively small and declining company (several major health insurance companies have recently dropped coverage of OxyContin, for example--a leading indicator of shrinking market share).[18] Purdue had an outsized role in the opioid crisis because it pioneered applying the pharmaceutical industry's dubious promotional practices to sell an opioid. Once other companies followed suit, however, the opioid market became crowded and highly competitive; Purdue's OxyContin was a significant but not dominant player (16% market share by some measures[19]). On top of that, the company's role in the opioid crisis has inflicted significant reputational harm that transforming it into a public benefit corporation is unlikely to repair. In short, even a reformed Purdue will not be able to undo the damage inflicted to industry ethics.

<u>Second, the new public benefit corporation would be unlikely to generate the promised revenue</u>. Based on historical examples, such as the failed experiment with Metopon detailed in *White Market Drugs*, we believe that non-commercial products are unlikely to succeed in a market organized around competition, promotion, and profit. Metopon was an opioid developed and marketed by the Federal Bureau of Narcotics in 1946 "follow[ing] principles of science and therapeutic reform rather than to hunt for profit." There was no splashy advertising, just sober pronouncements of the drug's qualities in peer-reviewed medical journals. Despite the support of the Federal Bureau of Narcotics and leading pharmacologists at the National Research Council, Metopon made no headway against better-advertised competitors. Sales were so disappointing that by 1950 the Bureau relinquished the patent to the public and ended the experiment.[20] We see little reason that the new public benefit corporation would not meet a similar fate. In fact, we suspect that it is likely to fail as a business enterprise not long after it is begun.

<u>Third, Purdue's plan to remake itself as a provider of addiction treatment drugs such as buprenorphine is unlikely to succeed</u>. Unlike other drugs such as insulin, cost has never been a significant barrier to patients' use of addiction treatment drugs. Thus, any savings created by public benefit corporation manufacturing (itself a dubious proposition in a market suffused with generics) would have little impact on treatment availability. The main barriers to greater availability of addiction treatment drugs has been skepticism, stigma, and fear on the part of policymakers, medical authorities, and the recovery community. Having a company with Purdue's bad reputation associated with addiction treatment drugs would worsen, not improve, those barriers.

<u>Finally, transforming Purdue will send the wrong message to other pharmaceutical companies that the profits to be earned from bad behavior will exceed even the worst punishments</u>. For nearly thirty years, pharmaceutical companies appear to have factored in settlements with the Department of Justice, states, and other parties as a cost of doing business. By protecting Sackler family assets, and by inviting the family company to continue to do business and indeed to rehabilitate its name, the proposed settlement shows that even the most egregious behavior will not result in consequences comparable in scope to the

---

[18] Blake Farmer, "Insurer to Purdue Pharma: We Won't Pay for OxyContin Anymore," Nashville Public Radio / Kaiser Health Network News, https://khn.org/news/insurer-to-purdue-pharma-we-wont-pay-for-oxycontin-anymore/
[19] David Armstrong and Jeff Ernsthausen, "Purdue Pharma touts data that downplay its role in the opioid epidemic, new analysis shows" *STAT* (Sept. 9, 2019).
[20] Herzberg, *White Market Drugs*, 115-120.

immense profits that can be made through illegal and unethical promotion and the manipulation of the clinical literature.

In sum, turning Purdue into a public benefit corporation will not serve the public interest, either in the narrow sense of abating the opioid crisis or in the broader sense of abating the pharmaceutical industry's long-standing ethical crisis.

**RECOMMENDATIONS FOR ADDRESSING SYSTEMIC PROBLEMS**

In an effort to be constructive, and after careful consideration of historical precedent, we believe that the following ideas would serve the purposes articulated by the Court to abate the opioid crisis and to promote the public interest by minimizing the influence of greed in the pharmaceutical industry.

<u>Any settlement should include a significantly higher financial penalty for the Sackler family</u>. As noted earlier, past financial penalties have not been large enough to deter the industry from unlawful and unethical behavior. The Sackler's penalty would be even less because the settlement allows them to shield most of their considerable fortune by shifting costs to the supposed future earnings of an unpromising company. Numerous people serve long prison sentences for crimes resulting in far less harm than what this family has done; their financial penalty should match their misdeeds.

<u>The settlement should dissolve the company</u>. While a company still exists, so does hope for success, future profit, and vindication. Eliminating Purdue ensures that it will remain as an infamous symbol of past misdeeds and consequential justice—a strong deterrent to bad behavior by other companies.

<u>A portion of the settlement funds should be used to abate industry corruption of medical science and clinical decision making</u>. We agree with the Court that we cannot eliminate greed but we can minimize its effects. The best way to do so, we contend, is to create strategies that move the industry closer to its original "ethical" behavior and sensibilities. Some promising ideas for doing so include the development of alternative models for incentivizing innovation, mandatory licensing of third parties for unduly expensive medications, and public manufacturing of essential medicines such as opioids. A variety of efforts along these lines are being considered or underway by states and other parties.[21]

Although such big picture solutions may be beyond the scope of the Court, we believe that decisions about Purdue's assets should be made with an eye towards these long-term goals. A crucial step, we believe, is to address the corrosive influence of illegal and unethical marketing on scientific practice and medical decision making. We therefore urge the parties who may be involved in abatement planning,

