DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**DEBTORS' OBJECTION TO THE NAS CHILDREN
AD HOC COMMITTEE'S MOTION FOR ENTRY OF AN ORDER PURSUANT
TO 11 U.S.C. §§ 105(A) AND 107(B) AND FED. R. BANKR. P. 9018 AUTHORIZING
THE FILING OF CERTAIN INFORMATION AND EXHIBITS UNDER SEAL IN
CONNECTION WITH THE NAS CHILDREN AD HOC COMMITTEE'S EX PARTE
MOTION REQUESTING A COURT ORDER AUTHORIZING EXAMINATIONS
PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND 9006**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession

in these proceedings (collectively, the "**Debtors**," the "**Company**," or "**Purdue**") submit this

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

objection to the *NAS Children Ad Hoc Committee's Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the NAS Children Ad Hoc Committee's Ex Parte Motion Requesting a Court Order Authorizing Examinations Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* (the "**Motion**") [Dkt. No. 2139], and respectfully state as follows:

### Preliminary Statement

1. The NAS Children Ad Hoc Committee ("**NAS Committee**") seeks permission, pursuant to Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to file under seal a motion seeking discovery from the Debtors, pursuant to Bankruptcy Rule 2004, of documents related to certain "scientific information" believed to be "within the possession or control of the Debtors," and examination of certain records custodians regarding the same. (Mot. ¶ 1; Mot. Ex. B ¶ 3 ("**Rule 2004 Mot.**")).[2] In opposing the Motion, the Debtors are in no way suggesting that neonatal abstinence syndrome ("**NAS**") is not a serious issue or that the NAS Committee's efforts to advance a workable abatement program are not

---

[2] When the NAS Committee first filed the Motion, the underlying Rule 2004 Motion sought only "[a]ll Preclinical Toxicology Studies, including but not limited to reproductive toxicology, mutagenicity, genotoxicity, chromosomal, dose-ranging, exploratory, investigative or non-GLP studies regarding opioids in the possession of the Debtor(s) that have not been disclosed to the [U.S. Food and Drug Administration ("**FDA**")]." (Rule 2004 Mot. Ex. A.) In particular, the Committee speculates that Mundipharma, not the Debtors, may have conducted studies on mice, rats, or rabbits in the early 1990s related to toxicologic effects of hydrocodone on developing embryos and that the Debtors did not provide these studies to the FDA as part of the New Drug Application ("**NDA**") for OxyContin. Two days later, in response to the Debtors' request for the unredacted filing and later that same day in its email correspondence to the Court, the NAS Committee sent a revised Rule 2004 Motion seeking discovery with respect to sixteen (16) categories (including subcategories) of documents and searches regarding internal and external medical and scientific information, data, and studies related to fetal exposure—a substantial change to the Rule 2004 Motion that the NAS Committee failed to highlight for the Court. To the extent the revised requests also appear mostly to seek marketing materials and published literature on top of the requests for animal studies, they demand production of categories of documents that were already produced, are readily available via the published literature, and/or have no relevance to any forward-looking abatement plan.

2

important. Rather, the Debtors believe that, in light of the substantial information already made available to it, the NAS Committee already has the information that it needs, that its accusations of allegedly "secret" studies are speculative and without foundation, do not even relate to OxyContin or oxycodone, but rather relate to a hydromorphone product never at the heart of the underlying litigation, and that the cost and time that would be needed to conduct additional searches as sweeping as those contemplated by the Rule 2004 Motion would be of no additional benefit. Moreover, it is unclear why the Rule 2004 Motion needs to be decided now—if at all—and the costs, burden, and distraction associated with a motion that is simply unnecessary and fails to meet the "good cause" requirements for a Rule 2004 Motion cannot be justified.

