**FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

19-23649-shl    Doc 2156    Filed 12/18/20    Entered 12/18/20 16:36:58    Main Document
Pg 1 of 42

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO COMPEL
PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS, OR FOR IN
CAMERA REVIEW, BASED ON FAILURE OF THE SACKLERS AND THE DEBTORS
TO DEMONSTRATE DOCUMENTS IDENTIFIED ON LOGS ARE PRIVILEGED**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ...................................................................................................................4

I.      Production of the Privilege Logs ................................................................................4

ARGUMENT .......................................................................................................................7

I.      Choice of Law, Standard, and Burden of Proof ........................................................7

II.     The Sacklers and the Debtors Have Waived Any Privilege That Might Otherwise
Have Attached to Documents Disclosed to the Department of Justice..............................9

III.    The Baker and White Documents Should be Reviewed *In Camera*..................................14

IV.    The Withholding Parties' Common Interest Assertions are Insufficient............................19

V.     The Sacklers and the Debtors Wrongfully Withheld Tens of Thousands of
Documents and Communications Involving, or Shared with, Service Providers
and Other Third Parties Who Break Privilege ................................................................23

        A.     Communications Among Non-Lawyers Reflecting "Intent to Seek Legal
Advice" Are Not Privileged..........................................................................23

        B.     The Sacklers and the Debtors Cannot Claim Privilege Over Documents
and Communications with Public Relations Consultants .....................................24

        C.     The Withholding Parties Have Not Carried Their Burden of Proving
Communications With Accountants and Investment Advisors Are
Privileged     30

        D.     Documents and Communications With Gardeners, Architects, Art
Consultants, and a Panoply of Other Non-Lawyer Service Providers and
Other Third Parties Must Also be Produced .........................................................32

COMPLIANCE WITH RULES .............................................................................................33

NOTICE...........................................................................................................................34

NO PRIOR REQUEST........................................................................................................34

RESERVATION OF RIGHTS ...............................................................................................34

CONCLUSION...................................................................................................................34

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

## TABLE OF AUTHORITIES

*866 E. 164th St., LLC v. Union Mut. Fire Ins. Co.*,
No. 16-CV-03678(SN), 2016 WL 6901321 (S.D.N.Y. Nov. 23, 2016) ................................34

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
No. 14-CV-7126 (JMF), 2017 WL 280816 (S.D.N.Y. Jan. 20, 2017) ...................................11

*Am. Ins. Co. v. Elgot Sales Corp.*,
No. 97 CIV. 1327(RLC), 1998 WL 647206 (S.D.N.Y. Sept. 21, 1998) ...............................34

*In re Asia Global Cross, Ltd.*,
322 B.R. 247 (Bankr. S.D.N.Y. 2005) ...................................................................................8

*Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 499 F. Supp. 2d 475
(S.D.N.Y. 2007) ...............................................................................................................9, 33

*Bennett v. La Pere*,
112 F.R.D. 136 (D.R.I. 1986) .............................................................................................15

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*,
171 F. Supp. 3d 136 (S.D.N.Y. 2016)............................................................................ *passim*

*Calvin Klein Trademark Tr. v. Wachner*,
198 F.R.D. 53 (S.D.N.Y. 2000) ..............................................................................25, 26, 30

*Cendant Corp. v. Shelton*,
No. 3:06-CV-00854 (AWT), 2007 WL 2460701 (D. Conn. Aug. 24, 2007) ........................21

*In re Chevron Corp.*,
749 F. Supp. 2d 141 (S.D.N.Y. 2010)...................................................................................34

*Chevron Corp. v. Donzinger*,
296 F.R.D. 168 (S.D.N.Y. 2013) .........................................................................................22

*Chevron Corp. v. Salazar*,
No. 11 Civ. 3718 (LAK)(JCF), 2011 WL 3880896 (S.D.N.Y. Sept. 1, 2011) ......................30

*In re China Med. Techs., Inc.*,
539 B.R. 643 (Bankr. S.D.N.Y. 2015) ...................................................................................7

*In re Cty. of Erie*,
473 F.3d 413 (2d Cir. 2007).................................................................................................19

*Duttle v. Bandler & Kass*,
127 F.R.D. 46 (S.D.N.Y. 1989) ...........................................................................................24

*Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*,
232 F.R.D. 103 (S.D.N.Y. 2005) .........................................................................................32

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

*Gasperini v. Ctr. for Humanities, Inc.*,
    518 U.S. 415 (1996)...............................................................................................27

*In re Grand Jury Proceedings*,
    No. M-11-189, 2001 WL 1167497 (S.D.N.Y. Oct. 3, 2001)...............................24, 25

*In re Grand Jury Subpoenas Dated March 24, 2003*,
    265 F. Supp. 2d 321 (S.D.N.Y. 2003).............................................................26, 27

*Gruss v. Zwirn*,
    No. 09 CIV. 6441 (PGG)(MHD), 2013 WL 3481350 (S.D.N.Y. July 10, 2013)..............11, 12

*Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*,
    No. 02 Civ. 7955 DLC, 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) ..............25, 26, 27, 30

*In re Horowitz*,
    482 F.2d 72 (2d Cir. 1973).............................................................................8, 9

*In re Initial Pub. Offering Sec. Litig.*,
    249 F.R.D. 457 (S.D.N.Y. 2008) .........................................................................12

*Intex Recreation Corp. v. Team Worldwide Corp.*,
    471 F. Supp. 2d 11 (D.D.C. 2007) .......................................................................21

*Middlesex Retirement Sys. v. Quest Software, Inc.*,
    No. CV 06-6863-DOC (RNBx), 2009 WL 10673943, *at 4 & n.6 (C.D. Cal.
    July 8, 2009)...............................................................................................23, 25

*In re Modell*,
    171 B.R. 510 (Bankr. S.D.N.Y. 1994) ....................................................................8

*Morse/Diesel, Inc. v. Fid. & Deposit Co. of Md.*,
    122 F.R.D. 447 (S.D.N.Y. 1988) ..........................................................................15

*Music Sales Corp. v. Morris*,
    No. 98 Civ. 9002 (SAS) (FM), 1999 WL 974025 (S.D.N.Y. Oct. 26, 1999).........................34

*N. River Ins. Co. v. Columbia Cas. Co.*,
    No. 90 Civ. 2518 (MJL), 1995 WL 5792 (S.D.N.Y. Jan. 5, 1995)..........................................34

*Nat'l Day Laborer Org. Network v. USCIS*,
    No. 16 CIV. 387 (PAE), 2020 WL 5518114 (S.D.N.Y. Sept. 14, 2020).................................19

*In re North Plaza, LLC*,
    395 B.R. 113 (S.D. Cal. July 25, 2008) .................................................................34

*Obeid v. Mack*,
    No. 14 Civ. 6498(LTS)(HBP), 2016 WL 7176653 (S.D.N.Y. Dec. 9, 2016) ........................34

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

*Oliver v. Comm. for Re-Election of the President*,
    66 F.R.D. 553 (D.D.C. 1975)................................................................................15

*In re OM Sec. Litig.*,
    226 F.R.D. 579 (N.D. Ohio 2005) ......................................................................24

*Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165 (2d Cir. 2003) ..................................12

*Ravenell v. Avis Budget Grp., Inc.*,
    No. 08-CV-2113 (SLT), 2012 WL 1150450 (E.D.N.Y. Apr. 5, 2012) ..................27

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004)................................................................10

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    352 F. Supp. 3d 207 (E.D.N.Y. 2019) ................................................................27

*S.E.C. v. Roberts*,
    254 F.R.D. 371 (N.D. Cal. 2008)........................................................................24

*Schaeffler v. United States*,
    806 F.3d 34 (2d Cir. 2015)....................................................................................9

*In re Schick*,
    No. 96 B 42902, 1997 WL 465217 (Bankr. S.D.N.Y. Aug. 12, 1997)................9, 10

*Scott v. Chipotle Mexican Grill, Inc.*,
    94 F. Supp. 3d 585 (S.D.N.Y. 2015)...................................................................34

*In re Sealed Case*,
    856 F.2d 268 (D.C. Cir. 1988) ............................................................................12

*In re Signet Jewelers Ltd. Sec. Litig.*,
    332 F.R.D. 131 (S.D.N.Y. 2019) ........................................................................29

*In re Steinhardt Partners, L.P.*,
    9 F.3d 230 (2d Cir. 1993).............................................................................11, 12

*Summit Ltd. v. Levy*,
    111 F.R.D. 40 (S.D.N.Y. 1986) ..........................................................................31

*Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,
    No. 92 Civ. 3142 (RPP), 1993 WL 277182 (S.D.N.Y. July 21, 1993)..................12

*TIFD III-E, Inc. v. United States*,
    223 F.R.D. 47 (D. Conn. 2004)...........................................................................21

*TVT Records v. Island Def Jam Music Grp.*,
    214 F.R.D. 143 (S.D.N.Y. 2003) ....................................................................8, 17

**FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

*United States v. Ackert,*
    169 F.3d 136 (2d Cir. 1999)..................................................................8, 31, 34

*United States v. Arthur Young & Co.,*
    465 U.S. 805 (1984) ........................................................................................31

*United States v. Constr. Prods. Research, Inc.,*
    73 F.3d 464 (2d Cir. 1996)..........................................................................8, 9, 19

*United States v. DeFonte,*
    441 F.3d 92 (2d Cir. 2006)..........................................................................24, 25

*United States v. Kovel,*
    296 F.2d 918 (2d Cir. 1961)........................................................................31, 32

*United States v. Mejia,*
    655 F.3d 126 (2d Cir. 2011)..........................................................................8, 9

*United States v. Schwimmer,*
    892 F.2d 237 (2d Cir. 1989)........................................................................20, 21

