**FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

19-23649-shl    Doc 2157    Filed 12/18/20    Entered 12/18/20 16:41:43    Main Document
Pg 1 of 48

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION
TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS,
OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME FRAUD,
AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 7

    A.    Even the Limited and Incomplete Information Now Available Is
        Compelling ................................................................................................ 7

    B.    Discovery Stipulations, Agreed Schedule, and Privilege Logs ............. 16

    C.    Critical Discovery from "IACs," Other II Way Entities, and NRF Remains ........ 18

ARGUMENT ............................................................................................................ 23

    A.    The UCC is Entitled to the Fiduciary Documents Under the "Good Cause"
        Exception to Privilege ............................................................................. 23

        (1)    Purdue's Creditors Are the Debtors' *Only* Stakeholders ........... 25

        (2)    The Estate Claims Under Investigation Are Colorable ............ 26

        (3)    The UCC's Need for the Documents Is Manifest .................... 31

        (4)    The Nature of the Documents Sought Also Counsels Disclosure ............. 33

    B.    The UCC Is Entitled to the Crime-Fraud Documents ........................... 33

        (1)    Probable Cause to Believe a Crime or Fraud Has Been Committed ........ 35

        (2)    Communications Reasonably Related to Fraud ........................ 37

    C.    The At-Issue Documents Should Also Be Produced ............................. 38

COMPLIANCE WITH RULES ............................................................................... 41

NOTICE .................................................................................................................... 41

NO PRIOR REQUEST ............................................................................................ 41

RESERVATION OF RIGHTS ................................................................................. 41

CONCLUSION ......................................................................................................... 41

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia
    Commc'ns. Corp.),*
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) .....................................................................26

*Amusement Indus. Inc. v. Stern,*
    293 F.R.D. 420 (S.D.N.Y. 2013) .............................................................34, 35, 37

*Arista Records LLC v. Lime Grp. LLC,*
    No. 06 CV 5936, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) .......................39, 40

*In re Bairnco Corp. Sec. Litig.,*
    148 F.R.D. 91 (S.D.N.Y. 1993) ............................................................................24

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.,*
    210 F.R.D. 506 (S.D.N.Y. 2002) .....................................................................39, 40

*Cendant Corp. v. Shelton,*
    246 F.R.D. 401 (D. Conn. 2007).............................................................................36

*In re China Med. Techs., Inc.,*
    539 B.R. 643 (S.D.N.Y. 2015) ...............................................................................23

*Clark v. United States,*
    289 U.S. 1 (1933) ..................................................................................................34

*Cohen v. Uniroyal, Inc.,*
    80 F.R.D. 480 (E.D. Pa. 1978) ...............................................................................26

*In re Dow Corning Corp.,*
    261 F.3d 280 (2d Cir. 2001)...................................................................................23

*Duttle v. Bandler & Kass,*
    127 F.R.D. 46 (S.D.N.Y. 1989) .............................................................................34

*Galaxy CSI, LLC v. Galaxy Comput. Servs., Inc. (In re: Galaxy
    Comput. Servs., Inc.),*
    No. 1:04-CV-00007, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004)..................33, 35

*Garner v. Wolfinbarger,*
    430 F.2d 1093 (5th Cir. 1970) ...................................................................... *passim*

*Geissal v. Moore Med. Corp.,*
    192 F.R.D. 620 (E.D. Mo. 2000) ...........................................................................24

*In re Grand Jury Proceedings*,
    219 F.3d 175 (2d Cir. 2000)..................................................................................39

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
    731 F.2d 1032 (2d Cir. 1984)..................................................................34, 35, 37

*Hartford Fire Ins. Co. v. CMC Constr. Co., Inc.*,
    No. 3:06-CV-11, 2010 WL 11520219 (E.D. Tenn. Apr. 20, 2010)........................40

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
    No. 92 C 9076, 1993 WL 760214 (S.D.N.Y. Nov. 30, 1993) .................................31

*Irving Tr. Co. v. Gomez*,
    100 F.R.D. 273 (S.D.N.Y. 1983) ............................................................................34

*In re McKesson Corp. Deriv. Litig.*,
    No. 17-cv-01850, 2018 WL 2197548 (N.D. Cal. May 14, 2018)...........................30

*Miller v. Schweickart*,
    405 F. Supp. 366 (S.D.N.Y. 1975) .........................................................................28

*Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*,
    342 B.R. 416 (S.D.N.Y. 2006)..................................................................24, 25, 33

*Official Comm. of Unsecured Creditors v. Bay Harbour Mater Ltd. (In re BH S &
    B Holdings, LLC)*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) .............................................................27, 32

*In re Pfizer Inc. S'holder Deriv. Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010)....................................................................30

*In re Pfizer Inc. Sec Litig.*,
    No. 90 Civ. 1260, 1993 WL 561125 (S.D.N.Y. Dec. 23, 1993)............................25

*Quintel Corp., N.V. v. Citibank, N.A.*,
    567 F. Supp. 1357 (S.D.N.Y. 1983)........................................................................24

*In re Richard Roe, Inc.*,
    68 F.3d 38 (2d Cir. 1995)........................................................................................35

*RMED Int'l., Inc. v. Sloan's Supermarkets, Inc.*,
    94 CIV. 5587PKLRLE, 2003 WL 41996 (S.D.N.Y. Jan. 6, 2003) ........................31

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
    319 F.R.D. 100 (S.D.N.Y. 2017) .......................................................................33, 35

*In re Tribune Co. Fraudulent Conv. Litig.*,
    No. 12 CV 2652 (DLC), 2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) .............28, 37

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ............................................................27, 37

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ....................................................................................23

*United States v. Zolin*,
    491 U.S. 554 (1989) ...................................................................................................34

*Univ. of Pa. v. Equal Emp't Opportunity Comm'n*,
    493 U.S. 182 (1990) ...................................................................................................23

*In re W.R. Grace & Co.*,
    281 B.R. 852 (Bankr. D. Del. 2002) .........................................................................27

**State Cases**

*Boxer v. Husky Oil Co.*,
    429 A.2d 995 (Del. Ch. 1981) ...................................................................................27

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) .................................................................................28

*Grimes v. DSC Commc'ns Corp.*,
    724 A.2d 561 (Del. Ch. 1998) ...................................................................................33

*Jones v. Mackey Price Thompson & Ostler*,
    469 P.3d 879 (Utah 2020) ....................................................................................27, 37

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) ............................................................................................24

*Ret. Fund v. AmerisourceBergen Corp.*,
    C.A. No. 2019-05470, 2020 WL 132752 (Del. Ch. Jan. 13 2020) ............................30, 31, 37

**Federal Statutes**

11 U.S.C. § 541 ......................................................................................................................27

11 U.S.C. § 548(b) .................................................................................................................28

18 U.S.C. § 371 ......................................................................................................................31

21 U.S.C. §§ 331, 333, 352, 353 ...........................................................................................31

42 U.S.C. § 1320a-7b(b) ........................................................................................................31

**FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

**State Statutes**

Del. Code Ann. § 17-1101(d) ............................................................................28

**Rules**

Fed. R. Bankr. P.  9014(c) .................................................................................1

Fed. R. Bankr. P. 9017 ....................................................................................23

Fed. R. Evid. 501 ............................................................................................23

Local Bankruptcy Rule 9013-1(a) ....................................................................41

**Other Authorities**

https://www.latimes.com/nation/la-xpm-2011-sep-17-la-me-drugs-epidemic-
20110918-story.html ...............................................................................15

Pursuant to applicable rules, including Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, and the Amended Stipulation and Agreed Order Regarding Discovery Deadlines and Briefing Scheduling in the Chapter 11 Cases [ECF No. 1730] (the "**Scheduling Stipulation**"), the Official Committee of Unsecured Creditors (the "**UCC**") of Purdue Pharma, L.P. ("**PPLP**") and its affiliated debtors and debtors-in-possession (collectively, "**Purdue**" or the "**Debtors**") files this Motion Based On Good Cause, Crime-Fraud, and At-Issue Exceptions to the Attorney-Client Privilege (the "**Motion**") seeking an order, substantially in the form submitted herewith, requiring each of the Debtors and the CSPs[2] (collectively the "**Withholding Parties**") to (i) produce documents that have been or may be withheld on purported privilege grounds within categories identified below (the "**Challenged Documents**") or (ii) provide the Challenged Documents to the Court, or to a special master appointed by the Court (a "**Special Master**"), for review *in camera* and production to the UCC to the extent deemed appropriate.[3]  The Ad Hoc Group of Non-Consenting States ("**NCSG**") supports the relief requested in this Motion.

## PRELIMINARY STATEMENT

1.       On May 10, 2007, Purdue and three of its key executives pled guilty to criminal conduct relating to their sale and marketing of OxyContin.  At the same time, an entity affiliated with Purdue, the source of most of the Sackler family's wealth, agreed to make a $634 million settlement payment to the U.S. government.

2.       On May 17, 2007, David Sackler, who would later describe himself as the person

---

[2] As defined in the Scheduling Stipulation, the CSPs include the Raymond Side (or "**Side B**") Initial Covered Sackler Persons and Additional Custodians, and the Mortimer Side (or "**Side A**") Covered Parties.  The CSPs are sometimes referred to herein simply as the "**Sacklers**" or, as applicable, the "**Side A Sacklers**" and the "**Side B Sacklers**."  Terms defined in the Scheduling Stipulation shall have the meanings ascribed to them there to the extent used but not defined in the Motion.

[3] The UCC has met and conferred with the Withholding Parties in a good faith effort to resolve by agreement the issues raised in this Motion without the intervention of the Court but the parties were unable to do so. *See* Hurley Decl. ¶ 3.

who "manage[s] the family fortune,"[4] wrote panicked emails to Purdue board members Richard

and Jonathan Sackler, his father and uncle, respectively:

> [A]sk yourself how long it will take these lawyers to figure out that we
> might settle with them if they can freeze our assets and threaten us.
>                                           ***
> [W]hat do you think is going on in these courtrooms right now?  We're
> rich?  For how long?  Until which suits get through to the family?

3.      A few months later, Peter Boer, a Purdue director, warned Richard and Jonathan

about Purdue's "uncapped liabilities."  Boer wrote a memo recommending that "the family"

protect its wealth through "overseas assets" and other "defensive measures" that would make the

Sacklers' wealth "less attractive to litigants."  In April of 2008, the Sacklers installed Mr. Boer on

Purdue's board, where he remains.  Thereafter, and continuing through 2016, Purdue distributed

unprecedented sums to and for the benefit of the Sacklers, hoping then and now that these sums

would be beyond the reach of Purdue's creditors.

