# EXHIBIT 1

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| Plaintiffs, | **Adv. Pro. No. 19-08289 (RDD)** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| Defendants. | |

**DECLARATION OF BENJAMIN S. KAMINETZKY IN SUPPORT OF**
**DEBTORS' MOTION TO EXTEND THE PRELIMINARY INJUNCTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1. I am an attorney and partner of the law firm Davis Polk & Wardwell LLP ("**Davis Polk**"). Davis Polk represents Purdue Pharma L.P., its general partner Purdue Pharma Inc., and its Debtor subsidiaries (collectively, the "**Debtors**") in the above-captioned chapter 11 cases, jointly administered as *In re Purdue Pharma L.P.*, No. 19-23649, and in this adversary proceeding. The facts set forth in this declaration ("**Declaration**") are based upon my personal knowledge, my discussions with other Davis Polk attorneys representing the Debtors, and my review of relevant documents in connection with Davis Polk's representation of the Debtors. I submit this Declaration pursuant to 28 U.S.C. § 1746 and in support of the Debtors' motion to extend the preliminary injunction ("**Motion**").[2]

2. In the months since securing an extension of the Preliminary Injunction in March 2020,[3] the Debtors, in conjunction with core stakeholders, have made significant progress toward their ultimate objective of bringing these chapter 11 cases to a successful resolution. Key developments include the following: (1) critically important progress has been made on issues concerning allocation of the Debtors' estates, a foundational building block of any consensual

---

[2] Terms not otherwise defined herein have the meaning ascribed to them in the Motion.

[3] The preliminary injunction in these chapter 11 cases was initially entered on October 11, 2019, *see* Order Pursuant to 11 U.S.C. § 105(a) Granting, in part, Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 82], and became final on November 6, 2019, *see* Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Nov. 6, 2019) [ECF No. 105]. On March 30, 2020, the Court entered an order granting the Debtors' motion to extend the Preliminary Injunction for an additional 180 days, until October 5, 2020. *See* Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. March 30, 2020) [ECF No. 168]. The presently operative preliminary injunction order ("**Preliminary Injunction Order**") was entered on August 31, 2020. *See* Twelfth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. August 31, 2020) [ECF No. 194].

plan of reorganization; (2) extensive productions of discovery and due diligence materials by the Debtors to key creditor constituencies (totaling millions of pages); (3) significant and continuing productions of discovery and due diligence materials by the Sackler families (the "**Sackler Families**") and their associated entities (also totaling millions of pages); (4) the conclusion of the noticing plan and claims period, resulting in the filing of over 613,000 claims against the estates, and the commencement of the ongoing process of analyzing these claims; and (5) continued analysis of, and engagement with key constituencies regarding, post-emergence corporate and governance structures to enable the timely filing of what the Debtors hope will be a consensual plan of reorganization.

3. The Debtors have also made significant progress on a number of other important initiatives. These include (1) continued engagement with the Monitor appointed under the Debtors' voluntary self-injunction, who has issued two reports, dated May 20, 2020 and August 18, 2020, and implementation of his recommendations; and (2) obtaining court approval to fund the further development of a low-cost over-the-counter naloxone opioid overdose rescue medicine by a third-party, non-profit company. The Debtors also recently secured an additional extension of plan exclusivity, through December 10, 2020. And all of this is in addition to accomplishing dozens of other tasks and initiatives necessary to sustain the value of the Debtors' businesses and steer the Debtors through bankruptcy.

## SUBSTANTIAL PROGRESS ON ALLOCATION ISSUES

4. The parties have made substantial progress in mediation concerning the allocation of the value of the Debtors' estates. On August 31, 2020, the mediators requested that the mediation be extended until September 11, 2020 based upon the "substantial progress" that had been made to date and their "belie[f] that further agreements may be reached during the

3

requested extension"—a request that the Court granted on September 1, 2020. *See* Order Extending Mediation Termination Date, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 1, 2020) [ECF No. 1642]. In the time between September 1 and September 11, 2020, further critically important progress was made on allocation issues.

5. The progress in mediation required months of diligent effort by the Mediation Parties, the mediators, and the Debtors. These efforts included, as far as the Debtors understand, near-daily meetings, phone calls, and correspondence among those participating. The Debtors facilitated the meditation by, among other things, (i) providing memoranda on a variety of topics; (ii) providing presentations to the mediators on a number of topics, (iii) providing a presentation to the claimant groups on the value of the estates; (iv) participating in over a dozen update calls with the mediators to keep them apprised of developments in the Debtors' chapter 11 cases and to answer their questions on myriad subjects; and (v) discussing damages models with claimant groups.

