# EXHIBIT 2

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| Plaintiffs, | Adv. Pro. No. 19-08289 (RDD) |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| Defendants. | |

**DECLARATION OF BENJAMIN S. KAMINETZKY IN SUPPORT OF**
**DEBTORS' MOTION TO EXTEND THE PRELIMINARY INJUNCTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1. I am an attorney and partner of the law firm Davis Polk & Wardwell LLP ("**Davis Polk**"). Davis Polk represents Purdue Pharma L.P., its general partner Purdue Pharma Inc., and its Debtor subsidiaries (collectively, the "**Debtors**") in the above-captioned chapter 11 cases, jointly administered as *In re Purdue Pharma L.P.*, No. 19-23649 (RDD), and in this adversary proceeding. The facts set forth in this declaration ("**Declaration**") are based upon my personal knowledge, my discussions with other Davis Polk attorneys representing the Debtors, and my review of relevant documents in connection with Davis Polk's representation of the Debtors. I submit this declaration pursuant to 28 U.S.C. § 1746 and in support of the Debtors' motion to extend the preliminary injunction ("**Motion**").[2]

2. In the months since securing the Preliminary Injunction,[3] the Debtors have worked, including with core estate stakeholders, to develop and implement a framework for moving these chapter 11 cases to a successful resolution. Key accomplishments during this time period include: (1) continued information sharing by the Debtors, still not complete, which has involved near-daily contact and multiple and continuing in-person meetings with key creditor constituencies, and frequent and continuing requests for more information and analysis; (2) extensive information sharing by the Sackler families, still not complete (the "**Sackler Families**"); (3) the appointment of former Iowa Governor and former United States Secretary of Agriculture Thomas J. Vilsack to serve as monitor (the "**Monitor**") pursuant to the Voluntary

---

[2] Terms not otherwise defined herein have the meaning ascribed to them in the Motion.

[3] The preliminary injunction was initially entered on October 11, 2019, became final on November 6, 2019, *see* Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Nov. 6, 2019) [ECF No. 105], and has been subsequently amended. The presently operative preliminary injunction order ("**Preliminary Injunction Order**") was entered on February 17, 2020. *See* Seventh Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. March 4, 2020) [ECF No. 145].

2

Injunction the Debtors requested the Court enter in conjunction with their motion for a preliminary injunction; (4) the development, negotiation, and implementation of the bar dates and accompanying noticing plan; and (5) most recently, the appointment of two mediators to facilitate a mediation regarding certain allocation issues among creditor groups, the resolution of which is a necessary predicate to confirming a plan of reorganization.

3. The Debtors have also made significant progress on a number of other important initiatives. These include: (1) negotiations toward the establishment and implementation of a $200 million emergency relief fund; and (2) Court approval of a contract with a technology partner to advance the development of an injectable form of nalmefene hydrochloride, which the Debtors hope will be a valuable addition to the existing collection of opioid rescue mediations to combat overdoses from powerful synthetic opioids. And all of this is in addition to accomplishing dozens of other tasks and initiatives, such as assuming and rejecting contracts, securing an extension of plan exclusivity, stabilizing the businesses and the filing of the Debtors' schedules and statements of financial affairs.

## INFORMATION SHARING BY THE DEBTORS

4. As an initial matter, Debtors recognize that it is important that they provide appropriate information to estate stakeholders. For this reason, the Debtors' efforts to provide information responsive to requests from counsel, professionals, and members representing key creditor constituencies—spearheaded by the Debtors' financial advisor, AlixPartners LLP ("**AlixPartners**")—began almost from the very inception of the Debtors' chapter 11 cases and continue today.

5. In the weeks leading up to the October 11, 2019 hearing on the Debtors' motion for a preliminary injunction, the Debtors, through AlixPartners, provided diligence materials to