---

[21] Marisa Fernandez, "California Could Become First State to Produce Generic Drugs" *Axios* (Sept. 2, 2020); State of California Department of Justice, "Attorneys General Becerra and Landry Lead Bipartisan Coalition Urging Federal Government Action to Increase Access and Affordability of Remdesivir" (Aug. 4, 2020); "Vitale, Pou, Sweeney Bill to Limit Copayments for Insulin Advances" *InsiderNJ* (Nov. 16, 2020); "Fair Pharma? Intermountain's New Generic Drug Company" *NEJM Catalyst* (Feb. 1, 2018); Thomas Pogge, Matthew Rimmer, and Kim Rubenstein, *Incentives for Global Health: Patent Law and Access to Essential Medicines* (Cambridge University Press, 2010)

including the Court, state Attorneys General, the federal government, cities and towns, and all others involved, to consider these and similar ideas:

- Support efforts to build robust alternatives to industry marketing
    - Support studies and pilot initiatives of academic detailing, an evidence-based form of clinical outreach conducted by noncommercial entities such as universities.
    - Fund pilot programs that connect local communities of clinicians to the best available sources of information through the development of collaborative relationships with medical libraries.
- Support efforts to build robust alternatives to industry-funded medical education and Continuing Medical Education by establishing funds for educational events that require receiving institutions to develop and implement robust conflict of interest policies.
- Support the development of solutions to dubious industry-academic relations by providing financial support for research units at universities dedicated to the study and resolution of industry-academic problems, including exploration of legal repercussions for academic physicians and other researchers who participate in corrupt activities.

<u>Finally, it is critical that the emails and other documents held by Purdue over the course of its history enter the public domain</u>. A portion of the settlement should be used to establish an archive of industry documents that scholars and other researchers can analyze in the future. Research on the tobacco industry, the oil industry, the lead industry, and other powerful industries has benefited tremendously from having access to internal industry documents, many of which have been made available through litigation.[22] Research on the pharmaceutical industry has benefitted as well. Industry documents that have entered the public domain as a result of legal settlements have revealed important information about product safety, industry advertising, and efforts by drug manufacturers to distort science toward their own ends.[23]

We believe that *the single most important asset Purdue possesses is the documentary evidence of its past behavior.* In our view any settlement should ensure that the public has full access to this record.

---

[22] Lisa Bero, "Implications of the Tobacco Industry Documents for Public Health and Policy" *Annual Review of Public Health* 24 (2003), 267-288; Robert Proctor, *Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition* (University of California Press, 2012); Naomi Oreskes and Erik M. Conway, *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoking to Global Warming* (New York: Bloomsbury, 2010); Gerald Markowitz and David Rosner, *Lead Wars: The Politics of Science and the Fate of America's Children* (University of California Press, 2013). See also American Medicine and Public Health Historians and the Organization of American Historians, *Brief of* Amici Curiae *in Support of a Settlement Agreement Including Broad Transparency Provisions in the Interest of Future Research*, Case No. 1:17-MD-2804, U.S. District Court, Northern District of Ohio, "In re: National Prescription Opiate Legislation."

[23] For one important example, see Jon N. Jureidini, Jay D. Amsterdam, and Leemon B. McHenry, "The Citalopram CIT-MD-18 Pediatric Depression Trial: Deconstruction of Medical Ghostwriting, Data Mischaracterisation and Academic Malfeasance" *International Journal of Risk & Safety in Medicine* 28 (2016): 33-43. Jureidini et. al. examined more than 750 internal company documents related to Forest Pharmaceuticals' fraudulent marketing of two antidepressants in the early 2000s that were made available through litigation. The evidence demonstrates that the company made untruthful claims about the efficacy, and downplayed the risks, of citalopram in at least one ghostwritten article. The industry documents they analyzed can be found here: https://www.industrydocuments.ucsf.edu/drug/ For another example, see Michael A. Steinman, Lisa A. Bero, Mary-Margaret Chren, and Seth Landefeld, "The Promotion of Gabapentin: An Analysis of Internal Industry Documents," *Annals of Internal Medicine* 145 (2006): 284-293.

**CONCLUSION**

As historians of the pharmaceutical industry we have spent many years researching the behavior of companies that manufacture and sell medicines. Our work contributes to a large body of scholarship that explores how greed within the industry has led to significant harm, and that evaluates the successes and failures of past efforts to contain or minimize the impact of that greed. Based on our knowledge of this past record, we do not support transforming Purdue into a public benefit corporation. We do not believe it will accomplish the goals of abating the current opioid crisis or advancing the public good. We therefore urge the Court and the parties to seek a resolution that begins to address broader, systemic problems in the pharmaceutical industry exacerbated by Purdue's misdeeds. And finally, we would be happy to speak with the Court or with any interested parties about our scholarship or these suggestions.

David Herzberg, Ph.D.
Joseph M. Gabriel, Ph.D.

**APPENDIX: EXAMPLES OF UNETHICAL AND ILLEGAL MARKETING**

*Illegal marketing and other illegal practices* such as:
- Deceptive claims about safety and effectiveness
- Failing to disclose risks in advertising
- Providing kickbacks to physicians
- Promoting drugs for off-label use

*Ethically dubious - but not necessarily illegal - marketing* such as:
- Cultivating and financially supporting "key opinion leaders" (KOLs) through consulting payments and other means
- Paying physicians to speak about company products, sometimes providing company-written powerpoint presentations and other materials for their use
- Secret funding of patient advocacy groups to increase support for widespread use of products
- Investing in Continuing Medical Education (CME) and other "educational" activities

*Unethical - but not necessarily illegal - manipulation of the scientific process* such as:
- Manipulating scientific evidence to demonstrate effectiveness and conceal risks
- Manipulating the scientific literature through ghostwriting, declining to publish negative results, other means
- Funding clinical research primarily for advertising purposes
- Manipulating standards of care and other evidence-based treatment guidelines