2. *First*, the NAS Committee cannot establish the good cause necessary to warrant Rule 2004 examination because the requested information is relevant to neither the NAS Committee's ability to establish its own abatement claims (which have already been settled in connection with the successfully concluded mediation concerning allocation in these cases) nor the effective administration of this bankruptcy at its current critical stage. *Second*, despite their growing concerns regarding the relevance of the NAS Committee's inquiry (particularly in light of the NAS Committee's settlement), the Debtors have worked constructively with the NAS Committee for months to provide it with the information it seeks. As noted in the Rule 2004 Motion, during the most recent correspondence with the NAS Committee, the Debtors "confirm[ed that they] had no objection to" the NAS Committee working with the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") to search for additional scientific information in productions provided to the Creditors' Committee. (Rule 2004 Mot. ¶ 15.) However, instead of doing so, the NAS Committee filed this Motion in which, despite months of discussions, hundreds of thousands of pages of scientific information, and suggestions

3

for collaborating with other parties, the NAS Committee goes as far as insinuating, <u>without any basis</u>, that the Debtors are intentionally "withholding [certain information] from the public inspection" based on "secret" studies not provided to the FDA. (Rule 2004 Mot. ¶¶ 8-15, 29.) This bald assertion is clearly without merit. To the contrary, the Debtors have provided all information that is reasonably available. *Third*, the NAS Committee bases its belief that the additional information it now seeks from the Debtors by formal examination is actually within the <u>Debtors</u>' possession (as opposed to a non-Debtor entity) entirely on its wish—"upon information and belief"—that it is so. But such ponderings do not constitute the good cause required to support Rule 2004 examination. Nor do the purported abatement purposes that the NAS Committee attempts to identify. *Finally*, even if the information were both relevant to the NAS Committee's abatement purposes <u>and</u> within the Debtors' possession, because the documents (to the extent that they exist at Purdue) will be made available in the document repository that the Debtors have represented throughout these cases will be made available to the public upon confirmation and emergence, the NAS Committee cannot demonstrate that it will suffer any undue hardship or injustice without a Rule 2004 examination. Because the NAS Committee has failed to demonstrate that it is entitled to the underlying Rule 2004 relief that it seeks, the relief requested in the Motion is unnecessary and should be denied.

## Argument

3.      The NAS Committee has not established good cause for a Rule 2004 examination. Bankruptcy Rule 2004 provides that the Court may order the examination of any entity by motion of any party in interest. *See* Fed. R. Bankr. P. 2004(a). The scope of the examination is limited to the "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the bankruptcy estate, or to the debtor's

right to a discharge." *See* Fed. R. Bankr. P. 2004(b). The party seeking an examination pursuant to Bankruptcy Rule 2004 "has the burden to show good cause for the examination it seeks," and whether to grant such relief is within the Court's sound discretion. *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, No. 14-01840, 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) (citations omitted). "Good cause is shown if the examination is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *In re MF Global Inc.*, No. 11-02790, 2013 WL 74580, at *1 (Bankr. S.D.N.Y. Jan. 8, 2013) (internal citations omitted). Although the scope of permissible inquiry under Rule 2004 is generally broad, it is not unfettered. *See In re Bd. of Dirs. of Hopewell Int'l Inst. Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001); *In re Enron*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002). The movant must affirmatively establish good cause and courts must "bear in mind that the examination should not be so broad as to be more disruptive and costly to the [debtor] than beneficial to the [creditor]." *In re Eagle-Picher Indus., Inc.*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) (quoting *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987)). Moreover, "[t]he examination of a witness about matters having no relationship or no effect on the administration of an estate is improper." *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991); *see also In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D.Wis. 1984) ("[T]here are limits [to a 2004 examination]. An examination cannot be used for purposes of abuse or harassment. It also cannot stray into matters which are not relevant to the basic inquiry."). Ultimately, "Rule 2004 requires that [the Court] balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. at 712. Under this inquiry,

5

"[t]hat documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production." *Id*.