*United States v. Weissman,*
    195 F.3d 96 (2d Cir. 1999)...............................................................................21

*Universal Standard Inc. v. Target Corp.,*
    331 F.R.D. 80 (S.D.N.Y. 2019) ................................................................7, 30, 32

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.,*
    No. 01-CV-8854 (LTS)(THK), 2006 WL 1004472 (S.D.N.Y. Apr. 18, 2006).......................20

*In re Velo Holdings, Inc.,*
    473 B.R. 509 (Bankr. S.D.N.Y. 2012) ..............................................................22

*In re Weatherford Int'l Sec. Litig.,*
    No. 11 Civ. 1646, 2013 WL 12185082 (S.D.N.Y. Nov. 19, 2013) .........................................12

*Women's InterArt Ctr., Inc. v. N.Y.C. Econ. Dev.,*
    223 F.R.D. 156 (S.D.N.Y. 2004) ................................................................18, 19

**Rules**

Fed. R. Bankr. P. 9014(c) ............................................................................................1

Fed. R. Bankr. P. 9017.................................................................................................7

Fed. R. Evid. 408 ..................................................................................................14, 15

Fed. R. Evid. 410 ..................................................................................................14, 15

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

Fed. R. Evid. 501 .................................................................................................................7

Fed. R. Evid. 502 ...............................................................................................................13

Local Bankr. R. 7034-1(c) ..................................................................................................8

Local Bankr. R. 9013-1(a) ................................................................................................35

**Other Authorities**

154 Cong. Rec. H7817 (daily ed. Sept. 8, 2008) ...............................................................13

Pursuant to applicable rules, including Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, and the Amended Stipulation and Agreed Order Regarding Discovery Deadlines and Briefing Scheduling in the Chapter 11 Cases [ECF No. 1734] (the "**Scheduling Stipulation**"), the Official Committee of Unsecured Creditors (the "**UCC**") of Purdue Pharma, L.P. and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**") files this Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs are Privileged (the "**Motion**") seeking an order, substantially in the form submitted herewith, requiring each of the Debtors and the CSPs[2] (collectively, the "**Withholding Parties**") to (i) produce documents that have been or may be withheld on purported privilege grounds within categories identified below (the "**Withheld Documents**") or (ii) provide the Withheld Documents to the Court, or to a special master appointed by the Court (a "**Special Master**"), for review *in camera* and production to the UCC to the extent deemed appropriate. The Ad Hoc Group of Non-Consenting States ("**NCSG**") supports the relief requested in this Motion.

**PRELIMINARY STATEMENT**

1. The Sacklers and the Debtors have collectively withheld nearly 400,000[3] documents and communications responsive to the UCC's document requests on purported privilege grounds. The vast majority of these documents were withheld in their entirety, and still

---

[2] As defined in the Scheduling Stipulation, the CSPs include the Raymond Side (or "Side B") Initial Covered Sackler Persons and Additional Custodians and the Mortimer Side (or "Side A") Covered Parties. The CSPs are sometimes referred to herein simply as the "**Sacklers**" or, as applicable, the "**Side A Sacklers**" and the "**Side B Sacklers**." Terms defined in the Scheduling Stipulation shall have the meanings ascribed to them therein to the extent used but not defined in the Motion.

[3] Approximately 135,000 entries are on privilege logs the Debtors' prepared for pre-petition litigation. The UCC is not challenging those entries at this time, but specifically reserves its right to do so as discovery continues, including on grounds identified in this Motion and in the UCC's Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege (the "**Exceptions Motion**").

**FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

19-23649-shl    Doc 2156    Filed 12/18/20    Entered 12/18/20 16:36:58    Main Document
Pg 9 of 42

more logs are due from the Sacklers, the Debtors, and their affiliates after the date of this Motion. As set forth below, a large number of the documents withheld to date are not entitled to protection.[4]

2.      *First*, the Sacklers and the Debtors should be required to produce the documents, presentations, and communications they previously shared with the Department of Justice ("**DOJ**").  These materials are critical to the UCC's investigation of estate claims; the Sacklers and the Debtors waived any applicable privilege by producing them to their adversary; and the DOJ has not asserted any law enforcement or investigative privilege or otherwise opposed their production.

3.      *Second*, the Sacklers and the Debtors have withheld thousands of communications because Stuart Baker and/or Jonathan White, two individuals who act in both legal and business capacities for the Sacklers and the Debtors, appear on the communications.  But it is not apparent from the face of the logs that the predominant purpose of these communications involved Messrs. Baker and White acting in their legal, rather than business, capacity.  This issue is of paramount importance in this case given, among other things, Mr. Baker's significant business roles, including serving as what was characterized as the "*de facto*" chairman of Purdue, and in more than 150 other executive, director, and other business roles for the Sacklers, their trusts, Purdue, and other entities.  The Withholding Parties should be required to make these documents available for *in camera* review by the Court or a Special Master.

4.      *Third*, the Sacklers and the Debtors are withholding under a categorical "common interest" assertion a number of documents and communications, but the Withholding Parties have not provided information sufficient to establish the elements of such an assertion.  For their part, the Sacklers have refused even to identify all of the entries on their logs that they claim are subject

---

[4] The Debtors, the Sacklers, and their affiliates will no doubt identify more documents withheld from production in privilege logs scheduled to be produced after this Motion is filed.  The UCC reserves its rights to challenge these logs.

to common interest.  And the doctrine is not applicable to certain documents that have been identified by the Withholding Parties.  For instance, the logs identify communications among the Special Committee to the Board of Directors of Purdue Pharma L.P. (the "**Special Committee**"), and various Sackler family members and other Purdue Board members, even though the Special Committee has been charged with investigating claims *against* the Sacklers and the legacy board members.  The common interest doctrine does not protect communications among parties with adversarial interests of this kind.

5.      ***Fourth***, a large number of entries on the Sacklers' and the Debtors' logs indicate that no lawyers authored, sent, received, or were copied on the withheld communications.  Many of these entries indicate merely that they reflect "an intent to seek legal advice," which is not a valid basis upon which to withhold documents.

6.      ***Fifth***, over 27,000 entries on the logs produced so far copy or otherwise include third parties, including public relations firms, accountants, government adversaries, friends, gardeners, and art advisors.  Ordinarily, the inclusion of a non-lawyer third party on a communication precludes an assertion of privilege.  The UCC does not argue, however, as the Withholding Parties repeatedly suggested in pre-petition correspondence, that communications involving third parties can *never* be immune from disclosure, only that the Withholding Parties have not carried their burden of proving that the communications *that they actually withheld* are so immune.  The UCC therefore seeks an order requiring the Withholding Parties to (i) produce the Withheld Documents[5] or (ii) provide the Withheld Documents to the Court, or to a Special Master appointed by the Court, for review *in camera* and production to the UCC to the extent deemed appropriate.  The NCSG supports the relief requested in this Motion.

---

[5] The challenged entries associated with these categories, as they appear on the privilege logs, are included on Exhibits A-C to the transmittal Declaration of Mitchell Hurley (hereinafter, "**Hurley Decl.**" or "**Hurley Declaration**").

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

7.    The UCC is very aware that the relief it is seeking could result in very arduous work by the Court or a Special Master.  The UCC does not therefore make this request lightly.  However, the UCC, along with the NCSG, needs to investigate the Settlement Framework, including the estate causes of action.    Without receiving the inappropriately Withheld Documents, such investigation will be far from complete.  And recall—it is the Sacklers who seek releases.

**BACKGROUND**

**I.    Production of the Privilege Logs**

8.    As discussed in the accompanying Exceptions Motion, the scope and timing of the productions underway by the Sacklers and the Debtors were expressly negotiated by those parties, and subject to stipulations that they signed and that have been "so ordered" by the Court.  *See* Amended Stipulation and Agreed Order [ECF No. 1734] ¶¶ A-M.  Based on terms for which the UCC carefully bargained, the Sacklers and the Debtors have begun producing privilege logs on a rolling basis.  *See* Side A Stipulation [ECF No. 1347] ¶ 7; Side B Stipulation [ECF No. 1348] ¶¶ 11-13; Cohen Stipulation [ECF No. 1345] ¶¶ 9-11; Debtors' Stipulation [ECF No. 1553] ¶¶ 6-10.

9.    To date, the Sacklers have produced the following privilege logs, collectively containing 55,791 entries:

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

| Side A Sacklers – Side A Logs | |
|---|---|
| *Date* | *Number of Entries* |
| July 21, 2020 (amended and superseded on July 31, 2020 and August 28, 2020) | 34,590 |
| *Total* | *34,590*[6] |
| **Side B Sacklers – Side B Logs** | |
| *Date* | *Number of Entries* |
| July 22, 2020 (amended and superseded on July 26, 2020, August 5, 2020, September 8, 2020, and September 26, 2020) | 14,188 |
| September 4, 2020 (amended September 26, 2020) | 6,657 |
| September 21, 2020 (amended September 26, 2020) | 259 |
| October 22, 2020 | TBD |
| *Total* | *21,201*[7] |

10.    For their part, the Debtors have withheld from *post-petition* productions over 193,000 documents that are by definition responsive to informal requests[8] made by the UCC and other creditors, and/or search terms on which the parties agreed, as well as over 135,000 documents from *pre-petition* productions:

---

[6] In response to the UCC's correspondence challenging the Side A Logs, Side A removed a number of entries from its privilege logs, but to date has not produced an updated log. *See* Hurley Decl., Ex. 31 (Sept. 22, 2020 J. Ball Ltr.). The UCC has endeavored to avoid challenging any of those removed entries in this Motion.