4.      Between 2008 and 2012 alone, for example, Purdue transferred nearly $7 billion in

cash to or for the benefit of family trusts and foreign-based companies.  Through 2016, the total

cash distributions amounted to more than $10 billion,[5] along with at least another $1 billion in

other property (the "**Non-Cash Transfers**").  Virtually all of that vast wealth was moved into so-

called "spendthrift" trusts, many located in the Channel Islands, as well as to foreign "Independent

Associated Companies," or "IACs."  Remarkably, the Sacklers now actually tout the "defensive

measures" they took as having successfully placed their assets beyond the reach of Purdue's

creditors.

5.      The UCC is investigating valuable estate claims with the support and

encouragement of all of Purdue's creditors, and consistent with the cooperation stipulation agreed

---

[4] Hurley Decl., Ex. 57.

[5] A portion of the distributions was used to pay taxes owed by the Sacklers and their trusts.

to by the parties on July 17, 2020 and so ordered by the Court on July 31, 2020.  *See* Amended Stipulation and Agreed Order Among the Official Committee and Other Parties in Interest Regarding Discovery and the Sharing of Information in the Chapter 11 Cases [ECF No. 1543]. That investigation includes (i) whether Purdue's massive transfers of wealth to the Sacklers were the product of intentional or constructive fraud, and (ii) whether the Sacklers and other board members breached their fiduciary duties to Purdue in connection with such transfers and otherwise.

6.    Evidence of the knowledge, beliefs, and motivations of Purdue and the Sacklers in connection with the opioid crisis, the liability risk it posed, and the steps the Sacklers took to transfer value away from Purdue's creditors and to themselves are questions of obvious importance to these claims.  Review of documents that the Debtors, the Sacklers and the so-called IACs and Other II Way Entities[6] have thus far agreed to produce is still underway, and will not be complete for some weeks.  But already, strong evidence in support of the estate claims has emerged, as discussed in the Background section below, and the UCC expects more will be discovered.

7.    The Debtors and the Sacklers, however, are withholding nearly 400,000 documents responsive to the UCC's requests on grounds of alleged privilege.  It is virtually certain that much of the most probative evidence of Purdue's and the Sacklers' knowledge and motivations— "what they knew and when they knew it"—will be found among these materials to which only the Debtors and the Sacklers have access or familiarity.[7]  As demonstrated in the other privilege motion the UCC filed today, many of these documents simply are not privileged in the first place, and suggest a troubling desire by the Debtors and the Sacklers to hold back great swaths of information

---

[6] "**Other II Way Entities**" are "all entities jointly owned or controlled, directly or indirectly, by the two sides of the Sackler family that are not IACs."  [ECF No. 1340] ¶ 2.

[7] The UCC brings this Motion now based on the Court's direction at the July 23, 2020 omnibus hearing to surface privilege disputes promptly, and anticipates renewing aspects of the Motion as documents and logs continue to be produced.  For instance, at this time, neither the IACs nor the Other II Way Entities have yet delivered privilege logs, and their productions are weeks away from scheduled completion.

that is by definition responsive to requests propounded by the UCC and others.

8.    The information asymmetry created by withholding reams of relevant documents from the UCC is particularly problematic in light of the soon-to-be scheduled mediation with the Sacklers.  The UCC and the NCSG cannot adequately evaluate the settlement framework[8] favored by the Debtors and the Sacklers, or prepare for and participate in negotiations that could lead to unprecedented third-party releases, without first gaining access to these critical documents.  The Sacklers themselves recognized this dynamic in a letter to the NSCG just days ago, arguing that "fairness demands" that they have access in mediation to "the same information available to all other parties."

9.    The Court can end this informational asymmetry and enhance and likely expedite the UCC's investigation by enforcing three established exceptions to privilege:

(i) the *good cause exception* provides stakeholder beneficiaries with access to privileged communications initially procured by their fiduciaries;

(ii) the *crime-fraud exception* recognizes that communications made in furtherance of a fraudulent objective cannot properly be withheld from disclosure as privileged; and

(iii) the *at-issue exception* prevents parties from making factual claims, the truth of which only can be assessed by examination of privileged communications.

10.    All three exceptions are operative here.  The UCC is the only fiduciary in these proceedings whose sole job is to maximize value for unsecured creditors—Purdue's only stakeholders—and has an overwhelming interest in gaining access to privileged communications that could conclusively establish key elements of the estates' claims.  Denying that access, in contrast, benefits only the Sacklers (and, perhaps, past and present non-Sackler executives and board members of Purdue, many of whom also face claims and are proposed to receive releases).  Good cause therefore exists to provide Purdue's creditors with access to the Debtors' otherwise

---

[8] As referenced in the October 8, 2019 term sheet [ECF NO. 257] (the "**Settlement Framework**").

privileged material.

11.    Regarding the crime-fraud exception, more than sufficient evidence already has been adduced to make the necessary showing of "probable cause," both in connection with Purdue's extraordinary post-2007 transfers to the Sacklers, the trusts and the "IACs," and the board's alleged breaches of fiduciary duty.  Privileged communications "reasonably related" to that conduct must be produced.  And by putting their alleged good faith and knowledge directly at issue—including by denying that they could have known Purdue might face "meaningful litigation" before 2017—the Sacklers must now disclose privileged communications that may further demonstrate the falsity of that assertion.

12.    The privilege logs the Debtors and the Sacklers have produced to date do not provide sufficient information concerning the withheld documents to permit the UCC, or any other reader, to identify with certainty all the documents that should be produced pursuant to this Motion on an entry-by-entry basis.  The UCC therefore asks the Court to order production, or *in camera* review by the Court or a Special Master, of documents from January 1, 2006 forward that come within the categories identified in detail in Exhibit 101 to the accompanying Declaration of Mitchell Hurley dated September 29, 2020 ("**Hurley Decl.**"), and summarized below:

1. **Good Cause Exception (Privilege Claims Belonging to the Debtors)**. Privileged documents concerning (a) the Debtors' financial condition or awareness of same, (b) knowledge of actual or potential opioid claims, investigations or damages, (c) Purdue's attempts to insure opioid related claims, (d) whether or not to make cash or non-cash transfers to or for the Sacklers, (e) litigation risk after the 2007 settlement, (f) value received for non-cash transfers, (g) whistleblower activity relating to opioids, and (h) the liability risks of various types of transfers (as more fully defined on page 1 of Exhibit 101 to the Hurley Decl., the "**Fiduciary Documents**");

2. **Crime Fraud Exception (Privilege Claims Belonging to the Sacklers or the Debtors)**. Documents concerning (a) asset protection or estate planning measures relating to the Sacklers' or Purdue's liability, (b) fraudulent transfer risk relating to transfers, (c) ability of litigants to collect on judgments against Purdue, the Sacklers, their trusts and other affiliates, (d) exposure to liability

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

19-23649-shl    Doc 2157    Filed 12/18/20    Entered 12/18/20 16:41:43    Main Document
Pg 12 of 48

for breaches of fiduciary duty and other misconduct, and any efforts to conceal such misconduct or breaches of duty, (e) formation and administration of the Sacklers' trusts, (f) steps to avoid liability relating to distributions, or (g) non-cash transfers to or for the benefit of the Sacklers (as more fully defined on page 2 of Exhibit 101 to the Hurley Decl., the "**Crime Fraud Documents**"); and

3. **At Issue Exception (Privilege Claims Belonging to the Sacklers)**. Documents concerning (a) the Sacklers' claim that the board had a "good faith" belief that Purdue's opioid practices were legally compliant, (b) the claim that no one feared Purdue could "face meaningful litigation until 2017," and (c) any claimed good faith belief or reliance on counsel concerning propriety of cash and non-cash transfers (as more fully defined on page 3 of Exhibit 101 to the Hurley Decl., the "**At Issue Documents**").[9]

13.    Given the sheer number of documents the Debtors and the Sacklers have withheld to date, ensuring that all responsive documents subject to these exceptions are made available to the creditors and the Court will be painstaking work.  From the perspective of the UCC and the creditor parties whose interests it represents, however, that effort is not only justified, it is essential. Significantly, a settlement simply may not be possible without substantial additional transparency from Purdue and the Sacklers.

14.    Of equal importance, these cases present unique issues of public health, equity, and justice, and it is no exaggeration to say that the eyes of the nation are watching.  The relief sought by the UCC will help pull back the veil of secrecy that has long obscured the affairs of Purdue and the Sacklers relating to the opioid crisis and their roles in it, and do much to bolster the legitimacy of any plan that may emerge from these cases.  The UCC respectfully submits that the Motion should therefore be granted, which request is joined by the NCSG.

---

[9] In addition to defining the categories, the UCC has sought to identify non-exhaustive, illustrative lists of Challenged Documents that it believes may fit within these categories.  Hurley Decl., Ex. A (Excel Tabs L-M), Ex. B (Excel Tabs J-K), Ex. C (Excel Tabs N-O).  As noted, however, the UCC cannot identify those documents with certainty, and must rely on the withholding parties to supply the associated documents for production, or *in camera* review, as the Court may order.  The UCC reserves the right to seek documents in additional or different categories, including based on information that may be produced as a result of the Motion.

**FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

## BACKGROUND

15.    As discussed below, document discovery from the Debtors and the Sacklers is proceeding on the schedule and in the manner that those parties specifically agreed last summer, pursuant to stipulations so-ordered by the Court.  That discovery is not yet complete, however, and critical discovery from so-called "IACs," Other II Way Entities, and Norton Rose Fulbright ("**NRF**") is far from complete.  Nevertheless, the UCC already has uncovered information that supports both key estate claims and the relief sought by this Motion.

A.    **Even the Limited and Incomplete Information Now Available Is Compelling**

16.    While much discovery remains, strong evidence already has begun to emerge that supports the estates' fraudulent conveyance, breach of fiduciary duty, and other claims, and militates in favor of requiring the Debtors and the Sacklers to produce documents currently concealed from Purdue's creditors on privilege grounds.[10]

17.    For example, the Sacklers claim that the massive transfers they caused Purdue to make between 2007 and 2016 could not have been motivated by a desire to hinder or delay creditors because, supposedly, no one would have believed Purdue could "face meaningful litigation until 2017."  Hurley Decl., Ex. 58 (Dec. 6, 2019 presentation by Joseph Hage Aaronson LLC, on behalf of the Side B - Raymond-side Sacklers entitled "*In Re: Purdue Pharma L.P., et al.*: Presentation of Defenses: Pursuant to November 5, 2019 Amended Stipulation ¶ 17(b) (ECF No. 431) at 488.  The actual evidence contradicts the Sacklers' defense, however.

18.    The board certainly knew "meaningful litigation" was likely when Purdue gave a batch notice of OxyContin claims to its carriers under a 2001 Bermuda form tower.  And indeed, the UCC understands that Purdue has submitted or will submit claims in excess of the billion-

---

[10] The facts set forth herein should not be read as the complete set of facts upon which a complaint would be based; rather, they are set forth herein *solely* for purposes of establishing the predicate necessary to grant this Motion.