## **INFORMATION SHARING BY THE DEBTORS**

6. The Debtors continue to understand the importance of providing information to enable estate stakeholders to continue analyzing the proposed Settlement Framework. To that end, since the Court extended the Preliminary Injunction in March, the Debtors have produced a substantial amount of information both on their own volition and in response to hundreds of requests from numerous estate stakeholders on a wide variety of topics.

7. For example, the UCC requested that the Debtors produce documents from an extensive number of custodians and pursuant to a broad set of search terms (collectively, the "**UCC ESI Requests**"). The scope of the UCC ESI Requests involved time frames dating back, in some cases, 25 years. In May 2020, before reaching any formal agreement as to the scope of

production responsive to the UCC ESI Requests, the Debtors commenced rolling productions of such material so as to avoid undue delay. Then, over the following months, the Debtors participated in numerous virtual meetings and teleconferences with the UCC and Non-Consenting States to reach agreement on custodians, time frames, and search terms. These discussions culminated in a discovery stipulation executed on August 6, 2020. *See* Stipulation and Agreed Order Among the Official Committee, the Non-Consenting States Group and the Debtors Regarding Discovery in the Chapter 11 Cases, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. August 26, 2020) [ECF No. 1623] (the "**ESI Stipulation**").[4]

8. Productions pursuant to the ESI Stipulation have been substantial and are now nearly complete. To date, the Debtors have produced over 438,000 documents totaling more than 2.4 million pages pursuant to the ESI Stipulation based on the UCC's search terms, date ranges, and custodians. On September 1, 2020, the Debtors substantially completed their productions of such materials, and to date have served three privilege logs containing, in total, tens of thousands of entries. In addition, the Debtors have produced over 2.5 million documents previously produced during investigations. The Debtors expect to make their last production pursuant to the ESI Stipulation in the coming weeks.

9. Separate from the commitments described in the preceding paragraphs, the Debtors have also continued to receive and respond to requests on at least a weekly basis from the UCC, Non-Consenting States, and other creditor groups. In total, the Debtors have

---

[4] On July 31, 2020, the UCC, Non-Consenting States and certain other creditor groups other entered into an *Amended Stipulation and Agreed Order Among the Official Committee and Other Parties in Interest Regarding Discovery and the Sharing of Information in the Chapter 11 Cases*, which was so ordered by the Court, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. July 31, 2020) [ECF No. 1543] (the "**Discovery Coordination Stipulation**"), that provides, among other things, that the parties to that stipulation would coordinate their discovery efforts and ensure that discovery is carried out as efficiently as is practicable.

responded, in whole or in part, to hundreds of separate requests. This has included, to date, hundreds of requests from the UCC, dozens of separate requests from the Non-Consenting States, as well as several requests from constituencies including the ad hoc group of individual victims and ad hoc group of private insurance claimants, among others. Some of these requests have called for the Debtors to gather information dating back 20 years or more. Moreover, many of the requests have required the Debtors to make continuing productions of information as such material becomes available.

10. In May 2020, the Debtors provided to counsel and professionals for the UCC, the Ad Hoc Committee, and the Non-Consenting States an additional report prepared at the direction of the Special Committee spanning 401 pages, which detailed (1) all significant cash payments for goods, services, and other consideration made between the Debtors and other entities owned by or operated for the benefit of members of the Sackler Families and (2) all significant non-cash transfers from the Debtors to their parent entity, Pharmaceutical Research Associates L.P. (f/k/a Purdue Holdings L.P.), and/or their previous parent entity, PLP Associates Holdings L.P., for the period January 1, 2008 to September 15, 2019. This report was the product of over 4,500 hours of work by AlixPartners, hundreds of hours spent by Davis Polk lawyers working on behalf of the Special Committee, and a comprehensive review of the Debtors' records, including audited and unaudited financial statements, agreements, invoices, and the data recorded in the Debtors' SAP accounting system. This report was also filed in slightly redacted form on the public docket on May 29, 2020, which, together with the filing of the December 16, 2019 Report of the Special Committee, exemplifies the Debtors' commitment to transparency in this reorganization. *See* Notice of Filing of Report of the Special Committee, *In re Purdue Pharma L.P.*, 19-23649 (Bankr. S.D.N.Y. May 29, 2020) [ECF No. 1194]; Notice of Filing of Report of the Special

Committee, *In re Purdue Pharma L.P.*, 19-23649 (Bankr. S.D.N.Y. Dec. 16, 2019) [ECF No. 654].