3

the professionals for the ad hoc committee of government and other contingent litigation claimants ("**Ad Hoc Committee**") and for the Official Committee of Unsecured Creditors ("**UCC**") to enable their respective principals to determine whether or not to consent to various relief sought by the Debtors. Concurrently, in early October 2019, the Debtors entered into two agreements that have guided the Debtors' diligence efforts in the months since. First, on October 8, 2019, the Debtors filed a Summary Term Sheet between the Debtors and the Ad Hoc Committee ("**AHC Term Sheet**") which, among other obligations, requires the Debtors to provide certain diligence information to the Ad Hoc Committee. *See, e.g.*, Exhibit B of Summary Term Sheet, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Oct. 8, 2019) [ECF No. 257]. Second, on October 11, 2019, the Debtors, the UCC, Beacon Company, and Rosebay Medical Company L.P. (together with Beacon Company, "**Shareholder Parties**") submitted a stipulation pursuant to which the Debtors agreed to provide certain diligence materials to the UCC, and the Shareholders Parties agreed to provide certain diligence materials to the UCC and to the Debtors ("**UCC Stipulation**"). *See* Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties at ¶¶ 7, 17, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 291].[4]

6. In late October 2019, before the UCC Stipulation was so-ordered by the Court, the Debtors began to provide to the UCC discovery produced by the Debtors in the federal multidistrict litigation pending in the United States District Court for the Northern District of

---

[4] The obligations of the Shareholder Parties were expanded and amended on November 5, 2019, *see* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties at ¶ 17, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 5, 2019) [ECF No. 431-1], and the Court endorsed the stipulation on November 20, 2019, *see* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 20, 2019) [ECF No. 518].

4

Ohio ("**Ohio MDL**"), in which Debtors produced over 50 million pages of documents in total, and discovery produced by the Debtors in other similar civil litigations. In addition, the Debtors have agreed with other creditor groups that received materials in the Ohio MDL and other civil litigations will be deemed produced in the chapter 11 cases pursuant to the terms of the Protective Order, thereby obviating the need for such parties to re-seek access to that information.

7. Also in October 2019, the Debtors provided to counsel and professionals for the UCC, the Ad Hoc Committee, and the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**") a 356-page report on cash distributions and other payments made by the Debtors to or for the benefit of members of the Sackler Families during the period of January 1, 2008 to September 15, 2019 that was prepared at the direction of the Special Committee of the Debtors' Board of Directors ("**Special Committee**"). This report was the product of over 6,500 hours of work by AlixPartners, hundreds of hours spent by Davis Polk lawyers working on behalf of the Special Committee, and the review of over 3,000 documents, which review included analyzing enormous amounts of transactional data recorded in the Debtors' SAP accounting system (including general ledger and accounts payable data spanning more than 11 years). This report was filed in slightly redacted form on the public docket on December 16, 2019, which exemplifies the Debtors' responsiveness and commitment to transparency in this reorganization. *See* Notice of Filing of Report of the Special Committee, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Dec. 16, 2019) [ECF No. 654].

8. The Debtors' information sharing efforts in recent months have not been limited to the requests set forth in the AHC Term Sheet and the UCC Stipulation. For example, on October 18, 2019, the UCC submitted a 12-page initial information request to Debtors that

5

included 80 separately enumerated items, many seeking documents and information dating back to January 1, 1996.  In addition, counsel and professionals from the UCC, the Ad Hoc Committee, the Non-Consenting States, and other creditor constituencies have made and continue to make additional extensive and frequent informal requests for information, often on a rush or priority basis.  These requests have been propounded on the Debtors on at least a weekly, and sometimes even a daily, basis since mid-October 2019, and the Debtors have been working to respond appropriately under the circumstances.  Requests for information remain outstanding and are being addressed.

9. To date, the Debtors have produced over 50,000 pages of documents through a data room maintained by AlixPartners to counsel and professionals of various creditor constituencies.[5]  This has included both historical documents from Debtors and extensive original analyses prepared by the Debtors and Debtors' advisors in response to specific requests. Moreover, pursuant to the terms of the Protective Order,[6] the Debtors provided all such

---

[5] Prior to the signing of the Protective Order, Debtors produced over 1,880 documents to counsel and professionals for various creditor constituencies through the data room.  Debtors expect to re-produce all of these materials under the terms of the Protective Order.