  A. *The Requested Information is Not Relevant to Either Establishing the NAS Committee's Claims or the Administration of These Cases*

4.  As an initial matter, and as acknowledged in the Rule 2004 Motion, the NAS Committee participated in the months-long mediation concerning allocation in these cases, which resulted in, among other things, a settlement in the form of a term sheet that contemplates the establishment of a NAS abatement program. (Rule 2004 Mot. ¶ 2; *see also* Mediators' Report ¶ 7 (Sept. 23, 2020), Dkt. No. 1716.) As a result, the requested information is not necessary in order for the NAS Committee to establish its abatement claims because those claims have already been settled. *In re Drexel Burnham Lambert Grp.*, 123 B.R. at 712.[3]

5.  The NAS Committee's request similarly finds no place in the broader administration of these cases, which are at a critical stage—negotiation and confirmation of a plan of reorganization. The NAS Committee concededly represents that the information it seeks "is critical to medical experts, providers and staff in laying the groundwork for a timely and successful launch and implementation of the NAS Abatement Program"—a program that is contemplated to be established only <u>after</u> final confirmation of a plan that embodies certain conditions. (Rule 2004 Mot. ¶¶ 2-3; Mediators' Report ¶ 12.) But nowhere does the NAS Committee attempt to orient its request to the current and important needs of this bankruptcy. The notion that any allegedly missing toxicology study concerning mice, rats or rabbits from over twenty-five years ago, and involving hydromorphone rather than oxycodone, the active

---

[3] Moreover, as discussed in Part C., *infra*, the NAS Committee's request is also not relevant to the post-confirmation abatement purposes that it identifies.

6

ingredient in OxyContin, would materially impact the confirmation of the plan regarding NAS claimants or the priorities for abatement funding in order to treat those born with NAS or reduce the risk of NAS births going forward is simply unfounded. Similarly baseless is the NAS Committee's contention that Debtors should provide any of the additional information identified in its revised requests, such as copies of published studies or scientific references used for historic labeling/promotional activity for OxyContin (which would have been referenced in the materials already produced). Indeed, the NAS Committee admits that its true motivation is not related to the needs of this bankruptcy but rather is to "assess[] [Purdue's] wrongdoing" related to "misrepresentations and concealment of scientific evidence related to the long-term impacts of fetal opioid exposure." (Rule 2004 Mot. ¶ 5.) As this Court has noted, the discovery objective in these cases is "to perform due diligence," not "establish liability at a time when substantial amounts of value have already been offered." (Mar. 18, 2020 Omnibus Hr'g Tr. 93:6-21.)

6.   These cases are being diligently shepherded toward the finish line.[4] While the scope of inquiry under Bankruptcy Rule 2004 is generally broad, the value destructive detour in which the NAS Committee would like the Debtors to embark is precisely the kind of inquiry— untethered to the discovery of assets or the effective administration of these estates—that bankruptcy courts are empowered to deny. *See, e.g.*, *SIPC*, 2014 WL 5486279, at *3 (denying Rule 2004 motion even where the "request implicate[d] the acts and conduct of [a debtor]" because "the discovery ha[d] no bearing on the property, liabilities or financial condition of [the

---

[4] Indeed, just this past week, the Court urged the parties to reach agreement so that the Debtors can file a plan of reorganization in the near term. (Dec. 15, 2020 Omnibus Hr'g Tr. 35:21-36:11 (urging the parties to "conclude these negotiations [by January 31] so that a plan can be filed").)

7

estates] and w[ould] not affect the administration of [the estates]"); *In re Drexel Burnham Lambert Grp.*, 123 B.R. at 711.

   B. *The NAS Committee Has Access to a Wealth of Relevant Publicly Available and Debtor-Provided Scientific Information*

7.  The Rule 2004 Motion acknowledges (as it must) that the Debtors have worked constructively with the NAS Committee for many months in response to their informal requests and inquiries—including a previous draft of the Rule 2004 Motion—seeking certain scientific information. (Rule 2004 Mot. ¶¶ 8-15, 21.) In connection with those requests, the Debtors have to date either produced or identified as being a part of the MDL productions or other productions to which the NAS Committee already had access the following information that is specific to both use in pregnancy and NAS:

- A complete set of NDA files for OxyContin, Butrans, and Hysingla, including Bates-ranges for OxyContin: PURCHI-000008528 to PURCHI-003282833; Butrans: POK001852071 to POK003274809; and Hysingla: POK000827212 to POK001852069. These include all of the Company's FDA submissions, which include as applicable, submissions related to licensing and approvals of Purdue's opioid medications and specifically reference the FDA-imposed requirements for pre-clinical (animal model) testing;