[7] At approximately 10:30 p.m. on September 28, 2020, the night before the parties stipulated that the UCC would file this Motion, Side B informed the UCC that it was removing certain entries from the Side B Logs, but did not identify which documents it was removing. Additionally, Side B identified certain documents on its Logs that it has now produced in full and other documents related to the categories identified in the Exceptions Motion. Given the last-minute nature of this information, the UCC has not yet evaluated Side B's representations for purposes of this Motion, but will consider and withdraw challenges as appropriate in due course and in advance of the reply briefing and hearing dates set for this Motion.

[8] Pursuant to the Stipulation and Agreed Order Among the Official Committee, the Non-Consenting States Group and the Debtors Regarding Discovery in the Chapter 11 Cases [ECF No. 1623], the parties agreed that "for all purposes, including for purposes of [a] … Discovery Dispute Motion (or other discovery motion pursuant to this Stipulation) the Informal Requests shall be deemed to have been properly and timely served as formal discovery, subject to a full reservation of all objections by the Debtors, except any objection or argument that a request for disclosure or motion to compel should be denied because the Informal Requests were not formally served on the Debtors."

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

| The Debtors' Logs | |
|---|---|
| **Date** | **Number of Entries** |
| August 7, 2020 | 2,920 |
| August 15, 2020 (amended August 28, 2020) | 218 |
| September 15, 2020 | 63,842 |
| September 30, 2020 | TBD |
| **Total** | **66,980** |
| **The Debtors' DOJ Logs[9]** | |
| **Date** | **Number of Entries** |
| September 15, 2020 | 126,327 |
| **Total** | **126,327** |
| **The Debtors' Pre-Petition Logs[10]** | |
| **Date** | **Number of Entries** |
| Pre-petition | 136,468 |
| **Total** | **136,468** |

11.    The UCC does not currently seek relief with respect to the Pre-Petition Logs, but reserves its right to do so in the future, as it does with respect to additional privilege logs that are scheduled to be produced by the Withholding Parties and their affiliates in the coming weeks.[11]

---

[9] The Debtors produced two privilege logs dated September 15, 2020 that identify documents the Debtors withheld or redacted from their productions to the UCC even though the Debtors produced these same documents in their entirety to the DOJ.

[10] The Pre-Petition Logs contain documents that the Debtors withheld on alleged privilege grounds from the pre-petition productions that were made available to parties-in-interest in these cases.

[11] The UCC understands that privilege logs will be produced by the Independent Associated Companies (the "**IACs**"), defined in the UCC's Rule 2004 motion "by reference to the Amended Case Stipulation as all ex-U.S. pharmaceutical entities, related businesses, joint ventures, or other holdings directly or indirectly owned or controlled by any Shareholder Party and that are included in the financial information provided in the investment banker presentation made available to certain parties prior to the petition date," [ECF No. 1340] ¶ 2; Other II Way Entities, defined in the UCC's Rule 2004 motion as "all entities jointly owned or controlled, directly or indirectly, by the two sides of the Sackler family that are not IACs," [ECF No. 1340] ¶ 2; Norton Rose Fulbright LLP and its merger partner Chadbourne & Parke LLP (together, "**Norton Rose**"); Norton Rose partner Stuart Baker; Beth Cohen; and Moab Capital.

12.     In this Motion, the Side A Logs and Side B Logs are sometimes collectively referred to as the "**Sackler Logs**."  The Sackler Logs and the Debtors Logs (constituting all privilege logs thus far provided from all parties) are collectively referred to herein as the "**Privilege Logs**."[12]

## ARGUMENT

## I.     Choice of Law, Standard, and Burden of Proof

13.     Privilege determinations in bankruptcy cases are guided by the Federal Rules of Evidence.  *See* Fed. R. Bankr. P. 9017.  Under Federal Rule of Evidence 501, "[t]he common law— as interpreted by United States courts in light of reason and experience—governs a claim of privilege."  Fed. R. Evid. 501.  In connection with a 2004 examination in bankruptcy, federal law generally governs even where discovery is being taken concerning claims as to which state law supplies the rule of decision.  *See, e.g.*, *In re China Med. Techs., Inc.*, 539 B.R. 643, 648 (Bankr. S.D.N.Y. 2015).  The Withholding Parties do not appear to contend otherwise.[13]  *Id.* ("[N]either party challenges the Bankruptcy Court's proper determination that the 'common law' for the purposes of a Rule 2004 proceeding, is federal, not state common law."); *see also In re Asia Global Cross, Ltd.*, 322 B.R. 247, 254 (Bankr. S.D.N.Y. 2005) (similar).

14.     The standard and burden associated with assessing privilege claims are well-settled. To establish immunity from disclosure, the withholding party must demonstrate that (1) legal advice is sought (2) from a professional legal advisor in his capacity as such, (3) the communication relates to that purpose, and (4) the communication is made in confidence between

---

[12] The UCC has met and conferred with counsel for the Withholding Parties in a good faith effort to resolve by agreement the issues raised in this Motion without the intervention of the Court.  *See* Hurley Decl. ¶ 3.  Among other things, counsel met and corresponded with counsel for the Withholding Parties on numerous occasions concerning issues raised in this motion and the UCC's separate Privilege Exceptions Motion.  *Id.* & Exs. 1-38.  The parties resolved by agreement some issues that otherwise would have been included in this Motion, but were not able to resolve their other disputes.

[13] Local Rule 7034-1(c) required the Withholding Parties to specifically identify any "state's privilege rule" that they seek to invoke, and they identified none.  The Withholding Parties also at least tacitly agreed during meet and confers on application of federal law to privilege issues, and Side B has expressly invoked federal privilege law.  *See, e.g.*, Hurley Decl., Ex. 6 (Aug. 7, 2020 A. Lees Ltr. at 4); Ex. 9 (Aug. 16, 2020 J. Ball Ltr.).

the client and the legal advisor.  *See, e.g.*, *TVT Records v. Island Def Jam Music Grp.*, 214 F.R.D.

143, 144 (S.D.N.Y. 2003).  Courts "strictly confine[]" the privilege "within the narrowest possible

limits" because it "stands in derogation of the public's right to every [person's] evidence."  *Id.*

(citations and internal quotations omitted); *see also United States v. Mejia*, 655 F.3d 126, 132 (2d

Cir. 2011) (similar); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (similar).

15.    It is likewise axiomatic that the party asserting privilege bears the burden of

establishing all of its elements with respect to any information withheld from disclosure.  *See, e.g.*,

*United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).  Ordinarily, only

confidential communications "between the attorney and the client" can be privileged.  *United*

*States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) ("[T]he attorney-client privilege generally

applies only to communications between the attorney and the client.").  The inclusion of third

parties is contrary to the requirement that purportedly privileged communications be made and

kept in confidence.  *See Mejia*, 655 F.3d at 134 ("the presence of a third party counsels against

finding that the communication was intended to be, and actually was, kept confidential").  For the

same reason, disclosure of otherwise privileged communications to third parties generally waives

privilege.  *See Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (disclosure negates claim

that "communications were intended to be confidential."); *In re Horowitz*, 482 F.2d at 81-82.

16.    To be sure, exceptions to the rule exist.  However, the withholding party bears the

burden of proving that all of the elements supporting a claim of privilege still exist, including,

where a third party is involved, specific facts demonstrating that an exception to the ordinary rule

applies.  A purported privilege holder generally carries this burden "by way of affidavits or

equivalent statements discussing the applicability of the attorney-client privilege to **each**

**document at issue**."  *In re Modell*, 171 B.R. 510, 514 (Bankr. S.D.N.Y. 1994) (emphasis added).

Such document-by-document assertions are typically included in privilege logs.  *See, e.g.*, *Constr. Prods. Research, Inc.*, 73 F.3d at 473 ("To facilitate its determination of privilege, a court may require an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps.") (internal quotation marks and citation omitted); *In re Schick*, No. 96 B 42902, 1997 WL 465217, at *4 (Bankr. S.D.N.Y. Aug. 12, 1997) (describing S.D.N.Y. and Bankr. S.D.N.Y. local rules regarding privilege logs).

17.    Where a purported privilege holder fails to adequately describe the nature of the withheld documents, the privilege may be waived.  *See Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 499 F. Supp. 2d 475, 479 (S.D.N.Y. 2007) ("Failure to furnish an adequate privilege log is grounds for rejecting a claim of attorney client privilege."); *Constr. Prods. Research, Inc.*, 73 F.3d at 473-74 (affirming order compelling production of allegedly privileged documents where party failed to adequately describe privileged nature on privilege log); *In re Schick*, 1997 WL 465217, at *4 ("The failure to assert a timely privilege objection, and provide a privilege log, may result in a waiver of the privilege.") (citing cases).  *In camera* review may also be appropriate where logs lack sufficient detail to permit the Court to determine whether or not claims of privilege are valid.

## II.    The Sacklers and the Debtors Have Waived Any Privilege That Might Otherwise Have Attached to Documents Disclosed to the Department of Justice

18.    The Sacklers and the Debtors are under investigation by the DOJ in connection with their roles in the opioid crisis.  The UCC understands that each has (i) made written presentations to and exchanged other communications with the DOJ concerning opioid-related claims against them ("**DOJ Presentations and Communications**") and (ii) produced documents to the DOJ ("**DOJ Document Productions**").  Both the Sacklers and the Debtors have refused to produce the DOJ Presentations and Communications to the UCC, and the Debtors have withheld from the UCC

a substantial portion of their DOJ Document Productions.[14]  None of these materials are immune from discovery, and they should be ordered produced to the UCC without further delay.