19-23649-shl    Doc 2157    Filed 12/18/20    Entered 12/18/20 16:41:43    Main Document
Pg 14 of 48

dollar limits of that tower.  Purdue also repeatedly sought to replace the Bermuda "products hazard" insurance, as it reported at least seven times between 2008 and 2014, and the Sacklers took notice.  In 2010, for example, Purdue's CFO reported to the board that "Jon Sackler asked that we explore buying true risk transfer product liability insurance."  The CFO replied that coverage was unlikely at least until the new "tamper resistant" version of OxyContin was approved.  Hurley Decl., Ex. 59 at 875, 877.  Kathe Sackler urged Purdue's CFO to "include at the next meeting an update on insurance" and how Purdue could access "going forward insurance options sooner," rather than addressing insurance with "the Board three months after product approval."  *Id.* at 875-76.  But neither the introduction of tamper resistant OxyContin nor Purdue's annual efforts with their insurance brokers ever yielded the coverage the board sought.  As Purdue reported simply in 2012:  "U.S. product liability [products hazard] insurance is not available in the U.S. for OxyContin."  Hurley Decl., Ex. 60 at 2.[11]  Hence, the Sacklers' own wealth remained exposed to OxyContin claims, at least to the extent it was left in Purdue and not covered by pre-existing insurance.

19.    But even more direct evidence rebuts the Sacklers' denial that they feared litigation risk prior to 2017.  For example, in November 2006, about one month after Purdue reached an "agreement in principle" with the federal government to pay $634 million in settlement of opioid-related claims, *e.g.*, Hurley Decl., Ex. 61 at 3, Jonathan Sackler prepared a memo for his brother and fellow-board member, Richard.  Notwithstanding the recently agreed settlements, Jonathan worried about the family's "pharma issues," including that the industry had been "enshrined as a permanent whipping boy for politicians, regulators and the bar."  He cautioned that "[g]etting

---

[11] Regardless of whether Purdue's assessment of the availability of coverage for opioid claims was correct—and the UCC does not concede that it was—the fact is that the Sacklers were provided with that assessment repeatedly during the relevant period of time.

caught in the crossfire of the 'war on drugs' is obviously a huge risk" and that the family needed

to consider "if we have the stomach for that kind of volatility."  The memo noted that despite the

DOJ settlement in principle, "contingent liabilities continue to hover over the business" and

emphasized the need to "maximize[e] free cash."[12]

20.    The Sacklers' concerns about liability related to the opioid crisis did not abate after

the settlement was filed in the Western District of Virginia on May 10, 2007.  Just three days later,

Richard Sackler emailed a friend that "[t]he equating of marketing OxyContin with 'drug pushing'

is … very threatening . . . .  Frankly, I don't know what to do.  I'm not confident that this is

something that will blow over.  My sense is that it may get a lot worse in the coming weeks."[13]

21.    On May 17, 2007, David Sackler wrote the email cited above.  In it, David

recommended to Richard and Jonathan that the family use its "leverage now" to get cash "while

we can," rather "than thinking it will be there for us when we get sued."  Hurley Decl., Ex. 64.

David went on:

> [W]e're living in America.  This is the land of the free and the home of the
> blameless.  **We will be sued**.  Read the op ed stuff in these local papers and **ask
> yourself how long it will take these lawyers to figure out that we might settle with
> them if they can freeze our assets and threaten us**.

*Id.* (emphasis added).  At his deposition, David said he thought he was worrying in his email about

the risk that "the family would be sued in connection with Purdue's sale of OxyContin."  Hurley

Decl., Ex. 43 (David Sackler Dep. Aug. 28, 2020, 188).  He also acknowledged that by referring

to America as the "land of the blameless," he may have been suggesting that opioid victims would

blame the Sacklers for their addiction to OxyContin, rather than blame themselves.  *Id.* at 188-

---

[12] Hurley Decl., Ex. 62 (2006-11-20 email from Jonathan Sackler).
[13] Hurley Decl., Ex. 63 (2007-05-13 email from Richard Sackler).

89.[14]

22.    In June 2007, David would confess that Purdue had provided "enough of a rough ride over the last 10 years" and that he wanted out of the pharmaceutical business entirely.  Hurley Decl., Ex. 66.  Mortimer Sackler, a Purdue board member from the "other side" of the Sackler family—Side A—would soon express his agreement.  As Mortimer put it an email to Richard—a Side B Sackler— "[f]undamentally we don't want to stay in this business anymore (given the horrible risks, outlooks, difficulties, etc.) and I think the majority of your family feels the same way." Hurley Decl., Ex. 67.

23.    But selling Purdue would not be easy.  David himself worried in June 2007 that Purdue's "future liabilities" could "decimate" a prospective merger partner's stock price and interfere with a potential transaction.  Hurley Decl., Ex. 68 at PWG004474000.  David's concern that opioid liability could interfere with the family's ability to exit the business through a sale was reinforced in a memo Peter Boer provided to Jonathan Sackler and Richard Sackler on July 26, 2007.  Mr. Boer, a family advisor and current Purdue director, addressed "the family's desire to separate themselves from the unpleasantness and unfairness of the past two years," apparently through a sale.  Hurley Decl., Ex. 69 (the "**Boer Memo**") at PPLPUCC9000491386.  Though not a director at the time, Mr. Boer became a director after sending the Boer Memo.

24.    Mr. Boer warned the Sacklers, however, that due to the "uncapped nature" of Purdue's opioid-related liabilities, it might not be possible to find a buyer willing to make a bid that the Sacklers would consider accepting.  Touting his experience as an executive at W.R.

---

[14] Just two months before David sent his nervous email, Richard had sought to add David to the "boards of directors." However, the Sacklers' long-time confidante Stuart Baker advised that it "would be a mistake for David to be joining the Boards of Directors at this time."  Baker noted, however, that if Richard insisted, the boards of certain foreign IACs would be "the least sensitive."  Hurley Decl., Ex. 65.  Ultimately, Richard waited to install David on the board until 2012, when the five year corporate integrity agreement required in connection with the 2007 settlements ended.

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

19-23649-shl    Doc 2157    Filed 12/18/20    Entered 12/18/20 16:41:43    Main Document
Pg 17 of 48

Grace—another entity that declared bankruptcy in the face of massive tort liability—Boer cautioned that "perceptions of deep pockets hugely affect litigants' strategy." "For the family," Boer advised, "*it may be that overseas assets with limited transparency and jurisdictional shielding from U.S. judgments will be less attractive to litigants than domestic assets. . . . I presume the family has taken most of the appropriate defensive measures*." *Id.* In August 2007, "the next wave of civil litigation (eventually including third party payers, Kentucky Attorney General, class actions, mass actions, individual actions)" was filed. *See* Hurley Decl., Ex. 61 at PPLPC012000372436-37 (timeline prepared by Purdue in 2012 at the request of Richard Sackler).

25.     In April 2008, the Sacklers made Mr. Boer a member of Purdue's board. Practically on Boer's very first day as a Purdue director, Richard Sackler circulated a draft memo he and Boer apparently jointly authored, in which they lamented Purdue's "dangerous concentration of risk," and advised other Sackler family members that "the most certain way for the owners to diversify their risk is to distribute more free cash flow to themselves." Hurley Decl., Ex. 70 at 1 (memorandum from Peter Boer to Richard Sackler observing that "[i]n the event that a favorable deal cannot be structured during 2008, the most certain way for the owners to diversify their risk is to distribute more free cash flow to themselves if they cannot purchase diversifying assets"). Purdue then embarked on a series of transfers remarkably consistent with the plan laid out in the Boer memo in July 2007.

26.     The post-settlement cash transfers to and for the Sacklers' trusts and entities abroad represented an exponential increase from prior year distributions, in absolute terms, and as a percentage of Purdue's annual revenue, as illustrated in the chart below:



27.     In addition to the cash transfers, during the same period Purdue distributed property to or for the benefit of the Sackler family for less than reasonably equivalent value. *See, e.g.*, AlixPartners Non-Cash Report [ECF No. 1194] at 39, 50, 54, 56, 360. The UCC estimates the value of these Non-Cash Transfers to be more than $1 billion.

28.     Side B may argue that it opposed making large distributions from Purdue to the family trusts, at least in later years. But the Shareholders' Agreement for Purdue Pharma Inc. ("**PPI**"), the general partner of PPLP, specifically forbade distributions to shareholders absent a majority vote of *both* Side A and Side B during the relevant time period. *See* Hurley Decl., Ex. 106 (March 4, 2003 Shareholders' Agreement (Purdue Pharma Inc.)) § 1(a)(i)(2)(iv)-(vi) ("All actions by the Board of Directors of PPI shall be approved by the vote of each class of Directors, as follows: (a) a majority of the Class A Directors present at a meeting of the Board of Directors (the 'Class A Voting Requirements'), and (b) a majority of the Class B Directors then in office; provided, however, that if two Class B Directors are then in office, two Class B Directors (the 'Class B Voting Requirements')."); Hurley Decl., Ex. 107 at PPLPUCC500647328 (Schedule 1

("Restated Certificate of Incorporation of Purdue Pharma Inc.") to Minutes of a March 4, 2003 Meeting of the Board of Directors of Purdue Pharma Inc.). Hence, as David Sackler acknowledged at his deposition, none of the billions of dollars in distributions paid out to the Sacklers over the years would have been possible without the express consent of Side B, making Side B's arguments hollow. Hurley Decl., Ex. 43 (D. Sackler Dep. 379:6-380:3).

29. Notably, the lion's share of the cash distributions made to hinder, delay, or defraud creditors—nearly $7 billion—occurred between 2008 and 2012. *See* AlixPartners Cash Report [ECF No. 654-1] at 11. During those years, the two sides of the family appeared to be united in their desire to "take meaningful dollars off the table," and discussed a variety of means for achieving that goal. Hurley Decl., Ex. 71 at PPLPC042000011919. In 2008, for example, David and Richard appeared to favor a "leveraged recapitalization" as a way to "take meaningful dollars out of our equity in Purdue," but Jonathan balked at the prospect of keeping a large amount of borrowed cash on Purdue's balance sheet. He observed that if "Purdue had been carrying a billion dollars of debt" during the period of the DOJ investigation, "the family would have coughed it up . . . [i]t would have been a financial disaster." *Id.* at PPLPC042000011916. Instead "Jon [Side B] likes his plan which is Mortimer's [Side A] plan to get on with selling the business." *Id.* at PPLPC042000011911.