11.     Finally, the Debtors, UCC, and Non-Consenting States recently entered into a stipulation, which was so ordered by the Court, memorializing the parties' commitments to schedule depositions related to, among other things, the Estate Claims Investigation and/or Estate Causes of Action, as those terms are defined therein. *See* Stipulation and Agreed Order Among the Official Committee, the Non-Consenting States, the Ad Hoc Committee, and the Debtors Regarding Discovery Deadlines and Briefing Scheduling in the Chapter 11 Cases, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Aug. 25, 2020) [ECF No. 1609]. Depositions commenced on August 28, 2020.

## INFORMATION SHARING BY THE SACKLER FAMILIES

12.     These chapter 11 cases have also continued to allow the Debtors and key groups of estate stakeholders to obtain financial and other information from the Sackler Families.

13.     In the weeks following the extension of the Preliminary Injunction, orders were secured from the Court authorizing formal Rule 2004 discovery of certain members of the Sackler Families, their ex-U.S. affiliated companies (the "**IACs**"), and other affiliated entities and persons. *See* Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. Mar. 27, 2020) [ECF No. 992], *as amended*, Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. Apr. 2, 2020) [ECF No. 1008]; Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. May 12, 2020) [ECF No. 1143]; Order Pursuant to Federal Rules of

Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. July 6, 2020) [ECF No. 1340] (collectively, the "**Rule 2004 Orders**"). The UCC and Non-Consenting States then issued a number of subpoenas pursuant to the Rule 2004 Orders. The UCC, Sackler Families, and the IACs held numerous telephone calls (in which the Debtors participated) and exchanged numerous emails (on which the Debtors were typically copied) regarding the scope and timing of their productions.

14. These discussions resulted in a number of disagreements that were elevated to the Court's attention and eventually culminated in stipulations to produce information. In April 2020, for example, the UCC submitted a letter to the Court raising disputes in connection with the production of documents by the IACs. During a hearing on May 1, 2020, the Court directed the parties to continue to meet and confer, including directing counsel for certain members of the Sackler Families to direct the IACs to appoint counsel to coordinate with the UCC and to accept service of a subpoena. Ultimately, these efforts and others led to the consummation of agreements to produce discovery materials from, among others, (i) members of the Sackler Families and their respective trusts, *see* Stipulation and Agreed Orders Among the Official Committee and (I) the Mortimer-Side Covered Parties, (II) Certain Raymond-Side Covered Parties and (III) the IACS Regarding Discovery Deadlines in the Chapter 11 Cases, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. June 22, 2020) [ECF No. 1295 Exs. A-B]; and (ii) the IACs, *see* Second Stipulation and Agreed Order Among the Official Committee and the Stipulating IACs Regarding Discovery Deadlines in the Chapter 11 Cases, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. June 22, 2020) [ECF No. 1490].

15. To date, the Sackler Families have collectively produced over 370,000 documents

8

(totaling over 2 million pages). The IACs have collectively produced over 33,000 documents (totaling over a million pages).

16. The Debtors expect that outstanding discovery requests and disputes will be resolved expeditiously so that all parties in interest can analyze and refine the Settlement Framework and reach consensus on a plan of reorganization.

## BAR DATE AND CLAIMS PROCESSING

17. In the months since obtaining the extension of the Preliminary Injunction in March 2020, the General Bar Date has passed and over 613,000 claims have been filed. Managing this process during the disruption caused by the COVID-19 pandemic required significant attention and effort from the Debtors and their counsel.

18. First, to accommodate the challenges that many potential claimants were facing as the result of the pandemic, the Debtors worked to obtain court approval of a 30-day extension of the general bar date ("**General Bar Date**"), to July 30, 2020. *See* Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. June 3, 2020) [ECF No. 1221] ("**Extended General Bar Date**"). The process of negotiating the Extended General Bar Date required many phone calls and emails with various creditor groups—groups which held differing views as to the appropriate length of any bar date extension and the degree to which additional noticing was required. Ultimately, through the Debtors' efforts to build consensus, the relief sought by the Debtors—a 30-day extension of the bar date—was supported by the UCC, the ad hoc group of individual victims, and the Multi-State Governmental Entities Group, and granted by the Court. Moreover, to address possible concerns regarding the need to provide additional notice to potential claimants, the Debtors obtained court approval of an extended

9

notice plan (the "**Extended Notice Plan**") to ensure that information regarding the Extended General Bar Date was fully publicized.