[6] On January 28, 2020, the Court issued a Protective Order to govern discovery and diligence in the Debtors' chapter 11 proceedings.  *See* Protective Order, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Jan. 28, 2020) [ECF No. 784].  This Protective Order was the product of over three months of negotiations during which counsel for the Debtors held numerous telephone calls and exchanged hundreds of emails with representatives of various estate stakeholders to collect and reconcile their (often-conflicting) views.  The highly negotiated terms of the Protective Order reflect these efforts to achieve consensus and provide, among other things that (i) by default, any diligence or discovery propounded by the Debtors will be shared with the states' Attorneys General's offices and at least non-competitor members of the UCC, unless those groups agree to an exemption for specific information, *see, e.g.*, *id.* at ¶¶ 23, 30; (ii) information designated as Professionals' Eyes Only (whether Confidential or Highly Confidential) will be shared with states' Attorneys General's offices and at least non-competitor members of the UCC through a view-only platform, *see, e.g.*, *id.* at ¶¶ 40-42; and (iii) any information designated by either of the Sacker Families as Outside Professionals' Eyes Only, and thereby withheld from states' Attorneys General's offices and members of the UCC, among

6

documents designated as Professionals' Eyes Only (either Confidential or Highly Confidential), totaling over 30,000 pages, via the Debtors' view-only platform to the states' Attorneys General and to the appropriate members of the UCC.

### INFORMATION SHARING BY THE SACKLER FAMILIES

10. The Debtors' chapter 11 cases have not just provided a vehicle for the Debtors to produce information to creditor groups but have also allowed the Debtors and key groups of estate stakeholders to obtain important financial and other information from the Sackler Families.

11. Pursuant to the UCC Stipulation, the Shareholder Parties and certain members of the Sackler Families as defined therein were obligated to provide, among other things, (1) an explanation and analysis regarding where the assets held by certain members of the Sackler Families are located, in what format (e.g., trust, corporation, partnership) those assets are held, and why such format was selected; (2) a report of the approximate aggregate value of the assets owned by those members by category and the approximate liabilities by category; and (3) substantial information regarding the defenses that the Shareholder Parties intend to make with respect to any and all causes of action that have been or may be brought against them. *See* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties at ¶ 17, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 20, 2019) [ECF No. 518]. In recent months, the Sackler Families have invited counsel and professionals for Debtors and for the UCC, as well as members, counsel, and professionals for the Ad Hoc Committee and the Non-Consenting States, to attend

---

others, will be identified in a log in order to enable those creditor constituencies to evaluate whether to challenge such designation. *See, e.g.*, *id.* at ¶ 36.

7

three substantial half- to full-day presentations addressing these subjects and have provided reports together totaling over 1,200 pages, as well as supporting materials, to the attending parties. Since these meetings, the Debtors and others have been assessing the reports and supporting materials and have made additional, material requests for information and documents that remain outstanding. The Debtors expect that the Sackler Families will continue to respond to these requests.

12. Because funds from the sale of the Sackler Families' ex-U.S. independent affiliated companies (collectively, "**IACs**") constitute an important part of the proposed settlement structure, the UCC stipulation also calls for substantial diligence with respect to those entities. On January 8, 2020, the Debtors, along with representatives from the UCC, the Ad Hoc Committee, and the Non-Consenting States, attended a half-day presentation by counsel for certain IACs to begin the process of conducting such diligence.[7] In addition, professionals for the Debtors, the UCC, and the Ad Hoc Committee have had dozens of in-person and telephonic meetings with IAC personnel and professionals, including two multi-day diligence sessions in London and Dubai with the IACs' key regional management. A team of the Debtors' professionals from AlixPartners and PJT Partners LP also has reviewed a substantial number of documents provided by the IACs.

---

[7] The parties continue to have an open dialogue on issues related to the IACs and their value. To that end, on February 24, 2020, the Court entered an order approving the joint retention of KPMG LLP ("**KPMG**") by the Debtors and the UCC as a tax consultant to evaluate, advise, assist, and provide expert testimony, as required, with respect to, among other things, tax analysis of potential alternative structures related to the disposition, if any, of assets of the Debtors and/or any IAC(s) as part of the settlement structure. *See* Order Authorizing the Employment and Retention of KPMG LLP as Tax Consultant for the Debtors and the Official Committee of Unsecured Creditors *Nunc Pro Tunc* to December 23, 2019, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Feb. 24, 2020) [ECF No. 867].