- Investigational New Drug Application ("**INDA**") files for OxyContin, including Bates-range PDD8002000001 to PDD8002219555;

- Reproductive studies related to oxycodone use in animal models:

  o DSE-151 - In Vitro Chromosomal aberration: Bates number PDD1701693617

  o DSE-060 - Reproductive (embryo-fetal—Segment II) Range-Finding Study - Rat: Bates range PDD170377016 (2-54) and PDD1701377332 (209-325)

  o DSE-061 - Reproductive (embryo-fetal—Segment II) - Rat - DSE-061: Bates range PDD1701377016 (55-313) and PDD1701376694 (2-106)

  o DSE-058 - Reproductive (embryo-fetal—Segment II) Range-Finding Study - Rabbit - DSE-058: Bates numbers PDD1701376694 (107-257) and PDD1701694266 (IRDC)

8

- o DSE-059 - Reproductive (embryo-fetal—Segment II) - Rabbit - DSE-059: Bates numbers PDD1701376694 (256-317), PDD1701376376 (2-236), and PDD1701694884 (IRDC);

- Documents from Purdue's publications database, which reflects Purdue's internal review of scientific research by Purdue or Purdue employees being evaluated for publication, including Bates-range PPLP003491632 to PPLP004166152;

- Reprints of scientific publications that were approved for distribution to prescribers by sales representatives for the period November 1, 2008, to January 30, 2017, including Bates-range PURCHI-003282840 to PURCHI-003282944;

- Adverse Event Reports (including applicable Med Watch Reports), which include clinical observations of *in utero* exposure, if any, to the compounds under study, including Bates-range PPLP004385541 to PPLP004390686; and

- Studies responsive to various targeted interrogatories propounded by the NAS Committee.

8. Based on the above productions, the NAS Committee already has <u>all</u> of the information that was required to be (and was) made available to the FDA as part of each product NDA. Moreover, the Debtors encouraged the NAS Committee to coordinate with the Creditors' Committee to conduct searches for additional scientific information over the vast amount of documents provided to the Creditors' Committee during the course of its extensive and broad discovery in these cases. (Rule 2004 Mot. ¶ 15; *see, e.g.*, Debtors' Omnibus Obj. to the Official Comm.'s Mots. to Compel Production of Privileged Documents & Cross-Motion for a Protective Order ¶¶ 6, 15-19 (Oct. 15, 2020), Dkt. No. 1808 (describing the then-current amount of discovery produced to the Creditors' Committee in these cases).) Against this backdrop, there is no good faith reason to believe that reasonable investigative and discovery efforts have not already been undertaken with regard to all of the categories of documents at issue.

9. The NAS Committee also has access to a wealth of published data from multiple sources regarding current experience and best practices for addressing NAS as a result of fetal exposure to an array of both licit and illicit opioids, including scientific consensus documents

9

published by groups including the National Institutes of Health, the American Counsel of Obstetricians and Gynecologists ("**ACOG**"), the American Academy of Pediatrics ("**AAP**"), the American Society of Addiction Medicine ("**ASAM**"), the Substance Abuse and Mental Health Association ("**SAMHSA**"), and the Centers for Medicare and Medicaid Services ("**CMS**"), as well as various state authorities. The NAS Committee also has access to literature describing the use of opioids, particularly methadone, to treat opioid use disorder in pregnancy.

10. Despite the NAS Committee's access to broad swaths of scientific information related to *in utero* opioid exposure, it now asks the Court to compel the Debtors to undertake additional costly and burdensome discovery efforts to investigate its unfounded theory that the Debtors are withholding information related to additional "secret" rat and rabbit studies not provided to the FDA. (Rule 2004 Mot. ¶ 29.) The Court should decline the invitation. The NAS Committee's contention that this is needed to provide important scientific information relevant to care today is factually and scientifically unfounded and cannot support a bona fide discovery request.