19.    As a preliminary matter, the Withholding Parties have argued that the DOJ Presentations and Communications need not be produced because they are not "relevant."  But the DOJ Presentations and Communications and Document Productions relate to the very same events and transactions that animate many of the claims the UCC is investigating, and could well include important admissions and impeachment material concerning those matters.  Materials of this kind easily clear the low bar for relevance under applicable rules.  *See, e.g.*, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2017 WL 280816, at *1 (S.D.N.Y. Jan. 20, 2017) (compelling production of "white papers, presentations, written memoranda, or briefs shown or provided" to the CFTC or DOJ because despite differences in the regulators' investigations and the litigation at issue, "relevance, for purposes of discovery, is an extremely broad concept" (internal quotation marks and citations omitted); *see also In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("The scope of Rule 2004 examination is very broad, broader even than discovery under the Federal Rules of Civil Procedure.").

20.    Nor is there any significant burden associated with the productions the UCC seeks. Indeed, neither the Sacklers nor the Debtors have ever argued that producing the DOJ Presentations and Communications would represent a hardship of any kind.  *See, e.g.*, Hurley Decl., Ex. 43 (D. Sackler deposition testimony at 227:11-23) (indicating the Sacklers made approximately four presentations to the DOJ).  While the DOJ Production Documents the Debtors have withheld are

---

[14] The Sacklers represent that they produced to the UCC all of the underlying documents that they produced to the DOJ.  For their part, the Debtors produced approximately two million documents to the DOJ, and have withheld approximately 135,000 of such documents from production to the UCC.

voluminous, those documents have already been gathered, are available in electronic form, and can be produced to the UCC at the push of a button.

21.     Unable to justify withholding the DOJ materials based on relevance or burden, the Debtors argue that production is not required based on privilege. It is axiomatic, however, that disclosure of documents to a government adversary in the midst of an investigation waives any immunity from disclosure that might otherwise apply. *See, e.g.*, *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993) ("At the time of the submission of the memorandum to the Enforcement Division, the SEC and Steinhardt stood in an adversarial position. Steinhardt's voluntary submission of the memorandum to the Enforcement Division waived the protections of the work product doctrine as to subsequent civil litigants seeking the memorandum from Steinhardt.");[15] *In re Weatherford Int'l Sec. Litig.*, No. 11 Civ. 1646(LAK)(JCF), 2013 WL 12185082, at *7 (S.D.N.Y. Nov. 19, 2013) (parties "waived work product protection for the material that they provided to the SEC, as well as any underlying factual material explicitly referenced in it") (citation omitted); *Gruss v. Zwirn*, No. 09 CIV. 6441 (PGG)(MHD), 2013 WL 3481350, at *8 (S.D.N.Y. July 10, 2013) ("[W]hen a party provides documents to a government adversary []. . ., it ordinarily waives both attorney-client privilege and work product protection as to those documents.").

22.     The Debtors also rely on so-called "non-waiver" agreements as a basis for withholding the DOJ Document Productions. The UCC reserves all of its rights concerning the Debtors' claims that withheld DOJ Document Productions were privileged in the first instance. But even if they were, any privilege that *might* have existed respecting those documents certainly

---

[15] Indeed, Side B has already recognized this principle, citing both *In re Steinhardt* and *In re Weatherford* for the proposition that voluntary disclosure of documents "waives any arguable work product protection" in a recent letter to the Debtors' counsel requesting the production of certain documents referenced in an exhibit used at the Stephen Ives deposition. Hurley Decl., Ex. 42 (Sept. 26, 2020 M. Leventhal Ltr. at 2).

was waived when the Debtors produced them to the DOJ. *See Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 n.5 (2d Cir. 2003) (client authorizing law firm to send documents to SEC waived attorney-client privilege); *Steinhardt*, 9 F.3d at 235; *Gruss*, 2013 WL 3481350, at *8. The Debtors' non-waiver agreements do not change the outcome. As courts in this Circuit repeatedly have held, disclosure to an adverse government agency eliminates any privilege with respect to those documents even where made pursuant to a non-waiver agreement. *See, e.g.*, *id.* at *11; *In re Initial Pub. Offering Sec. Litig.*, 249 F.R.D. 457, 462-65 (S.D.N.Y. 2008).[16]

23.    The Debtors also argue that disclosing the DOJ documents would "improperly interfere[] with the DOJ's investigation."[17] However, to the extent an objection based on the so called "investigatory privilege" even would be valid—and the UCC does not so concede—that objection could be raised *only* by the government, not by the Debtors. *See, e.g.*, *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, No. 92 Civ. 3142 (RPP), 1993 WL 277182, at *1 (S.D.N.Y. July 21, 1993) (quoting *In re Sealed Case*, 856 F.2d 268, 271-72 (D.C. Cir. 1988)). The DOJ has not done so. Indeed, the UCC repeatedly has asked the Sacklers and the Debtors to identify any objection asserted by the DOJ in connection with the UCC's requests for DOJ documents, but they have supplied none. *See, e.g.*, Hurley Decl., Ex. 8 (Aug. 12, 2020 Letter to Sacklers ("Is it your contention that the DOJ" has "sought to assert [the investigatory] privilege? If so, please provide us with any documents and information that you claim memorialize that attempted invocation."); *cf. also* Hurley Decl., Ex. 39 (May 11, 2020 email from J. McClammy) ("Our understanding is

---

[16] Rule 502 "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation, while preserving the privilege as against other parties seeking information." 154 Cong. Rec. H7817, H7818 (daily ed. Sept. 8, 2008) (Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence).

[17] *See, e.g.*, Hurley Decl., Ex. 1 (email from James I. McClammy dated May 22, 2020); Ex. 3 (July 28, 2020 Ltr. From A. Lees); Ex. 9 (August 16, 2020 Ltr. From J. Ball).

that the DOJ is not taking a position now with respect to whether the requested materials should be produced.").

24.     In addition, the UCC asked DOJ lawyers during telephone calls over the summer to advise the UCC whether the DOJ would object to the Withholding Parties' production of DOJ materials.  The DOJ lawyers took no position during those calls, or since.  Another lawyer for the DOJ was present for the depositions of each of Marianna Sackler, David Sackler, and Stephen Ives, but raised no objection of any kind to the UCC's questioning concerning the DOJ's investigation. *See* Hurley Decl., Ex. 43 (David Sackler Dep. 66:13-18 (Alicia Bentley from the DOJ present); 211:9-224:1; 225:6-232:17 (series of questions regarding DOJ investigation)); Hurley Decl., Ex. 44 (Marianna Sackler Dep. 4:19-22 (Alicia Bentley and Bert Mayer from the DOJ present); 302:14-25 (questions regarding DOJ investigation); Hurley Decl., Ex. 45 (Stephen Ives Dep. 5:4-6 (Alicia Bentley from the DOJ present); 31:23-37:21, 309:19-310:14 (questions regarding DOJ investigation)).  In sum, despite multiple opportunities, the DOJ never has sought to assert any "investigatory privilege" concerning its examination, and neither the Debtors nor the Sacklers have standing to raise those objections on their own.

25.     In pre-Motion correspondence, the Withholding Parties also argued, incorrectly, that production of the DOJ materials should be denied as "contrary to the protections given to confidential settlement and plea discussions, including Federal Rules of Evidence 408 and/or 410." As an initial matter, there is no evidence to suggest any of the materials disclosed to the DOJ constitute settlement or plea discussions in the first place.  DOJ pleadings, subpoenas, letter demands, written responses, PowerPoint presentations, and other correspondence are exchanges between adversaries on the merits that do not qualify as settlement negotiations or plea discussions under Rules 408 and 410.

13

26.     In any case, Rules 408 and 410 are rules of admissibility, not discovery.  *See Morse/Diesel, Inc. v. Fid. & Deposit Co. of Md.*, 122 F.R.D. 447, 449 (S.D.N.Y. 1988) (observing that Rule 408 "only applies to the admissibility of evidence at trial and does not necessarily protect such evidence from discovery").

27.     Accordingly, courts have consistently held that settlement negotiations are not privileged and that parties may seek production of confidential settlement negotiations in related proceedings.  *See, e.g.*, *Oliver v. Comm. for Re-Election of the President*, 66 F.R.D. 553, 556 (D.D.C. 1975) ("While offers of settlement (and presumably also negotiations which led to such offers) are clearly not admissible at trial for a number of public policy reasons, such negotiations do not fall within the confines of the privileges recognized at common law."); *Bennett v. La Pere*, 112 F.R.D. 136, 138-39 (D.R.I. 1986) (rejecting contention that some "particularized showing" of need is necessary to discover settlement documents).  The DOJ materials should therefore be produced.

## III.    <u>The Baker and White Documents Should be Reviewed *In Camera*</u>

28.     The Sacklers and the Debtors have withheld 3,015 documents and communications on which Stuart Baker and/or Jonathan White are the only lawyers copied.[18]  While Baker and White both are attorneys, both also had many non-legal, business roles at the Debtors and with the Sacklers, their trusts, and affiliates.  Both are also long-time Sackler associates:  Baker has worked with the Sacklers and their companies for several decades, while White has worked with the Sacklers since at least 1998.[19]  In addition to acting as a trustee, Baker was a director or officer of more than 120 IACs and 30 other affiliated entities,[20] served as Executive Vice President and a

---

[18] *See* Exhibit A (Excel Tab A), Exhibit B (Excel Tab A), and Exhibit C (Excel Tab A) to Hurley Declaration for corresponding entries from the Side A's, Side B's, and the Debtors' Logs, respectively.

[19] *See* Hurley Decl., Ex. 50 (Purdue Pharma Inc. Board Chart).

[20] *See* Hurley Decl., Ex. 40 (April 9, 2020 J. McLaughlin Ltr.).

variety of other positions for Purdue Pharma L.P., Purdue Pharma Inc., and a number of affiliates,[21]

and even described himself as the "*de facto*" chairman of Purdue.[22]  Apparently on an annual basis,

Mr. Baker would provide to the Purdue and MNP boards a summary of his activities for the year,

which would then be used in setting his compensation, and which illustrate the extraordinary non-

legal reach Mr. Baker had in the affairs of Purdue and the other entities owned by the Sacklers.