30. The Sacklers appear to have explored sale transactions in vain for some period, and did not agree on a leveraged recapitalization. Instead, they proceeded to simply distribute the value of Purdue to themselves and away from Purdue's creditors in astonishing and unprecedented sums. True to the strategy referenced in the 2007 Boer Memo, the transfers were accomplished using a network of Sackler-owned companies and more than 100 trusts, many of which are based overseas.

13

31.     Incredibly, in these cases, the Sacklers actually tout that structure—recommended by Boer—as a "significant obstacle" to recovery by Purdue's creditors.  The Sacklers' boast in their defense presentations that a significant portion of Sackler family assets are "located outside the U.S. and held for the benefit of family members who are not subject to the jurisdiction of U.S. courts," and that "the IACS are … foreign entities held by foreign trusts for the benefit of the shareholders."  Hurley Decl., Ex. 72 (December 6, 2019 presentation by Debevoise & Plimpton, on behalf of the Side A - Mortimer-side Sacklers entitled "Presentation of Defenses ('Side A'): Pursuant to November 5, 2019 Amended Stipulation ¶ 17(b) (ECF No. 431)) at 71.  According to the Sacklers, by structuring their assets in a manner consistent with the Boer Memo, their wealth is largely beyond the "reach" of "creditors" of Purdue and the individual Sackler beneficiaries due to their network of trusts.  *Id*. at 72.

32.     To be sure, the Sacklers appeared to be more careful about putting their concerns about opioid liability in writing as the years went on, apparently avoiding email for sensitive matters, and relying on encryption where available, or the presence of lawyers to shield discovery. *See, e.g.*, Hurley Decl., Ex. 73 (Whatsapp chat on 10/10/2017 regarding negative press where Samantha Sackler Hunt states, "Happy to discuss. Think better in person or on text than by long email chains. Please do not include me in email chains. Especially if no lawyer on chain."); Hurley Decl., Ex. 74 (Whatsapp chats from 2017 to 2019 regarding negative press where Mortimer D.A. Sackler states "I really think there is too much email on all of this. Best not to write emails and to restrict to discussions on the phone when possible," and "I thought we had agreed no more email on this subject? Would have been better to send all that summary via this chat," and Samantha Sackler Hunt states "…What's App group chats are not at all encrypted. Only person to person are. FYI"); Hurley Decl., Ex. 108 (12/4/15 email from Kathe Sackler stating: "all internal

communications between AF and C&P and/or McG on tax matters related to Tax Notices or Audits are to be handled by telephone NOT BY EMAIL . . . . [u]nder no circumstances should Email be used for such communications with tax agencies, unless specifically approved by Les Schreyer."), Hurley Decl., Ex. 76 (email on 3/6/2015 discussing a problematic medical practice where Phil Cramer writes "We can discuss offline" to which Kimberly Meyers responds "Offline, foreshadowing…….overwhelming"), Hurley Decl., Ex. 77 (email chain on 10/20/2017 regarding press strategy where Mortimer Sackler states "we should discuss the below on the phone not on email").

33.    But there can be no doubt the Sacklers remained aware of the litigation threat throughout the period the transfers were being made to hinder and delay creditors.  As discussed above, Purdue reported regularly that it was unable to get products (hazard) insurance to cover OxyContin, including, at least, in 2008, 2010, 2011, 2012, 2013, 2014 and 2018, leaving Purdue exposed to OxyContin liability that might otherwise have been set off by new products hazard coverage.  *See, e.g.*, Hurley Decl., Ex. 78 at PWG004497897; Hurley Decl., Ex. 59 at PPLPC012000259875, 877; Hurley Decl., Ex. 79 at PWG004463777-78; Hurley Decl., Ex. 60; Hurley Decl., Exs. 80-82.  The drumbeat of reporting on the opioid crisis also continued throughout the period, including the vast financial harm it inflicted.  *See, e.g*., Sept. 17, 2011, *LA Times*, "Drug deaths now outnumber traffic fatalities in U.S., data show," https://www.latimes.com/nation/la-xpm-2011-sep-17-la-me-drugs-epidemic-20110918-story.html.

34.    In May 2012, David Sackler forwarded to his father a copy of a letter Purdue received from United States Senate Finance Committee in connection with its investigation of pharmaceutical company marketing practices. Hurley Decl., Ex. 83 at RSF00679318-23.  The Finance Committee letter sought documents from Purdue concerning its marketing and promotion

of opioids dating back to 1997, and included data concerning the astonishing personal and financial

cost of the opioid crisis. And in a "4Q2012 Compliance Report to the Board of Directors" dated

in January of 2013, Purdue's chief compliance officer warned that government agencies "continue

to focus" on the pharmaceutical industry, that the value of settlements was on the rise, and that

"incarceration [is] more likely." Hurley Decl., Ex. 84 at PPLPUCC001456443. Similar reports

were made to the board in 2014 and 2015. *E.g.*, Hurley Decl., Ex. 85 at PPLP004411166–176

(1Q2014 Quarterly Compliance Report to Board of Directors); Hurley Decl., Ex. 86 at

PPLP004412071–075 (1Q2015 Quarterly Compliance Report to Board of Directors). As

discussed in the Argument section below, these facts are more than sufficient to establish the

"probable cause" necessary to justify disclosure of related privileged documents based on the

crime-fraud exceptions, and support the UCC's "at-issue" waiver argument as well.

35.      Breach of fiduciary duty allegations also can justify application of the crime-fraud

exception. Purdue's "primary liability" for its conduct in connection with the opioid crisis is

relevant to the estates' breach of fiduciary duty and other claims and, as discussed below, the UCC

has been limited in its attempts in these cases to take new primary liability discovery. Nevertheless,

a more than credible basis exists to believe that the board may have breached its fiduciary duties,

including based on claims made and evidence adduced pre-petition in the MDL, as discussed in

more detail in the Argument section below. The categories of documents sought pursuant to the

Motion are summarized in the Preliminary Statement, and detailed in Exhibit 101 to the Hurley

Declaration.

**B.      Discovery Stipulations, Agreed Schedule, and Privilege Logs**

36.      During recent hearings and Court conferences, the Debtors and the Sacklers have

expressed substantial discontent at the scope of discovery the UCC is undertaking. Discovery

already has illuminated important facts previously unknown to creditors, however, and the UCC

submits its completion is critical.   Moreover, the overwhelming majority of the document

disclosures currently underway by the Sacklers and the Debtors were specifically agreed to by

those parties in stipulations that they negotiated over the course of weeks, and that were submitted

to and "so-ordered" by the Court.   *See, e.g.*, ECF No. 1295 (June 22, 2020 notice attaching

stipulations among UCC, Sacklers, and IACs); ECF No. 1623 (stipulation among Debtors, UCC,

and NCSG regarding document discovery).   When the Sacklers and the Debtors signed the

stipulations, they knew the precise number of documents that they were agreeing to review for

most custodians based on search terms they negotiated with the UCC and "hit reports" identifying

the number of documents returned by the agreed search criteria.[15]

37.     The current schedule for completion of document discovery by the Sacklers and the

Debtors is also consistent with the stipulations they entered over the summer, and that the Debtors

recently reaffirmed.   *See Amended Stipulation and Agreed Order Regarding Discovery Deadlines

and Briefing Scheduling in the Chapter 11 Cases* [ECF No. 1734].   At the Court's urging, the UCC

and other creditors have sought to accelerate depositions (and this Motion) in an effort to complete

discovery as expeditiously as is reasonably possible under the circumstances.[16]

38.     Regarding this Motion, the UCC has long foreshadowed its view that privilege

challenges could be among the most important litigated issues in these cases.   In the stipulations,

the UCC carefully bargained for privilege logs to be produced on a rolling basis so that the

disclosing parties could not wait until all document discovery was finished before identifying

---

[15] The Sacklers "ACSP" custodians were the exception; the Sacklers had not yet run hit reports for those custodians,
so the stipulations provided an agreed upper limit on the number of documents subject to production without further
Court intervention.   In each case, however, the UCC's search terms actually returned substantially *fewer* ACSP
documents than the upper limit in the Stipulations.

[16] In the eight business days since the September 17, 2020 court conference concerning mediation, at least four
witnesses have contacted the UCC to cancel or delay until November depositions that previously had been scheduled
or requested in September and October.

allegedly privileged documents (the Sacklers' preferred approach).  The UCC anticipated that the

Debtors, the Sacklers, and others might produce lengthy and complex privilege logs, and was

determined to ensure the parties and the Court had enough time to process those logs and address

appropriate challenges.

39.    The UCC's forecast turned out to be accurate.  The final Sackler log is not due until

October 22, 2020, but between the Sacklers and the Debtors, just under 250,000 documents have

already been identified that were returned by search terms agreed under the stipulations, but not

produced to the UCC based on a claim of privilege.  Additionally, the Debtors withheld another

135,000 documents from their productions in pre-petition litigation.  Final logs from the IACs and

others are not due to be produced until October.[17]

## C.    Critical Discovery from "IACs," Other II Way Entities, and NRF Remains

40.    The UCC and its constituents continue to believe that it is important to conduct

necessary diligence before any serious discussion can be had regarding what the appropriate price

is that the Sacklers will have to pay for their requested releases.  Among other things, based on

facts it has learned in the course of its investigation, the UCC believes discovery from the "IACs,"

so-called Other II Way Entities, and NRF is essential.  Although this brief does not seek relief

regarding the items set forth in this section, it is important for the Court to understand both that

much more needs to be done, and how the UCC may need to come back before the Court with

additional privilege arguments regarding the IACs.

41.    First, the record now indicates that *Purdue itself is an IAC*.  The separation between

Purdue and the "Mundipharma" IACs identified in these cases appears to be artificial. *See, e.g.*,

---

[17] As noted elsewhere, the UCC may need to return to the Court for additional relief after additional logs are produced
by the disclosing parties and reviewed and considered by the UCC, and does not currently challenge entries on the
pre-petitions logs, but reserves its right to do so in the future.

ECF No. 518 at 3, 20 (amended stipulation defining IACs as "ex-U.S. pharmaceutical entities …
owned or controlled by any Shareholder Party"). Indeed, documents ranging from 1991 all the
way up to 2017 describe Purdue as an IAC. *E.g.* Hurley Decl., Ex. 102 (June 22, 2017 press release
describing Purdue as "a privately held pharmaceutical company [that] is part of a global network
of independent associated companies"); Hurley Decl., Ex. 88 at PPLP004417344 (June 7, 2013
board decision identifying Purdue as a "U.S. independent associated company"); Hurley Decl.,
Ex. 87 (1991 Sackler family distribution agreement listing Purdue among "II Way Companies"
alongside the international "Mundipharma" entities).