19.     The Debtors also successfully executed the Supplemental Notice Plan and Extended Notice Plan. Before requests to extend the bar date were filed, the Debtors managed and adjusted the Supplemental Notice Plan to maximize the reach and frequency—and optimize the costs—of the plan across all media channels, including adjustments in response to the developing COVID-19 pandemic. In addition, the Debtors worked collaboratively with estate stakeholders to refine the Supplemental Noticing Plan and address certain concerns that had been raised. For example, between late March and July 30, 2020, the Debtors had at least six calls with the ad hoc committee for NAS Children regarding feedback to the Supplemental Noticing Plan. Although the Debtors believed that the Supplemental Notice Plan already adequately addressed the issues that had been highlighted, the Debtors, in the spirit of cooperation, implemented additional NAS-specific noticing measures. Likewise, between April and July 30, 2020, the Debtors had several calls with the ad hoc group of individual victims. Again, in the spirit of cooperation, the Debtors agreed to implement certain additional noticing measures, including sending a notice flyer to additional third-party organizations identified by the ad hoc group of individual victims and targeting recovery or addiction organizations with social media and online advertisements.

20.     Ultimately, the Debtors' noticing efforts resulted in the filing of more than 613,000 proofs of claim by the Extended General Bar Date. The Debtors, in conjunction with Prime Clerk LLC, have produced a claims register for claims filed by July 30, 2020, and have begun the process of analyzing the claims, which is expected to continue for some time.

**PLAN OF REORGANIZATION AND POST-EMERGENCE PREPARATION**

21. In addition to the foregoing, the Debtors have been working diligently to develop a plan structure that will, among other things, build upon progress made in mediation, resolve the claims pending against the Debtors' estates, and create a viable post-emergence structure for the reorganized businesses. Planning for the emergence of a highly complex company such as the Debtors is complicated by the presence of numerous legal, structural, and governance questions—many seemingly of first impression—that will have to be addressed expeditiously before the Debtors can successfully resolve these cases.

**IMPORTANT INITIATIVES RELATED TO THE DEBTORS' BUSINESSES AND OTHER CHAPTER 11 ITEMS**

22. In addition, the Debtors have made progress on a number of initiatives designed to protect and maximize the value of the estates and to put estate resources to the productive use of ameliorating the national opioid crisis.

23. In June 2020, the Debtors also secured court approval to continue funding the development of a low-cost over-the-counter naloxone opioid overdose rescue medicine by non-profit, Harm Reduction Therapeutics, Inc. ("HRT"). *See* Order Authorizing Debtors to Enter into Funding Agreement, *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (Bankr. S.D.N.Y. June 25, 2020) [ECF No. 1301]. The Debtors filed their original motion seeking this relief on April 1, 2020, but agreed to adjourn the matter twice in order to work to address the concerns of several parties in interest. In an effort to resolve potential objections to this important project, the Debtors provided a substantial amount of diligence material requested by various parties, engaged in numerous telephonic meetings to discuss HRT, its product development timeline, and the ultimate benefits of an over-the-counter naloxone opioid overdose rescue medicine, and made a number of changes to the requested relief in response to feedback they received.

11

24. The Debtors also continue to engage productively with their monitor, Secretary Thomas J. Vilsack, who was retained in February 2020 pursuant to the Voluntary Injunction that the Debtors requested the Bankruptcy Court impose in connection with the Preliminary Injunction (the "**Monitor**"). Among other things, the Debtors have provided the Monitor with full access to information and key personnel and have facilitated the Monitor's retention of two experts to assist in the fulfillment of the Monitor's mandate. Moreover, since the Preliminary Injunction was extended in March, the Monitor has filed two reports with the Court (on May 20, 2020 and August 18, 2020 respectively) in connection with his monitoring of the Debtors' implementation of the Voluntary Injunction. The Debtors have been working diligently with their professionals to address the Monitor's observations and recommendations.

25. In July 2020, the Debtors requested, and the Court granted, an order extending the exclusive period in which to file a chapter 11 plan by 150 days, through and including December 10, 2020. *See* Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement and Motion of Debtors for Entry of a Second Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. July 09, 2020) [ECF No. 1365]; Second Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof ¶ 2, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Jul. 24, 2020) [ECF No. 1517].

26. The headline items discussed above are all important accomplishments that have enabled the Debtors to move ever-closer to a successful reorganization. However, they are only one part of what the Debtors have accomplished over the prior months. The Debtors have continued to operate their complex pharmaceutical business while in chapter 11 since September 2019. Simply preserving the value of the enterprise in this environment requires the dedicated

12

efforts of the Debtors' employees and management to manage and maintain customer relationships, address and react to matters before the bankruptcy court and associated media attention, and work through any number of other issues that arise because the Debtors are in chapter 11, all while performing their ordinary-course responsibilities and managing through the COVID-19 crisis.

27. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 16, 2020 in New York, New York

/s/ Benjamin S. Kaminetzky
Benjamin S. Kaminetzky