## THE DEBTORS' RETENTION OF A VOLUNTARY INJUNCTION MONITOR

13. The Debtors announced on February 21, 2020 that they retained former Iowa Governor and former United States Secretary of Agriculture Thomas J. Vilsack to serve as Monitor pursuant to the Voluntary Injunction that the Debtors requested the Court enter in connection with the motion for a preliminary injunction. The Debtors retained Secretary Vilsack as Monitor after a thorough search process that included the consideration of over 20 candidates proposed by various creditor constituencies, as well as candidates identified by the Debtors themselves. These candidates included former state Attorneys General, former high-level Food and Drug Administration officials, and other individuals with strong compliance experience, like Secretary Vilsack. The Monitor search process also involved interviews with a narrower set of the proposed candidates in which the Debtors and numerous creditor constituencies participated. The selection of Secretary Vilsack underscores the Debtors' commitment to abide scrupulously by the Voluntary Injunction that the Debtors requested the Court impose and to work closely with key creditors in doing so.

## THE BAR DATE AND NOTICE PROGRAM

14. On February 3, 2020, this Court entered an order establishing the bar dates and related procedures for filings proofs of claim, approving proof of claim forms, and approving the form and manner of the Debtors' proposed notice program, including the supplemental notice plan to reach unknown claimants ("**Supplemental Notice Plan**"). *See* Bar Date Order, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Feb. 3, 2020) [ECF No. 800].

15. Although ultimately uncontested, the bar date order was the culmination of months of good faith, diligent discussions between the Debtors and the UCC, the Ad Hoc Committee, the Non-Consenting States, the multi-state group comprising approximately 1,222

9

entities as set forth in the verified statement pursuant to Bankruptcy Rule 2019, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Oct. 30, 2019) [ECF No. 409] ("**MSGE Group**"), the ad hoc committee of NAS babies as set forth in the verified statement pursuant to Bankruptcy Rule 2019, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Oct. 22, 2019) [ECF No. 341] ("**Ad Hoc Committee of NAS Babies**"), the ad hoc group of hospital plaintiffs as set forth in the verified statement pursuant to Bankruptcy Rule 2019, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 22, 2019) [ECF No. 90] ("**Ad Hoc Group of Hospitals**"), and the United States Department of Justice, among others.

16. The process of negotiating the bar dates, proof of claim forms, and noticing plan began in earnest in October 2019 and intensified in late November and December 2019. Between November 28, 2019 and January 3, 2020, when the Debtors ultimately filed the bar date motion, the Debtors participated in over 30 scheduled telephonic meetings with various creditor constituencies—including calls held on Christmas Eve, New Year's Eve, and New Year's Day. During the same period, the Debtors also received dozens of additional unscheduled calls from interested groups and parties to provide comments and ask questions, and received and responded to hundreds of emails. The various creditor constituencies held differing, and often conflicting, positions regarding the establishment of the claims process and noticing plan that needed to be reconciled and resolved in order to achieve consensus.

17. Negotiations did not end with the filing of the Debtors' motion on January 3, 2020. During the three weeks between that filing and the January 24, 2020 omnibus hearing at which the motion was heard, the Debtors attended at least 13 telephonic meetings with creditor groups to discuss and address further comments to the proposed order. These efforts culminated in the Debtors filing an amended proposed bar date order on the night of January 23, 2020,

10

which contained a number of material changes that reflected suggestions or recommendations of parties in interest. *See* Notice of Filing of Revised Proposed Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Jan. 23, 2020) [ECF No. 776]. Even after the January omnibus hearing, the Debtors continued to work diligently to address open issues and concerns. The Debtors had approximately five more scheduled telephonic meetings and one in-person meeting with representatives from various creditor groups following January 24, 2020.

18. In the weeks since the Court entered the bar date order, the Debtors have begun the noticing process. Mailings to all known claimants were completed on February 18, 2020. On February 21, 2020, the Debtors' claims website related to the Supplemental Notice Plan became accessible online, and on February 24, 2020, social media postings began. On February 27, 2020, the Court-approved bar date notice was published in the *New York Times*, *USA Today*, and the *Wall Street Journal*. Throughout the development and implementation of this noticing process, the Debtors have been in frequent communication with the UCC, and at the UCC's request, the Debtors recently retained a media expert to assist the Debtors with their outreach efforts.

19. The Debtors' work on the Supplemental Notice Plan is not complete. Because of the broad scope of the media components of the plan, many elements remain to be finalized, and significant work remains to be done, including, among other things, finalizing the TV and radio commercials and other noticing materials, buying and placing the remaining print and out-of-home advertisements, and monitoring the roll out of the various aspects of the Supplemental Notice Plan. The Debtors remain committed to continuing to work constructively and

collaboratively with the UCC and all interested constituencies in the continued roll out of the Debtors' notice program that will ensure effective, robust and adequate notice.