C. *The Additional Information the NAS Committee Seeks Is Not Within the Possession of the Debtors or Is Not Relevant to the Abatement Purposes It Identifies*

11. The NAS Committee has provided no colorable support for its assertion that the information it seeks—if it exists—is within the Debtors' possession and not already produced. (*Id.* ¶ 3.) Instead, the NAS Committee asserts "upon information and belief" that certain preliminary studies in hydrocodone were conducted by Mundipharma and that "upon information and belief" the "damming and disturbing information" gleaned from such studies is now in the Debtors' possession. (*Id.* ¶¶ 13, 28.) But the NAS Committee has never offered the Debtors—or now the Court—any reason to believe, beyond its own mere speculation, that such pre-clinical studies not submitted to the FDA were actually conducted by any entity—much less

10

that any information related to them came to be within the Debtors' possession. (Rule 2004 Mot. ¶ 25.) Put differently, whatever the NAS Committee's suspicions may be about the goings-on of a non-Debtor entity, such as Mundipharma (*Id.* ¶¶ 34-37), such musings do not support Rule 2004 examination of the Debtors. In fact, the Debtors informed the NAS Committee as much and proposed that the NAS Committee discuss these issues with counsel for the non-Debtor entities. (*Id.* ¶ 13) According to the NAS Committee, that inquiry has not been completed. (*Id.*) In the meantime, however, the NAS Committee should not be permitted to continue to press the Debtors to expend substantial estate resources searching for what likely amounts to a phantom needle in the haystack and distract from the ongoing effort to complete the production of materials sought by the Creditors' Committee and the Ad Hoc Group of Non-Consenting States.

12.    Moreover, the NAS Committee's assertion that testimony from Marianna Sackler, Dr. Richard Sackler, and Craig Landau supports its "contentions that the Debtors are in possession of undisclosed [s]cientific [i]nformation" is unavailing. (*Id.* ¶ 35.) The testimony that Marianna Sackler "interned as PR Assistant for Mundipharma Italy's Milan office" and "was tasked with 'reviewing periodicals, news articles, [and] scientific articles in Italy'" (*Id.*) suggests nothing more than that she collected publicly available material—material that the NAS Committee has as much access to as anyone. And, as Craig Landau testified, "all studies, clinical or pre-clinical, intended to support the approval and registration of a product are part of a new drug application, and therefore, submitted by definition to FDA." (*Id.*) These NDA files have been provided to the NAS Committee. Simply put, an asserted lack of knowledge or awareness about the mere "possibility" of additional studies does not come close to supporting

11

the NAS Committee's allegation that the Debtors are in possession of "hidden" or "undisclosed" scientific information. (*Id.* ¶¶ 25, 35.)

13. Even assuming *arguendo* that the information it seeks does exist (and even further assuming *arguendo* that such information is within the Debtors' possession), the NAS Committee has failed to articulate any reasoned need for the additional discovery it demands for the abatement purposes that it identifies. The NAS Committee seeks "[a]ll Preclinical Toxicology Studies, including but not limited to reproductive toxicology, mutagenicity, genotoxicity, chromosomal, dose-ranging, exploratory, investigative or non-GLP studies regarding opioids in the possession of the Debtor(s) that have not been disclosed to the FDA" [as well as numerous other animal studies]. (Rule 2004 Mot. Ex. A.) But the NAS Committee's theory that these purportedly hidden pre-clinical animal studies from over twenty-five years ago hold the proverbial key to understanding the effects of *in utero* exposure to opioids today is unfounded. As an initial matter, it is a basic premise of epidemiology that animal studies are hypothesis-generating and are not evidence of an effect on human beings.[5] Indeed, leading medical and scientific organizations—like ACOG, AAP, ASAM, SAMHSA and CMS—have looked to the decades of human experience (as opposed to early animal studies) to formulate treatment recommendations.[6]

---

[5] *See, e.g.*, Bracken, M. J. R. Soc. Med. 2009 Mar. 1, 102(3): 120–122 ("The concept that animal research, particularly that relating to pharmaceuticals and environmental agents, may be a poor predictor of human experience is not new."), *accessible at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2746847/; Van Norman, G., *Limitations of Animal Studies for Predicting Toxicity in Clinical Trial*, JACC Basic Transl. Sci. 2019 Nov. 4(7): 845–854, *accessible at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6978558/.