29.    For example, Baker identified all of the following non-legal roles in his 2015

"Report of SDB Activities and Responsibilities," many of which are non-legal:[23]

Purdue U.S. Matters:  Serves as a member of the Purdue Executive Committee … advises
on significant commercial transactions and strategic alliances and attends meetings and
conference calls regarding same … serves as a member of the Pension Investment
Committee which overseas Purdue 401(k) and the Purdue Pension Plan …

Boards of Directors:  Conducts and chairs Meetings of the Boards of Directors of the
worldwide independent associated companies[24] … on an almost daily basis in
conversations with various Directors, discusses various aspects of the businesses of the
independent associated companies … works  with Executives, Directors and the Agenda
Committee to prepare … reports to the Boards of Directors and to members of the Sackler
Family … provides final Decisions to Executives for implementation of action items …

Committees of the Board of Directors  … Coordinates requests by management for
Committee review … provides and coordinates necessary information to the Committees
in connection with the activities of each Committee …

Directorships:  … SDB is a director and/or an officer of approximately 75 Sackler
companies … with respect to the non-U.S. [IACs] in many cases SDB and CBM are the
sole Directors.  Other than for Purdue Pharma Inc. in the U.S., SDB … is the sole director
of some U.S. independent associated companies ….  SDB serves as a trustee and director
of various Sackler family trusts.

Financial Matters: … Responsible, with [Purdue's CFO], for the preparation for a potential
financing to support acquisition of investments by Purdue Pharma L.P. and other
independent associated companies … requires regular interaction with J.P. Morgan …

---

[21] *See* Hurley Decl., Ex. 40 (April 9, 2020 J. McLaughlin Ltr.).

[22] *See* Hurley Decl., Ex. 52 (Jonathan Sackler stating that Mr. Baker is considered "the de facto chairman" of the
Purdue board).

[23] *See* Hurley Decl., Ex. 49 (Report of SDB Activities and Responsibilities March 31, 2015).

[24] As explained in the accompanying Exceptions Motion, Purdue itself was considered one of the Independent
Associated Companies or IACs.

responsible for overseeing the preparation of the worldwide consolidated financial statements …

<u>Agreement/Document Review and Execution</u>:  Executes (approximately 2,500 in 2014) documents on behalf of the worldwide independent associated companies including … relating to governance … regulatory filings … tax returns, annual reports, banking documents, investment paperwork … in addition … SDB reviews and comments upon hundreds of additional documents and agreements each year …

30.    Baker's memo goes on to describe additional non-legal roles within the categories identified above, as well as in "internal audit," "new product introduction," "Bermuda," "International Patent Matters," "Budget Meetings," and "Recruitment of Senior Executives and Directors," among others.[25]  The 2015 memo is typical in its breadth of memos Mr. Baker prepared in earlier and later years.  In response to the UCC's requests, Mr. Baker's counsel produced a 15-page list identifying 257 different roles or positions Mr. Baker "holds or held at Purdue, IACs, as well as certain Sackler family affiliates," including Side A and Side B trusts.  *See* Hurley Decl., Ex. 40 (April 9, 2020 Ltr. from J. McLaughlin).  Based on the available record, it is at least possible that Mr. Baker was the single most important executive in the entire network of companies and trusts owned by or for the benefit of the Sacklers.[26]

31.    Mr. White has also played a number of non-legal roles for the Debtors, the Sacklers, and related entities, including as a past member of Purdue's Board, a member of the Boards of MNP Consulting Limited and other Sackler family entities, and as a trustee for Sackler family trusts.[27]  Mr. White regularly participated in Side A family council meetings[28] and served in a non-

---

[25] *Id.*

[26] While the UCC understands that the Sacklers may argue that Mr. Baker's roles were legal in nature, the UCC is requesting that an independent third party review the communications.

[27] *See* Hurley Decl., Ex. 50 (Purdue Pharma Inc. Board Chart); Ex. 109 (MNP Consulting Limited List of Directors); Ex. 51 (Mortimer-Side Informational Presentation, Nov. 22, 2019, at 75, 83 (listing White as trustee of Flat Creek Purpose Trust and Soft River Purpose Trust)); *see also* public filings listing Jonathan White as director of Sackler-related companies, https://www.sec.gov/Archives/edgar/data/744218/000110465917009252/a17-3162_1424b3.htm; *see also* Hurley Decl., Ex. 47 (Theresa Sackler Dep. (Day 1) 50:18-52:6 and (Day 2) 452:21-453:12 (describing Jonathan White's trustee positions).

[28] *See* Hurley Decl., Exs. 53, 54.

legal role as part of what Side A referred to as the "Trustee/Protector Group" related to the Sacklers' trusts.[29]  In addition to serving as a trustee personally, Mr. White is also the president of entities that act as trustees of Side A trusts in the United States, as well as serving as the "protector" for Side A's Jersey-based trusts.[30]  Significantly, Mr. White was involved in substantive deliberations and decisions concerning the amount and timing of distributions of Purdue's profits—central aspects of the UCC's investigation in this case.[31]  Indeed, while it is undisputed that Mr. White had a wide variety of business roles for the Sacklers and their affiliates over many years, no specific evidence has been presented concerning whether, how frequently, or in what capacity White acted for the Sacklers as a lawyer.

32.    The vague and conclusory log entries simply are not sufficient to carry the Withholding Parties' burden of demonstrating the communications with Baker and White are privileged.  Only legal advice, not business advice, can be shielded by the privilege.  *Women's InterArt Ctr., Inc. v. N.Y.C. Econ. Dev.*, 223 F.R.D. 156, 160 (S.D.N.Y. 2004) (citation omitted).  When counsel are also high-ranking management executives within a company, determining whether counsel may have been functioning in a legal or business capacity regarding a particular communication may not be easily discerned.  *TVT Records*, 214 F.R.D. at 145 (noting that counsel's communications in capacity as business executives were not privileged and that assertion of a "blanket privilege for large portions of the communications" by counsel who were also business executives was "overly broad").

33.    As the withholding parties, the Sacklers and the Debtors bear the burden of establishing that the "predominant purpose" of a withheld communication was legal.  *See, e.g.*,

---

[29] *See* Hurley Decl., Ex. 55.

[30] *See* Hurley Decl., Ex. 51 (Mortimer-Side Informational Presentation, Nov. 22, 2019, at 75, 83).

[31] *See* Hurley Decl., Ex. 56 (regarding disagreement between Side A and Side B regarding Bermuda distributions).

*Constr. Prods. Research, Inc.*, 73 F.3d at 473 ("The party asserting the privilege must establish the essential elements of the privilege.") (citing cases); *Nat'l Day Laborer Org. Network v. USCIS*, No. 16 CIV. 387 (PAE), 2020 WL 5518114, at *8 (S.D.N.Y. Sept. 14, 2020) (holding that where a communication contains both legal and business advice, it will be privileged if its "predominant purpose" was to render or solicit legal advice) (citing *In re Cty. of Erie*, 473 F.3d 413, 420 (2d Cir. 2007)).

34.     The information provided by the Withholding Parties on the Privilege Logs is insufficient to make that showing.  For example, Side A has withheld Baker and White communications identified as "[d]iscussing legal advice re: investment/business transactions" and "[p]roviding information for purpose of legal advice re: investment/business transactions."[32] Entries provided by Side B and the Debtors with respect to Baker and White documents are similarly opaque.  *See* Hurley Decl., Ex. B (Excel Tab A) at PS-00049202, described as "Confidential communication requesting and reflecting provision of legal advice regarding Purdue business structure;" Ex. C (Excel Tab A) at PL-00013045, described as "email correspondence providing legal advice regarding general corporate advice."

35.     Entries of this kind at most indicate the document included both legal and business matters.  They do not demonstrate that the ***predominant purpose*** of the communication was legal.  *See, e.g.*, *Women's InterArt Ctr., Inc.*, 223 F.R.D. at 161 (explaining that "[s]ince these notes appear to relate to business information and [d]efendants have provided no explanatory supplements, they have not sustained their burden" under the attorney-client privilege).  Considering the extensive non-legal roles occupied by Baker and White, these descriptions do not carry the Withholding Parties' burden of proving that the referenced documents are privileged.  *See Urban Box Office*

---

[32] Hurley Decl., Ex. A (Excel Tab A).

*Network, Inc. v. Interfase Managers, L.P.*, No. 01-CV-8854 (LTS)(THK), 2006 WL 1004472, at *6

(S.D.N.Y. Apr. 18, 2006) ("Where there are several possible interpretations of a document based

upon the surrounding circumstances, the party asserting the privilege must produce evidence

sufficient to satisfy a court that legal, not business, advice is being sought.") (citation omitted).