42.     Until 2019, an entity called MNP Consulting ("**MNP**") was the advisory board for
the IACs. MNP's board at all times was composed solely of directors who were members of the
Sackler family, or their designees. Hurley Decl., Ex. 109. In general, the same persons who served
as MNP directors also served as directors of Purdue. *Compare* Hurley Decl., Ex. 50 (PPI), *with*
Hurley Decl., Ex. 109 (MNP Consulting Limited). From time to time, MNP would issue to Purdue
what it sometimes called "recommendations," and sometimes simply called "decisions." *See, e.g.*,
Hurley Decl., Ex. 99 (April 14, 2009 Decision re "Funding—Rhodes Pharmaceuticals L.P.").
Among other things, MNP directed Purdue to make distributions to the Sacklers and their affiliates.
Hurley Decl., Ex. 100 (April 1, 2010 Decision re "Purdue Pharma L.P. —2Q 2010 Distribution").
To date, the UCC has deposed three current and/or former MNP directors, and none could
remember a single instance of any IAC refusing to follow a "recommendation" given by MNP, or
identify a single example, large or small, of such a refusal. *See* Hurley Decl., Ex. 47 (Theresa
Sackler Dep. Sept. 23, 2020, 63:25–65:16); Hurley Decl., Ex. 43 (D. Sackler Dep. 86:20–87:10);
Hurley Decl., Ex. 46 (Ilene Sackler Dep. Sept. 18, 2020, 91:18–92:7). Purdue also appears to have
been a primary funding source for other IACs that did "not generate sufficient income to cover all

19

of their expenses." *See, e.g.*, Hurley Decl., Ex. 89 (describing IACs that "historically have been funded by Purdue Pharma L.P. (US)").

43.     Ongoing IAC discovery therefore is necessary to understand how and why decisions were made concerning Purdue's affairs, including its cash distributions to the Sacklers, and the degree to which the IACs and their value can (or should) be separated from Purdue in these cases.  In addition, ex-U.S. IACs and Other II Way Entities were the subject, or recipients, of Purdue non-cash transfers in exchange for what appears to be less than reasonably equivalent value.  The UCC has been seeking discovery for months from those entities in an effort to investigate the circumstances of suspicious transactions between Purdue and other Sackler-owned entities.

44.     While the UCC's review of such transactions is ongoing (and has indeed been stymied time after time in these cases), it has identified the following problematic non-cash transfers, among others:

    a.     Royalties from international sales of OxyContin by the IACs:  PPLP has historically licensed OxyContin to IACs in return for a modest royalty. Preliminary analysis indicates the royalty values paid to Purdue were far below market, resulting in substantial value transferred from PPLP to the IACs.  *See AlixPartners Non-Cash Report* [ECF No. 1194] at 39.

    b.     Transfer of non-ADF OxyContin IP rights from PPLP to PRA LP: PPLP launched an abuse deterrent formulation (ADF) of OxyContin in 2010 and pulled the non-ADF version from the market in the US. However, PPLP continued to collect royalties from the IACs' international sales of non-ADF OxyContin until January 1, 2017, when PPLP transferred the IP rights of non-ADF OxyContin to PRA for no consideration via a series of Assignment and Assumption Agreements.  *See AlixPartners Non-Cash Report* [ECF No. 1194] at 56.  To this day, the IACs pay PRA royalties for non-ADF sales abroad.

    c.     Transfer of PPLP's equity interest in Infinity Pharmaceuticals Inc. to PRA LP: Infinity is a publicly traded biopharma company.  PPLP owned shares in Infinity, which it transferred for no consideration to PRA LP in 2008, 2009, and 2013.  The market price of the shares totaled approximately $263.1 million at the time of the transfers.  *See AlixPartners Non-Cash*

*Report* [ECF No. 1194] at 50. On April 16, 2013, Beacon Co. and Rosebay Medical Co. L.P. each sold 5,708,282 shares of Infinity for proceeds of $438.4 million. *See* Hurley Decl., Ex. 104 (Apr. 16, 2013 Beacon SEC Form 4); Hurley Decl., Ex. 105 (Apr. 16, 2013 Rosebay Medical SEC Form 4).

    d.    <u>Transfer of PPLP's equity interest in Lucien Holdings Sarl to PRA LP</u>: Lucien is an IAC, which was contributed to PPLP on January 1, 2008. While under its ownership from 2008 until April 2010, capital contributions by PPLP were reported to total $198 million. Lucien along with multiple other IACs it directly or indirectly owned, was transferred out of PPLP in 2010 at a book value of negative $0.5 million as recorded by PPLP. *AlixPartners Non-Cash Report* [ECF No. 1194] at 54, 360. However, with the effective "seed money" from PPLP, as well as the hundreds of millions that have been invested in the Lucien-related entities by way of indirect cash distributions from PPLP, Lucien appears to now have significant holdings in IACs throughout the current global structure.

    45.    Collectively, these non-cash transfers (the "**Non-Cash Transfers**") represent at least another $1 billion in value transferred by Purdue for the benefit of the Sacklers during the period 2008 to 2019.

    46.    On July 22, 2020, the UCC and certain of the IACs entered into a discovery stipulation, outlining deadlines for the production from the IACs of documents responsive to the UCC's subpoena. *Second Stipulation and Agreed Order Among the Official Committee and the Stipulating IACS Regarding Discovery Deadlines in the Chapter 11 Cases* [ECF No. 1490, 1518] ("**IAC Discovery Stipulation**"). Per the IAC Discovery Stipulation, and subsequent negotiations between the parties to this stipulation, productions were or are due between September 18 and October 19, 2020, with privilege logs due within 15 calendar days of each production. *Id.* The IACs have produced to date approximately 85,000 documents, which were identified from manual searches, as well as searches of email and other electronically stored data. However, counsel for the IACs recently informed the UCC that documents responsive to certain of the UCC's priority requests—including notably, those related to the cash and Non-Cash Transfers to the IACs—are largely, if not solely, in the custody of NRF. *See* Hurley Decl., Ex. 41 (September 16, 2020 Ltr.

from M. Hirschfield).

47.     For example, counsel for the IACs recently advised the UCC that NRF appears to have been largely, and perhaps solely, responsible for developing the terms of the agreements concerning many of the Non-Cash Transfers.  Among other things, the UCC now understands that NRF set royalty rates, tracked the sale of OxyContin abroad, and calculated the payments for royalty amounts owed by and to the IACs.  The UCC has been advised that the IACs, and potentially also the Debtors, have few or no records pertaining to these subjects, which are maintained by NRF.  Hurley Decl., Ex. 41, Ex. 91 (email correspondence between Marc Hirschfield and Ashley Crawford).  While the UCC has received some assurances from counsel for the IACs that collection of these documents, which are critical to the UCC's investigation, is *now* underway, it remains unclear whether they will be produced by the deadlines called for in the IAC Discovery Stipulation.[18]  In addition, the IACs are still in the process of collecting data for one custodian.   Other discovery from NRF is also crucially important, and not yet completed.

48.     Since July 31, 2020, the Simpson Thacher law firm has been authorized by Stuart Baker, the Debtors, the Sacklers, and their other affiliates, to coordinate NRF's production of documents responsive to requests served on those parties that are in NRF's immediate possession. Simpson recently advised the UCC, however, that NRF has retained its own counsel—the Cleary Gottlieb law firm—in connection with these matters.  The UCC is working diligently to obtain necessary discovery from NRF voluntarily, but may return to the Court for additional relief, including after logs of IAC and NRF documents are produced.  NRF, IAC, and other productions likely will require resolution of additional privilege issues when completed.

---

[18] Notably, the documents the IACs now claim are in the possession of NRF, and that NRF has apparently just begin to collect, fall within the categories of documents the UCC sought from the Sacklers and NRF directly in November and December 2019, respectively. *See* Hurley Decl., Ex. 91.

## ARGUMENT

**A.    The UCC is Entitled to the Fiduciary Documents Under the "Good Cause"
Exception to Privilege**

49.    The Debtors, including Purdue Pharma Inc. ("**PPI**"), the general partner of PPLP,
have withheld from production to the UCC hundreds of thousands of documents that are
responsive to the UCC's requests in these cases.  The withheld documents almost certainly include
information directly relevant to the estate claims that the UCC is investigating on behalf of all
creditors, and that will be the subject of the soon-to-be-scheduled mediation.  As the sole remaining
beneficiaries of the board's fiduciary duties, the UCC's constituents should be given access to the
Fiduciary Documents.

50.    The attorney-client privilege serves important purposes, but it is not absolute.
Indeed, as "an obstacle to the investigation of the truth," the privilege "ought to be strictly confined
within the narrowest possible limits."  *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100-01 (5th Cir.
1970) (internal quotations and citation omitted).   In appropriate cases, where the policies
underlying the privilege are outweighed by more important ones, disclosure may be required.  *See
Univ. of Pa. v. Equal Emp't Opportunity Comm'n*, 493 U.S. 182, 189 (1990); *United States v.
Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).  The "good cause" or "fiduciary" exception is one
such ground for requiring production of otherwise privileged documents.  *In re Dow Corning
Corp.*, 261 F.3d 280, 286 (2d Cir. 2001).[19]

51.    In *Garner*, the stockholders of a corporation alleged that corporate directors and
officers had engaged in securities fraud and other misconduct in connection with certain
transactions.  *Id.* at 1095.   The corporation refused on privilege grounds to provide
communications relating to the transactions, and the stockholders moved to compel.  *Id.* at 1096.

---

[19] Privilege determinations in bankruptcy cases in a non-adversarial posture are governed by federal law.  *See* Fed. R.
Bankr. P. 9017; Fed. R. Evid. 501; *see, e.g.*, *In re China Med. Techs., Inc.*, 539 B.R. 643, 648 (S.D.N.Y. 2015).

The Fifth Circuit held that where fiduciaries are alleged to have acted "inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public" mean the privilege must be subject to the stockholder's right to "show cause why it should not be invoked." *Id.* at 1103-04. As the *Garner* court held, it is "difficult to rationally defend the assertion of the privilege if all, or substantially all, [stakeholders] desire to inquire into the attorney's communications with corporate representatives." *Id.* at 1101.

52.     When corporate entities like PPI become insolvent, creditors replace equity holders as the residual beneficiaries of the fiduciaries' duties, and succeed to the stockholder's right to show cause why the fiduciaries should not be permitted to invoke privilege under the circumstances. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007) (when corporation is insolvent, "its creditors take the place of the shareholders as the residual beneficiaries"); *Garner*, 430 F.2d at 1103-04. And the good cause exception has been applied in bankruptcy cases, *e.g.*, *Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*, 342 B.R. 416, 424 (S.D.N.Y. 2006) (hereinafter "*G-I Holdings*") and in a wide variety of other contexts as well. *See In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 97-99 (S.D.N.Y. 1993) (good cause exception applied in stock purchaser suit regarding litigation liability related to "90,000 asbestos-related cases"); *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 624 (E.D. Mo. 2000) (ERISA administrators and beneficiaries); *Quintel Corp., N.V. v. Citibank, N.A.*, 567 F. Supp. 1357, 1360-63 (S.D.N.Y. 1983) (bank acting as fiduciary in real estate transaction).