## MEDIATION ON CERTAIN ALLOCATION ISSUES

20. To facilitate a consensual resolution on allocation issues, the Debtors—after reaching agreement with core creditor constituencies on a mediation architecture—filed a motion for entry of an order appointing the Honorable Layn Phillips and Mr. Kenneth Feinberg as co-mediators to mediate discussions of allocation between the non-federal public claimants, on the one hand, and the private claimants, on the other. At a telephonic hearing on March 2, 2020, the Court approved the Debtors' mediation motion. *See* Order Appointing Mediators, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. March 4, 2019) [ECF No. 895].

21. The Debtors believe that such allocation discussions, facilitated by two highly respected mediators, will allow key constituencies to express their views on the ultimate allocation of the Debtors' assets in these cases in a timely, productive, and effective manner while avoiding unnecessary and potentially considerable litigation costs and delays. The Debtors are hopeful that successful resolution of this issue will, in turn, provide the foundation for discussions and agreement on allocation issues within the private and public claimant groups.

## IMPORTANT INITIATIVES RELATED TO ESTATE RESOURCES AND OTHER CHAPTER 11 ITEMS

22. In addition to the foregoing, the Debtors have made significant progress on a number of initiatives designed to protect and maximize the value of the estates and to put estate resources to the productive use of ameliorating the national opioid crisis. These include (1) negotiations toward the establishment of an emergency relief fund, and (2) meaningful progress toward the development of an opioid reversal medication that has the potential to reverse overdoses from powerful synthetic opioids and save lives.

12

23. As part of the UCC Stipulation mentioned earlier, the Debtors and the UCC agreed to begin work to build creditor consensus on a $200 million emergency fund (the "**Emergency Fund**"). *See* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties at ¶ 11, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 518].

24. Since October, the Debtors, the UCC, the Ad Hoc Committee, and the Non-Consenting States have endeavored to reach consensus on the appropriate deployment of the $200 million to provide immediate, lifesaving recovery support services to victims of the opioid crisis. These negotiations have been complicated and at times contentious, with a number of constituencies holding differing views on subjects such as appropriate initiatives, distribution mechanisms, and required personnel. Nonetheless, the parties are continuing to work toward a consensual resolution on the outstanding issues. The Debtors expect to file a motion on the Emergency Fund in the near future.

25. On February 21, 2020, the Court granted a motion filed by the Debtors to enter into a development agreement with a technology partner (the "**Development Agreement**"). *See* Order (I) Shortening Notice with Respect to Debtors' Motion for Authorization to Enter Into Development Agreement and (II) Authorizing Entry Into Development Agreement, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Feb. 24, 2020) [ECF No. 868]. The purpose of the Development Agreement is to develop an easy-to-use nalmefene autoinjector that has the potential to reverse overdoses from powerful synthetic opioids and serve as a valuable complement to currently available opioid rescue medications. The Development Agreement requires a relatively limited investment and provides flexibility in the form of termination and assignment rights if the product fails for whatever reason to play its expected key role in the

13

Debtors' public health mission.

26. In addition to the progress made on many of the aforementioned items, the Debtors have also accomplished a great deal of important chapter 11 tasks since the injunction was first entered.

27. The Debtors successfully renegotiated a lease to remain in One Stamford Forum after the end of the year, which the Court approved on February 24, 2020. *See* Order (I) Authorizing the Rejection of Commercial Lease, (II) Authorizing Entry Into New Headquarters Lease, and (III) Granting Related Relief, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Feb. 24, 2020) [ECF No. 866].

28. In January 2019, the Debtors requested, and the Court granted, an order extending the period of plan exclusivity by 180 days, through and including July 13, 2020. *See* Motion for Entry of an Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Jan. 10, 2020) [ECF No. 734]; Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof at ¶ 2, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Jan. 28, 2020) [ECF No. 782]. No creditor constituency voiced formal or informal objections to the Debtors' motion to extend exclusivity. *See* January 24 Omnibus Hr'g Tr. at 20:6-24.

29. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 4, 2020 in New York, New York

> */s/* Benjamin S. Kaminetzky
> Benjamin S. Kaminetzky

14