[6] *See, e.g.*, Center for Medicaid and CHIP Services Informational Bulletin, *State Guidance for Implementation of the Treatment for Infants with Neonatal Abstinence Syndrome in Residential Pediatric Recovery Centers* (July 26, 2019), *accessible at* https://www.medicaid.gov/federal-policy-guidance/downloads/cib072619-1007.pdf; SAMHSA, *Clinical Guidance for Treating Pregnant and Parenting Women with Opioid Use Disorder and Their Infants*, HHS Pub. No. (SMA) 18-5054, at 4 (2018), *accessible at* https://store.samhsa.gov/sites/default/files/d7/priv/sma18-5054.pdf; ACOG, *Opioid Use Disorder and Pregnancy*, *available at* https://www.acog.org/patient-resources/faqs/pregnancy/opioid-use-disorder-and-pregnancy.

14. Moreover, animal studies related to exposure to OxyContin during pregnancy have been addressed repeatedly in the product label. A section of the 1996 OxyContin Label devoted to "Pregnancy" discussed animal studies looking at the risk of birth defects "which did not reveal harm to the fetus," but noted that animal studies are "not always predictive of human response" and that no "adequate and well-controlled" human studies exist. An update to the section in 2016 included an expanded discussion of potential birth defects, noting again the absence of controlled human data and describing mixed results of studies of rats and rabbits (including at doses above those given therapeutically to humans), with reference to both company data and published literature.[7]

15. In short, the NAS Committee's insistence that the Debtors divert resources to locate chimerical toxicological studies on rats and rabbits that have likely already been produced, including because of the breadth of the Creditors' Committee's search terms and custodians, is unlikely to result in any benefit.

### D. *The NAS Committee Has Not Demonstrated That It Will Suffer Any Undue Hardship By Waiting for the Document Repository Contemplated at the End of These Cases*

16. The NAS Committee references as support for its requested relief the Debtors' statements made in support of approval of the DOJ settlement agreement that the document repository described in that agreement is meant to set a floor, not a ceiling, with respect to the scope of Purdue's future disclosure, and remarks by Mr. Preis and the Court at the November omnibus hearing regarding the fact that discovery is still ongoing in these cases. (Rule 2004 Mot. ¶¶ 26-27.) But these statements only further demonstrate that there is no need <u>now</u> for the NAS Committee's requested examination. To be sure—far from attempting to avoid

---

[7] *See* U.S. Food & Drug Admin., OxyContin Full Prescribing Information ("**FPI**") (May 13, 1996), Bates number PDD1501603661; 2016 OxyContin FPI (Dec. 2016), Bates number PPLPC031001522632.

13

transparency as the NAS Committee suggests (*Id.* ¶¶ 29-30)—the Debtors have represented throughout these cases that the Debtors' non-privileged documents will be made available in a document repository accessible by the general public. (*See, e.g.*, Nov. 17, 2020 Omnibus Hr'g Tr. 96:13-15 (M. Huebner noting that the public document repository that has been mentioned at six hearings is a "bankable promise" and "now also a binding obligation . . . under the DOJ deal"); Oct. 28, 2020 Omnibus Hr'g Tr. 30:20-22 (M. Huebner noting that "[t]here will be a large, meaningful, fully public repository of documents in this case when it is over as these companies emerge").) As a result, to the extent that any of the information that the NAS Committee seeks is within the Debtors' possession, it will be made available to it after confirmation and upon emergence. Based upon the foregoing, however, the NAS Committee has not articulated any credible reason why it needs additional discovery now—especially in light of the expected near-term filing of the Debtors' plan of reorganization. Moreover, that the Creditors' Committee's diligence efforts related to matters critical to resolving these cases are ongoing does not convert the NAS Committee's theorizing into an appropriate inquiry for Rule 2004 examination.

## **Conclusion**

For the reasons set forth above, the Debtors respectfully request that the Court deny the Motion.

[*Remainder of page intentionally left blank*]

Dated: December 18, 2020
      New York, New York

*/s/ James I. McClammy*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

15