36.     To be sure, Messrs. Baker and White were lawyers, and the UCC acknowledges

that they likely were party to some communications that are in fact privileged.  But the Withholding

Parties have failed to prove that the documents withheld from production are privileged, and have

refused to revise the Privilege Logs to provide more detail concerning those documents.  The UCC

therefore respectfully requests that an *in camera* review of the Baker and White documents be

conducted by the Court or a Special Master, so that non-privileged documents are produced.[33]

## IV.    The Withholding Parties' Common Interest Assertions are Insufficient

37.     The Side A Sacklers, the Side B Sacklers, and the Debtors have all indicated that

they are withholding documents in part based on the so-called "common interest doctrine."  When

properly supported, the common interest doctrine "protect[s] the confidentiality of

communications passing from one party to the attorney for another party where a joint defense

effort or strategy has been decided upon and undertaken by the parties and their respective

counsel."  *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (citation omitted).  The

common interest doctrine applies only if the underlying communication itself is privileged and,

like other privilege concepts, is narrowly construed.  *United States v. Weissman*, 195 F.3d 96, 100

(2d Cir. 1999); *TIFD III-E, Inc. v. United States*, 223 F.R.D. 47, 49 (D. Conn. 2004) ("The common

interest rule extends the attorney client privilege to privileged communications revealed to a third

---

[33] Exhibit A (Excel Tab A), Exhibit B (Excel Tab A), and Exhibit C (Excel Tab A) to the Hurley Declaration contain
the privilege entries upon which Baker or White are the only counsel listed.

party who shares a common legal goal with the party in possession of the original privilege.")
(citation omitted).

38.     "As in all claims of privilege arising out of the attorney-client relationship, a claim
resting on the common interest rule requires a showing that the communication in question was
given in confidence," and the burden of establishing common interest "in all its elements, always
rests upon the person asserting it." *Schwimmer*, 892 F.2d at 244.  Among other things, the party
resisting discovery must demonstrate that "there was an agreement, though not necessarily in
writing, embodying a cooperative and common enterprise towards an identical legal strategy."
*Cendant Corp. v. Shelton*, No. 3:06-CV-00854(AWT), 2007 WL 2460701, at *3 (D. Conn. Aug.
24, 2007) (internal quotation marks and citation omitted).  Even where a common interest is
identified, "the party seeking to rely on the doctrine must still demonstrate that the specific
communications at issue were designed to facilitate a common legal interest." *Intex Recreation
Corp. v. Team Worldwide Corp.*, 471 F. Supp. 2d 11, 16 (D.D.C. 2007).

39.     On their logs, the Debtors identified each entry as to which they claim the common
interest doctrine applies.  But the Debtors have refused to provide other information necessary to
carry their burden of proof with respect to those documents.  For example, in correspondence dated
August 11 and 30, 2020, the UCC asked the Debtors to advise (i) when Purdue first entered into a
common interest agreement with the Sacklers or their affiliates, (ii) if the agreement was
terminated, the date of termination, (iii) the effective dates of any other common interest
agreements, and (iv) the specific nature of the alleged common interest between the Debtors and
the Sacklers.  *See* Hurley Decl., Ex. 17 (Aug. 30, 2020 Hurley Ltr. at 2).  But the Debtors refused
to answer any of the UCC's questions, which they claimed were unnecessary.  *Id.*, Ex. 21 (Sept. 8,
2020 J. McClammy Ltr. at 3).  The Debtors were mistaken.  As discussed above, they had, and

retain, the burden of proving that common interest documents were withheld pursuant to an "agreement" among the parties, though not necessarily written, of establishing the specific and "identical" interest they share with non-Debtors on the withheld documents, and connecting that interest and agreement to the specific documents withheld.[34]

40.    For their part, the Sacklers have refused even to identify which entries on their logs are subject to a claim of common interest.  Side A's original log contained a note on the cover page that "[c]laims of attorney-client privilege and work product protection include reliance on common interest, joint defense, and similar doctrines of non-waiver," which was effectively a claim that *all* entries on the Side B Log were subject to common interest.  The Sacklers since have identified entries involving restructuring counsel that the Sacklers claim are subject to common interest protection.  However, the Sacklers have advised they also are withholding many other documents on the basis of common interest, but have refused to identify which.  This approach is not sufficient.  *See Chevron Corp. v. Donziger*, 296 F.R.D. 168, 203 (S.D.N.Y. 2013) (common interest must be "based on competent evidence") (internal quotation marks and citation omitted); *In re Velo Holdings, Inc.*, 473 B.R. 509, 514 (Bankr. S.D.N.Y. 2012) ("each document or communication must be separately evaluated" to determine whether common interest applies).

41.    The UCC also is troubled by the Debtors' apparently continuing belief that they share an "identical legal interest" with the Sacklers, and by the involvement of members of the Debtors' Special Committee in connection with that purported common interest.  The Special Committee was formed in May 2019 and is composed of Messrs. Miller, Buckfire, Dubel, and

---

[34] The Sacklers provided the UCC with a "Memorandum of Understanding" dated May 15, 2018 between and among certain Purdue entities and members of the Sackler family and their associates.  *See* Hurley Decl., Ex. 48.  However, many of the documents withheld on common interest grounds by the Debtors pre-date the 2018 agreement and the later joinders by other parties.  In any case, notwithstanding the Memorandum, the UCC does not concede that the interests of parties are, were or could have been sufficiently identical to support a claim of common interest.

Cola, who also are "at-large directors." According to the Debtors, the Special Committee is tasked with "overseeing various investigations, including an exhaustive review by outside experts of distributions made by the Debtors to the Sackler Families and their affiliates, as well as any dealings between the Debtors and any member of the Sackler Families or any of their affiliates." *See* Debtors' Informational Brief [ECF No. 17 at 16].

42.    Nevertheless, the Privilege Logs identify 326 communications, dated after the Special Committee's formation, that involve members of the Sackler family (and/or their designees on the board) and members of the Special Committee, including relating to topics on which the UCC would expect the Special Committee to be at odds with the Sacklers. *See* Hurley Decl., Ex. A (Excel Tab B), Ex. B (Excel Tab I), Ex. C (Excel Tab B).[35] The UCC questions whether these materials can be withheld on common interest grounds. *See Middlesex Retirement Sys. v. Quest Software, Inc.*, No. CV 06-6863-DOC (RNBx), 2009 WL 10673943, *at 4 & n.6 (C.D. Cal. July 8, 2009) (holding that special committee "did not have the requisite 'common interest' with the persons it was investigating and with whom the privileged communications in question were shared"). Claims of common interest over communications with the plenary board that may relate to Special Committee business also appear dubious.[36] *See S.E.C. v. Roberts*, 254 F.R.D. 371, 374 n.4 (N.D. Cal. 2008) (plenary board lacked "common interest with the Special Committee since it was the Special Committee's mandate to ascertain whether members of the Board may have

---

[35] Side B has stated that privilege log entries with an "OLK indication" are documents that "do not have reliable metadata, including with respect to the date of the document." The UCC is challenging such log entries containing Special Committee members, because it appears that they are documents and communications occurring after the Special Committee's formation, based on the parties and the document descriptions listed for these log entries.

[36] *See e.g.* Hurley Decl., Ex. C (Excel Tab B) (control no. PL-00012333) (email among all four Special Committee members and current Side B Director re: "Thoughts following yesterday's special committee meeting," described as "[e]mail correspondence seeking legal advice regarding opioid-related civil litigation affecting the Company").

engaged in wrongdoing"); *In re OM Sec. Litig.*, 226 F.R.D. 579, 592 (N.D. Ohio 2005) (plenary

board and audit committee).

## V.    The Sacklers and the Debtors Wrongfully Withheld Tens of Thousands of Documents and Communications Involving, or Shared with, Service Providers and Other Third Parties Who Break Privilege

### A.    Communications Among Non-Lawyers Reflecting "Intent to Seek Legal Advice" Are Not Privileged

43.    Side A has withheld 276 documents that do not include a lawyer and are described

merely as "[r]eflecting an intent to seek legal advice" regarding various topics, and sometimes

mentioning a lawyer or law firm.[37]   Documents like these that anticipate a future privileged

communication but do not themselves reflect one are not privileged.  *See Duttle v. Bandler & Kass*,

127 F.R.D. 46, 52 (S.D.N.Y. 1989) ("To hold otherwise would expand the attorney-client privilege

without limit, since countless communications within an organization could be considered

preparatory to seeking legal advice."); *see also United States v. DeFonte*, 441 F.3d 92, 95-96 (2d

Cir. 2006) (observing that notes made in preparation for communication with attorney are

privileged only if in fact "the notes were communicated by the client to the attorney").

44.    While Side A maintains that communications reflecting an "intent to seek legal

advice" *may* be privileged, citing *In re Grand Jury Proceedings*, No. M-11-189, 2001 WL

1167497, at *28 (S.D.N.Y. Oct. 3, 2001) ("*In re Grand Jury 2001*"), that case is inapposite.  The

*In re Grand Jury 2001* court reviewed multiple rounds of *ex parte*, *in camera* submissions from

the government and the target of the grand jury inquiry, and conducted an evidentiary hearing with

direct and cross examination of witnesses on the privilege issues.  *See id.* at *1-2.  Only after that

extensive presentation of evidence and *in camera* review did the court conclude that the subject

---

[37] Exhibit A (Excel Tab C) to the Hurley Declaration contains the Side A Log entries that do not copy a lawyer and include the privilege description "intent to seek legal advice."

documents had been "created at counsel's request to supply counsel with information necessary to provide legal advice and need not be disclosed." *Id.*[38] Needless to say, Side A has made no such showing here. Indeed, Side A has failed even to assert that the "intended" legal advice was ever actually sought, an omission that by itself is fatal to its claim of privilege. *See DeFonte*, 441 F.3d at 95-96.

>    **B.**    **The Sacklers and the Debtors Cannot Claim Privilege Over Documents and Communications with Public Relations Consultants**

45.    The Privilege Logs collectively list 15,159 entries with public relations firms, including many communications without counsel. Courts in the Second Circuit consistently refuse to extend privilege protections to public relations firms, even when their services relate to pending litigation. *See, e.g.*, *Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, No. 02 Civ. 7955 DLC, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("A media campaign is not a litigation strategy."); *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) ("It may be that the modern client comes to court as prepared to massage the media as to persuade the judge; but nothing in the client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status."). Disclosure of otherwise privileged materials to public relations firms thus typically waives privilege. *See Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 146-47 (S.D.N.Y. 2016); *Calvin Klein Trademark Tr.*, 198 F.R.D. at 54-55; *Haugh*, 2003 WL 21998674, at *3.