53.     The decision in *G-I Holdings* is apposite. There, the debtor filed for chapter 11 voluntary reorganization "in the face of massive asbestos liabilities." 342 B.R. at 418. A committee of asbestos tort creditors was appointed to pursue fraudulent conveyance and other claims relating to G-I's prepetition distribution of its most valuable asset to or for the benefit of

G-I's then equity owners through a spin-off transaction.  *Id.*  Applying the good cause exception,

the SDNY bankruptcy court ordered G-I to produce categories of privileged documents identified

by the creditors committee, including so that the creditors committee could evaluate claims that

G-I carried out the challenged transaction "in good faith," and because the creditors committee

represented G-I's "entire bankruptcy estate" in its effort to "set[] aside the transfers," and "because

it is the beneficiary of the fiduciary duties owed by G-I's management."  *Id.* at 424-425.

54.    "For simplicity of analysis," *G-I Holdings* followed the lead of a district court

decision in grouping "the *Garner* factors into four broad categories:  (1) the discovering party's

stake in the fiduciary relationship; (2) the apparent merits of the claim; (3) the need of the

discovering party for the information; and (4) the nature of the communication itself."  *Id.* at 424

(quoting *In re Pfizer Inc. Sec Litig.,* No. 90 Civ. 1260, 1993 WL 561125, at *13 (S.D.N.Y. Dec.

23, 1993)).  As discussed below, all of the factors referenced in *G-I Holdings* weigh in favor of

disclosure here.

**(1)    Purdue's Creditors Are the Debtors' *Only* Stakeholders**

55.    The Debtors had no funded debt when they filed for bankruptcy, and the unsecured

creditors whose interests the UCC represents therefore are the Debtors' sole stakeholders.  As in

*Garner*, the estate claims the UCC is investigating through discovery would benefit all of those

stakeholders equally, and would not be brought "on behalf of individual shareholders or

claimants," a factor that causes courts to "bring a lesser degree of scrutiny to bear in determining

whether good cause exists."  *See G-I Holdings*, 342 B.R. at 424-25.  Indeed, one court observed

that where, as here, "unanimity or substantial unanimity exists … the [*Garner*] court suggested

that the attorney-client privilege would be immediately overcome without further inquiry into

other elements of good cause." *Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480, 484, n.4 (E.D. Pa. 1978).[20]

### (2)    The Estate Claims Under Investigation Are Colorable

56.    The standard for presenting a "colorable" claim is a "relatively easy one to make,"
and is satisfied where the proposed litigation will not be a "hopeless fling."  *Adelphia Commc'ns
Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns. Corp.)*, 330 B.R. 364, 376, 386 (Bankr.
S.D.N.Y. 2005).  Here, the Sacklers have all but admitted colorability not only by agreeing that the
entire value of Purdue will go for the benefit of creditors but also by offering to pay billions of
dollars more in part to settle the estates' claims.  The UCC also has identified substantial evidence
and information in support of key estates' claims, as briefly discussed below.

57.    ***Constructive fraudulent conveyance***.  The estates have the right to claw back the
value of any transfers the Debtors made (i) in exchange for less than reasonably equivalent value
(ii) while the Debtors were insolvent or that rendered the Debtors insolvent.  It is undisputed that
the Sacklers provided no consideration at all for billions of dollars of cash transfers to their trusts
and foreign subsidiaries, including huge cash conveyances since 2007, and more than $1 billion in
Non-Cash Transfers may also have been made during the period for less than equivalent value.
*See, e.g.*, *AlixPartners Non-Cash Report* [ECF No. 1194] at 39, 50, 54, 56, 360.

58.    Regarding insolvency, the Debtors have resisted providing the UCC with the full
additional "primary liability" discovery it sought.  However, the value of claims asserted against
the Debtors are historically vast.  The States alone claim damages against the Debtors amounting
to $630 billion dating from 2007-2019.  That sum does not count the damages alleged by all other
public and private plaintiffs, and by itself would render the Debtors deeply insolvent even if

---

[20] As noted above, the UCC represents the interests of creditors of all of the Debtors, including PPI.  PPI is subject to
filed creditor claims in these cases of approximately $2 billion, and PPI's only material asset is a fractional interest in
PPLP, an entity which itself is subject to *trillions* of dollars in claims.

discounted dramatically for litigation risk and the passage of time. *See In re W.R. Grace & Co.*, 281 B.R. 852, 869 (Bankr. D. Del. 2002) (assessing the debtor's solvency at the time of the fraudulent transfer and including future asbestos-related personal injury or property damage claims that had not yet been asserted against the debtor at the time of transfer). When other claims are included, the Debtors' total alleged liability is measured in the *trillions of dollars*. These facts easily meet the low standard necessary to show the estates' constructive fraud claims are colorable.

59.    ***Intentional fraudulent conveyance***. Transfers made with actual intent to hinder, delay, or defraud creditors are recoverable by the estates as fraudulent. It is unnecessary to prove that defrauding creditors was the *sole* motivation of the transferor; rather, a transfer is intentionally fraudulent if "at least one of the [transferor's] motives was an impermissible one." *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 n.8 (Utah 2020) (collecting cases); *In re Tronox Inc.*, 503 B.R. 239, 278-79 (Bankr. S.D.N.Y. 2013) (collecting cases). As discussed above, evidence adduced by the UCC even through its incomplete investigation to date strongly suggests that the Sacklers' actions were motivated by the desire to transfer value out of Purdue and away from creditors as a result of the "uncapped nature" of Purdue's potential opioid liability.

60.    ***Breach of fiduciary duty***. The estate's breach of fiduciary duty claims are likewise colorable. Officers and directors of a corporate general partner like PPI owe fiduciary duties to the partnership, and PPLP's claims for breach of those duties belong to the estates. *Official Comm. of Unsecured Creditors v. Bay Harbour Mater Ltd. (In re BH S & B Holdings, LLC)*, 420 B.R. 112, 152 (Bankr. S.D.N.Y. 2009) ("The claim for breach of fiduciary duty is derivative under Delaware law, and constitutes property of the estate under 11 U.S.C. § 541."); *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997-98 (Del. Ch. 1981) (finding that "the fiduciary duty of fair dealing by a general partner to a limited partner is no less than that owed by a corporate director to a shareholder")

(quoting *Miller v. Schweickart*, 405 F. Supp. 366, 369 (S.D.N.Y. 1975)); *see also Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180-1181 (Del. Ch. 1999) (limited partners in partnership asserted direct claims against corporate general partner and its directors). Delaware law permits a partnership to limit the fiduciary duties of its general partner, but PPLP apparently did not do so until 2018. 6 Del. Code Ann. § 17-1101(d). PPLP's 1997 limited partnership agreement ("1997 LPA") specifically provides that "[t]he General Partner [PPI] shall be under a fiduciary duty to conduct the affairs of the Partnership in the best interests of the Partnership and of the Limited Partners, including the safekeeping of all Partnership funds and assets and the use thereof for the exclusive benefit of the Partnership."[21]

61.     In these cases, far from keeping safe "all Partnership funds and assets … for the exclusive benefit of the Partnership," the Sacklers caused Purdue to transfer "fantastic sums" from the Partnership to and for the benefit of themselves and their children. Hurley Decl., Ex 90. As alleged above, Purdue likely was insolvent when the transfers were made, which by itself would subject those transfers to "entire fairness" review. *Cf. In re Tribune Co. Fraudulent Conv. Litig.*, No. 12 CV 2652 (DLC), 2019 WL 294807, at *12, *17 (S.D.N.Y. Jan. 23, 2019) ("[A] director of an insolvent corporation is interested in a transaction if he or she receives a personal benefit not shared by all of the insolvent corporation's creditors."). The Debtors' disclosure of additional merits documents responsive to the UCC's requests has been limited, as noted elsewhere, and 2004 discovery is still far from complete.

62.     Among other things, the UCC has not yet deposed any Debtor witnesses.

---

[21] PPLP's execution on March 7, 2018 of a Third Amended and Restated Limited Partnership Agreement on March 7, 2018 ("2018 LPA") purporting to eliminate PPI's fiduciary duties is immaterial here. Among other things, much of the misconduct occurred while the 1997 LPA was still in effect, and no consideration was provided for the amendments in the 2018 LPA, which was executed when Purdue was almost certainly insolvent. *See* 11 U.S.C. § 548(b).

Moreover, some of the Sackler witnesses that have been deposed have exhibited an extraordinary lack of knowledge concerning basic facts relating to the family's enterprise. For instance, Ilene Sackler served on the board of MNP for 20 years, but when asked to describe that entity even generally, she testified: "I don't know. I can't tell you. … I don't know what the entity is." Hurley Decl., 46 (I. Sackler Dep. 78:7-12). David Sackler, who was on Purdue's board from 2012 to 2018, and on MNP's board from 2012 to 2019, claimed not to know whether Stuart Baker was ever an executive at Purdue or any Sackler-affiliated entities, though Mr. Baker in fact held some 126 titles at various IACs, and was described by David's uncle as the *de facto* chairman of Purdue in August 2013. Hurley Decl., Ex. 40, Ex. 43 (D. Sackler Dep. 156:5-157:21), Ex. 52; *see also* Official Committee of Unsecured Creditors' Mot. to Compel Prod. of Purportedly Privileged Docs., or for *In Camera* Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Docs. Identified on Logs are Privileged at 14-16 (detailing Baker roles).

63.    Nevertheless, credible allegations of mismanagement by Purdue's fiduciaries have been made, including in connection with their alleged failure to adequately monitor Purdue's compliance with the law in connection with its sale and marketing of opioids. The MDL plaintiffs specifically allege that Purdue's suspicious order monitoring ("**SOM**") system was not reasonably designed to detect suspicious orders and was "wholly inadequate to guard against diversion" because, among other things, it was controlled by sales and finance personnel and focused on financial considerations rather than the prevention of diversion. Hurley Decl., Ex. 92 at 37-40.

64.    The MDL plaintiffs also allege that Purdue had information in its possession that would have enabled it to prevent diversion—in the form of chargeback data from wholesalers and various types of prescriber-level information from internal and external sources—but that it failed to use this information to adequately identify, halt, and report suspicious orders. Hurley Decl., Ex.

92 at 39-40, Ex. 93 at 31-32. These allegations and additional deficiencies in Purdue's SOM

compliance are reflected in the MDL plaintiffs' expert report, which concluded that "Purdue

Pharma did not maintain effective controls to prevent diversion, and did not maintain an adequate

SOM program and failed to take reasonable steps to prevent its products from being diverted"

Hurley Decl., Ex. 94 at 168.