46.    Privilege can neither be created, nor preserved, by the mere fact that counsel hired the public relations firm. *See, e.g.*, *id.* at *1, 3 (holding that no privilege attached to communications with public relations consultant hired by counsel purportedly to "provide . . . advice to assist [counsel] in providing legal services"). Nor does privilege attach just because a

---

[38] And, in any event, the *In re Grand Jury 2001* court undertook the very *in camera* review the UCC seeks here.

public relations firm's analysis is actually helpful to an attorney's provision of legal advice. *See,
e.g.*, *Calvin Klein Trademark Tr.*, 198 F.R.D. at 54 (rejecting privilege claim, reasoning that "[t]he
possibility that such activity may also have been helpful to [counsel] in formulating legal strategy
is neither here nor there"); *Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 146 ("Although
West End's services may have been useful to counsel . . . such a showing alone is insufficient to
find that the attorney-client privilege has not been waived by disclosure to a public relations
consultant.").

47.    In meet and confer correspondence, the withholding parties have argued that
circumstances *might* exist under which a document could be privileged, despite the presence of a
public relations firm. *See* Hurley Decl., Ex. 6 (Aug. 7, 2020 A. Lees Ltr. at 4-5); Ex. 10 (Aug. 16,
2020 A. Lees Ltr. at 6-7); Ex. 16 (Aug. 23, 2020 J. Ball Ltr. at 1-4); Ex. 21 (Sept. 8, 2020 J.
McClammy Ltr. at 7).  The Sacklers primarily rely on *In re Grand Jury Subpoenas Dated March
24, 2003*, 265 F. Supp. 2d 321, 323-24, 330 (S.D.N.Y. 2003) (hereinafter "*In re Grand Jury 2003*"),
in which the court held that communications involving public relations professionals may be
privileged if they constitute efforts to influence prosecutors' and regulators' decisions whether to
indict in a high-profile grand jury investigation.

48.    But, the Second Circuit has yet to recognize a non-waiver doctrine even close to
the scope announced in *In re Grand Jury 2003*, and many district courts have declined to extend
that decision beyond its particular context. *See, e.g.*, *Haugh*, 2003 WL 21998674, at *3 (suggesting
there is an open question whether *In re Grand Jury 2003* was correctly decided); *In re Restasis
(Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 212 (E.D.N.Y. 2019)
("[T]he case's precedential value is likely limited to its unique context"); *Ravenell v. Avis Budget
Grp., Inc.*, No. 08-CV-2113 (SLT), 2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) (noting *In re*

*Grand Jury 2003* "has arguably extended the privilege the furthest," and "[t]he reach of that case may be further limited by its context: . . . a high profile grand jury investigation").[39]

49.     Moreover, despite numerous conferences, the Sacklers have provided no evidence, or even allegations, that the withheld public relations documents constitute or relate to efforts to influence prosecutors.  To the contrary, the only explanation the parties have offered suggests that the Sacklers and the Debtors engaged public relations firms to improve their reputation with the general public.  *See, e.g.*, Hurley Decl., Ex. 6 (Aug. 7, 2020 A. Lees Ltr. at 4) (discussing a desire to rebut information shared with the public by plaintiffs and attorneys general); Ex. 16 (Aug. 23, 2020 J. Ball Ltr. at 2) (same); Ex. 21 (Sept. 8, 2020 J. McClammy Ltr. at 7) (arguing public relations firms do not break privilege if they assist in formulations of public relations "in connection with litigation").  Hence, even if *In re Grand Jury 2003*'s holding were accepted, it would not apply here.  *Cf. Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 147 (holding public relations firm destroyed privilege, and *In re Grand Jury 2003* was inapposite because counsel used firm for "communicating with the general public at large").

50.     The UCC has identified the following public relations firms and individuals on the Privilege Logs and appendices as public relations professionals:

---

[39] Given that it is not a Second Circuit opinion—and particularly in light of its questionable precedential value—this Court is under no obligation to follow the *In re Grand Jury 2003* opinion.  *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430 n.10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom sits alone and renders decisions not binding on the others.").

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

| Side A Logs[40] | Side B Logs[41] | The Debtors Logs[42] |
|---|---|---|
| Edelman* | Edelman | Edelman |
| Goldin Solutions | Goldin Solutions** | Goldin Solutions |
| Sard Verbinnen & Co.* | Sard Verbinnen & Co. | Sard Verbinnen & Co. |
| Teneo | Teneo | Teneo |
| Dezenhall Resources | Dezenhall Resources** | Dezenhall Resources |
| Stu Loeser & Co. | Stu Loeser & Co. | Stu Loeser & Co. |
| Kitchen Table Partners | The Dilenschneider Group | Purple Strategies |
| Purple Strategies | Hill & Knowlton Strategies | Risa Heller |
| Hanover Communications | Kitchen Table Partners | Kitchen Table Partners |
| International | Lake Partners Strategy | Purple Strategies |
| Ingo Reckhorn | Consultants** | Hanover Communications |
| | Purple Strategies | APCO Worldwide |
| | Risa Heller | Brunswick Group |
| | | Charles Ryan |
| | | Cohn Wolfe |
| | | Cooney Waters |
| | | Global Strategy Group |
| | | Ketchum |
| | | McGinn Group |
| *appendix notes as retained by Side A counsel | **appendix notes as retained by Side B counsel | No engagement information provided in appendix |

51.     Notably—despite multiple requests during conferences to do so—the Withholding
Parties have provided very little information concerning the inception, scope, and nature of the
public relations firms' engagements beyond generic statements in their privilege log appendices.
Of the dozens of firms identified on the Privilege Logs, engagement agreements have been
provided only for three:  Dezenhall Resources (Side A, Aug. 6, 2019), Goldin Solutions (Side B,
Nov. 12, 2018), and Lake Partners Strategy Consultants (Side B, May 8, 2019).[43]  Even to the
extent the firms' activities were consistent with the nature of the engagements described in the
letters, application of the privilege would be questionable.  But those firms also appear on a

---

[40] See Exhibit A (Excel Tab D) of the Hurley Declaration for corresponding entries from the Side A Logs.

[41] See Exhibit B (Excel Tab B) of the Hurley Declaration for corresponding entries from the Side B Logs.

[42] See Exhibit C (Excel Tab C) of the Hurley Declaration for corresponding entries from the Debtors Logs.

[43] Although identified on Side B's Log as a "consulting expert," the engagement letter Side B produced for Lake
Partners indicates its services are intended to assist counsel in influencing media coverage.

significant number of log entries that do not apparently fall within the purported scope of their services.  Representatives from Dezenhall, Goldin, and Lake Partners are on 266 Privilege Log entries where counsel is completely absent.  *See* Hurley Decl., Ex. A (Excel Tab D.1) (Side A), Ex. B (Excel Tab B.1) (Side B), Ex. C (Excel Tab C.1) (Debtors).  It is questionable what, if anything, these firms could be doing to assist in providing legal advice when they are not even communicating with their purported client—*i.e.*, counsel to Side B.

52.    Even where counsel is present, the Sacklers and the Debtors cannot claim a blanket privilege over communications with Dezenhall, Goldin, and Lake Partners solely because they have engagement letters with counsel.  Over 740 entries on the Privilege Logs appear to be garden variety monitoring and commenting on news stories concerning Purdue and the Sacklers.  *See* Hurley Decl., Ex. A (Excel Tab D.2) (Side A), Ex. B (Excel Tab B.2) (Side B), Ex. C (Excel Tab C.2) (Debtors).  This is precisely the type of non-privileged work that public relations firms are generally hired to perform, and that courts have uniformly held is not privileged.  *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y. 2019) (public relations firms broke privilege because they were "involved in public relations activities aimed at burnishing [the client's] image" rather than "called upon to perform a specific litigation task that the attorneys needed") (citation omitted); *Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 147 (no privilege attached to public relations communications where party failed to demonstrate the firm "performed a function beyond that which a public relations firm might ordinarily be called upon to do").

53.    The Side A and Side B appendices add some information, but not enough, and not always consistently.  For example, Side B identifies Teneo as "engaged by Debtor" while Side A identifies Teneo as "retained by **counsel** to Purdue," and the Debtors provide no information at all.  The UCC therefore has little confidence in these representations.  Side A provides some additional

information on the scope of the public relations firms on its logs.  However, the descriptions are practically all the same: "Public relations advice to counsel related to media coverage concerning opioid litigation against Purdue and its former directors."  General public relations advice of this kind in the context of litigation is not privileged.  *See Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 146-47; *Calvin Klein Trademark Tr.*, 198 F.R.D. at 54-55; *Haugh*, 2003 WL 21998674, at *3.  Accordingly, for these public relations firms for whom the Withholding Parties have failed to supply any engagement letters or other pertinent evidence, the Court should apply the general rule that there is no privilege protection for communications with such persons.

54.    The Sacklers and the Debtors additionally each assert work-product immunity as a basis for withholding at least some of their communications with public relations firms.  But establishing work product protection over communications with public relations firms is a heavy burden to carry.  *See Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 93 (S.D.N.Y. 2019) ("[M]any cases have rejected work product protection for material relating to public relations activities."); *Calvin Klein Trademark Tr.*, 198 F.R.D. at 55 ("[I]t is obvious that as a general matter public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called 'work product' doctrine."); *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK)(JCF), 2011 WL 3880896, at *1-2 (S.D.N.Y. Sept. 1, 2011) (compelling production of documents purportedly reflecting work product analysis of "how best to react" to court judgment, because the underlying discussion related to public relations).  The information the Withholding Parties have supplied is inadequate to establish work product protection relating to the public relations firms.