65.    Such allegations support colorable claims for breach of fiduciary duty.  *See*

*Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, C.A. No. 2019-05470, 2020 WL

132752, at *9 (Del. Ch. Jan. 13 2020) (allegations that distributor's board failed adequately to

monitor opioid sales and permitted corporation to violate law sufficient for "credible basis"

showing);  *In re McKesson Corp. Deriv. Litig.*, No. 17-cv-01850, 2018 WL 2197548, at *1 (N.D.

Cal. May 14, 2018) (denying motion to dismiss complaint because plaintiffs alleged that directors

and officers of a pharmaceutical distributor failed to implement either an effective suspicious order

monitoring system or controls sufficient to alert them to the failures of their order monitoring

system); *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 462-63 (S.D.N.Y. 2010)

(denying motion to dismiss breach of fiduciary duty claims because plaintiffs alleged that directors

and officers of a pharmaceutical manufacturer knew or should have known about but consciously

failed to address misconduct relating to the promotion of its drugs).[22]

66.    In addition to civil claims, the United States is asserting very substantial liability

for alleged criminal conduct that Purdue's fiduciaries failed to monitor or prevent.  In its criminal

---

[22] Colorable claims of board misconduct are also amply demonstrated by the massive proofs of claim filed by the
federal government in these cases. As reflected in its civil proof of claim, the United States is asserting civil claims
against Purdue for single damages in the amount of $2.8 billion or in excess thereof, plus treble damages and penalties,
for conduct occurring from 2010 through 2018. Hurley Decl., Ex. 95 (DOJ Civil Proof of Claim) at 3-4. These claims
arise under the False Claims Act, among other causes of action, and relate to allegations that Purdue knowingly or
recklessly caused the federal government to pay for prescriptions that were medically unnecessary and/or resulted
from various types of unlawful kickbacks paid to physicians, specialty pharmacies, and an electronic health records
vendor.  *Id.* at 4-7.

proof of claim, the United States alleges conduct that it claims could result in a criminal fine of

$6.2 billion or more, forfeiture of $3.5 billion or more, and an order of restitution for losses suffered

by victims of such criminal conduct.  Hurley Decl., Ex. 96 (DOJ Criminal Proof of Claim) at 1-2.

According to the government, the conduct in question potentially implicates a number of federal

criminal laws, including the "anti-kickback violations (42 U.S.C. § 1320a-7b(b)), misbranding in

violation of the Food, Drug, and Cosmetic Act (21 U.S.C. §§ 331, 333, 352, 353), conspiracy (18

U.S.C. § 371), and others." *Id.*  Such conduct also supports breach of fiduciary duty claims.  *See*

*AmerisourceBergen*, 2020 WL 132752, at *21 (internal quotations and citations omitted) ("[A]

fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly

causing it to seek profit by violating the law.").

### (3)    The UCC's Need for the Documents Is Manifest

67.    The UCC has a substantial and urgent need for the Fiduciary Documents to timely

evaluate the Settlement Framework and the potential claims against the Sacklers and others.

Courts in the Southern District of New York have consistently held that the necessity of the

information is the most important factor in the good cause analysis.  *See, e.g.*, *RMED Int'l., Inc. v.*

*Sloan's Supermarkets, Inc.*, 94 CIV. 5587PKLRLE, 2003 WL 41996, at *5 (S.D.N.Y. Jan. 6, 2003)

("The apparent necessity of the information and its availability from other sources is considered

the most important factor and is stressed by courts when undertaking the Garner analysis."); *In re*

*Int'l Bus. Machines Corp. Sec. Litig.*, No. 92 C 9076, 1993 WL 760214, at *5 (S.D.N.Y. Nov. 30,

1993) ("The fourth *Garner* factor, the necessity or desirability of plaintiffs having the information

and its availability from other sources, is significant.").

68.    With the Court's encouragement, mediation of the claims against the Sacklers is

scheduled to begin soon, and the parties that support the Settlement Framework —the Debtors and

the Sacklers—will have a distinct advantage as long as the UCC remains excluded from the

Fiduciary Documents.  The content of those documents is known to the Debtors, of course, who have access to them currently, and the Sacklers may as well.  The UCC asked the Debtors whether copies of its privileged documents were provided to the Sacklers.  The Debtors confirmed that they shared privileged documents with the Sacklers pre-petition, but said they did not know the full extent of that sharing or the degree to which privileged documents might remain in the possession of the Sacklers and their counsel.

69.    It is thus possible that the Sacklers *still* have copies of key privileged documents.  And of course, the Sacklers were Purdue board members until recently and therefore had access to those documents at one time and likely were the authors or recipients of many of them.  Hence, of the mediating parties, it is only Purdue's *creditors* who are in the dark completely concerning the contents of these materials.  It is simply unrealistic to expect creditors to negotiate a settlement while operating with this type of information asymmetry.  Indeed, in a recent letter to the NCSG, the Sacklers themselves argued that "fairness" demands that all mediation parties "have access to the same documents" so the Sacklers "can prepare for and engage in … settlement negotiations based on the same information available to all."  *See* Hurley Decl., Ex. 103.  Creditors likewise should have the "same information available to all" in the mediation, including the privilege documents that are familiar or available to the Sacklers and the Debtors.

70.    Relatedly, the UCC cannot fully assess the value of the claims that the Debtors propose to release pursuant to the Settlement Framework without access to the Fiduciary Documents.  The UCC's task is to compare the value offered under the Settlement Framework with the value potentially available to creditors if the claims are not settled and instead contributed to a post-emergence litigation trust.  In the latter scenario, a litigation trustee almost certainly would have access to Purdue's privileged communications, including the Fiduciary Documents.

32

Hence the UCC cannot accurately weigh the value of the competing alternatives without access to privileged documents that could well enhance the value of the claims against the Sacklers, and that would be available to the post-emergence litigation trustee.

### (4)    The Nature of the Documents Sought Also Counsels Disclosure

71.    The categories of documents the UCC seeks are consistent with the teachings of *Garner*.   The UCC seeks documents "related to past" not "prospective actions," does not seek restructuring-related privileged documents, and has defined its categories carefully to encompass documents that are likely to be the most relevant to the estate claims the UCC is investigating.  *See Garner*, 430 F.2d at 1104.   Unfortunately, the UCC cannot identify with certainty all of the documents that fall within or outside of the defined categories, as the logs simply do not provide sufficient detail for that determination.[23]   The UCC's reliance on categories—and ultimately on the Debtors, who have access to the contents of the withheld documents—is appropriate under the circumstances.  *See, e.g.*, *Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*, No. 01 Civ 8539(RWS), 2006 WL 2883255, at *1  (explaining on rehearing that documents subject to motion "fell into five subject matter categories" identified by tort committee as important to claims); *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 569 (Del. Ch. 1998) (ordering production of categories of privileged documents based on good cause exception).

### B.    The UCC Is Entitled to the Crime-Fraud Documents

72.    The crime-fraud doctrine extinguishes any privilege or work product protection as to communications made in furtherance of a fraud or breach of fiduciary duty.  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 319 F.R.D. 100, 109 (S.D.N.Y. 2017); *Galaxy CSI, LLC v. Galaxy Comput. Servs., Inc. (In re: Galaxy Comput. Servs., Inc.)*, No. 1:04-CV-00007, 2004 WL

---

[23] The UCC has done its best to identify specific documents by control number that the UCC believes may be within the identified categories.  *See, e.g.*, Hurley Decl., Ex. 101. But given the limits of the logs, the UCC cannot be certain of those designations, and includes them solely for purposes of illustration and as an aid for the Court.

3661433, at *2 (E.D. Va. Mar. 31, 2004).  The exception applies equally to claims of attorney-client privilege and work product immunity, and is designed to ensure that the "seal of secrecy" in otherwise privileged communications does not extend to communications made in furtherance of a fraudulent objective.  *See United States v. Zolin*, 491 U.S. 554, 563 (1989); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) ("[A]dvice in furtherance of a fraudulent or unlawful goal . . . . is socially perverse, and the client's communications seeking such advice are not worthy of protection.") (citation omitted).  Thus, "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.  He must let the truth be told."  *Clark v. United States*, 289 U.S. 1, 15 (1933).

73.    The crime-fraud exception can be invoked in connection with claims for fraudulent transfer and breach of fiduciary duty, and applies to any communications "sought or rendered in furtherance of what is known or reasonably should be known to be unlawful conduct."  *Irving Tr. Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983).  The central focus in crime-fraud cases is whether a document or communication furthered a fraudulent objective.  Thus, the crime-fraud exception may apply regardless of innocence of the participants—attorney or client.  *Amusement Indus. Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) (crime-fraud exception applies "even if the attorney has no inkling that the matter he or she is working on involves any improper conduct"); *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 56 (S.D.N.Y. 1989) ("[L]egal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice.").  Accordingly, while the UCC's crime-fraud arguments primarily concern a scheme by the Sacklers and non-Sackler Directors, they apply equally to any document custodian—including the Debtors.  *See Duttle*, 127 F.R.D. at 56 ("[T]he ultimate perpetrator cannot insulate attorney-client

communications used to further his fraud by keeping other participants in ignorance.").

74.    A party seeking discovery under the crime-fraud exception must establish: (1) that "there is probable cause to believe that a crime or fraud has been attempted or committed"; and (2) "that the communications were in furtherance thereof." *Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107 (quoting *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)).  In civil actions, some courts articulate this standard as requiring "*substantial reason* to believe that [the party at issue] engaged in or attempted to commit a fraud and used communications with [her] attorney to do so." *See Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107 (emphasis in original).  In either case, however, it is "not an overly demanding standard." *Id.* (quoting *Amusement Indus.*, 293 F.R.D. at 427).

### (1)    Probable Cause to Believe a Crime or Fraud Has Been Committed

75.    "Probable cause" does not require the discovering party to actually prove a fraudulent objective, or even that a fraudulent objective is "more probable than not." *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039; *see also Amusement Indus.*, 293 F.R.D. at 426 ("Obviously, there need not be a 'definitive[]' showing of the fraudulent nature of the client's objective.") (citation omitted).  "[T]here need only be presented a reasonable basis for believing that the objective was fraudulent." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039.  Importantly, "[t]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause." *Amusement Indus.*, 293 F.R.D. at 427.

76.    The crime-fraud exception is properly invoked where communications relate to apparent fraudulent transfers and breaches of fiduciary duty. *See, e.g.*, *Sec. Investor Prot. Corp.*, 319 F.R.D. at 109 ("As the Trustee accurately observes, these intentional actions to hinder, delay, or defraud BLMIS's creditors arguably constitute fraudulent transfers under the Bankruptcy Code . . . which are themselves sufficient to trigger the crime-fraud exception.") (citation omitted); *In re Galaxy Comput. Servs.*, 2004 WL 3661433, at *2 ("The crime/fraud exception has been applied to

reach both fraudulent transfers in the bankruptcy context and breaches of fiduciary duty.")
(citations omitted).