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

        **C.**     **The Withholding Parties Have Not Carried Their Burden of Proving Communications With Accountants and Investment Advisors Are Privileged**[44]

55.      Communications with accountants and accounting firm personnel are generally not shielded by privilege. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) ("[N]o confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases.") (internal quotation marks and citation omitted). Thus, where the communication at issue "is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961). Likewise, communications with financial or investment advisors generally vitiate privilege claims. *See Ackert*, 169 F.3d at 139-40 (rejecting privilege claim over communications with investment banker, noting "the attorney-client privilege generally applies only to communications between the attorney and the client").

56.      This general rule holds true even where counsel is involved in communications with third parties like accountants and investment advisors. *See, e.g.*, *Ackert*, 169 F.3d at 139-40; *Summit Ltd. v. Levy*, 111 F.R.D. 40, 42 (S.D.N.Y. 1986). The presence of a non-lawyer still vitiates the privilege unless the non-lawyer acts like a translator, supplying analysis essential to counsel's rendition of legal advice. *See, e.g.*, *Kovel*, 296 F.2d at 922. It is not enough that the accountant's input is important to counsel's ultimate opinion. *See, e.g.*, *Ackert*, 169 F.3d at 139 ("[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client.") (citation omitted); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (communications with financial consultant not privileged without demonstration they were essential to attorney's legal advice).

---

[44] For the avoidance of doubt, the UCC does not intend to and is not seeking the disclosure of documents with investment bankers or financial advisers retained in connection with restructuring.

57.    The Withholding Parties' log entries are far too vague and conclusory to establish that financial professionals played any kind of role in the communication that would permit privilege to attach.[45]  Side A's Log includes descriptions such as "[p]roviding information for purpose of legal advice re: trusts and estates;" "personal transactions; "taxes;" and "investment/business transactions."  *See* Hurley Decl., Ex. A (Excel Tab E) at *e.g*., control nos. 1056, 9629, 14109.  Similarly, Side B's Logs list accountant communications regarding topics like "distribution(s);" "family estate;" and "potential transaction."  *See id*., Ex. B (Excel Tab C) at *e.g*., control nos. PS-00039030, PS-01582088, PS-00432170, PS-00649766.  The Debtors feature accountant and financial professional communications regarding "general corporate advice"; and "distributions or other transfers of assets from the Company."  *See id*., Ex. C (Excel Tab D) at *e.g*., control nos. PL-00002148, PL-00012070.

58.    Descriptions of this kind do not establish that the accountant was acting as an essential "translator" for a lawyer or otherwise justify withholding the associated communication. *See Kovel*, 296 F.2d at 922; *Universal Standard, Inc.*, 331 F.R.D. at 87-88.  Nor have the Withholding Parties provided or offered to provide any more details concerning the scope of the accountants' and investment advisors' services related to the withheld communications, despite the UCC's requests.    The Withholding Parties' observations that communications involving accountants and investment advisors *can* be privileged are not helpful, as they have failed to provide facts demonstrating that *the actual communications they withheld from production* are privileged.[46]  *See Aurora Loan Servs., Inc.*, 499 F. Supp. 2d at 479 ("The burden of establishing attorney-client or work product privilege is on the party asserting the respective privilege.").

---

[45] The entries involving accounting and financial professionals subject to challenge are identified in Exhibit A (Excel Tab E), Exhibit B (Excel Tab C), and Exhibit C (Excel Tab D) to Hurley Declaration for corresponding entries from Side A's, Side B's, and the Debtors' Logs, respectively.

[46] *See* Hurley Decl., Ex. 14 (Aug. 22, 2020 A. Lees Ltr. at 1-2); Ex. 16 (Aug. 23, 2020 J. Ball Ltr. at 3).

Likewise, the Debtors have asserted that an accountant's presence on an otherwise privileged communication does not waive privilege if that accountant is "assisting counsel in providing legal advice," but have not provided any evidence to demonstrate that the identified accountants were engaged in that function with respect to the specific documents identified on the Debtors' Logs.[47]

> **D.    Documents and Communications With Gardeners, Architects, Art Consultants, and a Panoply of Other Non-Lawyer Service Providers and Other Third Parties Must Also be Produced**

59.    In addition to withholding thousands of documents and communications copying public relations firms, accountants, and investment advisors, the withholding parties have improperly withheld 3,397 documents and communications with other kinds of service providers and third parties.  For Side A, these other third parties include architects, building and construction contractors/managers, gardeners, farm and estate managers, personal "friends" of various Sacklers, a chef and other restaurant employees, charity directors, and art consultants, *see* Hurley Decl., Ex. A (Excel Tab F); insurance brokers, *id.* (Excel Tab G); bankers, *id.* (Excel Tab H); real estate brokers, *id.* (Excel Tab I); co-investors and/or counterparties to transactions, *id.* (Excel Tab J); and a variety of consultants, *id.* (Excel Tab K).  The Debtors claim privilege over communications with lobbyists, Hurley Decl. Ex. C (Excel Tab E); consultants, *id.* (Excel Tab F); real estate firms, *id.* (Excel Tab G); non-Debtors' counsel including counsel for Purdue's employees and Mortimer Sackler's personal counsel, *id.* (Excel Tab H); non-affiliates of the Debtors, *id.* (Excel Tab I); bankers, *id.* (Excel Tab J); insurance brokers, *id.* (Excel Tab K); other third party participants such as security firms and non-affiliate pharmaceutical companies, *id.* (Excel Tab L); and participants whose role the Debtors have not identified at all, *id.* (Excel Tab M).[48]  Side B asserts privilege over

---

[47] *See* Hurley Decl., Ex. 21 (Sept. 8, 2020 J. McClammy Ltr. at 7).

[48] Despite the UCC's requests, the Debtors' Logs contain numerous entries including individuals for which the Debtors have not provided information concerning their roles and affiliations to allow the UCC to determine if these individuals are third parties that break privilege.  *See* Hurley Decl., Ex. 29 (Sept. 21, 2020 M. Hurley Ltr.).

its communications involving consultants, Hurley Decl. Ex. B (Excel Tab D); co-investors, *id.* (Excel Tab E); bankers, *id.* (Excel Tab F); real estate firms, *id.* (Excel Tab G); and other third parties, such as a recipient of a charitable donation and an individual who "assist[s] with identifying charitable opportunities," *id.* (Excel Tab H).

60.    In some cases, the Sacklers or the Debtors have claimed circumstances "could" exist that would permit an assertion of privilege over communications with such non-lawyer third parties. But, even if true, many more circumstances "could" exist that ***do not*** permit a privilege assertion with the above types of third parties. *Music Sales Corp. v. Morris,* No. 98 Civ. 9002 (SAS) (FM), 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999) ("The voluntary disclosure of privileged attorney-client communications to unrelated third parties typically constitutes a waiver of the privilege."); *see also Ackert*, 169 F.3d at 139-40 (banker); *Obeid v. Mack*, No. 14 Civ. 6498(LTS)(HBP), 2016 WL 7176653, at *8-9 (S.D.N.Y. Dec. 9, 2016) (investor); *866 E. 164th St., LLC v. Union Mut. Fire Ins. Co.*, No. 16-CV-03678(SN), 2016 WL 6901321, at *1 (S.D.N.Y. Nov. 23, 2016) (insurer); *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 591-92 (S.D.N.Y. 2015) (consultant); *In re Chevron Corp.,* 749 F. Supp. 2d 141, 165 (S.D.N.Y. 2010) (lawyer acting as lobbyist); *In re North Plaza, LLC*, 395 B.R. 113, 126 (S.D. Cal. July 25, 2008) (real estate broker); *Am. Ins. Co. v. Elgot Sales Corp.,* No. 97 CIV. 1327(RLC), 1998 WL 647206, at *2 (S.D.N.Y. Sept. 21, 1998) (insurance adjuster); *N. River Ins. Co. v. Columbia Cas. Co.,* No. 90 Civ. 2518 (MJL), 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995) (insurer and insured). Having failed to identify specific facts establishing the privileges claimed, these other third party documents must be produced or provided to the Court or a Special Master for review *in camera*.

## COMPLIANCE WITH RULES

61.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.

The UCC submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## NOTICE

62.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion.  The Official Committee respectfully submits that no further notice is required.

## NO PRIOR REQUEST

63.     No prior request for the relief sought in this Motion has been made.

## RESERVATION OF RIGHTS

64.     The UCC and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Motion, to seek additional discovery, add additional parties, or to raise additional grounds for granting this Motion during any reply briefing or hearing on the Motion.

## CONCLUSION

65.     For all the foregoing reasons, the UCC respectfully requests that the Court grant the Motion in its entirety, and enter an order requiring the Withholding Parties to (i) produce the Withheld Documents or (ii) provide the Withheld Documents to the Court, or to a Special Master appointed by the Court, for review *in camera* and production to the UCC to the extent deemed appropriate.  The NCSG supports the relief requested herein.

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

New York, New York                              AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  September 29, 2020


                                        By: /s/ *Mitchell P. Hurley*                        

                                            Ira S. Dizengoff
                                            Arik Preis
                                            Mitchell P. Hurley
                                            Joseph L. Sorkin
                                            Sara L. Brauner
                                            One Bryant Park
                                            New York, New York 10036
                                            Telephone: (212) 872-1000
                                            Facsimile: (212) 872-1002
                                            idizengoff@akingump.com
                                            apreis@akingump.com
                                            mhurley@akingump.com
                                            jsorkin@akingump.com
                                            sbrauner@akingump.com

                                            *Counsel to the Official Committee of Unsecured*
                                            *Creditors of Purdue Pharma, L.P., et al.*