77.     As noted elsewhere, the UCC accelerated the filing of this Motion based on the
Court's admonition at the July 23, 2020 conference to surface privilege disputes promptly.
Discovery is still far from complete, and the UCC suspects that Fiduciary Documents may provide
further evidence suggesting a fraud has been committed.  But even at this early stage, the UCC
adduced evidence that it believes in good faith meets the probable cause standard with respect to
both intentional fraudulent conveyance and breach of fiduciary duty.

78.     In *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), for example,
the district court found "probable cause" in connection with an intentional fraudulent conveyance
claim where the alleged privilege holder created and funded a trust "with actual intent to hinder,
delay, or defraud creditors."  In support of its finding, the *Shelton* court noted that the trust was
created when the privilege holder's companies were facing huge losses following exposure of a
fraudulent accounting scheme.  *Id.*  Over the course of several years, the privilege holder managed
to transfer $7.5 million worth of assets to the trust he created.  *Id.*  During that time, the privilege
holder also managed to go from holding his assets in a manner "totally exposed to claims of his
creditors" to having them almost completely shielded from creditors.  *Id.* at 405-06.  The court
ruled that these suspicious, albeit circumstantial facts (some of which were only before the court
by judicial notice), were enough to warrant application of the crime-fraud exception.  *Id.* at 406.

79.     As detailed above, the circumstances around the billions the Sacklers caused to
transfer to their trusts and foreign affiliates are substantially more compelling than those in *Shelton*,
and support a finding of probable cause.  This is particularly so because the UCC is not required
at this state of the proceedings to "prove" fraud, or even show that the validity of its claims is

"more likely than not." *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039. Nor must the UCC show that hindering or delaying Purdue's creditors was the *only* motive for the transfers. *E.g. Jones,* 469 P.3d at 890, n.8. The evidence here is more than sufficient to form a "reasonable belief" that "at least one of the [Sackler's] motives was an impermissible one." *Id*; *see also In re Tronox*, 503 B.R. at 278-79.

80.    The same evidence supports a breach of fiduciary duty claim against Purdue's directors. To the extent Purdue was insolvent at the time of any of the identified transfers, those transactions would be materially self-interested, and sufficient by themselves to plead a breach of the duty of loyalty. *In re Tribune*, 2019 WL 294807, at *17. The board's management also resulted in more than *$2 trillion* of claims being asserted against the Debtors, a fact which by itself supplies a "reasonable basis for believing" the board failed to discharge its fiduciary duties. *See supra*, ¶¶ 63-66; *AmerisourceBergen Corp.*, 2020 WL 132752, at *11, *19 (holding plaintiffs were entitled to investigate whether company's fiduciaries breached their duties by consciously failing "to establish and monitor the necessary information and reporting systems" which led to "a significant corporate trauma, as evidenced by its recent offer . . . to pay $10 billion to settle with the state attorneys general"); *see also* Section A(2), *supra* (describing additional allegations relating to breach of fiduciary duty claims).

### (2)    Communications Reasonably Related to Fraud

81.    To be considered "in furtherance" of the fraud, an allegedly privileged communication need only share a "purposeful nexus" with or be "reasonably relate[d]" to the fraudulent conduct. *Amusement Indus.*, 293 F.R.D. at 427 (internal quotations omitted). The UCC has identified the categories of documents that the UCC suspects have been withheld and are reasonably related to the fraudulent schemes. *See* Hurley Decl., Ex. 101. The UCC also has identified certain illustrative log entries that the believes may come within the identified

categories, but its ability to do so was greatly limited by the vague nature of many of the descriptions on the logs.[24]

## C.    The At-Issue Documents Should Also Be Produced

82.    As referenced above, on November 25, 2019, the two sides of the Sackler family provided written and oral presentations ("Presentations") in which they identified "the defenses that [they] intend to make with regard to any and all causes of action that have been or may be asserted against them."  *See* Hurley Decl., Ex. 72 (Side A presentation), Ex. 58 (Side B presentation); *see also* Motion to Allow/Motion to Make Publicly Available the Raymond Sackler Family's Presentation of Dec. 6, 2019 [ECF No. 685] (withdrawn).  The Presentations included assertions putting "at issue" communications with counsel.

83.    The Sacklers made clear in their presentations that their own alleged "good faith," knowledge and state of mind will be central to their defenses in these cases.  For example, the Sacklers argue that actual fraudulent conveyance cannot be established, supposedly because the Sacklers did not "kn[o]w" Purdue could "face meaningful litigation until 2017," and therefore had no motive to secrete Purdue's assets.  Hurley Decl., Ex. 58 at 488.  Similarly, they claim insolvency cannot be established because it depends on a "wave of litigation that no one could reasonably have anticipated at the time the distributions were made."  Hurley Decl., Ex. 72 at 67-68; *see also* Hurley Decl., Ex. 58 at 470 ("No reasonable person would have believed that Purdue would face a meaningful number of opioid related lawsuits or judgments before 2017.")[25]

84.    Regarding primary liability, the Sacklers claim the board acted at all times in the

---

[24] The UCC of course lacks access to the withheld documents themselves, so only the withholding parties ultimately can ensure that they produce or make available for inspection the correct universe of documents that are within the identified categories.

[25] The Sacklers base their argument on a misinterpretation of the law of New York, which does not apply to the estates' fraudulent conveyance claims, but the UCC must nevertheless prepare to meet that argument head-on.

good faith belief that they were doing nothing wrong.  Indeed, the Side B Sacklers actually include

in their defense presentation a section entitled "Good Faith and Reasonableness," in which they

argue that the Sacklers and other members of the board "knew" and "understood" that Purdue's

sale and marketing of OxyContin was lawful, including based on reports the board received from

Purdue's compliance and legal departments.  Hurley Decl., Ex. 58 at 29-50.

85.    Having put at issue their knowledge and states of mind concerning questions of

liability and other matters, the Sacklers must disclose related communications that might otherwise

have been deemed privileged.  "[A] party may not assert that it believed its conduct was lawful,

and simultaneously claim privilege to block inquiry into the basis for the party's state of mind or

belief." *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936, 2011 WL 1642434, at *2

(S.D.N.Y. Apr. 20, 2011).   As such, a party waives privilege when he puts privileged

communications "at issue" by asserting a claim or defense "that in fairness requires examination

of protected communications."  *Id.*  Whether fairness requires disclosure is decided on a case-by-

case basis.  *In re Grand Jury Proceedings*, 219 F.3d 175, 182-83 (2d Cir. 2000).  The "at issue"

doctrine applies to both attorney-client privileged and attorney work product documents.  *Bank*

*Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 511 (S.D.N.Y. 2002).

86.    In *Arista Records*, a copyright infringement damages proceeding, the defendant

claimed his decision to transfer assets from his corporation into family limited partnerships was

not intended "to avoid any potential legal exposure from being sued" for infringement.  2011 WL

1642434, at *1.  He went on to claim that "he did not believe that [his company] … would be sued

for copyright infringement" at the time of the transfers, and that the transfers therefore could not

have been motivated by fraud.  *Id.*  The court held that the defendant could not argue that he "acted

in good faith and without an improper motive," and at the same time deny "access to the advice

given by counsel," even though defendant did not expressly invoke reliance on counsel." *Id.* at *2.

87.     Indeed, where a party puts at issue its "state of mind, such as [its] good faith belief in the lawfulness of his conduct," the party must disclose related communications with counsel regardless of whether the party explicitly relied on an advice of counsel defense because such communications "may well demonstrate the falsity of its claim." *Id.* at *3 (citation and internal quotation omitted). Even if the party did not rely on counsel at all, the discovering party "still would be entitled to know if [the withholding party] ignored his counsel's advice." *Id.*; *see also Bank Brussels Lambert*, 210 F.R.D. at 510 ("Under this standard, a party does not have to expressly state that it relied on any advice from his attorney.").

88.     As discussed above, the Sacklers have put their communications with counsel at issue by explicitly and implicitly putting their knowledge and good faith at issue. Though unnecessary to trigger waiver, Side B actually references legal advice expressly in connection with its good faith defense. Among other things, Side B claims that "Legal or Compliance reviewed sales force call notes," and that marketing material was approved by counsel as bases for concluding that Side B directors acted in good faith. Hurley Decl., Ex. 58 at 37-38. And like the defendant in *Arista Records*, the Sacklers argue that when they transferred billions of dollars from Purdue to their family trusts, they could not have been motivated by a desire to hinder creditors because, at the time of the transfers, they had no reason to believe Purdue would "face meaningful litigation." Hurley Decl., Ex. 58 at 493; *see also* Hurley Decl., Ex. 72 at 67-68. Related communications with counsel must therefore be produced. *See, e.g., Hartford Fire Ins. Co. v. CMC Constr. Co., Inc.*, No. 3:06-CV-11, 2010 WL 11520219, at *4 (E.D. Tenn. Apr. 20, 2010) (defendant implicitly waived attorney-client privilege by asserting "she simply followed [counsel's] advice when she made the transfers at issue" and therefore could not have had "actual

FILED IN UNREDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER
REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

intent to hinder, delay, or defraud").

## COMPLIANCE WITH RULES

89.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. The UCC submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## NOTICE

90.    Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion.  The UCC respectfully submits that no further notice is required.

## NO PRIOR REQUEST

91.    No prior request for the relief sought in this Motion has been made.

## RESERVATION OF RIGHTS

92.    The UCC and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Motion, to seek additional discovery, add additional parties, or to raise additional grounds for granting this Motion during any reply briefing or hearing on the Motion.

## CONCLUSION

93.    For the foregoing reasons the UCC respectfully asks the Court to grant the Motion in full, and to order the Debtors and the Sacklers to (i) produce the Challenged Documents and/or (ii) provide the Challenged Documents to the Court or a Special Master for *in camera* review.  The NCSG supports the relief requested herein.

New York, New York                    AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  September 29, 2020


By: /s/ *Mitchell P. Hurley*_____

      Ira S. Dizengoff
      Arik Preis
      Mitchell P. Hurley
      Joseph L. Sorkin
      Sara L. Brauner
      One Bryant Park
      New York, New York 10036
      Telephone: (212) 872-1000
      Facsimile: (212) 872-1002
      idizengoff@akingump.com
      apreis@akingump.com
      mhurley@akingump.com
      jsorkin@akingump.com
      sbrauner@akingump.com

      *Counsel to the Official Committee of Unsecured
      Creditors of Purdue Pharma, L.P., et al.*